**MINUTE ENTRY**
**FALLON, J.**
**JUNE 9, 2011**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|                                                          |   |                            |
|----------------------------------------------------------|---|----------------------------|
|                                                          | : | **MDL NO. 2047**           |
| **IN RE: CHINESE-MANUFACTURED DRYWALL**                  | : |                            |
| **PRODUCTS LIABILITY LITIGATION**                        | : | **SECTION:  L**            |
|                                                          | : |                            |
|                                                          | : | **JUDGE FALLON**           |
|                                                          | : | **MAG. JUDGE WILKINSON**   |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO ALL CASES**

A telephone status conference was held on this date in the Chambers of Judge Eldon E. Fallon to discuss the status of written discovery responses from defendants Taishan Gypsum Co., Ltd. ("TG") and Taian Taishan Plasterboard Co. Ltd. ("TTP") and to schedule dates for the next round of Rule 30(b)(6) depositions of these parties in Hong Kong, as well as the logistics involving these depositions. The conference was transcribed by official Court Reporter Toni Tusa. Ms. Tusa can be contacted at 504-589-7778 for questions about or to purchase copies of the transcript. Frank Spano participated on behalf of TG and TTP. Leonard Davis and Arnold Levin participated on behalf of the Plaintiffs' Steering Committee ("PSC").

To begin the conference and put the issues in perspective, the Courts summarized the relevant procedural history of TG and TTP's involvement with the MDL litigation. This summary follows. On June 15, 2009, this Court was designated as the transferee court for federal cases involving Chinese-manufactured drywall, creating Multi-District Litigation 2047. Since the inception of MDL 2047, numerous cases have been consolidated before this Court. A number of

JS10(00:35)

these cases involve claims against TG and TTP for their alleged role as manufacturers of a substantial amount of this Chinese drywall. *See e.g. Germano v. Taishan Gypsum Co., Ltd.*, No. 09-6687; *Mitchell Company, Inc. v. Knauf Gips KG*, No. 09-4115; *Steiner v. Beijing New Bldg. Material, PLC*, No. 09-6545; *Gross v. Knauf Gips KG*, No. 09-6690; *La. State v. Knauf Gips KG*, No. 10-340; *Wiltz v. Beijing New Bldg. Material Pub. Ltd. Co.*, No. 10-361; *Abel v. Taishan Gypsum Co., Ltd.*, No. 11-80. TG and TTP were successfully served through the Hague Convention in certain of these cases, *see* (R. Doc. 1-7)(No. 09-6687); (R. Doc. 2141)(No. 09-md-2047); (R. Doc. 2553)(No. 09-md-2047), refused service in other cases, *see* (R. Docs. 7028, 7029)(No. 09-md-2047), and in others, service has not yet been executed.

In *Germano v. Taishan Gypsum Co., Ltd.*, No. 09-6687, service was executed on TG, *see* (R. Doc. 1-7)(No. 09-6687), but TG failed to timely enter an appearance. As a result, a Preliminary Default was issued against TG on November 20, 2009. (R. Doc. 487)(No. 09-md-2047). The Court moved forward with the claims against TG in *Germano*, ruling on *Daubert* and limine motions and presiding over an evidentiary hearing on February 19 and 22, 2010. *See* (R. Docs. 1223, 1258). Thereafter, the Court issued detailed Findings of Fact & Conclusions of Law regarding the problems caused by TG's Chinese drywall, remediation protocol for properties with Chinese drywall, and a calculation of damages. (R. Doc. 2380). On May 11, 2010, the Court entered a Default Judgement against TG, awarding damages in the amount of $2,609,129.99. (R. Doc. 3013). On June 10, 2010, TG filed a Notice of Appeal of this Default Judgment. (R. Doc. 3670).

Thereafter, for the first time in the litigation, Notices of Appearances were filed on behalf of TG and TTP, *see* (R. Docs. 4324, 4325), as well as other responses and motions. *See e.g.* (R. Docs. 4307, 4325, 4666, 4667, 4800). On August 20, 2010, the attorneys for TP and TTP were

appointed to the Defendants' Steering Committee.  (R. Doc. 5286).          On September 10, 2010, TG filed a Motion to Vacate the Default Judgment, Dismiss the Action and to Seek Remand from the Court of Appeals.  (R. Doc. 5515).  This Motion is largely based upon the notion that this Court lacks personal jurisdiction, *see id.*, a factually pregnant issue which requires discovery for proper resolution thereof.  On October 1, 2010, the United States Court of Appeal for the Fifth Circuit issued an Order granting an unopposed motion to stay further proceedings until this Court provides an indicative ruling on TG's Motion to Vacate.  (R. Doc. 5649).  Then this Court issued an Order pursuant to Rule 62.1 to allow it to proceed with TG's Motion prior to determination of the appeal by the Circuit Court.  (R. Doc. 6101).  In furtherance of this Order, the Court directed the parties to begin the written discovery and depositions necessary to resolve the personal jurisdiction challenges raised by TP's Motion to Vacate.  Accordingly, in Fall 2010 the first notices were filed for Federal Rule of Civil Procedure 30(b)(6) depositions of TG and TTP, *see* (R. Doc. 5839, 5840), and the parties proceeded with written discovery.

