UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL DOCKET: 2047<br><br>SECTION:  L |
| **THIS DOCUMENT RELATES TO:** | JUDGE FALLON<br>MAG. JUDGE WILKINSON |

*Payton, et al. v. Knauf Gips, KG, et al.*
EDLA 09-07628

*Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*
EDLA 2:10-cv-000361

*Gross, et al. v. Knauf Gips, KG, et al.*
EDLA 2:09-cv-6690

*Rogers, et al. v. Knauf Gips, KG, et al.*
EDLA 2:10-cv-00362

*Amato, et al. v. Liberty Mutual Ins. Co.*
EDLA 2:10-cv-00932

*Hernandez, et al. v. AAA Insurance, et al.*
EDLA 2:10-cv-03070

*Kenneth Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shangdong Taihe Dongxin Co., Ltd., et al.*
EDLA 2:11-cv-080

*Daniel Abreu, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*
EDLA 2:11-cv-252

*Haya, et al. v. Taishan Gypsum Co., Ltd., et al.*
EDLA 2:11-CV-1077

*Vickers, et al. v. Knauf Gips, KG, et al.*
EDLA 2:09-cv-04117
_____/

1061985v.1

**CERTAIN HOMEBUILDERS' RESPONSE IN OPPOSITION TO THE JOINT MOTION FOR ORDERS: (1) PRELIMINARILY APPROVING THE STIPULATION AND SETTLEMENT; (2) CONDITIONALLY CERTIFYING THE SETTLEMENT CLASS; (3) ISSUING CLASS NOTICE; AND (4) SCHEDULING A FAIRNESS HEARING REGARDING THE PROPOSED BANNER SETTLEMENT**

Certain Homebuilders[1] hereby submit their response in opposition to the Joint Motion for Orders: (1) Preliminarily Approving the Stipulation and Settlement; (2) Conditionally Certifying the Settlement Class; (3) Issuing Class Notice; and (4) Scheduling a Fairness Hearing Regarding the Proposed Banner Settlement ("Motion to Approve Banner Settlement Agreement") [D.E. 9470], and in support thereof state as follows:

1.  On June 14, 2011, the Plaintiffs' Steering Committee ("PSC"), Banner Supply Co. and all of its related entities ("Banner"),[2] and Banner's Insurers (including Chartis, FCCI, Hanover, and Maryland Casualty), surreptitiously filed their Motion to Approve Banner Settlement Agreement, asking this Court to, among other things,

---

[1] The following homebuilders, through their counsel, have authorized the Homebuilders' Steering Committee to file this response on their behalf: Lennar Corporation; Lennar Homes, LLC f/k/a Lennar Homes, Inc.; U.S. Home Corporation; Taylor-Woodrow Communities at Vasari, LLC; Taylor Morrison Construction Company; Taylor Morrison Services, Inc.; Morrison Homes, Inc.; Taylor Morrison of Florida, Inc.; Taylor Morrison, Inc.; Taylor Woodrow Homes Central Florida Division, LLC; Taylor Woodrow, Inc.; Taylor Woodrow at Vasari, LLC; Taylor Woodrow Homes Florida, Inc.; Taylor Woodrow Homes-Southwest, Florida Division, LLC; Beazer Homes Corp.; Centerline Homes at Georgetown, LLC; Completed Communities II, LLC; Centerline Homes at Delray, Inc.; Centerline Homes Construction, Inc.; Centerline Homes, Inc.; KB HOME Florida LLC; KB HOME Jacksonville LLC; KB HOME Orlando LLC; KB HOME/Shaw Louisiana LLC; KB HOME Tampa LLC; KB HOME Fort Myers LLC; KB Home Treasure Coast LLC; Northstar Homes, Inc.; Northstar Holdings, Inc.; Northstar Holdings at B&A, LLC; M/I Homes, Inc.; M/I Homes of Tampa, LLC; D.R. Horton, Inc.; LPR Builders, Inc.; Regatta Construction, LLC; RCR Holdings II, LLC; Ray Beck, Inc.; Carter's Custom Homes, Inc.; David E. Diggs; Palm Coast Construction, LLC; Royal Homes, LLC; U.S. Construction & Development Corp.; and Deerfield Court Townhomes, LLC (Lavish Holding Corp.). This opposition is being filed reserving all defenses, and without waiver of objections to service of process, jurisdiction or venue.

