**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO: *Payton, et al. v. Knauf Gips, KG, et al.*, and Case No. 2:09-cv-07628 (E.D. La.) *Vickers, et al. v. Knauf Gips KG, et al.* Case No. 2:09-cv-04117 (E.D. La.) | |

<u>**CROSS-CLAIM PLAINTIFF BANNER'S CROSS-CLAIM AND AMENDED CROSS-CLAIM AGAINST KNAUF**</u>

Cross-Claim Plaintiffs Banner Supply Co.; Banner Supply Company Pompano, LLC; Banner Supply Company Fort Myers, LLC; Banner Supply Company Tampa, LLC; Banner Supply Co. Port St. Lucie, LLC; and Banner Supply International, LLC (collectively, "Banner"), for their Cross-Claim and Amended Cross-Claim for damages and for declaratory relief against Cross-Claim Defendants Gebrueder Knauf Verwaltungsgesellschaft, KG ("Gebr. Knauf"); Knauf Gips KG ("Knauf Gips"); Knauf International, GmbH ("Knauf International"); Knauf Insulation, GmbH ("Knauf Insulation"); and Knauf Plasterboard (Tianjin) Co. Ltd. ("Knauf Tianjin") (collectively, the "Knauf Defendants") allege:

<u>**NATURE OF THE ACTION**</u>

1.      The Knauf Defendants, all arms of a sprawling German industrial giant, lied to Banner about defective drywall Knauf manufactured in China and shipped to the United States ("Knauf Drywall").  Knauf then compounded its fraud by trying to evade responsibility, shifting blame entirely onto small Florida businesses, such as Banner, that relied on Knauf to tell the truth. Banner, the David to Knauf's Goliath, did nothing more than distribute Knauf Drywall after receiving certifications and warranties from Knauf that it was fit for use; and then rely upon additional representations from Knauf that its drywall was not defective once problems began to

surface.  Banner now seeks to hold the Knauf Defendants accountable for their deceitful conduct in 2006 and 2007, when Knauf admittedly made material misrepresentations about the fitness and quality of Knauf Drywall.

2.      In 2006, Banner alerted Knauf that homebuilders had complained that Knauf Drywall gave off a certain smell.  In response, Knauf sent a senior executive to Florida to investigate.  Knauf then told Banner and others that it had commissioned independent testing of Knauf Drywall, and that Knauf had concluded its drywall was not defective because "the difference in smell is no more than the difference between Chinese natural gypsum plasterboard and synthetic plasterboard."

3.      On June 8, 2011, a senior Knauf executive admitted that Knauf actually knew in 2006, even as it assured Banner that Knauf Drywall was not defective, that its claims of fitness were false.  Although Knauf claimed in 2006 and 2007 that "the difference in smell is no more than the difference between Chinese natural gypsum plasterboard and synthetic plasterboard," Knauf knew this statement was false because it knew that the smell was caused by sulfur compounds emitted from Knauf Drywall.  In 2006, Knauf understood that these emissions rendered its product defective.  Knauf further admitted that, also in 2006, Knauf knew that the off-gassing of sulfur compounds could corrode metals commonly used in construction, yet it never told Banner of this risk.

4.      Rather than take responsibility for its actions, Knauf claims it is not subject to U.S. jurisdiction, telling its American customers – homebuilders, suppliers, and installers of drywall – that no judgment against Knauf would ever be enforced in the People's Republic of China, where Knauf Tianjin resides.  Knauf's cowardice and calculus have transformed innocent links in the distribution chain, like Banner, into targets of lawsuits brought on behalf of aggrieved homeowners. Knauf's affirmative refusal to be held accountable and its misrepresentations also damaged Banner's reputation, as Knauf did nothing to correct or dispel inaccurate allegations of collusion with Banner

reported by the media, which Knauf knew were blatantly false.  As a direct result of Knauf's deceit and fraud, several significant customers no longer do business with Banner.

5.      On June 13, 2011, Banner entered a proposed class action settlement in *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL 2047 (E.D. La.).  Banner agreed to tender the totality of its available insurance assets, which would provide some compensation for homeowners damaged by Knauf Drywall.  Knauf's fraudulent actions have devastated Banner's business and reputation.  The Banner companies are small Florida businesses.  In contrast, Knauf is an international powerhouse comprised of dozens of substantial companies acting in concert, with large-scale operations in the United States.

6.      Knauf is in fact subject to U.S. jurisdiction because it is a single, worldwide enterprise that maintains a significant presence in the United States, while its component entities do not maintain separate operational control.  The European Court of Justice has upheld a fine against Knauf for its participation in a drywall cartel, finding Knauf's operations to be controlled by a shadow entity created by operation of a document called the "Knauf Family Contract."  Case C-407/08 P, *Knauf Gips KG v. Comm'n*, 2010 E.C.R. 00000, 5 C.M.L.R. 708 (2010).  For the convenience of the Court, true and correct copies of the Judgment of the European Court of Justice and the Opinion of Advocate General Mazak are attached hereto as Exhibits A and B.  Additionally, a true and correct translation of the Decision of the Court of First Instance of the European Communities, Case T-52/03, *Knauf Gips KG v. Comm'n*, 2008 E.C.R. II-00115, which was upheld by the European Court of Justice (in the opinion attached as Exhibit A), is attached as Exhibit C.

7.      This cross-claim seeks redress for Banner's loss of business and reputation, and will place liability for Knauf Drywall where it ultimately and rightfully belongs.  Knauf has admitted its responsibility for the damages caused by its defective product.  Knauf has admitted the representations it made to Banner were false.  Knauf should not be permitted to retain billions of

dollars earned by concealing defects from the citizens of Florida, while forcing smaller American businesses like Banner to clean up its mess.

## PARTIES

### CROSS-CLAIM PLAINTIFFS

8.     Banner is a group of Florida companies, the first of which was founded 58 years ago and organized under the laws of Florida, which sells building supplies such as lumber, insulation, metal framing accessories, plaster and accessories, gypsum products, and specialty items.  The Banner entities have principal places of business as follows:

    a.    **Banner Supply Co.**: 7195 N.W. 30th Street, Miami, FL 33122;

    b.    **Banner Supply Company Pompano, LLC**: 1660 SW 13th Court, Pompano Beach, FL 33069;

    c.    **Banner Supply Company Fort Myers, LLC**: 2910 Cargo Street, Fort Myers, FL 33916;

    d.    **Banner Supply Company Tampa, LLC**: 12514 South U.S. Highway 41, Gibsonton, FL 33534;

    e.    **Banner Supply International, LLC**: 7195 N.W. 30th Street, Miami, FL 33122.

    f.    **Banner Supply Company Port St. Lucie, LLC**: 2910 N.W. Settle Avenue, Port St. Lucie, FL 34986.

### CROSS-CLAIM DEFENDANTS

9.     Upon information and belief, Cross-Claim Defendants are all companies in the Knauf Group, a global family of entities that supplies building materials, including drywall and other building products, to customers in more than 50 countries, including the United States.  Knauf has more than 130 production plants in over 40 countries, generating annual revenues of more than 5.5 billion Euros.  Knauf's worldwide network of manufacturing companies is capable of producing in excess of one billion square feet of drywall annually.

10.     Upon information and belief, at all times relevant herein, Cross-Claim Defendants were all governed by the Knauf Family Contract formed on December 9, 1994 for the express purpose of ensuring that (i) all Knauf entities (collectively the "Knauf Group" or "Knauf") are operated under single, unified management and direction; (ii) all capital invested in the Knauf Group remains within the Knauf family; and (iii) none of the companies in the Knauf Group can be separately controlled.

11.     Upon information and belief, Gebr. Knauf is a corporation organized under the laws of Germany with its principal place of business at Postfach 10, D-97343 Iphofen, Germany.  Gebr. Knauf is a holding company that manages a portfolio of subsidiary companies for its 22 shareholders, comprising 21 members of the Knauf family and a company owned by four Knauf family members.  Gebr. Knauf is the direct parent of defendant Knauf International and the ultimate parent of defendant Knauf Tianjin.  Upon information and belief, at all times relevant herein, Gebr. Knauf's general partners were Nikolaus and Baldwin Knauf, who were primarily responsible for managing all the various corporations and other entities within the Knauf Group.

12.     Upon information and belief, Knauf International is a corporation organized under the laws of Germany with its principle place of business at the same address as Gebr. Knauf:  Postfach 10, D-97343 Iphofen, Germany.  Knauf International is owned, operated and controlled by members of the Knauf family and by Gebr. Knauf, and is the direct parent of Knauf Tianjin.

13.     Upon information and belief, Knauf Insulation is a corporation organized under the laws of Germany with its principle place of business at the same address as Gebr. Knauf and Knauf International: Postfach 10, D-97343 Iphofen, Germany.  Knauf Insulation is owned and controlled by members of the Knauf family and Gebr. Knauf.  Knauf Insulation owns several manufacturing facilities in the United States, including plants in Shelbyville, Indiana; Lanett, Alabama; and Shasta Lake, California.

14.     Upon information and belief, Knauf Gips is a limited partnership organized under the laws of Germany with its principal place of business at the same address as Gebr. Knauf, Knauf Insulation, and Knauf International: Postfach 10, D-97343 Iphofen, Germany.  At all relevant times herein, all of the shares of Knauf Gips were held by the same group of 22 shareholders who own Gebr. Knauf, namely, 21 members of the Knauf family and a company formed by four members of the Knauf family.

15.     Upon information and belief, Knauf Tianjin is a corporation organized under the laws of China with its principal place of business at North Yinhe Bridge, East Jingjin Road, RC-300400, Tianjin, China.  At all times relevant herein, Knauf Tianjin was ultimately owned and controlled pursuant to the Knauf Family Contract by 21 members of the Knauf family and by the other companies and entities within the Knauf Group.  Knauf Tianjin manufactured defective drywall and exported the same into the United States, including into Florida.

### PERSONAL JURISDICTION

#### THE KNAUF ENTITIES ARE A "SINGLE ECONOMIC UNIT"

16.     All Knauf Defendants are governed by the Knauf Family Contract, which controls the operation of all entities within the Knauf Group under single, unified management and direction.

17.     On July 8, 2008, the Court of First Instance of the European Communities held "all businesses owned by the Knauf family constitute a single economic entity pursuing common interests." Case T-52/03, *Knauf Gips KG v. Comm'n*, 2008 E.C.R. II-00115 ¶ 350.  On July 1, 2010, the European Court of Justice affirmed the holding that "the companies belonging to the Knauf family constitute a single economic unit."  Case C-407/08 P, *Knauf Gips KG v. Comm'n*, 2010 E.C.R. 00000, 5 C.M.L.R. 708 ¶ 72 (2010).  The European Court of Justice, Case C-407/08 P ¶¶ 66-69, found that this holding was justified by the following factual findings by the Court of First Instance:

a.     The stated purpose of the Knauf Family Contract "is to ensure the single management and direction of the companies in the Knauf Group. . . . [T]he contract's objective is also to guarantee, first, the single and concentrated exercise of the rights of the companies in the whole group, and second, the adoption of decisions concerning the direction, management, organisation and legal form of the company so that they are not hindered by a single shareholder or a small number of shareholders. . . . ;"

b.     Knauf Gips, Gebr. Knauf and its subsidiaries are all owned by the same 21 Knauf family members and a company formed by four other members of that family;

c.     The same two shareholders, both Knauf family members, managed all the Knauf entities, thus ensuring the single management and direction required by the Knauf Family Contract;

d.     Gebr. Knauf "is merely a holding company, without staff, managing the portfolio companies which its [*sic*] holds for the 22 shareholders which own it;" and

e.     Gebr. Knauf depends upon Knauf Gips for its managers and premises.

18.     Upon information and belief, Knauf Gips and Gebr. Knauf had a full and fair opportunity to contest the foregoing findings of the European Court of Justice.

19.     Upon information and belief, Knauf Tianjin manifests no corporate interests separate from those of Knauf; instead, it functions solely to achieve the goals established within the Knauf Family Contract by acting as the agent and/or alter ego of Gebr. Knauf, Knauf International, Knauf Gips, and/or Knauf Insulation.

20.     Upon information and belief, members of the Knauf family, including those individuals responsible for managing Knauf entities, have stated publicly that Knauf Tianjin is owned and operated by the Knauf Group.

21.     Upon information and belief, Knauf Gips, Gebr. Knauf, and Knauf International each individually participated, ratified, approved, and directed the improper acts and omissions of Knauf Tianjin.

22.     Upon information and belief, at all times relevant herein, under the direction and control of the Knauf family and/or the twenty-two shareholders of Knauf Gips and Gebr. Knauf:

a.     The sales and technical support staff of Knauf Gips provided support and services to all Knauf entities, including Knauf International, Knauf Tianjin, and Knauf Insulation;

b.     Knauf Gips was responsible for drywall production technology at Knauf Tianjin;

c.     Knauf Gips supervised, monitored, and controlled the manufacturing, marketing, and sales of drywall products manufactured by Knauf Tianjin;

d.     Knauf Gips was responsible for establishing, implementing, supervising, and maintaining quality control at Knauf Tianjin; and

e.     Knauf Tianjin advertised that its staff had been trained in Germany, German engineers were responsible for quality control, and Knauf Tianjin used Knauf equipment imported from Germany.

23.     Upon information and belief, at all times relevant herein, the Knauf family and Knauf Gips managed and controlled the worldwide branding and use of the "KNAUF" label on drywall products produced by the Knauf Group, including the defective products at issue in this case.

24.     Upon information and belief, at all times relevant herein, all Knauf entities shared marketing materials and website resources, including the display and use of the distinctive and exclusive "KNAUF" logo.

### KNAUF IS SUBJECT TO GENERAL PERSONAL JURISDICTION IN FLORIDA

25.     This Court has general personal jurisdiction over Knauf pursuant to federal law, Florida's long-arm statute, Fla. Stat. § 48.193, and due process because Knauf is engaged in substantial and not isolated activity within Florida.

26.     Knauf has engaged in substantial and not isolated activity in Florida by, *inter alia*: (1) exporting Knauf's products manufactured within the United States to other countries via a Miami-based exporter; (2) selling and marketing the defective drywall in this District and the State of Florida; (3) delivering tons of Knauf Drywall into this District and the State of Florida; (4) causing the defective drywall to reach Florida homeowners; and (5) engaging in fraudulent activity within this District and the State of Florida.

27.     Upon information and belief, Knauf maintains a presence in the United States, with physical plants in Indiana, California, and Alabama.  Knauf's U.S. operations export products through International Building Products Corporation, located in Miami.

28.     Upon information and belief, Knauf placed Knauf Drywall within the stream of commerce specifically targeting consumers in Florida and other U.S. states.  According to U.S. Customs and Census records, in 2006, Knauf Tianjin shipped at least 38.7 million pounds of Knauf Drywall directly from Knauf Tianjin to Florida through the Ports of Tampa, Canaveral, and Miami. Upon information and belief, Knauf Tianjin accounted for 78% of all Chinese-manufactured drywall imported into the United States in 2006.

29.     Upon information and belief, millions of pounds of defective Knauf Drywall were used in the construction of Florida homes.

### KNAUF IS SUBJECT TO SPECIFIC PERSONAL JURISDICTION IN FLORIDA

30.     This Court has personal jurisdiction over Knauf pursuant to federal law, Florida's long-arm statute, Fla. Stat. § 48.193, and due process because Knauf committed a tortious act within

the state.  Knauf is therefore subject to personal jurisdiction in the courts of Florida for any cause of action arising from the commission of that tortious act.

31.     Upon information and belief, Knauf committed tortious acts of fraud within the State of Florida by sending a representative, Prof. Hans-Ulrich Hummel, to Florida to sample and test the defective drywall installed in Florida homes, and then transmitting into the State of Florida, fraudulent and incomplete reports of test results to Banner and others.  The causes of action alleged herein arise from the commission of that fraud in Florida.

32.     Also, and in the alternative, this Court has personal jurisdiction over Knauf pursuant to federal law, Florida's long-arm statute, Fla. Stat. § 48.193, and due process because Knauf "[c]aus[ed] injury to . . . property within this state arising out of an act or omission by the defendant outside this state . . . [and] [p]roducts, materials, or things processed, serviced, or manufactured [by Knauf] anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use." Fla. Stat. § 48.193(1)(f).  Knauf is therefore subject to personal jurisdiction in the courts of Florida "for any cause of action arising from" the injuries caused by Knauf's acts or omissions.  Fla. Stat. § 48.193(1).

33.     Knauf caused injury to Banner and homeowners in Florida through acts and omissions occurring outside the State of Florida by designing, selecting, mining, manufacturing, assembling, processing, inspecting, testing, using, maintaining, marketing, advertising, soliciting, selling, offering, distributing, supplying, providing, delivering, exporting, and/or importing unfit, or otherwise defective drywall, which when used in the ordinary course of commerce caused property damage in the State of Florida.

34.     Knauf Tianjin has appeared in lawsuits filed in Florida's state and federal courts, as well as in *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL 2047 (E.D. La.), to defend claims relating to defective drywall.

10

35.     In the event the Court finds it has proper jurisdiction over the parties and the transactions at issue in this case for the purposes of hearing the Plaintiffs' suit, this Cross-Claim "aris[es] out of the [same] transaction or occurrence that is the subject matter of . . . the original action." Fla. R. Civ. P. 1.170.  Therefore, the Court should similarly find that it has jurisdiction over this Cross-Claim and over the Knauf Defendants since the underlying facts are identical.

## FACTUAL ALLEGATIONS

### BANNER PURCHASED AND SOLD KNAUF DRYWALL

36.     Banner obtained approximately one hundred million (100,000,000) square feet of Chinese-manufactured drywall, most of which was manufactured by Knauf.

37.     Upon information and belief, the Knauf Drywall purchased by Banner originated in Knauf Tianjin, and was sold to Banner via transactions conducted with Rothchilt International Ltd. ("Rothchilt") and La Suprema Trading, Inc. and La Suprema Enterprises, Inc. ("La Suprema"). Upon information and belief, at all times relevant herein, Rothchilt was Knauf Tianjin's exclusive export agent to Florida; and La Suprema was Rothchilt's exclusive import agent into Florida.

38.     Without modifying the Knauf Drywall in any way, Banner resold it to others in Florida.

39.     Upon information and belief, Knauf certified that the Knauf Drywall was of good quality as reflected in certificates of warranty, certificates of good condition, mill certificates, statements for letters of credit, ASTM certifications, and certificates of origin.

### KNAUF KNEW OR SHOULD HAVE KNOWN KNAUF DRYWALL WAS DEFECTIVE
#### *Knauf Entered Florida and Tested Knauf Drywall*

40.     In or around October 2006, several homebuilders complained that the Chinese-manufactured drywall Banner had distributed gave off an abnormal odor.  Banner contacted Knauf's agents and informed them of the complaints.

41.     Upon information and belief, at the time it was contacted about complaints, Knauf knew that the Knauf Drywall was defective.  Knauf has admitted it knew that Knauf Drywall was defective by the end of 2006.

42.     In 2006, at the instruction of a member of the Knauf family, Professor Hans-Ulrich Hummel, the head of research and development at Knauf Gips and a member of the board of directors at Knauf Gips, traveled to the State of Florida, inspected several homes built with Knauf Drywall, and secured samples of Knauf Drywall for testing.

43.     Upon information and belief, in November 2006, Knauf tested or commissioned the testing of the Knauf Drywall samples at Fraunhofer-Gesellschaft zur Förderung der angewandten Forschung e.V., through its subsidiary, Fraunhofer-Institut für Bauphysik, among other laboratories (the "Fraunhofer Testing").

44.     Upon information and belief, Knauf conducted internal testing of the Knauf Drywall samples at Knauf Gips and other Knauf entities.  Knauf also commissioned additional testing from other scientific institutions, including Air Sense and the Helmholtz Institute.

45.     The Fraunhofer Testing, along with tests conducted internally and by other institutions, included x-ray testing, gas chromatography testing, chemical composition testing, and odor-related testing revealed that Knauf Drywall was defective.

46.     Upon information and belief, Knauf also sent Mark Norris, an officer of Knauf Tianjin, to Florida in 2006 with representatives of a private consulting firm, the Center for Toxicology and Environmental Health ("CTEH"), hired by Knauf's counsel after Knauf knew that Knauf Drywall was defective and emitted sulfur containing compounds.

47.     Upon information and belief, before November 29, 2006, CTEH tested the Knauf Drywall samples.  If properly performed, these tests would have revealed that Knauf Drywall was defective.

## *Knauf Understood that Testing Revealed Knauf Drywall was Defective*

48.     Upon information and belief, on or before November 29, 2006, Knauf executives and employees, including Isabel Knauf, Baldwin Knauf, Nikolaus Knauf, Hans-Ulrich Hummel, Martin Halbach, David Gregory, Mark Norris, Hans-Peter Ingenillem, Tony Robson, and/or Ann Zhong, received reports that Knauf Drywall contained unsuitable quantities of sulfur compounds that would be released in gaseous form under certain circumstances, rendering Knauf Drywall defective and unfit for its intended use.

49.     On or about December 13, 2006, Knauf executives, including Isabel Knauf, Baldwin Knauf, Nikolaus Knauf, Martin Halbach, David Gregory, Hans-Peter Ingenillem, Wayne Studdon, and Joerg Schanow, received a report from Prof. Hans-Ulrich Hummel titled "Abschlussbericht zur Geruchsproblrmatik bei Knauf-Platten aus Tianjin:  Ursachen – Folgen – Lösungsansätze," or "Final Report on Odor Problem with Drywall from Tianjin: Causes-Consequences-Solutions" stating that the natural gypsum used to make Knauf Drywall contained organic sulfur compounds that were being released in gaseous form, rendering Knauf Drywall defective and unfit for its intended use.

50.     On June 8, 2011, Knauf admitted that upon learning the results of tests on Knauf Drywall in 2006, it knew that (i) defects in Knauf Drywall were the cause of the complaints Banner had received from homebuilders; (ii) the odor from Knauf Drywall sold to Banner was not the normal smell of "Chinese natural gypsum plasterboard," as Knauf informed Banner and others; and (iii) that the defect in Knauf Drywall could cause corrosion of metals commonly used in construction.

51.     Knauf has admitted that in October 2006, upon receiving the result of tests performed on Knauf Drywall, it immediately made material changes in the operations at Knauf Tianjin, modified the formula it used to make its drywall products, and then terminated its production of Knauf Drywall manufactured solely or primarily from natural gypsum.

## *Knauf Failed to Advise Banner that Knauf Drywall Was Defective*

52.     In spite of Knauf's promise to Banner that it would inform Banner of testing results, Knauf failed to disclose to Banner that Knauf Drywall was defective and instead concealed that information from Banner.

53.     Knauf failed to disclose to Banner complete results and analysis of the Fraunhofer Testing, as well as other testing conducted internally and by other institutions.

54.     Upon information and belief, altogether Knauf provided Banner with the partial testing results from CTEH, Knauf failed to provide complete results and misrepresented CTEH as an independent consultant,  Knauf entered into a purportedly privileged and confidential arrangement with CTEH, instructing Knauf's attorneys to oversee the testing of Knauf Drywall by CTEH and edit information sent to Knauf's customers to make it appear Knauf Drywall was not defective in any way.  Knauf arranged with CTEH that the results of CTEH's allegedly independent tests would not become public unless they could be portrayed as finding that Knauf Drywall was not defective.

55.     Upon information and belief, after consulting with Knauf's counsel and preparing several allegedly privileged drafts, CTEH issued a report to Knauf dated November 29, 2006 (the "CTEH Report").  In forwarding the CTEH Report to entities that purchased Knauf Drywall, Knauf represented that Knauf Drywall was not defective because "the difference in smell is no more than the difference between Chinese natural gypsum plasterboard and synthetic plasterboard." Knauf omitted any reference to the fact that independent testing labs and Knauf itself had already concluded that Knauf Drywall was defective and  that accelerated metal corrosion would result from the defect.

56.     Upon information and belief, Knauf's employees, officers and attorneys censored drafts of CTEH's report to withhold evidence that Knauf Drywall was defective and unfit for its intended use or purpose.

**KNAUF MISREPRESENTED MATERIAL FACTS TO BANNER**

57.     Knauf had a duty to warn Banner and Florida consumers about the hazards of Knauf Drywall, but failed to do so.  Instead, Knauf falsely represented to Banner, both affirmatively and by omission, that Knauf Drywall was not defective.  Knauf's assurances were incomplete, inaccurate and misleading because, for example, they omitted any mention of the risk of potential property corrosion, despite Knauf's knowledge of this risk.

58.     Knauf also misrepresented CTEH as an independent, nationally recognized expert, instead of disclosing Knauf's privileged and confidential relationship with CTEH or the fact that CTEH consulted with Knauf's attorneys when preparing the CTEH Report.

**BANNER REASONABLY RELIED UPON KNAUF'S REPRESENTATIONS**

59.     In late 2006 and early 2007, Banner only had knowledge of a smell emitted by Knauf Drywall, which Knauf assured was the natural smell of Chinese drywall. Banner lacked any knowledge that Knauf Drywall contained substances that could cause corrosion to metals used in construction.

60.     Upon information and belief, Knauf is one of the world's foremost drywall manufacturers, which possesses knowledge and expertise superior to the knowledge of a distributor or  supplier such as Banner, with regard to the adverse effects caused by the emission of sulfur compounds from gypsum.

61.     Upon information and belief, Knauf also possessed superior knowledge concerning the composition of Knauf Drywall, the sources of Knauf's gypsum, Knauf's manufacturing processes, and Knauf's quality control procedures for ensuring that Knauf Drywall meets applicable standards.

62.     Upon information and belief, Knauf recognized its superior knowledge and intended that Banner, a mere intermediary in the distribution chain, rely upon Knauf's representations

concerning the fitness of Knauf Drywall.  When meeting with concerned members of the construction industry while gathering samples of Knauf Drywall in Florida, Knauf distributed materials describing the Knauf Group, with the explicit intention of providing comfort and inspiring reliance upon Knauf's worldwide reputation and expertise.

63.     Banner did, in fact, rely upon Knauf's expertise and superior knowledge regarding the fitness of Knauf Drywall, as well as Knauf's representations relating to the same.

64.     Knauf offered to replace a portion of the drywall it sold to Banner with American-made drywall, so long as Banner agreed to release Knauf "from and against all claims, demands, damages, liabilities, expenses, and causes of action, including, but not limited to, property, product liability, diminution of value, trespass, nuisance, negligence, stigma, medical monitoring, personal injury, bodily injury and third-party claims, which were or could be claimed by [Banner]" arising from Knauf Drywall.

65.     Knauf's affirmative misrepresentations and misrepresentations by omission were material inducements to enter into this settlement agreement, which also required Banner to "keep confidential the terms and provisions of the Settlement Agreement," and "not make statements regarding any perceived or actual smell or health risks relating to Knauf Tianjin plasterboard."  This settlement agreement (the "Knauf Agreement") was fully executed by all parties as of February 13, 2007.  Knauf did not provide adequate consideration for Banner's agreement.

### IN THE ALTERNATIVE, KNAUF AND BANNER WERE MUTUALLY MISTAKEN

66.     The lack of defect in Knauf Drywall was a central and basic tenet of the Knauf Agreement.  If Knauf was unaware of the defect in Knauf Drywall, then, like Banner, Knauf was mistaken as to a material fact underlying the terms of the Knauf Agreement.

67.     The parties' mutual mistake as to the actual risks and detrimental impacts associated with Knauf Drywall is material to the parties' performance under the Knauf Agreement.

68.     If Banner had known of the actual risks associated with Knauf Drywall, it would not have executed the Knauf Agreement.

69.     However, as a result of the mutual mistake, the parties agreed that Banner would keep confidential the existence and terms of the Knauf Agreement, and would not make any statements regarding risks associated with Knauf Drywall.

70.     Due to both Knauf's concealment of the defective nature of its drywall and Knauf's imposition of a contractually-mandated gag, Banner has been sued by numerous parties for failing to warn its customers about potential property damage caused by Knauf Drywall.

71.     Only after Knauf was ordered to produce documents in the District Court for the Eastern District of Louisiana, *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL 2047 (E.D. La.), and the Court ordered depositions of Knauf executives to proceed, did Banner first become aware of evidence demonstrating that Knauf knew of the defective nature of Knauf Drywall at the time it induced Banner to enter the Knauf Agreement.

72.     On February 16, 2011, Banner rescinded the Knauf Agreement.

### BANNER HAS BEEN DAMAGED BY KNAUF'S SUPPLY OF DEFECTIVE DRYWALL AND FRAUDULENT MISREPRESENTATIONS

73.     Banner's distribution of Knauf Drywall, and reliance upon Knauf's assurances regarding the same, caused Banner to lose prominent customers and suffer significant damage to its business, reputation, and goodwill.

74.     Banner has been forced to defend itself against claims relating to about 3,000 properties allegedly containing Knauf Drywall distributed by Banner, even though Banner was merely an innocent intermediary that unwittingly sold a defective product.

## CAUSES OF ACTION

### FIRST CLAIM

### *Fraud and Deceit*

75.     Banner adopts and restates paragraphs 1 to 74 as if fully set forth herein.

76.     Banner asserts a claim against Knauf for fraud and deceit.

77.     Knauf has admitted that in 2006, it knew that Knauf Drywall was defective  and that the sulfur compounds found in the Knauf Drywall emit a gas that could cause metal corrosion.

78.     Upon information and belief, with this knowledge, Knauf fraudulently:

        a.      misrepresented to Banner that Knauf Drywall was not defective;

        b.      failed to disclose the potentially corrosive effects that could be caused by the sulfur compounds emitted by Knauf Drywall;

        c.      failed to disclose complete authorizing instructions, results, and analysis of all internal and external testing commissioned and conducted upon Knauf Drywall; and

        d.      misrepresented CTEH as an independent expert, instead of disclosing Knauf's purported engagement of CTEH as a "consulting expert" or the fact that CTEH consulted with Knauf's attorneys when preparing the CTEH Report.

79.     Upon information and belief, Knauf made these representations either knowing they were false, or willfully, wantonly, and recklessly disregarding whether they were true.

80.     Upon information and belief, Knauf failed to provide complete, relevant, and material information when making statements regarding the fitness of Knauf Drywall.

81.     At all times relevant herein, Knauf possessed superior knowledge and expertise in gypsum manufacturing and production, the chemical composition of Knauf Drywall, the effect of installing Knauf Drywall in various climates, and the potentially corrosive nature of sulfur compounds emitted from Knauf Drywall.

82.     At all times relevant herein, Banner lacked knowledge of or related to whether Knauf Drywall was fit for normal use, and the potentially corrosive effect of sulfur compounds emitted from Knauf Drywall.

83.     Knauf intended for Banner to rely upon its representations that Knauf Drywall was neither hazardous nor defective.

84.     Upon information and belief, Knauf distributed material providing information about the Knauf Group to representatives of corporate entities within the chain of distribution of Knauf Drywall, with the explicit intention of providing comfort and inspiring reliance upon Knauf's worldwide reputation and expertise.

85.     Banner justifiably relied on Knauf's fraudulent representations that Knauf Drywall was not defective.

86.     In reliance upon, and as a direct and proximate result of Knauf's fraudulent statements and omissions declaring that Knauf Drywall was not defective, and that "the smell is no more than the difference between Chinese natural gypsum and synthetic plasterboard," Banner executed the Knauf Agreement, which has now been rescinded.

87.     In reliance upon, and as a direct and proximate result of Knauf's fraudulent statements and omissions, Banner did not warn customers purchasing Knauf Drywall that the product was defective, or inform customers who had previously purchased Knauf Drywall from Banner that remedial measures should be taken to prevent property damage where Knauf Drywall was installed.

88.     As a direct and proximate result of Knauf's fraudulent statements and omissions, Banner's reputation as a supplier of construction products has been severely damaged and its business has been exposed to significant liabilities in an amount to be proven at trial.

89.     Such damages include, but are not limited to, payments made and expenses incurred in the remediation of homes containing Knauf Drywall supplied by Banner, lost profits, loss of goodwill, and damage to Banner's reputation.

## SECOND CLAIM

### *Fraudulent Misrepresentation*

90.     Banner adopts and restates the paragraphs 1 to 74 as if fully set forth herein.

91.     Banner asserts a claim against Knauf for fraudulent misrepresentation.

92.     Upon information and belief, Knauf fraudulently misrepresented to Banner:

a.     that Knauf Drywall was not defective;

b.     the potentially corrosive effects that could be caused by the sulfur compounds emitted by Knauf Drywall;

c.     the complete authorizing instructions, results, and analysis of all internal and external testing commissioned and conducted upon Knauf Drywall; and

d.     that CTEH was an independent expert, instead of disclosing Knauf's purported engagement of CTEH as a "consulting expert" or the fact that CTEH consulted with Knauf's attorneys when preparing the CTEH Report.

93.     Upon information and belief, Knauf made these fraudulent misrepresentations either knowing they were false, or willfully, wantonly, and recklessly disregarding whether they were true.

94.     Upon information and belief, Knauf failed to provide complete, relevant and material information when making statements regarding the use of Knauf Drywall.

95.     At all times relevant herein, Knauf possessed superior knowledge and expertise in gypsum manufacturing and production, the chemical composition of Knauf Drywall, the effect of installing Knauf Drywall in various climates, and the potentially corrosive nature of sulfur compounds emitted from Knauf Drywall.

96.     At all times relevant herein, Banner lacked knowledge of or related to whether Knauf Drywall was fit for normal use, and the potentially corrosive effect of sulfur compounds emitted from Knauf Drywall.

97.     Knauf intended for Banner to rely upon its representations that Knauf Drywall was not defective.

98.     Upon information and belief, Knauf distributed material providing information about the Knauf Group to representatives of corporate entities within the chain of distribution of Knauf Drywall, with the explicit intention of providing comfort and inspiring reliance upon Knauf's worldwide reputation and expertise.

99.     Banner justifiably relied on Knauf's fraudulent misrepresentations that Knauf Drywall was not defective.

100.    In reliance upon, and as a direct and proximate result of Knauf's fraudulent misrepresentations declaring that "the smell [of Knauf Drywall] is no more than the difference between Chinese natural gypsum and synthetic plasterboard," Banner executed the Knauf Agreement, which has now been rescinded.

101.    In reliance upon, and as a direct and proximate result of Knauf's fraudulent misrepresentations, Banner did not warn customers purchasing Knauf Drywall that the product was defective, or inform customers who had previously purchased Knauf Drywall from Banner that remedial measures should be taken to prevent property damage where Knauf Drywall was installed.

102.    As a direct and proximate result of Knauf's fraudulent misrepresentations, Banner's reputation as a supplier of construction products has been severely damaged and its business has been exposed to significant liabilities in an amount to be proven at trial.

103.     Such damages include, but are not limited to, payments made and expenses incurred in the remediation of homes containing Knauf Drywall supplied by Banner, lost profits, loss of goodwill, and damage to Banner's reputation.

### THIRD CLAIM

### _Negligent Misrepresentation_

104.     Banner adopts and restates the paragraphs 1 to 74 as if fully set forth herein.

105.     In the alternative, Banner asserts a claim against Knauf for negligent misrepresentation.

106.     Upon information and belief, Knauf made the misrepresentations alleged in paragraph 92 either knowing they were false, or under circumstances in which Knauf ought to have known they were false.

107.     Knauf intended for Banner to rely upon the misrepresentations as alleged in paragraph 92.

108.     Banner justifiably relied upon Knauf's misrepresentations as alleged in paragraph 92.

109.     In reliance upon, and as a direct and proximate result of Knauf's negligent misrepresentations declaring that "the smell [of Knauf Drywall] is no more than the difference between Chinese natural gypsum and synthetic plasterboard," Banner executed the Knauf Agreement, which has now been rescinded.

110.     In reliance upon, and as a direct and proximate result of Knauf's negligent misrepresentations, Banner did not warn customers purchasing Knauf Drywall that the product was defective, or inform customers who had previously purchased Knauf Drywall from Banner that remedial measures should be taken to prevent property damage where Knauf Drywall was installed.

111.    As a direct and proximate result of Knauf's negligent misrepresentations, Banner's reputation as a supplier of construction products has been severely damaged and its business has been exposed to significant liabilities in an amount to be proven at trial.

112.    Such damages include, but are not limited to, payments made and expenses incurred in the remediation of homes containing Knauf Drywall supplied by Banner, lost profits, loss of goodwill, and damage to Banner's reputation.

### FOURTH CLAIM

### *Fraudulent Concealment*

113.    Banner adopts and restates paragraphs 1 to 74 as if fully set forth herein.

114.    Banner asserts a claim against Knauf for fraudulent concealment.

115.    Upon information and belief, Knauf fraudulently concealed from Banner, and/or intentionally omitted:

      a.    that Knauf Drywall was defective;

      b.    the potentially corrosive effects that could be caused by the sulfur compounds emitted by Knauf Drywall;

      c.    the complete authorizing instructions, results, and analysis of all internal and external testing commissioned and conducted upon Knauf Drywall; and

      d.    that CTEH was not an independent expert; that Knauf had sought to enter into a purportedly privileged relationship with CTEH; and that CTEH consulted with Knauf's attorneys when preparing the CTEH Report.

116.    At all times relevant herein, Knauf had knowledge of the material facts regarding Knauf Drywall as alleged herein.

117.    At all times relevant herein, knowledge of the material facts regarding Knauf Drywall alleged herein was not within the reasonably diligent attention, observation or judgment of Banner.

118.     Upon information and belief, at all times relevant herein, Knauf's concealment and omission of material facts concerning Knauf Drywall was made purposefully, willfully, wantonly, and/or recklessly to mislead Banner and others that Knauf Drywall was not defective and fit for continued installation.

119.     Banner was reasonably misled by Knauf's fraudulent concealment and/or intentional omission of material facts concerning Knauf Drywall.

120.     As a direct and proximate result of Knauf's fraudulent concealment and/or intentional omission of material facts concerning Knauf Drywall, Banner executed the Knauf Agreement, which should now be rescinded.

121.     As a direct and proximate result of Knauf's fraudulent concealment and/or intentional omission of material facts concerning Knauf Drywall, Banner has incurred damages, including payments made and expenses incurred in the remediation of homes containing Knauf Drywall supplied by Banner, lost profits, loss of goodwill, and damage to Banner's reputation.

## FIFTH CLAIM

### *Florida Deceptive and Unfair Trade Practices Act*

122.     Banner adopts and restates paragraphs 1 to 74 as if fully set forth herein.

123.     Banner asserts a claim against Knauf for violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-501.213 (2011).

124.     Banner is a "Consumer" within the meaning of Fla. Stat. § 501.203(7).

125.     Knauf's advertising, soliciting, providing, offering, and/or distributing Knauf Drywall constitutes "Trade or Commerce" within the meaning of Fla. Stat. § 501.203(8).

126.     Knauf's acts and omissions as fully set forth herein constitute "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" that are unlawful pursuant to Fla. Stat. § 501.204(1).

127.     As a result of such acts and omissions that violate Fla. Stat. § 501.204(1), Banner has suffered losses including, but not limited to, lost profits, damage to Banner's reputation, and loss of goodwill, which constitute actual damages for which Banner is entitled to relief pursuant Fla. Stat. § 501.211(2).

128.     Banner is also entitled to recover its reasonable attorneys' fees and costs upon prevailing in this matter pursuant to Fla. Stat. § 501.2105.

### SIXTH CLAIM

### *Negligence*

129.     Banner adopts and restates paragraphs 1 to 74 as if fully set forth herein.

130.     Banner asserts a claim against Knauf for negligence.

131.     Knauf owed a duty to Banner to exercise reasonable care in the design, selection, mining, manufacture, assembly, processing, inspection, testing, use, maintenance, marketing, advertising, soliciting, sale, offering, distribution, supply, provision, delivery, export, and/or import of Knauf Drywall, including a duty to adequately warn Banner of Knauf's failure to do the same. Specifically, Knauf's duty included, but was not limited to, using reasonable care to do the following:

   a.     design, select, mine, manufacture, assemble, process, inspect, test, use, and maintain Knauf Drywall to prevent the advertising, soliciting, sale, offering, distribution, supply, provision, delivery, export, and/or import of Knauf Drywall containing the defects alleged herein, including the emission of sulfur compounds capable of causing the corrosion of metals;

   b.     select and test the gypsum used in the manufacture of Knauf Drywall to ensure that the Knauf Drywall did not contain excessive levels of sulfur compounds;

25

c.      conduct regularly scheduled maintenance at Knauf Tianjin to prevent defects in Knauf Drywall;

d.      refrain from designing, selecting, mining, manufacturing, assembling, processing, inspecting, testing, using, maintaining, marketing, advertising, soliciting, selling, offering, distributing, supplying, providing, delivering, exporting, and/or importing Knauf Drywall without sufficient knowledge as to the product's manufacturing defects;

e.      provide adequate warning as to the defective nature of Knauf Drywall and risk of damages arising therefrom; and

f.      refrain from misrepresenting that Knauf Drywall was fit for its intended purpose and not defective, as well as the severity of known defects.

132.   Knauf was negligent and breached its duty to exercise reasonable care in the design, selection, mining, manufacture, assembly, processing, inspection, testing, use, maintenance, marketing, advertising, soliciting, sale, offering, distribution, supply, provision, delivery, export, and/or import of Knauf Drywall, including a duty to adequately warn of its failure to do the same. Knauf's breaches of duty included, but were not limited to the following:

a.      failing to use reasonable care in the design, selection, mining, manufacture, assembly, processing, inspection, testing, use, maintenance, marketing, advertising, soliciting, sale, offering, distribution, supply, provision, delivery, export, and/or import of Knauf Drywall, to prevent Knauf Drywall from containing defects as set forth herein, including the emission of sulfur compounds capable of causing the corrosion of metals;

b.      failing to use reasonable care in the selection, mining, inspection, and testing of the gypsum used in the manufacture, assembly, and/or processing of Knauf Drywall to ensure that the Knauf Drywall did not contain excessive levels of sulfur compounds;

c. failing to use reasonable care to conduct regularly scheduled maintenance at Knauf Tianjin to prevent defects in Knauf Drywall;

d. failing to use reasonable care to refrain from designing, selecting, mining, manufacturing, assembling, processing, inspecting, testing, using, maintaining, marketing, advertising, soliciting, selling, offering, distributing, supplying, providing, delivering, exporting, and/or importing Knauf Drywall without sufficient knowledge as to the product's manufacturing defects;

e. failing to use reasonable care to provide adequate warning as to the defective nature of Knauf Drywall; and

f. failing to use reasonable care to refrain from misrepresenting that Knauf Drywall was fit for its intended purpose and not defective, as well as the severity of known defects.

133. As a direct and proximate result of Knauf's negligence, Banner has incurred damages, including payments made and expenses incurred in the remediation of homes containing Knauf Drywall supplied by Banner, lost profits, loss of goodwill, and damage to Banner's reputation.

## SEVENTH CLAIM

### *Strict Liability*

134. Banner adopts and restates paragraphs 1 to 74 as if fully set forth herein.

135. Banner asserts a claim against Knauf for strict liability.

136. At all times relevant hereto, Knauf conducted business designing, selecting, mining, manufacturing, assembling, processing, inspecting, testing, using, maintaining, marketing, advertising, soliciting, selling, offering, distributing, supplying, providing, delivering, exporting, and/or importing Knauf Drywall.

137.    All Knauf Drywall supplied by Banner was placed in the stream of commerce by Knauf and was specifically targeted to Banner, other Florida consumers, and consumers in other states.

138.    Knauf intended that Knauf Drywall reach Banner and the ultimate consumer, homeowners, in substantially the same condition as designed, selected, mined, manufactured, assembled, processed, inspected, tested, used, maintained, marketed, advertised, solicited, sold, offered, distributed, supplied, provided, delivered, exported, and/or imported by Knauf.

139.    Banner and homeowners received the Knauf Drywall in substantially the same condition as designed, selected, mined, manufactured, assembled, processed, inspected, tested, used, maintained, marketed, advertised, solicited, sold, offered, distributed, supplied, provided, delivered, exported, and/or imported by Knauf.

140.    At all times relevant hereto, the Knauf Drywall was used in a manner consistent with the uses intended by, or known to, Knauf and in accordance with Knauf's directions and instructions.

141.    Upon information and belief, the Knauf Drywall designed, selected, mined, manufactured, assembled, processed, inspected, tested, used, maintained, marketed, advertised, solicited, sold, offered, distributed, supplied, provided, delivered, exported, and/or imported by Knauf was defective.

142.    Knauf Drywall was defective in design because Knauf Drywall failed to perform as an ordinary customer would expect when used in an intended or reasonably foreseeable manner.

143.    Upon information and belief, at all times relevant herein, the process designed by Knauf to design, select, mine, manufacture, assemble, process, inspect, test, use, maintain, market, advertise, solicit, sell, offer, distribute, supply, provide, deliver, export, and/or import Knauf Drywall failed to remove sufficient impurities from Knauf Drywall to prevent corrosive sulfur compounds from being emitted from Knauf Drywall and damaging property.

144.    At all times relevant herein, on balance, the benefits of Knauf's design of the process for designing, selecting, mining, manufacturing, assembling, processing, inspecting, testing, using, maintaining, marketing, advertising, soliciting, selling, offering, distributing, supplying, providing, delivering, exporting, and/or importing Knauf Drywall did not outweigh the risk of danger inherent in such design.

145.    Upon information and belief, Knauf Drywall was defective as manufactured and emitted corrosive sulfur compounds that damaged property.

146.    Upon information and belief, Knauf designed, selected, mined, manufactured, assembled, processed, inspected, tested, used, and/or maintained Knauf Drywall, and/or any of its composite parts in a manner insufficient to remove impurities from Knauf Drywall, caused sulfur compounds to be emitted from Knauf Drywall that damaged property.

147.    Upon information and belief, Knauf is also strictly liable for failing to adequately warn Banner and homeowners of the risk that sulfur compounds would be emitted from Knauf Drywall, which Knauf knew or should have known in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of the design, selection, mining, manufacture, assembly, processing, inspection, testing, use, maintenance, marketing, advertising, soliciting, sale, offering, distribution, supply, provision, delivery, export, and/or import of Knauf Drywall.

148.    Banner was unaware of the defective nature of Knauf Drywall, and could not have reasonably discovered that Knauf Drywall was defective.

149.    The manufacturing and design defects in Knauf Drywall, as well as Knauf's failure to adequately warn Banner of Knauf Drywall's defective nature, were the direct and proximate cause of damages to Banner, including payments made and expenses incurred in the remediation of homes

containing Knauf Drywall supplied by Banner, lost profits, loss of goodwill, and damage to Banner's reputation.

## EIGHTH CLAIM

### *Equitable and/or Common Law Indemnification*

150.    Banner adopts and restates paragraphs 1 to 74 as if fully set forth herein.

151.    Banner asserts a claim against Knauf for equitable and/or common law indemnification.

152.    Upon information and belief, Knauf is vicariously, constructively, derivatively, and/or technically liable for any allegedly wrongful act of Banner arising out of Banner's distribution of Knauf Drywall.

153.    As an innocent intermediary, Banner has a clear right to indemnification from Knauf, as Banner is entirely without fault in causing any loss, and all Banner's liability to any third party or Plaintiffs arising out of Banner's distribution of Knauf Drywall results solely from Knauf's wrongful design, selection, mining, manufacture, assembly, processing, inspection, testing, use, maintenance, marketing, advertising, soliciting, sale, offering, distribution, supply, provision, delivery, export, and/or import of a defective product.

## NINTH CLAIM

### *Contribution*

154.    Banner adopts and restates paragraphs 1 to 74 as if fully set forth herein.

155.    Banner did not manufacture the Knauf Drywall that allegedly damaged Plaintiffs and others; and, thus, is not ultimately responsible for the damages alleged by Plaintiffs and others arising out of Banner's distribution of Knauf Drywall.

156.    However, if as a result of Banner's distribution of Knauf Drywall, Banner is held liable for all or any part of Plaintiffs' alleged damages, Knauf, as joint tortfeasor would be obligated

to contribute, reimburse and is liable to Banner for any payment by Banner of such alleged damages to the extent such payment exceeds Banner's pro rata share of liability.

### TENTH CLAIM

### *Mutual Mistake*

157.    Banner adopts and restates paragraphs 1 to 74 as if fully set forth herein.

158.    In the alternative, Banner asserts a claim against Knauf for mutual mistake with respect to the Knauf Agreement.

159.    If Knauf was reasonably unaware at the time of the Knauf Agreement that Knauf Drywall would cause property damage through emission of sulfur compounds, then both Knauf and Banner were mistaken as to whether Knauf Drywall was defective.

160.    Banner and Knauf entered into the Knauf Agreement, whereby Banner released all claims against Knauf related to Knauf Drywall, due to the basic assumption and essential belief in Knauf's representations that Knauf Drywall was not defective.

161.    Knauf's assertion that Knauf Drywall was not defective had a material effect on the bargain as it induced Banner not only to release Banner's claims against Knauf, but also to keep the existence and terms of the Knauf Agreement confidential.

162.    The confidentiality demanded by the Knauf Agreement prevented Banner from notifying Banner's customers that Knauf Drywall was defective, and led to accusations of fraud and collusion with Knauf.

163.    The Knauf Agreement did not place the risk of mistake on Banner.

164.    As a result of this mutual mistake, Banner seeks rescission of the Knauf Agreement.

### PRAYER FOR RELIEF

WHEREFORE, Cross-Claim Plaintiffs request that this Court:

A.      rescind the Knauf Agreement;

B.      enter judgment against Cross-Claim Defendants for all damages caused by their conduct, including, but not limited to, payments made and expenses incurred in the remediation of homes containing Knauf Drywall supplied by Banner, lost profits, loss of goodwill, and damage to Banner's reputation;

C.      award Cross-Claim Plaintiffs their reasonable litigation expenses, costs, and attorneys' fees;

D.      award Cross-Claim Plaintiffs pre- and post-judgment interest, to the extent allowable by law;

E.      award injunctive and/or declaratory relief as is necessary to protect the interests of Cross-Claim Plaintiffs; and

F.      award such other and further relief as equity and justice may require.

## DEMAND FOR JURY TRIAL

Cross-Claim Plaintiffs hereby demand a trial by jury as to all issues so triable as a matter of right.

Respectfully submitted this 13th day of July, 2011,

**WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC**

*/s/ Michael A. Sexton*
**MICHAEL A. SEXTON**
**NICHOLAS P. PANAYOTOPOULOS**
mailto:3344 Peachtree Road, Suite 2400
Atlanta, GA 30326
Telephone: (404) 876-2700
Fax: (404) 875-9433
msexton@wwhgd.com

***Counsel for Banner Supply Co.; Banner Supply Company Pompano, LLC; Banner Supply Company Fort Myers, LLC; Banner Supply Company Tampa, LLC; and Banner Supply International, LLC***

**PETERSON & ESPINO, P.A.**

*/s/ Michael P. Peterson*
**MICHAEL P. PETERSON**
10631 North Kendall Drive, Suite 220
Miami, FL 33176
Telephone: (305) 270-3773
Fax: (305) 275-7410
mpeterson@petersonespino.com

***Counsel for Banner Port St. Lucie, LLC***

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Cross-Claim and Amended Cross-Claim Against Knauf has been served on Plaintiffs' Liaison Counsel Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by e-mail; and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pretrial Order No. 6, in accordance with the procedures established in MDL 2047, on this 13th day of July, 2011.

*/s/ Michael A. Sexton*
**MICHAEL A. SEXTON**

***Counsel for Banner Supply Co.; Banner Supply Company Pompano, LLC; Banner Supply Company Fort Myers, LLC; Banner Supply Company Tampa, LLC; and Banner Supply International, LLC***

# EXHIBIT A

JUDGMENT OF THE COURT (Second Chamber)

1 July 2010 (*)

(Appeal – Agreements, decisions and concerted practices – Plasterboard – Access to the file – Inculpatory and exculpatory evidence – Concept of 'undertaking' – Economic unit – Company responsible for the economic unit's actions – Argument raised for the first time during the judicial proceedings)

In Case C-407/08 P,

APPEAL under Article 56 of the Statute of the Court of Justice, brought on 19 September 2008,

**Knauf Gips KG,** formerly Gebrüder Knauf Westdeutsche Gipswerke KG, established in Iphofen (Germany), represented by M. Klusmann and S. Thomas, Rechtsanwälte,

appellant,

the other party to the proceedings being:

**European Commission,** represented by F. Castillo de la Torre and R. Sauer, acting as Agents, with an address for service in Luxembourg,

defendant at first instance,

THE COURT (Second Chamber),

composed of J.N. Cunha Rodrigues, President of the Chamber, P. Lindh, U. Lõhmus, A. Ó Caoimh and A. Arabadjiev (Rapporteur), Judges,

Advocate General: J. Mazák,

Registrar: K. Malacek, Administrator,

having regard to the written procedure and further to the hearing on 22 October 2009,

after hearing the Opinion of the Advocate General at the sitting on 11 February 2010,

gives the following

**Judgment**

1   By its appeal, Knauf Gips KG, formerly Knauf Westdeutsche Gipswerke KG ('Knauf' or 'the appellant'), seeks the setting aside of the judgment of 8 July 2008 of the Court of First Instance of the European Communities (now 'the General Court') in Case T-52/03 *Knauf Gips* v *Commission* ('the judgment under appeal'), by which it dismissed Knauf's application for annulment of Commission Decision 2005/471/EC of 27 November 2002 relating to proceedings

under Article 81 of the EC Treaty against BPB PLC, Gebrüder Knauf Westdeutsche Gipswerke KG, Société Lafarge SA and Gyproc Benelux NV (Case No COMP/E-1/37.152 – Plasterboard) (OJ 2005 L 166, p. 8; 'the contested decision').

## Legal context

2    Article 15(2) of Council Regulation No 17 of 6 February 1962: First Regulation implementing Articles [81] and [82] of the Treaty (OJ, English Special Edition 1959-1962, p. 87) provided:

'The Commission may by decision impose on undertakings or associations of undertakings fines of from 1 000 to 1 000 000 units of account, or a sum in excess thereof but not exceeding 10% of the turnover in the preceding business year of each of the undertakings participating in the infringement where, either intentionally or negligently:

(a)    they infringe Article [81] (1) [EC] or Article [82 EC] …

…'

## Facts

3    In the judgment under appeal, the General Court summarised the facts which gave rise to the proceedings before it as follows:

'1    The applicant Knauf … , manufactures and markets plaster-based building materials.

2    The applicant is a limited partnership created under German law. All its capital is owned by 21 members of the Knauf family and a company which holds the shares of four other members. The personally liable managing partners are Mr B and Mr C.

3    On the basis of information received, on 25 November 1998 the Commission carried out unannounced inspections at the premises of eight undertakings operating in the plasterboard sector, including the applicant and other undertakings in the Knauf Group. On 1 July 1999, it pursued its investigations at the premises of two other undertakings.

4    The Commission then sent requests for information under Article 11 of Council Regulation No 17 … to the various undertakings concerned. It requested information concerning certain documents obtained from those undertakings' premises during the inspections in November 1998 and July 1999. Knauf replied thereto on 14 September 1999.

5    On 18 April 2001, the Commission initiated the administrative procedure in this case and adopted a statement of objections ['the statement of objections'], which it addressed to the undertakings BPB PLC ['BPB'], Knauf, Société Lafarge SA ('Lafarge'), Etex SA and Gyproc Benelux NV ('Gyproc'). The undertakings concerned submitted their written observations and were given access to the Commission's investigation file in the form of a copy on CD-Rom which was sent to them on 17 May 2001.

6    The applicant replied to the statement of objections by letter of 6 July 2001.

7    Hearings took place on 17 July 2001. BPB and Gyproc presented part of their case *in*

*camera*.

8    By letter of 10 August 2001, the Hearing Officer sent non-confidential versions of BPB's and Gyproc's documents to the applicant.

9    By letter of 20 August 2001, the applicant requested access to all the documents which had been added to the file since the dispatch of the CD-ROM and, in particular, to the replies of the other undertakings concerned by the administrative procedure to the statement of objections.

10   On 7 September 2001, the Hearing Officer sent to the applicant three additional documents which Lafarge had sent to the Commission following the hearing of 17 July 2001.

11   By letter of 11 September 2001, the Commission rejected the applicant's request of 20 August 2001 for access to the other documents in the file.

12   On 19 November 2002, the Hearing Officer adopted his report.

13   On 27 November 2002, the Commission adopted the [contested] decision.

14   The operative part of the [contested] decision states:

'Article 1

BPB … , the Knauf Group, … Lafarge … and Gyproc … have infringed Article 81(1) [EC] by participating in a set of agreements and concerted practices in the plasterboard business.

The duration of the infringement was as follows:

(a)    BPB …: from 31 March 1992, at the latest, to 25 November 1998;

(b)    [the] Knauf [Group]: from 31 March 1992, at the latest, to 25 November 1998;

(c)    … Lafarge …: from 31 August 1992, at the latest, to 25 November 1998;

(d)    Gyproc …: from 6 June 1996, at the latest, to 25 November 1998;

…

Article 3

In respect of the infringement referred to in Article 1, the following fines are imposed on the following undertakings:

(a)    BPB …: EUR 138.6 million;

(b)    … Knauf …: EUR 85.8 million;

(c)    … Lafarge …: EUR 249.6 million;

(d)     Gyproc …: EUR 4.32 million;

…'

15    The Commission found in the [contested] decision that the undertakings concerned participated in a single and continuous agreement which was manifested in the following conduct constituting agreements or concerted practices:

–     the representatives of BPB and Knauf met in London (United Kingdom) in 1992 ['the London meeting'] and expressed the common desire to stabilise the plasterboard markets in Germany, the United Kingdom, France and the Benelux;

–     the representatives of BPB and Knauf established, as from 1992, information exchange arrangements, to which Lafarge and subsequently Gyproc acceded, relating to their sales volumes on the German, French, United Kingdom and Benelux plasterboard markets;

–     the representatives of BPB, Knauf and Lafarge exchanged information, on various occasions, prior to price increases on the United Kingdom market;

–     in view of particular developments on the German market, the representatives of BPB, Knauf, Lafarge and Gyproc met at Versailles (France) in 1996, Brussels (Belgium) in 1997 and The Hague (Netherlands) in 1998 with a view to sharing out or at least stabilising the German market;

–     the representatives of BPB, Knauf, Lafarge and Gyproc exchanged information on various occasions and concerted their action on the application of price increases on the German market between 1996 and 1998.

16    For the purpose of calculating the amount of the fine, the Commission applied the methods set out in its Guidelines on the method of setting fines imposed pursuant to Article 15(2) of Regulation No 17 and Article 65(5) of the ECSC Treaty (OJ 1998 C 9, p. 3; 'the Guidelines').

17    In fixing the starting amount of the fines, determined according to the gravity of the infringement, the Commission initially considered that the undertakings concerned had committed an infringement which was very serious by its very nature in so far as the aim of the practices at issue was to put an end to the price war and to stabilise the market through exchanges of confidential information. The Commission also considered that the practices at issue had had an impact on the market, since the undertakings concerned represented almost all plasterboard supply and the various manifestations of the cartel had been put into practice in a highly concentrated and oligopolistic market. As regards the geographic extent of the relevant market, the Commission considered that the cartel had covered the four main European Community markets, namely Germany, the United Kingdom, France and the Benelux.

18    Considering, next, that there was a considerable disparity between the undertakings concerned, the Commission took a differentiated approach, relying for that purpose on the sales turnover for the product concerned on the relevant markets during the last complete year of the infringement. On that basis, the starting amount of the fines was set

at EUR 80 million for BPB, EUR 52 million for Knauf and Lafarge and EUR 8 million for Gyproc.

19      In order to ensure that the fine had a sufficiently deterrent effect having regard to the size and global resources of the undertakings, the starting amount of the fine imposed on Lafarge was increased by 100%, becoming EUR 104 million.

20      In order to take account of the duration of the infringement, the starting amount was then increased by 65% for BPB and Knauf, by 60% for Lafarge and by 20% for Gyproc, the infringement being classified by the Commission as of long duration in the case of Knauf, Lafarge and BPB and of medium duration in the case of Gyproc.

21      In respect of aggravating circumstances, the basic amount of the fines imposed on BPB and Lafarge was increased by 50% on account of repeated infringement.

22      Next, the Commission reduced by 25% the fine imposed on Gyproc on account of attenuating circumstances, in that it had acted as a destabilising element helping to limit the impact of the cartel on the German market and it was absent from the United Kingdom market.

23      Finally, the Commission reduced the amount of the fines by 30% for BPB and by 40% for Gyproc, pursuant to Section D.2 of the Commission Notice on the non-imposition or reduction of fines in cartel cases (OJ 1996 C 207, p. 4; …). Accordingly, the final amount of the fines imposed was EUR 138.6 million for BPB, EUR 85.8 million for Knauf, EUR 249.6 million for Lafarge and EUR 4.32 million for Gyproc.'

### The judgment under appeal

4      Knauf brought an action for annulment of the contested decision by application lodged at the Registry of the General Court on 13 February 2003. In the alternative, it requested the General Court to reduce the amount of the fine imposed on it.

5      By the judgment under appeal, the General Court dismissed that action in its entirety.

### Forms of order sought by the parties

6      By its appeal Knauf claims that the Court of Justice should:

–      set aside the judgment under appeal;

–      in the alternative, refer the case back to the General Court for a fresh decision;

–      in the further alternative, reduce the fine imposed on the appellant by Article 3 of the contested decision in an appropriate manner and, in any event, by EUR 54.51 million;

–      order the Commission to pay the costs.

7      The Commission contends that the appeal should be dismissed and Knauf ordered to pay the costs.

**The appeal**

8    In support of its appeal, Knauf relies on three grounds of appeal, alleging breach, first, of the rights of the defence, second, of Article 81 EC and, third, of Article 15 of Regulation No 17.

*The first ground of appeal, alleging breach of the rights of the defence*

9    This ground of appeal divides into two distinct limbs which it is appropriate to examine in turn.

The first limb of the first ground of appeal, relating to the refusal of access to inculpatory evidence

–    Arguments of the parties

10   Knauf challenges, in essence, paragraphs 49 and 50 of the judgment under appeal in that the General Court unlawfully failed in its obligation to examine the consequences of the Commission's refusal to give it access to certain items of inculpatory evidence. It submits that since it had identified the inculpatory documents which were not disclosed to it and the passages of the contested decision based exclusively on that evidence, no additional information is necessary to conclude that, had that evidence been excluded, the corresponding parts of that decision would have been different. Given that those parts concern the material element of the infringement as a whole, the result to which the contested decision led would have been different.

11   The Commission contends that the first limb of the first ground of appeal is inoperative, because it criticises a superfluous argument, as is apparent from paragraph 63 of the judgment under appeal. In addition, the Commission claims that Knauf has not shown that the result at which the contested decision arrived would have been different if the appellant had had access to the undisclosed inculpatory documents.

–    Findings of the Court

12   The General Court held, in paragraph 49 of the judgment under appeal, that, with the exception of some more detailed examples, the appellant merely listed the recitals in the preamble to the contested decision in which the documents to which access was refused are mentioned and concluded that such listing was insufficient to satisfy the obligation under the case-law that an applicant must show that the result at which the Commission arrived in its decision would have been different if the documents in question had been disallowed as evidence against it. Consequently, as is stated in paragraph 50 of the judgment under appeal, the General Court examined the alleged breach of the right of access to the documents as containing inculpatory evidence only in the light of the complaints expressly raised by the appellant.

13   In that regard, it is settled case-law that the failure to communicate a document constitutes a breach of the rights of the defence only if the undertaking concerned shows, first, that the Commission relied on that document to support its objection concerning the existence of an infringement and, second, that the objection could be proved only by reference to that document. If there were other documentary evidence of which the parties were aware during the administrative procedure that specifically supported the Commission's findings, the fact that an incriminating document not communicated to the person concerned was inadmissible as

evidence would not affect the validity of the objections upheld in the contested decision. It is thus for the undertaking concerned to show that the result at which the Commission arrived in its decision would have been different if a document which was not communicated to that undertaking and on which the Commission relied to make a finding of infringement against it had to be disallowed as evidence (Joined Cases C-204/00 P, C-205/00 P, C-211/00 P, C-213/00 P, C-217/00 P and C-219/00 P *Aalborg Portland and Others* v *Commission* [2004] ECR I-123, paragraphs 71 to 73).

14    The mere listing of the recitals in the preamble to the contested decision in which the documents to which access was refused are mentioned is not capable of showing, by itself, that the result at which the Commission arrived in that decision would have been different if those documents had been disallowed as evidence.

15    Accordingly, the first limb of the first ground of appeal must be rejected as unfounded.

    The second limb of the first ground of appeal, relating to the refusal of access to exculpatory evidence

    –    Arguments of the parties

16    First, Knauf complains that the General Court erroneously summarised, in paragraphs 64 and 65 of the judgment under appeal, its argument concerning the Commission's refusal to give it access to certain items of exculpatory evidence.

17    Secondly, Knauf submits that, in paragraphs 70 to 78 of the judgment under appeal, the General Court incorrectly applied the Court's case-law relating to exculpatory evidence. Thus, an applicant is required to show not that if it had had access to the replies provided by the other undertakings concerned to the statement of objections, the contested decision would have been different in content, but only that it could have used those documents for its defence. Yet, it alleges, the General Court considered whether the exculpatory evidence cited by the appellant could have had repercussions on the result of that decision.

18    Thirdly, Knauf challenges the General Court's finding that BPB's reply to the statement of objections contained no exculpatory evidence. It claims that, according to the general principles concerning evidence, statements made by the other undertakings concerned constitute evidence. Moreover, the fact that the appellant deployed the same arguments in the course of the administrative procedure does not change the nature of such statements.

19    Lastly, the appellant complains that the General Court failed to take account of certain passages, which it had invoked as undisclosed exculpatory evidence, in BPB's reply to the statement of objections.

20    The Commission contends that the General Court correctly applied the Court's case-law and did not distort the appellant's argument.

21    The Commission contends also that Knauf has confined itself to reproducing the arguments which it already deployed before the General Court, seeking thus to obtain a further examination of its claims by the Court of Justice, which makes the second limb of the first ground of appeal inadmissible. Moreover, the appellant has not demonstrated how the undisclosed evidence in question would have been helpful for its defence.

– Findings of the Court

22    A corollary of the principle of respect for the rights of the defence, the right of access to the file means that the Commission must give the undertaking concerned the opportunity to examine all the documents in the investigation file which may be relevant for its defence. Those documents include both incriminating and exculpatory evidence, save where the business secrets of other undertakings, the internal documents of the Commission or other confidential information are involved (*Aalborg Portland and Others* v *Commission*, paragraph 68 and the case-law cited).

23    As regards failure to disclose an exculpatory document, it is settled case-law that the undertaking concerned need establish only that the non-disclosure was able to influence, to its detriment, the course of the procedure and the content of the Commission's decision. It is thus sufficient for the undertaking to show that it would have been able to use the exculpatory documents for its defence, in the sense that, had it been able to rely on them during the administrative procedure, it would have been able to invoke evidence which was not consistent with the inferences made at that stage by the Commission and therefore could have had an influence, in any way at all, on the assessments made by the Commission in any decision, at least as regards the gravity and duration of the conduct in which the undertaking was found to have engaged and, accordingly, the level of the fine (*Aalborg Portland and Others* v *Commission*, paragraphs 74 and 75 and the case-law cited).

24    It follows that it is for the appellant to establish not only that it did not have access to certain exculpatory evidence, but also that it could have used that evidence for its defence.

25    The General Court held in that regard, in paragraphs 72 to 77 of the judgment under appeal, that the appellant had not shown that it could have used the undisclosed documents in question for its defence, given that, during the administrative procedure, it had raised the same arguments as those contained in those documents and that those arguments had been rejected by the Commission in the contested decision. It was on that basis that the General Court could conclude, in paragraph 78 of that judgment, that, even if the appellant had been able to avail itself of those documents during the administrative procedure, the Commission's findings could not have been influenced by them.

26    The appellant has not put in issue the General Court's findings that it had not shown that it could have used for its defence the documents which were not disclosed to it during the administrative procedure.

27    Accordingly, even if the documents in question do, as the appellant claims, constitute exculpatory evidence, that cannot entail the setting aside of the judgment under appeal.

28    Likewise, if, as the appellant argues, the General Court erroneously applied, in paragraph 74 of the judgment under appeal, the case-law referred to in paragraph 23 of the present judgment in holding that the information contained in an undisclosed exculpatory document, namely paragraph 4.2.1 of BPB's reply to the statement of objections, could not have changed the 'final result' of the contested decision, that error could not entail the setting aside of the judgment under appeal since the appellant did not try to show that it could have used that information for its defence in the light, particularly, of the General Court's finding that the Commission had already taken account of such arguments in that decision.

29    That complaint must, therefore, be rejected as inoperative.

30    The complaint alleging distortion of the arguments presented by Knauf at first instance, which it alleges were summarised erroneously in paragraph 65 of the judgment under appeal, cannot succeed either.

31    An appellant alleging distortion of its own arguments must, under Article 256 TFEU, the first paragraph of Article 58 of the Statute of the Court of Justice of the European Union and indent (c) of the first subparagraph of Article 112(1) of its rules of procedure, indicate precisely the arguments alleged to have been distorted by the General Court (see, by analogy, *Aalborg Portland and Others* v *Commission*, paragraph 50). However, the appellant has not indicated precisely those of its arguments which it alleges were distorted in the judgment under appeal.

32    Moreover, since the appellant does not complain that the General Court failed to respond to its pleas in law and claims at first instance, the question whether the General Court erroneously summarised the appellant's arguments is irrelevant to the result of these proceedings.

33    Nor can this Court uphold the complaint alleging failure, by the General Court, to take account of certain passages in BPB's reply to the statement of objections and, particularly, of paragraphs 4.1.16 and 4.2.3 thereof.

34    As regards paragraph 4.1.16 of that reply, its main import lies in the statement that 'competition remained intense across the various European markets' despite the 'alleged undertaking' reached at the London meeting. However, the issue of continued competition was addressed by the General Court at paragraphs 72 and 75 of the judgment under appeal.

35    As regards paragraph 4.2.3 of BPB's reply to the statement of objections, BPB stated that the figures exchanged between it and its competitors did not form part of its planning process. However, the General Court responded implicitly to the appellant's argument when it examined, in paragraphs 73 and 74 for the judgment under appeal, the statements concerning the purpose of that exchange of information and the alleged fact that the information thus exchanged was known only to Mr D, a director of Gyproc and Chief Executive Officer of BPB.

36    Consequently, the second limb of the first ground of appeal must be rejected.

37    Hence, Knauf's first ground of appeal must be rejected.

   *The second ground of appeal, alleging breach of Article 81(1)EC*

   Arguments of the parties

38    Knauf claims that the General Court concluded that Article 81(1) EC had been infringed relying, in paragraphs 140 to 298 of the judgment under appeal, on findings based on undisclosed inculpatory evidence. Thus, the General Court did not comply with its own statement, in paragraph 63 of that judgment, that it would not take that inculpatory evidence into account when it examined the substance of the case.

39    In addition, the appellant submits that, even taking the undisclosed inculpatory evidence into account, none of the five elements of the infringement found against it, namely, the London meeting in 1992, the exchange of information concerning sales volumes in Germany, France,

the Benelux and the United Kingdom from 1992 to 1998, the exchange of information on price increases in the United Kingdom during the same period, the agreements on market shares in Germany (meetings at Versailles, Brussels and The Hague) from June 1996 and the agreements on price increases in Germany from 1996, fulfils the criteria for finding an infringement under Article 81(1) EC.

40    The Commission submits that the second ground of appeal is inadmissible in its entirety as it concerns only findings of fact by the General Court.

41    Furthermore, the Commission notes that Knauf does not deny the existence of a single, continuous infringement on which the contested decision is based. The existence of an anti-competitive practice or agreement is to be inferred, it submits, from a number of coincidences and indicia which, taken together, may, in the absence of another plausible explanation, constitute evidence of an infringement of the competition rules.

Findings of the Court

42    As regards, first, the complaint that the General Court relied, to conclude that Article 81(1) EC had been infringed, on findings based on undisclosed inculpatory evidence, the appellant refers, only in summary fashion, to paragraphs 140 to 298 of the judgment under appeal, without indicating precisely the undisclosed inculpatory evidence on which it alleges that the General Court based its reasoning.

43    It follows from Article 256 TFEU, the first paragraph of Article 58 of the Statute of the Court of Justice and Article 112(1)(c) of its Rules of Procedure, that an appeal must indicate precisely the contested elements of the judgment which the appellant seeks to have set aside and also the legal arguments specifically advanced in support of the appeal (see, in particular, Case C-352/98 P *Bergaderm and Goupil* v *Commission* [2000] ECR I-5291, paragraph 34; Case C-248/99 P *France* v *Monsanto and Commission* [2002] ECR I-1, paragraph 68; and Case C-487/06 P *British Aggregates* v *Commission* [2008] ECR I-10515, paragraph 121).

44    That complaint is, therefore, inadmissible.

45    As regards, secondly, the argument that none of the five elements of conduct found against the appellant was an infringement, the General Court found, in paragraph 306 of the judgment under appeal, that it is clear from the contested decision that 'the set of agreements and concerted practices in the present case form part of a series of actions by the undertakings in question pursuing a single economic aim, namely the restriction of competition, and constitute the various manifestations of a complex, continuous agreement the object and effect of which was to restrict competition. In view of the fact that the abovementioned agreements and concerted practices gave, without interruption from 1992 until 1998, substantive shape to the parties' common wish to stabilise, and hence restrict competition on, at least the German, French, United Kingdom and Benelux plasterboard markets, the Commission characterises the infringement as single, complex and continuous.' At paragraph 321 of that judgment, the General Court rejected the appellant's arguments against the characterisation of the cartel as a single, continuous infringement.

46    Knauf does not challenge the General Court's finding of a single, continuous infringement, but confines itself to asserting that none of the elements constituting the infringement imputed to it substantiate an infringement of Article 81(1) EC.

47     In that regard, it should be recalled that in order to establish that there has been an infringement of Article 81(1) EC, the Commission must produce firm, precise and consistent evidence (see, to that effect, Joined Cases C-89/85, C-104/85, C-114/85, C-116/85, C-117/85 and C-125/85 to C-129/85 *Ahlström Osakeyhtiö and Others* v *Commission* [1993] ECR I-1307, paragraph 127). However, it is not necessary for every item of evidence produced by the Commission to satisfy those criteria in relation to every aspect of the infringement. It is sufficient if the body of evidence relied on by that institution, viewed as a whole, meets that requirement.

48     Therefore, even if, as the appellant asserts, none of the different elements of the infringement in question constitutes, considered separately, an agreement or concerted practice prohibited by Article 81(1) EC, such a conclusion does not prevent those elements, considered together, from constituting such an agreement or practice.

49     As the Court has already held, since the prohibition on participating in anti-competitive practices and agreements and the penalties which infringers may incur are well known, it is normal that the activities which those practices and agreements involve take place in a clandestine fashion, for meetings to be held in secret, frequently in a non-member country, and for the associated documentation to be reduced to a minimum. Even if the Commission discovers evidence explicitly showing unlawful contact between traders, such as the minutes of a meeting, it will normally be only fragmentary and sparse, so that it is often necessary to reconstitute certain details by deduction. In most cases, the existence of an anti-competitive practice or agreement must be inferred from a number of coincidences and indicia which, taken together, may, in the absence of another plausible explanation, constitute evidence of an infringement of the competition rules (see, to that effect, *Aalborg Portland and Others* v *Commission*, paragraphs 55 to 57).

50     That complaint is, therefore, without foundation.

51     Accordingly, Knauf's second ground of appeal must be rejected as being, in part, inadmissible and, in part, unfounded.

*The third ground of appeal, alleging breach of Articles 15 of Regulation No 17 and 81 EC*

Arguments of the parties

52     Knauf claims, at the outset, that it is apparent from the wording of paragraph 348 of the judgment under appeal that the General Court failed to act with objectivity and impartiality but, on the contrary, was prejudiced in considering that a fine should be imposed for the acts committed by Gebrüder Knauf Verwaltungsgesellschaft KG ('GKV') and its subsidiaries, although the finding that they had benefited from the infringement in question is not supported by any reasoning.

53     The appellant submits that the General Court also infringed Article 15 of Regulation No 17 by concluding that it formed an economic unit with the other companies owned by the Knauf family ('the Knauf Group'), and by imputing to it liability for the activities of those companies.

54     Knauf criticises the evidence on which the General Court based its conclusion that it formed an economic unit with GKV and its subsidiaries. In particular, it asserts that the judgment in Case C-286/98 P *Stora Kopparbergs Bergslags* v *Commission* [2000] ECR I-9925 is not

applicable in this case since the appellant is not controlled by and does not control another company. In addition, the judgment in Case T-66/99 *Minoan Lines* v *Commission* [2003] ECR II-5515, to which the General Court referred in paragraphs 350, 351 and 355 of the judgment under appeal, is not applicable either, since that judgment concerns commercial agency arrangements. The same applies to the judgment in Case T-9/99 *HFB and Others* v *Commission* [2002] ECR II-1487, since the existence of an economic unit was based, in that judgment, on the fact that all the shares in the different companies were held by the same person, whereas, here, the appellant and GKV are owned by 22 persons, each with a minority shareholding.

55    Nor, it is submitted, may a finding of an economic unit be based on the joint control of the appellant and the other companies in the Knauf Group by the numerous shareholders belonging to the Knauf family, since joint control is excluded where shifting or varying majorities are possible among the shareholders. The family contract of 9 December 1994 ('the family contract'), mentioned by the General Court in paragraph 349 of the judgment under appeal, did not place the companies in question under joint control. Knauf submits, in that regard, that the judgment under appeal is inconsistent with the Court's case-law and, in particular, with the judgment in Case C-196/99 P *Aristrain* v *Commission* [2003] ECR I-11005, in which, according to Knauf, it was held that the simple fact that the share capital of two separate commercial companies belongs to the same person or the same family is insufficient, in itself, to establish that those two companies constitute an economic unit.

56    In addition, the fact that the same two shareholders managed all the companies in the Knauf Group and that they represented them during the period when the infringement was observed is alleged to be irrelevant. The same is claimed to apply to the exchanges of information between the companies in that group, the communication of turnovers in connection with the administrative procedure, the fact that most of the documents found during the inspections were on Knauf's letterhead with its address and details, and its capacity as interlocutor during the administrative procedure.

57    As regards the imputation to the appellant of liability for the activities of the companies in the Knauf Group, it criticises paragraph 356 of the judgment under appeal, claiming that the fact that it is the only company not managed by GKV does not explain the reason for which the fine was imposed not on GKV but on Knauf alone.

58    Knauf argues that there is a contradiction between, on the one hand, the statement, contained in paragraph 357 of the judgment under appeal, that it coordinates the operational activities of the Knauf Group on the relevant market and, on the other hand, that contained in paragraph 337 of that judgment, to the effect that 'there is … not one legal entity which, at [the] head [of the Knauf Group], could, as the body charged with coordinating the Group's activities, be held responsible for the infringements committed by the various companies in the group'.

59    Finally, the appellant criticises paragraphs 359 and 360 of the judgment under appeal, according to which it should have challenged, during the administrative procedure, the conclusion that it constituted an economic unit with the other companies in the Knauf Group, or be faced with the prospect of no longer being able to do so before the General Court. It submits that such conclusion infringes the *in dubio pro reo* principle.

60    The Commission contests all the arguments put forward by the appellant in support of the third

ground of appeal contending that the General Court's findings concerning the existence of an economic unit contain no error of law.

Findings of the Court

61    As regards, first, the allegation of the General Court's lack of objectivity and impartiality, based on the finding, in paragraph 348 of the judgment under appeal, that GKV's subsidiaries benefited from the infringement in question, it is important to note that the Court of Justice has no jurisdiction, on appeal, to establish the facts or, in principle, to examine the evidence which the General Court accepted in support of those facts. The appraisal of those facts and the evidence produced to the General Court does not therefore, save where the clear sense of the evidence has been distorted, constitute a point of law which is subject, as such, to review by the Court of Justice (see Joined Cases C-322/07 P, C-327/07 P and C-338/07 P *Papierfabrik August Koehler and Others* v *Commission* [2009] ECR I-0000, paragraph 52 and the case-law cited).

62    Since the appellant has not alleged distortion of the clear sense of the evidence on which the General Court relied for its conclusion, in paragraph 348 of the judgment under appeal, that GKV's subsidiaries benefited from the infringement in question, its allegation seeks, in reality, to obtain a further appraisal of that evidence, which is not within the jurisdiction of the Court of Justice to undertake. Consequently, that complaint must be rejected as inadmissible.

63    As regards, secondly, the allegation of breach of Article 15 of Regulation No 17, Knauf challenges both the General Court's conclusion that GKV and its subsidiaries, on the one hand, and the appellant, on the other, constitute an economic unit in the competition law sense and its conclusion that the appellant is the company responsible for the activities of the Knauf Group.

64    As regards the question of the existence of an economic unit, it is settled case-law that the competition law of the European Union covers the activities of undertakings and that the concept of an undertaking covers any entity engaged in an economic activity, regardless of its legal status and the way in which it is financed. The concept of an undertaking, in the same context, must be understood as designating an economic unit even if in law that economic unit consists of several persons, natural or legal (Case C-97/08 P *Akzo Nobel and Others* v *Commission* [2009] ECR I-0000, paragraphs 54 and 55 and the case-law cited).

65    The existence of an economic unit may thus be inferred from a body of consistent evidence, even if some of that evidence, taken in isolation, is insufficient to establish the existence of such a unit.

66    In this case, the General Court concluded that there was an economic unit on the basis of a body of evidence. Thus, in paragraph 344 of the judgment under appeal, it held, first, that the shareholders in the appellant and the other companies owned by the Knauf family, particularly those owned by GKV, are the same, namely 21 natural persons who are members of that family and a company formed by four other members of that family.

67    Secondly, the General Court pointed out, in paragraph 345 of the judgment under appeal, that the two managing shareholders in Knauf, Mr B and Mr C, are also managing shareholders of all the companies in the Knauf Group.

68    Thirdly, whilst holding, in paragraph 347 of the judgment under appeal, that GKV has shareholdings in several companies which operate on the plasterboard market and are controlled by the Knauf family, the General Court stated, in paragraph 348 of the judgment under appeal, that GKV is merely a holding company, without staff, managing the portfolio companies which its holds for the 22 shareholders which own it and that it depends for managers and premises on the appellant.

69    Fourthly, the General Court took account, in paragraph 349 of the judgment under appeal, of the family contract, Article 1(2) of which provides that its purpose is to ensure the single management and direction of the companies in the Knauf Group. According to paragraphs 3 and 4 of that article, the contract's object is also to guarantee, first, the single and concentrated exercise of the rights of the companies in the whole group, and second, the adoption of decisions concerning the direction, management, organisation and legal form of the company so that they are not hindered by a single shareholder or a small number of shareholders. Among those companies are, particularly, under Article 2 of the family contract, Knauf and GKV.

70    Fifthly, the General Court held, in paragraph 346 of the judgment under appeal, that all the appellant's sales figures exchanged in connection with the infringement in question referred to all the companies in the Knauf group which operate on the plasterboard market and that there was no evidence that Mr B and Mr C did not represent that group in connection with the various manifestations of the infringement.

71    Finally, it is clear from paragraph 347 of the judgment under appeal that the appellant itself, without being presented with any requests to that end by the Commission, sent to the Commission all the turnovers of the Knauf Group in its reply of 19 September 2002 to the request for information made under Article 11 of Regulation No 17.

72    It was on the basis of that body of evidence that the General Court could conclude, correctly, in paragraph 350 of the judgment under appeal, that the companies belonging to the Knauf family constitute a single economic unit.

73    As regards the fact, expressly relied upon by Knauf, that both GKV and it are owned by 22 shareholders, none of whom has a majority of shares or votes, which makes possible the formation of varying majorities within the different companies in the Knauf Group, the General Court took account of the fact that all those companies are held by the same 22 shareholders, who are, in addition, members of the Knauf family, only in so far as it is only one of the elements capable of establishing the existence of an economic unit. Moreover, the possibility of varying majorities forming within a group of companies does not, by itself, exclude the possibility of the existence of a single economic unit.

74    Contrary to Knauf's argument, the General Court did not misapply the judgment in *Aristrain* v *Commission*. Indeed, the Court of Justice found, at paragraph 99 of that judgment, that the simple fact that the share capital of two separate commercial companies is held by the same person or the same family is insufficient, in itself, to establish that those two companies are an economic unit. As is clear from what is stated in the preceding paragraph, the General Court did not rely solely on the fact the companies in the Knauf Group are owned by the same family to conclude that there was an economic unit.

75    Knauf also challenges the relevance of the family contract to which the General Court referred

in paragraph 349 of the judgment under appeal. In its submission, that contract is intended only to enable, in future, the shareholdings constituting the capital of the companies in the Knauf Group to remain in the possession of members of the Knauf family. Its purpose is, in addition, to prevent those companies being controlled by certain shareholders or groups of shareholders.

76    Even if the family contract's objectives are actually those mentioned in the preceding paragraph, the appellant does not deny that the contract's purpose, as expressly stated in Article 1(2) is 'to ensure the single management and direction of the Knauf undertakings'.

77    The appellant submits, in addition, that the fact that Mr B and Mr C are the managers of all the companies in the Knauf Group is irrelevant as regards the existence of an economic unit, since that fact does not exclude the possibility that the different companies in that group are independent under the law of competition. However, the fact that those companies are managed by the two same shareholders actually permits the single management and direction thereof for the purposes of Article 1(2) of the family contract.

78    As regards the exchanges of sales figures of all the companies in the Knauf Group which operated on the plasterboard market in connection with the infringement in question, it is appropriate to point out that, contrary to the appellant's submission, that fact is an additional item of evidence tending to indicate that those companies acted, at least during the infringement, as an economic unit with a common interest.

79    The allegation that the General Court infringed the *in dubio pro reo* principle in holding, in paragraph 346 of the judgment under appeal, that there was no evidence that Mr B and Mr C did not represent the Knauf Group in connection with the infringement cannot be accepted. In fact, in paragraph 346 the General Court simply held that the evidence submitted to it indicated that Mr B and Mr C played a representational role for that group in connection with the infringement and that no evidence had been produced before it to establish that such was not the case.

80    In that regard, according to the Court's case-law, it is for the party or the authority alleging an infringement of the competition rules to prove the existence thereof and it is for the undertaking or association of undertakings invoking the benefit of a defence against a finding of an infringement to demonstrate that the conditions for applying such defence are satisfied, so that the authority will then have to resort to other evidence. Thus, although according to those principles the legal burden of proof is borne either by the Commission or by the undertaking or association concerned, the factual evidence on which a party relies may be of such a kind as to require the other party to provide an explanation or justification, failing which it is permissible to conclude that the burden of proof has been discharged (see *Aalborg Portland and Others* v *Commission*, paragraphs 78 and 79).

81    Knauf also claims that certain judgments on which the General Court relied to arrive at the judgment under appeal are irrelevant.

82    As regards the judgment in *Stora Kopparbergs Bergslags* v *Commission*, it should be noted that the General Court did not refer to that judgment for the conclusion that there was an economic unit. Besides, the fact that, in the present proceedings, the subsidiary is not wholly owned by a parent company, contrary to the facts of the case which gave rise to that judgment, does not exclude the possible existence of an economic unit, in the competition law sense.

83    As regards the judgment in *Minoan Lines* v *Commission*, the General Court cited it only as a point of reference in support of considerations of general application in competition matters, without drawing any analogy between the specific facts of the case which gave rise to that judgment and those of the present case.

84    Indeed, the General Court observed, in paragraphs 350, 351 and 355 of the judgment under appeal, referring to settled case-law, that the concept of an 'undertaking' in competition law must be understood as designating an economic unit for the purpose of the subject-matter of the agreement in question even if in law that economic unit consists of several persons, natural or legal and that such an economic entity consists of a unitary organisation of personal, tangible and intangible elements, which pursue a specific economic aim on a long-term basis and can contribute to the commission of an infringement of the kind in Article 81(1) EC. The General Court also decided that, where a group of companies constitutes one and the same undertaking the Commission may impute liability for an infringement committed by the undertaking and impose a fine on the company responsible for the actions of the group in the context of the infringement.

85    The same applies to the judgment in *HFB and Others* v *Commission*, since it is clear from paragraph 343 of the judgment under appeal that the General Court referred to that judgment only as an example in order to illustrate the relevance, to the determination as to the existence of an economic unit, of certain factual matters, such as, in particular, the fact that the same person had key functions within the management bodies of the companies in the group and the fact that that person represented, at directors' meetings, the various companies and that those companies were allocated a single quota for the purposes of the cartel.

86    It follows from the foregoing that the General Court did not err in law in finding that the companies belonging to the Knauf family constitute an economic unit.

87    As regards the appellant's role within the Knauf Group, the General Court held, in paragraph 358 of the judgment under appeal, that it presented itself, during the administrative procedure, as sole interlocutor with the Commission and did not deny that capacity at any time during that procedure. In paragraph 359 of that judgment, the General Court pointed out that, while it appeared that the Commission considered, in the statement of objections, that the infringement concerned the entire Knauf Group and that, on the basis of the information contained in that statement, the appellant could not have been unaware that it was liable to be the addressee of a final decision of the Commission, it nonetheless replied to the Commission without putting in issue its role as the company responsible for the actions of that group in connection with the infringement.

88    The General Court concluded, in paragraph 360 of the judgment under appeal, that, in such a situation, the onus was on the appellant to react during the administrative procedure, or be faced with the prospect of no longer being able to do so, by demonstrating that, despite the factors relied on by the Commission, the appellant could not be held liable for the infringement committed by the companies in the Knauf Group.

89    In that regard, as the appellant correctly argues as regards the application of Articles 81 EC and 82 EC, there is no requirement under the law of the European Union that the addressee of the statement of objections must challenge its various matters of fact or law during the administrative procedure, if it is not to be barred from doing so later at the stage of judicial proceedings.

90    Although an undertaking's express or implicit acknowledgement of matters of fact or of law during the administrative procedure before the Commission may constitute additional evidence when determining whether an action is well founded, it cannot restrict the actual exercise of a natural or legal person's right to bring proceedings before the General Court under the fourth paragraph of Article 263 TFEU.

91    In the absence of a specific legal basis, such a restriction is contrary to the fundamental principles of the rule of law and of respect for the rights of the defence. Moreover, the rights to an effective remedy and of access to an impartial tribunal are guaranteed by Article 47 of the Charter of Fundamental Rights of the European Union which, under the first subparagraph of Article 6(1) TEU, has the same legal value as the Treaties. Under Article 52(1) of that Charter, any limitation on the exercise of the rights and freedoms recognised by the Charter must be provided for by law.

92    Consequently, in holding that the onus was on Knauf to react during the administrative procedure, or be faced with the prospect of no longer being able to do so before the Courts of the Union, the General Court erred in law.

93    Accordingly, first, the judgment under appeal must be set aside insofar as the General Court found, in paragraph 362 thereof, that the appellant was the company responsible for the actions of the Knauf Group in connection with the infringement, and, second, the rest of the appeal must be dismissed.

### The plea in law before the General Court, alleging breach of Article 15(2) of Regulation No 17

94    In accordance with the first paragraph of Article 61 of the Statute of the Court of Justice, if the appeal is well founded, that Court must quash the General Court's decision. It may then itself give final judgment in the matter, where the state of the proceedings so permits. That is the case here.

95    As regards the appellant's role within the Knauf Group, it must be examined whether the Commission made an error of assessment in considering it solely responsible for the actions of the companies in that group, which together constitute an economic unit, as has been established in paragraph 86 of the present judgment.

96    It is apparent from the group structure chart provided by the appellant in reply to a written question from the General Court that, in 2001, at the apex of that group were three companies, namely the appellant, GKV and Knauf Fiber Glass GmbH. The latter, the centre of activities of which is in the United States, did not, however, operate on the plasterboard market.

97    That same chart reveals that GKV owns, directly or indirectly, dozens of companies, many of which do operate on that market.

98    It should, therefore, be examined whether the Commission was entitled to impute liability for the infringement in question to Knauf and not to GKV.

99    That would be the case if GKV did not determine its conduct on the market in question independently.

100   In order to decide whether a company determines its conduct on the market independently, account must be taken of all the relevant factors relating to the economic, organisational and legal links which exist between it and the company in the same group which is considered to be responsible for the actions of that group, and which may vary from case to case and cannot therefore be set out in an exhaustive list (see, by analogy, *Akzo Nobel and Others* v *Commission*, paragraph 74).

101   In the present case, first, it has been established that GKV is only a holding company, with no staff, managing portfolio companies which it holds for the 22 shareholders which own it, and that finding has not been criticised by Knauf.

102   Secondly, it is clear from paragraph 497 of the contested decision that GKV depends on Knauf both for its premises and for its staff, at least in part; that finding has moreover not been challenged by the appellant.

103   Thirdly, it is established that Knauf is the only company in the Knauf Group which operates on the market in question and which is not managed by GKV.

104   Fourthly, most of the Knauf Group's documents seised by the Commission during the inspections were printed on the appellant's letterhead which gives its details. Even if that company was correct in arguing, as it did on the appeal, that those documents were photocopied by chance or selected intentionally by the Commission's officials responsible for the inspection, the fact remains that it has not adduced any evidence capable of supporting that argument.

105   Fifthly, according to the group structure chart mentioned in paragraph 96 of the present judgment, among the companies in the Knauf Group which operate on the plasterboard market, the appellant is the company with by far the largest relevant turnover. That fact indicates its predominance within that group, at least as regards that market.

106   It follows from the preceding findings that, in reality, GKV does not determine its conduct on that market independently, but is dependent in that regard on Knauf.

107   Contrary to the latter's argument, the fact that there is no single legal person at the apex of the Knauf Group is no obstacle to the appellant being held liable for the actions of that group.

108   Indeed, the legal structure particular to a group of companies, which is characterised by the absence of a single legal person at the apex of that group, is not decisive where that structure does not reflect the effective functioning and actual organisation of the group.

109   Consequently, the lack of subordinating legal links between the appellant and GKV cannot cast any doubt on the conclusion that the former of those two companies must be held liable for the activities of the Knauf Group, since it is established that, in reality, GKV does not determine its conduct on the plasterboard market independently.

110   It follows that the Commission made no error of assessment in holding that the appellant should be considered to be responsible for all the activities of the Knauf Group.

111   Accordingly, the fourth plea in law in the action brought by the appellant before the General Court, alleging breach of Article 15(2) of Regulation No 17 must be rejected.

**Costs**

112   Under the first paragraph of Article 122 of the Rules of Procedure, where the appeal is well founded and the Court itself gives final judgment in the case, it is to make a decision as to costs.

113   Under Article 69(2) of those rules which, under Article 118 thereof, applies to appeals, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. However, under the first subparagraph of Article 69(3) of those rules, the Court may, where each party succeeds on some and fails on other heads of claim, order that each party shall bear its own costs.

114   In this case, since both Knauf and the Commission have been unsuccessful in part in their claims on the appeal, it is appropriate to decide that each of them shall bear its own costs relating to the appeal.

115   By contrast, since the action for annulment brought by Knauf has been dismissed, paragraph 2 of the operative part of the judgment under appeal must be confirmed as regards the costs relating to the proceedings at first instance.

On those grounds, the Court (Second Chamber) hereby:

1.   **Sets aside the judgment of 8 July 2008 of the Court of First Instance of the European Communities in Case T‑52/03** *Knauf Gips* **v** *Commission* **insofar as it imputes to Knauf Gips KG liability for the infringements committed by the companies constituting the Knauf Group;**

2.   **Dismisses the rest of the appeal;**

3.   **Dismisses the action brought by Knauf Gips KG for annulment of Commission Decision 2005/471/EC of 27 November 2007 relating to proceedings under Article 81 of the EC Treaty against BPB PLC, Gebrüder Knauf Westdeutsche Gipswerke KG, Société Lafarge SA and Gyproc Benelux NV (Case No COMP/E-1/37.152 – Plasterboard);**

4.   **Orders each party to bear its own costs relating to the appeal and Knauf Gips KG to pay all the costs at first instance.**

[Signatures]

---

\* Language of the case: German.

# EXHIBIT B

OPINION OF ADVOCATE GENERAL
MAZÁK
delivered on 11 February 2010 (1)

**Case C-407/08 P**

**Knauf Gips KG, formerly Gebr. Knauf Westdeutsche Gipswerke KG**
v
**European Commission**

(Appeal – Competition – Cartel – Plasterboard market – Infringement of Article 81 EC – Administrative procedure – Infringement of the rights of the defence – Access to the file – Refusal to communicate incriminating evidence – Refusal to communicate exculpatory evidence – Agreements and concerted practices constituting a single infringement – Infringement of the 10% ceiling under Article 15(2) of Regulation No 17 – Economic unit)

**I – Introduction**

1.     By its appeal, Knauf Gips KG, formerly Gebrüder Knauf Gipswerke KG (hereinafter also referred to as the 'appellant'), requests the Court, inter alia, to set aside the judgment of the Court of First Instance (Third Chamber) of 8 July 2008 in Case T-52/03 *Knauf Gips* v *Commission* (2) (the 'contested judgment') in its entirety. In the alternative, the appellant seeks that the Court refer the case back to the Court of First Instance for a fresh decision and in the further alternative, a reduction of the fine imposed on it, and in any event by at least EUR 54.51 million.

**II – Legal framework**

2.     Article 15(2) of Council Regulation No 17 of 6 February 1962, First Regulation implementing Articles [81] and [82] of the Treaty (3) provides:

'The Commission may by decision impose on undertakings or associations of undertakings fines of from 1 000 to 1 000 000 units of account, or a sum in excess thereof but not exceeding 10% of the turnover in the preceding business year of each of the undertakings participating in the infringement where, either intentionally or negligently:

(a)     they infringe Article [81](1) or Article [82] of the Treaty; …'

**III – Background to the appeal**

A –   *Contested decision*

3.     On 27 November 2002, the Commission adopted the Decision 2005/471/EC relating to proceedings under Article 81 of the EC Treaty against BPB PLC, Gebrüder Knauf Westdeutsche Gipswerke KG, Société Lafarge SA and Gyproc Benelux NV (Case No COMP/E-1/37.152 –

Plasterboard) (the 'contested decision') in which it found that BPB plc ('BPB'), the Knauf group, Société Lafarge SA ('Lafarge') and Gyproc Benelux NV ('Gyproc') had infringed Article 81(1) EC by participating in a set of agreements and concerted practices in the plasterboard business. (4) The Commission considered that BPB, Knauf, (5) Lafarge and Gyproc had entered into and participated without interruption in a complex and continuing agreement contrary to Article 81(1) EC which was manifested in the following conduct constituting agreements or concerted practices:

–   the representatives of BPB and Knauf met in London in 1992 and expressed the common desire to stabilise the markets in Germany (hereinafter 'German market'), the United Kingdom (hereinafter 'UK market'), France (hereinafter 'French market') and the Netherlands, Belgium and Luxembourg (hereinafter 'Benelux market');

–   the representatives of BPB and Knauf established, as from 1992, information exchange arrangements, to which Lafarge and subsequently Gyproc acceded, relating to their sales volumes on the German, French, UK and Benelux plasterboard markets;

–   the representatives of BPB, Knauf and Lafarge exchanged information, on various occasions, prior to price increases on the UK market;

–   in view of particular developments on the German market, the representatives of BPB, Knauf, Lafarge and Gyproc met at Versailles in 1996, Brussels in 1997 and The Hague in 1998 with a view to sharing out or at least stabilising the German market;

–   the representatives of BPB, Knauf, Lafarge and Gyproc exchanged information on various occasions and concerted their action on the application of price increases on the German market between 1996 and 1998. (6)

4.   Pursuant to Article 1 of the contested decision, the duration of the infringement was as follows:

–   'BPB PLC: from 31 March 1992, at the latest, to 25 November 1998;

–   Knauf: from 31 March 1992, at the latest, to 25 November 1998;

–   Société Lafarge SA: from 31 August 1992, at the latest, to 25 November 1998;

–   Gyproc Benelux NV: from 6 June 1996, at the latest, to 25 November 1998.'

5.   The Commission considered, having regard to the nature of the conduct in question, its practical impact on the plasterboard market which was highly concentrated and oligopolistic in nature and the fact that it covered the four principal markets at the heart of the European Community, that the addressees of the contested decision had committed a very serious infringement of Article 81(1) EC. The following fines were imposed on the following undertakings:

–   BPB: EUR 138.6 million,

–   Gebrüder Knauf Westdeutsche Gipswerke KG: EUR 85.8 million,

–   Lafarge: EUR 249.6 million,

–   Gyproc: EUR 4.32 million. (7)

6.   As regards the fine imposed on the appellant, at paragraphs 495 to 499 of the contested decision, the Commission stated:

'(495) It is established that Knauf [group] actively participated in all the anticompetitive conduct described in this Decision and that [Knauf group's high level representatives], [Mr B and Mr C,] were personally

involved in that conduct.

(496) The Decision is addressed to Knauf Westdeutsche Gipswerke in view of the particular structure of the Knauf group. The Commission is unable to identify one individual at the head of the group of companies constituting the undertaking. Consequently, there is not one legal entity which, at its head, could, as the body charged with coordinating the group's activities, be held responsible for the infringements committed by the various companies composing it.

(497) Knauf Westdeutsche Gipswerke, of which [Mr B] and [Mr C] are [high level representatives], is the most representative company in that undertaking. In particular, as regards Gebrüder Knauf Verwaltungsgesellschaft KG, the function of which is to administer other companies of the Knauf group, it must be noted that it is dependent, at least partly, on Knauf Westdeutsche Gipswerke both for its premises and for its staff.

(498) In those circumstances, and in order that matters of pure form do not stand in the way of a finding of conduct on the plasterboard market by Knauf [group] for purposes of the application of the competition rules, the Commission considers that Knauf Westdeutsche Gipswerke must be held responsible for all the actions of Knauf [group]. Knauf Westdeutsche Gipswerke has not objected to the fact that the Commission sent it the statement of objections, despite the fact that this made clear that the Commission intended to hold it responsible for all of Knauf's conduct.

(499) The Commission considers that, with a view to the possible imposition of a fine […], the turnover to be taken into account for the purposes of this Decision is that of the "undertaking" within the meaning of Article 81(1) of the Treaty, that is to say in this case the worldwide turnover achieved by all the companies of the Knauf group as communicated by Knauf to the Commission.' ([8])

7.      The Commission had also previously noted at paragraphs 38 and 39 of the contested decision:

'(38) Founded in 1932 and having its head office and a large industrial plant at Iphofen, Bavaria (Germany), Knauf now comprises a number of private companies which are still owned by … or so shareholders belonging to the Knauf family. The company likes to present itself as the family-owned company, Knauf Westdeutsche Gipswerke: "The firm Gebr. Knauf Westdeutsche Gipswerke, Iphofen, founded in 1932, is at present not only one of the leading producers of building materials in Europe, but a group which operates worldwide and whose activities are not restricted to the production of gypsum-based materials. Despite its growth, Knauf remains a family-owned business, being owned by the Alfons and Karl Knauf families …"

(39) Knauf Westdeutsche Gipswerke is in fact the oldest of the companies in the Knauf group and employs a large number (more than 1 000) of the group's employees; it is at present a limited partnership whose [high level representatives] are [Messrs B and C] … The company operates on the same premises and with the same staff as another company, Gebrüder Knauf Verwaltungsgesellschaft KG, which is also a limited partnership whose [high level representatives] are also [Mr B] and [Mr C] and whose function is to administer other companies in the Knauf group. It should also be noted that, in addition to having the same management, the two limited partnerships have exactly the same shareholding structure (the same individuals holding exactly the same share in the company capital). Gebrüder Knauf Verwaltungsgesellschaft KG has a very small number of employees, also on the Iphofen site.'

B –    *Proceedings before the Court of First Instance*

8.      By application lodged at the registry of the Court of First Instance on 13 February 2003, and registered as case T-52/03, Knauf Gips KG sought the annulment of the contested decision in so far as that decision concerned it or, in the alternative, an appropriate reduction of the fine imposed on it by the contested decision and an order that the Commission pay the costs.

9.      In its action before the Court of First Instance, Knauf Gips KG raised eight pleas. By its first plea,

Knauf Gips KG claimed that the contested decision infringes its rights of defence. Knauf Gips KG submitted, inter alia, that the contested decision is based on evidence which had not been made available to it despite its requests to that effect. Knauf Gips KG's second plea was based on an infringement of Article 81(1) EC. By its third plea, Knauf Gips KG claimed an infringement of the concept of a single infringement. By its fourth plea, Knauf Gips KG claimed that the contested decision infringes Article 15(2) of Regulation No 17 with regard to the upper limit of the fine. By its fifth plea, Knauf Gips KG claimed that the contested decision infringed Article 253 EC and Article 15(2) of Regulation No 17 and the general principles of law by its assessment of the fine. By its sixth plea, Knauf Gips KG claimed that the Commission infringed the principle of equal treatment, because it did not reduce the fine imposed on it despite the fact that it had cooperated with the Commission to the same extent as BPB, whose fine was reduced by 30%. By its seventh plea, Knauf Gips KG claimed that the excessive length of the administrative procedure led to an infringement of Article 6(1) of the European Convention for the Protection of Human Rights and Fundamental Freedoms and the principle of good administration. In its eighth and final plea Knauf Gips KG claimed an error in law and an error in assessment in the setting of the rate of interest applied for late payment of the fine.

10.     The Court of First Instance delivered its judgment on 8 July 2008 in which it dismissed the action brought by Knauf Gips KG. Knauf Gips KG was ordered to pay the costs.

## IV –  Appeal procedure

11.     On 19 September 2008, the appellant lodged an appeal against the contested judgment. The appellant requests the Court to:

–     set aside the contested judgment in its entirety;

–     in the alternative, refer the case back to the Court of First Instance for a fresh decision;

–     in the further alternative, reduce the fine imposed on the appellant by Article 3 of the contested decision in an appropriate manner, and in any event by at least EUR 54.51 million;

–     order the Commission to pay the costs.

12.     The Commission contends that the Court should:

–     dismiss the appeal in its entirety;

–     order the appellant to pay the costs.

13.     The appeal against the contested judgment is based on three pleas. By its first plea on appeal, the appellant submits that its rights of defence were breached. By its second plea on appeal, the appellant submits that there was an infringement of Article 81(1) EC. By its third plea on appeal, the appellant submits that Article 15(2) of Regulation No 17 and Article 81 EC were infringed.

14.     A hearing was held on 22 October 2009.

## V –  First ground of appeal: infringement of rights of defence

15.     The appellant submits that the Court of First Instance infringed its rights of defence due to the incorrect application of the rules concerning firstly, refusal of access to incriminating documents and secondly, refusal of access to exculpatory evidence.

A –   *Refusal of access to incriminating documents*

1.     Contested judgment

16.     At first instance, Knauf Gips KG submitted that the contested decision is largely based on incriminating evidence to which it did not have access despite requests in that regard.

17.     The Court of First Instance at paragraph 41 of the contested judgment confirmed that Knauf Gips KG did not have access during the administrative procedure before the Commission to the replies of the other addressees of the statement of objections. That court considered that since documents that have not been communicated to the parties concerned during the administrative procedure are not admissible evidence, it is necessary, if the Commission relied in the final decision on documents that were not in the investigation file and were not communicated to the applicant, to exclude those documents as evidence. If however there was other documentary evidence of which the parties were aware during the administrative procedure that specifically supported the Commission's findings, the fact that an incriminating document not communicated to the person concerned was inadmissible as evidence would not affect the validity of the objections upheld in the contested decision. The Court of First Instance considered therefore that it is for the undertaking concerned to show that the result at which the Commission arrived in its decision would have been different if a document which was not communicated to that undertaking and on which the Commission relied to make a finding of infringement against it had to be disallowed as evidence. (9)

18.     The Court of First Instance noted at paragraph 49 of the contested judgment that Knauf Gips KG had merely listed, with a few exceptions, the passages in the contested decision in which the documents to which access was refused were mentioned. That court considered that such a listing was insufficient to satisfy the obligation on Knauf Gips KG laid down by the case-law in relation to undisclosed incriminating evidence. The Court of First Instance then proceeded to examine the alleged infringement of access to incriminating evidence in respect of those complaints expressly raised by Knauf Gips KG. (10) The Court of First Instance, upon examination of the documents in question, found that the finding of the Commission in the contested decision would not have been different if the documents in question had been removed from the file. The Court of First Instance stated however that it would examine the substance of the case eliminating, for the sake of completeness, all the incriminating elements resulting from the responses of the other addressees of the statement of objections in order to verify whether the assessment of the Commission concerning the existence and the effects of the infringement is sufficiently established even in the absence of such elements. (11)

2.     Argument

19.     The appellant contends that the Court of First Instance incorrectly refused to examine the examples of undisclosed evidence which the appellant had indicated. The appellant considers that where it cites the evidence in question and the passages of the contested decision which are exclusively based on that evidence, no additional indication is necessary in order to conclude that, if that evidence had been eliminated, at least those sections of the reasoning of the contested decision would have been different. Given that it is evident that the passages described by the appellant concerned the material aspect of the infringement as a whole, it is clear that the contested decision would have been totally different. The passages of the contested decision which were actually examined by the Court of First Instance (see paragraphs 51 to 63 of the contested judgment) are not decisive, given that the appellant's rights of defence were already infringed due to reliance by the Commission in other passages of the contested decision on undisclosed incriminating evidence which was not examined by that court.

20.     The Commission considers that, given that the appellant's complaint is directed only against the grounds of the contested judgment contained in paragraphs 49 and 50, that complaint cannot lead to that judgment being set aside. The grounds in question were included for the sake of completeness, as, in accordance with paragraph 63 of the contested judgment, the Court of First Instance did not take into account the evidence in question when it examined the substance of the contested decision. Moreover, the Commission considers that the appellant has not satisfied the requirements laid down by the Court in *Aalborg Portland and Others* v *Commission* (12) in relation to incriminating evidence. In accordance with that judgment, the Court requires the concerned party to demonstrate that the result at which the Commission arrived in its decision would have been different. The global reference made by the

appellant to different passages of the contested decision in which the documents in question are merely mentioned is insufficient as otherwise it would require the Court of First Instance to demonstrate a causal link between the refusal of access to the evidence in question and the alleged infringement of the rights of the defence.

3.     Assessment

21.     I would note, firstly, that the appellant contests the findings of the Court of First Instance contained in paragraphs 49 and 50 of the contested judgment. No objection however is raised by the appellant to the detailed findings of the Court of First Instance contained in paragraphs 51 to 62 of the contested judgment in relation to the specific complaints raised by Knauf Gips KG concerning certain evidence.

22.     Moreover, contrary to the Commission's assertion, the findings of the Court of First Instance at paragraphs 49 and 50 and indeed at paragraphs 51 to 62 of the contested judgment were not included for the sake of completeness, that quality having been explicitly ascribed by that court to its position contained in paragraph 63 of that judgment. Thus the settled case-law pursuant to which the Court rejects outright challenges directed solely against grounds included purely for the sake of completeness as they cannot result in the judgment under appeal being set aside (13) is not, in my view, of direct application to the plea at hand.

23.     As regards the appellant's claim relating to the failure by the Court of First Instance to examine the examples of undisclosed evidence which the appellant had indicated, I consider that this claim is manifestly unfounded.

24.     Knauf Gips KG argues essentially that the Court of First Instance wrongly concluded that a listing of the passages in the contested decision in with undisclosed evidence was referred to was insufficient to satisfy the obligation laid down by the case-law which requires the interested party to demonstrate that the result at which the Commission arrived in its decision would have been different if a document which was not communicated to that undertaking and on which the Commission relied to make a finding of infringement against it had to be disallowed as evidence.

25.     It is settled case-law that the failure to communicate a document constitutes a breach of the rights of the defence only if the undertaking concerned shows, first, that the Commission relied on that document to support its objection concerning the existence of an infringement and, second, that the objection could be proved only by reference to that document. If there were other documentary evidence of which the parties were aware during the administrative procedure that specifically supported the Commission's findings, the fact that an incriminating document not communicated to the person concerned was inadmissible as evidence would not affect the validity of the objections upheld in the contested decision. It is thus for the undertaking concerned to show that the result at which the Commission arrived in its decision would have been different if a document which was not communicated to that undertaking and on which the Commission relied to make a finding of infringement against it had to be disallowed as evidence. (14)

26.     In my view, the Court of First Instance did not err in law by finding that a mere listing of the passages of the contested decision in which undisclosed evidence is mentioned is insufficient to discharge the clear burden imposed on the undertaking concerned pursuant to the *Aalborg Portland and Others* v *Commission* (15) case-law.

B –     *Refusal of access to exculpatory evidence and infringement of the rights of defence concerning the exchange of information*

27.     I shall deal in this section for the sake of convenience with the second and third part of the appellant's first ground of appeal as both parts concern the second part of Knauf Gips KG's first plea before the Court of First Instance relating to refusal of access to exculpatory evidence. (16)

1.     Contested judgment

28.     At paragraph 67 of the contested judgment, the Court of First Instance, citing *Aalborg Portland and Others* v *Commission*, stated that where an exculpatory document has not been communicated, the undertaking concerned must only establish that its non-disclosure was able to influence, to its disadvantage, the course of the proceedings and the content of the decision of the Commission. It is sufficient for the undertaking to show that it would have been able to use the exculpatory documents in its defence, in the sense that, had it been able to rely on them during the administrative procedure, it would have been able to put forward evidence which did not agree with the findings made by the Commission at that stage and would therefore have been able to have some influence on the Commission's assessment in any decision it adopted, at least as regards the gravity and duration of the conduct of which it was accused and, accordingly, the level of the fine. The possibility that a document which was not disclosed might have influenced the course of the proceedings and the content of the Commission's decision can be established only if a provisional examination of certain evidence shows that the documents not disclosed might – in the light of that evidence – have had a significance which ought not to have been disregarded. (17)

29.     After granting the appellant access to the non-confidential replies of the other producers to the Commission's statement of objections, the Court of First Instance considered that even if Knauf Gips KG had been able to rely on those documents during the administrative procedure, the Commission's assessment could not have been influenced by those documents. (18)

2.      Argument

30.     The appellant considers that the Court of First Instance incorrectly summarised at paragraph 65 of the contested judgment its claims in its application in Case T-52/03 and comments contained in a separate document dated 7 July 2006 concerning the refusal of the Commission to allow it access to exculpatory evidence. The findings of that court at paragraphs 64 to 79 of the contested judgment thereby infringe the rights of defence of the appellant and are unfounded.

31.     The appellant also considers that the Court of First Instance incorrectly applied the case-law of the Court concerning exculpatory evidence. According to the appellant, it does not have to show that, if it had had access to the replies provided by the other producers to the statement of objections, the Commission decision would have been different in content, but only that it would have been able to use those documents for its defence. (19) The appellant considers that at paragraphs 70 to 78 of the contested judgment, the Court of First Instance incorrectly examined whether certain exculpatory evidence referred to by the appellant could have affected the result of the contested decision.

32.     In addition, the appellant contests the finding by the Court of First Instance pursuant to which BPB's reply to the statement of objections does not contain any exculpatory evidence. (20) The appellant claims that in accordance with the general principles of evidence, the statements made by other interested parties are evidence. Moreover, the fact that the appellant has raised the same arguments does not change the nature of such statements by other interested parties.

33.     The appellant claims that the Court of First Instance failed to examine the statement in point 4.1.16 of BPB's reply that the London meeting was at most a spontaneous discussion. The Court of First Instance also failed to examine BPB's statement at 4.2.3 of its reply that the figures exchanged between BPB and its competitors did not enter the BPB planning process. Moreover, the Court of First Instance did not examine the importance of the evidence concerning the establishment of the existence of the meetings in Brussels and The Hague in 1997 and 1998 which followed the alleged first meeting in Versailles. Knauf Gips KG, in a document dated 7 July 2006, stated that it is clear from points 4.3.28 and 4.3.34 of BPB's reply that no anti-competitive agreement was reached at the Versailles meeting. As regards the meetings in Brussels and The Hague, the Commission simply concluded that the parties followed the alleged agreement reached at Versailles. However, points 4.3.28 and 4.3.34 of BPB's reply concerning the Versailles meeting could have been used to demonstrate that the conclusion concerning the meetings in Brussels and The Hague was unfounded.

34.    The Commission raises again an argument which it raised before the Court of First Instance and which was not addressed by that court. The Commission notes that it annexed to its refusal to grant access to the appellant to the replies of the other producers to the statement of objections an indication of the remedies available to the appellant. Given that the appellant did not seize the hearing officer on the matter and thus failed to exhaust the remedies available to it during the administrative procedure, the appellant implied that it would not follow-up on its request. The Commission therefore considers that given that the right of access to the file should have been dealt with during the administrative procedure, the appellant had no right to claim an infringement of the rights of the defence before the Court of First Instance.

35.    The Commission considers that the Court of First Instance correctly applied the test laid down in *Aalborg Portland and Others* v *Commission* (21) concerning exculpatory evidence. The Commission also considers that the contested judgment does not distort the arguments of the appellant.

36.    The Commission considers that the appellant's claims at point 31 above are inadmissible as the appellant is simply reproducing the arguments which it raised before the Court of First instance and is seeking a new assessment of its claims by the Court. Moreover, the appellant has not demonstrated how the undisclosed evidence in question would have been helpful for its defence. The Commission also considers that the appellant's claim at point 33 above is materially incorrect.

3.    Assessment

37.    I shall deal firstly with the claim of the Commission raised at point 34 above. The Commission argues in effect that the second and third part of the appellant's first ground of appeal are estopped as the appellant failed to exhaust all the remedies available to it concerning access to the documents in question during the administrative procedure before the Commission.

38.    I consider that that argument should be rejected. Firstly, the Commission has not established that the appellant actively misled it or failed to act in good faith with regard to the undisclosed documents in question during the administrative procedure. The mere failure of the appellant to exhaust its remedies before the Commission could not have inappropriately induced any misapprehension on the part of the Commission that the appellant would not follow up on its request of access to the documents in question before the Community courts. (22) Secondly, in the absence of any legislative provision which specifically requires an interested party to exhaust the remedies available to it during the administrative procedure before the Commission, I consider that the imposition of such a requirement by the Court would inappropriately limit the rights of defence of that party and deny it full access to justice. (23)

39.    As regards the claim by the appellant referred to at point 30 above to the effect that paragraph 65 of the contested judgment incorrectly summarised its arguments, it should be noted that those exact arguments were contained in point 43 of the Judge-Rapporteur's report for the hearing before the Court of First Instance, that hearing having been held on 23 January 2007.

40.    According to the case-law of the Court, the purpose of the Judge-Rapporteur's report is to present in summary form the elements of fact and law in the case and the pleas and arguments of the parties, and it is open to the parties before or during the hearing to ask for corrections to be made or to express reservations. Moreover, the judges of the Court of First Instance who took part in the deliberations had access throughout the procedure to all the documents which made up the case-file. (24)

41.    In Case T-52/03, the Judge-Rapporteur's report was sent to the parties by the registry of the Court of First Instance on 11 December 2006 and the parties were invited to submit observations on that report prior to the hearing. Contrary to the Commission, which on 15 January 2007 submitted written observations on the report in question, Knauf Gips KG did not submit any observations. Moreover, at the hearing on 23 January 2007, Knauf Gips KG did not raise any objection to the summary of its claims and arguments contained in the Judge-Rapporteur's report. The absence of such an objection is reflected in the minutes of the hearing drawn up by the Registrar pursuant to Article 63 of the Rules of Procedure of

the Court of First Instance which were signed by the President and by the Registrar and which constitute an official record.

42.     In the absence of any objection on the part of Knauf Gips KG to the Judge-Rapporteur's report in Case T-52/03 and given that the formation of the Court of First Instance had access throughout the procedure to all the documents which made up the case-file in that case, I consider that the appellant's claim referred to at point 30 above should be dismissed.

43.     Moreover, for the sake of completeness, I would stress that it is clear from the findings of the Court of First Instance at paragraphs 68 to 77 of the contested judgment that that court examined in detail the claims raised by Knauf Gips KG (25) concerning the Commission's refusal to grant it access to exculpatory evidence.

44.     As regard the appellant's claim that the Court of First Instance incorrectly applied the case-law of the Court concerning exculpatory evidence, it is sufficient for the undertaking to show that it would have been able to use the exculpatory documents in its defence, in the sense that, had it been able to rely on them during the administrative procedure, it would have been able to put forward evidence which did not agree with the findings made by the Commission at that stage and would therefore have been able to have some influence on the Commission's assessment in any decision it adopted, at least as regards the gravity and duration of the conduct of which it was accused and, accordingly, the level of the fine. The possibility that a document which was not disclosed might have influenced the course of the proceedings and the content of the Commission's decision can be established only if a provisional examination of certain evidence shows that the documents not disclosed might – in the light of that evidence – have had a significance which ought not to have been disregarded. (26)

45.     The Court of First Instance specifically referred to the above case-law on undisclosed exculpatory evidence at paragraph 67 of the contested judgment. Moreover, at paragraph 78 of the contested judgment, the Court of First Instance found that if Knauf Gips KG had had access to the documents in question during the administrative procedure, the Commission's assessment could not have been influenced by those documents.

46.     I would note that despite the overall finding of the Court of First Instance at paragraph 78 of the contested judgment, the wording of paragraph 74 of the contested judgment in which that court states that point 4.2.1 of BPB's reply 'could not have changed the final result' is rather inapt in the context of exculpatory evidence and is somewhat reminiscent of the case-law applicable to undisclosed incriminating evidence. (27) However, in my view, the use of such terminology is not such as to invalidate the contested judgment. I consider that a mere statement, without any supporting evidence, by another party to a cartel in which it seeks to deny the anti-competitive object or effect of an exchange of information cannot constitute exculpatory evidence.

47.     Consequently, I consider that the claim referred to at point 31 above should be rejected.

48.     As regards the appellant's claims at points 31 and 32 above in which it contests the finding by the Court of First Instance that certain sections of BPB's reply to the statement of objections do not contain exculpatory evidence, it should be borne in mind that the appraisal of the facts by the Court of First Instance does not – save where the clear sense of the evidence produced before it is distorted – constitute a question of law which is subject, as such, to review by the Court. (28)

49.     In my view, the assessment carried out by the Court of First Instance at paragraphs 69 to 78 of the contested judgment concerned whether the sections of BPB's reply to the Commission's statement of objections constituted exculpatory evidence and could have been used by Knauf Gips KG for its defence. It therefore concerned a question of fact. (29) In the absence of any claim that the Court of First Instance distorted the facts, the appellant's complaint against the assessment by the Court of First Instance must, in my view, be rejected as inadmissible.

50.     As regards the claim referred to at point 33 above that the Court of First Instance failed to

examine Knauf Gips KG's claims concerning point 4.1.16 of BPB's reply, I consider that it cannot be upheld. The main import of point 4.1.16 of BPB's reply to the statement of objections is that 'competition remained intense across the various European markets' despite the 'alleged undertaking' reached at the London meeting. The issue of continued competition was in fact addressed by the Court of First Instance at paragraphs 72 and 75 of the contested judgment. The claim that the Court of First Instance failed to examine Knauf Gips KG's submission concerning point 4.2.3 of BPB's reply to the statement of objections which provided that the figures exchanged between BPB and its competitors did not enter the BPB planning process must, in my view, be rejected in the light of paragraph 74 of the contested judgment. Paragraph 74 of the contested judgment specifically assesses the claim by BPB that the information exchanged was only known by Mr [D], director of Gyproc and Chief Executive Officer of BPB.

51.    In addition, it is clear from paragraph 76 of the contested judgment that the Court of First Instance examined points 4.3.28 and 4.3.34 of BPB's reply concerning the Versailles meeting and found that their contents did not constitute exculpatory evidence. Given that Knauf Gips KG's claim concerning the meetings in Brussels and The Hague in 1997 and 1998 respectively was dependent on a finding by the Court of First Instance that points 4.3.28 and 4.3.34 of BPB's reply concerning the Versailles meeting constituted exculpatory evidence, I consider that that court did not incorrectly fail to address Knauf Gips KG's claim concerning the meetings in Brussels and The Hague.

52.    I therefore consider that the Court should reject the first ground of appeal in its entirety.

## VI – Second ground of appeal: infringement of Article 81 EC

### A –   *Argument*

53.    The appellant claims that paragraphs 140 to 298 of the contested judgment are without sufficient material basis as the Court of First Instance based its finding of an infringement of Article 81(1) EC on undisclosed incriminating evidence. Moreover, the Court of First Instance did not respect its assertion at paragraph 63 of the contested judgment that it would not take into account the evidence in question when it examined the substance of the contested decision.

54.    The appellant submits that, even taking into account illegal evidence, the finding of the Court of First Instance in respect of the five elements of the infringement by the appellant does not support a finding of an infringement of Article 81(1) EC. According to the Court of First Instance the infringement in question was composed of five parts, namely, the meeting in London in 1992, the exchange of information concerning sale quantities in Germany, France, Benelux and the United Kingdom from 1992 to 1998, the exchange of information on price increases in the United Kingdom from 1992 to 1998, the agreements on market shares in Germany (Versailles, Brussels and The Hague meetings) from June 1996 and the agreement on price increases in Germany from 1996. However, on the basis of the findings of fact of the Court of First Instance, none of those situations fulfils the criteria for finding an infringement pursuant to Article 81(1) EC. The appellant also criticises various aspects of the ruling of the Court of First Instance in relation to the five elements or manifestations contained in paragraphs 140 to 298 of the contested judgment.

55.    The Commission considers that the appellant's second ground of appeal is inadmissible as the appellant merely criticises the findings of fact of the Court of First Instance. The Commission also notes that the appellant does not contest the existence of a single, continuous infringement on which the contested decision is based. The appellant's second ground of appeal is based on the concept that none of the parts or elements of the infringement, which, considered together, constitute the infringement, infringe in themselves Article 81 EC. The appellant thus misconstrues the essential point of the contested decision and the Court of First Instance's assessment of the evidence. The Court of First Instance, referring to *AalborgPortland and Others* v *Commission*, (30) considered that the existence of an anti-competitive practice or agreement must be inferred from a number of coincidences and indicia which, taken together, may, in the absence of another plausible explanation, constitute evidence of an

infringement of the competition rules. The Court of First Instance held that that case-law is transposable to the concept of a single continuous infringement as each manifestation corroborates the existence of such an infringement.

56.     The Commission also considers that the appellant's claim at point 53 above is inadmissible as the appellant failed to identify the sections of the contested judgment which it criticises and merely refers summarily to paragraphs 140 to 298 of the contested judgment.

B –   *Assessment*

57.     It is clear from paragraph 299 of the contested judgment that Knauf Gips KG claimed before the Court of First Instance that it could not be charged with participation in a single infringement over a lengthy period thereby leading to a reduction in gravity of the infringement and to the prescription of isolated facts that allegedly took place more than five years before the beginning of proceedings.

58.     The Court of First Instance found at paragraph 306 of the contested judgment that it is clear from paragraph 479 of the contested decision 'that the set of agreements and concerted practices in the present case form part of a series of actions by the undertakings in question pursuing a single economic aim, namely the restriction of competition, and constitute the various manifestations of a complex, continuous agreement the object and effect of which was to restrict competition. In view of the fact that the abovementioned agreements and concerted practices gave, without interruption from 1992 until 1998, substantive shape to the parties' common wish to stabilise, and hence restrict competition on, at least the German, French, UK and Benelux plasterboard markets, the Commission characterises the infringement as single, complex and continuous.' Thus Article 1 of the contested decision provides, inter alia, that the appellant 'infringed Article 81(1) of the Treaty by participating in a set of agreements and concerted practices in the plasterboard business'. (31) Applying the case-law in *Aalborg Portland and Others* v *Commission* (32) the Court of First Instance rejected Knauf Gips KG's plea against the qualification of the practices in question as a single, continuous infringement. (33)

59.     The appellant has not called into question that finding of the Court of First Instance on the existence of a single, continuous infringement of Article 81(1) EC in the present appeal. Rather the appellant seeks to demonstrate that none of the individual five elements or manifestations of the infringement support, in isolation, a finding of an infringement of Article 81(1) EC. Given that the contested decision and indeed the contested judgment are premissed on the existence of a single, continuous infringement, albeit made up of different elements, I consider that it is of no avail for the appellant to claim that those individual elements, viewed in isolation, do not constitute an infringement of Article 81(1) EC. The claim in question should therefore, in my opinion, be rejected.

60.     Moreover, given that the appellant has failed to specifically identify the elements of incriminating evidence allegedly invoked by the Court of First Instance in its finding at paragraphs 140 to 298 of the contested judgment, I consider that that claim should be rejected as inadmissible due to vagueness.

61.     I therefore consider that the Court should reject the second ground of appeal.

**VII – Third ground of appeal: infringement of Article 15 of Regulation No 17 and Article 81 EC**

A –   *Argument*

62.     The appellant claims that the Court of First Instance infringed Article 15 of Regulation No 17 by taking into account the turnover of the companies within the Knauf group when calculating the 10% upper limit imposed by that provision. It considers that the Court of First Instance erred in law in finding that the appellant formed an economic unit with the other companies in the Knauf group and by considering that the appellant was responsible for the actions of the Knauf group.

63.     The appellant considers that at paragraph 348 of the contested judgment, the Court of First Instance failed to act with objectivity and impartiality. The appellant contests the finding of the Court of

First Instance that Gebrüder Knauf Verwaltungsgesellschaft KG benefited from the infringement in question.

64.     The appellant claims that the Court of First Instance incorrectly considered that it together with Gebrüder Knauf Verwaltungsgesellschaft KG and its subsidiaries constitute an economic unit.

65.     The appellant contests the nine factors on which the Court of First Instance based its finding of an economic unit. The appellant considers that *Stora Kopparbergs Bergslags* v *Commission* (34) is not applicable as the appellant is not controlled by another company. Moreover, the appellant does not hold any shares in the companies related to Gebrüder Knauf Verwaltungsgesellschaft KG. The appellant considers that the case-law relating to commercial agents (35) referred to at paragraphs 350, 351 and 355 of the contested judgment is also not applicable. The appellant considers that *HFB and Others* v *Commission*, (36) referred to at paragraphs 343 to 346 of the contested judgment, is also not applicable as in that case the finding of an economic unit was based on the fact that all the shares in the different companies were held by the same person. In the case at hand, the appellant and Gebrüder Knauf Verwaltungsgesellschaft KG are held by 22 shareholders each of which has a minority shareholding.

66.     A finding of an economic unit may also not be based on the joint control of the appellant and the other companies by the many shareholders belonging to the Knauf families. A finding of joint control is excluded where shifting or varying majorities are possible among the shareholders. The Court of First Instance in *Baustahlgewebe* v *Commission* (37) and the Commission in its decision in that case, found that there was no economic unit in a case concerning four minority shareholders. The family contract mentioned at paragraph 349 of the contested judgment did not place the companies in question under joint control.

67.     The appellant considers that the contested judgment is contrary to the case-law of the Court, in particular *Aristrain* v *Commission*, (38) in which the Court found that the simple fact that the share capital of two separate commercial companies is held by the same person or the same family is insufficient, in itself, to establish that those two companies are an economic unit with the result that, under Community competition law, the actions of one company can be attributed to the other and that one can be held liable to pay a fine for the other.

68.     The appellant considers that there are no other legal reasons which justify the finding of an economic unit. The fact that the same two shareholders managed all the Knauf companies is irrelevant (paragraph 345 of the contested judgment). At paragraph 346 of the contested judgment, the Court of First Instance stated that there is no evidence that the two Knauf cousins Mr [B] and Mr [C] did not represent the Knauf group within the framework of the different manifestations of the infringement. The appellant claims that the statement of the Court of First Instance infringes the principle of *in dubio pro reo*. Moreover, the fact that the same persons represent different companies does not imply that the companies are not autonomous from a competition perspective. The appellant also considers that the finding at paragraph 346 of the contested judgment that the sales figures exchanged in the course of the infringement related to the different companies in the Knauf group does not indicate anything with regard to the structural relations between the participants or the companies concerned by the exchange and thus the existence of an economic unit. In addition, the appellant considers that the finding at paragraph 347 of the contested judgment that the existence of an economic unit is also based on the fact that Knauf Gips KG, following a request, sent the Commission, in addition to its own turnover figures, the turnover figures of the other companies within the Knauf group, is legally ineffective. The information in question was sent following inspections and in order to avoid the Commission considering that the disclosure was unsatisfactory. The appellant considers that the statement at paragraph 356 of the contested judgment in support of the finding of an economic unit is contradictory. The fact that the appellant is the only company which is not managed by Gebrüder Knauf Verwaltungsgesellschaft KG does not explain why the fine has been imposed on the appellant and not on Gebrüder Knauf Verwaltungsgesellschaft KG. It is not clear why the appellant should be considered as an economic unit with Gebrüder Knauf Verwaltungsgesellschaft KG given that the appellant is independent of the latter. The appellant contests the finding at paragraph 357 of the contested judgment to the effect that as 'most' of the documents

found during inspections were on its headed notepaper the appellant represents the Knauf group. The appellant considers that a rule of interpretation which concludes that the person who produces 'most' of the documents automatically 'represents' the other participants in the infringement is not supported by the legal systems of the Member States or by Community cartel law. Moreover, it is not clear how the Commission selected the documents in question from all the documents available during the investigation. The appellant considers that the statement at paragraph 357 of the contested judgment that there is no doubt that the appellant coordinates the operational activities of the Knauf group on the relevant market is diametrically opposed to the statement at paragraph 337 of the contested judgment that there is 'consequently not one legal entity which, at its head, could, as the body charged with coordinating the group's activities, be held responsible for the infringements committed'. The statement at paragraph 358 of the contested judgment that the appellant was the sole interlocutor with the Commission during the administrative procedure is not legally conclusive and stems from the fact that in the letter accompanying the statement of objections of 19 April 2001, the Commission opened a formal procedure only against the appellant despite the fact that inspections also took place at other companies. The appellant claims that its lawyers replied to the statement of objections in the appellant's name and on its behalf.

69.     The appellant also contests the statements at paragraphs 359 and 360 of the contested judgment in accordance with which the appellant, during the administrative procedure, should have objected to the Commission's supposition of the existence of an economic unit in order not to be estopped from doing so. The appellant considers that those statements infringe the principle of *in dubio pro reo*. Given that the statement of objections was only addressed to the appellant, the appellant only pleaded on its own behalf. The statement of objections did not indicate that the appellant would be held responsible for the other companies with the Knauf name.

70.     The Commission considers that the Court of First Instance came to its finding of the existence of an economic unit on the basis of a number of elements (paragraph 342 of the contested judgment) including in particular the fact that in the course of the infringement the Knauf cousins represented the whole of the Knauf group, the fact that the sales figures exchanged during the course of the infringement related to all the Knauf companies active on the plasterboard market (paragraph 346 of the contested judgment) and the fact that the shares of the companies within the Knauf group held by the holding company Gebrüder Knauf Verwaltungsgesellschaft KG were administered by the latter on behalf of the family company which held and controlled it. The statement at paragraph 348 of the contested judgment must be viewed in context. Given that context, the Court of First Instance has not shown itself to be biased. Indeed, if it is established that the Knauf cousins represented the whole group in the infringement, it is clear that all the Knauf companies benefited from the infringement.

71.     The Commission notes that the Court of First Instance did not refer to the *Stora Kopparbergs Bergslags* v *Commission* (39) case-law but to the general principles governing the existence of an economic unit. *Stora Kopparbergs Bergslags* v *Commission* (40) and the case-law concerning commercial agents are cases of specific application of the general principles in question. In any event, it is possible in this case to draw a parallel with the *Stora Kopparbergs Bergslags* v *Commission* (41) case-law even if it is not directly applicable. The Court of First Instance found that the companies within the Knauf group were controlled by the Knauf family in accordance with the family contract which ensured that the whole group fell under single management. The Knauf cousins managed all the companies within the group including the two parent companies and they represented all the Knauf companies active on the plasterboard market within the framework of the infringement. The Commission considers that the appellant's claims concerning *HFB and Others* v *Commission* (42) are not relevant. At paragraphs 342 and 343 of the contested judgment the Court of First Instance stated that the existence of an economic unit must be assessed on a case-by-case basis and it is possible (as in *HFB and Others* v *Commission*) to find that an economic unit exists on the basis of a series of elements which demonstrate a relationship of control. The Court of First Instance saw a parallel between *HFB and Others* v *Commission* and the present case in the control that the Knauf family company exercises over the Knauf group, the key position of the Knauf cousins, the manner in which they present themselves as representatives of the Knauf group and the fact that the sales figures exchanged during the infringement related to the whole

group. The Court approved such criteria in its judgment in *Dansk Rørindustri and Others* v *Commission*. (43)

72.    The Commission considers that the appellant's observations on the possibility of fluctuating majorities amongst the shareholders contradict the family contract which guarantees a single management and the single, concentrated exercise of shareholder rights. Moreover, the Commission considers that the fact that there are fluctuating majorities amongst the shareholders is irrelevant as in accordance with the family contract there are two decision-making organs which exercise control over the Knauf group (together with the management of the two Knauf cousins of the whole group) and guarantee that the group acts on the market as a single unit. The control exercised by the family company was confirmed by the appellant in its response of 19 September 2002 to a question of the Commission (paragraph 347 of the contested judgment).

73.    The Commission considers that the contested judgment does not contradict the finding of the Court in *Aristrain* v *Commission*. (44) The finding of the contested judgment on the existence of an economic unit is not simply based on the fact that the two parent companies within the Knauf group have identical shareholders. The Commission also claims that the different circumstances established by the Court of First Instance prove the existence of an economic unit. In that regard the Commission stresses the position of the Knauf cousins as managing shareholders who ensured the single management of the group (paragraph 345 of the contested judgment). The Knauf cousins were personally implicated in the infringement and the group's competitors considered their actions as those of the Knauf group (paragraph 346 of the contested judgment). Moreover, the Commission notes that the appellant does not contest the fact that the sales figures exchanged within the framework of the infringement concerned all the Knauf companies active on the plasterboard market. The aggregation of the sales figures demonstrated that the whole Knauf group is represented by the Knauf cousins (or the appellant). As regards the appellant's statement relating to the forwarding of its turnover and that of the other companies within the Knauf group to the Commission, the Commission notes that the information was forwarded after the statement of objections had been sent. The statement of objections only mentions the appellant as the addressee. The Court of First Instance correctly found that the fact that the appellant furnished, of its own volition, the turnover of the Knauf group and those Knauf companies active on the plasterboard market is additional evidence that the appellant itself considered that there existed an economic unit and that it represented all the Knauf companies which produce plasterboard.

74.    The Commission considers that the appellant's arguments concerning the assessment by the Court of First Instance of its particular role within the Knauf group (paragraph 354 of the contested judgment) are irrelevant as the appellant only contests the existence of an economic unit. The following remarks are thus ancillary in nature.

75.    The Commission stresses the particular position of the appellant as the Knauf company responsible for the infringement. The Commission notes that the appellant is one of the two parent companies within the group. Contrary to Gebrüder Knauf Verwaltungsgesellschaft KG, the appellant is not a mere holding company and the former depends on the appellant for certain resources. Gebrüder Knauf Verwaltungsgesellschaft KG as a mere holding company could not be held responsible for the actions of the group (paragraphs 348 and 355 of the contested judgment), that responsibility lies with the appellant. The Court of First Instance found at paragraphs 346 and 357 of the contested judgment that the appellant coordinated the operational activities of the Knauf group on the relevant market. That finding does not conflict with the statement at paragraph 361 of the contested judgment that it is not possible to identify any legal entity which, at its head, coordinates the group's activities. Even though the appellant is only one of two parent companies, it had a coordinating role due in particular to the fact that it was used by the Knauf cousins as an instrument to manage the undertaking.

76.    As regards the appellant's claims at point 69 above concerning estoppel, the Commission considers that the appellant both before and after the notification of the statement of objections acted in the name of the other Knauf companies. The Commission considers that the Court of First Instance's statements at paragraphs 359 and 360 of the contested judgment must be viewed in the context of the

statement at paragraph 358. During the administrative procedure the appellant stated that it had a leading role within the Knauf undertaking and thus gave the impression to the Commission that it was at the head of the group. The Commission therefore notified the statement of objections to the appellant and not to the other companies within the group, while nonetheless indicating that the infringement concerned the Knauf group (paragraph 359 of the contested judgment).

B –   *Assessment*

77.    In my view, the appellant's claim that the Court of First Instance, at paragraph 348 of the contested judgment, failed to act with objectivity and impartiality, is wholly unsubstantiated and unfounded. The mere fact that the Court of First Instance's finding of fact in that paragraph differs from the appellant's claims by no means indicates any lack of objectivity and impartiality on the part of that court. Moreover, as was pointed out by the Commission, it is clear, in particular from paragraphs 344 to 347 of the contested judgment, that the finding of the Court of First Instance in paragraph 348 of the contested judgment that Gebrüder Knauf Verwaltungsgesellschaft KG and its subsidiaries benefited from the infringement in question was based on a number of considerations which were examined and assessed by that court and was thus not reached in the abstract.

78.    Furthermore, the finding of the Court of First Instance that Gebrüder Knauf Verwaltungsgesellschaft KG and its subsidiaries benefited from the infringement in question constitutes an assessment of facts which, in the absence of any distortion of the clear sense of the evidence, falls pursuant to Article 225 EC and the first paragraph of Article 58 of the Statute of the Court of Justice within the exclusive jurisdiction of the Court of First Instance. (45)

79.    The Court of First Instance examined in the context of Knauf Gips KG's plea concerning the infringement of Article 15 of Regulation No 17 firstly, whether the Knauf group constituted an economic unit for the purposes of competition law and secondly, whether Knauf Gips KG was responsible for the coordination of the actions of the Knauf group. In my view and contrary to the submission of the Commission at point 74 above, the appellant has challenged, in the course of the appeal proceedings before this Court, the findings of the Court of First Instance on both the aforementioned matters.

80.    On the question of the existence of an economic unit, it is settled case-law that Community competition law refers to the activities of undertakings, and that the concept of an undertaking covers any entity engaged in an economic activity, regardless of its legal status and the way in which it is financed. The Court has also stated that the concept of an undertaking, in the same context, must be understood as designating an economic unit even if in law that economic unit consists of several persons, natural or legal. (46) Thus, in my view, the assessment of whether a group of companies constitutes an economic unit is not a matter of legal form but requires a case-by-case analysis, close attention being paid to the specific facts of each individual case. Moreover, I would note that the existence of an economic unit may be found on the basis of a number of different facts, none of which would individually substantiate such a finding.

81.    As regards the appellant's claim that the *Stora Kopparbergs Bergslags* v *Commission* (47) case-law is not applicable, I would note firstly that the Court of First Instance did not rely in the contested judgment on that case in its assessment of the existence of an economic unit. In addition, the fact that the appellant does not in parallel with the specific facts of *StoraKopparbergs Bergslags* v *Commission*, inter alia, control 100% of the shares of another company does not, in my view, prevent a finding on other grounds that the appellant forms part of an economic unit for the purposes of competition law.

82.    Moreover, while the Court of First Instance did cite case-law relating to commercial agents at paragraphs 350, 351 and 355 of the contested judgment and cited *HFB and Others* v *Commission* (48) at paragraph 343 of the contested judgment, there is no indication that the Court of First Instance considered that the specific facts of those cases were replicated in the present case. (49) The Court of First Instance merely sought to highlight, in general terms, a number of factors which may give rise to a finding of an economic unit.

83.     As regards the appellant's claims at point 66 above, I would note that in *Baustahlgewebe* v *Commission* the Court of First Instance assessed whether agreements must be regarded as an agreement internal to a group and thus not caught by Article 81(1) EC. The Court of First Instance found in that case that Article 81 EC does not apply to agreements and concerted practices between undertakings belonging to a single group as parent company and subsidiary if those undertakings form an economic unit within which the subsidiary has no real freedom to determine its course of action on the market. Such a situation does not exist where an undertaking exercises no control over another other than that deriving from a holding in its capital which falls far short of a majority interest. (50)

84.     In *Baustahlgewebe* v *Commission*, the Court of First Instance found on the facts that the actual degree of control which was exercised by Arbed over Baustahlgewebe corresponded to its percentage holding in the capital thereof, namely 25.001%, which falls far short of a majority interest. The Court of First Instance found that such a holding does not justify the conclusion that the companies in question belonged to a group within which they formed an economic unit with the result that an agreement between those two undertakings restricting competition would not be caught by Article 81(1) EC.

85.     In my view, it is clear that the Court of First Instance in *Baustahlgewebe* v *Commission* (51) did not base its finding on absence of control solely on the numerical percentage shareholding of Arbed in Baustahlgwebe, but examined the actual level or degree of control in question and found that it was insufficient. The actual reality rather than mere form was thus, in my view, correctly favoured by the Court of First Instance. I consider therefore that the mere legal possibility of fluctuating majorities within the Knauf group of companies, including the appellant and Gebrüder Knauf Verwaltungsgesellschaft KG, due to the existence of 22 shareholders does not *per se* exclude a finding of an economic unit.

86.     I also consider that the appellant has failed to demonstrate that the contested judgment is contrary to the judgment of the Court in *Aristrain* v *Commission*. (52) In that case, the Court found that the simple fact that the share capital of two separate commercial companies is held by the same person or the same family is insufficient, in itself, (53) to establish that those two companies are an economic unit with the result that, under Community competition law, the actions of one company can be attributed to the other and that one can be held liable to pay a fine for the other. (54) It is clear from the extensive findings of the Court of First Instance at paragraphs 337 to 362 of the contested judgment that that court did not base its finding on the existence of an economic unit on the basis of one simple, isolated fact. (55) Indeed the appellant itself in its appeal objected to the 'nine' grounds (56) on which the Court of First Instance based its finding concerning the existence of an economic unit.

87.     In my view, contrary to the claim of the appellant at point 68 above, the Court of First Instance has at paragraphs 344 to 350 of the contested judgment listed a number of facts which, taken together rather than in isolation, lead to the conclusion that the companies owned by the Knauf family constitute an economic unit for the purposes of Article 81(1) EC.

88.     It is clear from the contested judgment that all the companies within the Knauf group have the same 22 shareholders which are made up of the two branches of the Knauf family (57) and that all those companies were managed by the same two Knauf cousins. (58)

89.     The Court of First Instance also found at paragraph 346 of the contested judgment that there is no evidence that the two Knauf cousins did not represent the Knauf group within the framework of the infringement and it is uncontested that the sales figures exchanged during the infringement in question related to all the companies in the Knauf group active on the plasterboard market. I consider that the Court of First Instance did not infringe the principle of *in dubio pro reo* by its statement regarding the absence of any evidence which would indicate that the Knauf cousins did not represent the Knauf group during the infringement in question. The Court of First Instance merely stated that the evidence points to the representative role of the Knauf cousins and that no evidence has been presented to indicate otherwise. There is no indication that the Court of First Instance had any hesitation regarding the probative value of the evidence actually available to it. Moreover, in my view, the fact that the sales figures exchanged related to all the companies in the Knauf group active on the plasterboard market

constitutes additional evidence which tends to indicate that those companies acted as an economic unit with a common interest. Contrary to the claim of the appellant at point 68 above, it is not necessary that such an exchange should demonstrate some formal structural link between the companies in question.

90.     At paragraph 347 of the contested judgment, the Court of First Instance also found that the appellant, in its response of 19 September 2002 to a request for information by the Commission pursuant to Article 11 of Regulation No 17, not only indicated its own turnover, as requested by the Commission, but also volunteered without being requested, inter alia, the turnover of all the companies within the Knauf group. I consider that the Court of First Instance rightly treated that fact as additional evidence that the companies belonging to the Knauf family constitute an economic unit with common interests. I do not find the appellant's claim that it sent the information in question in order to avoid the Commission considering that the disclosure was unsatisfactory convincing. (59) The information in question was sent on 19 September 2002, more than one year after the Commission had specifically addressed the statement of objections, inter alia, to the appellant (60) on 18 April 2001. Given that the statement of objections must specify unequivocally the legal person on whom fines may be imposed and be addressed to that person, (61) the appellant, when it forwarded the turnover figures in question on 19 September 2002 was fully aware that a fine could be imposed on it rather than on the other companies within the Knauf group. (62) The Court of First Instance also found that Gebrüder Knauf Verwaltungsgesellschaft KG was only a holding company without personnel which was managed by the same management as the appellant, on the same premises of the appellant. (63) In addition, the Court of First Instance at paragraph 349 of the contested judgment cited *in extensio* Article 1 of the Knauf family contract which seeks to ensure, inter alia, that the companies within the Knauf group are under a single management with a common purpose. (64)

91.     I consider therefore that the appellant has failed to demonstrate that the Court of First Instance erred in law in finding that the companies belonging to the Knauf family constitute an economic unit.

92.     As regards the levying of the fine on the appellant, it is settled case-law that the anti-competitive conduct of an undertaking can be attributed to another undertaking where it has not decided independently upon its own conduct on the market but carried out, in all material respects, the instructions given to it by that other undertaking, having regard in particular to the economic and legal links between them. (65)

93.     In addition, in my view it can be surmised from *Aristrain* v *Commission* that it may in certain circumstances be possible to impute to a company all of the acts of a group even though that company has not been identified as the legal person at the head of that group with responsibility for coordinating the group's activities. (66)

94.     The Court of First Instance found that Knauf Gips KG was responsible for the actions of the Knauf group on the basis of a number of factors. (67)

95.     As an integral part of its reasoning on the matter the Court of First Instance noted at paragraph 359 of the contested judgment that the Commission considered in the statement of objections that the infringement concerned the whole Knauf group. In addition, according to that court, the appellant should have been aware from the statement of objections that it was likely to be the addressee of the Commission's final decision. Despite this fact, the appellant replied to the Commission without putting in question its role as the company responsible for the actions of the group in the course of the infringement. The Court of First Instance, citing *Akzo Nobel and Others* v *Commission* (68) stated that in such a situation, the onus was on the appellant to react during the administrative procedure, or be faced with the prospect of no longer being able to do so, by demonstrating that, despite the factors relied on by the Commission, it could not be held liable for the infringement committed by the Knauf group. (69)

96.     I consider that the Court of First Instance erred in law by finding that unless the appellant reacted during the course of the administrative procedure it would be estopped from doing so before the Court of First Instance. In my view, in the absence of a finding by the Court of First Instance that the appellant

actively misled the Commission or failed to act in good faith during the administrative procedure as to its role within the Knauf group, the mere failure of the appellant to contest during that procedure a particular position adopted by the Commission, and more specifically in the statement of objections, cannot limit the rights of defence of the appellant before the Court of First Instance and deny it full access to justice.

97.     It follows that the contested judgment must be set aside in so far as it found that Knauf Gips KG was responsible for the actions of the Knauf group and in dismissing Knauf Gips KG's plea based on an infringement of Article 15(2) of Regulation No 17.

98.     Under Article 61 of the Statute of the Court of Justice, if the appeal is well founded, the Court is to quash the decision of the General Court. It may then itself give final judgment in the matter, where the state of the proceedings so permits, or refer the case back to the General Court for judgment.

99.     In the present case, I consider that the state of the proceedings is such as to permit final judgment in the matter. It therefore falls, in my view, to the Court to give final judgment on the appellant's application for reduction of the fine imposed on it by the contested decision.

100. It should be noted that, in addition to its findings at paragraphs 359 and 360 of the contested judgment, the Court of First Instance also found at paragraph 356 of the contested judgment that the appellant was the only company active on the relevant market which was not managed by the holding company Gebrüder Knauf Verwaltungsgesellschaft KG. ([70](#)) In my view, that fact alone does not explain why the fine was imposed on the appellant.

101. However, the Court of First Instance had previously found at paragraph 348 of the contested judgment that Gebrüder Knauf Verwaltungsgesellschaft KG was only a holding company without personnel which was managed by the same management as the appellant, on the premises of the appellant. These facts tend to demonstrate, in my view, that while the two companies are legally distinct, the appellant is in fact materially responsible for the coordination of the activities of the holding company Gebrüder Knauf Verwaltungsgesellschaft KG and therefore the other companies in the Knauf group held by the latter.

102. The Court of First Instance also stated at paragraph 357 of the contested judgment that most of the documents coming from the Knauf group found by the Commission during its investigation were on the headed note paper of the appellant. It is clear from *Aalborg Portland and Others* v *Commission* ([71](#)) that in the context of an investigation concerning a cartel, the evidence found by the Commission during its investigation is normally only fragmentary and sparse and it is often necessary to reconstitute certain details by deduction. I consider that such written evidence, despite the fact that it may, as claimed by the appellant, only be a cross-section of the documents actually available during the investigation is very compelling evidence of the coordinating or key role played by the appellant in relation to the operational activities of the Knauf group in the context of the infringement.

103. In my view, the finding at paragraph 358 of the contested judgment that the appellant was the sole interlocutor with the Commission during the administrative procedure is not, as claimed by the appellant, legally conclusive in itself. However, it does tend to indicate that the appellant plays a key role in the Knauf group in the context of the infringement, ([72](#)) a fact which is also corroborated, in my view, by the finding of the Court of First Instance at paragraph 347 of the contested judgment concerning the voluntary communication by the appellant of the turnover figures of all the companies within the Knauf group.

104. The appellant claims that its position as sole interlocutor stems from the fact that in the letter accompanying the statement of objections of 19 April 2001, the Commission opened a formal procedure only against the appellant despite the fact that inspections took place at other companies. In my view, that claim is not credible given that in its response to the statement of objections, which was ostensibly written on its behalf, the appellant in fact referred not only to its own behaviour and situation but also on a number of occasions to the behaviour of the Knauf group and other companies within the Knauf group. In

addition, as claimed by the Commission, there is nothing to suggest that the reference at paragraph 358 of the contested judgment to the administrative procedure before the Commission is limited to the investigation following the notification of the statement of objections and does not cover the procedure which predated that notification.

105. In view of the facts referred to in points 100 to 104 of this opinion, I consider that the Court should find that the Commission did not make an error of assessment in finding that Knauf Gips KG was the company responsible for coordinating the Knauf group in the context of the infringement. It follows from the foregoing that the plea put forward by Knauf Gips KG in support of its application before the Court of First Instance, concerning infringement of Article 15(2) of Regulation No 17, is in my view unfounded and should, therefore, be rejected.

## VIII – Costs

106. Under Article 69(2) of the Rules of Procedure, which applies to appeal proceedings by virtue of Article 118 thereof, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. Since the Commission has applied in its pleadings for the appellant to be ordered to pay the costs, and the appellant has been unsuccessful, the appellant must be ordered to pay the costs. As regards the costs of the proceedings at first instance which led to the contested judgment, they should in my view be borne in the manner determined in paragraph 2 of the operative part of that judgment.

## IX – Conclusion

107. I therefore consider that the Court should:

– set aside the judgment of the Court of First Instance of the European Communities (Third Chamber) of 8 July 2008 in Case T-52/03 *Knauf Gips* v *Commission* in so far as that court held that Knauf Gips KG was responsible of the action of the Knauf group and dismissed its plea based on an infringement of Article 15(2) of Council Regulation No 17 of 6 February 1962, First Regulation implementing Articles [81] and [82] of the Treaty;

– for the rest, dismiss the appeal;

– dismiss the action for annulment brought by Knauf Gips KG before the Court of First Instance to the extent to which it is based on a plea in law alleging infringement of Article 15(2) of Regulation No 17;

– order Knauf Gips KG to pay the costs of the present proceedings. The costs of the proceedings at first instance leading to the judgment of the Court of First Instance referred to in paragraph 1 of the operative part of this opinion should be borne in the manner set out in paragraph 2 of the operative part of that judgment.

---

1 – Original language: English.

---

2 – Not published in the ECR.

---

3 – OJ, English Special Edition 1959-1962, p. 87.

---

4 – OJ 2005 L 166, p. 8. See Article 1 of the contested decision.

---

5 – In footnote 4 to the contested decision, the Commission stated that 'Knauf' means all the companies in the Knauf group.

---

6 – See paragraph 2 of the contested decision.

7 – See Article 3 of the contested decision.

8 –      Internal citations omitted.

9 – See paragraphs 45 to 47 of the contested judgment and the case-law cited therein.

10 – See paragraph 50 et seq.

11 – See paragraph 63 of the contested judgment.

12 – Joined Cases C-204/00 P, C-205/00 P, C-211/00 P, C-213/00 P, C-217/00 P and C-219/00 P [2004] ECR I-123.

13 – See, to that effect, order in Case C-137/95 P *SPO and Others* v *Commission* [1996] ECR I-1611, paragraph 47; judgments in Case C-362/95 P *Blackspur DIY and Others* v *Council and Commission* [1997] ECR I-4775, paragraph 23; and Joined Cases C-403/04 P and C-405/04 P *Sumitomo Metal Industries and Nippon Steel* v *Commission* [2007] ECR I-729, paragraph 106.

14 – See *Aalborg Portland and Others* v *Commission*, cited in footnote 12, paragraphs 71 to 73 and the case-law cited therein.

15 – Cited in footnote 12.

16 – See paragraphs 67 to 78 of the contested judgment.

17 – *Aalborg Portland and Others* v *Commission*, cited in footnote 12, paragraphs 74 to 76.

18 – See paragraph 78 of the contested judgment.

19 – See, in particular, Case C-51/92 P *Hercules Chemicals* v *Commission* [1999] ECR I-4235, paragraph 81.

20 – See paragraphs 70 to 77 of the contested judgment.

21 – Cited in footnote 12.

22 – See by analogy Case C-297/98 P *SCA Holding* v *Commission* [2000] ECR I-10101, paragraph 37. In addition, the Court stated in the *Aalborg Portland and Others* v *Commission* case (cited in footnote 12) at paragraphs 101 to 106, that in the context of an action brought before the Court of First Instance against the decision closing an administrative procedure, it is open to that court to order measures of organisation of procedure and to arrange full access to the file, in order to determine whether the Commission's refusal to disclose or communicate a document may be detrimental to the defence of the undertaking concerned. As that examination is limited to a judicial review of the pleas in law, it has neither the object nor the effect of replacing a full investigation of the case in the context of an administrative procedure. It is common ground that belated disclosure of documents in the file does not put the undertaking which has brought the action against the Commission decision back into the situation it would have been in if it had been able to rely on those documents in presenting its written and oral observations to the Commission. Given both the different purpose and extent of the grant of access to the file before the Court of First Instance and the Commission, I do not consider that failure to exhaust all remedies during the administrative procedure should preclude the appellant from raising the matter of denial of access before the Community courts.

23 – See by analogy Case T-30/89 *Hilti* v *Commission* [1991] ECR II-1439, paragraph 38. In addition, in the event that an applicant's claim concerning the exculpatory nature of undisclosed documents were to prosper and it is established that that party failed to avail of a remedy during the administrative procedure to which it had effective access, the Court could consider any dilatory behaviour by that party if established when awarding the costs pursuant to Article 69(3) of the Rules of Procedure of the Court of Justice which provides, inter alia, that the Court may order a party, even if successful, to pay costs which the Court considers that party to have unreasonably or vexatiously caused the opposite party to incur.

24 – Case C-161/97 P *Kernkraftwerke Lippe-Ems* v *Commission* [1999] ECR I-2057, paragraph 58.

25 – In its application in Case T-52/03 and in the separate document drawn up by Knauf Gips KG on 7 July 2006. See reference to the document in question at paragraph 68 of the contested judgment.

26 – *Aalborg Portland and Others* v *Commission*, cited in footnote 12, paragraphs 74 to 76.

27 – And which requires that undertaking to show that the result at which the Commission arrived in its decision would have been different if a document which was not communicated to that undertaking and on which the Commission relied to make a finding of infringement against it had to be disallowed as evidence.

28 – Joined Cases C-238/99 P, C-244/99 P, C-245/99 P, C-247/99 P, C-250/99 P to C-252/99 P and C-254/99 P *Limburgse Vinyl Maatschappij and Others* v *Commission* [2002] ECR I-8375, paragraph 330.

29 – *Limburgse Vinyl Maatschappij and Others* v *Commission*, cited in footnote 28, paragraph 331.

30 – Cited in footnote 12.

31 – See paragraph 307 of the contested judgment.

32 – See paragraph 309 of the contested judgment; case cited in footnote 12.

33 – See paragraph 321 of the contested judgment.

34 – Case C-286/98 P [2000] ECR I-9925.

35 – Case T-66/99 *Minoan Lines* v *Commission* [2003] ECR II-5515.

36 – Case T-9/99 [2002] ECR II-1487.

37 – Case T-145/89 [1995] ECR II-987.

38 – Case C-196/99 P [2003] ECR I-11005.

39 – Cited in footnote 34.

40 – Idem.

41 – Idem.

42 – Cited in footnote 36.

43 – Joined Cases C-189/02 P, C-202/02 P, C-205/02 P to C-208/02 P and C-213/02 P [2005] ECR I-5425.

44 – Case cited in footnote 38.

45 – Joined Cases C-101/07 P and C-110/07 P *Coop de France bétail et viande and Others* v *Commission* [2008] ECR I-0000, paragraph 58; see also Joined Cases C-322/07 P, C-327/07 P and C-338/07 P *Papierfabrik August Koehler and Others* v *Commission* [2009] ECR I-0000, paragraph 52.

46 – Case C-97/08 P *Akzo Nobel and Others* v *Commission* [2009] ECR I-0000, paragraphs 54 and 55.

47 – Case cited in footnote 34.

48 – Case cited in footnote 36.

49 – Indeed it is clear from the wording of paragraph 343 of the contested judgment that *HFB and Others* v *Commission* was cited as an example (case cited in footnote 36).

50 – Case cited in footnote 37, paragraph 107.

51 – Case cited in footnote 37.

52 – Case cited in footnote 38.

53 – The terms 'simple fact' and 'in itself' are key in understanding the import of the Court's ruling.

54 – Idem, paragraph 99.

55 – See paragraph 342 of the contested judgment in which the Court of First Instance itself confirmed that while the simple fact that the share capital of two separate commercial companies is held by the same person or the same family is insufficient, it may be possible to consider that there is an economic unit on the basis of a number of elements.

56 – See point 65 above.

57 – See paragraph 344 of the contested judgment.

58 – See paragraph 345 of the contested judgment.

59 – It also contradicts somewhat the appellant's observations with respect to the finding of the Court of First Instance at paragraph 358 of the contested judgment and which is not disputed by the appellant that the latter was the sole interlocutor with the Commission during the administrative procedure.

60 – No other company within the Knauf group was the addressee of the statement of objections although it is clear that the infringement referred to in the statement of objections concerned the Knauf group.

61 – See Joined Cases C-395/96 P and C-396/96 P *Compagnie maritime belge transports and Others* v *Commission* [2000] ECR I-1365, paragraphs 143 and 146, and Case C-176/99 P *ARBED* v *Commission* [2003] ECR I-10687, paragraph 21.

62 – See the appellant's claims at points 68 and 69 above.

63 – See paragraph 348 of the contested judgment.

64 – Article 1, entitled 'Aim of the contract', provides: '1. The aim of the present contract is to maintain the Knauf companies as family companies. 2. The aim of the present contract is to ensure a *single management* of the Knauf companies. 3. *The aim of the present contract is to guarantee a single, concentrated exercise of rights in all the Knauf companies.* 4. The aim of the present contract is to ensure that the decisions necessary for the future management, organisation and legal form of the company continue to be possible and cannot be impeded by a single shareholder or a small number of them' (emphasis added).

65 – See, in particular, Case C-294/98 P *Metsä-Serla and Others* v *Commission* [2000] ECR I-10065, paragraph 27.

66 – See paragraphs 98 and 99 (case cited in footnote 38). It was not possible in that case to impute responsibility due to a lack of evidence.

67 – See paragraphs 354 to 361 of the contested judgment.

68 – Case T-330/01 [2006] ECR II-3389, paragraph 88.

69 – See paragraph 360 of the contested judgment.

70 – This fact is not disputed.

71 – See paragraphs 55 to 57 (case cited in footnote 12).

72 – See by analogy *Akzo Nobel and Others* v *Commission*, cited in footnote 46, paragraph 50.

# EXHIBIT C

**IMPORTANT LEGAL NOTICE**: The information on this site is subject to a clause of "non-liability" and is protected by copyright.

**WORKING DOCUMENT**

DECISION OF THE COURT (Third Chamber)

8th July, 2008 (*)

"Competition - Agreements - The plasterboard market - Decision finding an offence against Article 81 EC - Access to file - Single and continuous offence - Attribution - Fine - Guidelines on the calculation of fines - Cooperation during the administrative proceedings"

In Case T-52/03,

**Knauf Gips KG**, formerly Gebrüder Knauf Westdeutsche Gipswerke KG, established in Iphofen (Germany), represented initially by M. Klusmann and F. Wiemer, then by Klusmann, lawyers,

Applicant,

against

**Commission of the European Communities**, represented initially by F. Castillo de la Torre and S. Rating, then by Castillo de la Torre and R. Sauer, as agents,

Defendant,

concerning an application for the cancellation of Commission decision 2005/471/EC of 27th November 2002 relating to proceedings under Article 81 [EC] against BPB plc, Gebrüder Knauf Westdeutsche Gipswerke KG, Société Lafarge SA and Gyproc Benelux NV (Case COMP/E-1/37.152 – Plasterboards) (OJ 2005, L 166, p. 8), or alternatively, a request for a reduction of the fine imposed on the Applicant,

THE COURT OF FIRST INSTANCE
OF THE EUROPEAN COMMUNITIES (Third Chamber),

consisting of Mr. M. Jaeger, Chairman, Ms. V. Tilli and Mr. O. Czúcz, Judges,
Clerk: Ms. K. Pochec, Administrator,
considering the written proceedings and after the hearing on 23rd January 2007,
makes this

**Judgement**

**Facts of the dispute**

1 The Applicant, Knauf Gips KG, formerly Gebrüder Knauf Westdeutsche Gipswerke KG (hereinafter "Knauf" or "the Applicant"), produces and sells plaster-based building materials.

2 The Applicant is a limited partnership under German law. All its shares are held by 21 members of the Knauf family and by a company which holds the shares of the four other associates. The managing partners who are personally liable are [B] and [C].

3 As a result of information which it had learned, the Commission proceeded, on 25th November 1998, with unannounced audits of eight companies active in the plasterboard sector, including the Applicant and other companies in the Knauf group. On 1st July 1999, it carried out investigations of two other companies.

4 The Commission then issued requests for information under Article 11 of Regulation no. 17 of the

Council of 6th February 1962, the first regulation implementing Articles [81 EC] and [82 EC] (OJ 1962, 13, p. 204), to the various companies concerned. The Commission requested information on documents obtained in the premises of these companies during the audits of November 1998 and July 1999. Knauf replied to this request on 14th September 1999.

5 On 18th April 2001, the Commission initiated administrative proceedings and issued a statement of objections against the companies, BPB plc, Knauf, Société Lafarge SA (hereinafter "Lafarge"), Etex SA and Gyproc Benelux NV (hereinafter "Gyproc"). The companies concerned submitted their written observations and had access to the investigation file of the Commission in the form of a copy on CD-ROM which was sent to them on 17th May 2001.

6 The Applicant responded to the statement of objections by letter dated 6th July 2001.

7 The hearings were held on 17th July 2001. BPB and Gyproc presented part of their case in camera.

8 By letter of 10th August 2001, the Hearing Officer sent non-confidential versions of the documents of BPB and Gyproc to the Applicant.

9 By letter dated 20th August 2001, the Applicant requested access to all documents in the file that had been added to the latter since the CD-ROM had been sent, and especially to the answers to the statement of objections from the other companies concerned by the administrative proceedings.

10 On 7th September 2001, the Hearing Officer sent the Applicant three additional documents that Lafarge had forwarded to the Commission following the hearing on 17th July 2001.

11 On 11th September 2001, the Commission rejected the request of the Applicant of 20th August 2001 which aimed to obtain access to other parts of the file.

12 On 19th November 2002, the Hearing Officer issued his report.

13 On 27th November 2002, the Commission enacted decision 2005/471/EC relating to proceedings under Article 81 [EC] against BPB, Knauf, Lafarge and Gyproc (Case COMP/E-1/37.152 – Plasterboards) (OJ 2005, L 166, p. 8, hereinafter "the impugned decision").

14 The impugned decision states the following:

*First Article*

BPB [...], the Knauf group [...], Lafarge [...] and Gyproc [...] have infringed Article 81, paragraph 1, [EC] by participating in a range of agreements and concerted practices in the plasterboard sector.

The offence had the following duration:

a) BPB [...]: from 31st March 1992, at the latest, to 25th November 1998

b) [the] Knauf [group]: from 31st March 1992, at the latest, to 25th November 1998

c) [...] Lafarge [...]: from 31st August 1992, at the latest, to 25th November 1998

d) [...] Gyproc: from 6th June 1996, at the latest, to 25th November 1998

[...]

*Article 3*

For the offence referred to in the First Article, the following fines are imposed on the respective companies:

a) BPB […]: 138.6 million euros
b) [.,.] Knauf [...]: 85.8 million euros

c) [...] Lafarge [...]: 249.6 million euros
d) Gyproc [...]: 4.32 million euros

[...]"

15 The Commission considers, in the impugned decision, that the companies involved participated in a single continuing offence that was manifested in the following conduct, consisting in agreements or concerted practices:

- the representatives of BPB and Knauf met in London (United Kingdom) in 1992 and expressed their common will to stabilise the plasterboard markets in Germany, the United Kingdom, France and Benelux;
- the representatives of BPB and Knauf established information exchange systems, starting in 1992, to which Lafarge and then Gyproc adhered, concerning their sales volumes in the German, United Kingdom, French and Benelux markets;
- on various occasions, the representatives of BPB, Knauf and Lafarge exchanged information in advance on price increases in the United Kingdom market;
- facing particular developments in the German market, the representatives of BPB, Knauf, Lafarge and Gyproc met in Versailles (France) in 1996, Brussels (Belgium) in 1997 and The Hague (Netherlands) in 1998 in order to share out or at least stabilise the German market;
- the representatives of BPB, Knauf, Lafarge and Gyproc exchanged information on various occasions and prearranged the application of price increases in the German market between 1996 and 1998.

16 For the purposes of calculating the fine, the Commission applied the methodology outlined in the guidelines for setting fines imposed pursuant to Article 15, paragraph 2 of Regulation no. 17 and to Article 65, paragraph 5, of the ECSC Treaty (OJ 1998, C 9, p. 3, hereinafter the "guidelines").

17 In setting the start amount of the fines, determined according to the seriousness of the offence, the Commission first considered that the companies concerned had committed a very serious offence by its very nature, as the purpose of the practices concerned was to put an end to the price war and to stabilise the market by the exchange of confidential information. The Commission also considered that the practices in question had had an impact on the market, as the companies concerned represented almost the entire supply of plasterboards, and the different aspects of the agreement had been implemented in a very concentrated and oligopolistic market. As to the geographic market concerned, the Commission considered that the agreement had covered the four main markets within the European Community, namely Germany, the United Kingdom, France and Benelux.

18 Considering also that there was a considerable disparity between the companies concerned, the Commission decided to differentiate between them on the basis of their turnovers derived from sales of the product in question in the markets concerned during the last complete year of the offence. On this basis, the start amount of fine was set at 80 million euros for BPB, 52 million euros for Knauf and Lafarge and 8 million euros for Gyproc.

19 To ensure that the fine served as a sufficient deterrent, given the size and global resources of the companies, the amount of the fine imposed on Lafarge was increased by 100%, rising to 104 million euros.

20 To take into account the duration of the offence, the start amount was then increased by 65% for BPB and
Knauf, by 60% for Lafarge and by 20% for Gyproc, as the offence was assessed by the Commission as a long-term offence in the cases of Knauf, Lafarge and BPB and as a medium-term offence in the case of Gyproc.

21 As regards aggravating circumstances, the amount of the fines inflicted on BPB and Lafarge was increased by 50% on the grounds of their reoffending.

22 Next, the Commission reduced the fine imposed on Gyproc by 25% in the light of mitigating circumstances, as it had been a destabilising element helping to limit the effects of the agreement on

the German market and was absent from the United Kingdom market.

23 Finally, the Commission reduced the fines by 30% for BPB and by 40% for Gyproc, pursuant to Section D, paragraph 2, of the Commission Communication concerning the non-imposition of fines or the reduction of their amount in cases regarding  agreements (OJ 1996 C 207, p. 4, hereinafter "the communication on cooperation"). Therefore, the final amounts of the fines imposed were 138.6 million euros for BPB, 85.8 million euros for Knauf, 249.6 million euros for Lafarge and 4.32 million euros for Gyproc.

**Proceedings and conclusions of the Parties**

24 By application lodged at the Registry of the Court on 13th February 2003, the Applicant introduced the present appeal.

25 With the composition of the Chambers of the Court having been changed at the start of the new judicial year, the Reporting Judge was assigned to the Third Chamber, to which this case was therefore allocated.

26  After the Reporting Judge's report, the Court (Third Chamber) decided to open the oral proceedings and, within the framework of the measures to organise proceedings provided in Article 64 of the Rules of Court Procedure, invited the parties to submit certain documents and addressed questions to them in writing, which they answered within the time limit.

27 The Parties were heard presenting their arguments and replying to the oral questions asked by the Court in the hearing of 23rd January 2007.

28 The Applicant concludes that the Court should:
- quash the impugned decision insofar as it concerns the Applicant;
- as an alternative, reduce in an appropriate manner the amount of the fine that was imposed on the Applicant by the Commission in the impugned decision;
- order the Commission to pay the expenses.

29 The Commission concludes that the Court should:
- reject the appeal;
- order the Applicant to pay the expenses.

In Law

30 The Applicant raises eight grounds to support its appeal. The first is derived from a violation of the rights of defence. For the second ground, the Applicant alleges a violation of Article 81 paragraph 1 EC. The third ground is derived from a violation of the notion of continuous offence. As part of the fourth ground, the Applicant raises an obvious misinterpretation in the determination of the economic unit to which the alleged offence is attributed. The fifth ground is derived from a breach of the obligation of justification as well as of Article 15, paragraph 2 of Regulation No. 17 regarding the determination of the basic amount of the fine. For the sixth ground, the Applicant accuses the Commission of a violation of the principle of equal treatment in respect of the application of the communication on cooperation. The seventh ground is derived from a violation of Article 6, paragraph 1, of the European Convention for the Protection of Human Rights and Fundamental Freedoms (ECHR) and the principle of good administration. For the eighth ground, the Applicant raises an error of law and an obvious misinterpretation in the setting of default interest.

*1. On the first ground, derived from a violation of the rights of defence*

31 This ground consists of seven parts in which the Applicant claims that:

- the impugned decision is essentially founded on evidence which it has never had access to despite requests to that effect;
- such evidence may contain exculpatory evidence;
- the impugned decision is significantly at odds with the statement of objections;
- when the statement of objections was drafted, the evidence made available to the companies

concerned, via access to the file, was, for the most part, incomplete;
- the hearing of Gyproc was wrongly held in camera;
- the Hearing Officer changed during the proceedings;
- its right to be heard was violated on account of the inadequate language skills of the staff of the Commission in charge of the case.

*On the first part, derived from a refusal of access to exculpatory evidence.*

Arguments of the Parties

32 The Applicant considers that the impugned decision is, to a large extent, founded on evidence which it never had access to, whilst it had expressly requested such access by letter dated 20th August 2001. The Commission should have granted the Applicant access to all the evidence subsequently been mentioned in the impugned decision.

33 This applies, in particular, to the answers of BPB, Lafarge and Gyproc to the statement of objections and the statement of Mr. [G], one of the managers of Lafarge, after the hearing. The Applicant claims that the Commission relied on these documents to evaluate facts and take evidence in grounds 56, 57, 59, 102, 106, 112, 114, 127 et seq, 153, 173 , 175, 181, 184, 186 et seq, 209, 211 to 213, 232, 234, 242, 250, 253, 274, 276 and 395 of the impugned decision.

34 The Applicant considers that, even if it did not appeal against the rejection of its request for access to the file, the Commission had the obligation to supplement or replace the statement of objections and to grant enhanced access to evidence, insofar as it intended to base the impugned decision on documents that had not been disclosed to the companies concerned.

35 The Commission considers that the answers of the other recipients of the statement of objections are not part of the administrative file for the sole reason that it was closed at the moment of sending this statement. The obligation to provide access to these answers would exist only if the Commission used these responses to establish the existence of an offence committed by another company. Therefore, it would be important only to determine whether the impugned decision was based on elements of fact that were not already the subject of the statement of objections.

36 The Commission admits that it denied access to the answers of other participants in the agreement on the grounds that it was not essential to the defence of Knauf within the context of the statement of objections. The Commission stresses that this decision of refusal mentioned the avenues of appeal. However, the Applicant did not contact the Hearing Officer or any other agent of the Commission on this subject. The latter concludes from this that the Applicant did not wish to appeal for access to the entire investigation file.

37 The Commission argues that, in any event, it referred only incidentally to the answers of the other participants in the agreement to support its conclusions, and that the accuracy of the latter was demonstrated independently.

Evaluation of the Court

38 One must first note that access to the file in competition cases is primarily intended to allow the addressees of a statement of objections to take note of the evidence contained in the Commission file so that, on this basis, they can properly respond to the conclusions reached by the Commission in its statement of objections. Hence, access to the file provides procedural safeguards designed to protect the rights of defence and to ensure, in particular, the effective exercise of the right to be heard (see decision of the Court of 30th September 2003, Atlantic Container Line and Others v Commission, T-191/98, T-212/98 to T-214/98, Rec. p. II-3275, paragraph 334, and the cases cited).

39 As regards incriminating evidence, the obligation of access to the file only covers the items finally retained in the decision and not all the objections that the Commission could possibly have made at any stage of the administrative proceedings (decision in Atlantic Container Line and Others v Commission, paragraph 38 above, paragraph 337). Indeed, a document can be considered an item of incriminating evidence with respect to an applicant party only when used by the Commission as supporting evidence for an offence in which the applicant party is alleged to have participated

(Decision of the Court of 15th March 2000, Cimenteries CBR and Others v Commission, T-25/95, T-26/95, T-30/95 to T-32/95, T-34/95 to T-39/95 , T-42/95 to T-46/95, T-48/95, T-50/95 to T-65/95, T-68/95 to T-71/95, T-87/95, T-88/95, T-103/95 and T-104/95, Rec. p. II-491, hereinafter "the cement decision", paragraph 284).

40 In addition, the Applicant cannot, generally or abstractly, require access to documents or information that has not been disclosed to it without specifying how the incriminating evidence retained by the Commission in the impugned decision had been determined by such documents or information. In fact, according to the jurisprudence, arguments of a general nature are not sufficient to establish the reality of a violation of the rights of defence, which must be examined in light of the circumstances specific to each case in question (decision in Atlantic Container Line and Others v Commission, paragraph 38 above, paragraphs 353 and 354).

41 As regards access to the answers of the other recipients of the statement of objections, it is undisputed that the Applicant did not have access to them during the administrative proceedings.

42 Regarding the failure of communication of the alleged incriminating evidence that did not appear in the investigation file, the Court notes that respect for the rights of defence is a fundamental principle of Community law and must be observed in all circumstances, including any proceedings that could lead to a penalty, even if it is an administrative procedure. It requires that companies and associations of companies concerned be able, at the stage of administrative proceedings, to make known their views on the reality and relevance of the facts, obligations and circumstances invoked by the Commission (decisions of the Court of 13th February 1979, Hoffmann-La Roche v. Commission, 85/76, Rec. p. 461 paragraph 11, and of 10th March 1992, Shell v. Commission T-11/89, Rec. p.II-757, paragraph 39).

43 Secondly, it should be noted that, if the Commission intends to rely on a passage in an answer to a statement of objections or on a document annexed to such an answer to establish the existence of an offence in a procedure for the application of Article 81, paragraph 1, EC, the other companies involved in these proceedings must be able to comment on such a piece of evidence. In such circumstances, the passage in question is indeed an item of incriminating evidence against the various companies alleged to have participated in the offence (see the cement decision, paragraph 39 above, paragraph 386, and that of 27th September 2006, Avebe v Commission, T-314/01, Rec. p. II-3085, paragraph 50, and the cases cited).

44 In fact, a document can be considered an item of incriminating evidence only when used by the Commission as supporting evidence for an offence committed by a company. In order to establish a violation of its rights of defence, it is not enough for the company in question to demonstrate that it was unable to comment during the administrative proceedings on a document used in any given part of the impugned decision. It must demonstrate that the Commission used this document in the impugned decision as a piece of evidence for an offence in which the company is alleged to have participated (decision of the Court of 27th September 2006, Dresdner Bank and Others v Commission T-44/02 OP, T-54/02 OP, T-56/02 OP, T-60/02 OP and T-61/02 OP, Rec. p. II-3567, paragraph 158).

45 Given that the documents not disclosed to the companies concerned during the administrative proceedings are not admissible evidence, if it is proved that the Commission has based its decision on documents that are not in the investigation file and had not been communicated to the applicants, those documents must not be retained as evidence (the cement decision, paragraph 39 above, paragraph 382).

46 If there is other documentary evidence that the companies concerned were aware of during the administrative proceedings that specifically supports the conclusions of the Commission, the elimination, as a piece of evidence, of the incriminating document that has not been communicated does not invalidate the objections raised in the impugned decision (decision of the Court of 7th January 2004, Aalborg Portland and Others v Commission, C-204/00 P, C-205/00 P, C-211/00 P, C -213/00 P, C-217/00 P and C-219/00 P, Rec. p. 1-123, paragraph 72).

47 Hence, it is incumbent on the company concerned to demonstrate that the conclusion which the Commission reached in its decision would have been different if a document which was not communicated, and on which the Commission based its accusation against the company, could not

have been used as incriminating evidence against it (decision Aalborg Portland and Others v Commission, paragraph 46 above, paragraph 73).

48 In this case, Knauf only claims that:

„[Knauf] has never even been able to consult several key pieces of evidence on which the decision is founded to a large extent. In question are, especially, the answers of BPB, Lafarge and Gyproc to the statement of Mr. [G] of Lafarge submitted after the oral hearing. Despite this, in the essential passages of the [impugned] decision listed below, the Defendant has based its evaluation of facts and taking of evidence on these documents (as defined in [ground] 429 of the [impugned] decision) [grounds] 56, 57 (4x), 59, 102, 106, 112, 114, 127 et seq., 153, 173, 175, 181, 184, 186 et seq., 209, 211, 212, 213, 232, 234, 242 (2x), 250, 253, 274 and 276 of the [impugned] decision. Details:

- as part of its first complaint concerning an offence at the meeting in London in 1992, the Defendant relied upon the response of BPB to the statement of objections to answer the question of what function this meeting had ([ground] 57 and 437 of the [impugned] decision) and whether there was, subsequently, a "turning point" in the plasterboard markets ([ground] 71 of the [impugned] decision).

- As part of its second complaint concerning the exchange of market statistics, the Defendant uses the answer of BPB to the statement of objections as the main evidence to prove the allegedly illegal exchange of information ([grounds] 102, 106, 114, 127 et seq., 209 and 211 of the [impugned] decision). In particular, it bases its assertion that the purpose of this exchange of information was to put an end to the price war on this single item of evidence ([grounds] 106 et seq. and 114 of the [impugned] decision).

- As part of its third complaint concerning the information relating to price increases in the United Kingdom, the Defendant uses the answers of BPB and Lafarge to the statement of objections in order to establish the repercussions of the alleged agreements in that country ([ground] 212 of the [impugned] decision).

- The Defendant also attempts to demonstrate its fourth complaint concerning the alleged German market stabilisation based primarily on the answers to the statement of objections of BPB, Gyproc and Lafarge, and it does so, for example, to answer the question of whether there was an agreement on the division of the German market ([ground] 213 of the [impugned] decision).

- The Defendant bases its allegation that the representatives of the companies reached an agreement during their meeting in Versailles in 1996 on the answer of BPB ([grounds] 232 and 234 of the [impugned] decision) and on the declaration of Mr. [G] ([ground] 242 of the [impugned] decision), to which the Applicant did not have access.

- As regards the evidence of its fifth complaint concerning the exchange of information and the concerted price increases on the German market, the Defendant uses the answers of BPB and Lafarge to the statement of objections in particular to establish an alleged price increase ([ground] 395 of the [impugned] decision)."

49 As is apparent from this quotation, apart from some more detailed examples, the Applicant only lists the grounds of the impugned decision in which the documents to which access was denied are mentioned. Such an enumeration is not enough to satisfy the obligation required by jurisprudence, according to which the Applicant must demonstrate that the conclusion which the Commission reached in this decision would have been different if the disputed documents had been excluded as incriminating evidence.

50 Accordingly, it is necessary to examine the alleged violation of access to documents, as in items containing incriminating evidence, only in the light of complaints specifically raised by the Applicant.

51 Regarding the example presented by Knauf concerning the meeting in London in 1992, the existence and the purpose of this meeting had already been admitted by BPB in its answer of 28th October 1999 to the second request for information under article 11 of Regulation no. 17, that the Commission forwarded to the Applicant in Appendix D to the statement of objections. Moreover, the existence of this meeting was confirmed by Knauf in its answer to the statement of objections.

Furthermore, as is apparent from article 56 of the impugned decision, in its answer to the statement of objections, BPB presented no new facts, but only sought to minimise the importance of the meeting in London.

52 The conclusion that this meeting changed the situation in the market in question does not concern the existence of an offence, but its eventual effects. In addition, the Commission had already claimed in the statement of objections that, shortly after the meeting in London, a price increase had occurred. Accordingly, it is not a new item of incriminating evidence to which the Applicant did not have access.

53 Regarding the example of the exchange of data on sales volumes in the four markets involved, the Applicant does not deny the existence of this exchange. In addition, as is apparent from the impugned decision, this existence is confirmed by several items of documentary evidence (grounds 74 to 94). However, the Applicant believes that the Commission uses the response of BPB to the statement of objections as the main evidence to demonstrate that the purpose of this exchange was to end the price war.

54 This claim must be rejected. Indeed, as is apparent from the examination of the second ground hereinafter, given the oligopolistic nature of the plasterboard market, the exchange of information reduced the degree of uncertainty of the companies concerned regarding the functioning of the market involved. Thus, by the exchange of information, the participants in the agreement were able to monitor the evolution of market shares of each and ensure that no producer would change the stability of the market dramatically.

55 The admission of the Applicant itself that, as it was organized, the exchange of information pursued a single purpose, namely to gain an overview of individual estimates of market conditions and especially market volume, supports the conclusion of the Commission. Indeed, an interpretation according to which the Applicant needed to know the market volume to verify that, although it was agreed to end the price war, its market share did not decline is more plausible. If the market were transparent and if the exchanged data could be collected on the market, the companies in question would not have needed to begin the contentious exchange. In addition, it is apparent from ground 117 of the impugned decision that the exchanged data was not available on the market.

56 This conclusion is corroborated by the answer of BPB of 28th October 1999 to the second request for information:
"[Knauf and BPB] agreed to exchange their sales volume figures for 1991 to build a reliable foundation for the future to check that this agreement [English original: "understanding"] was implemented (that is, simply to give each other a more accurate picture of the global size of the market and therefore their own market shares). This was necessary because there were no reliable industry statistics."

57 Hence, the answer of BPB to the statement of objections is not the only evidence before the Commission as to the purpose of the contentious exchange.

58 As for the example concerning the price increases in the United Kingdom and Germany, the reference to the answers of Lafarge and BPB to the statement of objections set out in grounds 212 and 395 of the impugned decision only concerns the alleged effects of the offence. In this respect it should be noted that, for the purposes of Article 81, paragraph 1, EC, taking into account the practical effects of an agreement is unnecessary if it appears that the latter has the purpose of preventing, restricting or distorting competition within the Common Market (decision in Aalborg Portland and Others v Commission, paragraph 46 above, paragraph 261). In these circumstances, even if the answers of BPB and Lafarge referred to in grounds 212 and 395 of the impugned decision had been obviated, it would not influence, in any manner whatsoever, the assessments made by the Commission in its decision regarding the existence of the offence. The issue of whether the exclusion of this piece of evidence is likely to affect the evaluation of the effects of the offence on the market and therefore on the amount of the fine will be covered in the review of the fifth ground regarding the appeal against the amount of the fine imposed on the Applicant.

59 As regards the Applicant's assertion that the Commission's demonstration of the stabilisation of the German market is mainly based on the answers of BPB, Lafarge and Gyproc to the statement of objections, it is no longer relevant. It is apparent from grounds 220 to 231 of the impugned decision that from the findings of the Commission regarding the meeting in Versailles are based primarily on a note by Gyproc, cited in ground 222 of the decision, and on the statements made by this company attached to the statement of objections. In addition, Knauf admitted the existence of this meeting and the fact that the situation in the German market had been discussed on this occasion.

60 As regards the Applicant's complaint that it did not have access to the statement of Mr. [G] communicated by Lafarge to the Commission following the hearing, which is cited in grounds 132, 170, 213, 228 and 504 of the impugned decision, this statement is factually incorrect. Indeed, the statement of Mr [G] was transmitted to the Applicant by the Hearing Officer by letter dated 7th September 2001, which is attached to the application.

61 Furthermore, it should be noted that the Commission only concluded that the companies in question had met at Versailles in 1996, in Brussels in 1997 and at The Hague in 1998 in order to share out, or at least stabilise the German market, but did not allege that they had succeeded in concluding an agreement on the allocation of shares of German market.

62 Accordingly, the result which the Commission reached in the impugned decision would not have been different if the answers of BPB, Lafarge and Gyproc to the statement of objections mentioned by Knauf had to be removed from the file. It follows that the complaint of denial of access to incriminating evidence cannot be allowed, subject to the possible impact of the failure to take into account the statements of Lafarge and BPB, in grounds 212 and 395 of the impugned decision, on setting the amount of the fine imposed on the Applicant.

63 However, the Court will examine hereunder the merits of the case, additionally eliminating all the incriminating evidence derived from other recipients of the statement of objections, in order to verify whether the Commission's evaluation of the existence and effects of the offence is sufficiently corroborated without the contentious elements.

*On the second part, derived from a denial of access to pieces of evidence that may contain exculpatory evidence*

Arguments of the Parties

64 The Applicant considers that its rights have also been infringed because it did not have an opportunity to review the new pieces of evidence to verify whether they contained exculpatory evidence. It is the Applicant's responsibility to decide which documents are relevant to its defence.

65 This applies especially to the answer of BPB to the statement of objections. The Applicant argues that, in a press release dated 27th November 2002, BPB denied having participated in illegal practices. For this reason, the Applicant believes that the Commission may have cited only the incriminating passages of the answers of BPB to the statement of objections, without placing them in context.

66 The Commission considers that this argument is a reversal of the allegation according to which the Applicant was unfairly denied access to the answers of the other recipients to the statement of objections.

Evaluation of the Court

67 As regards the lack of communication of a document for the defence, the company concerned must only establish that its non-disclosure might have influenced, to its detriment, the conduct of the administrative proceedings and the content of the decision of the Commission. It is enough for the company to demonstrate that it could have used that document for its defence, in the sense that, if it had been able to use it in the administrative proceedings, it could have invoked elements which did not fit with the deductions made at this stage by the Commission and would therefore have influenced, in any manner whatsoever, the assessments made by the latter in its decision, at least

with regard to the severity and duration of the behaviour that it was accused of and, hence, the amount of the fine. In this context, the possibility that a non-disclosed document could have had an influence on the conduct of the administrative procedure and the content of the decision of the Commission can be established only after a preliminary examination of some evidence that the non-disclosed documents might - in the light of this evidence – have an importance that should not have been overlooked (decision in Aalborg Portland and Others v Commission, paragraph 46 above, paragraphs 74 to 76).

68 With Knauf having requested access to the answers of other recipients of the decision to the statement of objections in its note of 20th August 2001 and having raised this complaint, the Court decided, within the framework of measures for organising proceedings, to grant it access to the non-confidential versions of these answers. It also invited it to submit its observations in order to demonstrate why it believes that the failure to communicate these documents could have undermined its defence. The answer was received from Knauf on 7th July 2006. The Commission filed its comments on this answer on 20th October 2006.

69 Regarding the meeting in London, Knauf believes that the answer of BPB to the statement of objections could support its own arguments to show that, even if BPB and Knauf had conceded having exchanged some statistical information, this exchange could not have had any influence on competition and had not been concluded in order to reduce the existing competition. In this respect, it refers to paragraphs 4.1.17 and 4.1.25 of the response of BPB to the statement of objections. Knauf inferred that BPB did not admit to the offence but, on the contrary, impugned it.

70 However, it cannot be considered that this is exculpatory evidence. In fact, in two points of the answer of BPB to which Knauf makes reference, BPB, without disputing the facts as such, claims that no agreement was concluded. However, the fact that another participant in the agreement denies that certain facts are an offence cannot be regarded as exculpatory evidence in its favour (see, in this sense, the decision of the Court of 27th September 2006, Jungbunzlauer / Commission, T- 43/02, Rec. p.II-3435, paragraph 353).

71 Regarding Knauf's assertion that paragraph 4.1.15 of the answer of BPB demonstrates that it distrusted the cousins of the Knauf family, and that, hence, the exchange of information could not limit competition because BPB doubted that it would receive accurate information, it is enough to say that, even assuming that BPB did not trust the information provided by Knauf, the offence committed is not eliminated, insofar as the failure to fulfil an agreement does not change its very existence (decision of the Court of 15th June 2005, Tokai Carbon and Others v Commission, T-71/03, T-74/03 , T-87/03 and T-91/03, not published in the Report, paragraph 74; see also, in this sense, the decisions of the Court of 11th March 1999, Thyssen Stahl v Commission, T-141/94, Rec. p . II-347, paragraphs 233, 255, 256 and 341, and of 27th September 2006, Roquette Freres v Commission, T-322/01, Rec. p.II-3137, paragraphs 172 to 176).

72 Regarding its claim that tight competition in the market persisted after the meeting in London, Knauf used the same argument in its answer to the statement of objections.

73 Regarding the exchange of information on the four markets in question, Knauf considers that paragraph 4.2.1 of the answer of BPB could have helped its defence, given that BPB also denies that the exchange of information which occurred after 1993 had the purpose of controlling the implementation of any agreement or common practice. Again, this is a statement and not an item of exculpatory evidence. The mere fact that BPB made, in essence, the same arguments as Knauf regarding the legal characterisation of facts does not constitute an item of exculpatory evidence.

74 From the same paragraph 4.2.1, it is also apparent that, according to BPB, this exchange of information was known only to Mr [D], Director of Gyproc and the Chief Executive Officer (CEO) of BPB from 1994 to 1999. Knauf concluded that if the exchanged information does not reach the people who decide the competition policy of a company, the exchange of information cannot affect its competitive behaviour, its purpose or its effects. However, this factor could not have changed the final result, given that the Commission already considered such arguments in grounds 447 to 454 of the impugned decision. Moreover, it has not been demonstrated that the exchanged information was actually known only to Mr [D].

75 Regarding the foreseen price increases in the United Kingdom market, Knauf considers that it could have used in its defence the information provided in paragraph 4.2.20 of the answer of BPB, according to which the exchanged information was unreliable, and in paragraph 4.3.46, according to which BPB was under strong competition from Knauf in the United Kingdom. As is apparent in Knauf's answer of 7th July 2006, however, the latter already presented similar information in its defence in its own answer to the statement of objections.

76 Regarding the alleged German market stabilisation, Knauf believes it could have used paragraphs 4.3.28 and 4.3.34 of the answer of BPB to the statement of objections to support its argument that there was no agreement reached at the meeting of Versailles. However, the mere fact that, in the paragraphs cited, BPB made, essentially, the same arguments as Knauf regarding the lack of agreement does not constitute exculpatory evidence.

77 Regarding the information exchange system that the companies concerned had organised in November 1996 with the help of an independent expert (hereinafter the "information exchange system"), Knauf considers that it could have used in its defence paragraphs 4.3.38 and 4.3.39 of the answer of BPB in which it asserts that it considered the system in question legal a priori. In this respect, it should be noted that a possible classification of the information exchange system by the participants in the agreement is not an element of fact which could be used as exculpatory evidence, but that this classification falls within the competence of the Court. In addition, as the Commission argued, Knauf already emphasised the allegedly legal nature of the information exchange system in its answer to the statement of objections.

78 Accordingly, even if the Applicant had been able to avail itself of these documents during the administrative proceedings, the assessment made by the Commission could not have been influenced by these documents.

79 Regarding all the above, the complaint derived from denial of access to the file regarding exculpatory evidence must be rejected.

*On the third part regarding the differences between the impugned decision and the statement of objections*

Arguments of the Parties

80 The Applicant claims that the impugned decision differs from the statement of objections as it is based on new facts.

81 In particular, this is alleged to be the case regarding the circumstances surrounding the meeting in London in 1992. In the statement of objections (paragraphs 38 to 40), the Commission covered this meeting only briefly and in a very general manner over a page and a half. In the impugned decision (grounds 52 to 73), however, over six pages, it raised detailed objections concerning the meeting between the Applicant and BPB, complaints which contained many differences from the statement of objections presented, and which were founded on excerpts from the answers of the companies in question, which were not forwarded to the parties concerned in the statement of objections, nor in any subsequent document.

82 The Commission rejects this claim. It indicates that the statement of objections (paragraphs 38 to 40) and the impugned decision (grounds 52 to 73) show no substantial differences as regards statement of the facts.

Evaluation of the Court

83 Respect for the rights of defence in a proceeding that could lead to sanctions such as those at issue requires that the companies and associations of companies in question should be able, at the stage of administrative proceedings, to effectively communicate their perspective on the reality and relevance of the facts, complaints and circumstances alleged by the Commission (decision in Atlantic Container Line and Others v Commission, paragraph 38 above, paragraph 138).

84 This requirement is respected when the decision does not attribute to the concerned parties

offences that are different from those referred to in the statement of objections and retains only the facts which the concerned parties have had the opportunity to explain. It follows that the Commission can uphold only the objections on which they have had the opportunity to make known their point of view (decision in Atlantic Container Line and Others v Commission, paragraph 38 above, paragraph 138).

85 In the present case it is clear that Knauf had an opportunity to present its observations on the key complaint underlying the approach of the Commission, namely the idea that Knauf and BPB entered into an agreement during the meeting in London.

86 In this respect, as is apparent from paragraphs 38 to 40 of the statement of objections, the Commission clearly indicates that it considers that, at this meeting, BPB and Knauf agreed on the fact that the price war must be ended, and that they agreed to exchange their sales volume figures for 1991. The Commission adds that it was after the meeting held in London between BPB and Knauf that Lafarge and Gyproc entered the process of information exchange.

87 The fact that the set of observations relating to the meeting in London is longer in the impugned decision is explained by the fact that in the latter, the Commission also added the comments of the Applicant and of BPB in its first evaluation regarding the finality of the meeting in London.

88 In this respect, it should be noted that the legal characterisation of facts used in the statement of objections can, by definition, only be provisional, and a subsequent decision of the Commission cannot be annulled on the sole ground that the final conclusions derived from these facts do not correspond precisely to this intermediate characterisation. In fact, the Commission must hear the addressees of a statement of objections and, where appropriate, take into account their comments aiming to answer the objections raised by changing its analysis, precisely to respect their rights of defence (decision of the Court of 8th July 2004, Mannesmannröhren-Werke v Commission, T-44/00, Rec. p.II-2223, paragraph 100).

89 It follows that it is necessary to reject the third part of the first ground.

*On the fourth part, derived from the incompleteness of the documents provided.*

Arguments of the Parties

90 According to the Applicant, when the statement of objections was drafted, the evidence made available to the companies concerned, via access to the file, was, for the most part, incomplete.

91 It adds that certain parties' concealing of documents exceeded what was necessary. Non-confidential summaries should also have been redacted in order to restate the nature and content of said documents precisely enough to ascertain and, if necessary, contest the justification for concealing material.

92 The administrative file also had no table of contents indicating its documents.

93 The Commission emphasises that it allowed the Applicant to consult the administrative file by sharing all non-confidential documents electronically (CD-ROM), in addition to an enumerative list indicating the origin of each of the file's items as well as the non-confidential version of the confidential documents.

Evaluation of the Court

94 The Applicant affirms, in a very general manner, that it was granted incomplete access to the file and that the concealment of certain passages of the document exceeded what was necessary, that the Commission violated its obligation to redact non-confidential summaries of said documents and that no table of contents was submitted.

95 In this respect, one must recall that, in compliance with article 44, paragraph 1, c) and d), of the Rules of Procedure, the application must contain a summary of the evidence referred to. Moreover, according to the jurisprudence, independently of any terminology issues, this statement must be

clear and precise enough to allow the Defendant to prepare its defence and to allow the Court to rule on the appeal, if necessary, without having to inquire further. In fact, for an appeal to be acceptable, basic factual and legal elements must be present, at least in summary, but coherently and comprehensibly, in the text of the appeal itself, in order to guarantee juridical security and just administration of justice (see the Roquette Freres/Commission decision, paragraph 71 supra, paragraph 208, and the cases cited).

96 In this particular case, the Applicant has not identified precisely enough the documents whose passages are said to have been unjustifiably concealed. Indeed, the Applicant only gives one example, that of the outdated prices. But even in this example, the Applicant does not explain which document it is from, and did not append it to its request.

97 The alleged absence of a table of contents is not corroborated either.

98 The fact that the Commission did not submit a list of all documents included in its administrative file to the companies concerned at the administrative proceedings stage does not in itself constitute a violation of the rights of defence (in this connection, see the decision in Mannesmannrohren-Werke/Commission, paragraph 88 supra, paragraph 54).

99 In any event, it must be noted that the rights of defence are only violated by a procedural irregularity inasmuch as the latter had a real effect on the company's opportunity to defend itself (decision in Mannesmannrohren-Werke/Commission, paragraph 88 supra, paragraph 55).

100 But the Applicant does not explain how the objections raised in the present context have affected its defence.

101 Consequently, the fourth part of the first ground must be rejected.


*On the fifth part, relating to confidentiality of the hearing of Gyproc*


Arguments of the Parties

102 The Applicant considers that the Hearing Officer should not have heard Gyproc in the absence of the other companies involved. The erroneous nature of the Hearing Officer's decision derives, in particular, from article 12, paragraph 3 of Commission Regulation (EC) No. 2842/98, dated 22nd December 1998, in relation to hearings in certain procedures based on articles [81 EC] and [82 EC] (OJ L 354, p. 18), which states that the exclusion of the other companies concerned by the administrative procedure and which took part in the hearing would only be justified in the event that there were a legitimate interest in secrecy. But the Applicant considers that Gyproc did not claim such an interest. The confidential treatment requested by Gyproc concerned its relationship with its two shareholders. Yet, according to the Hearing Officer's summary notice, the object of the confidential hearing of 17th July 2001 was on a different subject, namely that Gyproc was a minor company and as such a reduced fine would possibly be justified. The Applicant argues that the confidential hearing should have been stopped given that its real object differed from the object previously announced.

103 The Applicant argues that this technical irregularity has not been regularised by the fact that the Commission, by letter dated 10th August 2001, sent it a summary of the various non-confidential parts of the statements made by Mr. [E], the director representing Gyproc, during this confidential hearing.

104 The Applicant states that it, like Lafarge and BPB, pointed out the technical irregularity prior to the beginning of Gyproc's confidential hearing. As such, the Hearing Officer's final report was also tarnished by a technical irregularity, since it did not mention procedural objections raised by the Applicant on this point.

105 The Commission concludes that this argument should be rejected.

Evaluation of the Court

106   By this objection, the Applicant asserts, in essence, that the Hearing Officer wrongfully heard Gyproc in the absence of the other concerned companies on the grounds that it did not claim for itself a legitimate interest in secrecy. However, it does not specify in what way its exclusion from the hearing of Gyproc concretely violated its rights of defence. It gives no examples of the manner in which the Commission should have used, in the disputed decision, any information possibly transmitted by Gyproc during that hearing.

107   Indeed, the Applicant only considers that the object of this interview may have had an influence on the determination of Gyproc's participation in the arrangement and, consequently, the amount of the fine. It considers that the Commission, wrongfully, did not take into account Gyproc's adherence to a group and that the latter is, in reality, not a small business.

108   In this regard, suffice it to say that, even assuming that, as a result of the hearing in question, the amount of the fine imposed on Gyproc by the Commission was too low, the respect of the principle of equality of treatment must be reconciled with the principle of legality according to which no person may claim, to his profit, an illegality committed in favour of others (decision of the Court of 20th March 2002, Logstor Ror/Commission, T-16/99, Rec. p.II-1633, paragraph 350).

109   Hence, even assuming that Gyproc may have influenced the Commission as to the determination of the amount of its own fine at the confidential hearing, such a situation does not constitute a reason for cancellation favouring the claimant.

110   Regarding the Applicant's argument which states that the administrative procedure has also been flawed by the fact that the Hearing Officer's report was incomplete, in that its objections to the confidentiality of Gyproc's hearing were not mentioned, this argument must be rejected for the same reasons used to justify the rejection of the complaint relating to the confidentiality of Gyproc's hearing.

111   In any event, it should be noted that the rights of defence are not violated by a procedural irregularity except to the extent that it had an effect on the concerned company's ability to defend itself (decision in Mannesmannrohren-Werke/Commission, paragraph 88 above, paragraph 55).

112   However, the Applicant has not demonstrated that this was the case.

In these circumstances, the fifth part of the first ground must be rejected.

*On the sixth part, relating to the change of the Hearing Officer during the administrative proceedings*

Arguments of the Parties

114   The Applicant argues that the Hearing Officer was changed during the administrative proceedings. Therefore there was no guarantee of continuity in the rights of defence.

115   In addition, in his report, the Hearing Officer did not consider the Applicant's objection stating that it had not had access to key evidence used in the appealed decision, in particular, the responses to the statement of objections. Neither did he mention the objection relating to the incompleteness of the file allocated before the statement of objections was drafted.

116   The Commission emphasises that the defence of the Applicant has not been hindered by the change of Hearing Officer. As to the report of the latter, it would constitute a purely internal document of the Commission and would be considered of opinion value only.

117   The Commission argues that companies that intend to contest the access to the file that has been granted to them should submit a justified request, something the Applicant has failed to do.

Evaluation of the Court

118   Regarding the change of the Hearing Officer during the administrative proceedings, it is clear from the outset that the Applicant does not explain how the change of Hearing Officer concretely violates its rights of defence.

119   Regarding the allegedly incomplete nature of the Hearing Officer's file, the Applicant contends that the Hearing Officer did not mention its objections of a procedural nature. Its final report therefore contains errors that could have influenced the Commission, to the detriment of the Applicant.

120   In this regard, it should be noted that, according to grounds 2, 3 and 8 of the 2001/462/EC decision, ECSC of the Commission of 23rd May 2001 concerning the terms of reference of hearing officers in certain competition proceedings (OJ L 162, p. 21), the Commission is reminded to ensure that the right of the persons affected by competition proceedings to be heard throughout these proceedings is guaranteed. It must entrust the conduct of these administrative proceedings to an independent person who possesses the necessary integrity to contribute to the objectivity, transparency and effectiveness of these proceedings.

121   It is provided in section 13, paragraph 1, in the decision 2001/462:

"The Hearing Officer shall report to the Commission's member responsible for competition on the hearing and on the conclusions he draws, as to respect of the right to be heard. The observations in this report relate to the procedural aspects, including the disclosure of documents and access to the file, the response time allowed for the statements of objections and the conduct of the hearing."

122   Under article 15 and article 16, paragraph 1, decision 2001/462, the Hearing Officer must prepare a final report on the right to be heard, which will also consider whether the draft of the decision deals only with the objections on which the companies involved have had an opportunity to express their views. This report is attached to the draft of the decision submitted to the Commission, so that when it makes a decision, it will be fully informed of "all relevant factors" regarding the conduct of the administrative proceedings and the enforcement of the right to be heard.

123   As is apparent from the foregoing provisions, it is not incumbent on the Hearing Officer to collect all the procedural objections presented by the concerned parties during the administrative proceedings. He is only required to communicate to the Commission the objections relevant to the determination of the legality of the conduct of the administrative proceedings (decision of the Court of 29th April 2004, Tokai Carbon and Others v. Commission, T-236/01, T- 239/01, T-244/01 to T-246/01, T-251/01 and T-252/01, Rec. p.II-1181, paragraph 53).

124   In the present case, the Hearing Officer submitted a final report on 19th November 2002, pursuant to article 15 of decision 2001/462. In this final report, he does not actually mention the fact that Knauf had, during the administrative proceedings, submitted a request for access to the responses of the other recipients of the statement of objections.

125   In this regard, it should be noted that the report of the Hearing Officer is considered a purely internal document of the Commission, which is not intended to supplement or to correct the companies' argumentation and, therefore, it should not bear any decisive aspect that the Community judge has to take into account in exercising his control (judgements of the Court of 20th April 1999, Limburgse Vinyl Maatschappij and Others v.Commission, T-305/94 to T-307/94, T-313/94 to T-316/94 , T-318/94, T-325/94, T-328/94, T-329/94 and T-335/94, Rec. p.II-931, hereinafter "judgement LVM / Commission", paragraph 375, and 20th March 2002, HFB and others v. Commission, T-9/99 Rec. p. II-1487, paragraph 40).

126   Accordingly, the fact that the report of the Hearing Officer is incomplete or erroneous cannot be considered a technical irregularity of the administrative proceedings which may invalidate the decision constituting its outcome.

127   In any event, given that the Applicant has not demonstrated that its rights of defence have been violated by the denial of access to the other recipients' responses to the statement of objections, the argument concerning the alleged incompleteness of the final report of the Hearing Officer is

ineffective.

128   It follows from the above that the sixth part of the first ground must be rejected.

*On the seventh part, alleging infringement of the right to be heard resulting from the inadequate language skills of the employees in charge of the case*

Arguments of the Parties

129   The Applicant considers that the Commission violated its rights to defence and the principle of the right to be heard by replacing, at an advanced stage of the administrative proceedings and after the hearing, the employees initially in charge of the case, who were fluent in German, with employees who did not possess adequate competence in that language. It believes that the core essence of the right to be heard means that the person concerned should be understood by the employee in charge of the case, and this without difficulty.

130   The Applicant presents different concrete examples that, according to it, illustrate the fact that the statements that were made as part of its response to the statement of objections were, from a linguistic point of view, not understood, or at least, misunderstood. The Applicant believes that this had negative repercussions for it in the decision being challenged, given that, in some critical passages, the latter was based on textual interpretations of the Applicant's own statements.

131   The Applicant presents as the first example of inadequate or incorrect understanding of its statements the erroneous interpretation of its response to the statement of objections regarding the meeting in London. The Applicant's legal counsellor declared that what had actually been discussed in London was clearly "in the eyes of everyone" nothing but "promises from politicians" (Sonntagsrede eines Politikers). The Commission, which cited this statement in the impugned decision (ground 65), wrongfully added that the Applicant had expressed a "common understanding". The poor understanding of the Commission can also be seen in the following comment:

"[Knauf] believes, as far as we understand the meaning of this sentence, that there was no more mutual commitment in the remarks exchanged than in the promises of politicians. However, the Commission considers that the wording used by Knauf allows one, at least, to confirm the existence of a willingness to influence one another."

132   A second example given by the Applicant is the evaluation of the meeting in London made by the Commission in ground 69 of the impugned decision. BPB mentioned the term "agreement" (understanding), but only wanted to indicate that it and the Applicant reached an understanding on the analysis of a determined point: it was not necessarily to be considered a concerted practice. That is why, in its response to the statement of objections, the Applicant explained that there had been no agreement or anything similar between BPB and itself. The Applicant's legal counsellor said, to support its claims, that there may have been, at most, an "appeal to commercial reason". It follows from this explanation of the legal counsellor that there was not necessarily an "appeal to commercial reason", but, hypothetically, the subject of the discussion could, at most, have been something totally vague and indeterminate.

133   Similarly, the Commission's assertion set out in ground 126 of the impugned decision, according to which Knauf's statements largely confirm the presentation of the facts in BPB's statements regarding the alleged exchange of information and its purpose, shows that the Commission was, from a linguistic point of view, unable to appreciate Knauf's objections.

134   As for ground 241 of the impugned decision, in which the Commission considers that the declaration of Knauf was not devoid of ambiguity, the latter maintains that the objection raised by it in its response to the statement of objections is of great clarity, in that it unequivocally denies that an agreement was concluded.

135   The Commission disputes the Applicant's claims and maintains that, in any event, even if it had misinterpreted certain statements, this could possibly be considered an error of substance, but not an error in the proceedings.

Evaluation of the Court

136   In this part, the Applicant asserts, in essence, that its right to be heard has been violated on the grounds that the Commission's employees in charge of the handling of the case after the hearing did not have sufficient competence in the German language and, consequently, the impugned decision is filled with misinterpretations of its response to the statement of objections.

137   In this regard, even assuming that it is established that the Commission's employees in charge of the case lacked the necessary linguistic competence, it is sufficient to note, given that Knauf argues that the Commission violated the rights of defence, that the linguistic competence of a member of the team in charge of the investigation of an agreement cannot in itself be determinative regarding the question of whether a possible violation of the rights of defence has been committed by the Commission.

138   Indeed, if the Commission, in interpreting the statements of the Applicant, and by using them as a demonstration of different facts, made a mistake, it is an error that taints the substance of the impugned decision (see, in this regard, 15th June 2005 judgement of Tokai Carbon and Others v. Commission, paragraph 71 above, paragraph 154). Hence, it is necessary to examine the examples that the Applicant submitted regarding the alleged linguistic inadequacy of the employees in charge of the case in the context of the second ground, which aims to demonstrate that there was no violation of Article 81 paragraph 1 EC.

139   It follows that the seventh part of the first ground must be rejected, insofar as the Applicant raised it as a violation of its procedural rights. Therefore, the first ground must be rejected in its entirety.

   *2.   On the second ground, based on a violation of article 81, paragraph 1, EC*

140   The Applicant considers that it should not be considered responsible for any infringement of section 81, paragraph 1, EC. As such, it challenges the illegal nature of the following elements:

   the meeting in London in 1992;

   the exchange of information on the quantities sold in Germany, France, Benelux and the United Kingdom from 1992 to 1998;

   the exchange of information about price increases in the United Kingdom from 1992 to 1998;

   the agreements on market shares in Germany (meetings of Versailles, Brussels and The Hague) from June 1996;

   the agreements on price increases in Germany since 1996.

141   The Commission argues that it has considered that each of these individual acts constituted a manifestation of the common will of the participants at least to stabilise the German, French, UK and Benelux plasterboard markets.

   *On the first part, relating to an agreement to stabilise the relevant market during the meeting in London in 1992*

   Arguments of the Parties

142   The Applicant argues that the Commission was unable to provide any evidence that restrictive competition agreements had been sought or reached at the meeting in London in  1992. It denies that its representatives expressed, with those of BPB, the shared willingness to stabilise the German, French, United Kingdom and Benelux markets during this meeting. On the contrary, the two companies denied ever having brokered, or even attempted to broker, an agreement on price increases or market shares. It refers to BPB's statements, such as the ones cited in the footnotes on pages 38 and 40 of the impugned decision, as well as its response to the statement of objections. In addition, it would not be logical that only two vendors of the products concerned

by the proceedings would agree on this point.

143   The Applicant states that, in an oligopolistic market, the fact that, after an intense price war, different operators expressed their desire to see the relationships in the market become more stable may also be the expression of an independent company's behaviour.

144   The Commission based its objection solely on BPB's statements and those of the Applicant. However, these statements do not allow the conclusion that restrictive competition agreements were concluded or desired. The Applicant maintains that there would only be an infringement of article 81 paragraph 1 EC if the companies involved assured each other that they would change their behaviour in the market in a specific manner. When companies just to try to persuade a competitor to raise its prices without also commiting themselves to changing their own pricing policy, there is no agreement.

145   The Applicant adds that the mere exchange of common ground concerning the severity of the competition that BPB and itself had to face at the meeting in London is just as insufficient to ascertain a common will (meeting of the minds) as the fact that they exchanged some statistical data after the meeting.

146   The Applicant argues that the Commission has provided no evidence of the supposed turning point for prices in the plasterboard market that it presents as evidence of the existence of an agreement on prices in ground 71 of the impugned decision. It contends that it follows from the quoted passage in the footnote of page 40 of the impugned decision that BPB, unilaterally and in an experimental manner, raised its prices, but other companies did not emulate that raise, so prices, in part, fell back to their former level and, in part, dropped even lower than the latter. As such, BPB's statement proved, on the contrary, that the companies did set their prices independently of each other.

147   The reference, in grounds 72 and 438 of the impugned decision, to an allegedly reduced expansion by the companies that participated in the meeting in London is also not correct. In ground 49 of the impugned decision, the Commission correctly described the expansion programme of the Applicant in the late 80s and early 90s with regard to the Scandinavian, Belgian, Spanish, French and British markets. In 1992, this expansion was largely carried out in such a way that the Applicant focused on the emerging markets in Central and Eastern Europe in which it was competing with other producers from Western Europe. Consequently, the Applicant's expansion continued without restriction after the meeting in London. These new capacities increased the pressure of competition in the geographic markets relevant to these proceedings, given that the products in question were traded across different borders.

148   The Commission argues that an anti-competitive agreement does not necessitate that the participants feel bound by that agreement. Only what the Applicant suggested to BPB is decisive. Indeed, the two main operators of the market were, at least, entitled to assume, in view of their reciprocal assurances relating to their desire to change the current situation of the market, that the other would act accordingly. Their respective statements were in agreement on the substance and therefore necessarily translated into a common willingness. The beginning of the exchange of sales figures after the meeting in London proved that such was the actual assumption of Knauf and BPB (grounds 437 to 441 of the impugned decision).

149   The Commission states that there is no indication in the impugned decision that the meeting in London was merely intended to end a price war, but that it contributed to its conclusion, first, by raising a mutual trust and, secondly, by generating the agreement concerning the exchange of data on sales volumes. The other participant, BPB, confirmed these two factors (grounds 55 et seq. of the impugned decision). The London meeting was the first joint action of a continuous behavioural pattern (grounds 419 and 441 of the impugned decision). However, there would also have been an infringement even if the meeting in London had not taken place, as is clearly shown, in particular, by the involvement of Lafarge in the agreement despite its absence from said meeting.

150   The Commission confirms that the impugned decision was not based on an element derived from a "turning point" on prices. Only the facts exhibited contained a quotation from BPB relating to this "turning point" (footnote on page 40), along with the finding that the meeting in London in

1992 brought an end to the unstable situation of competition in Europe, as described in ground 49. In addition to BPB, Gyproc also confirmed (ground 67) that "a turning point was noted in price developments in the different markets" (ground 60).

151   As for the development of production capacities, the Commission maintains that it evaluated, in the impugned decision, the behaviour of the Applicant only for the geographic markets in question. In addition, the reunification of Germany may explain the following rapid expansion of the construction industry.

Evaluation of the Court

152   As a first step, it should be noted that the Applicant disputes neither the existence of the London meeting nor its participation in this meeting. However, it believes that no collusive agreement was ever concluded.

153   It is therefore advisable to examine whether the meeting in London had an anti-competitive purpose.

154   On this subject, Knauf stated in its response to the statement of objections:

"Contrary to the assumption by the Commission, [the debate] did not conclude in an agreement on the end of the price war. What may perhaps have happened is that mutual appeals to commercial reason may have been made in order to end devastating price developments. That the competition between the involved companies could not continue for very long under these disastrous conditions, and that consequently the price war needed to end, was so clear at that time that everyone reached an understanding which had the value of a politician's Sunday speech."

155   In addition, as is apparent from ground 55 of the impugned decision, BPB had revealed, in its second response to the inquiry, that, during that meeting, its representatives and those of Knauf "[reached] an agreement that it was [in] its interest, and [that] of Knauf and [that of] the [Industry as a whole (including, ultimately, the consumers' interests) to put an end to the disastrous price war, and that the producers should strive to be competitive at more sustainable economic levels."

156   BPB subsequently said that the word "understanding" used by it should only be interpreted in its most general sense, namely that of "consensus of opinion".

157   According to consistent case law, for there to be an agreement according to the meaning set forth in article 81 paragraph 1 EC, it is sufficient that the companies expressed their common willingness to behave on the market in a specific manner (Judgements of the Court HFB e.a./Commission, paragraph 125 above, paragraph 199, of 11th December 2003, Adriatica di Navigazione/Commission, T-61/99, Rec. p. II-5349, paragraph 88, and of 27th July 2005, Brasserie nationale e.a./Commission, T-49/02 to T-51/02, Rec. p.II-3033, paragraph 118). Regarding the expression of that common willingness, it is sufficient that a stipulation is made expressing the involved companies' willingness to behave on the market in accordance to these terms (judgement of the Court of 14th October 2004, Bayerische Hypo- und Vereinsbank/Commission, T-56/02, Rec. p.II-3495, paragraph 60).

158   It follows that to constitute an agreement according to the meaning in article 81 paragraph 1 EC, it is sufficient that an act or apparent unilateral behaviour shows the concordant willingness of at least two companies involved; the form of this concordance is not conclusive by itself (judgement of the Court of 13th July 2006, Commission/Volkswagen, C-74/04 P, Rec. p. I-6585, paragraph 37).

159   The criteria of coordination and cooperation identified by the case law, far from requiring the development of a real "plan", must be understood in the light of the inherent design of the treaty provisions relating to competition, according to which any economic operator must determine independently the policy it intends to adopt in the common market. Whilst it is true that this requirement of independence does not exclude the right of economic operators to adapt intelligently to the verified or expected behaviour of their competitors, it is, however, rigorously opposed to the establishment of any direct or indirect contact between such operators when it aims to influence, or has the effect of influencing, the behaviour in the market of an actual or

potential competitor, or to disclose to such a competitor the behaviour which it has adopted or is considering for the market (Court judgement of 16th December 1975 Suiker Unie e.a./Commission, 40/73 to 48/73, 50/73, 54/73 to 56/73, 111/73, 113/73 and 114/73, Rec. p. 1663, paragraphs 173 and 174, and judgement Adriatica  di Navigazione/Commission, paragraph 157 above, paragraph 89).

160   Such is the case when, between several companies, there is a gentleman's agreement representing the faithful expression of such a common willingness for the restriction of competition. In these circumstances, it is irrelevant to evaluate whether the companies considered themselves obliged – legally, factually or morally - to behave in the mutually agreed way (judgement HFB e.a./Commission, paragraph 125 above, paragraph 200)

161   This being the case, in particular, of anti-competition agreements which arise during meetings of competitors, the Court found that an infringement to article 81 paragraph 1 EC occurred when these meetings were intended to restrict, to prevent or to distort the competition game and aimed to artificially organise the functioning of the market (Court judgement of 15th October 2002, Limburgse Vinyl Maatschappij e.a./Commission, C-238/99 P, C-244/99 P, C-245/99 P, C-247/99 P, C-250/99 P to C-252/99 P and C-254/99 P, Rec. p. I-8375, paragraphs 508 and 509).

162   The Court considers that Knauf's explanation about the subject of the meeting in London meets the criteria described by the aforementioned case law. Indeed, as is clear from the impugned decision, Knauf and BPB both clearly expressed their common willingness to put an end to the price war and to stabilise the market. Knauf itself even admits to having referred to mutual appeals to commercial reason.

163   This finding is not invalidated by the Applicant's assertion set forth in the seventh part of the first ground, according to which its response to the statement of objections did not mean that an "appeal to commercial reason" necessarily occurred, but that, hypothetically, the object of the discussion could, at most, have been about something completely vague and indeterminate.

164   This assertion is not convincing. On the contrary, it gives the impression that the Applicant is trying to skew its own writings. Indeed, it is apparent from its response to the statement of objections that it indicated the following:

   "What may perhaps have happened is that mutual appeals to commercial reason may have been made in order to end devastating price developments."

165   It is clear from this sentence that the Applicant has made a reference to an appeal to commercial reason. Moreover, even if that sentence contains the word "perhaps" (vielleicht), the explanation that the discussion was not about the need to put an end to the price war is not credible. Indeed, if the Applicant had not talked with BPB about this necessity, it would have had no reason to mention that this may have been discussed.

166   Knauf's statements combined with BPB's answer to the second request for information are enough to demonstrate that both BPB and Knauf expressed their desire to end a price war and therefore limit the competition.

167   Also following the case law cited in paragraph 161 above, the argument of the Applicant raised in the context of the seventh part of the first ground that what had been discussed in London was clearly "in everyone's eyes" nothing but "promises from politicians" (Sonntagsrede eines Politikers) is irrelevant to evaluate the subject of the London's meeting.

168   Knauf's argument raised in the seventh part of the first ground claiming that the Commission did not understand that, in its response to the statement of objections, it explained that there has not been an agreement or anything similar between BPB and itself, is also irrelevant. Indeed, it is clear from the impugned decision that the Commission perfectly understood that Knauf did not admit the existence of an agreement.

169   In this regard, it should be noted that, once a company participates, even without taking an active part, in meetings between companies with an anti-competitive objective and does not distance itself publicly from the contents of such meetings, thus giving the impression to the

other participants that it subscribes to the conclusion of the meetings and that it will comply with it, it can be regarded as established that it participated in the agreement resulting from those meetings (judgement HFB e.a./Commission paragraph 125 above, paragraph 137).

170   The anti-competitive purpose of the meeting in London is also corroborated by the exchange of information that took place between the companies after that meeting. As it is apparent from ground 58 of the impugned decision, BPB indicated the following in its response to the second information inquiry:

      "[Mr. [A] and the cousins of the Knauf family agreed during this meeting to share their sales figures for 1991 to build a reliable base for the future to verify that the understanding was reached (that is, simply to give each other a more accurate picture of the overall size of the market and therefore of their own market shares). This was necessary because there were no reliable industry statistics."

171   Knauf also acknowledged that BPB and itself agreed to an exchange of sales data for the German, British, French and Belgian markets.

172   Knauf's arguments aiming to claim that this was at most a mere attempt to reach an agreement cannot be accepted. Indeed, the fact that BPB and Knauf expressed their common willingness to end the price war and stabilise the markets in question constitutes an agreement within the meaning of article 81, paragraph 1, EC.

173   In addition, as the quotation cited in paragraph 170 above demonstrates, Knauf and BPB executed their plan, putting the agreement in motion by proceeding to an exchange of information on sales volumes for the four concerned markets. But if these companies did not consider that they had entered into an agreement to terminate the price war and stabilise the concerned markets, they would not have needed to monitor the markets by exchanging data on sales volumes.

174   As regards the Applicant's arguments alleging that the Commission has not demonstrated that there was indeed a stability of prices or market shares, they cannot refute this conclusion.

175   In this regard, suffice it to say that, for the purposes of the application of article 81 paragraph 1 EC, it is sufficient that an agreement is intended to limit, prevent or distort the competition game, regardless of its actual effects. Accordingly, in the case of agreements reached at meetings of competitors, a violation of this provision is constituted when the meetings have such an objective and thus intend artificially to organise the functioning of the market. In such cases, the responsibility of a specific company for the infringement is properly established when it has participated in these meetings fully aware of their subject, even if it did not then apply any of the measures agreed upon during the meetings. The company's more or less regular attendance at the meetings, and the more or less complete implementation of the agreed measures, affect not the existence of its responsibility, but its extent, and therefore the level of the sanction imposed (Court judgement of 28th June 2005, Dansk R0rindustri e.a/ Commission, C-189/02 P, C-202/02 P, C-205/02 P and C-208/02 P C-213/02 P, Rec. p.I-5425, paragraph 145). Companies that enter into an agreement to limit competition do not, in principle, escape from the application of article 81 paragraph 1 EC by claiming that their agreement could not have an appreciable impact on competition.

176   The same observation applies to the argument of the Applicant that the Commission made a mistake in considering that it had restricted its production capacities.

177   It turns out that the Commission rightly considered that, during the London meeting, BPB and Knauf had expressed their common willingness to end the price war and stabilise the concerned market. Accordingly, the first part of the second plea must be rejected.

      *On the second part, relating to the exchanges of information on the quantities sold in Germany, France, Benelux and the United Kingdom from 1992 to 1998*

      Arguments of the Parties

178   The Applicant admits that it shared sales statistics with BPB, Lafarge and Gyproc. This exchange of information was not, however, intended to support other activities related to an agreement. It should therefore not be regarded as an infringement of article 81 paragraph 1 EC.

179   It argues that, before the judgement of the Court (of First Instance) of 12th July 2001, Tate & Lyle e.a./ Commission (T-202/98, T-204/98 and T-207/98, Rec. P. II-2035, confirmed by the judgement of the (High) Court of 29th April 2004, British Sugar/Commission, C-359/01 P, Rec. p.I-4933), the Courts considered the exchange of information about the market as an infringement of article 81 paragraph 1 EC only when such an exchange was accompanied by an agreement of any kind or when the existence of a restrictive effect on competition was established.

180   They also maintains that, in the absence of informational value of the exchanged sales data, there is no restriction of competition. They emphasises that the figures were only disclosed in a very crude and imprecise form. Furthermore, they would only have been exchanged in a sporadic manner and very late and were, therefore, for the most part simply historical in nature. They maintains that, the fact that the exchanged sales figures were compiled annually, semi-annually or quarterly cannot infer that companies have also communicated the data at this rate. They adds that the informational value of sales figures was further undermined by the fact that, the latter were not broken down for the various types of plasterboards.

181   The applicant considers that, the way the information exchange was organised, it could only achieve just one purpose, that is, to broadly verify the individual estimates as to the market conditions, including the volume thereof.

182   They adds that, it falls to the Commission to prove that They intended to restrict competition through the actions that  they are accused of. The applicant indicates that, They, Lafarge and Gyproc, stressed in all of their statements  the fact that the exchange of information was not intended to limit competition between them, but it was aimed at trying to improve their understanding of changes in the market..

183   The applicant considers that, even if it could be considered that the exchange of sales data constituted an infringement of  article 81, paragraph 1 of the Treaty Establishing the European Communities it would, by no means, be a very serious offence. A system for the exchange of market information  that, as in this case, is not accompanied by an apportioning of the market or of the clientele or pricing agreements can only, according to the applicant, influence competition in a negligible manner.

184   The Commission argues that, in a small oligopolistic market, secret information exchange informs the companies on their competitors' position in the market and on their sales strategy and, therefore, substantially restricts residual competition. The Commission stresses that the applicant herself, considers the exchanged information about market shares and prices as business secrets.

185   They adds that the complaint concerning the information exchange system tends to specifically claim that this system is the result of the 1992 London meeting (points 112, 114 and 122 of the contested decision) and that it has limited competition as part of the unique and complex offence (pointspoint162 and 442 to 454 of the contested decision). They also indicates that this information exchange has not been the only means of monitoring competitors. In addition, by reference to point 58 of the contested decision, the Commission noted that BPB and its CEO at that time, Mr. [A],, have both acknowledged that the exchange of information served to control the                                                                                                        agreements.

Evaluation of the Court

186   Having admitted the existence of the information exchange in question, the applicant's arguments are solely intended to challenge the legal  consideration of the uncontested facts made by the Commission.

187    According to the case-law on agreements on the exchange of information, such agreements are incompatible with the rules on competition if they reduce or remove the degree of uncertainty as to the operation of the market in question with the result that competition between undertakings is restricted (Judgment of the Court of the 23 November 2006, ASNEF EQUIFAX and Administracion Del Estado, C-238/05, Rec. p. 1-11125, para 51).

188    In effect, it is inherent in the Treaty provisions on competition that every economic operator must determine autonomously the policy which it intends to pursue on the common market. Thus, according to that case-law, such a requirement of autonomy precludes any direct or indirect contact between economic operators of such a kind as either to influence the conduct on the market of an actual or potential competitor or to reveal to such a competitor the conduct which an operator has decided to follow itself or contemplates adopting on the market, where the object or effect of those contacts is to give rise to conditions of competition which do not correspond to the normal conditions of the market in question, taking into account the nature of the products or the services provided, the size and number of the undertakings and also the volume of the market(ASNEF-EQUIFAX and Administracion del Estado judgment, paragraph 187 above, paragraph 52 ).

189    As regards the legality of the exchange of information, it is clear from the case law that, on a truly competitive market, the fact that a given economic operator *a trader takes into account information on the operation of the market, made available to him under the information exchange system, in order to adjust his conduct on the market, is not likely, having regard to the atomised nature of the supply, to reduce or remove for the other traders all uncertainty* about the foreseeable nature of his competitors' conduct. The Court of First Instance considered, however, that on a highly concentrated oligopolistic market, such as the market in question, the exchange of information on the market was such as to enable traders to know the market positions and strategies of their competitors and thus to impair appreciably the competition which exists between traders.(Judgment of the Court of 28 May 1998, Deere v Commission, C-7/95 P, Rec. p. 1-3111, paragraphs 88 and 90).

190    It should be presumed, subject to contrary proof, that it is the concerned operators' duty to adduce, that the companies participating in the consultation and remaining active in the market take into account the information exchanged with their competitors to determine their behaviour in that market. It is all the more so when the consultation occurs on a regular basis over a long period (HFB and others v Commission judgment, paragraph 125 above, paragraph 216).

191    In the present case, the plasterboards market was oligopolistic, which is besides not disputed by the applicant. It should therefore be verified whether, given this characteristic of the market, the exchange of information of the concerned businesses relating to the functioning of the market in question reduced or removed the degree of uncertainty of the concerned businesses relating to the functioning of the market in question and thus restricted competition in said market.

192    The applicant considers that, as it was organised, the exchange of information could only help achieve a single objective, namely checking   the individual estimates according to market conditions, including  volume.

193    The affirmation of the applicant is a mere allegation contradicted by the statements of BPB concerning the aim of the exchange between Knauf and BPB relating to sales figures, which show that the information in question was aimed at bringing the price war to an end. Indeed, according to the response of BPB of 28 October 1999 to the second request for information, repeated in point 58 of the contested decision:

       "[The representatives of BPB and Knauf ] have agreed to exchange the figures of their 1991 sales volumes to build a sound basis for the future in order to verify that the understanding  was put into play (that is simply to say, giving to each other a more accurate picture of the overall size of the market and therefore their own market share). This was required because there were no reliable industry statistics"

194    Furthermore, if the market was transparent and if the exchanged data on the market could be c,

as alleged by the applicant, the  businesses in question would not have needed to start the litigation. But it appears from pointpoint117 of the contested decision that data exchanged  on the market was not available . The companies had then an interest in exchanging the data in question.

195   As regards the applicant's  contention said through the seventh part of the first plea, alleging that the Commission would have estimated, in the contested decision, that They had confirmed that the exchange of information had been used for the  control of market shares, whilst They had claimed the opposite in her response to the statement of objections, this claim is not founded given that it is clear from the examination of the applicant's arguments set out in the contested decision, that They denied this matter.

196   With regards to  the applicant's argument that, there was no restriction of competition in the absence of informational value of exchanged sales data, given that the figures had been communicated in a very raw and imprecise form without being broken down, depending on different kinds of plasterboards, this allegation is irrelevant. Insofar as the exchange of information between the companies in question were intended to monitor if their respective market shares remained stable or, at least, were not decreasing. Indeed, the applicant and BPB, having expressed a common desire to terminate the price war and stabilise the markets in question at the meeting in London, to achieve this goal then it was enough for the companies in question to know that, by stopping the price war they would not lose their market share, to this end, the general sales data, which allowed for the calculation of  market shares, were sufficient. It also explains why the figures did not have to be broken down for the different kinds of plasterboards.

197   Regarding the applicant's argument that the data exchange was not made at regular intervals and, for that reason, it was not a control mechanism, the examination of the meeting in London demonstrated, however, that the most plausible explanation is that this exchange constituted a control mechanism to check that the price war had in fact ended. In any case, the applicant does not really support her argument. In addition, the applicant's argument concerns only anticipated effects of the exchange of data and even assuming that, it is justified, would not remove the anticompetitive nature of the said exchange.

198   As for the applicant's contention that the frequency with which the data was compiled into tables does not demonstrate that the exchange of such data has also been done with the same frequency, it is ineffective in the present case. Indeed, even assuming that the data on sales volumes were exchanged less frequently than show tables found during the investigations, it would not invalidate the conclusion that such exchange was anticompetitive. In any case, it is clear that the applicant has not provided any evidence tending to show that the periodicity of these tables does not correspond to the frequency at which information exchanges were carried out. In these circumstances, it is appropriate to conclude that the applicant has failed to demonstrate that the Commission's conclusion that the exchange had followed the same frequency as that of these tables is tainted with errors.

199   This same conclusion applies to the applicant's affirmation that the exchange of information was often conducted with significant delay; the given data concerning several quarters. Moreover, this assertion is contradicted by the response of BPB of 28 October 1999 to the second request for information, which indicates that it sometimes turned out  that the information exchange occurred only two months after the end of the period to which the exchanged figures were related. In this regard, even assuming that the information had been exchanged with a delay of two months, this delay would not affect the usefulness of this information to monitor that the market share of each company involved remained stable. In addition, as emanating from the response of BPB, such delays were not frequent, so that the Commission was able, quite  rightly, to consider that, overall, these delays did not affect the anticompetitive nature of these exchanges. However, as has already been noted above, these firms are better placed to prove the exact means of such exchanges.

200   Regarding the applicant's allegation that the information provided was frequently erroneous, They does not explain further or demonstrate this statement. In any event, even assuming that the information provided was false and that the companies in question had relied more on the results of their own research, such information was not without influencing on the degree of uncertainty of competitors behaviour on the market for other producers. Indeed, they show that those firms were pursuing a common goal with an anticompetitive purpose, namely to end a

price war, which required a mutual trust.

201   At this last point, it should be also noted that the fact of not respecting an agreement makes no difference in the existence thereof (see, in effect, Thyssen Stahl v Commission judgment, paragraph 71 above, paragraphs 233, 255, 256 and 341). Even that the fact is established that, some participants in the agreement were able to deceive other participants by sending incorrect information and use the agreement in their interests, without complying with it, the offence committed is not eliminated by this simple fact (see, in this sense, Judgment of 15 June 2005, Tokai Carbon and others v Commission, paragraph 71 above, item 74).

202   As for the applicant's argument that exchange of information was not, in any event, a very serious offence, there would be an interest to examine it, if that was considered as a separate offence and not as a constituent element of a continuing and complex offence noted by the Commission. This argument cannot, therefore, be dissociated from an examination of the third way , based on the violation of a sole infringement

203   The applicant maintains that, before the Tate&Lyle and others v Commission judgment, (paragraph 179 above), information exchange on the market would have been regarded as an offence only if it had been accompanied by an agreement of any kind or if the existence of a restrictive effect on competition had been established.

204   In this respect, it is important to recall  that the interpretation that the Court gives to a provision of Community law is limited to illuminate and clarify the meaning and scope thereof, as it would have been understood and applied from the time of its entry into force. It follows that, the provision so construed can and must be applied by the judge, even in legal reports arising and established before the Court ruling on the request for interpretation, if further conditions for bringing before the competent courts proceedings relating to the administration of that provision are satisfied (judgment of the Court of 15 March 2005, Bidar, C-209/03, Rec. p. 1-2119, paragraph 66).

205   As regards the object of the exchange of sales volumes in the  United Kingdom market, the Commission considers, in point 171 of the contested decision that its object was identical to that of the exchange of data on sales volumes on the four markets concerned, which Knauf did not contest.

206   In conclusion, the collusive nature of exchanges of information regarding quantities sold in Germany, in France,  Benelux and the United Kingdom from 1992 to 1998 are sufficiently demonstrated.

207   The second part of the second plea can, thereby not stand.

*With regard to  the third part, relating to trade information on price increases in the United Kingdom for the period from 1992 until 1998.*

Arguments of the parties

208   The applicant stated that the Commission has not shown the existence of a single case in which a company has, in  advance, informed another company of a price increase. The Commission cannot even attempt to say that companies agree to inform each other of price increases.

209   In addition, even if the applicant had informed another company, in advance, of rising prices, it would only be perceived as the unilateral behaviour of a company.

210   According to the applicant, the Commission does not specifically show the existence of an exchange of information before 7 September 1996. Thus, the period covered by the alleged offence, would start, in any case, on 7 September 1996 and not from 1992.

211   The Commission considers that the comments on the frequency or the reciprocity of such exchanges are irrelevant given that these exchanges will also fall in the broader context of a continuing                                                                                              offence.

212   The relative rarity of known contacts ought to be appreciated in the light of the fact that, in any event, representatives of the parties to the agreement held meetings regularly informed each other on other factors. In addition, price increases would have occurred only twice a year on the market in the United Kingdom. This factor ought to be taken into account in the overall assessment in the same way as the mutual dependence between prices and market shares and the fact that parallel conduct is a serious indication of a concerted practice.

Evaluation of the Court

213   The applicant has confirmed, in response to a written question from the Court that They did not dispute that the exchanges of information on price increases on the United Kingdom market as had occurred during the period from 7 September 1996 until 1 November 1998. However, They denies the anticompetitive nature of these exchanges saying they were simply the communication of decisions that had already been taken. In addition, some information had, perhaps, been communicated unilaterally.

214   With regard to the Commission, it reaffirmed, in response to an oral question from the Court that, for the period prior to 7 September 1996, it did not find any documentary evidence of contacts between the companies involved.
      Accordingly, it is necessary to examine, first, if, for the period prior to 7 September 1996, the parallelism of price increases enough shows the existence of a violation of the right to competition and, secondly, whether, for the period from 7 September 1996 until 1 November 1998, the collusive nature of contacts allowed between the firms in question is proved to the requisite legal standard.

215   Accordingly, it is necessary to consider first, if, for the period prior to 7 September 1996, the parallelism of price increases enough shows the occurrence of a violation of the right of competition and, secondly, whether, for the period from 7 September 1996 until 1 November 1998, the collusive nature of allowed contacts between the firms in question is proved to the requisite legal standard.

216   In this connection, it is important to check if the quasi-simultaneity of announcements of price increases and parallelism of announced prices, as it has been noted, are a serious body of evidence, clear and consistent evidence of a prior consultation aimed at informing competitors of price increases. A parallelism of behaviour cannot be regarded as furnishing proof of consultation unless consultation constitutes the only plausible explanation. It should indeed, reflect the fact that, if article 81 EC prohibits any form of collusion with a distortion of competition nature, it does not reject the right of economic operators to intelligently adapt to the observed behaviour or anticipated conduct of their competitors (Judgment of the Court of 31 March 1993, Ahlstrom Osakeyhtio and others, C-89/85, C-104/85, C-114/85, C-116/85, C-117/85 and C-125/85 to C-129/85 Rec. p. 1-1307, paragraph 71).

217   As regards the period prior to 7 September 1996, it is clear from points 198 to 200 of the contested decision that the announcements of price increases were quasi-simultaneous four times. Thus, the announcement of 21 July 1992 of British Gypsum (hereafter "BG"), a BPB subsidiary in United Kingdom (entered into force at the end of August 1992), was followed by the announcement of 31 July 1992 of Lafarge (Redland) (entered into force on 31 August 1992). Knauf announced new prices on 3 August 1992 (with a new price list for September 1992).

218   BPB announced in November 1993, a rise of 12% to come into force in January 1994. Lafarge has followed this announcement, but Knauf did not fully follow it.

219   Knauf announced on 29 September 1994 an increase of approximately 6.5% to take effect on 1 March 1995, and BPB announced on 2 December 1994 an 9% increase with effect from 27 February 1995. This increase was followed by the announcement of an identical rise by Lafarge on 6 January 1995, to take effect on the same date.

220   On 22 September 1995, BG announced a price increase of 12% for standard boards with effect

from 1 January 1996. This announcement was followed by Lafarge, which announced the same increase on 13 October 1995, with effect on 1 January 1996 and by Knauf, which announced the same increase on 27 October 1995, effective on the same date.

221   Thus, as regards the period before 7 September 1996, BPB price increases, Knauf and Lafarge followed one another at close intervals, or were even concomitant.

222   However, in the present case, even if the intervals between the various announcements of price increases eventually allowed companies to become aware of those increases with information from the market, and although these increases have not always been exactly on the same level, the quasi-simultaneity of announcements of price increases and the parallelism of announced prices, are strong evidence of collusion in light of these announcements, since such increases were part of a context characterised by the fact that, as the Commission noted in the contested decision, the applicant and BPB had agreed at the meeting in London at the beginning of the year 1992 to end a price war on the four European markets.

223   In any event, it is clear that the Commission concluded, in point 476 of the contested decision, regarding the exchange of data on price increases on the market in the United Kingdom, only on the existence of contacts admitted by BPB, Knauf and Lafarge, which were followed by some price increases, referring in this respect to point 211 of the contested decision. For the rest, as is apparent from point 210 of the said decision, They said They could only see the behavioural parallelism of businesses, also incurred in other collusive contacts, without inferring that this parallelism had necessarily been preceded by consultation. They also clearly, by the use of the word "however" in English, French and Dutch of point 211 of the contested decision, opposed this simple parallelism of the admitted existence of contacts preceding announcements of price increases.

224   In regard to the period after 7 September 1996, the existence of contacts between competitors on price increases in the UK is demonstrated by the following documentary evidence;

225   First, according to a BG internal memorandum, during the weekend of 7 and 8 September 1996, Knauf has announced that it would follow the price increase decided by BG, when its intentions are specifically specified. As is apparent from point 201 of the contested decision, this discussion took place before the release by BG of the increase announcements of its rates on 9 September 1996.

226   Knauf admits the existence of this discussion, but denies that it was an offence.

227   Moreover, Lafarge followed this increase on 20 September 1996.

228   In the second place, the quasi-simultaneity of announcements of price increases and announced prices parallelism have continued. Thus, the Commission noted, in points 203 and 204 of the contested decision, that on 3 June 1997, BG had announced an increase of 3.8 % for standard plates, with effect from 1 August 1997. Lafarge announced on its side, an increase of 3.7% with effect from 4 August 1997, and Knauf announced an increase of 3.7%, effective the same day as that of Lafarge. Furthermore, on 27 January 1998, BG announced a price increase of 4.4% with effect from 1 April 1998. Lafarge announced for its part, an increase of 4.1%, with effect from 6 April 1998,
and Knauf announced the same increase, with effect from 1 April 1998.

229   Thirdly, it is clear from point 205 of the contested decision that before the announcement of BG's increase on 8 September 1998 of a price increase of 5% with effect from 1 November 1998, Lafarge's representative indicated to an official of BG that, for budgetary reasons, Lafarge was not prepared to follow the price increase provided for in the beginning of January the following year. But then, if the  companies concerned had not agreed to exchange information on price increases, Lafarge would not have needed to notify the representative of BG that it would not follow the increase provided for.

230   Fourthly, BPB acknowledged that there had been what it calls an "isolated occasion" when Mr.

[N], general manager of BG, had telephoned the directors of Lafarge and Knauf in the UK, informing them of the intentions of BG as regards prices, and the envisaged range of increase (point 207 of the contested decision ). These phone calls, even if BPB does not give, even approximately, their dates, and even if they are qualified by it of "purely courtesy calls" show that the competitors have had contacts in regard to price increases.

231  In those circumstances, the Commission considered rightly, in point 477 of the contested decision that, the contacts on the price increases on the market in the United Kingdom constituted a concerted practice prohibited by Article 81, paragraph 1 EC.

232  This conclusion is not invalidated by the argument that it was a unilateral behaviour. It is certainly true that the concept of concerted practice actually implies the existence of contacts characterised by reciprocity. However, this condition is satisfied, when the disclosure by a competitor to another, of his intentions or his future behaviour on the market has been sought or, at the very least, accepted by the second party (Cement judgment, paragraph 39 above, item 1849).

233  As regards the applicant claims that the price information transmitted were known to clients of the concerned company before it was released to the competitors and, thus, the information disclosed would have already been collected on the marketplace by them, it must be remembered that the mere fact of having received information concerning competitors, information that an independent operator preserve as trade secrets, is sufficient to manifest the existence of an anti-competition intention (Tate & Lyle Others v Commission judgment, paragraph 179 above, paragraph 66). Moreover, discussions on which the Commission has found direct evidence took place before the official announcements of price increases.

234  Given the circumstances of the case, the Commission has shown, with the requisite legal standard, that the three companies had been informed of the higher prices on the market in the United Kingdom during the period from 1992 to 1998.

235  Therefore, the third part of the second plea must be set aside,

*On the fourth part, relating to agreements on market shares in Germany,*

*Arguments of the parties*

236  The applicant agrees that all companies acknowledged that their representatives met during the Eurogypsum congress of Versailles in June 1996 and had addressed, on this occasion the situation on the German market. Then, these companies would not have an agreement on magnitudes of their respective market shares in the future. It is clear from the note cited in point 221 of the contested decision that, the representatives of companies have only expressed wishes regarding the importance that the said market shares should have. Such a wish was merely  unilateral behaviour that cannot be an offence. It is at most an attempt to an agreement. Preparatory acts aimed at obtaining agreement wills would not constitute an offence in section 81, paragraph 1, CE, and that, even when the objective was actually of reaching such an agreement.

237  The applicant states that, her market share has decreased during the period covered by this alleged offence and revolution prices was negative, as it comes out of the expert report communicated to the Commission with the answer to the statement of objections.

238  Knauf argues that the subject of the meeting in Brussels was to discuss the opportunity of the proposed joint acquisition project of the Norgips factory in Opole (Poland). In the then context, the situation on the German market of plasterboards would have naturally been raised during the discussion, but without the participants having to comply in any form whatsoever, with determined market shares. It is clear, however, from Knauf and Lafarge claims cited in points 252 and 253 of the contested decision that at no time, the stabilization of market shares in Germany has never been an issue.

239  The applicant adds, referring to points 256 and the following of the contested decision, according to corroborating statements of all companies, the meeting of representatives of companies, held at The Hague in May 1998, has also not reached an agreement on market shares.

240   In point 264 of the contested decision, the Commission claims that the companies had "all agreed that their market shares are determined by mutual agreement" which does not provide, however, any evidence.

241   As regards the exchange of sales figures on Germany by the intermediary independent expert, the applicant points out that such an exchange was neither more accurate nor more reliable than the figures directly exchanged between businesses. It only permitted companies to calculate, after the fact, their own market share, as the Commission itself admits it in point 271 of the contested decision.

242   The applicant denies that this exchange served to put into play an allegedly concluded agreement at the meeting in Versailles in 1996. The fact that this exchange was established only months after the meeting at Versailles already argues against this thesis. The weaknesses of the system of direct exchange of information is also demonstrated with regard to the information exchange system information exchange system.

243   The Commission refers to the contested decision (points 263 to 267 and 465 to 469) and argues that an exchange of information in preparation of an agreement is already a concerted practice within the meaning of Article 81, paragraph 1, EC. They added that no reproach is directed to the applicant for having eliminated the competition but for having restricted it.

244   As regards the information exchange system, it would have made it more difficult the exchange of inaccurate information in the context of other systems and therefore would have contributed to the operation thereof.

Evaluation of the Court

245   It appears from argumentation of the applicant that, They does not dispute the existence of meetings of Versailles, Brussels and The Hague. In addition, They admits having participated in these meetings and having discussed the situation of the German market. However, They considers that the Commission has not demonstrated that the companies involved have made a joint commitment.

246   Accordingly, the question on which the applicant and the Commission disagree on is the legal classification of meetings of Versailles, Brussels and The Hague and the information exchange system.

247   But then, as regards the applicant argumentation to demonstrate that there has been no agreement on distribution of market shares in Germany, it should be noted that in the contested decision, the Commission found in point 469, *in fine*, that "an agreement was/had been concluded between the [concerned companies], with the intention of distributing among themselves the German market or at the very least of stabilising it. This agreement constitutes a special demonstration of the complex and continued Agreement for the purpose of restricting competition in the market for plasterboards at least the four main European markets. Moreover, it is clear from points 462, 463, 465 and 469 of the contested decision that, the Commission considers, irrespective of whether such an agreement had been concluded or not, the companies involved, by expressing their common willingness of sharing the German market or, at least to stabilize it, had concluded an agreement within the meaning of Article 81 paragraph 1 EC.

248   Thus, even if the Commission had failed to demonstrate that the sanctioned companies have reached an agreement in the narrow sense of sharing market shares in Germany, it would be enough to find from undisputed facts that companies in question had knowingly substituted practical cooperation between them by the risks of competition, remaining in direct contact in order to stabilize the German market. Accordingly, it is necessary to verify if this was the case in the present case.

249   In respect of the meeting held in Versailles in June 1996, its existence is not disputed, nor the fact that, during its course, the companies in question disclosed their actual sales figures for the year 1995, they have discussed the stabilization of their market shares on the German market and Gyproc did not agree for the market share the other companies were offering him.

250    As regards the Brussels meeting of 4 December 1997, Knauf also admits its existence, but said it was mainly the occasion to discuss the proposed joint acquisition of the Norgips factory even if the situation of the German market was also evoked.

251    As for the meeting in The Hague in May 1998, Knauf does not deny that it occurred. However, the discussions, even if the subject were the situation in Germany, would not give a concrete result. In this respect, it is apparent from point 257 of the contested decision that, according to Gyproc, the participants exchanged their figures on sales volumes in Germany for the first four months of the year 1998, that each participant evoked the market share he was interested having in Germany and that, the total market shares representing 101%, the participants proposed to Gyproc to limit its market share to 11%, but the latter refused.

252    Therefore, it is clear from the foregoing that, even if a specific agreement on the division of the German market could be concluded either at the meeting of Versailles or during the subsequent meetings held in Brussels and The Hague, the four companies involved have expressed a common will to stabilize the German market and therefore restrict competition. Thus, the holding of the meeting of Versailles revealed the existence of an agreement in principle to a German market share between BPB, Knauf, Lafarge and Gyproc, as the Commission argues in point 264 of the contested decision.

253    In fact, it is not disputed by Knauf that, during the meeting in Versailles, notwithstanding the position taken by Gyproc, the other three companies, BPB, Lafarge and itself, have indicated to each other the market shares on which they agreed and that these market shares corresponded to those the companies already held. In this respect, we must also remember that the companies do not deny that they exchanged at the meeting of Versailles their sales figures for the year 1995.

254    We should also take into account the information exchange system. The existence of this system supports the contention of the Commission that these companies have wanted to stabilize the German market. In fact, each producer handed over the sales figures in confidence to the independent expert and the results were compiled by the staff of the latter to give an overall figure, which was then communicated, to the participants. This figure allowed anyone to calculate his own market share, but not others. The figures were provided on a quarterly basis and concerned the sales figures of each. In addition, producers have communicated to the independent expert, in confidence, the figures from January to December 1995 and those from January to September 1996.

255    Therefore, the information exchange system, allowed the companies in question to control if their market shares on the German market remained relatively stable.

256    With regard to the legal appreciation of that situation, it must be remembered that, the act of communicating information to your competitors in order to prepare an agreement is sufficient to prove the existence of a concerted practice within the meaning of Article 81 EC (see, in this sense, Judgment of the Court of 6 April 1995, Trefilunion/Commission, T-148/89, Rec. p. II-1063, paragraph 82).

257    In fact, the concept of concerted practice within the meaning of Article 81, paragraph 1, EC, is a form of coordination between companies which, without having reached the completion of an agreement as such, knowingly substitute, a practical cooperation between them for the risks of competition (Suiker Unie and others v Commission judgments, paragraph 159 above, paragraph 26, and Ahlstrom Osakeyhtio and others, paragraph 216 above, paragraph 63).

258    The criteria of coordination and cooperation constituting a concerted practice, far from requiring the development of a real "plan" must be understood in the light of the inherent design of the EC Treaty provisions relating to competition, according to which, any economic operator must determine independently the policy he intends to adopt in the common market and conditions he intends to offer to his customers (judgments of the Court Deere v Commission, paragraph 189 above, paragraph 86, and of 2 October 2003, Thyssen Stahl v Commission C-194/99 P, Rec. p. I-10821, paragraph 82).

259    While it is true that, this requirement of independence does not exclude the right of operators to adapt intelligently to the observed or anticipated behaviour of their competitors, it is however strictly precluded to attempt any direct or indirect contacts between such operators, the object or

effect of which is conditions of competition which would not correspond to normal conditions of the market in question, given the nature of the products or services offered, the importance and the number of companies and the volume of the market (judgments Deere v Commission, paragraph 189 above, paragraph 87, and of 2 October 2003, Thyssen Stahl v Commission, paragraph 258 above, paragraph 83).

260   Moreover, as the Court has found in the Ciment judgment, paragraph 39 above (paragraph 1852), to establish a concerted practice, it is not necessary to prove that the competitor has a firm commitment, towards one or several others, to adopt a particular behaviour or that, competitors have fixed their future behaviour on the market. It suffices that, through its declaration of intention, the competitor eliminates or, at least substantially reduces the uncertainty about the behaviour expected from him on the market.

261   In this regard, the Commission considered, rightly, in point 466 to the contested decision that, the very fact for a company, to indicate that, it does not want a market share greater than those already detained is sufficient information to its competitors on an essential element of its strategy.

262   Furthermore, it should be noted that, the market in question presents a highly concentrated oligopolistic nature. But, in such a market, the exchange of information is likely to enable companies to know the position of their competitors in the market and their business strategies and thus to significantly alter the competition that exists between economic operators (Deere v Commission judgment, paragraph 189 above, paragraphs 88 to 90, and of 2 October 2003, Thyssen Stahl v Commission, paragraph 258 above, paragraph 84).

263   Besides, given the general context on the aim of stabilising the concerned markets, information exchange on the German market has allowed companies in question to control whether, the market shares of competitors remained stable.

264   Finally, as regards the applicant's submissions that, in the absence of agreement, the Commission would at least demonstrate the effects on the market. It should be noted that, for purposes of applying article 81, paragraph 1,EC taking into account the practical effects of an agreement is unnecessary, therefore it appears that this is intended to prevent, restrict or distort competition inside of the common market (Aalborg Portland and others v Commission judgment, paragraph 46 above, paragraph 261).

265   Similarly, a concerted practice falls to article 81, paragraph 1, EC even in the absence of anticompetitive effects on the market. Indeed, it derives from the very wording of that provision that, as in the case of agreements between companies and decisions by associations of companies, concerted practices are prohibited, regardless of any effect when they have an anti-competition object (Judgment of the Court of 21 September 2006, Nederlandse Federatieve Vereniging voor de Groothandel op Elektrotechnisch Gebied v Commission, C-105/04 P, Rec. p. 1-8725, paragraphs 137 and 138).

266   Then, if the very notion of concerted practice implies the existence of a behaviour of participating firms in the market, it does not necessarily imply that such behaviour results in the concrete effect of restricting, preventing or distorting competition (Nederlandse Federatieve Vereniging voor de Groothandel op Elektrotechnisch Gebied/Commission judgment, paragraph 265 above, paragraph 139).

267   Given the overall context of the case, the Court considers that, based on undisputed facts, the Commission has shown, with the requisite legal standard that, the companies involved, even if they had not reached a conclusion on a specific agreement on the distribution of the German market between them, they had expressed their common will to behave on this market in a determined way, namely by restricting competition on that market by the stabilization thereof.

268   Accordingly, the fourth part of the second plea cannot stand.

*On the fifth part, relating to agreements on price increases in Germany*

Arguments of the parties

269   According to the applicant, the Commission has been unable to prove that companies had agreed on price increases that occurred on the German market from 1996 to 1998. They, nevertheless, acknowledges that companies have informed each other from time to time on price increases that had already been decided upon. It appears, however, the evidence adduced in points 291 and 305 and 375 of the contested decision that the announcement of price increases was made simultaneously or after sending the price lists to clients. Thus, the Commission has not demonstrated a reduction in the degree of uncertainty or a weakening of the secrecy of competition. Even if competitors had been advised of a price increase before the clients, which was not the case, it would be a simple unilateral behaviour, which is not constituent of an offence, and not an agreement between competitors.

270   The note cited in points 291 and following of the contested decision that, the Commission presented as a means of essential proof, shows that the competitors watched each other in an anner and they often followed price increases of other companies. However, this behaviour would reveal precisely that there was no agreement between these companies, but just cases of legal price diktats as often happens in oligopolistic markets. The piece of evidence relied on by the Commission in points 293 and 337 of the contested decision reveals, moreover, that the prices of competitors clearly differed, which also militates against the existence of concerted price increases. The evidence adduced in points 301, 323 and following and 368 of the contested decision would reveal that, there was clearly a strong competition between the concerned companies on the German market of plasterboards.

271   Regarding the discussion They had with Lafarge on the behaviour of a part of the latter (points 361 and following of the contested decision), the applicant maintains that even if Lafarge and herself had agreed on supplying a client in Hamburg, it would, at most, constitute a crime on Article 1 of the Gesetz gegen Wettbewerbsbeschrankungen (German Act against restraints of competition) which would have been the exclusive jurisdiction of the Landeskartellbehorde (competent authority as regards agreements in the Land) of Hamburg, and not automatically a crime on Article 81 paragraph 1, EC for which the Commission is the only competent for prosecution.

272   The Commission refers to points 290 and following and 471 and following of the contested decision, which would be based in particular on the applicant's confession (points 308 and following of the contested decision). The Commission argues that the prior disclosure of information which was accepted, undoubtedly lead to a lessening of competition (points 314 and 472 to 474 of the contested decision). This follows also the note of Mr. [Z], commercial director of Knauf (points 315 to 319 of the contested decision). The instruction to the rumour of a price increase during the first quarter of 1999, given by the applicant to her sales staff on 22 October 1998, would be an example among others (point 377 of the contested decision). The same price increase, not yet "decided upon" at that time, would be evoked in the internal report of a meeting of the Board of Directors of BPB on 13 October 1998 (point 380 of the contested decision), and in the note, also internally, Mr. [X], Director General of Lafarge Gips, of 7 October 1998 (points 290 and following and 381 of the contested decision).

273   Regarding the discussion Knauf had with Lafarge on the behaviour of the latter, the Commission considers that its importance lies in the ease with which Knauf has written to a competitor to prevent a particular behaviour. Such a letter would be inconceivable in the absence of a general framework of cooperation.

Evaluation of the Court

274   It is necessary to examine the argument of the applicant that, the direct contacts between his rivals, which They does not deny the existence, does not constitute an anticompetitive behaviour.

275   Concerning the assertion of the applicant that it was a purely unilateral behaviour, it is true that

the concept of concerted practice effectively assumes the existence of contacts characterised by reciprocity. However, this condition is satisfied if the disclosure by a competitor to another, his intentions or his future behaviour on the market was requested or at the very least, accepted by the other (Ciment judgment, paragraph 39 above, item 1849).

276   Furthermore, in the matter that gave rise to the judgment of the Court on 24 October 1991, Rhône-Poulenc v Commission (T-I/89, Rec. p. 11-867), under which the applicant was accused to have taken part in meetings during which competitors were exchanging information on, inter alia, the prices they intended to adopt on the market, the Court found that, a company, by its participation in a meeting with an anti-competition subject, had, not only pursued the aim of eliminating in advance, the relative uncertainty about the future behaviour of its competitors, but has also necessarily taken into account, directly or indirectly, information obtained during these meetings to determine the policy it intended to follow on the market (paragraphs 122 and 123).

277   This conclusion is also applicable where, as in the present case, the involvement of one or more companies in a concerted practice having an anti-competition nature is confined only to the receipt of information about the future behaviour of its competitors in the market.

278   In fact, any economic operator must determine independently the commercial policy, that  he intends to follow in the market. This, therefore, is opposed in making any direct or indirect contact between economic operators, which has the purpose or effect of influencing their behaviour in the market, giving rise to conditions of competition which do not correspond to normal market conditions in question, but also in any disclosure by a company to a competitor, of the behaviour you decided or you intends to adopt in the market. (LVM v Commission judgment, paragraph 125 above, paragraph 720).

279   In regard to the assertion of the applicant according to which, the transmitted information on prices were known to clients of the concerned company before it was released to the competitors and, thus, the disclosed information would have already been collected on the market by the latter, it must be remembered that the mere fact of having received some information about competitors, information which, an independent operator preserves as trade secrets, is sufficient to manifest the existence of an anti-competition spirit (Tate & Lyle and others v Commission judgment, paragraph 179 above, paragraph 66).

280   But, the applicant's affirmation that the price information were known by the customers prior to disclosure to competitors and, thus, could be collected on the market must be rejected, assuming this fact as established, does not imply that, at the time of sending the price lists to competitors, those prices already bore an objective connotation in the market, easily spotted. The direct sending allowed competitors to be aware of this information in a simpler way, fast and direct than through the market. In addition, this prior sending allowed them to create an atmosphere of mutual certainty as to their future pricing policies.

281   The applicant also argues that the companies in question concerted together on price increases on the German market between 1996 and 1998 without discussing in detail the evidence presented by the Commission, except for a note of 7 October 1998 cited in point 290 of the contested decision. It merely states that the Commission did not prove that the increases in question had been the object of prior consultation and it was a normal situation in an oligopolistic market where, competitors follow prices fixed by other companies.

282   In this connection, it should be noted that, the potential exchange must be considered in the context of the period characterised by a set of anti-competitive events for a common will of the competitors to stabilise the market of plasterboards on the four major European markets, including the German market. In addition, it should also be noted that, if the contents of a an isolated document found by the Commission may not reveal in a unequivocal manner, the existence of an anticompetitive behaviour, in a way that, they said contents could potentially only be explained by a desire to restrict competition, this fact cannot exclude that, this document could be interpreted as supporting the existence of such a willingness, when it is part of a series of other documents that provide strong evidence of the existence of a present day an similar anticompetitive behaviour.

283   Regarding the internal memo dated October 1994 discovered in the premises of the  Rigips Company (German BPB subsidiary), the Commission believes, rightly, that said memo reveals a

knowledge of the strategy of competitors and is evidence as to the contacts between them. Indeed, the author of this memo, having first summarised the situation in the market, says Gyproc sales manager had complained that his company had lost market shares and had to regain them. In addition, it was provided for in the note to freeze prices at the level mentioned in it and that higher prices would take effect on 1 February 1995. This last remark is particularly revealing. While sending the price increase announcements by Knauf was unilateral and if BPB was merely following the price rise, the latter could not have known in October 1994 that a price increase was scheduled for February 1995, given that Knauf had announced the price rise in November 1994. Moreover, if BPB had become aware of the price hikes through customers, as it claims, nothing prevented from demonstration to contradict the evidence that the Commission found. In addition, it should be noted that, price hikes actually took effect on 1 February 1995.

284    Moreover, it should be noted that, despite these concrete evidence of collusive contacts between producers, the Commission considers only, in point 329 of the contested decision, that competitors have informed each other of their intentions regarding price rises on 1 February 1995 without claiming that this note is a direct evidence of collusion on price increases.

285    Moreover, the fact that the Commission mentions again in this context, the meeting in Versailles in June 1996, which was designed to stabilize the German market is quite relevant as it is an indication that the concerned companies have felt the need to re-discuss the situation on the German market after the failure of price hikes in 1995.

286    This view is supported by the note of 17 December 1996 from Lafarge (point 335 of the contested decision). Indeed, the author begins the note stating:

"We discussed again the current situation on the German market."

287    In addition, interpretation given by the Commission of that note marked "strictly confidential and personal!" is not tainted with error. This note reflects a clear concern of its author, in the context of a price increase announced by all producers on 1 February 1997, regarding the behaviour of its competitors and pricing policies, and of the reduction in particular, they were putting into effect. It establishes the existence of direct contact between competitors during which they have expressed their intentions and analysis. Indeed, the author of this note explains that the price offered by BPB to some customers would be "less than the agreed lowest price level of the time" and that, "this would again lead to a destabilisation. He adds:

"Knauf granted prices for projects until May 1997 at a lower level compared to the agreed price. With us, they insist on discipline for the price [s] increase [s] [...], increasing the price to the agreed level ([2.5-3] DM/m$^2$) will be very difficult.

288    In these circumstances, the Court considers that the Commission believes rightly, in point 352 of the contested decision, that, at the time of the rise in prices in February 1997, a direct dialogue on the rise in prices was reached among competitors and, at the very least, competitors had informed each other of their intentions in anticipation of rising prices.

289    As regards the attempt to raise prices in September 1997, it should be noted that the four companies involved, have sent letters announcing the price increase on 1 September 1997, in May or early June 1997 (point 353 of the contested decision).

290    In addition, exchanges between Knauf and Lafarge, mentioned in paragraph 356 of the contested decision, as examples, confirm the existence of cooperation on price increases and a control of prices charged by distributors in general. Indeed, the fact that a company did not hesitate to contact competitors to discuss about clients or the prices charged by a distributor corroborates the existence of cooperation between producers.

291    The Commission gives another example, which is, in its view, a supplemental manifestation of consultations held between BPB, Knauf, Lafarge and Gyproc on the German market, namely the attempt to raise prices in September and October 1998.

292    In this respect, it is certainly true that BPB announced, in June 1998, a price increase for

September 1998 and that, other competitors did it in August 1998 for an increase that was scheduled from October 1998. On this occasion, Knauf sent a copy of his announcement of higher prices at the private address of a director of BPB.

293   However, it must be remembered that it is usual, through anti-competitive agreements and practices that, the operations are conducted in a clandestine way, that meetings that are held secretly and related documentation is limited to a minimum. It follows that, even if the Commission discovers evidence explicitly establishing illegal contact between operators, they will normally be only fragmentary and scattered, so it is often necessary to reconstitute certain details by deductions. Accordingly, in most cases, the existence of a practice or an anticompetitive agreement must be inferred from a number of coincidences and indications which, taken together, may constitute, in the absence of another coherent explanation, evidence of a breach of competition rules (Aalborg Portland and others v Commission judgment, paragraph 46 above, paragraphs 55 to 57).

294   In the present case, given the context of the case, the Court considered that, the sending of a copy by Knauf, of the announcement of price increases to a private address of a director of BPB, which is an unusual way to communicate between competing firms, is sufficient to prove that, in the absence of another plausible explanation provided by the applicant, a close cooperation between producers also existed with regard to price increases in the German market which occurred in September and October 1998.

295   Finally, regarding the memorandum of Lafarge on 7 October 1998 (points 290 to 294 of the contested decision), it is true that this memorandum, if it were the only evidence found, does not constitute sufficient evidence of a prior consultation on price increases. However, viewed in the context of other evidence described above, this memorandum confirms the existence, on the one hand, of contacts between competitors on price increases and the link between them and, on the other hand, of discussions on market shares in Germany. Indeed, taking into account, the other steps which the concerned companies began to stabilise the German market, the parallelism of price increases and the discovery by the Commission during its audits, of numerous copies of announcements of price increases of competitors in the premises of such companies, that they have partially admitted having sent or received directly from their competitors, the coherent interpretation of this memorandum may not be the one given by the applicant.

296   In these circumstances, the Court considers that the Commission considered, rightly, that the information exchange system relating to price increases implemented between BPB, Knauf, Lafarge and Gyproc on the German market was a concerted practice, contrary to Article 81, paragraph 1, EC.

297   The fifth part of the second plea is therefore unsubstantiated.

298   Therefore, the second plea must be rejected in its entirety.

*3. On the third plea, based on a violation of the concept of single infringement*

*Arguments of the parties*

299   The applicant alleges, alternatively, that, under any circumstances, there could not have been any single infringement of long duration. This would result in a lesser severity of the offence and the prescription of isolated facts, which are believed to have occurred more than five years before the beginning of proceedings.

300   The applicant maintains that, even assuming the existence of "isolated violations" identified by the Commission and their offending character, these would not constitute a single infringement, given that there was no overall plan. They argues that if the Commission considers that, the individual acts They suppressed, are part of an overall infringement, it cannot simply prove the existence of isolated facts but must also demonstrate a single and circumstantial action plan from the concerned companies. The idea behind the concept of a continuing offence would, in effect, the uniqueness of intention from participants to commit a determined offence in an indeterminate number of cases, but within a single action plan.

301   Although the Commission's objections concerning the London meeting were accurate and proven, the agreements reached during this meeting could not be an overall plan for all subsequent acts in the accusation, given that, only two representatives of companies active on the plasterboards market were present at that meeting. The Commission did not even attempt to demonstrate that, during the meeting in London, the integration of other companies had been planned.

302   The sporadic exchange of information in 1992 and 1993 could not be described as an element of a continued or continuing offence because of the large time intervals between the exchanges. Thus, as it results from tables of Mr [D] in 1992, There have been only one such exchange, and in 1993, companies would exchange their sales figures, at most, two times. It would therefore not be a permanent practice.

303   Such a comprehensive plan could not have been conceived during meetings of representatives of companies at Versailles in 1996, in Brussels in 1997 and at The Hague in 1998, given that, as well as the Commission itself indicates, only the German market was the object of discussion and not the French, the United Kingdom and Benelux markets.

304   The main consequence of the absence of a continuity link between the isolated acts in the accusation would be that the oldest facts would be present and could no longer be the subject of prosecution. The limitation period was interrupted by the audits of the Commission on 25 November 1998, so that the facts prior to 25 November 1993 would not have given rise to fines if they constituted elements of a continuous or continued offence, which is not the case, according to the applicant.

305   The Commission contends that the contested decision is not based on the complaint of a "comprehensive plan conceived during the meeting in London" but on behaviours consistent in time as well as in terms of their anti-competitive goals. Such behaviour would constitute, not putting into play a comprehensive plan, but the proof of the existence of a continuing offence, which beginning was to be fixed in early 1992 even though the meeting in London had not taken place, since it is at that time that participants in the agreement introduced their information exchange system,

*Evaluation of the Court*

It is advisable, as an introduction, to observe that from the contested decision (point 479) that the Commission considers that the overall agreements and concerted practices of the present case, were part of a series of efforts of the concerned companies in pursuit of a single economic goal, namely the restriction of competition and represented various manifestations of a complex and continuing agreement which had the object and effect of restricting competition. Considering that the agreements and concerted practices cited above had realized, in an uninterrupted manner from 1992 until 1998, the manifestation of the common will of those companies to stabilize and thus restrict competition at least in the German, French , United Kingdom and Benelux markets of plasterboards, the Commission described the offence as unique, complex and continuous.

306   Thus, section one of the contested decision states that the concerned companies, including the applicant, "have violated article 81, paragraph 1, [EC] by participating in a set of agreements and concerted practices in the area of plasterboards.

307   There is need to first consider the applicant's argument that, the Commission erred in law, by concluding on the existence of a comprehensive plan from different manifestations of the offence in question without demonstrating that, a common will existed independently of those different manifestations.

308   It should be noted that in most instances, the existence of a practice or an anticompetitive agreement must be inferred from a number of coincidences and clues which, all considered, may constitute, in the absence of a coherent alternative explanation, evidence of a breach of the rules of competition (Aalborg Portland and others v Commission judgment, paragraph 46 above, paragraph 57). This case law is transposable to the concept of unique and continuous infringement. Indeed, when the offence is complex, unique and continuous, each manifestation confirms the demonstration that, such an infringement has actually occurred.

309   Thus, unlike the assertions of the applicant, the different manifestations of the offence in question must be apprehended in an overall context that explains their rationale. This is a production of proofs in which the probative value of different elements of fact is corroborated or refuted by other elements of existing fact, which together can prove the existence of a unique infringement.

310   Knauf also considers that the Commission has not demonstrated to the requisite legal standard the common purpose that unites the different manifestations in both unique and continuous infringement.

311   In this connection, there is need to recall that, a violation of Article 81 paragraph 1, EC may result from not only an isolated act, but also a series of acts or of a continuous behaviour. This interpretation cannot be contested because one or more elements of this series of acts or continuous behaviour could also constitute in themselves, considered isolated, a violation of this provision. When different actions are part of an overall plan, because of their identical object of distorting competition inside of the common market, the Commission is entitled to attribute responsibility for these actions according to the involvement with the offence taken as a whole (Aalborg Portland and others v Commission judgment, paragraph 46 above, paragraph 258).

312   In the present case, it is clear from the examination of the second plea that, Knauf participated, from the meeting in London, in a unique, complex and continuous offence, characterised by a common goal to end a price war and stabilize the four markets of plasterboards. Indeed, meetings, information exchange and practices relating to pricing pursued the same anti-competitive purpose of keeping the price at a competitive level, and to reduce competition between companies operating on the relevant market.

313   The items displayed within the scope of the second plea allow to considered that it was rightly that, the Commission found, in point 432 of the contested decision, the following:   "These different manifestations appear [...] clearly complementary, considering the functioning of the plasterboards market. The improvement of the economic situation of businesses through price increases made it necessary to coordinate these companies in terms of market shares. "

315   The Court considers that, in the circumstances of the case, the agreements and concerted practices formed part, because of their identical purpose and their narrow synergies, in a general plan, which was part, in turn, in a series of efforts by companies involved pursuing a single economic goal, namely influencing the price revolution. As rightly affirms the Commission In point 422 of the contested decision, it would be artificial to split up such continuous conduct, characterised by a single purpose, into several separate offences, when it is, rather, a single infringement, which progressively manifested itself in both agreements and concerted practices. The uniqueness of the offence arises, in fact, from the uniqueness of the aim pursued by each participant in the agreement and not under the terms thereof (see, in effect, Ciment judgment, point 39 above, paragraph 4127).

316   In addition, as part of a global agreement extending over several years, a lag of several months between the manifestations of the agreement does not matter. The fact that different actions are part of an overall plan because of their identical object is however decisive (Aalborg Portland and others v Commission judgment, paragraph 46 above, paragraph 260).

317   Regarding the argument drawn from the absence of such a plan, just remember that the concept of infringement is a unique situation in which several companies have participated in an offence consisting of a continuous behaviour pursuing a single economic purpose, aimed at distorting economic competition or even individual offences linked together by an identical object (same final aim of the set of elements) and subjects (same concerned companies, conscious to participate in the common goal).

318   Finally, with regard to the applicant's affirmation that the uniqueness of the offence would be refuted by the fact that the number of firms that took part in some anticompetitive manifestations would be limited and that some companies would not participate in the offence from the beginning, it suffices to note that, the fact that a company did not participate in all the constituent elements of an agreement or that it plays a minor role is not relevant to establish the existence of an offence committed by it. There has not to be taken into consideration such elements, except

in the appreciation of the seriousness of the offence and, if any, of determining the amount of fine (Aalborg Portland v Commission judgment, paragraph 46 above, paragraph 86).

319   Thus, even if the agreements and concerted practices referred to in Article 81, paragraph 1, EC necessarily result from collaboration by several companies, which are all sponsors of the offence, their participation can take different forms, depending on the particular characteristics of the concerned market and the position of each company in this market, the aims pursued and the means of implementation chosen or envisaged.

320   Consequently, the mere fact that, each participant in the offence in its own forms do not challenge the qualification of the offence of single and continuous infringement.

321   II follows from the foregoing that, the complaints directed against the qualification of the agreement of single and continuous infringement are not founded.

*4. On the fourth plea, based on a violation of Article 15, paragraph 2 of regulation no.17 in respect of the turnover used to calculate the amount of the fine*

Arguments of the parties

322   The applicant states that they are  not the parent company of a group formed by the "Knauf companies". Indeed, there is no Knauf group or company constituting an economic unit within the meaning of the competition law. Thus, the turnover of Gebruder Knauf Verwaltungsgesellschaft KG and its subsidiaries would not be attributable to him, given that both companies did not form an economic unit because of the absence of a parent company or another common legal entity.

323   The applicant maintains that it is not dominated by any natural person or legal entity, not even by MM. [B] and [C]. The partners of the applicant would be, however, 21 people belonging to both parties of the Knauf family [...] and a company which hold shares of the other four associates. While both associated managers, MM. [B] and [C], would be both individually entitled to represent the company and, in principle, responsible for business management. The financial plan and annual investments would, however, be subject to approval of a committee of associates currently consisting of eight members, representing both parties of the Knauf family. It is clear from these provisions that no company or associate would sustainably dominate the applicant, by himself or herself. Yet, the recognition of a report of accountability can only rely on a decisive influence of a company at the top of the group. In this respect, it would not be sufficient to refer to family relationships between the various associates. This circumstance would not lead to a requirement of consistency of decisions on all companies in the Knauf Group.

324   The result is that, it would not be possible to take into account the revenues of other companies or the relationships they maintain with the applicant. There is no economic unity between the applicant and other companies justifying such responsibility to the penalty.

325   This would be true regardless of the fact that, individuals who hold shares in the applicant are also associated with other companies in the Knauf group and that Mr. [B] and [C] are also associated managers of Gebruder Knauf Verwaltungsgesellschaft and other companies.

326   The applicant indicates that, it is a limited partnership under German law. Thus, the charging principles developed in respect of companies with shares cannot apply.

327   In fact, They and her same-venture companies, during the reference year, would realise a consolidated turnover of up to a value of 312.9 million Euros, so They could only be imposed a fine of 31.29 million Euros.

328   The applicant considers that this error of law must, because of its scope and grossly erroneous character of considerations relating to the determination of the amount of the fine resulting from it, also lead to the rescission of the contested decision in its entirety.

329   Referring to point 496 of the contested decision, the applicant argues that the Commission, however, was not able to identify, definitively, the responsible company. The Commission did not

even attempt to demonstrate that certain conduct reproached to MM. [B] and [C] were attributable to the companies of the Knauf group. Despite this, the Commission has wrongly withheld revenues earned by companies of the Knauf group.

330   Referring to its reply to the statement of objections, the applicant denies having admitted being responsible for all companies in the Knauf group regarding the attribution of turnovers.

331   The Commission observes that the applicant has admitted that, the group description contained in points 38 and following and 496 of the contested decision was correct. In addition, They would address, from the start of administrative proceedings, the audit decisions of four firms affiliated with the applicant - including Gebruder Knauf Verwaltungsgesellschaft - and would find, in the contested decision, that these companies were a single company lead by MM. [B] and [C].

332   The Commission adds that, in her response to the statement of objections, the applicant did not criticise the attribution of the offence.

333   The Commission contends that, when the addressee of the decision, to who is attributed the responsibility of the offence, is at the head of a group constituting an economic unit, the turnover taken into account in calculating the fine is that of the whole group. In the present case, the coordination of the group behaviour would be under the two partnerships indefinitely responsible for the applicant and for Gebruder Knauf Verwaltungsgesellschaft, MM. [B] and [C], who not only administered the two companies, but also the Knauf group as a unique economic unit pursuing common interests. Gebruder Knauf Verwaltungsgesellschaft would depend, on not only managers but also the staff and premises of the applicant. The Commission considers that the facts are similar in this respect, to those of the case that gave rise to the HFB and others v Commission judgment, paragraph 125 above.

334   The Commission emphasizes that all the sales figures of the applicant, exchanged in the framework of the offence in question, related to the general body of the Knauf group.

335   This finding is supported by the behaviour adopted by the applicant during the administrative proceedings, during which, They would introduce herself as being, in regard to companies in the Knauf group, the only speaker to the Commission about the unique infringement. The Commission argues that, the applicant never questioned her predominant role within the group, nor the attribution of the offence to this group. In addition, They would stress, herself, on the role of her managers as managers of the "Knauf group", for example, in her response to the request of information of 8 July 1999. The Commission refers to several other examples in its evidence

336   Finally, the family contract of 9 December 1994, Annex to the application, corroborates the conclusion of the Commission on a single management of the group. Article 5 of the family contract confirms, moreover, that the contract creates a civil entity and binds all partners of the two limited partnerships. It is thus clear that Gebruder Knauf Verwaltungsgesellschaft would depend on other group of companies, with the applicant, including in legal terms.


*Evaluation of the Court*

337   From the outcome of the contested decision, the Commission considered that, the applicant should be  held responsible for the set of actions of the Knauf group and chosen her as recipient of the contested decision. Indeed, it is apparent from points 495 to 499 of the contested decision what follows:

"495. It is undisputed that, the Knauf [group] actively participated in all of the anticompetitive behaviours described in this decision and that leaders at the highest level of the Knauf group, MM. [B] and [C], have been personally involved in these behaviours.

496. The decision is addressed to Knauf [...], taking into account the particular structure of the Knauf group. Indeed, the Commission is unable to identify a legal entity, which leads the group of companies constituting the business. Accordingly, there is not any legal entity, at the top, which could have been, as responsible for the coordination of the action of the group, charged with offences committed by the various companies , that make it up.

497. However, Knauf [...], for which, MM. [B] and [C] are the general partners, is the most representative company of this business. In particular, with regard to Gebruder Knauf Verwaltungsgesellschaft [...] whose function is to administer other companies in the Knauf group, note that it dependent on Knauf [...], both for its premises, for its staff, at least in part.

498. Under these conditions, and to avoiding that, purely formal problems object to the finding of the behaviour on the market of plasterboards of the Knauf [group] for the purposes of applying the rules of competition, the Commission considers that, Knauf [...] must be held responsible for the set of acts of the Knauf [group]. Moreover, Knauf [...] did not object to the fact that, the Commission had sent it the complaints, which established however, that the Commission intended to hold it responsible for the behaviour of the Knauf [group].

499. The Commission considers that, in order of a possible fine imposition (see Section 3) the turn over retained for this decision is that of the 'Business' defined in [Article 81, paragraph 1, EC]. That is to say, as it happens to be, the worldwide turnover realised by all the companies of the Knauf group, as communicated by Knauf to the Commission."

338  It should also be noted that the applicant does not dispute that, the contested decision was communicated to her, but argues that They cannot be held liable for the acts of the whole Knauf group.

339  Accordingly, the relevant question in the present case is not whether the applicant was responsible for the offence in question, but whether the Commission could take into account, when determining the ceiling of 10% for the fine, the turnover of the Knauf group, including the Gebruder Knauf Verwaltungsgesellschaft and its subsidiaries, without formally assign the responsibility of the offence to all the companies constituting the Knauf group. This question divides into two parts. First, it is important to check if the Knauf group is an economic unit within the meaning of competition law. Secondly, it is necessary to control whether the Commission has demonstrated to the requisite legal standard that, the applicant was the legal entity, which, at the head of the Knauf Group, was responsible for the coordination of the action thereof.

340  As regards the concept of economic unity, it must be remembered that, in the context of competition law, the concept of a business covers any entity exercising an economic activity, regardless of the legal status of the entity and its mode of financing (judgments of the Court of 16 March 2004, AOK-Bundesverband and others, C-264/01, C-306/01, C-354/01 and C-355/01, Rec. p. 1-2493 , paragraph 46, and Dansk Rørindustri and others v Commission, paragraph 175 above, paragraph 112).

341  It appears from this case that, the concept of a business under the provisions of the treaty in the matter of competition does not require that, the concerned economic unity be endowed with a legal personality. It is an interpretation of generality (Dansk R0rindustri and others v Commission judgment, paragraph 175 above, paragraph 113). Thus, the interpretation of the concept of business within the meaning of the provisions of the treaty in the field of competition is primarily determined by aspects which are more economic than legal.

342  In this respect, even if it is true that, the fact that the capital of distinct commercial companies belongs to any one person or even a family is not sufficient in itself to establish the existence between these companies, of an economic unit with the result, under the community law of competition, that the acts either can be imputed to the other and that either, may be required to pay a fine for the other (Judgment of the Court of 2 October 2003, Aristrain v Commission, C-196/99 P Rec. p. 1-11005, paragraph 99), it is possible to conclude in the existence of an economic unit in the light of a set of elements.

343  For example, in the case that gave rise to the HFB and others v Commission judgment, paragraph 125 above, that existence was established on the basis of control by a natural person from the concerned companies, namely, in addition to the direct or indirect detention by the latter or by his wife of all or substantially all of the shares, the occupancy by that person, of functions within the management bodies of these companies and the fact that, he represented, at meetings of the club of directors, the different companies and these were given just one quota in the context of the agreement.

344   In the present case, it is undisputed that the partners of the applicant and other companies held by the Knauf family, including Gebruder Knauf Verwaltungsgesellschaft, are the same, i.e. 21 individual members of the Knauf family and a company comprising four other members of the Knauf family, all individuals belonging to both parties of the Knauf family [...].

345   In addition, it is admitted by the applicant that, his two partners and managers, MM. [B] and [C], are also partners and managers of all those companies.

346   Moreover, there is nothing in any document that MM. [B] and [C] would not represent the Knauf group during the various manifestations of the offence. In this regard, the Commission argued, without being contradicted on that point by the applicant that, all the sales figures that, the applicant exchanged during the offence in question pertained to the general body of the group of companies Knauf active in the market for plasterboards.

347   Furthermore, it comes out from the response of the applicant to a question in writing form the Court that, Gebruder Knauf Verwaltungsgesellschaft has interests in companies that are active in the plasterboards market. It equally appears, from the response of the applicant of 19 September 2002, at the request of information under Article 11 of regulation No. 17 that, there are several companies operating in the market for plasterboards and controlled by the Knauf family. In addition, in this response, the applicant has herself, even without a request in that sense from the Commission transmitted to the latter, the total turn over of the Knauf Group, namely 2.244 billion Euros. They indicated that, the total turnover of companies in the Knauf group did not relate "only to [herself] – as asked by the Commission – but to the general body of Knauf particular companies active in the market for plasterboards." Thus, They indicated that the turnover of Knauf group companies active in the market for plasterboards accounted for 54% of the total turnover of the group.

348   However, it cannot be accepted that, the companies that are held by Gebruder Knauf Verwaltungsgesellschaft, which has the sole function of managing the other companies, can escape the punishment imposed under the offence of which they benefited. Indeed, as is clear from the responses from the applicant to written and oral questions from the Court, Gebruder Knauf Verwaltungsgesellschaft is a holding company with no staff, managing participation companies it holds for the 22 associates who possess it. The applicant did not deny the affirmation from the Commission that, Gebruder Knauf Verwaltungsgesellschaft not only depended on its managers, but also occupied its premises.

349   Finally, the family contract provides as follows: Article 1: Object of the contract:

1. The object of this contract is to preserve the Knauf companies as family businesses.

2. The object of this contract is to provide a singular steering and management of the Knauf

companies.

3. The object of this contract is to ensure a singular and focused exercise of the rights of businesses for all the Knauf companies.

4. The object of this contract is to ensure that the necessary decisions for the future regarding leadership, management, organization and legal form of the company are possible and can not be prevented by a single partner or by a small number of them.


Article 2 – The Knauf Companies
1. The Knauf companies within the meaning of this contract include:
Knauf [...]
[Gebruder] Knauf Verwaltungsgesellschaft [...] "

350   Thus, it follows from the foregoing that all businesses owned by the Knauf family constitute a single economic entity pursuing common interests. In fact, according to a constant law, the concept of business, placed in the context of competition law, must be understood as denoting an economic unit in terms of the object of the agreement in question, even if, from the legal perspective, the economic unit is constituted by several natural persons or legal entities.

(Judgments of the Court HFB and others v Commission, paragraph 125 above, paragraph 66, and of 11 December 2003, Minoan Lines v Commission, T-66/99, Rec. p. 11-5515, paragraph 121).

351   It has also been considered that, such economic entity was a unitary organization of individuals, pursuing a determined and sustainable economic goal, and which can contribute to commit an offence under article 81, Paragraph 1, EC (Minoan Lines v Commission judgment, paragraph 350 above, paragraph 122).

352   Thus, the Commission rightly found that, the various companies held by the Knauf family were an economic unit.

353   In this connection, it is to be emphasized that the turnover cited in article 15, paragraph 2, of regulation 17 under the upper limit of the amount of the fine that may be imposed, means as the total turnover of the concerned company, which alone gives an approximate indication of the importance and the influence thereof in the market (judgment of the court of 7 June 1983, Musique Diffusion Francaise and others v Commission, 100/80 to 103/80, Rec. p. 1825, paragraph 119, and judgment of the Court of 6 April 1995, Baustahlgewebe v Commission, T-145/89, Rec. p.11-987, paragraph 158). Indeed, in the case of a company constituted by a group of companies acting as a single economic entity, only the combined turnover of all the companies may be an indication of the size and economic power of the business in question (HFB v Commission judgment, paragraph 125 above, paragraph 529).

354   Regarding the role of the applicant within the Knauf group, it must be remembered that, it is possible to allocate to a company, all the actions of a group if that company is identified as being the legal person who, at the top of the group, was responsible for the coordination of its action (Aristrain v Commission judgment, paragraph 342 above, paragraph 98).

355   Thus, when a group of companies constitutes a single business, the Commission may impute liability of an offence committed by that company and fine the company responsible of the action of the group in the frame of the offence (Minoan Lines v Commission judgment, paragraph 350 above, paragraph 122).

356   In the present case, according to the diagram provided by the applicant in response to a written question from the Court that, They is the only company active in the relevant market that is not managed by the holding company Gebruder Knauf Verwaltungsgesellschaft.

357   In addition, it clearly follows from written documents from from the documents that the applicant has submitted to the Knauf group. Indeed, most of the documents found by the Commission during the audits, except for the announcements about price increases in the United Kingdom, from the Knauf group were written on paper with header of the applicant with her coordinates. Thus, there is no reason to doubt the affirmation of the Commission, which has also not been challenged by the applicant, stating that, the latter coordinates the operational activities of the Knauf group in the relevant market.

358   In addition, the applicant introduced herself, during the administrative proceedings, as the sole interlocutor of the Commission. They did not object to this quality at any time of the administration procedure.

359   Moreover, it appears that the Commission regarded, in the statement of objections (point 18 and 19) that, the offence involved the whole Knauf group. In addition, based on information contained in the statement of objections, the applicant could not ignore that, They was likely to be the recipient of a final decision of the Commission. However, the applicant replied to the Commission without questioning her role as a company responsible of the action for a group under the infraction.

360   In such a situation, it was her responsibility to react during the administrative proceedings, under risk of not being able to do so, by demonstrating that, despite the elements selected by the Commission, the offence committed by the Knauf group was not attributable to her (Judgment of the Court of 27 September 2006, Akzo Nobel v Commission, T-330/01, Rec. p. 11-3389, paragraph88)

361    In the absence of a legal person who, at the head of the Knauf group, might have, as responsible for the coordination of the action of the group, been charged with offences committed by the various constitutive companies, the formal separation of these companies, resulting from their separate legal personality, does not object to the Commission that the applicant takes responsibility for the actions of the whole of the group following the finding of the unit of their behaviour in the market to purposes of applying the rules of competition.

362    In conclusion, the Commission did not err in considering that there was a single economic entity constituted by the various companies held by the Knauf family and that the applicant was the company responsible for the action of the Knauf group within the scope of the offence. Therefore, the plea relied on by the applicant regarding the violation of Article 15, paragraph 2 of regulation No. 17, because of the inclusion of the turn over of the Knauf Group for Calculation of the fine, must be rejected.

*5. On the fifth plea, based on a violation of Article 253 EC and of Article 15, paragraph 2 of Regulation No. 17 as well as general principles in calculating the amount of the fine*

363    This plea consists of two parts relating to the disproportionate nature of the base amount of a fixed fine based, on the one hand, on the seriousness of the offence and, on the other hand, on the duration thereof. As regards the amount at the start of 52 million Euros, in the first place, the applicant indicates a non-justifiable and opaque character of the determination of that amount. Second, They argues the erroneous taking into account of a real negative impact of offences on the plasterboards market. Thirdly, They challenges the generally disproportionate character of fixed amounts considering the practice of the Commission in the past.

364    As for the increase of the amount of the fine according to the duration of the offence, first, it would be disproportionate in view of the earlier practice of the Commission. Secondly, the Commission erred by adding, under the term of the offence, the starting fixed amount depending on its seriousness, given that, by nature, crimes such as those at issue extend over several years. Thirdly, the applicant considers that the Commission erred in considering that, it was a single and continuing offence. Fourth, They considers that the maximum amount of a fine equivalent to 10% of the total turnover can only be envisaged in the worst cases.

*On the first part, relating to the disproportionate nature of the starting amount of the fine determined according to the seriousness of the offence*
*On the violation of the obligation of motivation*

*Arguments of the parties*

365    The applicant considers that the Commission has provided no convincing explanation of the manner in which it reached the figure of 52 million Euros in respect of both the absolute amount or the high value of such amount as compared to that withheld against other concerned companies by the administrative proceedings.

366    The applicant also considers that the contested decision, including turn overs and market shares as indicated by the Commission do not show the criteria consistent with the principle of equality of treatment which were used to separate companies involved in three categories for purposes of determining the basic amounts. They reproaches to the Commission of a lack of reasons as to the absolute and relative values of the amounts actually used for these three categories.

367    According to the applicant, a complete and detailed set of reasons would be particularly necessary in the case of discretionary decisions.

368    The Commission points out that, referring to point 546 of the contested decision, the differentiated basic treatment of different companies is due to the relative size of their turnovers derived from sales of the concerned product and the market share they held in the four basic markets in question during the last complete year of the offence.

Evaluation of the Court

369   With regard to the obligation to state reasons for the  scope of the calculation of the fine imposed
      for violation of EU competition authorities, it must be remembered that that fine must be
      determined under the provisions of Article 15, (2), (2) of Regulation no.no.17, which states, "[t]o
      determine the amount of the fine, beside the severity of the offence, the length of it should be
      taken into consideration." In this respect, the guidelines, as well as communication on
      cooperation, contain rules on the indicative elements of appreciation which is considered by the
      Commission to measure that severity and duration of the offence (Judgment of the Court dated
      July 9th, 2003, Cheil 3edang/Commission, T-220/00, Rec. p. 11-2473, paragraph 217). In these
      circumstances, the requirements of substantial formality that is the obligation to state reasons
      are met when the Commission indicate in their decision the elements of appreciation that they
      took into account while applying their guidelines and, if any, communication on cooperation,
      which enabled them to measure the severity and duration of the offence while calculating the
      amount of the fine (judgment Cheil Jedang v Commission, cited above, paragraph 218).

370   It is certainly true that in the present case the Commission did not indicate any figures other than
      those relating to the involved companies' market shares, on which basis they determined the
      minimal fine imposed on the applicant to be 52 million Euros.

371   However, under the obligation to state reasons, the Commission is not required to indicate in its
      decision the figures for the calculation of fines (Judgment of the Court dated November 16th,
      2000, Stora Kopparbergs Bergslags / Commission, C-286/98 P, Rec. p. 1-9925, paragraph 66).

372   Vindication of figures relating to the calculation of fines, however useful such data is, is not
      essential under the auspices of this  to impose fines   , although it must be stressed that in any
      state case, the Commission, through the exclusive and mechanical use of arithmetic formulas,
      cannot avail itself of its discretionary power (Judgment of the Court dated October 2nd, 2003,
      Salzgitter, C-182/99 P, Rec. p. 1-10761, paragraph 75).

373   Indeed, as regards the reasons for setting the fines in absolutes, it should be noted that fines
      constitute an instrument of the competition policy the Commission must be accorded a margin of
      appreciation in determining their amount in order to guide the conduct of undertakings towards
      compliance with the rules of competition (Judgment of the Court of 6 April 1995, Martinelli v
      Commission, T-150/89, Rec. p. 11-1165, paragraph 59).

374   Furthermore, it is important to try to avoid for the fines to be easily predictable by economic
      operators. Indeed, if the Commission was obligated to indicate in its decision the figures for the
      calculation of fines, it would affect their deterring effect. If the amount of the fine was the result of
      a calculation obeying a simple arithmetic formula, companies would have the possibility to
      predict a penalty and compare it with the profits they would get by breaking the right to
      competition's rules.

375   In this case, it should be noted that the Commission has explained from line 522 to 553 of the
      contested decision the elements they took into consideration in calculating the amount of the
      fines in respect of the seriousness of the offence for each company. However, it is clear from the
      above considerations that the Commission brings to light clearly and in detail the logic that it
      followed, enabling the applicant to know the factors taken into account when measuring the
      severity of the offence for calculating the amount of the fine, and enabling the Court to exercise
      its control. It can therefore be held that the contested decision meets the requirement of
      motivation that incumbent upon the Commission under article 253 EC.

376   As to the reasons for the difference between the amounts of fines imposed departure of the
      undertakings concerned, it is clear from line 522 to 549 that the Commission took into
      consideration the market share of each company on the four concerned markets during the last
      calendar year of the offence, and has deduced that BPB must be placed in a first category,
      Knauf and Lafarge in a second one, and Gyproc in a third one, so that there can be a
      differentiation as to their actions.

377   In this respect, it is necessary to recall that it is well settled thats permissible, in determining   the
      fine, to take into account the overall turnover of the company, which is an indication, even if
      approximate and imperfect, of  the size and economic power that they wield and the proportion

of that turnover that comes from goods being the object of the offence and is therefore likely to give an indication of the amount thereof. One must not give these numbers a disproportionate importance relatively to other elements of appreciation and, consequently, the setting of an appropriate fine can be the result of a simple calculation based on the total turnover. It is particularly so when the merchandise in question represents only a small fraction of that figure (judgment Musique diffusion française and Others v Commission, paragraph 353 above, paragraph 121, and Dansk Rarindustri Others v Commission, paragraph 175 above, paragraph 243).

378   Thus, the Commission took into account the specific position of the applicant, by applying to the different companies involved a different treatment based on their market share and derived from their revenue from selling the product in question on the four main markets of the Community in which the offence occurred.

379   Accordingly, the objections to the violation of the obligation to state reasons as regards the fixing of the fine's amount imposed to Knauf for the seriousness of the offence must be dismissed.

On the offence's effects

Arguments of the parties

380   The applicant disputes the findings that the Commission has drawn, in lines 532 to 538 of the decision contested, on the purported effects of the offence. Neither line 60 nor lines 212 or 395 of the contested decision contain specific findings on the concrete effects of the purported agreements.

381   First, it emphasizes that the contested decision contains no reference to the French and Benelux markets. Secondly, it argues that if the Commission wished to retain an adverse effect on competition because the conduct of the companies in question as part of the penalty's determination, it is required to concretely establish the existence of such effects.

382   The applicant argues that, even if it is true that the market share experienced  "relative stability", it can be explained in several ways and is not necessarily the activities of a cartel of operators of the market . But one single legal alternative explanation for this phenomenon is sufficient to switch the burden of proof on the Commission.

383   As regards the end of the price war, the applicant believes it can also be the result of autonomous market behaviour and is not necessarily linked to entente activities.

384   According to the applicant, the mere fact that statistics on the market in question are exchanged does not automatically mean that such exchange has harmful effects on competition.

385   The Commission states that it based its overall evaluation, while assessing the seriousness of the offence, on the real damage caused by the entente. The entente's participants have actually applied the agreed price increases after having previously announced them through systems of exchange, and they put an end to the price war earlier than they would have in the absence of agreements (lines 531 and following, including line 534 was 538, of the decision contested).

386   Given the manifestly anticompetitive  and continuous nature of the offence, it is not necessary to demonstrate the existence of negative consequences upon competition.

387   The Commission submits, in any case, that the effect of the entente has been a weakening of competition, which was contributed to by exchanges of information, regardless of their use (lines 162 onwards of the decision contested).

Evaluation of the Court

388   It should be noted that under the terms of Section 1A, first paragraph of the Guidelines, in calculating the amount of the fine depending on the seriousness of the offence, the Commission will consider, inter alia, the "actual effects [of the offence] on the market when it is measurable".

389  In this respect, it is necessary to analyze the exact meaning of "where it [that is to say the concrete effects] is measurable". In particular, it is to determine whether, within the meaning of these terms, the Commission can only consider concrete impact an offence in its calculation of fines if and insofar as it is able to quantify this impact.

390  It should be emphasised that as well as appreciating  the effects of agreements or practices with regard to Article 81 EC, said article also implies the need to take into consideration the specific context in which they fit, including: the economic and legal contexts in which these companies operate; the nature of the goods or services affected, as well as the actual conditions for the structure and operationand of the market or markets in question (judgment ASNEF-EQUIFAX and Administración del Estado, paragraph 187 above, paragraph 49).

391  In addition, the examination of an agreement's effects on the market necessarily implies the use of assumptions. In this context, the Commission must, in particular.consider what would have been the price of the product in question in the absence of an agreement. But in examining  the causes for the actual price evolution, it is risky to speculate on the respective contribution of each of these causes. It should reflect the objective fact that, because of the entente on prices, the companies in question precisely renounced their independence in order to compete on prices. Thus, the assessment of the effects resulting from factors other than the voluntary abstention from companies concerned with the agreement is necessarily founded on reasonable probabilities and not quantifiable accurately.

392  Accordingly, unless point A, first paragraph of the guidelines is stripped of the criterion of its effectiveness, the Commission's reliance on an agreement's concrete effects on the market cannot be reproached to them, this entente having an anti-competitive aim, without quantifying these effects or providing an assessment on this topic. Therefore, the concrete effects of an agreement on the market should be regarded as sufficiently proven if the Commission is able to provide credible and concrete evidence showing a reasonable probability that the entente had an impact on the market.

393   In the present case, the summary of the analysis run by the Commission (lines 534 to 538 of the decision contested) indicates that it was based on several clues that lead to the existence of a real effect of the entente on the market. Indeed, it argues that the entente's participants held all, or a substantial, amount of the plasterboards within  the four markets on which the entente applied. It also goes to show that the various elements of the entente were put into practice, in that the companies in question actually altered their behaviour following the London meeting and that the  information was exchanged throughout the period in question, in major markets and more specifically in the markets of the United Kingdom and Germany. With regard to prices, it is added, referring to lines 212 and 395 of the decision being contested, that they tended to rise or, at the very least, stabilise and that the contracts relating to iprice increases were actually related to the publication of price lists subsequently used as the prices charged to customers. In addition, it was considered that market shares had enjoyed relative stability during the period in question, greater than in the past period of 1988 to 1992 qualified by companies involved in price wars in referring to lines 71, 196 and 289 of the contested decision and the relevant appendix

394  Both the fact that the entente participants held the majority (or even substantially all) of the market and the fact that the arrangements put in evidence were specifically intended to raise prices at a higher level than they would have reached without them are indications tending to show that the offence was likely to cause significant anticompetitive effects.

395  Thus, the Commission cannot be blamed for having considered that the fact that the entente participants had a great share of this market was an important factor, which it was obliged to take in consideration, in order to consider the actual impact of the agreement on the market. It cannot indeed be denied that the probability that an agreement on prices and the stabilisation of a market is efficient increases with the amount of market shares that are shared by participants in this agreement. If it is true that, in itself, that fact does not establish the existence of a concrete impact on the market, the fact remains that in the contested decision, the Commission had not established sof the relationship between cause and effect, but has only considered it in the same way as other elements.

396  About the Commission's statement that the prices have actually tended to rise or, at the very

least, stabilise (line 534 of the contested decision , it should be noted that the Commission is not providing any statistics on price evolution, but merely stating that Lafarge and BPB have said in their reply to the statement of objections that the prices on the United Kingdom and Germany's markets have tended to go up or at least to stabilise.

397   In this respect it should be noted, regarding the responses of Lafarge and BPB to the statement of objections, that the Court decided, in the sake of completeness, to dismiss them as an element against the applicant, as stated in paragraph 63 above.

398   However, it cannot be required of the Commission, when an entente is established, to systematically demonstrate that the agreements have effectively allowed the companies in question to get to a level of prices for transactions that is superior and above that that would have prevailed in the absence of agreement. It is disproportionate to require such demonstration and it would consume considerable resources since it requires the use of hypothetical assessed figures, founded on economic models of which the exactness is not easily verifiable by the judge and the infallibility is not proved (findings of General Attorney M. Mischo in the judgment of the Court of November 16th, 2000, Mo och Domsjö / Commission, C-283/98 P, Rec. p. 1-9855, 1 - 9858, paragraph 109).

399   In the present case, it appears from the contested decision, which was not contested by the applicant on this point that the price war has ended, which was, by definition, the effect of raising prices to levels superior to those who have prevailed in the absence of illicit arrangements.

400   In addition, the fact that the contacts relating to price increases were linked to the publication of price lists subsequently included in the prices charged to customers (considering 534 of the decision contested) has, by nature, affected the market and the behaviour of the different actors, both on the side of the bid and demand, given that such announcements have influenced the process of price determination, in that the listing price was a reference in case of individual negotiation of transaction prices with customers (see, in this sense, Judgment of the Court of 14 May 1998 Finnboard v Commission, T-338/94, Rec. p. 11-1617, paragraph 342), which have necessarily been their trading prices margin limited (see, in this sense, judgment LVM / Commission, paragraph 125 above, paragraph 745).

401   Moreover, setting a price, even just as a target, affects competition because it allows all the entente's participants to predict with a reasonable degree of certainty what the pricing policy pursued by their competitors is (Judgment of the Court of October 17, 1972, Vereeniging van Cementhandelaren Commission, 8 / 72, Rec. p. 977, paragraph 21). More generally, such agreements include direct intervention in the essential parameters of competition in the market in question (Judgment of March 11th, 1999, Thyssen Stahl v Commission, paragraph 71 above, paragraph 675). Indeed, expressing a common will to implement a certain price level to their products, the producers no longer determine their policy on the market independently, thus infringing the inherent Treaty's design on the provisions relating to competition (see, in this sense, Judgment of the Court of May 14, 1998, BPB de Eendracht v Commission, T-311/94, Rec. p. 11-1129, paragraph 192).

402   Accordingly, the Court considers that the Commission has shown, with the appropriate right, an actual impact of the entente on the market's pricing.

403   Regarding the Commission's statement in line 534 of the decision contested that the market share experienced a relative stability during the period in question because of the offence in question, it should be noted that this assertion is not confirmed. It may seem clear from the graph in the appendix to the contested decision, to which the Commission refers, that the market share during the period from 1992 to 1998 appear to have remained relatively stable. Nevertheless, in the absence of data relating to the situation on the market before the agreement, this graph does not prove with the requisite legal standard that this stability, assuming it was established, was the consequence of the offence in question.

404   As regards the information exchange, it is well settled that it must be presumed that unless proof to the contrary is adduced by the operators in question that the companies participating in the consultation and remaining active in the market take the information exchanged with their competitors into account to determine their behaviour in this market. It is all the more so when the concertation occurs on a regular basis over a long period, as is the case in the present case

(see HFB and Others v Commission, paragraph 125 above, paragraph 216, and the cited case law).

405   In light of the foregoing considerations, the Court finds that the Commission has sufficient evidence on the effects of the offence on the market, with the exception of the stability of market shares.

406   Thus, it is necessary to consider whether the fact that the Commission has not shown any effects of purported offence has a bearing on the classification of the very serious offence of infringement and therefore the amount of the fine,

407   In connection it should be noted that the seriousness of the crime must be established based on many elements such as the particular circumstances of the case, its context and the deterrent scope of its penalties, without establishing a binding or exhaustive list of criteria which must be taken into account (Judgment of the Court of July 17, 1997, Ferriere Nord v. Commission, C-219/95 P, Rec. p. 1-4411, paragraph 33).

408   The Court judged in the Judgment of September 30th, 2003, Michelin v Commission (T-203/01, Rec. P. 11-4071, paragraphs 258 and 259), that the seriousness of the offence could be established by reference to the nature and intent of the abusive behaviour, and that, under consistent settled case law the object of some behaviour could be more important for determining the amount of the fine than those related to its effects.

408   The Court confirmed this approach by considering that the effect of an anticompetitive practice was not a guiding factor in evaluating the adequate amount of the fine. Elements that have an intentional aspect may be more significant than those relating to the effects, particularly when these offences are inherently serious such as price understandings and market allocations (decision of October 2nd, 2003, Thyssen Stahl v Commission, paragraph 258 above, paragraph 118).

409   Furthermore, it should be reminded that horizontal agreements on prices have always been regarded as one of the most serious infringements of the Community law on competition (Judgments of the Court Tate & Lyle v Commission, paragraph 179 above, paragraph 103, and March 19th, 2003, CMA CGM and Others v Commission, T-213/00, Rec. p. 11-913, paragraph 262).

410   Finally, it should also be noted that the Commission did not grant the offence's real impact on the market a preponderant importance in determining the fine's starting amount. Indeed, the Commission also based its assessment on other elements, namely the finding that the offence should be qualified as very serious by its very nature (points 528 to 530 of the decision contested) and that the relevant geographic market was an important part of the community market, geographically and in value, as it represents approximately 80% of that market's total value (points 539 to 542 of the contested decision).

411   In regard to the relevant geographic market's scope, the applicant stated that the Commission did not, to the requisite legal standard, show that the agreement also involved the French and Benelux markets. In this respect, just remind the meeting in London and that these markets were also concerned by the exchange of information on the quantities sold.

412   While the Commission can legally conclude that the various events were part of a single offence because they were part of a comprehensive plan to distort competition, the fact that the number and intensity collusive practices varied depending on the market does not mean that the offence did not involve the markets on which the practices have been less intense and less numerous. Indeed, it is artificial to divide a continuous conduct, characterised by one single purpose, several distinct offences because those actions varied according to the market concerned. It would only be appropriate to take into account such elements while appreciating the gravity of the offence and, if applicable, while determining the fine's amount (see, *mutatis mutandis*, Judgment of the Court July 8th, 1999, Commission v Anic, C-49/92 P, Rec. p. 1-4125, paragraph 90).

413   Then, under all the foregoing considerations, it was proper for the Commission to qualify the offence as being very serious.

414   In addition, the Court considers, in its full jurisdiction and in the light of the foregoing considerations, that the fact that the effects of the offence have only been shown partially is not likely to challenge its appreciation of the fine's starting amount fixed depending on the severity, as established by the Commission.

Breach of the principle of proportionality in relation to the Commission's past practice

Arguments of the parties

416   The applicant invokes the illegality of the general method of calculation defined by the guidelines given that the latter totally ignore the proportionality of the sanctions to the company's turnover. The severity of the punishment has different effects on each company in question, and this, in particular, is to the detriment of small and medium sized companies. The applicant considers that only the determination of a sanction proportionate to the turnover can be envisaged.

417   They consider, in any case, that the fines imposed on her have been absolutely disproportionate, even in relation to other matters judged in accordance with the new principles.

418   In its decisions to impose fines on the basis of the adopted guidelines or of communication on cooperation, which involved offences of a similar type and duration, the Commission always used starting amounts that were comparatively inferior as regards the seriousness of the offence. These amounts have always represented a smaller percentage of the turnover in the case of the company concerned and  that of the applicant. The latter relies on nine other cases as examples of this disproportion.

419   She argues that the Commission does not compare the fine's starting amount with the company in question's turnover, but only with the overall size of the benchmark market. By doing this, it would deny the fact that the recipients of decisions by which it imposes fines are isolated businesses and not a sector of activity. The fines would be sanctions against individuals and not collective punishment affecting all firms operating in a market.

420   The Commission considers it necessary to first consider the two main characteristics of the market in question, namely its oligopolistic structure and its value. In this regard, it argues that, during the last complete year of the offence, the market value of plasterboards was 1.21 billion Euros, or 1.4 times that of carbonless paper's market, while the starting amount of the fine imposed on the entente's main participant - 80 million Euros for BPB - is only 1.12 times higher than the one imposed for the entente on paper sticker. That market's value is also three times as high as that of the graphite electrodes market, while the starting amount is only tantamount to double that determined in the matter of graphite electrodes. In calculating the amount of the fine, the Commission also considered the fact that the entente on plasterboards was less structured and may also be less successful than with the previous agreements, if this had not been the case, the fine would have been higher. However, in spite of a strained relationship, this agreement would have been more dangerous than the foregoing agreements, as it acted on a narrow oligopolistic market and included all competitors in the market

.Evaluation of the Court

421   Regarding the applicant's allegation that the fine imposed on her is disproportionate and excessive in relation to her company's turnover, it suffices to note that as well as the Commission is not obligated to perform the calculation of the fine's amounts with the concerned companies' turnover as a basis, it is not required to ensure, in case of fines imposed on several companies involved in the same offence, that the final amount calculated for the fines imposed on the companies in question reflect any differentiation between them as to their total turnover or their turnover in the product in question's market (Dansk Rørindustri Others v Commission, paragraph 175 above, paragraphs 255 and 312).

422   Furthermore, Community law does not contain any principle of general application stating that the sanction must be proportionate to the company's importance in the market for the products

concerned with the offence (Judgment of the Court May 18th, 2006, Archer Daniels Midland and Archer Daniels Midland Ingredients v Commission, C-397/03 P, Rec. p. 1-4429, paragraph 101).

423   Article 15, paragraph 2 of Regulation no.no.17 does not require either that, if fines are imposed on several companies involved in the same offence, the amount of the fine imposed on a small business or average size be not higher, as a percentage of sales, than one imposed on larger companies. Indeed, it is clear from this provision that, for both small businesses and medium size as well as for those of superior size, the severity and duration of the offence should be taken into consideration to determine the amount of the fine. To the extent that the Commission imposes fines on companies involved in the same offence, justified for each by the severity and duration of the offence, it cannot be blamed that for some of them, the amount of the fine is higher, in terms of turnover, than that of other companies (Judgment of the Court of March 20th, 2002, Dansk Rørindustri / Commission, T-21/99, Rec. P. 11-1681, paragraph 203).

424   The applicant's argument that the disproportionate nature of the fine imposed is evident when the amount is compared to that of the fines imposed to other companies in similar cases must also be rejected. The Commission cannot, in fact, be forced to set fines that are proportionate to turnover and perfectly consistent with those determined in prior cases.

425   It should be emphasised that, in this respect, one of the Commission's decisions cannot serve as alegal framework for fines in competition matters and that decisions emanating from other cases are only of indicative value with regard to the existence of a possible breach to the principle of equality of treatment, given that it is unlikely that the circumstances particular to them, such as: markets, products, businesses and the periods concerned, are identical (Judgment of the Court of September 21st, 2006, JCB Service v Commission, C-167/04 P, Rec. P. 1-8935, paragraphs 201 and 205).

426   The fact that the Commission has, in the past, imposed fines of a certain level in certain instances of infringement does not deprive it of the possibility of raising that threshold within the limits indicated by the Regulation no.no. 17, where this is necessary, to ensure the implementation of the Community's competition policy (Judgment Musique Diffusion Franchise & others v Commission, paragraph 353 above, paragraph 109).

427   It is important to add that in calculating the fines imposed under section 15, paragraph 2 of Regulation no.no.17, a differentiated treatment between the companies concerned is inherent to the exercise of the powers the Commission is entitled to under this provision. Indeed, within its margin of appreciation, the Commission is required to individualise the penalty to the behaviours and characteristics specific to the companies concerned to ensure, in each case, the full effectiveness of the Community's competition policy (see, in this sense, Judgment of the Court of June 29th, 2006, SGL Carbon v Commission, C-308/04 P, Rec. p. 1-5977, paragraph 46, and the cited cases).

428   Concerning this, it should be noted that the Court has the competence to assess the appropriateness of the fines' amount, as part of the unlimited jurisdiction accorded to it by Articles 229 EC and Article 17 of Regulation no.17.

429   In the present case the Court considers that the offence is particularly serious in view of certain elements, as the Commission noted in lines 534, 535 and 539 to 542 of the contested decision. This is particularly the case because of the market's oligopolistic nature and of the fact that the offence in question affected all or substantially all of the sheets of plaster's offer on the four markets being the object of a national entente. In addition, that market's size, both geographically and in terms of value, was great. Indeed, the four major markets in question were the community's main plasterboard markets and represented approximately 80% of the community's market's total value, which amounted to 1.21 billion Euros last complete year of the offence. Finally, with regard to the nature of the product concerned, the entente has necessarily had an impact on a substantial part of the construction market and thus affected a very important sector of the whole economy.

430   Moreover, it does not appear that the starting amount, established in relation to the offence's seriousness, is more severe in the present case than that imposed in other cases given the size of the market in question. However, this comparison does not mean that the relevant market's

size is the best or the only criterion for comparing the fines imposed in different arrangements. Indeed, a comparison between several agreements is difficult, given that the different elements that the Commission may take into account to evaluate the seriousness of the offence are numerous. Moreover, as has been recalled in paragraphs 425 and 426 above, such a comparison, in any case, can only be performed as an indication, as the Commission's decisional practice cannot serve as legal framework for fines in competition matters.

431   Given the many elements making the offence particularly serious in the present case (see paragraph 429 above), the Court finds that the fine's starting amount imposed on the applicant, determined according to the severity of the offence, is proportionate.

432   Finally, it should be noted that the upper limit of 10% referred to in article 15, paragraph 2 of Regulation no.no.17 relates to the overall turnover of the company in question and only the final amount of the fine must comply with this limit. The final amount of the fine imposed on the applicant in the  contested decision, or 85.8 million, representing only about 3.2% of its global turnover in 2001 – 2, 7 billion Euros –, cannot justify a clear disproportion between the fine and the size of its business.

433   From all the above arguments emerges the fact that the applicant's arguments, aimed to demonstrate that the fine's starting amount was disproportionate, being based on the seriousness of the offence, must be rejected.

*On the second part, relating to the amount of the fine determined according to the offence's duration*

On the breach of the principle of proportionality having regard to past practice

Arguments of the parties

434   The applicant considers that an increase of 10% of the amount of the fine for each year offence is appropriate only when the seriousness of it remains unchanged during the period in question. That would make sense given that the increase is done by the application of a certain percentage to the starting amount, which is determined based on the seriousness of the totality of the offence.

However, in the present case, as regards the period extending from the meeting held in London in early 1992 until that held in Versailles in 1996, the Commission would only accuse the companies in question of having exchanged sales figures and having inquired about the price increases already decided upon on the United Kingdom's market. With regard to the following period, which stretches from the meeting in Versailles until the verification of these companies, the Commission moreover accuses those companies to have reached agreements regarding price-raising and distribution of the German market. Thus, it would be inappropriate to increase the starting amount in competition with the maximum rate provided for by the guidelines, namely 10% per year between 1992 and 1996.

435   The Commission considers that the applicant is confusing the frequency of anticompetitive acts with
the intensity of the single offence under which these acts fall. According to the Commission, in markets such as that at issue in the present case, competition can be reduced with relatively limited means, so that the existence of larger intervals between each of the acts gives no indication.

Evaluation of the Court

436   Regarding the objection by the applicant that the Commission automatically apply the maximum rates of 10% per annum, it should be noted that even if the point 1.B, first paragraph, third indent, of the guidelines do not provide for automatic increase of 10% per year for breaches of long duration, it leaves in this respect a margin of appreciation to the Commission (see the Cheil Jedang / Commission, paragraph 369 above, paragraph 134).

437   In the present case, at line 554 of the contested decision, the Commission noted that Knauf had committed the offence for six years and seven months, a long duration under the guidelines, and it thus increases the amount of fine by 65% having regard to the seriousness of the offence. It appears that the Commission respected the rules it had imposed in the guidelines. Moreover, the Court considers that this increase of 65%, having regard to the duration of the offence, is, in the present case, no clearly disproportionate.

438   Regarding the applicant's affirmation that the Commission did not consider the differentiated intensity of the offence during the period in question, it should be noted that the increase is done by the application of a certain percentage to the starting amount, which is determined based on the seriousness of the ensemble of the offence, already reflecting the different intensities of the offence. Thus, it would be logical to into account, for the duration of the offence and for take this amount's increase, a variation in the intensity of the offence during the period concerned.

439   It follows that the appeal about the erroneous nature of the increase in the fine's amount under the offence's duration must be rejected.

      On the double take into consideration of the offence's duration

      Arguments of the parties

440   The applicant argues that offences qualified as very serious in the guidelines usually extend regularly over several years. Thus, the Commission cannot, in taking into consideration the length of the offence, significantly bring in the serious nature of the act which was already taken into account in classifying the offence of very serious.

441   The applicant disputes, for the same reason, the legality of the guidelines. She believes that it is not possible to appreciate the length of an offence in the same way regardless of their nature without violating the principle of proportionality. She stressed that Article 15, paragraph 2 of Regulation 17 does not take into account separately the severity and duration of the offence.

442   The Commission argues that Article 15 of Regulation 17 refers to the severity and duration of an offence as factors determining the amount of the fine. It would therefore account that the damage suffered by the consumer and the company's expected profit depend to a large extent on the duration of the offence.

      Evaluation of the Court

443   The applicant stated that agreements on prices and volumes are, by nature, long term crimes and that therefore, the increase for the duration of the offence in question would account a second time to the length of it. In this respect, it should be noted that, even assuming that some types of ententes are inherently designed to last, it is important always to differentiate, under section 15, paragraph 2 of Regulation no. 17, between the period of their actual functioning and their seriousness as results from their own nature (Judgment of June 15th, 2005, Tokai Carbon and Others v Commission paragraph 71 above, paragraph 275).

444   Accordingly, in the present case, the increase in the amount of the fine under the duration of the offence does not address a second time to the length of it, so it should be disregarded.

      On the uniqueness and continuity of the offence

      Arguments of the parties

445   The applicant stated that there was no single infringement and such infringement has not been established. Those would be isolated acts that concern the tax year 1992, followed by a period of over four years for which no ground had been raised by the Commission, followed finally by the acts occurred between 1996 and 1998 . Accordingly, duration of two years for the offence would eventually have justified a maximum increase of 20% of the starting amount.

446   The Commission maintains that, given that the decision contested is a continuing offence, it is unnecessary to revisit that argument.

Evaluation of the Court

447   It should be noted that, in its arguments, Knauf essentially proceeds to a reformulation of the ensemble of arguments already exposed to support the third plea, invoking the infringement of the concept of single and continuous offence. Accordingly, insofar as it is clear from paragraphs 306 to 321 above that the third plea is not founded, the arguments advanced by Knauf to support this complaint are not either.

448   This claim is therefore invalid.

On the absence of taking into consideration of the upper limit of the penalty provided for in Article 15, paragraph 2 of Regulation no.no.17

Arguments of the parties

449   The applicant considers that the statutory maximum penalty, namely the 10%, can be considered only in severe cases. Now, this is not the case in the present case. Only by taking into account all the aggravating circumstances would the fine be proportional to the sanctions already imposed in similar cases and to anterior ones to come. Article 15, paragraph 2 of Regulation no.17 should, as a provision of law school, be interpreted and applied in respect of the obligation of proportionality as a general principle of Community law.

450   In addition, she argues that the upper limit should be applicable not only to the final amount of the fine, but also to each intermediate amount. However, in the present case, the basic amount for calculating the fine would have been superior to this limit.

451   The Commission stresses that the final amount of the fine the applicant is less than the maximum allowed.

Evaluation of the Court

452   It should be noted that the applicant's assertion that the upper limit of a fine's amount -- that may not exceed 10% of the corresponding total turnover -- amounts to a maximum penalty, is erroneous. Indeed, as is clear from jurisprudence, this limit's objective is separate and independent from the criteria of severity and duration of the offence. Namely, it is to avoid that fines are inflicted for which it is foreseeable that companies, given their size, as determined by their overall turnover -- even roughly and imperfectly --, will not be able to pay (Judgment Dansk Rørindustri v Commission, paragraph 175 above, paragraphs 280 and 282).

453   II is therefore a limit, uniformly applicable to all companies and articulated according to the size of each, for the avoidance of fines of excessive and disproportionate level (Judgment Dansk Rørindustri and Others v Commission paragraph 175 above, paragraph 281).

454   Its only possible consequence is that the amount of the fine, basically calculated on the criteria of seriousness and the duration of the offence, is reduced to the maximum level allowed when it exceeds the latter. Its application implies that the company in question does not pay the whole of the penalty that should, in principle, be due under an assessment based on such criteria (Dansk Rørindustri Others v Commission, paragraph 175 above, paragraph 283).

455   In regard to the applicant's argument that the upper limit applies to each intermediate amount, it should be noted that Article 15, paragraph 2 of Regulation no.no.17 shall not preclude the Commission from referring, in its calculation, to an intermediate amount exceeding 10% of the company in question's turnover, provided that the amount of the fine finally imposed upon the company does not exceed the maximum limit (Judgment of the Court of March 20th, 2002, LR AF 1998 v Commission, T-23/99, Rec. p. 11-1705, paragraph 288).

456   However, as has been emphasised in paragraph 432 above, the final amount of the fine imposed on the applicant does not exceed the upper limit provided in Article 15, paragraph 2 of Regulation no. 17.

457   Accordingly, this objection cannot be allowed. It results from all the foregoing that the fifth plea

must be rejected.

*6. On the sixth plea, based on a violation of the principle of equality of treatment*

*Arguments of the parties*

458    The applicant considers that the fact that the Commission has not reduced the amount of her fine despite having cooperated in the same proportions as BPB, which was granted a 30% reduction of the amount of the fine, is a violation of the principle of equality of treatment. BPB, as the applicant, disputed the accusations from a legal perspective while admitting the facts -- that the meetings in London, Versailles, Brussels and The Hague had taken place, that the market's general situation had been discussed there, and that statistics on the market as well as information relating to price increases that had already been decided upon, were exchanged.

459    According to the applicant, given that in the case of BPB, this cooperation has led to a reduction of 30% of the amount of the fine, it should have been taken into account in the same manner in her case.

460    The Commission argues, referring to lines 593 and 596 and following of the decision contested, that BPB has provided information beyond that that was asked for by the inquiry under Article 11 of Regulation no.17 and partially recognized the facts. However, the applicant not only failed to do so, but also created difficulties from the audits on, briefly answered the Commission's questions and used her access to the case's record to delay as much as possible the administrative proceedings .

*Evaluation of the Court*

461    It appears from the petition that Knauf alleged that the Commission refused to grant him a reduction under the cooperation in violation of the principle of equality of treatment, although it acknowledged the same facts as BPB.

462    The Court considers that as the applicant's arguments are based on a comparison with the cooperation of BPB, they do not stand.

463    In the present case, it follows a combined reading of lines 592 597 of the contested decision that the Commission has granted a 30% reduction in the amount of the fine imposed on BPB because of three cumulative elements, namely the fact that, firstly, its cooperation in establishing the facts had gone beyond its obligations arising out of Article 11 of Regulation no.no.17; secondly, it admitted some of the offence's constitutive facts and, thirdly, it had been the first participant to the entente to provide complementary elements to those discovered during audits, and to confirm the existence of the entente.

464    In this regard, first, it is clear that the applicant does not even pretend to have provided the Commission with information going beyond those it was required to file under Article 11 of Regulation no.no.17. Instead, she appears from her reply dated September 14th, 1999 at the Commission's request for information -- dated July 8th, 1999 -- that she had only replied to questions asked by the latter. In addition, the applicant even refused to answer a question from the Commission related to the meeting of Versailles by invoking her right not to answer questions where they might incriminate her. However, it should be noted that according to case law, cooperation to the inquiry that does not exceed that which results from companies' obligations under section 11, paragraphs 4 and 5 of Regulation no.no.17 does not justify a reduction of fine (Judgment of the Court of July 18th, 2005 Scandinavian Companies System v Commission, T-241/01, Rec. p. 11-2917, paragraph 218).

465    In the second place, BPB has acknowledged the qualification of offence of the facts. As is clear from the very statements of the applicant, she only acknowledged that the meetings in London, Versailles and The Hague had taken place, that there had been discussions on the market's general situation, and statistics on the market as well as information relating to price increases that had already been decided upon were exchanged.

466    In this connection it should be noted that the Commission may consider, for purposes of

determining the amount of a fine, of the assistance that it was given by the company in question to recognise the existence of the offence with less difficulty and, in particular the fact that a company has acknowledged its involvement with the offence. It can give the company which has helped a significant reduction in its fine and grant a significant reduction compared to another company that does not merely deny the main allegations of fact on which it bases its objections (Judgment of the Court of 14 July 2005, Acerinox vs. Commission C-57/02 P, Rec. p. 1-6689, paragraph 88).

467   Furthermore, a distinction should be made between, on the one hand, the explicit recognition of an offence and, secondly, the mere failure to deny it, which does not contribute to facilitate Commission's task to discover and punish violations of EU competition rules (Judgment of the Court of July 14th, 2005, ThyssenKrupp v, Commission C-65/02 P and C-73/02 P, Rec. 1-6773 p. , paragraph 58).

468   As is apparent from the examination of the second plea, the applicant still firmly denies that there was collusive behaviour. Thus, in the light of such a denial, it cannot be considered that the fact that some excerpts of the response of the applicant to the statement of objections the existence suggest an exchange of information and a participation to meetings in order to adopt a tougher stance on prices has allowed the Commission to establish the existence of the offence with less difficulty.

469   Thirdly, Knauf was not the first entente's participant to provide complementary elements in addition to those discovered during audits and confirming the entente's existence. In this respect, it is clear from the contested decision (paragraph 65) that the Commission finds that Knauf did not contest the facts described by BPB about the meeting in London. It appears also in lines 64, 96, 190, 202 and 208 of the decision contested that Knauf did not accept the description given by the Commission of information exchanges among competitors operated upon even if it does not substantially dispute it in its response to the statement of objections.

470   Regarding the meeting in Versailles, it is clear from paragraph 240 of the contested decision that Knauf has stated in its reply to the Statement of Objections that an "unexpected" discussion between the leaders of the four companies had taken place, of which the initial subjects were issues related to raw materials and certain difficulties experienced by a merchant, Knauf has also admitted that the situation in the German market had been mentioned.

471   Regarding the Brussels meeting, it is clear from considering paragraph 252 of the contested decision that Knauf did not contest this meeting's existence. As for the meeting in The Hague, there is no direct reference in the contested decision to the position that Knauf has taken on this issue. Similarly, regarding the exchange of data on price increases on the German market, It appears from paragraph 308 of thecontested decision that Knauf has only acknowledged that referral letters announcing competitor price increases could have occasionally occured.

472   It should be noted that, under the appreciation of the companies' cooperation, the Commission cannot deny the principle of equality of treatment, general principle of Community law, which is only infringed when similar situations are treated differently or that different situations are treated equally, unless such treatment is objectively justified (see Judgment of the Court of December 13th, 2001, Krupp Thyssen Stainless and Acciai speciali Terni v. Commission, T-45 / 98 and T-47/98, Rec. p. 11-3757, paragraph 237, and the cases cited).

473   It is established, in this respect, that a difference of treatment between the companies in question must be attributable when the degrees of cooperation are not comparable, particularly insofar as they consist of different information or providing information at different stages of the administrative proceedings or in different circumstances (see, in this sense, Krupp Thyssen Stainless and Acciai speciali Terni v Commission, paragraph 472 above, paragraphs 245 and 246).

474   The examination of BPB and Knauf's behaviour during the administrative proceedings clearly demonstrated differences in the degree of cooperation and, therefore, the absence of a breach of the principle of equality of treatment between BPB and Knauf. Accordingly, the plea alleging infringement of the principle of equality of treatment must be rejected as unfounded.

*7. On the seventh plea, derived from the unusually long duration of the Administrative Procedure*

*Arguments of the parties*

475   The applicant relies on the overly long duration of the administrative proceedings. It would be a violation of Article 6, paragraph 1, of the ECHR and the principle of good administration. She argues that administrative proceedings interfere with their work within the company and that the rumours already in themselves greatly affect the company's reputation and restrict its ability to obtain credits,

476   The applicant observes that the Commission began its investigations in 1998, but took the contested decision that by the end of 2002, following a procedure of more than four years, although she was in possession of all the determining factor in 1999 or at the latest, after the audit. Accordingly, the sanction imposed on the applicant is much higher, given that the Commission has only recently raised the general level of penalties. This would entail the illegality of fixing the amount of the fine to a level exceeding that which would have been held in 2000 or 2001.

477   The Commission denies that the administrative proceedings were conducted over an abnormally long period.

*Evaluation of the Court*

478   The observation of a reasonable time in the conduct of administrative procedures in matters of competition policy is a general principle of Community law which the community court enforces (see the Nederlandse Vereniging voor de Federatieve Groothandel Elektrotechnische op gebied v Commission paragraph 265 above, paragraph 35).

479   However, the finding of an excessive length of administrative proceedings is not in itself sufficient to set a violation of the principle of reasonable time, without assessing the effects of such a length on the applicant's rights of defence.

480   Indeed, as regards the application of competition rules, overtaking the reasonable time may constitute grounds for annulment only in the case of a violations-finding decision, when it was established that violation of this principle violates the companies in question's rights of defence. Apart from this specific hypothesis, the non-compliance to the obligation to act within a reasonable time does not affect the validity of the administrative proceedings under Regulation no.no.17 (Judgment of the Court of December 16th, 2003, Nederlandse Vereeniging Federatieve Groothandel voor de op gebied Elektrotechnische / Commission T-5/00 etT-6/00, Rec. p. 11-5761, paragraph 74).

481   In the present case, Knauf hasn't mentioned anywhere in his writings in what allegedly exceeding the reasonable time would have interfered with her rights of defence. In fact, she only mentions labour disturbances within the company and an attack on his reputation and his ability to obtain credits.

482   Thus, Knauf has presented no circumstantial argument that would consider that the rights of defence could have been compromised, including during the investigation phase, before the statement of objections. However, a general argument is not apt to establish the truth of a violation of the rights of the defence, which must be examined according to the specific circumstances of each case (Judgment of September 21st, 2006, Nederlandse Vereniging Federatieve Groothandel voor de op gebied Elektrotechnische v Commission, paragraph 265 above, paragraph 59).

483   In any event, the Court finds that the administrative proceedings conducted by the Commission did not, in the present case, exceed a reasonable time.

484   The duration of the administrative proceedings' first phase was not excessively long, in fact, following the first investigations carried out under article 14, paragraph 3 of Regulation no.17, which took place November 25th, 1998, the Commission sent the first request for information under section 11 of Regulation no.17, January 27th, 1999 has BPB. On July 1st, 1999, the Commission conducted other audits under section 14, paragraph 3 of Regulation no.17. On

September 21st, 1999, the Commission addressed a second request for information to BPB, which provided a response on October 28th, 1999. On March 30th, 2000, the Commission addressed a third request for information to BPB, which provided a reply on May 18th, 2000. The Commission shall address requests for information under the said Article 11 Knauf July 8th, 1999, and Lafarge's Etex and September 21st, 1999, in which she requested information on the documents it had obtained in these companies' premises during the audits of November 1998 and July 1999. Knauf replied on September 14th, 1999, Lafarge on October 29th, 1999 and Gyproc on November 2nd, 1999.

485   The administrative proceedings' phase, which commenced with the statement of objections dated April 18th, 2001 and ended with the contested decision's adoption on November 27th, 2002 lasted 19 months, including the companies in question's audits. Given the factual elements of this case and the number of companies concerned, the duration of this phase of the administrative proceedings was reasonable.

486   Finally, with regard to the applicant's argument that his punishment would have been lower if the Commission had terminated the administrative proceedings earlier given that it is only recently that it raised the general level of its sanctions, it must be rejected. Indeed, even assuming that the general level of fines has increased during the administrative proceedings, it suffices to note that the fact that the Commission, in the past, has given fines of a certain level for certain types of crime do not deprive the possibility of raising that level within the limits indicated in regulation no.no.17 if that is necessary to ensure the implementation of the EU competition policy, but on the contrary, the effective application of the community competition rules requires that the Commission may at any time adjust the level of fines to the requirements of this policy (Judgment Musique Diffusion Franchise and Others v Commission, paragraph 353 above, paragraph 109, and Dansk Rørindustri Others v Commission, paragraph 175 above, paragraph 169)).

487   It follows from the above considerations that the seventh plea must be rejected as unfounded. 8.

*On the eighth plea, derived from the setting of interest rates too high*

*Arguments of the parties*

488   The applicant observes that the rate of interest on arrears shall be fixed 6.79% for the period following the expiration of the period of payment. In case of formation of a bank guarantee, the interest rate would be 4.79%. She challenges the lawfulness of such rate of interest, which she believes are too high and have been fixed without any legal basis and in violation of Article 253 EC.

489   Interest rates so high would also be an impediment to the use of justified remedies guaranteeing legal protection because they constitute a additional penalty prohibiting the use of a means of legal protection.

490   In any event, the Commission should, in accordance with the principle of the most favourable law, account for those faced with such rates of interest, take into account of the European Central Bank (ECB)'s subsequent refinancing rates.

491   According to the Commission, if Community law did not permit laws to penalize a company for the advantage it can obtain in the delay in the payment of a fine, it would encourage the introduction of manifestly unfounded actions, whose sole purpose is to delay payment.

492   As regards the amount of default interest, the Court stated that, by requiring that rate of interest, is the practice by the ECB rate in the first working day of the month in which the contested decision was adopted, plus 3.5 percentage points, did not exceed the discretionary margin she enjoyed.

*Evaluation of the Court*

493   It appears from section 3 of the decision complained that the fines imposed are payable within a period of three months after notification of the decision appealed. They added that "at the end of

that period, interest will automatically be payable at the rate of interest applied by the ECB's refinancing operations on the first day of the month in which this decision was adopted, plus 3.5 percentage points, or 6.79%".

494   It appears also from the letter of December 3rd, 2002, by which the Commission brought the contested decision to the applicant's knowledge, that the Commission decided not to recover the debt for the duration of the proceedings provided that the applicant gives his Agreement to the administration of an interest rate of 4.79% and that it is a bank guarantee.

495   It is settled case law (Court decision of October 25th, 1983, AEG, 107/82 Coll. P. 3151, paragraphs 141 to 143; judgments of the Court of July 14th 1995, CB vs. Commission T-275/94, Rec. p. 11-2169, paragraphs 46 to 49, and LR AF 1998 v Commission, paragraph 455 above, paragraphs 395 and 396) that the Commission's powers under Article 15 , paragraph 2 of regulation no.no.17 include the option of determining the due date of the fines and the date from which the default interest begins to accrue, of setting interest rate and decide the mode of execution of its decision by requiring, if necessary, the establishment of a bank guarantee covering the main amount and interest of the fines imposed. In the absence of such power, the advantage that companies are likely to derive from late payment of fines would weaken the sanctions imposed by the Commission in its task to the look after the administration of competition rules. Thus, the application of interest for late fines is justified to avoid that the effect of useful addresses is frustrated by practices carried out unilaterally by companies delaying to pay the fines which they were convicted and to preclude these companies are advantaged over those who pay the payment of fines that was assigned to them at maturity (Judgment of April 29, 2004, Tokai Carbon and Others v Commission, paragraph 123 above, paragraph 475).

496   In this context, jurisprudence has recognized that the Commission has the right to set the default interest at market rate plus 3.5% (judgments of the Court CB / Commission, paragraph 495 above, paragraph 54, of October 8th, 1996, Compagnie Maritime Beige transports and Others v Commission, T-24/93 to T-26/93 and T-28/93, Rec. p. 11-1201, paragraph 250, and LR AF 1998 v Commission, paragraph 455 above, paragraph 397 ) and, in the hypothesis of the formation of a bank guarantee at the market rate plus 1.5% (see CB v Commission, paragraph 495 above, paragraph 54). In these judgments, the Court granted the default interest of 7.5, 13.25 and 13.75%, in specifying that the Commission was authorized to make a point of reference located at a higher level than the rate proposed by the borrower, applicable on the market, to the extent necessary to discourage dilatory behaviour (see LR AF 1998 v Commission, paragraph 455 above, paragraph 398).

497   In these circumstances, it is clear that the Commission, by imposing an interest rate of 6.79% is the interest rate applied by the ECB's main refinancing operations on the first working day of the month during which the contested decision was adopted, plus 3.5%, did not exceed the discretion it enjoys in determining the interest rate of delay.

498   In addition, nothing prevents the applicant from paying the fine at maturity, at the time fixed by Article 3 of the contested decision, despite the introduction of an appeal against this decision. Indeed, in case the appeal by the applicant is allowed, the Commission's obligations under Article 233 EC, to ensure the execution of judgment that cancels the fines imposed on a company for breach of the rules of competition, or by reducing the amount in question, above all, the obligation for the Commission to repay all or part of the amount of the fine paid by the company in question, and also the payment of default interest generated by this amount (Judgment of the Court of July 8th, 2004, Corus UK v Commission, T-48/00, Rec. p. 11-2325, paragraphs 222 and 223).

499   In regard to the fact that late interest rates do not fluctuate compared to the ECB (European Central Bank) rate, this aspect also underlines the discretion which the Commission has in the setting of a late interest rate. Certainly, the idea of linking any interest rate to a fixed rate by the Central Bank normally reflects the idea that in this way, the interest rate follows changes in the financial market.. However, the applicant has not demonstrated that, in determining the interest rate, the Commission has strayed from its wide powers of appreciation. Indeed, it must be remembered that a fixed rate can also be beneficial in cases where the base rate increases.

500   It follows that the eighth plea must be rejected, and accordingly the appeal in its entirety.

**Costs**

501 Under article 87, paragraph 2, of the Rules of Procedure, the unsuccessful party liable for  costs, if such is the Court's conclusion. The applicant being unsuccessful, they shall therefore be ordered to paycosts, in accordance with the conclusions of the Commission.

For these reasons,

THE COURT (Third Chamber)

hereby decides and rules that:

1)     **The appeal is dismissed.**

2)     **Knauf Gips KG is is to pay  costs.**

Jaeger Tiili Czucz

Thus pronounced in open court in Luxembourg on July 8th, 2008.

The Registrar The President

E. Coulon M. Jaeger

Table of Contents

Facts underlying the dispute

Procedure and conclusions of the parties

On Rights
1. On the first plea, derived from the violation of rights of the defence on the first part of a refusal of access to evidence to support
Arguments of the parties
    Evaluation of the Court on the second part of a denial of access to evidence that may contain exculpatory evidence
Arguments of the parties
    Evaluation of the Court on the third part, relating to differences between the contested decision and the statement of objections

Arguments of the parties
    Evaluation of the Court on the fourth part of the incomplete nature of the documents provided
Arguments of the parties
    Evaluation of the Court on the fifth part, relating to confidentiality of the hearing of Gyproc
Arguments of the parties
    Evaluation of the Court on the sixth part on the change of the Hearing Officer during the
administrative proceedings


    Arguments of the parties


    Evaluation of the Court on the seventh part, alleging infringement of the right to be heard
resulting inadequate language skills of staff in charge of the case
Arguments of the parties
Evaluation of the Court
2.                    On the second plea, based on a violation of article 81, paragraph
1 EC
On the first ground, relating to an agreement for the market's stabilization at the meeting in
London in 1992
Arguments of the parties
    Evaluation of the Court on the second part, relating to trade information on the quantities sold
in Germany, France, Benelux and the United Kingdom for the period from 1998 until1992
Arguments of the parties
    Evaluation of the Court on the third part, relating to trade information on price increases in the
United Kingdom for the period from 1992 to 1998
Arguments of the parties
    Evaluation of the Court the fourth part, relating to agreements on market shares in Germany
Arguments of the parties
    Evaluation of the Court on the fifth part, relating to agreements on price increases in Germany
Arguments of the parties
Evaluation of the Court
3.                    On the third plea, based on a violation of the concept of single infringement
Arguments of the parties Evaluation of the Court
4.                    On the fourth plea, based on a violation of Article 15, paragraph
2 of regulation no.no.17 with regard to the turnover used for
calculating the amount of the fine
Arguments of the parties Evaluation of the Court
5.                    On the fifth plea, based on a violation of Article 253 EC and
Article 15, paragraph 2 of regulation no.no.17 and general principles
in computing the amount of the fine
On the first part, on the disproportionate nature of the starting amount of the fine determined
according to the offence's seriousness On the violation of the obligation to state reasons
-   Arguments of the parties
    -   Evaluation of the Court on the effects of the offence
-   Arguments of the parties
-   Evaluation of the Court
on the breach of the principle of proportionality in relation to the past practice of the Commission
-   Arguments of the parties
-   Evaluation of the Court
on the second part, on the amount of the penalty determined according to the offence's duration
On Breach of the principle of proportionality having regard to the former practices


-   Arguments of the parties

- Evaluation of the Court
On the double take in consideration of the offence's duration
- Arguments of the parties
- Evaluation of the Court
On the uniqueness and continuity of the offence
- Arguments of the parties
- Evaluation of the Court
On the absence of taking into consideration of the penalty's upper limit, provided in article 15, paragraph 2 of regulation no.no.17
- Arguments of the parties
- Evaluation of the Court
6.           On the sixth plea, based on a violation of the principle of equality of treatment
Arguments of the parties Evaluation of the Court
7.           On the seventh plea, based on the unusually long duration of Administrative Procedure
Arguments of the parties Evaluation of the Court
8. On the eighth plea, based on overly high setting of interest rates
Arguments of the parties
Evaluation of the Court

Costs
* Language of proceedings: German.