1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3

4    IN RE: CHINESE MANUFACTURED        * Docket 09-MD-2047
             DRYWALL PRODUCTS           *
5            LIABILITY LITIGATION       * May 6, 2011
                                        *
6    This Document Relates to All Cases * 9:00 a.m.
     * * * * * * * * * * * * * * * * * *

7

8

9

10                   MOTION HEARING BEFORE THE
                     HONORABLE ELDON E. FALLON
11                 UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14
     For the Plaintiffs:          Levin, Fishbein, Sedran & Berman
15                                BY: ARNOLD LEVIN, ESQ.
                                  510 Walnut Street, Suite 500
16                                Philadelphia, Pennsylvania 19106

17

18
     For the Homebuilders:        Stone Pigman Walther,
19                                  Wittmann & Hutchinson
                                  BY: DOROTHY WIMBERLY, ESQ.
20                                546 Carondelet Street
                                  New Orleans, Louisiana 70130
21

22

23   For the Homebuilders:        Greenberg Traurig PA
                                  BY: HILARIE BASS, ESQ.
24                                1221 Brickell Avenue
                                  Miami, Florida 33131
25

1    APPEARANCES CONTINUED:

2    For Interior Exterior:        GALLOWAY, JOHNSON, TOMPKINS,
                                      BURR & SMITH
3                                  BY: RICHARD DUPLANTIER, ESQ.
                                  701 Poydras Street
4                                  40th Floor
                                  New Orleans, Louisiana 70139
5

6

7    For Southern Homes:          Sher, Garner, Cahill, Richter,
                                      Klein, McAlister & Hilbert
8                                  BY: JAMES GARNER, ESQ.
                                  909 Poydras Street
9                                  28th Floor
                                  New Orleans, Louisiana 70112
10

11

12   For The Mitchell Company:    Cunningham Bounds, LLC
                                  BY: STEVEN L. NICHOLAS, ESQ.
13                                 1601 Dauphin Street
                                  Mobile, Alabama 36604
14

15

16   For Landmark American:       Deutsch, Kerrigan & Stiles
                                  BY: JUDY BURNTHORNE, ESQ.
17                                 755 Magazine Street
                                  New Orleans, Louisiana 70130
18

19

20   For North River:             Thompson Coe
                                  BY: KEVIN RISLEY, ESQ.
21                                 One Riverway
                                  Suite 1600
22                                 Houston, Texas 77056

23

24

25

1   <u>APPEARANCES CONTINUED</u>:

2   For National Surety:          Jones, Walker, Waechter,
                                   Poitevent, Carrère & Denègre
3                                  BY: MEGAN DONOHUE, ESQ.
                                   201 St. Charles Avenue
4                                  50th Floor
                                   New Orleans, Louisiana 70170
5

6

7   For Hal Collums and           KARI BERGERON, ESQ.
    D.R. Horton - Gulf Coast:     Attorney at Law
8                                  P.O. Box 2471
                                   Baton Rouge, Louisiana 70821
9

10

11  For Marsiglia                 Duplass, Zwain, Bourgeois
    Construction:                  & Morton
12                                 BY: JOSEPH BEARDEN, ESQ.
                                   3838 N. Causeway Boulevard
13                                 Suite 2900
                                   Metairie, Louisiana 70002
14

15

16  For Arch Insurance            Adams, Hoefer, Holwadel &
    Company:                       Eldridge, L.L.C.
17                                 BY: D. RUSSELL HOLWADEL, ESQ.
                                   400 Poydras Street
18                                 Suite 2450
                                   New Orleans, Louisiana 70130
19

20

21  Also Present:                 Hugh Scott, ESQ.
                                   Liberty Mutual Fire
22                                 Insurance Company

23

24

25

1  APPEARANCES CONTINUED:

2  Official Court Reporter:        Jodi Simcox, RMR, FCRR
                                   500 Poydras Street
3                                  Room B-406
                                   New Orleans, Louisiana 70130
4                                  (504) 589-7780

5

6
   Proceedings recorded by mechanical stenography, transcript
7
   produced by computer.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1                          **PROCEEDINGS**

2                         **(May 6, 2011)**

3              **THE COURT:**  Be seated, please. Good morning, ladies

4     and gentlemen.  Call the case, please.

5              **THE DEPUTY CLERK:**  MDL-09-2047, *In re: Chinese*

6     *Drywall.*

7              **THE COURT:**  Counsel, make their appearance for the

8     record.

9              **MR. LEVIN:**  Arnold Levin for the potential class

10    counsel and the Plaintiffs' Steering Committee.

11             **THE COURT:**  Hilarie, why don't you make your

12    appearance.

13             **MS. BASS:**  Hilarie Bass on behalf of the

14    Homebuilders' Steering Committee.

15             **MR. GARNER:**  James Garner, Your Honor, for Southern

16    Homes and other Louisiana builders.

17             **THE COURT:**  I know there are other people in the room

18    and many of you all are scheduled to speak, and I certainly

19    will hear from you.  Let me make a couple of remarks by way of

20    background.

21                      As we all know, Hurricanes Katrina and Rita

22    devastated the Gulf Coast in August of 2005.  This coincided

23    with the housing boom in the East Coast, primarily; and all of

24    that contributed to a shortage of drywall in the construction

25    and rehabilitation of homes throughout the United States.

1             As a result, approximately between 2005 and

2     2008, Chinese Drywall was imported into the United States

3     because we ran out of our nationally-created drywall.  The

4     drywall was used in many areas of the United States, primarily

5     in Florida, Louisiana, Alabama, Mississippi, Texas, Virginia

6     some on the West Coast and some other areas, but those were the

7     States that primarily seem to have been affected in great

8     amounts.

9             Sometime after the installation of the Chinese

10    drywall in these properties, homeowners, residents and

11    occupants began to notice some odd odors; they also began to

12    notice corrosion of metal components, failure of electronics

13    and appliances; and in some cases some physical complaints,

14    some physical ailments, such as nosebleeds, skin irritation and

15    respiratory problems, to name a few.

16             In response to these complaints, a number of

17    governmental agencies and special interest groups, notably the

18    Federal Consumer Products Safety Commission, began to

19    investigate and conduct testing regarding this Chinese Drywall.

20             The present litigation was commenced by the

21    filing of lawsuits in both federal and state courts in those

22    affected areas.  Many of the property owners filed suit, as

23    well as homebuilders who repaired the property, and others

24    joined into the litigation.

25             Because of the commonality of the facts in the

1    various federal lawsuits, the litigation was declared a

2    Multi-District Litigation and it bears the number of 2047.

3    This was declared by the Judicial Panel on Multi-District

4    Litigation.

5                On June 15th, 2009, the panel transferred all of

6    the federal actions alleging damages as a result of drywall to

7    this Court in the Eastern District of Louisiana.  Since the

8    inception of Multi-District Litigation 2047, numerous cases

9    have been consolidated containing thousands of claims.  The

10   Court has presided over monthly meetings and other meetings in

11   between.  We have had a lot of hearings. We've had a number of

12   bellwether trials.  And, of course, I appointed the various

13   committees to represent the various entities.

14               The cases, many of them, are still proceeding in

15   state court.  I made an effort to contact the state judges and

16   coordinate this litigation with the litigation going on in the

17   various state entities.  I'm happy to report that all of us

18   have been able to work together, and, hopefully, that's helped

19   the litigants.

20               Because one of the purposes of coordinating is

21   to make it easier on the litigants and the attorneys so that

22   you don't have to be in, quote, two places at one time; and so

23   that you don't have to take and retake and retake various

24   depositions.  We try to set it up so that the depositions that

25   are taken can be used in all of the proceedings, and,

1   hopefully, that cuts down on costs and also is of assistance to
2   the litigants and to the lawyers.

3               After a lot of discussion, after a lot of
4   discovery, the first notable breakthrough towards resolving the
5   MDL litigation came in October of 2010, when the PSC and the
6   Knauf entities, a manufacturer of Chinese Drywall, entered into
7   a court-approved pilot program.

8               This was a pilot program with no strings
9   attached.  The parties wanted to see whether or not a program
10  could be constructed so that it was consistent with the rulings
11  of the Court that I set forth in various findings of fact which
12  I constructed as a result of the bellwether trials, to see how
13  it worked on the ground.

14              You can prepare all sorts of concepts, but until
15  you put them in action, sometimes we're not sure that they
16  work.  We thought about airplanes since the 1700s; but until
17  the Wright brothers got it off the ground, it was just a theory
18  and not a practice.  So we wanted to get this one off the
19  ground and see how it worked.

20              The pilot program morphed into a bigger program,
21  and now the parties are discussing whether or not they can
22  monetize this program and see whether or not we can finish it
23  out and complete the process.

