UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE MANUFACTURED | * | MDL No. 2047 |
| DRYWALL PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | JOSEPH C. WILKINSON, JR. |
| | * | |

* * * * * * * * * * * * * ** * * * * * ** * * * * * * * ** *

**THIS DOCUMENT RELATES TO:  *All Cases***

**SUPPLEMENTAL BRIEF BY DEFENDANTS TAISHAN GYPSUM CO. LTD.
AND TAIAN TAISHAN PLASTERBOARD CO., LTD. WITH RESPECT
TO MOTIONS TO COMPEL FURTHER JURISDICTIONAL DISCOVERY**

Taishan Gypsum Co. Ltd. ("TG") and Tai'an Taishan Plasterboard Co., Ltd. ("TTP") (together, "Defendants"), by its attorneys Hogan Lovells US LLP ("HL") and Stanley, Reuter, Ross, Thornton & Alford, LLC, submit this memorandum in opposition to the motion by the Plaintiffs' Steering Committee ("PSC") to *inter alia*, Compel Production of Documents by Defendants. (R. Doc. 8685.)[1]

**INTRODUCTION**

The PSC seeks to expand the scope of discovery far beyond what is reasonably necessary to develop the facts relevant to personal jurisdiction.  Under the governing law, which the Supreme Court recently clarified in *Nicastro*, the question of jurisdiction is determined based on whether a foreign defendant's conduct  directed towards the forum state amounted to purposeful availment of the benefits of doing business in that state.  Accordingly, the jurisdictional

---

[1] Other purportedly interested parties joined in the PSC's motion.  With the exception of Venture Supply Inc. ("Venture Supply"), none of the other parties has raised objections to Defendants' document production in the course of the meet-and-confer process.  Venture Supply submitted papers to the Court on August 19, 2011; their concerns are addressed, *infra*

discovery in this case should remain focused on TG and TTP's contacts and communications related to sales or attempted sales of drywall to companies in the U.S.

The record shows TG and TTP have provided more than adequate jurisdictional discovery.  Defendants have searched and searched again, and produced every document they could find that is a communication with anyone in the U.S. that relates to anyone in the U.S., or has anything at all to do with TG or TTP's sales of drywall to anyone in the U.S.  Further, TG and TTP have produced all of the transactional documents in their possession, i.e., contracts, invoices, shipping documents, etc., concerning their sales of drywall in dimensions commonly used in the U.S.   Other than a request for certain irrelevant VAT documents and an unsubstantiated concern about whether HL conducted a proper search of the Defendants' ESI, the PSC no longer objects to the Defendants' production of these documents.

The PSC also sought discovery concerning TG's relationship with BNBM, a shareholder of TG, and TG's relationship with its subsidiary TTP.  In response, Defendants have produced the complete corporate files of TG and TTP, and all the documents in TG's possession regarding BNBM's acquisition of shares in TG.  Since BNBM did not participate in the management of TG, Defendants do not have any further documents related to BNBM to produce.  These documents, as well as the Rule 30(b)(6) testimony Defendants have already provided, demonstrate that BNBM's relationship with TG was that of a shareholder, and nothing more.  Consequently, for purposes of assessing TG's and TTP's jurisdictional contacts, there is no need to undertake further discovery concerning their relationship with BNBM or any "upstream" entities.

Although in briefs and at Court conferences the PSC has repeatedly made unsubstantiated allegations concerning a so-called "spiderweb" of companies related to TG, has made false statements regarding Defendants status as state-owned entities, and has made other scandalous

allegations, after eight months of discovery there is not a shred of evidence to support the PSC's baseless claims. As discussed below, the Court should not permit the PSC to pursue further wasteful and burdensome discovery in the vain hope they will find something to justify their far-fetched alter-ego and agency theories of jurisdiction.

Defendants recognize that the Court must have a full record of the relevant facts to decide the question of jurisdiction and have therefore participated in discovery in good faith and at great expense. For the reasons explained below, however, Defendants respectfully request that the Court protect them from the unnecessary burden, disruption and expense of the PSC's never ending requests for documents that are nothing but fishing expeditions highly unlikely to yield any additional relevant documents.

## SUMMARY OF THE DISPUTE

In brief, the PSC originally requested in a letter dated June 24, 2011, that Defendants produce fifteen categories of documents. As a result of the meet-and-confer process which occurred subsequent to the PSC's motion, the PSC has agreed that the defendants have produced all documents required by eight of their fifteen requests; the PSC still seeks production with regard to seven of its requests.

Defendants' position is that the five requests which seek information for the purpose of imputing to TG the activities of its major shareholder, BNBM, and entities affiliated with BNBM, are improper because the PSC has not presented any evidence that suggests with reasonable particularity that the requirements for imputation for jurisdictional purposes, via veil piercing, agency, or any other theory, can be met. There is no evidence to support the PSC's conclusions that TG's and BNBM's relationship was anything other than the standard relationship between a major shareholder and the company whose shares are held.

3

With respect to the PSC's request for documents concerning whether TG and TTP were required to charge value added tax ("VAT"), Defendants' position is that the information sought is completely irrelevant to the issue at hand, *i.e.*, whether by their external acts Defendants' purposely availed themselves of the benefits of the forum state.  Lastly, the PSC's final request relates to its concern of whether HL conducted a proper search for Defendants' electronically stored information ("ESI").  Defendants' position is that this "concern" is specious, especially considering that neither the PSC nor any other party has sought discovery from Defendants with respect to their search for ESI.

As discussed below, Defendants have provided a complete production of documents in response to those of the PSC's document requests that are appropriate.

## HISTORY OF THE DISPUTE

The history of the PSC's motion is set forth in the Court's Minute Entry dated June 9, 2011 (R. Doc. 9524) and will be repeated only to the extent necessary to put this submission in context.

The origin of this dispute lies in the PSC's admission that it took the depositions of Defendants' three 30(b)(6) witnesses in April 2011 in Hong Kong without knowing or understanding the substance of the documents the Defendants had produced in advance of the depositions.  Upon their return from Hong Kong, the PSC filed the instant motion to compel requesting many of the same documents that had already been produced.  Thus, in ruling on the PSC's motion to compel the production of documents, the Court entered an order on May 26, 2011, that "direct[ed] the parties to organize their written discovery and **determine which documents have not yet been produced**.  Any disputes remaining after meeting-and-conferring should be brought before the Court for a decision."  (R. Doc. 9107) (emphasis supplied).

As is set forth below, after three months of meet-and-confer sessions, emails, and letter

4

writing, the PSC finally has accepted that Defendants have produced all the documents the PSC requested in advance of the depositions.  In order to get to that point, however, Defendants and their counsel have had to do a lot of the PSC's work for them: among other things, Defendants identified for the PSC all the documents they had produced which were responsive to the PSC's requests; Defendants described the procedures that were used to locate and gather documents responsive to the PSC's requests; and Defendants described their systems relating to ESI and emails, although the PSC did not broach this topic with any of the deponents.

Thus, on June 6, 2011, Defendants sent the PSC a letter, a copy of which is attached hereto as Exhibit A, identifying by Bates Number the documents Defendants had produced in response to the PSC's demands but which the PSC nevertheless had moved to compel. [2]

On June 9, 2011, Defendants and the PSC participated in a telephone status conference before the Court.  (R. Doc. 9524.)  At that conference, the PSC expressed the following nebulous concern:

> What we have been told is that we have what was here as of the time Hogan Lovells went and had an opportunity to get the documents.  We are very concerned as to the production that we got and what may or may not exist, and I will leave it at that.

(R. Doc. 9524 at 17).  In response, Defendants reiterated that they had produced all documents relating to Defendants' sales of drywall in dimensions commonly used in the United States and to their contacts with the United States.  In addition, HL described in detail the process by which it had searched for responsive documents.  As HL stated, a team consisting of New York and Chinese attorneys made four trips to China, interviewed witnesses, and collected documents. Further,

---

[2] In addition, on June 22, 2011, Defendants provided the PSC and this Court with two charts summarizing TG's and TTP's deposition testimony according to the PSC's deposition topics.

> So when email files were searched, my colleagues—not the client, my colleagues—sat at the computers, downloaded the documents, ran the searches, and printed the emails. My colleagues and I went from room to room and file to file and collected the documents. So, I have a lot of confidence in the completeness of the document collection. I have a real concern about vague allegations without any substance that the document producing [sic] was not complete.

(*Id.* at 25.)

Thereafter, the Court wrote in a Minute Entry:

> With regard to written discovery document production, the Court directed TG and TTP to formulate a list of documents requested which they have already produced, then the PSC is to determine which document requests are still outstanding and provide such to TG and TTP. Thereafter, if there are any disputes regarding production, the parties are to meet-and-confer to attempt to resolve such, but if they are unable to do so, they are to submit letters to the Court detailing their respective positions why or why not certain documents are discoverable.

(*Id.* at 6.)

The parties held a telephone status conference with the Court on June 23, 2011. In the Court's Minute Entry, the Court wrote that the "PSC indicated it was continuing to review the discovery in its possession" and that Defendants asserted "there is no more written discovery that needs to be produced other than certain documents it plans to produce shortly." (R. Doc. At 9639).

On June 24, 2011, the PSC requested by letter, a copy of which is attached as Exhibit B, that Defendants produce fifteen enumerated categories of documents. The PSC explained that it required the documents because it still did not know what Defendants had produced: "We have, thus far, been unable to determine if the [requested] documents have been produced . . . If any of the documents to be produced are responsive to our requested documents, please identify the particular document . . ." (Ltr. at 2.) Among the documents requested were documents related to

the business affairs of BNBM, and other entities "upstream" of BNBM (referred to within as "Requests for Upstream Discovery"), which the  PSC alleged were "missing" despite the fact that the PSC had twice moved to compel the production of these documents, and Court had twice denied the PSC's motions in this respect, and despite the fact that the June 6 chart clearly showed that documents related to the business affairs of BNBM and other "upstream entities" had not been produced.

In the June 24 letter, the PSC again questioned whether Defendants' production of documents was complete:

> We also recognize that some of the documents in the categories may have been produced (*i.e.*, value added tax documents, as just one example) but we believe the production is incomplete based upon comments made by you or deposition testimony and therefore additional documents are requested.

(Ltr. at 2.) Defendants responded to the PSC's demands by a letter date July 1, 2011, a copy of which is attached as Exhibit C and is incorporated herein by reference.  The letter provided (1) full explanations of Defendants' objections to certain of the PSC's document requests, including those relating to BNBM and the "upstream entities"; and (2) statements that complete production of documents had been made with respect to the other categories.  Defendants further reminded the PSC of the Court's directive requiring that Plaintiffs explain *why* they needed the documents and information requested.  The PSC, up until this point, had not provided any explanation as to how the additional documents they sought were relevant to whether this Court had personal jurisdiction over Defendants.

On July 12, 2011, the PSC responded by letter, a copy of which is attached as Exhibit D, and again contended, without basis, that the document production had been incomplete.  The PSC argued, yet again, that Defendants had improperly limited the production based on

Defendants' position that "Taishan and its affiliates did not market their product in the United States and did not target any particular state." The PSC further claimed that in its view the deposition testimony indicated that more documents should have been produced. The PSC repeated their request for Upstream Discovery (Requests 1, 2, 3, 5, and 10), the personnel files of Defendants' employees who had been involved in the sale of drywall to "the United States including territories Guam, US Virgin Islands, Puerto Rico" (Request 8) and "Value Added Tax related documents and communications involving the export of product including representations made to the government of China and others regarding export of products" (Request 13). With respect to the remaining requests, the PSC only sought confirmation that all responsive documents had been provided, as Defendants had represented in their July 1 letter.

Defendants responded by letter dated July 27, 2011, a copy of which is attached as Exhibit E, and which is incorporated herein by reference. In that letter, Defendants once more explained that they had not limited their responses in the way the PSC suggested and that Defendants had produced all documents and communications, within their custody and control, that could be reasonably located, concerning the sale of drywall manufactured to dimensions commonly used in the U.S. and/or concerning contacts by Defendants with entities located in the U.S. Additionally, Defendants represented that they had produced all documents responsive to Requests 4, 6-9 and 11-15, and made clear that they disagreed about the propriety of the Requests for Upstream Discovery (1-3, 5 and 10) and Requests 8 and 9.

The parties held a meet-and-confer on July 29, 2011 at which they appeared to have found some common ground. The parties agreed to disagree about whether the Requests for Upstream Discovery were relevant to the jurisdictional questions before the Court and whether Defendants should be obliged to produce additional documents relating to the taxation of TG and

TTP under Chinese law.  The PSC agreed, however, to accept Defendants' representation that all responsive documents had been produced with respect to the other requests, but asked HL to provide a list of the persons affiliated with Defendants whose computers HL had searched for responsive documents.

On August 3, 2011, Defendants sent the PSC an email, a copy of which is attached as Exhibit F, which listed the seven employees whose electronic files had been searched for responsive documents.  The PSC and Venture Supply each responded with emails dated August 3, 2011, copies of which are attached as Exhibit G, in which they questioned whether it was appropriate to search for ESI only in the seven employees' emails.   In response, Defendants sent an email dated August 5, a copy of which is attached as Exhibit H, that detailed the rationale behind this search for responsive documents.  Defendants explained that they do not maintain corporate records in ESI, and that they do not have company computer servers.  To the extent any business was conducted by email, Defendants did not have corporate email accounts, but a limited number of their employees conducted business via personal accounts on MSN Messenger and similar services. (*See* Exhibit E.) Additionally, the computers that were in use during the relevant time frame Defendants sold drywall to the dimensions commonly used in the United States, 2005-2008, are no longer available as the relevant employees and directors were issued new computers when TG moved to new headquarters in February and March 2009.[3]  As a result, the available local computers did not even contain email files of any sort.  Instead, emails had to be searched for through the email provider's servers.

Further, Defendants informed the PSC and Venture Supply that HL searched the available emails of everyone at TG or TTP likely to have been involved in the business of selling

---

[3] The move occurred before TG was served in any of these actions.

or manufacturing drywall made to US specifications.  That certain names did not appear in the list of persons whose emails were searched did not mean that a search was not made to determine if they had emails.  Numerous employees of TG and TTP, which are manufacturers located in provincial China, did not have email accounts or conduct business through emails.

Venture Supply responded by letter on August 8, and the PSC responded by email on August 9, copies of which are attached as Exhibit I.  Venture Supply hypothesized that the Defendants might have backed up electronic information that could be searched, and suggested that the Defendants' should search the personal e-mail accounts of other unspecified employees. Venture Supply also suggested that Defendants should search the e-mail accounts of specific Taishan employees, as Jia Tongchun[4] had testified used that these employees used Jia's e-mail account to conduct his business.

In its August 9 email, the PSC stated that it reserved its right to dispute whether all documents responsive to Requests 4, 6-9, and 11-15 had been produced, although if they had all been produced the PSC would not raise any issues with respect to those Requests to the Court. On August 12, 2011, the PSC sent another email, a copy of which is attached as Exhibit J, in which it clarified its "reservations."  The PSC stated that it agreed not to pursue Requests 4, 6, 7, 8, 9, 11, 14 and 15, subject to its complaint that Defendants may have failed to properly search and produce electronically stored information.  The PSC stated that it would seek production of the following documents, now denominated as Requests 1-7.  Requests 1-5 seek production of documents relating to the business affairs of BNBM, and Defendant's relationship with BNBM and BNBM's shareholders, Request 6 seeks production of communications regarding the sale or shipment or possible sale or shipment of any product to United States including its territories.

---

[4] Jia Tongchun ("Jia") is the General Manager of TG, and testified as a 30(b)(6) witness on behalf of TG at the depositions that took place on April 4 and 5.  Relevant excerpts of the transcript of his deposition are attached hereto as Exhibit K.

Request 7 seeks production of Value Added Tax related documents and communications involving the export of product, including representations made to the government of China and others regarding export of products.

Defendants' responses to these document requests follow below.

## ARGUMENT

### A.   Discovery Should Be Limited To Information Potentially Relevant To Personal Jurisdiction and Must Be Proportionate and Necessary

Under the Federal Rules, discovery is only permissible where relevant to a claim or defense. Fed. R. Civ. P. 26(b)(1) (2010). The Rule further provides that "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." Thus, the threshold requirement for <u>any</u> discovery request under Rule 26 is that the request be relevant to a claim or defense. Consequently, since the Court has permitted *jurisdictional* discovery only, Plaintiffs' discovery requests must be relevant to the issue of personal jurisdiction. *See* Transcript of Oct. 14, 2010 Status Conf. at 24:4-24:5.

As the Fifth Circuit has held, in order to obtain jurisdictional discovery, a plaintiff needs to present "factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts." *Fielding v. Herbert Burda Media, Inc.,* 415 F.3d 419, 429 (5th Cir. 2005) (quoting *Toys 'R Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 456 (3d Cir.2003)); *accord* 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1067.6 (3d ed.2004) (noting that jurisdictional discovery can be obtained "when there is some basis for believing that [it] would be fruitful"); s*ee also Cent. States, Se & Sw. Areas Pension Fund v. Reimer Express World Cup*, 230 F.3d 934, 946-47 (7th Cir. 2000) (affirming denial of jurisdictional discovery from foreign defendant because plaintiffs alleged only that the entities were affiliates, not that the parents exercised an "unusually high degree of control over the subsidiary"); *Quantum*

*Loyalty Sys., Inc. v. TPG Rewards, Inc,* , No. 09-22-SLR/MPT, 2009 WL 5184350 (D. Del. Dec. 23, 2009), modified in part 2010 WL 1337621 (D. Del. March 31, 2010) (Although the Third Circuit allows jurisdictional discovery unless claims are "clearly frivolous," complaint alleging jurisdiction by reason of agency and alter ego dismissed without discovery when pleadings failed to allege specific facts to support the claims).  As is set forth below, in the Fifth Circuit the relevant facts would be those showing that the entities were not in reality separate and distinct. *Hargrave v. Fibreboard Corp.*, 710 F.2d. 1154 (5th Cir. 1983).

In addition, <u>all</u> discovery requests are subject to the proportionality, burden and cost limitations set forth in Rule 26(b)(2)(C). In keeping with the requirement of proportionality, courts are authorized to make any order which justice requires to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c) (2010).  In that regard, the Supreme Court has instructed district courts to exercise this discretion to limit discovery against foreign corporations in particular. *See Societe Nationale Industrielle Aerospatiale v. U.S. Dist. C. for S. Dist. of Iowa*, 482 U.S. 522, 546 (1987) ("American courts, in supervising pretrial proceedings involving foreign nationals, should exercise special vigilance to protect foreign litigants from the danger that unnecessary or unduly burdensome discovery . . . . Judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests."); *Cent. States*, 230 F.3d at 946 ("Foreign nationals usually should not be subjected to extensive discovery in order to determine whether personal jurisdiction over them exists.").

Finally, the party seeking discovery bears the burden of showing its necessity.  *Freeman v. United States*, 556 F.3d 326, 341 (5th Cir. 2009).  The burden can only be met by alleging *specific facts* that demonstrate a need for discovery, and cannot be satisfied by "vague assertions

that additional discovery will produce needed, but unspecified facts."[5]  *Id.* at 341-42 (citation omitted).  The burden is high where a party claims that otherwise distinct corporations are abusing the corporate form.  *See generally Adm'rs. of Tulane Educ. Fund v. Biomeasure, Inc.*, 687 F. Supp. 2d 620, 624 (E.D. La. 2009) (discussing presumption that even related corporations are institutionally independent in determining whether jurisdictional contacts can be attributed from one to another) (citing *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999)).

### B.     Requests for Upstream Discovery Seeking Documents Concerning BNBM and Other Upstream Entities Are Improper

In Requests 1-5, the PSC seeks production of documents relating to BNBM and entities purportedly affiliated with BNBM, both "upstream" and as affiliates, including:  (1) CNBM, a major shareholder of BNBM; (2) the Chinese government, which has a relationship with CNBM's corporate parent through an entity known as SASAC; and (3) affiliates of BNBM and CNBM, including BNBM USA, BNBM America, and an entity known as United Suntech Craft, Inc.[6]  The PSC's Requests are based on the belief that it is entitled to a fishing expedition so that they can attempt to impute the upstream entities' contacts with the United States to Defendants through one or more theories, including "alter ego," "agency," or "undertaker" liability.  The PSC is wrong.

As is set forth below, there is no evidence that BNBM and TG were anything other than

---

[5] Before the depositions, the PSC twice moved to compel the production of additional documents concerning BNBM and upstream entities, and twice the Court denied the PSC's motions because it made only unsupported conclusory allegations regarding the relationship between the entities.  (Rec. Doc. Nos. 7136 and 7511.)  Nothing has changed.

[6] Several witnesses testified that TG had no connection – and had not even heard of – BNBM USA or BNBM America. (Jia Tr. 397:1-398:7). See also, transcript of deposition of Peng Wenlong on April 7 and 8, 2011 ("Peng") 180:19-181:8, relevant excerpts of which are attached hereto as Exhibit M.)  Further, our research, based on material available through the internet, reveals that United Suntech is a subsidiary of an entity known as CNBMI, and is in the garden tool supply business.

separate companies, and that BNBM's relationship to TG was merely that of a large shareholder. Thus, the request can be cut off at its roots, and there is no need to engage in a micro-economic debate about corporate structure in China and the role of the Chinese government in managing corporate affairs.

<ol>
<li>The PSC Has Not Provided Any Basis to Overcome<br>the Presumption of Corporate Separateness</li>
</ol>

There is a presumption in the law that separate corporations are judicially independent. *Kelly v. Syria Shell Petrol. Dev. B.V.,* 213 F.3d 841, 856-57 ("typically, the corporate independence of companies defeats the assertion of jurisdiction over one by using contacts with the other.") (original citation omitted).  The Fifth Circuit has held that the activities of separate corporate entities can be imputed to one another only when "they do not in reality constitute separate and distinct corporate entities." *Hargrave*, 710 F.2d. at 1159. Citing *Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333 (1925), the *Hargrave* court wrote:

> *Cannon*, then, stands for the proposition that so long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other…. We have noted often that 100% stock ownership and commonality of officers and directors are not alone sufficient to establish an alter ego relationship between two corporations. Generally, our cases demand proof of control by the parent over the internal business operations and affairs of the subsidiary in order to fuse the two for jurisdictional purposes.  The degree of control exercised by the parent must be greater than that normally associated with common ownership and directorship.

*Id.* (internal citations omitted).

Subsequent to *Hargrave*, the Fifth Circuit has developed a list of factors that are relevant when considering whether the activities of the entities are fused and the corporate veil can be pierced for the purpose of personal jurisdiction: (1) amount of stock owned by the parent of the subsidiary; (2) did the two corporations have separate headquarters; (3) did they have common

14

officers and directors; (4) did they observe corporate formalities; (5) did they maintain separate accounting systems; (6) did the parent exercise complete authority over general policy; (7) did the subsidiary exercise complete authority over daily operations. *Dickson Marine,* 179 F.3d at 339 (citation omitted).[7]

The PSC's position, unburdened by any factual evidence, is that the documents and testimony provided at Defendants' Rule 30(b)(6) depositions provide evidence of "close ties between BNBM and TG;" as the PSC rather more colorfully put it at the June 9th hearing, there is a "spiderweb" of relations between TG and various upstream entities. The only evidence the PSC has offered of these "close ties" or "spiderweb" is that BNBM is TG's parent[8] that Jia testified that BNBM and TG operate as a "joint venture,"[9] that Jia has sat on the board of BNBM since 2008, and that employees of BNBM do sit and have sat on the board of TG.[10]

The evidence the PSC cites does not show anything more than a typical relationship between a large shareholder and the company it has invested in. This is consistent with the

---

[7] Although the issue is not settled in the Fifth Circuit, it is Defendants' position that the Court should likely look at the law of the state of incorporation (in this case, China) to determine whether it is appropriate to pierce the veil of corporations for purposes of imputing jurisdictional contacts. *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 647 (5th Cir. 2002). The PSC has never argued that veil piercing could be justified under that law, as under Company Law of the People's Republic of China, Art. 20 a showing of a clear abuse of the corporate form is generally required for party to pierce corporate veil.

Even under some arguably more lenient standard, however, the PSC cannot make the required showing.

[8] The facts show that BNBM is a shareholder of TG. BNBM acquired 42% of the shares of TG in 2005; that same year BNBM also acquired 100% of the shares of Tai'an Donglian Investment Trading Co. Ltd., which itself owns 23% of the shares of TG. *See* http://www.cnbmltd.com/news_report/en/361.pdf and http://notice.singtao.com/ADMA/03323/epdf/WSPR_160407_CNBM_E.pdf (last visited August 19, 2011).

[9] The PSC has mischaracterized Jia's testimony. "Joint venture" is a legal term. Jia, a layperson, testified that, to him, once BNBM became a shareholder of TG, the two companies formed a "cooperation," a term he used interchangeably with "joint venture." (Jia Tr. at 203:2-204:19.)

[10] The PSC also has argued that the following show the "close ties between BNBM and TG": (1) the name "Taihe Group" was used for a group of companies located in Taian; and (2) BNBM's website states that "CNBM has BNBM and CBMIE as the core unites [sic], and BNBM PLC is the integrated company of . . . CNBM . . . ." As we pointed out to the PSC, these arguments are non-sequiturs. The name Taihe Group does not refer to BNBM or any upstream entities. BNBM's website does not refer to TG.

testimony of Jia, which established nothing more than that BNBM owned shares in TG.[11]  He testified that BNBM had no role in TG's manufacturing or sale of drywall to U.S. dimensions, does not share facilities or production lines with TG, does not share employees with TG, did not provide any loans to TG, and does not get its gypsum at the same mines as TG.  (Jia Tr. at 190:9-191:22; 196:10-197:4.)  While Jia sits on the Board of BNBM and in that capacity attends its annual meetings, he otherwise has no regular contact with BNBM, and he testified that he did not receive or maintain annual reports from BNBM because "these documents don't have too much relevance to [TG]." (Jia Tr. at 34:9-35:24.)   The evidence further shows that these two companies religiously maintained corporate formalities and exerted minimal influence over each other's policies and daily operation. (*See e.g.* Jia Tr. 163:10-15; 199:15- 201:5.)

The PSC's bare allegations of "BNBM's control" and "the entities' close ties" are simply not sufficient to warrant more burdensome discovery into BNBM's corporate structure. Its assertions ostensibly relevant to veil piercing are mere conclusory allegations of ownership or control by upstream affiliates and should be disregarded as such.  Even if taken at face value, they are insufficient as they fall short of alleging — even in conclusory fashion — the abuse of corporate form or the level of day-to-day control necessary to pierce a corporate veil and impute the alleged jurisdictional contacts of one company to another.  *See Kelly*, 213 F.3d at 857; *Cent. States,* 230 F.3d at 945 (evidence of corporate affiliation insufficient to establish requisite control for purposes of finding alter ego).  In *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 587 (5th Cir. 2010), the Court held that the two entities were not a "single business enterprise"

---

[11] The PSC had ample opportunity to question Jia on this subject, as TG has already produced voluminous responsive documents from its files, including documents related to the guarantee provided by BNBM on behalf of TG (Rec Doc. No. 8685-1, at 5, request 1)) (*see, e.g.*, Exhibit N, TG 0020677-681); documents related to BNBM's acquisition of shares in TG including shareholder resolutions, audit reports, corporate filings reflecting the acquisition, minutes and other reports provided to BNBM in its capacity as a shareholder (requests 2 and 5); and TG's government filings (request 7).  (*See, e.g.*, Ex. N, TG 0020644-5, TG 0020666.)

despite far more evidence than is present here: (1) both entities' brands and products were identical; (2) both entities shared office space and phone numbers; (3) they shared the exact same officers and directors; (4) employees testified they could not distinguish between the companies; and (5) intercompany debt where companies maintained corporate formalities and maintained separate funds and accounts. The Fifth Circuit found, however, that the entities did not abuse the corporate form, and they observed corporate formalities at all times. They maintained separate books, had separate tax identification numbers, held separate shareholder meetings, and observed statutory formalities in both their formation and the liquidation of one of the entities. As the Court wrote:

> Even where some factors suggest that one entity is the alter ego of another, the maintenance of corporate formalities tips in favor of finding that the entities are not alter egos. *Id* at 588 (citation omitted).

*Accord, Biomeasure,* 687 F. Supp. 2d at 627 (refusing to impute contacts of subsidiary to parent where (1) parent owned 100% of subsidiary; (2) companies shared some officers and directors; and (3) parent exercised supervision over subsidiary's general policy decisions, but parent did not control daily operations of subsidiary and the companies observed corporate formalities).

At bottom, Plaintiffs have not pointed to any evidence that could overcome the presumption of corporate separateness between TG and its upstream affiliates, and allow those other entities jurisdictional contacts, if any, to be imputed to TG or TTP. Thus, Upstream Discovery should be denied. *See Kelly*, 213 F.3d at 855 (denying jurisdictional discovery because no amount of fact-finding would create basis for jurisdiction pursuant to plaintiff's claims).

17

2.      Defendants Do Not Have Possession, Custody
        or Control over the Upstream Documents

Even if the Court were to find that these documents were relevant and discoverable, the

documents the PSC requests are not in the possession, custody or control of Defendants.  Under

the Federal Rules, an entity can only produce documents over which it possesses or over which it

has custody or control.  Research has not located a single case holding or suggesting that where,

as here, the foreign non-party shareholder and a corporate defendant subsidiary function

independently, the defendant has possession, custody, or control of the parents' documents

simply because one of the defendant's employees sits on the board of the non-party shareholder.

The Third Circuit, which is the only circuit court to have addressed the issue, held that a

corporate defendant did not have possession, custody or control over a non-defendant affiliate

corporation's documents even though the defendant's president (who was also a director and

stockholder) was the Chairman of the Board of Directors of the non-defendant affiliate.  *Gerling

Int'l Ins. Co. v. Comm'r of IRS*, 839 F.2d 131 (3d Cir. 1988); *accord Novartis Pharms. Corp. v.

Eon Labs Mfg., Inc., 206* F.R.D. 392, 395 (D. Del. 2002) (mere fact that defendant had right to

access foreign company's documents under an agreement did not give defendant "control" over

documents for discovery purposes); *PCI Parfums et Cosmetiques Int'l v. Perfumania, Inc.*, No.

93-Civ-9009, 1998 WL 646645, at * 2 (S.D.N.Y. Sept. 21, 1998) (defendant did not have control

over documents of related foreign entity based on, *inter alia,* ownership by defendant's director

75% interest in foreign entity).

C.      **The PSC's Agency and Undertaker Theories Do Not
        Entitle It to Upstream Discovery**

The PSC claims that upstream discovery is mandated under either an agency theory of

liability or pursuant to the "undertaker" theory of liability.  Both these theories of liability

depend on proof of the same sort of "control" which is necessary to prove the alter-ego theory, and thus both theories founder because the PSC has provided no evidence that BNBM controlled TG in any way; the PSC has offered only baseless suppositions.

Because there is no evidence of an express agency agreement between TG or TTP and any other entity,[12] the PSC bases its allegation of "agency" on the purported "control" BNBM had over TG.  Fifth Circuit courts recognize that the analysis of the "control" element for agency is similar to alter ego analysis and requires something more than a beneficial relationship or overlap in corporate structure.  *See Biomeasure*, 687 F. Supp.2d at 629 (to succeed on agency theory of personal jurisdiction, plaintiff must prevail under factors set forth in *Dickson Marine*,); *see also Dickson Marine*, 179 F.3d at 338 (subsidiary acting as "middleman" for parent's benefit "not enough" to establish prima facie case of control); *Nolan v. Boeing Co.,* 736 F. Supp. 120 (E.D. La. 1990) (organizational structure alone, including shared employees and shared offices not enough to impute jurisdiction based on agency theory).  Thus, the mere existence of a parent-subsidiary relationship does not demonstrate the type of "control" required to form an agency relationship for the purposes of imputing jurisdictional contacts between a foreign parent and its subsidiary.  *See,   Reynolds Am., Inc. v. Gero*, 56 So.3d 117, 119-20 (Fla. 3d DCA 2011) (cited by the PSC in its July 12, 2011 letter) (applying Florida law, Plaintiff's sole allegation of the parent/subsidiary relationship "is wholly inadequate to support the existence of an agency relationship . . . to establish an agency relationship between a parent and its subsidiary, . . . a 'high and very significant' level of control exerted by the parent over the subsidiary's actions must be demonstrated.").

---

[12] An agency relationship may be express or de facto.  *Stripling v. Jordan Prod.  Co. LLC*, 234 F.3d 863, 870 (5th Cir. 2000).  As the Fifth Circuit has recognized, "de facto agency' may be proven by the presence of three elements at time of contracting: (1) '[m]anifestation by alleged principal, either by words or conduct, that alleged agent is employed as such by principal'; (2) '[t]he agent's acceptance of the arrangement'; and (3) '[t]he parties understood that principal will *control* the undertaking.'"  *Id.* (alterations in original) (emphasis added).

The PSC's theory that the "undertaker" doctrine entitles it to upstream discovery also is erroneous. Section 324A of the Restatement (Second) of Torts defines the doctrine as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> > (a) his failure to exercise reasonable care increases the risk of such harm, or
> >
> > (b) he has undertaken to perform a duty owed by the other to the third person, or
> >
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Nothing in the "undertaker" doctrine suggests that it can provide a basis for imputing the contacts of one entity to another for jurisdictional purposes, and, according to our research, no court has ever imputed contacts based on this doctrine.

### D.   The PSC's Requests for Documents Concerning Tax Documents Should Be Denied

In the following request, the PSC continues to seek additional documents relating to Defendants' tax status beyond what Defendants already produced.

> Value Added Tax related documents and communications involving the export of product including representations made to the government of China and others regarding export of products.

Defendants showed in their June 6 letter that they have provided the tax documents accompanying every sale of drywall made to dimensions commonly used in the United States. (*See, e.g.,* Ex. N, TG 0001632 – 01645, 0019858 – 19866, 0019947 – 19960.) In addition, to the extent any communications related to exports existed, they were produced.

The only possible relevance of the VAT information the PSC seeks -- information about Defendants' tax status under Chinese law -- is in relation to TG's purpose in forming TTP. The

20

witnesses testified that TTP was formed because TG could not issue VAT invoices to those customers who requested them.[13] (Transcript of deposition of Zhang Jianchun, April 5, 2011 ("Zhang"), 128:24-129:2, attached as Exhibit L; Jia Tr. 480:24-481:24.)  Documents related to VAT have nothing to do with the fundamental jurisdictional question at bar, however, whether Defendants sold and marketed their drywall to a particular U.S. state.  *See J. McIntyre Machinery, Ltd. v. Nicastro*, ___ U.S. ___, 131 S. Ct. 2780 (2011) (personal jurisdiction requires purposeful availment by defendant towards a particular state).  The documents the PSC has requested do not relate in any way to the issue of personal jurisdiction, as no amount of discovery on these subjects will advance any arguments related to Defendants' purposeful availment toward any particular state in the United States in the relevant period, and no further discovery on these topics will inform any bona fide theory of alter ego relevant to the outstanding motions to dismiss for lack of jurisdiction.  *See Alpine View Co. v. Atlas Copco Ab*, 205 F.3d 208, 221 (5th Cir. 2000) (discovery into jurisdictional contacts properly denied where it "could not have added any significant facts" to the analysis).  Consequently, further document production related to VAT should be denied.

### E.   Defendants Satisfied Their Discovery Obligations By Collecting All Electronic Communications Relating to the Sales of Drywall to U.S. Dimensions from All Defendants' Employees That Had Any Involvement in the Sales of Such Drywall

In Request 6, the PSC continues to request written or electronic communications of all sorts, regarding the sale or shipment or possible sale or shipment of any product to United States including its territories.  Additionally, the PSC has represented that it will not pursue eight Requests, previously denominated 4, 6, 7, 8, 9,11, 14 and 15, but it has purported to "reserve" an

---

[13] In the July 12, 2011, letter, The PSC itself cited an Article of Chinese law that directly supports this point: "if an enterprise sells VAT-free goods [as TG was doing], it is precluded from issuing a special VAT-invoice [which is why TG formed TTP as a separate company]."

objection that  Defendants may have failed to properly search and produce electronically stored information ("ESI").[14]  This accusation is extraordinary, as it is not based on any testimony from Defendants because no one asked Defendants' 30(b)(6) witnesses a single question about document preservation, retention, or the process employed to search for documents.  Instead, HL has in good faith exceeded its obligations under the Federal Rules by providing the PSC with the factual information that the PSC failed to seek from available fact witnesses, only to have the PSC question the good faith and competency of HL.  As the facts show, however, Defendants satisfied their obligations under Federal Rule of Civil Procedure 26(g) to collect and produce all electronically stored information.[15]

Defendants are drywall manufacturers in provincial China, and they have never had company computer servers or even company e-mails, but instead used personal internet email accounts, MSN Messenger and similar services.  Thus, arguably responsive emails may not have been retained in the regular course of business.

The Defendants also did not have company computer servers, and HL confirmed that such documents did not reside on hard drives.  Further, as mentioned above, the computers currently used by the relevant employees and directors of the Defendants are not the same as those that were used in 2005-2008, the relevant time frame. (Exhibit H.)

---

[14] Request 6 seems to be solely based on a claim of insufficient ESI production, as the PSC has withdrawn its requests for employee records relating to sales to the United States and territories, and its overlapping request for documents reflecting Defendants' relationship with exporters, agents, distributors, suppliers and/or brokers that shipped products to the United States and its territories.

[15] The PSC's unfounded accusation that discovery of ESI was not sufficient mirrors their previous complaints that the volume of documents produced could not represent all the responsive documents in Defendants' possession, custody and control.  While the PSC previously argued that Defendants must have limited their document production (1) based on Defendants' position "that Taishan and its affiliates did not market their product in the United States and did not target any particular state," and (2) the production of documents made so far may not have been thorough, Defendants disproved these allegations in their July 1 and 24 letters, and the PSC purported to accept Defendants' explanations.  On the chance that the PSC's "concern" about ESI is merely old wine in a new bottle, we refer the Court to the PSC's previous claims that the document production was inadequate, and our refutation of those arguments, contained in Exhibits B, C, D, and E.

As Defendants set forth in their August 3 email, HL searched all available emails of everyone under Defendants' control who HL was informed was likely to be involved in the business of selling or manufacturing drywall that was made to US specifications: Peng Wenlong, the Director of Foreign Sales for TTP; Che Gong and Yang Jiapo, Peng's associates involved in foreign sales; Zhang Jijun and Jia Kai, the Manager of and an employee in TG's Purchasing Department; Zhang Jianchun, the Secretary to the Board of Directors of TG and, later, of TTP; and, Jia Tongchun, the General Manager of TG. The fact that other names do not appear on the list does not mean that no search was made to determine if others possessed responsive documents. As HL informed the PSC, most TG and TTP employees did not conduct their business by email. Thus, for example, Peng Shiliang and Song Qinghai, a director and a manager of TTP, respectively, did not have email accounts and did not conduct business through emails. HL searched the emails of those people involved in manufacturing and sales who had emails to search. Thus HL's search for responsive emails relating to manufacturing and sales was appropriate in all respects.

On August 8, 2011, Venture Supply requested that Defendants search the e-mails of Zhang Jianchun, Chen Xi [sic] Hua, and Zhao Xiu Yun because Jia had testified that these individuals occasionally reviewed or sent e-mails on his behalf. The PSC had previously made exactly this request; however, as Defendants informed the Court on May 26, 2011, Defendants have already searched and provided responsive e-mails from Zhang Jianchun, and searches of the accounts of Messrs. Chen and Zhao would be fruitless, as each used Jia's account when dealing with e-mails on Jia's behalf, making the search of Jia's account, which was done prior to the depositions in April, sufficient to have captured any relevant e-mails involving Zhao and Chen. (Transcript of May 26, 2011 Status Conf. at 76) No such further searches are necessary.

23

Venture Supply also suggested on August 8, 2011 that it "would not be troublesome" for Defendants to search the personal e-mail accounts of an unnamed and unspecified number of employees.  There is, however, no basis to believe that additional employees have any relevant information.  Furthermore, conducting searches of such databases – which have routinely involved a U.S.-qualified attorney reviewing e-mails in the presence of the account's custodian in China – would be extremely burdensome for Defendants, not to mention invasive for the employees.

At bottom, counsel has endeavored to locate all ESI and has no reason to believe additional such information exists.

In any event, one may question what the purpose of searching for ESI other than email would be.  As Defendants have stated, and as the PSC has accepted, Defendants have produced all transactional documents responsive to the PSC's requests: all invoices, VAT invoices, the guarantees given by BNBM to TG, TG and TTP corporate resolutions, marketing materials, etc.  The only other kind of documents that would augment the production of transactional documents are emails discussing them.  As we have explained, all such emails as could be located have been produced, and the PSC has accepted this representation.  Thus, there is in fact no controversy regarding ESI, notwithstanding the PSC's attempt to manufacture one, and the concern should be dismissed.

## CONCLUSION

For the foregoing reasons, additional discovery on these issues should be denied.

Respectfully submitted,

| | |
|---|---|
| Joe Cyr | /s/ Thomas P. Owen Jr. |
| Frank T. Spano | Richard C. Stanley (La. Bar No. 8487) |
| Eric Statman | Thomas P. Owen, Jr. (La. Bar No. 28181) |
| HOGAN LOVELLS US LLP | STANLEY, REUTER, ROSS, THORNTON & |
| 875 Third Avenue | ALFORD, LLC |
| New York, New York 10022 | 909 Poydras Street, Suite 2500 |
| E-mail: Joe.cyr@hoganlovells.com | New Orleans, Louisiana 70112 |
| Frank.spano@hoganlovells.com | Telephone: 504-523-1580 |
| Eric.statman@hoganlovells.com | Facsimile: 504-524-0069 |
| Telephone: 212-918-3000 | E-mail: rcs@stanleyreuter.com |
| Facsimile: 212-918-3100 | tpo@stanleyreuter.com |
| *Attorneys for Taishan Gypsum Co., Ltd. and* | *Attorneys for Taishan Gypsum Co., Ltd. and* |
| *Taian Taishan Plasterboard Co., Ltd.* | *Taian Taishan Plasterboard Co., Ltd.* |

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Supplemental Brief By Defendants Taishan Gypsum Co. Ltd. and Taian Taishan Plasterboard Co., Ltd. With Respect to Motions to Compel Further Jurisdictional Discovery has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail and upon all parties by electronically uploading the same to Lexis Nexis File & Serve in accordance with the Pretrial Order No. 6, and that the foregoing was also electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 22nd day of August, 2011.

/s/ Thomas P. Owen Jr.

25