**IMPORTANT**

*If you are in any doubt about this prospectus, you should obtain independent professional advice.*



# China National Building Material Company Limited*
# 中國建材股份有限公司

*(a joint stock limited company incorporated in the People's Republic of China with limited liability)*

## GLOBAL OFFERING

| | |
|---|---|
| Number of H Shares offered pursuant to the Global Offering | : 654,214,000 (subject to adjustment and the Over-allotment Option) |
| Number of Public Offer Shares | : 65,422,000 (subject to adjustment) |
| Number of International Placing Shares | : 588,792,000 (including 59,474,000 Sale H Shares) (subject to adjustment and the Over-allotment Option) |
| Maximum offer price | : HK$2.75 per H Share payable in full on application in Hong Kong dollars, subject to refund, plus 1% brokerage, SFC transaction levy of 0.005% and Stock Exchange trading fee of 0.005% |
| Nominal value | : RMB 1.00 each |
| Stock code | : 3323 |

**Sole Global Coordinator, Bookrunner, Sponsor and Lead Manager**

**Morgan Stanley**

---

The Stock Exchange of Hong Kong Limited and Hong Kong Securities Clearing Company Limited take no responsibility for the contents of this prospectus, make no representation as to its accuracy or completeness and expressly disclaim any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this prospectus.

A copy of this prospectus, having attached thereto the documents specified in the paragraph entitled "Documents Delivered to the Registrar of Companies" in Appendix IX to this prospectus, has been registered by the Registrar of Companies in Hong Kong as required by Section 342C of the Companies Ordinance (Chapter 32 of the Laws of Hong Kong). The Securities and Futures Commission and the Registrar of Companies in Hong Kong take no responsibility for the contents of this prospectus or any other document referred to above.

The Offer Price is expected to be fixed by agreement between the Global Coordinator, on behalf of the Underwriters, the Selling Shareholders and the Company on the Price Determination Date. The Price Determination Date is expected to be on or around Thursday, March 16, 2006 and, in any event, not later than Tuesday, March 21, 2006. The Offer Price will be not more than HK$2.75 and is currently expected to be not less than HK$2.30 unless otherwise announced. Investors applying for Public Offer Shares must pay, on application, the maximum offer price of HK$2.75 for each H Share together with a brokerage of 1%, SFC transaction levy of 0.005% and Stock Exchange trading fee of 0.005%.

The Global Coordinator, on behalf of the Underwriters, may, with the consent of the Company (on behalf of itself and the Selling Shareholders), reduce the indicative Offer Price range (which is HK$2.30 to HK$2.75 per H Share) and/or the number of Offer Shares below that stated in this prospectus at any time on or prior to the morning of the last day for lodging applications under the Hong Kong Public Offering. In such a case, notices of the reduction in the indicative offer price range and/or the number of Offer Shares will be published in the South China Morning Post and the Hong Kong Economic Times not later than the morning of the day which is the last day for lodging applications under the Hong Kong Public Offering. If applications for Public Offer Shares have been submitted prior to the day which is the last day for lodging applications under the Hong Kong Public Offering, then even if the offer price range and/or the number of Offer Shares is so reduced such applications cannot be subsequently withdrawn. If, for any reason, the Offer Price is not agreed between the Company (on behalf of itself and the Selling Shareholders) and the Global Coordinator, on behalf of the Underwriters, the Global Offering (including the Hong Kong Public Offering) will not proceed.

The Company is incorporated, and its businesses are located, in the PRC. Potential investors should be aware of the differences in the legal, economic, and financial systems between the mainland of the PRC and Hong Kong and that there are different risk factors relating to making an investment in PRC-incorporated companies. Potential investors should also be aware that the regulatory framework in the PRC is different from the regulatory framework in Hong Kong and should take into consideration the different market nature of the Shares of the Company. Such differences and risk factors are set out in the sections entitled "Risk Factors" and "Appendix VI — Summary of Principal PRC Legal and Regulatory Provisions" and "Appendix VII — Summary of Articles of Association." Investors should also be aware that the companies and securities regulatory framework in the PRC to which the Group is subject has only recently been introduced.

The obligations of the Hong Kong Underwriters under the Hong Kong Underwriting Agreement to subscribe for, and to procure applicants for the subscription for, the Public Offer Shares, are subject to termination by the Global Coordinator (on behalf of the Hong Kong Underwriters) if certain grounds arise at any time prior to 8:00 a.m. on the day that trading in the Offer Shares commences on the Stock Exchange. Such grounds are set out in the section entitled "Underwriting — Underwriting Arrangements and Expenses — Hong Kong Public Offering — Hong Kong Underwriting Agreement — Grounds for termination" in this prospectus. It is important that you refer to that section for further details.

The Offer Shares have not been and will not be registered under the U.S. Securities Act or any state securities laws of the United States. The Offer Shares are being offered only (1) to qualified institutional buyers in the United States in reliance on Rule 144A under the U.S. Securities Act or (2) outside the United States in reliance on Regulation S under the U.S. Securities Act.

\* For identification only

March 13, 2006

# HISTORY, REORGANIZATION AND GROUP STRUCTURE

The following chart sets out the simplified corporate structure of the Group immediately after the Global Offering, assuming the Over-allotment Option is not exercised:

```
                                    Parent
                    ┌─────────────────┼─────────────────┐
                 100%│              100%│             100%│
                  BNBMG          CNBM Trading    Building Material Academy    Cinda    Public Investors
                 39.60%*            6.07%*            17.78%*              3.51%*        33.00%*
                    └─────────────────┼─────────────────┘           0.03%*
                                   Company
        ┌──────────┬────────────┬────────┴────────┬────────────┬──────────┐
      9.90%      60.33%       40.17%           23.00%        77.00%     91.00%
    China United   BNBM      China Fiberglass   China Composites    China Triumph
     (Cement)  (Lightweight   (Glass Fiber)      (Composites)      (Engineering)
               Building
               Materials)
      90.10%
```

China United (Cement) subsidiaries: Luhong 80.34%, Huaihai 68.79%, Nanyang 100%, Qingzhou 80%, Zoucheng Luhong 58%, Ziyan 67.71%, (42%, 20%)

BNBM subsidiaries: BNBM Huaxu 64%, BND 80%, Taishan 75%, Taihe 42%; Shenzhen B&Q 35%

China Fiberglass: Jushi Group 59.9%

China Composites: Zhongfu Lianzhong 94.5%, Zhonglu Tianma 40.0%, Zhonglu Liberty 89%, Yaohua 16.26%; Liberty TOLI 60%

China Triumph: Nanjing Triumph 51.15%, Shenzhen Triumph 55% (15%, 15%), Hengbo Triumph 70% (30%)

* Sum of these shareholding percentages may differ from total due to rounding.

**11**

Confidential - Subject to Further Confidentiality Review

```
1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
2

3                                    § MDL NO. 2047
     IN RE:                          §
4    CHINESE-                        § SECTION: L
     MANUFACTURED                    §
5    DRYWALL PRODUCTS                § JUDGE FALLON
     LIABILITY                       §
6    LITIGATION                      § MAGISTRATE
                                     § JUDGE WILKINSON
7
                     - - -
8
          CROSS NOTICED IN VARIOUS OTHER ACTIONS
9
10
                     - - -
11
                   April 6, 2011
12
                     - - -
13
         CONFIDENTIAL - SUBJECT TO FURTHER
14              CONFIDENTIALITY REVIEW
15                   - - -
16       Videotaped deposition of JIANCHUN
     ZHANG, held at 3 Pedder Street, Central,
17   Hong Kong, China, commencing at 9:12
     a.m., on the above date, before Linda L.
18   Golkow, Certified Court Reporter,
     Registered Diplomate Reporter, Certified
19   Realtime Reporter and Notary Public.
20
21                   - - -
22
              GOLKOW TECHNOLOGIES, INC.
23        ph 877.370.3377 | fax 917.591.5672
                  deps@golkow.com
24
```

Confidential - Subject to Further Confidentiality Review

Page 138

1 a long time ago.
2     Q.  Did TG have a quality
3 control department from 2006 to 2008?
4     A.  Yes.
5     Q.  Did the other Taishan
6 subsidiaries rely upon advice from the
7 quality control department from TG?
8         MR. STATMAN: I'm going to
9     object to this as being outside
10    the scope. If you can answer, go
11    ahead, based on your own personal
12    knowledge.
13        THE WITNESS: The
14    subsidiaries of TG, they have
15    their own independent QC
16    department.
17 BY MR. MONTOYA:
18    Q.  But do those people in those
19 subsidiaries, do they rely upon the
20 quality control department of TG?
21        MR. MONTOYA: I'm letting
22    counsel know that I'm asking this
23    question under topic 17.
24        MR. STATMAN: I understand

Page 139

1 what topic 17 says, and I believe
2 it's outside the scope, but he can
3 go ahead and answer.
4         THE WITNESS: They don't
5     rely, they are not to rely. They
6     have their own department. They
7     can handle it on their own.
8 BY MR. MONTOYA:
9     Q.  Where is your office
10 located, you, personally, your own?
11    A.  At TG.
12    Q.  At a particular plant or
13 factory?
14    A.  Inside an office building.
15    Q.  Where?
16    A.  In the city of Tai'an, the
17 province of Shandong, in China.
18    Q.  Are there any TTP employees
19 in your office?
20        MR. STATMAN: Objection to
21    form. It's vague and ambiguous.
22 BY MR. MONTOYA:
23    Q.  You can answer, sir.
24    A.  No.

Page 140

1     Q.  At any time were there any
2 employees of TTP that had offices at TG
3 in the building where your office is?
4     A.  No.
5     Q.  Why was TTP formed?
6     A.  For the purpose of issuing
7 the invoice for VAT.
8     Q.  Could TG do the same type of
9 invoicing for VAT?
10        MR. STATMAN: Objection,
11    time frame.
12 BY MR. MONTOYA:
13    Q.  From 2006 to 2008?
14    A.  Mr. Attorney, would you mind
15 to ask this question again completely.
16    Q.  Sure.
17        Let me first ask you what
18 you mean by TTP being set up for
19 invoicing VAT?
20    A.  According to the rules of
21 the requirement for the tax, TG needs to
22 set up an independent company.
23    Q.  To do what?
24    A.  What do you mean by "what"?

Page 141

1     Q.  To set up an independent
2 company to do what?
3     A.  To issue the invoice for
4 VAT.
5     Q.  Was that a business
6 advantage for TG?
7         MR. STATMAN: Objection to
8     form, vague and ambiguous.
9 BY MR. MONTOYA:
10    Q.  You can answer.
11    A.  It is a question related to
12 the finance, so, it is very troublesome
13 to make it clear.
14    Q.  Do your best, please.
15    A.  Some of the customers, they
16 need us to issue the invoices for the VAT
17 purpose. But TG is an enterprise
18 exempted from the VAT tax. Let me take a
19 minute to think about it before I respond
20 to you.
21        Do you want me to continue
22 to respond here?
23    Q.  Please, please.
24    A.  The bureau, the tax bureau

Confidential - Subject to Further Confidentiality Review

Page 142

1  informed TG during the second half of the
2  year 2006, if TG wants to continue to
3  enjoy the exemption for VAT tax, they
4  cannot issue VAT invoices to these
5  customers that requested for the invoices
6  for VAT. But for some of the customers,
7  it is a must that they get the invoices
8  for VAT. In order to fulfill the
9  requirement of these customers that wants
10 to have the VAT invoices, TG must
11 independently establish a company totally
12 independent from TG to produce and to
13 sell the drywalls to the customers that
14 want to have the VAT type of invoices.
15 This company must be totally independent
16 from TG. The tax bureau must monitor
17 this company. It is for the purpose of
18 resolving the problem of issuing VAT
19 invoices. So, after discussion and
20 consultation with the tax bureau, under
21 their suggestion, TG established TTP.
22        When I'm saying this, I
23 don't know whether, Mr. Attorney, whether
24 you can understand me or not.

Page 143

1    Q.  I understand you completely
2  fine.
3        The customers that requested
4  VAT invoicing, were they outside -- were
5  any of them outside of China?
6        MR. STATMAN: Objection to
7  form.
8        THE WITNESS: It is a
9  financial knowledge. I cannot
10 give a professional explanation.
11 BY MR. MONTOYA:
12   Q.  It may be my question that's
13 confusing.
14       Were any of the customers
15 that requested VAT invoicing located
16 outside of China?
17       INTERPRETER 1: Counsel, a
18 lot of time for the questions to
19 be translated into the way the
20 Chinese says it, a lot of time I
21 need to interpret it upside down.
22 So, sometimes I need to finish
23 listening to the whole sentence
24 before I can flip over to

Page 144

1  translate.
2        MR. MONTOYA: Okay. If you
3  could translate the way you think
4  is best, I understand.
5        INTERPRETER 1: Thank you.
6        THE WITNESS: I don't know,
7  because the policy for taxation is
8  different for each country.
9  BY MR. MONTOYA:
10   Q.  Would I need to look at the
11 VAT invoices to see if those customers
12 were outside the United States?
13       INTERPRETER 1: Outside the
14 United States?
15       MR. MONTOYA: I'm sorry,
16 outside of China. Thank you.
17       MR. STATMAN: Can you reask
18 the question.
19 BY MR. MONTOYA:
20   Q.  Would the best way for me to
21 find out if the VAT invoicing was for
22 customers outside of China be to look at
23 the VAT invoices?
24       MR. STATMAN: Objection to

Page 145

1  form, but if you can answer, go
2  ahead.
3        THE WITNESS: I don't
4  understand. What do you mean?
5  BY MR. MONTOYA:
6    Q.  Where are the VAT invoices
7  that we've been discussing for TTP
8  located, the documents?
9        INTERPRETER 1: What?
10       MR. MONTOYA: The documents.
11       THE WITNESS: Who are you
12 referring to?
13 BY MR. MONTOYA:
14   Q.  TTP's VAT invoices.
15   A.  At the finance of TTP.
16   Q.  Are those documents still
17 available?
18   A.  Yes.
19   Q.  Do you know if they are in
20 paper or on a computer?
21   A.  Written.
22   Q.  Do you have a company e-mail
23 address for either TTP or TG?
24       INTERPRETER 1: Company

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3   _____
                                §  MDL NO. 2047
     IN RE:                     §
 4   CHINESE-                   §  SECTION: L
     MANUFACTURED               §
 5   DRYWALL PRODUCTS           §  JUDGE FALLON
     LIABILITY                  §
 6   LITIGATION                 §  MAGISTRATE
                                §  JUDGE WILKINSON
 7   _____

 8                     - - -
          CROSS NOTICED IN VARIOUS OTHER ACTIONS
 9
                       - - -
10
                    April 5, 2011
11
                       - - -
12
          CONFIDENTIAL - SUBJECT TO FURTHER
13              CONFIDENTIALITY REVIEW
14                     - - -
15        Videotaped deposition of TONGCHUN
     JIA, held at 3 Pedder Street, Central,
16   Hong Kong, China, commencing at 9:03
     a.m., on the above date, before Linda L.
17   Golkow, Certified Court Reporter,
     Registered Diplomate Reporter, Certified
18   Realtime Reporter and Notary Public.
19
                       - - -
20
21
22             GOLKOW TECHNOLOGIES, INC.
          ph 877.370.3377 | fax 917.591.5672
23                 deps@golkow.com
24
```

Page 479

1  That was the right time for it,
2  but not now. Let's go until 5:30.
3     Thank you.
4     MR. PANAYOTOPOULOS: I just
5  want to note for the record that
6  on behalf of my client, I have not
7  had an opportunity to ask any
8  questions, and we will attempt to
9  ask that this deposition gets
10  continued if it gets cut off by
11  counsel I guess at 5:30.
12     MS. EISELEN: Likewise for
13  Interior/Exterior.
14     MR. CYR: What is your
15  suggestion with respect to how
16  we're supposed to conduct these
17  depositions? I don't understand.
18  Do you just think we're just going
19  to go to midnight?
20     MR. PANAYOTOPOULOS: The
21  same way that every other
22  deposition gets conducted. If we
23  don't have an opportunity, we'll
24  need to come back at another time.

Page 480

1  If we can do it later today, I'm
2  willing to stay as late as we need
3  to.
4     MR. CYR: No. We're going
5  to wrap it up at 5:30. I'm sorry.
6  Go ahead, sir.
7     MR. BRENNER: I'll note the
8  same objection. I have maybe ten
9  minutes worth of questions.
10     MR. BLACK: I want to make
11  the objection for the State of
12  Louisiana. Same objection.
13     MR. PANAYOTOPOULOS:
14  Reservation of rights.
15     MS. EISELEN: Same.
16     MR. HARDT: Can I ask a
17  question?
18  BY MR. HARDT:
19     Q. Let me ask you this.
20  Was TTP formed as a
21  subsidiary of TG to sell drywall to US
22  importers?
23     A. No.
24     Q. Can you explain for me why

Page 481

1  after the formation of TTP in February of
2  2006 that only TTP made sales to US
3  importers and TG did not?
4     A. In the year 2006, the
5  department -- the tax department, they
6  inform us that we cannot issue invoice
7  for VAT. That's value-added tax. But
8  there were a lot of the customers of TG,
9  they were -- they are asking for the
10  issuing of invoice for VAT. So, under
11  the suggestions of the tax bureau,
12  therefore, all the customers, they wanted
13  to use VAT invoices. They would go to
14  TTP. We will use TTP to do the
15  production. That is for the convenience
16  of the management of that tax, because
17  most of the customers that sold for --
18  that buy the products to be sold to
19  somewhere outside of China for the
20  drywall, most of them, they require the
21  invoice of the VAT. Therefore, the
22  products produced by TTP, they would have
23  a lot of the products sold outside of
24  China. TG has very few of them.

Page 482

1     MR. HARDT: I wish I had
2  time to delve into that answer,
3  but I'm going to pass the witness.
4     MR. CYR: (Addressing Mr.
5  Chen.)
6     Mr. Jia has complained about
7  the time. Could you ask him if we
8  can go until 5:30.
9     Okay.
10     - - -
11     EXAMINATION
12     - - -
13  BY MR. BRENNER:
14     Q. Mr. Jia, I represent Tobin
15  Trading, Incorporated.
16     Did you ever meet with any
17  representative of Tobin Trading,
18  Incorporated?
19     A. I have never seen any.
20     Q. The product that TG sold to
21  Venture Supply, where was the factory
22  located that produced the product?
23     A. In the city called Tai'an in
24  the province of Shandong.

Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2

 3     _____   § MDL NO. 2047
       IN RE:                        §
 4     CHINESE-                      § SECTION: L
       MANUFACTURED                  §
 5     DRYWALL PRODUCTS              § JUDGE FALLON
       LIABILITY                     §
 6     LITIGATION                    § MAGISTRATE
                                     § JUDGE WILKINSON
 7     _____

 8         CROSS NOTICED IN VARIOUS OTHER ACTIONS
                          - - -
 9

10                     April 7, 2011
11                        - - -

12
                CONFIDENTIAL - SUBJECT TO FURTHER
13                   CONFIDENTIALITY REVIEW
14                        - - -
15          Videotaped deposition of WENLONG
       PENG, held at 3 Pedder Street, Central,
16     Hong Kong, China, commencing at 8:59
       a.m., on the above date, before Linda L.
17     Golkow, Certified Court Reporter,
       Registered Diplomate Reporter, Certified
18     Realtime Reporter and Notary Public.
19
20                        - - -
21
22              GOLKOW TECHNOLOGIES, INC.
          ph 877.370.3377 | fax 917.591.5672
23                 deps@golkow.com
24
```

Page 134

1  Q. What customers outside of
2  the United States asked for measurements
3  in feet as opposed to millimeters or
4  centimeters or meters?
5      A. Customers from Canada, from
6  Panama, from Africa, they will ask the
7  kind of measurement in feet or in inches.
8      Q. Mr. Peng, where in this
9  e-mail do you mention customers from
10 Canada, Panama or Africa?
11     A. In this e-mail?
12     Q. Uh-huh.
13     A. I did not say that -- I did
14 not say I mention this in this e-mail.
15 What I mean is that this kind of
16 measurement by the inch, by the feet, I
17 was responding to your earlier question.
18 You were asking about what other
19 countries would be using the measurement
20 of feet and inches. I answer you -- I
21 answer to your question to tell you the
22 answer. I did not say that it was in
23 this e-mail.
24     Q. Thank you.

Page 135

1      Mr. Peng, when was TTP
2  formed, what year and month, if you know?
3      A. **According to my**
4  **recollection, it was in the year 2006 in**
5  **the month of February.**
6      Q. So, Mr. Peng, from February
7  2006 to May of 2006, you formed all this
8  experience in exporting to the United
9  States that's referenced in your e-mail?
10 Is that what your recollection is?
11     A. I just mentioned earlier
12 that my level was very limited. And in
13 this e-mail where I was not very good to
14 express my meaning -- I mean in terms of
15 expressing what I want to say, it was not
16 accurate. It was not objective. It
17 requires me to give explanation of what I
18 want to express in this sentence of what
19 I said. Do you want me to give an
20 explanation?
21     Q. I would like to ask a
22 different question at this point, and
23 then if he wants to come back, he should
24 remind me, and I'm okay with that. But

Page 136

1  let me ask a different question.
2      Mr. Peng, this e-mail says
3  that you say we're "exporting...gypsum
4  board to the" U.S. with a "quantity of
5  600,000 sheets every month." My question
6  to you is, three months after TTP
7  started, it was already shipping 600,000
8  boards of gypsum a month to the USA; is
9  that correct?
10     A. That is not what I meant.
11     Q. But your e-mail says you're
12 shipping 600,000 boards a month in May of
13 2006. Was that also a false statement?
14         MR. SPANO: Objection to
15     form, mischaracterizes.
16         MR. SEEGER: I'm going to
17     strike that question.
18 BY MR. SEEGER:
19     Q. Your e-mail says you were
20 shipping 600,000 sheets of e-mail every
21 month. Was that true or false?
22         MR. SPANO: Objection to the
23     form, mischaracterizes the e-mail
24     again.

Page 137

1          THE WITNESS: What I mean in
2      this e-mail was our company has --
3      can produce this amount of drywall
4      with the thickness of 12.7 mm. If
5      you have such a requirement, we
6      can produce it.
7          MR. PANAYOTOPOULOS:
8      Objection, nonresponsive. I would
9      appreciate a yes or no, and then
10     he can explain, but we're not
11     getting any responsive answers
12     from this witness.
13 BY MR. SEEGER:
14     Q. Can the witness answer my
15 question yes or no?
16         MR. SEEGER: What did he say?
17         INTERPRETER 1: Both -- he
18     was saying no, no, but the first
19     "no" and the second "no" are using
20     different Chinese words.
21         MR. SEEGER: Did he mean
22     something different by those two
23     "nos"?
24 BY MR. SEEGER: