# EXHIBIT H

# Illustration of Shareholding and Controlling Relation between BNBM and Its Ultimate Controlling Shareholders



Taishan & BNBM
Structure/ Government Control 00113

EXHIBIT

H



State-owned Assets Supervision and Administration Commission of the State Council (SASAC), the People's Republic of China

**Main Functions and Responsibilities**

## Main Functions and Responsibilities of SASAC

1. Authorized by the State Council, in accordance with the Company Law of the People's Republic of China and other administrative regulations, the State-owned Assets Supervision and Administration Commission of the State Council (SASAC) performs investor's responsibilities, supervises and manages the state-owned assets of the enterprises under the supervision of the Central Government (excluding financial enterprises), and enhances the management of the state-owned assets.

2. SASAC shoulders the responsibility of supervising the preservation and increment of the value of the state-owned assets of the supervised enterprises; establishes and improves the index system of the preservation and increment of the value of the state-owned assets, and works out assessment criteria; supervises and administers the preservation and increment the value of the state-owned assets of the supervised enterprises through statistics and auditing; and is responsible for the management work of wages and remuneration of the supervised enterprises and formulates policies regulating the income distribution of the top executives of the supervised enterprises and organizes implementation of the policies.

3. SASAC guides and pushes forward the reform and restructuring of state-owned enterprises, advances the establishment of modern enterprise system in SOEs, improves corporate governance, and propels the strategic adjustment of the layout and structure of the state economy.

4. SASAC appoints and removes the top executives of the supervised enterprises, and evaluates their performances through legal procedures and either grants rewards or inflicts punishments based on their performances; establishes corporate executives selection system in accordance with the requirements of the socialist market economy system and modern enterprise system, and improves incentives and restraints system for corporate management.

5. In accordance with related regulations, SASAC dispatches supervisory panels to the supervised enterprises on behalf of the state council and takes charge of daily management of the supervisory panels.

6. SASAC is responsible for organizing the supervised enterprises to turn the state-owned capital gains over to the state, participates in formulating management system and method of the state-owned capital operational budget, and is responsible for working out the state-owned capital operational budget and final accout and their implementation in accordance with related regulations.

7. SASAC is responsible for urging the supervised enterprises to carry out the guiding principles, policies, related laws and regulations and standards for safety production and inspects the results in accordance with the responsibilities as investor.

8. SASAC is responsible for the fundamental management of the state-owned assets of enterprises, works out draft laws and regulations on the management of the state-owned assets, establishes related rules and regulations and directs and supervises the management

Taishan & BNBM
Structure/ Government Control 00136

work of local state-owned assets according to law.

9.SASAC undertakes other tasks assigned by the State Council.

Taishan & BNBM
Structure/ Government Control 00137

### IMPORTANT

> *If you are in any doubt about this prospectus, you should obtain independent professional advice.*



**CNBM**

# China National Building Material Company Limited\*
# 中國建材股份有限公司

*(a joint stock limited company incorporated in the People's Republic of China with limited liability)*

## GLOBAL OFFERING

|  |  |
|---|---|
| *Number of H Shares offered pursuant to the Global Offering* | **654,214,000 (subject to adjustment and the Over-allotment Option)** |
| *Number of Public Offer Shares* | **65,422,000 (subject to adjustment)** |
| *Number of International Placing Shares* | **588,792,000 (including 59,474,000 Sale H Shares) (subject to adjustment and the Over-allotment Option)** |
| *Maximum offer price* | **HK\$2.75 per H Share payable in full on application in Hong Kong dollars, subject to refund, plus 1% brokerage, SFC transaction levy of 0.005% and Stock Exchange trading fee of 0.005%** |
| *Nominal value* | **RMB 1.00 each** |
| *Stock code* | **3323** |

**Sole Global Coordinator, Bookrunner, Sponsor and Lead Manager**

**Morgan** Stanley

*The Stock Exchange of Hong Kong Limited and Hong Kong Securities Clearing Company Limited take no responsibility for the contents of this prospectus, make no representation as to its accuracy or completeness and expressly disclaim any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this prospectus.*

*A copy of this prospectus, having attached thereto the documents specified in the paragraph entitled "Documents Delivered to the Registrar of Companies" in Appendix IX to this prospectus, has been registered by the Registrar of Companies in Hong Kong as required by Section 342C of the Companies Ordinance (Chapter 32 of the Laws of Hong Kong). The Securities and Futures Commission and the Registrar of Companies in Hong Kong take no responsibility for the contents of this prospectus or any other document referred to above.*

*The Offer Price is expected to be fixed by agreement between the Global Coordinator, on behalf of the Underwriters, the Selling Shareholders and the Company on the Price Determination Date. The Price Determination Date is expected to be on or around Thursday, March 16, 2006 and, in any event, not later than Tuesday, March 21, 2006. The Offer Price will be not more than HK\$2.75 and is currently expected to be not less than HK\$2.30 unless otherwise announced. Investors applying for Public Offer Shares must pay, on application, the maximum offer price of HK\$2.75 for each H Share together with a brokerage of 1%, SFC transaction levy of 0.005% and Stock Exchange trading fee of 0.005%.*

*The Global Coordinator, on behalf of the Underwriters, may, with the consent of the Company (on behalf of itself and the Selling Shareholders), reduce the indicative Offer Price range (which is HK\$2.30 to HK\$2.75 per H Share) and/or the number of Offer Shares below that stated in this prospectus at any time on or prior to the morning of the last day for lodging applications under the Hong Kong Public Offering. In such a case, notices of the reduction in the indicative offer price range and/or the number of Offer Shares will be published in the South China Morning Post and the Hong Kong Economic Times not later than the morning of the day which is the last day for lodging applications under the Hong Kong Public Offering. If applications for Public Offer Shares have been submitted prior to the day which is the last day for lodging applications under the Hong Kong Public Offering, then even if the offer price range and/or the number of Offer Shares is so reduced such applications cannot be subsequently withdrawn. If, for any reason, the Offer Price is not agreed between the Company (on behalf of itself and the Selling Shareholders) and the Global Coordinator, on behalf of the Underwriters, the Global Offering (including the Hong Kong Public Offering) will not proceed.*

*The Company is incorporated, and its businesses are located, in the PRC. Potential investors should be aware of the differences in the legal, economic, and financial systems between the mainland of the PRC and Hong Kong and that there are different risk factors relating to making an investment in PRC-incorporated companies. Potential investors should also be aware that the regulatory framework in the PRC is different from the regulatory framework in Hong Kong and should take into consideration the different market nature of the Shares of the Company. Such differences and risk factors are set out in the sections entitled "Risk Factors" and "Appendix VI — Summary of Principal PRC Legal and Regulatory Provisions" and "Appendix VII — Summary of Articles of Association." Investors should also be aware that the companies and securities regulatory framework in the PRC to which the Group is subject has only recently been introduced.*

*The obligations of the Hong Kong Underwriters under the Hong Kong Underwriting Agreement to subscribe for, and to procure applicants for the subscription for, the Public Offer Shares, are subject to termination by the Global Coordinator (on behalf of the Hong Kong Underwriters) if certain grounds arise at any time prior to 8:00 a.m. on the day that trading in the Offer Shares commences on the Stock Exchange. Such grounds are set out in the section entitled "Underwriting — Underwriting Arrangements and Expenses — Hong Kong Public Offering — Hong Kong Underwriting Agreement — Grounds for termination" in this prospectus. It is important that you refer to that section for further details.*

*The Offer Shares have not been and will not be registered under the U.S. Securities Act or any state securities laws of the United States. The Offer Shares are being offered only (1) to qualified institutional buyers in the United States in reliance on Rule 144A under the U.S. Securities Act or (2) outside the United States in reliance on Regulation S under the U.S. Securities Act.*

\* *For identification only*

March 13, 2006

## DEFINITIONS

| | |
|---|---|
| "Bengbu Triumph" | 蚌埠凱盛工程技術有限公司 (China Triumph Bengbu Engineering and Technology Company Limited), a limited liability company incorporated on July 21, 2004 under the laws of the PRC and a subsidiary of the Company, in which China Triumph directly and indirectly holds an 85.92% equity interest |
| "BNBM" | 北新集團建材股份有限公司 (Beijing New Building Material Company Limited), a joint stock limited company incorporated on May 30, 1997 under the laws of the PRC and a subsidiary of the Company, in which the Company holds a 60.33% equity interest. Its A shares are listed on the Shenzhen Stock Exchange |
| "BNBMG" | 北新建材(集團)有限公司 (Beijing New Building Material (Group) Company Limited), a limited liability company incorporated on August 4, 1984 under the laws of the PRC and a wholly-owned subsidiary of Parent. BNBMG directly holds a 59.11% equity interest in the Company immediately prior to the Global Offering and is a Promoter |
| "BNBM Homes" | 北新房屋有限公司 (BNBM Homes Company Limited), a limited liability company incorporated on December 27, 2002 under the laws of the PRC and a subsidiary of the Company, in which BNBM holds a 64% equity interest |
| "BNBM Plastic" | 北新建塑有限公司 (BNBM Building Plastic Company Limited), a limited liability company incorporated on December 11, 1998 under the laws of the PRC and a subsidiary of the Company, in which BNBM has a 55% equity interest |
| "BNBM PNG" | 北新巴布亞新畿內亞有限公司 (BNBM PNG Limited), a company incorporated on June 12, 1992 under the laws of Papua New Guinea and a subsidiary of the Company, which is wholly-owned by BND |
| "BND" | 北新物流有限公司 (BND Co., Limited), a limited liability company incorporated on January 8, 2001 under the laws of the PRC and a subsidiary of the Company, in which BNBM holds an 80% equity interest |
| "BND Decoration" | 深圳北新裝飾設計工程有限公司 (BND Decoration Company Limited), a limited liability company incorporated on November 18, 1999 under the laws of the PRC and a subsidiary of the Company, in which BND has a 93% equity interest |
| "Board" | the board of Directors |

# DEFINITIONS

| | |
|---|---|
| "China Triumph" | 中國凱盛國際工程有限公司 (China Triumph International Engineering Company Limited), a limited liability company established on December 28, 1991 under the laws of the PRC and a subsidiary of the Company, in which the Company directly holds a 91% equity interest, and includes, except where the context otherwise requires, all of its subsidiaries |
| "China United" | 中國聯合水泥有限責任公司 (China United Cement Company Limited), a limited liability company established on September 29, 1992 under the laws of the PRC and a subsidiary of the Company, in which the Company directly and indirectly holds a 96.07% equity interest, and includes, except where the context otherwise requires, all of its subsidiaries |
| "Cinda" | 中國信達資產管理公司 (China Cinda Asset Management Corporation), an asset management company established on January 4, 1999 under the laws of the PRC that holds a 5.25% equity interest in the Company immediately prior to the Global Offering and is a Promoter |
| "CNBM Equipment" | 中國建築材料及設備進出口公司 (China National Building Material and Equipment Import and Export Company), a state-owned enterprise established on June 24, 1985 prior to its conversion into the Company under the laws of the PRC |
| "CNBM Trading" | 中建材集團進出口公司 (China National Building Material Import and Export Company), a state-owned enterprise established on February 8, 1994 under the laws of the PRC and a wholly-owned subsidiary of Parent. CNBM Trading directly holds a 9.06% equity interest in the Company immediately prior to the Global Offering and is a Promoter |
| "CNG" | compressed natural gas |
| "Companies Ordinance" | the Companies Ordinance (Chapter 32 of the Laws of Hong Kong), as amended, supplemented or otherwise modified from time to time |
| "Company" | 中國建材股份有限公司 (China National Building Material Company Limited), a joint stock limited company incorporated on March 28, 2005 under the laws of the PRC |
| "Company Law" | 中華人民共和國公司法 (the Company Law of the PRC), as enacted by the Standing Committee of the Eighth NPC on December 29, 1993 and effective on July 1, 1994, as amended, supplemented or otherwise modified from time to time |

**Group Structure**

The following charts set out the simplified corporate structure of the Group immediately before the Global Offering, assuming no changes in shareholding after the Latest Practicable Date (all percentages shown are approximate figures):



\* Sum of these shareholding percentages may differ from total due to rounding.

The following chart sets out the simplified corporate structure of the Group immediately after the Global Offering, assuming the Over-allotment Option is not exercised:



\* Sum of these shareholding percentages may differ from total due to rounding.

*The Stock Exchange of Hong Kong Limited takes no responsibility for the contents of this announcement, makes no representation as to its accuracy or completeness and expressly disclaims any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this announcement.*



# CNBM

# China National Building Material Company Limited *

中 國 建 材 股 份 有 限 公 司

*(a joint stock limited company incorporated in the People's Republic of China with limited liability)*

(Stock code: 3323)

## CONNECTED TRANSACTION
## ACQUISITION OF THE ENTIRE EQUITY INTEREST IN
## TAIAN DONGLIAN INVESTMENT TRADING COMPANY LIMITED

## CONNECTED TRANSACTION
## PROVISION OF FINANCIAL ASSISTANCE TO
## TAIAN STATE OWNED ASSETS MANAGEMENT COMPANY

**Financial Adviser**

ANGLO CHINESE
CORPORATE FINANCE, LIMITED

---

On 28 August, 2006, the board of directors of the Company announced that BNBM, a 52.4% owned subsidiary of the Company, entered into the following transactions:

**I. ACQUISITION OF THE ENTIRE EQUITY INTEREST IN DONGLIAN**

On 28 August, 2006, BNBM, Liu Huan and Jiao Wen Bo entered into the Share Transfer Agreement whereby BNBM proposes to acquire all the equity interest in Donglian, which holds 23% of the equity interest in Taihe, for a consideration of Rmb114,540,000. Liu Huan is the vendor of 80.13% of equity interest in Donglian whereas Jiao Wen Bo is the vendor of 19.87% of equity interest in Donglian.

**II. PROVISION OF FINANCIAL ASSISTANCE TO STATE OWNED COMPANY**

On 28 August, 2006, BNBM and State Owned Company entered into the Loan Agreement whereby BNBM agreed to grant a loan of Rmb 50 million to State Owned Company for a period of one year. It is a condition of the Loan Agreement that State Owned Company shall pledge the 16% of equity interest in Taihe, a subsidiary of BNBM, that it owns as collateral for the Loan. State Owned Company undertakes to BNBM that the equity interest pledged by it is free from encumbrances.

The Acquisition and the provision of the Loan are independent transactions not conditional on each other.

Each of the Acquisition and the provision of the Loan constitutes a connected transaction of the Company under Chapter 14A of the Listing Rules. As each of the percentage ratios (other than the profits ratio) is on an annual basis less than 2.5%, the provision of the Loan is only subject to the reporting requirements and is exempt from the independent shareholders' approval requirements under Rule 14A.34 of the Listing Rules. The Acquisition is subject to reporting and announcement requirements under the Listing Rules and the approval of the independent shareholders of the Company.

No shareholder of the Company is required to abstain from voting if the Company were to convene a special general meeting for the purpose of approving the Acquisition because no substantial shareholders of the Company has an interest that is different from that of other shareholders in relation to the Acquisition. A written approval on the Acquisition will be obtained from China National Building Material Group Corporation, the parent company and a substantial shareholder of the Company, and the three wholly owned subsidiaries of China National Building Material Group Corporation, namely Beijing New Building Material (Group) Company Limited, China National Building Material Import and Export Company and China Building Materials Academy, which collectively hold approximately 60.34% of the issued shares in the Company as at the date of this announcement. The Company will apply for a waiver under Rule 14A.43 of the Listing Rules to The Stock Exchange of Hong Kong Limited from convening the extraordinary meeting to approve the Acquisition. A circular containing, among other things, details of the Acquisition, a letter of advice from each of the independent board committee of the Company and the independent financial adviser on the Acquisition will be despatched to the shareholders of the Company as soon as practicable.

---

**I. ACQUISITION OF THE ENTIRE EQUITY INTEREST IN DONGLIAN**

The board of directors of the Company announces that BNBM proposes to acquire all the equity interest in Donglian on and subject to the terms of the Share Transfer Agreement.

**Date of the Share Transfer Agreement**

28 August, 2006

**Parties**

BNBM as the purchaser

Liu Huan as the vendor of 80.13% of equity interest in Donglian

Jiao Wen Bo as the vendor of 19.87% of equity interest in Donglian

**Assets to be acquired**

Subject to the fulfillment of the conditions of the Share Transfer Agreement, BNBM will acquire from Liu Huan and Jiao Wen Bo the entire equity interest in Donglian which in turn holds a 23% equity interest in Taihe. The equity interest to be acquired will be acquired free from encumbrances.

After the completion of the Share Transfer Agreement, the effective shareholding of BNBM in Taihe will increase from 42% to 65%. BNBM has gained long term control of Taihe's board of directors in connection with the acquisition of the 42% equity interest in Taihe in April 2005. Therefore, Taihe is accounted for as a subsidiary of BNBM before and after the Acquisition.

**Consideration**

The consideration payable by BNBM for the equity interest in Donglian is Rmb114,540,000, which was determined after arm's length negotiations between BNBM and the vendors. The consideration will be financed partly from the internal resources and partly from the external borrowings of CNBM Group. Details of the financing have yet to be finalised as at the date of this announcement.

The consideration of Rmb114,540,000 represents a premium of 5.9% over the net asset value of Donglian of Rmb107,740,000 as at 30 June, 2006, based on the assessment of an independent professional valuer who adopted a replacement cost approach in valuing the assets and liabilities of Donglian.

**Conditions of the Share Transfer Agreement**

Completion of the Share Transfer Agreement is subject to, inter alia, compliance with the articles of association of BNBM and the requirements under the listing rules of the (if necessary) relevant stock exchanges and obtaining approvals from the directors and the shareholders of BNBM and the Company. The conditions of the Share Transfer Agreement cannot be waived by the parties thereto.

**Completion of the Share Transfer Agreement**

Completion of the Share Transfer Agreement is expected to take place immediately after all the conditions of the Share Transfer Agreement have been fulfilled.

**Reasons for the entering into the Share Transfer Agreement**

Following BNBM's acquisition of the 42% equity interest of Taihe, the Company has become the largest producer of gypsum boards in the PRC. The acquisition has also enhanced the Company's ability to serve a broader base of customers. The directors of the Company believe that the Acquisition will enable CNBM Group to further enhance its competitiveness and consolidate its leading position in the PRC gypsum board market as it will participate more actively in the daily operations and management of Taihe with a view to improving its profitability.

The board of directors (including the independent non-executive directors) of the Company considers that the terms of the Share Transfer Agreement to be fair and reasonable, on normal commercial terms and in the interest of the shareholders of the Company as a whole.

**Information on Donglian**

Donglian is an investment holding company. Its principal activity is the investment in building materials companies. Its major investment is a 23% equity interest in Taihe, a subsidiary of BNBM.

Based on the generally accepted accounting principles in the PRC, Donglian had an audited net asset value of approximately Rmb78.7 million as at 30 June, 2006. Its audited profit before tax for the two years ended 31 December, 2004 and 2005 and the six months ended 30 June, 2006 was nil, approximately Rmb15.7 million and Rmb6.3 million respectively. Its audited profit after tax for the two years ended 31 December, 2004 and 2005 and the six months ended 30 June, 2006 was nil, approximately Rmb14.6 million and Rmb6.3 million respectively.

*The Stock Exchange of Hong Kong Limited takes no responsibility for the contents of this announcement, makes no representation as to its accuracy or completeness and expressly disclaims any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this announcement.*



## CNBM

# China National Building Material Company Limited*

# 中 國 建 材 股 份 有 限 公 司

*(a joint stock limited company incorporated in the People's Republic of China with limited liability)*

(Stock code: 3323)

### CONNECTED TRANSACTION
### ACQUISITION OF THE ENTIRE EQUITY INTEREST IN
### TAIAN DONGLIAN INVESTMENT TRADING COMPANY LIMITED

### CONNECTED TRANSACTION
### PROVISION OF FINANCIAL ASSISTANCE TO
### TAIAN STATE OWNED ASSETS MANAGEMENT COMPANY

**Financial Adviser**

### ANGLO CHINESE
CORPORATE FINANCE, LIMITED

**Implications of the entering into the Share Transfer Agreement under the Listing Rules**

In relation to the Acquisition, Liu Huan, one of the vendors, is an associate of Donglian by virtue of his 80.13% equity interest in Donglian, which is a substantial shareholder of Taihe. Liu Huan is a connected person of the Company within the meaning of the Listing Rules. Therefore, the Acquisition constitutes a connected transaction of the Company under Chapter 14A of the Listing Rules and is subject to reporting and announcement requirements under the Listing Rules and the approval of the independent shareholders of the Company.

**PROVISION OF FINANCIAL ASSISTANCE TO STATE OWNED COMPANY**

The board of directors of the Company announces that BNBM, a 52.4% owned subsidiary of the Company, is proposing to grant the Loan to State Owned Company on and subject to the terms of the Loan Agreement.

**Date of the Loan Agreement**

28 August, 2006

**Lender**

BNBM

**Borrower**

State Owned Company

The shareholder of State Owned Company is Taian City State Owned Assets Management Committee, which is a state owned enterprise. State Owned Company is an investment holding company. It holds 16% of equity interest in Taihe, a subsidiary of BNBM. BNBM owns 42% of equity interest in Taihe. As explained above, Taihe became a subsidiary consolidated with BNBM since April 2005.

**Principal amount of the Loan**

Rmb 50 million

**Term**

Subject to the fulfilment of the conditions of the Loan Agreement, BNBM will make available the Loan to State Owned Company within immediately after the conditions of the Loan Agreement have been fulfilled.

State Owned Company will repay the Loan within one year from the date the Loan is granted.

In the event that the Loan is not repaid in full when the Loan becomes due for repayment, a penalty payment calculated on a daily basis at 0.1% on the outstanding amount of the Loan is payable by State Owned Company to BNBM. If State Owned Company defaults on the repayment of the principal amount of the Loan and the interest fee payable thereon, BNBM has the right to foreclose the collateral pledged by State Owned Company with respect to the Loan as described below.

**Interest payable by State Owned Company**

Interest, which is payable by State Owned Company to BNBM bi-annually, is calculated on the basis of the benchmark one year lending rate (which is 6.12% as at the date of this announcement) declared by the People's Bank of China from time to time plus a margin of 10% of such benchmark rate is payable by State Owned Company to BNBM bi-annually. Each instalment of the interest fee is payable 20 days before it falls due.

**Collateral**

State Owned Company will pledge the 16% of equity interest in Taihe that it owns as collateral for the Loan. State Owned Company undertakes to BNBM that the equity interest pledged by it is free from encumbrances. According to the Loan Agreement, the validity of the pledge is valid for a period of 24 months from the date State Owned Company is obliged to repay the Loan. If the Loan is not repaid within the 24 month period, in accordance with the PRC laws, the pledge will cease to be valid.

Taihe is engaged in production and sale of gypsum boards with broad market penetration in northern, eastern and central China. As at 30 June, 2006, Taihe had unaudited net asset value of approximately Rmb326.8 million. Based on the generally accepted accounting principles in the PRC, Taihe's audited profit before tax for the two years ended 31 December, 2004 and 2005 was approximately Rmb32.0 million and approximately Rmb64.3 million respectively. Its audited profit after tax for the two years ended 31 December, 2004 and 2005 was approximately Rmb17.9 million and approximately Rmb60.0 million respectively. It has unaudited profit before tax and profit after tax of approximately Rmb44.8 million approximately Rmb37.6 million for the six months ended 30 June, 2006.

Based on the unaudited net asset value of Taihe as at 30 June, 2006, the net asset value of Taihe attributable to the collateral is approximately Rmb52.3 million.

Based on the audited net profit of Taihe for the year ended 30 December, 2005, the net profit of Taihe attributable to the collateral is approximately Rmb9.6 million.

**Conditions of the Loan Agreement**

Completion of the Loan Agreement is subject to, inter alia, compliance with the articles of association of BNBM and the requirements under the listing rules of the relevant stock exchanges and obtaining approvals from the directors and the shareholders of BNBM (if necessary) and the Company. The conditions of the Loan Agreement cannot be waived by the parties thereto.

**Completion of the Loan Agreement**

Completion of the Loan Agreement is expected to take place immediately after all the conditions of the Loan Agreement have been fulfilled.

**Information on State Owned Company**

State Owned Company is an investment holding company. Its major investments include a 16% shareholding interest in Taihe. The shareholder of State Owned Company is Taian City State Owned Assets Management Committee which is in turn owned by the government of Taian City.

**Shareholding Structure**

The following is a graphical illustration of the shareholding relationships between the Company, State Owned Company, Taihe and its shareholders as at the date of this announcement:



The Stock Exchange of Hong Kong Limited takes no responsibility for the contents of this announcement, makes no representation as to its accuracy or completeness and expressly disclaims any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this announcement.



## CNBM

# China National Building Material Company Limited *

# 中 國 建 材 股 份 有 限 公 司

*(a joint stock limited company incorporated in the People's Republic of China with limited liability)*

(Stock code: 3323)

### CONNECTED TRANSACTION
### ACQUISITION OF THE ENTIRE EQUITY INTEREST IN
### TAIAN DONGLIAN INVESTMENT TRADING COMPANY LIMITED

### CONNECTED TRANSACTION
### PROVISION OF FINANCIAL ASSISTANCE TO
### TAIAN STATE OWNED ASSETS MANAGEMENT COMPANY

**Financial Adviser**

## ANGLO CHINESE
CORPORATE FINANCE, LIMITED

**Reasons for the entering into the Loan Agreement**

After the acquisition of the 42% equity interest in Taihe by BNBM in April 2005, CNBM Group had become the largest gypsum board producer in the PRC. BNBM acquired a 42% equity interest in Taihe with a view to enhancing the Group's presence in the gypsum board market in China. As State Owned Company does not presently intend to sell their equity stake in Taihe, the Company and State Owned Company decided to enter into the Loan Agreement in which State Owned Company is prohibited from selling its 16% equity interest to any other third parties during the term of the Loan Agreement. The Company may consider making further investments in Taihe upon the expiry of the Loan Agreement.

For the reasons set out above and having considered that the fees payable on the Loan are comparable to the market lending rate in the PRC, the directors of the Company consider the granting of the Loan to be fair and reasonable, on normal commercial terms and in the interest of the Company and its shareholders as a whole.

**Implications of the entering into the Loan Agreement under the Listing Rules**

State Owned Company is a substantial shareholder of Taihe, a subsidiary of BNBM and is accordingly a connected person of the Company within the meaning of the Listing Rules. The Loan constitutes financial assistance pursuant to Rule 14A.13(2) of the Listing Rules and the granting of the Loan constitutes a connected transaction of the Company under Chapter 14A of the Listing Rules and is subject to reporting and announcement requirements under the Listing Rules and the approval of the independent shareholders of the Company.

The Acquisition and the provision of the Loan are independent transactions not conditional on each other.

**INFORMATION ON THE COMPANY**

The Company is a leading building materials company in China with significant operations in the cement, lightweight building materials, glass fiber and fiberglass reinforced plastic products and engineering services business segments.

**GENERAL**

The Company will appoint an independent financial adviser to advise an independent committee of the board of directors of the Company and the independent shareholders of the Company on the fairness and reasonableness of the Acquisition.

No shareholder of the Company is required to abstain from voting if the Company were to convene a special general meeting for the purpose of approving the Acquisition because no substantial shareholders of the Company has an interest that is different from that of other shareholders in relation to the Acquisition. A written approval of the Acquisition will be obtained from China National Building Material Group Corporation, the parent company and a substantial shareholder of the Company, and the three wholly owned subsidiaries of China National Building Material Group Corporation, namely Beijing New Building Material (Group) Company Limited, China National Building Material Import and Export Company and China Building Materials Academy, which collectively hold approximately 60.34% of the issued shares in the Company as at the date of this announcement. The Company will apply for a waiver under Rule 14A.43 of the Listing Rules to The Stock Exchange of Hong Kong Limited from convening the special general meeting to approve the Acquisition. A circular containing, among other things, details of the Acquisition, letter of advice from each of the independent board committee of the Company and the independent financial adviser on the Acquisition will be despatched to the shareholders of the Company as soon as practicable.

**DEFINITIONS**

| | |
|---|---|
| "Acquisition" | the acquisition of the entire equity interest in Donglian by BNBM pursuant to the terms and conditions of the Share Transfer Agreement |
| "BNBM" | Beijing New Building Material Company Limited* (北京新型建材股份有限公司), a joint stock limited company incorporated under the laws of the PRC, and a 52.4% subsidiary of the Company whose A shares are listed on the Shenzhen Stock Exchange |
| "Company" | China National Building Material Company Limited* (中國建材股份有限公司), a joint stock limited company incorporated under the laws of the PRC |
| "CNBM Group" | the Company and its subsidiaries |
| "Donglian" | Taian Donglian Investment Trading Company Limited* (泰安市東聯投資貿易有限公司) |
| "Listing Rules" | The Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited |
| "Loan" | a loan of Rmb 50 million to be granted by BNBM to State Owned Company pursuant to terms and conditions of the Loan Agreement |
| "Loan Agreement" | the conditional agreement dated 28 August, 2006 entered into between the BNBM and State Owned Company in relation to the Loan |
| "PRC" | the People's Republic of China |
| "Share Transfer Agreement" | the conditional agreement dated 28 August, 2006 entered into among the BNBM, Liu Huan and Jiao Wen Bo in relation to the Acquisition |
| "State Owned Company" | Taian State Owned Assets Management Company* (泰安市國有資產經營公司) |
| Taihe | Shangdong Taihe Dongxin Company Limited* (山東泰和東新股份有限公司), a joint stock limited company incorporated under the laws of the PRC and a subsidiary of BNBM, in which BNBM has a 42% equity interest |
| "Rmb" | Renminbi yuan, the lawful currency of the PRC |

*For identification only*

As at the date of this announcement, the board of directors of the Company comprises:

*Executive Directors:*
Song Zhiping
Cao Jianglin
Li Yimin
Peng Shou

*Non-Executive Directors:*
Cui Lijun
Huang Anzhong
Zuo Fenggao

*Independent Non-Executive Directors:*
Zhang Renwei
Zhou Daojiong
Chi Haibin
Lau Ko Yuen, Tom

By Order of the Board
Chang Zhangli
*Company Secretary*

Hong Kong, 28 August, 2006

*   For identification purposes only



China National Building Material Company Limited *

(Stock Code：3323)

**CNBM**



2010 ANNUAL REPORT

*For identification only

## Definitions 

*In this annual report, unless the context otherwise requires, the following terms shall have the meanings set out below:*

| | |
|---|---|
| "Aobao Chemical" | 山東奧寶化工集團有限公司 Shandong Aobao Chemical Group Company Limited |
| "Baker Tilly HK" | Baker Tilly Hong Kong Limited（天職香港會計師事務所有限公司，formerly known as 天華香港會計師事務所有限公司） |
| "Baishan Jingang" | 金剛（集團）白山水泥有限公司 (Jingang (Group) Baishan Cement Company Limited) |
| "Bengbu Triumph" | 蚌埠凱盛工程技術有限公司 (China Triumph Bengbu Engineering and Technology Company Limited) |
| "BNBM" | 北新集團建材股份有限公司 (Beijing New Building Material Company Limited) |
| "BNBMG" | 北新建材（集團）有限公司 (Beijing New Building Material (Group) Company Limited) |
| "BNBM Homes" | 北新房屋有限公司 (BNBM Homes Company Limited) |
| "BNBM PNG" | 北新巴布亞新幾內亞有限公司 (BNBM Papua New Guinea Company Limited) |
| "BND" | 北新物流有限公司(BND Co., Limited) |
| "Board" | the board of directors of the Company |
| "Building Materials Academy" | 中國建築材料科學研究總院 (China Building Materials Academy) |
| "China Composites" | 中國複合材料集團有限公司 (China Composites Group Corporation Limited) |
| "China Fibreglass" | 中國玻纖股份有限公司(China Fibreglass Company Limited) |
| "China Triumph" | 中國建材國際工程集團有限公司 (China Triumph International Engineering Company Limited) |
| "China United" | 中國聯合水泥集團有限公司 (China United Cement Corporation) |

## Shareholding Structure of the Group 

The simplified structure of the Group as at 31 December 2010 is set out as below:



—— All the above percentages are calculated by rounding to two decimal places.

Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
 2

 3      _____  § MDL NO. 2047
        IN RE:                    §
 4      CHINESE-                  § SECTION: L
        MANUFACTURED              §
 5      DRYWALL PRODUCTS          § JUDGE FALLON
        LIABILITY                 §
 6      LITIGATION                § MAGISTRATE
        _____  § JUDGE WILKINSON

 7
                        -   -   -
 8
          CROSS NOTICED IN VARIOUS OTHER ACTIONS
 9
                        -   -   -
10
                    April 7, 2011
11
                        -   -   -
12
            CONFIDENTIAL - SUBJECT TO FURTHER
13                CONFIDENTIALITY REVIEW
14                      -   -   -
15         Videotaped deposition of WENLONG
        PENG, held at 3 Pedder Street, Central,
16      Hong Kong, China, commencing at 8:59
        a.m., on the above date, before Linda L.
17      Golkow, Certified Court Reporter,
        Registered Diplomate Reporter, Certified
18      Realtime Reporter and Notary Public.
19
20                      -   -   -
21
22          GOLKOW TECHNOLOGIES, INC.
        ph 877.370.3377 | fax 917.591.5672
23             deps@golkow.com
24
```

Confidential - Subject to Further Confidentiality Review

Page 134

1     Q.   What customers outside of
2 the United States asked for measurements
3 in feet as opposed to millimeters or
4 centimeters or meters?
5     A.   Customers from Canada, from
6 Panama, from Africa, they will ask the
7 kind of measurement in feet or in inches.
8     Q.   Mr. Peng, where in this
9 e-mail do you mention customers from
10 Canada, Panama or Africa?
11     A.   In this e-mail?
12     Q.   Uh-huh.
13     A.   I did not say that -- I did
14 not say I mention this in this e-mail.
15 What I mean is that this kind of
16 measurement by the inch, by the feet, I
17 was responding to your earlier question.
18 You were asking about what other
19 countries would be using the measurement
20 of feet and inches.  I answer you -- I
21 answer to your question to tell you the
22 answer.  I did not say that it was in
23 this e-mail.
24     Q.   Thank you.

Page 135

1          Mr. Peng, when was TTP
2 formed, what year and month, if you know?
3     A.   According to my
4 recollection, it was in the year 2006 in
5 the month of February.
6     Q.   So, Mr. Peng, from February
7 2006 to May of 2006, you formed all this
8 experience in exporting to the United
9 States that's referenced in your e-mail?
10 Is that what your recollection is?
11     A.   I just mentioned earlier
12 that my level was very limited.  And in
13 this e-mail where I was not very good to
14 express my meaning -- I mean in terms of
15 expressing what I want to say, it was not
16 accurate.  It was not objective.  It
17 requires me to give explanation of what I
18 want to express in this sentence of what
19 I said.  Do you want me to give an
20 explanation?
21     Q.   I would like to ask a
22 different question at this point, and
23 then if he wants to come back, he should
24 remind me, and I'm okay with that.  But

Page 136

1 let me ask a different question.
2          Mr. Peng, this e-mail says
3 that you say we're "exporting...gypsum
4 board to the" U.S. with a "quantity of
5 600,000 sheets every month."  My question
6 to you is, three months after TTP
7 started, it was already shipping 600,000
8 boards of gypsum a month to the USA; is
9 that correct?
10     A.   That is not what I meant.
11     Q.   But your e-mail says you're
12 shipping 600,000 boards a month in May of
13 2006.  Was that also a false statement?
14          MR. SPANO:  Objection to
15     form, mischaracterizes.
16          MR. SEEGER:  I'm going to
17     strike that question.
18 BY MR. SEEGER:
19     Q.   Your e-mail says you were
20 shipping 600,000 sheets of e-mail every
21 month.  Was that true or false?
22          MR. SPANO:  Objection to the
23     form, mischaracterizes the e-mail
24     again.

Page 137

1          THE WITNESS:  What I mean in
2 this e-mail was our company has --
3 can produce this amount of drywall
4 with the thickness of 12.7 mm.  If
5 you have such a requirement, we
6 can produce it.
7          MR. PANAYOTOPOULOS:
8     Objection, nonresponsive.  I would
9     appreciate a yes or no, and then
10     he can explain, but we're not
11     getting any responsive answers
12     from this witness.
13 BY MR. SEEGER:
14     Q.   Can the witness answer my
15 question yes or no?
16          MR. SEEGER:  What did he say?
17          INTERPRETER 1:  Both -- he
18     was saying no, no, but the first
19     "no" and the second "no" are using
20     different Chinese words.
21          MR. SEEGER:  Did he mean
22     something different by those two
23     "nos"?
24 BY MR. SEEGER:

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE MANUFACTURED      *  MDL No. 2047
DRYWALL PRODUCTS LIABILITY      *
LITIGATION                          *  SECTION L
                                       *
                                       *  JUDGE ELDON E. FALLON
                                       *
                                       *  MAGISTRATE JUDGE
                                       *  JOSEPH C. WILKINSON, JR.
                                       *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**THIS DOCUMENT RELATES TO:** *Germano, et al. v. Taishan Gypsum Co., Ltd., et al., Case No. 09-6687*

PEOPLE'S REPUBLIC OF CHINA
CITY OF TAI'AN

## DECLARATION OF JIA TONGCHUN

     This is a declaration being made in accordance with and pursuant to 28 U.S.C. § 1746.

     I, JIA TONGCHUN, declare under penalty of perjury under the laws of the United States of America that the following statements are true and correct:

     1.  I am over eighteen (18) years of age, am competent to testify to the matters contained herein, and have personal knowledge of these facts. My native language is Chinese. I do not understand, speak, read, or write English. I signed a Chinese version of this Declaration as well as the English version of this Declaration after it was translated for me by a translator with the law firm of Hogan Lovells International LLP.

     2.  I am Chairman of the Board and General Manager of Taishan Gypsum Co., Ltd. ("Taishan"). I joined Taishan on February 2, 1999 as the leader of the factory and subsequently became Chairman of the Board and General Manager in 2002.

1

**EXHIBIT B**

3.   When I joined the company, it was called Shandong Taihe Taishan Plasterboard Main Factory (Group).  In 2002, the company changed its name to Shandong Taihe Dongxin Co., Ltd. ("Taihe"), when it became a company limited by shares under Chinese law.  In 2007, Taihe became Taishan.

4.   Taishan is a Chinese corporation with its principal place of business in Tai'an City, Shandong Province, People's Republic of China ("China").

5.   Taishan has approximately 1,600 employees, all of whom are located in China.

6.   In 1992, Taishan started manufacturing paper-coated drywall ("drywall").

7.   Taishan manufactures drywall exclusively in China.

8.   Taishan is one of the largest drywall manufacturers in China.  Taishan has won numerous awards and accolades for the quality of its operations, company management, resource management and compliance with environmental standards.  Taishan has been certified as a "China Top Brand" reflecting official recognition by the national General Administration of Quality Supervision Inspection and Quarantine ("GAQSIQ") of its high quality and superior reputation.  Additionally, Taishan has also received other quality and environmental protection certifications, including, for example, the International Organization for Standardization ("ISO") 9001 standard (for quality management), the ISO 14001 standard (for environmental protection) and certification to use the "China Environmental Labeling" mark.

9.   Taishan sells drywall exclusively in China.

10.  Taishan never has manufactured products in Virginia.

11.  Taishan never has sold drywall in Virginia.

12.  Taishan never has marketed drywall in Virginia.

13.  Taishan never has distributed drywall in, or shipped drywall to, Virginia.

2

14. Taishan never has advertised in Virginia.

15. Taishan never has performed services in Virginia.

16. Taishan does not have offices and does not own or lease real or personal property in Virginia.

17. Taishan does not maintain any bank accounts in Virginia.

18. Taishan never has appointed an agent to accept service of process in Virginia.

19. Taishan never has paid taxes or incurred tax liability in Virginia.

20. Taishan is not registered to do business in Virginia.

21. Taishan never has been incorporated in Virginia.

22. Taishan never has maintained any corporate books or records in Virginia.

23. Taishan does not have a mailing address or telephone number in Virginia.

24. Taishan has no officers, directors, employees, or agents in Virginia.  None of Taishan's officers, directors, employees, or agents maintain a residence or place of business in Virginia.

25. No officers, directors, employees, or agents of Taishan have visited Virginia for business purposes.

26. In approximately November of 2005, Phillip Perry, of Tobin Trading, Inc., contacted Taishan to inquire about Taishan's drywall. Mr. Perry said he was an agent of Venture Supply, Inc. ("Venture Supply"), a Virginia company.

27. Mr. Perry visited Taishan in China in approximately November 2005.  During his first visit to Taishan, Mr. Perry, on behalf of Venture Supply, negotiated a contract providing for the sale of drywall by Taishan.

28. The first contract, dated November 17, 2005, was drafted and signed in

3

Tai'an City, China. A copy is attached as Exhibit A.   The contract provided for production of the drywall according to the "relative standard of China GB/T9775-1999."   Under the terms of the contract, Venture Supply purchased the drywall in China and was then responsible for transporting the drywall to its desired location. Prior to shipment, Mr. Perry, as Venture Supply's representative, was responsible for inspecting the drywall in China and ensuring that the quality, specifications and packing met Venture Supply's requirements.   Taishan was responsible for complying with the contractual terms and for delivering the drywall in China in accordance with Venture Supply's arrangements. Additionally, the November 17, 2005 contract included an arbitration clause, which provided that "[a]ll disputes in connection with this contract" that cannot be amicably be negotiated will be submitted in China to the Foreign Trade Arbitration Commission of the China Council for the Promotion of International Trade, now know as the China International Economic Trade Arbitration Commission ("CIETAC").

29. On December 16, 2005, Mr. Perry, Venture Supply's agent, visited Taishan to inspect the drywall and agreed to transport of the drywall to the Lian Yungang port.   A copy of his Inspection Certificate is attached as Exhibit B. Mr. Perry certified in the Inspection Certificate that he had inspected the goods in China and that they met Venture Supply's specifications and quality requirements.

30. On the same day, Taishan and Venture Supply entered into a second contract. A copy of this contract is attached as Exhibit C.  Like the first contract, this contract was negotiated and drafted in Tai'an City, China. Mr. Perry, on behalf of Venture Supply, and Taishan both signed the second agreement while in Tai'an City, China. Also like the first contract, the second contract provided for the sale of drywall in China, and required Venture Supply to be responsible for shipping arrangements and charges. The second contract similarly required that Mr. Perry inspect

4

the goods in Taishan's factory and China loading port to make sure that the quality, specifications and packing met Venture Supply's requirements. Like the first contract, it also contained an arbitration clause, providing for arbitration of claims arising out of the contract before CIETAC in China.

31. On or about March 11, 2006, Mr. Perry again visited Taishan to inspect the drywall and to give approval to transfer it to the loading port. A copy of his Inspection Certificate is attached as Exhibit D. Mr. Perry similarly certified in this Inspection Certificate that he had inspected the drywall in China and that it met buyer's specifications and quality requirements.

32. Pursuant to both contracts, Venture Supply was responsible for transporting the drywall to the final destination, and Venture Supply was also responsible for insuring the drywall once title was transferred to it in China.

33. After delivery of the drywall to a port in China, Taishan had nothing more to do with the drywall thereafter. Taishan had no knowledge or information concerning whether any of the drywall it supplied in China pursuant to those contracts would be distributed or used in Virginia.

34. The Taian Shandong Province Special Invoices for Export for the purchases by Venture Supply are attached together as Exhibit E. These invoices were generated by Taishan for tax purposes after the Venture Supply transactions were complete. They show that Venture Supply purchased a total of 153,912 sheets of drywall from Taishan in China. The invoices also list "FOB" as the term of delivery, meaning that Venture Supply purchased the drywall in China and was responsible for arranging, and paying for, shipment to the desired destination.

35. No employee or representative of Taishan was ever present in Virginia in connection with the Venture Supply contracts or otherwise in connection with the drywall business.

36. Other than the two contracts with Venture Supply, Taishan did not enter into any

5

other contracts with entities based in Virginia. Nor did Taishan enter into any other contracts with companies specifically providing for the supply of drywall in Virginia.

37. Venture Supply made payments for the drywall to Taishan's bank in China.

38. Taishan's two sales to Venture Supply were made in China. They are the only sales of drywall Taishan has made to any customer based in the United States.

39. Tai'an Taishan Plasterboard Co. Ltd. ("TTP") is a wholly owned subsidiary of Taishan formed in February 2006. TTP manufactures and sells drywall exclusively in China. TTP has not entered into any contracts with any companies located in Virginia. TTP has had no contact with Virginia whatsoever.

40. In light of Taishan's lack of contacts with Virginia and for other reasons discussed below, on behalf of Taishan, I respectfully request that Taishan be excused for failure to appear in this case.

41. Taishan did not intend to offend the court or to challenge its powers. Based upon our lack of contacts with Virginia and for other reasons discussed below, we sincerely did not believe that it was necessary for Taishan to appear.

42. Taishan has never been involved in litigation of this nature in the United States or anywhere else in the world. Taishan has had no experience with, and did not understand, the litigation process in Virginia or in the United States.

43. No employee at Taishan has sufficient mastery of the English language to read and understand legal documents written in English. As a result, no legal document sent to Taishan only in English underwent meaningful review. Taishan thus did not understand the consequences of not responding to the Amended Complaint.

44. No employee at Taishan has any understanding whatsoever of the United States' judicial

6

process to understand the nature or consequence of the claims asserted in the litigation in the United States. This is true even if the relevant documents are translated into Chinese.

45. Taishan received only one document related to this litigation from the Chinese courts and that was the Amended Complaint. The Chinese court did not provide Taishan with any other documents. And Taishan still has not received any other documents relating to this lawsuit in Chinese.

46. When Taishan received the Amended Complaint, we could not understand how this litigation could possibly involve Taishan directly. Taishan sells drywall exclusively in China. Taishan has not sold any drywall in the United States. The sales Taishan made in China to Venture Supply were covered by arbitration clauses providing for the arbitration of contractual disputes in China. Taishan had no involvement with the drywall it sold to Venture Supply after it was delivered to Venture Supply in China. Taishan complied with its contractual obligations and had no reason to believe that its drywall had quality problems.

47. Now that Taishan is aware that a default judgment has been entered, however, it is forced to defend itself and its reputation and erase the judgment suggesting that its product is defective. It retained counsel in the United States and concluded it was necessary to appear and participate in this action. Taishan is determined to appear in this case in order to challenge the jurisdiction of the Court and otherwise defend itself as necessary.

48. Among our highest priorities is to erase the default judgment in this case. We

respectfully ask the Court to do that and to give us a chance to defend the claims made against us.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 15, 2010.

Jia Tongchun

8

美国地区法院
路易斯安那州东部区

关于：中国生产的石膏板产品责任诉讼     *   跨地区诉讼第 2047 号

                                         *   L 部分

                                         *   Eldon E. Fallon 法官

                                         *   Joseph C. Wilkinson, Jr. 司法官

                                         *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

关于：Germano 等诉泰山石膏股份有限公司等一案，案件编号第 09-6687 号

中华人民共和国泰安市

<u>贾同春的声明</u>

     本声明系根据并依照《美国法典》第 28 卷第 1746 条发表。

     本人贾同春，根据美利坚合众国法律项下的伪证处罚规定声明，以下陈述真

实、准确：

1. 本人年龄超过十八（18）岁，有资格对本宣誓书所述事宜作证，并且本人知悉该等事
   实。本人的母语是中文。本人不会听、说、谈、写英文。本人签署了本声明的中文文
   本，也签署了一份由霍金路伟国际律师事务所为我翻译的本声明的英文翻译件。

2. 本人系泰山石膏股份有限公司（"泰山"）的董事长和总经理。本人于1999年2月2日
   加入泰山，担任厂长职务，后于2002年起担任董事长和总经理职务。

3. 本人加入公司时，公司名称为山东泰和泰山纸面石膏板总厂（集团）。2002年，根据
   中国法律，公司成为一家股份有限公司，并更名为山东泰和东新股份有限公司（"泰
   和"）。2007年，泰和更名为泰山。

4. 泰山为一家中国公司，其主要营业地为中华人民共和国（"中国"）山东省泰安市。

5. 泰山约有1,600名员工，全部在中国境内工作。

6. 泰山自1992年起开始生产纸面石膏板（"石膏板"）。

7. 泰山只在中国境内生产石膏板。

8. 泰山是中国最大的石膏板生产商之一。泰山曾因其出色的经营、公司管理、资源管理

   及符合环保标准，荣获了很多奖项和赞许。泰山还被中华人民共和国国家质量监督检

   验检疫总局（"GAQSIQ"）评为"中国名牌"，认可了泰山优异的质量和极高的声

   誉。另外，泰山还获得了其他质量和环保证书，其中包括国际标准化组织

   （"ISO"）9001标准（质量管理）认证，ISO14001标准（环境保护）认证，和"中

   国环境标志"产品认证。

9. 泰山只在中国境内出售石膏板。

10. 泰山从未在弗吉尼亚州生产过任何产品。

11. 泰山从未在弗吉尼亚州出售过石膏板。

12. 泰山从未在弗吉尼亚州营销过其石膏板。

13. 泰山从未在弗吉尼亚州分销过其石膏板或是往弗吉尼亚州运输过石膏板。

14. 泰山从未在弗吉尼亚州作过广告宣传。

15. 泰山从未在弗吉尼亚州提供过任何服务。

16. 泰山在弗吉尼亚州没有办事处，没有任何动产或不动产，也没有租借过任何动产或不

    动产。

17. 泰山未在弗吉尼亚州开立任何银行账户。

18. 泰山从未在弗吉尼亚州委托过任何代理人接受诉讼书状送达。

2

19. 泰山从未在弗吉尼亚州纳税或产生任何纳税义务。

20. 泰山并未在弗吉尼亚州注册从事业务。

21. 泰山从未在弗吉尼亚州组建过任何实体。

22. 泰山从未在弗吉尼亚州有过任何公司簿册或记录。

23. 泰山在弗吉尼亚州没有邮寄地址或电话号码。

24. 泰山在弗吉尼亚州没有高级职员、董事、员工或代理人。泰山的高级职员、董事、员工或代理人在弗吉尼亚州均无住所或营业地。

25. 泰山的高级职员、董事、员工或代理人均未以商务目的到访过弗吉尼亚州。

26. 大约2005年11月，Tobin Trading Inc. 的Phillip Perry与泰山取得联系，问询泰山的石膏板。Perry先生声称代理一家名为Venture Supply Inc.（"Venture Supply"）的弗吉尼亚公司。

27. Perry先生大约在2005年11月份到中国访问泰山。在其首次访问泰山期间，Perry先生代表Venture Supply与泰山经磋商达成了一份销售石膏板的合同。

28. 2005年11月17日签署的首份合同是在中国泰安起草并签署的，随附附件A为该合同的复印件。合同规定，石膏板应依照"中国GB/T9775-1999的相应标准"生产。根据合同条款，Venture Supply在中国购买石膏板，并负责将石膏板运至其要求的目的地。装运前，作为Venture Supply的代表，Perry先生负责在中国检查石膏板并确保质量、规格和包装均符合Venture Supply的要求。泰山则负责遵守合同条款以及依据Venture Supply的安排在中国交付石膏板。另外，2005年11月17日签署的合同含有仲裁条款，该条款规定，"由本合同引起的所有争议"如无法通过友好协商解决的，

3

应交由中国国际贸易促进委员会对外贸易仲裁委员会（现名为中国国际经济贸易仲裁委员会（"CIETAC"））仲裁解决。

29. 2005年12月16日，Venture Supply的代理人Perry先生来到泰山，在检验石膏板后同意将石膏板运至连云港港口。随附附件B为其验货证明书的复印件。Perry先生在验货证明书中证实其已在中国验货并且货物符合Venture Supply的规格和质量要求。

30. 同日，泰山与Venture Supply签署了第二份合同。随附附件C为该合同的复印件。与第一份合同一样，该合同亦在中国泰安市磋商并起草。Perry先生代表Venture Supply在中国泰安市与泰山签署了第二份合同。与第一份合同一样，第二份合同规定在中国出售石膏板，并要求Venture Supply负责安排运输以及相关费用。同样，第二份合同要求Perry先生在泰山工厂和中国装货港验货，以确保质量、规格和包装均符合Venture Supply的要求。与第一份合同一样，该合同亦含有仲裁条款，指定在中国由CIETAC仲裁解决任何因该合同而引起的主张。

31. 2006年3月11日前后，Perry先生再次来到泰山检验石膏板并同意将石膏板运至装货港。随附附件D为其验货证明书的复印件。同样，Perry先生在该份验货证明书中证实其已在中国检验石膏板并且石膏板符合买方的规格和质量要求。

32. 根据上述两份合同，Venture Supply负责将石膏板运送至最终目的地，另外还负责石膏板的所有权在中国转移至Venture Supply后的保险事宜。

33. 在中国港口交付石膏板之后，泰山与该等石膏板就再无关系。对于泰山在中国依据该等合同供应的石膏板是否被分销到弗吉尼亚州或在弗吉尼亚州使用，泰山毫不知情。

34. 随附附件E为Venture Supply采购石膏板的山东省泰安市出口商品专用发票汇总。该等发票系由泰山为税务目的在Venture Supply交易完成后开具的。该发票显示

4

Venture Supply 在中国从泰山总计购买了153,912张石膏板。发票也列明交付条款为 "FOB"，即Venture Supply在中国采购石膏板，并负责安排装运至其要求的目的地 并支付费用。

35. 泰山的员工或代表从未为Venture Supply合同或石膏板业务相关的其他事项而访问过 弗吉尼亚州。

36. 除与Venture Supply签署的两份合同外，泰山未与位于弗吉尼亚州的任何其他实体签 订过任何其他合同。泰山也未与专向弗吉尼亚州供应石膏板的公司签订过任何其他合 同。

37. Venture Supply将石膏板货款均付到了泰山在中国的银行账户内。

38. 泰山和Venture Supply的两笔交易都发生在中国。这是泰山向在美国的客户出售石膏 板的唯一交易。

39. 泰安泰山纸面石膏板有限公司（"TTP"）是于2006年2月成立的泰山全资子公司。 TTP只在中国生产和销售石膏板。TTP并未与任何位于弗吉尼亚州的公司签订过任何 合同。TTP与弗吉尼亚州没有任何的联系接触。

40. 鉴于泰山与弗吉尼亚州没有联系，以及以下提及的其他原因，本人代表泰山恳请贵法 院谅解泰山未在本案审判中应诉。

41. 泰山并非有意冒犯法庭或挑战其权威。鉴于泰山与弗吉尼亚州没有接触，以及以下提 及的其他原因，泰山当时真的认为泰山没有必要应诉。

42. 泰山从未在美国或世界上其他国家牵涉该种性质的诉讼。对于弗吉尼亚州或美国的 诉讼程序，泰山没有任何经验和知识可言。

43. 泰山员工所掌握的英语程度也无法达到能够阅读并理解以英文书写的法律文书的水平。因此，发往泰山的仅以英文书写的法律文书均未经泰山仔细探究，故而泰山并不理解不对经修订的起诉书做出回应的后果。

44. 泰山员工对美国司法程序一无所知，也无法理解美国诉讼中所提出的权利主张的性质或后果。即使相关文件翻译成中文，这一问题依然存在。

45. 泰山仅从中国法院收到本案相关的一份文件，即经修订的起诉书。中国法院并未向泰山提供任何其他文件，并且泰山到目前为止尚未收到与本案相关的任何其他中文文件。

46. 在收到本案的经修订的起诉书时，泰山并不理解本案怎么会有可能直接牵涉到泰山。因为泰山仅在中国销售石膏板，从未在美国销售过任何石膏板。泰山在中国向Venture Supply销售石膏板的事宜受仲裁条款管辖，该条款规定合同争议在中国通过仲裁解决。泰山在中国将石膏板交付给Venture Supply后，便不再与其出售给Venture Supply的石膏板有任何牵连。泰山遵守了其合同义务，并且没有理由认为泰山的石膏板有任何质量问题。

47. 泰山现在意识到法院已做出缺席判决，为了公司的声誉，泰山不得不进行抗辩，并申请撤销该份判定泰山产品存在缺陷的判决。泰山在美国聘请了律师，并认定有必要应诉并参加本案诉讼。泰山下定决心在本案中应诉，从而对贵法院的司法管辖权提出异议以及在其他方面为其进行必要的辩护。

6

48. 泰山的当务之急是寻求撤销本案的缺席判决。泰山恳请贵法院撤销缺席判决，让泰山有机会针对提出的诉求进行抗辩。

本人根据美利坚合众国法律项下的伪证处罚规定声明，上述内容真实、准确。

签署于 2010 年 8 月 15 日。

贾同春

7