UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED DRYWALL          )          MDL NO. 2047
PRODUCTS LIABILITY LITIGATION                )
                                             )          SECTION: L
                                             )
                                             )          JUDGE FALLON
                                             )          MAG. JUDGE WILKINSON
_____)

**THIS DOCUMENT RELATES TO ALL CASES**

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' STEERING COMMITTEE'S AND THE "QUESTIONERS"[1] RENEWED MOTION CHALLENGING THE ADEQUACY AND COMPLETENESS OF THE DISCOVERY RESPONSES OF DEFENDANTS TAISHAN GYPSUM CO. LTD. AND TAIAN TAISHAN PLASTERBOARD CO., LTD., AND TO COMPEL DISCOVERY & JURISDICTIONAL DEPOSITIONS TO OCCUR IN JANUARY 2012**

NOW INTO COURT COMES, the Plaintiffs' Steering Committee ("PSC") and the "Questioners"[2] who, pursuant to the Orders entered by this Honorable Court on May 26, 2011, (Rec. Doc. 9107), June 9, 2011, (Rec. Doc. 9524) and June 23, 2011 (Rec. Doc. 9639), submits this Supplemental Memorandum in Support of Plaintiffs' Steering Committee's and the Questioners Renewed Motion Challenging the Adequacy and Completeness of the Discovery Responses of Defendants Taishan Gypsum Co. Ltd. and Taian Taishan Plasterboard Co., Ltd., and to Compel Discovery & Jurisdictional Depositions to Occur in January 2012.  Taishan Gypsum Co., Ltd.

---

[1] See Paragraph IV of Minute Entry dated May 26, 2011 (Rec. Doc. 9107).

[2] The Questioners are comprised of the various parties who submitted Motions and/or Joinders in connection with the PSC's Motion to Compel Production of Documents and Further Jurisdictional Depositions of the Taishan Defendants and for Sanctions (Rec. Doc. 8685); see also, (Rec. Docs. 8695, 8755, 8765, 8758, 8792).   Venture Supply, Inc., Porter Blaine Corp. and Tobin Trading are not presently part of the Questioners due to a potential conflict.

("TG") and Taian Taishan Plasterboard Co., Ltd. ("TTP") are collectively referred to herein as "Taishan" or "Defendants".

In accordance with the Minute Entry dated June 9, 2011, following the status conference on that date, the Questioners identified the additional categories of documents requested from Taishan by letter dated June 24, 2011, copy attached as Exhibit "A".  Subsequently, Taishan and the Questioners conducted additional meet-and-confers.  In addition, there were numerous telephone conferences and communications by and between the Questioners and/or the PSC and Taishan.  As an example, the communications from the Questioners dated July 12, 2011 (copy attached as Exhibit "B"), August 3, 2011 (copy attached as Exhibit "C") and August 9, 2011 (copy attached as Exhibit "D") reference some of the Questioners communications with Defendants addressing requested documents.  The Meet and Confer process between the Questioners and Defendants has resulted in agreement between the parties as to eight items identified as A through H below.  Defendants have advised that they have provided all documents that they have with respect to each request identified in A through H below, and therefore based on this representation, the Questioners will not pursue these matters at this time, except insofar as these items may include additional discovery responses as a result of Defendants' failure to provide a complete production, including with respect to electronically stored information.   Furthermore, Defendants have advised that they recognize their obligation regarding the duty to supplement the responses if additional information is revealed.

A) **TG/TTP documents reflecting marketing and sales efforts aimed toward the United States including territories Guam, US Virgin Islands, Puerto Rico, etc., including:**

    i.      **drywall, and**
    ii.     **other products sold by TG/TTP.**

B) **As to TTP:**

    i.      **internal monthly reports of operations;**
    ii.     **communications between Jia and TTP, including reports;**
    iii.    **monthly reports sent to TG, BNBM, or other entities in the Taishan group;**
    iv.   **communications between Jia and Board of Directors;**
    v.    **audited financial statements on a monthly basis;**
    vi.   **annual Reports; and**
    vii.   **business plan for 2006 and 2007.**

C) **Records or transactions of cost sharing between TG and TTP.**

D) **Records of employees who dealt with sales of drywall to the United States including territories Guam, US Virgin Islands, Puerto Rico, etc., including:**

    i.      **payroll records;**
    ii.     **personnel file including job descriptions and evaluations;**
    iii.    **identification/business cards;**
    iv.   **employment agreements; and**
    v.    **expense reports.**

E) **Documents regarding the decision to shut down TTP's drywall production.**

F) **Documents reflecting the relationship with any of the exporters, agents, distributors, suppliers, and/or brokers that shipped products to the United States including territories Guam, U.S. Virgin Islands, Puerto Rico, etc., including but not limited to those listed in the MPF.**

G) **The fee information, guarantee contracts between BNBM and TG and related communications (see TG0020680).**

H) **Records related to any ISO (International Standard Organization) certification, including, but not limited to, ISO 9001, ISO 14004, and ISO 10003.**

There remain disputes between the parties as to the other discovery requests made on June 24, 2011. In order to obtain the necessary discovery in advance of the Taishan 30(b)(6) depositions scheduled to take place in Hong Kong in January 2012, as well as any others, the Questioners request that Taishan should be ordered to comply with the outstanding discovery requests as set forth below.

Documents identified in numbers 1 through 7 below, have been requested by the Questioners and are still in dispute.   Numbered items 1, 2, 3, 4, and 5 have been joined together and are referred to herein as the "Upstream/Downstream" documents.   Items 6 and 7 will be addressed separately, with item 6 focusing on the inadequacy of Taishan's collection of electronic documents, which impacts not only to items 1 through 5 below, but also as it relates to those items not in dispute, referenced as A through H above.

1) **Documents relating to BNBM upstream entities, including:**

    a.    **the relationship and communications between them;**
    b.    **the legal corporate structure; and**
    c.    **interaction between the various members of the affiliated or related entities.**

2) **Documents showing the relationship between TG/TTP and BNBM and its respective owners/shareholders, including:**

    a.    **communications and documents relating to the formation of TTP.**

3) **A corporate entity organizational chart relating to BNBM and its upstream and downstream entities, including:**

    a.    **the relationship and communications between them;**
    b.    **the legal corporate structure;**
    c.    **interaction between the various members of the affiliated or related entities; and**

4

      **d.**     see also, allegations in the Amorin Complaint, filed June 13, 2011 in the MDL, CA11-1395.

**4)**  **All annual reports, government filings, or foreign government filings created by BNBM during the relevant time period.**

**5)**  **Board minutes of BNBM and/or TG where either entity is, or both are, discussed including matters regarding operations and finance.**

**6)**  **Any written or electronic communication, including but not limited to MSN, Instant Messenger, text messages, regarding the sale or shipment or possible sale or shipment of any product to United States including territories Guam, U.S. Virgin Islands, Puerto Rico, etc., customers.**

**7)**  **Value Added Tax related documents and communications involving the export of product including representations made to the government of China and others regarding export of products.**

### UPSTREAM/DOWNSTREAM DOCUMENTS HAVE NOT BEEN PRODUCED BY TAISHAN (DISCUSSION REGARDING ITEMS 1, 2, 3, 4, & 5 ABOVE)

Documents responsive to requests 1, 2, 3, 4 and 5 above are relevant to the determination of, among other things, whether an alter ego, undertaker or agency relationship exists between Taishan, its parent corporation, Beijing New Building Materials Co., Ltd. ("BNBM"), and other entities upstream to BNBM.  The relationship between Taishan and its parent corporations is, without question, relevant to personal jurisdiction, because a parent corporation's contacts with the United States can be imputed to its subsidiary for purposes of personal jurisdiction. *See, e.g., Walker v. Newgent*, 583 F.2d 163, 167 (5th Cir. 1978) ("personal jurisdiction can still be found to exist over [the foreign subsidiary corporation] if the relationship between the parent corporation, GM, which does business in the State of Texas, and the [foreign subsidiary corporation], is one which would allow the court to find that the doing of business of the parent corporation can be imputed to the subsidiary . . . Our cases dealing with the agency relationship with regard to in

personam jurisdiction and the requirement of doing business address the situation where jurisdiction is sought over the parent corporation through its subsidiary's local activities. . . . The issue in the instant case is the reverse of that situation, but the same legal principles apply."); *Carson v. Maersk, Ltd.,* 61 F. Supp. 2d 607, 610-11 (S.D. Tex. 1999) ( "under certain circumstances, a sufficiently close relationship between a parent and its subsidiary may subject one corporation to personal jurisdiction based on the contacts of the other. . . . To impute the contacts of one corporation to another, there must be evidence of one corporation exercising sufficient control over the other to make the other its agent or alter ego. . . . Plaintiffs have produced evidence that [parent corporation] nonetheless dominates virtually every aspect of its former subsidiary's operations. Accordingly, the Court concludes that for the purpose of personal jurisdiction, [subsidiary corporation] is the alter ego of [parent corporation].") **(citations omitted).**

Defendants have refused to produce the requested documents on the claimed assertion that they "do not possess or control such documents."   Rather, Defendants assert, such documents are in the possession, custody or control of BNBM, and Defendants maintain that they are not obliged to produce documents in the possession of BNBM because "[t]here is a presumption of corporate separateness . . . and the burden is on the plaintiff to demonstrate abuse of the corporate form or a fraudulent purpose between the two entities to obtain the discovery [the Questioners] are seeking."  *See* Exhibit "E" (Taishan's July 27, 2011 letter) attached hereto.  Given the close relationship between China National Building Material Group Corporation, China National Building Material Company Limited, BNBM, and Taishan, the discovery requested should be provided.

6

### A. Taishan cannot withhold documents within its "control" under the meaning of Fed. R. Civ. P. 34(a).

A motion for the production of documents is entitled to broad and liberal treatment. *See, e.g. M.L.C., Inc. v. North American Philips Corp.,* 109 F.R.D. 134 (S.D.N.Y. 1986).   Documents need not be in a party's physical possession to be discoverable; they need only be in the party's custody or control.   It is well settled that a party need not have actual possession of documents to be deemed in control of them.   Control includes the legal right of the producing party to obtain documents from another source upon demand.   *Id.*   A party may be ordered to produce documents where that party has the legal right to obtain the documents, even though that party retains no copy, and regardless of whether the documents are beyond the jurisdiction of the court. *Id.*

In deciding whether a subsidiary has "control" over documents held by its parent corporation, courts focus on the closeness of the relationship between the entities.   If the requisite degree of closeness is found, production of the documents is required, even if in the possession of foreign parent or affiliates, irrespective of whether they are subject to personal jurisdiction of the Court.   *See, e.g., Flavel v. Svedala Industries, Inc.*, 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P 43,027 (E.D. Wis. 1993); *Cooper Inds., Inc. v. British Aerospace, Inc.,* 102 F.R.D. 918, 919 (S.D.N.Y.1984); *Johnson v. Cloos Int'l. Inc.* 1990 WL 106560, at *1-2 (N.D.Ill.1990); *In re Uranium Antitrust Litigation,* 480 F.Supp. 1138, 1145-53. If a party "can obtain the information from sources under its control, it may not avoid answering by alleging ignorance." *See, e.g., Ferber v. Sharp Electronics Corp.,* 40 Fed.R.Serv.2d 950 (S.D.N.Y. 1984). Furthermore, a party may be required to produce documents even if they belong to a third person who is not a party to

the action and even though the documents and things are themselves beyond the jurisdiction of the Court. *See, e.g. Japan Halon Co. Ltd. v. Great Lakes Chemical Corp.,* 155 F.R.D. 626 (N.D. Ind.1993).   Thus, the relevant inquiry is whether Taishan has the requisite degree of control over the documents sought.  *See, e.g., Afros S.P.A. v. Krauss-Maffei Corp.,* 113 F.R.D. 127, 129 (D.Del.1986); *In re Uranium Antitrust Litigation,* 480 F.Supp. 1138, 1145-53 (N.D.Ill.1979).

The question regarding Taishan's control over the requested Upstream/Downstream documents is easily answered: Mr. Jia is the Chairman of TG and sits on the Board of Directors of BNBM.   See Deposition of T. Jia at 121: 5-7, 47:21-24, 49:13-17 and 64:2-9, Exhibit "F".   At the BNBM board meetings he receives reports from the General Manager of BNBM.  *Id.* at 92:5-14.   The annual report of BNBM is made available at these meetings.  *Id.* at 94:11-95:4.   While Taishan would like to dispute it, Mr. Jia testified that BNBM and Taishan have a "joint venture."  *Id.* at 200: 3-16; 203: 1-10.   Thus, two rhetorical questions arise: Does a member of a board of directors have the right to demand documents from the company on whose board of directors he sits?   Does a member of a joint venture have a right to demand documents from its joint venture partner?   The answers to both questions are an unequivocal "yes." Accordingly, because Defendants have the requisite control and ability to obtain the Upstream/Downstream documents, Defendants should be required to produce the requested documents.

> **B.  Movants need not show abuse of the corporate form and fraudulent purpose or alter ego to obtain the requested documents from Taishan.**

Defendants' position is also incorrect as a matter of law: abuse of the corporate form and fraudulent purpose is simply not the standard for determining whether Taishan has "possession,

custody or control" of documents under Fed. R. Civ. P. 34(a).   Federal courts construe "possession custody or control" very broadly under Rule 34; in particular, a party is not required to have legal ownership or physical possession of the requested documents, rather, control is defined as the legal right, authority or ability to obtain the documents.   *See United States ex rel. Branch Consultants v. Allstate Ins. Co*., 2010 U.S. Dist. LEXIS 98283 (E.D. La. Aug. 31, 2010) ("Rule 34 is broadly construed and documents within a party's control are subject to discovery, even if owned by a nonparty."); *see also Camden Iron and Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438, 441 (D.N.J. 1991); *Bank of N.Y. v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135 (S.D.N.Y. 1997); *Scott v. Arex, Inc.*, 124 F.R.D. 39, 41 (D. Conn. 1989); *Flavel v. Svedala Indus., Inc*., 92-C-1095, 1993 WL 580831 (E.D. Wis. Dec. 13, 1993) ("In spirit with the current policy of permissive discovery, a party is generally considered to have "control" over documents under Rule 34(a) if it can likely obtain such documents upon demand . . . [this analysis] promotes the policies underlying Rule 34(a).").   Taishan cannot be allowed to shield crucial documents from discovery merely by storing them in a parent company or affiliate.[3]   *See, e.g., Cooper Industries, Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918 (S.D.N.Y. 1984).

In the context of determining whether a subsidiary has possession, custody or control of documents belonging to its parent, courts consider the nature of the relationship between them to determine whether the subsidiary has "access to the documents" and "ability to obtain the documents."   Contrary to Taishan's assertion, however, the relationship **need not** rise to the level

---

3  The Questioners have not been able to obtain documents from several of the Upstream/Downstream Entities because either they have avoided making an appearance in a United States court, have had a default judgment obtained against them, or are outside of the subpoena power of the Court.

of agency or alter ego (although a finding of alter ego or agency will generally suffice to meet the Rule 34 requirement of control).[4]   *Addamax Corp. v. Open Software Found.,Inc*., 148 F.R.D. 462, 467 (D.Mass. 1993).    District courts have explicitly rejected the notion that veil-piercing or alter ego standards applied for purposes of liability are applicable in the context of Rule 34(a).   *See, e.g.*, *Flavel v. Svedala*, 1993 WL 580831 (E.D. Wis. 1993) ("a party may exercise the requisite degree of "control" over documents held by a related entity under the discovery rules without exhibiting the degree of interrelationship necessary to project liability upon such entity pursuant to the [applicable liability statute]. **The degree of relationship between a domestic subsidiary and a foreign parent required to subject the latter to liability . . . is certainly greater than that needed to subject the latter to document production through the former.**") (emphasis added); *Camden Iron & Metal, Inc. v. Marubeni Am. Corp*., 138 F.R.D. 438, 442 (D.N.J. 1991) ("**Rule 34(a) does not require plaintiff to demonstrate an alter ego relationship in order to show that a litigant 'controls' documents or things that are possessed by a parent corporation** with respect to a specific transaction involving parent and subsidiary . . . the determination of control turns upon whether the intracorporate relationship establishes some legal right, authority or ability to obtain the requested documents on demand.") (emphasis added); *Alcan Int'l Ltd. v. S.A. Day Mfg. Co*., 176 F.R.D. 75, 78 (W.D.N.Y. 1996).

### C. Analysis of Defendants' close relationship with BNBM requires production of the requested documents.

The analysis of control in the context of a parent-subsidiary relationship for purposes of

---

4)    While it is the PSC's and the Questioners' view that BNBM and Taishan did, in fact, have an alter ego and/or agency relationship, in light of the irrelevance of that issue for purposes of a Rule 34(a) analysis, that is a discussion for another day.

Rule 34 is fact-specific and depends on the totality of circumstances.   The presence or absence of any one factor is not dispositive.   *See Flavel v. Svedala Indus., Inc*., 92-C-1095, 1993 WL 580831 (E.D. Wis. Dec. 13, 1993) ("because none of these factors acts as an exclusive test, each factor need not be satisfied to prove the existence of Rule 34(a) "control.").   Among the factors to be considered are:

> (1) commonality of ownership;

> (2) exchange or intermingling of directors, officers or employees of the two corporations;

> (3) exchange of documents between the corporations in the ordinary course of business;

> (4) the financial relationship between the corporations;

> (5) any benefit or involvement of the nonparty corporation in the transaction;

> (6) oversight responsibility by the parent of the subsidiary; and

> (7) involvement of the non-party corporation in the litigation.

*See Shell Global v. RMS*, 2011 WL 3418396 (S.D. Tex. 2011); *Super Film of Am., Inc. v. UCB Films, Inc*., 219 F.R.D. 649, 655 (D. Kan. 2004); *In re Global Power*, 418 B.R. 833 (Bankr. D. Del. 2009) (standard for "control" turns on "nature of the relationship," which requires examination of three factors: (1) corporate structure of parent/subsidiary; (2) parent's connection to transaction; and (3) degree to which parent will benefit); *Camden Iron and Metal, Inc., v. Marubeni America Corp.*, 138 F.R.D. 438, 439, 441 (D.N.J. 1991) (defendant had control over documents in the possession of its non-party foreign parent where, *inter alia*, defendant was a wholly owned subsidiary of parent and employees were often transferred between parent and defendant subsidiary); *Afros S.P.A. v. Krauss-Maffei Corp*., 113 F.R.D. 127, 131-32 (D. Del.

1986) ("Whether a subsidiary is wholly or partially owned by the parent, the overlap of directors, officers, and employees, or the financial relationship between the corporations all aid in the analysis of control . . . a non-party's participation in a transaction, and its consequent possession of related documents, must be considered in determining control for Rule 34 purposes . . . [here], [t]he relationship between [subsidiary defendant] and [parent] is very close. In addition to being a wholly owned subsidiary, [subsidiary defendant's] Board consists of upper echelon [parent] employees who have substantial oversight responsibility in that corporation."); *Flavel v. Svedala Indus., Inc*., 92-C-1095, 1993 WL 580831 (E.D. Wis. Dec. 13, 1993) ("a sufficiently close corporate relationship exists between a domestic subsidiary and a foreign parent to compel the former to produce documents held by the latter if their degree of interrelation is evidenced by (1) adequate ownership share in the subsidiary by the parent; (2) interlocking management structures; (3) sufficient control exercised by the foreign parent over the subsidiary's directors, officers, and employees; and/or (4) a 'connection to the transaction' at issue.").

### i.   <u>There is a commonality of interest between BNBM and Taishan that requires the production of the requested documents.</u>

Nearly all of the above-listed factors are present here.  The Questioners, completely independent of the discovery responses provided by Taishan, that have performed an investigation and uncovered documents that reveal the complex relationship between CNBM, BNBM and their various subsidiaries.   Despite requests made in the discovery process from Taishan and Taishan's refusal to cooperate, and the roadblocks that have been erected to prevent the Questioners from obtaining discovery from the Upstream/Downstream entities, many of whom have refused to make an appearance in the United States, it is clear that the CNBM/BNBM/Taishan entities are

12

interrelated. First, there is commonality of ownership between BNBM and Taishan.[5]   The

parent-subsidiary relationship between BNBM and Taishan is evident even on the face of the

Taishan's less-than-robust production.   Moreover, through an independent investigation, the

Questioners have uncovered additional documents and information that demonstrate that BNBM,

TG and TTP are each part of a complex web of interrelated Chinese state-owned corporations in

the building materials sector.   The totality of information compiled to date by the Questioners

regarding Taishan and its parent entities' corporate structure is reflected in the diagram below,

entitled "Taishan 2006 Corporate Structure," as well as by Exhibit "G".   This diagram indicates

that BNBM owns a majority stake—65%—in TG, which in turns owns 100% of TTP. (BNBM

owns 42% of TG directly and 23% indirectly, through Tai'an Donglian Investments Trading

Company, Ltd. ("Donglian"), a wholly owned subsidiary of BNBM.)    Further, as the diagram

demonstrates, BNBM, TG and TTP are all rungs of the same corporate ladder, with the same

ultimate parent in the form of The State Owned Asset Supervision and Administration

Commission of State Counsel ("SASAC")[6], and the same intermediate parents in the form of

---

5 See attached Exhibit "G", corporate structure analysis.

6 The State Owned Asset Supervision and Administration Commission of State Counsel ("SASAC") is a special
commission of the People's Republic of China, directly under the State Council.   In essence, the SASAC is the PRC.
It is responsible for managing China's state-owned enterprises, including appointing top executives and approving any
mergers or sales of stock or assets, as well as drafting laws related to state-owned enterprises.   *See* State-owned
Assets   Supervision   and   Administration   Commission   (available   at:   en.wikipedia.org/wiki/
State-owned_Assets_Supervision_and_Administration_Commission).   The Chairman and Party Secretary is Wang
Yong.   *Id.*   According to its website, the SASAC:

> [P]erforms the responsibility as the investor on behalf of the state; supervises and
> manages the state-owned assets of enterprises according to law; guides and
> pushes forward the reform and restructuring of SOEs. SASAC appoints and
> removes top executives of the enterprises under the supervision of the Central
> Government, evaluates their performances, and grants them rewards or inflicts
> punishments.   SASAC also directs and supervises the management work of local

China National Building Material Group Corporation ("CNBM Group") and China National Building Material Company Limited ("CNBM"). [7] Further, there are public investors that are based in the United States. For instance, Morgan Stanley, JP Morgan Chase & Co., and T. Rowe Price Group, Inc., are all prominently identified as substantial shareholders of China National Building Material Company Limited. [8]

---

state-owned assets.

*See* SASAC website (www.sasac.gov.cn/n2963340/n2963378/2965645.html).   SASAC owns 100% of China National New Building Materials (Group) Corporation. *See* Taishan & BNBM Structure/Government Control, Document No. 00113.

7)   The information reflected in this diagram was derived primarily from information independently located by the Questioners:   Illustration of Shareholding and Controlling Relation between BNBM and Its Ultimate Controlling Shareholders, Taishan & BNBM Structure/Government Control   00113; CNBM Global Offering, dated March 16, 2006, pp. 18, 20, 96- 97; CNBM Announcement re: Connected Transaction Acquisition of the Entire Equity Interest in Tai'an Donglian Investment Trading Company Limited Connected Transaction Provision of Financial Assistance to Tai'an State Owned Assets Management Company, dated August 28, 2006; CNBM 2010 Annual Report, pp. 7, 13; Wenlong Peng Depo., dated April 7, 2011, p. 135:3-5; Dec. of Tongchun Jia, dated August 15, 2010, ¶ 39. (See Exhibit "H".)

8)   Subpoenas have been issued by the PSC to all of these entities and pending before the Court presently are Motions to Compel against JP Morgan Chase & Co. and T. Rowe Price Group, Inc.

14



**TAISHAN 2006 CORPORATE STRUCTURE**
Post March 16, 2006 Global Offering and August 28, 2006 Acquisition of Tai'an Donglian Investments Trading Co., Ltd.

As demonstrated in the above diagram,[9] at the top rung of the corporate ladder was SASAC, which owned 100% of CNBM Group.   In turn, CNBM Group owned 100% of Beijing New Building Material (Group) ("BNBM Group"), China National Building Material Import and Export Company ("CNBM Trading"), and China Building Materials Academy.   These three entities, BNBM Group, CNBM Trading, and China Building Materials Academy, along with China Cinda Asset Management Corporation ("Cinda") and the Public Investors are known as the

---

9)   This diagram reflects Taishan's upstream corporate structure after the March 16, 2006 Global Offering of CNBM's shares on the Hong Kong Stock Exchange and the acquisition of Tai'an Donglian Investments Trading Co., Ltd by BNBM.   The corporate structure that existed in 2006 remains largely unchanged to this day.   See Exhibit "G".

"Promoters" collectively own 100% of CNBM.   Interestingly, a number of the public investors are United States companies.

**ii.  BNBM and Taishan share numerous officers and directors, giving Taishan the requisite control over the requested documents.**

*Second*, BNBM and Taishan shared and continue to share numerous officers and directors. For example, Tongchun Jia, Cao Jianglin, Wang Bing and Yang Yanjun each sit on the Boards of both BNBM and   Taishan Gypsum.   Mr. Tongchun serves as a Director, General Manager, and Chairman of Taishan Gypsum and has held the positions of Director, Deputy General Manager, and Manager of BNBM.[10]   Mr. Cao is a Supervisor at TG, and has held the positions of Chairman, President, and Supervisor of BNBM, and President and Executive Director of CNBM.   Mr. Wang serves as a Director of Taishan Gypsum and has held the positions of Chairman, Director, and General Manager of BNBM, and Vice President at CNBM.   Mr. Yang serves a Director of Taishan Gypsum and has served as Deputy General Manager, Chief Accountant, Chief Financial Officer, and Finance Director of BNBM, as well as Chief Accountant and Deputy General Manager at CNBM.[11]   Several of these Taishan executives were also executives at BNBM's parent, CNBM, including Cao Jianglin, Wang Bing and Yang Yanjun.

---

10)    *See* Taishan Gypsum 2006 Articles of Association (TG0020675-TG0020676 & TG0020710); Taishan Gypsum Resolution of the First Meeting of the Fourth Board of Directors (2008) (TG 0020789); CNBM Overseas Regulatory Announcement, Summary of BNBM Annual Report (2008); CNBM Overseas Regulatory Announcement, Summary of BNBM Annual Report (2009); and Capital IQ -Standard and Poor (July 26, 2011), attached as Exhibit "I".

11)    *See* Taishan Gypsum 2006 Articles of Association (TG0020675-TG0020676 & TG0020710); CNBM Overseas Regulatory Announcement, Summary of BNBM Annual Report (2008); CNBM Overseas Regulatory Announcement, Summary of BNBM Annual Report (2009); and Capital IQ - Standard and Poor (July 26, 2011), see Exhibit "I".

### iii.   BNBM had oversight responsibility for Taishan, further proof of control over the requested documents.

*Third*, BNBM had oversight responsibility for Taishan.   For example, BNBM appointed a majority of TG and TTP's board members.[12]   And, according to CNBM, with the purchase of Donglian, which gave BNBM an additional 23% interest in TG, "BNBM . . . **gained long term control** of Taihe's (Taishan Gypsum) board of directors."[13]   Indeed, according to CNBM, the entire purpose of BNBM's acquisition of Donglian was to "enable CNBM Group to further enhance its competitiveness and consolidate its leading position in the PRC gypsum board market as **it will participate more actively in the daily operations and management of Taihe (Taishan Gypsum)** with a view to improving its profitability."   *Id.* (emphasis added).

There is a financial interrelationship between Taishan and the BNBM Upstream/Downstream entities.   For instance, BNBM provided a RMB 100 million loan guarantee to TG.[14]   This is just one evidence of their close financial parent subsidiary dealings. Another example is found in a Maximum Amount Guarantee Agreement, see Exhibit "M", TG0025560-63.   This document clearly identifies Shandong Taihe Dongxin Co., Ltd. (the former name of TG) as the debtor on debts formed between February 15, 2006 to February 14, 2007 with BNBM as the guarantor.[15]   The Agreement, Article VIII., <u>Miscelleaneous</u>, requires that "the

---

12)   *See* 2006 Articles of Association of Shangdong Taihe Dongxin Co. (TG0020686-717) and 2007 Articles of Association of Taishan Gypsum Co. (TG0020725-48, see Exhibit "J").

13)   *See* CNBM "Connected Transaction Acquisition of the Entire Equity Interest in Taian Donglian Investment Trading Company Limited Connected Transaction Provision of Financial Assistance to Taian State Owned Assets Management Company," dated August 28, 2006 (emphasis added), see Exhibit "K".

14)   *See* Shandong 2005 Annual Shareholder Meeting Resolution (TG0020677-81), see Exhibit "L".

15  Unfortunately, the Master Contract identified in this exhibit has not been produced to the Questioners.   Also, the

Guarantor [BNBM] shall actively be aware of the operation of the Debtor [Taishan] and the occurrence and conduction of the business hereunder."   Questioners are entitled to discover this information.   These financial dealings and others that are believed to be in existence clearly show the close relationship between the Upstream/Downstream entities.

### iv.   BNBM was in active concert and participation with Taishan in connection with defective drywall in the United States.

*Fourth*, BNBM participated in the transactions at issue in this litigation.   BNBM shipped defective Chinese drywall to the United States (New Orleans and Florida), as reported by the U.S. Consumer Product Safety Commission and as testified to in these consolidated cases.[16]   Further, BNBM employees were   copied on Taishan communications concerning the sales of drywall at issue here.   *See, e.g.*, TG0001377-0001386 (copying David Wei of BNBM), Exhibit "N".

In addition, Taishan has not asserted, much less demonstrated, an inability to obtain the requested documents, which is yet another factor weighing in favor of a finding of control for purposes of Rule 34.   *States ex rel. Branch Consultants v. Allstate Ins. Co.*, 2010 U.S. Dist. LEXIS 98283 (E.D. La. Aug. 31, 2010) (affirming order of Magistrate Judge requiring parent to produce documents in the possession of its subsidiary because, *inter alia*, the subsidiary "does not contend that it is unable to procure the files from its subsidiary."); *Camden Iron and Metal, Inc., v. Marubeni Am. Corp.*, 138 F.R.D. 438, 439, 441 (D. N.J. 1991) (defendant's failure to show inability to obtain requested documents   weighed in favor of finding that defendant had control

---

Questioners have not seen "the truthful, integral and valid financial statements and other relevant materials and information" that are called for in the Agreement.

16)   *See* New From CSPC, "CPSC Identifies Manufacturers of Problem Drywall Made in China," May 25, 2010, available at http://www.cpsc.gov/cpscpub/prerel/prhtml10/10243.html; Dep. of M. Norris, 8/10/11, at 5-7 and 23-25.

over foreign parent's documents).

While Taishan has repeatedly invoked the testimony of Jia Tongchun in an effort to debunk the theory that BNBM exercised control over TG's activities, this reliance on deposition testimony is misplaced.  The Court itself has noted that such testimony is "useless" and has ordered the corporate depositions to be re-taken.  Moreover, Taishan cannot simply rely upon its employee's own self-serving testimony to thwart document discovery.  Nor can Taishan stand upon its assertion that the requested documents are not in its possession, custody or control.  *Cooper Indus., Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918, 920 (S.D.N.Y. 1984) (conclusory statements submitted by defendant to show the relevant documents were not in its custody or control did not suffice).

The relationship between Taishan and BNBM is precisely the close parent-subsidiary relationship that courts have consistently found to be sufficient to give a subsidiary corporation possession, custody and control over documents of its foreign parent.  Further, the requested documents go to the heart of key issues of personal jurisdiction in this litigation, and are particularly necessary in light of the paltry amount of documents produced by Taishan to date, and the multitude of document requests as to which Taishan has asserted they simply have no responsive documents.[17]  Having demonstrated the requisite possession, custody and control of

---

17 For instance, the Questioners believe there are a lot of documents that have not been produced which are relevant to jurisdictional issues, particularly in light of the paltry amount of documents produced by Taishan to date:  of a total production of approximately 16,000 documents, approximately 8,200 documents pertain to Taishan's purchase of U.S. waste paper product (approximately 2,100 of those documents are invoices for waste paper and approximately 6,100 are pictures of waste paper).   Thus, a whopping 51% of Taishan's production consists of documents that pertain to Taishan's purchase of U.S. waste paper product and have nothing to do with the referenced categories of documents requested by the Questioners.

the Upstream/Downstream documents, Movants respectfully request that the Court enter an order requiring Defendants to produce the requested documents.

**TAISHAN IMPROPERLY LIMITED ITS SEARCH OF ELECTRONICALLY STORED INFORMATION, INCLUDING EMAILS AND OTHER ELECTRONIC DOCUMENTS (DISCUSSION REGARDING ITEM 6 ABOVE, HOWEVER, IT ALSO APPLIES TO ITEMS 1, 2, 3, 4, 5 & 7 AS WELL AS ITEMS A, B, C, D, E, F, G, & H)**

The adequacy of Taishan's search for documents in advance of its production for all of the items requested by the Questioners is crucial to determine whether its production is truly "complete."   As part of the Questioner's efforts to gauge the "completeness" of Taishan's production, the Questioners   requested numerous times that Taishan make a production from all corporate individuals that may have responsive documents.   In the meet and confer that took place on July 29, 2011, the Questioners specifically asked Taishan to identify the custodians whose computers were reviewed in connection with jurisdictional discovery responses by Taishan.   On August 3, 2011, Hogan and Lovells ("HL") responded to the request and stated that it had only "searched the computers of everyone under Defendants' control who we [HL] are informed was involved in the business of selling or manufacturing drywall that was made to US specifications. Peng Wenlong; Che Gong; Yang Jiapo; Jia Kai; Zhang Jijun; Zhang Jianchun; Jia Tongchun." These individuals whose computers were searched are little more than the sales staff of TTP and what appear to be other lower-ranking employees in the organization along with Jia Tongchun and Zhang Jianchun, the chairman and secretary of TG.[18]

---

18  While the exact number of people employed by TG has yet to be determined, it is clear that the handful of custodians are only a small part of a far larger workforce that likely reached the low thousands.  For example, in 2006, TG had 17 Directors, general Managers and Supervisors who oversaw a substantial enterprise that held assets in the amount of RMB 7,234,900 and generated net profits 99,754,450.26 yuan.  See TG0020384, TG0020722.  See also, http://www.made-in-china.com/showroom/zhucunshuang, http://www.hellotrade.com/taishan-gypsum-china/, and

Taishan cast a very narrow net over its electronically stored information ("ESI") limiting its searches to only the lower ends of its employees and to the sale of drywall.   The Questioners' discovery requests sought jurisdictional related documents and requested the production of documents about, among other things, the upstream/downstream entities, the relationship between all of the entities that cooperated in the manufacture of TG's drywall, strategic business decisions of Taishan, the decision to establish and then to shut down TTP, the application for VAT exemptions and any informal agreements relating to cost sharing between TG and BNBM.   These discovery requests sought information that may be beyond the knowledge of the seven custodians whose information was searched.   For example, Request No. 1 sought "Documents relating to BNBM upstream entities, including . . . the relationship and communications between them," and the decisions relating to, *inter alia*, the establishment and dissolution of TTP may easily reach above Mt. Tongchun.

HL only searched the computers of those personnel it was informed were involved in the business of selling or manufacturing drywall made to U.S. specifications.   It did not search the computers of all members of the TG board, its directors or executives.   For example, it did not search the computers of those persons who were not only active in TG, but also had leadership roles in BNBM and CNBM, such as Cao Jianglin (a Supervisor at TG and the Chairman, President and Supervisor for BNBM), Wang Bing (a Director at TG who has held the positions of Chairman, Director and General Manager of BNBM *and* Vice President at CNBM), or Yang Yanjun (a Director at TG who has served as Deputy General Manager, Chief Accountant, Chief Financial

http://xianhali.greentradebay.com/.

Officer and Finance Director of BNBM *and* served as Chief Accountant and Deputy manager at CNBM).

Based on the failure of Taishan to adequately gather ESI from a sufficient range of custodians, Taishan should be ordered to search the computers and documents of the above named leaders in the CNBM entities as well as those of their administrative support staff, and to meet and confer with the Questioners regarding the identities of other potential custodians who played a leadership role in the business of TG as is relevant to the discovery requests propounded by the Questioners.

## TAISHAN REFUSED TO MAKE A COMPLETE PRODUCTION REGARDING ITS MARKETING AND SALES EFFORTS AIMED TOWARDS THE UNITED STATES

Taishan has also refused to produce any further documents related to its sales and marketing efforts aimed towards the United States, citing in support of its position a baseless interpretation of the Supreme Court's recent plurality decision in *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011).  That decision reversed the New Jersey Supreme Court's exercise of specific personal jurisdiction over a British manufacturer of machinery that injured the plaintiff in New Jersey. The defendant did not market its machinery in New Jersey where the accident occurred, did not ship any of its machines to New Jersey, and no more than four of its machines (the record suggested only one machine), including the one that injured the plaintiff, ended up in New Jersey. The defendant did attend annual conventions for the scrap metal industry to advertise its machines, but never in New Jersey, and it contracted with an independent distributor to sell its product in the United States. *Id*. at 2786.   On the basis of these facts, the New Jersey Supreme Court held that "courts can exercise jurisdiction over a foreign manufacturer of a

product so long as the manufacturer 'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states.'" 131 S. Ct. at 2785 (emphasis added).  With four justices joining a plurality opinion authored by Justice Kennedy and Justice Alito joining a concurring opinion authored by Justice Breyer, *Nicastro* reversed the New Jersey Supreme Court.   Taishan has taken the position that, in light of *Nicastro*, its "sales, marketing, and distribution outside the handful of states at issue in this case is not relevant."   Letter from Frank T. Spano, Hogan Lovells, to Lenny Davis, Herman, Herman, Katz & Cotlar, LLP (July 1, 2011) (see Exhibit "O", attached hereto.)

Taishan's reliance on *Nicastro* is misplaced. The controlling opinion in *Nicastro* is Justice Breyer's concurrence,[19] which explicitly rejected the plurality's attempt to "refashion" the law of personal jurisdiction.   Justice Breyer noted that *Nicastro* "[is] an unsuitable vehicle for making broad pronouncements that refashion basic jurisdictional rules," *Id.* at 2793, and opted to instead "adhere strictly to [Supreme Court] precedents and the limited facts found by the New Jersey Supreme Court." *Id.* at 2794.   Given that there was not even a showing that the British defendant "delivered its goods in the stream of commerce 'with the expectation that they will be purchased' by New Jersey users," *id.* at 2792 (citing *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 298 (1990)), Justice Breyer held that the particular facts of the case did not warrant the exercise of personal jurisdiction. *Id.* at 2792.   In criticizing the plurality's strict approach to jurisdiction, the concurrence raises a number of pertinent questions that are likely to impact a future case with

_____

19    It is well-established that in cases like *Nicastro*, "when no opinion . . . commands the support of the majority of the justices, the holding of the Court is the position taken by the justices who based their acquiescence in the decision on the narrowest grounds." *United States v. Eckford*, 910 F. 2d 216, 219 n. 8 (5th Cir. 1990) (citing *Marks v. United States*, 430 U.S. 188 (1977)).

different facts:

> The plurality seems to state strict rules that limit jurisdiction where a defendant does not "inten[d] to submit to the power of a sovereign" and cannot "be said to have targeted the forum." But what do those standards mean when a company targets the world by selling products from its Web site? And does it matter if, instead of shipping the products directly, a company consigns the products through an intermediary (say, Amazon.com) who then receives and fulfills the orders? And what if the company markets its products through popup advertisements that it knows will be viewed in a forum? *Those issues have serious commercial consequences but are totally absent in this case.*

*Id.* (emphasis added).

Because *Nicastro* does not alter from the Supreme Court's prior holdings on specific personal jurisdiction, the Fifth Circuit's pre-*Nicastro* stream-of-commerce analysis remains intact and determines the relevance – and, hence, the discoverability – of Taishan's sales and marketing efforts directed to the United States.  In particular, Fifth Circuit precedent makes it clear that courts may exercise personal jurisdiction over a foreign manufacturer which intentionally places its products into the stream of commerce and reasonably anticipates their use in the forum state. *See, e.g., Irving v. Owens-Corning Fiberglas Corp*., 864 F. 2d 383, 385-387 (5th Cir. 1989); *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F. 3d 415, 420 (5th Cir. 1993) (noting that "[a]bsent rejection by a majority on the Supreme Court, we have continued to apply the stream of commerce analysis found in our pre-*Asahi* cases").  Accordingly, Taishan's sales to U.S. distributors, even those outside the forum states, may provide evidence upon which this Court would exercise personal jurisdiction, *i.e.,* evidence of Taishan's placement of its product into the stream of commerce in a manner that reasonably anticipated their use in the forum states. The discovery

sought by the Questioners is thus within the "broadly defined" scope of relevance in the context of jurisdictional discovery, *Wyatt v. Kaplan*, 686 F. 2d 276, 284 (5th Cir. 1982). This Court should compel Taishan to make a complete production of its sales and marketing efforts so that the Court may determine the question of its jurisdiction.

## TAISHAN WRONGLY REFUSES TO PROVIDE RELEVANT VAT DOCUMENTS (DISCUSSION REGARDING ITEM 7 ABOVE)

The Questioners have requested Value Added Tax ("VAT") related documents and communications involving the export of product, including representations made to the government of China and others regarding export of products have been requested by the Questioners.   According to the testimony of Jianchun Zhang, TG implemented a policy to exempt themselves from all VAT, and TTP implemented a half-exemption policy during the time period of 2006-2007.   (See Zhang, Tr. 153, Exhibit "P"). This assertion was confirmed by review of translated versions of the BNBM Annual Reports from 2005 through 2009.   To date, Defendants have not produced any communications from government authorities or records kept by TG or TTP indicating any VAT exemptions.   What Defendants have produced are a series of invoices, many of which bear the label "VAT Invoice" as well as a caveat stating, "This copy does not serve as a voucher for reimbursement or tax deduction purposes." (*See, e.g.*, TG0019867, Exhibit "Q".)   Pursuant to Article 21 of the "Provisional Regulations on VAT of the People's Republic of China," if an enterprise sells VAT-free goods, it is precluded from issuing a special VAT-invoice. On multiple occasions, deponents for Defendants testified that these invoices were provided to customers "for VAT purposes." (See Jia Tr. at 481, Exhibit "R"; *see also* Zhang Tr. at 140-143, 152-154, Exhibit "S".) Defendants have also provided a few

pieces of correspondence indicating reimbursement rates were changing at one point while these transactions with exporters were taking place.    However, there has not been any correspondence regarding how the invoices are to be used. (See, e.g., TG 0022051-0022060, Exhibit "T".) Defendants have also not produced any documentation related to VAT exemptions.   If such documentation exists, it should be produced.

Based on the function and application of the VAT, as well as testimony provided by representatives for Defendants at deposition, Defendants must have either generated or received additional documents related to the VAT which they have not yet provided. These documents fall into several categories within the umbrella of the VAT request, which include, but are not limited to the following and it should be produced:

- VAT exemption application documents filed by TG and TTP;

- Examination, confirmation and/or approval documents relating to VAT exemption application issued by taxation authorities and received by TG or TTP; and

- Any correspondence from or to Chinese tax authorities, including but not limited to the Shandong State Tax Bureau, the Taian State Tax Bureau of Shandong Province, the State Tax Bureau of Taian High and New Technology Industrial Development Zone, the Ministry of Finance and the State Administration of Taxation.

## CONCLUSION

"Disclosure, like all discovery, is not a game. It should have as its goal the preparation of cases for trial or settlement. Neither the "new" rules nor the "old" were intended to be used as swords by overzealous litigators. Because the amended rules attempt to change a culture of advocacy in which "hiding the pea" has too frequently been the objective, courts must not tolerate their abuse. In construing them, however, care must be taken not to elevate form over substance. Like all rules, their interpretation and application will require common sense and cooperation."*Bryan v Riddel* 875 P.2d 131, 136: 178 Ariz. 472, 477 (1994).   Taishan cannot continue to "hide the pea".   Taishan must be ordered to produce the requested discovery responses.

Respectfully submitted,

Dated:   August 22, 2011

/s/ Leonard A. Davis
Russ M. Herman, Esquire
Leonard A. Davis, Esquire
Stephen J. Herman, Esquire
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhkc.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*

Arnold Levin, Esq.
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel*
*MDL 2047*

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm. LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Robert C. Josefsberg
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
rjosefsberg@podhurst.com

Ervin A. Gonzalez
Colson, Hicks, Eidson, Colson
  Matthews, Martinez, Gonzales,
  Kalbac & Kane
255 Aragon Avenue, 2nd Floor
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
  Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
Lambert and Nelson
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Bruce William Steckler
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
  & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker
Parker, Waichman, Alonso LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

James Robert Reeves
Lumpkin & Reeves
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger
Seeger Weiss, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Richard J. Serpe
Law Offices of Richard J. Serpe
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
rserpe@serpefirm.com

Daniel K. Bryson
Lewis & Roberts
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
Phone: (919) 981-0191
Fax: (919) 981-0431
dkb@lewis-roberts.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

## OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.WSuite   650
Washington, DC 20006
Phone: (202) 540-7200
Fax:   (202) 540-7201
rlewis@hausfeldllp.com

Jeremy W. Alters
Alters Law Firm
4141 N.E. 2nd Avenue
Suite 201
Miami, FL 33137
Phone: (305) 571-8550
Fax: (305) 571-8559
jeremy@alterslaw.com

Andrew A. Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 (mailing address)
15058 River Road
Hahnville, LA   70057
Phone:   (985) 783-6789
Fax:   (985) 783-1333
andrew@lemmonlawfirm.com

30

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 22nd day of August, 2011.

/s/ Leonard A. Davis
Leonard A. Davis
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Ave.
New Orleans, LA   70113
PH:   (504) 581-4892
Fax:   (504) 561-6024
ldavis@hhkc.com