# EXHIBIT B



| | | | | |
|---|---|---|---|---|
| **HERMAN HERMAN KATZ & COTLAR** L.L.P. ATTORNEYS AT LAW Est. 1942 | 820 O'Keefe Avenue New Orleans, Louisiana 70113-1116  p: 504.581.4892 f: 504.561.6024 e: info@hhkc.com  hhkc.com | Harry Herman (1914-1987) Russ M. Herman* Maury A. Herman* Morton H. Katz* Sidney A. Cotlar* Steven J. Lane Leonard A. Davis* James C. Klick¹ Stephen J. Herman | Brian D. Katz Soren E. Gisleson ——— Joseph E. Cain Jennifer J. Greene¹ John S. Creevy Jeremy S. Epstein¹ Joseph A. Kott, M.D. J.D. (Of Counsel) | Offices in New Orleans and Covington, Louisiana  This firm and its partners are also partners in Herman Gerel, LLP (formerly known as Herman, Mathis, Casey, Kitchens & Gerel, LLP)  * A Professional Law Corporation ¹ Also Admitted in Texas ‡ Also Admitted in Arkansas |

July 12, 2011

<u>VIA EMAIL</u>

Frank Spano
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
frank.spano@hoganlovells.com

    Re:    **In Re: Chinese Drywall Products Liability Litigation**
              **MDL-2047**

Dear Frank:

      This letter shall serve as a response to your letter of July 1, 2011, and is in furtherance of the Court's Minute Entries dated June 9, 2011 and June 23, 2011. Rest assured that the "questioners" have considered the list of documents provided in your June 6, 2011 letter, the Summary of Deposition Testimony provided on June 22, 2011, and your recent July 1, 2011 letter. We have also taken into consideration *Goodyear Dunlap Tires Operations, SA v. Brown* and *J. McIntyre Machinery, Ltd. v. Nicastro*, the two (2) recent Supreme Court opinions involving personal jurisdiction. After we have had an opportunity to review a complete production of documents, we can then, in sequential order, address the depositions of TG's and TTP's Rule 30(b)(6) representatives (see Minute Entry dated June 9, 2011). We have already given you a preview of the areas of inquiry for corporate depositions in our letter of June 24, 2011.

      TG and TTP (collectively, "Taishan" or "Defendants") have consistently taken the position that Taishan and its affiliates did not market their product in the United States and did not target any particular state. It appears that Taishan's responses to the discovery requests have been limited based on that position. As we previously pointed out, the corporate representatives have failed to fully answer questions in the depositions that relate to this contention. We believe there are a lot of documents that have not been produced and which are relevant to jurisdictional issues, particularly in light of the paltry amount of documents produced by TG and TTP to date: of a total production of approximately 16,000 documents, approximately 8,200 documents pertain to Taishan's purchase of U.S. waste paper products (approximately 2100 of those

EXHIBIT B

July 12, 2011
Page - 2 -

documents are invoices for waster paper and approximately 6,100 are pictures of waste paper). Thus, a whopping 51 percent of Taishan's production consists of documents that pertain to Taishan's purchase of U.S. waste paper products and have nothing to do with the below-referenced categories of documents.

Even with Taishan's obfuscation and failure to fully cooperate with discovery requests, we have been able to determine the following:

1. Shandong Taihe Dongxin Co., Ltd., the predecessor entity to TG, has marketing materials that promotes itself stating: "[w]e have a self-supported import and export ability, our products not only sell well in our domestic market, also export to many countries, *e.g.* UAE, Indonesia, India, Russia, **U.S.A.**, etc. The high quality plasterboard is in accordance with ISO9001; 2000 Standard." (See Jia Exhibit No. 2, emphasis added). Clearly, TG held itself out and marketed on its website that its products entered into the stream of commerce in the United States. Moreover, the last page of this document shows Taishan exporting directly to the United States with pictures of ships and airplanes. Other documentation shows that Peng Wen-Long ("Frank") made representations such as, "[t]he export of gypsum boards to the United States last year was 18 million square meters, and the 127 mm gypsum board has passed the US Professional ASTM Inspection." (see TG0022728). This only further demonstrates the incredible testimony of Mr. Jia and Frank that there was no intent to ship drywall with U.S. measurements to the United States because it was "too heavy." (Jia Tr. at 218, 262; Peng Tr. at 277-281). In fact, Frank states in an email that "[w]e largely and steadily export our gypsum board to the U.S.A. . . . . We are the first who use container to export? (sic) gypsum board to USA in China, we have the professional salespersons and workers for USA market." (see TG0022595). Based upon representations such as this, Frank made quotations and secured business from the United States.

2. Bill Cher advised customers that there was no problem in supplying gypsum board meeting United States standards to customers. He stated that "[i]n 2006, we exported a lot to the U.S. and satisfied the ASTM C36 or C1396 Standards, and also obtained the inspection report which has now expired. But we can meet the U.S. standard." (see TG0025287).

3. Apollo Yang acknowledged that the United States market was growing and considered applying for UL Certification (see TG0019796).

4. Frank also responded to inquiries on gypsum board orders and advised "[f]irst, we are exporting our gypsum board to the USA with quantity of 600,000 sheets every month. We have much experience on exporting to the USA." (see TG0000415).

July 12, 2011
Page - 3 -

5. Apollo Yang frequently responded to customers and provided quotations, including the shipment of drywall to various ports in the United States, including forum states, Florida and Louisiana (see TG0019813).

6. Oriental Trading Company, LLC, based in Miami, acknowledged to Bill Cher that it was "very interested in having the opportunity of distributing, selling and representing your products here in the United States." (see TG000610).

7. Shandong Taihe Dongxin Co., Ltd. cooperated "by joint efforts" with Sam Porter in the United States and faxed communications back and forth to the United States (see V000386).

8. Yang Jiapo acknowledged that many American customers wanted samples and because there were too many, they could not satisfy the demands (see TG0019840-41).

9. Frank and Bill Cher communicated with a United States company regarding the sale of metal studs and drywall, including providing it with information regarding adherence to the ASTM standards and arranging for shipping of the products (see TG0022112; TG22448-22453; TG0021721; and TG0021964-65).

10. Marketing was done through the Alibaba.com, an internet site in 2006-2007, that reached the United States and received inquiries from Florida and other states for Taishan products. (see Peng Tr. at 290-299; Ex. 11 to Peng Tr.; TG0021224-26; TG0022535-36; TG0022542-46; and TG0022559).

11. Shandong Taihe Dongxin Co., Ltd. entertained customers from the United States and knew that gypsum was being imported to the United States. Also, Tobin Trading, Inc. was to be its "sole agent" (see TOB00212-213 and TG0025348-349).

12. Frank and Yang Jaipo both entertained United States customers at visits to the company in China (see TTRNSL0026 and TG0021411-21415).

13. Taian Taishan Plasterboard Co., Ltd. entered into contracts with American companies for delivery terms in the United States (see TG0021695-97).

14. Shandong Taihe Dongxin Co., Ltd. through Frank, acting for the Taihe Group, actively assisted in finding ships to ship metal studs from China to the USA (see TG0000011).

15. Apollo Yang acknowledged that Oriental Trading Co. has been importing their products to the United States. (see TG0001215).

July 12, 2011
Page - 4 -

16. Apollo Yang "…delivered a ships cargo to Tampa…" and acknowledged that he had regular cooperation with American companies, including The China Corporation, Ltd., Rothchilt International, Ltd., HLT/GAC International, and Metro Resources Corporation (see TG0019797).

17. Invoices and Packing Lists evidence that Taian Taishan Plasterboard Co., Ltd. shipped products directly to Louisiana and Florida (see TG0019365-66; TG0020090-92; TG0019966-75).

18. An agreement regarding the export of gypsum board between Taian City Taishan Gypsum Board Co., Ltd. and U.S. Jiadian Building Material Company out of South Carolina in the United States was entered into whereby Taian City Taishan Gypsum Board Co., Ltd. compensated the United States-based company for losses caused by gypsum board (see TG0020116-17).

19. A Settlement and Release Agreement was entered into between Taian Taishan Plasterboard Co., Ltd. and Guardian Building Products Distribution, Inc. to settle certain disputes arising out of sales contracts, including claims that arose in the United States (see TG0020118-121).

20. Tainted Taishan drywall is known to have been found in hundreds of homes throughout the United States (see various Omni Complaints and state court filings).

The above-cited documents are entirely inconsistent with many of the contentions made by the Taishan deponents at the 30(b)(6) depositions. We therefore believe that numerous misstatements have been made, and are thus not inclined to limit our discovery requests based on representations made in those depositions. Accordingly, in order to adequately discover facts relating to jurisdictional matters, it is essential that the below-listed documents be produced.

**Documents Requested:**

1. Documents relating to BNBM upstream entities, including:
    a. the relationship and communications between them;
    b. the legal corporate structure; and
    c. interaction between the various members of the affiliated or related entities.

2. Documents showing the relationship between TG/TTP and BNBM and its respective owners/shareholders, including:
    a. communications and documents relating to the formation of TTP.

July 12, 2011
Page - 5 -

3. A corporate entity organizational chart relating to BNBM and its upstream and downstream entities, including:
    a. the relationship and communications between them;
    b. the legal corporate structure;
    c. interaction between the various members of the affiliated or related entities; and
    d. see also, allegations in the Amorin Complaint, filed June 13, 2011 in the MDL, CA11-1395.

5. All annual reports, government filings, or foreign government filings created by BNBM during the relevant time period.

**Questioners' Comments and Reply:** Contrary to Taishan's assertion that the Court has twice rejected attempts to discover documents relating to parent and affiliated companies, the Court deferred ruling on these requests pending the first round of depositions of TG and TTP's 30(b)(6) witnesses. Clearly, the lack of information provided by the witnesses at the depositions relating to that subject highlight the need for the production of the requested documents.

For example, despite the fact that Mr. Jia was designated to discuss the management structures of TG, TTP and the "related entities" and the relationship between those entities (*e.g.*, deposition topics 4, 5, 6 and 7), Mr. Jia testified that he really did not review BNBM documents prior to the deposition, other than some unidentified documents he found on the internet (Jia, Tr. 30-31). In addition, the only documents he identified relating to BNBM which he says he sees are annual reports which he said are handed out at board meetings, and which he leaves on the table. (Jia, Tr. 30-35.)

This testimony is disingenuous at best. Mr. Jia is on the board of directors of BNBM in addition to being on the board of TG. BNBM owns more than fifty percent of TG, and BNBM and TG operate as a "joint venture." (Jia, Tr. 66; 203-04). Another member of the board of BNBM also sits on the board of TG - Bing Wang (Jia, Tr. 103) (who at some point was chairman of the board of directors of BNBM (Jia, Tr. 105)), and we also believe that BNBM deputy general managers Yanjun Yang and Jianjun Jia sit on the board of TG.

Despite the clearly close ties between BNBM and TG, we have been told, in effect, that we need to be satisfied with the following self-serving testimony of Jia as to the relationships between the companies:

    (a) at the Board of Director meetings of BNBM, he "will listen to the report by the GM" and may give his opinion (Jia, Tr. 64, 95);
    (b) that the "secretary of the board of directors" of TG gives the report to the BNBM board (Jia, Tr. 98);
    (c) that the relationship between BNBM and TG is one of "investor" and "invested" (Jia, Tr. 65);

July 12, 2011
Page - 6 -

  (d) that there is no formal report to BNBM of the activities of TG or TTP, but there may be phone calls or meetings over tea (Jia, Tr. 139-140) (although he later changes this and says that he does not talk about TG with his friends over tea (Jia, Tr. 143));
  (e) that many in the management of BNBM are Mr. Jia's good friends (Jia, Tr. 140);
  (f) that if TG were to joint venture with or acquire another company, that decision would not be brought up to the board of BNBM (Jia, Tr. 163), even though BNBM sits on the board of TG (Jia, Tr. 165);
  (g) that there was a name used by a group of companies – the "Taihe Group" – that included TG, and at first he could not recall any other companies using that name (Jia, Tr. 182-183), but then suggested that "TTP, TG, Tai'an, and all the other companies under Tai'an…are all in general being called Taihe"[1] (Jia, Tr. 189-190);
  (h) that according to him, TG and BNBM never shared employees (Jia, Tr. 190)(although they clearly share and exchange board members);
  (i) that BNBM has not made a loan to TG, but has guaranteed loans (Jia, Tr., 191);
  (j) that BNBM and TG do not share plants, factories or production lines (Jia, Tr. 196);
  (k) that BNBM is paid dividends from TG under a formula that was adopted when the two companies began to "cooperate" (Jia, Tr. 201);
  (l) that BNBM and TG are a "joint venture" or a "cooperation" (Jia, Tr. 203);
  (m) that BNBM issued a press release about the allegations in the U.S. regarding TG's drywall (Jia, Tr. 392 – 393); and
  (n) that he personally knows nothing about BNBM's operations in the U.S. (Jia, Tr. 394), does not recall any presentations to BNBM's board about any business in the U.S. (Jia, Tr. 396), and does not know if BNBM does business in the U.S. (Jia, Tr. 397-398).

  Taishan proposes that this is the totality of the evidence that will be provided relating to the interrelationship between TG and BNBM, or any other upstream entity for that matter. This proposal is simply not acceptable. First, much of the above-cited information is either insufficient or simply incredible. Second, even if the testimony itself were sufficient and credible, we are unaware of any court limiting discovery to the undocumented testimony of a clearly biased witness. If you are aware of authorities that say that a party is not entitled to explore by document requests the sufficiency or truthfulness of testimony by a corporate witness, please let us know.

  As you know, even in the latest Supreme Court decision of *Goodyear Dunlop Tires Operations, S.A. v. Brown,* Record No. 10-76 (June 27, 2011), the Court addressed without

---

[1] It is clear that the Taihe Group is an umbrella entity for the Taishan entities. Peng Wenlong utilized "Taihe Group" in his emails to the United States (Peng. Tr. at 152-159), and the marketing materials for Shandong Taihe Dongxin (TG) have a picture of a massive factory with "Taihe Group" painted on the sign, under Mr. Jia Tongchun's picture with comments about exporting to the United States. Jia, Ex. 2. The notion that TG is a small entity only in China that has not cast a broad net worldwide is not consistent with our understanding of the documents we have seen thus far.

July 12, 2011
Page - 7 -

deciding the issue of considering a parent corporation's connections with the United States as part of a Court's inquiry as to jurisdiction over a subsidiary, citing *Brilmayer & Paisley, Personal Jurisdiction and Substantive Legal Relations: Corporations, Conspiracies, and Agency*, 74 Cal.L. Rev. 1, 14, 29–30 (1986) (merging parent and subsidiary for jurisdictional purposes requires an inquiry "comparable to the corporate law question of piercing the corporate veil"). Although we do not concede that the jurisdictional "piercing" theory requires the same level of proof as piercing for the transfer of liability, clearly the issues of control, dual management and the interrelationships of the two entities are relevant to an inquiry as to whether TG's parent or subsidiary companies' contacts with the United States or any particular state can be considered in determining jurisdiction over TG. (See discussion below on Agency, Undertaker and Alter Ego/Veil Piercing.)

Given the relevance of the inquiries, we do not accept the proposition that the questioners need to rely solely on the unsupported and insufficient testimony of a witness chosen by TG to address these issues. We are entitled to the documents we have requested to explore these issues. The convenient response that TG does not have possession of any of the requested documents is not sufficient. Certainly Mr. Jia and Mr. Bing Wang, who sit on both boards, have access to many of the documents requested. At the very least, TG would have records of the reports its secretary of the board prepared and presented to the board of BNBM and records relating to any or all loans guaranteed by BNBM. (Jia, Tr. 98 and 191.)

In addition, BNBM's website, available to customers in the United States, states: "For the trading business, CNBM has BNBM and CBMIE as the core unites [sic], and BNBM PLC is the integrated company of China New Building Materials (CNBM) covering manufacture, R&D, sales and international trade."

4. **TG/TTP documents reflecting marketing and sales efforts aimed toward the United States including territories Guam, US Virgin Islands, Puerto Rico, etc., including:**
    a. drywall, and
    b. other products sold by TG/TTP.

**Questioners' Comments and Reply:** Defendants claim that all marketing materials have been produced. However, the scant of volume of materials produced is inconsistent with the attached e-mails and marketing materials, which demonstrate a concerted effort by these defendants to market and sell Chinese drywall throughout the United States.

The miniscule volume of marketing materials produced to date is also at odds with one of the central facts of this case: that millions of sheets of Defendants' drywall was imported to the United States and installed in homes from Virginia to Texas. We know that the drywall was marketed and shipped to the United States, as reflected in e-mails and efforts to sell drywall on websites such as Alibaba.com. (See the alibaba.com information) Where are the materials, e-mails, documents, and information to support the information provided in these e-mails and transport of this drywall into the United States? In light of the overwhelming facts and evidence

July 12, 2011
Page - 8 -

developed to date, the testimony of Defendants' witnesses seems somewhat disingenuous and unreliable.

Defendants' efforts to deny this request based on the Supreme Court's decisions in *J. McIntyre Machinery, Ltd. v. Nicastro* and *Goodyear Dunlop Tires Operations, S. A. v. Brown* is not only misplaced, but also fails to take into account the facts of this case as they relate to those decisions. To the contrary, we believe that the Court's decision in *Nicastro* demonstrates the need for this discovery and its importance for determining jurisdiction in cases, such as the one at bar, that concern the impact of global marketing on jurisdictional analysis. In the concurring opinion, Justices Breyer and Alito recognize that *Nicastro* does not address companies that target the world in selling products and use intermediaries to do so, and note that these issues have serious consequences that have yet to be addressed by the Court:

> The plurality seems to state strict rules that limit jurisdiction where a defendant does not "inten[d] to submit to the power of a sovereign" and cannot "be said to have targeted the forum." *Ante*, at 7. But what do those standards mean when a company targets the world by selling products from its Web site? And does it matter if, instead of shipping the products directly, a company consigns the products through an intermediary (say, Amazon.com) who then receives and fulfills the orders? And what if the company markets its products through popup advertisements that it knows will be viewed in a forum? Those issues have serious commercial consequences but are totally absent in this case.

6. As to TTP:
   a. internal monthly reports of operations;
   b. communications between Jia and TTP, including reports;
   c. monthly reports sent to TG, BNBM, or other entities in the Taishan group;
   d. communications between Jia and Board of Directors;
   e. audited financial statements on a monthly basis;
   f. annual Reports; and
   g. business plan for 2006 and 2007.

**Questioners' Comments and Reply:** We appreciate the response set forth in your July 1, 2011 letter. Please provide confirmation that your client, TTP, and its parent company, TG, themselves performed a thorough search for responsive documents to provide to your firm for review and production, along with a description of the scope and manner of the searches that were performed. We appreciate the fact that counsel can only review and produce documents provided by its clients, and we would like to make sure that the companies themselves performed a thorough a thorough search.

7. **Records or transactions of cost sharing between TG and TTP.**

July 12, 2011
Page - 9 -

      **Questioners' Comments and Reply:** We understand Mr. Zhang's testimony; however, your response is evasive and insufficient. Simply because Mr. Zhang says there are no formal cost sharing agreements does not mean that no such agreements exist or that documents *related* to such agreements can be withheld. Was a search conducted? If it is your answer that no such documents are in the possession, custody, or control of TG or TTP, then your response should say so. Please also provide confirmation that an independent search of documents provided has been undertaken by TG and TTP (as opposed to solely by your law firm) to confirm what Mr. Zhang has stated.

8.     **Records of employees who dealt with sales of drywall to the United States including territories Guam, US Virgin Islands, Puerto Rico, etc., including:**
    a. payroll records;
    b. personnel file including job descriptions and evaluations;
    c. identification/business cards;
    d. employment agreements; and
    e. expense reports.

      **Questioners' Comments and Reply:** The request for records of employees is merely an example of the categories of documents initially requested in Plaintiffs' First Request for Production of Documents. (See Nos. 10, 14, 15, 17, 18, 19, 20, 24, 25, and 30). For instance, Request Nos. 14, 15, 17, 18, 19, 20, 24, and 25 all require you to provide documents such as, communications, marketing, reports regarding actual or prospective purchasers, customer service reports relating to the sales of Chinese drywall to the United States, which would obviously be a part of the records of the employees involved with the sale of drywall to the United States. Request No. 10 also requires you to produce employee expense reports. Moreover, the records of employees would certainly fall within "corporate records" which was Request No. 30. Furthermore, Judge Fallon has directed the parties to meet and confer and to address documents that are missing or will help expedite the discovery process in light of TG's and TTP's failure to cooperate in earlier discovery. We believe the requested information will assist in addressing the next dispute involving depositions of TG's and TTP's Rule 30(b)(6) representatives.

      You further object to this request as "oppressive . . . and unduly burdensome." We are surprised and confused by this as you have consistently taken the position that your client has had no sales of drywall to the United States, with the exception of a few occasions. If sales to the U.S. occurred only on a few occasions, it is difficult to understand how the request for records of employees who dealt with U.S. sales could be "oppressive . . . and unduly burdensome." Presumably, there would be only a few employees who would have dealt with the sales of drywall to the United States, and the resulting amount of documentation would therefore be small. Frank has testified that there were only five individuals that were involved with the sales: Frank, Apollo Yang, Bill Cher, Owen Li and Zhang. (Peng Tr. at 112, 300). Assuming his testimony is correct, your objection is unfounded and we request that you produce the records for such employees.

July 12, 2011
Page - 10 -

Finally, your claim that these documents are "irrelevant" to the issue at hand has no bearing upon the discoverability of this information. Plaintiffs' request is within the permissible scope of discovery under Fed.R.Civ.P. 26 (b), which provides that the proper standard for discoverability is whether the request is reasonably calculated to lead to the discovery of admissible evidence. For example, payroll records and evaluations of employees dealing with sales of drywall to the United States may show whether the employees were given financial incentives to make sales to the United States. Indeed, Taishan's corporate representative, Frank, testified at his deposition that his salary was related to the sales of drywall. (See Peng Tr. at 303). Such records may also indicate a joint payroll system with upstream entities, which is relevant to veil-piercing. Production of personnel files will also likely lead to the discovery of evidence going to jurisdictional issues. For example, a job description which includes the responsibility of making sales in the United States supports our contention that Defendants are subject to the jurisdiction of American courts. The same rationale applies to job evaluations, business cards, employment agreements, etc. Moreover, the expense reports would assist Plaintiffs to determine whether the employees spent funds on promoting sale of drywall to the United States or travelled to the United States.

**9.    Documents regarding the decision to shut down TTP's drywall production.**

**Questioners' Comments and Reply:** Documents and information regarding TG's decision to shut down TTP's drywall production are relevant for two reasons. First, there may be documents discussing the shutdown of TTP's factory in the context of sales to the United States, and the forum states. For example, did TTP shut down TG's factory because of decline in demand to the United States? This would clearly be a relevant inquiry for jurisdictional purposes.

Second, the decision to shut down TTP's drywall production goes to TG's liability for TTP's actions based on its control of TTP, which in turn has implications for personal jurisdiction. TG admits TTP was its subsidiary and that it formed TTP to handle overseas sales of its drywall. Various Plaintiffs' complaints, and the Omnibus Complaints, consistently plead, in part, TG's liability for TTP's actions based upon the following theories: a) alter ego/veil piercing; b) agency; and c) the undertaker doctrine. A brief discussion of the agency, alter ego and undertaker doctrines is below. All three theories provide a basis for deeming TG liable for TTP's acts and omissions. The common thread through all of these theories of liability is control. The question is, how much control did TG have over TTP? Part of the answer to that question is found in what amount of control TG exercised upon TTP in shutting down the factory. TG's control of TTP is also relevant to a jurisdictional inquiry, because pursuant to each of these theories, TTP's contacts with the United States may be imputed to TG for purposes of personal jurisdiction.