# EXHIBIT E

# Hogan Lovells

HOGAN LOVELLS US LLP
875 3rd Avenue
New York, NY 10022
Telephone: 212-918-3000
Facsimile: 212-918-3100

July 27, 2011

**BY EMAIL**

Lenny Davis, Esq.
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: 504-581-4892

Re: **IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION; MDL No. 2047**

Dear Lenny:

We write on behalf of Defendants Taishan Gypsum Co. Ltd. ("TG") and Tai'an Taishan Plasterboard Co., Ltd. ("TTP") (together, "Defendants") in response to your letter of July 12, 2011. As we will be meeting and conferring in our offices on July 29, 2011, we will keep this letter as brief as possible.

Notwithstanding the length of your letter, in our view you have essentially made the following three arguments for why further document discovery is required, and all three are incorrect:

1. The Defendants limited their responses based on their position "that Taishan and its affiliates did not market their product in the United States and did not target any particular state";

2. The production of documents made so far may not have been thorough; and

3. The documents produced so far belie the deposition testimony offered on behalf of the Defendants, and that some of that testimony is "disingenuous."

Although at least two of your arguments challenge the integrity of this firm and its clients,[1] without any basis, we nonetheless will address each of these erroneous contentions in turn.

---

[1] You have made similar baseless accusations before, perhaps most notably in the *Amorin* complaints, where in three separate pleadings you seek damages on behalf of plaintiffs who have previously asserted claims in other complaints, based on allegations of inappropriate litigation behavior. We will, of course, respond to these meritless, preposterous, and unprofessional allegations if and when service is effectuated.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia. Hogan Lovells refers to the international legal practice comprising Hogan Lovells US LLP, Hogan Lovells International LLP, Hogan Lovells Worldwide Group (a Swiss Verein), and their affiliated businesses with offices in: Abu Dhabi Alicante Amsterdam Baltimore Beijing Berlin Boulder Brussels Caracas Colorado Springs Denver Dubai Dusseldorf Frankfurt Hamburg Hanoi Ho Chi Minh City Hong Kong Houston London Los Angeles Madrid Miami Milan Moscow Munich New York Northern Virginia Paris Philadelphia Prague Rome San Francisco Shanghai Silicon Valley Singapore Tokyo Ulaanbaatar Warsaw Washington DC Associated offices: Budapest Jeddah Riyadh Zagreb



EXHIBIT E

1. <u>Scope of Responses to Document Request</u>

You have repeatedly misstated Defendants' position with respect to the scope of the documents they have produced, and you continue to do so. As we consistently have stated, Defendants have produced all responsive documents and communications, within their custody and control and that could be reasonably identified and located, concerning the sale of drywall manufactured to dimensions commonly used in the U.S. and/or concerning contacts by Defendants with entities located in the U.S.

The broad scope of Defendants' production is confirmed by your complaint that we produced 8,200 documents pertaining to Defendants' purchase of U.S. waste paper. Had the production been limited based on our "position" that Taishan and its affiliates did not market their product in the United States and did not target any particular state, Defendants would not have produced documents relating to the purchase of U.S. waste paper.

Although you contend that the production of 8000 separate documents responsive to your document requests indicates that Defendants have failed to "fully cooperate with document requests," there are numerous other, more likely, explanations for why there might be fewer documents than you expect. For example, many documents you think Defendants should possess, such as bills of lading, may not have been created by them or provided to them, as we will point out specifically, below. As an additional example, Defendants testified that they did not use a corporate email server in the course of their business, but instead used personal internet email accounts, MSN Messenger and similar services. Thus, arguably responsive emails may not have been retained in the regular course of business.

2. <u>Thoroughness of the Production</u>

In supposed justification for your persistence in reiterating your requests, even when we have stated that all responsive documents have been produced, you demand that we provide confirmation from our clients that they "performed a thorough search for responsive documents." Such a demand is unfounded. As officers of the Court, we have done our diligence in conjunction with the Federal Rules of Civil Procedure and no further confirmation from the clients is required. In fact, at the telephone status conference with the Court held on June 9, 2011, we exceeded the requirements of the Federal Rules by explaining our involvement in the process of organizing document retrieval from the clients. No more is necessary.

3. <u>Consistency of the Testimony and the Documents Produced to Date</u>

In our view, contrary to your assertions, the deposition testimony offered by the Defendants is consistent with the documents produced so far.[2] Insofar as you have requested particular documents in order to impeach the testimony provided so far, our responses follow.

---

[2] Although you list 20 examples of documentary evidence that you claim belie the testimony, in many instances you have incorrectly characterized the documents and twisted their meaning in an attempt to prove your contentions. For example, and without limitation, you assert that Apollo Yang acknowledged that the U.S. market was growing, and considered applying for UL certification. What the document actually says is: "we have not applied for UL Certification, but if the US marked continues to grow, we will consider this." Thus, the words of the document do not support your characterization of it.

While you are certainly free to make whatever arguments you wish to the Court, mischaracterizing documents does not, in our view, advance the purposes of the meet and confer process.

2

**Documents Requested:**

**1, 2, 3, 5.     Documents relating to BNBM upstream entities:**

**Response:** Our responses remain unchanged since our July 1, 2011 correspondence. Contrary to your assertion, the documents and testimony do not evidence "close ties between BNBM and TG." The only evidence your offer of "close ties" is that BNBM owns more than 50% of TG, that Jia testified that BNBM and TG operate as a "joint venture" (a phrase which he clarified), that Jia sits on the board of BNBM, and that employees of BNBM do sit and have sat on the board of TG.[3] From these paltry facts you argue that the extensive testimony from Jia demonstrating that BNBM and TG are and were separate, independent companies is untrue.

Your conclusion is unfounded: the evidence you cite demonstrates nothing more than a typical relationship between a large shareholder and the company it has invested in (as you know, TG is not a wholly owned subsidiary of BNBM).

Judge Fallon previously has denied the PSC's motions to compel the production of additional documents concerning BNBM. (Rec. Doc. Nos. 7136 and 7511) The Court made clear that the PSC was entitled to ask questions about BNBM and other of TG's upstream and downstream affiliates at the depositions, and based on those answers he would re-visit the issue as to whether plaintiffs are entitled to further discovery. You had an opportunity to ask Jia those questions, and, as you acknowledge on pages 5 and 6 of your letter, Jia's responses to the questions did not reveal anything but a typical shareholder relationship between BNBM and TG. In our view, the absence of any evidence to support the argument that the activities of the two corporations should be attributed one to the other does not entitle you to additional discovery. Simply put, the PSC has not shown any basis for additional discovery on this subject.

There is a presumption of corporate separateness, which you repeatedly ignore, and the burden is on the plaintiff to demonstrate abuse of the corporate form or a fraudulent purpose between two entities to obtain the discovery you are seeking. Further, even your allegations of "control" or "close ties" are not sufficient to obtain discovery relating to veil piercing under any theory. Moreover, as the testimony you cite shows, BNBM did not "control" TG's activities in any meaningful way.

We further object to your request for documents in BNBM's possession because, as we set forth in our July 1 letter, these documents are not in possession, custody or control of Defendants. We are aware of no case law holding or suggesting that when, as the evidence here shows, the non-party major shareholder and a corporate defendant subsidiary function independently, the defendant has possession, custody or control of the parents' documents simply because employees of the non-party shareholder sit on the board of the defendant and an employee of the defendant subsidiary sits on the board of the corporate shareholder parent.

**4.     TG/TTP documents reflecting marketing and sales efforts aimed toward the United States including territories Guam, US Virgin Islands, Puerto Rico, etc., including:**

      a.     drywall, and

      b.     other products sold by TG/TTP.

---

[3] You also argue that the following show the "close ties between BNBM and TG": (1) the use of the name "Taihe Group" for a group of companies located in Taiian, which group of companies does not include BNBM; and (2) BNBM's website states that "CNBM has BNBM and CBMIE as the core unites [sic], and BNBM PLC is the integrated company of ... CNBM . . . ." These arguments are non-sequiturs.

3

**Response:** As stated in our July 1 letter, all marketing materials responsive to this request have already been produced. (*See, e.g.,* TG 0025132.) If the size of the production is smaller than you believe it should be, the most reasonable explanation for the size of the production is that Defendants did not market to, or actively make sales efforts towards, the United States.

You argue that the volume of documents related to marketing is at odds with the fact that drywall manufactured by Defendants was imported into the United States, and ask "Where are the materials ... to support the ... transport of this drywall to the United States?" The answer is as Defendants testified: they made virtually all of their sales of drywall in dimensions commonly used in the U.S. to Chinese companies in China. Defendants would have no documents reflecting transport of this drywall into the U.S; Defendants' Chinese customers were the exporters and would possess this information.

Further, although we question whether marketing that was not directed to any of the pertinent forum states is relevant under *Nicastro*, we have not withheld any documents on this basis, instead, we have produced all marketing materials relating to the production of drywall made in the dimensions commonly used in the U.S.

We maintain that the volume of document production is consistent with Defendants' testimony that Defendants did not market or direct sales efforts toward the United States.[4] (TG Chart at 7-8; TTP Chart at 7-8.)

6. **As to TTP:**

   a. **internal monthly reports of operations;**

   b. **communications between Jia and TTP, including reports;**

   c. **monthly reports sent to TG, BNBM, or other entities in the Taishan group;**

   d. **communications between Jai [sic] and Board of Directors;**

   e. **audited financial statements on a monthly basis;**

   f. **annual Reports; and**

   g. **business plan for 2006 and 2007.**

**Response**: Our response remains unchanged since our July 1, 2011 correspondence.

As explained above, your request that Defendants provide confirmation that an independent search of documents provided has been undertaken by Defendants, "as opposed to solely by your law firm" is inappropriate.

---

[4] We also find your interpretation of the holdings in *J. McIntyre Machinery, Ltd. V. Nicastro* and *Goodyear Dunlop Tires Operations, S.A. v. Brown* as applied to the facts of this case to be incorrect, but that will be addressed in our papers submitted to the Court.

4

7.     **Records or transactions of cost sharing between TG and TTP.**

**Response:** Our response remains the same as in our July 1, 2011, letter, where we stated that "Defendants have no documents responsive" to this request. Your contention that we should have stated that "no such documents are in the possession, custody or control of TG or TTP" is mere semantic quibbling and does not advance the meet and confer process. Mr. Zhang, the designated witness for this topic, testified that TG and TTP did not have any cost sharing agreements. (TG Chart at 4, citing Zhang 113:11-114:6.) Further, Defendants' attorneys have searched the records of TG and TTP and have not identified any cost sharing agreements. Defendants have sufficiently complied with this request. Your request that Defendants provide confirmation that an independent search of documents provided has been undertaken by Defendants, "as opposed to solely by your law firm" is, again, uncalled for.

8.     **Records of employees who dealt with sales of drywall to the United States including territories Guam, US Virgin Islands, Puerto Rico, etc., including:**
    a.     **payroll records;**
    b.     **personnel file including job descriptions and evaluations;**
    c.     **identification/business cards;**
    d.     **employment agreements; and**
    e.     **expense reports.**

**Response:** In our July 1 letter, we stated that this request was new, and asked you to explain why such documents are relevant to the issue of whether the Court has personal jurisdiction over Defendants.[5] In response, you claim that this request was encompassed within previous document requests, although the relationship of this request to those previous requests is far from obvious. Nonetheless, to the extent you seek documents responsive to Request Nos. 14, 15, 17, 18, 19, 20, 24 and 25, the documents in Defendants' possession, custody and control have already been produced. Further, we refer you to our letter of June 6, 2011 identifying the documents that have been produced from the correspondence files of Apollo Yang, Bill Che, Owen Li and Zhang.

To the extent you request payroll records and evaluations of employees dealing with sales of drywall, your argument that these documents "*may show* whether the employees were given financial incentives to make sales to the United States", that they "*may* also indicate a joint payroll system with upstream entities" and that "personnel files *will also likely* lead to the discovery of evidence going to jurisdictional issues" merely evidence that you are on a fishing expedition. Your inquiry is far afield from the only relevant issue: whether Defendants undertook actions to purposely avail themselves of the benefits of a particular forum state. *See, Nicastro.*

---

[5] Contrary to your assertion, relevance is the threshold of Rule 26(b), which states "Parties may obtain discovery regarding any non-privileged matter that is *relevant* to any claim or defense" (emphasis added).

5

9. **Documents regarding the decision to shut down TTP's drywall production.**

**Response:** In our July 1 letter, we asked you to explain how documents evidencing the decision to shut down a manufacturing operation could possibly lead to the discovery of admissible evidence based on that entity's purposeful availment of activities with a state. You give two reasons: (1) "there may be documents discussing the shutdown of TTP's factory in the context of sales to the United States, and the forum states"; and (2) the decision "goes to TG's liability for TTP's actions based on its control of TTP, which in turn has implications for personal jurisdiction."

With regard to (1), Zhang testified at length that the decision to shut down TTP was for tax reasons. (We refer you to our letter of June 22, TTP Chart at 3). Thus, your speculation that the shutdown was in the context of sales to the U.S. is completely unfounded, and again, simply a fishing expedition.

With regard to (2), notwithstanding your dissertation on theories by which whatever contacts TTP may have had with the U.S. could be imputed to TG, it is ludicrous to contend that the 100% owner of a subsidiary's stock does not have the unilateral power to shut down that subsidiary's operations for whatever reason it wishes, whenever it wishes. In our view, such a tautology does not constitute the type of "control" relevant to any imputation analysis. Further, the circumstances behind the decision **not** to market or sell products can have no relevance to the inquiry essential to personal jurisdiction: availment of the benefits of a forum state. *See, Nicastro.*

10. **Board minutes of BNBM and/or TG where either entity is, or both are, discussed including matters regarding operations and finance.**

**Response:** Our response remains unchanged since our July 1, 2011 correspondence. We also refer you to our comments above with respect to Documents requested relating to 1, 2, 3 and 5.

11. **Documents reflecting the relationship with any of the exporters, agents, distributors, suppliers, and/or brokers that shipped products to the United States including territories Guam, US Virgin Islands, Puerto Rico, etc., including but not limited to those listed in the MPF.**

**Response:** Our response remains unchanged since our July 1, 2011 correspondence.

Regarding the chart provided in your letter, we respond as follows:

a. On page 13 of your letter, you allege that no documents have been produced with regard to ten "exporters." This is untrue. We refer you to invoices related to seven of the ten "exporters" on your list. We have located TG 1622-1630; 19858-19866; 19867-19880; 19937-19946; 19947-19960; 20015; 20016; 20079-20088. We will provide you with the documents related to Qingdao Kanghong Import and Export Co. Ltd, Jiangsu Sainty International Economic & Technical Cooperation Corporation, Ltd., and Zibo International Economic and Technical Cooperation Corporation when we meet on July 29 at our offices.

b. On pages 14 through 17, you claim that our production is missing customs forms, bills of lading and shipping and delivery documents. These documents are not "missing." Defendants never had them. Virtually all of the transactions at issue were conducted with Chinese trading companies. Obviously, there would be no need for Defendants to have customs forms, which are generated when products are to be shipped outside of the country. Likewise, bills of lading are generated only when products are placed into the custody of a carrier. If the Chinese buyers picked up the drywall at Defendants' factories, no bill of lading would have been provided to Defendants.. The only

6

documents that would be generated for this course of business would be invoices and/or sales contracts, which documents have been provided, as noted in the middle column of your chart.

c. On pages 14 through 17, you claim that our production is missing tax forms and specification sheets. Much of this information can be found in the VAT invoices, already produced. *Again, all documents related to these sales have been produced*; there is nothing left to provide. Indeed, this lack of documentation is consistent with Defendants' position that they did not ship drywall to the United States.

d. We address the remaining issues set forth in the chart specifically below:

| Customer | Documents alleged to be missing | Documents actually produced | Documents unavailable |
|---|---|---|---|
| Shandong Oriental International Trading Corp. Ltd. | Quantity on Purchase Contract (TG0023837) does not match up with the MPF. Please clarify. | | In instances where the contract quantity and the invoice quantity differ, the quantity shown on the invoice is the best evidence of the actual sale. |
| Lianyungang Yuntai International Trade Co., Ltd. | Contract (TG24051-24056) is incomplete and illegible. Please provide a legible copy. Invoices for May 19, 2005 appear to be missing. | The date listed in the MPF for May 19, 2005 is a typographical error and should have read May 19, 2006. Invoices for that date can be found at TG19958-59. | We have checked our records and the copy of TG24051-24056 is the best available. |
| Shanghai Yuyuan Market Import & Export Co., Ltd. | Invoices | The invoices were produced. *See* TG 1535-1542; 1614-1621; 1622-1624; 1632-1634; 19858-19860; 19920-19936; 19937-19943; 19945-19946; 20062-20078; 20079-20085; 20087-20088. | |
| Orient International Holding Shanghai Foreign Trade Co., Ltd. | Invoices | The invoices were produced. *See* TG 1517-1519; 1596-1598; 19951-19954; | |
| Beijing Building Materials Import & Export Co., Ltd. | Quantity of the Invoice and Purchase Contract do not match up with the MPF. Please clarify. | | *See* response above to Shandong Oriental. |
| Qingdao Joy | Invoices | The invoices were produced. *See* TG 1625; 19861 | |

12.   Any written or electronic communication, including but not limited to MSN, Instant Messenger, text messages, regarding the sale or shipment or possible sale or

7

shipment of any product to United States including territories Guam, US Virgin Islands, Puerto Rico, etc., customers.

**Response:** Our response remains unchanged since our July 1, 2011 correspondence. As stated above, the Federal Rules do not require Defendants to "confirm" the particulars of their collection and production of documents.

13. **Value Added Tax related documents and communications involving the export of product including representations made to the government of China and others regarding export of products.**

**Response:** Our response remains unchanged since our July 1, 2011 correspondence. The only possible relevance of VAT-related documents is in relation to the purpose of forming TTP. The witnesses testified that TTP was formed because TG could not issue VAT invoices to those customers who requested them. The Article of Chinese law you cite on page 18 directly supports this point: "if an enterprise sells VAT-free goods [as TG was doing], it is precluded from issuing a special VAT-invoice [which is why TG formed TTP as a separate company]." We do not agree that the other documents you request, including "communications from government authorities," "correspondence regarding how the invoices are to be used" or "documentation related to VAT exemptions," relate in any way to the issue of personal jurisdiction.

14. **The fee information, guarantee contracts between BNBM and TG and related communications (see TG0020680).**

**Response:** Our response remains unchanged since our July 1, 2011 correspondence. We have not located any further documents relevant to this request.

15. **Records related to any ISO (International Standard Organization) certification, including but not limited to ISO 9001, ISO 14004, and ISO 10003.**

**Response:** In response to our request for an explanation of how ISO certifications could be relevant to personal jurisdiction issues, you claim, without citation, that "ISO standards require that investigations be made into customer complaints." Nonetheless, it is our position that post-sale investigations have nothing to do with the question of personal jurisdiction and instead relate to the merits. Further, to the extent they have them, Defendants have produced documents relating to complaints from US customers. We refer you to our letter of June 6 at 2 and our letter of June 22, TG Chart at 5, TTP Chart at 11-12. Thus, Defendants have produced all responsive documents in their possession, custody and control.

8

Conclusion

In sum, we are heartened that you apparently have taken into consideration our prior correspondence and the charts we have provided pointing you to relevant testimony and document production. Notwithstanding our divergent opinions on a number of outstanding issues, we are hopeful that at our July 29 meet and confer we will be able to resolve or at least narrow the issues.

Sincerely,

*[signature]*

Eric Statman

Eric.statman@hoganlovells.com
D 212 909 0609

cc: Hon. Eldon E. Fallon
Frank T. Spano
Arnold Levin
Russ Herman
Chris Seeger
Ervin Gonzalez
Richard Serpe
Patrick Montoya
Fred Longer
Nick Panayotopoulos
Jane Byrne
Julia Beskin
Hillarie Bass
Dorothy Wimberly
Mark Salky
Tim Kolaya
Ken Hardt
Jim Garner
Matthew Clark
Carlina Eiselen
David Black
Ted Brenner
Gerald E. Meunier
Rick Stanley
Tom Owen