# EXHIBIT "C"

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

June 29, 2011

VIA ONLINE SUBMISSION: http://www.regulations.gov;
http://www.fdic.gov/regulations/laws/federal/propose.html; http://www.fca.gov;
http://comments.cftc.gov

Office of the Comptroller of the Currency
250 E Street, SW
Mail Stop 2-3
Washington, DC 20219.

Jennifer J. Johnson, Secretary
Board of Governors of the Federal Reserve
   System
20th Street and Constitution Ave, NW
Washington, DC 20551.

Robert E. Feldman, Executive Secretary
Attention:  Comments, Federal Deposit
   Insurance Corporation
550 17th Street, NW
Washington, DC 20429.

Alfred M. Pollard, General Counsel
Attention:  Comments/ RIN 2590-AA45
Federal Housing Finance Agency
Fourth Floor, 1700 G Street, NW
Washington, DC 20552.

Gary K. Van Meter, Acting Director
Office of Regulatory Policy
Farm Credit Administration
1501 Farm Credit Drive
McLean, VA 22102-5090.

David A. Stawick, Secretary
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581.

Re:   Proposed Rules Relating to Margin Requirements for Swap Dealers and Major
      Swap Participants

Ladies and Gentlemen:

        We, on behalf of Bank of America Corporation, Citigroup Inc., The
Goldman Sachs Group, Inc., JPMorgan Chase & Co., Morgan Stanley and Wells Fargo &
Company (the "*U.S. Banking Organizations*"), are responding to proposing releases
(the "*Prudential Regulator Proposing Release*" and the "*CFTC Proposing Release*")
issued by (i) the Board of Governors of the Federal Reserve System, the Office of the
Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Farm Credit



SC1:3039342.6

of the margin requirements would be contrary to the terms of Title VII and Congressional intent and will damage the competitiveness of U.S. banking organizations and potentially the U.S. financial system itself.

### A. The Agencies Should Reconsider their Approaches to Extraterritorial Application of the Margin Rules

#### 1. Our Proposed Approach

We believe that, consistent with Title VII, swap transactions that take place outside of the United States between two non-U.S. parties should not be subject to the margin requirements regardless of whether the non-U.S. swap entity is part of a U.S. organization or the swap counterparty is guaranteed by a U.S. entity. To that end, the Prudential Regulators' final rule should treat transactions between the Non-U.S. Operations and counterparties located outside the United States that are organized under non-U.S. law or licensed or otherwise authorized to operate in a non-U.S. jurisdiction (regardless of affiliation with, or guaranty by, a U.S. entity) in the same manner as transactions between "foreign covered swap entities" and non-U.S. counterparties in the Prudential Regulators' proposed rule. The CFTC's rule should be amended in a manner consistent with the Prudential Regulators' rule, with the proposed modifications.

#### 2. Our Proposed Approach Is Consistent with the Statutory Requirements and Supports U.S. Competitiveness

- **The extraterritorial limits of Title VII require that the margin requirements not be applied to transactions outside the United States except in limited circumstances**

As proposed, the Agencies' margin rules may be imposed on transactions without regard to their effect on U.S. activities or commerce and where there is no evasion intent. This is inconsistent with the explicit extraterritorial limits of Title VII, which states that its provisions shall not apply outside the United States unless those activities have a "direct and significant connection with activities in, or effect on, commerce of the United States" or contravene rules or regulations the CFTC may promulgate to prevent evasion. U.S. banking organizations have established operations outside the United States not to evade U.S. requirements but because, among other reasons, in many jurisdictions applicable law mandates a local presence to engage in swap transactions. Furthermore, to the extent that a swap transaction involving a non-U.S. branch or subsidiary of a U.S. entity could have an impact on the safety and soundness of the U.S. parent or on the U.S. financial system, the existing U.S. regulation and consolidated supervision of the U.S. parent, together with local regulation of the Non-U.S. Operations, should provide sufficient protections without requiring application of U.S. margin rules.

- **Margin rules that are inconsistent with the extraterritorial limits of Title VII will damage the competitiveness of U.S. institutions**

  The proposed margin rules will undermine the competitive position of the U.S. Banking Organizations by:

  - o Subjecting swap transactions to dual and potentially conflicting regulation in those jurisdictions that impose margin requirements on non-cleared swaps;

  - o Driving counterparties to non-U.S. competitors and limiting the ability of the Non-U.S. Operations to hedge risks with local banks in those jurisdictions that do not impose margin requirements, or impose less severe requirements, on non-cleared swaps; and

  - o Excluding U.S. Banking Organizations from jurisdictions that do not have an existing infrastructure or legal framework to support compliance with the proposed margin requirements.

- **The proposed margin rules may encourage the migration of derivatives activity to markets outside the jurisdiction of U.S. regulators**

  Modifying the proposed rules as we recommend in this letter may help stem the loss of customers to non-U.S. competitors and therefore retain more of the global derivatives activity within the U.S. regulatory framework—a comprehensive supervisory structure in the case of U.S. banking organizations. As a result, U.S. regulators will be better able to monitor the effect of developments in the global derivatives market on U.S. financial stability.

- **As proposed, the margin rules could undermine the very goals they were designed to achieve**

  We understand and support the statutory mandate to protect the safety and soundness of the swap entities and overall financial stability. However, the proposed rules could have unintended consequences that undermine those goals by driving customers to non-U.S. competitors, which will reduce the size of the U.S. Banking Organizations' customer pool and limit the U.S. Banking Organizations' ability to manage and transfer risks. In addition, both U.S. and non-U.S. end-users would have reduced hedging opportunities and, therefore, increased costs, if the services of U.S. firms or non-U.S. subsidiaries of U.S. firms were not available to them, or available only at higher cost. These consequences could diminish the safety and soundness of U.S. swap entities and thus may have an effect on the broader U.S. financial system itself. Furthermore, given the increasingly global nature of the derivatives markets, rules that have the effect of encouraging customers to transact with non-U.S. firms will harm U.S.

-4-

firms in all their operations and will cause risk to accumulate unevenly and inefficiently in the overall market.[4]

- **Applying the margin rules to transactions outside the United States would not be consistent with precedent**

The CFTC traditionally has not asserted jurisdiction over transactions, or entities that engage in transactions, that take place or operate outside the United States, and there is no compelling reason to deviate from that approach here.[5]  In addition, Congress has long recognized the need for U.S. banking organizations to be able to compete in foreign jurisdictions.  Consequently, Congress has embedded this policy in several statutes that authorize certain entities within the banking organization to conduct activities outside the United States in a manner similar to that in which institutions organized in foreign jurisdictions conduct their business.

In sum, the proposed rules do not strike an appropriate balance between protective measures and continued competitive vigor of U.S. banking organizations.[6]

---

[4]     As Secretary Geithner recently stated, "We live in a global financial marketplace, with other financial centers competing to attract a greater share of future financial activity and profits.  As we strengthen the protections we need in the United States, we have to reduce the chance that risk just moves outside the United States.  Allowing that would not just weaken the relative strength of U.S. firms and markets, it would also leave the world economy vulnerable to future crises."  Treas. Sec. Geithner, speech to the International Money Conference, June 6, 2011, available at http://www.treasury.gov/press-center/press-releases/Pages/tg1202.aspx.

[5]     As has been noted, exempting activities outside the United States that do not have a significant and direct effect on U.S. commerce from new requirements "is consistent with the historical practice by U.S. regulators of recognizing and deferring to foreign regulatory authorities when registered entities engage in activities outside the U.S. and are subject to comparable foreign regulatory oversight."  Letter from Sen. Stabenow and Rep. Lucas to The Hon. Sheila C. Blair, Chairman, Federal Deposit Insurance Corp., The Hon. Ben S. Bernanke, Chairman, The Federal Reserve System, The Hon. Mary L. Schapiro, Chairman, Securities and Exchange Commission, The Hon. Gary Gensler, Chairman, Commodity Futures Trading Commission, Mr. John G. Walsh, Acting Comptroller, Office of the Comptroller of the Currency, The Hon. Leland A. Strom, Chairman, Farm Credit Administration and Mr. Edward J. Demarco, Acting Director, Federal Housing Finance Authority (June 20, 2011).

[6]     *See* Letter from Sen. Schumer, Sen. Gillibrand, Rep. Maloney, Rep. Meeks, Rep. Crowley, Rep. McCarthy, Rep. Ackerman, Rep. Israel, Rep. Weiner, Rep. King, Rep. Grimm, Rep. Hayworth, Rep. Gibson, Rep. Hanna, Rep. Reed, Rep. Towns, Rep. Engel and Rep. Clarke to The Hon. Ben Bernanke, Chairman, Board of Governors of the Federal Reserve System, The Hon. Sheila Bair, Chairman, Federal Deposit Insurance Corporation, The Hon. Gary Gensler, Chairman, Commodity Futures Trading

-5-

**B.     The Agencies Should Exclude Foreign Sovereigns from the Definition of "Financial End-User"**

Non-U.S. Operations are likely to be at a particular competitive disadvantage with respect to their transactions with foreign sovereigns. In the Agencies' proposals, foreign sovereigns are defined as "financial end-users," and most will not be able to meet the requirements to be considered "low risk." As a result, foreign sovereigns will be subject to the more substantial margin requirements applicable to high-risk end-users. In contrast, other non-U.S. jurisdictions are unlikely to apply margin requirements to foreign sovereigns at all, which means there will be a significant incentive for foreign sovereigns to do business with non-U.S. swap entities that are not subject to the U.S. margin requirements. The loss of these customers for all derivative transactions has a significant knock-on effect for other banking services for foreign sovereigns, such as export-import financing and access to debt underwriting, as well as overall market access. Accordingly, we recommend that foreign sovereigns be excluded from the category of "financial end-users."

**C.     The Agencies Should Exclude Inter-affiliate Transactions from the Margin Requirements**

Margin requirements for inter-affiliate transactions have not been addressed by either the Prudential Regulators or the CFTC and thus could be read to apply to such activity. The Agencies should permit the U.S. Banking Organizations to engage in swap transactions with their affiliates, regardless of the jurisdictions of the parties, to support risk management and risk-allocation strategies free from margin requirements. To do otherwise could create a disincentive to appropriate risk management by U.S. swap entities and inadvertently create new operational and credit risks to the banking organization by requiring margin to be held by a third party.

**II.     Extraterritorial Application of Margin Rules**

**A.     Overview of the Prudential Regulators' Proposed Rule**

The Prudential Regulators' proposed margin rule imposes on a swap entity's transactions margin requirements that vary depending on the type of counterparty. With respect to U.S. bank holding companies, U.S. banks and their prudentially regulated subsidiaries that are covered swap entities, the Prudential Regulators' proposed margin rule imposes margin requirements without regard to

---

Commission and Mr. John Walsh, Acting Controller, Office of the Comptroller of the Currency (May 17, 2011) ("Congress was cognizant of the need to strike [a balance between implementing the new safeguards and harming the competitiveness of U.S. financial institutions vis-à-vis their international counterparts]. . . . We are concerned that your respective rule proposals would disrupt that balance and could have significant negative effects on the competitiveness of U.S. institutions.").

SCI:3039342.6

whether the banking organization's swap entity is organized or located abroad and without regard to whether the counterparty is located inside or outside the United States. In contrast, with respect to foreign banking organizations that are covered swap entities, the Prudential Regulators' proposed margin rule does not apply to certain qualifying foreign derivative transactions.  Specifically, the margin requirements would not apply to any "foreign non-cleared swap or foreign non-cleared security-based swap" of a "foreign covered swap entity."[7]  A "foreign non-cleared swap or foreign non-cleared security-based swap" is defined as a non-cleared swap or non-cleared security-based swap where the counterparty is not organized under U.S. law or otherwise located in the United States, and no U.S. affiliate of the counterparty has guaranteed the counterparty's obligations under the transaction.[8]  A "foreign covered swap entity" is a covered swap entity that is not (i) a company organized under U.S. law; (ii) a branch or office of a company organized under U.S. law; (iii) a U.S. branch, agency or subsidiary of a foreign bank; or (iv) controlled, directly or indirectly, by a company that is organized under U.S. law.[9]

**B.      Overview of the CFTC's Proposed Rule**

The CFTC's proposed margin rule is substantially similar to the Prudential Regulators' rule in many respects.  Like the Prudential Regulators' rule, the CFTC's proposed rule contemplates margin and other requirements that vary depending on the category of the counterparty.  However, the application of the CFTC's proposed rule to transactions outside of the United States is unclear and could be read as applying to all transactions of a covered swap entity, even those that would be foreign covered swap entities under the Prudential Regulators' rule, with a non-U.S. counterparty.

**C.      Dodd-Frank Standard for Extraterritorial Application of Title VII**

*1.      Statutory Framework*

The statutory text of Dodd-Frank reflects Congressional intent that Title VII generally should not apply to overseas swap activities.  Section 722(d)(i) of Dodd-Frank provides that the provisions of Title VII that amend the Commodity Exchange Act (as amended, the "*CEA*") shall not apply to swap activities outside the United States unless those activities have a "direct and significant connection with activities in, or effect on, commerce of the United States" or contravene rules or regulations that the CFTC may promulgate "to prevent the evasion" of Title VII.[10]  Section 772(c) of Dodd-

---

[7]     Section ___.9(a) of the Prudential Regulators' proposed rule.

[8]     Section ___.9(b) of the Prudential Regulators' proposed rule.

[9]     Section ___.9(c) of the Prudential Regulators' proposed rule.

[10]    The Supreme Court has stated that this "prevent evasion" language, which also appears in Section 30(b) of the Exchange Act, was not sufficient to make that statute apply

-7-

Frank, amending the Securities Exchange Act of 1934 (as amended, the "*Exchange Act*"), provides that Title VII and the rules and regulations prescribed thereunder will not apply to "any person insofar as such person transacts a business in security-based swaps without the jurisdiction of the United States, unless such person transacts such business in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate to prevent the evasion of any provision of [Title VII]."

### 2. *Application to the Agencies' Proposed Rules*

The automatic and universal application of margin requirements, under the Prudential Regulators' proposed rule, to foreign swap and security-based swap transactions of entities that do not meet the definition of "foreign covered swap entity" under the Prudential Regulators' proposed rule contravenes the statutory language for the Non-U.S. Operations. Transactions of the Non-U.S. Operations should be treated the same as transactions by foreign covered swap entities, as defined in the Prudential Regulators' proposed rule.

The statute requires both a "direct" and "significant" connection with or effect on U.S. activities or commerce, or an attempt to evade the requirements of the statute, in order for its provisions to apply extraterritorially. Accordingly, the proposed automatic and universal treatment of the Non-U.S. Operations' transactions could only be justified if the mere existence of a U.S. parent <u>always</u> means that the transaction has a "direct" and a "significant" connection with, or effect on, commerce of the United States, or that all such transactions constitute "evasion." Had Congress intended such a highly constrictive reading of the exemption, it could have readily said so explicitly. At the very least, the Agencies would need to make an informed and demonstrable finding of such connection, effect or evasion. The Proposed Rules therefore go beyond the limitations on extraterritorial application imposed by Dodd-Frank.[11]

The mere affiliation of a non-U.S. swap dealer or major swap participant with a U.S. parent does not constitute a direct and a significant connection if there is a wholly non-U.S. transaction with a non-U.S. counterparty, nor does such affiliation

---

extraterritorially: "[t]he provision seems to us directed at actions abroad that might conceal a domestic violation, or might cause what would otherwise be a domestic violation to escape on a technicality." *Morrison v. Nat'l Australia Bank*, 130 S. Ct. 2869, 2822-83 (2010). The Court recognized that it might be possible to interpret such language as creating an extraterritorial application, but held that "possible interpretations of statutory language do not override the presumption against extraterritoriality." *Id.*

[11]   In response to a series of questions by Ranking Member Barney Frank during a hearing in front of the House Financial Services Committee on June 16, 2011, the Federal Reserve, the OCC, the FDIC and the CFTC acknowledged that they have authority under the statute to take the potential competitive disadvantage to U.S. firms into account when determining the extraterritorial scope of the statute.

-8-

evidence any evasion of the margin rules or other Title VII provisions. The CFTC's rule does not distinguish between U.S. and foreign swap entities and is similarly overbroad in its reach. In fact, the CFTC's proposed rule could be read as applying to all transactions of a covered swap entity, even those that would be foreign covered swap entities under the Prudential Regulators' rule, with a non-U.S. counterparty, whether or not such transactions have any connection with or effect on U.S. activities or commerce.

Our reading of the statutory language is strongly supported, indeed virtually compelled, by judicial precedent. It is a "long-standing principle of American law that legislation of Congress, 'unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'"[12]

Furthermore, sections 722 and 772 of Dodd-Frank evidence Congress' recognition that the statute, and the SEC's and CFTC's jurisdiction, do not extend to the regulation of non-U.S. persons and non-U.S. markets. Title VII reflects a Congressional intent to strike a careful balance with respect to extraterritoriality by permitting the CFTC and SEC to reach entities or activities outside the United States to prevent evasion of Title VII or in limited circumstances where there is a direct and significant connection with or effect on U.S. commerce. It would be inconsistent with this intent to apply the margin requirements to the Non-U.S. Operations' activities with non-U.S. counterparties simply because the Non-U.S. Operations have a U.S. parent.

Further, both Agencies' proposed rules will require the Non-U.S. Operations to post margin to another registered swap dealer if the U.S. parent provides a guarantee.[13] Requiring margin in these circumstances is also inconsistent with the territorial limits of the statute. The presence of a guarantee by a U.S. parent does not create a direct and significant effect on U.S. commerce or activities. The risk is borne by a foreign covered swap entity, so the effect on U.S. commerce should be at most indirect and will rarely be "significant" with respect to the swap entity. In addition, unlike a transaction with a U.S. counterparty, these transactions are highly unlikely to have a direct and significant effect on U.S. activities because of the counterparty's activities.

We understand concern has been expressed that unless the margin requirements are applied to non-U.S. operations of U.S. institutions both U.S. swap entities and their U.S. counterparties may attempt to shift their derivatives transactions to those non-U.S. operations for the purpose of avoiding the U.S. margin requirements. We believe that the blanket application of the margin requirements to all transactions by non-U.S. operations because of the possibility that derivatives activity may move offshore

---

[12]     *Id.* at 2877-78 (quoting *EEOC* v. *Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)).

[13]     *See* § ___.9(a)(2) of the Prudential Regulators' proposed rule (limiting the exception for certain swap transactions outside of the United States to those in which no U.S. affiliate of the counterparty has guaranteed the counterparty's obligations under the transaction.)

SCI:3039342.6

exceeds the extraterritorial scope and intent of the statute. This approach would cause significant damage to the U.S. Banking Organizations' longstanding overseas derivatives business that they conduct out of their Non-U.S. Operations for legitimate business reasons, including to comply with local licensing requirements, and not for the purpose of evading Title VII. The Agencies have recognized that they have the authority to take into account competitive harm to U.S. institutions when determining the appropriate scope of the extraterritorial application of the statute,[14] and we submit that the potentially severe competitive damage to U.S. institutions needs to be weighed against concerns about the possibility for evasion. We believe that this evaluation should be done once the Agencies have an opportunity to see whether swap entities or other swap market participants move business offshore inappropriately in response to the requirements. At that point, the Agencies could address the specific circumstances that raise concerns in a manner that is tailored to the particular entity or practice without disrupting legitimate foreign business activities of U.S. institutions.

The Appendix to this letter provides responses to the questions posed in the Prudential Regulators' Proposing Release relating to the treatment of non-U.S. transactions.

### D.  Our Proposed Approach to Extraterritorial Application

The appropriate treatment of transactions that take place outside the United States could be achieved by (i) including non-U.S. branches and offices of U.S. banks, Edge corporations ("*Edges*"), and non-U.S. subsidiaries, branches and offices of U.S. banking organizations or their non-bank subsidiaries in the definition of "foreign covered swap entity" by eliminating §___.9(c)(2) and (c)(4) from the definition in the Prudential Regulators' rule, (ii) modifying §___.9(c)(1) of the Prudential Regulators' rule to refer to any covered swap entity that is "[N]ot a United States branch or office of a company organized under the laws of the United States or any State," (iii) removing transactions that are guaranteed by U.S. entities from the definition of "foreign non-cleared swap or foreign non-cleared security-based swap" by eliminating §___.9(b)(2) from the Prudential Regulators' rule and (iv) including, in the CFTC rule, the provisions from §___.9 of the Prudential Regulators' rule, with the same deletions and additions noted in (i)-(iii) above.

These proposals also would help harmonize the CFTC's and the Prudential Regulators' respective rules as required by the statute.[15] Maintaining consistency

---

[14]   *Financial Regulatory Reform: The International Context, Hearing before the House Committee on Financial Reform*, 112th Congress, June 16, 2011 (testimony of The Hon. Sheila C. Bair, The Hon. Lael Brainard, The Hon. Gary Gensler, The Hon. Mary Schapiro, The Hon. Daniel K. Tarullo and Mr. John Walsh).

[15]   Section 731(e)(2)(d)(ii) of Dodd-Frank ("[The Agencies] shall, to the maximum extent practicable, establish and maintain comparable . . . minimum initial and variation margin

-10-

SC1:3039342.6

between the two sets of rules overall will ensure that entities engaged in the same activities are treated similarly.

**E.      Consequences to U.S. Banking Organizations of the Extraterritorial Application of the Margin Rules**

*1.      Effect on Competitiveness of U.S. Firms*

Establishing the appropriate jurisdictional scope of the margin requirements is also critical to the ability of the U.S. Banking Organizations to maintain their competitive positions in foreign marketplaces. Subjecting the Non-U.S. Operations to the U.S. margin rules will increase their and their customers' costs and encourage many customers to trade instead with non-U.S. swap entities which could have lesser or no margin requirements. Imposing margin requirements on the foreign transactions of the Non-U.S. Operations would place them at a disadvantage to their foreign competitors because the Non-U.S. Operations would be subject either to margin requirements where their local competitors are not or additional margin requirements that may be different from and conflict with local requirements.[16] Furthermore, the restrictions on the types of eligible margin, which would exclude, for example, non-U.S. currency (except where it is the currency in which payment obligations under the swap are required to be settled) and G7 sovereign debt, will limit the flexibility of non-U.S. customers in meeting the margin requirements.

In addition, the application of margin requirements will effectively exclude U.S. Banking Organizations altogether from jurisdictions that do not have the infrastructure or legal framework to support compliance with the proposed margin requirements. For example, some jurisdictions do not have experienced custodians or a developed body of law around the custodial relationship. In those jurisdictions, the Non-U.S. Operations will not be able to meet the requirements in the proposed rules requiring segregation of collateral at a third-party custodian that applies the same insolvency regime as would apply to the non-U.S. swap dealer or major swap participant.[17] This is

---

requirements, including the use of non cash collateral, for [swap dealers and major swap participants].").

[16]    *See* Letter from Sen. Schumer *et al.* to The Hon. Ben Bernanke *et al.* (May 17, 2011) ("[A]bsent harmonization between new rules here and abroad, disparate treatment of U.S. firms will only encourage participants in the derivatives markets to do business with non-U.S. firms.").

[17]    *See* § ___.7 of the Prudential Regulators' proposed rule and § 23.158 of the CFTC proposed rule (requiring, among other things, that a covered swap entity that enters into a non-cleared swap or non-cleared security-based swap with another swap entity must post initial margin to the swap entity and must require that all funds or other property the covered swap entity provides as initial margin are held by a third-party custodian that

the case in a significant number of jurisdictions. For example, market practice in many important jurisdictions in Asia currently is inconsistent with the requirements of the margin rules—in particular, requirements for compulsory taking of collateral upfront and for the segregation thereof with third party custodians.

The problem the Non-U.S. Operations face is compounded by the need to hedge their risks when entering into derivative transactions with non-U.S. commercial end-users, which the Non- U.S. Operations typically do through transactions with local banks. However, local banks will be reluctant to enter into these transactions with the Non-U.S. Operations, because of the margin requirements (or greater margin requirements than those imposed by local regulators), and this will limit the U.S. Banking Organizations' ability to manage the associated risks. Without willing counterparties for hedging transactions, the ability of the Non-U.S. Operations to enter into transactions with commercial end-users will be inhibited even under the CFTC proposed rule, which does not impose an initial margin requirement on transactions with those counterparties.[18] This difficulty with hedging for the Non-U.S. Operations would have significant knock-on effects for other business lines that offer services to commercial end-users, such as corporate banking or treasury functions. This impact is also likely to be particularly significant on relations with multinational U.S. firms that use U.S. banks as global providers of financial and risk management services.

Furthermore, a reduction in the customer pool would also limit the Non-U.S. Operations' ability to manage and transfer risks. A portfolio's risks and costs are mitigated when there is sufficient volume and diversification of the transaction pool. Such an effect from a reduction in customer volume and diversification that precludes this mitigation is contrary to one of the key purposes of Dodd-Frank, which is to reduce systemic risk for individual institutions and in the financial system.

The Prudential Regulators' rule clearly puts the Non-U.S. Operations on unequal footing with their foreign competitors by limiting the exception for certain swap transactions outside the United States to those entities that do not have a U.S. parent. The solution to this competitive disparity created by the Prudential Regulators' proposed rule does not reside in a broad reading of the CFTC proposal. That proposal could be read to contain no exemption for non-U.S. covered swap entities and their transactions with both the non-U.S. affiliates of U.S. organizations and any non-U.S. registered swap dealer not affiliated with a U.S. organization. These non-U.S. entities would be subject to both U.S. and any local requirements in their dealings with non-U.S. customers, with little, if any, benefit to the financial system.

---

applies the same insolvency regime as would apply to the non-U.S. swap dealer or major swap participant).

[18]     Section 23.154 of the CFTC's proposed rule.

-12-

In addition, because the Agencies' proposed rules would require the Non-U.S. Operations to post margin to another non-U.S. registered swap dealer if the U.S. parent provides a guarantee, the proposed rules also place the U.S. Banking Organizations at a competitive disadvantage relative to their foreign counterparts.[19]  For example, margin requirements would apply where the Non-U.S. Operations are engaged in hedging activities, as customers, with non-U.S. registered swap dealers.  Unlike their foreign competitors, the Non-U.S. Operations will be forced to post margin if their U.S. parent provides a guarantee, whereas their non-U.S. competitors can receive a guarantee from their non-U.S. parent and conduct transactions with a non-U.S. registered swap dealer without having to post margin (under the Prudential Regulators' proposal).  This will increase the costs of their transactions and hinder the ability to access swap liquidity and risk-mitigating hedges.

### 2.   *Migration of Derivative Activities to Non-U.S. Jurisdictions*

Application of margin requirements to the transactions of the Non-U.S. Operations outside the United States will inevitably encourage customers to do business instead with non-U.S. competitors, thus moving more derivatives activity outside of the jurisdiction of U.S. regulators.  Modifying the proposed rules as we recommend in this letter will help retain more of the global derivatives activity within the U.S. regulatory framework.

As described below, the U.S. Banking Organizations, including the Non-U.S. Operations, are subject to supervision by the applicable federal banking agencies with respect to all of their activities.  Retaining this activity in U.S. Banking Organizations will promote financial stability as these transactions will be conducted by entities subject to examination and extensive safety and soundness regulation by the federal banking agencies. In addition, keeping more of the derivatives activity within the U.S. regulatory framework would help the CFTC and other applicable regulators monitor developments in the global derivatives market and the effect such developments may have on the stability of the U.S. financial system.

### F.   **Reliance on the Existing Supervisory and Regulatory Framework for Non-U.S. Operations**

We understand that these competitive disadvantages and other issues would not be persuasive if there were no regulation of the Non-U.S. Operations.  All the Non-U.S. Operations, however, are subject to regulation and supervision by the applicable federal banking agency.  This framework provides the regulators with a view of the risks and impacts on any U.S. affiliate or parent of a covered swap entity and

---

[19]    *See* § ___.9(a)(2) of the Prudential Regulators' proposed rule (limiting the exception for certain swap transactions outside of the United States to those in which no U.S. affiliate of the counterparty has guaranteed the counterparty's obligations under the transaction.)

-13-

therefore obviates the need to apply the margin rules to non-U.S. transactions. As a preliminary matter, the bank itself, including its subsidiaries, branches, and offices, is subject to supervision and regulation by the applicable Prudential Regulator and subject to regular examination.

- _Edges_.  Edges are corporations organized under the Edge Act (now Section 25A of the Federal Reserve Act) with the approval of the Federal Reserve Board and are subject to supervision and regulation by the Federal Reserve Board.[20]  Edges were created to permit U.S. banking organizations to engage in international or foreign banking and other financial operations to promote the foreign trade of the United States and thus are authorized to exercise "sufficiently broad powers to enable them to compete effectively with similar foreign-owned institutions in the United States and abroad."[21]  Non-U.S. subsidiaries of Edges are subject to applicable law and regulation in the countries in which they are organized, in addition to being supervised by the Federal Reserve Board.  Edges are authorized to engage in a wider range of activities than their U.S. parent banks to help promote the ability of U.S. Banking Organizations to compete in international markets.  Furthermore, Edges may engage in activities in the United States only to the extent they are incidental to their foreign activities.

- _Branches and other offices_.  U.S. banks may establish branches and other offices in foreign jurisdictions with the prior approval of the Federal Reserve Board.[22]  As noted, these foreign branches and offices are subject to ongoing supervision by the Prudential Regulator for the bank.  Similar to many other activities conducted through a foreign branch, the swap activities of foreign branches are focused overseas and generally conducted with non-U.S. persons.  Like Edges, foreign branches permit the U.S. Banking Organizations to compete with their foreign counterparts because such branches may exercise powers "as may be usual in connection with the transaction of the business of banking in the places where such foreign branch shall transact business."[23]  Similar to Edges, non-U.S. branches of U.S. banks also are authorized to engage in a wider range of activities than the U.S. parent bank.

---

[20]     _See_ 12 U.S.C. §§ 611; 614; _see also_ 12 C.F.R. § 211.5.  Edges may be organized and established by member banks, which are expressly permitted to hold their shares.  See 12 U.S.C. §§ 601, 24(7).  Edges may establish branches and subsidiaries in foreign countries in order to conduct their activities.

[21]     12 U.S.C. § 611a.

[22]     _See_ 12 U.S.C. § 601.

[23]     12 U.S.C. § 604a.

-14-

- Nonbank subsidiaries.  Non-U.S. nonbank subsidiaries of U.S. bank holding companies are subject to consolidated supervision by the Federal Reserve, and the authority of the Federal Reserve to supervise and examine nonbank subsidiaries of the holding company was expanded under Dodd-Frank.[24]  This authority extends to the non-U.S. branches or offices of the nonbank subsidiaries.

Given the absence of direct and significant effect on U.S. activities or commerce in many cases, any indirect risks associated with the Non-U.S. Operations' swap transactions outside the United States should be addressed adequately in the supervisory process.  The existing bank regulatory framework applicable to the U.S. Banking Organizations already requires prudent credit risk management, which could include collection and posting of margin where appropriate.  Through the supervisory process, the federal banking agencies can evaluate risk to the safety and soundness of the swap entity and the impact on its U.S. parent and require changes to the organization's credit risk management on a more tailored basis.  Further, monitoring of capital placed into the Non-U.S. Operations in relation to the risks posed by any swaps activity in those operations will help regulators assess the impact, if any, to the U.S. parent.

Although we understand that these same protections exist with respect to U.S. activities, we submit that it would be reasonable to rely on this framework for non-U.S. activities in light of the explicit statutory limits on extraterritorial application and the potential consequences of rejection of extraterritorial limitations to U.S. competitiveness.  This is particularly the case where long-standing and unchanged Congressional policy is to not hinder the competitiveness of U.S. banking organizations abroad, but to give the regulators authority to monitor the safety and soundness of such operations on a consolidated basis.

The Non-U.S. Operations also will be subject to requirements in the jurisdictions in which they operate, and those local rules will help reduce the potential that swap transactions between the Non-U.S. Operations and non-U.S. counterparties would pose a risk to the safety and soundness of the swap entity or the financial system.  Taking into account local regulation, particularly where the local regime is reasonably designed to regulate derivatives activity in that jurisdiction (even if not the same as U.S. regulation), also would be consistent with the explicit limitations on the extraterritorial scope of Title VII and the CFTC's recognition of the importance of international comity in determining the extraterritorial application of Federal statutes.[25]  Not deferring to local regulation could also lead to inconsistent regulatory approaches.  As Secretary Geithner has pointed out, such inconsistent approaches not only disadvantage U.S. banks, but by

---

[24]      12 U.S.C. § 1831c.

[25]      75 Fed. Reg. at 71382 (citing *Hartford Fire Ins. Co.* v. *California*, 509 U.S. 764 (1993) and Restatement (Third) of Foreign Relations Law of the United States §§ 402-403 (1987)).

-15-

shifting risk out of the United States may leave the global marketplace more vulnerable to future economic crisis.[26]

Furthermore, in many jurisdictions, the Non-U.S. Operations have been established because certain activities may only be engaged in by entities organized or licensed under local law—not as a means to evade U.S. regulation. For example, in China, India, Indonesia, South Korea and Taiwan, only local banks and local branches of foreign banks may engage in swap activities. In the European Union, an E.U.-organized entity is given "preference" or "passport" authority to engage in swap transactions with customers domiciled throughout the European Union. Thus, to undertake E.U.-organized business transactions in the European Union in an efficient manner, the U.S. Banking Organizations must have an E.U.-organized entity to conduct the business.

### G. Limiting the Application of Margin Rules to Non-U.S. Swaps and Security-Based Swaps Would Be Consistent with Precedent

The CFTC's Proposing Release and proposed rule do not address the extraterritorial application of the proposed margin rules. Because there are no carve-outs for foreign transactions, the rule could be read to apply broadly to all transactions by swap entities. The CFTC, however, traditionally has not asserted jurisdiction over transactions, or entities that engage in transactions, that take place or operate outside of the United States. Congress explicitly adopted this policy in Sections 722 and 772 of Dodd-Frank. To the extent that the Prudential Regulators are creating rules pursuant to Dodd-Frank's amendments to the Commodity Exchange Act, the CFTC precedents (discussed in the following paragraph) are relevant to the Prudential Regulators' proposed rule as well.

The CFTC has recognized, as a principle of international law and comity, that domestic regulations, such as margin requirements under the CEA, apply only when either the conduct in question occurred within the United States, or conduct outside the United States has a significant impact within the United States. Foreign individuals or firms that deal solely with foreign customers and do not conduct business in or from the United States have not been required to register under the CEA.[27] For example, the CFTC generally does not require persons to register as futures commission merchants or introducing brokers when they are located outside the United States and transact business only with foreign customers. The CFTC has explicitly included foreign branches of

---

[26]     *See supra* note 4.

[27]     *See* CFTC Statement of Policy, *Exercise of Commission Jurisdiction Over Reparation Claims That Involve Extraterritorial Activities by Respondents*, 49 Fed. Reg. 14721 (1984).

-16-

futures commission merchants under this approach.[28] In addition, the CFTC does not require foreign brokers to register as futures commission merchants, or obtain an exemption from such registration, if the foreign brokers offer or sell foreign futures or options contracts to non-U.S. persons only.[29] These exemptions from registration allow the entities to operate free from the transaction-level or business conduct requirements imposed on registered entities. Instead, those entities are subject to the requirements imposed on them by local authorities.

Furthermore, as discussed above, there is longstanding U.S. statutory and public policy supporting the ability of Edges and foreign branches of U.S. banks to compete effectively in foreign markets.[30] As a result, even though these entities are subject to U.S. regulation and supervision, they are provided greater latitude to operate on par with local institutions. This same recognition of the need for U.S. banking organizations to be able to compete in foreign jurisdictions should be reflected in the margin rules and other transaction-specific rules—for nonbank subsidiaries as well as Edges and foreign branches.

We believe, particularly in light of the territorial scope of Title VII, that the combination of U.S. regulation and supervisory oversight of the U.S. Banking Organizations and local regulation is sufficient to protect against risk to the U.S. financial system.

---

[28]   *See* Request for IB Registration No-Action Position, CFTC Staff Ltr. No. 00-44 (CCH) 28,095 (Mar. 31, 2000).

[29]   *See* 17 C.F.R. Part 30.

[30]   12 U.S.C. § 615(a). The Federal Reserve Board has previously determined, in Regulation K, that swaps activity is "usual . . . in connection with the transaction of the business of banking or other financial operations" in other countries. *See* 12 C.F.R. § 211.10(a)(19) (commodity swaps); § 211.10(b) (incorporating all of the activities permitted under Regulation Y, including § 225.28(b)(8)(ii) of Regulation Y which permits broad swaps activities). Some activities have been approved notwithstanding the fact that they are impermissible for depository institutions under U.S. regulations and impermissible under Regulation Y for bank holding company activities. *See, e.g.,* Citibank Overseas Inv. Corp., 1985 Fed. Res. Interpretive Ltr. (Dec. 9, 1985) (approving an Edge's application to conduct real estate brokerage activities through a subsidiary); 67 Fed. Res. Bull. 269, 366 (April 1981) (approving an Edge's application to engage in the underwriting of credit life, credit accident and credit health insurance regardless of whether the insurance is directly related to the extension of credit by the Edge or its affiliates); and 12 C.F.R. §§ 211.10(a)(14), (15) (permitting Edges to underwrite and deal in equity securities outside of the U.S.).

-17-

### III.  Categorization of Foreign Sovereigns

The Non-U.S. Operations are likely to be at a particular disadvantage when competing for the business of foreign sovereigns.  In the Agencies' rules, foreign sovereigns are defined as "financial end-users,"[31] and they will not be able to meet the requirements to be considered "low risk" because both  proposed rules require a financial end-user to be subject to capital requirements established by a U.S. Prudential Regulator or a state insurance regulator in order to be considered "low risk"—a requirement that obviously no foreign sovereign would meet.[32]  As a result, foreign sovereigns will be subject to the more substantial margin requirements applicable to high-risk end-users.  These margin requirements will be a significant incentive for them to transact with non-U.S. swap entities that are not subject to the U.S. margin requirements.  This impact is magnified by the breadth of the definition of "foreign sovereign."  The definition includes any "government of any foreign country or a political subdivision, agency, or instrumentality thereof," which could include entities such as sovereign wealth funds.[33]  The range of customers that meet the definition of foreign sovereign are an important part of the U.S. Banking Organizations' client bases.[34]

Indeed, the Non-U.S. Operations will be placed at a competitive disadvantage because other jurisdictions are unlikely to apply margin requirements to foreign sovereigns at all.  For example, the current draft of the Regulation of the European Parliament and of the Council of the European Union on OTC derivative transactions, central counterparties and trade repositories exempts sovereigns from its scope altogether.[35]  Subjecting transactions with foreign sovereign counterparties to U.S. margin requirements will thus be a significant incentive for them to transact with non-U.S. swap entities.

---

[31]  Section ___.2(h)(6) of the Prudential Regulators' proposed rule and § 23.150 of the CFTC's proposed rule.

[32]  Section ___.2(h)(3) of the Prudential Regulators' proposed rule and § 23.153(c) of the CFTC's proposed rule.

[33]  Section ___.2(h)(6) of the Prudential Regulators' proposed rule and § 23.150 of the CFTC's proposed rule.

[34]  A Non-U.S. Operation could, of course, impose margin requirements on a sovereign (or sovereign-related entity) if its credit deteriorated, or could decide not to deal with the sovereign altogether.

[35]  Paragraph 18 of the Proposal for a Regulation of the European Parliament and of the Council on Derivative Transactions, Central Counterparties and Trade Repositories, Council Document 8857/11, dated April 11, 2011.

SCI:3039342.6

The loss of sovereign customers could have a significant knock-on effect for other banking products and services, such as debt underwriting and export-import financing, as well as overall market access. Moreover, because local corporate entities may see their government shift business away from the U.S. Banking Organizations, they may also migrate to a more favored non-U.S. local dealer. Indeed, quasi-governmental and supranational organizations have already begun raising questions about dealing with the U.S. Banking Organizations.

## IV.    Treatment of Inter-affiliate Swap Transactions

Although margin requirements for inter-affiliate transactions were not addressed by either the Prudential Regulators or the CFTC, the Agencies should permit Non-U.S. Operations to engage in inter-affiliate swap transactions with their U.S. affiliates to support risk management and risk-allocation strategies, without subjecting those transactions to margin requirements. As a general matter, we do not believe that transactions between affiliates present the concerns and risks that give rise to a need for the application of the regulatory requirements applicable to swaps and were not intended by Congress to be encompassed within the relevant provisions of Dodd-Frank. Many financial institutions, including the U.S. Banking Organizations, use internal swap transactions to allocate and manage financial risk among their various affiliates and this approach has been adopted by many other enterprise-type companies with commonly owned, but legally separate, entities. In particular, because such transactions are effected within the same economic group, there is no change in beneficial ownership of the rights and obligations in an inter-affiliate transaction and, consequently, there is no bona fide "swap" transaction that should be subject to the proposed margin requirements.

If a U.S. swap entity enters into swaps with customers, and, in seeking to manage risk, enters into swaps with its Non-U.S. Operations, such swaps should not trigger imposition of margin requirements for the Non-U.S. Operations. Similarly, if the Non-U.S. Operations seek to manage risk by entering into swap transactions with a U.S. swaps entity, margin requirements should not be imposed. Inter-affiliate transactions do not pose the same risks or regulatory concerns as transactions with external counterparties, primarily because internal transactions do not create the systemic risk or credit exposures between market participants that Dodd-Frank seeks to address. No congressional policy was enunciated in Dodd-Frank indicating that inter-affiliate trades should be cleared or that uncleared inter-affiliate swaps exhibit greater risk than cleared swaps. Imposing margin requirements on such transactions will make more costly the legitimate risk allocation and risk mitigation methods used by a wide variety of market participants.

In fact, imposing margin requirements on inter-affiliate transactions may, in some cases, create greater risks to the organization. For example, segregating margin at third party independent custodians for inter-affiliate trades between two swap dealer or major swap participant affiliates will create new external operational risks. Furthermore, in most cases the U.S. affiliate itself would be a registered swaps entity, which means that

-19-

the activities would already be subject to oversight in the United States.  In such instances, any issues such inter-affiliate transactions may raise could be addressed through oversight of the registered swap entities or other means that are targeted to address any concerns with affiliate swaps.

This approach would be consistent with the CFTC's recognition that a person may not need to be considered a swap entity when swaps simply represent an "allocation of risk within a corporate group" because "[s]waps and security-based swaps between persons under common control may not involve the interaction with unaffiliated persons that [the CFTC] believes is the hallmark of the elements of the definitions that refer to holding oneself out as a dealer or being commonly known as a dealer."[36]  This position is also consistent with the CFTC's historical practice, pursuant to which non-U.S. entities may hedge in the United States through their U.S. affiliates without being subject to the jurisdictions of the CEA and the CFTC.[37]

## V.        Conclusion

The statutory limits on extraterritorial application of Title VII, which are consistent with long-standing U.S. policy and other key policy considerations, strongly weigh in favor of not applying the margin rules to transactions between Non-U.S. Operations and non-U.S. counterparties.  Such application is unnecessary because the existing regulatory and supervisory framework is sufficient to mitigate the risks at issue, would place the U.S. Banking Organizations at a significant competitive disadvantage to their foreign counterparts and may actually exacerbate risk. Such a consequence is plainly and directly at odds with Congressional intent.

\*          \*          \*

---

[36]   See "Further Definition of 'Swap Dealer,' 'Security-Based Swap Dealer,' 'Major Swap Participant,' 'Major Security-Based Swap Participant' and 'Eligible Contract Participant,'" 75 Fed. Reg. 80174 (Dec. 21, 2010).

[37]   See, e.g., CFTC-OGC Interp. Ltr. No. 86-2 ¶ 22,943 (May 22, 1985) (recognizing that a non-U.S. subsidiary may cover or hedge transactions through its U.S. parent without necessarily being subject to the CEA).

-20-

We appreciate the opportunity to comment to the Agencies on the proposed margin requirements, and would be pleased to discuss any questions the Agencies may have with respect to this letter. Any questions about this letter may be directed to Sarah Lee, Associate General Counsel, Bank of America Corporation, at 646-855-0837; Don Bendernagel, Managing Director, Citigroup Inc., at 212-816-3806; Hugh C. Conroy Jr., Managing Director & Associate General Counsel, Citigroup Inc., at 212-816-0501; Tom Riggs, Managing Director, The Goldman Sachs Group, Inc., at 212-902-1426; Diane Genova, Managing Director, JPMorgan Chase & Co., at 212-648-0268; Richard Ostrander, Managing Director, Morgan Stanley, at 212-7625346; Barry Taylor-Brill, Managing Counsel, Wells Fargo & Company, at 704-383-0606; and Kenneth M. Raisler, Sullivan & Cromwell LLP, at 212-558-4675, Andrea R. Tokheim, Sullivan & Cromwell LLP, at 212-558-7015; J. Virgil Mattingly, Sullivan & Cromwell LLP, at 212-558-7028; and H. Rodgin Cohen, Sullivan & Cromwell LLP, at 212-558-3534.

Sincerely,

*Sullivan & Cromwell LLP*

cc:   Honorable Gary Gensler, Chairman
      Honorable Bart Chilton, Commissioner
      Honorable Michael Dunn, Commissioner
      Honorable Scott O'Malia, Commissioner
      Honorable Jill E. Sommers, Commissioner
            Commodity Futures Trading Commission

      Honorable Mary L. Schapiro, Chairman
      Honorable Luis A. Aguilar, Commissioner
      Honorable Kathleen L. Casey, Commissioner
      Honorable Troy A. Paredes, Commissioner
      Honorable Elisse B. Walter, Commissioner
            Securities and Exchange Commission

      Sarah Lee, Associate General Counsel
            Bank of America Corporation

      Don Bendernagel, Managing Director
      Hugh C. Conroy Jr., Managing Director & Associate General Counsel
            Citigroup Inc.

      Tom Riggs, Managing Director
            The Goldman Sachs Group, Inc.

-21-

SC1:3039342.6

Diane Genova, Managing Director
JPMorgan Chase & Co.

Richard Ostrander, Managing Director
Morgan Stanley

Barry Taylor-Brill, Managing Counsel
Wells Fargo & Company

SC1:3039342.6

## Appendix

**Question 83. Does the proposed rule's treatment of the swap and security-based swap transactions of foreign covered swap entities appropriately limit application of the margin requirements in a manner consistent with the territorial scope of sections 731 and 764 of the Dodd-Frank Act?**

The treatment under the Prudential Regulators' proposed rule of swap and security-based swap transactions of foreign covered swap entities exceeds the territorial scope of Sections 731 and 764 of Dodd-Frank. For example, applying margin requirements to every transaction by a foreign covered swap entity with a foreign counterparty where the transaction is guaranteed by a U.S. entity is an overly broad exercise of jurisdiction because it assumes, without analysis or support, that any transaction guaranteed by a U.S. entity would have a direct and significant effect on U.S. commerce or would be a *per se* evasion of the rules. Such unsupported assumptions are not consistent with the boundaries of extraterritorial application of U.S. legislation.

The CFTC's proposed rule provides no allowance for swap and security-based swap transactions conducted outside the United States and is therefore also an overly broad exercise of jurisdiction that is inconsistent with the territorial scope of the Dodd-Frank Act.

**Question 84(a). Is the proposed rule's treatment of the foreign swap and security based swap transactions of U.S. covered swap entities appropriate? 84(b) Should such transactions be subject to the same exclusion that has been proposed for the foreign swap and security-based swap transactions of foreign covered swap entities? 84(c) If so, why?**

The treatment under the Prudential Regulators' proposed rule of foreign swap and security-based swap transactions of U.S. covered swap entities is not appropriate for the Non-U.S. Operations. The CFTC's proposed rule is even more expansive and inconsistent with basic precepts of extraterritoriality as it does not distinguish between U.S. and foreign swap entities. Under the Prudential Regulators' rule, transactions by the Non-U.S. Operations should be treated the same as transactions by foreign covered swap entities, and the CFTC's rule should be changed to be consistent.

The Agencies' proposed margin rules exceed the extraterritorial limits in Dodd-Frank. The statute requires a direct and a significant connection with or effect on U.S. commerce for extraterritorial application or requires a rule to prevent evasion of a U.S. law. As proposed, this rule would potentially capture all transactions whether or not they have *any* effect or connection, not just a "direct *and* significant" effect or connection. Furthermore, the rules would apply to *any* transaction, not just those designed to evade requirements.

-23-

Maintaining the proposed approach would put U.S. firms at a significant competitive disadvantage by driving non-U.S. companies and sovereigns to transact with non-U.S. swap dealers that will apply only the locally mandated rules that local companies would expect to apply. Furthermore, application of margin requirements to the transactions of the Non-U.S. Operations outside the United States will inevitably encourage customers to do business instead with non-U.S. competitors, thus moving more derivatives activity outside of the jurisdiction of U.S. regulators. Modifying the proposed rules as we recommend in this letter will help retain more of the global derivatives activity within the U.S. regulatory framework.

The U.S. Banking Organizations, including the Non-U.S. Operations, are subject to supervision by the applicable federal banking agencies with respect to all of their activities. Retaining this activity in U.S. Banking Organizations will promote financial stability as these transactions will be conducted by entities subject to examination and extensive safety and soundness regulation by the federal banking agencies. In addition, keeping more of the derivatives activity within the U.S. regulatory framework would help the CFTC and other applicable regulators monitor developments in the global derivatives market and the effect such developments may have on the stability of the U.S. financial system.

**Question 85(a). Should the proposed rule expand the definition of foreign covered swap entity to include (i) the foreign subsidiaries of U.S. companies or (ii) the foreign branches of U.S. insured depository institutions? 85(b) If so, why? 85(c) How could the potential risks to the U.S. parent company or insured depository institution related to its subsidiary or branch's activity be limited or eliminated? 85(d) Is this operationally feasible?**

The definition of "foreign covered swap entity" in the Prudential Regulators' proposed rule should include the Non-U.S. Operations. As discussed in response to Question 84, this approach would be consistent with the limits on extraterritorial application in the statute and long-standing U.S. practice. In addition, the CFTC should adopt a similar exception that would exempt non-cleared swaps conducted between any non-U.S. swap entity, regardless of a U.S. affiliation, and a foreign counterparty from margin requirements.

In light of the territorial limits in the statute and serious competitive issues, risk to the U.S. parent company posed by the Non-U.S. Operations should be addressed through the existing regulatory and supervisory framework. The U.S. Banking Organization already must have prudent credit risk management, which may include collection and posting of margin where appropriate. Through the existing supervisory process, the federal banking agencies can evaluate risk to the safety and soundness of the swap entity and any impact on its U.S. parent and require changes to the organizations' credit risk management on a more tailored basis. Further, monitoring of capital placed into the Non-U.S. Operations in relation to the risks posed by any swaps activity in those operations will help regulators assess the impact, if any, to the U.S. parent. In many

-24-

jurisdictions, it is likely that the Non-U.S. Operations will be subject to local margin requirements, which would help mitigate the risk to the swap entity and the U.S. parent and should be taken into account, particularly where the local regulatory regime is reasonably designed to regulate derivatives activity conducted therein (even if not the same as that in the U.S.), when supervising the U.S. Banking Organizations.

There is longstanding U.S. statutory and public policy to provide Edges and foreign branches of U.S. banks with the ability to compete effectively in foreign markets.[38]  As a result, even though these entities are subject to U.S. regulation and supervision, they are provided greater latitude to operate on a competitive parity with local institutions.  This same recognition of the need for U.S. banking organizations to be able to compete in foreign jurisdictions should be reflected in the margin rules and other transaction-specific rules—for nonbank subsidiaries as well as Edges and foreign branches.  In this case, the clear statutory limit on the scope of extraterritorial application would allow the Agencies to define the jurisdictional scope of Title VII's requirements in a way that does not disadvantage U.S. institutions so long as there is no direct or significant connection with or effect on U.S. commerce.  Given U.S. regulatory and supervisory oversight, as well as local regulation, an overly broad application of the margin rule requirements is not required to avoid such a direct or significant effect.[39]

**Question 86. What impact is the proposed rule's treatment of the foreign swap and security-based swap transactions of U.S. covered swap entities likely to have on the structure, management, and/or competitiveness of U.S. covered swap entities?**

Establishing the appropriate jurisdictional scope of the margin requirements is critical to the ability of the U.S. Banking Organizations to maintain their competitive positions in foreign marketplaces.  Imposing margin requirements on their Non-U.S. Operations' foreign transactions would place them at a disadvantage to their foreign competitors because the Non-U.S. Operations would be subject to additional margin requirements that may be different from and conflict with local requirements.  Non-U.S. banking organizations should not be burdened by dual and potentially conflicting requirements.  A foreign subsidiary or branch of a U.S. entity that is already subject to local, non-U.S. regulation should not be forced to comply with U.S. margin requirements when trading with non-U.S. customers.

The Agencies' proposals potentially could subject U.S. institutions to multiple margin requirements in a jurisdiction and would hamper their ability to provide services to non-U.S. customers, which may cause certain non-U.S. customers to migrate

---

[38]     See footnote 21 above.

[39]     As discussed above, if the mere existence of an affiliation or broad relationship constituted a "direct" and a "significant" effect, the statute would have been written differently.

away from the Non-U.S. Operations.  The proposed rules may also drive counterparties to non-U.S. competitors in those jurisdictions that do not impose margin requirements, or impose more liberal requirements, on non-cleared swaps.  A reduction in the customer pool would limit the Non-U.S. Operations' ability to manage and transfer risks.  Such an effect is contrary to one of the purposes of Dodd-Frank, which is to reduce systemic risk in the financial system.

Both proposed margin rules may exclude U.S. Banking Organizations from jurisdictions that do not have an existing infrastructure or legal framework to support compliance with the proposed margin requirements.  Even under the CFTC proposal, which could be read to contain no exemption for non-U.S. swap dealers, both the non-U.S. affiliates of U.S. organizations and any non-U.S. registered swap dealer not affiliated with a U.S. organization will be subject to both U.S. and any local requirements in their dealings with non-U.S. customers, with little, if any, benefit to the financial system.  Non-U.S. customers have no expectation that they would be required to satisfy U.S. margin rules, which would disrupt the conduct of legitimate business that likely has no direct or significant effect on U.S. commerce.

From a structure and management perspective, there will be incentives to avoid becoming a covered swap entity, thus disrupting client relationships that may need to be curtailed, and creating inefficiencies in product availability to customers as well as in the ability to manage risk across the entire affiliated financial institution.

U.S. swap entities are likely to be at a particular competitive disadvantage with respect to their transactions with foreign sovereigns.  Foreign sovereigns are defined as "financial end-users," and will not be able to meet the requirements to be considered "low risk" because both the CFTC's and the Prudential Regulators' proposed rules require a financial end-user to be subject to capital requirements established by a U.S. Prudential Regulator or a state insurance regulator in order to be considered "low risk"— a requirement that no foreign sovereign could meet.  As a result, foreign sovereigns will be subject to the more substantial margin requirements applicable to high-risk end-users, which will be a significant incentive for them to transact with non-U.S. swap entities.

**Question 87(a). Is the proposed rule's definition of a foreign swap or security-based swap transaction appropriate? 87(b) In particular, is the requirement that no U.S. affiliate guarantee the foreign counterparty's obligations under the swap or security-based swap transaction appropriate? 87(c) Would an alternative definition more appropriately differentiate between U.S. and foreign counterparties for these purposes? 87(d) If so, what should that definition be?**

Again, we believe this is an overly broad application of the margin requirements and is likely to subject these transactions to unnecessary regulation even though the transactions may have little effect on U.S. commerce.

-26-

**Question 88(a). Is the proposed rule's definition of a foreign covered swap entity appropriate? 88(b) Would an alternative definition more appropriately differentiate between U.S. and foreign counterparties for these purposes? 88(c) If so, what should that definition be?**

For the reasons discussed above in response to Questions 84 and 85, the definition of foreign covered swap entity should be modified by (i) including non-U.S. branches and offices of U.S. banks, Edges, and non-U.S. subsidiaries, branches and offices of U.S. banking organizations or their non-bank subsidiaries in the definition of "foreign covered swap entity" by eliminating § ____.9(c)(2) and (c)(4) from the definition in the Prudential Regulators' rule and (ii) modifying § ____.9(c)(1) of the Prudential Regulators' rule to refer to any covered swap entity that is "[N]ot a United States branch or office of a company organized under the laws of the United States or any State." Further, the definition of "foreign non-cleared swap or foreign non-cleared security-based swap" should be modified by removing transactions that are guaranteed by U.S. entities by eliminating § ____.9(b)(2) from the Prudential Regulators' rule. In addition, the CFTC proposal should include a provision such as the Prudential Regulators' § ____.9, as revised to reflect the changes and addition noted in the previous two sentences.

**Question 89(a). Is the proposed rule's application of the margin requirements to all U.S. swaps and security-based swaps of a covered swap entity, regardless of whether that covered swap entity is U.S. or foreign, appropriate? 89(b) Should the proposed rule treat such transactions differently? 89(c) If so, how?**

Non-U.S. and U.S. swap entities should be treated the same with respect to transactions that take place outside the United States between non-U.S. entities (including the Non-U.S. Operations). As discussed above, consistent with the extraterritorial limits on application of Title VII, such transactions should not be subject to the margin requirements.

**Question 90. What impact is the proposed rule's treatment of the swap and security-based swap transactions of foreign covered swap entities likely to have on the structure, management, and/or competitiveness of foreign covered swap entities?**

For the reasons stated above, the proposed margin requirements will benefit the competitive position of foreign covered swap entities over their U.S. counterparts. The rule may encourage otherwise unnecessary restructuring of U.S. organizations to move U.S. business out of non-U.S. entities to remove the need for such entities to register as U.S. swap dealers. Under the Prudential Regulators' rule, such restructurings will not have to be conducted by their non-U.S. competitors because those competitors will be able to leave both their U.S. and non-U.S. business in the same entity.

-27-