# EXHIBIT "D"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------

No. 10 Civ. 4974 (RJS)

--------------------------

GUCCI AMERICA, INC., *et al.*,

Plaintiffs,

VERSUS

WEIXING LI, *et al.*,

Defendants.

--------------------------

MEMORANDUM AND ORDER
August 23, 2011

--------------------------

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Gucci America, Inc. and certain of its affiliates bring this trademark infringement action against the owners and operators of a Chinese website dedicated to the sale of imitation handbags and other items. On July 12, 2010, the Court entered a preliminary injunction that, among other things, froze funds in Defendants' accounts at the Chinese headquarters of non-party Bank of China ("Bank of China" or the "Bank"). Since the Court's issuance of the preliminary injunction, Plaintiffs have sought from the Bank, pursuant to Rule 45 of the Federal Rules of Civil Procedure, documents and information relating to Defendants' accounts that Plaintiffs assert are critical to their investigation of Defendants' alleged counterfeiting operations. The Bank has refused to produce the requested documents to the extent that they are located in the Bank's offices in China, arguing that Chinese bank secrecy laws prevent it from doing so.

Before the Court is Plaintiffs' motion to compel Bank of China to comply with the Rule 45 subpoena as well as the asset freeze provision of the preliminary injunction. Also before the Court is the Bank's cross-motion to modify the preliminary injunction so as to terminate the provisions that freeze Defendants' assets that are held by the Bank in any of its locations in China. For the reasons that follow, Plaintiffs' motion is granted and Bank of China's motion is denied.

## I. BACKGROUND

### A. Facts[1]

Plaintiffs are distributors of luxury handbags, clothing, jewelry, fragrances, and home products.[2] (SAC ¶¶ 6-9.) In or around June 2010, Plaintiffs discovered that Defendants and their affiliates were offering for sale on the internet counterfeit versions of Plaintiffs' products. Defendants allegedly advertised these products as authentic, thereby "deceiv[ing] and mislead[ing] consumers into believing that Defendants' products or activities are authorized or sponsored by the Plaintiffs." (*Id.* ¶ 47.)

On June 25, 2010, Plaintiffs initiated this action against Weixing Li, Lijun Xu, and certain "John Does," doing business as, inter alia, Redtagparty, Designer Handbags, Myluxurybags.com, Xpressdesigners.com, and Xpressdesigner.net, pursuant to the Lanham Act, 15 U.S.C. § 1051, *et seq.*, and related state-law causes of action.[3] Plaintiffs subsequently entered into a settlement agreement with Defendant Lijun Xu. (Doc. No. 21.) No other Defendant has appeared in this action.

Upon Plaintiffs' motion, filed contemporaneously with their Complaint, the Court entered a temporary restraining order (the "TRO") on June 25, 2010, which froze Defendants' assets and enjoined Defendants from, among other things, manufacturing, distributing, marketing, or selling counterfeit goods. (Doc. No. 3.) On July 12, 2010, the Court converted the TRO into a preliminary injunction. (Doc. No. 12 (the "Injunction").) Because Plaintiffs had obtained evidence that certain Defendants had wired proceeds of the counterfeit sales operation to accounts at the Chinese headquarters of Bank of China, the Injunction specifically referenced certain of Defendants' accounts with the Bank. The Injunction, which was issued pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure, the Lanham Act, and the Court's inherent equitable powers, provides, in relevant part:

> [A]ny banks . . . who receive actual notice of this order by personal service or otherwise, are, without prior approval of the Court, restrained and enjoined from transferring, disposing of, or secreting any money, stocks, bonds, real or personal property, or other assets of Defendants. . . . This includes but is not limited to . . . any and all Bank of China accounts associated with or utilized by Weixing Li, Lijun Xu, Redtagparty, Myluxurybags.com and/or any of the other Defendants, including but not limited to the accounts ending in the last four digits 2443 and 1235, as identified in correspondence between Plaintiffs and Defendant Lijun Xu's counsel.

(Injunction at 6-7.)

Plaintiffs served Bank of China with the Injunction at a New York City branch on July 13, 2010. Three days later, Plaintiffs served the Bank with a subpoena, which, pursuant to the terms of the Injunction (*see*

---

[1] The following facts, which are undisputed, are taken from the Second Amended Complaint ("SAC"), the parties' memoranda of law, and the parties' declarations and exhibits attached thereto.

[2] Plaintiffs are Gucci America, Inc., Balenciaga America, Inc., Balenciaga S.A., Bottega Veneta International S.A.R.L., Bottega Veneta Inc., Luxury Goods International S.A., and Yves Saint Laurent America, Inc.

[3] In the Amended Complaint, filed on October 4, 2010, Ting Xu and Kuelala.com were added as Defendants. (Doc. No. 18.)

*id.* at 9), required the Bank to produce documents in its possession within ten days (Declaration of Robert L. Weigel, dated December 6, 2010, Doc. No. 28 ("Weigel Decl."), Ex. 5 (the "Subpoena") at 1). On July 26, 2010, Bank of China filed objections to the Subpoena. (Weigel Decl., Ex. 8.) Among the bases for its objections, the Bank claimed that the New York branch upon which the Subpoena was served does not have "possession, custody, or control over information located in any other branch or office of the Bank of China." (*Id.* at 4.) The Bank also objected to the extent that compliance with the Subpoena would violate Chinese law and insisted that Plaintiffs' discovery request was more properly made under the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention"). (*Id.* at 5.) Ultimately, Bank of China produced responsive documents that were in the possession of its New York branch. The Bank, however, refused to produce responsive documents located in any of its branches in China.

In the months following the Court's issuance of the Injunction, Plaintiffs made several requests for confirmation that the Bank had, in fact, frozen Defendants' assets. The Bank refused to provide such confirmation, responding that it "disagree[d] with [Plaintiffs'] assertion that the Court's orders require that the Bank of China freeze accounts located in China." (Weigel Decl., Ex. 12, at 2.) The Bank further asserted that "Chinese law plainly prohibits disclosure in response to an order of a United States court" and "the freezing of accounts in China would violate Chinese law and subject Bank of China to liability." (*Id.*)

On December 6, 2010, Plaintiffs filed a "Motion to Compel Third Party Bank of

China to Comply with this Court's Orders and Plaintiffs' Subpoena." (Doc. No. 26.) On December 22, 2010, the Bank filed its opposition to Plaintiffs' motion and cross-moved "to modify the Court's Orders" so as to terminate the provisions of the Injunction that required the Bank to freeze Defendants' assets that are held by the Bank in China. (Doc. No. 34.) The two motions were fully submitted as of January 3, 2011.

On March 10, 2011, after receiving permission from the Court, Plaintiffs filed a Second Amended Complaint that substituted seven new Defendants for certain of the "John Does."[4] (Doc. No. 55.) The Second Amended Complaint alleges that the New Defendants are recipients of wire transfers from Bank of China accounts registered to Defendants.

Following a change of counsel by the Bank, on June 3, 2011, the Court heard oral argument on the parties' cross-motions. At the conference, the Bank's new counsel represented that the Bank's position with respect to the motions had not changed, and that it would continue to advance the arguments that were argued by the Bank's former counsel in their briefs.[5]   (*See*

---

[4] The Second Amended Complaint added the following Defendants: Wenying Guo, Xiaochao Shang, Lei Xu, Fengyuan Zhao, Liqun Zhao, Ming Zhao, and Peiyuan Zhao (collectively, the "New Defendants").

[5] On January 5, 2011, the Court held a conference at which Plaintiffs sought entry of a default judgment against Defendants. At the conference, Bank of China raised objections to the inclusion of a turnover provision in any default judgment entered by the Court. In light of the arguments raised at the conference, the Court permitted the parties to submit supplemental briefing with respect to whether the Court has the authority to order a foreign bank to turn over a judgment debtor's assets. While the parties' respective arguments on this issue were again raised at the June 3, 2011 conference, they are not relevant to the instant motions. The Court presumes that

Transcript of June 3, 2011 Oral Argument, ("Tr."), at 3-4.)

## II. DISCUSSION

### A. Restraint of Overseas Assets

While the Lanham Act does not specifically authorize the restraint of a defendant's assets, it does entitle a plaintiff who establishes a violation of his rights in connection with a registered trademark, "subject to the principles of equity, to recover . . . defendant's profits." 15 U.S.C. § 1117(a). A district court, therefore, "has authority to freeze [a defendant's] assets insofar as they could be used to satisfy an award of . . . profits pursuant to Plaintiffs' Lanham Act Claims." *Balenciaga Am., Inc. v. Dollinger*, No. 10 Civ. 2912 (LTS), 2010 WL 3952850, at *7 (S.D.N.Y. Oct. 8, 2010); *accord N. Face Apparel Corp. v. TC Fashions*, No. 05 Civ. 9083 (RMB), 2006 WL 838993, at *3 (S.D.N.Y. Mar. 30, 2006) (citing *Levi Strauss & Co. v. Sunrise Int'l Trading*, 51 F.3d 982, 987 (11th Cir. 1995); *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992)).

Bank of China argues, nevertheless, that this Court "does not have the authority to issue a pre-judgment extraterritorial restraint directed at assets held by a third party." (BOC's Mem. at 14.)   In support of its argument, Bank of China relies on the Supreme Court's decision in *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), which held that a district court "had no authority to issue a preliminary injunction preventing [a party] from disposing of [its] assets pending adjudication of [a] contract claim for money damages," *id.* at 333.   In

reaching this holding, however, the Court was careful to distinguish an action for money damages where a restraint is sought on a party's general assets – as was the case in *Grupo Mexicano* – from a case in which a party is seeking an asset freeze pursuant to a court's equitable powers.   *See id.* Significantly, the *Grupo Mexicano* Court noted that its holding was "entirely consistent" with the holdings of two prior cases that found the asset freeze provisions of a preliminary injunction appropriate in cases where the relief sought was equitable in nature. *See id.* at 324-26 (distinguishing the Court's prior holdings in *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940), and *United States v. First Nat. City Bank*, 379 U.S. 378 (1965)).

Indeed, "courts since *Grupo Mexicano* have found that where plaintiffs seek both equitable and legal relief in relation to *specific* funds, a court retains its equitable power to freeze assets." *Quantum Corp. Funding, Ltd. v. Assist You Home Health Servs. of Va.*, 144 F. Supp. 2d 241, 250 n.9 (S.D.N.Y. 2001) (collecting cases); *accord Balenciaga*, 2010 WL 3952850, at *7. Here, in addition to seeking money damages and a permanent injunction, Plaintiffs seek an accounting of the profits made by Defendants as a result of their counterfeiting operation. (*See* SAC at 44.)   An accounting of profits is equitable relief that authorizes a district court to freeze a party's assets. *See, e.g., Motorola, Inc. v. Abeckaser*, No. 07 Civ. 3963 (CPS), 2009 WL 1362833, at *3 (E.D.N.Y. May 14, 2009) ("[B]ecause the Lanham Act does give courts the authority to order equitable relief in the form of an accounting of the seller's profits, this Court has the authority to order injunctive relief freezing assets in order to ensure availability of final equitable relief.")   Moreover, in contrast to the general asset restraint that was at issue in *Grupo Mexicano*, here the

---

Plaintiffs will reassert their application for a default judgment once the New Defendants have been served.

4

Injunction freezes assets in accounts that have been specifically connected to Defendants' counterfeiting operation. Accordingly, an asset freeze is appropriate in order to determine the amount by which Defendants profited from their counterfeiting activities. *See Balenciaga*, 2010 WL 3952850, at *7 (denying motion seeking modification of the preliminary injunction and noting that "[t]he Court . . . has authority to freeze the Individual Defendants' assets insofar as they could be used to satisfy an award of their profits pursuant to Plaintiffs' Lanham Act claims").

The fact that the some of the funds subject to the Injunction are located outside of the United States does not, contrary to the Bank's arguments, deprive the Court of authority to issue the asset restraint. As the Supreme Court has stated, in upholding an asset restraint against a foreign bank, "[o]nce personal jurisdiction of a party is obtained, the District Court has authority to order it to 'freeze' property under [the party's] control, whether the property be within or without the United States." *First Nat. City Bank*, 379 U.S. at 384; *accord Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303, 312 (2010) ("[A] court with personal jurisdiction over a nondomicilliary present in New York has jurisdiction over that individual's tangible or intangible property, even if the situs of the property is outside of New York."). Nor is there any merit to the Bank's argument that the Lanham Act does not apply extraterritorially. *See A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 126 F. Supp. 2d 328, 336 (S.D.N.Y. 2001) ("It is well-established that United States courts have jurisdiction to apply the Lanham Act to allegedly infringing conduct occurring outside the United States when necessary to prevent harm to United States commerce." (citing *Steele v. Bulova Watch Co.*, 344 U.S.

280 (1952)). Here, there is no dispute that Defendants, despite failing to appear in this action, are subject to this Court's jurisdiction. The Court, therefore, possesses the power to restrain Defendants' assets whether they are located domestically or abroad. Accordingly, the Bank's motion to modify the Court's Orders is denied.[6]

## B. Production of Documents Located in China

As noted above, Plaintiffs seek from the Bank, pursuant to a Rule 45 subpoena, production of information related to Defendants' accounts. While the Bank has produced this information to the extent that it is accessible from its New York branch – the branch upon which the Subpoena was served – the Bank has failed to produce any documents or account information located in China. According to the Bank, Chinese bank secrecy laws prohibit the disclosure of

---

[6] Both in its brief and at oral argument, Bank of China advanced the position that the Court lacks the authority to restrain assets located in the Bank's Chinese branches because of the "separate entity rule" – a principle of New York law that construes each branch of a bank as a separate entity, "in no way concerned with accounts maintained by depositors in other branches or at the home office." (BOC Mem. at 14 (quoting *Lok Prakashan Ltd. v. India Abroad Publ'n, Inc.*, No 00 Civ. 5862 (LAP), 2002 WL 1585820, at *1 (S.D.N.Y. July 16, 2002) (citation and internal quotation omitted).) According to the Bank, where, as here, jurisdiction over the Bank is predicated on the Bank's presence in New York, the Court lacks the authority to reach assets located abroad. (*Id.* at 15.) The separate entity rule, however, applies only "for attachment purposes." *Allied Mar., Inc. v. Descatrade, SA*, 620 F.3d 70, 74 (2d Cir. 2010). Thus, while the separate entity rule may become relevant to this action following an entry of default judgment against Defendants, it is inapposite here, where Plaintiffs merely seek a preliminary injunction pursuant to the Lanham Act and the Court's equitable powers and not "the attachment of property pursuant to Rule 64 of the Federal Rules of Civil Procedure and New York state law." *Balenciaga*, 2010 WL 3952850, at *8.

customer account information without consent. The Bank argues that, because production of the information sought by Plaintiffs could subject the Bank to civil and criminal liability, the appropriate way for Plaintiffs to make a request for documents is through the Hague Convention.

In determining whether to order a party to produce documents in contravention of the laws of a foreign country, courts in this Circuit have employed the five-factor test set forth in the Restatement (Third) of Foreign Relations Law of the United States § 442(1)(c).[7] *See, e.g., Strauss v. Credit Lyonnais*, 249 F.R.D. 429, 438 (E.D.N.Y. 2008); *Ssangyong Corp. v. Vida Shoes Int'l*, No. 03 Civ. 5014 (KMW) (DFE), 2004 WL 1125659, at *6 (S.D.N.Y. May 20, 2004). Pursuant to this test, courts deciding whether to order production of documents located abroad are directed to consider: (i) "the importance to the investigation or litigation of the documents or other information requested;" (ii) "the degree of specificity of the request;" (iii) "whether the information originated in the United States;" (iv) "the availability of alternative means of securing the information;" and (v) "the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." Restatement (Third) Foreign Relations Law § 442(1)(c). In addition, courts in the Second Circuit may also consider "the hardship of compliance on the party or witness from whom discovery is sought [and] the good faith of the party

resisting discovery." *Minpeco S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987); *see also Reino De Espana v. Am. Bureau of Shipping*, No. 03 Civ. 3573 (LTS) (RLE), 2005 WL 1813017, at *3 (S.D.N.Y. Aug. 1, 2005). The Court will address each of these factors in turn.

### 1. The Importance of the Documents to the Litigation

Plaintiffs assert that the information they seek – documents related to Defendants' bank accounts in China – is "critical to their ability to investigate Defendants' counterfeiting operations and [to] hold Defendants accountable for their counterfeiting operations." (Pls.' Reply at 17.) Specifically, Plaintiffs argue that this information is necessary to uncover the identity of other infringers acting in concert with Defendants, to track the revenue generated by Defendants' infringing conduct, and to enable Plaintiffs to recover damages.

This factor clearly weighs in favor of Plaintiffs. First, the documents sought by the Subpoena are likely to provide the most fruitful avenue for discovering the identity of additional infringers. Further, given that every remaining Defendant has failed to appear in this action, the only issue likely to be before the Court is the amount of Plaintiffs' damages. As a practical matter, therefore, information related to Defendants' bank accounts is likely to provide the most effective measure of the revenues generated by Defendants in contravention of United States trademark laws. *See Gucci America, Inc. v. Curveal Fashion*, No. 09 Civ. 8458 (RJS) (THK), 2010 WL 808639, at *3 (S.D.N.Y. March 8, 2010) (finding this factor "weighs heavily in favor of Plaintiffs" where the plaintiffs sought to enforce a

---

[7] Prior to the publication of the Restatement (Third), the Second Circuit explicitly adopted the approach set forth in the Restatement (Second). *See Trade Dev. Bank v. Cont'l Ins. Co.*, 469 F.2d 35, 41 (2d Cir. 1972). For purposes of this motion, the approach set forth in the Restatement (Third) does not differ from the Restatement (Second) in any meaningful way.

default judgment against defendants accused of trademark infringement). Accordingly, the Court finds that the documents requested in the Subpoena are important to the instant litigation.

## 2. The Specificity of the Requests

The Subpoena seeks production of information limited solely to Defendants' accounts at Bank of China. Plaintiffs have already identified two such accounts and have connected them to Defendants' counterfeiting activities. As other courts in this district have found, such a request is sufficiently specific and discrete to weigh in favor of Plaintiffs. *See Milliken & Co. v. Bank of China*, 758 F. Supp. 2d 238, 247 (S.D.N.Y. 2010) (finding that the petitioner's document request was sufficiently narrowly tailored where it "sought information limited to specific accounts" related to the petitioner's claims); *Curveal*, 2010 WL 808639, at *3 (finding this factor to weigh in favor of the plaintiffs where they "narrowly tailored the requests to target Defendants' accounts . . . [that] Plaintiffs have shown to be a repository for nearly $1 million of funds received by Defendants as a result of their infringing activities"). Accordingly, the Court finds that the Subpoena is sufficiently specific such that this factor weighs in favor of Plaintiffs.

## 3. Whether the Information Originated Outside of the United States

There is no genuine dispute that the information that Plaintiffs seek in the Subpoena originated in China and is currently located there. Plaintiffs nevertheless argue that this information is accessible to the Bank's United States branches, and that the Bank's New York branch "routinely transfers money between

accounts located at [its] New York branch and its branches in China." (Pls.' Reply at 18.) According to Plaintiffs, the Bank has produced similar information in other cases, which demonstrates that "the Bank has the practical ability to obtain customer account information from its overseas branches." (*Id.* at 18-19.)

With respect to this factor, the fact that the Bank may have produced information from its offices in China in other litigation is beside the point. Where the information at issue originated and remains located outside of the United States, this factor weighs against the requesting party. *See Milliken*, 758 F. Supp. 2d at 247; *Curveal*, 2010 WL 808639, at *3. Accordingly, this factor weighs in favor of the Bank.

## 4. Alternative Methods of Securing Information

"'If the information sought can easily be obtained elsewhere, there is little or no reason to require a party to violate foreign law.'" *Reino de Espana*, 2005 WL 1813017, at *9 (quoting *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992)). Conversely, "if the information cannot be *easily obtained* through alternative means, this factor is said to counterbalance the previous factor – the location of the documents and information – and weighs in favor of disclosure." *Curveal*, 2010 WL 808639, at *3 (emphasis in original). Here, the Bank argues that the Hague Convention provides Plaintiffs with a perfectly adequate means of securing the information it has requested without forcing the Bank to violate Chinese law. Plaintiffs contend that a Hague Convention request is unnecessarily costly, time consuming, and is fraught with uncertainty.

In support of their respective positions,

each party has put forward exhibits and expert reports attesting to the effectiveness, or ineffectiveness, of Hague Convention requests for documents located in China. These materials suggest that China typically processes Hague Convention requests within six-to-twelve months and that approximately 50% of such requests are granted. (*See* Letter from Lanier Saperstein, dated June 3, 2011, Ex. D; Letter from Robert Weigel, dated June 1, 2011; Letter from Lanier Saperstein, dated May 19, 2011, Ex. C.) While Plaintiffs and the Bank do not appear to contest the accuracy of these figures, they vigorously dispute whether, as a practical matter, a Hague Convention request represents a viable alternative method for Plaintiffs to obtain the information they seek. The Bank argues that China's compliance rate with Hague Convention requests is comparable to that of other countries. (*See* Tr. at 32.) The Bank also notes that the State Department recently revised a section of its website, removing language that Plaintiffs cited for the proposition that Hague Convention requests in China "have not been particularly successful in the past." (Pls.' Reply at 20 (quoting Decl. of Jennifer C. Halter, dated January 3, 2011, Doc. No. 40, Ex. R).) According to the Bank, this is reflective of significant improvements by China demonstrating that Hague Convention requests are "not futile." (Tr. at 31.)

The Bank, however, fails to cite authority for the proposition that a Hague Convention request must be "futile" for this factor to weigh in favor of the requesting party. Indeed, if that were so, all parties would have to resort to the Hague Convention in the first instance as long as there was *some* likelihood of compliance – a position courts have rejected. Significantly, the Supreme Court has noted that determining whether notions of international

comity require a party to utilize Convention procedures is a fact-intensive inquiry requiring "scrutiny in each case of the particular facts, sovereign interests, and likelihood that resort to those procedures will prove effective." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 544 (1987). The Court observed that

> [i]n many situations the Letter of Request procedure authorized by the Convention would be unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules. A rule of first resort in all cases would therefore be inconsistent with the overriding interest in the just, speedy, and inexpensive determination of litigation in our courts.

*Id.* at 542 (internal citations and quotation marks omitted). The Bank's position that Hague Convention requests must be futile before a court can forego its procedures is thus plainly in tension with the Supreme Court's rejection of a blanket rule requiring resort to Convention procedures in the first instance. As the Court stressed,

> [a]n interpretation of the Hague Convention as the exclusive means for obtaining evidence located abroad would effectively subject every American court hearing a case involving a national of a [signatory] state to the internal laws of that state. Interrogatories and document requests are staples of international commercial litigation, no less than of other suits, yet a rule of exclusivity would subordinate the court's supervision of even the most routine of these pretrial proceedings to the

actions or, equally, to the inactions of foreign judicial authorities.

*Id.* at 539.

Indeed, courts in this Circuit have found that, as a general matter, "the outcome of a request pursuant to the Convention is by no means certain, and making the request will undeniably result in delays of unknown, and perhaps considerable, duration. Thus, the mere fact that the Hague Convention provides an alternative method for obtaining the documents is not proof that it is necessarily an effective, or efficient, method for doing so in this case." *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06 Md. 1775, 2010 WL 1189341, at *2 (E.D.N.Y. Mar. 29, 2010); *see also Milliken*, 758 F. Supp. 2d at 248 (finding this factor to weigh in favor of requesting party where "its requests would not necessarily be honored, but would only be taken 'seriously' by Chinese authorities").

The evidence put forward by Plaintiffs further persuades the Court that a Hague Convention request does not present an easily obtainable alternative for Plaintiffs in this case. Plaintiffs' expert, a former practitioner of international law and current law professor specializing in the laws of China, credibly opines that "a Hague Convention request issued by a United States court is not a realistic or meaningful option for the Plaintiffs in this case to obtain the information that they seek." (Decl. of Donald Clarke, dated Jan. 3, 2011, Doc. No. 41 ("Clarke Report") at 12.) Professor Clarke's conclusion is echoed by a paper presented at the American Bar Association's 2008 annual meeting, which notes that the "Hague Convention is of limited utility in China in large part because its implementation remains uncertain and unpredictable." (Letter from Robert Weigel,

dated June 1, 2011, Ex. A, at 32.) This evidence, which is largely consistent with case law discussing the efficacy of Hague Convention requests generally, is sufficient to demonstrate that a Hague Convention request in this case would be "unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules." *Aerospatiale*, 482 U.S. at 542.

The Bank argues, however, that Plaintiffs' evidence is no longer relevant in light of the State Department's deletion of language from its website suggesting that Hague Convention requests in China "have not been particularly successful in the past." (*See* Letter from Lanier Saperstein, dated May 19, 2011 at 2.) Indeed, in a recently-issued opinion, Magistrate Judge Pitman concluded that the State Department's revision of its website rendered the plaintiffs' evidence, which was substantially similar to the evidence put forward by Plaintiffs here, "less persuasive." *Tiffany (NJ) LLC v. Andrew*, No. 10 Civ. 9471 (WHP) (HBP), 2011 WL 3135850, at *13 (S.D.N.Y. July 25, 2011). As a result, Judge Pitman was unable to conclude that a request pursuant to the Hague Convention was "futile," and consequently found that this factor weighed in favor of the nonparty Chinese banks. *Id.*

The Court respectfully disagrees. While both Professor Clarke's report and the ABA paper cite to the deleted language from the State Department's website, the conclusions reached by each of these authorities is additionally supported by a variety of independent sources. Professor Clarke's conclusions, for example, were based on "academic and professional legal studies, research, teaching and publishing over the course of many years as a professor of law, . . . [and] personal experience and familiarity

9

with the Chinese legal system and courts." (Clarke Report at 3-4.) Likewise, the ABA paper cites, among other things, law review articles and Chinese statutes. Thus, while the Court agrees with Judge Pitman that "there is a dearth of information as to the current efficiency" of Hague Convention requests in China, *Tiffany*, 2011 WL 3135850, at *13, the Court is reluctant to discount Plaintiffs' evidence and the case law cited above solely because of an unexplained revision to the State Department's website. Without concrete evidence suggesting that China's compliance with Hague Convention requests has, in fact, dramatically improved, the Court is inclined to defer to the authorities cited above that have found that Hague Convention requests in circumstances similar to those presented here are not a viable alternative method of securing the information Plaintiffs seek.

Accordingly, the Court finds that this factor weighs in favor of Plaintiffs.

5. Balance of National Interests

The Supreme Court has stated that concerns of international comity require that "American courts . . . take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state." *Aerospatiale*, 482 U.S. at 546. Whether comity favors resort to the Hague Convention requires a "particularized analysis of the respective interests of the foreign nation and the requesting nation." *Id.* at 543-44.

Here, the Bank has submitted two expert affidavits attesting to the fact that China does, in fact, have bank secrecy laws that prevent disclosure of an individual's account information without consent. According to Professor Wu, a drafter of China's Commercial Bank Laws and regulations promulgated thereunder, "[t]hese provisions reflect a considered decision by the Chinese government that providing some assurance of confidentiality regarding customer information is essential to fostering a modern banking system in China that will be in line with the banking systems in other nations." (Decl. of Zhipan Wu, dated Dec. 22, 2010, Doc. No. 37 ("Wu Decl.") ¶ 11.)

While China undoubtedly has an interest in enforcing its bank secrecy laws, "[i]t is clear that American courts are not required to adhere blindly to the directives of [foreign blocking statutes]." *Aerospatiale*, 482 U.S. at 544 n.29. Indeed, bank secrecy laws are entitled to less deference when their protections amount to "simply a privilege that can be waived by the customer." *United States v. First City Nat'l Bank*, 396 F.2d 897, 903 (2d Cir. 1968); *accord SEC v. Banca Della Svizzera Italiana*, 92 F.R.D. 111, 118 (S.D.N.Y. 1981) ("It is also of significance that the secrecy privilege . . . is one belonging to the bank customers and may be waived by them. It is not something required to protect the Swiss government itself or some other public interest.").

Professor Wu notes that the protections provided by China's bank secrecy laws can be waived by the account holder himself or by a "competent organ," a designation that includes public bodies such as the "people's court," "taxation authority," "public security organ," "industrial commercial administrative organ," and "securities regulation organ." (Wu Decl. ¶¶ 15-16.) In total, Professor Wu cites no fewer than thirteen different "organs" that "have the power to inquire about, freeze and deduct the deposits of entities and individuals."

(Wu Decl., Ex. B-4 at 5)   This strongly suggests that China's bank secrecy laws merely confer an individual privilege on customers rather than reflect a national policy entitled to substantial deference. *See Curveal*, 2010 WL 808639, at *6 (finding this factor to weigh in favor of the party seeking disclosure where the bank secrecy laws "permit[] disclosure under certain circumstances"). Moreover, the Chinese government has not voiced any objections to disclosure in this case, which "militates against a finding that strong national interests of the foreign country are at stake." *Minpeco*, 116 F.R.D. at 525 (citing *United States v. Davis*, 767 F.2d 1025, 1035 (2d Cir. 1985)).

China's limited national interest in this case is further highlighted by the fact that the Bank has purposely chosen to do business in New York and has availed itself of the myriad benefits that come with establishing a presence in the United States' premier financial center. Having made such a determination, and reaped the rewards that flow therefrom, the Bank can hardly hide behind Chinese bank secrecy laws as a shield against the requirements faced by other United States-based financial institutions. This is particularly true where the bank secrecy laws at issue have been used to facilitate serious violations of United States law. *See First Nat'l City Bank of New York v. Internal Revenue Serv*, 271 F.2d 616, 620 (2d Cir. 1959) ("If the Bank cannot . . . comply with the lawful requirements both of the United States and [a foreign country], perhaps it should surrender to one sovereign or the other the privileges received therefrom."); *see also Richmark Corp.*, 959 F.2d at 1479 ("Just as United States companies doing business in [China] must expect to abide by [Chinese] law, when Beijing availed itself of business opportunities in this country, it undertook an

obligation to comply with the lawful orders of United States courts.").

It need hardly be stated that the United States itself has a powerful interest in enforcing the acts of Congress, especially those, such as the Lanham Act, that are designed to protect intellectual property rights and prevent consumer confusion. *See Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107-08 (2d Cir. 2000). In light of this significant interest, coupled with the fact that counterfeiters like Defendants appear to have deliberately utilized foreign bank secrecy provisions to facilitate global infringement schemes in violation of the Lanham Act, the Court finds that the balance of national interests clearly weighs in favor of Plaintiffs.[8]

### 6. Hardship of Compliance

Citing the declaration of Professor Wu, the Bank contends that, if forced to comply with the Subpoena, "not only would Bank of China be subject to heavy fines, but employees of Bank of China could spend several years in jail." (Wu Decl. ¶ 25.) In support of these conclusions, Professor Wu points to two Chinese cases that purportedly demonstrate that "Chinese courts take seriously commercial bank obligations to

---

[8] The Court notes that in *Tiffany*, Judge Pitman found that "the Chinese interest in protecting its account holders' confidentiality appears more significant" than the United States' "interest in enforcing its orders and protecting trademark rights." *Tiffany*, 2011 WL 3135850, at *16. As is evident from the discussion above, the Court respectfully disagrees with Judge Pitman's conclusion. As the Second Circuit has recognized, there is a significant public interest in enforcing the Lanham Act, which protects consumers and manufactures from a variety of harms. *See Hermes*, 219 F.3d at 107. The Court fails to see how that interest is outweighed by Chinese bank secrecy laws, the protections of which may be waived, especially where such laws are susceptible to use and exploitation by international counterfeiters.

keep customer account information confidential." (*Id.* ¶ 23.) However, neither of these cases supports the conclusion that Professor Wu reaches here – that compliance with a foreign court order would subject the Bank to civil or criminal penalties. In one case, *Ruihua Li v. Agricultural Bank of China Jinggangshan Branch*, the plaintiff sued his bank after the bank released the plaintiff's assets to a third-party creditor based solely on the creditor's representation that the plaintiff had authorized the release of the funds to satisfy his debt. (Wu Decl., Ex. B-7 at 6-7.) The court, unsurprisingly, found that the bank had not acted in accordance with Chinese banking laws and ordered the bank to refund the plaintiff the amount that was transferred from his bank account. (*Id.* at 8.)

In the other case cited by Professor Wu, *Yongshen Wang v. Bank of China Nanjing Hexi Branch*, due to lapses in the defendant bank's security system, three men were able to duplicate the plaintiff's ATM card and thereafter illegally withdraw funds from the plaintiff's account. (Wu Decl., Ex. B-8 at 7-8.) The court found that the defendant bank had failed to safeguard the plaintiff's account information and ordered the bank to pay the plaintiff the amount he lost plus interest.[9] (*Id.* at 13-14.)

The cases cited by the Bank are plainly inapposite to the facts of the case at bar. Indeed, the Bank has cited no specific instance in which a Chinese financial institution was punished for complying with a foreign court order directing the

production of documents. To the contrary, Plaintiffs cite at least one case in which Bank of China produced, pursuant to a court order, documents similar to those that Plaintiffs seek here. (*See* Pls.' Reply at 5-7 (citing *Gucci America, Inc. v. MyReplicaHandbag.com*, 07 Civ. 2438 (JGK) (S.D.N.Y.).) In light of these facts, as well as the inability of the Bank to point to any case where a Chinese bank was subjected to liability for disclosing the type of information sought here, the Court finds the Bank's representation of the liability that it faces to be unduly speculative. As in other cases, such speculation is insufficient to demonstrate the hardship of compliance. *See Curveal*, 2010 WL 808639, at *7 (ordering disclosure where the likelihood of prosecution was "slight and speculative"); *Air Cargo II*, 2010 WL 2976220, at *2 ("The possibility that [the defendant] will suffer hardship in complying with a discovery order is speculative at best. Although the defendant cites the prospect of criminal sanctions, . . . it has cited no instance in which such sanctions have been imposed.")

Accordingly, the Court finds that this factor weighs in favor of Plaintiffs.

### 7. Good Faith of the Party Resisting Discovery

"Although good faith will not insulate a party from the obligation to respond in discovery, '[b]ad faith delays and dilatory tactics will weigh against the objecting party." *Milliken*, 758 F. Supp. 2d at 250 (quoting *Strauss*, 249 F.R.D. at 456). Given that there is no dispute that China has, at least nominally, adopted banking secrecy laws, the Court cannot find that the Bank's opposition to the Subpoena has been in bad faith. While it is certainly conceivable that Bank of China has actively assisted

---

[9] In one other case referenced by Professor Wu, the defendants were imprisoned after selling confidential phone lists that they had illegally obtained. Because the description of the case provided by Professor Wu does not indicate that the defendants obtained this information from a bank, it is unclear how this case has any relevance to the instant action. (Wu Decl. at 14-15, Ex. B-9.)

Defendants in concealing illegally-obtained profits, the Court cannot make such a finding based on the record before it. Therefore, this factor weighs in favor of the Bank.

\* \* \*

After careful consideration of the various interests implicated in this dispute, the Court finds that a balancing of the Restatement factors strongly weighs in favor of ordering the Bank to comply with the Subpoena. This result is particularly warranted in light of (i) the Bank's failure to demonstrate an actual likelihood that compliance with the Subpoena would result in criminal or civil liability in China, (ii) the Bank's failure to put forward credible, non-speculative evidence that requests made through the Hague Convention represent a viable alternative method of obtaining discovery, (iii) the clear and obvious harm caused by counterfeiters to mark holders such as Plaintiffs, and (iv) the fact that such counterfeiters have deliberately utilized institutions such as the Bank to thwart Congress and the reach of the Lanham Act.

Accordingly, Plaintiffs' motion to compel is granted, and the Bank shall produce all information requested by the Subpoena within fourteen days of the date of this Order.

### C. Attorney's Fees

Where a party does not obey a discovery order, the court may issue a range of sanctions, including an assessment of fees. However, the Court may not order this payment if "the opposing party's nondisclosure, response, or objection was substantially justified" or "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5).

Here, the Court finds that the Bank's opposition to Plaintiffs' discovery requests was substantially justified and, therefore, an award of attorney's fees is not warranted. As noted above, there is no evidence that the Bank acted in bad faith. Further, the case law and expert reports put forward by the Bank demonstrate that the Bank had a legitimate basis for its position. *See Pierce v. Underwood*, 487 U.S. 552, 565 (1988) ("[s]ubstantially justified" under Rule 37 does not mean "justified to a high degree" but rather that there was a "genuine dispute" or that "reasonable people could differ" as to the appropriateness of the contested action). Taken as a whole, the arguments advanced by the Bank are reflective of a genuine dispute with Plaintiffs. That the Court ultimately disagreed with the position taken by the Bank does not mean that the Bank's actions were improper or otherwise unjustified. As noted above, the issue before the Court involved a highly fact-specific inquiry and the application of a multi-pronged balancing test that was far from completely one-sided. Accordingly, Plaintiffs' request for attorney's fees is denied.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' motion to compel is granted, and Bank of China's motion to modify the Court's Orders is denied. The Bank shall produce all information requested by the Subpoena within fourteen days of the date of this Order. The Clerk of Court is respectfully directed to terminate the motions located at docket numbers 26 and 34.

SO ORDERED.

Dated: August 23, 2011
New York, New York

_____
RICHARD J. SULLIVAN
United States District Judge

\* \* \*

Plaintiffs are represented by Anne
Maureen Coyle, Esq., Howard Sean Hogan,
Esq., Jennifer Colgan Halter, Esq., Kimberly
Michelle Lindsay, Esq., Netra Sreeprakash,
Esq., and Robert L. Weigel, Esq. of Gibson,
Dunn & Crutcher, LLP, 200 Park Avenue,
New York, NY 10166.

Bank of China is represented by Andrew
Hunter Reynard, Esq., Lanier Saperstein,
Esq., and Pamela Rogers Chepiga, Esq. of
Allen & Overy, LLP, 1221 Avenue of the
Americas, New York, NY 10020.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-23-11

14