# EXHIBIT A



IN THE CIRCUIT COURT FOR THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

MARLENE BENNETT,                      CASE NO. 502009CA014458
                                      Civil Division "AA" Chinese Drywall
        Plaintiff,

vs.

CENTERLINE HOMES INC., et al.,

        Defendants.

_____/

## OMNIBUS ORDER ON PLAINTIFFS' NEGLIGENCE CLAIMS

The court has under consideration the homebuilder defendants' Omnibus Motion to Dismiss Plaintiff Homeowners' Negligence Claims. The installer and supplier defendants have each filed amicus briefs in support of the homebuilders' motion. The issue now before the court has been fully briefed, and was argued at the case management conference held on February 25, 2011. Having reviewed the submissions of the parties, and having heard the argument of counsel, the court makes the following findings.

The issue before the court is whether the plaintiffs can state a claim for negligence against any of the defendants (homebuilders, installers or suppliers). Each class of defendant argues that a claim sounding in negligence is not available to the plaintiffs as there was no duty to protect the plaintiffs from an unknown and unforeseeable harm. All parties concede that the issue of whether a duty exists in a negligence action is a question of law. *Michael & Phillip, Inc. v. Sierra*, 776 So.2d 294, 296 (Fla. 4th DCA 2000).

The court will first address whether there exists a general duty to inspect or test the Chinese manufactured drywall for a latent defect, or to warn homeowners of the existence of a latent defect in the drywall. It appears clear that such a duty does not exist here.

1

Florida law does not impose a duty to inspect a product for a latent defect, or to warn others about a latent defect, unless the product is inherently dangerous. *See Mendez v Honda Motor Co.*, 738 F.Supp. 481 (S.D. Fla. 1990); *K-Mart Corp. v. Chairs, Inc.*, 506 So.2d 7, 8 n. 3 (Fla. 5th DCA 1987) (retailers have no duty to inspect for latent defects.), *review denied*, 513 So.2d 1060 (Fla.1987); *Dayton Tire and Rubber Co. v. Davis*, 348 So.2d 575, 582 (Fla. 1st DCA 1977) (No duty to warn or inspect unless inherently dangerous.), *quashed on other grounds*, 358 So.2d 1339 (Fla.1978); *Odum v. Gulf Tire and Supply Company*, 196 F.Supp. 35 (N.D.Fla.1961).   A product is inherently dangerous if it is "burdened with a latent danger which derives from the very nature of the article itself." *Tampa Drug Co. v. Wait*, 103 So.2d 603, 608 (Fla.1958).   Chinese manufactured drywall, while apparently defective, cannot be categorized as inherently dangerous.

To the extent the plaintiffs seek to state a claim sounding in negligence based on a general duty to inspect, test or warn, such a claim is not available. However, this does not end the inquiry. The defendants, in any class, could be held liable in negligence if they had actual or implied notice of the defect in the Chinese manufactured drywall. *Carter v. Hector Supply Co.*, 128 So.2d 390, 392 (Fla. 1961); *Ryan v. Atlantic Fertilizer & Chemical Co.*, 515 So.2d 324, 326 (Fla. 3rd DCA 1987).

Notice must be determined on an individual, case by case, basis.   The court cannot, therefore, hold that all negligence claims are barred on an omnibus basis.   To the extent the plaintiffs can, in good faith, plead notice against an individual defendant in a specific case, such a claim will survive a motion to dismiss.

2

The court is cognizant of the fact that as to certain defendants, the plaintiffs have not pled notice.  If not amended, these claims will be dismissed.[1]  To the extent the plaintiffs have alleged notice in individual cases, negligence claims in these cases will survive dismissal at this stage.

Based on the foregoing, it is hereby,

ORDERED AND ADJUDGED that the defendants' omnibus motion to dismiss the plaintiffs' negligence claims is granted, in part, and denied, in part.  Any claim based on a general duty to test or inspect for, or to warn of, a latent defect in Chinese manufactured drywall will be dismissed.  Claims based on actual or implied notice of the defect will not be dismissed.  This order is being entered on an omnibus basis and will be applied to individual cases as required.

DONE AND ORDERED in Chambers, at West Palm Beach, Palm Beach County, Florida this /8ᵗ day of March, 2011.

JUDGE GLENN D. KELLEY
CIRCUIT COURT JUDGE

Copies furnished to:

Plaintiffs' Liaison Counsel, C. David Durkee, Esq., 121 Alhambra Plaza, Suite 1603, Coral Gables, FL 33134; Defendants' Liaison Counsel, Todd R. Ehrenreich, Esq. and Michael A. Sexton, Esq., 2601 S. Bayshore Drive, Suite 850, Miami, FL 33133; and for distribution to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with the Electronic Service Order entered in this case.

---

[1] In such cases, the Plaintiffs will need to determine whether there is a good faith basis to allege notice.

3

# EXHIBIT B



Nov 10 2010
3:14PM

IN THE CIRCUIT COURT FOR THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

MARLENE BENNETT,                    CASE NO. 50 2009 CA 014458
                                    Civil Division "AA" Chinese Drywall
    Plaintiff,

vs.

CENTERLINE HOMES INC., et al.,

    Defendants.
_____/

## OMNIBUS ORDER ON PENDING MOTIONS TO DISMISS

The Court has under consideration the following omnibus motions: 1) Homebuilder Defendants Omnibus Motion to Dismiss Plaintiff Homeowners' Tort Claims Under the Economic Loss Rule and Claims for Private Nuisance (joined by the Albanese-Popkin defendants); 2) Banner Supply Company's Omnibus Opening Brief On Economic Loss Rule and Nuisance (joined by certain installer defendants); 3) Homebuilder Defendants Omnibus Motion to Dismiss Plaintiff Homeowners' Strict Liability Claims. The omnibus motions now before the Court have been fully briefed, and were argued at scheduled case management conferences. Having reviewed the submissions of the parties, and having heard the argument of counsel, the Court makes the following findings.

### Economic Loss Rule

The first issue for consideration is the application of Florida's economic loss rule to the tort claims asserted by the homeowner plaintiffs. The Supreme Court discussed at length the origins and application of the economic loss rule in *Indemnity Insurance Company of North America v. American Aviation, Inc.*, 891 So.2d 532 (Fla. 2004).

1

The economic loss rule is a limitation on tort claims where the damages suffered are economic losses. Economic losses are defined as damages for inadequate value, costs of repair and replacement of defective products, or loss of profits. *Id.* at 536; *see also, Casa Clara Condominium Association, Inc. v. Charley Toppino & Sons, Inc.*, 620 So.2d 1244 (Fla. 1993). These damages are also described as the loss of the "benefit of the bargain" or "disappointed economic expectations." *Indemnity Insurance, id* at 536.

All of the parties here acknowledge that the economic loss rule would not bar a claim for personal injury caused by defective Chinese manufactured drywall. Therefore, to the extent that the plaintiff homeowners are suing in tort for personal injury, the economic loss rule does not apply and such claims are not subject to dismissal. The issue is whether- and to what extent - the economic loss rule bars the recovery of economic damages in the pending Chinese drywall cases.

The Supreme Court made clear in *Indemnity Insurance* that the economic loss rule applies in two distinct circumstances. First, the rule applies to parties in contractual privity for matters arising out of the contract. Second, the rule applies to liability for a defective product that causes damage to the product, but causes no personal injury or damage to other property. Both applications of the rule must be examined here.

1. Contractual Privity Economic Loss Rule

The defendant homebuilders assert that the plaintiff homeowners are barred from asserting tort claims for their economic losses based on the application of the contractual privity economic loss rule. The Court agrees.

The Supreme Court in *Indemnity Insurance* explained the rational for application of the contractual privity economic loss rule as follows:

2

A party to a contract who attempts to circumvent the contractual agreement by making a claim for economic loss in tort is, in effect, seeking to obtain a better bargain than originally made. Thus, when the parties are in privity, contract principles are generally more appropriate for determining remedies for consequential damages that the parties have, or could have, addressed through their contractual agreement. Accordingly, courts have held that a tort action is barred where a defendant has not committed a breach of duty apart from a breach of contract. *Indemnity Insurance, id* at 536-537.

The plaintiffs' tort claims for economic losses against defendants in contractual privity fall squarely within the scope of the exclusionary rule expressed by the Supreme Court.

There are recognized exceptions to application of the contractual privity economic loss rule. Independent torts such as fraud in the inducement are not barred by the economic loss rule. *HTP, Ltd. v. Lineas Aereas Costarrricenses, S.A.*, 685 So.2d 1238 (Fla. 1996). Claims for negligence in rendering professional services are not barred. *Moransais v. Heathman*, 744 So.2d 973 (Fla. 1999). Likewise, statutory claims are not barred by the economic loss rule. *Comptech Intern, Inc. v. Milan Commerce Park, Ltd.*, 753 So.2d 1219 (Fla. 1999).

None of the recognized exceptions apply here.[1] The damages sought by the plaintiff homeowners arise out of the contracts they entered with the defendant homebuilders. Traditional contract damages must be applied to the economic losses suffered by the plaintiffs.

---

[1] It is clear that homeowners are not exempt from the application of the economic loss rule on public policy grounds. *Casa Clara Condominium Association, Inc. v. Charley Toppino & Sons, Inc.*, 620 So.2d 1244, 1247 (Fla. 1993) (refusing to exempt homeowners from the economic loss rule despite their status as "an appealing, sympathetic class"). Moreover, the Court will not create an exception to the contractual privity economic loss rule based on an assertion that the drywall is an unreasonably dangerous product.

3

## 2. Products Liability Economic Loss Rule

The products liability economic loss rule applies in limited circumstances notwithstanding the absence of privity. The rule applies when the product causes damage to itself, but causes no personal injury or damage to other property. The issue here is whether the plaintiff homeowners' tort claims against the defendant suppliers and installers -- who are not in privity with the plaintiffs - are barred by the economic loss rule. The Court holds that such claims are not barred.

It appears clear from the Supreme Court's discussion in *Indemnity Insurance* that application of the products liability economic loss rule is limited. That is to say, the Supreme Court made clear that the products liability economic loss rule should not be extended beyond its intended purpose, and the rule must only be applied in those limited circumstance where all elements necessary for its application have been satisfied.

The Court has considered the well-reasoned discussion of the economic loss rule in Judge Fallon's order in *In Re Chinese Manufactured Drywall Products Liability Litigation*, 680 F.Supp.2d 780 (N.D. Louisiana 2010). Judge Fallon traces the origins and history of the rule in Florida (and elsewhere) and discusses the application of the economic loss rule to non-privity defendants in the multi-district Chinese drywall litigation.

It is not necessary to repeat here the analysis of Judge Fallon in considering the application of the economic loss rule to non-privity defendants. However, the Court will briefly address Judge Fallon's conclusion -- a conclusion which this Court adopts.

Judge Fallon essentially concludes that the Chinese drywall at issue here presents a unique factual scenario that does implicate the products liability economic loss rule at

4

all. The factual distinction lies in the nature of the alleged defect and its impact, or lack thereof, on the product itself.

In cases like *Casa Clara*, the defect in the product damaged the product itself. The defect in the concrete caused the concrete to fail and, presumably, to damage other components of the home. Here, the alleged defect does not damage or affect the product (Chinese manufactured drywall) at all.

In defining the application of the products liability economic loss rule, the Supreme Court has stated that the rule is implicated where "there is a defect in a product that *causes damage to the product*, but causes no personal injury or damage to other property." *Indemnity Insurance, id.* 536 [emphasis added]. Here the alleged defect causes *no damage to the product* and causes *only* personal injury or damage to other property. Under such unique circumstances, the Court agrees that the products liability economic loss rule does not apply.

<u>Private Nuisance</u>

The Court will next consider whether plaintiff can state a claim for private nuisance based on the allegation that the Chinese manufactured drywall is off-gassing causing a nuisance within the effected homes. All defendants assert that the claim for private nuisance under such circumstances cannot be asserted. The Court agrees with the defendants.

Florida law essentially defines nuisance as:

using one's property as to injure the land or some incorporeal right of one's neighbor... The law of nuisance plays between two antithetical extremes: The principle that every person is entitled to use his property for any purpose that he sees fit, and the opposing principle that everyone is bound to use his property in such a manner as not to injure the property or rights of his neighbor... The law of private nuisance is a law of degree; it

5

generally turns on the factual question whether the use to which the property is put is a reasonable use under the circumstances.

*Beckman v. Marshall*, 85 So. 2d 552, 554-55 (Fla. 1956) (approving and adopting the language of *Antonik v. Chamberlain*, 78 N.E.2d 752 (Ohio Ct. App., 1947).

Plaintiffs assert that there is no exhaustive definition of what constitutes a nuisance citing *Windward Marina, L.L.C. v. City of Destin*, 743 So. 2d 635 (Fla. 1st DCA 1999). While this may be true, Florida law recognizes that the doctrine of private nuisance is essentially a mechanism which protects the property rights of one land owner from the unrestrained exercise of the property rights of another. *Jones v. Trawick*, 75 So. 2d 785, 787 (Fla. 1954) ("This court recognizes that the law of private nuisance is bottomed on the fundamental rule that every person should so use his own property as not to injure that of another") (citing *Reaver v. Martin Theatres of Florida, Inc.*, 52 So. 2d 682 (Fla. 1951). It seems clear that the underlying policy of private nuisance jurisprudence does not support the plaintiffs' application of the doctrine of private nuisance in this case.

Plaintiffs rely heavily on the four-part test for proving the existence of a private nuisance purportedly established by the Court in *Beckman*. According to the plaintiffs, none of the four components makes any mention of a requirement that a private nuisance must involve two landowners. However, such a roadmap for establishing a private nuisance is neither expressed nor implied by the Court in *Beckman*.

In fact, much of the instructive language in *Beckman* seems to contradict the plaintiffs' position that nuisance actions do not necessarily involve contemporaneous and proximate private land owners. *Beckman, id* at 555 ("no one has absolute freedom in the

6

use of his property, because he must be restrained in his use by the existence of equal rights of his neighbor to the use of his property."). *Id.*

Further, none of the cases plaintiffs rely on directly support the contention that a nuisance may exist absent a defendant's exercise of its property rights. *See, e.g., Davey Compressor Co. v. City of Delray Beach*, 639 So. 2d 595 (Fla. 1994) (holding that a defendant who illegally disposed of a highly toxic solvent by dumping it onto the grounds at the rear of its facility created a nuisance because it contaminated plaintiff's water supply); *Kotcher v. Santaniello*, 438 So. 2d 440, 441 (Fla. 1983) (declining to reverse an injunctive order which was "principally predicated upon a determination that the appellants' conduct in keeping and training dogs for attack and security purposes constituted a nuisance in the residential neighborhood where all of the parties resided").

The only case which arguably supports plaintiffs' position, *Putnam v. Roudebush*, 352 So. 2d 908 (Fla. 2d DCA 1977), held that a noisy air conditioner was a "continuing nuisance" that constituted a "permanent defect in the realty." However, private nuisance was not even a claim in the *Putnam* case. The Court's reference to the air conditioning being a nuisance was merely a descriptive reference, and not a statement of a legal claim.

Taken together, neither the case law nor the policy underpinnings of the nuisance doctrine support such a cause of action for private nuisance in this case. The Court concludes that plaintiffs' claims for private nuisance must be dismissed.

## Strict Liability

The defendant homebuilders have moved to dismiss the plaintiffs' strict liability claims. The homebuilders advance two grounds for dismissal. First, the homebuilder defendants assert that only manufacturers of the product and those in the chain of

7

distribution can be held strictly liable and they are neither.   Second, the defendant homebuilders assert that strict liability does not apply to improvements to real property. The Court will begin with the homebuilders' second argument.

The law in Florida appears to be well settled that strict liability does not apply to improvements to real property as improvements to real property are not considered products.  *Plaza v. Fisher Development, Inc.*, 971 So.2d 918 (Fla. 3rd DCA 2007); *Neumann v. Davis Water & Waste, Inc.*, 433 So. 2d 559 ( Fla. 2d DCA 1983) *see Easterday v. Masiello*, 518 So.2d 260, 261 (Fla.1988) ("[I]t has long been recognized that the doctrine of strict products liability does not apply to structural improvements to real estate."); *Jackson v. L.A.W. Contracting Corp.*, 481 So.2d 1290, 1291 (Fla. 5th DCA 1986).

Plaintiffs argue that an exception exists with respect to improvements to real property "where the injuries result not from the real property as improved by the alleged defective product but directly from a defective product manufactured by defendant, which product may have itself been incorporated into the improvement of the realty before the injury from the product occurred." *Jackson v. L.A.W. Contracting Corp.*, 481 So.2d 1290, 1292 (Fla. 5th DCA 1986); *Craft v. Wet 'N Wild, Inc.*, 489 So.2d 1221, 1222 (Fla. 5th DCA 1986).  Plaintiffs conceded at oral argument that this exception has never been applied in a reported Florida case.  Indeed, the exception appears to be *dicta* in the cases that mention it.

Whether the exception advanced by the plaintiffs exists or not, it does not appear that the exception would apply to the defendant homebuilders in this case.   The exception appears to apply to the manufacturer of an allegedly defective product which

8

happens to be incorporated into the real property. The defendant homebuilders did not manufacture the drywall at issue.

The defendant homebuilders also argue that only manufacturers, and those in the distributive chain of a product, can be held strictly liable. Defendant homebuilders assert that they are not manufacturers and they are not within the distribution chain of the drywall at issue. While the plaintiffs argue otherwise, the Court finds that the defendant homeowners' position has merit.

Based on the foregoing, it is hereby,

**ORDERED AND ADJUDGED** that the plaintiff homeowners' tort claims against the defendant homeowners seeking economic losses are dismissed based on the privity economic loss rule. The request of the defendant suppliers and installers (who lack privity with the plaintiffs) to dismiss the plaintiffs' tort claims based on the products liability economic loss rule is denied. The plaintiffs' claim for private nuisance against all defendants is dismissed. Likewise, the plaintiffs' claims for strict liability against the homebuilder defendants are dismissed.

**DONE AND ORDERED** in Chambers, at West Palm Beach, Palm Beach County, Florida this 5th day of November, 2010.

JUDGE GLENN D. KELLEY
CIRCUIT COURT JUDGE

Copies furnished to:

Plaintiffs' Liaison Counsel, C. David Durkee, Esq., 121 Alhambra Plaza, Suite 1603, Coral Gables, FL 33134; Defendants' Liaison Counsel, Todd R. Ehrenreich, Esq. and Michael A. Sexton, Esq., 2601 S. Bayshore Drive, Suite 850, Miami, FL 33133; and for distribution to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with the Electronic Service Order entered in this case.

# EXHIBIT C

IN THE CIRCUIT COURT OF THE 19TH
JUDICIAL CIRCUIT IN AND FOR
ST. LUCIE COUNTY, FLORIDA.

CASE NO. 562010CA001463

SURESH and OMA BISSOON,

   Plaintiffs,

v.

CENTERLINE HOMES CONSTRUCTION, INC.,
a Florida corporation; CENTERLINE PORT ST.
LUCIE LTD., a Florida Limited Partnership;
OCEAN COAST DRYWALL, INC., a Florida
Corporation; and BANNER SUPPLY COMPANY
PORT SAINT LUCIE, LLC, a Florida Limited
Liability Company,

   Defendants,
_____/

ORDER ON DEFENDANTS', CENTERLINE PORT ST. LUCIE, LTD.,
AND CENTERLINE HOMES CONSTRUCTION, INC.'s
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

THIS CAUSE, having come before the Court upon Defendants', Centerline Port St. Lucie

Ltd and Centerline Homes Construction, Inc.'s, Motion to Dismiss Plaintiffs' Second Amended

Complaint, and the Court having heard argument of counsel and being otherwise advised in

the premises, it is hereupon,

ORDERED and ADJUDGED that said motion be and the same is hereby granted in that

although Plaintiff's strict liability claims do allege defective product distribution, permanent

Improvements to real property are not products for purposes of products strict liability actions. These claims are dismissed.

Likewise the motion is granted because Plaintiff's private insurance claims do not state a cause of action against these defendants. These claims are also dismissed.

The motion is otherwise denied.

These defendants are permitted twenty (20) days to answer the Complaint.

DONE AND ORDERED in Chambers at Fort Pierce, Saint Lucie County, Florida this 24th day of March, 2011.

DWIGHT L. GEIGER, Circuit Judge

Copies furnished:
Vanessa M. Serrano, Esquire
C. David Durkee, Esquire

# EXHIBIT D

*cc. Manning*
*IBP*

**PAUL HOMES**
**CONSTRUCTION AGREEMENT - 10' Tiebeam**                    *#889*

AGREEMENT made this 17ᵗʰ of May, 2005, by and between Brian Lambert and Madeleine Twining, of 1725 Lafayette Drive, Jamison, PA 18929, Phone: 215-491-4010 (M) or 215-491-1579 (B), 215-570-8976 her cell, 215-317-1613 his cell, Email: zenhertdiver@hotmail.com, maddijlk@aol.com, hereinafter called "Owner" and Paul Homes, Inc., d/b/a Paul Homes, 4524 SE 16th Place #2C, Cape Coral, FL 33904, phone: (239) 542-1750; fax (239) 542-0925 hereinafter called the "Contractor."

WHEREAS, the Contractor promises and agrees to and with the Owners that he will for consideration hereinafter mentioned construct a residence on land known as LOT 16 - 17, BLOCK 1456, UNIT 16, SUBDIVISION Cape Coral County of Lee, State of Florida.

1.   The Contractor shall construct upon the building site a building in accordance with the plans and specifications hereto attached.

2.   The Contractor shall provide all materials and perform all work of the construction provided for in the plans and specifications in a workmanship like manner, according to standard building practices in the community.

OWNER shall pay the Contractor for such construction in the amount of FOUR HUNDRED SEVEN THOUSAND FOUR HUNDRED U.S. Dollars

$ 407,400     payable as follows:
$< 10,000>  (A Deposit (Earnest Money) due upon contract signing made payable to Paul Homes *PO*
$ 397,400     As per Lender's/Contractor's draw schedule

3.   Owner herewith grants access to the land to the Contractor, for construction of a new residence. Owner may occupy the residence upon substantial completion and issuance of Certificate of Occupancy and payment by owner of all monies due the Contractor per this Agreement. Unpaid monies from the date of completion bear 18.0% interest. It is expressly understood and agreed that the Owners are not to occupy or otherwise take possession of the premises being improved pursuant to this contract prior to such final settlement unless written consent of such occupancy is granted to the owners by the Contractor.

4.   After the plans and specifications are signed and sealed, they shall become a Contract Document. No changes will be made except by a written change order, signed by both parties.  Each change by the Owners subsequent to said construction plans and specifications, shall carry a processing fee of $200.00 per change order in addition to regular charges or credits to the change requested. IT IS SPECIFICALLY UNDERSTOOD THAT NO STRUCTURAL CHANGES OR MODIFICATIONS WILL BE ACCEPTED AFTER THE PLANS ARE SUBMITTED TO THE ENGINEER TO BE SEALED.

5.   Contractor agrees to use his best effort to deliver the building specified herein on or about 210 days (7 months) from start of construction. Start of construction is defined as the date on which concrete footings are poured.

6.   This Agreement shall be binding upon the heirs, executors, administrators, successors and assigns of the Owner and Contractor.

7.   The Contractor will furnish Builder's Risk Insurance in the full amount of this contract during the construction period. Contractor will also furnish Public Liability Insurance.

8.   The Owners agree that the Contractor shall have the right to substitute materials or items of comparable quality for such material or items that may be unobtainable by reason of labor disputes or discontinuance of production for any reason.  Contractor shall give Owner advance notice of substitutions when possible. No Owner-supplied material.

9.   The Contractor will pay utility company bills for electricity and water used during construction. Should electricity or water not be available to the Owner's lot during construction, the Contractor will rent equipment to provide same at the Owner's expense at prevailing local rates.

10. The Contractor guarantees all workmanship and material for one year from delivery to Owner. Two years warranty on mechanicals. This guarantee is in exclusion of and in lieu of all other guarantees and warranties, and liability terminates one year from date of delivery. All manufacturer's warranties shall continue in force and effect according to their titles. Purchaser may not assign this Agreement without the prior written consent of the Contractor.

11. The Contractor will furnish brick paver driveway and walkway of up to _900_ square feet. Addition 1 driveway and walkway will be charged to the Owner at $6.60 per square foot.

12. The Contractor will connect to public water and sewer lines to a distance of 65/60 feet. Cost of lines required over that distance and any connection fees will be borne by the Owners.

13. If there is to be a mortgage and construction loan, the Owners agree to make application, when directed, with an approved bona fide lending institution and to execute all necessary papers for a mortgage loan on the above described property in an amount necessary to close. The Owner agrees to pay all loan costs including the cost of abstract or title insurance premium, Intangible Tax with Documentary Stamps on the mortgage, all recording fees, credit report, appraisal fees and any loan charges made by the lending institution .  Flood insurance, any prepaid insurance requirement and all construction interest is to be paid by the Owner.

14. This Agreement covers construction of the above-described residence on a clear and level lot.  Should the slope or elevation of the lot be such as to require extra foundation block or fill dirt under the slab, patio, drives or walks, over and above that which would be required for the Standard Two Course Foundation, the expense of same will be borne by the Owners.  The expense of any fill dirt required at the time of grading the lawn area, removal of excess dirt, trees and vegetation necessary to provide proper grade, any additional expenses caused by rock or other adverse subsoil conditions, and expense of electric service runs across the building necessitated by power company pole locations and regulations, or underground electric and/or telephone service when required will be borne by Owners. Expense for retaining walls for pool, home, or patio foundations shall be by Owners.

*3 Course 6"*

INITIALS: PAUL HOMES: ___
                    OWNER: ___
                    OWNER: ___

**CONSTRUCTION AGREEMENT - Page 2**
Mr. Lambert and Ms. Twining

15. If the Owners or governmental agency causes a delay in starting construction beyond ninety (90) days from the date of this Agreement, the contract price may be subject to change.

16. At the final closing, an affidavit of "no liens" covering all materials and labor will be presented to the Owners by the Contractor.

17. The Contractor shall not be held responsible for the following:  A) Rock formations encountered during construction (subsoil conditions); B) Removal of trees, boulders, brush or stumps; C) Non-structural cracks in concrete; and D) Perishable items such as sod, plants, or trees after installation, if neglected by Owner.

18. It is hereby understood that the Contractor is to deliver the above listed residence on owner's lot to the point of completion (C/O obtained). The Contractor is hereby authorized to execute any and all additions as outlined in above mentioned articles to make livable delivery possible, in accordance with any and all governmental regulations and laws. It is understood that the charges, if applicable, shall be paid by the Owners.

19. Owners hereby agree that the Contractor may proceed immediately to secure the necessary documents that may be required by the lending institution to approve the loan and/or by the appropriate building department or Governmental Agency to secure the necessary building permits. The documents include but are not limited to Surveys, Soil Analysis, Percolation Testing, Preliminary Drawings and Blueprints. In the event the loan is denied the Owners, or the Owners cancel or default on this Agreement prior to construction permit issued, any expense and overhead incurred by the Contractor in securing said documents including sales expenses shall be paid for by the Owners.

20. Closing and settlement of the Agreement will be within fifteen (15) days of notice by Contractor to Owner that the premises are substantially ready for occupancy. Owner shall not unreasonably delay closing because of minor work that does not interfere with occupancy. Said minor work will be listed on a compliance list, signed by the Owner and Contractor. This work will be scheduled and completed by the Contractor as quickly as possible after occupancy. Time is of the essence in this Agreement. Should the Owner fail to close and settle the contract within the specified fifteen (15) days, Owner shall be liable to Contractor for interest at the rate of 18.0% per annum on the amounts unpaid on the Contract.

21. All claims or disputes that arise out of, or are otherwise related to this agreement, shall be resolved by state court litigation, with venue to lie in Lee County, Florida. However, in the event Contractor proceeds with a lien foreclosure action because of contractor having recorded a construction lien against owner's property in another county than Lee County, Contractor shall have the right, but not the obligation, to litigate all claims or disputes in the other county, as well. The parties to this agreement specifically and knowingly waive right to trial by jury, agree to submit all claims or disputes to bench trial, only. The prevailing party shall recover, from the loosing party, all reasonable attorney fees and court costs and other suit expenses incurred, whether or not such costs or expenses are ordinarily taxable under the Uniform Guidelines for Taxing Costs.

22. THE CONTRACTOR WILL NOT BE HELD RESPONSIBLE FOR ANYTHING NOT INCLUDED AS PART OF THE CONTRACT DOCUMENTS.  IT IS EXPRESSLY STATED THAT ALL TERMS AND CONDITIONS OF THIS CONTRACT ARE INCLUDED IN THIS AGREEMENT. THE CONTRACTOR OR ANY OF THEIR AGENTS HAVING NOT MADE ANY REPRESENTATIONS OR PROMISES IN ADDITION TO THOSE MADE A PART OF THIS CONTRACT.  CONTRACTOR IS ONLY BOUND WHEN WRITTEN ADDENDUMS ARE SIGNED BY BOTH PARTIES AND MADE A PART OF THIS AGREEMENT. WRITTEN CHANGE ORDERS ARE SUBJECT TO WORK NOT HAVING BEEN STARTED OR ORDERED ON AFFECTED ITEMS.

23. Other Agreements made a part of this contract are:
    A. Addendums 1, 2, 3, 4, 5, 6 & 7 are hereby made a part of this agreement.

**ACCEPTED AND APPROVED**

OWNER            DATE              PAUL HOMES              DATE
                                   Robert D. Knight, Jr. - Vice President

OWNER            DATE

PAUL HOMES
EXECUTIVE CONSTRUCTION FEATURES
ADDENDUM #1 SPECIFICATIONS
10' TIEBEAM

RESIDENCE FOR: Mr. Lambert and Ms. Twining  MODEL TYPE: 10' Coral View Platinum Package w/Pool

STANDARD CONSTRUCTION FEATURES (MAY BE REVISED BY ADDENDUM #2):

## CONSTRUCTION

* All building permits
* Builders Risk Insurance.  Note: Owner responsible for flood insurance if required.
* Full set of construction blue prints
* 8" X 16" steel reinforced concrete footer with 2 course stemwall     3 course  *[handwritten]*
* 4" reinforced concrete slab with 6 mil. vapor barrier
* CBS construction with complete stucco exterior (skip-trowel finish)
* 8" X 16" continuous steel reinforced tiebeam
* Certified soil treatment against termites under concrete slab
* Engineered roof trusses with steel anchor hurricane straps embedded in the beam
* ¼" plywood roof sheathing
* Bronze or white framed aluminum windows with screens
* Aluminum garage service door
* Alcoa aluminum soffit and 6" fascia
* Steel garage door
* Garage floor finished with concrete stain
* 2" x 4" wood studs in interior walls framed at 16" O. C.

## INSULATION & AIR CONDITIONER

* Living areas only - R-30 ceilings, R-5 masonry walls
* RHEEM 12 SEER high efficiency AC unit
* All walk-in closets are air conditioned with separate ducts
* Air returns as required by Building Code

## INTERIOR TRIM

* ½" drywall interior with light knock down finish
* Shower wall to be dense shield and tub wall to be water resistant greenboard
* Raised panel interior doors ( 8' high colonist)
* Colonial baseboards and door casings
* Insulated metal entry doors
* Kwikset interior lever doorknobs with choice of finish
* Kwikset 600 series entry handleset with choice of finish
  (polished brass cannot be warranted against pitting)
* Ventilated shelving in all closets
* Pull down attic stairs in garage

## INTERIOR FINISH

* Standard wall tile in tub & shower area
* Recessed soap/shampoo holder and tiled seat in walk-in showers
* Corian window sills in glacier white
* Shower door in master bath – chrome track with obscure glass
* Model carpet
* Free professional decorator service

## PAINTING

* Flexbon #14 paint or equivalent with 2 coats exterior
* Flexbon #14 paint or equivalent sprayed with 1 coat interior
* Flexbon #14 enamel or equivalent interior doors and trims
* Interior ceiling, trim and walls to be same color
* Exterior stucco trim to be different from walls (one trim color)

INITIALS: PAUL HOMES:
OWNER:
OWNER:

**PAUL HOMES**
**EXECUTIVE CONSTRUCTION FEATURES**
**ADDENDUM #1 SPECIFICATIONS - Page 2**
**10' TIEBEAM**

RESIDENCE FOR:  Mr. Lambert and Ms. Twining  MODEL TYPE: 10' Coral View Platinum Package w/Pool

**ELECTRICAL**

- Structured Wiring Solution to include:
  - Includes up to 6 telephone/data outlet locations
  - Includes up to 6 coax outlet locations for video with amplification
  - Includes RG-6 coax cable
  - Includes satellite TV pre-wire (2 high speed coax cables to SW corner location for satellite dish hook-up)
  - Includes high speed cable (1 CAT5 and 1 RG6 coax) from service provider location
- Hurricane Generator Ready Panel Program to include:
  - Includes 200 Amp main breaker electrical panel with mechanical interlock breaker with generator manual transfer switch
  - Includes one (1) 50 Amp 220 Volt generator interface breaker
  - Includes one (1) 50 Amp 220 Volt generator receptacle
  - Includes one (1) 50' cord with 50 Amp 220 Volt plug for generator panel, receptacle and 30 Amp 120/240 Volt plug for generator
- Back to hook 200 amp overhead electrical service with circuit panel
- 'Deco' white electrical switches and outlets
- Smoke detectors to code
- 2 exterior water proof outlets
- Garage door opener
- 7 ceiling fans Model #10525
- Additional ceiling fans installed at $65 per fan
- All recessed lighting (shown on blue prints) included
- Main line surge protector
- Front door bell chimes

**PLUMBING**

- PEX overhead plumbing
- 50 gallon water heater
- 1/3 HP garbage disposal
- Cultured marble tops in baths
- Laundry tub with Nemeo base cabinet and standard faucet in laundry room
- Icemaker line
- 3 exterior hose bibs
- Standard white Americast tub in guest bath
- Standard white 'American Standard' elongated water-saver toilets
- Soaking tub in master bath

**CABINETS**

- Custom raised panel cabinets with full European fronts in kitchen
- 36" custom raised panel vanity cabinets with full European fronts and marble tops in baths
- Concealed hinges in kitchen & bathrooms
- Full length mirror above all vanities
- Mirrored medicine cabinets
- 42" high upper cabinets in kitchen — *FRAME LESS* *BL* *ML*
- Upper cabinets in laundry room (Thermofoil)
- Ceramic tile on outside wall of bar

**EXTERIOR FINISH**

- Up to 7000 sq ft of Floratam sod
- Landscaping to meet code
- 900 sq ft of brick paver drives and walks
- Full outside rain gutters and downspouts
- Concrete stain on garage floor

INITIALS: PAUL HOMES:
OWNER:
OWNER:

**PAUL HOMES**
**ADDENDUM NO. 2 – Page 1 of 2**
Mr. Lambert & Ms. Twining
10' Coral View Platinum Package with Pool
LOT 16 - 17, BLOCK 1456, UNIT 16

1. The Coral View 10' design, right hand garage, 3 Bedroom/2 ½ baths with                 $407,400
   approximately 2,311 sq ft living with approximately 3,314 sq ft total. Home to be positioned
   on the lot with 25' front setback and centered on lot.

2. Lot Preparation                                                                         Included
   a. All fill and grading for a two course stemwall on existing grade.
   b. Water line hook-up to 65'
   c. Sewer line hook-up to 60'
   d. Dual water line installation if available
   e. Surveys
   f. Impact Fee Allowance of $ 3,087
   g. Water & Sewer Impact Fee and Water Meter Allowance of $ 4,309
   h. School Impact Fee Allowance of $2,283

   *[handwritten: 3 course £5 not.]*

3. The following Platinum Package is included:
   a. Ten (10) year structural warranty and Two (2) years on major systems
   b. Standard lot improvements on existing grade, and all Impact/Permit Fees for a standard
      80'x125' Cape Coral lot with water and sewer
   c. Storm panels as required by the Florida Building Code
   d. All required surveys and engineered blueprints
   e. Color-Thru barrel tile roof in standard colors
   f. 10' Tie Beam with 8' raised panel interior doors and 5-1/4" Colonial Trim
   g. Good Cents Package: Tinted windows, R-5 energy board on masonry walls, R 30 insulation in ceilings,
      12 SEER A/C unit, heat recovery system, 50 gallon water heater, mastic all duct joints and programmable
      thermostat
   h. Granite or Zodiaq® counter tops in kitchen (Level 1) and Corian® window sills in Glacier White.
   i. High quality wood cabinetry in choice of finishes and designs kitchen and master bath/bath #2
   j. Complete flooring package including tile floors everywhere except bedrooms and closets (Deluxe Series).
   k. TAJ leaded glass front entry doors and mini-blind insert in pool bath door
   l. Crown molding in all tray ceilings and four (4) plant shelf outlets on one switch
   m. Full perimeter security system with 2 keypads and 2 motion detectors
   n. GE Appliances Stainless Steel: Smooth top range JBP82, Over the Range Advantium SCA2000,
      Dishwasher GSD5500, 25 cu ft Refrigerator GS825 w/water & ice, Washer WCRE6270D and Dryer
      DWXR483EB
   o. Manabloc Plumbing System and State-Of-The-Art Wiring System
   p. Rounded interior drywall corners and two interior paint colors
   q. 42" upper cabinets in laundry room (Thermofoil)
   r. Decorator light fixtures ($2,800 allowance)
   s. Upgraded Moen plumbing fixtures in choice of finishes as follows:
      Kitchen: Moen 7570 Salora w/Pull-Out Spray, Sink & Strainers,
      Master Bath: (2) Moen 4570C/P/S7372C/P Monticello Chrome P13, (1) Moen T951Monticello Chrome
      PB Deckmount, (1) Moen 3847C/P Personal Shower on Glide Bar w/a Moen T2444C/P to
      turn on & off and Chrome Strainer
      Guest Baths: (1) Moen Castelby 4938C/P Lav Faucet, (1) Moen TL2378C/P Tub & Shower Faucet, (1)
      Chrome Tub Trim Kit
   t. Cultured marble tops in all baths and soaking tub in master bath
   u. Pool bath with sink Reminiscence #0511,800and toilet Reminiscence #2011.026
   v. Seven (7) ceiling fans - Model #10525 installed
   w. Full outside rain gutters and downspouts
   x. Brick paver sealed driveway, walkway and entry
   y. Automatic garage door opener with 2 remote controls
   z. Deluxe zoned lawn sprinkler system and Floratam sod and landscaping allowance of $2,000
   aa. Wire lathe and stucco on lanai and entry ceilings
   bb. Ceramic tile on outside wall of bar and Deluxe Series tile backsplash in kitchen
   cc. In Wall Pest Prevention System
   dd. Summer kitchen on lanai, includes privacy wall, base cabinets with stucco finish and stainless steel doors,,
       sink, hood venting, two (2)GFI outlets, two (2) overhead can lights with switch, Vermont 30" gas grill,
       under counter stainless steel refrigerator
   ee. Garage floor finished with concrete stain and paver sealant applied to all pavers

INITIALS: PAUL HOMES:
OWNER:
OWNER:

**PAUL HOMES**
**ADDENDUM NO. 2 - Page 2 of 2**
Mr. Lambert & Ms. Twining
16' Coral View Platinum Package with Pool
LOT 16 - 17, BLOCK 1456, UNIT 16

4. Provide a pool package of:

   a.  Up to 30' Vanishing Edge 14' x 28' Diamond Brite pool in standard colors with an
       approximate 22' x 62' brick paver deck & lanai — *sealed*
   b.  6' x 8' raised 18" spillover spa with solar blanket, light, blower and air switch
   c.  5 ton heat pump
   d.  Add pool bar with tiled seats in and out of pool with paver steps to bar area
   e.  Add umbrella system over pool bar
   f.  Picture Frame Screen
   g.  Hayward Boss pool/spa remote control system
   h.  Up to three course pool retaining wall
   i.  Bronze or white mansard cage with 2 doors and super gutter
   j.  Timer, pump, filter, light, tablet chlorinator and autofill
   k.  Manual cleaning equipment
   l.  Includes a pool alarm system per Florida Statutes Chapter 515
   m.  If additional retaining wall is necessary, there will be an extra charge of $1,200 per course,
       (includes masonry, labor, stucco and paint). Should the pool retaining wall
       exceed 30" in height, building code requires safety railings around the enclosure.
       (Cost of such to be additional)

5. Coral View Model Specific Platinum Package Items:

   a.  Mosaic Floor Medallion
   b.  Breakfast nook tile rug and listello border
   c.  Hexagon mirror with tile border behind sink wall in pool bath

6. Provide the following upgrades that are included:

   a.  Add 3' to right side of garage (78 sq. ft.)
   b.  Add 18' wide garage door in lieu of 16'
   c.  Rain head in master bath shower (like Coral View Model)
   d.  Raise windows in master bedroom to 40" AFF
   e.  Add outdoor hot/cold shower without tile
   f.  Drop crown molding in den down and add one (1) switch and one (1) outlet for future rope lighting
   g.  Add two (2) outlets and one (1) switch for future rope light under master bath vanities
   h.  Add one (1) outlet and one (1) switch in guest bath vanity
   i.  Upgrade kitchen appliances to stainless steel
   j.  Add culvert under driveway, if required
   k.  $550 allowance for underground electric
   l.  Delete one 16 single hung window in bedroom #3
   m.  Add tile walkway from entry door of master bedroom to master bath

                                                        **Total Investment $407,400**

**ACCEPTED AND APPROVED**

_____  5-19-05        _____  5-17-05
OWNER                      DATE            PAUL HOMES                 DATE
                                          Robert D. Knight, Jr. - Vice President

_____  5-19-05
OWNER                      DATE

**PAUL HOMES**
**ADDENDUM #3 - DISCLOSURES TO PURCHASER**

**SALES DISCLOSURE:**
Upon closing of the purchase of your home, additional costs may be borne by you in the form of closing costs. A list of the known major cost items are:

1. Homeowner's Insurance.
2. Intangible Tax.
3. Documentary Stamps on Deed.
4. Recording Fees on Deed.
5. Title Insurance.
6. Proration of Real Estate Taxes, County Garbage Collection, and Homeowner's Association fees.

If you will be obtaining financing for your purchase, additional costs related to the new mortgage are:

7. Survey.
8. Service Fee (or Origination Fee) on new mortgage.
9. Documentary Stamps on new note.
10. Recording Fees on Mortgage.
11. Credit Report Fee.
12. Mortgage Company's Fees.
13. Appraisal Fee.
14. Title Insurance for Mortgagee.
15. Set-up of Escrow Account (taxes and insurance).

**RADON GAS:**
Radon is naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit. Pursuant to §404.056(8), Florida Statutes.

_____ _____     _____ _____
OWNER           DATE          OWNER           DATE

**PAUL HOMES**
**ADDENDUM #4**
**EXPRESS ASSUMPTION OF RISK AND LIABILITY RELEASE AGREEMENT**

I, the undersigned, hereby acknowledge that I am voluntarily entering upon the residential construction site commonly referred to as Block 1456, Lots 16 - 17, Unit 16, Cape Coral Subdivision. I acknowledge and appreciate that hazardous conditions exist upon the construction site which are unavoidable and ongoing, and that certain risks and dangers exist which are inherent in any construction site, including, but not limited to, loss or damage to personal property, personal injury or fatality. Such risks stem from the operation of power tools, construction vehicles, the falling of tools and/or materials, trenches and holes created during the construction process as well as innumerable risks incident to the construction of dwelling units.

I AM AWARE THAT ENTRY UPON THE CONSTRUCTION SITE IS A HAZARDOUS ACTIVITY, AND I AM VOLUNTARILY ENTERING UPON THE CONSTRUCTION SITE WITH THE KNOWLEDGE OF THE DANGER INVOLVED AND I AGREE TO ACCEPT AND ASSUME ANY AND ALL RISKS OF INJURY, DEATH AND PROPERTY DAMAGE TO MYSELF, MY HEIRS, OR VISITOR THAT ACCOMPANY ME.

Initial _____          Initial _____

I assume the risks set forth above and agree to release, indemnify and hold harmless Paul Homes, Inc., d/b/a Paul Homes and its officers, directors, shareholders, employees and agents from any liability, resulting from the negligence or other acts of others, its agents and employees, suffered on the construction site. In addition, I hereby release and discharge Paul Homes, Inc., d/b/a Paul Homes, its agents and employees, from all claims and actions I, my heirs, my invited visitors, or legal representatives now have or may hereafter have, for injury or damages arising out of or related to my entry upon the construction site.

I HAVE CAREFULLY READ THIS PARAGRAPH AND FULLY UNDERSTAND ITS CONTENTS. I AM AWARE THAT THIS IS A RELEASE OF LIABILITY AND LIMITS MY RIGHTS TO SUE Paul Homes, Inc., D/B/A PAUL HOMES IN THE EVENT OF INJURY, DEATH OR PROPERTY DAMAGE TO MYSELF, MY VISITORS OR ANY MEMBER OF MY FAMILY, AND I SIGN IT OF MY OWN FREE WILL.

Initial _____          Initial _____

PAUL HOMES
ADDENDUM #5 - NOTICE OF CONSUMER RIGHTS

## NOTICE OF CONSUMER RIGHTS UNDER THE
## CONSTRUCTION INDUSTRIES RECOVERY FUND

You have certain rights under Florida law if you have suffered damages caused by a state-licensed contractor or a construction company with whom you have signed a contract. State law requires that you be provided with this notice of your rights regarding the Construction Industries Recovery Fund, including how and where you can file a claim against the Fund for reimbursement of any damages you have suffered.

You may be eligible for reimbursement if you have suffered monetary loss due to certain acts (described below) by the contractor, financially responsible officer or business organization licensed under Chapter 489, Part I, Florida Statutes. The Fund is available only in cases where the contract was signed and the violation occurred on or after July 1, 1993.

### Who Is Eligible?

In order to seek compensation from the Construction Industries Recovery Fund, you must have:

1. Entered into a written contract with a licensed contractor for work on residential real property;
2. Commenced legal action against the contractor, financially responsible officer or business organization; and
3. Suffered a financial loss due to the contractor:
   a) Knowingly violating applicable city, county or state building codes or laws;
   b) Committing mismanagement or misconduct in the practice of contracting that causes financial harm to a customer;
   c) Abandoning a construction project for more than 90 days; or
   d) Signing a false statement claiming that the work is bonded, that all payments to subcontractors have been made, or claiming to have provided certain worker's compensation and insurance protection.

Florida laws provide specific definitions for determining whether a contractor's actions may constitute one of these violations. See §489.129(1)(d), (h), (k), (l), Fla. Stat. In addition, you must notify the Construction Industry Licensing Board (CILB) of your claim by certified mail at the time you commence legal action.

Filing a complaint against a contractor is not the same as filing a claim against the Fund. Even if you file a complaint against a contractor with the Department of Business and Professional Regulation (DBPR), you still have to give the CILB notice of your claim and you will

also be required to file a Construction Industries Recovery Fund Claim Form with the CILB.

To request a Construction Industries Recovery Fund Claim Form or to receive more information about the Fund, write to:

Construction Industry Licensing Board
7960 Arlington Expressway, Suite 300
Jacksonville, Florida 32211-7467
Phone (904) 359-6310

If you have questions and/or want to file a complaint with the DBPR against the contractor, the financially responsible officer and/or the business organization, please write to the Complains Section, DBPR, 1940 North Monroe Street, Tallahassee, Florida 32399-0782.

### Conditions For Recovery

In order to recover from the Fund, you must be an individual - not a company. The Recovery Fund is a last resort. Before you can receive any money from the Fund, you must have obtained a final judgment from a Florida court or a restitution order from the CILB based on the types of violations of law already mentioned. Both the violation of law and the signing of the construction contract must have occurred on or after July 1, 1993. Before the Fund will pay you any money, you must show that you have made every effort to determine if there are any assets from which you can recover all or part of the money you are owed. If so, you must try to recover before you can collect from the Fund. You have to file a claim for recovery with the Fund within 2 years of the time the violation of law happens or within 2 years of the time you find out or should have found out about the violation of law. No claim can be made more than 4 years after the time the violation of law happened.

### Payments From The Fund

The Fund does not pay post-judgment interest, punitive damages, or attorneys fees. The Fund only pays what you have not yet collected for actual or compensatory damages. The Fund pays the lesser of up to $25,000 per claim, or $25,000 per transaction, or $50,000 per contractor.

FOR MORE INFORMATION ABOUT THE FUND, SEE §§489.140 to 489.143, FLA. STAT. AND RULES 61G4-21.001 TO 61G4-21.005, FLA. ADMIN. CODE.

The undersigned acknowledges that this notice was received prior to or at the time of making your initial payment/deposit with PAUL HOMES.

_____  5-19-05          _____  15-19-05
OWNER           DATE                      OWNER           DATE

# EXHIBIT E

C I T Y   O F   C A P E   C O R A L RECEIVED
------ CERTIFICATE OF OCCUPANCY ------
P E R M A N E N T                    SEP 2 9 2006

ISSUE DATE:          10/02/06       BY:

LOCATION: 444 SE 13TH PL

STRAP #: 18-44-24-C3-01456-0160          PERMIT #: 05-00030797

OWNER INFORMATION:                       OCCUPANCY TYPE  :  RESIDENTIAL 1 & 2 FA
    LAMBERT BRIAN +
    1725 LAFAYETTE DR                    CONST. TYPE     :  TYPE VI UNSPRK/UNPRO
    TWINING MADELEINE T/C
    JAMISON, PA 18929-1642               ALLOWABLE OCC CONTENT:

CONTRACTOR INFORMATION:                  ALLOWABLE FLOOR LOAD :
    PAUL GARY G
    PAUL HOMES                           GAC UNIT            :  16-0
    4524 SE 16TH PL #2C
    CAPE CORAL, FL 33904-7475            PLAT BOOK PAGE#  :  07
    (941)542-1750                        # OF PLATTED LOTS:              2.0000
    COMPETENCY #:                        ZONING           :  R1BW
    REG OR STATE LIC: CGC047296
                                         TYPE OF WORK     :  NEW CONSTRUCTION

                                         NUMBER OF STORIES   :         1.00

                                         FLOOD ELEVATION     :

                                         FLOOD CODE          :              B

                                         NUMBER OF BEDROOMS  :         3.00

                                         NUMBER OF BATHROOMS :         2.50

                                         TOTAL DWELLING UNITS :        1.00

                                         TOTAL BLDG SIZE     :      3315.00

SAID PREMISES HEREBY ARE FOUND TO COMPLY WITH THE BUILDING
ORDINANCES AND ZONING OF SAID CITY.  THIS FORM IS A
"CERTIFICATE OF OCCUPANCY" WHEN VALIDATED.

DATE 10/2/06

                    DEPT. OF COMMUNITY DEVELOPMENT

        VOID UNLESS SIGNED BY BUILDING OFFICIAL