IN THE CIRCUIT COURT OF THE 15th
JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO:

GEOFFREY JOHNSON and AIASHA JOHNSON,
husband and wife,

    Plaintiffs,

v.

LAVISH HOLDING CORP.
a Florida corporation,

    Defendant.

                        /

CIVIL ACTION
JURY DEMANDED

RECEIVED FOR FILING

OCT 1 9 2009

SHARON R. BOCK
CLERK & COMPTROLLER
CIRCUIT CIVIL DIVISION

## COMPLAINT

Plaintiffs GEOFFREY JOHNSON and AIASHA JOHNSON bring this action against: Lavish Holding Corp. (referred to herein as "LHC"). All facts contained in this complaint are alleged upon information and belief and based upon the investigation of counsel.

### JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction as the amount in controversy exceeds $15,000.00, exclusive of interest, costs, and attorneys' fees.

2.    Venue in this action is proper because, among other things, the Plaintiffs reside in Palm Beach County, Florida and at least one of the causes of action accrued in Palm Beach County, Florida.

3.    This Court has personal jurisdiction over the resident Defendant pursuant to Florida Statutes § 48.193(2) because it is "engaged in substantial and not isolated activity within this state." *See* Fla. Stat. § 48.193(2). Additionally, Plaintiffs' causes of action arise from

Defendant, personally or through its agents, causing injury to Plaintiffs and/or Plaintiffs' property within the State of Florida arising out of acts or omissions of Defendant and, at the time of the injury, products, materials, or things selected, installed, or otherwise provided by Defendant which were used and consumed within the State of Florida in the ordinary course of commerce, trade, or use. *See* Fla. Stat. §48.193(1)(f)(2).

## INTRODUCTION

4.      The drywall used by the Defendant in the Plaintiffs' home is inherently defective because it emits various sulfide gases and/or other chemicals through "off-gassing" that creates noxious, "rotten egg-like" odors, and causes damage and corrosion ("the Defect") to home structure and mechanical systems such as air-conditioner and refrigerator coils, copper tubing, faucets, metal surfaces, electrical wiring, and computer wiring, as well as personal and other property such as microwaves, utensils, personal property, electronic appliances, jewelry, and other household items ("Other Property"). The compounds emitted by the drywall at issue are also capable of, among other things, harming the health of individuals subjected to prolonged exposure. These chemical compounds cause and have caused dangerous health consequences including, among other things, respiratory problems, sinus problems, eye irritation and nose bleeds.

5.      This Defect is latent and existed in the Chinese drywall at the time of installation regardless of the way the product was installed, maintained, and/or painted. There is no repair that will correct the Defect.

6.      As a result of Defendant's conduct as alleged herein, Plaintiffs have suffered economic losses by owning a home containing inherently defective drywall that has caused damage to Plaintiffs' home and Other Property.

7.      Plaintiffs have incurred or will incur tens of thousands of dollars in damages including, but not limited to:  repair/replacement of Plaintiffs' home, Other Property, and any materials contaminated or corroded by the drywall as a result of "off-gassing;" incidental and consequential damages; and diminution of value of Plaintiffs' home.

8.      Further, as a result of Defendant's conduct as alleged herein, Plaintiffs have suffered, or will suffer, harm and/or been exposed to an increased risk of harm and thus has need for injunctive and/or equitable relief in the form of emergency notice, environmental monitoring, and medical monitoring.

## THE PARTIES

### PLAINTIFFS

9.      Plaintiffs GEOFFREY JOHNSON and AIASHA JOHNSON own and reside in the home located at 190 SE 2nd Street, Deerfield Beach, FL  33441, which is located in a development known as "Deerfield Court Townhomes."

10.     Plaintiffs' home was built using defective Chinese drywall in approximately 2007.  Plaintiffs have had substantial problems with Plaintiffs' home, including but not limited to the corrosive effects of the sulfur and/or other compounds in the drywall; has suffered or will suffer adverse medical effects and personal injury; and has suffered injury to personal and real property as a result of Defendant's conduct as further described herein.

### DEFENDANT

11.     Defendant, LHC, is a Florida corporation with its principal place of business in Palm Beach County, Florida.

12.     LHC is a Florida Corporation and is a leading Florida developer of high quality and luxury homes which prides itself on craftsmanship, meticulous attention to detail, and a

passion for perfection.  LHC is located in Boca Raton, Palm Beach County, Florida.  LHC has built luxury homes throughout South Florida

13.     Defendant LHC purchased or otherwise procured drywall manufactured in China ("Chinese drywall") for use in the homes Defendant was developing and building in the State of Florida.  LHC installed or caused the installation of Chinese drywall in the Plaintiffs' home. Defendant's acts or omissions, directly or indirectly through its agents, employees, or affiliates, with respect to the Chinese drywall, have injured Plaintiffs as alleged herein.  LHC also failed to provide adequate warnings regarding the hazardous and defective nature of Chinese drywall.

14.     At all times relevant hereto, LHC acted by and through its employees, agents, apparent agents and representatives, who were acting within the course and scope of its employment, agency, apparent agency and representation and in the furtherance of Defendant's interests.

## GENERAL ALLEGATIONS

**A.     Chinese Drywall Distribution in Florida**

15.     Tens of millions of square feet of Chinese drywall was used in the construction of Florida homes between 2004 and the present.

16.     Because of a shortage of construction materials from a booming housing market and the massive damage in the United States in 2005 caused by Hurricanes Katrina and Wilma, builders, suppliers, and importers began bringing significant stocks of foreign manufactured Chinese drywall into Florida and the United States.

17.     At least 550 million pounds of Chinese drywall came into the United States from approximately 2004 to 2006 -- enough to construct 60,000 average-size homes.

18.     Nearly 60 percent of the Chinese drywall that came into the United States came in through Florida ports.

19.     Miami's port received the largest number of shipments of Chinese drywall. Public records show that more than 100 million pounds of Chinese drywall were off-loaded in Miami.  Other ports with significant Chinese drywall off-loading include Port Everglades (80 million pounds), Tampa (50 million pounds), as well as Port Manatee, Pensacola, Port Canaveral, and Jacksonville.

**B.     Drywall Background**

20.     Drywall is also commonly known as gypsum board, wallboard, plasterboard, rock lath, sheetrock, gyproc, or simply, board.  A drywall panel is made of a paper liner wrapped around an inner core made primarily from hardened gypsum plaster.

21.     In order to form drywall, gypsum must be "calcined," or partially dehydrated by heating.  It is then ground into a powder and mixed with water to form a slurry which is poured between two paper layers like a sandwich.  When the core sets and is dried in a large drying chamber, the "sandwich" becomes rigid and strong enough for use as a building material.

22.     Drywall may consist of two other materials with sulfur content: alkyl ethoxy sulfates as foaming agents and lignin or napthalene sulfonates as dispersing agents.

23.     Synthetic gypsum is generally manufactured with byproducts of coal-fired power plants.  Coal combustion byproducts ("CCBs") are the inorganic residues that remain after pulverized coal is burned.  The primary CCBs used in drywall are byproducts resulting from a utility's attempts to remove sulfur from flue gases.

C.      The Defective Drywall Emits Noxious and Corrosive Levels of Sulfur

24.     The Chinese drywall used by Defendant contained naturally mined gypsum and synthetic gypsum manufactured from CCBs.

25.     When gypsum, mined or synthetic, is subjected to certain environmental conditions, the product breaks down into sulfate ions which in turn can be chemically transformed into hydrogen sulfide gas and other sulfide gases.  The problem of sulfide emissions from drywall is well understood in the drywall industry and has been studied for many years. The level of sulfides emitted from drywall may depend, in part, on contamination of the drywall with sulfur materials or the use of contaminated gypsum materials.

26.     Sulfide emissions from drywall have been a particular problem in landfills and, as such, many landfills refuse to accept drywall or place strict limitations on the amounts and on the ways in which drywall can be disposed. An independent consulting firm, hired by a Miami-based builder, has concluded there is little doubt that the Chinese drywall used by Defendant is the cause of the corrosion in many residents' homes.

27.     One of the managing principals of the independent testing firm stated that: "We have definitely identified that a combination of sulfide gases are the cause of the corrosion of the coils.  The substances we've found are well known to cause that kind of corrosion."

28.     The firm's December 2008 results found three sulfide gases: carbon disulfide, carbonyl sulfide and dimethyl sulfide.

29.     Hydrogen sulfide was found in previous testing that the company conducted on the Chinese drywall: "Our previous studies indicate, however, that carbon disulfide, carbonyl sulfide, and hydrogen sulfide are gases that can be associated with emissions from Chinese drywall."

30.     One manufacturer has stated that the problem drywall came from a specific gypsum mine that supplied various manufacturers. But other published reports from independent environmental testing firms and building experts have said the source of the drywall problem is waste materials from the scrubbers of coal-fired power plants used to make the drywall in China.

31.     One importer acknowledged in published reports that the defective Chinese Drywall was "well known in the industry" by 2007.

32.     Plaintiffs could not have discovered the existence of the defect in the Chinese-manufactured drywall until press reports about the defects were released in December 2008.

**D.     The Need for Medical Monitoring for the Health Effects of Sulfur Emitting Drywall**

33.     Hydrogen sulfide ("H2S"), one of the chemicals found to have been released from drywall, is considered a broad-spectrum poison, meaning that it can poison several different systems in the body, although the nervous system is most affected.

34.     The toxicity of H2S is comparable with that of hydrogen cyanide. It forms a complex bond with iron in the mitochondrial cytochrome enzymes, thereby blocking oxygen from binding and stopping cellular respiration.

35.     Exposure to lower concentrations of sulfides can result in eye irritation, a sore throat and cough, nausea, shortness of breath, and fluid in the lungs.

36.     Long-term, low-level exposure to sulfides has been associated with fatigue, loss of appetite, headaches, irritability, poor memory, and dizziness. Chronic exposure to low levels of sulfides has also been implicated in increased miscarriage and reproductive health issues.

37.     Defendant's tortious acts and omissions have significantly increased the risk of Plaintiffs contracting a serious latent disease.

E.    **The Sulfur Emitting Drywall Injures the Health of Affected Homeowners**

38.    As a direct and proximate result of Defendant's actions and omissions, Plaintiffs' home and bodies have been exposed to the defective drywall and the corrosive and harmful effects of the sulfide gases and other chemicals being released from these proven hazardous substances.

39.    As a direct and proximate result of Defendant's use of defective drywall and the corrosive effects of the sulfide gases and other chemicals being released from these products, the Plaintiffs have suffered or will suffer damages for injuries from medical ailments, including but not limited to respiratory problems, sinus problems, eye irritations and nosebleeds, in addition to the creation of noxious odors, which smell like "rotten eggs."

F.    **The Mere Existence of Chinese Drywall Has Diminished Home Values**

40.    Because neither the long term effects of Chinese drywall, nor the triggers of the adverse chemical processes within the Chinese drywall are yet fully understood, the mere existence of Chinese manufactured drywall in a particular home causes automatic and substantial diminution of value to a home. All homes found or disclosed to have Chinese drywall are tainted by the mere existences of the drywall in the home, even if it is ultimately determined that some drywall manufactured in China is not defective. While the Plaintiffs are certain that Plaintiffs' home contains defective Chinese drywall, if it is ultimately determined that the drywall in Plaintiffs' home is not defective, even though it was manufactured in China, Plaintiffs have still sustained a diminution of value of Plaintiffs' home and is entitled to recover damages for that diminution of value.

### Conditions Precedent

41.    All notice required by Chapter 558, Florida Statutes, and conditions precedent to bringing this action have been met or were waived by Defendant.

### FRAUDULENT CONCEALMENT

42.    The running of any statute of limitations has been tolled due to Defendant's fraudulent concealment.   By failing to disclose a known defect to Plaintiffs, and misrepresenting the nature of its product as safe for its intended use, Defendant actively concealed from Plaintiffs the true risks associated with Plaintiffs' drywall.

43.    Plaintiffs could not have reasonably known or have learned of the manufacturing defect alleged herein and that those risks were a direct and proximate result of Defendant's acts and omissions.

44.    In addition, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the defective nature of its drywall.   Defendant was under a duty to disclose the true information about its product and it failed in that duty to Plaintiffs.

45.    Plaintiffs had no knowledge that Defendant was engaged in the wrongdoing alleged herein due to the acts of fraudulent concealment alleged herein.

### COUNT I

### NEGLIGENCE

46.    Plaintiffs incorporate and restate paragraphs 1-45 as if fully set forth herein.

47.    Defendant owed a duty to Plaintiffs to exercise reasonable care in the selecting, purchasing, inspecting, and/or installing of the defective drywall in the homes marketed and sold to Plaintiffs to prevent the drywall from containing Defects as set forth herein.

48.     Defendant also owed a duty to Plaintiffs to adequately warn of its failure to do the same; instruct the Plaintiffs of the Defects associated with drywall; not to misrepresent that the drywall was safe for its intended purpose when, in fact, it was not; and not to conceal information from Plaintiffs regarding reports of adverse effects associated with drywall.

49.     Defendant was negligent and breached its duty to exercise reasonable care in the selection, purchase, inspection, and/or installation of drywall.  Defendant further breached its duty to adequately warn of its failure to do the same.

50.     Defendant further breached its duty by:  failing to adequately warn and instruct the Plaintiffs of the Defects associated with drywall; misrepresenting that drywall was safe for its intended purpose when, in fact, it was not; concealing information from Plaintiffs regarding reports of adverse effects associated with drywall; and improperly concealing and/or misrepresenting information from the Plaintiffs concerning the severity of risks and dangers of the defective Chinese drywall and/or the manufacturing Defect.

51.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred economic and other damages and is entitled to recover monetary damages for:  diminution of value of Plaintiffs' home, replacement/repair of Plaintiffs' home; the removal and replacement of all of the drywall contained in Plaintiffs' home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal surfaces and household  items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

52.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages for the costs of

moving while Plaintiffs' home is being repaired; renting of comparable housing during the duration of the repair; the loss of use and enjoyment of real property; and other related expenses.

53.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, because Plaintiffs have incurred or will incur personal injuries and/or are experiencing or at risk of experiencing serious and dangerous health consequences from such exposure.

54.     Defendant knew or should have known that its wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

## COUNT II

### STRICT LIABILITY

55.     Plaintiffs incorporate and restate paragraphs 1-45 as if fully set forth herein.

56.     Defendant was responsible for the selection, purchase, inspection, and installation of the drywall at issue.

57.     By the time the drywall left the Defendant's hands, the risks associated with the product far outweighed its benefits.

58.     Further, by the time the drywall left the Defendant's hands, it knew, or should have known, the product was unsafe, defective, and could cause serious physical and economic harm to Plaintiffs.

59.     Defendant had a duty to provide Plaintiffs with a safe and properly functioning product. This is a duty Defendant failed to uphold.

60.    Because the product created an unreasonable risk to Plaintiffs' home and person, Defendant is strictly liable for economic and physical injuries to Plaintiffs.

61.    No prudent buyer of a home with the defective drywall product could be expected to determine on his or her own that the product was dangerous and defective.

62.    Defendant not only selected, purchased, inspected, and installed poorly designed and defective drywall, but also failed to give Plaintiffs adequate warning regarding the risks associated with defective drywall product.

63.    The Chinese drywall was a substantial factor in the economic and physical losses that have been, and continue to be, incurred by the Plaintiffs.

64.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred economic damages and is entitled to recover monetary damages for: diminution of value of Plaintiffs' home; replacement/repair of Plaintiffs' home; the removal and replacement of all of the drywall contained in Plaintiffs' home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

65.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages for the costs of moving while Plaintiffs' home is being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; and other related expenses.

66.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, because Plaintiffs have incurred or will incur personal injuries and/or are experiencing or at risk of experiencing serious and dangerous health consequences from such exposure.

## COUNT III

### BREACH OF EXPRESS WARRANTY

67.    Plaintiffs incorporate and restate paragraphs 1-45 as if fully set forth herein.

68.    Defendant expressly warranted that the drywall installed in Plaintiffs' home was safe, efficacious, well tested and of high quality.

69.    By installing a defective, unsafe, and poorly manufactured drywall product, Defendant has breached its express warranty.

70.    Defendant knew or should have known that its warranties were specious.

71.    Plaintiffs relied on these express warranties to Plaintiffs' detriment.

72.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred economic damages and is entitled to recover monetary damages for: diminution of value of Plaintiffs' home; replacement/repair of Plaintiffs' home; the removal and replacement of all of the drywall contained in Plaintiffs' home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

73. As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages for the costs of moving while Plaintiffs' home is being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; and other related expenses.

74. As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, because Plaintiffs have incurred or will incur personal injuries and/or are experiencing or at risk of experiencing serious and dangerous health consequences from such exposure.

## COUNT IV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

75. Plaintiffs incorporate and restate paragraphs 1-45 as if fully set forth herein.

76. Defendant was in privity with Plaintiffs.

77. At the time Defendant selected, purchased, inspected, and installed the defective drywall, Defendant knew, or it was reasonably foreseeable, that the drywall would be used in the Plaintiffs' home as a building material, and impliedly warranted the product to be fit for that use.

78. The Chinese drywall product was placed into the stream of commerce by Defendant in a defective condition and the defective drywall was expected to, and did, reach users, handlers, and persons coming into contact with said product without substantial change in the condition in which it was sold.

79.     The drywall was defective because it was not fit for the uses intended or reasonably foreseeable by Defendant; to wit, the installation of the drywall in Plaintiffs' home for use as a building material, because it contained defects as set forth herein.

80.     The Defendant thus breached the implied warranty of merchantability because the drywall was not fit to be installed in Plaintiffs' home as a building material due to the defects set forth herein.

81.     Defendant had reasonable and adequate notice of the Plaintiffs' claims for breach of implied warranty of merchantability and failed to cure.

82.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of Plaintiffs' home; diminution of value of Plaintiffs' home; the removal and replacement of all of the drywall contained in Plaintiffs' home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

83.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages for the costs of moving while Plaintiffs' home is being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; and other related expenses.

84.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to

the adverse health effects of defective drywall, because Plaintiffs have incurred or will incur personal injuries and/or is experiencing or at risk of experiencing serious and dangerous health consequences from such exposure.

85.     Defendant knew or should have known that its wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

## COUNT V

### BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

86.     Plaintiffs incorporate and restate paragraphs 1-45 as if fully set forth herein.

87.     Defendant was in privity with Plaintiffs.

88.     The Chinese drywall product was placed into the stream of commerce by Defendant in a defective condition and was expected to, and did, reach users, handlers, and persons coming into contact with said product without substantial change in the condition in which it was sold.

89.     The drywall was defective because it was not fit for the specific purpose of being installed in the Plaintiffs' home as a building material, for which Plaintiffs bought the product in reliance on the judgment of Defendant.

90.     The Defendant breached the implied warranty of fitness for a particular purpose because the drywall was not fit to be installed in Plaintiffs' home as a building material due to the defects set forth herein.

91.     Defendant had reasonable and adequate notice of the Plaintiffs' claims for breach of implied warranty of merchantability and failed to cure.

92.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: diminution of value of Plaintiffs' home; replacement/repair of Plaintiffs' home; the removal and replacement of all of the drywall contained in Plaintiffs' home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

93.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages for the costs of moving while Plaintiffs' home is being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; and other related expenses.

94.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, because Plaintiffs have incurred or will incur personal injuries and/or are experiencing or at risk of experiencing serious and dangerous health consequences from such exposure.

95.    Defendant knew or should have known that its wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

## COUNT VI

### NEGLIGENT MISREPRESENTATION

96.    Plaintiffs incorporate and restate paragraphs 1-45 as if fully set forth herein.

97.    As discussed herein, Defendant negligently misrepresented material facts regarding the characteristics of the drywall and omitted other material facts that should have been disclosed to Plaintiffs.

98.    In disseminating information regarding the drywall, Defendant negligently caused statements to be made, which it knew or should have known were inaccurate and untrue.

99.    In disseminating information regarding the drywall, Defendant intended for Plaintiffs to rely on its misrepresentations and Plaintiffs justifiably relied on its misrepresentations.

100.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: diminution of value of Plaintiffs' home; replacement/repair of Plaintiffs' home; the removal and replacement of all of the drywall contained in Plaintiffs' home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

101.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages for the costs of moving while Plaintiffs' home is being repaired; renting of comparable housing during the

duration of the repairs; the loss of use and enjoyment of real property; and other related expenses.

102.   As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, because Plaintiffs have incurred or will incur personal injuries and/or are experiencing or at risk of experiencing serious and dangerous health consequences from such exposure.

<u>COUNT VII</u>

EQUITABLE RELIEF, INJUNCTIVE RELIEF AND MEDICAL MONITORING

103.   Plaintiffs incorporate and restate paragraphs 1-45 as if fully set forth herein.

104.   Because no adequate remedy exists for the conduct of Defendant, equitable and injunctive relief is appropriate.

105.   Plaintiffs will suffer irreparable injury if the Court does not order injunctive relief and medical monitoring.

106.   Plaintiffs demands that Defendant: (A) recall, repurchase and/or repair Plaintiffs' home; (B) initiate and pay for a medical monitoring program under Florida law; (C) identify, at its own expense, each and every home with the defective drywall, if necessary, testing every home in which the defective drywall may potentially be found.

107.   Medical monitoring is a necessary component of the relief the Court should order because some of the sulfur compounds being emitted from the defective drywall are very hazardous. For example, Hydrogen Sulfide ("H2S"), one of the compounds found in the drywall is a broad-spectrum poison – meaning it can attack more than one system of the body simultaneously. H2S most commonly affects the central nervous system.

Through a complex reaction the H2S prevents oxygen from reaching cells in the body, essentially preventing them from "breathing."

108.   As a direct consequence of the wrongful and/or tortious acts and/or omissions of Defendant's conduct, Plaintiffs have been exposed to H2S, and other toxins, in quantities sufficient to harm Plaintiffs.  The long term effects of exposure to the toxins emanating from the defective drywall are unknown.  Thus, there is a need for medical monitoring.

109.   Until it has been conclusively established that all defective drywall has been removed and that air quality is safe, Defendant should bear the expense of air and environmental monitoring in Plaintiffs' home.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury as to all issues so triable as a matter of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Honorable Court grant the following relief:

a.   An order requiring that Defendant pay compensation to Plaintiffs to the full extent permitted by the law;

b.   An order requiring medical monitoring;

c.   Costs and expenses in this litigation, including, but not limited to, expert

fees, filing fees, and reasonable attorneys' fees; and

d.    Such other relief as the Court may deem just and appropriate.

Dated: October 16, 2009                    Respectfully submitted,

Jeremy W. Alters (Fla. Bar No. 111790)
Kimberly L. Boldt (Fla. Bar No. 957399)
Robert B. Brown, III (Fla. Bar No. 621609)
ALTERS BOLDT BROWN RASH & CULMO, PA
4141 N.E. 2nd Avenue, Suite 201
Miami, Florida  33137
(305) 571-8550 phone
(305) 571-8558 fax
jeremy@abbrclaw.com
kimberly@abbrclaw.com
bob@abbrclaw.com