UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **RUSS M. HERMAN AND ARNOLD LEVIN,** | : | Case No. 2:12-cv-00497-KDE-SS |
| | : | |
| Plaintiffs, | : | |
| | : | SECT. L MAG 2 |
| v. | : | |
| | : | |
| **CATAPHORA, INC. AND ROGER CHADDERDON,** | : | |
| | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR ISSUANCE OF PRESERVATION ORDER**

    **I.    INTRODUCTION.**

Plaintiffs, Russ M. Herman and Arnold Levin ("Plaintiffs"), respectively, are the Court appointed Plaintiffs' Liaison and Lead Counsel in the Chinese Manufactured Drywall Litigation, MDL No. 2047, now pending in this Court before the Honorable Eldon E. Fallon. *See* Complaint at ¶¶ 4 and 5. Plaintiffs are also members of the Plaintiffs' Steering Committee ("PSC") in the Chinese Drywall Litigation. *Id.* For the reasons set forth in detail below, Plaintiffs respectfully request that the Court issue a preservation order that enjoins Defendants, Cataphora, Inc. ("Cataphora") and Roger Chadderdon ("Chadderdon") (collectively "Defendants"), from destroying any evidence pertinent to Plaintiffs' defamation and interference with prospective advantage claims.

    **II.    FACTS.**

At the very early stages of the Chinese drywall litigation, the PSC created a technology

1

committee in part to investigate and hire vendors who could assist the PSC on technical matters. Jerry Parker, who is a member of the PSC, was appointed the head of the technology committee. Mr. Parker entered negotiations with Defendants for Cataphora to provide the PSC with litigation support services. *See* Complaint at ¶ 15. After protracted negotiations, Mr. Parker and Defendants came to terms and signed a contract. *Id.* at ¶¶ 17 and 18. This contract is invalid since Defendants inserted, without Mr. Parker's knowledge or the knowledge of any other PSC member, various contractual provisions that materially altered the terms of the agreement that had been negotiated by Mr. Parker and Defendants (*i.e.*, Defendants inserted a term that made an initial fixed fee non-refundable and included an illegal success fee in the contract). *Id.* at ¶ 17.

Within hours of the full execution of the underlying contract by all parties, Defendants instructed Cataphora to stop all work on the drywall litigation. Defendants subsequently terminated the contract approximately two weeks after the contract had been fully executed. Defendants performed no services under the contract with the PSC. *Id.* at ¶ 19.

Defendants confected numerous claims against the PSC in a complaint they filed in the United States District Court for the Northern District of California. *Id.* at ¶ 20. Although there were multiple grounds that entitled Plaintiffs to a dismissal of the lawsuit filed against them in the Northern District of California, the Honorable Bernard Zimmerman who presided over the case in the Northern District of California allowed the matter to go to trial, and the jury rendered a verdict in favor of Defendants and against the PSC for $317,113 in lost profits on September 19, 2011. *Id*. Judge Zimmerman also awarded Defendants $734,095 in attorney's fees.[1] *Id*. The PSC is presently appealing these judgments to the United States Court of Appeals for the Ninth

---

[1] Defendants are currently seeking an additional $119,200 in attorney's fees.

Circuit (Dkt. Nos. 12-15072 and 12-15149).

Shortly after the jury verdict in the California proceedings, Defendants engaged in a deliberate and malicious campaign designed to defame and commercially disparage Plaintiffs and other members of the PSC.  *Id.* at ¶¶ 21-23.  Chadderdon made a series of defamatory statements about the Plaintiffs which were published over the internet on or about September 26, 2011.  *Id*. A website, Abovethelaw.com, quoted Chadderdon as making the following statements concerning the Plaintiffs which have been published and are now available to the Plaintiffs' clients, prospective clients, members of the legal community, and the public:

> "These guys are the worst of hypocrites that you can possibly find ... They claim to be trying to help the little guy, but what they're doing is trying to put more money in their own pockets.  Everyone knows that, but this is a case that illustrates it beyond what I have ever seen."

A copy of the above statements by Chadderdon, as they appear on abovethelaw.com, is attached hereto as Exhibit "A".

These defamatory statements by Chadderdon were intended to harm Plaintiffs' standing in the legal community and to negatively impact Plaintiffs' image before prospective jurors.  *See* Complaint at ¶¶ 30-31.  In addition to the above defamatory statements by Chadderdon, Chadderdon also contacted a prominent member of the Defendants' Steering Committee ("DSC"), Kerry Miller, and offered to provide valuable insights about the Plaintiffs and their litigation strategies.  See exhibit "B".

More recently, one of Cataphora's marketing associates, Lauren Vilders, contacted a CBS affiliate in Miami Florida, WFOR, and asked CBS to run a story attacking a former member of the PSC, Victor Diaz, with respect to the contract disputes between the PSC and Defendants.

Ms. Vilders' communication is as follows:

> I'm contacting you about a story that you might find of interest for CBS Miami regarding prominent Miami attorney Victor Manuel Diaz of VM Diaz and Partners law firm. The story relates to the Chinese Drywall class action lawsuit.
>
> Mr. Diaz is a member of the Chinese Drywall Plaintiffs' Steering Committee - a group of very wealthy plaintiffs' attorneys who specialize in class action lawsuits such as this, purportedly working for the little guy. But they have forced a small employee-owned company to spend more than $1 million in legal fees to recover approximately $300,000 these attorneys owe it. Despite a jury verdict awarding Cataphora the money owed, plus costs, the plaintiffs still have not paid Cataphora a single penny. If you include the amounts spent on both sides' legal fees, something like an estimated $3 million has been spent arguing over $300,000 by these hot shot attorneys, and they continue to drag the case to an appeal, hoping to bankrupt the small company with which they had a valid contract. This is a striking local example of the kind of behavior that drives national calls for tort law reform, which are sure to be an issue yet again in the forthcoming presidential and congressional elections.
>
> Cataphora, an award-winning investigative software company that has been featured in media such as The New York Times, NPR, Fortune, Business Week etc., was initially retained by the Chinese Drywall Plaintiffs' Steering Committee to use its software to provide both investigative services and e-discovery. However, subsequent to these plaintiffs signing the contract, and getting court permission to use these funds for this purpose, they defaulted on the contract, instead doing the work, for which they were not well qualified, themselves. These local plaintiffs' attorneys have already collected over $1 billion from defendant companies on behalf of the victims of Chinese drywall. However, it is estimated that close to half of that money goes to plaintiff expense funds and contingency fees. In other words, upwards of $500 million has gone to these plaintiffs' attorneys, but they can't pay their $300,000 contract as awarded by a jury.
>
> Such bad behavior should be exposed to the public, especially in this election year. I would be happy to discuss further details of this matter with you.

A copy of Ms. Vilders' communication to CBS Miami is attached hereto as Exhibit "C".

Defendants are clearly engaged in a protracted and deliberate campaign that is designed to defame/commercially disparage Plaintiffs and other members of the PSC.  Because Plaintiffs are aware of Defendants' efforts to smear their good names with respect to CBS Miami, Abovethelaw.com, and the DSC in the Chinese drywall litigation, Plaintiffs are concerned that Defendants may have reached out to other members of the media and legal community to besmirch Plaintiffs as well.

### III.     ARGUMENT.

Because Plaintiffs have had no discovery on the scope of Defendants' defamation and commercial disparagement, they are entitled to full discovery on this conduct by Defendants.  Given the vitriol with which Defendants have attacked the Plaintiffs and other members of the PSC privately, there is a strong likelihood that Defendants may conceal their slanders and spoliate evidence.  For this reason, Plaintiffs request that the Court issue a preservation order that precludes Defendants from destroying any evidence that is relevant to Plaintiffs' defamation and interference with prospective advantage claims.

A preservation order enjoining a party from destroying relevant evidence is appropriate where a court finds that: (1) there is a legitimate concern for the continuing existence and maintenance of the integrity of the evidence in question absent an order preserving the evidence; (2) such concerns outweigh any harm to the defendants that may result from a preservation order; and (3) defendants will not be unduly burdened by such an order.  *See Tracfone Wireless, Inc. v. King Trading, Inc.*, 2008 WL 918243, * 1 (N.D. Tex. Mar. 13, 2008); *AT & T Mobility LLC v. Arena Trading, Inc.*, No. 3-08-CV-0330-P, 2008 WL 624104 at *1 (N.D.Tex. Mar.5, 2008).

There is a legitimate concern for the continuing existence and maintenance of the integrity of the evidence in question absent an order preserving the evidence. As noted above, Defendants are engaged in a very deliberate and surreptitious campaign that is designed to harm Plaintiffs at all costs. Defendants have reached out to members of the bar as well as members of the media in furtherance of their campaign to injure Plaintiffs. Given the secrecy with which Defendants have attempted to defame and commercially disparage Plaintiffs, Defendants may be taking measures to cover their tracks. Accordingly, it is respectfully submitted that a preservation order is essential to ensure the continuing existence and maintenance of evidence of Defendants' campaign to slander and commercially disparage Plaintiffs.

Finally, the issuance of a preservation order will not harm or unduly burden the Defendants and is consistent with Defendants' duty to preserve evidence.[2] An appropriate preservation order in this matter should instruct that Defendants maintain documents and other materials evidencing communications about the Plaintiffs and other members of the PSC. It is

---

[2] It is well recognized that a party to litigation has a duty to preserve all relevant evidence. The court discussed this obligation to preserve relevant evidence in detail in *Tango Transp., LLC v. Transp. Int'l Pool, Inc.*, 2009 WL 3254882 (W.D. La. Oct. 8, 2009):

> The duty to preserve evidence "arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Toth*, 2009 WL 528245, at *2. "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents." *Id*. The scope of the duty to preserve evidence includes employees likely to have relevant information, i.e., 'the key players' in the litigation. *Consolidated Aluminum*, 244 F.R.D. at 339.

*Tango Transp., LLC*, 2009 WL 3254882 at * 3.

respectfully submitted that such an order is necessary to insure that Defendants comply with their obligation to preserve evidence.

### III. CONCLUSION.

WHEREFORE, for the reasons set forth above, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Issuance of Preservation Order.

Respectfully submitted,

By:  /s/ Arnold Levin
Arnold Levin
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Pro se

Dated: February 27, 2012

By:  /s/ Russ M. Herman
Russ M. Herman
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Pro se