Confidential - Subject to Further Confidentiality Review

1    Dongxin Company, Limited entered into a

2    sales contract with Venture Supply Inc.

3    of Norfolk, Virginia for the sale of

4    100,000 sheets of drywall?

5         A.    I don't know which country

6    was the buyer.  I only was aware that

7    Peng Wenlong consulted me for the

8    thickness of the drywall, which is 12.7,

9    as well as the pricing of the drywall.

10        Q.    Did you approve the

11   thickness and pricing of the drywall for

12   this sale?

13        A.    I approved it.

14        Q.    This contract indicates that

15   the drywall was sold at the price of

16   $3.58 a sheet for a total of $358,000.

17   Is that the price you approved?

18        A.    Yes.

19        Q.    Is $3.58 a sheet consistent

20   with the price that Shandong Taihe

21   Dongxin was charging customers for

22   drywall in November of 2005?

23             MR. SPANO:  Objection to

24        form.

Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I don't recall

 2         clearly the price at the time.

 3              THE COURT:  It's time to

 4         change the tape as I understand

 5         it.  Let's take a break, 10-minute

 6         break.

 7              THE VIDEOTAPE TECHNICIAN:

 8         We're going off the record.  The

 9         time is 4:38.

10                   -   -   -

11              (Whereupon, a recess was

12         taken from 4:38 p.m. until 4:47

13         p.m.)

14                   -   -   -

15              THE VIDEOTAPE TECHNICIAN:

16         This is the beginning of Tape

17         Number 3.  We're going back on the

18         record.  The time is 4:47.

19    BY MR. MEUNIER:

20         Q.   Mr. Fu, this November 2005

21    contract between Shandong and Venture

22    Supply provides that the drywall will be

23    inspected by Mr. Phillip Perry of Tobin

24    Trading Inc. before the sale is final.
```

Confidential - Subject to Further Confidentiality Review

```
 1    Were you aware of that provision?

 2            A.    Peng Wenlong had reported to

 3    me the pricing of it.  I approved of the

 4    contract.  I'm not sure about the

 5    business details that they discussed

 6    about.

 7            Q.    I meant to ask you this

 8    before.  But Mr. Peng Wenlong, you said,

 9    was assigned to work with export sales

10    because he spoke English?  Is that true?

11            A.    Correct.

12            Q.    I think I've marked that as

13    Fu-3.

14                  MR. MEUNIER:  I next show

15            you a document which is Bates

16            numbered 19854 through 19857 which

17            I will mark as Fu Number 4.

18                        -   -   -

19                  (Whereupon, Deposition

20            Exhibit Fu-4, Contract, Bates

21            stamped TG 00019854 through TG

22            00019857, was marked for

23            identification.)

24                        -   -   -
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. MEUNIER:

 2         Q.    Mr. Fu, this is a contract

 3    dated December 6, 2005 between Shandong

 4    Taihe Dongxin Company and Venture Supply

 5    of Norfolk, Virginia for the sale of

 6    100,000 additional sheets of drywall.

 7    Were you aware of this agreement?

 8         A.    I know that, but I don't

 9    know the detailed content of it.

10         Q.    Yes, sir.  But again, you

11    approved the price, which in this case

12    was $3.58 a sheet -- I'm sorry, $3.66 a

13    sheet, for a total sale price of

14    $366,800.  You approved that, did you?

15         A.    It is so for the price.

16         Q.    And you approved the

17    agreement, didn't you?

18         A.    Yes.

19         Q.    Why was the price increased

20    from $3.58 a sheet to $3.66 a sheet

21    between November 17 and December 16,

22    2005?

23         A.    The costs were different.

24    The costs for each time period were
```

Confidential - Subject to Further Confidentiality Review

1    different.

2          Q.    So, the price per sheet

3    could change even in one month, true?

4          A.    Because this was the first

5    time we did business, we had to be

6    careful.  Afterwards, we could have some

7    small changes.  This was the first time

8    we had carefully calculated the price for

9    the specification of 12.7.  Therefore,

10   this has a reference value for future

11   transactions.

12         Q.    Are you saying that you

13   expected to continue to sell drywall to

14   Venture Supply at a price that would

15   become customary for that customer?

16         A.    As long as it takes its

17   money to China and we deliver the

18   products in China, we could do that.  We

19   deliver in China, but they would have to

20   take care of where they want it to ship

21   to because it was the first time we did

22   business together.

23         Q.    But the contract did specify

24   a price in US dollars, correct?

Confidential - Subject to Further Confidentiality Review

1         A.      Yes, yes.

2         Q.      And like the November 2005

3    contract with Venture Supply, this one

4    provides for an inspection of the product

5    by Mr. Phillip Perry before the sale is

6    final, that, again, was a detail that you

7    left to Mr. Peng Wenlong, true?

8         A.      Correct.

9         Q.      If you look at the second

10   page of the contract which is Bates

11   numbered 19855, I ask you to confirm that

12   that is the signature of Peng Wenlong

13   using the company seal of Shandong Taihe

14   Dongxin?

15        A.      I don't see the signature of

16   Peng Wenlong.

17        Q.      You don't see a signature

18   written in the area where the seal stamp

19   is made?

20        A.      This is my signature.

21        Q.      This is your signature?

22        A.      That's my signature.

23        Q.      So, you signed this

24   contract?

Confidential - Subject to Further Confidentiality Review

1        A.      Yes.

2        Q.      So, you have seen --

3        A.      I approved it, including the

4   price.

5        Q.      And you signed it?

6        A.      Yes.

7        Q.      And you signed it in

8   English?

9        A.      That was our first time I

10   did business.  No.  This is Chinese

11   character.

12        Q.      Yes, but the document is

13   written in English, and your signature is

14   on the document in English, true?

15              MR. SPANO:  Objection, asked

16          and answered.

17              THE WITNESS:  That's Chinese

18          character.

19   BY MR. MEUNIER:

20        Q.      Is the language of the

21   contract in English?

22              MR. SPANO:  Objection.

23              THE COURT:  I'm going to

24          overrule the objection.

Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  This was the
 2           first time we did business.  We
 3           have never done that before.  Peng
 4           Wenlong translated it into
 5           Chinese.  I reviewed the contract.
 6           I saw it was okay.  I approved it.
 7  BY MR. MEUNIER:
 8           Q.    So, all of the language in
 9  this contract which you signed was read
10  to you in China in Chinese by Mr. Peng
11  Wenlong translating the document?
12           A.    Correct.  I saw that.
13           Q.    And with the authority of
14  Shandong Taihe Dongxin, you then approved
15  and signed this sales contract, didn't
16  you?
17           A.    Yes, yes.
18           Q.    And you put your company's
19  seal on the place where you signed,
20  right?
21           A.    Yes.
22                MR. MEUNIER:  Your Honor, if
23           you would just give me five
24           minutes recess, I'll just review
```

Confidential - Subject to Further Confidentiality Review

```
1        my notes and see if there's

2        anything further.

3              THE COURT:  Let's do it in a

4        couple of minutes.  I don't think

5        we need five.

6              MR. MEUNIER:  Yes.

7              THE VIDEOTAPE TECHNICIAN:

8        Going off the record.  The time is

9        4:59.

10              -  -  -

11              (Whereupon, a recess was

12        taken from 4:59 p.m. until 5:01

13        p.m.)

14              -  -  -

15              MR. MEUNIER:  Your Honor,

16        I'll tender the witness.

17              THE COURT:  No further

18        questions from Mr. Meunier.

19              THE VIDEOTAPE TECHNICIAN:

20        We're going back on the video

21        record.  The time is 5:01.

22              -  -  -

23              EXAMINATION

24              -  -  -
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. GONZALEZ:
 2          Q.    Hi, Mr. Fu.  I'm Ervin
 3    Gonzalez.
 4                Once TTP was formed, were
 5    all of the export sales conducted through
 6    it as opposed to TG?
 7          A.    Correct.
 8          Q.    So, at that point, TG
 9    stopped selling export sales, and they
10    were all done through TTP, correct?
11          A.    It is not entirely so.
12    There was a person who remained there
13    whose name is -- there is a person called
14    Zhang Nan, Z-H-A-N-G, last name, first
15    name, N-A-N.  He did not go to TTP.  He
16    remained there at TG.  He remained at TG.
17          Q.    Was he a salesperson to sell
18    exports?
19          A.    He was in charge of trading,
20    not necessarily exporting.
21          Q.    But the exporting part of
22    the business was through TTP once TTP was
23    formed, correct?
24          A.    If TG could have some
```

Confidential - Subject to Further Confidentiality Review

1    businesses of their own, they could also

2    do that.

3         Q.    Right.

4         A.    But for some local

5    businesses, if they needed value added

6    invoices, they would need to go to TTP

7    because only TTP could issue such

8    invoices.

9         Q.    That's how TG worked through

10   TTP?

11        A.    What is it?

12        Q.    That's how TG worked through

13   TTP?  When they needed to export and use

14   the VAT benefits of TTP, it went through

15   TTP?

16        A.    No.  At the time that we

17   established TTP was because many of the

18   local customers wanted to have value

19   added invoices.

20        Q.    So TG established TTP to

21   carry that out?

22        A.    Correct.

23        Q.    And TG and TTP worked

24   closely together?

Confidential - Subject to Further Confidentiality Review

```
 1        A.     It's an independent company.

 2        Q.     Yes.  But you worked closely

 3   together?

 4        A.     They don't work together.

 5        Q.     Well, you sold the same

 6   brands of drywall, correct?

 7        A.     We could authorize them to

 8   sell this brand of drywall.

 9        Q.     And they, in fact, did sell

10   the same brands of drywall that were

11   manufactured by TG?

12        A.     Correct.

13        Q.     And the employees that were

14   working for TTP previously worked for TG?

15        A.     Correct.

16        Q.     And when TTP stopped

17   existing, those employees like Bill --

18   like Che Gang and Peng Wenlong went back

19   to work at TG?

20        A.     Correct.

21        Q.     And the address we heard

22   yesterday from Mr. Jia, the address for

23   TTP and TG were the same?

24        A.     What was the address you're
```

Confidential - Subject to Further Confidentiality Review

```
 1    talking about?  I don't understand.

 2              Q.    The address for the

 3    businesses.

 4              A.    They were about three

 5    kilometers distance of the two companies.

 6    TTP is located at Houzhou Village of

 7    Taian, while TG is located at Dawenkou.

 8              Q.    The directors that were

 9    established for TTP came from TG, right?

10              A.    Yes.

11              Q.    The plant that was used by

12    TTP was previously owned by TG, correct?

13              A.    Yes.

14              Q.    When TTP stopped existing,

15    those plants went back to TG, correct?

16              A.    It was purchased back

17    because it was bought in the first place.

18              Q.    Same plant?

19              A.    Yes.

20              Q.    And the formulas that were

21    used to make drywall were the same for

22    TTP and for TG?

23              A.    The formulas of

24    manufacturing, I believe each of the
```

Confidential - Subject to Further Confidentiality Review

1    companies has slight difference from the

2    others because some of the equipments

3    were added.  After adding of the

4    equipments, the efficiency were better.

5         Q.    For the newer companies?  In

6    terms of efficiency, they were better for

7    the newer companies because they had new

8    machines, right?

9         A.    No.  Some dryer was added.

10        Q.    But the ingredients were --

11        A.    After adding of the dryer,

12   it is not necessary that the speed was

13   added.

14        Q.    The ingredients were the

15   same?

16        A.    Yes.

17        Q.    And if a product had the

18   name, for example, Dun, and it was made

19   at TTP's plant, or the same Dun was made

20   at TG, it's the same quality of drywall

21   that would be coming from each plant,

22   correct?

23        A.    I don't know who made Dun

24   brand products.  I knew that we made

Confidential - Subject to Further Confidentiality Review

```
 1    Taishan brand products.  We all made

 2    Taishan brand products.

 3           Q.    I represent to you that the

 4    Dun brand is listed in the TG catalog

 5    that's Exhibit Number 13 --

 6                 MR. DAVIS:  20.

 7    BY MR. GONZALEZ:

 8           Q.    20 in your deposition.

 9           A.    I haven't seen that.

10           Q.    May I have the exhibit,

11    please?

12           A.    Where is it?

13                 (Handing over document.)

14           Q.    I will show you.

15           A.    This is our trademark.  We

16    have registered many trademarks.  It is

17    not necessarily that we would manufacture

18    the trademark.

19           Q.    The trademark that you

20    registered, when you say "you," it's the

21    corporation, TG?  Yes?

22           A.    Yes.

23           Q.    And that's true for the Dun

24    trademark?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    Okay.  And are these other

 3   trademarks on that Exhibit 20?

 4          A.    Yes.

 5          Q.    And can you identify all of

 6   the registered trademarks for TG that are

 7   listed there, please?

 8          A.    All of these?

 9          Q.    Yes.  But can you tell the

10   names, because some of them are in

11   Chinese, and I can't read Chinese?

12          A.    Taishan, West Lake, Five

13   Star, Dun, Ma.

14          Q.    You were previously shown,

15   when my colleague was asking you some

16   questions, an exclusive agency agreement

17   to sell the Dun product in the United

18   States of America.  Were you aware that

19   that was occurring at the time that the

20   contract was entered into?

21               MR. SPANO:  Objection, no

22          foundation.

23               THE COURT:  I'll allow him

24          to answer.
```

Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I was not

 2         aware of that.

 3   BY MR. GONZALEZ:

 4         Q.    Let me ask you just a few

 5   other questions, and then I'll pass you

 6   to my other colleague.  Were you

 7   compensated, without telling us the

 8   amount, for your services on the board of

 9   directors of TTP?

10         A.    I had no compensation.  TG.

11         Q.    So, you were only

12   compensated by TG, correct?

13         A.    Correct.

14         Q.    And you served also on the

15   board of TTP for no additional

16   compensation, correct?

17         A.    Correct.

18         Q.    Did the board of directors

19   of TTP have the right to hire and fire

20   employees for TTP?

21         A.    We did not have such a

22   right.

23         Q.    Who had the right to hire

24   and fire employees for TTP?
```

Confidential - Subject to Further Confidentiality Review

1          A.      Peng Shiliang.

2          Q.      Who is that by title?

3          A.      He's the general manager,

4    general manager's responsibility.

5          Q.      General manager of TTP?

6          A.      TTP's.

7          Q.      Prior to his working for

8    TTP, did he also work for TG?

9          A.      Yes.

10          Q.      Did he go back to work for

11    TG after TTP stopped working?

12          A.      Yes, currently, yes.

13          Q.      As TTP was being formed, who

14    at -- let me restate that.

15          As TTP was being formed, who

16    at TG decided what employees would stop

17    working at TG and begin working at TTP?

18          A.      They volunteer.  They could

19    volunteer because a new company was

20    formed.

21          Q.      Who was asking for the

22    volunteers on behalf of TG?

23          A.      By notification because we

24    formed TTP company.

Confidential - Subject to Further Confidentiality Review

1          Q.     Who issued the notification?

2     Was it the board, was it the general

3     manager?  And to be specific, here's what

4     I'm asking.  What person on behalf of TG

5     or entity on behalf of TG said to the TG

6     employees, we're creating TTP, and we're

7     looking for volunteers to work at TTP?

8                    MR. SPANO:  Objection.  Your

9               Honor, he answered the first

10              question.  I think it should be

11              translated.

12                   THE COURT:  Yes.

13                   THE INTERPRETER:  Do you

14              want me to answer the question, or

15              what was the first?

16                   MR. SPANO:  I'm asking that

17              you to translate his answer to the

18              first question which I heard him

19              give you.

20                   INTERPRETER:  He did?

21                   THE COURT:  Let's back up

22              then.

23                   MR. SPANO:  We can move on.

24     BY MR. GONZALEZ:

Confidential - Subject to Further Confidentiality Review

1        Q.      What person on behalf of TG

2    or entity on behalf of TG said to the TG

3    employees, we're creating TTP, and we're

4    looking for volunteers to work at TTP?

5        A.      There was no such a person.

6    It was the office.

7        Q.      But somebody at the office

8    must have come up with the idea, we need

9    volunteers to set up TTP, send out a

10   notice?

11       A.      That I do not know.

12       Q.      We were discussing the

13   brochure that discussed shipments or

14   exports to the United States of America,

15   and you were telling us that it was in

16   the brochure because it actually was good

17   to show that exports were made to foreign

18   countries including the United States of

19   America.  Do you agree with me that being

20   able to sell goods to the United States

21   of America is a good thing for the

22   business?

23               MR. SPANO:  Objection to

24        form.  Lack of foundation.

Confidential - Subject to Further Confidentiality Review

```
 1                    THE COURT:  You have to be a

 2            little more specific.  Good thing

 3            for business?

 4   BY MR. GONZALEZ:

 5            Q.    You agree with me that

 6   selling goods to the United States of

 7   America is something that it would be

 8   considered a positive factor for the

 9   business in terms of prestige?

10                    MR. SPANO:  Objection, calls

11            for speculation.

12                    THE COURT:  I'll overrule

13            the objection.  He's speaking for

14            the company.

15                    THE WITNESS:  It was not

16            only to sell to the United States,

17            but the image was meant to be a

18            global company, not necessarily

19            any specific country.

20   BY MR. GONZALEZ:

21            Q.    And that was actually one of

22   the reasons that you created the brochure

23   that's known as Exhibit 20, correct,

24   "you," the business?
```

Confidential - Subject to Further Confidentiality Review

1      A.    Yes, like I said.

2            MR. GONZALEZ:  Thank you.

3      That's all I have.  I'll pass the

4      witness.

5            MR. SPANO:  Your Honor, for

6      the record, I would like to renew

7      my objection.  Mr. Fu is not

8      speaking for the company.

9            THE COURT:  Okay.  I

10     understand.  The same ruling.  I

11     overruled the objection.

12           Anybody else from any

13     company?

14           MS. BASS:  No.

15           Any redirect on Mr. Wu?

16                -   -   -

17                EXAMINATION

18                -   -   -

19     BY MR. SPANO:

20     Q.    Mr. Fu, I have to ask you a

21     few questions.

22     A.    Okay.

23     Q.    Do you recall testifying

24     earlier this afternoon to the effect that

Confidential - Subject to Further Confidentiality Review

```
 1    if you were paid the money, you would

 2    ship out the product?

 3         A.    Yes.

 4         Q.    Did Taishan Gypsum ship out

 5    any products to any state in the United

 6    States of America?

 7         A.    No.

 8         Q.    Do you recall answering a

 9    series of questions regarding the export

10    activities of Taishan Gypsum described in

11    the product brochure, Jia Exhibit 20?

12         A.    Our products had always been

13    delivered in China.  As of the shipping

14    cost and where they shipped to, it would

15    be handled and decided by the customers.

16    We don't know where they were shipped to.

17         Q.    Did Taishan Gypsum or TTP's

18    export activities ever include shipping

19    drywall to any state in the U.S.?

20         A.    No.

21              MR. SPANO:  That's all I

22         have.

23              THE COURT:  Okay.  That's

24         the end.  Thank you very much.
```

Confidential - Subject to Further Confidentiality Review

```
1              Tomorrow we're going to start at

2              8:30 and try to get through a

3              little bit faster.

4                   THE VIDEOTAPE TECHNICIAN:

5              This concludes today's deposition

6              of Fu Tinghuan.  The total number

7              of tapes today is four.  Going off

8              the record at 5:23.

9                        -   -   -

10                  (Whereupon, the deposition

11             concluded at 5:23 p.m.)

12                       -   -   -

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E
 2
 3
                     I, LINDA L. GOLKOW, a
 4    Registered Diplomate Reporter, Certified
      Court Reporter and Notary Public, do
 5    hereby certify that, pursuant to notice,
      the deposition of TINGHUAN FU was duly
 6    taken on January 10, 2012 at 1:30 p.m.
      before me.
 7
 8              The said TINGHUAN FU was
      duly sworn by The Court according to law
 9    to tell the truth, the whole truth and
      nothing but the truth and thereupon did
10    testify as set forth in the above
      transcript of testimony.  The testimony
11    was taken down stenographically by me.
12
                I do further certify that
13    the above deposition is full, complete
      and a true record of all the testimony
14    given by the said witness.
15
16
              Linda L. Golkow
17            Registered Diplomate Reporter
              Certified Realtime Reporter
18
19
20              (The foregoing certification
      of this transcript does not apply to any
21    reproduction of the same by any means,
      unless under the direct control and/or
22    supervision of the certifying reporter.)
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3

 4              Please read your deposition

 5   over carefully and make any necessary

 6   corrections.  You should state the reason

 7   in the appropriate space on the errata

 8   sheet for any corrections that are made.

 9

10              After doing so, please sign

11   the errata sheet and date it.  It will be

12   attached to your deposition.

13

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

```
 1                  - - - - - -

                     E  R  R  A  T  A

 2                  - - - - - -

 3     PAGE   LINE   CHANGE

 4     ____   ____   _____

 5       REASON:   ___  _____

 6     ____   ____   _____

 7       REASON:   ____  _____

 8     ____   ____   _____

 9       REASON:   _____  _____

10     ____   ____   _____

11       REASON:   _____  _____

12     ____   ____   _____

13       REASON:   _____  _____

14     ____   ____   _____

15       REASON:   _____  _____

16     ____   ____   _____

17       REASON:   _____  _____

18     ____   ____   _____

19       REASON:   _____  _____

20     ____   ____   _____

21       REASON:   _____  _____

22     ____   ____   _____

23       REASON:   _____  _____

24
```

Confidential - Subject to Further Confidentiality Review

1

2                    ACKNOWLEDGMENT OF DEPONENT

3

            I,_____, do

4   hereby certify that I have read the
    foregoing pages, 1-126, and that the same

5   is a correct transcription of the answers
    given by me to the questions therein

6   propounded, except for the corrections or
    changes in form or substance, if any,

7   noted in the attached Errata Sheet.

8

    _____

9   TINGHUAN FU              DATE

10

11

12

13

14

15

    Subscribed and sworn

16  to before me this
    _____ day of _____, 20____.

17

    My commission expires:_____

18

19  _____

    Notary Public

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
1                    LAWYER'S NOTES

2     PAGE   LINE

3     ____   ____    _____

4     ____   ____    _____

5     ____   ____    _____

6     ____   ____    _____

7     ____   ____    _____

8     ____   ____    _____

9     ____   ____    _____

10    ____   ____    _____

11    ____   ____    _____

12    ____   ____    _____

13    ____   ____    _____

14    ____   ____    _____

15    ____   ____    _____

16    ____   ____    _____

17    ____   ____    _____

18    ____   ____    _____

19    ____   ____    _____

20    ____   ____    _____

21    ____   ____    _____

22    ____   ____    _____

23    ____   ____    _____

24    ____   ____    _____
```