Confidential - Subject to Further Confidentiality Review

 1    I don't recall.

 2              Q.     It was your custom to

 3    provide that information if requested?

 4              A.     Not necessarily.  It depends

 5    on whether the shipping company would

 6    provide me such information.  I would

 7    copy it to the shipping company, and they

 8    would copy to me and I will copy to them.

 9    Usually, I don't even look at the

10    details.

11              Q.     In the same e-mail from Mr.

12    Gonima, he asked you to provide the cost

13    of shipping drywall screws to a number of

14    cities, including 11 US cities.  Is that

15    true?

16              A.     You mean here?

17              Q.     Yes.  Same e-mail.

18              A.     I believe that's only an

19    inquiry, just like what I explained

20    earlier.  They asked me to help them to

21    inquire.

22              Q.     Yes, sir.

23              And let me correct the

24    record.  It's actually 13 cities.  I'll

Confidential - Subject to Further Confidentiality Review

1    read them for the record.  This is for

2    the cost of shipping drywall screws,

3    Miami, Florida; West Palm Beach, Florida;

4    Tampa, Florida; Savannah, Georgia;

5    Charleston, South Carolina; Wilmington,

6    North Carolina; Norfolk, Virginia;

7    Newark, New Jersey; Long Beach,

8    California; Houston, Texas; Gulfport,

9    Mississippi; New Orleans, Louisiana; Las

10   Vegas in Nevada, in parens, via, V-I-A,

11   Long Beach, California.

12              Your custom was to ask

13   shipping agents for this information, and

14   then if they provided it to you, you

15   would give that to a customer like Mr.

16   Gonima.  Correct?

17         A.    My customed way of dealing

18   with this is usually I don't even look at

19   the contents, but I will send it directly

20   to the shipping agents.  And the shipping

21   agents, after they fill up the

22   information, if -- which is if they could

23   give me an instant answer, then I could

24   forward it to the client.  If the

Confidential - Subject to Further Confidentiality Review

1    shipping company were not able to provide

2    me with the information for a longer

3    period of time, perhaps we'll just put it

4    aside, unless the customer would mention

5    it again, and then there will be another

6    cycle of activity.

7         Q.    You've testified about the

8    $100,000 reimbursement request that was

9    made by Oriental Trading Company.

10             Do you recall that?

11        A.    Yes, I remember.

12        Q.    This $100,000 was an advance

13   deposit made by Oriental Trading when it

14   signed the sole agency agreement in

15   October 2006.  Is that true?

16        A.    No.  It had nothing to do

17   whatsoever with that agreement.  It is

18   also that afterwards our intercompany

19   wished to purchase products from us, just

20   like any other customer.  And they wired

21   the payment to us.  And for many reasons,

22   they did not actually want to have the

23   products.  So later on, according to

24   perhaps Mr. Ivan in Oriental Company,

Confidential - Subject to Further Confidentiality Review

1    upon his request, he entrusted a

2    representative office in China to have us

3    send back the payment to the account

4    number in China of that representative

5    office.  That's what was going on.

6         Q.    You tried to convince your

7    company to return the $100,000 to

8    Oriental Trading.  Is that true?

9         A.    It was not that I attempted

10   to persuade my company; it was because

11   there was a rule of foreign currency

12   exchange in China.  There were many

13   redundant processes.  We had to find out

14   a way to handle this amount of money.

15        Q.    And the way that you and

16   your company proposed to handle this

17   problem was to export additional products

18   to Oriental Trading instead of paying

19   back the cash.  Is that true?

20        A.    The circumstance was at the

21   time, because of foreign currency rules

22   and regulations in China, according to

23   the request of Oriental company, we were

24   supposed to return it back to them.  But

Confidential - Subject to Further Confidentiality Review

```
 1    it was really, really hard to operate

 2    that way.  So after discussion with

 3    Oriental company to try to find a

 4    solution for it.

 5            Q.    I show you an exchange of

 6    e-mails from December 2008.  It's Bates

 7    number 21477, and I have marked it as Che

 8    Exhibit Number 12.

 9                        -   -   -

10                (Deposition Exhibit No.

11            Che-12, E-mail chain, top one

12            dated Dec 19, 2008, Bates stamped

13            TG 0021477, was marked for

14            identification.)

15                        -   -   -

16                MR. SPANO:  Objection.  It's

17            two half e-mails here.

18                MR. MEUNIER:  21477?

19                MR. SPANO:  Does it continue

20            on the next page?

21                MR. MEUNIER:  I'm looking at

22            the one in the middle.  It's a

23            complete e-mail.

24                MR. SPANO:  Okay.  If that's
```

Confidential - Subject to Further Confidentiality Review

1           all you're going to question him

2           on.

3  BY MR. MEUNIER:

4           Q.    I'm referring to your e-mail

5  to Mr. Guzman dated December 16, 2008 in

6  which you said, starting in the second

7  sentence, "I am working hard to return

8  the money to you, but our bank and our

9  accounting departments need time to

10  operate this thing.  It is so complicated

11  and time-consuming.  I suggest that we

12  can export something to you, for example

13  the metal keels, the steel belt price

14  have went down in China.  And some

15  customers from USA start to order the

16  metal keels now.  We think it is the most

17  operable and easiest way."

18           Let's clear that up for the

19  record.

20           Metal keels are the frames

21  or studs that the drywall attaches to?

22           A.    Stud?   Oh, okay.

23           THE INTERPRETER:

24           Interpreter clarification.

Confidential - Subject to Further Confidentiality Review

1           Deponent said the stud is supposed

2           to be translated as dragon bone,

3           so I will use dragon bone from now

4           on.

5     BY MR. MEUNIER:

6           Q.     Very, very nice.

7                  What are the metal keels

8     that you were referring to in this

9     e-mail?

10          A.     Usually I call metal keel

11    metal stud.  I don't really use metal

12    keel that much.

13          Q.     But whether you call it

14    metal keel or metal stud or dragon bone,

15    it is a product manufactured by TG, at

16    the same factory where the drywall is

17    made, and the drywall attaches to the

18    metal stud or keel.  Is that true?

19                 MR. SPANO:  Objection,

20            compound and no foundation.

21                 THE COURT:  I agree.

22            Sustain.

23                 MR. MEUNIER:  I'll rephrase.

24    BY MR. MEUNIER:

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Let me just ask this
 2    question.
 3                Did TG make metal keels?
 4          A.    No.
 5          Q.    Did TTP make metal keels?
 6          A.    No.
 7          Q.    Who made metal keels that
 8    you were referring to in this e-mail?
 9                THE INTERPRETER:  Literal
10          translation of the name of the
11          company that the deponent was
12          saying is --
13                THE WITNESS:  Golden Shield
14          Construction Material Company or
15          Golden Dun, either.
16    BY MR. MEUNIER:
17          Q.    But the metal keel is
18    something that drywall attaches to, Mr.
19    Che?
20          A.    When we do the hanging
21    ceiling or the divider, we would first of
22    all place the metal stud.  And then we
23    will use the nail to attach the gypsum
24    board to it.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And the company that you
 2  just named that you said makes the metal
 3  keel, that was a company created by the
 4  Taihe Group.   Correct?
 5          A.    I'm not sure about the
 6  specific relationship of this company
 7  with TG.
 8          Q.    How did you have authority
 9  in your December 16, 2008 e-mail to offer
10  the export of metal keels to Mr. Gonima
11  as an employee of Taishan Gypsum?
12          A.    I bought it and I sold it.
13          Q.    Taishan Gypsum bought it?
14          A.    It was not actually
15  operated.  If at the time I worked for
16  TTP, then TTP would have bought it and
17  then we would have sold it to the client.
18  If at the time I worked for TG, I would
19  have used the name -- TG company's name
20  to buy the product and in turn sell it to
21  the client.
22          Q.    In Mr. Gonima's reply to you
23  in the e-mail of December 19, 2008 on
24  this document, he told you,
```

Confidential - Subject to Further Confidentiality Review

```
 1    "Unfortunately, the actual situation in

 2    USA is not the best for import new

 3    products and the owner" of "the company

 4    needs the reimbursement" of the US

 5    dollars 100,000.

 6              However, even after this,

 7    your boss continued to suggest that

 8    instead of refunding the cash, your

 9    company wanted to export goods to

10    Oriental Trading Company.  Is that true?

11         A.    I don't see it over here.

12    It's not here.  Right?

13         Q.    Yes, sir.  I'm going to show

14    you an exchange of e-mails from March

15    2009 on a document Bates numbered 21470.

16                   -  -  -

17              (Deposition Exhibit No.

18              Che-13, E-mail chain, top one

19              dated March 6, 2009, Bates stamped

20              TG 0021470, was marked for

21              identification.)

22                   -  -  -

23    BY MR. MEUNIER:

24         Q.    I first direct your
```

Confidential - Subject to Further Confidentiality Review

1    attention to a March 6, 2009 e-mail from

2    Leonardo Guzman on behalf of Oriental

3    Trading.

4              MR. CHEN:  I'm sorry,

5         Counsel.  Is there another Bates

6         number on there?  Because it's not

7         in our book.

8              MR. MEUNIER:  21470.

9              MR. EUGENE CHEN:  I go

10        straight from 69 to 75, or if you

11        have another copy.

12             MR. SPANO:  You can go ahead

13        with it.

14   BY MR. MEUNIER:

15        Q.    In his e-mail to you, Mr.

16   Guzman asks if you have any news about

17   the $100,000 reimbursement.  And in your

18   reply e-mail of March 6, 2009, you say

19   the following:  "I still try my best to

20   convince our boss to pay the" US dollar

21   100,000 "to you.  but my boss said that

22   making the account of bank is difficult,

23   so he suggest we" export "the goods to

24   you, I often talk about this things with

Confidential - Subject to Further Confidentiality Review

1    our boss.  I need wait for that he

2    agree."

3                Who was your boss that you

4    were referring to in that mail?

5         A.    When I talk about boss here,

6    it's only to express to him that we take

7    this issue seriously.  Actually, I really

8    didn't need the boss to coordinate.  This

9    needed to be coordinated with the

10   accounting department.

11        Q.    Who was the boss that you

12   were referring to?

13        A.    No specific name.  It's only

14   a way of expression which was telling him

15   that we took the issue seriously.

16        Q.    So when you told him I often

17   talk about this with my boss, with our

18   boss, you were not being truthful?

19        A.     It's not that I was not

20   truthful.  It is only a way to do sales.

21   When I say boss, then the client would

22   assume that I took it very seriously.  I

23   was trying to help him to get the money

24   back.  In fact, the boss actually was not

Confidential - Subject to Further Confidentiality Review

 1   in charge of detailed businesses.

 2   Usually, I would need only to coordinate

 3   with financial department for issues like

 4   this.

 5        Q.    Who was your boss in March

 6   of 2009?

 7        A.    March 2009 I went back to

 8   TG.

 9        Q.    So who was your boss?

10        A.    Our big boss should be

11   General Manager Jia.  However, I only

12   reported to Manager Peng for my work.

13   There were quite a few levels in between

14   us.

15        Q.    Peng Wenlong is the boss you

16   reported to?

17        A.    You shouldn't say boss.  We

18   don't call him boss.  The boss here does

19   not have a specific person that we're

20   referring to.  It's not referred to any

21   specific person called that.

22        Q.    Well, when you told Mr.

23   Gonima that instead of repaying cash, the

24   boss suggested the export of goods, what

Confidential - Subject to Further Confidentiality Review

1    export of goods were you referring to?

2         A.    What he says is as long as

3    we can find a way to return this amount

4    of money differently, there's no

5    specification on that.

6              THE COURT:  Let's take a

7              break at this time.  We'll come

8              back at 1:00.

9              VIDEOTAPE TECHNICIAN:  We're

10             going off the record.  The time is

11             12:02.

12                  -  -  -

13             (A luncheon recess was taken

14             from 12:02 p.m. to 1:01 p.m.)

15                  -  -  -

16             VIDEOTAPE TECHNICIAN:  We're

17             going back on the video record.

18             The time is 1:01 p.m.

19             THE COURT:  You may proceed,

20             Counsel.

21   BY MR. MEUNIER:

22        Q.    Mr. Che, I'm showing you an

23   e-mail dated January 5, 2006, addressed

24   to you from Jing Zhang, Bates numbered TG

Confidential - Subject to Further Confidentiality Review

```
 1    886, which I will mark as Che Number 14.

 2                      -   -   -

 3                    (Deposition Exhibit No.

 4            Che-14, E-mail dated 1/5/2006,

 5            Bates stamped TG 0000886, was

 6            marked for identification.)

 7                      -   -   -

 8    BY MR. MEUNIER:

 9            Q.    In this e-mail, Mr. Zhang

10    asked you for price information on

11    certain sizes of gypsum board, and in

12    paragraph 8, said the following to you,

13    "I need better price of it..because we

14    are consider increase to 20 contains per

15    month.  Because yesterday, you told me

16    price is too" high, "after shipping

17    everything it will be about 9 dollars per

18    piece is too high for cost to doing this

19    business.  i Need better price, And we

20    are looking for long  term relationship

21    with you.  So, we would like to have"

22    competitive "price to compete local

23    manufactory in this blooming

24    opportunities.  After Hurricane Katrina,
```

Confidential - Subject to Further Confidentiality Review

1    the Great New Orleans area need rebuild,

2    and housing market in USA is very hot in

3    these days.  The both effects, we hope

4    you and us can both take advantage from

5    it.  So, please give us your best price,

6    you can offer."

7              How did you know Mr. Zhang?

8         A.    I don't recall.

9         Q.    He ends this e-mail by

10   saying, "Thanks a lot buddy."

11             Was he a friend of yours?

12        A.    That's what he said.  I

13   think it is only out of politeness from

14   him to me.

15        Q.    Was he a friend of yours?

16        A.    I think it is only an

17   inquiry of price.  He was only a -- my

18   understanding to that is, first of all,

19   it is out of his politeness to me.  And

20   number two, I think he is a potential

21   buyer.

22        Q.    And in fact, you responded

23   to his e-mail, giving him the information

24   he wanted and even giving him shipping

Confidential - Subject to Further Confidentiality Review

```
 1    costs from China to Louisiana, didn't
 2    you?
 3              A.    Can I take a look at the
 4    e-mails?
 5              Q.    Yes.
 6                    I'm going to show you a
 7    document now that's Bates numbered TG 907
 8    and 908.  I will mark it as Che Exhibit
 9    Number 15.
10                         -   -   -
11                    (Deposition Exhibit No.
12              Che-15, E-mail chain, top one
13              dated 1/10/2006, Bates stamped TG
14              0000907 and TG 0000908, was marked
15              for identification.)
16                         -   -   -
17    BY MR. MEUNIER:
18              Q.    The first e-mail I refer you
19    to is one on TG 908, the second page.
20    And it is an e-mail to you from Mike
21    Westbrook on January 10, 2006.  Mr.
22    Westbrook tells you in the e-mail, "Mr.
23    Jing Zhang has been trying to get a
24    written quotation from you on 4 sizes of
```

Confidential - Subject to Further Confidentiality Review

1    Sheetrock."

2              And then your e-mail of

3    reply is January 10, 2006, which starts

4    on TG 907.  You address this e-mail,

5    "Dear Mr. Mike and Mr. Zhang."

6              So you were responding to

7    both Mike Westbrook and Jing Zhang with

8    this e-mail.  Correct?

9         A.    Can you provide me with

10   another e-mail which states what company

11   that this person belong to?  I can't

12   recall this person.

13        Q.    Look at the e-mail just

14   above yours, which is from Mike Westbrook

15   to you of January 10, 2006.  And he signs

16   it "Mike Westbrook, Advanced Products

17   International."

18             And Advanced Products is one

19   of the companies that you are here to

20   testify about on behalf of TG and TTP.

21   Correct?

22        A.    Yes.

23        Q.    And in your January 10, 2006

24   e-mail to Mike Westbrook which you

Confidential - Subject to Further Confidentiality Review

```
 1    addressed to both Mr. Mike and Mr. Zhang,

 2    you provided the price and shipping cost

 3    information that was requested in Mr.

 4    Zhang's e-mail to you of January 5, 2006.

 5    Correct?

 6         A.    I quoted to him FOB price

 7    according to the principle of our

 8    company.  And again, I inquired the

 9    shipping cost according to the request of

10    the customer.

11         Q.    Yes.  Mr. Zhang did not

12    specifically ask you for shipping cost to

13    Louisiana, but he told you about the

14    great need to rebuild in New Orleans

15    because of the Hurricane Katrina.

16    Correct?

17         A.    First of all, I'd like to

18    confirm, the company ADP and the final

19    customer whom we handled in the end, who

20    and who are the same customer.  I'm a

21    little confused here.

22         Q.    Let's take it a step at a

23    time.

24              In your e-mail of January
```

Confidential - Subject to Further Confidentiality Review

1    10, 2006 --

2           A.    But you have to remind me.

3    Then I can refresh my memory.

4           Q.    It's Advanced Products, Mr.

5    Che.

6           A.    I don't remember this

7    company.  This should not be the end user

8    for exporting.

9                 MR. SPANO:  I object to an

10                assertion of fact.  That's not a

11                question.

12   BY MR. MEUNIER:

13          Q.    We'll look at some documents

14   in a moment.  Let me just, before I move

15   on, ask this question.

16                In your e-mail of January

17   10, 2006 to Mr. Mike and Mr. Zhang, you

18   provided ocean freight cost for drywall

19   to be shipped from Qingdao to Louisiana.

20   Is that true?

21          A.    The reason why I ask you for

22   the name of the handling company was

23   because I will need that name in order to

24   answer your question accurately.  But if

Confidential - Subject to Further Confidentiality Review

1    you're not telling me who that handling

2    company is, it's hard for me to remember.

3         Q.    Let's --

4         A.    What is the name of the

5    company that eventually appeared on the

6    manufacturer's list?

7         Q.    Let's do it this way.

8              Look at the top of the page

9    which is the Bates stamp 908, paragraph

10   number 3 of your e-mail of January 10,

11   2006 addressed to Mr. Mike and Mr. Zhang.

12             Does your e-mail read as

13   follows:  "Ocean freight is USd

14   1850/40fcl from Qingdao to LA"?  Does it

15   read that way?

16        A.    I can't explain to you

17   because I don't remember the name of that

18   company.

19        Q.    In the --

20        A.    Is it a problem for you to

21   provide me with the name of the handling

22   company?

23        Q.    Mr. Che, in the summer of

24   2006, is it true that TTP sold over

Confidential - Subject to Further Confidentiality Review

```
 1    11,000 pieces of drywall to APIC Building

 2    Materials, which was shipped to New

 3    Orleans, Louisiana?

 4              MR. SPANO:  Objection,

 5         compound.

 6              MR. MEUNIER:  I show you

 7         documents that have been --

 8              I'm sorry, Judge.

 9              THE COURT:  Go ahead.  Show

10         him the document first.

11    BY MR. MEUNIER:

12         Q.    I show you documents that

13    were previously marked as Peng Shiliang

14    Numbers 4, 5, 6 and 7.

15              Do you recognize those as

16    the invoice and packing list forms of

17    TTP?

18         A.    You should have provided

19    this to me earlier.  Then I would have

20    remembered.  The final handling company

21    in the end should be Triax.  The handler

22    should be Ms. Wei, who we mentioned in

23    morning.  He -- she was the one who

24    handled this transaction throughout.
```

Confidential - Subject to Further Confidentiality Review

```
 1                THE INTERPRETER:

 2           Interpreter clarify gender.

 3   BY MR. MEUNIER:

 4           Q.    On the July 3 --  I'm sorry.

 5                THE INTERPRETER:  I haven't

 6           interpreted it yet.

 7                MR. MEUNIER:  I'm sorry.

 8                THE WITNESS:  On the e-mail

 9           he did not ask me the price for

10           shipping and I did not provide the

11           price for shipping.  Then it

12           should -- must be Ms. Wei who

13           asked me the question.  Because

14           without request from the customer,

15           I would not have quoted the ocean

16           shipping cost.  This is only to

17           help out the customer.  Our

18           operation is only FOB Qingdao, the

19           Chinese port delivery.

20   BY MR. MEUNIER:

21           Q.    But you provided shipping

22   costs to Louisiana after being told by

23   Mr. Zhang that Hurricane Katrina had

24   created a great need to rebuild in the
```

Confidential - Subject to Further Confidentiality Review

1    New Orleans area?

2         A.    As of what the customer has

3    said is the customer's problem.  It must

4    be that somebody asked for the price,

5    because I didn't know what was the

6    destination port.  I'm sure it was

7    someone who asked for the quotation.

8         Q.    Mr. Che, the invoice and

9    packing list which is marked Peng

10   Shiliang-4 and -5, I believe?

11        A.    Thank you.

12        Q.    You're welcome.

13              Those two documents show

14   that 5,676 pieces of drywall were shipped

15   to New Orleans, Louisiana.  Correct?

16        A.    Isn't it FOB Chinese port

17   delivery?

18        Q.    Do you see the reference to

19   New Orleans, Louisiana under the date

20   July 3, 2006 on both of these TTP

21   documents?

22        A.    If you look at the source of

23   these documents, you should have known

24   that it was Ms. Wei who asked us to put a

Confidential - Subject to Further Confidentiality Review

1    seal on it.  We did not produce this

2    document.

3         Q.    These are forms with your

4    company's name at the top, TTP.  Correct?

5         A.    It was Ms. Wei, the middle

6    person in trading, that had made the form

7    and requested us to stamp on it so that

8    she could get the price difference in the

9    middle.  It was Ms. Wei who made all of

10   these.

11        Q.    Are these part of the

12   business records of Taian Taishan

13   Plasterboard Company, Limited?

14        A.    I can't remember clearly

15   what this is all about.  I don't know if

16   you have any document with our stamps on

17   it.  If that's all the documents you

18   have, you can't really prove it.  Because

19   I could write your name on it, too.

20        Q.    Sir, it's up to the judge

21   about what is proven, not you.

22             Do you understand?

23             THE COURT:  Let's just ask

24             questions, please.