Confidential - Subject to Further Confidentiality Review

1          A.      This is done according to

2    the requirement of Madam Chen Bilai.

3          Q.      In paragraph 6 on page 2,

4    any disputes about the contract are to be

5    submitted to the foreign trade

6    arbitration commission of the China

7    council for promotion international

8    trade; is that correct?

9          A.      If that what it says, that's

10   what it says.

11         Q.      Are you familiar with the

12   foreign trade arbitration commission of

13   the china council for promotion of

14   international trade?

15         A.      I'm not familiar.

16         Q.      I show you a document which

17   is Bates numbered TG 21696.  And I'm

18   sorry, I will mark that as Che Number 21.

19                  -   -   -

20              (Deposition Exhibit No.

21         Che-21, Contract dated 23rd

22         November 2006, Bates stamped TG

23         0021696, was marked for

24         identification.)

Confidential - Subject to Further Confidentiality Review

```
 1                      -  -  -

 2   BY MR. MEUNIER:

 3          Q.     And this is a contract of

 4   November 23, 2006 between TTP as seller

 5   and B America Corporation as buyer which

 6   cancels the contract of September 2, 2006

 7   that we just looked at; is that correct?

 8          A.     That's what appears to be in

 9   this document.  But after we have

10   delivered our products to B America,

11   there was still $1,000 left, and B

12   America requested us to return the $1,000

13   to them.  In order to do that according

14   to the regulations of the foreign

15   currency institution of China, we have to

16   do this in order to return $1,000 back to

17   them.

18          Q.     The reason that TTP and B

19   America canceled their contract of

20   September 2, 2006 was because of a drop

21   in the price in the American market.

22   Correct?

23          A.     I don't recall that was the

24   reason.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    I will read the last
 2   sentence of the document in front of you,
 3   which is a contract of November 23, 2006,
 4   Bates numbered 21696 and marked as
 5   Che-21.  "The reason is" -- "the reason,"
 6   meaning the reason for cancellation, "is
 7   that both parties can not bear the
 8   dropped price in the American market."
 9              Do you agree that's what the
10   contract says?
11          A.    That's what it says on the
12   contract.  But the reality was it was
13   only for the purpose of providing an
14   appendix to Chinese foreign currency
15   management institution.
16          Q.    That statement in this
17   contract bears the seal of TTP; is that
18   correct?
19          A.    Correct.
20          Q.    Who placed that seal on this
21   contract?
22          A.    I don't recall.
23          Q.    I show you e-mails -- an
24   e-mail exchange from November of 2006 on
```

Confidential - Subject to Further Confidentiality Review

1    documents which are Bates numbered 21702

2    and 21698.  And I will mark this as Che

3    Exhibit 22.

4                    -   -   -

5              (Deposition Exhibit No.

6          Che-22, E-mail chain, top one

7          dated November 24, 2006, Bates

8          stamped TG 0021702 and TG 0021698,

9          was marked for identification.)

10                   -   -   -

11   BY MR. MEUNIER:

12         Q.    First, will you please read

13   for the record your e-mail to Rafael

14   Sardi of November 23, 2006 at the bottom

15   of TG 21698, subject of the e-mail being

16   "Contract."

17         A.    Should I read it for you

18   right now?

19         Q.    Yes.

20         A.    Manager Chen, hello.  I'm

21   sending you two copies of the contract.

22   One is for the Foreign Exchange

23   Administration and -- correction.  The

24   Foreign Exchange Administration would

Confidential - Subject to Further Confidentiality Review

1    need one contract and one contract

2    termination of contract in order to

3    release the payment.  Please ask the

4    customer to review, stamp and send to us.

5    I wish you business success.  Che Gang.

6              Q.    Were you forwarding with

7    this e-mail the contract that we have

8    been looking at that was entered into in

9    November of 2006 cancelling the September

10   2006 contract?

11             A.    Can you repeat?

12             Q.    Which contract were you

13   forwarding with your November 23, 2006

14   e-mail?

15             A.    I don't see attachment here.

16             Q.    What contract were you

17   referring to in your e-mail that you just

18   read to us?

19             A.    I could speculate -- from

20   the e-mail I can make that speculation,

21   but I'm not sure, because there is no

22   attachment appears on the e-mail.

23             Q.    Now, you've indicated that

24   there was a refund of money requested by

Confidential - Subject to Further Confidentiality Review

```
 1    B America as a customer of TTP.  Is that
 2    true?
 3          A.    Yes.
 4          Q.    And as your company did in
 5    the case of Oriental Trading, rather than
 6    send cash money as a refund to the
 7    customer, you offered to export
 8    additional product to the customer in
 9    America.  Is that true?
10          A.    No.  The money is not much
11    at all.  It was impossible for us to send
12    additional products.
13          Q.    I want to show you a
14    document which is Bates numbered TG 485.
15    It's an e-mail exchange of February --
16    I'm sorry, December 2006 and February
17    2007.
18                    -  -  -
19              (Deposition Exhibit No.
20          Che-23, E-mail chain, top one
21          dated 2/16/2007, Bates stamped TG
22          0000485, was marked for
23          identification.)
24                    -  -  -
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. MEUNIER:

 2            Q.    Please first refer to the

 3    bottom e-mail on that page, from Rafael

 4    Sardi to you dated December 5, 2006 in

 5    which he says, "Dear Sir Please respond

 6    if you have processed the refund."

 7                  Do you see that e-mail?

 8            A.    Yes, I see it.

 9            Q.    And it was copied to Enlly

10    Castro, spelled E-N-L-L-Y C-A-S-T-R-O,

11    and Chen Bilai, C-H-E-N, B-I-L-A-I.

12                  Who are those individuals?

13            A.    Chen Bilai is a person that

14    I just mentioned to you.  I don't know

15    who the other person is.  I'm sorry,

16    correction, I don't remember who that

17    person is.

18            Q.    Look at the e-mail above

19    that from Chen Bilai to Rafael Sardi

20    dated February 15, 2007.

21                  Is Chen Bilai a man or a

22    woman?

23            A.    Woman.

24            Q.    Ms. Chen tells Mr. Sardi the
```

Confidential - Subject to Further Confidentiality Review

```
 1    following:  "Mr. Che told me they had got

 2    permission from the Local Foreign

 3    Currency Bureau to refund the US dollar

 4    to you."  She then says, "But the person

 5    who operates the issue told them the

 6    information of USD from you no longer in

 7    their computer as it's over three months.

 8    So it has problem to refund it to you.  I

 9    suggest when they have order from

10    American company, they may ask that

11    American customer to decrease the said

12    sum from the total payment and wire it to

13    your account.  They agreed to do so when

14    they have order."

15               So Mr. Che, is it true that

16    instead of refunding the cash to B

17    America, your company was proposing to

18    give a factory credit to an American

19    customer on a future order?

20          A.    No.

21          Q.    What then was being offered

22    instead of a cash refund?

23          A.    I believe the e-mail was

24    sent from Madam Chen Bilai to this
```

Confidential - Subject to Further Confidentiality Review

1    person.  She introduced a possibility of

2    refund.  I don't remember the exact

3    discussion of this issue.

4              Q.    Please look at Mr. Sardi's

5    e-mail to Chen Bilai which is above the

6    one we read.  It's dated February 16,

7    2007.

8                   In that e-mail, Mr. Sardi

9    asks the factory to give the very best

10   FOB price for certain sizes of gypsum

11   board and concludes by saying, "This so

12   we can consume our credit we have at the

13   factory."

14                  Was a factory credit given

15   to Mr. Sardi's company as requested?

16             A.    No.

17             Q.    How was the 100 or how was

18   the cash refund resolved?

19             A.    Because the remaining refund

20   balance is too small, we had discussed

21   with the foreign currency administration

22   in several occasions.  I do not know

23   eventually how did Madam Chen Bilai

24   handled this matter.

Confidential - Subject to Further Confidentiality Review

1          Q.     But after these events

2     involving the cancellation of that

3     contract, you continued to do business

4     with B America, shipping product to the

5     United States.   Is that true?

6          A.     No.

7          Q.     I show you a document which

8     is Bates numbered TG 514, which I'll mark

9     as Che Exhibit 24.

10                    -   -   -

11               (Deposition Exhibit No.

12          Che-24, E-mail chain, top one

13          dated 4/10/2007, Bates stamped TG

14          0000514, was marked for

15          identification.)

16                    -   -   -

17    BY MR. MEUNIER:

18          Q.     Please look at these

19    e-mails, Mr. Che.

20          A.     I see it.

21          Q.     I will refer you to the

22    e-mail in the middle dated April 10, 2007

23    from Rafael Sardi in Miami, Florida to

24    you.

Confidential - Subject to Further Confidentiality Review

```
 1                    "Hello Bill," he says.

 2          A.     Where is it?

 3          Q.     It's the April 7 -- I'm

 4   sorry, April 10, 2007, Rafael Sardi to

 5   Bill Cher.  April 10, 2007.  Right here.

 6   It's in the middle, near the hole.

 7                    Do you see it?

 8          A.     This one?

 9          Q.     "Hello Bill," do you see it?

10          A.     Yes, I see it.

11          Q.     "Hello Bill, We confirm

12   final destination is Port of Miami.  We

13   confirm that our custom broker to clear

14   the goods is Delmar Logistics (GA) Inc.

15   Please confirm as soon as you ship."

16                    Do you see your reply e-mail

17   of April 10, 2007 just above the one I

18   just read?

19          A.     Hmm.

20          Q.     Is that a yes?

21          A.     I see it.  I see it.

22          Q.     Did you tell Mr. Sardi in

23   your e-mail, "We will arrange the

24   shipping to Miami Port at an early time"?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.     The handling of this issue
 2   was that Madam Chen Bilai requested us to
 3   confirm with the foreign handler
 4   regarding the final destination of the
 5   shipment.  When we say arrange shipment,
 6   we meant to arrange to pack the products
 7   in the container and ship it to Chinese
 8   ports and deliver it to the shipping
 9   agent, which Chen Bilai, Madam Chen Bilai
10   had arranged.
11          Q.     You were still doing
12   business with B America and shipping
13   product to the United States in business
14   with that company a year later, in April
15   of 2008, weren't you?
16               MR. SPANO:  Objection to
17          form.
18               THE COURT:  What's the issue
19          with form?
20               MR. SPANO:  He just
21          testified they didn't ship to the
22          United States.
23               THE COURT:  He said doing
24          business.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. SPANO:  He said -- I

 2        believe the question included

 3        shipping transfer.

 4              MR. MEUNIER:  I'll rephrase,

 5        Judge.

 6              THE COURT:  Rephrase the

 7        question.

 8   BY MR. MEUNIER:

 9        Q.    A year after that e-mail to

10   Mr. Sardi that we just talked about, your

11   company was still doing business with B

12   America Corporation.  True?

13        A.    In my memory, we have had

14   communication for a long period of time

15   with B America.  It's probably because of

16   the issue of $1,000.  But the actual

17   transacted product should be only one.

18        Q.    I'm showing you a document

19   which is Bates number TG 843.  It's an

20   exchange of e-mails from April 2008.  I'm

21   marking it as Che Exhibit Number 25.

22                  -   -   -

23              (Deposition Exhibit No.

24        Che-25, E-mail chain, top one
```

Confidential - Subject to Further Confidentiality Review

```
1            dated 4/21/2008, Bates stamped TG

2            0000843, was marked for

3            identification.)

4                   -   -   -

5  BY MR. MEUNIER:

6            Q.    And the e-mail at the bottom

7  of this document, Ms. Maria Muci,

8  M-U-C-I, asked you for FOB prices for

9  Sheetrock.  Is that true?

10           A.    Correct.

11           Q.    And in your e-mail reply of

12 April 15, 2008, you provided her with

13 drywall prices as well as FOB shipping

14 costs.  True?

15           A.    FOB shipping cost.

16           Q.    Don't you set forth the

17 information in your e-mail about shipping

18 costs?

19           A.    Where is it?

20           Q.    Do you see FOB in your

21 e-mail mentioned twice, Mr. Che?

22           A.    Is FOB price, not FOB

23 shipping cost.

24           Q.    And in your e-mail to her,
```

Confidential - Subject to Further Confidentiality Review

```
 1   you say you hope to "establish business
 2   as soon as possible."  True?
 3          A.    This is a formality in doing
 4   business.  I always use such formality
 5   expression in my e-mails.
 6          Q.    In the top e-mail on this
 7   document dated April 21, 2008 from Maria
 8   Muci, B America Corporation, in Doral,
 9   D-O-R-A-L, Florida, she thanked you for
10   your reply and asked you to send a small
11   sample of Sheetrock.
12               Do you see that?
13          A.    That is a request of the
14   customer.
15          Q.    Was it still the practice of
16   your company in April of 2008 to send
17   samples through the mail to locations in
18   the United States if the customer paid
19   for the postage?
20          A.    In this period of time, I
21   had already moved back to work in TG.
22   For the handling of samples sent to the
23   customers, it was that customer would
24   tell us the specification and models that
```

Confidential - Subject to Further Confidentiality Review

```
1    they needed.  If we happened to have such

2    samples with us, and the customer would

3    willing to pay for the postage, the

4    shipping cost, then we would provide the

5    sample in accordance with their

6    requirements.

7            Q.     In her e-mail, Ms. Muci

8    asked you to send a small sample of 1/2

9    inch and 5/8 inch and said it could also

10   be a letter-sized sample, 8-and-a-half

11   inches by 11 inches.  That would be the

12   size of this piece of paper.  Correct?

13           A.     Can you repeat that?

14           Q.     She refers to a sample size

15   that could be letter size, 8-and-a-half

16   by 11 inches.  I represent to you that

17   these pages that we look at are

18   8-and-a-half by 11 inches.

19           A.     That's the requirement of

20   the customer.

21           Q.     Yes.

22                  Who were you working for in

23   April of 2008?

24           A.     In April 2008, I worked for
```

Confidential - Subject to Further Confidentiality Review

1    TG.

2           Q.      Did you have the authority

3    of TG in April of 2008 to send Maria Muci

4    of B America Corporation in Doral,

5    Florida a sample of drywall that was

6    8-and-a-half by 11 inches, the size of

7    this piece of paper?

8           A.      I don't recall.

9           Q.      You don't recall if you had

10   that authority?

11          A.      I don't recall whether I had

12   shipped the sample to her.  We still have

13   the same principle which I mentioned

14   earlier.

15          Q.      So you had the authority of

16   your company to send a sample that size.

17   Correct?

18          A.      It's not the matter of

19   whether I have the authority of the

20   company or not, it's a matter of whether

21   I have the sample or not in my hand.

22          Q.      But if you had the sample in

23   that size and the customer asked for it

24   in that size, you would send it.  Is that

Confidential - Subject to Further Confidentiality Review

1    true?

2         A.    The precondition is that the

3    payment had to be prepaid.

4         Q.    I want to talk about OEG

5    Building Materials.

6               Is it true that you began

7    having business dealings with OEG through

8    a gentleman named Ernest Teitelbaum and

9    Joseph Weiss as early as the fall of

10   2005?

11        A.    In the beginning of 2006, we

12   did business through a Ms. Wang in China

13   who approached us, who approached our

14   company and expressed their willingness

15   to purchase our gypsum board, the

16   willingness to purchase our gypsum board.

17   And then through Ms. Wang, Ernest was

18   introduced to us.  At the time Ms. Wang

19   said that she was I believe the

20   representative of Ernest company.

21        Q.    In the beginning of doing

22   business with OEG, your company sold

23   gypsum board or drywall only?

24        A.    We handled gypsum board in

Confidential - Subject to Further Confidentiality Review

```
 1    the beginning with TOA company.

 2            Q.      TOA?

 3            A.      TOV.

 4            Q.      TOV.    They were an agent of

 5    OEG Building Materials?

 6            A.      No.   I remember earlier

 7    Ernest company was called TOV.   And then

 8    it changed their name to OEG.

 9            Q.      Did there come a time when

10    TTP began selling not only drywall but

11    also metal studs to OEG Building

12    Materials?

13            A.      Yes.   Yes.   At the time not

14    only we provided the customers with

15    gypsum board, but also later we purchased

16    from Golden Shield company in accordance

17    with request of the customer the metal

18    stud and then sent to OEG.

19                       -   -   -

20            (Deposition Exhibit No.

21    Che 26, Sales Contract dated 13th

22    Feb. 2007, TG 0019685 through TG

23    0019687, was marked for

24    identification.)
```

Confidential - Subject to Further Confidentiality Review

```
 1                  -  -  -
 2   BY MR. MEUNIER:
 3        Q.    I show you a document which
 4   is Bates numbered TG 19685 through 19687
 5   entitled "Sales Contract" dated February
 6   13, 2007.
 7              MR. EUGENE CHEN:  What was
 8        that, please?
 9              MR. MEUNIER:  TG 19685
10        through TG 19687.
11   BY MR. MEUNIER:
12        Q.    Is this the sales contract
13   that was entered into on February 13,
14   2007 between TTP and OEG Building
15   Material?
16        A.    I believe this should be a
17   draft of the contract.
18        Q.    Was this contract signed?
19        A.    I don't recall.
20        Q.    Did TTP enter into an
21   agreement with OEG Building Material for
22   the sale of metal studs to be produced
23   and inspected between December 2006 and
24   February 16, 2007?
```

Confidential - Subject to Further Confidentiality Review

1          A.     TTP company uses -- used to

2     sell to OEG company the metal stud.

3     However, I don't recall whether the

4     agreement was entered or not.

5          Q.     But you do recall that you

6     sent this sales contract to Joseph Weiss

7     and Ernest Teitelbaum at OEG with an

8     e-mail of February 13, 2007, the same

9     date as the contract?

10         A.     I don't recall very clearly

11    about that.

12         Q.     I show you a document which

13    is Bates numbered 19683 and 19684.  This

14    is from you to Joseph Weiss at OEG, and

15    it's dated February 13, 2007.  Correct?

16                    -   -   -

17              (Deposition Exhibit No.

18         Che-27, E-mail dated 2/13/2007 and

19         attachment, Bates stamped TG

20         0019683 and TG 0019684, was marked

21         for identification.)

22                    -   -   -

23              THE WITNESS:  Correct.

24    BY MR. MEUNIER:

Confidential - Subject to Further Confidentiality Review

1          Q.     And one of the attachments

2     with your e-mail is STUD, S-T-U-D,

3     Contract OEG 07021301, which is the same

4     number on the sales contract that we just

5     looked at; is that correct?

6          A.     The numbers are the same.

7          Q.     You also sent Mr. Weiss a

8     price list for steel.  Is that true?

9          A.     I think the numbers are the

10    same.  However, the part before the

11    number is incomplete, so I cannot

12    confirm.  This is only half.  Correction,

13    this is only part of it, so I can't

14    confirm.

15         Q.     What contract, if not this

16    one, did you send to Mr. Weiss with your

17    e-mail of February 13, 2007 making

18    reference to the exact same number on the

19    sales contract we've looked at?

20         A.     I don't recall.  I'm only

21    saying that in front of the number there

22    were some letters on this contract.

23    However, on the other contract, it did

24    not have the letters, so I cannot

Confidential - Subject to Further Confidentiality Review

```
 1    reconfirm that.

 2           Q.    Mr. Che, just before the

 3    date of this February 2007 sale contract

 4    with OEG, your company agreed to pay for

 5    an increase in the price of steel in

 6    China to lower the cost of metal studs

 7    being paid by OEG.  Is that true?

 8           A.    Can you repeat that?

 9           Q.    Just before the date of this

10    February 2007 sales contract with OEG,

11    your company agreed to pay for an

12    increase in the price of steel in China

13    to lower the cost of metal studs being

14    paid by OEG.  Is that true?

15           A.    That's the expression on the

16    e-mail, but in reality, it may not

17    necessarily be the fact.

18           Q.    I show you a document which

19    is Bates numbered TG 19701, reflecting an

20    e-mail exchange of January 27 and 28,

21    2007 between you and Joseph Weiss.

22                   -   -   -

23           (Deposition Exhibit No.

24    Che-28, E-mail chain, top one
```

Confidential - Subject to Further Confidentiality Review

 1          dated 1/28/2007, Bates stamped TG

 2          0019701, was marked for

 3          identification.)

 4                    -  -  -

 5    BY MR. MEUNIER:

 6          Q.     In his -- I'm sorry?

 7          A.     It's the e-mail that I sent

 8    to Joe.

 9          Q.     In his e-mail of January 27,

10    2007 to you, Mr. Weiss told you -- asked

11    you to provide updated prices and told

12    you the prices "have to be more

13    competitive."  Is that true?

14          A.     Where is it?

15          Q.     It's in his e-mail to you of

16    January 27, 2007?

17          A.     Yes.

18          Q.     In your e-mail reply of

19    January 28, 2007, and I refer you to the

20    second paragraph.  I'll read it as

21    follows:  "Actually the price of steel

22    belt has increased by about 6%.  We tried

23    our best to persuade the steel belt

24    factory to keep the same price for us,"

Confidential - Subject to Further Confidentiality Review

```
 1    but "we have a long time and steady

 2    demand on steel belt.  Finally the steel

 3    factory offered the price 3% higher than

 4    last delivery in the case that we pay 50%

 5    of full amount in advance in four days.

 6    In order to build up the long time

 7    business cooperation and support you to

 8    compete in USA market, we will swallow

 9    the increased cost; we will offer the

10    same price as last 16 containers."

11                Is that what you said in

12    your e-mail of January 28, 2007 to Joseph

13    Weiss of OEG?

14         A.    This is what I said in the

15    e-mail.  But my expression meant that the

16    customer could give us new orders as soon

17    as possible, because the raw materials

18    price is increasing, because our price

19    that had been handled was FOB Chinese

20    port delivery.  We didn't really care

21    about anything else.

22         Q.    But you did tell Mr. Weiss

23    that your company on January 28, 2007

24    would swallow the increased cost of steel
```