Confidential - Subject to Further Confidentiality Review

1       version of the site, the portions that

2       were in English, do you know?

3               A.      I'm not sure.

4               Q.      And Mr. Peng, I'm going to

5       ask you just a few questions about the

6       website, because you're actually

7       designated as the person to speak for the

8       company about the Taihe Group website.

9               A.      Yes.  Go ahead, please.

10              Q.      Do you feel prepared to

11      answer questions about the website?

12              A.      Under the instruction of the

13      attorney, I got to know some of the

14      information.

15              Q.      Okay.  That's fine.

16                      Do you know when -- I think

17      I might have asked you this.

18                      Do you know who would

19      provide content to the website in

20      English, who did the English language

21      stuff?

22              A.      At the time we entrusted a

23      third-party company to design and format

24      the website.

Confidential - Subject to Further Confidentiality Review

1          Q.     What's the name of that

2     company?

3          A.     As far as I know, one is --

4     one is called Taian Jinchao company.

5          Q.     Who at your company

6     interacted with this third-party vendor?

7          A.     We don't have a designated

8     person to do the work.  In many

9     circumstances, it was those newly

10    graduate, who just graduated from college

11    and came to our factory to work.  Perhaps

12    a new students -- graduated students came

13    to our company to work for about two,

14    three months, and then they change their

15    post or resigned and then they no longer

16    contact with the web designer.  And we

17    always have new colleagues to take over

18    the job, to make the job continuous,

19    continue.  That's the basic information.

20    Sometimes perhaps there was a period of

21    time that nobody actually did this job.

22         Q.     Was the website under the

23    direction of any particular department?

24    Was it under foreign trade, for example,

Confidential - Subject to Further Confidentiality Review

1    your department?

2            A.     Foreign trade department did

3    not direct the work.

4            Q.     Then what department did?

5            A.     Generally TG company has a

6    department called office, which is

7    equivalent to a department of an

8    executive office.

9            Q.     And do you know who in that

10   office or in that executive office

11   directed these college students with

12   regard to content that was put on the

13   website?

14           A.     We call this person office

15   manager.  There is no such a designated

16   person as the office manager.

17           Q.     What are some of the names

18   of the people who fulfilled this position

19   as manager with regard to the website?

20           A.     Like I said, the office

21   manager is a position in different period

22   of time.  There were different people who

23   held the position.

24           Q.     Can you identify who they

Confidential - Subject to Further Confidentiality Review

1    were from, let's say, from 2006 through

2    2008?

3          A.    I'm not sure.  At the time

4    it should be a Qin Qingwen.

5          Q.    Anyone else you can think

6    of?

7          A.    I'm not sure about the other

8    people.

9          Q.    My last question on this

10   topic, did TTP ever have its own

11   dedicated website?

12         A.    TTP had not been established

13   for long.  It does not have its own

14   designated website.

15         Q.    Mr. Peng, if you go to the

16   first page of this e-mail, I want to

17   refer you to the bottom half.  It's dated

18   August 30, 2007.  And this is from Jacky

19   Yu to you.  It says, "Thank you for your

20   info Frank.  I have sent your

21   introduction to US counterpart today."

22               Did I read that correctly?

23         A.    Yes, I see.  That's what it

24   says in the e-mail.

Confidential - Subject to Further Confidentiality Review

1          Q.    And then in your response,

2     which is the top half of the e-mail, I'm

3     sorry --

4          A.    I'd like to further explain.

5          Q.    Go ahead.

6          A.    The e-mail dated August the

7     30th, I do not see who received the

8     e-mail.

9          Q.    I agree with you, sir, but

10    it does say "Thank you for your info

11    Frank."

12               And that's you.  Right?

13          A.    Yes.  That's what it says in

14    the e-mail.  I admit that.

15          Q.    The top half of the e-mail,

16    which is your response, once again, you

17    say, "Yours faithfully, Frank, Taihe

18    Dongxin Co., Ltd."

19               You don't say TTP.  Correct,

20    sir?

21          A.    I've already responded to

22    this question earlier.  The ending of the

23    e-mail is what it is.  But it was a

24    computer set formality.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Thank you.

 2                Mr. Peng, from time to time,

 3     you personally were involved with

 4     handling shipping arrangements of your

 5     product to customers in the US.  Correct,

 6     sir?

 7          A.    We were not in charge of

 8     shipping the product to US.  Sometimes

 9     upon the request of the customers, we do

10     some necessary contacts.

11          Q.    Okay.

12                But you yourself made

13     arrangements from time to time for

14     shipping for customers.  Is that fair to

15     say or not?

16          A.    It's not fair.  It's not

17     accurate.

18          Q.    Mr. Peng, what we've marked

19     as Peng Exhibit 21.

20                      -  -  -

21                (Deposition Exhibit No.

22                Peng-21, E-mail chain, top one

23                dated August 6, 2007, Bates

24                stamped TG 0021964, TG 0021966 and
```

Confidential - Subject to Further Confidentiality Review

```
1              TG 0021991, was marked for

2              identification.)

3                     -  -  -

4     BY MR. SEEGER:

5              Q.    It's TG 0021964.  Actually,

6     I'm just going to refer to 264.

7              This is a discussion, an

8     e-mail, between you and Joe Weiss from a

9     USA company.  Correct, sir?

10             A.    Correct.

11             Q.    And you wrote this in

12    English?

13             A.    That's the e-mail that I

14    wrote to the customer.  Correct.  It was

15    written in English.

16             Q.    Here the subject is

17    "Schedule," and you're informing the US

18    customer who is in the USA.  Correct?

19    Joe Weiss is located in the USA?

20             A.    The customer came to our

21    company once, and he did say that he was

22    from the United States.

23             Q.    So you knew you were

24    speaking with the US customer in this
```

Confidential - Subject to Further Confidentiality Review

1    e-mail.  Correct, sir?  I mean, look at

2    his e-mail address.

3                MR. SPANO:  Objection to

4          form.

5                THE WITNESS:  Yes.  Like I

6          answered you earlier, this

7          customer came to our company and

8          claimed to be from America.

9    BY MR. SEEGER:

10         Q.    That's all I have on that.

11               MR. SEEGER:  Judge, I got

12         15, 20 minutes.  Can I keep going

13         or --

14               THE COURT:  Yes.

15   BY MR. SEEGER:

16         Q.    Now, what working

17   relationship, if any, did you personally

18   have with BNBM?

19         A.    We have no working

20   relationship.

21         Q.    You personally have dealt

22   with BNBM USA.  Correct, sir?

23         A.    As you mention it, there was

24   a Mr. Wei who was from Beijing.  He

Confidential - Subject to Further Confidentiality Review

1    brought a buyer to come to our company to

2    purchase our product.  But he introduced

3    that customer personally on his own

4    behalf.  At the time, he said that he had

5    a friend that needed to purchase our

6    product.  But I have no impression and no

7    recollection whatsoever of BNBM that Mr.

8    Attorney had just mentioned.  The e-mail

9    address of Mr. Wei is BNBM USA.

10          Q.    I'm sorry.  I didn't mean to

11   interrupt.

12          A.    What I'm trying to say is,

13   because Mr. Wei introduced a friend on

14   his own behalf to our company, therefore,

15   I do not know anything about the company

16   of Mr. Wei, BNBM USA as Mr. Attorney had

17   just mentioned.

18          Q.    Right.

19                But this was -- you didn't

20   have one singular dealing with BNBM USA;

21   you had several dealings with BNBM USA.

22   Correct, sir?

23          A.    Mr. Wei introduced one

24   customer at that time.

Confidential - Subject to Further Confidentiality Review

1          Q.     And you were copied on

2     e-mails between the customer and Mr. Wei.

3     Correct, sir?

4          A.     Sometimes.

5          Q.     And you made arrangements

6     for the customer to come visit your

7     factory through BNBM USA.  Correct, sir?

8          A.     I don't understand your

9     question.

10          Q.     Did you make arrangements

11     for the US customer, through BNBM USA, to

12     come visit your factory?

13          A.     It is a wrong statement.  At

14     the time it was Mr. Wei who took American

15     customer to come to our company.  It was

16     Mr. Wei who make the arrangement.

17          Q.     Well, it was Mr. Wei asking

18     you to make arrangements for the US

19     customer.  Correct, sir?

20          A.     The whole process was

21     arranged by Mr. Wei, but Mr. Wei asked me

22     to arrange lodging and transportation for

23     the customer once the customer arrived in

24     our plant.

Confidential - Subject to Further Confidentiality Review

1          Q.     And you did that.  Right?

2          A.     Correct.  I arranged the

3    local hotel in Taian, according to the

4    request of Mr. Wei.  And I arranged the

5    transportation between the customer and

6    our company.

7                I mean, the transportation

8    between the hotel where the customer

9    stayed and our plant.  I do not know

10   anything outside of Taian.  Neither had I

11   arranged anything for anywhere else out

12   of Taian.

13         Q.     I think I'm down to my last

14   exhibit.

15                    -   -   -

16                (Deposition Exhibit No.

17                Peng-22, E-mail chain, top one

18                dated 6/3/2006, Bates stamped TG

19                0001377 and TG 0001378, was marked

20                for identification.)

21                    -   -   -

22                MR. SEEGER:  Do you know

23                what this was previously marked in

24                his earlier deposition?

Confidential - Subject to Further Confidentiality Review

1                  -   -   -

2                  (A discussion off the record

3          occurred.)

4                  -   -   -

5   BY MR. SEEGER:

6          Q.    Mr. Peng, for the record,

7   I'm going to be showing you Peng

8   Exhibit 23, which is TG 22650.  I only

9   have a couple questions for that.

10             MR.  CHEN:  I'm sorry, what

11         was that?  Which one was Peng-22?

12             MR. SEEGER:  Did --

13             MR. CHEN:  Did you actually

14         mark Peng-22?

15             MR. SEEGER: I marked one and

16         I didn't use it, so I'm going to

17         change this to 22.

18             Thank you.

19             I'm going to go ahead and

20         put this in.

21             Peng-22, let me identify

22         that first.  It's TG 0001377 and

23         1378, which I'll just mark and

24         we're not going to ask you

Confidential - Subject to Further Confidentiality Review

```
 1          questions.
 2               And now I'm marking Peng-23,
 3          which is TG 0022650.
 4                    -   -   -
 5               (Deposition Exhibit No.
 6          Peng-23, E-mail dated October 9,
 7          2007, Bates stamped TG 0022650,
 8          was marked for identification.)
 9                    -   -   -
10     BY MR. SEEGER:
11          Q.    Mr. Peng, I just have a
12     couple questions about what we've just
13     marked.  I think we already know because
14     we've been here for a week who OEG
15     Building Material is.
16               That was a building material
17     supplier from Brooklyn, New York.
18     Correct?
19          A.    That's your attorney's
20     position.  That's the information your
21     attorneys received.  I'm not very sure
22     about that.
23               THE INTERPRETER:
24               Interpreter clarification.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  TOV company
 2            did purchase something -- product
 3            from our company.
 4    BY MR. SEEGER:
 5            Q.    That's fair enough.  It's
 6    the same company.  Right?
 7                    A couple questions.
 8                    Mr. Peng, this is an e-mail
 9    you wrote to Mr. Yu in English.  Correct?
10            A.    Which one?  This is not the
11    one?
12                    MR. SPANO:  23.
13                    MR. SEEGER:  Oh, here it is.
14            Frank had it.
15                    We're looking at this one.
16            I'm sorry.
17                    MR. DAVIS:  Just so our
18            record is clear, do we have an
19            Exhibit 22?
20                    MR. SEEGER:  Yes.  I just
21            marked it.
22                    THE COURT:  1377.
23                    MR. DAVIS:  Thank you.
24                    MR. SEEGER:  That was my
```

Confidential - Subject to Further Confidentiality Review

```
 1              fault.  Sorry, Len.
 2    BY MR. SEEGER:
 3              Q.    So my question to you is --
 4    I forgot my question.
 5                    Anyway, the subject line on
 6    this e-mail is "metal stud customer."
 7    Correct, sir?
 8              A.    Yes.  That's what it said on
 9    the subject line.
10              Q.    And at this time frame,
11    you're a TTP employee.  Correct?  That's
12    your testimony?
13              A.    That's right.  In that time
14    frame, I was TTP's employee.
15              Q.    You wrote this e-mail in
16    English.  Correct, sir?
17              A.    Yes.  This is the e-mail
18    that I wrote.
19              Q.    You sign off, "Frank,
20    Taishan Gypsum Co., Ltd."  Correct, sir?
21              A.    Yes.  That's a sign-off of
22    the e-mail.
23                    MR. SEEGER:  Judge, I'll
24              just save whatever I have for
```

Confidential - Subject to Further Confidentiality Review

```
 1           recross after Frank.

 2                   THE COURT:  Anybody else on

 3           the questions today?

 4                   MR. SEEGER:  Thank you, Mr.

 5           Peng.

 6                   THE WITNESS:  Thank you.

 7                   THE COURT:  You want to take

 8           a short break, Hilarie?

 9                   MS. BASS:  Yes.  Two

10           minutes.

11                   THE COURT:  Let's do a

12           ten-minute break.

13                   VIDEOTAPE TECHNICIAN:  Going

14           off the record.  The time is 9:49.

15                         -   -   -

16                   (A recess was taken from

17           9:49 a.m. to 9:59 a.m.)

18                         -   -   -

19                   VIDEOTAPE TECHNICIAN:  Back

20           on the record.  The time is 9:59.

21                         -   -   -

22                   EXAMINATION

23                         -   -   -

24      BY MS. BASS:
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Good morning.

 2          A.    Hello.

 3          Q.    I'd like you to take a look

 4   at a document previously marked in the

 5   Jia deposition as Exhibit 33.

 6                Is that your e-mail address

 7   in the "To" reference?

 8          A.    When I apply for MSN, it

 9   gave automatically an e-mail address.

10   But usually I don't use this e-mail

11   address.

12          Q.    So clempwl@hotmail.com,

13   that's not an e-mail address that you

14   utilize?

15          A.    Like I said, I applied for

16   MSN.  But this is like a byproduct that

17   was given to me, which is an e-mail

18   address.  Basically, I could say that I

19   usually don't use it at all.

20          Q.    Did you receive this e-mail

21   from Paul Brinkmann of the South Florida

22   Business Journal on or about January 27,

23   2009?

24          A.    It appears to me that this
```

Confidential - Subject to Further Confidentiality Review

```
 1    person send the e-mail to those people

 2    that are on the "to" line, sent to those

 3    e-mail addresses.  But like I explained

 4    earlier, usually I don't even check the

 5    e-mail.

 6            Q.    Did you receive a copy of

 7    this inquiry from the South Florida

 8    Business Journal asking about your

 9    knowledge about odors and other problems

10    associated with your drywall product?

11            A.    Like I said earlier, the

12    document does say that the e-mail was

13    sent to those e-mail addresses, but I

14    didn't check.  I didn't use this e-mail

15    address.

16            Q.    So that means the answer to

17    my question is no, you did not receive

18    it?

19            A.    I've never checked this

20    e-mail address.

21            Q.    Were you informed by any of

22    the other recipients of this e-mail

23    regarding this inquiry?

24            A.    Other recipients?  Can you
```

Confidential - Subject to Further Confidentiality Review

1    ask again?  I'm not clear about that.

2              Q.    Yes.

3              Do you know who else

4    received this e-mail?

5              A.    It appears to be e-mail

6    address of Manager Che and e-mail address

7    of Manager Yang Jiapo.

8              Q.    Did either of those

9    individuals inform you that there was an

10   investigative reporter from the South

11   Florida Business Journal inquiring into

12   complaints about your drywall product?

13             A.    I have not received report

14   from them.

15             Q.    Are you aware of whether

16   they received this e-mail?

17             A.    I don't know whether they

18   have seen this e-mail address or not, or

19   whether they understood the e-mail or

20   not.

21             Q.    I'd like you to take a look

22   at the document that was previously

23   marked as Exhibit 22 to this deposition.

24             THE COURT:  Do you have a

Confidential - Subject to Further Confidentiality Review

```
 1              Bates number?

 2                   MS. BASS:  Yes, I'm sorry.

 3              This is TG -- I have it as 461,

 4              but I believe the marked copy is a

 5              different Bates number.

 6                   MR. SPANO:  1377.

 7                   MS. BASS:  Thank you.  It is

 8              TG 1377.

 9   BY MS. BASS:

10         Q.    This e-mail requests that

11   gypsum board be produced by TTP with a

12   specification of a contact phone number

13   and then Tampa, Florida.

14              Do you see that as part of

15   that e-mail?

16         A.    Where is it?

17         Q.    Do you see that reference?

18         A.    Is this the one?

19         Q.    Yes.

20         A.    This is the e-mail sent from

21   Mr. Richard to Mr. Wei regarding some

22   requirements of the marks of the gypsum

23   board.

24         Q.    And did you agree to stamp
```

Confidential - Subject to Further Confidentiality Review

1    Tampa, Florida on the back of the gypsum

2    board you were going to be producing?

3         A.    That's a requirement of the

4    customer, and also it is something that I

5    could do.  We would stamp it for the

6    customer.  Of course, the precondition

7    would be it is not illegal, not against

8    any regulations.

9         Q.    Did you in fact produce

10   drywall with the stamp Tampa, Florida on

11   the back?

12        A.    Well, I don't recall, but

13   according to the common sense that I

14   have, usually we would stamp a line of

15   marks on the back of the gypsum board.

16   But I'm afraid we couldn't do it in this

17   case, because from what appears here,

18   there are quite a few lines.  Our

19   technology only allow one line to be

20   produced.

21        Q.    But you are aware that the

22   request was that you stamp your board

23   with the designation Tampa, Florida on

24   it.  Correct?

Confidential - Subject to Further Confidentiality Review

```
1          A.    I only know that the
2    customer did have the request, which is
3    to mark the gypsum board according to the
4    request.
5          Q.    Thank you.
6                I only have one last set of
7    questions, and that relates to an
8    agreement that was discussed at length
9    over the last few days between TTP and
10   Oriental Trading Company.
11               Mr. Peng Wenlong, it is
12   correct, is it not, that you did receive
13   a $100,000 deposit from Oriental Trading
14   Company?
15         A.    Oriental company did wire
16   this amount of money to TTP company.
17         Q.    And that was part of your
18   ongoing relationship to sell gypsum board
19   to Oriental Trading, was it not?
20         A.    You can't say that.  It was
21   only that there was intention of the
22   Oriental company to purchase gypsum board
23   from our company.  And they -- in turn,
24   they wired a part of the money to us.
```

Confidential - Subject to Further Confidentiality Review

```
 1      There's no difference from what our

 2      common practice is when we want to make a

 3      purchase.

 4                  MS. BASS:  Thank you.  I

 5          have nothing further.

 6                  THE WITNESS:  Thank you.

 7                      -  -  -

 8                  EXAMINATION

 9                      -  -  -

10   BY MR. HARDT:

11          Q.     Good morning, Mr. Peng.  My

12   name is Ken Hardt, and I represent

13   Venture Supply.  I met you last time in

14   April.

15          A.     Hello.

16          Q.     Do you recall that there was

17   two separate contracts with Venture

18   Supply and TG for the sale of drywall?

19          A.     Correct.  At the time, we

20   signed two contracts.

21          Q.     Right.

22                 And there was two separate

23   shipments of drywall to Venture Supply.

24   Correct?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    The two contracts are what
 2   we call two orders.
 3          Q.    Right.
 4                And there was two separate
 5   shipments of drywall to Venture Supply.
 6   Correct?
 7          A.    Yes.   Venture Supply company
 8   placed order for two shipments, but for
 9   the detailed shipment, it was the
10   arrangement of Venture Supply.
11          Q.    Okay.   There was two
12   separate ships.
13                That's all I'm asking you?
14                THE COURT:   Shipments.
15                THE WITNESS:   We shipped the
16          product in two separate times to
17          the designated port by Mr. Phillip
18          to a port called Lianyungang,
19          China.
20   BY MR. HARDT:
21          Q.    Right.
22                And in the first shipment of
23   drywall to Venture Supply, do you recall
24   being told that some of the product was
```

Confidential - Subject to Further Confidentiality Review

1    damaged during the shipment?

2         A.    I remember Mr. Phillip

3    mentioned that to me, the product was

4    damaged during unloading.

5         Q.    Right.

6               And you worked with Mr.

7    Phillip, Mr. Phillip Perry, that's who

8    we're talking about.  Right?

9         A.    It has always been Mr.

10   Phillip who contacted us.

11        Q.    But he was Venture's agent

12   over -- dealing with TG; is that right?

13        A.    The circumstance then was

14   that Mr. Phillip came to our company.

15   And he, on behalf of Venture Company, had

16   some detailed communication with our

17   company.

18        Q.    Right.

19               After you were told that

20   there was damaged product during the

21   first shipment, you worked with Mr.

22   Phillip on how to better secure or pack

23   the drywall for the second shipment.

24   Right?