# EXHIBIT B



Transcript of the Testimony of:  **Tongchun Jia**

01/10/2012

Chinese Drywall

Confidential - Subject to Further Confidentiality Review

```
 1           UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
 2

 3      _____    § MDL NO. 2047
                            §
        IN RE:              §
 4      CHINESE-            § SECTION: L
        MANUFACTURED        §
 5      DRYWALL PRODUCTS    § JUDGE FALLON
        LIABILITY           §
 6      LITIGATION          § MAGISTRATE
                            § JUDGE WILKINSON
        _____    §
 7
                    -   -   -
 8
        CROSS NOTICED IN VARIOUS OTHER ACTIONS
 9
                    -   -   -
10
                  January 10, 2012
11
                    -   -   -
12
           CONFIDENTIAL - SUBJECT TO FURTHER
13               CONFIDENTIALITY REVIEW
14                  -   -   -
15           Continued videotaped deposition of
        TONGCHUN JIA, held at the Executive
16      Centre, Level 3, Three Pacific Place, One
        Queen's Road East, Hong Kong, China,
17      commencing at 8:57 a.m., on the above
        date, before Linda L. Golkow, Certified
18      Court Reporter, Registered Diplomate
        Reporter, Certified Realtime Reporter and
19      Notary Public.
                    -   -   -
20
21
22           GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph | 917.591.5672 fax
23              deps@golkow.com
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    BEFORE:
             HONORABLE ELDON E. FALLON
 2           UNITED STATES FEDERAL COURT -
             EASTERN DISTRICT OF LOUISIANA
 3
 4    APPEARANCES:
 5
 6        SEEGER WEISS LLP
          BY:  CHRISTOPHER A. SEEGER, ESQUIRE
 7        BY:  SCOTT A. GEORGE, ESQUIRE
          One William Street
 8        New York, New York 10004
          (212) 584-0700
 9        cseeger@seegerweiss.com
          Sgeorge@seegerweiss.com
10        Representing the Plaintiffs'
          Steering Committee
11
12        HERMAN HERMAN KATZ & COTLAR, LLP
          BY:  LEONARD A. DAVIS, ESQUIRE
13        820 O'Keefe Avenue
          New Orleans, Louisiana 70113
14        (504) 581-4892
          Ldavis@hhkc.com
15        Representing the Plaintiffs'
          Steering Committee
16
17        COLSON HICKS EIDSON
          BY:  ERVIN GONZALEZ, ESQUIRE
18        BY:  PATRICK S. MONTOYA, ESQUIRE
          255 Alhambra Circle
19        Penthouse
          Coral Gables, Florida 33134
20        (305) 476-7400
          Ervin@colson.com
21        Patrick@colson.com
          Representing Plaintiffs' Steering
22        Committee in the Federal and State
          Coordinated Actions
23
24    APPEARANCES (CONTINUED):
```

```
 1

          LEVIN, FISHBEIN, SEDRAN & BERMAN
 2        BY:  ARNOLD LEVIN, ESQUIRE
          510 Walnut Street
 3        Suite 500
          Philadelphia, Pennsylvania 19106
 4        (215) 592-1500
          Alevin@lfsblaw.com
 5        Representing the Plaintiffs'
          Steering Committee
 6
 7
          GAINSBURGH, BENJAMIN, DAVID, MEUNIER
 8        & WARSHAUER, L.L.C.
          BY:  GERALD E. MEUNIER, ESQUIRE
 9        2800 Energy Centre
          1100 Poydras Street
10        New Orleans, Louisiana 70163
          (504) 522-2304
11        gmeunier@gainsben.com
          Representing the Plaintiffs'
12        Steering Committee
13
14        HOGAN LOVELLS US LLP
          BY:  JOE CYR, ESQUIRE
15        BY:  FRANK T. SPANO, ESQUIRE
          875 Third Avenue
16        New York, New York 10022
          (212) 918-3000
17        joe.cyr@hoganlovells.com
          frank.spano@hoganlovells.com
18        Representing Taishan Gypsum Co.
          Ltd. and Taian Taishan
19        Plasterboard Company Ltd. and the
          Witness, Tongchun Jia
20
21
22
23
24   APPEARANCES (CONTINUED):
```

Confidential - Subject to Further Confidentiality Review

```
 1
         HOGAN LOVELLS
 2       BY:  ALLAN LEUNG, ESQUIRE
         11th Floor, One Pacific Place
 3       88 Queensway
         Hong Kong
 4       (852) 2219 0888
         allan.leung@hoganlovells.com
 5       Representing Taishan Gypsum Co.
         Ltd. and Taian Taishan
 6       Plasterboard Company Ltd. and the
         Witness, Tongchun Jia
 7
 8       HOGAN LOVELLS INTERNATIONAL LLP
         BY:  EUGENE CHEN, ESQUIRE
 9       BY:  JIENI JI, ESQUIRE
         18th Floor, Park Place
10       1601 Nanjing Road West
         Shanghai, China 200040
11       (86 21) 6122 3800
         eugene.chen@hoganlovells.com
12       Representing Taishan Gypsum Co.
         Ltd. and Taian Taishan
13       Plasterboard Company Ltd. and the
         Witness, Tongchun Jia
14
15       GREENBERG TRAURIG, LLP
         BY:  HILARIE BASS, ESQUIRE
16       1221 Brickell Avenue
         Miami, Florida 33131
17       (305) 579-0745
         bassh@gtlaw.com
18       Representing the Home Builders
         Steering Committee
19
20       PERKINS COIE LLP
         BY:  DAVID L. BLACK, ESQUIRE
21       1899 Wynkoop Street - Suite 700
         Denver, Colorado 80202
22       (303) 291-2300
         DBlack@perkinscoie.com
23       Representing the State of Louisiana
24  APPEARANCES (CONTINUED):
```

```
 1
         BRENNER, EVANS & MILLMAN, P.C.
 2       BY:  THEODORE I. BRENNER, ESQUIRE
         411 East Franklin Street
 3       Suite 200
         Richmond, Virginia 23218
 4       Tbrenner@beylaw.com
         (804) 644-1300
 5       Representing Tobin Trading Company
 6
         McKENRY, DANCIGERS, DAWSON &
 7       LAKE, P.C.
         BY:  J. BRIAN SLAUGHTER, ESQUIRE
 8       192 Ballard Court
         Suite 400
 9       Virginia Beach, Virginia 23462
         (757) 461-2500
10       Jbslaughter@va-law.org
         Representing Atlantic Homes LLC and
11       Multiple Other Virginia-Based
         Defendants
12
13       QUINN EMANUEL URQUHART & SULLIVAN,LLP
         BY:  JANE M. BYRNE, ESQUIRE
14       BY:  JULIA BESKIN, ESQUIRE
         51 Madison Avenue, 22nd Floor
15       New York, New York 10010
         (212) 849-7000
16       Janeburne@quinnemanuel.com
         Juliabeskin@Quinnemanuel.Com
17       Representing Chartis Select Insurance
         Company and Related Chartis Insurers
18
19       WEINBERG, WHEELER, HUDGINS, GUNN &
         DIAL, LLC
20       BY:  MICHAEL SEXTON, ESQUIRE
         3344 Peachtree Road, NE
21       Suite 2400
         Atlanta, Georgia 30326
22       (404) 876-2700
         msexton@wwhgd.com
23       Representing Various Banner
         Defendants
24
```

Confidential - Subject to Further Confidentiality Review

```
 1
 2        SINNOTT, NUCKOLS & LOGAN, PC
          BY:  KENNETH F. HARDT, ESQUIRE
 3        13811 Village Mill Drive
          Midlothian, Virginia 23114
 4        (804) 378-7600
          khardt@snllaw.com
 5        Representing Venture Supply, Inc. and
          Porter-Blaine Corp.
 6
 7

    ALSO PRESENT:
 8
          SUNNY WANG, INTERPRETER
 9
10
11                        -   -   -
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES VIA TELEPHONE:
 2
 3       GALLOWAY JOHNSON TOMPKINS BURR and SMITH
         BY:  CARLINA C. EISELEN, ESQUIRE
 4       One Shell Square
         701 Poydras Street, 40th Floor
 5       New Orleans, Louisiana 70139
         (504) 525-6802
 6       ceiselen@gjtbs.com
         Representing Interior/Exterior
 7       Building Supply
 8
         HUNTON & WILLIAMS LLP
 9       BY:  A. TODD BROWN, ESQUIRE
         Bank of America Plaza
10       101 South Tryon Street - Suite 3500
         Charlotte, North Carolina  28280
11       (704) 378-4700
         Tbrown@hunton.com
12       Representing Stock Building Supply, LLC
13
14       JONES, WALKER, WAECHTER, POITEVENT,
         CARRERE & DENEGRE LLP
15       BY:  MEGAN E. DONOHUE, ESQUIRE
         600 Jefferson Street, Suite 1600
16       Lafayette, Louisiana 70501
         (337) 262-9062
17       mdonohue@joneswalker.com
         Representing Fireman's Fund Insurance
18       Company
19
         DUPLASS ZWAIN BOURGEOIS PFISTER &
20       WEINSTOCK
         BY:  PHILIP WATSON, ESQUIRE
21       3838 N. Causeway Boulevard
         Suite 2900
22       Metairie, Louisiana 70002
         (504) 832-3700
23       pwatson@duplass.com
         Representing R&H Masonry, Inc., and
24       Swedberg Enterprises, Inc.
```

```
 1    APPEARANCES VIA TELEPHONE (CONTINUED):
 2
      FULMER LEROY ALBEE BAUMANN
 3    BY:  CANDACE MOSS, ESQUIRE
      BY:  MICHAEL P. McCAHILL, ESQUIRE
 4    2866 East Oakland Park Boulevard
      Ft. Lauderdale, Florida 33306
 5    (954) 707-4430
      mosscandace@fulmerleroy.com
 6    mmccahill@fulmerleroy.com
      Representing Independent Builders
 7    Supply Association (IBSA)
 8
      WEINBERG, WHEELER, HUDGINS, GUNN &
 9    DIAL, LLC
      BY:  P. SHANE O'NEILL, ESQUIRE
10    3344 Peachtree Road, NE
      Suite 2400
11    Atlanta, Georgia 30326
      (404) 876-2700
12    soneill@wwhgd.com
      Representing Various Banner
13    Defendants
14
      WRIGHT, FULFORD, MOORHEAD & BROWN,
15    P.A.
      BY:  DORYK B. GRAF, JR., ESQUIRE
16    145 N. Magnolia Ave.
      Orlando, Florida 32801
17    (407) 425-0234
      dgraf@wfmblaw.com
18    Representing West Construction, Inc.
19
20    QUINN EMANUEL URQUHART & SULLIVAN, LLP
      BY: CLINTON DOCKERY, ESQIURE
21    51 Madison Avenue, 22nd Floor
      New York, New York 10010
22    (212) 849-7000
      clintondockery@quinnemanuel.com
23    Representing Chartis Select Insurance
      Company and Related Chartis Insurers
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA TELEPHONE (CONTINUED):
 2

      BUCHANAN INGERSOLL & ROONEY PC
 3    BY:  C. ROBERT ZAPPALA, ESQUIRE
      One Oxford Centre
 4    301 Grant Street, 20th Floor
      Pittsburgh, Pennsylvania 15219
 5    (412) 562-1041
      bobby.zappala@bipc.com
 6    Representing 84 Lumber Company, LP
 7

      MEIROSE & FRISCIA, P.A.
 8    BY: JASON A. LUBLINER, ESQUIRE
      5550 W. Executive Drive
 9    Suite 250
      Tampa, Florida 33609
10    (813) 289-8800
      groot@meirosefriscia.com
11    Representing Central Florida
      Finishers and LTL Construction, Inc.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1    APPEARANCES VIA STREAM:
 2

      BECNEL LAW FIRM, L.L.C.
 3    BY:  ROBERT BECNEL, ESQUIRE
      106 W. 7th Street
 4    Reserve, Louisiana 70084
      (985) 536-1186
 5    robbecnel@aol.com
      Representing the Plaintiffs'
 6    Steering Committee
 7

      PARKER WAICHMAN ALONSO LLP
 8    BY:  JORDAN L. CHAIKIN, ESQUIRE
      3301 Bonita Beach Road
 9    Bonita Springs, Florida 34134
      (239) 390-1000
10    Jchaikin@yourlaywer.com
      Representing Plaintiffs' Steering
11    Committee
12

      MORGAN & MORGAN
13    BY:  PETE V. ALBANIS, ESQUIRE
      12800 University Drive
14    Suite 600
      Fort Myers, Florida 33907
15    (877) 667-4265
      Representing the Plaintiffs
16
17    IRPINO LAW FIRM
      BY:  ANTHONY IRPINO, ESQUIRE
18    2216 Magazine Street
      New Orleans, Louisiana 70130
19    Airpino@irpinolaw.com
      (504) 525-1500
20    Representing the Plaintiffs
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
      GALLOWAY JOHNSON TOMPKINS BURR and SMITH
 3    BY:  CARLINA C. EISELEN, ESQUIRE
      One Shell Square
 4    701 Poydras Street, 40th Floor
      New Orleans, Louisiana 70139
 5    (504) 525-6802
      ceiselen@gjtbs.com
 6    Representing Interior/Exterior
      Building Supply
 7
      HEARD & MEDACK, P.C.
 8    BY:  JAMES DAVIS, ESQUIRE
      9494 Southwest Freeway, Suite 700
 9    Houston, Texas 77074
      (713) 772-6400
10    jdavis@heardmedackpc.com
      Representing CastleRock Communities, L.P.
11
12
      HUNTON & WILLIAMS LLP
13    BY:  A. TODD BROWN, ESQUIRE
      Bank of America Plaza
14    101 South Tryon Street
      Suite 3500
15    Charlotte, North Carolina  28280
      (704) 378-4700
16    tbrown@hunton.com
      Representing Stock Building Supply, LLC
17
18
      SHER GARNER CAHILL RICHTER KLEIN &
19    HILBERT, L.L.C.
      BY:  MATTHEW C. CLARK, ESQUIRE
20    909 Poydras Street
      Suite 2800
21    New Orleans, Louisiana 70112
      (504) 299-2100
22    mclark@shergarner.com
      Representing the Southern Home
23    Defendants
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2

 3         QUINN EMANUEL URQUHART & SULLIVAN, LLP
           BY: CLINTON DOCKERY, ESQUIRE
 4         51 Madison Avenue, 22nd Floor
           New York, New York 10010
 5         (212) 849-7000
           clintondockery@quinnemanuel.com
 6         Representing Chartis Select Insurance
           Company and Related Chartis Insurers
 7

 8         JONES, WALKER, WAECHTER, POITEVENT,
           CARRERE & DENEGRE LLP
 9         BY:  MEGAN E. DONOHUE, ESQUIRE
           600 Jefferson Street, Suite 1600
10         Lafayette, Louisiana 70501
           (337) 262-9062
11         mdonohue@joneswalker.com
           Representing Fireman's Fund Insurance
12         Company
13
           DEUTSCH, KERRIGAN & STILES
14         BY:  MELISSA M. SWABACKER, ESQUIRE
           755 Magazine St.
15         New Orleans, Louisiana  70130
           (504) 581-5141
16         mswabacker@dkslaw.com
           Representing Landmark American
17         Insurance Company
18
19
                       -   -   -
20
21
22
23
24
```

```
 1                        -   -   -
 2                    I N D E X
 3    WITNESS                          PAGE NO.
 4    TONGCHUN JIA
 5
 6      By Mr. Gonzalez                   841
 7      By Ms. Bass                       883
 8      By Mr. Brenner                    913
 9      By Mr. Black                      922
10      By Mr. Sexton                     933
11      By Mr. Cyr                        935
12
13                        -   -   -
14                  E X H I B I T S
15
      NO.            DESCRIPTION          PAGE NO.
16
17      Plaintiff's   E-mail chain, top    850
                      one dated
18      Jia-29        12/12/2005, Bates
                      stamped TG 0019840
19                    and TG 0019841
20      Plaintiff's   Translation of       851
        Jia-29A       e-mail chain, top
21                    one dated
                      12/12/2005, Bates
22                    stamped TG 0019840
                      and TG 0019841
23      Plaintiff's   Contract, Bates      852
        Jia-30        stamped TG 0019854
24                    through TG 0019857
```

Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Plaintiff's Jia-31 | E-mail chain, top one dated 7/27/2006, Bates stamped TG 0019348 through TG 0019352 | 860 |
| 5 | Plaintiff's Jia-32 | E-mail chain, top one dated 8/2/2006, Bates stamped TG 0019381 and TG 0019382 | 867 |
| 8 | Plaintiff's Jia-33 | E-mail dated 1/27/2009, Bates stamped TG 0019356 | 899 |
| 10 | Plaintiff's Jia-34 | E-mail and attachment dated August 15, 2009, Bates stamped TG 0025155 through TG 0025158 | 903 |
| 13 | Plaintiff's Jia-35 | E-mail dated 8/17/2009, Bates stamped TG 0019235 and TG 0019236 | 906 |
| 16 | Plaintiff's Jia-36 | Document partly in Chinese, "Chinese Drywall Default Ruling shows Need to Hold Foreign Manufacturers Accountable in U.S. Justice System," Bates stamped TG 0025352 through TG 0025355 | 909 |

Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -

 2            THE VIDEOTAPE TECHNICIAN:

 3     We are now on the record.  My name

 4     is Dan Lawlor.  I'm a videographer

 5     for Golkow Technologies.

 6            Today's date is January 10,

 7     2012, and the time is 8:57 a.m.

 8            This is the continuation of

 9     the deposition of Tongchun Jia.

10            Your Honor, you may proceed.

11

12                    -  -  -

13            TONGCHUN JIA, after having

14     been previously sworn, was

15     examined and testified as follows:

16                    -  -  -

17            THE COURT:  Mr. Jia, you are

18     still under oath, sir.

19            You may proceed, Counsel.

20                    -  -  -

21            EXAMINATION

22                    -  -  -

23 BY MR. GONZALEZ:

24            Q.   Good morning, Mr. Jia.
```

Confidential - Subject to Further Confidentiality Review

1          A.     Good morning.

2          Q.     Mr. Jia, were you aware that

3    Mr. Che Gang was previously an employee

4    of TG?

5          A.     Yes.

6          Q.     Before he began his

7    employment with TTP, he was an employee

8    of TG.  Is that your understanding?

9          A.     Yes.

10               THE COURT:  Try to keep your

11         voice up, please.

12               MR. GONZALEZ:  Sure.

13   BY MR. GONZALEZ:

14         Q.     Is it also your

15   understanding that Mr. Peng Wenlong was

16   also an employee of TG before he became

17   an employee of TTP?

18               THE INTERPRETER:  Peng

19         Wenlong?

20               MR. GONZALEZ:  Peng Wenlong.

21         My pronunciation is awful.  I

22         apologize.

23               THE INTERPRETER:  Can you

24         write it down for me?

```
 1                    MR. GONZALEZ:  P-E-N-G,

 2           W-E-N-L-O-N-G.

 3                    THE INTERPRETER:  He doesn't

 4           know.  If you can write it down

 5           for him, it would be great.

 6                    MR. GONZALEZ:  (Attorney

 7           complies.)

 8                    THE WITNESS:  Yes.

 9   BY MR. GONZALEZ:

10           Q.    Before he worked for TTP, he

11   was an employee of TG, correct?

12           A.    Yes.

13           Q.    And do you know how they

14   became employees of TTP?

15           A.    After the establishment of

16   TTP, they were hired by TTP.

17           Q.    Who made the decision to

18   hire them by TTP?

19           A.    The decision to hire was by

20   the board of directors.

21           Q.    Of what company?

22           A.    TTP's.

23           Q.    But here's my question.

24   They were employees of TG, and then they
```

Confidential - Subject to Further Confidentiality Review

```
 1    became employees of TTP.  How was the

 2    decision made, okay, you're not going to

 3    work any more for TG, now you're going to

 4    work for TTP?

 5         A.    They personally agreed to

 6    work for TTP, as the board of directors

 7    hired them to work for TTP, and as a big

 8    shareholder, also agreed for them to work

 9    for TTP.

10         Q.    Meaning the "big

11    shareholder" being TG?

12         A.    Yes.

13         Q.    So with the agreement of TG

14    and the agreement of TTP?

15         A.    There was no agreement.

16         Q.    Can you explain to me, you

17    said that the TG board had authorized

18    them to work for TTP.  That's my

19    understanding.  Tell me what you meant.

20         A.    TTP intended to hire these

21    gentlemen to work for TTP.

22         Q.    So they stopped working for

23    TG and began working for TTP?

24         A.    Correct.
```

Confidential - Subject to Further Confidentiality Review

```
1          Q.     Was TG okay with that?
2          A.     TG respected their personal
3    opinions.
4          Q.     The personal opinions of
5    TTP?
6          A.     No.  Their own personal
7    opinions.
8          Q.     The employees?
9          A.     Right.
10         Q.     When they began working at
11   TTP, they worked in the same address?
12         A.     No.
13         Q.     They drove to the same
14   parking lot?
15         A.     They didn't have their own
16   cars.
17         Q.     Oh.  I thought you told me
18   that Che Gang had his own car yesterday?
19         A.     I didn't mention that Che
20   Gang had his own car, but I said Yang
21   Jiapo had his own car.
22         Q.     Yang Jiapo, I apologize.
23                In 2006, the TG board agreed
24   to invest $7 million in TTP?
```

1          A.      You mean TG?

2          Q.      Yes.

3          A.      Correct.

4          Q.      That was done to relieve the

5     financial pressure on TTP at that time,

6     correct?

7          A.      Correct.

8          Q.      Can you tell us what

9     countries TG exports to, other than the

10    United States, where 5/8 inch or half

11    inch sizes are used?

12         A.      I'm not sure about the

13    details.  You may ask Peng Wenlong.  We

14    know that for this size of gypsum, we had

15    also sold a lot in China.

16         Q.      My question is, outside of

17    China, what is your recollection of the

18    countries that purchased those sizes from

19    TG, let's say from 2005 through 2008?

20         A.      I can't take a guess.  I

21    don't know the details.  I would suggest

22    you to have Mr. Peng Wenglong answer the

23    questions.

24         Q.      And I will ask him.  And the

Confidential - Subject to Further Confidentiality Review

```
 1    reason for my question is when I heard
 2    you discussing the sizes of the drywall
 3    at 5/8 inch and half inches, I heard you
 4    mention to my colleague that there were
 5    other countries that were purchasing
 6    those sizes from TG, and I'm asking you
 7    to explain that answer a little more to
 8    the best of your ability.  If you can
 9    remember, what can you remember about
10    those countries -- customers in those
11    countries that would purchase?
12          A.    I don't think you had a full
13    understanding of my statement yesterday.
14    I said the gypsum board using US ASTM
15    standard not only serve the people of
16    America but the people of the world.  As
17    far as I know, Canada and some countries
18    in South America also need these gypsum
19    boards.  I did not say yesterday that TG
20    had provided these sizes of gypsum board
21    to other countries other than America.
22    Neither did I deny that we have sold
23    these sizes of gypsum board to other
24    countries.  I'm not able to give you a
```

Confidential - Subject to Further Confidentiality Review

1    detailed answer to your question.  I

2    apologize.

3          Q.    No need to.

4                The ASTM standards, do you

5    know what those letters stand for?

6          A.    No.  I know ASTM standard is

7    a standard that was made by some standard

8    associations in America, but as of what

9    ASTM stand for, I do not know.

10         Q.    American Society for Testing

11   and Materials.  Have you ever read those

12   standards?

13               MR. CYR:  Objection.

14               THE COURT:  I'll let him

15         answer.  Overrule the objection.

16               THE WITNESS:  I'm an

17         executive started as an engineer.

18         I did ask my colleague to bring me

19         the ASTM standard, and I read it.

20         But I may not understand to a full

21         extent.

22   BY MR. GONZALEZ:

23         Q.    Who on behalf of TG would

24   make sure that the products that are

1    going to be shipped internationally would

2    meet ASTM standards?

3           A.    The standard that we use is

4    in accordance with the requirements of

5    the customers.  We would always try our

6    best.  Sometimes the requirement of the

7    customers of certain standard that we

8    could not accommodate, then we would not

9    produce.

10           Q.    My question is, who on

11    behalf of TG would be the individual or

12    individuals that would determine whether

13    the standards, for example, if an

14    American company were to request drywall

15    from TG and request that it meet the ASTM

16    standards, who on behalf of TG would be

17    the person or persons responsible for

18    determining whether the specifications

19    were met?

20           A.    We don't have such

21    representative in TG.  But we would take

22    our products to Hangzhou Institution for

23    testing.  That is the requirement of the

24    customer.  As long as the institution in

1    Hangzhou believe that we met the ASTM

2    standard, and when we send the data to

3    the client, they would agree, then the

4    deal was done.  And Taishan Gypsum

5    Company strictly followed the standard of

6    ASO 14000 in quality.  It also has its

7    own quality control department.

8            Q.    Same questions for TTP.  Was

9    it the same process that was used by TG?

10   In other words, did TTP use the same

11   process of assurance with American

12   Society for Testing Materials for product

13   that was being sent to the United States

14   as TG?

15           A.    I'm not sure whether the

16   products are for America, but we have

17   indeed produced products according to

18   these specifications and in accordance

19   with the same process.

20                    -   -   -

21           (Whereupon, Deposition

22   Exhibit Jia-29, E-mail chain, top

23   one dated 12/12/2005, Bates

24   stamped TG 0019840 and TG 0019841,

Confidential - Subject to Further Confidentiality Review

1    and Deposition Exhibit Jia-29A,

2    Translation of e-mail chain, top

3    one dated 12/12/2005, Bates

4    stamped TG 0019840 and TG 0019841,

5    was marked for identification.)

6            -  -  -

7            MR. GONZALEZ:  I'm going to

8    show you what's been marked as

9    Exhibit 29, and 29A being the

10   translation.  It is a document

11   dated December 12, 2005 from Leon

12   Liu to Yang Jiapo.  That's the top

13   e-mail address.  The Bates stamp

14   number is 19840 and 19841.

15           MS. BYRNE:  What's the

16   Exhibit Number?

17           MR. GONZALEZ:  29 and 29A.

18           MR. CYR:  The exhibit is

19   before the witness.

20           MR. GONZALEZ:  Thank you.

21   BY MR. GONZALEZ:

22        Q.   Have you seen this document

23   before?

24        A.   No.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    According to this document,
 2   samples were sent to American customers
 3   of drywall, and at some point, the
 4   decision was made not to send any more
 5   samples because too many Americans were
 6   requesting samples, and the needs could
 7   not be satisfied.  Were you aware that
 8   your company was sending samples to the
 9   United States of drywall?
10        A.    If there had been many
11   customers asked for samples from our
12   company, I do not deny that we might have
13   sent the samples to those customers.
14        Q.    Were you aware that so many
15   samples were being sent to American
16   customers that you couldn't send any more
17   to satisfy the needs of American
18   customers requesting drywall samples from
19   your company?
20        A.    I'm not aware of that.
21                    -   -   -
22             (Whereupon, Deposition
23        Exhibit Jia-30, Contract, Bates
24        stamped TG 0019854 through TG
```

Confidential - Subject to Further Confidentiality Review

```
 1          0019857, was marked for

 2          identification.)

 3               -   -   -

 4          MR. GONZALEZ:  Next one will

 5      be Exhibit 30.  It's Bates stamp

 6      number TG 19854 through TG 19857.

 7      It is a contract dated December

 8      16, 2005.  The seller is Shandong

 9      Taihe Dongxin Co., Ltd., the

10      buyer, Venture Supply, Inc., with

11      an address of Norfolk, Virginia.

12          MR. CYR:  The exhibit is

13      before the witness.

14          THE WITNESS:  I don't

15      understand.

16  BY MR. GONZALEZ:

17      Q.    Mr. Jia, I know you were a

18  high-ranking officer in your company and

19  you may not be aware of the day-to-day

20  details, but were you aware that Shandong

21  Taihe Dongxin, now known as TG, sold

22  drywall to Venture Supply for delivery in

23  Virginia, the United States of America?

24          MR. CYR:  Objection.
```

```
 1            THE COURT:  I'll overrule

 2       the objection.  He's under cross.

 3       I'll allow it.

 4            THE WITNESS:  I don't know

 5       that.  I would like to further

 6       explain.  Some of the customers

 7       came to our company and requested

 8       us to manufacture products for

 9       them.  Some of the customer might

10       say that they would send our

11       products to America or to certain

12       places in America.  However, we do

13       not know whether those products

14       had indeed be shipped to America

15       or be used in any areas in

16       America.  We have no way of

17       knowing that, and we do not know

18       that information.  America is an

19       advanced commercial country.

20       There are many business

21       transactions.  Some of the

22       customers may claim they're from

23       the United States, but in the end,

24       they ship their products to Canada
```

Confidential - Subject to Further Confidentiality Review

```
 1            or other places, which we didn't
 2            care, and we have never asked.
 3                Mr. Counsel just mentioned
 4            that I am a high-level executive
 5            in Taishan.  That's true.  I do
 6            have extensive understanding of
 7            gypsum board.  I have worked with
 8            this company for over ten years.
 9            I had contributed greatly for the
10            company started from when it was
11            rather small to where it is right
12            now.  I understand basic
13            commercial common senses.
14                INTERPRETER:  Interpreter
15            clarification.
16                THE WITNESS:  The product
17            gypsum board is a heavy product.
18            To export such a product for a
19            long period of time is an action
20            that's inimaginable.  The shipping
21            cost is very expensive.  To ship
22            our products to somewhere tens of
23            thousand kilometers away, it is
24            not very economical.  Common sense
```

```
1          tells us that it is impossible for

2          us to have long-lasting sales in

3          American market.  Under the

4          guidance of my theory, it is

5          impossible for us to have any plan

6          to occupy American market.

7               America is a country that

8          invented gypsum board and also is

9          a country who had produced gypsum

10         board as the earliest.  America

11         has great capability of

12         manufacturing gypsum boards.  And

13         the biggest gypsum board

14         manufacturer is in America. Our

15         company as a company that had only

16         established for over ten years, we

17         did not have sufficient

18         experience.  It is inimaginable

19         for us to challenge the US gypsum

20         board manufacturers.  Neither had

21         we ever had the plan of selling

22         our gypsum boards to America or to

23         establish a plant in America.

24         This is the most simple and basic
```

```
 1           fact.  I don't understand why you
 2           have such an unfair understanding
 3           of our company.
 4                  May I go to the restroom.
 5                  THE VIDEOTAPE TECHNICIAN:
 6           We're going off the record.  The
 7           time is 9:26.
 8                        -   -   -
 9                  (Whereupon, a recess was
10           taken from 9:26 a.m. until 9:30
11           a.m.)
12                        -   -   -
13                  THE VIDEOTAPE TECHNICIAN:
14           We're back on the record.  The
15           time is 9:30.
16                  THE COURT:  Before you
17           start, Mr. Jia, please listen
18           closely to the question and answer
19           the question.  Don't assume that
20           anyone is expressing any opinion
21           about your company.  They're just
22           asking questions, and please
23           answer the question.
24                  THE WITNESS:  Okay.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    THE COURT:  You may proceed,
 2        Counsel.
 3   BY MR. GONZALEZ:
 4        Q.    If you could please turn to
 5   the second page of Bates 30.
 6                    MR. CYR:  Do you mean
 7        Exhibit 30?
 8                    MR. GONZALEZ:  I'm sorry.
 9        Exhibit 30, second page.
10   BY MR. GONZALEZ:
11        Q.    There's some Chinese writing
12   underneath or around the signature.  And
13   can you tell us what the Chinese writing
14   says?
15        A.    This is one of our company
16   seals.
17        Q.    What does it say?  No, the
18   Chinese writing inside?
19        A.    Our company's name.
20        Q.    Can you read it for us in
21   Chinese?
22        A.    Taihe Dongxin Company
23   Limited.
24        Q.    And who signed it?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.     I can't see it very clearly.

 2          Q.     Do you recognize the

 3   signature?

 4          A.     I have rarely seen this

 5   signature.

 6          Q.     Can you make out the name?

 7          A.     I'm not sure for now.

 8          Q.     Who had the authority to

 9   sign contracts on behalf of the company

10   at that time?

11                 MR. CYR:  In December of

12          2005?

13                 MR. GONZALEZ:  Yes.

14                 THE WITNESS:  You mean

15          December 2005?

16   BY MR. GONZALEZ:

17          Q.     Yes.  What level of employee

18   would have the authority to sign

19   contracts?

20          A.     I can't be very sure about

21   it, but at the time, it should be a

22   person called Fu Tinghuan.

23          Q.     What position would that

24   individual have in the company?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    This person was the sales

 2     manager of TG.

 3          Q.    Did TG have an international

 4     sales department?

 5          A.    Yes.

 6          Q.    Was that in 2005?

 7          A.    2005.  I can't recall.

 8     Perhaps because it's been too long.

 9          Q.    And would that also be true

10     in 2006?

11          A.    We kept the department in

12     2006.

13          Q.    And how about 2007?

14          A.    Yes.

15          Q.    And finally in 2008?

16          A.    Yes.

17               MR. GONZALEZ:  I show you a

18               document which will be Exhibit 31

19               and 31A.  It is just 31.  Bates

20               stamp number TG 0019348 through TG

21               0019352.

22                     -  -  -

23               (Whereupon, Deposition

24               Exhibit Jia-31, E-mail chain, top
```

Confidential - Subject to Further Confidentiality Review

```
 1            one dated 7/27/2006, Bates stamped

 2            TG 0019348 through TG 0019352, was

 3            marked for identification.)

 4                    -  -  -

 5   BY MR. GONZALEZ:

 6            Q.    And the top says from

 7   Tanader Tang to Wuyu, and the date is

 8   July 27, 2006.  First page has Chinese

 9   writing on it apparently.  Mr. Jia, have

10   you seen this document before?

11            A.    No.

12            Q.    It's regarding, if you look

13   at the Chinese -- the e-mail in Chinese,

14   it's regarding the purchase and sale of

15   drywall from Taihe to be sent to Fort

16   Lauderdale, Florida, correct?

17            A.    I cannot be sure of that.

18            Q.    If you read the Chinese on

19   the first two pages, it's regarding the

20   purchase and sale of drywall from Taihe

21   to be sent to Fort Lauderdale, Florida,

22   correct?

23            A.    I don't see that.

24            Q.    Do you see the Chinese
```

Case 2:09-md-02047-EEF-MBN Document 13246-10 Filed 03/26/12 Page 39 of 100

Confidential - Subject to Further Confidentiality Review

```
 1    language where it says "Re:" and it says

 2    "Taihe drywall"?

 3           A.    I don't understand English

 4    though.

 5           Q.    No.  No.  In Chinese -- oh,

 6    I'm sorry.  Yeah, it does say Taihe.

 7    What is this language here, sir?

 8           A.    Subject.

 9           Q.    And I apologize for

10    pointing.

11                 So next to "subject,"

12    there's some English language, and you

13    can translate the word Taihe drywall?

14           A.    I don't know what is

15    drywall.

16           Q.    You don't know what is meant

17    by drywall there?

18           A.    I know what is drywall.

19           Q.    All right.  And then it

20    discusses the purchase and sale of

21    drywall and the dimensions, correct?

22    That's in Chinese?

23           A.    Not in its entirety.  These

24    are only some specifications.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    What does the first sentence
 2   say starting with the name?  And I
 3   apologize for pointing.
 4          A.    Manager Tang:  Hello, your
 5   e-mail has been received in accordance
 6   with your request.  Here is our response.
 7          Q.    And what is the response?
 8          A.    The response is that we can
 9   manufacture the gypsum board according to
10   these specifications.  It also states FOB
11   Qingdao.
12          Q.    And then it has the price in
13   US dollars, right, sir?
14          A.    Oh, yes, the price is in US
15   dollars.  But on the document, it does
16   not describe where would the product be
17   shipped to or where would the product be
18   used at.
19          Q.    And we'll get to that.
20                If you go to the second
21   page, and I'll show you here so I don't
22   have to reach over.  Can you tell us what
23   this says (indicating)?
24          A.    It says, the above
```

Confidential - Subject to Further Confidentiality Review

 1    information is for your reference.

 2           Q.    And by whom is it signed?

 3           A.    Che Gang.

 4           Q.    Che Gang?  At that time, did

 5    Che Gang work for Taihe or TG?

 6           A.    I'm not sure about the time

 7    period, but if the time was in 2005, I

 8    believe this person worked for TG.

 9           Q.    And if you'd turn to the

10    next Bates stamp number or the next page,

11    19350, this one is in English.  If the

12    translator will read under subject, it

13    says "Taihe:  Drywall."

14               And it states, if you look

15    at the grid, the dimensions, the type of

16    drywall, where it's coming from, where it

17    says Qingdao, the pieces, and the

18    estimated shipment costs, Qingdao to Port

19    Everglades in Fort Lauderdale, Florida.

20    Do you see where it says "Fort

21    Lauderdale, Florida"?

22               MR. CYR:  Objection.  He

23          doesn't read English.

24               MR. GONZALEZ:  I understand

```
 1          that.  I had the interpreter show
 2          him where it is.
 3               THE COURT:  What's the
 4          question?
 5               MR. CYR:  So, she's
 6          testifying.
 7               THE COURT:  What is the
 8          question?
 9    BY MR. GONZALEZ:
10          Q.    Were you aware that this
11    document included this shipment to Fort
12    Lauderdale, Florida?
13               MR. CYR:  Objection.
14               THE COURT:  I'll overrule
15          the objection.  If he doesn't
16          understand it, he can ask.
17               THE WITNESS:  Number one, I
18          don't understand English.  If the
19          English and the Chinese version
20          are the same in content, then I
21          will answer a question.
22    BY MR. GONZALEZ:
23          Q.    Were you aware that the
24    goods were being sent to Fort Lauderdale,
```

Confidential - Subject to Further Confidentiality Review

```
 1    Florida at that time, July of 2006?

 2            A.    I don't know.  I would like

 3    to further explain.  Taihe is not exactly

 4    TG.  Taihe is the general name of our

 5    area.  I'm not sure at the time Che Gang

 6    responded to this e-mail.  Did he respond

 7    on behalf of TG or TTP?  Also, this is

 8    only a quotation.  I do not know whether

 9    the transaction was actually went through

10    or not.

11            THE COURT:  Let's ask

12            another question.

13    BY MR. GONZALEZ:

14            Q.    This is your business

15    record, correct, of the company?

16            MR. CYR:  Objection.

17            THE COURT:  Take business

18            out and ask the question, company

19            record.

20    BY MR. GONZALEZ:

21            Q.    This is a company record,

22    correct?

23            A.    I don't know whether it is

24    the company record of TTP's or TG's.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    I show you what's been
 2   previously marked in Mr. Peng's
 3   deposition as Exhibit Number 8, and it
 4   will be marked as Exhibit 32.  It's Bates
 5   stamp numbers TG 19381, TG 19382.
 6                    -   -   -
 7          (Whereupon, Deposition
 8          Exhibit Jia-32, E-mail chain, top
 9          one dated 8/2/2006, Bates stamped
10          TG 0019381 and TG 0019382, was
11          marked for identification.)
12                    -   -   -
13   BY MR. GONZALEZ:
14          Q.    And the e-mail on the top
15   says from Grace Wei, W-E-I, to SDth818,
16   and there's some Chinese language in the
17   top.  Do you know who Grace Wei is?
18          THE INTERPRETER:  Can I take
19          a look?
20          MR. CYR:  His question has
21          nothing to do with this document.
22          He's just asking.
23          INTERPRETER:  I need to
24          refer that to --
```

Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT:  She just wanted
 2         to look at the name.
 3              INTERPRETER:  Because it is
 4         here, so I did not write
 5         everything down.
 6              THE WITNESS:  Wei?  I don't
 7         know who that person is.
 8  BY MR. GONZALEZ:
 9         Q.   Can you read that little
10  paragraph here in the top that's in
11  response to the English e-mail on the
12  bottom?
13              MR. CYR:  Objection.
14  BY MR. GONZALEZ:
15         Q.   Let me put it in context,
16  and I'll restate the question.  Put it in
17  context, and I'm going to ask you next
18  what the response was.  But the e-mail
19  below states, "Our customers would like
20  to get a letter from Shandong Taihe
21  Dongxin Co. on there company letter head.
22              "Stating:
23              "Shandong Taihe Dongxin Co.
24  Gypsum board that is in the 12 containers
```

Confidential - Subject to Further Confidentiality Review

```
 1   (listed below) that were shipped last

 2   week are made to ASTM C-1396 standards

 3   and it is the best quality gypsum board

 4   that Taihe makes and is the same quality

 5   that Taihe sends to other customer in the

 6   United States.  Shandong Taihe Dongxin

 7   Co. stands 100% behind our gypsum board

 8   and if any quality problems were detected

 9   with he gypsum board Taihe will replace

10   the board at no cost to the customer."

11               And can you tell us what the

12   response was in Chinese?

13               MR. CYR:  He wants you to

14         read the Chinese.

15               THE WITNESS:  I don't know

16         who is responding to who in here.

17   BY MR. GONZALEZ:

18         Q.    Can you please read the

19   Chinese language for us so we can

20   understand what it says.

21         A.    Manager Wei, Manager Peng,

22   hello.  Please look at the e-mail below,

23   which is the e-mail from the customer.

24   He requested that you would need to write
```

Confidential - Subject to Further Confidentiality Review

```
 1    a verification with your company's

 2    letterhead and to have your executives

 3    sign and put a stamp on it.  He also said

 4    that it would be the best if you could

 5    list one or two company names of American

 6    company who purchased gypsum board from

 7    you.  This will strongly prove that our

 8    products have no quality problems.  Thank

 9    you.  Wei Dongling.

10               I don't understand this.

11         Q.    To your knowledge, was a

12    certification letter sent by Shandong

13    Taihe Dongxin Company as was requested?

14         A.    I don't know.

15               THE COURT:  Let's see if we

16         can get through this quickly.

17               MR. GONZALEZ:  Yes, Your

18         Honor.

19    BY MR. GONZALEZ:

20         Q.    Mr. Jia, can you tell us why

21    you traveled to Japan in 2010?

22         A.    I went to Japan for

23    business.

24         Q.    Drywall business?  The
```

Confidential - Subject to Further Confidentiality Review

```
 1    drywall business?

 2           A.    No.

 3           Q.    What type of business?

 4           MR. CYR:  Objection.

 5           THE COURT:  I sustain that

 6      objection.  If it has to do with

 7      drywall, it's one thing.  If it's

 8      something else, it's not relevant.

 9  BY MR. GONZALEZ:

10           Q.    Just so we're clear, did you

11  travel to Japan for business involving

12  drywall in 2010?

13           A.    No.

14           Q.    Did you travel for business

15  in 2007 to Russia involving drywall?

16           A.    No.

17           Q.    In 2006, your trip to Japan,

18  was that involving drywall business?

19           A.    When was that?

20           Q.    2006?

21           A.    No.

22           Q.    In your trip to Thailand in

23  2006, was that for drywall business?

24           MR. CYR:  Objection.
```

Case 2:09-md-02047-EEF-JCW Document 13246-10 Filed 03/26/12 Page 48 of 100
Case 2:09-md-02047-EEF-JCW Document 13254-10 Filed 03/21/12 Page 23 of 28
Confidential - Subject to Further Confidentiality Review

```
 1                    THE COURT:  I'll overrule

 2           the objection.

 3                    THE WITNESS:  No.

 4    BY MR. GONZALEZ:

 5           Q.     In 2005, your trip to United

 6    Arab Emirates, was that involving the

 7    drywall business?

 8           A.     Yes.

 9           Q.     Who did you meet with in

10    2005 in the United Arab country?

11           A.     I don't recall.

12           Q.     Were you able to sell

13    drywall to the United Arab countries at

14    that time or thereafter?

15           A.     I sold some.

16           Q.     What years did those

17    transactions cover?

18           A.     Well, I don't recall the

19    exact period of time, but we did sell

20    some of our gypsum board to United Arab.

21           Q.     Do you remember the last

22    date, in other words, the year you

23    started and the year you finished, unless

24    you're still selling?
```

Confidential - Subject to Further Confidentiality Review

```
 1         A.    I don't recall.  But you
 2    could ask Che Gang or our Manager Peng,
 3    my colleagues.  Perhaps they could
 4    remember.
 5         Q.    Che Gang is one of your
 6    colleagues?
 7         A.    Right now, yes.  He's my
 8    subordinate.
 9         Q.    Your trip in 2004 to
10    Germany, did that involve business
11    involving drywall?
12         A.    No.
13         Q.    Your trip to Korea and
14    Thailand in 2002, did that involve the
15    business of drywall?
16         A.    Which year was that?
17         Q.    2002?
18         A.    No.
19         Q.    Did you meet with Knauf at
20    any time after 2006 to discuss drywall
21    matters?
22              INTERPRETER:  Interpreter
23         clarify gender.
24              THE WITNESS:  They did want
```

Confidential - Subject to Further Confidentiality Review

```
 1          to make an appointment to meet us,

 2          but we did not meet them.

 3   BY MR. GONZALEZ:

 4          Q.    You've never spoken with any

 5   Knauf representatives to discuss drywall

 6   matters from 2006 through the present?

 7   Is that true?

 8          A.    No.

 9          Q.    Does the Knauf gypsum plant

10   operate 24 hours a day?

11              MR. CYR:  Objection.

12              THE COURT:  If he knows.

13              THE WITNESS:  It is

14          impossible for me to know whether

15          another company is operating.  But

16          I know they have not yet filed

17          bankruptcy.

18   BY MR. GONZALEZ:

19          Q.    My question is whether TG

20   operates 24 hours a day?

21          A.    Sometimes.  What do you mean

22   by that?  Do you mean production line

23   works 24 hours or do you mean everybody's

24   heartbeat beats 24 hours?
```

```
 1          Q.     The business is working 24

 2     hours.

 3                 MR. CYR:  Objection.

 4                 THE COURT:  It's a little

 5          too broad, production.

 6     BY MR. GONZALEZ:

 7          Q.     The manufacturing of drywall

 8     in the TG plant occurs 24 hours a day?

 9          A.     What are the manufacturers

10     referring to here?

11          Q.     Making of drywall.

12          A.     There are many plants that

13     manufacture gypsum board.  Some operate

14     24 hours a day.  Some operate once in a

15     few months.  It depends on the demand of

16     the market.  I don't know what you're

17     referring to here.

18          Q.     And when you're operating 24

19     hours a day, you have three shifts of

20     employees that work seven days a week?

21          A.     They do have different

22     shifts because the production line of

23     gypsum board is very special.  Sometimes

24     they work 24 hours, but when they operate
```

Confidential - Subject to Further Confidentiality Review

1    three to four days, sometimes they would

2    need to stop for maintenance and repair.

3    And the employees take turn to take rest.

4         Q.    From 2005 through 2008, TG

5    employed about 2,000 workers, correct?

6         A.    Including or not including

7    the employees in the subsidiaries?

8         Q.    Total.

9         A.    There are many subsidiaries

10   for TG.  I don't know employees you're

11   referring to, employees on the production

12   lines of TG or the employees on the

13   production lines of TG's subsidiaries.

14        Q.    Between the years 2005 and

15   2008, given your level in the company,

16   are you aware of the number of employees

17   that TG employed?

18        A.    If you can limit your scope,

19   I would be able to give you a clear

20   answer.

21        Q.    I want to know for all the

22   company, all of TG, do you know the

23   number of employees that TG employed

24   during those years, 2005 to 2008?

Confidential - Subject to Further Confidentiality Review

```
1                 MR. CYR:  Objection.
2                 THE COURT:  Including
3         subsidiaries?
4                 MR. GONZALEZ:  Yes.
5                 THE WITNESS:  If that
6         includes the companies that we
7         have shares in and the companies
8         that we hold 100 percent of share
9         from the year 2002 and 2008, I'd
10        say about 4,000 to 5,000 employees
11        because the people are floating.
12        So, I cannot for sure give you an
13        accurate number.
14   BY MR. GONZALEZ:
15        Q.    And sometimes they worked
16   for TG, and sometimes they worked for TTP
17   during that time, correct, depending on
18   the needs?
19                MR. CYR:  Objection.
20                THE COURT:  Let's be a
21        little more precise as to  --
22   BY MR. GONZALEZ:
23        Q.    During the years 2006, after
24   TTP was created, through the date that
```

Confidential - Subject to Further Confidentiality Review

```
1    TTP stopped doing business, TG and its

2    related companies often shared employees

3    with TTP as needed, correct?

4          A.    We have never shared

5    employees.

6          Q.    You had a strategic alliance

7    and used each other's employees as needed

8    during those dates?

9               MR. CYR:  Objection.

10              THE COURT:  Yeah.  That's

11         already asked and answered.  We

12         have to move on.

13   BY MR. GONZALEZ:

14         Q.    Is your phone number

15   0538-8811449?

16         A.    I used to have this number.

17         Q.    Was it your cell phone

18   number?

19         A.    Not my cell phone number.

20         Q.    What number was it, for your

21   home or your business?

22         A.    It is a land line.

23         Q.    For your home or business?

24         A.    Business.
```

Confidential - Subject to Further Confidentiality Review

```
1          Q.    And what about the number

2     13853881569, was that your cell phone,

3     home or business number?

4          A.    Can you repeat the phone

5     number again?  I don't remember clearly.

6          Q.    Yes, sir.  13853881569.

7          A.    Yes.

8          Q.    And was it your business,

9     cell phone or home number?

10         A.    It is my cell phone number,

11    which I have used for over ten years.

12         Q.    I won't call you.

13              THE COURT:  Anything

14         further?

15              MR. GONZALEZ:  Yes, Your

16         Honor.

17              THE WITNESS:  I don't wish

18         that you would call me.

19    BY MR. GONZALEZ:

20         Q.    Did you attend or a

21    representative of TG attend the Global

22    Drywall Conference in Shanghai in 2007?

23         A.    Representing which company?

24         Q.    Any of the companies that
```

Confidential - Subject to Further Confidentiality Review

```
 1    are part of the TG family?

 2            A.    I don't remember which year

 3    was it, but there was a global drywall

 4    conference held in Shanghai which I

 5    participated.

 6            Q.    Did you meet with any Knauf

 7    representatives at that conference?

 8            A.    No.

 9            Q.    Do you recall who was sent

10    on behalf of TG to the drywall conference

11    held in Orlando, Florida in 2006?

12            A.    In my impression, we did not

13    participate in that conference.

14            Q.    You don't recall

15    participating in the conference?

16            A.    No.

17            Q.    You spoke before of having

18    an honorary position with BNBM, I believe

19    you said.  Is that correct?

20            A.    Correct.

21            Q.    Is that position compensated

22    for, without telling us the amount?

23            A.    No.

24            Q.    Do you have a business card
```

Confidential - Subject to Further Confidentiality Review

1   with you today?

2           A.    I do not have a business

3   card with me today.

4           Q.    Do you have more than -- I

5   know you don't have one on you today, but

6   when you have a business card, do you

7   have more than one?  And to be clear, I

8   don't mean the same card many times, I

9   mean, do you have different cards with

10  different positions?

11              INTERPRETER:  Interpreter

12          clarification.

13              THE COURT:  Are you about

14          finished?

15              MR. GONZALEZ:  Yes.  One way

16          or the other.

17              THE WITNESS:  I don't like

18          the fact that many people carry

19          many name cards as many of

20          so-called scholars in China do.

21          That's not myself.

22  BY MR. GONZALEZ:

23          Q.    What does your business card

24  indicate as your title and for what

```
 1    company?

 2          A.     General manager and the

 3    director of the board of directors of TG.

 4    The general manager and director of the

 5    board of directors of TG and an engineer.

 6          MR. GONZALEZ:  Thank you,

 7          sir.  I appreciate your patience

 8          and your cooperation with our

 9          questions.

10          THE COURT:  We'll take a

11          15-minute break at this time.

12          THE VIDEOTAPE TECHNICIAN:

13          Off the record.  This is the end

14          of Tape Number 2.

15                   -  -  -

16          (Whereupon, a recess was

17          taken from 10:13 a.m. until 10:25

18          a.m.)

19                   -  -  -

20          THE VIDEOTAPE TECHNICIAN:

21          We're going back on the video

22          record.  The time is 10:25.

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -

 2                 EXAMINATION

 3                    -  -  -

 4    BY MS. BASS:

 5         Q.    Good morning, Mr. Jia.  My

 6    name is Hilarie Bass, and I represent the

 7    Home Builders Steering Committee in the

 8    United States litigation.

 9              When did you first become

10    aware that litigation had been filed

11    against either TG or TTP in the United

12    States?

13         A.    I don't remember the exact

14    time, but perhaps it was in the second

15    half year of 2009.

16         Q.    Do you recall receiving a

17    Chinese translation of the lawsuits that

18    were filed against your company?

19         A.    I have received several

20    documents.  I don't know which one you

21    are referring to.

22         Q.    Do you recall receiving what

23    is described as a Complaint?

24         A.    I have received several
```

Confidential - Subject to Further Confidentiality Review

1    during that period of time.  Because I

2    don't understand English, I don't know

3    whether they are complaints or judgments.

4    I just don't know.

5           Q.    Did you receive copies of

6    documents that had been translated into

7    Chinese?

8           A.    Perhaps, but I don't know

9    which one you're referring to.

10          Q.    In August of 2009, do you

11   recall having received a Chinese

12   translation of a document that was filed

13   in the State of Florida courts against

14   your company?

15          A.    I don't recall.

16          Q.    If you received such a

17   document, would you have reviewed it?

18          A.    I would.

19          Q.    Would you have spoken to an

20   attorney about what it was you had

21   received?

22          A.    I would have had my other

23   assistants such as Peng Wenlong to handle

24   it.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Do you recall having asked
 2    Peng Wenlong to review documents you
 3    received from the United States courts?
 4          A.     I'm sure they have been
 5    reviewed, but I do not recall the content
 6    of the documents.
 7          Q.     Did you as head of the board
 8    of directors of your company arrange to
 9    retain counsel to assist you with the US
10    litigation?
11          A.     Usually after received
12    documents of American litigation, we
13    would meet and find legal consultant to
14    consult about them.
15          Q.     Did you undertake that
16    effort in this case?
17          A.     I'm sure I did.
18          Q.     Do you recall when you made
19    an effort to retain counsel with
20    reference to the US litigation regarding
21    drywall?
22          A.     I would like to know your
23    definition of retention of counsel.  Does
24    it mean that after we signed a retainer
```

Confidential - Subject to Further Confidentiality Review

```
 1    agreement or does it mean that I just

 2    make phone calls to consult the counsel?

 3         Q.    I will try and clarify.

 4               When did you first contact

 5    counsel to discuss the lawsuit, without

 6    disclosing the contents of your

 7    conversation?

 8         A.    Which law firm are you

 9    referring to?

10         Q.    Any law firm.

11         A.    We had a legal counsel, and

12    we did not receive all the documents of

13    the American litigation in one period of

14    time.  I consulted a lawyer from Taian

15    for the documents we first received

16    regarding the litigation.

17               INTERPRETER:  Interpreter

18          clarify gender.

19               THE WITNESS:  Because he had

20          a limit on his ability, so he also

21          contacted his American attorney

22          friends to further inquire

23          information about the litigation.

24          After such inquiry, because we
```

Confidential - Subject to Further Confidentiality Review

```
 1          take this litigation very

 2          seriously, we don't feel that's

 3          sufficient.  We have consulted a

 4          law firm called Chinese phonetic,

 5          according to Chinese phonetic

 6          pronunciation, Ao Rui, perhaps

 7          A-O, R-U-I.  During that period of

 8          time, many American law firms sent

 9          us letters.  Some of them send

10          their representatives in China to

11          come to our company to give us

12          some advices and to try to win our

13          retainer.

14                INTERPRETER:  Your name in

15          Chinese he just said.

16                MR. CYR:  I don't know what

17          it is in Chinese, but last name is

18          C-Y-R in English.

19   BY MS. BASS:

20          Q.    Hogan Lovells?

21                MR. CYR:  The law firm is

22          Hogan Lovells, H-O-G --

23                INTERPRETER:  Hogan Lovells,

24          is it?
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. CYR:  H-O-G-A-N, new

 2         word, L-O-V-E-L-L-S.

 3              THE WITNESS:  After

 4         discussion of our directors, we

 5         had made a final decision to

 6         choose Hogan Lovells as our

 7         counsel.  This is the whole

 8         process of our seeking of legal

 9         counsel.

10    BY MS. BASS:

11         Q.   Is it correct that it took

12    almost a full year to retain Hogan

13    Lovells after you had been served with

14    processing the American lawsuits?

15         A.   Yes.  Less than a year.

16         Q.   11 months to be exact?

17         A.   Pretty much.

18         Q.   Does your company have any

19    attorneys on staff?

20         A.   I don't know what is the

21    definition of attorney on staff.

22         Q.   An employee of your company

23    who is also an attorney?

24         A.   No.
```

Confidential - Subject to Further Confidentiality Review

1          Q.     Do you recall how long after

2     you received the Chinese translation of

3     the American lawsuit it took before you

4     contacted the Chinese lawyer in your

5     local area?

6          A.     Very quick.

7          Q.     Did there come a time when

8     you learned that a default had been

9     entered against your company both in the

10    Federal Court in Louisiana and the State

11    Court in Florida?

12         A.     I really don't know how many

13    default judgments were there.

14         Q.     When was the first time you

15    became aware that any default judgment

16    had been entered against your company?

17         A.     I remember there was a

18    judgment of 260,000.  I'm not sure what

19    was the name of the case though, but I

20    believe it was Judge Fallon who had given

21    me the judgment.

22         Q.     Do you recall when you

23    received a copy of that judgment?

24         A.     I don't recall.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Do you recall filing an

 2    affidavit in the state court action in

 3    Miami, Dade County, Florida?

 4          A.     I did submit an affidavit.

 5          Q.     Do you recall stating in

 6    that affidavit the following: "No

 7    employee at Taishan has sufficient

 8    mastery of the English language to read

 9    and understand legal documents written in

10    English"?

11          A.     Yes.

12          Q.     Additionally you said, "As a

13    result, no legal document sent to Taishan

14    only in English underwent meaningful

15    review."

16          A.     No.

17          Q.     That is not what you said in

18    your affidavit?

19          A.     No, that's not what I meant.

20    You understood it incorrectly.  Yes.

21          Q.     What did you mean to say in

22    your affidavit?

23          A.     I don't understand.

24          Q.     Mr. Jia, in your affidavit,
```

Confidential - Subject to Further Confidentiality Review

```
 1    I believe you stated that you did not

 2    understand the consequences of responding

 3    to the Complaint because you did not read

 4    English.  Do you recall having made that

 5    statement?

 6              A.    Yes.

 7              Q.    In fact, you did receive a

 8    copy of the Complaints filed against your

 9    company translated into Chinese?

10                   MR. CYR:  Objection.

11                   THE COURT:  If he doesn't

12              understand it, he can ask.

13              Overrule the objection.

14                   THE WITNESS:  I don't know

15              what circumstance you're talking

16              about here.

17    BY MS. BASS:

18              Q.    Do you recall having

19    received copies of the Complaints filed

20    against your company translated into the

21    Chinese language?

22                   MR. CYR:  Objection.

23                   THE COURT:  Be more specific

24              as to the State or Federal Court.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MS. BASS:  Okay.
 2   BY MS. BASS:
 3         Q.    Do you recall having been
 4   served with a copy of a Complaint that
 5   was filed against your company in the
 6   State Court of Miami-Dade, Florida on or
 7   about August 3rd of 2009 translated into
 8   Chinese?
 9         A.    I don't recall, but I do not
10   deny that I may have received it.
11         Q.    When was the first time you
12   became aware that there were complaints
13   about Taishan-manufactured drywall that
14   had been utilized in the United States?
15              MR. CHEN:  Can you please
16         clarify if you mean Complaints as
17         in legal pleadings, because that's
18         how the translation is.
19              MR. CYR:  Thank you, Eugene.
20              MS. BASS:  I'll restate the
21         question.
22   BY MS. BASS:
23         Q.    When was the first time you
24   became aware that customers were unhappy
```

Confidential - Subject to Further Confidentiality Review

```
 1    with the Taishan drywall that had been

 2    utilized in their homes in the United

 3    States?

 4          A.    I believe there was a media

 5    coverage in about June or July of 2009.

 6          Q.    Did you take any steps at

 7    that time to investigate whether there

 8    was a problem with drywall your company

 9    had manufactured?

10          A.    At the time, I did not

11    believe the media's report.  When I first

12    received the Complaint, I felt that there

13    might be a problem.  The company might be

14    in trouble.  The problem I just said was

15    not a problem as of a problem in quality

16    of our gypsum board but a problem of our

17    company, the trouble.

18                The first step we took was

19    to inquire legal services.  On the other

20    hand, we underwent investigation and

21    verification of the quality of our

22    products.  We believed that our quality

23    had no problem.

24          Q.    Did you undertake any
```

Confidential - Subject to Further Confidentiality Review

1    testing of your board to determine

2    whether it had elevated levels of sulfur?

3         A.    We had an investigation of

4    all the customers, especially important

5    customers that we had over the years, and

6    none of those customers ever had reported

7    problem as reflected with the American

8    media report.   The gypsum mine and the

9    gypsum raw material, all that, and the

10   production of gypsum board were in

11   accordance with the requirements of the

12   customers.  We had performed the

13   requirements of the contract between us

14   and our customers.

15              Up to today, no customers

16   who claim to be American customers nor

17   distributors in China had ever complained

18   that the gypsum board that we

19   manufactured had the problem as depicted

20   in the American media.   In other words,

21   in the past 20 years during our

22   production of gypsum board, no customers

23   had ever said that there were problems

24   with the gypsum board that we

Case 2:09-md-02047-EEF-MBN  Document 13246-1  Filed 03/26/12  Page 71 of 100
Case 2:09-md-02047-EEF-JCW  Document 13154-1  Filed 03/21/12  Page 2 of 26
Confidential - Subject to Further Confidentiality Review

```
 1    manufactured.

 2            Q.      Did you undertake any

 3    testing to determine whether your gypsum

 4    board had elevated levels of sulfur?

 5            A.      We did have the test.

 6            Q.      Was that a test that was

 7    undertaken by employees of TG or TTP?

 8            A.      Those companies did the

 9    test.

10            Q.      Can you identify the names

11    of the employees who underwent -- who

12    supervised those tests?

13            A.      I can't.

14            Q.      Is there a report of the

15    results of that test?

16            A.      The raw material to produce

17    gypsum board has sulfur level.  It is not

18    only the fact for the manufacturers in

19    China but also a fact for the

20    manufacturers in America.

21                    INTERPRETER:  Interpreter

22            needs a moment to check

23            dictionary.

24                    (Discussion with interpreter
```

```
 1           and Mr. Chen in Chinese.)

 2                MR. CHEN:  I'm sorry, I

 3           don't know how to translate that.

 4           It's a technical term.

 5                INTERPRETER:  Give me a

 6           minute, please.

 7                The interpreter is asking

 8           the witness to repeat what he

 9           said.

10                THE WITNESS:  All raw

11           materials has element of calcium

12           sulfate.

13   BY MS. BASS:

14           Q.    Is there a written report

15   reflecting the results of the testing

16   undertaken by your company?

17           A.    If we have it, I could get

18   it for you.

19           Q.    Do you recall when that

20   testing was undertaken?

21           A.    I don't recall the time.

22           Q.    Do you recall specifically

23   what they were testing for when those

24   tests were undertaken?
```

```
 1          A.    It is impossible for me to
 2   know every detail.
 3          Q.    Do you know generally
 4   whether or not the testing endeavored to
 5   determine whether there was off-gassing
 6   from the gypsum that would deteriorate
 7   copper or silver?
 8               INTERPRETER:  Interpreter
 9         needs clarification.
10               THE WITNESS:  I'm an
11         engineer.  I know that it is
12         impossible to have the result as
13         you just described.
14   BY MS. BASS:
15          Q.    Is it your view that it is
16   impossible for gypsum board to cause
17   deterioration in copper and silver?
18               MR. CYR:  Objection.
19               THE COURT:  You are asking
20         him for an opinion.  Let's restate
21         the question.
22               MS. BASS:  Okay.
23   BY MS. BASS:
24          Q.    Did the testing undertaken
```

Confidential - Subject to Further Confidentiality Review

1    by your company attempt to determine

2    whether or not off-gassing of your gypsum

3    could cause deterioration in copper or

4    silver?

5          A.    I don't think your question

6    is clear.

7          Q.    Do you know what the purpose

8    of the testing undertaken by your company

9    was?

10         A.    After we became aware of the

11   reports, we discussed the problem with

12   some people.  In the results, we felt

13   that there was no relevancy.

14         Q.    It is your view that your

15   gypsum board was not in any way

16   defective?

17         A.    That's my belief.

18               MS. BASS:  Can I have marked

19         as Exhibit 33.  This is a document

20         that is in your notebook.  It is

21         TG 0019356.

22               MR. CYR:  Okay.

23                    -   -   -

24               (Whereupon, Deposition

Confidential - Subject to Further Confidentiality Review

```
 1          Exhibit Jia-33, E-mail dated

 2     1/27/2009, Bates stamped TG

 3     0019356, was marked for

 4     identification.)

 5              -   -   -

 6          MS. BASS:  This is an e-mail

 7     dated 1/27/2009 from a reporter at

 8     the South Florida Business

 9     Journal.

10  BY MS. BASS:

11          Q.    My first question for the

12  witness is, can he identify the e-mail

13  recipients that are noted in this e-mail.

14          THE COURT:  Counsel, do you

15     want to see that?

16          MR. CYR:  I can look at it

17     at the same time.

18          THE WITNESS:  I don't know.

19  BY MS. BASS

20          Q.    You don't recognize the

21  e-mail address of Frank Clem?

22          A.    I don't know.

23          Q.    Were you informed by any

24  employees of your company that a reporter
```

1    from a business journal in Miami, Florida

2    had inquired as to complaints about odor

3    and other defects in your gypsum board?

4        A.    I've heard of such reports,

5    but I'm not sure whether it's from Miami

6    or what newspaper was it from.

7        Q.    Did someone, one of your

8    employees, communicate to you back in

9    January of '09 that they had been

10   contacted regarding complaints about

11   Taishan-manufactured gypsum board that

12   was being utilized in Miami, Florida.

13       A.    I'm not sure about the exact

14   time, but there were some employees who

15   reported that to me.  I'm not sure

16   whether their report was about Miami or

17   other places.

18       Q.    Did you undertake any

19   investigation to determine whether or not

20   there was an unusual odor coming from

21   Taishan Gypsum board that had been

22   imported into the United States?

23       A.    We firmly believe that our

24   gypsum board has no problem.

1        Q.      Did you undertake any type

2    of testing to determine whether or not

3    there was an unusual odor coming from the

4    gypsum board that your company had

5    manufactured and had been utilized in the

6    United States?

7        A.      Taishan Gypsum board did not

8    undertake such tests.

9        Q.      The testing that you

10   previously referred to as having been

11   undertaken by your company, is that

12   testing separate and apart from the

13   testing of the Chinese government about

14   which you testified in your last

15   deposition?

16       A.      You asked me whether our

17   company had underwent any tests, but as a

18   company, our capability is limited.  It

19   is impossible for us to have such a lab

20   to undergo tests in the big scale.  We

21   only did some local tests.

22       Q.      Could you please describe

23   what type of local tests you undertook?

24   And when I say "you," I mean your

Confidential - Subject to Further Confidentiality Review

```
 1    company?

 2           A.    For example, we bought the

 3    raw materials, and we analyzed the

 4    elements, different elements in the

 5    material.  That's something we could do.

 6           Q.    Is there any documentation

 7    within the records of your company

 8    reflecting this type of testing that

 9    you're referring to?

10           A.    I can go back and check.

11           MS. BASS:  I would ask that

12           those documents be produced

13           because it's the first time we've

14           been informed that such testing

15           occurred.  And we, to the best of

16           my knowledge, have not received

17           any documentation reflecting that

18           such testing occurred.

19           MR. CYR:  We can discuss it

20           with the judge.  I object because

21           I don't understand the relevance

22           to the jurisdiction.

23           THE COURT:  I'll deal with

24           that at another time.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MS. BASS:  Yes.

 2  BY MS. BASS:

 3        Q.    Mr. Jia, were you aware that

 4  the CPSC of the United States government

 5  issued questions to your company

 6  regarding the quality of your gypsum in

 7  August of 2009?

 8        A.    No.

 9              MS. BASS:  Can I show you a

10              document that's been marked as TG

11              0025155, which we will mark for

12              the purposes of this deposition as

13              Exhibit Number 34.

14                    -  -  -

15              (Whereupon, Deposition

16              Exhibit Jia-34, E-mail and

17              attachment dated August 15, 2009,

18              Bates stamped TG 0025155 through

19              TG 0025158, was marked for

20              identification.)

21                    -  -  -

22  BY MS. BASS:

23        Q.    Could you please look at the

24  document that has been marked as Exhibit
```

```
 1    34 and let us know whether or not you
 2    have seen this document before?
 3              MS. BASS:  It is within your
 4         binders.
 5              MR. CYR:  Right.  I'm trying
 6         to save time.
 7              MS. BASS:  No problem.
 8              The document is TG 25155
 9         through 158.
10              MR. CYR:  It's a different
11         translation.
12              MS. BASS:  I don't know what
13         document you're looking at, Mr.
14         Cyr.
15              MR. CYR:  It's a part of the
16         document you handed the witness.
17              MS. BASS:  No.  No, it's
18         not.  That is not the document
19         before the witness.  That's not
20         been marked as Exhibit 34.
21              MR. CYR:  I won't argue with
22         you.  It's just that it's the only
23         way I got it in my hands.
24    BY MS. BASS:
```

Confidential - Subject to Further Confidentiality Review

1          Q.     The question, Mr. Jia, is

2    simply whether you have seen this

3    document before?

4          A.     I have not seen this

5    document before.

6          Q.     Were you aware of inquiries

7    from the United States CPSC regarding the

8    quality of the drywall manufactured by

9    your company?

10         A.     I don't know.

11         Q.     Did you participate in a

12   tour of your factory with representatives

13   of the CPSC of the US government?

14         A.     I participated.

15         Q.     Do you recall when that tour

16   took place?

17         A.     I don't remember the exact

18   date, but perhaps it is in mid 2009.

19         Q.     What did you understand was

20   the reason that the CPSC was coming to

21   tour your factory?

22         A.     I don't know the reason for

23   it, but I received them warmly.

24         Q.     Did anyone from the CPSC

```
 1    inform you about concerns that they had

 2    about the quality of the drywall that had

 3    been manufactured by your plant and was

 4    being utilized in the United States?

 5         A.    No.

 6              MS. BASS:  I would next like

 7         to have marked as 35 a document

 8         which has been Bated as TG 19235

 9         through 236 and ask you whether or

10         not you're familiar with the

11         e-mail address of the recipient of

12         this document.

13              -   -   -

14         (Whereupon, Deposition

15    Exhibit Jia-35, E-mail dated

16    8/17/2009, Bates stamped TG

17    0019235 and TG 0019236, was marked

18         for identification.)

19              -   -   -

20              THE WITNESS:  I only know

21         the character of Che Gang.

22    BY MS. BASS:

23         Q.    And Che Gang is an employee

24    of TTP in August of 2009, correct?
```

Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes.  What did you say, 2009
 2    or 2008?
 3            Q.    The date of this e-mail is
 4    August of 2009.
 5            A.    He was not an employee of
 6    TTP at that time.
 7            Q.    Do you know what entity
 8    employed Mr. Che as of August of 2009?
 9            A.    TG.
10            Q.    Did Mr. Che inform you that
11    he had received information about claims
12    relating to Chinese drywall that had --
13    claims of Chinese drywall that had been
14    tied to corrosion of metal components,
15    foul smells and complaints by homeowners
16    of health issues?
17            A.    Not only Che Gang reported
18    me that issue but also other employees
19    who referred the media report to me for
20    review.
21            Q.    In fact, this document
22    references that the CPSC was coming to
23    visit China beginning on August 17, 2009.
24    Does that help refresh your recollection
```

Confidential - Subject to Further Confidentiality Review

```
 1    as to when the CPSC toured your factory?

 2         A.    I don't remember the exact

 3    date.  As I mentioned, perhaps it was in

 4    mid 2009.  That day was very hot.

 5         Q.    Did you discuss with any

 6    representatives of the CPSC during their

 7    tour of your factory their concern that

 8    your drywall was causing corrosion of

 9    metal components in homes in the United

10    States?

11         A.    We did not discuss that.

12         Q.    Are you aware of anyone else

13    who was employed by your company that

14    engaged in discussions with the CPSC

15    regarding their concerns about the

16    quality of your drywall?

17         A.    No.  Let me give you a brief

18    of the tour.  May I?

19         Q.    Yes.

20         A.    It was about 10:30 in the

21    morning accompanied by some government

22    officials.  I was told that there were

23    about four or five people from CPSC were

24    planning to come to our manufacturer for
```

Confidential - Subject to Further Confidentiality Review

```
 1    a tour.  I led them for tour in every

 2    place in our factory.  And we sampled our

 3    products, and I was told it was for

 4    analysis and testing.   They stayed in

 5    our company for about 25 or around 30

 6    minutes, less than 30 minutes.  We

 7    didn't actually sit down like we're

 8    sitting down today for discussions.

 9    After we saw them off, it all ended.  We

10    never again saw anybody from CPSC.

11              MS. BASS:  I would like to

12         next mark as Exhibit 36 a document

13         which has been Bated as TG 0025352

14         through 55.

15                   -  -  -

16         (Whereupon, Deposition

17    Exhibit Jia-36, Document partly in

18    Chinese, "Chinese Drywall Default

19    Ruling shows Need to Hold Foreign

20    Manufacturers Accountable in U.S.

21    Justice System," Bates stamped TG

22    0025352 through TG 0025355, was

23    marked for identification.)

24                   -  -  -
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. BASS:

 2            Q.    And ask the witness if you

 3    can recall having seen that document

 4    before?

 5            A.    Let me take a look.

 6            Q.    Please.

 7                  MR. BLACK:  Could you read

 8            the Bates Numbers again.

 9                  MS. BASS:  TG 25352 through

10            55.

11                  MR. BLACK:  Thank you.

12                  (Reviewing document.)

13                  THE WITNESS:  I got an idea.

14    BY MS. BASS

15            Q.    Do you recall being informed

16    around September of 2009 that a default

17    had been entered against your company for

18    its failure to respond to a lawsuit filed

19    against it in the State of Louisiana in

20    Federal Court?

21            A.    Yes.

22            Q.    Were you aware of the

23    consequences of what a default meant

24    against your company in the US legal
```

Confidential - Subject to Further Confidentiality Review

```
1    proceedings?

2         A.    No.

3         Q.    Is it correct that it was --

4    a motion and your affidavit were not

5    filed in the legal proceedings in the

6    United States until September of 2010?

7         A.    I don't recall that.

8         Q.    Are you aware that at some

9    point your counsel filed a motion to

10   vacate the default that is referenced in

11   Exhibit 36?

12        A.    Yes.

13        Q.    And that that motion was not

14   filed until sometime in September of

15   2010, more than a year after you -- after

16   this news report regarding the entry of

17   the default?

18             MR. CYR:  Objection,

19        different default.

20             THE COURT:  Let's restate it

21        then.

22   BY MS. BASS:

23        Q.    Are you aware of how long

24   after your notice of the default entered
```

Confidential - Subject to Further Confidentiality Review

```
1    against you in Federal Court in New

2    Orleans it took for your company to file

3    a motion to vacate in that proceeding?

4              MR. CYR:  Objection, vague.

5              THE COURT:  Why don't the

6         records just speak for itself?

7         What difference does it make?

8              MS. BASS:  That's fine, Your

9         Honor.

10             THE COURT:  Anything

11        further?

12             MS. BASS:  No, Your Honor,

13        thank you.

14             THE COURT:  Anybody else?

15             THE VIDEOTAPE TECHNICIAN:

16        Going off the video record at

17        11:23.

18                  -   -   -

19             (Whereupon, a recess was

20        taken from 11:23 a.m. until 11:25

21        a.m.)

22                  -   -   -

23             THE VIDEOTAPE TECHNICIAN:

24        This is the beginning of Tape
```

Confidential - Subject to Further Confidentiality Review

```
 1              Number 4.  Going on the record at

 2         11:25.

 3                   THE COURT:  Go ahead.

 4                        -   -   -

 5                   EXAMINATION

 6                        -   -   -

 7    BY MR. BRENNER:

 8         Q.    Good morning, Mr. Jia.  My

 9    name is Theodore Brenner.  I represent

10    Tobin Trading in the Germano action.

11                   THE COURT:  Keep your voice

12         up, please, so they can hear you.

13    BY MR. BRENNER:

14         Q.    Are you familiar, sir, with

15    the company known as THBM?

16         A.    Yes.

17         Q.    What is the business of

18    THBM?

19         A.    THBM is abbreviation of

20    Taihe Dongxin Company, Limited.  This is

21    the name that we usually use.  I'm not

22    sure if it is legally binding.

23         Q.    So, do you have before you,

24    Mr. Jia, the document that is marked --
```

Confidential - Subject to Further Confidentiality Review

```
 1   has been marked as Exhibit Number 20?

 2           A.    Yes.

 3           Q.    This is a document that is

 4   marketing materials -- excuse me.

 5                 Is this a document that is a

 6   marketing material published by the

 7   Shandong Taihe Dongxin Company?

 8           A.    Yes.

 9           Q.    Is it your testimony that

10   the references within this material to

11   THBM are references to the Shandong Taihe

12   Dongxin Company?

13           A.    For the convenience of

14   communication, you can say that for now.

15           Q.    I don't think I understand

16   your answer to my question, Mr. Jia.

17   If you will look through Exhibit Number

18   20, you will see references to THBM,

19   specifically on the second and third page

20   and on the sixth and seventh pages?

21           A.    Like I said, these four

22   letters are not especially for Taishan

23   Gypsum board.

24                 INTERPRETER:  Interpreter
```

Confidential - Subject to Further Confidentiality Review

1          correction.  Taishan Gypsum.

2          Delete the "board," please.

3    BY MR. BRENNER:

4          Q.    Isn't it your testimony that

5    THBM is the same entity or the same

6    reference as Shandong Taihe Dongxin

7    Company?

8          A.    Not necessarily.

9          Q.    Please explain any

10   differences between THBM and Shandong

11   Taihe Dongxin Company?

12         A.    Taihe Dongxin Company used

13   to be the name of Taishan Gypsum.  For

14   the convenience of communication and

15   identification, we used initial of each

16   of the English letters of the characters.

17   But for some of the companies in Taian,

18   they also abbreviated their company name

19   as THBM.  Therefore, THBM is not only for

20   Taishan.

21         Q.    In Exhibit 20 that's before

22   you on pages 6 and 7, it appears to say

23   "THBM is widely used and much popular."

24   Is that accurate, Mr. Jia?

Confidential - Subject to Further Confidentiality Review

```
 1          A.    Where is it?

 2                MR. CYR: (Indicating.)

 3                THE WITNESS:  This says

 4          Taihe Building Material is wide

 5          used and much popular.

 6   BY MR. BRENNER:

 7          Q.    Is it your testimony that

 8   THBM as used in this marketing material

 9   does not refer to TG?

10          A.    It is TG.

11          Q.    Did THBM maintain any sales

12   offices?

13          A.    THBM, Taihe Dongxin Company

14   Limited does have its sales office.

15          Q.    Does it have more than one

16   sales office, more than one geographical

17   location?

18          A.    I don't understand what you

19   mean by that.

20          Q.    I want to know whether THBM

21   maintained more than one sales office?

22          A.    What time period?

23          Q.    2005/2006.

24          A.    I don't think the number one
```

Confidential - Subject to Further Confidentiality Review

1    office or two offices have the same

2    concept between you and me.  Maybe you

3    can use square meter.

4         Q.    My question to you, sir,

5    involves offices in more than one

6    location.

7         A.    One location?

8         Q.    Let me ask another question.

9    Did THBM have an agent, a sales agent in

10   Guangzhou, China in 2005/2006?

11              INTERPRETER:  Sir, do you

12        mean Guangzhou?

13   BY MR. BRENNER:

14        Q.    (Handing over spelling.)

15        A.    We have about 400 TG

16   salespeople who are located in all over

17   China with offices and residence in their

18   respective geographic location.  It is

19   common for them to have office and

20   residence in other locations.

21        Q.    Were all of those 400

22   salespeople -- strike that.

23              In 2005/2006, were all of

24   those 400 salespeople employees of TG?

Confidential - Subject to Further Confidentiality Review

```
 1          A.     Part of them are the

 2    employees of TG.   Part of them were the

 3    employees of TTP.   And many of them

 4    are -- many others were the employees of

 5    other subsidiaries.

 6          Q.     For those who were employees

 7    of TTP -- of TG, were they authorized to

 8    make sales and make quotations for

 9    purchase on behalf of TG?

10          A.     Yes.

11          Q.     In 2005 and 2006, TG owned a

12    paper factory used to make paper involved

13    in the drywall production process.   Is

14    that true?

15          A.     TG has a workshop that's

16    manufactured the paper that is involved

17    in making the drywall.

18          Q.     And is it true that the

19    waste paper purchased for use in that

20    workshop was purchased from the United

21    States?

22          A.     Not all of them.

23          Q.     Is it true with respect to

24    some of the paper that was used in that
```

Confidential - Subject to Further Confidentiality Review

```
 1    workshop?

 2         A.    Yes.

 3         Q.    And the paper that was

 4    purchased in the United States for use in

 5    that workshop was shipped from the United

 6    States to China; is that true?

 7         A.    I'm not sure about the

 8    detailed business process.

 9         Q.    Which TG employee or

10    employees were in charge of the paper

11    purchased from the United States for use

12    in the TG workshop?

13         A.    Purchasing department.

14         Q.    Do you know the names of any

15    of the persons in the purchasing

16    department that were so involved?

17         A.    Usually there are three to

18    five people involved in this process.

19         Q.    Can you provide us today

20    with any of the names of the three to

21    five people that were involved in this

22    process in the year 2005/2006?

23         A.    Zhang Jijun.

24         Q.    Do you know the names of any
```

Confidential - Subject to Further Confidentiality Review

1    of the other people so involved?

2         A.    It's been six or seven

3    years, so, I do not recall exactly the

4    names of other people, but I'm sure that

5    this person is still participating in the

6    process.

7         Q.    To your knowledge, has Mr.

8    Zhang ever traveled to the United States

9    for the purpose of purchasing paper for

10   use in the TG workshop?

11        A.    No.

12        Q.    To your knowledge, has any

13   employee of TG or any agent of TG

14   traveled to any of the states in the

15   United States to participate in the

16   acquisition of paper for use in the TG

17   workshop?

18        A.    No.

19        Q.    In the years 2005/2006, did

20   TG have any contracts or agreements with

21   persons to act as its agent in the United

22   States to serve as a supplier of paper

23   used in the workshop?

24        A.    I'm not sure about this.

Confidential - Subject to Further Confidentiality Review

1          Q.     Who would know?

2          A.     The importing of the paper

3    in the most part was processed in the

4    transaction in China.  We regularly asked

5    for bidding from the sellers in the

6    United States and elsewhere.  It is still

7    the case today.

8          Q.     And who is the person within

9    TG that would know the information for

10   the years 2005/2006 regarding the

11   purchase of paper in the United States

12   and the shipment of the paper from the

13   United States to China for TG?

14         A.     Zhang Jijun.

15         Q.     The same individual that you

16   identified before?

17         A.     Yes.

18                MR.  BRENNER:  Thank you,

19         sir, for answering my questions.

20                THE COURT:  Let's take a

21         five-minute break at this time.

22                THE VIDEOTAPE TECHNICIAN:

23         We're going off the record at

24         11:45.

Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -

 2              (Whereupon, a recess was

 3         taken from 11:45 a.m. until 11:53

 4         a.m.)

 5                    -  -  -

 6              THE VIDEOTAPE TECHNICIAN:

 7         We are back on the record.  The

 8         time is 11:53.

 9              THE COURT:  You may proceed,

10         Counsel.

11                    -  -  -

12              EXAMINATION

13                    -  -  -

14  BY MR. BLACK:

15         Q.   Good morning.  I'm David

16  Black.  I represent the State of

17  Louisiana.

18              Yesterday your counsel asked

19  you some questions about Louisiana.  You

20  know where Louisiana is located, do you

21  not, Mr. Jia?

22         A.   No.

23         Q.   Do you know that there were

24  storms in Louisiana in 2005 that caused
```

Confidential - Subject to Further Confidentiality Review

```
 1    great property damage there?

 2            A.    I don't know that.  I only

 3    know there is a place called New Orleans

 4    that has suffered damage.   I don't know

 5    which state does New Orleans belong to.

 6            Q.    New Orleans is in the State

 7    of Louisiana.  I'll represent that to

 8    you.  And for you in the materials

 9    business, storms provide a sales

10    opportunity, do they not?

11            A.    Not all disasters in nature

12    would provide such opportunities.

13            Q.    Disasters which destroy

14    property and destroy houses provide that

15    opportunity, don't they?

16            A.    Not opportunities to all

17    manufacturers.

18            Q.    They provide those

19    opportunities to you, do they not?

20            A.    No.

21            Q.    Mr. Jia, you report --

22                  Yesterday you described your

23    reports on the business activities of TG

24    each year?
```

```
 1           A.    Yes.

 2           Q.    And your counsel marked your

 3     reports for the years 2005, 2006, 2007

 4     and 2008 and maybe 2009, correct?

 5           A.    Yes.

 6           Q.    And in those reports, you

 7     not only report on the activities of the

 8     past year, but you set forth work

 9     assignments for the next year, correct?

10                 INTERPRETER:  Interpreter

11           clarification.

12                 THE WITNESS:  I think I

13           made -- there were statements in

14           the report.

15     BY MR. BLACK:

16           Q.    You make these reports to

17     the board of directors, correct, of TG?

18           A.    And also shareholders'

19     conference.

20           Q.    And you make these reports

21     as truthful as you can make them,

22     correct?

23           A.    Correct.

24           Q.    When you --
```