Confidential - Subject to Further Confidentiality Review

```
 1                    Before you make the reports,
 2     you gather information from within your
 3     company; do you not?
 4          A.    Yes.
 5          Q.    From whom do you gather
 6     information with respect to the sales of
 7     TG's products?
 8                    MR. CYR:  Objection, vague.
 9                    THE COURT:  Let's be a
10          little more precise time-wise and
11          otherwise.
12     BY MR. BLACK:
13          Q.    From whom did you gather the
14     information concerning the sales of TG's
15     products in 2006 in your report on that
16     date?
17          A.    I receive information on
18     sales daily.
19          Q.    And you receive information
20     from the sales department?
21          A.    Not entirely from the sales
22     department.
23          Q.    Where else do you receive
24     information?
```

Confidential - Subject to Further Confidentiality Review

1        A.      Some of the customers

2   directly contact me to provide

3   information.

4        Q.      Do you receive information

5   with respect to foreign sales?

6        A.      No.

7        Q.      So, your information is

8   limited to sales only in China?

9        A.      Most of the time, yes.

10        Q.      But sometimes you receive

11   information concerning sales outside of

12   China, correct?

13        A.      Yes.

14        Q.      When did your company first

15   set up a website presence?

16        A.      I don't know. I forgot.

17        Q.      In your 2006 report which

18   you marked as -- which we marked as

19   Exhibit Number 26, you described as one

20   of your strategies to intensify online

21   sales.  What did you mean by

22   "intensifying online sales"?

23        A.      "Intensify online sales"

24   refers to that online sales can serve the

Confidential - Subject to Further Confidentiality Review

```
 1    customers more directly and conveniently.
 2            Q.    So, you had an online
 3    presence in 2006 then, correct?
 4            A.    I believe so.
 5            Q.    Under your leadership, was
 6    the first online presence set up for TG?
 7            A.    I'm not sure whether it was
 8    in 2006, 2003 or 2005, but we do have a
 9    website that reflects our company as a
10    window of our company.
11            Q.    As a leader of the company,
12    who did you direct to set up that
13    presence?
14            A.    I don't know who set up the
15    website.
16            Q.    Who maintains the website
17    for your company Taishan or its
18    predecessor?
19            A.    Maybe the office, but I
20    don't know how to explain it clearly now.
21            Q.    Your company monitors
22    responses from your websites, does it
23    not?
24            A.    I don't know.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Well, if you're intensifying

 2   online sales, you're --

 3                What did you mean by the

 4   term "intensify online sales"?

 5          A.    Other enterprises also

 6   emphasizes on to intensify online sales.

 7   It is a very popular term, therefore, in

 8   my report, I also stressed on intensify

 9   online sales.  That's all to the meaning

10   of it.  There was no detailed arrangement

11   in that regard.

12          Q.    You wanted to have more

13   sales by using your online presence, did

14   you not?

15          A.    Yes.

16          Q.    And you knew that people

17   around the world read your website,

18   correct?

19                MR. CYR:  Objection,

20          speculation.

21                THE COURT:  Yes, it is

22          speculation.  What was his intent?

23   BY MR. BLACK:

24          Q.    Did you receive --
```

Confidential - Subject to Further Confidentiality Review

1                    What was your intent in

2     setting up your website?

3            A.    The reason for setting up

4     the website is to have more people know

5     Taishan Gypsum.

6            Q.    And buy Taishan Gypsum's

7     product, correct?

8            A.    I don't exclude that

9     intention.

10           Q.    And you tracked sales as it

11    relates to your website presence, did you

12    not?

13           A.    I am not familiar with

14    websites.  I am illiterate of websites.

15           Q.    Well, in your Exhibit 27,

16    which was your report on the year 2007,

17    under the heading "Sales work reached new

18    breakthrough," you stated that one of the

19    reasons was "the advantage of a strong

20    online market."  Correct?

21           A.    Yes.

22           Q.    And you also described for

23    2007 that one of the reasons for that was

24    that you refined your website, correct?

Confidential - Subject to Further Confidentiality Review

1        A.      Yes.

2        Q.      And you gave directions to

3    those in your company who was handling

4    the online presence to make it more

5    accessible to people for sales, correct?

6        A.      And also for the people who

7    would have the opportunity to contact our

8    company in the future.

9        Q.      And you knew that --

10              You knew from your contacts

11   with the sales department that people

12   from America contacted you through your

13   website presence, did you not?

14       A.      I don't know.

15       Q.      And that those people were

16   searching for drywall from your company?

17              MR. CYR:  Objection.

18              THE COURT:  How would he

19       know that?  I sustain the

20       objection.

21   BY MR. BLACK:

22       Q.      Who within your sales

23   department was responsible for responding

24   to online requests for sales?

```
1            A.    I don't know who would be

2    responsible for that.

3            Q.    Who is responsible for your

4    sales of Taishan Gypsum products in the

5    years 2005, 6, 7 and 8?

6            A.    Fu Tinghuan.

7            Q.    And he is here to testify

8    this week, is he not?

9            A.    I believe you are notified

10   of that.

11           Q.    And you would refer

12   inquiries concerning the role of Internet

13   sales in growth of your gypsum sales to

14   Mr. Fu?

15           A.    No.

16           Q.    Who would you refer those

17   inquiries to?

18           A.    Well, I've only heard the

19   word "website sales," therefore, I used

20   it in my report.  I'm not very familiar

21   with computer.  Because of my busy work

22   schedule, I don't really use computer

23   that much.  I only use computer for the

24   purpose of reading the news.  Therefore,
```

Case 2:09-md-02047-EEF-MBN  Document 13754-3  Filed 03/21/12  Page 8 of 120
Confidential - Subject to Further Confidentiality Review

```
 1      I have not arranged Manager Fu for any

 2      detailed responses for the website sales.

 3              Q.    You wrote your reports that

 4      your counsel marked for Exhibits 25

 5      through 29 with the idea that people

 6      would believe what you said in your

 7      reports, correct?

 8              A.    Yes.

 9              Q.    You were truthful when you

10      wrote those reports, were you not?

11              A.    Yes.

12              Q.    And you wrote these reports

13      to the board of directors and to the

14      shareholders, correct?

15                    MR. CYR:  Objection.  That's

16              the third time.

17                    THE COURT:  Yes.  We've gone

18              through this already.

19      BY MR BLACK:

20              Q.    You intended that the board

21      of directors and the shareholders rely on

22      those reports, did you not?

23              A.    Yes.

24              Q.    And the board of directors
```

Confidential - Subject to Further Confidentiality Review

```
 1    accepted those reports, correct?

 2            A.    Yes.

 3                  MR. BLACK:  I have nothing

 4        further.

 5                  THE COURT:  Any redirect?

 6                  MR. CYR:  Yes, Your Honor,

 7        just very briefly.

 8                  MR. SEXTON:  I have less

 9        than five minutes.

10                  THE COURT:  All right.

11        Let's try to do it in three.

12                     -   -   -

13                     EXAMINATION

14                     -   -   -

15   BY MR. SEXTON:

16            Q.    Good afternoon, sir.  My

17   name is Mike Sexton.

18                  Have you heard of a company

19   called Rothchilt International, Limited

20   possibly out of Taiwan?

21            A.    You pronounce this name in

22   English.  I wish you could pronounce it

23   in Chinese.

24            Q.    Me too.
```

Confidential - Subject to Further Confidentiality Review

```
 1            A.     Because I'm not sure which

 2    company you're referring to.

 3            Q.     Have you dealt with any

 4    brokers of drywall or other products

 5    based in Taiwan?

 6            A.     No.

 7            Q.     Have you ever heard of a

 8    company called La Suprema?

 9            A.     No.

10            Q.     And finally, sir, have you

11    heard of my client, Banner Supply?

12            A.     I have not heard of it.

13            Q.     And to the best of your

14    knowledge today, you are not aware of TG

15    or TTP selling any drywall that

16    ultimately landed in the hands of Banner

17    Supply, correct?

18            A.     I don't know.

19                   MR. SEXTON:  Thank you very

20            much.

21                   THE COURT:  Any redirect?

22                   -  -  -

23                   EXAMINATION

24                   -  -  -
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. CYR:

 2           Q.    Mr. Jia, you were asked some

 3    questions about whether or not you

 4    received compensation as a result of your

 5    honorary position with BNBM.  Do you

 6    recall that question?

 7           A.    I remember.

 8           Q.    Do you remember that you

 9    answered the question, no, that you did

10    not receive any compensation?

11           A.    Yes.

12           Q.    Will you please clarify your

13    answer?

14           A.    Yes.  I have not received a

15    penny for the position that I have with

16    BNBM as it deputy general manager.  My

17    salary is all from TG.  The position as a

18    director in BNBM, that led to 25,000 RMB

19    that I received.  In China, we call it

20    the fee of vehicle and horses.  Because I

21    shouldn't ask for reimbursement when I go

22    for the board of directors meeting from

23    TG.  The directors of the board of

24    director of BNBM had a stipulation that
```

Confidential - Subject to Further Confidentiality Review

1    for all directors, the fee of vehicle and

2    horses is set to be 25,000 RMB.  That's

3    all.

4         Q.    Mr. Jia, I'm going to show

5    you what has been marked as Defendant's

6    22 and ask you if you recall the

7    questions that Mr. Seeger asked you with

8    respect to the projects that are

9    reflected in that document?

10        A.    Yes.

11        Q.    Just so that the record is

12   clear, were separate subsidiaries

13   established for the purposes of those

14   projects?

15             MR. SEEGER:  Objection,

16        leading, Your Honor.

17             THE COURT:  I'll allow it in

18        view of the translation and the

19        difficulty in doing it.

20             THE WITNESS:  I don't quite

21        understand your question.

22   BY MR. CYR:

23        Q.    Were separate subsidiaries

24   established for the purposes of the

```
1    projects reflected in the exhibit?
2         A.    I don't quite understand.
3    What do you mean by "subsidiaries"?
4         Q.    Companies.
5         A.    I understand now companies.
6         Q.    Were separate companies
7    established for the purpose of the
8    projects reflected in the exhibit?
9         A.    Yes.
10        Q.    Were Shandong Taihe and BNBM
11   shareholders in those companies?
12        A.    Yes.
13        Q.    Have either TG or TTP ever
14   been in a joint venture agreement with
15   BNBM?
16        A.    I don't understand your
17   concept of joint venture.
18        Q.    Mr. Seeger referred to these
19   projects as joint ventures between BNBM
20   and Shandong Taihe.  Do you recall that?
21   Do you recall that?
22        A.    You're asking me?
23        Q.    Yes.  Do you recall that?
24        A.    Yes, yes.
```

Confidential - Subject to Further Confidentiality Review

1      Q.   Do you have familiarity with

2  the concept of a joint venture under

3  Chinese law?

4      A.   Under Chinese law, whenever

5  there are two or more stockholders to

6  invest in one enterprise, that would be

7  called joint venture.  If the share is

8  one percent, that would also be

9  considered as joint venture.  A joint

10  venture is a concept that whenever there

11  are two or more shareholders investing in

12  one company, the company is completely

13  separately operated.  The joint venture

14  concept is a concept of shareholders.

15            MR. CYR:  I have no further

16        questions, Your Honor.

17            THE COURT:  All right.

18        We'll end here, and we'll come

19        back at 1:30.  We'll stand in

20        recess until 1:30.

21            THE VIDEOTAPE TECHNICIAN:

22        This concludes the deposition of

23        Tongchun Jia.  The total number of

24        tapes used today is four.  We're

Confidential - Subject to Further Confidentiality Review

```
 1            going off the record at 12:27.

 2                     -   -   -

 3               (Whereupon, the deposition

 4       concluded at 12:27 p.m.)

 5                     -   -   -

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E
 2
 3
                I, LINDA L. GOLKOW, a
 4    Registered Diplomate Reporter, Certified
      Court Reporter and Notary Public, do
 5    hereby certify that, pursuant to notice,
      the deposition of TONGCHUN JIA was duly
 6    taken on January 10, 2012 at 8:57 a.m.
      before me.
 7
 8              The said TONGCHUN JIA was
      duly sworn by the Court according to law
 9    to tell the truth, the whole truth and
      nothing but the truth and thereupon did
10    testify as set forth in the above
      transcript of testimony.  The testimony
11    was taken down stenographically by me.
12
                I do further certify that
13    the above deposition is full, complete
      and a true record of all the testimony
14    given by the said witness.
15
16
          Linda L. Golkow
17        Registered Diplomate Reporter
          Certified Realtime Reporter
18
19
20              (The foregoing certification
      of this transcript does not apply to any
21    reproduction of the same by any means,
      unless under the direct control and/or
22    supervision of the certifying reporter.)
23
24
```

```
 1              INSTRUCTIONS TO WITNESS

 2

 3

 4              Please read your deposition

 5   over carefully and make any necessary

 6   corrections.  You should state the reason

 7   in the appropriate space on the errata

 8   sheet for any corrections that are made.

 9

10              After doing so, please sign

11   the errata sheet and date it.  It will be

12   attached to your deposition.

13

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

1            - - - - -

           E R R A T A

2            - - - - -

3   PAGE   LINE   CHANGE

4   _____  _____  _____

5     REASON:  ____ _____

6   _____  _____  _____

7     REASON:  ____ _____

8   _____  _____  _____

9     REASON:  _____ _____

10  _____  _____  _____

11    REASON:  _____ _____

12  _____  _____  _____

13    REASON:  _____ _____

14  _____  _____  _____

15    REASON:  _____ _____

16  _____  _____  _____

17    REASON:  _____ _____

18  _____  _____  _____

19    REASON:  _____ _____

20  _____  _____  _____

21    REASON:  _____ _____

22  _____  _____  _____

23    REASON:  _____ _____

24

Confidential - Subject to Further Confidentiality Review

```
1
2                ACKNOWLEDGMENT OF DEPONENT
3
            I,_____ , do
4    hereby certify that I have read the
     foregoing pages, 827-944 through 494 and
5    that the same is a correct transcription
     of the answers given by me to the
6    questions therein propounded, except for
     the corrections or changes in form or
7    substance, if any, noted in the attached
     Errata Sheet.
8
9    _____
     TONGCHUN JIA              DATE
10
11
12
13
14
15
16   Subscribed and sworn
     to before me this
17   _____ day of _____, 20____.
18   My commission expires:_____
19
     _____
20   Notary Public
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    LAWYER'S NOTES

 2     PAGE   LINE

 3     ____   ____   _____

 4     ____   ____   _____

 5     ____   ____   _____

 6     ____   ____   _____

 7     ____   ____   _____

 8     ____   ____   _____

 9     ____   ____   _____

10     ____   ____   _____

11     ____   ____   _____

12     ____   ____   _____

13     ____   ____   _____

14     ____   ____   _____

15     ____   ____   _____

16     ____   ____   _____

17     ____   ____   _____

18     ____   ____   _____

19     ____   ____   _____

20     ____   ____   _____

21     ____   ____   _____

22     ____   ____   _____

23     ____   ____   _____

24     ____   ____   _____
```

# EXHIBIT C



Transcript of the Testimony of: **Tinghuan Fu**

01/10/2012

Chinese Drywall

Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2

 3      _____    § MDL NO. 2047
        IN RE:                 §
 4      CHINESE-               § SECTION: L
        MANUFACTURED            §
 5      DRYWALL PRODUCTS        § JUDGE FALLON
        LIABILITY               §
 6      LITIGATION              § MAGISTRATE
        _____    § JUDGE WILKINSON
 7
                    -   -   -
 8
          CROSS NOTICED IN VARIOUS OTHER ACTIONS
 9
                    -   -   -
10
                 January 10, 2012
11
                    -   -   -
12
          CONFIDENTIAL - SUBJECT TO FURTHER
13            CONFIDENTIALITY REVIEW
14                  -   -   -
15          Videotaped deposition of
        TINGHUAN FU, held at the Executive
16      Centre, Level 3, Three Pacific Place, One
        Queen's Road East, Hong Kong, China,
17      commencing at 1:30 p.m., on the above
        date, before Linda L. Golkow, Certified
18      Court Reporter, Registered Diplomate
        Reporter, Certified Realtime Reporter and
19      Notary Public.
                    -   -   -
20
21
22
            GOLKOW TECHNOLOGIES, INC.
23      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
```

```
 1    BEFORE:
 2          HONORABLE ELDON E. FALLON
            UNITED STATES FEDERAL COURT -
 3          EASTERN DISTRICT OF LOUISIANA
 4
      APPEARANCES:
 5
 6          GAINSBURGH, BENJAMIN, DAVID, MEUNIER
            & WARSHAUER, L.L.C.
 7          BY:  GERALD E. MEUNIER, ESQUIRE
            2800 Energy Centre
 8          1100 Poydras Street
            New Orleans, Louisiana 70163
 9          (504) 522-2304
            gmeunier@gainsben.com
10          Representing the Plaintiffs'
            Steering Committee
11
12          HERMAN HERMAN KATZ & COTLAR, LLP
            BY:  LEONARD A. DAVIS, ESQUIRE
13          820 O'Keefe Avenue
            New Orleans, Louisiana 70113
14          (504) 581-4892
            Ldavis@hhkc.com
15          Representing the Plaintiffs'
            Steering Committee
16
17          COLSON HICKS EIDSON
            BY:  ERVIN GONZALEZ, ESQUIRE
18          BY:  PATRICK S. MONTOYA, ESQUIRE
            255 Alhambra Circle
19          Penthouse
            Coral Gables, Florida 33134
20          (305) 476-7400
            Ervin@colson.com
21          Patrick@colson.com
            Representing Plaintiffs' Steering
22          Committee in the Federal and State
            Coordinated Actions
23
24
```

```
 1    APPEARANCES (CONTINUED):
 2
          LEVIN, FISHBEIN, SEDRAN & BERMAN
 3        BY:  ARNOLD LEVIN, ESQUIRE
          510 Walnut Street - Suite 500
 4        Philadelphia, Pennsylvania 19106
          (215) 592-1500
 5        Alevin@lfsblaw.com
          Representing the Plaintiffs'
 6        Steering Committee
 7
          SEEGER WEISS LLP
 8        BY:  SCOTT A. GEORGE, ESQUIRE
          One William Street
 9        New York, New York 10004
          (212) 584-0700
10        Sgeorge@seegerweiss.com
          Representing the Plaintiffs'
11        Steering Committee
12
          HOGAN LOVELLS US LLP
13        BY:  FRANK T. SPANO, ESQUIRE
          875 Third Avenue
14        New York, New York 10022
          (212) 918-3000
15        Frank.spano@hoganlovells.com
          Representing Taishan Gypsum Co.
16        Ltd. and Taian Taishan
          Plasterboard Company Ltd. and the
17        Witness, Tinghuan Fu
18
          HOGAN LOVELLS INTERNATIONAL LLP
19        BY:  EUGENE CHEN, ESQUIRE
          18th Floor, Park Place
20        1601 Nanjing Road West
          Shanghai, China 200040
21        (86 21) 6122 3800
          eugene.chen@hoganlovells.com
22        Representing Taishan Gypsum Co.
          Ltd. and Taian Taishan Plasterboard
23        Company Ltd. and the Witness,
          Tinghuan Fu
24
```

```
 1    APPEARANCES (CONTINUED):
 2

      GREENBERG TRAURIG, LLP
 3    BY:  HILARIE BASS, ESQUIRE
      1221 Brickell Avenue
 4    Miami, Florida 33131
      (305) 579-0745
 5    bassh@gtlaw.com
      Representing the Home Builders
 6    Steering Committee
 7

      PERKINS COIE LLP
 8    BY:  DAVID L. BLACK, ESQUIRE
      1899 Wynkoop Street
 9    Suite 700
      Denver, Colorado 80202
10    (303) 291-2300
      DBlack@perkinscoie.com
11    Representing the State of Louisiana
12

      THOMPSON COE COUSINS & IRONS, L.L.P.
13    BY:  KEVIN F. RISLEY, ESQUIRE
      One Riverway
14    Suite 1600
      Houston, Texas 77056
15    (713) 403-8210
      krisley@thompsoncoe.com
16    Representing The North River
      Insurance Company
17
18    BRENNER, EVANS & MILLMAN, P.C.
      BY:  THEODORE I. BRENNER, ESQUIRE
19    411 East Franklin Street
      Suite 200
20    Richmond, Virginia 23218
      Tbrenner@beylaw.com
21    (804) 644-1300
      Representing Tobin Trading Company
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (CONTINUED):
 2
 3         McKENRY, DANCIGERS, DAWSON & LAKE, P.C.
           BY:  J. BRIAN SLAUGHTER, ESQUIRE
 4         192 Ballard Court
           Suite 400
 5         Virginia Beach, Virginia 23462
           (757) 461-2500
 6         Jbslaughter@va-law.org
           Representing Atlantic Homes LLC and
 7         Multiple Other Virginia-Based
           Defendants
 8
 9         QUINN EMANUEL URQUHART & SULLIVAN,LLP
           BY:  JANE M. BYRNE, ESQUIRE
10         BY:  JULIA BESKIN, ESQUIRE
           51 Madison Avenue
11         22nd Floor
           New York, New York 10010
12         (212) 849-7000
           Janeburne@quinnemanuel.com
13         Juliabeskin@Quinnemanuel.Com
           Representing Chartis Select Insurance
14         Company and Related Chartis Insurers
15
16         WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
           BY:  MICHAEL SEXTON, ESQUIRE
17         3344 Peachtree Road, NE
           Suite 2400
18         Atlanta, Georgia 30326
           (404) 876-2700
19         msexton@wwhgd.com
           Representing Various Banner
20         Defendants
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (CONTINUED):

 2

        SINNOTT, NUCKOLS & LOGAN, PC

 3      BY:  KENNETH F. HARDT, ESQUIRE

        13811 Village Mill Drive

 4      Midlothian, Virginia 23114

        (804) 378-7600

 5      khardt@snllaw.com

        Representing Venture Supply, Inc. and

 6      Porter-Blaine Corp.

 7

     ALSO PRESENT:

 8

        SUNNY WANG, INTERPRETER

 9

10

11                     -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1    APPEARANCES VIA TELEPHONE:
 2
 3        GALLOWAY JOHNSON TOMPKINS BURR and SMITH
          BY:  CARLINA C. EISELEN, ESQUIRE
 4        One Shell Square
          701 Poydras Street, 40th Floor
 5        New Orleans, Louisiana 70139
          (504) 525-6802
 6        ceiselen@gjtbs.com
          Representing Interior/Exterior
 7        Building Supply
 8
          HUNTON & WILLIAMS LLP
 9        BY:  A. TODD BROWN, ESQUIRE
          Bank of America Plaza
10        101 South Tryon Street
          Suite 3500
11        Charlotte, North Carolina  28280
          (704) 378-4700
12        Representing Stock Building Supply, LLC
13
14        JONES, WALKER, WAECHTER, POITEVENT,
          CARRERE & DENEGRE LLP
15        BY:  MEGAN E. DONOHUE, ESQUIRE
          600 Jefferson Street, Suite 1600
16        Lafayette, Louisiana 70501
          (337) 262-9062
17        mdonohue@joneswalker.com
          Representing Fireman's Fund Insurance
18        Company
19
          FULMER LEROY ALBEE BAUMANN
20        BY:  MICHAEL P. McCAHILL, ESQUIRE
          2866 East Oakland Park Boulevard
21        Ft. Lauderdale, Florida 33306
          (954) 707-4430
22        mmccahill@fulmerleroy.com
          Representing Independent Builders
23        Supply Association (IBSA)
24
```

```
 1    APPEARANCES VIA TELEPHONE (CONTINUED):
 2
 3         WRIGHT, FULFORD, MOORHEAD & BROWN, P.A.
           BY:  DORYK B. GRAF, JR., ESQUIRE
 4         145 N. Magnolia Ave.
           Orlando, Florida 32801
 5         (407) 425-0234
           dgraf@wfmblaw.com
 6         Representing West Construction, Inc.
 7
 8         QUINN EMANUEL URQUHART & SULLIVAN, LLP
           BY: CLINTON DOCKERY, ESQUIRE
 9         51 Madison Avenue, 22nd Floor
           New York, New York 10010
10         (212) 849-7000
           clintondockery@quinnemanuel.com
11         Representing Chartis Select Insurance
           Company and Related Chartis Insurers
12
13         RUMBERGER, KIRK & CALDWELL, P.A.
           BY:  MONICA C. SEGURA, ESQUIRE
14         Brickell Bayview Centre, Suite 3000
           80 Southwest 8th Street
15         Miami, Florida 33130
           (305) 358-5577
16         Representing several defendants and
           Defendants' Liaison Counsel for
17         Installers
18         BUCHANAN INGERSOLL & ROONEY
           BY:  C. ROBERT ZAPPALA, ESQUIRE
19         One Oxford Centre
           301 Grant Street, 20th Floor
20         Pittsburgh, Pennsylvania 15219
           (412) 392-2135
21         bobby.zappala@bipc.com
           Representing 84 Lumber
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA TELEPHONE (CONTINUED):

 2

 3        WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC

          BY:  P. SHANE O'NEILL, ESQUIRE

 4        3344 Peachtree Road, NE

          Suite 2400

 5        Atlanta, Georgia 30326

          (404) 876-2700

 6        soneill@wwhgd.com

          Representing Various Banner

 7        Defendants

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1     APPEARANCES VIA STREAM:
 2
       BECNEL LAW FIRM, L.L.C.
 3     BY:  ROBERT BECNEL, ESQUIRE
       106 W. 7th Street
 4     Reserve, Louisiana 70084
       (985) 536-1186
 5     robbecnel@aol.com
       Representing the Plaintiffs'
 6     Steering Committee
 7
       PARKER WAICHMAN ALONSO LLP
 8     BY:   JORDAN L. CHAIKIN, ESQUIRE
       3301 Bonita Beach Road
 9     Bonita Springs, Florida 34134
       (239) 390-1000
10     Jchaikin@yourlaywer.com
       Representing Plaintiffs' Steering
11     Committee
12
       MORGAN & MORGAN
13     BY:  PETE V. ALBANIS, ESQUIRE
       12800 University Drive
14     Suite 600
       Fort Myers, Florida 33907
15     (877) 667-4265
       Representing the Plaintiffs
16
17     IRPINO LAW FIRM
       BY:  ANTHONY IRPINO, ESQUIRE
18     2216 Magazine Street
       New Orleans, Louisiana 70130
19     Airpino@irpinolaw.com
       (504) 525-1500
20     Representing the Plaintiffs
21
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 13246-1 Filed 03/26/12 Page 33 of 120
Case 2:09-md-02047-EEF-JCW Document 13254-1 Filed 03/21/12 Page 3 of 126
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3         GALLOWAY JOHNSON TOMPKINS BURR and SMITH
           BY:   CARLINA C. EISELEN, ESQUIRE
 4         One Shell Square
           701 Poydras Street, 40th Floor
 5         New Orleans, Louisiana 70139
           (504) 525-6802
 6         ceiselen@gjtbs.com
           Representing Interior/Exterior
 7         Building Supply
 8
           HEARD & MEDACK, P.C.
 9         BY:   JAMES DAVIS, ESQUIRE
           9494 Southwest Freeway, Suite 700
10         Houston, Texas 77074
           (713) 772-6400
11         jdavis@heardmedackpc.com
           Representing CastleRock Communities, L.P.
12
13
           HUNTON & WILLIAMS LLP
14         BY:   A. TODD BROWN, ESQUIRE
           Bank of America Plaza
15         101 South Tryon Street
           Suite 3500
16         Charlotte, North Carolina  28280
           (704) 378-4700
17         tbrown@hunton.com
           Representing Stock Building Supply, LLC
18
19
           SHER GARNER CAHILL RICHTER KLEIN &
20         HILBERT, L.L.C.
           BY:   MATTHEW C. CLARK, ESQUIRE
21         909 Poydras Street
           Suite 2800
22         New Orleans, Louisiana 70112
           (504) 299-2100
23         mclark@shergarner.com
           Representing the Southern Home
24         Defendants
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3        QUINN EMANUEL URQUHART & SULLIVAN, LLP
          BY: CLINTON DOCKERY, ESQUIRE
 4        51 Madison Avenue, 22nd Floor
          New York, New York 10010
 5        (212) 849-7000
          clintondockery@quinnemanuel.com
 6        Representing Chartis Select Insurance
          Company and Related Chartis Insurers
 7
 8        JONES, WALKER, WAECHTER, POITEVENT,
          CARRERE & DENEGRE LLP
 9        BY:  MEGAN E. DONOHUE, ESQUIRE
          600 Jefferson Street, Suite 1600
10        Lafayette, Louisiana 70501
          (337) 262-9062
11        mdonohue@joneswalker.com
          Representing Fireman's Fund Insurance
12        Company
13
          DEUTSCH, KERRIGAN & STILES
14        BY:  MELISSA M. SWABACKER, ESQUIRE
          755 Magazine St.
15        New Orleans, Louisiana  70130
          (504) 581-5141
16        mswabacker@dkslaw.com
          Representing Landmark American
17        Insurance Company
18
19        WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
          BY:  SHUBHRA MASHELKAR, ESQUIRE
20        3344 Peachtree Road, NE
          Suite 2400
21        Atlanta, Georgia 30326
          (404) 876-2700
22        Smashelkar@wwhgd.com
          Representing Various Banner
23        Defendants
24
```

```
 1                    -  -  -
 2                 I N D E X
    WITNESS                         PAGE NO.
 3
    TINGHUAN FU
 4
          By Mr. Spano              22
 5        By Mr. Meunier            37
          By Mr. Gonzalez           111
 6        By Mr. Spano              124
 7
 8                    -  -  -
               E X H I B I T S
 9
    NO.          DESCRIPTION        PAGE NO.
10
    Fu-1         Information on the   59
11               Members to the
                 Board of Directors,
12               Members to the
                 Board of
13               Supervisors and
                 Managers of
14               Shandong Taihe
                 Dongxin Co., Ltd.,
15               Bates stamped TG
                 0020710
16
    Fu-1A        Document in          59
17               Chinese, Bates
                 stamped TG 0020710
18
    Fu-2         Information on       60
19               Directors,
                 Supervisors and
20               Managers of
                 Shandong Taihe
21               Dongxin Co., Ltd.,
                 Bates stamped TG
22               0020712
23  Fu-2A        Document in          60
                 Chinese, Bates
24               stamped TG 0020712
```

Confidential - Subject to Further Confidentiality Review

```
 1

      Fu-3           Contract, Bates       98
 2                   stamped TG 0001684
                     and TG 0001685
 3

      Fu-4           Contract, Bates       101
 4                   stamped TG 00019854
                     through TG 00019857
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1                    -  -  -
2               THE VIDEOTAPE TECHNICIAN:
3         We are now on the record.  My name
4         is Dan Lawlor.  I'm a videographer
5         for Golkow Technologies.
6               Today's date is January 10,
7         2012, and the time is 1:30 p.m.
8               This video deposition is
9         being held in Hong Kong, China in
10        the matter of Chinese Drywall
11        Litigation for the United States
12        District Court, Eastern District
13        of Louisiana, MDL Number 2047 and
14        cross-noticed in various other
15        actions.
16              The deponent today is Fu,
17        Tinghuan.
18              Will Your Honor and all
19        those present state your presence
20        for the record.
21              THE COURT:  Judge Eldon
22        Fallon, Eastern District of
23        Louisiana.
24              MR. MEUNIER:  Gerry Meunier
```

Confidential - Subject to Further Confidentiality Review

```
 1        appearing for the Plaintiffs'

 2        Steering Committee in the MDL.

 3            MR. DAVIS:  Leonard Davis on

 4        behalf of the Plaintiffs' Steering

 5        committee and Plaintiffs' Liaison

 6        Counsel.

 7            MS. BASS:  Hilarie Bass from

 8        Miami, Florida on behalf of the

 9        Home Builders Steering Committee.

10            MR. GONZALEZ:  Good

11        afternoon.  Ervin Gonzalez on

12        behalf of the PSC and the MDL

13        liaison states.

14            MR. MONTOYA:  Patrick

15        Montoya on behalf of the PSC and

16        the MDL liaison states' counsel.

17            MR. SLAUGHTER:  Brian

18        Slaughter from McKenry, Dancigers,

19        Dawson & Lake.  I'm here

20        representing Atlantic Homes, LLC.

21            MR. BRENNER:  Theodore

22        Brenner.  I represent Tobin

23        Trading in the Germano action.

24            MR. HARDT:  Kenneth Hardt, I
```

```
 1          represent Venture Supply in the

 2          Germano action and in the

 3          Alexander state court action.

 4                MS. BYRNE:  Jane Byrne from

 5          Quinn Emanuel on behalf of the

 6          Chartis insurers.  With me is my

 7          colleague, Julia Beskin.

 8                MR. SEXTON:  Mike Sexton for

 9          certain Banner Supply entities.

10                MR. BLACK:  David Black for

11          the State of Louisiana, with

12          reservations that are pending in

13          our motion to remand.

14                MR. LEVIN:  Arnold Levin,

15          lead counsel, Plaintiffs' Steering

16          Committee.

17                MR. SPANO:  Frank Spano for

18          the defendants, Taishan Gypsum and

19          TTP.

20                MR.CHEN:  Eugene Chen from

21          Hogan Lovells for Taishan Gypsum

22          and TTP.

23                THE VIDEOTAPE TECHNICIAN:

24          The court reporter today is Linda
```

Confidential - Subject to Further Confidentiality Review

```
 1              Golkow.  Your Honor, please

 2         proceed.

 3                       -   -   -

 4              TINGHUAN FU, after having

 5         been duly sworn, was examined and

 6         testified as follows:

 7                       -   -   -

 8              THE WITNESS:  Yes, I do.

 9              THE COURT:  Have a seat,

10         please.

11              You may proceed, Counsel.

12                       -   -   -

13              EXAMINATION

14                       -   -   -

15  BY MR. SPANO:

16         Q.    Mr. Fu, who is your current

17  employer?

18         A.    Taishan Gypsum Company,

19  Limited.

20         Q.    What position do you hold

21  with Taishan Gypsum?

22         A.    My current position or prior

23  position?  What time period?

24         Q.    What's your job now?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    I am the manager of the

 2   sales company.  I'm also the deputy

 3   general manager in charge of sales.

 4          Q.    When did you first start

 5   working for the company?

 6          A.    July 1999.

 7          Q.    What was the name of the

 8   company at that time?

 9          A.    Shandong Taihe Dongxin

10   Company, Limited.

11          Q.    What was your position when

12   you joined the company in July of 1999?

13          A.    When I first joined the

14   company, I was a salesperson.

15          Q.    What did you do as a

16   salesperson?

17          A.    To sell gypsum board all

18   over China.

19          Q.    How long did you work as a

20   salesperson?

21          A.    As a salesperson, I worked

22   for over two years.

23          Q.    Until approximately 2001 you

24   worked as a salesperson?
```

```
 1          A.      In the year 2001, I was a
 2    deputy director of sales department.
 3          Q.      What did you do as deputy
 4    director of the sales department
 5    beginning in 2001?
 6          A.      To assist our director of
 7    sales for daily management.
 8          Q.      Who was the director of
 9    sales in 2001?
10          A.      Mr. Li Ruizhong.
11          Q.      To your knowledge, did the
12    company have any export sales between
13    1999 and 2001?
14          A.      I don't know.  No, not in
15    that period of time.
16          Q.      What was your next position
17    after deputy sales manager?
18          A.      In May 2004, I became the
19    sales manager.  The Li that I mentioned
20    earlier, Director Li, retired.
21          Q.      What were your major
22    responsibilities as sales manager
23    beginning in May 2004?
24          A.      To manage the sales
```

```
 1   assignment.

 2          Q.     Please explain what you mean

 3   by "sales assignment."

 4          A.     Which is to sell gypsum

 5   boards.

 6          Q.     As sales manager, did you

 7   have anyone that you supervised?

 8          A.     I supervised the

 9   salespeople.

10          Q.     Approximately how many

11   salespeople did Taishan Gypsum have in

12   the 2004/2005 time frame?

13          A.     More than 40, less than 50.

14          Q.     After 2005, between 2006 and

15   2008, did the number of salesmen go up or

16   down significantly?

17          A.     A few people left, about six

18   or seven people left to TTP.

19          Q.     When did that occur?

20          A.     2006.

21          Q.     Do you recall the names of

22   the people who left the TG sales

23   department to join TTP?

24          A.     There was a Peng Wenlong and
```

Confidential - Subject to Further Confidentiality Review

1    Yang Jiapo, Kong Qingguo, Che Gang.  And

2    also a Hou Jie and a few more which I

3    cannot recall.  I cannot recall their

4    names.

5          Q.    Did you remain as the sales

6    manager of Taishan Gypsum through the end

7    of 2007?

8          A.    I still am until today.

9          Q.    To your knowledge, when did

10   Taishan Gypsum begin getting involved in

11   export sales?

12         A.    Perhaps 2005, the second

13   half of 2005.

14         Q.    What happened in the second

15   half of 2005 in terms of the company

16   getting involved in export sales?

17         A.    What do you mean, what

18   happened?

19         Q.    Describe generally how the

20   company started getting involved in

21   export sales?

22         A.    At the time, some trading

23   companies came to our company and also

24   some foreign customers came to our

Confidential - Subject to Further Confidentiality Review

1    company.

2         Q.    How did the company respond

3    to those events?

4         A.    For these matters, I

5    arranged somebody who was able to speak

6    foreign language, such as Mr. Peng

7    Wenlong, to greet these people.

8         Q.    Did there come a time when

9    you assigned any other employees in TG to

10   get involved in export sales besides Mr.

11   Peng Wenlong?

12        A.    I only arranged Peng Wenlong

13   to be in charge of receiving the other

14   people, but I'm not sure whether he has

15   arranged other people to assist him of

16   doing that.

17        Q.    Did you, yourself, have any

18   contacts with the trading companies or

19   foreign companies that came to TG in

20   connection with export sales?

21        A.    No.  Because I don't

22   understand English, only Peng Wenlong

23   could communicate with them.

24        Q.    Did you supervise Mr. Peng

```
 1    Wenlong's activities in connection with

 2    export sales?

 3          A.    Yes.  I supervised Peng

 4    Wenlong.

 5          Q.    What did you do to supervise

 6    him?

 7          A.    At the time, because we were

 8    not very familiar of exporting, so, I

 9    told Mr. Peng Wenlong some principles of

10    dealing with the foreign customers and

11    trading companies, being that contracts

12    should be signed in China and the

13    products should be loaded in China.  I

14    have also told him the pricing and the

15    risk that come along with it and also the

16    principle of prepayment.  Because at the

17    time, we were not very familiar with

18    foreign trading, so, I arrange him to get

19    familiar with these principles.

20          Q.    Other than establishing the

21    principles for dealing with export sales,

22    did you do anything else in terms of

23    supervising the export sales activities?

24          A.    For example, the contracts
```

1    that we sign and the price of the

2    contracts, I will have to have the final

3    saying of that.  And also the

4    specification that required by the

5    customers, whether the products could be

6    manufactured, it was also my

7    responsibility to communicate with the

8    manufacturing department.

9          Q.    Did Peng Wenlong get your

10   approval for each of the export sales

11   that the company entered into?

12         A.    No.

13         Q.    Did he have the authority to

14   enter into contracts involving export

15   sales without your approval?

16         A.    Yes.  For example -- yes.

17         Q.    Was it the practice that he

18   would consult with you regarding the

19   terms of each sale?

20         A.    What is it?  What is it that

21   he needed to consult me with?

22         Q.    I'll withdraw the question.

23               Did Mr. Peng Wenlong consult

24   with you regarding the pricing of sales?

Confidential - Subject to Further Confidentiality Review

```
 1          A.    For the pricing, as long as

 2    the money could arrive and as long as it

 3    has been a pricing that we agreed prior

 4    to that.  Of course, for the first time

 5    he had to consult me, but afterwards, he

 6    didn't have to consult me for pricing.

 7          Q.    Do you recall Mr. Peng

 8    consulting with you regarding any sales

 9    to American customers?

10              MR. GONZALEZ:  Your Honor,

11          can we have a date on those, a

12          time reference on those?

13              THE COURT:  I'm sorry.

14          Let's ask time reference so that

15          we understand what the time frame

16          is.

17    BY MR. SPANO:

18          Q.    During what period did Mr.

19    Peng Wenlong work in foreign sales for

20    Taishan Gypsum?

21          A.    2005, from the second half

22    of 2005.

23          Q.    Until when?

24          A.    What is it that you said?
```

Confidential - Subject to Further Confidentiality Review

```
 1    But in February of 2006, he went to TTP.

 2              Q.    During that time period,

 3    approximately the second half of 2005,

 4    until when Mr. Peng went to work for TTP,

 5    did he consult with you regarding any

 6    sales or potential sales to American

 7    customers?

 8              INTERPRETER:  Interpreter

 9         clarification.

10              THE WITNESS:  Not really for

11         the sales, but for the first time,

12         when a contract was entered, I

13         would need to calculate the cost,

14         the thickness of the gypsum board.

15         But for the contracts, afterwards,

16         he did not need to consult me.

17    BY MR. SPANO:

18              Q.    Do you recall Mr. Peng

19    consulting with you regarding a contract

20    for 12.7 millimeter thick drywall in the

21    second half of 2005?

22              A.    I'm aware of that.  He

23    consulted me for the pricing of the

24    specification of 12.7 millimeter
```

Case 2:09-md-02047-EEF-MBN Document 13456-15 Filed 03/26/12 Page 50 of 120
Case 2:09-md-02047-EEF-MBN Document 13454-15 Filed 03/26/12 Page 50 of 120
Confidential - Subject to Further Confidentiality Review

```
 1   thickness.
 2          Q.    Did he consult with you
 3   regarding any other aspect of that sale
 4   of 12.7 millimeter drywall?
 5          A.    I was not in charge of other
 6   aspects of the business as of who did he
 7   sell it to.  I was only in charge of the
 8   cost to produce gypsum board of this
 9   thickness and the pricing of the gypsum
10   board accordingly.
11          Q.    Do you recall learning the
12   name of the customer of the 12.7
13   millimeter drywall?
14          A.    I don't know.
15          Q.    Do you recall whether the
16   customer for the 12.7 millimeter drywall
17   was an American company?
18          A.    No, I don't know.
19          Q.    Do you recall hearing the
20   name of a company called Venture Supply
21   in 2005 or 2006?
22          A.    I don't understand English,
23   so, I don't know what is that at all.
24          Q.    Were you introduced to any
```

Confidential - Subject to Further Confidentiality Review

```
 1    customers for 12.7 millimeter drywall in

 2    2005 or 2006?

 3          A.    I was introduced to or did I

 4    introduce to someone else?  What?

 5          Q.    I'll withdraw the question.

 6                Do you recall meeting with

 7    or speaking with any customers or

 8    potential customers for the 12.7

 9    millimeter thick drywall in 2005 or 2006?

10          A.    No.

11          Q.    Have you ever held any

12    positions in TTP?

13          A.    I'm the director of TTP.

14          Q.    Are there other directors of

15    TTP?

16          A.    Yes.

17          Q.    Who are they?

18          A.    There are three directors,

19    the others being Peng Shiliang and Wang

20    Fenqin.

21          Q.    During what time period have

22    you been a director of TTP?

23          A.    Starting from February 2006

24    until after three years according to the
```

```
 1    company rule.  However, there was no

 2    election after three years.  That was the

 3    end of it.  And TTP in the year 2007

 4    stopped its operation, so, there was no

 5    reelection.

 6          Q.    Did T -- withdrawn.

 7                What were your main

 8    responsibilities when you served on the

 9    board of TTP?

10          A.    To review and discuss the

11    reports of the company, annual reports.

12    To make -- to review the reports.  And

13    sometimes our directors meet for some

14    daily matters as well.

15          Q.    Was there an annual report

16    for TTP for 2006?

17          A.    Yes.

18          Q.    For 2007?

19          A.    Yes.

20          Q.    Did you see both of those

21    annual reports?

22          A.    Yes.

23          Q.    Did those annual reports

24    contain any information regarding export
```

Confidential - Subject to Further Confidentiality Review

1    sales?

2           A.      The profit distribution and

3    performance, all that.  But for the

4    sales, it would not be reflected in the

5    report.  How could the sales be reflected

6    in the report?

7           Q.      Were TTP sales reflected in

8    the annual report in any way?

9           A.      To be reflected in any way?

10          Q.      I'll withdraw the question.

11                  Did the TTP annual reports

12    that you saw show the amount of sales of

13    drywall by TTP?

14          A.      There was -- the volume of

15    sales included square meters that was

16    sold.

17          Q.      Was the volume of sales

18    differentiated in any way between

19    domestic sales and export sales?

20          A.      There was a volume, but

21    which one you are talking about?  I know

22    that there was a total sales volume.

23          Q.      In addition to showing total

24    sales, did the annual reports also show

Confidential - Subject to Further Confidentiality Review

```
 1    the portion of the total sales that was

 2    export sales?

 3         A.    No.

 4         Q.    Did TTP have a sales

 5    manager?

 6         A.    TTP has a responsible

 7    person, who is Peng Wenlong.

 8         Q.    Was Peng Wenlong the person

 9    responsible for sales of TTP?

10         A.    Yes.

11         Q.    Did you supervise Peng

12    Wenlong's sales activities in TTP?

13         A.    I was not in charge.  I was

14    only the director.

15         Q.    As a director, did you play

16    any role in supervising TTP's sales?

17         A.    When we first formed the

18    board of directors, we had elected Peng

19    Shiliang as the chairman of the board of

20    directors.  I was told that whenever

21    there was a need for guidance in the

22    business, I was the one to ask.

23              INTERPRETER:  Interpreter

24         clarification.
```

Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  Basically I
 2          did not give any guidance.
 3   BY MR. SPANO:
 4          Q.    Did Mr. Peng Shiliang give
 5   any guidance to the sales activities of
 6   TTP?
 7          A.    I'm not sure about that.
 8   He's the general manager.
 9          Q.    Did Peng Wenlong consult
10   with you regarding any of the sales
11   transactions of TTP?
12          A.    He did not consult me.
13          MR. SPANO:  Pass the
14          witness.
15          THE COURT:  Are you
16          finished?
17          MR. SPANO:  Yes, sir.
18          THE COURT:  You tender the
19          witness?
20          MR. SPANO:  Yes.
21                  -  -  -
22              EXAMINATION
23                  -  -  -
24   BY MR. MEUNIER:
```

Confidential - Subject to Further Confidentiality Review

```
 1            Q.      Good afternoon, Mr. Fu.

 2                    You testified that you are

 3      the manager of the sales company and the

 4      deputy general manager in charge of sales

 5      for Taishan Gypsum today, true?

 6            A.      Correct.

 7            Q.      Are those different

 8      positions?

 9            A.      I was the general -- I was

10      the deputy general manager and the

11      director of the sales company.  There's

12      supposed to be a separate director for

13      the sales company, but there was none of

14      that.  So, I also became the manager of

15      the sales company.

16            Q.      What is the name of the

17      sales company?

18            A.      Actually, it's only a

19      department.  It is a department that was

20      in charge of sales for Taishan Gypsum

21      Company.

22            Q.      Who is the general manager

23      in charge of sales?

24                    INTERPRETER:  Interpreter
```

Confidential - Subject to Further Confidentiality Review

```
 1          clarification.
 2                  THE WITNESS:  There was a
 3          general manager Jia, J-I-A, above
 4          me, but I am the deputy general
 5          manager, and my last name is Fu,
 6          which also, coincidently, means
 7          deputy in Chinese.
 8                  MR. CHEN:  I'm sorry.  At
 9          least half of his comments weren't
10          translated.
11                  THE INTERPRETER:  Can you
12          tell me what was that?
13                  MR. CHEN:  I shouldn't, but
14          you might ask him.
15                  THE COURT:  Let him restate
16          it.
17                  INTERPRETER:  Well, he's
18          further explaining, so before
19          that, do you want to --
20                  THE COURT:  No.  No.  You
21          can comment.  Ask him to restate
22          it.
23                  THE WITNESS:  I was the
24          deputy general manager in charge
```

Confidential - Subject to Further Confidentiality Review

```
 1              of sales.  I was also the manager
 2              of the sales company.
 3    BY MR. MEUNIER:
 4         Q.    Who was your boss as deputy
 5    general manager in charge of sales?
 6         A.    On top of me was General
 7    Manager Jia, J-I-A.  I report to him.
 8         Q.    Who reports to you as boss
 9    as deputy general manager in charge of
10    sales?
11         A.    Because I'm the manager of
12    sales, the salespeople report to me.
13         Q.    And who is your boss as the
14    manager of the sales department?
15         A.    Who is my boss?  That would
16    be General Manager Jia.
17         Q.    Is that Mr. Jia who gave his
18    deposition earlier today?
19         A.    Yes.
20         Q.    So, as I understand it, in
21    the area of sales, you report at Taishan
22    Gypsum to Mr. Jia as your boss?
23         A.    Correct.
24         Q.    And all of the sales
```

Confidential - Subject to Further Confidentiality Review

```
 1    personnel at Taishan Gypsum report to you

 2    as their boss, is that true?

 3         A.    Yes.

 4         Q.    And that includes sales

 5    personnel involved in export sales, true?

 6              MR. SPANO:  Objection.

 7              THE COURT:  Do you have an

 8         objection?  Did you object?

 9              MR. SPANO:  Yeah.  I object

10         to --

11              THE COURT:  I overrule the

12         objection.

13              Look, let me tell the

14         witness something.  She has to

15         interpret what you're saying.  So,

16         give her an opportunity to

17         interpret.  Pause in between your

18         paragraphs so she can catch up

19         with you.

20              Do you want to restate the

21         question?

22              MR. MEUNIER:  I didn't get a

23         response.

24    BY MR. MEUNIER:
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     The question is, is it true
 2     that all sales personnel, including those
 3     involved in export sales, report to you
 4     as their boss?
 5          A.     I'm a manager.  Not all the
 6     salespeople report to me.
 7          Q.     Who else do salespeople
 8     report to as their boss other than you?
 9          A.     I have a deputy manager.
10          Q.     Who is that?
11          A.     Xue Shufeng.  X-U,
12     S-H-U-F-E-N-G.  Correction.  X-U-E, last
13     name, instead of X-U.
14          Q.     Does Mr. Xue report to you
15     on the activities of the salespeople who
16     report to him?
17          A.     It's not necessary.
18          Q.     Does Mr. Xue, therefore,
19     have full authority to supervise the
20     sales personnel, including those in
21     export sales?
22          A.     He managed in assistance of
23     me.
24          Q.     You told us that there were
```

Case 2:09-md-02047-EEF-MBN Document 13246-5 Filed 03/26/12 Page 61 of 120
Case 2:09-md-02047-EEF-JCW Document 13254-5 Filed 03/21/12 Page 1 of 20
Confidential - Subject to Further Confidentiality Review

```
 1    40 to 50 sales employees at TG before TTP

 2    was formed in 2006; is that correct?

 3         A.    Which year was that?

 4         Q.    Before TTP was formed in

 5    2006 --

 6         A.    Yes.

 7         Q.    -- is it true there were 40

 8    to 50 salespeople working for TG?

 9         A.    Less than 50.

10         Q.    But more than 40?

11         A.    Correct.

12         Q.    How many were involved in

13    export sales?

14         A.    You mean the employee of TG?

15         Q.    Yes.

16         A.    During the time 2005 and

17    2006, it was Peng Wenlong who was

18    assigned to be in charge of that.  Some

19    people who understood foreign language

20    was assigned to greet those people.  But

21    we did not assign in detail who would be

22    responsible for that.

23         Q.    How many others besides Peng

24    Wenlong were assigned to deal with
```

Confidential - Subject to Further Confidentiality Review

```
 1    foreign customers?

 2           A.    Che Gang, Yang Jiapo.  They

 3    are also salespeople.

 4           Q.    Yang Jiapo also known as

 5    Apollo Yang?

 6           A.    I don't know he has this

 7    name.

 8           Q.    Che Gang also known as Frank

 9    Clem?

10           A.    I'm not sure.

11           Q.    I'm sorry.  I misspoke.  Che

12    Gang also known as Bill Cher?

13           MR. SPANO:  Objection to

14        form.

15           THE WITNESS:  I don't know.

16    BY MR. MEUNIER:

17           Q.    Do you know why training

18    companies and foreign customers came to

19    your company in the second half of 2005,

20    which you say is when export sale

21    activity began?

22           MR. SPANO:  Objection to

23        form.  I think it came out

24        training, and I think he meant to
```

```
 1          say trading, but he can clarify.

 2   BY MR. MEUNIER:

 3          Q.    Training companies is what I

 4   heard him say.

 5               THE COURT:  Let him answer

 6          the question.  I'll overrule the

 7          objection.

 8               THE WITNESS:  I also don't

 9          know why they came to our company.

10   BY MR. MEUNIER:

11          Q.    Did the foreign customers

12   who came to your company include the

13   United States?

14          A.    I don't know.  I already

15   responded to you earlier.

16          Q.    Do you know which foreign

17   customers came to your company?

18          A.    I don't know.

19          Q.    When Peng Wenlong, Yang

20   Jiapo and Che Gang left to become

21   employees of TTP in 2006, were they given

22   any principles for dealing with foreign

23   customers?

24          A.    They were in charge of the
```

Confidential - Subject to Further Confidentiality Review

1    detailed operation.  I was not.

2         Q.    To your knowledge, did any

3    supervisor give to these three sales

4    personnel guidance on how to deal with

5    foreign customers when they became

6    employees of TTP in 2006?

7         A.    I don't know.

8         Q.    Who supervised Peng Wenlong,

9    Yang Jiapo and Che Gang as sales

10   employees of TTP?

11        A.    TTP's general manager, which

12   I'm not sure about their detailed

13   arrangements.

14        Q.    And TTP's general manager is

15   Peng Shiliang?

16        A.    Peng Shiliang is the general

17   manager.

18        Q.    You told us that one of the

19   principles you gave Peng Wenlong for

20   dealing with export sales was that

21   contracts should be signed in China.  Is

22   that true?

23        A.    Yes, because that was our

24   first time dealing with exporting.  I did

Confidential - Subject to Further Confidentiality Review

 1    not quite -- I was not quite familiar

 2    with that.  In order to decrease the

 3    risk, we decided to do that.

 4            Q.    What risk are you referring

 5    to?

 6            A.    To deliver in China, to pay

 7    in China.  We were afraid that we were

 8    not going to get the money.

 9            Q.    Aside from the risk of not

10    getting paid, did you see any other risks

11    in making sales contracts with foreign

12    customers?

13            A.    I don't know.  It was only

14    in the second half year of 2005.  I have

15    not done that before.  That's all I could

16    think of.

17            Q.    Did you give Mr. Peng

18    Wenlong any other instructions about

19    contracts being signed, other than the

20    ones you have mentioned so far today?

21            A.    No.

22            Q.    Did Peng Wenlong have a

23    company seal to use in signing sales

24    contracts with foreign customers?

Confidential - Subject to Further Confidentiality Review

```
1                MR. SPANO:  Objection to
2          form.
3                THE COURT:  If he knows, he
4          can answer.  If he doesn't, he
5          doesn't.
6                MR. SPANO:  Your Honor, it's
7          a question of time frame, which
8          company.
9                THE COURT:  That's a
10         legitimate objection.  I sustain
11         it.
12               MR. MEUNIER:  Let me break
13         it down.
14    BY MR. MEUNIER:
15         Q.    First I ask you this
16    question for the period from the second
17    half of 2005 to February of 2006 when
18    Peng Wenlong was involved in export sales
19    for TG.  During that period of time, did
20    he have a company seal to use for signing
21    sales contracts with foreign customers?
22         A.    What company seal are you
23    talking about?  I don't understand.
24         Q.    A company seal of either
```

Confidential - Subject to Further Confidentiality Review

```
 1    Shandong or Taishan Gypsum?

 2         A.    I don't know that.

 3         Q.    Did Peng Wenlong, to your

 4    knowledge, ever have a company seal of

 5    any kind to use for signing contracts?

 6         A.    I don't know.

 7               THE COURT:  Is it a seal or

 8         a stamp?

 9               MR. MEUNIER:  Am I using a

10         word that might be confusing?

11               INTERPRETER:  In Chinese, it

12         is the same translation.

13    BY MR. MEUNIER:

14         Q.    Did any of the sales

15    personnel for Taishan Gypsum have company

16    seals or stamps to use in signing

17    contracts?

18         A.    The stamps are necessary

19    when signing of a contract.

20         Q.    Yes.

21               Did Peng Wenlong have a

22    stamp that he was given by the company,

23    by Taishan Gypsum?

24         A.    I don't know.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Was there any restriction on
 2     who got stamps?
 3          A.      I believe there should be
 4     somebody who is in charge of the stamps.
 5     The stamps cannot be easily accessed by
 6     just anyone.
 7          Q.      So who is in charge of the
 8     stamps, Mr. Fu?
 9          A.      It should be somebody in the
10     office.  I'm not sure who exactly that
11     person is.
12          Q.      Are you saying that stamps
13     are kept in a safe or locked so that
14     sales personnel cannot get to them
15     without permission?
16          A.      I don't know about the
17     stamps.  I don't know how -- or them
18     being managed.  I'm not sure about that.
19     I'm not sure about the management of the
20     stamps.
21          Q.      Who, if not you, would know
22     about the management of the stamps for
23     Taishan Gypsum?
24          A.      I don't know the stamps.  I
```

Confidential - Subject to Further Confidentiality Review

1    don't know the management of the stamps.

2    I go out every day for sales.  I don't

3    know who is responsible for the stamps

4    and who manages the stamps.

5         Q.    But is it true that you

6    assume that a sales personnel who uses a

7    stamp has permission from the company to

8    use it?

9              MR. SPANO:  I object to the

10         form.

11             THE COURT:  Restate that.  I

12         agree.  Restate the question.

13   BY MR. MEUNIER:

14        Q.    If a salesperson employed by

15   Taishan Gypsum has possession of a stamp

16   and uses it, is it true that he got the

17   stamp with permission from the company?

18        A.    If he thinks it is

19   reasonable, he could put a stamp on it.

20   As long as he thinks that, there is no

21   risk, because he has the money, he could

22   stamp it.

23        Q.    And that's true for any

24   salesperson working for Taishan Gypsum?

Confidential - Subject to Further Confidentiality Review

1          A.    I know for the salesperson,

2    that's the case.  I'm not sure about

3    other people.

4          Q.    You told us that one of the

5    principles you gave Mr. Peng Wenlong for

6    export sales contracts was that the

7    products should be loaded in China.  Is

8    that true?

9          A.    Yes.

10         Q.    Was it okay if Taishan

11   Gypsum arranged for the freight costs of

12   shipping the product to a foreign country

13   after loading?

14              MR. SPANO:  I object to the

15         form.

16              THE COURT:  I'm sorry.

17         Object to the form.

18              MR. SPANO:  On vagueness.

19              THE COURT:  If you can put

20         some time in there.

21   BY MR. MEUNIER:

22         Q.    When you communicated to Mr.

23   Peng Wenlong that product should be

24   loaded in China for export sales

Confidential - Subject to Further Confidentiality Review

```
1    agreements that he made, did you tell him

2    that Taishan Gypsum could not pay for

3    freight costs in shipping the product

4    after it was loaded to a foreign country?

5         A.    I'm not sure about that

6    part.  I only know according to the

7    principle that we had been following for

8    local transactions, the manufacturer

9    would produce, and the products would be

10   verified and loaded in China.  I'm not

11   sure about the trading part.

12        Q.    You told us that Peng

13   Wenlong did not get authority from the

14   company on all of the export sales

15   agreements he signed.  Is that true?

16        A.    I only said that as long as

17   the price is reasonable and as long as he

18   could get back the payment, he could go

19   ahead with it.

20        Q.    Do you know of any sales

21   agreements with foreign customers made by

22   Peng Wenlong which were made without the

23   authority of your company?

24        A.    I don't know.
```

```
 1          Q.    Do you know of any sales

 2   agreements made by Che Gang with foreign

 3   customers that were made without the

 4   authorization of your company?

 5          A.    I don't know.

 6          Q.    You referred to a contract

 7   sale -- I'm sorry -- a sales contract in

 8   2005 or 6 dealing with 12.7 millimeter

 9   thickness of drywall.  Do you remember

10   that?

11          A.    I did mention the thickness

12   of the gypsum board, and I did say that I

13   calculated for the cost and the price of

14   that.

15          Q.    Are you saying, Mr. Fu, that

16   that sales contract was not authorized by

17   your company?

18          A.    I only have the guidance

19   that as long as the price is reasonable

20   and the money can be received, they could

21   go ahead with it.  That's all I said.

22          Q.    So the record is clear, I

23   want to be sure I understand your

24   testimony.
```

Confidential - Subject to Further Confidentiality Review

```
 1              You know of no sales

 2    contract entered into with a foreign

 3    customer by Taishan Gypsum sales

 4    personnel that was unauthorized by the

 5    company; is that correct?

 6         A.    Authorization?  What is the

 7    definition of authorization?

 8    Authorization is -- let me tell you that

 9    we authorize all the salespeople as a way

10    of doing business in China to do

11    business.  That's authorization.

12         Q.    So, your company, to your

13    knowledge, has approved all export sales

14    agreements with foreign customers that

15    have been made by your sales personnel to

16    this date; is that true?

17         A.    You have to specify what

18    kind of agreement are you talking about.

19    For the agreements which we have already

20    received a payment, that would be a valid

21    agreement, not including the oral

22    agreement.

23         Q.    Have you or anyone, to your

24    knowledge, on behalf of Taishan Gypsum
```

```
 1   ever advised a foreign customer that a

 2   salesperson did not have authority to

 3   enter into a sales agreement for drywall?

 4          A.    Can you repeat your

 5   question?

 6                THE COURT:  Why don't you

 7          read it again.

 8                THE WITNESS:  I have never

 9          met a foreign customer.  How could

10          I even tell them all the above?

11   BY MR. MEUNIER:

12          Q.    Thank you.

13                And to your knowledge, sir,

14   no one else on behalf of Taishan Gypsum

15   has given that advice to a foreign

16   customer?  Is that true?

17          A.    I don't know.

18          Q.    During the time TTP operated

19   between February 2006 and 2007, was the

20   nature of its drywall business different

21   from the nature of the business of

22   Taishan Gypsum?

23          A.    The product, gypsum boards,

24   are all the same.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Were the sales and marketing

 2    activities of TTP the same as the sales

 3    and marketing activities of TG?

 4          A.    I don't know that of TTP.  I

 5    only know TG.  I'm not in charge of that.

 6          Q.    You were a director at TTP,

 7    were you not?

 8          A.    I'm the director, but I was

 9    not in charge of the sales.

10          Q.    Do you know of any

11    differences in the sales practices of TTP

12    and TG?

13          A.    I don't know if there is any

14    differences.

15          Q.    Do you know of any

16    differences in the marketing practices of

17    TTP and TG?

18          A.    I don't know if there is any

19    differences.  I have never compared them.

20          Q.    You told us that the 2006

21    and 2007 annual reports of TTP gave the

22    total volume of drywall sales in square

23    meters.  Is that true?

24          A.    Correct.
```

Confidential - Subject to Further Confidentiality Review

1    Q.    To know the total volume of

2    those sales, the company needed to know

3    the total volume of export sales; is that

4    true?

5    A.    There was specific people

6    who are in charge of drafting the annual

7    report.  I was only in charge of

8    reviewing it.

9    Q.    Who would know the total

10   volume of export sales for TTP for 2006

11   and 2007?

12   A.    I don't know that.  I only

13   know in the year 2006, it was 26 million.

14   And in 2007, it was 40 million.  I do not

15   know the detailed categories.

16        THE COURT:  Okay.  We have

17        to change the tape at this time.

18        We'll take a break for 15 minutes.

19        THE VIDEOTAPE TECHNICIAN:

20        Off the record.  The time is 2:51,

21        end of Tape Number 2.

22             -  -  -

23        (Whereupon, a recess was

24        taken from 2:51 p.m. until 3:08

Confidential - Subject to Further Confidentiality Review

```
 1          p.m.)

 2                    -  -  -

 3          THE COURT:  Sir, you are

 4     still under oath.

 5          THE VIDEOTAPE TECHNICIAN:

 6     We're going back on the video

 7     record.  The time is 3:08.

 8          THE COURT:  You may proceed,

 9     Counsel.

10  BY MR. MEUNIER:

11          Q.    Mr. Fu, during the period of

12     your entire employment by Shandong and

13     Taishan Gypsum, and during the period of

14     time as a director of TTP, do you know of

15     any written policy of any of those

16     companies that specifically dealt with

17     contracts for the foreign sale of

18     drywall?

19          A.    Never.

20          Q.    Were sales personnel at

21     Shandong and Taishan Gypsum and then also

22     at TTP assigned e-mails for the purpose

23     of doing business?

24               MR. SPANO:  Object to the
```

Confidential - Subject to Further Confidentiality Review

```
 1              form.  The name Shandong is a

 2              place.

 3                   MR. MEUNIER:  Shandong Taihe

 4              Dongxin.

 5                   THE COURT:  That's the full

 6              name, or is it just the place of

 7              the location?

 8                   MR. CHEN:  That's what we've

 9              agreed as the shortened form of

10              the company name as opposed to

11              Shandong, which alone is just a

12              province.

13                   THE COURT:  Right.

14   BY MR. MEUNIER:

15         Q.    Shall I ask the question

16   again?  I'll ask the question.

17                   INTERPRETER:  Do you want me

18              to repeat it in Chinese?  I have

19              it too.

20                   MR. MEUNIER:  Just make sure

21              Shandong is spelled out.

22                   (Interpreter repeats

23              question to witness.)

24                   THE WITNESS:  They all have
```

Case 2:09-md-02047-EEF-MCW   Document 13454-16   Filed 03/21/12   Page 9 of 20
Confidential - Subject to Further Confidentiality Review

```
1              their own e-mails.
2    BY MR. MEUNIER:
3         Q.    Were they allowed to use
4    their own e-mails to conduct sales
5    business for these companies?
6         A.    We never have such
7    regulation nor have we any restriction
8    about that.  As long as they get the
9    payment and have the deal done.
10        Q.    Were they also allowed to
11   use instant messaging to conduct sales
12   business?
13        A.    There is no such regulation,
14   nor was there any arrangement about that
15   either.
16        Q.    As long as they got the
17   money?
18        A.    Correct.
19        Q.    That was the main
20   requirement, wasn't it?
21        A.    Correct.  In our local
22   business, that's the same way.
23        Q.    Right.  But it's true in
24   your export business too.  The main
```

```
1    requirement was to get the money in

2    export sales, true?

3         A.    Correct.  As long as you

4    get -- I get the payment, I will ship out

5    the product for you.

6         Q.    Yes.  And you did that,

7    didn't you?  The company did that?

8         A.    That's my requirement to

9    them.

10        Q.    It was your requirement as

11   an employee of your company?

12        A.    That's my requirement.

13        Q.    Were sales personnel allowed

14   to use text messaging in sales activity

15   as long as they got the money?

16        A.    We don't have any

17   regulations about that.

18        Q.    So, text messaging was not

19   prohibited, true?

20        A.    It was not prohibited,

21   neither was there a regulation to permit

22   or not permit that.

23        Q.    Mr. Fu, let me show you a

24   document which has been Bates numbered TG
```

Confidential - Subject to Further Confidentiality Review

```
 1   20710.

 2           A.    I don't understand.

 3                 MR. MEUNIER:  There's a

 4           translation.

 5                 MS. BASS:  What Exhibit

 6           Number will that be?

 7                 MR. MEUNIER:  This will be

 8           Fu Number 1.

 9                    -   -   -

10                 (Whereupon, Deposition

11           Exhibit Fu-1, Information on the

12           Members to the Board of Directors,

13           Members to the Board of

14           Supervisors and Managers of

15           Shandong Taihe Dongxin Co., Ltd.,

16           Bates stamped TG 0020710, and

17           Deposition Exhibit Fu-1A, Document

18           in Chinese, Bates stamped TG

19           0020710, was marked for

20           identification.)

21                    -   -   -

22                 MR. MEUNIER:  20710 is the

23           Bates Number.

24   BY MR. MEUNIER:
```

Confidential - Subject to Further Confidentiality Review

```
1          Q.    Is it true, Mr. Fu, that you

2     are listed on this document as a member

3     of the board of supervisors of Shandong

4     Taihe Dongxin Company Limited?

5          A.    Supervisors, yes, I was a

6     supervisor.

7          Q.    And you were elected as a

8     member of the board of supervisors; is

9     that true?

10         A.    Correct.

11                    -   -   -

12              (Whereupon, Deposition

13         Exhibit Fu-2, Information on

14         Directors, Supervisors and

15         Managers of Shandong Taihe Dongxin

16         Co., Ltd., Bates stamped TG

17         0020712, and Deposition Exhibit

18         Fu-2A, Document in Chinese, Bates

19         stamped TG 0020712, were marked

20         for identification.)

21                    -   -   -

22              MR. MEUNIER:  And I show you

23         a document which has been Bates

24         numbered 20712.  I'll mark as Fu
```

Confidential - Subject to Further Confidentiality Review

1           Number 2 the English and as Fu-2

2           the Chinese version of that

3           document.

4                MR. SPANO:   What number is

5           the exhibit?

6                MR. MEUNIER:   20712.  It's

7           Fu Number 2.

8    BY MR. MEUNIER:

9           Q.    Would you confirm that that

10   is your photograph and your correct

11   personal information as a member of the

12   board of supervisors of Shandong Taihe

13   Dongxin?

14          A.    Yes, yes.

15          Q.    For what period of time were

16   you a member of the board of supervisors

17   of Shandong Taihe Dongxin?

18          A.    From April 2005 to 2008.

19          Q.    When the company changed its

20   name to Taishan Gypsum, did you remain an

21   elected member of the board of

22   supervisors?

23          A.    Yes.

24          Q.    What is your understanding

Confidential - Subject to Further Confidentiality Review

```
 1    of the duties and responsibilities of a

 2    supervisor of Shandong, or Taishan

 3    Gypsum, as it was later called?

 4         A.    To supervise and review the

 5    ways the managers act according to the

 6    company's regulations.  For those that

 7    were not in compliance with regulations,

 8    I would correct them.

 9         Q.    Did you ever, as a member of

10    the board of supervisors of Shandong,

11    later called Taishan Gypsum, have the

12    need to correct a manager or director of

13    the company?

14         A.    No.

15         Q.    Were the export sales

16    activities of Shandong, later called

17    Taishan Gypsum, always conducted in

18    accordance with the shareholder

19    resolutions when you served as a

20    supervisor?

21         A.    We stopped doing that

22    afterwards.  TTP did it.

23         Q.    Up until the time TTP was

24    formed, is it true that the export sales
```

Confidential - Subject to Further Confidentiality Review

```
 1    activities of the directors of Shandong

 2    and Taishan Gypsum were always conducted

 3    in accordance with shareholder

 4    resolutions?

 5              MR. SPANO:  Objection,

 6         foundation.

 7              THE COURT:  Well, if he

 8         knows, I'll let him do it.  What

 9         is the foundation?  What's your

10         problem?

11              MR. SPANO:  The problem is

12         that there's no foundation that

13         there were shareholder resolutions

14         that addressed export sales.

15              THE COURT:  Let's ask him

16         that.

17              MR. MEUNIER:  Let me

18         rephrase the question.

19    BY MR. MEUNIER:

20         Q.   Up until the time TTP was

21    formed, is it true that the export sales

22    activities of the directors of Shandong

23    and Taishan Gypsum were always conducted

24    in accordance with the policies of those
```

Confidential - Subject to Further Confidentiality Review

1   companies?

2         A.    First of all, exporting

3   policy, exporting policy, we never had a

4   policy for exporting policy.  How should

5   I put it?  What word should I put it?  We

6   have not emphasize on that.

7         Q.    You did have export sales

8   activity, correct?

9         A.    Yes, we do have the

10  activity, but...

11        Q.    And you had certain

12  guidelines for conducting that activity,

13  correct?

14        A.    No.  What do you mean by

15  "guidelines"?

16        Q.    Were there any company

17  practices for conducting export sales?

18        A.    The policy --

19              INTERPRETER:  Interpreter

20        clarification.

21              THE COURT:  Let's just

22        translate.  Let's not have any

23        discussions with the witness.

24        What did he say?  Let's restate

Confidential - Subject to Further Confidentiality Review

```
 1              the question.

 2                   INTERPRETER:  He repeated

 3              what he said.  He had an accent,

 4              so...

 5                   THE COURT:  Let's ask the

 6              question again and then translate

 7              it.

 8   BY MR. MEUNIER:

 9         Q.   Aside from getting paid,

10   were there any company requirements of

11   Shandong, or later Taishan Gypsum,

12   concerning the export sales of drywall to

13   foreign customers?

14                   THE COURT:  Gerry, he was

15              going to object.  You've got to

16              put time on there.

17   BY MR. MEUNIER:

18         Q.   For the time frame starting

19   when export sales activity began at

20   Taishan Gypsum or Shandong, ending when

21   TTP was formed.

22         A.   Yes.

23         Q.   What were they?

24         A.   My requirement was an oral
```

Confidential - Subject to Further Confidentiality Review

```
 1    requirement, which we did not set the

 2    exporting as our main direction of sales.

 3    Because of the value of the exporting

 4    goods were low, the cost for shipment was

 5    high.  It was easy to be damaged.  We

 6    would not have that as a direction.

 7    Wherever there is a customer who come

 8    with money, we would, however, do

 9    business with them.  That's our guidance.

10         Q.    Including a customer from

11    the United States, true?

12         A.    All tradings, all

13    exportings.

14         Q.    Including the United States?

15         A.    Yes.

16         Q.    So, my question, sir, is

17    that for the entire time you served as a

18    supervisor for Shandong and then Taishan

19    Gypsum, did you ever know those

20    guidelines to be violated?

21         A.    I don't know.

22         Q.    How often did the Shandong

23    board of supervisors meet when you were a

24    member?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.     During a board of directors

 2   meeting or during the meeting of the

 3   supervisors, maybe once or twice a year.

 4          Q.     How often did the board of

 5   supervisors of Taishan Gypsum meet when

 6   you were a member?

 7          A.     The supervisors?  Twice a

 8   year.

 9          Q.     Were there discussions at

10   these meetings about the marketing of

11   drywall by the company?

12          A.     That would not be discussed.

13          Q.     Were there discussions at

14   these meetings about the export sales of

15   drywall by the company?

16          A.     No.

17          Q.     How did the supervisors

18   become informed about the marketing and

19   sales, export sales of drywall?

20          A.     It is not necessary for the

21   supervisors to know this information.

22          Q.     Who, other than supervisors,

23   needed to know that information?

24          A.     I don't know who would know.
```

Confidential - Subject to Further Confidentiality Review

```
 1    Why are you asking me?

 2         Q.    Who at Shandong, and later

 3    Taishan Gypsum, kept informed about --

 4              THE INTERPRETER:  Excuse me.

 5         I need a break for five minutes.

 6         Is that okay?

 7              THE COURT:  Sure.

 8              THE VIDEOTAPE TECHNICIAN:

 9         We are off the record.  The time

10         is 3:30.

11                   -   -   -

12              (Whereupon, a recess was

13         taken from 3:30 until 3:36 p.m.)

14                   -   -   -

15              THE VIDEOTAPE TECHNICIAN:

16         We're back on the record.  The

17         time is 3:36.

18    BY MR. MEUNIER:

19         Q.    Mr. Fu, you have told us

20    that marketing and export sales

21    activities were not discussed at the

22    meetings of the Shandong, and later

23    Taishan Gypsum, board of supervisor

24    meetings you attended.  Is that correct?
```

```
1         A.      Correct.

2         Q.      Which, if any, job positions

3    at Shandong, and later Taishan Gypsum,

4    were kept informed of these marketing and

5    export sales activities?

6         A.      Can you repeat the question?

7                 (Interpreter repeats the

8    question.)

9                 For those who are in charge

10   of the daily operations in sales in the

11   company, the supervisors and board of

12   directors were not required to know the

13   information.

14        Q.      You've indicated that

15   Shandong, and later Taishan Gypsum, did

16   not keep separate records of the volume

17   of export sales.  Is that true?

18        A.      Separate records?

19        Q.      Yes.  The volume of only

20   export sales, was that ever kept as a

21   record by either Shandong or Taishan

22   Gypsum?

23        A.      There should be a volume.

24   There should be a statistic number, but
```

1    it's not on the advertisement.

2        Q.    Was someone in charge of

3    keeping that statistic or measurement

4    that is the volume of export sales?

5        A.    I believe there should be a

6    record.

7        Q.    Who is the person who keeps

8    that record today?

9        A.    You mean TG?

10       Q.    I want to include Shandong,

11   when the export sales activity was

12   occurring when it was called Shandong, as

13   well as TG.

14       A.    I believe Peng Wenlong

15   should have the information.

16       Q.    Were records of the volume

17   of export sales kept for TTP when it was

18   in operation?

19       A.    I believe a record should

20   exist also for that.

21       Q.    Which individual would have

22   those records?

23       A.    I do not know who was in

24   charge of the record, but I only know

```
 1    that Peng Wenlong is in charge of sales.

 2            Q.     Was Peng Wenlong's salary

 3    influenced by the amount of sales he

 4    made?

 5                   MR. SPANO:  Objection.

 6                   THE COURT:  "Influenced"

 7         might be a problem.

 8    BY MR. MEUNIER:

 9            Q.     Dependent on?

10                   THE COURT:  Related to.

11    BY MR. MEUNIER:

12            Q.     Related to?

13            A.     I believe there should be a

14    relation.

15            Q.     Tell me what --

16            A.     There is a relation.

17            Q.     Excuse me.

18                   Explain the relation.

19            A.     There is no detailed

20    explanation for that.  If the amount is

21    not much, then the salary is not that

22    much.

23            Q.     But is it true that the

24    greater the volume of sales Peng Wenlong
```

Confidential - Subject to Further Confidentiality Review

1    was responsible for, the greater his

2    salary?

3            A.    He could get promoted.

4            Q.    In addition to being

5    promoted, would he also make more money,

6    the more sales he made?

7            A.    Yes, yes.

8            Q.    Is the same true of other

9    salespeople in addition to Peng Wenlong?

10           A.    Yes.  There are also

11   relationships between -- for their sales.

12           Q.    So that would be true for

13   both Che Gang and Yang Jiapo?

14           A.    Both of them.

15           Q.    As Mr. Peng Wenlong's direct

16   supervisor, did you evaluate his job

17   performance?

18               MR. SPANO:  Objection to

19           form.  Which company are you

20           referring to?

21   BY MR. MEUNIER:

22           Q.    You were his direct

23   supervisor when he was employed by

24   Taishan Gypsum; is that true?

Confidential - Subject to Further Confidentiality Review

```
 1          A.    Correct.

 2          Q.    And you were a director at

 3   TTP when he was an employee of TTP after

 4   that, true?

 5          A.    Correct.

 6          Q.    For the period when he

 7   worked at both Taishan Gypsum and TTP,

 8   did you consider Peng Wenlong to be a

 9   competent employee?

10          A.    He was very diligent in his

11   work.

12          Q.    Trustworthy?

13          A.    I believe he's good.

14          Q.    Have you ever had reason to

15   discipline or criticize him for his job

16   performance?

17          A.    I have not criticized him

18   during the period of time that I managed

19   TG.  I did not manage him either in TTP.

20          Q.    Are you also familiar with

21   the work of Che Gang as a sales employee

22   of Taishan Gypsum?

23          A.    Peng Wenlong was in charge

24   of that.  I was not in charge of the
```

Confidential - Subject to Further Confidentiality Review

```
 1    details.
 2          Q.    Even though you were not in
 3    charge of the details, were you generally
 4    aware of the job performance of Che Gang?
 5          A.    I think he's also good.
 6          Q.    Trustworthy?
 7          A.    I trust him.
 8          Q.    To your knowledge, was there
 9    ever any reason for him to be disciplined
10    or criticized in his job performance
11    either at Taishan Gypsum or at TTP?
12          A.    No.
13          Q.    Would you say the same about
14    Yang Jiapo?
15          A.    Yang Jiapo resigned.
16          Q.    Yes, but before he resigned,
17    did you consider him to be a competent
18    employee?
19          A.    This young man was a little
20    lazy.
21          Q.    Under what circumstances did
22    he resign?
23          A.    He did not keep a good
24    working relationship with other
```

1   colleagues.

2          Q.     Aside from him being, as you

3   put it, lazy and not getting along with

4   his colleagues, did you know of any other

5   problems with his performance as a sales

6   employee?

7          A.     He started a company with

8   his older brother.

9          Q.     Is that why he left the

10  employment of Taishan Gypsum?

11         A.     He established a company

12  with his older brother.

13         Q.     And is that why he resigned

14  from the employment of your company?

15         A.     That was the reason.

16         Q.     While he was an employee of

17  Shandong, Taishan Gypsum and TTP, did you

18  ever know Yang Jiapo to exceed his

19  authority as a salesperson?

20         A.     I don't know.

21         Q.     Is it true that together

22  with director Xue Yuli, X-U-E, Y-U-L-I,

23  you have had responsibility for

24  supervising the product marketing plans

```
1    of Taishan Gypsum?

2          A.      What time period?

3          Q.      During any period of time,

4    have you had responsibility for

5    supervising the product marketing plans

6    of Taishan Gypsum?

7          A.      Xue Yuli was in charge of

8    sales before 2008.

9          Q.      Mr. Fu, if Mr. Jia testified

10   under oath on April 4th, 2011, and I'll

11   give counsel the page and line numbers of

12   that deposition if needed, that together

13   with Director Yuli, you had

14   responsibility for supervising the

15   product marketing plans of Taishan

16   Gypsum, would you agree with that

17   testimony?

18         A.      Before 2008, that was the

19   case.

20         Q.      Tell me what you did in

21   order to supervise the product marketing

22   plans of Taishan Gypsum before 2008?

23         A.      The product marketing plan

24   was to act according to the report of
```

1    general manager Jia made in the end of

2    the year.

3         Q.    Part of that plan was to

4    intensify online sales; is that true?

5              MR. SPANO:  Objection,

6         foundation.

7              MR. MEUNIER:  The testimony

8         of Mr. Jia.

9              THE COURT:  Don't speak,

10        please.

11             MR. MEUNIER:  Sorry, Judge.

12             THE COURT:  It's before me.

13        I'll allow him to answer.

14             THE WITNESS:  I don't

15        recall.  I don't recall when was

16        the report made.

17   BY MR. MEUNIER:

18        Q.    Do you recall as part of

19   product marketing plans of Taishan Gypsum

20   that you helped supervise before 2008

21   that the company intensified its efforts

22   in the area of online sales?

23        A.    We did not say intensify the

24   online sales.  There was online sales

Confidential - Subject to Further Confidentiality Review

 1    exists, existence.

 2         Q.    How did the company promote

 3    online sales?

 4         A.    We did not promote online

 5    sales.

 6         Q.    Did the company have a

 7    website that customers could use to

 8    conduct online sales of drywall?

 9         A.    What website?  The customer

10    did not conduct that on the website.  The

11    transaction could not be made online.

12         Q.    How were online sales of

13    drywall conducted by Taishan Gypsum?

14         A.    We only have a website of

15    Taishan Gypsum Company.  You can only

16    view the website.  There was no online

17    sales.  It's a company website.  You

18    cannot make transactions on it.

19         Q.    So, your testimony is that

20    Taishan Gypsum has never conducted sales

21    of drywall through online transactions?

22         A.    I don't know what you're

23    referring to.  I don't understand this

24    part.  I have never done online

Confidential - Subject to Further Confidentiality Review

1    transactions.

2            Q.    All right.  Let's get back

3    to marketing.

4            A.    Okay.

5            Q.    You told me in supervising

6    the marketing plans of Taishan Gypsum

7    before 2008, you acted according to the

8    report of the company chairman Jia.  Is

9    that correct?

10           A.    Yes, yes.

11           Q.    And please tell me in as

12   much detail as you can how the marketing

13   plans were conducted in accordance with

14   the reports of Mr. Jia?

15           A.    We investigated the markets

16   according to the occupation -- the

17   percentage that our competitor had

18   occupied.  We would want to take part --

19   take some of that.

20           Q.    Did you investigate foreign

21   markets?

22           A.    Like I mentioned, we did not

23   set foreign market as our main direction.

24   Naturally, we would not promote that

```
 1    part.
 2         Q.    Are you familiar with this
 3    document, Mr. Fu, which has been
 4    previously marked as Jia Exhibit 20?
 5         A.    I'm familiar with it.
 6         Q.    Is that a brochure that was
 7    used by Shandong to market its products,
 8    including drywall?
 9         A.    Yes.
10         Q.    Did you have input or did
11    you contribute to the language in this
12    brochure?
13         A.    No, I did not write on it.
14         Q.    Was this same brochure later
15    used when the company changed its name to
16    Taishan Gypsum?
17         A.    Yes.
18         Q.    Do you agree that the
19    brochure states that the company has
20    export ability and that its products sell
21    well in many countries, including the
22    United States of America?
23         A.    This is only a general way
24    of saying that when you do business in
```

Confidential - Subject to Further Confidentiality Review

```
 1    China.  This is not necessarily be the

 2    fact.

 3            Q.    Are you saying that the

 4    brochure is not true in making that

 5    statement?

 6            A.    Correct.  This is the way we

 7    do business in China.  Our purpose is to

 8    let our local customer have the

 9    impression of an image of a big company.

10            Q.    Is this brochure published

11    in English?

12            A.    Not in English.  Most of

13    them are in Chinese.  It is for the local

14    customers.

15            Q.    Is the information in this

16    brochure on the company's website?

17            A.    Some of them.  Perhaps part

18    of them.

19            Q.    Is the language on the

20    company's website English?

21                  MR. SPANO:  Object to form,

22            time frame.

23                  THE COURT:  Put the time

24            frame in.
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. MEUNIER:

 2          Q.    Is the language on the

 3    company Taishan Gypsum's website today in

 4    English?

 5          A.    I don't know if there is

 6    Chinese on it.  I know there is Chinese

 7    version on it.

 8                THE COURT REPORTER:  I don't

 9          know if there is Chinese on it.  I

10          know there is Chinese version on

11          it.

12                THE WITNESS:  I don't know

13          if there is English on it.  I know

14          there is Chinese version on it.

15                I don't read English.  I

16          always type Chinese character

17          Taishan Gypsum, and then our

18          website would pop up.

19    BY MR. MEUNIER:

20          Q.    But your website does have

21    English language, allowing those who

22    speak English to read what is on the

23    website; is that correct?

24          A.    If there is Chinese version,
```

```
 1    they could read it.

 2                  MR. CHEN:  I'm sorry.

 3                  MR. MEUNIER:  I didn't ask

 4          you about Chinese.

 5                  INTERPRETER:  Excuse me,

 6          interpreter clarification.

 7                  Correction, interpreter

 8          correction.

 9                  THE WITNESS:  If there is an

10          English version, they could read

11          it.

12    BY MR. MEUNIER:

13          Q.    Does the website have

14    information on it in the English

15    language?

16          A.    I don't know, because we

17    didn't make that.  It is the sales

18    department who made it.

19          Q.    Who is in charge of the

20    company's website today?

21          A.    The office.

22          Q.    Who in the office?

23          A.    I don't know who, but the

24    office in the headquarter is in charge of
```

```
 1    the website.
 2           Q.    In your various positions
 3    managing and supervising sales activity,
 4    is it your testimony you have never dealt
 5    with the company's website?
 6           A.    Correct.
 7           Q.    Referring again to the
 8    brochure which is Jia Exhibit 20, I'm
 9    showing you the last page which has a map
10    of the countries in the world.  Do you
11    see that?
12           A.    I see it.
13           Q.    Do you see the line drawn
14    from China to the United States of
15    America?
16           A.    Yes, I see it.
17           Q.    Is that an accurate
18    statement of the export ability of the
19    company?
20                 MR. SPANO:  Object to form.
21                 THE COURT:  Ability or
22           activity?
23    BY MR. MEUNIER:
24           Q.    Does that map accurately
```

 1    reflect the export activity of the

 2    company?

 3         A.    No.

 4         Q.    Why not?

 5         A.    No.  This is also just like

 6    what I described before.  It is for the

 7    people to realize it is a big company.

 8    The small companies, the private

 9    companies in China also do things like

10    this.

11         Q.    So, does your company want

12    foreign customers to be misled about the

13    export ability and activity of your

14    company?

15         A.    No.  This is for the

16    impression of a good image of a big

17    company for the local customers, for the

18    local customers.

19         Q.    So, are you misleading local

20    customers when you tell them about the

21    export ability and activity of your

22    company?

23              MR. SPANO:  Objection.

24         Objection to form.  It's not

```
 1          personal statements.

 2                  MR. MEUNIER:  I'll restate

 3          the question, Your Honor.

 4   BY MR. MEUNIER:

 5          Q.    Is Shandong Taihe Dongxin

 6   Company misleading the customers who read

 7   this brochure about the export ability

 8   and activity of the company?

 9          A.    No.  It is Chinese mode.

10          Q.    Is it the Chinese mode to

11   not tell the truth about the company?

12          A.    That's not true.  You

13   shouldn't be understanding it that way.

14   In China, we exaggerate a little bit.

15   Exaggerate a little bit, that's allowed.

16          Q.    You exaggerate it, but it is

17   still true that the company had export

18   ability and activity as indicated in the

19   brochure?  Is that true?

20          A.    Yes.  We exported some.

21          Q.    Did you export to all the

22   places where the lines are drawn on the

23   map that I showed you?

24          A.    No, no, that's not true.
```

1    Q.    Which ones did you not

2    export to, Mr. Fu?

3    A.    I'm sure it exaggerated a

4    little bit.  But I'm not sure exactly

5    where had it not exported to.

6    Q.    Based on your knowledge and

7    experience, can you tell us where the

8    company has exported to?

9    A.    I'm not in charge of that.

10   I'm not in charge of the detailed sales,

11   so, I don't know exactly where they were

12   shipped to.  We deliver in China.  We

13   don't know where did some of the

14   customers send the products to.

15   Q.    Mr. Yang Jiapo was employed

16   as a salesperson at Shandong, Taishan

17   Gypsum and then TTP; is that correct?

18   A.    Correct.

19   Q.    I want to show you a

20   document which is Bates numbered 1443

21   through 1448.  I'm sorry, I don't have a

22   translation with me.

23   A.    I don't understand this.

24   Q.    Mr. Fu, please turn to the

1    last page of this document, which is

2    1448.  Do you see the three e-mail

3    addresses given there?

4         A.    I don't know where they are.

5    I don't know whose e-mail addresses are

6    those.

7         Q.    You don't recognize those as

8    the e-mail addresses of Yang Jiapo?

9         A.    No, I don't recognize this.

10   I don't really use e-mail myself.

11        Q.    Let me refer you to another

12   document, Mr. Fu, that's been previously

13   marked as Jia number 13.  It's entitled

14   "Sole Agency Agreement."  It is dated

15   October 20, 2006, and at that time, you

16   were one of the directors of TTP; is that

17   true?

18        A.    Correct.

19        Q.    And the title of this "Sole

20   Agency Agreement" -- I'm sorry, the sole

21   agency agreement refers to the seller as

22   Taian Taishan Plasterboard Company,

23   Limited and the buyer, Oriental Trading

24   Company, LLC.  Are you familiar with this

```
 1    agreement?
 2              MR. SPANO:  Objection to
 3         form.
 4              THE COURT:  Do you want to
 5         show him the document?  Where is
 6         the document?
 7              MR. SPANO:  He hasn't shown
 8         it to him.
 9              THE COURT:  Show him the
10         document.
11              THE WITNESS:  Please, first
12         of all, do not ask me any sales
13         business regarding TTP.  Perhaps
14         you don't understand the way we do
15         business in China.  In China, the
16         directors and the supervisors do
17         not in charge of detailed
18         business.  Maybe you don't
19         understand the responsibilities of
20         directors and supervisors in
21         China.
22                   -  -  -
23              (Whereupon, a discussion off
24         the record occurred.)
```

Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -

 2               THE WITNESS:  Can you

 3          translate for me.

 4   BY MR. MEUNIER:

 5          Q.    Mr. Fu, please refer to the

 6   third page of this document.

 7          A.    (Witness complies.)

 8          Q.    Is it true that the Chinese

 9   language appearing on that page states

10   that Taian Taishan Plasterboard Company,

11   Limited certifies that Oriental Trading

12   Company, LLC as its exclusive agency for

13   the Dun brand in the United States of

14   America?

15          A.    Don't ask me.  I'm not in

16   charge of the sales of TTP.  You don't

17   understand.  And also please tell him

18   that the supervisors in China, including

19   directors, do not in charge of the

20   detailed operation.  They only meet twice

21   a year for supervisors' meeting and for

22   directors' meeting to discuss the annual

23   reports.  Now you're showing me these.  I

24   don't know how to answer you.
```

```
 1          Q.    Did Taishan Gypsum, or

 2    before it, Shandong Taihe Dongxin,

 3    manufacture drywall under the brand name

 4    Dun, D-U-N?

 5          A.    I don't know.  I don't

 6    recall.

 7          Q.    You have never heard of the

 8    brand name Dun?

 9          A.    I've heard of it, but we do

10    not necessarily manufacture all the

11    brands that have the name as the brand.

12          Q.    Has Shandong Taishe -- I'm

13    sorry -- Shandong Taihe Dongxin or

14    Taishan Gypsum ever manufactured drywall

15    under the brand name Dun?

16          A.    I don't know like I said

17    before.

18          Q.    Has TTP ever manufactured

19    drywall under the brand name Dun?

20          A.    TTP, I don't know.

21          Q.    Have any of the companies I

22    just mentioned, Shandong Taihe Dongxin,

23    Taishan Gypsum or TTP manufactured

24    drywall for customers with thickness,
```

```
 1   length and width measured in inches and

 2   feet?

 3        A.    I don't know the inches and

 4   the feet.  I don't understand the

 5   details.  I only know the specifics.

 6                INTERPRETER:  The

 7           interpreter need clarification.

 8                THE WITNESS:  I don't

 9           understand what you said about the

10           specifications in inches and feet.

11           We custom made products according

12           to requirements of customers.  I

13           only know the prices and

14           coordinate on the manufacturer.

15           If we can do it, we'll do it.  I

16           don't know anything else.

17   BY MR. MEUNIER:

18        Q.    Inches and feet are not

19   measurements used in China, true?

20        A.    In China, we produce drywall

21   according to national standard 9.5 or 12.

22   I don't know anything else.

23        Q.    9.5 or 12 what?

24        A.    China National Standard.
```

Confidential - Subject to Further Confidentiality Review

1        Q.    If a customer requests that

2    you do so, will Taishan Gypsum

3    manufacture drywall to sell to that

4    customer in measurements of inches and

5    feet?

6        A.    You have to convert it to

7    the thickness according to Chinese

8    measurement.  When you are talking about

9    feet and inches, I do not understand.

10       Q.    I will try to ask the

11   question again.

12             If a customer wants to buy

13   drywall from Taishan Gypsum and wants it

14   to have a thickness measured in inches,

15   will the company make the drywall with

16   that thickness?

17       A.    After converting into the

18   measurements in China, if we could make

19   it, we would make it.  If we could not,

20   we would not accept the order.

21       Q.    Did you ever advise Che Gang

22   before October 20, 2006 that he was not

23   authorized to do business with Oriental

24   Trading Company LLC?

```
1          A.     What was the time again?

2          Q.     At any time before October

3    20, 2006.

4          A.     I have never arranged works

5    for Che Gang.  It had always been Peng

6    Wenlong who did that.

7          Q.     What do you mean you never

8    arranged words for Che Gang?  I don't

9    understand.

10              THE COURT REPORTER:  I'm

11         sorry, it's works, not words?

12              INTERPRETER:  Works,

13         W-O-R-K-S.

14   BY MR. MEUNIER:

15         Q.     Did you or anyone else on

16   behalf of Taishan Gypsum or TTP ever

17   advise a representative of Oriental

18   Trading Company that Mr. Che Gang was not

19   authorized to do business with that

20   company?

21         A.     I don't know anything about

22   the detail of the businesses.

23              MR. MEUNIER:  Your Honor, I

24         object to the nonresponsiveness of
```

Confidential - Subject to Further Confidentiality Review

```
1           the answer.  I'll ask the question
2           again.
3                THE COURT:  Let's ask the
4           question.  Listen closely.  Listen
5           closely to the question, and
6           answer it, if you can.
7    BY MR. MEUNIER:
8           Q.    Mr. Fu, did you or anyone
9    else on behalf of Taishan Gypsum or TTP
10   ever advise a representative of Oriental
11   Trading Company that Mr. Che Gang was not
12   authorized to do business with that
13   company?
14          A.    I don't know Oriental
15   Trading Company.  I don't know whether
16   anybody else advised this company of
17   such.
18          Q.    Did you ever advise a
19   representative of that company that Mr.
20   Che Gang was not authorized to do
21   business with the company?
22          A.    Like I said before, I don't
23   know the existence of this company.
24          Q.    Please look at the third
```

Confidential - Subject to Further Confidentiality Review

1    page of the document again.  Do you

2    recognize the signature on that page

3    under the company name Taian Taishan

4    Plasterboard Company, Limited?

5         A.    I know that's Che Gang's,

6    and a seal which says Taishan

7    Plasterboard Company.

8         Q.    Do you agree that Mr. Che

9    Gang on that document used a seal given

10   to him by his company?

11        A.    Tell him that during this

12   period of time, these are two separate

13   companies.  It has nothing to do with me

14   whether he stamped the company seal or

15   not.

16        Q.    Does it appear to be a seal

17   given to sales personnel such as Mr. Che

18   Gang by the employer of that salesperson?

19        A.    How do I know about it?

20        Q.    I'm asking you to look at

21   the seal on the document.

22        A.    The seal has nothing to do

23   with me.  I'm in charge of two

24   independent companies.  The company

Case 2:09-md-02047-EEF-MCW Document 13246-57 Filed 03/26/12 Page 119 of 120
Case 2:09-md-02047-EEF-MCW Document 13246-57 Filed 03/26/12 Page 120 of 120
Confidential - Subject to Further Confidentiality Review

```
 1   you're talking about has nothing to do
 2   with me.
 3          Q.    My question is different.
 4   Do you recognize that seal as a seal
 5   given to Mr. Gang?
 6          A.    Like I said, I know the
 7   seal, and I know Che Gang's name.
 8          Q.    When you say you "know the
 9   seal," what do you mean?
10          A.    You asked me whether I
11   recognize this.  I said I do recognize
12   these characters.
13          Q.    Do you recognize that as a
14   company seal given to salespeople
15   employed by the company?
16          A.    How do I know about it?  I'm
17   not in charge of this company.
18                THE COURT:  Is that the
19          company seal?
20                THE WITNESS:  It is the
21          company seal where the employee
22          worked.
23                MR. MEUNIER:  Thank you.
24          Thank you, Judge.
```

Confidential - Subject to Further Confidentiality Review

```
1   BY MR. MEUNIER:

2        Q.    In November and December of

3   2005, you directly supervised the sales

4   activity of Peng Wenlong.  Is that true?

5        A.    Correct.

6        Q.    Have you heard of a US

7   company called Venture Supply Inc.?

8        A.    You asked me once, but I

9   don't know that name.

10       Q.    I show you a document which

11  is Bates numbered TG 1684 and 1685.

12            MR. SPANO:  Is this going to

13       be marked as an exhibit?

14            MR. MEUNIER:  I'll mark this

15       document as Fu Exhibit 3.

16              -  -  -

17            (Whereupon, Deposition

18       Exhibit Fu-3, Contract, Bates

19       stamped TG 0001684 and TG 0001685,

20       was marked for identification.)

21              -  -  -

22  BY MR. MEUNIER:

23       Q.    Were you aware, Mr. Fu, that

24  on November 17, 2005, Shandong Taihe
```