Confidential - Subject to Further Confidentiality Review

1    Dongxin Company, Limited entered into a

2    sales contract with Venture Supply Inc.

3    of Norfolk, Virginia for the sale of

4    100,000 sheets of drywall?

5         A.    I don't know which country

6    was the buyer.  I only was aware that

7    Peng Wenlong consulted me for the

8    thickness of the drywall, which is 12.7,

9    as well as the pricing of the drywall.

10        Q.    Did you approve the

11   thickness and pricing of the drywall for

12   this sale?

13        A.    I approved it.

14        Q.    This contract indicates that

15   the drywall was sold at the price of

16   $3.58 a sheet for a total of $358,000.

17   Is that the price you approved?

18        A.    Yes.

19        Q.    Is $3.58 a sheet consistent

20   with the price that Shandong Taihe

21   Dongxin was charging customers for

22   drywall in November of 2005?

23             MR. SPANO:  Objection to

24        form.

Confidential - Subject to Further Confidentiality Review

 1          THE WITNESS:  I don't recall

 2     clearly the price at the time.

 3          THE COURT:  It's time to

 4     change the tape as I understand

 5     it.  Let's take a break, 10-minute

 6     break.

 7          THE VIDEOTAPE TECHNICIAN:

 8     We're going off the record.  The

 9     time is 4:38.

10               -  -  -

11          (Whereupon, a recess was

12     taken from 4:38 p.m. until 4:47

13     p.m.)

14               -  -  -

15          THE VIDEOTAPE TECHNICIAN:

16     This is the beginning of Tape

17     Number 3.  We're going back on the

18     record.  The time is 4:47.

19  BY MR. MEUNIER:

20          Q.   Mr. Fu, this November 2005

21  contract between Shandong and Venture

22  Supply provides that the drywall will be

23  inspected by Mr. Phillip Perry of Tobin

24  Trading Inc. before the sale is final.

Confidential - Subject to Further Confidentiality Review

1      Were you aware of that provision?

2             A.     Peng Wenlong had reported to

3      me the pricing of it.  I approved of the

4      contract.  I'm not sure about the

5      business details that they discussed

6      about.

7             Q.     I meant to ask you this

8      before.  But Mr. Peng Wenlong, you said,

9      was assigned to work with export sales

10     because he spoke English?  Is that true?

11            A.     Correct.

12            Q.     I think I've marked that as

13     Fu-3.

14            MR. MEUNIER:  I next show

15            you a document which is Bates

16            numbered 19854 through 19857 which

17            I will mark as Fu Number 4.

18                   -   -   -

19            (Whereupon, Deposition

20            Exhibit Fu-4, Contract, Bates

21            stamped TG 00019854 through TG

22            00019857, was marked for

23            identification.)

24                   -   -   -

Case 2:09-md-02047-EEF-MBN Document 13754-8 Filed 03/21/12 Page 4 of 129

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. MEUNIER:

 2         Q.    Mr. Fu, this is a contract

 3    dated December 6, 2005 between Shandong

 4    Taihe Dongxin Company and Venture Supply

 5    of Norfolk, Virginia for the sale of

 6    100,000 additional sheets of drywall.

 7    Were you aware of this agreement?

 8         A.    I know that, but I don't

 9    know the detailed content of it.

10         Q.    Yes, sir.  But again, you

11    approved the price, which in this case

12    was $3.58 a sheet -- I'm sorry, $3.66 a

13    sheet, for a total sale price of

14    $366,800.  You approved that, did you?

15         A.    It is so for the price.

16         Q.    And you approved the

17    agreement, didn't you?

18         A.    Yes.

19         Q.    Why was the price increased

20    from $3.58 a sheet to $3.66 a sheet

21    between November 17 and December 16,

22    2005?

23         A.    The costs were different.

24    The costs for each time period were
```

Confidential - Subject to Further Confidentiality Review

1    different.

2         Q.    So, the price per sheet

3    could change even in one month, true?

4         A.    Because this was the first

5    time we did business, we had to be

6    careful.  Afterwards, we could have some

7    small changes.  This was the first time

8    we had carefully calculated the price for

9    the specification of 12.7.  Therefore,

10   this has a reference value for future

11   transactions.

12        Q.    Are you saying that you

13   expected to continue to sell drywall to

14   Venture Supply at a price that would

15   become customary for that customer?

16        A.    As long as it takes its

17   money to China and we deliver the

18   products in China, we could do that.  We

19   deliver in China, but they would have to

20   take care of where they want it to ship

21   to because it was the first time we did

22   business together.

23        Q.    But the contract did specify

24   a price in US dollars, correct?

Confidential - Subject to Further Confidentiality Review

1      A.      Yes, yes.

2      Q.      And like the November 2005

3  contract with Venture Supply, this one

4  provides for an inspection of the product

5  by Mr. Phillip Perry before the sale is

6  final, that, again, was a detail that you

7  left to Mr. Peng Wenlong, true?

8      A.      Correct.

9      Q.      If you look at the second

10  page of the contract which is Bates

11  numbered 19855, I ask you to confirm that

12  that is the signature of Peng Wenlong

13  using the company seal of Shandong Taihe

14  Dongxin?

15      A.      I don't see the signature of

16  Peng Wenlong.

17      Q.      You don't see a signature

18  written in the area where the seal stamp

19  is made?

20      A.      This is my signature.

21      Q.      This is your signature?

22      A.      That's my signature.

23      Q.      So, you signed this

24  contract?

Confidential - Subject to Further Confidentiality Review

```
 1          A.     Yes.

 2          Q.     So, you have seen --

 3          A.     I approved it, including the

 4   price.

 5          Q.     And you signed it?

 6          A.     Yes.

 7          Q.     And you signed it in

 8   English?

 9          A.     That was our first time I

10   did business.  No.  This is Chinese

11   character.

12          Q.     Yes, but the document is

13   written in English, and your signature is

14   on the document in English, true?

15                 MR. SPANO:  Objection, asked

16          and answered.

17                 THE WITNESS:  That's Chinese

18          character.

19   BY MR. MEUNIER:

20          Q.     Is the language of the

21   contract in English?

22                 MR. SPANO:  Objection.

23                 THE COURT:  I'm going to

24          overrule the objection.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  This was the

 2              first time we did business.  We

 3              have never done that before.  Peng

 4              Wenlong translated it into

 5              Chinese.  I reviewed the contract.

 6              I saw it was okay.  I approved it.

 7    BY MR. MEUNIER:

 8              Q.    So, all of the language in

 9    this contract which you signed was read

10    to you in China in Chinese by Mr. Peng

11    Wenlong translating the document?

12              A.    Correct.  I saw that.

13              Q.    And with the authority of

14    Shandong Taihe Dongxin, you then approved

15    and signed this sales contract, didn't

16    you?

17              A.    Yes, yes.

18              Q.    And you put your company's

19    seal on the place where you signed,

20    right?

21              A.    Yes.

22                    MR. MEUNIER:  Your Honor, if

23              you would just give me five

24              minutes recess, I'll just review
```

Confidential - Subject to Further Confidentiality Review

```
 1          my notes and see if there's
 2          anything further.
 3                THE COURT:  Let's do it in a
 4          couple of minutes.  I don't think
 5          we need five.
 6                MR. MEUNIER:  Yes.
 7                THE VIDEOTAPE TECHNICIAN:
 8          Going off the record.  The time is
 9          4:59.
10                     -   -   -
11                (Whereupon, a recess was
12          taken from 4:59 p.m. until 5:01
13          p.m.)
14                     -   -   -
15                MR. MEUNIER:  Your Honor,
16          I'll tender the witness.
17                THE COURT:  No further
18          questions from Mr. Meunier.
19                THE VIDEOTAPE TECHNICIAN:
20          We're going back on the video
21          record.  The time is 5:01.
22                     -   -   -
23                EXAMINATION
24                     -   -   -
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. GONZALEZ:

 2         Q.    Hi, Mr. Fu.  I'm Ervin

 3    Gonzalez.

 4               Once TTP was formed, were

 5    all of the export sales conducted through

 6    it as opposed to TG?

 7         A.    Correct.

 8         Q.    So, at that point, TG

 9    stopped selling export sales, and they

10    were all done through TTP, correct?

11         A.    It is not entirely so.

12    There was a person who remained there

13    whose name is -- there is a person called

14    Zhang Nan, Z-H-A-N-G, last name, first

15    name, N-A-N.  He did not go to TTP.  He

16    remained there at TG.  He remained at TG.

17         Q.    Was he a salesperson to sell

18    exports?

19         A.    He was in charge of trading,

20    not necessarily exporting.

21         Q.    But the exporting part of

22    the business was through TTP once TTP was

23    formed, correct?

24         A.    If TG could have some
```

Confidential - Subject to Further Confidentiality Review

1    businesses of their own, they could also

2    do that.

3           Q.     Right.

4           A.     But for some local

5    businesses, if they needed value added

6    invoices, they would need to go to TTP

7    because only TTP could issue such

8    invoices.

9           Q.     That's how TG worked through

10   TTP?

11          A.     What is it?

12          Q.     That's how TG worked through

13   TTP?  When they needed to export and use

14   the VAT benefits of TTP, it went through

15   TTP?

16          A.     No.  At the time that we

17   established TTP was because many of the

18   local customers wanted to have value

19   added invoices.

20          Q.     So TG established TTP to

21   carry that out?

22          A.     Correct.

23          Q.     And TG and TTP worked

24   closely together?

Confidential - Subject to Further Confidentiality Review

```
 1         A.     It's an independent company.

 2         Q.     Yes.  But you worked closely

 3   together?

 4         A.     They don't work together.

 5         Q.     Well, you sold the same

 6   brands of drywall, correct?

 7         A.     We could authorize them to

 8   sell this brand of drywall.

 9         Q.     And they, in fact, did sell

10   the same brands of drywall that were

11   manufactured by TG?

12         A.     Correct.

13         Q.     And the employees that were

14   working for TTP previously worked for TG?

15         A.     Correct.

16         Q.     And when TTP stopped

17   existing, those employees like Bill --

18   like Che Gang and Peng Wenlong went back

19   to work at TG?

20         A.     Correct.

21         Q.     And the address we heard

22   yesterday from Mr. Jia, the address for

23   TTP and TG were the same?

24         A.     What was the address you're
```

Confidential - Subject to Further Confidentiality Review

1    talking about?  I don't understand.

2          Q.    The address for the

3    businesses.

4          A.    They were about three

5    kilometers distance of the two companies.

6    TTP is located at Houzhou Village of

7    Taian, while TG is located at Dawenkou.

8          Q.    The directors that were

9    established for TTP came from TG, right?

10          A.    Yes.

11          Q.    The plant that was used by

12    TTP was previously owned by TG, correct?

13          A.    Yes.

14          Q.    When TTP stopped existing,

15    those plants went back to TG, correct?

16          A.    It was purchased back

17    because it was bought in the first place.

18          Q.    Same plant?

19          A.    Yes.

20          Q.    And the formulas that were

21    used to make drywall were the same for

22    TTP and for TG?

23          A.    The formulas of

24    manufacturing, I believe each of the

Confidential - Subject to Further Confidentiality Review

1    companies has slight difference from the

2    others because some of the equipments

3    were added.  After adding of the

4    equipments, the efficiency were better.

5         Q.    For the newer companies?  In

6    terms of efficiency, they were better for

7    the newer companies because they had new

8    machines, right?

9         A.    No.  Some dryer was added.

10        Q.    But the ingredients were --

11        A.    After adding of the dryer,

12   it is not necessary that the speed was

13   added.

14        Q.    The ingredients were the

15   same?

16        A.    Yes.

17        Q.    And if a product had the

18   name, for example, Dun, and it was made

19   at TTP's plant, or the same Dun was made

20   at TG, it's the same quality of drywall

21   that would be coming from each plant,

22   correct?

23        A.    I don't know who made Dun

24   brand products.  I knew that we made

Confidential - Subject to Further Confidentiality Review

```
 1    Taishan brand products.  We all made

 2    Taishan brand products.

 3          Q.    I represent to you that the

 4    Dun brand is listed in the TG catalog

 5    that's Exhibit Number 13 --

 6                MR. DAVIS:  20.

 7    BY MR. GONZALEZ:

 8          Q.    20 in your deposition.

 9          A.    I haven't seen that.

10          Q.    May I have the exhibit,

11    please?

12          A.    Where is it?

13                (Handing over document.)

14          Q.    I will show you.

15          A.    This is our trademark.  We

16    have registered many trademarks.  It is

17    not necessarily that we would manufacture

18    the trademark.

19          Q.    The trademark that you

20    registered, when you say "you," it's the

21    corporation, TG?  Yes?

22          A.    Yes.

23          Q.    And that's true for the Dun

24    trademark?
```

Confidential - Subject to Further Confidentiality Review

```
1         A.    Yes.

2         Q.    Okay.  And are these other

3    trademarks on that Exhibit 20?

4         A.    Yes.

5         Q.    And can you identify all of

6    the registered trademarks for TG that are

7    listed there, please?

8         A.    All of these?

9         Q.    Yes.  But can you tell the

10   names, because some of them are in

11   Chinese, and I can't read Chinese?

12        A.    Taishan, West Lake, Five

13   Star, Dun, Ma.

14        Q.    You were previously shown,

15   when my colleague was asking you some

16   questions, an exclusive agency agreement

17   to sell the Dun product in the United

18   States of America.  Were you aware that

19   that was occurring at the time that the

20   contract was entered into?

21             MR. SPANO:  Objection, no

22        foundation.

23             THE COURT:  I'll allow him

24        to answer.
```

Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  I was not

 2         aware of that.

 3    BY MR. GONZALEZ:

 4         Q.    Let me ask you just a few

 5    other questions, and then I'll pass you

 6    to my other colleague.  Were you

 7    compensated, without telling us the

 8    amount, for your services on the board of

 9    directors of TTP?

10         A.    I had no compensation.  TG.

11         Q.    So, you were only

12    compensated by TG, correct?

13         A.    Correct.

14         Q.    And you served also on the

15    board of TTP for no additional

16    compensation, correct?

17         A.    Correct.

18         Q.    Did the board of directors

19    of TTP have the right to hire and fire

20    employees for TTP?

21         A.    We did not have such a

22    right.

23         Q.    Who had the right to hire

24    and fire employees for TTP?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.     Peng Shiliang.

 2          Q.     Who is that by title?

 3          A.     He's the general manager,

 4   general manager's responsibility.

 5          Q.     General manager of TTP?

 6          A.     TTP's.

 7          Q.     Prior to his working for

 8   TTP, did he also work for TG?

 9          A.     Yes.

10          Q.     Did he go back to work for

11   TG after TTP stopped working?

12          A.     Yes, currently, yes.

13          Q.     As TTP was being formed, who

14   at -- let me restate that.

15                 As TTP was being formed, who

16   at TG decided what employees would stop

17   working at TG and begin working at TTP?

18          A.     They volunteer.  They could

19   volunteer because a new company was

20   formed.

21          Q.     Who was asking for the

22   volunteers on behalf of TG?

23          A.     By notification because we

24   formed TTP company.
```

Confidential - Subject to Further Confidentiality Review

```
 1             Q.    Who issued the notification?

 2      Was it the board, was it the general

 3      manager?  And to be specific, here's what

 4      I'm asking.  What person on behalf of TG

 5      or entity on behalf of TG said to the TG

 6      employees, we're creating TTP, and we're

 7      looking for volunteers to work at TTP?

 8                   MR. SPANO:  Objection.  Your

 9             Honor, he answered the first

10             question.  I think it should be

11             translated.

12                   THE COURT:  Yes.

13                   THE INTERPRETER:  Do you

14             want me to answer the question, or

15             what was the first?

16                   MR. SPANO:  I'm asking that

17             you to translate his answer to the

18             first question which I heard him

19             give you.

20                   INTERPRETER:  He did?

21                   THE COURT:  Let's back up

22             then.

23                   MR. SPANO:  We can move on.

24      BY MR. GONZALEZ:
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     What person on behalf of TG

 2    or entity on behalf of TG said to the TG

 3    employees, we're creating TTP, and we're

 4    looking for volunteers to work at TTP?

 5          A.     There was no such a person.

 6    It was the office.

 7          Q.     But somebody at the office

 8    must have come up with the idea, we need

 9    volunteers to set up TTP, send out a

10    notice?

11          A.     That I do not know.

12          Q.     We were discussing the

13    brochure that discussed shipments or

14    exports to the United States of America,

15    and you were telling us that it was in

16    the brochure because it actually was good

17    to show that exports were made to foreign

18    countries including the United States of

19    America.  Do you agree with me that being

20    able to sell goods to the United States

21    of America is a good thing for the

22    business?

23                 MR. SPANO:  Objection to

24          form.  Lack of foundation.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    THE COURT:  You have to be a
 2           little more specific.  Good thing
 3           for business?
 4  BY MR. GONZALEZ:
 5           Q.    You agree with me that
 6  selling goods to the United States of
 7  America is something that it would be
 8  considered a positive factor for the
 9  business in terms of prestige?
10                    MR. SPANO:  Objection, calls
11           for speculation.
12                    THE COURT:  I'll overrule
13           the objection.  He's speaking for
14           the company.
15                    THE WITNESS:  It was not
16           only to sell to the United States,
17           but the image was meant to be a
18           global company, not necessarily
19           any specific country.
20  BY MR. GONZALEZ:
21           Q.    And that was actually one of
22  the reasons that you created the brochure
23  that's known as Exhibit 20, correct,
24  "you," the business?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes, like I said.

 2                MR. GONZALEZ:  Thank you.

 3          That's all I have.  I'll pass the

 4          witness.

 5                MR. SPANO:  Your Honor, for

 6          the record, I would like to renew

 7          my objection.  Mr. Fu is not

 8          speaking for the company.

 9                THE COURT:  Okay.  I

10          understand.  The same ruling.  I

11          overruled the objection.

12                Anybody else from any

13          company?

14                MS. BASS:  No.

15                Any redirect on Mr. Wu?

16                     -   -   -

17                EXAMINATION

18                     -   -   -

19     BY MR. SPANO:

20          Q.    Mr. Fu, I have to ask you a

21     few questions.

22          A.    Okay.

23          Q.    Do you recall testifying

24     earlier this afternoon to the effect that
```

Confidential - Subject to Further Confidentiality Review

1    if you were paid the money, you would

2    ship out the product?

3         A.    Yes.

4         Q.    Did Taishan Gypsum ship out

5    any products to any state in the United

6    States of America?

7         A.    No.

8         Q.    Do you recall answering a

9    series of questions regarding the export

10   activities of Taishan Gypsum described in

11   the product brochure, Jia Exhibit 20?

12        A.    Our products had always been

13   delivered in China.  As of the shipping

14   cost and where they shipped to, it would

15   be handled and decided by the customers.

16   We don't know where they were shipped to.

17        Q.    Did Taishan Gypsum or TTP's

18   export activities ever include shipping

19   drywall to any state in the U.S.?

20        A.    No.

21             MR. SPANO:  That's all I

22        have.

23             THE COURT:  Okay.  That's

24        the end.  Thank you very much.

Confidential - Subject to Further Confidentiality Review

```
 1            Tomorrow we're going to start at

 2            8:30 and try to get through a

 3            little bit faster.

 4                 THE VIDEOTAPE TECHNICIAN:

 5            This concludes today's deposition

 6            of Fu Tinghuan.  The total number

 7            of tapes today is four.  Going off

 8            the record at 5:23.

 9                      -  -  -

10            (Whereupon, the deposition

11            concluded at 5:23 p.m.)

12                      -  -  -

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1             C E R T I F I C A T E
 2
 3
                   I, LINDA L. GOLKOW, a
 4    Registered Diplomate Reporter, Certified
      Court Reporter and Notary Public, do
 5    hereby certify that, pursuant to notice,
      the deposition of TINGHUAN FU was duly
 6    taken on January 10, 2012 at 1:30 p.m.
      before me.
 7
 8                 The said TINGHUAN FU was
      duly sworn by The Court according to law
 9    to tell the truth, the whole truth and
      nothing but the truth and thereupon did
10    testify as set forth in the above
      transcript of testimony.  The testimony
11    was taken down stenographically by me.
12
                   I do further certify that
13    the above deposition is full, complete
      and a true record of all the testimony
14    given by the said witness.
15
16
                   Linda L. Golkow
17                 Registered Diplomate Reporter
                   Certified Realtime Reporter
18
19
20                 (The foregoing certification
      of this transcript does not apply to any
21    reproduction of the same by any means,
      unless under the direct control and/or
22    supervision of the certifying reporter.)
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3

 4              Please read your deposition

 5   over carefully and make any necessary

 6   corrections.  You should state the reason

 7   in the appropriate space on the errata

 8   sheet for any corrections that are made.

 9

10              After doing so, please sign

11   the errata sheet and date it.  It will be

12   attached to your deposition.

13

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

                      E R R A T A

 2                    - - - - - -

 3    PAGE   LINE   CHANGE

 4    ____   ____   _____

 5       REASON:   ___   _____

 6    ____   ____   _____

 7       REASON:   ____   _____

 8    ____   ____   _____

 9       REASON:   ____   _____

10    ____   ____   _____

11       REASON:   _____   _____

12    ____   ____   _____

13       REASON:   _____   _____

14    ____   ____   _____

15       REASON:   _____   _____

16    ____   ____   _____

17       REASON:   _____   _____

18    ____   ____   _____

19       REASON:   _____   _____

20    ____   ____   _____

21       REASON:   _____   _____

22    ____   ____   _____

23       REASON:   _____   _____

24
```

Confidential - Subject to Further Confidentiality Review

1

2          ACKNOWLEDGMENT OF DEPONENT

3

           I,_____, do

4    hereby certify that I have read the

     foregoing pages, 1-126, and that the same

5    is a correct transcription of the answers

     given by me to the questions therein

6    propounded, except for the corrections or

     changes in form or substance, if any,

7    noted in the attached Errata Sheet.

8

     _____

9    TINGHUAN FU                DATE

10

11

12

13

14

15

     Subscribed and sworn

16   to before me this

     _____ day of _____, 20____.

17

     My commission expires:_____

18

19   _____

     Notary Public

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
 1                  LAWYER'S NOTES

 2    PAGE   LINE

 3    ____   ____   _____

 4    ____   ____   _____

 5    ____   ____   _____

 6    ____   ____   _____

 7    ____   ____   _____

 8    ____   ____   _____

 9    ____   ____   _____

10    ____   ____   _____

11    ____   ____   _____

12    ____   ____   _____

13    ____   ____   _____

14    ____   ____   _____

15    ____   ____   _____

16    ____   ____   _____

17    ____   ____   _____

18    ____   ____   _____

19    ____   ____   _____

20    ____   ____   _____

21    ____   ____   _____

22    ____   ____   _____

23    ____   ____   _____

24    ____   ____   _____
```

# EXHIBIT D



Transcript of the Testimony of: **Shiliang Peng**

01/11/2012

Chinese Drywall

Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2

 3      _____
                                 §  MDL NO. 2047
        IN RE:                   §
 4      CHINESE-                 §  SECTION: L
        MANUFACTURED             §
 5      DRYWALL PRODUCTS         §  JUDGE FALLON
        LIABILITY                §
 6      LITIGATION               §  MAGISTRATE
        _____ §  JUDGE WILKINSON
 7
                         -   -   -
 8
          CROSS NOTICED IN VARIOUS OTHER ACTIONS
 9
                         -   -   -
10
                  January 11, 2012
11
                         -   -   -
12
           CONFIDENTIAL - SUBJECT TO FURTHER
13              CONFIDENTIALITY REVIEW
14                       -   -   -
15           Videotaped deposition of
        SHILIANG PENG, held at the Executive
16      Centre, Level 3, Three Pacific Place, One
        Queen's Road East, Hong Kong, China,
17      commencing at 8:30 a.m., on the above
        date, before Linda L. Golkow, Certified
18      Court Reporter, Registered Diplomate
        Reporter, Certified Realtime Reporter and
19      Notary Public.
                         -   -   -
20
21
22           GOLKOW TECHNOLOGIES, INC.
          877.370.3377 ph | 917.591.5672 fax
23                  deps@golkow.com
24
```

Confidential - Subject to Further Confidentiality Review

```
 1   BEFORE:
 2          HONORABLE ELDON E. FALLON
            UNITED STATES FEDERAL COURT -
 3          EASTERN DISTRICT OF LOUISIANA
 4
 5   APPEARANCES:
 6
            GAINSBURGH, BENJAMIN, DAVID, MEUNIER
 7          & WARSHAUER, L.L.C.
            BY:  GERALD E. MEUNIER, ESQUIRE
 8          2800 Energy Centre
            1100 Poydras Street
 9          New Orleans, Louisiana 70163
            (504) 522-2304
10          gmeunier@gainsben.com
            Representing the Plaintiffs'
11          Steering Committee
12
            HERMAN HERMAN KATZ & COTLAR, LLP
13          BY:  LEONARD A. DAVIS, ESQUIRE
            820 O'Keefe Avenue
14          New Orleans, Louisiana 70113
            (504) 581-4892
15          Ldavis@hhkc.com
            Representing the Plaintiffs'
16          Steering Committee
17
            COLSON HICKS EIDSON
18          BY:  ERVIN GONZALEZ, ESQUIRE
            BY:  PATRICK S. MONTOYA, ESQUIRE
19          255 Alhambra Circle
            Penthouse
20          Coral Gables, Florida 33134
            (305) 476-7400
21          Ervin@colson.com
            Patrick@colson.com
22          Representing Plaintiffs' Steering
            Committee in the Federal and State
23          Coordinated Actions
24
```

Case 2:09-md-02047-EEF-MCW Document 13450-9 Filed 03/26/12 Page 34 of 129
Case 2:09-md-02047-EEF-MCW Document 13454-9 Filed 03/21/12 Page 5 of 29
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (CONTINUED):
 2

      LEVIN, FISHBEIN, SEDRAN & BERMAN
 3    BY:  ARNOLD LEVIN, ESQUIRE
      510 Walnut Street - Suite 500
 4    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 5    Alevin@lfsblaw.com
      Representing the Plaintiffs'
 6    Steering Committee
 7

      SEEGER WEISS LLP
 8    BY:  SCOTT A. GEORGE, ESQUIRE
      One William Street
 9    New York, New York 10004
      (212) 584-0700
10    Sgeorge@seegerweiss.com
      Representing the Plaintiffs'
11    Steering Committee
12

      HOGAN LOVELLS US LLP
13    BY:  JOE CYR, ESQUIRE
      875 Third Avenue
14    New York, New York 10022
      (212) 918-3000
15    Joe.cyr@hoganlovells.com
      Representing Taishan Gypsum Co.
16    Ltd. and Taian Taishan
      Plasterboard Company Ltd. and the
17    Witness, Shiliang Peng
18

      HOGAN LOVELLS INTERNATIONAL LLP
19    BY:  EUGENE CHEN, ESQUIRE
      18th Floor, Park Place
20    1601 Nanjing Road West
      Shanghai, China 200040
21    (86 21) 6122 3800
      eugene.chen@hoganlovells.com
22    Representing Taishan Gypsum Co.
      Ltd. and Taian Taishan Plasterboard
23    Company Ltd. and the Witness,
      Shiliang Peng
24
```

```
 1    APPEARANCES (CONTINUED):
 2

      GREENBERG TRAURIG, LLP
 3    BY:  HILARIE BASS, ESQUIRE
      1221 Brickell Avenue
 4    Miami, Florida 33131
      (305) 579-0745
 5    bassh@gtlaw.com
      Representing the Home Builders
 6    Steering Committee
 7

      PERKINS COIE LLP
 8    BY:  DAVID L. BLACK, ESQUIRE
      1899 Wynkoop Street
 9    Suite 700
      Denver, Colorado 80202
10    (303) 291-2300
      DBlack@perkinscoie.com
11    Representing the State of Louisiana
12

      THOMPSON COE COUSINS & IRONS, L.L.P.
13    BY:  KEVIN F. RISLEY, ESQUIRE
      One Riverway
14    Suite 1600
      Houston, Texas 77056
15    (713) 403-8210
      krisley@thompsoncoe.com
16    Representing The North River
      Insurance Company
17
18    BRENNER, EVANS & MILLMAN, P.C.
      BY:  THEODORE I. BRENNER, ESQUIRE
19    411 East Franklin Street
      Suite 200
20    Richmond, Virginia 23218
      Tbrenner@beylaw.com
21    (804) 644-1300
      Representing Tobin Trading Company
22
23
24
```

```
 1    APPEARANCES (CONTINUED):
 2

      McKENRY, DANCIGERS, DAWSON &
 3    LAKE, P.C.
      BY:  J. BRIAN SLAUGHTER, ESQUIRE
 4    192 Ballard Court
      Suite 400
 5    Virginia Beach, Virginia 23462
      (757) 461-2500
 6    Jbslaughter@va-law.org
      Representing Atlantic Homes LLC and
 7    Multiple Other Virginia-Based
      Defendants
 8
 9    QUINN EMANUEL URQUHART & SULLIVAN,LLP
      BY:  JANE M. BYRNE, ESQUIRE
10    BY:  JULIA BESKIN, ESQUIRE
      51 Madison Avenue
11    22nd Floor
      New York, New York 10010
12    (212) 849-7000
      Janeburne@quinnemanuel.com
13    Juliabeskin@Quinnemanuel.Com
      Representing Chartis Select Insurance
14    Company and Related Chartis Insurers
15
16    WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
      BY:  MICHAEL SEXTON, ESQUIRE
17    3344 Peachtree Road, NE
      Suite 2400
18    Atlanta, Georgia 30326
      (404) 876-2700
19    msexton@wwhgd.com
      Representing Various Banner
20    Defendants
21
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 13246-9 Filed 03/26/12 Page 37 of 129
Case 2:09-md-02047-EEF-MCW Document 13454-9 9 Filed 03/21/12 Page 8 of 28
Confidential - Subject to Further Confidentiality Review

```
 1        APPEARANCES (CONTINUED):
 2
          SINNOTT, NUCKOLS & LOGAN, PC
 3        BY:  KENNETH F. HARDT, ESQUIRE
          13811 Village Mill Drive
 4        Midlothian, Virginia 23114
          (804) 378-7600
 5        khardt@snllaw.com
          Representing Venture Supply, Inc. and
 6        Porter-Blaine Corp.
 7
     ALSO PRESENT:
 8
          SUNNY WANG, INTERPRETER
 9
10
11                      -   -   -
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1    APPEARANCES VIA TELEPHONE:
 2
 3        GALLOWAY JOHNSON TOMPKINS BURR and SMITH
          BY:   CARLINA C. EISELEN, ESQUIRE
 4        One Shell Square
          701 Poydras Street, 40th Floor
 5        New Orleans, Louisiana 70139
          (504) 525-6802
 6        ceiselen@gjtbs.com
          Representing Interior/Exterior
 7        Building Supply
 8
          HUNTON & WILLIAMS LLP
 9        BY:   A. TODD BROWN, ESQUIRE
          Bank of America Plaza
10        101 South Tryon Street
          Suite 3500
11        Charlotte, North Carolina  28280
          (704) 378-4700
12        Representing Stock Building Supply, LLC
13
14        JONES, WALKER, WAECHTER, POITEVENT,
          CARRERE & DENEGRE LLP
15        BY:   MEGAN E. DONOHUE, ESQUIRE
          600 Jefferson Street, Suite 1600
16        Lafayette, Louisiana 70501
          (337) 262-9062
17        mdonohue@joneswalker.com
          Representing Fireman's Fund Insurance
18        Company
19
          FULMER LEROY ALBEE BAUMANN
20        BY:   MICHAEL P. McCAHILL, ESQUIRE
          2866 East Oakland Park Boulevard
21        Ft. Lauderdale, Florida 33306
          (954) 707-4430
22        mosscandace@fulmerleroy.com
          mmccahill@fulmerleroy.com
23        Representing Independent Builders
          Supply Association (IBSA)
24
```

```
 1    APPEARANCES VIA TELEPHONE (CONTINUED):
 2
 3         WRIGHT, FULFORD, MOORHEAD & BROWN, P.A.
           BY:  DORYK B. GRAF, JR., ESQUIRE
 4         145 N. Magnolia Ave.
           Orlando, Florida 32801
 5         (407) 425-0234
           dgraf@wfmblaw.com
 6         Representing West Construction, Inc.
 7
 8         QUINN EMANUEL URQUHART & SULLIVAN, LLP
           BY: CLINTON DOCKERY, ESQUIRE
 9         51 Madison Avenue, 22nd Floor
           New York, New York 10010
10         (212) 849-7000
           clintondockery@quinnemanuel.com
11         Representing Chartis Select Insurance
           Company and Related Chartis Insurers
12
13         RUMBERGER, KIRK & CALDWELL, P.A.
           BY:  MONICA C. SEGURA, ESQUIRE
14         Brickell Bayview Centre, Suite 3000
           80 Southwest 8th Street
15         Miami, Florida 33130
           (305) 358-5577
16         Representing several defendants and
           Defendants' Liaison Counsel for
17         Installers
18
           BUCHANAN INGERSOLL & ROONEY
19         BY:  C. ROBERT ZAPPALA, ESQUIRE
           One Oxford Centre
20         301 Grant Street, 20th Floor
           Pittsburgh, Pennsylvania 15219
21         (412) 392-2135
           bobby.zappala@bipc.com
22         Representing 84 Lumber
23
24
```

```
 1    APPEARANCES VIA STREAM:
 2

      BECNEL LAW FIRM, L.L.C.
 3    BY:  ROBERT BECNEL, ESQUIRE
      106 W. 7th Street
 4    Reserve, Louisiana 70084
      (985) 536-1186
 5    robbecnel@aol.com
      Representing the Plaintiffs'
 6    Steering Committee
 7

      PARKER WAICHMAN ALONSO LLP
 8    BY:  JORDAN L. CHAIKIN, ESQUIRE
      3301 Bonita Beach Road
 9    Bonita Springs, Florida 34134
      (239) 390-1000
10    Jchaikin@yourlaywer.com
      Representing Plaintiffs' Steering
11    Committee
12

      MORGAN & MORGAN
13    BY:  PETE V. ALBANIS, ESQUIRE
      12800 University Drive
14    Suite 600
      Fort Myers, Florida 33907
15    (877) 667-4265
      Representing the Plaintiffs
16
17    IRPINO LAW FIRM
      BY:  ANTHONY IRPINO, ESQUIRE
18    2216 Magazine Street
      New Orleans, Louisiana 70130
19    Airpino@irpinolaw.com
      (504) 525-1500
20    Representing the Plaintiffs
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2

 3         GALLOWAY JOHNSON TOMPKINS BURR and SMITH
           BY:  CARLINA C. EISELEN, ESQUIRE
 4         One Shell Square
           701 Poydras Street, 40th Floor
 5         New Orleans, Louisiana 70139
           (504) 525-6802
 6         ceiselen@gjtbs.com
           Representing Interior/Exterior
 7         Building Supply
 8

           HEARD & MEDACK, P.C.
 9         BY:  JAMES DAVIS, ESQUIRE
           9494 Southwest Freeway, Suite 700
10         Houston, Texas 77074
           (713) 772-6400
11         jdavis@heardmedackpc.com
           Representing CastleRock Communities, L.P.
12

13

           HUNTON & WILLIAMS LLP
14         BY:  A. TODD BROWN, ESQUIRE
           Bank of America Plaza
15         101 South Tryon Street
           Suite 3500
16         Charlotte, North Carolina  28280
           (704) 378-4700
17         tbrown@hunton.com
           Representing Stock Building Supply, LLC
18

19

           SHER GARNER CAHILL RICHTER KLEIN &
20         HILBERT, L.L.C.
           BY:  MATTHEW C. CLARK, ESQUIRE
21         909 Poydras Street
           Suite 2800
22         New Orleans, Louisiana 70112
           (504) 299-2100
23         mclark@shergarner.com
           Representing the Southern Home
24         Defendants
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3        QUINN EMANUEL URQUHART & SULLIVAN, LLP
          BY: CLINTON DOCKERY, ESQUIRE
 4        51 Madison Avenue, 22nd Floor
          New York, New York 10010
 5        (212) 849-7000
          clintondockery@quinnemanuel.com
 6        Representing Chartis Select Insurance
          Company and Related Chartis Insurers
 7
 8        JONES, WALKER, WAECHTER, POITEVENT,
          CARRERE & DENEGRE LLP
 9        BY:  MEGAN E. DONOHUE, ESQUIRE
          600 Jefferson Street, Suite 1600
10        Lafayette, Louisiana 70501
          (337) 262-9062
11        mdonohue@joneswalker.com
          Representing Fireman's Fund Insurance
12        Company
13
          DEUTSCH, KERRIGAN & STILES
14        BY:  MELISSA M. SWABACKER, ESQUIRE
          755 Magazine St.
15        New Orleans, Louisiana  70130
          (504) 581-5141
16        mswabacker@dkslaw.com
          Representing Landmark American
17        Insurance Company
18        PUGH, ACCARDO, HAAS, RADECKER, CAREY
          & HYMEL, LLC
19        BY:  DONNA M. YOUNG, ESQUIRE
          1100 Poydras Street
20        Suite 3200
          New Orleans, Louisiana 70163
21        Dyoung@pugh-law.com
          (504) 799-4500
22        Representing Stock Building Supply
23
24
```

Confidential - Subject to Further Confidentiality Review

```
1    APPEARANCES VIA STREAM (CONTINUED):

2

3        WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
         BY:  SHUBHRA MASHELKAR, ESQUIRE
4        3344 Peachtree Road, NE
         Suite 2400
5        Atlanta, Georgia 30326
         (404) 876-2700
6        Smashelkar@wwhgd.com
         Representing Various Banner
7        Defendants

8
                        -   -   -
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                      -  -  -
 2                 I N D E X
 3   WITNESS                        PAGE NO.
 4   SHILIANG PENG
 5    By Mr. Meunier                   19
 6    By Ms. Bass                     112
 7    By Mr. Cyr                      116
 8    By Mr. Meunier                  124
 9
10
11                      -  -  -
12               E X H I B I T S
13
     NO.           DESCRIPTION        PAGE NO.
14
15    Peng S.-1    E-mail chain, top     51
                   e-mail in English
16                 dated August 03,
                   2006, Bates stamped
17                 TG 0019798 through
                   TG 0019800
18
      Peng S.-2    E-mail chain, top     56
19                 one dated
                   12/12/2005, Bates
20                 stamped TG 0019840
                   and TG 0019841
21
      Peng S.-3    E-mail chain, top     59
22                 one dated
                   10/15/2005, Bates
23                 stamped TG 0019813
                   and TG 0019814
24
```

Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Peng S.-4 | Invoice dated July 03, 2006, Bates stamped TG 0020090 | 80 |
| 2 | | | |
| 3 | Peng S.-5 | Taian Taishan Plasterboard Co., Ltd., Packing List dated July 03, 2006, Bates stamped TG 0019366 | 83 |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| | Peng S.-6 | Taian Taishan Plasterboard Co., Ltd., Invoice dated July 20, 2006, Bates stamped TG 00120091 | 88 |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | Peng S.-7 | Taian Taishan Plasterboard Co., Ltd., Invoice dated July 20, 2006, Bates stamped TG 00120092 | 88 |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| | Peng S.-8 | Taian Shandong Province Special Invoice for Export, Bates number TG 0001657, TG 0001658, TG 0001661, TG 0001663 through TG 0001670, and TG 0001680 through TG 0001682 | 91 |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | Peng S.-9 | Settlement and Release Agreement, Bates stamped TG 0020118 through TG 0020122 | 100 |
| 20 | | | |
| 21 | | | |
| 22 | Peng S.-10 | Contract, Bates stamped TG 0001704 through TG 0001706 | 112 |
| 23 | | | |
| 24 | | | |

Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Jia | Document in Chinese, 122 | |
| | Defendant's 45 | Bates stamped TG | |
| 2 | | 0026004 through TG | |
| | | 0026006 | |
| 3 | | | |
| | Jia | 2006 Financial | 122 |
| 4 | Defendant's 45A | Statement of Taian | |
| | | Taishan Plasterboard | |
| 5 | | Co., Ltd., Bates | |
| | | stamped TG 0026004 | |
| 6 | | through TG 0026006667 | |
| 7 | Jia | Document in Chinese, 123 | |
| | Defendant's 46 | Bates stamped TG | |
| 8 | | 0026007 through TG | |
| | | 0026009 | |
| 9 | | | |
| | Jia | Balance Sheet, Bates 123 | |
| 10 | Defendant's 46A | stamped TG 0026007 | |
| | | through TG 0026009 | |
| 11 | | | |
| | Jia | Document in Chinese, 123 | |
| 12 | Defendant's 47 | Bates stamped TG | |
| | | 0026010 through TG | |
| 13 | | 0026012 | |
| 14 | Jia | 2008 Financial | 123 |
| | Defendant's 47A | Statement of Taian | |
| 15 | | Taishan Plasterboard | |
| | | Co., Ltd. Balance | |
| 16 | | Sheet, Bates stamped TG | |
| | | 0026010 through TG | |
| 17 | | 0026012 | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -

 2              THE VIDEOTAPE TECHNICIAN:

 3        We are now on the record.  My name

 4        is Dan Lawlor.  I'm a videographer

 5        for Golkow Technologies.  Today's

 6        date is January 11, 2012 and the

 7        time is 8:30 a.m.

 8              This video deposition is

 9        being held in Hong Kong, China in

10        the matter of Chinese Drywall

11        Litigation for the United States

12        District Court, Eastern District

13        of Louisiana, MDL Number 2047 and

14        cross-noticed in various other

15        actions.

16              The deponent today is

17        Shiliang Peng.  Will Your Honor

18        and all those present please state

19        your presence for the record.

20              THE COURT:  Judge Eldon

21        Fallon, Eastern District of

22        Louisiana.

23              MR. MEUNIER:  Gerry Meunier

24        appearing for the Plaintiffs'
```

Confidential - Subject to Further Confidentiality Review

1        Steering Committee in the MDL.

2                MR. DAVIS:  Leonard Davis on

3        behalf of the Plaintiffs' Steering

4        Committee and Plaintiffs' Liaison

5        Counsel.

6                MS. BASS:  Hilarie Bass on

7        behalf of Home Builders Steering

8        Committee.

9                MR. GONZALEZ:  Good morning.

10       Ervin Gonzalez and Patrick Montoya

11       on behalf of the PSC and the MDL

12       liaison states.

13               MR. HARDT:  Good morning,

14       Ken Hardt on behalf of Venture

15       Supply in the Germano action and

16       the Alexander state court action.

17               MR. BRENNER:  Theodore

18       Brenner on behalf of Tobin Trading

19       in the Germano action.

20               MR. SLAUGHTER:  Brian

21       Slaughter.  I'm here on behalf of

22       Atlantic Homes, LLC both in the

23       Commonwealth of Virginia and in

24       the MDL matters.

Case 2:09-md-02047-EEF-JCW Document 13246-9 Filed 03/26/12 Page 49 of 128
Case 2:09-md-02047-EEF-JCW Document 13254-9 Filed 03/21/12 Page 20 of 28
Confidential - Subject to Further Confidentiality Review

```
 1              MR. SEXTON:  Mike Sexton on
 2        behalf of certain Banner Supply
 3        entities.
 4              MR. BLACK:  David Black on
 5        behalf of the State of Louisiana
 6        reserving the positions set forth
 7        in our pending remand motion.
 8              MR. LEVIN:  Arnold Levin,
 9        lead counsel, Plaintiffs' Steering
10        Committee.
11              MR. GEORGE:  Scott Alan
12        George, Seeger Weiss, PSC.
13              MS. BESKIN:  Julia Beskin
14        from Quinn, Emanuel Urquhart &
15        Sullivan for the Chartis insurance
16        group.
17              MR. RISLEY:  Kevin Risley on
18        behalf of North River Insurance
19        Company.
20              MR. CYR:  Eugene Chen and
21        Joe Cyr of Hogan Lovells on behalf
22        of Defendants Taishan Gypsum and
23        TTP.
24              THE COURT:  Would you rise,
```

Confidential - Subject to Further Confidentiality Review

```
 1            please, sir.

 2                     -   -   -

 3            SHILIANG PENG, after having

 4     been duly sworn, was examined and

 5     testified as follows:

 6                     -   -   -

 7            THE COURT:  Have a seat,

 8     please.

 9            You may begin, Counsel.

10                     -   -   -

11            EXAMINATION

12                     -   -   -

13  BY MR. MEUNIER:

14     Q.    Good morning.

15     A.    Hello.

16     Q.    Would you please state your

17  name and business address.

18     A.    My name is Peng Shiliang,

19  last name, P-E-N-G, first name,

20  S-H-I-L-I-A-N-G.

21            I don't quite understand

22  what you mean by business address.

23     Q.    What address or addresses do

24  you use in order to conduct your
```

Confidential - Subject to Further Confidentiality Review

 1   business?

 2          A.    When I do my business?

 3          Q.    Do you have an office?

 4          A.    What period of time?

 5          Q.    Today.

 6          A.    Today I don't have an

 7   office.

 8          Q.    By whom are you employed?

 9          A.    I don't have an office right

10   now.

11          Q.    By whom are you employed?

12          A.    I don't understand from the

13   beginning.  What do you mean by business

14   address?

15          Q.    I'm asking a different

16   question now.  Who do you work for?

17          A.    Currently I work for TG.

18          Q.    In your work for TG, do you

19   work in an office?

20          A.    I work in the manufacture.

21          Q.    You work at a manufacturing

22   plant?

23          A.    Correct.  I work in a

24   manufacture plant.

```
 1          Q.    Please give us the address

 2    of that plant.

 3                INTERPRETER:  Interpreter

 4          clarification.

 5                In Lucheng city,

 6          L-U-C-H-E-N-G, Shanxi province,

 7          S-H-A-N-X-I.

 8    BY MR. MEUNIER:

 9          Q.    Does the plant manufacture

10    drywall?

11          A.    There is a plant that

12    manufacture drywall.

13          Q.    Is the plant where you work

14    owned by TG?

15          A.    Yes.

16          Q.    What is your job position?

17          A.    I'm the manager of this

18    plant.

19          Q.    What are the duties and

20    responsibilities of the manager of the

21    plant?

22          A.    My duties are to be in

23    charge of the daily operation of the

24    plant to ensure its normal operation.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Who is the boss that you

 2     report to?

 3          A.     I report to the executives

 4     of TG.

 5          Q.     And who are they?

 6          A.     Mr. Jia Tongchun.

 7          Q.     Anyone else?

 8          A.     And also Mr. Ren Xulian,

 9     R-E-N, last name, first name,

10     X-U-L-I-A-N.

11          Q.     What is the job position of

12     Mr. Ren Xulian?

13          A.     Deputy general manager of

14     TG.

15          Q.     Which employees at the plant

16     report to you as their boss?

17          A.     Deputy production general

18     manager and the people in charge in

19     financial department and supply

20     department.

21          Q.     Please give me the names of

22     those people.

23          A.     Production manager, Mr. Chen

24     Zhongjian, last name, C-H-E-N, first
```

1    name, Z-H-O-N-G-J-I-A-N.

2         Q.    Who in the financial

3    department reports to you?

4         A.    Dai Zhiming, D-A-I, last

5    name, first name, Z-H-I-M-I-N-G.

6         Q.    Who in the support

7    department reports to you?  I'm sorry.

8    Who in the supply department reports to

9    you?

10        A.    Sun Qingli, last name,

11   S-U-N, first name, Q-I-N-G-L-I.

12        Q.    Are you in your current job

13   involved in the marketing or sale of

14   gypsum board?

15        A.    I have not participated in

16   marketing and sales activities.

17        Q.    How long have you held your

18   current position?

19        A.    Since April 2009 until

20   today.

21        Q.    What was your position with

22   TG before April of 2009?

23             MR. CYR:  Objection.

24             THE COURT:  What's the

```
 1          objection for?

 2              MR. CYR:  The question

 3          assumes that he worked for TG

 4          prior to April of 2009.

 5              THE COURT:  Let's clarify

 6          that, please.

 7   BY MR. MEUNIER:

 8          Q.    Did you work for TG before

 9   2009, Mr. Peng?

10          A.    I did not work for TG before

11   that.

12          Q.    Who did you work for before

13   that?

14          A.    Before that, I worked for

15   TTP.

16          Q.    Is it true you started

17   working for TTP when that company was

18   created in February 2006?

19          A.    Yes, absolutely correct.

20          Q.    Tell me the job positions

21   you held with TTP between April 2006 and

22   April 2009.

23              MR. CYR:  That would be

24          February 2006.
```

1                MR. MEUNIER:  I'm sorry,

2          February 2006 and April 2009.

3                THE WITNESS:  My position in

4          TTP while I worked there were

5          Chairman of the Board of Directors

6          and general manager.

7    BY MR. MEUNIER:

8          Q.    In that position, were you

9    in charge of the daily operations of TTP?

10         A.    In that position, I was in

11   charge of the daily operation of TTP.

12         Q.    TTP was owned 100 percent by

13   TG; is that correct?

14         A.    Can you repeat that?

15         Q.    TTP was owned 100 percent by

16   TG; is that correct?

17         A.    TG is the only shareholder

18   of TTP.

19         Q.    When you were the manager of

20   TTP, did you report to any of the

21   executives of TG?

22         A.    As the manager of TTP, I

23   worked independently.  I did not report

24   to the executives of TG.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Who reported to you as boss
 2    during the time you were manager of TTP?
 3          A.    TTP's production manager and
 4    other relevant department managers in TTP
 5    reported to me.
 6          Q.    Please give me their names
 7    and job positions.
 8          A.    Song Qinghai, Mr. Song
 9    Qinghai, last name, S-U-N-G, first name,
10    Q-I-N-G-H-A-I.
11                MR. CHEN:  Pardon me, just
12          for clarification, the Pinyin is
13          S-O-N-G, not S-U.
14    BY MR. MEUNIER:
15          Q.    Was he the production
16    manager at TTP?
17          A.    Correct.  He was the
18    production manager of TTP.
19          Q.    Who were the other relevant
20    employees who reported to you at TTP?
21          A.    Mr. Peng Wenlong at sales
22    department.
23          Q.    Was he in charge of the
24    sales department at TTP?
```

Confidential - Subject to Further Confidentiality Review

```
1          A.     He was in charge of the
2    sales department in TTP.
3          Q.     Who else reported to you?
4          A.     Zhang Min in financial
5    department.  Last name, Z-H-A-N-G, first
6    name, M-I-N.
7          Q.     Who worked under Mr. Peng
8    Wenlong in the sales department of TTP?
9          A.     There were about seven or
10   eight employees under him and worked for
11   him.
12         Q.     Can you give me the names of
13   those you remember?
14         A.     Mr. Che Gang, Mr. Yang
15   Jiapo.  I can't remember the rest of the
16   names.
17         Q.     Are you a member of the
18   board of directors of TG?
19         A.     I am a member of TG's board
20   of directors.
21         Q.     For how long have you been a
22   member?
23         A.     Since its establishment in
24   February 2006 until today.
```

Confidential - Subject to Further Confidentiality Review

 1         Q.     I was asking about you being

 2    a member of the board of directors of TG

 3    not TTP?

 4         A.     I am not a member of the

 5    board of directors in TG.

 6         Q.     Have you ever been a member

 7    of the board of directors of either

 8    Shandong Taihe Dongxin or Taishan Gypsum?

 9         A.     Neither.

10         Q.     Who did you work for before

11    TTP was created in February 2006?

12         A.     Before the establishment of

13    TTP in the year 2006, I worked at a

14    workshop in -- manufacturer workshop in

15    TG.

16         Q.     Were you employed by TG when

17    the name of the company was Shandong

18    Taihe Dongxin?

19         A.     Can you repeat the question?

20         Q.     Were you employed by a

21    company named Shandong Taihe Dongxin?

22         A.     Yes, correct.

23         Q.     When did you start working

24    for that company?

```
 1            A.     In 1991.

 2            Q.     Did you continue to work for

 3    that company after it changed its name to

 4    Taishan Gypsum?

 5            A.     Can you repeat it?

 6            Q.     When did Shandong Taihe

 7    Dongxin change its name to Taishan

 8    Gypsum?

 9            A.     I don't recall that.

10            Q.     Did you work for Shandong

11    Taihe Dongxin until February 2006?

12            A.     Yes.

13            Q.     And then after TTP --

14                   After you left TTP in April

15    of 2009, you went back to work for the

16    company which at that time was called

17    Taishan Gypsum; is that true?

18            A.     Correct.  At the time, it

19    was already Taishan Gypsum Company.

20            Q.     Tell me all the positions

21    you held at Shandong Taihe Dongxin

22    between 1991 and February 2006?

23            A.     I did not have a position in

24    TG.
```

```
 1          Q.    No.  I was asking about
 2    Shandong Taihe Dongxin.  When you --
 3    shall I ask it again?
 4          A.    I was only an ordinary
 5    employee at TG.
 6          Q.    What job positions did you
 7    have at Shandong Taihe Dongxin from 1991,
 8    when you started, until February of 2006,
 9    when you went to work for TTP?
10          A.    I was only a director of one
11    of TG's production manufacturer workshop.
12          Q.    Were you the director of
13    that production workshop from 1991 until
14    February 2006?
15          A.    Yes.
16          Q.    Which production facility
17    did you direct?
18          A.    It is just one of TG's
19    gypsum board workshop.
20                MR. MEUNIER:  Madam
21                Interpreter, I'm not clear about
22                the meaning of the word
23                "workshop."  Maybe you can help.
24                THE COURT:  Well, ask the
```

```
 1            witness.

 2     BY MR. MEUNIER:

 3            Q.     Is a workshop a

 4     manufacturing facility?

 5            A.     Workshop is a manufacturer

 6     facility.

 7            Q.     Did you direct the same

 8     manufacturing facility from 1991 until

 9     February 2006?

10            A.     Yes, I directed that one

11     workshop.

12            Q.     Please give me the location

13     of that facility.

14            A.     It's located in Dawenkou

15     Town, Taian.

16            Q.     What product or products

17     does the facility manufacture?

18            A.     Those workshops produce and

19     only produce paper-faced gypsum board.

20            Q.     Who reported to you as boss

21     when you directed that facility from 1991

22     to February 2006?

23            A.     The deputy director of the

24     workshop reported to me.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Who was the deputy director?

 2          A.     The deputy director was Hou

 3   Yanyun, last name, H-O-U, first name,

 4   Y-A-N-Y-U-N.

 5          Q.     Who did you report to as

 6   your boss when you were the director of

 7   that facility?

 8          A.     I reported to, at the time I

 9   reported to Mr. Duan Zhentao, D-U-A-N,

10   first name, Z-H-E-N-T-A-O.

11          Q.     What was his position?

12          A.     Production manager.

13          Q.     Who were the sales employees

14   involved in the sale of gypsum board

15   manufactured at that facility between

16   1991 and February 2006?

17          A.     I was only in charge of the

18   production in the workshop.  I'm not sure

19   about the detailed sales employees.

20          Q.     Who was in charge of the

21   sales employees for the gypsum board

22   manufactured by that facility when you

23   were the director?

24          A.     Like I said, I was only in
```

Confidential - Subject to Further Confidentiality Review

```
1    charge of the production of the workshop.

2    I'm not sure who was in charge of the

3    sales.

4         Q.    You don't know who

5    supervised the sales personnel for the

6    gypsum board made at that facility when

7    you were the director?

8         A.    I was not in charge of the

9    sales.  I was only in charge of the

10   production of the workshop.

11        Q.    I understand you were not in

12   charge.  My question is, do you know who

13   was in charge of the sales personnel?

14        A.    TG was in charge of the

15   sales.

16        Q.    Who at TG?

17        A.    I had minimal contact with

18   the sales part.  As of now, I really

19   can't remember who was the person in

20   charge of sales.

21        Q.    How often did the board of

22   directors of TTP meet when you were chair

23   of the board from February 2006 to April

24   2009?
```

Confidential - Subject to Further Confidentiality Review

```
1          A.     The board of directors

2     meeting in TTP was held irregularly,

3     usually once a year.

4          Q.     Were reports made at the

5     board of directors meetings concerning

6     the marketing or sale of gypsum board?

7          A.     Sometimes at a board of

8     directors meeting, these words were

9     discussed.

10          Q.     Who made the report at the

11     board of directors meetings on marketing

12     and sales at TTP?

13          A.     Can you repeat the question?

14          Q.     Who made the report on

15     drywall marketing and sales at the board

16     of directors meetings for TTP?

17          A.     Usually I would make the

18     report for the board of directors.

19          Q.     How did you gather

20     information on the marketing and sale of

21     gypsum board in order to make that

22     report?

23          A.     The report was only a simple

24     summary of our productions and sales.
```

```
 1          Q.    How did you get the summary
 2    on sales?
 3          A.    I requested the balancing
 4    between the production and sales lower
 5    the product payments risk to provide good
 6    service for the customers.
 7          Q.    How did you learn the total
 8    volume of drywall sales as director of
 9    TTP?
10          A.    TTP's financial department
11    would have the statistics.
12          Q.    Were the reports on the
13    volume of drywall sales from the
14    financial department made in writing?
15          A.    It was in written form.
16          Q.    What was the name of the
17    written form?
18          A.    It was only a very simple
19    production and sales statistic report.
20          Q.    Is that the name of the
21    report, sales and statistic report?
22          A.    There wasn't a detailed name
23    for that report.  It's only reflected as
24    a form of form.
```

Confidential - Subject to Further Confidentiality Review

```
 1           Q.     Did the report contain

 2    information on foreign sales?

 3                  MR. CYR:   Objection.

 4                  THE COURT:   Can you ask him

 5           for the time frame.

 6    BY MR. MEUNIER:

 7           Q.     During the time these

 8    reports were made between February 2006

 9    and April 2009 at TTP, did the reports

10    contain information on sales to foreign

11    customers?

12           A.     Like I just said, it was

13    only a very simple statistic form.

14    Because our company, TTP, did not do

15    direct exporting, therefore, the form was

16    not reflected on that.

17           Q.     What do you mean "The

18    company did not do direct exporting," Mr.

19    Peng?

20           A.     Hasn't Mr. Attorney asked me

21    the question regarding exporting to other

22    countries?

23           Q.     Did TTP sell drywall to

24    foreign customers?
```

```
 1              INTERPRETER:  Interpreter
 2        clarification.
 3              THE WITNESS:  To sell the
 4        drywall to who?
 5   BY MR. MEUNIER:
 6        Q.    Did the purchasers of TTP
 7   drywall between February 2006 and April
 8   2009 include businesses outside of China?
 9        A.    All the paper-faced drywall
10   that TTP produced had transactions within
11   China.
12        Q.    Is it your testimony that no
13   foreign customers purchased drywall
14   manufactured by TTP between February 2006
15   and April 2009?
16        A.    Like I said, all the
17   transactions regarding our products were
18   within China.
19        Q.    Do you deny that Peng
20   Wenlong, Che Gang and Yang Jiapo all
21   dealt and did business with foreign
22   customers when they were sales personnel
23   of TTP?
24        A.    You said deny?
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Is it true that the sales

 2    personnel, Peng Wenlong, Che Gang and

 3    Yang Jiapo, did business with foreign

 4    customers when they were sales employees

 5    of TTP?

 6        A.    I would like to repeat.

 7    Number one, all our transactions were

 8    within China.  Number two, some of our

 9    sales employees did sign some contracts

10    with the trading companies in China.

11            MR. MEUNIER:  Your Honor, I

12        would like to move on, but I don't

13        think I'm getting a response to

14        the question.  I'll try one more

15        time.

16            MR. CYR:  I agree, Counsel.

17    BY MR. MEUNIER:

18        Q.    Did Peng Wenlong, Che Gang

19    and Yang Jiapo, as sales employees of

20    TTP, between February 2006 and April

21    2009, do business with foreign purchasers

22    of drywall, by that I mean, purchasers

23    who were not in China?

24        A.    I don't have an impression
```

```
 1   of that.

 2                  May I use the restroom?

 3                  THE COURT:  Yes.

 4                  THE VIDEOTAPE TECHNICIAN:

 5         Going off the record.  The time is

 6         9:20.

 7                  THE COURT:  Let's take a

 8         10-minute break at this time.

 9                        -   -   -

10                  (Whereupon, a recess was

11         taken from 9:20 a.m. until 9:34

12         a.m.)

13                        -   -   -

14                  THE VIDEOTAPE TECHNICIAN:

15         Going back on the record,

16         beginning of Tape Number 2.  The

17         time is 9:34.

18   BY MR. MEUNIER:

19         Q.    Mr. Peng, what documents did

20   you review in order to prepare for this

21   deposition?

22         A.    In order to prepare for

23   today's deposition, I have, together with

24   my attorney, reviewed relevant
```

```
 1    information about TTP.

 2          Q.    What relevant information

 3    did you review?

 4          A.    Most of the information are

 5    about the article of incorporation of TTP

 6    and the resolution of the meeting of

 7    board of directors.

 8          Q.    What did the resolution deal

 9    with?

10          A.    One is at the establishment

11    of TTP, the purchasing of TTP from TG of

12    the two production lines.  And another

13    resolution was about TTP decided to sell

14    the two production lines to TG.

15          Q.    Does that refer to the sale

16    of TTP assets to TG when TTP stopped

17    doing business in April 2009?

18          A.    Correct.

19          Q.    What other documents, if

20    any, did you review?

21          A.    That's all I can name for

22    now.

23          Q.    How many meetings have you

24    had with your attorney in order to
```

Confidential - Subject to Further Confidentiality Review

 1    prepare for this deposition?

 2         A.    I didn't really pay

 3    attention, so, I can't really tell.

 4         Q.    What do you mean you didn't

 5    pay attention?

 6         A.    I didn't really pay

 7    attention how many times we met.

 8              INTERPRETER:  Correction.

 9              THE WITNESS:  I met with my

10         attorney.

11              MR. CHEN:  I'm sorry.  I

12         don't think the word "cuee" is

13         being translated.

14              MR. DAVIS:  Excuse me, Your

15         Honor.  We have a translator.

16              THE COURT: That's all right.

17         But do you understand?

18              MR. CHEN:  This is just a

19         recommendation for the interpreter

20         to accept or reject.

21              THE COURT:  Go ahead.

22         What's the problem?

23              MR. CHEN:  I think he's

24         saying I didn't specifically pay

Case 2:09-md-02047-EEF-JCW Document 13246-20 Filed 03/26/12 Page 73 of 128
Case 2:09-md-02047-EEF-JCW Document 13254-20 Filed 03/26/12 Page 74 of 128
Confidential - Subject to Further Confidentiality Review

```
 1            attention to that matter, and

 2            that's just my suggestion to you

 3            whether to accept it.

 4                  THE COURT:  Let's get a

 5            clarification.  What do you mean?

 6            Ask him the question again, what

 7            do you mean by that.

 8    BY MR. MEUNIER:

 9            Q.    When you said you didn't pay

10    attention, what do you mean by that?

11            A.    Which is that I did not

12    remember how many times I met with my

13    attorney.

14            Q.    Did you meet with anyone

15    else besides your attorney in order to

16    prepare for this deposition?

17            A.    Beside my attorney, I've

18    also met with Mr. Jia Tongchun and Mr.

19    Peng Wenlong.  Jia Tongchun spelling is

20    J-I-A, first name, T-O-N-G-C-H-U-N.

21            Q.    Were any attorneys present

22    when you met with Mr. Jia and Mr. Peng

23    Wenlong?

24            A.    No.
```

Confidential - Subject to Further Confidentiality Review

1        Q.    What did you discuss with

2    them?  First Mr. Jia, tell me everything

3    you remember discussing with Mr. Jia.

4        A.    It's hard for me to remember

5    and to say what exactly we have said at

6    the time.  I don't remember clearly.

7        Q.    When did you meet with Mr.

8    Jia?

9        A.    I'm not sure about the time.

10       Q.    Was it yesterday?

11       A.    Not yesterday.

12       Q.    Was it within the last week?

13       A.    We came together.  Of course

14   we met within the week.

15       Q.    Did Mr. Jia talk to you

16   about this case?

17       A.    In this process, we did not

18   talk about the case.

19       Q.    Did he give you advice how

20   to answer questions today?

21       A.    Like I said, in this

22   process, we did not talk about this

23   issue, so, we did not communicate about

24   this.

Confidential - Subject to Further Confidentiality Review

```
 1            Q.    You told me you met with him
 2    to get ready for the deposition.  What
 3    did you mean by that?
 4            A.    We came together by car.  If
 5    I had come by myself, I wouldn't be
 6    familiar with the route and the agenda.
 7    It would be safer that way.
 8                  THE COURT:  Let me interrupt
 9            and say something.
10                  Sir, I am the Judge who will
11            decide the issues in this case.
12            One thing I do when I make that
13            decision, I listen to the
14            testimony and I evaluate the
15            credibility of the truthfulness of
16            the witnesses.  I listen closely
17            to what people say, and it's
18            important for you to listen to the
19            question and to answer the
20            question, if you can.  Do you
21            understand that?
22                  THE WITNESS:  I understand.
23                  THE COURT:  Because if I get
24            the impression that you are not
```

Confidential - Subject to Further Confidentiality Review

```
 1          answering the question

 2          intentionally, I will discount

 3          your testimony and not believe it.

 4                  Do you understand that?

 5              THE WITNESS:  I understand.

 6              THE COURT:  Now let's

 7          continue with the deposition, and

 8          keep that in mind, please.

 9   BY MR. MEUNIER:

10          Q.    Mr. Peng, when you met with

11   Mr. Jia to get ready for this deposition,

12   what did you and Mr. Jia discuss?

13              MR. CYR:  Objection, asked

14          and answered.

15              THE COURT:  The reason that

16          I'm going to allow it is because I

17          think it was asked, but I'm not

18          sure it was answered.  So I'll

19          overrule the objection.

20              THE WITNESS:  Can you repeat

21          your question?

22   BY MR. MEUNIER:

23          Q.    When you met with Mr. Jia to

24   get ready for this deposition, what did
```

Confidential - Subject to Further Confidentiality Review

1    you and Mr. Jia talk about?

2         A.    Mr. Jia and I checked on

3    some information of TTP.

4         Q.    What information?

5         A.    Like I just mentioned, such

6    as TTP's Article of Incorporation and

7    resolution of the board of directors

8    meeting.

9         Q.    Anything else besides that?

10        A.    Nothing else.

11        Q.    You did not talk about sales

12   to foreign customers?

13        A.    We did not talk about the

14   sales.  We did not sell to foreign

15   customers.  Our transaction has always

16   been within China, so, we cannot talk

17   about that.

18        Q.    Did Mr. Jia advise you to

19   say that today?

20        A.    No, no.

21        Q.    When you and Mr. Peng

22   Wenlong met in order for you to prepare

23   for this deposition, what did you and he

24   discuss?

```
 1            A.    We talked about, as I said,
 2    the Article of Incorporation and the
 3    resolution of TG.  We also talked about
 4    the aspects of sales.
 5            Q.    Explain what you mean by
 6    that, "aspects of sales."
 7            A.    Because Mr. Peng Wenlong was
 8    in charge of the sales in TTP.
 9    Therefore, I asked him for information
10    regarding TTP's sales.
11            Q.    What information did you ask
12    him for, and what information did he give
13    you?
14            A.    He told me how the sales of
15    our gypsum board went about.
16            Q.    What exactly did he tell
17    you?
18            A.    Him and I only simply tried
19    to remember the sales work at TTP and how
20    we dealt with customers.
21            Q.    And what did you and he
22    remember about that?
23            A.    One is how much have we
24    produced and how much have we sold.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And how much was produced

 2    and sold?

 3          A.     From the establishment of

 4    the company in 2006 until we stopped

 5    doing business, we had all together

 6    produced over 60 million square meter of

 7    the product.

 8          Q.     And how much was sold?

 9          A.     We've sold them all.

10    There's a balance between production and

11    sales.

12          Q.     How much was sold to

13    customers outside of China?

14                 MR. CYR:  Objection.

15                 THE COURT:  Ask him first

16          whether or not any was.

17    BY MR. MEUNIER:

18          Q.     Were any of the 60 square

19    meters -- I'm sorry -- 6 --

20                 INTERPRETER:  Million.

21    BY MR. MEUNIER:

22          Q.     -- 6 million square meters

23    sold to customers outside of China?

24          A.     All the transactions of our
```

1   productions were taking place in China.

2   Perhaps some trading companies sold them

3   to outside of China.

4          Q.     How many of the purchasers

5   were outside of China?

6          A.     I was not in charge of the

7   detailed sales work, and it has been too

8   long.  I could not say exactly how much.

9          Q.     What is your best estimate

10   of how much?

11          A.     I could not give such an

12   estimation because all our products were

13   delivered in China.  As of how much had

14   the trading companies sold to us out of

15   China, I could not possibly know.

16          Q.     Why did TTP sales personnel

17   provide price and shipping cost

18   information for TTP gypsum board to

19   customers in the United States?

20          A.     I was not in charge of the

21   specific sales work.  For that question,

22   you should ask Mr. Peng Wenlong.

23          Q.     Do you believe sales

24   personnel for TTP provided price and

Confidential - Subject to Further Confidentiality Review

```
 1    shipping cost information for gypsum

 2    board to customers in the United States?

 3           A.    I don't know about that.

 4           Q.    Did they do that?

 5           A.    Like I said, I really don't

 6    know.

 7           Q.    Did they have authority to

 8    do that?

 9           A.    They will decide themselves

10    how will they sell, in what way did they

11    make the sales.

12           Q.    Did they have authority to

13    provide this information even for a

14    specific construction project located in

15    the United States of America?

16           A.    Because TTP had established

17    for a short period of time, I don't think

18    in that respect they had much experience

19    to do such job.

20           Q.    Did they have the authority

21    to do this?

22           A.    Whether they could do it or

23    not, I'm not sure.

24                 MR. MEUNIER:  Let me show
```

```
 1          you documents that have been

 2          marked TG 19798 through 19800, and

 3          I'll mark that as Peng Exhibit 1.

 4                    -  -  -

 5                 (Whereupon, Deposition

 6          Exhibit Peng S.-1, E-mail chain,

 7          top e-mail in English dated August

 8          03, 2006, Bates stamped TG 0019798

 9          through TG 0019800, was marked for

10          identification.)

11                    -  -  -

12  BY MR. MEUNIER:

13          Q.    Mr. Peng, at the bottom of

14  Page 19798, continuing to the top of

15  19799, is an e-mail of August 1, 2006

16  from Josephine Wang to Yang Jiapo in

17  which Josephine Wang tells Mr. Yang she

18  is interested in learning more about his

19  product and doing business with him and

20  advises him that her company is currently

21  building in Philadelphia a project called

22  South Bridge.  She then asks Mr. Yang to

23  forward information about how he sells

24  abroad.
```

1              Please listen as the

2      translator reads the reply from Mr. Yang

3      to Ms. Wang by e-mail dated August 3rd,

4      2006 at 3:11 a.m.  It is in the middle of

5      Page 19798.

6              MR. MEUNIER:  (Addressing

7      the interpreter.)  Would you please read

8      it in English for us?

9              INTERPRETER:  I'm sorry.

10          You mean the one in the middle?

11              MR. MEUNIER:  Yes.

12              INTERPRETER:  Ms. Wang,

13          hello.  I'm glad to have received

14          your e-mail and now I'm sending

15          you all the information.  Please

16          take a look.  Normal gypsum board

17          4 by 12 by half, FOB Qingdao USD

18          4.15/PCS 660 PCS/40 FCL 26.5

19          tons/40 FCL.

20              A new line.  4 by 8 by 1 and

21          a half -- I'm sorry.  Let me try

22          again.

23              4 by 8 by half USD

24          2.77/PCS 960 PCS/40 FCL.

Confidential - Subject to Further Confidentiality Review

```
 1                    Skip a line.  A new line.  4

 2            by 12 by half FOB LIANYUNGANG USD

 3            4.2/PCS 76 PCS/tray.

 4                    A new line.  4 by 8 by

 5            half USD 2.8/PCS 76 PCS/tray.

 6                    A new line.  Our company is

 7            the biggest gypsum board

 8            production facility.  Please take

 9            heart for the product quality and

10            volume.

11                    Skip line.  Best wishes!

12                    Skip three or four lines.

13            Yang Jiapo, 2006.8.2.

14    BY MR. MEUNIER:

15            Q.    Did Mr. Yang in this e-mail

16    provide to this person accurate and

17    truthful information concerning TTP

18    prices and shipping information?

19            A.    The detailed sales employees

20    would be in charge of the detailed

21    handling of specific sales in the process

22    of sales.  As Chairman of the Board of

23    Directors and general manager of the

24    company, I did not participate in that.
```

Confidential - Subject to Further Confidentiality Review

```
 1    Therefore, I have never seen this -- the
 2    content of this document.
 3           Q.    Mr. Peng, as long as TTP got
 4    paid, was it okay with you as director
 5    that the company sold its gypsum board to
 6    be used in a construction project in
 7    Philadelphia, Pennsylvania?
 8           A.    The sales principle of our
 9    company is to ensure production and sales
10    balancing and also to decrease the risk
11    that comes with the payment.  Therefore,
12    it doesn't matter who we sell the
13    products to, the collection of payment
14    has to be ensured.
15           Q.    Is it true that export
16    sales, when you were an employee of
17    Shandong, increased in the second half of
18    2005?
19           A.    Can you repeat it?
20           Q.    Is it true that export
21    sales, when you were employed at
22    Shandong, increased in the second half of
23    2005?
24           A.    Shandong?
```

1          Q.     Yes.

2          A.     Employee of Shandong?

3          Q.     No, sir.  I'm referring to

4     when you worked for Shandong in the

5     second half of 2005.

6                 Shandong Taihe Dongxin, when

7     you worked for that company in the second

8     half of 2005, is it true that export

9     sales of gypsum board increased?

10         A.     Like I said, in the year

11    2005, I was only a director of a

12    production workshop in TG.  I was not in

13    charge of the sales work.  Therefore, I

14    would not specifically collect

15    informations about this.  Therefore, I do

16    not know whether the exporting sales

17    increased.

18         Q.     Before they went to work for

19    TTP, Peng Wenlong, Che Gang and Yang

20    Jiapo were all sales employees of

21    Shandong Taihe Dongxin, true?

22         A.     That's true.  They were all

23    salespeople in TG.

24         Q.     In the second half of 2005,

```
 1    as sales employees of Shandong Taihe

 2    Dongxin, is it true they provided price

 3    and shipping costs information to

 4    customers in the United States of

 5    America?

 6          A.    I insist on my prior

 7    statement.  I was only a director of a

 8    production workshop.  I was not aware of

 9    the detailed sales work.

10          Q.    Let me show you an example

11    of what I mean.

12                MR. MEUNIER:  I show you a

13          document which is Bates numbered

14          TG 19840 and 19841, and I will

15          mark that as Peng Number 2.

16                     -  -  -

17                (Whereupon, Deposition

18          Exhibit Peng S.-2, E-mail chain,

19          top one dated 12/12/2005, Bates

20          stamped TG 0019840 and TG 0019841,

21          was marked for identification.)

22                     -  -  -

23    BY MR. MEUNIER:

24          Q.    Mr. Peng, at the bottom of
```

```
 1    19840, continuing to the top of 19841, is

 2    an e-mail of December 12, 2005 to Mr.

 3    Yang Jiapo from Leon Liu, L-I-U, in which

 4    Mr. Liu asked for pricing information on

 5    32,000 boards for delivery in the Port of

 6    New York/New Jersey and pricing

 7    information on an additional 32,000

 8    boards for delivery to the Port of

 9    Savannah, Georgia.  In his e-mail to Mr.

10    Liu of December 11, 2005, which is in the

11    middle of 19840, please read Mr. Yang's

12    response.  And I'll ask the interpreter

13    to please read it in English for the

14    record.

15              INTERPRETER:  Here

16         (indicating)?

17              THE WITNESS:  (Reading in

18         Chinese.)

19              Mr. Liu, hello.  Regarding

20         to the port pricing, in this

21         e-mail, we have not received the

22         pricing of the port.  We can only

23         give you a pricing -- FOB pricing

24         for the customer's reference.
```

```
 1                A new line.  4 by 12 by half

 2           ordinary gypsum board: FOB USD

 3           3.68/PCS.

 4                A new line.  Response can be

 5           provided for other requirements as

 6           well.

 7                A new line.  For the matter

 8           of samples, our company currently

 9           has a rule that our company will

10           not bear any cost for samples over

11           200 RMB because right now there

12           are too many American customers

13           that ask for samples, we do not

14           want to get a special approval.

15           We apologize.  I'm sorry.

16                A new line.  Thank you.

17                A new line.  Jiapo.

18                A new line.  2005.12.12.

19      BY MR. MEUNIER:

20           Q.   Mr. Peng, as the director of

21      Shandong Taihe Dongxin gypsum board

22      manufacturing facility in December of

23      2005, was it okay with you if the drywall

24      produced there was sold for delivery to
```

```
 1    ports in the United States of America as
 2    long as the company got paid?
 3          A.    I insist on my prior
 4    statement that I was only a director of
 5    the production workshop.  As of the
 6    requirements for the salespeople, I
 7    really did not know.  I'm very sorry.
 8          Q.    Let me show you one other
 9    example, and then we'll move to a
10    different subject.  This is a document
11    Bates numbered TG 19813 and 19814 which I
12    will mark as Peng Number 3.
13                   -   -   -
14                (Whereupon, Deposition
15          Exhibit Peng S.-3, E-mail chain,
16          top one dated 10/15/2005, Bates
17          stamped TG 0019813 and TG 0019814,
18          was marked for identification.)
19                   -   -   -
20    BY MR. MEUNIER:
21          Q.    Mr. Peng, in this document,
22    there is an e-mail at the bottom of 19813
23    addressed to Mr. Yang Jiapo from Wenny
24    Yin, Y-I-N, dated October 15, 2005.  And
```

Confidential - Subject to Further Confidentiality Review

```
 1    in this e-mail, Ms. Yin requests

 2    information on certain pieces of gypsum

 3    board to be sent to the Port of

 4    Jacksonville, Florida, 100,000 pieces,

 5    and an additional 100,000 pieces to the

 6    Port of New Orleans, Louisiana.  Will you

 7    please read quietly to yourself Mr.

 8    Yang's e-mail reply of October 15, 2005

 9    at the top of 19813, and I will ask the

10    court reporter to read it in English for

11    the record.

12              THE COURT:  You mean the

13         interpreter?

14              MR. MEUNIER:  I'm sorry, the

15         interpreter.

16              THE WITNESS:  You mean

17         quietly reading it, meaning do not

18         read it out loud?

19              MR. MEUNIER:  Correct.  But

20         I would ask the interpreter to

21         please read it out loud in English

22         for the record.

23              INTERPRETER:  Dear Wenny

24         Yin, hello.  I have been following
```

```
1          up on the cargo ship for

2          individual cargos, and I have not

3          received a response.  Finally, I

4          have received information

5          regarding the ship, therefore, I

6          will give you the price.  Please

7          take a look.  Ordinary gypsum

8          board 3660 by 1220 by 12.7

9          mm CNFNEW ORLEANS PORT USD

10         7.22/PCS.

11              A new line.  Package, gypsum

12         board tray, 60 pieces/tray,

13         plastic inner membrane untie

14         humidity.

15              INTERPRETER:  Interpreter

16         needs clarification.

17              (Discussion of interpreter

18         and Mr. Chen in Chinese.)

19              MR. CHEN:  I think either is

20         fine.

21              INTERPRETER:  Waterproof

22         exterior gypsum board protection,

23         horizontal and vertical steel

24         belts packaging.
```

```
 1                     A new line.  Term of

 2           payment, LC, instant payment, L/C.

 3                     A new line.  In addition,

 4           there is no ship to Jacksonville

 5           port.

 6                     Skip a few lines.  Thank

 7           you.  Please reply if you have any

 8           questions.

 9                     Skip a few lines.  Jiapo.

10                     A new line.  2005.10.15.

11    BY MR. MEUNIER:

12           Q.    Mr. Peng, when Mr. Yang and

13    other employees became sales personnel

14    for TTP, did they provide this same type

15    of detailed information about cargo and

16    shipping to the United States when they

17    dealt with customers?

18           A.    Salespeople were in charge

19    of detailed sales process in respect to

20    different circumstances.  Therefore, I

21    don't know whether they would do that or

22    not.

23           Q.    So, as the manager of TTP,

24    you left that up to the sales personnel?
```

Confidential - Subject to Further Confidentiality Review

1    Is that true?

2          A.    Correct.

3          Q.    One more question, Mr. Peng,

4    about this e-mail.  You'll notice that

5    information is requested on October 15,

6    2005 for 100,000 pieces of gypsum board

7    to go to the New Orleans port.  Were you

8    aware that only six weeks before that, a

9    major storm had destroyed property in the

10   New Orleans area, creating a great need

11   for rebuilding?

12         A.    Orleans, you mean Orleans?

13   Is that how should I put it?

14         Q.    New Orleans is good.

15         A.    New Orleans.  I have read

16   the news about the storm in New Orleans.

17   What was your question again?

18         Q.    Were you aware that this

19   storm in New Orleans, which was six weeks

20   before the e-mail we just read, created a

21   need for significant rebuilding in the

22   New Orleans area?

23         A.    Like I said, I have read the

24   news about the old New Orleans storm from

Confidential - Subject to Further Confidentiality Review

1    media, and I know about it, but I don't

2    know how they rebuilt the houses.

3              MR. MEUNIER:  Your Honor, I

4         have about an hour left, but this

5         might be a good breaking point for

6         me.

7              THE COURT:  All right.

8         Let's take a 15-minute break at

9         this time.

10             THE VIDEOTAPE TECHNICIAN:

11        Going off the record.  This is the

12        end of Tape Number 2.  The time is

13        10:33.

14                  -   -   -

15             (Whereupon, a recess was

16        taken from 10:33 a.m. until 10:50

17        a.m.)

18                  -   -   -

19             THE COURT:  Sir, you are

20        still under oath.

21             THE VIDEOTAPE TECHNICIAN:

22        Going back on the video record,

23        the time is 10:50.  This is the

24        beginning of Tape Number 3.

Confidential - Subject to Further Confidentiality Review

 1   BY MR. MEUNIER:

 2        Q.    Mr. Peng, when you were

 3   manager of TTP, did you prepare a general

 4   manager's annual report of the company's

 5   work?

 6        A.    Our TTP's annual report has

 7   always been issued by our accounting

 8   firm.

 9        Q.    Did you approve and sign the

10   annual report?

11        A.    The annual report was

12   completed by the third party independent

13   accounting firm.

14        Q.    Let me refer you to exhibits

15   Jia 26 and 27, Defendant Jia Exhibits 26

16   and 27, which are the general manager

17   reports of TG for the years 2006 and

18   2007.  Have you seen those documents

19   before?

20        A.    I've heard in the general

21   manager's meeting for annual report, but

22   let me take a look.

23             (Reviewing documents.)

24             I have not seen these two

Confidential - Subject to Further Confidentiality Review

```
 1    reports.  I have not.

 2           Q.    Did TTP prepare annual

 3    reports that were similar to those

 4    reports?

 5           A.    TTP have not prepared

 6    reports that are similar to these.

 7           Q.    You said you have not seen

 8    those reports, but that you heard reports

 9    at certain meetings.  Is that correct?

10           A.    I can't recall now.  I'm

11    very sorry.

12           Q.    Well, what meetings were you

13    talking about?

14           A.    These two reports, I do not

15    remember that I have seen these two

16    reports.

17           Q.    Do I understand, Mr. Peng,

18    that you have never been a member of the

19    board of directors of either Shandong

20    Taihe Dongxin or Taishan Gypsum?

21           A.    Correct.  I'm not a member

22    of TG's board of directors.

23           Q.    And you never have been?

24           A.    I have never been a member
```

Confidential - Subject to Further Confidentiality Review

1    of TG's board of directors.

2           Q.    And you have never been a

3    member of the board of directors of

4    Shandong Taihe Dongxin?

5           A.    No, I have not been a member

6    of the board of directors of Shandong

7    Taihe Dongxin.

8           Q.    Is it true that TTP was

9    created for reasons related to value

10   added taxes?

11          A.    The purpose of TTP's

12   establishment was to be able to provide

13   value added tax invoices to the customers

14   who had such requests.

15          Q.    Was there any difference in

16   the nature of the drywall business

17   conducted by TG and TTP?

18               MR. CYR:  Objection, vague.

19               MR. MEUNIER:  I wanted to be

20        general, but...

21               THE COURT:  I think that's a

22        valid objection.  I sustain it.

23   BY MR. MEUNIER:

24          Q.    Can you tell us if there are

Confidential - Subject to Further Confidentiality Review

```
 1    any differences, Mr. Peng, between the

 2    drywall manufacturing process used by TG

 3    or Shandong and the process used by TTP?

 4         A.    The manufacturing process

 5    for manufacturing paper-faced drywall are

 6    pretty much the same.

 7         Q.    And TG, even when it was

 8    called Shandong Taihe Dongxin,

 9    manufactured certain brand names of

10    drywall such as Five Star and Dun; is

11    that true?

12         A.    I don't recall clearly as of

13    what brand of product the TG manufactured

14    at the time.

15         Q.    Did TG and TTP manufacture

16    drywall under the same brand names?

17         A.    TG authorized TTP to use the

18    brand Taishan and Taishan Wang.

19         Q.    Did TTP manufacture under

20    the brand names Five Star and Dun?

21         A.    We did not produce these two

22    brand's products.  The authorized

23    products -- the authorized brands were

24    Taishan and Taishan Wang, and also we
```

1   manufactured according to the

2   requirements of the customers.

3          Q.     Do you know of any

4   differences between TG and TTP in how

5   they marketed and sold their drywall?

6          A.     Well, I have not analyzed

7   the differences between the two.  The

8   sales principle of TTP were to keep the

9   balance between production and sales, to

10  lower the risk of payment collection, to

11  make sure to provide good services for

12  our customers.

13                INTERPRETER:  Interpreter

14         clarification.

15                THE WITNESS:  To have a

16         better control of the pricing.

17  BY MR. MEUNIER:

18         Q.     And those are the same

19  principles that applied to Shandong Taihe

20  Dongxin and TG, true?

21         A.     These are the principles

22  applied to TTP.  As of TG's sales

23  principles, they must have had their own.

24  I'm not sure whether the principles are

1    the same as TTP's.

2         Q.    As far as you know, when

3    sales employees of Shandong Taihe Dongxin

4    became sales employees of TTP, were they

5    given any new or different rules or

6    guidelines for how they conducted sales?

7         A.    I don't understand your

8    question.

9         Q.    As far as you know, were the

10   sales employees of TTP given any rules or

11   guidelines that were different from the

12   rules and guidelines they had as sales

13   employees of Shandong Taihe Dongxin?

14        A.    They would summarize on the

15   experiences in TG.  But as for TG's

16   special circumstances, they should base

17   their principles on TG's circumstances.

18        Q.    But as far as you know, the

19   rules they followed were the same, true?

20        A.    The same as to who?

21        Q.    Shandong Taihe Dongxin.

22              INTERPRETER:  Interpreter

23        clarification.

24              THE WITNESS:  TTP's sales

1          employees only follow the rules

2          and principles of sales of TTP's.

3     BY MR. MEUNIER:

4          Q.     Can you tell me how those

5     rules and principles were different from

6     the rules and principles for sales

7     employees of Shandong Taihe Dongxin?

8          A.     TTP had its own sales

9     principle, while TG had its own

10    principle.  Whether the two principles

11    were the same, I'm not sure.

12         Q.     TTP stopped operating in

13    what year?

14         A.     TTP stopped operating in

15    January 2008.

16         Q.     Why?

17         A.     Through the two years

18    operation of TTP, the customers who

19    requested value added invoices were not

20    that much -- not that many.  However, TTP

21    had two paper-faced gypsum production

22    lines of 2 by 20 million.

23              According to the regulation

24    of our country, for those enterprises

Confidential - Subject to Further Confidentiality Review

```
 1    that had reached the production volume of

 2    20 million paper-faced gypsum board would

 3    be able to enjoy half of the value added

 4    tax benefit.  So TTP's board of directors

 5    and its shareholders had decided to stop

 6    the operation of TTP.  That's the reason

 7    behind TTP's stop of operating.

 8            Q.    But you remained an employee

 9    of TTP until April of 2009?

10            A.    You mean TTP's employee or I

11    myself?

12            Q.    You told us earlier that you

13    worked for TTP until April 2009, true?

14            A.    Correct, yes.

15            Q.    If TTP stopped operations in

16    January of 2008, please explain what you

17    did as its employee between January 2008

18    and April 2009?

19            A.    Even though during this

20    period of time, TTP had stopped its

21    operation, but there were still some

22    relevant assets and accountings that

23    needed to be handled.

24            Q.    Did the company earn any
```

```
 1    revenue or income between January 2008

 2    and April 2009?

 3         A.    There were a little bit of

 4    profit in that period of time, which were

 5    the gypsum board that were left and also

 6    some raw materials that were left.

 7         Q.    Who paid your salary between

 8    January 2008 and April 2009?

 9         A.    During that period of time,

10    I still got paid from TTP.

11         Q.    Were you paid the same

12    salary as before January 2008?

13         A.    I'm very sorry.  That's my

14    privacy.  Can I not answer that question?

15         Q.    I'm not asking you for the

16    dollar amount.  I'm just asking if the

17    salary stayed the same?

18              MR. CYR:  I think the Judge

19         wants to rule.

20              MR. MEUNIER:  I want to make

21         sure he understands that I don't

22         want his dollar amount.

23              THE COURT:  I don't want you

24         to say how much.  The question is
```

Confidential - Subject to Further Confidentiality Review

```
1              whether it's the same.

2                   THE WITNESS:  Not the same.

3    BY MR. MEUNIER:

4         Q.    How different?

5                   THE COURT:  More or less?

6                   THE WITNESS:  Because TTP

7              had stopped its operations at the

8              time, the salary that I received

9              was less than when it was operated

10             normally.

11   BY MR. MEUNIER:

12        Q.    Is it true you have kept an

13   office at TTP?

14        A.    You mean right now?

15        Q.    As of April 6, 2011, is it

16   true you still kept an office at TTP?

17        A.    Right now, the people

18   left -- I'm sorry.

19                  Right now, the people that

20   remained in TTP still is working there.

21        Q.    But you are no longer

22   employed by TTP; is that true?

23        A.    According to TTP's company

24   law, the election is to be held every
```

Confidential - Subject to Further Confidentiality Review

 1    three years.  But there was no election

 2    after three years, but I am still the

 3    legal person of TTP.

 4          Q.    You are today an employee of

 5    Taishan Gypsum, true?

 6          A.    Yes, I am right now an

 7    employee of Taishan Gypsum.

 8          Q.    And your entire salary is

 9    paid by Taishan Gypsum, true?

10          A.    My current salary is paid by

11    the company located in Shanxi, Lucheng.

12          Q.    Which company is that, sir?

13          A.    That's a subsidiary of TG

14    located in Shandong, Liaocheng to produce

15    paper-faced gypsum board.

16          Q.    That is a different

17    subsidiary than TTP, true?

18          A.    Correct.  This is only a

19    branch company.

20          Q.    What is the name of that

21    company?

22          A.    Shanxi Lucheng Taishan

23    Gypsum.  Shanxi Lucheng Taishan Gypsum,

24    Lucheng branch office.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.      But even though you are an
 2   employee of Taishan Gypsum and your
 3   salary is paid by a different subsidiary
 4   of Taishan Gypsum, it is true that you
 5   still keep an office at TTP?  Is that
 6   true?
 7          A.      Where is it?
 8          Q.      Do you still keep an office
 9   at a TTP location, sir?
10          A.      TTP has office.
11          Q.      And you still have an office
12   at that location, don't you?
13          A.      Which location?
14          Q.      At the location of TTP.  At
15   any location of TTP, is it true that you
16   have an office?
17          A.      I have my own office in TTP.
18          Q.      So, you have an office at
19   TTP, and you also have an office at the
20   Taishan Gypsum factory in Lucheng,
21   correct?
22          A.      Correct.
23          Q.      Tell me the percentages of
24   time you spend at those two offices.  How
```

Confidential - Subject to Further Confidentiality Review

1    much at one office versus the other?

2         A.    Because TTP had stopped its

3    production and business and it does not

4    have much business right now, and also

5    there were remaining personnels working

6    at TTP.  Therefore, my time is basically

7    being spent at the office in Shanxi,

8    Lucheng branch office.

9         Q.    But you do spend some time

10   at the TTP office, don't you?

11        A.    I basically do not stay at

12   TTP.

13        Q.    But you keep an office there

14   and do go there sometimes, don't you, Mr.

15   Peng?

16        A.    Because there are still

17   remaining people work at the office right

18   now, if there is any issue, we

19   communicate through telephone.  My main

20   job right now is at Lucheng's branch

21   office.

22        Q.    But you still hold the title

23   of director or manager of TTP, don't you?

24             MR. CYR:  Objection.

Confidential - Subject to Further Confidentiality Review

```
 1                    THE COURT:  What's the basis

 2            of the objection?  Asked and

 3            answered?

 4                    MR. CYR:  And I recommend

 5            that the interpreter not interpret

 6            my statement.

 7                    THE COURT:  Right.

 8                    MR. CYR:  I believe that

 9            he's testified that he terminated

10            his position at TTP in April of

11            2009.  The record is clear about

12            that.  What the record is not

13            clear about, in my opinion, is

14            that he continues to hold the

15            position of, quote, legal

16            representative, closed quote, of

17            TTP today, and that has been the

18            misunderstanding during your

19            dialogue during the last five

20            minutes.

21                    MR. MEUNIER:  Well, I'll

22            change my question based on

23            counsel's direction, Judge.

24     BY MR. MEUNIER:
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Do you still hold a title

 2   with TTP today, namely, legal

 3   representative, is that true?

 4          A.    I am a legal person of TTP

 5   right now.

 6          Q.    That is why from time to

 7   time you have to talk on the phone or

 8   work with the people who remain at TTP?

 9   Is that true?

10          A.    Correct.

11          Q.    But your entire salary for

12   all work activity, including that, is

13   today paid by a different subsidiary of

14   Taishan Gypsum; isn't that true?

15          A.    Correct.

16          Q.    Do you sometimes refer to

17   this group of customers as the Taishan

18   Group?  Group of companies, rather, as

19   the Taishan Group?

20          A.    No.

21          Q.    Is it true, Mr. Peng, that

22   in July of 2006, TTP sold more than

23   11,000 pieces of gypsum board to a

24   company called Advanced Products or APIC
```

Confidential - Subject to Further Confidentiality Review

1    for shipment to New Orleans, Louisiana in

2    the United States of America?

3         A.    I'm not sure about the

4    English name of that company you just

5    said.

6         Q.    Have you ever heard of

7    American -- I'm sorry -- Advanced

8    Products or APIC Building Materials?

9         A.    I don't recall the name of

10   these two companies.

11             MR. MEUNIER:  I show you a

12             document which has been stamped TG

13             20090, and I'll mark that as Peng

14             Number 4.  And the title of it is

15             "Taian Taishan Plasterboard

16             Company, Limited invoice."

17                  -   -   -

18             (Whereupon, Deposition

19             Exhibit Peng S.-4, Invoice dated

20             July 03, 2006, Bates stamped TG

21             0020090, was marked for

22             identification.)

23                  -   -   -

24   BY MR. MEUNIER:

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Are you familiar with this
 2   invoice form?
 3          A.     I'm not familiar with this
 4   invoice form.
 5          Q.     Are you familiar with the
 6   company Triax Trading & Logistics, LLC?
 7          A.     I'm not familiar with this
 8   name.
 9                 MR. MEUNIER: I show you
10          another document which I'll mark
11          as Peng Number 5, which is Bates
12          numbered 19366 entitled Taian
13          Taishan Plasterboard Company,
14          Limited "Packing List."
15                      -  -  -
16                 (Whereupon, Deposition
17          Exhibit Peng S-5, Taian Taishan
18          Plasterboard Co., Ltd., Packing
19          List dated July 03, 2006, Bates
20          stamped TG 0019366, was marked for
21          identification.)
22                      -  -  -
23   BY MR. MEUNIER:
24          Q.     Are you familiar with this
```

Confidential - Subject to Further Confidentiality Review

```
 1   form?

 2            MR. CHEN:  I'm sorry,

 3        Counsel.  I have in my binder it

 4        goes from 19364 to 374.  You said

 5        366?

 6            MR. MEUNIER:  366.  Let me

 7        state for the record for The Court

 8        and for counsel that there does

 9        appear to be duplicate stamping on

10        these documents.  For example, the

11        invoice I refer to of July 3, '06

12        is Bates Number 20090.  It's also

13        Bates numbered 19365.  They appear

14        to be the same documents.

15            MR. CYR:  Can I just see it?

16            MR. MEUNIER:  (Handing over

17        document.)

18            What I have marked as Fu --

19        I'm sorry, Peng Number 4 is

20        actually two Bates Numbers.  19365

21        and 20090.

22            And what I have marked as

23        Peng Number 5 is Bates numbered

24        19366, and I submit that it's
```

1              clear they deal with the same

2              transaction, which is what I

3              intended to clarify.

4       BY MR. MEUNIER:

5              Q.    Mr. Peng, my question now

6       is, are you familiar with the packing

7       list form, which is Peng Number 5?

8              A.    I'm not familiar with this

9       document.

10             Q.    If both of the documents I'm

11      showing you, Peng 4 and 5, have the same

12      invoice number, which is SDTH0622, and

13      the same date of July 3, 2006, is it fair

14      to say they both deal with the same

15      transaction?

16             A.    I'm not clear about that.  I

17      can't be sure of that.

18             Q.    The invoice refers to a

19      quantity of 5,676 pieces of gypsum board

20      at a cost in US dollars of $4.25 each for

21      a total amount of $24,123 being shipped

22      from Qingdao to New Orleans, Louisiana.

23      Did TTP sell this gypsum board on July

24      3rd, 2006 as indicated on the invoice and

 1    packing list?

 2        A.    I'm sure the gypsum board

 3    was sold, but I really am not sure about

 4    the process.

 5        Q.    Would you, though, as

 6    director, approve the sale of TTP gypsum

 7    board at that price to be shipped to New

 8    Orleans, Louisiana in July of 2006?

 9        A.    The price of gypsum board

10    was specifically discussed and determined

11    by the sales department.

12        Q.    And if the price was right,

13    it was okay that the board was being

14    shipped to New Orleans, Louisiana in the

15    United States, true?

16        A.    After the price was

17    determined, I am not sure where exactly

18    the gypsum board was shipped to.

19        Q.    But TTP authorized the

20    shipment of board purchased at this price

21    to New Orleans, Louisiana in the United

22    States, true?

23        A.    Our gypsum board, which is

24    the gypsum board that produced by TTP,

```
 1    has always been delivered in China.

 2    Whether it would be shipped to that

 3    location or how was it shipped to that

 4    location, I am not sure about the

 5    process.

 6           Q.    But from TTP's own sales

 7    documents, including these invoices and

 8    packing lists, TTP knew that the gypsum

 9    board was being delivered to New Orleans,

10    Louisiana, correct?

11                 MR. CYR:  Objection.

12                 THE COURT:  Ask him about

13           the invoices.

14    BY MR. MEUNIER:

15           Q.    Do you agree the invoice and

16    packing list of your company, TTP at that

17    time, indicated that this gypsum board

18    being sold by TTP was being delivered to

19    New Orleans, Louisiana?

20           A.    Please repeat your question.

21                 THE COURT:  Why don't you

22           read it back to him.

23    BY MR. MEUNIER:

24           Q.    You agree that the invoice
```

Confidential - Subject to Further Confidentiality Review

1    and packing list I'm showing you, which

2    are your company's invoice and packing

3    list, show that this gypsum board that

4    you sold was shipped to New Orleans,

5    Louisiana, true?

6              A.    Because TTP produced the

7    gypsum board.

8              THE COURT:  Let me see the

9              invoice.

10             THE WITNESS:  (Handing over

11             document.)

12             THE COURT:  The invoice

13             which is marked Exhibit Number 4,

14             which is invoice SDTH0622,

15             indicates that the material will

16             be delivered from -- is that O or

17             Q?

18             MR. MEUNIER:  Q.

19             THE COURT:  Q-I-N-G-D-A-O to

20             New Orleans, Louisiana.  It's

21             dated July 3rd, 2006.  Isn't that

22             correct, sir?

23             THE WITNESS:  The location

24             that is written on this invoice

Confidential - Subject to Further Confidentiality Review

```
 1           was marked by us according to the

 2           requirement of the customers.

 3   BY MR. MEUNIER:

 4        Q.    Did the company wish to make

 5   money from that sale?

 6                THE COURT:  Which company?

 7                MR. MEUNIER:  TTP.

 8                THE WITNESS:  As a

 9           manufacturing company, making

10           money is, of course, its main

11           purpose.

12   BY MR. MEUNIER:

13        Q.    And so TTP intended to make

14   money and did make money from the sale of

15   the gypsum board reflected on those

16   documents in front of you; is that true?

17        A.    To sell our paper-faced

18   gypsum board, we, of course, need to

19   concern about the cost and, of course,

20   the profit.

21                THE COURT:  I will take that

22           as an indication that the answer

23           is yes?

24                Now, I tell you again, sir,
```

```
1           you took an oath today to tell the

2           truth.  If I find that you did not

3           tell the truth intentionally, that

4           will be very bad for your company

5           as well as you.  Do you understand

6           that, sir?

7                THE WITNESS:  I understand.

8                THE COURT:  Any further

9           questions?

10               MR. MEUNIER:  Additional

11          documents, Your Honor.

12                    -   -   -

13               (Whereupon, Deposition

14          Exhibit Peng S-6, Taian Taishan

15          Plasterboard Co., Ltd., Invoice

16          dated July 20, 2006, Bates stamped

17          TG 00120091, and Deposition

18          Exhibit Peng S-7, Taian Taishan

19          Plasterboard Co., Ltd., Invoice

20          dated July 20, 2006, Bates stamped

21          TG 00120092, were marked for

22          identification.)

23                    -   -   -

24     BY MR. MEUNIER:
```

```
 1          Q.    Mr. Peng, I show you an

 2   invoice which is Bates numbered TG 20091,

 3   which I'll mark as Peng-6, and an invoice

 4   Bates numbered 20092, which I'll mark as

 5   Peng-7.  And I will ask you to confirm

 6   that these invoices both refer to the

 7   sale of 5,760 pieces of drywall at the

 8   cost of $4.34 in US dollars on July 20,

 9   2006 with shipment from Qingdao, China to

10   New Orleans, Louisiana.

11          A.    I don't understand English.

12   I don't understand.

13          Q.    If the documents I put in

14   front of you reflect the sale of over

15   5,000 pieces of drywall priced in US

16   dollars and being shipped to New Orleans,

17   Louisiana, do you have any reason, as you

18   sit here today, to deny that the

19   documents are accurate in reflecting that

20   information?

21          A.    I do not deny.

22          Q.    The prices of the gypsum

23   board per sheet or per piece are

24   different in the July 3rd and July 20
```

```
 1    sales transactions reflected by these

 2    invoices.  Can you explain why?

 3              THE COURT:  Do you have much

 4         more?

 5              MR. MEUNIER:  Your Honor,

 6         I'm afraid I do.  I probably have

 7         another 45 minutes.  I'm sorry.

 8         It's going a little slower than I

 9         thought.

10              MR. CYR:  You're showing him

11         documents he's never seen before.

12              MR. MEUNIER:  He's the

13         director of the company.

14              MR. CYR:  It's you and the

15         Judge are in charge.

16              THE COURT:  Folks, no.  He's

17         not in charge.  I'm in charge.

18              MR. MEUNIER:  I have another

19         maybe 30 to 45 minutes.

20              THE COURT:  We'll take a

21         break in ten minutes, and then

22         we'll come back.

23    BY MR. MEUNIER:

24         Q.   Why were the prices
```

Confidential - Subject to Further Confidentiality Review

1    different in those invoices?

2         A.    The price of the gypsum

3    board sold is affected by volume, cost

4    and shipping distance.  Therefore, it has

5    some certain ups and downs in pricing.

6    The specific salespeople are in charge of

7    this operation.

8         Q.    Mr. Peng, I want to show you

9    a series of documents which are entitled

10   "Taian Shandong Province Special Invoice

11   for Export," which I'll mark as Peng-8 in

12   globo, Bates number TG 1657, 1658, 1661,

13   1663, 1664, 1665, 1666, 1667, 1668, 1669,

14   1670, 1680, 1681 and 1682.

15                   -   -   -

16              (Whereupon, Deposition

17         Exhibit Peng S.-8, Taian Shandong

18         Province Special Invoice for

19         Export, Bates number TG 0001657,

20         TG 0001658, TG 0001661, TG 0001663

21         through TG 0001670, and TG 0001680

22         through TG 0001682, was marked for

23         identification.)

24                   -   -   -

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. MEUNIER:

 2         Q.    Are you familiar with this

 3    form?

 4         A.    I have not seen these forms

 5    because I'm not a detailed financial

 6    personnel nor the detailed sales

 7    personnel.

 8         Q.    Do you deny that the forms

 9    all indicate that the exporter is Taian

10    Taishan Plasterboard Company, Limited?

11              MR. CYR:  Objection.

12              THE COURT:  Now, wait a

13              minute.  I sustain the objection.

14              They are what they are.  If he has

15              not seen them, how is he going to

16              testify about them?  They are what

17              they are.  This witness said he

18              hasn't seen them.

19    BY MR. MEUNIER:

20         Q.    Mr. Peng, were special forms

21    required by the local Shandong province

22    government for the export sale of gypsum

23    board by TTP?

24         A.    I'm not familiar in this
```

Confidential - Subject to Further Confidentiality Review

```
 1    part, because I'm not the person detailly

 2    operating the sales.

 3              THE COURT REPORTER:

 4         Detailed?

 5              INTERPRETER:  Detailly

 6         operating the sales.

 7    BY MR. MEUNIER:

 8         Q.    Although you're not familiar

 9    with the details, Mr. Peng, you do know,

10    don't you, that the government required

11    special invoice for the export of gypsum

12    board by TTP?

13         A.    I don't know whether special

14    invoices were used, but I know it had to

15    be approved and recorded by the foreign

16    trading department.

17         Q.    And you do not deny, do you,

18    that between 2006 and 2007, TTP made

19    export sales of gypsum board for delivery

20    to the United States, to New Orleans,

21    Louisiana, to Miami, Florida, and to New

22    York, New York?  You don't deny that, do

23    you?

24              MR. CYR:  Objection.
```

```
 1              THE COURT:  What's the

 2         basis, Joe?

 3              MR. CYR:  (Addressing the

 4         interpreter.)  Please don't

 5         interpret.

 6              It just seems to me that

 7         it's going to be difficult in the

 8         translation to distinguish between

 9         not denying and actually knowing.

10         If you want to know if he knew

11         that, I think the better question

12         is whether or not he knew that.

13         I'm just afraid that you're going

14         to get a "yes" on don't deny.  I'm

15         not quite sure what it means.

16              THE COURT:  Ask him about

17         knowing.  I think that's a

18         legitimate observation.  If this

19         witness knows, he knows.  If he

20         doesn't know, he doesn't.

21    BY MR. MEUNIER:

22         Q.   Mr. Peng, do you know that

23    in 2006 and 2007, TTP, as reflected by

24    these invoices, sold gypsum board that
```

```
 1    was delivered to New Orleans, Louisiana,

 2    the USA, Miami, Florida, Miami/USA and

 3    New York?

 4          A.    All our gypsum boards were

 5    delivered in China.  Whether some other

 6    trading company had actually shipped them

 7    over there or how were they shipped over

 8    there, I'm not sure about that.

 9          Q.    But you don't deny that

10    forms that TTP may have filled out for

11    export purposes indicate the shipping

12    destinations in the United States that I

13    have mentioned?  You do not dispute that,

14    do you?

15          A.    Let me put it this way.

16    Reflected in this document, the exporting

17    enterprise name is TTP.  This is in

18    accordance with the fixed form of the

19    special invoice for export.  Customers

20    will tell us where did they want us to

21    ship the products to according to the

22    invoice, then we would write down the

23    destination on the invoice.  As of

24    whether it had indeed shipped to that
```

Confidential - Subject to Further Confidentiality Review

```
 1    place, I am not sure.  Because this

 2    belongs to customer's business secret,

 3    therefore, we would neither ask nor

 4    speculate.

 5         Q.    Who filled out the

 6    information on these forms?

 7         A.    I'm not sure whether the

 8    information on the form was filled out by

 9    the financial department or the taxation

10    department.

11         Q.    But you would agree, all the

12    information on the forms was verified by

13    your company?

14         A.    This invoice does belong to

15    our company.

16              MR. MEUNIER:  Thank you,

17         sir.  I'll mark that as Peng

18         Number 8 in globo.

19              Your Honor, I have one final

20         area of questioning for this

21         witness which I think will take

22         about 30 minutes.  If The Court

23         would like me to do so after a

24         break, I will.
```

Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT:  What's your

 2         situation, Joe?  Do you want to go

 3         on or you want to take a break.

 4              MR. CYR:  I'm going to need

 5         20 minutes if Your Honor allows

 6         it.  So, I guess it's just a

 7         question of whether you decide

 8         that we have an early lunch now or

 9         break for lunch at 1.  If you only

10         go a half hour, I can finish

11         before 1:00.

12              THE COURT:  I don't have any

13         problem.  You have to get out of

14         here.  That's why --

15              MR. CYR:  No, no, no.  I

16         don't have to get out of here this

17         afternoon, Judge.  It is tomorrow

18         morning.

19              MR. MEUNIER:  But if we

20         delay lunch, the witness could be

21         free.

22              MR. CYR:  Yeah, yeah.  That

23         would be great.

24              MR. MEUNIER:  I don't know
```

Confidential - Subject to Further Confidentiality Review

```
 1            who else has questions, though.

 2                 MR. CYR:  So, if it's all

 3            right with the Judge, we can --

 4                 THE COURT:  You want to

 5            continue?  I don't have any

 6            problem.

 7                 MR. CYR:  Continue until

 8            1:00.

 9                 THE COURT:  Okay.  That's

10            fine.

11                 THE VIDEOTAPE TECHNICIAN:  I

12            do need to change tape though.

13                 THE COURT:  Let's change

14            tapes.

15                 THE VIDEOTAPE TECHNICIAN:

16            Going off the record.  This is the

17            end of Tape Number 3.  The time is

18            12:05.

19                      -   -   -

20                 (Whereupon, a recess was

21            taken from 12:05 p.m. until 12:20

22            p.m.)

23                      -   -   -

24                 THE VIDEOTAPE TECHNICIAN:
```