Confidential - Subject to Further Confidentiality Review

```
 1          This is the beginning of Tape

 2          Number 4.  Going on the record at

 3          12:20.

 4    BY MR. MEUNIER:

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**Exhibit D Part 5**
**Section 99:5-111:15**
**FILED UNDER SEAL**

Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8      **Exhibit D Part 5**

       **Section 99:5-111:15**
9
       **FILED UNDER SEAL**

10

11

12

13

14

15

16              THE COURT:  Any further

17      questions?

18              MR. MEUNIER:  I don't think

19      I do.  If I could just tender the

20      witness.

21              THE COURT:  Anybody else

22      from the --

23              MS. BASS:  I'm just going to

24      ask him to mark one document,

Confidential - Subject to Further Confidentiality Review

```
 1          please.

 2                    -   -   -

 3                 EXAMINATION

 4                    -   -   -

 5   BY MS. BASS:

 6          Q.    Good afternoon.  My name is

 7   Hilarie Bass, and I just have one quick

 8   set of questions for you.

 9               MS. BASS:  I would like to

10          have marked as the next exhibit

11          for this deposition, which I

12          believe is 10, a document with

13          Bates Number TG 1704.

14                    -   -   -

15               (Whereupon, Deposition

16          Exhibit Peng S-10, Contract, Bates

17          stamped TG 0001704 through TG

18          0001706, was marked for

19          identification.)

20                    -   -   -

21   BY MS. BASS:

22          Q.    The Bates Number of this

23   document is TG 1704 through 1706.  Please

24   take a moment and review the document.
```

Confidential - Subject to Further Confidentiality Review

```
 1    My question is whether or not you can

 2    recall having seen that document before?

 3         A.    I haven't seen this

 4    document.  I don't understand English

 5    anyways.

 6         Q.    Could you look at the third

 7    page of the document, please, and

 8    identify for us who on behalf of Taian

 9    Taishan Plasterboard Company, Limited

10    signed this agreement?

11         A.    You mean the three

12    characters here?

13         Q.    Yes.

14         A.    Yang Jiapo.

15         Q.    And that individual was a

16    salesperson at TTP in June of 2006,

17    correct?

18         A.    He was a salesperson of TTP.

19         Q.    Were you aware of a

20    transaction in which TTP sold gypsum

21    board to Wood Nation, Inc. for delivery

22    in Tampa, Florida?

23         A.    I have only heard it from

24    Peng, Yang Jiapo, from TTP.  Can you
```

1    repeat your question?

2         Q.    Yes.

3               Were you aware of an

4    agreement by which TTP agreed to sell its

5    gypsum board to a company entitled Wood

6    Nation, Inc. based in Tampa, Florida?

7         A.    I've only heard that some of

8    our gypsum boards was sold in America.

9    But I'm not sure whether there was such a

10   transaction.

11        Q.    Would your approval have

12   been sought for a transaction which

13   contemplated 20 to 30 containers of

14   gypsum to be sold each week between June

15   2006 through December 2006 for delivery

16   at the port of Tampa, Florida?

17        A.    My sales principle is the

18   balancing of production and sales, which

19   is you should sell whatever volume that

20   we produce.  As of in what period of time

21   and to where were they sold to, they did

22   not need to report to me.

23        Q.    My last question is, can you

24   identify for us the seal of TTP on this

1    agreement?  It is spread over the three

2    pages?

3           A.    It says Taian City, Taishan

4    plaster stone.  Correction, Plasterboard

5    Company, Limited.

6           Q.    Can you identify that as the

7    seal of TTP?

8           A.    The seal of TTP was the seal

9    that I just read to you which says Taian

10   Taishan Plasterboard Company, Limited.

11          Q.    So, the answer to my

12   question is yes, this is the seal of TTP?

13              INTERPRETER:  Interpreter

14              clarification.  I think he meant

15              the one before.

16              MS. BASS:  That's why I'm

17              asking again.

18              THE WITNESS:  The seal is

19              different from the one before.  It

20              has English on it, but the other

21              seal does not have English on it.

22   BY MS. BASS:

23          Q.    Do you recognize having seen

24   this seal with both Chinese and English

```
 1    writing that states Taian Taishan

 2    Plasterboard Company?  It will be easier

 3    to read like this.

 4              (Handing over document.)

 5    A.     Yes, yes.  That's it.

 6              MS. BASS:  Thank you very

 7    much.

 8              THE COURT:  Anyone else?

 9              (No response.)

10              THE COURT:  Let's take a

11    break then at this time.  We'll

12    come back at 2:00, please.

13              MR. CYR:  If you want,

14    Judge, I can probably get through

15    it in 10, 15 minutes.

16              THE COURT:  Let's do that.

17    That's fine.

18              MR. CYR:  May I begin, Your

19    Honor?

20              THE COURT:  Yes, please.

21                  -   -   -

22              EXAMINATION

23                  -   -   -

24    BY MR. CYR:
```

```
 1          Q.     Mr. Peng, during the time

 2     TTP was operating, did Peng Wenlong ever

 3     tell you that some of TTP's customers

 4     said they intended to ship the drywall to

 5     the U.S.?

 6          A.     Yes.

 7          Q.     Did you have any knowledge

 8     at that time where the drywall was

 9     actually shipped?

10          A.     I didn't know where exactly

11     where the drywall is to be shipped to,

12     but according to Mr. Peng Wenlong, who

13     said that some of the customers might

14     ship the gypsum boards to the United

15     States.

16          Q.     Did you have any knowledge

17     where the drywall was actually used?

18          A.     We don't know exactly where

19     were they used at.

20          Q.     When the other lawyer was

21     asking you questions about your meeting

22     with Mr. -- discussions with Mr. Jia

23     about preparing for the deposition, you

24     indicated that you talked with Mr. Jia
```

1    about a few of the TTP documents.  Do you

2    remember that testimony?

3         A.    I remember that.

4         Q.    In your discussions with Mr.

5    Jia, did you discuss anything else

6    besides that?

7         A.    Nothing else.

8         Q.    Have I ever asked you that

9    question before?

10        A.    No.

11        Q.    How many employees did TTP

12   have?

13        A.    TTP, while it was in

14   production or in normal operation, it had

15   about 260 employees.

16        Q.    Did TTP ever share any of

17   its employees with TG?

18        A.    TTP's employees were its own

19   employees.  It did not share employees

20   with TG.

21        Q.    Did TTP have its own

22   production facility?

23        A.    TTP had its own facility,

24   its own office, and its own employees.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Did TTP share its production

 2     facility with TG?

 3          A.     TTP had its own production

 4     facility.  It did not use the facility of

 5     production of TG's.

 6          Q.     Did TTP purchase its own

 7     supplies for the gypsum board?

 8          A.     TTP had its own production

 9     and purchased its own raw material that

10     was needed for the production.

11          Q.     Did TTP have its own bank

12     accounts?

13          A.     TTP had an independent

14     financial department.  Of course it had

15     its own bank account.

16          Q.     Did TTP pay its own

17     employees?

18          A.     TTP's employees worked at

19     TTP.  Of course TTP would be the company

20     that paid them.

21          Q.     Was TTP ever inspected by a

22     government agency with respect to whether

23     or not it operated independently?

24          A.     Yes.  We had to register,
```

Confidential - Subject to Further Confidentiality Review

```
 1    put in record and receive approval from

 2    relevant institutions of the government.

 3         Q.    What government agency

 4    inspected TTP with respect to whether it

 5    operated independently?

 6         A.    The department of business

 7    licensing, the department of taxation,

 8    and other inspection institutions.

 9         Q.    I would like to direct your

10    attention to Defendant's Exhibit 37.

11    Take a look at that and tell the Judge

12    and plaintiff's counsel what that

13    document is.

14              MR. HARDT:  Can you give us

15         the Bates Number?

16              MR. CYR:  Yes.  It's Bates

17         TG 20850, 20851.

18              THE COURT:  What's the

19         question?

20              MR. CYR:  Can we proceed?

21              THE COURT:  Yes, please do.

22    BY MR. CYR:

23         Q.    Could you tell the Judge and

24    plaintiffs' counsel what that document
```

Confidential - Subject to Further Confidentiality Review

```
 1   is?

 2        A.    It is a capital verification

 3   description issued by a third-party

 4   accounting firm to Shandong Taihe Dongxin

 5   Plasterboard Company, Limited.

 6        Q.    Was it prepared at the

 7   request of TTP?

 8        A.    Yes.  It was requested by

 9   TTP because Shandong TG Company was going

10   to add registered capital, therefore,

11   capital verification was needed.

12        Q.    Please look at Defendant's

13   Exhibit 45, 46 and 47.  While Mr. Jia is

14   looking at those documents, I'll quickly

15   cite the TG numbers.

16            45 is TG 26004 through TG

17   26006.

18            Defendant's Exhibit 46 is TG

19   26007 through TG 26009.

20            And Defendant's 47 is TG

21       26010 through TG 26012.

22        MS. BASS:  Are they being

23       separately marked in this?

24        MR. CYR:  They have already
```

```
 1          been marked as Defendant's 45, 46

 2          and 47.

 3               MS. BASS:  So they are not

 4          being separately marked in this

 5          deposition?

 6               MR. CYR:  I believe that Ms.

 7          Bass correctly points out that

 8          although they were premarked, it

 9          hasn't been reflected in the

10          transcript of this deposition.

11          Thank you.

12                    -   -   -

13               (Whereupon, Deposition

14          Exhibit Jia Defendant's-45,

15          Document in Chinese, Bates stamped

16          TG 0026004 through TG 0026006;

17          Deposition Exhibit Jia

18          Defendant's-45A, 2006 Financial

19          Statement of Taian Taishan

20          Plasterboard Co., Ltd., Bates

21          stamped TG 0026004 through TG

22          0026006.

23                    -   -   -

24               (Whereupon, Deposition
```

Confidential - Subject to Further Confidentiality Review

```
 1          Exhibit Jia Defendant's-46,

 2          Document in Chinese, Bates stamped

 3          TG 0026007 through TG 0026009;

 4          Deposition Exhibit Jia

 5          Defendant's-46A, Balance Sheet,

 6          Bates stamped TG 0026007 through

 7          TG 0026009.

 8                    -  -  -

 9               (Whereupon, Deposition

10          Exhibit Jia Defendant's-47,

11          Document in Chinese, Bates stamped

12          TG 0026010 through TG 0026012, and

13          Deposition Exhibit Jia

14          Defendant's-47A, 2008 Financial

15          Statement of Taian Taishan

16          Plasterboard Co., Ltd. Balance

17          Sheet, Bates stamped TG 0026010

18          through TG 0026012, were marked

19          for identification.)

20                    -  -  -

21    BY MR. CYR:

22          Q.   Mr. Peng, could you tell The

23    Court and plaintiffs' counsel what these

24    documents are?
```

```
 1          A.    These are the accounting

 2     report provided by a third-party

 3     accounting firm regarding TTP's

 4     accounting report in the years of 2006,

 5     2007 and 2008.

 6          Q.    Did TTP provide information

 7     to the independent accounting firm for

 8     the purposes of their preparation of

 9     those three reports?

10          A.    All the information provided

11     was through the independent financial

12     department of TTP.

13               MR. CYR:  Thank you, Your

14          Honor.  I have no further

15          questions.

16               THE COURT:  Any redirect?

17               MR. MEUNIER:  Briefly, Your

18          Honor.

19                    -   -   -

20                  EXAMINATION

21                    -   -   -

22     BY MR. MEUNIER:

23          Q.    Mr. Peng, in response to

24     your attorney's questions, you say that
```

1    Peng Wenlong did tell you that some TTP

2    drywall was being sold and shipped to

3    different locations in the USA; is that

4    true?

5              MR. CYR:  Objection.

6         Misstates the record.

7              THE COURT:  Sustain the

8         objection.  Restate it.

9    BY MR. MEUNIER:

10        Q.   Is it true that you knew

11   from Peng Wenlong that TTP drywall was

12   being shipped to the US?

13        A.   I've only heard it from Mr.

14   Peng Wenlong.  He said that some of the

15   trading customers might have shipped some

16   of the gypsum boards to the United

17   States.

18        Q.   Were the sales employees of

19   TTP allowed to enter into sales

20   agreements for TTP drywall which they

21   knew was being shipped to the United

22   States?

23        A.   They may sign such

24   agreements, but as far as I know, all

Confidential - Subject to Further Confidentiality Review

1    these products that was mentioned in the

2    agreements were transactioned through the

3    trading companies in China.

4         Q.    Did it matter to you where

5    TTP board was being shipped to and used

6    in the United States as long as TTP made

7    a profit on those sales?

8              MR. CYR:  Objection, vague.

9              THE COURT:  I don't see that

10        being vague.  I overrule the

11        objection.

12             MR. CYR:  Answer the

13        question, Mr. Peng.

14             THE WITNESS:  Can you repeat

15        the question?

16   BY MR. MEUNIER:

17        Q.    Did it matter to you where

18   the TTP board was being shipped to and

19   used in the United States as long as TTP

20   made a profit on those sales?

21        A.    We're not sure exactly where

22   would be our gypsum board be shipped to.

23        Q.    It was okay if it was

24   shipped to the US and used in the U.S. as

1    long as you made a profit; is that true?

2         A.    After entering into

3    agreements with our customers, I'm sure

4    our customers had their own benefits in

5    mind.  We would not take into

6    consideration where they would use the

7    product at.

8         Q.    So, it was okay if you made

9    sales agreements for the sale of drywall

10   that was shipped and used in the U.S.,

11   right?

12        A.    Our trading customers may

13   ship our gypsum board to the United

14   States, but as of where did they use the

15   gypsum board in, we don't have the right

16   to ask.

17             MR. MEUNIER:  I have no

18        further questions.

19             THE COURT:  We'll come back

20        at 2:30.

21             THE VIDEOTAPE TECHNICIAN:

22        That concludes today's deposition.

23        Going off the record at 1:24.

24                  -  -  -

Confidential - Subject to Further Confidentiality Review

```
 1              (Whereupon, the deposition

 2        concluded at 1:24 p.m.)

 3                 -   -   -

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                  C E R T I F I C A T E
 2
 3
                    I, LINDA L. GOLKOW, a
 4    Registered Diplomate Reporter, Certified
      Court Reporter and Notary Public, do
 5    hereby certify that, pursuant to notice,
      the deposition of SHILIANG PENG was duly
 6    taken on January 11, 2012 at 8:30 a.m.
      before me.
 7
 8                  The said SHILIANG PENG was
      duly sworn by The Court according to law
 9    to tell the truth, the whole truth and
      nothing but the truth and thereupon did
10    testify as set forth in the above
      transcript of testimony.  The testimony
11    was taken down stenographically by me.
12
                    I do further certify that
13    the above deposition is full, complete
      and a true record of all the testimony
14    given by the said witness.
15
16
          Linda L. Golkow
17        Registered Diplomate Reporter
          Certified Realtime Reporter
18
19
20                  (The foregoing certification
      of this transcript does not apply to any
21    reproduction of the same by any means,
      unless under the direct control and/or
22    supervision of the certifying reporter.)
23
24
```

```
 1                   INSTRUCTIONS TO WITNESS

 2

 3

 4                   Please read your deposition

 5       over carefully and make any necessary

 6       corrections.  You should state the reason

 7       in the appropriate space on the errata

 8       sheet for any corrections that are made.

 9

10                   After doing so, please sign

11       the errata sheet and date it.  It will be

12       attached to your deposition.

13

14                   It is imperative that you

15       return the original errata sheet to the

16       deposing attorney within thirty (30) days

17       of receipt of the deposition transcript

18       by you.  If you fail to do so, the

19       deposition transcript may be deemed to be

20       accurate and may be used in court.

21

22

23

24
```

1                         - - - - - -

                        E R R A T A

2                         - - - - - -

3    PAGE   LINE   CHANGE

4    ____   ____   _____

5        REASON:   ____ _____

6    ____   ____   _____

7        REASON:   ____ _____

8    ____   ____   _____

9        REASON:   ____ _____

10   ____   ____   _____

11       REASON:   ____ _____

12   ____   ____   _____

13       REASON:   ____ _____

14   ____   ____   _____

15       REASON:   ____ _____

16   ____   ____   _____

17       REASON:   ____ _____

18   ____   ____   _____

19       REASON:   ____ _____

20   ____   ____   _____

21       REASON:   ____ _____

22   ____   ____   _____

23       REASON:   ____ _____

24

Confidential - Subject to Further Confidentiality Review

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
                I,_____, do
 4    hereby certify that I have read the
      foregoing pages, 1-132, and that the same
 5    is a correct transcription of the answers
      given by me to the questions therein
 6    propounded, except for the corrections or
      changes in form or substance, if any,
 7    noted in the attached Errata Sheet.
 8

      _____
 9    SHILIANG PENG                    DATE
10
11
12
13
14
15
      Subscribed and sworn
16    to before me this
      _____ day of _____, 20____.
17
      My commission expires:_____
18
19    _____
      Notary Public
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1              LAWYER'S NOTES

 2     PAGE   LINE

 3     ____   ____    _____

 4     ____   ____    _____

 5     ____   ____    _____

 6     ____   ____    _____

 7     ____   ____    _____

 8     ____   ____    _____

 9     ____   ____    _____

10     ____   ____    _____

11     ____   ____    _____

12     ____   ____    _____

13     ____   ____    _____

14     ____   ____    _____

15     ____   ____    _____

16     ____   ____    _____

17     ____   ____    _____

18     ____   ____    _____

19     ____   ____    _____

20     ____   ____    _____

21     ____   ____    _____

22     ____   ____    _____

23     ____   ____    _____

24     ____   ____    _____
```

# EXHIBIT E



Transcript of the Testimony of:  **Gang Che**

01/11/2012

Chinese Drywall

Confidential - Subject to Further Confidentiality Review

```
 1           UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
 2

 3      _____    § MDL NO. 2047
                            §
        IN RE:              §
 4      CHINESE-            § SECTION: L
        MANUFACTURED        §
 5      DRYWALL PRODUCTS    § JUDGE FALLON
        LIABILITY           §
 6      LITIGATION          § MAGISTRATE
        _____    § JUDGE WILKINSON
 7
                        -   -   -
 8
           CROSS NOTICED IN VARIOUS OTHER ACTIONS
 9
                        -   -   -
10
                   January 11, 2012
11
                        -   -   -
12
            CONFIDENTIAL - SUBJECT TO FURTHER
13              CONFIDENTIALITY REVIEW
14                      -   -   -
15          Videotaped deposition of  GANG
        CHE, held at the Executive Centre, Level
16      3, Three Pacific Place, One Queen's Road
        East, Hong Kong, China, commencing at
17      2:29 p.m., on the above date, before Ann
        Marie Mitchell, Certified Court Reporter,
18      Registered Diplomate Reporter, Certified
        Realtime Reporter and Notary Public.
19                      -   -   -
20
21
             GOLKOW TECHNOLOGIES, INC.
22      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    BEFORE:
              HONORABLE ELDON E. FALLON
 2            UNITED STATES FEDERAL COURT -
              EASTERN DISTRICT OF LOUISIANA
 3
 4
      APPEARANCES:
 5
 6        GAINSBURGH, BENJAMIN, DAVID, MEUNIER
          & WARSHAUER, L.L.C.
 7        BY:  GERALD E. MEUNIER, ESQUIRE
          2800 Energy Centre
 8        1100 Poydras Street
          New Orleans, Louisiana 70163
 9        (504) 522-2304
          gmeunier@gainsben.com
10        Representing the Plaintiffs'
          Steering Committee
11
12        HERMAN HERMAN KATZ & COTLAR, LLP
          BY:  LEONARD A. DAVIS, ESQUIRE
13        820 O'Keefe Avenue
          New Orleans, Louisiana 70113
14        (504) 581-4892
          Ldavis@hhkc.com
15        Representing the Plaintiffs'
          Steering Committee
16
17        COLSON HICKS EIDSON
          BY:  ERVIN GONZALEZ, ESQUIRE
18        BY:  PATRICK S. MONTOYA, ESQUIRE
          255 Alhambra Circle
19        Penthouse
          Coral Gables, Florida 33134
20        (305) 476-7400
          Ervin@colson.com
21        Patrick@colson.com
          Representing Plaintiffs' Steering
22        Committee in the Federal and State
          Coordinated Actions
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (CONTINUED):
 2

      LEVIN, FISHBEIN, SEDRAN & BERMAN
 3    BY:  ARNOLD LEVIN, ESQUIRE
      510 Walnut Street - Suite 500
 4    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 5    Alevin@lfsblaw.com
      Representing the Plaintiffs'
 6    Steering Committee
 7

      SEEGER WEISS LLP
 8    BY:  SCOTT A. GEORGE, ESQUIRE
      One William Street
 9    New York, New York 10004
      (212) 584-0700
10    Sgeorge@seegerweiss.com
      Representing the Plaintiffs'
11    Steering Committee
12

      HOGAN LOVELLS US LLP
13    BY:  FRANK T. SPANO, ESQUIRE
      875 Third Avenue
14    New York, New York 10022
      (212) 918-3000
15    frank.spano@hoganlovells.com
      Representing Taishan Gypsum Co.
16    Ltd. and Taian Taishan
      Plasterboard Company Ltd. and the
17    Witness, Gang Che
18

      HOGAN LOVELLS INTERNATIONAL LLP
19    BY:  EUGENE CHEN, ESQUIRE
      BY:  JIENI JI, ESQUIRE
20    18th Floor, Park Place
      1601 Nanjing Road West
21    Shanghai, China 200040
      (86 21) 6122 3800
22    eugene.chen@hoganlovells.com
      Representing Taishan Gypsum Co.
23    Ltd. and Taian Taishan Plasterboard
      Company Ltd. and the Witness,
24    Gang Che
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (CONTINUED):
 2
          GREENBERG TRAURIG, LLP
 3        BY:  HILARIE BASS, ESQUIRE
          1221 Brickell Avenue
 4        Miami, Florida 33131
          (305) 579-0745
 5        bassh@gtlaw.com
          Representing the Home Builders
 6        Steering Committee
 7
          PERKINS COIE LLP
 8        BY:  DAVID L. BLACK, ESQUIRE
          1899 Wynkoop Street
 9        Suite 700
          Denver, Colorado 80202
10        (303) 291-2300
          DBlack@perkinscoie.com
11        Representing the State of Louisiana
12
          THOMPSON COE COUSINS & IRONS, L.L.P.
13        BY:  KEVIN F. RISLEY, ESQUIRE
          One Riverway
14        Suite 1600
          Houston, Texas 77056
15        (713) 403-8210
          krisley@thompsoncoe.com
16        Representing The North River
          Insurance Company
17
18        BRENNER, EVANS & MILLMAN, P.C.
          BY:  THEODORE I. BRENNER, ESQUIRE
19        411 East Franklin Street
          Suite 200
20        Richmond, Virginia 23218
          Tbrenner@beylaw.com
21        (804) 644-1300
          Representing Tobin Trading Company
22
23
24
```

```
 1   APPEARANCES (CONTINUED):
 2
 3        McKENRY, DANCIGERS, DAWSON & LAKE, P.C.
          BY:  J. BRIAN SLAUGHTER, ESQUIRE
 4        192 Ballard Court
          Suite 400
 5        Virginia Beach, Virginia 23462
          (757) 461-2500
 6        Jbslaughter@va-law.org
          Representing Atlantic Homes LLC and
 7        Multiple Other Virginia-Based
          Defendants
 8
 9        QUINN EMANUEL URQUHART & SULLIVAN,LLP
          BY:  JULIA BESKIN, ESQUIRE
10        51 Madison Avenue
          22nd Floor
11        New York, New York 10010
          (212) 849-7000
12        Juliabeskin@Quinnemanuel.Com
          Representing Chartis Select Insurance
13        Company and Related Chartis Insurers
14
15        WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
          BY:  MICHAEL SEXTON, ESQUIRE
16        3344 Peachtree Road, NE
          Suite 2400
17        Atlanta, Georgia 30326
          (404) 876-2700
18        msexton@wwhgd.com
          Representing Various Banner
19        Defendants
20
          SINNOTT, NUCKOLS & LOGAN, PC
21        BY:  KENNETH F. HARDT, ESQUIRE
          13811 Village Mill Drive
22        Midlothian, Virginia 23114
          (804) 378-7600
23        khardt@snllaw.com
          Representing Venture Supply, Inc. and
24        Porter-Blaine Corp.
```

Confidential - Subject to Further Confidentiality Review

```
 1    ALSO PRESENT:

 2         SUNNY WANG, INTERPRETER

 3

 4

                         -  -  -

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1    APPEARANCES VIA TELEPHONE:
 2
 3         GALLOWAY JOHNSON TOMPKINS BURR and SMITH
           BY:  CARLINA C. EISELEN, ESQUIRE
 4         One Shell Square
           701 Poydras Street, 40th Floor
 5         New Orleans, Louisiana 70139
           (504) 525-6802
 6         ceiselen@gjtbs.com
           Representing Interior/Exterior
 7         Building Supply
 8
           HUNTON & WILLIAMS LLP
 9         BY:  A. TODD BROWN, ESQUIRE
           Bank of America Plaza
10         101 South Tryon Street
           Suite 3500
11         Charlotte, North Carolina  28280
           (704) 378-4700
12         Representing Stock Building Supply, LLC
13
14         JONES, WALKER, WAECHTER, POITEVENT,
           CARRERE & DENEGRE LLP
15         BY:  MEGAN E. DONOHUE, ESQUIRE
           600 Jefferson Street, Suite 1600
16         Lafayette, Louisiana 70501
           (337) 262-9062
17         mdonohue@joneswalker.com
           Representing Fireman's Fund Insurance
18         Company
19
           FULMER LEROY ALBEE BAUMANN
20         BY:  MICHAEL P. McCAHILL, ESQUIRE
           2866 East Oakland Park Boulevard
21         Ft. Lauderdale, Florida 33306
           (954) 707-4430
22         mosscandace@fulmerleroy.com
           mmccahill@fulmerleroy.com
23         Representing Independent Builders
           Supply Association (IBSA)
24
```

Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES VIA TELEPHONE (CONTINUED):
 2
 3       WRIGHT, FULFORD, MOORHEAD & BROWN, P.A.
         BY:  DORYK B. GRAF, JR., ESQUIRE
 4       145 N. Magnolia Ave.
         Orlando, Florida 32801
 5       (407) 425-0234
         dgraf@wfmblaw.com
 6       Representing West Construction, Inc.
 7
 8       QUINN EMANUEL URQUHART & SULLIVAN, LLP
         BY: CLINTON DOCKERY, ESQUIRE
 9       51 Madison Avenue, 22nd Floor
         New York, New York 10010
10       (212) 849-7000
         clintondockery@quinnemanuel.com
11       Representing Chartis Select Insurance
         Company and Related Chartis Insurers
12
13       RUMBERGER, KIRK & CALDWELL, P.A.
         BY:  MONICA C. SEGURA, ESQUIRE
14       Brickell Bayview Centre, Suite 3000
         80 Southwest 8th Street
15       Miami, Florida 33130
         (305) 358-5577
16       Representing several defendants and
         Defendants' Liaison Counsel for
17       Installers
18
         BUCHANAN INGERSOLL & ROONEY
19       BY:  C. ROBERT ZAPPALA, ESQUIRE
         One Oxford Centre
20       301 Grant Street, 20th Floor
         Pittsburgh, Pennsylvania 15219
21       (412) 392-2135
         bobby.zappala@bipc.com
22       Representing 84 Lumber
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM:
 2

      BECNEL LAW FIRM, L.L.C.
 3    BY:  ROBERT BECNEL, ESQUIRE
      106 W. 7th Street
 4    Reserve, Louisiana 70084
      (985) 536-1186
 5    robbecnel@aol.com
      Representing the Plaintiffs'
 6    Steering Committee
 7

      PARKER WAICHMAN ALONSO LLP
 8    BY:  JORDAN L. CHAIKIN, ESQUIRE
      3301 Bonita Beach Road
 9    Bonita Springs, Florida 34134
      (239) 390-1000
10    Jchaikin@yourlaywer.com
      Representing Plaintiffs' Steering
11    Committee
12

      MORGAN & MORGAN
13    BY:  PETE V. ALBANIS, ESQUIRE
      12800 University Drive
14    Suite 600
      Fort Myers, Florida 33907
15    (877) 667-4265
      Representing the Plaintiffs
16

17    IRPINO LAW FIRM
      BY:  ANTHONY IRPINO, ESQUIRE
18    2216 Magazine Street
      New Orleans, Louisiana 70130
19    Airpino@irpinolaw.com
      (504) 525-1500
20    Representing the Plaintiffs
21
22
23
24
```

Case 2:09-md-02047-EEF-JCW Document 13246-25 Filed 03/26/12 Page 36 of 124
Case 2:09-md-02047-EEF-JCW Document 13154-25 Filed 03/21/12 Page 1 of 25
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2

 3         GALLOWAY JOHNSON TOMPKINS BURR and SMITH
           BY:   CARLINA C. EISELEN, ESQUIRE
 4         One Shell Square
           701 Poydras Street, 40th Floor
 5         New Orleans, Louisiana 70139
           (504) 525-6802
 6         ceiselen@gjtbs.com
           Representing Interior/Exterior
 7         Building Supply
 8

           HEARD & MEDACK, P.C.
 9         BY:   JAMES DAVIS, ESQUIRE
           9494 Southwest Freeway, Suite 700
10         Houston, Texas 77074
           (713) 772-6400
11         jdavis@heardmedackpc.com
           Representing CastleRock Communities, L.P.
12

13
           HUNTON & WILLIAMS LLP
14         BY:   A. TODD BROWN, ESQUIRE
           Bank of America Plaza
15         101 South Tryon Street
           Suite 3500
16         Charlotte, North Carolina  28280
           (704) 378-4700
17         tbrown@hunton.com
           Representing Stock Building Supply, LLC
18

19
           SHER GARNER CAHILL RICHTER KLEIN &
20         HILBERT, L.L.C.
           BY:   MATTHEW C. CLARK, ESQUIRE
21         909 Poydras Street
           Suite 2800
22         New Orleans, Louisiana 70112
           (504) 299-2100
23         mclark@shergarner.com
           Representing the Southern Home
24         Defendants
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3        QUINN EMANUEL URQUHART & SULLIVAN, LLP
          BY: CLINTON DOCKERY, ESQUIRE
 4        51 Madison Avenue, 22nd Floor
          New York, New York 10010
 5        (212) 849-7000
          clintondockery@quinnemanuel.com
 6        Representing Chartis Select Insurance
          Company and Related Chartis Insurers
 7
 8        JONES, WALKER, WAECHTER, POITEVENT,
          CARRERE & DENEGRE LLP
 9        BY:  MEGAN E. DONOHUE, ESQUIRE
          600 Jefferson Street, Suite 1600
10        Lafayette, Louisiana 70501
          (337) 262-9062
11        mdonohue@joneswalker.com
          Representing Fireman's Fund Insurance
12        Company
13
          DEUTSCH, KERRIGAN & STILES
14        BY:  MELISSA M. SWABACKER, ESQUIRE
          755 Magazine St.
15        New Orleans, Louisiana  70130
          (504) 581-5141
16        mswabacker@dkslaw.com
          Representing Landmark American
17        Insurance Company
18        PUGH, ACCARDO, HAAS, RADECKER, CAREY
          & HYMEL, LLC
19        BY:  DONNA M. YOUNG, ESQUIRE
          1100 Poydras Street
20        Suite 3200
          New Orleans, Louisiana 70163
21        Dyoung@pugh-law.com
          (504) 799-4500
22        Representing Stock Building Supply
23
24
```

Confidential - Subject to Further Confidentiality Review

```
1    APPEARANCES VIA STREAM (CONTINUED):

2

     WEINBERG, WHEELER, HUDGINS, GUNN &

3    DIAL, LLC

     BY:  SHUBHRA MASHELKAR, ESQUIRE

4    3344 Peachtree Road, NE

     Suite 2400

5    Atlanta, Georgia 30326

     (404) 876-2700

6    Smashelkar@wwhgd.com

     Representing Various Banner

7    Defendants

8

                    -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                         -   -   -
                       I N D E X
 2                         -   -   -
 3     Testimony of:  GANG CHE
 4       By Mr. Gonzalez                 18
 5


 6                         -   -   -

                      E X H I B I T S
 7

                           -   -   -
 8
 9       NO.                 DESCRIPTION        PAGE
10       Che-1     Sole Agency Agreement,      37
                   4 pages
11
         Che-2     E-mail chain, top one       59
12                 dated 4/17/2007, Bates
                   stamped TG 0000915
13                 through TG 0000920
14       Che-3     Packet of Invoices,         67
                   Bates stamped TG
15                 0019968 through TG
                   0019975
16
         Che-4     E-mail in Chinese           76
17                 dated May 27, 2010
                   with attachment, 2
18                 pages
19       Che-5     Printout of Instant         87
                   Messages, 41 pages
20
         Che-6     Letter dated November      108
21                 26, 2008, Bates
                   stamped TG 0021501
22                 through TG 0021505
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2           DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

        Direction to Witness Not to Answer

 5

                      Page Line

 6

 7

 8

 9

        Request for Production of Documents

10

                      Page Line

11

12

13

14

                    Stipulations

15

                      Page Line

16

17

18

19

20              Question Marked

21                    Page Line

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1              VIDEOTAPE TECHNICIAN:  We

 2         are now on the record.  My name is

 3         Dan Lawlor.  I'm the videographer

 4         for Golkow Technologies.  Today's

 5         date is January 11, 2012, and the

 6         time is 2:29 p.m.  This video

 7         deposition is being held in Hong

 8         Kong, China, in the matter of

 9         Chinese Drywall Litigation for the

10         United States District Court,

11         Eastern District of Louisiana, MDL

12         Number 2047, and cross-noticed in

13         various other actions.  The

14         deponent today is Che Gang.

15              Will Your Honor and all

16         present state appearances for the

17         record, please.

18              THE COURT:  Judge Eldon

19         Fallon, United States District

20         Court, Eastern District of

21         Louisiana.

22              MR. GONZALEZ:  Good

23         afternoon.  Ervin Gonzalez.  I'm

24         joined by Patrick Montoya on
```

Confidential - Subject to Further Confidentiality Review

```
 1          behalf of the PSC and the MDL

 2          liaison states.

 3               MS. BASS:  Hilarie Bass on

 4          behalf of the Home Builders

 5          Steering Committee.

 6               MR. GEORGE:  Scott Alan

 7          George, Seeger Weiss, for PSC.

 8               MR. HARDT:  Ken Hardt on

 9          behalf of Venture Supply in the

10          Germano action and the Alexander

11          state court action.

12               MS. BESKIN:  Julia Beskin

13          from Quinn Emanuel on behalf of

14          the Chartis Insurance Group.

15               MR. RISLEY:  Kevin Risley

16          for the North River Insurance

17          Company.

18               MR. SLAUGHTER:  Brian

19          Slaughter here on behalf of

20          Atlantic Homes, LLC and the

21          Commonwealth of Virginia matters

22          and the MDL.

23               MR. BRENNER:  I'm Ted

24          Brenner, and I'm here for Tobin
```

Confidential - Subject to Further Confidentiality Review

```
 1          Trading in the Germano case.

 2               MR. SEXTON:  Mike Sexton on

 3          behalf of certain Banner Supply

 4          entities.

 5               MR. MEUNIER:  Gerry Meunier

 6          appearing for the Plaintiffs

 7          Steering Committee in the MDL.

 8               MR. BLACK:  David Black

 9          appearing for the State of

10          Louisiana.

11               MR. LEVIN:  Arnold Levin,

12          lead counsel, PSC.

13               MR. DAVIS:  Leonard Davis on

14          behalf of the Plaintiffs Steering

15          Committee and Plaintiffs Liaison

16          Counsel.

17               MR. SPANO:  Frank Spano,

18          Eugene Chen and Jieni Ji for the

19          defendants TG and TTP.

20               VIDEOTAPE TECHNICIAN:  Our

21          court reporter today is Ann Marie

22          Mitchell.  And Your Honor, will

23          you proceed.

24                    -   -   -
```

Confidential - Subject to Further Confidentiality Review

```
 1                    GANG CHE, after having been

 2           duly sworn, was examined and

 3           testified as follows:

 4                         -  -  -

 5                    THE WITNESS:  What should I

 6           say?  Should I repeat what you

 7           said?

 8                    THE COURT:  No.  Say yes.

 9                    THE WITNESS:  Yes, I do.

10                    THE COURT:  Be seated,

11           please.

12                    You may proceed, Counsel.

13                         -  -  -

14                    EXAMINATION

15                         -  -  -

16   BY MR. GONZALEZ:

17           Q.    Good afternoon, sir.

18           A.    Good afternoon.

19           Q.    Tell us your name, please.

20           A.    Che Gang, last name C-H-E,

21   first name G-A-N-G.

22           Q.    Do you go by any other

23   names?

24           A.    What are the names you're
```

Confidential - Subject to Further Confidentiality Review

```
 1    referring to?

 2           Q.     Your Western names.

 3           A.     Bill.

 4           Q.     Bill Cher or Bill Che?

 5           A.     It should be pronounced Bill

 6    Cher.

 7           Q.     How is it spelled?

 8           A.     B-I-L-L.

 9           Q.     And the last name?

10           A.     C-H-E.

11           Q.     By whom are you employed?

12           A.     What time period?

13           Q.     Currently.

14           THE COURT:  Would you hold

15    it a minute.

16           MR. GONZALEZ: Yes, Your

17    Honor.

18           THE WITNESS:  Taishan

19    Gypsum.

20    BY MR. GONZALEZ:

21           Q.     How long have you worked for

22    Taishan Gypsum, in any of its corporate

23    names?

24           A.     Do you mean that you want me
```

Confidential - Subject to Further Confidentiality Review

```
 1    to let you know my resume?

 2           Q.    I will ask you that, but

 3    right now I'm asking you how long have

 4    you been employed with a company now

 5    known as TG?

 6           A.    I joined TG in around 2001,

 7    and then I was hired to join TTP in

 8    around 2006.  In the year 2008, we went

 9    back to TG until today.

10           Q.    What position did you start

11    with at TG in 2001?

12           A.    Salesperson.

13           Q.    What position were you hired

14    to do for TTP in 2006?

15           A.    Salesperson.

16           Q.    And when you returned to TG,

17    what position did you return to?

18           A.    I was still a salesperson.

19           Q.    Who did you apply with or

20    how did you get the position at TTP?

21           A.    After the establishment of

22    TTP, the office of TTP put up a notice,

23    like hiring notice.  And then we

24    registered and went to TTP.
```

```
 1          Q.    Who asked you to begin

 2    working at TTP as opposed to TG?

 3               MR. SPANO:  Objection, lack

 4          of foundation.

 5               THE COURT:  Ervin, could you

 6          wait a minute.

 7               Could you get me started?

 8               VIDEOTAPE TECHNICIAN:  Going

 9          off the record.  The time is 2:36.

10                    -   -   -

11               (A discussion off the record

12          occurred.)

13                    -   -   -

14               VIDEOTAPE TECHNICIAN:  Back

15          on the video record.  The time is

16          2:39.

17    BY MR. GONZALEZ:

18          Q.    Who, if anyone, asked you to

19    apply at TTP when it started?

20          A.    I volunteered.

21          Q.    Who asked for volunteers?

22          A.    I don't understand your

23    question.

24          Q.    Yes.  Someone's asking for
```

 1    volunteers to leave TG to start TTP.  Who

 2    is it that issued that request?

 3          A.    I volunteered, which

 4    means -- which meant that I wanted to do

 5    it myself.

 6          Q.    To whom did you volunteer?

 7          A.    To TTP.

 8          Q.    TTP was made up initially of

 9    employees that previously worked at TG.

10    Correct?

11          A.    I'm not sure of that.

12          Q.    You used to work for TG,

13    we've already established that, when you

14    started working at TTP.  Correct?

15          A.    Correct.

16          Q.    Your colleague Peng Wenlong

17    also worked at TG before he began working

18    at TTP.  Correct?

19          A.    Correct.

20          Q.    Peng Shiliang also worked at

21    TG before he worked at TTP.  Correct?

22          A.    I have never heard of this

23    name.

24                Can you give me the

Confidential - Subject to Further Confidentiality Review

```
 1   spelling, please?

 2                   MR. CHEN:  If you write down

 3           the name.  It's being translated

 4           by the way you're pronouncing it

 5           in English, so if you write down

 6           the name --

 7   BY MR. GONZALEZ:

 8           Q.    The individual who testified

 9   prior to him.

10           A.    Peng Shiliang is his name.

11           Q.    He worked at TG before he

12   worked at TTP.  Correct?

13           A.    I'm not sure.

14           Q.    Do you know Yang Jiapo?

15           A.    Yes.

16           Q.    He worked at TG before he

17   started working at TTP.  Correct?

18           A.    Yes.

19           Q.    And you know many other

20   colleagues that previously worked at TG

21   before working at TTP.  Correct?

22                   MR. SPANO:  Objection to

23           form.

24                   THE COURT:  He said he
```

```
 1          wasn't sure, I thought.

 2                    Is that what he said?

 3                    MR. GONZALEZ:  I don't think

 4          he answered.

 5                    THE COURT:  Oh, okay.  He

 6          didn't answer.  Okay.  Objection

 7          as to form.

 8                    What's the form, Frank?

 9                    MR. SPANO:  Vagueness,

10          particularly in the way many

11          colleagues would be interpreted,

12          concerned.

13                    THE COURT:  Say other

14          colleagues.

15   BY MR. GONZALEZ:

16          Q.    And you know of many other

17   colleagues that previously worked at TG

18   before working at TTP.  Correct?

19          A.    I don't know your definition

20   of many.  Is it two or three?

21          Q.    What's your definition of

22   many, sir?

23          A.    It is a vague concept.

24                    THE COURT:  Ask him all of
```

1          the people that -- name all of

2          them.

3     BY MR. GONZALEZ:

4          Q.     Can you name all of the

5     individuals that you know who worked at

6     TG before they joined TTP?

7          A.     I'm sorry, my memory is not

8     that good.

9          Q.     You don't remember any other

10    name?

11         A.     You can say a name, then I

12    will try to refresh my memory.  But if

13    you want me to try to recollect my

14    memory, it's too general of a question.

15         Q.     What's your educational

16    background, sir?

17         A.     AA degree.  AA degree.

18         Q.     Associate in arts from a

19    college?

20         A.     In China we just call it AA

21    college graduate.

22         Q.     So you are a college

23    graduate?

24         A.     I'm not sure what's your

Confidential - Subject to Further Confidentiality Review

```
 1    definition of college.  We just call it
 2    AA degree college.
 3         Q.    Sir, you are an individual
 4    with an AA degree college.  Yes?
 5         A.    Correct.
 6         Q.    What is your degree in?
 7         A.    Accounting.
 8         Q.    When did you graduate with
 9    an accounting degree?
10              THE INTERPRETER:
11              Interpreter needs clarification.
12              There is a difference in
13              translation.
14                 In America you say a degree,
15              you have a degree, but he said he
16              doesn't have a degree.  I don't
17              know how should I translate it.
18    BY MR. GONZALEZ:
19         Q.    When did you receive the AA
20    college?  What is the date?
21              THE INTERPRETER:
22              Interpreter clarification.
23                 When you mean, when did he
24              receive the college, what do you
```

```
 1          mean?
 2                  MR. GONZALEZ:  The college
 3          AA.
 4                  THE INTERPRETER:  The degree
 5          or the college?
 6                  MR. GONZALEZ:  That's what
 7          he said.  He said he has an AA
 8          college degree.
 9                  THE INTERPRETER:  Sorry,
10          interpreter doesn't understand
11          your question.
12  BY MR. GONZALEZ:
13          Q.    When did you receive your AA
14  college degree?  What is the date?
15          A.    I graduated in 1997.
16          Q.    In those five years before
17  you started working at TG after
18  graduation, where did you work?
19          A.    In a garment factory.
20          Q.    As an accountant?
21          A.    No.
22          Q.    Did you ever work as an
23  accountant?
24          A.    No.
```

```
 1          Q.     What did you do in the
 2    garment factory?  Sales?
 3          A.     Everything.
 4          Q.     What do you mean by
 5    everything?
 6          A.     Whenever I was needed to
 7    carry stuff or I was needed to deliver
 8    stuff, I did those kind of odd jobs.
 9          Q.     And how did you get your job
10    at TG?
11          A.     TG was hiring.  I also
12    volunteered.
13          Q.     You volunteered to work at
14    TG?
15                 THE INTERPRETER:  Sorry,
16          interpreter clarification.
17                 THE WITNESS:  I volunteered.
18    BY MR. GONZALEZ:
19          Q.     And they accepted your
20    willingness to work at TG?
21          A.     Correct.
22          Q.     And similarly, you
23    volunteered to work as a salesperson at
24    TTP once TG formed TTP for purposes of
```

```
 1    benefiting for VAT matters.  Correct?
 2                    MR. SPANO:  Objection,
 3           compound.
 4                    THE COURT:  It's going to
 5           take us a while to get through
 6           this.  I have to leave Saturday.
 7           So we'll see what we can do with
 8           it.  Let's ask him another
 9           question.
10    BY MR. GONZALEZ:
11           Q.    I want to direct your
12    attention to the day the decision was
13    made to stop the existence of TTP.
14                    How did that come about?
15           A.    I don't understand your
16    question about the day to stop the
17    existence of TTP.
18           Q.    TTP stopped being in
19    existence in 2007.  Right?
20           A.    Till the end of 2007.
21           Q.    Why did it end?
22           A.    I was only a salesperson.  I
23    don't understand.
24           Q.    How did you find out you
```

1    were going to get to go back to work at

2    TG?

3            A.    I had to eat.  I had to look

4    for a job.

5            Q.    But you understand that TG

6    owned TTP.  Correct?

7            A.    I'm sorry, I'm only a

8    salesperson.  I don't know anything

9    greater.

10           Q.    How would you describe your

11   command of the English language?

12           A.    I learned a little bit in

13   college, but it was very poor.

14           Q.    In your job for TG, did you

15   work in the export sales department?

16                 MR. SPANO:  Objection to

17           form and foundation.

18                 THE COURT:  Ask him whether

19           or not they had a department.

20   BY MR. GONZALEZ:

21           Q.    Did the company have an

22   export department, TG?

23           A.    At the time, we call it

24   export department.  I don't know whether

Confidential - Subject to Further Confidentiality Review

```
1    they had a certificate for that.

2          Q.    Did you work for the export

3    department?

4          A.    I worked in that department.

5          Q.    Did you also work in that

6    department while you were working for

7    TTP?

8                MR. SPANO:  Objection.

9                THE WITNESS:  I don't

10               understand the accurate meaning of

11               your question.

12   BY MR. GONZALEZ:

13         Q.    Did you work for the export

14   department at TTP?

15         A.    Which export department are

16   you talking about?

17         Q.    How many did you have?

18         A.    Just one.

19         Q.    Did you work at that one?

20         A.    You mean the export

21   department at TG?

22         Q.    TTP.

23         A.    They didn't call it export

24   department.
```

1     Q.     What did they call it?

2     A.     It was only called a sales

3  department.

4     Q.     And in the sales department,

5  did you work on international trades?

6     A.     We only did sales.

7     Q.     Did you sell product to

8  American companies?

9     A.     It depends on how do you

10  define it.

11     Q.     I define it as companies

12  that are out of the United States of

13  America.

14            Did you sell product to

15  individuals in the United States of

16  America while you were a salesperson for

17  TTP?

18     A.     Please repeat the question.

19  I don't quite understand.

20     Q.     Did you sell products to

21  companies in the United States of America

22  while you worked as a salesperson at TTP?

23     A.     While I worked at TTP as a

24  salesperson, our principle was that we

Confidential - Subject to Further Confidentiality Review

```
 1    deliver our products to buyers in China.

 2    As of where would the buyers ship the

 3    products to, I'm not sure.

 4           Q.    Sir, my question is whether

 5    you sold product to companies in the

 6    United States of America while you were a

 7    salesperson for TTP?

 8           A.    You ask the same question I

 9    thought I have already answered you.

10           Q.    Is the answer yes or is the

11    answer no?

12           A.    I think you have a problem

13    in defining the scope.

14           Q.    Perhaps we can help you

15    understand what the question means, sir.

16                 You've heard of the United

17    States of America?

18           A.    Okay.

19           Q.    Correct?

20           A.    Yes.

21           Q.    You've heard of businesses

22    in the United States of America?

23           A.    What do you mean by

24    businesses in America?
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Do you know what business

 2    means, the term "business"?

 3               THE INTERPRETER:

 4          Interpreter clarification.

 5               In Chinese, business can be

 6          interpreted as a company is a

 7          business, as a transaction is a

 8          business or as commercial is also

 9          translated business.  Which one?

10               MR. GONZALEZ:  A company.

11               THE WITNESS:  You mean

12          company?

13               Some customers claimed that

14          they were companies from the

15          United States.  We couldn't

16          distinguish that.

17    BY MR. GONZALEZ:

18          Q.    And some individuals from

19    the United States contacted you in order

20    to do business with them, transactions

21    with them, where you were willing to sell

22    drywall to them.  Correct?

23               MR. SPANO:  Objection to

24          form.
```

Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT:  Please restate

 2         the question, make it smaller,

 3         please.

 4   BY MR. GONZALEZ:

 5         Q.    Sir, you transacted business

 6   with individuals in the United States

 7   when you were a salesperson for TTP.

 8   Isn't that true, sir?

 9         A.    There were some customers

10   who claimed to be people from the United

11   States, and they came to us for business

12   transactions.

13         Q.    And one of them was Oriental

14   Trading Company, LLC.  Correct?

15         A.    Oriental Trading Company.  I

16   know Oriental.

17         Q.    Ivan Gonima, your friend

18   from Miami.  Do you remember him?

19         A.    I remember Ivan.

20         Q.    Ivan was a friend of yours.

21   Right?

22         A.    He's my customer.

23         Q.    In fact, he's still your

24   customer?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.     We have not -- we have not
 2   been having business dealings for a long
 3   time.
 4          Q.     The last business dealing
 5   you had with him by virtue of an e-mail
 6   was in May 2011, wasn't it?
 7          A.     2011?
 8          Q.     When was the last time you
 9   spoke with Mr. Gonima through e-mail,
10   text message or instant messaging?
11          A.     I'm sorry, I don't remember
12   clearly.
13          Q.     Do you think it was a year
14   ago or more than a year ago?
15          A.     There are too many stuff.  I
16   really can't remember that.
17          Q.     You can't remember having
18   done business recently with Ivan Gonima
19   in the United States?
20          A.     I don't remember.  When you
21   say recent, what do you mean?
22          Q.     All right, sir.
23                 Let's talk about a sole
24   agency agreement that you had on
```

Confidential - Subject to Further Confidentiality Review

```
 1    behalf -- that you signed on behalf of

 2    TTP with Oriental Trading Company on

 3    October 20, 2006.

 4              Do you remember that, sir?

 5         A.    Only to recent couple of

 6    days with the assistance of my attorney

 7    when I saw these documents did that

 8    refresh my memory.

 9         Q.    And what do you remember

10    about that agreement?

11         A.    According to our

12    recollection, at the time there was a

13    gentleman called Jorge and the Chinese

14    person came to our company.

15         Q.    Sir, I'm going to show you

16    what we'll mark as Exhibit Number 1 to

17    your deposition.

18              -  -  -

19              (Deposition Exhibit No.

20         Che-1, Sole Agency Agreement, 4

21         pages, was marked for

22         identification.)

23              -  -  -

24    BY MR. GONZALEZ:
```

Confidential - Subject to Further Confidentiality Review

1          Q.    And this is identified as

2     "Sole Agency Agreement."

3               And that's your signature at

4     the bottom of the first page, isn't it,

5     sir?

6          A.    No.

7          Q.    Does your signature appear

8     on the signature line there, sir?

9          A.    Which one, can you point it?

10         Q.    Yours?

11         A.    You mean this one?

12         Q.    If that's your signature,

13     that's the one I'm asking about, sir.

14         A.    Yes.

15         Q.    And that's underneath the

16     Taishan -- Taian Taishan Plasterboard

17     Company, Ltd.  Right?

18         A.    Correct.

19         Q.    And it has the Taian Taishan

20     Plasterboard contract seal.  Correct?

21         A.    Correct.

22         Q.    And it has the little star

23     in the middle, doesn't it, sir?

24         A.    Yes.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Then if you turn the page

 2   one page before it, your signature

 3   appears on that page as well, doesn't it,

 4   sir?

 5        A.    Correct.

 6        Q.    And it says, "The seller."

 7   You can read that English, can't you,

 8   sir?

 9        A.    I can understand simple

10   Chinese -- simple English, as I told you

11   earlier.

12        Q.    You signed this --

13              You signed that contract.

14   Right, sir?

15        A.    The signature is mine.

16        Q.    And can you tell us this

17   contract number, the SDTH, does that

18   stand for you?

19        A.    You're correct.

20        Q.    And this was your

21   relationship, right, at TTP, meaning

22   Oriental Trading Company was a client

23   that you worked with?

24        A.    Correct.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And before you entered into

 2    this contract, you asked for permission

 3    to sign it on behalf of the company.

 4    Correct?

 5          A.     I only reported my work to

 6    Mr. Peng Wenlong.

 7          Q.     Your colleague?

 8          A.     You can say that.

 9          Q.     With this agreement, you

10    were going to sell gypsum board

11    manufactured with a thickness of a 1/2

12    inch or 5/8 inch and the width of 4 feet,

13    the length of 8 feet, 9 feet, 10 feet or

14    12 feet, under the brand name of Dun as

15    referenced in the first paragraph.

16    Correct?

17          A.     This should be in accordance

18    with the request of the customer.

19          Q.     And TTP was a seller of the

20    Dun brand drywall.  Correct?

21          A.     No.

22          Q.     It was not?

23          A.     We have never sold that.

24          Q.     TG sold it.  Correct?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    Correct.

 2          Q.    So you were selling TG's

 3   drywall in this contract.  Correct?

 4          A.    No.

 5          Q.    I'm going to show you

 6   Exhibit Number 20 to Mr. Jia's

 7   deposition.

 8                This is the Shandong Taihe

 9   Dongxin Company, Ltd.'s catalog, now

10   known as TG.  And I'd like you to turn to

11   the page that has the registered

12   trademarks for the products that it

13   sells.

14                And you see the Dun brand

15   there, sir?

16          A.    Yes.

17          Q.    And that's spelled D-U-N.

18   Correct?

19          A.    Correct.

20          Q.    And this contract is between

21   TTP and Oriental Trading Company.  That's

22   Exhibit Number 1 to your deposition.

23   Correct?

24          A.    Can you repeat that?
```

Confidential - Subject to Further Confidentiality Review

 1        Q.     Yes.   The seller under this

 2    contract, Exhibit Number 1, is Taian

 3    Taishan Plasterboard Company, Ltd.; is

 4    that correct?

 5        A.     Yes.

 6        Q.     And the buyer is Oriental

 7    Trading Company, LLC.   Correct?

 8        A.     Yes.

 9        Q.     And if you look at paragraph

10    number 1, it states, "The brand name of

11    'DUN' showing as in the seller's

12    catalogue only"; is that correct, sir?

13        A.     That's what it said here.

14        Q.     And it's spelled D-U-N.

15    Correct?

16        A.     Correct.

17        Q.     And the area identified in

18    paragraph 2 of this sole agency agreement

19    between TTP and Oriental Trading Company

20    is defined as "limited to the territory

21    of the USA."   Correct, sir?   Paragraph 2.

22        A.     Can you interpret it for me,

23    what he says?

24        Q.     The interpreter will do that

Confidential - Subject to Further Confidentiality Review

```
 1    for you.

 2                    THE INTERPRETER:  Which

 3         paragraph?

 4    BY MR. GONZALEZ:

 5         Q.    Number 2, paragraph 2.

 6         A.    Can you give me a clear

 7    version?  I can't see it very clearly.

 8         Q.    I can show you mine.  It's

 9    got some highlights.  Can you please read

10    paragraph 2.

11         A.    You don't have to show it to

12    me.  You can read it yourself.  Okay.

13              This is the request of the

14    customer.

15         Q.    It says, "Sole Sales Area:

16    Limited to the territory of the" United

17    States of America.  Right?

18         A.    I'm only hearing the

19    interpretation because I don't understand

20    this.

21         Q.    Sir, my question is,

22    according to the contract that's been

23    interpreted for your benefit, the sole

24    sales area in this sole agency agreement
```

Confidential - Subject to Further Confidentiality Review

```
 1    is limited to the territory of the USA.

 2    Correct?

 3         A.    If that's your

 4    interpretation, then that's the

 5    interpretation.  That's what it appears

 6    to be in the document.

 7         Q.    You understand what USA

 8    means.  Right, sir?

 9         A.    Yes.

10         Q.    It's the United States of

11    America.  Right?

12         A.    Yes.

13         Q.    And if you look at the

14    certificate, sir, at the end, third page,

15    that writing is in Chinese.  Correct?

16         A.    Both English and Chinese.

17         Q.    And do you understand the

18    Chinese?

19         A.    Yes.

20         Q.    Why don't you read that

21    Chinese for us?

22         A.    Can you give me a clearer

23    version of that document?

24         Q.    Yes, sir.  You can use mine.
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.     Thank you.

 2          Q.     You're welcome, sir.

 3                 Yes.  The Chinese?

 4          A.     I should read everything?

 5          Q.     Yes.  All the Chinese.

 6          A.     Is the pronunciation

 7   Oriental Company?  How do you pronounce

 8   this?

 9                 Taian Taishan Plasterboard

10   Company, Limited, certificate -- Taian

11   Taishan Plasterboard Company, Limited

12   certifies that Oriental Trading Company,

13   LLC as its exclusive agency for the Dun

14   brand in the United States of America.

15   The certificate shall be considered with

16   the understanding that it may be

17   effective on the date of their signing.

18   The validity period and responsibility

19   and law of the certificate are all

20   subject to the items in the formal

21   exclusive agency agreement (start SDTH

22   061020) and signed by two parties

23   accordingly.  The signature is Che Gang.

24          Q.     And that's your signature.
```

Confidential - Subject to Further Confidentiality Review

```
 1    Right, sir?

 2            A.    Yes.

 3            Q.    The Chinese language that

 4    you see there, that was prepared by your

 5    company.  Right, sir?

 6            A.    That has been translated

 7    according to the request of the customer.

 8            Q.    The Chinese language that

 9    was put in this contract was done by your

10    company.  Right, sir?

11            A.    The language here was

12    translated according to the English

13    language provided by the customer.

14            Q.    It was translated in China?

15            A.    The document was signed in

16    China.

17            Q.    And the Chinese language

18    that is there was put there in China?

19            A.    I don't quite understand the

20    question.

21            Q.    Mr. Gonima does not speak

22    Chinese.  Correct?

23            A.    I'm sorry, this person is,

24    according to this document, it appears to
```

Confidential - Subject to Further Confidentiality Review

```
 1    be a Jorge, not Gonima.

 2              Q.    Jorge Arevalo who was Mr. --

 3    not law partner.  Let me restate that.

 4                    Jorge Arevalo who was Mr.

 5    Gonima's partner in Oriental Trading.

 6    Correct?

 7              A.    That's what he claimed

 8    himself to be.

 9              Q.    He did not speak Chinese.

10    Correct?

11              A.    Yes.

12              Q.    And you spoke Chinese?

13              A.    Yes.

14              Q.    And that Chinese language

15    was there when you signed the agreement.

16    Correct, sir?

17              A.    I don't understand your

18    question.

19              Q.    My question is, the Chinese

20    language that appears on that page over

21    your signature was there when you signed

22    it?

23              A.    Like I said earlier, the

24    Chinese language was a translation of the
```

Confidential - Subject to Further Confidentiality Review

```
 1    English language that is reflected in the

 2    document.  And then I put my signature on

 3    it.

 4            Q.    Did you keep a copy of this

 5    agreement, sir, when you signed it?

 6            A.    At the time Mr. Jorge took a

 7    Chinese interpreter with him.  He

 8    expressed his willingness for this

 9    business transaction.  But because he

10    said he didn't have his company seal,

11    therefore, he needed to bring all the

12    original documents to him and put a seal

13    and then mail it to us.  But he did not

14    keep his promise.  I have never received

15    such documents from him.  Therefore, in

16    my memory, and from the record of a

17    company, I have not found this document.

18    I'm sorry.

19            Q.    They paid you for the goods.

20    Right, sir?

21            A.    What time period?

22                  MR. SPANO:  Ob --

23                  THE COURT:  Objection.

24                  The goods as reflected in
```

```
 1           the document.
 2   BY MR. GONZALEZ:
 3           Q.    Yes.   They paid you for some
 4   drywall, didn't they?
 5                 MR. SPANO:   Objection to
 6           form.
 7                 THE COURT:   Sustained.
 8                 When you say some --
 9                 MR. GONZALEZ:   Say some?
10                 THE COURT:   No.   You said
11           some.
12                 MR. GONZALEZ:   Yes.   It's an
13           ongoing agreement, Judge.
14                 THE COURT:   I see.
15                 MR. GONZALEZ:   Which
16           ended --
17                 THE COURT:   Did you receive
18           any.
19   BY MR. GONZALEZ:
20           Q.    Did you receive any payments
21   from Oriental Trading Company for
22   drywall?
23           A.    Can you repeat that?   You
24   were on and off.   I didn't quite
```

Confidential - Subject to Further Confidentiality Review

1    understand.

2         Q.    Did you receive any payments

3    for drywall from Oriental Trading

4    Company?

5              MR. SPANO:  Objection to

6         form.  Ever?

7              THE COURT:  Yes.  When?

8    BY MR. GONZALEZ:

9         Q.    After October 20, 2006,

10   which is the date of this sole agency

11   agreement, did you receive any payments

12   for drywall from a company known to you

13   as Oriental Trading Company, LLC?

14        A.    Please let me know what is

15   the expiration date of this.

16        Q.    Sir, my question is, did you

17   receive any monies from Oriental Trading

18   Company after October 20, 2006 for

19   drywall?

20        A.    Yes.

21        Q.    And you actually sent some

22   drywall to be shipped to the United

23   States?

24        A.    The term I did was FOB.

Confidential - Subject to Further Confidentiality Review

1          Q.      Yes.  Drywall?

2          A.      The term of shipment that I

3    handled was FOB Chinese port.  As of

4    where did the customer ship the product

5    to, I'm not sure about it.

6          Q.      You knew it was the United

7    States of America because they had the

8    exclusive agency agreement to sell the

9    product there.  Correct, sir?

10          A.      The customer did tell us so,

11    but I do not know exactly where it's

12    finally ended in.

13          Q.      In fact, the customer even

14    worked with you to make sure that the

15    labels that were used on the product

16    would have red, white and blue, as in the

17    American flag, with the words "Dun" on

18    it.  Correct?

19          A.      The customer designed it.

20          Q.      And you assisted him.

21    Correct?

22          A.      The customer designed it

23    himself.

24          Q.      With your authority.  Right,

Confidential - Subject to Further Confidentiality Review

1   sir?

2          A.    I do not have the right to

3   authorize people.

4          Q.    I'm going to show you what

5   will be marked as -- well, actually, it's

6   already marked as Jia-28.

7                And you used the e-mail

8   address SDTH818@163.com.  Correct?

9          A.    That's mine.

10         Q.    And you also used Wuyu,

11  W-U-Y-U?

12         A.    That's a MSN account.

13         Q.    That's your MSN account?

14         A.    Correct.

15         Q.    All right, sir.

16               And you received this e-mail

17  that I'm showing you.  Correct?

18         A.    As it appears here, it did

19  send to my inbox.

20         Q.    And if we look at the first

21  page, which is Bates stamp number TG

22  23841 on the bottom, it is from Ivan

23  Gonima to Wuyu.  And it says, "Dear

24  Bill."

```
 1                 And that's your Western

 2    name.  Correct?

 3                 MR. SPANO:  You have the

 4           wrong Bates number.

 5    BY MR. GONZALEZ:

 6           Q.    Correction.  Exhibit 28 is

 7    Bates stamp number 21643.

 8                 Bill is the name that you

 9    were being referenced to by Ivan Gonima.

10    He called you Bill?

11           A.    Yes.

12           Q.    And here, Bill writes to

13    you, "Dear" -- I'm sorry, Ivan Gonima

14    writes to you, "Dear Bill:  Attached you

15    will find a Microsoft Power Point file

16    showing the final arts for the binding

17    tapes to be used with the" 4 foot by

18    8 foot by 1/2 inch and the 4 foot by

19    12 inch by 1/2 inch "drywall sheets.  We

20    went thru all the issues we have already

21    discussed and everything is reviewed and

22    checked.

23                 "Please notice the

24    following:...The colors BLUE and RED are
```

1    the same ones as the...in the American

2    Flag.  WHITE is regular white."

3              Do you remember having

4    received that e-mail, sir?

5         A.    On what appears here, it

6    seems that I have received this e-mail.

7    But it has been too long.  I really can't

8    recall.

9         Q.    Okay, sir.

10             If you could turn the page.

11        A.    I'm sorry, I didn't

12   understand you?

13        Q.    I'm asking you to turn the

14   page.

15             This e-mail is from you.

16   Right?  Wuyu, SDTH818@163.com?

17        A.    Correct.

18        Q.    And it's dated February 24,

19   2007.  Correct?

20        A.    Isn't it February the 22nd

21   here?

22        Q.    It says 2007-2-22, Ivan

23   Gonima.

24             And you wrote, "Dear Mr.

Confidential - Subject to Further Confidentiality Review

1    Ivan, I am sorry, Please send the file to

2    this e-mail address, because the office"

3    e-mail "can not be opened by me."

4              And you sent that e-mail.

5    Right, sir?

6         A.   From what appears to be,

7    that I send it.

8         Q.   And what does this say here

9    in Chinese?

10        A.   My name.

11        Q.   And is that written in your

12   Chinese name?

13        A.   Yes.

14        Q.   So Che Gang?

15        A.   Your Chinese is not bad.

16        Q.   Oh, great.

17             And then you also wrote the

18   American version, Bill Cher?

19        A.   I believe so.

20        Q.   All right.

21             And attached to it are the

22   actual strips that are going to be used

23   on the label for the drywall.  Correct?

24        A.   This should be something

1    that a customer sent me.  Right?

2           Q.     My question is, attached to

3    it is the tape that's used on -- to be

4    used on the drywall that's going to be

5    sold.  Correct?

6           A.     The customer requested us to

7    put it on the gypsum board that were

8    going to be sold.

9           Q.     That's what the e-mail was

10   referring to when they said they wanted

11   it to be red, white and blue.  Correct?

12   Right, sir?

13          A.     Can you repeat your

14   question?

15          Q.     The e-mail that we just saw

16   was referring to wanting this labeling to

17   be red, white and blue.  Correct?

18          A.     Correct.

19          Q.     And your company did that.

20   Correct?

21          A.     I don't remember clearly.

22          Q.     When the product was sent

23   from China to the port to be sent FOB to

24   the United States of America, it was

1    already labeled as Dun brand.  Correct?

2            A.    Can you interpret again?

3            Q.    Yes.

4                  When the product was sent

5    from China to the port to be sent FOB to

6    the United States of America, it was

7    already labeled as Dun brand.  Correct?

8            A.    When I sent the products FOB

9    to the shipping company requested by the

10   client, if there was nothing changed to

11   that, it should be the label that is used

12   here, but I do not remember clearly about

13   it.

14           Q.    I'm going to show you what's

15   been marked --

16           A.    I'm sorry, can I drink some

17   water, take a break?

18                 THE COURT:  Yes, certainly.

19           You want to take a break?

20                 THE WITNESS:  I just want to

21           get some water and take a little

22           break.

23                 THE COURT:  Okay.

24                 THE WITNESS:  Thank you.

Confidential - Subject to Further Confidentiality Review

```
1            VIDEOTAPE TECHNICIAN:  Going

2       off the record, the time is 3:35.

3            THE COURT:  Take 15 minutes.

4                 -  -  -

5            (A recess was taken from

6       3:35 p.m. to 3:49 p.m.)

7                 -  -  -

8            THE COURT:  Back on the

9       record, the deposition is

10      resuming.  You're still under

11      oath, sir.

12           VIDEOTAPE TECHNICIAN:  We're

13      back on the video record at 3:49.

14 BY MR. GONZALEZ:

15      Q.   I'm going to show you what's

16 been marked as Exhibit Number 2 to your

17 deposition.  It's Bates stamp numbers TG

18 915 through 920.  And I'd like to direct

19 your attention specifically with page

20 918, Bates stamp number 918.  And the

21 middle of the page where it starts with

22 an e-mail from you, that's Wuyu.  That

23 would be you.  Correct?

24                -  -  -
```

Confidential - Subject to Further Confidentiality Review

```
 1                (Deposition Exhibit No.

 2           Che-2, E-mail chain, top one dated

 3           4/17/2007, Bates stamped TG

 4           0000915 through TG 0000920, was

 5           marked for identification.)

 6                  -  -  -

 7                THE WITNESS:  That's what it

 8           appears to be.

 9     BY MR. GONZALEZ:

10           Q.    All right, sir.

11                And you're writing in

12     English.  Correct?

13           A.    That's what it appears to

14     be.

15           Q.    How do you write in English?

16           A.    Can I explain?

17           Q.    Yes, please.

18           A.    Well, after we received

19     English e-mails, first of all, we would

20     use tools such as dictionary, electronic

21     tools, computer tools to translate it

22     into Chinese, and with the help of Mr.

23     Peng, the person in charge, to translate

24     from English to Chinese.  After I
```

 1    understood the intention of the client,

 2    then I would use Chinese to write my

 3    response.  And again, with the help of

 4    the translation tools, such as the

 5    dictionaries, I will translate -- I will

 6    translate that into English and to send

 7    to the client.

 8         Q.    You just said Mr. Peng who

 9    was in charge, is that Peng Wenlong?

10         A.    Yes.

11         Q.    What's he in charge of?

12         A.    What time period?

13         Q.    TTP?

14         A.    Sales.

15         Q.    So he was the head of sales?

16         A.    At the time there was no

17    such an assignment document.  It was only

18    understood that he was in charge of a few

19    of us.

20         Q.    Were you equal to him or was

21    he your superior?

22         A.    He's my superior.

23         Q.    I'd like you to look at that

24    e-mail that's from you to Mr. Ivan Gonima

```
 1    dated April 13, 2007.  And for reference,

 2    and I will have a question afterwards, it

 3    says, "Dear Mr. Ivan, I am very glad to

 4    receive your e-mail."

 5              "We indeed operated and are

 6    operating with a 28-29ton containers to

 7    export our products to America.  And we

 8    can show 26-26.5ton on the bill and

 9    packing list.  The ocean freight from

10    Qingdao" -- and I apologize for the

11    pronunciation -- "to Miami and New York

12    is $2950-3000/40GP.  If you need, I can

13    operate it for you.

14              "2.  About the clients in

15    five cities you mentioned, they are the

16    clients to which we once exported our

17    products.  Now there is no client to

18    which we can export 800,000 sheets of the

19    boards per month.  Now we are exporting

20    not very large a quantity of the boards

21    to America.  And you are the only

22    distributor of the brand DUN in America,

23    there is no doubt about this point.

24              "Thanks and best regards!
```

Confidential - Subject to Further Confidentiality Review

```
 1    Yours faithfully," then written in

 2    Chinese, Che Gang and the English name

 3    Bill Cher.

 4                  You sent that e-mail.

 5    Right, sir?

 6          A.    Yes.

 7          Q.    And the cities that Mr.

 8    Gonima was referencing actually appear on

 9    the next page.

10                  If you look at paragraph 2,

11    sir, this is from Ivan Gonima to you, and

12    it is dated April the 15th, 2007.

13    Paragraph 2, and I'll read it -- put it

14    into context and then I'll have a

15    question.

16                  "Given that you are going to

17    operate it I am going to need your actual

18    freight rates from Qingdao to different

19    cities in the USA for a" 40-foot "GP

20    container.  Here is the list of cities I

21    need so I can review my price lists:  a,

22    Gulfport, Mississippi...; b, New Orleans,

23    Louisiana...; c, Long Beach,

24    California...; d, Las Vegas, Nevada...;
```

Confidential - Subject to Further Confidentiality Review

1    e, Savannah, Georgia...; f, Atlanta,

2    Georgia...; g, Charleston, South

3    Carolina; h, Wilmington, North Carolina;

4    I, San Juan, Puerto Rico...; j" -- well,

5    those are foreign countries.  So that's

6    it for the United States.

7                So you were aware that Mr.

8    Gonima was interested in selling products

9    in the United States as the exclusive

10   agent for Dun brand to those cities in

11   the United States.  Right, sir?

12        A.    It's a long statement.  You

13   can take out what you read before.  What

14   was the last sentence you said?

15        Q.    You were aware that Mr.

16   Gonima wanted to sell the drywall, the

17   Dun drywall, as the exclusive agent to

18   your company to the cities listed in

19   paragraph 2 of that e-mail, those cities

20   in the United States listed in paragraph

21   2 of the e-mail?

22        A.    No.  This is only an

23   intention that a customer expressed.  Our

24   operation was only FOB Chinese port

Confidential - Subject to Further Confidentiality Review

```
 1   delivery.

 2           Q.    Well, sir, the paragraph

 3   before was an e-mail from you saying that

 4   you were happy to be the operator of 28-

 5   to 29-ton containers to export products

 6   to America.

 7                 Do you remember seeing that

 8   one?

 9           A.    That's what you interpreted,

10   but from my memory, I really can't

11   remember.

12           Q.    If you look at the paragraph

13   at the very top of that page Bates stamp

14   number 917, and the page before that, it

15   starts, that's an e-mail from you, right,

16   sir, Wuyu, SDTH818@163.com?

17           A.    Where is it?

18           Q.    Right here.

19           A.    That's me.

20           Q.    And it's to Ivan Gonima,

21   igonima.  Correct?

22           A.    I don't remember his e-mail

23   address, so this is the same, this one

24   and that one?
```

Confidential - Subject to Further Confidentiality Review

1          Q.    That's the start of it.  It

2    says igonima.  Correct?

3          A.    I know.  So this is the top

4    of that e-mail.  Right?

5          Q.    Yes, sir.

6          A.    So that's it.

7          Q.    It starts, "Dear Mr. Ivan,

8    Thank you very much for your kindly

9    attention.

10              "The shipping agent in

11   Qingdao confirmed the ocean freight

12   USD2950-3000.00 to Miami or New York.

13   Would you please pay the ocean freight

14   directly to" the "shipping company or

15   indirectly through us to the shipping

16   company?"

17              Do you recall sending those

18   instructions to Mr. Gonima for the

19   shipping of the Dun product to the United

20   States?  Correct?

21              MR. SPANO:  Objection to

22         form.  The question

23         mischaracterizes the question as

24         an instruction.

Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT:  Ask another

 2         question, please.

 3              MR. GONZALEZ:  You want me

 4         to rephrase it, Judge?

 5              THE COURT:  Yes.

 6    BY MR. GONZALEZ:

 7         Q.   You sent that e-mail to Mr.

 8    Gonima.  Correct, sir?

 9         A.   Like I said, yes.

10         Q.   And the first invoices for

11    the orders to Oriental Trading Company as

12    the exclusive agent for the Dun brand on

13    behalf of TTP were from -- the products

14    were sent from Qingdao to Miami.

15    Correct?

16              MR. SPANO:  Object to the

17         form.  Object to the form,

18         compound, and there's no

19         foundation that that company

20         served as an exclusive agent.

21              THE COURT:  Just restate it.

22    BY MR. GONZALEZ:

23         Q.   The first shipment by TTP to

24    Oriental Trading Company was from Qingdao
```

Case 2:09-md-02047-EEF-JCW Document 13246-27 Filed 03/26/12 Page 93 of 124
Case 2:09-md-02047-EEF-JCW Document 13254-7 Filed 03/21/12 Page 93 of 124
Confidential - Subject to Further Confidentiality Review

```
 1    to Miami, and it was dated May 28, 2007.

 2    Correct?

 3              MR. SPANO:  Objection to

 4         form.

 5              THE COURT:  I'll overrule

 6         it.  You can answer.

 7              THE WITNESS:  Can you repeat

 8         the question?

 9              THE COURT:  Why don't you

10         read it to him.

11              THE WITNESS:  I don't

12         remember clearly about it.

13    BY MR. GONZALEZ:

14         Q.   I'm going to show you what's

15    been marked as composite Exhibit Number 3

16    to your deposition.

17                   -  -  -

18              (Deposition Exhibit No.

19         Che-3, Packet of Invoices, Bates

20         stamped TG 0019968 through TG

21         0019975, was marked for

22         identification.)

23                   -  -  -

24    BY MR. GONZALEZ:
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Bates stamp number TG 19968
 2   through TG 19975.
 3                 These are invoices for
 4   export from the Taian Shandong province.
 5   Correct, sir?
 6          A.     This is the customized
 7   invoice produced by the taxation bureau.
 8          Q.     The information that's
 9   provided is provided by what company?
10          A.     Which part of the
11   information you're talking about?
12          Q.     How does the province
13   bureau, the Taian Shandong Province
14   Bureau, get the information to put on
15   these sheets?  Who provides the
16   information?
17          A.     The form was made by Taian
18   City Taxation Bureau.  But the
19   information was filled out by the
20   financial department of our company.
21          Q.     Your company being TTP?
22          A.     Yes.
23          Q.     All right, sir.
24                 As reflected in these
```

Confidential - Subject to Further Confidentiality Review

```
 1    invoices, the shipments on all of these

 2    pages were to Miami.  Correct?

 3         A.    No.  Let me finish, please.

 4         Q.    I haven't said a word.

 5               THE INTERPRETER:  Let me

 6         explain to him what the "bless

 7         you" means.

 8               THE WITNESS:  I'm sorry.

 9    BY MR. GONZALEZ:

10         Q.    No problem.

11         A.    Well, the term of the

12    transaction as it reflects here is FOB

13    Chinese port.  And this is the

14    requirement of the customer for us to

15    give to the shipping company.  We don't

16    really know where exactly was the

17    destination of the customer.  The

18    taxation bureau required us to fill out

19    the form, so we don't really know exactly

20    where the shipment was shipped to.

21         Q.    Have you heard of a city

22    called Miami?

23         A.    Miami Heat.

24         Q.    That's right.
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.     Basketball.

 2          Q.     That's in Florida, right,

 3    United States of America?

 4          A.     That I don't know.  I only

 5    know Miami Heat.

 6          Q.     United States.  It's in the

 7    United States.  Right?  Yes?

 8          A.     Yes.

 9          Q.     Okay.

10                 The first page refers to

11    "From:  Qingdao."  That's in China.

12    Correct?

13          A.     Yes.

14          Q.     "To:  Miami."  Right?

15          A.     First of all, it's a

16    customized form which is requested by the

17    taxation bureau for us to fill out.  This

18    is only the information provided by the

19    shipping company of the clients.  We did

20    not actually verify that information.  If

21    they had told us the shipments would have

22    been to the destination of Hong Kong, we

23    would have filled out Hong Kong.

24          Q.     But you filled out Miami,
```

Confidential - Subject to Further Confidentiality Review

1    didn't you?

2         A.    The shipping company of the

3    clients told me this information, and I

4    filled it out according to the

5    information being told, just like what

6    you're seeing right now.

7         Q.    Yes, sir.  And what we're

8    seeing is M-I-A-M-I, Miami.  Right?

9         A.    Yes.

10        Q.    The first page is for 4,900

11   pieces, correct, of gypsum board?

12        A.    That's what it appears to

13   be.

14        Q.    The next one says 5,880

15   pieces of gypsum board to Miami.  Right,

16   sir?

17        A.    Miami is, as what I had

18   explained to you earlier, but the 5,880

19   pieces is correct.

20        Q.    Of gypsum board?

21        A.    That's what it appears to

22   be.

23        Q.    The next page says 1,960

24   pieces of gypsum board.  Right, sir?

Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    And the next page says 4,900

 3   pieces of gypsum board?

 4          A.    Yes.

 5          Q.    And the next page says 2,940

 6   pieces of gypsum board?

 7          A.    Yes.

 8          Q.    And the next page says 2,010

 9   pieces of gypsum board?

10          A.    Yes.

11          Q.    And the next page says 6,700

12   pieces of gypsum board?

13          A.    Yes.

14          Q.    And the next page says 6,700

15   pieces of gypsum board.  Correct, sir?

16          A.    Yes.

17          Q.    And you complied with that

18   request.  Right?  You provided the

19   drywall set forth in these documents?

20          A.    I don't understand, what do

21   you mean by complied with?  What request?

22          Q.    You provided 4,900 pieces of

23   gypsum board for export as indicated in

24   the first document, Bates stamp number
```

```
 1    19968?

 2          A.     I provided to customer at

 3    Chinese port this volume of gypsum board.

 4          Q.     And the volume indicated in

 5    each one of the pages that makes up

 6    composite exhibit Che-3 is accurate.

 7    Correct?

 8          A.     Yes.

 9          Q.     Mr. Peng Wenlong went by the

10    name of Frank Clem as his Western

11    version; is that right?

12          A.     I only know for sure his

13    name is Frank, but I'm not sure about the

14    name after that.

15          Q.     So we're clear, that's the

16    individual that you said was your

17    supervisor in sales while you worked for

18    TTP.  Right?

19          A.     He was a person in charge in

20    our TTP for the sales department.

21          Q.     And earlier when you said

22    that you along with Peng were aware of

23    the sole agency agreement that is Exhibit

24    Number 1 to your deposition with Oriental
```

Confidential - Subject to Further Confidentiality Review

 1   Trading Company, Peng Wenlong is the Peng

 2   you were referring to.  Correct?

 3        A.    Mr. Peng nor I were aware of

 4   the agreement that is written on top over

 5   there.  But it was not like what you have

 6   just said, meant.

 7        Q.    My question is whether Mr.

 8   Peng Wenlong was the individual that you

 9   meant when you said you were aware of the

10   agreement with Oriental Trading Company?

11        A.    Yes.  Yes, the person that

12   was aware of that agreement together with

13   me was Mr. Peng Wenlong.

14        Q.    Mr. Che, you had

15   communications with Ivan Gonima, the

16   principal of Oriental Trading Company, as

17   late as May 27, 2010; is that correct?

18        A.    I don't recall clearly about

19   that.

20        Q.    Do you recall having e-mails

21   sent to Mr. Ivan Gonima providing

22   quotations for gypsum board, metal studs,

23   metal track screws and joining tape on

24   behalf of Taishan Gypsum Company?

Case 2:09-md-02047-EEF-MBN Document 18346-28 Filed 03/26/12 Page 101 of 124
Case 2:09-md-02047-EEF-MBN Document 13454-28 Filed 05/21/12 Page 2 of 25
Confidential - Subject to Further Confidentiality Review

```
 1          A.    I don't remember clearly

 2    about that.

 3          Q.    Is your e-mail address still

 4    SDTH818@163.com?

 5          A.    Yes.

 6          Q.    And is your MSN address

 7    wuyu374@hotmail.com?

 8          A.    Yes.

 9                MR. GONZALEZ:  Your Honor,

10          at this time I'd like to use this

11          document, which I'm showing to you

12          I guess in an in camera capacity

13          at this point.

14                THE INTERPRETER:

15          Interpreter clarification, what do

16          you mean, in camera capacity?

17                MR. GONZALEZ:  It's not for

18          the witness.

19                THE INTERPRETER:  Okay.

20                THE COURT:  All right.

21          Impeachment.

22                MR. GONZALEZ:  May I use it,

23          Your Honor?

24                THE COURT:  Yes.
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. GONZALEZ:

 2           Q.     Let me show you what's been

 3    marked as Che-4 to your deposition.

 4                         -  -  -

 5                  (Deposition Exhibit No.

 6           Che-4, E-mail in Chinese dated May

 7           27, 2010 with attachment, 2 pages,

 8           was marked for identification.)

 9                         -  -  -

10    BY MR. GONZALEZ:

11           Q.     That is an e-mail from you.

12    Correct, sir?

13           A.     Yes.

14           Q.     It says, "From," and that's

15    your name in Chinese, Che Gang?

16           A.     Correct.

17           Q.     And you sent it to Ivan

18    Gonima.  Correct?

19           A.     That's what it appears to

20    be.

21           Q.     And it has a quotation.

22    Right?

23           A.     Whatever appears here is

24    accurate.
```

Confidential - Subject to Further Confidentiality Review

 1          Q.      The attachment is a

 2    quotation on behalf of Taishan Gypsum

 3    Company.  Correct?

 4          A.      If this is indeed the

 5    attachment from this, then this is

 6    correct.

 7          Q.      All right, sir.

 8                  And the date on the e-mail

 9    is May 27, 2010.  Correct?

10          A.      It is May.  Then that's it.

11          Q.      And at that time, when you

12    sent this e-mail, you worked for Taishan.

13    Correct?

14          A.      In the year 2010, I already

15    worked for TG.

16          Q.      TG?

17          A.      TG.

18          Q.      You didn't work for anybody

19    else at that time?

20          A.      No.

21          Q.      And you have --

22                  The quotation you provided

23    was for gypsum board, metal studs, metal

24    tracks, screws and joining tape.

Confidential - Subject to Further Confidentiality Review

```
 1   Correct?
 2          A.     These are all the requests
 3   of the client.
 4          Q.     These are products that
 5   Taishan Gypsum sells.  Correct?
 6          A.     In this period of time, we
 7   could sell these products at Taishan
 8   Gypsum.
 9          Q.     In fact, you prepared this
10   quotation of -- for Taishan Gypsum
11   Company, didn't you?
12          A.     Let me explain.
13          Q.     Well, sir, with all due
14   respect, you can explain, but you need to
15   answer my question first.
16                 You prepared this quotation
17   on behalf of Taishan Gypsum.  Right, sir?
18          A.     The explanation I'm going to
19   explain is answer to question.
20                 THE COURT:  Wait, wait.
21                 THE WITNESS:  Do you want to
22          know --
23                 THE COURT:  You can explain
24          it.  Go ahead.  Answer the
```

Confidential - Subject to Further Confidentiality Review

 1         question.

 2              THE WITNESS:  -- what

 3         really -- what's going on?

 4              At the time we owed Oriental

 5         Trading Company $100,000 when I

 6         worked for TTP.  So all these was

 7         suggestions about how should we

 8         handle that $100,000.  So all

 9         these shipments you're seeing here

10         were suggestions about that issue.

11         Don't only look at the titles.

12    BY MR. GONZALEZ:

13         Q.    Thank you, sir.  That's very

14    helpful.

15              So what you're trying to do

16    is to pay your debt to Oriental Trading

17    through providing some goods as listed in

18    this invoice or quotation from Taishan

19    Gypsum; is that correct?

20         A.    I don't understand.

21         Q.    Why don't you tell me again

22    why it is that you are providing this

23    quotation to Ivan Gonima as a

24    representative of Oriental Trading as it

Confidential - Subject to Further Confidentiality Review

1  relates to the $100,000 that TTP owed it?

2       A.    The customer requested us to

3  prepare this quotation, but as I reminded

4  you earlier, do not only look at the

5  title.

6       Q.    Yes.  You were explaining to

7  me how you were providing this

8  information with respect to monies that

9  were owed to Oriental Trading as a result

10 of transactions done with TTP.

11            Please explain exactly what

12 you meant by that.

13      A.    In this period of time, the

14 company where I worked at had already

15 become TG.  However, I had to handle the

16 money that I owed to him.  Therefore, as

17 I said earlier, do not only look at the

18 title.  This is only a form that I

19 randomly grabbed.  The content of it was

20 for the purpose of handling the $100 of

21 Oriental Trading Company.  This is a

22 fact.

23      Q.    $100,000.  Correct?

24      A.    Correct.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And it was owed by TTP.

 2   Correct?

 3          A.    Correct.

 4          Q.    To Oriental Trading.

 5   Correct?

 6          A.    Correct.

 7          Q.    And you recognize Ivan

 8   Gonima as being part of Oriental Trading?

 9          A.    He claimed to be.

10          Q.    You believed him?

11          A.    The fact reflected during

12   the whole process of operation, that he

13   should be the representative of Oriental

14   Trading Company.

15          Q.    All right, sir.

16                Just so we're clear, when

17   you wrote here on the bottom your name,

18   Bill Che, that's your American name.

19   Right, sir?  Yes?

20          A.    Yes.

21          Q.    And you signed on behalf of

22   Taishan Gypsum Company.  Correct?

23          A.    Like I emphasized earlier --

24                THE INTERPRETER:
```

Confidential - Subject to Further Confidentiality Review

```
 1          Interpreter clarification.

 2              THE WITNESS:  Like I

 3          emphasized earlier, the fact was

 4          for the purpose of the repayment.

 5          Do not keep on falling up on the

 6          frame.

 7  BY MR. GONZALEZ:

 8          Q.    When you worked for TTP,

 9  were you paid by TG?

10          A.    No.

11          Q.    Did you make more money if

12  you had more sales?

13          A.    You can say that.

14          Q.    Yes?

15          A.    Yes.

16          Q.    Did you have a commission or

17  bonus system?

18          A.    Commission?  If you talk

19  about commission in China, that's

20  illegal.

21          Q.    A bonus?

22          A.    We do have bonus.

23          Q.    And you have customers --

24              When you worked for TTP, you
```

Confidential - Subject to Further Confidentiality Review

```
 1   had customers throughout the world?

 2               MR. SPANO:  Objection,

 3        vague.

 4               THE COURT:  Give the dates.

 5        Give the dates.  You said during

 6        the time you worked.

 7   BY MR. GONZALEZ:

 8        Q.    Yes.  During the time you

 9   worked for TTP, did you have customers

10   throughout the world?

11        A.    We only operate based on

12   deliver our products at the ports in

13   China.  As of whether the clients would

14   ship them to all over the world or not,

15   we wouldn't know about that.

16        Q.    My question is, do you know

17   whether you had clients all over the

18   world when you worked for TTP?

19        A.    Like I just answered, we

20   just delivered the goods at Chinese

21   ports.  And whether the customers are in

22   the big scope of all over the world, I

23   don't know that.

24        Q.    What countries do you have
```

Case 2:09-md-02047-EEF-MCW   Document 13246-28 Filed 03/26/12   Page 110 of 124
Case 2:09-md-02047-EEF-MCW   Document 13154-28 Filed 03/21/12   Page 110 of 125
Confidential - Subject to Further Confidentiality Review

1   customers in that you do know of when you

2   worked for TTP?

3        A.   I don't recall the

4   circumstance at that time.  But we only

5   deliver in Chinese ports for our

6   customers.  Therefore, we didn't care

7   where the customer went.

8        Q.   Did you have other customers

9   in the United States of America other

10   than Ivan Gonima, you?

11        A.   Me?

12        Q.   Yes, you personally.

13        A.   Some of my customers claim

14   to be American companies, but I had never

15   verified that fact.

16        Q.   What were their company

17   names?

18        A.   If you ask me to remember on

19   the spot, I couldn't.  Could you give me

20   a reminder?

21        Q.   Do you remember doing

22   business with Ivan Gonima from 2006

23   through 2010?

24        A.   Can you repeat the time?

```
 1          Q.     Yes.   From --

 2                 Do you remember doing

 3     business with Ivan Gonima or his company,

 4     Oriental Trading, from October 2006

 5     through the summer of 2010?

 6                 MR. SPANO:   Objection to

 7          form, to the vagueness of "doing

 8          business."

 9                 THE COURT:   I don't think

10          that's vague.   I'll allow it.

11          Overrule the objection.

12                 THE WITNESS:   Please repeat.

13                 MR. GONZALEZ:   Could you

14          read it back for us, please.

15                 THE WITNESS:   I don't have a

16          clear recollection of the period.

17     BY MR. GONZALEZ:

18          Q.     How did you meet Mr. Gonima

19     or his business, Oriental Trading?

20          A.     Do you need my further

21     explanation?

22          Q.     I want to know how you first

23     met him.

24          A.     When I make my statements, I
```

1    may not be able to give you accurate

2    count as of time.  Approximately in 2006

3    a Chinese person called Wu Jiansong

4    self-claimed to be the representative of

5    a foreign company in China.  He expressed

6    his willingness of purchasing the

7    products of our company, afterwards, even

8    informed us in his e-mail saying that Wu

9    Jiansong represented his company.  And

10   then we were able to have the contact

11   with Oriental company.

12          Q.    How did you have contact

13   with Oriental Trading Company?

14          A.    Through e-mail.

15          Q.    Did you ever meet in person?

16          A.    He once came to visit our

17   plant.

18          Q.    Do you remember having

19   instant messaging conversations with Mr.

20   Gonima, back and forth?

21          A.    We had communication on MSN.

22          Q.    Can you tell us what instant

23   messaging means?

24          A.    I don't understand what you

```
 1    mean by that.
 2          Q.    Where you can send messages
 3    back and forth instantly.  MSN?
 4          A.    In my recollection, it has
 5    always been the case that Mr. Irvine
 6    would left a message for us on MSN.  When
 7    we came to work, we would respond to his
 8    messages.  It was as if e-mail
 9    communications, because we had different
10    working hours.
11          Q.    I want to show you what
12    we'll mark as Exhibit Number 5 to the
13    deposition.
14                    -   -   -
15                (Deposition Exhibit No.
16          Che-5, Printout of Instant
17          Messages, 41 pages, was marked for
18          identification.)
19                    -   -   -
20    BY MR. GONZALEZ:
21          Q.    It purports to be MSN or
22    instant messaging between yourself and
23    Ivan Gonima.  And it is pages 2 through
24    41.
```

Confidential - Subject to Further Confidentiality Review

1           MR. SPANO:  May we have a

2       copy of the exhibit, please?

3           MR. GONZALEZ:  1 through 41,

4       I'm sorry.  Pages 1 through 41.

5   BY MR. GONZALEZ:

6       Q.    And you are referred to in

7   this document as "Mr. Che Gang."

8   Correct?

9       A.    That's what appears to be.

10      Q.    When you use MSN, is it

11  through a phone or is it through a

12  computer?

13      A.    Usually through a computer.

14      Q.    And you were very friendly

15  with Mr. Gonima.  Correct?  Ivan?

16      A.    Out of politeness.

17      Q.    You knew he was from Miami,

18  Florida?

19      A.    He claimed to be.

20      Q.    In fact, you even discussed

21  the fact that you would work on weekends,

22  on Saturdays and Sundays.  Right?

23      A.    Can you point out where is

24  it?

```
 1          Q.    Do you remember having those
 2    conversations?
 3          A.    I don't recall.  I don't
 4    recall.
 5          Q.    Do you recall --
 6                THE COURT:  Let's get to the
 7          meat of it.  We're visiting now.
 8                MR. GONZALEZ:  There's a
 9          method to this, Your Honor, but
10          I'll get right to it.
11    BY MR. GONZALEZ:
12          Q.    Sir, if you could look at
13    page number 2.
14                On February 7, 2007, Mr.
15    Gonima is writing to you.  It's actually
16    from you, Che Gang, to Ivan Gonima.  "We
17    are ready for other products...  please
18    let us know the exact" dates "for
19    different products."
20                Do you remember sending
21    that?
22          A.    That's what appears to be in
23    here, but I don't recall.
24          Q.    The last entry dated
```

Confidential - Subject to Further Confidentiality Review

```
 1    February 7, 2007, you're discussing

 2    setting up a long-term business

 3    relationship with Ivan Gonima offering

 4    the lowest prices?

 5              MR. SPANO:  Note my

 6         objection to the use of this

 7         exhibit that wasn't identified

 8         prior to the deposition in

 9         accordance with the Court's order.

10              THE COURT:  Was this used in

11         a deposition?

12              MR. GONZALEZ:  This was from

13         the deposition of Ivan Gonima,

14         Your Honor.  It's an exhibit to

15         it.

16              I'm sorry, Your Honor.  This

17         was a document that was provided

18         to the Court.

19              MR. DAVIS:  Your Honor, if I

20         may.  I'm sorry.

21              MR. GONZALEZ:  Yes, please.

22              MR. DAVIS:  Your Honor, if I

23         may, this was one of the documents

24         that was provided to you in
```

Confidential - Subject to Further Confidentiality Review

```
 1          advance of the deposition for

 2          impeachment purposes.  That's what

 3          this document is.

 4                THE COURT:  Okay.

 5                You may continue.

 6  BY MR. GONZALEZ:

 7          Q.    Do you remember offering the

 8  lowest prices to Mr. Gonima in order to

 9  set up a long-term business relationship

10  with him?

11          A.    This is only out of

12  politeness.

13          Q.    All right, sir.

14                But you wrote it.  Correct?

15          A.    I don't recall.

16          Q.    It's got on your name on

17  there, doesn't it, Che Gang?

18          A.    Because my MSN is always

19  online in my computer, it is also

20  possible that while I was not in the

21  company, someone else was chatting with

22  him, because no password was needed.

23          Q.    Here's what you said out of

24  politeness to Ivan.  "In order to set up
```

```
 1    long term business relation, we will

 2    offer you the lowest price."  You said

 3    that out of politeness.  Right, sir?

 4         A.    I think this is out of my

 5    politeness.  Just like when I say you are

 6    friend but this is the first time we met.

 7         Q.    Page 3.  Ivan Gonima sends

 8    you a message on February 7, 2007.  "As

 9    you know American manufacturers are

10    lowering their prices."

11              And you respond within

12    seconds to Ivan.  "Yes, I see.  We need

13    to support each other."

14              That's what you wrote in

15    your response.  Right, sir?

16         A.    I'm not sure.

17         Q.    You're not sure if you said

18    that?

19         A.    Correct.  I don't recall.

20    It's like what I had explained to you

21    earlier.  My MSN has always been online

22    in my computer.  Perhaps it was not me

23    who was typing out that, because my

24    English is poor.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Where is your computer
 2   located?  In your business at that time?
 3          A.     In my office.  In my
 4   company.
 5          Q.     Your company, TTP?
 6          A.     You have to look at the
 7   time.
 8          Q.     Time 1:02:26, February 7,
 9   2007.  TTP?
10          A.     Yes.  The computer was in
11   TTP.
12          Q.     Page 4.  I'd like to address
13   your attention to the second entry from
14   Ivan to you.  "Last week on Tuesday we
15   made another 2 transfers from Miami.
16   Wachovia Bank for the last 2 proforma
17   invoices you sent me."
18               Do you recall those
19   transactions, sir?
20          A.     I don't recall.  That's what
21   it appears to be, but I don't recall.
22          Q.     Do you recall having
23   discussions about running weekly orders
24   for 20,000 sheets with Mr. Gonima?
```

Confidential - Subject to Further Confidentiality Review

 1    February 25, 2007, 8:06:26.

 2           A.     Who sent this?

 3           Q.     It says from Ivan to you,

 4    Mr. Che.  And it, quote, states, "Our

 5    goal is to have always weekly orders

 6    running for 20,000 sheets."  And your

 7    response within 3 minutes, on the same

 8    date, "Yes, we will try our best to

 9    prompt our business."

10                  Do you recall that

11    discussion, sir?

12           A.     Should I explain to you

13    again?

14           Q.     Yes.  Do you recall that

15    discussion?

16           A.     My computer has -- had

17    always have MSN online.  I don't recall

18    this issue.  And I'm also not sure that I

19    said that.

20           Q.     So do you think somebody

21    walked into your computer and wrote to

22    Mr. Gonima and sent all these things out?

23           A.     I don't deny that, because

24    I'm not sure of that.

```
 1          Q.     So who do you think did it?
 2   A co-employee?  Who?
 3          A.     I can't -- I cannot guess.
 4          Q.     So somebody was in --
 5          A.     Can I have a glass of water?
 6                 THE COURT:  Can somebody get
 7          him a glass of water.
 8                 THE WITNESS:  Thank you.
 9   BY MR. GONZALEZ:
10          Q.     Somebody pretending to be
11   you was using your MSN text messaging to
12   Mr. Gonima sending information about
13   sales that weren't you.  That's what
14   you're telling us?
15          A.     No.  I'd like to explain to
16   you again.  My computer was at my working
17   location.  My MSN has always been online.
18   Perhaps when I stepped out, the computer
19   was still there.  So MSN would show that
20   somebody was having a conversation.
21   Perhaps somebody from my office saw it
22   and responded to him.  The name that
23   appears to be my name and the customer's
24   name were only the fixed feature formed
```

```
 1    on MSN.  Perhaps it was not Ivan who was

 2    talking to us.  Therefore, I don't think

 3    you can confirm anything based on that.

 4            Q.    Page 12, please.  March 4,

 5    2007.

 6                  Where was your computer?

 7    Was it in an office or was it in a work

 8    area at that time?

 9            A.    I don't understand your

10    question.  Please explain.

11            Q.    Where did you have your

12    computer, in an office, a private office,

13    or in a computer bank area?

14            A.    I'm not sure.

15            Q.    You're not sure if you had a

16    private office or if you worked in an

17    open area with a lot of different

18    computers, like here?

19            A.    First of all, I do not have

20    a private, individual office.  But MSN

21    can be signed on at any computer in any

22    place, as long as you download the MSN

23    tool.  It's been too long.  I cannot

24    verify clearly of what you've asked of
```

Confidential - Subject to Further Confidentiality Review

1    me.  I'm very sorry.  I'm very sorry.

2          Q.    I'd like you to look at page

3    12, the entry of March 4, 2007 at

4    10:25:51 from Ivan to Mr. Che Gang.

5    There's a discussion here about "MILLIONS

6    of sheets!"

7                Do you see that?

8                MR. SPANO:  Objection to

9          form.

10               THE WITNESS:  I don't

11         understand.

12   BY MR. GONZALEZ:

13         Q.    Do you see where it says,

14   "Yes but not that much...remember, this

15   client is talking about MILLIONS of

16   sheets"?

17               If you go a little further

18   down, you're providing him with the best

19   prices for the volume sales and you talk

20   about sending 10,000 sheets by seven

21   days.

22               My question is, do you

23   recall having those discussions with Mr.

24   Gonima?

```
 1              MR. SPANO:  I object to this
 2         question.  It's cherry picking
 3         snippets of conversations and also
 4         misquoting him.
 5              THE COURT:  It's under
 6         cross-examination.  I'll allow it.
 7              Let me make a comment to --
 8         let me make a comment.
 9              I mention this to you,
10         because you should understand the
11         following.  I'm the judge who will
12         preside and is presiding over this
13         case.  I listen very closely to
14         the evidence and to the testimony,
15         and I'm trying to understand it.
16         It's important for me in doing
17         that to also determine the
18         credibility of the witness.  I
19         mention that to you because I'm
20         listening to what you're saying,
21         and I just want you to know that.
22         If you don't understand a
23         question, say it, and it will be
24         restated.  But I'm concerned about
```