Confidential - Subject to Further Confidentiality Review

```
 1          some of the comments that you're

 2          making.  I mention that to you

 3          because I want you to understand

 4          this process, which you may not

 5          understand.

 6               Let's continue.

 7               THE WITNESS:  First of all,

 8          thank you, Judge, for your

 9          reminding -- for your reminder.

10               But what this friend has

11          said has been too long indeed.

12          It's impossible for me to store so

13          many information in my brain.  I

14          can try to help him to recollect.

15               THE COURT:  And if you don't

16          remember, just say you don't

17          remember.

18               THE WITNESS:  I only want to

19          state the facts.

20               THE COURT:  Right.

21               THE WITNESS:  Thank you.

22    BY MR. GONZALEZ:

23          Q.    In addition to drywall, you

24    do recall having discussed selling metal
```

1    framing for purposes of shipment to the

2    United States to Oriental Trading.

3    Correct?

4         A.    It was reflected on the

5    document earlier.

6         Q.    If you can turn to page 28,

7    sir.  The date is May 8, 2007.  The time

8    is 10:34:08.  Ivan writes to you, "We are

9    also going to place our first order for

10   metal framing."

11              Ivan writes to you, "Where

12   in the USA are you exporting your metal

13   framing to?"

14              You respond, as Mr. Che

15   Gang, on May 8, 2007, "The board of first

16   order...have been shipped on 1st" of

17   "May."  The next entry from you to Ivan

18   at 10:35:38 seconds at May 8, 2007,

19   "Miami and New york."

20              Do you recall having that

21   conversation, sir, through this MSN

22   messaging?

23        A.    That's what it appears to

24   be, but I don't recall.

Confidential - Subject to Further Confidentiality Review

```
1        Q.     Page 34, August the 15th,

2   2007, again, metal studs.

3              Do you recall writing to Mr.

4   Che Gang that you on behalf of your

5   company were exporting metal studs to the

6   United States of America?

7        A.     Where is it?

8        Q.     August the 15th, 2007, 10:33

9   53 seconds from Mr. Che Gang to Ivan, "We

10  can operate some metal studs."

11             Answer from Ivan, "Sure, we

12  can do that and it will help."

13             Statement from you at

14  10:34:14, Mr. Che Gang to Ivan, "We are

15  exporting to USA."

16             Do you see that, sir?

17       A.     I am looking at it now.

18       Q.     Do you recall that

19  conversation on August of 2007 by MSN

20  messaging?

21       A.     That's what appears to be

22  here.

23       Q.     Do you recall having

24  discussions for a very long commercial
```

```
 1    relationship with Ivan and your company?
 2                  THE INTERPRETER:
 3          Interpreter clarification.
 4                  THE WITNESS:  Give me
 5          something you're sure of.  I don't
 6          know what you meant by long-term
 7          what.
 8    BY MR. GONZALEZ:
 9          Q.    Page 37.  8/15/2007 is the
10    date.  The time is 10:55:20.  The
11    statement from Ivan to Mr. Che Gang and
12    response by Mr. Che Gang to Ivan.
13    Statement from Mr. Ivan, "We are looking
14    for a very long commercial relationship."
15                  Answer from Che Gang at
16    10:55:52 on the same date, "You can
17    success."
18                  Do you recall that, sir?
19          A.    First of all, let me tell
20    you that the stuff on MSN, as I had also
21    explained to Mr. Judge as well as
22    explained to you, that I do not recall
23    clearly about it.  But from the form that
24    appears here, it should be a polite
```

Confidential - Subject to Further Confidentiality Review

```
 1    response only.  There's no substantial

 2    meaning to that.

 3         Q.    Well, let me ask you this,

 4    sir.  You agree with me that the more

 5    product you sell, the better it is for

 6    the company.  Correct?

 7         A.    For sure.

 8         Q.    And the more product you

 9    sell, the better it is for you?

10         A.    It's better for me.

11         Q.    You would have no objection

12    to selling a lot of product to Ivan

13    Gonima or Oriental Trading.  Correct?

14         A.    It is the same.  It doesn't

15    matter who I sell it to, as long as I get

16    the money.

17         Q.    That's right.  They have to

18    pay you?

19         A.    And then they get the goods.

20         Q.    Right?

21         A.    Therefore, it doesn't matter

22    who I sell it to.

23         Q.    In fact, if you look at the

24    promotional materials that your company,
```

Confidential - Subject to Further Confidentiality Review

```
 1    TTP, had during the time of its

 2    existence, it bragged about the fact that

 3    it sold to the United States of America.

 4    Correct?

 5          A.    I don't know what are the

 6    materials you're referring to here.

 7          Q.    The company held itself out

 8    as a worldwide company.  Correct?

 9          A.    That's only a way for

10    marketing.

11          Q.    Sure.

12                And for marketing purposes,

13    the company held itself as a worldwide

14    company?

15          A.    I don't recall that.

16          Q.    And TG holds itself out as a

17    worldwide company too, doesn't it?

18          A.    I have not paid attention to

19    that.

20          Q.    Can you look at Exhibit 20

21    then, please, that's in front of you.

22          A.    Yes.

23          Q.    That's Jia-20.  Second page.

24    Second page.  Yes.
```

Confidential - Subject to Further Confidentiality Review

1                        The paragraph that states --

2                        This is a marketing material

3      from Shandong Taihe Dongxin, now known as

4      TG.   Correct?

5              A.    It is a brochure of Taihe.

6              Q.    Which is now --

7                        The company is now known as

8      TG.   Yes?

9              A.    Yes.

10             Q.    If you turn to the second

11     page, where it's highlighted there,

12     starting with the statement, "We have a

13     self-supported import and export ability,

14     our products not only sell well in our

15     domestic market also export to many

16     countries e.g. U.A.E., Indonesia, India,

17     Russia, U.S.A."

18                       That's what it says.  Right,

19     sir?  That's what it states?

20             A.    If that's what it says,

21     that's what it says.

22             Q.    All right, sir.

23                       And it's truthful, isn't it?

24             A.    That I don't know.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     You --

 2          A.     Because I'm only a

 3   salesperson.  I'm a user of this

 4   material.  I'm not a decision-maker of

 5   this material, neither am I the producer

 6   of this material.  I'm sorry, I can't

 7   explain to you.

 8          Q.     Maybe you can help me a

 9   little more.

10          A.     I'd love to.

11          Q.     You consider yourself an

12   honorable person, don't you?

13          A.     Absolutely.

14          Q.     And you believe you work for

15   an honorable company, don't you?

16          A.     That's right.

17          Q.     Because honor is extremely

18   important, isn't it?

19          A.     Correct.  The reason I said

20   that is because I want to explain a fact.

21   I am an honest person.  I am only a

22   salesperson.  For greater issues, I do

23   not know.  If you want to buy gypsum

24   board, you can come to me.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     You work for an honorable

 2    company?

 3          A.     I believe so.

 4          Q.     In fact, one of the things

 5    that is stated in that paragraph about

 6    the quality of the company is that it has

 7    strict management.  Correct?  I'm not

 8    done with the question.

 9          A.     I believe personally

10    whatever has been said on a brochure is

11    the fact.  That's my personal opinion,

12    because I work for an honest company.

13          Q.     Thank you, sir.  I

14    appreciate that.

15               THE COURT:  I'd like to go

16          to 5:30 today.

17               MR. GONZALEZ:  Yes, Your

18          Honor, we can.

19               THE WITNESS:  Thank you.

20               Judge, we're all hungry.

21    BY MR. GONZALEZ:

22          Q.     Going to the next statement

23    --

24               You agree with me that the
```

Confidential - Subject to Further Confidentiality Review

```
 1    product that is provided to your

 2    customers should be high quality?

 3         A.    Yes.

 4         Q.    And you agree with me that

 5    your customers should be honored?

 6              THE INTERPRETER:

 7              Interpreter needs a moment for

 8              that.

 9              MR. GONZALEZ:  It's right

10              here.

11              THE WITNESS:  Yes.

12    BY MR. GONZALEZ:

13         Q.    And you agree with me that

14    the company has a keen social

15    responsibility?

16         A.    That's my personal belief.

17         Q.    Now, sir, I'm going to show

18    you what is Bates stamp number TG 0021503

19    through TG 0021505.  And it will be the

20    next exhibit number, which will be Che-6.

21                   -  -  -

22              (Deposition Exhibit No.

23              Che-6, Letter dated November 26,

24              2008, Bates stamped TG 0021501
```

Confidential - Subject to Further Confidentiality Review

```
 1            through TG 0021505, was marked for

 2            identification.)

 3                    -   -   -

 4                    THE WITNESS:  Can I have

 5            these documents?

 6   BY MR. GONZALEZ:

 7            Q.    Yes.

 8            A.    Should I return it back to

 9   you?

10                    THE COURT:  While he's

11            looking at the document, do you

12            want to change the tapes if we

13            need to?

14                    VIDEOTAPE TECHNICIAN:  Thank

15            you.  Going off the record at

16            5:12.

17                    THE WITNESS:  Can I go to

18            the restroom?

19                    THE COURT:  Yes.

20                    THE WITNESS:  Thank you.

21                    -   -   -

22            (A recess was taken from

23            5:12 p.m. to 5:19 p.m.)

24                    -   -   -
```

Confidential - Subject to Further Confidentiality Review

```
 1              VIDEOTAPE TECHNICIAN:  We're

 2         going back on the record.  This is

 3         the beginning of Tape Number 3.

 4         The time is 5:19.

 5  BY MR. GONZALEZ:

 6         Q.    All right, sir.  The exhibit

 7  before you is Exhibit Number 6.  And the

 8  top e-mail is an e-mail that you sent.

 9  Right?

10         A.    Yes.

11         Q.    In fact, it has your name in

12  Chinese and in English, Che Gang and Bill

13  Cher.  Right?

14         A.    I can't see my e-mail

15  address right.

16         Q.    SDTH818@163.com?

17         A.    That's my e-mail address.

18         Q.    All right, sir.

19         A.    But it doesn't have a title

20  like the one that we have.

21         Q.    The document says Bill Cher

22  and it has your name in Chinese as Che

23  Gang.  Right?

24              MR. SPANO:  I object to this
```

Confidential - Subject to Further Confidentiality Review

```
1          use of a partial document.  This

2          is not the whole document.  As you

3          can see, it chops half an e-mail

4          off at the top.

5               THE COURT:  Just give him

6          the whole document.

7               MR. SPANO:  I request that

8          you use the whole document as it

9          was --

10               THE COURT:  That's fair.

11               MR. SPANO:  -- produced by

12          the defendants.

13               MR. GONZALEZ:  Your Honor,

14          this is what was produced by the

15          defendant, and it's TG 0021503

16          through TG 0021505.  And I'll show

17          the Court a copy of it.

18               MR. SPANO:  It's not

19          correct.  It starts at 501.

20               MR. GONZALEZ:  I just don't

21          have it.  I'm happy to use yours.

22               THE COURT:  Give him yours,

23          Frank.  You've got the one.  It's

24          fine.  No. Give the witness it.
```

Confidential - Subject to Further Confidentiality Review

```
 1            That's the main thing.

 2                  MR. SPANO:  I want him to

 3            have a chance to look at it.

 4                  MR. GONZALEZ:  Thanks very

 5            much.

 6                  Do you want me to mark this

 7            one instead?

 8                  MR. SPANO:  Please.

 9                  MR. GONZALEZ:  It will be TG

10            21501 to TG 21505.

11      BY MR. GONZALEZ:

12            Q.    The first page is a letter

13      from Leonardo Guzman, office manager of

14      OTC, Oriental Trading Company, to you at

15      Taian Taishan Plasterboard Company dated

16      November 26, 2008.  And on the top it

17      says "U.S. DUN Distributors."  And it's

18      actually notarized.

19                  Do you recall receiving that

20      letter?  Do you recall receiving that

21      letter?

22            A.    I don't recall clearly about

23      that.

24            Q.    You previously referenced
```

Confidential - Subject to Further Confidentiality Review

1   the $100,000 that TTP needed to reimburse

2   to Oriental Trading Company.

3              Do you recall that testimony

4   earlier today?

5       A.    Yes.

6       Q.    And you were showing me how

7   you were sending out some quotes on

8   products in an attempt to deal with this

9   $100,000 that TTP owed Oriental Trading?

10  Remember --

11      A.    That's the content of the

12  quotation, not the frame.

13      Q.    Now, this letter, November

14  26, 2008, references the $100,000 that

15  you were discussing before.  Correct?

16      A.    That's what it appears to

17  be.

18      Q.    What it states for reference

19  is the letter to you as Mr. Bill Cher at

20  Taian Taishan Plasterboard Company, Ltd.

21  "Dear Mr. Bill Cher:  According to the

22  information sent by Denise Romano (owner

23  of Oriental Trading Company) please we

24  are formally requesting from you a full

Confidential - Subject to Further Confidentiality Review

```
 1    reimbursement of the ONE HUNDRED THOUSAND

 2    DOLLARS...we transferred several months

 3    ago (May 30th 2007) without using it yet.

 4    Please proceed to," and then they gave

 5    you the bank information, which is Bank

 6    of Wachovia Bank, City:  Miami, Florida,

 7    United States of America.  And it is

 8    signed by Leonardo Guzman, office manager

 9    for OTC, on behalf of United States --

10    U.S. DUN Distributors; is that correct?

11         A.    It is not correct.

12         Q.    It is not correct?  What's

13    not correct about it, sir?

14         A.    Right.  First of all, in

15    2008, I already worked at TG.  And also

16    as Dun Distributor, it had never taken

17    effectiveness.  It is only a document

18    that the customer made himself.

19         Q.    Sir, Dun is requesting

20    $100,000 reimbursement.  Correct?

21              Let me clarify the question.

22    Leonard Guzman as the office manager for

23    OTC on letterhead that states U.S. DUN

24    Distributors is requesting from Taian
```

```
 1    Taishan Plasterboard, Attention:  Bill

 2    Cher, reimbursement of $100,000.

 3    Correct?

 4          A.    The request of reimbursement

 5    was the fact.  However, the title -- the

 6    title of this letter was made by the

 7    client.

 8          Q.    That's right.  Because on

 9    November of 2008, Taian Taishan

10    Plasterboard was no longer in existence.

11    Correct?

12          A.    It had stopped operation.

13          Q.    And at the time you worked

14    for TG.  Correct?

15          A.    Correct.

16          Q.    And if you turn to the next

17    page, you responded to Leonardo Guzman.

18    And at the time, you worked for TG.

19    Correct?

20          A.    May I have the date of this

21    e-mail?

22          Q.    It's a response to an e-mail

23    dated -- a letter dated November 26,

24    2008.  And the notary date is December 1,
```

Confidential - Subject to Further Confidentiality Review

```
 1    2008.

 2                So as of that date, you work

 3    for TG.  Correct, sir?

 4                MR. SPANO:  Objection to

 5          form, to the mischaracterization

 6          of this as a response.  There's no

 7          basis for that.

 8    BY MR. GONZALEZ:

 9          Q.    The question is, as of the

10    date of December 1, 2008, you worked for

11    TG?

12          A.    December the 1st, 2008, I

13    was working for TG at the time.

14          Q.    All right, sir.

15                If you turn to the second

16    page of this document and look at a Bates

17    stamp number 21502, you write the

18    following:  "Dear Mr. Guzman, I am glad

19    to receive your information, I have

20    informed you that I will send back your

21    money, but I need your information to do

22    documents for our government, you have

23    send it to me today.  I will make two

24    contracts to you, please sign on them and
```

Confidential - Subject to Further Confidentiality Review

1    send back to me.  Please confirm the

2    following information.  Bank:  Wachovia

3    Bank, City:  Miami, Florida, United

4    States of America, Account...:  Oriental

5    Trading Company, LLC," and then you have

6    the account number.  And it's signed,

7    "Thanks and best wishes!  yours

8    faithfully," and then your name in

9    Chinese, which is Che Gang.  Correct?

10         A.    The Chinese name, Che Gang,

11   is my name.

12         Q.    And the Bill Cher is your

13   Anglo version.  Correct?

14         A.    It is correct that my

15   English name is Bill Cher, but since this

16   document has neither the title nor the

17   bottom part, if you can for sure confirm

18   that this is the correct document, then

19   that's correct.

20         Q.    Do you recall having sent

21   this letter?

22              MR. SPANO:  Objection to

23        form.

24              THE WITNESS:  I don't have a

Case 2:09-md-02047-EEF-JCW Document 13754-29 Filed 03/21/12 Page 20 of 126

Confidential - Subject to Further Confidentiality Review

```
1              clear recollection of dates.

2                   THE COURT:  He answered,

3              I'll allow it.

4                   MR. GONZALEZ:  Do you recall

5              -- I'm sorry.

6                   THE WITNESS:  I have already

7              answered.

8                   THE COURT:  Go ahead.

9                   MR. GONZALEZ:  We can break

10             now, Your Honor, if you'd like.

11             It's already past 5:30.

12                  THE COURT:  Why don't we do

13             that.  And we're going to come

14             back at 8:30, folks.

15                  MR. GONZALEZ:  We have to

16             finish him and then one more

17             witness and we're okay.  And I

18             don't have a lot left.

19                  MR. MEUNIER:  Your Honor, I

20             probably have about two hours with

21             this witness.

22                  VIDEOTAPE TECHNICIAN:  This

23             completes --

24                  THE COURT:  Come back at
```

Confidential - Subject to Further Confidentiality Review

```
 1        8:30.

 2              MR. GONZALEZ:  We're on

 3        schedule, Judge.  We'll be okay.

 4              THE WITNESS:  How long will

 5        that take for me to finish my

 6        deposition?

 7              MR. GONZALEZ:  Tomorrow.

 8              THE WITNESS:  The whole day?

 9              MR. GONZALEZ: Your lawyer

10        has to ask questions too.

11              VIDEOTAPE TECHNICIAN:  We're

12        going off the record at 5:33.

13        This ends today's deposition.

14              (Deposition adjourned at

15        approximately 5:33 p.m.)

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E
 2
 3

                I, ANN MARIE MITCHELL, a
 4   Registered Diplomate Reporter, Certified
     Court Reporter and Notary Public, do
 5   hereby certify that, pursuant to notice,
     the deposition of GANG CHE was duly taken
 6   on January 11, 2012 at 2:29 p.m. before
     me.
 7
 8              The said GANG CHE was duly
     sworn by The Court according to law to
 9   tell the truth, the whole truth and
     nothing but the truth and thereupon did
10   testify as set forth in the above
     transcript of testimony.  The testimony
11   was taken down stenographically by me.
12
                I do further certify that
13   the above deposition is full, complete
     and a true record of all the testimony
14   given by the said witness.
15
16

              Ann Marie Mitchell
17            Registered Diplomate Reporter
              Certified Realtime Reporter
18
19
20              (The foregoing certification
     of this transcript does not apply to any
21   reproduction of the same by any means,
     unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3

 4              Please read your deposition

 5   over carefully and make any necessary

 6   corrections.  You should state the reason

 7   in the appropriate space on the errata

 8   sheet for any corrections that are made.

 9

10              After doing so, please sign

11   the errata sheet and date it.  It will be

12   attached to your deposition.

13

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        - - - - - -

                         E R R A T A

 2                        - - - - - -

 3      PAGE   LINE   CHANGE

 4      ____   ____   _____

 5        REASON:   ____ _____

 6      ____   ____   _____

 7        REASON:   ____ _____

 8      ____   ____   _____

 9        REASON:   _____ _____

10      ____   ____   _____

11        REASON:   _____ _____

12      ____   ____   _____

13        REASON:   _____ _____

14      ____   ____   _____

15        REASON:   _____ _____

16      ____   ____   _____

17        REASON:   _____ _____

18      ____   ____   _____

19        REASON:   _____ _____

20      ____   ____   _____

21        REASON:   _____ _____

22      ____   ____   _____

23        REASON:   _____ _____

24
```

Confidential - Subject to Further Confidentiality Review

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
                I,_____, do
 4     hereby certify that I have read the
       foregoing pages, 1-124, and that the same
 5     is a correct transcription of the answers
       given by me to the questions therein
 6     propounded, except for the corrections or
       changes in form or substance, if any,
 7     noted in the attached Errata Sheet.
 8

       _____
 9     GANG CHE                        DATE
10
11
12
13
14
15
       Subscribed and sworn
16     to before me this
       _____ day of _____, 20____.
17
       My commission expires:_____
18
19     _____
       Notary Public
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    LAWYER'S NOTES

 2     PAGE  LINE

 3     _____ _____   _____

 4     _____ _____   _____

 5     _____ _____   _____

 6     _____ _____   _____

 7     _____ _____   _____

 8     _____ _____   _____

 9     _____ _____   _____

10     _____ _____   _____

11     _____ _____   _____

12     _____ _____   _____

13     _____ _____   _____

14     _____ _____   _____

15     _____ _____   _____

16     _____ _____   _____

17     _____ _____   _____

18     _____ _____   _____

19     _____ _____   _____

20     _____ _____   _____

21     _____ _____   _____

22     _____ _____   _____

23     _____ _____   _____

24     _____ _____   _____
```

# EXHIBIT F



Transcript of the Testimony of: **Gang Che**

01/12/2012

Chinese Drywall

Confidential - Subject to Further Confidentiality Review

```
 1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
 2

 3    _____     § MDL NO. 2047
                                  §
      IN RE:                      §
 4    CHINESE-                    § SECTION: L
      MANUFACTURED                §
 5    DRYWALL PRODUCTS            § JUDGE FALLON
      LIABILITY                   §
 6    LITIGATION                  § MAGISTRATE
                                  § JUDGE WILKINSON
      _____
 7
                       -   -   -
 8

       CROSS NOTICED IN VARIOUS OTHER ACTIONS
 9
                       -   -   -
10

                  January 12, 2012
11
                       -   -   -
12

         CONFIDENTIAL - SUBJECT TO FURTHER
13             CONFIDENTIALITY REVIEW
14                     -   -   -
15         Continued videotaped deposition of
      GANG CHE, held at the Executive Centre,
16    Level 3, Three Pacific Place, One Queen's
      Road East, Hong Kong, China, commencing
17    at 8:28 a.m., on the above date, before
      Ann Marie Mitchell, Certified Court
18    Reporter, Registered Diplomate Reporter,
      Certified Realtime Reporter and Notary
19    Public.
                       -   -   -
20
21
22           GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com
24
```

Confidential - Subject to Further Confidentiality Review

```
 1   BEFORE:
 2           HONORABLE ELDON E. FALLON
             UNITED STATES FEDERAL COURT -
 3           EASTERN DISTRICT OF LOUISIANA
 4
 5   APPEARANCES:
 6
     GAINSBURGH, BENJAMIN, DAVID, MEUNIER
 7   & WARSHAUER, L.L.C.
     BY:  GERALD E. MEUNIER, ESQUIRE
 8   2800 Energy Centre
     1100 Poydras Street
 9   New Orleans, Louisiana 70163
     (504) 522-2304
10   gmeunier@gainsben.com
     Representing the Plaintiffs'
11   Steering Committee
12
     HERMAN HERMAN KATZ & COTLAR, LLP
13   BY:  LEONARD A. DAVIS, ESQUIRE
     820 O'Keefe Avenue
14   New Orleans, Louisiana 70113
     (504) 581-4892
15   Ldavis@hhkc.com
     Representing the Plaintiffs'
16   Steering Committee
17
     COLSON HICKS EIDSON
18   BY:  ERVIN GONZALEZ, ESQUIRE
     BY:  PATRICK S. MONTOYA, ESQUIRE
19   255 Alhambra Circle
     Penthouse
20   Coral Gables, Florida 33134
     (305) 476-7400
21   Ervin@colson.com
     Patrick@colson.com
22   Representing Plaintiffs' Steering
     Committee in the Federal and State
23   Coordinated Actions
24
```

Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (CONTINUED):
 2

     LEVIN, FISHBEIN, SEDRAN & BERMAN
 3   BY:  ARNOLD LEVIN, ESQUIRE
     510 Walnut Street - Suite 500
 4   Philadelphia, Pennsylvania 19106
     (215) 592-1500
 5   Alevin@lfsblaw.com
     Representing the Plaintiffs'
 6   Steering Committee
 7

     SEEGER WEISS LLP
 8   BY:  SCOTT A. GEORGE, ESQUIRE
     One William Street
 9   New York, New York 10004
     (212) 584-0700
10   Sgeorge@seegerweiss.com
     Representing the Plaintiffs'
11   Steering Committee
12

     HOGAN LOVELLS US LLP
13   BY:  JOE CYR, ESQUIRE
     BY:  FRANK T. SPANO, ESQUIRE
14   875 Third Avenue
     New York, New York 10022
15   (212) 918-3000
     Joe.cyr@hoganlovells.com
16   frank.spano@hoganlovells.com
     Representing Taishan Gypsum Co.
17   Ltd. and Taian Taishan
     Plasterboard Company Ltd. and the
18   Witness, Gang Che
19

     HOGAN LOVELLS INTERNATIONAL LLP
20   BY:  EUGENE CHEN, ESQUIRE
     18th Floor, Park Place
21   1601 Nanjing Road West
     Shanghai, China 200040
22   (86 21) 6122 3800
     eugene.chen@hoganlovells.com
23   Representing Taishan Gypsum Co.
     Ltd. and Taian Taishan Plasterboard
24   Company Ltd. and the Witness, Gang Che
```

```
 1    APPEARANCES (CONTINUED):
 2
          GREENBERG TRAURIG, LLP
 3        BY:  HILARIE BASS, ESQUIRE
          1221 Brickell Avenue
 4        Miami, Florida 33131
          (305) 579-0745
 5        bassh@gtlaw.com
          Representing the Home Builders
 6        Steering Committee
 7
          PERKINS COIE LLP
 8        BY:  DAVID L. BLACK, ESQUIRE
          1899 Wynkoop Street
 9        Suite 700
          Denver, Colorado 80202
10        (303) 291-2300
          DBlack@perkinscoie.com
11        Representing the State of Louisiana
12
          THOMPSON COE COUSINS & IRONS, L.L.P.
13        BY:  KEVIN F. RISLEY, ESQUIRE
          One Riverway
14        Suite 1600
          Houston, Texas 77056
15        (713) 403-8210
          krisley@thompsoncoe.com
16        Representing The North River
          Insurance Company
17
18        BRENNER, EVANS & MILLMAN, P.C.
          BY:  THEODORE I. BRENNER, ESQUIRE
19        411 East Franklin Street
          Suite 200
20        Richmond, Virginia 23218
          Tbrenner@beylaw.com
21        (804) 644-1300
          Representing Tobin Trading Company
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (CONTINUED):
 2
      McKENRY, DANCIGERS, DAWSON &
 3    LAKE, P.C.
      BY:  J. BRIAN SLAUGHTER, ESQUIRE
 4    192 Ballard Court
      Suite 400
 5    Virginia Beach, Virginia 23462
      (757) 461-2500
 6    Jbslaughter@va-law.org
      Representing Atlantic Homes LLC and
 7    Multiple Other Virginia-Based
      Defendants
 8
 9    QUINN EMANUEL URQUHART & SULLIVAN, LLP
      BY:  JANE M. BYRNE, ESQUIRE
10    BY:  JULIA BESKIN, ESQUIRE
      51 Madison Avenue
11    22nd Floor
      New York, New York 10010
12    (212) 849-7000
      Janeburne@quinnemanuel.com
13    Juliabeskin@Quinnemanuel.Com
      Representing Chartis Select Insurance
14    Company and Related Chartis Insurers
15
      WEINBERG, WHEELER, HUDGINS, GUNN &
16    DIAL, LLC
      BY:  MICHAEL SEXTON, ESQUIRE
17    3344 Peachtree Road, NE
      Suite 2400
18    Atlanta, Georgia 30326
      (404) 876-2700
19    msexton@wwhgd.com
      Representing Various Banner
20    Defendants
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1        APPEARANCES (CONTINUED):
 2

          SINNOTT, NUCKOLS & LOGAN, PC
 3        BY:  KENNETH F. HARDT, ESQUIRE
          13811 Village Mill Drive
 4        Midlothian, Virginia 23114
          (804) 378-7600
 5        khardt@snllaw.com
          Representing Venture Supply, Inc. and
 6        Porter-Blaine Corp.
 7

     ALSO PRESENT:
 8

          SUNNY WANG, INTERPRETER
 9
10

                         -   -   -

11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1    APPEARANCES VIA TELEPHONE:
 2

      HUNTON & WILLIAMS LLP
 3    BY:  A. TODD BROWN, ESQUIRE
      Bank of America Plaza
 4    101 South Tryon Street
      Suite 3500
 5    Charlotte, North Carolina  28280
      (704) 378-4700
 6    Representing Stock Building Supply, LLC
 7
 8    JONES, WALKER, WAECHTER, POITEVENT,
      CARRERE & DENEGRE LLP
 9    BY:  MEGAN E. DONOHUE, ESQUIRE
      600 Jefferson Street, Suite 1600
10    Lafayette, Louisiana 70501
      (337) 262-9062
11    mdonohue@joneswalker.com
      Representing Fireman's Fund Insurance
12    Company
13
      FULMER LEROY ALBEE BAUMANN
14    BY:  MICHAEL P. McCAHILL, ESQUIRE
      2866 East Oakland Park Boulevard
15    Ft. Lauderdale, Florida 33306
      (954) 707-4430
16    mmccahill@fulmerleroy.com
      Representing Independent Builders
17    Supply Association (IBSA)
18
19
20
21
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 13246-30 Filed 03/26/12 Page 36 of 126
Case 2:09-md-02047-EEF-JCW Document 13254-3 Filed 03/21/12 Page 9 of 126
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM:
 2
        BECNEL LAW FIRM, L.L.C.
 3      BY:  DANIEL E. BECNEL, JR., ESQUIRE
        BY:  ROBERT BECNEL, ESQUIRE
 4      106 W. 7th Street
        Reserve, Louisiana 70084
 5      (985) 536-1186
        dbecnel@becnellaw.com
 6      robbecnel@aol.com
        Representing the Plaintiffs'
 7      Steering Committee
 8
        PARKER WAICHMAN ALONSO LLP
 9      BY:  JORDAN L. CHAIKIN, ESQUIRE
        3301 Bonita Beach Road
10      Bonita Springs, Florida 34134
        (239) 390-1000
11      Jchaikin@yourlaywer.com
        Representing Plaintiffs' Steering
12      Committee
13
        MORGAN & MORGAN
14      BY:  PETE V. ALBANIS, ESQUIRE
        12800 University Drive
15      Suite 600
        Fort Myers, Florida 33907
16      (877) 667-4265
        Representing the Plaintiffs
17
18      IRPINO LAW FIRM
        BY:  ANTHONY IRPINO, ESQUIRE
19      2216 Magazine Street
        New Orleans, Louisiana 70130
20      Airpino@irpinolaw.com
        (504) 525-1500
21      Representing the Plaintiffs
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3        GALLOWAY JOHNSON TOMPKINS BURR and SMITH
          BY:  CARLINA C. EISELEN, ESQUIRE
 4        One Shell Square
          701 Poydras Street, 40th Floor
 5        New Orleans, Louisiana 70139
          (504) 525-6802
 6        ceiselen@gjtbs.com
          Representing Interior/Exterior
 7        Building Supply
 8
          HEARD & MEDACK, P.C.
 9        BY:  JAMES DAVIS, ESQUIRE
          9494 Southwest Freeway, Suite 700
10        Houston, Texas 77074
          (713) 772-6400
11        jdavis@heardmedackpc.com
          Representing CastleRock Communities, L.P.
12
13
          HUNTON & WILLIAMS LLP
14        BY:  A. TODD BROWN, ESQUIRE
          Bank of America Plaza
15        101 South Tryon Street
          Suite 3500
16        Charlotte, North Carolina  28280
          (704) 378-4700
17        tbrown@hunton.com
          Representing Stock Building Supply, LLC
18
19
          SHER GARNER CAHILL RICHTER KLEIN &
20        HILBERT, L.L.C.
          BY:  MATTHEW C. CLARK, ESQUIRE
21        909 Poydras Street
          Suite 2800
22        New Orleans, Louisiana 70112
          (504) 299-2100
23        mclark@shergarner.com
          Representing the Southern Home
24        Defendants
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3         QUINN EMANUEL URQUHART & SULLIVAN, LLP
           BY: CLINTON DOCKERY, ESQUIRE
 4         51 Madison Avenue, 22nd Floor
           New York, New York 10010
 5         (212) 849-7000
           clintondockery@quinnemanuel.com
 6         Representing Chartis Select Insurance
           Company and Related Chartis Insurers
 7
 8         JONES, WALKER, WAECHTER, POITEVENT,
           CARRERE & DENEGRE LLP
 9         BY:  MEGAN E. DONOHUE, ESQUIRE
           600 Jefferson Street, Suite 1600
10         Lafayette, Louisiana 70501
           (337) 262-9062
11         mdonohue@joneswalker.com
           Representing Fireman's Fund Insurance
12         Company
13
           PUGH, ACCARDO, HAAS, RADECKER, CAREY
14         & HYMEL LLC
           BY:  DONNA M. YOUNG, ESQUIRE
15         1100 Poydras Street
           Suite 3200
16         New Orleans, Louisiana 70163
           (504) 799-4500
17         dyoung@pugh-law.com
           Representing Stock Building Supply
18
19         DEUTSCH, KERRIGAN & STILES
           BY:  MELISSA M. SWABACKER, ESQUIRE
20         755 Magazine St.
           New Orleans, Louisiana  70130
21         (504) 581-5141
           mswabacker@dkslaw.com
22         Representing Landmark American
           Insurance Company
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM (CONTINUED):

 2

         WEINBERG, WHEELER, HUDGINS, GUNN &

 3       DIAL, LLC

         BY:  SHUBHRA MASHELKAR, ESQUIRE

 4       3344 Peachtree Road, NE

         Suite 2400

 5       Atlanta, Georgia 30326

         (404) 876-2700

 6       Smashelkar@wwhgd.com

         Representing Various Banner

 7       Defendants

 8                 -  -  -

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2                     I N D E X
 3                        -   -   -
 4
 5    Testimony of:  GANG CHE
 6       By Mr. Gonzalez            141
         By Mr. Meunier             184
 7       By Mr. Spano               341
         By Mr. Gonzalez            378
 8       By Mr. Meunier             391
 9
                          -   -   -
10
                     E X H I B I T S
11
                          -   -   -
12
13       NO.                 DESCRIPTION    PAGE
14       Che              E-mail dated      342
         Defendant's-1    8/30/2006, Bates
15                        stamped TG
                          0000575
16
         Che              Tai'an Taishan    356
17       Defendant's-2    Plasterboard Co.,
                          Ltd. Manufacturer
18                        Profile Form
19       Che-7            Re-Notice of Oral 185
                          and Videotaped
20                        Deposition
                          Pursuant to Fed.
21                        R. Civ. P.
                          30(b)(6), 17
22                        pages
23
24
```

Case 2:09-md-02047-EEF-MBN Document 13246-30 Filed 03/26/12 Page 41 of 126
Case 2:09-md-02047-EEF-MBN Document 13254-30 Filed 03/26/12 Page 15 of 126
Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Che-8 | E-mail chain, top one | 200 |
| 2 | | dated 8 Nov 2006, Bates stamped TG | |
| 3 | | 0000521 through TG 0000526 | |
| 4 | Che-9 | E-mail dated | 210 |
| 5 | | 1/10/2007, Bates stamped TG 0000628 | |
| 6 | Che-10 | E-mail chain, top one | 240 |
| 7 | | dated 4/18/2007, Bates stamped TG 0000913 and | |
| 8 | | TG 0000914 | |
| 9 | Che-11 | E-mail dated 5/10/2007, Bates stamped TG 0000902 | 246 |
| 10 | | | |
| 11 | Che-12 | E-mail chain, top one dated Dec 19, 2008, | 252 |
| 12 | | Bates stamped TG 0021477 | |
| 13 | Che-13 | E-mail chain, top one | 257 |
| 14 | | dated March 6, 2009, Bates stamped TG 0021470 | |
| 15 | | | |
| 16 | Che-14 | E-mail dated 1/5/2006, Bates stamped TG 0000886 | 262 |
| 17 | | | |
| 18 | Che-15 | E-mail chain, top one dated 1/10/2006, Bates | 264 |
| 19 | | stamped TG 0000907 and TG 0000908 | |
| 20 | Che-16 | E-mail chain, top one dated 7/3/2006, TG | 275 |
| 21 | | 0019383 | |
| 22 | Che-17 | Letter dated 10-31-06, Bates stamped TG | 282 |
| 23 | | 0019376 | |
| 24 | | | |

Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Che-18 | E-mail chain, top one dated 7/10/2006, Bates stamped TG 0000631 and TG 0000633 | 284 |
| 2 | | | |
| 3 | | | |
| 4 | Che-19 | Contract dated 2th Sep. 2006, Bates stamped TG 0021704 and TG 0021705 | 293 |
| 5 | | | |
| 6 | Che-20 | Page of Contract, Bates stamped TG 0021695 | 295 |
| 7 | | | |
| 8 | Che-21 | Contract dated 23rd November 2006, Bates stamped TG 0021696 | 298 |
| 9 | | | |
| 10 | Che-22 | E-mail chain, top one dated November 24, 2006, Bates stamped TG 0021702 and TG 0021698 | 301 |
| 11 | | | |
| 12 | | | |
| 13 | Che-23 | E-mail chain, top one dated 2/16/2007, Bates stamped TG 0000485 | 303 |
| 14 | | | |
| 15 | Che-24 | E-mail chain, top one dated 4/10/2007, Bates stamped TG 0000514 | 307 |
| 16 | | | |
| 17 | Che-25 | E-mail chain, top one dated 4/21/2008, Bates stamped TG 0000843 | 310 |
| 18 | | | |
| 19 | Che-26 | Sales Contract dated 13th Feb. 2007, TG 0019685 through TG 0019687 | 316 |
| 20 | | | |
| 21 | Che-27 | E-mail dated 2/13/2007 and attachment, Bates stamped TG 0019683 and TG 0019684 | 318 |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Che-28 | E-mail chain, top one dated 1/28/2007, Bates | 320 |
| 2 | | stamped TG 0019701 | |
| 3 | Che-29 | E-mail dated July 14, | 323 |
| | | 2007, Bates stamped TG | |
| 4 | | 0021997 | |
| 5 | Che-30 | E-mail with date in | 328 |
| | | Chinese, Bates stamped | |
| 6 | | TG 0021469 | |
| 7 | Che-31 | E-mail dated June 7, | 331 |
| | | 2007 with attachment, | |
| 8 | | Bates stamped TG | |
| | | 0021242 and TG 0021243 | |
| 9 | | | |
| | Che-32 | E-mail dated June 20, | 335 |
| 10 | | 2007 with attachment, | |
| | | Bates stamped TG | |
| 11 | | 0021228 through TG | |
| | | 0021232 | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

        Direction to Witness Not to Answer

 5

                    Page Line

 6

 7

 8

 9

        Request for Production of Documents

10

                    Page Line

11

12

13

14

                    Stipulations

15

                    Page Line

16

17

18

19

                  Question Marked

20

                    Page Line

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1              VIDEOTAPE TECHNICIAN:  We're

 2         now on the record.  My name is Dan

 3         Lawlor.  I'm the videographer for

 4         Golkow Technologies.

 5              Today's date is January 12,

 6         2012, and the time is 8:28 a.m.

 7         This is a continuation of the

 8         deposition of Che Gang.  Our court

 9         reporter today is Ann Marie

10         Mitchell.  And, Your Honor, you

11         may proceed.

12              THE COURT:  Sir, you're

13         still under oath.

14              You may proceed, Counsel.

15              MR. GONZALEZ:  Yes, Your

16         Honor.

17                    -  -  -

18              EXAMINATION

19                    -  -  -

20    BY MR. GONZALEZ:

21         Q.    Good morning, sir.

22         A.    Good morning.

23         Q.    I'm going to show you what's

24    been marked as Exhibit Number 30 to Mr.
```

Case 2:09-md-02047-EEF-MBN  Document 13254-30  Filed 03/21/12  Page 20 of 126
Confidential - Subject to Further Confidentiality Review

```
 1    Jia's deposition.  This is a contract for

 2    drywall between the seller, Shandong

 3    Taihe Dongxin, now known as TG, and the

 4    buyer, Venture Supply with an address of

 5    Norfolk, Virginia, for the sale of

 6    100,000 sheets of standard gypsum board.

 7              Were you the seller of this

 8    product to that company?

 9              MR. SPANO:  Objection to

10         form.  According to what I'm

11         reading here, the question said

12         Banner Supply.  I don't think that

13         was intended.

14              MR. EUGENE CHEN:  That's how

15         it was translated as well, or in

16         the translation, Banner Supply.

17              THE COURT:  Did you ask

18         Banner?

19              MR. GONZALEZ:  No, Your

20         Honor, I didn't.

21              THE COURT: Okay.

22              THE INTERPRETER:  Venture

23         Supply?

24              MS. BASS:  It's Venture
```

Confidential - Subject to Further Confidentiality Review

```
 1           Supply.  Thank you.
 2                THE COURT:  Okay.  It's
 3           Venture.
 4      BY MR. GONZALEZ:
 5           Q.    Were you the seller of this
 6      product to Venture Supply?
 7           A.    I'm sorry, I'm not aware of
 8      this transaction.
 9           Q.    Can you look at the
10      signature line on the second page.
11                Can you tell us whose
12      signature that is?
13           A.    I believe it's Mr. Fu's.  I
14      don't have a clear view of this, but it
15      should be his.  There is a seal on top of
16      it.
17           Q.    Who is Mr. Fu?
18           A.    The Mr. Fu who came to
19      testify the day before yesterday.
20           Q.    He was a co-employee of
21      yours at TTP at the time of this -- oh,
22      I'm sorry.
23                He was a co-employee of
24      yours at TG, December of 2005?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    Can you tell us what the

 3   language in Chinese is inside of the

 4   seal?

 5          A.    Shandong Taihe Dongxin

 6   Company, Limited.

 7          Q.    When you were working for

 8   TTP, what was the relationship that TTP

 9   had with TG, if any?

10                MR. SPANO:  Objection to

11          form.

12                THE COURT:  He said if any.

13          I'll allow it.  Overruled.

14                THE WITNESS:  What is it?

15          Can you repeat?

16   BY MR. GONZALEZ:

17          Q.    Yes, sir.

18                When you were working for

19   TTP, what relationship did TTP have with

20   TG, if any?

21          A.    What do you mean by if any?

22          Q.    Do you know the working

23   relationship between TTP and TG at the

24   time that you worked for TTP?
```

Confidential - Subject to Further Confidentiality Review

```
 1            A.    I'm sorry, I'm only a

 2     salesperson.  I'm not sure.

 3            Q.    If somebody from TG asked

 4     you to do something while you were

 5     working for TTP, would you do it?

 6            A.    If it -- if it is private

 7     request between friends, because I used

 8     to work for TG.  It depends on what was

 9     the circumstance.

10            Q.    So if somebody from TG that

11     you knew would ask you to do something

12     for TG while you worked for TTP, you

13     would do it?

14            A.    I said it depends.

15            Q.    Did someone from T --

16            If a big boss from TG came

17     into TTP to want to fire somebody that

18     worked for TTP, were they able to do it,

19     based on your understanding?

20            A.    It's not what I could

21     understand.

22            Q.    You don't know?  I'm sorry,

23     you don't understand my question or...

24            A.    I meant I don't know.
```

Confidential - Subject to Further Confidentiality Review

1          Q.     You don't know.

2                 And so I can clarify, if a

3     big boss from TG could walk into TTP and

4     say, this needs to change or that person

5     needs to be fired, would they have the

6     authority to do so, based on your

7     understanding?

8          A.     I don't know.

9          Q.     Did you ever have officials

10    from TG tour the TTP offices and plant,

11    to your knowledge?

12         A.     I didn't pay attention.

13         Q.     Do you recall that ever

14    happening?

15         A.     I don't recall.

16         Q.     How many of your employees

17    at TTP do you recall having positions

18    with both TTP and TG at the same time?

19         A.     I don't know.

20         Q.     When you volunteered to work

21    at TTP, did you volunteer to work -- do

22    you need some water?  Please.

23         A.     Thank you.

24         Q.     Okay.

Confidential - Subject to Further Confidentiality Review

```
 1                    When you volunteered to work

 2      at TTP at the time that you were working

 3      at TG, did you volunteer to go to the

 4      sales department or did someone ask you

 5      to go to the sales department of TTP?

 6              A.    I volunteered to work in the

 7      sales department of TTP.

 8              Q.    Who did you announce that

 9      to?

10              A.    A few of us had a

11      discussion, and then we decided there

12      were bigger development space over there,

13      so we went over there.

14              Q.    My question is, who did you

15      tell?

16              A.    Can you explain, what do you

17      mean, who did I tell?

18              Q.    Let me give you an example.

19      If I were going to volunteer to do

20      something at another company, I would

21      first have to tell my current boss in my

22      company, I'm going to go volunteer to

23      work at that company, and then I would

24      have to go speak to the boss at the new
```

Confidential - Subject to Further Confidentiality Review

1    company and say, I volunteer to work for

2    your company.

3              Who did you speak with?

4         A.    At the time I was only a

5    salesperson, a person who was in charge

6    of sales.  I only told Mr. Peng.  And

7    then we went to the other office,

8    expressed our willingness to volunteer

9    work at TTP.  TTP's office, that was.

10        Q.    Who is Mr. Peng?

11        A.    Peng Wenlong.

12        Q.    And Mr. Peng Wenlong also

13    went with you to TTP?

14        A.    Correct.

15        Q.    Who did you speak with at

16    TTP to volunteer?

17        A.    I went to register at TTP's

18    office.

19        Q.    Did you speak with a person?

20        A.    Of course I talked to a

21    person.

22        Q.    Can you tell us who you

23    talked to?

24        A.    I don't recall.

```
 1              Q.     Who was the first person you

 2    recall speaking with about working at TTP

 3    as a salesperson?  For example, if I were

 4    you, and you were the person that was

 5    going to be in charge of making sure you

 6    have a sales staff, I may say, hi, I'm

 7    Ervin, I would like to work in your sales

 8    department, can you use me.

 9              Did you have such a

10    conversation?

11              A.     I don't understand what you

12    mean.

13              Q.     Did you have to apply for

14    the position, or once you volunteered,

15    you had the position?

16              A.     As long as you register at

17    the TTP office, which I mentioned

18    earlier, and they thought it was okay,

19    then it was okay.

20              Q.     So you didn't go through an

21    interview process.  Correct?

22              A.     I don't know whether go to

23    register would be count as interview.

24              Q.     When was your last day at TG
```

```
 1    and when was your first day at TTP?

 2           A.    I don't have a clear

 3    recollection of that.

 4           Q.    Did you change offices,

 5    physical offices?

 6           A.    You mean after I changed my

 7    company?

 8           Q.    Yes.

 9           A.    Yes.

10           Q.    Where did you move from?

11           A.    From TG's office.

12           Q.    Where was it, TG's office,

13    in comparison to the TTP office?

14           A.    Do I need to let you know

15    the details?

16           Q.    Yes, if you know them.

17           A.    TG's office was located in

18    Shandong province, Taian city, Daiyue

19    district, Dawenkou, while TTP's office

20    was located in Shandong province, Taian

21    city, Daiyue district, Dawenkou town,

22    Houzhou village.

23           Q.    And you worked in both

24    places?  First when you worked at TG you
```

1    worked at the address you just gave me

2    for TG, and when you worked at TTP, you

3    worked at the address for TTP; is that

4    correct?

5              A.    Correct.

6              Q.    I'm going to show you what's

7    been marked as Exhibit 31 to Mr. Jia.  It

8    is an e-mail from Tanader Tang to Wuyu,

9    sdth818@163.com, dated July 27, 2006,

10   Bates stamp number TG 19348 through TG

11   19352.  And it starts with Chinese

12   language for two pages and then continues

13   on to some invoice looking matter.

14              THE INTERPRETER:  Sorry,

15          Counsel, what was your question?

16          The last of the question.

17   BY MR. GONZALEZ:

18              Q.    Yes.

19              Was this e-mail sent to you?

20              A.    Can you give me a moment to

21   take a look?

22              Q.    I'm talking about the first

23   page.  At the top, yes.

24              A.    Do I only look at the first

Confidential - Subject to Further Confidentiality Review

1    page?

2          Q.     For right now.

3          A.     Yes.

4          Q.     And is the bottom part in

5    Chinese something that you sent?

6          A.     You mean this page and this

7    page following that page?

8          Q.     If you look at the e-mail on

9    the top it says from Wuyu.  I think it

10   says it.

11              What does it say here in

12   Chinese?  Is that to or --

13         A.     Is this a title of the

14   e-mail?

15         Q.     No.  I'm asking you because

16   I don't understand Chinese.

17              What does this say?

18         A.     Sender.

19         Q.     Sender.

20              And is that you, the sender?

21         A.     The sender's e-mail address

22   is mine.

23         Q.     And you sent it to whom?

24              THE INTERPRETER:  I'm sorry,

Confidential - Subject to Further Confidentiality Review

1          what did you say?

2   BY MR. GONZALEZ:

3          Q.    To whom did you send it?

4          A.    The person who received the

5   e-mail.

6          Q.    Is that Tanader Tang?

7          A.    It says this.

8          Q.    Is this Tanader Tang?

9          A.    A Manager Tang.

10         Q.    And the subject is "Taihe:

11  Drywall"; is that correct?

12               MR. SPANO:  Object to the

13         form of the question.  It

14         mischaracterizes the document,

15         which is a reply to an e-mail that

16         had that subject line.

17               THE COURT:  Okay.  Yeah.

18         Let's clarify that, Ervin.

19  BY MR. GONZALEZ:

20         Q.    I'm referring to the very

21  top where it says "re."

22               The "re" says "Taihe:

23  Drywall"; is that correct?

24         A.    Do I need to answer a

1    question?

2           Q.    Yes.

3                 Is it correct that it's

4    referring to Taihe drywall?

5           A.    I'm sorry, "re" is reply,

6    which means I did not come up with the

7    subject.

8           Q.    Sir, here's my question.

9                 What does this say in

10   Chinese?

11          A.    Subject.

12          Q.    And the subject is "Taihe:

13   Drywall."  And "060727" is what it says;

14   is that correct?

15          A.    If you read it this way,

16   that's the way it is.  But what I've been

17   trying to tell you is this is the reply

18   of the e-mail prior to that.  It is not

19   the subject that I came up with.

20          Q.    You wrote this e-mail.

21   Correct, sir?

22          A.    The e-mail below that was

23   written by me.

24          Q.    In Chinese?

Confidential - Subject to Further Confidentiality Review

```
1          A.     Correct.

2          Q.     With some Western language.

3    Correct?

4          A.     You can say that, because

5    some of those cannot be expressed in

6    Chinese.  I had to write it that way.

7          Q.     Tell us what the first

8    sentence says, this one here?

9          A.     Hello.  E-mail received.

10   First of all, here's a reply, according

11   to your request.

12         Q.     And what was the reply?

13         A.     The reply is the reply to

14   the prior e-mail that was sent to me.

15         Q.     What does the next sentence

16   say?  It starts with "2440" star "1220"

17   star "12.7" millimeter star, Chinese

18   language.  What does that say?

19         A.     It says:  Specification,

20   ordinary paper-faced gypsum board, manual

21   tray mixed packing, 40 inches -- 40 feet

22   oversized height.  Container that can

23   contain 960 pieces.  FOB Qingdao port.

24   Price USD 2.65 per piece.
```

```
 1          Q.     And then the last sentence
 2    on the next page at Bates stamp number
 3    19349, what does that say?
 4          A.     The above information is for
 5    reference.  I look forward to your reply.
 6          Q.     And it's signed by?
 7          A.     Che Gang.
 8          Q.     You?
 9          A.     Yes.
10          Q.     And then the next page,
11    Bates stamp number 19350, this is the
12    e-mail that you were responding to.
13    Correct?
14          A.     I don't understand.
15          Q.     This e-mail, you were -- the
16    Chinese language e-mail that we just read
17    was a response to that.  Correct?
18          A.     I'll have to take a look.
19                 From what appears here, that
20    should be the case.
21          Q.     And if you look at the
22    e-mail below that one that starts from
23    Tanader Tang, sent Friday, July 21, 2006,
24    to sdth818@163.com, wuyu374@126.com, that
```

Confidential - Subject to Further Confidentiality Review

1    is also an e-mail that was sent to you.

2    Correct?

3        A.    Correct.

4        Q.    And this is referring to

5    drywall that is going to be sent from

6    your company to Fort Lauderdale, Florida.

7    Right, sir?

8            MR. SPANO:  Objection to

9        form.  Completely mischaracterizes

10       the document, no foundation.

11           THE COURT:  Let's ask him

12       what is it then.

13   BY MR. GONZALEZ:

14       Q.    This is an e-mail to you.

15   Correct, sir?

16       A.    This one?

17       Q.    Yes.

18       A.    Yes.

19       Q.    You received it on or about

20   July 21, 2006.  Correct?

21       A.    That's what appears.

22       Q.    And in this e-mail, they

23   were asking you information to move

24   forward on a big development.  And I'll

```
 1    have the interpreter read the first

 2    sentence which states, "How are you now?

 3    Trust everything is getting well."  And

 4    the next two sentences, "Glad to inform

 5    you that our project has a big

 6    development now.  Now, we shall move

 7    forward drywall case."  Next sentence,

 8    "But we need to get your confirmation on

 9    the price at first."  Final sentence,

10    "Would you please give us your support on

11    this...earlier time?  Thanks."

12              Then there's a grid that

13    follows that goes into the next page with

14    the dimensions for the drywall requested,

15    estimated shipment costs from Qingdao to

16    Port Everglades in Fort Lauderdale,

17    Florida and the number of pieces that are

18    requested.

19              This e-mail was sent to you

20    at or about the time so indicated.

21    Correct?

22        A.    That's what appears to be.

23        Q.    And it's requesting pieces

24    of drywall, 640 normal.  Correct?
```

```
1          A.    Hmm.
2                THE COURT:  Is that a yes?
3                THE WITNESS:  Yes, yes.
4     BY MR. GONZALEZ:
5          Q.    640 pieces of fire
6     retardant.  Correct?
7          A.    Does it mean fireproof?
8          Q.    Yes.
9          A.    Yes.
10         Q.    510 pieces of waterproof?
11         A.    Correct.
12         Q.    And they were --
13               The dimensions were 4 feet
14    by 12 feet by half inch.  Correct?
15         A.    Yes.
16         Q.    Going on to the next page,
17    it also requests 460 pieces of normal
18    drywall?
19         A.    Yes.
20         Q.    And 460 pieces of fire
21    retardant drywall.  Correct?
22         A.    Yes.
23         Q.    And the Chinese e-mail that
24    you sent, the e-mail in Chinese language
```

Confidential - Subject to Further Confidentiality Review

1    that you sent, was in response to that

2    request?

3            A.     From what it says here, it

4    looks like the specification that I

5    provided was a little too much.  I'm not

6    sure.  It was not in accordance with the

7    request of the customer, so I'm not sure

8    whether this e-mail was a response to the

9    other e-mail.

10           Q.     You were writing to --

11           A.     Because here and there are

12   not the same.

13           Q.     You were writing to Tanader

14   Tang.  Correct?  In Chinese language?

15           A.     To Manager Tang.

16           Q.     And you sent your e-mail on

17   or about July the 27th, 2006?

18           A.     Correct.  That's what

19   appears to be.

20           Q.     And the "re" is "Taihe:

21   Drywall-060727."  Correct?

22           A.     Correct.

23           Q.     What does that number mean,

24   060727?

Confidential - Subject to Further Confidentiality Review

```
 1          A.    I'll have to ask the
 2   customer.
 3          Q.    Does it mean anything --
 4          A.    Because he wrote it.
 5          Q.    Is it an internal number to
 6   you or to the customer?
 7          A.    This is e-mail that's sent
 8   to me by my customer.  I only replied to
 9   the subject that was sent to me.
10          Q.    That's my question.
11                Is the number, is that a
12   reference that the customer uses or a
13   reference that your business uses?
14          A.    The customer's.
15          Q.    Did you have an ongoing
16   relationship with Tang?
17          A.    No.
18          Q.    Do you remember having done
19   business with Tang?
20          A.    I don't remember.
21          Q.    Do you recall this
22   transaction at all, the one you're
23   referring to right now?  Other than
24   reviewing these documents, do you have an
```

Confidential - Subject to Further Confidentiality Review

```
 1    independent recollection of that

 2    transaction?

 3                     MR. SPANO:  Objection to

 4            form, no foundation there was a

 5            transaction.

 6                     THE COURT:  Let's clear that

 7            up.

 8                     MR. GONZALEZ:  That's what I

 9            asked him.

10    BY MR. GONZALEZ:

11            Q.    Do you have independent

12    recollection of this transaction, outside

13    of the form?

14            A.    I don't really remember.

15            Q.    Would you say you're a

16    person with a good memory or a bad

17    memory?

18            A.    I think I'm an ordinary

19    person.

20            Q.    Ordinary?  Normal memory?

21            A.    Very ordinary.

22            Q.    Some people have very good

23    memory, some people have very bad memory.

24                   You think yours is just
```

Confidential - Subject to Further Confidentiality Review

```
1    normal?

2           A.    You have to perform a test

3    on me.  I don't quite get you.

4           Q.    I won't do that, sir.

5                 I'd like to show you what's

6    been marked as Exhibit Number 32 to Mr.

7    Jia and Number 8 to Mr. Peng's

8    depositions.  It's Bates stamp number TG

9    19381 through TG 19382.

10                The very top is from Grace

11   Wei to SDTH818.

12                That's you.  Right, sir,

13   SDTH818?

14          A.    That's my e-mail address.

15          Q.    It's dated August 2, 2006.

16                At that time you were

17   working for TTP.  Correct?

18          A.    Correct.

19          Q.    Can you please tell us what

20   you wrote in Chinese to Grace Wei on or

21   about August the 2nd, 2006?

22          A.    This is an e-mail sent to me

23   by Ms. Wei, not the other way around.

24          Q.    I apologize.  You're
```

Confidential - Subject to Further Confidentiality Review

```
 1    correct.

 2                Can you please tell us what

 3    Ms. Grace wrote to you in Chinese?

 4         A.    Do you want me to read it

 5    for you?

 6         Q.    Verbatim, please.

 7         A.    Okay.

 8                Manager Che, Manager Peng,

 9    hello.  Please look at below customer's

10    e-mail.  They requested you to write

11    verification using the letterhead of your

12    company's and to have your boss sign and

13    seal.  And also he said it is best that

14    if you could list one or two of the

15    American companies' name who bought

16    gypsum board from your company.  That

17    will be a powerful verification to verify

18    that our product has no quality problem.

19    Thank you.  Wei, Dongling.

20         Q.    The certification that was

21    requested included the language that was

22    set forth in the e-mail below, which is

23    written in English.  And it states, and

24    I'll ask a question after that, "Shandong
```

Confidential - Subject to Further Confidentiality Review

1   Taihe Dongxin...Gypsum board that is in

2   the 12 containers (listed below) that

3   were shipped last week are made to ASTM

4   C-1396 standards and it is the best

5   quality gypsum board that Taihe makes and

6   is the same quality that Taihe sends to

7   other customers in the United States.

8   Shandong Taihe Dongxin Co. stands 100%

9   behind our gypsum board and if any

10  quality problems were detected with" the

11  "gypsum board Taihe will replace the

12  board at no cost to the customer."

13          Was such a certification

14  provided as requested by Ms. Grace Wei to

15  you and Mr. Peng?

16          A.   No.   This is something sent

17  to me by the customer.

18          Q.   Yes.   She's asking you to do

19  something that -- to give her client the

20  language that she put below.

21          Did you do so?

22          A.   That's request of customer.

23          Q.   Did you comply with the

24  request?

Confidential - Subject to Further Confidentiality Review

```
 1          A.     But in my recollection, I
 2   did not provide such document.
 3          Q.     Did Mr. Peng Wenlong provide
 4   such documents?
 5          A.     You have to ask Mr. Peng.
 6          Q.     Do you know if the manager
 7   or the supervisor that she was requesting
 8   sign the letter did so?
 9          A.     As far as I can remember,
10   no.
11          Q.     Do you know Grace Wei?
12          A.     Yes.
13          Q.     Who is she?
14          A.     A female comrade in China.
15          Q.     Where did she work?  At the
16   time of the e-mail, where did she work?
17          A.     As far as my personal
18   understanding is, because she had never
19   specified that, she should be freelance
20   trader, because she goes everywhere to
21   help out, to introduce her customers to
22   some company, and in return, to get
23   commission or the price difference.
24          Q.     At the time of this e-mail
```

Confidential - Subject to Further Confidentiality Review

```
 1    in 2006, did Ms. Grace Wei have a working

 2    relationship with TTP?

 3          A.    Can you repeat that?

 4          Q.    Yes.

 5                At the time of this e-mail

 6    in August of 2006, did Ms. Grace Wei have

 7    a working relationship with TTP?

 8          A.    She's also a freelancer.

 9    She's not our employee.

10          Q.    Did she work with your

11    company as a freelancer?

12          A.    That depends on how you

13    define work relationship.

14          Q.    Did she introduce customers

15    to your company for the purchase of

16    goods?

17          A.    Yes.

18          Q.    And she was one of other

19    freelancers that your company worked with

20    at the time to introduce customers for

21    the sale of goods.  Correct?

22          A.    If you ask me on the spot, I

23    really can't remember.  But if you give

24    me an example, that may refresh my
```

Confidential - Subject to Further Confidentiality Review

1    memory.  But I'm sure she is.

2            Q.    Let's use this one with Ms.

3    Wei.

4                  You understood that Ms. Wei

5    was referring to customers in the United

6    States that were purchasing your product.

7    Correct?

8            A.    Ms. Wei only introduced to

9    us a customer.  She claimed that the

10   customer was in the United States.  But

11   that's not something we would pay

12   attention to.  I did not verify either.

13           Q.    Well, here she's asking for

14   very specific information regarding

15   matters in the United States, isn't she?

16           A.    Who requested that?

17           Q.    Ms. Grace Wei was asking you

18   to provide a certification that boards

19   that were shipped to the United States

20   met the American Society of Testing and

21   Materials, ASTM, C-1396.  Correct?

22           A.    From what appears on the

23   e-mail, that was her request.

24           Q.    She was also requesting a

Confidential - Subject to Further Confidentiality Review

 1   certification from a supervisor at TTP

 2   that the drywall that had been sent in

 3   the 12 containers listed below was of the

 4   same high quality as the drywall that

 5   Taihe had sent to other customers in the

 6   United States?

 7        A.    First of all, this is an

 8   e-mail sent to us by the customer.  She

 9   asked us to provide that to her.

10   However, in my recollection, we did not

11   provide such document.

12        Q.    Did she also work as a

13   freelance person with TG?

14        A.    I think she is a freelancer

15   to any company, unless as she claims that

16   she has her own company, because we have

17   never verified her identification.

18        Q.    To your knowledge, did she

19   work with you when you were at TG?  I

20   don't mean as a co-employee.  I mean her

21   as a freelance person and you as a

22   salesperson for TG.

23        A.    I don't recall.  I don't

24   remember.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Does she still work with you

 2     as a freelancer and you as a salesperson

 3     now at TG?

 4          A.    No.   We have not been

 5     contacting with this person for a long

 6     time, for either company.

 7          Q.    Do you know if the drywall

 8     that was manufactured by TTP in 2007 and

 9     2008 came from the Luneng mine in China?

10                MR. SPANO:  Objection, form.

11                THE COURT:  Why don't you

12           ask which mine.  Sustained.  Why

13           don't you ask first which mine and

14           then we'll pursue it.

15                I'll let him do that.  I'll

16           overrule the objection.  Go ahead.

17                MR. GONZALEZ:  I had

18           referenced it to Luneng mine, I

19           believe, Your Honor.  I'll rephase

20           it, just so we're clear.  I may

21           have muttered it.

22     BY MR. GONZALEZ:

23          Q.    Do you know if the drywall

24     that was manufactured by TTP in 2008 came
```

Confidential - Subject to Further Confidentiality Review

```
 1    from materials from the Luneng mine?

 2                  MR. SPANO:  Objection to

 3           form, lack of foundation.

 4                  THE INTERPRETER:  Is that a

 5           Chinese name, Luneng mine?

 6                  MR. GONZALEZ:  L-U-N-E-N-G,

 7           L-U-N-E-N-G, Luneng mine.

 8                  THE COURT:  I'll overrule

 9           the objection.

10                  Let him answer if he can.

11           You may answer.

12                  THE INTERPRETER:  The

13           interpreter doesn't find this word

14           in the dictionary.  Is that a

15           Chinese word?

16                  MR. GONZALEZ:  It's a

17           location.

18                  MR. EUGENE CHEN:  Right.

19           It's a name.  It's a proper name,

20           Luneng.

21                  THE INTERPRETER:  Luneng?

22                  MR. CHEN:  Yes.

23                  THE WITNESS:  Repeat your

24           question, please.
```

Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. GONZALEZ:

 2          Q.     Yes.

 3                 Do you know if the drywall

 4   that was produced by TTP during the years

 5   of 2000 and 2008 were made with raw

 6   materials that were mined from the Luneng

 7   mine, 2007 and 2008?

 8          A.     I think there is a problem

 9   with the time period.  You said 2000?

10   2000 there was no TTP yet.

11          Q.     2007 through 2008.

12          A.     In the year 2008, isn't it

13   that TTP has stopped its operation?

14          Q.     Yes, sir.

15                 From 2006 -- let's do it

16   year by year.

17                 And with reference to TTP,

18   and it's in 2006, do you know if the

19   materials used to make drywall at TTP

20   came from the Luneng mine in that year?

21          A.     I'm only a salesperson, not

22   a supplier.  I don't know.

23          Q.     You do not know?

24          A.     Correct.
```

 1          Q.     How about in 2008, do you

 2     know, same question, I'm sorry, as to

 3     2007?

 4          A.     Neither do I know that.  I'm

 5     a seller, not a buyer.

 6          Q.     For 2005 for TG while you

 7     worked there, do you know if the

 8     materials that were used to make drywall

 9     by TG in 2005 came from the Luneng mine?

10               MR. SPANO:  Objection.  I

11          feel we're clearly going into the

12          merits here.  Mining and

13          manufacturing has nothing to do

14          with the question of personal

15          jurisdiction.

16               THE COURT:  I think that's a

17          valid objection.  Overrule it -- I

18          mean, I'll sustain it.

19               MR. GONZALEZ:  And that

20          would be true for any questions so

21          related, Your Honor?

22               THE COURT:  Yeah.  I think

23          that that's -- unless it's tied to

24          jurisdiction, these depositions

```
 1              are limited to jurisdiction.
 2                   MR. GONZALEZ:  All right.
 3              Let me take a shot at it, Judge.
 4                   THE COURT:  Go ahead.
 5    BY MR. GONZALEZ:
 6              Q.    Do you know if in 2005
 7    materials that were used by TG to
 8    manufacture drywall that ultimately ended
 9    up in the United States of America came
10    from the Luneng mine?
11              A.    I don't know.  The same
12    opinion I provided to you earlier.  I'm
13    only a salesperson.
14              Q.    Would your answer be the
15    same for all years 2005, 2006, 2007 and
16    2008?
17              A.    I work for different
18    companies in different years.  You have
19    to define that.  But the thing is, I'm
20    only a salesperson.  I sell gypsum board.
21    I do not purchase gypsum board.  So I'm
22    not aware of these.  I would not have had
23    the contact with these matters.
24              Q.    Are you aware of any
```

Confidential - Subject to Further Confidentiality Review

```
 1    investigation by the United States

 2    Consumer Product Safety Commission

 3    regarding the Luneng mine?

 4          A.    Can you repeat that again?

 5          Q.    Are you aware of any

 6    investigation by the United States

 7    Consumer Protection service group of the

 8    Luneng mine?  I'm sorry.  Let me rephrase

 9    that.

10                Are you aware of any

11    investigation by the Consumer Product

12    Safety Commission involving the Luneng

13    mine?

14          A.    I don't know.

15          Q.    Are you aware of any

16    investigation by any United States

17    individual or entity of the Luneng mine?

18          A.    I don't know.

19          Q.    Do you know Yamin Yuan?

20    Pronunciation is probably wrong,

21    Y-A-M-I-N, first name.  I guess that's

22    the last name.  And the first name

23    Y-U-A-N.  Yamin Yuan?

24          A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

1        Q.      And tell us who he is?

2        A.      Yuan Yamin should be our

3    colleague in TG.

4        Q.      Was he a salesperson also?

5        A.      Yes.

6        Q.      He currently works at TG

7    with you in sales?

8        A.      Yes.

9        Q.      And before that, he worked

10   at TTP with you in sales.  Correct?

11       A.      No.

12       Q.      Has he always worked at TG

13   in sales, as far as you know?

14       A.      If my memory is correct,

15   when he joined, the TTP should have

16   already stopped its operation.

17       Q.      Do you know Mr. Li Zhizhen?

18   And I will he spell it.  First name, L-I,

19   second name, Z-H-I-Z-E-N?  Z-H-I-Z-E-N,

20   Z-H-I-Z-E-N, Z-H-I-Z-H-E-N.

21       A.      I have not heard of such

22   name, according to the translation.

23               THE INTERPRETER:  Could you

24          write it for me, please?

```
 1              MR. GONZALEZ:  My

 2         handwriting is probably worse than

 3         my pronunciation, but you are

 4         forewarned.

 5              Can you understand that?  My

 6         writing, I mean.

 7              THE INTERPRETER:  Yeah.

 8    BY MR. GONZALEZ:

 9         Q.    Do you know this person?

10         A.    Yes.

11         Q.    Does he work with you at TG

12    currently?

13         A.    Yes.

14         Q.    Did he work with you at TTP

15    before he worked at TG?

16         A.    That I don't remember

17    clearly, but --

18              THE INTERPRETER:

19         Interpreter clarify gender.

20              THE WITNESS:  But whether he

21         worked before in TG, I don't

22         recall.  However, I've never

23         worked with him in TTP, which

24         means that he never been to TTP.
```

Confidential - Subject to Further Confidentiality Review

```
1              He worked at TG, but I don't
2              recall when did he join TG.
3    BY MR. GONZALEZ:
4              Q.    And help me pronounce Mr.
5    Li -- is it Li?
6                    THE INTERPRETER:  Li.
7    BY MR. GONZALEZ:
8              Q.    Mr. Li's name correctly, Mr.
9    Li Zhizhen?
10             A.    Zhizhen.
11             Q.    Really hard, Zhizhen.  Okay,
12   I'm sorry.
13                   Was he a salesperson?
14             A.    Yes.
15             Q.    How long did you take to
16   prepare for this deposition?
17             A.    How many days?  It has been
18   about four, five days.
19             Q.    How many hours per day?
20             A.    I'm not sure.  Sometimes
21   shorter, sometimes longer.
22             Q.    Eight, ten hours or less per
23   day?
24             A.    I'll have to calculate for
```

Confidential - Subject to Further Confidentiality Review

```
 1    you.

 2            Q.    Please do so.

 3            A.    Sometimes from around 9:00

 4    in the morning, about six, seven hours

 5    sometimes, and sometimes eight, nine

 6    hours.  If I cannot recollect memory of

 7    certain documents, I would have to go

 8    back to the hotel and lay in bed and

 9    think about it.  I don't know whether

10    that counts as part of preparation.

11            Q.    Yes.

12            A.    It's hard for me to

13    calculate.  After all, it is not my

14    normal work hour.

15            Q.    Sure.  And where did you do

16    the preparation, what city?

17            A.    After I got here.

18            Q.    In Hong Kong?

19            A.    Yes.

20            Q.    When did you arrive in Hong

21    Kong, the date?

22            A.    Where is my certificate?

23    Which day was that?

24            Q.    Well, today is the 12th of
```

Confidential - Subject to Further Confidentiality Review

```
 1    January.
 2            A.      Perhaps the 6th.  Perhaps
 3    the 6th I entered.  I didn't pay
 4    attention.
 5            Q.      Did you meet with the
 6    company's attorneys to go over the
 7    documents?
 8            A.      You mean the attorney in
 9    Hogan Lovells?
10            Q.      Any of the company's
11    attorneys.  Did you meet with any of the
12    company's attorneys, whether they're from
13    China or the United States, in
14    preparation for your deposition?
15            A.      I met Hogan Lovells, Hogan
16    Lovells, attorney Hogan Lovells.
17            Q.      Did they work with you for
18    those four to five days in your
19    preparation for today's deposition?
20            A.      They helped me to refresh my
21    memory of these documents, and they
22    requested me to answer your question
23    truthfully.
24            Q.      Did they tell you to say
```

1    that?  I'm sorry.  You're right.

2                    MR. SPANO:  Objection.

3                    THE COURT:  Sustain the

4          objection.

5                    MR. GONZALEZ:  I agree,

6          Judge.  I withdraw it.  That was

7          inappropriate.

8                    THE COURT:  Do you have much

9          more?

10                   MR. GONZALEZ:  Just a little

11         bit, Judge.

12                   THE COURT:  All right.

13   BY MR. GONZALEZ:

14         Q.    Did you meet with those

15   attorneys every day for those four to

16   five days to prepare?

17         A.    We meet every day.  But as

18   who we meet, each day is different.

19         Q.    Were you asked by your

20   supervisors to testify in this case at

21   TG?

22                   THE INTERPRETER:

23         Interpreter clarification.  When

24         you say supervisor, you mean

Confidential - Subject to Further Confidentiality Review

```
 1          supervisor as the manager or
 2          supervisor in the board of
 3          supervisors?
 4               MR. GONZALEZ:  His bosses.
 5               THE WITNESS:  The company
 6          asked me to come to testify.  I
 7          did not want to come because I
 8          never had such experience before.
 9          I think whenever we contact --
10          we're contacted with an attorney,
11          it's as if that we have committed
12          a crime.  So I'm very worried and
13          very afraid, but the company said
14          if I do not come, they would fire
15          me and they would sue me in the
16          courthouse.  So I had to do it.  I
17          had to come.  It's almost Chinese
18          New Year.  I had to come here.
19   BY MR. GONZALEZ:
20          Q.    Who at the company told you
21   that?
22          A.    Mr. Peng notified me.
23          Q.    Mr. Peng is the one that
24   shared his sentiments that you needed to
```

Confidential - Subject to Further Confidentiality Review

```
 1    come for those reasons?

 2          A.      They notified me in separate

 3    occasions.  In the very beginning, the

 4    company asked me to come, and I said, I'm

 5    not going.  And I said, it has nothing

 6    personal to do with me.  But they gave me

 7    lots of pressure from different channels.

 8    There was no way out.  I had to come.

 9    But I'm really afraid in my heart,

10    because I've never seen so many lawyers

11    before.  This is my first time see a

12    judge, any judge.  This is my first time.

13          Q.      This is your only job

14    currently?

15          A.      What do you mean by that?

16          Q.      You don't work anywhere

17    else?

18          A.      No.  I only work in TG.

19          Q.      Your job is important to you

20    and your family?

21          A.      Correct.

22          Q.      And you're very loyal to

23    your company?

24          A.      Correct.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    MR. GONZALEZ:  Thank you,

 2          sir.  Thank you.  Appreciate it.

 3                    THE COURT:  15-minute break

 4          here.

 5                    MR. GONZALEZ:  I'm going to

 6          pass the witness, Your Honor.

 7                    THE COURT:  Okay.

 8                    VIDEOTAPE TECHNICIAN:  We're

 9          going off the record.  The time is

10          9:30.

11                       -   -   -

12               (A recess was taken from

13          9:30 a.m. to 9:43 a.m.)

14                       -   -   -

15                    VIDEOTAPE TECHNICIAN:  Going

16          back on the record.  The beginning

17          of Tape Number 2.  The time is

18          9:43.

19                       -   -   -

20                    EXAMINATION

21                       -   -   -

22     BY MR. MEUNIER:

23          Q.    Good morning, Mr. Che.

24          A.    Good morning.
```

```
 1          Q.    I want to begin my

 2   questioning by confirming on the record

 3   that you are appearing in yesterday and

 4   today's deposition not only as an

 5   individual witness but also as a witness

 6   designated by TG and TTP to testify on

 7   behalf of those companies regarding

 8   business dealings with Oriental Trading,

 9   Advanced Products and Triax Trading &

10   Logistics, American Five Star, TOV

11   Trading, and B America Corporation; is

12   that correct?

13               MR. SPANO:  To save time,

14        may I just confirm that for you?

15               MR. MEUNIER:  Yes.  Is that

16        confirmed?

17               MR. SPANO:  Yes, that's

18        correct.

19                    -   -   -

20               (Deposition Exhibit No.

21        Che-7, Re-Notice of Oral and

22        Videotaped Deposition Pursuant to

23        Fed. R. Civ. P. 30(b)(6), 17

24        pages, was marked for
```

 1            identification.)

 2                   -   -   -

 3    BY MR. MEUNIER:

 4            Q.    And I'd like to mark and

 5    attach as Che Exhibit Number 7 the notice

 6    of the deposition of Taishan Gypsum and

 7    TTP pursuant to Federal Rule of Civil

 8    Procedure 30(b)(6).  It's Document 11411

 9    filed in the record.

10            Mr. Che, were all of your

11    business dealings with the companies that

12    I just mentioned conducted while you were

13    employed by either TG or TTP?

14            A.    I'm sorry, I don't remember

15    all the companies that you just

16    mentioned.

17            Q.    That's fine, sir.  I'll

18    repeat them.

19            Were all of your business

20    dealings with Oriental Trading conducted

21    while you were an employee of either TTP

22    or TG?

23            A.    What do you mean by or?  You

24    mean both TTP and TG or either --

Confidential - Subject to Further Confidentiality Review

1        Q.      Either/or.  One or the

2    other.

3        A.      The majority of the business

4    dealings with Oriental was with TTP, and

5    later on after I came to TG, I helped to

6    handle the issue of $100,000.

7                THE INTERPRETER:

8                Interpreter clarification.

9                THE WITNESS:  I think it is

10               something about honor, so I have

11               to handle that issue for the

12               customer.

13   BY MR. MEUNIER:

14       Q.      Were all of your business

15   dealings with Advanced Products and Triax

16   Trading & Logistics conducted while you

17   were an employee of either TG or TTP?

18       A.      What is the company before

19   Triax?

20       Q.      Advanced Products or APIC

21   Building Materials.

22       A.      Can I have the name?  I

23   don't know.

24               Are these the same company?

Confidential - Subject to Further Confidentiality Review

1    I do have impression with Triax.

2          Q.    You were also designated by

3    your company to testify about dealings

4    with Advanced Products.

5                Are you not familiar with

6    that company?

7          A.    I don't understand your

8    handwriting.

9                Can you give me something

10   more formal, the name of the company in

11   the e-mails?  That would refresh my

12   memory.

13               I know this, yes.

14         Q.    Were all of your dealings

15   with Advanced Products International

16   Corporation conducted while you were an

17   employee of either TTP or TG?

18         A.    Yes, while I worked for TTP.

19         Q.    Were all of your business

20   dealings with American Five Star

21   conducted while you were an employee of

22   either TG or TTP?

23         A.    Yes, TTP.

24         Q.    Were all of your business

```
 1    dealings with TOV Trading conducted while
 2    you were an employee of either TG or TTP?
 3         A.    Can you repeat that?
 4         Q.    Were all of your business
 5    dealings with TOV Trading conducted while
 6    you were an employee of either TG or TTP?
 7         A.    Yes.
 8         Q.    Were all of your business
 9    dealings with B America Corporation
10    conducted while you were an employee of
11    either TG or TTP?
12         A.    What are the companies?
13         Q.    B America Corporation.
14         A.    Yes.
15         Q.    And do you recall that TOV
16    Trading later became known as OEG, OEG?
17         A.    I remember.
18         Q.    And your dealings with OEG
19    were also conducted while you were an
20    employee of either TG or TTP.  Is that
21    true?
22         A.    I worked with OEG while I
23    was employed with TTP.  And later, I
24    helped them with some military
```

Confidential - Subject to Further Confidentiality Review

```
 1    construction projects.

 2           Q.    Now, yesterday you testified

 3    about your dealings with --

 4           A.    I said assisted with them.

 5           Q.    Yesterday, Mr. Che, you

 6    testified about your dealings with Jorge

 7    Arevalo, Ivan Gonima and Leonardo Guzman

 8    of Oriental Trading.

 9                 Do you remember that?

10    A.    Who is Jorge?

11    Q.    Jorge.

12    A.    Oh, I know Jorge.

13    Q.    I was trying to give --

14    A.    I don't know who Jorge is.

15           Q.    So do you remember talking

16    about your dealings with Messrs. Arevalo,

17    Gonima and Guzman with Oriental Trading?

18           A.    I remember the names of

19    these people.  We had communications.

20           Q.    You recall that you first

21    met Mr. Arevalo and Mr. Gonima in 2006

22    when they visited the Shandong Taihe

23    Dongxin factory in Taian city, China.

24    True?
```

Confidential - Subject to Further Confidentiality Review

```
1              A.     Can you repeat?

2              Q.     Do you recall that you first

3     met Mr. Arevalo and Mr. Gonima --

4              A.     Stop.

5                     What are the names again?

6              Q.     Jorge Arevalo and Ivan

7     Gonima.

8              A.     In my memory, they did not

9     come together for the first time.

10             Q.     They came on separate

11    visits?

12             A.     They came together once, and

13    then they came separately also.  But I'm

14    not sure about the sequencing.

15             Q.     On these visits, did you

16    tour the Shandong Taihe Dongxin factory

17    in Taian city, China with them?

18             A.     Can you repeat that?

19             Q.     Did you tour the Shandong

20    Taihe Dongxin factory in Taian city,

21    China with them?

22             A.     In what time period?

23             Q.     When they visited you in

24    2006.
```

Confidential - Subject to Further Confidentiality Review

1          A.      In year 2006, it must be TTP

2     that they visited.

3          Q.      Which factory would they

4     have visited with you in 2006?

5          A.      It must be TTP that they

6     visited in the year 2006, because at the

7     time I worked with TTP.

8          Q.      What was the location of the

9     factory?

10          A.      In our TTP's plant.  I've

11     already told you the detailed address

12     when I was being asked by the other

13     gentleman.

14          Q.      Do you recall during that

15     visit that these men asked if your

16     company was already selling drywall in

17     the United States?

18          A.      I don't have a clear

19     recollection of the details that happened

20     at that time.

21          Q.      Is it true you told them

22     that your company already had a drywall

23     customer or client in New York?

24          A.      I don't remember clearly the

Confidential - Subject to Further Confidentiality Review

```
 1    detailed content of our conversation, but

 2    you can use e-mail to -- for me to

 3    refresh my memory, but I really don't

 4    remember.  It's been too long.

 5          Q.    But you do not deny telling

 6    them at that time that you had a customer

 7    in New York, do you?

 8          A.    I had neither admitted nor

 9    denied, because I don't remember clearly

10    about that.

11          Q.    Do you recall telling Mr.

12    Gonima during the factory visit in 2006

13    that your company could print Oriental

14    Trading Company's bar code on the drywall

15    they ordered?

16          A.    I don't remember what

17    exactly I told him during -- in the

18    conversation, but during the preparation

19    of the deposition, with assistance of my

20    attorney, we reviewed some document, some

21    e-mail to be exact, that Mr. Irvine

22    designed the bar code himself and

23    requested us to put bar codes on the

24    products that he ordered.
```

Confidential - Subject to Further Confidentiality Review

```
 1            Q.     And at his request, you

 2    arranged to have that company's bar code

 3    put on the drywall that they ordered.

 4    True?

 5            A.     Yes.  Upon their request.

 6            Q.     Why did you agree to do

 7    this, Mr. Che?

 8            A.     Because at the time, Mr.

 9    Irvine promised us that he would purchase

10    big volume of my product.  Because the

11    principle of our company is the more you

12    sell, the more bonus you get.  I believed

13    him.  But the fact is that he made an

14    exaggeration.  He only bought a little

15    bit of our product.

16            Q.     You wanted him to buy more,

17    didn't you?

18            A.     It doesn't matter who, as

19    long as that person buys my products, I

20    could get more bonuses.

21            Q.     You wanted Mr. Gonima and

22    his company, Oriental Trading, to buy

23    more drywall from your company, didn't

24    you?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    I hope that any company to
 2    purchase more of our products.  It
 3    doesn't matter who.  If you want, that's
 4    fine, too.
 5          Q.    If I want to buy drywall
 6    from you today and take it back to New
 7    Orleans, Louisiana, would you be happy to
 8    make those arrangements with me?
 9          A.    Don't tell me where you're
10    sending the goods to.  Just give me
11    money.  You can take it wherever you want
12    to.
13          Q.    You would be happy, on
14    behalf of your company --
15          A.    The issue is money.
16          Q.    -- to take my money for
17    drywall, no matter which city in the
18    United States of America I took the
19    drywall to.  Is that true?
20          A.    That's your problem.  I
21    don't care.  I don't care -- I only care
22    that you give me money.
23          Q.    And it wouldn't matter to
24    you which city in the United States I
```

Confidential - Subject to Further Confidentiality Review

```
 1    took the drywall to; is that correct?
 2            A.    That's your problem.
 3            Q.    And you wouldn't care, would
 4    you?
 5            A.    That's your problem.
 6            Q.    You would not care which
 7    city I took it to in the United States?
 8            A.    I don't care where would my
 9    customer deliver our products to.  What
10    we do is only to give the products to the
11    customer in China.  The presumption is
12    that the customer pay us in full.
13            Q.    Now, when you put a bar code
14    on drywall that you are manufacturing for
15    a customer, does that help for the sales
16    transaction involving that drywall after
17    it reaches its destination?
18                  MR. SPANO:  Objection to
19            form.
20                  THE COURT:  What's the
21            problem, Frank?
22                  MR. SPANO:  It's --
23                  THE COURT:  I'm sorry?
24                  MR. SPANO:  I think it's
```

```
 1              very confusing.
 2                    THE COURT:  Well, let's see
 3              if the witness can answer.  I'll
 4              overrule it if he can't.
 5                    Can you answer the question,
 6              sir?
 7    BY MR. MEUNIER:
 8              Q.    Repeat it?
 9              A.    I don't quite understand
10    what you said.
11              Q.    I'll repeat the question.
12                    When you put a bar code on
13    drywall that you are manufacturing for a
14    customer, does that bar code help with
15    the sales transaction when that drywall
16    is purchased after it reaches its
17    destination?
18                    THE COURT:  I sustain the
19              objection to that.  How would he
20              know?
21    BY MR. MEUNIER:
22              Q.    Do you know what a bar code
23    is used for?
24              A.    What bar code are you
```

Confidential - Subject to Further Confidentiality Review

```
 1     referring to?

 2          Q.    Any bar code.

 3                If you go to a store and the

 4     cashier slides the bar code --

 5          A.    Do you mean the sealing tape

 6     of the gypsum board?

 7          Q.    No.  I have been talking

 8     about a bar code.

 9                Do you know what that is?

10          A.    I'm sorry.

11          Q.    I'm showing you a Coca-Cola

12     Zero can.

13                Do you see the bar code on

14     this can?  It's in the shape of a bottle.

15          A.    This is called bar code?

16          Q.    Yes, sir.

17                It is slid by the cashier

18     across a machine at the time of purchase.

19     Correct?  You know what bar codes are

20     used for?

21          A.    No.  Because in China, we

22     don't have this.  I thought it's a

23     pattern.  I really don't know what is

24     that for.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Perhaps you didn't
 2    understand my earlier question.  We'll
 3    leave this area, but I want to be clear
 4    for the record.
 5              Did you agree at the request
 6    of Mr. Gonima during his visit to the
 7    factory that your company could print
 8    Oriental Trading's bar code on the
 9    drywall that you were manufacturing for
10    that company?
11          A.    I'd like to repeat.  The
12    customer, Mr. Irvine, designed a pattern.
13    My understanding is that it's only a
14    pattern.  I don't understand what you
15    said about that.  He requested us to put
16    the pattern on the product he was going
17    to purchase from us.  I complied with the
18    customer's request and put it there,
19    because he promised that he would buy big
20    volume of our products.  But in fact, he
21    bragged about it.
22          Q.    After you signed the sole
23    agency agreement of October 20, 2006 with
24    Oriental Trading, which is Che Number 1,
```

Confidential - Subject to Further Confidentiality Review

 1    you sent Mr. Gonima prices for different

 2    sizes and shipping costs of gypsum board.

 3              Is that true?

 4         A.    Can I take a look at the

 5    document?  Where is the exhibit?

 6         Q.    I'm showing you documents

 7    that are Bates numbered TG 521 through

 8    526, which I'll mark as Che Number 8.

 9              -   -   -

10              (Deposition Exhibit No.

11              Che-8, E-mail chain, top one dated

12              8 Nov 2006, Bates stamped TG

13              0000521 through TG 0000526, was

14              marked for identification.)

15              -   -   -

16    BY MR. MEUNIER:

17         Q.    Please refer to the e-mail

18    from you that begins at the bottom of the

19    page marked 522 and concludes on the page

20    marked 525.

21         A.    This is the beginning?

22         Q.    Yes.  Bottom of 522.

23         A.    So this is the beginning and

24    up to here?

Confidential - Subject to Further Confidentiality Review

 1          Q.    Yes.

 2          A.    What's your question?

 3          Q.    You sent this e-mail of

 4   November 6, 2006 to Mr. Gonima after the

 5   sole agency agreement was signed and

 6   provided him with shipping costs for

 7   various sizes of gypsum board.  Is that

 8   true?

 9          A.    Where is it?

10          Q.    Did you provide him with

11   pricing information for drywall?

12          A.    Isn't it FOB Qingdao Chinese

13   port price?

14          Q.    You gave him prices per

15   sheet for shipping from China.  Is that

16   true?

17          A.    FOB is to deliver in China.

18          Q.    So these prices were what it

19   would cost him to get the drywall from a

20   factory to the Qingdao port?

21          A.    Which is to say that I

22   deliver the goods to the customer in

23   Qingdao port or to the shipping agency

24   that he had entrusted with.  The shipping

Confidential - Subject to Further Confidentiality Review

```
1    agency that the customer had entrusted.

2           Q.    Now, please look at Mr.

3    Gonima's reply e-mail of November 8,

4    2006, beginning on the bottom of 521 and

5    concluding at 522.

6           A.    This one?

7           Q.    Yes.

8           A.    Where does it start?

9           Q.    Bottom of 521.

10          A.    I know that.

11          Q.    To the middle of 522.

12          A.    But the title of the e-mail

13   like this one, like this one, like who

14   sent it and what's the date?  Where is

15   that part, like this one?

16          Q.    Mr. Che, the e-mail I'm

17   referring to indicates that it is from

18   ivangonima@orientaltradingusa.com.  Is

19   that true?

20          A.    I can't confirm that because

21   you don't have the start, starting part.

22          Q.    Mr. Che, do you deny getting

23   this e-mail?

24          A.    You should provide me the
```

Confidential - Subject to Further Confidentiality Review

```
 1    complete information so I can see who

 2    sent it to who, the complete information.

 3    But you're providing me with incomplete

 4    information, so it doesn't really help me

 5    to refresh my memory.

 6           Q.    Mr. Che, these are your

 7    company records produced to us.

 8                 Do you deny getting this

 9    e-mail?

10           A.    I'm not saying that I deny,

11    but I want to see a complete document.

12           Q.    It's the most complete

13    document your company has given us, sir.

14                 Did Mr. Gonima in this

15    e-mail to you ask you to give him freight

16    costs for Miami and other cities in the

17    United States?

18           A.    Can you translate the

19    content of the e-mail for me?

20           Q.    Paragraph 2 from Mr.

21    Gonima's e-mail to you on 522.  "Could

22    you quote me the actual freight cost for

23    a 40" foot "FLC from Qingdao to Miami,"

24    Florida, "New York," New York, "Los
```

Confidential - Subject to Further Confidentiality Review

```
 1    Angeles," California "and Orlando,"
 2    Florida.  "(In this case it would include
 3    land freight too from Miami to Orlando)?"
 4              He asked you for that
 5    information, did he not?
 6         A.    First of all, if Mr. Judge
 7    believes the information you're providing
 8    to me is complete from the e-mail, I can
 9    only see that a customer requested us to
10    help him for -- to find out the shipping
11    cost to these destinations.
12              THE INTERPRETER:
13         Interpreter clarification.
14              THE WITNESS:  For us, it
15         doesn't matter what were the
16         destinations they wanted us to ask
17         for, to China or to Hong Kong.  We
18         were only trying to help the
19         customer.  The final operation was
20         FOB in Chinese port.  The
21         decisions had always been made by
22         the customers.  This is only out
23         of politeness.
24    BY MR. MEUNIER:
```

Confidential - Subject to Further Confidentiality Review

1      Q.    In the next paragraph, Mr.

2   Gonima mentioned that Jorge told him you

3   already had a distributor for one of your

4   brands in the New York area, and Mr.

5   Gonima asked if it would be possible to

6   have that company name and phone number.

7              Please now refer to your

8   reply e-mail, which is at the top of TG

9   521, dated November 8, 2006, addressed to

10  Mr. Ivan Gonima.

11             Please refer to the second

12  paragraph in which you said, "About the

13  information" --

14      A.    Wait a minute.  So is this

15  the beginning part of this e-mail?  So

16  that's me and this is Irvine.  This is

17  November the 8th, 2006.  Is that the one

18  you're referring to?  Is that the e-mail

19  you're referring to?

20      Q.    Yes, Mr. Che.

21      A.    Yes.  Please ask the

22  question.

23      Q.    In the second paragraph you

24  stated, "About the information about our

Confidential - Subject to Further Confidentiality Review

```
 1    client in New York, I will ask him if he

 2    is willing to let me tell you that.  Then

 3    I will reply" to "you!"

 4                    So you agree you had told

 5    Jorge and Ivan that you had a customer or

 6    client in New York when they visited the

 7    factory.  True?

 8           A.    This is only a marketing

 9    strategy.

10           Q.    Were you lying to Mr. Gonima

11    and to Mr. Arevalo when you told them you

12    had a customer or client in New York?

13           A.    It's not a lie.

14           Q.    Was it the truth?

15           A.    It's a strategy, a way to

16    sale -- for sales.

17           Q.    Was it the truth?

18           A.    How should I explain it to

19    you?  When I communicated with the client

20    regarding this information, the purpose

21    was for me to have a higher price to sell

22    my products to the client.  That's all.

23    It's only the way of sales and strategy

24    of marketing.  It could be a presumption.
```

```
 1              Q.    So in order to do business

 2     with these customers in the United

 3     States, you used the strategy of lying?

 4              A.    I don't like the word "lie."

 5              Q.    In order to do business with

 6     these customers in the United States, you

 7     used the strategy of exaggerating?

 8              A.    The strategy can be applied

 9     to any customer.  Maybe the customer is

10     in China, maybe a customer in a project.

11     It could be applied to anyone.

12                    THE COURT:  Ask whether he

13              had a customer.

14     BY MR. MEUNIER:

15              Q.    Did you or did you not have

16     a client in New York as stated in this

17     e-mail to Ivan Gonima on November 8,

18     2006?

19              A.    In my memory, it seems a

20     customer told us that they would want to

21     ship the goods to that place.  But as

22     whether they actually shipped it or not,

23     I'm not sure.  I've never been to

24     America.
```

```
 1            Q.    So you did have a client who
 2    told you he would ship and use your
 3    product in New York?
 4                  MR. SPANO:  Objection,
 5            compound.
 6                  MR. MEUNIER:  I'll break it
 7            down.
 8    BY MR. MEUNIER:
 9            Q.    So you did have a client who
10    told you that he would ship your product
11    to New York?
12            A.    A customer mentioned that to
13    us, saying that they would want to ship
14    the stuff to New York, but it was the
15    client's decision on their final
16    operation.  I did not verify.  All we did
17    was to receive the payment from the
18    customer, and we deliver inside China in
19    Chinese port.
20            Q.    Who was the customer who
21    said he would ship your product to New
22    York?
23            A.    I don't recall.
24            Q.    You then told Mr. Gonima in
```

Confidential - Subject to Further Confidentiality Review

```
 1    your November 8, 2006 e-mail that the

 2    ocean freight of the 40 GP to Miami was

 3    $3,400.  Correct?

 4            A.     Where is it?

 5            Q.     The next sentence after the

 6    statement about the client in New York.

 7            A.     This is to help the client

 8    to find out the shipping cost upon the

 9    customer's request.

10            Q.     But that was the cost to

11    ship the drywall from Qingdao to Miami,

12    Florida in the United States.  True?

13            A.     That's not what it reflects

14    here, but that's what I believe.  But it

15    doesn't reflect here.  It doesn't say

16    from where to where.  It doesn't say from

17    where, but it does say to where.

18            Q.     And you found out the cost

19    of shipping your drywall to Miami,

20    Florida in the United States.  True?

21            A.     This is ocean shipping cost

22    that I have found out for the client to

23    Florida, Miami.

24            Q.     Mr. Che, I show you an
```

```
 1    e-mail of January 10, 2007 from Ivan

 2    Gonima to you marked as Che Number 9.

 3                     -  -  -

 4              (Deposition Exhibit No.

 5         Che-9, E-mail dated 1/10/2007,

 6         Bates stamped TG 0000628, was

 7         marked for identification.)

 8                     -  -  -

 9              MR. SPANO:  What's the

10         Bates, please?

11              MR. MEUNIER:  Oh, I'm sorry,

12         Bates 628, TG 628.

13    BY MR. MEUNIER:

14         Q.    In the second paragraph of

15    this e-mail, Mr. Gonima says, "The test

16    reports Jorge brought with him when he

17    met with you in China are almost 90% in

18    Chinese.  Several customers have asked

19    for" these -- "for those reports but as

20    you can understand they want to see them

21    in English."

22              What test reports is Mr.

23    Gonima referring to?

24         A.    I don't recall.  It is not
```

Confidential - Subject to Further Confidentiality Review

 1    specified here.

 2            Q.     In the next paragraph, Mr.

 3    Gonima states, "Basically we need test

 4    reports supporting that all test required

 5    by American Codes & Standards are

 6    passed."

 7                   Do you know what test

 8    reports he refers to?

 9            A.     I don't recall, but from

10    here, I can't confirm.

11            Q.     Is it true that both TG and

12    TTP would furnish drywall that met ASTM

13    standards if requested by the customer?

14            A.     Can you repeat that?

15            Q.     Is it true that both TG and

16    TTP would provide drywall that met the

17    standards of the ASTM if requested by the

18    customer?

19            A.     From here, I can't really

20    see which test report did the customer

21    request.  So I can't really guess -- I

22    can't really guess for you.

23            Q.     That does not answer my

24    question, sir.

1          My question is whether TG

2     and TTP would agree to provide drywall

3     that met ASTM standards if requested by

4     the customer?

5          A.    This is only a test.  Right?

6     We used to have something like that at

7     TTP.  I believe this in TTP has been too

8     long.  I don't quite remember.  There

9     should be a test report regarding this in

10    TTP.  But I don't remember where did it

11    come from, because I'm only a

12    salesperson.

13         Q.    You know that ASTM stands

14    for the American Society for Testing and

15    Materials?

16         A.    I'm only notified of that

17    during these few days of preparing for

18    the deposition.  I only knew it by ASTM

19    before.  I only knew that it was a test

20    for the purpose of testing reports.  I

21    don't really know too much about these

22    details.

23         Q.    Have you now had the

24    opportunity to read the transcription of

1    the instant message conversations between

2    you and Mr. Gonima that was marked as Che

3    Number 5 at yesterday's deposition?

4            A.      The gentleman showed me that

5    information yesterday in here.

6            Q.      Have you now had an

7    opportunity to read the document?

8            A.      My English is not very good.

9    I can't read it myself, and I don't have

10   time for it.

11           Q.      Has it been read to you in

12   Chinese?

13           A.      No.

14           Q.      But when you typed your part

15   of those instant message conversations

16   with Mr. Gonima, you typed them in

17   English, did you not?

18           A.      Like I told the gentleman

19   over there yesterday.

20                   Were you here yesterday?

21           Q.      Yes.

22           A.      Okay, thank you.

23           Q.      So you typed them in

24   English?

1          A.      Like I said, I'm not sure.

2     Do I need to explain again?

3          Q.      Did you type your part of

4     those instant message conversations in

5     English?

6                  MR. SPANO:  Do you want me

7          to show him?

8                  MR. MEUNIER:  Please.

9                  THE WITNESS:  I had already

10         explained to you yesterday, MSN is

11         not an e-mail account.  After I

12         typed the message in my e-mail

13         account, I will sign off, but MSN

14         has always been online.  And the

15         computer was in my office.  It is

16         possible that he send me a

17         message, however, I replied to him

18         afterwards, after a long time.  It

19         is also possible that I was not in

20         the office and a colleague saw

21         that a customer was sending a

22         message, and then the colleague of

23         mine would be sitting there and

24         chat with the customer.  So I'm

Confidential - Subject to Further Confidentiality Review

```
1           not sure.  A booklet like this, in

2           order for me to be able to read it

3           understandably, it will take me

4           about a month.

5   BY MR. MEUNIER:

6           Q.    Is it true that when you

7   offered to give Mr. Gonima the lowest

8   possible prices for drywall in order to

9   set up a long-term business relationship,

10  you learned from him that American

11  drywall manufacturers were lowering their

12  prices?

13          A.    Where is it?

14          Q.    Please refer to page 2 of

15  Exhibit Che Number 1.  Is it 1?

16              MR. SPANO:  I think it's 5.

17              MR. MEUNIER:  Or Che-5, I'm

18          sorry.

19  BY MR. MEUNIER:

20          Q.    And I will --

21          A.    Which line are you referring

22  to?

23          Q.    I will begin with the entry

24  on February 7, 2007 at 12:55:36 a.m.
```

Confidential - Subject to Further Confidentiality Review

```
 1            A.    There is no 36.

 2            Q.    No.  Bottom of page 2.

 3            A.    There is 26.  26.  Right?

 4    12:51:26?

 5            Q.    No.  12:55:36.

 6            A.    Oh, 55.  Got it.

 7            Q.    I will read the portion I'm

 8    interested in for the record, and you

 9    will hear it from the translator.

10            Ivan.  "Please do not forget

11    if possible to send me a scale price

12    list.  Let's say from 0 to 15,000; from

13    15,000 to 50,000; from 50,000 to 75,000,"

14    et cetera.

15            A.    I'm sorry.  You don't have

16    to read it.  Let her read.  I can't

17    listen to both.

18            Can I have her interpret for

19    me directly?  I can't hear both.

20            Q.    Yes.

21            THE INTERPRETER:  I can wait

22            until you finish and then

23            interpret for him.

24            THE WITNESS:  I'm sorry, I
```

Confidential - Subject to Further Confidentiality Review

1           can't hear.

2                    MR. MEUNIER:  Why don't I

3           read it first for the record.  Why

4           don't I read it first for the

5           record first.

6                    THE WITNESS:  I'm sorry, I

7           don't know the rules.

8                    THE COURT:  Read it for the

9           record.

10    BY MR. MEUNIER:

11           Q.    Ivan.  "Please do not forget

12    if possible to send me a scale price

13    list.  Let's say from 0 to 15,000; from

14    15,000 to 50,000; from 50,000 to 75,000,"

15    et cetera.  "Something like that if you

16    have one."

17                    "Some customers asking us

18    what discount we can give them if they

19    sign a long term contract with us."

20                    Mr. Che Gang.  "In order to

21    set up long term business relation, we

22    will offer you the lowest price."

23                    Ivan.  "Great; I really

24    appreciate that."

```
 1                    "As you know American

 2     manufacturers are lowering their prices."

 3                    Mr. Che Gang.  "Yes, I see.

 4     We need support each other."

 5                    Ivan.  "So, when will you

 6     give me that lowest price list?"

 7                    Mr. Che Gang.  "We will

 8     offer the best price to you in our

 9     proforma invoice."

10                    MR. MEUNIER:  Please

11           translate that portion.

12     BY MR. MEUNIER:

13           Q.    Do you have any fact or

14     reason to disagree that that was the

15     conversation you had with Ivan Gonima?

16           A.    First of all, like I explain

17     to you earlier, I'm not sure -- I'm not

18     sure that this was me who sent the

19     message.  But I think everything on there

20     were polite response.  It is a way to

21     sale, just like if I'm selling this glass

22     of water, I'm selling him for $2.  I'm

23     selling to you for $3.  But in order to

24     sell you for a higher price, I will still
```

Confidential - Subject to Further Confidentiality Review

1    tell you that your price is lowest.

2    That's not a problem.  This is only a way

3    to sale.  But I really can't sure that I

4    sent these messages, because I don't

5    recall.

6              Q.    Yes.

7                    And if you want to sell to

8    me in America, and I tell you what the

9    American price for the goods is, you then

10   have an opportunity to give me a lower

11   price in order to sell.   True?

12             A.    Not necessarily.  It depends

13   on whether it will cover my costs or not.

14   I will never do anything that doesn't

15   cover the cost.

16             Q.    But taking costs into

17   account, you would try to compete with

18   the American price if you knew it?

19             A.    Can you repeat that

20   completely?

21             Q.    Taking the shipping costs

22   into account, you would still try to

23   price the drywall to compete with the

24   American price if you knew it?

```
 1          A.     In order to survive and to

 2    sell.  I don't care where are you sending

 3    the products to.  I compete with other

 4    manufacturer of gypsum board everywhere

 5    in order to make money.  If I could offer

 6    higher price, I will not sell it for

 7    lower price.  If the price in China is

 8    higher than yours, then I'll sell it to

 9    Chinese customer, not to American

10    customers.  We didn't really care about

11    different markets.  We do that only for

12    profit.

13          Q.     How did you keep up with the

14    price of drywall in America?

15               MR. SPANO:  Objection, lack

16          of foundation.

17               THE COURT:  Let's restate

18          that and ask whether he knows.

19    BY MR. MEUNIER:

20          Q.     As a salesperson, did you

21    try to find out the price of drywall in

22    other countries where you were selling

23    your drywall?

24          A.     We didn't care --
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. SPANO:  Objection, lack
 2         of foundation to that question.
 3              THE WITNESS:  We didn't
 4         care.
 5  BY MR. MEUNIER:
 6         Q.    Yesterday you were shown an
 7  e-mail to you from Mr. Gonima in which he
 8  asked that the drywall that Oriental
 9  Trading bought to be sold under the Dun
10  brand should have bonding tape with the
11  colors red, white and blue, the same as
12  the American flag.
13              Do you remember that?
14         A.    Can I see that document?
15         Q.    It's Jia Number 27.
16         A.    Can I go take a glass of
17  water?
18              THE COURT:  Yes.  Take a
19         10-minute break at this time.
20              VIDEOTAPE TECHNICIAN:  Going
21         off the record.  The time is
22         10:39.
23                   -   -   -
24              (A recess was taken from
```

Confidential - Subject to Further Confidentiality Review

```
 1            10:39 a.m. to 10:54 a.m.)

 2                      -   -   -

 3               VIDEOTAPE TECHNICIAN:  Going

 4         back on the record.  Beginning of

 5         Tape Number 3.  The time is 10:54.

 6    BY MR. MEUNIER:

 7         Q.    Mr. Che, yesterday you were

 8    shown an e-mail to you from Mr. Gonima in

 9    which he asked that the drywall that

10    Oriental Trading bought under the Dun

11    brand have bonding tape with the colors

12    red, white and blue, the same as the

13    American flag.

14               Do you remember that?

15         A.    Can you repeat that?

16         Q.    Do you remember yesterday

17    talking about this e-mail?

18         A.    Yes.

19         Q.    In fact, you knew from Mr.

20    Gonima that he wanted to use red, white

21    and blue because those are the colors of

22    the American flag.  True?

23         A.    I only remember that at the

24    time the customer designed the label of
```