Confidential - Subject to Further Confidentiality Review

```
 1    his request.  We produced according to

 2    the request of the customer.

 3          Q.     But you knew that he wanted

 4    those colors because they are the colors

 5    of the American flag.  True?

 6          A.     We did according to his

 7    request.

 8          Q.     But you knew he wanted those

 9    colors because they are the colors of the

10    American flag.

11                 Is that true?

12          A.     Whatever states in the

13    e-mail, then that's what it is, because

14    you have not yet translated for me

15    sentence by sentence.  But you can point

16    out for me which sentence you're

17    referring to.

18          Q.     I'm not going to go over

19    that e-mail again.  It was done

20    yesterday.  But I now want to refer you

21    to the instant messaging document again.

22    And I will read first for the record and

23    then ask the translator to provide the

24    Chinese to you, starting at the bottom of
```

Confidential - Subject to Further Confidentiality Review

1    page 6, date and time entry, February 25,

2    2007, 8:30:48 p.m.

3                Ivan.  "It is very important

4    for me to make sure you have this file

5    and the design for the tape showing the

6    right colors."

7                Mr. Che Gang.  "Another

8    question we want to confirm is that the

9    blue color of DUN logo is the same as the

10   background of letter D."

11               Ivan.  "Yes sir, it is the

12   same."

13               "So now you have it?  I

14   mean, you can see the tape with all the

15   colors?"

16               Mr. Che Gang.  "It appears a

17   little lighter than background of D."

18               Ivan.  "We want to use BLUE

19   RED and WHITE because those are the

20   colors of the American Flag."

21               "Yes I know.  We had that

22   problem because we scanned the DUN logo

23   from the catalog you gave us.  Because of

24   that it appears lighter."

```
 1                    Mr. Che Gang.  "You mean
 2      besides color white, we have color of
 3      blue, red and black, no others...?"
 4                    Ivan.  "Yes sir, you got it
 5      right."  In caps, "BLUE and," in caps,
 6      "RED from the American Flag plus," in
 7      caps, "WHITE and," in caps, "BLACK.  That
 8      is it; no more colors."
 9                    "Do you think we have it
10      right now or do you have another
11      question?"
12                    Mr. Che Gang.  "We will ask
13      the tape factory to design the bonding
14      tape as your requirements, and then let
15      you check it."
16                    Aside from you suggesting
17      that some other employee besides you
18      pretended to be you in sending these
19      instant messages, do you have any other
20      factual reason to dispute that this is
21      what you and Mr. Gonima said?
22                    MR. SPANO:  I object to the
23          form, it mischaracterizes the
24          testimony.
```

Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT:  He's under

 2         cross.  I'll allow it.

 3              THE INTERPRETER:  Where is

 4         the start of the e-mail, please?

 5              MR. MEUNIER:  2/25/07 at

 6         8:30:48.  That's on page 6.

 7              THE INTERPRETER:  Thank you.

 8              Just one moment, please.

 9         Where is ending of the reading?

10              MR. EUGENE CHEN:  There

11         should be one more.

12              MR. MEUNIER:  Ended at

13         2/25/2007, 8:41:50.

14              Mr. Che Gang.  "We will ask

15         the tape factory," et cetera.

16              THE WITNESS:  From the

17         document itself, it is only to

18         discuss and to confirm a design

19         pattern of Mr. Irvine.  We were

20         just trying to meet client's

21         requirement.

22    BY MR. MEUNIER:

23         Q.   Do you have any reason to

24    disagree that that was the conversation
```

```
 1    with Mr. Gonima, aside from suggesting

 2    that someone else pretended to be you?

 3          A.    It's not somebody pretended

 4    to be me.   It is somebody did that in my

 5    replacement, perhaps at the time I was

 6    not in the office.   We're talking about

 7    the content now.

 8          Q.    As a sales employee of TTP

 9    and TG, did you use a company computer

10    for all of your e-mails and instant

11    messaging?

12          A.    I did use company's

13    computer.   However, all the e-mail

14    accounts belong to ourself.

15          Q.    Did you save all of your

16    e-mails that you sent or received using a

17    company computer as a sales employee of

18    TTP and TG?

19          A.    Not necessarily.   Some of

20    the data -- some of the data were lost

21    because of reinstallation of computer.

22    And sometimes the e-mail accounts were

23    our private accounts, the accounts that

24    we applied ourselves.   The storage space
```

Confidential - Subject to Further Confidentiality Review

```
 1    in the e-mail was rather small.  When the

 2    space was not sufficient, we would delete

 3    the older e-mails.

 4         Q.    Did you save the instant

 5    messaging from your work as a sales

 6    employee of TTP and TG?

 7         A.    TTP and what company?

 8         Q.    TG.

 9         A.    I did not do that purposely.

10         Q.    You did not save your

11    instant message material?

12         A.    I did not save it purposely.

13    Perhaps it automatically created a saved

14    version, but when I reinstall the

15    computer, they are all lost.  Therefore,

16    I don't have any memory of these

17    information.

18         Q.    Yesterday you were asked

19    about your instant message conversation

20    with Mr. Gonima in which you told him

21    your company could manufacture 10,000

22    sheets of drywall a day, 30,000 a month

23    using one production line.

24         A.    Where is it?
```

```
 1          Q.     Let me finish the question
 2     first.
 3                 And that you could have
 4     three production lines if necessary.
 5                 Do you remember that
 6     discussion yesterday?
 7          A.     We did not discuss about
 8     that yesterday.
 9          Q.     Isn't it true, Mr. Che, that
10     you told Ivan Gonima that your company
11     could make 10,000 sheets of drywall in
12     one day in response to him telling you
13     that he needed millions of pieces of
14     drywall because construction was booming
15     in Las Vegas?  Is that true?
16          A.     I don't know where in the
17     document you're referring to.
18          Q.     Please refer to page 11 of
19     the instant message exhibit.  I will
20     begin reading at March 4, 2007,
21     8:35:45 p.m.
22                 Ivan.  "Did you receive my
23     e-mail about a client in Las Vegas?  I
24     need to talk to you urgently about that
```

Confidential - Subject to Further Confidentiality Review

```
 1    volume of sheets of drywall."

 2                   "I need to know what is the

 3    maximum number of sheets" (4 feet by

 4    8 feet by 1/2 inch) "you can supply us.

 5    That is what they need."

 6                   "I also need to know what is

 7    the best price you can give me for this

 8    volume.  We are talking about millions of

 9    units and we would have to sign a

10    contract with this buyer."

11                   "Construction is booming in

12    Las Vegas and they need millions of

13    pieces."

14                   "Please answer me when you

15    read this; I will be checking it because

16    I need an urgent answer."

17                   "Thanks."

18                   Mr. Che Gang.  4 feet by

19    8 feet by 1/2 inch "regular gypsum board

20    loading 980 sheets/40fcl by pallet, FOB

21    qingdao port price" US dollar 2.60 per

22    sheet.

23                   "This is the best price."

24                   "We can make 10000
```

Confidential - Subject to Further Confidentiality Review

 1   sheets/one day."

 2            Do you have any reason to

 3   deny that this was the conversation you

 4   had with Mr. Gonima?

 5        A.    Let's not talk about the

 6   same things we talked about before.

 7   Let's only talk about the issues that is

 8   reflected or here.  You can ask me

 9   questions on that.

10        Q.    Sir, I will decide what

11   questions to ask you subject to the

12   judge's order.

13            Is that understood?

14        A.    I understand.

15        Q.    My question is, do you have

16   any reason to deny that that was the

17   conversation you had with Ivan Gonima?

18        A.    I also do not have any

19   reason to confirm that it's our

20   conversation.

21        Q.    After the October 2006

22   agreement with Oriental Trading for the

23   sale of gypsum board, you also discussed

24   with Mr. Gonima his company's purchase of

Confidential - Subject to Further Confidentiality Review

```
 1    related products, such as metal studs,

 2    screws and tape.  Is that true?

 3            A.    That's not what it reflected

 4    here.  Only gypsum board.

 5            Q.    I'm not talking about --

 6            A.    We are talking about here.

 7            Q.    -- that part of the document

 8    anymore.

 9            A.    You're talking too fast.  I

10    can't follow.

11            Q.    Let's put that away.

12            A.    You just mentioned this, and

13    now you're changing to another subject.

14    I don't understand.

15            Q.    Yes.

16            A.    I'm sorry.

17            Q.    After the sole agency

18    agreement with Oriental Trading in

19    October of 2006 for the sale of gypsum

20    board under the Dun brand, you also

21    discussed with Mr. Gonima selling his

22    business products related to drywall such

23    as metal studs or frames, screws and

24    bonding tape.  Is that true?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    No.  First of all, because

 2    Oriental company had exaggerated their

 3    volume.  And upon the customer's request,

 4    I signed that agreement with them.

 5    However, the precondition for the

 6    effectiveness of the contract is that it

 7    has to be within a period of time that we

 8    both agreed to sell certain volume of

 9    gypsum board.  But in fact, during that

10    period of time, he did not sell anything

11    at all.  Therefore, that agreement is

12    invalid.  And also, after Jorge took the

13    agreement, he once promised to mail back

14    the original to us; however, we have

15    never received that, as far as I can

16    remember, and also, we did not find it in

17    our company's file.  Therefore, I'm even

18    more assured that the agreement is

19    invalid.  As of what you have said about

20    metal stud --

21               THE INTERPRETER:

22          Interpreter clarification.

23               THE WITNESS:  As what you

24          have mentioned, metal stud and
```

Case 2:09-md-02047-EEF-JCW Document 13246-34 Filed 03/26/12 Page 12 of 125
Case 2:09-md-02047-EEF-JCW Document 13254-34 Filed 03/21/12 Page 12 of 125
Confidential - Subject to Further Confidentiality Review

```
 1              screw, the discussion about these

 2              was for the purpose of returning

 3              and resolving the $100,000 that

 4              Oriental company would pay us.

 5              This has also been the same

 6              request that Oriental company

 7              expressed in multiple e-mails.

 8              That's a fact of this.

 9   BY MR. MEUNIER:

10          Q.      Are you finished?

11          A.      Yes.

12          Q.      Before giving Mr. Gonima

13   prices on metal frames and other

14   products, you wanted to know the price

15   levels for these products charged by

16   American manufacturers.  Isn't that true?

17          A.      I don't recall.

18          Q.      Please refer to page 20 of

19   the instant message document.  I will

20   read starting at the top of that page for

21   the date March 13, 2007, 9:22:47 p.m.

22                  Ivan.  "Any news on the

23   metal frame and other products?"

24                  Mr. Che Gang.  "At this
```

Confidential - Subject to Further Confidentiality Review

1  moment, the price of steel belt is

2  increasing, not steady."

3         "We want to offer you a

4  steady price for metal stud to you.

5         Ivan.  "But still I need to

6  have a price; our clients are asking for

7  a quote."

8         "I understand your point but

9  we have to compare with the american

10 manufacturers pricing."

11        "I think they are also

12 paying high price for the steel belt they

13 are" using.  Not suing, sorry.

14        Mr. Che Gang.  "Would you

15 please let us know the price level of

16 American manufacturers?"

17        Do you have any reason to

18 deny that this was the conversation you

19 had with Mr. Gonima?

20     A.    I can't be sure that I was

21 the person who said that.

22     Q.    Is it true that you provided

23 US customers not only shipping costs to

24 cross the ocean from China to the US but

Confidential - Subject to Further Confidentiality Review

```
 1    also land transportation costs from US

 2    ports to inland cities?

 3          A.    Upon request of the

 4    customers, I had only inquired some of

 5    the prices of their requests.  But as of

 6    where are they going, for me, it's

 7    meaningless.

 8          Q.    For example, you agreed to

 9    give Mr. Gonima the cost of transporting

10    your company's drywall across land from

11    Miami, Florida to Orlando, Florida.  Is

12    that true?

13          A.    Where is it?

14          Q.    At page 25 of the instant

15    message document.  I will begin reading

16    at the bottom time entry.  Date entry is

17    April 14, 2007 at 10:34:42 p.m.

18                Ivan.  "I understan you will

19    ship the containers to Miami," Florida

20    "or could you give me a price up to

21    Orlando...including the land portion?"

22                Mr. Che Gang.  "Can he

23    operate the 40 container of 28-29 tons?"

24                Ivan.  "Yes, he can."
```

Confidential - Subject to Further Confidentiality Review

1                    "We already found a way to

2        solve that problem."

3                    Mr. Che Gang.  "Ok fine."

4                    Ivan.  "But if you can give

5        me a price from Qingdao to Orlando

6        directly I will consider your quote."

7                    Mr. Che Gang:  "Ok sir, I

8        will."

9                    Do you have any reason to

10       deny that that was your conversation with

11       Mr. Gonima?

12            A.    I can't confirm that.

13            Q.    Mr. Che, you learned that a

14       storm called Hurricane Katrina had caused

15       the destruction of property and the need

16       to rebuild some cities in the area of

17       that storm.  Is that true?

18            A.    I don't recall.

19            Q.    Please, on the same page

20       we've been reading from, which is page 26

21       of the instant message document, I'll

22       begin reading it on April 14, 2007 at

23       10:38:10 p.m.

24                   Ivan.  "I will be waiting

Confidential - Subject to Further Confidentiality Review

```
 1    for your answer.  The quote from Qingdao

 2    to Gulfport is VERY," in caps, very,

 3    "important.  We have somebody asking us

 4    for 2,000,000" 4 feet by 8 feet by 1/2

 5    inch "sheets."

 6                "These would be for the

 7    reconstruction of some cities destroyed

 8    by Hurricane Katrina."

 9                Mr. Che Gang.  "Ok sir, I

10    will confirm it quickly, have a great

11    night!"

12                Do you have any reason to

13    deny that that was the conversation you

14    had with Mr. Gonima?

15         A.    This is only a message sent

16    by the customer.  I really can't recall.

17    I also cannot confirm that it was indeed

18    me who was having a conversation with

19    him.

20         Q.    Yesterday you were shown a

21    series of e-mails Bates numbered TG 915

22    through TG 920.  It's marked as Che

23    Number 2.  And I want to again direct

24    your attention to Mr. Gonima's e-mail of
```

Confidential - Subject to Further Confidentiality Review

```
 1    April 15, 2007, starting on page TG 917.

 2              In that e-mail, Mr. Gonima

 3    asked you for --

 4         A.    Which one?

 5         Q.    I just -- it's the e-mail

 6    from Ivan Gonima to the witness.  It's

 7    dated April 15, 2007, and it begins on

 8    the page which is Bates numbered TG 917.

 9         A.    This one?

10         Q.    Yes.

11              In that e-mail, Mr. Gonima

12    asked you for ocean freight rates for

13    your company's drywall to be shipped to a

14    number of cities, which included eight

15    cities in the United States of America.

16    Is that true?

17         A.    This is only an e-mail in

18    which the customer asked me to help him

19    inquire about the shipping costs.

20         Q.    Yes, sir.

21              But the fact is that you

22    then responded and gave him the requested

23    information for those cities, didn't you?

24         A.    I was only helping out the
```

Confidential - Subject to Further Confidentiality Review

```
 1    customer.  In fact, my operation was done

 2    still according to FOB Chinese port.

 3         Q.    I show you a document which

 4    is Bates numbered TG 913 to TG 914 and

 5    refer you to your e-mail to Oriental

 6    Trading dated April 17, 2007.

 7              I think I'm going to give it

 8    a separate exhibit number.  It was not

 9    included in the other.

10              MR. MEUNIER:  What's the

11         number?

12              MR. SPANO:  913.

13              MR. MEUNIER:  Yes, but it's

14         Che --

15              MR. SPANO:  10.

16              MR. MEUNIER:  Che Number 10.

17                   -  -  -

18              (Deposition Exhibit No.

19         Che-10, E-mail chain, top one

20         dated 4/18/2007, Bates stamped TG

21         0000913 and TG 0000914, was marked

22         for identification.)

23                   -  -  -

24    BY MR. MEUNIER:
```

Confidential - Subject to Further Confidentiality Review

1         Q.    Is it true that in this

2    e-mail, in response to Mr. Gonima's

3    request, you provided shipping cost

4    information for eight cities in the

5    United States of America?

6         A.    Which e-mail are you talking

7    about?  The one on the bottom or the one

8    on the top?

9         Q.    Yes.  From Wuyu, sent

10   Tuesday April 17, 2007, 11:17 p.m.,

11   "Subject:...Shipping."

12              Is it true that in response

13   to Mr. Gonima's earlier e-mail, you

14   provided shipping cost information for

15   your company's drywall to be sent to

16   eight cities in the United States of

17   America?

18        A.    Is inquiry for shipping cost

19   stated in this e-mail on top?

20        Q.    No.  I suggest to you that

21   the list of the cities matches the list

22   of the cities in Mr. Gonima's e-mail to

23   you on April 14, 2007, which we just

24   looked at.

Confidential - Subject to Further Confidentiality Review

1                Do you see that, sir?

2        A.    He's the judge.  First of

3  all, I don't understand English very

4  well.  If I am shown like this, I don't

5  understand the context.  I'd like the

6  interpreter to explain to me content of

7  these e-mails.  Otherwise, I can't answer

8  the question.

9        Q.    When you are clear what

10  e-mail I'm referring you to --

11        A.    This one?

12        Q.    -- the interpreter will

13  translate for you.

14        A.    Okay.

15        Q.    In the e-mail from you dated

16  April 17, 2007, did you provide shipping

17  cost information for the same cities in

18  Mr. Gonima's e-mail to you of April 14,

19  2007?

20        A.    Yes.  Upon the request of

21  Mr. Ivan, I inquired the shipping costs

22  for him.  Mr. Ivan told me some of these

23  names.

24        Q.    Yes.

Confidential - Subject to Further Confidentiality Review

```
 1                 And you obtained shipping

 2     cost information for the following

 3     cities:  Gulfport, Mississippi; New

 4     Orleans, Louisiana; Long Beach,

 5     California; Las Vegas, Nevada; Savannah,

 6     Georgia; Atlanta, Georgia; Charleston,

 7     South Carolina; and Wilmington, North

 8     Carolina.  Eight cities in the United

 9     States.  True?

10             A.    I don't recall the details.

11     But according to the principle of our

12     operation in a company, usually when the

13     customer ask for our help for such

14     information, I would copy the ports in

15     question and send to a few shipping

16     companies and to have them fill out the

17     information, which are the prices, and

18     then copy it back, send it to the

19     customer.  As where the customer would

20     like to send it to, those were the

21     requirement of the customers.  For us,

22     it's all the same.  It doesn't matter

23     where they're sending to.  They could

24     send it to these places or Hong Kong or
```

1   China.  We were only providing help.  In

2   fact, the principle that our company

3   required of us was only to deliver in

4   China.

5          Q.    How did you obtain this

6   information?

7          A.    Shipping agent quoted the

8   information.

9          Q.    Explain the letters in the

10  parentheses after each of these cities?

11         A.    I don't understand that

12  either.

13         Q.    For example, Gulfport,

14  Mississippi, you put in parentheses "(CY

15  - DR)."

16                What does that stand for?

17         A.    I only copied that

18  information to the shipping agent, and

19  the shipping agent quoted the price and I

20  copied it back.  I did not pay special

21  attention to these.  I also don't

22  understand what he meant by that.

23         Q.    And is that also true for

24  the letters in parentheses after the

Confidential - Subject to Further Confidentiality Review

```
 1    numbers, for example, "EMC," "APL," et

 2    cetera?

 3          A.    These are the shipping

 4    agent's abbreviation.  That I know.  This

 5    is something that we use often.

 6          Q.    Las Vegas, Nevada is not a

 7    port city, is it?

 8          A.    I don't know.

 9          Q.    But you provided shipping

10    costs for that city.  True?

11          A.    I don't know these

12    information.  I just copied it to the

13    shipping agency, and the shipping agent

14    provided the information back to me, I'll

15    copy it back to them.  What I can

16    understand are the pricings provided by

17    the shipping companies.  That's what it

18    is reflected here.

19          Q.    So some of the cost --

20          THE INTERPRETER:  One

21          moment, please.

22          MR. MEUNIER:  Oh, I'm sorry.

23          THE WITNESS:  What I could

24          understand was that in this part
```

Confidential - Subject to Further Confidentiality Review

```
 1          are the name of the shipping

 2          company and on this part were the

 3          prices.  I didn't really pay

 4          attention to the rest of them.  I

 5          didn't understand either.

 6  BY MR. MEUNIER:

 7          Q.    Some of the cost

 8  information, for example, in the case of

 9  Las Vegas, Nevada, as far as you know,

10  involved land transportation costs as

11  well.  Is that true?

12          A.    I don't know.

13          Q.    Later Mr. Gonima asked you

14  to provide shipping cost information for

15  some additional cities in the United

16  States.  Is that true?

17          A.    Where is it?

18          Q.    I'm going to show you an

19  e-mail from Mr. Gonima to you dated May

20  10, 2007.  I've marked it as Che Number

21  11.

22                      -  -  -

23          (Deposition Exhibit No.

24  Che-11, E-mail dated 5/10/2007,
```

Confidential - Subject to Further Confidentiality Review

```
 1            Bates stamped TG 0000902, was

 2            marked for identification.)

 3                    -  -  -

 4            MR. SPANO:  What are the

 5    Bates?

 6            MR. MEUNIER:  Oh, I'm sorry.

 7    Bates number is TG 902.

 8            THE WITNESS:  What is your

 9    question?

10    BY MR. MEUNIER:

11        Q.    In this e-mail to you, Mr.

12    Gonima asked you to provide ocean freight

13    rates for drywall to four US cities --

14    actually, I'm sorry, five US cities as

15    follows:  West Palm Beach and Tampa,

16    Florida; Houston, in Texas; Norfolk, in

17    Virginia; Newark, in New Jersey.

18        A.    This is also upon the

19    request of Mr. Irvin, to have us to

20    assist him in inquiring the shipping

21    costs.

22        Q.    And you provided that

23    information to Mr. Gonima?

24        A.    There is no response here.
```

Case 2:09-md-02047-EEF-MCW   Document 13454-35   Filed 03/21/12   Page 10 of 25
Confidential - Subject to Further Confidentiality Review

1    I don't recall.

2         Q.    It was your custom to

3    provide that information if requested?

4         A.    Not necessarily.  It depends

5    on whether the shipping company would

6    provide me such information.  I would

7    copy it to the shipping company, and they

8    would copy to me and I will copy to them.

9    Usually, I don't even look at the

10   details.

11        Q.    In the same e-mail from Mr.

12   Gonima, he asked you to provide the cost

13   of shipping drywall screws to a number of

14   cities, including 11 US cities.  Is that

15   true?

16        A.    You mean here?

17        Q.    Yes.  Same e-mail.

18        A.    I believe that's only an

19   inquiry, just like what I explained

20   earlier.  They asked me to help them to

21   inquire.

22        Q.    Yes, sir.

23              And let me correct the

24   record.  It's actually 13 cities.  I'll

Confidential - Subject to Further Confidentiality Review

1    read them for the record.  This is for

2    the cost of shipping drywall screws,

3    Miami, Florida; West Palm Beach, Florida;

4    Tampa, Florida; Savannah, Georgia;

5    Charleston, South Carolina; Wilmington,

6    North Carolina; Norfolk, Virginia;

7    Newark, New Jersey; Long Beach,

8    California; Houston, Texas; Gulfport,

9    Mississippi; New Orleans, Louisiana; Las

10   Vegas in Nevada, in parens, via, V-I-A,

11   Long Beach, California.

12              Your custom was to ask

13   shipping agents for this information, and

14   then if they provided it to you, you

15   would give that to a customer like Mr.

16   Gonima.  Correct?

17        A.    My customed way of dealing

18   with this is usually I don't even look at

19   the contents, but I will send it directly

20   to the shipping agents.  And the shipping

21   agents, after they fill up the

22   information, if -- which is if they could

23   give me an instant answer, then I could

24   forward it to the client.  If the

Confidential - Subject to Further Confidentiality Review

 1   shipping company were not able to provide

 2   me with the information for a longer

 3   period of time, perhaps we'll just put it

 4   aside, unless the customer would mention

 5   it again, and then there will be another

 6   cycle of activity.

 7            Q.    You've testified about the

 8   $100,000 reimbursement request that was

 9   made by Oriental Trading Company.

10            Do you recall that?

11            A.    Yes, I remember.

12            Q.    This $100,000 was an advance

13   deposit made by Oriental Trading when it

14   signed the sole agency agreement in

15   October 2006.  Is that true?

16            A.    No.  It had nothing to do

17   whatsoever with that agreement.  It is

18   also that afterwards our intercompany

19   wished to purchase products from us, just

20   like any other customer.  And they wired

21   the payment to us.  And for many reasons,

22   they did not actually want to have the

23   products.  So later on, according to

24   perhaps Mr. Ivan in Oriental Company,

 1    upon his request, he entrusted a

 2    representative office in China to have us

 3    send back the payment to the account

 4    number in China of that representative

 5    office.  That's what was going on.

 6            Q.    You tried to convince your

 7    company to return the $100,000 to

 8    Oriental Trading.  Is that true?

 9            A.    It was not that I attempted

10    to persuade my company; it was because

11    there was a rule of foreign currency

12    exchange in China.  There were many

13    redundant processes.  We had to find out

14    a way to handle this amount of money.

15            Q.    And the way that you and

16    your company proposed to handle this

17    problem was to export additional products

18    to Oriental Trading instead of paying

19    back the cash.  Is that true?

20            A.    The circumstance was at the

21    time, because of foreign currency rules

22    and regulations in China, according to

23    the request of Oriental company, we were

24    supposed to return it back to them.  But

Confidential - Subject to Further Confidentiality Review

1    it was really, really hard to operate

2    that way.  So after discussion with

3    Oriental company to try to find a

4    solution for it.

5         Q.    I show you an exchange of

6    e-mails from December 2008.  It's Bates

7    number 21477, and I have marked it as Che

8    Exhibit Number 12.

9                    -  -  -

10                 (Deposition Exhibit No.

11             Che-12, E-mail chain, top one

12             dated Dec 19, 2008, Bates stamped

13             TG 0021477, was marked for

14             identification.)

15                    -  -  -

16                 MR. SPANO:  Objection.  It's

17             two half e-mails here.

18                 MR. MEUNIER:  21477?

19                 MR. SPANO:  Does it continue

20             on the next page?

21                 MR. MEUNIER:  I'm looking at

22             the one in the middle.  It's a

23             complete e-mail.

24                 MR. SPANO:  Okay.  If that's

Confidential - Subject to Further Confidentiality Review

1          all you're going to question him

2          on.

3    BY MR. MEUNIER:

4          Q.    I'm referring to your e-mail

5    to Mr. Guzman dated December 16, 2008 in

6    which you said, starting in the second

7    sentence, "I am working hard to return

8    the money to you, but our bank and our

9    accounting departments need time to

10   operate this thing.  It is so complicated

11   and time-consuming.  I suggest that we

12   can export something to you, for example

13   the metal keels, the steel belt price

14   have went down in China.  And some

15   customers from USA start to order the

16   metal keels now.  We think it is the most

17   operable and easiest way."

18          Let's clear that up for the

19   record.

20          Metal keels are the frames

21   or studs that the drywall attaches to?

22         A.    Stud?  Oh, okay.

23              THE INTERPRETER:

24         Interpreter clarification.

```
 1              Deponent said the stud is supposed

 2              to be translated as dragon bone,

 3              so I will use dragon bone from now

 4              on.

 5    BY MR. MEUNIER:

 6         Q.    Very, very nice.

 7              What are the metal keels

 8    that you were referring to in this

 9    e-mail?

10         A.    Usually I call metal keel

11    metal stud.  I don't really use metal

12    keel that much.

13         Q.    But whether you call it

14    metal keel or metal stud or dragon bone,

15    it is a product manufactured by TG, at

16    the same factory where the drywall is

17    made, and the drywall attaches to the

18    metal stud or keel.  Is that true?

19              MR. SPANO:  Objection,

20         compound and no foundation.

21              THE COURT:  I agree.

22         Sustain.

23              MR. MEUNIER:  I'll rephrase.

24    BY MR. MEUNIER:
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Let me just ask this
 2    question.
 3                Did TG make metal keels?
 4          A.    No.
 5          Q.    Did TTP make metal keels?
 6          A.    No.
 7          Q.    Who made metal keels that
 8    you were referring to in this e-mail?
 9                THE INTERPRETER:  Literal
10          translation of the name of the
11          company that the deponent was
12          saying is --
13                THE WITNESS:  Golden Shield
14          Construction Material Company or
15          Golden Dun, either.
16    BY MR. MEUNIER:
17          Q.    But the metal keel is
18    something that drywall attaches to, Mr.
19    Che?
20          A.    When we do the hanging
21    ceiling or the divider, we would first of
22    all place the metal stud.  And then we
23    will use the nail to attach the gypsum
24    board to it.
```

1          Q.     And the company that you

2     just named that you said makes the metal

3     keel, that was a company created by the

4     Taihe Group.   Correct?

5          A.     I'm not sure about the

6     specific relationship of this company

7     with TG.

8          Q.     How did you have authority

9     in your December 16, 2008 e-mail to offer

10    the export of metal keels to Mr. Gonima

11    as an employee of Taishan Gypsum?

12         A.     I bought it and I sold it.

13         Q.     Taishan Gypsum bought it?

14         A.     It was not actually

15    operated.   If at the time I worked for

16    TTP, then TTP would have bought it and

17    then we would have sold it to the client.

18    If at the time I worked for TG, I would

19    have used the name -- TG company's name

20    to buy the product and in turn sell it to

21    the client.

22         Q.     In Mr. Gonima's reply to you

23    in the e-mail of December 19, 2008 on

24    this document, he told you,

1    "Unfortunately, the actual situation in

2    USA is not the best for import new

3    products and the owner" of "the company

4    needs the reimbursement" of the US

5    dollars 100,000.

6              However, even after this,

7    your boss continued to suggest that

8    instead of refunding the cash, your

9    company wanted to export goods to

10   Oriental Trading Company.  Is that true?

11        A.    I don't see it over here.

12   It's not here.  Right?

13        Q.    Yes, sir.  I'm going to show

14   you an exchange of e-mails from March

15   2009 on a document Bates numbered 21470.

16                  -   -   -

17              (Deposition Exhibit No.

18              Che-13, E-mail chain, top one

19              dated March 6, 2009, Bates stamped

20              TG 0021470, was marked for

21              identification.)

22                  -   -   -

23   BY MR. MEUNIER:

24        Q.    I first direct your

Confidential - Subject to Further Confidentiality Review

```
 1   attention to a March 6, 2009 e-mail from

 2   Leonardo Guzman on behalf of Oriental

 3   Trading.

 4               MR. CHEN:  I'm sorry,

 5          Counsel.  Is there another Bates

 6          number on there?  Because it's not

 7          in our book.

 8               MR. MEUNIER:  21470.

 9               MR. EUGENE CHEN:  I go

10          straight from 69 to 75, or if you

11          have another copy.

12               MR. SPANO:  You can go ahead

13          with it.

14   BY MR. MEUNIER:

15          Q.    In his e-mail to you, Mr.

16   Guzman asks if you have any news about

17   the $100,000 reimbursement.  And in your

18   reply e-mail of March 6, 2009, you say

19   the following:  "I still try my best to

20   convince our boss to pay the" US dollar

21   100,000 "to you.  but my boss said that

22   making the account of bank is difficult,

23   so he suggest we" export "the goods to

24   you, I often talk about this things with
```

Confidential - Subject to Further Confidentiality Review

```
 1    our boss.  I need wait for that he

 2    agree."

 3                  Who was your boss that you

 4    were referring to in that mail?

 5           A.    When I talk about boss here,

 6    it's only to express to him that we take

 7    this issue seriously.  Actually, I really

 8    didn't need the boss to coordinate.  This

 9    needed to be coordinated with the

10    accounting department.

11           Q.    Who was the boss that you

12    were referring to?

13           A.    No specific name.  It's only

14    a way of expression which was telling him

15    that we took the issue seriously.

16           Q.    So when you told him I often

17    talk about this with my boss, with our

18    boss, you were not being truthful?

19           A.    It's not that I was not

20    truthful.  It is only a way to do sales.

21    When I say boss, then the client would

22    assume that I took it very seriously.  I

23    was trying to help him to get the money

24    back.  In fact, the boss actually was not
```

Confidential - Subject to Further Confidentiality Review

```
 1    in charge of detailed businesses.

 2    Usually, I would need only to coordinate

 3    with financial department for issues like

 4    this.

 5           Q.    Who was your boss in March

 6    of 2009?

 7           A.    March 2009 I went back to

 8    TG.

 9           Q.    So who was your boss?

10           A.    Our big boss should be

11    General Manager Jia.  However, I only

12    reported to Manager Peng for my work.

13    There were quite a few levels in between

14    us.

15           Q.    Peng Wenlong is the boss you

16    reported to?

17           A.    You shouldn't say boss.  We

18    don't call him boss.  The boss here does

19    not have a specific person that we're

20    referring to.  It's not referred to any

21    specific person called that.

22           Q.    Well, when you told Mr.

23    Gonima that instead of repaying cash, the

24    boss suggested the export of goods, what
```

Confidential - Subject to Further Confidentiality Review

1    export of goods were you referring to?

2              A.    What he says is as long as

3    we can find a way to return this amount

4    of money differently, there's no

5    specification on that.

6                        THE COURT:  Let's take a

7              break at this time.  We'll come

8              back at 1:00.

9                        VIDEOTAPE TECHNICIAN:  We're

10             going off the record.  The time is

11             12:02.

12                            -   -   -

13                        (A luncheon recess was taken

14             from 12:02 p.m. to 1:01 p.m.)

15                            -   -   -

16                        VIDEOTAPE TECHNICIAN:  We're

17             going back on the video record.

18             The time is 1:01 p.m.

19                        THE COURT:  You may proceed,

20             Counsel.

21   BY MR. MEUNIER:

22             Q.    Mr. Che, I'm showing you an

23   e-mail dated January 5, 2006, addressed

24   to you from Jing Zhang, Bates numbered TG

Confidential - Subject to Further Confidentiality Review

```
 1    886, which I will mark as Che Number 14.

 2                    -  -  -

 3                 (Deposition Exhibit No.

 4         Che-14, E-mail dated 1/5/2006,

 5         Bates stamped TG 0000886, was

 6         marked for identification.)

 7                    -  -  -

 8    BY MR. MEUNIER:

 9         Q.    In this e-mail, Mr. Zhang

10    asked you for price information on

11    certain sizes of gypsum board, and in

12    paragraph 8, said the following to you,

13    "I need better price of it..because we

14    are consider increase to 20 contains per

15    month.  Because yesterday, you told me

16    price is too" high, "after shipping

17    everything it will be about 9 dollars per

18    piece is too high for cost to doing this

19    business.  i Need better price, And we

20    are looking for long  term relationship

21    with you.  So, we would like to have"

22    competitive "price to compete local

23    manufactory in this blooming

24    opportunities.  After Hurricane Katrina,
```

Confidential - Subject to Further Confidentiality Review

```
 1    the Great New Orleans area need rebuild,

 2    and housing market in USA is very hot in

 3    these days.  The both effects, we hope

 4    you and us can both take advantage from

 5    it.  So, please give us your best price,

 6    you can offer."

 7                   How did you know Mr. Zhang?

 8         A.    I don't recall.

 9         Q.    He ends this e-mail by

10    saying, "Thanks a lot buddy."

11                   Was he a friend of yours?

12         A.    That's what he said.  I

13    think it is only out of politeness from

14    him to me.

15         Q.    Was he a friend of yours?

16         A.    I think it is only an

17    inquiry of price.  He was only a -- my

18    understanding to that is, first of all,

19    it is out of his politeness to me.  And

20    number two, I think he is a potential

21    buyer.

22         Q.    And in fact, you responded

23    to his e-mail, giving him the information

24    he wanted and even giving him shipping
```

Confidential - Subject to Further Confidentiality Review

 1    costs from China to Louisiana, didn't

 2    you?

 3            A.    Can I take a look at the

 4    e-mails?

 5            Q.    Yes.

 6                  I'm going to show you a

 7    document now that's Bates numbered TG 907

 8    and 908.  I will mark it as Che Exhibit

 9    Number 15.

10                        -   -   -

11                  (Deposition Exhibit No.

12            Che-15, E-mail chain, top one

13            dated 1/10/2006, Bates stamped TG

14            0000907 and TG 0000908, was marked

15            for identification.)

16                        -   -   -

17    BY MR. MEUNIER:

18            Q.    The first e-mail I refer you

19    to is one on TG 908, the second page.

20    And it is an e-mail to you from Mike

21    Westbrook on January 10, 2006.  Mr.

22    Westbrook tells you in the e-mail, "Mr.

23    Jing Zhang has been trying to get a

24    written quotation from you on 4 sizes of

Confidential - Subject to Further Confidentiality Review

```
 1    Sheetrock."

 2                    And then your e-mail of

 3    reply is January 10, 2006, which starts

 4    on TG 907.  You address this e-mail,

 5    "Dear Mr. Mike and Mr. Zhang."

 6                    So you were responding to

 7    both Mike Westbrook and Jing Zhang with

 8    this e-mail.  Correct?

 9         A.    Can you provide me with

10    another e-mail which states what company

11    that this person belong to?  I can't

12    recall this person.

13         Q.    Look at the e-mail just

14    above yours, which is from Mike Westbrook

15    to you of January 10, 2006.  And he signs

16    it "Mike Westbrook, Advanced Products

17    International."

18                    And Advanced Products is one

19    of the companies that you are here to

20    testify about on behalf of TG and TTP.

21    Correct?

22         A.    Yes.

23         Q.    And in your January 10, 2006

24    e-mail to Mike Westbrook which you
```

Confidential - Subject to Further Confidentiality Review

```
 1    addressed to both Mr. Mike and Mr. Zhang,

 2    you provided the price and shipping cost

 3    information that was requested in Mr.

 4    Zhang's e-mail to you of January 5, 2006.

 5    Correct?

 6          A.    I quoted to him FOB price

 7    according to the principle of our

 8    company.  And again, I inquired the

 9    shipping cost according to the request of

10    the customer.

11          Q.    Yes.  Mr. Zhang did not

12    specifically ask you for shipping cost to

13    Louisiana, but he told you about the

14    great need to rebuild in New Orleans

15    because of the Hurricane Katrina.

16    Correct?

17          A.    First of all, I'd like to

18    confirm, the company ADP and the final

19    customer whom we handled in the end, who

20    and who are the same customer.  I'm a

21    little confused here.

22          Q.    Let's take it a step at a

23    time.

24                In your e-mail of January
```

Case 2:09-md-02047-EEF-JCW   Document 13246-9   Filed 03/26/12   Page 45 of 125
Case 2:09-md-02047-EEF-JCW   Document 13154-35   Filed 03/21/12   Page 20 of 25
Confidential - Subject to Further Confidentiality Review

1    10, 2006 --

2            A.    But you have to remind me.

3    Then I can refresh my memory.

4            Q.    It's Advanced Products, Mr.

5    Che.

6            A.    I don't remember this

7    company.  This should not be the end user

8    for exporting.

9                  MR. SPANO:  I object to an

10                 assertion of fact.  That's not a

11                 question.

12   BY MR. MEUNIER:

13           Q.    We'll look at some documents

14   in a moment.  Let me just, before I move

15   on, ask this question.

16                 In your e-mail of January

17   10, 2006 to Mr. Mike and Mr. Zhang, you

18   provided ocean freight cost for drywall

19   to be shipped from Qingdao to Louisiana.

20   Is that true?

21           A.    The reason why I ask you for

22   the name of the handling company was

23   because I will need that name in order to

24   answer your question accurately.  But if

Confidential - Subject to Further Confidentiality Review

```
 1    you're not telling me who that handling

 2    company is, it's hard for me to remember.

 3         Q.    Let's --

 4         A.    What is the name of the

 5    company that eventually appeared on the

 6    manufacturer's list?

 7         Q.    Let's do it this way.

 8              Look at the top of the page

 9    which is the Bates stamp 908, paragraph

10    number 3 of your e-mail of January 10,

11    2006 addressed to Mr. Mike and Mr. Zhang.

12              Does your e-mail read as

13    follows:  "Ocean freight is USd

14    1850/40fcl from Qingdao to LA"?  Does it

15    read that way?

16         A.    I can't explain to you

17    because I don't remember the name of that

18    company.

19         Q.    In the --

20         A.    Is it a problem for you to

21    provide me with the name of the handling

22    company?

23         Q.    Mr. Che, in the summer of

24    2006, is it true that TTP sold over
```

Confidential - Subject to Further Confidentiality Review

```
 1   11,000 pieces of drywall to APIC Building

 2   Materials, which was shipped to New

 3   Orleans, Louisiana?

 4              MR. SPANO:  Objection,

 5        compound.

 6              MR. MEUNIER:  I show you

 7        documents that have been --

 8              I'm sorry, Judge.

 9              THE COURT:  Go ahead.  Show

10        him the document first.

11   BY MR. MEUNIER:

12        Q.    I show you documents that

13   were previously marked as Peng Shiliang

14   Numbers 4, 5, 6 and 7.

15              Do you recognize those as

16   the invoice and packing list forms of

17   TTP?

18        A.    You should have provided

19   this to me earlier.  Then I would have

20   remembered.  The final handling company

21   in the end should be Triax.  The handler

22   should be Ms. Wei, who we mentioned in

23   morning.  He -- she was the one who

24   handled this transaction throughout.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    THE INTERPRETER:

 2            Interpreter clarify gender.

 3    BY MR. MEUNIER:

 4        Q.     On the July 3 --  I'm sorry.

 5                    THE INTERPRETER:  I haven't

 6            interpreted it yet.

 7                    MR. MEUNIER:  I'm sorry.

 8                    THE WITNESS:  On the e-mail

 9            he did not ask me the price for

10            shipping and I did not provide the

11            price for shipping.  Then it

12            should -- must be Ms. Wei who

13            asked me the question.  Because

14            without request from the customer,

15            I would not have quoted the ocean

16            shipping cost.  This is only to

17            help out the customer.  Our

18            operation is only FOB Qingdao, the

19            Chinese port delivery.

20    BY MR. MEUNIER:

21        Q.     But you provided shipping

22    costs to Louisiana after being told by

23    Mr. Zhang that Hurricane Katrina had

24    created a great need to rebuild in the
```

Case 2:09-md-02047-EEF-JCW Document 13246-9 Filed 03/26/12 Page 49 of 125
Case 2:09-md-02047-EEF-JCW Document 13254-95 Filed 03/21/12 Page 24 of 25
Confidential - Subject to Further Confidentiality Review

1    New Orleans area?

2          A.    As of what the customer has

3    said is the customer's problem.  It must

4    be that somebody asked for the price,

5    because I didn't know what was the

6    destination port.  I'm sure it was

7    someone who asked for the quotation.

8          Q.    Mr. Che, the invoice and

9    packing list which is marked Peng

10   Shiliang-4 and -5, I believe?

11         A.    Thank you.

12         Q.    You're welcome.

13               Those two documents show

14   that 5,676 pieces of drywall were shipped

15   to New Orleans, Louisiana.  Correct?

16         A.    Isn't it FOB Chinese port

17   delivery?

18         Q.    Do you see the reference to

19   New Orleans, Louisiana under the date

20   July 3, 2006 on both of these TTP

21   documents?

22         A.    If you look at the source of

23   these documents, you should have known

24   that it was Ms. Wei who asked us to put a

Confidential - Subject to Further Confidentiality Review

1    seal on it.  We did not produce this

2    document.

3          Q.    These are forms with your

4    company's name at the top, TTP.  Correct?

5          A.    It was Ms. Wei, the middle

6    person in trading, that had made the form

7    and requested us to stamp on it so that

8    she could get the price difference in the

9    middle.  It was Ms. Wei who made all of

10   these.

11         Q.    Are these part of the

12   business records of Taian Taishan

13   Plasterboard Company, Limited?

14         A.    I can't remember clearly

15   what this is all about.  I don't know if

16   you have any document with our stamps on

17   it.  If that's all the documents you

18   have, you can't really prove it.  Because

19   I could write your name on it, too.

20         Q.    Sir, it's up to the judge

21   about what is proven, not you.

22               Do you understand?

23               THE COURT:  Let's just ask

24         questions, please.

Confidential - Subject to Further Confidentiality Review

```
 1                    MR. MEUNIER:  Sorry, Judge.

 2    BY MR. MEUNIER:

 3            Q.    Mr. Che, why is APIC

 4    Building Materials identified under the

 5    reference shipping mark on both of these

 6    documents?

 7            A.    I don't know.  I did not

 8    make this document.

 9            Q.    The other two documents are

10    Peng-6 and Peng-7.  Both are invoices

11    dated July 20, 2006.  Both refer to 5,760

12    pieces of drywall being shipped to New

13    Orleans.  One is an invoice addressed to

14    Advanced Products International

15    Corporation in California.  The other

16    invoice is addressed to Triax Trading &

17    Logistics.

18                    Do you know why separate

19    invoices from TTP were sent to those

20    different companies for the same

21    transaction?

22                    MR. SPANO:  Objection, lack

23         of foundation.

24                    THE COURT:  If he doesn't
```

Confidential - Subject to Further Confidentiality Review

```
 1          know, he can say no.  I'll
 2          overrule it.
 3               THE WITNESS:  I didn't make
 4          this, so I don't know.
 5   BY MR. MEUNIER:
 6          Q.    Do you recall that around
 7   the time of the July 3, 2006 invoice and
 8   packing list for the shipment to New
 9   Orleans, you learned from the vice
10   president of Advanced Products that there
11   was a problem on receiving the drywall
12   because it was broken on the corners?
13               MR. SPANO:  Objection to the
14          shipment part of the question.
15               MR. MEUNIER:  I'll reask the
16          question.
17   BY MR. MEUNIER:
18          Q.    Do you remember hearing from
19   the vice president of Advanced Products
20   International on or about July 3, 2006
21   that a shipment of drywall received was a
22   problem because the drywall was broken on
23   the corners?
24          A.    Can I take a look at that
```

Confidential - Subject to Further Confidentiality Review

```
 1   e-mail?

 2            Q.     Do you remember what I'm --

 3            A.     I don't have a clear

 4   recollection.

 5            Q.     I show you a document Bates

 6   numbered TG 19383.  We'll mark it as

 7   Che-16.

 8                           -  -  -

 9            (Deposition Exhibit No.

10   Che-16, E-mail chain, top one

11            dated 7/3/2006, TG 0019383, was

12            marked for identification.)

13                           -  -  -

14   BY MR. MEUNIER:

15            Q.     At the top there appears to

16   be an e-mail from Grace Wei to you on

17   July 3, 2006.  Please read her e-mail.

18            A.     Manager Che, hello.  Last

19   time Zhang Nan -- last time when Zhang

20   Nan was there, two containers products

21   were shipped out.  Now there's a problem

22   with the shipment.  Please look at the

23   picture.  Below is an e-mail of the

24   customer.  He said, if that's the case,
```

Confidential - Subject to Further Confidentiality Review

```
 1    they will not want the remaining 11

 2    containers.  Please handle it and let us

 3    know how should we explain to the

 4    customer.  Thank you, Wei Dongling.

 5             Q.    How did you respond to this

 6    request?

 7             A.    On here you can see the

 8    handler of this transaction has always

 9    been Ms. Wei.  I don't remember whatever

10    handled this issue.

11             Q.    Did your company not agree

12    to respond to Mr. Scudder, the vice

13    president of Advanced Products

14    International?

15             A.    I don't recall.

16             Q.    You were earlier shown an

17    e-mail which is previously marked Jia

18    Number 32.  You may have already read

19    this for the record, but tell me what Ms.

20    Wei in her e-mail of August 2, 2006 told

21    you at the top of --

22                   MR. BRENNER:  Can you give

23          us the Bates number?

24                   MR. MEUNIER: I'm sorry.
```

Confidential - Subject to Further Confidentiality Review

```
 1              It's TG 19381 and 19382,

 2         previously marked as Jia Number

 3         32.

 4              THE WITNESS:  This is the

 5         e-mail that sent by Ms. Wei to me

 6         and copied to Manager Peng.

 7    BY MR. MEUNIER:

 8         Q.    What does it say?

 9              MR. SPANO:  Objection, asked

10         and answered.

11              THE WITNESS:  We were asked

12         to provide a verification.

13              THE COURT:  I'll let him

14         answer it.

15    BY MR. MEUNIER:

16         Q.    Was that done?

17         A.    No.

18         Q.    Was this problem with the

19    shipment to Advanced Products ever

20    resolved with that company?

21         A.    As far as I can remember.

22    It was not our product's problem.  It was

23    because the way they packed in the

24    container was not in accordance with our
```

```
 1   suggestions.

 2              THE INTERPRETER:

 3          Interpreter clarification.

 4              THE WITNESS:  On both sides,

 5          there were empty spaces.

 6          Therefore, during the shipping,

 7          damage was done to the products.

 8          We only handle delivery to Chinese

 9          port.  It was the responsibility

10          of the customer to ship the

11          product to the destination.

12          Therefore, it's not our problem.

13   BY MR. MEUNIER:

14          Q.    Have you continued to do

15   business with Advanced Products, this

16   company, Advanced Products International?

17          A.    Where is it?

18          Q.    Mr. Che, this is one of the

19   companies that you are designated to

20   speak about on behalf of TTP and TG.

21              Do you understand that?

22          A.    I testify on Triax.

23          Q.    As well as Advanced

24   Products.  That's what your counsel has
```

1    verified on the record.

2            A.    I'm sorry, my English is not

3    good.  I can only remember the first

4    letter of the company name.  I do not

5    remember the whole name of the company.

6    I don't think I've been rude to you.

7            Q.    Tell me on behalf of TTP and

8    TG whether you are still doing business

9    with Advanced Products?

10           A.    You mean Advanced?  In my

11   memory, the end user's name of the form

12   that TTP filled out according to the

13   requirement of the taxation bureau was

14   Triax.  My personal understanding is I

15   have only done business with Triax, the

16   actual business.

17           Q.    So you do not feel that you

18   are able to answer my questions about the

19   business dealings between TTP and TG with

20   Advanced Products International; is that

21   correct?

22                 MR. SPANO:  Objection, lack

23           of foundation with regard to the

24           business dealings.

Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT:  Let's ask him

 2         whether or not he knows anything

 3         about them.

 4    BY MR. MEUNIER:

 5         Q.    The problem is that we were

 6    told at the beginning of today's

 7    questioning by me that you were

 8    designated by TTP and TG to testify for

 9    those companies about certain customers.

10    One of those customers is Advanced

11    Products as well as Triax.

12              Do you feel you can answer

13    my questions about TTP and TG and their

14    business relationship with Advanced

15    Products, or should I be asking someone

16    else about that?

17         A.    I think I can answer the

18    questions on that.

19         Q.    So I again ask you whether

20    after the dispute concerning the broken

21    drywall that was shipped to New Orleans

22    after Mr. Scudder of Advanced Products

23    asked for a letter saying that your

24    company would stand behind that product,
```

Confidential - Subject to Further Confidentiality Review

 1   did your company, TTP or TG, continue to

 2   do business with Advanced Products?

 3        A.    I have a suggestion for the

 4   judge, because my English is really poor.

 5   This name -- these names are too long.  I

 6   don't know which one is which one.  Can

 7   you make an abbreviation of the company,

 8   call it API?  My memory is API.  You said

 9   so much of the name of the company, I was

10   not able to match the two together.

11        Q.    I'm sorry.  I will refer to

12   the company as API.

13              Do you continue to do

14   business with API?

15        A.    In my memory, I have only

16   had some business communication with API.

17   But the end user reflected on my invoices

18   should be Triax.

19        Q.    As of October 2006, API

20   reported to you that the drywall that you

21   furnished to them for their customers had

22   caused great harm to the company, because

23   after installing some of it, it had to be

24   pulled off the walls because it was

Confidential - Subject to Further Confidentiality Review

```
 1   defective.  Is that true?

 2                   MR. SPANO:  Objection to

 3        form.

 4                   THE COURT:  Show it to him.

 5                   MR. MEUNIER:  I'll show him

 6        a document.

 7   BY MR. MEUNIER:

 8        Q.    I'm going to show you now a

 9   document which is Bates numbered TG

10   19376.  It's a letter dated October 31,

11   2006, from James Scudder, vice president,

12   Advanced Products International, to

13   Shandong Taihe Dongxin Company, Limited.

14   And I'll mark it as Che Exhibit 17.

15                   -   -   -

16                   (Deposition Exhibit No.

17        Che-17, Letter dated 10-31-06,

18        Bates stamped TG 0019376, was

19        marked for identification.)

20                   -   -   -

21   BY MR. MEUNIER:

22        Q.    This letter is addressed to

23   Frank Clem.  Correct?

24        A.    Correct.
```

Confidential - Subject to Further Confidentiality Review

```
 1            Q.      However, since you are the
 2    designated representative and witness on
 3    behalf of TTP and TG for matters dealing
 4    with API, I ask you whether you recall
 5    this letter being received from Mr.
 6    Scudder?
 7            A.      I don't recall that I have
 8    received this letter.
 9            Q.      In this letter, Mr. Scudder
10    indicates that his company may "file a
11    complaint to the U.S. and China
12    governments who regulate import and
13    export of products to make sure this does
14    not happen to anyone else."  He further
15    states that "the filing to the United
16    States importing regulators will stop
17    Taihe for exporting to the United
18    States."
19                    Did anyone at TTP or TG
20    respond to this letter?
21            A.      In my memory, I did not
22    respond to it.
23            Q.      Did anyone on behalf of TTP
24    or TG respond to the letter?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    I don't know.

 2          Q.    In the same month of July

 3  2006, when thousands of pieces of gypsum

 4  board were shipped to New Orleans, you

 5  provided shipping prices to a customer in

 6  Louisiana for drywall to be used in

 7  Louisiana.  Is that true?

 8              MR. SPANO:  Objection.

 9              THE COURT:  If he doesn't

10          understand it, he can answer the

11          question.  I'll overrule the

12          objection.

13              THE WITNESS:  I don't

14          understand what you're saying.

15              THE COURT:  Show him.

16  BY MR. MEUNIER:

17          Q.    I'll show you e-mails, an

18  exchange of e-mails from July 2006, Bates

19  numbered TG 631 and TG 633.

20                    -  -  -

21              (Deposition Exhibit No.

22          Che-18, E-mail chain, top one

23          dated 7/10/2006, Bates stamped TG

24          0000631 and TG 0000633, was marked
```

Confidential - Subject to Further Confidentiality Review

```
 1             for identification.)

 2                   -   -   -

 3   BY MR. MEUNIER:

 4        Q.    In an e-mail of July 10,

 5   2006, from you -- from -- addressed to

 6   you from Jeff Zhou, Z-H-O-U, he asked you

 7   to provide -- to "please find out the

 8   freight from Qingdao to New Orleans."

 9             Do you see that in the first

10   paragraph of his e-mail?

11        A.    Yes.

12        Q.    And do you see how in

13   paragraph 4 he asked you to send samples

14   to him at TP Construction, Inc. located

15   on Jefferson Highway in Jefferson,

16   Louisiana?

17        A.    Yes, I see it.

18        Q.    Did you send those samples

19   as requested?

20        A.    First of all, I don't have a

21   recollection on this issue at the time

22   it -- at the time it happened.  However,

23   according to the principle of our

24   company, in this circumstance, customer
```

Confidential - Subject to Further Confidentiality Review

1    had to pay postage in order for us to

2    give them the stuff.

3          Q.    Please refer to the other

4    page of this e-mail exchange, which is TG

5    633.  In the bottom e-mail, Mr. Zhou

6    writes to you on July 6 -- I'm sorry,

7    July 10, 2006 and thanks you for your

8    information but then asks you to explain

9    how freight will be charged.  Correct?

10         A.    That's what it appears to

11   be.

12         Q.    And then in your July 11,

13   2006 reply to him, you gave him that

14   explanation and also sent an attachment

15   with that e-mail.  Correct?

16         A.    You said July the 11th,

17   2006.  I don't have it here.  Where is

18   it?

19         Q.    It's in the middle of TG

20   633, July 11, 2006.

21              You provided an attachment

22   for loading by break bulk.

23              Do you see that?

24              THE INTERPRETER:

Confidential - Subject to Further Confidentiality Review

```
 1            Interpreter clarification.
 2   BY MR. MEUNIER:
 3        Q.    Second sentence, "Please
 4   refer to attachment for loading by break
 5   bulk."
 6            THE INTERPRETER:  There is
 7        no such word B-R-E-A-K in my
 8        dictionary.
 9   BY MR. MEUNIER:
10        Q.    Mr. Che, you wrote this in
11   English?
12        A.    My English is so poor, I
13   don't even know what I wrote.
14        Q.    So you wrote the words in
15   English "break bulk."  Tell us what you
16   meant?
17        A.    I always make mistakes.  I
18   don't know either.
19        Q.    In the e-mail above that,
20   addressed to you on July 16, 2006 from
21   Mr. Zhou, he says, "Dear Mr. Che, I got
22   your samples thanks."
23            Tell me how you mailed
24   drywall samples to a construction company
```

Confidential - Subject to Further Confidentiality Review

1    in Jefferson, Louisiana in July 2006?

2           A.    I don't have a clear

3    recollection on how we mailed it out, but

4    there is a principle in our company that

5    in this circumstance, the client had to

6    prepay the postage for us to mail it out.

7    It doesn't matter where the client is

8    located.

9           Q.    Have your companies, TG and

10   TTP, mailed drywall samples to states

11   other than Louisiana, states of the

12   United States?

13          A.    If the customer requested

14   this and had paid, and paid us the

15   postage, we could mail it to wherever the

16   customer would like us to mail it to.

17   The precondition is postage had to be

18   prepaid.

19          Q.    So if the customer prepays,

20   your companies, TTP and TG, will use the

21   United States mail service to send

22   drywall samples to cities in the United

23   States.  True?

24          A.    Usually, the payment of

Confidential - Subject to Further Confidentiality Review

```
 1   postage was not paid by the customer in

 2   this channel.  Usually the customer would

 3   assign a specific mailing company --

 4               THE INTERPRETER:

 5               Interpreter clarification.

 6               THE WITNESS:  -- to have a

 7               reverse payment.

 8   BY MR. MEUNIER:

 9               Q.   How big are the drywall

10   samples that --

11               THE INTERPRETER:  I'm sorry,

12               correction.

13               THE WITNESS:  I'd like to

14               give you example of the method of

15               payment.

16   BY MR. MEUNIER:

17               Q.   Yes.

18               A.   For example, if you want a

19   sample and you like me to mail it to you,

20   you want me to use DHL, then I will give

21   you the sample to DHL.  And DHL will

22   deliver it to you, and you will talk

23   about the cost with DHL.  Our job was

24   only to give the sample to DHL.  You
```

Confidential - Subject to Further Confidentiality Review

1    would be the one who take care of the

2    cost.

3            Q.    I will pay for it, but you

4    will put it in a container and address it

5    to a United States city to be sent to

6    that city as a drywall sample.  Is that

7    true?

8            A.    It was a customer who

9    provided me an address.  And it was a

10   customer who should contacted the

11   shipping company.

12           Q.    How large are the drywall

13   samples that TG and TTP customarily

14   mailed to customers in cities in the

15   United States?

16                 MR. SPANO:  Objection to

17           form.

18                 THE COURT:  What's the

19           problem, Frank?

20                 MR. SPANO:  Customarily

21           mailed.

22                 THE COURT:  Okay.  How would

23           you do it?

24                 MR. MEUNIER:  Overrule?

Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT:  No.  I'll let

 2        you rephrase the question.

 3        Sustained.

 4   BY MR. MEUNIER:

 5        Q.    How large are the drywall

 6   samples that you have known TTP or TG to

 7   mail to customers in United States

 8   cities?

 9        A.    Usually our way of handling

10   customers' requests is as follows:  First

11   of all, the client would give us the

12   specification she requires, the

13   specifications.  Correction.  The model

14   number instead of specifications, the

15   last specification.  If we have such a

16   sample and plus the customer would like

17   to pay for the mailing cost, then we

18   would provide that to the customer.

19        Q.    I understand, sir.

20              My question was, how large

21   physically are the sample sizes that you

22   have known to be sent to customers in the

23   United States?

24        A.    It's not a fixed size.  It
```

Confidential - Subject to Further Confidentiality Review

```
 1    could be this big.

 2            Q.    What's the smallest size

 3    you've -- you had experience with?

 4            A.    The smallest could be this

 5    small.

 6                  MR. MEUNIER:  Is that clear

 7            on the record?

 8                  THE COURT:  As big as a

 9            baseball.

10                  THE WITNESS:  Like this,

11            like a cake.  It depends on how

12            much mailing cost the customer is

13            willing to pay.

14    BY MR. MEUNIER:

15            Q.    And what's the largest size

16    sample you have known to be sent to a

17    customer in the United States?

18            A.    I don't recall.  Usually

19    it's about this size.

20            Q.    Indicate for the camera,

21    please.

22            A.    The normal size, like this

23    size.

24            Q.    Okay.  Thank you.
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    Can I go to the rest room?

 2               MR. MEUNIER:  Yes.

 3               THE COURT:  Let's take a

 4          15-minute break.

 5               VIDEOTAPE TECHNICIAN:  We're

 6          off the record.  The time is 1:57.

 7                    -   -   -

 8          (A recess was taken from

 9          1:57 p.m. to 2:12 p.m.)

10                    -   -   -

11               VIDEOTAPE TECHNICIAN:  Going

12          back on the record.  Beginning of

13          Tape Number 5.  The time is 2:12.

14   BY MR. MEUNIER:

15          Q.    Mr. Che, the next company I

16     want to talk about is B America

17     Corporation.

18               On September 2, 2006, TTP

19     entered into a written contract with B

20     America for the sale of 1,320 pieces of

21     drywall.  Correct?

22                    -   -   -

23               (Deposition Exhibit No.

24          Che-19, Contract dated 2th Sep.
```

Confidential - Subject to Further Confidentiality Review

```
 1          2006, Bates stamped TG 0021704 and

 2          TG 0021705, was marked for

 3          identification.)

 4                    -  -  -

 5   BY MR. MEUNIER:

 6          Q.    For the record, I've handed

 7   the witness a document which is Bates

 8   stamped 21704 and 21705.  I've marked it

 9   as Che -- what's the number?

10               THE INTERPRETER:  19.

11               MR. MEUNIER:  -- 19.

12               THE WITNESS:  I only

13          remember that we had one gypsum

14          board transaction with B America

15          Corporation.  I believe the

16          quantity is smaller than this one.

17   BY MR. MEUNIER:

18          Q.    Did you sign this contract

19   on behalf of Taishan -- I'm sorry, TTP?

20          A.    I don't recall whether I

21   signed a contract or not at the time.

22          Q.    I show you a document which

23   is Bates number TG 21695, which I am

24   marking as Che Number 20.
```

Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -

 2                      (Deposition Exhibit No.

 3              Che-20, Page of Contract, Bates

 4              stamped TG 0021695, was marked for

 5              identification.)

 6                      -   -   -

 7    BY MR. MEUNIER:

 8              Q.    And I represent to you it is

 9    the second page of that contract in front

10    of you, and this second page is signed on

11    behalf of TTP; is that correct?

12              A.    It's not my signature.

13              Q.    Whose signature is that for

14    TTP?

15              A.    I believe it should be -- I

16    don't recognize it.

17              Q.    Well, since you are

18    designated by the company to talk about B

19    America, I will continue to question you

20    about this contract.

21                      Is it true the contract was

22    for the sale of 1,320 pieces of drywall

23    for a total amount of 1 -- I'm sorry,

24    $13,490.40?
```

```
 1          A.     That's what it appears to
 2    be.
 3          Q.     And the price per piece
 4    stated in the contract is $10.22 per
 5    piece.  Is that true?
 6          A.     Correct.
 7          Q.     We have seen other
 8    transactions in this case where the TG or
 9    TTP drywall was priced at a little over
10    $3 apiece.
11                 Can you tell me why this
12    price is so much higher than the price in
13    other cases?
14          A.     It depends on the way of
15    handling of this company.  First of all,
16    B America company did business through a
17    Madam Chen Bilai in China who approached
18    our company, expressed her willingness to
19    represent a company to purchase our
20    products, and requested our company to
21    provide her with FOB quotation according
22    to her requested specifications.
23                 Afterwards -- afterwards,
24    Madam Chen Bilai started operation of her
```

Confidential - Subject to Further Confidentiality Review

 1    ocean shipping business.  And according

 2    to her requirements, we added her ocean

 3    shipping cost on it.  There should be

 4    also the cost of insurance in the money

 5    that we have asked from B America company

 6    includes the ocean shipping cost and

 7    insurance that we pay on their behalf.

 8    That's why the price is high.

 9            Q.    Under this contract, the

10    gypsum board to be produced was required

11    to meet a standard of ASTM C-1396 as

12    stated in paragraph 2 at the bottom of

13    page 1 of the contract.

14                 Do you see that?

15            A.    I see it.

16            Q.    And that is an American

17    standard for drywall.  True?

18            A.    My understanding that it was

19    a standard that has been used by

20    everybody in the world, not necessarily

21    in America only.

22            Q.    The delivery of this drywall

23    was to be in Miami, Florida, as stated in

24    paragraph 4 on page 2; is that correct?

```
 1            A.      This is done according to

 2    the requirement of Madam Chen Bilai.

 3            Q.      In paragraph 6 on page 2,

 4    any disputes about the contract are to be

 5    submitted to the foreign trade

 6    arbitration commission of the China

 7    council for promotion international

 8    trade; is that correct?

 9            A.      If that what it says, that's

10    what it says.

11            Q.      Are you familiar with the

12    foreign trade arbitration commission of

13    the china council for promotion of

14    international trade?

15            A.      I'm not familiar.

16            Q.      I show you a document which

17    is Bates numbered TG 21696.  And I'm

18    sorry, I will mark that as Che Number 21.

19                    -   -   -

20                    (Deposition Exhibit No.

21            Che-21, Contract dated 23rd

22            November 2006, Bates stamped TG

23            0021696, was marked for

24            identification.)
```

Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -

 2    BY MR. MEUNIER:

 3         Q.     And this is a contract of

 4    November 23, 2006 between TTP as seller

 5    and B America Corporation as buyer which

 6    cancels the contract of September 2, 2006

 7    that we just looked at; is that correct?

 8         A.     That's what appears to be in

 9    this document.  But after we have

10    delivered our products to B America,

11    there was still $1,000 left, and B

12    America requested us to return the $1,000

13    to them.  In order to do that according

14    to the regulations of the foreign

15    currency institution of China, we have to

16    do this in order to return $1,000 back to

17    them.

18         Q.     The reason that TTP and B

19    America canceled their contract of

20    September 2, 2006 was because of a drop

21    in the price in the American market.

22    Correct?

23         A.     I don't recall that was the

24    reason.
```

```
 1          Q.    I will read the last
 2   sentence of the document in front of you,
 3   which is a contract of November 23, 2006,
 4   Bates numbered 21696 and marked as
 5   Che-21.  "The reason is" -- "the reason,"
 6   meaning the reason for cancellation, "is
 7   that both parties can not bear the
 8   dropped price in the American market."
 9              Do you agree that's what the
10   contract says?
11          A.    That's what it says on the
12   contract.  But the reality was it was
13   only for the purpose of providing an
14   appendix to Chinese foreign currency
15   management institution.
16          Q.    That statement in this
17   contract bears the seal of TTP; is that
18   correct?
19          A.    Correct.
20          Q.    Who placed that seal on this
21   contract?
22          A.    I don't recall.
23          Q.    I show you e-mails -- an
24   e-mail exchange from November of 2006 on
```

Confidential - Subject to Further Confidentiality Review

```
 1    documents which are Bates numbered 21702

 2    and 21698.  And I will mark this as Che

 3    Exhibit 22.

 4                     -  -  -

 5              (Deposition Exhibit No.

 6              Che-22, E-mail chain, top one

 7              dated November 24, 2006, Bates

 8              stamped TG 0021702 and TG 0021698,

 9              was marked for identification.)

10                     -  -  -

11    BY MR. MEUNIER:

12         Q.    First, will you please read

13    for the record your e-mail to Rafael

14    Sardi of November 23, 2006 at the bottom

15    of TG 21698, subject of the e-mail being

16    "Contract."

17         A.    Should I read it for you

18    right now?

19         Q.    Yes.

20         A.    Manager Chen, hello.  I'm

21    sending you two copies of the contract.

22    One is for the Foreign Exchange

23    Administration and -- correction.  The

24    Foreign Exchange Administration would
```

1    need one contract and one contract

2    termination of contract in order to

3    release the payment.  Please ask the

4    customer to review, stamp and send to us.

5    I wish you business success.  Che Gang.

6           Q.    Were you forwarding with

7    this e-mail the contract that we have

8    been looking at that was entered into in

9    November of 2006 cancelling the September

10   2006 contract?

11          A.    Can you repeat?

12          Q.    Which contract were you

13   forwarding with your November 23, 2006

14   e-mail?

15          A.    I don't see attachment here.

16          Q.    What contract were you

17   referring to in your e-mail that you just

18   read to us?

19          A.    I could speculate -- from

20   the e-mail I can make that speculation,

21   but I'm not sure, because there is no

22   attachment appears on the e-mail.

23          Q.    Now, you've indicated that

24   there was a refund of money requested by

Case 2:09-md-02047-EEF-MBN   Document 13456-37 Filed 03/26/12 Page 81 of 125
Case 2:09-md-02047-EEF-MBN   Document 13454-37 Filed 03/21/12 Page 6 of 125
Confidential - Subject to Further Confidentiality Review

```
 1    B America as a customer of TTP.  Is that

 2    true?

 3          A.    Yes.

 4          Q.    And as your company did in

 5    the case of Oriental Trading, rather than

 6    send cash money as a refund to the

 7    customer, you offered to export

 8    additional product to the customer in

 9    America.  Is that true?

10          A.    No.  The money is not much

11    at all.  It was impossible for us to send

12    additional products.

13          Q.    I want to show you a

14    document which is Bates numbered TG 485.

15    It's an e-mail exchange of February --

16    I'm sorry, December 2006 and February

17    2007.

18                      -   -   -

19                (Deposition Exhibit No.

20          Che-23, E-mail chain, top one

21          dated 2/16/2007, Bates stamped TG

22          0000485, was marked for

23          identification.)

24                      -   -   -
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. MEUNIER:

 2            Q.    Please first refer to the

 3    bottom e-mail on that page, from Rafael

 4    Sardi to you dated December 5, 2006 in

 5    which he says, "Dear Sir Please respond

 6    if you have processed the refund."

 7                 Do you see that e-mail?

 8            A.    Yes, I see it.

 9            Q.    And it was copied to Enlly

10    Castro, spelled E-N-L-L-Y C-A-S-T-R-O,

11    and Chen Bilai, C-H-E-N, B-I-L-A-I.

12                 Who are those individuals?

13            A.    Chen Bilai is a person that

14    I just mentioned to you.  I don't know

15    who the other person is.  I'm sorry,

16    correction, I don't remember who that

17    person is.

18            Q.    Look at the e-mail above

19    that from Chen Bilai to Rafael Sardi

20    dated February 15, 2007.

21                 Is Chen Bilai a man or a

22    woman?

23            A.    Woman.

24            Q.    Ms. Chen tells Mr. Sardi the
```

 1    following:  "Mr. Che told me they had got

 2    permission from the Local Foreign

 3    Currency Bureau to refund the US dollar

 4    to you."  She then says, "But the person

 5    who operates the issue told them the

 6    information of USD from you no longer in

 7    their computer as it's over three months.

 8    So it has problem to refund it to you.  I

 9    suggest when they have order from

10    American company, they may ask that

11    American customer to decrease the said

12    sum from the total payment and wire it to

13    your account.  They agreed to do so when

14    they have order."

15              So Mr. Che, is it true that

16    instead of refunding the cash to B

17    America, your company was proposing to

18    give a factory credit to an American

19    customer on a future order?

20         A.    No.

21         Q.    What then was being offered

22    instead of a cash refund?

23         A.    I believe the e-mail was

24    sent from Madam Chen Bilai to this

Case 2:09-md-02047-EEF-MBN   Document 13456-37 Filed 03/26/12 Page 84 of 125
Case 2:09-md-02047-EEF-MBN   Document 13454-37 Filed 03/21/12 Page 90 of 125
Confidential - Subject to Further Confidentiality Review

1    person.  She introduced a possibility of

2    refund.  I don't remember the exact

3    discussion of this issue.

4          Q.    Please look at Mr. Sardi's

5    e-mail to Chen Bilai which is above the

6    one we read.  It's dated February 16,

7    2007.

8              In that e-mail, Mr. Sardi

9    asks the factory to give the very best

10   FOB price for certain sizes of gypsum

11   board and concludes by saying, "This so

12   we can consume our credit we have at the

13   factory."

14             Was a factory credit given

15   to Mr. Sardi's company as requested?

16         A.    No.

17         Q.    How was the 100 or how was

18   the cash refund resolved?

19         A.    Because the remaining refund

20   balance is too small, we had discussed

21   with the foreign currency administration

22   in several occasions.  I do not know

23   eventually how did Madam Chen Bilai

24   handled this matter.

```
 1          Q.     But after these events

 2    involving the cancellation of that

 3    contract, you continued to do business

 4    with B America, shipping product to the

 5    United States.  Is that true?

 6          A.     No.

 7          Q.     I show you a document which

 8    is Bates numbered TG 514, which I'll mark

 9    as Che Exhibit 24.

10                      -   -   -

11                 (Deposition Exhibit No.

12          Che-24, E-mail chain, top one

13          dated 4/10/2007, Bates stamped TG

14          0000514, was marked for

15          identification.)

16                      -   -   -

17    BY MR. MEUNIER:

18          Q.     Please look at these

19    e-mails, Mr. Che.

20          A.     I see it.

21          Q.     I will refer you to the

22    e-mail in the middle dated April 10, 2007

23    from Rafael Sardi in Miami, Florida to

24    you.
```

Confidential - Subject to Further Confidentiality Review

```
1                    "Hello Bill," he says.

2          A.    Where is it?

3          Q.    It's the April 7 -- I'm

4     sorry, April 10, 2007, Rafael Sardi to

5     Bill Cher.  April 10, 2007.  Right here.

6     It's in the middle, near the hole.

7                    Do you see it?

8          A.    This one?

9          Q.    "Hello Bill," do you see it?

10         A.    Yes, I see it.

11         Q.    "Hello Bill, We confirm

12    final destination is Port of Miami.  We

13    confirm that our custom broker to clear

14    the goods is Delmar Logistics (GA) Inc.

15    Please confirm as soon as you ship."

16                   Do you see your reply e-mail

17    of April 10, 2007 just above the one I

18    just read?

19         A.    Hmm.

20         Q.    Is that a yes?

21         A.    I see it.  I see it.

22         Q.    Did you tell Mr. Sardi in

23    your e-mail, "We will arrange the

24    shipping to Miami Port at an early time"?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    The handling of this issue

 2   was that Madam Chen Bilai requested us to

 3   confirm with the foreign handler

 4   regarding the final destination of the

 5   shipment.  When we say arrange shipment,

 6   we meant to arrange to pack the products

 7   in the container and ship it to Chinese

 8   ports and deliver it to the shipping

 9   agent, which Chen Bilai, Madam Chen Bilai

10   had arranged.

11          Q.    You were still doing

12   business with B America and shipping

13   product to the United States in business

14   with that company a year later, in April

15   of 2008, weren't you?

16               MR. SPANO:  Objection to

17          form.

18               THE COURT:  What's the issue

19          with form?

20               MR. SPANO:  He just

21          testified they didn't ship to the

22          United States.

23               THE COURT:  He said doing

24          business.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    MR. SPANO:  He said -- I

 2         believe the question included

 3         shipping transfer.

 4                    MR. MEUNIER:  I'll rephrase,

 5         Judge.

 6                    THE COURT:  Rephrase the

 7         question.

 8    BY MR. MEUNIER:

 9         Q.    A year after that e-mail to

10    Mr. Sardi that we just talked about, your

11    company was still doing business with B

12    America Corporation.  True?

13         A.    In my memory, we have had

14    communication for a long period of time

15    with B America.  It's probably because of

16    the issue of $1,000.  But the actual

17    transacted product should be only one.

18         Q.    I'm showing you a document

19    which is Bates number TG 843.  It's an

20    exchange of e-mails from April 2008.  I'm

21    marking it as Che Exhibit Number 25.

22                      -  -  -

23              (Deposition Exhibit No.

24    Che-25, E-mail chain, top one
```

Confidential - Subject to Further Confidentiality Review

```
 1              dated 4/21/2008, Bates stamped TG
 2              0000843, was marked for
 3              identification.)
 4                       -   -   -
 5   BY MR. MEUNIER:
 6              Q.    And the e-mail at the bottom
 7   of this document, Ms. Maria Muci,
 8   M-U-C-I, asked you for FOB prices for
 9   Sheetrock.  Is that true?
10              A.    Correct.
11              Q.    And in your e-mail reply of
12   April 15, 2008, you provided her with
13   drywall prices as well as FOB shipping
14   costs.  True?
15              A.    FOB shipping cost.
16              Q.    Don't you set forth the
17   information in your e-mail about shipping
18   costs?
19              A.    Where is it?
20              Q.    Do you see FOB in your
21   e-mail mentioned twice, Mr. Che?
22              A.    Is FOB price, not FOB
23   shipping cost.
24              Q.    And in your e-mail to her,
```

Confidential - Subject to Further Confidentiality Review

1    you say you hope to "establish business

2    as soon as possible."  True?

3          A.    This is a formality in doing

4    business.  I always use such formality

5    expression in my e-mails.

6          Q.    In the top e-mail on this

7    document dated April 21, 2008 from Maria

8    Muci, B America Corporation, in Doral,

9    D-O-R-A-L, Florida, she thanked you for

10   your reply and asked you to send a small

11   sample of Sheetrock.

12               Do you see that?

13         A.    That is a request of the

14   customer.

15         Q.    Was it still the practice of

16   your company in April of 2008 to send

17   samples through the mail to locations in

18   the United States if the customer paid

19   for the postage?

20         A.    In this period of time, I

21   had already moved back to work in TG.

22   For the handling of samples sent to the

23   customers, it was that customer would

24   tell us the specification and models that

Confidential - Subject to Further Confidentiality Review

1   they needed.  If we happened to have such

2   samples with us, and the customer would

3   willing to pay for the postage, the

4   shipping cost, then we would provide the

5   sample in accordance with their

6   requirements.

7           Q.    In her e-mail, Ms. Muci

8   asked you to send a small sample of 1/2

9   inch and 5/8 inch and said it could also

10  be a letter-sized sample, 8-and-a-half

11  inches by 11 inches.  That would be the

12  size of this piece of paper.  Correct?

13          A.    Can you repeat that?

14          Q.    She refers to a sample size

15  that could be letter size, 8-and-a-half

16  by 11 inches.  I represent to you that

17  these pages that we look at are

18  8-and-a-half by 11 inches.

19          A.    That's the requirement of

20  the customer.

21          Q.    Yes.

22                Who were you working for in

23  April of 2008?

24          A.    In April 2008, I worked for

Confidential - Subject to Further Confidentiality Review

```
 1    TG.

 2           Q.     Did you have the authority

 3    of TG in April of 2008 to send Maria Muci

 4    of B America Corporation in Doral,

 5    Florida a sample of drywall that was

 6    8-and-a-half by 11 inches, the size of

 7    this piece of paper?

 8           A.     I don't recall.

 9           Q.     You don't recall if you had

10    that authority?

11           A.     I don't recall whether I had

12    shipped the sample to her.  We still have

13    the same principle which I mentioned

14    earlier.

15           Q.     So you had the authority of

16    your company to send a sample that size.

17    Correct?

18           A.     It's not the matter of

19    whether I have the authority of the

20    company or not, it's a matter of whether

21    I have the sample or not in my hand.

22           Q.     But if you had the sample in

23    that size and the customer asked for it

24    in that size, you would send it.  Is that
```

Confidential - Subject to Further Confidentiality Review

1    true?

2          A.    The precondition is that the

3    payment had to be prepaid.

4          Q.    I want to talk about OEG

5    Building Materials.

6                Is it true that you began

7    having business dealings with OEG through

8    a gentleman named Ernest Teitelbaum and

9    Joseph Weiss as early as the fall of

10   2005?

11         A.    In the beginning of 2006, we

12   did business through a Ms. Wang in China

13   who approached us, who approached our

14   company and expressed their willingness

15   to purchase our gypsum board, the

16   willingness to purchase our gypsum board.

17   And then through Ms. Wang, Ernest was

18   introduced to us.  At the time Ms. Wang

19   said that she was I believe the

20   representative of Ernest company.

21         Q.    In the beginning of doing

22   business with OEG, your company sold

23   gypsum board or drywall only?

24         A.    We handled gypsum board in

Confidential - Subject to Further Confidentiality Review

```
 1    the beginning with TOA company.

 2              Q.    TOA?

 3              A.    TOV.

 4              Q.    TOV.   They were an agent of

 5    OEG Building Materials?

 6              A.    No.   I remember earlier

 7    Ernest company was called TOV.   And then

 8    it changed their name to OEG.

 9              Q.    Did there come a time when

10    TTP began selling not only drywall but

11    also metal studs to OEG Building

12    Materials?

13              A.    Yes.   Yes.   At the time not

14    only we provided the customers with

15    gypsum board, but also later we purchased

16    from Golden Shield company in accordance

17    with request of the customer the metal

18    stud and then sent to OEG.

19                        -   -   -

20              (Deposition Exhibit No.

21    Che 26, Sales Contract dated 13th

22    Feb. 2007, TG 0019685 through TG

23    0019687, was marked for

24    identification.)
```

Confidential - Subject to Further Confidentiality Review

```
 1                   -  -  -

 2   BY MR. MEUNIER:

 3        Q.    I show you a document which

 4   is Bates numbered TG 19685 through 19687

 5   entitled "Sales Contract" dated February

 6   13, 2007.

 7                  MR. EUGENE CHEN:  What was

 8          that, please?

 9                  MR. MEUNIER:  TG 19685

10          through TG 19687.

11   BY MR. MEUNIER:

12        Q.    Is this the sales contract

13   that was entered into on February 13,

14   2007 between TTP and OEG Building

15   Material?

16        A.    I believe this should be a

17   draft of the contract.

18        Q.    Was this contract signed?

19        A.    I don't recall.

20        Q.    Did TTP enter into an

21   agreement with OEG Building Material for

22   the sale of metal studs to be produced

23   and inspected between December 2006 and

24   February 16, 2007?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.     TTP company uses -- used to

 2     sell to OEG company the metal stud.

 3     However, I don't recall whether the

 4     agreement was entered or not.

 5          Q.     But you do recall that you

 6     sent this sales contract to Joseph Weiss

 7     and Ernest Teitelbaum at OEG with an

 8     e-mail of February 13, 2007, the same

 9     date as the contract?

10          A.     I don't recall very clearly

11     about that.

12          Q.     I show you a document which

13     is Bates numbered 19683 and 19684.  This

14     is from you to Joseph Weiss at OEG, and

15     it's dated February 13, 2007.  Correct?

16                     -   -   -

17               (Deposition Exhibit No.

18               Che-27, E-mail dated 2/13/2007 and

19               attachment, Bates stamped TG

20               0019683 and TG 0019684, was marked

21               for identification.)

22                     -   -   -

23               THE WITNESS:  Correct.

24     BY MR. MEUNIER:
```

Confidential - Subject to Further Confidentiality Review

1          Q.     And one of the attachments

2     with your e-mail is STUD, S-T-U-D,

3     Contract OEG 07021301, which is the same

4     number on the sales contract that we just

5     looked at; is that correct?

6          A.     The numbers are the same.

7          Q.     You also sent Mr. Weiss a

8     price list for steel.  Is that true?

9          A.     I think the numbers are the

10    same.  However, the part before the

11    number is incomplete, so I cannot

12    confirm.  This is only half.  Correction,

13    this is only part of it, so I can't

14    confirm.

15         Q.     What contract, if not this

16    one, did you send to Mr. Weiss with your

17    e-mail of February 13, 2007 making

18    reference to the exact same number on the

19    sales contract we've looked at?

20         A.     I don't recall.  I'm only

21    saying that in front of the number there

22    were some letters on this contract.

23    However, on the other contract, it did

24    not have the letters, so I cannot

Confidential - Subject to Further Confidentiality Review

```
 1    reconfirm that.

 2           Q.     Mr. Che, just before the

 3    date of this February 2007 sale contract

 4    with OEG, your company agreed to pay for

 5    an increase in the price of steel in

 6    China to lower the cost of metal studs

 7    being paid by OEG.  Is that true?

 8           A.     Can you repeat that?

 9           Q.     Just before the date of this

10    February 2007 sales contract with OEG,

11    your company agreed to pay for an

12    increase in the price of steel in China

13    to lower the cost of metal studs being

14    paid by OEG.  Is that true?

15           A.     That's the expression on the

16    e-mail, but in reality, it may not

17    necessarily be the fact.

18           Q.     I show you a document which

19    is Bates numbered TG 19701, reflecting an

20    e-mail exchange of January 27 and 28,

21    2007 between you and Joseph Weiss.

22                          -  -  -

23                  (Deposition Exhibit No.

24           Che-28, E-mail chain, top one
```

Confidential - Subject to Further Confidentiality Review

```
 1          dated 1/28/2007, Bates stamped TG

 2          0019701, was marked for

 3          identification.)

 4               -  -  -

 5   BY MR. MEUNIER:

 6          Q.    In his -- I'm sorry?

 7          A.    It's the e-mail that I sent

 8   to Joe.

 9          Q.    In his e-mail of January 27,

10   2007 to you, Mr. Weiss told you -- asked

11   you to provide updated prices and told

12   you the prices "have to be more

13   competitive."  Is that true?

14          A.    Where is it?

15          Q.    It's in his e-mail to you of

16   January 27, 2007?

17          A.    Yes.

18          Q.    In your e-mail reply of

19   January 28, 2007, and I refer you to the

20   second paragraph.  I'll read it as

21   follows:  "Actually the price of steel

22   belt has increased by about 6%.  We tried

23   our best to persuade the steel belt

24   factory to keep the same price for us,"
```

Confidential - Subject to Further Confidentiality Review

1    but "we have a long time and steady

2    demand on steel belt.  Finally the steel

3    factory offered the price 3% higher than

4    last delivery in the case that we pay 50%

5    of full amount in advance in four days.

6    In order to build up the long time

7    business cooperation and support you to

8    compete in USA market, we will swallow

9    the increased cost; we will offer the

10   same price as last 16 containers."

11              Is that what you said in

12   your e-mail of January 28, 2007 to Joseph

13   Weiss of OEG?

14        A.    This is what I said in the

15   e-mail.  But my expression meant that the

16   customer could give us new orders as soon

17   as possible, because the raw materials

18   price is increasing, because our price

19   that had been handled was FOB Chinese

20   port delivery.  We didn't really care

21   about anything else.

22        Q.    But you did tell Mr. Weiss

23   that your company on January 28, 2007

24   would swallow the increased cost of steel

Confidential - Subject to Further Confidentiality Review

```
 1    in China in order to support his company
 2    to compete in the USA market.  Correct?
 3          A.    This is only to express that
 4    we would like the customer to place new
 5    orders as soon as possible, but we did
 6    not know whether the reality was so.  We
 7    didn't care where the customer's markets
 8    were located.  Perhaps in Hong Kong.
 9    Perhaps in inland China.  This is only a
10    formality way of expression.
11          Q.    You told us earlier that a
12    new company was created at some point to
13    manufacture the metal studs.
14                Do you recall that?
15          A.    I don't recall.
16          Q.    Excuse me.
17                I show you a document Bates
18    number TG 21997, which I have marked as
19    Che Exhibit 29.
20                      -   -   -
21                (Deposition Exhibit No.
22          Che-29, E-mail dated July 14,
23          2007, Bates stamped TG 0021997,
24          was marked for identification.)
```

Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -

 2    BY MR. MEUNIER:

 3         Q.    This is an e-mail of July

 4    14, 2007 from you to Joe Weiss at OEG.

 5    Correct?

 6         A.    Yes.

 7         Q.    In the second to last

 8    paragraph, you told him the following:

 9    "Another thing is that our group set up a

10    new company, Taian Jindun Building

11    Material Co., Ltd which will be

12    especially for the business of metal

13    stud."

14               Who did you mean by our

15    group?

16         A.    It does not specify here.

17    In fact, they said in the earlier stage,

18    we purchased the steel stud from Jindun

19    company to sell it to OEG.  But later,

20    because we had no profit in the

21    operation, so we can only ask OEG to deal

22    directly with Jindun company.  But we

23    were embarrassed to tell the customer

24    that in the earlier stage, we actually
```

Confidential - Subject to Further Confidentiality Review

1    purchased from the company and sold it to

2    them.  Therefore, we use this kind of way

3    to indirectly express what we needed to

4    express.

5           Q.    Yes.  But in the next

6    sentence you say, "So we will sign the

7    contract and make all the paperwork under

8    the name of Taian Jindun Building

9    Material Co., Ltd."  Correct?

10          A.    The expression meant at the

11   time because we could not operate that

12   way anymore, so we would want the

13   personnel in Jindun company to deal

14   directly with them, but the salespeople

15   in Jindun did not speak English at all.

16   Their English was not even as good as

17   mine.  Therefore, we had to operate that

18   on their behalf.

19          Q.    In the paragraph above the

20   one we've been reading from you, you

21   suggested to Mr. Weiss that he change

22   shipping companies.  Is that true?

23          A.    Can you translate this

24   paragraph for me?

     1          Q.    I will read the second to

     2    last sentence.

     3               "And in fact OOCI ship is

     4    just two or three days before than ZIM.

     5    So we suggest changing the container to

     6    ZIM shipping."

     7               These were the shipping

     8    companies that took the product over the

     9    ocean from China to America.  Correct?

    10          A.    I don't know, because what I

    11    was trying to express was only that.

    12    There was a shipping company that could

    13    have more volume while the other shipping

    14    company did not agree that we could put

    15    more products in it.  In order to put

    16    more of my products in it, so I suggested

    17    him to change to another shipping

    18    company.  I didn't pay attention to the

    19    destination of the product.

    20          Q.    But it was shipping over the

    21    ocean from China to the customer.

    22    Correct?

    23          A.    It was handled by the

    24    client, I believe.  I only found the

Confidential - Subject to Further Confidentiality Review

```
 1    shipping agent, that Miss somebody.

 2           Q.    Are these shipping

 3    companies, companies that handled the

 4    shipment of product from China to the

 5    customer?

 6           A.    From the e-mail, this

 7    Sheila, the lady, should be the shipping

 8    agent of the customer.

 9           Q.    And you say the reason you

10    recommended to this American customer

11    that they change shipping companies was

12    so that your company could put more

13    product on the ship.  Right?

14           A.    What does it mean in the

15    beginning of the paragraph, did it mean

16    to change the shipping company to this

17    one or did it mean to cancel the shipping

18    company?

19           Q.    It's your e-mail, Mr. Che.

20    You'll have to tell us.

21           A.    I don't recall.

22           Q.    Mr. Che, you were aware of

23    an economic crisis affecting the United

24    States in 2008, were you not?
```

Confidential - Subject to Further Confidentiality Review

1      A.     I believe it affected the

2  world.

3      Q.     Isn't it true that you were

4  not only aware of this crisis, but you

5  were also aware that the United States

6  government made payments to businesses

7  which were called bailouts to address

8  this crisis?

9      A.     I can't confirm that.  I am

10  not sure.  I don't have a clear

11  recollection of that.

12      Q.     Isn't it true that in

13  February of 2009, your employer saw an

14  opportunity to sell more gypsum board and

15  metal studs in the United States after

16  these bailout plans were carried out?

17      A.     I don't recall.

18      Q.     I show you a document which

19  is Bates numbered TG 0021469 --

20             -   -   -

21             (Deposition Exhibit No.

22  Che-30, E-mail with date in

23  Chinese, Bates stamped TG 0021469,

24  was marked for identification.)

Confidential - Subject to Further Confidentiality Review

```
 1                      -  -  -

 2    BY MR. MEUNIER:

 3           Q.    -- which I will mark as Che

 4    Exhibit Number 30, 21469.  This is an

 5    e-mail of February 23, 2009 from you to

 6    Joseph Weiss at OEG.  Is that true?

 7           A.    Yes.

 8           Q.    And in the second paragraph,

 9    second sentence, you wrote the following:

10    "As far as we know that your government

11    is carrying out many bailout plans.  And

12    the economic is turning better and

13    better.  We received several inquiries on

14    the gypsum board and metal studs from

15    U.S.  You are one of our first-ten

16    customers since we have a very good

17    cooperation record.  So we prefer to

18    restarting our U.S. business with you

19    rather than others."

20                  You agree you wrote that to

21    Mr. Weiss in this e-mail of February 23,

22    2009.  Correct?

23           A.    It was an e-mail that I sent

24    on February the 23rd, 2009 to Joe.
```

Confidential - Subject to Further Confidentiality Review

```
 1    Because my English is not good, I'd say
 2    it's very poor, maybe I did not express
 3    myself clearly.  I think the entire
 4    document should be a document of
 5    formality in order to sell.  I expressed
 6    my willingness to follow up with my old
 7    customers who have made purchase with us
 8    before to ask whether they'd like to
 9    continue to purchase our product.
10         Q.    You saw an opportunity to
11    renew business with OEG.  Correct?
12         A.    It's not that I saw an
13    opportunity, but in formality, I was only
14    greeting an old customer to see whether
15    he would still willing to purchase our
16    product.  I think this is only a
17    follow-up e-mail.
18         Q.    You wanted to restart your
19    US business.  True?
20         A.    Because at the time, my
21    handling with OEG was the term of FOB
22    Chinese port.  I didn't care which market
23    was he located at.  This was only a
24    greeting out of formality.  What I cared
```

Confidential - Subject to Further Confidentiality Review

 1    about was whether he would purchase my

 2    product.

 3         Q.    The final business that I

 4    want to talk to you about is American

 5    Five Star.

 6         A.    Can somebody get me a glass

 7    of water?

 8         Q.    Isn't it true there were

 9    discussions between TTP and American Five

10    Star about American Five Star becoming

11    the exclusive distributor of TTP gypsum

12    board in the United States?

13         A.    It was a request of Five

14    Star Company requesting us to approve

15    them to be our agent.

16         Q.    I show you a document which

17    is Bates numbered 21242 and 43, which

18    I'll mark as Che Exhibit 31.

19                   -  -  -

20              (Deposition Exhibit No.

21         Che-31, E-mail dated June 7, 2007

22         with attachment, Bates stamped TG

23         0021242 and TG 0021243, was marked

24         for identification.)

Confidential - Subject to Further Confidentiality Review

```
 1                        -  -  -

 2    BY MR. MEUNIER:

 3           Q.     And I refer you to an e-mail

 4    of June 7, 2007 from Alan Fine, general

 5    manager, American Five Star Products, LLC

 6    to you.  And to be more correct, Mr. Fine

 7    addresses this e-mail to you and to Peng

 8    Wenlong; is that right?

 9           A.     Yes.

10           Q.     He thanks you "for meeting

11    with us today."

12                  Do you recall meeting with

13    representatives of American Five Star

14    Products on June 7, 2007?

15           A.     I only remember that he

16    came.  I do not remember if not seeing

17    the date, the exact date of the meeting.

18           Q.     Who did you meet with

19    besides Mr. Fine?

20           A.     In my memory we call him

21    Alan.

22           Q.     Jorge Arevalo?

23           A.     Should be together with

24    Jorge.  I only know Jorge.
```

1          Q.    Is that the same Jorge that

2    you dealt with in doing business with

3    Oriental Trading?

4          A.    Yes, that's him.

5          Q.    He gets around?

6          A.    And Jorge took Mr. Alan

7    again came to visit our company.

8          Q.    Mr. Fine tells you and Mr.

9    Peng in this e-mail, "Attached is the

10   Certificate we discussed at the end of

11   the meeting."

12              Do you see that?

13         A.    That certificate?

14         Q.    Yes.  He refers to an

15   attachment of a certificate discussed at

16   the end of the meeting.  Correct?

17         A.    What was your question?

18         Q.    Look at the second page,

19   which is TG 21243, and you see a

20   certificate attached to Mr. Fine's e-mail

21   which states in the first paragraph that

22   TTP "certifies that American Five Star

23   Products LLC is its exclusive distributor

24   for all products sold under the Five Star

1    brand in the United States."

2                Do you see that?

3         A.    Yes, I see it.

4         Q.    Why were you and Mr. Peng

5    willing to discuss with representatives

6    of American Five Star at this meeting an

7    agreement to make American Five Star the

8    exclusive distributor for all TTP

9    products sold in the US?

10        A.    He was the representative of

11   Five Star that asked us to become --

12   asked us to issue the certificate.  It

13   was them wanted to discuss with us.  We

14   could not just disregard our customer.

15        Q.    Why were you willing to

16   consider an agreement to make American

17   Five Star the exclusive distributor for

18   all of your products in the US?

19        A.    It was not our

20   consideration.  It was just the intention

21   of the customer which they wanted to

22   discuss with us.

23        Q.    But in fact, your boss

24   proposed a contract with American Five

Confidential - Subject to Further Confidentiality Review

```
 1    Star to make them the exclusive

 2    distributor after this e-mail.  Is that

 3    true?

 4            A.    I don't recall.

 5            Q.    I'll show you a document

 6    which is Bates numbered TG 21228 through

 7    21232.

 8                         -  -  -

 9                  (Deposition Exhibit No.

10            Che-32, E-mail dated June 20, 2007

11            with attachment, Bates stamped TG

12            0021228 through TG 0021232, was

13            marked for identification.)

14                         -  -  -

15    BY MR. MEUNIER:

16            Q.    I refer you to the first

17    page, 21228, which is an e-mail from Alan

18    Fine, American Five Star Products, to you

19    and Peng Wenlong in which he says, "Dear

20    Frank and Bill, Jorge forwarded to me the

21    proposed contract approved by your

22    boss-manager."

23                  Who was your boss manager

24    who made this proposed contract that
```

Confidential - Subject to Further Confidentiality Review

```
 1    Jorge had forwarded?

 2           A.    I don't know who did Jorge

 3    refer to.

 4           Q.    No, sir.  My question is,

 5    who was your boss manager who gave Jorge

 6    a proposed contract with American Five

 7    Star?

 8                 MR. SPANO:  Objection, no

 9           foundation.

10                 THE COURT:  Show him the

11           letter.

12                 MR. MEUNIER:  He's got the

13           e-mail in front of him.  It says,

14           "Jorge forwarded to me the

15           proposed contract approved by your

16           boss-manager."

17                 MR. SPANO:  And your

18           question said that the boss

19           manager gave Jorge a contract.

20           There's no suggestion that --

21                 MR. MEUNIER:  "Jorge

22           fowarded" --

23                 THE COURT:  Restate the

24           question.
```

Confidential - Subject to Further Confidentiality Review

1    BY MR. MEUNIER:

2         Q.    The e-mail, the first

3    sentence of the e-mail to you and Frank,

4    you and Peng Wenlong, from Alan Fine,

5    says, "Jorge forwarded to me," Alan Fine,

6    "the proposed contract approved by your

7    boss-manager."

8              My question is, who was the

9    boss manager who approved a proposed

10   contract and gave it to Jorge?

11        A.    I don't know who had agreed

12   such a proposed contract, so I don't know

13   who did Jorge refer to.  I think Jorge

14   was talking to Alan here.

15        Q.    Mr. Fine goes on in his

16   e-mail to you to say he understands "if

17   your company cannot make the full

18   agreement with the terms we discussed in

19   your office two weeks ago.  I have

20   submitted a new contract with some

21   clarifications and the most important

22   terms to us."

23              Do you see that?

24        A.    I see it.

```
 1          Q.     Please look at the attached
 2   document, which is entitled "Exclusive
 3   Distribution Agreement" bearing the date
 4   of June 21, 2007.
 5                Is this the contract which
 6   Alan Fine forwarded to you and Peng
 7   Wenlong for your company, TTP, to
 8   consider?
 9          A.     I don't have a clear
10   recollection, but from what it appears to
11   be, that should be the case, because I do
12   not remember such an agreement was ever
13   signed.
14          Q.     If you look at the last
15   page, Mr. Che, which is 21232, there is a
16   signature by Alan Fine on behalf of
17   American Five Star Products.
18                Is it your testimony you
19   don't recall if TTP ever signed this
20   agreement?
21          A.     I don't recall.
22          Q.     Did you review the
23   agreement?
24          A.     No.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Who reviewed the agreement
 2   on behalf of TTP?
 3                MR. SPANO:  Objection.
 4                MR. MEUNIER:  If anyone?
 5          Will that solve it?
 6                THE COURT:  Just put "if
 7          anyone."
 8   BY MR. MEUNIER:
 9          Q.    Who, if anyone, reviewed
10   this agreement on behalf of TTP?
11          A.    What were you asking or do
12   you mean if I'm seeing the document right
13   now?  Or actually, I just flipped the
14   page.  I did not really review the
15   document.
16          Q.    No, sir.  When this document
17   was forwarded with Mr. Fine's e-mail to
18   you and Peng Wenlong on June 20, 2007,
19   who, if anyone, on behalf of TTP reviewed
20   the agreement?
21          A.    I don't recall.
22          Q.    In principle, was TTP
23   opposed to the idea of making an
24   exclusive distribution agreement with
```

Confidential - Subject to Further Confidentiality Review

 1    this American company?

 2           A.    In my recollection, we did

 3    not agree to sign this agreement with

 4    them.

 5           Q.    I understand that.

 6                 But did TTP object in

 7    principle to the idea of an exclusive

 8    distribution agreement with American Five

 9    Star?

10           A.    I don't recall the

11    circumstance at that time.

12                 Can I go to the restroom?

13                 THE COURT:  It's time.

14                 VIDEOTAPE TECHNICIAN:  We're

15           going off the record.  The time is

16           3:47.

17                 THE COURT:  15-minute break.

18                    -  -  -

19                 (A recess was taken from

20           3:47 p.m. to 4:02 p.m.)

21                    -  -  -

22                 VIDEOTAPE TECHNICIAN:  Back

23           on the record at 4:02.

24                 THE COURT:  Any further

Confidential - Subject to Further Confidentiality Review

```
 1          questions?

 2               MR. MEUNIER:  I tender the

 3          witness.

 4               THE COURT:  Anybody else

 5          questioning for cross?

 6               Go ahead, Frank.  It's late

 7          in the day.

 8                    -   -   -

 9               EXAMINATION

10                    -   -   -

11     BY MR. SPANO:

12          Q.    Good afternoon, Mr. Che.

13               Did TTP enter into any kind

14     of agreement with American Five Star for

15     that company to distribute its drywall?

16          A.    As far as I can remember,

17     that will be no.

18          Q.    Did TG or TTP ever sell any

19     drywall to American Five Star?

20          A.    In my recollection, no.

21          Q.    Do you recall the

22     circumstances of how Oriental Trading was

23     introduced to TTP?

24          A.    At the time Oriental Trading
```

```
 1    was -- first of all, Oriental Trading had

 2    a person in China whose name is Wu

 3    Jiansong who contacted us and expressed

 4    his willingness of purchasing our

 5    product.  And later Mr. Evan from

 6    Oriental Trading told me that Wu Jiansong

 7    was his representative in China.  We were

 8    able to contact Mr. Evan through Wu

 9    Jiansong.  And after that, Mr. Jorge, Mr.

10    Jorge from Oriental, again, through an

11    agent in Beijing came to our company to

12    visit.  And then he said he was also from

13    the Oriental company.  That was the

14    circumstance.

15           Q.    I'd like to mark an exhibit.

16    Can I borrow your stickers?

17                 MR. MEUNIER:  Yes.

18                      -   -   -

19                 (Deposition Exhibit No. Che

20    Defendant's-1, E-mail dated

21    8/30/2006, Bates stamped TG

22    0000575, was marked for

23    identification.)

24                      -   -   -
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. SPANO:
 2           Q.    We've marked as Defendant's
 3    Exhibit Che-1 Bates number TG 575.
 4                 Mr. Che, do you recognize
 5    this document as an e-mail from Ivan
 6    Gonima to you, cc Wu Jian Song, dated
 7    August 30, 2006?
 8           A.    Yes.
 9           Q.    I'd like to read the first
10    paragraph into the record and then ask
11    the translator to translate it for the
12    witness.
13                 MR. DAVIS:  Excuse me.  I
14           don't see the exhibit in the
15           binder that was provided.
16                 Was that provided?  Was that
17           document provided by defendants in
18           advance?
19                 MR. SPANO:  It may not have
20           been.
21                 MR. DAVIS:  I'm just not
22           aware of it.
23                 MR. SPANO:  I haven't
24           cross-checked.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. DAVIS:  Can we get

 2         copies, please.

 3              And Your Honor, we object to

 4         the use of that document.

 5              THE COURT:  What's your view

 6         of it, Frank?

 7              MR. SPANO:  I actually think

 8         this document was marked by them

 9         by some different Bates number

10         already, and I was just trying to

11         save time not to go look through

12         the pile.

13              MR. DAVIS:  Subject to the

14         objection.

15              MR. SPANO:  If it's an

16         issue, I'll go through the pile.

17              MR. DAVIS:  Subject to the

18         objection.

19              THE COURT:  Go ahead.  Do

20         it.

21    BY MR. SPANO:

22         Q.    "My name is Ivan Gonima and

23    I am the Executive Vice-President of

24    Oriental Trading...based in Miami,
```

1    Florida, USA.  Our China Office Manager,

2    Mr. Wu Jian Song, has already contacted

3    you about our interest in doing business

4    with your company for importing drywall

5    (Gypsum Board) to the USA."

6              Does that paragraph that's

7    been translated correctly reflect the

8    circumstances of Oriental's Trading first

9    introduction to TTP?

10       A.    It does say that Ivan Gonima

11   through his Chinese representative Wu

12   Jiansong to approach us and expressed

13   their intention of purchasing our

14   product.

15             MR. SPANO:  For the record,

16             I can now confirm we designated

17             this as an exhibit before the

18             deposition.

19   BY MR. SPANO:

20       Q.    Did TTP solicit any contact

21   with Oriental Trading before Oriental

22   Trading contacted TTP through their China

23   office manager?

24       A.    No.

1          Q.     Do you recall having

2     discussions with Oriental Trading's

3     representatives in China regarding

4     Oriental Trading distributing TTP's

5     drywall?

6          A.     Can you interpret again?

7               THE INTERPRETER:  Yes.

8               THE WITNESS:  I don't recall

9          very clearly about that.

10              THE COURT:  What are you

11         looking for?  Let me see if I can

12         help you.

13              MR. SPANO:  I'm looking for

14         Che-1, the exclusive agency

15         agreement.

16              MR. MEUNIER:  I have it.  It

17         was Jia-13.

18    BY MR. SPANO:

19         Q.     Could you please take a look

20    at this document, the sole agency

21    agreement, and let me know if it

22    refreshes your recollection regarding any

23    discussions you had with Oriental Trading

24    about their possibly distributing TTP's

Confidential - Subject to Further Confidentiality Review

```
 1   drywall?

 2           A.     I believe the agreement was

 3   discussed with Jorge of Oriental Trading.

 4           Q.     What were your discussions

 5   with Jorge that led up to the signing of

 6   this agreement?

 7           A.     At the time Jorge came to

 8   visit our plant, exaggerated on the fact

 9   that he needed a big volume of our

10   product and asked to sign such an

11   agreement with us.  At the time, in order

12   to sell more product, we agreed on such

13   an agreement.  However, the precondition

14   for the effectiveness of this agreement

15   was that between November 2006 to --

16               THE INTERPRETER:  One

17           moment.

18               THE WITNESS: -- and February

19           2007, they had to purchase over

20           20,000 of gypsum board from us.

21           But in fact, during this period of

22           time, Oriental Trading did not

23           purchase any of our gypsum board.

24           And also, at the time Jorge took
```