Confidential - Subject to Further Confidentiality Review

```
 1        away those original copies of this
 2        agreement back to his office and
 3        said after signing and stamping on
 4        the agreement, he would provide us
 5        with the original agreement.  But
 6        from my recollection and the
 7        documents of our company, Jorge
 8        did not give us back such
 9        documents.  Therefore, in our
10        company, we believe this is a void
11        agreement.
12             MR. GONZALEZ:  Your Honor, I
13        have several objections addressed
14        to the last answer.  One, to the
15        extent that they are discussing
16        oral discussions with respect to
17        affecting the written contract, it
18        violates the statute of frauds.
19        To the extent that they're -- they
20        requested --
21             Gerry, can you move your
22        head.
23             To the extent that they
24        requested a legal opinion on the
```

1        effectiveness of the written

2        contract, it calls for a legal

3        conclusion and should be stricken.

4        The statements about,

5        quote/unquote, the state of mind

6        of Jorge is pure speculation, and

7        the transactional discussions are

8        hearsay.

9                On all those grounds, we

10        move to strike the answer.

11                THE COURT:  All right.

12                MR. SPANO:  Your Honor, this

13        is discovery, and the statute of

14        frauds is not an objection to a

15        question at a deposition.

16                THE COURT:  This may go to

17        whether or not it's admissible in

18        evidence or whether or not it's

19        admissible at trial, but I'm going

20        to allow it in discovery at this

21        stage.

22                MR. GONZALEZ:  Just so I'm

23        clear, Your Honor, I won't make

24        these objections if the Court is

1      saying that trial and

2      admissibility matters are

3      preserved.  My understanding,

4      perhaps erroneously, was that the

5      Court was here to address these

6      issues once and for all.

7              THE COURT:  Well, when I do,

8      I can make some rulings on it, but

9      I'm not going to exclude this.

10     I'll take those motions into

11     consideration, and I'll decide

12     whether or not they're admissible.

13     But they go to the weight of the

14     evidence and they go to something

15     whether or not it's admissible at

16     trial.  But I'm not going to deal

17     with that at this time.

18             MR. GONZALEZ:  I simply ask

19     so that I wouldn't waste the

20     Court's time with additional

21     objections if it wasn't

22     appropriate.  Thank you, Your

23     Honor.

24             THE COURT:  Yes.

```
 1              MR. MEUNIER:  Judge, just
 2         for the record, on behalf of the
 3         PSC in the MDL, we join in the
 4         request that the testimony be
 5         considered inadmissible.
 6              THE COURT:  I don't mind you
 7         keep mentioning it.  If there is
 8         something that you feel is
 9         excluded, mention it and I'll deal
10         with it one way or the other.  But
11         this one I'm going to allow.
12    BY MR. SPANO:
13         Q.    Mr. Che, did Oriental
14    Trading perform the requirements of
15    paragraph 3 of the sole agency agreement?
16         A.    Can you summarize what the
17    third paragraph is saying here?
18         Q.    Yes.  I'll ask my questions
19    in English and I'll ask you to translate
20    them.
21              Assuming the agreement
22    required that Oriental Trading purchased
23    not less than 20,000 sheets of one unique
24    size of drywall from the beginning of
```

```
 1    November of 2006 to the end of February

 2    2007, did Oriental Trading perform that

 3    requirement of the agreement?

 4          A.    No.

 5          Q.    And assuming the agreement

 6    required Oriental Trading to purchase not

 7    less than 1 million sheets of drywall in

 8    the 12 months following February 2007,

 9    did Oriental Trading perform that

10    requirement of the agreement?

11          A.    Neither.

12          Q.    Did Oriental Trading ever

13    serve as a distributor for TTP under the

14    terms of the sole agency agreement,

15    Exhibit 13 Jia?

16                MR. GONZALEZ:  Objection,

17          Your Honor, lack of foundation,

18          speculation.

19                THE COURT:  He's speaking --

20          the difficulty I'm having with

21          some of the objections, all of

22          which may be valid, is that the

23          focus in these depositions is

24          jurisdiction.  Also, this witness
```

```
 1          is testifying as a 30(b)(6)

 2          witness who's giving us the

 3          company's view.  There's also an

 4          issue of whether or not the

 5          contract was signed, or if it was,

 6          whether it was void because of

 7          lack of compliance.

 8               Because of all of those

 9          things, I'm going to allow him to

10          testify as to what the company's

11          position was.  So that it may

12          be -- it may not be admissible for

13          the substance of the contract, but

14          it may have some relevance in

15          jurisdiction.  And that's the way

16          I see it.

17               So I'm going to overrule

18          this objection for those reasons.

19               THE WITNESS:  Can you ask

20          the question again?

21   BY MR. SPANO:

22          Q.   Did Oriental Trading ever

23   serve as a distributor for TTP under the

24   terms of the sole agency agreement?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    No.
 2          Q.    Sometime after February
 3    2007, did Oriental Trading purchase
 4    drywall from TTP?
 5          A.    Yes, a little bit.
 6          Q.    What were the terms of sale
 7    of the drywall sales that TTP made to
 8    Oriental Trading?
 9              THE COURT:  At what time?
10              MR. SPANO:  The sales made
11          in 2007.
12              THE WITNESS:  After the
13          incompliance of this agreement,
14          TTP treated Oriental company sales
15          just as same as TTP treated the
16          other companies, according to
17          customers' required product size,
18          specification and label.  We had
19          produced the product that the
20          customer had required and
21          delivered to the customer in
22          Chinese port, which was FOB term.
23          The customer arranged the shipping
24          matter.
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. SPANO:
 2         Q.    What were the payment terms
 3    of the Oriental Trading sales?
 4         A.    Prepay the full payment, and
 5    then we will deliver our product.
 6         Q.    Were the terms of sale to
 7    Oriental Trading substantially the same
 8    as the terms of sale TTP gave to other
 9    buyers from the US who came to China to
10    purchase drywall?
11         A.    The way and the term of
12    handling Oriental Trading Company was the
13    same as any company that came from abroad
14    to buy our product.
15         Q.    I'm marking TTP's
16    manufacturer's profile form.
17              Do I need to distribute
18    copies of that or does everybody have it?
19              MR. MEUNIER:  If you're
20              going to question the witness
21              about it, I'd like to have a copy.
22              MR. SPANO:  Okay.
23              MS. BASS:  Is it a composite
24              of both?
```

Confidential - Subject to Further Confidentiality Review

```
 1                    MR. SPANO:  No.  Just TTP

 2            with translation.

 3                         -  -  -

 4                    (Deposition Exhibit No. Che

 5            Defendant's-2, Tai'an Taishan

 6            Plasterboard Co., Ltd.

 7            Manufacturer Profile Form, was

 8            marked for identification.)

 9                         -  -  -

10     BY MR. SPANO:

11            Q.    This will be Defendant's

12     Che-2.

13                    Mr. Che, I'd like to draw

14     your attention to the TTP manufacturer's

15     profile form, Exhibit A, the Chinese

16     version.

17                    Could you look at the

18     entries for Oriental Trading on Exhibit

19     A, which run from number 234 to 243,

20     except for 235?

21            A.    I see it.  I got it.

22            Q.    Did TTP ship any of the

23     drywall reflected in these sales entries

24     on the manufacturer's profile form to
```

```
 1    Miami, Florida?
 2            A.    No.  We only performed FOB
 3    Chinese port delivery to our -- with our
 4    client.
 5            Q.    Did TTP ship any of the
 6    drywall reflected in these Oriental
 7    Trading sales shown on the manufacturer's
 8    profile form to any destination in the
 9    USA?
10            A.    No.  We only delivered in
11    Chinese port.
12            Q.    To the company's --
13            A.    Delivery.
14            Q.    I'm sorry.
15            THE INTERPRETER:  He just
16            said the word "delivery."
17    BY MR. SPANO:
18            Q.    To the company's knowledge,
19    did Oriental Trading distribute anywhere
20    in the USA any of the drywall it
21    purchased from TTP as reflected here on
22    the manufacturer's profile form?
23            MR. GONZALEZ:  Object to
24            foundation.
```

Confidential - Subject to Further Confidentiality Review

1          THE COURT:  I'm sorry, I
2      didn't hear that.
3          MR. GONZALEZ:  Objection as
4      to foundation.
5          THE COURT:  Let's rephrase
6      it, Frank.
7  BY MR. SPANO:
8      Q.    Did TG or TTP ever receive
9  any information indicating that Oriental
10 Trading distributed in the USA any of the
11 drywall that it purchased from TTP?
12     A.    Oriental company had never
13 told us that they had delivered and
14 distributed the product that it purchased
15 from us, plus the usages of the product.
16     Q.    Did TG or TTP ever receive
17 any information indicating where the
18 drywall that Oriental Trading purchased
19 from TTP would be used?
20     A.    No.  We were never told of
21 that.
22     Q.    Could you look at the column
23 on the manufacturer's profile form
24 entitled "Edge Sealing Tape Markings."

Confidential - Subject to Further Confidentiality Review

1                    And what does the entry on

2    the profile form indicate with respect to

3    the markings on the edge sealing tape of

4    the drywall TTP sold to Oriental Trading?

5                    MR. GONZALEZ:  Objection,

6              document speaks for itself.

7                    THE COURT:  I'm going to

8              overrule the objection.

9                    THE WITNESS:  According to

10             the label that designed by

11             Oriental company, we produced the

12             requested product, which was as

13             same as the other companies that

14             had labels.  It is only --

15                    THE INTERPRETER:

16             Interpreter clarification.

17                    THE WITNESS:  It is only a

18             mark that we -- that we did

19             according to the request of the

20             customer to put the label on the

21             product.  And it was produced

22             according to the request of the

23             client.

24    BY MR. SPANO:

1          Q.    I'd like to show you what

2    has been previously marked as Jia-28, and

3    the last page of that exhibit, TG

4    26000019.

5               Is this, what is shown here,

6    what TTP put on the edge sealing tape of

7    the drywall that it sold to Oriental

8    Trading?

9          A.    It is the mark that designed

10   by Oriental Trading Company for its

11   product.

12               MR. GONZALEZ:  Your Honor,

13          may we have a time frame.

14               THE COURT:  Just ask him

15          about the time, when this was

16          done.

17               MR. SPANO:  At the time of

18          sale.

19               THE COURT:  When is that?

20               MR. SPANO:  As reflected in

21          the manufacturer's profile form.

22          It has all these dates.  Would you

23          like me --

24               THE COURT:  No, no, that's

Confidential - Subject to Further Confidentiality Review

1          okay.  As reflected on those

2          dates.

3    BY MR. SPANO:

4          Q.    Do you know if the mark

5    shown on Jia-28 was in fact affixed to

6    the drywall that was sold to Oriental

7    Trading as reflected in the sales on the

8    manufacturer's profile form we've been

9    discussing?

10         A.    I believe so.

11         Q.    What is the function of edge

12   sealing tape on drywall?

13         A.    It was only a mark.  It's

14   just like a person's name, to verify --

15   to verify -- it's a name, for people to

16   recognize.

17         Q.    Setting aside what is marked

18   on the tape, what is the function of the

19   tape itself?

20         A.    The tape function is to make

21   sure that the upper side of the gypsum

22   board are not damaged.  And it will be

23   peeled off during usage of the board.

24         Q.    In your understanding, is

```
 1    the normal practice to remove the edge

 2    sealing tape before the drywall is

 3    installed?

 4         A.    Correct.

 5         Q.    Did Oriental Trading ever

 6    report to TTP that it resold any of the

 7    drywall that it bought from TTP?

 8         A.    No.

 9         Q.    Who selected the destination

10    for the drywall that Oriental Trading

11    purchased from TTP?

12         A.    Oriental Trading Company

13    itself.

14         Q.    Did Mr. Gonima communicate

15    the selected destination to you?

16              THE COURT:  The objection is

17         vague, I would sustain that

18         objection.  To whom.

19    BY MR. SPANO:

20         Q.    Did TTP communicate --

21              THE COURT:  I'm sorry, I

22         didn't hear you.

23    BY MR. SPANO:

24         Q.    Did Oriental Trading
```

```
 1    communicate to TTP the destination that

 2    Oriental Trading selected for the

 3    drywall?

 4         A.    No.

 5         Q.    Did you assist Oriental

 6    Trading with the shipping arrangements

 7    for the drywall it purchased from TTP?

 8         A.    I only assisted Oriental

 9    Trading Company to communicate with

10    shipping agent regarding the shipping

11    cost.  But the detailed handling was

12    between Oriental company itself and the

13    shipping agent.

14              THE WITNESS:  Can I go get

15         some water?

16    BY MR. SPANO:

17         Q.    Do you recall answering

18    questions regarding quotes for shipping

19    cost to various cities in the United

20    States that you provided to Oriental

21    Trading?

22         A.    I remember that I've

23    answered those questions, but it has

24    always been copy and copy, so I don't
```

Confidential - Subject to Further Confidentiality Review

```
 1    really recall those quotations, but I do

 2    remember that I answer question regarding

 3    that.

 4            Q.     For what reason did you

 5    provide information on shipping costs to

 6    various cities in the United States to

 7    Oriental Trading?

 8            A.     Upon the request of Ivan.

 9            Q.     And why did you provide that

10    information in response to Oriental

11    Trading's request?

12            A.     Because at the time, Mr.

13    Ivan thought that the shipping cost that

14    he got from over there was a little

15    higher, so he would like to compare the

16    shipping cost from both sources and asked

17    us to help him with that and see if we

18    could find something cheaper, which is

19    the ocean shipping cost.

20            Q.     Did the information that TTP

21    provided to Oriental Trading regarding

22    ocean shipping costs to various cities

23    indicate that TTP was willing to ship

24    drywall to those cities?
```

```
 1              MR. GONZALEZ:  Your Honor, I
 2         object.  It calls for a legal
 3         conclusion and also attempts to
 4         usurp the fact-finding capacity of
 5         the Court.
 6              THE COURT:  I'll overrule
 7         the objection and allow it.
 8              THE WITNESS:  Can you repeat
 9         the question?
10              THE COURT:  Why don't you
11         just read it.
12              THE WITNESS:  Please
13         translate it for me.
14              No.  We deliver to the
15         client only in Chinese ports.  It
16         was the decision of the customer
17         as of where they would like to
18         ship the goods to.
19    BY MR. SPANO:
20         Q.   Do you recall having
21    discussions with Oriental Trading where
22    they indicated to you the amount of
23    drywall they expected to buy from TTP?
24         A.   I don't recall the exact
```

 1   amount, but we did have that discussion.

 2         Q.    How did it happen that

 3   Oriental Trading wound up with an unused

 4   $100,000 payment to TTP?

 5         A.    Because Oriental Trading

 6   wanted to purchase our product.

 7   Therefore, they prepaid.  But because of

 8   their company's problem, they did not

 9   place order for that.  And afterwards,

10   through discussion, we refund the amount

11   of money to a company that they had

12   entrusted, which is a representative

13   office of that company in China.  We

14   refunded to their account in China.

15         Q.    After all of the discussions

16   back and forth with Oriental Trading

17   about how their payment would be

18   refunded, did Oriental Trading ultimately

19   instruct TTP to transfer the money to a

20   company in China?

21         A.    Yes.

22         Q.    And did TTP in fact transfer

23   the $100,000 unused Oriental Trading

24   payment to the bank account in China of

Confidential - Subject to Further Confidentiality Review

1    the company Oriental Trading instructed

2    it to give the money to?

3          A.    Yes.

4          Q.    Could you look at the

5    manufacturer's profile form again,

6    Exhibit A, entry number 235.

7                Do you see the entry there

8    regarding TTP's sale to B America

9    Corporation?

10         A.    I see it.

11         Q.    What was the term of that

12   sale as it related to shipment?

13         A.    They call it C-I-F.

14         Q.    What does CIF stand for?

15         A.    CIF is -- that's on top of

16   FOB.  Ocean shipment costs and insurance

17   were added.

18         Q.    To what was the ocean

19   shipment and insurance costs added?

20         A.    FOB price.

21         Q.    Did the price of the drywall

22   that TTP charged to B America include the

23   cost of ocean freight and insurance?

24         A.    Yes.  The customer paid all

Confidential - Subject to Further Confidentiality Review

1    the CIF cost and through Madam Chen Bilai

2    to arrange the shipment.  We only, in

3    accordance with the client's request, to

4    pay on their behalf the ocean freight

5    cost and insurance cost.

6         Q.    To whom did TTP pay the

7    ocean freight cost and insurance cost on

8    behalf of B America?

9         A.    To the shipping agent it

10   arranged, which was arranged by the

11   customer which was entrusted by the

12   client.

13        Q.    Who selected the destination

14   for the drywall that B America purchased?

15        A.    The customer.

16        Q.    In the course of the

17   transaction, did TTP learn that the

18   destination selected by B America was

19   Miami, Florida?

20        A.    Client's shipping agent once

21   told us that they would ship the product

22   to the destination requested by the

23   client.  I don't remember the exact name

24   of the destination, but it was written on

Confidential - Subject to Further Confidentiality Review

```
1    the invoice.  However, whether it was

2    eventually shipped to what place, I am

3    not sure.

4          Q.    Did TTP ship the drywall it

5    sold to B America to Miami, Florida?

6          A.    We did not.

7          Q.    Did TTP ship the drywall it

8    sold to B America to anyplace in the

9    United States of America?

10         A.    No.

11         Q.    Did B America ever indicate

12   that it resold -- I'll withdraw that.

13               Did B America ever report to

14   TTP that it resold any of the drywall

15   that it purchased from TTP?

16         A.    No.

17         Q.    Did B America ever inform or

18   advise TTP about where the drywall it

19   purchased from TTP was going to be used?

20         A.    No.

21               THE INTERPRETER:  May the

22         interpreter request a two minutes

23         break?

24               THE COURT:  Sure.
```

Confidential - Subject to Further Confidentiality Review

```
 1              VIDEOTAPE TECHNICIAN:  Going
 2         off the record, the time is 5:03.
 3              THE COURT:  We'll take a
 4         five-minute break at this time.
 5                   -   -   -
 6              (A recess was taken from
 7         5:03 p.m. to 5:10 p.m.)
 8                   -   -   -
 9              VIDEOTAPE TECHNICIAN:  Going
10         back on the video record.  The
11         time is 5:10.
12   BY MR. SPANO:
13         Q.    Mr. Che, could you look next
14   at entry number 178 on the TTP
15   manufacturer's profile form related to
16   Triax Trading?
17         A.    I see it.
18         Q.    Is this the transaction that
19   you discussed also involving API?
20         A.    Yes.
21         Q.    Did TTP ship the drywall
22   sold to API or Triax Trading to New
23   Orleans, Louisiana?
24         A.    No, we did not ship it.
```

Confidential - Subject to Further Confidentiality Review

1    Q.    Did TTP ship that drywall to

2    any port in the United States of America?

3    A.    No.  Our term was only

4    deliver in Chinese port.

5    Q.    Who made the shipping

6    arrangements with respect to the API or

7    Triax Trading sale?

8    A.    In this transaction, there

9    was a Ms. Wei who made the arrangement

10   for everything.  We only had the term FOB

11   Chinese port performed.

12   Q.    Could you please look at

13   what's been previously marked as Peng S.

14   Exhibit 4, which says "Invoice."

15   A.    I see it.

16   Q.    To the company's knowledge,

17   who prepared this document?

18   A.    This is a document that Ms.

19   Wei sent to us.

20   Q.    Why did she send this

21   document to TTP?

22   A.    Because Triax company

23   eventually wire the money to TTP.  Ms.

24   Wei was only a freelance trader.

1    Therefore, she send this to us and

2    requested us to stamp on it.

3         Q.    Do you see where on this

4    exhibit it says, "To:  New Orleans, LA"?

5         A.    I see it now, but I did not

6    pay attention before.

7         Q.    To the company's knowledge,

8    where did that information that appears

9    on this document come from?

10        A.    I don't know.  Ms. Wei

11   prepared this.

12        Q.    Do you recall answering

13   questions regarding TTP's sale to a

14   company called TOV, later named OEG?

15        A.    Yes.

16        Q.    Could you look on the

17   manufacturer's profile form to entries

18   219 through 222?

19        A.    I see it.

20        Q.    What were the terms of sale

21   related to shipment for the drywall sales

22   reflected in those entries to TOV?

23        A.    In my memory, TOV was also

24   handled as FOB Chinese port as its term

Confidential - Subject to Further Confidentiality Review

1    of delivery.

2         Q.    Did TTP ship the drywall it

3    sold to TOV to New York?

4         A.    We did not make this

5    shipment arrangement.

6         Q.    Did TTP ship the drywall it

7    sold to TOV to any location in the USA?

8         A.    No.

9         Q.    Did TTP ever receive any

10   information regarding whether TOV resold

11   any of the drywall it purchased from TTP?

12        A.    No.

13        Q.    Did TOV indicate to TTP

14   where the drywall it was purchasing was

15   going to be used?

16        A.    No.

17        Q.    Did B America ever indicate

18   to TTP where the drywall it was

19   purchasing from TTP was going to be used?

20        A.    No.

21        Q.    Did TTP sell metal studs to

22   TOV?

23        A.    In my recollection, it was

24   showed -- it was sold to OEG after the

Confidential - Subject to Further Confidentiality Review

1    change of name.  I'm not very sure about

2    that.

3              Q.    Okay.

4                    Assuming TTP sold the studs

5    to OEG, what were the terms of those

6    sales as they related to shipment?

7              A.    It's also the term of FOB

8    Chinese port.

9              Q.    Did TTP ship any of the

10   metal studs it sold to OEG to any

11   location in the USA?

12             A.    No.

13             Q.    Did TG or TTP ever sell

14   metal studs to any other company that

15   indicated it was from the United States?

16             A.    Can you repeat it?

17                   Any other company?  No.

18             Q.    Were all the metal studs

19   that TTP sold to OEG manufactured by

20   Jindun?

21             A.    Yes, as far as I can

22   remember.

23             Q.    And at the time that Jindun

24   manufactured the metal studs that TTP

Confidential - Subject to Further Confidentiality Review

 1    sold to OEG, was it a subsidiary of --

 2    was -- withdrawn.

 3              In 2006 and 2007, was Jindun

 4    a subsidiary of TG?

 5        A.    What was Jindun?  I didn't

 6    hear very clearly of the last part of the

 7    translation.

 8              THE INTERPRETER:  May the

 9              interpreter repeat the

10              interpretation?

11              MR. SPANO:  Yes, please.

12              THE WITNESS:  I'm not very

13              sure about that.

14    BY MR. SPANO:

15        Q.    I'm showing you what was

16    marked earlier as Che Exhibit Number 18.

17              Do you recall answering

18    questions earlier about the drywall

19    samples sent to Mr. Bo Zhou, Bo Zhou?

20        A.    I remember that I did answer

21    this question earlier.

22        Q.    After TTP sent the samples

23    to Bo Zhou, did he buy any drywall?

24        A.    I don't recall he bought our

Confidential - Subject to Further Confidentiality Review

1    product.

2              Q.   Did TG or TTP ever send

3    drywall to any customer or potential

4    customer that didn't actually ask for it

5    beforehand?

6                   MR. MEUNIER:  Objection to

7              form, Your Honor, unless it's made

8              clear that we're talking about

9              drywall samples.

10                  MR. SPANO:  I misspoke.

11             That's what I meant to say.  I'll

12             ask again.

13                  THE COURT:  All right.

14   BY MR. SPANO:

15             Q.   Regarding drywall samples

16   provided to customers, did TG or TTP ever

17   send them out to anyone who didn't ask

18   for them first?

19             A.   In my recollection, no.

20                  MR. SPANO:  Tender the

21             witness, Your Honor.

22                  THE COURT:  Any redirect,

23             Ervin?

24                  MR. GONZALEZ:  Yes.

Confidential - Subject to Further Confidentiality Review

```
 1          Briefly, Your Honor.  Hopefully

 2          briefly.

 3                  THE WITNESS:  Can I take a

 4          break?

 5                  THE COURT:  You need a break

 6          or are you --

 7                  THE WITNESS:  How much

 8          longer?

 9                  MR. GONZALEZ:  Short.

10                  THE WITNESS:  My neck cannot

11          take it anymore.

12                  MR. MEUNIER:  I will have a

13          little bit too, Judge.

14                  THE WITNESS:  If you have

15          too many questions, you have to

16          wait.

17                  VIDEOTAPE TECHNICIAN:  We're

18          going off the record at 5:27.

19                      -  -  -

20                  (A recess was taken from

21          5:27 p.m. to 5:33 p.m.)

22                      -  -  -

23                  VIDEOTAPE TECHNICIAN:  We're

24          back on the video record at 5:33.
```

Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -

 2                   EXAMINATION

 3                      -   -   -

 4   BY MR. GONZALEZ:

 5        Q.     Good afternoon, Mr. Che.

 6   I'm going to show you Exhibit Number 1 to

 7   your deposition, Che-1.

 8               Can you confirm for me that

 9   the sole agency agreement is dated

10   October 20, 2006?

11        A.     That's what appears on the

12   document.

13        Q.     I'm going to show you what's

14   been marked as Exhibit 28 in the Jia

15   deposition.  This is the document that

16   refers to the labels for the Oriental

17   Trade Company's drywall purchase from TTP

18   that were going to be labeled Dun

19   Distributors that you discussed with your

20   attorney.

21               And you recall that

22   discussion with your attorney about that

23   document.  Correct?

24        A.     We did.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.      The date of the e-mails

 2   discussing the labels that are going to

 3   be used for Oriental Trade Company's

 4   drywall purchase from TTP is February of

 5   2007.  Right, sir?

 6          A.      It says February the 25th,

 7   2007.

 8          Q.      And that is about November,

 9   December, January, February, March, five

10   months after the date of Exhibit Number

11   1, the sole agency agreement.  Correct?

12          A.      Can you repeat that?

13          Q.      Yes.

14          The date of the e-mail

15   discussing the labeling that's going to

16   go on the drywall that will be labeled

17   Dun Drywall for OTC that was manufactured

18   by TTP is five months after the date of

19   the exclusive agency agreement.  Correct?

20          MR. SPANO:  Objection to

21          form, lack of foundation.

22          THE COURT:  Well, the

23          document itself --

24          It seems to me the document
```

Confidential - Subject to Further Confidentiality Review

1          speaks for itself, so it's

2          pointing out that one's in

3          November and one's in March.

4                    MR. GONZALEZ:  October and

5          February, Your Honor.

6                    THE COURT:  I'm sorry,

7          October and February.

8                    MR. GONZALEZ:  Yes, sir.

9                    THE COURT:  So I could take

10         judicial notice that it's five

11         months.

12                   MR. GONZALEZ:  Yes, Your

13         Honor.  I'll move to my next

14         point.

15    BY MR. GONZALEZ:

16                   Q.    I'm going to show you

17    exhibit to your deposition Che Number 2.

18    And I'm turning it to page 917 Bates

19    stamp number.

20                   I heard you state when your

21    lawyer was questioning you that you were

22    not aware what states the drywall that

23    was being purchased by Oriental Trade

24    Corporation or OTC from your company was

Confidential - Subject to Further Confidentiality Review

```
 1    going to be shipped in the United States.
 2                   Is that what you said
 3    before?
 4         A.     I said I was not sure.  I
 5    did not verify.
 6         Q.     To be clear, I believe what
 7    you said was that you were not aware of
 8    receiving any information from OTC with
 9    respect to where they were going to be
10    sending the drywall purchased from TTP;
11    is that correct?  Is that what you said?
12                   MR. SPANO:  Objection.  It
13            mischaracterizes the testimony.
14                   THE COURT:  Let's ask him --
15                   You have the character -- he
16            says that you misstated it.  You
17            used a couple of words that he
18            didn't.  So I would sustain the
19            objection.
20    BY MR. GONZALEZ:
21         Q.     Sir, do you agree with me
22    that you received an e-mail from Oriental
23    Trade Corporation indicating that they
24    were going to be sending product, drywall
```

1    product, from TTP to numerous cities in

2    the United States of America?  And for

3    time reference, we're referring to the

4    e-mail from Ivan Gonima dated April the

5    15th, 2007.  That e-mail was directed to

6    you.  Right, sir?

7                    MR. SPANO:  I object to the

8              mischaracterization of the

9              document and mixing that in with a

10             question that simply asked him

11             whether he received the e-mail.  I

12             think the e-mail speaks for

13             itself.  It doesn't say anything

14             about Oriental Trading sending

15             drywall anywhere.  It's simply a

16             request for freight quotes, which

17             we've spent --

18                    THE COURT:  Wait, wait,

19             wait.  Just a moment.

20                    MR. SPANO:  -- which we

21             spent a long time talking about.

22                    THE COURT:  Wait.  I

23             understand your objection.

24                    I'll overrule the objection.

```
 1          Let's go forward.
 2               THE WITNESS:  Repeat it,
 3          please.
 4               MR. GONZALEZ:  Can you read
 5          it back to him, please.
 6    BY MR. GONZALEZ:
 7          Q.    Do you agree with me that
 8    you received an e-mail from Oriental
 9    Trade Corporation indicating they were
10    going to be sending drywall product from
11    TTP to numerous cities in the United
12    States of America?  And for time
13    reference I'm referring to the e-mail
14    from Ivan Gonima dated April the 15th,
15    2007.
16          A.    I don't recall.
17          Q.    That's your name.  Right,
18    sir, Bill Cher, Che Gang?
19          A.    Yes.
20          Q.    Your memory was very good
21    when your lawyer was questioning you --
22               THE COURT:  Wait.  Come on,
23          no comment.
24               MR. SPANO:  I object to
```

1           that.

2                   THE COURT:  Yes.  I'll

3           strike that.

4                   MR. GONZALEZ:  I was going

5           to ask about the preparation, Your

6           Honor.  I will rephrase it.

7                   THE COURT:  Rephrase it.

8   BY MR. GONZALEZ:

9           Q.    Was the reason that you were

10  able to recall dates and conversations

11  that happened in the past so clearly

12  during the examination you had with your

13  attorney because you reviewed the

14  documents last night with your lawyers?

15                  MR. SPANO:  Object to the

16          mischaracterization of the

17          testimony.

18                  THE COURT:  He's under

19          cross.  I'll allow it.

20                  THE WITNESS:  What do you

21          mean by that?

22  BY MR. GONZALEZ:

23          Q.    Did you last night go over

24  certain documents with your attorney to

Confidential - Subject to Further Confidentiality Review

1    discuss your examination by your lawyer

2    today?

3                MR. SPANO:  Object on

4          privilege, Your Honor.

5                THE COURT:  He's not asking

6          him what he discussed, just

7          whether.  The privilege doesn't

8          attach to that.  It's 501.

9                THE WITNESS:  What was your

10         question?

11               MR. GONZALEZ:  May you read

12         it back, please?

13               THE INTERPRETER:  Yes.

14               THE WITNESS:  No.

15   BY MR. GONZALEZ:

16         Q.    All right, sir.

17         A.    I went to sleep.  Your

18   question is rather long -- rather long.

19   My brain is not really working right now.

20         Q.    Okay.  Maybe I can shorten

21   the questions.

22               Paragraph number 2 of this

23   e-mail provided you and your company with

24   the following information with respect to

```
 1    OTC's intent on shipping product:

 2                    "Given that you are going to

 3    operate it I am going to need your actual

 4    ocean freight rates from Qingdao to

 5    different cities in the USA for a"

 6    40-foot "GP container.  Here is the list

 7    of cities I need so I can review my price

 8    lists," A through H, Gulfport,

 9    Mississippi; New Orleans, Louisiana; Long

10    Beach, California; Las Vegas, Nevada;

11    Savannah, Georgia; Atlanta, Georgia;

12    Charleston, South Carolina; Wilmington,

13    North Carolina and San Juan, Puerto Rico?

14         A.    You don't have to translate

15    that.  It's meaningless.

16         Q.    That was information that

17    was available to you with respect to the

18    cities that OTC was intending to send

19    product.  Correct?

20                    THE COURT:  Just a moment.

21                    MR. SPANO:  Object to the

22             first question.  Object to the

23             first question because it

24             contained a sidebar assertion of
```

Confidential - Subject to Further Confidentiality Review

```
 1          Oriental Trading's intent that

 2          appears nowhere in the document.

 3          And object to the second question

 4          because he asked the second

 5          question before he had a chance to

 6          answer the first question.

 7               MR. GONZALEZ:  The first

 8          statement was not a question, it

 9          was a preface to the question,

10          which was what he claims to be the

11          second question.  I prefaced it

12          with references to the e-mail, and

13          I asked a question with respect to

14          the e-mail.  So from an

15          evidentiary perspective, it would

16          be an infirm question had I not

17          properly set forth the predicate

18          for it.

19               THE COURT:  Let's first ask

20          him, did you receive this e-mail.

21   BY MR. GONZALEZ:

22          Q.    Sir, this e-mail indicates

23   that you received it.  Correct?

24          A.    Yes.
```

```
 1          Q.    All right, sir.

 2                And it indicates numerous

 3    cities in the United States to where the

 4    product is intended to be sent.  Correct?

 5                MR. SPANO:  Objection.

 6                Continued mischaracterization of

 7                the document.  There's not a word

 8                in that e-mail about Oriental's

 9                intent.  There's not a word about

10                sending drywall anywhere.

11    BY MR. GONZALEZ:

12          Q.    Is that right, sir?

13                MR. GONZALEZ:  I'm sorry, we

14                need a ruling from the Court.

15                THE COURT:  I sustain the

16                objection.  He received the

17                e-mail.  Let's leave it at that.

18    BY MR. GONZALEZ:

19          Q.    Now, if you can turn the

20    page to 918.  This is an e-mail that you

21    sent to Mr. Gonima.  Correct?

22          A.    This one?

23          Q.    Yes.

24          A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

1          Q.     And in it you state, "We

2     indeed operated and are operating with a

3     28-29ton containers to export our

4     products to America.  And we can show 26"

5     to 26 -- "26-26.5ton on the bill and

6     packing list.  The ocean freight from

7     Qingdao to Miami and New York

8     is...2950-3000/40GP.  If you need, I can

9     operate it for you."

10                MR. GONZALEZ:  He doesn't

11            need to answer.  Thank you.

12                THE COURT:  One thing.  Do

13            we need -- what's the witness's

14            standpoint?  He said something

15            about that he's overly tired.

16            We've been here since 8:30.  I

17            don't mind trying to finish him,

18            but if he can't testify, I don't

19            want to -- if you can take a break

20            and come back and finish him.

21                MR.  MEUNIER:  I have a

22            short amount of time.

23                THE COURT:  Well, I leave it

24            up to the witness.

Confidential - Subject to Further Confidentiality Review

```
 1              MR. SPANO:  Can I have a
 2    word with him?
 3              THE COURT:  Sure.
 4              MR. SPANO:  Because I'm
 5    concerned about his ability to
 6    think at this point.
 7              THE COURT:  Right.
 8              VIDEOTAPE TECHNICIAN:  Going
 9    off the record, the time is 5:49.
10                     -   -   -
11              (A recess was taken from
12    5:49 p.m. to 5:53 p.m.)
13                     -   -   -
14              THE COURT:  What do you want
15    to do, Frank?
16              MR. SPANO:  Mr. Che will
17    continue, and he will let us know
18    if he can't finish.
19              THE COURT:  Ervin, are you
20    done?
21              MR. GONZALEZ:  Yes, thank
22    you.
23              VIDEOTAPE TECHNICIAN:  Go
24    back on the video record.  The
```

```
 1              time is 5:53.

 2                    -  -  -

 3                 EXAMINATION

 4                    -  -  -

 5   BY MR. MEUNIER:

 6         Q.     Mr. Che, your attorney put

 7   into the record Ivan Gonima's e-mail to

 8   you of August 30, 2006.  It's TG 575 and

 9   it's been marked as Che Defendant-1.

10              Do you have that in front of

11   you?

12              Please look at this e-mail,

13   Mr. Che, and in particular the second

14   paragraph.

15              Mr. Gonima states at the

16   beginning of that paragraph, "I have been

17   already contacting some big customers of

18   us in order to offer them your product

19   and there is a lot of interest" in "it."

20                 In less than two months --

21                 Less than two months after

22   you received that e-mail, TTP signed an

23   agreement certifying Oriental Trading as

24   the exclusive agent to sell TTP's Dun
```

1    brand in the United States.   Correct?

2         A.    We signed this agreement on

3    October the 20th.

4         Q.    And you signed that

5    agreement in order to sell more product.

6    Isn't that correct?

7         A.    The first reason for signing

8    of the agreement was because Jorge

9    exaggerated on his demand.   It was based

10   on his strong request.   Then we thought

11   that we could actually sell more product.

12   And there was a precondition.   And under

13   that precondition, the agreement was

14   entered.

15        Q.    Yes, sir.

16              But TTP signed this

17   agreement with Oriental Trading in order

18   to sell more product in the United States

19   of America.   Isn't that true?

20        A.    We signed the agreement not

21   because we cared where the customer would

22   sell our product to.   We only wanted them

23   to buy our product.   I never cared about

24   the destination of the customers.

1    Q.    But you signed the agreement

2    for an exclusive agency to sell in the

3    United States, and you did that in order

4    to sell more product.  True?

5    A.    To sell more product is

6    correct.  But to sell it in America was a

7    request of the customer.

8    Q.    You have indicated that

9    Oriental Trading did not fulfill the

10   agreement to purchase no less than 20,000

11   sheets or no less than a million sheets.

12             Do you remember that

13   testimony?

14   A.    I remember I said that in a

15   time -- in a certain time frame.

16   Q.    Why were those important

17   conditions of the agreement?

18   A.    Through the condition we

19   intend to prove that the customer

20   actually did not exaggerate his demand.

21   If the customer could reach such a

22   condition which tells us that he did not

23   exaggerate his demand, he could then

24   purchase our product.  This agreement can

```
 1    only come into force under such

 2    condition.  This is a very important

 3    precondition.  We have precondition for

 4    any contract with any customer.

 5           Q.    So the volume of sales was

 6    important in this agency agreement with

 7    OTC?

 8           A.    The precondition is very

 9    important.

10           Q.    Can you identify a single

11    document in writing where TTP advised

12    Oriental Trading that it was not in

13    compliance with the sole agency

14    agreement?

15           A.    I don't remember we notified

16    them like this in written form, because

17    the document, the document that was taken

18    away by Jorge in my memory.  And

19    according to the file of the company, we

20    had never received the originals

21    supposedly to be mailed back to us.

22    Therefore, we thought that Jorge did not

23    even agreed with this agreement.

24           Q.    To your knowledge, Mr. Che,
```

```
 1    has TTP or TG before your testimony today

 2    ever announced the position that this

 3    agreement with OTC was violated by OTC?

 4           A.    This document, except that

 5    Mr. Peng and I had reviewed it before

 6    that, before our testimonies.  Perhaps

 7    you have showed it to other people.  But

 8    before we testified, only Mr. Peng and I

 9    were aware of it.  Therefore, we don't

10    think that this agreement was valid.  So

11    we did not need to notify them for they

12    did not mail back us the originals.  I

13    think this is the basic trust issue.

14                 What happened?

15           Q.    I'm looking for the profile

16    form that you were shown by your lawyer.

17                 Mr. Che, your attorney

18    referred you to page 2 of Exhibit A to

19    the TTP profile form, item number 9, and

20    asked you to tell the Court what the

21    marking was on drywall purchased by

22    Oriental Trading.

23                 Do you remember that?

24           A.    Item 9.
```

Confidential - Subject to Further Confidentiality Review

1       Q.      Item 9 and --

2       A.      That's not what it is.

3       Q.      It's page 2 of Exhibit A.

4               MR. MEUNIER:  Is it a

5       different page for the Chinese

6       version, Frank?

7               THE WITNESS:  I don't see

8       it.

9               MR. SPANO:  I didn't refer

10      him to that.  It's not Oriental

11      Trading.

12  BY MR. MEUNIER:

13      Q.      Do you recall your testimony

14  that the Taishan marking was on Oriental

15  Trading drywall?

16      A.      No.

17      Q.      It was not, was it?

18      A.      I don't remember I testified

19  on that.

20      Q.      The Oriental Trading drywall

21  is shown in items 234 and 236 through

22  243; is that correct?

23      A.      Can you repeat the number?

24      Q.      Number 234.

Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    And number 236 through 243?

3        A.    Yes.

4        Q.    Those are the Oriental

5    Trading drywall purchases.  Correct?

6        A.    Yes.

7        Q.    And all of those had the Dun

8    design on the tape.  Correct?

9        A.    We manufactured the product

10   according to the design of Oriental

11   Trading Company.  This is only a marked

12   product.

13       Q.    And you agreed in all of

14   those cases that Mr. Gonima's request to

15   put the colors of the American flag, red,

16   white and blue, on the tape.  Correct?

17             MR. SPANO:  Objection, asked

18        and answered.

19   BY MR. MEUNIER:

20       Q.    Is that correct?

21             THE COURT:  Over the

22        objection, I'll allow you to

23        answer it.

24             THE WITNESS:  Can you repeat

Confidential - Subject to Further Confidentiality Review

```
 1        that?

 2   BY MR. MEUNIER:

 3        Q.    On all of the Dun drywall,

 4   you agreed at Mr. Gonima's request to put

 5   the colors of the American flag on the

 6   tape, red, white and blue; is that

 7   correct?

 8        A.    We agreed to produce the

 9   label according to customer's design.

10   However, the color the customer indicated

11   was only for us to be able to find the

12   same color, because we can find American

13   flag on any website.  If that is a flag

14   of his own company, I'm nowhere --

15   there's nowhere to be found.  When he

16   choose red, he could also indicate it is

17   the color red on the flag of China.

18        Q.    Mr. Che, we want to end this

19   deposition.

20            Do I have to go back to the

21   instant messaging where you were told by

22   Mr. Gonima he wanted those colors because

23   they were the colors of the American

24   flag?  Do we have to repeat that?
```

Confidential - Subject to Further Confidentiality Review

```
 1                    MR. SPANO:  Objection, asked
 2            and answered.
 3                    THE COURT:  Overrule the
 4            objection.
 5                    THE WITNESS:  Please repeat.
 6    BY MR. MEUNIER:
 7            Q.    Do you recall the instant
 8    messaging conversation we went over
 9    earlier today where Mr. Gonima told you,
10    we want to use blue, red and white
11    because those are the colors of the
12    American flag?  Do you remember that?
13            A.    I don't recall what was on
14    the instant message, but I do recall what
15    you mentioned regarding the tape.
16            Q.    Thank you.
17                    And therefore, according to
18    this profile form prepared by your
19    company, 37,980 pieces of drywall made by
20    TTP were exported to the United States
21    with the colors of the American flag put
22    on them by your company.  Is that true?
23                    MR. SPANO:  Objection to
24            form, compound, lack of
```

Case 2:09-md-02047-EEF-MBN Document 13454-1 Filed 03/21/12 Page 3 of 138
Confidential - Subject to Further Confidentiality Review

```
 1          foundation.

 2               THE COURT:  I'll overrule

 3          the objection and allow it.

 4  BY MR. MEUNIER:

 5          Q.    Isn't that true?

 6          A.    Please repeat.

 7          Q.    Therefore, according to this

 8  profile form prepared by your company,

 9  37,980 pieces of drywall made by TTP were

10  exported to the United States with the

11  colors of the American flag put on them

12  by your company.  Is that true?

13          A.    The 30,000-something pieces

14  of drywall, did you mean the drywall of

15  Oriental Trading Company?

16          Q.    The Dun drywall of Oriental

17  Trading Company.

18          A.    The product Oriental Trading

19  Company purchased from us that we have

20  manufactured the label according to the

21  requirement of Oriental company.  As for

22  what colors they'd use, it was the

23  customer's business.  I thought he

24  reminded me in that way so I could find
```

Confidential - Subject to Further Confidentiality Review

```
1    the colors easily.  It is as if a color

2    sample.  Therefore, the American flag

3    that you mentioned in this document I

4    personally do not think has any actual

5    meaning.  We only used it as color

6    samples.

7            Q.    Finally -- you're glad.

8            A.    Thank you.

9            Q.    You testified when your

10   attorney was asking you questions that

11   TTP did not know the destination of the

12   drywall that it made and sold to American

13   customers.  Is that your testimony?

14           A.    Yes.  What I intended to

15   express was that I was not sure.  I did

16   not verify.

17           Q.    However, Mr. Che, TTP's own

18   business records reflect the US

19   destinations of drywall that it sold to

20   certain American customers.  Isn't that

21   true?

22           A.    Can I look at your record?

23           Q.    For example, do you remember

24   the invoice to Advanced Products and
```

Confidential - Subject to Further Confidentiality Review

```
 1    Triax with the destination New Orleans on

 2    it?

 3            A.    Triax invoice was prepared

 4    by Ms. Wei, not me.

 5            Q.    Yes, yes.

 6                  But you remember the

 7    document we're talking about?

 8            A.    I remember you provided me

 9    and asked me to read those documents.

10            Q.    Yes, yes.

11                  And New Orleans is on there

12    as a destination.  Correct?

13            A.    Ms. Wei filled it up that

14    way.  But what was the final facts, I

15    don't know.

16            Q.    But Ms. Wei, you said,

17    provided the invoice forms to your

18    company, and your company, TTP, put its

19    stamp on the form, you said?

20            A.    What I said was originally

21    that Ms. Wei provided such document and

22    requested us to stamp for her, but we --

23    I do not recollect in my memory what

24    actually happened.
```

Confidential - Subject to Further Confidentiality Review

```
 1         Q.    And the destinations of

 2    Miami, New Orleans, New York and USA are

 3    also reflected on the company's special

 4    invoices for exports.  Correct?

 5         A.    Can I take a look at your

 6    exhibit?

 7         Q.    For the record, he's looking

 8    at Peng Shiliang --

 9              MR. MEUNIER:  What's the

10         number, Frank?

11              MR. SPANO:  8.

12    BY MR. MEUNIER:

13         Q.    -- 8.

14         A.    Let me explain to you

15    regarding the document.

16         Q.    Yes, sir.

17         A.    Upon the requirement of

18    Chinese government taxation institution,

19    we had to completely fill out -- fill up

20    a document as such.  All of the

21    information on it was formality.  We did

22    not have any right to make changes.

23              As for the destination

24    appearing here -- as for the destination
```

Confidential - Subject to Further Confidentiality Review

```
 1    appearing here, we, through the

 2    customer's shipping agent -- we through

 3    the customer's shipping agent, we were

 4    told.  But actually where it was sent to,

 5    we did not verify either, because it was

 6    handled by the customer.  What we needed

 7    to do was only to deliver in Chinese

 8    port, according to the term of FOB.  The

 9    precondition was that the customer had to

10    pay us first.  Therefore, do not only

11    look at the formality that could not be

12    changed.  We delivered to the shipping

13    agency of the customer in Chinese port.

14    That's all.  We delivered our product.

15              MR. MEUNIER:  Thank you.  No

16         further questions.

17              THE WITNESS:  Thank you.

18              THE COURT:  That completes

19         the deposition.

20              VIDEOTAPE TECHNICIAN:  That

21         concludes today's deposition and

22         also Tape Number 7 and going off

23         the record at 6:21.

24              (Witness excused.)
```

Confidential - Subject to Further Confidentiality Review

```
 1                    (Deposition concluded at

 2            approximately 6:21 p.m.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 18345-1 Filed 03/26/14 Page 59 of 138
Case 2:09-md-02047-EEF-MBN Document 18454-1 Filed 03/21/14 Page 9 of 138
Confidential - Subject to Further Confidentiality Review

```
 1            C E R T I F I C A T E

 2

 3

                 I, ANN MARIE MITCHELL, a
 4    Registered Diplomate Reporter, Certified
      Court Reporter and Notary Public, do
 5    hereby certify that, pursuant to notice,
      the deposition of GANG CHE was duly taken
 6    on January 12, 2012 at 8:28 a.m. before
      me.

 7

 8               The said GANG CHE was duly
      sworn by The Court according to law to
 9    tell the truth, the whole truth and
      nothing but the truth and thereupon did
10    testify as set forth in the above
      transcript of testimony.  The testimony
11    was taken down stenographically by me.

12

                 I do further certify that
13    the above deposition is full, complete
      and a true record of all the testimony
14    given by the said witness.

15

16

      Ann Marie Mitchell
17    Registered Diplomate Reporter
      Certified Realtime Reporter

18

19

20               (The foregoing certification
      of this transcript does not apply to any
21    reproduction of the same by any means,
      unless under the direct control and/or
22    supervision of the certifying reporter.)

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                 INSTRUCTIONS TO WITNESS

 2

 3

 4             Please read your deposition

 5   over carefully and make any necessary

 6   corrections.  You should state the reason

 7   in the appropriate space on the errata

 8   sheet for any corrections that are made.

 9

10             After doing so, please sign

11   the errata sheet and date it.  It will be

12   attached to your deposition.

13

14             It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

```
1                    - - - - - -

                   E R R A T A

2                    - - - - - -

3    PAGE  LINE  CHANGE

4    _____ _____   _____

5     REASON:  ____ _____

6    _____ _____   _____

7     REASON:  ____ _____

8    _____ _____   _____

9     REASON:  ____ _____

10   _____ _____   _____

11    REASON:  _____ _____

12   _____ _____   _____

13    REASON:  _____ _____

14   _____ _____   _____

15    REASON:  _____ _____

16   _____ _____   _____

17    REASON:  _____ _____

18   _____ _____   _____

19    REASON:  _____ _____

20   _____ _____   _____

21    REASON:  _____ _____

22   _____ _____   _____

23    REASON:  _____ _____

24
```

```
 1
 2                  ACKNOWLEDGMENT OF DEPONENT
 3
                       I,_____, do
 4      hereby certify that I have read the
        foregoing pages, 125-410, and that the
 5      same is a correct transcription of the
        answers given by me to the questions
 6      therein propounded, except for the
        corrections or changes in form or
 7      substance, if any, noted in the attached
        Errata Sheet.
 8
 9      _____
        GANG CHE                        DATE
10
11
12
13
14
15
16      Subscribed and sworn
        to before me this
17      _____ day of _____, 20____.
18      My commission expires:_____
19
        _____
20      Notary Public
21
22
23
24
```

```
1                    LAWYER'S NOTES

2        PAGE   LINE

3        _____  _____   _____

4        _____  _____   _____

5        _____  _____   _____

6        _____  _____   _____

7        _____  _____   _____

8        _____  _____   _____

9        _____  _____   _____

10       _____  _____   _____

11       _____  _____   _____

12       _____  _____   _____

13       _____  _____   _____

14       _____  _____   _____

15       _____  _____   _____

16       _____  _____   _____

17       _____  _____   _____

18       _____  _____   _____

19       _____  _____   _____

20       _____  _____   _____

21       _____  _____   _____

22       _____  _____   _____

23       _____  _____   _____

24       _____  _____   _____
```

# EXHIBIT G



Transcript of the Testimony of: **Wenlong Peng**

01/13/2012

Chinese Drywall

Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2

 3      _____      §  MDL NO. 2047
        IN RE:                §
 4      CHINESE-              §  SECTION: L
        MANUFACTURED          §
 5      DRYWALL PRODUCTS      §  JUDGE FALLON
        LIABILITY             §
 6      LITIGATION            §  MAGISTRATE
                              §  JUDGE WILKINSON
 7      _____

                    -  -  -
 8
           CROSS NOTICED IN VARIOUS OTHER ACTIONS
 9
                    -  -  -
10
                 January 13, 2012
11
                    -  -  -
12
           CONFIDENTIAL - SUBJECT TO FURTHER
13              CONFIDENTIALITY REVIEW
14                  -  -  -
15         Continued videotaped deposition of
        WENLONG PENG, held at the Executive
16      Centre, Level 3, Three Pacific Place, One
        Queen's Road East, Hong Kong, China,
17      commencing at 8:32 a.m., on the above
        date, before Ann Marie Mitchell,
18      Certified Court Reporter, Registered
        Diplomate Reporter, Certified Realtime
19      Reporter and Notary Public.
                    -  -  -
20
21
             GOLKOW TECHNOLOGIES, INC.
22      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
23
24
```

Case 2:09-md-02047-EEF-MBN Document 18246-10 Filed 03/26/14 Page 67 of 138
Case 2:09-md-02047-EEF-MBN Document 18454-1 Filed 03/21/14 Page 4 of 18
Confidential - Subject to Further Confidentiality Review

```
 1    BEFORE:

 2          HONORABLE ELDON E. FALLON
            UNITED STATES FEDERAL COURT -
 3          EASTERN DISTRICT OF LOUISIANA

 4

 5    APPEARANCES:

 6

      GAINSBURGH, BENJAMIN, DAVID, MEUNIER
 7    & WARSHAUER, L.L.C.
      BY:  GERALD E. MEUNIER, ESQUIRE
 8    2800 Energy Centre
      1100 Poydras Street
 9    New Orleans, Louisiana 70163
      (504) 522-2304
10    gmeunier@gainsben.com
      Representing the Plaintiffs'
11    Steering Committee

12

      HERMAN HERMAN KATZ & COTLAR, LLP
13    BY:  LEONARD A. DAVIS, ESQUIRE
      820 O'Keefe Avenue
14    New Orleans, Louisiana 70113
      (504) 581-4892
15    Ldavis@hhkc.com
      Representing the Plaintiffs'
16    Steering Committee

17

      COLSON HICKS EIDSON
18    BY:  ERVIN GONZALEZ, ESQUIRE
      BY:  PATRICK S. MONTOYA, ESQUIRE
19    255 Alhambra Circle
      Penthouse
20    Coral Gables, Florida 33134
      (305) 476-7400
21    Ervin@colson.com
      Patrick@colson.com
22    Representing Plaintiffs' Steering
      Committee in the Federal and State
23    Coordinated Actions

24
```

Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (CONTINUED):
 2
         LEVIN, FISHBEIN, SEDRAN & BERMAN
 3       BY:  ARNOLD LEVIN, ESQUIRE
         510 Walnut Street - Suite 500
 4       Philadelphia, Pennsylvania 19106
         (215) 592-1500
 5       Alevin@lfsblaw.com
         Representing the Plaintiffs'
 6       Steering Committee
 7
         SEEGER WEISS LLP
 8       BY:  SCOTT A. GEORGE, ESQUIRE
         One William Street
 9       New York, New York 10004
         (212) 584-0700
10       Sgeorge@seegerweiss.com
         Representing the Plaintiffs'
11       Steering Committee
12
         HOGAN LOVELLS US LLP
13       BY:  FRANK T. SPANO, ESQUIRE
         875 Third Avenue
14       New York, New York 10022
         (212) 918-3000
15       frank.spano@hoganlovells.com
         Representing Taishan Gypsum Co.
16       Ltd. and Taian Taishan
         Plasterboard Company Ltd. and the
17       Witness, Wenlong Peng
18
         HOGAN LOVELLS INTERNATIONAL LLP
19       BY:  EUGENE CHEN, ESQUIRE
         BY:  JIENI JI, ESQUIRE
20       18th Floor, Park Place
         1601 Nanjing Road West
21       Shanghai, China 200040
         (86 21) 6122 3800
22       eugene.chen@hoganlovells.com
         Representing Taishan Gypsum Co.
23       Ltd. and Taian Taishan Plasterboard
         Company Ltd. and the Witness, Wenlong
24       Peng
```

```
 1   APPEARANCES (CONTINUED):
 2
         GREENBERG TRAURIG, LLP
 3       BY:  HILARIE BASS, ESQUIRE
         1221 Brickell Avenue
 4       Miami, Florida 33131
         (305) 579-0745
 5       bassh@gtlaw.com
         Representing the Home Builders
 6       Steering Committee
 7
         PERKINS COIE LLP
 8       BY:  DAVID L. BLACK, ESQUIRE
         1899 Wynkoop Street
 9       Suite 700
         Denver, Colorado 80202
10       (303) 291-2300
         DBlack@perkinscoie.com
11       Representing the State of Louisiana
12
         THOMPSON COE COUSINS & IRONS, L.L.P.
13       BY:  KEVIN F. RISLEY, ESQUIRE
         One Riverway
14       Suite 1600
         Houston, Texas 77056
15       (713) 403-8210
         krisley@thompsoncoe.com
16       Representing The North River
         Insurance Company
17
18       BRENNER, EVANS & MILLMAN, P.C.
         BY:  THEODORE I. BRENNER, ESQUIRE
19       411 East Franklin Street
         Suite 200
20       Richmond, Virginia 23218
         Tbrenner@beylaw.com
21       (804) 644-1300
         Representing Tobin Trading Company
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (CONTINUED):
 2
 3        McKENRY, DANCIGERS, DAWSON & LAKE, P.C.
          BY:  J. BRIAN SLAUGHTER, ESQUIRE
 4        192 Ballard Court
          Suite 400
 5        Virginia Beach, Virginia 23462
          (757) 461-2500
 6        Jbslaughter@va-law.org
          Representing Atlantic Homes LLC and
 7        Multiple Other Virginia-Based
          Defendants
 8
 9        QUINN EMANUEL URQUHART & SULLIVAN,LLP
          BY:  JANE M. BYRNE, ESQUIRE
10        BY:  JULIA BESKIN, ESQUIRE
          51 Madison Avenue
11        22nd Floor
          New York, New York 10010
12        (212) 849-7000
          Janeburne@quinnemanuel.com
13        Juliabeskin@Quinnemanuel.Com
          Representing Chartis Select Insurance
14        Company and Related Chartis Insurers
15
          WEINBERG, WHEELER, HUDGINS, GUNN &
16        DIAL, LLC
          BY:  MICHAEL SEXTON, ESQUIRE
17        3344 Peachtree Road, NE
          Suite 2400
18        Atlanta, Georgia 30326
          (404) 876-2700
19        msexton@wwhgd.com
          Representing Various Banner
20        Defendants
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1        APPEARANCES (CONTINUED):

 2

          SINNOTT, NUCKOLS & LOGAN, PC

 3        BY:  KENNETH F. HARDT, ESQUIRE

          13811 Village Mill Drive

 4        Midlothian, Virginia 23114

          (804) 378-7600

 5        khardt@snllaw.com

          Representing Venture Supply, Inc. and

 6        Porter-Blaine Corp.

 7

     ALSO PRESENT:

 8

          SUNNY WANG, INTERPRETER

 9

10

11                    -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1   APPEARANCES VIA TELEPHONE:
 2
 3       GALLOWAY JOHNSON TOMPKINS BURR and SMITH
         BY:  CARLINA C. EISELEN, ESQUIRE
 4       One Shell Square
         701 Poydras Street, 40th Floor
 5       New Orleans, Louisiana 70139
         (504) 525-6802
 6       ceiselen@gjtbs.com
         Representing Interior/Exterior
 7       Building Supply
 8
         HUNTON & WILLIAMS LLP
 9       BY:  A. TODD BROWN, ESQUIRE
         Bank of America Plaza
10       101 South Tryon Street
         Suite 3500
11       Charlotte, North Carolina  28280
         (704) 378-4700
12       Representing Stock Building Supply, LLC
13
14       JONES, WALKER, WAECHTER, POITEVENT,
         CARRERE & DENEGRE LLP
15       BY:  MEGAN E. DONOHUE, ESQUIRE
         600 Jefferson Street, Suite 1600
16       Lafayette, Louisiana 70501
         (337) 262-9062
17       mdonohue@joneswalker.com
         Representing Fireman's Fund Insurance
18       Company
19
         FULMER LEROY ALBEE BAUMANN
20       BY:  MICHAEL P. McCAHILL, ESQUIRE
         2866 East Oakland Park Boulevard
21       Ft. Lauderdale, Florida 33306
         (954) 707-4430
22       mosscandace@fulmerleroy.com
         mmccahill@fulmerleroy.com
23       Representing Independent Builders
         Supply Association (IBSA)
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA TELEPHONE (CONTINUED):
 2
 3         WRIGHT, FULFORD, MOORHEAD & BROWN, P.A.
           BY:  DORYK B. GRAF, JR., ESQUIRE
 4         145 N. Magnolia Ave.
           Orlando, Florida 32801
 5         (407) 425-0234
           dgraf@wfmblaw.com
 6         Representing West Construction, Inc.
 7
 8         QUINN EMANUEL URQUHART & SULLIVAN, LLP
           BY: CLINTON DOCKERY, ESQUIRE
 9         51 Madison Avenue, 22nd Floor
           New York, New York 10010
10         (212) 849-7000
           clintondockery@quinnemanuel.com
11         Representing Chartis Select Insurance
           Company and Related Chartis Insurers
12
13         RUMBERGER, KIRK & CALDWELL, P.A.
           BY:  MONICA C. SEGURA, ESQUIRE
14         Brickell Bayview Centre, Suite 3000
           80 Southwest 8th Street
15         Miami, Florida 33130
           (305) 358-5577
16         Representing several defendants and
           Defendants' Liaison Counsel for
17         Installers
18
           BUCHANAN INGERSOLL & ROONEY
19         BY:  C. ROBERT ZAPPALA, ESQUIRE
           One Oxford Centre
20         301 Grant Street, 20th Floor
           Pittsburgh, Pennsylvania 15219
21         (412) 392-2135
           bobby.zappala@bipc.com
22         Representing 84 Lumber
23
24
```

```
 1    APPEARANCES VIA STREAM:
 2
      BECNEL LAW FIRM, L.L.C.
 3    BY:  ROBERT BECNEL, ESQUIRE
      106 W. 7th Street
 4    Reserve, Louisiana 70084
      (985) 536-1186
 5    robbecnel@aol.com
      Representing the Plaintiffs'
 6    Steering Committee
 7
      PARKER WAICHMAN ALONSO LLP
 8    BY:  JORDAN L. CHAIKIN, ESQUIRE
      3301 Bonita Beach Road
 9    Bonita Springs, Florida 34134
      (239) 390-1000
10    Jchaikin@yourlaywer.com
      Representing Plaintiffs' Steering
11    Committee
12
      MORGAN & MORGAN
13    BY:  PETE V. ALBANIS, ESQUIRE
      12800 University Drive
14    Suite 600
      Fort Myers, Florida 33907
15    (877) 667-4265
      Representing the Plaintiffs
16
17    IRPINO LAW FIRM
      BY:  ANTHONY IRPINO, ESQUIRE
18    2216 Magazine Street
      New Orleans, Louisiana 70130
19    Airpino@irpinolaw.com
      (504) 525-1500
20    Representing the Plaintiffs
21
22
23
24
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3         GALLOWAY JOHNSON TOMPKINS BURR and SMITH
           BY:  CARLINA C. EISELEN, ESQUIRE
 4         One Shell Square
           701 Poydras Street, 40th Floor
 5         New Orleans, Louisiana 70139
           (504) 525-6802
 6         ceiselen@gjtbs.com
           Representing Interior/Exterior
 7         Building Supply
 8
           HEARD & MEDACK, P.C.
 9         BY:  JAMES DAVIS, ESQUIRE
           9494 Southwest Freeway, Suite 700
10         Houston, Texas 77074
           (713) 772-6400
11         jdavis@heardmedackpc.com
           Representing CastleRock Communities, L.P.
12
13
           HUNTON & WILLIAMS LLP
14         BY:  A. TODD BROWN, ESQUIRE
           Bank of America Plaza
15         101 South Tryon Street
           Suite 3500
16         Charlotte, North Carolina  28280
           (704) 378-4700
17         tbrown@hunton.com
           Representing Stock Building Supply, LLC
18
19
           SHER GARNER CAHILL RICHTER KLEIN &
20         HILBERT, L.L.C.
           BY:  MATTHEW C. CLARK, ESQUIRE
21         909 Poydras Street
           Suite 2800
22         New Orleans, Louisiana 70112
           (504) 299-2100
23         mclark@shergarner.com
           Representing the Southern Home
24         Defendants
```

```
 1      APPEARANCES VIA STREAM (CONTINUED):
 2
 3          QUINN EMANUEL URQUHART & SULLIVAN, LLP
            BY: CLINTON DOCKERY, ESQUIRE
 4          51 Madison Avenue, 22nd Floor
            New York, New York 10010
 5          (212) 849-7000
            clintondockery@quinnemanuel.com
 6          Representing Chartis Select Insurance
            Company and Related Chartis Insurers
 7
 8          JONES, WALKER, WAECHTER, POITEVENT,
            CARRERE & DENEGRE LLP
 9          BY:  MEGAN E. DONOHUE, ESQUIRE
            600 Jefferson Street, Suite 1600
10          Lafayette, Louisiana 70501
            (337) 262-9062
11          mdonohue@joneswalker.com
            Representing Fireman's Fund Insurance
12          Company
13
            DEUTSCH, KERRIGAN & STILES
14          BY:  MELISSA M. SWABACKER, ESQUIRE
            755 Magazine St.
15          New Orleans, Louisiana  70130
            (504) 581-5141
16          mswabacker@dkslaw.com
            Representing Landmark American
17          Insurance Company
18
            WEINBERG, WHEELER, HUDGINS, GUNN &
19          DIAL, LLC
            BY:  SHUBHRA MASHELKAR, ESQUIRE
20          3344 Peachtree Road, NE
            Suite 2400
21          Atlanta, Georgia 30326
            (404) 876-2700
22          Smashelkar@wwhgd.com
            Representing Various Banner
23          Defendants
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -
                  I N D E X
 2                    -  -  -
 3    Testimony of:  WENLONG PENG
 4      By Mr. Seeger              464, 544
        By Ms. Bass                510
 5      By Mr. Hardt               517
        By Ms. Beskin              523
 6      By Mr. Spano               526
 7
                      -  -  -
 8
                E X H I B I T S
 9
                      -  -  -
10
11      NO.              DESCRIPTION        PAGE
12      Peng-18   E-mail chain, top one     466
                  dated November 20,
13                2006, Bates stamped TG
                  0022595 and TG 0022596
14
        Peng-19   E-mail in Chinese         482
15                dated May 11, 2007,
                  Bates stamped TG
16                0022728
17      Peng-19A  E-mail in Chinese         482
                  dated May 11, 2007,
18                Bates stamped TG
                  0022728
19
        Peng-20   E-mail chain, top one     488
20                dated August 30, 2007,
                  Bates stamped TG
21                0021369 through TG
                  0021372
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1      Peng-21    E-mail chain, top one    500
                   dated August 6, 2007,
 2                 Bates stamped TG
                   0021964, TG 0021966
 3                 and TG 0021991
 4      Peng-22    E-mail chain, top one    505
                   dated 6/3/2006, Bates
 5                 stamped TG 0001377 and
                   TG 0001378
 6
        Peng-23    E-mail dated October     507
 7                 9, 2007, Bates stamped
                   TG 0022650
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                      -   -   -

 4

        Direction to Witness Not to Answer

 5

                    Page Line

 6

 7

 8

 9

        Request for Production of Documents

10

                    Page Line

11

12

13

14

                    Stipulations

15

                    Page Line

16

17

18

19

20             Question Marked

21                  Page Line

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1              VIDEOTAPE TECHNICIAN:  We

 2        are on the record.  My name is Dan

 3        Lawlor.  I'm a videographer for

 4        Golkow Technologies.  Today's date

 5        is January 13, 2012, and the time

 6        is 8:32 a.m.  This video

 7        deposition is being held in Hong

 8        Kong, China in the matter of

 9        Chinese Drywall Litigation, for

10        the United States District Court,

11        Eastern District of Louisiana, MDL

12        Number 2047 and cross-noticed in

13        various other actions.  The

14        deponent today is Peng Wenlong.

15              Will Your Honor and all

16        present state your appearances for

17        the record.

18              THE COURT:  Judge Eldon

19        Fallon, United States District

20        Court, Eastern District of

21        Louisiana.

22              MR. SEEGER:  Chris Seeger,

23        Seeger Weiss, on behalf of the PSC

24        and plaintiffs.  With me is Scott
```

```
1              George from my office.

2                   MS. BASS:  Hilarie Bass, on

3              behalf of the Home Builders

4              Steering Committee.

5                   MR. GONZALEZ:  Good morning.

6              Ervin Gonzalez and Patrick Montoya

7              on behalf of the PSC and MDL

8              states' liaison counsel.

9                   MR. HARDT:  Good morning.

10             Ken Hardt on behalf of Venture

11             Supply in the Germano action and

12             the Alexander state court action.

13                  MR. BRENNER:  Theodore

14             Brenner on behalf of Tobin Trading

15             in the Germano action.

16                  MR. SLAUGHTER:  Brian

17             Slaughter here on behalf of

18             Atlantic Homes, LLC and the

19             Commonwealth of Virginia matters

20             and the MDL.

21                  MR. SEXTON:  Mike Sexton on

22             behalf of certain Banner Supply

23             entities.

24                  MR. LEVIN:  Arnold Levin,
```

Confidential - Subject to Further Confidentiality Review

```
 1              lead counsel, PSC.

 2                   MR. DAVIS:  Leonard Davis on

 3              behalf of the Plaintiffs' Steering

 4              Committee and Plaintiffs' Liaison

 5              Counsel.

 6                   MR. BLACK:  David Black on

 7              behalf of the State of Louisiana,

 8              preserving our rights set forth in

 9              our pending remand motion.

10                   MR. MEUNIER:  Gerry Meunier

11              for the PSC and the MDL.

12                   MS. BYRNE:  Jane Byrne and

13              Julia Beskin from Quinn Emanuel

14              for the Chartis Group of insurance

15              companies.

16                   MR. RISLEY:  Kevin Risley

17              for the North River Insurance

18              Company.

19                   MR. SPANO:  Frank Spano,

20              Eugene Chen and Jieni Ji, Hogan

21              Lovells, for the defendants TG and

22              TTP.

23                   VIDEOTAPE TECHNICIAN:  The

24              court reporter today is Ann Marie
```

```
1              Mitchell.  And, Your Honor, please
2              proceed.
3                        -   -   -
4                   WENLONG PENG, after having
5              been duly sworn, was examined and
6              testified as follows:
7                        -   -   -
8                   THE COURT:  You may proceed,
9              Counsel.
10                  MR. SEEGER:  Thank you, Your
11             Honor.
12                       -   -   -
13                  EXAMINATION
14                       -   -   -
15      BY MR. SEEGER:
16             Q.   Good morning, Mr. Peng.
17      Good to see you again.
18             A.   Hello.
19             Q.   I questioned you in April.
20             A.   That's correct, the last
21      time.
22             Q.   I've got some exhibits I
23      want to go through, and we should be able
24      to get through this relatively quickly
```

1    today, from my perspective.

2            Mr. Peng, did you have an

3    opportunity to review your testimony from

4    April?

5        A.    With the direction of Hogan

6    Lovells' attorney, I did review the

7    testimony.

8        Q.    Is there anything about that

9    testimony you'd like to start off with

10   correcting, or are you satisfied with

11   your testimony?

12       A.    I believe with the

13   instruction of my attorney, I did make

14   some corrections.

15           MR. SEEGER:  Frank, were

16           those provided to us?

17           MR. SPANO:  Yes.  There was

18           an errata sheet filed.

19           MR. SEEGER:  Just that.

20           Okay.

21   BY MR. SEEGER:

22       Q.    Thank you, Mr. Peng.

23           Mr. Peng, I'd like to start

24   off by marking an exhibit that I'd like

```
 1    to ask you some questions about.

 2                  For the record, we are

 3    marking this as Peng Exhibit 18.  It's

 4    Bates stamped TG 22595 through 22623.

 5                  Hold on one second.  Let me

 6    just check.

 7                  No.  I'm sorry.  Let me

 8    correct this.  There's two extra pages on

 9    this.  It's TG 22595 and 596.

10                       -  -  -

11                  (Deposition Exhibit No.

12          Peng-18, E-mail chain, top one

13          dated November 20, 2006, Bates

14          stamped TG 0022595 and TG 0022596,

15          was marked for identification.)

16                       -  -  -

17    BY MR. SEEGER:

18          Q.    Mr. Peng, first of all, I

19    want to start off, this is your e-mail.

20    Correct?

21          A.    Yes.  The sender of the

22    e-mail, according to what appears here,

23    is mine.

24          Q.    So at the top, it's an
```

1    e-mail from you to Owen Li; is that

2    correct?

3            A.    Yes.   That's the e-mail I

4    sent to Owen Li.

5            Q.    Owen Li is a TG employee at

6    this time.   Right?

7            A.    Yes.   At the time, he was

8    the employee of TG.

9            Q.    And in this time frame,

10   which is November of 2006, you were an

11   employee for TTP.   Correct?

12           A.    Yes.

13           Q.    Okay.

14               So just to be clear, at the

15   very top, the e-mail exchange at the top

16   of the e-mail is from you and Owen Li,

17   who is with TG?

18           A.    Yes.   It is an e-mail that I

19   sent to Mr. Li.

20           Q.    Thank you.

21               Mr. Peng, if you look

22   further down on this exhibit --

23               First of all, this is an

24   e-mail that you wrote in English.

Confidential - Subject to Further Confidentiality Review

```
 1    Correct, sir?
 2           A.    This is an e-mail that I
 3    forwarded.
 4           Q.    But the e-mail below, you
 5    see the further down -- let me just point
 6    it out to you.  Right there.  Let's go to
 7    that one.
 8           A.    Yes.  That's the e-mail I
 9    forwarded.
10           Q.    So that e-mail exchange
11    further down the page is between you and
12    a Walter Yu; is that correct?
13           A.    Correct.
14           Q.    And it's November 18, 2006,
15    while you were a TTP employee.  Correct?
16           A.    At the time Mr. Yu was
17    hoping to purchase product from TG, but
18    at the time I worked for TTP, therefore,
19    I forwarded the e-mail to a Mr. Li in TG.
20           Q.    So the e-mail -- now I'm
21    focused on the one between you and Walter
22    Yu -- it's in English.  Correct?  It was
23    originally drafted in English?
24           A.    Actually, I copied some
```

1     formats from the Internet and put it

2     there, and through the help of some

3     tools, such as dictionaries and plus some

4     corrections had been made, I have done a

5     lot of work, and then I put the e-mail

6     together like this.

7             Q.    But just to answer my

8     question, Mr. Peng, if you can, just to

9     make it simple, this e-mail that is in

10    English, no matter how you put it

11    together, was composed by you.  Correct,

12    sir?

13            A.    Yes, it is in English.  But

14    I've spent a lot of time in preparing for

15    this e-mail.

16            Q.    Okay.  Well, thank you.  I

17    appreciate that.

18                  Mr. Peng, it starts off by

19    saying that it was nice to talk -- it

20    suggests you had a phone discussion with

21    this Mr. Walter Yu and yourself.

22                  Was that discussion in

23    English?

24            A.    I don't recall.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And it discusses the sale of
 2     gypsum board and metal stud.
 3                 Do you see that at the
 4     beginning of the e-mail?
 5          A.     Yes.   That what -- that's
 6     what the e-mail appears to be.
 7          Q.     At this time frame, TTP sold
 8     gypsum board.  Correct, sir?
 9          A.     Right.  In that period of
10     time, TTP did produce and sell gypsum
11     board.
12          Q.     TTP did not sell metal
13     studs.  Correct, Mr. Peng?
14          A.     But at the time, if the
15     customer would like to ask for quotation
16     or purchase from TTP the metal stud, it
17     is possible that we would purchase the
18     product from someone else and in turn
19     sell it to the customer.  However, in my
20     recollection and in our record, we did
21     not make any transaction with this Mr.
22     Yu.
23          Q.     Well, Mr. Peng, if you could
24     just try not to anticipate future
```

Confidential - Subject to Further Confidentiality Review

```
 1    questions and just answer the one I'm

 2    asking, it will go a lot faster, if you

 3    don't mind.

 4            A.    I was not anticipating.

 5    Looking at the e-mail, I thought about

 6    that and then I just spoke out.

 7            Q.    Thank you.  I didn't mean to

 8    be rude with that correction.  I'm trying

 9    to move it along.

10            A.    I understand.

11            Q.    Thank you, Mr. Peng.

12                  The question I have is, did

13    TTP manufacture and sell metal studs in

14    this time frame?

15                  MR SPANO:  Objection,

16            compound.

17    BY MR. SEEGER:

18            Q.    I'm going to restate the

19    question, Mr. Peng.

20                  In the time frame of this

21    e-mail, did TTP manufacture metal studs?

22            A.    In this time frame, TTP did

23    not.

24            Q.    Thank you.
```

Confidential - Subject to Further Confidentiality Review

```
 1              Did TTP sell metal studs in

 2     this time frame?

 3         A.    In approximately the same

 4     time frame, TTP, in my recollection, did

 5     sell the metal stud, but I'm not sure the

 6     exact time frame.  I'd say in between

 7     2006 and 2007.  Perhaps in between 2006

 8     and 2007, in the time frame of two years.

 9     But I'm not sure it falls into the exact

10     date as stated here.

11         Q.    And you mentioned earlier

12     that you would buy metal studs from

13     another manufacturer.

14              Typically that would be a

15     manufacturer of metal studs that was

16     either TG or owned by TG.  Correct, sir?

17         A.    That's not so.  If the

18     customer would like to purchase metal

19     stud from TTP, and we would ask for

20     quotations from all the companies under

21     the umbrella of TG and other companies,

22     because we would like to have the lowest

23     price possible to sell it to a customer.

24     The precondition would be that the
```

Confidential - Subject to Further Confidentiality Review

1    quotation we have has to meet the

2    requirement of the customer.

3            Q.    And, Mr. Peng, let's

4    continue to read your e-mail.

5                  Right below where it says

6    gypsum board and metal stud, it said, "I

7    would like to take this opportunity to

8    introduce our company and products."

9    Then it says, "Shandong Taihe Dongxin

10   Co., Ltd. is one of the biggest"

11   companies "which is devoting in gypsum

12   board and relative products in China."

13                 Did I read that correctly?

14           A.    That's what it says in

15   e-mail.

16           Q.    Just to be clear, Shandong

17   Taihe Dongxin Company, Ltd. is TG.

18   Correct?

19           A.    Correct.  TG's name was

20   changed from this company, Shandong Taihe

21   company.

22           Q.    Before the name change, TG

23   was referred to as Shandong Taihe Dongxin

24   Company, Ltd.  Correct?

Confidential - Subject to Further Confidentiality Review

```
1           A.      You can say that.

2           Q.      Well, you say that, right,

3    Mr. Peng, in your e-mail?

4           A.      What do you mean?

5           Q.      It's okay.  Strike it.

6    We'll go to another question.

7                   And then Sunny, if you can

8    find this spot, further down in the

9    middle of the e-mail, it says, "Our" half

10   inch "board passes."

11                  THE INTERPRETER:  Yes.

12   BY MR. SEEGER:

13          Q.      "Our" half inch "board

14   passes the ASTM C1396 and ASTM C36 test."

15                  Do you see that, Mr. Peng?

16          A.      That's what I wrote in the

17   e-mail, but I would like to further

18   explain.  In that circumstance, the

19   reason I wrote it was because TTP's

20   product was sent to China Building

21   Materials Testing Center, and a testing

22   report was then produced.  Even though TG

23   did not have the report, but I personally

24   think at that time frame that the product
```

Confidential - Subject to Further Confidentiality Review

```
 1    of TG and TTP had not much difference,

 2    and it should be able to meet the

 3    requirement on the testing report.

 4          Q.    Mr. Peng, and if we --

 5                The ASTM standards that

 6    we're looking at in the e-mail, those are

 7    US standards for gypsum board.  Correct,

 8    sir?

 9          A.    I don't think so.  From our

10    understanding, the standard was nothing

11    but an organization called ASTM, which

12    stipulated on the specifications and

13    standards of gypsum board.  It is public,

14    it is international.  I think if you say

15    it is an American standard, it is

16    inappropriate and it is wrong.

17          Q.    Okay.

18                Mr. Peng, further down in

19    that e-mail, it says, "We largely."

20                MR. SEEGER:  Sunny, are you

21          able to find that?  The sentence

22          that starts, "We largely."

23                THE INTERPRETER:  Next

24          paragraph?  Oh, yes, I got it.
```

Case 2:09-md-02047-EEF-MBN Document 18246-10 Filed 03/26/12 Page 95 of 138
Case 2:09-md-02047-EEF-MBN Document 18454-3 Filed 03/21/12 Page 7 of 128
Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. SEEGER:

 2         Q.    See it?  Okay.

 3               Mr. Peng, will you read

 4   along with the translator.

 5               It says, "We largely and

 6   steadily export our gypsum boards to the

 7   U.S.A."

 8               Did I read that correctly?

 9               MR. SPANO:  Objection.  Can

10         you please read the entire

11         sentence?

12               MR. SEEGER:  If you think

13         it's relevant.

14               Want me to read it, Judge?

15               THE COURT:  Yeah, sure.

16   BY MR. SEEGER:

17         Q.    I'll read it again.

18               "We largely and steadily

19   export our gypsum boards to the U.S.A.,

20   Southeast Asia, Middleeast, Russia,"

21   Ukraine "and so on."

22               Did I read that correctly,

23   Mr. Peng?

24         A.    That is what is written in
```

Confidential - Subject to Further Confidentiality Review

1    the e-mail, but at the time, what I was

2    trying to express was, in that

3    circumstance, we did have many customers,

4    but gypsum board from our company, and

5    those buyers might have shipped the

6    product to different places.

7             Q.    Thank you, Mr. Peng.

8                   And then if you look further

9    down, it says "We have."  It says, "We

10   have already," it says "expored," I think

11   you mean exported, "more than 15 million

12   square meters of gypsum board to the USA

13   since the beginning of this year."

14                  That's what it says.  Right,

15   sir?

16             A.    It's like what I have

17   explained to you earlier.  In fact, TG

18   and TTP, neither had shipped product

19   directly to America.  It's only that a

20   customer shipped the product to places

21   outside of China.  We call it export.

22             Q.    And, Mr. Peng, the next

23   sentence I'm going to read to you, my

24   question is simply going to be, is that

Case 2:09-md-02047-EEF-MBN Document 18246-10 Filed 03/26/12 Page 97 of 138
Case 2:09-md-02047-EEF-MBN Document 13454-3 Filed 03/21/12 Page 9 of 138
Confidential - Subject to Further Confidentiality Review

1    what you wrote in your e-mail?  So if you

2    can answer that yes or no, I'd appreciate

3    it.

4              I'm going to read.  "We are

5    the first."

6              MR. SEEGER:  Do you see

7         that, Sunny?

8    BY MR. SEEGER:

9         Q.    "We are the first who use

10   container to export gypsum board to USA

11   in China, we have the professional

12   salespersons and workers for USA market."

13             You wrote that.  Right?

14        A.    To be accurate, I don't

15   recall the exact content of the e-mail.

16   But according to the address of the

17   e-mail, I believe that I wrote this

18   e-mail.  And like I said, I used many

19   tools in order to write this e-mail at

20   the time.  Perhaps my expressions were

21   hard to be expressed, and they were not

22   accurate.

23             Like I said, there were many

24   buyers came to our company and bought our

```
 1        gypsum board.  And according to the
 2        requirement of the buyers, we packed them
 3        and we shipped them according to their
 4        requirements.  Our understanding at the
 5        time was very limited.  From the gypsum
 6        board companies that we knew at the time,
 7        we were the first company that was able
 8        to pack the gypsum board according to
 9        customers' requirements.
10                  THE COURT:  Let me make --
11                  Mr. Peng, I'm the judge who
12             is presiding over this case.
13             We're trying to get out of here
14             today.  Please listen to the
15             question and answer the question.
16             If you need to explain yourself,
17             I'll give you an opportunity or
18             your attorney can ask you later on
19             to explain yourself.  But please
20             try to answer the question.
21                  THE WITNESS:  Okay.  Thank
22             you, Judge.
23        BY MR. SEEGER:
24             Q.    Thank you, Mr. Peng.
```

Confidential - Subject to Further Confidentiality Review

1          Mr. Peng, this isn't the

2    first e-mail you wrote to customers in

3    English.  Correct, sir?

4          A.    I don't have a clear

5    recollection of that.

6          Q.    Well, we could say you wrote

7    more than one e-mail in English to

8    customers or potential customers.  Right,

9    sir?

10          A.    Accurately, beside this one,

11    I should have written others as well.

12          Q.    Mr. Peng, I think we

13    established from your deposition in April

14    that you graduated school with an English

15    literature degree.  Right, sir?

16          A.    Correct.  My study subject

17    was English in college.

18          Q.    Thank you.

19          And if you go to the next

20    page of this e-mail, my last question,

21    where you sign off, you sign off "Yours

22    faithfully, Export manager, Frank."

23    Correct, sir?

24          A.    I remember in my deposition

Confidential - Subject to Further Confidentiality Review

```
 1      in April, I already explained it to you,

 2      which was a set format in a computer.

 3           Q.    Right.  And, Mr. Peng, just

 4      to be clear, I'm asking you that the

 5      words on this page, you agree that in

 6      your e-mail, it signs off, "Yours

 7      faithfully, Export manager, Frank."

 8      Correct, sir?

 9           A.    Yes.  That's what appears in

10      the e-mail.

11           Q.    And that name Frank is a

12      name that you had used from time to time,

13      Frank Clem, in addition to your own

14      Chinese name.  Correct, sir?

15           A.    Correct.

16           Q.    Thank you, Mr. Peng.  That's

17      all I have on that one.

18                 I'm going to mark the next

19      exhibit.

20                 For the record, I'm marking

21      Exhibits 19 and 19A.  19 is Bates stamped

22      TG 0022728.  That's the Chinese version.

23      And 19A is the English translation of

24      22728.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -

 2            (Deposition Exhibit No.

 3        Peng-19, E-mail in Chinese dated

 4        May 11, 2007, Bates stamped TG

 5        0022728, and Deposition Exhibit

 6        No. Peng-19A, E-mail in Chinese

 7        dated May 11, 2007, Bates stamped

 8        TG 0022728, were marked for

 9        identification.)

10                    -  -  -

11            THE WITNESS:  Should I take

12        a look at the Chinese version

13        first?

14  BY MR. SEEGER:

15        Q.    Absolutely.  Just tell me

16  when you're ready, Mr. Peng.

17        A.    I'm reading it.

18        Q.    Okay.

19        A.    I'm done reading the Chinese

20  version.

21        Q.    Mr. Peng, this is an

22  e-mail -- I'm working off the English

23  translation, sir.  And you should feel

24  free to look back at the Chinese version
```

Confidential - Subject to Further Confidentiality Review

```
 1    to check the English translation if you

 2    feel the need.

 3              This e-mail is dated May 11,

 4    2007.  Correct?

 5         A.    Correct.

 6         Q.    And at this time, you're

 7    an employee --

 8         A.    It was written at that time.

 9         Q.    I'm sorry.  I didn't mean to

10    interrupt.

11              At this time, you're an

12    employee of TTP also.  Correct, sir?

13         A.    Correct.

14         Q.    And the subject line on the

15    English version, just confirm the Chinese

16    says it, it says "Taishan gypsum boards."

17    Is that correct?

18         A.    That's what it says on the

19    subject line.

20         Q.    Okay.

21              Do you see who the e-mail is

22    going to?  Because there's only an e-mail

23    address there.

24         A.    There is a Mr. Zhang under
```

Confidential - Subject to Further Confidentiality Review

1    that, but I'm not sure exactly who that

2    person is.

3        Q.    And then again in this

4    e-mail, Mr. Peng, you describe -- the

5    company you're describing as a key

6    national manufacturer is Shandong Taihe

7    Dongxin.  Correct, sir?  That's TG?

8        A.    The e-mail, especially the

9    first paragraph, was introduction that I

10   did to the client upon their request.

11   Usually before placing order, the buyers

12   would like to know something about the

13   manufacturer.  They would request -- they

14   would require us to give background

15   introduction of the company, some basic

16   information.

17            As a salesperson at the

18   time, in order to reach a deal, and try

19   our best to keep the customer, we would

20   give an introduction of our company.  At

21   the time I worked for TTP, TTP was a

22   newly founded company.  Usually the

23   customer would request us to introduce

24   the background of TTP and whether we have

Confidential - Subject to Further Confidentiality Review

```
 1    any support.  So our -- and what is the

 2    superior company of this company.  Under

 3    that circumstance, I would introduce

 4    Shandong Taihe Dongxin Company to the

 5    customer, to indicate that TTP company

 6    has a strong background.  Of course, for

 7    production and sales of TTP, it had

 8    always been carried on, carried out by

 9    TTP itself.

10              The second paragraph of this

11    e-mail was a quotation for gypsum board

12    that I made.  That's what I see the

13    e-mail is about.

14              THE COURT:  One moment.

15              MR. SPANO:  Your Honor, may

16         I, with the Court's permission,

17         have a moment with the witness?

18              THE COURT:  Yes.  Let's take

19         a ten-minute break at this time,

20         please.

21              VIDEOTAPE TECHNICIAN:  Going

22         off the record.  The time is 9:06.

23                   -  -  -

24              (A recess was taken from
```

Case 2:09-md-02047-EEF-MBN Document 18246-10 Filed 03/26/14 Page 105 of 138
Case 2:09-md-02047-EEF-JCW Document 18154-3 Filed 01/21/14 Page 97 of 138
Confidential - Subject to Further Confidentiality Review

```
 1              9:06 a.m. until 9:14 a.m.)

 2                      -   -   -

 3              VIDEOTAPE TECHNICIAN:  Going

 4         back on the video record.  The

 5         time is 9:14.

 6    BY MR. SEEGER:

 7         Q.    Mr. Peng, the background of

 8    the company that you're giving in this

 9    e-mail is for TG.  Correct, sir?

10         A.    Yes.  I did mention TG.

11         Q.    And TTP is not specifically

12    mentioned in this e-mail anywhere, is it,

13    sir?

14         A.    No, it was not specifically

15    mentioned.

16         Q.    In fact, if you look on the

17    Chinese version and if you look at the

18    English version and you put that in front

19    of you, under your name on the Chinese

20    version, it says, "Taihe Dongxin Co.,

21    Ltd.," under your name on the Chinese

22    version.  Correct, sir?

23         A.    Like I said earlier, it is a

24    fixed format produced by the computer.
```

Confidential - Subject to Further Confidentiality Review

```
 1        It has always been there.
 2             Q.    But Mr. Peng, just to be
 3   clear that I'm reading it correctly,
 4   "Taihe Dongxin Co., Ltd.," which appears
 5   beneath your name on the Chinese version,
 6   that's not TTP.  Correct, sir?
 7             A.    It does not appear to be
 8   TTP.
 9             Q.    Then my question also for
10   you is, do you know who did the English
11   translation of the Chinese version of
12   this e-mail?
13             A.    I don't know.
14             MR. SPANO:  Objection.
15             MR. SEEGER:  I just asked
16        him if he knew.
17             MR. SPANO:  Do you mean for
18        purposes of the litigation?
19             MR. SEEGER:  I just wanted
20        to know if he knew who did the
21        translation.
22             MR. SPANO:  I object on work
23        product grounds.
24             MR. SEEGER:  Okay.  I'll go
```

Case 2:09-md-02047-EEF-MBN Document 18246-10 Filed 03/26/12 Page 107 of 138
Case 2:09-md-02047-EEF-JCW Document 14154-43 Filed 04/24/12 Page 19 of 28
Confidential - Subject to Further Confidentiality Review

```
 1              to the next question, Your Honor.

 2    BY MR. SEEGER:

 3         Q.    To be clear, Mr. Peng,

 4    beneath your name on the Chinese version

 5    it says "Taihe Dongxin Co., Ltd.," but

 6    that does not appear in the English

 7    translation, does it, sir?

 8         A.    Let me take a look.

 9         Q.    Go ahead.

10         A.    The English version does not

11    appear to have the company's name.

12         Q.    You can put that aside.

13    Thank you, Mr. Peng.

14              For the record, what I've

15    marked as Exhibit Peng-20 is TG 0021369

16    through 21372.

17                   -   -   -

18              (Deposition Exhibit No.

19         Peng-20, E-mail chain, top one

20         dated August 30, 2007, Bates

21         stamped TG 0021369 through TG

22         0021372, was marked for

23         identification.)

24                   -   -   -
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. SEEGER:

 2           Q.    You can go ahead and take a

 3    look at this, Mr. Peng.

 4                 Mr. Peng, you wrote this

 5    e-mail, the portions of this e-mail that

 6    you wrote, you wrote in English.

 7    Correct, sir?

 8           A.    Yes.  I wrote a couple of

 9    sentences in English.

10           Q.    And if we go to -- if you go

11    to about the third page on this --

12                 MR. SEEGER:  Judge, do you

13           want me to wait?

14                 THE COURT:  No, that's okay.

15    BY MR. SEEGER:

16           Q.    If you go to the third page

17    of the e-mail, so we can go back in time.

18                 You receive an e-mail on

19    August 28, 2007 from a Jacky Yu.

20    Correct, sir?

21           A.    Yes.  On August 28, 2007, I

22    see Jacky Yu here.  I did write, but

23    however, I do not see who is the e-mail

24    written to.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    It says, "Hi Mr. Peng" right
 2    below that.
 3                Right here, sir?
 4          A.    Yes, that's what it says.
 5          Q.    Are you satisfied that's
 6    you, Mr. Peng?
 7          A.    But I do not see who the
 8    e-mail was sent to in this e-mail, so I
 9    can't be sure.
10          Q.    Let's start with Jacky Yu.
11                Do you know the company
12    Metal Sourcing Specialist - Asia?
13          A.    In my impression that Jacky
14    Yu came to our company.  However, I am --
15    I do not have a lot of impression about
16    his company name.
17          Q.    Okay.
18                If we look at the paragraph
19    that starts "Right now," on this date,
20    Mr. Yu writes to you, "Right now I am
21    searching for some new potential
22    suppliers which specialize in making
23    metal stud and truck" -- it says "truck,"
24    I think it means track.  "As a USA
```

Confidential - Subject to Further Confidentiality Review

```
 1    company we mainly deal in North America

 2    Market, so it is necessary that

 3    you...have business experience with US

 4    customer.  Would you" please "introduce

 5    me" to "your company such as how big your

 6    company?  How long...you in biz with US?

 7    Who are the top 5 customers?"

 8              Did I read that correctly,

 9    sir?

10         A.    That's what it says in the

11    e-mail.

12         Q.    Thank you.

13              Now, if you go, if you turn

14    forward one page to August 29th.

15              Sorry.  I was trying to

16    help.

17              Now, this e-mail at the top

18    is from you to Jacky Yu.  Correct, sir?

19    Do you see that?

20         A.    What it appears to be me and

21    Jacky Yu, not Yu.

22         Q.    Sorry.  I apologize.  I'm

23    going to mess a lot of names up in this

24    deposition, so I apologize in advance.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    And the date is August 29,

 2     2007.  Right, sir?

 3          A.    Yes.

 4          Q.    And you were a TTP employee

 5     at this time.  Correct, sir?

 6          A.    Correct.

 7          Q.    And the subject line is

 8     "Metal stud."

 9                    Do you see that?

10          A.    Yes.  Correct.

11          Q.    And your response is,

12     starting with the second sentence, "I

13     would like to take this opportunity to

14     introduce our company and products as

15     following."

16                    And the first name in the

17     next paragraph is the predecessor name

18     for TG.  Correct, sir?

19          A.    Yes.

20          Q.    And then further down where

21     it says "We export," it says, "We export

22     the metal frame especially to USA such as

23     New York and Norfolk."  Correct, sir?

24     Does it say that?
```

Confidential - Subject to Further Confidentiality Review

1          A.      That's what it says in the

2     e-mail.

3          Q.      The following sentence says,

4     "Any further information please visit,"

5     and it gives a website address, doesn't

6     it?

7          A.      Correct.

8          Q.      It's www.taihegroup.com?

9          A.      Correct.

10          Q.      Now, this is the site that

11     you would refer customers to, US

12     customers or anywhere in the world.

13     Correct, sir?

14          A.      No.

15          Q.      This is the site you

16     referred to in this e-mail to this

17     potential US customer.  Correct, sir?

18          A.      This e-mail is only for Mr.

19     Yu upon his request.

20          Q.      And you understood that Mr.

21     Yu was looking for a supplier of drywall

22     and metal studs for USA customers.

23     Correct, sir?

24          A.      I only know that he was

1    willing to buy some metal stud product.

2         Q.    For US customers.  Correct,

3    sir?  That's what he says in his e-mail

4    to you?

5         A.    That's what it says in Mr.

6    Yu's e-mail.

7         Q.    Thank you.

8              Now, the site, do you know

9    when this site, www.taihegroup.com, first

10   became active, the year?

11        A.    I don't know when did it set

12   up and run, but at least it was before I

13   joined the company, I joined TG.

14        Q.    You joined TG, was it 2003?

15        A.    Correct.  2003 I joined the

16   company.

17        Q.    And it was an English

18   version of this website.  Correct, sir?

19        A.    The website was in --

20   majority of the website is in Chinese,

21   and the details are in Chinese.  For the

22   frames of the e-mail and the subject of

23   the e-mail are in English.

24        Q.    Who developed the English

Confidential - Subject to Further Confidentiality Review

1    version of the site, the portions that

2    were in English, do you know?

3        A.    I'm not sure.

4        Q.    And Mr. Peng, I'm going to

5    ask you just a few questions about the

6    website, because you're actually

7    designated as the person to speak for the

8    company about the Taihe Group website.

9        A.    Yes.  Go ahead, please.

10       Q.    Do you feel prepared to

11   answer questions about the website?

12       A.    Under the instruction of the

13   attorney, I got to know some of the

14   information.

15       Q.    Okay.  That's fine.

16             Do you know when -- I think

17   I might have asked you this.

18             Do you know who would

19   provide content to the website in

20   English, who did the English language

21   stuff?

22       A.    At the time we entrusted a

23   third-party company to design and format

24   the website.

Confidential - Subject to Further Confidentiality Review

1          Q.     What's the name of that

2     company?

3          A.     As far as I know, one is --

4     one is called Taian Jinchao company.

5          Q.     Who at your company

6     interacted with this third-party vendor?

7          A.     We don't have a designated

8     person to do the work.  In many

9     circumstances, it was those newly

10    graduate, who just graduated from college

11    and came to our factory to work.  Perhaps

12    a new students -- graduated students came

13    to our company to work for about two,

14    three months, and then they change their

15    post or resigned and then they no longer

16    contact with the web designer.  And we

17    always have new colleagues to take over

18    the job, to make the job continuous,

19    continue.  That's the basic information.

20    Sometimes perhaps there was a period of

21    time that nobody actually did this job.

22         Q.     Was the website under the

23    direction of any particular department?

24    Was it under foreign trade, for example,

Confidential - Subject to Further Confidentiality Review

1    your department?

2          A.     Foreign trade department did

3    not direct the work.

4          Q.     Then what department did?

5          A.     Generally TG company has a

6    department called office, which is

7    equivalent to a department of an

8    executive office.

9          Q.     And do you know who in that

10   office or in that executive office

11   directed these college students with

12   regard to content that was put on the

13   website?

14         A.     We call this person office

15   manager.  There is no such a designated

16   person as the office manager.

17         Q.     What are some of the names

18   of the people who fulfilled this position

19   as manager with regard to the website?

20         A.     Like I said, the office

21   manager is a position in different period

22   of time.  There were different people who

23   held the position.

24         Q.     Can you identify who they

Confidential - Subject to Further Confidentiality Review

1    were from, let's say, from 2006 through

2    2008?

3          A.    I'm not sure.  At the time

4    it should be a Qin Qingwen.

5          Q.    Anyone else you can think

6    of?

7          A.    I'm not sure about the other

8    people.

9          Q.    My last question on this

10   topic, did TTP ever have its own

11   dedicated website?

12         A.    TTP had not been established

13   for long.  It does not have its own

14   designated website.

15         Q.    Mr. Peng, if you go to the

16   first page of this e-mail, I want to

17   refer you to the bottom half.  It's dated

18   August 30, 2007.  And this is from Jacky

19   Yu to you.  It says, "Thank you for your

20   info Frank.  I have sent your

21   introduction to US counterpart today."

22               Did I read that correctly?

23         A.    Yes, I see.  That's what it

24   says in the e-mail.

Case 2:09-md-02047-EEF-MBN Document 13346-10 Filed 03/26/12 Page 118 of 138
Case 2:09-md-02047-EEF-MBN Document 13346-44 Filed 03/26/12 Page 5 of 158
Confidential - Subject to Further Confidentiality Review

```
 1            Q.    And then in your response,

 2     which is the top half of the e-mail, I'm

 3     sorry --

 4            A.    I'd like to further explain.

 5            Q.    Go ahead.

 6            A.    The e-mail dated August the

 7     30th, I do not see who received the

 8     e-mail.

 9            Q.    I agree with you, sir, but

10     it does say "Thank you for your info

11     Frank."

12                  And that's you.  Right?

13            A.    Yes.  That's what it says in

14     the e-mail.  I admit that.

15            Q.    The top half of the e-mail,

16     which is your response, once again, you

17     say, "Yours faithfully, Frank, Taihe

18     Dongxin Co., Ltd."

19                  You don't say TTP.  Correct,

20     sir?

21            A.    I've already responded to

22     this question earlier.  The ending of the

23     e-mail is what it is.  But it was a

24     computer set formality.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Thank you.
 2                Mr. Peng, from time to time,
 3    you personally were involved with
 4    handling shipping arrangements of your
 5    product to customers in the US.  Correct,
 6    sir?
 7          A.    We were not in charge of
 8    shipping the product to US.  Sometimes
 9    upon the request of the customers, we do
10    some necessary contacts.
11          Q.    Okay.
12                But you yourself made
13    arrangements from time to time for
14    shipping for customers.  Is that fair to
15    say or not?
16          A.    It's not fair.  It's not
17    accurate.
18          Q.    Mr. Peng, what we've marked
19    as Peng Exhibit 21.
20                     -  -  -
21                (Deposition Exhibit No.
22                Peng-21, E-mail chain, top one
23                dated August 6, 2007, Bates
24                stamped TG 0021964, TG 0021966 and
```

```
 1              TG 0021991, was marked for

 2              identification.)

 3                        -  -  -

 4    BY MR. SEEGER:

 5              Q.    It's TG 0021964.  Actually,

 6    I'm just going to refer to 264.

 7                    This is a discussion, an

 8    e-mail, between you and Joe Weiss from a

 9    USA company.  Correct, sir?

10              A.    Correct.

11              Q.    And you wrote this in

12    English?

13              A.    That's the e-mail that I

14    wrote to the customer.  Correct.  It was

15    written in English.

16              Q.    Here the subject is

17    "Schedule," and you're informing the US

18    customer who is in the USA.  Correct?

19    Joe Weiss is located in the USA?

20              A.    The customer came to our

21    company once, and he did say that he was

22    from the United States.

23              Q.    So you knew you were

24    speaking with the US customer in this
```

```
 1    e-mail.  Correct, sir?  I mean, look at
 2    his e-mail address.
 3              MR. SPANO:  Objection to
 4         form.
 5              THE WITNESS:  Yes.  Like I
 6         answered you earlier, this
 7         customer came to our company and
 8         claimed to be from America.
 9    BY MR. SEEGER:
10         Q.    That's all I have on that.
11              MR. SEEGER:  Judge, I got
12         15, 20 minutes.  Can I keep going
13         or --
14              THE COURT:  Yes.
15    BY MR. SEEGER:
16         Q.    Now, what working
17    relationship, if any, did you personally
18    have with BNBM?
19         A.    We have no working
20    relationship.
21         Q.    You personally have dealt
22    with BNBM USA.  Correct, sir?
23         A.    As you mention it, there was
24    a Mr. Wei who was from Beijing.  He
```

Confidential - Subject to Further Confidentiality Review

1    brought a buyer to come to our company to

2    purchase our product.  But he introduced

3    that customer personally on his own

4    behalf.  At the time, he said that he had

5    a friend that needed to purchase our

6    product.  But I have no impression and no

7    recollection whatsoever of BNBM that Mr.

8    Attorney had just mentioned.  The e-mail

9    address of Mr. Wei is BNBM USA.

10          Q.   I'm sorry.  I didn't mean to

11   interrupt.

12          A.   What I'm trying to say is,

13   because Mr. Wei introduced a friend on

14   his own behalf to our company, therefore,

15   I do not know anything about the company

16   of Mr. Wei, BNBM USA as Mr. Attorney had

17   just mentioned.

18          Q.   Right.

19               But this was -- you didn't

20   have one singular dealing with BNBM USA;

21   you had several dealings with BNBM USA.

22   Correct, sir?

23          A.   Mr. Wei introduced one

24   customer at that time.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And you were copied on
 2     e-mails between the customer and Mr. Wei.
 3     Correct, sir?
 4          A.     Sometimes.
 5          Q.     And you made arrangements
 6     for the customer to come visit your
 7     factory through BNBM USA.  Correct, sir?
 8          A.     I don't understand your
 9     question.
10          Q.     Did you make arrangements
11     for the US customer, through BNBM USA, to
12     come visit your factory?
13          A.     It is a wrong statement.  At
14     the time it was Mr. Wei who took American
15     customer to come to our company.  It was
16     Mr. Wei who make the arrangement.
17          Q.     Well, it was Mr. Wei asking
18     you to make arrangements for the US
19     customer.  Correct, sir?
20          A.     The whole process was
21     arranged by Mr. Wei, but Mr. Wei asked me
22     to arrange lodging and transportation for
23     the customer once the customer arrived in
24     our plant.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And you did that.  Right?

 2          A.    Correct.  I arranged the

 3    local hotel in Taian, according to the

 4    request of Mr. Wei.  And I arranged the

 5    transportation between the customer and

 6    our company.

 7              I mean, the transportation

 8    between the hotel where the customer

 9    stayed and our plant.  I do not know

10    anything outside of Taian.  Neither had I

11    arranged anything for anywhere else out

12    of Taian.

13          Q.    I think I'm down to my last

14    exhibit.

15                   -  -  -

16              (Deposition Exhibit No.

17         Peng-22, E-mail chain, top one

18         dated 6/3/2006, Bates stamped TG

19         0001377 and TG 0001378, was marked

20         for identification.)

21                   -  -  -

22              MR. SEEGER:  Do you know

23         what this was previously marked in

24         his earlier deposition?
```

Confidential - Subject to Further Confidentiality Review

```
 1                  -   -   -
 2              (A discussion off the record
 3         occurred.)
 4                  -   -   -
 5   BY MR. SEEGER:
 6         Q.    Mr. Peng, for the record,
 7   I'm going to be showing you Peng
 8   Exhibit 23, which is TG 22650.  I only
 9   have a couple questions for that.
10              MR.  CHEN:  I'm sorry, what
11         was that?  Which one was Peng-22?
12              MR. SEEGER:  Did --
13              MR. CHEN:  Did you actually
14         mark Peng-22?
15              MR. SEEGER: I marked one and
16         I didn't use it, so I'm going to
17         change this to 22.
18              Thank you.
19              I'm going to go ahead and
20         put this in.
21              Peng-22, let me identify
22         that first.  It's TG 0001377 and
23         1378, which I'll just mark and
24         we're not going to ask you
```

Confidential - Subject to Further Confidentiality Review

```
 1          questions.

 2               And now I'm marking Peng-23,

 3          which is TG 0022650.

 4                    -  -  -

 5               (Deposition Exhibit No.

 6          Peng-23, E-mail dated October 9,

 7          2007, Bates stamped TG 0022650,

 8          was marked for identification.)

 9                    -  -  -

10   BY MR. SEEGER:

11          Q.    Mr. Peng, I just have a

12   couple questions about what we've just

13   marked.  I think we already know because

14   we've been here for a week who OEG

15   Building Material is.

16               That was a building material

17   supplier from Brooklyn, New York.

18   Correct?

19          A.    That's your attorney's

20   position.  That's the information your

21   attorneys received.  I'm not very sure

22   about that.

23               THE INTERPRETER:

24               Interpreter clarification.
```

Case 2:09-md-02047-EEF-MBN Document 18245-10 Filed 03/26/12 Page 127 of 138
Case 2:09-md-02047-EEF-JCW Document 13154-11 Filed 03/21/12 Page 44 of 88
Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  TOV company
 2          did purchase something -- product
 3          from our company.
 4    BY MR. SEEGER:
 5          Q.    That's fair enough.  It's
 6    the same company.  Right?
 7                    A couple questions.
 8                    Mr. Peng, this is an e-mail
 9    you wrote to Mr. Yu in English.  Correct?
10          A.    Which one?  This is not the
11    one?
12                    MR. SPANO:  23.
13                    MR. SEEGER:  Oh, here it is.
14          Frank had it.
15                    We're looking at this one.
16          I'm sorry.
17                    MR. DAVIS:  Just so our
18          record is clear, do we have an
19          Exhibit 22?
20                    MR. SEEGER:  Yes.  I just
21          marked it.
22                    THE COURT:  1377.
23                    MR. DAVIS:  Thank you.
24                    MR. SEEGER:  That was my
```

Confidential - Subject to Further Confidentiality Review

```
 1            fault.  Sorry, Len.
 2   BY MR. SEEGER:
 3            Q.    So my question to you is --
 4   I forgot my question.
 5                 Anyway, the subject line on
 6   this e-mail is "metal stud customer."
 7   Correct, sir?
 8            A.    Yes.  That's what it said on
 9   the subject line.
10            Q.    And at this time frame,
11   you're a TTP employee.  Correct?  That's
12   your testimony?
13            A.    That's right.  In that time
14   frame, I was TTP's employee.
15            Q.    You wrote this e-mail in
16   English.  Correct, sir?
17            A.    Yes.  This is the e-mail
18   that I wrote.
19            Q.    You sign off, "Frank,
20   Taishan Gypsum Co., Ltd."  Correct, sir?
21            A.    Yes.  That's a sign-off of
22   the e-mail.
23                 MR. SEEGER:  Judge, I'll
24            just save whatever I have for
```

Confidential - Subject to Further Confidentiality Review

```
 1          recross after Frank.

 2                  THE COURT:  Anybody else on

 3          the questions today?

 4                  MR. SEEGER:  Thank you, Mr.

 5          Peng.

 6                  THE WITNESS:  Thank you.

 7                  THE COURT:  You want to take

 8          a short break, Hilarie?

 9                  MS. BASS:  Yes.  Two

10          minutes.

11                  THE COURT:  Let's do a

12          ten-minute break.

13                  VIDEOTAPE TECHNICIAN:  Going

14          off the record.  The time is 9:49.

15                          -   -   -

16                  (A recess was taken from

17          9:49 a.m. to 9:59 a.m.)

18                          -   -   -

19                  VIDEOTAPE TECHNICIAN:  Back

20          on the record.  The time is 9:59.

21                          -   -   -

22                          EXAMINATION

23                          -   -   -

24      BY MS. BASS:
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Good morning.

 2          A.    Hello.

 3          Q.    I'd like you to take a look

 4     at a document previously marked in the

 5     Jia deposition as Exhibit 33.

 6                Is that your e-mail address

 7     in the "To" reference?

 8          A.    When I apply for MSN, it

 9     gave automatically an e-mail address.

10     But usually I don't use this e-mail

11     address.

12          Q.    So clempwl@hotmail.com,

13     that's not an e-mail address that you

14     utilize?

15          A.    Like I said, I applied for

16     MSN.  But this is like a byproduct that

17     was given to me, which is an e-mail

18     address.  Basically, I could say that I

19     usually don't use it at all.

20          Q.    Did you receive this e-mail

21     from Paul Brinkmann of the South Florida

22     Business Journal on or about January 27,

23     2009?

24          A.    It appears to me that this
```

Case 2:09-md-02047-EEF-MBN Document 18245-14 Filed 03/26/12 Page 131 of 138
Case 2:09-md-02047-EEF-JCW Document 13154-14 Filed 03/21/12 Page 13 of 28
Confidential - Subject to Further Confidentiality Review

1    person send the e-mail to those people

2    that are on the "to" line, sent to those

3    e-mail addresses.  But like I explained

4    earlier, usually I don't even check the

5    e-mail.

6            Q.    Did you receive a copy of

7    this inquiry from the South Florida

8    Business Journal asking about your

9    knowledge about odors and other problems

10   associated with your drywall product?

11           A.    Like I said earlier, the

12   document does say that the e-mail was

13   sent to those e-mail addresses, but I

14   didn't check.  I didn't use this e-mail

15   address.

16           Q.    So that means the answer to

17   my question is no, you did not receive

18   it?

19           A.    I've never checked this

20   e-mail address.

21           Q.    Were you informed by any of

22   the other recipients of this e-mail

23   regarding this inquiry?

24           A.    Other recipients?  Can you

Confidential - Subject to Further Confidentiality Review

```
 1    ask again?  I'm not clear about that.

 2            Q.    Yes.

 3                  Do you know who else

 4    received this e-mail?

 5            A.    It appears to be e-mail

 6    address of Manager Che and e-mail address

 7    of Manager Yang Jiapo.

 8            Q.    Did either of those

 9    individuals inform you that there was an

10    investigative reporter from the South

11    Florida Business Journal inquiring into

12    complaints about your drywall product?

13            A.    I have not received report

14    from them.

15            Q.    Are you aware of whether

16    they received this e-mail?

17            A.    I don't know whether they

18    have seen this e-mail address or not, or

19    whether they understood the e-mail or

20    not.

21            Q.    I'd like you to take a look

22    at the document that was previously

23    marked as Exhibit 22 to this deposition.

24                  THE COURT:  Do you have a
```

Confidential - Subject to Further Confidentiality Review

1          Bates number?

2                    MS. BASS:  Yes, I'm sorry.

3          This is TG -- I have it as 461,

4          but I believe the marked copy is a

5          different Bates number.

6                    MR. SPANO:  1377.

7                    MS. BASS:  Thank you.  It is

8          TG 1377.

9    BY MS. BASS:

10         Q.    This e-mail requests that

11   gypsum board be produced by TTP with a

12   specification of a contact phone number

13   and then Tampa, Florida.

14                Do you see that as part of

15   that e-mail?

16         A.    Where is it?

17         Q.    Do you see that reference?

18         A.    Is this the one?

19         Q.    Yes.

20         A.    This is the e-mail sent from

21   Mr. Richard to Mr. Wei regarding some

22   requirements of the marks of the gypsum

23   board.

24         Q.    And did you agree to stamp

Confidential - Subject to Further Confidentiality Review

```
 1    Tampa, Florida on the back of the gypsum

 2    board you were going to be producing?

 3         A.    That's a requirement of the

 4    customer, and also it is something that I

 5    could do.  We would stamp it for the

 6    customer.  Of course, the precondition

 7    would be it is not illegal, not against

 8    any regulations.

 9         Q.    Did you in fact produce

10    drywall with the stamp Tampa, Florida on

11    the back?

12         A.    Well, I don't recall, but

13    according to the common sense that I

14    have, usually we would stamp a line of

15    marks on the back of the gypsum board.

16    But I'm afraid we couldn't do it in this

17    case, because from what appears here,

18    there are quite a few lines.  Our

19    technology only allow one line to be

20    produced.

21         Q.    But you are aware that the

22    request was that you stamp your board

23    with the designation Tampa, Florida on

24    it.  Correct?
```

Case 2:09-md-02047-EEF-MBN Document 18245-10 Filed 03/26/14 Page 135 of 138
Case 2:09-md-02047-EEF-JCW Document 13451-14 Filed 03/24/12 Page 22 of 28
Confidential - Subject to Further Confidentiality Review

1      A.      I only know that the

2    customer did have the request, which is

3    to mark the gypsum board according to the

4    request.

5      Q.      Thank you.

6              I only have one last set of

7    questions, and that relates to an

8    agreement that was discussed at length

9    over the last few days between TTP and

10   Oriental Trading Company.

11             Mr. Peng Wenlong, it is

12   correct, is it not, that you did receive

13   a $100,000 deposit from Oriental Trading

14   Company?

15     A.      Oriental company did wire

16   this amount of money to TTP company.

17     Q.      And that was part of your

18   ongoing relationship to sell gypsum board

19   to Oriental Trading, was it not?

20     A.      You can't say that.  It was

21   only that there was intention of the

22   Oriental company to purchase gypsum board

23   from our company.  And they -- in turn,

24   they wired a part of the money to us.

Case 2:09-md-02047-EEF-MBN Document 18246-104 Filed 03/26/12 Page 136 of 138
Case 2:09-md-02047-EEF-JCW Document 13154-14 Filed 03/21/12 Page 20 of 28
Confidential - Subject to Further Confidentiality Review

```
 1    There's no difference from what our
 2    common practice is when we want to make a
 3    purchase.
 4              MS. BASS:  Thank you.  I
 5         have nothing further.
 6              THE WITNESS:  Thank you.
 7                   -  -  -
 8              EXAMINATION
 9                   -  -  -
10    BY MR. HARDT:
11         Q.    Good morning, Mr. Peng.  My
12    name is Ken Hardt, and I represent
13    Venture Supply.  I met you last time in
14    April.
15         A.    Hello.
16         Q.    Do you recall that there was
17    two separate contracts with Venture
18    Supply and TG for the sale of drywall?
19         A.    Correct.  At the time, we
20    signed two contracts.
21         Q.    Right.
22              And there was two separate
23    shipments of drywall to Venture Supply.
24    Correct?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    The two contracts are what
 2    we call two orders.
 3          Q.    Right.
 4                And there was two separate
 5    shipments of drywall to Venture Supply.
 6    Correct?
 7          A.    Yes.  Venture Supply company
 8    placed order for two shipments, but for
 9    the detailed shipment, it was the
10    arrangement of Venture Supply.
11          Q.    Okay.  There was two
12    separate ships.
13                That's all I'm asking you?
14                THE COURT:  Shipments.
15                THE WITNESS:  We shipped the
16          product in two separate times to
17          the designated port by Mr. Phillip
18          to a port called Lianyungang,
19          China.
20    BY MR. HARDT:
21          Q.    Right.
22                And in the first shipment of
23    drywall to Venture Supply, do you recall
24    being told that some of the product was
```

Confidential - Subject to Further Confidentiality Review

1    damaged during the shipment?

2         A.    I remember Mr. Phillip

3    mentioned that to me, the product was

4    damaged during unloading.

5         Q.    Right.

6               And you worked with Mr.

7    Phillip, Mr. Phillip Perry, that's who

8    we're talking about.  Right?

9         A.    It has always been Mr.

10   Phillip who contacted us.

11        Q.    But he was Venture's agent

12   over -- dealing with TG; is that right?

13        A.    The circumstance then was

14   that Mr. Phillip came to our company.

15   And he, on behalf of Venture Company, had

16   some detailed communication with our

17   company.

18        Q.    Right.

19               After you were told that

20   there was damaged product during the

21   first shipment, you worked with Mr.

22   Phillip on how to better secure or pack

23   the drywall for the second shipment.

24   Right?