UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE MANUFACTURED | * | MDL No. 2047 |
| DRYWALL PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | JOSEPH C. WILKINSON, JR. |
| | * | |

* * * * * * * * * * * * * * * ** * * * * * * * * * * *

**THIS DOCUMENT RELATES TO:** *Germano, et al. v. Taishan Gypsum Co. Ltd., et al.*,
**Case No. 09-6687**

**MEMORANDUM OF LAW IN SUPPORT OF TAISHAN GYPSUM CO. LTD.'S
RENEWED MOTION TO VACATE THE DEFAULT
JUDGMENT AND DISMISS THE COMPLAINT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................1

PROCEDURAL HISTORY....................................................................................................2

      A.     Plaintiffs File Suit In The Eastern District of Virginia ............................................2

      B.     Plaintiffs Fail To Serve The Second Amended Complaint.....................................3

      C.     Plaintiffs Move For A Default On The Unserved Second Amended
             Complaint.................................................................................................................3

      D.     Plaintiff-Intervenors Obtain A Default Judgment On The Unserved
             Second Amended Complaint ...................................................................................4

      E.     TG Moves To Vacate The Default Judgment And To Dismiss The
             Complaint.................................................................................................................5

FACTUAL BACKGROUND ..................................................................................................6

      A.     TG Never Has Conducted Business In Virginia Or Anywhere Else
             In The U.S...............................................................................................................6

      B.     TG Made Only Two Isolated Sales In China To Venture Supply ..........................7

ARGUMENT .......................................................................................................................10

I.     THE DEFAULT SHOULD BE VACATED BECAUSE THE COURT
      LACKS PERSONAL JURISDICTION OVER TG .........................................................10

      A.     Plaintiffs Are Unable To Satisfy Virginia's Long-Arm Statute ...........................12

      B.     Plaintiffs Are Unable To Satisfy The Requirements Of Due
             Process ...................................................................................................................15

             1.     Plaintiffs Cannot Establish That TG Had Minimum
                   Contacts With Virginia ..............................................................................16

                    a.     Plaintiff Cannot Prove TG Purposefully Availed
                         Itself Of The Virginia Market .......................................................29

                    b.     Plaintiffs Cannot Prove That TG Purposefully
                         Availed Itself Of The Virginia Market Based Upon
                         TG's Alleged Awareness Of Sales In Virginia..............................33

i

c.     Plaintiffs Cannot Prove That TG Engaged In Substantial Conduct Directed At The Forum State As Required By The Fourth Circuit ................................................ 34

2.     Plaintiffs Cannot Establish That Their Causes Of Action Arose Out Of Or Resulted From TG's Contacts With Virginia ................................................................................................ 38

3.     The Exercise Of Jurisdiction Over TG Would Be Unreasonable and Would Offend Traditional Notions Of Fair Play And Substantial Justice ................................................ 39

II.     THE DEFAULT JUDGMENT MUST BE SET ASIDE BECAUSE PLAINTIFFS FAILED TO SERVE THE PLEADINGS UPON WHICH IT WAS BASED ................................................................................................ 45

III.     THE DEFAULT JUDGMENT SHOULD BE SET ASIDE ON THE GROUNDS OF EXCUSABLE NEGLECT ...................................................... 47

A.     TG's Default Was Not Willful ................................................................ 47

B.     Vacating The Default Judgment Will Not Prejudice Plaintiffs ........................... 49

C.     TG Has A Meritorious Defense ............................................................. 50

D.     The Other Factors Weigh In Favor Of Vacatur ..................................... 50

1.     TG Will Incur Significant Financial Losses If The Default Stands ................................................................................................ 50

2.     TG Acted Expeditiously to Vacate The Default ...................... 51

IV.     THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE VIRGINIA CONSUMER PROTECTION ACT ............................................. 51

CONCLUSION .................................................................................................... 52

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**CASES**

*Affinity Memory & Micro, Inc. v. K & Q Enter.*,
   20 F. Supp. 2d 948 (E.D. Va. 1998) ...................................................................................13

*Ainsworth v. Cargotec USA, Inc.*,
   No. 10-236, 2011 WL 4443626 (S.D. Miss. Dec. 15, 2011), *Lv. to appeal granted*,
   No. 11-90052 (5th Cir. Mar. 1, 2012) ...............................................................................28

*Amberg v. FDIC*,
   934 F.2d 681 (5th Cir. 1991) ...........................................................................................10

*America Online, Inc. v. Huang*,
   106 F. Supp. 2d 848 (E.D. Va. 2000) ..............................................................................12

*Anunciation v. West Capital Fin. Servs. Corp.*,
   97 F.3d 1458 (9th Cir. 1996) ...........................................................................................47

*Asahi Metal Indus. Co., Ltd. v. Superior Court*,
   480 U.S. 102 (1987) ..................................................................................................... passim

*Bangkok Bank Ltd. v. Wallant Int'l Trade, Inc.*,
   No. 88-2675, 1989 WL 156299 (S.D.N.Y. Dec. 18, 1989) ..............................................50

*Bay Tobacco, LLC v. Bell Quality Tobacco Prod., LLC*,
   261 F. Supp. 2d 483 (E.D. Va. 2003) .................................................................12, 13, 37

*Bituminous Cas. Corp. v. Garcia*,
   223 F.R.D. 308 (N.D. Tex. 2004) ....................................................................................47

*Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*,
   841 F.2d 646 (5th Cir. 1988) ...........................................................................................45

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ..................................................................................................... passim

*Calder v. Jones*,
   465 U.S. 783 (1984) .........................................................................................................43

*Carl Marks & Co. v. Union of Soviet Socialist Republics*,
   665 F. Supp. 323 (E.D.N.Y. 1987), *aff'd* 841 F.2d 26 (2d Cir. 1988)...................................48

*Chung v. Nana Dev. Corp.*,
   783 F.2d 1124 (4th Cir. 1986) ...............................................................................35, 36, 39

*City of Virginia Beach v. Roanoke River Basin Ass'n*,
   776 F.2d 484 (4th Cir. 1985) ...................................................................................11

*Consulting Eng'rs Corp. v. Geometric Ltd.*,
   561 F.3d 273 (4th Cir. 2009) ........................................................................... passim

*De James v. Magnificent Carriers, Inc.*,
   654 F.2d 280 (3d Cir. 1981)...............................................................................20, 46

*Desantis v. Hafner Creations*,
   949 F. Supp. 419 (E.D. Va. 1996) ........................................................................15

*Dow Chem. Canada ULC v. Superior Court*,
   202 Cal. App. 4th 170 (Cal. Ct. App. 2011) .........................................................28

*E. & J. Gallo Winery v. Cantine Rallo, S.p.A.*,
   430 F. Supp. 2d 1064 (E.D. Cal., 2005)...............................................................49

*Ellicott Machine Corp., Inc. v. John Holland Party Ltd.*,
   995 F.2d 474 (4th Cir. 1993) ...............................................................................12

*English & Smith v. Metzger*,
   901 F.2d 36 (4th Cir. 1990) .................................................................................13

*Fed. Ins. Co. v. Lake Shore Inc.*,
   886 F.2d 654 (4th Cir. 1989) ...............................................................................35

*Frizzell v. Danieli Corp., et al.*,
   CL09-5120 (Va. Cir. Ct. Norfolk Dec. 22, 2010).....................................13, 36, 37

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   131 S. Ct. 2846 (2011).....................................................................................18, 38

*Gordonsville Indus., Inc. v. Am. Artos Corp.*,
   549 F. Supp. 200 (W.D. Va. 1982) ......................................................................15

*Gray v. Riso Kagaku Corp.*,
   82 F.3d 410, 1996 WL 181488 (4th Cir. April 17, 1996).................................40, 41

*Hanson v. Denckla*,
   357 U.S. 235 (1958)..............................................................................................17

*Harper Macleod Solicitors v. Keaty & Keaty*,
   260 F.3d 389 (5th Cir. 2001) ...............................................................................10

*Helicopteros Nacionales de Columbia, S.A. v. Hall*,
   466 U.S. 408 (1984)..........................................................................................18, 19

iv

*Highlands Fuel Delivery, LLC v. Am. Ins. Co.*,
 No. 2011-00291, 2011 WL 7110393 (Super. Ct. N.H. Nov. 29, 2011) ...................................28

*In re The Celotex Corp.*,
 124 F.3d 619 (4th Cir. 1997) ..................................................................................................35

*In re Chinese Manufactured Drywall Prods. Liab. Litig.*,
 767 F. Supp. 2d 649 (E.D. La. 2011) ....................................................................................11

*In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*,
 No. 07-1873, 2010 WL 1489894 (E.D. La. Apr. 12, 2010)...................................................11

*In re Marinez*,
 589 F.3d 772 (5th Cir. 2009) ................................................................................................49

*In re OCA, Inc.*,
 551 F.3d 359 (5th Cir. 2008) ...........................................................................................47, 50

*In re Pabst Licensing GMBH & Co. KG Litig.*,
 602 F. Supp. 2d 10 (D.D.C. 2009) ........................................................................................11

*In re Provenza*,
 316 B.R. 177 (Bankr. E.D. La. 2003) ....................................................................................45

*In re Sterling Foster & Co., Sec. Litig.*,
 222 F. Supp. 2d 289 (E.D.N.Y. 2002) ...................................................................................11

*In re WellNx Mktg. & Sales Practices Litig.*,
 No. 07-1861, 2010 WL 3652457 (D. Mass. Sept. 15, 2010)..................................................11

*Int'l Shoe Co. v. Washington*,
 326 U.S. 310 (1945)........................................................................................................ passim

*Jackson v. FIE Corp.*,
 302 F.3d 515 (5th Cir. 2002) ..........................................................................................10, 12

*James v. Claiborne*,
 No. 07-1570, 2009 WL 994951 (W.D. La. Apr. 13, 2009) ...................................................46

*Jenkens & Gilchrist v. Groia & Co.*,
 542 F.3d 114 (5th Cir. 2008) ................................................................................................50

*Keeton v. Hustler Magazine, Inc.*,
 465 U.S. 770 (1984)...............................................................................................................21

*Keranos, LLC v. Analog Devices, Inc.*,
 No. 10-207, 2011 WL 4027427 (E.D. Tex. Sept. 12, 2011)..................................................28

*Lesnick v. Hollingsworth & Vose Co.*,
   35 F.3d 939 (4th Cir. 1994) ....................................................................................34, 35, 36

*Lewis v. Lynn*,
   236 F.3d 766 (5th Cir. 2001) .............................................................................................51

*Lopez v. NTI, LLC*,
   No. 08-1579, 2008 WL 5120542 (D. Md. Dec. 4, 2008).....................................................46

*May v. Osako & Co., Ltd.*,
   CL08002245-00, 2011 WL 4544889. (Cir. Ct. Va. Sept. 12, 2011) .....................................28

*McGee v. Int'l Life Ins. Co.*,
   335 U.S. 220 (1957)............................................................................................................19

*Morris v. B.C. Olympiakos, SFP*,
   721 F. Supp. 2d 546 (S.D. Tex. 2010) ...............................................................................12

*Nicastro v. J. McIntyre Machinery, Ltd.*,
   131 S. Ct. 2780 (2011) ............................................................................................. passim

*Northern Ins. Co. of New York v. Const. Navale Bordeaux*,
   No. 11-60462, 2011 WL 2682950 (S.D. Fla. July 11, 2011)...............................................28

*Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of Republic of Venezuela*,
   575 F.3d 491 (5th Cir. 2009) .............................................................................................48

*OMI Holding, Inc. v. Royal Ins. Co. of Canada*,
   149 F.3d 1086 (10th Cir. 1998) .........................................................................................43

*Oticon v. Sebotek Hearing Sys., LLC*,
   No. 08-5489, 2011 WL 3702423 (D. N.J. Aug. 22, 2011) ..................................................28

*Peanut Corp. of Am. v. Hollywood Brands, Inc.*,
   696 F.2d 311 (4th Cir. 1982) .............................................................................................13

*Practical Concepts, Inc. v. Republic of Bolivia*,
   811 F.2d 1543 (D.C. Cir. 1987)..........................................................................................49

*Prejean v. Sonatrach, Inc.*,
   652 F.2d 1260 (5th Cir. 1981) ...........................................................................................40

*Promotions Ltd. v. Brooklyn Bridge Centennial Comm'n*,
   763 F.2d 173 (4th Cir. 1985) .............................................................................................36

*Prototype Prod., Inc. v. Reset, Inc.*,
   No. 11-196, 2011 WL6960617 (E.D. Va. Oct. 14, 2011).....................................................20

*Robinson v. Sanctuary Music*,
   383 Fed. App'x 54 (2d Cir. 2010)....................................................................47, 49

*Rockwell Int'l Corp. v. KND Corp.*,
   83 F.R.D. 556 (N.D. Tex. 1979) ..............................................................................12

*Seiferth v. Helicopteros Atuneros, Inc.*,
   472 F.3d 266 (5th Cir. 2006) ...........................................................................12, 38

*Shaffer v. Heitner*,
   433 U.S. 186 (1977).................................................................................................26

*Smith v. Teledyne Cont'l Motors, Inc.*,
   No. 10-02152, 2012 WL 10836 (D. S.C. Jan. 3, 2012) ....................................27, 36

*Thompson v. Chrysler Motors Corp.*,
   755 F.2d 1162 (5th Cir. 1985) ...................................................................................3

*United States v. Williams*,
   517 F.3d 801 (5th Cir. 2008) ..................................................................................45

*Van Dusen v. Barrack*,
   376 U.S. 612 (1969).................................................................................................11

*Varnes v. Local 91, Glass Blowers Ass'n*,
   674 F.2d 1365 (11th Cir. 1982) ..............................................................................45

*Walk Haydel & Assoc., Inc. v. Coastal Power Prod. Co.*,
   517 F.3d 235 (5th Cir. 2008) ...............................................................................2, 12

*Windsor v. Spinner Indus. Co.*,
   No. 10-114, 2011 WL 5005199 (D. Md. Oct. 20, 2011) ...................................27, 36

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980)........................................................................................ passim

**FEDERAL STATUTES**

28 U.S.C. § 1407.............................................................................................................11

**OTHER STATUTES**

Va. Code Ann. § 8.01-328.1 (2009).....................................................................4, 12, 13

**RULES**

Fed. R. Civ. P. 4.......................................................................................................45, 46

Fed. R. Civ. P. 5............................................................................................2, 5, 45, 46

Fed. R. Civ. P. 12 ........................................................................................................1

Fed. R. Civ. P. 24 ...................................................................................................2, 45

Fed. R. Civ. P. 55 ...............................................................................................1, 10, 47

Fed. R. Civ. P. 60 ...........................................................................................1, 10, 47, 51

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Amendment XIV, § 1 ....................................................................1, 12, 16

**OTHER AUTHORITIES**

4B Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and
    Procedure* § 1146 (3d Ed. 2010)................................................................................46

## INTRODUCTION

Defendant Taishan Gypsum Co. Ltd. ("TG") submits this memorandum in support of its renewed motion (1) pursuant to Federal Rules of Civil Procedure 55(c) and 60(b) for an order vacating the November 20, 2009 order of this Court holding TG in preliminary default and vacating the May 11, 2010 default judgment in the amount of $2,758,356.20 (the "Judgment"); and (2) for an order pursuant to Fed. R. Civ. P. 12(b)(2), dismissing this action on the grounds of lack of personal jurisdiction.

Since September 2010, when TG first moved to vacate the Judgment, the parties have taken extensive jurisdictional discovery.[1]  The evidence developed through that discovery demonstrates that TG never has conducted business in Virginia or anywhere else in the U.S.  TG only had one U.S. customer to whom it sold drywall on two isolated occasions.  TG delivered the drywall in China, did not ship it to Virginia or anywhere else in the U.S., and was not aware of where Venture Supply would be marketing the drywall.  Accordingly, the Court must conclude that TG is not subject to jurisdiction under the long-arm statute of Virginia, the forum State where Plaintiffs filed their original Complaint.  In addition, the Due Process Clause of the Fourteenth Amendment of the United States Constitution precludes the Court's exercise of personal jurisdiction over TG.  TG lacked minimum contacts with Virginia and Plaintiffs' causes of action do not arise out of or result from TG's alleged contacts with Virginia.  Furthermore, even if TG had minimum contacts with Virginia, the assertion of jurisdiction over TG would be unfair and unreasonable, in violation of Due Process.  For these reasons, the Judgment is void for lack of personal jurisdiction and the Complaint must be dismissed.

---

[1] On September 10, 2010, TG filed a Motion to Vacate the Default Judgment, Dismiss the Action and to Seek Remand from the Court of Appeals.  (Doc. No. 5515).

The Judgment is also void because (1) Plaintiff-Intervenors did not properly serve TG with their motion to intervene or the pleading required by Fed. R. Civ. P. 24(c) and 5(a)(2); (2) TG was not served with the Second Amended Complaint, on which the default was entered and on which the Judgment was based; and (3) the Judgment cannot stand to the extent that it is based on a Complaint that this Court has already found fails to state a claim under the Virginia Consumer Protection Act.  Further, the Judgment should be vacated because any failure by TG to timely respond to the Second Amended Complaint was excusable.

## PROCEDURAL HISTORY

### A.    Plaintiffs File Suit In The Eastern District of Virginia

Plaintiffs Michelle Germano, Dennis and Sharon Jackson, and Jason and Lisa Dunaway (the "*Germano* Plaintiffs"), owners of three homes in Virginia, commenced this action on May 1, 2009 by filing a Complaint in the Eastern District of Virginia.[2]

On May 26, 2009, the *Germano* Plaintiffs filed their First Amended Complaint, asserting individual claims and claims on behalf of "all other similarly situated owners and residents of residential homes in the Commonwealth of Virginia containing defective drywall that was designed, manufactured . . . by Defendant Taishan . . . ."  (Index. 09-6687 ("*Germano*"), Doc. No. 1-1 at 1).  The *Germano* Plaintiffs served the First Amended Complaint on TG on or about August 3, 2009.  The First Amended Complaint is the only pleading that TG received in connection with this action prior to the Court's entry of a default judgment.[3]  (Jia Decl. ¶ 45).

---

[2]  *Germano, et al. v. Taishan Gypsum Co. Ltd., et al.*, No. 09-CV-202 (E.D. Va. May 1, 2009).

[3]  The facts relevant to this motion are set forth in documents and deposition transcripts attached to the accompanying declaration of Frank T. Spano, dated April 2, 2012, ("Spano Decl.").  On January 6, 2012, the Court entered an Order Regarding Authenticity and Admissibility of Certain Documents Identified by Parties for Use at Depositions in Hong Kong during the week of January 9, 2012, (Doc. 12126) (the "Admissibility Stipulation").  The documents relied upon by TG in support of its motion are admissible for purposes of this Court's evidentiary hearing on the issue of personal jurisdiction based upon deposition testimony and other applicable law as well as the Admissibility Stipulation.  *See Walk Haydel & Assoc., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir.

When TG received the First Amended Complaint, it could not understand how this litigation could involve the company.  (*Id.* ¶ 46).  TG had complied with its contractual obligations to its sole U.S. customer and had no reason to believe there were any issues with the quality of its drywall.  (*Id.*)  Since TG had never had a role in the distribution or installation of drywall in Virginia and Venture Supply had not raised with TG any issue with the quality of the drywall it purchased, TG did not believe that it was necessary to appear in the proceedings.  (*Id.* ¶ 41).

### B.    Plaintiffs Fail To Serve The Second Amended Complaint

After the *Germano* Plaintiffs' case was transferred to this Court on October 13, 2009, they moved to amend the First Amended Complaint by "interlineation."  (Doc. No 396).  This amendment involved new claims not contained in the First Amended Complaint served upon TG; for the first time the *Germano* Plaintiffs sought to allege that they represented a national class of homeowners with claims against TG.  (*Id.*)  The Court granted the *Germano* Plaintiffs' motion to amend the First Amended Complaint (Doc. No. 469), but plaintiffs never served TG with their Second Amended Complaint, and TG did not receive the Second Amended Complaint, prior to the entry of the Judgment.  (Jia Decl. ¶ 45).

### C.    Plaintiffs Move For A Default On The Unserved Second Amended Complaint

On November 18, 2009, the same day that the Court granted their motion to file a Second Amended Complaint, the *Germano* Plaintiffs moved this Court for entry of default against TG. (Doc. No. 464).  Again, as with the Second Amended Complaint, Plaintiffs failed to serve their

---

2008) ("When the defendant disputes the factual bases for jurisdiction . . . the court may receive interrogatories, depositions, or 'any combination of the recognized methods of discovery' to help it resolve the jurisdictional issue"), (citing *Thompson v. Chrysler Motors Corp*., 755 F.2d 1162, 1165 (5th Cir. 1985)).

Attached to the Spano Decl. as Exhibit 1 is a true and correct copy of the Declaration of Jia Tongchun, Chairman, General Manager and Senior Engineer of Taishan ("Jia Decl."), dated August 15, 2010, which was filed in support of TG's original motion to vacate/dismiss in September 2010.  The extensive jurisdictional discovery conducted since the filing of TG's initial motion confirms the facts stated in the Jia Decl.

default motion on TG.  The Court entered a preliminary default against TG on November 20, 2009.  (Doc. No. 487).

On December 3, 2009, Jerry and Inez Baldwin, Steven and Elizabeth Heischober, Joseph and Kathy Leach, Preston and Rachel McKellar, J. Frederick and Vanessa Michaux, William and Deborah Morgan, and Robert and Lea Orlando (collectively, the "Plaintiff-Intervenors"), moved to intervene in this action.  (*See* Doc. No. 548).  The Plaintiff-Intervenors alleged that each was the owner of a house in Virginia in which allegedly defective drywall manufactured by TG had been installed, that they were each plaintiffs in related actions pending in state court in Virginia, that their state court complaints stated claims against TG, and that they adopted the (unserved) Second Amended Complaint in the *Germano* action.  (*Id.* at 2-3).  The Court granted Plaintiff-Intervenors' motion to intervene on December 20, 2009.  (Doc. No. 641).  Plaintiff-Intervenors did not serve TG with their motion to intervene or any pleading.  Consequently, prior to the entry of the default judgment, TG had no notice of the Plaintiff-Intervenors' claims.  (Jia Decl. ¶ 45).

### D.   Plaintiff-Intervenors Obtain A Default Judgment On The Unserved Second Amended Complaint

On February 19 and 22, 2010, the Court held an evidentiary hearing to assess damages allegedly suffered by Plaintiff-Intervenors.  (*See* Doc. Nos. 1223, 1258).  Only Plaintiff-Intervenors put on evidence during the two-day, uncontested trial.  (*Id.*)  On April 8, 2010, the Court issued its Findings of Fact.  (Doc. No. 2380).

Although Plaintiff-Intervenors offered evidence that they obtained drywall from Venture Supply marked "Shandong Taihe," they did not offer evidence establishing that TG was subject to jurisdiction under Virginia's long-arm statute.  (*See* Doc. No. 2380 at p. 9).  *See* Va. Code Ann. § 8.01-328.1 (2009)).  In particular, there was no evidence that TG "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue

from goods used or consumed or services rendered in this Commonwealth," as the long-arm statute requires for jurisdiction over an out-of-state seller of goods.  *See* Va. Code Ann. § 8.01-328.1(A) and (5), discussed in Section I.(A), *infra*; *see generally* Doc. No. 2380).

### E.      TG Moves To Vacate The Default Judgment And To Dismiss The Complaint

After TG learned of the default judgment, it retained counsel, who entered an appearance on June 10, 2010, reserving its objections to the Court's jurisdiction.  (Jia Decl. ¶ 47; Doc. No. 3668).  The same day, TG filed a Notice of Appeal from, *inter alia*, the default judgment.  (Doc. No. 3670).  The appeal is currently pending in the Fifth Circuit.  However, the Court of Appeals remanded TG's appeal to this Court for the limited purpose of permitting it to determine this motion to vacate.[4]

Following remand, the Court ordered the parties to engage in discovery for the purpose of determining whether there is personal jurisdiction over TG or its subsidiary Tai'an Taishan Plasterboard Co., Ltd. ("TTP"; TG and TTP are referred to collectively as the "Taishan Defendants") in various actions in the multi-district litigation before this Court in which one or both of the Taishan Defendants have been served.  (Doc. 6006).  Over the next approximately 18 months, the parties conducted extensive jurisdictional discovery.   The Taishan Defendants produced more than 26,000 pages of documents and produced six witnesses for a total of approximately two weeks of depositions in Hong Kong.  In addition, the Plaintiffs' Steering Committee (the "PSC") has conducted document discovery and depositions of numerous other parties and witnesses.  The PSC has continued jurisdictional discovery through March 2012.

---

[4] *In re Chinese Manufactured Drywall Products Liability Litigation*, Docket No. 10-30568 (5th Cir. June 22, 2010).

## FACTUAL BACKGROUND

### A.    TG Never Has Conducted Business In Virginia Or Anywhere Else In The U.S.

TG is a Chinese corporation with its principal place of business in Tai'an City, Shandong Province, People's Republic of China.  (Jia Decl. ¶¶ 2, 4.)  TG has manufactured drywall since 1992.  (Jia Decl. ¶ 6).  TG manufactures and sells drywall exclusively in China.  (*Id.* ¶¶ 7-9). The evidence shows TG has not engaged in any activities in Virginia:

- TG never has manufactured, marketed, sold or distributed drywall in Virginia. (Jia Decl. ¶¶ 10-13).

- TG never has advertised in Virginia or performed any services there.[5] (Jia Decl. ¶¶ 14-15).

- TG has had a website since approximately 2003, some parts of which are in English.   (Peng Tr. 541:16:542:13).   TG's website is entirely passive; customers cannot purchase drywall or any other products through the website, nor can customers communicate with TG through the website.[6]  (Peng Tr. 542:14-543:5).

- TG never has had an office, bank account or agent appointed to accept service of process in Virginia.[7]  (Jia Decl. ¶¶ 16-18).

- TG never has paid taxes or had a mailing address in Virginia.  (Jia Decl. ¶¶ 18, 23; Jia Tr. 537:1-4).

- TG never has owned or leased any real or personal property in Virginia.  (Jia Decl. ¶ 16; Jia Tr. 535:20-24, 538:15-18).

- TG never has paid any taxes in Virginia, or registered to do business there. (Jia Decl. ¶¶ 19-20; Jia Tr. 536:12-15).

---

[5]  *See* transcript of the deposition of Peng Wenlong which took place on April 7 and 8, 2011 and January 13, 2012 ("Peng Tr.") at 528:1-3, a complete copy of which, including Exhibits 1 through 23, is attached to the Spano Decl. as Exhibit 3.

[6]  *See* transcript of the deposition of Fu Tinghuan, which took place on January 10, 2012 ("Fu Tr.") at 78:12-18, a complete copy of which, including Exhibits 1 through 4, is attached to the Spano Decl. as Exhibit 6.

[7]  *See* transcript of the deposition of Jia Tongchun, which took place on April 4 and 5, 2011 and January 9 and 10, 2012 ("Jia Tr.") at 536:1-4, 537:5-8, a complete copy of which including Plaintiffs' Exhibits 1 through 36 and Defendants' Exhibits 1 through 47A, is attached to the Spano Decl. as Exhibit 2.

- TG never has maintained a place of business in Virginia.  (Jia Decl. ¶¶ 21-24).

- No employees, officers, directors or agents of TG have ever resided in or visited Virginia.[8]  (Jia Decl. ¶¶ 24-25; Jia Tr. 537:13-17; Peng Tr. 38:3-5, 275:7-11).

- None of TG's employees have ever attended a trade show or exhibition in the U.S.  (Peng Tr. 273:13:274:13).

**B.**     **TG Made Only Two Isolated Sales In China To Venture Supply**

Over its entire history TG made only two sales to a U.S. company.[9]  TG sold drywall in China to Venture Supply Inc. ("Venture Supply"), a company based in Virginia.  (*See* TG's MPF).  TG delivered the drywall to Venture Supply at a Chinese port, and then Venture Supply shipped the drywall to the destination it selected.  (Peng Tr. 526:11-24).  TG never sold drywall in Virginia or shipped drywall to Virginia, or to any other State in the U.S.  (*See* Jia Decl. ¶¶ 13, 33; Peng Tr. 526:10-17; *see also* TG's MPF).  TG learned of Venture Supply's intended destination for the drywall but had no control over what Venture Supply did with the drywall after TG delivered it to the Chinese port.  TG completed its sales in China and did not care where Venture Supply shipped it.  (Peng Tr. 322: 5-323:18, 527:1-14).

In the fall of 2005, Venture Supply sent its representative to China to solicit business from TG.  (Jia Decl. ¶ 27; Peng Tr. 366:10-17).  Phillip Perry of Tobin Trading, identified himself as a representative of Venture Supply, contacted TG and asked whether TG could make drywall in 1/2" thickness.  (Jia Decl. ¶ 26; Peng Tr. 366:10-370:4, 519:11-17; Spano Decl. Ex. 9).  Perry visited TG's manufacturing plant in November 2005.  (Jia Decl. ¶ 27; Peng Tr. 366:10-14),

---

[8] *See* transcript of the deposition of Zhang Jianchun, which took place on April 6, 2011 ("Zhang Tr.") at 83:7-17, a complete copy of which, including Exhibits 13 through 17, is attached to the Spano Decl. as Exhibit 4.

[9] *See* TG's Manufacturer's Profile Form, dated October 13, 2010 ("TG's MPF"), a copy of which is attached to the Spano Decl. as Exhibit 8.  Peng Wenlong, who was the manager of the foreign sales department at TG between 2005 and February 2006, and who oversaw the sales activities of TTP between February 2006 and January 2008, testified that he reviewed the records of TG and that the information contained in TG's MPF was accurate.  (*See* Peng Tr. 531:6-20).

and Venture Supply negotiated two contracts with TG in China.[10]   (Jia Decl. ¶¶ 27, 30; *see* also Spano Decl. Exs. 10, 11).  The Venture Supply Contracts were executed in China and provided that any disputes arising from their performance would be resolved in China through arbitration before the Foreign Trade Arbitration Commission of the China Council for the Promotion of International Trade.  (*See* Venture Supply Contracts; Peng Tr. 370:13-16, 371:3).

The Venture Supply Contracts required TG to deliver drywall to Venture Supply in China, FOB a Chinese port.[11]   (Jia Decl. ¶¶ 27, 28, 30; Spano Decl. Exs. 14, 15).  The FOB sales were implemented as follows:  Venture Supply decided where it wanted to ship the drywall and made arrangements to ship the drywall from a port in China to its intended destination.[12]   (Peng Tr. 371:9-24, 518:3-10; Spano Decl. Ex. 16).   TG provided Perry with contact information for shipping agents, and passed on information concerning available ships, freight rates, and similar information.  (Peng Tr. 357:12-358:14, 372:13-374:8; Spano Decl. Ex. 16).

Venture Supply decided where to ship the drywall, when to ship the drywall, and by what means.  (*Id.*)  Venture Supply's shipping agent prepared a Bill of Lading and related shipping documents and provided copies of them to TG.   (Spano Decl. Exs. 17, 18; Peng Tr. 362:10-364:5).  According to information provided by Venture Supply's shipping agent, Venture Supply shipped the drywall it purchased under the first contract to Norfolk, Virginia, and shipped the

---

[10] Attached to the Spano Decl. as Exhibits 12 and 13 are copies of the only two contracts between TG and a Virginia entity, Venture Supply, dated November 17, 2005 and December 16, 2005, respectively ("Venture Supply Contracts").

[11] "FOB" stands for "Free on Board".  *See* INVESTOPEDIA, definition of "Free on Board – FOB", *available at* http://www.investopedia.com/terms/f/fob.asp#axzz1quo6ICYd (last visited April 2, 2012).  "Free on Board" is a "trade term requiring the seller to deliver goods on board a vessel designated by the buyer.  The seller fulfills its obligations to deliver when the goods have passed over the ship's rail."

[12] *See* transcript of the deposition of Sam Porter, President of Venture Supply, taken December 16 and 17, 2009, at 66:15-67:9, relevant excerpts of which are attached to the Spano Decl. as Exhibit 7.

drywall it purchased pursuant to the second contract to Camden, New Jersey.[13]  (Spano Decl. Exs. 17, 18, 21).  Because Venture Supply had arranged to pay TG for the drywall by Letters of Credit in China, the shipping documents were required to be presented to a bank in China in order for TG to get paid.  (*See* Spano Decl. Ex. 19).[14]

Based upon information from Venture Supply's shipping agent, TG prepared a Tai'an Shandong Special Invoice for Export ("Export Invoice").  (Jia Decl. ¶ 34; Spano Decl. Ex. 20). The tax authorities required all companies selling goods to be exported out of China to complete an Export Invoice.  (Peng Tr. 323:2-324:24, 431:10-23).[15]  The main purpose of the Export Invoices was to record that the goods were being sold for export, so any VAT tax that had been paid could be eligible for refund.  TG is listed as the "exporter" on the Export Invoices, indicating that the goods were sold in China for export.  (*See* Spano Decl., Ex. 20).

TG delivered the drywall by truck to the Chinese port selected by Venture Supply. (Spano Decl. Ex. 16; Peng Tr. 526:18-24).  At the port, TG surrendered possession of the drywall to Venture Supply's shipping agent and the sale was complete.  (Jia Decl. ¶¶ 32, 33). After TG delivered the drywall in China, Venture Supply paid TG and TG had no further involvement with the goods.  (Peng Tr. 526:10-24).

---

[13] Venture had some trouble finding a shipper for the second shipment of drywall purchased from TG and contemplated shipping the drywall to ports other than Norfolk or Camden, including ports in Mobile and New Orleans.  (*See* Spano Decl. Ex. 22; Porter Tr. 254:10-255:14).  TG had no involvement in these decisions.  (*Id.*). The second shipment ultimately went to Camden, New Jersey.

[14] The Bill of Lading provided by Venture Supply's shipping agent list TG as the "shipper."  This, however, only signified that TG surrendered possession to the shipping agent who arranged to load the drywall on the ship that Venture Supply selected and paid for through its shipping agent.

[15] *See also* transcript of the deposition of Che Gang, taken on January 11 and 12, 2012 ("Che Tr.") at 67:14,-68:7, 69:11-20, 70:15-71:5, a complete copy of which, including Plaintiffs' Exhibits 1 through 32 and Defendants' Exhibits 1 and 2, is attached to the Spano Decl. as Exhibit 5.

The testimony cited from the Peng Tr. and Che Tr. discusses Export Invoices related to a sales transaction between TTP and another entity.  However, the form of the Export Invoice used for the sales to Venture Supply was the same, and thus, this testimony is also applicable here.

TG did not intend or expect that Venture Supply would re-sell the drywall in Virginia. Ventura Supply did not advise TG it was planning to do so.  (Jia Tr. 543:1-14; Peng Tr. 332:15-20).  TG was never involved in the sale, distribution, installation or use of drywall in Virginia. (Jia Decl. ¶ 33).  Other than its two isolated sales to Venture Supply, TG did not sell any other products to any U.S. companies.  (*See* TG's MPF).

## ARGUMENT

## I.   THE DEFAULT SHOULD BE VACATED BECAUSE THE COURT LACKS PERSONAL JURISDICTION OVER TG

"Federal Courts generally disfavor default judgments, preferring to resolve disputes according to their merits."  *Harper Macleod Solicitors v. Keaty & Keaty*, 260 F.3d 389, 393 (5th Cir. 2001); *see Amberg v. FDIC*, 934 F.2d 681, 686 (5th Cir. 1991) ("Defaults are not favored and their strict enforcement 'has no place in the Federal Rules.'").  Fed. R. Civ. P. 55(c) provides that the court "may set aside a default judgment under Rule 60(b)."  Rule 60(b) provides, *inter alia*,

> (b)     On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order or proceeding for the following reasons:
>
> > (1)  mistake, inadvertence, surprise or excusable neglect; . . .
> >
> > (4)  the judgment is void;  . . .
> >
> > (6)  any other reason that justifies relief.

Rule 60(b)(4) compels the Court to vacate a default judgment where personal jurisdiction is lacking and/or service if process was insufficient.  Rule 60(b)(4) "embodies the principle that in federal court, a defendant is always free to ignore judicial proceedings, risk a default judgment, and then challenge that 'judgment on jurisdictional grounds.'"  *Jackson v. FIE Corp.*, 302 F.3d 515, 522 (5th Cir. 2002) (citation omitted).

10

Governing Law

This action was originally filed in the Eastern District of Virginia and transferred to this Court in accordance with 28 U.S.C. § 1407. Consequently, this Court must determine whether the transferor court in Virginia could exercise personal jurisdiction over TG. *See In re WellNx Mktg. & Sales Practices Litig.*, No. 07-1861, 2010 WL 3652457, at *1 (D. Mass. Sept. 15, 2010) ("In an MDL case, personal jurisdiction is derived from the transferor court.") (citing *In re Pabst Licensing GMBH & Co. KG Litig.*, 602 F. Supp. 2d 10, 14 (D.D.C. 2009) ("In multidistrict litigation such as this, the transferee court must apply the law of the transferor forum to determine personal jurisdiction."); *In re Sterling Foster & Co., Sec. Litig.*, 222 F. Supp. 2d 289, 300 (E.D.N.Y. 2002) (applying the Long-Arm Statute of the transferor forum in multidistrict litigation)). *See also In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, No. 07-1873, 2010 WL 1489894, at *1 (E.D. La. Apr. 12, 2010); *Van Dusen v. Barrack*, 376 U.S. 612, 639-40 (1969). *Accord In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 767 F. Supp. 2d 649, 656-57 n.2 (E.D. La. 2011) ("If the cases were transferred by the MDL Panel to this Court for consolidation, the Court would be obligated under the same Fifth Circuit law to look to the law of the foreign forum to determine personal jurisdiction"). (*See also* Doc. No 10269 at 15).

To determine whether there is a basis for personal jurisdiction over TG in Virginia, a district court is required to apply a two-part analysis. *City of Virginia Beach v. Roanoke River Basin Ass'n*, 776 F.2d 484, 487-88 (4th Cir. 1985). *First*, the court must look to the law of Virginia to determine whether there is jurisdiction over the defendant. *Id.* *Second*, the court must determine whether the exercise of jurisdiction is consistent with federal Due Process requirements. *Id.* Thus, "[a] federal district court may only exercise personal jurisdiction over a foreign corporation if such jurisdiction is authorized by the long-arm statute of the state in which it sits and the application of the long-arm statute is consistent with the due process clause of the

11

Fourteenth Amendment." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009).

<u>Burden of Proof</u>

Although this Court must determine whether the Eastern District of Virginia has a basis for personal jurisdiction over TG, the burden of proof is governed by the law of this Court and the Fifth Circuit.  Plaintiffs have the burden of proving: (1) that the defendant has minimum contacts with the forum state, *i.e.*, that it "purposely directed its activities toward the forum state or purposely availed itself of the privilege of conducting activities there, [and that] (2) the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts."  *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 272 (5th Cir. 2006).  If the plaintiff satisfies those elements, the burden then shifts to the defendant to prove that the exercise of personal jurisdiction is not fair and reasonable.  *Id.*  Where, as here, the Court is conducting an evidentiary hearing, Plaintiffs must establish jurisdiction by a preponderance of the evidence.  *See Walk Haydel & Assoc., Inc.*, 517 F.3d at 241-42.[16]

**A.**     **Plaintiffs Are Unable To Satisfy Virginia's Long-Arm Statute**

<u>TG Did Not Transact Business In Virginia</u>

TG did not transact business in Virginia pursuant to Va. Code Ann. § 8.01-238.1(A)(1) of the long-arm statute.[17]  A contract between a resident and a non-resident defendant does not, by

---

[16] A majority of the district courts in the Fifth Circuit place the burden on the plaintiff even where a default judgment has been entered (*see, e.g. Rockwell Int'l Corp. v. KND Corp.*, 83 F.R.D. 556, 559 n.1 (N.D. Tex. 1979); *Morris v. B.C. Olympiakos*, *SFP*, 721 F. Supp. 2d 546, 556-7 (S.D. Tex. 2010)), although the Fifth Circuit has not expressly resolved this issue (*Jackson*, 302 F.3d at 521, n.6).

[17] The Virginia long-arm statute, Va. Code Ann. § 8.01-328.1 provides as follows in relevant part:

A. A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action *arising from* the person's:

1. Transacting any business in this Commonwealth;

itself, provide sufficient minimum contacts for personal jurisdiction. *Bay Tobacco, LLC v. Bell Quality Tobacco Prod., LLC*, 261 F. Supp. 2d 483, 493 (E.D. Va. 2003) (citing *Ellicott Machine Corp., Inc. v. John Holland Party Ltd.*, 995 F.2d 474, 478 (4th Cir. 1993); *America Online, Inc. v. Huang*, 106 F. Supp. 2d 848, 855-56 (E.D. Va. 2000)).   Instead, the court will examine the following: "(1) where the contract was negotiated and executed, (2) who initiated the contact, (3) the extent of the communications . . . between the parties, and (4) where the obligations of the parties under the contract were to be performed. *Bay Tobacco*, 261 F. Supp. 2d at 493 (citing *Affinity Memory & Micro, Inc. v. K & Q Enter.*, 20 F. Supp. 2d 948, 952 (E.D. Va. 1998); *Peanut Corp. of Am. v. Hollywood Brands, Inc.*, 696 F.2d 311, 314 (4th Cir. 1982); *English & Smith v. Metzger*, 901 F.2d 36, 39 (4th Cir. 1990). Thus, in *Bay Tobacco*, where a Virginia based plaintiff initiated contact with defendant  in North Carolina, where there was no evidence that the agreement was executed in Virginia, and where defendant delivered cigarettes FOB North Carolina for transport into Virginia, the court found that the defendant had not transacted business in Virginia within the meaning of the long-arm statute. *Accord* Letter Opinion of Judge

---

2. Contracting to supply services or things in this Commonwealth;

3. Causing tortious injury by an act or omission in this Commonwealth;

4. Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth;

5. Causing injury in this Commonwealth to any person by breach of warranty expressly or impliedly made in the sale of goods outside this Commonwealth when he might reasonably have expected such person to use, consume, or be affected by the goods in this Commonwealth, provided that he also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth;

*       *       *

C. When jurisdiction over a person is based solely upon this section, only a cause of action *arising from* acts enumerated in this section may be asserted against him; however, nothing contained in this chapter shall limit, restrict or otherwise affect the jurisdiction of any court of this Commonwealth over foreign corporations which are subject to service of process pursuant to the provisions of any other statute.

(emphasis added).

Karen J. Burrell, *Frizzell v. Danieli Corp., et al.,* CL09-5120 (Va. Cir. Ct. Norfolk Dec. 22, 2010).

<u>TG Does Not Regularly Do or Solicit Business in Virginia</u>

Only two other provisions of the Virginia long-arm statute are potentially applicable to the facts alleged.  They are Va. Code Ann. § 8.01-328.1(A)(4) and (5).  Subsection 4 states the circumstances under which a foreign defendant may be subject to personal jurisdiction arising from conduct "[c]ausing tortious injury in this Commonwealth by an act or omission outside this Commonwealth . . ." and subsection (5) states the circumstances under which a defendant may be subject to jurisdiction for conduct "[c]ausing injury in this Commonwealth to any person by breach of warranty expressly or impliedly made in the sale of goods outside this Commonwealth . . ."  Both subsections require, among other things, that the foreign defendant also "regularly does or solicits business or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth."

TG never has manufactured, advertised, sold or distributed drywall in Virginia or engaged in conduct of any kind in Virginia.  TG sold and delivered drywall to Venture Supply in China and nowhere else.  It plainly, then, does not regularly do or solicit business in Virginia as required by both subsections (4) and (5) of the statute.  Likewise, since the evidence shows TG did not intend or have an expectation that the drywall it sold to Venture Supply would be re-sold or used in Virginia, *see* p. 10, *supra*, Plaintiffs also cannot prove that TG "might reasonably have expected such person to use, consume, or be affected by goods in this Commonwealth."

And, there is no basis to conclude that TG "derives substantial revenue" from drywall "used or consumed" in Virginia.  Furthermore, even if the amount that Venture Supply paid TG

when it purchased drywall in China was considered as revenue TG derived from drywall used in Virginia, it was not substantial revenue to TG.  Venture Supply's purchase was an infinitesimal part of TG's total sales.[18]  Under the circumstances, TG's isolated sales to Venture Supply do not "evidence the regularity persistency, or substantiality of contact which would adequately satisfy the alternate requirements of subsections (4) and (5) of the above Virginia long arm statute."  *Gordonsville Indus., Inc. v. Am. Artos Corp.*, 549 F. Supp. 200, 203 (W.D. Va. 1982) (revenue of $13,955 received by non-resident to design and manufacture hot oil boiler for Virginia resident did not meet requirements for "substantial revenues from goods used or consumed or services rendered" in Virginia; in addition the exercise of jurisdiction would violate due process).[19]

Based on the foregoing, TG is not subject to personal jurisdiction under Virginia's long-arm statute, and the Court's jurisdictional analysis should not proceed any further.  *See Desantis v. Hafner Creations*, 949 F. Supp. 419, 423 (E.D. Va. 1996) (Virginia long-arm statute extends personal jurisdiction to the boundaries of Due Process, "[b]ut it is equally well-settled that Virginia's long-arm statute must be satisfied even in those situations where it could plausibly be argued that a lesser standard would meet due process") (internal quotation marks and citation omitted).

### B.   Plaintiffs Are Unable To Satisfy The Requirements Of Due Process

Consistent with the requirements of Due Process, and assuming that the relevant long-arm statute has been satisfied, the Fourth Circuit engages in a three-part inquiry to determine

---

[18] TG received $358,000 from its sale to Venture Supply that Venture Supply shipped to Virginia.  In 2006, TG's total sales revenue was over $97,000,000.  (Jia Tr. Def's Ex. 30A).  Thus, the Venture Supply sale was 0.37% of TG's total sales received that year.

[19] In addition, to satisfy subsection 5 of the long arm statute, Plaintiffs would also be required to meet their burden of proving that when TG sold drywall in China to Venture Supply it "reasonably expected" that Plaintiffs would use that drywall in Virginia, a fact that Plaintiffs cannot establish based on the evidence.

whether specific jurisdiction exists over a non-resident defendant.  *Consulting Engr's*, 561 F.3d at 278.  *First*, it considers "the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State."  *Id.  Second*, "whether the plaintiffs' claim arises out of those activities."  *Id.   Third*, "whether the exercise of personal jurisdiction would be constitutionally reasonable."  *Id.* (citation omitted).  All three prongs of the test must be satisfied for jurisdiction to comport with Due Process.  *Id.* at 279.  In this case, the record evidence shows that the three prongs of Due Process are not met, and the Court cannot exercise personal jurisdiction over TG.

### 1.    Plaintiffs Cannot Establish That TG Had Minimum Contacts With Virginia

Even when a case meets the requirements of a state long-arm statute, a forum state court is restrained from exercising personal jurisdiction by Due Process.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980).  The Due Process clause of the Fourteenth Amendment of the U.S. Constitution provides:  "[N]or shall any State deprive any person of life, liberty or property, without Due Process of law . . . ."  U.S. Const. Amend. XIV, § 1.  To satisfy constitutional due process requirements, a defendant must have sufficient "minimum contacts" with the forum State such that the maintenance of the "suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation and citation omitted).  The *International Shoe* test has two elements, requiring (1) a claim that arises out of or relates to actions by the defendant that are directed towards forum residents and (2) circumstances where jurisdiction would not otherwise offend "fair play and substantial justice."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 477 (1985).

The first element – minimum contacts – is required because Due Process "does not contemplate that a state may make a binding judgment *in personam* against an individual or

corporate defendant with which the state has no contacts, ties, or relations." *Int'l Shoe*, 326 U.S. at 319.[20]   Jurisdiction can only be exercised where the defendant's contacts have created a "substantial connection" with the forum State.  *Burger King Corp.*, 471 U.S. at 475.   Thus, regardless of how convenient the forum might be to the plaintiff, or how strong the forum State's interest in applying its law to the controversy, Due Process does not permit a court to exercise jurisdiction over a defendant who does not have the required level of minimum contacts with the forum State.  *World-Wide Volkswagen Corp.*, 444 U.S. at 294.   Nevertheless, even if minimum contacts are present, the second element – requiring that an assertion of jurisdiction be constitutionally fair and reasonable – may be absent, requiring the Court not to exercise jurisdiction even if plaintiffs prove minimum contacts.  *Burger King*, 471 U.S. at 476-477. These considerations of fairness and their application to this case are discussed in Section 1(B)(3), *infra*.  Thus, the Supreme Court's precedents have consistently required both minimum contacts with a particular State forum as well as circumstances that render the assertion of jurisdiction fair and reasonable.

<u>Plaintiffs Must Show Purposeful Availment Of The Forum State</u>

To satisfy the requirement of minimum contacts, "purposeful availment" of the forum State must be shown.  "[I]t is essential in each that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus

---

[20] The current Justices of the Supreme Court have expressed different views about the underlying rationale for the requirement of minimum contacts with a particular State forum.  According to Justices Kennedy, Roberts, Scalia and Thomas, the four Justices who comprised the plurality in the Supreme Court's recent ruling in  *Nicastro v. J. McIntyre Machinery, Ltd*., 131 S. Ct. 2780 (2011), the requirement of minimum contacts exists mainly to ensure that any person subject to jurisdiction has done purposeful acts sufficient to submit himself to the forum State's sovereign power.  121 S. Ct. at 2787-88.  Justice Breyer, in his concurring opinion joined by Justice Alito, did not discuss limitations on sovereignty as the main rationale for requiring purposeful minimum contacts.  Instead, Justice Breyer focused on the Court's prior explanations of minimum contacts as having been centered on whether "it is fair, in light of the defendants contacts *with that forum*, to subject the defendant to suit there."  131 S. Ct. at 2793 (emphasis in original).  The dissent, written by Justice Ginsburg, with whom Justices Sotomayor and Kagan joined, viewed the constitutional limits on the adjudicatory authority of a court in a particular state as a protection of individual liberty, not a question of submission to state sovereignty.  131 S. Ct. at 2793.

invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), *citing Int'l Shoe,* 326 U.S. at 319. In addition to showing that the defendant "purposefully directed his activities at the residents of the forum," a plaintiff must also demonstrate that his cause of action "arise[s] out of" those activities. *Burger King Corp. v. Rudzewicz*, 417 U.S. 462, 472 (1985) (citation and quotation omitted). The purposeful availment requirement ensures that the defendant is not "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Id.* at 475 (quotations and citations omitted). It also protects a defendant from having to defend himself in a forum where he should not have anticipated being sued. *See World-Wide Volkswagen Corp.*, 444 U.S. at 297.

There are two forms of personal jurisdiction: general and specific. General jurisdiction is necessary to adjudicate claims that are not related to a defendant's contacts with the forum state. *Helicopteros Nacionales de Columbia, S.A.  v. Hall*, 466 U.S. 408, 414 nn. 8 & 9 (1984). "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 131 S. Ct. 2846, 2851 (2011) (citing *Int'l Shoe*, 326 U.S. at 317). Specific jurisdiction is a more limited form of jurisdiction which can be asserted for disputes that "arise out of or are connected with the activities within the state" by the defendant. *Int'l Shoe,* 326 U.S. at 319; *Helicopteros Nacionales,* 466 U.S. at 414 n.9.

A plaintiff may establish a basis for specific jurisdiction if it can prove that the out-of-state defendant "purposefully directed his activities at the residents of the forum" and that plaintiff's claim "arise[s] out of those activities." *Burger King,* 471 U.S. at 472. (internal quotations and citations omitted). The "purposeful availment" requirement for specific

jurisdiction may be satisfied "where the contacts proximately result from actions by the defendant *himself* that create a *substantial connection* with the forum State." *Burger King Corp.*, 471 U.S. at 472 (quoting *McGee v. Int'l Life Ins. Co.*, 335 U.S. 220, 223 (1957)) (emphasis is in original). However, "some single or occasional acts" related to a forum State may not be sufficient to establish minimum contacts with that State if "their nature and quality and the circumstances of their commission" create only an attenuated connection between the defendant and the forum State. *Int'l Shoe*, 326 U.S. at 318. The conduct of other parties cannot establish purposeful availment by the defendant of the forum State. A defendant will not be haled into a jurisdiction as a result of the "unilateral activity of those who claim some relationship with a nonresident defendant." *Helicopteros Nacionales*, 466 U.S. at 417. As summarized below, the Supreme Court has provided guidance on the application of the Due Process requirement to questions of specific jurisdiction.[21]

<u>World-Wide Volkswagen</u>

In *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980), the Supreme Court reiterated the purposeful availment requirement, and explained that it is not satisfied merely because a defendant sold a product outside of the State when it was foreseeable the product might cause injury in the State. The Court held that a New York automobile retailer and distributor were not subject to jurisdiction in Oklahoma even though it was *foreseeable* that the purchaser might bring the automobile to Oklahoma. "It is argued, however, that . . . it was

---

[21] In the PSC's response to TG's initial motion to vacate, the PSC stated that "[t]he sum of all of these contacts pertaining to Taishan's sales of its problematic drywall in Virginia specifically as well as in other parts of the United States permit the exercise of jurisdiction over Taishan in these proceedings." (Doc. No. 6248 at 15). Accordingly, it appears that Plaintiffs have opposed this motion by arguing the Court has specific jurisdiction over TG. Plaintiffs have not argued that the Court has general jurisdiction over TG, nor could they. As discussed below, TG's isolated sales to Venture Supply in China are insufficient to establish minimum contacts for specific jurisdiction, and they are even further below the level of continuous and systematic contacts with Virginia that are necessary to establish general jurisdiction.

'foreseeable' that the Robinson's Audi would cause injury in Oklahoma.  Yet 'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process clause." 444 U.S. at 295.  Instead, "the foreseeability that is critical to due process analysis . . . is that the *defendant's conduct and connection with the forum State* are such that he should reasonably anticipate being haled into court there."  *Id.* at 297 (emphasis added).

The Supreme Court further explained, in *dicta*, that the requirement of purposeful availment may be satisfied if "a corporation . . . delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state."  *Id.* at 298-299. [22]  For example, if sales of a defendant's products in the State are not an isolated occurrence but result from its efforts to serve the market in the State, it may have an "expectation" that its products would be purchased in the State, and should reasonably anticipate being subject to suit there.  *Id.* at 297-298.

<u>Burger-King</u>

In *Burger King*, the Supreme Court considered whether Due Process permitted personal jurisdiction in Florida over a Florida franchisor's breach of contract suit against its Michigan franchisee.  Apart from the franchise agreements at issue, the Michigan franchisee had no contacts with Florida.  The franchisee, however, regularly communicated with the franchisor's Miami headquarters both in forming the agreements and in seeking resolution of disputes and paid all monthly fees to the franchisor in Miami.

The Supreme Court held that Due Process embodies a "fair warning requirement" that is satisfied "if the defendant has 'purposefully directed' his activities at residents of the forum."

---

[22] The term "stream of commerce" refers to the commercial practice of selling a product to a third party for further sale to consumers.  *De James v. Magnificent Carriers, Inc.*, 654 F.2d 280, 285 (3d Cir. 1981); *Prototype Prod., Inc. v. Reset, Inc.*, No. 11-196, 2011 WL6960617 (E.D. Va. Oct. 14, 2011).

471 U.S. at 472 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). The Court also explained the weight to be given to a contract with a forum State resident:

> If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.

471 U.S. at 478 (emphasis in original).

Applying these principles to the Michigan franchisee, the Supreme Court found Due Process was satisfied because the franchise relationship had a "substantial connection" with Florida. The franchisee had "deliberately 'reach[ed] out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise"; the franchise was "a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida, which included a choice of Florida law in the franchise agreement." 471 U.S. at 479-480. (internal citations omitted)

<u>Asahi</u>

A few years later, in *Asahi Metal Indus. Co., Ltd. v. Superior Court*, 480 U.S. 102, 109, 116-117 (1987), the Supreme Court addressed Due Process in the context of a "stream of commerce" case. The Court unanimously held that a Japanese tire valve manufacturer's sale of hundreds of thousands of tire valves to a Taiwanese motorcycle tire manufacturer who incorporated the valves into tires shipped to California, was not subject to personal jurisdiction in California in the tire manufacturer's indemnification suit. The Supreme Court explained that "[c]onsidering the international context, the heavy burden on the alien defendant, and the slight

interests of the plaintiff and the forum State, the exercise of personal jurisdiction by a California court over *Asahi* in this instance would be unreasonable and unfair." 480 U.S. at 116.[23]

A majority of the Justices in *Asahi*, however, did not agree on whether the seller of the valves had purposefully availed itself of a California forum. Four members of the Court, in an opinion written by Justice O'Connor, held that taking into account the valve manufacturer's complete lack of activities directed at California and the fact that it did not create, control or employ the distribution system that brought its valves into California, the valve manufacturer had not purposely availed itself of a California forum, even assuming it was aware that some of its valves would be incorporated in tire tubes sold in California. *Id.* at 113. According to Justice O'Connor, Due Process required more than mere awareness of the product's possible entry into the forum state through the stream of commerce:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. *But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.*

480 U.S. at 112 (emphasis added).

---

[23] All nine Justices agreed that exercising personal jurisdiction would be unfair and unreasonable, in violation of Due Process. In *Asahi*, Justice O'Connor delivered the opinion of the plurality of the Court, joined by Justices Rehnquist, Powell and Scalia, finding that the defendant did not have sufficient minimum contacts with the forum State, and that the exercise of jurisdiction would not be fair and reasonable. 480 U.S. at 114-116. Justice Brennan, in an opinion joined by Justices White, Marshall and Blackmun agreed that exercising jurisdiction would not be fair and reasonable, but contended there had been purposeful availment by the foreign defendant. *Id.* at 116. Justice Stevens wrote a separate opinion, joined by Justices White and Blackmun, also agreeing that the exercise of personal jurisdiction would not be reasonable and fair, but contending that this finding rendered unnecessary any examination of minimum contacts. *Id.* at 121-122.

Thus, Justice O'Connor's opinion required "something more" than "mere awareness that the manufacturer's product would be marketed in the forum State" and provided examples of affirmative conduct specifically targeting or directed to the forum State that might satisfy the requirement of purposeful availment.  Four Justices, in a decision written by Justice Brennan, concluded that the valve manufacturer purposefully availed itself of a California forum principally because it (1) was aware of the operation of the distribution system that resulted in the tires being sold in California, (2) knew it would benefit economically from the sale of tires in California, and (3) had made regular and extensive sales of its valves to a manufacturer it knew was making regular sales of the final product in California.  *Id.* at 121.  According to Justice Brennan, Due Process is satisfied when a defendant has a "regular and anticipated flow" of its products into the stream of commerce with an awareness that its products would be marketed in the forum State:

> The stream of commerce refers not to unpredictable currents or eddies, but to the *regular and anticipated flow of products* from manufacture to distribution to retail sale.  As long as a participant in this process is aware that the final product is being marketed in the forum state, the possibility of a lawsuit there cannot come as a surprise.

*Id.* at 116 (emphasis added).

The concurring opinion of Justice Stevens in *Asahi*, with whom Justices White and Blackmun joined, would not reach the question of purposeful availment because of the conclusion that the assertion of jurisdiction would be unfair and unreasonable.  Nevertheless, Justice Stevens also observed that the valve manufacturer had done something more than merely being aware that its products might be sold in California:  "I would be inclined to conclude that a regular course of dealing that results in deliveries of over 100,000 units annually over a period of

several years would constitute 'purposeful availment.'"  *Id.* at 122 (Stevens, J. concurring in part and concurring in the judgment).

A close reading of the concurring opinions in *Asahi* also indicates that while each disagreed with Justice O'Connor's statement of the purposeful availment standard, each found the valve manufacturer had in fact engaged in additional activity beyond merely just being aware its product might be re-sold in the forum State.  Justice Brennan found the requisite showing of purposeful availment based on the valve manufacturer's awareness of the distribution system that resulted in its products being sold in California, the economic benefits it derived from sales in California, and its "regular and extensive sales of component parts to a manufacturer it knew was making regular sales of the final product in California."  *Id.* at 121.

<u>Nicastro</u>

In June 2011, the Supreme Court issued its ruling in *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011).  *Nicastro* was decided by a plurality of four Justices, with the concurrence of two Justices. A majority of the Court reiterated the requirement of purposeful availment of a particular State forum in a stream of commerce case, and rejected arguments that a defendant who introduced its products into the stream of commerce could be subject to personal jurisdiction merely because it could foresee or expect that its product would be re-sold in the forum State.

In *Nicastro,* the plaintiff had injured his hand on a metal shearing machine installed at his New Jersey workplace.  The metal shearing machine was manufactured by defendant J. McIntyre Machinery, Ltd. ("McIntyre"), a company based in the United Kingdom.  For several years prior to the accident, McIntyre had used McIntyre America, an Ohio-based company as the exclusive U.S. distributor for its machines.  Through its U.S. distributor, McIntyre had sold up to four

machines that ended up in New Jersey.  Between 1990 and 2005, McIntyre officials travelled to a number of industry conventions in various U.S. cities where McIntyre promoted sales of its machines.  Plaintiff's employer attended at least one of the conventions, after which he purchased the McIntyre metal shear involved in the accident.  131 S. Ct. at 2786.  McIntyre also advertised the machines on its website, held U.S. and U.K. patents on its technology, and referred to "American National Standards Regulations" for the use of scrap metal processing equipment in its product brochure.  *Id.* at 2795 (Ginsburg, J., dissenting opinion).

The New Jersey Supreme Court adopted Justice Brennan's *Asahi* test and concluded it could exercise personal jurisdiction because McIntyre "knew or reasonably should have known that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states" and McIntyre had "failed to take some reasonable step to prevent the distribution of its products in this State."  *Id.* at 2787 (internal quotation and citation omitted).  A majority of the U.S. Supreme Court justices rejected the standard announced by the New Jersey Supreme Court, and held that a non-resident manufacturer's marketing efforts directed to the U.S. generally, rather than toward a specific state, fail to satisfy the requirement of purposeful availment of the privilege of conducting activities in the forum State.  131 S. Ct. at 2790 (Kennedy, J., plurality opinion); *id.* at 2792, 2793 (Breyer, J., concurring in judgment).

Contrary to Justice Brennan's concurring opinion in *Asahi*, a majority of the Supreme Court in *Nicastro* also rejected the proposition that the foreseeability of litigation in the forum State, based on an awareness that the product is being marketed in the forum State, can be determinative of whether personal jurisdiction can be exercised consistent with Due Process.  As the plurality wrote:

>It was the premise of the [Justice Brennan] concurring opinion that the defendant's ability to anticipate suit renders the assertion of jurisdiction fair.  In this way, the opinion made foreseeability the touchstone of jurisdiction.
>
>\*                    \*                    \*
>
>But Justice Brennan's concurrence, advocating a rule based on general notions of fairness and foreseeability, is inconsistent with the premises of lawful judicial power.  *This Court's precedents make clear that it is the defendant's actions, not his expectations that empower a State's court to subject him to judgment*.

131 S. Ct. at 2788-89 (emphasis added).

Similarly, the concurrence rejected the New Jersey Supreme Court's "knows or reasonably should know" that the product might be sold in any state standard for purposeful availment.  As Justice Breyer wrote:

>[T]o adopt this view would abandon the heretofore accepted inquiry of whether, focusing upon the relationship between "the defendant, the *forum*, and the litigation," it is fair, in light of the defendant's contacts *with that forum*, to subject the defendant to suit there.  *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977) (emphasis added).  It would ordinarily rest jurisdiction instead upon no more than the occurrence of a product-based accident in the forum state.  But this Court has rejected the notion that a defendant's amenability to suit "travels with the chattel."  *World-Wide Volkswagen*, 444 U.S. at 296.

131 S. Ct. at 2793.

Therefore, Justice Breyer found that "I cannot reconcile so automatic a rule [as adopted by the New Jersey Supreme Court] with the constitutional demand for 'minimum contacts' and 'purposefu[l] avail[ment]', each of which rests upon a particular notion of defendant-focused fairness."  *Id.* at 2793 (citation omitted).  Considering the facts of *Nicastro*, Justice Breyer found that McIntyre neither purposely availed itself of the State of New Jersey nor delivered its goods in the stream of commerce with the "expectation" that they would be purchased by New Jersey users.  *Id.* at 2792.  Thus, the Supreme Court in *Nicastro* found that "expectation" is not a variant

of the requirement of purposeful availment in stream of commerce cases, <u>but rather that the</u> <u>"expectation" necessary for personal jurisdiction was not satisfied by a sale into the stream of</u> <u>commerce unaccompanied by specific efforts to sell to the forum State</u>. *Id.*[24]

A majority of the *Nicastro* Court thus resolved any doubt that "foreseeability" might be sufficient in stream of commerce cases. The Supreme Court has rejected the idea that foreseeability alone, or even awareness, that a defendants products might end up in a forum State is sufficient to show purposeful availment or an "expectation" that its product would be purchased by consumers in the forum State.

A growing number of courts has recognized that a majority of the *Nicastro* court rejected the idea that Due Process can be satisfied if it is merely shown that a non-resident "knew or should have known" that its product was distributed by a third party in the forum state and have instead required a showing of conduct specifically directed toward the forum State to establish purposeful availment. *See Windsor v. Spinner Indus. Co.*, No. 10-114, 2011 WL 5005199, at *4 (D. Md. Oct. 20, 2011) ("*McIntyre* clearly rejects foreseeability as the standard for personal jurisdiction . . . . That holding now commands the assent of six Justices of the Supreme Court, all on substantially the same grounds, and is therefore binding precedent."); *Smith v. Teledyne Cont'l Motors, Inc.*, No. 10-02152, 2012 WL 10836 (D. S.C. Jan. 3, 2012) (six Justices in *Nicastro* agreed that Justice O'Connor's test should be applied, although the concurrence

---

[24] Justice Ginsburg's dissent argued that McIntyre had purposefully availed itself of the forum State through its contacts with the U.S. as a whole:

"In sum, McIntyre UK, by engaging McIntyre America to promote and sell its machines in the United States, 'purposefully availed itself' of the United State market nationwide, not a market in a single State or a discrete collection of States. McIntyre UK thereby availed itself of the market of all States in which its products were sold by its exclusive distributor." 131 S. Ct. at 2801.

It is worth noting, however, that even the dissent did not find purposeful availment based only on the defendant's mere awareness that its product might be re-sold in a forum State. The dissent viewed McIntyre's regular attendance and exhibitions at industry conventions in the U.S. as a "purposeful step to reach customers for its products anywhere in the United States." *Id.* at 2798.

rejected the plurality's stricter approach emphasizing sovereignty); *Oticon v. Sebotek Hearing Sys., LLC*, No. 08-5489, 2011 WL 3702423, at *8-9 (D. N.J. Aug. 22, 2011) (the "plurality expressly rejected the test articulated by Justice Brennan in *Asahi*" . . . . and "Justice Breyer, in his concurrence, would not adopt as strict a rule as that enunciated by the plurality, but he too voiced his disagreement with the notion that mere foreseeability is the cornerstone of the stream of commerce jurisprudence."); *Dow Chem. Canada ULC v. Superior Court*, 202 Cal. App. 4th 170 (Cal. Ct. App. 2011) ("In . . . *Nicastro* . . . the Supreme Court resolved . . .); *Keranos, LLC v. Analog Devices, Inc.*, No. 10-207, 2011 WL 4027427, at *10 (E.D. Tex. Sept. 12, 2011) (adopting *Nicastro* plurality's test for amenability to jurisdiction in stream-of-commerce case);[25] *Highlands Fuel Delivery, LLC v. Am. Ins. Co.*, No. 11-00291, 2011 WL 7110393 (Super. Ct. N.H. Nov. 29, 2011) ("The Supreme Court's decisions in *J. McIntyre* (plurality plus the concurrence) reflect that the majority of the court did not accept what was termed the stream-of-commerce theory of jurisdiction adopted by the New Jersey Supreme Court, but instead insisted that more needs to be shown for the purposeful availment factor to be satisfied in a particular case."); *see also Northern Ins. Co. of New York v. Const. Navale Bordeaux*, No. 11-60462, 2011 WL 2682950, at *5 (S.D. Fla. July 11, 2011) (finding that six Justices in *Nicastro* reiterated importance of "purposeful availment" requirement and requiring "something more" than "merely placing a product into the stream of commerce); *May v. Osako & Co., Ltd.*, No. CL08002245-00, 2011 WL 4544889 (Cir. Ct. Va. Sept. 12, 2011) ("In *Nicastro*, the Supreme Court of the United States strongly affirmed Justice O'Connor's substantial connection analysis set forth in *Asahi* . . . over Justice Brennan's foreseeability test.")

---

[25] But *see Ainsworth v. Cargotec USA, Inc*., No. 10-236, 2011 WL 4443626, at * 2 (S.D. Miss. Dec. 15, 2011) (Justice Breyer's Opinion was the holding in *Nicastro* as he concurred in the Judgment on the narrowest ground and Justice Breyer's Opinion was only applicable to cases presenting the same factual scenario as *Nicastro*), *Lv. to appeal granted*, No. 11-90052 (5th Cir. Mar. 1, 2012).

<u>Undisputed Points</u>

Based upon the foregoing precedents, the following points of law cannot be disputed.

1.      Due Process requires purposeful availment of a particular State forum.

2.      A national marketing campaign as in *Nicastro* does not satisfy purposeful availment of any particular State forum.

3.      A sales contract between a foreign seller and a resident buyer is not sufficient in and of itself to show purposeful availment.

4.      A sale into the stream of commerce, unaccompanied by specific efforts to sell to the forum State, does not satisfy the requirement of purposeful availment, even when it is foreseeable that the product will end up in the forum state.

5.      When a forum resident has initiated contact with a foreign manufacturer, and negotiations for the resulting contract all occurred outside of the forum, no purposeful availment has been shown.

6.      Contractual choice of law is a factor to be considered in evaluating purposeful availment and the choice of foreign law indicates that the seller did not avail itself of the benefits and protections of the forum.

As explained below, applying the law to the evidence in this case compels the conclusion that the Court may not exercise jurisdiction over TG.

      a.     <u>Plaintiff Cannot Prove TG Purposefully Availed Itself Of The Virginia Market</u>

Comparing the facts of this case to those in *Nicastro* illustrates that Plaintiffs cannot show that TG purposefully availed itself of the Virginia market and that TG therefore lacks the minimum contacts with Virginia required for personal jurisdiciton by Due Process.  McIntyre, the foreign manufacturer that the Supreme Court found was not subject to jurisdiction in New Jersey, sold its products to a distributor located in Ohio, with the understanding that its products would be re-sold throughout the United States.  McIntyre attended conventions in the U.S. along with its distributor to advertise its products.  The U.S. distributor structured its advertising and sales efforts with McIntyre's direction and guidance.  McIntyre sold some of its machines on

consignment.  McIntyre held both U.S. and European patents on its technology.  As the plurality found, McIntyre "directed marketing and sales efforts at the United States."  As the concurrence wrote, McIntyre, "permitted, indeed wanted its independent American Distributor to sell its machines to anyone in American willing to buy them . . . ."  Nonetheless, as the majority found, McIntyre had no office in New Jersey, did not pay taxes or own property in New Jersey, and neither advertised nor sent any employees in New Jersey; its only contact with New Jersey was that its distributor sent one or up to four machines there.  As the concurrence wrote, McIntyre had no "regular . . . flow" or "regular course" of sales in New Jersey, and there was no 'something more', such as state-related design, advertising, advice, marketing or anything else." There was no showing of any specific effort to sell in New Jersey.  Thus, there was no showing that McIntyre had "'purposefully availed itself of the privilege of conducting activities in New Jersey," or that McIntyre "delivered its goods in the stream of commerce 'with the expectation that they will be purchased' by New Jersey users."

Like McIntyre, TG made no sales in the forum State, did not make any effort to market its products to the forum State, did not advertise there, and had no offices, employees or property in the forum State.  But TG's connection to Virginia was even more attenuated than McIntyre's connection to New Jersey.  Unlike McIntyre, TG did not travel to the U.S. to seek out customers. Venture Supply initiated contact with TG, travelled to China to negotiate the contracts with TG, entered into contracts providing for arbitration in China.  Pursuant to those contracts Venture Supply made two, isolated purchases of drywall from TG in China, for which it took delivery FOB in China.  The sales were completed when TG delivered the drywall to Venture Supply in China.  Also unlike McIntyre, TG did not use a U.S. distributor to market or re-sell its products in the U.S.

TG's lesser contacts are also reflected in TG's absence from any conventions or trade shows in the U.S. and its lack of involvement in any marketing or advertising activities with any U.S. company.  Also unlike McIntyre, TG did not have any trademarks or other intellectual property registered in the U.S.  TG did not purposefully avail itself the benefits and protections of a Virginia forum; to the contrary, TG purposefully avoided doing so by completing the sale to Venture Supply FOB in China.  *See World-Wide Volkswagen*, 444 U.S. at 297 (a nonresident may permissibly structure his primary conduct so as to avoid being haled into court in a particular state).

Even if one were to speculate based on *dicta* in Justice Breyer's concurring opinion in *Nicastro* that "target[ing] the world by selling products from its Web site" or "consign[ing] the products to an intermediary (say, Amazon.com) who then receives and fulfills the orders", 131 S. Ct. at 2793, could be an element of showing purposeful availment in some cases, TG did none of those things.  TG was willing to serve the export market outside China by selling to customers from other countries, including the U.S.  But that does not suggest that TG "targets the world by selling products from its Web site."  131 S. Ct. at 2793 (Breyer, J., concurring).  In fact, TG never had an export marketing plan, let alone a marketing plan directed to Virginia.  Moreover, TG never sold products from its web site.  TG's web site was passive:  No products could be purchased through the web site.

Nor did TG ever "consign" its drywall to "an intermediary" who received and fulfilled orders from customers in Virginia.  Likewise, even under the *Nicastro* dissent's "purposeful avail[ment] . . . of the United States market nationwide" standard, TG should not be subject to personal jurisdiction.  TG had no U.S. marketing plan or distributor, did not sell or advertise

anywhere in the U.S., and did nothing to target the U.S. market, even generally.  *See* 131 S. Ct. at 2801.

In addition, there is no evidence that any re-sales of TG's drywall that may have occurred in Virginia resulted from efforts by TG to "seek to serve" the market in the forum State. *Nicastro*, 131 S. Ct. at 2788.  Consequently, TG could not be found to have the type of "expectation" of re-sales of its drywall in Virginia that the Supreme Court in *World-Wide Volkswagen* postulated could lead a non-resident to reasonably anticipate being subject to a suit in a forum State.  *World-Wide Volkswagen Corp.* 444 U.S. at 297.

TG's isolated sales to Venture Supply are also a stark contrast to the franchise agreements that were a basis for personal jurisdiction in *Burger King*.  TG did not "reach out" to Venture Supply in Virginia.  Quite the opposite:  Venture Supply's representative approached TG in China.  There was also nothing "long-term" about Venture Supply's relationship with TG like the deep 20-year relationship in *Burger King*.  Venture Supply made only two isolated FOB purchases in China from TG over a period of a few months.  There were no "continuing and wide-reaching contacts" between TG and Virginia – there were hardly any contacts at all.  The Venture Supply Contracts did not provide for any payments, performance or other activities by TG in Virginia, and TG did not engage in any activities in Virginia.  In addition, the Venture Supply Contracts required arbitration in China; this further demonstrates that the parties did not contemplate that disputes related to their agreement would be resolved by courts outside of China.  Thus, the principles announced and applied in *Burger King* also require that TG should not be subject to jurisdiction in this case.

        b.       <u>Plaintiffs Cannot Prove That TG Purposefully Availed Itself Of The Virginia Market Based Upon TG's Alleged Awareness Of Sales In Virginia</u>

It would also be unavailing for Plaintiffs to argue that TG was aware of or could foresee that Venture Supply planned to market in Virginia the drywall it purchased from TG in China. *First*, the *Nicastro* majority clearly rejected the "awareness that the product will be marketed in the forum State" standard that Justice Brennan advocated in *Asahi*. The Supreme Court's precedents indicate that something more is required, such as a "regular . . . flow" or "regular course" of sales by TG directed to Virginia or "special state-related design, advertising, advice, or marketing" directed to Virginia by TG. *Nicastro*, 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment). None of those additional factors is even arguably present here.

*Second*, even if the Brennan test were applied, there is no evidence TG was aware that Venture Supply would market the drywall in Virginia. TG merely made one-off sales in China to a company that indicated it wanted to ship some of the drywall to Virginia. TG did not participate in any distribution process intended to market TG's drywall in Virginia.[26]

TG's conduct in relation to the forum State was even more attenuated than that of the valve manufacturer that was held not subject to personal jurisdiction in *Asahi*. Unlike *Asahi*, TG did not make "regular and extensive sales" to an entity "it knew was making regular sales" of its products in the forum State, and furthermore, as the evidence also shows, the lawsuit was a "surprise" to TG. *See Asahi,* 480 U.S. at 116, 121. (Brennan, J., concurring in part and concurring in the judgment). Nor can it be said that TG benefited economically from the sale of its products in the forum State, one of the factors Justice Brennan viewed as relevant to

---

[26] Venture Supply shipped its first purchase to Norfolk apparently because it was expedient for it to do so. Venture Supply considered a number of destinations for its second purchase from TG and eventually settled on New Jersey. These circumstances further undermine any allegations that TG was aware of Venture Supply's plan to market the drywall in Virginia.

establishing minimum contacts.  *Id.* at 121.  Venture Supply paid the purchase price to TG when it delivered the drywall in China.  <u>TG, therefore, did not derive economic benefit from any re-sales of drywall in Virginia.</u>  Accordingly, even if Justice Brennan's concurring opinion in *Asahi* (which is not governing law) is considered, TG cannot be found to have purposely availed itself of the forum State of Virginia.

c.   <u>Plaintiffs Cannot Prove That TG Engaged In Substantial Conduct Directed At The Forum State As Required By The Fourth Circuit</u>

Even prior to *Nicastro*, the law in the Fourth Circuit was that "awareness that the product will be marketed in the forum State" was insufficient to establish purposeful availment.  In *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 945 (4th Cir. 1994), the Fourth Circuit adopted the O'Connor test from *Asahi*, finding that it was consistent with prior Supreme Court jurisprudence.  The Fourth Circuit held that a defendant must do more than merely place the product in the stream of commerce to purposefully avail itself of a particular forum, even if the defendant was aware that the stream may or will sweep the product into the forum State.  *Id.* at 945 ("To permit a state to assert jurisdiction over any person in the country whose product is sold in the state simply because a person must expect that to happen destroys the notion of individual sovereignties inherent in our system of federalism.").  The Fourth Circuit went on to hold that the placement of a product in the stream of commerce must be accompanied by a "substantial connection to the forum state by an action purposefully directed toward the forum state or otherwise."  *Id.* at 945-46.  The *Lesnick* court held that "*purposeful*" means "intentional" and that nothing short of the defendant's intent to distribute products in the forum would render it amenable to jurisdiction there.  *Id.*  For the exercise of jurisdiction to be constitutionally permissible, the defendant must have undertaken some additional conduct to service the forum market beyond merely selling a product on foreign soil to a forum company; the defendant must

34

have advertised in the forum, established channels for providing regular advice to customers in the forum, or marketed the product through a sales agent in the forum. *Id.*; *see also Chung v. Nana Dev. Corp.*, 783 F.2d 1124, 1127-1128 (4th Cir. 1986) (foreseeability that product would arrive in forum State irrelevant unless defendant has purposeful contacts with forum State).

In addition to *Lesnick*, other courts in the Fourth Circuit have held that a court may not exercise personal jurisdiction over a foreign defendant for its conduct abroad unless the defendant deliberately directed – and *intended* to direct – its conduct at the forum state. *See, e.g., In re The Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997) (contacts must be "purposeful") (citation omitted); *Consulting Eng'rs Corp.*, 561 F.3d at 278 (listing principal factors to consider in determining whether defendant has engaged in purposeful availment). Thus, under Fourth Circuit law, which accords with the holdings of the *Nicastro* plurality and concurrence, TG's FOB sale to Venture Supply in China does not constitute purposeful availment of a Virginia forum. *See Fed. Ins. Co. v. Lake Shore Inc.*, 886 F.2d 654, 657-658 (4th Cir. 1989) (sale of malfunctioning cargo winch manufactured in Michigan and shipped FOB Michigan did not give rise to specific jurisdiction over claim for damages caused by the winch in South Carolina, because the defendant had no control over the shipment of the winch once it was sold).

Similarly, in *Chung*, a Virginia buyer sued an Alaska seller who had shipped goods to Virginia. The shipment was insufficient to give rise to specific jurisdiction over the Alaska defendant – even where the Virginian plaintiff had negotiated the contract over the telephone from Virginia and the goods were damaged en route there. 783 F.2d at 1128-30. The Fourth Circuit held that because the defendant had responded to (and not initiated) inquiries from Virginia, the contract was finalized in Alaska, payment was made in Alaska, and the parties did not have a longstanding relationship, the Alaskan defendant could not be sued in Virginia for its

shortcomings in shipping the product to Virginia.  *Id.* at 1128.  In this case, TG, like the

defendant in *Chung*, "merely responded to [the customer's] unilateral inquiries and "made no

purposeful effort of its own to develop a market for its product in Virginia."  TG, however, did

even less than the defendant in *Chung*.  TG did not ship the drywall to Virginia; Venture Supply

did.  Responding to a customer's sales request outside the country in this manner does not show

any purposeful activity directed to Virginia.  *See Consulting Eng'rs Corp.*, 561 F.3d at 280

(contract with Virginia-counterparty governed by Virginia law was too attenuated a contact

where a Virginia party initiated the business dealings, which occurred primarily in India);

*Promotions Ltd. v. Brooklyn Bridge Centennial Comm'n*, 763 F.2d 173, 174-75 (4th Cir. 1985)

(Virginia promoter's unilateral contacts with New York City officials and official's forwarding

of contacts to others did not alone provide sufficient minimum contacts with Virginia) (per

curiam).

Likewise, the district court's rulings within the Fourth Circuit since *Nicastro* have

continued to follow *Lesnick* and require more than an awareness that the stream of commerce

might sweep the product into the forum State.  *See, e.g., Teledyne Cont. Motors*, 2012 WL 10836,

at *4 (long-arm cases in the Fourth Circuit continue to follow *Lesnick* and apply stream-of-

commerce plus test); *Windsor*, 2011 WL 5005199 at *5 (applying *Lesnick*, purposeful availment

requires "additional conduct" beyond foreseeability).

Recently, in *Frizzell*,[27] a Virginia state court held that when the defendant had sold its

products FOB either in Ohio or Pennsylvania but its customer shipped them to Virginia, and the

defendant knew of the destination and packaged and prepared the product for shipment, the

transaction did not occur in Virginia and the Court could not exercise jurisdiction under Va.

---

[27] *See* Letter Opinion of Judge Karen J. Burrell, *Frizzell v. Danieli Corp., et al.,* CL09-5120 (Va. Cir. Ct. Norfolk Dec. 22, 2010).

Code § 8.01-238-1(A)(1).  The *Frizzell* court relied on the decision of the federal court in *Bay Tobacco*, 261 F. Supp. 2d 483.  In *Bay Tobacco*, plaintiff, a Virginia company, entered into a contract to purchase cigarettes from defendant, a North Carolina company.  Plaintiff initiated the contact with defendant.  The defendant delivered the cigarettes FOB North Carolina, and the defendant arranged to ship the cigarettes to Virginia.  The Court found that the FOB delivery in North Carolina diminished the jurisdictional significance of the shipments into Virginia.  The court wrote:

> [Plaintiff] will not, and should not, be allowed to stretch [Defendant's] business obligations into the Commonwealth simply by asking [Defendant] to load its cigarettes on a tractor trailer bound for Virginia . . . [Defendant's] shipment of [Plaintiff's] cigarettes into Virginia does not show that Defendant transacted business in the Commonwealth, and the Court may not exercise jurisdiction over the contract claim on that basis . . . The Court has already decided that these shipments were not purposefully directed contacts, but were fortuitous contacts, made at [Plaintiff's] request and for [Plaintiff's] convenience . . . .

*Bay Tobacco,* 261 F. Supp. 2d at 494-95.

Further, the *Bay Tobacco* court found that Virginia could not exercise specific jurisdiction over defendant because plaintiff's tort claims arose only from activities outside of Virginia.[28]  Even if TG's sale to Venture Supply in China is considered a jurisdictional contact with Virginia, it certainly was not purposeful.  Rather, similar to the circumstances in *Bay Tobacco*, Venture Supply solicited its purchase of drywall outside Virginia and then decided it wanted to ship that drywall to Virginia.  Any resulting TG's contacts with Virginia arising from that transaction were "fortuitous contacts" made at Venture Supply's "request" and for Venture

---

[28] To the extent it could be found, as some courts have, that there was no common ground in *Nicastro* and hence no majority, the law of the Fourth Circuit pre-*Nicastro* would apply.  As noted above, the guiding principles in the Fourth Circuit concerning purposeful availment have remained consistent, both before and after *Nicastro*.

Supply's "convenience".  TG lacks minimum contacts with Virginia and therefore the Court lacks personal jurisdiction over TG.[29]

### 2.   Plaintiffs Cannot Establish That Their Causes Of Action Arose Out Of Or Resulted From TG's Contacts With Virginia

Plaintiffs assert causes of action against TG for negligence, negligence per se, breach of express and implied warranty, private nuisance, violation of consumer protection actions and for equitable and injunctive relief and medical monitoring.  Each cause of action is based upon the conclusory allegation that Plaintiffs' homes contain "defective drywall that was designed, manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold by defendants Taishan, Tobin and/or Venture."  (Second Am. Compl. ¶¶ 5, 7 9).

To satisfy their burden of proving personal jurisdiction, in addition to showing that TG is subject to the Virginia long-arm statute and had minimum contacts, Plaintiffs must show that their causes of action against TG arise out of or result from TG's alleged contacts with Virginia. *Seiferth*, 472 F.3d at 271.  *See also* Va. Code Ann. § 8.01-328.1(C) (jurisdiction under long-arm statute only for "a cause of action arising from acts enumerated in this section"); *Int'l Shoe*, 326 U.S. at 319.  Plaintiffs, therefore, must prove that the drywall they claim caused their damages is traceable to drywall that TG sold to Venture Supply which Venture Supply shipped to Virginia: the mere presence of TG's drywall in Plaintiffs' homes is insufficient to establish that fact.  If Plaintiffs' drywall was obtained from Venture Supply's shipment of drywall to New Jersey or by other means, then Plaintiffs' damages have nothing to do with TG's alleged contacts with Virginia.  Thus, unless Plaintiffs can show the required nexus between their alleged injury and

---

[29] TG's isolated sales in China to Venture Supply are also insufficient to establish that it had the continuous and systematic contacts with Virginia required for general jurisdiction.  Indeed, far more significant contacts have been found insufficient for general jurisdiction. *See Goodyear*, 131 S. Ct. at 2852 (affiliates' sales of tens of thousands of defendants tires in forum State insufficient).

Venture Supply's shipment of TG's drywall from China to Virginia, and they cannot, the Court should decline to exercise personal jurisdiction over TG, even if it found TG had minimum contacts with Virginia.

### 3.   The Exercise Of Jurisdiction Over TG Would Be Unreasonable and Would Offend Traditional Notions Of Fair Play And Substantial Justice

The Court cannot exercise personal jurisdiction over TG if it would offend "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316.  As the Supreme Court has explained:

> Once it had been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'  Thus, courts in 'appropriate case[s]' may evaluate [1] 'the burden on the defendant,' [2] 'the forum State's interest in adjudicating the dispute,' [3] 'the plaintiff's interest in obtaining convenient and effective relief,' [4] 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and [5] the 'shared interest of the several States in furthering fundamental substantive social policies.

*Burger King*, 471 U.S. at 476-477 (citations omitted and internal numbering added).

Justice Brennan, the author of the Court's opinion in *Burger King,* further explained that these considerations of fairness and reasonableness may be dispositive of the question of personal jurisdiction:  Nevertheless, minimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has engaged in forum activities."  *Id.* at 477-478 (citation omitted).  Conversely, even if the assertion of jurisdiction would be fair and reasonable, minimum contacts must still be present.  *See Chung*, 783 F.2d at 1127-30 (reversing the trial court's finding of jurisdiction where defendant's ties with the forum were "virtually nonexistent" and holding that "[f]actors such as the burden on the defendant, the plaintiff's interest in obtaining effective relief, and the forum state's concern with

adjudicating the dispute are generally addressed only after it has been decided that a defendant purposefully established minimum contacts" and that "[b]ecause personal jurisdiction here fails the threshold test of 'minimum contacts,' we need not separately consider the convenience of any particular forum to the respective parties") (internal citation and quotations omitted); *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1269 n.15 (5th Cir. 1981) (although forum's interest and relative convenience of the parties can serve to enhance contacts with forum to a quality that justifies jurisdiction, they are never sufficient conditions to jurisdiction by themselves).

Thus, even if the Court were to find that (1) TG was subject to jurisdiction under Virginia's long-arm statute, (2) TG had the requisite minimum contacts with Virginia, and (3) Plaintiffs' causes of action claims arose out of or resulted from those contacts, that would not mark the end of its jurisdictional inquiry. The Court still could not exercise personal jurisdiction over TG unless it would also be constitutionally fair and reasonable to do so under all of the circumstances, including TG's very attenuated contacts with Virginia. As explained below, each of the four fairness factors the Supreme Court has identified weighs against the assertion of personal jurisdiction over TG.

The first factor – the burden on the defendant – is particularly compelling. As the Supreme Court explained in *Asahi*, "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." 480 U.S. at 114; *see also Gray v. Riso Kagaku Corp.*, 82 F.3d 410, 1996 WL 181488, at *4 (4th Cir. April 17, 1996) (exercise of jurisdiction unreasonable over Japanese company due to language and cultural barriers and distance of South Carolina forum from Japan). The Supreme Court has cautioned

that "[G]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi*, 480 U.S. at 115 (citation omitted).

In order to defend this lawsuit on its merits, TG would bear the extraordinarily unfair and unjust burden of having to travel around the world. Beyond sheer travel time, TG would have to surmount logistical and bureaucratic difficulties in terms of transportation, voluminous translations, governmental approvals, and deep-seated cultural differences that would likely be prohibitively expensive to overcome. *See Gray*, 1996 WL 181488, at *4. The Court and the parties' experience with jurisdictional discovery dramatically illustrate the point. The difficulties of travel for Chinese nationals required that jurisdictional depositions be taken in Hong Kong, far from TG's headquarters in Shandong Province, China and also a half a world away from this forum. Enormous time and expense were also required for the translation of testimony and documents. In addition, because of disputes regarding translations and other problems with discovery in international litigation, the Court ordered a second round of depositions in Hong Kong. Altogether, jurisdictional discovery has taken more than 18 months. Needless to say, these burdens would increase exponentially if TG were required to defend itself on the merits. The burdens imposed on TG would, therefore, be so severe as to be constitutionally unreasonable. *See Burger King Corp.*, 471 U.S. at 478. ("[J]urisdictional rules may not be employed in such a way as to make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent.") (citation omitted).

The second factor – the interests of the forum State – also does not favor asserting jurisdiction over TG. TG did not engage in any activities in Virginia. Consequently, Virginia's interest in adjudicating claims against parties that actually supplied, distributed or installed

drywall in Virginia are served only by proceeding with the litigation against Venture Supply and other entities who engaged in such activities.

Similarly, the third factor – the interests of Plaintiffs – is served by allowing the litigation to proceed against the multiple parties who Plaintiffs allege supplied, distributed or installed the drywall in their homes.  In this manner, Plaintiffs will likely be able to obtain relief without the delay, complexity and unfairness of dragging TG into this litigation from China.

The fourth factor – the judicial system's interest in efficient resolution of controversies – also suggests that jurisdiction over TG is not appropriate, as the aforementioned difficulties of intercontinental, multi-lingual, cross-cultural adjudication would needlessly complicate and prolong these proceedings.

Finally, the shared interest of the "several states" in a case involving a foreign defendant "calls for a court to consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction by [the forum State]."  *Asahi*, 480 U.S. at 115-116.  In that assessment, "the procedural and substantive interests of other *nations* . . . as well as the Federal interest in Government's foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State."  *Id.* at 115 (emphasis in original).

Here, China's substantive policies most assuredly do not weigh in favor of diluting the guarantee of Due Process so far as to allow jurisdiction over TG.  In addition, the interests of international comity indicate jurisdiction would be unreasonable.  TG and Venture Supply entered into a contracts providing that all disputes would be decided in a Chinese arbitration under Chinese law.  Moreover, TG sold drywall to Venture Supply in China without being aware

that Venture Supply would market the drywall in Virginia.  Under the circumstances, subjecting

TG to unexpected litigation half a world away would certainly defeat its reasonable expectations

in the transactions under its contracts with Venture Supply, and offend principles of international

comity.  *OMI Holding, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1097 (10th Cir. 1998)

(adjudication of dispute with Canadian defendants arising out of contract negotiated in Canada

and governed under Canadian law would implicate Canada's sovereign interest in interpreting its

laws and militated in favor of dismissal).

　　　　As noted above, in *Asahi*, all nine Justices agreed that it would not be fair and reasonable

to assert jurisdiction over a Japanese tire valve manufacturer in a California case allegedly

arising from its defective product, imported into California by a Taiwanese tire manufacturer.

As Justice Ginsburg explained in dissent in *Nicastro*:

> The decision was not a close call.  The Court had before it a
> foreign plaintiff, a Taiwanese manufacturer, and a foreign
> defendant, the Japanese valve-assembly maker, and the
> indemnification dispute concerned a transaction between those
> parties that occurred abroad.  All agreed on the bottom line:  The
> Japanese valve-assembly manufacturer was not reasonably brought
> into the California courts to litigate a dispute with another foreign
> party over a transaction that took place outside the United States.
>
> Given the confines of the controversy, the dueling opinions of
> Justice Brennan and Justice O'Connor were hardly necessary.
> How the Court would have 'estimate[d] . . . the
> inconveniences,' . . . had the injured California originally sued
> *Asahi* is a debatable question.  Would this Court have given the
> same weight to the burdens on the foreign defendant had those
> been counterbalanced by the burdens litigating in Japan imposed
> on the local California plaintiff?  *Cf. Calder v. Jones*, 465 U.S. 783,
> 788 (1984) (a plaintiff's contacts with the forum "may be so
> manifold as to permit jurisdiction when it would not exist in their
> absence.")
>
> In any event, *Asahi*, unlike McIntyre UK, did not itself seek out
> customers in the United States, it engaged no distributor to
> promote its wares here, it appeared at no tradeshows in the United
> States, and, of course, it had no Web site advertising its products to

> the world.  Moreover, *Asahi* was a component part manufacturer
> with 'little control over the final destination of its products once
> they were delivered into the stream of commerce.'  It was
> important to the Court in *Asahi* that 'those who use *Asahi*
> components in their final products, and sell those products in
> California, [would be] subject to the application of California tort
> law.' 480 U.S. at 115, 107 S. Ct. 1026 (majority opinion).

131 S. Ct. at 2802-2803 (Ginsburg J. dissenting) (internal citation omitted).

The decision in this case should also not be a close call.  TG's isolated FOB sales to Venture Supply were foreign transactions that took place entirely abroad.  As demonstrated above, TG, like the Japanese valve manufacturer in *Asahi*, "did not itself seek out customers in the United States, it engaged no distributor to promote its wares here, [and] it appeared at no tradeshows in the United States."[30]  Just as the Japanese valve manufacturer in *Asahi*, TG had "little control over the final destination of its products once they were delivered into the stream of commerce."

Furthermore, subjecting TG to jurisdiction merely because Plaintiffs allege that TG could foresee some of its drywall be sold by Venture Supply in Virginia cannot be squared with traditional notions of fair play and substantial justice.  "[T]he fact that the defendant is a foreign, rather than a domestic, manufacturer makes the basic fairness of an absolute [foreseeability] rule yet more uncertain."  *Nicastro*, 131 S. Ct. at 2793-94 (Breyer, J., concurring).

In light of all of the foregoing considerations, exercising personal jurisdiction over TG would contravene "traditional notions of fair play and substantial justice," in violation of the Due Process Clause.

---

[30] Although TG had a website, it existed for years before any sale to the U.S., and there is no evidence TG designed it or used it to target the market in Virginia or anywhere else in the U.S.  (Peng Tr. 542:1-7, 543:2-5; Fu Tr. 78:6-18).

## II.     THE DEFAULT JUDGMENT MUST BE SET ASIDE BECAUSE PLAINTIFFS FAILED TO SERVE THE PLEADINGS UPON WHICH IT WAS BASED

In keeping with the principle that default judgments are disfavored, the courts have required "strict compliance" with the legal prerequisites establishing the court's power to render the judgment.  *Varnes v. Local 91, Glass Blowers Ass'n*, 674 F.2d 1365, 1369 (11th Cir. 1982), *quoted by Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind,* 841 F.2d 646, 650 (5th Cir. 1988).  This default judgment should be vacated for the additional reasons that (1) Plaintiff-Intervenors did not serve TG with either their motion for intervention or a pleading  in compliance with Rules 24(c) and 5(a)(2); and (2) the *Germano* Plaintiffs never served the Second Amended Complaint on TG.

"A motion to intervene must be served on the parties as provided in Rule 5 . . . and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c).  Rule 5(a)(2) provides: "No service is required on a party who is in default for failing to appear.  But a pleading that asserts a *new claim for relief* against such a party must be served on that party under Rule 4."  Fed. R. Civ. P. 5(a)(2) (emphasis supplied).[31]  In the case of a foreign defendant, Rule 4(f)(1) requires service to be made by an "internationally agreed means of service," in this case the Hague Convention.

The addition of identifiable new plaintiffs through a motion to intervene constitutes the assertion of "new claims," even when the new plaintiffs are part of a putative class identified in a

---

[31] TG acknowledges that the Court in its ruling on Plaintiff-Intervenors' Petition for Attorneys' Fees determined that they were not required to serve TG with their motion to intervene, a complaint in intervention or the Second Amended Complaint because their claims were not "new."  *See* "Decision Partially Denying the Motion of Plaintiff – Intervenors For Attorney's Fees" (Doc. No. 4872).  The Court is not bound to follow its previous decision, however.  It is not law of the case, as the issue has not been decided by the Fifth Circuit. *See United States v. Williams*, 517 F.3d 801, 806 (5th Cir. 2008) ("The law of the case doctrine contemplates that an issue of fact or law decided *on appeal* may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal.") (quotation and citation omitted) (emphasis supplied).  Even if it were law of the case, the law of the case doctrine is discretionary, and the law of the case need not be followed if it was rendered as a result of clear error.  *In re Provenza*, 316 B.R. 177, 220 (Bankr. E.D. La. 2003).

previous pleading. *See James v. Claiborne*, No. 07-1570, 2009 WL 994951, at *5 (W.D. La. Apr. 13, 2009); *accord Lopez v. NTI, LLC*, No. 08-1579, 2008 WL 5120542, at *3 (D. Md. Dec. 4, 2008). In *James*, for example, the court certified the class to which the newly joined plaintiffs belonged, but still held that it was improper to grant them a default judgment when they had not served the defendant with an amended complaint providing notice of their individual claims. *James*, 2009 WL 994951, at *5.[32] Thus, it is irrelevant that Plaintiff-Intervenors may be part of the putative class described in the *Germano* plaintiffs' pleadings.

Indeed, in their reply to the opposition to the motions to intervene in the *Gross* action, the intervening plaintiffs, also represented by the PSC, conceded that they were required to serve an amended pleading in intervention pursuant to the Hague Convention and advised their process server, APS International, Ltd., "that the complaints in intervention will need to be served consistent with the Hague Convention (assuming intervention is allowed)." (Doc. No. 5167 at 2, 5). Given this concession, the Plaintiff-Intervenors should not be heard to argue here that such service was not required in this case.

The default judgment is void for the additional reason that Plaintiffs did not serve TG with the Second Amended Complaint upon which the default judgment was based. Pursuant to Rule 5(a)(2), Plaintiffs were required to serve the Second Amended Complaint on TG in accordance with Rule 4 because it introduced new claims. Among other things, the Second Amended Complaint sought certification of a national class, whereas Plaintiffs' First Amended Complaint sought class certification of a class of Virginia residents. Further, upon filing of the Second Amended Complaint, the First Amended Complaint became a nullity, but the preliminary

---

[32] In addition to *James* and *Lopez*, a leading treatise states unequivocally that additional claims brought by new parties are "new claims" under Rule 5(a). 4B Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 1146 (3d Ed. 2010).

default and the default judgment were entered on the basis of the Second Amended Complaint. This Court did not have jurisdiction over TG with respect to the Second Amended Complaint, and the preliminary default and default judgment must be vacated. *See Anunciation v. West Capital Fin. Servs. Corp.*, 97 F.3d 1458 (9th Cir. 1996) (court found that the lower court had jurisdiction over a defendant only as to the original complaint, with which he was served, and not as to the amended complaint, which was improperly served).

## III. THE DEFAULT JUDGMENT SHOULD BE SET ASIDE ON THE GROUNDS OF EXCUSABLE NEGLECT

Pursuant to Fed. R. Civ. P. 60(b)(1), the court may set aside a default judgment where the defaulting party can show "excusable neglect." In determining whether a party has acted with excusable neglect, the Fifth Circuit has explicitly incorporated the "good cause" standard applicable to vacating entries of default under Fed. R. Civ. P. 55. *In re OCA, Inc.*, 551 F.3d 359, 369 (5th Cir. 2008). The factors a court will consider include (1) whether the default was willful; (2) whether setting it aside would prejudice the adversary; and (3) whether a meritorious defense is presented. *Id.* In addition, the court may consider (4) whether the public interest was implicated; (5) whether there was significant financial loss to the defendant; and (6) whether the defendant acted expeditiously to correct the default. *Id.*

### A. TG's Default Was Not Willful

A default is not willful where the defendant lacked actual notice of the action pending against it. *See Robinson v. Sanctuary Music*, 383 Fed. App'x 54 (2d Cir. 2010) (good cause found where defendants had not been properly served with process prior to default judgment pursuant to the Hague Convention.); *Bituminous Cas. Corp. v. Garcia*, 223 F.R.D. 308, 313-14 (N.D. Tex. 2004) (vacating a default judgment where intervenors adversely affected by judgment had no notice of the suit or entry of default).

TG did not willfully default.  Although TG was served with the initial Complaint, TG did not receive notice of the preliminary default, the Second Amended Complaint, Plaintiff-Intervenors' motion to intervene, the evidentiary hearing or the default judgment, until after the default judgment was entered.  (Jia Tr. 910:15-21 (recalling first learning of the U.S. litigation against TG in the second half of 2009)).  TG then promptly took action to retain counsel in China and to locate and retain counsel in the U.S.  (Jia Tr. 885:11-888:24, 889:1-6 (TG contacted counsel "very quick" after learning of the default judgment.)).  Once it retained U.S. counsel, TG appeared and made cooperating with this Court "amongst its highest priorities."  (Jia Decl. ¶ 48).

Courts have vacated defaults where defendants had a good-faith basis for believing that they were not subject to the jurisdiction of the forum court, even if the belief was invalid.  *See Carl Marks & Co. v. Union of Soviet Socialist Republics*, 665 F. Supp. 323 (E.D.N.Y. 1987) (vacatur of default judgments entered against the Soviet Union where defendant did not believe the court could have jurisdiction over it), *aff'd*, 841 F.2d 26 (2d Cir. 1988); *cf. Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of Republic of Venezuela*, 575 F.3d 491, 503 (5th Cir. 2009) (vacating default with instructions that lower court determine arbitrability of dispute). Here, TG did not understand the significance of the First Amended Complaint, and could not imagine how its sales of drywall in China could have legitimately resulted in U.S. litigation it was required to participate in.  (Jia Decl. ¶¶ 41, 46).  As set forth above, TG has *no* business dealings with Virginia and in fact, is not subject to personal jurisdiction in Virginia.  Thus, TG had a reasonable belief that responding to the complaint was unnecessary and its failure to do so is excusable.

TG's excusable neglect is also attributable to its ignorance of the American legal system and its proceedings.  TG did not understand the consequences of not responding to the First

Amended Complaint.  (Jia Decl. ¶¶ 42-44; Jia Tr. 910:22-911:2 (Mr. Jia was not aware of the legal consequences of what a default meant in US legal proceedings)).  *See, e.g., Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1552 (D.C. Cir. 1987) (remanding with instructions to consider, *inter alia,* whether failure to respond to a complaint "was the excusable result of 'a broad divergence in [American and Bolivian] cultural, governmental, and political approaches to the present case.'") (citation omitted); *E. & J. Gallo Winery v. Cantine Rallo, S.p.A.*, 430 F. Supp. 2d 1064 (E.D. Cal., 2005) (vacating default judgment entered against non-English speaking, foreign defendant that received summons and complaint but did not understand the nature of the suit).  Moreover, by failing to serve the intervention motion and the Second Amended Complaint, Plaintiff-Intervenors and the *Germano* Plaintiffs deprived TG of the opportunity to consider the consequences of not responding or to participate in the hearing upon which the default judgment was based.

### B.    Vacating The Default Judgment Will Not Prejudice Plaintiffs

A plaintiff will not be prejudiced upon vacatur of a default judgment where it cannot show the "'loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion.'"  *Robinson*, 383 Fed. App'x at 58 (citation omitted).  Here, there is no reason to believe that any evidence has been lost, that discovery would be any more difficult than prior to the default, or that any fraud has taken place.

While the cost of requiring Plaintiff-Intervenors to prove their case on the merits will be more expensive than winning by default; that is not the type of prejudice that justifies allowing the default judgment to remain.  *In re Marinez*, 589 F.3d 772, 778 (5th Cir. 2009) ("'There is no prejudice to the plaintiff where the setting aside of the default has done no harm to plaintiff except to require [him] to prove [his] case.'") (citation omitted, alteration in original).

### C.    TG Has A Meritorious Defense

In determining whether a meritorious defense exists, "'[t]he underlying concern is . . . whether there is some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default.'"  *In re OCA, Inc.*, 551 F.3d at 373, quoting *Jenkens & Gilchrist v. Groia & Co.*, 542 F.3d 114, 122 (5th Cir. 2008).  That possibility exists here.  First, TG is not subject to jurisdiction in Virginia.  In addition, even if the judgment were not void, there are other potentially meritorious defenses.  For example, the Findings of Fact do not state whether Plaintiff-Intervenors' houses were inspected to determine if the allegedly defective drywall therein was manufactured by TG.  Additionally, there is a question whether the drywall at issue was defective when it left TG's hands in China or if it was damaged or contaminated by a third-party during transit or after it arrived in the U.S.  Accordingly, if the Court determines that it has jurisdiction and the case should proceed on the merits, substantial additional fact-finding would be necessary.  And that process of fact finding should be a trial conducted under the Federal Rules of Civil Procedure, including the defendant's right to challenge any evidence offered by plaintiffs and challenge testimony by cross-examination.

### D.    The Other Factors Weigh In Favor Of Vacatur

#### 1.    TG Will Incur Significant Financial Losses If The Default Stands

"Default judgments are particularly disfavored in lawsuits involving large amounts of money."  *Bangkok Bank Ltd. v. Wallant Int'l Trade, Inc.*, No. 88-2675, 1989 WL 156299, at *2 (S.D.N.Y. Dec. 18, 1989).  Courts should vacate a default judgment where the default judgment would cause significant financial loss to the default party.  *In re OCA, Inc.*, 551 F.3d at 374 (vacating default judgment of $600,000).  The default judgment against TG of over $2.7 million warrants vacatur.

### 2.      TG Acted Expeditiously to Vacate The Default

Under Fed. R. Civ. P. 60, a defaulting party may challenge default within a "reasonable" amount of time, and, in any case, within one year of entry.  Here, TG moved to vacate within a few months of learning of the default judgment; a reasonable amount of time, especially given the complexity of the matter.  Since June 2010, TG has participated fully in the litigation, and cooperated with counsel and the Court to assemble the facts necessary for the Court to consider its motion.  TG has filed its MPF, produced thousands of documents, and presented witnesses for two weeks of depositions in Hong Kong.  TG's conduct since entering the case should also weigh in favor of vacating its prior default because its good faith participation in the litigation reflects that it was not willfully ignoring the litigation prior to the default.

## IV.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE VIRGINIA CONSUMER PROTECTION ACT

To the extent the Plaintiff-Intervenors' claims are based on the VCPA, the default must be vacated.  As this Court has previously held, the complaint did not state a claim under the VCPA because TG's sale of drywall to Venture Supply was not a "consumer transaction" within the meaning of the VCPA (Doc. No. 4872 at 12); the Court cannot properly grant a default judgment on a legally insufficient complaint, *Lewis v. Lynn*, 236 F.3d 766, 767-68 (5th Cir. 2001).

51

## CONCLUSION

For all of the foregoing reasons, the Court should vacate the default judgment and dismiss the action against TG.

Dated: April 2, 2012

Respectfully submitted,

Thomas P. Owen Jr.
Joe Cyr
Frank T. Spano
Eric Statman
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
Telephone: 212-918-3000
Facsimile: 212-918-3100
Joe.cyr@hoganlovells.com
Frank.spano@hoganlovells.com
Eric.statman@hoganlovells.com

Richard C. Stanley (La. Bar No. 8487)
Thomas P. Owen, Jr. (La. Bar No. 28181)
STANLEY, REUTER, ROSS, THORNTON &
ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: 504-523-1580
Facsimile: 504-524-0069
rcs@stanleyreuter.com
tpo@stanleyreuter.com

**Attorneys for Defendant
Taishan Gypsum Co. Ltd.**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum of Law in Support of Taishan Gypsum Co. Ltd's Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint. has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail and upon all parties by electronically uploading the same to Lexis Nexis File & Serve in accordance with the Pretrial Order No. 6, and that the foregoing was also electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 2nd day of April, 2012.

/s/ Thomas P. Owen, Jr.