UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE MANUFACTURED | * | MDL No. 2047 |
| DRYWALL PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | JOSEPH C. WILKINSON, JR. |
| | * | |

*  *  *  *  *  *  *  *  *  *  *  **  *  *  *  *  *  **  *  *  *  *  *  **  *  *

**THIS DOCUMENT RELATES TO:**  *The Mitchell Co., Inc. v. Knauf Gips KG, et al.*, **Case No. 09-4115**

**TAISHAN GYPSUM CO. LTD.'S MEMORANDUM
IN SUPPORT OF ITS RENEWED MOTION
PURSUANT TO RULES 55(C) AND 12(B)(2) TO
<u>VACATE THE ENTRY OF DEFAULT AND DISMISS THIS ACTION</u>**

# TABLE OF CONTENTS

<u>Page</u>

INTRODUCTION ...............................................................................................................1

PROCEDURAL BACKGROUND.......................................................................................2

    A.    Plaintiff Files And Serves The Complaint ...............................................................2

    B.    Plaintiff Failed To Serve The Amended Complaint Alleging A Nationwide Class Action .................................................................................3

    C.    Plaintiff Obtains A Default On The Unserved Amended Complaint .....................5

FACTUAL BACKGROUND ...............................................................................................5

    A.    TG Never Has Conducted Business In Florida Or Anywhere Else In The U.S. ......................................................................................................5

    B.    There Is No Evidence Plaintiff Purchased Any Drywall Manufactured By TG ......................................................................................7

    C.    TTP Operated Independently Of TG ......................................................................8

        1.    TTP Observed Corporate Formalities ........................................................9

        2.    TTP's Daily Operations Were Managed Independently Of TG ...............................................................................................10

        3.    TTP's Facilities And Employees Were Independent Of TG ...................11

        4.    TTP Ceased Operations In 2008 For Economic Reasons.........................12

    D.    TTP Never Has Conducted Business In Florida Or Elsewhere In The U.S. ......................................................................................................13

        1.    Overview Of TTP's Sales Of Drywall.....................................................13

        2.    Most Of TTP's Sales Were To Chinese Trading Companies ...................14

        3.    TTP Made Isolated Sales In China To Three Companies That Advised TTP They Intended To Ship To Florida.............................14

            a.    Wood Nation...................................................................................15

            b.    Oriental Trading.............................................................................18

            c.    B America .....................................................................................21

I.    THE PRELIMINARY DEFAULT SHOULD BE VACATED BECAUSE THE COURT LACKS PERSONAL JURISDICTION OVER TG ...................................23

    A.    Plaintiff Is Unable To Satisfy Florida's Long-Arm Statute To Establish Personal Jurisdiction Over TG .................................................26

        1.    TG Has Not Conducted Business In Florida.................................27

        2.    TG Has Not Committed A "Tortious Act" In Florida ..............................28

        3.    TG's Alleged Conduct Did Not Cause Plaintiff to Sustain An "Injury To Person Or Property" In Florida ...........................28

        4.    TG Has Not Engaged In Substantial Activity In Florida As Required For General Jurisdiction Under The Long-Arm Statute ..............................................................................29

    B.    Due Process Would Not Permit The Court To Exercise Personal Jurisdiction Over TG...............................................................29

        1.    Plaintiff Cannot Establish That TG Had Minimum Contacts With Florida..............................................................42

        2.    Plaintiff Cannot Prove Its Causes Of Action Arose Out Of Or Resulted From TG's Contacts With Florida.........................44

        3.    The Exercise Of Jurisdiction Over TG Would Be Unreasonable And Would Offend Traditional Notions Of Fair Play And Substantial Justice .............................................44

II.    TTP'S CONTACTS CANNOT BE ATTRIBUTED TO TG ...........................................45

    A.    The Court Should Not Disregard TTP's Separate Corporate Personhood..........................................................................45

        1.    TTP's Separate Corporate Personhood Should Be Respected Under Chinese Law ...............................................47

        2.    TTP's Separate Corporate Personhood Would Be Respected Under Florida Law ................................................50

    B.    TTP Was Not TG's Agent ...................................................................55

III.    PLAINTIFF IS UNABLE TO SATISFY FLORIDA'S LONG-ARM STATUTE TO EXERCISE PERSONAL JURISDICTION OVER TTP.........................57

    A.    TTP Has Not Conducted Business In Florida.......................................57

    B.    TTP Has Not Committed A "Tortious Act" In Florida..........................58

C. TTP's Alleged Conduct Did Not Cause Plaintiff To Sustain An "Injury To Person Or Property" In Florida ............................................................58

D. TTP Has Not Engaged In Substantial Activity In Florida As Required For General Jurisdiction Under The Long-Arm Statute.........................59

IV. DUE PROCESS WOULD NOT PERMIT THE COURT TO EXERCISE PERSONAL JURISDICTION OVER TTP....................................................................62

A. Plaintiff Cannot Establish That TTP Had Minimum Contacts With Florida ..............................................................................................................62

1. Plaintiff Cannot Prove That TTP Purposefully Availed Itself Of The Florida Market Based On TTP's Alleged Awareness Of Sales In Florida ...................................................65

2. Plaintiff Cannot Prove That TTP Directed Its Conduct At The Forum State As Required By The Eleventh Circuit ...........................66

B. Plaintiff Cannot Prove Its Causes Of Action Arose Out Of Or Resulted From TTP's Contacts With Florida .........................................................72

C. The Exercise Of Jurisdiction Over TTP Would Be Unreasonable And Would Offend Traditional Notions Of Fair Play And Substantial Justice ...............................................................................................73

V. THE DEFAULT SHOULD BE SET ASIDE FOR THE ADDITIONAL REASON THAT PLAINTIFFS FAILED TO SERVE THE PLEADINGS UPON WHICH THE DEFAULT JUDGMENT WAS BASED ......................................77

VI. THE PRELIMINARY DEFAULT SHOULD ALSO BE SET ASIDE ON THE GROUNDS OF EXCUSABLE NEGLECT.................................................................78

A. TG Did Not Willfully Default.................................................................................79

B. Vacating The Default Will Not Prejudice Plaintiff.................................................80

C. TG Has Meritorious Defenses ..............................................................................81

D. TG Acted Expeditiously To Vacate The Default....................................................82

CONCLUSION...........................................................................................................................83

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advertects, Inc. v. Sawyer Indus., Inc.*,
   84 So. 2d 21 (Fla. 1955)................................................................................................55

*Aetna Life & Cas. Co. v. Therm-O-Disc, Inc.*,
   511 So. 2d 992 (Fla. 1987).............................................................................28, 59, 81

*Am. Investors Life Ins. Co. v. Webb Life Ins. Agency, Inc.*,
   876 F. Supp. 1278 (S.D. Fla. 1995) ...........................................................................4, 26

*Amberg v. FDIC*,
   934 F.2d 681 (5th Cir. 1991) ......................................................................................78

*Asahi Metal Corp., Ltd. v. Superior Court*,
   480 U.S. 102 (1987)........................................................................................... passim

*Assoc. Transp. Line, Inc. v. Productos Fitosanitarios Proficol El Carmen, S.A.*,
   197 F.3d 1070 (11th Cir. 1999) ...............................................................................58, 66

*Banco Cont'l., S.A. v. Transcom Bank (Barbados), Ltd.*,
   922 So. 2d 395 (Fla. 3d DCA 2006 same)...................................................................56

*Banton Indus., Inc. v. Dimatic Die & Tool Co.*,
   801 F.2d 1283 (11th Cir. 1986) ...............................................................................68, 69

*Benjamin v. Western Boat Building Corp.*,
   472 F.2d 723 (5th Cir. 1973). .....................................................................................68

*Bituminous Cas. Corp. v. Garcia*,
   223 F.R.D. 308 (N.D. Tex. 2004) ................................................................................80

*Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*,
   841 F.2d 646 (5th Cir. 1988) ......................................................................................77

*Blumberg v. Weiss & Co.*,
   922 So. 2d 361 (Fla. 3d DCA 2006) .......................................................................28, 58

*Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*,
   786 F.2d 1055 (11th Cir. 1986) ..................................................................................69

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)........................................................................................... passim

*Calder v. Jones*,
465 U.S. 783 (1984)...........................................................................................74

*Carl Marks & Co. v. USSR*,
665 F. Supp. 323 (S.D.N.Y. 1987), *aff'd*, 841 F.2d 26 (2d Cir. 1988)....................79

*Charia v. Cigarette Racing Team*,
583 F.2d 184 (5th Cir. 1978) ...........................................................................67, 68

*Christus St. Joseph's Health Sys. v. Witt Biomedical Corp.*,
805 So. 2d 1050 (Fla. 5th DCA 2002).................................................................71

*Cook-Waite Lab., Inc. v. Napier*,
166 So. 2d 675 (Fla. 2d DCA 1964) ....................................................................62

*Cross Country Home Servs., Inc. v. Home Serv. USA Corp.*,
No. 08-61456, 2010 WL 55439 (S.D. Fla. Jan. 6, 2010).......................................56

*Crowe v. Paragon Relocation Res., Inc.*,
506 F. Supp. 2d 1113 (N.D. Fla. 2007).................................................................72

*Cruz v. Mylan, Inc.*,
No. 09-1106, 2010 WL 598688 (M.D. Fla. Feb. 17, 2010)....................................82

*Dalton v. R & W Marine, Inc.*,
897 F.2d 1359 (5th Cir. 1990) ...........................................................................71

*Dania Jai-Alai Palace, Inc. v. Sykes*,
450 So. 2d 1114 (Fla. 1984)...........................................................................50, 54

*Davis v. Pyrofax Gas Corp.*,
492 So. 2d 1044 (Sup. Ct. Fla. 1986)...................................................................72

*De James v. Magnificent Corners, Inc.*,
654 F.2d 280 (3rd Cir. 1982) ...........................................................................35

*Delray Beach Aviation Corp. v. Mooney Aircraft Inc.*,
332 F.2d 135 (5th Cir. 1964) ...........................................................................60

*Dow Chem. Canada ULC v. Superior*,
202 Cal. App. 4th 170 (2011) ...........................................................................42

*E. & J. Gallo Winery v. Cantine Rallo, S.p.A.*,
430 F. Supp. 2d 1064 (E.D. Cal. 2005)...............................................................80

*Effjohn Int'l Cruise Holdings, Inc. v. A&L Sales, Inc.*,
346 F.3d 552 (5th Cir. 2003) .......................................................................23, 79

v

*Elite Aluminum Corp. v. Trout*,
    451 F. Supp. 2d 1311 (S.D. Fla. 2006) .................................................................43

*Enic, PLC v. F.F. South & Co.*,
    870 So. 2d 888 (Fla. 5th DCA 2004) .............................................................55, 56

*Essex Ins. Co. v. Zota*,
    607 F. Supp. 2d 1340 (S.D. Fla. 2009), *aff'd*, 408 F. App'x 323 (11th Cir. 2011) ................61

*Estate of Scutieri v. Chambers*,
    386 F. App'x 951 (11th Cir. 2010) ................................................................58

*F.A. Riviere v. St. James Episcopal Church of Clayton, Georgia, Inc.*,
    545 So. 2d 449 (Fla. 3d DCA 1989) ...............................................................59

*Felch v. Tranportes Lar-Mex SA DE CV*,
    92 F.3d 320 (5th Cir. 1996) ........................................................................25

*Ferens v. John Deere Co.*,
    494 U.S. 516 (1990)................................................................................45

*Francosteel Corp. v. M/V Charm*,
    19 F.3d 624 (11th Cir. 1994) ..................................................................66, 70

*Future Tech. Today, Inc. v. OSF Healthcare Sys.*,
    218 F.3d 1247 (S.D. Fla. 1999) ...............................................................27, 57

*Gadea v. Star Cruises, Ltd.*,
    949 So. 2d 1143 (Fla. 3d DCA 2011) ..............................................................53

*GAF Corp. v. Zack Co.*,
    445 So. 2d 350 (Fla. 3d DCA 1984) ...............................................................81

*Gasparini v. Pordomingo*,
    972 So. 2d 1053 (Fla. 3d DCA 2008) ..............................................................51

*Gen. Cigar Holdings, Inc. v. Altadis, S.A.*
    205 F. Supp. 2d 1335 (S.D. Fla. 2002) ......................................................55, 56, 70

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    131 S. Ct. 2846 (2011)........................................................................32, 71

*Gray v. Riso Kagaku Corp.*,
    82 F.3d 410, 1996 WL 181488 (4th Cir. Apr. 17, 1996).............................................75

*Hanson v. Denckla*,
    357 U.S. 235 (1958)..........................................................................31, 39

*Harper Macleod Solicitors v. Keaty*,
    260 F.3d 389 (5th Cir. 2001) ................................................................24

*Helicopteros Nacionales de Columbia, S.A. v. Hall*,
    466 U.S. 408 (1984)................................................................32, 33, 72

*Highlands Fuel Delivery, LLC v. Am. Ins. Co.*,
    No. 218-2011-00291, 2011 WL 7110393 (N.H. Super. Ct. Nov. 29, 2011). ........................42

*Hobbs v. Don Mealey Chevrolet*,
    642 So. 2d 1149 (Fla. 5th DCA 1994) ................................................................54

*In re Chinese Manufactured Drywall Prods. Liab. Litig.*,
    767 F. Supp. 2d 649 (E.D. La. 2011) ................................................................24

*In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*,
    No. 07-1873, 2010 WL 1489894 (E.D. La. Apr. 12, 2010)................................................................24

*In re Harrell*,
    351 B.R. 221 (Bankr. M.D. Fla. 2006) ................................................................61

*In re Marinez*,
    589 F.3d 772 (5th Cir. 2009) ................................................................81

*In re OCA, Inc.*,
    551 F.3d 359 (5th Cir. 2008) ................................................................24

*In re Pabst Licensing GMBH & Co. KG Litig.*,
    602 F. Supp. 2d 10 (D.D.C. 2009) ................................................................24

*In re Sterling & Co. Sec. Litig.*,
    222 F. Supp. 2d 289 ................................................................24

*In re Vioxx Prod. Liab. Litig.*,
    478 F. Supp. 2d 897 (E.D. La. 2007)................................................................45

*In re WellNx Mktg. & Sales Practices Litig.*,
    No. 07-1861, 2010 WL 3652457 (D. Mass. Sept. 15, 2010)................................................................24

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945)................................................................ passim

*Jackson v. FIE Corp.*,
    302 F.3d 515, 521 n.6 (5th Cir. 2002) ................................................................25

*Jenkins & Gilchrist v. Groia & Co.*,
    542 F.3d 114 (5th Cir. 2008) ................................................................81

*Jenkins v. Fawcett Publ'ns, Inc.*,
    204 F. Supp. 361 (N.D. Fla. 1962)................................................................60

*Juelich v. Yamazaki Mazak Optonics Corp.*,
    682 N.W.2d 565 (Minn. 2004)....................................................................34

*Kalb, Voorhis v. Am. Fin. Corp.*,
    8 F.3d 130 (2d Cir. 1993)...........................................................................46

*Kawasaki Steel Corp. v. Middleton*,
    699 S.W.2d 199 (Tex. 1985)........................................................................34

*Keeton v Hustler Magazine, Inc.*,
    465 U.S. 770 (1984)....................................................................................34

*Keranos, LLC v. Analog Devices, Inc.*,
    No. 10-207, 2011 WL 4027427 (E.D. Tex. Sept. 12, 2011) ....................42

*Kernel Records Oy v. Mosley*,
    No. 09-21597, 2010 WL 2812565 (S.D. Fla. July 5, 2010)......................54

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941)....................................................................................45

*Lacy v. Sitel Corp.*,
    227 F.3d 290 (5th Cir. 2000) ......................................................................78

*Madara v. Hall*,
    916 F.2d 1510 (11th Cir. 1990) .............................................................43, 66

*Maschinenfabrik Seydelmann v. Altman*,
    468 So. 2d 286 (Fla. 2d DCA 1985) ...........................................................69

*Matter of Dierschke*,
    975 F.2d 181 (5th Cir. 1992) ......................................................................78

*May v. Osako & Co., Ltd.*,
    CL08002245-00, 2011 WL 4544889 (Va. Cir. Ct. Sept. 12, 2011) ........42

*McFadden Ford, Inc. v. Mancuso*,
    766 So. 2d 241 (Fla. 4th DCA 2000) ..........................................................54

*McGee v. Int'l Life Ins. Co.*,
    335 U.S. 220 (1957)....................................................................................33

*McRae v. J.D./M.D., Inc.*,
    511 So. 2d 540 (Fla. 1987)..........................................................................26

*Milberg Factors, Inc. v. Greenbaum,*
   585 So. 2d 1089 (Fla. 3d DCA 1991) ...................................................................28

*Miller v. Toyota Motor Corp.,*
   No. 07-1358, 2008 WL 4525058 (M.D. Fla. Oct. 6, 2008) ................................51, 52

*Mitchell v. DiMare,*
   936 So. 2d 1178 (Fla. 5th DCA 2006) ..................................................................61

*Morris v. B.C. Olympiakos, SFP,*
   721 F. Supp. 2d 546 (S.D. Tex. 2010) ...................................................................25

*Nelson v. Park Indus., Inc.,*
   717 F.2d 1120 (7th Cir. 1983) ..............................................................................34

*Newmark Ladder & Bracket Co. v. Eadie,*
   125 So. 2d 915 (Fla. 3d DCA 1961) .....................................................................60

*Nicastro v. J. McIntyre Machinery, Ltd.,*
   131 S. Ct. 2780 (2011) ............................................................................... passim

*North Am. Clearing, Inc. v. Brokerage Corp. Sys.,*
   666 F. Supp. 2d 1299 (M.D. Fla. 2009) .............................................................51, 54

*Northern Ins. Co. of New York v. Constr. Navale Bordeaux,*
   No. 11-60462, 2011 WL 2682950 (S.D. Fla. July 11, 2011) ............................29, 41

*Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of Venezuela,*
   575 F.3d 491 (5th Cir. 2009) ................................................................................79

*Nova Info Sys. Inc. v. Greenwich Ins. Co.,*
   365 F.3d 996 (11th Cir. 2004) ..............................................................................82

*OMI Holding, Inc. v. Royal Ins. Co. of Canada,*
   149 F.3d 1086 (10th Cir.1998) .............................................................................77

*Osorio v. Dole Food Co.,*
   No. 07-22693, 2009 WL 48189 (S.D. Fla. Jan. 5, 2009) ..................................69, 70

*Oticon v. Sebotek Hearing Sys., LLC,*
   No. 08-5498, 2011 WL 3702423 (D. N.J. Aug. 22, 2011) ....................................42

*Patin v. Thoroughbred Power Boats, Inc.,*
   294 F.3d 640 (5th Cir. 2002) ................................................................................46

*Practical Concepts, Inc. v. Republic of Bolivia,*
   811 F.2d 1543 (D.C. Cir. 1987) ............................................................................79

*Price v. Point Marine, Inc.*,
610 So. 2d 1339 (Fla. 1st DCA 1992) ...................................................................59

*Prototype Prods., Inc. v. Reset, Inc.*,
No. 11-196, 2011 WL6960617 (E.D. Va. Oct. 14, 2011).......................................35

*Resolution Trust Corp. v. Latham & Watkins*,
909 F. Supp. 923 (S.D.N.Y. 1995) .......................................................................54

*Rexam Airspray, Inc. v. Arminak*,
471 F. Supp. 2d 1292 (S.D. Fla. 2007) .................................................................71

*Robinson v. Sanctuary Music*,
383 F. App'x 54, 58 (2d Cir. 2010) ......................................................................80

*Rockwell Int'l Corp. v. KND Corp.*,
83 F.R.D. 556 (N.D. Tex. 1979) ...........................................................................25

*Ruckstuhl v. Owens Corning Fiberglass Corp.*,
731 So. 2d 881 (La. 1999) ....................................................................................34

*RX Solutions, Inc. v. Express Pharm. Servs., Inc.*,
746 So. 2d 475 (Fla. 2d DCA 1999) .....................................................................61

*Saint-Gobain Autover USA, Inc. v. Fuyao Glass Indus. Grp. Co., Ltd.*,
No. 05-71079, 2005 WL 3454402 (E.D. Mich. Dec. 16, 2005) ............................78

*Sea Lift, Inc. v. Refinadora Costarricense De Petroleo, S.A.*,
792 F.2d 989 (11th Cir. 1986) ...............................................................29, 44, 71, 72

*Seiferth v. Helicopteros Atuneros, Inc.*,
472 F.3d 266 (5th Cir. 2006) ................................................................................25

*Shin-Kobe Electric Machinery Co., Ltd. v. Rockwell*,
750 So. 2d 67 (Fla. 2d DCA 1999) ..................................................................66, 70

*Singletary v. B.R.X., Inc.*,
828 F.2d 1135 (5th Cir. 1987) ..........................................................................67, 72

*Smith v. Teledyne Cont'l. Motors, Inc.*,
No. 10-02152, 2012 WL 10836 (D. S.C. Jan. 3, 2012) .........................................41

*Sparta Motors, Inc. v. Lube Power, Inc.*,
337 Ill. App. 3d 556, 786 N.E.2d 613 (2003) .......................................................34

*State v. Am. Tobacco, Co.*,
707 So. 2d 851 (Fla. 4th DCA 1998).....................................................................56

*Sun Trust Bank v. Sun Int'l Hotels Ltd.*,
   184 F. Supp. 2d 1246 (S.D. Fla. 2001) ............................................................................53, 55

*Thompson v. Chrysler Motors Corp.*,
   755 F.2d 1162 (5th Cir. 1985) .......................................................................................2

*Travel Opportunities of Fort Lauderdale, Inc. v. Walter Karl List Mgmt. Inc.*,
   726 So. 2d 313 (Fla. 4th DCA 1998) ...........................................................................27

*United Techs. Corp. v. Mazer*,
   556 F.3d 1260 (11th Cir. 2009) ....................................................................................25

*Van Dusen v. Barrack*,
   376 U.S. 612 (1969)...........................................................................................24, 45

*Varnes v. Local 91, Glass Bottle Blowers Ass'n*,
   674 F.2d 1365 (11th Cir. 1982) ....................................................................................77

*Verizon Trademark Servs., LLC v. Producers, Inc.*,
   810 F. Supp. 2d 1321 (M.D. Fla. 2011).................................................................51, 53

*Verizon Trademark Servs., LLC v. The Producers, Inc.*,
   No. 10-665, 2011 WL 3629002 (M.D. Fla. Aug. 18, 2011).........................................53

*Vermeulen v. Renault, U.S.A., Inc.*,
   985 F.2d 1534 (11th Cir. 1993) ....................................................................................67

*Viznai v. United Homes of New York, Inc.*,
   No. 07-4173, 2009 WL 931178 (E.D.N.Y. Apr. 3, 2009) .............................................78

*Walk Haydel & Assoc., Inc. v. Coastal Power Prod. Co.*,
   517 F.3d 235 (5th Cir. 2008) ..................................................................................2, 25

*Warth v. Seldin*,
   422 U.S. 490 (1975)......................................................................................................81

*WH Smith, Plc v. Benages & Assocs., Inc.*,
   51 So. 3d 577 (Fla. 3d DCA 2010) ...............................................................................52

*Windsor v. Spinner Indus. Co.*,
   10-114, 2011 WL 5005199 (D. Md. Oct. 20, 2011) ......................................................41

*Wm. E. Strasser Construction Corp. v. Linn*,
   97 So. 2d 458 (Fla. 1957)..............................................................................................60

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980)............................................................................................. passim

**FEDERAL STATUTES**

28 U.S.C. § 1407 ..................................................................................................3, 24

**OTHER STATUTES**

Fla Stat. § 48.181 .................................................................................59, 60, 62, 71

Fla. Stat § 48.193 (2010)........................................................................... passim

Fla. Stat. § 672.313 (2010)...............................................................................82

**RULES**

Fed. R. Civ. P. 4 .............................................................................................77

Fed. R. Civ. P. 5(a)(2) .....................................................................................77

Fed R. Civ. P. 12(b)(2)......................................................................................1

Fed. R. Civ. P. 44.1..........................................................................................46

Fed. R. Civ. P. 55(c) ...........................................................................1, 23, 78

Fed. R. Civ. P. 60(b) ...................................................................................23, 24

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Amendment XIV, § 1 ............................................................1, 30

**OTHER AUTHORITIES**

10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and
   Procedure* § 2697 (3d Ed. 1998).............................................................81

Defendant Taishan Gypsum Co. Ltd. ("TG") submits this memorandum in support of its motion for an order (1) pursuant to Rule 55(c) of the Federal Rules of Civil Procedure vacating the September 23, 2009 order of this Court holding TG in preliminary default; and (2) pursuant to Rule 12(b)(2) dismissing this action for lack of personal jurisdiction.

## INTRODUCTION

Since September 2010, when TG first moved to vacate the preliminary default, the parties have taken extensive jurisdictional discovery.[1] The evidence developed through that discovery demonstrates that TG did not sell drywall to any customer who claimed to be from Florida or to any customer that indicated it intended to ship drywall to Florida. There is no evidence that Plaintiff, an Alabama-based homebuilder, purchased any drywall manufactured by TG.

Based on the evidence, the Court must conclude that TG is not subject to jurisdiction under the long-arm statute of Florida, the forum State where Plaintiff filed its original complaint. In addition, the Due Process Clause of the Fourteenth Amendment of the United States Constitution precludes the Court's exercise of personal jurisdiction over TG. TG lacked minimum contacts with Florida, and Plaintiff cannot show its causes of action arose out of or resulted from TG's alleged contacts with Florida. Furthermore, even if Plaintiff could satisfy the long-arm statute and demonstrate that TG had minimum contacts with Florida, the assertion of personal jurisdiction over TG would not be fair and reasonable, in violation of Due Process.

The evidence also shows that TG's subsidiary, Tai'an Taishan Plasterboard Co., Ltd. ("TTP"), operated independently of TG. Accordingly, there is no basis to attribute any of TTP's activities to TG for jurisdictional purposes. Furthermore, TTP itself lacked the requisite minimum contacts with Florida for the purposes of being subject to the Court's jurisdiction. TTP

---

[1] On September 21, 2010, TG filed a Motion to Vacate the Preliminary Default and to Dismiss the Action. (Doc. No. 5583).

made only isolated sales of drywall in China to three companies that advised TTP they intended to ship drywall to Florida. As directed by the purchasers, TTP delivered drywall to ports in China and did not control where the customers shipped the drywall. TTP was not aware that any of the companies that purchased drywall from TTP in China would market that drywall in Florida. There also is no evidence that Plaintiff bought or used any of the drywall TTP sold in China to the companies that intended to ship it to Florida. Therefore, attributing TTP's contacts to TG would not supply TG with the minimum contacts that it lacked. The preliminary default must be vacated, and the Complaint must be dismissed.

The preliminary default order is also void because Plaintiff did not properly serve TG with its Amended Complaint on which the default was entered. Further, even assuming the Court has jurisdiction over TG, the default should be vacated because any failure by TG to timely respond was excusable.

## PROCEDURAL BACKGROUND

### A.   Plaintiff Files And Serves The Complaint

Plaintiff commenced suit on March 6, 2009 by filing the Complaint in the Northern District of Florida ("Complaint" or "Compl.").[2] Plaintiff asserted that it was an Alabama company, based in Mobile, Alabama, that purchased drywall from two distributors, Interior & Exterior Building Supply ("Inex") and Rightway Drywall Inc. ("Rightway") based in Louisiana

---

[2] The facts relevant to this motion are set forth in documents and depositions attached to the accompanying declaration of Frank T. Spano, dated April 4, 2012 ("Spano Decl."). On January 6, 2012, the Court entered an Order Regarding Authenticity and Admissibility of Certain Documents Identified by Parties for Use at Depositions in Hong Kong the week of January 9, 2012, (Doc. No. 12126) (the "Admissibility Stipulation"). All of the documents relied upon by TG in support of its motion are admissible pursuant to the Admissibility Stipulation, relevant deposition testimony or other applicable law. *See Walk Haydel & Assoc., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008) ("When the defendant disputes the factual bases for jurisdiction . . . the court may receive interrogatories, depositions, or 'any combination of the recognized methods of discovery' to help it resolve the jurisdictional issue.") (citing *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985)) (emphasis added).

A copy of the Complaint is attached to the Spano Decl. as Exhibit 6.

and Georgia, respectively.  (Compl. ¶¶ 8-10, 21).  Plaintiff further claimed on information and belief that this drywall was manufactured by Knauf and TG.  Plaintiff asserted claims against Knauf and its affiliates and agents and against TG, but not against any affiliate or agent of TG.  (*Id.*)  After constructing homes in several states, including Florida, Plaintiff claimed that it was informed that the drywall was defective, that Plaintiff had an obligation to replace it, and that, as a result, it would incur an unspecified expense.  (Compl. ¶¶ 8-10, 19-20).  Plaintiff further alleged that its drywall claims were filed individually and on behalf of "persons and entities in the States of Louisiana, Georgia, Texas, and Florida who used drywall manufactured by [the Defendants] for the construction, repair, or remodeling of any improvement to real property and who incurred any expense associated with (1) repair or replacement or all or part of drywall, and/or (2) other property damaged by the defective drywall, and/or (3) is liable to owners of the property for said damages." (Compl. ¶ 25).  Plaintiff served the Complaint on TG on or about May 8, 2009.

When TG received the Complaint, it did not understand how this litigation could involve the company.[3]  (Jia Decl. ¶ 33).  As TG never sold or distributed drywall in Florida, TG did not believe that it was necessary to appear in the proceedings. (*Id.*).

### B.   Plaintiff Failed To Serve The Amended Complaint Alleging A Nationwide Class Action

On June 15, 2009, Plaintiff's case was transferred to this Court by the Multidistrict Litigation Panel in accordance with 28 U.S.C. § 1407.  On July 7, 2009, Plaintiff filed an Amended Complaint ("Amended Complaint" or "Am. Compl.") that changed the size, character, and complexion of the claims levied against TG.  (Doc. No. 42).  Critically, the Amended

---

[3] Attached to the Spano Decl. as Exhibit 1 is a true and correct copy of the Declaration of Jia Tongchun, Chairman, General Manager and Senior Engineer of Taishan ("Jia Decl."), dated September 16, 2010, which was filed in support of TG's original motion to vacate/dismiss in September 2010.  The extensive jurisdictional discovery conducted since the filing of TG's initial motion has substantiated the facts stated in the Jia Decl.

Complaint purported to add a putative "nationwide" class of "users of [defendant's] drywall . . ." to the Complaint's class of "persons and entities in the States of Louisiana, Georgia, Texas, and Florida."  (Am. Compl. ¶ 29).[4]  Plaintiff did not serve TG with the Amended Complaint.  (Jia Decl. ¶ 32), and TG did not answer or appear with respect to the Amended Complaint.

The Amended Complaint contains only the following allegations in support of the exercise of jurisdiction over TG:

- "Taishan[5] purposefully availed itself of the jurisdiction of this court by selling and shipping substantial quantities of drywall into the States of Florida and Louisiana."[6]  (Am. Compl. ¶ 8).

- "Taishan has continuously and systematically distributed and sold drywall to numerous purchasers in the States of Florida and Louisiana and Taishan's drywall is installed in numerous homes in both States." (*Id.*).

- "As discussed more fully below, and upon information and belief, Taishan manufactured and sold to certain suppliers in the States of Alabama, Mississippi, Louisiana, Georgia, and Florida, defective gypsum drywall that was installed in homes being built by Mitchell and Class Members, thereby causing substantial damage." (*Id.*).

- "Upon information and belief, Taishan manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within the States of Alabama, Mississippi, Louisiana, Georgia and Florida." (*Id.*).

- "The defective drywall in the affected homes was supplied by Interior & Exterior and Rightway.  Upon information and belief, Interior & Exterior and

---

[4] The "nationwide class" was proposed "in the alternative" to a class of covered persons or entities in Alabama, Louisiana, Georgia, Texas or Florida.  (Am. Compl. ¶ 29).  Additionally, the Amended Complaint dramatically changed Plaintiff's theory of causation.  Whereas the Complaint originally alleged that "sulfur" rendered the drywall unsuitable for its intended purpose (Compl. ¶ 16), the Amended Complaint claimed that one or more "contaminates" in the drywall rendered it unsuitable for its intended purposes, thereby expanding Plaintiff's theory of the root cause of the defective product.  (Am. Compl. ¶ 21).

[5] The Amended Complaint refers to TG as "Taishan".

[6] As set forth above, the operative question is whether TG is subject to jurisdiction in Florida.  *See infra* pp. 24-25.  Accordingly, any allegations that TG had contact with Louisiana or any other states other than Florida have no bearing on the inquiry as to whether TG is subject to jurisdiction in Florida.  *See, e.g., Am. Investors Life Ins. Co. v. Webb Life Ins. Agency, Inc.*, 876 F. Supp. 1278, 1281 (S.D. Fla. 1995) (North Carolina contacts could not subject defendant to jurisdiction in Florida).

Rightway received the defective drywall directly or indirectly from the Manufacturers, who manufactured the defective drywall in China." (*Id.* ¶ 25).

C.    **Plaintiff Obtains A Default On The Unserved Amended Complaint**

On September 2, 2009, Plaintiff moved for entry of default against TG for failure to answer or move with respect to the Complaint or the Amended Complaint.  (Doc. Nos. 190, 256). TG did not receive any notice of this application.  On September 23, 2009, the Court entered a preliminary default against TG based on the Amended Complaint, which had not been served on TG.  (Doc. No. 277).  By order dated October 9, 2009, the Court extended indefinitely the deadline for Plaintiff to file its motion for confirmation of the preliminary default.  (Doc. No. 335).  To date, Plaintiff has not moved to confirm the preliminary default.  After learning of the preliminary default, TG retained counsel and appeared in this action on June 10, 2010, explicitly reserving its objections to the Court's jurisdiction.  (Jia Decl. ¶¶ 34-35).

On October 14, 2010, the Court ordered the parties to engage in discovery for the purpose of determining whether there is jurisdiction over TG or TTP (collectively, the "Taishan Defendants").  (Doc. No 6006).  Over the next approximately 18 months, the parties conducted extensive jurisdictional discovery.  The Taishan Defendants produced more than 26,000 pages of documents and produced six witnesses for approximately two weeks of depositions in Hong Kong.  In addition, the Plaintiffs' Steering Committee (the "PSC") has conducted depositions of other parties and witnesses.  The PSC has continued to conduct jurisdictional discovery through March 2012.

**FACTUAL BACKGROUND**

A.    **TG Never Has Conducted Business In Florida Or Anywhere Else In The U.S.**

TG is a Chinese corporation with its principal place of business in Tai'an City, Shandong Province, People's Republic of China.  (Jia Decl. ¶¶ 4).  TG has manufactured drywall since

1992.  (*Id.* ¶ 6).  TG manufactures and sells drywall exclusively in China.  (*Id.* ¶¶ 7-9, 33).  The evidence shows TG has not engaged in any activities in Florida:

- TG never has manufactured, marketed, sold or distributed drywall in Florida. (Jia Decl. ¶¶ 10-13).

- TG never has advertised in Florida or performed any services there.[7]  (Jia Decl. ¶¶ 14-15).

- TG has had a website since approximately 2003, some parts of which are in English.[8]

- TG's website is entirely passive; customers cannot purchase drywall or any other products through the website nor can customers communicate with TG through the website.[9]  (*See* Peng Tr. 542:14-543:5).

- TG never has registered to do business or had an office, bank account or agent appointed to accept service of process in Florida.  (Jia Decl. ¶¶ 16-18, 20; Jia Tr. 536:1-4, 536:12-15, 537:5-8).

- TG never has paid taxes or had a mailing address in Florida.  (Jia Decl. ¶¶ 19, 23; Jia Tr. 537:1-4).

- TG never has owned or leased any real or personal property in Florida.  (Jia Decl. ¶ 16; Jia Tr. 535:20-24, 538:15-18).

- No employee, officer, director or agent of TG ever has maintained a place of business or resided in Florida, or visited Florida.[10]  (Jia Decl. ¶¶ 24-25; Jia Tr. 537:13-17; Peng Tr. 38:3-5; 275:7-11).

- None of TG's employees ever has attended a trade show or exhibition in the U.S.  (Peng Tr. 273:13-274:13).

---

[7] *See* transcript of the deposition of Jia Tongchun, which took place on April 4 and 5, 2011 and January 9 and 10, 2012 ("Jia Tr.") at 539:8-12, a copy of which, including Defendants' Exhibits 1 through 47A, and Plaintiffs' Exhibits 1 through 36,  is attached to the Spano Decl. as Exhibit 2.  Some of the testimony and exhibits from the Jia Tr., and from transcripts of the other witnesses set forth below,  have been designated as "Highly Confidential" and will be filed under seal, in accordance with Pre-trial Order No. 16.

[8] *See* transcript of the deposition of Peng Wenlong, which took place on April 7 and 8, 2011 and January 13, 2012 ("Peng Tr.") at 542:14:543:5, a copy of which, including Exhibits 1 through 23, is attached to the Spano Decl. as Exhibit 3.  Peng Wenlong was the manager of the foreign sales department at TG from the second half of 2004 to February 2006 and oversaw sales activities of TTP between February 2006 to January 2008.

[9] *See* transcript of the deposition of Fu Tinghuan, which took place on January 10, 2012 ("Fu Tr.") at 78:12-18, a complete copy of which, including Exhibits 1 through 4, is attached to the Spano Decl. as Exhibit 6.

[10] *See* transcript of the deposition of Zhang Jianchun, which took place on April 6, 2011 ("Zhang Tr.") at 83:7-17, a copy of which, including Exhibits 13 through 17, is attached to the Spano Decl. as Exhibit 4.

TG made only two sales of drywall to companies based in the U.S.  On both occasions, TG sold drywall in China to a Virginia company, Venture Supply, Inc. ("Venture Supply").  (*See* TG's MPF).  Each sale was made pursuant to a contract that required payment in full in China and specified China as the arbitral forum in which any disputes would be resolved.  (*See* Spano Decl. Ex. 10).  Each delivery was FOB[11] a Chinese port, and the Bills of Lading furnished to TG by Venture Supply's shipping agent indicate that Venture Supply shipped its first order to Norfolk, Virginia and the second to Camden, New Jersey.  (*See* Spano Decl. Ex. 11).

The evidence also suggests that Venture Supply made a single, one-off sale of a small amount of drywall (approx. 4500 sheets) it purchased from TG to Banner Supply Co. ("Banner") in Florida.  (*See* Deposition of Sam Porter, principal of Venture Supply, dated December 16, 2009 ("Porter Tr.") at 139:6-141:11).[12]  There is no evidence of what Banner did with the drywall it purchased from Venture Supply.

### B.   There Is No Evidence Plaintiff Purchased Any Drywall Manufactured By TG

Plaintiff filed numerous profile forms in the MDL (*see* Spano Decl. Ex. 13), and in these profile forms it stated either that Knauf was the manufacturer of drywall that Plaintiff purchased or that the identity of the manufacturer was unknown.  Plaintiff alleges it purchased drywall from Rightway and Inex and no other distributors.  Rightway stated in its profile form that it did not know the identity of the manufacturer of the drywall it purchased and sold.[13]  Inex stated in its profile form[14] that it purchased from a Canadian company, Metro Resources, drywall

---

[11] "FOB" stands for "Free on Board".  *See* INVESTOPEDIA, definition of "Free on Board – FOB", *available at* http://www.investopedia.com/terms/f/fob.asp#axzz1quo6ICYd (last visited April 2, 2012).  "Free on Board" is a "trade term requiring the seller to deliver goods on board a vessel designated by the buyer.  The seller fulfills its obligations to deliver when the goods have passed over the ship's rail."

[12] Relevant excerpts of the Porter Tr. are annexed to the Spano Decl. as Exhibit 12.

[13] Rightway's Contractor/Installer Defendant Profile Forms are attached to the Spano Decl. as Exhibit 14.

[14] Inex's Distributor Profile Form is attached to the Spano Decl. as Exhibit 15.

manufactured by Knauf and by TTP, TG's subsidiary.[15]  TTP, however, is not a defendant in this action, and Plaintiff has not alleged that TTP's sales should be attributed to TG under any theory or for any reason.

### C.   TTP Operated Independently Of TG

For environmental reasons, the Chinese government has encouraged industries to utilize recycled materials in manufacturing; one form of which was to give companies an exemption from value added tax ("VAT").  By 2005, TG was utilizing a sufficient percentage of recycled material in its drywall to qualify for a VAT exemption.  Nevertheless, certain domestic Chinese customers desired to pay VAT for tax and accounting purposes.  (*See* Jia Tr. 480:24-481:24, 644:3-646:15; Zhang Tr. 141:24-142:21; Fu Tr. 109:4-22).   In 2005, however, the Chinese government informed TG that it could not continue its former practice of issuing VAT invoices to customers, without jeopardizing its exemption from VAT. (*Id.*).

The Chinese tax bureau advised TG in 2005 that TG had to establish a totally independent company if it wanted to issue VAT invoices to its customers.  As a result, TG established TTP.  (*See* Jia Tr. 480:24-481:24, 644:3-646:15; Zhang Tr. 141:24-142:21; Fu Tr. 109:4-22.)  TG did not form TTP for the purpose of selling drywall to US importers (*see* Jia Tr. 480:20-23), although it recognized that sales would primarily be made to companies who would ship the goods outside of China.[16]  Nevertheless, TTP maintained its own international sales department in 2005-2008.  (Jia Tr. 860:3-16; Fu Tr. 108:8-109:2).  As Fu Tinghuan, TG's manager of sales, explained, TG and TTP did not work together.  (Fu Tr. 110:2-4).

---

[15] Assuming, solely for the purpose of argument, that Metro Resources did re-sell TTP drywall, it did not purchase that drywall directly from TTP.  TTP has no record of having sold any drywall to Metro Resources, nor does it have any record of sales to Rightway.  (Spano Decl. Ex. 16 ("TTP MPF")).

[16] "Most of the customers that . . . buy the products to be sold somewhere outside of China for the drywall, most of them, they require the invoice of the VAT.  Therefore, the products produced by TTP, they would have a lot of the products sold outside of China."  (Jia Tr. 480:24-481:24; *see also* Zhang Tr. 140:5-142:21).

8

### 1.   TTP Observed Corporate Formalities

TG scrupulously observed corporate formalities when it established TTP.  TTP's founding documents were executed on February 10, 2006.  (*See* Jia Tr., Def.'s Ex. 34A).[17]  First, in accordance with Chinese law, TG was registered in the business license department.  (*See* Jia Tr., Def.'s Ex. 33A).  As the business license department requires a company to have an office, a manufacturer's site, a scope of business declaration, and a third party asset evaluation report, TG sold equipment to TTP, leased a manufacturing site to TTP, and made a capital contribution to TTP.  (*See* Jia Tr. 648:22-649:18; Def.'s Exs. 37A, 40A, 42A and 43A).[18]

As is shown by TTP's Capital Verification Description, TG initially contributed 15 million RMB to TTP's capital account.  (*See* Jia Tr., Def.'s Ex. 37A).  When TTP sought additional operating capital from TG, TTP provided information to a third party accounting firm which issued a Capital Verification Description.[19]  (*See* Jia Tr., Def.'s Ex. 37A).

On February 10, 2006, TG entered into a lease agreement with TTP for the property TTP used as its manufacturing site.  (*See* Jia Tr., Def.'s Ex. 40A).  TTP's business was located three kilometers from TG's business.  (Fu Tr. 111:2-7).  TTP paid 80,000 RMB, which was believed to be the market value, for the leased property.  (*See* Jia Tr. 659:16-660:20).[20]

---

[17] In most cases, where a deposition exhibit is in Chinese, the English translation was marked as an exhibit with the same number, but with the suffix "A".  For example, Def.'s Ex. 34 to the Jia Tr. is a Chinese language document.  Its English translation is Def.'s Ex. 34A.  For the convenience of the English-speaking Court and parties, citations will point to English translations.

[18] On July 22, 2006, the shareholders of TG decided to make an additional capital contribution of 7 million RMB to TTP.  (Jia Tr. 656:22-657:16, Def.'s Ex. 38A).  To reflect the additional capital contribution, TTP was required to revise its Articles of Incorporation.  (Jia Tr. 658:10-659:4, Def.'s Ex. 39A).

[19] *See* transcript of the deposition of Peng Shiliang, which took place on January 11, 2012 ("Shiliang Tr.") at 120:9-121:11, a copy of which, including Exhibits 1 through 10, is attached to the Spano Decl. as Exhibit 7.

[20] The original agreement to lease TG's manufacturing facility was revised on February 20, 2006 to reflect an increase in the lease rate that was more reasonable.  (*See* Jia Tr. 663:5-664:22, Def.'s Ex. 43A).

Additionally, on February 20, 2006, TG and TTP entered into a written agreement whereby TG sold manufacturing equipment to TTP. (*See* Jia Tr. 174:2-175:5; 474:23-475:5, 662:12-20, Def.'s Ex. 42A; Zhang Tr. 149:24-151:4). The purchase price was based on market value. (*See* Jia Tr. 662:24-663:4). On February 20, 2006, TG licensed the use of the trademark "Taishan" to TTP; TG's authorization was required in order for TTP to use TG's trademarks. (*See* Jia Tr. 175:10-20, 445:8-448:15, 661:8-21, Def.'s Ex. 41A; Zhang Tr. 149:4-9).

TG also created Articles of Incorporation for TTP, signed by Jia as TG's legal representative. (*See* Jia Tr. 651:10-652:1, Def.'s Ex. 34A). TTP documented the appointment of Messrs. Peng Shiliang, Fu and Wang as the three members of its Board of Directors (as specified in the Article of Incorporation). (*See* Jia Tr. 652:19-653:21, Def.'s Ex. 35A). TTP's senior officers were Peng Shiliang, its general manager, and Song Qinghai, its production manager. (*See* Jia Tr. 646:22-647:6; Zhang Tr. 78:24-79:7). TTP did not share any directors or managers with TG. (*See* Zhang Tr. 80:21-81:10).[21] TTP provided information to third party accounting firms for the purposes of preparing financial statements for the years 2006, 2007 and 2008. (*See* Shiliang Tr. 123:22-124:12; Jia Tr., Def.'s Exs. 45A, 46A and 47A).

## 2. TTP's Daily Operations Were Managed Independently Of TG

TTP maintained operational independence from TG. Peng Shiliang was responsible for the everyday operations of TTP. (*See* Shiliang Tr. 24:20-25:11). He, not the Board of Directors, had the right to hire and fire employees in his role as general manager. (Fu Tr. 115:18-116:4; Jia Tr. 210:6-17). The department managers of TTP reported to Peng Shiliang (*See* Shiliang Tr. 26:1-27:6) and in his capacity as general manager he did not report to TG's executives. (*See* Shiliang Tr. 25:19-24). About once per month, TTP sent a written report to Jia's office. (*See* Jia

---

[21] Jia was never a director or officer of TTP. (Jia Tr. 112:23-113:2; Peng Tr. 158:21-159:1). Indeed, Jia was unaware of TTP's sales policies and operations. (Jia Tr. 122:1-24).

Tr. 131:18-132:16).  When necessary, TTP's directors would verbally communicate with Jia. (*Id*.).  The reports would provide the specifics of production and the volume of sales, but they did not provide information regarding the identity of customers.  (Jia Tr. 443:18-444:5; *see also* Jia Tr. 133:17-19).  TG and TTP had no cost-sharing agreements.  Instead, "[w]hen TG provide[s] assistance or help to TTP, TTP has to pay a fee to TG."  (Zhang Tr. 113:11-114:6).

### 3.    TTP's Facilities And Employees Were Independent Of TG

TTP operated as a separate entity from TG.  It had its own production facility and did not use or share TG's production facility.  (*See* Jia Tr. 170:14-18; Shiliang Tr. 118:21-119:5).  TTP purchased its own equipment, supplies and materials including production equipment, lab equipment and computers.  (*See* Shiliang Tr. 119:6-10; Zhang Tr. 110:13-111:10).  TTP had its own, separate offices (*See* Jia Tr. 171:7-9, 647:21-23; Peng Tr. 70:17-20; Zhang Tr. 126:21-127:7), its own factory, which it leased from TG (*See* Jia Tr. 171:4-6, 175:7-9, 648:9-17, Def.'s Exs. 40A, 43A) and its own warehouse (*See* Jia Tr. 170:23-171:3).

TTP had its own bank accounts, an independent financial department, and paid its own employees.  (*See* Jia Tr. 196:1-8; Zhang Tr. 42:4-6; Shiliang Tr. 119:11-20).  TG never loaned money to TTP (*See* Jia Tr. 192:7-8, 195:14-17), and TG did not guarantee loan obligations to banks for TTP.  (*See* Jia Tr. 192:4-6).  TG and TTP had separate after-sales departments (*See* Jia 433:15-434:6), and independent quality control departments (*See* Zhang 138:13-139:7).  TG had no responsibility to remedy any defects in TTP products.  (*See* Jia 451:1-3).  TTP was inspected by the Department of Business Licensing and the Department of Taxation, among others, to ensure that it operated independently.  (*See* Shiliang Tr. 119:21-120:8).

TTP hired 260 employees, none of whom were shared with TG.   (*See* Shiliang Tr. 118:11-20; Jia Tr. 171:10-12, 877:23-878:5).  While some of TTP's employees had been

previously employed by TG,[22] there is no record of exactly how many.[23]  These employees were not assigned or seconded to TTP.  (*See* Jia Tr. 844:5-845:9).  Rather, after TTP was established, TTP put up a hiring notice.  (*See* Che Tr. 20:19-24).  Che, one of the TG employees who left TG to work for TTP, testified that he volunteered to work for TTP.  (Che Tr. 21:18-5).  Che explained that he had a discussion with a few TG employees, and they decided that TTP had a "bigger development space," so they requested to work for TTP. (Che Tr. 147:8-13; *see also* Fu Tr. 116:15-24).

### 4.        TTP Ceased Operations In 2008 For Economic Reasons

TTP's last sale to a U.S. company was in July 2007 (*See* TTP's MPF).  TTP ceased the production of drywall in 2008 "for the consideration of economic interests" (Zhang Tr. 151:16-19), because fewer customers required VAT invoices.  (Zhang Tr. 152:4-154:20).  The decision to shut down TTP was made "together by the Board of Directors of Taishan and TTP."  (Zhang Tr. 155:3-5).

On January 1, 2008, TTP entered into a written agreement whereby it re-sold to TG the equipment it had purchased from TG.  (*See* Jia Tr. 665:24-666:10, Def.'s Ex. 44A).  Although TTP was not wound up, TTP currently has no income for its operations.  (*See* Zhang Tr. 66:1-3).  It still has some assets, however, including factories and equipment, and accounts.  (Zhang Tr. 57:7-23).

---

[22] *See* transcript of the deposition of Che Gang, taken January 11 and 12, 2012 ("Che Tr."), at 22:8-25:14, a complete copy of which, with Defendants' Exhibits 1 and 2 and Plaintiffs' Exhibits 1 through 32, is attached to the Spano Decl. as Exhibit 5.

[23] In approximately February 2006, salesmen Peng, Jaipo and Che transferred from TG to TTP to work on foreign sales for TTP.  (*See* Peng Tr. 384:13-17; Che Tr. 20:2-9, 23:14-18).

### D.     TTP Never Has Conducted Business In Florida Or Elsewhere In The U.S.

TTP manufactured drywall between 2006 and 2008 exclusively in China. (*See* Jia Decl. ¶ 26; *see also* TTP's MPF).  The evidence shows TTP never engaged in any activities in Florida:

- TTP did not manufacture, market, sell or distribute drywall in Florida. (*Id.*; *see also* Peng Tr. 282:10-283:9).

- TTP never had its own website and did not develop any sales or promotional materials on the internet. (Peng Tr. 283:15-284:6, 306:9-20).

- TG's website does not mention TTP. (*See* Peng Tr. 283:10-16).

- TTP did not have an office, bank account or agent appointed to accept service of process in Florida.

- TTP never has paid taxes or had a mailing address in Florida.

- TTP never has owned or leased any real or personal property in Florida.

- No employees, officers, directors or agents of TTP ever have maintained a place of business, resided in or visited Florida. (*See* Zhang Tr. 82:6-25; Peng Tr. 275:7-11).

- No TTP employee ever attended a trade show or exhibition in the U.S. (*See e.g.* Peng Tr. 273:13-274:6).

- TTP did not have any trademarks or other intellectual property registered in the U.S.

### 1.     Overview Of TTP's Sales Of Drywall

As discussed above, TG formed TTP in early 2006 for the purpose of having an independent company that could legally issue VAT invoices to Chinese customers.  TTP sold drywall for a relatively short period of time, between approximately March 2006 and July 2007.  TTP's MPF identifies each sale of drywall that TTP made in the dimensions used in the U.S. (*See* Spano Decl. Ex. 16).  The MPF lists sales to both Chinese and foreign customers.  (*Id.*).  The information set forth in TTP's MPF was collected from a variety of sources, including contracts, invoices, shipping documents and correspondence.  (*See* Peng Tr. 342:17-343:19,

13

529:4-531:20).  TTP sold drywall on a made-to-order, OEM basis.  TTP marked the drywall as instructed by its customers.  (*See e.g.,* Che Tr. 358:22-359:23).  Unless requested by a customer, TTP did not put any markings on the drywall which could identify it as the manufacturer.  (*See* TTP's MPF; Che Tr. 358:22-359:23).

**2.**     **Most Of TTP's Sales Were To Chinese Trading Companies**

The vast majority of TTP's sales were to Chinese trading companies.  (*See* Spano Decl. Ex. 16).  The Chinese trading companies were competitors of TTP and each other.  They rarely disclosed to TTP the identity of any customer to whom they were re-selling the drywall or where they were shipping it.[24]  (*See* Shiliang Tr. 94:22–96:4, 126:17-127:16).  Because the Chinese trading companies paid for the drywall in advance and usually took delivery of the drywall at TTP's factory in China, TTP did not require this information.  (*Id.*).  TTP did not ship any drywall it sold to Chinese trading companies anywhere outside of China.  (*See* Shiliang Tr. 94:22-95:8; Che Tr. 32:20-33:3, 83:8-15, 196:6-12, Fu Tr. 87:6-14, 121:8-16).

As shown on TTP's MPF, some of the Chinese trading companies ordered drywall with English-language markings, including statements to the effect that the drywall met ASTM standards.  (*See generally* TTP's MPF).  However, no Chinese trading company indicated to TTP that the drywall it purchased from TTP would end up being re-sold in Florida or used by consumers in Florida.  (*See* Peng Tr. 322:18-323:1; Jia Tr. 543:15-20).

**3.**     **TTP Made Isolated Sales In China To Three Companies That Advised TTP They Intended To Ship To Florida**

TTP did not actively market to foreign customers.  Potential foreign customers typically initiated contact with TTP directly or through their representatives in China.  (*See, e.g.,* Spano Decl. Ex. 18).  As the record shows, TTP was contacted by numerous potential foreign

---

[24] A rare exception was TTP's sale to Shenzhen Yongfeng Investment Co., Ltd.  ("Shenzhen").  Shenzhen reportedly shipped the drywall it purchased from TTP to New York.  (*See* TTP MPF at Nos. 229-230, 232-233).

customers seeking information concerning TTP's ability to supply drywall.  TTP responded to these requests with pricing, shipping cost and other information that was requested.  (*Id.*).  There were many communications of this nature but very few actual sales to foreign customers.  Eventually three companies - Wood Nation, Inc. ("Wood Nation"), Oriental Trading Company LLC ("Oriental Trading"), and B America Corp. ("B America") - purchased drywall from TTP in China and advised TTP that they intended to ship the drywall they purchased to Florida.  (*See* TTP MPF at Nos. 177, 234-243).  TTP had no other customers who informed TTP they planned to ship to Florida.

TTP completed its sales to the three companies in China and delivered the drywall to the port in China they selected.  TTP did not ship any of the drywall it sold to those companies – or anyone else – to Florida.[25]  Sometimes, when requested by a customer, TTP would assist with shipping arrangements.  (*See* Peng Tr. 270:1-271:14, 318:21-319:17, 321:7-23); s*ee also* Sections a, b and c, below).  This typically involved TTP's contacting shipping agents in China who would provide price quotes for shipping, locate available ships, and arrange for storage at the port and loading on the ship, always at the customer's expense.  (*See* Che Tr. 201:3-202:1, 241:1-246:5, Pl.'s Exs. 2, 8, 10; Peng Tr. 500:2-10).  However, regardless of the extent to which TTP assisted with shipping arrangements, the customer always decided where to ship the product, when to ship it, and by what means.  The customer was always responsible for the cost of shipping.  (*See* Fu Tr. 121:8-16).

a.      <strong>Wood Nation</strong>

In mid-2006, an employee of Beijing New Building Materials LLC ("BNBM") named

---

[25] Separate from actual drywall sales, at the request of particular customers, TTP would provide small samples of drywall if the factory had them available and the customer pre-paid for the cost of shipping them.  (*See* Che Tr. 285:4-286:2, 287:19-288:18, 376:15-19,  Ex. 18; Peng Tr. 267:23-269:13; *see also* Shiliang Tr., Ex. 2).

David Wei introduced Wood Nation to TTP.[26]  Wei was acquainted with Wood Nation's president Richard Hannam, as they had worked together at a company named BNBM USA, that was defunct by 2005, and Wood Nation had previously purchased drywall from BNBM.[27]  TTP had no prior contact with Wood Nation prior to when Wei first contacted TTP regarding Wood Nation.  (*See* Peng Tr. 193:20-194:4).  Wei introduced TTP to Wood Nation as a favor to his friend.  (*See* Hannam Tr. A 48:20-23; Hannam Tr. B 49:15-19).  Wei acted completely independently of BNBM.  (*See* Hannam Tr. A 48:24-49:11; Hannam Tr. B 53:9-15).  Wei took great care not to let BNBM know that he was introducing its customer to another competing company, TTP.  (*See* Hannam Tr. B 53:9-15).

Wei brought Hannam to TTP's factory in Tai'an.  Hannam met with Peng Wenlong.  (*See* Hannam Tr. B 52:2-14; Peng Tr. 190:2-8).  At the meeting, Hannam expressed an interest in buying TTP's drywall.  (*See* Peng Tr. 193:23-194:20).

Wood Nation entered into a single contract in China to purchase drywall from TTP on one isolated occasion.  (*See* TTP MPF at No. 177; Spano Decl. Ex. 22).  The terms of sale for Wood Nation were FOB a Chinese port.  (*See* Peng Tr. 534:2-9; Hannam Tr. B 79:1-10; Spano Decl. Exs. 22, 23).

TTP's FOB sales to Wood Nation (and to Oriental Trading, discussed below) worked as follows:  The customer decided where it wanted to ship the drywall and made arrangements to ship the drywall from a port in China to its destination.  (*See* Hannam Tr. B 79:11-12, 80:1-15; Spano Decl. Ex. 24).  TTP then delivered the drywall to the port in China selected by the customer.  (*See* Peng Tr. 534:2-23).  At the port, TTP surrendered possession of the drywall to

---

[26] *See* transcript of the deposition of Richard Hannam of Wood Nation, taken on February 14, 2011 ("Hannam Tr. A") at 45:24-46:19, relevant excerpts of which are attached to the Spano Decl. as Exhibit 19.

[27] *See* transcript of the deposition of Richard Hannam taken on February 13, 2012 ("Hannam Tr. B") at 50:10-52:14, relevant excerpts of which are attached to the Spano Decl. as Exhibit 20.

the customer's shipping agent, and the sale was complete.  (*See* Peng Tr. 535:1-7; s*ee also, e.g.*, Spano Decl. Ex. 24).  TTP was not responsible for shipping the drywall anywhere beyond the Chinese port.  The shipping agent prepared various shipping documents and provided copies of them to TTP.  (Spano Decl. Exs. 24, 25).  In short, the FOB term meant that the buyer was responsible for shipping to its selected destination outside of China and that TTP had no control over the destination.

Hannam testified that he handled all of Wood Nation's shipping arrangements.  (Hannam Tr. B 80:4-20).  After TTP delivered Wood Nation's drywall to its shipping agent in China, TTP prepared a Tai'an Shandong Special Invoice for Export ("Export Invoice"). (Spano Decl. Ex. 26). The tax authorities required that TTP complete an Export Invoice for any sales of goods to be exported out of China.  (*See* Peng Tr. 323:2-324:24, 431:10-23; Che Tr. 67:14-68:7, 69:11-20, 70:15-71:6).  The main purpose of the Export Invoice was to record that the goods were being sold for export, so any VAT tax that had been paid could be eligible for refund.  The listing of TTP as the "exporter" of the Wood Nation drywall on the Invoice for Export does not indicate that TTP shipped the Wood Nation drywall to Florida.  TTP did not ship Wood Nation's drywall to Florida or anywhere else in the U.S.  (*See* Peng Tr. 535:8-14).  At the time of the sale, neither Wood Nation nor Wei indicated that the drywall Wood Nation was purchasing would be re-sold or used in Florida. (*See* Peng Tr. 535:18-536:4; Hannam Tr. B 80:16-81:3).  As Hannam testified:

> Q:  Do you recall mentioning that you were planning to resell to
> DWC  to TTP?
> A:  No I don't recall and would not have.
> Q:  Why wouldn't you have?
> A:  You just don't do that, don't tell your supplier where you are
> selling your product.

(Hannam Tr. B 80:23-81:3).

### b.      Oriental Trading

In the summer of 2006, Oriental Trading approached TTP through Oriental Trading's China office manager and asked TTP for a quote on drywall.  (*See* Che Tr. 345:20-24; Spano Decl. Ex. 27, 30).  Oriental Trading also requested a meeting with TTP in China, to which TTP agreed.  (*See* Spano Decl. Exs. 27, 29).  In various conversations and communications, Oriental Trading represented to TTP that it had a number of large customers and was planning to buy large quantities of drywall from TTP.  (*See, e.g.* Spano Decl. Exs. 30 and 31).

In the fall of 2006, Jorge Arevalo, of Oriental Trading, travelled to China to meet with TTP.  Arevalo led TTP to believe that Oriental Trading would distribute TTP's drywall in the U.S.  (*See, e.g.* Spano Decl. Ex. 27).  Based upon these representations, which turned out to be false, in October 2006, TTP signed what was denominated a Sole Agency Agreement ("SAA") with Oriental Trading.  (Jia Tr., Pl.'s Ex. 13).  Notwithstanding the title of the SAA, nothing in the Agreement gave Oriental Trading the right to act as TTP's sales agent in the U.S.  The SAA merely provided Oriental Trading with the right to purchase TTP's drywall under the brand name "DUN" in the "territory of the U.S.A."  (SAA ¶¶ 1-2.)  Oriental had no right to make sales on TTP's behalf.  Under the SAA, Oriental Trading had to pay for the drywall in advance and could not return any unsold drywall to TTP for a refund.  It did not matter whether Oriental Trading re-sold the drywall to anyone.

Ivan Gonima of Oriental Trading gave inconsistent and contradictory testimony regarding the SAA.  According to Gonima, Arevalo procured the SAA in his personal capacity and later sold participatory interests in the SAA to Gonima and Denise Romano.[28]  It was not until sometime after Arevalo procured the SAA that Oriental Trading had any funding for its

---

[28] *See* deposition of Ivan Gonima, taken December 13, 2011 ("Gonima Tr. A") at 24:8-13, 58:13-60:22, relevant excerpts of which are annexed to the Spano Decl. as Exhibit 28.

operations.  (*Id.*)  Thus, for all practical purposes, Oriental Trading was not an operating business

at the time Arevalo obtained Che's signature on the SAA.[29]  After meeting with TTP in China,

Arevalo promised to return a copy of the SAA executed by Oriental Trading to TTP, but he

never did.[30]

The SAA was never performed by Oriental Trading.  The SAA contained an initial

purchase obligation for Oriental Trading.  Paragraph 3 of the SAA provided as follows:

> "Within the validity of this Agreement, the buyer shall undertake
> to purchase from the seller the products above-mentioned not less
> than 20,000 sheets of one unique size from the beginning of
> November 2006 to the end of 2007 . . . ."

Oriental Trading did not meet its initial purchase obligation.  (*See* Che Tr. 351:13-352:4; Gonima

Tr. B 53:9-54:20).  The SAA also required Oriental Trading to purchase not less than 1,000,000

sheets of drywall in the twelve months following February 2007.  Oriental Trading did not meet

that requirement either.  (*See* Che Tr. 352:5-11; Gonima Tr. B 54:21-55:3).[31]

Oriental Trading did not purchase any drywall at all from TTP until late April 2007.  (*See*

TTP MPF at Nos. 234-243; Che Tr. 354:2-5).  Between April and July 2007, Oriental Trading

purchased relatively small quantities of drywall from TTP, and it never fulfilled the requirements

of the SAA.  (*See* TTP MPF Nos. 234-243).

When Oriental Trading eventually did purchase drywall from TTP, it did so on the same

terms TTP was offering to other purchasers.  (*See* Che Tr. 354:6-355:14).  TTP did not provide a

---

[29] *See* deposition of Ivan Gonima taken February 14, 2012 ("Gonima Tr. B") at 28:9-32:15, 46:4-19, relevant excerpts of which are attached to the Spano Decl. as Exhibit 29.

[30] Gonima initially testified that he had one meeting with TTP in China, but at his second deposition, conducted after TTP's deposition in Hong Kong, Gonima recalled a second meeting where Oriental Trading returned an executed copy of the SAA to TTP.  (*See* Gonima Tr. A 55:16-57:16; Gonima Tr. B 19:24-23:15).  Che, however, did not recall such a meeting, and TTP has no record of receiving the SAA back from Oriental Trading.  (*See* Che Tr. 48:4-18, 347:4-348:11).

[31] Oriental Trading also never provided the market reports and forecasts required by the SAA.  (SAA § 6).  Any disputes in connection with the SAA were to be submitted to Foreign Trade Arbitration Commission in China. (SAA § 7).

distributor's discount to Oriental Trading.  TTP required that Oriental Trading make a cash deposit for each order, just like any other purchaser.  (*Id.*).

At Oriental Trading's direction, TTP marked "Dun Drywall" on the edge sealing tape of the drywall that Oriental Trading purchased.  (*See* Spano Decl. Ex. 32; Che Tr. 397:7-12).  Unbeknownst to Mr. Che at the time, TTP had not been authorized by TG to use the DUN trademark.  (*See* Jia Tr. 801:15-802:10).

The terms of shipment for Oriental Trading were FOB, Qindao.  (*See* Gonima Tr. B 57:19-21).  Oriental Trading was responsible for shipping the drywall to the destination it selected.  (*See* Gonima Tr. B 58:1-19, 59:17-60:25; Che Tr. 362:9-13).  TTP was not responsible for shipping the drywall anywhere beyond the Chinese port and had no control over its actual destination.  (*See* Che Tr. 363:5-13). According to the information provided by Oriental Trading, Miami, USA was the destination of the drywall.  (*See* Che Tr., Pl.'s Ex. 2).  Oriental Trading hired the shipping agent and customs' broker.  Oriental Trading then directed Che to book space on a ship on its behalf and deliver the drywall to a Chinese port.  (*See* Che Tr., Pl.'s Ex. 2).  TTP did not ship the Oriental Trading drywall to Miami or anywhere else in the U.S.  (*See* Che Tr. 356:22-357:11).  After TTP delivered the drywall to Oriental Trading's shipping agent in China, TTP prepared Export Invoices.  (Spano Decl. Ex. 33).

At Oriental Trading's request, TTP obtained information from shipping agents concerning ocean freight rates to other locations in the U.S. and passed the information onto Oriental Trading.  (*See* Che Tr. 238:20-245:18, 363:5-365:18, Pl.'s Ex. 2).  TTP, however, did not ship drywall to any of those locations either.

In May, 2007, Oriental Trading paid a $100,000 deposit to TTP, apparently anticipating it would make future purchases.  (*See* Che Tr. 366:2-14; Gonima A 143:5-21, 144:6-14; Spano

Decl. Ex. 34).  Oriental Trading did not make further purchases and demanded its money back.
It was difficult for TTP to transfer the money directly back to Oriental Trading, due to currency
transfer restrictions in China.  (*See* Che Tr. 250:12-252:4; Gonima Tr. A 144:1-5).  Oriental
Trading and TTP had discussions over an extended period of time regarding how to accomplish
the return of Oriental Trading's deposit.  (*See* Spano Decl. Ex. 35).  The parties discussed
various options, including Oriental Trading purchasing other products from TG to use up its
deposit.  Ultimately, the parties agreed that TTP could refund the money to another Chinese
company with whom Oriental Trading had a relationship.  (*See* Che Tr. 366:15-367:3; Spano
Decl. Ex. 36).  As directed by Oriental Trading, TTP refunded the deposit to the account of Yin
Hong Bin in China.  (*See id.*).

At the time of the sales neither Oriental Trading nor any representative of Oriental
Trading indicated to TTP that its drywall would be resold or used in Florida.  (*See* Che Tr. 358:8-
21, 362:5-13).  In fact, Oriental Trading never re-sold or distributed any of the drywall it
purchased from TTP.  Oriental Trading reportedly donated its inventory of TTP drywall to the
Habitat for Humanity charity.  (*See* Gonima Tr. A 62:2-15, 82:18-83:19).

### c.     B America

B America initiated contact with TTP in China through an intermediary in China, a
freelance broker named Chen Bilai.[32]  (Che Tr. 296:14-22).  TTP had no prior contact with B
America.  In September 2006, B America signed a purchase contract with TTP.  (Spano Decl.
Ex. 38).[33]  B America cancelled the contract a few months later due to what it claimed was less
than expected demand for drywall.  (*Id.*).  Ultimately, B America purchased only 660 sheets of

---

[32] *See* transcript of the deposition of Rafael Sardi of Onyx GBH Corp. taken on February 9, 2012 ("Sardi Tr.") at
18:7-19:10, 46:3-6, relevant excerpts of which are attached to the Spano Decl. as Exhibit 37.

[33] According to Sardi, the initial transaction was to be sent to Venezuela, not anywhere in the U.S. (Sardi Tr. 21:4-
22).  After that transaction fell through, B America decided to have drywall shipped to Miami.  (Sardi Tr. 21:10-22,
32:17-33:11).

drywall from TTP on a single occasion.  (*See* TTP's MPF at No. 235; Spano Decl. Ex. 39).

The terms of TTP's sale to B America related to shipping were "CIF".  (*See* Sardi Tr. 71:2-7; Che Tr. 367:11-13; Spano Decl. Exs. 38, 39).  "CIF" stands for "cost of insurance and freight", and means that the cost of shipping and insurance was included in the purchase price per sheet of drywall that B America paid to TTP.  (*See* Sardi Tr. 71:20-23; Che Tr. 367:11-17).  TTP purchased the insurance in China on behalf of B America and provided B America with a certificate of insurance from the insurance carrier.  (*See* Spano Decl. Ex. 40).  In a CIF sale, TTP delivered the drywall to the port in China and surrendered possession of the drywall to the customer's shipment agent.  The customer selected the destination and directed the shipping arrangements made on its behalf, just as in the case of an FOB sale.  (*See* Che Tr. 368:6-369:9; Sardi Tr. 28:2-8).

Chen Bilai received direction from B America regarding the selected ship and destination and handled any other shipping arrangements on behalf of B America.  (*See* Che Tr. 367:21-368:5).  According to the shipping documents prepared by B America's shipping agent, Miami was the destination that B America selected.  (*See* Spano Decl. Ex. 41).

TTP did not select Miami as the destination for the B America drywall.  (*See* Che Tr. 368:13-15).  TTP did not ship the B America drywall to Miami or anywhere else in the U.S. (*See* Che Tr. 369:4-10).  At the time of the sale, neither B America nor any representative of B America indicated to TTP that the drywall it purchased from TTP would be re-sold or used in Florida.[34]  (*See* Che Tr. 369:11-20).

---

[34] Subsequent to the 2007 sale, in response to the customer's request TTP sent small samples of drywall to B America in Florida at the customer's shipping expense.  (Spano Decl. Ex. 42).

## ARGUMENT

**I.  THE PRELIMINARY DEFAULT SHOULD BE VACATED BECAUSE THE COURT LACKS PERSONAL JURISDICTION OVER TG**

As set forth below, the evidence does not support the exercise of personal jurisdiction over TG.  According to its profile forms, Plaintiff, an Alabama corporation, obtained drywall from just two distributors, Inex and Rightway.  (*See* Spano Decl. Ex. 13).  According to Inex's profile form, some of the drywall it sold was manufactured by TTP.  (*See* Spano Decl. Ex. 15).  According to Rightway's profile form, it does not know who manufactured the drywall it bought and sold.  (*See* Spano Decl. Ex. 14).  There is no evidence that TG made any sales to Plaintiff, Inex, Rightway or any person or entity in Florida.  Because there is a complete lack of evidence that TG engaged in any activities in Florida or connected to Florida, there is no basis for the Court to exercise personal jurisdiction over TG consistent with the requirements of Florida's long-arm statute and Due Process.  The preliminary default against TG must be vacated and the Complaint dismissed.

### Defaults Are Not Favored

"Defaults are not favored and their strict enforcement 'has no place in the Federal Rules.'" *Effjohn Int'l Cruise Holdings, Inc. v. A&L Sales, Inc.*, 346 F.3d 552, 563 (5th Cir. 2003) (citation omitted).  Fed. R. Civ. P. 55(c) provides that the court "may set aside a default judgment under Rule 60(b)."  Rule 60(b) provides, *inter alia*,

> (b)      On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order or proceeding for the following reasons:
>
> (1)  mistake, inadvertence, surprise or excusable neglect; . . .
>
> (4)  the judgment is void;  . . .
>
> (6)  any other reason that justifies relief.

Rule 60(b)(4) compels Courts to vacate defaults where personal jurisdiction is lacking and/or service of process was insufficient. *Harper Macleod Solicitors v. Keaty*, 260 F.3d 389, 393 (5th Cir. 2001) (judgment against parties not subject to personal jurisdiction is a nullity). Where, as here, the default has only been entered and not reduced to a default judgment, district courts are even more willing to set aside an entry of default. As the Fifth Circuit has stated: "courts apply essentially the same standards to motion to set aside a *default* and a *judgment by default* . . . we have also stated that the former is more readily granted than a motion to set aside a default judgment." *In re OCA, Inc.,* 551 F.3d 359, 371 (5th Cir. 2008) (quotations and citation omitted).

<u>Florida Law Governs the Jurisdictional Inquiry.</u>

This action was originally filed in the Northern District of Florida and transferred to this Court in accordance with 28 U.S.C. § 1407. Consequently, this Court must determine whether the transferor court in Florida could exercise personal jurisdiction over TG. *See In re WellNx Mktg. & Sales Practices Litig.*, No. 07-1861, 2010 WL 3652457, at *1 (D. Mass. Sept. 15, 2010) ("In an MDL case, personal jurisdiction is derived from the transferor court.") (citing *In re Pabst Licensing GMBH & Co. KG Litig.*, 602 F. Supp. 2d 10, 14 (D.D.C. 2009) ("In multidistrict litigation such as this, the transferee court must apply the law of the transferor forum to determine personal jurisdiction."); *In re Sterling Foster & Co., Sec. Litig.*, 222 F. Supp. 2d 289, 300 (E.D.N.Y. 2002) (applying the long-arm statute of the transferor forum in multidistrict litigation)). *See also In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, No. 07-1873, 2010 WL 1489894, at *1 (E.D. La. Apr. 12, 2010); *Van Dusen v. Barrack*, 376 U.S. 612, 639-40 (1969). *Accord In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 767 F. Supp. 2d 649, 656-57 n.2 (E.D. La. 2011) ("If the cases were transferred by the MDL Panel to this Court for consolidation, the Court would be obligated under the same Fifth Circuit law to look to the law of the foreign forum to determine personal jurisdiction"). (*See also* Doc. No. 10269 at 15.)

To determine whether there is a basis for personal jurisdiction over TG in Florida, a district court is required to apply a two-part analysis:  First, the court must look to the law of Florida to determine whether there is jurisdiction over the defendant; second, the court must determine whether the exercise of jurisdiction would be consistent with federal Due Process requirements.  *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009).

Plaintiff Has The Burden Of Proof.

Although this Court must determine whether the Northern District of Florida has a basis for jurisdiction over TG, the burden of proof is governed by the law of the Fifth Circuit.  Plaintiff has the burden of establishing that the exercise of jurisdiction over TG was proper.  *See Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 270 (5th Cir. 2006).  Plaintiff has the burden of proving: (1) that the defendant has minimum contacts with the forum state, *i.e.*, that it "purposely directed its activities toward the forum state or purposely availed itself of the privilege of conducting activities there, [and that] (2) the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts."  472 F.3d at 272.  If the plaintiff satisfies those elements, the burden then shifts to the defendant to prove that the exercise of personal jurisdiction is not fair and reasonable.  *Id.*  Where, as here, the Court is conducting an evidentiary hearing, Plaintiff must establish jurisdiction by a preponderance of the evidence.  *See Walk Haydel,* 517 F.3d  at 241-42 (citing *Felch v. Tranportes Lar-Mex SA DE CV*, 92 F.3d 320, 326 (5th Cir. 1996)).[35]

In this case, Plaintiff cannot meet its burden of proving by a preponderance of the evidence that (1) TG is subject to jurisdiction under Florida's long-arm statute; (2) TG had the

---

[35] A majority of the district courts in the Fifth Circuit place the burden on the plaintiff even where a default judgment has been entered (*see, e.g. Rockwell Int'l Corp. v. KND Corp.*, 83 F.R.D. 556, 559 n.1 (N.D. Tex. 1979); *Morris v. B.C. Olympiakos, SFP*, 721 F. Supp. 2d 546, 556-7 (S.D. Tex. 2010)), although the Fifth Circuit has not expressly resolved this issue.  *See Jackson v. FIE Corp.*, 302 F.3d 515, 521 n.6. (5th Cir. 2002).

requisite contacts with Florida required by Due Process for the exercise of jurisdiction; and (3) Plaintiff's causes of action arise out of or result from TG's contacts with Florida.  For these reasons, the Court should find it lacks jurisdiction over TG.  However, even if Plaintiff could satisfy the long-arm statute, and demonstrate that its causes of action arise out of or result from TG's contacts with Florida, the exercise of personal jurisdiction would not be fair and reasonable, in violation of Due Process.

### A.    Plaintiff Is Unable To Satisfy Florida's Long-Arm Statute To Establish Personal Jurisdiction Over TG

The Court may exercise jurisdiction only to the extent permitted by Florida law. "Florida's long-arm statute, which must be strictly construed, confers less jurisdiction upon Florida courts than allowed by the Due Process Clause." *Am. Investors* 876 F. Supp. at 1280 (citing *McRae v. J.D./M.D., Inc.*, 511 So. 2d 540, 543 (Fla. 1987)) (citation omitted).

Only three provisions of the Florida long-arm statute are potentially applicable to provide specific jurisdiction over TG based upon the facts Plaintiff has alleged.  Florida Statutes Sections 48.193 (1)(a), (b), and (f) provide as follows:

> 1.      Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself … to the jurisdiction of the courts of this state for any cause of action *arising from* the doing of any of the following acts:
>
> (a)      Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
>
> (b)      Committing a tortious act within this state . . .
>
> (f)      Causing injury to persons or property within this state arising out of an act or an omission by the defendant outside of this state, if, at or about the time of the injury, either:
>
>> 1.      The defendant was engaged in solicitation or service activities within this state; or

> 2.      Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.[36]

Fla. Stat § 48.193 (2010) (emphasis added).

A feature common to all of the foregoing provisions of the long-arm statute is the requirement that the claims *arose from* the defendant's activities, or that the defendant causes injury.  Because Plaintiff did not purchase any drywall manufactured by TG, and TG did not engage in any activities in Florida that caused Plaintiff injury, TG cannot be subject to the long-arm statute, and jurisdictional inquiry need go no further.  Moreover, even if that inconvenient fact is ignored, and it is hypothesized that some of the drywall TG sold to Venture Supply in China made its way into Florida, the plain words of Florida's long arm statute do not allow for jurisdiction to be exercised over TG.

### 1.      TG Has Not Conducted Business In Florida

"In order to establish that a defendant is 'carrying on business' in Florida for the purposes [of § 48.193(1)] of the long-arm statute, the activities of the defendant must be considered collectively and show a general course of business activity in the state for pecuniary benefit." *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (S.D. Fla. 1999) (citations omitted).  Factors relevant to this analysis include the presence or operation of an office in Florida, the number of clients served, and the percentage of overall revenue from Florida clients.  *See Travel Opportunities of Fort Lauderdale, Inc. v. Walter Karl List Mgmt. Inc.*,

---

[36] The other acts listed by the long-arm statute are inapplicable to the case at bar. They include: "(c) Owning, using, possessing, or holding a mortgage or other lien on any real property within this state; (d) Contracting to insure any person, property, or risk located within this state at the time of contracting; (e) With respect to a proceeding for alimony, child support, or division of property in connection with an action to dissolve a marriage . . . ; (g) Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state; (h) With respect to a proceeding for paternity, engaging in the act of sexual intercourse within this state with respect to which a child may have been conceived." § 48.193.

726 So. 2d 313, 314 (Fla. 4th DCA 1998) (19 sales in Florida worth $198,000 over two year period insufficient for purposes of applying section 48.193(1)(a)); *Milberg Factors, Inc. v. Greenbaum*, 585 So. 2d 1089, 1091 (Fla. 3d DCA 1991).  In this case, TG has never had an office, bank account, or any property in Florida.  It has no officers, directors or employees in Florida and none of its officers, directors or employees have ever so much as visited Florida.  TG has never sold drywall to any companies located in Florida.  Thus, TG has not conducted business in Florida and there is no basis for the Court to exercise jurisdiction pursuant to Fla. Stat. § 48.193(1)(a).

### 2.      TG Has Not Committed A "Tortious Act" In Florida

For a court to exercise jurisdiction under § 48.193(1)(b) of the Florida long-arm statute, Plaintiff must show that TG committed a "substantial aspect of the alleged tort" in Florida.  Here, the evidence shows that TG did not sell drywall to any Florida entity.  Even accepting Plaintiff's allegation that it purchased drywall from two foreign distributors, who received the drywall from TG "directly or indirectly," and that Plaintiff used the drywall in Alabama and Florida (Am. Compl. ¶¶ 19, 20, 25), there is no tortious act by TG in Florida.  Florida courts have held that downstream injury in Florida caused by a product placed into the stream of commerce outside Florida does not constitute commission of a substantial aspect of the tort for purposes of § 48.193(1)(b).  *Blumberg v. Weiss & Co.*, 922 So. 2d 361, 364 (Fla. 3d DCA 2006).

### 3.      TG's Alleged Conduct Did Not Cause Plaintiff to Sustain An "Injury To Person Or Property" In Florida

Here, Plaintiff, an Alabama supplier of drywall to others, asserts only claims for economic loss in Alabama.  Under Florida law, economic injury does not satisfy the "injury to persons or property" requirement for jurisdiction under section 48.193(1)(f).  *Aetna Life & Cas. Co. v. Therm-O-Disc, Inc.*, 511 So. 2d 992, 993-94 (Fla. 1987).  In addition to failing to meet the

threshold requirement of an injury to persons or property in the State, Plaintiff also cannot satisfy

the additional requirements of Section 48.193(f) that TG was engaged in solicitation or service

activities in the State or that its injury was caused by products manufactured by TG used or

consumed in the State.  Accordingly, § 48.193(1)(f) cannot provide jurisdiction here.

### 4. TG Has Not Engaged In Substantial Activity In Florida As Required For General Jurisdiction Under The Long-Arm Statute

Section 48.193(2) of the Florida long-arm statute provides for general jurisdiction.  *See*

*Northern Ins. Co. of New York v. Constr. Navale Bordeaux*, No. 11-60462, 2011 WL 2682950 at

*3 (S.D. Fla. July 11, 2011).[37]   In this case, Plaintiff cannot offer evidence that would subject TG

to jurisdiction pursuant to Sections 48.193(2).   TG's only sales to a U.S. customer were two

isolated sales in China to a Virginia corporation.   TG did not make any sales in Florida, did not

ship any drywall to Florida, did not market its products to Florida and did not engage in

substantial activities in the state.   TG never has been incorporated in Florida, kept any corporate

records in Florida and is not registered to do business in Florida.   Likewise, TG has no officers,

directors, employees, or agents in Florida.   In fact, no officers, directors, employees, or agents of

TG have ever visited Florida for business purposes.   Thus, TG cannot be subject to general

jurisdiction in Florida.

### B. Due Process Would Not Permit The Court To Exercise Personal Jurisdiction Over TG

Even when the requirements of the Florida long-arm statute are met, courts are restrained

from exercising jurisdiction by Due Process.  *See Sea Lift, Inc. v. Refinadora Costarricense De*

*Petroleo, S.A.*, 792 F.2d 989, 993 (11th Cir. 1986).   In this case, even if the Court could find that

---

[37] The statute provides:

"[a] defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity."

TG was subject to personal jurisdiction under Florida's long-arm statute, Due Process precludes this Court's exercise of personal jurisdiction over TG.  Plaintiff is unable to prove that TG had minimum contacts with Florida and that its causes of action arise out of those contacts, as Due Process requires.  Furthermore, the exercise of personal jurisdiction over TG would not be constitutionally fair and reasonable, in violation of Due Process.

<u>Due Process Requires Minimum Contacts With The Forum State</u>

The Due Process clause of the Fourteenth Amendment of the U.S. Constitution provides: "[N]or shall any State deprive any person of life, liberty or property, without Due Process of law . . . ."  U.S. Const. Amend. XIV, §1.  To satisfy the constitutional due process requirement, a defendant must have sufficient "minimum contacts" with the forum state such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation and citation omitted).  The *Int'l Shoe* test has two elements, requiring (1) a claim that arises out of or relates to actions by the defendant himself directed toward forum residents and (2) circumstances where jurisdiction would not otherwise offend "fair play and substantial justice."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 477 (1985).

The first element – minimum contacts – is required because Due Process "does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations."  *Int'l Shoe*, 326 U.S. at 319.[38]  Jurisdiction can only be exercised where the defendant's contacts have created a

---

[38] The current Justices of the Supreme Court have expressed different views about the underlying rationale for the requirement of minimum contacts with a particular State forum.  According to Justices Kennedy, Roberts, Scalia and Thomas, the four Justices who comprised the plurality in the Supreme Court's recent ruling in *Nicastro v. J. McIntyre Machinery, Ltd.*, 131 S. Ct. 2780 (2011), the requirement of minimum contacts exists mainly to ensure that any person subject to jurisdiction has done purposeful acts sufficient to submit himself to the forum State's sovereign power.  131 S. Ct. at 2787-88.  Justice Breyer, in his concurring opinion joined by Justice Alito, did not

"substantial connection" with the forum State.  *Burger King,* 471 U.S. at 475.  Thus, regardless of how convenient the forum might be to the plaintiff, or how strong the forum State's interest in applying its law to the controversy, Due Process does not permit a court to exercise jurisdiction over a defendant who does not have the requisite level of minimum contacts with the forum State.  *See World-Wide Volkswagen*, *Corp. v. Woodson* 444 U.S. 286, 294 (1980).  Nevertheless, even if minimum contacts are present, the second element – that an assertion of jurisdiction be constitutionally fair and reasonable – may be absent, requiring the Court not to exercise jurisdiction despite the existence of minimum contacts.  *See Burger King*, 471 U.S. at 476-477.  These considerations of fairness and their application to this case are discussed in Sections I.B.(3) and IV.C., *infra*.  Thus, the Supreme Court's precedents have consistently required both minimum contacts with a particular State forum as well as circumstances that render the assertion of jurisdiction fair and reasonable.

<u>To Establish Minimum Contacts, Purposeful Availment Of The Forum State Must Be Shown</u>

To satisfy the requirement of minimum contacts, "purposeful availment" of the forum State must be shown.  "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws."  *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (*citing Int'l Shoe,* 326 U.S. at 319).  In addition to showing that the defendant "purposefully directed his activities at the residents of the forum," the Plaintiff must also demonstrate his cause

---

discuss limitations on sovereignty as the main rationale for requiring purposeful minimum contacts.  Instead, Justice Breyer focused on the Court's prior explanations of minimum contacts as having been centered on whether "it is fair, in light of the defendants contacts *with that forum*, to subject the defendant to suit there." *Id.* at 2793 (emphasis in original).  The dissent, written by Justice Ginsburg, with whom Justices Sotomayor and Kagan joined, viewed the constitutional limits on the adjudicatory authority of a court in a particular state as a protection of individual liberty, not a question of submission to state sovereignty.  *Id.*

of action "arise[s] out of" those activities.  *Burger King*, 417 U.S. at 472 (citation and quotation omitted).  The purposeful availment requirement ensures that the defendant is not "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts."  *Id.* at 475 (quotations and citations omitted). It also protects a defendant from having to defend himself in a forum where he should not have anticipated being sued.  *See World-Wide Volkswagen*, 444 U.S. at 297.

There are two forms of personal jurisdiction: general and specific.  General jurisdiction is necessary to adjudicate claims that are not related to a defendant's contacts with the forum state. *See Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 nn.8 & 9 (1984).  "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State."  *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 131 S. Ct. 2846, 2851 (2011) (citing *Int'l. Shoe*, 326 U.S. at 317). Specific jurisdiction is a more limited form of jurisdiction which can be asserted for disputes that "arise out of or are connected with the activities within the state" by the defendant.  *Int'l. Shoe Co.,* 326 U.S. at 319; *Helicopters Nacionales,* 466 U.S. at 414 n.9.  Plaintiff's allegations in the Complaint may be read to encompass claims that TG is subject to specific jurisdiction. Accordingly, the foregoing sections address the Plaintiff's failure to satisfy the Due Process requirements for specific jurisdiction.[39]

A plaintiff may establish a basis for specific jurisdiction if it can prove that the out-of-state defendant "purposefully directed his activities at the residents of the forum" and that

---

[39] Plaintiff has not alleged that TG is subject to general jurisdiction in Florida, nor could it, in view of TG's complete lack of any business activities in Florida.  As explained below, TG did not have the minimum contacts necessary for specific jurisdiction let alone the continuous and systematic contacts necessary for general jurisdiction.

plaintiff's claim "arise[s] out of those activities." *Burger King,* 471 U.S. at 472. (internal quotations and citations omitted). The "purposeful availment" requirement for specific jurisdiction may be satisfied "where the contacts proximately result from actions by the defendant *himself* that create a *substantial connection* with the forum State. *Id.* (quoting *McGee v. Int'l Life Ins. Co.*, 335 U.S. 220, 223 (1957)) (emphasis is in original). However, "some single or occasional acts" related to a forum State may not be sufficient to establish minimum contacts if "their nature and quality and the circumstances of their commission" create only an attenuated connection between the defendant and the forum State. *Int'l Shoe*, 326 U.S. at 318. The conduct of other parties cannot establish purposeful availment by the defendant of the forum State. A defendant will not be haled into a jurisdiction as a result of the "unilateral activity of those who claim some relationship with a nonresident defendant." *Helicopteros Nacionales*, 466 U.S. at 417. As summarized below, the Supreme Court has provided guidance on the application of the Due Process requirement to questions of specific jurisdiction.

World-Wide Volkswagen

In *World-Wide Volkswagen* the Supreme Court reiterated the purposeful availment requirement and explained that it is not satisfied merely because a defendant who sold a product outside of the State could have foreseen that the product might cause injury in the State. The Court held that a New York automobile retailer and distributor were not subject to jurisdiction in Oklahoma even though it was *foreseeable* that the purchaser might bring the automobile to Oklahoma. "It is argued, however, that . . . it was 'foreseeable' that the Robinson's Audi would cause injury in Oklahoma. Yet 'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process clause." *World-Wide Volkswagen,* 444 U.S. at 295. Instead, "the foreseeability that is critical to due process analysis . . . is that the *defendant's conduct and connection with the forum State* are such that he should reasonably anticipate being

33

haled into court there." *Id.* at 297 (emphasis added).

The Supreme Court further explained, in *dicta*, that the requirement of purposeful availment may be satisfied if "a corporation . . . delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." *Id.* at 298-299. For example, if sales of a defendant's products in the State are not an isolated occurrence but are a result of its efforts to serve the market in the State, it may have an "expectation" that its products would be purchased in the State, and should reasonably anticipate being subject to suit there. *Id.* at 297-298.[40]

<u>Burger King</u>

In *Burger King,* the Supreme Court considered whether Due Process permitted personal jurisdiction in Florida over a Florida franchisor's breach of contract suit against its Michigan franchisee. Apart from the franchise agreements at issue, the Michigan franchisee had no contacts with Florida. The franchisee, however, regularly communicated with the franchisor's Miami headquarters both in forming the agreements and in seeking resolution of disputes and paid all monthly fees to the franchisor in Miami.

The Supreme Court held that Due Process embodies a "fair warning requirement" that is satisfied "if the defendant has 'purposefully directed' his activities at residents of the forum." *Burger King,* 471 U.S. at 472 (citing *Keeton v Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)).

---

[40] Numerous courts have recognized that this assertion was *dicta*. *See* e.g., *Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1124-25 (7th Cir. 1983); *Sparta Motors, Inc. v. Lube Power, Inc.*, 337 Ill. App. 3d 556, 564, 786 N.E.2d 613, 620 (2003); *Ruckstuhl v. Owens Corning Fiberglass Corp.*, 731 So. 2d 881, 887 (La. 1999); *Juelich v. Yamazaki Mazak Optonics Corp.*, 682 N.W.2d 565, 571, n.4 (Minn. 2004); *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 201 (Tex. 1985).

The Court also explained the weight to be given to a contract with a forum State resident:

> If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.

471 U.S. at 478 (emphasis in original).

Applying these principles to the Michigan franchisee, the Supreme Court found Due Process was satisfied because the franchise relationship had a "substantial connection" with Florida. The franchisee had "deliberately 'reach[ed] out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise;" the franchise was "a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida, which included a choice of Florida law in the franchise agreement." *Id.* at 479-480.  (internal citations omitted)

<u>Asahi</u>

A few years later, in *Asahi Metal Corp., Ltd. v. Superior Court*, 480 U.S. 102, 109, 116-117 (1987), the Supreme Court addressed Due Process in the context of a "stream of commerce" case.[41]  The Court unanimously held that a Japanese tire valve manufacturer's sale of hundreds of thousands of tire valves to a Taiwanese motorcycle tire manufacturer that incorporated the valves into tires shipped to California, was not subject to personal jurisdiction in California in the tire manufacturer's indemnification suit.  The Supreme Court explained that "[c]onsidering the international context, the heavy burden on the alien defendant, and the slight interests of the plaintiff and the forum State, the exercise of personal jurisdiction by a California court over *Asahi* in this instance would be unfair and unreasonable."  480 U.S. at 116.

---

[41] The term "stream of commerce" refers to the commercial practice of selling a product to a third party for further sale to consumers.  *De James v. Magnificent Corners, Inc.*, 654 F.2d 280, 285 (3rd Cir. 1982); *Prototype Prods., Inc. v. Reset, Inc.*, No. 11-196, 2011 WL6960617 (E.D. Va. Oct. 14, 2011).

A majority of the Justices in *Asahi*, however, did not agree on whether the seller of the valves had purposefully availed itself of a California forum.  Four members of the court, in an opinion written by Justice O'Connor, held that taking into account the valve manufacturer's complete lack of activities directed at California and the fact that it did not create, control or employ the distribution system that brought its valves into California, the valve manufacturer had not purposely availed itself of a California forum, even assuming it was aware that some of its valves would be incorporated in tire tubes sold in California.  *See id.* at 113.  According to Justice O'Connor, Due Process required more than mere awareness of the product's possible entry into the forum state through the stream of commerce:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State.  Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.  *But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.*

480 U.S. at 112 (emphasis added).

Thus, Justice O'Connor's opinion required "something more" than "mere awareness that the manufacturer's product would be marketed in the forum State" and provided examples of affirmative conduct specifically targeting or directed to the forum State that might satisfy the requirement of purposeful availment.

Four justices, in a decision written by Justice Brennan, concluded that the valve manufacturer had purposefully availed itself of a California forum principally because it (1) was aware of the operation of the distribution system that resulted in the tires being sold in California,

(2) knew it would benefit economically from the sale of tires in California, and (3) had made regular and extensive sales of its valves to a manufacturer it knew was making regular sales of the final product in California.  *See id.* at 121.  According to Justice Brennan, Due Process is satisfied when a defendant has a "regular and anticipated flow" of its products into the stream of commerce with an awareness that its products would be marketed in the forum State:

> The stream of commerce refers not to unpredictable currents or eddies, but to the *regular and anticipated flow of products* from manufacture to distribution to retail sale.  As long as a participant in this process is aware that the final product is being marketed in the forum state, the possibility of a lawsuit there cannot come as a surprise.

480 U.S. at 116 (emphasis added).

The concurring opinion of Justice Stevens in *Asahi*, with whom Justices White and Blackmun joined, would not reach the question of purposeful availment because of the conclusion that the exercise of personal jurisdiction over the foreign manufacturer would be unfair and unreasonable, in violation of Due Process.  Nevertheless, Justice Stevens observed that the manufacturer had done something more than merely being aware that its products might be sold in California:  "I would be inclined to conclude that a regular course of dealing that results in deliveries of over 100,000 units annually over a period of several years would constitute 'purposeful availment.'"  *Id.* at 122 (Stevens, J. concurring in part and concurring in the judgment).

A close reading of the other concurring opinions in *Asahi* also indicates that, while each disagreed with Justice O'Connor's statement of the purposeful availment standard each also found the manufacturer had engaged in additional activity beyond just being aware its products might be re-sold in the forum State.  Justice Brennan found the requisite showing of purposeful availment based on the manufacturer's awareness of the distribution system that resulted in its

products being sold in California, the economic benefits it derived from sales in California, and its "regular and extensive sales of component parts to a manufacturer it knew was making regular sales of the final product in California." *Id.* at 121.

Nicastro

In June 2011, the Supreme Court issued its ruling in *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011). *Nicastro* was decided by a plurality of four Justices, with the concurrence of two Justices. A majority of the Court reiterated the requirement of purposeful availment of a particular state forum in stream of commerce cases and rejected arguments that a defendant that has introduced its product into the stream of commerce can be subject to personal jurisdiction merely because it could foresee or expect that its product would be re-sold in the forum State.

In *Nicastro*, the plaintiff had injured his hand on a metal shearing machine installed at his New Jersey workplace. The metal shearing machine was manufactured by defendant, J. McIntyre Machinery, Ltd. ("McIntyre"), a company based in the United Kingdom. For several years prior to the accident, McIntyre had used McIntyre America, an Ohio-based company, as its exclusive U.S. distributor for its machines. Through its U.S. distributor, McIntyre had sold up to four machines that ended up in New Jersey. Between 1990 and 2005, McIntyre officials travelled to a number of industry conventions in various U.S. cities where McIntyre promoted sales of its machines. Plaintiff's employer attended at least one of the conventions, after which he purchased the McIntyre metal shear involved in the accident. 131 S. Ct. at 2786. McIntyre also advertised the machines on its website, held U.S. and U.K. patents on its technology, and referred to "American National Standards Institute Regulations" for the use of scrap metal processing equipment in its product brochure. 131 S. Ct. at 2795 (Ginsburg, J., dissenting opinion).

The New Jersey Supreme Court adopted Justice Brennan's *Asahi* test and concluded it could exercise personal jurisdiction because McIntyre "knew or reasonably should have known that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states" and McIntyre had "failed to take some reasonable step to prevent the distribution of its products in this State."  131 S. Ct. at 2787 (internal quotation and citation omitted).  A majority of the U.S. Supreme Court justices rejected the standard applied by the New Jersey Supreme Court, and held that a non-resident manufacturer's marketing efforts directed to the U.S. generally, rather than toward a specific state, fail to satisfy the requirement of purposeful availment of the privilege of conducting activities in the forum State.  *Id.* at 2790 (Kennedy, J., plurality opinion); *id.* at 2792-93 (Breyer, J., concurring in judgment).[42]

Contrary to Justice Brennan's concurring opinion in *Asahi*, a majority of the Supreme Court in *Nicastro* also rejected the proposition that the foreseeability of litigation in the forum State, based on an awareness that the product is being marketed in the forum State, is determinative of whether personal jurisdiction can be exercised consistent with Due Process.  As the plurality wrote:

> It was the premise of the [Justice Brennan] concurring opinion that the defendant's ability to anticipate suit renders the assertion of jurisdiction fair.  In this way, the opinion made foreseeability the touchstone of jurisdiction.

> *          *          *

---

[42] As the plurality wrote, purposeful availment by the defendant allows the sovereign state to exercise the power to subject that defendant to judgment for its conduct.  *Nicastro*, 131 S. Ct. at 2783; *accord, Hanson*, 357 U.S. at 253; *see also Int'l Shoe*, 326 U.S. at 320 ("[The Due Process] clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties or relations.  But, to the extent that a corporation exercises the privileges of conducting activities within a state, it enjoys the benefits and protection of the laws of that state.  The exercise of that privilege may give rise to obligations. . . .").

> But Justice Brennan's concurrence, advocating a rule based on general notions of fairness and foreseeability, is inconsistent with the premises of lawful judicial power.  *This Court's precedents make clear that it is the defendant's actions, not his expectations that empower a State's court to subject him to judgment.*

131 S. Ct. at 2788-89 (emphasis added).

Similarly, the concurrence rejected the New Jersey Supreme Court's "knows or reasonably should know" that the product might be sold in any state standard for purposeful availment.  As Justice Breyer wrote:

> [T]o adopt this view would abandon the heretofore accepted inquiry of whether, focusing upon the relationship between "the defendant, the *forum*, and the litigation," it is fair, in light of the defendant's contacts *with that forum*, to subject the defendant to suit there.  It would ordinarily rest jurisdiction instead upon no more than the occurrence of a product-based accident in the forum state.  But this Court has rejected the notion that a defendant's amenability to suit "trave[l]s with the chattel."

131 S. Ct. at 2793 (citations omitted).

Therefore, Justice Breyer found that "I cannot reconcile so automatic a rule [as adopted by the New Jersey Supreme Court] with the constitutional demand for 'minimum contacts' and 'purposefu[l] avail[ment]', each of which rests upon a particular notion of defendant-focused fairness."  *Id.* (citation omitted).

Considering the facts, Justice Breyer found that McIntyre neither purposely availed itself of the State of New Jersey nor delivered its goods in the stream of commerce with the "expectation" that they would be purchased by New Jersey users.  *Id.* at 2792.  Thus, the Supreme Court in *Nicastro* found that "expectation" is not a variant of the requirement of "purposeful availment" in stream of commerce cases, but rather that the "expectation" necessary for personal jurisdiction was not satisfied by a sale into the stream of commerce unaccompanied

by specific efforts to sell to the forum State.  *Id.*[43]

A majority of the *Nicastro* Court thus resolved any doubt that "foreseeability" might be sufficient in stream of commerce cases.  The Supreme Court clearly has rejected the idea that foreseeability alone, or even awareness, that a defendant's products might end up in a forum State is sufficient to show purposeful availment of the forum State.

A growing number of courts have recognized that a majority of the *Nicastro* court rejected the idea that Due Process can be satisfied it if is merely shown that a non-resident defendant "knew or should have known" that its product was distributed by a third party in the forum State.  Among others, a district court in the Northern District of Florida, the transferor court here, interpreted *Nicastro* to require purposeful availment of a particular State forum, which is not satisfied by mere awareness that the product will be marketed in the forum State.  *See Northern Ins. Co.,* 2011 WL 2682950 at *6 (Foreign boat manufacturer that sold boat in another State could not reasonably anticipate suit in Florida for malfunctions that occurred in Florida; manufacturer's sales of 20 boats in Florida through dealers, appearance at Florida trade shows and industry advertising in U.S. generally did not provide "something more" than sale into stream of commerce required by *Nicastro*).[44]

---

[43] Justice Ginsburg's dissent argued that McIntyre had purposefully availed itself of the forum State through its contacts with the U.S. as a whole:

> "In sum, McIntyre UK, by engaging McIntyre America to promote and sell its machines in the United States, 'purposefully availed itself' of the United State market nationwide, not a market in a single State or a discrete collection of States.  McIntyre UK thereby availed itself of the market of all States in which its products were sold by its exclusive distributor."

131 S. Ct. at 2801.  It is worth noting, however, that even the dissent did not find purposeful availment based only on the defendant's mere awareness that its product might be re-sold in a forum State.  The dissent viewed McIntyre's regular attendance and exhibitions at industry conventions in the U.S. as a "purposeful step to reach customers for its products anywhere in the United States."  *Id.* at 2798.

[44] *See also Windsor v. Spinner Indus. Co.*, 10-114, 2011 WL 5005199, at *4 (D. Md. Oct. 20, 2011) ("*McIntyre* clearly rejects foreseeability as the standard for personal jurisdiction . . . .  That holding now commands the assent of six Justices of the Supreme Court, all on substantially the same grounds, and is therefore binding precedent."); *Smith v. Teledyne Cont'l. Motors, Inc.*, No. 10-02152, 2012 WL 10836 (D. S.C. Jan. 3, 2012) (six Justices in *Nicastro*

As set forth below, *Nicastro* is also consistent with numerous prior rulings by courts within the Eleventh Circuit which have held that when a buyer initiates contact with a foreign manufacturer, and the sale and delivery of the product take place outside of Florida, and the foreign manufacturer does not have other, purposeful contacts with Florida, the foreign manufacturer has not established the minimum contacts with Florida.  *See*, pp. 67-72, *infra*.[45]

### 1.   Plaintiff Cannot Establish That TG Had Minimum Contacts With Florida

Plaintiff cannot meet its burden of showing that TG has minimum contacts with Florida. There is no evidence that TG purposefully availed itself of the benefits and protections of Florida and that Plaintiffs' causes of action arise out of or result from TG's contacts with Florida.  At most, the evidence establishes that TG made isolated sales of drywall in China to Venture Supply, and that after Venture Supply shipped the drywall to Virginia and New Jersey, Venture Supply sold some of it to Banner Supply in Florida.  There is no evidence that Plaintiff bought or used any of this drywall.  TG's sale in China to a Virginia company without any awareness or

---

agreed that Justice O'Connor's test should be applied, although the concurrence rejected the plurality's stricter approach emphasizing sovereignty); *Oticon v. Sebotek Hearing Sys., LLC*, No. 08-5498, 2011 WL 3702423, at *8-9 (D. N.J. Aug. 22, 2011) (the "plurality expressly rejected the test articulated by Justice Brennan in *Asahi*" and "Justice Breyer, in his concurrence, would not adopt as strict a rule as that enunciated by the plurality, but he too voiced his disagreement with the notion that mere foreseeability is the cornerstone of the stream of commerce jurisprudence"); *Dow Chem. Canada ULC v. Superior*, 202 Cal. App. 4th 170 (Ca. 2011) ("In . . . *Nicastro* . . . the Supreme Court resolved . . .); *Keranos, LLC v. Analog Devices, Inc.*, No. 10-207, 2011 WL 4027427 (E.D. Tex. Sept. 12, 2011) (under *Nicastro* a showing of purposeful availment is required) (*but see Ainsworth v. Cargotec USA, Inc.*, No. 10-236, 2011 WL 44 3626, at * 2 (S.D. Miss. Dec. 15, 2011) (Justice Breyer's opinion was the holding in *Nicastro* as he concurred in the Judgment on the narrowest ground and Justice Breyer's opinion was only applicable to cases presenting the same factual scenario as *Nicastro*), *Leave to appeal granted*, No. 11-90052 (5th Cir. March 1, 2012); *Highlands Fuel Delivery, LLC v. Am. Ins. Co.*, No. 2011-291, 2011 WL 7110393 (N.H. Super. Ct. Nov. 29, 2011) ("The Supreme Court's decisions in *J. McIntyre* (plurality plus the concurrence) reflect that the majority of the court did not accept what was termed the stream-of-commerce theory of jurisdiction adopted by the New Jersey Supreme Court, but instead insisted that more needs to be shown for the purposeful availment factor to be satisfied in a particular case."); *May v. Osako & Co., Ltd.*, CL08002245-00, 2011 WL 4544889 (Va. Cir. Ct. Sept. 12, 2011) ("In *Nicastro*, the Supreme Court of the United States strongly affirmed Justice O'Connor's substantial connection analysis set forth in *Asahi* . . . over Justice Brennan's foreseeability test.").

[45] To the extent it could be found, as some courts have, that there was no common ground in *Nicastro* and hence no majority, the law of the Eleventh Circuit pre-*Nicastro* would apply.

expectation that the drywall would be marketed in Florida cannot possibly establish purposeful availment of Florida by TG.  This is not even a "stream-of-commerce" case because there can be no showing of a "regular and anticipated flow" of TG's products to Florida, (*Nicastro,* 131 S. Ct. at 2792; *Asahi*, 480 U.S. at 116) and thus there is no "purposeful availment."

Likewise, Plaintiff's vague and counter-factual allegations that TG's drywall was brought into the forum by third parties (or Plaintiff itself) (s*ee* Am. Compl ¶ 25) are insufficient to establish that TG purposefully availed itself of the benefits and protections of Florida.  *See Madara v. Hall*, 916 F.2d 1510, 1516-7 (11th Cir. 1990) (denying jurisdiction over defendant that allegedly libeled plaintiff in magazine distributed in Florida on basis that defendant was "not the magazine's publisher and did not control its circulation and distribution") (citing *Asahi*, 480 U.S. at 1032-33); *see also Elite Aluminum Corp. v. Trout*, 451 F. Supp. 2d 1311, 1316-17 (S.D. Fla. 2006) (declining to exercise specific jurisdiction over alleged patent infringer that made single sale and shipment into Florida where plaintiff initiated the sale and acted through an intermediary to bring defendant's product into the state).

It is an understatement to say that TG's contacts with the forum State were substantially less than those of the non-resident manufacturer not subject to jurisdiction in *Nicastro*.  McIntyre sold its products to its distributor in Ohio with the intention that its products be re-sold throughout the U.S., and some of its product was sold in New Jersey.  TG, however, had no U.S. distributor.  TG's only two sales to a U.S. company were to Venture Supply, FOB a China port. TG delivered the drywall to Venture Supply in China.  Venture Supply informed TG that Venture Supply planned to ship the first order of drywall it purchased to Virginia and the second order to New Jersey, but TG had no control over where Venture Supply shipped the drywall.  TG had no expectation whatsoever that its drywall would be re-sold in Florida.  If some of the

drywall ended up in Florida thereafter (a fact as to which there is no admissible evidence) it was not due to any intentional act on the part of TG and thus does not amount to minimum contacts with Florida. *See Nicastro*, 131 S. Ct. at 2788 ("The defendant's transmission of goods permits the exercise of jurisdiction only when the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State."); (plurality) and 131 S. Ct. at 2792 ("Mr. Nicastro, who here bears the burden of proving jurisdiction, has shown no specific effort by the British Manufacturer to sell in New Jersey.") (Breyer, J. concurring opinion.) Eleventh Circuit Law, which has consistently held that FOB sales outside the forum do not constitute purposeful availment of the forum, *see infra,* pp. 67-72, requires the same result.

### 2. Plaintiff Cannot Prove Its Causes Of Action Arose Out Of Or Resulted From TG's Contacts With Florida

Plaintiff also cannot possibly satisfy the additional Due Process requirement for specific jurisdiction that its causes of action "arose out of" or "relate to" TG's contacts with Florida. *Sea Lift*, 792 F.2d at 992-93. Instead, Plaintiff's claims, if any, arise from drywall that it purchased from Louisiana and Georgia entities and brought into Florida. Plaintiff cannot establish that TG had the minimum contacts with Florida necessary to be subject to specific jurisdiction consistent with the Due Process Clause of the Constitution.[46]

### 3. The Exercise Of Jurisdiction Over TG Would Be Unreasonable And Would Offend Traditional Notions Of Fair Play And Substantial Justice

The inquiry into whether the assertion of personal jurisdiction would comport with "fair play and substantial justice" is only conducted after it has been decided that a defendant purposefully established minimum contacts with the forum state. *Burger King* 471 U.S. at 477.

---

[46] TG did not engage in any activities in Florida or direct any of its activities at Florida. (*See* Jia Tr. 539:8-12). Therefore, it also lacked continuous and systematic contacts necessary for general jurisdiction in Florida.

Because Plaintiff is unable to show TG had minimum contacts with Florida, it is unnecessary, and somewhat redundant, to argue that it also would be constitutionally unfair and unreasonable to assert jurisdiction over TG.   Nonetheless, the arguments made below (*see* Point IV.C, *infra*) with respect to the unfairness of subjecting TTP to jurisdiction would apply with even greater force to TG.

## II.   TTP'S CONTACTS CANNOT BE ATTRIBUTED TO TG

### A.   The Court Should Not Disregard TTP's Separate Corporate Personhood

Although Plaintiff makes no claims against or regarding non-party TTP, TG anticipates that Plaintiff may argue that TTP's activities should be attributed to TG for the purpose of asserting jurisdiction over TG.   The only drywall manufacturer Plaintiff potentially can identify as a defendant other than Knauf is TTP, as Plaintiff alleges that it bought drywall from Inex and Inex has stated in its profile form that it purchased TTP drywall in addition to Knauf drywall. However, as is shown below, there is no basis for attributing TTP's activities to TG in the event Plaintiff makes such an argument.

Florida's Choice Of Law Rules Govern Whether TTP's Activities Can Be Attributed to TG.

An MDL court sitting in diversity must apply the choice of law rules of the transferor court.   *Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990) (superseded by statute on other grounds); *Van Dusen*, 376 U.S. at 639; *In re Vioxx Prod. Liab. Litig.*, 478 F. Supp. 2d 897, 903 (E.D. La. 2007).   Accordingly, this Court should apply the law that would apply in the Northern District of Florida.   As a federal court sitting in diversity the Northern District of Florida would be required to apply the substantive law of the forum state including its choice of law provisions. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).   Accordingly, this Court should apply Florida choice of law rules to the question of whether to attribute the activities of one

entity to another for purposes of personal jurisdiction.

<u>Chinese Law Should Apply</u>

In order to determine whether the acts of one entity may be attributed to another, at the very least it is essential first to understand the nature of that entity under the laws of the country in which it was formed.  China has a comprehensive law ("Company Law") that it enacted to facilitate Chinese business growth and transition the Chinese economy from a communist planned economy to a more modern market economy.[47]  (Zhu Decl. ¶ 15).  Among other things, the Company Law regulates the relationship between shareholders and their companies and the relationship between companies and third parties. (*See generally* Zhu Decl.).  TG and TTP were formed as separate and distinct legal entities pursuant to the Company Law and are subject to it. (See *id.* at ¶¶ 49, 52; *see also* Jia Tr., Def's. Exs. 33A, 34A, 35A, 37A, 40A, 42A, 43A, 45A, 46A and 47A).

Although no Florida court has spoken directly to the issue, the better rule of decision is to apply the law of the place of incorporation, China, to the question of whether TTP's activities can be imputed to TG.  *See Kalb, Voorhis v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) (Because a corporation is "a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away"); *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 647 (5th Cir. 2002) (under Louisiana law, law of place of incorporation applies when the defendant was claimed to be subject to jurisdiction based on imputation of its

---

[47] Pursuant to Fed. R. Civ. P. 44.1, TG has previously provided the PSC with notice that it believes Chinese law should govern legal issues related to the attribution of contacts for jurisdictional purposes.  *See* Defendants' Memorandum in Support Of Motion For A Protective Order, January 14, 2011 (Doc. No. 7003-1) at 15, n. 7; and Supplemental Brief With Respect To Motions To Compel Further Jurisdictional Discovery, dated Aug. 22, 2011 (Doc. No. 10162) at 15 n.17, and Rule 44.1 Statement, dated February 17, 2012 (Doc. No. 12533).  Accordingly, TG submits the accompanying Declaration of Zhu Yan, dated March 30, 2012 ("Zhu Decl."), describing the applicable Chinese law.

subsidiary's activities in the forum).  Moreover, as a matter of international comity, Chinese law should be respected and should determine when the integrity and separate corporate personhoods of Chinese companies such as TG and TTP should be recognized and when it should be ignored.

As is shown below, under either Chinese or Florida law, before the activities of one business entity will be imputed to the other, Plaintiff must prove an abuse of the corporate form to evade the company's debt.  The evidence here shows, however, that TTP was operated independently for a legitimate business purpose, and thus its activities cannot be imputed to TG.

### 1.   TTP's Separate Corporate Personhood Should Be Respected Under Chinese Law

As the Zhu Declaration states, TG is a company formed under the law of China and, as such, is subject to Chinese law, *Gongsi Fa*, or "Company Law," which regulates the formation, operation and governance of all Chinese corporations.  (*See* Zhu Decl. ¶¶ 12, 15, 49).[48]  Under Chinese law, each Chinese corporation is, by definition, a limited liability business entity, which has its own independent personality such that it can, *inter alia*, make contracts, incur debts on its own behalf and sue and be sued in its own name.  (*See id.* ¶ 22).

Under the Company Law, a company[49] may establish subsidiary companies that are recognized as separate and distinct legal entities that, like their parent, must also comply with the Company Law.  (*See id.* ¶¶ 38-42).  Even though a parent company and subsidiary company are distinct legal entities, the parent and subsidiary may, and, indeed, usually do, have common employees, officers, managers and/or directors.  (*See id.* ¶ 40).  The parent company, by virtue of its ownership and/or voting shares, will also often exert some level of control over the subsidiary,

---

[48] In China, a corporation is referred to as a "company" and corporate law is referred to as "company law."  (*Id.* ¶ 11).

[49] In 2005, the Company Law was amended to allow one corporation to own up to 100 percent of a subsidiary company – an arrangement that was prohibited in earlier forms of the Company Law.  (*See id.* ¶ 17).

for example, by directing the subsidiary's marketing strategy and business operations. (*See id.* ¶ 41). The type and extent of such control is normally provided for in the subsidiary's articles of incorporation in terms of shareholder's voting rights over important issues.[50]

As Zhu has opined, TG and TTP were duly organized under the laws of China. Each company is separately registered as an individual independent legal person in accordance with Chinese law. (*See* Zhu Decl. ¶ 49*).*

Further, under Chinese law, TG and TTP are legally distinct from one another and the traits and acts of each are not attributable to the others for liability or jurisdictional purposes unless attribution is permissible under an alternative legal theory as described below. (*See id.* ¶ 54).

The Company Law contains two provisions that permit a court to disregard a company's separate legal personality:

> Where any of the shareholders of a company evades the payment of its debts by abusing the independent status of juridical person or the shareholder's limited liabilities, and thus seriously damages the interest of any creditor, it shall bear the joint and several liabilities for the debts of the company.

and

> If the shareholder of a one-person limited liability company[51] is unable to prove that the property of the one-person limited liability company is independent from his own property, he shall bear joint and several liabilities for the debts of the company.

---

[50] The Company Law does, however, have some strict prohibitions regarding parent company's controlling power over the subsidiary. For example, no company may, directly or through its subsidiary, lend money to any of its directors, supervisors, or senior managers and neither the controlling shareholder, nor the actual controller, nor any of the directors, supervisors or senior management of the company may injure the interests of the company by taking advantage of its connection to or relationship with the company. (*See* Zhu Decl. ¶ 41).

[51] In China, the term "one-person limited liability company" is a term used to describe a wholly owned subsidiary. (*See, e.g., id.* ¶ 37.)

(*Id.* ¶ 47 (quoting Articles 34 and 20 of the Company Law)).  These two conditions are related in that both serve to ensure that creditors can differentiate what corporation they are doing business with and where corporate property exists that can satisfy a specific corporation's debt.

While the court will examine a variety of factors in assisting in its determination, in practice, Chinese courts will not disregard the separate corporate identity of parent and subsidiary companies unless a showing has been made of severe harm to a company's creditors caused by a shareholder's intentional and malicious abuse of the corporate form in order to evade company debt.  (*See* Zhu Decl. ¶ 48.)   As is shown below, because the evidence shows that  TG did not misuse TTP's corporate form to evade the payment of debt, and that TG's property was independent from TTP's, the acts of TTP are not attributable to TG under Chinese law.

<u>TG Did Not Abuse TTP's Corporate Form In Order To Evade Creditor Debt</u>

The facts set forth above (s*ee* pp. 8-12, *supra*), clearly establish that TG formed TTP for a valid business purpose, selling drywall to customers who wanted VAT invoices.  TG provided 22 million RMB to capitalize TTP, and therefore, there can be no claim that TTP was not adequately capitalized.  TTP owned its own manufacturing equipment, maintained its own bank accounts, and was operated independently, without the need for loans or financial assistance from TG. TTP ceased operating because the volume of its business did not justify the expense of its operations.  Further, TTP ceased operations before any lawsuits concerning drywall were filed, and thus this corporate decision could not possibly have had anything to do with attempts to avoid liability in this litigation.   There is simply no evidence to suggest TG abused TTP's corporate form to evade payment of its debts.

<u>TG And TTP Are Legally Distinct Entities With Separate Corporate Property</u>

TTP's property was independent from TG's.  *See* pp. 8-12, *supra.*  To summarize, TG provided TTP with an initial capital contribution of 15 million RMB.  As is shown by TTP's

Capital Verification Description, TG made the capital contribution as part of a structured business arrangement between two distinct entities – not through the unregulated commingling of funds.  TG made an additional capital contribution of 7 million RMB in 2006, and TTP revised its Article of Incorporation accordingly.  Each company kept its own financial records reflecting what property it owned and the assets of each corporation were separately evaluated by an independent party.

TTP leased, at market value, the property it used as its manufacturing site, which was three kilometers, from TG. TTP had its own office facilities.  TTP purchased its own manufacturing equipment, at market price.  TTP licensed the use of TG's trademark.  TTP purchased its own supplies.  TG and TTP maintained separate bank accounts and TTP paid its own employees, none of whom worked for TG while working at TTP.

TTP never used any of TG's property as if it was its own, or vice versa.  From the inception of TTP, all of the business transactions between the two companies were at arm's length, and were thoroughly documented in accordance with Chinese law.  All of the above demonstrates that TTP's property was independent of TG's.

As the foregoing shows, the only two circumstances under which the juridical independence of parent and subsidiary corporations could be ignored under Chinese law are inapplicable here.  Thus, under Chinese corporate law, TTP's contacts cannot be imputed to TG.

## 2. TTP's Separate Corporate Personhood Would Be Respected Under Florida Law

Under Florida law, in order to ignore corporate personhood and impute the contacts of independent entities to one another for jurisdictional purposes, Plaintiff must prove both: (1) that the subsidiary is a mere instrumentality or alter ego of the parent; *and*, as under Chinese law, (2) that the subsidiary was formed for an improper purpose. *Dania Jai-Alai Palace, Inc. v. Sykes*,

450 So. 2d 1114, 1120-21 (Fla. 1984); *Verizon Trademark Servs., LLC v. Producers, Inc.*, 810 F. Supp. 2d 1321, 1329-30 (M.D. Fla. 2011). The conduct that must be shown to establish an "improper purpose" goes beyond causing a shell corporation to breach a contract or commit conversion; rather, it must be shown that the corporate form has been abused so as to mislead or defraud creditors. *See North Am. Clearing, Inc.*, 666 F. Supp. 2d 1299, 1308. Plaintiff cannot make either showing here.

### TTP Was Not A Mere Instrumentality Of TG

In order to establish that the subsidiary was a mere instrumentality of the parent and that jurisdiction should be asserted over the parent due to the activities of its subsidiary, Plaintiff must prove that the parent dominated and controlled the subsidiary to such an extent that the subsidiary's independent existence was in fact non-existent and the parent was in fact an alter ego of the corporation. *See Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008). The law is clear, however, that control by a parent over some of the affairs of its subsidiary is insufficient to show that the subsidiary was a mere instrumentality of the parent, and that adherence to corporate formalities militates against any showing that the subsidiary is a mere instrumentality of the parent. Florida's courts have consistently declined to find that the subsidiary was a mere instrumentality of its parent in factual circumstances where the domination by the parent over the subsidiary was far greater than it is here.

For example, in *Miller v. Toyota Motor Corp.*, No. 07-1358, 2008 WL 4525058 (M.D. Fla. Oct. 6, 2008), the plaintiff sought to exercise jurisdiction over the parent, Toyota Motors Corporation, ("TMC"), a Japanese corporation, based on the contacts of its American subsidiary, Toyota Motor ("TMS"). TMC sold vehicles to TMS in Japan, which TMS then imported and sold to a privately-held company in the U.S. That company distributed the vehicles to various dealers around the U.S. with some of the vehicles ultimately ending up in Florida. One of the

vehicles caused injury to the plaintiff.  The plaintiff claimed that TMS was a mere instrumentality of TMC because TMC (a) sent employees to the U.S. occasionally to conduct focus groups; (b) "loaned" employees to TMS; (c) had the ability to recall the products and reimbursed its subsidiary for certain warranty claims; (d) derived approximately $71 million per year in revenue from vehicles sold in Florida; (e) entered into an import agreement with TMS where TMC was permitted to set sales figures for TMS and to provide guidance and advice, which TMS was required to follow must follow; (f) had some control over TMS's business plan; and (g) shared officers and directors with TMS.  *Miller*, 2008 WL 4525058, at *5.

The court refused to find that TMS was an instrumentality of TMC.  The court wrote:

> "paper matters in the law governing corporations.  One of the key purposes of incorporation is to protect the shareholders from the corporation's liabilities. This concept applies in the context of asserting personal jurisdiction over a parent corporation by virtue of its subsidiary's contacts."

*Id.* at *5.

The court further noted that "intermingling of corporate officers and board members is a common occurrence in the parent-subsidiary relationship, and it does not establish that the subsidiary is the alter-ego of the parent corporation." *Id.*  Further, the fact that the parent exercises some control over the subsidiary is insufficient to establish an alter ego relationship. "The relevant inquiry is whether the level of control is so extensive that the subsidiary 'functions solely to achieve the purpose of the dominant corporation.'" *Id.*

Numerous other courts have refused to find that a subsidiary was a mere instrumentality of its parent under Florida law where the parent exercised supervisory control over the subsidiary and where the parent and subsidiary shared overlapping officers and directors. *See, e.g.*, *WH Smith, Plc v. Benages & Assocs., Inc.*, 51 So. 3d 577, 582-83 (Fla. 3d DCA 2010) (no instrumentality finding for personal jurisdiction even where parent made "all significant

decisions" for subsidiary but evidence demonstrated that affiliated companies leased their own offices, maintained their own bank accounts, had separate management, directors and officers, sharing only one officer); *Verizon Trademark Servs.,* 810 F. Supp. 2d 1321 and *Verizon Trademark Servs., LLC v. The Producers, Inc.*, No. 10-665, 2011 WL 3629002 (M.D. Fla. Aug. 18, 2011) (corporate affiliate's Florida contacts not attributable to Defendant where, despite forming subsidiaries for the improper purpose of cybersquatting, companies observed all relevant corporate formalities, filed annual reports, paid all required taxes, kept corporate minutes, passed board resolutions, maintained separate corporate records and separate bank accounts); *Sun Trust Bank v. Sun Int'l Hotels Ltd.*, 184 F. Supp. 2d 1246, 1269-70 (S.D. Fla. 2001) (shared business address, overlapping officers and employees, employees of parent authorized to sign bank account of subsidiaries; parent exercising final authority regarding subsidiaries' advertising content and parent's officers and directors frequently traveling to Florida to discuss financial, administrative and marketing issues all not sufficient to show instrumentality or improper purpose where no evidence of co-mingling of funds, cross-accessing bank accounts or improper payments existed and evidence that the subsidiaries received a fee for the services they performed for the parent, operated their own accounts and paid their own expenses did exist); *Gadea v. Star Cruises, Ltd.,* 949 So. 2d 1143 (Fla. 3d DCA 2011) (sharing some officers and directors, having a unified or "global" strategy and goals, cross-selling in promotional materials, and performing services for one another not sufficient to satisfy the alter ego test).

Here, there is no evidence that TG controlled the business affairs of TTP in any way greater than that normally associated with a parent's ownership of a subsidiary. While TG formed TTP and owned 100% of TTP's shares, TG and TTP had separate headquarters, did not have common offices and directors, observed all corporate formalities, and maintained separate

accounting systems.  TG and TTP did not share employees.  Thus, under Florida law, TTP was not TG's instrumentality.

Most importantly, TG did not exercise complete authority over TTP's general policy, and exercised no authority over TTP's daily operations.  As the testimony establishes, Peng Shiliang was responsible for the daily operations of TTP; he had the right to hire and fire employees, and the department managers of TTP reported to him.  (*See* Shiliang Tr. 24:20-25:11, 26:1-27:6; Fu Tr. 115:23-116:1).  TTP managed its daily operations autonomously and there is no evidence to the contrary.

<u>TTP Was Not Organized To Mislead Creditors</u>

Under Florida law, as under Chinese law, the activities of the subsidiary cannot be imputed to the parent for jurisdictional purposes unless it is proven that the parent organized its subsidiary in order to mislead creditors or defraud them.  *See North Am. Clearing, Inc. v. Brokerage Corp. Sys.*, 666 F. Supp. 2d 1299, 1308 (M.D. Fla. 2009); *Hobbs v. Don Mealey Chevrolet*, 642 So. 2d 1149, 1156 (Fla. 5th DCA 1994) ("[t]he corporate veil will not be penetrated . . . unless it is shown that the corporation was organized or employed to mislead creditors or to work a fraud upon them."), *citing Dania Jai-Alai Palace*, 450 So. 2d at 1120.  Moreover, under Florida law, the plaintiff must make a showing of *intent* to engage in improper conduct for a finding of alter ego.  *See Kernel Records Oy v. Mosley*, No. 09-21597, 2010 WL 2812565 (S.D. Fla. July 5, 2010); *Resolution Trust Corp. v. Latham & Watkins*, 909 F. Supp. 923, 931 (S.D.N.Y. 1995) ("Absent proof of intentionally fraudulent conduct, courts simply do not pierce the corporate veil under Florida law."); *McFadden Ford, Inc. v. Mancuso*, 766 So. 2d 241, 243 (Fla. 4th DCA 2000) (jurisdiction not available under alter ego theory where plaintiff offerws no proof of wrongdoing).

As set forth above, there is not a shred of evidence that TG formed TTP to mislead

creditors or to work a fraud upon them.  TG formed TTP to sell drywall to customers who wanted VAT invoices.  "There is nothing inherently improper about corporations creating subsidiaries to perform specific functions.  This is what holding companies do.  A contrary finding would 'ignore the historical justification for the corporate enterprise system.'"  *Sun Trust Bank* 184 F. Supp. 2d at 1269-70 (*quoting Advertects, Inc. v. Sawyer Indus., Inc.*, 84 So. 2d 21 (Fla. 1955)).  Thus, because Plaintiffs cannot demonstrate the "improper conduct" required for an alter ego finding, TTP's contacts cannot be imputed to TG.[52]

### B.   TTP Was Not TG's Agent

There also is no evidence to support the theory that TG could be subject to jurisdiction because TTP acted as its agent in Florida.[53]  To establish agency for the purpose of exercising personal jurisdiction over the principal, Plaintiff must prove "(1) acknowledgment by the principal that the agent will act for it; (2) the agent's acceptance of the undertaking; and (3) control by the principal over the action of the agent."  *Enic, PLC v. F.F. South & Co., Inc.,* 870 So. 2d 888, 891 (Fla. 5th DCA 2004).  Personal jurisdiction cannot be exercised over a principal based on an act of its agent unless the act was within the scope of the agent's employment and the principal directed the act.

While Plaintiff cannot establish any of the above elements of the agency test, the Florida courts recognize that when plaintiffs try to fit the parent-subsidiary relationship into principal-agent garb the central issue is whether the parent had operational control over the subsidiary.  As the court wrote in *Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335, 1343 (S.D.

---

[52] There is no basis to attribute the "knowledge" of TTP's employees to TG on some independent and lesser showing than the abuse of corporate form standard which must be satisfied in order to attribute TTP's activities to TG.

[53] Fla. Stat. § 48.193 extends jurisdiction over entities that personally or through an agent engage in conduct that is subject to the long-arm-statute.

Fla. 2002) "in general, the presence of a subsidiary is insufficient on its own to establish jurisdiction over the parent corporation.  A plaintiff must show that the subsidiary is merely an agent through which the parent company conducts business or that the subsidiary's separate corporate status is formed only and without any semblance of individual identity.  Stated simply, the parent must have sufficient control over the actions of its subsidiary." 205 F. Supp. 2d 1335, 1343 (S.D. Fla. 2002) (citations omitted), *aff'd,* 54 F. App'x 492 (11th Cir. 2002); *see also State v. Am. Tobacco, Co.*, 707 So. 2d 851, 854 (Fla. 4th DCA 1998) (analyzing claim of jurisdiction over parent, court wrote "The issue of control is critical to the issue of agency."); *Cross Country Home Servs., Inc. v. Home Serv. USA Corp.*, No. 08-61456, 2010 WL 55439, at *3 (S.D. Fla. Jan. 6, 2010) (same); *Banco Cont'l., S.A. v. Transcom Bank (Barbados), Ltd.*, 922 So. 2d 395, 400 (Fla. 3d DCA 2006) (same); *Enic,* 870 So. 2d at 891 (same).

The "sufficient" control needed to exercise jurisdiction under an agency theory is "operational control."  "What is required for jurisdiction based on agency is not *some* control but *operational* control by the parent over the subsidiary." *Gen. Cigar*, 205 F. Supp. 2d at 1344. (emphasis in original).

A finding of control is warranted only when "the subsidiary 'manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation.'"  *State v. Am. Tobacco Co.*, 707 So. 2d 851, 856 (Fla. 4th DCA 1998) (finding no agency although parent directed subsidiary's policies). (citations omitted). In *General Cigar*, the court found that there was no showing of "operational control" when the subsidiary maintained its own production facilities, distributed its own products through its own sales organization, maintained its own accounts, and paid its own employees, even though it did not have independent marketing or strategic plans. *Gen. Cigar*, 205 F. Supp. 2d at 1344.

As shown above (see Section II.A.(3)), Plaintiff cannot establish that TG exercised complete operational control over TTP, and thus jurisdiction cannot be asserted over TG on the theory that TTP was TG's agent.[54]

## III.   PLAINTIFF IS UNABLE TO SATISFY FLORIDA'S LONG-ARM STATUTE TO EXERCISE PERSONAL JURISDICTION OVER TTP

Even assuming TTP's activities could be attributed to TG, those activities could not provide a basis for the Court to exercise jurisdiction over TG because TTP itself is not subject to the Court's jurisdiction.   As discussed above, the threshold issue to be determined in the jurisdictional analysis is whether the defendant's conduct falls within the relevant long-arm statute.   In this case, each of the potentially applicable provisions of the Florida long-arm statute requires that the defendant has purposefully engaged in activity in Florida or otherwise directly serviced the Florida market.   TTP's conduct does not meet this requirement and therefore the Court lacks jurisdiction over TTP.

### A.        TTP Has Not Conducted Business In Florida

As discussed above, "in order to establish that a defendant is 'carrying on business' in Florida for the purposes [of § 48.193(1)] of the long-arm statute, the activities of the defendant must be considered collectively and show a general course of business activity in the state for pecuniary benefit."   *Future Tech. Today, Inc.*, 218 F.3d at 1249 (citations omitted).   In this case, TTP has never had an office or any employees in Florida.   It made only isolated sales in China to three companies that advised TTP they intended to ship drywall to Florida.   Those sales

---

[54] The PSC has previously asserted that the contacts of one entity can be imputed to another under an "undertaker" theory, which is described in Section 324A of the Restatement (Second) of Torts as imposing liability for physical harm in certain situations  on "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things…" Nothing in the "undertaker" doctrine suggests that it can provide a basis for imputing the contacts of one entity to another for jurisdictional purposes, and, according to our research, no court has ever imputed contacts based on this doctrine.

comprised a very small percentage of its sales revenue.[55]  TTP did not ship any of the drywall it sold to those customers to Florida.  TTP also had no involvement in any of those customers' efforts to re-sell, install, or use the drywall in Florida.  Thus, TTP has not conducted business in Florida and there is no basis for the Court to exercise jurisdiction pursuant to Fla. Stat. § 48.193(1)(a).

### B.   TTP Has Not Committed A "Tortious Act" In Florida

For a court to exercise jurisdiction under § 48.193(1)(b) of the Florida long-arm statute, plaintiff must show that TTP committed a "substantial aspect of the alleged tort" in Florida. *Estate of Scutieri v. Chambers*, 386 F. App'x 951, 954 n.6 (11th Cir. 2010).  Since Plaintiff is an Alabama company, its economic injury, if any, occurred in Alabama, not Florida.  Even assuming, solely for the purpose of argument Plaintiff sustained an economic loss in Florida as a result of TTP's isolated sales of drywall in China, such "injury" would not be sufficient to place TTP within the statute.  *See Assoc. Transp. Line, Inc. v. Productos Fitosanitarios Proficol El Carmen, S.A.*, 197 F.3d 1070, 1072-73 (11th Cir. 1999) (injury in Florida is an insufficient basis to assert jurisdiction under § 48.193(1)(b)); *Blumberg*, 922 So. 2d at 364, (when plaintiff suffered a stroke in Florida, substantial aspect of the tortious conduct was not in Florida because sale of product alleged to have caused stroke occurred elsewhere).[56]

### C.   TTP's Alleged Conduct Did Not Cause Plaintiff To Sustain An "Injury To Person Or Property" In Florida

As was set forth above, Plaintiff's allegations of economic injury do not satisfy the "injury to persons or property" requirement for jurisdiction under § 48.193(1)(f) of the long-arm

---

[55] Based on the sales data in TTP's MPF, TTP obtained less than 1% of its revenue from sales to the three companies that advised they intended to ship to Florida.

[56] For purposes of the long-arm statute, TTP has limited its comments to the absence of any tortious activity by TTP in Florida.  However, Plaintiff is also unable to prove that TTP committed a tortious act outside of Florida that resulted in Plaintiff's injury.

statute.  *Aetna Life*, 511 So. 2d at 993-94.  Moreover, even assuming Plaintiff alleged "injury to persons or property within this state," § 48.193(1)(f), does not apply when "persons outside [of Florida] are injured by acts or omissions which occur *outside* the state."  *Price v. Point Marine, Inc.*, 610 So. 2d 1339, 1342 (Fla. 1st DCA 1992) (emphasis added); *see also F.A. Riviere v. St. James Episcopal Church of Clayton, Georgia, Inc.*, 545 So. 2d 449 (Fla. 3d DCA 1989) (for this Section to apply injury must be in Florida).  Here, Plaintiff is an Alabama-based company. Therefore, Plaintiff's alleged economic loss occurred in Alabama, not Florida, and is outside the ambit of Fla. Stat.§ 48.193(1)(f).

### D.   TTP Has Not Engaged In Substantial Activity In Florida As Required For General Jurisdiction Under The Long-Arm Statute

Plaintiff cannot offer evidence that would subject TTP to jurisdiction pursuant to Fla. Stat. § 48.193(2), the "general jurisdiction" statute.  TTP made only a few isolated sales in China to companies that advised TTP that they intended to ship drywall to Florida.  There is, however, no evidence TTP manufactured, sold, distributed, advertised or promoted its drywall, or any other products, in Florida.  Furthermore, TTP never has been incorporated in Florida nor kept any corporate records in Florida and is not registered to do business in Florida.  TTP had no officers, directors, employees, or agents in Florida.  No officers, directors, employees, or agents of TTP ever have visited Florida for business purposes.

In addition, although Fla. Stat. § 48.181(3) contains certain provisions related to jurisdiction over non-residents that make sales in Florida through distributors, as shown below, they do not apply here.  Fla. Stat. § 48.181(3) provides:

> Any person, firm, or corporation which sells, consigns, or leases by any means whatsoever tangible or intangible personal property, through brokers, jobbers, wholesalers, or distributors to any person, firm or corporation in this state is conclusively presumed to be both engaged in substantial and not isolated activities within this

> state and operating, conducting, engaging in, or carrying on a
> business or business venture in this state.

Anyone invoking Section 48.181(3) bears the burden of showing facts which justify its applicability; the statute is strictly construed. *See Wm. E. Strasser Constr. Corp. v. Linn*, 97 So. 2d 458, 459 (Fla. 1957).

Section 48.181(3) requires a showing that the defendant actually controlled the sale of its products in Florida through a distributor. *See Delray Beach Aviation Corp. v. Mooney Aircraft Inc.*, 332 F.2d 135, 140 (5th Cir. 1964) (Texas aircraft manufacturer had requisite control over Florida distributor that it actively supervised through frequent trips to Florida where distributor was also required to maintain aircraft sales and service facilities, maintain sales staff and engage in solicitation, advertising and promotional activities for manufacturer's aircraft). However, there is "no authority in the Florida statute upon which to predicate a holding making every manufacturer whose goods are ultimately sold in Florida by independent stores, whether selling wholesale or retail, amenable to service of process in the courts of the state . . . [T]his Court cannot give such broad construction to the words 'wholesaler' and 'distributor' as used in the statute." *Jenkins v. Fawcett Publ'ns, Inc.*, 204 F. Supp. 361, 364 (N.D. Fla. 1962). Thus, merely shipping goods to a customer in Florida who did not function as a broker, jobber, wholesaler or distributor does not fall within Section 48.181(3). *See Newmark Ladder & Bracket Co. v. Eadie*, 125 So. 2d 915, 915-916 (Fla. 3d DCA 1961).

TTP did not sell, consign or lease any personal property directly in Florida, nor did it do so through a distributor or agent.[57] Since Oriental Trading did not fulfill its initial purchase

---

[57] As set forth above, notwithstanding its title, the SAA was not an agency agreement. It was, at most, an exclusive sales agreement.

obligations under the SAA, it did not become a valid agreement.  As Che explained,[58] Oriental Trading's satisfaction of its initial purchase obligation was a condition precedent to the effectiveness of the Agreement.  "A condition precedent is an act or event, other than a lapse of time, that must occur before a binding contract will arise." *Mitchell v. DiMare*, 936 So. 2d 1178, 1180 (Fla. 5th DCA 2006).  Where a contract contains a condition precedent, the parties' obligations do not "mature" until that condition has been fulfilled.  *See In re Harrell*, 351 B.R. 221, 245 (Bankr. M.D. Fla. 2006) (finding that a contract was "not formed" because the parties failed to fulfill the condition precedent of a particular express approval: "[A]lthough it was [the parties'] intent to enter into a binding agreement, the contract lapsed and failed to ripen into a legal agreement with mutual obligations on both parties. Ergo, the Court cannot find a contract between the parties . . . .").  Under Florida law, the failure to fulfill a condition precedent "results in there being no contract." *Essex Ins. Co. v. Zota*, 607 F. Supp. 2d 1340, 1351 (S.D. Fla. 2009), *aff'd*, 408 F. App'x 323 (11th Cir. 2011).

In addition, even apart from the questionable validity of the SAA, there is no dispute that Oriental Trading never functioned as TTP's U.S. distributor or agent.  In fact, Oriental Trading did not sell any drywall at all.  Oriental Trading never advertised or promoted TTP's drywall in the U.S.  Oriental Trading never prepared or distributed any marketing material concerning TTP's drywall.  There is also no evidence of Oriental Trading doing anything to publicize that it was (supposedly) TTP's agent or distributor in the U.S.  In short, TTP did not sell any drywall in Florida through a distributor or agent.

---

[58] If a contract term is ambiguous, parol evidence is admissible to explain it.  *See RX Solutions, Inc. v. Express Pharm. Servs., Inc.*, 746 So. 2d 475, 476 (Fla. 2d DCA 1999) (parol evidence is proper when a contract's terms are incomplete or facially ambiguous).  In this case, the testimony of Che, who drafted the agreement is admissible to prove that the parties intended the initial purchase obligation as a condition to the validity of the Agreement.  (Che Tr. 346:13-354:1, 391:6-395:13).  Moreover, Gonima stated that Oriental Trading understood that it would have to meet TTP's purchase requirements for a certain period of time before it became TTP's representative in the U.S. (Gonima Tr. B 49:25-56:15; Spano Decl. Ex. 30).

TTP's sales to Wood Nation, Oriental Trading and B America were simple sales to purchasers that were completed in China, not sales to distributors.  TTP had no control over the drywall after selling it to its customers in China, and did not participate in any efforts by Wood Nation, Oriental Trading or B America to market or distribute drywall in Florida.  TTP did not make any sales in Florida "through" Wood Nation, Oriental Trading or B America, and thus cannot be subject to jurisdiction based on Fla. Stat. § 48.181(3).  *See Cook-Waite Lab., Inc. v. Napier*, 166 So. 2d 675 (Fla. 2d DCA 1964) (Delaware corporation which sold hypodermic needles in New York FOB various warehouses (none in Florida) to a Florida wholesaler was not subject to substituted service of process since it exercised no control over the needles or the wholesalers subsequent to the sale).

## IV.   DUE PROCESS WOULD NOT PERMIT THE COURT TO EXERCISE PERSONAL JURISDICTION OVER TTP

Even if the Plaintiff could prove that TTP was subject to Florida's long-arm statute, it still must show that the exercise of jurisdiction would be consistent with Due Process.  The evidence shows that Plaintiff is unable to do so because (1) TTP lacked minimum contacts with Florida that satisfy the requirements of Due Process sufficient for the Court to exercise personal jurisdiction and (2) Plaintiff's causes of action do not arise out of or result from TTP's alleged contacts with Florida.  Furthermore, even assuming Plaintiff could show that TTP had minimum contacts with Florida, the exercise of jurisdiction over TTP would not be constitutionally fair and reasonable, in violation of Due Process.

### A.   Plaintiff Cannot Establish That TTP Had Minimum Contacts With Florida

TTP's contacts with the forum State were substantially less than those of the foreign manufacturer that was not subject to jurisdiction in *Nicastro*.  Like McIntyre, TTP made no sales in the forum State, did not make any effort to market its products to the forum State, did not

advertise there, and had no offices, employees or property in the forum State.  Unlike McIntyre, TTP did not sell any products through a U.S. distributor or direct its marketing or sales efforts to the U.S.  TTP also never travelled to the U.S. to seek out customers as McIntyre did.  The sales of TTP's product to Florida companies came about only after Wood Nation, Oriental Trading and B America initiated contact with TTP, and entered into contracts providing for the delivery of drywall by TTP in China, either FOB or CIF.

The absence of TTP's minimum contacts is further reflected by TTP never having attended conventions or trade shows in the U.S. and its lack of involvement in any marketing or advertising with any U.S. company.  Also, unlike McIntyre, TTP did not have any trademarks or other intellectual property registered in the U.S.  TTP did not purposefully avail itself of the benefits and protections of a Florida forum; to the contrary, TTP purposefully avoided doing so, by completing its sales in China and not marketing in Florida.  *See World-Wide Volkswagen*, 444 U.S. at 297 (a nonresident may permissibly structure his primary conduct so as to avoid being haled into court in a particular state).  Thus, TTP cannot be subject to jurisdiction in Florida, for all the reasons McIntyre was not subject to jurisdiction in New Jersey, and then some.

Even if one were to speculate based on Justice Breyer's concurring opinion in *Nicastro* that "targeting the world by selling products from its Web site" or "consign[ing] the products through an intermediary (say, Amazon.com) who then receives and fulfills the orders", 131 S. Ct. at 2793, could be an element of showing purposeful availment, TTP did none of those things. TTP was willing to serve the export market outside China by passively selling to customers who approached TTP from other countries, including the U.S., but did not do anything that remotely approached "targeting the world".  In fact, TTP did not have its own website, and TG's website made no mention of TTP.  Furthermore, TTP never had an export marketing plan, let alone a

marketing plan directed to Florida.  Nor did TTP ever "consign" its drywall to "an intermediary" who received and fulfilled orders from customers in Florida.  Likewise, even under the *Nicastro* dissent's "purposeful avail[ment] . . . of the United States market nationwide" standard, TTP cannot be subject to personal jurisdiction.  TTP had no U.S. marketing plan or distributor, did not sell or advertise anywhere in the U.S., and did nothing to target the U.S. market, even generally. *Id.* at 2801.[59]

TTP's isolated sales in China also stand in a stark contrast to the purposeful activity of out-of-state franchisees in *Burger King*.  TTP did not "reach out" to Wood Nation, Oriental Trading or B America in Florida.  Quite the opposite, the Florida companies or their representatives approached TTP in China.  There was also nothing "long-term" about those companies' relationships with TTP.  Wood Nation and B America each only made one purchase. Oriental Trading placed a few orders over a two-month period, then stopped, and ask for its deposit back.  TTP did not control whether or not those companies re-sold the drywall in Florida and had no role in marketing in Florida.  There were no "continuing and wide-reaching contacts" between TTP and Florida – there were hardly any contacts at all.  TTP's sales to Wood Nation, Oriental Trading and B America did not involve any payments, performance or other activities by TTP in Florida.  Consequently, the principles announced and applied in *Burger King* also dictate that TTP should not be subject to jurisdiction in this case.

TTP did not engage in conduct that was "something more" than placing its drywall into the stream of commerce.  To the extent that any of TTP's drywall was re-sold in Florida, it resulted from the purposeful, unilateral acts of Wood Nation, Oriental Trading or B America

---

[59] Similarly, because TTP's isolated sales to three companies in China did not reflect its efforts to "seek to serve" the Florida market, it cannot be said to have the type of "expectation" of sales in the forum State that the Supreme Court in *Volkswagen* postulated could satisfy purposeful availment.  *Nicastro*, 131 S. Ct. at 2788.

(and possibly others) in bringing drywall purchased in China into Florida and selling it there, not from TTP's efforts directed toward Florida.  However, the unilateral conduct of a third party bringing a product into a State cannot be attributed to an out-of-state Defendant.  *See World-Wide Volkswagen*, 444 U.S. at 298.

   1.   **Plaintiff Cannot Prove That TTP Purposefully Availed Itself Of The Florida Market Based On TTP's Alleged Awareness Of Sales In Florida**

It would also be unavailing for Plaintiff to argue that TTP was "aware" of or could foresee that Wood Nation, Oriental Trading or B America planned to market some of the drywall purchased from TTP in China in Florida.  *First*, the *Nicastro* majority clearly rejected the "awareness that the product will be marketed in the forum State" standard that Justice Brennan advocated in *Asahi*.  The Supreme Court's precedents indicate that something more is required, such as a "regular . . . flow" or "regular course" of sales by TTP directed to Florida or "special state-related design, advertising, advice, or marketing" directed to Florida by TTP.  *Nicastro* 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment).  *See also Nicastro,* 131 S. Ct. at 2788 ("The Defendant's transmission of goods permits the exercise of jurisdiction only where the Defendant can be said to have targeted the forum; as a general rule, it is not enough that the Defendant might have predicted that its goods will reach the forum State.") (Kennedy, J., plurality opinion.)  None of those factors is even arguably present here.

*Second*, even if the Brennan test were applied, TTP did not participate in a distribution process that resulted in the sale of its drywall in Florida and was not aware that those companies would market the drywall in Florida.  TTP's connection to the forum State, therefore, was even more attenuated than that of the valve manufacturer that was not held subject to personal jurisdiction in *Asahi*.  Unlike *Asahi*, TTP did not make "regular and extensive sales" of its drywall in China to an entity "it knew was making regular sales" of that drywall in Florida, and

as the evidence also shows, the lawsuit came as a "surprise" to TTP.  *See Asahi,* 480 U.S. at 116,

121.  (Brennan, J., concurring in part and concurring in the judgment).[60]  Nor can it be said that

TTP benefit[ed] economically from the sale of its products in the forum State, one of the factors

Justice Brennan viewed as relevant to establishing minimum contacts.  *Asahi*, 480 U.S. at 121.

Wood Nation, Oriental Trading and B America each paid TTP the purchase price prior to

delivery of the drywall in China.  Thus, <u>TTP did not derive economic benefit from any re-sales</u>

<u>of drywall in Florida</u>.  Accordingly, even if Justice Brennan's concurring opinion in *Asahi*

(which is not governing law) is considered, TTP cannot be found to have purposely availed itself

of the forum State of Florida.  *See also Shin-Kobe Elec. Mach. Co., Ltd. v. Rockwell*, 750 So. 2d

67, 69 (Fla. 2d DCA 1999) (no personal jurisdiction in Florida over battery manufacturer that

sold products in Japan to manufacturer of forklifts that were shipped to Florida; similarly to

*Asahi*, defendant did not control where forklift would be distributed; in addition no evidence of

intent to serve Florida market).

### 2. Plaintiff Cannot Prove That TTP Directed Its Conduct At The Forum State As Required By The Eleventh Circuit

It is well settled in the Eleventh Circuit that the mere placement of a product into the

stream of commerce with the awareness that one's product will enter a particular state is not the

standard for purposeful availment and is insufficient to satisfy due process.  *Assoc. Transp.,* 197

F.3d at 1075 (citing *Asahi*, 480 U.S. at 112-13); *Francosteel Corp. v. M/V Charm*, 19 F.3d 624,

628 (11th Cir. 1994) (same).  In *Madara,* 916 F.2d at 1519 the Eleventh Circuit expressly

adopted Justice O'Connor's more stringent purposeful availment, "foreseeability plus" standard

---

[60] Likewise, if one were to assume, based on the profile forms filed by Plaintiffs and others, that Plaintiff obtained the TTP drywall at issue in this case from Inex in Louisiana who obtained it from Metro Resources in Michigan who obtained it from unidentified sources, there remains no evidence TTP was aware that the drywall would be re-sold or used in Florida.

from *Asahi*.[61]  The law in the Eleventh Circuit is that FOB sales outside of the forum State do not constitute purposeful availment of the State even when the seller arranged for shipment of the product into the forum.  *Charia v. Cigarette Racing Team*, 583 F.2d 184 (5th Cir. 1978).[62]  *See also Singletary v. B.R.X., Inc.*, 828 F.2d 1135, 1136 (5th Cir. 1987) (finding that "contact was weakened even further by the fact that the sale was initiated by the buyer, and was shipped F.O.B. California, the seller's place of business").

<u>Charia</u>

In *Charia*, the plaintiff was a Louisiana resident who had purchased a boat from a Florida based boatbuilder.  *Charia*, 583 F.3d 184.  Defendant had sold four boats to Louisiana residents within  a five-year period.  Plaintiff had seen advertisements that defendant placed in several national magazines and had contacted defendant to purchase a boat.  They had several conversations about the boat, agreed on a price, and defendant arranged for delivery.  The boat was shipped FOB Florida and the transportation cost was added to the purchase price.  *Id.*

The Fifth Circuit found that jurisdiction could not be exercised over the defendant in Louisiana consistent with Due Process.  *Id.* at 189-190.  It found that advertising in national magazines was not a significant contact, nor was exchanging phone calls.  The Court also concluded that the place where the contract was completed was fortuitous, and what was more important was that the only face-to-face discussions about the sale occurred in Florida, indicating "that the locus of the contract was in Florida, where [the defendant's] activity, the building of the boat, was to take place."  *Id.* at 188.

---

[61] *But see Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534 (11th Cir. 1993) (court did not choose any of the competing *Asahi* tests, but determined that defendant's contacts were sufficient to satisfy the O'Connor test).

[62] *Charia* remains controlling law in the Eleventh Circuit as it has never been overruled.

Further, the court found that because Cigarette sold the boat FOB Florida it could not be argued under a "stream of commerce rationale" that it was indirectly shipping its product into Louisiana and could have reasonably foreseen that the sale would have effects in Louisiana. Moreover, the court held that Cigarette's sale of four boats to Louisiana residents over a five-year period were "isolated and sporadic" sales that "did not involve purposeful conduct within Louisiana so as to avail itself of the benefits and protections of Louisiana's laws." *See also, Benjamin v. Western Boat Bldg. Corp.*, 472 F.2d 723 (5th Cir. 1973). (Louisiana resident who initiated purchase of boat from Washington State boatbuilder and accepted delivery in Washington did not satisfy burden of proving minimum contacts of boatbuilder in Louisiana, notwithstanding communications regarding contract to plaintiff in Louisiana).

Banton

In accordance with *Charia*, courts in the Eleventh Circuit have often held that FOB sales made outside of the forum State do not constitute purposeful availment of the State where the purchaser solicited the product from the manufacturer. *See Banton Indus., Inc. v. Dimatic Die & Tool Co.*, 801 F.2d 1283 (11th Cir. 1986). *Banton* involved a Nebraska defendant who, in response to an unsolicited offer, sold several thousand pulleys FOB Omaha to an Alabama plaintiff. The parties had conducted transactions the same way for four years. Plaintiff alleged the pulleys were defective, and sued for breach of warranty. The Eleventh Circuit affirmed dismissal of the complaint for lack of personal jurisdiction and wrote:

> [Defendant's] activities in this case do not provide the "minimum contacts" with Alabama that due process requires. [Defendant] is not an Alabama corporation and has no contacts with that state other than its sales of goods to an Alabama resident. Nor does [Defendant] actively seek business in Alabama. In fact, the contract and sale upon which [Plaintiff] bases its claim arose out of [Plaintiff's] unsolicited order of goods from [Defendant]. Furthermore, [Defendant] tendered the goods to [Plaintiff] in Omaha, Nebraska. At no time did any representative of

68

> [Defendant] enter Alabama.  In sum, although we recognize that [Defendant] had business dealings with an Alabama resident, we conclude that its actions were too insignificant to subject it to suit in Alabama.

801 F.2d at 1284-85.  *See also Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055 (11th Cir. 1986) (Missouri default judgment was void because the Missouri court could not exercise jurisdiction over the defendant, a Georgia corporation that purchased goods from a Missouri manufacturer, where all negotiations took place in Georgia, and no representative of the buyer visited Missouri to negotiate contract or inspect the plant).

*Banton* also requires that the Court find it cannot exercise jurisdiction over TTP.  Like the foreign manufacturer there, TTP did not actively seek business in the forum State.  Rather, TTP took unsolicited orders for drywall outside the State, tendered the drywall to its customers outside the State and never had a TTP representative enter the State.  *See also Maschinenfabrik Seydelmann v. Altman*, 468 So. 2d 286, 288-290 (Fla. 2d DCA 1985) (no jurisdiction over German manufacturer of meat grinder that sold FOB Germany to manufacturer's U.S. distributor in Massachusetts, even though distributor had delivered 23 machines valued at $750,000 to Florida).

<u>Osorio</u>

In *Osorio v. Dole Food Co.*, No. 07-22693, 2009 WL 48189, at *11-13 (S.D. Fla. Jan. 5, 2009), the issue before the Court was whether to enforce a Nicaraguan judgment against certain U.S. defendants claimed who claimed the Nicaraguan Court did not have personal jurisdiction over them.  The Court found that the defendant Shell was not subject to jurisdiction in Nicaragua because even though it had delivered its pesticide to neighboring Honduras and Costa Rica, because plaintiff's "do not provide any evidence to show that Shell was at all aware of the use of its product in Nicaragua or that such use was part of the regular and anticipated flow of the

product." *Id.* at *12.  Further, there was no evidence Shell had "directed its activities toward Nicaragua or otherwise engaged in activities that would constitute purposeful availment of the Nicaraguan forum." *Id.  Osorio* further exemplifies that merely placing products into the stream of commerce, such as TTP did in this case, is insufficient to establish purposeful availment of the forum State in the Eleventh Circuit.

Likewise in *Shin-Kobe*, 750 So. 2d at 69-70 an injured Florida resident sued a foreign battery manufacturer for damages he suffered when the battery in a forklift he was operating exploded.  Defendant had no contact with Florida and transacted no business there.  The foreign manufacturer sold its batteries to a Japanese company, which installed the batteries in forklifts, and had no control over where the forklift manufacturer shipped or sold its products.  The court found that the case was similar to *Asahi*.  Citing to the O'Connor test, the court found that the defendant did not control where the forklift would be distributed, and that there "was no evidence of additional conduct … including an intent or purpose to serve Florida.  It did not design the product for the market in Florida, advertise in Florida, establish channels for providing regular advice to customers in Florida, or market the product through a distributor who agreed to serve as the sales agent in Florida … [It] made all of its money with the initial sale . . . and the resales . . . were not purposeful sales by [the defendant]." *Id.* at 70.

In this case, TTP did not perform any part of its sales contracts in Florida.  However, even a contract that requires some performance in Florida is insufficient to establish purposeful availment in the absence of purposeful activity directed to the State.  For example, the Eleventh Circuit has ruled that entering into a contract to ship cargo to a forum State was insufficient to constitute purposeful availment of the State.  *See Francosteel Corp.*, 19 F.3d at 628 (signing Bills of Lading and contract to ship cargo to Georgia did not constitute purposeful availment of

70

Georgia).  *See also Gen. Cigar*, 205 F. Supp. 2d at 1347 (no jurisdiction over foreign antitrust defendant that met with co-conspirators in Florida on multiple occasions, advertised its product in Florida and nationally, and previously sold its product in Florida and elsewhere in the U.S.).

Furthermore, in *Christus St. Joseph's Health Sys. v. Witt Biomedical Corp.*, 805 So. 2d 1050, 1053-1054 (Fla. 5th DCA 2002), a Florida appellate court explicitly recognized that, as the Supreme Court stated in *Burger King*, a contract with a corporation located in the state is not enough, by itself, to subject a foreign resident to jurisdiction.  In *Christus*, the Court found that an out-of-state defendant lacked minimum contacts with Florida, notwithstanding that it made two purchases of medical equipment from Florida, payment was required to be made in Florida and on-line servicing of the equipment was provided from Florida.

Here, Plaintiff cannot establish that TTP engaged in purposeful activity directed to the forum State as required by the Eleventh Circuit to establish that TTP had minimum contacts with Florida.  TTP merely made unsolicited sales in China to companies that advised TTP they intended to ship drywall to Florida.[63]  TTP lacks minimum contacts with Florida and therefore Due Process does not permit the Court to exercise personal jurisdiction over TTP.[64]

---

[63] Even if the SAA is considered to have been a valid agreement, it does not supply minimum contacts because there was no purposeful activity by TTP directed to Florida that was associated with it.  *See Sea Lift*, 792 F.2d at 993 ("A contract is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences with themselves are the real object of the business transaction'") (citing *Burger King*, 105 S. Ct. at 2185).  In the case of the SAA, there were no "future consequences" because Oriental never performed the agreement or sold any TTP drywall.

[64] TTP's sales to Wood Nation, Oriental Trading and B America in China also cannot be characterized as the continuous and systematic contacts necessary for general jurisdiction in Florida.  Indeed, far more significant contacts have been found insufficient for general jurisdiction.  *See Goodyear,* 131 S. Ct. at 2852 (affiliates' sales of tens of thousands of defendant's tire in forum State insufficient); *Dalton v. R & W Marine, Inc.,* 897 F.2d 1359, 1362 n.3 (5th Cir. 1990) (declining to exercise jurisdiction when the defendant's purchases combined with its sales in the forum yielded 12.9% of its total profit); *Rexam Airspray, Inc. v. Arminak,* 471 F. Supp. 2d 1292, 1300 (S.D. Fla. 2007) (1% of total business in Florida insufficient to confer general jurisdiction).  Thus, even if TTP were found to have  made sales in Florida 'through a distributor' within the meaning of Fla Stat. § 48.181, TTP's sales to Wood Nation, Oriental Trading or B America do not provide the continuous and systematic contacts necessary for general jurisdiction consistent with the Due Process Clause.

**B.**     **Plaintiff Cannot Prove Its Causes Of Action Arose Out Of Or Resulted From TTP's Contacts With Florida**

In the Eleventh Circuit, a defendant may be subject to specific jurisdiction when the cause of action "arises from" the defendant's forum-related activities.  *Sea Lift*, 792 F.2d at 993 (citing *Helicopteros*, 466 U.S. at 414 n.8); *see also Crowe v. Paragon Relocation Res., Inc.*, 506 F. Supp. 2d 1113, 1120 (N.D. Fla. 2007) (plaintiff must show a direct affiliation, nexus, or substantial connection between cause of action and defendant's in-state conduct).[65]

Here, Plaintiff cannot establish that its causes of action arose from TTP's alleged contacts with Florida.  Plaintiff cannot establish that any drywall it used is traceable to any sales of drywall by TTP that are alleged to supply its minimum contacts with Florida.  Put differently, there is no evidence that TTP "purposefully availed" itself of Florida when it sold any drywall that Plaintiff used.  Plaintiff alleges that it purchased drywall from Inex in Louisiana and Rightway in Georgia.  Rightway's MPF states that it does not know the manufacturer of the drywall it purchased.  (Spano Decl. Ex. 14).  Inex claims it obtained TTP drywall from Metro Resources, a Canadian company.  (Spano Decl. Ex. 15).  Thus, there is no factual basis to conclude that Plaintiff's claims arose out of or resulted from TTP's minimum contacts with Florida.  For this reason, the Court should decline to exercise personal jurisdiction over TTP, even if it finds TTP had minimum contacts with Florida.  *See Singletary*, 828 F.2d at 1136-1137 (affirming jurisdictional dismissal of products liability claims that did not arise out of non-resident defendant's sales or advertisements in Louisiana).

---

[65] *See also* Fla. Stat. § 48.193(1) (jurisdiction under long-arm statute only for "a cause of action arising from the doing of any of the following acts . . .)  For purposes of Section 48.193(1)(f) of the Florida long-arm statute it is sufficient if non-resident defendant is alleged to be soliciting sales, promoting, or distributing the same product as that which caused the injury in Florida.  *Davis v. Pyrofax Gas Corp.*, 492 So. 2d 1044, 1045-1046 (Sup. Ct. Fla. 1986).

C.      **The Exercise Of Jurisdiction Over TTP Would Be Unreasonable And Would Offend Traditional Notions Of Fair Play And Substantial Justice**

The Court cannot exercise personal jurisdiction over TTP if it would offend "traditional notions of fair play and substantial justice." *Int'l. Shoe*, 326 U.S. at 316.  As the Supreme Court has explained:

> Once it had been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'  Thus, courts in 'appropriate case[s]' may evaluate [1] 'the burden on the defendant,' [2] 'the forum State's interest in adjudicating the dispute,' [3] 'the plaintiff's interest in obtaining convenient and effective relief,' [4] 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and [5] the 'shared interest of the several States in furthering fundamental substantive social policies.'

*Burger King,* 471 U.S. at 476-477 (citations omitted and internal numbering added).

In *Asahi*, all nine Justices agreed that it would not be fair and reasonable to assert jurisdiction over a foreign manufacturer in a case brought by a foreign plaintiff when the manufacturer's sale did not take place in the United States.  As Justice Ginsburg explained in her dissent in *Nicastro*:

> The decision was not a close call.  The Court had before it a foreign plaintiff, a Taiwanese manufacturer, and a foreign defendant, the Japanese valve-assembly maker, and the indemnification dispute concerned a transaction between those parties that occurred abroad.  All agreed on the bottom line:  The Japanese valve-assembly manufacturer was not reasonably brought into the California courts to litigate a dispute with another foreign party over a transaction that took place outside the United States.
>
> Given the confines of the controversy, the dueling opinions of Justice Brennan and Justice O'Connor were hardly necessary.  How the Court would have 'estimate[d] . . . the inconveniences,' . . . had the injured California originally sued Asahi is a debatable question.  Would this Court have given the same weight to the burdens on the foreign defendant had those been counterbalanced by the burdens litigating in Japan imposed

73

> on the local California plaintiff?  *Cf. Calder v. Jones*, 465 U.S. 783, 788 (1984) (a plaintiff's contacts with the forum "may be so manifold as to permit jurisdiction when it would not exist in their absence.")
>
> In any event, Asahi, unlike McIntyre UK, did not itself seek out customers in the United States, it engaged no distributor to promote its wares here, it appeared at no tradeshows in the United States, and, of course, it had no Web site advertising its products to the world.  Moreover, Asahi was a component part manufacturer with 'little control over the final destination of its products once they were delivered into the stream of commerce.'  It was important to the Court in *Asahi* that 'those who use Asahi components in their final products, and sell those products in California, [would be] subject to the application of California tort law.'  480 U.S. at 115, 107 S. Ct. 1026 (majority opinion).

131 S. Ct. at 2802-2803 (Ginsburg J., dissenting) (internal citations and quotations omitted).  The decision in this case should also not be a close call.  TTP's isolated sales in China to Wood Nation, Oriental Trading and B America were foreign transactions that took place entirely abroad.  TTP, like the Japanese valve manufacturer in *Asahi*, "did not itself seek out customers in the United States, it engaged no distributor to promote its wares here,[66] [and] it appeared at no tradeshows in the United States."  *Id.* at 2803.  Just as the Japanese valve manufacturer in *Asahi*, TTP had "little control over the final destination of its products once they were delivered . . . ."  *Id.*  Lastly, the plaintiff here, Mitchell,  is similarly situated to the Taiwanese manufacturer in Asahi.  It is seeking claims for economic loss, and as was shown above, those claims arose in its home state, Alabama, not in Florida.  Whether  Mitchell's claims arose from the use of the product in Florida does not distinguish the situation here from *Asahi*, where the claims arose from the use of the product in California.

Furthermore, the five fairness factors the Supreme Court has identified weigh against the assertion of personal jurisdiction over TTP.  The first factor – the burden on the defendant – is

---

[66] As noted above, the SAA was never a valid agreement and, in any case, TTP never marketed or sold any drywall through a distributor in Florida.

particularly compelling.  As the Supreme Court explained in *Asahi,* "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."  480 U.S. at 114; s*ee also Gray v. Riso Kagaku Corp.*, 82 F.3d 410, 1996 WL 181488, at *4 (4th Cir. Apr. 17, 1996) (exercise of jurisdiction unreasonable over Japanese company due to language and cultural barriers and distance of South Carolina forum from Japan).   The Supreme Court has cautioned that "[G]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field."  *Asahi*, 480 U.S. at 115 (citation omitted).

In order to defend this lawsuit on its merits, TTP would bear the extraordinarily unfair and unjust burden of having to travel around the world. Beyond sheer travel time, TTP would have to surmount logistical and bureaucratic difficulties in terms of transportation, voluminous translations, governmental approvals, and deep-seated cultural differences that would likely be prohibitively expensive to overcome.  *See Gray*, 1996 WL 181488, at *4. The Court and the parties' experience with jurisdictional discovery dramatically illustrates the point.   The difficulties of travel for Chinese nationals required that jurisdictional depositions be taken in Hong Kong, far from TTP's headquarters in Shandong Province, China and also a half a world away from this forum.  Enormous time and expense were also required for the translation of testimony and documents.  In addition, because of disputes regarding translations and other problems with discovery in international litigation, the Court ordered a second round of depositions in Hong Kong.  Altogether, jurisdictional discovery has taken more than 16 months. Needless to say, these burdens would increase exponentially if TTP was required to defend on the merits.  The burdens imposed on TTP would, therefore, be so severe as to be constitutionally

unreasonable.  *See Burger King*, 471 U.S. at 478 ("jurisdictional rules may not be employed in such a way as to make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent") (citation omitted).

The second factor, the interests of the forum State, also does not favor asserting jurisdiction over TTP.  TTP did not engage in any activities in Florida, and Mitchell is an Alabama resident that suffered injury, if at all, in Alabama.

Similarly, the third factor – the interests of Plaintiff – are served allowing the litigation to proceed against the multiple parties subject to the Court's jurisdiction who Plaintiff alleges were in the chain of distribution of drywall it installed in homes in Florida.  In this manner, Plaintiff will likely be able to obtain relief without the delay, complexity and unfairness of dragging TTP into this litigation from China.

The fourth factor – the judicial system's interest in efficient resolution of controversies – also suggests that jurisdiction over TTP is not appropriate, as the aforementioned difficulties of intercontinental, multi-lingual, cross-cultural adjudication would needlessly complicate and prolong these proceedings.

Finally, the shared interest of the "several states" in a case involving a foreign defendant "calls for a court to consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction by [the forum State]." *Asahi*, 480 U.S. at 115-116.  In that assessment, "the procedural and substantive interests of other *nations* . . . as well as the Federal interest in Government's foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State." *Id. at* 115 (emphasis in original).

Here, China's substantive policies most assuredly do not weigh in favor of diluting the guarantee of Due Process so far as to allow jurisdiction over TTP.  In addition, the interests of international comity indicate jurisdiction would be unreasonable.   TTP sold and delivered drywall exclusively in China, and its sales to companies that indicated they were shipping to Florida were an infinitesimal portion of TT's business.  Subjecting TTP to unexpected litigation half a world away would certainly defeat its reasonable expectations in those transactions, and offend principles of international comity.  *OMI Holding, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1097 (10th Cir.1998) (adjudication of dispute with Canadian defendants arising out of contract negotiated in Canada and governed under Canadian law would implicate Canada's sovereign interest in interpreting its laws and militated in favor of dismissal).

The foregoing arguments are even more powerful with respect to TG, which never supplied drywall to anyone who claimed to be from Florida, and was not aware of anyone marketing TG drywall in Florida.  In light of all of the foregoing considerations, exercising personal jurisdiction over either TG or TTP would contravene "traditional notions of fair play and substantial justice," in violation of the Due Process Clause of Constitution.

## V.     THE DEFAULT SHOULD BE SET ASIDE FOR THE ADDITIONAL REASON THAT PLAINTIFFS FAILED TO SERVE THE PLEADINGS UPON WHICH THE DEFAULT JUDGMENT WAS BASED

In keeping with the principle that default judgments are disfavored, courts have required "strict compliance" with the legal prerequisites establishing the courts' power to render such judgments.  *Varnes v. Local 91, Glass Bottle Blowers Ass'n*, 674 F.2d 1365, 1369 (11th Cir. 1982), *quoted by Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind,* 841 F.2d 646, 650 (5th Cir. 1988).

Pursuant to Rule 5(a)(2), Plaintiff was required to serve the Amended Complaint on TG in accordance with Rule 4 because the Amended Complaint introduced new claims.  Among

other things, the Amended Complaint sought certification of a nationwide class of persons, whereas the initial complaint sought class certification of a discrete class of builders in specific states.  Further, upon filing of the Amended Complaint, the initial (served) Complaint became a nullity, rendering it an inapt vehicle for the default.  *Viznai v. United Homes of New York, Inc.*, No. 07-4173, 2009 WL 931178, at *2 (E.D.N.Y. Apr. 3, 2009) (finding "the filing of an amended complaint would render the defaults of the [defendants] a nullity" because the amended complaint renders the original "of no legal effect") (citations omitted); *Saint-Gobain Autover USA, Inc. v. Fuyao Glass Indus. Grp. Co., Ltd.,* No. 05-71079, 2005 WL 3454402, at *2 (E.D. Mich. Dec. 16, 2005) (setting aside default based on original complaint "which is now a nullity because it was later amended.")   Accordingly, even if TG could be subject to jurisdiction in Florida, the preliminary default should be set aside because Plaintiff did not serve TG with the Amended Complaint on which the default was granted.

## VI.   THE PRELIMINARY DEFAULT SHOULD ALSO BE SET ASIDE ON THE GROUNDS OF EXCUSABLE NEGLECT

Pursuant to Fed. R. Civ. P. 55(c), a court may set aside an entry of default for "good cause." "[T]he requirement of 'good cause' . . . ha[s] generally been interpreted liberally." *Amberg v. FDIC*, 934 F.2d 681, 685 (5th Cir. 1991) (internal citation omitted). Three factors are examined when determining "good cause":   (1) whether the failure to act was willful; (2) whether setting the default aside would prejudice the adversary; and (3) whether a meritorious claim has been presented.  *Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000).  These factors are not exclusive; instead, they are to be regarded simply as a means to identify good cause. *Matter of Dierschke*, 975 F.2d 181, 184 (5th Cir. 1992).  Other factors may be considered, such as whether the party acted expeditiously to correct the default.  *Id.*   "In any event, entries of default are serious; 'where there are no intervening equities[,] any doubt should . . . be resolved

in favor of the movant to the end of securing a trial upon the merits'"  *Effjohn*, 346 F.3d at 563 (citation omitted).

### A.     TG Did Not Willfully Default

Courts have vacated defaults where defendants had a good faith basis for believing that they were not subject to the jurisdiction of the forum court, even if the belief was invalid.  *Carl Marks & Co. v. USSR*, 665 F. Supp. 323 (S.D.N.Y. 1987), *aff'd*, 841 F.2d 26 (2d Cir. 1988) (vacating default judgments entered against the Soviet Union where defendant did not believe the court could have jurisdiction over it); *cf. Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of Venezuela*, 575 F.3d 491, 503 (5th Cir. 2009) (vacating default with instructions that lower court determine arbitrability of dispute).  Here, TG did not willfully default.  It did not intend to offend the Court or challenge its powers.  (*See* Jia Decl. ¶ 28).  TG did not understand the significance of the Complaint, and it could not imagine how its sales of drywall in China could have legitimately resulted in U.S. litigation.  (*See* Jia Decl. ¶ 33).  Given TG's lack of any sales or other business activities in Florida, it is understandable that TG believed it did not need to respond to the Complaint.  (Jia Decl. ¶ 28).  Once TG learned of the nature of the U.S. proceedings, TG promptly appeared and made cooperating with this Court "amongst its highest priorities." (Jia Decl. ¶¶ 34, 35).

Furthermore, TG's good faith is reflected in its conduct of the litigation since it has appeared, including its massive document productions, and production of corporate and individual witnesses for extensive depositions in Hong Kong.

Excusable neglect may also be found where a party was ignorant of the U.S. judicial process.  *See, e.g., Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1551 (D.C. Cir. 1987) (remanding with instructions to consider, *inter alia,* whether failure to respond to a complaint "was the excusable result of 'a broad divergence in [American and Bolivian] cultural,

governmental, and political approaches to the present case.'") (citation omitted); *E. & J. Gallo Winery v. Cantine Rallo, S.p.A.*, 430 F. Supp. 2d 1064 (E.D. Cal. 2005) (vacating default judgment entered against non-English speaking, foreign defendant that received summons and complaint but did not understand the nature of the suit).

In this case, TG's failure to respond to the Complaint was due in large measure to its ignorance of the U.S. legal system.  TG has never been involved in litigation of this nature in the United States or anywhere else in the world.  (*See* Jia Decl. ¶ 29).  TG has had no experience with the litigation process in Florida or anywhere else in the United States.  (*Id.)*.  No employee at TG had any prior experience whatsoever with the U.S. judicial process to understand the nature or consequences of the claims asserted in this litigation.  (*See* Jia Decl. ¶ 31).

Moreover, a default is not willful where the defendant lacked actual notice of the action pending against it.  *See Robinson v. Sanctuary Music*, 383 F. App'x 54, 58 (2d Cir. 2010) (finding good cause where defendants had not been properly served with process prior to default judgment pursuant to the Hague Convention.); *Bituminous Cas. Corp. v. Garcia*, 223 F.R.D. 308, 313-14 (N.D. Tex. 2004) (vacating a default judgment where intervenors adversely affected by judgment had no notice of the suit or entry of default).  By failing to serve the Amended Complaint or the motion for a default judgment, Plaintiff did not afford TG actual notice of its claims.  (*See* Jia Decl. ¶ 32)  This deprived TG of the opportunity to consider the consequences of not responding or participating in the hearing upon which the default was based.  (*See* Jia Tr. 910:22-911:2).

## B.    Vacating The Default Will Not Prejudice Plaintiff

A plaintiff will not be prejudiced upon vacatur of a default where it cannot show that vacatur will cause the "loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion."  *Robinson*, 383 F. App'x at 58 (citation omitted).

Here, there is no reason to believe that any evidence has been lost, that discovery would be any more difficult than prior to the default, or that any fraud has taken place. Moreover, requiring Plaintiff to prove its case on the merits is not the type of prejudice that justifies allowing the entry of default to remain. *In re Marinez*, 589 F.3d 772, 778 (5th Cir. 2009) ("There is no prejudice to the plaintiff where the setting aside of the default has done no harm to plaintiff except to require [him] to prove [his] case.") (citation omitted, alteration in original).

      **C.**     **TG Has Meritorious Defenses**

In determining whether a meritorious defense exists, "'[t]he underlying concern is . . . whether there is some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default.'" *Jenkins & Gilchrist v. Groia & Co.*, 542 F.3d 114, 122 (5th Cir. 2008) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2697 (3d Ed. 1998)). That possibility exists here. *First*, TG is not subject to jurisdiction in Florida. *Supra*, Part I. *Second*, the evidence shows that Plaintiff does not purport to know whose drywall it bought, and, in any case, it is incontrovertible that Plaintiff did not purchase drywall manufactured by TG. Even if it could be shown that Plaintiff purchased drywall manufactured by TTP, there is no basis to impute TTP's activities to TG. *Third*, Plaintiff, an Alabama builder, lacks standing to sue on behalf of property owners nationwide. (Am. Compl. ¶¶ 4, 29). *See Warth v. Seldin*, 422 U.S. 490, 501 (1975). *Fourth,* the Amended Complaint fails to state claims as a matter of law. Plaintiff's tort claims for negligence/gross negligence (Count I) and strict products liability (Count II) are barred by the economic loss rule. *See Aetna Life*, 511 So. 2d at 994 (citing *GAF Corp. v. Zack Co.*, 445 So. 2d 350, 354 (Fla. 3d DCA 1984) (no cognizable personal injury or property damage sustained by roofer under economic loss rule as a result of its purchase and installation of the defective roofing materials). Plaintiff cannot succeed on its claim for unjust enrichment (Count III) because alleged payments

to TG *purchasers* of drywall other than Plaintiff did not confer a benefit *from* Plaintiff *to* TG. *See Nova Info Sys. Inc. v. Greenwich Ins. Co*., 365 F.3d 996, 1007-08 (11th Cir. 2004) (to succeed on a claim for unjust enrichment defendant must have received a benefit from the plaintiff).  Plaintiff's cause of action for breach of implied warranty (Count IV) also fails because Plaintiff failed to allege any privity between Plaintiff and TG. *Cruz v. Mylan, Inc.*, No. 09-1106, 2010 WL 598688, at *2 (M.D. Fla. Feb. 17, 2010) (Florida law requires privity between the contracting parties in claims for breach of the implied warranty of fitness and the implied warranty of merchantability) (citation omitted).  Nor can Plaintiff's breach of express warranty claim (Count VI)[67] go forward where the Complaint is devoid of any allegation that TG made "an affirmation of fact or promise" to Plaintiff.  *See* Fla. Stat. § 672.313 (2010) ("[A]ny affirmation of fact or promise made *by the seller to the buyer* which relates to the goods and becomes part of the basis of the bargain creates an express warranty") (emphasis supplied).

In addition to the legal insufficiency of the Amended Complaint, the fundamental factual issues such as whether the drywall at issue actually originated with TG, whether it was defective when sold, or if it was damaged due to improper shipment storage or installation, are serious issues that should not be determined in a vacuum without discovery, evidence, cross-examination and fact-finding.  Accordingly, if the Court determines it has jurisdiction, the case should proceed on the merits.

### D.    TG Acted Expeditiously To Vacate The Default

When TG received the Complaint, the company could not understand how the litigation could involve TG due to its extremely limited connection to the United States.  (*See* Jia Decl. ¶ 33).  After TG became aware that the default was entered, however, it retained counsel in the

---

[67] The Amended Complaint does not allege a Count V.  (Am. Compl. ¶¶ 66-74).

United States and concluded it was necessary to appear and participate in this action.  (*See* Jia Decl. ¶ 34; Jia Tr. 885:11-888:24, 889:1-6 (TG contacted counsel "very quick" after learning of the default judgment.)).  TG then promptly appeared before this Court and moved for dismissal.

## **CONCLUSION**

For all of the foregoing reasons, the Court should vacate the entry of default and dismiss the action against TG.

Respectfully submitted,

Thomas P. Owen Jr.
Joe Cyr
Frank T. Spano
Eric Statman
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
Telephone: 212-918-3000
Facsimile: 212-918-3100
Joe.cyr@hoganlovells.com
Frank.spano@hoganlovells.com
Eric.statman@hoganlovells.com

Richard C. Stanley (La. Bar No. 8487)
Thomas P. Owen, Jr. (La. Bar No. 28181)
STANLEY, REUTER, ROSS, THORNTON & ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: 504-523-1580
Facsimile: 504-524-0069
rcs@stanleyreuter.com
tpo@stanleyreuter.com

**Attorneys for Defendant Taishan Gypsum Co. Ltd.**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing Memorandum of Law in Support of Taishan Gypsum Co. Ltd's Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint. has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail and upon all parties by electronically uploading the same to Lexis Nexis File & Serve in accordance with the Pretrial Order No. 6, and that the foregoing was also electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 4th day of April, 2012.


<u>/s/ Thomas P. Owen, Jr.</u>