

Transcript of the Testimony of:  **Gang Che**

01/11/2012

Chinese Drywall

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA

2

  _____

3         § MDL NO. 2047
  IN RE:     §
4  CHINESE-    § SECTION: L
  MANUFACTURED  §
5  DRYWALL PRODUCTS § JUDGE FALLON
  LIABILITY    §
6  LITIGATION   § MAGISTRATE
  _____ § JUDGE WILKINSON

7

       - - -

8

  CROSS NOTICED IN VARIOUS OTHER ACTIONS

9

       - - -

10

     January 11, 2012

11

       - - -

12

  CONFIDENTIAL - SUBJECT TO FURTHER
13    CONFIDENTIALITY REVIEW
14      - - -
15    Videotaped deposition of  GANG
  CHE, held at the Executive Centre, Level
16  3, Three Pacific Place, One Queen's Road
  East, Hong Kong, China, commencing at
17  2:29 p.m., on the above date, before Ann
  Marie Mitchell, Certified Court Reporter,
18  Registered Diplomate Reporter, Certified
  Realtime Reporter and Notary Public.
19      - - -
20
21

    GOLKOW TECHNOLOGIES, INC.
22  877.370.3377 ph | 917.591.5672 fax
     deps@golkow.com
23
24

```
 1   BEFORE:
             HONORABLE ELDON E. FALLON
 2           UNITED STATES FEDERAL COURT -
             EASTERN DISTRICT OF LOUISIANA
 3
 4
     APPEARANCES:
 5
 6       GAINSBURGH, BENJAMIN, DAVID, MEUNIER
         & WARSHAUER, L.L.C.
 7       BY:  GERALD E. MEUNIER, ESQUIRE
         2800 Energy Centre
 8       1100 Poydras Street
         New Orleans, Louisiana 70163
 9       (504) 522-2304
         gmeunier@gainsben.com
10       Representing the Plaintiffs'
         Steering Committee
11
12       HERMAN HERMAN KATZ & COTLAR, LLP
         BY:  LEONARD A. DAVIS, ESQUIRE
13       820 O'Keefe Avenue
         New Orleans, Louisiana 70113
14       (504) 581-4892
         Ldavis@hhkc.com
15       Representing the Plaintiffs'
         Steering Committee
16
17       COLSON HICKS EIDSON
         BY:  ERVIN GONZALEZ, ESQUIRE
18       BY:  PATRICK S. MONTOYA, ESQUIRE
         255 Alhambra Circle
19       Penthouse
         Coral Gables, Florida 33134
20       (305) 476-7400
         Ervin@colson.com
21       Patrick@colson.com
         Representing Plaintiffs' Steering
22       Committee in the Federal and State
         Coordinated Actions
23
24
```

```
 1   APPEARANCES (CONTINUED):
 2
         LEVIN, FISHBEIN, SEDRAN & BERMAN
 3       BY:  ARNOLD LEVIN, ESQUIRE
         510 Walnut Street - Suite 500
 4       Philadelphia, Pennsylvania 19106
         (215) 592-1500
 5       Alevin@lfsblaw.com
         Representing the Plaintiffs'
 6       Steering Committee
 7
         SEEGER WEISS LLP
 8       BY:  SCOTT A. GEORGE, ESQUIRE
         One William Street
 9       New York, New York 10004
         (212) 584-0700
10       Sgeorge@seegerweiss.com
         Representing the Plaintiffs'
11       Steering Committee
12
         HOGAN LOVELLS US LLP
13       BY:  FRANK T. SPANO, ESQUIRE
         875 Third Avenue
14       New York, New York 10022
         (212) 918-3000
15       frank.spano@hoganlovells.com
         Representing Taishan Gypsum Co.
16       Ltd. and Taian Taishan
         Plasterboard Company Ltd. and the
17       Witness, Gang Che
18
         HOGAN LOVELLS INTERNATIONAL LLP
19       BY:  EUGENE CHEN, ESQUIRE
         BY:  JIENI JI, ESQUIRE
20       18th Floor, Park Place
         1601 Nanjing Road West
21       Shanghai, China 200040
         (86 21) 6122 3800
22       eugene.chen@hoganlovells.com
         Representing Taishan Gypsum Co.
23       Ltd. and Taian Taishan Plasterboard
         Company Ltd. and the Witness,
24       Gang Che
```

```
 1    APPEARANCES (CONTINUED):
 2

      GREENBERG TRAURIG, LLP
 3    BY:  HILARIE BASS, ESQUIRE
      1221 Brickell Avenue
 4    Miami, Florida 33131
      (305) 579-0745
 5    bassh@gtlaw.com
      Representing the Home Builders
 6    Steering Committee
 7

      PERKINS COIE LLP
 8    BY:  DAVID L. BLACK, ESQUIRE
      1899 Wynkoop Street
 9    Suite 700
      Denver, Colorado 80202
10    (303) 291-2300
      DBlack@perkinscoie.com
11    Representing the State of Louisiana
12

      THOMPSON COE COUSINS & IRONS, L.L.P.
13    BY:  KEVIN F. RISLEY, ESQUIRE
      One Riverway
14    Suite 1600
      Houston, Texas 77056
15    (713) 403-8210
      krisley@thompsoncoe.com
16    Representing The North River
      Insurance Company
17
18    BRENNER, EVANS & MILLMAN, P.C.
      BY:  THEODORE I. BRENNER, ESQUIRE
19    411 East Franklin Street
      Suite 200
20    Richmond, Virginia 23218
      Tbrenner@beylaw.com
21    (804) 644-1300
      Representing Tobin Trading Company
22
23
24
```

```
 1    APPEARANCES (CONTINUED):
 2
 3        McKENRY, DANCIGERS, DAWSON & LAKE, P.C.
          BY:  J. BRIAN SLAUGHTER, ESQUIRE
 4        192 Ballard Court
          Suite 400
 5        Virginia Beach, Virginia 23462
          (757) 461-2500
 6        Jbslaughter@va-law.org
          Representing Atlantic Homes LLC and
 7        Multiple Other Virginia-Based
          Defendants
 8
 9        QUINN EMANUEL URQUHART & SULLIVAN,LLP
          BY:  JULIA BESKIN, ESQUIRE
10        51 Madison Avenue
          22nd Floor
11        New York, New York 10010
          (212) 849-7000
12        Juliabeskin@Quinnemanuel.Com
          Representing Chartis Select Insurance
13        Company and Related Chartis Insurers
14
15        WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
          BY:  MICHAEL SEXTON, ESQUIRE
16        3344 Peachtree Road, NE
          Suite 2400
17        Atlanta, Georgia 30326
          (404) 876-2700
18        msexton@wwhgd.com
          Representing Various Banner
19        Defendants
20
          SINNOTT, NUCKOLS & LOGAN, PC
21        BY:  KENNETH F. HARDT, ESQUIRE
          13811 Village Mill Drive
22        Midlothian, Virginia 23114
          (804) 378-7600
23        khardt@snllaw.com
          Representing Venture Supply, Inc. and
24        Porter-Blaine Corp.
```

1    ALSO PRESENT:

2        SUNNY WANG, INTERPRETER

3

4

                      -   -   -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1   APPEARANCES VIA TELEPHONE:
 2
 3       GALLOWAY JOHNSON TOMPKINS BURR and SMITH
         BY:  CARLINA C. EISELEN, ESQUIRE
 4       One Shell Square
         701 Poydras Street, 40th Floor
 5       New Orleans, Louisiana 70139
         (504) 525-6802
 6       ceiselen@gjtbs.com
         Representing Interior/Exterior
 7       Building Supply
 8
         HUNTON & WILLIAMS LLP
 9       BY:  A. TODD BROWN, ESQUIRE
         Bank of America Plaza
10       101 South Tryon Street
         Suite 3500
11       Charlotte, North Carolina  28280
         (704) 378-4700
12       Representing Stock Building Supply, LLC
13
14       JONES, WALKER, WAECHTER, POITEVENT,
         CARRERE & DENEGRE LLP
15       BY:  MEGAN E. DONOHUE, ESQUIRE
         600 Jefferson Street, Suite 1600
16       Lafayette, Louisiana 70501
         (337) 262-9062
17       mdonohue@joneswalker.com
         Representing Fireman's Fund Insurance
18       Company
19
         FULMER LEROY ALBEE BAUMANN
20       BY:  MICHAEL P. McCAHILL, ESQUIRE
         2866 East Oakland Park Boulevard
21       Ft. Lauderdale, Florida 33306
         (954) 707-4430
22       mosscandace@fulmerleroy.com
         mmccahill@fulmerleroy.com
23       Representing Independent Builders
         Supply Association (IBSA)
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA TELEPHONE (CONTINUED):

 2

 3    WRIGHT, FULFORD, MOORHEAD & BROWN, P.A.
      BY:  DORYK B. GRAF, JR., ESQUIRE
 4    145 N. Magnolia Ave.
      Orlando, Florida 32801
 5    (407) 425-0234
      dgraf@wfmblaw.com
 6    Representing West Construction, Inc.

 7

 8    QUINN EMANUEL URQUHART & SULLIVAN, LLP
      BY: CLINTON DOCKERY, ESQUIRE
 9    51 Madison Avenue, 22nd Floor
      New York, New York 10010
10    (212) 849-7000
      clintondockery@quinnemanuel.com
11    Representing Chartis Select Insurance
      Company and Related Chartis Insurers
12

13    RUMBERGER, KIRK & CALDWELL, P.A.
      BY:  MONICA C. SEGURA, ESQUIRE
14    Brickell Bayview Centre, Suite 3000
      80 Southwest 8th Street
15    Miami, Florida 33130
      (305) 358-5577
16    Representing several defendants and
      Defendants' Liaison Counsel for
17    Installers

18
      BUCHANAN INGERSOLL & ROONEY
19    BY:  C. ROBERT ZAPPALA, ESQUIRE
      One Oxford Centre
20    301 Grant Street, 20th Floor
      Pittsburgh, Pennsylvania 15219
21    (412) 392-2135
      bobby.zappala@bipc.com
22    Representing 84 Lumber

23

24
```

```
 1    APPEARANCES VIA STREAM:
 2
         BECNEL LAW FIRM, L.L.C.
 3       BY:  ROBERT BECNEL, ESQUIRE
         106 W. 7th Street
 4       Reserve, Louisiana 70084
         (985) 536-1186
 5       robbecnel@aol.com
         Representing the Plaintiffs'
 6       Steering Committee
 7
         PARKER WAICHMAN ALONSO LLP
 8       BY:  JORDAN L. CHAIKIN, ESQUIRE
         3301 Bonita Beach Road
 9       Bonita Springs, Florida 34134
         (239) 390-1000
10       Jchaikin@yourlaywer.com
         Representing Plaintiffs' Steering
11       Committee
12
         MORGAN & MORGAN
13       BY:  PETE V. ALBANIS, ESQUIRE
         12800 University Drive
14       Suite 600
         Fort Myers, Florida 33907
15       (877) 667-4265
         Representing the Plaintiffs
16
17       IRPINO LAW FIRM
         BY:  ANTHONY IRPINO, ESQUIRE
18       2216 Magazine Street
         New Orleans, Louisiana 70130
19       Airpino@irpinolaw.com
         (504) 525-1500
20       Representing the Plaintiffs
21
22
23
24
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3        GALLOWAY JOHNSON TOMPKINS BURR and SMITH
          BY:  CARLINA C. EISELEN, ESQUIRE
 4        One Shell Square
          701 Poydras Street, 40th Floor
 5        New Orleans, Louisiana 70139
          (504) 525-6802
 6        ceiselen@gjtbs.com
          Representing Interior/Exterior
 7        Building Supply
 8
          HEARD & MEDACK, P.C.
 9        BY:  JAMES DAVIS, ESQUIRE
          9494 Southwest Freeway, Suite 700
10        Houston, Texas 77074
          (713) 772-6400
11        jdavis@heardmedackpc.com
          Representing CastleRock Communities, L.P.
12
13
          HUNTON & WILLIAMS LLP
14        BY:  A. TODD BROWN, ESQUIRE
          Bank of America Plaza
15        101 South Tryon Street
          Suite 3500
16        Charlotte, North Carolina  28280
          (704) 378-4700
17        tbrown@hunton.com
          Representing Stock Building Supply, LLC
18
19
          SHER GARNER CAHILL RICHTER KLEIN &
20        HILBERT, L.L.C.
          BY:  MATTHEW C. CLARK, ESQUIRE
21        909 Poydras Street
          Suite 2800
22        New Orleans, Louisiana 70112
          (504) 299-2100
23        mclark@shergarner.com
          Representing the Southern Home
24        Defendants
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3       QUINN EMANUEL URQUHART & SULLIVAN, LLP
         BY: CLINTON DOCKERY, ESQUIRE
 4       51 Madison Avenue, 22nd Floor
         New York, New York 10010
 5       (212) 849-7000
         clintondockery@quinnemanuel.com
 6       Representing Chartis Select Insurance
         Company and Related Chartis Insurers
 7
 8       JONES, WALKER, WAECHTER, POITEVENT,
         CARRERE & DENEGRE LLP
 9       BY:  MEGAN E. DONOHUE, ESQUIRE
         600 Jefferson Street, Suite 1600
10       Lafayette, Louisiana 70501
         (337) 262-9062
11       mdonohue@joneswalker.com
         Representing Fireman's Fund Insurance
12       Company
13
         DEUTSCH, KERRIGAN & STILES
14       BY:  MELISSA M. SWABACKER, ESQUIRE
         755 Magazine St.
15       New Orleans, Louisiana  70130
         (504) 581-5141
16       mswabacker@dkslaw.com
         Representing Landmark American
17       Insurance Company
18       PUGH, ACCARDO, HAAS, RADECKER, CAREY
         & HYMEL, LLC
19       BY:  DONNA M. YOUNG, ESQUIRE
         1100 Poydras Street
20       Suite 3200
         New Orleans, Louisiana 70163
21       Dyoung@pugh-law.com
         (504) 799-4500
22       Representing Stock Building Supply
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM (CONTINUED):

 2

         WEINBERG, WHEELER, HUDGINS, GUNN &
 3       DIAL, LLC
         BY:  SHUBHRA MASHELKAR, ESQUIRE
 4       3344 Peachtree Road, NE
         Suite 2400
 5       Atlanta, Georgia 30326
         (404) 876-2700
 6       Smashelkar@wwhgd.com
         Representing Various Banner
 7       Defendants

 8
                       -   -   -
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    -  -  -
                   I N D E X
 2                    -  -  -
 3    Testimony of:  GANG CHE
 4     By Mr. Gonzalez              18
 5
                       -  -  -
 6
                E X H I B I T S
 7
                       -  -  -
 8
 9    NO.              DESCRIPTION        PAGE
10    Che-1    Sole Agency Agreement,   37
                4 pages
11
      Che-2    E-mail chain, top one    59
12             dated 4/17/2007, Bates
               stamped TG 0000915
13             through TG 0000920
14    Che-3    Packet of Invoices,      67
               Bates stamped TG
15             0019968 through TG
               0019975
16
      Che-4    E-mail in Chinese        76
17             dated May 27, 2010
               with attachment, 2
18             pages
19    Che-5    Printout of Instant      87
               Messages, 41 pages
20
      Che-6    Letter dated November    108
21             26, 2008, Bates
               stamped TG 0021501
22             through TG 0021505
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                     -  -  -

 2            DEPOSITION SUPPORT INDEX

 3                     -  -  -

 4

      Direction to Witness Not to Answer
 5
                    Page Line
 6

 7

 8

 9

      Request for Production of Documents
10
                    Page Line
11

12

13

14
                    Stipulations
15
                    Page Line
16

17

18

19

20              Question Marked
21                  Page Line
22

23

24
```

```
 1              VIDEOTAPE TECHNICIAN:  We

 2         are now on the record.  My name is

 3         Dan Lawlor.  I'm the videographer

 4         for Golkow Technologies.  Today's

 5         date is January 11, 2012, and the

 6         time is 2:29 p.m.  This video

 7         deposition is being held in Hong

 8         Kong, China, in the matter of

 9         Chinese Drywall Litigation for the

10         United States District Court,

11         Eastern District of Louisiana, MDL

12         Number 2047, and cross-noticed in

13         various other actions.  The

14         deponent today is Che Gang.

15              Will Your Honor and all

16         present state appearances for the

17         record, please.

18              THE COURT:  Judge Eldon

19         Fallon, United States District

20         Court, Eastern District of

21         Louisiana.

22              MR. GONZALEZ:  Good

23         afternoon.  Ervin Gonzalez.  I'm

24         joined by Patrick Montoya on
```

```
1              behalf of the PSC and the MDL

2              liaison states.

3                   MS. BASS:  Hilarie Bass on

4              behalf of the Home Builders

5              Steering Committee.

6                   MR. GEORGE:  Scott Alan

7              George, Seeger Weiss, for PSC.

8                   MR. HARDT:  Ken Hardt on

9              behalf of Venture Supply in the

10             Germano action and the Alexander

11             state court action.

12                  MS. BESKIN:  Julia Beskin

13             from Quinn Emanuel on behalf of

14             the Chartis Insurance Group.

15                  MR. RISLEY:  Kevin Risley

16             for the North River Insurance

17             Company.

18                  MR. SLAUGHTER:  Brian

19             Slaughter here on behalf of

20             Atlantic Homes, LLC and the

21             Commonwealth of Virginia matters

22             and the MDL.

23                  MR. BRENNER:  I'm Ted

24             Brenner, and I'm here for Tobin
```

```
 1          Trading in the Germano case.

 2               MR. SEXTON:  Mike Sexton on

 3          behalf of certain Banner Supply

 4          entities.

 5               MR. MEUNIER:  Gerry Meunier

 6          appearing for the Plaintiffs

 7          Steering Committee in the MDL.

 8               MR. BLACK:  David Black

 9          appearing for the State of

10          Louisiana.

11               MR. LEVIN:  Arnold Levin,

12          lead counsel, PSC.

13               MR. DAVIS:  Leonard Davis on

14          behalf of the Plaintiffs Steering

15          Committee and Plaintiffs Liaison

16          Counsel.

17               MR. SPANO:  Frank Spano,

18          Eugene Chen and Jieni Ji for the

19          defendants TG and TTP.

20               VIDEOTAPE TECHNICIAN:  Our

21          court reporter today is Ann Marie

22          Mitchell.  And Your Honor, will

23          you proceed.

24                    -  -  -
```

Confidential - Subject to Further Confidentiality Review

```
 1              GANG CHE, after having been
 2         duly sworn, was examined and
 3         testified as follows:
 4                  -  -  -
 5              THE WITNESS:  What should I
 6         say?  Should I repeat what you
 7         said?
 8              THE COURT:  No.  Say yes.
 9              THE WITNESS:  Yes, I do.
10              THE COURT:  Be seated,
11         please.
12              You may proceed, Counsel.
13                  -  -  -
14              EXAMINATION
15                  -  -  -
16   BY MR. GONZALEZ:
17         Q.    Good afternoon, sir.
18         A.    Good afternoon.
19         Q.    Tell us your name, please.
20         A.    Che Gang, last name C-H-E,
21    first name G-A-N-G.
22         Q.    Do you go by any other
23    names?
24         A.    What are the names you're
```

1    referring to?

2            Q.    Your Western names.

3            A.    Bill.

4            Q.    Bill Cher or Bill Che?

5            A.    It should be pronounced Bill

6    Cher.

7            Q.    How is it spelled?

8            A.    B-I-L-L.

9            Q.    And the last name?

10           A.    C-H-E.

11           Q.    By whom are you employed?

12           A.    What time period?

13           Q.    Currently.

14                 THE COURT:  Would you hold

15           it a minute.

16                 MR. GONZALEZ: Yes, Your

17           Honor.

18                 THE WITNESS:  Taishan

19           Gypsum.

20    BY MR. GONZALEZ:

21           Q.    How long have you worked for

22    Taishan Gypsum, in any of its corporate

23    names?

24           A.    Do you mean that you want me

1    to let you know my resume?

2         Q.    I will ask you that, but

3    right now I'm asking you how long have

4    you been employed with a company now

5    known as TG?

6         A.    I joined TG in around 2001,

7    and then I was hired to join TTP in

8    around 2006.  In the year 2008, we went

9    back to TG until today.

10        Q.    What position did you start

11   with at TG in 2001?

12        A.    Salesperson.

13        Q.    What position were you hired

14   to do for TTP in 2006?

15        A.    Salesperson.

16        Q.    And when you returned to TG,

17   what position did you return to?

18        A.    I was still a salesperson.

19        Q.    Who did you apply with or

20   how did you get the position at TTP?

21        A.    After the establishment of

22   TTP, the office of TTP put up a notice,

23   like hiring notice.  And then we

24   registered and went to TTP.

```
 1          Q.    Who asked you to begin

 2    working at TTP as opposed to TG?

 3                MR. SPANO:  Objection, lack

 4          of foundation.

 5                THE COURT:  Ervin, could you

 6          wait a minute.

 7                Could you get me started?

 8                VIDEOTAPE TECHNICIAN:  Going

 9          off the record.  The time is 2:36.

10                      -  -  -

11                (A discussion off the record

12          occurred.)

13                      -  -  -

14                VIDEOTAPE TECHNICIAN:  Back

15          on the video record.  The time is

16          2:39.

17    BY MR. GONZALEZ:

18          Q.    Who, if anyone, asked you to

19    apply at TTP when it started?

20          A.    I volunteered.

21          Q.    Who asked for volunteers?

22          A.    I don't understand your

23    question.

24          Q.    Yes.  Someone's asking for
```

```
 1    volunteers to leave TG to start TTP.  Who

 2    is it that issued that request?

 3           A.    I volunteered, which

 4    means -- which meant that I wanted to do

 5    it myself.

 6           Q.    To whom did you volunteer?

 7           A.    To TTP.

 8           Q.    TTP was made up initially of

 9    employees that previously worked at TG.

10    Correct?

11           A.    I'm not sure of that.

12           Q.    You used to work for TG,

13    we've already established that, when you

14    started working at TTP.  Correct?

15           A.    Correct.

16           Q.    Your colleague Peng Wenlong

17    also worked at TG before he began working

18    at TTP.  Correct?

19           A.    Correct.

20           Q.    Peng Shiliang also worked at

21    TG before he worked at TTP.  Correct?

22           A.    I have never heard of this

23    name.

24                 Can you give me the
```

Confidential - Subject to Further Confidentiality Review

```
 1   spelling, please?

 2             MR. CHEN:  If you write down

 3        the name.  It's being translated

 4        by the way you're pronouncing it

 5        in English, so if you write down

 6        the name --

 7   BY MR. GONZALEZ:

 8        Q.    The individual who testified

 9   prior to him.

10        A.    Peng Shiliang is his name.

11        Q.    He worked at TG before he

12   worked at TTP.  Correct?

13        A.    I'm not sure.

14        Q.    Do you know Yang Jiapo?

15        A.    Yes.

16        Q.    He worked at TG before he

17   started working at TTP.  Correct?

18        A.    Yes.

19        Q.    And you know many other

20   colleagues that previously worked at TG

21   before working at TTP.  Correct?

22             MR. SPANO:  Objection to

23        form.

24             THE COURT:  He said he
```

```
 1          wasn't sure, I thought.

 2                  Is that what he said?

 3                  MR. GONZALEZ:  I don't think

 4          he answered.

 5                  THE COURT:  Oh, okay.  He

 6          didn't answer.  Okay.  Objection

 7          as to form.

 8                  What's the form, Frank?

 9                  MR. SPANO:  Vagueness,

10          particularly in the way many

11          colleagues would be interpreted,

12          concerned.

13                  THE COURT:  Say other

14          colleagues.

15  BY MR. GONZALEZ:

16          Q.   And you know of many other

17  colleagues that previously worked at TG

18  before working at TTP.  Correct?

19          A.   I don't know your definition

20  of many.  Is it two or three?

21          Q.   What's your definition of

22  many, sir?

23          A.   It is a vague concept.

24                  THE COURT:  Ask him all of
```

```
 1            the people that -- name all of

 2            them.

 3    BY MR. GONZALEZ:

 4            Q.    Can you name all of the

 5    individuals that you know who worked at

 6    TG before they joined TTP?

 7            A.    I'm sorry, my memory is not

 8    that good.

 9            Q.    You don't remember any other

10    name?

11            A.    You can say a name, then I

12    will try to refresh my memory.  But if

13    you want me to try to recollect my

14    memory, it's too general of a question.

15            Q.    What's your educational

16    background, sir?

17            A.    AA degree.  AA degree.

18            Q.    Associate in arts from a

19    college?

20            A.    In China we just call it AA

21    college graduate.

22            Q.    So you are a college

23    graduate?

24            A.    I'm not sure what's your
```

```
 1   definition of college.  We just call it

 2   AA degree college.

 3          Q.    Sir, you are an individual

 4   with an AA degree college.  Yes?

 5          A.    Correct.

 6          Q.    What is your degree in?

 7          A.    Accounting.

 8          Q.    When did you graduate with

 9   an accounting degree?

10              THE INTERPRETER:

11              Interpreter needs clarification.

12              There is a difference in

13              translation.

14                  In America you say a degree,

15              you have a degree, but he said he

16              doesn't have a degree.  I don't

17              know how should I translate it.

18   BY MR. GONZALEZ:

19          Q.    When did you receive the AA

20   college?  What is the date?

21              THE INTERPRETER:

22              Interpreter clarification.

23                  When you mean, when did he

24              receive the college, what do you
```

```
 1          mean?

 2                    MR. GONZALEZ:  The college

 3          AA.

 4                    THE INTERPRETER:  The degree

 5          or the college?

 6                    MR. GONZALEZ:  That's what

 7          he said.  He said he has an AA

 8          college degree.

 9                    THE INTERPRETER:  Sorry,

10          interpreter doesn't understand

11          your question.

12   BY MR. GONZALEZ:

13          Q.    When did you receive your AA

14   college degree?  What is the date?

15          A.    I graduated in 1997.

16          Q.    In those five years before

17   you started working at TG after

18   graduation, where did you work?

19          A.    In a garment factory.

20          Q.    As an accountant?

21          A.    No.

22          Q.    Did you ever work as an

23   accountant?

24          A.    No.
```

```
 1              Q.    What did you do in the

 2    garment factory?  Sales?

 3              A.    Everything.

 4              Q.    What do you mean by

 5    everything?

 6              A.    Whenever I was needed to

 7    carry stuff or I was needed to deliver

 8    stuff, I did those kind of odd jobs.

 9              Q.    And how did you get your job

10    at TG?

11              A.    TG was hiring.  I also

12    volunteered.

13              Q.    You volunteered to work at

14    TG?

15                    THE INTERPRETER:  Sorry,

16          interpreter clarification.

17                    THE WITNESS:  I volunteered.

18    BY MR. GONZALEZ:

19              Q.    And they accepted your

20    willingness to work at TG?

21              A.    Correct.

22              Q.    And similarly, you

23    volunteered to work as a salesperson at

24    TTP once TG formed TTP for purposes of
```

Confidential - Subject to Further Confidentiality Review

```
 1    benefiting for VAT matters.  Correct?

 2                MR. SPANO:  Objection,

 3          compound.

 4                THE COURT:  It's going to

 5          take us a while to get through

 6          this.  I have to leave Saturday.

 7          So we'll see what we can do with

 8          it.  Let's ask him another

 9          question.

10    BY MR. GONZALEZ:

11          Q.    I want to direct your

12    attention to the day the decision was

13    made to stop the existence of TTP.

14                How did that come about?

15          A.    I don't understand your

16    question about the day to stop the

17    existence of TTP.

18          Q.    TTP stopped being in

19    existence in 2007.  Right?

20          A.    Till the end of 2007.

21          Q.    Why did it end?

22          A.    I was only a salesperson.  I

23    don't understand.

24          Q.    How did you find out you
```

Confidential - Subject to Further Confidentiality Review

```
 1    were going to get to go back to work at

 2    TG?

 3           A.    I had to eat.  I had to look

 4    for a job.

 5           Q.    But you understand that TG

 6    owned TTP.  Correct?

 7           A.    I'm sorry, I'm only a

 8    salesperson.  I don't know anything

 9    greater.

10           Q.    How would you describe your

11    command of the English language?

12           A.    I learned a little bit in

13    college, but it was very poor.

14           Q.    In your job for TG, did you

15    work in the export sales department?

16                 MR. SPANO:  Objection to

17           form and foundation.

18                 THE COURT:  Ask him whether

19           or not they had a department.

20    BY MR. GONZALEZ:

21           Q.    Did the company have an

22    export department, TG?

23           A.    At the time, we call it

24    export department.  I don't know whether
```

Confidential - Subject to Further Confidentiality Review

1    they had a certificate for that.

2          Q.    Did you work for the export

3    department?

4          A.    I worked in that department.

5          Q.    Did you also work in that

6    department while you were working for

7    TTP?

8                MR. SPANO:  Objection.

9                THE WITNESS:  I don't

10          understand the accurate meaning of

11          your question.

12   BY MR. GONZALEZ:

13         Q.    Did you work for the export

14   department at TTP?

15         A.    Which export department are

16   you talking about?

17         Q.    How many did you have?

18         A.    Just one.

19         Q.    Did you work at that one?

20         A.    You mean the export

21   department at TG?

22         Q.    TTP.

23         A.    They didn't call it export

24   department.

1      Q.    What did they call it?

2      A.    It was only called a sales

3   department.

4      Q.    And in the sales department,

5   did you work on international trades?

6      A.    We only did sales.

7      Q.    Did you sell product to

8   American companies?

9      A.    It depends on how do you

10  define it.

11     Q.    I define it as companies

12  that are out of the United States of

13  America.

14           Did you sell product to

15  individuals in the United States of

16  America while you were a salesperson for

17  TTP?

18     A.    Please repeat the question.

19  I don't quite understand.

20     Q.    Did you sell products to

21  companies in the United States of America

22  while you worked as a salesperson at TTP?

23     A.    While I worked at TTP as a

24  salesperson, our principle was that we

Confidential - Subject to Further Confidentiality Review

1    deliver our products to buyers in China.

2    As of where would the buyers ship the

3    products to, I'm not sure.

4          Q.    Sir, my question is whether

5    you sold product to companies in the

6    United States of America while you were a

7    salesperson for TTP?

8          A.    You ask the same question I

9    thought I have already answered you.

10          Q.    Is the answer yes or is the

11    answer no?

12          A.    I think you have a problem

13    in defining the scope.

14          Q.    Perhaps we can help you

15    understand what the question means, sir.

16                You've heard of the United

17    States of America?

18          A.    Okay.

19          Q.    Correct?

20          A.    Yes.

21          Q.    You've heard of businesses

22    in the United States of America?

23          A.    What do you mean by

24    businesses in America?

```
 1              Q.    Do you know what business

 2     means, the term "business"?

 3                    THE INTERPRETER:

 4              Interpreter clarification.

 5                    In Chinese, business can be

 6              interpreted as a company is a

 7              business, as a transaction is a

 8              business or as commercial is also

 9              translated business.  Which one?

10                    MR. GONZALEZ:  A company.

11                    THE WITNESS:  You mean

12              company?

13                    Some customers claimed that

14              they were companies from the

15              United States.  We couldn't

16              distinguish that.

17     BY MR. GONZALEZ:

18              Q.    And some individuals from

19     the United States contacted you in order

20     to do business with them, transactions

21     with them, where you were willing to sell

22     drywall to them.  Correct?

23                    MR. SPANO:  Objection to

24              form.
```

Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT:  Please restate

 2         the question, make it smaller,

 3         please.

 4    BY MR. GONZALEZ:

 5         Q.    Sir, you transacted business

 6    with individuals in the United States

 7    when you were a salesperson for TTP.

 8    Isn't that true, sir?

 9         A.    There were some customers

10    who claimed to be people from the United

11    States, and they came to us for business

12    transactions.

13         Q.    And one of them was Oriental

14    Trading Company, LLC.  Correct?

15         A.    Oriental Trading Company.  I

16    know Oriental.

17         Q.    Ivan Gonima, your friend

18    from Miami.  Do you remember him?

19         A.    I remember Ivan.

20         Q.    Ivan was a friend of yours.

21    Right?

22         A.    He's my customer.

23         Q.    In fact, he's still your

24    customer?
```

1          A.     We have not -- we have not

2     been having business dealings for a long

3     time.

4          Q.     The last business dealing

5     you had with him by virtue of an e-mail

6     was in May 2011, wasn't it?

7          A.     2011?

8          Q.     When was the last time you

9     spoke with Mr. Gonima through e-mail,

10    text message or instant messaging?

11         A.     I'm sorry, I don't remember

12    clearly.

13         Q.     Do you think it was a year

14    ago or more than a year ago?

15         A.     There are too many stuff.  I

16    really can't remember that.

17         Q.     You can't remember having

18    done business recently with Ivan Gonima

19    in the United States?

20         A.     I don't remember.  When you

21    say recent, what do you mean?

22         Q.     All right, sir.

23                Let's talk about a sole

24    agency agreement that you had on

```
 1    behalf -- that you signed on behalf of

 2    TTP with Oriental Trading Company on

 3    October 20, 2006.

 4              Do you remember that, sir?

 5         A.   Only to recent couple of

 6    days with the assistance of my attorney

 7    when I saw these documents did that

 8    refresh my memory.

 9         Q.   And what do you remember

10    about that agreement?

11         A.   According to our

12    recollection, at the time there was a

13    gentleman called Jorge and the Chinese

14    person came to our company.

15         Q.   Sir, I'm going to show you

16    what we'll mark as Exhibit Number 1 to

17    your deposition.

18                   -  -  -

19              (Deposition Exhibit No.

20         Che-1, Sole Agency Agreement, 4

21         pages, was marked for

22         identification.)

23                   -  -  -

24    BY MR. GONZALEZ:
```

```
 1            Q.    And this is identified as
 2    "Sole Agency Agreement."
 3                  And that's your signature at
 4    the bottom of the first page, isn't it,
 5    sir?
 6            A.    No.
 7            Q.    Does your signature appear
 8    on the signature line there, sir?
 9            A.    Which one, can you point it?
10            Q.    Yours?
11            A.    You mean this one?
12            Q.    If that's your signature,
13    that's the one I'm asking about, sir.
14            A.    Yes.
15            Q.    And that's underneath the
16    Taishan -- Taian Taishan Plasterboard
17    Company, Ltd.  Right?
18            A.    Correct.
19            Q.    And it has the Taian Taishan
20    Plasterboard contract seal.  Correct?
21            A.    Correct.
22            Q.    And it has the little star
23    in the middle, doesn't it, sir?
24            A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

1        Q.    Then if you turn the page

2    one page before it, your signature

3    appears on that page as well, doesn't it,

4    sir?

5        A.    Correct.

6        Q.    And it says, "The seller."

7    You can read that English, can't you,

8    sir?

9        A.    I can understand simple

10   Chinese -- simple English, as I told you

11   earlier.

12       Q.    You signed this --

13             You signed that contract.

14   Right, sir?

15       A.    The signature is mine.

16       Q.    And can you tell us this

17   contract number, the SDTH, does that

18   stand for you?

19       A.    You're correct.

20       Q.    And this was your

21   relationship, right, at TTP, meaning

22   Oriental Trading Company was a client

23   that you worked with?

24       A.    Correct.

Confidential - Subject to Further Confidentiality Review

1          Q.     And before you entered into

2   this contract, you asked for permission

3   to sign it on behalf of the company.

4   Correct?

5          A.     I only reported my work to

6   Mr. Peng Wenlong.

7          Q.     Your colleague?

8          A.     You can say that.

9          Q.     With this agreement, you

10  were going to sell gypsum board

11  manufactured with a thickness of a 1/2

12  inch or 5/8 inch and the width of 4 feet,

13  the length of 8 feet, 9 feet, 10 feet or

14  12 feet, under the brand name of Dun as

15  referenced in the first paragraph.

16  Correct?

17         A.     This should be in accordance

18  with the request of the customer.

19         Q.     And TTP was a seller of the

20  Dun brand drywall.  Correct?

21         A.     No.

22         Q.     It was not?

23         A.     We have never sold that.

24         Q.     TG sold it.  Correct?

```
 1          A.    Correct.

 2          Q.    So you were selling TG's

 3   drywall in this contract.  Correct?

 4          A.    No.

 5          Q.    I'm going to show you

 6   Exhibit Number 20 to Mr. Jia's

 7   deposition.

 8                This is the Shandong Taihe

 9   Dongxin Company, Ltd.'s catalog, now

10   known as TG.  And I'd like you to turn to

11   the page that has the registered

12   trademarks for the products that it

13   sells.

14                And you see the Dun brand

15   there, sir?

16          A.    Yes.

17          Q.    And that's spelled D-U-N.

18   Correct?

19          A.    Correct.

20          Q.    And this contract is between

21   TTP and Oriental Trading Company.  That's

22   Exhibit Number 1 to your deposition.

23   Correct?

24          A.    Can you repeat that?
```

```
 1          Q.    Yes.  The seller under this

 2   contract, Exhibit Number 1, is Taian

 3   Taishan Plasterboard Company, Ltd.; is

 4   that correct?

 5          A.    Yes.

 6          Q.    And the buyer is Oriental

 7   Trading Company, LLC.  Correct?

 8          A.    Yes.

 9          Q.    And if you look at paragraph

10   number 1, it states, "The brand name of

11   'DUN' showing as in the seller's

12   catalogue only"; is that correct, sir?

13          A.    That's what it said here.

14          Q.    And it's spelled D-U-N.

15   Correct?

16          A.    Correct.

17          Q.    And the area identified in

18   paragraph 2 of this sole agency agreement

19   between TTP and Oriental Trading Company

20   is defined as "limited to the territory

21   of the USA."  Correct, sir?  Paragraph 2.

22          A.    Can you interpret it for me,

23   what he says?

24          Q.    The interpreter will do that
```

Confidential - Subject to Further Confidentiality Review

1    for you.

2              THE INTERPRETER:  Which

3         paragraph?

4    BY MR. GONZALEZ:

5         Q.    Number 2, paragraph 2.

6         A.    Can you give me a clear

7    version?  I can't see it very clearly.

8         Q.    I can show you mine.  It's

9    got some highlights.  Can you please read

10   paragraph 2.

11             A.    You don't have to show it to

12   me.  You can read it yourself.  Okay.

13             This is the request of the

14   customer.

15        Q.    It says, "Sole Sales Area:

16   Limited to the territory of the" United

17   States of America.  Right?

18        A.    I'm only hearing the

19   interpretation because I don't understand

20   this.

21        Q.    Sir, my question is,

22   according to the contract that's been

23   interpreted for your benefit, the sole

24   sales area in this sole agency agreement

1   is limited to the territory of the USA.

2   Correct?

3          A.    If that's your

4   interpretation, then that's the

5   interpretation.  That's what it appears

6   to be in the document.

7          Q.    You understand what USA

8   means.  Right, sir?

9          A.    Yes.

10         Q.    It's the United States of

11  America.  Right?

12         A.    Yes.

13         Q.    And if you look at the

14  certificate, sir, at the end, third page,

15  that writing is in Chinese.  Correct?

16         A.    Both English and Chinese.

17         Q.    And do you understand the

18  Chinese?

19         A.    Yes.

20         Q.    Why don't you read that

21  Chinese for us?

22         A.    Can you give me a clearer

23  version of that document?

24         Q.    Yes, sir.  You can use mine.

Confidential - Subject to Further Confidentiality Review

```
 1          A.      Thank you.

 2          Q.      You're welcome, sir.

 3                  Yes.  The Chinese?

 4          A.      I should read everything?

 5          Q.      Yes.  All the Chinese.

 6          A.      Is the pronunciation

 7   Oriental Company?  How do you pronounce

 8   this?

 9                  Taian Taishan Plasterboard

10   Company, Limited, certificate -- Taian

11   Taishan Plasterboard Company, Limited

12   certifies that Oriental Trading Company,

13   LLC as its exclusive agency for the Dun

14   brand in the United States of America.

15   The certificate shall be considered with

16   the understanding that it may be

17   effective on the date of their signing.

18   The validity period and responsibility

19   and law of the certificate are all

20   subject to the items in the formal

21   exclusive agency agreement (start SDTH

22   061020) and signed by two parties

23   accordingly.  The signature is Che Gang.

24          Q.      And that's your signature.
```

```
 1   Right, sir?

 2         A.     Yes.

 3         Q.     The Chinese language that

 4   you see there, that was prepared by your

 5   company.  Right, sir?

 6         A.     That has been translated

 7   according to the request of the customer.

 8         Q.     The Chinese language that

 9   was put in this contract was done by your

10   company.  Right, sir?

11         A.     The language here was

12   translated according to the English

13   language provided by the customer.

14         Q.     It was translated in China?

15         A.     The document was signed in

16   China.

17         Q.     And the Chinese language

18   that is there was put there in China?

19         A.     I don't quite understand the

20   question.

21         Q.     Mr. Gonima does not speak

22   Chinese.  Correct?

23         A.     I'm sorry, this person is,

24   according to this document, it appears to
```

Confidential - Subject to Further Confidentiality Review

1    be a Jorge, not Gonima.

2         Q.    Jorge Arevalo who was Mr. --

3    not law partner.  Let me restate that.

4              Jorge Arevalo who was Mr.

5    Gonima's partner in Oriental Trading.

6    Correct?

7         A.    That's what he claimed

8    himself to be.

9         Q.    He did not speak Chinese.

10   Correct?

11        A.    Yes.

12        Q.    And you spoke Chinese?

13        A.    Yes.

14        Q.    And that Chinese language

15   was there when you signed the agreement.

16   Correct, sir?

17        A.    I don't understand your

18   question.

19        Q.    My question is, the Chinese

20   language that appears on that page over

21   your signature was there when you signed

22   it?

23        A.    Like I said earlier, the

24   Chinese language was a translation of the

Confidential - Subject to Further Confidentiality Review

```
 1    English language that is reflected in the

 2    document.  And then I put my signature on

 3    it.

 4          Q.   Did you keep a copy of this

 5    agreement, sir, when you signed it?

 6          A.   At the time Mr. Jorge took a

 7    Chinese interpreter with him.  He

 8    expressed his willingness for this

 9    business transaction.  But because he

10    said he didn't have his company seal,

11    therefore, he needed to bring all the

12    original documents to him and put a seal

13    and then mail it to us.  But he did not

14    keep his promise.  I have never received

15    such documents from him.  Therefore, in

16    my memory, and from the record of a

17    company, I have not found this document.

18    I'm sorry.

19          Q.   They paid you for the goods.

20    Right, sir?

21          A.   What time period?

22               MR. SPANO:  Ob --

23               THE COURT:  Objection.

24               The goods as reflected in
```

```
 1        the document.
 2   BY MR. GONZALEZ:
 3        Q.   Yes.  They paid you for some
 4   drywall, didn't they?
 5             MR. SPANO:  Objection to
 6        form.
 7             THE COURT:  Sustained.
 8             When you say some --
 9             MR. GONZALEZ:  Say some?
10             THE COURT:  No.  You said
11        some.
12             MR. GONZALEZ:  Yes.  It's an
13        ongoing agreement, Judge.
14             THE COURT:  I see.
15             MR. GONZALEZ:  Which
16        ended --
17             THE COURT:  Did you receive
18        any.
19   BY MR. GONZALEZ:
20        Q.   Did you receive any payments
21   from Oriental Trading Company for
22   drywall?
23        A.   Can you repeat that?  You
24   were on and off.  I didn't quite
```

Confidential - Subject to Further Confidentiality Review

```
 1    understand.

 2         Q.    Did you receive any payments

 3    for drywall from Oriental Trading

 4    Company?

 5              MR. SPANO:  Objection to

 6         form.  Ever?

 7              THE COURT:  Yes.  When?

 8    BY MR. GONZALEZ:

 9         Q.    After October 20, 2006,

10    which is the date of this sole agency

11    agreement, did you receive any payments

12    for drywall from a company known to you

13    as Oriental Trading Company, LLC?

14         A.    Please let me know what is

15    the expiration date of this.

16         Q.    Sir, my question is, did you

17    receive any monies from Oriental Trading

18    Company after October 20, 2006 for

19    drywall?

20         A.    Yes.

21         Q.    And you actually sent some

22    drywall to be shipped to the United

23    States?

24         A.    The term I did was FOB.
```

Confidential - Subject to Further Confidentiality Review

1        Q.    Yes.  Drywall?

2        A.    The term of shipment that I

3    handled was FOB Chinese port.  As of

4    where did the customer ship the product

5    to, I'm not sure about it.

6        Q.    You knew it was the United

7    States of America because they had the

8    exclusive agency agreement to sell the

9    product there.  Correct, sir?

10       A.    The customer did tell us so,

11   but I do not know exactly where it's

12   finally ended in.

13       Q.    In fact, the customer even

14   worked with you to make sure that the

15   labels that were used on the product

16   would have red, white and blue, as in the

17   American flag, with the words "Dun" on

18   it.  Correct?

19       A.    The customer designed it.

20       Q.    And you assisted him.

21   Correct?

22       A.    The customer designed it

23   himself.

24       Q.    With your authority.  Right,

Confidential - Subject to Further Confidentiality Review

```
 1   sir?

 2          A.    I do not have the right to

 3   authorize people.

 4          Q.    I'm going to show you what

 5   will be marked as -- well, actually, it's

 6   already marked as Jia-28.

 7                And you used the e-mail

 8   address SDTH818@163.com.  Correct?

 9          A.    That's mine.

10          Q.    And you also used Wuyu,

11   W-U-Y-U?

12          A.    That's a MSN account.

13          Q.    That's your MSN account?

14          A.    Correct.

15          Q.    All right, sir.

16                And you received this e-mail

17   that I'm showing you.  Correct?

18          A.    As it appears here, it did

19   send to my inbox.

20          Q.    And if we look at the first

21   page, which is Bates stamp number TG

22   23841 on the bottom, it is from Ivan

23   Gonima to Wuyu.  And it says, "Dear

24   Bill."
```

```
 1                   And that's your Western

 2    name.  Correct?

 3                   MR. SPANO:  You have the

 4           wrong Bates number.

 5    BY MR. GONZALEZ:

 6           Q.   Correction.  Exhibit 28 is

 7    Bates stamp number 21643.

 8                   Bill is the name that you

 9    were being referenced to by Ivan Gonima.

10    He called you Bill?

11           A.   Yes.

12           Q.   And here, Bill writes to

13    you, "Dear" -- I'm sorry, Ivan Gonima

14    writes to you, "Dear Bill:  Attached you

15    will find a Microsoft Power Point file

16    showing the final arts for the binding

17    tapes to be used with the" 4 foot by

18    8 foot by 1/2 inch and the 4 foot by

19    12 inch by 1/2 inch "drywall sheets.  We

20    went thru all the issues we have already

21    discussed and everything is reviewed and

22    checked.

23                   "Please notice the

24    following:...The colors BLUE and RED are
```

Confidential - Subject to Further Confidentiality Review

1    the same ones as the...in the American

2    Flag.  WHITE is regular white."

3              Do you remember having

4    received that e-mail, sir?

5         A.    On what appears here, it

6    seems that I have received this e-mail.

7    But it has been too long.  I really can't

8    recall.

9         Q.    Okay, sir.

10              If you could turn the page.

11        A.    I'm sorry, I didn't

12    understand you?

13        Q.    I'm asking you to turn the

14    page.

15              This e-mail is from you.

16    Right?  Wuyu, SDTH818@163.com?

17        A.    Correct.

18        Q.    And it's dated February 24,

19    2007.  Correct?

20        A.    Isn't it February the 22nd

21    here?

22        Q.    It says 2007-2-22, Ivan

23    Gonima.

24              And you wrote, "Dear Mr.

Confidential - Subject to Further Confidentiality Review

1     Ivan, I am sorry, Please send the file to

2     this e-mail address, because the office"

3     e-mail "can not be opened by me."

4               And you sent that e-mail.

5     Right, sir?

6          A.     From what appears to be,

7     that I send it.

8          Q.     And what does this say here

9     in Chinese?

10         A.     My name.

11         Q.     And is that written in your

12    Chinese name?

13         A.     Yes.

14         Q.     So Che Gang?

15         A.     Your Chinese is not bad.

16         Q.     Oh, great.

17               And then you also wrote the

18    American version, Bill Cher?

19         A.     I believe so.

20         Q.     All right.

21               And attached to it are the

22    actual strips that are going to be used

23    on the label for the drywall.  Correct?

24         A.     This should be something

1    that a customer sent me.  Right?

2          Q.    My question is, attached to

3    it is the tape that's used on -- to be

4    used on the drywall that's going to be

5    sold.  Correct?

6          A.    The customer requested us to

7    put it on the gypsum board that were

8    going to be sold.

9          Q.    That's what the e-mail was

10   referring to when they said they wanted

11   it to be red, white and blue.  Correct?

12   Right, sir?

13         A.    Can you repeat your

14   question?

15         Q.    The e-mail that we just saw

16   was referring to wanting this labeling to

17   be red, white and blue.  Correct?

18         A.    Correct.

19         Q.    And your company did that.

20   Correct?

21         A.    I don't remember clearly.

22         Q.    When the product was sent

23   from China to the port to be sent FOB to

24   the United States of America, it was

```
 1    already labeled as Dun brand.  Correct?

 2          A.    Can you interpret again?

 3          Q.    Yes.

 4                When the product was sent

 5    from China to the port to be sent FOB to

 6    the United States of America, it was

 7    already labeled as Dun brand.  Correct?

 8          A.    When I sent the products FOB

 9    to the shipping company requested by the

10    client, if there was nothing changed to

11    that, it should be the label that is used

12    here, but I do not remember clearly about

13    it.

14          Q.    I'm going to show you what's

15    been marked --

16          A.    I'm sorry, can I drink some

17    water, take a break?

18                THE COURT:  Yes, certainly.

19          You want to take a break?

20                THE WITNESS:  I just want to

21          get some water and take a little

22          break.

23                THE COURT:  Okay.

24                THE WITNESS:  Thank you.
```

```
 1            VIDEOTAPE TECHNICIAN:  Going

 2        off the record, the time is 3:35.

 3            THE COURT:  Take 15 minutes.

 4                -  -  -

 5            (A recess was taken from

 6        3:35 p.m. to 3:49 p.m.)

 7                -  -  -

 8            THE COURT:  Back on the

 9        record, the deposition is

10        resuming.  You're still under

11        oath, sir.

12            VIDEOTAPE TECHNICIAN:  We're

13        back on the video record at 3:49.

14  BY MR. GONZALEZ:

15        Q.    I'm going to show you what's

16  been marked as Exhibit Number 2 to your

17  deposition.  It's Bates stamp numbers TG

18  915 through 920.  And I'd like to direct

19  your attention specifically with page

20  918, Bates stamp number 918.  And the

21  middle of the page where it starts with

22  an e-mail from you, that's Wuyu.  That

23  would be you.  Correct?

24                -  -  -
```

Confidential - Subject to Further Confidentiality Review

```
 1                    (Deposition Exhibit No.

 2            Che-2, E-mail chain, top one dated

 3            4/17/2007, Bates stamped TG

 4            0000915 through TG 0000920, was

 5            marked for identification.)

 6                       -  -  -

 7                    THE WITNESS:  That's what it

 8            appears to be.

 9   BY MR. GONZALEZ:

10            Q.    All right, sir.

11                    And you're writing in

12   English.  Correct?

13            A.    That's what it appears to

14   be.

15            Q.    How do you write in English?

16            A.    Can I explain?

17            Q.    Yes, please.

18            A.    Well, after we received

19   English e-mails, first of all, we would

20   use tools such as dictionary, electronic

21   tools, computer tools to translate it

22   into Chinese, and with the help of Mr.

23   Peng, the person in charge, to translate

24   from English to Chinese.  After I
```

1   understood the intention of the client,

2   then I would use Chinese to write my

3   response.  And again, with the help of

4   the translation tools, such as the

5   dictionaries, I will translate -- I will

6   translate that into English and to send

7   to the client.

8           Q.    You just said Mr. Peng who

9   was in charge, is that Peng Wenlong?

10          A.    Yes.

11          Q.    What's he in charge of?

12          A.    What time period?

13          Q.    TTP?

14          A.    Sales.

15          Q.    So he was the head of sales?

16          A.    At the time there was no

17  such an assignment document.  It was only

18  understood that he was in charge of a few

19  of us.

20          Q.    Were you equal to him or was

21  he your superior?

22          A.    He's my superior.

23          Q.    I'd like you to look at that

24  e-mail that's from you to Mr. Ivan Gonima

1    dated April 13, 2007.  And for reference,

2    and I will have a question afterwards, it

3    says, "Dear Mr. Ivan, I am very glad to

4    receive your e-mail."

5              "We indeed operated and are

6    operating with a 28-29ton containers to

7    export our products to America.  And we

8    can show 26-26.5ton on the bill and

9    packing list.  The ocean freight from

10   Qingdao" -- and I apologize for the

11   pronunciation -- "to Miami and New York

12   is $2950-3000/40GP.  If you need, I can

13   operate it for you.

14              "2.  About the clients in

15   five cities you mentioned, they are the

16   clients to which we once exported our

17   products.  Now there is no client to

18   which we can export 800,000 sheets of the

19   boards per month.  Now we are exporting

20   not very large a quantity of the boards

21   to America.  And you are the only

22   distributor of the brand DUN in America,

23   there is no doubt about this point.

24              "Thanks and best regards!

Confidential - Subject to Further Confidentiality Review

 1    Yours faithfully," then written in

 2    Chinese, Che Gang and the English name

 3    Bill Cher.

 4                You sent that e-mail.

 5    Right, sir?

 6         A.    Yes.

 7         Q.    And the cities that Mr.

 8    Gonima was referencing actually appear on

 9    the next page.

10                If you look at paragraph 2,

11    sir, this is from Ivan Gonima to you, and

12    it is dated April the 15th, 2007.

13    Paragraph 2, and I'll read it -- put it

14    into context and then I'll have a

15    question.

16                "Given that you are going to

17    operate it I am going to need your actual

18    freight rates from Qingdao to different

19    cities in the USA for a" 40-foot "GP

20    container.  Here is the list of cities I

21    need so I can review my price lists:  a,

22    Gulfport, Mississippi...; b, New Orleans,

23    Louisiana...; c, Long Beach,

24    California...; d, Las Vegas, Nevada...;

1   e, Savannah, Georgia...; f, Atlanta,

2   Georgia...; g, Charleston, South

3   Carolina; h, Wilmington, North Carolina;

4   I, San Juan, Puerto Rico...; j" -- well,

5   those are foreign countries.  So that's

6   it for the United States.

7              So you were aware that Mr.

8   Gonima was interested in selling products

9   in the United States as the exclusive

10  agent for Dun brand to those cities in

11  the United States.  Right, sir?

12       A.    It's a long statement.  You

13  can take out what you read before.  What

14  was the last sentence you said?

15       Q.    You were aware that Mr.

16  Gonima wanted to sell the drywall, the

17  Dun drywall, as the exclusive agent to

18  your company to the cities listed in

19  paragraph 2 of that e-mail, those cities

20  in the United States listed in paragraph

21  2 of the e-mail?

22       A.    No.  This is only an

23  intention that a customer expressed.  Our

24  operation was only FOB Chinese port

Confidential - Subject to Further Confidentiality Review

```
 1   delivery.
 2        Q.    Well, sir, the paragraph
 3   before was an e-mail from you saying that
 4   you were happy to be the operator of 28-
 5   to 29-ton containers to export products
 6   to America.
 7              Do you remember seeing that
 8   one?
 9        A.    That's what you interpreted,
10   but from my memory, I really can't
11   remember.
12        Q.    If you look at the paragraph
13   at the very top of that page Bates stamp
14   number 917, and the page before that, it
15   starts, that's an e-mail from you, right,
16   sir, Wuyu, SDTH818@163.com?
17        A.    Where is it?
18        Q.    Right here.
19        A.    That's me.
20        Q.    And it's to Ivan Gonima,
21   igonima.  Correct?
22        A.    I don't remember his e-mail
23   address, so this is the same, this one
24   and that one?
```

1          Q.    That's the start of it.  It

2    says igonima.  Correct?

3          A.    I know.  So this is the top

4    of that e-mail.  Right?

5          Q.    Yes, sir.

6          A.    So that's it.

7          Q.    It starts, "Dear Mr. Ivan,

8    Thank you very much for your kindly

9    attention.

10              "The shipping agent in

11   Qingdao confirmed the ocean freight

12   USD2950-3000.00 to Miami or New York.

13   Would you please pay the ocean freight

14   directly to" the "shipping company or

15   indirectly through us to the shipping

16   company?"

17              Do you recall sending those

18   instructions to Mr. Gonima for the

19   shipping of the Dun product to the United

20   States?  Correct?

21              MR. SPANO:  Objection to

22         form.  The question

23         mischaracterizes the question as

24         an instruction.

Confidential - Subject to Further Confidentiality Review

```
1              THE COURT:  Ask another
2         question, please.
3              MR. GONZALEZ:  You want me
4         to rephrase it, Judge?
5              THE COURT:  Yes.
6    BY MR. GONZALEZ:
7         Q.    You sent that e-mail to Mr.
8    Gonima.  Correct, sir?
9         A.    Like I said, yes.
10        Q.    And the first invoices for
11   the orders to Oriental Trading Company as
12   the exclusive agent for the Dun brand on
13   behalf of TTP were from -- the products
14   were sent from Qingdao to Miami.
15   Correct?
16             MR. SPANO:  Object to the
17        form.  Object to the form,
18        compound, and there's no
19        foundation that that company
20        served as an exclusive agent.
21             THE COURT:  Just restate it.
22   BY MR. GONZALEZ:
23        Q.    The first shipment by TTP to
24   Oriental Trading Company was from Qingdao
```

```
 1    to Miami, and it was dated May 28, 2007.

 2    Correct?

 3              MR. SPANO:  Objection to

 4         form.

 5              THE COURT:  I'll overrule

 6         it.  You can answer.

 7              THE WITNESS:  Can you repeat

 8         the question?

 9              THE COURT:  Why don't you

10         read it to him.

11              THE WITNESS:  I don't

12         remember clearly about it.

13    BY MR. GONZALEZ:

14         Q.   I'm going to show you what's

15    been marked as composite Exhibit Number 3

16    to your deposition.

17                   -  -  -

18              (Deposition Exhibit No.

19         Che-3, Packet of Invoices, Bates

20         stamped TG 0019968 through TG

21         0019975, was marked for

22         identification.)

23                   -  -  -

24    BY MR. GONZALEZ:
```

Confidential - Subject to Further Confidentiality Review

```
 1              Q.     Bates stamp number TG 19968

 2    through TG 19975.

 3                     These are invoices for

 4    export from the Taian Shandong province.

 5    Correct, sir?

 6              A.     This is the customized

 7    invoice produced by the taxation bureau.

 8              Q.     The information that's

 9    provided is provided by what company?

10              A.     Which part of the

11    information you're talking about?

12              Q.     How does the province

13    bureau, the Taian Shandong Province

14    Bureau, get the information to put on

15    these sheets?  Who provides the

16    information?

17              A.     The form was made by Taian

18    City Taxation Bureau.  But the

19    information was filled out by the

20    financial department of our company.

21              Q.     Your company being TTP?

22              A.     Yes.

23              Q.     All right, sir.

24                     As reflected in these
```

```
 1    invoices, the shipments on all of these

 2    pages were to Miami.  Correct?

 3         A.    No.  Let me finish, please.

 4         Q.    I haven't said a word.

 5               THE INTERPRETER:  Let me

 6         explain to him what the "bless

 7         you" means.

 8               THE WITNESS:  I'm sorry.

 9    BY MR. GONZALEZ:

10         Q.    No problem.

11         A.    Well, the term of the

12    transaction as it reflects here is FOB

13    Chinese port.  And this is the

14    requirement of the customer for us to

15    give to the shipping company.  We don't

16    really know where exactly was the

17    destination of the customer.  The

18    taxation bureau required us to fill out

19    the form, so we don't really know exactly

20    where the shipment was shipped to.

21         Q.    Have you heard of a city

22    called Miami?

23         A.    Miami Heat.

24         Q.    That's right.
```

Confidential - Subject to Further Confidentiality Review

```
 1            A.    Basketball.

 2            Q.    That's in Florida, right,

 3    United States of America?

 4            A.    That I don't know.  I only

 5    know Miami Heat.

 6            Q.    United States.  It's in the

 7    United States.  Right?  Yes?

 8            A.    Yes.

 9            Q.    Okay.

10                  The first page refers to

11    "From:  Qingdao."  That's in China.

12    Correct?

13            A.    Yes.

14            Q.    "To:  Miami."  Right?

15            A.    First of all, it's a

16    customized form which is requested by the

17    taxation bureau for us to fill out.  This

18    is only the information provided by the

19    shipping company of the clients.  We did

20    not actually verify that information.  If

21    they had told us the shipments would have

22    been to the destination of Hong Kong, we

23    would have filled out Hong Kong.

24            Q.    But you filled out Miami,
```

1    didn't you?

2         A.    The shipping company of the

3    clients told me this information, and I

4    filled it out according to the

5    information being told, just like what

6    you're seeing right now.

7         Q.    Yes, sir.  And what we're

8    seeing is M-I-A-M-I, Miami.  Right?

9         A.    Yes.

10        Q.    The first page is for 4,900

11   pieces, correct, of gypsum board?

12        A.    That's what it appears to

13   be.

14        Q.    The next one says 5,880

15   pieces of gypsum board to Miami.  Right,

16   sir?

17        A.    Miami is, as what I had

18   explained to you earlier, but the 5,880

19   pieces is correct.

20        Q.    Of gypsum board?

21        A.    That's what it appears to

22   be.

23        Q.    The next page says 1,960

24   pieces of gypsum board.  Right, sir?

1        A.      Yes.

2        Q.      And the next page says 4,900

3   pieces of gypsum board?

4        A.      Yes.

5        Q.      And the next page says 2,940

6   pieces of gypsum board?

7        A.      Yes.

8        Q.      And the next page says 2,010

9   pieces of gypsum board?

10       A.      Yes.

11       Q.      And the next page says 6,700

12   pieces of gypsum board?

13       A.      Yes.

14       Q.      And the next page says 6,700

15   pieces of gypsum board.  Correct, sir?

16       A.      Yes.

17       Q.      And you complied with that

18   request.  Right?  You provided the

19   drywall set forth in these documents?

20       A.      I don't understand, what do

21   you mean by complied with?  What request?

22       Q.      You provided 4,900 pieces of

23   gypsum board for export as indicated in

24   the first document, Bates stamp number

1    19968?

2          A.    I provided to customer at

3    Chinese port this volume of gypsum board.

4          Q.    And the volume indicated in

5    each one of the pages that makes up

6    composite exhibit Che-3 is accurate.

7    Correct?

8          A.    Yes.

9          Q.    Mr. Peng Wenlong went by the

10   name of Frank Clem as his Western

11   version; is that right?

12         A.    I only know for sure his

13   name is Frank, but I'm not sure about the

14   name after that.

15         Q.    So we're clear, that's the

16   individual that you said was your

17   supervisor in sales while you worked for

18   TTP.  Right?

19         A.    He was a person in charge in

20   our TTP for the sales department.

21         Q.    And earlier when you said

22   that you along with Peng were aware of

23   the sole agency agreement that is Exhibit

24   Number 1 to your deposition with Oriental

Confidential - Subject to Further Confidentiality Review

1    Trading Company, Peng Wenlong is the Peng

2    you were referring to.  Correct?

3            A.    Mr. Peng nor I were aware of

4    the agreement that is written on top over

5    there.  But it was not like what you have

6    just said, meant.

7            Q.    My question is whether Mr.

8    Peng Wenlong was the individual that you

9    meant when you said you were aware of the

10   agreement with Oriental Trading Company?

11           A.    Yes.  Yes, the person that

12   was aware of that agreement together with

13   me was Mr. Peng Wenlong.

14           Q.    Mr. Che, you had

15   communications with Ivan Gonima, the

16   principal of Oriental Trading Company, as

17   late as May 27, 2010; is that correct?

18           A.    I don't recall clearly about

19   that.

20           Q.    Do you recall having e-mails

21   sent to Mr. Ivan Gonima providing

22   quotations for gypsum board, metal studs,

23   metal track screws and joining tape on

24   behalf of Taishan Gypsum Company?

Confidential - Subject to Further Confidentiality Review

```
 1          A.     I don't remember clearly

 2    about that.

 3          Q.     Is your e-mail address still

 4    SDTH818@163.com?

 5          A.     Yes.

 6          Q.     And is your MSN address

 7    wuyu374@hotmail.com?

 8          A.     Yes.

 9               MR. GONZALEZ:  Your Honor,

10          at this time I'd like to use this

11          document, which I'm showing to you

12          I guess in an in camera capacity

13          at this point.

14               THE INTERPRETER:

15          Interpreter clarification, what do

16          you mean, in camera capacity?

17               MR. GONZALEZ:  It's not for

18          the witness.

19               THE INTERPRETER:  Okay.

20               THE COURT:  All right.

21          Impeachment.

22               MR. GONZALEZ:  May I use it,

23          Your Honor?

24               THE COURT:  Yes.
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. GONZALEZ:

 2         Q.    Let me show you what's been

 3    marked as Che-4 to your deposition.

 4                   -  -  -

 5              (Deposition Exhibit No.

 6         Che-4, E-mail in Chinese dated May

 7         27, 2010 with attachment, 2 pages,

 8         was marked for identification.)

 9                   -  -  -

10    BY MR. GONZALEZ:

11         Q.    That is an e-mail from you.

12    Correct, sir?

13         A.    Yes.

14         Q.    It says, "From," and that's

15    your name in Chinese, Che Gang?

16         A.    Correct.

17         Q.    And you sent it to Ivan

18    Gonima.  Correct?

19         A.    That's what it appears to

20    be.

21         Q.    And it has a quotation.

22    Right?

23         A.    Whatever appears here is

24    accurate.
```

 1          Q.    The attachment is a

 2   quotation on behalf of Taishan Gypsum

 3   Company.  Correct?

 4          A.    If this is indeed the

 5   attachment from this, then this is

 6   correct.

 7          Q.    All right, sir.

 8                And the date on the e-mail

 9   is May 27, 2010.  Correct?

10          A.    It is May.  Then that's it.

11          Q.    And at that time, when you

12   sent this e-mail, you worked for Taishan.

13   Correct?

14          A.    In the year 2010, I already

15   worked for TG.

16          Q.    TG?

17          A.    TG.

18          Q.    You didn't work for anybody

19   else at that time?

20          A.    No.

21          Q.    And you have --

22                The quotation you provided

23   was for gypsum board, metal studs, metal

24   tracks, screws and joining tape.

1    Correct?

2          A.    These are all the requests

3    of the client.

4          Q.    These are products that

5    Taishan Gypsum sells.  Correct?

6          A.    In this period of time, we

7    could sell these products at Taishan

8    Gypsum.

9          Q.    In fact, you prepared this

10   quotation of -- for Taishan Gypsum

11   Company, didn't you?

12         A.    Let me explain.

13         Q.    Well, sir, with all due

14   respect, you can explain, but you need to

15   answer my question first.

16               You prepared this quotation

17   on behalf of Taishan Gypsum.  Right, sir?

18         A.    The explanation I'm going to

19   explain is answer to question.

20               THE COURT:  Wait, wait.

21               THE WITNESS:  Do you want to

22         know --

23               THE COURT:  You can explain

24         it.  Go ahead.  Answer the

1          question.

2               THE WITNESS:  -- what

3          really -- what's going on?

4               At the time we owed Oriental

5          Trading Company $100,000 when I

6          worked for TTP.  So all these was

7          suggestions about how should we

8          handle that $100,000.  So all

9          these shipments you're seeing here

10         were suggestions about that issue.

11         Don't only look at the titles.

12    BY MR. GONZALEZ:

13         Q.    Thank you, sir.  That's very

14    helpful.

15              So what you're trying to do

16    is to pay your debt to Oriental Trading

17    through providing some goods as listed in

18    this invoice or quotation from Taishan

19    Gypsum; is that correct?

20         A.    I don't understand.

21         Q.    Why don't you tell me again

22    why it is that you are providing this

23    quotation to Ivan Gonima as a

24    representative of Oriental Trading as it

1    relates to the $100,000 that TTP owed it?

2         A.    The customer requested us to

3    prepare this quotation, but as I reminded

4    you earlier, do not only look at the

5    title.

6         Q.    Yes.  You were explaining to

7    me how you were providing this

8    information with respect to monies that

9    were owed to Oriental Trading as a result

10   of transactions done with TTP.

11              Please explain exactly what

12   you meant by that.

13        A.    In this period of time, the

14   company where I worked at had already

15   become TG.  However, I had to handle the

16   money that I owed to him.  Therefore, as

17   I said earlier, do not only look at the

18   title.  This is only a form that I

19   randomly grabbed.  The content of it was

20   for the purpose of handling the $100 of

21   Oriental Trading Company.  This is a

22   fact.

23        Q.    $100,000.  Correct?

24        A.    Correct.

```
 1          Q.     And it was owed by TTP.
 2   Correct?
 3          A.     Correct.
 4          Q.     To Oriental Trading.
 5   Correct?
 6          A.     Correct.
 7          Q.     And you recognize Ivan
 8   Gonima as being part of Oriental Trading?
 9          A.     He claimed to be.
10          Q.     You believed him?
11          A.     The fact reflected during
12   the whole process of operation, that he
13   should be the representative of Oriental
14   Trading Company.
15          Q.     All right, sir.
16                 Just so we're clear, when
17   you wrote here on the bottom your name,
18   Bill Che, that's your American name.
19   Right, sir?  Yes?
20          A.     Yes.
21          Q.     And you signed on behalf of
22   Taishan Gypsum Company.  Correct?
23          A.     Like I emphasized earlier --
24                 THE INTERPRETER:
```

```
 1              Interpreter clarification.

 2                   THE WITNESS:  Like I

 3              emphasized earlier, the fact was

 4              for the purpose of the repayment.

 5              Do not keep on falling up on the

 6              frame.

 7    BY MR. GONZALEZ:

 8              Q.   When you worked for TTP,

 9    were you paid by TG?

10              A.   No.

11              Q.   Did you make more money if

12    you had more sales?

13              A.   You can say that.

14              Q.   Yes?

15              A.   Yes.

16              Q.   Did you have a commission or

17    bonus system?

18              A.   Commission?  If you talk

19    about commission in China, that's

20    illegal.

21              Q.   A bonus?

22              A.   We do have bonus.

23              Q.   And you have customers --

24                   When you worked for TTP, you
```

Confidential - Subject to Further Confidentiality Review

1    had customers throughout the world?

2                    MR. SPANO:  Objection,

3            vague.

4                    THE COURT:  Give the dates.

5            Give the dates.  You said during

6            the time you worked.

7    BY MR. GONZALEZ:

8            Q.    Yes.  During the time you

9    worked for TTP, did you have customers

10   throughout the world?

11           A.    We only operate based on

12   deliver our products at the ports in

13   China.  As of whether the clients would

14   ship them to all over the world or not,

15   we wouldn't know about that.

16           Q.    My question is, do you know

17   whether you had clients all over the

18   world when you worked for TTP?

19           A.    Like I just answered, we

20   just delivered the goods at Chinese

21   ports.  And whether the customers are in

22   the big scope of all over the world, I

23   don't know that.

24           Q.    What countries do you have

```
 1    customers in that you do know of when you
 2    worked for TTP?
 3          A.    I don't recall the
 4    circumstance at that time.  But we only
 5    deliver in Chinese ports for our
 6    customers.  Therefore, we didn't care
 7    where the customer went.
 8          Q.    Did you have other customers
 9    in the United States of America other
10    than Ivan Gonima, you?
11          A.    Me?
12          Q.    Yes, you personally.
13          A.    Some of my customers claim
14    to be American companies, but I had never
15    verified that fact.
16          Q.    What were their company
17    names?
18          A.    If you ask me to remember on
19    the spot, I couldn't.  Could you give me
20    a reminder?
21          Q.    Do you remember doing
22    business with Ivan Gonima from 2006
23    through 2010?
24          A.    Can you repeat the time?
```

```
 1              Q.    Yes.  From --

 2              Do you remember doing

 3    business with Ivan Gonima or his company,

 4    Oriental Trading, from October 2006

 5    through the summer of 2010?

 6              MR. SPANO:  Objection to

 7         form, to the vagueness of "doing

 8         business."

 9              THE COURT:  I don't think

10         that's vague.  I'll allow it.

11         Overrule the objection.

12              THE WITNESS:  Please repeat.

13              MR. GONZALEZ:  Could you

14         read it back for us, please.

15              THE WITNESS:  I don't have a

16         clear recollection of the period.

17    BY MR. GONZALEZ:

18              Q.    How did you meet Mr. Gonima

19    or his business, Oriental Trading?

20              A.    Do you need my further

21    explanation?

22              Q.    I want to know how you first

23    met him.

24              A.    When I make my statements, I
```

```
 1    may not be able to give you accurate

 2    count as of time.  Approximately in 2006

 3    a Chinese person called Wu Jiansong

 4    self-claimed to be the representative of

 5    a foreign company in China.  He expressed

 6    his willingness of purchasing the

 7    products of our company, afterwards, even

 8    informed us in his e-mail saying that Wu

 9    Jiansong represented his company.  And

10    then we were able to have the contact

11    with Oriental company.

12          Q.    How did you have contact

13    with Oriental Trading Company?

14          A.    Through e-mail.

15          Q.    Did you ever meet in person?

16          A.    He once came to visit our

17    plant.

18          Q.    Do you remember having

19    instant messaging conversations with Mr.

20    Gonima, back and forth?

21          A.    We had communication on MSN.

22          Q.    Can you tell us what instant

23    messaging means?

24          A.    I don't understand what you
```

Confidential - Subject to Further Confidentiality Review

```
 1   mean by that.

 2        Q.    Where you can send messages

 3   back and forth instantly.  MSN?

 4        A.    In my recollection, it has

 5   always been the case that Mr. Irvine

 6   would left a message for us on MSN.  When

 7   we came to work, we would respond to his

 8   messages.  It was as if e-mail

 9   communications, because we had different

10   working hours.

11        Q.    I want to show you what

12   we'll mark as Exhibit Number 5 to the

13   deposition.

14                  -  -  -

15             (Deposition Exhibit No.

16             Che-5, Printout of Instant

17             Messages, 41 pages, was marked for

18             identification.)

19                  -  -  -

20   BY MR. GONZALEZ:

21        Q.    It purports to be MSN or

22   instant messaging between yourself and

23   Ivan Gonima.  And it is pages 2 through

24   41.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    MR. SPANO:  May we have a
 2          copy of the exhibit, please?
 3                    MR. GONZALEZ:  1 through 41,
 4          I'm sorry.  Pages 1 through 41.
 5   BY MR. GONZALEZ:
 6          Q.    And you are referred to in
 7   this document as "Mr. Che Gang."
 8   Correct?
 9          A.    That's what appears to be.
10          Q.    When you use MSN, is it
11   through a phone or is it through a
12   computer?
13          A.    Usually through a computer.
14          Q.    And you were very friendly
15   with Mr. Gonima.  Correct?  Ivan?
16          A.    Out of politeness.
17          Q.    You knew he was from Miami,
18   Florida?
19          A.    He claimed to be.
20          Q.    In fact, you even discussed
21   the fact that you would work on weekends,
22   on Saturdays and Sundays.  Right?
23          A.    Can you point out where is
24   it?
```

```
 1              Q.    Do you remember having those

 2    conversations?

 3              A.    I don't recall.  I don't

 4    recall.

 5              Q.    Do you recall --

 6              THE COURT:  Let's get to the

 7         meat of it.  We're visiting now.

 8              MR. GONZALEZ:  There's a

 9         method to this, Your Honor, but

10         I'll get right to it.

11    BY MR. GONZALEZ:

12              Q.    Sir, if you could look at

13    page number 2.

14              On February 7, 2007, Mr.

15    Gonima is writing to you.  It's actually

16    from you, Che Gang, to Ivan Gonima.  "We

17    are ready for other products... please

18    let us know the exact" dates "for

19    different products."

20              Do you remember sending

21    that?

22              A.    That's what appears to be in

23    here, but I don't recall.

24              Q.    The last entry dated
```

```
 1   February 7, 2007, you're discussing

 2   setting up a long-term business

 3   relationship with Ivan Gonima offering

 4   the lowest prices?

 5           MR. SPANO:  Note my

 6        objection to the use of this

 7        exhibit that wasn't identified

 8        prior to the deposition in

 9        accordance with the Court's order.

10           THE COURT:  Was this used in

11        a deposition?

12           MR. GONZALEZ:  This was from

13        the deposition of Ivan Gonima,

14        Your Honor.  It's an exhibit to

15        it.

16           I'm sorry, Your Honor.  This

17        was a document that was provided

18        to the Court.

19           MR. DAVIS:  Your Honor, if I

20        may.  I'm sorry.

21           MR. GONZALEZ:  Yes, please.

22           MR. DAVIS:  Your Honor, if I

23        may, this was one of the documents

24        that was provided to you in
```

```
 1          advance of the deposition for

 2          impeachment purposes.  That's what

 3          this document is.

 4               THE COURT:  Okay.

 5               You may continue.

 6  BY MR. GONZALEZ:

 7          Q.    Do you remember offering the

 8  lowest prices to Mr. Gonima in order to

 9  set up a long-term business relationship

10  with him?

11          A.    This is only out of

12  politeness.

13          Q.    All right, sir.

14               But you wrote it.  Correct?

15          A.    I don't recall.

16          Q.    It's got on your name on

17  there, doesn't it, Che Gang?

18          A.    Because my MSN is always

19  online in my computer, it is also

20  possible that while I was not in the

21  company, someone else was chatting with

22  him, because no password was needed.

23          Q.    Here's what you said out of

24  politeness to Ivan.  "In order to set up
```

Confidential - Subject to Further Confidentiality Review

1    long term business relation, we will

2    offer you the lowest price."  You said

3    that out of politeness.  Right, sir?

4         A.    I think this is out of my

5    politeness.  Just like when I say you are

6    friend but this is the first time we met.

7         Q.    Page 3.  Ivan Gonima sends

8    you a message on February 7, 2007.  "As

9    you know American manufacturers are

10   lowering their prices."

11             And you respond within

12   seconds to Ivan.  "Yes, I see.  We need

13   to support each other."

14             That's what you wrote in

15   your response.  Right, sir?

16        A.    I'm not sure.

17        Q.    You're not sure if you said

18   that?

19        A.    Correct.  I don't recall.

20   It's like what I had explained to you

21   earlier.  My MSN has always been online

22   in my computer.  Perhaps it was not me

23   who was typing out that, because my

24   English is poor.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Where is your computer
 2   located?  In your business at that time?
 3          A.    In my office.  In my
 4   company.
 5          Q.    Your company, TTP?
 6          A.    You have to look at the
 7   time.
 8          Q.    Time 1:02:26, February 7,
 9   2007.  TTP?
10          A.    Yes.  The computer was in
11   TTP.
12          Q.    Page 4.  I'd like to address
13   your attention to the second entry from
14   Ivan to you.  "Last week on Tuesday we
15   made another 2 transfers from Miami.
16   Wachovia Bank for the last 2 proforma
17   invoices you sent me."
18                Do you recall those
19   transactions, sir?
20          A.    I don't recall.  That's what
21   it appears to be, but I don't recall.
22          Q.    Do you recall having
23   discussions about running weekly orders
24   for 20,000 sheets with Mr. Gonima?
```

Confidential - Subject to Further Confidentiality Review

1    February 25, 2007, 8:06:26.

2          A.    Who sent this?

3          Q.    It says from Ivan to you,

4    Mr. Che.  And it, quote, states, "Our

5    goal is to have always weekly orders

6    running for 20,000 sheets."  And your

7    response within 3 minutes, on the same

8    date, "Yes, we will try our best to

9    prompt our business."

10               Do you recall that

11   discussion, sir?

12         A.    Should I explain to you

13   again?

14         Q.    Yes.  Do you recall that

15   discussion?

16         A.    My computer has -- had

17   always have MSN online.  I don't recall

18   this issue.  And I'm also not sure that I

19   said that.

20         Q.    So do you think somebody

21   walked into your computer and wrote to

22   Mr. Gonima and sent all these things out?

23         A.    I don't deny that, because

24   I'm not sure of that.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    So who do you think did it?
 2    A co-employee?  Who?
 3          A.    I can't -- I cannot guess.
 4          Q.    So somebody was in --
 5          A.    Can I have a glass of water?
 6                THE COURT:  Can somebody get
 7          him a glass of water.
 8                THE WITNESS:  Thank you.
 9    BY MR. GONZALEZ:
10          Q.    Somebody pretending to be
11    you was using your MSN text messaging to
12    Mr. Gonima sending information about
13    sales that weren't you.  That's what
14    you're telling us?
15          A.    No.  I'd like to explain to
16    you again.  My computer was at my working
17    location.  My MSN has always been online.
18    Perhaps when I stepped out, the computer
19    was still there.  So MSN would show that
20    somebody was having a conversation.
21    Perhaps somebody from my office saw it
22    and responded to him.  The name that
23    appears to be my name and the customer's
24    name were only the fixed feature formed
```

1    on MSN.  Perhaps it was not Ivan who was

2    talking to us.  Therefore, I don't think

3    you can confirm anything based on that.

4           Q.    Page 12, please.  March 4,

5    2007.

6                 Where was your computer?

7    Was it in an office or was it in a work

8    area at that time?

9           A.    I don't understand your

10   question.  Please explain.

11          Q.    Where did you have your

12   computer, in an office, a private office,

13   or in a computer bank area?

14          A.    I'm not sure.

15          Q.    You're not sure if you had a

16   private office or if you worked in an

17   open area with a lot of different

18   computers, like here?

19          A.    First of all, I do not have

20   a private, individual office.  But MSN

21   can be signed on at any computer in any

22   place, as long as you download the MSN

23   tool.  It's been too long.  I cannot

24   verify clearly of what you've asked of

```
 1    me.  I'm very sorry.  I'm very sorry.

 2         Q.    I'd like you to look at page

 3    12, the entry of March 4, 2007 at

 4    10:25:51 from Ivan to Mr. Che Gang.

 5    There's a discussion here about "MILLIONS

 6    of sheets!"

 7              Do you see that?

 8              MR. SPANO:  Objection to

 9         form.

10              THE WITNESS:  I don't

11         understand.

12    BY MR. GONZALEZ:

13         Q.    Do you see where it says,

14    "Yes but not that much...remember, this

15    client is talking about MILLIONS of

16    sheets"?

17              If you go a little further

18    down, you're providing him with the best

19    prices for the volume sales and you talk

20    about sending 10,000 sheets by seven

21    days.

22              My question is, do you

23    recall having those discussions with Mr.

24    Gonima?
```

```
 1              MR. SPANO:  I object to this

 2         question.  It's cherry picking

 3         snippets of conversations and also

 4         misquoting him.

 5              THE COURT:  It's under

 6         cross-examination.  I'll allow it.

 7              Let me make a comment to --

 8         let me make a comment.

 9              I mention this to you,

10         because you should understand the

11         following.  I'm the judge who will

12         preside and is presiding over this

13         case.  I listen very closely to

14         the evidence and to the testimony,

15         and I'm trying to understand it.

16         It's important for me in doing

17         that to also determine the

18         credibility of the witness.  I

19         mention that to you because I'm

20         listening to what you're saying,

21         and I just want you to know that.

22         If you don't understand a

23         question, say it, and it will be

24         restated.  But I'm concerned about
```

```
 1           some of the comments that you're

 2           making.  I mention that to you

 3           because I want you to understand

 4           this process, which you may not

 5           understand.

 6                Let's continue.

 7                THE WITNESS:  First of all,

 8           thank you, Judge, for your

 9           reminding -- for your reminder.

10                But what this friend has

11           said has been too long indeed.

12           It's impossible for me to store so

13           many information in my brain.  I

14           can try to help him to recollect.

15                THE COURT:  And if you don't

16           remember, just say you don't

17           remember.

18                THE WITNESS:  I only want to

19           state the facts.

20                THE COURT:  Right.

21                THE WITNESS:  Thank you.

22   BY MR. GONZALEZ:

23        Q.    In addition to drywall, you

24   do recall having discussed selling metal
```

```
 1   framing for purposes of shipment to the

 2   United States to Oriental Trading.

 3   Correct?

 4          A.    It was reflected on the

 5   document earlier.

 6          Q.    If you can turn to page 28,

 7   sir.  The date is May 8, 2007.  The time

 8   is 10:34:08.  Ivan writes to you, "We are

 9   also going to place our first order for

10   metal framing."

11               Ivan writes to you, "Where

12   in the USA are you exporting your metal

13   framing to?"

14               You respond, as Mr. Che

15   Gang, on May 8, 2007, "The board of first

16   order...have been shipped on 1st" of

17   "May."  The next entry from you to Ivan

18   at 10:35:38 seconds at May 8, 2007,

19   "Miami and New york."

20               Do you recall having that

21   conversation, sir, through this MSN

22   messaging?

23          A.    That's what it appears to

24   be, but I don't recall.
```

Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Page 34, August the 15th,
 2    2007, again, metal studs.
 3            Do you recall writing to Mr.
 4    Che Gang that you on behalf of your
 5    company were exporting metal studs to the
 6    United States of America?
 7            A.    Where is it?
 8            Q.    August the 15th, 2007, 10:33
 9    53 seconds from Mr. Che Gang to Ivan, "We
10    can operate some metal studs."
11            Answer from Ivan, "Sure, we
12    can do that and it will help."
13            Statement from you at
14    10:34:14, Mr. Che Gang to Ivan, "We are
15    exporting to USA."
16            Do you see that, sir?
17            A.    I am looking at it now.
18            Q.    Do you recall that
19    conversation on August of 2007 by MSN
20    messaging?
21            A.    That's what appears to be
22    here.
23            Q.    Do you recall having
24    discussions for a very long commercial
```

```
 1   relationship with Ivan and your company?
 2              THE INTERPRETER:
 3          Interpreter clarification.
 4              THE WITNESS:  Give me
 5          something you're sure of.  I don't
 6          know what you meant by long-term
 7          what.
 8   BY MR. GONZALEZ:
 9          Q.    Page 37.  8/15/2007 is the
10   date.  The time is 10:55:20.  The
11   statement from Ivan to Mr. Che Gang and
12   response by Mr. Che Gang to Ivan.
13   Statement from Mr. Ivan, "We are looking
14   for a very long commercial relationship."
15              Answer from Che Gang at
16   10:55:52 on the same date, "You can
17   success."
18              Do you recall that, sir?
19          A.    First of all, let me tell
20   you that the stuff on MSN, as I had also
21   explained to Mr. Judge as well as
22   explained to you, that I do not recall
23   clearly about it.  But from the form that
24   appears here, it should be a polite
```

Confidential - Subject to Further Confidentiality Review

```
1    response only.  There's no substantial

2    meaning to that.

3         Q.    Well, let me ask you this,

4    sir.  You agree with me that the more

5    product you sell, the better it is for

6    the company.  Correct?

7         A.    For sure.

8         Q.    And the more product you

9    sell, the better it is for you?

10        A.    It's better for me.

11        Q.    You would have no objection

12   to selling a lot of product to Ivan

13   Gonima or Oriental Trading.  Correct?

14        A.    It is the same.  It doesn't

15   matter who I sell it to, as long as I get

16   the money.

17        Q.    That's right.  They have to

18   pay you?

19        A.    And then they get the goods.

20        Q.    Right?

21        A.    Therefore, it doesn't matter

22   who I sell it to.

23        Q.    In fact, if you look at the

24   promotional materials that your company,
```

```
 1    TTP, had during the time of its

 2    existence, it bragged about the fact that

 3    it sold to the United States of America.

 4    Correct?

 5          A.    I don't know what are the

 6    materials you're referring to here.

 7          Q.    The company held itself out

 8    as a worldwide company.  Correct?

 9          A.    That's only a way for

10    marketing.

11          Q.    Sure.

12                And for marketing purposes,

13    the company held itself as a worldwide

14    company?

15          A.    I don't recall that.

16          Q.    And TG holds itself out as a

17    worldwide company too, doesn't it?

18          A.    I have not paid attention to

19    that.

20          Q.    Can you look at Exhibit 20

21    then, please, that's in front of you.

22          A.    Yes.

23          Q.    That's Jia-20.  Second page.

24    Second page.  Yes.
```

```
 1                    The paragraph that states --

 2                    This is a marketing material

 3    from Shandong Taihe Dongxin, now known as

 4    TG.  Correct?

 5            A.    It is a brochure of Taihe.

 6            Q.    Which is now --

 7                    The company is now known as

 8    TG.  Yes?

 9            A.    Yes.

10            Q.    If you turn to the second

11    page, where it's highlighted there,

12    starting with the statement, "We have a

13    self-supported import and export ability,

14    our products not only sell well in our

15    domestic market also export to many

16    countries e.g. U.A.E., Indonesia, India,

17    Russia, U.S.A."

18                    That's what it says.  Right,

19    sir?  That's what it states?

20            A.    If that's what it says,

21    that's what it says.

22            Q.    All right, sir.

23                    And it's truthful, isn't it?

24            A.    That I don't know.
```

1          Q.    You --

2          A.    Because I'm only a

3     salesperson.  I'm a user of this

4     material.  I'm not a decision-maker of

5     this material, neither am I the producer

6     of this material.  I'm sorry, I can't

7     explain to you.

8          Q.    Maybe you can help me a

9     little more.

10         A.    I'd love to.

11         Q.    You consider yourself an

12    honorable person, don't you?

13         A.    Absolutely.

14         Q.    And you believe you work for

15    an honorable company, don't you?

16         A.    That's right.

17         Q.    Because honor is extremely

18    important, isn't it?

19         A.    Correct.  The reason I said

20    that is because I want to explain a fact.

21    I am an honest person.  I am only a

22    salesperson.  For greater issues, I do

23    not know.  If you want to buy gypsum

24    board, you can come to me.

Confidential - Subject to Further Confidentiality Review

```
 1            Q.    You work for an honorable

 2    company?

 3            A.    I believe so.

 4            Q.    In fact, one of the things

 5    that is stated in that paragraph about

 6    the quality of the company is that it has

 7    strict management.  Correct?  I'm not

 8    done with the question.

 9            A.    I believe personally

10    whatever has been said on a brochure is

11    the fact.  That's my personal opinion,

12    because I work for an honest company.

13            Q.    Thank you, sir.  I

14    appreciate that.

15                  THE COURT:  I'd like to go

16          to 5:30 today.

17                  MR. GONZALEZ:  Yes, Your

18          Honor, we can.

19                  THE WITNESS:  Thank you.

20                  Judge, we're all hungry.

21    BY MR. GONZALEZ:

22            Q.    Going to the next statement

23    --

24                  You agree with me that the
```

Confidential - Subject to Further Confidentiality Review

```
 1    product that is provided to your

 2    customers should be high quality?

 3           A.    Yes.

 4           Q.    And you agree with me that

 5    your customers should be honored?

 6                 THE INTERPRETER:

 7           Interpreter needs a moment for

 8           that.

 9                 MR. GONZALEZ:  It's right

10           here.

11                 THE WITNESS:  Yes.

12    BY MR. GONZALEZ:

13           Q.    And you agree with me that

14    the company has a keen social

15    responsibility?

16           A.    That's my personal belief.

17           Q.    Now, sir, I'm going to show

18    you what is Bates stamp number TG 0021503

19    through TG 0021505.  And it will be the

20    next exhibit number, which will be Che-6.

21                       -  -  -

22                 (Deposition Exhibit No.

23           Che-6, Letter dated November 26,

24           2008, Bates stamped TG 0021501
```

```
 1          through TG 0021505, was marked for

 2          identification.)

 3                    -  -  -

 4               THE WITNESS:  Can I have

 5          these documents?

 6  BY MR. GONZALEZ:

 7          Q.    Yes.

 8          A.    Should I return it back to

 9  you?

10               THE COURT:  While he's

11          looking at the document, do you

12          want to change the tapes if we

13          need to?

14               VIDEOTAPE TECHNICIAN:  Thank

15          you.  Going off the record at

16          5:12.

17               THE WITNESS:  Can I go to

18          the restroom?

19               THE COURT:  Yes.

20               THE WITNESS:  Thank you.

21                    -  -  -

22          (A recess was taken from

23          5:12 p.m. to 5:19 p.m.)

24                    -  -  -
```

```
 1              VIDEOTAPE TECHNICIAN:  We're

 2         going back on the record.  This is

 3         the beginning of Tape Number 3.

 4         The time is 5:19.

 5   BY MR. GONZALEZ:

 6         Q.    All right, sir.  The exhibit

 7   before you is Exhibit Number 6.  And the

 8   top e-mail is an e-mail that you sent.

 9   Right?

10         A.    Yes.

11         Q.    In fact, it has your name in

12   Chinese and in English, Che Gang and Bill

13   Cher.  Right?

14         A.    I can't see my e-mail

15   address right.

16         Q.    SDTH818@163.com?

17         A.    That's my e-mail address.

18         Q.    All right, sir.

19         A.    But it doesn't have a title

20   like the one that we have.

21         Q.    The document says Bill Cher

22   and it has your name in Chinese as Che

23   Gang.  Right?

24              MR. SPANO:  I object to this
```

```
 1          use of a partial document.  This

 2          is not the whole document.  As you

 3          can see, it chops half an e-mail

 4          off at the top.

 5               THE COURT:  Just give him

 6          the whole document.

 7               MR. SPANO:  I request that

 8          you use the whole document as it

 9          was --

10               THE COURT:  That's fair.

11               MR. SPANO:  -- produced by

12          the defendants.

13               MR. GONZALEZ:  Your Honor,

14          this is what was produced by the

15          defendant, and it's TG 0021503

16          through TG 0021505.  And I'll show

17          the Court a copy of it.

18               MR. SPANO:  It's not

19          correct.  It starts at 501.

20               MR. GONZALEZ:  I just don't

21          have it.  I'm happy to use yours.

22               THE COURT:  Give him yours,

23          Frank.  You've got the one.  It's

24          fine.  No. Give the witness it.
```

1          That's the main thing.

2               MR. SPANO:  I want him to

3          have a chance to look at it.

4               MR. GONZALEZ:  Thanks very

5          much.

6               Do you want me to mark this

7          one instead?

8               MR. SPANO:  Please.

9               MR. GONZALEZ:  It will be TG

10         21501 to TG 21505.

11    BY MR. GONZALEZ:

12         Q.    The first page is a letter

13    from Leonardo Guzman, office manager of

14    OTC, Oriental Trading Company, to you at

15    Taian Taishan Plasterboard Company dated

16    November 26, 2008.  And on the top it

17    says "U.S. DUN Distributors."  And it's

18    actually notarized.

19              Do you recall receiving that

20    letter?  Do you recall receiving that

21    letter?

22         A.    I don't recall clearly about

23    that.

24         Q.    You previously referenced

Confidential - Subject to Further Confidentiality Review

 1    the $100,000 that TTP needed to reimburse

 2    to Oriental Trading Company.

 3              Do you recall that testimony

 4    earlier today?

 5        A.    Yes.

 6        Q.    And you were showing me how

 7    you were sending out some quotes on

 8    products in an attempt to deal with this

 9    $100,000 that TTP owed Oriental Trading?

10    Remember --

11        A.    That's the content of the

12    quotation, not the frame.

13        Q.    Now, this letter, November

14    26, 2008, references the $100,000 that

15    you were discussing before.  Correct?

16        A.    That's what it appears to

17    be.

18        Q.    What it states for reference

19    is the letter to you as Mr. Bill Cher at

20    Taian Taishan Plasterboard Company, Ltd.

21    "Dear Mr. Bill Cher:  According to the

22    information sent by Denise Romano (owner

23    of Oriental Trading Company) please we

24    are formally requesting from you a full

Confidential - Subject to Further Confidentiality Review

1   reimbursement of the ONE HUNDRED THOUSAND

2   DOLLARS...we transferred several months

3   ago (May 30th 2007) without using it yet.

4   Please proceed to," and then they gave

5   you the bank information, which is Bank

6   of Wachovia Bank, City:  Miami, Florida,

7   United States of America.  And it is

8   signed by Leonardo Guzman, office manager

9   for OTC, on behalf of United States --

10  U.S. DUN Distributors; is that correct?

11          A.    It is not correct.

12          Q.    It is not correct?  What's

13  not correct about it, sir?

14          A.    Right.  First of all, in

15  2008, I already worked at TG.  And also

16  as Dun Distributor, it had never taken

17  effectiveness.  It is only a document

18  that the customer made himself.

19          Q.    Sir, Dun is requesting

20  $100,000 reimbursement.  Correct?

21          Let me clarify the question.

22  Leonard Guzman as the office manager for

23  OTC on letterhead that states U.S. DUN

24  Distributors is requesting from Taian

1    Taishan Plasterboard, Attention:  Bill

2    Cher, reimbursement of $100,000.

3    Correct?

4         A.    The request of reimbursement

5    was the fact.  However, the title -- the

6    title of this letter was made by the

7    client.

8         Q.    That's right.  Because on

9    November of 2008, Taian Taishan

10   Plasterboard was no longer in existence.

11   Correct?

12        A.    It had stopped operation.

13        Q.    And at the time you worked

14   for TG.  Correct?

15        A.    Correct.

16        Q.    And if you turn to the next

17   page, you responded to Leonardo Guzman.

18   And at the time, you worked for TG.

19   Correct?

20        A.    May I have the date of this

21   e-mail?

22        Q.    It's a response to an e-mail

23   dated -- a letter dated November 26,

24   2008.  And the notary date is December 1,

1    2008.

2              So as of that date, you work

3    for TG.  Correct, sir?

4              MR. SPANO:  Objection to

5         form, to the mischaracterization

6         of this as a response.  There's no

7         basis for that.

8    BY MR. GONZALEZ:

9         Q.    The question is, as of the

10   date of December 1, 2008, you worked for

11   TG?

12        A.    December the 1st, 2008, I

13   was working for TG at the time.

14        Q.    All right, sir.

15             If you turn to the second

16   page of this document and look at a Bates

17   stamp number 21502, you write the

18   following:  "Dear Mr. Guzman, I am glad

19   to receive your information, I have

20   informed you that I will send back your

21   money, but I need your information to do

22   documents for our government, you have

23   send it to me today.  I will make two

24   contracts to you, please sign on them and

```
 1    send back to me.  Please confirm the

 2    following information.  Bank:  Wachovia

 3    Bank, City:  Miami, Florida, United

 4    States of America, Account...:  Oriental

 5    Trading Company, LLC," and then you have

 6    the account number.  And it's signed,

 7    "Thanks and best wishes!  yours

 8    faithfully," and then your name in

 9    Chinese, which is Che Gang.  Correct?

10         A.    The Chinese name, Che Gang,

11    is my name.

12         Q.    And the Bill Cher is your

13    Anglo version.  Correct?

14         A.    It is correct that my

15    English name is Bill Cher, but since this

16    document has neither the title nor the

17    bottom part, if you can for sure confirm

18    that this is the correct document, then

19    that's correct.

20         Q.    Do you recall having sent

21    this letter?

22              MR. SPANO:  Objection to

23         form.

24              THE WITNESS:  I don't have a
```

```
 1          clear recollection of dates.

 2               THE COURT:  He answered,

 3          I'll allow it.

 4               MR. GONZALEZ:  Do you recall

 5          -- I'm sorry.

 6               THE WITNESS:  I have already

 7          answered.

 8               THE COURT:  Go ahead.

 9               MR. GONZALEZ:  We can break

10          now, Your Honor, if you'd like.

11          It's already past 5:30.

12               THE COURT:  Why don't we do

13          that.  And we're going to come

14          back at 8:30, folks.

15               MR. GONZALEZ:  We have to

16          finish him and then one more

17          witness and we're okay.  And I

18          don't have a lot left.

19               MR. MEUNIER:  Your Honor, I

20          probably have about two hours with

21          this witness.

22               VIDEOTAPE TECHNICIAN:  This

23          completes --

24               THE COURT:  Come back at
```

```
 1          8:30.

 2               MR. GONZALEZ:  We're on

 3          schedule, Judge.  We'll be okay.

 4               THE WITNESS:  How long will

 5          that take for me to finish my

 6          deposition?

 7               MR. GONZALEZ:  Tomorrow.

 8               THE WITNESS:  The whole day?

 9               MR. GONZALEZ: Your lawyer

10          has to ask questions too.

11               VIDEOTAPE TECHNICIAN:  We're

12          going off the record at 5:33.

13          This ends today's deposition.

14               (Deposition adjourned at

15          approximately 5:33 p.m.)

16

17

18

19

20

21

22

23

24
```

```
 1                C E R T I F I C A T E
 2
 3
                         I, ANN MARIE MITCHELL, a
 4   Registered Diplomate Reporter, Certified
     Court Reporter and Notary Public, do
 5   hereby certify that, pursuant to notice,
     the deposition of GANG CHE was duly taken
 6   on January 11, 2012 at 2:29 p.m. before
     me.
 7
 8                       The said GANG CHE was duly
     sworn by The Court according to law to
 9   tell the truth, the whole truth and
     nothing but the truth and thereupon did
10   testify as set forth in the above
     transcript of testimony.  The testimony
11   was taken down stenographically by me.
12
                         I do further certify that
13   the above deposition is full, complete
     and a true record of all the testimony
14   given by the said witness.
15
16
             Ann Marie Mitchell
17           Registered Diplomate Reporter
             Certified Realtime Reporter
18
19
20                       (The foregoing certification
     of this transcript does not apply to any
21   reproduction of the same by any means,
     unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24
```

```
 1                 INSTRUCTIONS TO WITNESS

 2

 3

 4               Please read your deposition

 5    over carefully and make any necessary

 6    corrections.  You should state the reason

 7    in the appropriate space on the errata

 8    sheet for any corrections that are made.

 9

10               After doing so, please sign

11    the errata sheet and date it.  It will be

12    attached to your deposition.

13

14               It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24
```

```
 1                  - - - - - -

                E R R A T A

 2                  - - - - - -

 3   PAGE  LINE  CHANGE

 4   _____  _____  _____

 5     REASON: ____ _____

 6   _____  _____  _____

 7     REASON: _____ _____

 8   _____  _____  _____

 9     REASON: _____ _____

10   _____  _____  _____

11     REASON: _____ _____

12   _____  _____  _____

13     REASON: _____ _____

14   _____  _____  _____

15     REASON: _____ _____

16   _____  _____  _____

17     REASON: _____ _____

18   _____  _____  _____

19     REASON: _____ _____

20   _____  _____  _____

21     REASON: _____ _____

22   _____  _____  _____

23     REASON: _____ _____

24
```

Confidential - Subject to Further Confidentiality Review

```
 1
 2            ACKNOWLEDGMENT OF DEPONENT
 3
              I,_____, do
 4    hereby certify that I have read the
      foregoing pages, 1-124, and that the same
 5    is a correct transcription of the answers
      given by me to the questions therein
 6    propounded, except for the corrections or
      changes in form or substance, if any,
 7    noted in the attached Errata Sheet.
 8
      _____
 9     GANG CHE                         DATE
10
11
12
13
14
15
      Subscribed and sworn
16    to before me this
      _____ day of _____, 20_____.
17
      My commission expires:_____
18
19    _____
      Notary Public
20
21
22
23
24
```

1                    LAWYER'S NOTES

2      PAGE   LINE

3      _____  _____   _____

4      _____  _____   _____

5      _____  _____   _____

6      _____  _____   _____

7      _____  _____   _____

8      _____  _____   _____

9      _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____



Transcript of the Testimony of:  **Gang Che**

01/12/2012

Chinese Drywall

Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2

   _____
 3                             §  MDL NO. 2047
   IN RE:                      §
 4 CHINESE-                    §  SECTION: L
   MANUFACTURED                §
 5 DRYWALL PRODUCTS            §  JUDGE FALLON
   LIABILITY                   §
 6 LITIGATION                  §  MAGISTRATE
   _____ §  JUDGE WILKINSON
 7
                       -   -   -
 8
       CROSS NOTICED IN VARIOUS OTHER ACTIONS
 9
                       -   -   -
10
                   January 12, 2012
11
                       -   -   -
12
       CONFIDENTIAL - SUBJECT TO FURTHER
13            CONFIDENTIALITY REVIEW
14                     -   -   -
15        Continued videotaped deposition of
   GANG CHE, held at the Executive Centre,
16 Level 3, Three Pacific Place, One Queen's
   Road East, Hong Kong, China, commencing
17 at 8:28 a.m., on the above date, before
   Ann Marie Mitchell, Certified Court
18 Reporter, Registered Diplomate Reporter,
   Certified Realtime Reporter and Notary
19 Public.
                       -   -   -
20

21

22        GOLKOW TECHNOLOGIES, INC.
       877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com
24
```

Confidential - Subject to Further Confidentiality Review

```
 1   BEFORE:
 2           HONORABLE ELDON E. FALLON
             UNITED STATES FEDERAL COURT -
 3           EASTERN DISTRICT OF LOUISIANA
 4
 5   APPEARANCES:
 6
         GAINSBURGH, BENJAMIN, DAVID, MEUNIER
 7       & WARSHAUER, L.L.C.
         BY:  GERALD E. MEUNIER, ESQUIRE
 8       2800 Energy Centre
         1100 Poydras Street
 9       New Orleans, Louisiana 70163
         (504) 522-2304
10       gmeunier@gainsben.com
         Representing the Plaintiffs'
11       Steering Committee
12
         HERMAN HERMAN KATZ & COTLAR, LLP
13       BY:  LEONARD A. DAVIS, ESQUIRE
         820 O'Keefe Avenue
14       New Orleans, Louisiana 70113
         (504) 581-4892
15       Ldavis@hhkc.com
         Representing the Plaintiffs'
16       Steering Committee
17
         COLSON HICKS EIDSON
18       BY:  ERVIN GONZALEZ, ESQUIRE
         BY:  PATRICK S. MONTOYA, ESQUIRE
19       255 Alhambra Circle
         Penthouse
20       Coral Gables, Florida 33134
         (305) 476-7400
21       Ervin@colson.com
         Patrick@colson.com
22       Representing Plaintiffs' Steering
         Committee in the Federal and State
23       Coordinated Actions
24
```

```
 1    APPEARANCES (CONTINUED):
 2
      LEVIN, FISHBEIN, SEDRAN & BERMAN
 3    BY:  ARNOLD LEVIN, ESQUIRE
      510 Walnut Street - Suite 500
 4    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 5    Alevin@lfsblaw.com
      Representing the Plaintiffs'
 6    Steering Committee
 7
      SEEGER WEISS LLP
 8    BY:  SCOTT A. GEORGE, ESQUIRE
      One William Street
 9    New York, New York 10004
      (212) 584-0700
10    Sgeorge@seegerweiss.com
      Representing the Plaintiffs'
11    Steering Committee
12
      HOGAN LOVELLS US LLP
13    BY:  JOE CYR, ESQUIRE
      BY:  FRANK T. SPANO, ESQUIRE
14    875 Third Avenue
      New York, New York 10022
15    (212) 918-3000
      Joe.cyr@hoganlovells.com
16    frank.spano@hoganlovells.com
      Representing Taishan Gypsum Co.
17    Ltd. and Taian Taishan
      Plasterboard Company Ltd. and the
18    Witness, Gang Che
19
      HOGAN LOVELLS INTERNATIONAL LLP
20    BY:  EUGENE CHEN, ESQUIRE
      18th Floor, Park Place
21    1601 Nanjing Road West
      Shanghai, China 200040
22    (86 21) 6122 3800
      eugene.chen@hoganlovells.com
23    Representing Taishan Gypsum Co.
      Ltd. and Taian Taishan Plasterboard
24    Company Ltd. and the Witness, Gang Che
```

```
 1    APPEARANCES (CONTINUED):
 2
      GREENBERG TRAURIG, LLP
 3    BY:  HILARIE BASS, ESQUIRE
      1221 Brickell Avenue
 4    Miami, Florida 33131
      (305) 579-0745
 5    bassh@gtlaw.com
      Representing the Home Builders
 6    Steering Committee
 7
      PERKINS COIE LLP
 8    BY:  DAVID L. BLACK, ESQUIRE
      1899 Wynkoop Street
 9    Suite 700
      Denver, Colorado 80202
10    (303) 291-2300
      DBlack@perkinscoie.com
11    Representing the State of Louisiana
12
      THOMPSON COE COUSINS & IRONS, L.L.P.
13    BY:  KEVIN F. RISLEY, ESQUIRE
      One Riverway
14    Suite 1600
      Houston, Texas 77056
15    (713) 403-8210
      krisley@thompsoncoe.com
16    Representing The North River
      Insurance Company
17
18    BRENNER, EVANS & MILLMAN, P.C.
      BY:  THEODORE I. BRENNER, ESQUIRE
19    411 East Franklin Street
      Suite 200
20    Richmond, Virginia 23218
      Tbrenner@beylaw.com
21    (804) 644-1300
      Representing Tobin Trading Company
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (CONTINUED):
 2
         McKENRY, DANCIGERS, DAWSON &
 3       LAKE, P.C.
         BY:  J. BRIAN SLAUGHTER, ESQUIRE
 4       192 Ballard Court
         Suite 400
 5       Virginia Beach, Virginia 23462
         (757) 461-2500
 6       Jbslaughter@va-law.org
         Representing Atlantic Homes LLC and
 7       Multiple Other Virginia-Based
         Defendants
 8
 9       QUINN EMANUEL URQUHART & SULLIVAN, LLP
         BY:  JANE M. BYRNE, ESQUIRE
10       BY:  JULIA BESKIN, ESQUIRE
         51 Madison Avenue
11       22nd Floor
         New York, New York 10010
12       (212) 849-7000
         Janeburne@quinnemanuel.com
13       Juliabeskin@Quinnemanuel.Com
         Representing Chartis Select Insurance
14       Company and Related Chartis Insurers
15
         WEINBERG, WHEELER, HUDGINS, GUNN &
16       DIAL, LLC
         BY:  MICHAEL SEXTON, ESQUIRE
17       3344 Peachtree Road, NE
         Suite 2400
18       Atlanta, Georgia 30326
         (404) 876-2700
19       msexton@wwhgd.com
         Representing Various Banner
20       Defendants
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1        APPEARANCES (CONTINUED):

 2

          SINNOTT, NUCKOLS & LOGAN, PC
 3        BY:  KENNETH F. HARDT, ESQUIRE
          13811 Village Mill Drive
 4        Midlothian, Virginia 23114
          (804) 378-7600
 5        khardt@snllaw.com
          Representing Venture Supply, Inc. and
 6        Porter-Blaine Corp.

 7

      ALSO PRESENT:

 8

          SUNNY WANG, INTERPRETER

 9

10

                         -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1   APPEARANCES VIA TELEPHONE:
 2

     HUNTON & WILLIAMS LLP
 3   BY:  A. TODD BROWN, ESQUIRE
     Bank of America Plaza
 4   101 South Tryon Street
     Suite 3500
 5   Charlotte, North Carolina  28280
     (704) 378-4700
 6   Representing Stock Building Supply, LLC
 7

 8   JONES, WALKER, WAECHTER, POITEVENT,
     CARRERE & DENEGRE LLP
 9   BY:  MEGAN E. DONOHUE, ESQUIRE
     600 Jefferson Street, Suite 1600
10   Lafayette, Louisiana 70501
     (337) 262-9062
11   mdonohue@joneswalker.com
     Representing Fireman's Fund Insurance
12   Company
13

     FULMER LEROY ALBEE BAUMANN
14   BY:  MICHAEL P. McCAHILL, ESQUIRE
     2866 East Oakland Park Boulevard
15   Ft. Lauderdale, Florida 33306
     (954) 707-4430
16   mmccahill@fulmerleroy.com
     Representing Independent Builders
17   Supply Association (IBSA)
18
19
20
21
22
23
24
```

```
 1    APPEARANCES VIA STREAM:
 2
      BECNEL LAW FIRM, L.L.C.
 3    BY:  DANIEL E. BECNEL, JR., ESQUIRE
      BY:  ROBERT BECNEL, ESQUIRE
 4    106 W. 7th Street
      Reserve, Louisiana 70084
 5    (985) 536-1186
      dbecnel@becnellaw.com
 6    robbecnel@aol.com
      Representing the Plaintiffs'
 7    Steering Committee
 8
      PARKER WAICHMAN ALONSO LLP
 9    BY:  JORDAN L. CHAIKIN, ESQUIRE
      3301 Bonita Beach Road
10    Bonita Springs, Florida 34134
      (239) 390-1000
11    Jchaikin@yourlaywer.com
      Representing Plaintiffs' Steering
12    Committee
13
      MORGAN & MORGAN
14    BY:  PETE V. ALBANIS, ESQUIRE
      12800 University Drive
15    Suite 600
      Fort Myers, Florida 33907
16    (877) 667-4265
      Representing the Plaintiffs
17
18    IRPINO LAW FIRM
      BY:  ANTHONY IRPINO, ESQUIRE
19    2216 Magazine Street
      New Orleans, Louisiana 70130
20    Airpino@irpinolaw.com
      (504) 525-1500
21    Representing the Plaintiffs
22
23
24
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3        GALLOWAY JOHNSON TOMPKINS BURR and SMITH
          BY:  CARLINA C. EISELEN, ESQUIRE
 4        One Shell Square
          701 Poydras Street, 40th Floor
 5        New Orleans, Louisiana 70139
          (504) 525-6802
 6        ceiselen@gjtbs.com
          Representing Interior/Exterior
 7        Building Supply
 8
          HEARD & MEDACK, P.C.
 9        BY:  JAMES DAVIS, ESQUIRE
          9494 Southwest Freeway, Suite 700
10        Houston, Texas 77074
          (713) 772-6400
11        jdavis@heardmedackpc.com
          Representing CastleRock Communities, L.P.
12
13
          HUNTON & WILLIAMS LLP
14        BY:  A. TODD BROWN, ESQUIRE
          Bank of America Plaza
15        101 South Tryon Street
          Suite 3500
16        Charlotte, North Carolina  28280
          (704) 378-4700
17        tbrown@hunton.com
          Representing Stock Building Supply, LLC
18
19
          SHER GARNER CAHILL RICHTER KLEIN &
20        HILBERT, L.L.C.
          BY:  MATTHEW C. CLARK, ESQUIRE
21        909 Poydras Street
          Suite 2800
22        New Orleans, Louisiana 70112
          (504) 299-2100
23        mclark@shergarner.com
          Representing the Southern Home
24        Defendants
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3        QUINN EMANUEL URQUHART & SULLIVAN, LLP
          BY: CLINTON DOCKERY, ESQUIRE
 4        51 Madison Avenue, 22nd Floor
          New York, New York 10010
 5        (212) 849-7000
          clintondockery@quinnemanuel.com
 6        Representing Chartis Select Insurance
          Company and Related Chartis Insurers
 7
 8        JONES, WALKER, WAECHTER, POITEVENT,
          CARRERE & DENEGRE LLP
 9        BY:  MEGAN E. DONOHUE, ESQUIRE
          600 Jefferson Street, Suite 1600
10        Lafayette, Louisiana 70501
          (337) 262-9062
11        mdonohue@joneswalker.com
          Representing Fireman's Fund Insurance
12        Company
13
          PUGH, ACCARDO, HAAS, RADECKER, CAREY
14        & HYMEL LLC
          BY:  DONNA M. YOUNG, ESQUIRE
15        1100 Poydras Street
          Suite 3200
16        New Orleans, Louisiana 70163
          (504) 799-4500
17        dyoung@pugh-law.com
          Representing Stock Building Supply
18
19        DEUTSCH, KERRIGAN & STILES
          BY:  MELISSA M. SWABACKER, ESQUIRE
20        755 Magazine St.
          New Orleans, Louisiana  70130
21        (504) 581-5141
          mswabacker@dkslaw.com
22        Representing Landmark American
          Insurance Company
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES VIA STREAM (CONTINUED):

 2

         WEINBERG, WHEELER, HUDGINS, GUNN &
 3       DIAL, LLC
         BY:  SHUBHRA MASHELKAR, ESQUIRE
 4       3344 Peachtree Road, NE
         Suite 2400
 5       Atlanta, Georgia 30326
         (404) 876-2700
 6       Smashelkar@wwhgd.com
         Representing Various Banner
 7       Defendants
 8                    -  -  -
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1                    -   -   -
 2               I N D E X
 3                    -   -   -
 4
 5   Testimony of:  GANG CHE
 6    By Mr. Gonzalez              141
      By Mr. Meunier               184
 7    By Mr. Spano                 341
      By Mr. Gonzalez              378
 8    By Mr. Meunier               391
 9
                     -   -   -
10
              E X H I B I T S
11
                     -   -   -
12
13    NO.                 DESCRIPTION      PAGE
14    Che             E-mail dated         342
      Defendant's-1   8/30/2006, Bates
15                    stamped TG
                      0000575
16
      Che             Tai'an Taishan       356
17    Defendant's-2   Plasterboard Co.,
                      Ltd. Manufacturer
18                    Profile Form
19    Che-7           Re-Notice of Oral    185
                      and Videotaped
20                    Deposition
                      Pursuant to Fed.
21                    R. Civ. P.
                      30(b)(6), 17
22                    pages
23
24
```

Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Che-8 | E-mail chain, top one | 200 |
| | | dated 8 Nov 2006, | |
| 2 | | Bates stamped TG | |
| | | 0000521 through TG | |
| 3 | | 0000526 | |
| 4 | Che-9 | E-mail dated | 210 |
| | | 1/10/2007, Bates | |
| 5 | | stamped TG 0000628 | |
| 6 | Che-10 | E-mail chain, top one | 240 |
| | | dated 4/18/2007, Bates | |
| 7 | | stamped TG 0000913 and | |
| | | TG 0000914 | |
| 8 | | | |
| | Che-11 | E-mail dated | 246 |
| 9 | | 5/10/2007, Bates | |
| | | stamped TG 0000902 | |
| 10 | | | |
| | Che-12 | E-mail chain, top one | 252 |
| 11 | | dated Dec 19, 2008, | |
| | | Bates stamped TG | |
| 12 | | 0021477 | |
| 13 | Che-13 | E-mail chain, top one | 257 |
| | | dated March 6, 2009, | |
| 14 | | Bates stamped TG | |
| | | 0021470 | |
| 15 | | | |
| | Che-14 | E-mail dated 1/5/2006, | 262 |
| 16 | | Bates stamped TG | |
| | | 0000886 | |
| 17 | | | |
| | Che-15 | E-mail chain, top one | 264 |
| 18 | | dated 1/10/2006, Bates | |
| | | stamped TG 0000907 and | |
| 19 | | TG 0000908 | |
| 20 | Che-16 | E-mail chain, top one | 275 |
| | | dated 7/3/2006, TG | |
| 21 | | 0019383 | |
| 22 | Che-17 | Letter dated 10-31-06, | 282 |
| | | Bates stamped TG | |
| 23 | | 0019376 | |
| 24 | | | |

| 1 | Che-18 | E-mail chain, top one dated 7/10/2006, Bates stamped TG 0000631 and TG 0000633 | 284 |
| 2 | | | |
| 3 | | | |
| | Che-19 | Contract dated 2th Sep. 2006, Bates stamped TG 0021704 and TG 0021705 | 293 |
| 4 | | | |
| 5 | | | |
| 6 | Che-20 | Page of Contract, Bates stamped TG 0021695 | 295 |
| 7 | | | |
| 8 | Che-21 | Contract dated 23rd November 2006, Bates stamped TG 0021696 | 298 |
| 9 | | | |
| 10 | Che-22 | E-mail chain, top one dated November 24, 2006, Bates stamped TG 0021702 and TG 0021698 | 301 |
| 11 | | | |
| 12 | | | |
| | Che-23 | E-mail chain, top one dated 2/16/2007, Bates stamped TG 0000485 | 303 |
| 13 | | | |
| 14 | | | |
| | Che-24 | E-mail chain, top one dated 4/10/2007, Bates stamped TG 0000514 | 307 |
| 15 | | | |
| 16 | | | |
| | Che-25 | E-mail chain, top one dated 4/21/2008, Bates stamped TG 0000843 | 310 |
| 17 | | | |
| 18 | | | |
| | Che-26 | Sales Contract dated 13th Feb. 2007, TG 0019685 through TG 0019687 | 316 |
| 19 | | | |
| 20 | | | |
| 21 | Che-27 | E-mail dated 2/13/2007 and attachment, Bates stamped TG 0019683 and TG 0019684 | 318 |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Confidential - Subject to Further Confidentiality Review

```
 1    Che-28   E-mail chain, top one      320
                dated 1/28/2007, Bates
 2              stamped TG 0019701
 3    Che-29   E-mail dated July 14,      323
                2007, Bates stamped TG
 4              0021997
 5    Che-30   E-mail with date in        328
                Chinese, Bates stamped
 6              TG 0021469
 7    Che-31   E-mail dated June 7,       331
                2007 with attachment,
 8              Bates stamped TG
                0021242 and TG 0021243
 9
      Che-32   E-mail dated June 20,      335
10              2007 with attachment,
                Bates stamped TG
11              0021228 through TG
                0021232
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1                    -  -  -

 2           DEPOSITION SUPPORT INDEX

 3                    -  -  -

 4

        Direction to Witness Not to Answer
 5
                       Page  Line
 6

 7

 8

 9

        Request for Production of Documents
10
                       Page  Line
11

12

13

14
                      Stipulations
15
                       Page  Line
16

17

18

19

20               Question Marked
21                     Page  Line
22

23

24
```

```
 1              VIDEOTAPE TECHNICIAN:  We're
 2         now on the record.  My name is Dan
 3         Lawlor.  I'm the videographer for
 4         Golkow Technologies.
 5              Today's date is January 12,
 6         2012, and the time is 8:28 a.m.
 7         This is a continuation of the
 8         deposition of Che Gang.  Our court
 9         reporter today is Ann Marie
10         Mitchell.  And, Your Honor, you
11         may proceed.
12              THE COURT:  Sir, you're
13         still under oath.
14              You may proceed, Counsel.
15              MR. GONZALEZ:  Yes, Your
16         Honor.
17                   -   -   -
18              EXAMINATION
19                   -   -   -
20    BY MR. GONZALEZ:
21         Q.   Good morning, sir.
22         A.   Good morning.
23         Q.   I'm going to show you what's
24    been marked as Exhibit Number 30 to Mr.
```

```
 1    Jia's deposition.  This is a contract for

 2    drywall between the seller, Shandong

 3    Taihe Dongxin, now known as TG, and the

 4    buyer, Venture Supply with an address of

 5    Norfolk, Virginia, for the sale of

 6    100,000 sheets of standard gypsum board.

 7              Were you the seller of this

 8    product to that company?

 9              MR. SPANO:  Objection to

10         form.  According to what I'm

11         reading here, the question said

12         Banner Supply.  I don't think that

13         was intended.

14              MR. EUGENE CHEN:  That's how

15         it was translated as well, or in

16         the translation, Banner Supply.

17              THE COURT:  Did you ask

18         Banner?

19              MR. GONZALEZ:  No, Your

20         Honor, I didn't.

21              THE COURT: Okay.

22              THE INTERPRETER:  Venture

23         Supply?

24              MS. BASS:  It's Venture
```

1          Supply.  Thank you.

2                THE COURT:  Okay.  It's

3          Venture.

4    BY MR. GONZALEZ:

5          Q.    Were you the seller of this

6    product to Venture Supply?

7          A.    I'm sorry, I'm not aware of

8    this transaction.

9          Q.    Can you look at the

10   signature line on the second page.

11                Can you tell us whose

12   signature that is?

13         A.    I believe it's Mr. Fu's.  I

14   don't have a clear view of this, but it

15   should be his.  There is a seal on top of

16   it.

17         Q.    Who is Mr. Fu?

18         A.    The Mr. Fu who came to

19   testify the day before yesterday.

20         Q.    He was a co-employee of

21   yours at TTP at the time of this -- oh,

22   I'm sorry.

23                He was a co-employee of

24   yours at TG, December of 2005?

```
 1          A.    Yes.

 2          Q.    Can you tell us what the

 3    language in Chinese is inside of the

 4    seal?

 5          A.    Shandong Taihe Dongxin

 6    Company, Limited.

 7          Q.    When you were working for

 8    TTP, what was the relationship that TTP

 9    had with TG, if any?

10                MR. SPANO:  Objection to

11          form.

12                THE COURT:  He said if any.

13          I'll allow it.  Overruled.

14                THE WITNESS:  What is it?

15          Can you repeat?

16    BY MR. GONZALEZ:

17          Q.    Yes, sir.

18                When you were working for

19    TTP, what relationship did TTP have with

20    TG, if any?

21          A.    What do you mean by if any?

22          Q.    Do you know the working

23    relationship between TTP and TG at the

24    time that you worked for TTP?
```

```
 1          A.    I'm sorry, I'm only a
 2   salesperson.  I'm not sure.
 3          Q.    If somebody from TG asked
 4   you to do something while you were
 5   working for TTP, would you do it?
 6          A.    If it -- if it is private
 7   request between friends, because I used
 8   to work for TG.  It depends on what was
 9   the circumstance.
10          Q.    So if somebody from TG that
11   you knew would ask you to do something
12   for TG while you worked for TTP, you
13   would do it?
14          A.    I said it depends.
15          Q.    Did someone from T --
16                If a big boss from TG came
17   into TTP to want to fire somebody that
18   worked for TTP, were they able to do it,
19   based on your understanding?
20          A.    It's not what I could
21   understand.
22          Q.    You don't know?  I'm sorry,
23   you don't understand my question or...
24          A.    I meant I don't know.
```

```
 1          Q.    You don't know.

 2                And so I can clarify, if a

 3    big boss from TG could walk into TTP and

 4    say, this needs to change or that person

 5    needs to be fired, would they have the

 6    authority to do so, based on your

 7    understanding?

 8          A.    I don't know.

 9          Q.    Did you ever have officials

10    from TG tour the TTP offices and plant,

11    to your knowledge?

12          A.    I didn't pay attention.

13          Q.    Do you recall that ever

14    happening?

15          A.    I don't recall.

16          Q.    How many of your employees

17    at TTP do you recall having positions

18    with both TTP and TG at the same time?

19          A.    I don't know.

20          Q.    When you volunteered to work

21    at TTP, did you volunteer to work -- do

22    you need some water?  Please.

23          A.    Thank you.

24          Q.    Okay.
```

1            When you volunteered to work

2    at TTP at the time that you were working

3    at TG, did you volunteer to go to the

4    sales department or did someone ask you

5    to go to the sales department of TTP?

6            A.    I volunteered to work in the

7    sales department of TTP.

8            Q.    Who did you announce that

9    to?

10           A.    A few of us had a

11   discussion, and then we decided there

12   were bigger development space over there,

13   so we went over there.

14           Q.    My question is, who did you

15   tell?

16           A.    Can you explain, what do you

17   mean, who did I tell?

18           Q.    Let me give you an example.

19   If I were going to volunteer to do

20   something at another company, I would

21   first have to tell my current boss in my

22   company, I'm going to go volunteer to

23   work at that company, and then I would

24   have to go speak to the boss at the new

```
 1    company and say, I volunteer to work for

 2    your company.

 3              Who did you speak with?

 4         A.    At the time I was only a

 5    salesperson, a person who was in charge

 6    of sales.  I only told Mr. Peng.  And

 7    then we went to the other office,

 8    expressed our willingness to volunteer

 9    work at TTP.  TTP's office, that was.

10         Q.    Who is Mr. Peng?

11         A.    Peng Wenlong.

12         Q.    And Mr. Peng Wenlong also

13    went with you to TTP?

14         A.    Correct.

15         Q.    Who did you speak with at

16    TTP to volunteer?

17         A.    I went to register at TTP's

18    office.

19         Q.    Did you speak with a person?

20         A.    Of course I talked to a

21    person.

22         Q.    Can you tell us who you

23    talked to?

24         A.    I don't recall.
```

```
 1            Q.    Who was the first person you

 2    recall speaking with about working at TTP

 3    as a salesperson?  For example, if I were

 4    you, and you were the person that was

 5    going to be in charge of making sure you

 6    have a sales staff, I may say, hi, I'm

 7    Ervin, I would like to work in your sales

 8    department, can you use me.

 9                  Did you have such a

10    conversation?

11            A.    I don't understand what you

12    mean.

13            Q.    Did you have to apply for

14    the position, or once you volunteered,

15    you had the position?

16            A.    As long as you register at

17    the TTP office, which I mentioned

18    earlier, and they thought it was okay,

19    then it was okay.

20            Q.    So you didn't go through an

21    interview process.  Correct?

22            A.    I don't know whether go to

23    register would be count as interview.

24            Q.    When was your last day at TG
```

```
 1   and when was your first day at TTP?

 2              A.    I don't have a clear

 3   recollection of that.

 4              Q.    Did you change offices,

 5   physical offices?

 6              A.    You mean after I changed my

 7   company?

 8              Q.    Yes.

 9              A.    Yes.

10              Q.    Where did you move from?

11              A.    From TG's office.

12              Q.    Where was it, TG's office,

13   in comparison to the TTP office?

14              A.    Do I need to let you know

15   the details?

16              Q.    Yes, if you know them.

17              A.    TG's office was located in

18   Shandong province, Taian city, Daiyue

19   district, Dawenkou, while TTP's office

20   was located in Shandong province, Taian

21   city, Daiyue district, Dawenkou town,

22   Houzhou village.

23              Q.    And you worked in both

24   places?  First when you worked at TG you
```

1    worked at the address you just gave me

2    for TG, and when you worked at TTP, you

3    worked at the address for TTP; is that

4    correct?

5              A.    Correct.

6              Q.    I'm going to show you what's

7    been marked as Exhibit 31 to Mr. Jia.  It

8    is an e-mail from Tanader Tang to Wuyu,

9    sdth818@163.com, dated July 27, 2006,

10   Bates stamp number TG 19348 through TG

11   19352.  And it starts with Chinese

12   language for two pages and then continues

13   on to some invoice looking matter.

14              THE INTERPRETER:  Sorry,

15         Counsel, what was your question?

16         The last of the question.

17   BY MR. GONZALEZ:

18              Q.    Yes.

19              Was this e-mail sent to you?

20              A.    Can you give me a moment to

21   take a look?

22              Q.    I'm talking about the first

23   page.  At the top, yes.

24              A.    Do I only look at the first

Confidential - Subject to Further Confidentiality Review

```
 1   page?

 2        Q.    For right now.

 3        A.    Yes.

 4        Q.    And is the bottom part in

 5   Chinese something that you sent?

 6        A.    You mean this page and this

 7   page following that page?

 8        Q.    If you look at the e-mail on

 9   the top it says from Wuyu.  I think it

10   says it.

11              What does it say here in

12   Chinese?  Is that to or --

13        A.    Is this a title of the

14   e-mail?

15        Q.    No.  I'm asking you because

16   I don't understand Chinese.

17              What does this say?

18        A.    Sender.

19        Q.    Sender.

20              And is that you, the sender?

21        A.    The sender's e-mail address

22   is mine.

23        Q.    And you sent it to whom?

24              THE INTERPRETER:  I'm sorry,
```

```
 1          what did you say?

 2     BY MR. GONZALEZ:

 3          Q.    To whom did you send it?

 4          A.    The person who received the

 5     e-mail.

 6          Q.    Is that Tanader Tang?

 7          A.    It says this.

 8          Q.    Is this Tanader Tang?

 9          A.    A Manager Tang.

10          Q.    And the subject is "Taihe:

11     Drywall"; is that correct?

12                MR. SPANO:  Object to the

13          form of the question.  It

14          mischaracterizes the document,

15          which is a reply to an e-mail that

16          had that subject line.

17                THE COURT:  Okay.  Yeah.

18          Let's clarify that, Ervin.

19     BY MR. GONZALEZ:

20          Q.    I'm referring to the very

21     top where it says "re."

22                The "re" says "Taihe:

23     Drywall"; is that correct?

24          A.    Do I need to answer a
```

1    question?

2        Q.    Yes.

3              Is it correct that it's

4    referring to Taihe drywall?

5        A.    I'm sorry, "re" is reply,

6    which means I did not come up with the

7    subject.

8        Q.    Sir, here's my question.

9              What does this say in

10   Chinese?

11       A.    Subject.

12       Q.    And the subject is "Taihe:

13   Drywall."  And "060727" is what it says;

14   is that correct?

15       A.    If you read it this way,

16   that's the way it is.  But what I've been

17   trying to tell you is this is the reply

18   of the e-mail prior to that.  It is not

19   the subject that I came up with.

20       Q.    You wrote this e-mail.

21   Correct, sir?

22       A.    The e-mail below that was

23   written by me.

24       Q.    In Chinese?

1          A.     Correct.

2          Q.     With some Western language.

3     Correct?

4          A.     You can say that, because

5     some of those cannot be expressed in

6     Chinese.  I had to write it that way.

7          Q.     Tell us what the first

8     sentence says, this one here?

9          A.     Hello.  E-mail received.

10    First of all, here's a reply, according

11    to your request.

12         Q.     And what was the reply?

13         A.     The reply is the reply to

14    the prior e-mail that was sent to me.

15         Q.     What does the next sentence

16    say?  It starts with "2440" star "1220"

17    star "12.7" millimeter star, Chinese

18    language.  What does that say?

19         A.     It says:  Specification,

20    ordinary paper-faced gypsum board, manual

21    tray mixed packing, 40 inches -- 40 feet

22    oversized height.  Container that can

23    contain 960 pieces.  FOB Qingdao port.

24    Price USD 2.65 per piece.

```
 1          Q.    And then the last sentence
 2   on the next page at Bates stamp number
 3   19349, what does that say?
 4          A.    The above information is for
 5   reference.  I look forward to your reply.
 6          Q.    And it's signed by?
 7          A.    Che Gang.
 8          Q.    You?
 9          A.    Yes.
10          Q.    And then the next page,
11   Bates stamp number 19350, this is the
12   e-mail that you were responding to.
13   Correct?
14          A.    I don't understand.
15          Q.    This e-mail, you were -- the
16   Chinese language e-mail that we just read
17   was a response to that.  Correct?
18          A.    I'll have to take a look.
19                From what appears here, that
20   should be the case.
21          Q.    And if you look at the
22   e-mail below that one that starts from
23   Tanader Tang, sent Friday, July 21, 2006,
24   to sdth818@163.com, wuyu374@126.com, that
```

Confidential - Subject to Further Confidentiality Review

```
 1   is also an e-mail that was sent to you.

 2   Correct?

 3          A.    Correct.

 4          Q.    And this is referring to

 5   drywall that is going to be sent from

 6   your company to Fort Lauderdale, Florida.

 7   Right, sir?

 8                MR. SPANO:  Objection to

 9          form.  Completely mischaracterizes

10          the document, no foundation.

11                THE COURT:  Let's ask him

12          what is it then.

13   BY MR. GONZALEZ:

14          Q.    This is an e-mail to you.

15   Correct, sir?

16          A.    This one?

17          Q.    Yes.

18          A.    Yes.

19          Q.    You received it on or about

20   July 21, 2006.  Correct?

21          A.    That's what appears.

22          Q.    And in this e-mail, they

23   were asking you information to move

24   forward on a big development.  And I'll
```

Confidential - Subject to Further Confidentiality Review

```
 1    have the interpreter read the first

 2    sentence which states, "How are you now?

 3    Trust everything is getting well."  And

 4    the next two sentences, "Glad to inform

 5    you that our project has a big

 6    development now.  Now, we shall move

 7    forward drywall case."  Next sentence,

 8    "But we need to get your confirmation on

 9    the price at first."  Final sentence,

10    "Would you please give us your support on

11    this...earlier time?  Thanks."

12              Then there's a grid that

13    follows that goes into the next page with

14    the dimensions for the drywall requested,

15    estimated shipment costs from Qingdao to

16    Port Everglades in Fort Lauderdale,

17    Florida and the number of pieces that are

18    requested.

19              This e-mail was sent to you

20    at or about the time so indicated.

21    Correct?

22        A.    That's what appears to be.

23        Q.    And it's requesting pieces

24    of drywall, 640 normal.  Correct?
```

```
 1          A.    Hmm.

 2                THE COURT:  Is that a yes?

 3                THE WITNESS:  Yes, yes.

 4   BY MR. GONZALEZ:

 5          Q.    640 pieces of fire

 6   retardant.  Correct?

 7          A.    Does it mean fireproof?

 8          Q.    Yes.

 9          A.    Yes.

10          Q.    510 pieces of waterproof?

11          A.    Correct.

12          Q.    And they were --

13                The dimensions were 4 feet

14   by 12 feet by half inch.  Correct?

15          A.    Yes.

16          Q.    Going on to the next page,

17   it also requests 460 pieces of normal

18   drywall?

19          A.    Yes.

20          Q.    And 460 pieces of fire

21   retardant drywall.  Correct?

22          A.    Yes.

23          Q.    And the Chinese e-mail that

24   you sent, the e-mail in Chinese language
```

1    that you sent, was in response to that

2    request?

3             A.    From what it says here, it

4    looks like the specification that I

5    provided was a little too much.  I'm not

6    sure.  It was not in accordance with the

7    request of the customer, so I'm not sure

8    whether this e-mail was a response to the

9    other e-mail.

10            Q.    You were writing to --

11            A.    Because here and there are

12   not the same.

13            Q.    You were writing to Tanader

14   Tang.  Correct?  In Chinese language?

15            A.    To Manager Tang.

16            Q.    And you sent your e-mail on

17   or about July the 27th, 2006?

18            A.    Correct.  That's what

19   appears to be.

20            Q.    And the "re" is "Taihe:

21   Drywall-060727."  Correct?

22            A.    Correct.

23            Q.    What does that number mean,

24   060727?

```
 1            A.    I'll have to ask the

 2    customer.

 3            Q.    Does it mean anything --

 4            A.    Because he wrote it.

 5            Q.    Is it an internal number to

 6    you or to the customer?

 7            A.    This is e-mail that's sent

 8    to me by my customer.  I only replied to

 9    the subject that was sent to me.

10            Q.    That's my question.

11                  Is the number, is that a

12    reference that the customer uses or a

13    reference that your business uses?

14            A.    The customer's.

15            Q.    Did you have an ongoing

16    relationship with Tang?

17            A.    No.

18            Q.    Do you remember having done

19    business with Tang?

20            A.    I don't remember.

21            Q.    Do you recall this

22    transaction at all, the one you're

23    referring to right now?  Other than

24    reviewing these documents, do you have an
```

```
 1    independent recollection of that

 2    transaction?

 3              MR. SPANO:  Objection to

 4         form, no foundation there was a

 5         transaction.

 6              THE COURT:  Let's clear that

 7         up.

 8              MR. GONZALEZ:  That's what I

 9         asked him.

10    BY MR. GONZALEZ:

11         Q.   Do you have independent

12    recollection of this transaction, outside

13    of the form?

14         A.   I don't really remember.

15         Q.   Would you say you're a

16    person with a good memory or a bad

17    memory?

18         A.   I think I'm an ordinary

19    person.

20         Q.   Ordinary?  Normal memory?

21         A.   Very ordinary.

22         Q.   Some people have very good

23    memory, some people have very bad memory.

24              You think yours is just
```

Confidential - Subject to Further Confidentiality Review

```
 1    normal?

 2         A.    You have to perform a test

 3    on me.  I don't quite get you.

 4         Q.    I won't do that, sir.

 5              I'd like to show you what's

 6    been marked as Exhibit Number 32 to Mr.

 7    Jia and Number 8 to Mr. Peng's

 8    depositions.  It's Bates stamp number TG

 9    19381 through TG 19382.

10              The very top is from Grace

11    Wei to SDTH818.

12              That's you.  Right, sir,

13    SDTH818?

14         A.    That's my e-mail address.

15         Q.    It's dated August 2, 2006.

16              At that time you were

17    working for TTP.  Correct?

18         A.    Correct.

19         Q.    Can you please tell us what

20    you wrote in Chinese to Grace Wei on or

21    about August the 2nd, 2006?

22         A.    This is an e-mail sent to me

23    by Ms. Wei, not the other way around.

24         Q.    I apologize.  You're
```

1    correct.

2              Can you please tell us what

3    Ms. Grace wrote to you in Chinese?

4         A.    Do you want me to read it

5    for you?

6         Q.    Verbatim, please.

7         A.    Okay.

8              Manager Che, Manager Peng,

9    hello.  Please look at below customer's

10   e-mail.  They requested you to write

11   verification using the letterhead of your

12   company's and to have your boss sign and

13   seal.  And also he said it is best that

14   if you could list one or two of the

15   American companies' name who bought

16   gypsum board from your company.  That

17   will be a powerful verification to verify

18   that our product has no quality problem.

19   Thank you.  Wei, Dongling.

20        Q.    The certification that was

21   requested included the language that was

22   set forth in the e-mail below, which is

23   written in English.  And it states, and

24   I'll ask a question after that, "Shandong

1    Taihe Dongxin...Gypsum board that is in

2    the 12 containers (listed below) that

3    were shipped last week are made to ASTM

4    C-1396 standards and it is the best

5    quality gypsum board that Taihe makes and

6    is the same quality that Taihe sends to

7    other customers in the United States.

8    Shandong Taihe Dongxin Co. stands 100%

9    behind our gypsum board and if any

10   quality problems were detected with" the

11   "gypsum board Taihe will replace the

12   board at no cost to the customer."

13            Was such a certification

14   provided as requested by Ms. Grace Wei to

15   you and Mr. Peng?

16            A.    No.  This is something sent

17   to me by the customer.

18            Q.    Yes.  She's asking you to do

19   something that -- to give her client the

20   language that she put below.

21            Did you do so?

22            A.    That's request of customer.

23            Q.    Did you comply with the

24   request?

Confidential - Subject to Further Confidentiality Review

```
 1          A.     But in my recollection, I
 2    did not provide such document.
 3          Q.     Did Mr. Peng Wenlong provide
 4    such documents?
 5          A.     You have to ask Mr. Peng.
 6          Q.     Do you know if the manager
 7    or the supervisor that she was requesting
 8    sign the letter did so?
 9          A.     As far as I can remember,
10    no.
11          Q.     Do you know Grace Wei?
12          A.     Yes.
13          Q.     Who is she?
14          A.     A female comrade in China.
15          Q.     Where did she work?  At the
16    time of the e-mail, where did she work?
17          A.     As far as my personal
18    understanding is, because she had never
19    specified that, she should be freelance
20    trader, because she goes everywhere to
21    help out, to introduce her customers to
22    some company, and in return, to get
23    commission or the price difference.
24          Q.     At the time of this e-mail
```

1    in 2006, did Ms. Grace Wei have a working

2    relationship with TTP?

3         A.    Can you repeat that?

4         Q.    Yes.

5               At the time of this e-mail

6    in August of 2006, did Ms. Grace Wei have

7    a working relationship with TTP?

8         A.    She's also a freelancer.

9    She's not our employee.

10         Q.    Did she work with your

11   company as a freelancer?

12         A.    That depends on how you

13   define work relationship.

14         Q.    Did she introduce customers

15   to your company for the purchase of

16   goods?

17         A.    Yes.

18         Q.    And she was one of other

19   freelancers that your company worked with

20   at the time to introduce customers for

21   the sale of goods.  Correct?

22         A.    If you ask me on the spot, I

23   really can't remember.  But if you give

24   me an example, that may refresh my

1    memory.  But I'm sure she is.

2          Q.    Let's use this one with Ms.

3    Wei.

4                You understood that Ms. Wei

5    was referring to customers in the United

6    States that were purchasing your product.

7    Correct?

8          A.    Ms. Wei only introduced to

9    us a customer.  She claimed that the

10   customer was in the United States.  But

11   that's not something we would pay

12   attention to.  I did not verify either.

13         Q.    Well, here she's asking for

14   very specific information regarding

15   matters in the United States, isn't she?

16         A.    Who requested that?

17         Q.    Ms. Grace Wei was asking you

18   to provide a certification that boards

19   that were shipped to the United States

20   met the American Society of Testing and

21   Materials, ASTM, C-1396.  Correct?

22         A.    From what appears on the

23   e-mail, that was her request.

24         Q.    She was also requesting a

Confidential - Subject to Further Confidentiality Review

1    certification from a supervisor at TTP

2    that the drywall that had been sent in

3    the 12 containers listed below was of the

4    same high quality as the drywall that

5    Taihe had sent to other customers in the

6    United States?

7         A.    First of all, this is an

8    e-mail sent to us by the customer.  She

9    asked us to provide that to her.

10   However, in my recollection, we did not

11   provide such document.

12        Q.    Did she also work as a

13   freelance person with TG?

14        A.    I think she is a freelancer

15   to any company, unless as she claims that

16   she has her own company, because we have

17   never verified her identification.

18        Q.    To your knowledge, did she

19   work with you when you were at TG?  I

20   don't mean as a co-employee.  I mean her

21   as a freelance person and you as a

22   salesperson for TG.

23        A.    I don't recall.  I don't

24   remember.

```
 1            Q.    Does she still work with you

 2    as a freelancer and you as a salesperson

 3    now at TG?

 4            A.    No.  We have not been

 5    contacting with this person for a long

 6    time, for either company.

 7            Q.    Do you know if the drywall

 8    that was manufactured by TTP in 2007 and

 9    2008 came from the Luneng mine in China?

10               MR. SPANO:  Objection, form.

11               THE COURT:  Why don't you

12            ask which mine.  Sustained.  Why

13            don't you ask first which mine and

14            then we'll pursue it.

15               I'll let him do that.  I'll

16            overrule the objection.  Go ahead.

17               MR. GONZALEZ:  I had

18            referenced it to Luneng mine, I

19            believe, Your Honor.  I'll rephase

20            it, just so we're clear.  I may

21            have muttered it.

22    BY MR. GONZALEZ:

23            Q.    Do you know if the drywall

24    that was manufactured by TTP in 2008 came
```

```
 1    from materials from the Luneng mine?

 2              MR. SPANO:  Objection to

 3         form, lack of foundation.

 4              THE INTERPRETER:  Is that a

 5         Chinese name, Luneng mine?

 6              MR. GONZALEZ:  L-U-N-E-N-G,

 7         L-U-N-E-N-G, Luneng mine.

 8              THE COURT:  I'll overrule

 9         the objection.

10              Let him answer if he can.

11         You may answer.

12              THE INTERPRETER:  The

13         interpreter doesn't find this word

14         in the dictionary.  Is that a

15         Chinese word?

16              MR. GONZALEZ:  It's a

17         location.

18              MR. EUGENE CHEN:  Right.

19         It's a name.  It's a proper name,

20         Luneng.

21              THE INTERPRETER:  Luneng?

22              MR. CHEN:  Yes.

23              THE WITNESS:  Repeat your

24         question, please.
```

```
 1    BY MR. GONZALEZ:

 2             Q.    Yes.

 3                   Do you know if the drywall

 4    that was produced by TTP during the years

 5    of 2000 and 2008 were made with raw

 6    materials that were mined from the Luneng

 7    mine, 2007 and 2008?

 8             A.    I think there is a problem

 9    with the time period.  You said 2000?

10    2000 there was no TTP yet.

11             Q.    2007 through 2008.

12             A.    In the year 2008, isn't it

13    that TTP has stopped its operation?

14             Q.    Yes, sir.

15                   From 2006 -- let's do it

16    year by year.

17                   And with reference to TTP,

18    and it's in 2006, do you know if the

19    materials used to make drywall at TTP

20    came from the Luneng mine in that year?

21             A.    I'm only a salesperson, not

22    a supplier.  I don't know.

23             Q.    You do not know?

24             A.    Correct.
```

```
 1              Q.    How about in 2008, do you

 2     know, same question, I'm sorry, as to

 3     2007?

 4              A.    Neither do I know that.  I'm

 5     a seller, not a buyer.

 6              Q.    For 2005 for TG while you

 7     worked there, do you know if the

 8     materials that were used to make drywall

 9     by TG in 2005 came from the Luneng mine?

10              MR. SPANO:  Objection.  I

11         feel we're clearly going into the

12         merits here.  Mining and

13         manufacturing has nothing to do

14         with the question of personal

15         jurisdiction.

16              THE COURT:  I think that's a

17         valid objection.  Overrule it -- I

18         mean, I'll sustain it.

19              MR. GONZALEZ:  And that

20         would be true for any questions so

21         related, Your Honor?

22              THE COURT:  Yeah.  I think

23         that that's -- unless it's tied to

24         jurisdiction, these depositions
```

```
 1              are limited to jurisdiction.

 2                   MR. GONZALEZ:  All right.

 3              Let me take a shot at it, Judge.

 4                   THE COURT:  Go ahead.

 5    BY MR. GONZALEZ:

 6              Q.    Do you know if in 2005

 7    materials that were used by TG to

 8    manufacture drywall that ultimately ended

 9    up in the United States of America came

10    from the Luneng mine?

11              A.    I don't know.  The same

12    opinion I provided to you earlier.  I'm

13    only a salesperson.

14              Q.    Would your answer be the

15    same for all years 2005, 2006, 2007 and

16    2008?

17              A.    I work for different

18    companies in different years.  You have

19    to define that.  But the thing is, I'm

20    only a salesperson.  I sell gypsum board.

21    I do not purchase gypsum board.  So I'm

22    not aware of these.  I would not have had

23    the contact with these matters.

24              Q.    Are you aware of any
```

```
 1    investigation by the United States

 2    Consumer Product Safety Commission

 3    regarding the Luneng mine?

 4         A.    Can you repeat that again?

 5         Q.    Are you aware of any

 6    investigation by the United States

 7    Consumer Protection service group of the

 8    Luneng mine?  I'm sorry.  Let me rephrase

 9    that.

10              Are you aware of any

11    investigation by the Consumer Product

12    Safety Commission involving the Luneng

13    mine?

14         A.    I don't know.

15         Q.    Are you aware of any

16    investigation by any United States

17    individual or entity of the Luneng mine?

18         A.    I don't know.

19         Q.    Do you know Yamin Yuan?

20    Pronunciation is probably wrong,

21    Y-A-M-I-N, first name.  I guess that's

22    the last name.  And the first name

23    Y-U-A-N.  Yamin Yuan?

24         A.    Yes.
```

1        Q.     And tell us who he is?

2        A.     Yuan Yamin should be our

3    colleague in TG.

4        Q.     Was he a salesperson also?

5        A.     Yes.

6        Q.     He currently works at TG

7    with you in sales?

8        A.     Yes.

9        Q.     And before that, he worked

10   at TTP with you in sales.  Correct?

11       A.     No.

12       Q.     Has he always worked at TG

13   in sales, as far as you know?

14       A.     If my memory is correct,

15   when he joined, the TTP should have

16   already stopped its operation.

17       Q.     Do you know Mr. Li Zhizhen?

18   And I will he spell it.  First name, L-I,

19   second name, Z-H-I-Z-E-N?  Z-H-I-Z-E-N,

20   Z-H-I-Z-E-N, Z-H-I-Z-H-E-N.

21       A.     I have not heard of such

22   name, according to the translation.

23              THE INTERPRETER:  Could you

24       write it for me, please?

```
 1              MR. GONZALEZ:  My

 2         handwriting is probably worse than

 3         my pronunciation, but you are

 4         forewarned.

 5              Can you understand that?  My

 6         writing, I mean.

 7              THE INTERPRETER:  Yeah.

 8   BY MR. GONZALEZ:

 9         Q.    Do you know this person?

10         A.    Yes.

11         Q.    Does he work with you at TG

12   currently?

13         A.    Yes.

14         Q.    Did he work with you at TTP

15   before he worked at TG?

16         A.    That I don't remember

17   clearly, but --

18              THE INTERPRETER:

19         Interpreter clarify gender.

20              THE WITNESS:  But whether he

21         worked before in TG, I don't

22         recall.  However, I've never

23         worked with him in TTP, which

24         means that he never been to TTP.
```

```
 1              He worked at TG, but I don't

 2              recall when did he join TG.

 3      BY MR. GONZALEZ:

 4              Q.    And help me pronounce Mr.

 5      Li -- is it Li?

 6                    THE INTERPRETER:  Li.

 7      BY MR. GONZALEZ:

 8              Q.    Mr. Li's name correctly, Mr.

 9      Li Zhizhen?

10              A.    Zhizhen.

11              Q.    Really hard, Zhizhen.  Okay,

12      I'm sorry.

13              Was he a salesperson?

14              A.    Yes.

15              Q.    How long did you take to

16      prepare for this deposition?

17              A.    How many days?  It has been

18      about four, five days.

19              Q.    How many hours per day?

20              A.    I'm not sure.  Sometimes

21      shorter, sometimes longer.

22              Q.    Eight, ten hours or less per

23      day?

24              A.    I'll have to calculate for
```

1    you.

2          Q.    Please do so.

3          A.    Sometimes from around 9:00

4    in the morning, about six, seven hours

5    sometimes, and sometimes eight, nine

6    hours.  If I cannot recollect memory of

7    certain documents, I would have to go

8    back to the hotel and lay in bed and

9    think about it.  I don't know whether

10   that counts as part of preparation.

11         Q.    Yes.

12         A.    It's hard for me to

13   calculate.  After all, it is not my

14   normal work hour.

15         Q.    Sure.  And where did you do

16   the preparation, what city?

17         A.    After I got here.

18         Q.    In Hong Kong?

19         A.    Yes.

20         Q.    When did you arrive in Hong

21   Kong, the date?

22         A.    Where is my certificate?

23   Which day was that?

24         Q.    Well, today is the 12th of

1    January.

2        A.    Perhaps the 6th.  Perhaps

3    the 6th I entered.  I didn't pay

4    attention.

5        Q.    Did you meet with the

6    company's attorneys to go over the

7    documents?

8        A.    You mean the attorney in

9    Hogan Lovells?

10       Q.    Any of the company's

11   attorneys.  Did you meet with any of the

12   company's attorneys, whether they're from

13   China or the United States, in

14   preparation for your deposition?

15       A.    I met Hogan Lovells, Hogan

16   Lovells, attorney Hogan Lovells.

17       Q.    Did they work with you for

18   those four to five days in your

19   preparation for today's deposition?

20       A.    They helped me to refresh my

21   memory of these documents, and they

22   requested me to answer your question

23   truthfully.

24       Q.    Did they tell you to say

Confidential - Subject to Further Confidentiality Review

```
 1   that?  I'm sorry.  You're right.
 2                  MR. SPANO:  Objection.
 3                  THE COURT:  Sustain the
 4          objection.
 5                  MR. GONZALEZ:  I agree,
 6          Judge.  I withdraw it.  That was
 7          inappropriate.
 8                  THE COURT:  Do you have much
 9          more?
10                  MR. GONZALEZ:  Just a little
11          bit, Judge.
12                  THE COURT:  All right.
13   BY MR. GONZALEZ:
14          Q.    Did you meet with those
15   attorneys every day for those four to
16   five days to prepare?
17          A.    We meet every day.  But as
18   who we meet, each day is different.
19          Q.    Were you asked by your
20   supervisors to testify in this case at
21   TG?
22                  THE INTERPRETER:
23          Interpreter clarification.  When
24          you say supervisor, you mean
```

```
 1          supervisor as the manager or

 2          supervisor in the board of

 3          supervisors?

 4               MR. GONZALEZ:  His bosses.

 5               THE WITNESS:  The company

 6          asked me to come to testify.  I

 7          did not want to come because I

 8          never had such experience before.

 9          I think whenever we contact --

10          we're contacted with an attorney,

11          it's as if that we have committed

12          a crime.  So I'm very worried and

13          very afraid, but the company said

14          if I do not come, they would fire

15          me and they would sue me in the

16          courthouse.  So I had to do it.  I

17          had to come.  It's almost Chinese

18          New Year.  I had to come here.

19  BY MR. GONZALEZ:

20          Q.    Who at the company told you

21    that?

22          A.    Mr. Peng notified me.

23          Q.    Mr. Peng is the one that

24    shared his sentiments that you needed to
```

```
1    come for those reasons?

2           A.    They notified me in separate

3    occasions.  In the very beginning, the

4    company asked me to come, and I said, I'm

5    not going.  And I said, it has nothing

6    personal to do with me.  But they gave me

7    lots of pressure from different channels.

8    There was no way out.  I had to come.

9    But I'm really afraid in my heart,

10   because I've never seen so many lawyers

11   before.  This is my first time see a

12   judge, any judge.  This is my first time.

13          Q.    This is your only job

14   currently?

15          A.    What do you mean by that?

16          Q.    You don't work anywhere

17   else?

18          A.    No.  I only work in TG.

19          Q.    Your job is important to you

20   and your family?

21          A.    Correct.

22          Q.    And you're very loyal to

23   your company?

24          A.    Correct.
```

```
 1                    MR. GONZALEZ:  Thank you,

 2         sir.  Thank you.  Appreciate it.

 3                    THE COURT:  15-minute break

 4         here.

 5                    MR. GONZALEZ:  I'm going to

 6         pass the witness, Your Honor.

 7                    THE COURT:  Okay.

 8                    VIDEOTAPE TECHNICIAN:  We're

 9         going off the record.  The time is

10         9:30.

11                         -   -   -

12                    (A recess was taken from

13         9:30 a.m. to 9:43 a.m.)

14                         -   -   -

15                    VIDEOTAPE TECHNICIAN:  Going

16         back on the record.  The beginning

17         of Tape Number 2.  The time is

18         9:43.

19                         -   -   -

20                    EXAMINATION

21                         -   -   -

22    BY MR. MEUNIER:

23         Q.    Good morning, Mr. Che.

24         A.    Good morning.
```

```
 1              Q.    I want to begin my
 2    questioning by confirming on the record
 3    that you are appearing in yesterday and
 4    today's deposition not only as an
 5    individual witness but also as a witness
 6    designated by TG and TTP to testify on
 7    behalf of those companies regarding
 8    business dealings with Oriental Trading,
 9    Advanced Products and Triax Trading &
10    Logistics, American Five Star, TOV
11    Trading, and B America Corporation; is
12    that correct?
13              MR. SPANO:  To save time,
14         may I just confirm that for you?
15              MR. MEUNIER:  Yes.  Is that
16         confirmed?
17              MR. SPANO:  Yes, that's
18         correct.
19                   -  -  -
20              (Deposition Exhibit No.
21         Che-7, Re-Notice of Oral and
22         Videotaped Deposition Pursuant to
23         Fed. R. Civ. P. 30(b)(6), 17
24         pages, was marked for
```

Confidential - Subject to Further Confidentiality Review

```
 1          identification.)

 2               -  -  -

 3  BY MR. MEUNIER:

 4          Q.    And I'd like to mark and

 5  attach as Che Exhibit Number 7 the notice

 6  of the deposition of Taishan Gypsum and

 7  TTP pursuant to Federal Rule of Civil

 8  Procedure 30(b)(6).  It's Document 11411

 9  filed in the record.

10               Mr. Che, were all of your

11  business dealings with the companies that

12  I just mentioned conducted while you were

13  employed by either TG or TTP?

14          A.    I'm sorry, I don't remember

15  all the companies that you just

16  mentioned.

17          Q.    That's fine, sir.  I'll

18  repeat them.

19               Were all of your business

20  dealings with Oriental Trading conducted

21  while you were an employee of either TTP

22  or TG?

23          A.    What do you mean by or?  You

24  mean both TTP and TG or either --
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Either/or.  One or the

 2    other.

 3          A.    The majority of the business

 4    dealings with Oriental was with TTP, and

 5    later on after I came to TG, I helped to

 6    handle the issue of $100,000.

 7               THE INTERPRETER:

 8               Interpreter clarification.

 9               THE WITNESS:  I think it is

10               something about honor, so I have

11               to handle that issue for the

12               customer.

13    BY MR. MEUNIER:

14          Q.    Were all of your business

15    dealings with Advanced Products and Triax

16    Trading & Logistics conducted while you

17    were an employee of either TG or TTP?

18          A.    What is the company before

19    Triax?

20          Q.    Advanced Products or APIC

21    Building Materials.

22          A.    Can I have the name?  I

23    don't know.

24               Are these the same company?
```

```
 1    I do have impression with Triax.

 2            Q.    You were also designated by

 3    your company to testify about dealings

 4    with Advanced Products.

 5                  Are you not familiar with

 6    that company?

 7            A.    I don't understand your

 8    handwriting.

 9                  Can you give me something

10    more formal, the name of the company in

11    the e-mails?  That would refresh my

12    memory.

13                  I know this, yes.

14            Q.    Were all of your dealings

15    with Advanced Products International

16    Corporation conducted while you were an

17    employee of either TTP or TG?

18            A.    Yes, while I worked for TTP.

19            Q.    Were all of your business

20    dealings with American Five Star

21    conducted while you were an employee of

22    either TG or TTP?

23            A.    Yes, TTP.

24            Q.    Were all of your business
```

Confidential - Subject to Further Confidentiality Review

```
1    dealings with TOV Trading conducted while
2    you were an employee of either TG or TTP?
3         A.    Can you repeat that?
4         Q.    Were all of your business
5    dealings with TOV Trading conducted while
6    you were an employee of either TG or TTP?
7         A.    Yes.
8         Q.    Were all of your business
9    dealings with B America Corporation
10   conducted while you were an employee of
11   either TG or TTP?
12        A.    What are the companies?
13        Q.    B America Corporation.
14        A.    Yes.
15        Q.    And do you recall that TOV
16   Trading later became known as OEG, OEG?
17        A.    I remember.
18        Q.    And your dealings with OEG
19   were also conducted while you were an
20   employee of either TG or TTP.  Is that
21   true?
22        A.    I worked with OEG while I
23   was employed with TTP.  And later, I
24   helped them with some military
```

1    construction projects.

2         Q.    Now, yesterday you testified

3    about your dealings with --

4         A.    I said assisted with them.

5         Q.    Yesterday, Mr. Che, you

6    testified about your dealings with Jorge

7    Arevalo, Ivan Gonima and Leonardo Guzman

8    of Oriental Trading.

9              Do you remember that?

10        A.    Who is Jorge?

11        Q.    Jorge.

12        A.    Oh, I know Jorge.

13        Q.    I was trying to give --

14        A.    I don't know who Jorge is.

15        Q.    So do you remember talking

16   about your dealings with Messrs. Arevalo,

17   Gonima and Guzman with Oriental Trading?

18        A.    I remember the names of

19   these people.  We had communications.

20        Q.    You recall that you first

21   met Mr. Arevalo and Mr. Gonima in 2006

22   when they visited the Shandong Taihe

23   Dongxin factory in Taian city, China.

24   True?

Confidential - Subject to Further Confidentiality Review

```
 1          A.     Can you repeat?

 2          Q.     Do you recall that you first

 3   met Mr. Arevalo and Mr. Gonima --

 4          A.     Stop.

 5                 What are the names again?

 6          Q.     Jorge Arevalo and Ivan

 7   Gonima.

 8          A.     In my memory, they did not

 9   come together for the first time.

10          Q.     They came on separate

11   visits?

12          A.     They came together once, and

13   then they came separately also.  But I'm

14   not sure about the sequencing.

15          Q.     On these visits, did you

16   tour the Shandong Taihe Dongxin factory

17   in Taian city, China with them?

18          A.     Can you repeat that?

19          Q.     Did you tour the Shandong

20   Taihe Dongxin factory in Taian city,

21   China with them?

22          A.     In what time period?

23          Q.     When they visited you in

24   2006.
```

```
 1          A.      In year 2006, it must be TTP

 2   that they visited.

 3          Q.      Which factory would they

 4   have visited with you in 2006?

 5          A.      It must be TTP that they

 6   visited in the year 2006, because at the

 7   time I worked with TTP.

 8          Q.      What was the location of the

 9   factory?

10          A.      In our TTP's plant.  I've

11   already told you the detailed address

12   when I was being asked by the other

13   gentleman.

14          Q.      Do you recall during that

15   visit that these men asked if your

16   company was already selling drywall in

17   the United States?

18          A.      I don't have a clear

19   recollection of the details that happened

20   at that time.

21          Q.      Is it true you told them

22   that your company already had a drywall

23   customer or client in New York?

24          A.      I don't remember clearly the
```

Confidential - Subject to Further Confidentiality Review

1   detailed content of our conversation, but

2   you can use e-mail to -- for me to

3   refresh my memory, but I really don't

4   remember.  It's been too long.

5        Q.    But you do not deny telling

6   them at that time that you had a customer

7   in New York, do you?

8        A.    I had neither admitted nor

9   denied, because I don't remember clearly

10  about that.

11       Q.    Do you recall telling Mr.

12  Gonima during the factory visit in 2006

13  that your company could print Oriental

14  Trading Company's bar code on the drywall

15  they ordered?

16       A.    I don't remember what

17  exactly I told him during -- in the

18  conversation, but during the preparation

19  of the deposition, with assistance of my

20  attorney, we reviewed some document, some

21  e-mail to be exact, that Mr. Irvine

22  designed the bar code himself and

23  requested us to put bar codes on the

24  products that he ordered.

```
 1            Q.    And at his request, you

 2    arranged to have that company's bar code

 3    put on the drywall that they ordered.

 4    True?

 5            A.    Yes.  Upon their request.

 6            Q.    Why did you agree to do

 7    this, Mr. Che?

 8            A.    Because at the time, Mr.

 9    Irvine promised us that he would purchase

10    big volume of my product.  Because the

11    principle of our company is the more you

12    sell, the more bonus you get.  I believed

13    him.  But the fact is that he made an

14    exaggeration.  He only bought a little

15    bit of our product.

16            Q.    You wanted him to buy more,

17    didn't you?

18            A.    It doesn't matter who, as

19    long as that person buys my products, I

20    could get more bonuses.

21            Q.    You wanted Mr. Gonima and

22    his company, Oriental Trading, to buy

23    more drywall from your company, didn't

24    you?
```

Confidential - Subject to Further Confidentiality Review

```
 1           A.    I hope that any company to
 2    purchase more of our products.  It
 3    doesn't matter who.  If you want, that's
 4    fine, too.
 5           Q.    If I want to buy drywall
 6    from you today and take it back to New
 7    Orleans, Louisiana, would you be happy to
 8    make those arrangements with me?
 9           A.    Don't tell me where you're
10    sending the goods to.  Just give me
11    money.  You can take it wherever you want
12    to.
13           Q.    You would be happy, on
14    behalf of your company --
15           A.    The issue is money.
16           Q.    -- to take my money for
17    drywall, no matter which city in the
18    United States of America I took the
19    drywall to.  Is that true?
20           A.    That's your problem.  I
21    don't care.  I don't care -- I only care
22    that you give me money.
23           Q.    And it wouldn't matter to
24    you which city in the United States I
```

Confidential - Subject to Further Confidentiality Review

```
 1    took the drywall to; is that correct?

 2           A.    That's your problem.

 3           Q.    And you wouldn't care, would

 4    you?

 5           A.    That's your problem.

 6           Q.    You would not care which

 7    city I took it to in the United States?

 8           A.    I don't care where would my

 9    customer deliver our products to.  What

10    we do is only to give the products to the

11    customer in China.  The presumption is

12    that the customer pay us in full.

13           Q.    Now, when you put a bar code

14    on drywall that you are manufacturing for

15    a customer, does that help for the sales

16    transaction involving that drywall after

17    it reaches its destination?

18                 MR. SPANO:  Objection to

19           form.

20                 THE COURT:  What's the

21           problem, Frank?

22                 MR. SPANO:  It's --

23                 THE COURT:  I'm sorry?

24                 MR. SPANO:  I think it's
```

```
 1            very confusing.
 2                 THE COURT:  Well, let's see
 3            if the witness can answer.  I'll
 4            overrule it if he can't.
 5                 Can you answer the question,
 6            sir?
 7   BY MR. MEUNIER:
 8            Q.    Repeat it?
 9            A.    I don't quite understand
10   what you said.
11            Q.    I'll repeat the question.
12                 When you put a bar code on
13   drywall that you are manufacturing for a
14   customer, does that bar code help with
15   the sales transaction when that drywall
16   is purchased after it reaches its
17   destination?
18                 THE COURT:  I sustain the
19            objection to that.  How would he
20            know?
21   BY MR. MEUNIER:
22            Q.    Do you know what a bar code
23   is used for?
24            A.    What bar code are you
```

Confidential - Subject to Further Confidentiality Review

1    referring to?

2         Q.    Any bar code.

3               If you go to a store and the

4    cashier slides the bar code --

5         A.    Do you mean the sealing tape

6    of the gypsum board?

7         Q.    No.  I have been talking

8    about a bar code.

9               Do you know what that is?

10        A.    I'm sorry.

11        Q.    I'm showing you a Coca-Cola

12   Zero can.

13              Do you see the bar code on

14   this can?  It's in the shape of a bottle.

15        A.    This is called bar code?

16        Q.    Yes, sir.

17              It is slid by the cashier

18   across a machine at the time of purchase.

19   Correct?  You know what bar codes are

20   used for?

21        A.    No.  Because in China, we

22   don't have this.  I thought it's a

23   pattern.  I really don't know what is

24   that for.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Perhaps you didn't
 2   understand my earlier question.  We'll
 3   leave this area, but I want to be clear
 4   for the record.
 5               Did you agree at the request
 6   of Mr. Gonima during his visit to the
 7   factory that your company could print
 8   Oriental Trading's bar code on the
 9   drywall that you were manufacturing for
10   that company?
11          A.    I'd like to repeat.  The
12   customer, Mr. Irvine, designed a pattern.
13   My understanding is that it's only a
14   pattern.  I don't understand what you
15   said about that.  He requested us to put
16   the pattern on the product he was going
17   to purchase from us.  I complied with the
18   customer's request and put it there,
19   because he promised that he would buy big
20   volume of our products.  But in fact, he
21   bragged about it.
22          Q.    After you signed the sole
23   agency agreement of October 20, 2006 with
24   Oriental Trading, which is Che Number 1,
```

```
 1    you sent Mr. Gonima prices for different

 2    sizes and shipping costs of gypsum board.

 3              Is that true?

 4         A.    Can I take a look at the

 5    document?  Where is the exhibit?

 6         Q.    I'm showing you documents

 7    that are Bates numbered TG 521 through

 8    526, which I'll mark as Che Number 8.

 9                   -  -  -

10              (Deposition Exhibit No.

11         Che-8, E-mail chain, top one dated

12         8 Nov 2006, Bates stamped TG

13         0000521 through TG 0000526, was

14         marked for identification.)

15                   -  -  -

16    BY MR. MEUNIER:

17         Q.    Please refer to the e-mail

18    from you that begins at the bottom of the

19    page marked 522 and concludes on the page

20    marked 525.

21         A.    This is the beginning?

22         Q.    Yes.  Bottom of 522.

23         A.    So this is the beginning and

24    up to here?
```

Confidential - Subject to Further Confidentiality Review

```
 1           Q.    Yes.

 2           A.    What's your question?

 3           Q.    You sent this e-mail of

 4     November 6, 2006 to Mr. Gonima after the

 5     sole agency agreement was signed and

 6     provided him with shipping costs for

 7     various sizes of gypsum board.  Is that

 8     true?

 9           A.    Where is it?

10           Q.    Did you provide him with

11     pricing information for drywall?

12           A.    Isn't it FOB Qingdao Chinese

13     port price?

14           Q.    You gave him prices per

15     sheet for shipping from China.  Is that

16     true?

17           A.    FOB is to deliver in China.

18           Q.    So these prices were what it

19     would cost him to get the drywall from a

20     factory to the Qingdao port?

21           A.    Which is to say that I

22     deliver the goods to the customer in

23     Qingdao port or to the shipping agency

24     that he had entrusted with.  The shipping
```

1    agency that the customer had entrusted.

2          Q.    Now, please look at Mr.

3    Gonima's reply e-mail of November 8,

4    2006, beginning on the bottom of 521 and

5    concluding at 522.

6          A.    This one?

7          Q.    Yes.

8          A.    Where does it start?

9          Q.    Bottom of 521.

10         A.    I know that.

11         Q.    To the middle of 522.

12         A.    But the title of the e-mail

13   like this one, like this one, like who

14   sent it and what's the date?  Where is

15   that part, like this one?

16         Q.    Mr. Che, the e-mail I'm

17   referring to indicates that it is from

18   ivangonima@orientaltradingusa.com.  Is

19   that true?

20         A.    I can't confirm that because

21   you don't have the start, starting part.

22         Q.    Mr. Che, do you deny getting

23   this e-mail?

24         A.    You should provide me the

```
 1    complete information so I can see who

 2    sent it to who, the complete information.

 3    But you're providing me with incomplete

 4    information, so it doesn't really help me

 5    to refresh my memory.

 6          Q.    Mr. Che, these are your

 7    company records produced to us.

 8          Do you deny getting this

 9    e-mail?

10          A.    I'm not saying that I deny,

11    but I want to see a complete document.

12          Q.    It's the most complete

13    document your company has given us, sir.

14          Did Mr. Gonima in this

15    e-mail to you ask you to give him freight

16    costs for Miami and other cities in the

17    United States?

18          A.    Can you translate the

19    content of the e-mail for me?

20          Q.    Paragraph 2 from Mr.

21    Gonima's e-mail to you on 522.  "Could

22    you quote me the actual freight cost for

23    a 40" foot "FLC from Qingdao to Miami,"

24    Florida, "New York," New York, "Los
```

```
 1    Angeles," California "and Orlando,"

 2    Florida.  "(In this case it would include

 3    land freight too from Miami to Orlando)?"

 4              He asked you for that

 5    information, did he not?

 6         A.    First of all, if Mr. Judge

 7    believes the information you're providing

 8    to me is complete from the e-mail, I can

 9    only see that a customer requested us to

10    help him for -- to find out the shipping

11    cost to these destinations.

12              THE INTERPRETER:

13         Interpreter clarification.

14              THE WITNESS:  For us, it

15         doesn't matter what were the

16         destinations they wanted us to ask

17         for, to China or to Hong Kong.  We

18         were only trying to help the

19         customer.  The final operation was

20         FOB in Chinese port.  The

21         decisions had always been made by

22         the customers.  This is only out

23         of politeness.

24    BY MR. MEUNIER:
```

```
 1          Q.     In the next paragraph, Mr.
 2   Gonima mentioned that Jorge told him you
 3   already had a distributor for one of your
 4   brands in the New York area, and Mr.
 5   Gonima asked if it would be possible to
 6   have that company name and phone number.
 7               Please now refer to your
 8   reply e-mail, which is at the top of TG
 9   521, dated November 8, 2006, addressed to
10   Mr. Ivan Gonima.
11               Please refer to the second
12   paragraph in which you said, "About the
13   information" --
14          A.     Wait a minute.  So is this
15   the beginning part of this e-mail?  So
16   that's me and this is Irvine.  This is
17   November the 8th, 2006.  Is that the one
18   you're referring to?  Is that the e-mail
19   you're referring to?
20          Q.     Yes, Mr. Che.
21          A.     Yes.  Please ask the
22   question.
23          Q.     In the second paragraph you
24   stated, "About the information about our
```

```
 1    client in New York, I will ask him if he

 2    is willing to let me tell you that.  Then

 3    I will reply" to "you!"

 4              So you agree you had told

 5    Jorge and Ivan that you had a customer or

 6    client in New York when they visited the

 7    factory.  True?

 8         A.    This is only a marketing

 9    strategy.

10         Q.    Were you lying to Mr. Gonima

11    and to Mr. Arevalo when you told them you

12    had a customer or client in New York?

13         A.    It's not a lie.

14         Q.    Was it the truth?

15         A.    It's a strategy, a way to

16    sale -- for sales.

17         Q.    Was it the truth?

18         A.    How should I explain it to

19    you?  When I communicated with the client

20    regarding this information, the purpose

21    was for me to have a higher price to sell

22    my products to the client.  That's all.

23    It's only the way of sales and strategy

24    of marketing.  It could be a presumption.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    So in order to do business

 2   with these customers in the United

 3   States, you used the strategy of lying?

 4          A.    I don't like the word "lie."

 5          Q.    In order to do business with

 6   these customers in the United States, you

 7   used the strategy of exaggerating?

 8          A.    The strategy can be applied

 9   to any customer.  Maybe the customer is

10   in China, maybe a customer in a project.

11   It could be applied to anyone.

12                THE COURT:  Ask whether he

13          had a customer.

14   BY MR. MEUNIER:

15          Q.    Did you or did you not have

16   a client in New York as stated in this

17   e-mail to Ivan Gonima on November 8,

18   2006?

19          A.    In my memory, it seems a

20   customer told us that they would want to

21   ship the goods to that place.  But as

22   whether they actually shipped it or not,

23   I'm not sure.  I've never been to

24   America.
```

```
 1          Q.    So you did have a client who
 2    told you he would ship and use your
 3    product in New York?
 4               MR. SPANO:  Objection,
 5          compound.
 6               MR. MEUNIER:  I'll break it
 7          down.
 8    BY MR. MEUNIER:
 9          Q.    So you did have a client who
10    told you that he would ship your product
11    to New York?
12          A.    A customer mentioned that to
13    us, saying that they would want to ship
14    the stuff to New York, but it was the
15    client's decision on their final
16    operation.  I did not verify.  All we did
17    was to receive the payment from the
18    customer, and we deliver inside China in
19    Chinese port.
20          Q.    Who was the customer who
21    said he would ship your product to New
22    York?
23          A.    I don't recall.
24          Q.    You then told Mr. Gonima in
```

1    your November 8, 2006 e-mail that the

2    ocean freight of the 40 GP to Miami was

3    $3,400.  Correct?

4          A.    Where is it?

5          Q.    The next sentence after the

6    statement about the client in New York.

7          A.    This is to help the client

8    to find out the shipping cost upon the

9    customer's request.

10         Q.    But that was the cost to

11   ship the drywall from Qingdao to Miami,

12   Florida in the United States.  True?

13         A.    That's not what it reflects

14   here, but that's what I believe.  But it

15   doesn't reflect here.  It doesn't say

16   from where to where.  It doesn't say from

17   where, but it does say to where.

18         Q.    And you found out the cost

19   of shipping your drywall to Miami,

20   Florida in the United States.  True?

21         A.    This is ocean shipping cost

22   that I have found out for the client to

23   Florida, Miami.

24         Q.    Mr. Che, I show you an

```
 1    e-mail of January 10, 2007 from Ivan

 2    Gonima to you marked as Che Number 9.

 3                    -  -  -

 4              (Deposition Exhibit No.

 5         Che-9, E-mail dated 1/10/2007,

 6         Bates stamped TG 0000628, was

 7         marked for identification.)

 8                    -  -  -

 9              MR. SPANO:  What's the

10         Bates, please?

11              MR. MEUNIER:  Oh, I'm sorry,

12         Bates 628, TG 628.

13    BY MR. MEUNIER:

14         Q.    In the second paragraph of

15    this e-mail, Mr. Gonima says, "The test

16    reports Jorge brought with him when he

17    met with you in China are almost 90% in

18    Chinese.  Several customers have asked

19    for" these -- "for those reports but as

20    you can understand they want to see them

21    in English."

22              What test reports is Mr.

23    Gonima referring to?

24              A.    I don't recall.  It is not
```

 1    specified here.

 2           Q.     In the next paragraph, Mr.

 3    Gonima states, "Basically we need test

 4    reports supporting that all test required

 5    by American Codes & Standards are

 6    passed."

 7                  Do you know what test

 8    reports he refers to?

 9           A.     I don't recall, but from

10    here, I can't confirm.

11           Q.     Is it true that both TG and

12    TTP would furnish drywall that met ASTM

13    standards if requested by the customer?

14           A.     Can you repeat that?

15           Q.     Is it true that both TG and

16    TTP would provide drywall that met the

17    standards of the ASTM if requested by the

18    customer?

19           A.     From here, I can't really

20    see which test report did the customer

21    request.  So I can't really guess -- I

22    can't really guess for you.

23           Q.     That does not answer my

24    question, sir.

```
 1                  My question is whether TG

 2     and TTP would agree to provide drywall

 3     that met ASTM standards if requested by

 4     the customer?

 5          A.     This is only a test.  Right?

 6     We used to have something like that at

 7     TTP.  I believe this in TTP has been too

 8     long.  I don't quite remember.  There

 9     should be a test report regarding this in

10     TTP.  But I don't remember where did it

11     come from, because I'm only a

12     salesperson.

13          Q.     You know that ASTM stands

14     for the American Society for Testing and

15     Materials?

16          A.     I'm only notified of that

17     during these few days of preparing for

18     the deposition.  I only knew it by ASTM

19     before.  I only knew that it was a test

20     for the purpose of testing reports.  I

21     don't really know too much about these

22     details.

23          Q.     Have you now had the

24     opportunity to read the transcription of
```

1    the instant message conversations between

2    you and Mr. Gonima that was marked as Che

3    Number 5 at yesterday's deposition?

4         A.    The gentleman showed me that

5    information yesterday in here.

6         Q.    Have you now had an

7    opportunity to read the document?

8         A.    My English is not very good.

9    I can't read it myself, and I don't have

10   time for it.

11        Q.    Has it been read to you in

12   Chinese?

13        A.    No.

14        Q.    But when you typed your part

15   of those instant message conversations

16   with Mr. Gonima, you typed them in

17   English, did you not?

18        A.    Like I told the gentleman

19   over there yesterday.

20              Were you here yesterday?

21        Q.    Yes.

22        A.    Okay, thank you.

23        Q.    So you typed them in

24   English?

Confidential - Subject to Further Confidentiality Review

```
 1          A.    Like I said, I'm not sure.

 2    Do I need to explain again?

 3          Q.    Did you type your part of

 4    those instant message conversations in

 5    English?

 6              MR. SPANO:  Do you want me

 7          to show him?

 8              MR. MEUNIER:  Please.

 9              THE WITNESS:  I had already

10          explained to you yesterday, MSN is

11          not an e-mail account.  After I

12          typed the message in my e-mail

13          account, I will sign off, but MSN

14          has always been online.  And the

15          computer was in my office.  It is

16          possible that he send me a

17          message, however, I replied to him

18          afterwards, after a long time.  It

19          is also possible that I was not in

20          the office and a colleague saw

21          that a customer was sending a

22          message, and then the colleague of

23          mine would be sitting there and

24          chat with the customer.  So I'm
```

```
 1            not sure.  A booklet like this, in

 2            order for me to be able to read it

 3            understandably, it will take me

 4            about a month.

 5   BY MR. MEUNIER:

 6            Q.    Is it true that when you

 7   offered to give Mr. Gonima the lowest

 8   possible prices for drywall in order to

 9   set up a long-term business relationship,

10   you learned from him that American

11   drywall manufacturers were lowering their

12   prices?

13            A.    Where is it?

14            Q.    Please refer to page 2 of

15   Exhibit Che Number 1.  Is it 1?

16                 MR. SPANO:  I think it's 5.

17                 MR. MEUNIER:  Or Che-5, I'm

18            sorry.

19   BY MR. MEUNIER:

20            Q.    And I will --

21            A.    Which line are you referring

22   to?

23            Q.    I will begin with the entry

24   on February 7, 2007 at 12:55:36 a.m.
```

Confidential - Subject to Further Confidentiality Review

1          A.     There is no 36.

2          Q.     No.  Bottom of page 2.

3          A.     There is 26.  26.  Right?

4     12:51:26?

5          Q.     No.  12:55:36.

6          A.     Oh, 55.  Got it.

7          Q.     I will read the portion I'm

8     interested in for the record, and you

9     will hear it from the translator.

10               Ivan.  "Please do not forget

11     if possible to send me a scale price

12     list.  Let's say from 0 to 15,000; from

13     15,000 to 50,000; from 50,000 to 75,000,"

14     et cetera.

15          A.     I'm sorry.  You don't have

16     to read it.  Let her read.  I can't

17     listen to both.

18               Can I have her interpret for

19     me directly?  I can't hear both.

20          Q.     Yes.

21               THE INTERPRETER:  I can wait

22          until you finish and then

23          interpret for him.

24               THE WITNESS:  I'm sorry, I

 1              can't hear.

 2                     MR. MEUNIER:  Why don't I

 3              read it first for the record.  Why

 4              don't I read it first for the

 5              record first.

 6                     THE WITNESS:  I'm sorry, I

 7              don't know the rules.

 8                     THE COURT:  Read it for the

 9              record.

10  BY MR. MEUNIER:

11       Q.    Ivan.  "Please do not forget

12  if possible to send me a scale price

13  list.  Let's say from 0 to 15,000; from

14  15,000 to 50,000; from 50,000 to 75,000,"

15  et cetera.  "Something like that if you

16  have one."

17                     "Some customers asking us

18  what discount we can give them if they

19  sign a long term contract with us."

20                     Mr. Che Gang.  "In order to

21  set up long term business relation, we

22  will offer you the lowest price."

23                     Ivan.  "Great; I really

24  appreciate that."

     1                    "As you know American

     2    manufacturers are lowering their prices."

     3                    Mr. Che Gang.  "Yes, I see.

     4    We need support each other."

     5                    Ivan.  "So, when will you

     6    give me that lowest price list?"

     7                    Mr. Che Gang.  "We will

     8    offer the best price to you in our

     9    proforma invoice."

    10                    MR. MEUNIER:  Please

    11              translate that portion.

    12    BY MR. MEUNIER:

    13         Q.    Do you have any fact or

    14    reason to disagree that that was the

    15    conversation you had with Ivan Gonima?

    16         A.    First of all, like I explain

    17    to you earlier, I'm not sure -- I'm not

    18    sure that this was me who sent the

    19    message.  But I think everything on there

    20    were polite response.  It is a way to

    21    sale, just like if I'm selling this glass

    22    of water, I'm selling him for $2.  I'm

    23    selling to you for $3.  But in order to

    24    sell you for a higher price, I will still

Confidential - Subject to Further Confidentiality Review

1    tell you that your price is lowest.

2    That's not a problem.  This is only a way

3    to sale.  But I really can't sure that I

4    sent these messages, because I don't

5    recall.

6         Q.    Yes.

7              And if you want to sell to

8    me in America, and I tell you what the

9    American price for the goods is, you then

10   have an opportunity to give me a lower

11   price in order to sell.  True?

12        A.    Not necessarily.  It depends

13   on whether it will cover my costs or not.

14   I will never do anything that doesn't

15   cover the cost.

16        Q.    But taking costs into

17   account, you would try to compete with

18   the American price if you knew it?

19        A.    Can you repeat that

20   completely?

21        Q.    Taking the shipping costs

22   into account, you would still try to

23   price the drywall to compete with the

24   American price if you knew it?

Confidential - Subject to Further Confidentiality Review

```
 1          A.     In order to survive and to
 2    sell.  I don't care where are you sending
 3    the products to.  I compete with other
 4    manufacturer of gypsum board everywhere
 5    in order to make money.  If I could offer
 6    higher price, I will not sell it for
 7    lower price.  If the price in China is
 8    higher than yours, then I'll sell it to
 9    Chinese customer, not to American
10    customers.  We didn't really care about
11    different markets.  We do that only for
12    profit.
13          Q.     How did you keep up with the
14    price of drywall in America?
15               MR. SPANO:  Objection, lack
16          of foundation.
17               THE COURT:  Let's restate
18          that and ask whether he knows.
19    BY MR. MEUNIER:
20          Q.     As a salesperson, did you
21    try to find out the price of drywall in
22    other countries where you were selling
23    your drywall?
24          A.     We didn't care --
```

```
 1                MR. SPANO:  Objection, lack

 2          of foundation to that question.

 3                THE WITNESS:  We didn't

 4          care.

 5  BY MR. MEUNIER:

 6          Q.    Yesterday you were shown an

 7  e-mail to you from Mr. Gonima in which he

 8  asked that the drywall that Oriental

 9  Trading bought to be sold under the Dun

10  brand should have bonding tape with the

11  colors red, white and blue, the same as

12  the American flag.

13                Do you remember that?

14          A.    Can I see that document?

15          Q.    It's Jia Number 27.

16          A.    Can I go take a glass of

17  water?

18                THE COURT:  Yes.  Take a

19          10-minute break at this time.

20                VIDEOTAPE TECHNICIAN:  Going

21          off the record.  The time is

22          10:39.

23                     -   -   -

24                (A recess was taken from
```

```
 1          10:39 a.m. to 10:54 a.m.)

 2                    -  -  -

 3               VIDEOTAPE TECHNICIAN:  Going

 4          back on the record.  Beginning of

 5          Tape Number 3.  The time is 10:54.

 6   BY MR. MEUNIER:

 7          Q.    Mr. Che, yesterday you were

 8   shown an e-mail to you from Mr. Gonima in

 9   which he asked that the drywall that

10   Oriental Trading bought under the Dun

11   brand have bonding tape with the colors

12   red, white and blue, the same as the

13   American flag.

14               Do you remember that?

15          A.    Can you repeat that?

16          Q.    Do you remember yesterday

17   talking about this e-mail?

18          A.    Yes.

19          Q.    In fact, you knew from Mr.

20   Gonima that he wanted to use red, white

21   and blue because those are the colors of

22   the American flag.  True?

23          A.    I only remember that at the

24   time the customer designed the label of
```

Confidential - Subject to Further Confidentiality Review

1    his request.  We produced according to

2    the request of the customer.

3          Q.    But you knew that he wanted

4    those colors because they are the colors

5    of the American flag.  True?

6          A.    We did according to his

7    request.

8          Q.    But you knew he wanted those

9    colors because they are the colors of the

10   American flag.

11              Is that true?

12         A.    Whatever states in the

13   e-mail, then that's what it is, because

14   you have not yet translated for me

15   sentence by sentence.  But you can point

16   out for me which sentence you're

17   referring to.

18         Q.    I'm not going to go over

19   that e-mail again.  It was done

20   yesterday.  But I now want to refer you

21   to the instant messaging document again.

22   And I will read first for the record and

23   then ask the translator to provide the

24   Chinese to you, starting at the bottom of

1    page 6, date and time entry, February 25,

2    2007, 8:30:48 p.m.

3              Ivan.  "It is very important

4    for me to make sure you have this file

5    and the design for the tape showing the

6    right colors."

7              Mr. Che Gang.  "Another

8    question we want to confirm is that the

9    blue color of DUN logo is the same as the

10   background of letter D."

11             Ivan.  "Yes sir, it is the

12   same."

13             "So now you have it?  I

14   mean, you can see the tape with all the

15   colors?"

16             Mr. Che Gang.  "It appears a

17   little lighter than background of D."

18             Ivan.  "We want to use BLUE

19   RED and WHITE because those are the

20   colors of the American Flag."

21             "Yes I know.  We had that

22   problem because we scanned the DUN logo

23   from the catalog you gave us.  Because of

24   that it appears lighter."

 1                    Mr. Che Gang.  "You mean

 2     besides color white, we have color of

 3     blue, red and black, no others...?"

 4                    Ivan.  "Yes sir, you got it

 5     right."  In caps, "BLUE and," in caps,

 6     "RED from the American Flag plus," in

 7     caps, "WHITE and," in caps, "BLACK.  That

 8     is it; no more colors."

 9                    "Do you think we have it

10     right now or do you have another

11     question?"

12                    Mr. Che Gang.  "We will ask

13     the tape factory to design the bonding

14     tape as your requirements, and then let

15     you check it."

16                    Aside from you suggesting

17     that some other employee besides you

18     pretended to be you in sending these

19     instant messages, do you have any other

20     factual reason to dispute that this is

21     what you and Mr. Gonima said?

22                    MR. SPANO:  I object to the

23          form, it mischaracterizes the

24          testimony.

```
 1              THE COURT:  He's under
 2        cross.  I'll allow it.
 3              THE INTERPRETER:  Where is
 4        the start of the e-mail, please?
 5              MR. MEUNIER:  2/25/07 at
 6        8:30:48.  That's on page 6.
 7              THE INTERPRETER:  Thank you.
 8              Just one moment, please.
 9        Where is ending of the reading?
10              MR. EUGENE CHEN:  There
11        should be one more.
12              MR. MEUNIER:  Ended at
13        2/25/2007, 8:41:50.
14              Mr. Che Gang.  "We will ask
15        the tape factory," et cetera.
16              THE WITNESS:  From the
17        document itself, it is only to
18        discuss and to confirm a design
19        pattern of Mr. Irvine.  We were
20        just trying to meet client's
21        requirement.
22   BY MR. MEUNIER:
23        Q.   Do you have any reason to
24   disagree that that was the conversation
```

1    with Mr. Gonima, aside from suggesting

2    that someone else pretended to be you?

3         A.    It's not somebody pretended

4    to be me.  It is somebody did that in my

5    replacement, perhaps at the time I was

6    not in the office.  We're talking about

7    the content now.

8         Q.    As a sales employee of TTP

9    and TG, did you use a company computer

10   for all of your e-mails and instant

11   messaging?

12        A.    I did use company's

13   computer.  However, all the e-mail

14   accounts belong to ourself.

15        Q.    Did you save all of your

16   e-mails that you sent or received using a

17   company computer as a sales employee of

18   TTP and TG?

19        A.    Not necessarily.  Some of

20   the data -- some of the data were lost

21   because of reinstallation of computer.

22   And sometimes the e-mail accounts were

23   our private accounts, the accounts that

24   we applied ourselves.  The storage space

1    in the e-mail was rather small.  When the

2    space was not sufficient, we would delete

3    the older e-mails.

4         Q.    Did you save the instant

5    messaging from your work as a sales

6    employee of TTP and TG?

7         A.    TTP and what company?

8         Q.    TG.

9         A.    I did not do that purposely.

10        Q.    You did not save your

11   instant message material?

12        A.    I did not save it purposely.

13   Perhaps it automatically created a saved

14   version, but when I reinstall the

15   computer, they are all lost.  Therefore,

16   I don't have any memory of these

17   information.

18        Q.    Yesterday you were asked

19   about your instant message conversation

20   with Mr. Gonima in which you told him

21   your company could manufacture 10,000

22   sheets of drywall a day, 30,000 a month

23   using one production line.

24        A.    Where is it?

```
 1          Q.    Let me finish the question

 2   first.

 3                And that you could have

 4   three production lines if necessary.

 5                Do you remember that

 6   discussion yesterday?

 7          A.    We did not discuss about

 8   that yesterday.

 9          Q.    Isn't it true, Mr. Che, that

10   you told Ivan Gonima that your company

11   could make 10,000 sheets of drywall in

12   one day in response to him telling you

13   that he needed millions of pieces of

14   drywall because construction was booming

15   in Las Vegas?  Is that true?

16          A.    I don't know where in the

17   document you're referring to.

18          Q.    Please refer to page 11 of

19   the instant message exhibit.  I will

20   begin reading at March 4, 2007,

21   8:35:45 p.m.

22                Ivan.  "Did you receive my

23   e-mail about a client in Las Vegas?  I

24   need to talk to you urgently about that
```

1    volume of sheets of drywall."

2                    "I need to know what is the

3    maximum number of sheets" (4 feet by

4    8 feet by 1/2 inch) "you can supply us.

5    That is what they need."

6                    "I also need to know what is

7    the best price you can give me for this

8    volume.  We are talking about millions of

9    units and we would have to sign a

10   contract with this buyer."

11                   "Construction is booming in

12   Las Vegas and they need millions of

13   pieces."

14                   "Please answer me when you

15   read this; I will be checking it because

16   I need an urgent answer."

17                   "Thanks."

18                   Mr. Che Gang.  4 feet by

19   8 feet by 1/2 inch "regular gypsum board

20   loading 980 sheets/40fcl by pallet, FOB

21   qingdao port price" US dollar 2.60 per

22   sheet.

23                   "This is the best price."

24                   "We can make 10000

1    sheets/one day."

2              Do you have any reason to

3    deny that this was the conversation you

4    had with Mr. Gonima?

5         A.    Let's not talk about the

6    same things we talked about before.

7    Let's only talk about the issues that is

8    reflected or here.  You can ask me

9    questions on that.

10        Q.    Sir, I will decide what

11   questions to ask you subject to the

12   judge's order.

13             Is that understood?

14        A.    I understand.

15        Q.    My question is, do you have

16   any reason to deny that that was the

17   conversation you had with Ivan Gonima?

18        A.    I also do not have any

19   reason to confirm that it's our

20   conversation.

21        Q.    After the October 2006

22   agreement with Oriental Trading for the

23   sale of gypsum board, you also discussed

24   with Mr. Gonima his company's purchase of

1    related products, such as metal studs,

2    screws and tape.  Is that true?

3            A.    That's not what it reflected

4    here.  Only gypsum board.

5            Q.    I'm not talking about --

6            A.    We are talking about here.

7            Q.    -- that part of the document

8    anymore.

9            A.    You're talking too fast.  I

10   can't follow.

11           Q.    Let's put that away.

12           A.    You just mentioned this, and

13   now you're changing to another subject.

14   I don't understand.

15           Q.    Yes.

16           A.    I'm sorry.

17           Q.    After the sole agency

18   agreement with Oriental Trading in

19   October of 2006 for the sale of gypsum

20   board under the Dun brand, you also

21   discussed with Mr. Gonima selling his

22   business products related to drywall such

23   as metal studs or frames, screws and

24   bonding tape.  Is that true?

Confidential - Subject to Further Confidentiality Review

```
 1              A.    No.  First of all, because

 2    Oriental company had exaggerated their

 3    volume.  And upon the customer's request,

 4    I signed that agreement with them.

 5    However, the precondition for the

 6    effectiveness of the contract is that it

 7    has to be within a period of time that we

 8    both agreed to sell certain volume of

 9    gypsum board.  But in fact, during that

10    period of time, he did not sell anything

11    at all.  Therefore, that agreement is

12    invalid.  And also, after Jorge took the

13    agreement, he once promised to mail back

14    the original to us; however, we have

15    never received that, as far as I can

16    remember, and also, we did not find it in

17    our company's file.  Therefore, I'm even

18    more assured that the agreement is

19    invalid.  As of what you have said about

20    metal stud --

21              THE INTERPRETER:

22         Interpreter clarification.

23              THE WITNESS:  As what you

24         have mentioned, metal stud and
```

Confidential - Subject to Further Confidentiality Review

```
 1          screw, the discussion about these
 2          was for the purpose of returning
 3          and resolving the $100,000 that
 4          Oriental company would pay us.
 5          This has also been the same
 6          request that Oriental company
 7          expressed in multiple e-mails.
 8          That's a fact of this.
 9     BY MR. MEUNIER:
10          Q.    Are you finished?
11          A.    Yes.
12          Q.    Before giving Mr. Gonima
13     prices on metal frames and other
14     products, you wanted to know the price
15     levels for these products charged by
16     American manufacturers.  Isn't that true?
17          A.    I don't recall.
18          Q.    Please refer to page 20 of
19     the instant message document.  I will
20     read starting at the top of that page for
21     the date March 13, 2007, 9:22:47 p.m.
22               Ivan.  "Any news on the
23     metal frame and other products?"
24               Mr. Che Gang.  "At this
```

Confidential - Subject to Further Confidentiality Review

1    moment, the price of steel belt is

2    increasing, not steady."

3              "We want to offer you a

4    steady price for metal stud to you.

5              Ivan.  "But still I need to

6    have a price; our clients are asking for

7    a quote."

8              "I understand your point but

9    we have to compare with the american

10   manufacturers pricing."

11             "I think they are also

12   paying high price for the steel belt they

13   are" using.  Not suing, sorry.

14             Mr. Che Gang.  "Would you

15   please let us know the price level of

16   American manufacturers?"

17             Do you have any reason to

18   deny that this was the conversation you

19   had with Mr. Gonima?

20        A.    I can't be sure that I was

21   the person who said that.

22        Q.    Is it true that you provided

23   US customers not only shipping costs to

24   cross the ocean from China to the US but

Confidential - Subject to Further Confidentiality Review

```
 1    also land transportation costs from US

 2    ports to inland cities?

 3            A.    Upon request of the

 4    customers, I had only inquired some of

 5    the prices of their requests.  But as of

 6    where are they going, for me, it's

 7    meaningless.

 8            Q.    For example, you agreed to

 9    give Mr. Gonima the cost of transporting

10    your company's drywall across land from

11    Miami, Florida to Orlando, Florida.  Is

12    that true?

13            A.    Where is it?

14            Q.    At page 25 of the instant

15    message document.  I will begin reading

16    at the bottom time entry.  Date entry is

17    April 14, 2007 at 10:34:42 p.m.

18                  Ivan.  "I understan you will

19    ship the containers to Miami," Florida

20    "or could you give me a price up to

21    Orlando...including the land portion?"

22                  Mr. Che Gang.  "Can he

23    operate the 40 container of 28-29 tons?"

24                  Ivan.  "Yes, he can."
```

```
 1                    "We already found a way to
 2   solve that problem."
 3                    Mr. Che Gang.  "Ok fine."
 4                    Ivan.  "But if you can give
 5   me a price from Qingdao to Orlando
 6   directly I will consider your quote."
 7                    Mr. Che Gang:  "Ok sir, I
 8   will."
 9                    Do you have any reason to
10   deny that that was your conversation with
11   Mr. Gonima?
12        A.    I can't confirm that.
13        Q.    Mr. Che, you learned that a
14   storm called Hurricane Katrina had caused
15   the destruction of property and the need
16   to rebuild some cities in the area of
17   that storm.  Is that true?
18        A.    I don't recall.
19        Q.    Please, on the same page
20   we've been reading from, which is page 26
21   of the instant message document, I'll
22   begin reading it on April 14, 2007 at
23   10:38:10 p.m.
24                    Ivan.  "I will be waiting
```

```
 1    for your answer.  The quote from Qingdao
 2    to Gulfport is VERY," in caps, very,
 3    "important.  We have somebody asking us
 4    for 2,000,000" 4 feet by 8 feet by 1/2
 5    inch "sheets."
 6              "These would be for the
 7    reconstruction of some cities destroyed
 8    by Hurricane Katrina."
 9              Mr. Che Gang.  "Ok sir, I
10    will confirm it quickly, have a great
11    night!"
12              Do you have any reason to
13    deny that that was the conversation you
14    had with Mr. Gonima?
15         A.    This is only a message sent
16    by the customer.  I really can't recall.
17    I also cannot confirm that it was indeed
18    me who was having a conversation with
19    him.
20         Q.    Yesterday you were shown a
21    series of e-mails Bates numbered TG 915
22    through TG 920.  It's marked as Che
23    Number 2.  And I want to again direct
24    your attention to Mr. Gonima's e-mail of
```

1    April 15, 2007, starting on page TG 917.

2                   In that e-mail, Mr. Gonima

3    asked you for --

4          A.    Which one?

5          Q.    I just -- it's the e-mail

6    from Ivan Gonima to the witness.  It's

7    dated April 15, 2007, and it begins on

8    the page which is Bates numbered TG 917.

9          A.    This one?

10         Q.    Yes.

11                  In that e-mail, Mr. Gonima

12   asked you for ocean freight rates for

13   your company's drywall to be shipped to a

14   number of cities, which included eight

15   cities in the United States of America.

16   Is that true?

17         A.    This is only an e-mail in

18   which the customer asked me to help him

19   inquire about the shipping costs.

20         Q.    Yes, sir.

21                  But the fact is that you

22   then responded and gave him the requested

23   information for those cities, didn't you?

24         A.    I was only helping out the

Confidential - Subject to Further Confidentiality Review

```
 1    customer.  In fact, my operation was done

 2    still according to FOB Chinese port.

 3            Q.    I show you a document which

 4    is Bates numbered TG 913 to TG 914 and

 5    refer you to your e-mail to Oriental

 6    Trading dated April 17, 2007.

 7                 I think I'm going to give it

 8    a separate exhibit number.  It was not

 9    included in the other.

10                 MR. MEUNIER:  What's the

11            number?

12                 MR. SPANO:  913.

13                 MR. MEUNIER:  Yes, but it's

14            Che --

15                 MR. SPANO:  10.

16                 MR. MEUNIER:  Che Number 10.

17                      -   -   -

18                 (Deposition Exhibit No.

19            Che-10, E-mail chain, top one

20            dated 4/18/2007, Bates stamped TG

21            0000913 and TG 0000914, was marked

22            for identification.)

23                      -   -   -

24    BY MR. MEUNIER:
```

```
 1            Q.    Is it true that in this

 2    e-mail, in response to Mr. Gonima's

 3    request, you provided shipping cost

 4    information for eight cities in the

 5    United States of America?

 6            A.    Which e-mail are you talking

 7    about?  The one on the bottom or the one

 8    on the top?

 9            Q.    Yes.  From Wuyu, sent

10    Tuesday April 17, 2007, 11:17 p.m.,

11    "Subject:...Shipping."

12                  Is it true that in response

13    to Mr. Gonima's earlier e-mail, you

14    provided shipping cost information for

15    your company's drywall to be sent to

16    eight cities in the United States of

17    America?

18            A.    Is inquiry for shipping cost

19    stated in this e-mail on top?

20            Q.    No.  I suggest to you that

21    the list of the cities matches the list

22    of the cities in Mr. Gonima's e-mail to

23    you on April 14, 2007, which we just

24    looked at.
```

```
 1                    Do you see that, sir?

 2           A.    He's the judge.  First of

 3   all, I don't understand English very

 4   well.  If I am shown like this, I don't

 5   understand the context.  I'd like the

 6   interpreter to explain to me content of

 7   these e-mails.  Otherwise, I can't answer

 8   the question.

 9           Q.    When you are clear what

10   e-mail I'm referring you to --

11           A.    This one?

12           Q.    -- the interpreter will

13   translate for you.

14           A.    Okay.

15           Q.    In the e-mail from you dated

16   April 17, 2007, did you provide shipping

17   cost information for the same cities in

18   Mr. Gonima's e-mail to you of April 14,

19   2007?

20           A.    Yes.  Upon the request of

21   Mr. Ivan, I inquired the shipping costs

22   for him.  Mr. Ivan told me some of these

23   names.

24           Q.    Yes.
```

```
 1                    And you obtained shipping

 2      cost information for the following

 3      cities:  Gulfport, Mississippi; New

 4      Orleans, Louisiana; Long Beach,

 5      California; Las Vegas, Nevada; Savannah,

 6      Georgia; Atlanta, Georgia; Charleston,

 7      South Carolina; and Wilmington, North

 8      Carolina.  Eight cities in the United

 9      States.  True?

10           A.    I don't recall the details.

11      But according to the principle of our

12      operation in a company, usually when the

13      customer ask for our help for such

14      information, I would copy the ports in

15      question and send to a few shipping

16      companies and to have them fill out the

17      information, which are the prices, and

18      then copy it back, send it to the

19      customer.  As where the customer would

20      like to send it to, those were the

21      requirement of the customers.  For us,

22      it's all the same.  It doesn't matter

23      where they're sending to.  They could

24      send it to these places or Hong Kong or
```

```
 1    China.  We were only providing help.  In

 2    fact, the principle that our company

 3    required of us was only to deliver in

 4    China.

 5          Q.    How did you obtain this

 6    information?

 7          A.    Shipping agent quoted the

 8    information.

 9          Q.    Explain the letters in the

10    parentheses after each of these cities?

11          A.    I don't understand that

12    either.

13          Q.    For example, Gulfport,

14    Mississippi, you put in parentheses "(CY

15    - DR)."

16                What does that stand for?

17          A.    I only copied that

18    information to the shipping agent, and

19    the shipping agent quoted the price and I

20    copied it back.  I did not pay special

21    attention to these.  I also don't

22    understand what he meant by that.

23          Q.    And is that also true for

24    the letters in parentheses after the
```

```
 1    numbers, for example, "EMC," "APL," et

 2    cetera?

 3              A.    These are the shipping

 4    agent's abbreviation.  That I know.  This

 5    is something that we use often.

 6              Q.    Las Vegas, Nevada is not a

 7    port city, is it?

 8              A.    I don't know.

 9              Q.    But you provided shipping

10    costs for that city.  True?

11              A.    I don't know these

12    information.  I just copied it to the

13    shipping agency, and the shipping agent

14    provided the information back to me, I'll

15    copy it back to them.  What I can

16    understand are the pricings provided by

17    the shipping companies.  That's what it

18    is reflected here.

19              Q.    So some of the cost --

20              THE INTERPRETER:  One

21         moment, please.

22              MR. MEUNIER:  Oh, I'm sorry.

23              THE WITNESS:  What I could

24         understand was that in this part
```

```
 1          are the name of the shipping

 2          company and on this part were the

 3          prices.  I didn't really pay

 4          attention to the rest of them.  I

 5          didn't understand either.

 6   BY MR. MEUNIER:

 7          Q.    Some of the cost

 8   information, for example, in the case of

 9   Las Vegas, Nevada, as far as you know,

10   involved land transportation costs as

11   well.  Is that true?

12          A.    I don't know.

13          Q.    Later Mr. Gonima asked you

14   to provide shipping cost information for

15   some additional cities in the United

16   States.  Is that true?

17          A.    Where is it?

18          Q.    I'm going to show you an

19   e-mail from Mr. Gonima to you dated May

20   10, 2007.  I've marked it as Che Number

21   11.

22                    -  -  -

23          (Deposition Exhibit No.

24   Che-11, E-mail dated 5/10/2007,
```

```
 1          Bates stamped TG 0000902, was

 2          marked for identification.)

 3                     -  -  -

 4               MR. SPANO:  What are the

 5          Bates?

 6               MR. MEUNIER:  Oh, I'm sorry.

 7          Bates number is TG 902.

 8               THE WITNESS:  What is your

 9          question?

10     BY MR. MEUNIER:

11          Q.    In this e-mail to you, Mr.

12     Gonima asked you to provide ocean freight

13     rates for drywall to four US cities --

14     actually, I'm sorry, five US cities as

15     follows:  West Palm Beach and Tampa,

16     Florida; Houston, in Texas; Norfolk, in

17     Virginia; Newark, in New Jersey.

18          A.    This is also upon the

19     request of Mr. Irvin, to have us to

20     assist him in inquiring the shipping

21     costs.

22          Q.    And you provided that

23     information to Mr. Gonima?

24          A.    There is no response here.
```

Confidential - Subject to Further Confidentiality Review

```
 1    I don't recall.
 2              Q.    It was your custom to
 3    provide that information if requested?
 4              A.    Not necessarily.  It depends
 5    on whether the shipping company would
 6    provide me such information.  I would
 7    copy it to the shipping company, and they
 8    would copy to me and I will copy to them.
 9    Usually, I don't even look at the
10    details.
11              Q.    In the same e-mail from Mr.
12    Gonima, he asked you to provide the cost
13    of shipping drywall screws to a number of
14    cities, including 11 US cities.  Is that
15    true?
16              A.    You mean here?
17              Q.    Yes.  Same e-mail.
18              A.    I believe that's only an
19    inquiry, just like what I explained
20    earlier.  They asked me to help them to
21    inquire.
22              Q.    Yes, sir.
23                    And let me correct the
24    record.  It's actually 13 cities.  I'll
```

```
 1   read them for the record.  This is for

 2   the cost of shipping drywall screws,

 3   Miami, Florida; West Palm Beach, Florida;

 4   Tampa, Florida; Savannah, Georgia;

 5   Charleston, South Carolina; Wilmington,

 6   North Carolina; Norfolk, Virginia;

 7   Newark, New Jersey; Long Beach,

 8   California; Houston, Texas; Gulfport,

 9   Mississippi; New Orleans, Louisiana; Las

10   Vegas in Nevada, in parens, via, V-I-A,

11   Long Beach, California.

12              Your custom was to ask

13   shipping agents for this information, and

14   then if they provided it to you, you

15   would give that to a customer like Mr.

16   Gonima.  Correct?

17        A.    My customed way of dealing

18   with this is usually I don't even look at

19   the contents, but I will send it directly

20   to the shipping agents.  And the shipping

21   agents, after they fill up the

22   information, if -- which is if they could

23   give me an instant answer, then I could

24   forward it to the client.  If the
```

```
 1    shipping company were not able to provide

 2    me with the information for a longer

 3    period of time, perhaps we'll just put it

 4    aside, unless the customer would mention

 5    it again, and then there will be another

 6    cycle of activity.

 7         Q.    You've testified about the

 8    $100,000 reimbursement request that was

 9    made by Oriental Trading Company.

10              Do you recall that?

11         A.    Yes, I remember.

12         Q.    This $100,000 was an advance

13    deposit made by Oriental Trading when it

14    signed the sole agency agreement in

15    October 2006.  Is that true?

16         A.    No.  It had nothing to do

17    whatsoever with that agreement.  It is

18    also that afterwards our intercompany

19    wished to purchase products from us, just

20    like any other customer.  And they wired

21    the payment to us.  And for many reasons,

22    they did not actually want to have the

23    products.  So later on, according to

24    perhaps Mr. Ivan in Oriental Company,
```

 1    upon his request, he entrusted a

 2    representative office in China to have us

 3    send back the payment to the account

 4    number in China of that representative

 5    office.  That's what was going on.

 6         Q.    You tried to convince your

 7    company to return the $100,000 to

 8    Oriental Trading.  Is that true?

 9         A.    It was not that I attempted

10    to persuade my company; it was because

11    there was a rule of foreign currency

12    exchange in China.  There were many

13    redundant processes.  We had to find out

14    a way to handle this amount of money.

15         Q.    And the way that you and

16    your company proposed to handle this

17    problem was to export additional products

18    to Oriental Trading instead of paying

19    back the cash.  Is that true?

20         A.    The circumstance was at the

21    time, because of foreign currency rules

22    and regulations in China, according to

23    the request of Oriental company, we were

24    supposed to return it back to them.  But

```
 1    it was really, really hard to operate

 2    that way.  So after discussion with

 3    Oriental company to try to find a

 4    solution for it.

 5         Q.   I show you an exchange of

 6    e-mails from December 2008.  It's Bates

 7    number 21477, and I have marked it as Che

 8    Exhibit Number 12.

 9                   -  -  -

10              (Deposition Exhibit No.

11              Che-12, E-mail chain, top one

12              dated Dec 19, 2008, Bates stamped

13              TG 0021477, was marked for

14              identification.)

15                   -  -  -

16              MR. SPANO:  Objection.  It's

17              two half e-mails here.

18              MR. MEUNIER:  21477?

19              MR. SPANO:  Does it continue

20              on the next page?

21              MR. MEUNIER:  I'm looking at

22              the one in the middle.  It's a

23              complete e-mail.

24              MR. SPANO:  Okay.  If that's
```

1          all you're going to question him

2          on.

3    BY MR. MEUNIER:

4          Q.    I'm referring to your e-mail

5    to Mr. Guzman dated December 16, 2008 in

6    which you said, starting in the second

7    sentence, "I am working hard to return

8    the money to you, but our bank and our

9    accounting departments need time to

10   operate this thing.  It is so complicated

11   and time-consuming.  I suggest that we

12   can export something to you, for example

13   the metal keels, the steel belt price

14   have went down in China.  And some

15   customers from USA start to order the

16   metal keels now.  We think it is the most

17   operable and easiest way."

18          Let's clear that up for the

19   record.

20          Metal keels are the frames

21   or studs that the drywall attaches to?

22          A.    Stud?  Oh, okay.

23              THE INTERPRETER:

24          Interpreter clarification.

```
 1              Deponent said the stud is supposed

 2              to be translated as dragon bone,

 3              so I will use dragon bone from now

 4              on.

 5   BY MR. MEUNIER:

 6         Q.    Very, very nice.

 7              What are the metal keels

 8   that you were referring to in this

 9   e-mail?

10         A.    Usually I call metal keel

11   metal stud.  I don't really use metal

12   keel that much.

13         Q.    But whether you call it

14   metal keel or metal stud or dragon bone,

15   it is a product manufactured by TG, at

16   the same factory where the drywall is

17   made, and the drywall attaches to the

18   metal stud or keel.  Is that true?

19              MR. SPANO:  Objection,

20              compound and no foundation.

21                THE COURT:  I agree.

22              Sustain.

23              MR. MEUNIER:  I'll rephrase.

24   BY MR. MEUNIER:
```

```
 1              Q.    Let me just ask this
 2    question.
 3                    Did TG make metal keels?
 4              A.    No.
 5              Q.    Did TTP make metal keels?
 6              A.    No.
 7              Q.    Who made metal keels that
 8    you were referring to in this e-mail?
 9                    THE INTERPRETER:  Literal
10              translation of the name of the
11              company that the deponent was
12              saying is --
13                    THE WITNESS:  Golden Shield
14              Construction Material Company or
15              Golden Dun, either.
16    BY MR. MEUNIER:
17              Q.    But the metal keel is
18    something that drywall attaches to, Mr.
19    Che?
20              A.    When we do the hanging
21    ceiling or the divider, we would first of
22    all place the metal stud.  And then we
23    will use the nail to attach the gypsum
24    board to it.
```

1        Q.    And the company that you

2    just named that you said makes the metal

3    keel, that was a company created by the

4    Taihe Group.  Correct?

5        A.    I'm not sure about the

6    specific relationship of this company

7    with TG.

8        Q.    How did you have authority

9    in your December 16, 2008 e-mail to offer

10   the export of metal keels to Mr. Gonima

11   as an employee of Taishan Gypsum?

12       A.    I bought it and I sold it.

13       Q.    Taishan Gypsum bought it?

14       A.    It was not actually

15   operated.  If at the time I worked for

16   TTP, then TTP would have bought it and

17   then we would have sold it to the client.

18   If at the time I worked for TG, I would

19   have used the name -- TG company's name

20   to buy the product and in turn sell it to

21   the client.

22       Q.    In Mr. Gonima's reply to you

23   in the e-mail of December 19, 2008 on

24   this document, he told you,

```
 1    "Unfortunately, the actual situation in

 2    USA is not the best for import new

 3    products and the owner" of "the company

 4    needs the reimbursement" of the US

 5    dollars 100,000.

 6                However, even after this,

 7    your boss continued to suggest that

 8    instead of refunding the cash, your

 9    company wanted to export goods to

10    Oriental Trading Company.  Is that true?

11         A.    I don't see it over here.

12    It's not here.  Right?

13         Q.    Yes, sir.  I'm going to show

14    you an exchange of e-mails from March

15    2009 on a document Bates numbered 21470.

16                     -  -  -

17                (Deposition Exhibit No.

18         Che-13, E-mail chain, top one

19         dated March 6, 2009, Bates stamped

20         TG 0021470, was marked for

21         identification.)

22                     -  -  -

23    BY MR. MEUNIER:

24         Q.    I first direct your
```

1    attention to a March 6, 2009 e-mail from

2    Leonardo Guzman on behalf of Oriental

3    Trading.

4              MR. CHEN:  I'm sorry,

5         Counsel.  Is there another Bates

6         number on there?  Because it's not

7         in our book.

8              MR. MEUNIER:  21470.

9              MR. EUGENE CHEN:  I go

10        straight from 69 to 75, or if you

11        have another copy.

12             MR. SPANO:  You can go ahead

13        with it.

14   BY MR. MEUNIER:

15        Q.    In his e-mail to you, Mr.

16   Guzman asks if you have any news about

17   the $100,000 reimbursement.  And in your

18   reply e-mail of March 6, 2009, you say

19   the following:  "I still try my best to

20   convince our boss to pay the" US dollar

21   100,000 "to you.  but my boss said that

22   making the account of bank is difficult,

23   so he suggest we" export "the goods to

24   you, I often talk about this things with

Confidential - Subject to Further Confidentiality Review

```
1    our boss.  I need wait for that he

2    agree."

3                Who was your boss that you

4    were referring to in that mail?

5         A.    When I talk about boss here,

6    it's only to express to him that we take

7    this issue seriously.  Actually, I really

8    didn't need the boss to coordinate.  This

9    needed to be coordinated with the

10   accounting department.

11        Q.    Who was the boss that you

12   were referring to?

13        A.    No specific name.  It's only

14   a way of expression which was telling him

15   that we took the issue seriously.

16        Q.    So when you told him I often

17   talk about this with my boss, with our

18   boss, you were not being truthful?

19        A.    It's not that I was not

20   truthful.  It is only a way to do sales.

21   When I say boss, then the client would

22   assume that I took it very seriously.  I

23   was trying to help him to get the money

24   back.  In fact, the boss actually was not
```

1    in charge of detailed businesses.

2    Usually, I would need only to coordinate

3    with financial department for issues like

4    this.

5          Q.    Who was your boss in March

6    of 2009?

7          A.    March 2009 I went back to

8    TG.

9          Q.    So who was your boss?

10         A.    Our big boss should be

11   General Manager Jia.  However, I only

12   reported to Manager Peng for my work.

13   There were quite a few levels in between

14   us.

15         Q.    Peng Wenlong is the boss you

16   reported to?

17         A.    You shouldn't say boss.  We

18   don't call him boss.  The boss here does

19   not have a specific person that we're

20   referring to.  It's not referred to any

21   specific person called that.

22         Q.    Well, when you told Mr.

23   Gonima that instead of repaying cash, the

24   boss suggested the export of goods, what

Confidential - Subject to Further Confidentiality Review

```
 1    export of goods were you referring to?

 2          A.    What he says is as long as

 3    we can find a way to return this amount

 4    of money differently, there's no

 5    specification on that.

 6              THE COURT:  Let's take a

 7          break at this time.  We'll come

 8          back at 1:00.

 9              VIDEOTAPE TECHNICIAN:  We're

10          going off the record.  The time is

11          12:02.

12              -  -  -

13          (A luncheon recess was taken

14          from 12:02 p.m. to 1:01 p.m.)

15              -  -  -

16              VIDEOTAPE TECHNICIAN:  We're

17          going back on the video record.

18          The time is 1:01 p.m.

19              THE COURT:  You may proceed,

20          Counsel.

21    BY MR. MEUNIER:

22          Q.    Mr. Che, I'm showing you an

23    e-mail dated January 5, 2006, addressed

24    to you from Jing Zhang, Bates numbered TG
```

 1    886, which I will mark as Che Number 14.

 2                         -   -   -

 3                    (Deposition Exhibit No.

 4             Che-14, E-mail dated 1/5/2006,

 5             Bates stamped TG 0000886, was

 6             marked for identification.)

 7                         -   -   -

 8    BY MR. MEUNIER:

 9             Q.    In this e-mail, Mr. Zhang

10    asked you for price information on

11    certain sizes of gypsum board, and in

12    paragraph 8, said the following to you,

13    "I need better price of it..because we

14    are consider increase to 20 contains per

15    month.  Because yesterday, you told me

16    price is too" high, "after shipping

17    everything it will be about 9 dollars per

18    piece is too high for cost to doing this

19    business.  i Need better price, And we

20    are looking for long  term relationship

21    with you.  So, we would like to have"

22    competitive "price to compete local

23    manufactory in this blooming

24    opportunities.  After Hurricane Katrina,

```
 1    the Great New Orleans area need rebuild,

 2    and housing market in USA is very hot in

 3    these days.  The both effects, we hope

 4    you and us can both take advantage from

 5    it.  So, please give us your best price,

 6    you can offer."

 7                How did you know Mr. Zhang?

 8         A.    I don't recall.

 9         Q.    He ends this e-mail by

10    saying, "Thanks a lot buddy."

11                Was he a friend of yours?

12         A.    That's what he said.  I

13    think it is only out of politeness from

14    him to me.

15         Q.    Was he a friend of yours?

16         A.    I think it is only an

17    inquiry of price.  He was only a -- my

18    understanding to that is, first of all,

19    it is out of his politeness to me.  And

20    number two, I think he is a potential

21    buyer.

22         Q.    And in fact, you responded

23    to his e-mail, giving him the information

24    he wanted and even giving him shipping
```

```
 1   costs from China to Louisiana, didn't

 2   you?

 3            A.    Can I take a look at the

 4   e-mails?

 5            Q.    Yes.

 6                  I'm going to show you a

 7   document now that's Bates numbered TG 907

 8   and 908.  I will mark it as Che Exhibit

 9   Number 15.

10                       -  -  -

11                  (Deposition Exhibit No.

12            Che-15, E-mail chain, top one

13            dated 1/10/2006, Bates stamped TG

14            0000907 and TG 0000908, was marked

15            for identification.)

16                       -  -  -

17   BY MR. MEUNIER:

18            Q.    The first e-mail I refer you

19   to is one on TG 908, the second page.

20   And it is an e-mail to you from Mike

21   Westbrook on January 10, 2006.  Mr.

22   Westbrook tells you in the e-mail, "Mr.

23   Jing Zhang has been trying to get a

24   written quotation from you on 4 sizes of
```

1    Sheetrock."

2              And then your e-mail of

3    reply is January 10, 2006, which starts

4    on TG 907.  You address this e-mail,

5    "Dear Mr. Mike and Mr. Zhang."

6              So you were responding to

7    both Mike Westbrook and Jing Zhang with

8    this e-mail.  Correct?

9         A.    Can you provide me with

10   another e-mail which states what company

11   that this person belong to?  I can't

12   recall this person.

13        Q.    Look at the e-mail just

14   above yours, which is from Mike Westbrook

15   to you of January 10, 2006.  And he signs

16   it "Mike Westbrook, Advanced Products

17   International."

18             And Advanced Products is one

19   of the companies that you are here to

20   testify about on behalf of TG and TTP.

21   Correct?

22        A.    Yes.

23        Q.    And in your January 10, 2006

24   e-mail to Mike Westbrook which you

 1    addressed to both Mr. Mike and Mr. Zhang,

 2    you provided the price and shipping cost

 3    information that was requested in Mr.

 4    Zhang's e-mail to you of January 5, 2006.

 5    Correct?

 6         A.    I quoted to him FOB price

 7    according to the principle of our

 8    company.  And again, I inquired the

 9    shipping cost according to the request of

10    the customer.

11         Q.    Yes.  Mr. Zhang did not

12    specifically ask you for shipping cost to

13    Louisiana, but he told you about the

14    great need to rebuild in New Orleans

15    because of the Hurricane Katrina.

16    Correct?

17         A.    First of all, I'd like to

18    confirm, the company ADP and the final

19    customer whom we handled in the end, who

20    and who are the same customer.  I'm a

21    little confused here.

22         Q.    Let's take it a step at a

23    time.

24              In your e-mail of January

1   10, 2006 --

2         A.    But you have to remind me.

3   Then I can refresh my memory.

4         Q.    It's Advanced Products, Mr.

5   Che.

6         A.    I don't remember this

7   company.  This should not be the end user

8   for exporting.

9              MR. SPANO:  I object to an

10             assertion of fact.  That's not a

11             question.

12  BY MR. MEUNIER:

13        Q.    We'll look at some documents

14  in a moment.  Let me just, before I move

15  on, ask this question.

16             In your e-mail of January

17  10, 2006 to Mr. Mike and Mr. Zhang, you

18  provided ocean freight cost for drywall

19  to be shipped from Qingdao to Louisiana.

20  Is that true?

21        A.    The reason why I ask you for

22  the name of the handling company was

23  because I will need that name in order to

24  answer your question accurately.  But if

1    you're not telling me who that handling

2    company is, it's hard for me to remember.

3         Q.    Let's --

4         A.    What is the name of the

5    company that eventually appeared on the

6    manufacturer's list?

7         Q.    Let's do it this way.

8              Look at the top of the page

9    which is the Bates stamp 908, paragraph

10   number 3 of your e-mail of January 10,

11   2006 addressed to Mr. Mike and Mr. Zhang.

12             Does your e-mail read as

13   follows:  "Ocean freight is USd

14   1850/40fcl from Qingdao to LA"?  Does it

15   read that way?

16        A.    I can't explain to you

17   because I don't remember the name of that

18   company.

19        Q.    In the --

20        A.    Is it a problem for you to

21   provide me with the name of the handling

22   company?

23        Q.    Mr. Che, in the summer of

24   2006, is it true that TTP sold over

```
 1    11,000 pieces of drywall to APIC Building

 2    Materials, which was shipped to New

 3    Orleans, Louisiana?

 4              MR. SPANO:  Objection,

 5         compound.

 6              MR. MEUNIER:  I show you

 7         documents that have been --

 8              I'm sorry, Judge.

 9              THE COURT:  Go ahead.  Show

10         him the document first.

11    BY MR. MEUNIER:

12         Q.    I show you documents that

13    were previously marked as Peng Shiliang

14    Numbers 4, 5, 6 and 7.

15              Do you recognize those as

16    the invoice and packing list forms of

17    TTP?

18         A.    You should have provided

19    this to me earlier.  Then I would have

20    remembered.  The final handling company

21    in the end should be Triax.  The handler

22    should be Ms. Wei, who we mentioned in

23    morning.  He -- she was the one who

24    handled this transaction throughout.
```

```
 1              THE INTERPRETER:

 2         Interpreter clarify gender.

 3    BY MR. MEUNIER:

 4         Q.    On the July 3 --  I'm sorry.

 5              THE INTERPRETER:  I haven't

 6         interpreted it yet.

 7              MR. MEUNIER:  I'm sorry.

 8              THE WITNESS:  On the e-mail

 9         he did not ask me the price for

10         shipping and I did not provide the

11         price for shipping.  Then it

12         should -- must be Ms. Wei who

13         asked me the question.  Because

14         without request from the customer,

15         I would not have quoted the ocean

16         shipping cost.  This is only to

17         help out the customer.  Our

18         operation is only FOB Qingdao, the

19         Chinese port delivery.

20    BY MR. MEUNIER:

21         Q.    But you provided shipping

22    costs to Louisiana after being told by

23    Mr. Zhang that Hurricane Katrina had

24    created a great need to rebuild in the
```

 1    New Orleans area?

 2         A.    As of what the customer has

 3    said is the customer's problem.  It must

 4    be that somebody asked for the price,

 5    because I didn't know what was the

 6    destination port.  I'm sure it was

 7    someone who asked for the quotation.

 8         Q.    Mr. Che, the invoice and

 9    packing list which is marked Peng

10    Shiliang-4 and -5, I believe?

11         A.    Thank you.

12         Q.    You're welcome.

13               Those two documents show

14    that 5,676 pieces of drywall were shipped

15    to New Orleans, Louisiana.  Correct?

16         A.    Isn't it FOB Chinese port

17    delivery?

18         Q.    Do you see the reference to

19    New Orleans, Louisiana under the date

20    July 3, 2006 on both of these TTP

21    documents?

22         A.    If you look at the source of

23    these documents, you should have known

24    that it was Ms. Wei who asked us to put a

```
 1    seal on it.  We did not produce this

 2    document.

 3             Q.    These are forms with your

 4    company's name at the top, TTP.  Correct?

 5             A.    It was Ms. Wei, the middle

 6    person in trading, that had made the form

 7    and requested us to stamp on it so that

 8    she could get the price difference in the

 9    middle.  It was Ms. Wei who made all of

10    these.

11             Q.    Are these part of the

12    business records of Taian Taishan

13    Plasterboard Company, Limited?

14             A.    I can't remember clearly

15    what this is all about.  I don't know if

16    you have any document with our stamps on

17    it.  If that's all the documents you

18    have, you can't really prove it.  Because

19    I could write your name on it, too.

20             Q.    Sir, it's up to the judge

21    about what is proven, not you.

22                   Do you understand?

23                   THE COURT:  Let's just ask

24             questions, please.
```

```
 1                    MR. MEUNIER:  Sorry, Judge.

 2   BY MR. MEUNIER:

 3          Q.    Mr. Che, why is APIC

 4   Building Materials identified under the

 5   reference shipping mark on both of these

 6   documents?

 7          A.    I don't know.  I did not

 8   make this document.

 9          Q.    The other two documents are

10   Peng-6 and Peng-7.  Both are invoices

11   dated July 20, 2006.  Both refer to 5,760

12   pieces of drywall being shipped to New

13   Orleans.  One is an invoice addressed to

14   Advanced Products International

15   Corporation in California.  The other

16   invoice is addressed to Triax Trading &

17   Logistics.

18                    Do you know why separate

19   invoices from TTP were sent to those

20   different companies for the same

21   transaction?

22                    MR. SPANO:  Objection, lack

23        of foundation.

24                    THE COURT:  If he doesn't
```

 1          know, he can say no.  I'll

 2          overrule it.

 3              THE WITNESS:  I didn't make

 4          this, so I don't know.

 5  BY MR. MEUNIER:

 6          Q.   Do you recall that around

 7  the time of the July 3, 2006 invoice and

 8  packing list for the shipment to New

 9  Orleans, you learned from the vice

10  president of Advanced Products that there

11  was a problem on receiving the drywall

12  because it was broken on the corners?

13              MR. SPANO:  Objection to the

14          shipment part of the question.

15              MR. MEUNIER:  I'll reask the

16          question.

17  BY MR. MEUNIER:

18          Q.   Do you remember hearing from

19  the vice president of Advanced Products

20  International on or about July 3, 2006

21  that a shipment of drywall received was a

22  problem because the drywall was broken on

23  the corners?

24          A.   Can I take a look at that

```
 1    e-mail?

 2            Q.    Do you remember what I'm --

 3            A.    I don't have a clear

 4    recollection.

 5            Q.    I show you a document Bates

 6    numbered TG 19383.  We'll mark it as

 7    Che-16.

 8                      -  -  -

 9            (Deposition Exhibit No.

10            Che-16, E-mail chain, top one

11            dated 7/3/2006, TG 0019383, was

12            marked for identification.)

13                      -  -  -

14    BY MR. MEUNIER:

15            Q.    At the top there appears to

16    be an e-mail from Grace Wei to you on

17    July 3, 2006.  Please read her e-mail.

18            A.    Manager Che, hello.  Last

19    time Zhang Nan -- last time when Zhang

20    Nan was there, two containers products

21    were shipped out.  Now there's a problem

22    with the shipment.  Please look at the

23    picture.  Below is an e-mail of the

24    customer.  He said, if that's the case,
```

Confidential - Subject to Further Confidentiality Review

```
 1    they will not want the remaining 11

 2    containers.  Please handle it and let us

 3    know how should we explain to the

 4    customer.  Thank you, Wei Dongling.

 5              Q.    How did you respond to this

 6    request?

 7              A.    On here you can see the

 8    handler of this transaction has always

 9    been Ms. Wei.  I don't remember whatever

10    handled this issue.

11              Q.    Did your company not agree

12    to respond to Mr. Scudder, the vice

13    president of Advanced Products

14    International?

15              A.    I don't recall.

16              Q.    You were earlier shown an

17    e-mail which is previously marked Jia

18    Number 32.  You may have already read

19    this for the record, but tell me what Ms.

20    Wei in her e-mail of August 2, 2006 told

21    you at the top of --

22              MR. BRENNER:  Can you give

23         us the Bates number?

24              MR. MEUNIER: I'm sorry.
```

Confidential - Subject to Further Confidentiality Review

```
 1          It's TG 19381 and 19382,

 2          previously marked as Jia Number

 3          32.

 4              THE WITNESS:  This is the

 5          e-mail that sent by Ms. Wei to me

 6          and copied to Manager Peng.

 7  BY MR. MEUNIER:

 8          Q.    What does it say?

 9              MR. SPANO:  Objection, asked

10          and answered.

11              THE WITNESS:  We were asked

12          to provide a verification.

13              THE COURT:  I'll let him

14          answer it.

15  BY MR. MEUNIER:

16          Q.    Was that done?

17          A.    No.

18          Q.    Was this problem with the

19  shipment to Advanced Products ever

20  resolved with that company?

21          A.    As far as I can remember.

22  It was not our product's problem.  It was

23  because the way they packed in the

24  container was not in accordance with our
```

Confidential - Subject to Further Confidentiality Review

```
 1   suggestions.

 2              THE INTERPRETER:

 3          Interpreter clarification.

 4              THE WITNESS:  On both sides,

 5          there were empty spaces.

 6          Therefore, during the shipping,

 7          damage was done to the products.

 8          We only handle delivery to Chinese

 9          port.  It was the responsibility

10          of the customer to ship the

11          product to the destination.

12          Therefore, it's not our problem.

13   BY MR. MEUNIER:

14          Q.    Have you continued to do

15   business with Advanced Products, this

16   company, Advanced Products International?

17          A.    Where is it?

18          Q.    Mr. Che, this is one of the

19   companies that you are designated to

20   speak about on behalf of TTP and TG.

21              Do you understand that?

22          A.    I testify on Triax.

23          Q.    As well as Advanced

24   Products.  That's what your counsel has
```

```
 1   verified on the record.
 2        A.    I'm sorry, my English is not
 3   good.  I can only remember the first
 4   letter of the company name.  I do not
 5   remember the whole name of the company.
 6   I don't think I've been rude to you.
 7        Q.    Tell me on behalf of TTP and
 8   TG whether you are still doing business
 9   with Advanced Products?
10        A.    You mean Advanced?  In my
11   memory, the end user's name of the form
12   that TTP filled out according to the
13   requirement of the taxation bureau was
14   Triax.  My personal understanding is I
15   have only done business with Triax, the
16   actual business.
17        Q.    So you do not feel that you
18   are able to answer my questions about the
19   business dealings between TTP and TG with
20   Advanced Products International; is that
21   correct?
22             MR. SPANO:  Objection, lack
23        of foundation with regard to the
24        business dealings.
```

Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT:  Let's ask him
 2         whether or not he knows anything
 3         about them.
 4    BY MR. MEUNIER:
 5         Q.    The problem is that we were
 6    told at the beginning of today's
 7    questioning by me that you were
 8    designated by TTP and TG to testify for
 9    those companies about certain customers.
10    One of those customers is Advanced
11    Products as well as Triax.
12              Do you feel you can answer
13    my questions about TTP and TG and their
14    business relationship with Advanced
15    Products, or should I be asking someone
16    else about that?
17         A.    I think I can answer the
18    questions on that.
19         Q.    So I again ask you whether
20    after the dispute concerning the broken
21    drywall that was shipped to New Orleans
22    after Mr. Scudder of Advanced Products
23    asked for a letter saying that your
24    company would stand behind that product,
```

1    did your company, TTP or TG, continue to

2    do business with Advanced Products?

3          A.    I have a suggestion for the

4    judge, because my English is really poor.

5    This name -- these names are too long.  I

6    don't know which one is which one.  Can

7    you make an abbreviation of the company,

8    call it API?  My memory is API.  You said

9    so much of the name of the company, I was

10   not able to match the two together.

11         Q.    I'm sorry.  I will refer to

12   the company as API.

13               Do you continue to do

14   business with API?

15         A.    In my memory, I have only

16   had some business communication with API.

17   But the end user reflected on my invoices

18   should be Triax.

19         Q.    As of October 2006, API

20   reported to you that the drywall that you

21   furnished to them for their customers had

22   caused great harm to the company, because

23   after installing some of it, it had to be

24   pulled off the walls because it was

```
 1   defective.  Is that true?

 2                  MR. SPANO:  Objection to

 3           form.

 4                  THE COURT:  Show it to him.

 5                  MR. MEUNIER:  I'll show him

 6           a document.

 7   BY MR. MEUNIER:

 8           Q.    I'm going to show you now a

 9   document which is Bates numbered TG

10   19376.  It's a letter dated October 31,

11   2006, from James Scudder, vice president,

12   Advanced Products International, to

13   Shandong Taihe Dongxin Company, Limited.

14   And I'll mark it as Che Exhibit 17.

15                      -  -  -

16                  (Deposition Exhibit No.

17           Che-17, Letter dated 10-31-06,

18           Bates stamped TG 0019376, was

19           marked for identification.)

20                      -  -  -

21   BY MR. MEUNIER:

22           Q.    This letter is addressed to

23   Frank Clem.  Correct?

24           A.    Correct.
```

Confidential - Subject to Further Confidentiality Review

```
 1              Q.     However, since you are the

 2     designated representative and witness on

 3     behalf of TTP and TG for matters dealing

 4     with API, I ask you whether you recall

 5     this letter being received from Mr.

 6     Scudder?

 7              A.     I don't recall that I have

 8     received this letter.

 9              Q.     In this letter, Mr. Scudder

10     indicates that his company may "file a

11     complaint to the U.S. and China

12     governments who regulate import and

13     export of products to make sure this does

14     not happen to anyone else."  He further

15     states that "the filing to the United

16     States importing regulators will stop

17     Taihe for exporting to the United

18     States."

19                     Did anyone at TTP or TG

20     respond to this letter?

21              A.     In my memory, I did not

22     respond to it.

23              Q.     Did anyone on behalf of TTP

24     or TG respond to the letter?
```

Confidential - Subject to Further Confidentiality Review

1        A.    I don't know.

2        Q.    In the same month of July

3   2006, when thousands of pieces of gypsum

4   board were shipped to New Orleans, you

5   provided shipping prices to a customer in

6   Louisiana for drywall to be used in

7   Louisiana.  Is that true?

8             MR. SPANO:  Objection.

9             THE COURT:  If he doesn't

10            understand it, he can answer the

11            question.  I'll overrule the

12            objection.

13            THE WITNESS:  I don't

14            understand what you're saying.

15            THE COURT:  Show him.

16   BY MR. MEUNIER:

17        Q.    I'll show you e-mails, an

18   exchange of e-mails from July 2006, Bates

19   numbered TG 631 and TG 633.

20                  -  -  -

21            (Deposition Exhibit No.

22            Che-18, E-mail chain, top one

23            dated 7/10/2006, Bates stamped TG

24            0000631 and TG 0000633, was marked

```
 1          for identification.)

 2                    -   -   -

 3   BY MR. MEUNIER:

 4          Q.    In an e-mail of July 10,

 5   2006, from you -- from -- addressed to

 6   you from Jeff Zhou, Z-H-O-U, he asked you

 7   to provide -- to "please find out the

 8   freight from Qingdao to New Orleans."

 9               Do you see that in the first

10   paragraph of his e-mail?

11          A.    Yes.

12          Q.    And do you see how in

13   paragraph 4 he asked you to send samples

14   to him at TP Construction, Inc. located

15   on Jefferson Highway in Jefferson,

16   Louisiana?

17          A.    Yes, I see it.

18          Q.    Did you send those samples

19   as requested?

20          A.    First of all, I don't have a

21   recollection on this issue at the time

22   it -- at the time it happened.  However,

23   according to the principle of our

24   company, in this circumstance, customer
```

Confidential - Subject to Further Confidentiality Review

1    had to pay postage in order for us to

2    give them the stuff.

3         Q.    Please refer to the other

4    page of this e-mail exchange, which is TG

5    633.  In the bottom e-mail, Mr. Zhou

6    writes to you on July 6 -- I'm sorry,

7    July 10, 2006 and thanks you for your

8    information but then asks you to explain

9    how freight will be charged.  Correct?

10        A.    That's what it appears to

11   be.

12        Q.    And then in your July 11,

13   2006 reply to him, you gave him that

14   explanation and also sent an attachment

15   with that e-mail.  Correct?

16        A.    You said July the 11th,

17   2006.  I don't have it here.  Where is

18   it?

19        Q.    It's in the middle of TG

20   633, July 11, 2006.

21             You provided an attachment

22   for loading by break bulk.

23             Do you see that?

24                  THE INTERPRETER:

```
 1            Interpreter clarification.
 2   BY MR. MEUNIER:
 3            Q.    Second sentence, "Please
 4   refer to attachment for loading by break
 5   bulk."
 6                  THE INTERPRETER:  There is
 7            no such word B-R-E-A-K in my
 8            dictionary.
 9   BY MR. MEUNIER:
10            Q.    Mr. Che, you wrote this in
11   English?
12            A.    My English is so poor, I
13   don't even know what I wrote.
14            Q.    So you wrote the words in
15   English "break bulk."  Tell us what you
16   meant?
17            A.    I always make mistakes.  I
18   don't know either.
19            Q.    In the e-mail above that,
20   addressed to you on July 16, 2006 from
21   Mr. Zhou, he says, "Dear Mr. Che, I got
22   your samples thanks."
23                  Tell me how you mailed
24   drywall samples to a construction company
```

1    in Jefferson, Louisiana in July 2006?

2         A.    I don't have a clear

3    recollection on how we mailed it out, but

4    there is a principle in our company that

5    in this circumstance, the client had to

6    prepay the postage for us to mail it out.

7    It doesn't matter where the client is

8    located.

9         Q.    Have your companies, TG and

10   TTP, mailed drywall samples to states

11   other than Louisiana, states of the

12   United States?

13        A.    If the customer requested

14   this and had paid, and paid us the

15   postage, we could mail it to wherever the

16   customer would like us to mail it to.

17   The precondition is postage had to be

18   prepaid.

19        Q.    So if the customer prepays,

20   your companies, TTP and TG, will use the

21   United States mail service to send

22   drywall samples to cities in the United

23   States.  True?

24        A.    Usually, the payment of

```
 1    postage was not paid by the customer in

 2    this channel.  Usually the customer would

 3    assign a specific mailing company --

 4              THE INTERPRETER:

 5         Interpreter clarification.

 6              THE WITNESS:  -- to have a

 7         reverse payment.

 8    BY MR. MEUNIER:

 9         Q.    How big are the drywall

10    samples that --

11              THE INTERPRETER:  I'm sorry,

12         correction.

13              THE WITNESS:  I'd like to

14         give you example of the method of

15         payment.

16    BY MR. MEUNIER:

17         Q.    Yes.

18         A.    For example, if you want a

19    sample and you like me to mail it to you,

20    you want me to use DHL, then I will give

21    you the sample to DHL.  And DHL will

22    deliver it to you, and you will talk

23    about the cost with DHL.  Our job was

24    only to give the sample to DHL.  You
```

Confidential - Subject to Further Confidentiality Review

```
 1    would be the one who take care of the

 2    cost.

 3            Q.    I will pay for it, but you

 4    will put it in a container and address it

 5    to a United States city to be sent to

 6    that city as a drywall sample.  Is that

 7    true?

 8            A.    It was a customer who

 9    provided me an address.  And it was a

10    customer who should contacted the

11    shipping company.

12            Q.    How large are the drywall

13    samples that TG and TTP customarily

14    mailed to customers in cities in the

15    United States?

16                  MR. SPANO:  Objection to

17            form.

18                  THE COURT:  What's the

19            problem, Frank?

20                  MR. SPANO:  Customarily

21            mailed.

22                  THE COURT:  Okay.  How would

23            you do it?

24                  MR. MEUNIER:  Overrule?
```

```
 1                THE COURT:  No.  I'll let

 2         you rephrase the question.

 3         Sustained.

 4   BY MR. MEUNIER:

 5         Q.    How large are the drywall

 6   samples that you have known TTP or TG to

 7   mail to customers in United States

 8   cities?

 9         A.    Usually our way of handling

10   customers' requests is as follows:  First

11   of all, the client would give us the

12   specification she requires, the

13   specifications.  Correction.  The model

14   number instead of specifications, the

15   last specification.  If we have such a

16   sample and plus the customer would like

17   to pay for the mailing cost, then we

18   would provide that to the customer.

19         Q.    I understand, sir.

20               My question was, how large

21   physically are the sample sizes that you

22   have known to be sent to customers in the

23   United States?

24         A.    It's not a fixed size.  It
```

Confidential - Subject to Further Confidentiality Review

```
 1    could be this big.
 2              Q.    What's the smallest size
 3    you've -- you had experience with?
 4              A.    The smallest could be this
 5    small.
 6                    MR. MEUNIER:  Is that clear
 7         on the record?
 8                    THE COURT:  As big as a
 9         baseball.
10                    THE WITNESS:  Like this,
11         like a cake.  It depends on how
12         much mailing cost the customer is
13         willing to pay.
14    BY MR. MEUNIER:
15              Q.    And what's the largest size
16    sample you have known to be sent to a
17    customer in the United States?
18              A.    I don't recall.  Usually
19    it's about this size.
20              Q.    Indicate for the camera,
21    please.
22              A.    The normal size, like this
23    size.
24              Q.    Okay.  Thank you.
```

```
 1          A.    Can I go to the rest room?

 2                MR. MEUNIER:  Yes.

 3                THE COURT:  Let's take a

 4          15-minute break.

 5                VIDEOTAPE TECHNICIAN:  We're

 6          off the record.  The time is 1:57.

 7                      -  -  -

 8                (A recess was taken from

 9          1:57 p.m. to 2:12 p.m.)

10                      -  -  -

11                VIDEOTAPE TECHNICIAN:  Going

12          back on the record.  Beginning of

13          Tape Number 5.  The time is 2:12.

14   BY MR. MEUNIER:

15          Q.    Mr. Che, the next company I

16   want to talk about is B America

17   Corporation.

18                On September 2, 2006, TTP

19   entered into a written contract with B

20   America for the sale of 1,320 pieces of

21   drywall.  Correct?

22                      -  -  -

23                (Deposition Exhibit No.

24          Che-19, Contract dated 2th Sep.
```

```
1          2006, Bates stamped TG 0021704 and
2          TG 0021705, was marked for
3          identification.)
4                    -   -   -
5    BY MR. MEUNIER:
6          Q.    For the record, I've handed
7    the witness a document which is Bates
8    stamped 21704 and 21705.  I've marked it
9    as Che -- what's the number?
10               THE INTERPRETER:  19.
11               MR. MEUNIER:  -- 19.
12               THE WITNESS:  I only
13          remember that we had one gypsum
14          board transaction with B America
15          Corporation.  I believe the
16          quantity is smaller than this one.
17   BY MR. MEUNIER:
18         Q.    Did you sign this contract
19   on behalf of Taishan -- I'm sorry, TTP?
20         A.    I don't recall whether I
21   signed a contract or not at the time.
22         Q.    I show you a document which
23   is Bates number TG 21695, which I am
24   marking as Che Number 20.
```

Confidential - Subject to Further Confidentiality Review

```
 1                   -  -  -

 2              (Deposition Exhibit No.

 3         Che-20, Page of Contract, Bates

 4         stamped TG 0021695, was marked for

 5         identification.)

 6                   -  -  -

 7    BY MR. MEUNIER:

 8         Q.    And I represent to you it is

 9    the second page of that contract in front

10    of you, and this second page is signed on

11    behalf of TTP; is that correct?

12         A.    It's not my signature.

13         Q.    Whose signature is that for

14    TTP?

15         A.    I believe it should be -- I

16    don't recognize it.

17         Q.    Well, since you are

18    designated by the company to talk about B

19    America, I will continue to question you

20    about this contract.

21              Is it true the contract was

22    for the sale of 1,320 pieces of drywall

23    for a total amount of 1 -- I'm sorry,

24    $13,490.40?
```

```
 1          A.    That's what it appears to

 2   be.

 3          Q.    And the price per piece

 4   stated in the contract is $10.22 per

 5   piece.  Is that true?

 6          A.    Correct.

 7          Q.    We have seen other

 8   transactions in this case where the TG or

 9   TTP drywall was priced at a little over

10   $3 apiece.

11                Can you tell me why this

12   price is so much higher than the price in

13   other cases?

14          A.    It depends on the way of

15   handling of this company.  First of all,

16   B America company did business through a

17   Madam Chen Bilai in China who approached

18   our company, expressed her willingness to

19   represent a company to purchase our

20   products, and requested our company to

21   provide her with FOB quotation according

22   to her requested specifications.

23                Afterwards -- afterwards,

24   Madam Chen Bilai started operation of her
```

 1   ocean shipping business.  And according

 2   to her requirements, we added her ocean

 3   shipping cost on it.  There should be

 4   also the cost of insurance in the money

 5   that we have asked from B America company

 6   includes the ocean shipping cost and

 7   insurance that we pay on their behalf.

 8   That's why the price is high.

 9           Q.    Under this contract, the

10   gypsum board to be produced was required

11   to meet a standard of ASTM C-1396 as

12   stated in paragraph 2 at the bottom of

13   page 1 of the contract.

14               Do you see that?

15       A.    I see it.

16           Q.    And that is an American

17   standard for drywall.  True?

18       A.    My understanding that it was

19   a standard that has been used by

20   everybody in the world, not necessarily

21   in America only.

22           Q.    The delivery of this drywall

23   was to be in Miami, Florida, as stated in

24   paragraph 4 on page 2; is that correct?

```
 1          A.     This is done according to

 2   the requirement of Madam Chen Bilai.

 3          Q.     In paragraph 6 on page 2,

 4   any disputes about the contract are to be

 5   submitted to the foreign trade

 6   arbitration commission of the China

 7   council for promotion international

 8   trade; is that correct?

 9          A.     If that what it says, that's

10   what it says.

11          Q.     Are you familiar with the

12   foreign trade arbitration commission of

13   the china council for promotion of

14   international trade?

15          A.     I'm not familiar.

16          Q.     I show you a document which

17   is Bates numbered TG 21696.  And I'm

18   sorry, I will mark that as Che Number 21.

19                      -  -  -

20               (Deposition Exhibit No.

21               Che-21, Contract dated 23rd

22               November 2006, Bates stamped TG

23               0021696, was marked for

24               identification.)
```

1                       -  -  -

2      BY MR. MEUNIER:

3           Q.    And this is a contract of

4      November 23, 2006 between TTP as seller

5      and B America Corporation as buyer which

6      cancels the contract of September 2, 2006

7      that we just looked at; is that correct?

8           A.    That's what appears to be in

9      this document.  But after we have

10     delivered our products to B America,

11     there was still $1,000 left, and B

12     America requested us to return the $1,000

13     to them.  In order to do that according

14     to the regulations of the foreign

15     currency institution of China, we have to

16     do this in order to return $1,000 back to

17     them.

18          Q.    The reason that TTP and B

19     America canceled their contract of

20     September 2, 2006 was because of a drop

21     in the price in the American market.

22     Correct?

23          A.    I don't recall that was the

24     reason.

```
 1              Q.    I will read the last
 2    sentence of the document in front of you,
 3    which is a contract of November 23, 2006,
 4    Bates numbered 21696 and marked as
 5    Che-21.  "The reason is" -- "the reason,"
 6    meaning the reason for cancellation, "is
 7    that both parties can not bear the
 8    dropped price in the American market."
 9              Do you agree that's what the
10    contract says?
11              A.    That's what it says on the
12    contract.  But the reality was it was
13    only for the purpose of providing an
14    appendix to Chinese foreign currency
15    management institution.
16              Q.    That statement in this
17    contract bears the seal of TTP; is that
18    correct?
19              A.    Correct.
20              Q.    Who placed that seal on this
21    contract?
22              A.    I don't recall.
23              Q.    I show you e-mails -- an
24    e-mail exchange from November of 2006 on
```

```
 1    documents which are Bates numbered 21702

 2    and 21698.  And I will mark this as Che

 3    Exhibit 22.

 4                    -  -  -

 5                 (Deposition Exhibit No.

 6            Che-22, E-mail chain, top one

 7            dated November 24, 2006, Bates

 8            stamped TG 0021702 and TG 0021698,

 9            was marked for identification.)

10                    -  -  -

11    BY MR. MEUNIER:

12            Q.   First, will you please read

13    for the record your e-mail to Rafael

14    Sardi of November 23, 2006 at the bottom

15    of TG 21698, subject of the e-mail being

16    "Contract."

17            A.   Should I read it for you

18    right now?

19            Q.   Yes.

20            A.   Manager Chen, hello.  I'm

21    sending you two copies of the contract.

22    One is for the Foreign Exchange

23    Administration and -- correction.  The

24    Foreign Exchange Administration would
```

Confidential - Subject to Further Confidentiality Review

1    need one contract and one contract

2    termination of contract in order to

3    release the payment.  Please ask the

4    customer to review, stamp and send to us.

5    I wish you business success.  Che Gang.

6          Q.    Were you forwarding with

7    this e-mail the contract that we have

8    been looking at that was entered into in

9    November of 2006 cancelling the September

10   2006 contract?

11         A.    Can you repeat?

12         Q.    Which contract were you

13   forwarding with your November 23, 2006

14   e-mail?

15         A.    I don't see attachment here.

16         Q.    What contract were you

17   referring to in your e-mail that you just

18   read to us?

19         A.    I could speculate -- from

20   the e-mail I can make that speculation,

21   but I'm not sure, because there is no

22   attachment appears on the e-mail.

23         Q.    Now, you've indicated that

24   there was a refund of money requested by

1    B America as a customer of TTP.  Is that

2    true?

3            A.    Yes.

4            Q.    And as your company did in

5    the case of Oriental Trading, rather than

6    send cash money as a refund to the

7    customer, you offered to export

8    additional product to the customer in

9    America.  Is that true?

10           A.    No.  The money is not much

11   at all.  It was impossible for us to send

12   additional products.

13           Q.    I want to show you a

14   document which is Bates numbered TG 485.

15   It's an e-mail exchange of February --

16   I'm sorry, December 2006 and February

17   2007.

18                      -  -  -

19           (Deposition Exhibit No.

20           Che-23, E-mail chain, top one

21           dated 2/16/2007, Bates stamped TG

22           0000485, was marked for

23           identification.)

24                      -  -  -

```
 1    BY MR. MEUNIER:

 2         Q.    Please first refer to the

 3    bottom e-mail on that page, from Rafael

 4    Sardi to you dated December 5, 2006 in

 5    which he says, "Dear Sir Please respond

 6    if you have processed the refund."

 7              Do you see that e-mail?

 8         A.    Yes, I see it.

 9         Q.    And it was copied to Enlly

10    Castro, spelled E-N-L-L-Y C-A-S-T-R-O,

11    and Chen Bilai, C-H-E-N, B-I-L-A-I.

12              Who are those individuals?

13         A.    Chen Bilai is a person that

14    I just mentioned to you.  I don't know

15    who the other person is.  I'm sorry,

16    correction, I don't remember who that

17    person is.

18         Q.    Look at the e-mail above

19    that from Chen Bilai to Rafael Sardi

20    dated February 15, 2007.

21              Is Chen Bilai a man or a

22    woman?

23         A.    Woman.

24         Q.    Ms. Chen tells Mr. Sardi the
```

```
 1    following:  "Mr. Che told me they had got

 2    permission from the Local Foreign

 3    Currency Bureau to refund the US dollar

 4    to you."  She then says, "But the person

 5    who operates the issue told them the

 6    information of USD from you no longer in

 7    their computer as it's over three months.

 8    So it has problem to refund it to you.  I

 9    suggest when they have order from

10    American company, they may ask that

11    American customer to decrease the said

12    sum from the total payment and wire it to

13    your account.  They agreed to do so when

14    they have order."

15             So Mr. Che, is it true that

16    instead of refunding the cash to B

17    America, your company was proposing to

18    give a factory credit to an American

19    customer on a future order?

20         A.    No.

21         Q.    What then was being offered

22    instead of a cash refund?

23         A.    I believe the e-mail was

24    sent from Madam Chen Bilai to this
```

```
 1    person.  She introduced a possibility of

 2    refund.  I don't remember the exact

 3    discussion of this issue.

 4            Q.    Please look at Mr. Sardi's

 5    e-mail to Chen Bilai which is above the

 6    one we read.  It's dated February 16,

 7    2007.

 8                  In that e-mail, Mr. Sardi

 9    asks the factory to give the very best

10    FOB price for certain sizes of gypsum

11    board and concludes by saying, "This so

12    we can consume our credit we have at the

13    factory."

14                  Was a factory credit given

15    to Mr. Sardi's company as requested?

16            A.    No.

17            Q.    How was the 100 or how was

18    the cash refund resolved?

19            A.    Because the remaining refund

20    balance is too small, we had discussed

21    with the foreign currency administration

22    in several occasions.  I do not know

23    eventually how did Madam Chen Bilai

24    handled this matter.
```

```
 1        Q.    But after these events

 2  involving the cancellation of that

 3  contract, you continued to do business

 4  with B America, shipping product to the

 5  United States.  Is that true?

 6        A.    No.

 7        Q.    I show you a document which

 8  is Bates numbered TG 514, which I'll mark

 9  as Che Exhibit 24.

10                  -  -  -

11             (Deposition Exhibit No.

12        Che-24, E-mail chain, top one

13        dated 4/10/2007, Bates stamped TG

14        0000514, was marked for

15        identification.)

16                  -  -  -

17  BY MR. MEUNIER:

18        Q.    Please look at these

19  e-mails, Mr. Che.

20        A.    I see it.

21        Q.    I will refer you to the

22  e-mail in the middle dated April 10, 2007

23  from Rafael Sardi in Miami, Florida to

24  you.
```

1              "Hello Bill," he says.

2         A.    Where is it?

3         Q.    It's the April 7 -- I'm

4    sorry, April 10, 2007, Rafael Sardi to

5    Bill Cher.  April 10, 2007.  Right here.

6    It's in the middle, near the hole.

7              Do you see it?

8         A.    This one?

9         Q.    "Hello Bill," do you see it?

10        A.    Yes, I see it.

11        Q.    "Hello Bill, We confirm

12   final destination is Port of Miami.  We

13   confirm that our custom broker to clear

14   the goods is Delmar Logistics (GA) Inc.

15   Please confirm as soon as you ship."

16             Do you see your reply e-mail

17   of April 10, 2007 just above the one I

18   just read?

19        A.    Hmm.

20        Q.    Is that a yes?

21        A.    I see it.  I see it.

22        Q.    Did you tell Mr. Sardi in

23   your e-mail, "We will arrange the

24   shipping to Miami Port at an early time"?

```
 1          A.    The handling of this issue

 2   was that Madam Chen Bilai requested us to

 3   confirm with the foreign handler

 4   regarding the final destination of the

 5   shipment.  When we say arrange shipment,

 6   we meant to arrange to pack the products

 7   in the container and ship it to Chinese

 8   ports and deliver it to the shipping

 9   agent, which Chen Bilai, Madam Chen Bilai

10   had arranged.

11          Q.    You were still doing

12   business with B America and shipping

13   product to the United States in business

14   with that company a year later, in April

15   of 2008, weren't you?

16               MR. SPANO:  Objection to

17          form.

18               THE COURT:  What's the issue

19          with form?

20               MR. SPANO:  He just

21          testified they didn't ship to the

22          United States.

23               THE COURT:  He said doing

24          business.
```

```
 1                    MR. SPANO:  He said -- I
 2          believe the question included
 3          shipping transfer.
 4                    MR. MEUNIER:  I'll rephrase,
 5          Judge.
 6                    THE COURT:  Rephrase the
 7          question.
 8     BY MR. MEUNIER:
 9          Q.    A year after that e-mail to
10     Mr. Sardi that we just talked about, your
11     company was still doing business with B
12     America Corporation.  True?
13          A.    In my memory, we have had
14     communication for a long period of time
15     with B America.  It's probably because of
16     the issue of $1,000.  But the actual
17     transacted product should be only one.
18          Q.    I'm showing you a document
19     which is Bates number TG 843.  It's an
20     exchange of e-mails from April 2008.  I'm
21     marking it as Che Exhibit Number 25.
22                         -  -  -
23                    (Deposition Exhibit No.
24          Che-25, E-mail chain, top one
```

```
 1            dated 4/21/2008, Bates stamped TG

 2            0000843, was marked for

 3            identification.)

 4                      -   -   -

 5   BY MR. MEUNIER:

 6            Q.    And the e-mail at the bottom

 7   of this document, Ms. Maria Muci,

 8   M-U-C-I, asked you for FOB prices for

 9   Sheetrock.  Is that true?

10            A.    Correct.

11            Q.    And in your e-mail reply of

12   April 15, 2008, you provided her with

13   drywall prices as well as FOB shipping

14   costs.  True?

15            A.    FOB shipping cost.

16            Q.    Don't you set forth the

17   information in your e-mail about shipping

18   costs?

19            A.    Where is it?

20            Q.    Do you see FOB in your

21   e-mail mentioned twice, Mr. Che?

22            A.    Is FOB price, not FOB

23   shipping cost.

24            Q.    And in your e-mail to her,
```

```
 1    you say you hope to "establish business

 2    as soon as possible."  True?

 3              A.    This is a formality in doing

 4    business.  I always use such formality

 5    expression in my e-mails.

 6              Q.    In the top e-mail on this

 7    document dated April 21, 2008 from Maria

 8    Muci, B America Corporation, in Doral,

 9    D-O-R-A-L, Florida, she thanked you for

10    your reply and asked you to send a small

11    sample of Sheetrock.

12                   Do you see that?

13              A.    That is a request of the

14    customer.

15              Q.    Was it still the practice of

16    your company in April of 2008 to send

17    samples through the mail to locations in

18    the United States if the customer paid

19    for the postage?

20              A.    In this period of time, I

21    had already moved back to work in TG.

22    For the handling of samples sent to the

23    customers, it was that customer would

24    tell us the specification and models that
```

```
 1    they needed.  If we happened to have such

 2    samples with us, and the customer would

 3    willing to pay for the postage, the

 4    shipping cost, then we would provide the

 5    sample in accordance with their

 6    requirements.

 7              Q.    In her e-mail, Ms. Muci

 8    asked you to send a small sample of 1/2

 9    inch and 5/8 inch and said it could also

10    be a letter-sized sample, 8-and-a-half

11    inches by 11 inches.  That would be the

12    size of this piece of paper.  Correct?

13              A.    Can you repeat that?

14              Q.    She refers to a sample size

15    that could be letter size, 8-and-a-half

16    by 11 inches.  I represent to you that

17    these pages that we look at are

18    8-and-a-half by 11 inches.

19              A.    That's the requirement of

20    the customer.

21              Q.    Yes.

22              Who were you working for in

23    April of 2008?

24              A.    In April 2008, I worked for
```

1    TG.

2           Q.    Did you have the authority

3    of TG in April of 2008 to send Maria Muci

4    of B America Corporation in Doral,

5    Florida a sample of drywall that was

6    8-and-a-half by 11 inches, the size of

7    this piece of paper?

8           A.    I don't recall.

9           Q.    You don't recall if you had

10   that authority?

11          A.    I don't recall whether I had

12   shipped the sample to her.  We still have

13   the same principle which I mentioned

14   earlier.

15          Q.    So you had the authority of

16   your company to send a sample that size.

17   Correct?

18          A.    It's not the matter of

19   whether I have the authority of the

20   company or not, it's a matter of whether

21   I have the sample or not in my hand.

22          Q.    But if you had the sample in

23   that size and the customer asked for it

24   in that size, you would send it.  Is that

```
 1    true?

 2         A.    The precondition is that the

 3    payment had to be prepaid.

 4         Q.    I want to talk about OEG

 5    Building Materials.

 6               Is it true that you began

 7    having business dealings with OEG through

 8    a gentleman named Ernest Teitelbaum and

 9    Joseph Weiss as early as the fall of

10    2005?

11         A.    In the beginning of 2006, we

12    did business through a Ms. Wang in China

13    who approached us, who approached our

14    company and expressed their willingness

15    to purchase our gypsum board, the

16    willingness to purchase our gypsum board.

17    And then through Ms. Wang, Ernest was

18    introduced to us.  At the time Ms. Wang

19    said that she was I believe the

20    representative of Ernest company.

21         Q.    In the beginning of doing

22    business with OEG, your company sold

23    gypsum board or drywall only?

24         A.    We handled gypsum board in
```

```
 1    the beginning with TOA company.

 2            Q.    TOA?

 3            A.    TOV.

 4            Q.    TOV.  They were an agent of

 5    OEG Building Materials?

 6            A.    No.  I remember earlier

 7    Ernest company was called TOV.  And then

 8    it changed their name to OEG.

 9            Q.    Did there come a time when

10    TTP began selling not only drywall but

11    also metal studs to OEG Building

12    Materials?

13            A.    Yes.  Yes.  At the time not

14    only we provided the customers with

15    gypsum board, but also later we purchased

16    from Golden Shield company in accordance

17    with request of the customer the metal

18    stud and then sent to OEG.

19                       -  -  -

20            (Deposition Exhibit No.

21            Che-26, Sales Contract dated 13th

22            Feb. 2007, TG 0019685 through TG

23            0019687, was marked for

24            identification.)
```

```
 1                    -  -  -

 2   BY MR. MEUNIER:

 3          Q.    I show you a document which

 4   is Bates numbered TG 19685 through 19687

 5   entitled "Sales Contract" dated February

 6   13, 2007.

 7                    MR. EUGENE CHEN:  What was

 8          that, please?

 9                    MR. MEUNIER:  TG 19685

10          through TG 19687.

11   BY MR. MEUNIER:

12          Q.    Is this the sales contract

13   that was entered into on February 13,

14   2007 between TTP and OEG Building

15   Material?

16          A.    I believe this should be a

17   draft of the contract.

18          Q.    Was this contract signed?

19          A.    I don't recall.

20          Q.    Did TTP enter into an

21   agreement with OEG Building Material for

22   the sale of metal studs to be produced

23   and inspected between December 2006 and

24   February 16, 2007?
```

```
 1          A.    TTP company uses -- used to

 2    sell to OEG company the metal stud.

 3    However, I don't recall whether the

 4    agreement was entered or not.

 5          Q.    But you do recall that you

 6    sent this sales contract to Joseph Weiss

 7    and Ernest Teitelbaum at OEG with an

 8    e-mail of February 13, 2007, the same

 9    date as the contract?

10          A.    I don't recall very clearly

11    about that.

12          Q.    I show you a document which

13    is Bates numbered 19683 and 19684.  This

14    is from you to Joseph Weiss at OEG, and

15    it's dated February 13, 2007.  Correct?

16                    -  -  -

17              (Deposition Exhibit No.

18          Che-27, E-mail dated 2/13/2007 and

19          attachment, Bates stamped TG

20          0019683 and TG 0019684, was marked

21          for identification.)

22                    -  -  -

23              THE WITNESS:  Correct.

24    BY MR. MEUNIER:
```

1          Q.     And one of the attachments

2     with your e-mail is STUD, S-T-U-D,

3     Contract OEG 07021301, which is the same

4     number on the sales contract that we just

5     looked at; is that correct?

6          A.     The numbers are the same.

7          Q.     You also sent Mr. Weiss a

8     price list for steel.  Is that true?

9          A.     I think the numbers are the

10    same.  However, the part before the

11    number is incomplete, so I cannot

12    confirm.  This is only half.  Correction,

13    this is only part of it, so I can't

14    confirm.

15         Q.     What contract, if not this

16    one, did you send to Mr. Weiss with your

17    e-mail of February 13, 2007 making

18    reference to the exact same number on the

19    sales contract we've looked at?

20         A.     I don't recall.  I'm only

21    saying that in front of the number there

22    were some letters on this contract.

23    However, on the other contract, it did

24    not have the letters, so I cannot

```
 1    reconfirm that.

 2         Q.    Mr. Che, just before the

 3    date of this February 2007 sale contract

 4    with OEG, your company agreed to pay for

 5    an increase in the price of steel in

 6    China to lower the cost of metal studs

 7    being paid by OEG.  Is that true?

 8         A.    Can you repeat that?

 9         Q.    Just before the date of this

10    February 2007 sales contract with OEG,

11    your company agreed to pay for an

12    increase in the price of steel in China

13    to lower the cost of metal studs being

14    paid by OEG.  Is that true?

15         A.    That's the expression on the

16    e-mail, but in reality, it may not

17    necessarily be the fact.

18         Q.    I show you a document which

19    is Bates numbered TG 19701, reflecting an

20    e-mail exchange of January 27 and 28,

21    2007 between you and Joseph Weiss.

22                   -   -   -

23              (Deposition Exhibit No.

24         Che-28, E-mail chain, top one
```

```
 1            dated 1/28/2007, Bates stamped TG

 2            0019701, was marked for

 3            identification.)

 4                      -  -  -

 5   BY MR. MEUNIER:

 6            Q.    In his -- I'm sorry?

 7            A.    It's the e-mail that I sent

 8   to Joe.

 9            Q.    In his e-mail of January 27,

10   2007 to you, Mr. Weiss told you -- asked

11   you to provide updated prices and told

12   you the prices "have to be more

13   competitive."  Is that true?

14            A.    Where is it?

15            Q.    It's in his e-mail to you of

16   January 27, 2007?

17            A.    Yes.

18            Q.    In your e-mail reply of

19   January 28, 2007, and I refer you to the

20   second paragraph.  I'll read it as

21   follows:  "Actually the price of steel

22   belt has increased by about 6%.  We tried

23   our best to persuade the steel belt

24   factory to keep the same price for us,"
```

Confidential - Subject to Further Confidentiality Review

```
 1   but "we have a long time and steady

 2   demand on steel belt.  Finally the steel

 3   factory offered the price 3% higher than

 4   last delivery in the case that we pay 50%

 5   of full amount in advance in four days.

 6   In order to build up the long time

 7   business cooperation and support you to

 8   compete in USA market, we will swallow

 9   the increased cost; we will offer the

10   same price as last 16 containers."

11            Is that what you said in

12   your e-mail of January 28, 2007 to Joseph

13   Weiss of OEG?

14        A.    This is what I said in the

15   e-mail.  But my expression meant that the

16   customer could give us new orders as soon

17   as possible, because the raw materials

18   price is increasing, because our price

19   that had been handled was FOB Chinese

20   port delivery.  We didn't really care

21   about anything else.

22        Q.    But you did tell Mr. Weiss

23   that your company on January 28, 2007

24   would swallow the increased cost of steel
```

Confidential - Subject to Further Confidentiality Review

```
 1    in China in order to support his company
 2    to compete in the USA market.  Correct?
 3         A.    This is only to express that
 4    we would like the customer to place new
 5    orders as soon as possible, but we did
 6    not know whether the reality was so.  We
 7    didn't care where the customer's markets
 8    were located.  Perhaps in Hong Kong.
 9    Perhaps in inland China.  This is only a
10    formality way of expression.
11         Q.    You told us earlier that a
12    new company was created at some point to
13    manufacture the metal studs.
14              Do you recall that?
15         A.    I don't recall.
16         Q.    Excuse me.
17              I show you a document Bates
18    number TG 21997, which I have marked as
19    Che Exhibit 29.
20                   -  -  -
21              (Deposition Exhibit No.
22              Che-29, E-mail dated July 14,
23              2007, Bates stamped TG 0021997,
24              was marked for identification.)
```

```
 1                    -  -  -

 2   BY MR. MEUNIER:

 3         Q.    This is an e-mail of July

 4   14, 2007 from you to Joe Weiss at OEG.

 5   Correct?

 6         A.    Yes.

 7         Q.    In the second to last

 8   paragraph, you told him the following:

 9   "Another thing is that our group set up a

10   new company, Taian Jindun Building

11   Material Co., Ltd which will be

12   especially for the business of metal

13   stud."

14               Who did you mean by our

15   group?

16         A.    It does not specify here.

17   In fact, they said in the earlier stage,

18   we purchased the steel stud from Jindun

19   company to sell it to OEG.  But later,

20   because we had no profit in the

21   operation, so we can only ask OEG to deal

22   directly with Jindun company.  But we

23   were embarrassed to tell the customer

24   that in the earlier stage, we actually
```

Confidential - Subject to Further Confidentiality Review

1   purchased from the company and sold it to

2   them.  Therefore, we use this kind of way

3   to indirectly express what we needed to

4   express.

5        Q.    Yes.  But in the next

6   sentence you say, "So we will sign the

7   contract and make all the paperwork under

8   the name of Taian Jindun Building

9   Material Co., Ltd."  Correct?

10        A.    The expression meant at the

11   time because we could not operate that

12   way anymore, so we would want the

13   personnel in Jindun company to deal

14   directly with them, but the salespeople

15   in Jindun did not speak English at all.

16   Their English was not even as good as

17   mine.  Therefore, we had to operate that

18   on their behalf.

19        Q.    In the paragraph above the

20   one we've been reading from you, you

21   suggested to Mr. Weiss that he change

22   shipping companies.  Is that true?

23        A.    Can you translate this

24   paragraph for me?

Confidential - Subject to Further Confidentiality Review

```
 1            Q.    I will read the second to
 2    last sentence.
 3                 "And in fact OOCI ship is
 4    just two or three days before than ZIM.
 5    So we suggest changing the container to
 6    ZIM shipping."
 7                 These were the shipping
 8    companies that took the product over the
 9    ocean from China to America.  Correct?
10            A.    I don't know, because what I
11    was trying to express was only that.
12    There was a shipping company that could
13    have more volume while the other shipping
14    company did not agree that we could put
15    more products in it.  In order to put
16    more of my products in it, so I suggested
17    him to change to another shipping
18    company.  I didn't pay attention to the
19    destination of the product.
20            Q.    But it was shipping over the
21    ocean from China to the customer.
22    Correct?
23            A.    It was handled by the
24    client, I believe.  I only found the
```

Confidential - Subject to Further Confidentiality Review

```
 1    shipping agent, that Miss somebody.

 2         Q.    Are these shipping

 3    companies, companies that handled the

 4    shipment of product from China to the

 5    customer?

 6         A.    From the e-mail, this

 7    Sheila, the lady, should be the shipping

 8    agent of the customer.

 9         Q.    And you say the reason you

10    recommended to this American customer

11    that they change shipping companies was

12    so that your company could put more

13    product on the ship.  Right?

14         A.    What does it mean in the

15    beginning of the paragraph, did it mean

16    to change the shipping company to this

17    one or did it mean to cancel the shipping

18    company?

19         Q.    It's your e-mail, Mr. Che.

20    You'll have to tell us.

21         A.    I don't recall.

22         Q.    Mr. Che, you were aware of

23    an economic crisis affecting the United

24    States in 2008, were you not?
```

Confidential - Subject to Further Confidentiality Review

```
 1            A.    I believe it affected the

 2    world.

 3            Q.    Isn't it true that you were

 4    not only aware of this crisis, but you

 5    were also aware that the United States

 6    government made payments to businesses

 7    which were called bailouts to address

 8    this crisis?

 9            A.    I can't confirm that.  I am

10    not sure.  I don't have a clear

11    recollection of that.

12            Q.    Isn't it true that in

13    February of 2009, your employer saw an

14    opportunity to sell more gypsum board and

15    metal studs in the United States after

16    these bailout plans were carried out?

17            A.    I don't recall.

18            Q.    I show you a document which

19    is Bates numbered TG 0021469 --

20                       -   -   -

21                 (Deposition Exhibit No.

22            Che-30, E-mail with date in

23            Chinese, Bates stamped TG 0021469,

24            was marked for identification.)
```

Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -

 2   BY MR. MEUNIER:

 3          Q.    -- which I will mark as Che

 4   Exhibit Number 30, 21469.  This is an

 5   e-mail of February 23, 2009 from you to

 6   Joseph Weiss at OEG.  Is that true?

 7          A.    Yes.

 8          Q.    And in the second paragraph,

 9   second sentence, you wrote the following:

10   "As far as we know that your government

11   is carrying out many bailout plans.  And

12   the economic is turning better and

13   better.  We received several inquiries on

14   the gypsum board and metal studs from

15   U.S.  You are one of our first-ten

16   customers since we have a very good

17   cooperation record.  So we prefer to

18   restarting our U.S. business with you

19   rather than others."

20                You agree you wrote that to

21   Mr. Weiss in this e-mail of February 23,

22   2009.  Correct?

23          A.    It was an e-mail that I sent

24   on February the 23rd, 2009 to Joe.
```

1    Because my English is not good, I'd say

2    it's very poor, maybe I did not express

3    myself clearly.  I think the entire

4    document should be a document of

5    formality in order to sell.  I expressed

6    my willingness to follow up with my old

7    customers who have made purchase with us

8    before to ask whether they'd like to

9    continue to purchase our product.

10         Q.    You saw an opportunity to

11   renew business with OEG.  Correct?

12         A.    It's not that I saw an

13   opportunity, but in formality, I was only

14   greeting an old customer to see whether

15   he would still willing to purchase our

16   product.  I think this is only a

17   follow-up e-mail.

18         Q.    You wanted to restart your

19   US business.  True?

20         A.    Because at the time, my

21   handling with OEG was the term of FOB

22   Chinese port.  I didn't care which market

23   was he located at.  This was only a

24   greeting out of formality.  What I cared

```
 1   about was whether he would purchase my

 2   product.

 3          Q.    The final business that I

 4   want to talk to you about is American

 5   Five Star.

 6          A.    Can somebody get me a glass

 7   of water?

 8          Q.    Isn't it true there were

 9   discussions between TTP and American Five

10   Star about American Five Star becoming

11   the exclusive distributor of TTP gypsum

12   board in the United States?

13          A.    It was a request of Five

14   Star Company requesting us to approve

15   them to be our agent.

16          Q.    I show you a document which

17   is Bates numbered 21242 and 43, which

18   I'll mark as Che Exhibit 31.

19                    -  -  -

20             (Deposition Exhibit No.

21             Che-31, E-mail dated June 7, 2007

22             with attachment, Bates stamped TG

23             0021242 and TG 0021243, was marked

24             for identification.)
```

Confidential - Subject to Further Confidentiality Review

```
 1                   -  -  -

 2    BY MR. MEUNIER:

 3         Q.    And I refer you to an e-mail

 4    of June 7, 2007 from Alan Fine, general

 5    manager, American Five Star Products, LLC

 6    to you.  And to be more correct, Mr. Fine

 7    addresses this e-mail to you and to Peng

 8    Wenlong; is that right?

 9         A.    Yes.

10         Q.    He thanks you "for meeting

11    with us today."

12              Do you recall meeting with

13    representatives of American Five Star

14    Products on June 7, 2007?

15         A.    I only remember that he

16    came.  I do not remember if not seeing

17    the date, the exact date of the meeting.

18         Q.    Who did you meet with

19    besides Mr. Fine?

20         A.    In my memory we call him

21    Alan.

22         Q.    Jorge Arevalo?

23         A.    Should be together with

24    Jorge.  I only know Jorge.
```

```
1          Q.     Is that the same Jorge that
2   you dealt with in doing business with
3   Oriental Trading?
4          A.     Yes, that's him.
5          Q.     He gets around?
6          A.     And Jorge took Mr. Alan
7   again came to visit our company.
8          Q.     Mr. Fine tells you and Mr.
9   Peng in this e-mail, "Attached is the
10  Certificate we discussed at the end of
11  the meeting."
12                Do you see that?
13         A.     That certificate?
14         Q.     Yes.  He refers to an
15  attachment of a certificate discussed at
16  the end of the meeting.  Correct?
17         A.     What was your question?
18         Q.     Look at the second page,
19  which is TG 21243, and you see a
20  certificate attached to Mr. Fine's e-mail
21  which states in the first paragraph that
22  TTP "certifies that American Five Star
23  Products LLC is its exclusive distributor
24  for all products sold under the Five Star
```

1    brand in the United States."

2              Do you see that?

3         A.    Yes, I see it.

4         Q.    Why were you and Mr. Peng

5    willing to discuss with representatives

6    of American Five Star at this meeting an

7    agreement to make American Five Star the

8    exclusive distributor for all TTP

9    products sold in the US?

10        A.    He was the representative of

11   Five Star that asked us to become --

12   asked us to issue the certificate.  It

13   was them wanted to discuss with us.  We

14   could not just disregard our customer.

15        Q.    Why were you willing to

16   consider an agreement to make American

17   Five Star the exclusive distributor for

18   all of your products in the US?

19        A.    It was not our

20   consideration.  It was just the intention

21   of the customer which they wanted to

22   discuss with us.

23        Q.    But in fact, your boss

24   proposed a contract with American Five

```
 1    Star to make them the exclusive

 2    distributor after this e-mail.  Is that

 3    true?

 4            A.    I don't recall.

 5            Q.    I'll show you a document

 6    which is Bates numbered TG 21228 through

 7    21232.

 8                    -  -  -

 9            (Deposition Exhibit No.

10            Che-32, E-mail dated June 20, 2007

11            with attachment, Bates stamped TG

12            0021228 through TG 0021232, was

13            marked for identification.)

14                    -  -  -

15    BY MR. MEUNIER:

16            Q.    I refer you to the first

17    page, 21228, which is an e-mail from Alan

18    Fine, American Five Star Products, to you

19    and Peng Wenlong in which he says, "Dear

20    Frank and Bill, Jorge forwarded to me the

21    proposed contract approved by your

22    boss-manager."

23                Who was your boss manager

24    who made this proposed contract that
```

```
 1    Jorge had forwarded?

 2          A.    I don't know who did Jorge

 3    refer to.

 4          Q.    No, sir.  My question is,

 5    who was your boss manager who gave Jorge

 6    a proposed contract with American Five

 7    Star?

 8                MR. SPANO:  Objection, no

 9          foundation.

10                THE COURT:  Show him the

11          letter.

12                MR. MEUNIER:  He's got the

13          e-mail in front of him.  It says,

14          "Jorge forwarded to me the

15          proposed contract approved by your

16          boss-manager."

17                MR. SPANO:  And your

18          question said that the boss

19          manager gave Jorge a contract.

20          There's no suggestion that --

21                MR. MEUNIER:  "Jorge

22          fowarded" --

23                THE COURT:  Restate the

24          question.
```

Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. MEUNIER:

 2         Q.    The e-mail, the first

 3   sentence of the e-mail to you and Frank,

 4   you and Peng Wenlong, from Alan Fine,

 5   says, "Jorge forwarded to me," Alan Fine,

 6   "the proposed contract approved by your

 7   boss-manager."

 8              My question is, who was the

 9   boss manager who approved a proposed

10   contract and gave it to Jorge?

11         A.    I don't know who had agreed

12   such a proposed contract, so I don't know

13   who did Jorge refer to.  I think Jorge

14   was talking to Alan here.

15         Q.    Mr. Fine goes on in his

16   e-mail to you to say he understands "if

17   your company cannot make the full

18   agreement with the terms we discussed in

19   your office two weeks ago.  I have

20   submitted a new contract with some

21   clarifications and the most important

22   terms to us."

23              Do you see that?

24         A.    I see it.
```

1        Q.    Please look at the attached

2   document, which is entitled "Exclusive

3   Distribution Agreement" bearing the date

4   of June 21, 2007.

5            Is this the contract which

6   Alan Fine forwarded to you and Peng

7   Wenlong for your company, TTP, to

8   consider?

9        A.    I don't have a clear

10   recollection, but from what it appears to

11   be, that should be the case, because I do

12   not remember such an agreement was ever

13   signed.

14        Q.    If you look at the last

15   page, Mr. Che, which is 21232, there is a

16   signature by Alan Fine on behalf of

17   American Five Star Products.

18            Is it your testimony you

19   don't recall if TTP ever signed this

20   agreement?

21        A.    I don't recall.

22        Q.    Did you review the

23   agreement?

24        A.    No.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Who reviewed the agreement
 2   on behalf of TTP?
 3               MR. SPANO:  Objection.
 4               MR. MEUNIER:  If anyone?
 5          Will that solve it?
 6               THE COURT:  Just put "if
 7          anyone."
 8   BY MR. MEUNIER:
 9          Q.    Who, if anyone, reviewed
10   this agreement on behalf of TTP?
11          A.    What were you asking or do
12   you mean if I'm seeing the document right
13   now?  Or actually, I just flipped the
14   page.  I did not really review the
15   document.
16          Q.    No, sir.  When this document
17   was forwarded with Mr. Fine's e-mail to
18   you and Peng Wenlong on June 20, 2007,
19   who, if anyone, on behalf of TTP reviewed
20   the agreement?
21          A.    I don't recall.
22          Q.    In principle, was TTP
23   opposed to the idea of making an
24   exclusive distribution agreement with
```

1    this American company?

2           A.    In my recollection, we did

3    not agree to sign this agreement with

4    them.

5           Q.    I understand that.

6                 But did TTP object in

7    principle to the idea of an exclusive

8    distribution agreement with American Five

9    Star?

10          A.    I don't recall the

11   circumstance at that time.

12                Can I go to the restroom?

13                THE COURT:  It's time.

14                VIDEOTAPE TECHNICIAN:  We're

15          going off the record.  The time is

16          3:47.

17                THE COURT:  15-minute break.

18                     -   -   -

19                (A recess was taken from

20          3:47 p.m. to 4:02 p.m.)

21                     -   -   -

22                VIDEOTAPE TECHNICIAN:  Back

23          on the record at 4:02.

24                THE COURT:  Any further

```
 1          questions?

 2               MR. MEUNIER:  I tender the

 3          witness.

 4               THE COURT:  Anybody else

 5          questioning for cross?

 6               Go ahead, Frank.  It's late

 7          in the day.

 8                    -  -  -

 9               EXAMINATION

10                    -  -  -

11   BY MR. SPANO:

12          Q.    Good afternoon, Mr. Che.

13               Did TTP enter into any kind

14   of agreement with American Five Star for

15   that company to distribute its drywall?

16          A.    As far as I can remember,

17   that will be no.

18          Q.    Did TG or TTP ever sell any

19   drywall to American Five Star?

20          A.    In my recollection, no.

21          Q.    Do you recall the

22   circumstances of how Oriental Trading was

23   introduced to TTP?

24          A.    At the time Oriental Trading
```

Confidential - Subject to Further Confidentiality Review

```
 1    was -- first of all, Oriental Trading had

 2    a person in China whose name is Wu

 3    Jiansong who contacted us and expressed

 4    his willingness of purchasing our

 5    product.  And later Mr. Evan from

 6    Oriental Trading told me that Wu Jiansong

 7    was his representative in China.  We were

 8    able to contact Mr. Evan through Wu

 9    Jiansong.  And after that, Mr. Jorge, Mr.

10    Jorge from Oriental, again, through an

11    agent in Beijing came to our company to

12    visit.  And then he said he was also from

13    the Oriental company.  That was the

14    circumstance.

15         Q.    I'd like to mark an exhibit.

16    Can I borrow your stickers?

17              MR. MEUNIER:  Yes.

18                   -  -  -

19              (Deposition Exhibit No. Che

20         Defendant's-1, E-mail dated

21         8/30/2006, Bates stamped TG

22         0000575, was marked for

23         identification.)

24                   -  -  -
```

Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. SPANO:

 2           Q.    We've marked as Defendant's

 3   Exhibit Che-1 Bates number TG 575.

 4                 Mr. Che, do you recognize

 5   this document as an e-mail from Ivan

 6   Gonima to you, cc Wu Jian Song, dated

 7   August 30, 2006?

 8           A.    Yes.

 9           Q.    I'd like to read the first

10   paragraph into the record and then ask

11   the translator to translate it for the

12   witness.

13                 MR. DAVIS:  Excuse me.  I

14           don't see the exhibit in the

15           binder that was provided.

16                 Was that provided?  Was that

17           document provided by defendants in

18           advance?

19                 MR. SPANO:  It may not have

20           been.

21                 MR. DAVIS:  I'm just not

22           aware of it.

23                 MR. SPANO:  I haven't

24           cross-checked.
```

```
 1            MR. DAVIS:  Can we get
 2       copies, please.
 3            And Your Honor, we object to
 4       the use of that document.
 5            THE COURT:  What's your view
 6       of it, Frank?
 7            MR. SPANO:  I actually think
 8       this document was marked by them
 9       by some different Bates number
10       already, and I was just trying to
11       save time not to go look through
12       the pile.
13            MR. DAVIS:  Subject to the
14       objection.
15            MR. SPANO:  If it's an
16       issue, I'll go through the pile.
17            MR. DAVIS:  Subject to the
18       objection.
19            THE COURT:  Go ahead.  Do
20       it.
21  BY MR. SPANO:
22       Q.    "My name is Ivan Gonima and
23  I am the Executive Vice-President of
24  Oriental Trading...based in Miami,
```

Confidential - Subject to Further Confidentiality Review

```
 1    Florida, USA.  Our China Office Manager,
 2    Mr. Wu Jian Song, has already contacted
 3    you about our interest in doing business
 4    with your company for importing drywall
 5    (Gypsum Board) to the USA."
 6              Does that paragraph that's
 7    been translated correctly reflect the
 8    circumstances of Oriental's Trading first
 9    introduction to TTP?
10         A.   It does say that Ivan Gonima
11    through his Chinese representative Wu
12    Jiansong to approach us and expressed
13    their intention of purchasing our
14    product.
15              MR. SPANO:  For the record,
16         I can now confirm we designated
17         this as an exhibit before the
18         deposition.
19    BY MR. SPANO:
20         Q.   Did TTP solicit any contact
21    with Oriental Trading before Oriental
22    Trading contacted TTP through their China
23    office manager?
24         A.   No.
```

```
 1              Q.    Do you recall having

 2    discussions with Oriental Trading's

 3    representatives in China regarding

 4    Oriental Trading distributing TTP's

 5    drywall?

 6              A.    Can you interpret again?

 7                    THE INTERPRETER:  Yes.

 8                    THE WITNESS:  I don't recall

 9         very clearly about that.

10                    THE COURT:  What are you

11         looking for?  Let me see if I can

12         help you.

13                    MR. SPANO:  I'm looking for

14         Che-1, the exclusive agency

15         agreement.

16                    MR. MEUNIER:  I have it.  It

17         was Jia-13.

18    BY MR. SPANO:

19              Q.    Could you please take a look

20    at this document, the sole agency

21    agreement, and let me know if it

22    refreshes your recollection regarding any

23    discussions you had with Oriental Trading

24    about their possibly distributing TTP's
```

1   drywall?

2          A.    I believe the agreement was

3   discussed with Jorge of Oriental Trading.

4          Q.    What were your discussions

5   with Jorge that led up to the signing of

6   this agreement?

7          A.    At the time Jorge came to

8   visit our plant, exaggerated on the fact

9   that he needed a big volume of our

10  product and asked to sign such an

11  agreement with us.  At the time, in order

12  to sell more product, we agreed on such

13  an agreement.  However, the precondition

14  for the effectiveness of this agreement

15  was that between November 2006 to --

16              THE INTERPRETER:  One

17          moment.

18              THE WITNESS: -- and February

19          2007, they had to purchase over

20          20,000 of gypsum board from us.

21          But in fact, during this period of

22          time, Oriental Trading did not

23          purchase any of our gypsum board.

24          And also, at the time Jorge took

```
 1          away those original copies of this

 2          agreement back to his office and

 3          said after signing and stamping on

 4          the agreement, he would provide us

 5          with the original agreement.  But

 6          from my recollection and the

 7          documents of our company, Jorge

 8          did not give us back such

 9          documents.  Therefore, in our

10          company, we believe this is a void

11          agreement.

12               MR. GONZALEZ:  Your Honor, I

13          have several objections addressed

14          to the last answer.  One, to the

15          extent that they are discussing

16          oral discussions with respect to

17          affecting the written contract, it

18          violates the statute of frauds.

19          To the extent that they're -- they

20          requested --

21               Gerry, can you move your

22          head.

23               To the extent that they

24          requested a legal opinion on the
```

```
 1          effectiveness of the written

 2          contract, it calls for a legal

 3          conclusion and should be stricken.

 4          The statements about,

 5          quote/unquote, the state of mind

 6          of Jorge is pure speculation, and

 7          the transactional discussions are

 8          hearsay.

 9               On all those grounds, we

10          move to strike the answer.

11               THE COURT:  All right.

12               MR. SPANO:  Your Honor, this

13          is discovery, and the statute of

14          frauds is not an objection to a

15          question at a deposition.

16               THE COURT:  This may go to

17          whether or not it's admissible in

18          evidence or whether or not it's

19          admissible at trial, but I'm going

20          to allow it in discovery at this

21          stage.

22               MR. GONZALEZ:  Just so I'm

23          clear, Your Honor, I won't make

24          these objections if the Court is
```

Confidential - Subject to Further Confidentiality Review

```
 1          saying that trial and

 2          admissibility matters are

 3          preserved.  My understanding,

 4          perhaps erroneously, was that the

 5          Court was here to address these

 6          issues once and for all.

 7              THE COURT:  Well, when I do,

 8          I can make some rulings on it, but

 9          I'm not going to exclude this.

10          I'll take those motions into

11          consideration, and I'll decide

12          whether or not they're admissible.

13          But they go to the weight of the

14          evidence and they go to something

15          whether or not it's admissible at

16          trial.  But I'm not going to deal

17          with that at this time.

18              MR. GONZALEZ:  I simply ask

19          so that I wouldn't waste the

20          Court's time with additional

21          objections if it wasn't

22          appropriate.  Thank you, Your

23          Honor.

24              THE COURT:  Yes.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    MR. MEUNIER:  Judge, just
 2              for the record, on behalf of the
 3              PSC in the MDL, we join in the
 4              request that the testimony be
 5              considered inadmissible.
 6                    THE COURT:  I don't mind you
 7              keep mentioning it.  If there is
 8              something that you feel is
 9              excluded, mention it and I'll deal
10              with it one way or the other.  But
11              this one I'm going to allow.
12     BY MR. SPANO:
13         Q.    Mr. Che, did Oriental
14     Trading perform the requirements of
15     paragraph 3 of the sole agency agreement?
16         A.    Can you summarize what the
17     third paragraph is saying here?
18         Q.    Yes.  I'll ask my questions
19     in English and I'll ask you to translate
20     them.
21                    Assuming the agreement
22     required that Oriental Trading purchased
23     not less than 20,000 sheets of one unique
24     size of drywall from the beginning of
```

```
 1    November of 2006 to the end of February

 2    2007, did Oriental Trading perform that

 3    requirement of the agreement?

 4            A.    No.

 5            Q.    And assuming the agreement

 6    required Oriental Trading to purchase not

 7    less than 1 million sheets of drywall in

 8    the 12 months following February 2007,

 9    did Oriental Trading perform that

10    requirement of the agreement?

11            A.    Neither.

12            Q.    Did Oriental Trading ever

13    serve as a distributor for TTP under the

14    terms of the sole agency agreement,

15    Exhibit 13 Jia?

16                MR. GONZALEZ:  Objection,

17            Your Honor, lack of foundation,

18            speculation.

19                THE COURT:  He's speaking --

20            the difficulty I'm having with

21            some of the objections, all of

22            which may be valid, is that the

23            focus in these depositions is

24            jurisdiction.  Also, this witness
```

Confidential - Subject to Further Confidentiality Review

1           is testifying as a 30(b)(6)

2           witness who's giving us the

3           company's view.  There's also an

4           issue of whether or not the

5           contract was signed, or if it was,

6           whether it was void because of

7           lack of compliance.

8                Because of all of those

9           things, I'm going to allow him to

10          testify as to what the company's

11          position was.  So that it may

12          be -- it may not be admissible for

13          the substance of the contract, but

14          it may have some relevance in

15          jurisdiction.  And that's the way

16          I see it.

17               So I'm going to overrule

18          this objection for those reasons.

19               THE WITNESS:  Can you ask

20          the question again?

21     BY MR. SPANO:

22          Q.   Did Oriental Trading ever

23     serve as a distributor for TTP under the

24     terms of the sole agency agreement?

```
 1          A.    No.

 2          Q.    Sometime after February

 3   2007, did Oriental Trading purchase

 4   drywall from TTP?

 5          A.    Yes, a little bit.

 6          Q.    What were the terms of sale

 7   of the drywall sales that TTP made to

 8   Oriental Trading?

 9               THE COURT:  At what time?

10               MR. SPANO:  The sales made

11          in 2007.

12               THE WITNESS:  After the

13          incompliance of this agreement,

14          TTP treated Oriental company sales

15          just as same as TTP treated the

16          other companies, according to

17          customers' required product size,

18          specification and label.  We had

19          produced the product that the

20          customer had required and

21          delivered to the customer in

22          Chinese port, which was FOB term.

23          The customer arranged the shipping

24          matter.
```

```
 1   BY MR. SPANO:
 2        Q.    What were the payment terms
 3   of the Oriental Trading sales?
 4        A.    Prepay the full payment, and
 5   then we will deliver our product.
 6        Q.    Were the terms of sale to
 7   Oriental Trading substantially the same
 8   as the terms of sale TTP gave to other
 9   buyers from the US who came to China to
10   purchase drywall?
11        A.    The way and the term of
12   handling Oriental Trading Company was the
13   same as any company that came from abroad
14   to buy our product.
15        Q.    I'm marking TTP's
16   manufacturer's profile form.
17             Do I need to distribute
18   copies of that or does everybody have it?
19             MR. MEUNIER:  If you're
20        going to question the witness
21        about it, I'd like to have a copy.
22             MR. SPANO:  Okay.
23             MS. BASS:  Is it a composite
24        of both?
```

```
 1                    MR. SPANO:  No.  Just TTP

 2           with translation.

 3                       -  -  -

 4                    (Deposition Exhibit No. Che

 5           Defendant's-2, Tai'an Taishan

 6           Plasterboard Co., Ltd.

 7           Manufacturer Profile Form, was

 8           marked for identification.)

 9                       -  -  -

10   BY MR. SPANO:

11           Q.    This will be Defendant's

12   Che-2.

13                    Mr. Che, I'd like to draw

14   your attention to the TTP manufacturer's

15   profile form, Exhibit A, the Chinese

16   version.

17                    Could you look at the

18   entries for Oriental Trading on Exhibit

19   A, which run from number 234 to 243,

20   except for 235?

21           A.    I see it.  I got it.

22           Q.    Did TTP ship any of the

23   drywall reflected in these sales entries

24   on the manufacturer's profile form to
```

```
 1    Miami, Florida?
 2         A.    No.  We only performed FOB
 3    Chinese port delivery to our -- with our
 4    client.
 5         Q.    Did TTP ship any of the
 6    drywall reflected in these Oriental
 7    Trading sales shown on the manufacturer's
 8    profile form to any destination in the
 9    USA?
10         A.    No.  We only delivered in
11    Chinese port.
12         Q.    To the company's --
13         A.    Delivery.
14         Q.    I'm sorry.
15              THE INTERPRETER:  He just
16         said the word "delivery."
17    BY MR. SPANO:
18         Q.    To the company's knowledge,
19    did Oriental Trading distribute anywhere
20    in the USA any of the drywall it
21    purchased from TTP as reflected here on
22    the manufacturer's profile form?
23              MR. GONZALEZ:  Object to
24         foundation.
```

```
 1                    THE COURT:  I'm sorry, I
 2          didn't hear that.
 3                    MR. GONZALEZ:  Objection as
 4          to foundation.
 5                    THE COURT:  Let's rephrase
 6          it, Frank.
 7   BY MR. SPANO:
 8          Q.    Did TG or TTP ever receive
 9   any information indicating that Oriental
10   Trading distributed in the USA any of the
11   drywall that it purchased from TTP?
12          A.    Oriental company had never
13   told us that they had delivered and
14   distributed the product that it purchased
15   from us, plus the usages of the product.
16          Q.    Did TG or TTP ever receive
17   any information indicating where the
18   drywall that Oriental Trading purchased
19   from TTP would be used?
20          A.    No.  We were never told of
21   that.
22          Q.    Could you look at the column
23   on the manufacturer's profile form
24   entitled "Edge Sealing Tape Markings."
```

```
 1                    And what does the entry on

 2     the profile form indicate with respect to

 3     the markings on the edge sealing tape of

 4     the drywall TTP sold to Oriental Trading?

 5                    MR. GONZALEZ:  Objection,

 6             document speaks for itself.

 7                    THE COURT:  I'm going to

 8             overrule the objection.

 9                    THE WITNESS:  According to

10             the label that designed by

11             Oriental company, we produced the

12             requested product, which was as

13             same as the other companies that

14             had labels.  It is only --

15                    THE INTERPRETER:

16             Interpreter clarification.

17                    THE WITNESS:  It is only a

18             mark that we -- that we did

19             according to the request of the

20             customer to put the label on the

21             product.  And it was produced

22             according to the request of the

23             client.

24     BY MR. SPANO:
```

```
 1              Q.    I'd like to show you what
 2     has been previously marked as Jia-28, and
 3     the last page of that exhibit, TG
 4     26000019.
 5                    Is this, what is shown here,
 6     what TTP put on the edge sealing tape of
 7     the drywall that it sold to Oriental
 8     Trading?
 9              A.    It is the mark that designed
10     by Oriental Trading Company for its
11     product.
12                    MR. GONZALEZ:  Your Honor,
13          may we have a time frame.
14                    THE COURT:  Just ask him
15          about the time, when this was
16          done.
17                    MR. SPANO:  At the time of
18          sale.
19                    THE COURT:  When is that?
20                    MR. SPANO:  As reflected in
21          the manufacturer's profile form.
22          It has all these dates.  Would you
23          like me --
24                    THE COURT:  No, no, that's
```

```
 1          okay.  As reflected on those

 2          dates.

 3  BY MR. SPANO:

 4          Q.    Do you know if the mark

 5  shown on Jia-28 was in fact affixed to

 6  the drywall that was sold to Oriental

 7  Trading as reflected in the sales on the

 8  manufacturer's profile form we've been

 9  discussing?

10          A.    I believe so.

11          Q.    What is the function of edge

12  sealing tape on drywall?

13          A.    It was only a mark.  It's

14  just like a person's name, to verify --

15  to verify -- it's a name, for people to

16  recognize.

17          Q.    Setting aside what is marked

18  on the tape, what is the function of the

19  tape itself?

20          A.    The tape function is to make

21  sure that the upper side of the gypsum

22  board are not damaged.  And it will be

23  peeled off during usage of the board.

24          Q.    In your understanding, is
```

1    the normal practice to remove the edge

2    sealing tape before the drywall is

3    installed?

4           A.    Correct.

5           Q.    Did Oriental Trading ever

6    report to TTP that it resold any of the

7    drywall that it bought from TTP?

8           A.    No.

9           Q.    Who selected the destination

10   for the drywall that Oriental Trading

11   purchased from TTP?

12          A.    Oriental Trading Company

13   itself.

14          Q.    Did Mr. Gonima communicate

15   the selected destination to you?

16                THE COURT:  The objection is

17          vague, I would sustain that

18          objection.  To whom.

19   BY MR. SPANO:

20          Q.    Did TTP communicate --

21                THE COURT:  I'm sorry, I

22          didn't hear you.

23   BY MR. SPANO:

24          Q.    Did Oriental Trading

```
 1    communicate to TTP the destination that

 2    Oriental Trading selected for the

 3    drywall?

 4          A.    No.

 5          Q.    Did you assist Oriental

 6    Trading with the shipping arrangements

 7    for the drywall it purchased from TTP?

 8          A.    I only assisted Oriental

 9    Trading Company to communicate with

10    shipping agent regarding the shipping

11    cost.  But the detailed handling was

12    between Oriental company itself and the

13    shipping agent.

14                THE WITNESS:  Can I go get

15          some water?

16    BY MR. SPANO:

17          Q.    Do you recall answering

18    questions regarding quotes for shipping

19    cost to various cities in the United

20    States that you provided to Oriental

21    Trading?

22          A.    I remember that I've

23    answered those questions, but it has

24    always been copy and copy, so I don't
```

1    really recall those quotations, but I do

2    remember that I answer question regarding

3    that.

4          Q.    For what reason did you

5    provide information on shipping costs to

6    various cities in the United States to

7    Oriental Trading?

8          A.    Upon the request of Ivan.

9          Q.    And why did you provide that

10   information in response to Oriental

11   Trading's request?

12         A.    Because at the time, Mr.

13   Ivan thought that the shipping cost that

14   he got from over there was a little

15   higher, so he would like to compare the

16   shipping cost from both sources and asked

17   us to help him with that and see if we

18   could find something cheaper, which is

19   the ocean shipping cost.

20         Q.    Did the information that TTP

21   provided to Oriental Trading regarding

22   ocean shipping costs to various cities

23   indicate that TTP was willing to ship

24   drywall to those cities?

```
 1                 MR. GONZALEZ:  Your Honor, I

 2           object.  It calls for a legal

 3           conclusion and also attempts to

 4           usurp the fact-finding capacity of

 5           the Court.

 6                 THE COURT:  I'll overrule

 7           the objection and allow it.

 8                 THE WITNESS:  Can you repeat

 9           the question?

10                 THE COURT:  Why don't you

11           just read it.

12                 THE WITNESS:  Please

13           translate it for me.

14                 No.  We deliver to the

15           client only in Chinese ports.  It

16           was the decision of the customer

17           as of where they would like to

18           ship the goods to.

19  BY MR. SPANO:

20           Q.   Do you recall having

21  discussions with Oriental Trading where

22  they indicated to you the amount of

23  drywall they expected to buy from TTP?

24           A.   I don't recall the exact
```

```
 1    amount, but we did have that discussion.

 2         Q.    How did it happen that

 3    Oriental Trading wound up with an unused

 4    $100,000 payment to TTP?

 5         A.    Because Oriental Trading

 6    wanted to purchase our product.

 7    Therefore, they prepaid.  But because of

 8    their company's problem, they did not

 9    place order for that.  And afterwards,

10    through discussion, we refund the amount

11    of money to a company that they had

12    entrusted, which is a representative

13    office of that company in China.  We

14    refunded to their account in China.

15         Q.    After all of the discussions

16    back and forth with Oriental Trading

17    about how their payment would be

18    refunded, did Oriental Trading ultimately

19    instruct TTP to transfer the money to a

20    company in China?

21         A.    Yes.

22         Q.    And did TTP in fact transfer

23    the $100,000 unused Oriental Trading

24    payment to the bank account in China of
```

```
 1    the company Oriental Trading instructed

 2    it to give the money to?

 3          A.    Yes.

 4          Q.    Could you look at the

 5    manufacturer's profile form again,

 6    Exhibit A, entry number 235.

 7                Do you see the entry there

 8    regarding TTP's sale to B America

 9    Corporation?

10          A.    I see it.

11          Q.    What was the term of that

12    sale as it related to shipment?

13          A.    They call it C-I-F.

14          Q.    What does CIF stand for?

15          A.    CIF is -- that's on top of

16    FOB.  Ocean shipment costs and insurance

17    were added.

18          Q.    To what was the ocean

19    shipment and insurance costs added?

20          A.    FOB price.

21          Q.    Did the price of the drywall

22    that TTP charged to B America include the

23    cost of ocean freight and insurance?

24          A.    Yes.  The customer paid all
```

1    the CIF cost and through Madam Chen Bilai

2    to arrange the shipment.  We only, in

3    accordance with the client's request, to

4    pay on their behalf the ocean freight

5    cost and insurance cost.

6         Q.    To whom did TTP pay the

7    ocean freight cost and insurance cost on

8    behalf of B America?

9         A.    To the shipping agent it

10   arranged, which was arranged by the

11   customer which was entrusted by the

12   client.

13        Q.    Who selected the destination

14   for the drywall that B America purchased?

15        A.    The customer.

16        Q.    In the course of the

17   transaction, did TTP learn that the

18   destination selected by B America was

19   Miami, Florida?

20        A.    Client's shipping agent once

21   told us that they would ship the product

22   to the destination requested by the

23   client.  I don't remember the exact name

24   of the destination, but it was written on

Confidential - Subject to Further Confidentiality Review

```
 1    the invoice.  However, whether it was

 2    eventually shipped to what place, I am

 3    not sure.

 4          Q.    Did TTP ship the drywall it

 5    sold to B America to Miami, Florida?

 6          A.    We did not.

 7          Q.    Did TTP ship the drywall it

 8    sold to B America to anyplace in the

 9    United States of America?

10          A.    No.

11          Q.    Did B America ever indicate

12    that it resold -- I'll withdraw that.

13                Did B America ever report to

14    TTP that it resold any of the drywall

15    that it purchased from TTP?

16          A.    No.

17          Q.    Did B America ever inform or

18    advise TTP about where the drywall it

19    purchased from TTP was going to be used?

20          A.    No.

21                THE INTERPRETER:  May the

22          interpreter request a two minutes

23          break?

24                THE COURT:  Sure.
```

Confidential - Subject to Further Confidentiality Review

```
 1              VIDEOTAPE TECHNICIAN:  Going
 2         off the record, the time is 5:03.
 3              THE COURT:  We'll take a
 4         five-minute break at this time.
 5                   -  -  -
 6              (A recess was taken from
 7         5:03 p.m. to 5:10 p.m.)
 8                   -  -  -
 9              VIDEOTAPE TECHNICIAN:  Going
10         back on the video record.  The
11         time is 5:10.
12  BY MR. SPANO:
13         Q.    Mr. Che, could you look next
14  at entry number 178 on the TTP
15  manufacturer's profile form related to
16  Triax Trading?
17         A.    I see it.
18         Q.    Is this the transaction that
19  you discussed also involving API?
20         A.    Yes.
21         Q.    Did TTP ship the drywall
22  sold to API or Triax Trading to New
23  Orleans, Louisiana?
24         A.    No, we did not ship it.
```

```
 1          Q.    Did TTP ship that drywall to

 2    any port in the United States of America?

 3          A.    No.  Our term was only

 4    deliver in Chinese port.

 5          Q.    Who made the shipping

 6    arrangements with respect to the API or

 7    Triax Trading sale?

 8          A.    In this transaction, there

 9    was a Ms. Wei who made the arrangement

10    for everything.  We only had the term FOB

11    Chinese port performed.

12          Q.    Could you please look at

13    what's been previously marked as Peng S.

14    Exhibit 4, which says "Invoice."

15          A.    I see it.

16          Q.    To the company's knowledge,

17    who prepared this document?

18          A.    This is a document that Ms.

19    Wei sent to us.

20          Q.    Why did she send this

21    document to TTP?

22          A.    Because Triax company

23    eventually wire the money to TTP.  Ms.

24    Wei was only a freelance trader.
```

```
 1    Therefore, she send this to us and

 2    requested us to stamp on it.

 3           Q.    Do you see where on this

 4    exhibit it says, "To:  New Orleans, LA"?

 5           A.    I see it now, but I did not

 6    pay attention before.

 7           Q.    To the company's knowledge,

 8    where did that information that appears

 9    on this document come from?

10           A.    I don't know.  Ms. Wei

11    prepared this.

12           Q.    Do you recall answering

13    questions regarding TTP's sale to a

14    company called TOV, later named OEG?

15           A.    Yes.

16           Q.    Could you look on the

17    manufacturer's profile form to entries

18    219 through 222?

19           A.    I see it.

20           Q.    What were the terms of sale

21    related to shipment for the drywall sales

22    reflected in those entries to TOV?

23           A.     In my memory, TOV was also

24    handled as FOB Chinese port as its term
```

```
 1   of delivery.
 2          Q.    Did TTP ship the drywall it
 3   sold to TOV to New York?
 4          A.    We did not make this
 5   shipment arrangement.
 6          Q.    Did TTP ship the drywall it
 7   sold to TOV to any location in the USA?
 8          A.    No.
 9          Q.    Did TTP ever receive any
10   information regarding whether TOV resold
11   any of the drywall it purchased from TTP?
12          A.    No.
13          Q.    Did TOV indicate to TTP
14   where the drywall it was purchasing was
15   going to be used?
16          A.    No.
17          Q.    Did B America ever indicate
18   to TTP where the drywall it was
19   purchasing from TTP was going to be used?
20          A.    No.
21          Q.    Did TTP sell metal studs to
22   TOV?
23          A.    In my recollection, it was
24   showed -- it was sold to OEG after the
```

```
 1    change of name.  I'm not very sure about

 2    that.

 3              Q.    Okay.

 4                    Assuming TTP sold the studs

 5    to OEG, what were the terms of those

 6    sales as they related to shipment?

 7              A.    It's also the term of FOB

 8    Chinese port.

 9              Q.    Did TTP ship any of the

10    metal studs it sold to OEG to any

11    location in the USA?

12              A.    No.

13              Q.    Did TG or TTP ever sell

14    metal studs to any other company that

15    indicated it was from the United States?

16              A.    Can you repeat it?

17                    Any other company?  No.

18              Q.    Were all the metal studs

19    that TTP sold to OEG manufactured by

20    Jindun?

21              A.    Yes, as far as I can

22    remember.

23              Q.    And at the time that Jindun

24    manufactured the metal studs that TTP
```

```
 1   sold to OEG, was it a subsidiary of --

 2   was -- withdrawn.

 3               In 2006 and 2007, was Jindun

 4   a subsidiary of TG?

 5        A.    What was Jindun?  I didn't

 6   hear very clearly of the last part of the

 7   translation.

 8               THE INTERPRETER:  May the

 9          interpreter repeat the

10          interpretation?

11               MR. SPANO:  Yes, please.

12               THE WITNESS:  I'm not very

13          sure about that.

14   BY MR. SPANO:

15        Q.    I'm showing you what was

16   marked earlier as Che Exhibit Number 18.

17               Do you recall answering

18   questions earlier about the drywall

19   samples sent to Mr. Bo Zhou, Bo Zhou?

20        A.    I remember that I did answer

21   this question earlier.

22        Q.    After TTP sent the samples

23   to Bo Zhou, did he buy any drywall?

24        A.    I don't recall he bought our
```

Confidential - Subject to Further Confidentiality Review

```
 1   product.

 2            Q.    Did TG or TTP ever send

 3   drywall to any customer or potential

 4   customer that didn't actually ask for it

 5   beforehand?

 6                  MR. MEUNIER:  Objection to

 7            form, Your Honor, unless it's made

 8            clear that we're talking about

 9            drywall samples.

10                  MR. SPANO:  I misspoke.

11            That's what I meant to say.  I'll

12            ask again.

13                  THE COURT:  All right.

14   BY MR. SPANO:

15            Q.    Regarding drywall samples

16   provided to customers, did TG or TTP ever

17   send them out to anyone who didn't ask

18   for them first?

19            A.    In my recollection, no.

20                  MR. SPANO:  Tender the

21            witness, Your Honor.

22                  THE COURT:  Any redirect,

23            Ervin?

24                  MR. GONZALEZ:  Yes.
```

```
 1          Briefly, Your Honor.  Hopefully
 2     briefly.
 3              THE WITNESS:  Can I take a
 4     break?
 5              THE COURT:  You need a break
 6     or are you --
 7              THE WITNESS:  How much
 8     longer?
 9              MR. GONZALEZ:  Short.
10              THE WITNESS:  My neck cannot
11     take it anymore.
12              MR. MEUNIER:  I will have a
13     little bit too, Judge.
14              THE WITNESS:  If you have
15     too many questions, you have to
16     wait.
17              VIDEOTAPE TECHNICIAN:  We're
18     going off the record at 5:27.
19                   -  -  -
20              (A recess was taken from
21     5:27 p.m. to 5:33 p.m.)
22                   -  -  -
23              VIDEOTAPE TECHNICIAN:  We're
24     back on the video record at 5:33.
```

```
 1                  -  -  -

 2                EXAMINATION

 3                  -  -  -

 4    BY MR. GONZALEZ:

 5         Q.    Good afternoon, Mr. Che.

 6    I'm going to show you Exhibit Number 1 to

 7    your deposition, Che-1.

 8              Can you confirm for me that

 9    the sole agency agreement is dated

10    October 20, 2006?

11         A.    That's what appears on the

12    document.

13         Q.    I'm going to show you what's

14    been marked as Exhibit 28 in the Jia

15    deposition.  This is the document that

16    refers to the labels for the Oriental

17    Trade Company's drywall purchase from TTP

18    that were going to be labeled Dun

19    Distributors that you discussed with your

20    attorney.

21              And you recall that

22    discussion with your attorney about that

23    document.  Correct?

24         A.    We did.
```

1        Q.    The date of the e-mails

2   discussing the labels that are going to

3   be used for Oriental Trade Company's

4   drywall purchase from TTP is February of

5   2007.  Right, sir?

6        A.    It says February the 25th,

7   2007.

8        Q.    And that is about November,

9   December, January, February, March, five

10  months after the date of Exhibit Number

11  1, the sole agency agreement.  Correct?

12       A.    Can you repeat that?

13       Q.    Yes.

14            The date of the e-mail

15  discussing the labeling that's going to

16  go on the drywall that will be labeled

17  Dun Drywall for OTC that was manufactured

18  by TTP is five months after the date of

19  the exclusive agency agreement.  Correct?

20            MR. SPANO:  Objection to

21       form, lack of foundation.

22            THE COURT:  Well, the

23       document itself --

24            It seems to me the document

```
 1              speaks for itself, so it's

 2              pointing out that one's in

 3              November and one's in March.

 4                   MR. GONZALEZ:  October and

 5              February, Your Honor.

 6                   THE COURT:  I'm sorry,

 7              October and February.

 8                   MR. GONZALEZ:  Yes, sir.

 9                   THE COURT:  So I could take

10              judicial notice that it's five

11              months.

12                   MR. GONZALEZ:  Yes, Your

13              Honor.  I'll move to my next

14              point.

15   BY MR. GONZALEZ:

16         Q.   I'm going to show you

17   exhibit to your deposition Che Number 2.

18   And I'm turning it to page 917 Bates

19   stamp number.

20                   I heard you state when your

21   lawyer was questioning you that you were

22   not aware what states the drywall that

23   was being purchased by Oriental Trade

24   Corporation or OTC from your company was
```

```
 1    going to be shipped in the United States.

 2              Is that what you said

 3    before?

 4         A.    I said I was not sure.  I

 5    did not verify.

 6         Q.    To be clear, I believe what

 7    you said was that you were not aware of

 8    receiving any information from OTC with

 9    respect to where they were going to be

10    sending the drywall purchased from TTP;

11    is that correct?  Is that what you said?

12              MR. SPANO:  Objection.  It

13         mischaracterizes the testimony.

14              THE COURT:  Let's ask him --

15              You have the character -- he

16         says that you misstated it.  You

17         used a couple of words that he

18         didn't.  So I would sustain the

19         objection.

20    BY MR. GONZALEZ:

21         Q.    Sir, do you agree with me

22    that you received an e-mail from Oriental

23    Trade Corporation indicating that they

24    were going to be sending product, drywall
```

Confidential - Subject to Further Confidentiality Review

1    product, from TTP to numerous cities in

2    the United States of America?  And for

3    time reference, we're referring to the

4    e-mail from Ivan Gonima dated April the

5    15th, 2007.  That e-mail was directed to

6    you.  Right, sir?

7              MR. SPANO:  I object to the

8         mischaracterization of the

9         document and mixing that in with a

10        question that simply asked him

11        whether he received the e-mail.  I

12        think the e-mail speaks for

13        itself.  It doesn't say anything

14        about Oriental Trading sending

15        drywall anywhere.  It's simply a

16        request for freight quotes, which

17        we've spent --

18              THE COURT:  Wait, wait,

19        wait.  Just a moment.

20              MR. SPANO:  -- which we

21        spent a long time talking about.

22              THE COURT:  Wait.  I

23        understand your objection.

24              I'll overrule the objection.

```
 1            Let's go forward.

 2                  THE WITNESS:  Repeat it,

 3        please.

 4                  MR. GONZALEZ:  Can you read

 5        it back to him, please.

 6  BY MR. GONZALEZ:

 7        Q.    Do you agree with me that

 8  you received an e-mail from Oriental

 9  Trade Corporation indicating they were

10  going to be sending drywall product from

11  TTP to numerous cities in the United

12  States of America?  And for time

13  reference I'm referring to the e-mail

14  from Ivan Gonima dated April the 15th,

15  2007.

16        A.    I don't recall.

17        Q.    That's your name.  Right,

18  sir, Bill Cher, Che Gang?

19        A.    Yes.

20        Q.    Your memory was very good

21  when your lawyer was questioning you --

22                  THE COURT:  Wait.  Come on,

23        no comment.

24                  MR. SPANO:  I object to
```

```
 1            that.

 2                 THE COURT:  Yes.  I'll

 3            strike that.

 4                 MR. GONZALEZ:  I was going

 5            to ask about the preparation, Your

 6            Honor.  I will rephrase it.

 7                 THE COURT:  Rephrase it.

 8   BY MR. GONZALEZ:

 9            Q.    Was the reason that you were

10   able to recall dates and conversations

11   that happened in the past so clearly

12   during the examination you had with your

13   attorney because you reviewed the

14   documents last night with your lawyers?

15                 MR. SPANO:  Object to the

16            mischaracterization of the

17            testimony.

18                 THE COURT:  He's under

19            cross.  I'll allow it.

20                 THE WITNESS:  What do you

21            mean by that?

22   BY MR. GONZALEZ:

23            Q.    Did you last night go over

24   certain documents with your attorney to
```

Confidential - Subject to Further Confidentiality Review

```
 1    discuss your examination by your lawyer

 2    today?

 3              MR. SPANO:  Object on

 4         privilege, Your Honor.

 5              THE COURT:  He's not asking

 6         him what he discussed, just

 7         whether.  The privilege doesn't

 8         attach to that.  It's 501.

 9              THE WITNESS:  What was your

10         question?

11              MR. GONZALEZ:  May you read

12         it back, please?

13              THE INTERPRETER:  Yes.

14              THE WITNESS:  No.

15    BY MR. GONZALEZ:

16         Q.   All right, sir.

17         A.   I went to sleep.  Your

18    question is rather long -- rather long.

19    My brain is not really working right now.

20         Q.   Okay.  Maybe I can shorten

21    the questions.

22              Paragraph number 2 of this

23    e-mail provided you and your company with

24    the following information with respect to
```

```
 1   OTC's intent on shipping product:

 2               "Given that you are going to

 3   operate it I am going to need your actual

 4   ocean freight rates from Qingdao to

 5   different cities in the USA for a"

 6   40-foot "GP container.  Here is the list

 7   of cities I need so I can review my price

 8   lists," A through H, Gulfport,

 9   Mississippi; New Orleans, Louisiana; Long

10   Beach, California; Las Vegas, Nevada;

11   Savannah, Georgia; Atlanta, Georgia;

12   Charleston, South Carolina; Wilmington,

13   North Carolina and San Juan, Puerto Rico?

14        A.    You don't have to translate

15   that.  It's meaningless.

16        Q.    That was information that

17   was available to you with respect to the

18   cities that OTC was intending to send

19   product.  Correct?

20               THE COURT:  Just a moment.

21               MR. SPANO:  Object to the

22         first question.  Object to the

23         first question because it

24         contained a sidebar assertion of
```

1          Oriental Trading's intent that

2          appears nowhere in the document.

3          And object to the second question

4          because he asked the second

5          question before he had a chance to

6          answer the first question.

7                MR. GONZALEZ:  The first

8          statement was not a question, it

9          was a preface to the question,

10         which was what he claims to be the

11         second question.  I prefaced it

12         with references to the e-mail, and

13         I asked a question with respect to

14         the e-mail.  So from an

15         evidentiary perspective, it would

16         be an infirm question had I not

17         properly set forth the predicate

18         for it.

19                THE COURT:  Let's first ask

20         him, did you receive this e-mail.

21    BY MR. GONZALEZ:

22         Q.   Sir, this e-mail indicates

23    that you received it.  Correct?

24         A.   Yes.

```
 1          Q.    All right, sir.

 2                And it indicates numerous

 3   cities in the United States to where the

 4   product is intended to be sent.  Correct?

 5                MR. SPANO:  Objection.

 6                Continued mischaracterization of

 7                the document.  There's not a word

 8                in that e-mail about Oriental's

 9                intent.  There's not a word about

10                sending drywall anywhere.

11   BY MR. GONZALEZ:

12          Q.    Is that right, sir?

13                MR. GONZALEZ:  I'm sorry, we

14                need a ruling from the Court.

15                THE COURT:  I sustain the

16                objection.  He received the

17                e-mail.  Let's leave it at that.

18   BY MR. GONZALEZ:

19          Q.    Now, if you can turn the

20   page to 918.  This is an e-mail that you

21   sent to Mr. Gonima.  Correct?

22          A.    This one?

23          Q.    Yes.

24          A.    Yes.
```

```
 1              Q.    And in it you state, "We
 2    indeed operated and are operating with a
 3    28-29ton containers to export our
 4    products to America.  And we can show 26"
 5    to 26 -- "26-26.5ton on the bill and
 6    packing list.  The ocean freight from
 7    Qingdao to Miami and New York
 8    is...2950-3000/40GP.  If you need, I can
 9    operate it for you."
10              MR. GONZALEZ:  He doesn't
11         need to answer.  Thank you.
12              THE COURT:  One thing.  Do
13         we need -- what's the witness's
14         standpoint?  He said something
15         about that he's overly tired.
16         We've been here since 8:30.  I
17         don't mind trying to finish him,
18         but if he can't testify, I don't
19         want to -- if you can take a break
20         and come back and finish him.
21              MR. MEUNIER:  I have a
22         short amount of time.
23              THE COURT:  Well, I leave it
24         up to the witness.
```

```
 1              MR. SPANO:  Can I have a

 2         word with him?

 3              THE COURT:  Sure.

 4              MR. SPANO:  Because I'm

 5         concerned about his ability to

 6         think at this point.

 7              THE COURT:  Right.

 8              VIDEOTAPE TECHNICIAN:  Going

 9         off the record, the time is 5:49.

10                   -  -  -

11              (A recess was taken from

12         5:49 p.m. to 5:53 p.m.)

13                   -  -  -

14              THE COURT:  What do you want

15         to do, Frank?

16              MR. SPANO:  Mr. Che will

17         continue, and he will let us know

18         if he can't finish.

19              THE COURT:  Ervin, are you

20         done?

21              MR. GONZALEZ:  Yes, thank

22         you.

23              VIDEOTAPE TECHNICIAN:  Go

24         back on the video record.  The
```

```
 1            time is 5:53.

 2                    -  -  -

 3                 EXAMINATION

 4                    -  -  -

 5    BY MR. MEUNIER:

 6         Q.   Mr. Che, your attorney put

 7    into the record Ivan Gonima's e-mail to

 8    you of August 30, 2006.  It's TG 575 and

 9    it's been marked as Che Defendant-1.

10             Do you have that in front of

11    you?

12             Please look at this e-mail,

13    Mr. Che, and in particular the second

14    paragraph.

15             Mr. Gonima states at the

16    beginning of that paragraph, "I have been

17    already contacting some big customers of

18    us in order to offer them your product

19    and there is a lot of interest" in "it."

20             In less than two months --

21             Less than two months after

22    you received that e-mail, TTP signed an

23    agreement certifying Oriental Trading as

24    the exclusive agent to sell TTP's Dun
```

```
 1   brand in the United States.  Correct?

 2            A.    We signed this agreement on

 3   October the 20th.

 4            Q.    And you signed that

 5   agreement in order to sell more product.

 6   Isn't that correct?

 7            A.    The first reason for signing

 8   of the agreement was because Jorge

 9   exaggerated on his demand.  It was based

10   on his strong request.  Then we thought

11   that we could actually sell more product.

12   And there was a precondition.  And under

13   that precondition, the agreement was

14   entered.

15            Q.    Yes, sir.

16                  But TTP signed this

17   agreement with Oriental Trading in order

18   to sell more product in the United States

19   of America.  Isn't that true?

20            A.    We signed the agreement not

21   because we cared where the customer would

22   sell our product to.  We only wanted them

23   to buy our product.  I never cared about

24   the destination of the customers.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    But you signed the agreement
 2    for an exclusive agency to sell in the
 3    United States, and you did that in order
 4    to sell more product.  True?
 5          A.    To sell more product is
 6    correct.  But to sell it in America was a
 7    request of the customer.
 8          Q.    You have indicated that
 9    Oriental Trading did not fulfill the
10    agreement to purchase no less than 20,000
11    sheets or no less than a million sheets.
12                Do you remember that
13    testimony?
14          A.    I remember I said that in a
15    time -- in a certain time frame.
16          Q.    Why were those important
17    conditions of the agreement?
18          A.    Through the condition we
19    intend to prove that the customer
20    actually did not exaggerate his demand.
21    If the customer could reach such a
22    condition which tells us that he did not
23    exaggerate his demand, he could then
24    purchase our product.  This agreement can
```

```
 1    only come into force under such

 2    condition.  This is a very important

 3    precondition.  We have precondition for

 4    any contract with any customer.

 5         Q.    So the volume of sales was

 6    important in this agency agreement with

 7    OTC?

 8         A.    The precondition is very

 9    important.

10         Q.    Can you identify a single

11    document in writing where TTP advised

12    Oriental Trading that it was not in

13    compliance with the sole agency

14    agreement?

15         A.    I don't remember we notified

16    them like this in written form, because

17    the document, the document that was taken

18    away by Jorge in my memory.  And

19    according to the file of the company, we

20    had never received the originals

21    supposedly to be mailed back to us.

22    Therefore, we thought that Jorge did not

23    even agreed with this agreement.

24         Q.    To your knowledge, Mr. Che,
```

```
 1   has TTP or TG before your testimony today

 2   ever announced the position that this

 3   agreement with OTC was violated by OTC?

 4        A.    This document, except that

 5   Mr. Peng and I had reviewed it before

 6   that, before our testimonies.  Perhaps

 7   you have showed it to other people.  But

 8   before we testified, only Mr. Peng and I

 9   were aware of it.  Therefore, we don't

10   think that this agreement was valid.  So

11   we did not need to notify them for they

12   did not mail back us the originals.  I

13   think this is the basic trust issue.

14             What happened?

15        Q.    I'm looking for the profile

16   form that you were shown by your lawyer.

17             Mr. Che, your attorney

18   referred you to page 2 of Exhibit A to

19   the TTP profile form, item number 9, and

20   asked you to tell the Court what the

21   marking was on drywall purchased by

22   Oriental Trading.

23             Do you remember that?

24        A.    Item 9.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Item 9 and --

 2          A.    That's not what it is.

 3          Q.    It's page 2 of Exhibit A.

 4                MR. MEUNIER:  Is it a

 5          different page for the Chinese

 6          version, Frank?

 7                THE WITNESS:  I don't see

 8          it.

 9                MR. SPANO:  I didn't refer

10          him to that.  It's not Oriental

11          Trading.

12    BY MR. MEUNIER:

13          Q.    Do you recall your testimony

14    that the Taishan marking was on Oriental

15    Trading drywall?

16          A.    No.

17          Q.    It was not, was it?

18          A.    I don't remember I testified

19    on that.

20          Q.    The Oriental Trading drywall

21    is shown in items 234 and 236 through

22    243; is that correct?

23          A.    Can you repeat the number?

24          Q.    Number 234.
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    And number 236 through 243?

 3          A.    Yes.

 4          Q.    Those are the Oriental

 5    Trading drywall purchases.  Correct?

 6          A.    Yes.

 7          Q.    And all of those had the Dun

 8    design on the tape.  Correct?

 9          A.    We manufactured the product

10    according to the design of Oriental

11    Trading Company.  This is only a marked

12    product.

13          Q.    And you agreed in all of

14    those cases that Mr. Gonima's request to

15    put the colors of the American flag, red,

16    white and blue, on the tape.  Correct?

17                MR. SPANO:  Objection, asked

18          and answered.

19    BY MR. MEUNIER:

20          Q.    Is that correct?

21                THE COURT:  Over the

22          objection, I'll allow you to

23          answer it.

24                THE WITNESS:  Can you repeat
```

```
 1          that?

 2    BY MR. MEUNIER:

 3          Q.    On all of the Dun drywall,

 4    you agreed at Mr. Gonima's request to put

 5    the colors of the American flag on the

 6    tape, red, white and blue; is that

 7    correct?

 8          A.    We agreed to produce the

 9    label according to customer's design.

10    However, the color the customer indicated

11    was only for us to be able to find the

12    same color, because we can find American

13    flag on any website.  If that is a flag

14    of his own company, I'm nowhere --

15    there's nowhere to be found.  When he

16    choose red, he could also indicate it is

17    the color red on the flag of China.

18          Q.    Mr. Che, we want to end this

19    deposition.

20          Do I have to go back to the

21    instant messaging where you were told by

22    Mr. Gonima he wanted those colors because

23    they were the colors of the American

24    flag?  Do we have to repeat that?
```

Confidential - Subject to Further Confidentiality Review

```
 1                MR. SPANO:  Objection, asked
 2        and answered.
 3                THE COURT:  Overrule the
 4        objection.
 5                THE WITNESS:  Please repeat.
 6   BY MR. MEUNIER:
 7        Q.    Do you recall the instant
 8   messaging conversation we went over
 9   earlier today where Mr. Gonima told you,
10   we want to use blue, red and white
11   because those are the colors of the
12   American flag?  Do you remember that?
13        A.    I don't recall what was on
14   the instant message, but I do recall what
15   you mentioned regarding the tape.
16        Q.    Thank you.
17                And therefore, according to
18   this profile form prepared by your
19   company, 37,980 pieces of drywall made by
20   TTP were exported to the United States
21   with the colors of the American flag put
22   on them by your company.  Is that true?
23                MR. SPANO:  Objection to
24        form, compound, lack of
```

```
 1            foundation.

 2                 THE COURT:  I'll overrule

 3            the objection and allow it.

 4    BY MR. MEUNIER:

 5            Q.    Isn't that true?

 6            A.    Please repeat.

 7            Q.    Therefore, according to this

 8    profile form prepared by your company,

 9    37,980 pieces of drywall made by TTP were

10    exported to the United States with the

11    colors of the American flag put on them

12    by your company.  Is that true?

13            A.    The 30,000-something pieces

14    of drywall, did you mean the drywall of

15    Oriental Trading Company?

16            Q.    The Dun drywall of Oriental

17    Trading Company.

18            A.    The product Oriental Trading

19    Company purchased from us that we have

20    manufactured the label according to the

21    requirement of Oriental company.  As for

22    what colors they'd use, it was the

23    customer's business.  I thought he

24    reminded me in that way so I could find
```

```
 1    the colors easily.  It is as if a color

 2    sample.  Therefore, the American flag

 3    that you mentioned in this document I

 4    personally do not think has any actual

 5    meaning.  We only used it as color

 6    samples.

 7         Q.    Finally -- you're glad.

 8         A.    Thank you.

 9         Q.    You testified when your

10    attorney was asking you questions that

11    TTP did not know the destination of the

12    drywall that it made and sold to American

13    customers.  Is that your testimony?

14         A.    Yes.  What I intended to

15    express was that I was not sure.  I did

16    not verify.

17         Q.    However, Mr. Che, TTP's own

18    business records reflect the US

19    destinations of drywall that it sold to

20    certain American customers.  Isn't that

21    true?

22         A.    Can I look at your record?

23         Q.    For example, do you remember

24    the invoice to Advanced Products and
```

Confidential - Subject to Further Confidentiality Review

```
 1    Triax with the destination New Orleans on

 2    it?

 3            A.    Triax invoice was prepared

 4    by Ms. Wei, not me.

 5            Q.    Yes, yes.

 6                  But you remember the

 7    document we're talking about?

 8            A.    I remember you provided me

 9    and asked me to read those documents.

10            Q.    Yes, yes.

11                  And New Orleans is on there

12    as a destination.  Correct?

13            A.    Ms. Wei filled it up that

14    way.  But what was the final facts, I

15    don't know.

16            Q.    But Ms. Wei, you said,

17    provided the invoice forms to your

18    company, and your company, TTP, put its

19    stamp on the form, you said?

20            A.    What I said was originally

21    that Ms. Wei provided such document and

22    requested us to stamp for her, but we --

23    I do not recollect in my memory what

24    actually happened.
```

```
 1            Q.    And the destinations of

 2    Miami, New Orleans, New York and USA are

 3    also reflected on the company's special

 4    invoices for exports.  Correct?

 5            A.    Can I take a look at your

 6    exhibit?

 7            Q.    For the record, he's looking

 8    at Peng Shiliang --

 9              MR. MEUNIER:  What's the

10         number, Frank?

11              MR. SPANO:  8.

12    BY MR. MEUNIER:

13            Q.    -- 8.

14            A.    Let me explain to you

15    regarding the document.

16            Q.    Yes, sir.

17            A.    Upon the requirement of

18    Chinese government taxation institution,

19    we had to completely fill out -- fill up

20    a document as such.  All of the

21    information on it was formality.  We did

22    not have any right to make changes.

23              As for the destination

24    appearing here -- as for the destination
```

 1    appearing here, we, through the

 2    customer's shipping agent -- we through

 3    the customer's shipping agent, we were

 4    told.  But actually where it was sent to,

 5    we did not verify either, because it was

 6    handled by the customer.  What we needed

 7    to do was only to deliver in Chinese

 8    port, according to the term of FOB.  The

 9    precondition was that the customer had to

10    pay us first.  Therefore, do not only

11    look at the formality that could not be

12    changed.  We delivered to the shipping

13    agency of the customer in Chinese port.

14    That's all.  We delivered our product.

15            MR. MEUNIER:  Thank you.  No

16        further questions.

17            THE WITNESS:  Thank you.

18            THE COURT:  That completes

19        the deposition.

20            VIDEOTAPE TECHNICIAN:  That

21        concludes today's deposition and

22        also Tape Number 7 and going off

23        the record at 6:21.

24            (Witness excused.)

1                    (Deposition concluded at

2              approximately 6:21 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E
 2
 3
                    I, ANN MARIE MITCHELL, a
 4    Registered Diplomate Reporter, Certified
      Court Reporter and Notary Public, do
 5    hereby certify that, pursuant to notice,
      the deposition of GANG CHE was duly taken
 6    on January 12, 2012 at 8:28 a.m. before
      me.
 7
 8                  The said GANG CHE was duly
      sworn by The Court according to law to
 9    tell the truth, the whole truth and
      nothing but the truth and thereupon did
10    testify as set forth in the above
      transcript of testimony.  The testimony
11    was taken down stenographically by me.
12
                    I do further certify that
13    the above deposition is full, complete
      and a true record of all the testimony
14    given by the said witness.
15
16
              Ann Marie Mitchell
17            Registered Diplomate Reporter
              Certified Realtime Reporter
18
19
20                  (The foregoing certification
      of this transcript does not apply to any
21    reproduction of the same by any means,
      unless under the direct control and/or
22    supervision of the certifying reporter.)
23
24
```

```
 1              INSTRUCTIONS TO WITNESS

 2

 3

 4              Please read your deposition

 5   over carefully and make any necessary

 6   corrections.  You should state the reason

 7   in the appropriate space on the errata

 8   sheet for any corrections that are made.

 9

10              After doing so, please sign

11   the errata sheet and date it.  It will be

12   attached to your deposition.

13

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

```
 1                    - - - - - -

                     E R R A T A

 2                    - - - - - -

 3    PAGE   LINE   CHANGE

 4    _____  _____  _____

 5       REASON:  ____ _____

 6    _____  _____  _____

 7       REASON:  ____  _____

 8    _____  _____  _____

 9       REASON:  _____ _____

10    _____  _____  _____

11       REASON:  _____ _____

12    _____  _____  _____

13       REASON:  _____ _____

14    _____  _____  _____

15       REASON:  _____ _____

16    _____  _____  _____

17       REASON:  _____ _____

18    _____  _____  _____

19       REASON:  _____ _____

20    _____  _____  _____

21       REASON:  _____ _____

22    _____  _____  _____

23       REASON:  _____ _____

24
```

Confidential - Subject to Further Confidentiality Review

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
                 I,_____, do
 4     hereby certify that I have read the
       foregoing pages, 125-410, and that the
 5     same is a correct transcription of the
       answers given by me to the questions
 6     therein propounded, except for the
       corrections or changes in form or
 7     substance, if any, noted in the attached
       Errata Sheet.
 8
 9     _____
       GANG CHE                          DATE
10
11
12
13
14
15
16     Subscribed and sworn
       to before me this
17     _____ day of _____, 20_____.
18     My commission expires:_____
19
       _____
20     Notary Public
21
22
23
24
```

1                    LAWYER'S NOTES

2    PAGE   LINE

3    _____  _____   _____

4    _____  _____   _____

5    _____  _____   _____

6    _____  _____   _____

7    _____  _____   _____

8    _____  _____   _____

9    _____  _____   _____

10   _____  _____   _____

11   _____  _____   _____

12   _____  _____   _____

13   _____  _____   _____

14   _____  _____   _____

15   _____  _____   _____

16   _____  _____   _____

17   _____  _____   _____

18   _____  _____   _____

19   _____  _____   _____

20   _____  _____   _____

21   _____  _____   _____

22   _____  _____   _____

23   _____  _____   _____

24   _____  _____   _____

### Errata Sheet of Transcript of the Testimony of: Gang Che

车刚证人证言勘误表

**January 11 2012**

2012 年 1 月 11 日

| Page: Line<br>页码：行数 | Change from<br>原文 | Change to<br>更正 | Reason<br>原因 |
|---|---|---|---|
| 21:20 | "I volunteered"<br>"我志愿" | "I made a personal decision"<br>"我自愿" | Translation correction<br>翻译校正 |
| 22:3 | "I volunteered"<br>"我志愿" | "I made a personal decision"<br>"我自愿" | Translation correction<br>翻译校正 |
| 28:11-12 | "I also volunteered"<br>"我也志愿" | "I made a personal decision"<br>"我自愿" | Translation correction<br>翻译校正 |
| 28:17 | "I volunteered"<br>"我志愿" | "I made a personal decision"<br>"我自愿" | Translation correction<br>翻译校正 |
| 48:12 | "to"<br>"to" | "with"<br>"with" | Clarification<br>具体说明 |
| 82:5-6 | "Do not keep on falling up on the frame."<br>"不要总是拘泥于框架。" | "Do not keep on asking about the form."<br>"不要总是询问格式。" | Clarification<br>具体说明 |
| 86:4-5 | "to be the representative of a foreign company in China"<br>"是在中国一家外国公司的代表" | "to be the representative in China of a foreign company"<br>"是一家外国公司在中国的代表" | Clarification<br>具体说明 |
| 113:12 | "frame"<br>"框架" | "form"<br>"格式" | Translation correction<br>翻译校正 |

Confidential - Subject to Further Confidentiality Review

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
              I, _____, do
 4    hereby certify that I have read the
      foregoing pages, 1-124, and that the same
 5    is a correct transcription of the answers
      given by me to the questions therein
 6    propounded, except for the corrections or
      changes in form or substance, if any,
 7    noted in the attached Errata Sheet.
 8
      _____      2012. 3. 13
 9    GANG CHE                          DATE
10
11
12
13
14
15
      Subscribed and sworn
16    to before me this
      _____ day of _____, 20____.
17
      My commission expires:_____
18
19    _____
      Notary Public
20
21
22
23
24
```

证人宣誓书

我车刚特此证实，我已经阅读过上述第 1 至第 124 页，并且除在勘误表中关于的形式或实体上被更正的内容外，该第 1 至第 124 页是我被问及各个问题的答复的正确笔录记载。

_(签名)_                          2012·3·13

车刚                                日期

兹于            年        月        日

在本人前宣誓后成作本宣誓书

本人公证资格有效截止日期为          年          月          日

（公证人签名）

# 公　证　书

（2012）泰岱岳证外字第 200 号

申请人：车刚，男，一九七六年五月二日出生，公民身份号码：370902197605020950。

公证事项：签名

兹证明车刚于二〇一二年三月十三日在泰山石膏股份有限公司办公室，在本公证员的面前，在前面的《证人宣誓书》上签名。

中华人民共和国山东省泰安市岱岳公证处

公证员　张卫兵

二〇一二年三月十三日

XW37106359

# NOTARIAL   CERTIFICATE

(2012)Tai Daiyue Zheng Wai Zi No.200

Applicant: Che Gang, male, born on May 2, 1976, citizen ID No.:370902197605020950.

Issue under notarization: Signature.

This is to certify that Che Gang on Taishan Gypsum Co., Ltd Office on March 13, 2012 and with the presence of the under-mentioned notary signed on the *ACKNOWLEDGMENT OF DEPONENT*.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

March 13, 2012

XVI 37106387

# 公　证　书

（2012）泰岱岳证外字第 201 号

申请人：车刚，男，一九七六年五月二日出生，公民身份号码：370902197605020950。

公证事项：译本与原本相符

兹证明前面的（2012）泰岱岳证外字第 200 号《公证书》的英文译本内容与该公证书中文原本相符。

中华人民共和国山东省泰安市岱岳公证处

公证员　

二〇一二年三月十三日

XW37106362

# NOTARIAL   CERTIFICATE

(2012) Tai Daiyue Zheng Wai Zi No.201

Applicant: Che Gang, male, born on May 2, 1976, citizen ID No.:370902197605020950.

Issue under notarization: The translation is in conformity with the original copy.

This is to certify that the English translation content of (2012) Tai Daiyue Zheng Wai Zi No.200 *NOTARIAL CERTIFICATE* is in conformity with the Chinese original copy of that.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

March 13, 2012

XW37106389

# 公　证　书

中华人民共和国山东省泰安市岱岳公证处

## Errata Sheet of Transcript of the Testimony of: Gang Che

车刚证人证言勘误表

### January 12 2012

2012 年 1 月 12 日

| Page: Line(s) 页码：行数 | Change from 原文 | Change to 更正 | Reason 原因 |
|---|---|---|---|
| 146:12 | "I didn't pay attention"<br>"我没注意" | "I didn't notice that"<br>"我没注意到那件事" | Translation correction<br>翻译校正 |
| 190:12 | Jorge"<br>"Jorge" | "Jorge [the American pronunciation: George]"<br>"Jorge 【美式发音为 George】" | Clarification<br>具体说明 |
| 190:14 | Jorge"<br>"Jorge" | "Jorge [the Spanish pronunciation]"<br>"Jorge 【西班牙发音方式】" | Clarification<br>具体说明 |
| 227:5 | "replacement"<br>"替代" | "place"<br>"座位" | Translation correction<br>翻译校正 |
| 249:17 | "customed"<br>"定制" | "customary"<br>"习惯的" | Clarification<br>具体说明 |
| 250:18 | "our intercompany"<br>"我们公司间" | "Oriental company"<br>"Oriental 公司" | Spelling correction<br>拼写校正 |
| 270:9 | "he"<br>"他" | "she"<br>"她" | Clarification<br>具体说明 |
| 272:18 | "you can't really prove it"<br>"你无法证明" | "these documents alone do not tell anything"<br>"这些文件本身并不能说明什么" | Translation correction<br>翻译校正 |

- 2 -

| 289:7 | "reverse payment"<br><br>"反向支付" | "prepayment"<br><br>"偿还" | Translation correction<br><br>翻译校正 |
|---|---|---|---|
| 312:3 | "formality"<br><br>"手续" | "a set form"<br><br>"固定格式" | Translation correction<br><br>翻译校正 |
| 312:4 | "formality"<br><br>"手续" | "a set form"<br><br>"固定格式" | Translation correction<br><br>翻译校正 |
| 323:9 | "inland"<br><br>"内地" | "mainland"<br><br>"大陆" | Clarification<br><br>具体说明 |
| 323:10 | "formality way"<br>"手续" | "a set form"<br><br>"固定格式" | Translation correction<br><br>翻译校正 |
| 330:4-5 | "document of formality"<br>"格式文件" | "a set document form"<br><br>"一份格式文件表格" | Translation correction<br><br>翻译校正 |
| 403:21 | "formality"<br><br>"手续" | "a set form"<br><br>"固定格式" | Translation correction<br><br>翻译校正 |
| 404:11 | "formality"<br><br>"手续" | "a set form"<br><br>"固定格式" | Translation correction<br><br>翻译校正 |

Confidential - Subject to Further Confidentiality Review

1
2             ACKNOWLEDGMENT  OF  DEPONENT
3
                 I, _____ ,  do
4    hereby certify that I have read the
     foregoing pages, 125-410, and that the
5    same is a correct transcription of the
     answers given by me to the questions
6    therein propounded, except for the
     corrections or changes in form or
7    substance, if any, noted in the attached
     Errata Sheet.
8
9    _____        2012.3.13
     GANG CHE                          DATE
10
11
12
13
14
15
16   Subscribed and sworn
     to before me this
17   _____ day of _____, 20____.
18   My commission expires:_____
19
     _____
20   Notary Public
21
22
23
24

证人宣誓书

我车刚特此证实，我已经阅读过上述第 125 至第 410 页，并且除在勘误表中关于的形式或实体上被更正的内容外，该第 125 至第 410 页是我被问及各个问题的答复的正确笔录记载。

2012、3、13

车刚                          日期

兹于          年          月          日

在本人前宣誓后成作本宣誓书

本人公证资格有效截止日期为          年          月          日

（公证人签名）

# 公　证　书

（2012）泰岱岳证外字第 210 号

申请人：车刚，男，一九七六年五月二日出生，公民身份号码：370902197605020950。

公证事项：签名

兹证明车刚于二〇一二年三月十三日在泰山石膏股份有限公司办公室，在本公证员的面前，在前面的《证人宣誓书》上签名。

中华人民共和国山东省泰安市岱岳公证处

公证员　张卫岳

二〇一二年三月十三日

XM37106380

# NOTARIAL    CERTIFICATE

(2012)Tai Daiyue Zheng Wai Zi No.210

Applicant: Che Gang, male, born on May 2, 1976, citizen ID No.:370902197605020950.

Issue under notarization: Signature.

This is to certify that Che Gang on Taishan Gypsum Co., Ltd Office on March 13, 2012 and with the presence of the under-mentioned notary signed on the *ACKNOWLEDGMENT OF DEPONENT*.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

March 13, 2012

XW37106408

# 公　证　书

（2012）泰岱岳证外字第 211 号

申请人：车刚，男，一九七六年五月二日出生，公民身份号码：370902197605020950。

公证事项：译本与原本相符

兹证明前面的（2012）泰岱岳证外字第 210 号《公证书》的英文译本内容与该公证书中文原本相符。

中华人民共和国山东省泰安市岱岳公证处

公证员　张卫岳

二〇一二年三月十三日

XW37106382

# NOTARIAL   CERTIFICATE

(2012) Tai Daiyue Zheng Wai Zi No.211

Applicant: Che Gang, male, born on May 2, 1976, citizen ID No.:370902197605020950.

Issue under notarization: The translation is in conformity with the original copy.

This is to certify that the English translation content of (2012) Tai Daiyue Zheng Wai Zi No.210 *NOTARIAL CERTIFICATE* is in conformity with the Chinese original copy of that.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

March 13, 2012

# SOLE AGENCY AGREEMENT

Contract NO: SD TH051020

Date: 20th October 2006　　　　　Place: TAI AN CHINA

The seller: TAIAN TAISHAN PLASTERBOARD CO., LTD

　　Address: Dawenkou Daiyue District Tai an China

The buyer: ORIENTAL TRADING COMPANY, LLC

　　Address: 1111 BRICKELL BAY DRIVE, SUITE 1502 MIAMI, FL
33131 USA

This contract is made by and between the seller and buyer, Both the seller
and buyer wish to develop jointly business and through friendly negotiations,
enter into this agreement concerning to sole sales subject to the under
mentioned the terms and conditions:

1. Goods Description for Sole Sales: the gypsum board manufactured by
seller with the thickness of 1/2 inch or 5/8 inch, the width of 4 feet,
the length of 8 feet, 9feet, 10 feet or 12feet, under the brand name of
"DUN" showing as in the seller's catalogue only.

2. Sole Sales Area: Limited to the territory of the USA

3. Turnover: Within the validity of this Agreement, the buyer shall
undertake to purchase from the seller the products above-mentioned
not less than 20000 sheets of one unique size from the beginning of
November of 2006 to the end of February 2007, and the turnover
should not less than 1,000,000 sheets of the products mentioned in
article 1 in the following 12 months. This agreement will be valid for

Che

EXHIBIT NO. 1
1-11-12
L. GOLKOW

next 12 months if the buyer can reach 1,000,000 sheets in the first 12

months after February 2007. If the above mentioned turnover can not

be reached, the seller has the right to cancel this agreement.

4. Term of payment: 1) full amount in advance or 30% deposit by T/T

and the rest 70% payment by irrevocable sight L/C.

5. Market report: the buyer shall keep the seller well informed of the

gypsum board market information such as the current price, market

status as well as the market forecast.

6. Right and Obligation: All rights and obligations involved in this

Agreement shall not be transferred to any third party without the

written consent of both parties.

7. This agreement is valid from the date of signing by both parties and is

drawn in two original copies and each party kept one copy.

8. Arbitration: All distributes in connection with this agreement shall

be settled amicably by negotiation. In case no settlement can be

reached, the case under dispute may then be submitted to the foreign

trade arbitration commission of the China council for promotion

international trade. The decision of the arbitration shall be accepted

as final and binding upon both parties.

The seller: TAIAN TAISHAN PLASTERBOARD CO., LTD

The buyer: ORIENTAL TRADING COMPANY LLC



泰安市泰山纸面石膏板有限公司

CERTIFICATE

泰安市泰山纸面石膏板有限公司兹证明 ORIENTAL TRADING Company, LLC 为泰山泰
山纸面石膏板有限公司属"DUN"牌在美国的总经销。

本证明签字后即生效，本证明前所涉利法律效应均依照双方签订的独家经销商协议
(SDTH061020)中相关条款。

TAIAN TAISHAN PLASTERBOARD CO., LTD. certifies that ORIENTAL TRADING
Company, LLC as its exclusive agency for the DUN brand in the United States of America.

This certificate shall be considered with the understanding that it may be effective on the
date of their signing. The validity period and responsibility in law of this certificate are all
subject to the terms in the formal Exclusive Agency Agreement (SDTH061020) signed by
two parties accordingly.

In witness, the parties hereby have offered their signature as followed:

TAIAN TAISHAN PLASTERBOARD CO., LTD.          ORIENTAL TRADING COMPANY, LLC

(签字)                                          (Signature)

STATE OF FLORIDA
COUNTY OF Miami Dade

THE FOREGOING INSTRUMENT WAS ACKNOWLEDGED
BEFORE ME THIS __ DAY OF Dec by Jorge Arcualo
PERSONALLY KNOWN __ OR PRODUCED IDENTIFICATION __
TYPE OF IDENTIFICATION FDL A614255590890
NOTARY:



# State of Florida



### Department of State

## APOSTILLE

(Convention de La Haye du 5 octobre 1961)

1. Country:  United States of America

   This public document

2. has been signed by     Ramiro Angulo

3. acting in the capacity of   Notary Public of Florida

4. bears the seal/stamp of   Notary Public, State of Florida

### Certified

5. at   Tallahassee, Florida

6. the   Twenty-Seventh day of November, A.D., 2006

7. by   Secretary of State, State of Florida

8. No.   2006-83346

9. Seal/Stamp:          This apostille is NULL and VOID if the date in Item 6 occurs
                        before the execution date on the attached document.

                 10. Signature:

                          Sue M. Cobb

                      Secretary of State

DSDE 99  (3/03)

| | |
|---|---|
| **From:** | Ivan Gonima <otc.igg.orlando@gmail.com> |
| **To:** | 'wuyu' <sdth818@163.com> |
| **CC:** | alvaro@imperialstonemg.com <alvaro@imperialstonemg.com>;'OTC Orlando' <otc.orlando@gmail.com>;'DENISE ROMANO' <deniseromano5@yahoo.com> |
| **Sent:** | 4/17/2007 10:06:48 AM |
| **Subject:** | RE: RE: SHIPPING |

Dear Mr. Bill:

Thanks for your prompt answer. I am aware of MSC being much strict on an overweight container because that was one of the problems we had when we were dealing with Panlink. We have heard of ZIM but we have been told that sometimes they take a very long time to deliver the containers because they make a stop in Jamaica before coming to Miami. I just talked to our customs broker in Miami and he is telling me that if we can use MSC it would be better because it is a lot easier to get the containers out of the port in a timely manner with MSC than with ZIM. I would prefer if you try to book our shipment thru MSC but if for any reason you cannot do it you can use then, as a last resource, ZIM. Please be aware Mr. Bill that we do not want to have more delays with this order.

Sure we need you to book the shipping space now; that is what I have been telling you for a while. I am going to give you again – I already sent you several emails with this information -- the other information you are asking for:

**Consignee:**

Oriental Trading Company
Attention: Angel Garcia or Denise Romano
2 Alhambra Plaza – Suite 801
Coral Gables, FL 33134

Phone: (305) 446-8431

Emails

| | |
|---|---|
| Angel Garcia | amg@amgo.net |
| Denise Romano | deniseromano5@yahoo.com |
| Alvaro Salcedo | alvaro@imperialstonemg.com |

**Notify Party:**

ITBF
Attention: German Munoz
2261 NW 66 Avenue # 221
Miami, FL 33122
Phone: (305) 874-2225
Fax: (305) 874-2202

Emails:

| | |
|---|---|
| German Munoz | almu@bellsouth.net |
| Oscar Urra | oscar@itbfusa.com |

Destination Port for First Order:

Miami, Florida – USA

Best regards;

*Ivan Gonima*
*Oriental Trading Company, LLC*
*1600 33rd, Unit 101*
*Orlando, FL 32839*



Che

EXHIBIT NO. 1
1-11-12
L. GOLKOW

CONFIDENTIAL — SUBJECT TO

*Phone: (407) 574-6134*
*Fax: (407) 843-3910*

---

**From:** wuyu [mailto:sdth818@163.com]
**Sent:** Monday, April 16, 2007 9:25 PM
**To:** igonima@gonimaconstructors.com; otc.orlando@gmail.com
**Subject:** Re:RE: SHIPPING
**Importance:** High

Dear Mr.Guzman and Mr. Ivan,
      Thank you very much for your kindly attention on our business.
      The shipping company we are contacting are MSC and ZIM. Both of them like to accept our
booking and allow us to pay the ocean freight when the container arrive your port. But MSC's
stipulation on weight is much stricter than ZIM, so we prefer to ZIM. If you need us book the
shipping space now, please let us be informed of the detail information concerning the
consignee, notify party, destination port for the first order.

      Thank you and best wishes!

---

车刚
Bill  Cher
13561759284
E-mail:SDTH818@163.com
MSN:wuyu374@hotmail.com

在2007-04-17, "Ivan Gonima" <igonima@gonimaconstructors.com> 写道:
My dear friend:

That is fine; we will go with your ocean freight company. What is more convenient for you? We can pay them directly or we
can pay them thru you; it depends on which way will make the whole process easier for you and us. Just let me know which
way it would be better; we were dealing with a company using MSC (Mediterranean Shipping Company) and the agreement
we had was that we had to pay them once the containers were here at the port. Which carrier are you going to use? Please
book our first order as soon as possible.

I will let you know as soon as I have some news about that 2,000,000 sheets potential order; I know you will be very
interested in it and you will help us as much as you can. Every penny counts!

Please copy every email you send me to Mr. Leonardo Guzman at otc.orlando@gmail.com,; Mr. Guzman is our Orlando Office
Manager and he needs to be aware of everything.

I will be waiting for your answer letting us know when our first order is departing. Let me know if you need any more
information..

Best regards;


Ivan Gonima

---

**From:** wuyu [mailto:sdth818@163.com]
**Sent:** Sunday, April 15, 2007 10:29 PM
**To:** igonima@gonimaconstructors.com
**Subject:** Re:SHIPPING
**Importance:** High

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0000916

Dear Mr. Ivan,
  Thank you very much for your kindly attention.
  The shipping agent in Qingdao confirmed the ocean freight USD2950-3000.00 to Miami or New York. Would you please pay the ocean freight directly to shipping comapny or indirectly through us to the shiping company?

  And also please be informed that there is not a customer who are buying gypsum board from us reaching to 800000 sheets a month at this moment. There is no order which is more less than 800000 sheets. Please prompt the order of 2000000 sheets in an early time. We will do our best to cooperate with you.
  Thanks and best regard
  Yours faithfully


车刚
Bill Cher
13561759284
E-mail:SDTH818@163.com
MSN:wuyu374@hotmail.com

在2007-04-15, "Ivan Gonima" <igonima@gonimaconstructors.com> 写道:
My dear friend:

Thanks a lot for your prompt answer, I am very glad to receive your email.

1.- I never said I do not believe you about the 28 – 29 tons. I was just telling you about the issues we are facing here because of that weight. I have been working around the clock with my customs broker in Miami and we think we have found a solution for all the troubles we have faced so far. I really appreciate all your help and concern and I think the best thing to do right now is to let you operate the ocean freight and shipping from Qingdao to Miami, FL at a rate of $2,950-$3,000 (the lower the better, you know). We will make then all necessary arrangements to take the containers from Miami, FL to our warehouses in Fort Lauderdale, FL and Orlando, FL. This way you can load the 28 tons you have mentioned showing 26 – 26.5 tons on the bill and packing list and we will skip a lot of problems. Please go ahead and make all arrangements for shipping the first order (4' x 12' x ?").

2.- Given that you are going to operate it I am going to need your actual ocean freight rates from Qingdao to different cities in the USA for a 40' GP container. Here is the list of cities I need so I can review my price lists:

a) Gulf Port, Mississippi (CY – DR)
b) New Orleans, Louisiana (CY – CY)
c) Long Beach, California (CY – CY)
d) Las Vegas, Nevada (CY – DR)
e) Savannah, Georgia (CY – CY)
f) Atlanta, GA (CY – DR)
g) Charleston, South Carolina
h) Wilmington, North Carolina
i) San Juan, Puerto Rico (CY – CY)
j) Buenaventura, Colombia (CY – CY)
k) Cartagena, Colombia (CY – CY)
l) Puerto Limón, Costa Rica (CY – CY)

3.- I knew Jorge Arevalo was telling us lies about that distributor in New York; I always thought it was very difficult for somebody (I guess it is the client buying the Marathon brand drywall) to buy 800,000 sheets a month; thanks for clarifying that. I know that we are the only ones distributing the brand DUN in the United States; what I want to try to do with you is to get to an agreement in which we also take care of the customers actually importing from you other brands you produce so we can unify everything under DUN. It would be without any doubt beneficial for Taihe and for OTC. Look at it this way Mr. Bill;

we are pushing very hard for making this business a great one, although right now the construction industry in this country is declining, and you could help us strongly letting us take care of those customers directly. We have here warehouses, we can visit them on a weekly basis and we can deliver the product to their warehouses or job sites. That way it will be easier for them and probably they will buy more. What do you think about it?

I will be waiting for your prompt answer.

Best regards;

Ivan Gonima

**From:** wuyu [mailto:sdth818@163.com]
**Sent:** Friday, April 13, 2007 10:03 PM
**To:** igonima@gonimaconstructors.com
**Subject:** Re:RE: RE: SHIPPING
**Importance:** High

Dear Mr. Ivan ,
    I am very glad to receive your email.
    1. We indeed operated and are operating with 28-29ton containers to export our products to America. And we can show 26-26.5ton on the bill and packing list. The ocean freight from Qingdao to Miami and New York is $2950-3000/40GP. If you need, I can operate it for you
    2. About the clients in five cities you mentioned, they are the clients to which we once exported out products. Now there is no client to which we can export 800,000 sheets of the boards per month. Now we are exporting not very large a quantity of the boards to America. And you are the only distributor of the brand DUN in America, there is no doubt about this point.
    Thanks and best regards!
    Yours faithfully


——
车刚
Bill Cher
13561759284
E-mail:SDTH818@163.com
MSN:wuyu374@hotmail.com

在2007-04-12，"Ivan Gonima" <igonima@gonimaconstructors.com> 写道：
My dear friend Mr. Bill:

You are right! It was my mistake when typing. The sheets we need first are the 4' x 12' x ?".

I do not understand your point about the price per sheet when connecting it to the weight of the container. Could you please elaborate a little bit more? We were never told this before and as you may understand we have to follow the DOT rules here in the USA.

I have emailed my shipping agent as well as my customs broker about the way you explain your customers operate. By the way; are those customers here in the States? In which State? It would be a great help for us to have this information given that in such a way we can compare. Remember also that in the USA every State can have different laws and rules when deciding about their own roads and the load you can move.

Please give me an answer as soon as possible. We need to start moving these containers.

Best regards;

Ivan Gonima

**From:** wuyu [mailto:sdth818@163.com]

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0000918

**Sent:** Thursday, April 12, 2007 3:25 AM
**To:** igonima@gonimaconstructors.com
**Subject:** Re:RE: SHIPPING
**Importance:** High

Dear Mr. Ivan,

  I am glad to receive your email, but I have some blow question:
1. Is the first size you need 4' x 12' x ?" sheets? But the message you send me is "8' x 12' x ?" sheets".
2. The price we are operating is according to 670sheets/40GP, the gross weight of 670sheetsof 4'*12'*1/2" is 29 tons. If the gross weight can not exceed 25 tons, so we can only change the price..
3. Our customers operated in this way: load 28-29 ton of gypsum board per container in factory, when the container arrive the destination port, our customer unload the last row of gypsum board in the container at the port and carry them out by trucks, and then the weight of gypsum board in the container lower to about 20 ton, which is within the road-carrying weight limit.
  Thanks and best wishes!
  Yours faithfully

---
车刚
Bill Cher
13561759284
E-mail:SDTH818@163.com
MSN:wuyu374@hotmail.com

在2007-04-12,"Ivan Gonima" <igonima@gonimaconstructors.com> 写道:
Dear Mr. Bill,

Thanks a lot for your email. Here you will find the directions for shipping our first order:

  1) We need first the 8' x 12' x ?" sheets
  2) Half of this order will have Miami, FL as a destination; the other half will go to Orlando, FL. (50% of containers to Miami, FL and 50% of containers to Orlando, FL)
  3) Please issue one BL for each 5 containers or fraction. In other words, do not include more than 5 containers in one BL
  4) **THIS IS VERY IMPORTANT: MAKE SURE THAT THE MAXIMUM LOAD YOU PUT IN A 40' CONTAINER IS 55,000 POUNDS.** According to the DOT (Department of Transportation) regulations, we cannot move in Florida roads any load higher than that. For moving 55,000 pounds we already have to pay $150 for an overweight permit per container.
  5) Payment records are fine; we will be making another transfer soon for paying the remaining of the last two orders.
  6) The shipping agent for this first order is going to be Pacific Star International Logistics (Panlink). They have an office in China and their representative here in the USA is David Tam. His phone in the States is (516) 561-3958 ext. 201, his fax is (516) 561-4315 and his email address is davidt@panlink.com

Please let me know if you have any question.

Yours faithfully;

---

**From:** wuyu [mailto:sdth818@163.com]
**Sent:** Tuesday, April 10, 2007 3:45 AM
**To:** igonima@gonimaconstructors.com

CONFIDENTIAL — SUBJECT TO

**Subject:** Re:SHIPPING
**Importance:** High

Dear Mr. Ivan,
   Thank you for your great efforts on our business.
   We are arranging the production and loading at this moment. But please let us know which size of gypsum board do you need firstly, 8' or 12'?
   By the way, we received your payment 57385+40000+20000=USD117385.00 yet. Please check your payment accordingly.

   Best wishes!



——
车刚
Bill Cher
13561759284
E-mail:SDTH818@163.com
MSN:wuyu374@hotmail.com


远离垃圾邮件？免费帮你过滤98%的垃圾邮件！ www.126.com

远离垃圾邮件？免费帮你过滤98%的垃圾邮件！ www.126.com

远离垃圾邮件？免费帮你过滤98%的垃圾邮件！ >>

佳能PowerShot数码相机有奖征集中文名活动，开始啦！

佳能PowerShot数码相机有奖征集中文名活动，开始啦！

CONFIDENTIAL — SUBJECT TO

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

| 出 口 专 用 |
| Special Use for Export |

存　根　联
Counterfoil

发票代码 137090726307

发票号码 00001100

2007 月 5 28
2007 月 5 26 填
Date　Y　M　D

| | | |
|---|---|---|
| 出口企业名称：<br>Exporter Name: | 泰安市泰山纸面石膏板有限公司<br>TAIAN TAISHAN PLASTERBOARD CO.,LTD. | 出口企业税务登记证号：<br>Tax Registration No.: | 370903720743873<br>370903720743873 |
| 出口企业地址：<br>Address: | 泰安市岱岳区<br>DAWENKOU TAI`AN CITY CHINA | 电话：<br>Tel: 传真：<br>Fax: | 86-538-8811072　86-538-8812679<br>86-538-8811077　86-538-8812679 |
| 成交方式：<br>Term of Delivery: | FOB<br>FOB | 提单号：<br>B/L No.: PMSCHYQ2973<br>PMSCHYQ2973 合同号：<br>Contract No.: |
| 致：<br>To: | ORIENTAL TRADING COMPANY,LLC<br>ORIENTAL TRADING COMPANY,LLC | 付款方式：<br>Payment: T/T<br>T/T |
| | | 装船口岸：<br>From: QINGDAO 目的地：<br>To: MIAMI |

| 唛头及号码<br>Mark | 品 名 及 规 格<br>Description | 数 量<br>Quantity | 单 价<br>UnitPrice | 金 额<br>Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD<br>1220*2440*12.7mm | 4900PCS | USD2.6000/PCS | USD12740.00 |

合 计 ：
TOTAL：　USD12740.00

单位名称：(盖章)
Signature
(本发票手写无效)

第一联：存根联(填票单位留存)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

CHE
EXHIBIT NO. 3
1-11-12
L. GOLKOW

TG 0019968

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

| 出 口 专 用 |
| Special Use for Export |

存 根 联
Counterfoil

发票代码 137090726307
发票号码 00001100

| Date | 2007 | 月 5 | 填制 |
| | 2007 | M 5 | B8 |

| 出口企业名称: | 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号: | 370903720743873 |
| Exporter Name: | TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No: | 370903720743873 |
| 出口企业地址: | 泰安市岱岳区 | 电话 | 86-538-881 | 传真 | 86-538-8812679 |
| Address: | DAWENKOU TAI`AN CITY CHINA | Tel: | 86-538-881 1077 | | 86-538-8812679 |
| 成交方式: | FOB 提单号: | PMSCHY QQ2076 | | |
| Term of Delivery: | FOB B/L No: | PMSCHY QQ2076 No.: | | |
| 致: | ORIENTAL TRADING COMPANY,LLC | 付款方式: | T/T |
| To: | ORIENTAL TRADING COMPANY,LLC | Payment: | T/T |
| | | 装船口岸: | | 目的地: | |
| | | From: | QINGDAO | To: | MIAMI |

| 唛头及号码 Mark | 品 名 及 规 格 Description | 数 量 Quantity | 单 价 UnitPrice | 金 额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 1220*2440*12.7mm | 5880PCS | USD2. 6000/PCS | USD15288.00 |

| 合 计: | | | | |
| TOTAL: | USD15288.00 | | | |

单位名称:(盖章)
Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出 口 专 用
Special Use for Export

存 根 联
Counterfoil

发票代码 137090726307
发票号码 00001100

| | 2007 | 月 5 | 日填制 |
| --- | --- | --- | --- |
| Date | 2007 | M 5 | D 8 |

| 出口企业名称: 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号: 370903720743873 |
| --- | --- |
| Exporter Name: TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No: 370903720743873 |
| 出口企业地址: 泰安市岱岳区 | 电话: 86-538-8811677  86-538-8812679 |
| Address: DAWENKOU TAI`AN CITY CHINA | Tel: 86-538-8811677  86-538-8812679 |
| 成交方式: FOB 提单号: PMSCHYG32975 | 合同号: |
| Term of Delivery: FOB B/L No: PMSCHYG32975 | Contract No: |
| 致: ORIENTAL TRADING COMPANY,LLC | 付款方式: T/T |
| To: ORIENTAL TRADING COMPANY,LLC | Payment: T/T |
| | 装船口岸: 目的地: |
| | From: QINGDAO To: MIAMI |

| 唛头及号码 Mark | 品名及规格 Description | 数 量 Quantity | 单 价 UnitPrice | 金 额 Amount |
| --- | --- | --- | --- | --- |
| N/M | GYPSUM BOARD 1220*2440*12.7mm | 1960PCS | USD2.6000/PCS | USD5096.00 |

| 合 计: | | | | |
| --- | --- | --- | --- | --- |
| TOTAL: USD5096.00 | | | | |

单位名称:(盖章)
Signature
(本发票手写无效)

山东省泰安市出口商品专用发票

Taian Shandong Province Special Invoice for Export

出 口 专 用
Special Use for Export

存　根　联
Counterfoil

发票代码 13709072 6307
发票号码 00001269

Date | 2007 年 5 月 5 日填制
2007 M 5 D 5

| 出口企业名称： | 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
| Exporter Name: | TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No: | 370903720743873 |
| 出口企业地址： | 泰安市岱岳区 | 电话 | 86-538-8811077 | 86-538-8812679 |
| Address: | DAWENKOU TAI`AN CITY CHINA | Tel: | 86-538-8811077 | Fax: | 86-538-8812679 |
| 成交方式： FOB | 提单号： PMSCHYXY02974 | | |
| Term of Delivery: FOB | B/L No: PMSCHYXY02974 No: | | |
| 致： | ORIENTAL TRADING COMPANY,LLC | 付款方式： | T/T |
| To: | ORIENTAL TRADING COMPANY,LLC | Payment: | T/T |
| | | 装船口岸： | 目的地： |
| | | From: QINGDAO | To: MIAMI |

| 唛头及号码 Mark | 品名及规格 Description | 数量 Quantity | 单价 UnitPrice | 金额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 1220*2440*12.7mm | 4900PCS | USD2.6000/PCS | USD12740.00 |

| 合 计： | | | | |
| TOTAL: USD12740.00 | | | | |

单位名称:(盖章)
Signature
(本发票手写无效)

第一联：存根联（填票单位留存）

山东省利达印务有限公司 2006 年 12 月印

鲁国税（泰）字（2007）003 号 2.7 105×266.7×7

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出口专用
Special Use for Export

存 根 联
Counterfoil

发票代码 137090726307
发票号码 00001202

Date 2007 年 6 月 填制

| 出口企业名称：泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
| Exporter Name TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No: | 370903720743873 |
| 出口企业地址： 泰安市岱岳区 | 电话： 86-538-8811传真： 86-538-8812679 |
| Address: DAWENKOU TAI'AN CITY CHINA | Tel: 86-538-8811Fax: 86-538-8812679 |
| 成交方式： FOB 提单号： PMSCHYH16053895 | 合同号： |
| Term of Delivery: FOB B/L No: PMSCHYH16053895 | Contract No: |
| 致： ORIENTAL TRADING COMPANY,LLC | 付款方式： T/T |
| To: ORIENTAL TRADING COMPANY,LLC | Payment: T/T |
| 装船口岸： 目的地： |
| From: QINGDAO To: MIAMI |

| 唛头及号码<br>Mark | 品名及规格<br>Description | 数量<br>Quantity | 单价<br>UnitPrice | 金额<br>Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD<br>1220*2440*12.7mm | 2940sheets | USD2.6000/sheet | USD7644.00 |

| 合计：<br>TOTAL: | USD7644.00 |

单位名称：(盖章)
Signature
(本发票手写无效)

第一联：存根联（填票单位留存）

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出 口 专 用
Special Use for Export

存　根　联
Counterfoil

发票代码 137090726307
发票号码 00001214

Date 2007 月6 号填制
2007 M6 日

| 出口企业名称： | 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
|---|---|---|---|
| Exporter Name: TAIAN TAISHAN PLASTERBOARD CO.,LTD | | Tax Registration No: | 370903720743873 |
| 出口企业地址： | 泰安市岱岳区 | 电话： | 86-538-8811衡真 86-538-8812679 |
| Address : DAWENKOU TAI AN CITY CHINA | | Tel : | 86-538-8811传真 86-538-8812679 |
| 成交方式： FOB 提单号： PMSCHYI合肥0657 | | 付款方式： | T/T |
| Term of Delivery : FOB B/L No : PMSCHYIN011037No : | | Payment : | T/T |
| 致： ORIENTAL TRADING COMPANY,LLC | | 装船口岸： 目的地： | |
| To : ORIENTAL TRADING COMPANY,LLC | | From : QINGDAO To: MIAMI | |

| 唛头及号码 Mark | 品 名 及 规 格 Description | 数 量 Quantity | 单 价 UnitPrice | 金 额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 3660*1220*12.7mm | 2010PCS | USD3.8500/PCS | USD7738.50 |

| 合 计： TOTAL: | USD7738.50 |
|---|---|

单位名称：(盖章)
Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0019973

山东省泰安市出口商品专用发票

Taian Shandong Province Special Invoice for Export

| 出 口 专 用 |
| Special Use for Export |

## 存 根 联

Counterfoil

发票代码 137090726307

发票号码 00001216

2002 年 7 月 3 日填制
2007 Y M D
Date

| 出口企业名称：泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： 370903720743873 |
| Exporter Name: TAIAN TAISHAN PLASTERBOARD CO.,LTD. | Tax Registration No: 370903720743873 |
| 出口企业地址：泰安市街岳区 | 电话： 86-538-8811077 传真： 86-538-8812679 |
| Address: DAWENKOU TAI`AN CITY CHINA | Tel: 86-538-8811077 Fax: 86-538-8812679 |
| 成交方式： FOB 提单号： PMSCHYHYQ3055 | 合同号： |
| Term of Delivery: FOB B/L No: PMSCHYHYQ3055 | Contract No: |
| 致： ORIENTAL TRADING COMPANY,LLC | 付款方式： T/T |
| | Payment: T/T |
| To: ORIENTAL TRADING COMPANY,LLC | 装船口岸： 目的地： MIAMI/USA |
| | From: QINGDAO To: |

| 唛头及号码 Mark | 品名及规格 Description | 数量 Quantity | 单价 UnitPrice | 金额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 1220*3660*12.7 | 6700PCS | USD3.8500/PCS | USD25795.00 |

| 合 计： TOTAL： USD25795.00 | |
| | 单位名称：(盖章) Signature (本发票手写无效) |

第一联：存根联（填票单位留存）

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

| 出 口 专 用 |
| Special Use for Export |

存 根 联
Counterfoil

发票代码 137090726307
发票号码 00001219

| | 200年 月 3日填制 |
| Date | 200 7 M 3 D |

| 口企业名称：泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
| Importer Name: TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No.: | 370903720743873 |
| 口企业地址：    泰安市岱岳区 | 电话： | 86-538-88110 传真： | 86-538-8812679 |
| Address: DAWENKOU TAI`AN CITY CHINA | Tel.: | 86-538-8811077 Fax: | 86-538-8812679 |
| 发方式：        FOB | 提单号： PMSCHYHXQ8084 | |
| Term of Delivery:  FOB | B/L No: PMSCHYHXQ8084 No: | |
| : ORIENTAL TRADING COMPANY,LLC | 付款方式： T/T | |
| | Payment: T/T | |
| : ORIENTAL TRADING COMPANY,LLC | 装船口岸： 目的地： | |
| | From: QINGDAO To: MIAMI/USA | |

| 唛头及号码 Mark | 品名及规格 Description | 数量 Quantity | 单价 UnitPrice | 金额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 1220*3660*12.7 | 6700PCS | USD3.8500/PCS | USD25795.00 |

| 计： |
| TOTAL:   USD25795.00 |

单位名称:(盖章)
Signature
(本发票手写无效)

第一联：存根联(填票单位留存)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

**From:** 车刚 [mailto:sdth818@163.com]
**Sent:** Thursday, May 27, 2010 2:12 AM
**To:** Ivan Gonima
**Subject:** the quotation from bill

---

车刚 Bill Cher 13561759284
E-mail:SDTH818@163.com
MSN:wuyu374@hotmail.com
QQ: 1109075722

网易为中小企业免费提供企业邮箱（自主域名）

No virus found in this message.
Checked by AVG - www.avg.com
Version: 10.0.1411 / Virus Database: 2092/3998 - Release Date: 11/05/11



CHE
EXHIBIT NO. 4
1-11-12
L GOLKOW

CFJ20080090合同附页

# THE QUOTATION OF TAISHAN GYPSUM CO., LTD

| NO. | NAME | SIZE | UNIT | QUANTITY 20' container by loose packing | FOBQingdao port pice | the valid date |
|---|---|---|---|---|---|---|
| | | | | | | |
| 1 | gypsum board (regular) | 2440*1220*12.7mm | sheet | 680PCS/20' | USD3.20/PC | 14days |
| 2 | gypsum board (waterproof) | 2440*1220*12.7mm | sheet | 620PCS/20' | USD7.80/PC | 14days |
| 3 | metal stud (vertical) | QC61*30*3.5*0.7mm | sheet | 4752pcs/40' | USD1.94/pc | 14days |
| 4 | metal track (horizontal) | QU63.8*30*0.7mm | sheet | 4752pcs/40' | USD1.86/pc | 14days |
| 5 | screw | 3.5*35mm (600pcs/box) | box | in rest space of container | USD2.00/box | 14days |
| 6 | joining tape | 50mm*75M | roll | in rest space of container | USD1.18/roll | 14days |

TAISHAN GYPSUM CO., LTD.
BILL CHE
13561759284
EMAIL:SDTH818@163.COM
MSN:WUYU374@hotmail.com
2010-05-27

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
|      |      |      |     |         |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| 2/6/2007 | 11:46:35 PM | Ivan | Mr. Che Gang | Hi Sir |
| 2/7/2007 | 12:18:26 AM | Mr. Che Gang | Ivan | hi sir |
| 2/7/2007 | 12:18:38 AM | Mr. Che Gang | Ivan | I come back |
| 2/7/2007 | 12:28:38 AM | Ivan | Mr. Che Gang | Ok, how are you? |
| 2/7/2007 | 12:28:52 AM | Ivan | Mr. Che Gang | I am going to need 2 proforma invoices more |
| 2/7/2007 | 12:29:07 AM | Mr. Che Gang | Ivan | I am fine,Thank you ,and you ? |
| 2/7/2007 | 12:29:13 AM | Mr. Che Gang | Ivan | ok |
| 2/7/2007 | 12:31:56 AM | Ivan | Mr. Che Gang | I am doing very good. One proforma for 12,500 4' x 8' x 1/2" and another one for 20,000 4' x 12' x 1/2" |
| 2/7/2007 | 12:33:00 AM | Ivan | Mr. Che Gang | I need to talk to you about the tape that is going to bind two pieces of drywall together |
| 2/7/2007 | 12:34:27 AM | Ivan | Mr. Che Gang | Do you remeber it? As the one saying Marathon Construction |
| 2/7/2007 | 12:35:30 AM | Ivan | Mr. Che Gang | I already have the design for it with the colors we want as well as the names, barcode, etc. How can I send that design to you? I think you will order that roll of tape to some local producer in China, right? |
| 2/7/2007 | 12:37:23 AM | Ivan | Mr. Che Gang | Are u there? |
| 2/7/2007 | 12:37:42 AM | Mr. Che Gang | Ivan | yes,please send it to my email. |
| 2/7/2007 | 12:39:40 AM | Ivan | Mr. Che Gang | Yes sir, that one |
| 2/7/2007 | 12:40:18 AM | Ivan | Mr. Che Gang | The one you apply to 2 sheets of drywall at the end of the process and before packing it for shipping |
| 2/7/2007 | 12:41:39 AM | Mr. Che Gang | Ivan | You mean bonding tape? |
| 2/7/2007 | 12:43:14 AM | Ivan | Mr. Che Gang | Let's see. After manufacturing the drywall and at the end of the process you take 2 sheets and bond them together using tape at the edges. On that one you put the brand, etc. (As the one saying Marathon Construction) That is the one I am referring to |
| 2/7/2007 | 12:44:16 AM | Mr. | Ivan | I see. Could you please send it to me now? |



Che

EXHIBIT NO. 5

L. GOLKOW

1

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
|      |      |      |     |         |
|      | AM | Che Gang |  |  |
| 2/7/2007 | 12:45:45 AM | Ivan | Mr. Che Gang | I will send that design tomorrow, I have to finish some details. How width is it? Maybe 2 inches? |
| 2/7/2007 | 12:46:01 AM | Ivan | Mr. Che Gang | Can you send me the proformas please? To my email address |
| 2/7/2007 | 12:47:38 AM | Mr. Che Gang | Ivan | yes, usually we have the tape 5.5cm wide, but the letters should be a little less wide. |
| 2/7/2007 | 12:48:27 AM | Ivan | Mr. Che Gang | Yes sir, I understand that |
| 2/7/2007 | 12:48:44 AM | Ivan | Mr. Che Gang | I will email you the design we have |
| 2/7/2007 | 12:49:49 AM | Ivan | Mr. Che Gang | I had a meeting today with the Ocean Freight Company; Do you now how much is today a 40HQ from Qingdao to Miami? I want to compare with their price |
| 2/7/2007 | 12:50:15 AM | Ivan | Mr. Che Gang | Do you have for me ready the list with the metal frame and the tape and the screws ready? |
| 2/7/2007 | 12:51:26 AM | Mr. Che Gang | Ivan | Please note that we have to pay 1500RMB for each kind of color on the tape for the tape plate, for we have to ask some others to make the plate for us. |
| 2/7/2007 | 12:52:10 AM | Ivan | Mr. Che Gang | No problem sir, we understand that |
| 2/7/2007 | 12:53:13 AM | Mr. Che Gang | Ivan | we are ready for other products, but please let us know the exact size for different products. |
| 2/7/2007 | 12:53:35 AM | Ivan | Mr. Che Gang | Ok, I will email you tomorrow |
| 2/7/2007 | 12:53:58 AM | Mr. Che Gang | Ivan | Thank you, (Y) |
| 2/7/2007 | 12:54:00 AM | Ivan | Mr. Che Gang | It was a pleasure being there; thanks for all your kindness |
| 2/7/2007 | 12:54:22 AM | Mr. Che Gang | Ivan | We are very glad to talk with you. |
| 2/7/2007 | 12:55:36 AM | Ivan | Mr. Che Gang | Please do not forget if possible to send me a scale price list. Let's say from 0 to 15,000; from 15,000 to 50,000; from 50,000 to 75,000, etc. Something like that if you have one |
| 2/7/2007 | 12:56:01 AM | Ivan | Mr. Che Gang | Some customers asking us what discount we can give them if they sign a long term contract with us |
| 2/7/2007 | 1:01:41 AM | Mr. Che Gang | Ivan | In order to set up long term business relation, we will offer you the lowest price. |

2

| Date | Time | From | To | Message |
|------|------|------|----|---------|
| | | | | |
| 2/7/2007 | 1:02:05 AM | Ivan | Mr. Che Gang | Great; I really appreciate that |
| 2/7/2007 | 1:02:26 AM | Ivan | Mr. Che Gang | As you know American manufacturers are lowering their prices |
| 2/7/2007 | 1:02:59 AM | Mr. Che Gang | Ivan | Yes, I see. We need support each other. |
| 2/7/2007 | 1:03:40 AM | Ivan | Mr. Che Gang | So, when will you give me that lowest price list? |
| 2/7/2007 | 1:06:53 AM | Mr. Che Gang | Ivan | we will offer the best price to you in our profoma invoice. |
| 2/7/2007 | 1:07:45 AM | Ivan | Mr. Che Gang | Perfect sir |
| 2/7/2007 | 1:08:10 AM | Ivan | Mr. Che Gang | Please email me those 2 proforma invoices I need. I already have your bank information |
| 2/7/2007 | 1:08:21 AM | Mr. Che Gang | Ivan | ok |
| 2/7/2007 | 1:10:20 AM | Ivan | Mr. Che Gang | Have a great day sir; I am going to bed |
| 2/7/2007 | 1:10:40 AM | Mr. Che Gang | Ivan | good night |
| 2/25/2007 | 7:55:46 PM | Ivan | Mr. Che Gang | Hi Mr. Bill! |
| 2/25/2007 | 7:56:02 PM | Ivan | Mr. Che Gang | Back in your office after the new year festivities? |
| 2/25/2007 | 7:56:37 PM | Ivan | Mr. Che Gang | You were celebrating the new year, right? The year of the pig? |
| 2/25/2007 | 7:57:26 PM | Ivan | Mr. Che Gang | Did you receive my last email? The one answering yours and including the arts for the binding tape |
| 2/25/2007 | 7:57:33 PM | Mr. Che Gang | Ivan | Happy pig yera! |
| 2/25/2007 | 7:57:43 PM | Ivan | Mr. Che Gang | HAPPY PIG YEAR SIR!!!!! |
| 2/25/2007 | 7:58:12 PM | Mr. Che Gang | Ivan | yes, I am in office reading your email on bonding tyape. |
| 2/25/2007 | 7:58:16 PM | Ivan | Mr. Che | How many transfers and for what amount each have you received so far from us? |

| Date | Time | From | To | Message |
|------|------|------|------|---------|
| | | | | |

| Date | Time | From | To | Message |
|------|------|------|------|---------|
| | | | Gang | |
| 2/25/2007 | 7:59:44 PM | Mr. Che Gang | Ivan | We received USD20000.00 from you just one time. |
| 2/25/2007 | 8:00:35 PM | Ivan | Mr. Che Gang | Last week on Tuesday we made another 2 transfers from Miami. Wachovia Bank for the last 2 proforma invoices you sent me |
| 2/25/2007 | 8:01:51 PM | Ivan | Mr. Che Gang | I was aware of the first one; I know we made another two transfers last week. Could you please check with your bank? |
| 2/25/2007 | 8:02:20 PM | Mr. Che Gang | Ivan | How much amount did you send? We will check the bank later. |
| 2/25/2007 | 8:02:29 PM | Ivan | Mr. Che Gang | Let me tell you |
| 2/25/2007 | 8:02:37 PM | Mr. Che Gang | Ivan | ok |
| 2/25/2007 | 8:03:16 PM | Mr. Che Gang | Ivan | It is the frist working day for our bank today. |
| 2/25/2007 | 8:03:34 PM | Ivan | Mr. Che Gang | Oh, I see. Sure, because of the holidays |
| 2/25/2007 | 8:05:02 PM | Ivan | Mr. Che Gang | We transferred another $ 40,000. $ 20,000 to be applied to Invoice # 07020701 and $ 20,000 to be applied to invoice # 07020702 |
| 2/25/2007 | 8:05:18 PM | Ivan | Mr. Che Gang | So now we should have 3 orders in process |
| 2/25/2007 | 8:05:47 PM | Ivan | Mr. Che Gang | When are you going to have ready the first order we placed? We need to send you the rest of the money for that one |
| 2/25/2007 | 8:06:26 PM | Ivan | Mr. Che Gang | Our goal is to have always weekly orders running for 20,000 sheets |
| 2/25/2007 | 8:09:06 PM | Mr. Che Gang | Ivan | yes, we will try our best to prompt our business |
| 2/25/2007 | 8:09:12 PM | Ivan | Mr. Che Gang | Great! |
| 2/25/2007 | 8:09:46 PM | Ivan | Mr. Che Gang | It is very important for me to know if you have received the other $40,000. We made that transfer last tuesday |
| 2/25/2007 | 8:10:19 PM | Mr. Che Gang | Ivan | we have to check our bank later. |
| 2/25/2007 | 8:10:35 PM | Ivan | Mr. Che Gang | Thanks, please email me letting me know. |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| 2/25/2007 | 8:11:42 PM | Mr. Che Gang | Ivan | we will inform you firstly when we got the confirmation from our bank |
| 2/25/2007 | 8:11:54 PM | Ivan | Mr. Che Gang | Thanks a lot |
| 2/25/2007 | 8:14:19 PM | Ivan | Mr. Che Gang | Any questions about the art I emailed you for the bonding tape? |
| 2/25/2007 | 8:14:35 PM | Mr. Che Gang | Ivan | please wait. |
| 2/25/2007 | 8:14:54 PM | Ivan | Mr. Che Gang | Ok |
| 2/25/2007 | 8:15:48 PM | Mr. Che Gang | Ivan | We know that the "DUN" is blue, but where should we put the color red and white color? |
| 2/25/2007 | 8:17:17 PM | Mr. Che Gang | Ivan | And we think that the code should in black color, isn't it? |
| 2/25/2007 | 8:18:38 PM | Ivan | Mr. Che Gang | Let's see: RED would be only for the background for the letter U in DUN and the phrase GYPSUM BOARD PANEL DE YESO |
| 2/25/2007 | 8:21:35 PM | Ivan | Mr. Che Gang | The tape itsel will be WHITE so all the background, but the RED area I already described and the BLACK area where it says 2 pieces per bundle, will be WHITE |
| 2/25/2007 | 8:21:57 PM | Ivan | Mr. Che Gang | Yes, the BARCODE will be black |
| 2/25/2007 | 8:22:14 PM | Ivan | Mr. Che Gang | Do you have the art I sent showing all these colors? |
| 2/25/2007 | 8:22:33 PM | Mr. Che Gang | Ivan | could you please send us the design of bonding tape with the needed color? |
| 2/25/2007 | 8:22:37 PM | Ivan | Mr. Che Gang | The file I sent you show all colors and where they go |
| 2/25/2007 | 8:22:46 PM | Ivan | Mr. Che Gang | I already did |
| 2/25/2007 | 8:22:53 PM | Ivan | Mr. Che Gang | You have that design |
| 2/25/2007 | 8:23:35 PM | | | Ivan sends C:\Documents and Settings\Owner\My Documents\Drywall Project\Drywall Label to Taihe.ppt |
| 2/25/2007 | 8:23:39 PM | Mr. Che Gang | Ivan | we have the design with the blue, black color. |
| 2/25/2007 | 8:23:57 PM | Ivan | Mr. Che Gang | Please accept the file I am sending you |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |
| 2/25/2007 | 8:24:15 PM | Ivan | Mr. Che Gang | You should see there all the colors and the actual final design |
| 2/25/2007 | 8:24:26 PM | Mr. Che Gang | Ivan | yes, |
| 2/25/2007 | 8:24:26 PM | Ivan | Mr. Che Gang | Tell me please if you receive it fine |
| 2/25/2007 | 8:25:02 PM | Mr. Che Gang | Ivan | we are checking |
| 2/25/2007 | 8:25:04 PM | | | Transfer of "Drywall Label to Taihe.ppt" is complete. |
| 2/25/2007 | 8:25:08 PM | Ivan | Mr. Che Gang | Are you having problems with your office email address? |
| 2/25/2007 | 8:26:46 PM | Ivan | Mr. Che Gang | This file contain the final design with all the colors and the places those colors go |
| 2/25/2007 | 8:28:03 PM | Mr. Che Gang | Ivan | yes, we got it. Please send email to sdth818@163.com |
| 2/25/2007 | 8:28:27 PM | Ivan | Mr. Che Gang | I already did; let me send it again |
| 2/25/2007 | 8:28:38 PM | Mr. Che Gang | Ivan | I can not pass the public emial in the catalogue |
| 2/25/2007 | 8:29:02 PM | Mr. Che Gang | Ivan | We already got the real design |
| 2/25/2007 | 8:30:10 PM | Ivan | Mr. Che Gang | I just send it to sdth818@163.com Please tell me if you receive it |
| 2/25/2007 | 8:30:45 PM | Mr. Che Gang | Ivan | ok |
| 2/25/2007 | 8:30:48 PM | Ivan | Mr. Che Gang | It is very important for me to make sure you have this file and the design for the tape showing the right colors |
| 2/25/2007 | 8:34:10 PM | Mr. Che Gang | Ivan | Another question we want to confirm is that the blue color of DUN logo is the same as the backgroud of letter D. |
| 2/25/2007 | 8:34:26 PM | Ivan | Mr. Che Gang | Yes sir, it is the same |
| 2/25/2007 | 8:34:52 PM | Ivan | Mr. Che Gang | So now you have it? I mean, you can see the tape with all the colors? |
| 2/25/2007 | 8:35:07 PM | Mr. Che Gang | Ivan | It appears a litlle lighter than backgound of D. |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |
| 2/25/2007 | 8:35:17 PM | Ivan | Mr. Che Gang | We want to use BLUE RED and WHITE because those are the colors of the American Flag |
| 2/25/2007 | 8:36:06 PM | Ivan | Mr. Che Gang | Yes I know. We had that problem because we scanned the DUN logo from the catalog you gave us. Because of that it appears lighter |
| 2/25/2007 | 8:37:28 PM | Mr. Che Gang | Ivan | You mean besides color white, we have color of blue, red and black, no others color? |
| 2/25/2007 | 8:38:25 PM | Ivan | Mr. Che Gang | Yes sir, you got it right. BLUE and RED from the American Flag plus WHITE and BLACK. That is it; no more colors |
| 2/25/2007 | 8:41:18 PM | Ivan | Mr. Che Gang | Do you think we have it right now or do you have another question? |
| 2/25/2007 | 8:41:50 PM | Mr. Che Gang | Ivan | we will ask the tape factory to design the bonding tape as your requirements, and then let you check it. |
| 2/25/2007 | 8:42:49 PM | Ivan | Mr. Che Gang | Please. Let me know when you have it and I will check it. I have to go to bed; time to sleep. Please do not forget to check with your bank and let me know about those transfers. Have a great day! |
| 2/25/2007 | 8:43:48 PM | Mr. Che Gang | Ivan | have a great night! |
| 2/25/2007 | 8:43:50 PM | Mr. Che Gang | Ivan | bye |
| 2/25/2007 | 8:44:18 PM | Ivan | Mr. Che Gang | Bye |
| 2/26/2007 | 7:35:39 PM | Ivan | Mr. Che Gang | Hi, how are you? |
| 2/26/2007 | 7:36:14 PM | Mr. Che Gang | Ivan | I am fine,thank you . |
| 2/26/2007 | 7:36:26 PM | Ivan | Mr. Che Gang | Did you check with the bank about the transfers? |
| 2/26/2007 | 7:37:46 PM | Mr. Che Gang | Ivan | yes, I have received your payment. |
| 2/26/2007 | 7:38:05 PM | Ivan | Mr. Che Gang | We have a misunderstanding here with our bank and we need to know exactly how many transfers you have received and what are the amounts |
| 2/26/2007 | 7:38:32 PM | Ivan | Mr. Che Gang | Can you help me with this, please? |
| 2/26/2007 | 7:39:46 PM | Ivan | Mr. Che Gang | Could you please tell me how many transfers, the amounts and the date? Please, it would be a great help for us |
| 2/26/2007 | 7:40:21 PM | Mr. Che | Ivan | please wait. |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |
| | | Gang | | |
| 2/26/2007 | 7:40:37 PM | Ivan | Mr. Che Gang | Sure, no problem. Thanks |
| 2/26/2007 | 7:45:26 PM | Ivan | Mr. Che Gang | I will be having dinner with my family but you can write to me any time. This is my home computer |
| 2/26/2007 | 7:46:21 PM | Mr. Che Gang | Ivan | ok |
| 2/26/2007 | 7:46:31 PM | Ivan | Mr. Che Gang | Thanks |
| 2/26/2007 | 7:57:42 PM | Mr. Che Gang | Ivan | we received two transfers, USD20000.00 for first, USD40000.00 for second time. |
| 2/26/2007 | 7:59:15 PM | Ivan | Mr. Che Gang | That is what I thought; $20,000 before we went to China for our meeting at your factory and $40,000 last week |
| 2/26/2007 | 7:59:20 PM | Ivan | Mr. Che Gang | Is that all? |
| 2/26/2007 | 8:00:55 PM | Ivan | Mr. Che Gang | You have not received more transfers from us, right? Only $60,000 USD so far |
| 2/26/2007 | 8:05:20 PM | Mr. Che Gang | Ivan | yes ,toltally we received USD60000.00 so far,but USD40000.00 was received yesterday. |
| 2/26/2007 | 8:06:02 PM | Ivan | Mr. Che Gang | Thanks a lot my friend; this information is very important for us. |
| 2/26/2007 | 8:06:26 PM | Ivan | Mr. Che Gang | Any news about the art for the bonding tape? |
| 2/26/2007 | 8:06:44 PM | Mr. Che Gang | Ivan | you are welcome, my friend. |
| 2/26/2007 | 8:07:33 PM | Mr. Che Gang | Ivan | I have contacted the tape factory. |
| 2/26/2007 | 8:07:43 PM | Ivan | Mr. Che Gang | Great! |
| 2/26/2007 | 8:11:18 PM | Ivan | Mr. Che Gang | What did they say? |
| 2/26/2007 | 8:13:18 PM | Mr. Che Gang | Ivan | they will make the picture of sample and send it to me by email,then I will send it to you . |
| 2/26/2007 | 8:13:45 PM | Ivan | Mr. Che Gang | Thanks a lot Mr. Bill; that is a great thing so we can go ahead and decide about it |

| Date | Time | From | To | Message |
|------|------|------|----|---------|
| | | | | |

| Date | Time | From | To | Message |
|------|------|------|----|---------|
| 2/26/2007 | 8:14:59 PM | Mr. Che Gang | Ivan | ok |
| 2/26/2007 | 8:16:59 PM | Ivan | Mr. Che Gang | Do you remember Mr. Jorge Arevalo? He was with me and Mrs. Denise Romano during our last visit to your factory. He was the one who visited you the first time |
| 2/26/2007 | 8:21:11 PM | Mr. Che Gang | Ivan | yes, I do. |
| 2/26/2007 | 8:21:54 PM | Ivan | Mr. Che Gang | Have you received any transfer directly from him for paying drywall for our company? |
| 2/26/2007 | 8:26:30 PM | Mr. Che Gang | Ivan | What we can find out is the company name from which the transfer from but not which person. |
| 2/26/2007 | 8:28:21 PM | Ivan | Mr. Che Gang | Ah, ok. But from Oriental Trading Company, LLC you have in your records only $60,000 received. Right? |
| 2/26/2007 | 8:28:38 PM | Ivan | Mr. Che Gang | That is what we have in our records |
| 2/26/2007 | 8:30:01 PM | Mr. Che Gang | Ivan | yes |
| 2/26/2007 | 8:30:49 PM | Ivan | Mr. Che Gang | Thanks a lot my friend. Please let me know about the bonding tape as soon as you have any news. Have a great day. I am going to rest for now |
| 2/26/2007 | 8:32:05 PM | Mr. Che Gang | Ivan | ok.I do.Have a great night. |
| 2/26/2007 | 8:32:09 PM | Mr. Che Gang | Ivan | bye. |
| 2/26/2007 | 8:34:47 PM | Ivan | Mr. Che Gang | Bye; have a great day! |
| 2/27/2007 | 12:35:12 PM | Ivan | Mr. Che Gang | Are u working this late?!!!! |
| 2/27/2007 | 7:42:39 PM | Ivan | Mr. Che Gang | Mr. Cher, how are you? |
| 2/27/2007 | 7:44:08 PM | Mr. Che Gang | Ivan | I am fine ,thank you ,and you ? |
| 2/27/2007 | 7:44:16 PM | Ivan | Mr. Che Gang | I am doing fine sir |
| 2/27/2007 | 7:44:59 PM | Ivan | Mr. Che Gang | I am sorry I have to ask you again about something that I asked yesterday but it is very important and confidential |
| 2/27/2007 | 7:46:37 PM | Ivan | Mr. Che | We have made so far 3 transfers and you and me agree on that; $60,000 so far we have transferred under the name of Oriental Trading Company to be paid to Taihe |

| Date | Time | From | To | Message |
|------|------|------|----|---------|
| | | | | |
| | | | Gang | |
| 2/27/2007 | 7:48:15 PM | Ivan | Mr. Che Gang | One of the partners, Mr. Jorge Arevalo, is telling us that before the first transfer we made as a company for $20,000 (the first one you received) he made another one from his wife's personal account (her name is Adriana Toja). I personally do not believe that but I want to make sure |
| 2/27/2007 | 7:49:38 PM | Ivan | Mr. Che Gang | We have a meeting tomorrow and I want to know exactly so I do not make any mistakes |
| 2/27/2007 | 7:49:47 PM | Mr. Che Gang | Ivan | We only received 2 transfers(20000+40000) |
| 2/27/2007 | 7:50:07 PM | Ivan | Mr. Che Gang | That is what I know and I am pretty sure of it. |
| 2/27/2007 | 7:51:20 PM | Ivan | Mr. Che Gang | Is there any way you have received a transfer from Adriana Toja in the amount of $20,000 without specifing which company was transferring that money? From Bank of America in Miami |
| 2/27/2007 | 7:51:49 PM | Mr. Che Gang | Ivan | what amount did Mr. Jorge send on his wife name?we did not received. |
| 2/27/2007 | 7:52:27 PM | Ivan | Mr. Che Gang | He says $20,000 and he says it was before the first $20,000 we sent as Oriental Trading Company |
| 2/27/2007 | 7:57:06 PM | Mr. Che Gang | Ivan | We just can check which company send the money but not the person. |
| 2/27/2007 | 7:58:39 PM | Ivan | Mr. Che Gang | Yes, I agrre with you. And I do not believe somebody is going to send $20,000 to a company in China without saying which company do you have to apply that money to |
| 2/27/2007 | 8:01:50 PM | Mr. Che Gang | Ivan | Anyway,we will check again with our bank whether can we find which person send it. |
| 2/27/2007 | 8:02:56 PM | Mr. Che Gang | Ivan | Can you send us the paying application? It will help us check it. |
| 2/27/2007 | 8:03:23 PM | Ivan | Mr. Che Gang | Please; that would be great help. Again: Bank of America, Miami - Adriana Toja - $ 20,000 - Around January 10, 2007 |
| 2/27/2007 | 8:03:46 PM | Ivan | Mr. Che Gang | He says he will give it to me tomorrow. Once I have it I will scan it and email it to you |
| 2/27/2007 | 8:04:07 PM | Mr. Che Gang | Ivan | ok please |
| 2/27/2007 | 8:04:40 PM | Ivan | Mr. Che Gang | I will do so. This is very important. Thanks again |
| 2/27/2007 | 8:06:41 PM | Mr. Che Gang | Ivan | it is pleasure. |
| 2/27/2007 | 8:07:24 PM | Ivan | Mr. Che Gang | Bye my friend, I will email you tomorrow after that meeting if he gives me any paper at all |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
|      |      |      |     |         |
| 2/27/2007 | 8:08:09 PM | Mr. Che Gang | Ivan | ok ,my friend,Have a great night. |
| 2/27/2007 | 8:11:09 PM | Ivan | Mr. Che Gang | Have a great day in China; I am going to sleep because tomorrow I have to drive early to Miami - It will be around 4 hours if traffic is good |
| 2/27/2007 | 8:11:57 PM | Mr. Che Gang | Ivan | bye |
| 3/4/2007 | 8:34:21 PM | Ivan | Mr. Che Gang | Hi sir! How are you? |
| 3/4/2007 | 8:35:45 PM | Ivan | Mr. Che Gang | Did you receive my email about a client in Las Vegas? I need to talk to you urgently about that volume of sheets of drywall |
| 3/4/2007 | 8:36:59 PM | Ivan | Mr. Che Gang | I need to know what is the maximun number of sheets (4' x 8' x 1/2") you can supply us. That is what they need |
| 3/4/2007 | 8:38:27 PM | Ivan | Mr. Che Gang | I also need to know what is the best price you can give me for this volume. We are talking about million of units and we would have to sign a contract with this buyer |
| 3/4/2007 | 8:38:54 PM | Ivan | Mr. Che Gang | Construction is booming in Las Vegas and they need millions of pieces |
| 3/4/2007 | 8:42:00 PM | Ivan | Mr. Che Gang | Please answer me when you read this; I will be checking it because I need an urgent answer |
| 3/4/2007 | 8:42:02 PM | Ivan | Mr. Che Gang | Thanks |
| 3/4/2007 | 9:17:28 PM | Mr. Che Gang | Ivan | 4'*8'*1/2"regular gypsum board loading 980sheets/40fcl by pallet,FOB qingdao port price usd2.60/sheet. |
| 3/4/2007 | 9:17:37 PM | Mr. Che Gang | Ivan | this is the best price. |
| 3/4/2007 | 9:32:37 PM | Mr. Che Gang | Ivan | we can make 10000sheets /one day. |
| 3/4/2007 | 9:35:14 PM | Mr. Che Gang | Ivan | I am waitting for your confirmation onthe design of the bonding tape. |
| 3/4/2007 | 10:08:04 PM | Ivan | Mr. Che Gang | The bonding tape is ok; remeber one is for 4' x 12' x 1/2" and another one for 4' x 8' x 1/2". The only thing that changes is the measure of the sheet. The rest is the same |
| 3/4/2007 | 10:08:13 PM | Ivan | Mr. Che Gang | So you can go ahead with that tape |
| 3/4/2007 | 10:09:18 PM | Ivan | Mr. Che Gang | $2.60? That is the price you gave me before; could you go lower with a long term committment from this buyer? |
| 3/4/2007 | 10:21:45 PM | Ivan | Mr. Che | Ok my friend; I will talk to you tomorrow. Time to go to sleep |

| Date | Time | From | To | Message |
|------|------|------|----|---------|
| | | | | |
| | | | Gang | |
| 3/4/2007 | 10:22:05 PM | Mr. Che Gang | Ivan | please wait minutes |
| 3/4/2007 | 10:22:27 PM | Ivan | Mr. Che Gang | Sure, I am here. I will wait |
| 3/4/2007 | 10:24:10 PM | Mr. Che Gang | Ivan | you know that the rate of USD to RMB is becoming lower and lower. |
| 3/4/2007 | 10:25:51 PM | Ivan | Mr. Che Gang | Yes but not that much. And remeber, this client is talking about MILLIONS of sheets! |
| 3/4/2007 | 10:25:53 PM | Mr. Che Gang | Ivan | At this moment the rate is 7.73, and is still lowering. So even we keep the same price for you, we have to lose some money. |
| 3/4/2007 | 10:26:03 PM | Ivan | Mr. Che Gang | They are also talking about a possible decrease in the chinese economy and in that case the USD would be stronger again |
| 3/4/2007 | 10:26:59 PM | Ivan | Mr. Che Gang | 10,000 sheets per day from Monday to Friday (5 days) or working seven days? 50,000 or 70,000 per week? |
| 3/4/2007 | 10:27:43 PM | Ivan | Mr. Che Gang | I understand your point; just try to give me the best price you can. What about a price scale depending on order volume? |
| 3/4/2007 | 10:27:47 PM | Mr. Che Gang | Ivan | 10000 sheets by seven days |
| 3/4/2007 | 10:28:51 PM | Ivan | Mr. Che Gang | 70,000 a week or 300,000 a month |
| 3/4/2007 | 10:29:07 PM | Mr. Che Gang | Ivan | since we have already offered the lowest price for you to build up logn term relationship |
| 3/4/2007 | 10:29:21 PM | Ivan | Mr. Che Gang | I need to see what is the schedule this customer have |
| 3/4/2007 | 10:29:34 PM | Ivan | Mr. Che Gang | Ok, I understand your point. |
| 3/4/2007 | 10:30:21 PM | Ivan | Mr. Che Gang | Could you give me prices for metal tracks and metal studs 3 5/8", 10 feet long, 25 GA please. |
| 3/4/2007 | 10:30:31 PM | Ivan | Mr. Che Gang | And how many pieces per container |
| 3/4/2007 | 10:30:56 PM | Ivan | Mr. Che Gang | Please send me an email with that information |
| 3/4/2007 | 10:30:59 PM | Mr. Che Gang | Ivan | yes, 300000 sheets each month is of one line, we can have three lines to produce for you if necessary |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |
| 3/4/2007 | 10:31:41 PM | Ivan | Mr. Che Gang | So I could say that I can supply 900,000 sheets per month |
| 3/4/2007 | 10:33:03 PM | Mr. Che Gang | Ivan | ok we will send you the information on stud |
| 3/4/2007 | 10:34:10 PM | Ivan | Mr. Che Gang | Thanks; also drywall screws 1 1/8" and 1 5/8" as well as paper drywall tape and fiber tape, please |
| 3/4/2007 | 10:34:37 PM | Ivan | Mr. Che Gang | We have now a huge warehouse waiting for all the products you will ship to us |
| 3/4/2007 | 10:35:18 PM | Ivan | Mr. Che Gang | Have a great day. I will be waiting for your information |
| 3/4/2007 | 10:35:22 PM | Mr. Che Gang | Ivan | I would like to suggest you mixing the 10' stud with the length of 8'or 9' to fit the container |
| 3/4/2007 | 10:35:32 PM | Ivan | Mr. Che Gang | Have to go to bed. I will have a long day tomorrow |
| 3/4/2007 | 10:36:10 PM | Ivan | Mr. Che Gang | Perfect; no problem. Send me your offer in such a way we optimize the container |
| 3/4/2007 | 10:37:17 PM | Mr. Che Gang | Ivan | we will. Good night |
| 3/5/2007 | 9:02:12 PM | Ivan | Mr. Che Gang | Mr Bill, how are you? |
| 3/5/2007 | 9:02:54 PM | Ivan | Mr. Che Gang | Please do not forget to email me with the information about the metal tracks and studs as well as the drywall screws and tape. I really need that |
| 3/5/2007 | 9:03:02 PM | Mr. Che Gang | Ivan | I am fine ,Thank you ,and you ? |
| 3/5/2007 | 9:03:24 PM | Ivan | Mr. Che Gang | I am doing pretty good. Working hard with customers to get sales |
| 3/5/2007 | 9:03:31 PM | Ivan | Mr. Che Gang | There is a lot of interest |
| 3/5/2007 | 9:04:11 PM | Ivan | Mr. Che Gang | We just need to have the sheets in our warehouse to start selling! |
| 3/5/2007 | 9:04:29 PM | Mr. Che Gang | Ivan | Ok , I am conforming |
| 3/5/2007 | 9:04:44 PM | Ivan | Mr. Che Gang | By my research I know that metal is going to be great too |
| 3/5/2007 | 9:04:51 PM | Ivan | Mr. Che | You are conforming what? |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | Gang | |
| 3/5/2007 | 9:05:29 PM | Mr. Che Gang | Ivan | metal studs and screws |
| 3/5/2007 | 9:05:35 PM | Ivan | Mr. Che Gang | Ah, ok |
| 3/5/2007 | 9:09:19 PM | Mr. Che Gang | Ivan | As for the metal studs, do you need the only one size or some other size? |
| 3/5/2007 | 9:11:46 PM | Mr. Che Gang | Ivan | I think the stud should be matched with the tracks. |
| 3/6/2007 | 7:19:41 AM | Ivan | Mr. Che Gang | Make them match please |
| 3/6/2007 | 7:20:04 AM | Ivan | Mr. Che Gang | You still working? I just came to my office this morning |
| 3/6/2007 | 9:18:43 PM | Ivan | Mr. Che Gang | Hi Mr. Bill |
| 3/6/2007 | 9:18:51 PM | Ivan | Mr. Che Gang | How are you this morning? |
| 3/6/2007 | 9:51:29 PM | Ivan | Mr. Che Gang | I need your email about the rest of the products Mr. Bill. Please |
| 3/6/2007 | 9:57:23 PM | Ivan | Mr. Che Gang | Is the bonding tape ready? |
| 3/6/2007 | 10:00:03 PM | Mr. Che Gang | Ivan | morning sir |
| 3/6/2007 | 10:00:25 PM | Mr. Che Gang | Ivan | I just come back |
| 3/6/2007 | 10:00:32 PM | Ivan | Mr. Che Gang | Where were you? |
| 3/6/2007 | 10:01:28 PM | Mr. Che Gang | Ivan | my office |
| 3/6/2007 | 10:01:45 PM | Ivan | Mr. Che Gang | Oh, I see. I thought you were travelling out of China |
| 3/6/2007 | 10:02:15 PM | Mr. Che Gang | Ivan | oh ,I just come to my office |
| 3/6/2007 | 10:02:25 PM | Ivan | Mr. Che Gang | When are you going to email me the information for the other products? |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
|      |      |      |     |         |
| 3/6/2007 | 10:02:42 PM | Ivan | Mr. Che Gang | I really need them because we have many clients waiting for quotes |
| 3/6/2007 | 10:02:48 PM | Mr. Che Gang | Ivan | today , |
| 3/6/2007 | 10:02:53 PM | Ivan | Mr. Che Gang | Thanks a lot! |
| 3/6/2007 | 10:03:47 PM | Mr. Che Gang | Ivan | did you received my message in MSN last night |
| 3/6/2007 | 10:03:54 PM | Ivan | Mr. Che Gang | We have people waiting for quotes in Colombia, Costa Rica, Bahamas and Mexico |
| 3/6/2007 | 10:04:24 PM | Ivan | Mr. Che Gang | As for the metal studs, do you need the only one size or some other size? Mr. Che Gang said: I think the stud should be matched with the tracks. Ivan said: Make them match please |
| 3/6/2007 | 10:04:29 PM | Ivan | Mr. Che Gang | That part? |
| 3/6/2007 | 10:05:03 PM | Mr. Che Gang | Ivan | yes |
| 3/6/2007 | 10:05:45 PM | Ivan | Mr. Che Gang | Please do whatever you consider is the best in order to optimize the shipping |
| 3/6/2007 | 10:05:54 PM | Ivan | Mr. Che Gang | Match them if that is the case |
| 3/6/2007 | 10:08:03 PM | Mr. Che Gang | Ivan | ok, we will offer you the information with the matched size. |
| 3/6/2007 | 10:08:33 PM | Ivan | Mr. Che Gang | Perfect. I will waiting for it tomorrow when I wake up and come to my office |
| 3/6/2007 | 10:08:52 PM | Mr. Che Gang | Ivan | But what important us that it should be comply with your market demand. |
| 3/6/2007 | 10:10:20 PM | Ivan | Mr. Che Gang | Yes, here we have 25 GA, 3 5/8" 10 footer as the most commercial one. Also the 8' and the 9'. |
| 3/6/2007 | 10:12:15 PM | Mr. Che Gang | Ivan | I see, I will match them accordingly. |
| 3/6/2007 | 10:14:09 PM | Mr. Che Gang | Ivan | Do you need any studs which is jointly installed with the track 3 5/8" in project? |
| 3/6/2007 | 10:15:12 PM | Ivan | Mr. Che Gang | How is that? |
| 3/6/2007 | 10:23:27 PM | Mr. Che | Ivan | When installed,the track of 3 5/8" is put in the paralle level with groud, the stud is put erectlt crossed with the track. |

| Date | Time | From | To | Message |
|------|------|------|----|---------|
|  |  |  |  |  |
|  |  | Gang |  |  |
| 3/6/2007 | 10:25:08 PM | Mr. Che Gang | Ivan | so they have to be used together. |
| 3/6/2007 | 10:25:49 PM | Mr. Che Gang | Ivan | Are you here? |
| 3/6/2007 | 10:26:28 PM | Mr. Che Gang | Ivan | I will send you some pictures if you are not so clear until now. |
| 3/6/2007 | 10:27:25 PM | Mr. Che Gang | Ivan | ;) |
| 3/6/2007 | 11:58:09 PM | Ivan | Mr. Che Gang | I am back; I was bidding a construction job. Ok, send some pics please. I will be waiting for your email. Have a wonderful day! |
| 3/7/2007 | 9:25:23 PM | Ivan | Mr. Che Gang | Hi Sir, how are you? |
| 3/7/2007 | 9:26:33 PM | Mr. Che Gang | Ivan | I am fine,Thank you,sir |
| 3/7/2007 | 9:26:47 PM | Ivan | Mr. Che Gang | Good to know |
| 3/7/2007 | 9:27:10 PM | Ivan | Mr. Che Gang | Any news about our first order? Is it almost ready to be shipped? |
| 3/7/2007 | 9:28:53 PM | Ivan | Mr. Che Gang | I need to know when am I going to recieve the metal studs and other products price list |
| 3/7/2007 | 9:29:14 PM | Mr. Che Gang | Ivan | How are you Mr. Ivan? |
| 3/7/2007 | 9:29:24 PM | Ivan | Mr. Che Gang | I am very good sir |
| 3/7/2007 | 9:29:34 PM | Ivan | Mr. Che Gang | What about you? |
| 3/7/2007 | 9:31:23 PM | Mr. Che Gang | Ivan | We are ready to produce for you. But before we produce, please let us know what is detail quantity for each size do you need for the first order? |
| 3/7/2007 | 9:33:23 PM | Ivan | Mr. Che Gang | Don't you remember the first proforma invoice you sent me? We transferred you $ 20,000 for that one to start production. I thought it was ready for us to send the balance of the payment. How long is this going to take? It was for 4' x 12' x 1/2" |
| 3/7/2007 | 9:33:49 PM | Ivan | Mr. Che Gang | That transefer was the first one and it was sent more than a month ago |
| 3/7/2007 | 9:34:18 PM | Ivan | Mr. Che Gang | We need that product here as soon as possible Mr. Bill; we have many clients waiting |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| 3/7/2007 | 9:36:26 PM | Ivan | Mr. Che Gang | Are u there? |
| 3/7/2007 | 9:36:55 PM | Ivan | Mr. Che Gang | When will you email me the other information I have been waiting for my friend? I really need that |
| 3/7/2007 | 9:38:40 PM | Mr. Che Gang | Ivan | I am checking the invoice, |
| 3/7/2007 | 9:38:54 PM | Ivan | Mr. Che Gang | Ok |
| 3/7/2007 | 9:39:28 PM | Mr. Che Gang | Ivan | It mentioned 20100 sheets of 4'*12'*1/2", is it right? |
| 3/7/2007 | 9:39:38 PM | Ivan | Mr. Che Gang | Exactly, that one |
| 3/7/2007 | 9:40:11 PM | Ivan | Mr. Che Gang | And we agreed we would pay 30% for starting production and 70% before shipping the sheets |
| 3/7/2007 | 9:40:40 PM | Ivan | Mr. Che Gang | Given that you said production was going to take 20 days I thought you had them ready by now |
| 3/7/2007 | 9:41:05 PM | Ivan | Mr. Che Gang | We ahve also transferred another $40,000 for other 2 orders |
| 3/7/2007 | 9:41:07 PM | Mr. Che Gang | Ivan | yes, Sir. |
| 3/7/2007 | 9:41:32 PM | Ivan | Mr. Che Gang | one of them is 4' x 8' x 1/2" and the other one is 4' x 12' x 1/2" |
| 3/7/2007 | 9:41:53 PM | Mr. Che Gang | Ivan | We will fininsh the production for the first order in 7 days, |
| 3/7/2007 | 9:42:13 PM | Ivan | Mr. Che Gang | And we are ready to start transg=ferring the rest of the payments as well as $ 20,000 a week for new orders |
| 3/7/2007 | 9:42:25 PM | Ivan | Mr. Che Gang | Ok, that is great to know |
| 3/7/2007 | 9:42:41 PM | Ivan | Mr. Che Gang | Now, is the bonding tape ready? |
| 3/7/2007 | 9:43:17 PM | Mr. Che Gang | Ivan | please arrange shipping schedule and rest payment for first order。 |
| 3/7/2007 | 9:43:29 PM | Ivan | Mr. Che Gang | Please my friend; when you will give me prices for other products? My associates keep asking me and I always say tomorrow |
| 3/7/2007 | 9:43:38 PM | Ivan | Mr. Che | Perfect; I will |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |
| | | | Gang | |
| 3/7/2007 | 9:44:14 PM | Mr. Che Gang | Ivan | We finished the design of bonding tape, and we are producing the tape now. |
| 3/7/2007 | 9:44:25 PM | Ivan | Mr. Che Gang | Great sir, more good news |
| 3/7/2007 | 9:45:37 PM | Ivan | Mr. Che Gang | Sorry to keep asking; pricing for other products? |
| 3/7/2007 | 9:46:13 PM | Mr. Che Gang | Ivan | As for the studs and tracks, the price of material of steel belt is changing very ofen |
| 3/7/2007 | 9:47:05 PM | Mr. Che Gang | Ivan | we just want to confirm a steady price for you |
| 3/7/2007 | 9:47:48 PM | Ivan | Mr. Che Gang | I understand that but when are you going to give it to me? I need to give a quote for several big projects very soon |
| 3/7/2007 | 9:49:59 PM | Mr. Che Gang | Ivan | ok I see. |
| 3/7/2007 | 9:51:07 PM | Mr. Che Gang | Ivan | Anyway I will offer the current price accordingly. |
| 3/7/2007 | 9:51:32 PM | Ivan | Mr. Che Gang | Yes, we can do that. If later the steel belt goes down you can adjust the price |
| 3/7/2007 | 9:52:03 PM | Ivan | Mr. Che Gang | But we need to submit some quotes; and steel belt is the same for everybody today |
| 3/7/2007 | 9:53:10 PM | Ivan | Mr. Che Gang | Please email me today if you can |
| 3/7/2007 | 9:55:43 PM | Mr. Che Gang | Ivan | ok |
| 3/8/2007 | 7:56:27 PM | Ivan | Mr. Che Gang | Hi, please let me know if you emailed me about the metal framing |
| 3/8/2007 | 7:58:25 PM | Mr. Che Gang | Ivan | sorry sir, |
| 3/8/2007 | 8:01:31 PM | Mr. Che Gang | Ivan | because the price of steel material has changed now, I am waiting for the reply of the steel material factory.When I get the message from the steel material factory, I will reply to you at once. |
| 3/8/2007 | 9:34:41 PM | Ivan | Mr. Che Gang | Ok sir, thank you! |
| 3/9/2007 | 9:36:11 PM | Ivan | Mr. Che Gang | Hi sir |

18

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
|      |      |      |     |         |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| 3/9/2007 | 9:36:25 PM | Ivan | Mr. Che Gang | Working on a saturday morning? |
| 3/9/2007 | 10:14:35 PM | Ivan | Mr. Che Gang | I am back |
| 3/11/2007 | 10:44:06 PM | Ivan | Mr. Che Gang | Hi, how are you? |
| 3/11/2007 | 10:44:40 PM | Mr. Che Gang | Ivan | morning sir. |
| 3/11/2007 | 10:45:06 PM | Ivan | Mr. Che Gang | Good morning (China); good evening (USA) |
| 3/11/2007 | 10:45:39 PM | Ivan | Mr. Che Gang | What is going on sir? I noticed you received my email |
| 3/11/2007 | 10:46:58 PM | Mr. Che Gang | Ivan | sorry sir,Mr. bill have been outside office. |
| 3/11/2007 | 10:47:14 PM | Ivan | Mr. Che Gang | Oh, I see |
| 3/11/2007 | 10:47:22 PM | Ivan | Mr. Che Gang | Who am I talking to? |
| 3/11/2007 | 10:47:32 PM | Mr. Che Gang | Ivan | when he come back , i will inform him. |
| 3/11/2007 | 10:48:31 PM | Mr. Che Gang | Ivan | I am his assitant. |
| 3/11/2007 | 10:48:48 PM | Ivan | Mr. Che Gang | Oh, nice meeting you; what is your name? |
| 3/11/2007 | 10:52:04 PM | Ivan | Mr. Che Gang | Ok, have a good night. Please ask Mr. Bill if he can answer my last emails, mainly the one about the metal frame. We have several clients asking for a quote |
| 3/12/2007 | 10:18:57 PM | Ivan | Mr. Che Gang | Hi sir |
| 3/12/2007 | 10:19:02 PM | Ivan | Mr. Che Gang | Good morning! |
| 3/13/2007 | 9:18:05 PM | Ivan | Mr. Che Gang | Hi sir, how are you? |
| 3/13/2007 | 9:18:37 PM | Mr. Che Gang | Ivan | morningsir |
| 3/13/2007 | 9:22:04 PM | Ivan | Mr. Che | Hi, what is up? Were you traveling? |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |
| | | | Gang | |
| 3/13/2007 | 9:22:47 PM | Ivan | Mr. Che Gang | Any news on the metal frame and other products? |
| 3/13/2007 | 9:29:26 PM | Mr. Che Gang | Ivan | At this moment, the price of steel belt is increasing, not steady. |
| 3/13/2007 | 9:29:56 PM | Mr. Che Gang | Ivan | We want to offer you a steady price for metal stud to you |
| 3/13/2007 | 9:30:09 PM | Ivan | Mr. Che Gang | But still I need to have a price; our clients are asking for a quote |
| 3/13/2007 | 9:30:42 PM | Ivan | Mr. Che Gang | I understand your point but we have to compare with the american manufacturers pricing |
| 3/13/2007 | 9:31:19 PM | Ivan | Mr. Che Gang | I think they are also paying high price for the steel belt they are suing |
| 3/13/2007 | 9:31:41 PM | Ivan | Mr. Che Gang | using, not suing; sorry |
| 3/13/2007 | 9:32:09 PM | Mr. Che Gang | Ivan | Would you please let us konw the price level of American manufacturers? |
| 3/13/2007 | 9:34:38 PM | Ivan | Mr. Che Gang | I will check with a supplier and give you tomorrow the actual price for the 3 5/8" - 25 GA - 10 feet. What is your actual export price for this same one? |
| 3/13/2007 | 9:35:03 PM | Ivan | Mr. Che Gang | and how many pieces can you put in a container? |
| 3/13/2007 | 9:36:59 PM | Mr. Che Gang | Ivan | At this moment, we load 8', 9', 10', 12' mixed in one container. |
| 3/13/2007 | 9:42:13 PM | Mr. Che Gang | Ivan | Anyway, we will offer a price within three days 。 |
| 3/13/2007 | 9:45:20 PM | Ivan | Mr. Che Gang | ok, I will wait for it |
| 3/18/2007 | 10:06:20 PM | Ivan | Mr. Che Gang | Hi sir, how are you today? Good morning |
| 3/18/2007 | 10:09:18 PM | Ivan | Mr. Che Gang | Any news? |
| 3/18/2007 | 10:10:13 PM | Mr. Che Gang | Ivan | I will have tomorrow. |
| 3/18/2007 | 10:10:20 PM | Ivan | Mr. Che Gang | Great sir |

| Date | Time | From | To | Message |
|------|------|------|----|---------|
|      |      |      |    |         |

| Date | Time | From | To | Message |
|------|------|------|----|---------|
| 3/18/2007 | 10:10:42 PM | Ivan | Mr. Che Gang | So maybe I will have that when I wake up tomorrow morning! |
| 3/18/2007 | 10:10:55 PM | Mr. Che Gang | Ivan | I will inform you tomorrow. |
| 3/18/2007 | 10:11:02 PM | Ivan | Mr. Che Gang | Thanks |
| 3/18/2007 | 10:11:33 PM | Mr. Che Gang | Ivan | welcome |
| 3/18/2007 | 10:11:46 PM | Ivan | Mr. Che Gang | Going to bed. Talk to you tomorrow |
| 3/18/2007 | 10:12:25 PM | Mr. Che Gang | Ivan | ok , bye sir, have a great night |
| 3/22/2007 | 10:03:09 PM | Ivan | Mr. Che Gang | Bill, please check an email I just sent you and answer me as soon as possible. It is very important for us to have that information |
| 3/23/2007 | 9:03:46 PM | Ivan | Mr. Che Gang | Mr. Bill; I really need the information I requested in my email for ordering delivery. Please answer me as soon as you can. |
| 3/23/2007 | 9:04:20 PM | Ivan | Mr. Che Gang | This delay is affecting us sir, please help me with the questions I emailed. Thanks a lot for your help |
| 3/23/2007 | 9:09:13 PM | Mr. Che Gang | Ivan | sorry sir,I just come back from another city . |
| 3/23/2007 | 9:09:29 PM | Ivan | Mr. Che Gang | Oh, I see |
| 3/23/2007 | 9:09:44 PM | Ivan | Mr. Che Gang | Could you please check if you received my email? |
| 3/23/2007 | 9:28:53 PM | Ivan | Mr. Che Gang | I am sorry sir, I got disconected. Are u there? |
| 3/23/2007 | 9:30:02 PM | Ivan | Mr. Che Gang | I need to instruct the shipping company but I need first to know thw answers to the questions I emailed you yesterday. Please answer me as soon as possible |
| 3/23/2007 | 9:31:47 PM | Mr. Che Gang | Ivan | I have been out for business for three days. I just come back office this morning. |
| 3/23/2007 | 9:32:07 PM | Ivan | Mr. Che Gang | I see; were you traveling? |
| 3/23/2007 | 9:32:37 PM | Ivan | Mr. Che Gang | They are not really difficult questions; just some things I need to make sure before ordering shipment |
| 3/23/2007 | 9:33:20 PM | Mr. Che | Ivan | Yes, I will check your eamil |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |
| | | Gang | | |
| 3/23/2007 | 9:33:43 PM | Ivan | Mr. Che Gang | Thanks a lot my friend. That way I can work during the weekend with your answers |
| 3/23/2007 | 9:33:49 PM | Mr. Che Gang | Ivan | As we already got the bonding tape |
| 3/23/2007 | 9:34:14 PM | Ivan | Mr. Che Gang | Metal Frame is going up in the states! My supplier sent me a letter today |
| 3/23/2007 | 9:35:19 PM | Mr. Che Gang | Ivan | Please book the shiping for the boards and give us five days to produce. |
| 3/23/2007 | 9:35:28 PM | Ivan | Mr. Che Gang | 10% on April 1 and then another 10% in May |
| 3/23/2007 | 9:35:47 PM | Mr. Che Gang | Ivan | You can book shipping now. |
| 3/23/2007 | 9:35:54 PM | Ivan | Mr. Che Gang | Yes, I will book the shipping but I thought the drywall was already produced |
| 3/23/2007 | 9:36:45 PM | Ivan | Mr. Che Gang | But before booking the shipment I need to have answer to my questios, please |
| 3/23/2007 | 9:37:43 PM | Mr. Che Gang | Ivan | we finish production in five days. |
| 3/23/2007 | 9:37:51 PM | Ivan | Mr. Che Gang | Remember the drywall sheets have to say somewhere, in the bonding tape or in the edge of the sheet, Made in China |
| 3/23/2007 | 9:38:15 PM | Mr. Che Gang | Ivan | I will check your eamil |
| 3/23/2007 | 9:38:30 PM | Ivan | Mr. Che Gang | Thanks a lot; that is very important for me |
| 3/23/2007 | 9:39:00 PM | Mr. Che Gang | Ivan | We have already got the finished tape, |
| 3/23/2007 | 9:39:18 PM | Mr. Che Gang | Ivan | we can print "MADE IN CHINA" on back of the boards. |
| 3/23/2007 | 9:39:29 PM | Ivan | Mr. Che Gang | That will be perfect!!!! |
| 3/23/2007 | 9:40:26 PM | Ivan | Mr. Che Gang | Do you have picture(s) of the way you load the containers? |
| 3/23/2007 | 9:40:34 PM | Mr. Che Gang | Ivan | How do you think we produce for you today? |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |
| 3/23/2007 | 9:40:58 PM | Ivan | Mr. Che Gang | What do you mean? I do not understand your question |
| 3/23/2007 | 9:41:31 PM | Ivan | Mr. Che Gang | Are u working now? At your office? It is Saturday |
| 3/23/2007 | 9:41:57 PM | Mr. Che Gang | Ivan | yes 24 hours seven days |
| 3/23/2007 | 9:42:14 PM | Ivan | Mr. Che Gang | Wow!!!! Do you work on Sundays too? |
| 3/23/2007 | 9:42:26 PM | Mr. Che Gang | Ivan | of course |
| 3/23/2007 | 9:42:32 PM | Mr. Che Gang | Ivan | how about you? |
| 3/23/2007 | 9:42:35 PM | Ivan | Mr. Che Gang | I know the factory does but do you have to go to your office on Sundays? |
| 3/23/2007 | 9:42:47 PM | Mr. Che Gang | Ivan | yes |
| 3/23/2007 | 9:43:09 PM | Mr. Che Gang | Ivan | we will arrange the prodution today. |
| 3/23/2007 | 9:43:34 PM | Ivan | Mr. Che Gang | I only work at my office from Monday to Friday. If I have to do something extra I do it at home but usually I do not work on Sunday. Saturday only until noon but at home |
| 3/23/2007 | 9:43:42 PM | Ivan | Mr. Che Gang | Perfect! |
| 3/23/2007 | 9:43:45 PM | Mr. Che Gang | Ivan | we produce, please you book the shipping. |
| 3/23/2007 | 9:44:12 PM | Ivan | Mr. Che Gang | Do you have picture(s) of the way you load the 40' STD containers? |
| 3/23/2007 | 9:44:16 PM | Ivan | Mr. Che Gang | I will |
| 3/23/2007 | 9:45:07 PM | | | Mr. Che Gang sends fcl3.JPG |
| 3/23/2007 | 9:45:56 PM | | | You have successfully received C:\Documents and Settings\Owner\My Documents\My Received Files\fcl3.JPG from Mr. Che Gang. |
| 3/23/2007 | 9:46:02 PM | Mr. Che Gang | Ivan | I will have a meeting. |
| 3/23/2007 | 9:46:15 PM | Mr. Che Gang | Ivan | bye sir. |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| 3/23/2007 | 9:46:35 PM | Ivan | Mr. Che Gang | Bye and thanks, please do not forget to answer my email |
| 3/23/2007 | 9:46:56 PM | Mr. Che Gang | Ivan | yes |
| 3/23/2007 | 9:47:09 PM | Ivan | Mr. Che Gang | How many colums inside the container? |
| 3/23/2007 | 9:47:17 PM | Ivan | Mr. Che Gang | or piles |
| 3/23/2007 | 9:47:38 PM | Ivan | Mr. Che Gang | 8 pallets? |
| 3/23/2007 | 9:47:43 PM | Ivan | Mr. Che Gang | in 2 piles? |
| 3/23/2007 | 9:48:06 PM | Ivan | Mr. Che Gang | 8 x 76 = 608 plus some other loose, right? |
| 3/25/2007 | 10:03:16 PM | Ivan | Mr. Che Gang | Mr. Bill, good morning |
| 3/25/2007 | 10:04:20 PM | Ivan | Mr. Che Gang | I have not received an answer from you to my email; it is really URGENT sir! |
| 3/25/2007 | 10:05:19 PM | Ivan | Mr. Che Gang | I need to have that information by tomorrow before I go to my office. I was going to do some calculations with it during the weekend and you said Friday you were going to answer me but I have not received it yet |
| 3/25/2007 | 10:08:36 PM | Ivan | Mr. Che Gang | Here are the questions I need an answer for: |
| 3/25/2007 | 10:11:08 PM | Ivan | Mr. Che Gang | 1) Please confirm you have received the money (@$57,000) we transfer to pay completely the first order 2) What is the EXACT weight of each 4' x 12' x ½' sheet? 3) What is the EXACT weight of each 4' x 8' x ½' sheet? 4) When loading the container, how many pallets of 4' x 12' x ½' you put in? How many pieces against the walls on the sides? |
| 3/25/2007 | 10:11:25 PM | Ivan | Mr. Che Gang | 5) When loading the container, how many pallets of 4' x 8' x ½' you put in the container? How many pieces against the wall on the sides? |
| 3/25/2007 | 10:11:40 PM | Ivan | Mr. Che Gang | Please answer me those 5 simple questions as soon as possible |
| 3/26/2007 | 3:26:24 AM | | | Mr. Che Gang sends photo album.zip |
| 3/26/2007 | 3:31:31 AM | | | You have failed to receive file "photo album.zip" from Mr. Che Gang. |
| 4/14/2007 | 10:25:39 PM | Ivan | Mr. Che Gang | Hi Mr. Bill, how are you? |
| 4/14/2007 | 10:26:09 PM | Ivan | Mr. Che | Thanks for your email; I answered you already. Please proceed according to my last email |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |
| | | | Gang | |
| 4/14/2007 | 10:27:11 PM | Ivan | Mr. Che Gang | Please try to give me ocean rates to those cities I am requesting |
| 4/14/2007 | 10:27:13 PM | Mr. Che Gang | Ivan | ok ,sir |
| 4/14/2007 | 10:27:22 PM | Ivan | Mr. Che Gang | Did you receive it? |
| 4/14/2007 | 10:27:34 PM | Mr. Che Gang | Ivan | yes sir |
| 4/14/2007 | 10:27:58 PM | Ivan | Mr. Che Gang | Great, please give me an answer when you have time |
| 4/14/2007 | 10:28:10 PM | Mr. Che Gang | Ivan | but I will wait for it until monday |
| 4/14/2007 | 10:28:35 PM | Ivan | Mr. Che Gang | Can you help me with the other request about the porcelain for bathrooms? The toilets and the sinks? |
| 4/14/2007 | 10:28:46 PM | Ivan | Mr. Che Gang | Ok, that is fine. Monday will be OK |
| 4/14/2007 | 10:29:57 PM | Mr. Che Gang | Ivan | becuase the shipping agent will work on monday |
| 4/14/2007 | 10:30:11 PM | Ivan | Mr. Che Gang | I understand that |
| 4/14/2007 | 10:30:23 PM | Ivan | Mr. Che Gang | Which carrier will you use? |
| 4/14/2007 | 10:31:21 PM | Mr. Che Gang | Ivan | I must confirm it and then tell you |
| 4/14/2007 | 10:31:28 PM | Ivan | Mr. Che Gang | Ok, fine |
| 4/14/2007 | 10:32:55 PM | Ivan | Mr. Che Gang | ITBF (Mr. German Munoz) in Miami will be our customs broker here in the States |
| 4/14/2007 | 10:33:24 PM | Mr. Che Gang | Ivan | I see |
| 4/14/2007 | 10:34:42 PM | Ivan | Mr. Che Gang | I understan you will ship the containers to Miami, FL or could you give me a price up to Orlando, FL including the land portion? |
| 4/14/2007 | 10:34:45 PM | Mr. Che Gang | Ivan | can he operate the 40 container of 28-29tons? |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| 4/14/2007 | 10:34:53 PM | Ivan | Mr. Che Gang | Yes, he can |
| 4/14/2007 | 10:35:04 PM | Ivan | Mr. Che Gang | We already found a way to solve that problem |
| 4/14/2007 | 10:35:40 PM | Mr. Che Gang | Ivan | ok fine |
| 4/14/2007 | 10:35:42 PM | Ivan | Mr. Che Gang | But if you can give me a price from Qungdao to Orlando directly I will consider your quote |
| 4/14/2007 | 10:36:17 PM | Mr. Che Gang | Ivan | ok sir,I will |
| 4/14/2007 | 10:36:20 PM | Ivan | Mr. Che Gang | Has been a difficult enterprise but everything is fine now. We have to pay for an overweight permit but can be done |
| 4/14/2007 | 10:37:16 PM | Ivan | Mr. Che Gang | Going to sleep; have a great day! |
| 4/14/2007 | 10:38:10 PM | Ivan | Mr. Che Gang | I will be waiting for your answer. The quote from Qingdao to Golf Port is VERY important. We have somebody asking us for 2,000,000 4' x 8' x 1/2" sheets |
| 4/14/2007 | 10:38:37 PM | Ivan | Mr. Che Gang | These would be for the reconstruction of some cities destroyed by Hurricane Katrina |
| 4/14/2007 | 10:40:26 PM | Mr. Che Gang | Ivan | ok sir , I will confirm it quickly,have a great night! |
| 5/5/2007 | 8:44:59 PM | Ivan | Mr. Che Gang | Hi Mr. Bill; how are you? |
| 5/5/2007 | 8:45:30 PM | Ivan | Mr. Che Gang | I have emailed you twice asking about our orders but I have not received any answer. I just emailed you again |
| 5/5/2007 | 8:49:44 PM | Ivan | Mr. Che Gang | I am telling you about the new conformation of Oriental Trading Company. Jorge Arevalo is not a partner but his wife Adriana Toja is. She owns 24.99% of the shares but she is not part of the Board of Directors; she does not have any decision power. Same for Jorge Arevalo; he does not have any decision power in the company given he is not in the Board of Directors and he is not even a partner. |
| 5/5/2007 | 8:50:32 PM | Ivan | Mr. Che Gang | The only one making big decisions as a majority shares owner is Mrs. Denise Romano. This is very important for you to understand and have clear. |
| 5/5/2007 | 8:50:45 PM | Ivan | Mr. Che Gang | Are u there? |
| 5/5/2007 | 8:51:01 PM | Ivan | Mr. Che Gang | Please answer my emails as soon as you can. We need that information |
| 5/5/2007 | 9:03:03 PM | Mr. Che Gang | Ivan | Thank you my freind,and you ? |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
|      |      |      |     |         |
| 5/5/2007 | 9:03:05 PM | Mr. Che Gang | Ivan | |
| 5/5/2007 | 9:03:16 PM | Mr. Che Gang | Ivan | I will check my email |
| 5/5/2007 | 9:03:59 PM | Mr. Che Gang | Ivan | and reply you as soonas possbile |
| 5/5/2007 | 9:08:48 PM | Mr. Che Gang | Ivan | the board ofthe first order has been shipped.but the shipping agent is on holiday.they will work on 8 th March.at that time ,I will send the message of delivery of the goods to you . |
| 5/5/2007 | 9:40:16 PM | Ivan | Mr. Che Gang | What about the second order? |
| 5/5/2007 | 9:42:53 PM | Ivan | Mr. Che Gang | And the third order? Is it ready? We are going to transfer the amount we owe for the third one |
| 5/5/2007 | 9:43:15 PM | Mr. Che Gang | Ivan | I will book the shipping space after 8th March,and I will inform you of it as soon as possible. |
| 5/8/2007 | 10:22:16 PM | Ivan | Mr. Che Gang | Hi sir, how are you? |
| 5/8/2007 | 10:22:25 PM | Ivan | Mr. Che Gang | Have you received my emails? |
| 5/8/2007 | 10:23:02 PM | Ivan | Mr. Che Gang | Today is the 8th of May; what about our first 60 containers? Are they in the water? |
| 5/8/2007 | 10:23:18 PM | Mr. Che Gang | Ivan | yes ,sir i have received your email. |
| 5/8/2007 | 10:24:24 PM | Mr. Che Gang | Ivan | but I have a meetting all the time , |
| 5/8/2007 | 10:24:56 PM | Ivan | Mr. Che Gang | Ok, when am I going to receive an answer? It is very important for us now to know when the drywall is shipped |
| 5/8/2007 | 10:25:00 PM | Mr. Che Gang | Ivan | so we can not reply you. |
| 5/8/2007 | 10:25:06 PM | Ivan | Mr. Che Gang | I see, you are too busy |
| 5/8/2007 | 10:26:03 PM | Ivan | Mr. Che Gang | Mr. Bill; I think we are dealing here with a lot of money and for us it is very important that you take some time to answer our mails. Don't you think so? |
| 5/8/2007 | 10:27:26 PM | Ivan | Mr. Che Gang | We have rented a big warehouse and we have hired several employees so we need to have your cooperation here. I think it is not exactly encouraging to hear from you that you do not have time for answering our emails! |
| 5/8/2007 | 10:28:02 PM | Ivan | Mr. Che | Are you there? |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | Gang | |
| 5/8/2007 | 10:29:18 PM | Ivan | Mr. Che Gang | Please tell me what is the status of our orders |
| 5/8/2007 | 10:31:36 PM | Mr. Che Gang | Ivan | sorry sir , I listened phone just now. |
| 5/8/2007 | 10:31:54 PM | Ivan | Mr. Che Gang | That is ok my friend |
| 5/8/2007 | 10:32:10 PM | Ivan | Mr. Che Gang | I just need to know what is happening with our orders |
| 5/8/2007 | 10:32:35 PM | Mr. Che Gang | Ivan | I will reply you this afternoon |
| 5/8/2007 | 10:33:32 PM | Ivan | Mr. Che Gang | Please; I need to have an answer by tomorrow morning before I go to my office. I have our custom broker waiting for him to have the trucks and everything scheduled |
| 5/8/2007 | 10:34:08 PM | Ivan | Mr. Che Gang | We are also going to place our first order for metal framing |
| 5/8/2007 | 10:34:37 PM | Ivan | Mr. Che Gang | Where in the USA are you exporting your metal framing to? |
| 5/8/2007 | 10:35:11 PM | Mr. Che Gang | Ivan | the board of the first order(20100sheets of 3660*1220*12.7 ) have been shipped on 1st May |
| 5/8/2007 | 10:35:38 PM | Mr. Che Gang | Ivan | Miami and New york |
| 5/8/2007 | 10:35:46 PM | Ivan | Mr. Che Gang | That is a week ago; we have not received any notification yet. What about the second order? |
| 5/8/2007 | 10:36:17 PM | Ivan | Mr. Che Gang | How many containers of metal framing to Miami and how many to New York? |
| 5/8/2007 | 10:37:09 PM | Mr. Che Gang | Ivan | sorry sir , I must go to have meetting now. |
| 5/8/2007 | 10:37:41 PM | Ivan | Mr. Che Gang | Ok, please answer my email this afternoon so I have answers tomorrow morning here in USA |
| 5/8/2007 | 10:38:14 PM | Mr. Che Gang | Ivan | ok sir |
| 5/8/2007 | 10:38:16 PM | Mr. Che Gang | Ivan | bye |
| 5/8/2007 | 10:38:26 PM | Mr. Che Gang | Ivan | have a great night |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |
| 5/8/2007 | 10:38:35 PM | Ivan | Mr. Che Gang | And again my friend Mr. Bill, Jorge Arevalo does not have any decision power in this company. I do not know why I suspect he is in the middle of this now |
| 5/8/2007 | 10:38:45 PM | Ivan | Mr. Che Gang | Have a great day! |
| 5/9/2007 | 11:47:13 PM | Mr. Che Gang | Ivan | I have send email to you this morning |
| 5/15/2007 | 9:03:21 PM | Ivan | Mr. Che Gang | Hi sir how are you? |
| 5/15/2007 | 9:03:48 PM | Mr. Che Gang | Ivan | I am fine ,thank you ,and you ? |
| 5/15/2007 | 9:04:14 PM | Ivan | Mr. Che Gang | Doing good sir. I emailed you a copy of the transfers we made today for paying the other 2 orders |
| 5/15/2007 | 9:05:41 PM | Mr. Che Gang | Ivan | ok ,sir |
| 5/15/2007 | 9:06:11 PM | Mr. Che Gang | Ivan | I will check my email |
| 5/15/2007 | 9:06:14 PM | Ivan | Mr. Che Gang | By the way; do you have 2" metal framing, stud and track? |
| 5/15/2007 | 9:08:01 PM | Mr. Che Gang | Ivan | I have not, |
| 5/15/2007 | 9:08:47 PM | Ivan | Mr. Che Gang | Ok. for the 3 5/8" that you quoted us, do you have 20 gauge too or only 25? |
| 5/15/2007 | 9:11:57 PM | Ivan | Mr. Che Gang | Are u there? |
| 5/15/2007 | 9:18:26 PM | Mr. Che Gang | Ivan | I have 61(track)and 63.8(stud) |
| 5/15/2007 | 9:18:28 PM | Mr. Che Gang | Ivan | mm |
| 5/15/2007 | 9:18:56 PM | Mr. Che Gang | Ivan | I have 41mm(track)and 43mm(stud) |
| 5/15/2007 | 9:21:35 PM | Mr. Che Gang | Ivan | there are hole in 89mm(track) |
| 5/15/2007 | 9:22:07 PM | Mr. Che Gang | Ivan | there are not hole in 92mm(stud) |
| 5/15/2007 | 9:24:12 PM | Mr. Che | Ivan | sorry sir |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |
| | | | Gang | |
| 5/15/2007 | 9:26:00 PM | Mr. Che Gang | Ivan | II have 41mm(stud)and 43mm(track) have 61(stud)and 63.8(track) |
| 5/15/2007 | 9:26:21 PM | Mr. Che Gang | Ivan | I have 41mm(stud)and 43mm(track) I have 61(stud)and 63.8(track) |
| 5/15/2007 | 9:27:36 PM | Mr. Che Gang | Ivan | there are hole in 89mm(stud) there are not hole in 92mm(track) |
| 5/15/2007 | 9:29:46 PM | Mr. Che Gang | Ivan | we have both 20gauge and 25gauge. |
| 5/21/2007 | 8:39:05 PM | Mr. Che Gang | Ivan | Dear Mr. Ivan ,are you there |
| 5/21/2007 | 8:39:35 PM | Mr. Che Gang | Ivan | have you received my email? |
| 5/21/2007 | 8:40:58 PM | Mr. Che Gang | Ivan | Please reply me ,I t is very important for me to operate in next step. |
| 5/22/2007 | 6:57:56 AM | Ivan | Mr. Che Gang | I am sorry, I was travelling. Just came back |
| 5/22/2007 | 6:58:10 AM | Ivan | Mr. Che Gang | I will reply later from my office |
| 5/22/2007 | 6:58:29 AM | Ivan | Mr. Che Gang | YOU CAN GO AHEAD AND BOOK IT AT THE NEW PRICE |
| 5/22/2007 | 6:58:53 AM | Ivan | Mr. Che Gang | We have to discuss it later but for now GO AHEAD AND BOOK IT please |
| 5/22/2007 | 7:25:41 AM | Mr. Che Gang | Ivan | Please confirm that the buyer , consignee ,Notify Party and destination port are the same as those of the thirty containers we have delivered. |
| 5/22/2007 | 7:26:38 AM | Ivan | Mr. Che Gang | Yes sir, I confirm that. Same buyer, same consignee, same Notify Party and same destiantion port as in the first order |
| 5/22/2007 | 7:27:28 AM | Mr. Che Gang | Ivan | we will deliver the board of 4*8*1/2 (21containers*980=20580sheets)this time,is that right? |
| 5/22/2007 | 7:28:25 AM | Ivan | Mr. Che Gang | Exactly; 4 x 8 x 1/2" first and immediatelly the other one; both are already paid for 100% |
| 5/22/2007 | 7:28:54 AM | Ivan | Mr. Che Gang | It would be better if you can deliver both as soon as possible |
| 5/22/2007 | 7:28:59 AM | Mr. Che Gang | Ivan | yes sir ,I have received the money. |

30

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |
| 5/22/2007 | 7:29:26 AM | Ivan | Mr. Che Gang | So, please proceed to ship both orders. Separately but both |
| 5/22/2007 | 7:29:59 AM | Ivan | Mr. Che Gang | Any information about your fireproof sheets? |
| 5/22/2007 | 7:30:43 AM | Ivan | Mr. Che Gang | We need to know as soon as possible about that so we try to compete here with the 5/8" fire coded |
| 5/22/2007 | 7:31:15 AM | Ivan | Mr. Che Gang | Prices for drywall here in the USA are now VERY LOW and we need to have an edge. |
| 5/22/2007 | 7:31:48 AM | Mr. Che Gang | Ivan | ok ,after delivering the 21 containers,I will deliver the board of 4*12*1/2(30containers *670=20100sheets.). |
| 5/22/2007 | 7:32:18 AM | Ivan | Mr. Che Gang | If your price does not improve and ocean freight goes up we could be facing a serious problem because the american manufacturers are dropping prices sharply. |
| 5/22/2007 | 7:33:53 AM | Ivan | Mr. Che Gang | I think Mr. Bill it is time for both of us (OTC and Taihe) to try to come together with a plan for marketing your product strongly here in the USA. What do you think? We have everything ready and we will keep placing orders but we have to check the market together |
| 5/22/2007 | 7:34:03 AM | Mr. Che Gang | Ivan | ok, sir I will send the sample of 12.5 to you this time(in 21 containers) |
| 5/22/2007 | 7:35:03 AM | Ivan | Mr. Che Gang | Yes, I appreciate that. Please email me all the technical information you may have about your fireprof so we can prepare a marketing idea and plan |
| 5/22/2007 | 7:35:49 AM | Ivan | Mr. Che Gang | What percentage is it better over your regular drywall when resisiting fire? How many more hours will it stand in the presence of fire? |
| 5/22/2007 | 7:36:15 AM | Mr. Che Gang | Ivan | Ok ,please email these messages to me,becase we need to confirm them. |
| 5/22/2007 | 7:36:39 AM | Ivan | Mr. Che Gang | Yes, I will. But you can proceed so we do not waste more time |
| 5/22/2007 | 7:36:56 AM | Ivan | Mr. Che Gang | Any comments about our need to discuss a marketing plan? |
| 5/22/2007 | 7:37:54 AM | Mr. Che Gang | Ivan | no. |
| 5/22/2007 | 7:38:12 AM | Ivan | Mr. Che Gang | Why not sir? |
| 5/22/2007 | 7:38:40 AM | Ivan | Mr. Che Gang | It is important to review the actual conditions of this market I think |
| 5/22/2007 | 7:39:11 AM | Mr. Che Gang | Ivan | I have not thought it carefully now. |
| 5/22/2007 | 7:39:19 AM | Ivan | Mr. | I am sure you know how the building industry is at a low point now here in the |

31

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | AM | | Che Gang | USA and drywall prices are dropping |
| 5/22/2007 | 7:41:16 AM | Mr. Che Gang | Ivan | yes,I know.but the building meterial price is rising in china. |
| 5/22/2007 | 7:43:34 AM | Mr. Che Gang | Ivan | the exchange rate between RBM and USD is rising,It will do harm to export. |
| 5/22/2007 | 7:47:27 AM | Ivan | Mr. Che Gang | I know my friend but I also know we need to work closely as partners in this deal. Once the prices in USA go up again it is going to be great but right now we are facing a serious moment and I think you have to consider it |
| 5/22/2007 | 7:50:53 AM | Mr. Che Gang | Ivan | ok,my friend,I will do. |
| 5/22/2007 | 7:58:42 AM | Mr. Che Gang | Ivan | the shipping agent asked when to pay for the ocean freight. |
| 5/22/2007 | 7:59:11 AM | Mr. Che Gang | Ivan | how can I reply to him? |
| 5/22/2007 | 8:01:43 AM | Ivan | Mr. Che Gang | Bill, as we all know, a little bit before the containers arrive, or upon arrival, we have to recive a notice of arrival from the shipping company and we will proceed to pay the whole shipping charges. We have never seen before, and we have been importing for a long time, a shipping company asking us to pay before taking another order. |
| 5/22/2007 | 8:02:17 AM | Ivan | Mr. Che Gang | We will pay without any doubt because we need our containers as soon as posible but we need to make sure they have arrived. |
| 5/22/2007 | 8:02:38 AM | Ivan | Mr. Che Gang | What if we pay and the ship has a problem and has to go to another port? |
| 5/22/2007 | 8:03:11 AM | Ivan | Mr. Che Gang | They have to understand we are not going to deny payment but we need the documents to make sure our containers are at port |
| 5/22/2007 | 8:03:50 AM | Ivan | Mr. Che Gang | And please, tell them not to use that of not taking another order if we have not paid the first one in advance! |
| 5/22/2007 | 8:04:45 AM | Ivan | Mr. Che Gang | What about once we have this running and you need to ship us 30 containers a week? Do we have to pay 120 containers in advance while the ships are still in the water? |
| 5/22/2007 | 8:05:29 AM | Ivan | Mr. Che Gang | We will pay the ocean bill inmediatelly we receive the notice of arrival |
| 5/15/2007 | 9:29:46 PM | Mr. Che Gang | Ivan | we have both 20gauge and 25gauge. |
| 5/22/2007 | 8:15:07 AM | Mr. Che Gang | Ivan | ok,sir .I will tell him . |
| 5/22/2007 | 8:15:38 AM | Mr. Che Gang | Ivan | I will go home ,bye sir. |
| 5/25/2007 | 10:43:02 | Ivan | Mr. | Please sir, I need an answer to my last 4 emails. It is very important you answer us |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | PM | | Che Gang | in a timely manner |
| 6/27/2007 | 7:41:36 PM | Ivan | Mr. Che Gang | Hi my friend |
| 6/27/2007 | 7:41:55 PM | Ivan | Mr. Che Gang | Please check your emails; I need you to check yhe last one I sent you |
| 6/27/2007 | 7:42:03 PM | Ivan | Mr. Che Gang | It is very important!!!! |
| 7/26/2007 | 8:52:03 PM | Ivan | Mr. Che Gang | Hi sir, how are you? |
| 7/26/2007 | 8:52:37 PM | Mr. Che Gang | Ivan | I am fine , thank you , and you ? |
| 7/26/2007 | 8:53:39 PM | Mr. Che Gang | Ivan | I am reading your email. |
| 7/26/2007 | 8:54:12 PM | Mr. Che Gang | Ivan | I will do it as what you said |
| 8/15/2007 | 10:26:20 PM | Ivan | Mr. Che Gang | Bill, how are you? |
| 8/15/2007 | 10:26:33 PM | Ivan | Mr. Che Gang | You have not answered my last emails |
| 8/15/2007 | 10:26:47 PM | Ivan | Mr. Che Gang | I need to have a meeting with you in China |
| 8/15/2007 | 10:26:57 PM | Ivan | Mr. Che Gang | When could you receive me? |
| 8/15/2007 | 10:27:02 PM | Mr. Che Gang | Ivan | I am fine , thank you ,and you ? |
| 8/15/2007 | 10:27:19 PM | Ivan | Mr. Che Gang | The drywall market in the States is really in crisis!!!! |
| 8/15/2007 | 10:27:28 PM | Mr. Che Gang | Ivan | but I did not receive your email. |
| 8/15/2007 | 10:28:28 PM | Ivan | Mr. Che Gang | Right now they are selling a 4' x 12' x 1/2" delivered and stocked at the job site at $ 9.00 and our cost at Miami port is way over $ 10!!!! |
| 8/15/2007 | 10:29:00 PM | Ivan | Mr. Che Gang | We need to get together and see what we can do because we are now facing a serious situation |
| 8/15/2007 | 10:29:27 PM | Ivan | Mr. Che Gang | The market will eventually go back up but in the mean time it is necessary for us to do something |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| 8/15/2007 | 10:30:17 PM | Ivan | Mr. Che Gang | Maybe part of the strategy could be to sell Metal Framing & Drywall as a package |
| 8/15/2007 | 10:30:50 PM | Ivan | Mr. Che Gang | We have invested already over $1.3 million dollars and sales are not coming at all |
| 8/15/2007 | 10:31:10 PM | Ivan | Mr. Che Gang | Or looking for a cheaper ocean freight maybe |
| 8/15/2007 | 10:31:38 PM | Ivan | Mr. Che Gang | But the main question is when can we get together? I would fly to Shangai or Beijing |
| 8/15/2007 | 10:33:12 PM | Mr. Che Gang | Ivan | I think we need wait now.because the ocean freight is very high now. |
| 8/15/2007 | 10:33:28 PM | Ivan | Mr. Che Gang | We need to have that meeting as soon as possible |
| 8/15/2007 | 10:33:40 PM | Ivan | Mr. Che Gang | I agree with you |
| 8/15/2007 | 10:33:53 PM | Mr. Che Gang | Ivan | we can operate some metal studs |
| 8/15/2007 | 10:34:06 PM | Ivan | Mr. Che Gang | Sure, we can do that and it will help |
| 8/15/2007 | 10:34:14 PM | Mr. Che Gang | Ivan | we are exporting to USA |
| 8/15/2007 | 10:34:30 PM | Ivan | Mr. Che Gang | We now have a very good network for selling; problem is prices |
| 8/15/2007 | 10:34:39 PM | Ivan | Mr. Che Gang | Yes, you told me that before |
| 8/15/2007 | 10:34:47 PM | Ivan | Mr. Che Gang | 4 containers a week you said |
| 8/15/2007 | 10:35:02 PM | Mr. Che Gang | Ivan | the price metal studs shold be good. |
| 8/15/2007 | 10:35:20 PM | Ivan | Mr. Che Gang | When can I go to China to visit you so we can define everything? |
| 8/15/2007 | 10:36:03 PM | Mr. Che Gang | Ivan | ok ,welcome to china |
| 8/15/2007 | 10:36:24 PM | Mr. Che Gang | Ivan | welcome to visit our factory |
| 8/15/2007 | 10:36:40 PM | Ivan | Mr. Che | I received your email containing an excel file with your metal studs prices but I could not understand it. Could you clarify for me what each column means? |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
|      |      |      | Gang |        |
| 8/15/2007 | 10:36:47 PM | Ivan | Mr. Che Gang | When can you receive me? |
| 8/15/2007 | 10:37:25 PM | Ivan | Mr. Che Gang | I can plan this trip as soon as possible |
| 8/15/2007 | 10:38:00 PM | Mr. Che Gang | Ivan | ok ,you send your trip plan to me by email. |
| 8/15/2007 | 10:38:17 PM | Ivan | Mr. Che Gang | Would it be possible to have our meeting in Shangai or Beijing? |
| 8/15/2007 | 10:38:31 PM | Mr. Che Gang | Ivan | I will meet you |
| 8/15/2007 | 10:38:33 PM | Ivan | Mr. Che Gang | But I need to make sure you are going to be there |
| 8/15/2007 | 10:38:48 PM | Mr. Che Gang | Ivan | no , you need to jinan air port |
| 8/15/2007 | 10:39:39 PM | Ivan | Mr. Che Gang | Is there a good hotel in Taian city or do I have to stay in Jinan? |
| 8/15/2007 | 10:39:51 PM | Ivan | Mr. Che Gang | Ok, I will fly to Jinan |
| 8/15/2007 | 10:40:22 PM | Mr. Che Gang | Ivan | there is a good hotel in taian city |
| 8/15/2007 | 10:41:29 PM | Mr. Che Gang | Ivan | My friend from USA All stay there |
| 8/15/2007 | 10:41:33 PM | Ivan | Mr. Che Gang | That would be better because I think we will need to have at least 2 days for our meeting |
| 8/15/2007 | 10:41:37 PM | Ivan | Mr. Che Gang | Ok |
| 8/15/2007 | 10:42:10 PM | Ivan | Mr. Che Gang | You said you had some factory close to you producing compound; is that right? |
| 8/15/2007 | 10:43:19 PM | Ivan | Mr. Che Gang | We are interested in having a line with drywall, metal studs, drywall tape, screws and compound |
| 8/15/2007 | 10:44:12 PM | Ivan | Mr. Che Gang | Do you remeber Denise? The lady that went with me last time? She is very worried now because of the situation but looking into the future. She wants to invest but we need to have the whole line |
| 8/15/2007 | 10:45:52 PM | Mr. Che Gang | Ivan | ok ,I can send them to you |

| Date | Time | From | To | Message |
|------|------|------|----|---------|
| | | | | |

| Date | Time | From | To | Message |
|------|------|------|----|---------|
| 8/15/2007 | 10:46:29 PM | Ivan | Mr. Che Gang | Do you think we could meet during the last week of august or the first of September? |
| 8/15/2007 | 10:47:07 PM | Mr. Che Gang | Ivan | no problem |
| 8/15/2007 | 10:47:31 PM | Mr. Che Gang | Ivan | I will wait for you |
| 8/15/2007 | 10:47:44 PM | Ivan | Mr. Che Gang | Ok, let me check for tickets and I will let you know. What is the name of the hotel in Taian City? |
| 8/15/2007 | 10:48:58 PM | Ivan | Mr. Che Gang | I will email you tonight referring some questions about the last metal stud price list you sent me. |
| 8/15/2007 | 10:49:45 PM | Mr. Che Gang | Ivan | the name is RAMADA |
| 8/15/2007 | 10:49:52 PM | Ivan | Mr. Che Gang | Ok |
| 8/15/2007 | 10:49:57 PM | Ivan | Mr. Che Gang | By the way |
| 8/15/2007 | 10:50:06 PM | Mr. Che Gang | Ivan | bye |
| 8/15/2007 | 10:50:13 PM | Mr. Che Gang | Ivan | sorry |
| 8/15/2007 | 10:50:28 PM | Mr. Che Gang | Ivan | ok |
| 8/15/2007 | 10:50:32 PM | Ivan | Mr. Che Gang | I want you to know that Jorge Arevalo is facing serious legal problems |
| 8/15/2007 | 10:50:55 PM | Mr. Che Gang | Ivan | you can send the size of metal studs you need to me by email |
| 8/15/2007 | 10:51:16 PM | Ivan | Mr. Che Gang | He was taken to jail here in the USA and after that he was deported to Colombia |
| 8/15/2007 | 10:51:32 PM | Ivan | Mr. Che Gang | He cannot come back to live in the United States |
| 8/15/2007 | 10:52:05 PM | Mr. Che Gang | Ivan | oh,that is poor. |
| 8/15/2007 | 10:52:16 PM | Ivan | Mr. Che Gang | Yes; but he deserved it |
| 8/15/2007 | 10:52:36 PM | Ivan | Mr. Che | I want you to know this in case he approaches you again |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |
| | | | Gang | |
| 8/15/2007 | 10:53:00 PM | Ivan | Mr. Che Gang | He does not represent Oriental Trading Company and he cannot represent us |
| 8/15/2007 | 10:53:15 PM | Mr. Che Gang | Ivan | thank you |
| 8/15/2007 | 10:53:43 PM | Mr. Che Gang | Ivan | you have told me before |
| 8/15/2007 | 10:53:46 PM | Ivan | Mr. Che Gang | We are working with a lawyer to see what we can do about him because we do not want his association with our company |
| 8/15/2007 | 10:54:10 PM | Ivan | Mr. Che Gang | Yes; but now it was very serious and he is out of this country for ever |
| 8/15/2007 | 10:54:37 PM | Ivan | Mr. Che Gang | Ok, I will email you with my itinerary as well as the questions about other materials |
| 8/15/2007 | 10:55:00 PM | Mr. Che Gang | Ivan | ok |
| 8/15/2007 | 10:55:06 PM | Ivan | Mr. Che Gang | Thank you for understanding our actual situation because of the USA market |
| 8/15/2007 | 10:55:20 PM | Ivan | Mr. Che Gang | We are looking for a very long commercial relationship |
| 8/15/2007 | 10:55:52 PM | Mr. Che Gang | Ivan | you can success |
| 8/15/2007 | 11:01:36 PM | Ivan | Mr. Che Gang | Thanks. Have a great day! Bye; I am going to sleep now |
| 8/15/2007 | 11:02:00 PM | Mr. Che Gang | Ivan | have a great night |
| 8/15/2007 | 11:02:15 PM | Mr. Che Gang | Ivan | bye sir |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
|  |  |  |  |  |
| 9/3/2007 | 8:25:50 PM | Ivan Goni ma | Mr. Che Gang | Thanks for everything |
| 9/3/2007 | 8:26:09 PM | Mr. Che Gang | Ivan Goni ma | morning sir |
| 9/3/2007 | 8:26:13 PM | Ivan Goni ma | Mr. Che Gang | Please, give me Mr. Peng e-mail address |
| 9/3/2007 | 8:26:20 PM | Mr. Che Gang | Ivan Goni ma | ok |
| 9/3/2007 | 8:26:31 PM | Mr. Che Gang | Ivan Goni ma | i will ask him |
| 9/3/2007 | 8:27:25 PM | Ivan Goni ma | Mr. Che Gang | Don't you know it? Or you have to ask him if you can give it to me? |
| 9/3/2007 | 8:28:21 PM | Mr. Che Gang | Ivan Goni ma | yes ,because we are in one office. |
| 9/3/2007 | 8:28:47 PM | Ivan Goni ma | Mr. Che Gang | What? I do not understand |
| 9/3/2007 | 8:30:58 PM | Mr. Che Gang | Ivan Goni ma | ok, I will send it to you |
| 9/3/2007 | 8:31:16 PM | Ivan Goni ma | Mr. Che Gang | Anyways, I will be waiting for his email so I can write to him. Thank you |
| 9/3/2007 | 8:32:00 PM | Mr. Che Gang | Ivan Goni ma | what will you write? |
| 9/3/2007 | 8:32:17 PM | Ivan Goni ma | Mr. Che Gang | Why? |
| 9/3/2007 | 8:32:28 PM | Ivan Goni ma | Mr. Che Gang | I do not understand your question! |
| 9/3/2007 | 8:33:02 PM | Ivan Goni ma | Mr. Che Gang | I just want to have his email; that is all. I do not see why you think it is something wrong with it |
| 9/3/2007 | 8:33:23 PM | Ivan Goni ma | Mr. Che Gang | I told you when I was there that I wanted to thank him; that was all |
| 9/3/2007 | 8:35:20 PM | Mr. Che Gang | Ivan Goni ma | ok , no problem. but he is outside office. I wait for him to come back. |
| 9/3/2007 | 8:35:35 PM | Ivan Goni ma | Mr. Che Gang | ok |
| 9/3/2007 | 8:35:39 PM | Ivan Goni | Mr. Che | thanks |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| | | | | |
| | | ma | Gang | |
| 9/3/2007 | 8:35:51 PM | Mr. Che Gang | Ivan Goni ma | you are welcome. |
| 9/3/2007 | 8:36:07 PM | Mr. Che Gang | Ivan Goni ma | have a great night. |
| 9/3/2007 | 8:36:13 PM | Mr. Che Gang | Ivan Goni ma | bye sir. |
| 9/3/2007 | 8:36:24 PM | Ivan Goni ma | Mr. Che Gang | No, I a great day; I am in Shanghai now. |
| 9/3/2007 | 8:36:37 PM | Mr. Che Gang | Ivan Goni ma | oh , |
| 9/3/2007 | 8:36:40 PM | Ivan Goni ma | Mr. Che Gang | I will be going to the USA next Thursday |
| 9/3/2007 | 8:36:51 PM | Mr. Che Gang | Ivan Goni ma | i think you in U.S,A |
| 9/3/2007 | 8:36:56 PM | Ivan Goni ma | Mr. Che Gang | No, not yet |
| 9/3/2007 | 8:37:01 PM | Ivan Goni ma | Mr. Che Gang | It is a long trip |
| 9/3/2007 | 8:37:20 PM | Mr. Che Gang | Ivan Goni ma | y e s |
| 9/3/2007 | 8:37:27 PM | Ivan Goni ma | Mr. Che Gang | I am going from here to Tokyo, to Dallas and then to Orlando |
| 9/3/2007 | 8:37:35 PM | Ivan Goni ma | Mr. Che Gang | More than 30 hours flying |
| 9/3/2007 | 8:38:21 PM | Mr. Che Gang | Ivan Goni ma | I t  i s  t o o  h a r d . |
| 9/3/2007 | 8:39:43 PM | Ivan Goni ma | Mr. Che Gang | Y e s; I t is! I am glad you understand how difficult and expensive it is for us to come to visit you. Because of that we always want to get the more we can out of our meetings with you. |
| 9/3/2007 | 8:41:51 PM | Ivan Goni ma | Mr. Che Gang | Have a great day sir |
| 9/3/2007 | 8:42:38 PM | Mr. Che Gang | Ivan Goni ma | you too. |
| 9/4/2007 | 7:09:50 AM | Ivan Goni ma | Mr. Che Gang | Hi sir |

| Date | Time | From | To | Message |
|------|------|------|----|---------|
|      |      |      |    |         |
| 9/4/2007 | 7:10:02 AM | Ivan Gonima | Mr. Che Gang | Still waiting for Mr. Peng email |
| 10/11/2007 | 9:29:36 PM | Ivan Gonima | Mr. Che Gang | Hi sir |
| 10/11/2007 | 9:29:42 PM | Ivan Gonima | Mr. Che Gang | how are you? |
| 10/11/2007 | 9:33:10 PM | Mr. Che Gang | Ivan Gonima | I am fine ,thank you ,and you? |
| 10/11/2007 | 9:33:26 PM | Ivan Gonima | Mr. Che Gang | Fine too |
| 10/11/2007 | 9:33:48 PM | Ivan Gonima | Mr. Che Gang | I never heard back from you after I left China Sep 6 |
| 10/11/2007 | 9:34:00 PM | Ivan Gonima | Mr. Che Gang | I have emailed you but no answer at all |
| 10/11/2007 | 9:34:29 PM | Mr. Che Gang | Ivan Gonima | I did not receive your email. |
| 10/11/2007 | 9:34:54 PM | Ivan Gonima | Mr. Che Gang | Long time ago, I have emailed you twice |
| 10/11/2007 | 9:35:26 PM | Ivan Gonima | Mr. Che Gang | I have not received any of the information you were supposed to email me |
| 10/11/2007 | 9:39:48 PM | Ivan Gonima | Mr. Che Gang | Technical specs you were going to translate. Remember? |
| 10/11/2007 | 9:43:46 PM | Mr. Che Gang | Ivan Gonima | I am sorry, I have not received the email you sent .and the price of metal studs is high yet,so I did not send the email to you . |
| 10/11/2007 | 9:44:36 PM | Mr. Che Gang | Ivan Gonima | I am sorry ,I forgeted it,I will do . |
| 10/11/2007 | 9:49:36 PM | Mr. Che Gang | Ivan Gonima | when the price of metal studs go down,I will inform you. |
| 10/11/2007 | 9:50:08 PM | Ivan Gonima | Mr. Che Gang | OK, I NEED TECHICAL SPECS AS SOON AS POSSIBLE |
| 10/11/2007 | 9:50:21 PM | Ivan Gonima | Mr. Che Gang | OCEAN FREIGHT DOWN? |
| 10/11/2007 | 9:50:47 PM | Mr. Che Gang | Ivan Gonima | ok ,I will do it. |
| 10/11/2007 | 9:51:21 PM | Ivan Goni | Mr. Che | Drywall in USA keeps going down |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
|      |      |      |     |         |

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
|      |      | ma   | Gang |        |
| 10/11/2007 | 9:52:21 PM | Mr. Che Gang | Ivan Gonima | taht is a bad news |



## U.S. DUN Distributors

## ORIENTAL TRADING COMPANY, LLC

November 26, 2008

**Taian Taishan Plasterboard Co., LTD**
Attention: Mr. Bill Cher
Dawenkou Daiyue District Tai'an, China

**Re: USD 100,000.00 Reimbursement**

Dear Mr. Bill Cher:

According to the information sent by Denise Romano (owner of Oriental Trading Company), please we are formally requesting from you a full reimbursement of the ONE HUNDRED THOUSAND DOLLARS (USD$100,000.oo) we transferred several months ago (May 30th 2007) without using it yet. Please proceed to transfer us those funds back as soon as possible.

Here is the information you need for such a transfer:

Bank: Wachovia Bank
City: Miami, Florida, United States of America
Account Name: Oriental Trading Company, LLC
Account Number: 2000032162846
Routing (ABA): 067006432

Please inform me as soon as you execute this transaction. Please find attached the copy of the funds transfer and the copies of the e-mails between Taian Taishan and Oriental Trading Company about reimbursement process.

Best regards,

Leonardo Guzman
Office Manager OTC

C.C. Denise Romano – OTC President

State of Florida, County of Orange
The foregoing instrument was acknowledged before me this 1 day of December, 2008, by Leonardo Guzman.

(signature of Notary) SANDRA P. VASQUEZ Vasquez (name of Notary)

SANDRA P. VASQUEZ
Notary Public - State of Florida
My Comm. Expires Jun 20, 2010
Commission # DD 566206

Personally known. ✓

2 Alhambra Plaza, Suite 801, Coral Gables, FL 33134 / Ph. (407) 227-6067 - (786) 255-6688

C4e
EXHIBIT NO. 6
1-11-12
L. GOLKOW

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0021501

# U.S. DUN Distributors

## ORIENTAL TRADING COMPANY, LLC

Dear Mr. Guzman,

   I am glad to receive your information, I have informed you that I will send back your money, but I need your information to do docments for our goverment, you have send it to me today.I will make two contracts to you,please sign on them and send back to me.

   please confirm the following information (Bank: Wachovia Bank

City: Miami, Florida, United States of America

Account Name: Oriental Trading Company, LLC

Account Number: 2000032162846

Routing (ABA): 067006432)

is the same as the company and bank information you paid to us.Since our bank requires that the returned bank account and company must be the same as the paying bank account and company.

   thanks and best wishes!
   yours faithfully

车刚
Bill Cher
13561759284
E-mail:SDTH818@163.com
MSN:wuyu374@hotmail.com

Dear Mr. Bill Cher

Thank you very much for your prompt answer.

Yes Mr. Bill Cher, the information that I sent to you yesterday is the company information and the account used for sent the transfer USD 100,000.00 to your company in May 30 - 2007.

Thank you for all your help in this process. As soon as I receive the contracts, we will sign and send back to you.

Bank: Wachovia Bank, N.A.
City: Miami, Florida, United States of America
Account Name: Oriental Trading Company, LLC
Company Address: 2 Alhambra Plaza, Suite 801, Coral Gables, Florida, 33134 (USA)
Account Number: 2000032162846
Routing (ABA): 067006432

2 Alhambra Plaza, Suite 801, Coral Gables, FL 33134 / Ph. (407) 227-6067 - (786) 255-6688



CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0021502



# U.S. DUN Distributors

## ORIENTAL TRADING COMPANY, LLC

Best regards,

Leonardo Guzman

Dear Mr. Guzman,
   Thanks for your reply promptly, our bank tell me I can sent the amount through our personal account. The soonest and easiest way is sending through the West Union Service. Please let us know whether it is acceptable at your end.
        Thanks and best wishes!

4刘
Bill  Cher
13561759284
E-mail:SDTH818@163.com
MSN:wuyu374@hotmail.com

Dear Mr. Bill Cher,

Yes, the West Union Service way is perfect for our company, thank you.

I have one question sir:  Is the money transfer direct to the Wachovia Account for the West Union way or do you send me some information for pick up the transfer in the West Union Offices?

Please, in the contact names for the transfer: Denise Romano and / or Leonardo Guzman  , Company: Oriental Trading Company, LLC

Thank you very much and I wait your confirmation,

Best regards,

Leonardo Guzman
Office Manager OTC.

Dear Mr. Guzman,

   Thanks for your promptly reply, I have asked our bank, and they said that we must send the amount through our personal account to your personal account, so please give me you and Mr. Denise's personal account, and send your and Denise's office number and Mobile number to us, so that I will make the contract which our company and you

2 Alhambra Plaza, Suite 801, Coral Gables, FL 33134 / Ph. (407) 227-6067  - (786) 255-6688



CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0021503



# U.S. DUN Distributors

## ORIENTAL TRADING COMPANY, LLC

company all agree through personal account to pay money. Then I will return the amount to you as soon as possible.

Look forward your reply.

Yours faithfully

Bill Cher
13561759284
E-mail:SDTH818@163.com
MSN:wuyu374@hotmail.com

Dear Mr. Bill Cher

Thank you for your prompt answer. We agree that your company send us the money to the Denise Romano personal's account.

The following is the information of Denise Romano account:

| | |
|---|---|
| Account Name: | DENISE ROMANO |
| Bank: | BANK OF AMERICA |
| City: | Miami, Florida (United States of America) |
| Routing (ABA): | 063000047 |
| Account: | 004281025920 |

Denise Romano Mobile Number:  (786) 255-6688
Office Number:            (407) 227-6067

Thank you Mr. Bill Cher for all your help, please send us the contract and we will return to you as soon as possible.

Best regards,

Leonardo Guzman
Office Manager
Oriental Trading Company, LLC

Dear Mr. Bill Cher

The last week, I sent you the Denise Romano's personal account information. Please, I really appreciate send us the contract where your company and our company all agree to pay the money through a personal account. We will return the contract signed as soon as possible.

2 Alhambra Plaza, Suite 801, Coral Gables, FL 33134 / Ph. (407) 227-6067 - (786) 255-6688



CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0021504



# U.S. DUN Distributors

## ORIENTAL TRADING COMPANY, LLC

After signed the contract, when we have deposited the money in the Denise's account?

Thank you very much Mr. Bill Cher and I wait for your answer.

Sincerely,

Leonardo Guzman
Office Manager OTC

Dear Mr. Guzman,

   I am sorry for so long time no replying,because we have a holiday from 29th september to 5th october, I have explained this thing to our boss, but he did not agree return the payment by privite account. My boss are visiting our customers these days, I am waiting for application for you again when he come back. please wait for our message.

   In order to prompt it,please send us the formal paper, which shows the process of this issue,under your letter head,also please sign and stamp it.and please sean it and send it to us by email.

   thanks and best wishes!
   yours faithfully

存刚
Bill Cher
13561759284
E-mail:SDTH818@163.com
MSN:wuyu374@hotmail.com

2 Alhambra Plaza, Suite 801, Coral Gables, FL 33134 / Ph.(407) 227-6067 - (786) 255-6688



CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0021505