

Transcript of the Testimony of:  **Tinghuan Fu**

01/10/2012

Chinese Drywall

```
 1           UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
 2

     _____
 3                            §  MDL NO. 2047
     IN RE:                   §
 4   CHINESE-                 §  SECTION: L
     MANUFACTURED             §
 5   DRYWALL PRODUCTS         §  JUDGE FALLON
     LIABILITY                §
 6   LITIGATION               §  MAGISTRATE
     _____     §  JUDGE WILKINSON
 7

                  -  -  -
 8

      CROSS NOTICED IN VARIOUS OTHER ACTIONS
 9
                  -  -  -
10

                January 10, 2012
11
                  -  -  -
12

      CONFIDENTIAL - SUBJECT TO FURTHER
13          CONFIDENTIALITY REVIEW
14                -  -  -
15         Videotaped deposition of
     TINGHUAN FU, held at the Executive
16   Centre, Level 3, Three Pacific Place, One
     Queen's Road East, Hong Kong, China,
17   commencing at 1:30 p.m., on the above
     date, before Linda L. Golkow, Certified
18   Court Reporter, Registered Diplomate
     Reporter, Certified Realtime Reporter and
19   Notary Public.
                  -  -  -
20
21
22
            GOLKOW TECHNOLOGIES, INC.
23     877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
24
```

```
 1    BEFORE:
 2            HONORABLE ELDON E. FALLON
              UNITED STATES FEDERAL COURT -
 3            EASTERN DISTRICT OF LOUISIANA
 4
      APPEARANCES:
 5
 6        GAINSBURGH, BENJAMIN, DAVID, MEUNIER
          & WARSHAUER, L.L.C.
 7        BY:  GERALD E. MEUNIER, ESQUIRE
          2800 Energy Centre
 8        1100 Poydras Street
          New Orleans, Louisiana 70163
 9        (504) 522-2304
          gmeunier@gainsben.com
10        Representing the Plaintiffs'
          Steering Committee
11
12        HERMAN HERMAN KATZ & COTLAR, LLP
          BY:  LEONARD A. DAVIS, ESQUIRE
13        820 O'Keefe Avenue
          New Orleans, Louisiana 70113
14        (504) 581-4892
          Ldavis@hhkc.com
15        Representing the Plaintiffs'
          Steering Committee
16
17        COLSON HICKS EIDSON
          BY:  ERVIN GONZALEZ, ESQUIRE
18        BY:  PATRICK S. MONTOYA, ESQUIRE
          255 Alhambra Circle
19        Penthouse
          Coral Gables, Florida 33134
20        (305) 476-7400
          Ervin@colson.com
21        Patrick@colson.com
          Representing Plaintiffs' Steering
22        Committee in the Federal and State
          Coordinated Actions
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (CONTINUED):
 2
         LEVIN, FISHBEIN, SEDRAN & BERMAN
 3       BY:  ARNOLD LEVIN, ESQUIRE
         510 Walnut Street - Suite 500
 4       Philadelphia, Pennsylvania 19106
         (215) 592-1500
 5       Alevin@lfsblaw.com
         Representing the Plaintiffs'
 6       Steering Committee
 7
         SEEGER WEISS LLP
 8       BY:  SCOTT A. GEORGE, ESQUIRE
         One William Street
 9       New York, New York 10004
         (212) 584-0700
10       Sgeorge@seegerweiss.com
         Representing the Plaintiffs'
11       Steering Committee
12
         HOGAN LOVELLS US LLP
13       BY:  FRANK T. SPANO, ESQUIRE
         875 Third Avenue
14       New York, New York 10022
         (212) 918-3000
15       Frank.spano@hoganlovells.com
         Representing Taishan Gypsum Co.
16       Ltd. and Taian Taishan
         Plasterboard Company Ltd. and the
17       Witness, Tinghuan Fu
18
         HOGAN LOVELLS INTERNATIONAL LLP
19       BY:  EUGENE CHEN, ESQUIRE
         18th Floor, Park Place
20       1601 Nanjing Road West
         Shanghai, China 200040
21       (86 21) 6122 3800
         eugene.chen@hoganlovells.com
22       Representing Taishan Gypsum Co.
         Ltd. and Taian Taishan Plasterboard
23       Company Ltd. and the Witness,
         Tinghuan Fu
24
```

```
 1    APPEARANCES (CONTINUED):
 2
      GREENBERG TRAURIG, LLP
 3    BY:  HILARIE BASS, ESQUIRE
      1221 Brickell Avenue
 4    Miami, Florida 33131
      (305) 579-0745
 5    bassh@gtlaw.com
      Representing the Home Builders
 6    Steering Committee
 7
      PERKINS COIE LLP
 8    BY:  DAVID L. BLACK, ESQUIRE
      1899 Wynkoop Street
 9    Suite 700
      Denver, Colorado 80202
10    (303) 291-2300
      DBlack@perkinscoie.com
11    Representing the State of Louisiana
12
      THOMPSON COE COUSINS & IRONS, L.L.P.
13    BY:  KEVIN F. RISLEY, ESQUIRE
      One Riverway
14    Suite 1600
      Houston, Texas 77056
15    (713) 403-8210
      krisley@thompsoncoe.com
16    Representing The North River
      Insurance Company
17
18    BRENNER, EVANS & MILLMAN, P.C.
      BY:  THEODORE I. BRENNER, ESQUIRE
19    411 East Franklin Street
      Suite 200
20    Richmond, Virginia 23218
      Tbrenner@beylaw.com
21    (804) 644-1300
      Representing Tobin Trading Company
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (CONTINUED):

 2

 3        McKENRY, DANCIGERS, DAWSON & LAKE, P.C.
          BY:  J. BRIAN SLAUGHTER, ESQUIRE
 4        192 Ballard Court
          Suite 400
 5        Virginia Beach, Virginia 23462
          (757) 461-2500
 6        Jbslaughter@va-law.org
          Representing Atlantic Homes LLC and
 7        Multiple Other Virginia-Based
          Defendants
 8

 9        QUINN EMANUEL URQUHART & SULLIVAN,LLP
          BY:  JANE M. BYRNE, ESQUIRE
10        BY:  JULIA BESKIN, ESQUIRE
          51 Madison Avenue
11        22nd Floor
          New York, New York 10010
12        (212) 849-7000
          Janeburne@quinnemanuel.com
13        Juliabeskin@Quinnemanuel.Com
          Representing Chartis Select Insurance
14        Company and Related Chartis Insurers

15

16        WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
          BY:  MICHAEL SEXTON, ESQUIRE
17        3344 Peachtree Road, NE
          Suite 2400
18        Atlanta, Georgia 30326
          (404) 876-2700
19        msexton@wwhgd.com
          Representing Various Banner
20        Defendants

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (CONTINUED):

 2
           SINNOTT, NUCKOLS & LOGAN, PC
 3         BY:  KENNETH F. HARDT, ESQUIRE
           13811 Village Mill Drive
 4         Midlothian, Virginia 23114
           (804) 378-7600
 5         khardt@snllaw.com
           Representing Venture Supply, Inc. and
 6         Porter-Blaine Corp.

 7
      ALSO PRESENT:

 8
           SUNNY WANG, INTERPRETER

 9

10

11                    -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1    APPEARANCES VIA TELEPHONE:
 2
 3        GALLOWAY JOHNSON TOMPKINS BURR and SMITH
          BY:  CARLINA C. EISELEN, ESQUIRE
 4        One Shell Square
          701 Poydras Street, 40th Floor
 5        New Orleans, Louisiana 70139
          (504) 525-6802
 6        ceiselen@gjtbs.com
          Representing Interior/Exterior
 7        Building Supply
 8
          HUNTON & WILLIAMS LLP
 9        BY:  A. TODD BROWN, ESQUIRE
          Bank of America Plaza
10        101 South Tryon Street
          Suite 3500
11        Charlotte, North Carolina  28280
          (704) 378-4700
12        Representing Stock Building Supply, LLC
13
14        JONES, WALKER, WAECHTER, POITEVENT,
          CARRERE & DENEGRE LLP
15        BY:  MEGAN E. DONOHUE, ESQUIRE
          600 Jefferson Street, Suite 1600
16        Lafayette, Louisiana 70501
          (337) 262-9062
17        mdonohue@joneswalker.com
          Representing Fireman's Fund Insurance
18        Company
19
          FULMER LEROY ALBEE BAUMANN
20        BY:  MICHAEL P. McCAHILL, ESQUIRE
          2866 East Oakland Park Boulevard
21        Ft. Lauderdale, Florida 33306
          (954) 707-4430
22        mmccahill@fulmerleroy.com
          Representing Independent Builders
23        Supply Association (IBSA)
24
```

```
 1    APPEARANCES VIA TELEPHONE (CONTINUED):

 2

 3         WRIGHT, FULFORD, MOORHEAD & BROWN, P.A.
           BY:  DORYK B. GRAF, JR., ESQUIRE
 4         145 N. Magnolia Ave.
           Orlando, Florida 32801
 5         (407) 425-0234
           dgraf@wfmblaw.com
 6         Representing West Construction, Inc.

 7

 8         QUINN EMANUEL URQUHART & SULLIVAN, LLP
           BY: CLINTON DOCKERY, ESQUIRE
 9         51 Madison Avenue, 22nd Floor
           New York, New York 10010
10         (212) 849-7000
           clintondockery@quinnemanuel.com
11         Representing Chartis Select Insurance
           Company and Related Chartis Insurers

12

13         RUMBERGER, KIRK & CALDWELL, P.A.
           BY:  MONICA C. SEGURA, ESQUIRE
14         Brickell Bayview Centre, Suite 3000
           80 Southwest 8th Street
15         Miami, Florida 33130
           (305) 358-5577
16         Representing several defendants and
           Defendants' Liaison Counsel for
17         Installers
18         BUCHANAN INGERSOLL & ROONEY
           BY:  C. ROBERT ZAPPALA, ESQUIRE
19         One Oxford Centre
           301 Grant Street, 20th Floor
20         Pittsburgh, Pennsylvania 15219
           (412) 392-2135
21         bobby.zappala@bipc.com
           Representing 84 Lumber

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA TELEPHONE (CONTINUED):

 2

 3        WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
          BY:  P. SHANE O'NEILL, ESQUIRE
 4        3344 Peachtree Road, NE
          Suite 2400
 5        Atlanta, Georgia 30326
          (404) 876-2700
 6        soneill@wwhgd.com
          Representing Various Banner
 7        Defendants

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1    APPEARANCES VIA STREAM:
 2
      BECNEL LAW FIRM, L.L.C.
 3    BY:  ROBERT BECNEL, ESQUIRE
      106 W. 7th Street
 4    Reserve, Louisiana 70084
      (985) 536-1186
 5    robbecnel@aol.com
      Representing the Plaintiffs'
 6    Steering Committee
 7
      PARKER WAICHMAN ALONSO LLP
 8    BY:  JORDAN L. CHAIKIN, ESQUIRE
      3301 Bonita Beach Road
 9    Bonita Springs, Florida 34134
      (239) 390-1000
10    Jchaikin@yourlaywer.com
      Representing Plaintiffs' Steering
11    Committee
12
      MORGAN & MORGAN
13    BY:  PETE V. ALBANIS, ESQUIRE
      12800 University Drive
14    Suite 600
      Fort Myers, Florida 33907
15    (877) 667-4265
      Representing the Plaintiffs
16
17    IRPINO LAW FIRM
      BY:  ANTHONY IRPINO, ESQUIRE
18    2216 Magazine Street
      New Orleans, Louisiana 70130
19    Airpino@irpinolaw.com
      (504) 525-1500
20    Representing the Plaintiffs
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3        GALLOWAY JOHNSON TOMPKINS BURR and SMITH
          BY:  CARLINA C. EISELEN, ESQUIRE
 4        One Shell Square
          701 Poydras Street, 40th Floor
 5        New Orleans, Louisiana 70139
          (504) 525-6802
 6        ceiselen@gjtbs.com
          Representing Interior/Exterior
 7        Building Supply
 8
          HEARD & MEDACK, P.C.
 9        BY:  JAMES DAVIS, ESQUIRE
          9494 Southwest Freeway, Suite 700
10        Houston, Texas 77074
          (713) 772-6400
11        jdavis@heardmedackpc.com
          Representing CastleRock Communities, L.P.
12
13
          HUNTON & WILLIAMS LLP
14        BY:  A. TODD BROWN, ESQUIRE
          Bank of America Plaza
15        101 South Tryon Street
          Suite 3500
16        Charlotte, North Carolina  28280
          (704) 378-4700
17        tbrown@hunton.com
          Representing Stock Building Supply, LLC
18
19
          SHER GARNER CAHILL RICHTER KLEIN &
20        HILBERT, L.L.C.
          BY:  MATTHEW C. CLARK, ESQUIRE
21        909 Poydras Street
          Suite 2800
22        New Orleans, Louisiana 70112
          (504) 299-2100
23        mclark@shergarner.com
          Representing the Southern Home
24        Defendants
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):

 2

 3      QUINN EMANUEL URQUHART & SULLIVAN, LLP
        BY: CLINTON DOCKERY, ESQUIRE
 4      51 Madison Avenue, 22nd Floor
        New York, New York 10010
 5      (212) 849-7000
        clintondockery@quinnemanuel.com
 6      Representing Chartis Select Insurance
        Company and Related Chartis Insurers
 7

 8      JONES, WALKER, WAECHTER, POITEVENT,
        CARRERE & DENEGRE LLP
 9      BY:  MEGAN E. DONOHUE, ESQUIRE
        600 Jefferson Street, Suite 1600
10      Lafayette, Louisiana 70501
        (337) 262-9062
11      mdonohue@joneswalker.com
        Representing Fireman's Fund Insurance
12      Company

13
        DEUTSCH, KERRIGAN & STILES
14      BY:  MELISSA M. SWABACKER, ESQUIRE
        755 Magazine St.
15      New Orleans, Louisiana  70130
        (504) 581-5141
16      mswabacker@dkslaw.com
        Representing Landmark American
17      Insurance Company

18

19      WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
        BY:  SHUBHRA MASHELKAR, ESQUIRE
20      3344 Peachtree Road, NE
        Suite 2400
21      Atlanta, Georgia 30326
        (404) 876-2700
22      Smashelkar@wwhgd.com
        Representing Various Banner
23      Defendants

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -
 2                  I N D E X
     WITNESS                         PAGE NO.
 3
     TINGHUAN FU
 4
            By Mr. Spano                22
 5          By Mr. Meunier              37
            By Mr. Gonzalez            111
 6          By Mr. Spano               124
 7
 8                    -  -  -
                  E X H I B I T S
 9
       NO.          DESCRIPTION     PAGE NO.
10
     Fu-1          Information on the  59
11                 Members to the
                   Board of Directors,
12                 Members to the
                   Board of
13                 Supervisors and
                   Managers of
14                 Shandong Taihe
                   Dongxin Co., Ltd.,
15                 Bates stamped TG
                   0020710
16
     Fu-1A         Document in          59
17                 Chinese, Bates
                   stamped TG 0020710
18
     Fu-2          Information on       60
19                 Directors,
                   Supervisors and
20                 Managers of
                   Shandong Taihe
21                 Dongxin Co., Ltd.,
                   Bates stamped TG
22                 0020712
23   Fu-2A         Document in          60
                   Chinese, Bates
24                 stamped TG 0020712
```

1

    Fu-3           Contract, Bates     98

2                   stamped TG 0001684

                   and TG 0001685

3

    Fu-4           Contract, Bates     101

4                   stamped TG 00019854

                   through TG 00019857

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -

 2             THE VIDEOTAPE TECHNICIAN:

 3        We are now on the record.  My name

 4        is Dan Lawlor.  I'm a videographer

 5        for Golkow Technologies.

 6             Today's date is January 10,

 7        2012, and the time is 1:30 p.m.

 8             This video deposition is

 9        being held in Hong Kong, China in

10        the matter of Chinese Drywall

11        Litigation for the United States

12        District Court, Eastern District

13        of Louisiana, MDL Number 2047 and

14        cross-noticed in various other

15        actions.

16             The deponent today is Fu,

17        Tinghuan.

18             Will Your Honor and all

19        those present state your presence

20        for the record.

21             THE COURT:  Judge Eldon

22        Fallon, Eastern District of

23        Louisiana.

24             MR. MEUNIER:  Gerry Meunier
```

Confidential - Subject to Further Confidentiality Review

```
 1          appearing for the Plaintiffs'

 2          Steering Committee in the MDL.

 3                MR. DAVIS:  Leonard Davis on

 4          behalf of the Plaintiffs' Steering

 5          committee and Plaintiffs' Liaison

 6          Counsel.

 7                MS. BASS:  Hilarie Bass from

 8          Miami, Florida on behalf of the

 9          Home Builders Steering Committee.

10                MR. GONZALEZ:  Good

11          afternoon.  Ervin Gonzalez on

12          behalf of the PSC and the MDL

13          liaison states.

14                MR. MONTOYA:  Patrick

15          Montoya on behalf of the PSC and

16          the MDL liaison states' counsel.

17                MR. SLAUGHTER:  Brian

18          Slaughter from McKenry, Dancigers,

19          Dawson & Lake.  I'm here

20          representing Atlantic Homes, LLC.

21                MR. BRENNER:  Theodore

22          Brenner.  I represent Tobin

23          Trading in the Germano action.

24                MR. HARDT:  Kenneth Hardt, I
```

```
1          represent Venture Supply in the

2          Germano action and in the

3          Alexander state court action.

4               MS. BYRNE:  Jane Byrne from

5          Quinn Emanuel on behalf of the

6          Chartis insurers.  With me is my

7          colleague, Julia Beskin.

8               MR. SEXTON:  Mike Sexton for

9          certain Banner Supply entities.

10              MR. BLACK:  David Black for

11         the State of Louisiana, with

12         reservations that are pending in

13         our motion to remand.

14              MR. LEVIN:  Arnold Levin,

15         lead counsel, Plaintiffs' Steering

16         Committee.

17              MR. SPANO:  Frank Spano for

18         the defendants, Taishan Gypsum and

19         TTP.

20              MR.CHEN:  Eugene Chen from

21         Hogan Lovells for Taishan Gypsum

22         and TTP.

23              THE VIDEOTAPE TECHNICIAN:

24         The court reporter today is Linda
```

Confidential - Subject to Further Confidentiality Review

```
 1          Golkow.  Your Honor, please
 2          proceed.
 3                    -  -  -
 4              TINGHUAN FU, after having
 5          been duly sworn, was examined and
 6          testified as follows:
 7                    -  -  -
 8              THE WITNESS:  Yes, I do.
 9              THE COURT:  Have a seat,
10          please.
11              You may proceed, Counsel.
12                    -  -  -
13                 EXAMINATION
14                    -  -  -
15   BY MR. SPANO:
16          Q.    Mr. Fu, who is your current
17   employer?
18          A.    Taishan Gypsum Company,
19   Limited.
20          Q.    What position do you hold
21   with Taishan Gypsum?
22          A.    My current position or prior
23   position?  What time period?
24          Q.    What's your job now?
```

Confidential - Subject to Further Confidentiality Review

```
 1            A.    I am the manager of the

 2   sales company.  I'm also the deputy

 3   general manager in charge of sales.

 4            Q.    When did you first start

 5   working for the company?

 6            A.    July 1999.

 7            Q.    What was the name of the

 8   company at that time?

 9            A.    Shandong Taihe Dongxin

10   Company, Limited.

11            Q.    What was your position when

12   you joined the company in July of 1999?

13            A.    When I first joined the

14   company, I was a salesperson.

15            Q.    What did you do as a

16   salesperson?

17            A.    To sell gypsum board all

18   over China.

19            Q.    How long did you work as a

20   salesperson?

21            A.    As a salesperson, I worked

22   for over two years.

23            Q.    Until approximately 2001 you

24   worked as a salesperson?
```

Confidential - Subject to Further Confidentiality Review

1           A.    In the year 2001, I was a

2    deputy director of sales department.

3           Q.    What did you do as deputy

4    director of the sales department

5    beginning in 2001?

6           A.    To assist our director of

7    sales for daily management.

8           Q.    Who was the director of

9    sales in 2001?

10          A.    Mr. Li Ruizhong.

11          Q.    To your knowledge, did the

12   company have any export sales between

13   1999 and 2001?

14          A.    I don't know.  No, not in

15   that period of time.

16          Q.    What was your next position

17   after deputy sales manager?

18          A.    In May 2004, I became the

19   sales manager.  The Li that I mentioned

20   earlier, Director Li, retired.

21          Q.    What were your major

22   responsibilities as sales manager

23   beginning in May 2004?

24          A.    To manage the sales

Confidential - Subject to Further Confidentiality Review

 1   assignment.

 2        Q.    Please explain what you mean

 3   by "sales assignment."

 4        A.    Which is to sell gypsum

 5   boards.

 6        Q.    As sales manager, did you

 7   have anyone that you supervised?

 8        A.    I supervised the

 9   salespeople.

10        Q.    Approximately how many

11   salespeople did Taishan Gypsum have in

12   the 2004/2005 time frame?

13        A.    More than 40, less than 50.

14        Q.    After 2005, between 2006 and

15   2008, did the number of salesmen go up or

16   down significantly?

17        A.    A few people left, about six

18   or seven people left to TTP.

19        Q.    When did that occur?

20        A.    2006.

21        Q.    Do you recall the names of

22   the people who left the TG sales

23   department to join TTP?

24        A.    There was a Peng Wenlong and

Confidential - Subject to Further Confidentiality Review

1    Yang Jiapo, Kong Qingguo, Che Gang.  And

2    also a Hou Jie and a few more which I

3    cannot recall.  I cannot recall their

4    names.

5         Q.    Did you remain as the sales

6    manager of Taishan Gypsum through the end

7    of 2007?

8         A.    I still am until today.

9         Q.    To your knowledge, when did

10   Taishan Gypsum begin getting involved in

11   export sales?

12        A.    Perhaps 2005, the second

13   half of 2005.

14        Q.    What happened in the second

15   half of 2005 in terms of the company

16   getting involved in export sales?

17        A.    What do you mean, what

18   happened?

19        Q.    Describe generally how the

20   company started getting involved in

21   export sales?

22        A.    At the time, some trading

23   companies came to our company and also

24   some foreign customers came to our

Confidential - Subject to Further Confidentiality Review

1    company.

2         Q.    How did the company respond

3    to those events?

4         A.    For these matters, I

5    arranged somebody who was able to speak

6    foreign language, such as Mr. Peng

7    Wenlong, to greet these people.

8         Q.    Did there come a time when

9    you assigned any other employees in TG to

10   get involved in export sales besides Mr.

11   Peng Wenlong?

12        A.    I only arranged Peng Wenlong

13   to be in charge of receiving the other

14   people, but I'm not sure whether he has

15   arranged other people to assist him of

16   doing that.

17        Q.    Did you, yourself, have any

18   contacts with the trading companies or

19   foreign companies that came to TG in

20   connection with export sales?

21        A.    No.  Because I don't

22   understand English, only Peng Wenlong

23   could communicate with them.

24        Q.    Did you supervise Mr. Peng

1    Wenlong's activities in connection with

2    export sales?

3          A.    Yes.  I supervised Peng

4    Wenlong.

5          Q.    What did you do to supervise

6    him?

7          A.    At the time, because we were

8    not very familiar of exporting, so, I

9    told Mr. Peng Wenlong some principles of

10   dealing with the foreign customers and

11   trading companies, being that contracts

12   should be signed in China and the

13   products should be loaded in China.  I

14   have also told him the pricing and the

15   risk that come along with it and also the

16   principle of prepayment.  Because at the

17   time, we were not very familiar with

18   foreign trading, so, I arrange him to get

19   familiar with these principles.

20         Q.    Other than establishing the

21   principles for dealing with export sales,

22   did you do anything else in terms of

23   supervising the export sales activities?

24         A.    For example, the contracts

1    that we sign and the price of the

2    contracts, I will have to have the final

3    saying of that.  And also the

4    specification that required by the

5    customers, whether the products could be

6    manufactured, it was also my

7    responsibility to communicate with the

8    manufacturing department.

9         Q.    Did Peng Wenlong get your

10   approval for each of the export sales

11   that the company entered into?

12        A.    No.

13        Q.    Did he have the authority to

14   enter into contracts involving export

15   sales without your approval?

16        A.    Yes.  For example -- yes.

17        Q.    Was it the practice that he

18   would consult with you regarding the

19   terms of each sale?

20        A.    What is it?  What is it that

21   he needed to consult me with?

22        Q.    I'll withdraw the question.

23             Did Mr. Peng Wenlong consult

24   with you regarding the pricing of sales?

Confidential - Subject to Further Confidentiality Review

```
 1           A.    For the pricing, as long as

 2    the money could arrive and as long as it

 3    has been a pricing that we agreed prior

 4    to that.  Of course, for the first time

 5    he had to consult me, but afterwards, he

 6    didn't have to consult me for pricing.

 7           Q.    Do you recall Mr. Peng

 8    consulting with you regarding any sales

 9    to American customers?

10                 MR. GONZALEZ:  Your Honor,

11                 can we have a date on those, a

12                 time reference on those?

13                 THE COURT:  I'm sorry.

14                 Let's ask time reference so that

15                 we understand what the time frame

16                 is.

17    BY MR. SPANO:

18           Q.    During what period did Mr.

19    Peng Wenlong work in foreign sales for

20    Taishan Gypsum?

21           A.    2005, from the second half

22    of 2005.

23           Q.    Until when?

24           A.    What is it that you said?
```

Confidential - Subject to Further Confidentiality Review

 1    But in February of 2006, he went to TTP.

 2         Q.    During that time period,

 3    approximately the second half of 2005,

 4    until when Mr. Peng went to work for TTP,

 5    did he consult with you regarding any

 6    sales or potential sales to American

 7    customers?

 8              INTERPRETER:  Interpreter

 9         clarification.

10              THE WITNESS:  Not really for

11         the sales, but for the first time,

12         when a contract was entered, I

13         would need to calculate the cost,

14         the thickness of the gypsum board.

15         But for the contracts, afterwards,

16         he did not need to consult me.

17    BY MR. SPANO:

18         Q.    Do you recall Mr. Peng

19    consulting with you regarding a contract

20    for 12.7 millimeter thick drywall in the

21    second half of 2005?

22         A.    I'm aware of that.  He

23    consulted me for the pricing of the

24    specification of 12.7 millimeter

Confidential - Subject to Further Confidentiality Review

1    thickness.

2        Q.    Did he consult with you

3    regarding any other aspect of that sale

4    of 12.7 millimeter drywall?

5        A.    I was not in charge of other

6    aspects of the business as of who did he

7    sell it to.  I was only in charge of the

8    cost to produce gypsum board of this

9    thickness and the pricing of the gypsum

10   board accordingly.

11       Q.    Do you recall learning the

12   name of the customer of the 12.7

13   millimeter drywall?

14       A.    I don't know.

15       Q.    Do you recall whether the

16   customer for the 12.7 millimeter drywall

17   was an American company?

18       A.    No, I don't know.

19       Q.    Do you recall hearing the

20   name of a company called Venture Supply

21   in 2005 or 2006?

22       A.    I don't understand English,

23   so, I don't know what is that at all.

24       Q.    Were you introduced to any

```
 1    customers for 12.7 millimeter drywall in

 2    2005 or 2006?

 3          A.    I was introduced to or did I

 4    introduce to someone else?  What?

 5          Q.    I'll withdraw the question.

 6                Do you recall meeting with

 7    or speaking with any customers or

 8    potential customers for the 12.7

 9    millimeter thick drywall in 2005 or 2006?

10          A.    No.

11          Q.    Have you ever held any

12    positions in TTP?

13          A.    I'm the director of TTP.

14          Q.    Are there other directors of

15    TTP?

16          A.    Yes.

17          Q.    Who are they?

18          A.    There are three directors,

19    the others being Peng Shiliang and Wang

20    Fenqin.

21          Q.    During what time period have

22    you been a director of TTP?

23          A.    Starting from February 2006

24    until after three years according to the
```

```
 1    company rule.  However, there was no

 2    election after three years.  That was the

 3    end of it.  And TTP in the year 2007

 4    stopped its operation, so, there was no

 5    reelection.

 6            Q.    Did T -- withdrawn.

 7                  What were your main

 8    responsibilities when you served on the

 9    board of TTP?

10            A.    To review and discuss the

11    reports of the company, annual reports.

12    To make -- to review the reports.  And

13    sometimes our directors meet for some

14    daily matters as well.

15            Q.    Was there an annual report

16    for TTP for 2006?

17            A.    Yes.

18            Q.    For 2007?

19            A.    Yes.

20            Q.    Did you see both of those

21    annual reports?

22            A.    Yes.

23            Q.    Did those annual reports

24    contain any information regarding export
```

```
 1   sales?

 2          A.     The profit distribution and

 3   performance, all that.  But for the

 4   sales, it would not be reflected in the

 5   report.  How could the sales be reflected

 6   in the report?

 7          Q.     Were TTP sales reflected in

 8   the annual report in any way?

 9          A.     To be reflected in any way?

10          Q.     I'll withdraw the question.

11                 Did the TTP annual reports

12   that you saw show the amount of sales of

13   drywall by TTP?

14          A.     There was -- the volume of

15   sales included square meters that was

16   sold.

17          Q.     Was the volume of sales

18   differentiated in any way between

19   domestic sales and export sales?

20          A.     There was a volume, but

21   which one you are talking about?  I know

22   that there was a total sales volume.

23          Q.     In addition to showing total

24   sales, did the annual reports also show
```

```
 1    the portion of the total sales that was

 2    export sales?

 3          A.    No.

 4          Q.    Did TTP have a sales

 5    manager?

 6          A.    TTP has a responsible

 7    person, who is Peng Wenlong.

 8          Q.    Was Peng Wenlong the person

 9    responsible for sales of TTP?

10          A.    Yes.

11          Q.    Did you supervise Peng

12    Wenlong's sales activities in TTP?

13          A.    I was not in charge.  I was

14    only the director.

15          Q.    As a director, did you play

16    any role in supervising TTP's sales?

17          A.    When we first formed the

18    board of directors, we had elected Peng

19    Shiliang as the chairman of the board of

20    directors.  I was told that whenever

21    there was a need for guidance in the

22    business, I was the one to ask.

23               INTERPRETER:  Interpreter

24          clarification.
```

```
 1                  THE WITNESS:  Basically I
 2          did not give any guidance.
 3   BY MR. SPANO:
 4          Q.    Did Mr. Peng Shiliang give
 5   any guidance to the sales activities of
 6   TTP?
 7          A.    I'm not sure about that.
 8   He's the general manager.
 9          Q.    Did Peng Wenlong consult
10   with you regarding any of the sales
11   transactions of TTP?
12          A.    He did not consult me.
13              MR. SPANO:  Pass the
14          witness.
15              THE COURT:  Are you
16          finished?
17              MR. SPANO:  Yes, sir.
18              THE COURT:  You tender the
19          witness?
20              MR. SPANO:  Yes.
21                   -  -  -
22                 EXAMINATION
23                   -  -  -
24   BY MR. MEUNIER:
```

Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Good afternoon, Mr. Fu.

 2                    You testified that you are

 3   the manager of the sales company and the

 4   deputy general manager in charge of sales

 5   for Taishan Gypsum today, true?

 6              A.    Correct.

 7              Q.    Are those different

 8   positions?

 9              A.    I was the general -- I was

10   the deputy general manager and the

11   director of the sales company.  There's

12   supposed to be a separate director for

13   the sales company, but there was none of

14   that.  So, I also became the manager of

15   the sales company.

16              Q.    What is the name of the

17   sales company?

18              A.    Actually, it's only a

19   department.  It is a department that was

20   in charge of sales for Taishan Gypsum

21   Company.

22              Q.    Who is the general manager

23   in charge of sales?

24                    INTERPRETER:  Interpreter
```

```
 1          clarification.

 2               THE WITNESS:  There was a

 3          general manager Jia, J-I-A, above

 4          me, but I am the deputy general

 5          manager, and my last name is Fu,

 6          which also, coincidently, means

 7          deputy in Chinese.

 8               MR. CHEN:  I'm sorry.  At

 9          least half of his comments weren't

10          translated.

11               THE INTERPRETER:  Can you

12          tell me what was that?

13               MR. CHEN:  I shouldn't, but

14          you might ask him.

15               THE COURT:  Let him restate

16          it.

17               INTERPRETER:  Well, he's

18          further explaining, so before

19          that, do you want to --

20               THE COURT:  No.  No.  You

21          can comment.  Ask him to restate

22          it.

23               THE WITNESS:  I was the

24          deputy general manager in charge
```

Confidential - Subject to Further Confidentiality Review

```
 1          of sales.  I was also the manager

 2          of the sales company.

 3   BY MR. MEUNIER:

 4          Q.    Who was your boss as deputy

 5   general manager in charge of sales?

 6          A.    On top of me was General

 7   Manager Jia, J-I-A.  I report to him.

 8          Q.    Who reports to you as boss

 9   as deputy general manager in charge of

10   sales?

11          A.    Because I'm the manager of

12   sales, the salespeople report to me.

13          Q.    And who is your boss as the

14   manager of the sales department?

15          A.    Who is my boss?  That would

16   be General Manager Jia.

17          Q.    Is that Mr. Jia who gave his

18   deposition earlier today?

19          A.    Yes.

20          Q.    So, as I understand it, in

21   the area of sales, you report at Taishan

22   Gypsum to Mr. Jia as your boss?

23          A.    Correct.

24          Q.    And all of the sales
```

```
 1   personnel at Taishan Gypsum report to you

 2   as their boss, is that true?

 3         A.    Yes.

 4         Q.    And that includes sales

 5   personnel involved in export sales, true?

 6               MR. SPANO:  Objection.

 7               THE COURT:  Do you have an

 8         objection?  Did you object?

 9               MR. SPANO:  Yeah.  I object

10         to --

11               THE COURT:  I overrule the

12         objection.

13               Look, let me tell the

14         witness something.  She has to

15         interpret what you're saying.  So,

16         give her an opportunity to

17         interpret.  Pause in between your

18         paragraphs so she can catch up

19         with you.

20               Do you want to restate the

21         question?

22               MR. MEUNIER:  I didn't get a

23         response.

24   BY MR. MEUNIER:
```

```
 1              Q.    The question is, is it true

 2    that all sales personnel, including those

 3    involved in export sales, report to you

 4    as their boss?

 5              A.    I'm a manager.  Not all the

 6    salespeople report to me.

 7              Q.    Who else do salespeople

 8    report to as their boss other than you?

 9              A.    I have a deputy manager.

10              Q.    Who is that?

11              A.    Xue Shufeng.  X-U,

12    S-H-U-F-E-N-G.  Correction.  X-U-E, last

13    name, instead of X-U.

14              Q.    Does Mr. Xue report to you

15    on the activities of the salespeople who

16    report to him?

17              A.    It's not necessary.

18              Q.    Does Mr. Xue, therefore,

19    have full authority to supervise the

20    sales personnel, including those in

21    export sales?

22              A.    He managed in assistance of

23    me.

24              Q.    You told us that there were
```

```
 1    40 to 50 sales employees at TG before TTP

 2    was formed in 2006; is that correct?

 3          A.    Which year was that?

 4          Q.    Before TTP was formed in

 5    2006 --

 6          A.    Yes.

 7          Q.    -- is it true there were 40

 8    to 50 salespeople working for TG?

 9          A.    Less than 50.

10          Q.    But more than 40?

11          A.    Correct.

12          Q.    How many were involved in

13    export sales?

14          A.    You mean the employee of TG?

15          Q.    Yes.

16          A.    During the time 2005 and

17    2006, it was Peng Wenlong who was

18    assigned to be in charge of that.  Some

19    people who understood foreign language

20    was assigned to greet those people.  But

21    we did not assign in detail who would be

22    responsible for that.

23          Q.    How many others besides Peng

24    Wenlong were assigned to deal with
```

1  foreign customers?

2        A.    Che Gang, Yang Jiapo.  They

3  are also salespeople.

4        Q.    Yang Jiapo also known as

5  Apollo Yang?

6        A.    I don't know he has this

7  name.

8        Q.    Che Gang also known as Frank

9  Clem?

10        A.    I'm not sure.

11        Q.    I'm sorry.  I misspoke.  Che

12  Gang also known as Bill Cher?

13            MR. SPANO:  Objection to

14        form.

15            THE WITNESS:  I don't know.

16  BY MR. MEUNIER:

17        Q.    Do you know why training

18  companies and foreign customers came to

19  your company in the second half of 2005,

20  which you say is when export sale

21  activity began?

22            MR. SPANO:  Objection to

23        form.  I think it came out

24        training, and I think he meant to

```
 1              say trading, but he can clarify.

 2    BY MR. MEUNIER:

 3         Q.    Training companies is what I

 4    heard him say.

 5              THE COURT:  Let him answer

 6              the question.  I'll overrule the

 7              objection.

 8              THE WITNESS:  I also don't

 9              know why they came to our company.

10    BY MR. MEUNIER:

11         Q.    Did the foreign customers

12    who came to your company include the

13    United States?

14         A.    I don't know.  I already

15    responded to you earlier.

16         Q.    Do you know which foreign

17    customers came to your company?

18         A.    I don't know.

19         Q.    When Peng Wenlong, Yang

20    Jiapo and Che Gang left to become

21    employees of TTP in 2006, were they given

22    any principles for dealing with foreign

23    customers?

24         A.    They were in charge of the
```

Confidential - Subject to Further Confidentiality Review

```
 1    detailed operation.  I was not.

 2         Q.    To your knowledge, did any

 3    supervisor give to these three sales

 4    personnel guidance on how to deal with

 5    foreign customers when they became

 6    employees of TTP in 2006?

 7         A.    I don't know.

 8         Q.    Who supervised Peng Wenlong,

 9    Yang Jiapo and Che Gang as sales

10    employees of TTP?

11         A.    TTP's general manager, which

12    I'm not sure about their detailed

13    arrangements.

14         Q.    And TTP's general manager is

15    Peng Shiliang?

16         A.    Peng Shiliang is the general

17    manager.

18         Q.    You told us that one of the

19    principles you gave Peng Wenlong for

20    dealing with export sales was that

21    contracts should be signed in China.  Is

22    that true?

23         A.    Yes, because that was our

24    first time dealing with exporting.  I did
```

```
 1    not quite -- I was not quite familiar

 2    with that.  In order to decrease the

 3    risk, we decided to do that.

 4            Q.    What risk are you referring

 5    to?

 6            A.    To deliver in China, to pay

 7    in China.  We were afraid that we were

 8    not going to get the money.

 9            Q.    Aside from the risk of not

10    getting paid, did you see any other risks

11    in making sales contracts with foreign

12    customers?

13            A.    I don't know.  It was only

14    in the second half year of 2005.  I have

15    not done that before.  That's all I could

16    think of.

17            Q.    Did you give Mr. Peng

18    Wenlong any other instructions about

19    contracts being signed, other than the

20    ones you have mentioned so far today?

21            A.    No.

22            Q.    Did Peng Wenlong have a

23    company seal to use in signing sales

24    contracts with foreign customers?
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. SPANO:  Objection to

 2         form.

 3              THE COURT:  If he knows, he

 4         can answer.  If he doesn't, he

 5         doesn't.

 6              MR. SPANO:  Your Honor, it's

 7         a question of time frame, which

 8         company.

 9              THE COURT:  That's a

10         legitimate objection.  I sustain

11         it.

12              MR. MEUNIER:  Let me break

13         it down.

14    BY MR. MEUNIER:

15         Q.   First I ask you this

16    question for the period from the second

17    half of 2005 to February of 2006 when

18    Peng Wenlong was involved in export sales

19    for TG.  During that period of time, did

20    he have a company seal to use for signing

21    sales contracts with foreign customers?

22         A.   What company seal are you

23    talking about?  I don't understand.

24         Q.   A company seal of either
```

```
 1   Shandong or Taishan Gypsum?

 2        A.    I don't know that.

 3        Q.    Did Peng Wenlong, to your

 4   knowledge, ever have a company seal of

 5   any kind to use for signing contracts?

 6        A.    I don't know.

 7              THE COURT:  Is it a seal or

 8        a stamp?

 9              MR. MEUNIER:  Am I using a

10        word that might be confusing?

11              INTERPRETER:  In Chinese, it

12        is the same translation.

13   BY MR. MEUNIER:

14        Q.    Did any of the sales

15   personnel for Taishan Gypsum have company

16   seals or stamps to use in signing

17   contracts?

18        A.    The stamps are necessary

19   when signing of a contract.

20        Q.    Yes.

21              Did Peng Wenlong have a

22   stamp that he was given by the company,

23   by Taishan Gypsum?

24        A.    I don't know.
```

Confidential - Subject to Further Confidentiality Review

1          Q.    Was there any restriction on

2    who got stamps?

3          A.    I believe there should be

4    somebody who is in charge of the stamps.

5    The stamps cannot be easily accessed by

6    just anyone.

7          Q.    So who is in charge of the

8    stamps, Mr. Fu?

9          A.    It should be somebody in the

10   office.  I'm not sure who exactly that

11   person is.

12         Q.    Are you saying that stamps

13   are kept in a safe or locked so that

14   sales personnel cannot get to them

15   without permission?

16         A.    I don't know about the

17   stamps.  I don't know how -- or them

18   being managed.  I'm not sure about that.

19   I'm not sure about the management of the

20   stamps.

21         Q.    Who, if not you, would know

22   about the management of the stamps for

23   Taishan Gypsum?

24         A.    I don't know the stamps.  I

```
 1    don't know the management of the stamps.

 2    I go out every day for sales.  I don't

 3    know who is responsible for the stamps

 4    and who manages the stamps.

 5         Q.    But is it true that you

 6    assume that a sales personnel who uses a

 7    stamp has permission from the company to

 8    use it?

 9              MR. SPANO:  I object to the

10         form.

11              THE COURT:  Restate that.  I

12         agree.  Restate the question.

13    BY MR. MEUNIER:

14         Q.    If a salesperson employed by

15    Taishan Gypsum has possession of a stamp

16    and uses it, is it true that he got the

17    stamp with permission from the company?

18         A.    If he thinks it is

19    reasonable, he could put a stamp on it.

20    As long as he thinks that, there is no

21    risk, because he has the money, he could

22    stamp it.

23         Q.    And that's true for any

24    salesperson working for Taishan Gypsum?
```

```
 1           A.    I know for the salesperson,

 2    that's the case.  I'm not sure about

 3    other people.

 4           Q.    You told us that one of the

 5    principles you gave Mr. Peng Wenlong for

 6    export sales contracts was that the

 7    products should be loaded in China.  Is

 8    that true?

 9           A.    Yes.

10           Q.    Was it okay if Taishan

11    Gypsum arranged for the freight costs of

12    shipping the product to a foreign country

13    after loading?

14                 MR. SPANO:  I object to the

15           form.

16                 THE COURT:  I'm sorry.

17           Object to the form.

18                 MR. SPANO:  On vagueness.

19                 THE COURT:  If you can put

20           some time in there.

21    BY MR. MEUNIER:

22           Q.    When you communicated to Mr.

23    Peng Wenlong that product should be

24    loaded in China for export sales
```

1    agreements that he made, did you tell him

2    that Taishan Gypsum could not pay for

3    freight costs in shipping the product

4    after it was loaded to a foreign country?

5         A.    I'm not sure about that

6    part.  I only know according to the

7    principle that we had been following for

8    local transactions, the manufacturer

9    would produce, and the products would be

10   verified and loaded in China.  I'm not

11   sure about the trading part.

12        Q.    You told us that Peng

13   Wenlong did not get authority from the

14   company on all of the export sales

15   agreements he signed.  Is that true?

16        A.    I only said that as long as

17   the price is reasonable and as long as he

18   could get back the payment, he could go

19   ahead with it.

20        Q.    Do you know of any sales

21   agreements with foreign customers made by

22   Peng Wenlong which were made without the

23   authority of your company?

24        A.    I don't know.

Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Do you know of any sales
 2    agreements made by Che Gang with foreign
 3    customers that were made without the
 4    authorization of your company?
 5            A.    I don't know.
 6            Q.    You referred to a contract
 7    sale -- I'm sorry -- a sales contract in
 8    2005 or 6 dealing with 12.7 millimeter
 9    thickness of drywall.  Do you remember
10    that?
11            A.    I did mention the thickness
12    of the gypsum board, and I did say that I
13    calculated for the cost and the price of
14    that.
15            Q.    Are you saying, Mr. Fu, that
16    that sales contract was not authorized by
17    your company?
18            A.    I only have the guidance
19    that as long as the price is reasonable
20    and the money can be received, they could
21    go ahead with it.  That's all I said.
22            Q.    So the record is clear, I
23    want to be sure I understand your
24    testimony.
```

Confidential - Subject to Further Confidentiality Review

1              You know of no sales

2    contract entered into with a foreign

3    customer by Taishan Gypsum sales

4    personnel that was unauthorized by the

5    company; is that correct?

6              A.    Authorization?  What is the

7    definition of authorization?

8    Authorization is -- let me tell you that

9    we authorize all the salespeople as a way

10   of doing business in China to do

11   business.  That's authorization.

12             Q.    So, your company, to your

13   knowledge, has approved all export sales

14   agreements with foreign customers that

15   have been made by your sales personnel to

16   this date; is that true?

17             A.    You have to specify what

18   kind of agreement are you talking about.

19   For the agreements which we have already

20   received a payment, that would be a valid

21   agreement, not including the oral

22   agreement.

23             Q.    Have you or anyone, to your

24   knowledge, on behalf of Taishan Gypsum

Confidential - Subject to Further Confidentiality Review

1    ever advised a foreign customer that a

2    salesperson did not have authority to

3    enter into a sales agreement for drywall?

4          A.    Can you repeat your

5    question?

6                THE COURT:  Why don't you

7          read it again.

8                THE WITNESS:  I have never

9          met a foreign customer.  How could

10         I even tell them all the above?

11   BY MR. MEUNIER:

12         Q.    Thank you.

13               And to your knowledge, sir,

14   no one else on behalf of Taishan Gypsum

15   has given that advice to a foreign

16   customer?  Is that true?

17         A.    I don't know.

18         Q.    During the time TTP operated

19   between February 2006 and 2007, was the

20   nature of its drywall business different

21   from the nature of the business of

22   Taishan Gypsum?

23         A.    The product, gypsum boards,

24   are all the same.

Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Were the sales and marketing

 2    activities of TTP the same as the sales

 3    and marketing activities of TG?

 4            A.    I don't know that of TTP.  I

 5    only know TG.  I'm not in charge of that.

 6            Q.    You were a director at TTP,

 7    were you not?

 8            A.    I'm the director, but I was

 9    not in charge of the sales.

10            Q.    Do you know of any

11    differences in the sales practices of TTP

12    and TG?

13            A.    I don't know if there is any

14    differences.

15            Q.    Do you know of any

16    differences in the marketing practices of

17    TTP and TG?

18            A.    I don't know if there is any

19    differences.  I have never compared them.

20            Q.    You told us that the 2006

21    and 2007 annual reports of TTP gave the

22    total volume of drywall sales in square

23    meters.  Is that true?

24            A.    Correct.
```

Confidential - Subject to Further Confidentiality Review

```
 1            Q.    To know the total volume of

 2   those sales, the company needed to know

 3   the total volume of export sales; is that

 4   true?

 5            A.    There was specific people

 6   who are in charge of drafting the annual

 7   report.  I was only in charge of

 8   reviewing it.

 9            Q.    Who would know the total

10   volume of export sales for TTP for 2006

11   and 2007?

12            A.    I don't know that.  I only

13   know in the year 2006, it was 26 million.

14   And in 2007, it was 40 million.  I do not

15   know the detailed categories.

16                 THE COURT:  Okay.  We have

17            to change the tape at this time.

18            We'll take a break for 15 minutes.

19                 THE VIDEOTAPE TECHNICIAN:

20            Off the record.  The time is 2:51,

21            end of Tape Number 2.

22                     -  -  -

23                 (Whereupon, a recess was

24            taken from 2:51 p.m. until 3:08
```

```
 1          p.m.)

 2                    -  -  -

 3               THE COURT:  Sir, you are

 4          still under oath.

 5               THE VIDEOTAPE TECHNICIAN:

 6          We're going back on the video

 7          record.  The time is 3:08.

 8               THE COURT:  You may proceed,

 9          Counsel.

10     BY MR. MEUNIER:

11          Q.    Mr. Fu, during the period of

12     your entire employment by Shandong and

13     Taishan Gypsum, and during the period of

14     time as a director of TTP, do you know of

15     any written policy of any of those

16     companies that specifically dealt with

17     contracts for the foreign sale of

18     drywall?

19          A.    Never.

20          Q.    Were sales personnel at

21     Shandong and Taishan Gypsum and then also

22     at TTP assigned e-mails for the purpose

23     of doing business?

24               MR. SPANO:  Object to the
```

```
1           form.  The name Shandong is a
2           place.
3                   MR. MEUNIER:  Shandong Taihe
4           Dongxin.
5                   THE COURT:  That's the full
6           name, or is it just the place of
7           the location?
8                   MR. CHEN:  That's what we've
9           agreed as the shortened form of
10          the company name as opposed to
11          Shandong, which alone is just a
12          province.
13                  THE COURT:  Right.
14  BY MR. MEUNIER:
15          Q.   Shall I ask the question
16  again?  I'll ask the question.
17                  INTERPRETER:  Do you want me
18          to repeat it in Chinese?  I have
19          it too.
20                  MR. MEUNIER:  Just make sure
21          Shandong is spelled out.
22                  (Interpreter repeats
23          question to witness.)
24                  THE WITNESS:  They all have
```

Confidential - Subject to Further Confidentiality Review

```
 1            their own e-mails.

 2    BY MR. MEUNIER:

 3            Q.    Were they allowed to use

 4    their own e-mails to conduct sales

 5    business for these companies?

 6            A.    We never have such

 7    regulation nor have we any restriction

 8    about that.  As long as they get the

 9    payment and have the deal done.

10            Q.    Were they also allowed to

11    use instant messaging to conduct sales

12    business?

13            A.    There is no such regulation,

14    nor was there any arrangement about that

15    either.

16            Q.    As long as they got the

17    money?

18            A.    Correct.

19            Q.    That was the main

20    requirement, wasn't it?

21            A.    Correct.  In our local

22    business, that's the same way.

23            Q.    Right.  But it's true in

24    your export business too.  The main
```

```
 1    requirement was to get the money in

 2    export sales, true?

 3           A.    Correct.  As long as you

 4    get -- I get the payment, I will ship out

 5    the product for you.

 6           Q.    Yes.  And you did that,

 7    didn't you?  The company did that?

 8           A.    That's my requirement to

 9    them.

10           Q.    It was your requirement as

11    an employee of your company?

12           A.    That's my requirement.

13           Q.    Were sales personnel allowed

14    to use text messaging in sales activity

15    as long as they got the money?

16           A.    We don't have any

17    regulations about that.

18           Q.    So, text messaging was not

19    prohibited, true?

20           A.    It was not prohibited,

21    neither was there a regulation to permit

22    or not permit that.

23           Q.    Mr. Fu, let me show you a

24    document which has been Bates numbered TG
```

Confidential - Subject to Further Confidentiality Review

 1   20710.

 2          A.    I don't understand.

 3              MR. MEUNIER:  There's a

 4       translation.

 5              MS. BASS:  What Exhibit

 6       Number will that be?

 7              MR. MEUNIER:  This will be

 8       Fu Number 1.

 9                  -   -   -

10              (Whereupon, Deposition

11       Exhibit Fu-1, Information on the

12       Members to the Board of Directors,

13       Members to the Board of

14       Supervisors and Managers of

15       Shandong Taihe Dongxin Co., Ltd.,

16       Bates stamped TG 0020710, and

17       Deposition Exhibit Fu-1A, Document

18       in Chinese, Bates stamped TG

19       0020710, was marked for

20       identification.)

21                  -   -   -

22              MR. MEUNIER:  20710 is the

23       Bates Number.

24   BY MR. MEUNIER:

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Is it true, Mr. Fu, that you

 2     are listed on this document as a member

 3     of the board of supervisors of Shandong

 4     Taihe Dongxin Company Limited?

 5          A.    Supervisors, yes, I was a

 6     supervisor.

 7          Q.    And you were elected as a

 8     member of the board of supervisors; is

 9     that true?

10          A.    Correct.

11               -  -  -

12               (Whereupon, Deposition

13          Exhibit Fu-2, Information on

14          Directors, Supervisors and

15          Managers of Shandong Taihe Dongxin

16          Co., Ltd., Bates stamped TG

17          0020712, and Deposition Exhibit

18          Fu-2A, Document in Chinese, Bates

19          stamped TG 0020712, were marked

20          for identification.)

21               -  -  -

22               MR. MEUNIER:  And I show you

23          a document which has been Bates

24          numbered 20712.  I'll mark as Fu
```

Confidential - Subject to Further Confidentiality Review

```
 1          Number 2 the English and as Fu-2

 2          the Chinese version of that

 3          document.

 4                MR. SPANO:  What number is

 5          the exhibit?

 6                MR. MEUNIER:  20712.  It's

 7          Fu Number 2.

 8   BY MR. MEUNIER:

 9          Q.    Would you confirm that that

10   is your photograph and your correct

11   personal information as a member of the

12   board of supervisors of Shandong Taihe

13   Dongxin?

14          A.    Yes, yes.

15          Q.    For what period of time were

16   you a member of the board of supervisors

17   of Shandong Taihe Dongxin?

18          A.    From April 2005 to 2008.

19          Q.    When the company changed its

20   name to Taishan Gypsum, did you remain an

21   elected member of the board of

22   supervisors?

23          A.    Yes.

24          Q.    What is your understanding
```

Confidential - Subject to Further Confidentiality Review

 1    of the duties and responsibilities of a

 2    supervisor of Shandong, or Taishan

 3    Gypsum, as it was later called?

 4          A.    To supervise and review the

 5    ways the managers act according to the

 6    company's regulations.  For those that

 7    were not in compliance with regulations,

 8    I would correct them.

 9          Q.    Did you ever, as a member of

10    the board of supervisors of Shandong,

11    later called Taishan Gypsum, have the

12    need to correct a manager or director of

13    the company?

14          A.    No.

15          Q.    Were the export sales

16    activities of Shandong, later called

17    Taishan Gypsum, always conducted in

18    accordance with the shareholder

19    resolutions when you served as a

20    supervisor?

21          A.    We stopped doing that

22    afterwards.  TTP did it.

23          Q.    Up until the time TTP was

24    formed, is it true that the export sales

```
 1    activities of the directors of Shandong

 2    and Taishan Gypsum were always conducted

 3    in accordance with shareholder

 4    resolutions?

 5              MR. SPANO:  Objection,

 6         foundation.

 7              THE COURT:  Well, if he

 8         knows, I'll let him do it.  What

 9         is the foundation?  What's your

10         problem?

11              MR. SPANO:  The problem is

12         that there's no foundation that

13         there were shareholder resolutions

14         that addressed export sales.

15              THE COURT:  Let's ask him

16         that.

17              MR. MEUNIER:  Let me

18         rephrase the question.

19    BY MR. MEUNIER:

20         Q.   Up until the time TTP was

21    formed, is it true that the export sales

22    activities of the directors of Shandong

23    and Taishan Gypsum were always conducted

24    in accordance with the policies of those
```

Confidential - Subject to Further Confidentiality Review

```
 1   companies?

 2        A.    First of all, exporting

 3   policy, exporting policy, we never had a

 4   policy for exporting policy.  How should

 5   I put it?  What word should I put it?  We

 6   have not emphasize on that.

 7        Q.    You did have export sales

 8   activity, correct?

 9        A.    Yes, we do have the

10   activity, but...

11        Q.    And you had certain

12   guidelines for conducting that activity,

13   correct?

14        A.    No.  What do you mean by

15   "guidelines"?

16        Q.    Were there any company

17   practices for conducting export sales?

18        A.    The policy --

19             INTERPRETER:  Interpreter

20        clarification.

21             THE COURT:  Let's just

22        translate.  Let's not have any

23        discussions with the witness.

24        What did he say?  Let's restate
```

```
 1          the question.
 2               INTERPRETER:  He repeated
 3          what he said.  He had an accent,
 4          so...
 5               THE COURT:  Let's ask the
 6          question again and then translate
 7          it.
 8   BY MR. MEUNIER:
 9          Q.    Aside from getting paid,
10   were there any company requirements of
11   Shandong, or later Taishan Gypsum,
12   concerning the export sales of drywall to
13   foreign customers?
14               THE COURT:  Gerry, he was
15          going to object.  You've got to
16          put time on there.
17   BY MR. MEUNIER:
18          Q.    For the time frame starting
19   when export sales activity began at
20   Taishan Gypsum or Shandong, ending when
21   TTP was formed.
22          A.    Yes.
23          Q.    What were they?
24          A.    My requirement was an oral
```

Confidential - Subject to Further Confidentiality Review

1    requirement, which we did not set the

2    exporting as our main direction of sales.

3    Because of the value of the exporting

4    goods were low, the cost for shipment was

5    high.  It was easy to be damaged.  We

6    would not have that as a direction.

7    Wherever there is a customer who come

8    with money, we would, however, do

9    business with them.  That's our guidance.

10        Q.    Including a customer from

11   the United States, true?

12        A.    All tradings, all

13   exportings.

14        Q.    Including the United States?

15        A.    Yes.

16        Q.    So, my question, sir, is

17   that for the entire time you served as a

18   supervisor for Shandong and then Taishan

19   Gypsum, did you ever know those

20   guidelines to be violated?

21        A.    I don't know.

22        Q.    How often did the Shandong

23   board of supervisors meet when you were a

24   member?

```
 1           A.     During a board of directors

 2    meeting or during the meeting of the

 3    supervisors, maybe once or twice a year.

 4           Q.     How often did the board of

 5    supervisors of Taishan Gypsum meet when

 6    you were a member?

 7           A.     The supervisors?  Twice a

 8    year.

 9           Q.     Were there discussions at

10    these meetings about the marketing of

11    drywall by the company?

12           A.     That would not be discussed.

13           Q.     Were there discussions at

14    these meetings about the export sales of

15    drywall by the company?

16           A.     No.

17           Q.     How did the supervisors

18    become informed about the marketing and

19    sales, export sales of drywall?

20           A.     It is not necessary for the

21    supervisors to know this information.

22           Q.     Who, other than supervisors,

23    needed to know that information?

24           A.     I don't know who would know.
```

```
 1    Why are you asking me?

 2          Q.    Who at Shandong, and later

 3    Taishan Gypsum, kept informed about --

 4                THE INTERPRETER:  Excuse me.

 5          I need a break for five minutes.

 6          Is that okay?

 7                THE COURT:  Sure.

 8                THE VIDEOTAPE TECHNICIAN:

 9          We are off the record.  The time

10          is 3:30.

11                      -  -  -

12                (Whereupon, a recess was

13          taken from 3:30 until 3:36 p.m.)

14                      -  -  -

15                THE VIDEOTAPE TECHNICIAN:

16          We're back on the record.  The

17          time is 3:36.

18    BY MR. MEUNIER:

19          Q.    Mr. Fu, you have told us

20    that marketing and export sales

21    activities were not discussed at the

22    meetings of the Shandong, and later

23    Taishan Gypsum, board of supervisor

24    meetings you attended.  Is that correct?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    Correct.

 2          Q.    Which, if any, job positions

 3   at Shandong, and later Taishan Gypsum,

 4   were kept informed of these marketing and

 5   export sales activities?

 6          A.    Can you repeat the question?

 7                (Interpreter repeats the

 8   question.)

 9                For those who are in charge

10   of the daily operations in sales in the

11   company, the supervisors and board of

12   directors were not required to know the

13   information.

14          Q.    You've indicated that

15   Shandong, and later Taishan Gypsum, did

16   not keep separate records of the volume

17   of export sales.  Is that true?

18          A.    Separate records?

19          Q.    Yes.  The volume of only

20   export sales, was that ever kept as a

21   record by either Shandong or Taishan

22   Gypsum?

23          A.    There should be a volume.

24   There should be a statistic number, but
```

```
 1    it's not on the advertisement.
 2         Q.    Was someone in charge of
 3    keeping that statistic or measurement
 4    that is the volume of export sales?
 5         A.    I believe there should be a
 6    record.
 7         Q.    Who is the person who keeps
 8    that record today?
 9         A.    You mean TG?
10         Q.    I want to include Shandong,
11    when the export sales activity was
12    occurring when it was called Shandong, as
13    well as TG.
14         A.    I believe Peng Wenlong
15    should have the information.
16         Q.    Were records of the volume
17    of export sales kept for TTP when it was
18    in operation?
19         A.    I believe a record should
20    exist also for that.
21         Q.    Which individual would have
22    those records?
23         A.    I do not know who was in
24    charge of the record, but I only know
```

Confidential - Subject to Further Confidentiality Review

1    that Peng Wenlong is in charge of sales.

2           Q.    Was Peng Wenlong's salary

3    influenced by the amount of sales he

4    made?

5                  MR. SPANO:  Objection.

6                  THE COURT:  "Influenced"

7         might be a problem.

8    BY MR. MEUNIER:

9           Q.    Dependent on?

10                 THE COURT:  Related to.

11   BY MR. MEUNIER:

12          Q.    Related to?

13          A.    I believe there should be a

14   relation.

15          Q.    Tell me what --

16          A.    There is a relation.

17          Q.    Excuse me.

18                 Explain the relation.

19          A.    There is no detailed

20   explanation for that.  If the amount is

21   not much, then the salary is not that

22   much.

23          Q.    But is it true that the

24   greater the volume of sales Peng Wenlong

```
 1   was responsible for, the greater his

 2   salary?

 3         A.     He could get promoted.

 4         Q.     In addition to being

 5   promoted, would he also make more money,

 6   the more sales he made?

 7         A.     Yes, yes.

 8         Q.     Is the same true of other

 9   salespeople in addition to Peng Wenlong?

10         A.     Yes.  There are also

11   relationships between -- for their sales.

12         Q.     So that would be true for

13   both Che Gang and Yang Jiapo?

14         A.     Both of them.

15         Q.     As Mr. Peng Wenlong's direct

16   supervisor, did you evaluate his job

17   performance?

18               MR. SPANO:  Objection to

19         form.  Which company are you

20         referring to?

21   BY MR. MEUNIER:

22         Q.     You were his direct

23   supervisor when he was employed by

24   Taishan Gypsum; is that true?
```

```
1              A.      Correct.

2              Q.      And you were a director at

3      TTP when he was an employee of TTP after

4      that, true?

5              A.      Correct.

6              Q.      For the period when he

7      worked at both Taishan Gypsum and TTP,

8      did you consider Peng Wenlong to be a

9      competent employee?

10             A.      He was very diligent in his

11     work.

12             Q.      Trustworthy?

13             A.      I believe he's good.

14             Q.      Have you ever had reason to

15     discipline or criticize him for his job

16     performance?

17             A.      I have not criticized him

18     during the period of time that I managed

19     TG.  I did not manage him either in TTP.

20             Q.      Are you also familiar with

21     the work of Che Gang as a sales employee

22     of Taishan Gypsum?

23             A.      Peng Wenlong was in charge

24     of that.  I was not in charge of the
```

```
 1   details.

 2        Q.    Even though you were not in

 3   charge of the details, were you generally

 4   aware of the job performance of Che Gang?

 5        A.    I think he's also good.

 6        Q.    Trustworthy?

 7        A.    I trust him.

 8        Q.    To your knowledge, was there

 9   ever any reason for him to be disciplined

10   or criticized in his job performance

11   either at Taishan Gypsum or at TTP?

12        A.    No.

13        Q.    Would you say the same about

14   Yang Jiapo?

15        A.    Yang Jiapo resigned.

16        Q.    Yes, but before he resigned,

17   did you consider him to be a competent

18   employee?

19        A.    This young man was a little

20   lazy.

21        Q.    Under what circumstances did

22   he resign?

23        A.    He did not keep a good

24   working relationship with other
```

Confidential - Subject to Further Confidentiality Review

1    colleagues.

2           Q.    Aside from him being, as you

3    put it, lazy and not getting along with

4    his colleagues, did you know of any other

5    problems with his performance as a sales

6    employee?

7           A.    He started a company with

8    his older brother.

9           Q.    Is that why he left the

10   employment of Taishan Gypsum?

11          A.    He established a company

12   with his older brother.

13          Q.    And is that why he resigned

14   from the employment of your company?

15          A.    That was the reason.

16          Q.    While he was an employee of

17   Shandong, Taishan Gypsum and TTP, did you

18   ever know Yang Jiapo to exceed his

19   authority as a salesperson?

20          A.    I don't know.

21          Q.    Is it true that together

22   with director Xue Yuli, X-U-E, Y-U-L-I,

23   you have had responsibility for

24   supervising the product marketing plans

1    of Taishan Gypsum?

2          A.    What time period?

3          Q.    During any period of time,

4    have you had responsibility for

5    supervising the product marketing plans

6    of Taishan Gypsum?

7          A.    Xue Yuli was in charge of

8    sales before 2008.

9          Q.    Mr. Fu, if Mr. Jia testified

10   under oath on April 4th, 2011, and I'll

11   give counsel the page and line numbers of

12   that deposition if needed, that together

13   with Director Yuli, you had

14   responsibility for supervising the

15   product marketing plans of Taishan

16   Gypsum, would you agree with that

17   testimony?

18         A.    Before 2008, that was the

19   case.

20         Q.    Tell me what you did in

21   order to supervise the product marketing

22   plans of Taishan Gypsum before 2008?

23         A.    The product marketing plan

24   was to act according to the report of

1   general manager Jia made in the end of

2   the year.

3          Q.    Part of that plan was to

4   intensify online sales; is that true?

5               MR. SPANO:  Objection,

6          foundation.

7               MR. MEUNIER:  The testimony

8          of Mr. Jia.

9               THE COURT:  Don't speak,

10         please.

11              MR. MEUNIER:  Sorry, Judge.

12              THE COURT:  It's before me.

13         I'll allow him to answer.

14              THE WITNESS:  I don't

15         recall.  I don't recall when was

16         the report made.

17  BY MR. MEUNIER:

18         Q.    Do you recall as part of

19  product marketing plans of Taishan Gypsum

20  that you helped supervise before 2008

21  that the company intensified its efforts

22  in the area of online sales?

23         A.    We did not say intensify the

24  online sales.  There was online sales

Confidential - Subject to Further Confidentiality Review

1    exists, existence.

2         Q.    How did the company promote

3    online sales?

4         A.    We did not promote online

5    sales.

6         Q.    Did the company have a

7    website that customers could use to

8    conduct online sales of drywall?

9         A.    What website?  The customer

10   did not conduct that on the website.  The

11   transaction could not be made online.

12        Q.    How were online sales of

13   drywall conducted by Taishan Gypsum?

14        A.    We only have a website of

15   Taishan Gypsum Company.  You can only

16   view the website.  There was no online

17   sales.  It's a company website.  You

18   cannot make transactions on it.

19        Q.    So, your testimony is that

20   Taishan Gypsum has never conducted sales

21   of drywall through online transactions?

22        A.    I don't know what you're

23   referring to.  I don't understand this

24   part.  I have never done online

Confidential - Subject to Further Confidentiality Review

1    transactions.

2         Q.    All right.  Let's get back

3    to marketing.

4         A.    Okay.

5         Q.    You told me in supervising

6    the marketing plans of Taishan Gypsum

7    before 2008, you acted according to the

8    report of the company chairman Jia.  Is

9    that correct?

10        A.    Yes, yes.

11        Q.    And please tell me in as

12   much detail as you can how the marketing

13   plans were conducted in accordance with

14   the reports of Mr. Jia?

15        A.    We investigated the markets

16   according to the occupation -- the

17   percentage that our competitor had

18   occupied.  We would want to take part --

19   take some of that.

20        Q.    Did you investigate foreign

21   markets?

22        A.    Like I mentioned, we did not

23   set foreign market as our main direction.

24   Naturally, we would not promote that

Confidential - Subject to Further Confidentiality Review

```
 1   part.

 2        Q.    Are you familiar with this

 3   document, Mr. Fu, which has been

 4   previously marked as Jia Exhibit 20?

 5        A.    I'm familiar with it.

 6        Q.    Is that a brochure that was

 7   used by Shandong to market its products,

 8   including drywall?

 9        A.    Yes.

10        Q.    Did you have input or did

11   you contribute to the language in this

12   brochure?

13        A.    No, I did not write on it.

14        Q.    Was this same brochure later

15   used when the company changed its name to

16   Taishan Gypsum?

17        A.    Yes.

18        Q.    Do you agree that the

19   brochure states that the company has

20   export ability and that its products sell

21   well in many countries, including the

22   United States of America?

23        A.    This is only a general way

24   of saying that when you do business in
```

1    China.  This is not necessarily be the

2    fact.

3         Q.    Are you saying that the

4    brochure is not true in making that

5    statement?

6         A.    Correct.  This is the way we

7    do business in China.  Our purpose is to

8    let our local customer have the

9    impression of an image of a big company.

10         Q.    Is this brochure published

11    in English?

12         A.    Not in English.  Most of

13    them are in Chinese.  It is for the local

14    customers.

15         Q.    Is the information in this

16    brochure on the company's website?

17         A.    Some of them.  Perhaps part

18    of them.

19         Q.    Is the language on the

20    company's website English?

21              MR. SPANO:  Object to form,

22         time frame.

23              THE COURT:  Put the time

24         frame in.

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. MEUNIER:

 2         Q.    Is the language on the

 3    company Taishan Gypsum's website today in

 4    English?

 5         A.    I don't know if there is

 6    Chinese on it.  I know there is Chinese

 7    version on it.

 8              THE COURT REPORTER:  I don't

 9         know if there is Chinese on it.  I

10         know there is Chinese version on

11         it.

12              THE WITNESS:  I don't know

13         if there is English on it.  I know

14         there is Chinese version on it.

15              I don't read English.  I

16         always type Chinese character

17         Taishan Gypsum, and then our

18         website would pop up.

19    BY MR. MEUNIER:

20         Q.    But your website does have

21    English language, allowing those who

22    speak English to read what is on the

23    website; is that correct?

24         A.    If there is Chinese version,
```

Confidential - Subject to Further Confidentiality Review

```
 1   they could read it.

 2              MR. CHEN:  I'm sorry.

 3              MR. MEUNIER:  I didn't ask

 4         you about Chinese.

 5              INTERPRETER:  Excuse me,

 6         interpreter clarification.

 7              Correction, interpreter

 8         correction.

 9              THE WITNESS:  If there is an

10         English version, they could read

11         it.

12   BY MR. MEUNIER:

13         Q.   Does the website have

14   information on it in the English

15   language?

16         A.   I don't know, because we

17   didn't make that.  It is the sales

18   department who made it.

19         Q.   Who is in charge of the

20   company's website today?

21         A.   The office.

22         Q.   Who in the office?

23         A.   I don't know who, but the

24   office in the headquarter is in charge of
```

1    the website.

2         Q.    In your various positions

3    managing and supervising sales activity,

4    is it your testimony you have never dealt

5    with the company's website?

6         A.    Correct.

7         Q.    Referring again to the

8    brochure which is Jia Exhibit 20, I'm

9    showing you the last page which has a map

10   of the countries in the world.  Do you

11   see that?

12        A.    I see it.

13        Q.    Do you see the line drawn

14   from China to the United States of

15   America?

16        A.    Yes, I see it.

17        Q.    Is that an accurate

18   statement of the export ability of the

19   company?

20             MR. SPANO:  Object to form.

21             THE COURT:  Ability or

22        activity?

23   BY MR. MEUNIER:

24        Q.    Does that map accurately

```
 1    reflect the export activity of the

 2    company?

 3         A.    No.

 4         Q.    Why not?

 5         A.    No.  This is also just like

 6    what I described before.  It is for the

 7    people to realize it is a big company.

 8    The small companies, the private

 9    companies in China also do things like

10    this.

11         Q.    So, does your company want

12    foreign customers to be misled about the

13    export ability and activity of your

14    company?

15         A.    No.  This is for the

16    impression of a good image of a big

17    company for the local customers, for the

18    local customers.

19         Q.    So, are you misleading local

20    customers when you tell them about the

21    export ability and activity of your

22    company?

23              MR. SPANO:  Objection.

24         Objection to form.  It's not
```

```
 1              personal statements.

 2                   MR. MEUNIER:  I'll restate

 3              the question, Your Honor.

 4    BY MR. MEUNIER:

 5         Q.    Is Shandong Taihe Dongxin

 6    Company misleading the customers who read

 7    this brochure about the export ability

 8    and activity of the company?

 9         A.    No.  It is Chinese mode.

10         Q.    Is it the Chinese mode to

11    not tell the truth about the company?

12         A.    That's not true.  You

13    shouldn't be understanding it that way.

14    In China, we exaggerate a little bit.

15    Exaggerate a little bit, that's allowed.

16         Q.    You exaggerate it, but it is

17    still true that the company had export

18    ability and activity as indicated in the

19    brochure?  Is that true?

20         A.    Yes.  We exported some.

21         Q.    Did you export to all the

22    places where the lines are drawn on the

23    map that I showed you?

24         A.    No, no, that's not true.
```

1          Q.    Which ones did you not

2    export to, Mr. Fu?

3          A.    I'm sure it exaggerated a

4    little bit.  But I'm not sure exactly

5    where had it not exported to.

6          Q.    Based on your knowledge and

7    experience, can you tell us where the

8    company has exported to?

9          A.    I'm not in charge of that.

10   I'm not in charge of the detailed sales,

11   so, I don't know exactly where they were

12   shipped to.  We deliver in China.  We

13   don't know where did some of the

14   customers send the products to.

15         Q.    Mr. Yang Jiapo was employed

16   as a salesperson at Shandong, Taishan

17   Gypsum and then TTP; is that correct?

18         A.    Correct.

19         Q.    I want to show you a

20   document which is Bates numbered 1443

21   through 1448.  I'm sorry, I don't have a

22   translation with me.

23         A.    I don't understand this.

24         Q.    Mr. Fu, please turn to the

1    last page of this document, which is

2    1448.  Do you see the three e-mail

3    addresses given there?

4         A.    I don't know where they are.

5    I don't know whose e-mail addresses are

6    those.

7         Q.    You don't recognize those as

8    the e-mail addresses of Yang Jiapo?

9         A.    No, I don't recognize this.

10   I don't really use e-mail myself.

11        Q.    Let me refer you to another

12   document, Mr. Fu, that's been previously

13   marked as Jia number 13.  It's entitled

14   "Sole Agency Agreement."  It is dated

15   October 20, 2006, and at that time, you

16   were one of the directors of TTP; is that

17   true?

18        A.    Correct.

19        Q.    And the title of this "Sole

20   Agency Agreement" -- I'm sorry, the sole

21   agency agreement refers to the seller as

22   Taian Taishan Plasterboard Company,

23   Limited and the buyer, Oriental Trading

24   Company, LLC.  Are you familiar with this

```
 1   agreement?

 2              MR. SPANO:  Objection to

 3        form.

 4              THE COURT:  Do you want to

 5        show him the document?  Where is

 6        the document?

 7              MR. SPANO:  He hasn't shown

 8        it to him.

 9              THE COURT:  Show him the

10        document.

11              THE WITNESS:  Please, first

12        of all, do not ask me any sales

13        business regarding TTP.  Perhaps

14        you don't understand the way we do

15        business in China.  In China, the

16        directors and the supervisors do

17        not in charge of detailed

18        business.  Maybe you don't

19        understand the responsibilities of

20        directors and supervisors in

21        China.

22                   -  -  -

23              (Whereupon, a discussion off

24        the record occurred.)
```

```
 1                      -  -  -

 2              THE WITNESS:  Can you

 3        translate for me.

 4   BY MR. MEUNIER:

 5        Q.    Mr. Fu, please refer to the

 6   third page of this document.

 7        A.    (Witness complies.)

 8        Q.    Is it true that the Chinese

 9   language appearing on that page states

10   that Taian Taishan Plasterboard Company,

11   Limited certifies that Oriental Trading

12   Company, LLC as its exclusive agency for

13   the Dun brand in the United States of

14   America?

15        A.    Don't ask me.  I'm not in

16   charge of the sales of TTP.  You don't

17   understand.  And also please tell him

18   that the supervisors in China, including

19   directors, do not in charge of the

20   detailed operation.  They only meet twice

21   a year for supervisors' meeting and for

22   directors' meeting to discuss the annual

23   reports.  Now you're showing me these.  I

24   don't know how to answer you.
```

Confidential - Subject to Further Confidentiality Review

1        Q.    Did Taishan Gypsum, or

2    before it, Shandong Taihe Dongxin,

3    manufacture drywall under the brand name

4    Dun, D-U-N?

5        A.    I don't know.  I don't

6    recall.

7        Q.    You have never heard of the

8    brand name Dun?

9        A.    I've heard of it, but we do

10   not necessarily manufacture all the

11   brands that have the name as the brand.

12       Q.    Has Shandong Taishe -- I'm

13   sorry -- Shandong Taihe Dongxin or

14   Taishan Gypsum ever manufactured drywall

15   under the brand name Dun?

16       A.    I don't know like I said

17   before.

18       Q.    Has TTP ever manufactured

19   drywall under the brand name Dun?

20       A.    TTP, I don't know.

21       Q.    Have any of the companies I

22   just mentioned, Shandong Taihe Dongxin,

23   Taishan Gypsum or TTP manufactured

24   drywall for customers with thickness,

Confidential - Subject to Further Confidentiality Review

```
 1   length and width measured in inches and

 2   feet?

 3          A.    I don't know the inches and

 4   the feet.  I don't understand the

 5   details.  I only know the specifics.

 6                INTERPRETER:  The

 7          interpreter need clarification.

 8                THE WITNESS:  I don't

 9          understand what you said about the

10          specifications in inches and feet.

11          We custom made products according

12          to requirements of customers.  I

13          only know the prices and

14          coordinate on the manufacturer.

15          If we can do it, we'll do it.  I

16          don't know anything else.

17   BY MR. MEUNIER:

18          Q.    Inches and feet are not

19   measurements used in China, true?

20          A.    In China, we produce drywall

21   according to national standard 9.5 or 12.

22   I don't know anything else.

23          Q.    9.5 or 12 what?

24          A.    China National Standard.
```

Confidential - Subject to Further Confidentiality Review

1        Q.    If a customer requests that

2    you do so, will Taishan Gypsum

3    manufacture drywall to sell to that

4    customer in measurements of inches and

5    feet?

6        A.    You have to convert it to

7    the thickness according to Chinese

8    measurement.  When you are talking about

9    feet and inches, I do not understand.

10        Q.    I will try to ask the

11    question again.

12            If a customer wants to buy

13    drywall from Taishan Gypsum and wants it

14    to have a thickness measured in inches,

15    will the company make the drywall with

16    that thickness?

17        A.    After converting into the

18    measurements in China, if we could make

19    it, we would make it.  If we could not,

20    we would not accept the order.

21        Q.    Did you ever advise Che Gang

22    before October 20, 2006 that he was not

23    authorized to do business with Oriental

24    Trading Company LLC?

1          A.     What was the time again?

2          Q.     At any time before October

3     20, 2006.

4          A.     I have never arranged works

5     for Che Gang.  It had always been Peng

6     Wenlong who did that.

7          Q.     What do you mean you never

8     arranged words for Che Gang?  I don't

9     understand.

10               THE COURT REPORTER:  I'm

11          sorry, it's works, not words?

12               INTERPRETER:  Works,

13          W-O-R-K-S.

14     BY MR. MEUNIER:

15          Q.     Did you or anyone else on

16     behalf of Taishan Gypsum or TTP ever

17     advise a representative of Oriental

18     Trading Company that Mr. Che Gang was not

19     authorized to do business with that

20     company?

21          A.     I don't know anything about

22     the detail of the businesses.

23               MR. MEUNIER:  Your Honor, I

24          object to the nonresponsiveness of

```
 1              the answer.  I'll ask the question

 2              again.

 3                   THE COURT:  Let's ask the

 4              question.  Listen closely.  Listen

 5              closely to the question, and

 6              answer it, if you can.

 7    BY MR. MEUNIER:

 8         Q.    Mr. Fu, did you or anyone

 9    else on behalf of Taishan Gypsum or TTP

10    ever advise a representative of Oriental

11    Trading Company that Mr. Che Gang was not

12    authorized to do business with that

13    company?

14         A.    I don't know Oriental

15    Trading Company.  I don't know whether

16    anybody else advised this company of

17    such.

18         Q.    Did you ever advise a

19    representative of that company that Mr.

20    Che Gang was not authorized to do

21    business with the company?

22         A.    Like I said before, I don't

23    know the existence of this company.

24         Q.    Please look at the third
```

```
 1    page of the document again.  Do you

 2    recognize the signature on that page

 3    under the company name Taian Taishan

 4    Plasterboard Company, Limited?

 5         A.    I know that's Che Gang's,

 6    and a seal which says Taishan

 7    Plasterboard Company.

 8         Q.    Do you agree that Mr. Che

 9    Gang on that document used a seal given

10    to him by his company?

11         A.    Tell him that during this

12    period of time, these are two separate

13    companies.  It has nothing to do with me

14    whether he stamped the company seal or

15    not.

16         Q.    Does it appear to be a seal

17    given to sales personnel such as Mr. Che

18    Gang by the employer of that salesperson?

19         A.    How do I know about it?

20         Q.    I'm asking you to look at

21    the seal on the document.

22         A.    The seal has nothing to do

23    with me.  I'm in charge of two

24    independent companies.  The company
```

```
 1    you're talking about has nothing to do

 2    with me.

 3         Q.    My question is different.

 4    Do you recognize that seal as a seal

 5    given to Mr. Gang?

 6         A.    Like I said, I know the

 7    seal, and I know Che Gang's name.

 8         Q.    When you say you "know the

 9    seal," what do you mean?

10         A.    You asked me whether I

11    recognize this.  I said I do recognize

12    these characters.

13         Q.    Do you recognize that as a

14    company seal given to salespeople

15    employed by the company?

16         A.    How do I know about it?  I'm

17    not in charge of this company.

18              THE COURT:  Is that the

19         company seal?

20              THE WITNESS:  It is the

21         company seal where the employee

22         worked.

23              MR. MEUNIER:  Thank you.

24         Thank you, Judge.
```

```
 1   BY MR. MEUNIER:

 2        Q.    In November and December of

 3   2005, you directly supervised the sales

 4   activity of Peng Wenlong.  Is that true?

 5        A.    Correct.

 6        Q.    Have you heard of a US

 7   company called Venture Supply Inc.?

 8        A.    You asked me once, but I

 9   don't know that name.

10        Q.    I show you a document which

11   is Bates numbered TG 1684 and 1685.

12             MR. SPANO:  Is this going to

13        be marked as an exhibit?

14             MR. MEUNIER:  I'll mark this

15        document as Fu Exhibit 3.

16                  -  -  -

17             (Whereupon, Deposition

18        Exhibit Fu-3, Contract, Bates

19        stamped TG 0001684 and TG 0001685,

20        was marked for identification.)

21                  -  -  -

22   BY MR. MEUNIER:

23        Q.    Were you aware, Mr. Fu, that

24   on November 17, 2005, Shandong Taihe
```

1    Dongxin Company, Limited entered into a

2    sales contract with Venture Supply Inc.

3    of Norfolk, Virginia for the sale of

4    100,000 sheets of drywall?

5         A.    I don't know which country

6    was the buyer.  I only was aware that

7    Peng Wenlong consulted me for the

8    thickness of the drywall, which is 12.7,

9    as well as the pricing of the drywall.

10        Q.    Did you approve the

11   thickness and pricing of the drywall for

12   this sale?

13        A.    I approved it.

14        Q.    This contract indicates that

15   the drywall was sold at the price of

16   $3.58 a sheet for a total of $358,000.

17   Is that the price you approved?

18        A.    Yes.

19        Q.    Is $3.58 a sheet consistent

20   with the price that Shandong Taihe

21   Dongxin was charging customers for

22   drywall in November of 2005?

23             MR. SPANO:  Objection to

24        form.

```
 1              THE WITNESS:  I don't recall
 2         clearly the price at the time.
 3              THE COURT:  It's time to
 4         change the tape as I understand
 5         it.  Let's take a break, 10-minute
 6         break.
 7              THE VIDEOTAPE TECHNICIAN:
 8         We're going off the record.  The
 9         time is 4:38.
10                   -  -  -
11              (Whereupon, a recess was
12         taken from 4:38 p.m. until 4:47
13         p.m.)
14                   -  -  -
15              THE VIDEOTAPE TECHNICIAN:
16         This is the beginning of Tape
17         Number 3.  We're going back on the
18         record.  The time is 4:47.
19   BY MR. MEUNIER:
20         Q.    Mr. Fu, this November 2005
21   contract between Shandong and Venture
22   Supply provides that the drywall will be
23   inspected by Mr. Phillip Perry of Tobin
24   Trading Inc. before the sale is final.
```

1    Were you aware of that provision?

2         A.    Peng Wenlong had reported to

3    me the pricing of it.  I approved of the

4    contract.  I'm not sure about the

5    business details that they discussed

6    about.

7         Q.    I meant to ask you this

8    before.  But Mr. Peng Wenlong, you said,

9    was assigned to work with export sales

10   because he spoke English?  Is that true?

11        A.    Correct.

12        Q.    I think I've marked that as

13   Fu-3.

14             MR. MEUNIER:  I next show

15        you a document which is Bates

16        numbered 19854 through 19857 which

17        I will mark as Fu Number 4.

18                  -  -  -

19             (Whereupon, Deposition

20        Exhibit Fu-4, Contract, Bates

21        stamped TG 00019854 through TG

22        00019857, was marked for

23        identification.)

24                  -  -  -

```
 1    BY MR. MEUNIER:

 2         Q.    Mr. Fu, this is a contract

 3    dated December 6, 2005 between Shandong

 4    Taihe Dongxin Company and Venture Supply

 5    of Norfolk, Virginia for the sale of

 6    100,000 additional sheets of drywall.

 7    Were you aware of this agreement?

 8         A.    I know that, but I don't

 9    know the detailed content of it.

10         Q.    Yes, sir.  But again, you

11    approved the price, which in this case

12    was $3.58 a sheet -- I'm sorry, $3.66 a

13    sheet, for a total sale price of

14    $366,800.  You approved that, did you?

15         A.    It is so for the price.

16         Q.    And you approved the

17    agreement, didn't you?

18         A.    Yes.

19         Q.    Why was the price increased

20    from $3.58 a sheet to $3.66 a sheet

21    between November 17 and December 16,

22    2005?

23         A.    The costs were different.

24    The costs for each time period were
```

1    different.

2         Q.    So, the price per sheet

3    could change even in one month, true?

4         A.    Because this was the first

5    time we did business, we had to be

6    careful.  Afterwards, we could have some

7    small changes.  This was the first time

8    we had carefully calculated the price for

9    the specification of 12.7.  Therefore,

10   this has a reference value for future

11   transactions.

12        Q.    Are you saying that you

13   expected to continue to sell drywall to

14   Venture Supply at a price that would

15   become customary for that customer?

16        A.    As long as it takes its

17   money to China and we deliver the

18   products in China, we could do that.  We

19   deliver in China, but they would have to

20   take care of where they want it to ship

21   to because it was the first time we did

22   business together.

23        Q.    But the contract did specify

24   a price in US dollars, correct?

```
 1          A.    Yes, yes.

 2          Q.    And like the November 2005

 3   contract with Venture Supply, this one

 4   provides for an inspection of the product

 5   by Mr. Phillip Perry before the sale is

 6   final, that, again, was a detail that you

 7   left to Mr. Peng Wenlong, true?

 8          A.    Correct.

 9          Q.    If you look at the second

10   page of the contract which is Bates

11   numbered 19855, I ask you to confirm that

12   that is the signature of Peng Wenlong

13   using the company seal of Shandong Taihe

14   Dongxin?

15          A.    I don't see the signature of

16   Peng Wenlong.

17          Q.    You don't see a signature

18   written in the area where the seal stamp

19   is made?

20          A.    This is my signature.

21          Q.    This is your signature?

22          A.    That's my signature.

23          Q.    So, you signed this

24   contract?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    So, you have seen --

 3          A.    I approved it, including the

 4    price.

 5          Q.    And you signed it?

 6          A.    Yes.

 7          Q.    And you signed it in

 8    English?

 9          A.    That was our first time I

10    did business.  No.  This is Chinese

11    character.

12          Q.    Yes, but the document is

13    written in English, and your signature is

14    on the document in English, true?

15               MR. SPANO:  Objection, asked

16          and answered.

17               THE WITNESS:  That's Chinese

18          character.

19    BY MR. MEUNIER:

20          Q.    Is the language of the

21    contract in English?

22               MR. SPANO:  Objection.

23               THE COURT:  I'm going to

24          overrule the objection.
```

```
 1              THE WITNESS:  This was the
 2         first time we did business.  We
 3         have never done that before.  Peng
 4         Wenlong translated it into
 5         Chinese.  I reviewed the contract.
 6         I saw it was okay.  I approved it.
 7    BY MR. MEUNIER:
 8         Q.   So, all of the language in
 9    this contract which you signed was read
10    to you in China in Chinese by Mr. Peng
11    Wenlong translating the document?
12         A.   Correct.  I saw that.
13         Q.   And with the authority of
14    Shandong Taihe Dongxin, you then approved
15    and signed this sales contract, didn't
16    you?
17         A.   Yes, yes.
18         Q.   And you put your company's
19    seal on the place where you signed,
20    right?
21         A.   Yes.
22              MR. MEUNIER:  Your Honor, if
23         you would just give me five
24         minutes recess, I'll just review
```

```
1        my notes and see if there's

2        anything further.

3                THE COURT:  Let's do it in a

4        couple of minutes.  I don't think

5        we need five.

6                MR. MEUNIER:  Yes.

7                THE VIDEOTAPE TECHNICIAN:

8        Going off the record.  The time is

9        4:59.

10                 -  -  -

11                (Whereupon, a recess was

12        taken from 4:59 p.m. until 5:01

13        p.m.)

14                 -  -  -

15                MR. MEUNIER:  Your Honor,

16        I'll tender the witness.

17                THE COURT:  No further

18        questions from Mr. Meunier.

19                THE VIDEOTAPE TECHNICIAN:

20        We're going back on the video

21        record.  The time is 5:01.

22                 -  -  -

23                EXAMINATION

24                 -  -  -
```

```
 1    BY MR. GONZALEZ:

 2          Q.    Hi, Mr. Fu.  I'm Ervin

 3    Gonzalez.

 4                Once TTP was formed, were

 5    all of the export sales conducted through

 6    it as opposed to TG?

 7          A.    Correct.

 8          Q.    So, at that point, TG

 9    stopped selling export sales, and they

10    were all done through TTP, correct?

11          A.    It is not entirely so.

12    There was a person who remained there

13    whose name is -- there is a person called

14    Zhang Nan, Z-H-A-N-G, last name, first

15    name, N-A-N.  He did not go to TTP.  He

16    remained there at TG.  He remained at TG.

17          Q.    Was he a salesperson to sell

18    exports?

19          A.    He was in charge of trading,

20    not necessarily exporting.

21          Q.    But the exporting part of

22    the business was through TTP once TTP was

23    formed, correct?

24          A.    If TG could have some
```

```
 1    businesses of their own, they could also

 2    do that.

 3            Q.    Right.

 4            A.    But for some local

 5    businesses, if they needed value added

 6    invoices, they would need to go to TTP

 7    because only TTP could issue such

 8    invoices.

 9            Q.    That's how TG worked through

10    TTP?

11            A.    What is it?

12            Q.    That's how TG worked through

13    TTP?  When they needed to export and use

14    the VAT benefits of TTP, it went through

15    TTP?

16            A.    No.  At the time that we

17    established TTP was because many of the

18    local customers wanted to have value

19    added invoices.

20            Q.    So TG established TTP to

21    carry that out?

22            A.    Correct.

23            Q.    And TG and TTP worked

24    closely together?
```

```
 1          A.     It's an independent company.

 2          Q.     Yes.  But you worked closely

 3    together?

 4          A.     They don't work together.

 5          Q.     Well, you sold the same

 6    brands of drywall, correct?

 7          A.     We could authorize them to

 8    sell this brand of drywall.

 9          Q.     And they, in fact, did sell

10    the same brands of drywall that were

11    manufactured by TG?

12          A.     Correct.

13          Q.     And the employees that were

14    working for TTP previously worked for TG?

15          A.     Correct.

16          Q.     And when TTP stopped

17    existing, those employees like Bill --

18    like Che Gang and Peng Wenlong went back

19    to work at TG?

20          A.     Correct.

21          Q.     And the address we heard

22    yesterday from Mr. Jia, the address for

23    TTP and TG were the same?

24          A.     What was the address you're
```

1    talking about?  I don't understand.

2         Q.    The address for the

3    businesses.

4         A.    They were about three

5    kilometers distance of the two companies.

6    TTP is located at Houzhou Village of

7    Taian, while TG is located at Dawenkou.

8         Q.    The directors that were

9    established for TTP came from TG, right?

10        A.    Yes.

11        Q.    The plant that was used by

12   TTP was previously owned by TG, correct?

13        A.    Yes.

14        Q.    When TTP stopped existing,

15   those plants went back to TG, correct?

16        A.    It was purchased back

17   because it was bought in the first place.

18        Q.    Same plant?

19        A.    Yes.

20        Q.    And the formulas that were

21   used to make drywall were the same for

22   TTP and for TG?

23        A.    The formulas of

24   manufacturing, I believe each of the

Confidential - Subject to Further Confidentiality Review

1  companies has slight difference from the

2  others because some of the equipments

3  were added.  After adding of the

4  equipments, the efficiency were better.

5      Q.    For the newer companies?  In

6  terms of efficiency, they were better for

7  the newer companies because they had new

8  machines, right?

9      A.    No.  Some dryer was added.

10     Q.    But the ingredients were --

11     A.    After adding of the dryer,

12  it is not necessary that the speed was

13  added.

14     Q.    The ingredients were the

15  same?

16     A.    Yes.

17     Q.    And if a product had the

18  name, for example, Dun, and it was made

19  at TTP's plant, or the same Dun was made

20  at TG, it's the same quality of drywall

21  that would be coming from each plant,

22  correct?

23     A.    I don't know who made Dun

24  brand products.  I knew that we made

Confidential - Subject to Further Confidentiality Review

 1   Taishan brand products.  We all made

 2   Taishan brand products.

 3        Q.    I represent to you that the

 4   Dun brand is listed in the TG catalog

 5   that's Exhibit Number 13 --

 6              MR. DAVIS:  20.

 7   BY MR. GONZALEZ:

 8        Q.    20 in your deposition.

 9        A.    I haven't seen that.

10        Q.    May I have the exhibit,

11   please?

12        A.    Where is it?

13              (Handing over document.)

14        Q.    I will show you.

15        A.    This is our trademark.  We

16   have registered many trademarks.  It is

17   not necessarily that we would manufacture

18   the trademark.

19        Q.    The trademark that you

20   registered, when you say "you," it's the

21   corporation, TG?  Yes?

22        A.    Yes.

23        Q.    And that's true for the Dun

24   trademark?

```
 1          A.    Yes.

 2          Q.    Okay.  And are these other

 3    trademarks on that Exhibit 20?

 4          A.    Yes.

 5          Q.    And can you identify all of

 6    the registered trademarks for TG that are

 7    listed there, please?

 8          A.    All of these?

 9          Q.    Yes.  But can you tell the

10    names, because some of them are in

11    Chinese, and I can't read Chinese?

12          A.    Taishan, West Lake, Five

13    Star, Dun, Ma.

14          Q.    You were previously shown,

15    when my colleague was asking you some

16    questions, an exclusive agency agreement

17    to sell the Dun product in the United

18    States of America.  Were you aware that

19    that was occurring at the time that the

20    contract was entered into?

21               MR. SPANO:  Objection, no

22          foundation.

23               THE COURT:  I'll allow him

24          to answer.
```

```
 1              THE WITNESS:  I was not
 2         aware of that.
 3    BY MR. GONZALEZ:
 4         Q.    Let me ask you just a few
 5    other questions, and then I'll pass you
 6    to my other colleague.  Were you
 7    compensated, without telling us the
 8    amount, for your services on the board of
 9    directors of TTP?
10         A.    I had no compensation.  TG.
11         Q.    So, you were only
12    compensated by TG, correct?
13         A.    Correct.
14         Q.    And you served also on the
15    board of TTP for no additional
16    compensation, correct?
17         A.    Correct.
18         Q.    Did the board of directors
19    of TTP have the right to hire and fire
20    employees for TTP?
21         A.    We did not have such a
22    right.
23         Q.    Who had the right to hire
24    and fire employees for TTP?
```

Confidential - Subject to Further Confidentiality Review

```
 1            A.     Peng Shiliang.

 2            Q.     Who is that by title?

 3            A.     He's the general manager,

 4    general manager's responsibility.

 5            Q.     General manager of TTP?

 6            A.     TTP's.

 7            Q.     Prior to his working for

 8    TTP, did he also work for TG?

 9            A.     Yes.

10            Q.     Did he go back to work for

11    TG after TTP stopped working?

12            A.     Yes, currently, yes.

13            Q.     As TTP was being formed, who

14    at -- let me restate that.

15                   As TTP was being formed, who

16    at TG decided what employees would stop

17    working at TG and begin working at TTP?

18            A.     They volunteer.  They could

19    volunteer because a new company was

20    formed.

21            Q.     Who was asking for the

22    volunteers on behalf of TG?

23            A.     By notification because we

24    formed TTP company.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Who issued the notification?
 2  Was it the board, was it the general
 3  manager?  And to be specific, here's what
 4  I'm asking.  What person on behalf of TG
 5  or entity on behalf of TG said to the TG
 6  employees, we're creating TTP, and we're
 7  looking for volunteers to work at TTP?
 8               MR. SPANO:  Objection.  Your
 9          Honor, he answered the first
10          question.  I think it should be
11          translated.
12               THE COURT:  Yes.
13               THE INTERPRETER:  Do you
14          want me to answer the question, or
15          what was the first?
16               MR. SPANO:  I'm asking that
17          you to translate his answer to the
18          first question which I heard him
19          give you.
20               INTERPRETER:  He did?
21               THE COURT:  Let's back up
22          then.
23               MR. SPANO:  We can move on.
24  BY MR. GONZALEZ:
```

```
 1          Q.    What person on behalf of TG

 2   or entity on behalf of TG said to the TG

 3   employees, we're creating TTP, and we're

 4   looking for volunteers to work at TTP?

 5          A.    There was no such a person.

 6   It was the office.

 7          Q.    But somebody at the office

 8   must have come up with the idea, we need

 9   volunteers to set up TTP, send out a

10   notice?

11          A.    That I do not know.

12          Q.    We were discussing the

13   brochure that discussed shipments or

14   exports to the United States of America,

15   and you were telling us that it was in

16   the brochure because it actually was good

17   to show that exports were made to foreign

18   countries including the United States of

19   America.  Do you agree with me that being

20   able to sell goods to the United States

21   of America is a good thing for the

22   business?

23              MR. SPANO:  Objection to

24          form.  Lack of foundation.
```

Confidential - Subject to Further Confidentiality Review

```
 1                THE COURT:  You have to be a

 2           little more specific.  Good thing

 3           for business?

 4   BY MR. GONZALEZ:

 5           Q.   You agree with me that

 6   selling goods to the United States of

 7   America is something that it would be

 8   considered a positive factor for the

 9   business in terms of prestige?

10                MR. SPANO:  Objection, calls

11           for speculation.

12                THE COURT:  I'll overrule

13           the objection.  He's speaking for

14           the company.

15                THE WITNESS:  It was not

16           only to sell to the United States,

17           but the image was meant to be a

18           global company, not necessarily

19           any specific country.

20   BY MR. GONZALEZ:

21           Q.   And that was actually one of

22   the reasons that you created the brochure

23   that's known as Exhibit 20, correct,

24   "you," the business?
```

```
 1          A.    Yes, like I said.

 2               MR. GONZALEZ:  Thank you.

 3          That's all I have.  I'll pass the

 4          witness.

 5               MR. SPANO:  Your Honor, for

 6          the record, I would like to renew

 7          my objection.  Mr. Fu is not

 8          speaking for the company.

 9               THE COURT:  Okay.  I

10          understand.  The same ruling.  I

11          overruled the objection.

12               Anybody else from any

13          company?

14               MS. BASS:  No.

15               Any redirect on Mr. Wu?

16                   -   -   -

17               EXAMINATION

18                   -   -   -

19     BY MR. SPANO:

20          Q.    Mr. Fu, I have to ask you a

21     few questions.

22          A.    Okay.

23          Q.    Do you recall testifying

24     earlier this afternoon to the effect that
```

1  if you were paid the money, you would

2  ship out the product?

3        A.    Yes.

4        Q.    Did Taishan Gypsum ship out

5  any products to any state in the United

6  States of America?

7        A.    No.

8        Q.    Do you recall answering a

9  series of questions regarding the export

10  activities of Taishan Gypsum described in

11  the product brochure, Jia Exhibit 20?

12        A.    Our products had always been

13  delivered in China.  As of the shipping

14  cost and where they shipped to, it would

15  be handled and decided by the customers.

16  We don't know where they were shipped to.

17        Q.    Did Taishan Gypsum or TTP's

18  export activities ever include shipping

19  drywall to any state in the U.S.?

20        A.    No.

21              MR. SPANO:  That's all I

22        have.

23              THE COURT:  Okay.  That's

24        the end.  Thank you very much.

1           Tomorrow we're going to start at

2           8:30 and try to get through a

3           little bit faster.

4                THE VIDEOTAPE TECHNICIAN:

5           This concludes today's deposition

6           of Fu Tinghuan.  The total number

7           of tapes today is four.  Going off

8           the record at 5:23.

9                     -  -  -

10          (Whereupon, the deposition

11          concluded at 5:23 p.m.)

12                     -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
 1            C E R T I F I C A T E
 2
 3
                  I, LINDA L. GOLKOW, a
 4   Registered Diplomate Reporter, Certified
     Court Reporter and Notary Public, do
 5   hereby certify that, pursuant to notice,
     the deposition of TINGHUAN FU was duly
 6   taken on January 10, 2012 at 1:30 p.m.
     before me.
 7
 8                  The said TINGHUAN FU was
     duly sworn by The Court according to law
 9   to tell the truth, the whole truth and
     nothing but the truth and thereupon did
10   testify as set forth in the above
     transcript of testimony.  The testimony
11   was taken down stenographically by me.
12
                  I do further certify that
13   the above deposition is full, complete
     and a true record of all the testimony
14   given by the said witness.
15
16
             Linda L. Golkow
17           Registered Diplomate Reporter
             Certified Realtime Reporter
18
19
20                  (The foregoing certification
     of this transcript does not apply to any
21   reproduction of the same by any means,
     unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24
```

1                    INSTRUCTIONS TO WITNESS

2

3

4                    Please read your deposition

5    over carefully and make any necessary

6    corrections.  You should state the reason

7    in the appropriate space on the errata

8    sheet for any corrections that are made.

9

10                   After doing so, please sign

11   the errata sheet and date it.  It will be

12   attached to your deposition.

13

14                   It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

```
  1                  - - - - - -

                   E R R A T A

  2                  - - - - - -

  3    PAGE   LINE   CHANGE

  4    _____  _____  _____

  5       REASON:  ____ _____

  6    _____  _____  _____

  7       REASON:  _____ _____

  8    _____  _____  _____

  9       REASON:  _____ _____

 10    _____  _____  _____

 11       REASON:  _____ _____

 12    _____  _____  _____

 13       REASON:  _____ _____

 14    _____  _____  _____

 15       REASON:  _____ _____

 16    _____  _____  _____

 17       REASON:  _____ _____

 18    _____  _____  _____

 19       REASON:  _____ _____

 20    _____  _____  _____

 21       REASON:  _____ _____

 22    _____  _____  _____

 23       REASON:  _____ _____

 24
```

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
                I,_____, do
 4    hereby certify that I have read the
      foregoing pages, 1-126, and that the same
 5    is a correct transcription of the answers
      given by me to the questions therein
 6    propounded, except for the corrections or
      changes in form or substance, if any,
 7    noted in the attached Errata Sheet.
 8

      _____
 9    TINGHUAN FU                DATE
10
11
12
13
14
15
      Subscribed and sworn
16    to before me this
      _____ day of _____, 20_____.
17
      My commission expires:_____
18
19    _____
      Notary Public
20
21
22
23
24
```

1                    LAWYER'S NOTES

2      PAGE   LINE

3      ____   ____   _____

4      ____   ____   _____

5      ____   ____   _____

6      ____   ____   _____

7      ____   ____   _____

8      ____   ____   _____

9      ____   ____   _____

10     ____   ____   _____

11     ____   ____   _____

12     ____   ____   _____

13     ____   ____   _____

14     ____   ____   _____

15     ____   ____   _____

16     ____   ____   _____

17     ____   ____   _____

18     ____   ____   _____

19     ____   ____   _____

20     ____   ____   _____

21     ____   ____   _____

22     ____   ____   _____

23     ____   ____   _____

24     ____   ____   _____

# 公 证 书

**中华人民共和国山东省泰安市岱岳公证处**

### Errata Sheet of Transcript of the Testimony of: Tinghuan Fu

付廷环证人证言勘误表

**January 10 2012**

2012 年 1 月 10 日

| Page: Line(s)<br><br>页码：行数 | Change from<br><br>原文 | Change to<br><br>更正 | Reason<br><br>原因 |
|---|---|---|---|
| 30:3 | "2007"<br><br>"2007" | "2008"<br><br>"2008" | Translation correction<br><br>翻译校正 |
| 34:9-15 | "I was the general -- I was the deputy general manager and the director of the sales company. There's supposed to be a separate director for the sales company, but there was none of that. So, I also became the manager of the sales company."<br><br>"我是销售公司的总——我是销售公司的副总经理兼董事。销售公司本应该有一名独立的董事，但实际并没有，我也是销售公司的经理。" | "I also worked as a manager at the sales company. There's supposed to be a separate manager who is responsible for the sales, but nobody else signed an agreement for this position. Thus, I took both positions."<br><br>"我兼职销售公司经理。按道理说，副总上边应该有一个销售公司经理，但经理没签成。这两个职务我都兼。" | Translation correction<br><br>翻译校正 |
| 70:1 | "advertisement"<br><br>"广告" | "reports"<br><br>"报告" | Translation correction<br><br>翻译校正 |
| 81:1 | "This is not necessarily be the fact."<br><br>"这不一定是事实。" | "This is not necessarily the fact."<br><br>"这不一定是事实。" | Clarification<br><br>具体说明 |
| 82:6 | "Chinese"<br><br>"中文" | "English"<br><br>"英语" | Translation correction<br><br>翻译校正 |
| 83:21 | "The office"<br><br>"办公室" | "The administrative office"<br><br>"行政办公室" | Clarification<br><br>具体说明 |
| 92:14 | "manufacturer"<br><br>"生产商" | "Manufacturing Department"<br><br>"生产部" | Clarification<br><br>具体说明 |

- 2 -

| 112:11-13 | "After adding of the dryer, it is not necessary that the speed was added."<br><br>"加上烘干机后并不一定加快速度" | "It's not that way. Adding dryers does not necessarily mean speed will increase."<br><br>"不是这样的，加上烘干机后不一定意味着速度的加快。" | Clarification<br><br>具体说明 |
|---|---|---|---|
| 115:10 | "TG"<br><br>"泰山石膏" | "[but from] TG"<br><br>"【但从】泰山石膏" | Clarification<br><br>具体说明 |
| 116:18 | "volunteer"<br><br>"志愿" | "make a personal decision"<br><br>"自愿" | Translation correction<br><br>翻译校正 |
| 116:19 | "volunteer"<br><br>"志愿" | "make a personal decision"<br><br>"自愿" | Translation correction<br><br>翻译校正 |
| 118:6 | "the office"<br><br>"办公室" | "the administrative office"<br><br>"行政办公室" | Clarification<br><br>具体说明 |

Confidential - Subject to Further Confidentiality Review

1

2               ACKNOWLEDGMENT OF DEPONENT

3
                    I,_____, do
4       hereby certify that I have read the
        foregoing pages, 1-126, and that the same
5       is a correct transcription of the answers
        given by me to the questions therein
6       propounded, except for the corrections or
        changes in form or substance, if any,
7       noted in the attached Errata Sheet.

8
        _____    2012. 3. 13
9       TINGHUAN FU                  DATE

10

11

12

13

14

15

        Subscribed and sworn
16      to before me this
        _____ day of _____, 20____.
17
        My commission expires:_____
18

19      _____

        Notary Public
20

21

22

23

24

证人宣誓书

我付廷环特此证实，我已经阅读过上述第 1 页至第 126 页，并且除在勘误表中关于的形式或实体上被更正的内容外，该第 1 页至第 126 页是我被问及各个问题的答复的正确笔录记载。

2012.3.13

付廷环                                    日期

兹于            年            月            日

在本人前宣誓后成作本宣誓书

本人公证资格有效截止日期为            年            月            日

（公证人签名）

# 公 证 书

（2012）泰岱岳证外字第 204 号

申请人：付廷环，男，一九六八年四月十二日出生，公民身份号码：370206196804121677。

公证事项：签名

兹证明付廷环于二〇一二年三月十三日在泰山石膏股份有限公司办公室，在本公证员的面前，在前面的《证人宣誓书》上签名。

中华人民共和国山东省泰安市岱岳公证处

公证员　

二〇一二年三月十三日

XVI 37106367

# NOTARIAL   CERTIFICATE

(2012)Tai Daiyue Zheng Wai Zi No.204

Applicant: Fu Tinghuan, male, born on April 12, 1968, citizen ID No.:370206196804121677.

Issue under notarization: Signature.

This is to certify that Fu Tinghuan on Taishan Gypsum Co., Ltd Office on March 13, 2012 and with the presence of the under-mentioned notary signed on the *ACKNOWLEDGMENT OF DEPONENT*.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

March 13, 2012

XW37108395

# 公　　证　　书

（2012）泰岱岳证外字第 205 号

　　申请人：付廷环，男，一九六八年四月十二日出生，公民身份号码：370206196804121677。

　　公证事项：译本与原本相符

　　兹证明前面的（2012）泰岱岳证外字第 204 号《公证书》的英文译本内容与该公证书中文原本相符。

中华人民共和国山东省泰安市岱岳公证处

公证员　张卫岳

二〇一二年三月十三日

XM37105398

# NOTARIAL   CERTIFICATE

(2012) Tai Daiyue Zheng Wai Zi No.205

Applicant: Fu Tinghuan, male, born on April 12, 1968, citizen ID No.:370206196804121677.

Issue under notarization: The translation is in conformity with the original copy.

This is to certify that the English translation content of (2012) Tai Daiyue Zheng Wai Zi No.204 *NOTARIAL CERTIFICATE* is in conformity with the Chinese original copy of that.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

March 13, 2012

XW37106887

**Updated Fu Tr. Ex. 1**

**(English Translation of Fu Tr. Ex. 1A)**

Translation of TG 0020710

# INFORMATION ON THE MEMBERS TO THE BOARD OF DIRECTORS, MEMBERS TO THE BOARD OF SUPERVISORS AND MANAGERS OF <u>SHANDONG TAIHE DONGXIN CO., LTD.</u>

| Name | Gender | Position | Domicile | ID Number | Mode of Production |
|------|--------|----------|----------|-----------|--------------------|
| Jia Tongchun | Male | Chairman, Manager | No.265 Taishan Blvd, Taishan District, Tai'an City | 3709021960 02081514 | Election |
| Wang Bing | Male | Director | 39 Jiancaicheng West Rd., Xisanqi, Haidian District, Beijing | 3428231972 02177219 | Election |
| Jia Jianjun | Male | Director | (illegible), Haidian District, Beijing | 4201066408 08419 | Election |
| Yang Yanjun | Female | Director | (illegible), Chaoyang District, Beijing | 1101056702 11412 | Election |
| Xu Xinghu | Male | Director | 65 Chaoyang Rd., Ningyang Town, Shandong | 3709215501 24007 | Election |
| Xue Yuli | Male | Director | Plasterboard Main Factory, Dawenkou Town, Daiyue District, Tai'an | 3709111953 12305212 | Election |
| Ren Xulian | Male | Director | No.265 Taishan Blvd, Taishan District, Tai'an City | 3709021960 05271575 | Election |
| Cao Jianglin | Male | Supervisor | 39 Jiancaicheng West Rd., Xisanqi, Haidian District, Beijing | 3101101966 09108010 | Election |
| Fu Tinghuan | Male | Supervisor | (illegible), Taishan District, Tai'an City | 3702061968 04121677 | Election |
| Yang Quanmin | Male | Supervisor | Dawenkou Plasterboard Dormitory, Daiyue District, Tai'an | 3709116309 07531 | Election |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Instructions: (1) Please fill out this form by the following order: Members to the Board of Directors, Members to the Board of Supervisors and Managers.
(2) The "Position" refers to director, chairman, managing director, supervisor, manager and etc.
(3) The "Mode of Production" refers to appointment, election and employment.

泰山玻璃纤维股份有限 公司

## 董事会成员、监事会成员、经理情况

| 姓 名 | 性别 | 职 务 | 住 所 | 身份证号码 | 产生方式 |
|---|---|---|---|---|---|
| 贺同春 | 男 | 董事长兼经理 | 泰安市泰山区东山大街215号 | 370902196002081514 | 选举 |
| 于云 | 男 | 董事 | 杭州市江干区建设四路35号 | 342521197202157721 | 选举 |
| 贾建章 | 男 | 董事 | 北京市海淀区建春苑5栋103门1号 | 420106640808419 | 选举 |
| 杨艳军 | 女 | 董事 | 北京市朝阳区青后安里东建外门 | 110105670211412 | 选举 |
| 徐吴辰 | 男 | 董事 | 山东省寿光县朝阳路68号 | 370925150134007 | 选举 |
| 蒋之利 | 男 | 董事 | 山东省济南市市中区协和家园4栋 | 3704119513201112 | 选举 |
| 任绪道 | 男 | 董事 | 泰安市东山区泰山大街265号 | 370902196002134 | 选举 |
| 曹之林 | 男 | 监事 | 北京市海淀区建材城西路面热苑2门 | 310111966070800 | 选举 |
| 朱任环 | 男 | 监事 | 泰安市泰山区东岳大街36号 | 3202611680411011 | 选举 |
| 杨金民 | 男 | 监事 | 泰安市泰山区东岳大街祝贤管委会 | 3701116309071 | 选举 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

注：①按董事会成员、监事会成员、经理顺序填写。
②"职务"系指董事、董事长、执行董事、监事、经理等。
③"产生方式"是指委派、选举、聘用。



FU

EXHIBIT NO. 1A

1-10-12

L. GOLKOW

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020710

**Updated Fu Tr. Ex. 2**

**(English Translation of Fu Tr. Ex. 2A)**

**Translation of TG 0020712**

# INFORMATION ON DIRECTORS, SUPERVISORS AND MANAGERS OF <u>SHANDONG TAIHE DONGXIN CO., LTD.</u>

| | |
|---|---|
| Name: <u>Ren Xulian</u><br>Position: <u>Director</u><br>ID Number: 370902196005271575 | Name: <u>Cao Jianglin</u><br>Position: <u>Supervisor</u><br>ID Number: 310110196609108010 |
| (illegible image) | (illegible image) |
| Name: <u>Fu Tinghuan</u><br>Position: <u>Supervisor</u><br>ID Number: 370206196804121677 | Name: <u>Yang Quanmin</u><br>Position: <u>Supervisor</u><br>ID Number: 370911630907531 |
| Name: Fu Tinghuan<br>Gender: Male    Ethnic Group: Han<br>Date of Birth: April 12, 1968<br>Address: (illegible), Taishan District, Tai'an City, Shandong Province (illegible)<br>No.370206196804121677 | Name: Yang Quanmin<br>Gender: Male    Ethnic Group: Han<br>Date of Birth: September 7, 1963<br>Address: Plasterboard Dormitory, Dawenkou Town, Daiyue District, Tai'an City, Shandong Province<br>Issued on May 1, 1994 Valid for 20 years<br>No. 370911630907531 |
| Name: _____<br>Position:_____<br>ID Number: | Name: _____<br>Position:_____<br>ID Number: |
| (put the ID photocopy here) | (put the ID photocopy here) |
| The above identity cards are identical with their originals, and we hereby assume liability for their authenticity.<br>          (the company puts the seal here) Shandong Taihe Dongxin Co., Ltd. ||

Attached forms for the registration of corporate change.

山东泰和东新股份有限公司 公司董事、监事、经理情况表

| 姓名 任继平 职务 董事 | 姓名 鲁江林 职务 监事 |
|---|---|
| 身份证件号码: 3709021760437 1575 | 身份证件号码: 3101019660910801 0 |

| 姓名 付延环 职务 监事 | 姓名 杨金民 职务 监事 |
|---|---|
| 身份证件号码: 37020614680412167) | 身份证件号码: 370916309073 |

| 姓名 ____ 职务 ____ | 姓名 ____ 职务 ____ |
|---|---|
| 身份证件号码: | 身份证件号码: |
| （身份证件复印件粘贴处） | （身份证件复印件粘贴处） |

以上身份证件与原件一致，谨此对真实性承担责任。

公司变更登记附表

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020712

ec 11 05 02:17p    Don Woods                   757-333-7633                    p.2

FROM : TAIHE GROUP              FAX NO. : 00865388871017    Dec. 02 2005 20:26    P1

# Contract

Contract NO.: SDTH051117A

Date: 17TH November 2005              Place: TAI'AN CHINA

The seller: Shandong Taihe Dongxin CO., LTD

  Address: Dawenkou Daiyue District Tai'an China

The buyer: Venture Supply, Inc.

  Address: 1140 Azalea Garden Road, Norfolk VA 23502-5612

This contract is made by and between the seller & buyer, whereby the seller

agree to sell and the buyer agree to buy the under mentioned commodity

according to the terms and conditions stipulated below:

1.term of delivery: delivery commodity in China port.

| Commodity & specification | Quantity | Unit price FOBLiang Yungang | Total value |
|---|---|---|---|
| Standard gypsum board (T/E) 12.7*1220*3660mm | 100,000 sheets | USD 3.58/sheet | USD358, 000.00 |
| | | | |
| Total | 100,000 sheets | USD 3.58/sheet | USD358, 000.00 |
| Total value of the contract: US DOLLAR Three hundred fifty-eight thousand ONLY | | | |

2. Quality and packing terms: the gypsum board should be produced as per

  relative standard of China GB/T9775-1999, using plastic inner package

  and gypsum pallet. It should be inspected and confirmed by Mr. Phillip W

VENTURE SUPPLY, INC.          VENTURE SUPPLY, INC.
President    1140 Azalea Garden Rd.    1140 Azalea Garden Rd.
Samuel G. Porch    Norfolk, VA 23502    Norfolk, VA 23502

–2–



F U

EXHIBIT NO. 3
1-10-12
L. GOLKOW

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0001684

Perry who come from Tobin Trading Inc and represents the buyer, stating that they have inspected the goods in seller's factory and China loading port and that the quality, specifications and packing meet buyer's requirement, stating that they agree to deliver the good. The stating can be regarded as the satisfactions of the buyer with the gypsum boards and packing.    And the stating is the part of the contract.

3. Term of payment: USD128880.00 should be paid in advance, the rest should be by irrevocable letter of credit at sight.

4. The buyer should be in charge of ocean transportation and instance; the ocean freight should be paid at the buyer's end.

5. Force majeure: the seller shall not be hold responsibility for late or non-delivery of the goods owing to the generally recognized "force majeure" cause. However in such case, the seller shall inform the buyer in four working days.

6. Arbitration: All disputes in connection with this contract shall be settled amicably by negotiation. In case no settlement can be reached, the case under dispute may then be submitted to the Foreign Trade Arbitration Commission of the China Council for the Promotion of International Trade. The decision of the arbitration shall be accepted as final and binding upon both parties.

7. The fax copies are regarded as valid.

VENTURE SUPPLY, INC.
1140 Azalea Garden Rd.
Norfolk, VA 23502

The buyer: Venture Supply, Inc.
Stamp and signature

–3–

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

# Contract

Contract NO.:SDTH05121601

Date: 16TH December, 2005          Place: TAI'AN CHINA

The seller: Shandong Taihe Dongxin CO., LTD

   Address: Dawenkou Daiyue District Tai'an China

The buyer: Venture Supply, Inc.

   Address: 1140 Azalea Garden Road, Norfolk VA 23502-5612

This contract is made by and between the seller & buyer, whereby the seller

agrees to sell and the buyer agrees to buy the under mentioned commodity

according to the terms and conditions stipulated below:

1. Term of delivery: deliver commodity in China port.

| Commodity & Specification | Quantity | Unit Price | Total Value |
|---|---|---|---|
| Standard gypsum board (T/E) 12.7*1220*3660mm | 100,000 sheets | USD 3.668/sheet | USD366800.00 |
| Total | 100,000 sheets | USD 3.668/sheet | USD366800.00 |
| Total value of the contract:US DOLLAR Three hundred sixty-six thousand and eight hundred   ONLY | | | |

2. Quality and packing terms: the gypsum board should be produced as per

the relative standard of China GB/T9775-1999, using plastic inner package,

gypsum pallet, gypsum protecting board and steel belt. It should be



EXHIBIT NO. 4
L. GOLKOW

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

2/2

inspected and confirmed by Mr. Phillip W Perry, who comes from Tobin Trading Inc and representes the buyer, stating that they have inspected the goods in seller's factory and China loading port and that the quality, specifications and packing meet buyer's requirement. The stating can be regarded as the part of the contract.

3. Term of payment: 30% earnest money should be paid in advance, the rest should be by irrevocable letter of credit at sight. We agree to accept the one hundred percent letter of credit for future orders (except this one).

4. The buyer should be in charge of ocean transportation and insurance, the ocean freight should be paid at the buyer's end.

5. Force Majeure: the seller shall not be held responsible for late or non-delivery of the goods owing to the generally recognized "Force Majeure" cause. However in such case, the seller shall inform the buyer in four working days.

6. Arbitration: All disputes in connection with this contract shall be settled amicably by negotiation. In case no settlement can be reached, the case under dispute may then be submitted to the Foreign Trade Arbitration Commission of the China Council for the Promotion of International Trade. The decision of the arbitration shall be accepted as final and binding upon both parties.

The seller: Shandong Taihe Dongxin CO., LTD

The buyer: Venture Supply, Inc.



CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

Inspection    Certificate

Date:

I, appointed by the buyer as its representative, the

goods (3660*1220*12.7mm gypsum board (1/E)) in seller's factory, a

that may meet buyer's specifications and qual

constructed not subject to insect infestation (no mold),

packing meets buyer's requirements.

We agree to transfer the goods to the loading port.

Note: seller:   Shandong Taihe Dongxin Co., Ltd

    Buyer:   Venture Supply Inc.

Tobin

Phili

Signatu

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0019856

T/T DIRECTION:

**COMPANY:** TAIAN TAISHAN PLASTERBOARD CO., LTD

**BANK:** AGRICULTURAL BANK OF CHINA, TAIAN BRANCH

**BANK ADDRESS:** 96 YINGXUAN ROAD, TAIAN, CHINA

**ACCOUNT:** 1448101008194

**SWIFT BIC:** ABOCCNBJ150

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER