

Transcript of the Testimony of:  **Shiliang Peng**

01/11/2012

Chinese Drywall

```
 1           UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
 2

     _____
 3                          § MDL NO. 2047
     IN RE:                 §
 4   CHINESE-               § SECTION: L
     MANUFACTURED           §
 5   DRYWALL PRODUCTS       § JUDGE FALLON
     LIABILITY              §
 6   LITIGATION             § MAGISTRATE
     _____    § JUDGE WILKINSON
 7

                     -   -   -
 8
       CROSS NOTICED IN VARIOUS OTHER ACTIONS
 9
                     -   -   -
10
                 January 11, 2012
11
                     -   -   -
12
         CONFIDENTIAL - SUBJECT TO FURTHER
13           CONFIDENTIALITY REVIEW
14                   -   -   -
15         Videotaped deposition of
     SHILIANG PENG, held at the Executive
16   Centre, Level 3, Three Pacific Place, One
     Queen's Road East, Hong Kong, China,
17   commencing at 8:30 a.m., on the above
     date, before Linda L. Golkow, Certified
18   Court Reporter, Registered Diplomate
     Reporter, Certified Realtime Reporter and
19   Notary Public.
                     -   -   -
20

21
22         GOLKOW TECHNOLOGIES, INC.
       877.370.3377 ph | 917.591.5672 fax
23             deps@golkow.com
24
```

```
 1   BEFORE:
 2          HONORABLE ELDON E. FALLON
            UNITED STATES FEDERAL COURT -
 3          EASTERN DISTRICT OF LOUISIANA
 4
 5   APPEARANCES:
 6
        GAINSBURGH, BENJAMIN, DAVID, MEUNIER
 7      & WARSHAUER, L.L.C.
        BY:  GERALD E. MEUNIER, ESQUIRE
 8      2800 Energy Centre
        1100 Poydras Street
 9      New Orleans, Louisiana 70163
        (504) 522-2304
10      gmeunier@gainsben.com
        Representing the Plaintiffs'
11      Steering Committee
12
        HERMAN HERMAN KATZ & COTLAR, LLP
13      BY:  LEONARD A. DAVIS, ESQUIRE
        820 O'Keefe Avenue
14      New Orleans, Louisiana 70113
        (504) 581-4892
15      Ldavis@hhkc.com
        Representing the Plaintiffs'
16      Steering Committee
17
        COLSON HICKS EIDSON
18      BY:  ERVIN GONZALEZ, ESQUIRE
        BY:  PATRICK S. MONTOYA, ESQUIRE
19      255 Alhambra Circle
        Penthouse
20      Coral Gables, Florida 33134
        (305) 476-7400
21      Ervin@colson.com
        Patrick@colson.com
22      Representing Plaintiffs' Steering
        Committee in the Federal and State
23      Coordinated Actions
24
```

```
 1   APPEARANCES (CONTINUED):
 2
         LEVIN, FISHBEIN, SEDRAN & BERMAN
 3       BY:  ARNOLD LEVIN, ESQUIRE
         510 Walnut Street - Suite 500
 4       Philadelphia, Pennsylvania 19106
         (215) 592-1500
 5       Alevin@lfsblaw.com
         Representing the Plaintiffs'
 6       Steering Committee
 7
         SEEGER WEISS LLP
 8       BY:  SCOTT A. GEORGE, ESQUIRE
         One William Street
 9       New York, New York 10004
         (212) 584-0700
10       Sgeorge@seegerweiss.com
         Representing the Plaintiffs'
11       Steering Committee
12
         HOGAN LOVELLS US LLP
13       BY:  JOE CYR, ESQUIRE
         875 Third Avenue
14       New York, New York 10022
         (212) 918-3000
15       Joe.cyr@hoganlovells.com
         Representing Taishan Gypsum Co.
16       Ltd. and Taian Taishan
         Plasterboard Company Ltd. and the
17       Witness, Shiliang Peng
18
         HOGAN LOVELLS INTERNATIONAL LLP
19       BY:  EUGENE CHEN, ESQUIRE
         18th Floor, Park Place
20       1601 Nanjing Road West
         Shanghai, China 200040
21       (86 21) 6122 3800
         eugene.chen@hoganlovells.com
22       Representing Taishan Gypsum Co.
         Ltd. and Taian Taishan Plasterboard
23       Company Ltd. and the Witness,
         Shiliang Peng
24
```

```
 1    APPEARANCES (CONTINUED):
 2
      GREENBERG TRAURIG, LLP
 3    BY:  HILARIE BASS, ESQUIRE
      1221 Brickell Avenue
 4    Miami, Florida 33131
      (305) 579-0745
 5    bassh@gtlaw.com
      Representing the Home Builders
 6    Steering Committee
 7
      PERKINS COIE LLP
 8    BY:  DAVID L. BLACK, ESQUIRE
      1899 Wynkoop Street
 9    Suite 700
      Denver, Colorado 80202
10    (303) 291-2300
      DBlack@perkinscoie.com
11    Representing the State of Louisiana
12
      THOMPSON COE COUSINS & IRONS, L.L.P.
13    BY:  KEVIN F. RISLEY, ESQUIRE
      One Riverway
14    Suite 1600
      Houston, Texas 77056
15    (713) 403-8210
      krisley@thompsoncoe.com
16    Representing The North River
      Insurance Company
17
18    BRENNER, EVANS & MILLMAN, P.C.
      BY:  THEODORE I. BRENNER, ESQUIRE
19    411 East Franklin Street
      Suite 200
20    Richmond, Virginia 23218
      Tbrenner@beylaw.com
21    (804) 644-1300
      Representing Tobin Trading Company
22
23
24
```

```
 1    APPEARANCES (CONTINUED):
 2
        McKENRY, DANCIGERS, DAWSON &
 3      LAKE, P.C.
        BY:  J. BRIAN SLAUGHTER, ESQUIRE
 4      192 Ballard Court
        Suite 400
 5      Virginia Beach, Virginia 23462
        (757) 461-2500
 6      Jbslaughter@va-law.org
        Representing Atlantic Homes LLC and
 7      Multiple Other Virginia-Based
        Defendants
 8
 9      QUINN EMANUEL URQUHART & SULLIVAN,LLP
        BY:  JANE M. BYRNE, ESQUIRE
10      BY:  JULIA BESKIN, ESQUIRE
        51 Madison Avenue
11      22nd Floor
        New York, New York 10010
12      (212) 849-7000
        Janeburne@quinnemanuel.com
13      Juliabeskin@Quinnemanuel.Com
        Representing Chartis Select Insurance
14      Company and Related Chartis Insurers
15
16      WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
        BY:  MICHAEL SEXTON, ESQUIRE
17      3344 Peachtree Road, NE
        Suite 2400
18      Atlanta, Georgia 30326
        (404) 876-2700
19      msexton@wwhgd.com
        Representing Various Banner
20      Defendants
21
22
23
24
```

```
 1        APPEARANCES (CONTINUED):

 2

          SINNOTT, NUCKOLS & LOGAN, PC
 3        BY:  KENNETH F. HARDT, ESQUIRE
          13811 Village Mill Drive
 4        Midlothian, Virginia 23114
          (804) 378-7600
 5        khardt@snllaw.com
          Representing Venture Supply, Inc. and
 6        Porter-Blaine Corp.

 7

     ALSO PRESENT:

 8

          SUNNY WANG, INTERPRETER

 9

10

11                   -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA TELEPHONE:
 2
 3         GALLOWAY JOHNSON TOMPKINS BURR and SMITH
           BY:  CARLINA C. EISELEN, ESQUIRE
 4         One Shell Square
           701 Poydras Street, 40th Floor
 5         New Orleans, Louisiana 70139
           (504) 525-6802
 6         ceiselen@gjtbs.com
           Representing Interior/Exterior
 7         Building Supply
 8
           HUNTON & WILLIAMS LLP
 9         BY:  A. TODD BROWN, ESQUIRE
           Bank of America Plaza
10         101 South Tryon Street
           Suite 3500
11         Charlotte, North Carolina  28280
           (704) 378-4700
12         Representing Stock Building Supply, LLC
13
14         JONES, WALKER, WAECHTER, POITEVENT,
           CARRERE & DENEGRE LLP
15         BY:  MEGAN E. DONOHUE, ESQUIRE
           600 Jefferson Street, Suite 1600
16         Lafayette, Louisiana 70501
           (337) 262-9062
17         mdonohue@joneswalker.com
           Representing Fireman's Fund Insurance
18         Company
19
           FULMER LEROY ALBEE BAUMANN
20         BY:  MICHAEL P. McCAHILL, ESQUIRE
           2866 East Oakland Park Boulevard
21         Ft. Lauderdale, Florida 33306
           (954) 707-4430
22         mosscandace@fulmerleroy.com
           mmccahill@fulmerleroy.com
23         Representing Independent Builders
           Supply Association (IBSA)
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA TELEPHONE (CONTINUED):
 2
 3    WRIGHT, FULFORD, MOORHEAD & BROWN, P.A.
      BY:  DORYK B. GRAF, JR., ESQUIRE
 4    145 N. Magnolia Ave.
      Orlando, Florida 32801
 5    (407) 425-0234
      dgraf@wfmblaw.com
 6    Representing West Construction, Inc.
 7
 8    QUINN EMANUEL URQUHART & SULLIVAN, LLP
      BY: CLINTON DOCKERY, ESQUIRE
 9    51 Madison Avenue, 22nd Floor
      New York, New York 10010
10    (212) 849-7000
      clintondockery@quinnemanuel.com
11    Representing Chartis Select Insurance
      Company and Related Chartis Insurers
12
13    RUMBERGER, KIRK & CALDWELL, P.A.
      BY:  MONICA C. SEGURA, ESQUIRE
14    Brickell Bayview Centre, Suite 3000
      80 Southwest 8th Street
15    Miami, Florida 33130
      (305) 358-5577
16    Representing several defendants and
      Defendants' Liaison Counsel for
17    Installers
18
      BUCHANAN INGERSOLL & ROONEY
19    BY:  C. ROBERT ZAPPALA, ESQUIRE
      One Oxford Centre
20    301 Grant Street, 20th Floor
      Pittsburgh, Pennsylvania 15219
21    (412) 392-2135
      bobby.zappala@bipc.com
22    Representing 84 Lumber
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM:
 2
      BECNEL LAW FIRM, L.L.C.
 3    BY:  ROBERT BECNEL, ESQUIRE
      106 W. 7th Street
 4    Reserve, Louisiana 70084
      (985) 536-1186
 5    robbecnel@aol.com
      Representing the Plaintiffs'
 6    Steering Committee
 7
      PARKER WAICHMAN ALONSO LLP
 8    BY:  JORDAN L. CHAIKIN, ESQUIRE
      3301 Bonita Beach Road
 9    Bonita Springs, Florida 34134
      (239) 390-1000
10    Jchaikin@yourlaywer.com
      Representing Plaintiffs' Steering
11    Committee
12
      MORGAN & MORGAN
13    BY:  PETE V. ALBANIS, ESQUIRE
      12800 University Drive
14    Suite 600
      Fort Myers, Florida 33907
15    (877) 667-4265
      Representing the Plaintiffs
16
17    IRPINO LAW FIRM
      BY:  ANTHONY IRPINO, ESQUIRE
18    2216 Magazine Street
      New Orleans, Louisiana 70130
19    Airpino@irpinolaw.com
      (504) 525-1500
20    Representing the Plaintiffs
21
22
23
24
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3        GALLOWAY JOHNSON TOMPKINS BURR and SMITH
          BY:  CARLINA C. EISELEN, ESQUIRE
 4        One Shell Square
          701 Poydras Street, 40th Floor
 5        New Orleans, Louisiana 70139
          (504) 525-6802
 6        ceiselen@gjtbs.com
          Representing Interior/Exterior
 7        Building Supply
 8
          HEARD & MEDACK, P.C.
 9        BY:  JAMES DAVIS, ESQUIRE
          9494 Southwest Freeway, Suite 700
10        Houston, Texas 77074
          (713) 772-6400
11        jdavis@heardmedackpc.com
          Representing CastleRock Communities, L.P.
12
13
          HUNTON & WILLIAMS LLP
14        BY:  A. TODD BROWN, ESQUIRE
          Bank of America Plaza
15        101 South Tryon Street
          Suite 3500
16        Charlotte, North Carolina  28280
          (704) 378-4700
17        tbrown@hunton.com
          Representing Stock Building Supply, LLC
18
19
          SHER GARNER CAHILL RICHTER KLEIN &
20        HILBERT, L.L.C.
          BY:  MATTHEW C. CLARK, ESQUIRE
21        909 Poydras Street
          Suite 2800
22        New Orleans, Louisiana 70112
          (504) 299-2100
23        mclark@shergarner.com
          Representing the Southern Home
24        Defendants
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3        QUINN EMANUEL URQUHART & SULLIVAN, LLP
          BY: CLINTON DOCKERY, ESQUIRE
 4        51 Madison Avenue, 22nd Floor
          New York, New York 10010
 5        (212) 849-7000
          clintondockery@quinnemanuel.com
 6        Representing Chartis Select Insurance
          Company and Related Chartis Insurers
 7
 8        JONES, WALKER, WAECHTER, POITEVENT,
          CARRERE & DENEGRE LLP
 9        BY:  MEGAN E. DONOHUE, ESQUIRE
          600 Jefferson Street, Suite 1600
10        Lafayette, Louisiana 70501
          (337) 262-9062
11        mdonohue@joneswalker.com
          Representing Fireman's Fund Insurance
12        Company
13
          DEUTSCH, KERRIGAN & STILES
14        BY:  MELISSA M. SWABACKER, ESQUIRE
          755 Magazine St.
15        New Orleans, Louisiana  70130
          (504) 581-5141
16        mswabacker@dkslaw.com
          Representing Landmark American
17        Insurance Company
18        PUGH, ACCARDO, HAAS, RADECKER, CAREY
          & HYMEL, LLC
19        BY:  DONNA M. YOUNG, ESQUIRE
          1100 Poydras Street
20        Suite 3200
          New Orleans, Louisiana 70163
21        Dyoung@pugh-law.com
          (504) 799-4500
22        Representing Stock Building Supply
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM (CONTINUED):

 2

 3         WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
           BY:  SHUBHRA MASHELKAR, ESQUIRE
 4         3344 Peachtree Road, NE
           Suite 2400
 5         Atlanta, Georgia 30326
           (404) 876-2700
 6         Smashelkar@wwhgd.com
           Representing Various Banner
 7         Defendants

 8
                          -  -  -
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    -  -  -
 2                I N D E X
 3  WITNESS                        PAGE NO.
 4  SHILIANG PENG
 5   By Mr. Meunier                   19
 6   By Ms. Bass                     112
 7   By Mr. Cyr                      116
 8   By Mr. Meunier                  124
 9
10
11                    -  -  -
12              E X H I B I T S
13
    NO.            DESCRIPTION        PAGE NO.
14
15   Peng S.-1     E-mail chain, top    51
                   e-mail in English
16                 dated August 03,
                   2006, Bates stamped
17                 TG 0019798 through
                   TG 0019800
18
     Peng S.-2     E-mail chain, top    56
19                 one dated
                   12/12/2005, Bates
20                 stamped TG 0019840
                   and TG 0019841
21
     Peng S.-3     E-mail chain, top    59
22                 one dated
                   10/15/2005, Bates
23                 stamped TG 0019813
                   and TG 0019814
24
```

| 1 | Peng S.-4 | Invoice dated July | 80 |
| 2 | | 03, 2006, Bates stamped TG 0020090 | |
| 3 | Peng S.-5 | Taian Taishan Plasterboard Co., | 83 |
| 4 | | Ltd., Packing List dated July 03, | |
| 5 | | 2006, Bates stamped TG 0019366 | |
| 6 | | | |
| | Peng S.-6 | Taian Taishan | 88 |
| 7 | | Plasterboard Co., Ltd., Invoice dated | |
| 8 | | July 20, 2006, Bates stamped TG | |
| 9 | | 00120091 | |
| 10 | Peng S.-7 | Taian Taishan Plasterboard Co., | 88 |
| 11 | | Ltd., Invoice dated July 20, 2006, | |
| 12 | | Bates stamped TG 00120092 | |
| 13 | | | |
| | Peng S.-8 | Taian Shandong | 91 |
| 14 | | Province Special Invoice for Export, | |
| 15 | | Bates number TG 0001657, TG | |
| 16 | | 0001658, TG 0001661, TG 0001663 | |
| 17 | | through TG 0001670, and TG 0001680 | |
| 18 | | through TG 0001682 | |
| 19 | Peng S.-9 | Settlement and | 100 |
| 20 | | Release Agreement, Bates stamped TG | |
| 21 | | 0020118 through TG 0020122 | |
| 22 | Peng S.-10 | Contract, Bates | 112 |
| 23 | | stamped TG 0001704 through TG 0001706 | |
| 24 | | | |

Confidential - Subject to Further Confidentiality Review

```
 1    Jia              Document in Chinese, 122
      Defendant's 45 Bates stamped TG
 2                     0026004 through TG
                       0026006
 3
      Jia              2006 Financial    122
 4    Defendant's 45A Statement of Taian
                       Taishan Plasterboard
 5                     Co., Ltd., Bates
                       stamped TG 0026004
 6                     through TG 0026006667
 7    Jia              Document in Chinese, 123
      Defendant's 46  Bates stamped TG
 8                     0026007 through TG
                       0026009
 9
      Jia              Balance Sheet, Bates 123
10    Defendant's 46A stamped TG 0026007
                       through TG 0026009
11
      Jia              Document in Chinese, 123
12    Defendant's 47  Bates stamped TG
                       0026010 through TG
13                     0026012
14    Jia              2008 Financial    123
      Defendant's 47A Statement of Taian
15                     Taishan Plasterboard
                       Co., Ltd. Balance
16                     Sheet, Bates stamped TG
                       0026010 through TG
17                     0026012
18
19
20
21
22
23
24
```

```
 1                   -  -  -

 2              THE VIDEOTAPE TECHNICIAN:

 3         We are now on the record.  My name

 4         is Dan Lawlor.  I'm a videographer

 5         for Golkow Technologies.  Today's

 6         date is January 11, 2012 and the

 7         time is 8:30 a.m.

 8              This video deposition is

 9         being held in Hong Kong, China in

10         the matter of Chinese Drywall

11         Litigation for the United States

12         District Court, Eastern District

13         of Louisiana, MDL Number 2047 and

14         cross-noticed in various other

15         actions.

16              The deponent today is

17         Shiliang Peng.  Will Your Honor

18         and all those present please state

19         your presence for the record.

20              THE COURT:  Judge Eldon

21         Fallon, Eastern District of

22         Louisiana.

23              MR. MEUNIER:  Gerry Meunier

24         appearing for the Plaintiffs'
```

Confidential - Subject to Further Confidentiality Review

1      Steering Committee in the MDL.

2            MR. DAVIS:  Leonard Davis on

3      behalf of the Plaintiffs' Steering

4      Committee and Plaintiffs' Liaison

5      Counsel.

6            MS. BASS:  Hilarie Bass on

7      behalf of Home Builders Steering

8      Committee.

9            MR. GONZALEZ:  Good morning.

10     Ervin Gonzalez and Patrick Montoya

11     on behalf of the PSC and the MDL

12     liaison states.

13           MR. HARDT:  Good morning,

14     Ken Hardt on behalf of Venture

15     Supply in the Germano action and

16     the Alexander state court action.

17           MR. BRENNER:  Theodore

18     Brenner on behalf of Tobin Trading

19     in the Germano action.

20           MR. SLAUGHTER:  Brian

21     Slaughter.  I'm here on behalf of

22     Atlantic Homes, LLC both in the

23     Commonwealth of Virginia and in

24     the MDL matters.

Confidential - Subject to Further Confidentiality Review

```
 1              MR. SEXTON:  Mike Sexton on
 2         behalf of certain Banner Supply
 3         entities.
 4              MR. BLACK:  David Black on
 5         behalf of the State of Louisiana
 6         reserving the positions set forth
 7         in our pending remand motion.
 8              MR. LEVIN:  Arnold Levin,
 9         lead counsel, Plaintiffs' Steering
10         Committee.
11              MR. GEORGE:  Scott Alan
12         George, Seeger Weiss, PSC.
13              MS. BESKIN:  Julia Beskin
14         from Quinn, Emanuel Urquhart &
15         Sullivan for the Chartis insurance
16         group.
17              MR. RISLEY:  Kevin Risley on
18         behalf of North River Insurance
19         Company.
20              MR. CYR:  Eugene Chen and
21         Joe Cyr of Hogan Lovells on behalf
22         of Defendants Taishan Gypsum and
23         TTP.
24              THE COURT:  Would you rise,
```

```
 1              please, sir.

 2                      -  -  -

 3              SHILIANG PENG, after having

 4       been duly sworn, was examined and

 5       testified as follows:

 6                      -  -  -

 7              THE COURT:  Have a seat,

 8       please.

 9              You may begin, Counsel.

10                      -  -  -

11              EXAMINATION

12                      -  -  -

13  BY MR. MEUNIER:

14       Q.    Good morning.

15       A.    Hello.

16       Q.    Would you please state your

17  name and business address.

18       A.    My name is Peng Shiliang,

19  last name, P-E-N-G, first name,

20  S-H-I-L-I-A-N-G.

21              I don't quite understand

22  what you mean by business address.

23       Q.    What address or addresses do

24  you use in order to conduct your
```

1   business?

2          A.      When I do my business?

3          Q.      Do you have an office?

4          A.      What period of time?

5          Q.      Today.

6          A.      Today I don't have an

7   office.

8          Q.      By whom are you employed?

9          A.      I don't have an office right

10  now.

11         Q.      By whom are you employed?

12         A.      I don't understand from the

13  beginning.  What do you mean by business

14  address?

15         Q.      I'm asking a different

16  question now.  Who do you work for?

17         A.      Currently I work for TG.

18         Q.      In your work for TG, do you

19  work in an office?

20         A.      I work in the manufacture.

21         Q.      You work at a manufacturing

22  plant?

23         A.      Correct.  I work in a

24  manufacture plant.

```
 1              Q.     Please give us the address
 2   of that plant.
 3                   INTERPRETER:   Interpreter
 4           clarification.
 5                   In Lucheng city,
 6           L-U-C-H-E-N-G, Shanxi province,
 7           S-H-A-N-X-I.
 8   BY MR. MEUNIER:
 9              Q.     Does the plant manufacture
10   drywall?
11              A.     There is a plant that
12   manufacture drywall.
13              Q.     Is the plant where you work
14   owned by TG?
15              A.     Yes.
16              Q.     What is your job position?
17              A.     I'm the manager of this
18   plant.
19              Q.     What are the duties and
20   responsibilities of the manager of the
21   plant?
22              A.     My duties are to be in
23   charge of the daily operation of the
24   plant to ensure its normal operation.
```

```
 1          Q.     Who is the boss that you

 2   report to?

 3          A.     I report to the executives

 4   of TG.

 5          Q.     And who are they?

 6          A.     Mr. Jia Tongchun.

 7          Q.     Anyone else?

 8          A.     And also Mr. Ren Xulian,

 9   R-E-N, last name, first name,

10   X-U-L-I-A-N.

11          Q.     What is the job position of

12   Mr. Ren Xulian?

13          A.     Deputy general manager of

14   TG.

15          Q.     Which employees at the plant

16   report to you as their boss?

17          A.     Deputy production general

18   manager and the people in charge in

19   financial department and supply

20   department.

21          Q.     Please give me the names of

22   those people.

23          A.     Production manager, Mr. Chen

24   Zhongjian, last name, C-H-E-N, first
```

1    name, Z-H-O-N-G-J-I-A-N.

2         Q.    Who in the financial

3    department reports to you?

4         A.    Dai Zhiming, D-A-I, last

5    name, first name, Z-H-I-M-I-N-G.

6         Q.    Who in the support

7    department reports to you?  I'm sorry.

8    Who in the supply department reports to

9    you?

10        A.    Sun Qingli, last name,

11   S-U-N, first name, Q-I-N-G-L-I.

12        Q.    Are you in your current job

13   involved in the marketing or sale of

14   gypsum board?

15        A.    I have not participated in

16   marketing and sales activities.

17        Q.    How long have you held your

18   current position?

19        A.    Since April 2009 until

20   today.

21        Q.    What was your position with

22   TG before April of 2009?

23             MR. CYR:  Objection.

24             THE COURT:  What's the

```
 1          objection for?

 2               MR. CYR:  The question

 3          assumes that he worked for TG

 4          prior to April of 2009.

 5               THE COURT:  Let's clarify

 6          that, please.

 7  BY MR. MEUNIER:

 8          Q.   Did you work for TG before

 9  2009, Mr. Peng?

10          A.   I did not work for TG before

11  that.

12          Q.   Who did you work for before

13  that?

14          A.   Before that, I worked for

15  TTP.

16          Q.   Is it true you started

17  working for TTP when that company was

18  created in February 2006?

19          A.   Yes, absolutely correct.

20          Q.   Tell me the job positions

21  you held with TTP between April 2006 and

22  April 2009.

23               MR. CYR:  That would be

24          February 2006.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. MEUNIER:  I'm sorry,

 2         February 2006 and April 2009.

 3              THE WITNESS:  My position in

 4         TTP while I worked there were

 5         Chairman of the Board of Directors

 6         and general manager.

 7    BY MR. MEUNIER:

 8         Q.    In that position, were you

 9    in charge of the daily operations of TTP?

10         A.    In that position, I was in

11    charge of the daily operation of TTP.

12         Q.    TTP was owned 100 percent by

13    TG; is that correct?

14         A.    Can you repeat that?

15         Q.    TTP was owned 100 percent by

16    TG; is that correct?

17         A.    TG is the only shareholder

18    of TTP.

19         Q.    When you were the manager of

20    TTP, did you report to any of the

21    executives of TG?

22         A.    As the manager of TTP, I

23    worked independently.  I did not report

24    to the executives of TG.
```

Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Who reported to you as boss

 2    during the time you were manager of TTP?

 3              A.    TTP's production manager and

 4    other relevant department managers in TTP

 5    reported to me.

 6              Q.    Please give me their names

 7    and job positions.

 8              A.    Song Qinghai, Mr. Song

 9    Qinghai, last name, S-U-N-G, first name,

10    Q-I-N-G-H-A-I.

11              MR. CHEN:  Pardon me, just

12         for clarification, the Pinyin is

13         S-O-N-G, not S-U.

14    BY MR. MEUNIER:

15              Q.    Was he the production

16    manager at TTP?

17              A.    Correct.  He was the

18    production manager of TTP.

19              Q.    Who were the other relevant

20    employees who reported to you at TTP?

21              A.    Mr. Peng Wenlong at sales

22    department.

23              Q.    Was he in charge of the

24    sales department at TTP?
```

Confidential - Subject to Further Confidentiality Review

1          A.     He was in charge of the

2    sales department in TTP.

3          Q.     Who else reported to you?

4          A.     Zhang Min in financial

5    department.  Last name, Z-H-A-N-G, first

6    name, M-I-N.

7          Q.     Who worked under Mr. Peng

8    Wenlong in the sales department of TTP?

9          A.     There were about seven or

10   eight employees under him and worked for

11   him.

12         Q.     Can you give me the names of

13   those you remember?

14         A.     Mr. Che Gang, Mr. Yang

15   Jiapo.  I can't remember the rest of the

16   names.

17         Q.     Are you a member of the

18   board of directors of TG?

19         A.     I am a member of TG's board

20   of directors.

21         Q.     For how long have you been a

22   member?

23         A.     Since its establishment in

24   February 2006 until today.

Confidential - Subject to Further Confidentiality Review

1          Q.      I was asking about you being

2     a member of the board of directors of TG

3     not TTP?

4          A.      I am not a member of the

5     board of directors in TG.

6          Q.      Have you ever been a member

7     of the board of directors of either

8     Shandong Taihe Dongxin or Taishan Gypsum?

9          A.      Neither.

10         Q.      Who did you work for before

11    TTP was created in February 2006?

12         A.      Before the establishment of

13    TTP in the year 2006, I worked at a

14    workshop in -- manufacturer workshop in

15    TG.

16         Q.      Were you employed by TG when

17    the name of the company was Shandong

18    Taihe Dongxin?

19         A.      Can you repeat the question?

20         Q.      Were you employed by a

21    company named Shandong Taihe Dongxin?

22         A.      Yes, correct.

23         Q.      When did you start working

24    for that company?

Confidential - Subject to Further Confidentiality Review

```
1            A.    In 1991.

2            Q.    Did you continue to work for

3    that company after it changed its name to

4    Taishan Gypsum?

5            A.    Can you repeat it?

6            Q.    When did Shandong Taihe

7    Dongxin change its name to Taishan

8    Gypsum?

9            A.    I don't recall that.

10           Q.    Did you work for Shandong

11   Taihe Dongxin until February 2006?

12           A.    Yes.

13           Q.    And then after TTP --

14                 After you left TTP in April

15   of 2009, you went back to work for the

16   company which at that time was called

17   Taishan Gypsum; is that true?

18           A.    Correct.  At the time, it

19   was already Taishan Gypsum Company.

20           Q.    Tell me all the positions

21   you held at Shandong Taihe Dongxin

22   between 1991 and February 2006?

23           A.    I did not have a position in

24   TG.
```

```
 1            Q.    No.  I was asking about
 2   Shandong Taihe Dongxin.  When you --
 3   shall I ask it again?
 4            A.    I was only an ordinary
 5   employee at TG.
 6            Q.    What job positions did you
 7   have at Shandong Taihe Dongxin from 1991,
 8   when you started, until February of 2006,
 9   when you went to work for TTP?
10            A.    I was only a director of one
11   of TG's production manufacturer workshop.
12            Q.    Were you the director of
13   that production workshop from 1991 until
14   February 2006?
15            A.    Yes.
16            Q.    Which production facility
17   did you direct?
18            A.    It is just one of TG's
19   gypsum board workshop.
20                  MR. MEUNIER:  Madam
21            Interpreter, I'm not clear about
22            the meaning of the word
23            "workshop."  Maybe you can help.
24                  THE COURT:  Well, ask the
```

```
 1          witness.

 2   BY MR. MEUNIER:

 3          Q.    Is a workshop a

 4   manufacturing facility?

 5          A.    Workshop is a manufacturer

 6   facility.

 7          Q.    Did you direct the same

 8   manufacturing facility from 1991 until

 9   February 2006?

10          A.    Yes, I directed that one

11   workshop.

12          Q.    Please give me the location

13   of that facility.

14          A.    It's located in Dawenkou

15   Town, Taian.

16          Q.    What product or products

17   does the facility manufacture?

18          A.    Those workshops produce and

19   only produce paper-faced gypsum board.

20          Q.    Who reported to you as boss

21   when you directed that facility from 1991

22   to February 2006?

23          A.    The deputy director of the

24   workshop reported to me.
```

1          Q.     Who was the deputy director?

2          A.     The deputy director was Hou

3     Yanyun, last name, H-O-U, first name,

4     Y-A-N-Y-U-N.

5          Q.     Who did you report to as

6     your boss when you were the director of

7     that facility?

8          A.     I reported to, at the time I

9     reported to Mr. Duan Zhentao, D-U-A-N,

10    first name, Z-H-E-N-T-A-O.

11         Q.     What was his position?

12         A.     Production manager.

13         Q.     Who were the sales employees

14    involved in the sale of gypsum board

15    manufactured at that facility between

16    1991 and February 2006?

17         A.     I was only in charge of the

18    production in the workshop.  I'm not sure

19    about the detailed sales employees.

20         Q.     Who was in charge of the

21    sales employees for the gypsum board

22    manufactured by that facility when you

23    were the director?

24         A.     Like I said, I was only in

Confidential - Subject to Further Confidentiality Review

1    charge of the production of the workshop.

2    I'm not sure who was in charge of the

3    sales.

4        Q.    You don't know who

5    supervised the sales personnel for the

6    gypsum board made at that facility when

7    you were the director?

8        A.    I was not in charge of the

9    sales.  I was only in charge of the

10   production of the workshop.

11       Q.    I understand you were not in

12   charge.  My question is, do you know who

13   was in charge of the sales personnel?

14       A.    TG was in charge of the

15   sales.

16       Q.    Who at TG?

17       A.    I had minimal contact with

18   the sales part.  As of now, I really

19   can't remember who was the person in

20   charge of sales.

21       Q.    How often did the board of

22   directors of TTP meet when you were chair

23   of the board from February 2006 to April

24   2009?

1          A.     The board of directors

2    meeting in TTP was held irregularly,

3    usually once a year.

4          Q.     Were reports made at the

5    board of directors meetings concerning

6    the marketing or sale of gypsum board?

7          A.     Sometimes at a board of

8    directors meeting, these words were

9    discussed.

10         Q.     Who made the report at the

11   board of directors meetings on marketing

12   and sales at TTP?

13         A.     Can you repeat the question?

14         Q.     Who made the report on

15   drywall marketing and sales at the board

16   of directors meetings for TTP?

17         A.     Usually I would make the

18   report for the board of directors.

19         Q.     How did you gather

20   information on the marketing and sale of

21   gypsum board in order to make that

22   report?

23         A.     The report was only a simple

24   summary of our productions and sales.

```
 1            Q.     How did you get the summary

 2    on sales?

 3            A.     I requested the balancing

 4    between the production and sales lower

 5    the product payments risk to provide good

 6    service for the customers.

 7            Q.     How did you learn the total

 8    volume of drywall sales as director of

 9    TTP?

10            A.     TTP's financial department

11    would have the statistics.

12            Q.     Were the reports on the

13    volume of drywall sales from the

14    financial department made in writing?

15            A.     It was in written form.

16            Q.     What was the name of the

17    written form?

18            A.     It was only a very simple

19    production and sales statistic report.

20            Q.     Is that the name of the

21    report, sales and statistic report?

22            A.     There wasn't a detailed name

23    for that report.  It's only reflected as

24    a form of form.
```

Confidential - Subject to Further Confidentiality Review

1          Q.    Did the report contain

2    information on foreign sales?

3                   MR. CYR:  Objection.

4                   THE COURT:  Can you ask him

5            for the time frame.

6    BY MR. MEUNIER:

7          Q.    During the time these

8    reports were made between February 2006

9    and April 2009 at TTP, did the reports

10   contain information on sales to foreign

11   customers?

12         A.    Like I just said, it was

13   only a very simple statistic form.

14   Because our company, TTP, did not do

15   direct exporting, therefore, the form was

16   not reflected on that.

17         Q.    What do you mean "The

18   company did not do direct exporting," Mr.

19   Peng?

20         A.    Hasn't Mr. Attorney asked me

21   the question regarding exporting to other

22   countries?

23         Q.    Did TTP sell drywall to

24   foreign customers?

Confidential - Subject to Further Confidentiality Review

```
 1              INTERPRETER:  Interpreter
 2         clarification.
 3              THE WITNESS:  To sell the
 4         drywall to who?
 5    BY MR. MEUNIER:
 6         Q.    Did the purchasers of TTP
 7    drywall between February 2006 and April
 8    2009 include businesses outside of China?
 9         A.    All the paper-faced drywall
10    that TTP produced had transactions within
11    China.
12         Q.    Is it your testimony that no
13    foreign customers purchased drywall
14    manufactured by TTP between February 2006
15    and April 2009?
16         A.    Like I said, all the
17    transactions regarding our products were
18    within China.
19         Q.    Do you deny that Peng
20    Wenlong, Che Gang and Yang Jiapo all
21    dealt and did business with foreign
22    customers when they were sales personnel
23    of TTP?
24         A.    You said deny?
```

```
 1              Q.    Is it true that the sales

 2     personnel, Peng Wenlong, Che Gang and

 3     Yang Jiapo, did business with foreign

 4     customers when they were sales employees

 5     of TTP?

 6              A.    I would like to repeat.

 7     Number one, all our transactions were

 8     within China.  Number two, some of our

 9     sales employees did sign some contracts

10     with the trading companies in China.

11                   MR. MEUNIER:  Your Honor, I

12              would like to move on, but I don't

13              think I'm getting a response to

14              the question.  I'll try one more

15              time.

16                   MR. CYR:  I agree, Counsel.

17     BY MR. MEUNIER:

18              Q.    Did Peng Wenlong, Che Gang

19     and Yang Jiapo, as sales employees of

20     TTP, between February 2006 and April

21     2009, do business with foreign purchasers

22     of drywall, by that I mean, purchasers

23     who were not in China?

24              A.    I don't have an impression
```

1    of that.

2              May I use the restroom?

3              THE COURT:  Yes.

4              THE VIDEOTAPE TECHNICIAN:

5         Going off the record.  The time is

6         9:20.

7              THE COURT:  Let's take a

8         10-minute break at this time.

9                   -  -  -

10             (Whereupon, a recess was

11        taken from 9:20 a.m. until 9:34

12        a.m.)

13                  -  -  -

14             THE VIDEOTAPE TECHNICIAN:

15        Going back on the record,

16        beginning of Tape Number 2.  The

17        time is 9:34.

18   BY MR. MEUNIER:

19        Q.   Mr. Peng, what documents did

20   you review in order to prepare for this

21   deposition?

22        A.    In order to prepare for

23   today's deposition, I have, together with

24   my attorney, reviewed relevant

Confidential - Subject to Further Confidentiality Review

1    information about TTP.

2         Q.    What relevant information

3    did you review?

4         A.    Most of the information are

5    about the article of incorporation of TTP

6    and the resolution of the meeting of

7    board of directors.

8         Q.    What did the resolution deal

9    with?

10        A.    One is at the establishment

11   of TTP, the purchasing of TTP from TG of

12   the two production lines.  And another

13   resolution was about TTP decided to sell

14   the two production lines to TG.

15        Q.    Does that refer to the sale

16   of TTP assets to TG when TTP stopped

17   doing business in April 2009?

18        A.    Correct.

19        Q.    What other documents, if

20   any, did you review?

21        A.    That's all I can name for

22   now.

23        Q.    How many meetings have you

24   had with your attorney in order to

```
 1    prepare for this deposition?

 2          A.    I didn't really pay

 3    attention, so, I can't really tell.

 4          Q.    What do you mean you didn't

 5    pay attention?

 6          A.    I didn't really pay

 7    attention how many times we met.

 8               INTERPRETER:  Correction.

 9               THE WITNESS:  I met with my

10          attorney.

11               MR. CHEN:  I'm sorry.  I

12          don't think the word "cuee" is

13          being translated.

14               MR. DAVIS:  Excuse me, Your

15          Honor.  We have a translator.

16               THE COURT: That's all right.

17          But do you understand?

18               MR. CHEN:  This is just a

19          recommendation for the interpreter

20          to accept or reject.

21               THE COURT:   Go ahead.

22          What's the problem?

23               MR. CHEN:  I think he's

24          saying I didn't specifically pay
```

```
 1          attention to that matter, and

 2          that's just my suggestion to you

 3          whether to accept it.

 4              THE COURT:  Let's get a

 5          clarification.  What do you mean?

 6          Ask him the question again, what

 7          do you mean by that.

 8  BY MR. MEUNIER:

 9          Q.    When you said you didn't pay

10  attention, what do you mean by that?

11          A.    Which is that I did not

12  remember how many times I met with my

13  attorney.

14          Q.    Did you meet with anyone

15  else besides your attorney in order to

16  prepare for this deposition?

17          A.    Beside my attorney, I've

18  also met with Mr. Jia Tongchun and Mr.

19  Peng Wenlong.  Jia Tongchun spelling is

20  J-I-A, first name, T-O-N-G-C-H-U-N.

21          Q.    Were any attorneys present

22  when you met with Mr. Jia and Mr. Peng

23  Wenlong?

24          A.    No.
```

```
 1          Q.    What did you discuss with

 2   them?  First Mr. Jia, tell me everything

 3   you remember discussing with Mr. Jia.

 4          A.    It's hard for me to remember

 5   and to say what exactly we have said at

 6   the time.  I don't remember clearly.

 7          Q.    When did you meet with Mr.

 8   Jia?

 9          A.    I'm not sure about the time.

10          Q.    Was it yesterday?

11          A.    Not yesterday.

12          Q.    Was it within the last week?

13          A.    We came together.  Of course

14   we met within the week.

15          Q.    Did Mr. Jia talk to you

16   about this case?

17          A.    In this process, we did not

18   talk about the case.

19          Q.    Did he give you advice how

20   to answer questions today?

21          A.    Like I said, in this

22   process, we did not talk about this

23   issue, so, we did not communicate about

24   this.
```

```
 1            Q.    You told me you met with him

 2    to get ready for the deposition.  What

 3    did you mean by that?

 4            A.    We came together by car.  If

 5    I had come by myself, I wouldn't be

 6    familiar with the route and the agenda.

 7    It would be safer that way.

 8                 THE COURT:  Let me interrupt

 9            and say something.

10                 Sir, I am the Judge who will

11            decide the issues in this case.

12            One thing I do when I make that

13            decision, I listen to the

14            testimony and I evaluate the

15            credibility of the truthfulness of

16            the witnesses.  I listen closely

17            to what people say, and it's

18            important for you to listen to the

19            question and to answer the

20            question, if you can.  Do you

21            understand that?

22                 THE WITNESS:  I understand.

23                 THE COURT:  Because if I get

24            the impression that you are not
```

```
1           answering the question

2           intentionally, I will discount

3           your testimony and not believe it.

4                 Do you understand that?

5                 THE WITNESS:  I understand.

6                 THE COURT:  Now let's

7           continue with the deposition, and

8           keep that in mind, please.

9     BY MR. MEUNIER:

10          Q.    Mr. Peng, when you met with

11    Mr. Jia to get ready for this deposition,

12    what did you and Mr. Jia discuss?

13                MR. CYR:  Objection, asked

14          and answered.

15                THE COURT:  The reason that

16          I'm going to allow it is because I

17          think it was asked, but I'm not

18          sure it was answered.  So I'll

19          overrule the objection.

20                THE WITNESS:  Can you repeat

21          your question?

22    BY MR. MEUNIER:

23          Q.    When you met with Mr. Jia to

24    get ready for this deposition, what did
```

1    you and Mr. Jia talk about?

2         A.    Mr. Jia and I checked on

3    some information of TTP.

4         Q.    What information?

5         A.    Like I just mentioned, such

6    as TTP's Article of Incorporation and

7    resolution of the board of directors

8    meeting.

9         Q.    Anything else besides that?

10        A.    Nothing else.

11        Q.    You did not talk about sales

12   to foreign customers?

13        A.    We did not talk about the

14   sales.  We did not sell to foreign

15   customers.  Our transaction has always

16   been within China, so, we cannot talk

17   about that.

18        Q.    Did Mr. Jia advise you to

19   say that today?

20        A.    No, no.

21        Q.    When you and Mr. Peng

22   Wenlong met in order for you to prepare

23   for this deposition, what did you and he

24   discuss?

Confidential - Subject to Further Confidentiality Review

1          A.    We talked about, as I said,

2     the Article of Incorporation and the

3     resolution of TG.  We also talked about

4     the aspects of sales.

5          Q.    Explain what you mean by

6     that, "aspects of sales."

7          A.    Because Mr. Peng Wenlong was

8     in charge of the sales in TTP.

9     Therefore, I asked him for information

10    regarding TTP's sales.

11         Q.    What information did you ask

12    him for, and what information did he give

13    you?

14         A.    He told me how the sales of

15    our gypsum board went about.

16         Q.    What exactly did he tell

17    you?

18         A.    Him and I only simply tried

19    to remember the sales work at TTP and how

20    we dealt with customers.

21         Q.    And what did you and he

22    remember about that?

23         A.    One is how much have we

24    produced and how much have we sold.

```
 1          Q.    And how much was produced
 2   and sold?
 3          A.    From the establishment of
 4   the company in 2006 until we stopped
 5   doing business, we had all together
 6   produced over 60 million square meter of
 7   the product.
 8          Q.    And how much was sold?
 9          A.    We've sold them all.
10   There's a balance between production and
11   sales.
12          Q.    How much was sold to
13   customers outside of China?
14               MR. CYR:  Objection.
15               THE COURT:  Ask him first
16          whether or not any was.
17   BY MR. MEUNIER:
18          Q.    Were any of the 60 square
19   meters -- I'm sorry -- 6 --
20               INTERPRETER:  Million.
21   BY MR. MEUNIER:
22          Q.    -- 6 million square meters
23   sold to customers outside of China?
24          A.    All the transactions of our
```

1   productions were taking place in China.

2   Perhaps some trading companies sold them

3   to outside of China.

4        Q.    How many of the purchasers

5   were outside of China?

6        A.    I was not in charge of the

7   detailed sales work, and it has been too

8   long.  I could not say exactly how much.

9        Q.    What is your best estimate

10  of how much?

11       A.    I could not give such an

12  estimation because all our products were

13  delivered in China.  As of how much had

14  the trading companies sold to us out of

15  China, I could not possibly know.

16       Q.    Why did TTP sales personnel

17  provide price and shipping cost

18  information for TTP gypsum board to

19  customers in the United States?

20       A.    I was not in charge of the

21  specific sales work.  For that question,

22  you should ask Mr. Peng Wenlong.

23       Q.    Do you believe sales

24  personnel for TTP provided price and

```
 1    shipping cost information for gypsum

 2    board to customers in the United States?

 3            A.     I don't know about that.

 4            Q.     Did they do that?

 5            A.     Like I said, I really don't

 6    know.

 7            Q.     Did they have authority to

 8    do that?

 9            A.     They will decide themselves

10    how will they sell, in what way did they

11    make the sales.

12            Q.     Did they have authority to

13    provide this information even for a

14    specific construction project located in

15    the United States of America?

16            A.     Because TTP had established

17    for a short period of time, I don't think

18    in that respect they had much experience

19    to do such job.

20            Q.     Did they have the authority

21    to do this?

22            A.     Whether they could do it or

23    not, I'm not sure.

24                   MR. MEUNIER:  Let me show
```

```
 1            you documents that have been

 2            marked TG 19798 through 19800, and

 3            I'll mark that as Peng Exhibit 1.

 4                      -  -  -

 5            (Whereupon, Deposition

 6            Exhibit Peng S.-1, E-mail chain,

 7            top e-mail in English dated August

 8            03, 2006, Bates stamped TG 0019798

 9            through TG 0019800, was marked for

10            identification.)

11                      -  -  -

12   BY MR. MEUNIER:

13            Q.    Mr. Peng, at the bottom of

14   Page 19798, continuing to the top of

15   19799, is an e-mail of August 1, 2006

16   from Josephine Wang to Yang Jiapo in

17   which Josephine Wang tells Mr. Yang she

18   is interested in learning more about his

19   product and doing business with him and

20   advises him that her company is currently

21   building in Philadelphia a project called

22   South Bridge.  She then asks Mr. Yang to

23   forward information about how he sells

24   abroad.
```

```
 1                    Please listen as the

 2      translator reads the reply from Mr. Yang

 3      to Ms. Wang by e-mail dated August 3rd,

 4      2006 at 3:11 a.m.  It is in the middle of

 5      Page 19798.

 6                    MR. MEUNIER:  (Addressing

 7      the interpreter.)  Would you please read

 8      it in English for us?

 9                    INTERPRETER:  I'm sorry.

10             You mean the one in the middle?

11                    MR. MEUNIER:  Yes.

12                    INTERPRETER:  Ms. Wang,

13             hello.  I'm glad to have received

14             your e-mail and now I'm sending

15             you all the information.  Please

16             take a look.  Normal gypsum board

17             4 by 12 by half, FOB Qingdao USD

18             4.15/PCS 660 PCS/40 FCL 26.5

19             tons/40 FCL.

20                    A new line.  4 by 8 by 1 and

21             a half -- I'm sorry.  Let me try

22             again.

23                    4 by 8 by half USD

24             2.77/PCS 960 PCS/40 FCL.
```

```
 1              Skip a line.  A new line.  4
 2         by 12 by half FOB LIANYUNGANG USD
 3         4.2/PCS 76 PCS/tray.
 4              A new line.  4 by 8 by
 5         half USD 2.8/PCS 76 PCS/tray.
 6              A new line.  Our company is
 7         the biggest gypsum board
 8         production facility.  Please take
 9         heart for the product quality and
10         volume.
11              Skip line.  Best wishes!
12              Skip three or four lines.
13         Yang Jiapo, 2006.8.2.
14    BY MR. MEUNIER:
15         Q.    Did Mr. Yang in this e-mail
16    provide to this person accurate and
17    truthful information concerning TTP
18    prices and shipping information?
19         A.    The detailed sales employees
20    would be in charge of the detailed
21    handling of specific sales in the process
22    of sales.  As Chairman of the Board of
23    Directors and general manager of the
24    company, I did not participate in that.
```

```
 1    Therefore, I have never seen this -- the

 2    content of this document.

 3         Q.    Mr. Peng, as long as TTP got

 4    paid, was it okay with you as director

 5    that the company sold its gypsum board to

 6    be used in a construction project in

 7    Philadelphia, Pennsylvania?

 8         A.    The sales principle of our

 9    company is to ensure production and sales

10    balancing and also to decrease the risk

11    that comes with the payment.  Therefore,

12    it doesn't matter who we sell the

13    products to, the collection of payment

14    has to be ensured.

15         Q.    Is it true that export

16    sales, when you were an employee of

17    Shandong, increased in the second half of

18    2005?

19         A.    Can you repeat it?

20         Q.    Is it true that export

21    sales, when you were employed at

22    Shandong, increased in the second half of

23    2005?

24         A.    Shandong?
```

Confidential - Subject to Further Confidentiality Review

1          Q.     Yes.

2          A.     Employee of Shandong?

3          Q.     No, sir.  I'm referring to

4    when you worked for Shandong in the

5    second half of 2005.

6                 Shandong Taihe Dongxin, when

7    you worked for that company in the second

8    half of 2005, is it true that export

9    sales of gypsum board increased?

10         A.     Like I said, in the year

11   2005, I was only a director of a

12   production workshop in TG.  I was not in

13   charge of the sales work.  Therefore, I

14   would not specifically collect

15   informations about this.  Therefore, I do

16   not know whether the exporting sales

17   increased.

18         Q.     Before they went to work for

19   TTP, Peng Wenlong, Che Gang and Yang

20   Jiapo were all sales employees of

21   Shandong Taihe Dongxin, true?

22         A.     That's true.  They were all

23   salespeople in TG.

24         Q.     In the second half of 2005,

Confidential - Subject to Further Confidentiality Review

1   as sales employees of Shandong Taihe

2   Dongxin, is it true they provided price

3   and shipping costs information to

4   customers in the United States of

5   America?

6          A.    I insist on my prior

7   statement.  I was only a director of a

8   production workshop.  I was not aware of

9   the detailed sales work.

10         Q.    Let me show you an example

11  of what I mean.

12              MR. MEUNIER:  I show you a

13         document which is Bates numbered

14         TG 19840 and 19841, and I will

15         mark that as Peng Number 2.

16                    -  -  -

17              (Whereupon, Deposition

18         Exhibit Peng S.-2, E-mail chain,

19         top one dated 12/12/2005, Bates

20         stamped TG 0019840 and TG 0019841,

21         was marked for identification.)

22                    -  -  -

23  BY MR. MEUNIER:

24         Q.    Mr. Peng, at the bottom of

```
 1    19840, continuing to the top of 19841, is

 2    an e-mail of December 12, 2005 to Mr.

 3    Yang Jiapo from Leon Liu, L-I-U, in which

 4    Mr. Liu asked for pricing information on

 5    32,000 boards for delivery in the Port of

 6    New York/New Jersey and pricing

 7    information on an additional 32,000

 8    boards for delivery to the Port of

 9    Savannah, Georgia.  In his e-mail to Mr.

10    Liu of December 11, 2005, which is in the

11    middle of 19840, please read Mr. Yang's

12    response.  And I'll ask the interpreter

13    to please read it in English for the

14    record.

15              INTERPRETER:  Here

16         (indicating)?

17              THE WITNESS:  (Reading in

18         Chinese.)

19              Mr. Liu, hello.  Regarding

20         to the port pricing, in this

21         e-mail, we have not received the

22         pricing of the port.  We can only

23         give you a pricing -- FOB pricing

24         for the customer's reference.
```

Confidential - Subject to Further Confidentiality Review

```
 1                 A new line.  4 by 12 by half
 2           ordinary gypsum board: FOB USD
 3           3.68/PCS.
 4                 A new line.  Response can be
 5           provided for other requirements as
 6           well.
 7                 A new line.  For the matter
 8           of samples, our company currently
 9           has a rule that our company will
10           not bear any cost for samples over
11           200 RMB because right now there
12           are too many American customers
13           that ask for samples, we do not
14           want to get a special approval.
15           We apologize.  I'm sorry.
16                 A new line.  Thank you.
17                 A new line.  Jiapo.
18                 A new line.  2005.12.12.
19    BY MR. MEUNIER:
20           Q.    Mr. Peng, as the director of
21    Shandong Taihe Dongxin gypsum board
22    manufacturing facility in December of
23    2005, was it okay with you if the drywall
24    produced there was sold for delivery to
```

```
 1    ports in the United States of America as

 2    long as the company got paid?

 3          A.    I insist on my prior

 4    statement that I was only a director of

 5    the production workshop.  As of the

 6    requirements for the salespeople, I

 7    really did not know.  I'm very sorry.

 8          Q.    Let me show you one other

 9    example, and then we'll move to a

10    different subject.  This is a document

11    Bates numbered TG 19813 and 19814 which I

12    will mark as Peng Number 3.

13                    -  -  -

14              (Whereupon, Deposition

15          Exhibit Peng S.-3, E-mail chain,

16          top one dated 10/15/2005, Bates

17          stamped TG 0019813 and TG 0019814,

18          was marked for identification.)

19                    -  -  -

20    BY MR. MEUNIER:

21          Q.    Mr. Peng, in this document,

22    there is an e-mail at the bottom of 19813

23    addressed to Mr. Yang Jiapo from Wenny

24    Yin, Y-I-N, dated October 15, 2005.  And
```

```
 1    in this e-mail, Ms. Yin requests

 2    information on certain pieces of gypsum

 3    board to be sent to the Port of

 4    Jacksonville, Florida, 100,000 pieces,

 5    and an additional 100,000 pieces to the

 6    Port of New Orleans, Louisiana.  Will you

 7    please read quietly to yourself Mr.

 8    Yang's e-mail reply of October 15, 2005

 9    at the top of 19813, and I will ask the

10    court reporter to read it in English for

11    the record.

12              THE COURT:  You mean the

13         interpreter?

14              MR. MEUNIER:  I'm sorry, the

15         interpreter.

16              THE WITNESS:  You mean

17         quietly reading it, meaning do not

18         read it out loud?

19              MR. MEUNIER:  Correct.  But

20         I would ask the interpreter to

21         please read it out loud in English

22         for the record.

23              INTERPRETER:  Dear Wenny

24         Yin, hello.  I have been following
```

1          up on the cargo ship for

2          individual cargos, and I have not

3          received a response.  Finally, I

4          have received information

5          regarding the ship, therefore, I

6          will give you the price.  Please

7          take a look.  Ordinary gypsum

8          board 3660 by 1220 by 12.7

9          mm CNFNEW ORLEANS PORT USD

10          7.22/PCS.

11               A new line.  Package, gypsum

12          board tray, 60 pieces/tray,

13          plastic inner membrane untie

14          humidity.

15               INTERPRETER:  Interpreter

16          needs clarification.

17               (Discussion of interpreter

18          and Mr. Chen in Chinese.)

19               MR. CHEN:  I think either is

20          fine.

21               INTERPRETER:  Waterproof

22          exterior gypsum board protection,

23          horizontal and vertical steel

24          belts packaging.

```
 1              A new line.  Term of
 2         payment, LC, instant payment, L/C.
 3              A new line.  In addition,
 4         there is no ship to Jacksonville
 5         port.
 6              Skip a few lines.  Thank
 7         you.  Please reply if you have any
 8         questions.
 9              Skip a few lines.  Jiapo.
10              A new line.  2005.10.15.
11    BY MR. MEUNIER:
12         Q.    Mr. Peng, when Mr. Yang and
13    other employees became sales personnel
14    for TTP, did they provide this same type
15    of detailed information about cargo and
16    shipping to the United States when they
17    dealt with customers?
18         A.    Salespeople were in charge
19    of detailed sales process in respect to
20    different circumstances.  Therefore, I
21    don't know whether they would do that or
22    not.
23         Q.    So, as the manager of TTP,
24    you left that up to the sales personnel?
```

Confidential - Subject to Further Confidentiality Review

1    Is that true?

2          A.    Correct.

3          Q.    One more question, Mr. Peng,

4    about this e-mail.  You'll notice that

5    information is requested on October 15,

6    2005 for 100,000 pieces of gypsum board

7    to go to the New Orleans port.  Were you

8    aware that only six weeks before that, a

9    major storm had destroyed property in the

10   New Orleans area, creating a great need

11   for rebuilding?

12         A.    Orleans, you mean Orleans?

13   Is that how should I put it?

14         Q.    New Orleans is good.

15         A.    New Orleans.  I have read

16   the news about the storm in New Orleans.

17   What was your question again?

18         Q.    Were you aware that this

19   storm in New Orleans, which was six weeks

20   before the e-mail we just read, created a

21   need for significant rebuilding in the

22   New Orleans area?

23         A.    Like I said, I have read the

24   news about the old New Orleans storm from

Confidential - Subject to Further Confidentiality Review

```
 1   media, and I know about it, but I don't

 2   know how they rebuilt the houses.

 3              MR. MEUNIER:  Your Honor, I

 4         have about an hour left, but this

 5         might be a good breaking point for

 6         me.

 7              THE COURT:  All right.

 8         Let's take a 15-minute break at

 9         this time.

10              THE VIDEOTAPE TECHNICIAN:

11         Going off the record.  This is the

12         end of Tape Number 2.  The time is

13         10:33.

14                   -  -  -

15              (Whereupon, a recess was

16         taken from 10:33 a.m. until 10:50

17         a.m.)

18                   -  -  -

19              THE COURT:  Sir, you are

20         still under oath.

21              THE VIDEOTAPE TECHNICIAN:

22         Going back on the video record,

23         the time is 10:50.  This is the

24         beginning of Tape Number 3.
```

```
 1   BY MR. MEUNIER:

 2        Q.    Mr. Peng, when you were

 3   manager of TTP, did you prepare a general

 4   manager's annual report of the company's

 5   work?

 6        A.    Our TTP's annual report has

 7   always been issued by our accounting

 8   firm.

 9        Q.    Did you approve and sign the

10   annual report?

11        A.    The annual report was

12   completed by the third party independent

13   accounting firm.

14        Q.    Let me refer you to exhibits

15   Jia 26 and 27, Defendant Jia Exhibits 26

16   and 27, which are the general manager

17   reports of TG for the years 2006 and

18   2007.  Have you seen those documents

19   before?

20        A.    I've heard in the general

21   manager's meeting for annual report, but

22   let me take a look.

23             (Reviewing documents.)

24             I have not seen these two
```

1    reports.  I have not.

2         Q.    Did TTP prepare annual

3    reports that were similar to those

4    reports?

5         A.    TTP have not prepared

6    reports that are similar to these.

7         Q.    You said you have not seen

8    those reports, but that you heard reports

9    at certain meetings.  Is that correct?

10        A.    I can't recall now.  I'm

11   very sorry.

12        Q.    Well, what meetings were you

13   talking about?

14        A.    These two reports, I do not

15   remember that I have seen these two

16   reports.

17        Q.    Do I understand, Mr. Peng,

18   that you have never been a member of the

19   board of directors of either Shandong

20   Taihe Dongxin or Taishan Gypsum?

21        A.    Correct.  I'm not a member

22   of TG's board of directors.

23        Q.    And you never have been?

24        A.    I have never been a member

```
 1    of TG's board of directors.

 2          Q.    And you have never been a

 3    member of the board of directors of

 4    Shandong Taihe Dongxin?

 5          A.    No, I have not been a member

 6    of the board of directors of Shandong

 7    Taihe Dongxin.

 8          Q.    Is it true that TTP was

 9    created for reasons related to value

10    added taxes?

11          A.    The purpose of TTP's

12    establishment was to be able to provide

13    value added tax invoices to the customers

14    who had such requests.

15          Q.    Was there any difference in

16    the nature of the drywall business

17    conducted by TG and TTP?

18                MR. CYR:  Objection, vague.

19                MR. MEUNIER:  I wanted to be

20          general, but...

21                THE COURT:  I think that's a

22          valid objection.  I sustain it.

23    BY MR. MEUNIER:

24          Q.    Can you tell us if there are
```

```
 1    any differences, Mr. Peng, between the

 2    drywall manufacturing process used by TG

 3    or Shandong and the process used by TTP?

 4           A.    The manufacturing process

 5    for manufacturing paper-faced drywall are

 6    pretty much the same.

 7           Q.    And TG, even when it was

 8    called Shandong Taihe Dongxin,

 9    manufactured certain brand names of

10    drywall such as Five Star and Dun; is

11    that true?

12           A.    I don't recall clearly as of

13    what brand of product the TG manufactured

14    at the time.

15           Q.    Did TG and TTP manufacture

16    drywall under the same brand names?

17           A.    TG authorized TTP to use the

18    brand Taishan and Taishan Wang.

19           Q.    Did TTP manufacture under

20    the brand names Five Star and Dun?

21           A.    We did not produce these two

22    brand's products.  The authorized

23    products -- the authorized brands were

24    Taishan and Taishan Wang, and also we
```

Confidential - Subject to Further Confidentiality Review

```
 1   manufactured according to the

 2   requirements of the customers.

 3        Q.    Do you know of any

 4   differences between TG and TTP in how

 5   they marketed and sold their drywall?

 6        A.    Well, I have not analyzed

 7   the differences between the two.  The

 8   sales principle of TTP were to keep the

 9   balance between production and sales, to

10   lower the risk of payment collection, to

11   make sure to provide good services for

12   our customers.

13             INTERPRETER:  Interpreter

14        clarification.

15             THE WITNESS:  To have a

16        better control of the pricing.

17   BY MR. MEUNIER:

18        Q.    And those are the same

19   principles that applied to Shandong Taihe

20   Dongxin and TG, true?

21        A.    These are the principles

22   applied to TTP.  As of TG's sales

23   principles, they must have had their own.

24   I'm not sure whether the principles are
```

```
 1    the same as TTP's.

 2         Q.    As far as you know, when

 3    sales employees of Shandong Taihe Dongxin

 4    became sales employees of TTP, were they

 5    given any new or different rules or

 6    guidelines for how they conducted sales?

 7         A.    I don't understand your

 8    question.

 9         Q.    As far as you know, were the

10    sales employees of TTP given any rules or

11    guidelines that were different from the

12    rules and guidelines they had as sales

13    employees of Shandong Taihe Dongxin?

14         A.    They would summarize on the

15    experiences in TG.  But as for TG's

16    special circumstances, they should base

17    their principles on TG's circumstances.

18         Q.    But as far as you know, the

19    rules they followed were the same, true?

20         A.    The same as to who?

21         Q.    Shandong Taihe Dongxin.

22              INTERPRETER:  Interpreter

23         clarification.

24              THE WITNESS:  TTP's sales
```

```
 1            employees only follow the rules

 2            and principles of sales of TTP's.

 3    BY MR. MEUNIER:

 4            Q.    Can you tell me how those

 5    rules and principles were different from

 6    the rules and principles for sales

 7    employees of Shandong Taihe Dongxin?

 8            A.    TTP had its own sales

 9    principle, while TG had its own

10    principle.  Whether the two principles

11    were the same, I'm not sure.

12            Q.    TTP stopped operating in

13    what year?

14            A.    TTP stopped operating in

15    January 2008.

16            Q.    Why?

17            A.    Through the two years

18    operation of TTP, the customers who

19    requested value added invoices were not

20    that much -- not that many.  However, TTP

21    had two paper-faced gypsum production

22    lines of 2 by 20 million.

23                 According to the regulation

24    of our country, for those enterprises
```

1    that had reached the production volume of

2    20 million paper-faced gypsum board would

3    be able to enjoy half of the value added

4    tax benefit.  So TTP's board of directors

5    and its shareholders had decided to stop

6    the operation of TTP.  That's the reason

7    behind TTP's stop of operating.

8         Q.    But you remained an employee

9    of TTP until April of 2009?

10        A.    You mean TTP's employee or I

11   myself?

12        Q.    You told us earlier that you

13   worked for TTP until April 2009, true?

14        A.    Correct, yes.

15        Q.    If TTP stopped operations in

16   January of 2008, please explain what you

17   did as its employee between January 2008

18   and April 2009?

19        A.    Even though during this

20   period of time, TTP had stopped its

21   operation, but there were still some

22   relevant assets and accountings that

23   needed to be handled.

24        Q.    Did the company earn any

Confidential - Subject to Further Confidentiality Review

```
 1    revenue or income between January 2008

 2    and April 2009?

 3         A.    There were a little bit of

 4    profit in that period of time, which were

 5    the gypsum board that were left and also

 6    some raw materials that were left.

 7         Q.    Who paid your salary between

 8    January 2008 and April 2009?

 9         A.    During that period of time,

10    I still got paid from TTP.

11         Q.    Were you paid the same

12    salary as before January 2008?

13         A.    I'm very sorry.  That's my

14    privacy.  Can I not answer that question?

15         Q.    I'm not asking you for the

16    dollar amount.  I'm just asking if the

17    salary stayed the same?

18              MR. CYR:  I think the Judge

19         wants to rule.

20              MR. MEUNIER:  I want to make

21         sure he understands that I don't

22         want his dollar amount.

23              THE COURT:  I don't want you

24         to say how much.  The question is
```

```
 1              whether it's the same.

 2                   THE WITNESS:  Not the same.

 3    BY MR. MEUNIER:

 4         Q.    How different?

 5                   THE COURT:  More or less?

 6                   THE WITNESS:  Because TTP

 7         had stopped its operations at the

 8         time, the salary that I received

 9         was less than when it was operated

10         normally.

11    BY MR. MEUNIER:

12         Q.    Is it true you have kept an

13    office at TTP?

14         A.    You mean right now?

15         Q.    As of April 6, 2011, is it

16    true you still kept an office at TTP?

17         A.    Right now, the people

18    left -- I'm sorry.

19                   Right now, the people that

20    remained in TTP still is working there.

21         Q.    But you are no longer

22    employed by TTP; is that true?

23         A.    According to TTP's company

24    law, the election is to be held every
```

Confidential - Subject to Further Confidentiality Review

1    three years.  But there was no election

2    after three years, but I am still the

3    legal person of TTP.

4           Q.    You are today an employee of

5    Taishan Gypsum, true?

6           A.    Yes, I am right now an

7    employee of Taishan Gypsum.

8           Q.    And your entire salary is

9    paid by Taishan Gypsum, true?

10          A.    My current salary is paid by

11   the company located in Shanxi, Lucheng.

12          Q.    Which company is that, sir?

13          A.    That's a subsidiary of TG

14   located in Shandong, Liaocheng to produce

15   paper-faced gypsum board.

16          Q.    That is a different

17   subsidiary than TTP, true?

18          A.    Correct.  This is only a

19   branch company.

20          Q.    What is the name of that

21   company?

22          A.    Shanxi Lucheng Taishan

23   Gypsum.  Shanxi Lucheng Taishan Gypsum,

24   Lucheng branch office.

```
 1            Q.    But even though you are an

 2    employee of Taishan Gypsum and your

 3    salary is paid by a different subsidiary

 4    of Taishan Gypsum, it is true that you

 5    still keep an office at TTP?  Is that

 6    true?

 7            A.    Where is it?

 8            Q.    Do you still keep an office

 9    at a TTP location, sir?

10            A.    TTP has office.

11            Q.    And you still have an office

12    at that location, don't you?

13            A.    Which location?

14            Q.    At the location of TTP.  At

15    any location of TTP, is it true that you

16    have an office?

17            A.    I have my own office in TTP.

18            Q.    So, you have an office at

19    TTP, and you also have an office at the

20    Taishan Gypsum factory in Lucheng,

21    correct?

22            A.    Correct.

23            Q.    Tell me the percentages of

24    time you spend at those two offices.  How
```

Confidential - Subject to Further Confidentiality Review

1    much at one office versus the other?

2         A.    Because TTP had stopped its

3    production and business and it does not

4    have much business right now, and also

5    there were remaining personnels working

6    at TTP.  Therefore, my time is basically

7    being spent at the office in Shanxi,

8    Lucheng branch office.

9         Q.    But you do spend some time

10   at the TTP office, don't you?

11        A.    I basically do not stay at

12   TTP.

13        Q.    But you keep an office there

14   and do go there sometimes, don't you, Mr.

15   Peng?

16        A.    Because there are still

17   remaining people work at the office right

18   now, if there is any issue, we

19   communicate through telephone.  My main

20   job right now is at Lucheng's branch

21   office.

22        Q.    But you still hold the title

23   of director or manager of TTP, don't you?

24                MR. CYR:  Objection.

Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT:  What's the basis

 2         of the objection?  Asked and

 3         answered?

 4              MR. CYR:  And I recommend

 5         that the interpreter not interpret

 6         my statement.

 7              THE COURT:  Right.

 8              MR. CYR:  I believe that

 9         he's testified that he terminated

10         his position at TTP in April of

11         2009.  The record is clear about

12         that.  What the record is not

13         clear about, in my opinion, is

14         that he continues to hold the

15         position of, quote, legal

16         representative, closed quote, of

17         TTP today, and that has been the

18         misunderstanding during your

19         dialogue during the last five

20         minutes.

21              MR. MEUNIER:  Well, I'll

22         change my question based on

23         counsel's direction, Judge.

24    BY MR. MEUNIER:
```

Confidential - Subject to Further Confidentiality Review

1          Q.    Do you still hold a title

2    with TTP today, namely, legal

3    representative, is that true?

4          A.    I am a legal person of TTP

5    right now.

6          Q.    That is why from time to

7    time you have to talk on the phone or

8    work with the people who remain at TTP?

9    Is that true?

10         A.    Correct.

11         Q.    But your entire salary for

12   all work activity, including that, is

13   today paid by a different subsidiary of

14   Taishan Gypsum; isn't that true?

15         A.    Correct.

16         Q.    Do you sometimes refer to

17   this group of customers as the Taishan

18   Group?  Group of companies, rather, as

19   the Taishan Group?

20         A.    No.

21         Q.    Is it true, Mr. Peng, that

22   in July of 2006, TTP sold more than

23   11,000 pieces of gypsum board to a

24   company called Advanced Products or APIC

1    for shipment to New Orleans, Louisiana in

2    the United States of America?

3         A.    I'm not sure about the

4    English name of that company you just

5    said.

6         Q.    Have you ever heard of

7    American -- I'm sorry -- Advanced

8    Products or APIC Building Materials?

9         A.    I don't recall the name of

10   these two companies.

11              MR. MEUNIER:  I show you a

12              document which has been stamped TG

13              20090, and I'll mark that as Peng

14              Number 4.  And the title of it is

15              "Taian Taishan Plasterboard

16              Company, Limited invoice."

17                    -  -  -

18              (Whereupon, Deposition

19              Exhibit Peng S.-4, Invoice dated

20              July 03, 2006, Bates stamped TG

21              0020090, was marked for

22              identification.)

23                    -  -  -

24   BY MR. MEUNIER:

Confidential - Subject to Further Confidentiality Review

1          Q.    Are you familiar with this

2    invoice form?

3          A.    I'm not familiar with this

4    invoice form.

5          Q.    Are you familiar with the

6    company Triax Trading & Logistics, LLC?

7          A.    I'm not familiar with this

8    name.

9                MR. MEUNIER: I show you

10               another document which I'll mark

11               as Peng Number 5, which is Bates

12               numbered 19366 entitled Taian

13               Taishan Plasterboard Company,

14               Limited "Packing List."

15                         -  -  -

16               (Whereupon, Deposition

17               Exhibit Peng S-5, Taian Taishan

18               Plasterboard Co., Ltd., Packing

19               List dated July 03, 2006, Bates

20               stamped TG 0019366, was marked for

21               identification.)

22                         -  -  -

23   BY MR. MEUNIER:

24         Q.    Are you familiar with this

Confidential - Subject to Further Confidentiality Review

```
 1   form?

 2              MR. CHEN:  I'm sorry,

 3         Counsel.  I have in my binder it

 4         goes from 19364 to 374.  You said

 5         366?

 6              MR. MEUNIER:  366.  Let me

 7         state for the record for The Court

 8         and for counsel that there does

 9         appear to be duplicate stamping on

10         these documents.  For example, the

11         invoice I refer to of July 3, '06

12         is Bates Number 20090.  It's also

13         Bates numbered 19365.  They appear

14         to be the same documents.

15              MR. CYR:  Can I just see it?

16              MR. MEUNIER:  (Handing over

17         document.)

18              What I have marked as Fu --

19         I'm sorry, Peng Number 4 is

20         actually two Bates Numbers.  19365

21         and 20090.

22              And what I have marked as

23         Peng Number 5 is Bates numbered

24         19366, and I submit that it's
```

```
 1           clear they deal with the same

 2           transaction, which is what I

 3           intended to clarify.

 4   BY MR. MEUNIER:

 5           Q.    Mr. Peng, my question now

 6   is, are you familiar with the packing

 7   list form, which is Peng Number 5?

 8           A.    I'm not familiar with this

 9   document.

10           Q.    If both of the documents I'm

11   showing you, Peng 4 and 5, have the same

12   invoice number, which is SDTH0622, and

13   the same date of July 3, 2006, is it fair

14   to say they both deal with the same

15   transaction?

16           A.    I'm not clear about that.  I

17   can't be sure of that.

18           Q.    The invoice refers to a

19   quantity of 5,676 pieces of gypsum board

20   at a cost in US dollars of $4.25 each for

21   a total amount of $24,123 being shipped

22   from Qingdao to New Orleans, Louisiana.

23   Did TTP sell this gypsum board on July

24   3rd, 2006 as indicated on the invoice and
```

Confidential - Subject to Further Confidentiality Review

1  packing list?

2        A.    I'm sure the gypsum board

3  was sold, but I really am not sure about

4  the process.

5        Q.    Would you, though, as

6  director, approve the sale of TTP gypsum

7  board at that price to be shipped to New

8  Orleans, Louisiana in July of 2006?

9        A.    The price of gypsum board

10  was specifically discussed and determined

11  by the sales department.

12        Q.    And if the price was right,

13  it was okay that the board was being

14  shipped to New Orleans, Louisiana in the

15  United States, true?

16        A.    After the price was

17  determined, I am not sure where exactly

18  the gypsum board was shipped to.

19        Q.    But TTP authorized the

20  shipment of board purchased at this price

21  to New Orleans, Louisiana in the United

22  States, true?

23        A.    Our gypsum board, which is

24  the gypsum board that produced by TTP,

Confidential - Subject to Further Confidentiality Review

```
 1   has always been delivered in China.

 2   Whether it would be shipped to that

 3   location or how was it shipped to that

 4   location, I am not sure about the

 5   process.

 6           Q.    But from TTP's own sales

 7   documents, including these invoices and

 8   packing lists, TTP knew that the gypsum

 9   board was being delivered to New Orleans,

10   Louisiana, correct?

11                MR. CYR:  Objection.

12                THE COURT:  Ask him about

13           the invoices.

14   BY MR. MEUNIER:

15           Q.    Do you agree the invoice and

16   packing list of your company, TTP at that

17   time, indicated that this gypsum board

18   being sold by TTP was being delivered to

19   New Orleans, Louisiana?

20           A.    Please repeat your question.

21                THE COURT:  Why don't you

22           read it back to him.

23   BY MR. MEUNIER:

24           Q.    You agree that the invoice
```

1    and packing list I'm showing you, which

2    are your company's invoice and packing

3    list, show that this gypsum board that

4    you sold was shipped to New Orleans,

5    Louisiana, true?

6           A.    Because TTP produced the

7    gypsum board.

8                 THE COURT:  Let me see the

9          invoice.

10                THE WITNESS:  (Handing over

11         document.)

12                THE COURT:  The invoice

13         which is marked Exhibit Number 4,

14         which is invoice SDTH0622,

15         indicates that the material will

16         be delivered from -- is that O or

17         Q?

18                MR. MEUNIER:  Q.

19                THE COURT:  Q-I-N-G-D-A-O to

20         New Orleans, Louisiana.  It's

21         dated July 3rd, 2006.  Isn't that

22         correct, sir?

23                THE WITNESS:  The location

24         that is written on this invoice

```
 1          was marked by us according to the

 2          requirement of the customers.

 3   BY MR. MEUNIER:

 4          Q.    Did the company wish to make

 5   money from that sale?

 6                THE COURT:  Which company?

 7                MR. MEUNIER:  TTP.

 8                THE WITNESS:  As a

 9          manufacturing company, making

10          money is, of course, its main

11          purpose.

12   BY MR. MEUNIER:

13          Q.    And so TTP intended to make

14   money and did make money from the sale of

15   the gypsum board reflected on those

16   documents in front of you; is that true?

17          A.    To sell our paper-faced

18   gypsum board, we, of course, need to

19   concern about the cost and, of course,

20   the profit.

21                THE COURT:  I will take that

22          as an indication that the answer

23          is yes?

24                Now, I tell you again, sir,
```

```
1          you took an oath today to tell the

2          truth.  If I find that you did not

3          tell the truth intentionally, that

4          will be very bad for your company

5          as well as you.  Do you understand

6          that, sir?

7               THE WITNESS:  I understand.

8               THE COURT:  Any further

9          questions?

10               MR. MEUNIER:  Additional

11          documents, Your Honor.

12                    -   -   -

13               (Whereupon, Deposition

14          Exhibit Peng S-6, Taian Taishan

15          Plasterboard Co., Ltd., Invoice

16          dated July 20, 2006, Bates stamped

17          TG 00120091, and Deposition

18          Exhibit Peng S-7, Taian Taishan

19          Plasterboard Co., Ltd., Invoice

20          dated July 20, 2006, Bates stamped

21          TG 00120092, were marked for

22          identification.)

23                    -   -   -

24     BY MR. MEUNIER:
```

1        Q.    Mr. Peng, I show you an

2   invoice which is Bates numbered TG 20091,

3   which I'll mark as Peng-6, and an invoice

4   Bates numbered 20092, which I'll mark as

5   Peng-7.  And I will ask you to confirm

6   that these invoices both refer to the

7   sale of 5,760 pieces of drywall at the

8   cost of $4.34 in US dollars on July 20,

9   2006 with shipment from Qingdao, China to

10  New Orleans, Louisiana.

11       A.    I don't understand English.

12  I don't understand.

13       Q.    If the documents I put in

14  front of you reflect the sale of over

15  5,000 pieces of drywall priced in US

16  dollars and being shipped to New Orleans,

17  Louisiana, do you have any reason, as you

18  sit here today, to deny that the

19  documents are accurate in reflecting that

20  information?

21       A.    I do not deny.

22       Q.    The prices of the gypsum

23  board per sheet or per piece are

24  different in the July 3rd and July 20

```
 1    sales transactions reflected by these

 2    invoices.  Can you explain why?

 3              THE COURT:  Do you have much

 4         more?

 5              MR. MEUNIER:  Your Honor,

 6         I'm afraid I do.  I probably have

 7         another 45 minutes.  I'm sorry.

 8         It's going a little slower than I

 9         thought.

10              MR. CYR:  You're showing him

11         documents he's never seen before.

12              MR. MEUNIER:  He's the

13         director of the company.

14              MR. CYR:  It's you and the

15         Judge are in charge.

16              THE COURT:  Folks, no.  He's

17         not in charge.  I'm in charge.

18              MR. MEUNIER:  I have another

19         maybe 30 to 45 minutes.

20              THE COURT:  We'll take a

21         break in ten minutes, and then

22         we'll come back.

23    BY MR. MEUNIER:

24         Q.   Why were the prices
```

Confidential - Subject to Further Confidentiality Review

```
 1   different in those invoices?

 2          A.    The price of the gypsum

 3   board sold is affected by volume, cost

 4   and shipping distance.  Therefore, it has

 5   some certain ups and downs in pricing.

 6   The specific salespeople are in charge of

 7   this operation.

 8          Q.    Mr. Peng, I want to show you

 9   a series of documents which are entitled

10   "Taian Shandong Province Special Invoice

11   for Export," which I'll mark as Peng-8 in

12   globo, Bates number TG 1657, 1658, 1661,

13   1663, 1664, 1665, 1666, 1667, 1668, 1669,

14   1670, 1680, 1681 and 1682.

15                    -  -  -

16              (Whereupon, Deposition

17          Exhibit Peng S.-8, Taian Shandong

18          Province Special Invoice for

19          Export, Bates number TG 0001657,

20          TG 0001658, TG 0001661, TG 0001663

21          through TG 0001670, and TG 0001680

22          through TG 0001682, was marked for

23          identification.)

24                    -  -  -
```

```
 1   BY MR. MEUNIER:

 2        Q.    Are you familiar with this

 3   form?

 4        A.    I have not seen these forms

 5   because I'm not a detailed financial

 6   personnel nor the detailed sales

 7   personnel.

 8        Q.    Do you deny that the forms

 9   all indicate that the exporter is Taian

10   Taishan Plasterboard Company, Limited?

11             MR. CYR:  Objection.

12             THE COURT:  Now, wait a

13        minute.  I sustain the objection.

14        They are what they are.  If he has

15        not seen them, how is he going to

16        testify about them?  They are what

17        they are.  This witness said he

18        hasn't seen them.

19   BY MR. MEUNIER:

20        Q.    Mr. Peng, were special forms

21   required by the local Shandong province

22   government for the export sale of gypsum

23   board by TTP?

24        A.    I'm not familiar in this
```

Confidential - Subject to Further Confidentiality Review

```
 1    part, because I'm not the person detailly

 2    operating the sales.

 3                  THE COURT REPORTER:

 4          Detailed?

 5                  INTERPRETER:  Detailly

 6          operating the sales.

 7    BY MR. MEUNIER:

 8          Q.    Although you're not familiar

 9    with the details, Mr. Peng, you do know,

10    don't you, that the government required

11    special invoice for the export of gypsum

12    board by TTP?

13          A.    I don't know whether special

14    invoices were used, but I know it had to

15    be approved and recorded by the foreign

16    trading department.

17          Q.    And you do not deny, do you,

18    that between 2006 and 2007, TTP made

19    export sales of gypsum board for delivery

20    to the United States, to New Orleans,

21    Louisiana, to Miami, Florida, and to New

22    York, New York?  You don't deny that, do

23    you?

24                  MR. CYR:  Objection.
```

```
 1                THE COURT:  What's the

 2           basis, Joe?

 3                MR. CYR:  (Addressing the

 4           interpreter.)  Please don't

 5           interpret.

 6                It just seems to me that

 7           it's going to be difficult in the

 8           translation to distinguish between

 9           not denying and actually knowing.

10           If you want to know if he knew

11           that, I think the better question

12           is whether or not he knew that.

13           I'm just afraid that you're going

14           to get a "yes" on don't deny.  I'm

15           not quite sure what it means.

16                THE COURT:  Ask him about

17           knowing.  I think that's a

18           legitimate observation.  If this

19           witness knows, he knows.  If he

20           doesn't know, he doesn't.

21      BY MR. MEUNIER:

22           Q.   Mr. Peng, do you know that

23      in 2006 and 2007, TTP, as reflected by

24      these invoices, sold gypsum board that
```

Confidential - Subject to Further Confidentiality Review

1    was delivered to New Orleans, Louisiana,

2    the USA, Miami, Florida, Miami/USA and

3    New York?

4         A.    All our gypsum boards were

5    delivered in China.  Whether some other

6    trading company had actually shipped them

7    over there or how were they shipped over

8    there, I'm not sure about that.

9         Q.    But you don't deny that

10   forms that TTP may have filled out for

11   export purposes indicate the shipping

12   destinations in the United States that I

13   have mentioned?  You do not dispute that,

14   do you?

15        A.    Let me put it this way.

16   Reflected in this document, the exporting

17   enterprise name is TTP.  This is in

18   accordance with the fixed form of the

19   special invoice for export.  Customers

20   will tell us where did they want us to

21   ship the products to according to the

22   invoice, then we would write down the

23   destination on the invoice.  As of

24   whether it had indeed shipped to that

```
 1   place, I am not sure.  Because this

 2   belongs to customer's business secret,

 3   therefore, we would neither ask nor

 4   speculate.

 5        Q.   Who filled out the

 6   information on these forms?

 7        A.   I'm not sure whether the

 8   information on the form was filled out by

 9   the financial department or the taxation

10   department.

11        Q.   But you would agree, all the

12   information on the forms was verified by

13   your company?

14        A.   This invoice does belong to

15   our company.

16             MR. MEUNIER:  Thank you,

17        sir.  I'll mark that as Peng

18        Number 8 in globo.

19             Your Honor, I have one final

20        area of questioning for this

21        witness which I think will take

22        about 30 minutes.  If The Court

23        would like me to do so after a

24        break, I will.
```

Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT:  What's your
 2         situation, Joe?  Do you want to go
 3         on or you want to take a break.
 4              MR. CYR:  I'm going to need
 5         20 minutes if Your Honor allows
 6         it.  So, I guess it's just a
 7         question of whether you decide
 8         that we have an early lunch now or
 9         break for lunch at 1.  If you only
10         go a half hour, I can finish
11         before 1:00.
12              THE COURT:  I don't have any
13         problem.  You have to get out of
14         here.  That's why --
15              MR. CYR:  No, no, no.  I
16         don't have to get out of here this
17         afternoon, Judge.  It is tomorrow
18         morning.
19              MR. MEUNIER:  But if we
20         delay lunch, the witness could be
21         free.
22              MR. CYR:  Yeah, yeah.  That
23         would be great.
24              MR. MEUNIER:  I don't know
```

Confidential - Subject to Further Confidentiality Review

1          who else has questions, though.

2                  MR. CYR:  So, if it's all

3          right with the Judge, we can --

4                  THE COURT:  You want to

5          continue?  I don't have any

6          problem.

7                  MR. CYR:  Continue until

8          1:00.

9                  THE COURT:  Okay.  That's

10         fine.

11                 THE VIDEOTAPE TECHNICIAN:  I

12         do need to change tape though.

13                 THE COURT:  Let's change

14         tapes.

15                 THE VIDEOTAPE TECHNICIAN:

16         Going off the record.  This is the

17         end of Tape Number 3.  The time is

18         12:05.

19                      -  -  -

20                 (Whereupon, a recess was

21         taken from 12:05 p.m. until 12:20

22         p.m.)

23                      -  -  -

24                 THE VIDEOTAPE TECHNICIAN:

# FILED UNDER SEAL

**CERTAIN EXCERPTS OF THIS TRANSCRIPT HAVE BEEN DESIGNATED "HIGHLY CONFIDENTIAL" AND HAVE BEEN FILED UNDER SEAL, PURSUANT TO PRE-TRIAL ORDER NO. 16**

```
 1          please.

 2                  -  -  -

 3                  EXAMINATION

 4                  -  -  -

 5   BY MS. BASS:

 6          Q.    Good afternoon.  My name is

 7   Hilarie Bass, and I just have one quick

 8   set of questions for you.

 9               MS. BASS:  I would like to

10          have marked as the next exhibit

11          for this deposition, which I

12          believe is 10, a document with

13          Bates Number TG 1704.

14                  -  -  -

15               (Whereupon, Deposition

16          Exhibit Peng S-10, Contract, Bates

17          stamped TG 0001704 through TG

18          0001706, was marked for

19          identification.)

20                  -  -  -

21   BY MS. BASS:

22          Q.    The Bates Number of this

23   document is TG 1704 through 1706.  Please

24   take a moment and review the document.
```

1    My question is whether or not you can

2    recall having seen that document before?

3            A.    I haven't seen this

4    document.  I don't understand English

5    anyways.

6            Q.    Could you look at the third

7    page of the document, please, and

8    identify for us who on behalf of Taian

9    Taishan Plasterboard Company, Limited

10   signed this agreement?

11           A.    You mean the three

12   characters here?

13           Q.    Yes.

14           A.    Yang Jiapo.

15           Q.    And that individual was a

16   salesperson at TTP in June of 2006,

17   correct?

18           A.    He was a salesperson of TTP.

19           Q.    Were you aware of a

20   transaction in which TTP sold gypsum

21   board to Wood Nation, Inc. for delivery

22   in Tampa, Florida?

23           A.    I have only heard it from

24   Peng, Yang Jiapo, from TTP.  Can you

1    repeat your question?

2         Q.    Yes.

3               Were you aware of an

4    agreement by which TTP agreed to sell its

5    gypsum board to a company entitled Wood

6    Nation, Inc. based in Tampa, Florida?

7         A.    I've only heard that some of

8    our gypsum boards was sold in America.

9    But I'm not sure whether there was such a

10   transaction.

11        Q.    Would your approval have

12   been sought for a transaction which

13   contemplated 20 to 30 containers of

14   gypsum to be sold each week between June

15   2006 through December 2006 for delivery

16   at the port of Tampa, Florida?

17        A.    My sales principle is the

18   balancing of production and sales, which

19   is you should sell whatever volume that

20   we produce.  As of in what period of time

21   and to where were they sold to, they did

22   not need to report to me.

23        Q.    My last question is, can you

24   identify for us the seal of TTP on this

1   agreement?  It is spread over the three

2   pages?

3           A.    It says Taian City, Taishan

4   plaster stone.  Correction, Plasterboard

5   Company, Limited.

6           Q.    Can you identify that as the

7   seal of TTP?

8           A.    The seal of TTP was the seal

9   that I just read to you which says Taian

10  Taishan Plasterboard Company, Limited.

11          Q.    So, the answer to my

12  question is yes, this is the seal of TTP?

13               INTERPRETER:  Interpreter

14          clarification.  I think he meant

15          the one before.

16               MS. BASS:  That's why I'm

17          asking again.

18               THE WITNESS:  The seal is

19          different from the one before.  It

20          has English on it, but the other

21          seal does not have English on it.

22  BY MS. BASS:

23          Q.    Do you recognize having seen

24  this seal with both Chinese and English

Confidential - Subject to Further Confidentiality Review

```
 1    writing that states Taian Taishan

 2    Plasterboard Company?  It will be easier

 3    to read like this.

 4              (Handing over document.)

 5         A.   Yes, yes.  That's it.

 6              MS. BASS:  Thank you very

 7         much.

 8              THE COURT:  Anyone else?

 9              (No response.)

10              THE COURT:  Let's take a

11         break then at this time.  We'll

12         come back at 2:00, please.

13              MR. CYR:  If you want,

14         Judge, I can probably get through

15         it in 10, 15 minutes.

16              THE COURT:  Let's do that.

17         That's fine.

18              MR. CYR:  May I begin, Your

19         Honor?

20              THE COURT:  Yes, please.

21                   -  -  -

22                 EXAMINATION

23                   -  -  -

24    BY MR. CYR:
```

1        Q.    Mr. Peng, during the time

2    TTP was operating, did Peng Wenlong ever

3    tell you that some of TTP's customers

4    said they intended to ship the drywall to

5    the U.S.?

6        A.    Yes.

7        Q.    Did you have any knowledge

8    at that time where the drywall was

9    actually shipped?

10       A.    I didn't know where exactly

11   where the drywall is to be shipped to,

12   but according to Mr. Peng Wenlong, who

13   said that some of the customers might

14   ship the gypsum boards to the United

15   States.

16       Q.    Did you have any knowledge

17   where the drywall was actually used?

18       A.    We don't know exactly where

19   were they used at.

20       Q.    When the other lawyer was

21   asking you questions about your meeting

22   with Mr. -- discussions with Mr. Jia

23   about preparing for the deposition, you

24   indicated that you talked with Mr. Jia

```
 1    about a few of the TTP documents.  Do you

 2    remember that testimony?

 3            A.    I remember that.

 4            Q.    In your discussions with Mr.

 5    Jia, did you discuss anything else

 6    besides that?

 7            A.    Nothing else.

 8            Q.    Have I ever asked you that

 9    question before?

10            A.    No.

11            Q.    How many employees did TTP

12    have?

13            A.    TTP, while it was in

14    production or in normal operation, it had

15    about 260 employees.

16            Q.    Did TTP ever share any of

17    its employees with TG?

18            A.    TTP's employees were its own

19    employees.  It did not share employees

20    with TG.

21            Q.    Did TTP have its own

22    production facility?

23            A.    TTP had its own facility,

24    its own office, and its own employees.
```

Confidential - Subject to Further Confidentiality Review

1          Q.      Did TTP share its production

2    facility with TG?

3          A.      TTP had its own production

4    facility.  It did not use the facility of

5    production of TG's.

6          Q.      Did TTP purchase its own

7    supplies for the gypsum board?

8          A.      TTP had its own production

9    and purchased its own raw material that

10   was needed for the production.

11         Q.      Did TTP have its own bank

12   accounts?

13         A.      TTP had an independent

14   financial department.  Of course it had

15   its own bank account.

16         Q.      Did TTP pay its own

17   employees?

18         A.      TTP's employees worked at

19   TTP.  Of course TTP would be the company

20   that paid them.

21         Q.      Was TTP ever inspected by a

22   government agency with respect to whether

23   or not it operated independently?

24         A.      Yes.  We had to register,

```
 1   put in record and receive approval from

 2   relevant institutions of the government.

 3        Q.    What government agency

 4   inspected TTP with respect to whether it

 5   operated independently?

 6        A.    The department of business

 7   licensing, the department of taxation,

 8   and other inspection institutions.

 9        Q.    I would like to direct your

10   attention to Defendant's Exhibit 37.

11   Take a look at that and tell the Judge

12   and plaintiff's counsel what that

13   document is.

14             MR. HARDT:  Can you give us

15        the Bates Number?

16             MR. CYR:  Yes.  It's Bates

17        TG 20850, 20851.

18             THE COURT:  What's the

19        question?

20             MR. CYR:  Can we proceed?

21             THE COURT:  Yes, please do.

22   BY MR. CYR:

23        Q.    Could you tell the Judge and

24   plaintiffs' counsel what that document
```

Confidential - Subject to Further Confidentiality Review

1    is?

2         A.    It is a capital verification

3    description issued by a third-party

4    accounting firm to Shandong Taihe Dongxin

5    Plasterboard Company, Limited.

6         Q.    Was it prepared at the

7    request of TTP?

8         A.    Yes.  It was requested by

9    TTP because Shandong TG Company was going

10   to add registered capital, therefore,

11   capital verification was needed.

12        Q.    Please look at Defendant's

13   Exhibit 45, 46 and 47.  While Mr. Jia is

14   looking at those documents, I'll quickly

15   cite the TG numbers.

16             45 is TG 26004 through TG

17   26006.

18             Defendant's Exhibit 46 is TG

19   26007 through TG 26009.

20             And Defendant's 47 is TG

21        26010 through TG 26012.

22             MS. BASS:  Are they being

23        separately marked in this?

24             MR. CYR:  They have already

```
 1          been marked as Defendant's 45, 46

 2          and 47.

 3                  MS. BASS:  So they are not

 4          being separately marked in this

 5          deposition?

 6                  MR. CYR:  I believe that Ms.

 7          Bass correctly points out that

 8          although they were premarked, it

 9          hasn't been reflected in the

10          transcript of this deposition.

11          Thank you.

12                      -   -   -

13                  (Whereupon, Deposition

14          Exhibit Jia Defendant's-45,

15          Document in Chinese, Bates stamped

16          TG 0026004 through TG 0026006;

17          Deposition Exhibit Jia

18          Defendant's-45A, 2006 Financial

19          Statement of Taian Taishan

20          Plasterboard Co., Ltd., Bates

21          stamped TG 0026004 through TG

22          0026006.

23                      -   -   -

24                  (Whereupon, Deposition
```

Confidential - Subject to Further Confidentiality Review

```
 1           Exhibit Jia Defendant's-46,

 2           Document in Chinese, Bates stamped

 3           TG 0026007 through TG 0026009;

 4           Deposition Exhibit Jia

 5           Defendant's-46A, Balance Sheet,

 6           Bates stamped TG 0026007 through

 7           TG 0026009.

 8                   -  -  -

 9           (Whereupon, Deposition

10           Exhibit Jia Defendant's-47,

11           Document in Chinese, Bates stamped

12           TG 0026010 through TG 0026012, and

13           Deposition Exhibit Jia

14           Defendant's-47A, 2008 Financial

15           Statement of Taian Taishan

16           Plasterboard Co., Ltd. Balance

17           Sheet, Bates stamped TG 0026010

18           through TG 0026012, were marked

19           for identification.)

20                   -  -  -

21   BY MR. CYR:

22           Q.   Mr. Peng, could you tell The

23   Court and plaintiffs' counsel what these

24   documents are?
```

```
 1          A.    These are the accounting

 2   report provided by a third-party

 3   accounting firm regarding TTP's

 4   accounting report in the years of 2006,

 5   2007 and 2008.

 6          Q.    Did TTP provide information

 7   to the independent accounting firm for

 8   the purposes of their preparation of

 9   those three reports?

10          A.    All the information provided

11   was through the independent financial

12   department of TTP.

13             MR. CYR:  Thank you, Your

14          Honor.  I have no further

15          questions.

16             THE COURT:  Any redirect?

17             MR. MEUNIER:  Briefly, Your

18          Honor.

19                 -   -   -

20                EXAMINATION

21                 -   -   -

22   BY MR. MEUNIER:

23          Q.    Mr. Peng, in response to

24   your attorney's questions, you say that
```

```
 1    Peng Wenlong did tell you that some TTP

 2    drywall was being sold and shipped to

 3    different locations in the USA; is that

 4    true?

 5              MR. CYR:  Objection.

 6         Misstates the record.

 7              THE COURT:  Sustain the

 8         objection.  Restate it.

 9    BY MR. MEUNIER:

10         Q.    Is it true that you knew

11    from Peng Wenlong that TTP drywall was

12    being shipped to the US?

13         A.    I've only heard it from Mr.

14    Peng Wenlong.  He said that some of the

15    trading customers might have shipped some

16    of the gypsum boards to the United

17    States.

18         Q.    Were the sales employees of

19    TTP allowed to enter into sales

20    agreements for TTP drywall which they

21    knew was being shipped to the United

22    States?

23         A.    They may sign such

24    agreements, but as far as I know, all
```

1    these products that was mentioned in the

2    agreements were transactioned through the

3    trading companies in China.

4         Q.    Did it matter to you where

5    TTP board was being shipped to and used

6    in the United States as long as TTP made

7    a profit on those sales?

8              MR. CYR:  Objection, vague.

9              THE COURT:  I don't see that

10        being vague.  I overrule the

11        objection.

12             MR. CYR:  Answer the

13        question, Mr. Peng.

14             THE WITNESS:  Can you repeat

15        the question?

16   BY MR. MEUNIER:

17        Q.    Did it matter to you where

18   the TTP board was being shipped to and

19   used in the United States as long as TTP

20   made a profit on those sales?

21        A.    We're not sure exactly where

22   would be our gypsum board be shipped to.

23        Q.    It was okay if it was

24   shipped to the US and used in the U.S. as

Confidential - Subject to Further Confidentiality Review

1  long as you made a profit; is that true?

2      A.    After entering into

3  agreements with our customers, I'm sure

4  our customers had their own benefits in

5  mind.  We would not take into

6  consideration where they would use the

7  product at.

8      Q.    So, it was okay if you made

9  sales agreements for the sale of drywall

10  that was shipped and used in the U.S.,

11  right?

12      A.    Our trading customers may

13  ship our gypsum board to the United

14  States, but as of where did they use the

15  gypsum board in, we don't have the right

16  to ask.

17          MR. MEUNIER:  I have no

18      further questions.

19          THE COURT:  We'll come back

20      at 2:30.

21          THE VIDEOTAPE TECHNICIAN:

22      That concludes today's deposition.

23      Going off the record at 1:24.

24              -  -  -

1                    (Whereupon, the deposition

2          concluded at 1:24 p.m.)

3                    -  -  -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1              C E R T I F I C A T E
 2
 3
                    I, LINDA L. GOLKOW, a
 4    Registered Diplomate Reporter, Certified
      Court Reporter and Notary Public, do
 5    hereby certify that, pursuant to notice,
      the deposition of SHILIANG PENG was duly
 6    taken on January 11, 2012 at 8:30 a.m.
      before me.
 7
 8                  The said SHILIANG PENG was
      duly sworn by The Court according to law
 9    to tell the truth, the whole truth and
      nothing but the truth and thereupon did
10    testify as set forth in the above
      transcript of testimony.  The testimony
11    was taken down stenographically by me.
12
                    I do further certify that
13    the above deposition is full, complete
      and a true record of all the testimony
14    given by the said witness.
15
16
              Linda L. Golkow
17            Registered Diplomate Reporter
              Certified Realtime Reporter
18
19
20                  (The foregoing certification
      of this transcript does not apply to any
21    reproduction of the same by any means,
      unless under the direct control and/or
22    supervision of the certifying reporter.)
23
24
```

```
 1                INSTRUCTIONS TO WITNESS

 2

 3

 4              Please read your deposition

 5   over carefully and make any necessary

 6   corrections.  You should state the reason

 7   in the appropriate space on the errata

 8   sheet for any corrections that are made.

 9

10              After doing so, please sign

11   the errata sheet and date it.  It will be

12   attached to your deposition.

13

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
1                  - - - - - -

              E R R A T A

2                  - - - - - -

3   PAGE   LINE   CHANGE

4   _____  _____  _____

5     REASON: ____ _____

6   _____  _____  _____

7     REASON: _____ _____

8   _____  _____  _____

9     REASON: _____ _____

10  _____  _____  _____

11    REASON: _____ _____

12  _____  _____  _____

13    REASON: _____ _____

14  _____  _____  _____

15    REASON: _____ _____

16  _____  _____  _____

17    REASON: _____ _____

18  _____  _____  _____

19    REASON: _____ _____

20  _____  _____  _____

21    REASON: _____ _____

22  _____  _____  _____

23    REASON: _____ _____

24
```

1

2          ACKNOWLEDGMENT OF DEPONENT

3

           I,_____, do

4    hereby certify that I have read the
     foregoing pages, 1-132, and that the same

5    is a correct transcription of the answers
     given by me to the questions therein

6    propounded, except for the corrections or
     changes in form or substance, if any,

7    noted in the attached Errata Sheet.

8

     _____

9    SHILIANG PENG                        DATE

10

11

12

13

14

15

     Subscribed and sworn

16   to before me this
     _____ day of _____, 20_____.

17

     My commission expires:_____

18

19   _____
     Notary Public

20

21

22

23

24

1                    LAWYER'S NOTES

2     PAGE   LINE

3     _____  _____  _____

4     _____  _____  _____

5     _____  _____  _____

6     _____  _____  _____

7     _____  _____  _____

8     _____  _____  _____

9     _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23    _____  _____  _____

24    _____  _____  _____

# 公　证　书

中华人民共和国山东省泰安市岱岳公证处

**Errata Sheet of Transcript of the Testimony of: Shiliang Peng**

彭世亮证人证言勘误表

**January 11 2012**

2012 年 1 月 11 日

| Page: Line(s)<br><br>页码: 行数 | Change from<br><br>原文 | Change to<br><br>更正 | Reason<br><br>原因 |
|---|---|---|---|
| 34:1-2 | "the board of directors meeting in TTP was held irregularly"<br><br>"泰山纸面石膏板董事会不定期召开" | "the board of directors meeting in TTP was not always held at a designated time"<br><br>"泰山纸面石膏板董事会不总是在一个指定的时间召开" | Clarification<br><br>具体说明 |
| 35:3-6 | "I requested the balancing between the production and sales lower the product payments risk to provide good service for the customers."<br><br>"本人要求生产销售达到平衡，降低产品付款风险，以便为客户提供优质服务。" | "In terms of sales, I requested keeping a balance between production and sales, lower the payment risks, and provide good service for the customers."<br><br>"在销售方面，本人的要求是产销平衡、降低支付风险并为客户提供优质服务。" | Clarification<br><br>具体说明 |
| 49:14 | "the trading companies sold to us out of China"<br><br>"向我方在中国以外出售产品的贸易公司" | "the trading companies sold out of China"<br><br>"贸易公司向中国以外销售" | Translation correction<br><br>翻译校正 |
| 70:14-17 | "They would summarize on the experiences in TG. But as for TG's special circumstances, they should base their principles on TG's circumstances."<br><br>"他们将总结在泰山石膏的经验。但是就泰山石膏的特殊情况而言，他们将以泰山石膏的情况作为原则的依据。" | "They summarized rules based on their working experiences in TG. However, they also need to consider TTP's actual circumstances and to work based on TTP's sales rules."<br><br>"他们根据自己在泰山石膏的经验总结出了规律。但是，他们还须考虑泰山纸面石膏板的实际情况，且根据泰山纸面石膏板的销售规定开展工作。" | Translation correction<br><br>翻译校正 |
| 71:17-7 | "Through the two years operation of TTP, the customers who requested value added invoices were not that much – not that many. However, TTP | "TTP was established so that it could issue value added tax invoices to clients who needed them. It had two drywall production lines capable of producing 2 times | Clarification |

- 2 -

| 71:17-7 | "Through the two years operation of TTP, the customers who requested value added invoices were not that much – not that many. However, TTP had two paper-faced gypsum production lines of 2 by 20 million.<br><br>"通过泰山纸面石膏板的两年运营，要求开增值税发票的客户不多——没那么多。不过，泰山纸面石膏板有两条产量为两千万的双面纸石膏板生产线。<br><br>According to the regulation of our country, for those enterprises that had reached the production volume of 20 million paper-faced gypsum board would be able to enjoy half of the value added tax benefit. So TTP's board of directors and its shareholder had decided to stop the operation of TTP. That's the reason behind TTP's stop of operating."<br><br>依照我国的法律规定，凡是产量达到两千万纸面石膏板的企业可享受增值税减半优惠。因此，泰山纸面石膏板的董事会及其股东决定停止泰山纸面石膏板的运营。这就是泰山纸面石膏板停止运营的背后原因。" | "TTP was established so that it could issue value added tax invoices to clients who needed them. It had two drywall production lines capable of producing 2 times 20 million square meters. However, through its two years of operation, we realized that there were not that many customers who actually requested value added invoices.<br><br>"设立泰山纸面石膏板的目的是为了能够向需要增值税发票的客户开具增值税发票。泰山纸面石膏板有两个产量为两千万平方米的石膏板生产线。然而，通过两年的运营，我们意识到并没有多少客户真的需要开增值税发票。<br><br>Our country later issued a new regulation that provided that enterprises with a production capacity of 20 million square meters of drywall were able to enjoy a tax benefit of 50% off value added tax. Even with that benefit, however, TTP's production line capacity was double that target, and far more than the demand by customers for drywall with value added tax invoices, such that TTP had to pay 50% value added tax even in many transactions where customers did not need the VAT invoices.<br><br>我国后来颁布了一项新规定，规定石膏板产量超过两千万平方米的企业可以享受增值税减半优惠。但是，即使有这一优惠，泰山纸面石膏板生产线产量是该目标的两倍，远远超过了要求开具增值税发票客户的需求量，以至于泰山纸面石膏板不得不在客户不需要增值税发票的许多交易中支付50%的增值税。 | Clarification |

- 3 -

| | | TTP's board of directors and its shareholder decided the expense of paying unnecessary value added tax was not financially sensible, and decided to cease the operation of TTP. That's the reason why TTP stopped operating."<br><br>泰山纸面石膏板的董事会和股东决定，支付没有必要的增值税从财务角度并不明智，故决定停止泰山纸面石膏板的运营。这就是泰山纸面石膏板停止运营的原因。" | |
| 75:3 | "legal person"<br><br>"法人" | "legal representative"<br><br>"法人代表" | Translation correction<br><br>翻译校正 |
| 75:7 | "employee of Taishan Gypsum"<br><br>"泰山石膏员工" | "employee of a subsidiary of Taishan Gypsum"<br><br>"泰山石膏某子公司员工" | Clarification<br><br>具体说明 |
| 75:14 | "Liaocheng"<br><br>"聊城" | "Lucheng"<br><br>"潞城" | Spelling<br><br>拼写错误 |
| 79:4 | "legal person"<br><br>"法人" | "legal representative"<br><br>"法人代表" | Translation correction<br><br>翻译校正 |
| 102:23 | "Yes that's the company."<br><br>"是的，是公司。" | "Yes, it was TTP."<br><br>"是的，是泰山纸面石膏板。" | Clarification<br><br>具体说明 |
| 106:9-107:10 | "Even though the claim was about the nail puncturing power, however, in each of the stages, transportation, storage, loading and usage, if there was improper handling, there would also be quality problem arise from it.<br><br>"虽然索赔和钉子穿透力有关，但是在各个环节中，运输、存储、装货及使用，如果处理不当，也 | "Even though the claim was about the ability of the drywall to hold nails, in each of the stages of transportation, storage, loading, and usage, if there was improper handling, this could cause quality problems as well.  The opposing party suggested we undertake an on-site investigation of the product, but given the great distance, this would have been costly and difficult to arrange.<br><br>"即使索赔和石膏板抓钉力 | Clarification<br><br>具体说明 |

- 4 -

会产生质量问题。

The opposing party also suggested us to undertake an investigation on their using sites of the products, but because of the distance, which is rather great, and it's required great cost and personnel arrangements.

对方还建议我们对其使用产品的场所进行调查，但由于距离实在遥远，而且则需要大量的成本和人事安排。

And also based on the friendly cooperation relationship between TTP and Taigao Trading Company, and also in consideration of our capability of bearing such cost, it has to be within the limits of what we can bear. Even though we were sure that we had no such quality problems, however, based on the above points that I just mentioned, because TTP had already stopped its operation, we did not have sufficient energy nor financial capability to carry on, so that we reached such a settlement agreement."

另外，基于泰山纸面石膏板和泰高贸易公司之间的友好合作关系，也考虑到我们承受这些费用的能力，这应该在我们的承受范围之内。虽然我们肯定没有那些质量问题，但是，鉴于我提到的以上几点原因，因为泰山纸面石膏板早已停止运营，我们没有足够精力也没有财力

有关，但在运输、存储、装货及使用阶段如果处理不当，也会造成质量问题。对方建议我们对产品进行现场调查，但是考虑到路途遥远，这将花费大量金钱而且很难安排。

We considered the friendly and cooperative relationship between TTP and Taigao Trading Company and whether we could bear the cost. Even though we were certain our product had no quality problems, considering those points plus the fact that TTP had ceased operation such that we had neither the energy nor resources to carry on a fight, we reached a settlement."

我们考虑了泰山纸面石膏板和泰高贸易公司之间的友好合作关系以及能否承担费用。即使我们肯定自己的产品没有质量问题，但考虑到这些问题，加上泰山纸面石膏板已经停止运营，因此我们没有精力也没有资源抬架，我们达成了和解。"

- 5 -

| | | | |
|---|---|---|---|
| | 继续，因此我们达成了这一和解协议。" | | |
| 108:20-109:1 | "Q. But it was a benefit to TTP to resolve all claims under both US and China law through this agreement, true?<br><br>"问：但通过这一协议解决在美国和中国法律项下的所有索赔，对泰山纸面石膏板是有利的，对吧？<br><br>A. To be able to resolve the disputes of both parties, it is the purpose of our both parties."<br><br>答：能够解决双方的争议，这是我们双方的目的。" | "Q. But it was a benefit to TTP to resolve all claims under both US and China law through this agreement, true?<br><br>"问：但通过这一协议解决在美国和中国法律项下的所有索赔，对泰山纸面石膏板是有利的，对吧？<br><br>A. It was Guardian's attorney who prepared the draft of the Settlement and Release Agreement. We did not pay particular attention to the specific language 'whether such claim arose in the US or in the PRC.' Our only concern was to try and resolve the disputes of both parties as quickly as possible. That was the purpose of both parties."<br><br>答：和解及放款协议是由Guardian的律师起草的。我们并未特别注意"无论该索赔是在美国还是中国引起的"这一具体说法。我们只想尽力尽快解决双方的争议，这是双方的目的。" | Clarification<br><br>具体说明 |
| 126:2 | "transactioned"<br><br>"transactioned"（交易，错误拼写） | "transacted"<br><br>"transacted"（交易） | Spelling error<br><br>拼写错误 |

Confidential - Subject to Further Confidentiality Review

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
          I,_____, do
 4   hereby certify that I have read the
     foregoing pages, 1-132, and that the same
 5   is a correct transcription of the answers
     given by me to the questions therein
 6   propounded, except for the corrections or
     changes in form or substance, if any,
 7   noted in the attached Errata Sheet.
 8
                                  2012. h. 12
 9   SHILIANG PENG                 DATE
10
11
12
13
14
15
     Subscribed and sworn
16   to before me this
     _____ day of _____, 20_____.
17
     My commission expires:_____
18
19   _____
     Notary Public
20
21
22
23
24
```

证人宣誓书

我彭世亮特此证实，我已经阅读过上述第 1 页至第 132 页，并且除在勘误表中关于的形式或实体上被更正的内容外，该第 1 页至第 132 页是我被问及各个问题的答复的正确笔录记载。

彭世亮                                    日期             2012. 5. 15

兹于            年          月          日

在本人前宣誓后成作本宣誓书

本人公证资格有效截止日期为                年          月          日

（公证人签名）

# 公　证　书

（2012）泰岱岳证外字第 206 号

申请人：彭世亮，男，一九七一年二月三日出生，公民身份号码：220621197102030735。

公证事项：签名

兹证明彭世亮于二〇一二年三月十三日在泰山石膏股份有限公司办公室，在本公证员的面前，在前面的《证人宣誓书》上签名。

中华人民共和国山东省泰安市岱岳公证处

公证员　

二〇一二年三月十三日

XW37106372

# NOTARIAL   CERTIFICATE

(2012)Tai Daiyue Zheng Wai Zi No.206

Applicant: Peng Shiliang, male, born on February 3, 1971, citizen ID No.:220621197102030735.

Issue under notarization: Signature.

This is to certify that Peng Shiliang on Taishan Gypsum Co., Ltd Office on March 13, 2012 and with the presence of the under-mentioned notary signed on the *ACKNOWLEDGMENT OF DEPONENT*.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

March 13, 2012

XW 37106400

# 公　证　书

（2012）泰岱岳证外字第 207 号

申请人：彭世亮，男，一九七一年二月三日出生，公民身份号码：220621197102030735。

公证事项：译本与原本相符

兹证明前面的（2012）泰岱岳证外字第 206 号《公证书》的英文译本内容与该公证书中文原本相符。

中华人民共和国山东省泰安市岱岳公证处

公证员　

二〇一二年三月十三日

XW37106374

# NOTARIAL   CERTIFICATE

(2012) Tai Daiyue Zheng Wai Zi No.207

Applicant: Peng Shiliang, male, born on February 3, 1971, citizen ID No.:220621197102030735.

Issue under notarization: The translation is in conformity with the original copy.

This is to certify that the English translation content of (2012) Tai Daiyue Zheng Wai Zi No.206 *NOTARIAL CERTIFICATE* is in conformity with the Chinese original copy of that.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

March 13, 2012

XW37106402

6. 石膏板4 x11x1/2完成品的价格

我对贵公司的产品十分有兴趣,希望运用在我的工程里.请您能尽快的回复我需要的数据

再次感谢您的帮忙!

祝

　　商务顺利


王倩如


*Josephine Wang*
*Executive Vice President*
*Switzenbaum & Associates*
*200 South Broad Street*
*Sixth Floor*
*Philadelphia, PA 19102*
*215.772.1100 P*
*215.772.9520 F*
*josephine@switzenbaum.com*

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

---

**From:** 杨甲坡 [mailto:yjp09@163.com]
**Sent:** Thursday, August 03, 2006 3:11 AM
**To:** josephine wang
**Cc:** josephinewang@comcast.net
**Subject:** Re: RE: Sheetrock


王小姐:
您好, 很高兴收到您的邮件现在把各种资料发与您, 请过目:
普通石膏板
4x12x1/2 FOBQINGDAO USD4.15/PCS 660PCS/40FCL 26.5吨/40FCL
4x8x1/2 USD2.77/PCS 960PCS/40FCL

4x12x1/2 FOBLIANYUNGANG USD4.2/PCS 76PCS/托盘
4x8x1/2 USD2.8/PCS 76PCS/托盘
我公司为亚洲最大的石膏板生产基地, 产品质量和数量请放心!

祝:
安好!



杨甲坡
2006.8.2

From: "Josephine Wang" <josephine@switzenbaum.com>
To: yjp09@163.com
Date: Tue, 1 Aug 2006 11:40:42 +0800 (CST)
Subject: RE: Sheetrock


>
> Dear Mr. Yang,
>
> It was nice talking to you. I am interesting in learning more about your product and



possibly in doing business with you. Our company is currently building in Philadelphia, our
project is called South Bridge. You can check out our website at www.southbridgephilly.com.
Please forward me information about how you sale abroad. I need to understand your process,
the lead time and the logistic of it in order to make it work. I will also need to have some
references that I can verify your product and timeliness.
>
> I lookforward in receiving your response.
>
> Sincerely,
>
> Josephine Wang
> Executive Vice President
> Switzenbaum & Associates
> 200 South Broad Street
> Sixth Floor
> Philadelphia, PA 19102
> USA
> 1.215.772.1100 phone
> 1.215.772.9520 fax
> josephine@switzenbaum.com
>
-------------------------------
杨甲坡（apollo yang）
TEL：0086-538-8812002
FAX：0086-538-8811250
H P：　0086-13793836871
MSN：yjp09@hotmail.com


网 易 邮 箱 带 你 率 先 跨 入 3G 时 代 ！
3G 海 量 邮 箱，20 兆 超 大 附 件；网 络 记 事 本 ＋ RSS ＋ 大 容 量 网 盘，一 样 也 不 少

-------------------------------
杨甲坡（apollo yang） TEL：0086-538-8812002 FAX：0086-538-8811250 H P：　0086-13793836871
MSN：yjp09@hotmail.com



网 易 邮 箱 带 你 率 先 跨 入 3G 时 代 ！
3G 海 量 邮 箱，20 兆 超 大 附 件；网 络 记 事 本 ＋ RSS ＋ 大 容 量 网 盘，一 样 也 不 少

---------------------------
杨甲坡(apollo yang) TEL：0086-538-8812002 FAX：0086-538-8811250 H P：0086-13793836871
MSN：yjp09@hotmail.com

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

网 易 邮 箱 带 你 率 先 跨 入 3G 时 代 ！

3G 海 量 邮 箱，20 兆 超 大 附 件；网 络 记 事 本 ＋ RSS ＋ 大 容 量 网 盘，一 样 也 不 少

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0019800

| | |
|---|---|
| **From:** | Leon Liu <Leon@china-corporation.com> |
| **To:** | 杨甲坡 <yjp09@163.com> |
| **Sent:** | 12/12/2005 9:41:09 PM |
| **Subject:** | 答复: |

Hi Mr Yang,
Good mornig,
Can you afford the pricing and lead-time for the following(ASAP):

Volume: 64,000 or 100,000 or 200,000 Boards

Packaging: Break-bulk

Timing: Order to be placed in December 2005

Thickness: ½"

Dimensions: 12' x 4'

End Tape: Custom End Tape

Edge: Tapered

Thanks!

Leon

---

From: 杨甲坡 [mailto:yjp09@163.com]
Sent: 2005-12-11 (星期日) 19:54
To: Leon Liu
Subject: Re:

刘先生：

您好，关于此邮件港口价格，我们现在没有得到港口的价格，只能先把FOB的价格发与您，请与客户参考。

4x12x1/2普通石膏板：FOBUSD3.68/PCS

别的要求可以答复。

另外样品的事情，因为现在公司有规定，超过RMB200的样品费用公司一律不承担，因为现在美国的客户要样品的太多了，不敢特批，请原谅，对不起了。

谢谢

甲坡

2005.12.12

Hi Mr Yang,
Good afternoon,
Can you pricing on the following: (ASAP):

1.  Quantity: 32,000 Boards

    Dimensions: 12' x 4' x ½"



EXHIBIT NO. 2
1-11-12
L GOLKOW

End Tape: Custom End Tape

Edge: Tapered

Packaging: Break-bulk

Delivery: Port of NY/NJ

2. Quantity: 32,000 Boards

Dimensions: 12' x 4' x ½"

End Tape: Custom End Tape

Edge: Tapered

Packaging: Break-bulk

Delivery: Port of Savannah, Georgia

Thanks,

Leon


----------------------------
杨甲坡（apollo yang）TEL：0086-538-8812002 FAX：0086-538-8811250 H P：0086-13793836871
MSN：yjp09@hotmail.com


需要一个2000兆的免费邮箱吗？
网易免费邮箱是中国最多人使用的电子邮箱。

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0019841

| | |
|---|---|
| **From:** | yjp09 <yjp09@163.com> |
| **To:** | wenny yin <wenny@sctchina.com.cn> |
| **Sent:** | 10/15/2005 3:03:02 AM |
| **Subject:** | Re: New Gypsum Board quotation |
| **Attachments:** | Dcp_8801在车上吊装船.jpg; Dcp_8802龙门吊装船.jpg; 石膏托架包装.jpg |

Dear wenny yin :
您好, 一直在落实散货船的问题, 一直没有答复, 现在船的消息终于有了现在把价格报与您, 请过目:
普通石膏板:
3660x1220x12.7mm CNFNEW ORLEANS PORT USD7.22/PCS
包装:石膏板托盘, 60张/托盘, 塑料内膜套装防潮, 外面石膏板保护, 纵横钢带捆扎。
付款方式:即期L/C,
另外:没有到JACKSONVILLE PORT 的船。


谢谢, 有什么问题请回复。


甲坡
2005.10.15


> Dear Mr. Yang:
>
> As for the conversation between you and Mr. Boonsong, now we have another new quotation for you.
> Pls see the following information:
>
> Gypsum Board -Regular Type
> Size : 1/2" x 4" x 12" (inch)
>
> -- 100,000 pcs to Jacksonville port , Florida (abt 5,000 Mt )
> -- 100,000 pcs to New Orleans port (abt 5,000 Mt )
>
> Packing : To advise how's your packing
> Price : CNF FO ( by bulk vessel )
> Payment : by L/C
> Shipment : every 2 months
> Delivery : Nov 05
>
> Looking forward to your early reply
>
> Best Wishes
> Wenny Yin
> SCT co.,Ltd. (Guangzhou office)
> Tel: (20)-8365-2559 , 8333-8999 Ext.1217-1218
> Fax: (20)-8365-2595
> E-mail: wenny@sctchina.com.cn
> Web-side: www.scttrading.com
> ----------------------------
杨甲坡(apollo yang)
TEL : 0086-538-8812002


PENG S.
EXHIBIT NO. 3
1-11-12
L. GOLKOW

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

FAX：0086-538-8811250
ＨＰ：0086-13793836871
MSN：yjp09@hotmail.com

---

需 要 一 个 2000 兆 的 免 费 邮 箱 吗 ？
网易免费邮箱是中国最多人使用的电子邮箱。

---

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

# TAIAN TAISHAN PLASTERBOARD CO., LTD.

SOUTH SUBURB OF TAIAN, SHANDONG, CHINA

# INVOICE

INVOICE NO.: SDTH0622           DATE: JULY, 03, 2006

TO: TRIAX TRADING & LOGISTICS, LLC         TO:   NEW ORLEANS, LA

FROM: QINGDAO

| SHIPPING MARK | DESCRIPTION OF GOODS | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | | | | FOB QINGDAO |
| APIC BUILDING MATERIALS | 4FT X 12FT X1/2 IN GYPSUM BOARD | 5676PCS | USD4.25 | USD24123.00 |



PEN6 S.
EXHIBIT NO. 4
1 - 11 - 12
L. GOLKOW

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020090

## TAIAN TAISHAN PLASTERBOARD CO., LTD.

SOUTH SUBURB OF TAIAN, SHANDONG, CHINA

# PACKING LIST

SHIPPING MARK:                                   INVOICE NO. : SDTH0622
APIC BUILDING                                     DATE : JULY. 03, 2006
MATERIALS

FROM : QINGDAO, CHINA                             TO : NEW ORLEANS, LA

---

| DESCRIPTION OF GOODS | QUANTITY | NET WEIGHT | GROSS WEIGHT | VOLUME |
|---|---|---|---|---|
| 4FT X 12FT X1/2 IN GYPSUM BOARD | 132PKGS | 232,000KGS | 232,100KGS | 616CBM |
| 11X40'GP | | | | |



PENG S.

EXHIBIT NO. 5
1-11-12
L. GOLKOW

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0019366

# TAIAN TAISHAN PLASTERBOARD CO., LTD

### SOUTH SUBURB OF TAIAN, SHANDONG, CHINA

# INVOICE

INVOICE NO.: SDTH0622                    DATE: JUL. 20, 2006

TO: TRIAX TRADING & LOGISTICS, LLC, 3988 SAGE RIDGE, DRIVE YORBA LINDA, CA 91887 ATTN:
GREGORY UNRUH, TEL: 858 822-8078 FAX: 858 883-2966

FROM: QINGDAO, CHINA                     TO: NEW ORLEANS, LA

| SHIPPING MARK | DESCRIPTION OF GOODS | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | | | FOB QINGDAO | |
| APIC BUILDING MATERIALS | 4FT X 12FT X1/2 IN. GYPSUM BOARD | 5760PCS | USD4.34 | USD24998.40 |



Penc S.

EXHIBIT NO. 6

1-11-12

L. GOLKOW

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020091

# TAIAN TAISHAN PLASTERBOARD CO., LTD

### SOUTH SUBURB OF TAIAN, SHANDONG, CHINA

# INVOICE

INVOICE NO.: SDTH0622                          DATE: JUL. 20, 2006
TO: ADVANCE PRODUCTS INTERNATIONAL CORPORATION, 225 WEST 30TH STREET NATIONAL
CITY, CA 91950 USA
FROM: QINGDAO, CHINA                    TO: NEW ORLEANS, LA

| SHIPPING MARK | DESCRIPTION OF GOODS | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | | | FOB QINGDAO | |
| APIC BUILDING MATERIALS | 4FT X 12FT X1/2 IN GYPSUM BOARD | 5760PCS | USD4.34 | USD24998.40 |



Peng S.

EXHIBIT NO. 7
1-11-12
L. GOLKOW

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出　口　专　用
Special Use for Export

存　根　联
Counterfoil

137090626307

No **00012416**

2006年　9月　15　日填制
Date 2006 Y　9 M　15 D

| 出口企业名称：泰安市泰山纸面石膏板有限公司 | | 出口企业税务登记证号： | | 370911785030460 |
|---|---|---|---|---|
| Exporter TAIAN TAISHAN PLASTERBOARD CO.,LTD | | Tax Registration No: | | 370911785030460 |
| 出口企业地址：　泰安市岱岳区 | | 电话：　86-538-8811369 | 传真：　86-538-8811369 | |
| Address：　DAWENKOU TAI`AN CITY CHINA | | Tel：　86-538-8811369 | Fax：　86-538-8811369 | |
| 成交方式：　　CIF | 提单号：　RCKI188QINNOL50 | 合同号： | | |
| Term of Delivery：　CIF | B/L No：　RCKI188QINNOL50 | Contract No： | | |
| 致：　　GD DISTRIBUTORS,LLC | | 付款方式：　　CIF | | |
| To：　　GD DISTRIBUTORS,LLC | | Payment：　　CIF | | |
| | | 装船口岸：　青岛 | 目的地：　新奥尔良 | |
| | | From：　QINGDAO | To：　New Orleans | |

| 唛头及号码<br>Mark | 品名及规格<br>Description | 数量<br>Quantity | 单价<br>UnitPrice | 金额<br>Amount |
|---|---|---|---|---|
| | GYPSUM BOARD<br>3660*1220*12.7 | 1320PCS | USD8.7888/PCS | USD11601.22 |

合计：USD11601.22
TOTAL： USD11601.22

单位名称：(盖章)
Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER


EXHIBIT NO. **8**
in 9106
L. GOLKOW

TG 0001657

山东省泰安市泰山石膏板出口专用发票

Taian Shandong Province Special Invoice for Export

存 根 联
Counterfoil

发票代码 137090626307
发票号码 00017539

Date 2006 年 月2 2日填制
2006

| 出口企业名称： 泰安市泰山纸面石膏板有限公司 | | 出口企业税务登记证号： | | 370903785030460 |
|---|---|---|---|---|
| Exporter Name: TAIAN TAISHAN PLASTERBOARD CO.,LTD | | Tax Registration No: | | 370903785030460 |
| 出口企业地址： 泰安市岱岳区 | | 电话： | 86-538-8811011 传真： | 86-538-8812679 |
| Address: DAWENKOU TAI`AN CITY CHINA | | Tel: | 86-538-8811011 Fax： | 86-538-8812679 |
| 成交方式： FOB | 提单号： UMSCFPPP3503 | | 付款方式： T/T | |
| Term of Delivery: FOB | B/L No: UMSCFPPP3503 | | Payment: T/T | |
| 致： STONE PRIDE INTERNATIONAL CORP | | | | |
| To: STONE PRIDE INTERNATIONAL CORP | | 装船口岸： 青岛 目的地： USA | | |
| | | From: QINGDAO To: USA | | |

| 唛头及号码 Mark | 品名及规格 Description | 数 量 Quantity | 单 价 UnitPrice | 金 额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 1220*3600*12.7mm | 2640SHEETS | USD3.80/SHEETS | USD10032.00 |

| 合 计： | | | | |
|---|---|---|---|---|
| TOTAL: USD10032.00 | | | | |

单位名称：(盖章)
Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0001658

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出口专用
Special Use for Export

存　根　联
Counterfoil

发票代码 137090726307
发票号码 00001100

| | | | |
|---|---|---|---|
| Date | 2007 年 4 月 3 日填制 2007 M 4 3D | | |

| 出口企业名称：Exporter Name | 泰安市泰山纸面石膏板有限公司 TAIAN TAISHAN PLASTERBOARD CO.,LTD | 出口企业税务登记证号：Tax Registration No: | 370903785030460 370903785030460 |
|---|---|---|---|
| 出口企业地址：Address | 泰安市岱岳区 DAWENKOU TAI`AN CITY CHINA | 电话：Tel: | 86-538-8812679 86-538-8812679 |
| 成交方式：Term of Delivery | FOB　提单号：FOB　B/L No: | PMSCHYHYQ2868 合同号：PMSCHYHYQ2868 Contract No: | |
| 致：To: | ORIENTAL TRADING COMPANY, LLC ORIENTAL TRADING COMPANY, LLC | 付款方式：Payment: | T/T T/T |
| | | 装船口岸：From: QINGDAO | 目的地：To: MIAMI |

| 唛头及号码 Mark | 品 名 及 规 格 Description | 数 量 Quantity | 单 价 UnitPrice | 金 额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 3660*1220*12.7mm | 20100PCS | USD3.85/PCS | USD77385.00 |

| 合 计：TOTAL: | USD77385.00 |
|---|---|

单位名称:(盖章)
Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

山东省泰安市出口商品专用发票

Taian Shandong Province Special Invoice for Export

出 口 专 用
Special Use for Export

存 根 联
Counterfoil

发票代码 137090726307

发票号码 00001198

2007 年 5 月 28 日填制
2007     月 5     28
Date    Y     M     D

| 出口企业名称： | 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
|---|---|---|---|
| Exporter Name： | TAIAN TAISHAN  PLASTERBOARD CO.,LTD | Tax Registration No.： | 370903720743873 |
| 出口企业地址： | 泰安市岱岳区 | 电话： | 86-538-8811077 | 传真： | 86-538-8812679 |

出口企业地址： 泰安市岱岳区
Address: DAWENKOU TAI`AN CITY CHINA

电话： 86-538-8811077   传真： 86-538-8812679
Tel: 86-538-8811077   Fax: 86-538-8812679

成交方式： FOB   提单号： PMSCHYHYQ2973
Term of Delivery: FOB   B/L No.: PMSCHYHYQ2973   合同号： Contract No.:

致： ORIENTAL TRADING COMPANY,LLC
To: ORIENTAL TRADING COMPANY,LLC

付款方式： T/T
Payment： T/T

装船口岸： 目的地：
From: QINGDAO   To: MIAMI

| 唛头及号码<br>Mark | 品名及规格<br>Description | 数量<br>Quantity | 单价<br>UnitPrice | 金额<br>Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD<br>1220*2440*12.7mm | 4900PCS | USD2.6000/PCS | USD12740.00 |

合计：
TOTAL：   USD12740.00

单位名称：(盖章)
Signature
(本发票手写无效)

第一联：存根联(填票单位留存)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出口专用
Special Use for Export

存　根　联
Counterfoil

发票代码 137090726307

发票号码 00001198

| | 2007 | 月 5 | 日填制 |
| Date | 2007 | M 5 | D8 |

| 出口企业名称： | 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
| Exporter Name: | TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No: | 370903720743873 |
| 出口企业地址： | 泰安市岱岳区 | 电话： | 86-538-8812679 |
| Address: | DAWENKOU TAI`AN CITY CHINA | Tel: | 86-538-8812679 |
| 成交方式： | FOB　提单号：PMSCHYEVIQ3976 | 付款方式： | T/T |
| Term of Delivery: | FOB　B/L No: PMSCHYEVIQ3976 | Payment: | T/T |
| 致： | ORIENTAL TRADING COMPANY,LLC | 装船口岸：　　目的地： | |
| To: | ORIENTAL TRADING COMPANY,LLC | From:　QINGDAO　To:　MIAMI | |

| 唛头及号码 Mark | 品名及规格 Description | 数量 Quantity | 单价 UnitPrice | 金额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 1220*2440*12.7mm | 5880PCS | USD2.6000/PCS | USD15288.00 |

| 合 计： | |
|---|---|
| TOTAL: | USD15288.00 |

单位名称：(盖章)
Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

| 出　口　专　用 |
| Special Use for Export |

存　根　联
Counterfoil

发票代码 137090726307
发票号码 00001100

2007 月 5 日填制
Date 2007 M 5 D 8

| 出口企业名称： | 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
| Exporter Name: | TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No: | 370903720743873 |
| 出口企业地址： | 泰安市岱岳区 | 电话： | 86-538-8812671 | 传真 | 86-538-8812679 |
| Address : | DAWENKOU TAI`AN CITY CHINA | Tel： | 86-538-8812671 | Fax | 86-538-8812679 |
| 成交方式： | FOB 提单号： | PMSCHYQTYQ2975 | 合同号： | |
| Term of Delivery: | FOB B/L No: | PMSCHYQTYQ2975 | Contract No: | |
| 致： | ORIENTAL TRADING COMPANY,LLC | 付款方式： | T/T |
| To: | ORIENTAL TRADING COMPANY,LLC | Payment： | T/T |
| | | 装船口岸： | 目的地： |
| | | From: QINGDAO To: MIAMI |

| 唛头及号码 Mark | 品名及规格 Description | 数量 Quantity | 单价 UnitPrice | 金额 Amount |
| --- | --- | --- | --- | --- |
| N/M | GYPSUM BOARD 1220*2440*12.7mm | 1960PCS | USD2.6000/PCS | USD5096.00 |

| 合　计： TOTAL: | USD5096.00 |

单位名称:(盖章)
Signature
(本发票手写无效)

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出 口 专 用
Special Use for Export

存 根 联
Counterfoil

发票代码 137090726307
发票号码 00001200

| 出口企业名称： | 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
|---|---|---|---|
| Exporter Name: | TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No: | 370903720743873 |
| 出口企业地址： | 泰安市岱岳区 | 电话： | 86-538-8811077 | 86-538-8812677 |
| Address: | DAWENKOU TAI'AN CITY CHINA | Tel: | 86-538-8811077 | Fax: 86-538-8812677 |
| 成交方式： FOB | 提单号： PMSCHYKYQ2974 | | |
| Term of Delivery: FOB | B/L No: PMSCHYKYQ2974 | 合同号： No: | |
| 致： | ORIENTAL TRADING COMPANY,LLC | 付款方式： T/T | |
| To: | ORIENTAL TRADING COMPANY,LLC | Payment: T/T | |
| | | 装船口岸： 目的地： | |
| | | From: QINGDAO To: MIAMI | |

Date 2007 年 5 月 5 日 填制
Date 2007 Y 5 M 5 D 8

| 唛头及号码 Mark | 品名及规格 Description | 数 量 Quantity | 单 价 UnitPrice | 金 额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 1220*2440*12.7mm | 4900PCS | USD2.6000/PCS | USD12740.00 |

| 合 计： TOTAL: | USD12740.00 |
|---|---|

单位名称：(盖章)
Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出 口 专 用
Special Use for Export

存 根 联
Counterfoil

发票代码 137090726307
发票号码 00001202

| | | |
|---|---|---|
| Date | 2007 年 6 月 12 日填制 | |
| | 2007 M6 12 | |

| | | | | |
|---|---|---|---|---|
| 出口企业名称： 泰安市泰山纸面石膏板有限公司 | | 出口企业税务登记证号： | 370903720743873 | |
| Exporter Name TAIAN TAISHAN PLASTERBOARD CO.,LTD | | Tax Registration No： | 370903720743873 | |
| 出口企业地址： 泰安市岱岳区 | | 电话： | 86-538-8811679 传真： | 86-538-8812679 |
| Address： DAWENKOU TAI`AN CITY CHINA | | Tel： | 86-538-8811679 Fax： | 86-538-8812679 |
| 成交方式： FOB 提单号： PMSCHYH007995 | | | | |
| Term of Delivery： FOB B/L No： PMSCHYH007995 Contract No： | | | | |
| 致： ORIENTAL TRADING COMPANY,LLC | | 付款方式： T/T | | |
| | | Payment： T/T | | |
| To： ORIENTAL TRADING COMPANY,LLC | | 装船口岸： 目的地： | | |
| | | From： QINGDAO To： MIAMI | | |

| 唛头及号码 Mark | 品 名 及 规 格 Description | 数 量 Quantity | 单 价 UnitPrice | 金 额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 1220*2440*12.7mm | 2940sheets | USD2.6000/sheet | USD7644.00 |
| | | | | |

| | |
|---|---|
| 合 计： TOTAL： USD7644.00 | |

单位名称：(盖章)
Signature
(本发票手写无效)

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出 口 专 用
Special Use for Export

存 根 联
Counterfoil

发票代码13709072630 7
发票号码 0000121 4

Date  2007 年 6 月 26 日 填制
      2007    M6    26

| 出口企业名称： 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
| Exporter Name  TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No: | 370903720743873 |

| 出口企业地址： 泰安市岱岳区 | 电话： | 86-538-8811877 | 传真： | 86-538-8812679 |
| Address:  DAWENKOU TAI AN CITY CHINA | Tel: | 86-538-8811877 | Fax: | 86-538-8812679 |

| 成交方式： FOB 提单号： PMSCHYH003657 | | | |
| Term of Delivery: FOB  B/L No: PMSCHYH003657 | No: | | . |

| 致： ORIENTAL TRADING COMPANY,LLC | 付款方式： | T/T |
| To:  ORIENTAL TRADING COMPANY,LLC | Payment: | T/T |
| | 装船口岸： | 目的地： |
| | From:  QINGDAO  To:  MIAMI |

| 唛头及号码<br>Mark | 品 名 及 规 格<br>Description | 数 量<br>Quantity | 单 价<br>UnitPrice | 金 额<br>Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD<br>3660*1220*12.7mm | 2010PCS | USD3. 8500/PCS | USD7738. 50 |

| 合 计：<br>TOTAL:   USD7738. 50 | | | | |

单位名称：(盖章)
Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

| | | 出　口　专　用<br>Special Use for Export |
|---|---|---|

存　根　联
Counterfoil

发票代码 137090726307
发票号码 00001216

2007 年 7 月 3 日填制
2001   Y    M   D
Date

| 出口企业名称：泰安市泰山纸面石膏板有限公司<br>Exporter Name：TAIAN TAISHAN PLASTERBOARD CO.,LTD | 出口企业税务登记证号：<br>Tax Registration No： | 370903720743873<br>370903720743873 |
|---|---|---|
| 出口企业地址：泰安市岱岳区<br>Address：DAWENKOU TAI AN CITY CHINA | 电话：　　　　　传真：<br>Tel：　　　　　Fax： | 86-538-8811077   86-538-8812679<br>86-538-8811077   86-538-8812679 |
| 成交方式：　　　　FOB　提单号 PMSCHYHYQ3055<br>Term of Delivery：  FOB   B/L No： PMSCHYHYQ3055 | 合同号：<br>Contract No： | |
| 致：　　ORIENTAL TRADING COMPANY,LLC<br>To：　　ORIENTAL TRADING COMPANY,LLC | 付款方式：　　　T/T<br>Payment：　　　T/T | |
| | 装船口岸：　　　目的地：<br>From：   QINGDAO   To：  MIAMI/USA | |

| 唛头及号码<br>Mark | 品名及规格<br>Description | 数量<br>Quantity | 单价<br>UnitPrice | 金额<br>Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD<br>1220*3660*12.7 | 6700PCS | USD3.8500/PCS | USD25795.00 |

| 合计：<br>TOTAL：　USD25795.00 | |
|---|---|

单位名称：(盖章)
Signature
(本发票手写无效)

# 山东省泰安市出口商品专用发票
## Taian Shandong Province Special Invoice for Export

| | |
|---|---|
| | 出 口 专 用 |
| | Special Use for Export |

## 存 根 联
### Counterfoil

发票代码 137090726307

发票号码 00001219

Date 200年 月 3日填制
2007 M 3 D

| | | |
|---|---|---|
| 口企业名称：泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
| porter Name: TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No: | 370903720743873 |
| 口企业地址： 泰安市岱岳区 | 电话： 86-538-8811027 | 真： 86-538-8812679 |
| dress: DAWENKOU TAI`AN CITY CHINA | Tel: 86-538-8811027 | Fax: 86-538-8812679 |
| 货方式： FOB 提单号： PMSCHYHXQ0054 | 合同号： | |
| m of Delivery: FOB B/L No: PMSCHYHXQ0054 | Contract No: | |
| : ORIENTAL TRADING COMPANY,LLC | 付款方式： T/T | |
| | Payment: T/T | |
| : ORIENTAL TRADING COMPANY,LLC | 装船口岸： 目的地： | |
| | From: QINGDAO To: MIAMI/USA | |

| 唛头及号码<br>Mark | 品 名 及 规 格<br>Description | 数 量<br>Quantity | 单 价<br>UnitPrice | 金 额<br>Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD<br>1220*3660*12.7 | 6700PCS | USD3.8500/PCS | USD25795.00 |

合 计：
TOTAL: USD25795.00

单位名称：(盖章)
Signature
(本发票手写无效)

Signature
(本发票手写无效)

第一联：存根联（填票单位留存）

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0001670

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

专用出口
Special Use for Export

存 根 联
Counterfoil

137090626307
No **00013765**

2006年 月0 5日填制
Date 2005 NG 5D

| 出口企业名称：泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370911785030460 |
|---|---|---|
| Exporter Name: TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No.: | 370911785030460 |
| 出口企业地址： 泰安市岱岳区 | 电话： 86-538-88111传真： | 86-538-8812679 |
| Address: DAWENKOU TAI`AN CITY CHINA | Tel: 86-538-88110Fax: | 86-538-8812679 |
| 成交方式： FOB 提单号： ZIMUQIN24453号 | 付款方式： T/T | |
| Term of Delivery: FOB B/L No: ZIMUQIN Contract No: | Payment: T/T | |
| 致： TOV TRADING NEW YORK,USA | 装船口岸： 青岛 目的地： 纽约 | |
| To: TOV TRADING NEW YORK,USA | From: QINGDAO To: NEW YORK | |

| 唛头及号码 Mark | 品 名 及 规 格 Description | 数 量 Quantity | 单 价 UnitPrice | 金 额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 2440*1220*12.7mm | 9000PCS | USD2.60/PCS | USD23400.00 |

| 合 计： TOTAL: USD23400.00 | 单位名称：(盖章) Signature (本发票手写无效) |
|---|---|

Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0001680



山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出口专用
Special Use for Export

存　根　联
Counterfoil

137090626307

No  00013764

2006年　1月　5日填制
Date 2006y　1M　5D

| 出口企业名称：泰安市泰山纸面石膏板有限公司 Exporter NTaian TAISHAN PLASTERBOARD CO.,LTD | 出口企业税务登记证号： Tax Registration No.: | 370911785030460 370911785030460 |
|---|---|---|
| 出口企业地址：　泰安市岱岳区 Address：DAWENKOU TAI`AN CITY CHINA | 电话： 86-538-8811077 传真： Tel：86-538-8811077 Fax： | 86-538-8812679 86-538-8812679 |
| 成交方式：　　FOB 提单号：ZIMUQIN294455 Term of Delivery:　FOB   B/L No: ZIMUQIN294455 合同号： Contract No: | | |
| 致：　　TOV TRADING NEW YORK,USA To：　TOV TRADING NEW YORK,USA | 付款方式：　　T/T Payment:　　T/T | |
| | 装船口岸：青岛　目的地：纽约 From：　QINGDAO　To：　NEW YORK | |

| 唛头及号码 Mark | 品名及规格 Description | 数量 Quantity | 单价 UnitPrice | 金额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 2440*1220*12.7mm 3660*1220*12.7mm | 14000PCS 3400PCS | USD2.65/PCS USD4.0735/PCS | USD37100.00 USD13850.00 |

合　计：USD50950.00
TOTAL: USD50950.00

单位名称：(盖章)
Signature
(本发票手写无效)

(本发票手写无效)



山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

存 根 联
Counterfoil

1370906263307
No 00013763

2006年 月 5 日填制
Date 2006 M 5 D

| 出口企业名称：泰安市泰山纸面石膏板有限公司<br>Exporter Name: TAIAN TAISHAN PLASTERBOARD CO.,LTD | 出口企业税务登记证号： 370911785030460<br>Tax Registration No： 370911785030460 |
|---|---|
| 出口企业地址： 泰安市岱岳区<br>Address: DAWENKOU TAI`AN CITY CHINA | 电话： 86-538-8811107<br>Tel： 86-538-8811107 传真： 86-538-8812679<br>Fax： 86-538-8812679 |
| 成交方式： FOB 提单号： ZIMUQIN234455<br>Term of Delivery: FOB B/L No： ZIMUQIN234455 合同号： TDX06-RW041<br>Contract No： TDX06-RW041 | |
| 致： TOV TRADING NEW YORK,USA<br>To： TOV TRADING NEW YORK,USA | 付款方式： T/T<br>Payment： T/T |
| | 装船口岸： 青岛 目的地： 纽约<br>From： QINGDAO To： NEW YORK |

| 唛头及号码<br>Mark | 品名及规格<br>Description | 数 量<br>Quantity | 单 价<br>UnitPrice | 金 额<br>Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD<br>2440*1220*12.7mm | 2000PCS | USD2.60/PCS | USD5200.00 |

合 计：
TOTAL: USD5200.00

单位名称：(盖章)
Signature
(本发票手写无效)

Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

# PENG S/SHILIANG EXHIBIT 9
# FILED UNDER SEAL

# CONTRACT

**THE SELLERS:**   TAIAN TAISHAN PLASTERBOARD CO., LTD
DAWENKOU DAIYUE DISTRICT OF TAIAN
SHANDONG PROVINCE, CHINA 271026
TEL:0086-538-8812002 / 2017
FAX:0086-538-8812679
E-MAIL: clempwl123@163.com

**THE BUYERS:**   WOOD NATION, INC.
10740 PLANTATION BAY DRIVE
TAMPA, FLORIDA  33647
TEL: 813-994-6499
FAX: 813-994-4497
E-MAIL: woodnation@verizon.net

**CONTRACT NUMBER:  WN7350**

This contract is made by and between the Buyers and the Sellers, hereby the Buyers agree to buy and the Sellers agree to sell the under mentioned commodity according to the terms and conditions stipulated below:

1.    **COMMODITY:**  Gypsum Drywall (hereafter referred to as the "Product").

2.    **COUNTRY OF ORIGIN AND MANUFACTURERS:**  Peoples Republic of   China

3.    **SIZE SPECIFICATIONS:**  Shall be ½" in thickness, 4' in width and 12' in length.

4.    **GRADE STANDARDS:**  'Regular' and 'Ceiling' products shall be produced to American Society for Testing and Materials ("ASTM") C 1396-04 Standards.  'ASTM C 1396-04' shall be stamped on the back of each piece.

5.    **PACKING:**

   a)    To be packed in a manner suitable for long distance ocean container transportation.  The Sellers shall be liable for any damage of the commodity and expenses incurred on account of improper packing or improper protective measures taken by the Sellers in regard to the packing.

   b)    The 12 unitized portions shall consist of 40 piece units.  The remaining 180 pieces do not have to be unitized.

6.    **TIME OF SHIPMENT:**  Start June 2006 and ship through December 2006 at the rate of 20 to 30 containers per week.  Buyer shall advise Seller approximately 10 days in advance container availability for the next shipping segment.

7.    **QUANTITIES:**  Five hundred (500) forty foot (40') high cube container loads, each to contain six hundred and sixty (660) pieces.  'Regular' and 'Ceiling' products shall not be

Richard Hannan
6-10-2006

–26–



CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0001704

shipped in the same container.   The percentage ratio of 'Regular' vs 'Ceiling' shall be 66.6% 'Regular' and 33.3% 'Ceiling'.

8.   **PRICE:** USD $4.20 per piece for both Regular and Ceiling ½" 4'X12' FOB Qingdao, China.

9.   **TOTAL VALUE:** One million, three hundred and eighty six thousand dollars. (USD$1,386,000) +/- 2%.

10.   **PORT OF LOAD:** Qingdao, China

11.   **PORT OF DISCHARGE:** Tampa, Florida, USA

12.   **PAYMENT:** Within 10 working days of contract signing, Buyers shall open an irrevocable Letter of Credit (L/C) through "Bank of America, Trade Operations Office, USA" payable against Seller's draft drawn at sight on the Bank of America, Trade Operations Office, USA, accompanied by the commercial documents set out in paragraph 14. The L/C shall show 'Partial Shipments Allowed'. In addition, within 10 working days after signing of contract Buyer will place a USD100,000 security deposit with the Seller. This deposit shall be deducted from the final Seller's invoices. All bank charges at issuing bank are for the account of the applicant and all advising bank charges are for the account of the beneficiary. The L/C shall remain valid for negotiation freely at any bank until January 31, 2007.

13.   **CONTINGENCY:** If for any reason the container shipping rates increase to a prohibitive level, Buyer may choose to cancel, or delay shipments on this contract. This, with a thirty day written notice to the Seller from the Buyer. If Seller's costs increase to a prohibitive level, Seller shall give thirty days notice to the Buyer giving Buyer the option of increasing the cost of product, canceling or delaying shipments.

14.   **DOCUMENTS:**

   a)   Full set (i.e. 3/3 originals) of clean on board ocean bills of lading marked "Freight Collect" made out to order blank endorsed notifying Buyer. The bills of lading shall include the statement "NO SOLID WOOD PACKING MATERIAL".

   b)   Signed invoice in 4 originals indicating contract number, made out in details as per the relative contract.

   c)   Packing list in 4 originals, including piece count. The packing list shall state "NO SOLID WOOD PACKING MATERIAL".

   .e)   Certificate of Origin.

15.   **SHIPMENT:** December 31, 2006 or sooner.

16.   **SHIPPING ADVICE:** The Sellers shall, immediately upon the completion of the loading of the commodity, advise the Buyers by fax or e-mail of the contract no., commodity, quantity, trade term, invoiced value, container numbers and date of loading.

17.   **DELIVERY OF DOCUMENTS:** The Seller shall, within 21 working days after shipment, deliver the original documents specified above directly to the Buyer's bank.

-27-

*Richard Hanson*
6-10-2006

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

18. **CLAIMS:** Within 30 days after the arrival of the commodity at destination, should the quality, specification, or quantity be found not in conformity with the stipulations of the contract, except those claims for which the insurance company or the carrier accept liability, the Buyers shall, on the strength of an inspection certificate, have the right to claim for replacement with new commodity, or for compensation.

19. **FORCE MAJEURE:** Should any of the following circumstances prevent either party from carrying out its obligations under the contract, namely:  acts of civil or military authority; government acts, orders, or restrictions; earthquakes; or flood, the contract shall be extended for as long as the circumstances remain.  In the event that these circumstances continue for more than 30 days, each party shall have the right to refuse to continue the performance of its obligations under the contract and, in such case, no party shall be entitled to indemnification from the other party for any loss it may sustain.  In all cases, the party declaring force majeure is required to provide within 14 days acceptable documentation of the incident issued by the competent Government Authorities where the incident occurs as evidence thereof.

20. **CARGO DAMAGE AT SEA:** Sellers shall be liable for the full value of any product damaged due to improper stowing.  Buyers shall carry ALL RISK cargo insurance.

21. **BANKING CHARGES:** All the banking charges incurred by the Buyers shall be borne by the Buyers while all the banking charges incurred by the Sellers shall be borne by the Sellers

22. **GENERAL PROVISIONS:** This contract is subject to interpretation according INCOTERMS 2000. By signing this contract, previous correspondences and negotiations connected herewith shall be null and void. This contract comes into effect from signing date by fax; any amendment and additional clause to these conditions shall be valid only if made in written form and duly confirmed by both sides.

This contract shall come into effect immediately after each party has signed the contract (either by fax or original signature).  It is the intent of both Buyers and Sellers to also sign two original copies; with each party holding one copy.

THE BUYERS:  WOOD NATION, INC.

BY: _Richard Hanson_   DATE: _June 10, 2006_

TITLE: _President_

THE SELLERS:  TAIAN TAISHAN PLASTERBOARD CO., LTD.

BY: _____   DATE: _06. 6. 10_

TITLE: _____

−28−

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0001706