UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE MANUFACTURED          *   MDL No. 2047
DRYWALL PRODUCTS LIABILITY           *
LITIGATION                           *   SECTION L
                                     *
                                     *   JUDGE ELDON E. FALLON
                                     *
                                     *   MAGISTRATE JUDGE
                                     *   JOSEPH C. WILKINSON, JR.
                                     *

* * * * * * * * * * * * * * ** * * * * ** * * * * * *

**THIS DOCUMENT RELATES TO: ALL CASES**

**DECLARATION OF ZHU YAN**

This is a declaration being made in accordance with and pursuant to 28 U.S.C. § 1746.

ZHU YAN, being duly sworn, deposes and says:

<u>INTRODUCTION</u>

1.      I am a professor of law at the Renmin University of China Law School ("Renmin Law School") in Beijing, in the People's Republic of China ("China"), and work part time as an attorney at the law firm of Han Ding United, also located in Beijing.

2.      I am a Chinese national and reside in Beijing, China.

3.      I have been asked by Hogan Lovells US LLP, counsel for Taishan Gypsum Co. Ltd. ("TG") and Taian Taishan Plasterboard Co., Ltd. ("TTP"), Defendants in the above-captioned action, to: (a) provide an overview of general Chinese corporate law relating to the establishment of the rights and responsibilities of commercial entities in China; (b) to provide an overview of the general circumstances under which the separate corporate existence of Chinese companies will be disregarded for purposes of attributing conduct or activities to impose liability or to assert jurisdiction; (c) to describe the nature of TG, TTP and Beijing New Building

Material Public Limited Co. ("BNBM"); and (d) to describe the general circumstances under which the separate corporate existence of these companies will be disregarded for purposes of attributing conduct or activities to impose liability or to assert jurisdiction.

4.      Although I have been asked to make this Affidavit by Hogan Lovells US LLP, I consider it my duty to offer my independent explanation to the Court. I am not acting as an advocate for any party.

BACKGROUND AND QUALIFICATIONS

5.      I studied world political economy and international relationships at the Renmin University from which I obtained my Bachelor of Law degree in 1995. An academic interest in legal scholarship led me to pursue advanced degrees in civil and commercial law. I was awarded a master's degree in civil and commercial law in 1999 from Renmin Law School, and, later, a Ph.D. in 2003 from the University of Bremen, Germany. My Ph.D. thesis was "Comparative Research of Control of Unfair Terms Between Germany and China".

6.      I was qualified as Attorney in 1997 after I passed the 1996 National Bar Exam in Beijing. In 2006, after concluding my academic pursuits, I was admitted to the Chinese Bar Association. I am member in good standing and am licensed to practice, and have practiced Chinese law as representative or consultant in primary, Intermediate and Higher People's Court.

7.      I am also a tenured faculty member and the Deputy Director of the Department of Civil and Commercial Law of the preeminent Renmin Law School, which has consistently ranked at the top of evaluation reports issued by the Ministry of Education of China. (*See, e.g.,* China Academic Degrees & Graduate Education Information, *available at* http://www.cdgdc.edu.cn/xwyyjsjyxx/zlpj/xksppm/.)     The Renmin Law School edits and

publishes the nation's leading law journal, the "Jurists' Review", as well as the "RUC Law Review" and the "Chaoyang Law Review". I am the editor of the "Jurists' Review" in charge of the field of civil and commercial law.

8.    I am a member of the All-China Lawyers Association. My lawyer license number is [执业证号 11101200620603960] and my qualification number is [律师资格证号 019772110044]. I am also a Member and Chairman of the Association of Chinese Federal Chancellor Scholar of Humboldt Foundation in Germany, and the General Secretary Assistant of Chinese National Association of Civil Law in Beijing. I have authored and co-authored monographs and have published several legal articles in China (Mainland and Taiwan), Germany, Austria and USA (please see the bibliography, in both Mandarin and English, attached hereto as Exhibit A). I was a Humboldt Foundation Visiting Scholar in Germany (August 2007 to August 2008) and a Visiting Scholar at European Center of Tort Law and Insurance Law in Vienna, Austria (January 2009 and February 2009). I am currently a Harvard-Yenching Visiting Scholar at Harvard University in Cambridge, MA (August 2011 to August 2012).

9.    I have a broad expertise and practice in areas of civil law and commercial law including Chinese company law. (In China, a corporation is referred to as a "company" and, similarly, corporate law is referred to as "company law". I therefore use these terms throughout this Declaration.)

10.    A true and correct copy of my curriculum vitae is attached hereto as Exhibit B.

11.    I respectfully submit that I am competent to opine on Chinese company law and the other matters addressed in the remainder of this Declaration.

3

CONSULTED LEGAL AND FACTUAL SOURCES

12.     In preparation of this Declaration, I reviewed and/or considered the following

laws, rules, statutes, and regulations governing legal status of Chinese business entities,

including but not limited to the following:

- General Principles of Civil Law of People's Republic of China of 1986 (GPCL) (*Minfa Tongze*);
- Company Law (*Gongsi Fa*) (adopted by the Fifth Session of the Standing Committee of the Eighth National People's Congress, 19 December 1993, effective 1 July 1994, revised at the 18th Meeting of the Standing Committee of the Tenth National People's Congress, 27 October 2005, effective 1 January, 2006 (a true and correct copy of excerpts of which is attached hereto, along with an English version of the same, as Exhibit C);
- Provisions of the Supreme People's Court on Several Issues concerning the Application of the Company Law of the People's Republic of China (I) of (2006), (II) of 2008 and (III) of 2011 (*Zuigaorenminfayuan Guanyu Shiyong <Zhonghua renmin gonggheguo gongsifa> Ruogan Wenti de Guiding*). These three provisions of Company Law issued by the Peoples' Supreme Court respectively in 2006, 2008, 2011, all of which are still effective and have also binding force just like Company Law for parties concerned;
- Law of the People's Republic of China on Sole Proprietorship Enterprise of 2000 (*Geren Duzi Qiyefa*);
- Law of the People's Republic of China on Partnerships of 2007 (*Hehuo Qiyefa*);
- Administrative Regulations issued by Chinese State Council (*Guowuyuan Xingzhen Fagui*) concerning set up, registration of company;
- important courts decisions, particularly published by the People's Supreme Court, in which the court analyzed when to disregard the corporate integrity of a company; and
- monographs and articles regarding the theory of disregarding a company's legal personality of company and attribution theories of liability published in China.

13.     In preparation of this Declaration, I also reviewed the following:

- Deposition transcripts of Tongchun Jia taken April 4-5, 2011 and January 9-10, 2012 ("Jia Tr.")[1];
- Shandong Province Dept. of Finance Document, "Reply Concerning Issues Related to the Transfer of the State-Owned Shares of Shandong Taihe Dongxin Co., Ltd." dated July 22, 2002;

---

[1] A copy of the transcript of the deposition of Jia Tongchun, including Plaintiffs' Exhibits 1 through 36 and Defendants' Exhibits 1 through 47A, which took place on April 4 and 5, 2011 and January 9 and 10, 2012 is attached to the Declaration of Frank T. Spano, dated April 2, 2012 as Exhibit 2, which will be submitted to the Court simultaneously with this Declaration.

4

- Shandong Taihe Dongxin Co., Ltd. Shareholder List, dated August 10, 2002;
- Stock Transfer Agreement, dated March 24, 2005;
- Shandong Taihe Dongxin Co., Ltd. Resolutions of the General Meeting of Shareholders, dated March 24, 2005;
- Comparison Chart of Registered Capital of Shandong Taihe Dongxin Co., Ltd. before and after changes, dated April 25, 2005;
- Shandong Taihe Dongxin Co., Ltd. Resolutions of the General Meeting of Shareholders, dated April 25, 2005;
- Shandong Taihe Dongxin Co., Ltd. Articles of Incorporation, dated April 25, 2005;
- Shandong Taihe Dongxin Co., Ltd. Resolution of the Fourth Extraordinary General Meeting of Shareholders for the Year of 2005, dated June 26, 2005;
- Shandong Taihe Dongxin Co., Ltd. Asset Valuation Report, dated May 26, 2006;
- Shandong Taihe Dongxin Co., Ltd. Articles of Association, dated August 8, 2006;
- Taishan Gypsum Co., Ltd. Articles of Association, dated June 20, 2007;
- Shandong Taihe Dongxin Co., Ltd. Resolutions of the 2006 Annual General Meeting of Shareholders, dated June 20, 2007;
- Datasheet of the Directors, Supervisors, and Managers of Shandong Taihe Dongxin Co. Ltd.; Application Form for Company Record; and Certificate of Designated Representative or Jointly Appointed Agent, dated July 17, 2007;
- Taishan Gypsum Co., Ltd. 2008 Annual General Meeting, dated May 18, 2009;
- Taishan Gypsum Co., Ltd. Amendment to the Articles of Association, dated May 18, 2009;
- Shandong Taihe Dongxin Co., Ltd. Shareholder Meeting Resolutions, dated March 24, 2005;
- Shandong Taihe Dongxin Co., Ltd. 2005 Annual Shareholder Meeting Resolution, dated April 15, 2006;
- Shandong Taihe Dongxin Co., Ltd. 2006 Annual Shareholder Meeting Resolution, dated June 20, 2007;
- TG 2007 Annual Shareholder Meeting Resolution, dated May 20, 2008;
- TG, Ltd. 2008 Annual Shareholder Meeting Resolution, dated May 18, 2009;
- Shandong Taihe Dongxin Co., Ltd. Third Meeting of the Board of Directors Resolutions, dated April 15, 2006;
- Shandong Taihe Dongxin Co., Ltd. Fourth Meeting of the Third Board of Directors Resolutions, dated June 20, 2007;
- TG Fifth Meeting of the third session Board of Directors Resolutions, dated May 20, 2008;
- Shandong Taihe Dongxin Co., Ltd. Report regarding Overall Work Summary for 2005 and Work Arrangement for 2006, dated 2005;
- Shandong Taihe Dongxin Co., Ltd. 2006 Chief Executive Officer's Work Report;
- TG 2007 Chief Executive Officer's Work Report;
- TG 2008 Chief Executive Officer's Work Report;
- Shandong Taihe Dongxin Co., Ltd. 2005 Accounting Statement;
- Shandong Taihe Dongxin Co., Ltd. 2006 Accounting Statement;
- Taishan Gypsum Co., Ltd. 2007 Financial Statements;

- Taishan Gypsum Co., Ltd. 2008 Financial Statements;
- Tai'an Taishan Plasterboard Co., Ltd. Incorporation Registration Review Form, dated February 16, 2006;
- Tai'an Taishan Plasterboard Co., Ltd. Articles of Association, dated February 10, 2006;
- Tai'an Taishan Plasterboard Co., Ltd. Director Appointment Document, dated February 10, 2006;
- Tai'an Taishan Plasterboard Co., Ltd. Legal Representative Appointment Document, dated February 10, 2006;
- Tai'an Taishan Plasterboard Co., Ltd. Capital Verification Descriptions, dated June 22, 2006;
- Tai'an Taishan Plasterboard Co., Ltd. Shareholder Decisions, dated June 22, 2006;
- Tai'an Taishan Plasterboard Co., Ltd. Articles of Association, dated June 22, 2006;
- Lease Agreement between Shandong Taihe Dongxin Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd., dated February 10, 2006;
- Trademark Use Authorization between Shandong Taihe Dongxin Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd., dated February 20, 2006;
- Purchase and Sale Agreement between Shandong Taihe Dongxin Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd., dated February 20, 2006;
- Lease Agreement between Shandong Taihe Dongxin Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd., dated February 20, 2006;
- Purchase and Sale Agreement between TG and Tai'an Taishan Plasterboard Co., Ltd., dated January 1, 2008;
- Tai'an Taishan Plasterboard Co., Ltd. 2006 Financial Statement;
- Tai'an Taishan Plasterboard Co., Ltd. 2007 Financial Statement;
- Tai'an Taishan Plasterboard Co., Ltd. 2008 Financial Statement;
- China National Building Material Co., Ltd. Overseas Regulatory Announcement – Summary of BNBM 2009 Annual Report, dated March 24, 2010;
- China National Building Material Co., Ltd. Announcement of BNBM's Acquisition of Taian Donglian Investment Trading Co., Ltd., dated August 28, 2006;
- China National Building Material Co., Ltd. Overseas Regulatory Announcement re Event to Gypsum Board in US, dated May 28, 2010;
- Taishan 2006 Structure – Pre Global Offering, dated August 24, 2011;
- BNBM Annual Reports (2005 – 2008);
- TG's Business Registration (2007);
- Issuance by the Shandong Province Economic System Reform Commission "Concerning the Approval of the Establishment of Shandong Taihe Dongxin Co., Ltd.", dated June 4, 1998;
- Excerpts of the transcript of the deposition of Jianchun Zhang taken April 6, 2011 ("Zhang Tr.");
- *In re: Chinese-Manufactured Drywall Products Liability Litigation*, Amended Complaint, filed July 7, 2009 (relating to *The Mitchell Co. v. Knauf Gips KG, et al.*); and

- *In re: Chinese-Manufactured Drywall Products Liability Litigation*, Second Amended Complaint, filed November 18, 2009 (relating to *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihi Dongxin Co. Ltd., et al.*).

## OVERVIEW OF GENERAL CHINESE CORPORATE LAW

14.     Although China had enacted some laws regarding company law in the late 1970's and 1980's, such as the People's Republic of China Law On Chinese-Foreign Equity Joint Ventures of 1979 (*Zhongwai Hezi Qiyefa*) and Law of the People's Republic of China on Industrial Enterprises Owned by Whole People of 1988 (*Quanminsuoyouzi Qiyefa*), China did not have one unified legal framework that established the rights and responsibilities of companies, shareholders, or managers of companies until the National People's Congress promulgated the 1993 Company Law.

15.     The 1993 Company Law embraced the concept of limited liability business organizations and served, among other things, to: (a) facilitate the creation and recognition of business entities as separate legal persons in the form of a company in order to create and develop the new established market economy since 1992 which replaced the planned economy; (b) restructure the organization and management of state-owned enterprises in terms of separation of proprietary rights from managements rights; (c) to address problems of inefficiency; and (d) to promote competition and productivity.  The 1993 Company Law was, however, subject to criticism for encumbering economic growth by, *inter alia*, exerting too much administrative control over company development, not providing sufficient corporate governance structure, creating a high minimum statutory registered capital requirement, and by setting certain limits to company investments into other enterprises:  for example, a company could not

7

invest more than 50 percent of its net assets, nor could a company own 100 percent of subsidiary companies.

16.     The 1993 Company Law was amended respectively in 1999, 2004 and 2005. (The 1993 Company Law and its amendments collectively are referred to herein as "Company Law" and is cited as "CCL".)

17.     It is worth noting that in contrast to the previous versions, the Company Law as amended in 2005 permitted a company to own up to 100 percent of a subsidiary company in the form of a one-person company. (*See* Art. 14 and Art. 58 para. 2 CCL.)

18.     There are also three laws with respect to foreign investors, namely, Law of Chinese-Foreign Equity Joint Ventures (effective since January 1, 1980, last amendment in 2001), Law of Chinese-Foreign Contractual Joint Ventures (effective since 1988, last amendment in 2001) and Law of Wholly-Owned Foreign Enterprise (effective since 1986, last amendment in 2000). These three special laws regarding foreign investors are still effective. Each of them has an administrative regulation issued by the Chinese State Council.

19.     Since 1993, there have generally been three recognized business entity forms adopted and recognized in China: the sole proprietorship, the partnership and the company.

20.     Under Chinese law, a sole proprietorship is a business entity established within China and invested in by one natural person who personally owns all of the entity's property and assumes unlimited liabilities for the debts of the enterprise with his personal property. (*See* Art. 2 of the Law of the People's Republic of China on Sole Proprietorship Enterprise of 2000.)

21.     A general partnership is a business entity that is created by an agreement (written or oral) between two or more partners, who contribute funds, property, skill and the like, and

8

work jointly in operating the business.  General partners undertake unlimited liability and are jointly and severally liable for partnership debts.  (*See* Art. 2 para. 2 of the Law of the People's Republic of China on Partnerships of 2007.)  A limited liability partnership ("LLP") may also exist under Chinese law.  In an LLP, each limited partner's liability extends only to that limited partner's capital contribution.  (*See* Art. 2 para. 3 and Ch. 3 "Limited Liability Partnerships" in the Law of the People's Republic of China on Partnerships of 2007.)

22.   A "company" is a limited liability business entity which has its own independent personality such that it can, *inter alia*, make contracts and incur debts on its own behalf and sue and be sued in its own name.  (*See* Art. 2 CCL.)

23.   A joint stock company is a Chinese company form intended for large corporations with widely dispersed stock ownership.  It is the only form that may be listed on one of China's two stock exchanges and therefore the only form able to raise money directly from the public.  A joint stock company can issue shares either wholly subscribed to by its promoters or to a specified group or to the public.  (*See* Art. 78 CCL.)

24.   A "wholly state-owned" company is a special limited liability company in China, which is wholly owned by the state, for which the State Council or the local people's government authorizes the State-owned Assets Supervision and Administration Institution of the people's government at the same level to perform the functions of the capital contributor.  (*See* Sec.4 Ch. 2 CCL.)

25.   A company shareholder (also known as a "member") is an individual or entity that legally owns any part of a share of stock in the company.  Although shareholders own stock, they do not own the company itself and normally have no automatic right to manage or control

the company. Chinese Company Law does, however, provide shareholders basic rights, including the right to share the capital proceeds, vote on important decisions and resolutions, and choose managers. (*See* Art. 4 CCL.) Shareholders may be, and, indeed, are often, elected as directors or supervisors. As a general rule, a shareholder's liability is limited by the amount of capital contributed. Under Chinese law, shareholders are not agents of a company simply by virtue of their owned shares in the company.

26.    No more than 50 shareholders may establish a company. (*See* Art. 24 CCL.) Each shareholder may make capital contributions in different amounts, however, the amount of the initial capital contributions made by all shareholders must not be less than 20% of the company's registered capital, nor less than the statutory minimum amount of registered capital, and the margin shall be paid off by the shareholders within two years from the day when the company is set up. (*See* Art. 26 CCL.)

27.    According to Chinese law, the term "joint venture" may be used to describe a company in which two or more shareholders invest, regardless of the percentage of shares allocated between such shareholders.

COMPANY FORMATION AND REGULATION

28.    To set up a company, an application for business entity registration must be filed with the company registration authority, which is administered by the Administration for Industry and Commerce. (*See* Ch. 2 of the Regulations of the People's Republic of China on the Administration of Company Registration (2005 Revision) (Promulgated by Order No. 156 of the State Council of the People's Republic of China on June 24, 1994 and revised according to the Decision of the State Council on Revising the Regulations of the People's Republic of China on

10

the Administration of Company Registration on December 18, 2005).)  For registration, the filing

must contain:

- personal ID and other documents indicating founder's identity;
- certificate of capital to be contributed;
- name of the company to be registered;
- business scope;
- domicile with evidences such as real estate title or leasing contract;
- list of shareholders;
- organization of company and its rule regarding resolutions; and
- articles of incorporation.

(*See* Ch. 4 of the Regulations of the People's Republic of China on the Administration of

Company Registration of 2005.)

      29.    In 1999, the registration fee rate was reduced from one percent to 0.8 percent of

the company's whole capital for companies with less than 10,000,000.00 RMB Yuan.  The

registration fee for companies over that amount was changed from 0.5 percent to 0.4 percent of

the company's whole capital over 10,000,000.00, with an exemption for capital over

100,000,000.00 RMB Yuan.  (*See* Notification regarding the Registration Fees charged by the

Administration of Industry and Commerce issued by the State Bureau of Price and Ministry of

Finance of 1999.)

      30.    The company must be run in accordance with national Company Law and a

number of other regulations and statutory formalities.

      31.    For example, a general requirement under Company Law is that, before a

company can be established by registration, it must prepare articles of incorporation that must be

signed and affixed with the shareholders' seals and must include the following:

- name and address of the company;
- scope of business operations of the company;
- registered capital of the company;

- names and titles of shareholders;
- methods, amounts and time of capital contributions by the various shareholders;
- the company's organizations and its establishment methods, duties and rules of procedure;
- legal representative of the company; and
- other items deemed necessary by the shareholders to be stipulated.

Articles of incorporation have binding force over the company, its shareholders, directors, supervisors and senior managers. (*See* Art. 11 CCL.)

32.     A company must hold shareholders' meetings during which time the shareholders determine, *inter alia*, the company's operational guidelines and investment plans, which directors and supervisors to elect, and how executive compensation will be set. (*See* Art. 38 CCL.)

33.     A company must have a board of directors, unless otherwise provided. (*See* Art. 47, 51 CCL.)   The board of directors exercises important functions such as convening shareholders' meetings, presenting reports, implementing the resolutions made at the shareholder's meetings, and determining the company's business and investment plans. (*See* Art. 47 CCL.)

34.     A company must also set up a board of supervisors, which may oversee the financial affairs of the company and provide corporate oversight, putting forward proposals regarding the removal of any director or senior manager who violates any law, administration regulation, articles of incorporation or any resolution of the shareholders' meeting. For a limited liability company in which there is a relatively small number of shareholders or which is relatively small in scale, this requirement is fulfilled by a company having one or two supervisors. (*See* Art. 52 para. 1 CCL.) The board of supervisors may also demand that any director or senior manager make corrections if his or her actions have injured the interests of the

12

company.   (*See* Art. 54 CCL.)   The board of supervisors is comprised of shareholders' representatives and representatives of the employees' of the company at an appropriate ratio to be specifically prescribed in the articles of incorporation.  The employees' representatives on the board of supervisors are democratically elected by company employees.   The board of supervisors has one chairman who is elected by half or more of all the supervisors.   The chairman of the board of supervisors convenes and presides over the meetings of the board of supervisors.  No director or senior manager may concurrently serve as a supervisor.  (*See* Art. 52 CCL.)

35.     Each company must also have a legal representative (*Fading Daibiaoren*) which is registered with the Administration of Industry and Commerce and may legitimately represent the company for the business operations with third parties.  The legal representative position is assumed by the chairman of the board of directors, acting director or manager. (*See* Art. 13 CCL.)

36.     There are also Company Law requirements specific to company type.  For example, a joint stock limited company must regularly disclose to its shareholders information about remunerations received by the directors, supervisors and senior managers from the company (*see* Art. 117 CCL), and Company Law explicitly requires that a joint stock company have independent directors, (*see* Art. 123 CCL).  A joint company's stock and band must bear the signature of the legal representative along with the seal of the company. (*See* Art. 129 and Art. 156.)

37.     In China, there are additional, stricter, rules that apply to companies owned by one shareholder.  For example, the minimum amount of registered capital of a one-person

13

company amount to 100,000 RMB Yuan. (*See* Art. 59 para. 1 CCL.)  It is higher than the requirement of a normal company, which is normally RMB 30,000 Yuan. (*See* Art. 26 para. 2 CCL.)  Furthermore, the minimum amount of registered capital of a one-person company must be paid in one lump sum rather than in installments. (*See* Art. 59 para. 1 CCL.)  The shareholder must be clearly indicated in the company registration and the business license.  Although it has no board of directors, important decisions made by the sole shareholder must be in written form.  In order to protect the creditor's interests, a financial report by the end of the every financial year must be made and audited by an accounting firm. (*See* Art. 60-63 CCL.)  Note that the sole shareholder of a one-person company can be either one natural person or legal person shareholder.  However, although a natural person may establish a one-person company, that individual is prohibited from establishing more than one one-person company. (*See* Art. 59 para. 2 CCL.)

### PARENT AND SUBSIDIARY COMPANIES

38.    Under Article 14 of the Company Law, a company may establish subsidiary companies.  In China, the term "parent company" usually applies to the company that owns between 50 and 100 percent of the subsidiary.  However, if there is a lower ownership percentage but that percentage is sufficient to exert control over the company, the parent-subsidiary relationship may also be recognized.  According to Article 217, paragraph 2 of the Company Law, a "controlling shareholder" refers to: a shareholder whose capital contribution occupies 50% or more in the total capital of a limited liability company; a shareholder whose stocks occupy more than 50% of the total equity stocks of a joint stock limited company; or a shareholder whose capital contribution or proportion of stock is less than 50% but who enjoys a

14

voting right according to its capital contribution or the stocks it holds is large enough to impose a significant impact on the resolution of the shareholders' meeting or the shareholders' assembly. In all of the aforementioned cases, both the parent and subsidiary have their own legal person status and bear their civil liability independently. (*See* Art. 14, para. 2 CCL.)

39.    Under Chinese law, a subsidiary is an independently legal entity and bears liability independent of its parent company.

40.    Although a parent company and subsidiary company are distinct legal entities, it is not unusual that the parent and subsidiary may have common employees, officers, managers and/or directors to different degree.

41.    The parent company, as owner of the subsidiary (in whole or in part) and by virtue of its interest in the subsidiary's voting shares may, and often will, exert some level of control over the subsidiary, for example, by directing the subsidiary's marketing strategy and business operations.  The type and extent of such control is normally provided for in the subsidiary's articles of incorporation in terms of shareholder's voting rights over important issues. However, there are some strict prohibitions regarding the controlling power of the parent company.  For example, no company may, directly or through its subsidiary, lend money to any of its directors, supervisors, or senior managers. (*See* Art. 116 CCL.)  Neither the controlling shareholder, nor the actual controller, nor any of the directors, supervisors or senior management of the company may injure the interests of the company by taking advantage of its connection to or relationship with the company.  Anyone who causes any loss to the company due to violating the preceding prohibition is liable for the compensation. (*See* Art. 21 CCL.)

15

42.     Because subsidiary companies are independent legal persons, all Company Law provisions that apply to regular companies generally apply to subsidiary companies as well. (*See* Art. 59-64 CCL.)

43.     Subsidiaries are subject also to regulation by the Chinese tax bureau, which monitors the Chinese subsidiaries to see that they operate, and therefore may be taxed independently of their parent companies.  The government agency in charge of tax policy is the Ministry of Finance.  State and Local Administration of Taxation is in charge of tax collection and supervision.  Pursuant to Article 7 of the Law of the People's Republic of China Concerning the Administration of Tax Collection (adopted at the 27th meeting of the Standing Committee of the seventh National People's Congress on September 4, 1992; amended in accordance with the Decisions on Amending the Law of the People's Republic of China Concerning the Administration of Tax Collection made at the 12th meeting of the Standing Committee of the eighth National People's Congress on February 28, 1995; revised at the 21st meeting of the Standing Committee of the ninth National People's Congress on April 28, 2001), tax authorities shall extensively disseminate tax laws and administrative regulations, the knowledge of tax payment, and gratuitously provide taxpayers with consulting services on tax payment.

44.     Private tax consultant firms may also counsel parent and subsidiary companies to help devise arrangements whereby the two companies are structured and operate in a way that is economically beneficial to both and complies with all relevant Chinese statutes and regulations.

**LIMITED LIABILITY AND DISREGARDING THE INDEPENDENT PERSONALITY OF COMPANY**

45.     Under the 2005 Company Law, it is well settled that a parent company and its wholly-owned or partially-owned subsidiary are separate and distinct legal entities. (*See* Art. 14

para 2 CCL.)  The fact that the parent owns part or all of the shares of a subsidiary does not make the parent liable for the actions of the subsidiary, nor are the actions of the parent attributed to the subsidiary, or vice versa.

46.     As a general principle, because a parent and subsidiary company are legally distinct from one another, the traits and acts of each are not attributable to the other for liability or jurisdictional purposes unless attribution is permissible under an alternative legal theory.

47.     The Company Law contains two provisions that permit courts to disregard a company's independent legal personality:

> "Where any of the shareholders of a company evades the payment of its debts by abusing the independent status of juridical person or the shareholder's limited liabilities, and thus seriously damages the interest of any creditor, it shall bear the joint and several liabilities for the debts of the company."

and

> "If the shareholder of a one-person limited liability company is unable to prove that the property of the one-person limited liability company is independent from his own property, he shall bear joint and several liabilities for the debts of the company."

(*See* Art. 20 para. 3; Art. 64 CCL.)

48.     In practice, Chinese courts may disregard separate corporate identity when (a) the corporate form has been intentionally and maliciously abused by a shareholder in order to evade company debts; and (b) such abuse caused serious harm to company creditors.  Other factors may also be important to the court's decision whether to disregard separate corporate identity, including the following:

- undercapitalization or withdrawal of previously contributed capital from the company;
- commingling of the properties of a company and its shareholders, or of a parent and its subsidiary (in the case of a one-person company, the sole shareholder has the burden to establish the absence of commingling of properties (*see* Art. 64 CCL.);

17

- extensive overlapping of employees, business domiciles;
- failure to keep separate and distinct financial records between parent and subsidiary; and
- failure to abide by the requirements of corporate organization structure.

## BNBM, TG AND TTP

49.     The factual data I reviewed show that BNBM, TG and TTP were all duly organized under the laws of China.  Each company is separately registered as an individual independent legal person in accordance with Chinese law.  BNBM is the only company of the three that is publically listed on Shenzhen Stock Exchange (Stock Code: 00786) since 1997.

50.     According to the documents I reviewed, BNBM owns, directly and indirectly, 65% of TG's shares:  on March 24, 2005, BNBM directly purchased 42% of TG's shares, and in June 2006, BNBM purchased Taian Donglian Investment and Trade Company, Limited ("Donglian"), which then held 23% of TG's shares.  (Jia Tr. 576:22-577:16; Def's Ex. 6, Pl's Ex. 24 (CNBM Announcement of BNBM's Acquisition of Donglian, dated August 28, 2006).)

51.     The data I reviewed shows that TG observed the corporate formalities required under Chinese Company Law.  For example, for the period 2005-2008, TG held annual shareholder meetings in accordance with the requirements of its Articles of Incorporation.  (*See* Jia Tr., Def's Exs. 18-21 (TG Annual Shareholder Meeting Resolutions, dated April 15, 2006, June 20, 2007, May 20, 2008 and May 18, 2009).)  In accordance with TG's Articles of Incorporation, its Board of Directors met annually and issued written resolutions.  (*See* Jia Tr., Def's Exs. 22-24 (TG Director's Resolutions of the Third, Fourth and Fifth Meetings, dated April 15, 2006, June 20, 2007 and May 20, 2008, respectively).)  A yearly report of TG's operations was duly prepared by the General Management and distributed to the board of

directors and the shareholders. (*See* Jia Tr., Def's Exs. 25-27 (Chief Executive Officer's Work Report for the years 2005-2007).) In accordance with Chinese law, a third-party independent accounting firm prepared annual financial statements for TG. (Jia Tr. 638:10-643:14; *e.g.*, Def's Exs. 29-32 (TG Annual Financial Statements for 2005-08).)

52.      The data I reviewed shows that TG observed company formalities when it established TTP. In accordance with Chinese law, TTP was registered in the Business License Department and met the Department's criteria (*e.g.*, that it have an office, a scope of business declaration, third-party asset report, *etc.*). (Jia Tr. 648:22-649:18, Def's Exs. 33, 37, 40, 42 and 43.) TG also created Articles of Association for TTP, signed by TG's legal representative. (Jia Tr. 651:10-652:1; Def's Ex. 34.) TTP documented the appointment of its Board of Directors, as specified in TTP's Articles of Association. (Jia Tr. 652:19-653:21, Def's Ex. Jia 35.) TTP did not share any directors or managers with TG. (Zhang Tr. 80:21-81:10.) TTP provided information to third party accounting firms for the purposes of preparing financial statements for the years 2006, 2007 and 2008. (Jia Tr., Exs. 45, 47 and 46.)

53.      I am aware that TG initially contributed 15 million RMB to TTP's capital account. (*See* Jia Tr., Def's Ex. 37 (TTP Capital Verification Descriptions).) I note further that TTP rented manufacturing real estate (*see* Jia Tr., Def's Exs. 40, 43 (Lease Agreements between TG and TTP, dated Feb. 10 and 20, 2006)) and bought manufacturing equipment from TG (*see* Jia Tr., Def's Ex. 42 (Purchase and Sale Agreement, dated Feb. 20, 2006)). TTP also used the TG trademark by means of conducting a trademark authorization contract for a term of five years. (*See* Jia. Tr., Def's Ex. 41 (Trademark Use Authorization, dated Feb. 20, 2006).) These transactions are all adequately documented and constitute permissible transactions between a

parent company and its subsidiary under Chinese Company Law.  (*See* Art. 21 and Art. 217 para. 4 CCL.)

54.     Under Chinese law, TTP, TG and BNBM are legally distinct from one another and the traits and acts of each are not attributable to the others for liability or jurisdictional purposes unless attribution is permissible under an alternative legal theory as described in paragraphs 45 and 46 above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30 day of March, 2012

By: _____
        Zhu Yan

20