    The first formal discovery dispute involving TG and TTP arose on January 12, 2011, when the PSC filed a Motion Challenging the Adequacy and Completeness of the Discovery Responses of TG and TTP, and to Compel Discovery and Jurisdictional Depositions to Begin in February 2011.  (R. Doc. 6964).  Shortly thereafter, on January 14, 2011, TG and TTP filed a Motion for Protective Order.  (R. Doc. 7003).  Both motions were scheduled for hearing on January 20, 2011.  *See* (R. Docs. 6981, 7043).  After hearing from the parties on oral argument the Court denied both motions, issuing the following,

> IT IS ORDERED that the parties are to proceed with Rule 30(b)(6) depositions as soon as practicable.  The parties are directed to select mutually agreeable dates and inform the Court by next week.  IT IS FURTHER ORDERED that (sic) the scope of the depositions is to be broad, including questions about related, subsidiary, parent, and affiliated companies.  The

3

Court will be available by phone during the depositions to assist the parties. (R. Doc. 7136). On January 28, 2011, TG and TTP filed a Notice of document production in response to the PSC's first request. (R. Doc. 7268). In early February 2011, TG and TTP filed a Notice of their production of confidentiality and privilege logs. *See* (R. Docs. 7306, 7333).

On February 9, 2011, the PSC renewed their Motion Challenging the Adequacy and Completeness of the Discovery Responses of TG and TTP and to Compel Discovery and Jurisdiction Depositions to Begin in February 2011. (R. Doc. 7364). The Court held a status conference on February 16, 2011 to discuss the renewed motion. *See* (R. Doc. 7511). The Court denied the PSC's renewed motion, but reaffirmed its previous ruling that the parties were to go forward with the Rule 30(b)(6) depositions in Hong Kong during April 2011, and that the depositions were to cover information regarding TG and TTP's affiliates. *See id.* Additionally, the Court directed the parties to work together to timely produce written discovery necessary to the deposition topics, but stated that motions arising therefrom would be entertained following depositions, and directed TG and TTP to provide the PSC with a list of its Rule 30(b)(6) witnesses. *See id.* Finally, the Court encouraged the parties to contact it during the depositions in the case that any disputes arise. *See id.*

On February 17, 2011, the PSC Re-Noticed the Depositions of TG and TTP to take place beginning April 4, 2011 in Hong Kong and designated the deposition topics. (R. Docs. 7549, 7550, 8297, 8298). Other parties in the litigation noticed these depositions, including Venture Supply, Inc. and The Porter-Blaine Corp. *See* (R. Docs. 8251, 8351). On March 21, 2011, TG and TTP filed a Notice of further documents production to the PSC. *See* (R. Doc. 8290).

Twelve attorneys representing the PSC, homebuilders, suppliers, and other entities in the MDL litigation, traveled to Hong Kong to conduct the Rule 30(b)(6) depositions of TG and TPP.

The depositions commenced on April 4, 2011, and ended on April 8th.  The Rule 30(b)(6) witnesses deposed were Wenglong Peng, Tongchun Jia, and Jianchun Zhang.

On May 3, 2011, the PSC filed a Motion to Compel Production of Documents and Further Jurisdictional Depositions of the Taishan Defendants and a Motion for Sanctions.  (R. Doc. 8685). The Homebuilders' Steering Committee ("HSC") filed a similar motion.  *See* (R. Doc. 8695).  A number of parties joined in these motions, including Interior Exterior Building Supply, LP, Louisiana State, Venture Supply, Inc., Southern Homes, LLC, Tallow Creek, LLC, Springhill, LLC, and Tobin Trading, Inc.  *See* (R. Docs. 8755, 8758, 8768, 8792, 8805).  These motions were set for hearing on May 26, 2011.  *See* (R. Doc. 8800).  The Court issued the following rulings on these motions:

> Argument-GRANTED IN PART with regard to compelling further written discovery and depositions relevant to personal jurisdiction over the Taishan defendants, and CONTINUED IN PART with regard to the requests for sanctions.  These rulings will best further the Court's goal to resolve the pending Motion to Vacate filed by TG, which raises challenges to this Court's exercise of personal jurisdiction, a legal issue enshrouded in facts and requiring extensive depositions and written discovery.
>
> To carry out this Order, the Court directs the parties to organize their written discovery and determine which documents have not yet been produced.  Any disputes remaining after meeting-and-conferring should be brought before the Court for a decision.
>
> A number of counsel traveled to Hong Kong to carry out such depositions, but upon review of the transcripts thereof, the Court is convinced that these depositions were ineffective because of disagreement between interpreters, counsel, and witnesses, translation difficulties, speaking objections, colloquy among counsel and interpreters, and in general ensuing chaos.  Therefore, it is necessary to redo these depositions, this time under the supervision of the Court.  With regard to the next round of depositions, the Court directs the parties to designate witnesses to be deposed and objections thereto, and, if necessary, the Court will make a decision.  These witnesses are to be knowledgeable about the noticed topics and prepared to adequately answer questions.  The Court also directs the parties to select a single mutually agreeable translator, and if that is not possible, the Court will consult the State Department and receive recommendations for one.  The parties are to consider expanding the typical length of depositions to accommodate the numerous parties, but at the same time questioning should be carried out by a few designated attorneys who are to confer

with and consider the questions suggested by interested parties. Further, the next round of depositions will be supervised by either a special master appointed by the Court or Judge Fallon himself, depending upon costs and availability. This will allow for resolution of objections immediately. Objections are to be concise and free of reasoning.

The Court will revisit the issue of sanctions at a later date so the parties can concentrate on completing discovery.

Finally, in the near future the Court will schedule a status conference to discuss these directives in further detail. (R. Doc. 9107).

The present conference was scheduled pursuant to the preceding Order by the Court. (R. Doc. 9170). The Court commenced the conference by setting out the two issues involved in the TG and TTP discovery dispute: (1) written discovery document production, and (2) depositions of TG and TTP's Rule 30(b)(6) representatives. These issues will have to be resolved in sequential order. With regard to written discovery document production, the Court directed TG and TTP to formulate a list of documents requested which they have already produced, then the PSC is to determine which document requests are still outstanding and provide such to TG and TTP. Thereafter, if there are any disputes regarding production, the parties are to meet-and-confer to attempt to resolve such, but if they are unable to do so, they are to submit letters to the Court detailing their respective positions on why or why not certain documents are discoverable. The Court ordered the parties to have all written discovery issues resolved or set before the Court by July 25, 2011.

With regard to the depositions, the Court directed the parties to determine the following by late August, early September 2011: (1) designated counsel to ask questions at the depositions since it is not feasible for all interested parties to conduct questioning; (2) deposition topics; (3) Rule 30(b)(6) witnesses who are knowledgeable and prepared to address the noticed deposition topics; (4) a single, mutually agreeable translator with the proper training and skills to translate at the depositions, or alternatively, request the Court to contact the State Department for a translator; (5)

6

a mutually agreeable location with the appropriate amenities for the deposition; (6) the length of the depositions; and (7) a mutually agreeable, qualified court reporter.  Additionally, Judge Fallon intends to personally supervise the Hong Kong depositions.  Judge Fallon is available the following dates, which the parties are to consider and report back to the Court thereon: (1) the week of November 7, 2011, (2) the week of November 14, 2011, (3) the week of November 28, 2011, and (4) the week of December 5, 2011.

TG and TTP suggested that the parties submit charts to the Court detailing how the testimony from the previous depositions relates to the question of personal jurisdiction.  The Court permitted the parties to submit these charts and directed TG and TTP to share their already-completed chart with the PSC so that it may create its own.

Counsel for TG and TTP shared the viewpoint of his clients regarding the MDL litigation, indicating they are frustrated with the length of time it is taking for the Court to resolve the Motion to Vacate and the amount of discovery already completed.  In response, the Court invited the representatives of TG and TTP to meet with it to discuss the litigation.

The Court determined that regular conferences on these issues are appropriate to keep the discovery and depositions on track.  Accordingly, IT IS ORDERED that a telephone status conference is scheduled for June 23, 2011, at 9:00 a.m. central standard time.  The conference call number is 877-336-1839, access code 4227405, and security code 62311.

CC:    United States Court of Appeals for the Fifth Circuit

Attachment:    Conference transcript

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  CHINESE MANUFACTURED     *   Docket 09-MD-2047
            DRYWALL PRODUCTS         *
6           LIABILITY LITIGATION     *   June 9, 2011
                                     *
7   This Document Relates to All Cases  *   10:00 a.m.
    * * * * * * * * * * * * * * * * * * *

8

9

10            STATUS CONFERENCE BEFORE THE
               HONORABLE ELDON E. FALLON
11            UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14
     For the Plaintiffs:          Herman Herman Katz & Cotlar
15                                BY:  LEONARD A. DAVIS, ESQ.
                                  820 O'Keefe Avenue
16                                New Orleans, Louisiana 70113

17
     For the Defendants:          Hogan Lovells US, LLP
18                                BY:  FRANK T. SPANO, ESQ.
                                  875 Third Avenue
19                                New York, New York 10022

20
     Official Court Reporter:      Toni Doyle Tusa, CCR, FCRR
21                                500 Poydras Street, Room B-406
                                  New Orleans, Louisiana 70130
22                                (504) 589-7778

23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.

**PROCEEDINGS**

**(June 9, 2011)**

1

2

3      (WHEREUPON the following proceedings were held in

4 chambers with all parties participating by telephone.)

5      **THE COURT:**  Good morning.  This is Judge Fallon.  I

6 have a lot of people on the phone.  I ordinarily ask that you

7 announce yourself, but because of the numbers, I think we would

8 be here all day while people are announcing who they are.  What

9 I will ask, though, is that when you speak, if you speak, you

10 give your name so that I will know who is speaking.  I also

11 will have this transcribed.  If anybody needs a transcript, I

12 will let you know who is transcribing it and how you can get

13 it.

14      Let me start off by saying that we are meeting

15 today regarding the jurisdiction discovery concerning Taishan

16 Plasterboard, Ltd. and Taishan Gypsum.  These companies were

17 made parties to this MDL, which is MDL 2047.  They were served

18 under the Hague Convention.  No answer was filed.  After a

19 number of public announcements which I made at the monthly

20 status conferences, I set the matter up for default.

21      A preliminary default was taken.  I allowed

22 sufficient time to transpire, and then I set the matter for

23 confirmation of the preliminary default.  About a week went by

24 during the hearing, I heard testimony presented, and then I

25 issued my judgment.

1        The judgment proceeded.  On the last day for

2   taking an appeal, the defaulted defendants entered the case and

3   filed with the Court of Appeal an appeal asking that the Court

4   of Appeal vacate the Court's judgment on the ground that this

5   Court did not have personal jurisdiction over those defendants.

6   There was a motion, and the motion was not objected to or issue

7   was not taken with it.  At the request of the parties, the

8   Court of Appeal issued a limited remand to this Court to

9   determine whether or not it had jurisdiction over these

10  defendants.

11       The Court looked at the matter.  I felt that in

12  addition to legal issues which were briefed that there were

13  certain factual matters.  I felt the matter was really

14  enshrouded or impregnated with facts and that I needed some

15  limited factual discovery in order to focus on whether or not

16  there was personal jurisdiction present, so I directed the

17  parties to proceed along those lines.

18       They met and conferred and discussed certain

19  documents that the plaintiffs felt were necessary.  Many of the

20  documents were given; some of the documents were not.  I gave

21  the parties an opportunity to brief me on it.  I made some

22  rulings.  The 30(b)(6) depositions were set.  The parties

23  proceeded to Hong Kong to take the depositions.

24       As I mentioned at the last conference, I had an

25  opportunity to look over the transcripts of the depositions,

1   and I didn't feel that the transcripts were helpful to either
2   side.  I do think that the defendants have valid motions.  This
3   is not a frivolous motion.  It's a significant motion and they
4   make significant arguments.  Likewise, the plaintiffs urge
5   significant defenses.
6                   I didn't feel that the discovery that was taken
7   was of help to me.  I got to know the interpreters a lot.  I
8   understood their conflicts and their discussions and all of the
9   complaints about dialect and things of that sort, which were
10  interesting.  I heard from the lawyers.  The colloquy of the
11  lawyers went on and on.  Every once in a while I got a sentence
12  that was helpful to me.  I put those sentences together and it
13  barely made a page of the thousand or so pages of the
14  depositions.  It was in between, and it was almost like finding
15  a pearl in a sack of oysters.  I had to root and root and root,
16  and then it was so small that I couldn't do anything with it.
17  So, unfortunately, I see no alternative but to take another
18  look at this.
19                  I see the case as having two centers to it:
20  First, the documents; and, second, the depositions.  Let me say
21  that I want to set the depositions, but I want to set the
22  depositions in enough time to take them one last time.  I'm not
23  going to do this another time.  I think that the Court or the
24  Court's designee -- and it looks like it's going to be the
25  Court -- will have to go to Hong Kong or wherever the

 1   depositions are taken.

 2                   I want to discuss the dates with you-all.  I'm

 3   looking at the latter part of November or I'm looking at the

 4   front part of December as potential dates.  Once we set those

 5   dates, before the dates I need some document discovery from

 6   you-all, both sides perhaps.  With the documents, I need to

 7   know:  What has been produced; what, if anything, still is

 8   being sought.  I would expect you to meet and confer and then

 9   write me a letter telling me what the issues are.  I really

10   need this within 30 to 45 days.

11                   When we get to the depositions, I need to know:

12   Who is going to be deposed; what areas will be covered; where

13   will the depositions take place; who will be the interpreter;

14   who will ask the questions.  We need to focus on that within 45

15   days after the 30-day period for the documents.

16                   When I say "who will ask the questions," we have

17   too many people in this case.  We are not going to be able to

18   accommodate everybody.  I need everybody's understanding on

19   that.  It doesn't do you any good to go to Hong Kong or to go

20   to China and have five minutes to ask a question.  It's just

21   not good.  From the South, it takes you five minutes to say

22   "is."  That's just the way it is, so it won't work for us to do

23   it that way.  We are going to have to focus, and I'm going to

24   have to get you-all focused on that.

25                   We can't have interpreters, and check

1    interpreters, and check-check interpreters.  If you can't get

2    together on the interpreter in good faith, then I will get the

3    State Department to give me an interpreter and we'll do it that

4    way.

5                    I'm concerned about where the depositions are

6    taken.  It might well be that the best place to take them is in

7    the United States Embassy, or the United States Consulate, or

8    some office that the United States has in that area.

9                    The defendant has to know what areas you're

10   going to cover in a 30(b)(6) deposition.  The parties who speak

11   on those areas have to know what they are talking about and do

12   some research on it so that they are able to talk about it.

13                   I need your feedback on these things, but I

14   wanted to tell you the areas that I'm interested in you're

15   talking about and how we are going to go about it.  I'll hear

16   from either the plaintiffs or the defendants.

17                   **MR. LEVIN:**  Your Honor, this is Arnold Levin.  Good

18   morning.

19                   **THE COURT:**  Good morning.

20                   **MR. LEVIN:**  Len Davis will speak for the PSC.

21                   **MR. SPANO:**  Good morning, Your Honor.  It's Frank

22   Spano.  I'm happy to let the plaintiff speak first.  I just

23   wanted to point out in your recitation of the history of the

24   case, the only party with a judgment against it is

25   Taishan Gypsum, and Taishan Gypsum is the moving party to

```
 1      vacate the default and dismiss.  TTP is participating in the
 2      discovery.  I just wanted to add that clarification for the
 3      record.
 4               THE COURT:  I think Frank is right on that.  I agree
 5      with that.
 6               MR. DAVIS:  Hello, Your Honor.  We received your
 7      minute entry of June 2 and had an opportunity yesterday with a
 8      number of folks who I presume are on this call -- we had a
 9      number of people who participated in a call that lasted a
10      little bit longer than an hour yesterday to go over the items.
11      I'll briefly report to Your Honor on some of the items that we
12      did, in fact, discuss.  Your comments, I think, today are very
13      helpful and do give the parties guidance that we will all take
14      to heart and go back and we will have further discussions to
15      get you the information that you want.
16                    With respect to the dates of the depositions, we
17      heard you say November, December, and we will look at those
18      dates and from our side will certainly report back to you on
19      that.  That will give us some time to get you what you want
20      with respect to the documents up front.
21               THE COURT:  With November, let me say the week of
22      November 7 is doable, November 14 is doable, November 28 is
23      doable, and December 5 is double.  I think we get a little too
24      close to Christmas after that.  Those weeks seem to me to be
25      the weeks that you need to shoot for.  You have to get to me
```

8

 1   soon because I've got a fairly busy trial schedule and those

 2   weeks need to be set aside immediately.

 3         **MR. DAVIS:**  We will do that, Your Honor.  The general

 4   consensus on the call was that having Your Honor present at the

 5   depositions would be very beneficial, so we will look at those

 6   dates.  We were unable to talk about the length of the

 7   depositions due to the issue regarding what witnesses would be

 8   potentially produced, and I'll come back to that in a few

 9   minutes.

10         As to the location of the deposition, we asked

11   if Hogen Lovells' office would be available.  They are going to

12   look into that now that we have dates that aren't in the

13   summer, and they will get back to us.  I presume that they will

14   do so.  If not, we certainly think that we will find an

15   alternative location in Hong Kong.  We, from the plaintiffs'

16   side, have no problem with Your Honor reaching out and finding

17   a location.  We are happy to assist with that if need be.

18         We just need to make sure that logistics-wise we

19   don't have problems because, for instance, as the Court is

20   aware, these depositions are streamed, and the court reporter

21   needs the Internet and things like that, speakerphones, and so

22   we will coordinate that.

23         With respect to an interpreter, we believe that

24   Your Honor's assistance would be much appreciated.  We don't

25   think that the interpreters that were suggested last time by

1    Taishan will work.  We think that having the State Department
2    or somebody who Your Honor might suggest would be a good thing.
3    We are happy to do whatever Your Honor asks us to do with
4    respect to securing an interpreter that works in that matter.
5                    A court reporter you asked about in your order.
6    We all are in agreement that Golkow, who has done these court
7    reporting services in the past, is very competent and capable.
8    We have agreement that Golkow can do that.  Your Honor, we can
9    certainly put Linda Golkow in touch with anyone that you so
10   suggest so that we get the court reporting logistics taken care
11   of.  We don't see that as a problem.  I speak for everybody, I
12   believe, on that.
13                   With respect to designation of counsel for
14   questioning on what I call the questioner's side, we are going
15   to meet further and plan on meeting to discuss that.  We will
16   have that worked out so that we have streamlined questioning
17   and designated questioners rather than have the multitude of
18   people like are on this call asking questions.  We heard
19   Your Honor earlier on this call and we heard you previously in
20   court appearances and we all understand that.
21                   With respect to the scope of written discovery
22   and the witnesses, we spent a lot of time talking about that.
23   What we heard from Mr. Spano yesterday was that only one
24   witness on the Taishan side they are willing to put up.  I
25   believe after today's call and I hope after today's guidance

1    from the Court we'd have some further discussion on that

2    because, from our side, we think that there's more than

3    Mr. Peng who ought to be deposed.  We will have some more

4    discussions with Mr. Spano on that based upon Your Honor's

5    comments.

6                    With respect to documents, we understand from

7    Mr. Spano that there is an additional document that they have

8    to produce that they have recently found.  We also understand

9    better how the Hogan Lovells firm went through in securing the

10   documents.  We now understand that there is a lawyer in China

11   who was integral in gathering documents and making comments and

12   suggestions to the Chinese company.  We are going to have

13   further discussions with respect to documents.

14                   What we have been told is that we have what was

15   there as of the time Hogan Lovells went and had an opportunity

16   to get the documents.  We are very concerned as to the

17   production that we got and what may or may not exist, and I

18   will leave it at that.  We have a lot of concern and a lot to

19   look at.

20                   We did receive the letter of June 6 from the

21   Hogan Lovells firm from Matthew Galven that we have gone

22   through.  We have categorized every one of the documents and

23   put them in an organized fashion as they suggested were

24   responsive to the 13 areas of inquiry, and we had talked about

25   those 13 areas of inquiry.

1               We also talked about my memo, which Your Honor

2       was copied on, as well as the Hogan Lovells letter, my memo of

3       June 6 which laid out the documents to be identified.  It's our

4       intent to have further discussions with Mr. Spano and his crew

5       with respect to those documents.  We are very concerned as to

6       what we have, but more importantly what we do not have.  We

7       will have that discussion.

8               One of the things that we do need to bring to

9       the attention of the Court is that we are concerned about what

10      I'll call the related entities, the upstream and downstream

11      folks.  As Your Honor is aware, we have filed a number of

12      omnibus complaints, and I will tell the Court that we intend on

13      filing another omnibus complaint.

14              The problem that we have is that when we look a

15      the Chinese entities, they are like a spiderweb.  It's a

16      weaved, integral number of entities, some of which we find

17      things on, some of which no longer exist, and trying to get to

18      the bottom of it to find out who is actually acting through

19      these various subsidiaries and related entities is very

20      difficult.  Getting the witness who will be able to speak to

21      that and getting the documents are integral.  I can go into

22      specifics if the Court wants me to, but I don't think that the

23      Court wants to hear the different names of the witnesses who we

24      are concerned with or interested in.

25              THE COURT:  No, I don't need that now, but I will

1    need that.  I want to get everything worked out so everybody

2    knows who is going to be deposed, which documents are going to

3    be used, and things of that sort, so that it's not any surprise

4    to anybody.  Let's get this worked out before we go over there

5    so that we don't have to deal with it then.

6           **MR. DAVIS:**  We will do that, Your Honor, and I will

7    tell you I believe that having regular conferences with the

8    Court like you have done in prior matters with respect to class

9    cert and the others every week or every other week is very

10   helpful.

11          **THE COURT:**  I intend to do that.  Do you have

12   anything else, Lenny?

13          **MR. DAVIS:**  No.  I think that's it.

14          **THE COURT:**  Frank, let me hear from you.

15          **MR. SPANO:**  Thank you, Your Honor.  I'm going to wax

16   them of what I believe are inaccuracies in Lenny's comments.

17   Also, I have some responses to some of the points he raised.

18   Before I do that, last night I shared with Lenny some of the

19   client's perspective from China on all of this.  With the

20   Court's permission, I would like to share it with the Court as

21   well.

22          **THE COURT:**  Sure.  Right.

23          **MR. SPANO:**  Without apportioning any blame for what

24   has transpired thus far, we have a problem on our hands.  We

25   have a frustrated client that has a very strong view that it is

1    not subject, respectfully, to this Court's jurisdiction.  They

2    have counsel in China who have been counseling them regarding

3    the minimum contact standard and what that all means.  Their

4    perception is that it's not a terribly complicated issue.

5              Based on that perception, they simply cannot

6    understand why after eight months of jurisdictional discovery,

7    25,000 documents being produced, and five days of depositions,

8    the Court is not nearing the point where it can decide the

9    question of personal jurisdiction.  I'm making that comment by

10   no means attempting to reargue the motion to compel, but I

11   wish, as I told Lenny, to make everyone aware that there is

12   this growing sentiment at the client that they ought not to

13   have to wait much longer to have the jurisdictional issue

14   decided.  As time goes on and the discovery process becomes

15   more onerous, I'm very concerned about the client's continued

16   participation.

17             **THE COURT:**  Sure.  I understand.

18             **MR. SPANO:**  I say this only so, in determining how

19   much is really necessary to complete this process which is to

20   adduce the facts necessary for deciding the motion, we take

21   that into account.  This is very consistent with the Federal

22   Rules, anyway.  Rule 26 requires not only the question of

23   whether discovery could possibly be relevant to an issue, but

24   it also requires proportionality; is it worthwhile considering

25   what discovery has been had before, considering what the issue

1   is, is there a real chance of material nonduplicative discovery

2   to come out of a further extensive process, and weighing that

3   against the expense and the burden of the further discovery.

4               I've been thinking about how to short-circuit

5   this, perhaps.  One idea that I have is not to wait until after

6   the depositions in December to start the supplemental briefing

7   on the motion to vacate but to get into that now so we finish

8   briefing the motion, bring the material issues to the

9   forefront, and then that makes it much easier for the Court and

10  everyone to decide what the additional facts are that may be

11  needed for further discovery.

12              That, I believe, would likely be quicker in the

13  long run and certainly less expensive than going off and taking

14  days of additional testimony without the issues being squarely

15  framed and winding up with much more testimony, the vast

16  majority of which very unlikely will even be before the Court

17  on the motion because it won't be material.

18              In thinking through this, what we have done, we

19  have prepared a bunch of charts that actually summarize the

20  deposition testimony on each designated topic.  I think when

21  the substance of the testimony is organized that way, there is

22  a substantial amount of evidence that was developed at the

23  depositions.  We would be glad to share that with the Court and

24  others to move this process forward or as part of the

25  supplemental briefing.

1        **THE COURT:**  Would it surprise you, Frank, if the

2   other side would look at that chart and give me a chart of

3   their own which is exactly opposite to yours?

4        **MR. SPANO:**  Well --

5        **THE COURT:**  You see, I hear this during

6   presentations.  Oftentimes, the government in a criminal case

7   will say, "There is no reason to go to trial.  You just simply

8   need to have the person taken to jail."  The person says, "But

9   I'm not guilty."  The government says, "Well, how can you say

10  that in view of all this evidence?"

11       I hear that with plaintiffs and defendants in a

12  civil matter.  It's not unusual for the plaintiff to say, "Why

13  is the defendant going to trial?  He did me wrong.  I was fine

14  until this happened and now I'm not."  The defendant says,

15  "Well, it wasn't my fault, and you look pretty good to me."  So

16  we have to try the case.

17       So what I'm saying is your version of the facts

18  may make sense to you and to your family, but it probably is

19  not going to make sense to the opposing counsel.  So I don't

20  mind if you produce charts, but you're going to get charts from

21  the plaintiffs that take the exact opposite approach, and we

22  are going to be exactly where we are here and now.

23       **MR. SPANO:**  Well, the purpose of the chart would

24  simply be to lay out what exactly the testimony was on each

25  topic.  I think it would facilitate the Court and the PSC

1    saying, "What's missing?  What do we really need?"

2            **THE COURT:**  Okay.  That may not be bad.  I wouldn't

3    inhibit that.

4            **MR. SPANO:**  That would be the purpose, Your Honor.

5            **THE COURT:**  Sure.  Okay.

6            **MR. DAVIS:**  Your Honor, I would suggest that Frank

7    ought to send us those charts, we will look at them, and we can

8    have a discussion about it in our meet-and-confer.

9            **THE COURT:**  That's fine.  How long do you-all feel

10   these depositions will take?  Is this a week endeavor?

11           **MR. DAVIS:**  Your Honor, I think it depends on how

12   many witnesses there are.  We have suggested at this point at

13   least three people.  We have been told that Taishan will only

14   put up one.  So we are going to have to have some discussion on

15   that and maybe your input.

16           **THE COURT:**  Look, this is what we need to do.  In the

17   first place, let me focus you on the documents.  I would like

18   you, from the plaintiffs' standpoint, to figure out what you

19   have.  Frank says he gave you certain things and either you

20   didn't get them or you misplaced them or something of that

21   sort.  So you have to figure out what you have.  Then you have

22   to figure out what, if anything, you still need as you see it.

23   Then you need a meet-and-confer with Frank and find out what he

24   will give you and what he won't give you, and then give me a

25   letter telling me what he won't give you and why you need it.

1    Then, Frank, respond to the letter saying why you won't give

2    them and why he doesn't need it.  Then I will make the cut.  We

3    need to do this within 45 days of this meeting.

4              **MR. SPANO:**  Your Honor, if I may just clarify where

5    we are in that process, we have provided the PSC with a letter

6    last Friday where we identified by Bates number the key

7    documents relevant to personal jurisdiction that were produced

8    before the depositions but which nevertheless were the subject

9    of the motion to compel and caused a lot of confusion at the

10   hearing.  We told Lenny yesterday, in substance, that we

11   believed that these are all the documents necessary either to

12   complete an opposition brief to the motion or to support any

13   further limited depositions that the Court may find necessary.

14             **THE COURT:**  All right.

15             **MR. SPANO:**  What we are pointing to are all of the

16   documents underlying the transactions on the MPF involving U.S.

17   sized drywall, and all of the documents reflecting any kind of

18   contacts, direct or indirect, with a U.S. company related to

19   sales or potential sales of the drywall.  As to the sales, the

20   attempted sales, the contacts with the U.S., there is nothing

21   more for Taishan Gypsum to provide.  There is nothing else.

22             I need to correct some statements Lenny made

23   about document collection that I think there was a

24   misunderstanding on the call yesterday evening.  First of all,

25   the document collection in China was conducted exclusively by

1    my firm.  Between August and March, we made four trips to China

2    interviewing witnesses and collecting documents.  We did it,

3    and "we" meaning a team from New York supplemented by Chinese

4    lawyers from our Shanghai and Beijing offices.

5                    So when e-mail files were searched, my

6    colleagues -- not the client, my colleagues -- sat at the

7    computers, downloaded the documents, ran the searches, and

8    printed the e-mails.  My colleagues and I went from room to

9    room and file to file and collected the documents.  So I have a

10   lot of confidence in the completeness of the document

11   collection.  I have a real concern about vague allegations

12   without any substance that the document producing was not

13   complete.

14                    As I said, I'm happy to pursue those discussions

15   with Lenny, but I wanted the Court to understand the state of

16   affairs and, again, our belief based on the client problems we

17   have and the proportionality issue I alluded to that, my

18   goodness, 25,000 documents, every piece of paper in the

19   company, electronic or otherwise, related to contacts with the

20   U.S., how much more is needed to decide a motion for personal

21   jurisdiction?  This is the crux of, Your Honor said, why we

22   seem to be two ships passing in the night, and this is the crux

23   of what our client has a major problem with.

24              THE COURT:  I hear you.  In this case I have met with

25   the clients at other times.  I met with Knauf's people with the

1    consent of the parties.  I don't mind meeting with your people

2    if you want me to do so.  I will try to explain whatever you

3    need me to explain to them.

4              **MR. SPANO:**  Thank you, Your Honor.

5              **THE COURT:**  The documents, I would like you-all to

6    have that finalized and I want to put that to bed by July 25.

7    So immediately you ought to start meeting and finding out,

8    Lenny, what you have, what you need.  If Frank feels he can't

9    give it to you, tell me that in a letter.  Frank, you explain

10   to me why you didn't give it to them and why he doesn't need it

11   and why he is just being obstreperous or mean or something, and

12   then I will make that cut and we'll move on.

13             With the depositions, we need to know who.  Tell

14   me who you are going to put up, Frank, and who you want, Lenny,

15   and I will make that decision.  What areas will be covered,

16   where will the depositions take place, who will be the

17   interpreter, who will ask the questions, I really think that

18   needs to be done by late August, early September.  Then you-all

19   will have September, October, November to get ready for the

20   depositions, which will take place either the latter part of

21   November or the beginning of December.  I'll set aside a couple

22   days, five days, or something like that.  If we don't need it,

23   we will just come home early.

24             The next meeting, I will meet with you-all in

25   two weeks on the telephone.  I don't need the whole world at

```
 1    the meetings.  If you folks don't need to participate, that's
 2    fine.  You're welcome if you want to participate.
 3                THE LAW CLERK:  June 23 at 9:00 Central Time.
 4                THE COURT:  June 23, 9:00 Central Time, I'll meet
 5    with you on the phone.  I would like to know what you have done
 6    since our last meeting and what, if any, problems you're
 7    having.  If there are any issues, give me a letter a couple
 8    days before telling me so I will be able to be current on any
 9    issues that you need me to focus on and, if necessary, I will
10    rule at that time on various things.  We need to keep this
11    moving, guys.
12                MR. DAVIS:  Thank you, Your Honor.
13                THE COURT:  Anything else?  Thank you very much,
14    everybody, for participating.
15                (WHEREUPON the Court was in recess.)
16                            *  *  *
17                          CERTIFICATE
18          I, Toni Doyle Tusa, CCR, FCRR, Official Court
      Reporter for the United States District Court, Eastern District
19    of Louisiana, do hereby certify that the foregoing is a true
      and correct transcript, to the best of my ability and
20    understanding, from the record of the proceedings in the
      above-entitled and numbered matter.
21
22
23                              s/ Toni Doyle Tusa
                                Toni Doyle Tusa, CCR, FCRR
24                              Official Court Reporter
25
```