[2] "Banner" is defined under the Settlement Agreement to include "all Banner entities, including, but not limited to, Banner Supply Co., Banner Supply Co. Pompano, LLC, Banner Supply Co. Port St. Lucie, LLC ('Banner PSL'), Banner Supply Co. Ft. Myers, LLC, Banner Supply Co. Tampa, LLC, Banner Supply International, LLC, and any other entity insured under the Banner Insurance Policies and all of their past and present owners, shareholders, officers, directors, agents, attorneys, employees, parents, associates, subsidiaries, divisions, affiliates, insurers, and all predecessors and successors, assigns, or legal representatives." Banner Settlement Agreement, §1.1.1.

preliminarily approve the "Stipulation and Agreement of Settlement" they attached as Exhibit "A" to the Motion to Approve Banner Settlement Agreement ("Banner Settlement Agreement"). While many homebuilders intend to file detailed objections to the Banner Settlement Agreement sufficiently in advance of any final fairness hearing so that the objections can be fully argued and resolved at the time of that fairness hearing, the homebuilders did want to outline a few of their primary concerns with the Banner Settlement Agreement, which purports to substantially impact the homebuilders' rights. The homebuilders submit that such a fairness hearing should not be scheduled unless and until extensive revisions are made to fix the many issues and ambiguities with the provisions contained in the Banner Settlement Agreement.

2. As the Court is well aware, many homebuilders have spent millions of dollars repairing homes that were impacted by the defective Chinese-manufactured drywall at issue in this litigation ("Chinese Drywall"). These homebuilders made the decision to repair these homes early on, without any hope or guarantee of ever recovering a dime from the manufacturers, distributors, suppliers, brokers and installers who are responsible for the Chinese Drywall found in these homes ("Supply Chain Parties"). Accordingly, homebuilders have literally millions of dollars of claims that have been filed, or that will be filed, against these Supply Chain Parties, including Banner.

3. Regrettably, despite their significant and unique role in these proceedings (both as plaintiffs and defendants), and this Court's repeated directives to the PSC and Banner that the homebuilders be included in the Banner negotiations before any settlement was finalized, the homebuilders were intentionally excluded from these settlement negotiations. After the PSC had made previous arrangements to meet with

certain members of the Homebuilders' Steering Committee ("HSC") to discuss Banner settlement issues immediately *following* the June 14, 2011 monthly status conference, the homebuilders were shocked when the settlement was officially announced at that same monthly status conference.

4. This Court expressed its disappointment with the fact that the homebuilders were excluded from these settlement negotiations in the following exchange at the June 14th monthly status conference:

> MS. BASS: … I feel compelled to put on the record that despite the admonishment of this Court to include the homebuilders in the negotiation process, and despite the fact that this Court granted intervention to some of the builders so they could participate in the settlement of this class, the homebuilders have been totally excluded from this process.
>
> The Homebuilders Steering Committee was given a term sheet ten days ago with significant material terms not included.  We were assured that we would be included in the settlement discussions before anything went final.  We actually had offered to go to New York to do that, we offered to come in yesterday to do that.  We negotiated for a week over the time to get together to have the discussion, and we're shocked to find out when we arrived in court today that the deal had already been cut.
>
> I understand it's a complicated deal.  It may be the best deal possible.  But I can assure you, it is much easier to cut a deal when you're excluding one of the most important classes or subclasses of relevant interested parties, and that's what I believe has been done.
>
> We will meet with the PSC.  We will go through this settlement agreement on behalf of the Homebuilders Steering Committee.  But I must put on the record how offended we are with this process, that the insurance companies and Banner and the PSC have sliced and diced a deal and allocated risks and allocated the release provisions and the dollars without any input from the one set of parties at the table who spent millions of dollars to repair these homes.
>
> So we will go through this process, Your Honor, but I have to express my sincere concern about the possibility that all this work will be for naught.  Because if all the homebuilders object to the settlement, I suspect that neither Banner nor the insurance companies will be prepared to go forward.

> THE COURT: Yes. I'm disappointed that this occurred because that wasn't my understanding. I understood that everybody would be at the table this time and would participate in this agreement. And as I mentioned to counsel in conference, I want them to meet following this matter and see whether or not we're just dealing with a misunderstanding as opposed to something more serious.
>
> But I do agree that the significant people have to be plugged in and participate in these matters in order for them to be successful. So I don't want this to happen again.

Transcript of Status Conference, dated June 14, 2011, at pp. 9-10.

5. Upon reading the Banner Settlement Agreement, the homebuilders were surprised to see that the PSC, Banner and Banner's Insurers, took it upon themselves to attempt to negotiate a settlement, release, indemnity and permanent bar provision that not only affects all of the homebuilders' claims against Banner and Banner's Insurers, but also effectively releases all of the homebuilders' claims against all other defendants "downstream" from Banner (*e.g.,* the drywall installers, with which the homebuilders contracted directly) by requiring the homebuilders to indemnify and defend Banner for any third-party claims that such "downstream" defendants might bring against Banner in the event the homebuilders pursue their valuable claims against them. Banner Settlement Agreement, §3.3.5.

6. Insofar as the homebuilders are concerned, the Banner Settlement Agreement is entirely unfair, unreasonable and inadequate, and should not be approved – even preliminarily. Fed. R. Civ. P. 23(e)(2) ("If the proposal would bind class members, the court may approve it only after a hearing on finding that it is fair, reasonable, and adequate.") To be sure, the Banner Settlement Agreement reflects a blatant attempt by the PSC, Banner and Banner's Insurers to completely eviscerate the homebuilders' due process rights, by leaving homebuilders fully exposed to claims by

homeowners, while preventing homebuilders from pursuing Banner or any other defendants "downstream" from Banner (such as, for example, a drywall subcontractor or their insurers), on claims for indemnity, contribution or otherwise, and from pursuing the millions of dollars the homebuilders have spent repairing homes.

7. To make matters worse, by the time the homebuilders will be forced to decide whether to opt-out from the Banner settlement, Banner Settlement Agreement, § 6.1.1 ("Class Members will have sixty (60) days (or such different period as the Court may direct) to opt out of the Settlement…."), the homebuilders:

(i) will not know what portion of the settlement proceeds, if any, they will be allocated pursuant to Section 14 of the Banner Settlement Agreement;

(ii) will not know whether any members of the proposed class will receive any preferential treatment given their status (*e.g.,* a homeowner whose home has not been repaired vis-à-vis a homeowner whose home has been repaired but who has preserved claims for personal property and personal injury damages vis-à-vis a homebuilder whose outlayed millions of dollars to repair homes and received assignments of certain of the homeowners' claims); and

(iii) will not have received any consideration from any Supply Chain Parties "downstream" from Banner or their insurers in exchange for what is effectively their complete release.

8. The allocation concerns over which type of "Class Member" will get what kind of recovery in comparison to other not-so-similarly-situated "Class Members" serves to highlight the difficulty the PSC will have in establishing that the "claims or defenses of the representative parties are typical of the claims or defenses of the

1061985v.1

class."[3] Fed. R. Civ. P. 23(a)(3). As the Banner Settlement Agreement reads now, several categories of parties are included in the broad definition of the proposed settlement "Class," which is defined as:

> …all persons or entities with claims, known and unknown, against the Settling Defendants arising from, or otherwise related to, Chinese Drywall purchased from, supplied, distributed, marketed, used, sold and/or delivered by Banner.

Banner Settlement Agreement, § 1.1.3.[4] This definition is so broad that it would include, among many other types of persons or entities with possible claims against Banner: (1) homeowners whose homes have not been repaired; (2) tenants or other occupants of homeowners whose homes have not been repaired; (3) homeowners whose homes have been repaired but who have preserved some claims against Banner (*e.g.,* personal property and/or personal injury damages); (4) tenants or other occupants of homeowners whose homes have been repaired; (5) prior owners of homes whose homes have been repaired through repair agreements with subsequent homeowners; (6) homebuilders who have not repaired homes; (7) homebuilders who have repaired homes; (8) installers; and (9) potentially Knauf, who has repaired, and is continuing to repair, Banner-supplied homes through the Knauf pilot program. Without appropriate subclasses being created, the PSC will have difficulty meeting the typicality requirement for certifying the settlement class.

---

[3] The homebuilders are of the view that an allocation plan needs to be agreed to in advance of class notice being issued so that Class Members can determine whether to opt out. The homebuilders further believe that a claim validation process should be agreed to in advance so that parties can understand what will be required in order to submit a legitimate claim for entitlement to some of the insurance proceeds. Again, these issues could easily have been addressed had the PSC and Banner bothered to include the homebuilders in the settlement negotiation process.

[4] The term, "Settling Defendants," is defined to mean "Banner, Chartis, FCCI, Hanover, and Maryland Casualty." *Id.*, §1.19.

1061985v.1

9. Furthermore, given that the PSC permitted the Banner Settlement Agreement to be finalized without any meaningful involvement of homebuilders, and have proposed naming themselves as counsel for the entire Class, *id.*, §1.9.1, it is clear that the representative parties have no ability to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This adequacy requirement is "essential to due process, because a final judgment in a class action is binding on all class members." *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1083 (6th Cir. 1996) (citing *Hansberry v. Lee,* 311 U.S. 32, 42-43 (1940)). To meet the adequacy requirement, the "class representatives, their counsel, and the relationship between the two [must be] adequate to protect the interests of absent class members." *Unger v. Amedisys Inc.,* 401 F.3d 316, 321 (5th Cir. 2005) (citing *Stirman v. Exxon Corp.,* 280 F.3d 554, 562 (5th Cir. 2002)). The PSC can hardly be deemed adequate to represent the interest of the homebuilders, when they are at the same time representing thousands of plaintiffs in pending suits *against* those same homebuilders. The Court should not allow that obvious conflict of interest to materialize by approving the Banner Settlement Agreement as currently drafted.

10. Had the homebuilders been invited to the negotiations between the PSC, Banner and Banner's Insurers, as this Court expressly instructed, the homebuilders could have addressed all of the problems with the proposed settlement before it was formally presented to the Court and prematurely made public by the PSC through the various press releases and statements.

11. The way the Banner Settlement Agreement is written, particularly the broad definition of "Released Claims," an argument could be made that a Class Member

who later wants to pursue any claims against any of the settling "Insurers," but under separate insurance policies that are not issued directly to Banner, has released and is forever barred from bringing those claims. The homebuilders are confident that it was not the PSC's and Settling Defendants' intent for the release to operate this way, but Class Members must be permitted to pursue Chartis, FCCI, Hanover or Maryland Casualty under any other non-Banner Insurance Policies (as that term is defined in §1.5 of the Banner Settlement Agreement), and such Class Members should not have to indemnify any of these Insurers for suits brought under other non-Banner Insurance Policies.

12. Moreover, any settlement that leaves a homebuilder exposed to liability to a homeowner by not providing the homebuilder with a complete release, and at the same time effectively bars that same homebuilder from pursuing indemnity or some other form of recovery from the other defendants "downstream" from Banner, reflects a fundamental lack of due process and should be rejected out of hand.

13. Essentially, if the homebuilders do not opt-out of the settlement within the prescribed time frame, they will receive some unknown allocated portion of whatever is left, if anything, from the proceeds of the Banner Insurance Policies, <u>after</u> deducting, among other things, (a) amounts already earmarked for pending and prior settlements (Banner Settlement Agreement, §§ 1.13 and 1.14); (b) attorneys' fees and costs to the "PSC, common benefit attorneys, and privately retained attorneys for all Class Members" (*Id.*, § 14.7); and (c) the costs of administering the allocation of the Settlement proceeds (*Id.*, § 14.5).

1061985v.1

14. Whether the costs of providing notice to the Class will also be deducted from the settlement proceeds is anyone's guess, because there is an irreconcilable conflict within the Banner Settlement Agreement about who is to bear responsibility for these significant costs. Initially, the agreement states that the "PSC shall be solely responsible for the cost of providing notice." *Id.*, §5.3. Later on, however, the agreement provides that "…the cost of notice to Class Members will be paid out of the Settlement Funds." *Id.*, § 14.5. Which one is it? The homebuilders submit that the cost of notice must not be used to deplete the otherwise limited amount of Settlement Funds, particularly where, as here, the likelihood of this settlement agreement receiving final approval, given all of its problems, is minimal, at best. Quite frankly, the PSC should have to foot that bill, especially since they jumped the gun on finalizing the settlement without following this Court's instructions to involve the homebuilders in these discussions.

15. In exchange for their possible receipt of some unknown allocated amount, homebuilders are required under the Banner Settlement Agreement to grant a full and complete release of:

> …any and all claims against any Settling Defendants whatsoever (a) arising out of, in any manner related to, or connected in any way with Chinese Drywall, or the collective mitigation of, response to, and/or recovery from the damage caused by Chinese Drywall and/or any act and/or failure to act related in any way to any of the foregoing, including but not limited to, the ownership, use, rental, occupancy, design, construction, maintenance, and/or inspection of the Affected Homes and/or (b) for any and all losses, damages and/or injuries arising from, in any manner related to, or connected in any way with all and/or any of the foregoing, including but not limited to any and all claims that a Class Member has, may have, or may have had, regardless of whether such claim is known or unknown, filed or unfiled, asserted or as yet unasserted, or existing or contingent, whether asserted by petition, complaint, cross-claim, third party complaint, arbitral demand, written demand, or otherwise

> (or any judgment or order entered on such claims), based upon or alleging any act, conduct, status or obligation of any person or entity (including the Settlement Defendants) and/or any source of liability whatsoever, and regardless of the legal theory or theories of damages involved.

*Id.*, § 3.1.1.; *see also* § 3.3.1. ("…all Class Members…hereby fully, finally, and forever release, waive, discharge, surrender, forego, give up, abandon, and cancel any and all Released Claims (as defined in Section 3.1) against the Settling Defendants, including (but not limited to) those asserted, or that could have been asserted, in the Litigation, the Related Actions, and/or the Related Claims.")[5]

16. Unlike the structure of the Interior/Exterior Building Supply settlement, the Banner Settlement Agreement does not include an express provision requiring a release of all "Downstream Banner Releasees," such as installers. Nevertheless, it effectively operates the same way. In the Banner Settlement Agreement, Supply Chain Parties "downstream" from Banner are not expressly released. However, if a homebuilder chooses not to opt out and receives settlement proceeds, that homebuilder may still pursue its claims against an installer, but must indemnify Banner and its Insurers up to the amount of the settlement proceeds received by such homebuilder in the very likely event that this installer brings a third-party claim against Banner for contribution, indemnity or otherwise. *Id.*, §3.3.5. The fact that the homebuilder will have to give the settlement proceeds right back to Banner or its Insurers if they pursue their claims against installers is such a disincentive to pursuing those claims that it effectively operates to release them.

---

[5] Even if homebuilders are required to release all of their claims against Banner as part of this settlement, homebuilders with homes in litigation should still have ability to include Banner on the verdict form so that Banner is apportioned the appropriate percentage of fault in accordance with *Fabre v. Marin*, 623 So.2d 1182 (Fla. 1993), and its progeny. *See also* Fla. Stat. § 768.81.

17. The seriousness of the impact of this effective release on homebuilders' claims cannot be overstated. Many of the homebuilders used drywall subcontractors to purchase and install drywall in their homes pursuant to subcontract agreements that contained contractual indemnities and warranties, and that required the drywall subcontractors to name the homebuilders as additional insureds under the subcontractors' insurance policies. Given the structure of the Banner Settlement Agreement, these drywall subcontractors would effectively be fully released from any claims the homebuilders may have against them (whether contractual, statutory or otherwise), without having paid the homebuilders any form of consideration for such a release.[6] The same holds true for any other defendant "downstream" from Banner. Such a unreasonable and inadequate result is unacceptable to homebuilders.

18. Furthermore, even if the indemnity language in the Banner Settlement Agreement did not operate to effectively release homebuilder claims against others Supply Chain Parties "downstream" from Banner (which it does), the indemnity language is still problematic because it is too ambiguous. It reads:

> As of the Effective Date of the Settlement, to the extent of each Class Member's individual and net recovery, and to the extent the claim described in this Section arises out of the claim of that Class Member, each Class Member shall defend, indemnify, and hold harmless each of the Settling Defendants from and against (a) any and all claims by, on behalf of, through, or deriving from his, her, or its heirs, executors, representatives, attorneys or former attorneys, successors, employers, insurers, employer's insurers, heath insurers, heath care providers, assignees, subrogees, predecessors in interest, successors in interest, beneficiaries or survivors; and (b) any claims for contribution, common law indemnity, contractual indemnity, and/or subrogation, whether arising under tort, contract or otherwise, related in any way to the Released Claims of said Class Member released by this Settlement.

---

[6] The insurers of these drywall subcontractors would similarly be the beneficiaries of this effective release.

*Id.*, §3.3.5.  Just by way of example, consider the situation of homebuilder who has repaired homes and received assignments from its homeowners of all claims except for personal property damages and personal injury damages.  Assume that same homebuilder elects not to opt out and receives some settlement proceeds from its repaired homes.  If one of the homeowners of a repaired home opts out of the settlement and pursues their claims against the homebuilder and Banner for personal property and personal injury damage, does the homebuilder have an obligation to indemnify Banner and Banner's Insurers?  If so, is that obligation to indemnify capped at the amount of the homebuilders' recovery on just that one home, or is it capped at the amount of the homebuilders' full recovery on all of its repaired homes?  It is similarly unclear whether a non-opt out homebuilder that receives some settlement proceeds on certain repaired homes has any indemnity obligations to Banner under the Banner Settlement Agreement if an owner of one of that same homebuilder's unrepaired homes opts out of the settlement and pursues Banner in a separate lawsuit.  The homebuilders submit that under no circumstances should they ever have to indemnify Banner or Banner's Insurers for any claims the homebuilders do not control (*e.g.,* homeowner claims that were not assigned to such homebuilder, such as personal injury claims), and such indemnity obligations should be limited to the recovery on a house-by-house basis.  Any other result would be patently unfair and unreasonable.

19.    "A court can endorse a settlement *only* if the compromise is fair, reasonable and adequate."  *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (emphasis added).  Moreover, "where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is *not*

1061985v.1

enough to earn the judicial stamp of approval." *Id*. (emphasis added).

20.  Put simply, the rights and interests of the homebuilders are materially and negatively impacted by the Banner Settlement Agreement.  It should be flatly rejected by the Court.  The Court should also require that homebuilders be permitted to participate in any further negotiations that attempt to resolve any and all claims against any Supply Chain Defendants on a global basis.

**WHEREFORE,** for all the foregoing reasons, the homebuilders joining in this response object to the Banner Settlement Agreement, and respectfully request that the Court deny the Motion to Approve Banner Settlement Agreement.

Dated: July 5, 2011			Respectfully submitted,

**STONE PIGMAN WALTHER WITTMANN**
*Local Lead Counsel for the HSC*
546 Carondelet Street
New Orleans, LA 70130
Telephone: (504) 593-0804
Facsimile: (504) 593-0804
E-mail: pwittmann@stonepigman.com

By:   /s/ Phillip A. Wittmann
         PHILLIP A. WITTMANN
         Louisiana Bar No. 13625

**GREENBERG TRAURIG, P.A.**
*Lead Counsel for the HSC*
1221 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
Email: bassh@gtlaw.com

By:   /s/ Hilarie Bass
         HILARIE BASS
         Florida Bar No. 334323
         MARK A. SALKY
         Florida Bar No. 058221

**SIVYER BARLOW & WATSON**
*Member of the HSC*
401 E. Jackson Street, Suite 2225
Tampa, FL 33602
Telephone: (813) 221-4242
Facsimile: (813) 227-8598
Email: nsivyer@sbwlegal.com

By:   /s/ Neal Allen Sivyer
         NEAL A. SIVYER
         Florida Bar No. 373745

**KING & SPALDING LLP**
*Member of the HSC*
1180 Peachtree Street, NE
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
Email: kbuster@kslaw.com

By:   /s/ J Kevin Buster
         J. KEVIN BUSTER
         Georgia Bar No. 099267

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 5, 2011, this document has been served on Plaintiffs' Liaison Counsel, Russ Herman, Esq., and Defendants' Liaison Counsel, Kerry Miller, Esq., Homebuilders' Liaison Counsel, Dorothy Wimberly, Esq., and Insurer Defendants' Liaison Counsel, Judy Y. Barrasso, Esq., by U.S. mail and/or email or by hand delivery and I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and upon all parties by electronically uploading the same to Lexis/Nexis File & Serve in accordance with Pretrial Order No. 6.

/s/ Hilarie Bass
Hilarie Bass

*MIA 181,957,929v6 7-5-11*

1061985v.1