24              In any event, INEX became a party to the
25  litigation.  Knauf was a manufacturer; INEX, a distributer.

1   They became a party as a result of its purchase and latest

2   supply of the Chinese Drywall manufactured predominantly by

3   Knauf entities, but also by some Taishan entities.  INEX sold

4   this drywall to suppliers, developers, homebuilders, installers

5   in a number of states, predominantly Alabama, Louisiana,

6   Mississippi and Texas.

7                   After a significant amount of discovery, INEX

8   and its insurers began to focus on whether or not they could

9   look at this matter globally and see whether or not there was a

10  possibility of settling the case.  Settlement discussions

11  ensued.

12                  Recently, INEX and its primary insurers have

13  reached a settlement agreement with the plaintiffs' committee

14  under the broad terms of which the primary insurers would put

15  up their entire policy limits and INEX would assign its rights

16  to pursue claims against its excess insurer, North River

17  Insurance Company.

18                  The settlement fund is intended to benefit a

19  nationwide class consisting of, quote, all persons or entities

20  with claims known and unknown against the settling defendants

21  arising from or otherwise related in any way to Chinese Drywall

22  sold and distributed by INEX.

23                  The settling parties have filed the present

24  motion under Rule 23, seeking the following relief:  First, a

25  preliminary -- preliminary -- approval of the agreement; two, a

1   conditional certification of the settling class; third, the

2   issuance of a class notice; and fourth, a schedule for a

3   fairness hearing.

4            I posted this motion on my Web site, announced

5   it in open court and set a hearing for today.  I received a

6   number of objections to the hearing.  I've received extensive

7   briefing with citations.  I've reviewed all of the material

8   that you've given to me and now I'll hear from you orally.

9            First, the movants.

10            **MR. LEVIN:**  Good morning, Your Honor.  Arnold Levin.

11            Your Honor, you've allotted us an hour.  I don't

12   think I'll take an hour, but I would like to hold for rebuttal

13   that portion of the hour that I don't take, and I don't think

14   I'll take that in rebuttal, Your Honor.  Your Honor said at

15   least 10 or 12 minutes of what I intended to say, and I thank

16   you for that.

17            Your Honor, we're here today to seek preliminary

18   approval on the first class settlement in the Chinese Drywall

19   litigation.  Indeed, this is an icebreaker; and, hopefully, as

20   an icebreaker, it will open the ice and more will come through.

21            Your Honor, this settlement stops the bleed of

22   INEX, its carriers, the Plaintiffs' Steering Committee, the

23   plaintiffs and all others that are -- that have legitimate

24   claims that can take in the allocation process.  As such, it

25   was our purpose in settling to preserve the insurance funds of

1    INEX so that they would not be dissipated and they would be

2    available for the plaintiffs in this case; and to the extent

3    that there are legitimate claims of others, like builders, that

4    have legitimate claims, they would share in that recovery also.

5                    As such, we seek conditional certification of

6    two classes:  One, as to Louisiana subclass because of the

7    direct action statute that is afforded to Louisiana residents;

8    and another on an assignment of claims as to others.

9                    Now, what do I mean?  Rule 8, $8 million comes

10   up front to the plaintiffs less what the insurance carriers

11   have expended legitimately with regard to some of the objectors

12   that are now objecting to this settlement.  Rule 72, $72

13   million in potential recoveries on the assignment against the

14   excess carrier, North River, who has not come to the table.

15   Again, that money would be available for all legitimate claims.

16                   Why 72 and some money held back?  Because INEX

17   is a going concern and requires some of the money to pay

18   trip-and-fall claims and other claims.  This settlement was

19   negotiated at arm's length, and I could assure the Court that

20   it was at arm's length.

21                   One statement during the settlement discussions

22   comes to mind. The statement is:  I said, "I want more than the

23   72" -- after we got to the 72 -- "why are you holding on to

24   some more money, Mr. Nizialek, et. al.?  What could it be?"

25   His answer was, "When we wrote the policies, we didn't know

1    about Chinese Drywall."  And I said okay.  And we feel that

2    that is a legitimate settlement.

3              INEX is a going concern; and in order to

4    maintain that going concern, they requested, insisted, that

5    downstream customers of theirs that they had relationships with

6    be dismissed from the claim -- from the case.  In order to get

7    the Rule 8 recovery and the Rule 72 recovery, we agreed to

8    that. But as to the major downstream parties, we requested and

9    obtained an assignment, that the only way they get out,

10   builders, is an assignment of their insurance proceeds so that

11   we could deal with the insurance proceeds under the *Amato* case.

12             This settlement is brought pursuant to Rule

13   23(b)(3), which is not a mandatory class; it's an opt-out

14   class. And many of the objections that are filed, the objectors

15   can opt-out and paddle their own canoe.  So far, they haven't

16   chosen to do that.  They've lied in wait and when the

17   settlement was announced, then we heard from them for the first

18   time in this litigation.

19             Depositions were taken, experts were taken,

20   indeed, the cost of notice, the Plaintiffs' Steering Committee

21   is paying for the major costs.  It's about $229,000, plus

22   printing for additional -- for direct mailing of approximately

23   $20,000.  The carriers are paying $100,000 of that.  The

24   Plaintiffs' Steering Committee has decided that now is the time

25   to put that money up and resolve this case.  And we are paying

1  for that, not the builders, not any of the other objectors, not

2  Mitchell Homes, not any of them.  We're doing that.  But now

3  they speak.

4            Knauf is still in this case; and, hopefully,

5  Knauf will be brought more into this case in another aspect of

6  this case by virtue of this settlement.  We're open to discuss

7  settlement with Knauf or anybody else.  Certainly, there are

8  released parties here.  No settlement exists without released

9  parties.  Indeed, Landmark Insurance Company is a released

10  party and is objecting to the settlement.  My offer to them is

11  if they want not to be a released party, we certainly will talk

12  to them about compensating this class.

13            We have provided the Court with notice, a short

14  form notice, and a long form notice.  And, indeed, because of

15  the omni complaints in this case, we have approximately,

16  according to our expert, Kinsella Media, approximately a reach

17  of 90 percent of the class; and we'll be able to have testimony

18  to this in the fairness hearing, by virtue of direct mailing,

19  which is the best mailing under *Mulane versus Central*, *Hanover*,

20  or any of the other class action cases.  And we intend to have

21  first class mail as to anybody else that's a party.

22            We seek conditional certification.  We know that

23  it will be our burden at the fairness hearing to prove that

24  this settlement is fair, reasonable and adequate.  At this time

25  our burden is to make a prima facie case, even if that -- that

1    may even be too much of a burden, although we accept that

2    burden, that the class should know about this case and this

3    settlement and notice should go out so that they can either

4    object or opt-out.  We've built into the process a period of

5    mediation with regard to opt-outs to, hopefully, bring them

6    aboard.

7              The allocation of payments, we've preserved

8    until that particular aspect of the case; otherwise, we would

9    have subclasses, and we don't need them, because all we have to

10   do is -- we have avoided any conflict with any other class by

11   virtue of the fact that we've garnered all the money and we

12   haven't distributed it.  At that time others can come in

13   whether they be renters, builders, suppliers, installers,

14   tenants.  And we believe that is very adequate.

15             Now, Your Honor at some time mentioned that you

16   did you not want attorney's fees to be mentioned in the case

17   and certainly we'll take it out.  But I want to tell Your Honor

18   why I put it in there.  I didn't put it in there to obtain the

19   attorney's fees, I put it in there to suggest to the Court that

20   that's what we would seek.

21             And I thought that in a notice for the class,

22   the class should know at least what the attorneys are seeking,

23   not what the Court awarded.  And I was mindful, at least at

24   that time, of several local rules, including the Southern

25   District of New York, that requires that to be on a notice.

1    But we'll be guided by your order.

2              Now, we've received about 18 objections, and

3    rather than lie in wait, I'd like to speak to them up front.

4    Most of the objections, if not all of the objections, are the

5    type of objections that are raised at a fairness hearing and

6    not at preliminary approval.

7              It's my understanding that the Sexton objections

8    have been withdrawn this morning.  As to the builders, they

9    wanted a seat at the table.  Well, you don't need a seat at the

10   table if you have the money at issue and you have the ability

11   indeed, to partake in the allocation process.  And we've given

12   them that ability to partake in that allocation process.

13             North River, who is our target, has objected.

14   North River's objection is probably not even legitimate at the

15   fairness hearing because they become at issue only if Your

16   Honor were to determine that the settlement was fair,

17   reasonable and adequate and that we had the ability to amend

18   our pleadings and proceed against North River.  That would be a

19   Rule 12 or Rule 54 motion on behalf of North River, but not

20   right now.

21             The builders complain that there shouldn't be a

22   bar order, and they found a case in 1972; but I found many

23   cases after 1972 that say there has to be a bar order, and I

24   quoted *In re: Orthopedic Bone Screws*.  You can't settle a class

25   action without a bar order.

1          There has been some suggestion by some of the

2     objectors that Rule 23 does not contemplate preliminary

3     approval.  I've looked at Rule 23 many times and I agree, it

4     doesn't contemplate preliminary approval.  But the

5     jurisprudence is replete with preliminary approval hearings in

6     conditional class certifications involving settlements.  And I

7     just cite Your Honor's *Cope* case ahead of the Manual for

8     Complex Litigation, Fourth Edition, at 21.632.

9          Several of the builders have identified

10    themselves by name.  Other builders are just coming in as a

11    result of an objection filed by the builders' committee without

12    naming the builders in that committee.  Just like the Brian

13    Collins, a plaintiff's objection, doesn't name who his clients

14    are that's objecting.  Well, lawyers object, but they object on

15    behalf of their clients, and they have not been noted.

16          I can say that in being involved in both Florida

17    and Louisiana that the builders have maintained a very low

18    profile here in the Louisiana cases and the INEX cases.  None

19    of them have come forward and prosecuted these cases in the

20    MDL.  There is some represented by Mr. Garner that I believe

21    have prosecuted them in the state court, but they're nowhere to

22    be found with regard to INEX.

23          Mitchell has come in and objected. Mitchell is a

24    class action.  It involves builders that don't build.  They

25    have not remediated any of their homes; and nevertheless, they

1    have brought a class action seeking relief for builders who
2    have sustained no damages.
3              Mitchell has been around this litigation.  In
4    the pilot program involving the Prichard Housing Authority,
5    Mitchell agreed to contribute to the settlement.  Indeed, the
6    PSC, through me, was there at the negotiations.  They've
7    reneged on that, and that is another motion that is pending
8    before Your Honor that the Plaintiffs' Steering Committee
9    joined in with Knauf.
10             Mitchell's motion to intervene, unlike Lennar's
11   motion to intervene and others in the Banner proceedings, where
12   they are actively involved, Mitchell's was denied by Your Honor
13   the last conference that we had.
14             Your Honor, we contemplate having a special
15   master.  We haven't suggested one; but if the settlement is
16   approved, we will seek under Rule 53 to have a special master
17   assist the Court, if the Court desires it.
18             Your Honor, this is not easy litigation.  It
19   wasn't meant for sissies.  This litigation has been drawn out;
20   it has been protracted; it has been prolix.  It has been
21   against foreign defendants and domestic defendants.  It's taken
22   us to Germany; it's taken us to Hong Kong; and it will take us
23   back several more times.
24             When we're there, INEX is there. We have now
25   garnered INEX's insurance policies for a company that can't

1    withstand this litigation.  We've taken the money, not for
2    ourselves, not for the plaintiffs, not for the homeowners, not
3    for the tenants, and said, "Let's preserve it, wrap our hands
4    around it, put it in a pot and the Court will mediate your
5    arguments over the fund at a later page in this proceeding."
6            I think we've done a benefit for all of the
7    objectors that are standing here and objecting.  We're proud of
8    this settlement.  We're proud of this icebreaker.
9            One last thing, Your Honor, the order that we've
10   given you with the timetable will have to be expanded and we
11   will give it to you.  We find that we cannot place the
12   newspaper notifications in the time period that we suggested.
13   And it will take us out -- if I could find my notes -- to at
14   least October 13th for the fairness hearing.
15           Now, I'm not suggesting that it be October 13th,
16   but for the Court's -- to meet the Court's calendar, October
17   13th is the earliest date that we can do it.  That gives a lot
18   of people a lot of time to come on board.
19           Does Your Honor have any questions?
20       **THE COURT:**  The insurance policies that are being
21   tendered, are they depleting insurance policies; that is to
22   say --
23       **MR. LEVIN:**  I'm going to let insurance counsel handle
24   Everything there.
25       **MR. HOLWADEL:**  No, Your Honor, they're not.  They're

1    not eroding by the incurrence of the defense costs, no.

2           **THE COURT:**  That's all I have for that.

3           **MR. LEVIN:**  Thank you, Your Honor.

4                  I'll reserve the rest of my time, which I'm sure

5    that I won't need, but I don't want to give it to the

6    objectors.

7           **THE COURT:**  Okay.

8           **MR. LEVIN:**  Several of them have flights also.

9           **MR. DUPLANTIER:**  Your Honor, Richard Duplantier,

10   counsel for Interior Exterior.

11                 We want to echo the sentiments expressed by

12   Mr. Levin, that we agree, for the most part, these issues that

13   were raised by the objectors can be handled during the fairness

14   process, and that's really the proper mechanism through which

15   they raise these objections.

16                 We would also remind the Court that who is not

17   dismissed from this as a result of the settlement is the

18   manufacturers Knauf and Taishan, the ultimate responsible

19   parties.  And we continue to maintain our claim and our ability

20   on behalf of these objectors to pursue claims against Knauf and

21   the manufacturers for their ultimate responsibility.

22                 So we're a pass-through as well.  So this is a

23   benefit that we are giving to many of these objectors that

24   might not have occurred had we not been able to reach a

25   settlement.  We're going to reserve the remainder of our time

 1    for rebuttal as well.

 2              THE COURT:  Okay.  Let me hear from the insurers.

 3              MR. SCOTT:  May it please the Court, Hugh Scott for

 4    Liberty Mutual Fire Insurance Company.

 5              We are one of the settling defendants; and as

 6    Your Honor has gleaned, we support strongly the motion for

 7    preliminary approval.  This case, as has been referred to by

 8    Mr. Levin, is a mass of thousands of defendants, different

 9    players of all levels and all types.

10              And I suggest to the Court it's striking that

11    after the Court gave notice more than a week ago and the

12    settlement's been on the Court's Web site, we've had, I count,

13    with all deference to Mr. Levin, 13 objections -- he said 18, I

14    count 13 -- but it's a very small number of objections.

15              The point is that I think that that ought to

16    suggest to the Court that we ought to be proceeding with

17    preliminary approval to really test the mettle of the

18    settlement later on at the final approval stage.

19              In looking through those either 13 or 18

20    objections, Your Honor, the objections really fall into two

21    categories:  One I would characterize as procedural objections;

22    that is objections that say that preliminary approval -- the

23    preliminary approval is somehow defective.  And then there's

24    another category, which the vast majority of the these

25    objections are, which are what I would call substantive

1   objections to the settlement, people who say the settlement is

2   no good because of X, Y or Z.

3                    Those substantive objections are premature at

4   this time, I suggest to the Court.  Because the whole point of

5   having preliminary approval is you set up a time frame, a

6   schedule, for people to pursue the substantive objections later

7   on.  So I'd like to spend just a minute with the Court talking

8   about what I see as the two procedural objections.

9                    One of them is North River.  And North River

10  basically comes in and says, "Oh, Rule 23 doesn't have the

11  words *preliminary approval* in it, so you can't have a

12  preliminary approval hearing."  Well, this Court and Your Honor

13  has been part of the development of the jurisprudence about how

14  you implement settlements under Rule 23.

15                   And it's clear from that jurisprudence, and it's

16  been adopted, not only by this Court in the *Cope* case in 2001,

17  but also now the Manual for Multi-District Litigation that a

18  necessary step in the process to focus the objections and so

19  forth is preliminary approval and certification on a

20  conditional basis, which is all we're asking Your Honor for

21  here.  This is a clearly accepted and appropriate procedural

22  step, and I believe North River is incorrect in suggesting

23  otherwise.

24                   The second procedural type of objection is that

25  some of the objectors have said that they think the class

1    notice that's being proposed is defective.  Because they say

2    the class notice doesn't tell each member of the class how many

3    dollars and cents they're going to get out of the settlement.

4              Well, that's -- I suggest, that's a pretty

5    unusual and odd objection in a case like this where you've got

6    a class fund and the distribution, as contemplated in the

7    settlement agreement, is going to be made in an organized and

8    supervised manner by this Court determining whose claims are

9    worth what amount of money and to the extent to which

10   individuals should participate.

11             Of course, we can't tell them how many dollars

12   and cents they're going to get out of the settlement.  But what

13   we do tell them in the proposed notice is that there's going to

14   be an allocation process; that Your Honor is going to supervise

15   the allocation process, perhaps with the assistance of a

16   special master; that they will have an opportunity to intervene

17   and to participate in that process.  That's in the class

18   notice.

19             And so any notion that the notice is inadequate

20   because it doesn't appropriately describe what people are going

21   to get out of it I think is an ill-founded objection.

22             I think it's fair to say, Your Honor, that the

23   rest of the objections, and they fall into the category of

24   things like the scope of the bar order, release of downstream

25   parties, inclusion of builders in the class, so forth, all of

 1  those literally go to the merits of the settlement, and that is
 2  what we would be considering in the next phase at the final
 3  approval hearing.  And while those objections we take
 4  seriously, we believe not to be well founded.
 5                  But I suggest to the Court this is not the time
 6  to be having that fight.  And I'm not going to talk about the
 7  substantive objections, except I would like to touch on two of
 8  them because I'm aware that one of the standards Your Honor has
 9  established for preliminary approval is that the settlement
10  agreement has to, on its face, appear to be fair.
11                  So I think that, while the merits of the
12  objections ought to be addressed later on, I think it's fair to
13  respond to at least two of these objections with respect to the
14  general finding of fairness that Your Honor has to make.
15                  We have, we the insurers, Arch and Liberty
16  Mutual, have received letters from second layer excess
17  carriers, Landmark and National Surety.  We have an objection
18  by them made last Tuesday. We have a supplemental objection
19  made by them today -- or yesterday I believe it was.  So I feel
20  constrained to say a little bit about that.
21                  The two issues that National Surety and Landmark
22  seem to be concerned about are exhaustion:  Are we really
23  exhausting our policies; and are they really released, even
24  though they're declared to be released parties.
25                  With respect to those objections, I would say

1   three things to the Court:  First of all, I do believe that

2   those are merits-based objections that properly will get

3   addressed later on in the objection process.  But to the extent

4   that Your Honor is concerned about them for purposes of the

5   preliminary hearing, I would say that these excess carriers

6   have no standing to complain about what's going on here.

7   Because they are -- and Your Honor can read the definition of

8   *released parties* -- they are released parties in this claim in

9   this case, if the settlement goes forward.

10              Which means they are protected.  They will not

11  be at risk. They will not put up any money.  So their ox is not

12  being gored here; in fact, they're being protected.  So it

13  don't behoove them to come in here and cast stones at this

14  settlement agreement. We suggest they have no standing to do so

15  and we will make that argument later if they persist.

16              Finally, if you drill down all the way and look

17  at the substantive positions they've taken here, we would

18  suggest the substantive positions are without merit.  Are we

19  being exhausted here?

20              Mr. Holwadel's client and my client,

21  collectively, we have policies, $2 million aggregate limits a

22  year, that's $8 million.  Math is real easy:  2 times 4 is 8.

23  We are giving Mr. Levin's clients $8 million.  We are

24  exhausted.  That's how simple it is.  The exhaustion occurs

25  when we pay the claim and obtain a release for our insured,

1    INEX.  And that will occur on the approval of this settlement,

2    if the Court chooses to approve it.  Because at that point, we

3    will have paid $8 million to the plaintiffs and we will have

4    obtained releases for our policyholder.  So all of this stuff

5    about, are we exhausted or not, I frankly don't understand it.

6              The second issue they raise is whether they're

7    released parties or not.  If you look at the definition of

8    *released parties*, it includes insurers, all insurers, excluding

9    North River.  And the language of the settlement agreement is

10   absolutely clear on this point; and if we have to pursue

11   briefing and so forth on this point, we're fully prepared to do

12   that.

13             The second group of objectors that I'd like to

14   talk to you about very briefly is the builders.  That's, as

15   Your Honor knows, the vast majority of the people who have

16   articulated concerns about the settlement agreement.  Again,

17   these are premature, but I want to talk about them just for a

18   minute to the extent that Your Honor is thinking about them in

19   connection with finding if the settlement agreement is fair on

20   its face, which we believe it is.

21             As Mr. Levin has said, the insurers are putting

22   up the money for the benefit of everybody who's got claims

23   against INEX, and that includes the builders.  So they have an

24   opportunity to participate in this and to receive compensation

25   in it.  And the extent to which they receive compensation will

1    be determined by this Court in a fair and neutral proceeding.

2    So we think that the settlement is fair and a fair and

3    appropriate way of dealing with the builders' claims.

4                   I'll make some observations about the builders'

5    claims.  If they really don't want to participate in the

6    process, they can opt-out.  Now, if they opt-out, they said,

7    "Well, we'll be barred from seeking money from settled parties

8    if we opt-out."  Well, that's true.  But, as Your Honor knows,

9    a bar order is a very standard part.  You couldn't have

10   sophisticated settlements without bar orders.

11                  Look, for example, at Liberty Mutual's

12   situation.  Liberty Mutual is putting up all its limits, all

13   $4 million of its limits.  We need a bar order that says the

14   whole world can't chase us again if we put up all our money.

15   Because we can't put up all our money and be in a situation

16   where builders or other parties in Louisiana, under the direct

17   action statute, can turn around and sue us.  That would be the

18   ultimate unfairness.

19                  So the bar order is appropriate in this kind of

20   situation.  And it's nothing more than a more sophisticated

21   application of a very fundamental principle here that I know

22   Your Honor is familiar with, certainly under the Uniform Tort

23   Contribution Statue.  The deal is if you've got multiple

24   tortfeasors and one of them settles and the court finds that

25   that settlement is a fair contribution by that tortfeasor, then

1   a bar order enters saying the -- barring contribution claims;
2   and that's in the most simple of cases.  And you need that kind
3   of thing in the more complex cases or you'd never have a
4   settlement.
5              Finally, with respect to the builders, Your
6   Honor, let's not lose sight of the fact that this is a partial
7   settlement.  The builders have no right and should not be
8   looking to INEX to recoup all of their claims.  INEX is not
9   responsible for all of their claims.  The released parties
10  here, who the builders can't chase, are INEX and the people
11  below INEX.
12             And Your Honor knows full well that there are
13  people above INEX, the manufacturers who are actually the
14  people who are responsible for this, and the builders have
15  their claims against them.  They can pursue their claims.  To
16  the extent that they think that the money they might get
17  allocated by the Court in this settlement fund is inadequate,
18  they're protected.  They can pursue their claims.
19             So we would suggest to the Court that the
20  settlement meets the test that Your Honor has articulated.  The
21  test is whether it appears fair on its face.  It is well
22  established in the jurisprudence in this district, the Eastern
23  District of Louisiana, as well as nationwide, that the standard
24  that Your Honor is being asked to apply here is a much less
25  stringent standard for preliminary approval than it is for the

1   final approval down the line when we've vetted all the
2   objections.
3               And the standard that's been articulated is
4   whether the settlement -- proposed settlement appears to fall
5   within the range of possible approval.  And we submit to the
6   Court that that is absolutely, unquestionably the case here.
7   In terms of fairness, this settlement is a fair settlement from
8   Liberty's perspective because we've made available everything
9   we've got and we want to walk away from this, and we think INEX
10  does too, and that would be appropriate.
11              Let me close, Your Honor, by saying that if
12  preliminary approval were not to be granted here, I would view
13  that as metaphorically a closing of the door on the possibility
14  of working out some kind of arrangement here.
15              On the other hand, I think if preliminary
16  approval is granted -- I'm just talking about the preliminary
17  approval that we've asked for now -- I suggest to the Court
18  that that's opening the door.
19              Because if we have preliminary approval, as Your
20  Honor knows, there will be an objection process; there will be
21  briefing; there will be dialogue; there will be discussion;
22  and, hopefully, we get to the end of the day and we will have a
23  settlement that will be approved.
24              What we're asking Your Honor to do here is keep
25  that door open right now so we can go through that process.

1   We've worked long and hard to try and open that door, and we

2   ask the Court not to close it.  We ask Your Honor for

3   preliminary approval.

4              **THE COURT:**  All right.

5              **MR. DUPLANTIER:**  Do you have any questions, Your

6   Honor?

7              **THE COURT:**  No, I don't.

8              **MR. HOLWADEL:**  Going last, Judge -- good morning,

9   Your Honor.  Russel Holwadel for Arch Insurance Company, one of

10  the settling defendants.

11             Going last, obviously I don't have anything to

12  add other than, for the record, to support the position

13  advanced by the Plaintiff's Steering Committee, by INEX and by

14  Liberty.  Arch would adopt those arguments and urge the Court

15  to grant preliminary approval.

16             **THE COURT:**  All right.

17             **MS. BASS:**  Thank you, Your Honor.  Hilarie Bass on

18  behalf of the Homebuilders' Steering Committee.

19             Nobody is more aware of the need and the urgency

20  to resolve homeowner claims than the homebuilders.  And I

21  suggest to you that no one in this courtroom would question the

22  fact that the homebuilders have done more to expeditiously

23  resolve homeowner claims than anybody else in this proceeding.

24  That being said, there are issues of fundamental fairness and

25  due process here that cannot be ignored in an effort to quickly

1  grab insurance proceeds.

2              Now, the papers of the PSC go on at length about

3  how the consideration of a preliminary approval is limited to a

4  determination of whether the proposed settlement agreement is

5  fair, reasonable and adequate.  And they also go on to suggest

6  that there is a presumption in favor of that because of the

7  fact that there is an arm's length negotiation that's taken

8  place and, therefore, it's a relatively easy standard for this

9  Court to meet.

10             I suggest that neither of those items -- neither

11  of those facts is applicable in this case.  This proposed

12  agreement is neither fair, reasonable or adequate; and more

13  importantly, it was not the result of arm's length

14  negotiations, because as you just heard, there were three

15  parties at the table:  The PSC, INEX and the insurers.

16             The one party that was not at the table were the

17  homebuilders.  And contrary to Mr. Levin's suggestion, we were

18  not lying in wait.  As this Court is well aware, we have

19  consistently asked to be included in these discussions because

20  we're the parties that spent in excess of hundreds of millions

21  of dollars -- literally hundreds of million of dollars --

22  repairing homes.

23             Now, Your Honor is well aware of the discussions

24  about the Banner settlement. We were aware they were going on.

25  We have been told continuously that before any settlement was

1   reached, the homebuilders would be invited to the table so that
2   we could articulate our concerns and ensure that the provisions
3   being negotiated fairly addressed our concerns.

4                The PSC assured us that would occur; Your Honor
5   assured us that would occur.  Little did we know that while we
6   were fighting about our need to be at the table of the Banner
7   negotiations, that these INEX negotiations were going to
8   conclusion and exactly what we were promised would not occur
9   has taken place.

10                Now, we are not talking about a circumstance
11   where the only concern is how much money we're going to get
12   allocated.  Our position is no different than other class
13   members who are also being asked to wait and file objections
14   later.

15                In our case, Your Honor, these parties have
16   negotiated away our rights without us being at the table to
17   even discuss what was going on.  You heard Mr. Duplantier say,
18   "Well, the manufacturers have not been released."  The
19   manufacturers are not the only ones not being released here,
20   Your Honor, the builders are not being released.

21                In exchange, not only are the builders not being
22   released, but we are now being barred from pursuing existing
23   pending claims we have against installers and installers'
24   insurance companies.

25                Now, it may be that if we were at the table and

1   if we participated in these negotiations, we might determine
2   that that was an appropriate balancing to resolve these issues
3   and that there was value sufficient in getting access to these
4   INEX insurance proceeds that we would be willing to say, "You
5   know what, we understand. We're going to be sitting ducks.
6   We're going to continue to be sued by the homeowners and we're
7   going to be barred from pursuing the third-party claims that
8   many of our builders are actively negotiating currently.  Those
9   claims against installers and installer insurers are going to
10  disappear and maybe it would make sense for us to do that."

11              But from a due process standpoint, I apologize,
12  but the PSC is not the appropriate party to be making that
13  decision for us.  This is a poster-child example of a conflict
14  in a class.  We are being sued by the PSC.  How can they
15  possibly be negotiating the terms of what we're going to be
16  released from and what we're going to barred from pursuing?  If
17  we're a member of the class, then we have an adverse interest
18  to the PSC that's representing homeowners and we need to be at
19  the table.

20              I'm not suggesting that this settlement
21  agreement be blown up, and I'm not in the least bit threatened
22  by the suggestion that the door is going to close.  What we're
23  asking for is for this preliminary hearing to be continued
24  until such time that we are able to sit down with these parties
25  and make sure that the homebuilders' position is represented.

1          Because for these parties to negotiate away our

2    rights without us being given an opportunity to sit at the

3    table and participate in that process is a complete violation

4    of due process, and that's not a merits-based complaint that

5    can wait for a final fairness hearing.

6          That so goes to the fundamental fairness of this

7    settlement agreement that it needs to be resolved today, before

8    notice goes out and before we enter an allocation process.

9    There is absolutely no excuse for parties that have an adverse

10   interest to ours to be negotiating away our rights and to

11   determining what we're going to be released from and who we can

12   sue.

13         Now, it's also been suggested that merely by

14   virtue of having a seat at the table in the future that that's

15   going to solve all these problems. You just heard Mr. Levin

16   suggest that the builders may be able to establish a claim in

17   the allocation process, if we can meet some standard that

18   hasn't even been articulated yet.

19         So we are now being asked to not be released by

20   homeowners; to be barred from pursuing existing claims; and,

21   more importantly, not even knowing whether there's going to be

22   any consideration provided to us as part of the settlement

23   process.

24         We're not talking about the simple issue of how

25   we allocate among all the homeowners and whether they might get

1    $3 a square foot, or $5 a square foot, or $3,000 a home or

2    $10,000 a home.  We don't know if we're going to get anything.

3    And yet, these parties have negotiated away our rights, knowing

4    full well that the homebuilders should have had a seat at that

5    table.

6              And this inherent conflict continues.  Because

7    if you look at the settlement class that's being proposed,

8    there still aren't any homebuilders present; there still aren't

9    any homebuilders who are going to be class representatives

10   despite the fact that we are being named as class members and

11   that, once again, our rights are being contracted away.

12             I am not aware of any settlement ever where

13   settling parties have the ability to negotiate away the rights

14   of a party that's not at the table.  And this is something that

15   can be solved.  All that we have to do is tell these parties

16   that this is not the way these settlements are going to be

17   implemented; that if you're going to have rights of third

18   parties affected, you have to have appropriate representatives

19   of those parties at the table.

20             And I suggest to you, Your Honor, that if we

21   don't draw a line in the sand right now with this settlement,

22   this is going to continue.  Because the PSC is going to be well

23   aware of the fact that it's going to be seeking a very

24   substantial attorney's fee and why would they want the

25   homebuilders at the table when it's, oh, so much easier to

1   negotiate away their rights when they're not.

2              These are not objections that can wait until the

3   final fairness hearing.  They're well aware of the fact that

4   they negotiated away our rights, that we were not present, that

5   they have an inherent conflict because they are currently suing

6   us, and it is a violation of our due process rights and our

7   fundamental fairness.

8              This should not be approved at this point in

9   time, Your Honor.  You should make these parties go back to the

10  table and have the homebuilders involved and let's see whether

11  or not we can resolve those issues.

12             And maybe we'll have to make a determination,

13  that in lieu of getting this money or the possibility of being

14  allocated this money, that it's worth making the concessions

15  that these parties have already made on our behalf, but then it

16  won't violate due process.  Because then it will be knowing and

17  voluntary and we'll be participating, which is not going on

18  now.

19             Now, let me, in closing, suggest to you, Your

20  Honor, there was some suggestion that there were only 13 or 18

21  objections filed and that the homebuilders had not specifically

22  identified on whose behalf this was being filed.  Given the

23  short time frame and the hundreds of builders involved, we were

24  not able to specify on whose behalf these objections were filed

25  other than to have had a lengthy call where there was strong

1    support and strong concerns for just the positions that I'm

2    articulating today.

3              But we would be happy to provide to the Court

4    within a very short time frame a specific listing of every

5    homebuilder who's prepared to sign off on this objection.

6    Given the time frame of this hearing, we did not have the

7    ability to do that, but we are clearly happy to do so.

8              **THE COURT:**  Thank you very much.

9              Anyone else?  From the objectors?

10             **MS. BERGERON:**  Good morning, Your Honor.  Kari

11   Bergeron representing Hal Collums Construction and D.R. Horton,

12   Inc. - Gulf Coast.

13             On behalf of these builders we also filed an

14   opposition and we adopted, by reference, the arguments that

15   were asserted by the Homebuilders' Committee.  I don't have

16   much to add from what Hilarie just argued, but I just wanted to

17   give you a little background.

18             Hal Collums only has one house in the MDL; and

19   after he was sued, he asserted a third-party claim against

20   Interior Exterior.

21             But D.R. Horton - Gulf Coast is a larger builder

22   and they have spent a significant amount of money, like many

23   other builders, to repair homes.  In fact, in Louisiana, they

24   have repaired 29 homes.  Because of this, they filed their own

25   separate lawsuit here in the Eastern District of Louisiana,

1    which has been consolidated.  So they are a true plaintiff.  So

2    they are in a unique position because, of course, they're a

3    plaintiff and a defendant.

4              And like Hilarie said, we were not adequately

5    represented during the settlement negotiations.  The proposed

6    order allows this conflict of interest to continue by

7    appointing the members of the PSC to serve as counsel for

8    class.  And the proposed class reps, they're all homeowners,

9    none of which are homebuilders.  We believe that this is a

10   fundamental fairness issue and does not satisfy the preliminary

11   fairness evaluation.

12             Thank you.

13        **THE COURT:**  Okay. Thank you very much.

14        **MR. NICHOLAS:**  Good morning, Your Honor.  Steve

15   Nicholas for the Mitchell Company.

16             If I could, let me start with a couple of

17   factual inaccuracies from Mr. Levin's papers and his

18   presentation.

19             First, he noted that there's a motion to enforce

20   the settlement agreement as to Mitchell.  That's up next week,

21   and I don't know if Your Honor has had a chance to see our

22   reply there.  But in writing during those negotiations,

23   Mitchell always took the position, confirmed in writing with

24   the mediator, that we weren't releasing any claims, including

25   claims against INEX.  We'll tweak that next week, but I don't

1    believe that has anything to do with what we're here for today.

2                    Secondly, Mr. Levin says that we have no

3    damages, we've done no remediations.  It's true, Mitchell's not

4    completed remediations; but they have in excess of $100,000

5    out-of-pocket fixing homes or trying to fix homes that have

6    INEX-sold board.  So they have actual damages.  They're

7    interested in the settlement in order to pursue those actual

8    damages.

9                    Finally, in his papers and again this morning he

10   indicated that Mitchell attempted to intervene in the Banner

11   case and Your Honor denied that intervention.  He's mistaken

12   about that.  Mitchell never attempted to intervene in the

13   Banner case because Mitchell has no Banner board.  They're not

14   in that stream of commerce.

15                   Mitchell did try to intervene in these cases, in

16   the INEX cases, for the very reason that we're here today.  In

17   fact, I stood here with Mr. Levin and he said, "You can talk

18   about it in the allocation program."  And I said then to Your

19   Honor, "Rule 23 doesn't allow for that."  It still doesn't

20   allow for that.  What was necessary was the same thing in the

21   INEX situation is what Your Honor has allowed to happen in the

22   Banner situation and to let builders intervene for the purpose

23   of participating in the settlement.

24                   Now, I'm not going to talk about the conflict.

25   Factually, I'll adopt what Ms. Bass said.  And it's

1   definitional of an in-trial class conflict where one group of a
2   class is suing another.

3   But what I would like to talk about is Rule 23
4   and Rule 23(a).  It's certainly not premature, even the Manual
5   for Complex Litigation, which is quoted by the PSC in their
6   reply talks about one of the things Your Honor has to do now at
7   the preliminary approval stage is preliminarily approve a
8   class.  In order to do that, the United States Supreme Court
9   instructed in the *Amchem* case that Your Honor has to find that
10  the Rule 23(a) requirements are met here:  Numerosity,
11  typicality and commonalty and adequacy.

12  What the PSC is really saying here, if you look
13  through it, is Your Honor should gloss over all those
14  requirements because this is a good deal.  Like Ms. Bass, I'm
15  all for a good deal.  I'm all for getting the insurance
16  company's money.  But specifically what the Supreme Court said
17  in *Amchem* was you can't do that because of the due process and
18  constitutional implications of doing that.

19  I know Your Honor's familiar with the case. But
20  if you look at headnote 10, the court concludes in talking
21  about, well, what happens when we have a settlement Rule 23,
22  the court concludes that:  "Federal courts, in any case, lack
23  authority to substitute for Rule 23's certification criteria a
24  standard never adopted -- that if a settlement is 'fair,' then
25  certification is proper."

1              Your Honor has to find, as a matter of law, that

2    the homeowners and their counsel are adequate representatives

3    of the very builders that they're suing and don't intend to

4    release.  I don't think that passes the straight-face test that

5    you can't say they're adequate representatives.

6              All due respect to the PSC and their abilities

7    to negotiate a deal -- and maybe it is the deal -- but they

8    cannot be found to be adequate representatives under Rule 23(a)

9    for Your Honor to preliminarily approve a class where there's

10   only one class.

11             And what they sort of imply is, "Well, at the

12   allocation formula maybe there will be some subclasses and the

13   builders can come in."  But again, what *Amchem* teaches is if

14   you have subclasses, you have to have a representative and a

15   representative counsel for each member of that subclass -- for

16   each group of that subclass.

17             There are no builders present; there's no

18   builder representative; and there's no builder lawyer.  And to

19   suggest that the sort of the proof is in the pudding and the

20   money is going to be there at the end of the day, and that's

21   the only thing Your Honor should focus on, ignores the other

22   aspects of the settlement that are real.

23             We continued to negotiate.  In our case, in

24   Mitchell's case, it wasn't just an installer.  There's an

25   intermediary seller between INEX and Mitchell who made

1  representations to Mitchell about the quality of the board that

2  they were buying.  We have to give those claims up under this

3  settlement.  Maybe it's a good deal; maybe it's not.  We don't

4  know because we weren't there to participate in it.

5           Your Honor, I'll close this way:  If Your Honor

6  finds that the homeowners are adequate representatives and

7  their claims are typical -- and as Your Honor said in the Vioxx

8  case, typicality and adequacy sort of merge -- but if the

9  homeowners are capable of negotiating and settling out the

10  homebuilders' claims, then the reverse would be true.

11          Under that theory, the homebuilders could go to

12  Knauf and Taishan and whoever else and say, "Let's do a deal,"

13  and resolve all the homeowners claims in one fell swoop.  I

14  suspect that this side of the table wouldn't be so quick to say

15  that the interest of the homeowners and the homebuilders are

16  the same and that that would be an adequate representation of

17  their claims.  The reverse is true here.  We have to

18  participate.

19          That's all.  I won't argue anymore.  Thank you,

20  Your Honor.

21      **THE COURT:**  Thank you very much.

22      **MR. GARNER:**  James Garner for the Southern Homes

23  parties, Your Honor.  Thank you for allowing us to talk.

24          I'm going to quote my late mentor, Dermot

25  McGlinchey, because I thought about him as I was preparing for

1    this:  "The road to hell is paved with good intentions," as he

2    often said.  Settlement:  Good intention; payment to the

3    homeowners:  Good intention.  Depriving our clients -- and the

4    Louisiana builder is a little bit different -- depriving them

5    of their vested redhibition rights is obviously deficient and

6    is an injustice here, and those good intentions cannot serve as

7    a basis whether we're one objector or a thousand objectors, we

8    have got a vested property right.

9              As Your Honor is well aware from the 1971

10   Louisiana Supreme Court *Mercedes-Benz* case, we have a vested

11   property right, all the way up to the chain of title.  In

12   claims like -- and I'm sure you've read it -- we've got

13   subcontractor claims against one of our suppliers, Graf's here

14   that they seek to bar.

15             Now, one inaccuracy I want to comment upon

16   counsel, there's no bleed here.  These are not eroding policy

17   limits, and they're getting a defense.  So why the rush to do

18   this and trampling of rights.

19             Finally, I wholeheartedly like *Orthopedic Bone*

20   *Screw*, because as the court said -- and I know you've read it

21   but I'm going to read it for the record -- "Non-settling

22   defendants have, at a minimum, the setoff and judgment

23   reduction rights to which they're entitled by operation of

24   applicable state law."

25             In that case the court noted, the judge noted,

1   we handled it, it was done.  Here, it's the opposite.  And it's

2   a step further for us Louisiana people, which are special

3   because not only do we have defense and reduction -- the

4   judgment reduction rights, I have claims.  I'm like one of

5   them, except, as Ms. Bass said -- and I wholeheartedly adopt

6   her argument -- I wasn't at the table.

7                    So unless you've got any questions, I know

8   you've read all this.

9                    THE COURT:  I understand it.

10                   MR. GARNER:  Thank you, Your Honor.

11                   THE COURT:  Thank you very much.

12                   Anyone else from the objectors?

13                   MR. BEARDEN:  Your Honor, Joseph Bearden from

14  Marsiglia Construction.

15                   I'm not here to necessarily oppose the

16  settlement.  What I'm here to do is to request clarification

17  for certain entities like my client, Marsiglia Construction.

18  We are involved in this litigation in an extremely limited

19  fashion.  We remediated one home at No. 12 Pelham after

20  Katrina.

21                   In looking through the settlement agreement, it

22  does not appear that Marsiglia Construction is listed as one of

23  the 12 or 13 or so pages of INEX -- of downstream INEX

24  releasees.  Nevertheless, the supplier from whom Marsiglia

25  received the drywall, a company called Accurate, is listed as

1    one of the downstream INEX releasees.

2                    It's entirely possible that I've missed

3    Marsiglia on this list.  It's 12 pages or so of very small

4    print.  But without having seen Marsiglia listed here, having

5    seen the supplier listed as a downstream INEX releasee, I am

6    concerned to the extent that Marsiglia is, in fact, a

7    downstream INEX releasee.

8                    We don't appear to fit the definitions of a

9    builder as contemplated by the settlement agreement.  We don't

10   appear to fit the definition of a general contractor as defined

11   by the settlement agreement.  But clearly we were a contractor

12   involved in the rehabilitation of a home after Katrina through

13   a contract with a homeowner.

14                   It appears that the agreement contemplates an

15   entity like Marsiglia being released, but we're not

16   specifically released that I see.  So I'm seeking clarification

17   from the Court to the extent that clients, not only Marsiglia,

18   but clients like Marsiglia, and perhaps there's many others

19   that we just don't know because of the speed at which this was

20   done, that there are other clients, like Marsiglia, who should

21   be a downstream INEX releasee but are not specifically listed.

22                   So to the extent that Marsiglia is a downstream

23   INEX releasee, then I don't necessarily know that we have an

24   opposition; but to the extent we're not, we're going to adopt

25   the opposition of the homebuilders.  And frankly, Your Honor,

1   we just seek some clarification from the Court at this

2   preliminary stage as to whether Marsiglia and entities like it

3   are, in fact, downstream INEX releasees.

4                  Thank you, Your Honor.

5             **THE COURT:**  Thank you.

6             **MR. RISLEY:**  Good morning, Your Honor. Kevin Risley,

7   R-I-S-L-E-Y, on behalf of the North River Insurance Company.

8                  I'd like to start by responding to the comment

9   from Mr. Levin who said that North River didn't come to the

10  table on this deal.  We tried.  What's driven the settlement

11  is, as the Court probably expected, the upcoming bellwether

12  trial and the following INEX class certification hearing.  That

13  gets things done a lot of times.

14                 We asked to be involved in that.  We wanted to

15  participate, but INEX and the PSC and the primary carrier said,

16  "No, there's been no exhaustion.  You're excess. Don't be

17  involved," and we were excluded.  We were not told of the

18  settlement negotiations.  We were not given a chance to

19  participate.

20                 So I think it's somewhat misleading to say we

21  didn't come to the table; we didn't know there was a party

22  going on because the door was shut to us.

23            **THE COURT:**  Well, if they prevail, though, they will

24  substitute and you'll be at the table, the only one.

25            **MR. RISLEY:**  Oh, we'll be at the head of the table, I

 1   suspect.  In fact, it may be a very lonely table for us, but

 2   that may happen.

 3                Now, in our objections we have explained why we

 4   think this is a very flawed settlement agreement.  It purports

 5   to affect the rights of a lot of people who were not involved.

 6   You heard some of them.  We set forth in our objections why we

 7   believe our rights are being adversely affected.

 8                But the one point I want to talk about

 9   especially since we're talking about preliminary versus final,

10   is what notice is being given by this settlement announcement

11   on the issue of allocation.  There's no effort to explain to

12   class members or other affected parties what the range of

13   possible compensation might be.

14                Now, the PSC's response to that is to cite on

15   page 5 of their reply the *Katrina Canal Breaches* case, which

16   recognizes in some circumstances it may not be possible to give

17   reliable information.  What they don't say is why that would

18   apply here.

19                They throw down the number of $8 million.  We

20   know that's not what we're starting from.  There are

21   settlements that go out of it; there are notice costs.  So it's

22   not $8 million.  It's something less than that.  We know that

23   there will be deductions for attorney's fees and administration

24   expenses.  It looks like, based upon the information we have,

25   the amount that's available for distribution to class members

1   may be more in the range of $2.5- or $3 million.

2            Now, they know the number of class members, why

3   they can't provide some information, some range, is unknown to

4   us.  This is important, not just to the class members, but also

5   to North River for this reason:  If class members end up

6   getting $1,500 to $2,000 on average for a home, that has a

7   substantial impact on us as opposed to if they get $20- or

8   $25,000 for a home.  Whatever's left, we'll be the ones they'll

9   come knocking on our door to talk to.  So we should have some

10   idea about how much this may affect our potential liability.

11   They made no effort to do that.

12            What we would suggest is this:  If the Court

13   believes that the plaintiffs have shown enough, that the Court

14   is willing to consider the class and give people a chance to be

15   heard, then the appropriate thing to do is to approve the

16   sending of notice and setting a schedule.  We don't believe

17   it's appropriate for the Court to make preliminary findings and

18   conditional certifications.  I understand the jurisprudence has

19   done that in some occasions.  It's not in the rules.  The Fifth

20   Circuit has not, as far as I can tell, approved that situation,

21   nor have they said it's improper.

22            But rather than put the Court in the position of

23   making findings based solely on papers like this that affect

24   things such as releases, assignment of claims, exhaustion of

25   coverage, the Court shouldn't be sanctioning the settlement

1    view of that right now.  If the Court wants to let notice go

2    out and have a chance to be heard at a settlement hearing,

3    that's fine.  That's all the Court needs to do right now.

4                    Now, I will say, we don't think it should even

5    go that far because of our objections.  If the Court disagrees,

6    the Court should take a limited role in going forward and not

7    go beyond what Rule 23 provides.

8                    THE COURT:  Anyone else from the objectors?

9                    MS. DONOHUE:  Good morning, Your Honor.  Megan

10   Donohue on behalf of National Surety Corporation.

11                   We filed briefs jointly with Landmark and we'll

12   allow them to address the issues we raised.

13                   THE COURT:  All right.

14                   MS. DONOHUE:  Thank you.

15                   MS. BURNTHORN:  Your Honor, Judy Burnthorn for

16   Landmark.

17                   We kind of felt similarly to Marsiglia, as I

18   just heard it expressed, when we first read the settlement

19   agreement.  We thank the Court and all the settling defendants,

20   because when we first got the agreement, we reached out to the

21   Court, as well as to the other parties, and I know that you had

22   issued an instruction to them to clarify.  That has happened.

23   We had an objection with respect to the ambiguity of the

24   settlement agreement and that has been resolved with the

25   letters that we got.

1           Well, and, also, they nicely said the same thing
2    on the record, that we are released.  And I believe that they
3    most probably include in that category my colleague National
4    Surety, because we're basically in the same position.

5           We had a second objection.  That second
6    objection that we filed relates to the same thing that North
7    American [sic] was talking about with respect to allocation of
8    payments, that Liberty and Arch are asking for an order saying
9    that their policies are exhausted.

10          And normally, when I get a file as a coverage
11   counsel, I get the file and I have the checks and these things
12   have been paid.  And then I give my client, the excess carrier,
13   an opinion on whether there's exhaustion and whether my
14   client's policy is going to attach.

15          In this case it's a little bit different,
16   because it needs to be.  And Liberty and Arch are asking for an
17   order at the front end saying there's exhaustion so that they
18   can pay out their money.  We don't have any problem with that.
19   What concerns me, Your Honor, is I hear sometimes from the
20   primary carriers that we don't have standing.  What we would
21   propose is that there are a lot of standards that should go
22   what kind of payments get made.

23          North River said in their objection, there's the
24   possibility based on one of the definitions that a compensation
25   will be made for some non-reactive boards.  I don't think

1    that's going to happen, but we'd like to be in the allocation

2    process to make sure it doesn't happen.  So what we would

3    propose, and we have no objection to there being an order as

4    requested saying that there is exhaustion, but we'd like to

5    have participation in the allocation process that's described

6    in section 16 of the settlement agreement.

7              And the settlement agreement says that there

8    will be entertained interventions for the purpose of

9    participating in the allocation process.  We'd like to be an

10   interested party there.  We get concerned when we hear people

11   say, "You don't have any standing to do that," because I think

12   we do.  I think it's very fair, Your Honor, to say, "Landmark

13   we're not going to hear what you have to say right now, go to

14   section 16 of the allocation process."

15             What I don't think is fair, Your Honor, is if

16   they say, "Well, we're not going to throw what you have to say

17   in section 16 for the special master.  We're going to throw it

18   in the trash."  We don't want to be in the trash.  We just want

19   to postpone what we have to say until the section 16 allocation

20   process.  And with that, we would have no objection to the

21   order that's requested.

22             **THE COURT:**  All right.

23             **MS. BURNTHORN:**  Thanks.

24             **MS. WIMBERLY:**  Your Honor, Dorothy Wimberly

25   representing certain builders.  I just wanted to add to what

1    Ms. Bass had to say with respect to the unidentified builders.
2    We have been contacted by a number of newly added builders who
3    have not yet been served, but who are aware of this settlement
4    and would join in any objections.  But they're not yet
5    officially a party as they have not been served and they just
6    wanted the Court to be aware of that position.
7                 **THE COURT:**  All right.  Thank you very much.
8                 No other objectors?
9                 Okay, let me hear a response.
10                **MR. LEVIN:**  I will not need 20 minutes, Your Honor.
11                **THE COURT:**  Talk to me about the typicality issue
12    that's raised by the builders.
13                **MR. LEVIN:**  By the builders?
14                Your Honor, what we did here, and there is --
15    there can be no objection to typicality if we've received the
16    entire policy and made it available to anybody that wants to
17    take from that policy.  That was the issue.  That is not an
18    *Amchem* deficiency at all.  We're all in the same boat.  The pot
19    was the policy.  We got the policy and the ability to go
20    against North River.
21                Everybody's due process rights are protected in
22    the allocation process.  In the allocation process, we will not
23    be representing the builders.  Ms. Bass and others will
24    represent the builders in that process.  In the allocation
25    process, there will be a conflict perhaps between personal

1  injury, if there is any, and the damages for the homes.  That
2  will have to be taken care of.

3              But at this point, the -- what we had to
4  accomplish is to get the money.  And we were the ones that were
5  proceeding in this litigation, not the litigation with when
6  Banner's involved, and Lennar's involved with Banner, but in
7  this litigation.  And it was very, very costly to wrap our
8  hands around $8 million and the potential $72 million.

9              And it was our considered judgment that it had
10 to be done, and we did it, and we didn't flee with the money.
11 We don't have a distribution planned to give the money to the
12 homeowners.  That money is there; and it's there for the Court
13 to determine the allocation process, and due process will be
14 afforded everybody in that allocation process.

15         THE COURT:  They're concerned about the bar order, as
16 I read it, not necessarily the amounts or the terms of the
17 settlement, because you cannot get any more than the $8
18 million.  They're concerned about losing their rights against
19 other installers and the installers' insurers.

20         MR. LEVIN:  Judgments are made at arm's length in
21 settlement discussions.  That was a condition of the
22 settlement.  If it's not fair, reasonable and adequate that
23 that be a condition of the settlement at the fairness hearing,
24 the Court will not approve the settlement.

25              Even Ms. Bass said, "Perhaps, if I were there,

1    this would be fair, reasonable and adequate."  Well, she will

2    be there at the fairness hearing and she can make that judgment

3    right now based on the facts.

4              She didn't have to be at the table to determine

5    whether getting $8 million on an $8-million policy and the

6    ability to go against the excess carriers, which the plaintiffs

7    sued in direct actions in *Amato*, and which they will partake in

8    in an allocation process when we go down the road and North

9    River comes on board.

10             There is just no fundamental violation of due

11   process under *Amchem*.  *Amchem* recognized that these cases can

12   be settled on a class basis and a settlement basis and that the

13   only impediment to a litigation class was the manageability

14   problem, which does not exist in a settlement class.  So I

15   think we did it.

16             What we're overlooking here is that this Court

17   will make that determination at the fairness hearing, and as to

18   a lot of other objections that have been raised.  If you don't

19   like it -- I won't be offended -- opt-out.

20             **THE COURT:**  Okay.

21             **MR. LEVIN:**  I do want to say that I didn't think I

22   agreed with North River with anything, but I agree with them

23   half way.  I think if the Court determines any findings on the

24   preliminary approval stage, they should be very brief, very

25   generic and perhaps very vanilla, other than the order that

1   we've presented to you.  Because clearly a record will have to

2   be made out at the fairness hearing, and that's the time to do

3   it, and in the proceedings that ensue getting us to the

4   fairness hearing.

5           THE COURT:  Okay.

6           MS. DONOHUE:  Your Honor, if I may?

7           THE COURT:  Sure.

8           MS. DONOHUE:  Megan Donohue on behalf of National

9   Surety.  If we could just seek clarification from the PSC,

10  whether you also agree that National Surety, along with

11  Landmark, is a released party.

12          MR. LEVIN:  The answer is:  I will agree to

13  everything that Mr. Scott agrees to, and I'm sure that he will

14  agree with you.

15          MS. DONOHUE:  The only reason I bring this up again

16  is just now you stated that if the homebuilders needed to go,

17  they could go against the excess insurers, plural.  So...

18          MR. LEVIN:  Well, I -- plural is part of my nature,

19  because it's more. It wasn't directed at you.

20          MS. DONOHUE:  Thank you.

21          MR. DUPLANTIER:  Your Honor, I'd like to clarify a

22  couple of points factually just that I think are important

23  because you asked about the typicality issue with regard to

24  homebuilders.  What is very interesting here is that we've had

25  three identified homebuilders who have raised objections and

1    have the ability to opt out.  Only one of those homebuilders

2    has actually represented to this Court that they've remediated

3    any homes.

4              This process is going to allow the Southern

5    Homes properties to be remediated and the Mitchell Homes

6    properties to be remediated, so -- if they choose to opt in or

7    those property owners choose to opt in.  They're talking about

8    their affirmative claims that are not for remediation costs

9    that we see no evidence that even exceed the 8 million, much

10   less will reach the $72 million level.

11             The only other clarification, Your Honor, I

12   would like to make is that North River was invited to

13   participate in the settlement negotiations.  They chose not to

14   participate in those negotiations.  They were invited on

15   numerous occasions to participate.  They wanted to be part of

16   the trial, but they weren't giving us full participation in

17   settlement negotiations, and that's incorrect that they tried

18   to participate in this process.

19             **THE COURT:**  Okay.  Let me make a couple of comments

20   and I'll put my findings in writing.

21             Let me remind you that the challenge in this

22   case, oftentimes in MDLs there's two sides:  The plaintiffs, in

23   plural; and the defendant, singular.  Occasionally, there's two

24   or three defendants, plural; and plaintiffs, en masse, groups.

25             In this case, the challenge is that I have

1   nearly 1,000 defendants in this case.  We have about 30,000

2   plaintiffs.  I have 1,400 lawyers representing the parties in

3   this particular case.  It's very hard in that type of

4   environment to get everybody at a table, because the table's

5   not big enough.  There's no table big enough so that we can

6   have everybody at the table to accomplish any meaningful

7   purpose.  So it's a challenge.  It's a real problem.

8              My gut and my thought always is transparency:

9   Focus on transparency, invite everybody's input and have them

10  participate and try to resolve the matter in globo with

11  everybody around talking about it.  The sheer mass of the

12  particular case makes it very difficult.  So I have to approach

13  it from the concept of, "How do you eat an elephant?  One bite

14  at a time."  It's hard to do it all at the same time.

15             So this has been a challenge and I've adopted

16  the approach of trying to do the bellwether and do other

17  matters to get you some information on which you can base your

18  views.  We also, with that same concept, did the pilot program

19  to give you more information.  Because it seems to me that in

20  this particular case, at least, there seemed to be general

21  agreement that the drywall is problematic.

22             I've never heard anybody say it's not

23  problematic.  So it's problematic.  The issue is:  What do we

24  do about this problematic drywall?  There are different

25  approaches to it.  The way that I see the motions, the approval

```
 1    request, is that I do believe it should be -- and I said so in
 2    cases that I had written before -- it should really be a
 3    two-step process.
 4              Clearly, 23 doesn't provide that.  I don't say
 5    that 23 necessarily should be amended.  But in carrying out 23,
 6    it seems to me that I first look at a very preliminary
 7    evaluation of the matter.  Because there's no sense in sending
 8    a notice out if clearly on its face there is no possibility of
 9    having a class settlement.  It's just totally inconsistent with
10    every aspect of Rule 23.  I wouldn't want to waste people's
11    time.
12              The reason for that is notices cost thousands
13    and sometimes hundreds of thousands of dollars.  So I really
14    think it's an abuse of my job if I just say, "Go file a
15    notice," in every case.  Because the notice is problematic; and
16    in many cases, they don't deserve notice.  They don't even get
17    to that point, and they shouldn't be required to get to that
18    point and spend that money.  Litigants ought not be spending
19    that kind of money if there's no chance, it's not even
20    possible, it's not even within the realm of reason.
21              So I do think it's appropriate and it's an
22    appropriate thing and a fair thing to do in carrying out 23 to
23    make a preliminary evaluation.  At the preliminary evaluation
24    stage, I look upon it with a 12(b)(6) analysis.  I take the
25    information on the pleadings, I look at it, I assume that
```

1    they're true; and assuming everything they say is true, is

2    there a case; or assuming everything they say is true, if it is

3    not a case, then 12(b)(6) is the axe which clips it off at that

4    stage.

5                    So it's a very preliminary analysis that I look

6    at at this particular stage.  I'm not deciding allocation.  I'm

7    not scrutinizing the fairness of the amount.  I'm not even

8    focused on the settlement program at this level.  I'm not

9    looking at the specific wording of any bar order.  I don't know

10   about the bar order.  I think that there's significant issues

11   of typicality at this stage from the bar order standpoint.

12                   I think that it's a reasonable argument that if

13   you're going to take away something, that person from whom you

14   take it ought to at least have some input in it.  I mean if

15   they have no input, how can they be affected by it?  They

16   haven't even been in the process.  That's a fair argument.

17                   But I'm not even focused on that at this stage

18   of the analysis.  But I'll tell you now that that is a

19   significant issue; and if it is still unresolved later on, that

20   can be a busting issue that can create serious problems.

21                   But I see the preliminary approval stage as an

22   opportunity to look over the documents.  I see it as an

23   opportunity to get everybody focused on this particular matter

24   and matters, to get notice out so that everybody has a chance

25   to make objections.  Then in the real world what happens is

1  that the movants meet with the objectors and discuss the issues

2  to see whether or not they can be resolved at an earlier stage.

3          But at this particular stage, under my 12(b)(6)

4  preliminary analysis, I will find that it's appropriate to

5  preliminarily approve the motion without speaking on the

6  substance of it so that we can get the notice out and set an

7  appropriate fairness hearing in the future.

8          I would like, though, that before you set

9  particular dates, that you get some input from opposing counsel

10  to make sure that the dates are consistent and reasonable.

11      **MR. LEVIN:**  Your Honor, the dates have to be revised

12  anyway because of the notice, which gives us more time.  We

13  certainly will do that and early next week get a new order to

14  the Court.

15      **THE COURT:**  I'll put this out with a little more

16  specificity in my written opinion so that you can have it for

17  record purposes.  But, basically, I will be granting a

18  preliminary approval at this stage without any comments on the

19  bar order, its significance, the wording or without any

20  comments on the allocation at this point.

21      **MR. LEVIN:**  Understood, Your Honor.  I could thank

22  Your Honor for both myself and the objectors, from what I

23  gathered off the record, nobody's going to miss a flight.

24      **THE COURT:**  Thank you very much.  Court will stand in

25  recess.

1            (WHEREUPON, the proceedings were concluded.)

2                            *****

3                       **CERTIFICATE**

4          I, Jodi Simcox, RMR, FCRR, Official Court Reporter

5  for the United States District Court, Eastern District of

6  Louisiana, do hereby certify that the foregoing is a true and

7  correct transcript, to the best of my ability and

8  understanding, from the record of the proceedings in the

9  above-entitled and numbered matter.

10

11

12                         S/ Jodi Simcox, RMR, FCRR
                               Jodi Simcox, RMR, FCRR

13                             Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA