1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
2

    _____
3                                §  MDL NO. 2047
    IN RE:                       §
4    CHINESE-                    §  SECTION: L
    MANUFACTURED                 §
5    DRYWALL PRODUCTS            §  JUDGE FALLON
    LIABILITY                    §
6    LITIGATION                  §  MAGISTRATE
    _____         §  JUDGE WILKINSON
7

                 - - -
8

      CROSS NOTICED IN VARIOUS OTHER ACTIONS
9

                 - - -
10

               April 4, 2011
11

                 - - -
12

        CONFIDENTIAL - SUBJECT TO FURTHER
13            CONFIDENTIALITY REVIEW
14                 - - -
15          Videotaped deposition of TONGCHUN
    JIA, held at 3 Pedder Street, Central,
16   Hong Kong, China, commencing at 9:05
    a.m., on the above date, before Linda L.
17   Golkow, Certified Court Reporter,
    Registered Diplomate Reporter, Certified
18   Realtime Reporter and Notary Public.
19
20                 - - -
21
22          GOLKOW TECHNOLOGIES, INC.
        ph 877.370.3377 | fax 917.591.5672
23              deps@golkow.com
24

```
 1   APPEARANCES:
 2
 3
     SEEGER WEISS LLP
 4   BY:  CHRISTOPHER A. SEEGER, ESQUIRE
     BY:  JEFFREY S. GRAND, ESQUIRE
 5   One William Street
     New York, New York 10004
 6   (212) 584-0700
     cseeger@seegerweiss.com
 7   jgrand@seegerweiss.com
     Representing the Plaintiffs' Steering
 8   Committee
 9
10   COLSON HICKS EIDSON
     BY:  PATRICK S. MONTOYA, ESQUIRE
11   255 Alhambra Circle
     Penthouse
12   Coral Gables, Florida 33134
     (305) 476-7400
13   patrick@colson.com
     Representing Plaintiffs' Steering
14   Committee in the Federal and State
     Coordinated Actions
15
16
     LAW OFFICES OF RICHARD SERPE, P.C.
17   BY:  RICHARD J. SERPE, ESQUIRE
     580 East  Main Street
18   Suite 310
     Norfolk, Virginia 23510
19   (757) 233-0009
     rserpe@serpefirm.com
20   Representing the MDL Plaintiffs and
     the Germano Plaintiffs
21
22
23
              -  -  -
24
```

```
 1    APPEARANCES (CONTINUED):
 2
 3       HOGAN LOVELLS US LLP
         BY:  JOE CYR, ESQUIRE
 4       BY:  FRANK T. SPANO, ESQUIRE
         BY:  ERIC D. STATMAN, ESQUIRE
 5       BY:  RENEE GARCIA, ESQUIRE
         875 Third Avenue
 6       New York, New York 10022
         (212) 918-3000
 7       joe.cyr@hoganlovells.com
         frank.spano@hoganlovells.com
 8       renee.garcia@hoganlovells.com
         eric.statman@hoganlovells.com
 9       Representing Taishan Gypsum Co.
         Ltd. and Tai'an Taishan
10       Plasterboard Company Ltd. and the
         Witness, Tongchun Jia
11
12
         HOGAN LOVELLS INTERNATIONAL LLP
13       BY:  EUGENE CHEN, ESQUIRE
         18th Floor, Park Place
14       1601 Nanjing Road West
         Shanghai, China 200040
15       (86 21) 6122 3800
         eugene.chen@hoganlovells.com
16       Representing Taishan Gypsum Co.
         Ltd. and Tai'an Taishan
17       Plasterboard Company Ltd. and the
         Witness, Tongchun Jia
18
19
         JIGTIAN & GONGCHENG
20       BY:  CHUNGANG DONG, ESQUIRE
         34/F, Tower 3, China Central Place
21       77 Jianguo Road - Chaoyang District
         Beijing, China  200040
22       (86 10) 5809 1016
         Representing Taishan Gypsum Company
23       Limited and Tai'an Taishan
         Plasterboard Company
24
```

```
 1    APPEARANCES (CONTINUED):
 2
 3
      GREENBERG TRAURIG, LLP
 4    BY:  HILARIE BASS, ESQUIRE
      1221 Brickell Avenue
 5    Miami, Florida 33131
      (305) 579-0745
 6    bassh@gtlaw.com
      Representing the Home Builders
 7    Steering Committee
 8
 9    GALLOWAY JOHNSON TOMPKINS BURR and
      SMITH
10    BY:  CARLINA C. EISELEN, ESQUIRE
      One Shell Square
11    701 Poydras Street, 40th Floor
      New Orleans, Louisiana 70139
12    (504) 525-6802
      ceiselen@gjtbs.com
13    Representing Interior/Exterior
      Building Supply
14
15
      PERKINS COIE LLP
16    BY:  DAVID L. BLACK, ESQUIRE
      1899 Wynkoop Street - Suite 700
17    Denver, Colorado 80202
      (303) 291-2300
18    DBlack@perkinscoie.com
      Representing the State of Louisiana
19
20
21
22
23
24
```

```
 1   APPEARANCES (CONTINUED):
 2
 3       WEINBERG, WHEELER, HUDGINS, GUNN &
         DIAL, LLC
 4       BY:  NICHOLAS P. PANAYOTOPOULOS, ESQ.
         3344 Peachtree Road, NE
 5       Suite 2400
         Atlanta, Georgia 30326
 6       (404) 876-2700
         npanayo@wwhgd.com
 7       Representing Various Banner
         Defendants
 8
 9
         BRENNER, EVANS & MILLMAN, P.C.
10       BY:  THEODORE I. BRENNER, ESQUIRE
         411 East Franklin Street
11       Suite 200
         Richmond, Virginia 23218
12       (804) 644-1300
         Representing Tobin Trading Company
13
14
         McKENRY, DANCIGERS, DAWSON &
15       LAKE, P.C.
         BY:  J. BRIAN SLAUGHTER, ESQUIRE
16       192 Ballard Court
         Suite 400
17       Virginia Beach, Virginia 23462
         (757) 461-2500
18       Jbslaughter@va-law.org
         Representing Atlantic Homes LLC and
19       Multiple Other Virginia-Based
         Defendants
20
21
22
23
24
```

```
 1   APPEARANCES (CONTINUED):
 2
 3       SHER GARNER CAHILL RICHTER KLEIN &
         HILBERT, L.L.C.
 4       BY:  MATTHEW C. CLARK, ESQUIRE
         909 Poydras Street
 5       Suite 2800
         New Orleans, Louisiana 70112
 6       (504) 299-2100
         mclark@shergarner.com
 7       Representing the Southern Home
         Defendants
 8
 9
         SINNOTT, NUCKOLS & LOGAN, PC
10       BY:  KENNETH F. HARDT, ESQUIRE
         13811 Village Mill Drive
11       Midlothian, Virginia 23114
         (804) 378-7600
12       khardt@snllaw.com
         Representing Venture Supply, Inc. and
13       Porter-Blaine Corp.
14
15
16
17
18
19
20
21
22
23
24
```

```
 1   APPEARANCES VIA TELEPHONE:
 2
 3      KUCHLER POLK SCHELL WEINER &
        RICHESON LLC
 4      BY:  FRANCIS X. deBLANC, III,
        1615 Poydras Street
 5      Suite 1300
        New Orleans, Louisiana 70112
 6      (504) 592-0691
        slauricella@kuchlerpolk.com
 7      Representing Creola Ace Hardware and
        Thomas Gould Inc. in the MDL
 8
 9
        HUNTON & WILLIAMS LLP
10      BY:  A. TODD BROWN, ESQUIRE
        Bank of America Plaza
11      101 South Tryon Street
        Suite 3500
12      Charlotte, North Carolina  28280
        (704) 378-4700
13      Representing Stock Building Supply,
        LLC
14
15
        JONES, WALKER, WAECHTER, POITEVENT,
16      CARRERE & DENEGRE LLP
        BY:  MEGAN E. DONOHUE, ESQUIRE
17      600 Jefferson Street, Suite 1600
        Lafayette, Louisiana 70501
18      (337) 262-9062
        mdonohue@joneswalker.com
19      Representing Fireman's Fund Insurance
        Company
20
21
22
23
24
```

```
 1    APPEARANCES VIA TELEPHONE (CONTINUED):
 2
 3       DUPLASS ZWAIN BOURGEOIS PFISTER &
         WEINSTOCK
 4       BY:  PHILIP WATSON, ESQUIRE
         3838 N. Causeway Boulevard
 5       Suite 2900
         Metairie, Louisiana 70002
 6       (504) 832-3700
         pwatson@duplass.com
 7       Representing R&H Masonry, Inc., and
         Swedberg Enterprises, Inc.
 8
 9
         RUMBERGER, KIRK & CALDWELL, P.A.
10       BY:  ABIGAIL ROBERTS, ESQUIRE
         Brickell Bayview Centre, Suite 3000
11       80 Southwest 8th Street
         Miami, Florida 33130
12       (305) 358-5577
         aroberts@rumberger.com
13       Representing Defendants' Liaison
         Counsel for  Installers
14
15
         HAYNSWORTH SINKLER BOYD, P.A.
16       BY:  CHRISTOPHER B. MAJOR, ESQUIRE
         75 Beattie Place - 11th Floor
17       Greenville, South Carolina 29601
         (864) 240-3200
18       cmajor@hsblawfirm.com
         Representing USG Corporation and L&W
19       Supply Corporation
20
         PHELPS DUNBAR LLP
21       BY:  MITCHELL P. HASENKAMPF, ESQUIRE
         Canal Place
22       365 Canal Street, Suite 2000
         New Orleans, Louisiana 70130-6534
23       (504) 584-9249
         mitchell.hasenkampf@phelps.com
24       Representing State Farm
```

```
 1   APPEARANCES VIA TELEPHONE (CONTINUED):
 2
 3       FULMER LEROY ALBEE BAUMANN
         BY:  CANDACE MOSS, ESQUIRE
 4       2866 East Oakland Park Boulevard
         Ft. Lauderdale, Florida 33306
 5       (954) 707-4430
         mosscandace@fulmerleroy.com
 6       Representing Independent Builders
         Supply Association (IBSA)
 7
 8
         THOMPSON COE COUSINS & IRONS, L.L.P.
 9       BY:  SUZANNE M. PATRICK, ESQUIRE
         One Riverway, Suite 1600
10       Houston, Texas 77056
         (713) 403-8210
11       spatrick@thompsoncoe.com
         Representing The North River
12       Insurance Company
13
14       BERNARD, CASSISA, ELLIOTT & DAVIS,
         APLC
15       BY:  CAROLINE E. ELLIOTT, ESQUIRE
         1615 Metairie Road
16       Metairie, Louisiana 70005
         (504) 834-2612
17       elliottc@bernard-cassisa.com
         Representing  Phillips Abita Lumber
18       Company, Inc.
19
20
21
22
23
24
```

```
 1   APPEARANCES VIA STREAM:
 2
 3       BECNEL LAW FIRM, L.L.C.
         BY:  ROBERT BECNEL, ESQUIRE
 4       106 W. 7th Street
         Reserve, Louisiana 70084
 5       (985) 536-1186
         robbecnel@aol.com
 6       Representing the Plaintiffs'
         Steering Committee
 7
 8
         QUINN EMANUEL URQUHART & SULLIVAN,
 9       LLP
         BY: CLINTON DOCKERY
10       51 Madison Avenue, 22nd Floor
         New York, New York 10010
11       (212) 849-7000
         clintondockery@quinnemanuel.com
12       Representing Chartis Select Insurance
         Company and Related Chartis Insurers
13
14
         JONES, WALKER, WAECHTER, POITEVENT,
15       CARRERE & DENEGRE LLP
         BY:  MEGAN E. DONOHUE, ESQUIRE
16       600 Jefferson Street, Suite 1600
         Lafayette, Louisiana 70501
17       (337) 262-9062
         mdonohue@joneswalker.com
18       Representing Fireman's Fund Insurance
         Company
19
20
21
22
23
24
```

```
 1   APPEARANCES VIA STREAM (CONTINUED):
 2
 3       WOODLEY WILLIAMS LAW FIRM
         BY:  DONALD C. BROWN, ESQUIRE
 4       1 Lakeshore Drive
         Suite 1750
 5       Lake Charles, Louisiana 70629
         (337) 433-6328
 6       dcbrown@woodleywilliams.com
         Representing Devon International,
 7       Inc. Formerly, Devon International
         Trading, Inc.
 8
 9
         DEUTSCH, KERRIGAN & STILES
10       BY:  MELISSA M. SWABACKER, ESQUIRE
         755 Magazine St.
11       New Orleans, Louisiana  70130
         (504) 581-5141
12       mswabacker@dkslaw.com
         Representing Landmark American
13       Insurance Company
14
15       KUCHLER POLK SCHELL WEINER &
         RICHESON LLC
16       BY:  SOPHIA L. LAURICELLA, ESQUIRE
         1615 Poydras Street
17       Suite 1300
         New Orleans, Louisiana 70112
18       (504) 592-0691
         slauricella@kuchlerpolk.com
19       Representing Creola Ace Hardware and
         Thomas Gould Inc. in the MDL
20
21
22
23
24
```

```
 1   APPEARANCES VIA STREAM (CONTINUED):
 2
 3       TAYLOR WALKER, P.C.
         BY:  CHRISTOPHER J. WIEMKEN, ESQUIRE
 4       555 E. Main Street
         Suite 1300
 5       Norfolk, Virginia 23510
         (757) 625-7300
 6       Cwiemken@taylorwalkerlaw.com
 7
 8   ALSO PRESENT:
 9
10   Stephanie Chin, Official Interpreter
     (Interpreter 1)
11
12   Una Wong, Check Interpreter
     (Interpreter 2)
13                 -  -  -
14
15
16
17
18
19
20
21
22
23
24
```

```
1                    - - -
2                I N D E X
3                    - - -
4
5   Testimony of:  TONGCHUN JIA
6    By Mr. Seeger                        23
7
                     - - -
8
              E X H I B I T S
9
                     - - -
10
11   NO.              DESCRIPTION       PAGE
12   Jia-1     Handwritten note,         59
               Zhang Jiaiu Chun, Chen
13             Xinghua, and Zhao
               Siuyun
14
     Jia-2     Document entitled         81
15             "Shangdong Taihe
               Dongxin Co., Ltd.," 12
16             pages
17   Jia-3     Handwritten note in      112
               Chinese
18
     Jia-4     Handwritten note, Pang   138
19             Shi Liang
20   Jia-5     Handwritten note, Zhou   148
               Wan and Wu Fade
21
     Jia-6     Handwritten note, Ren    148
22             Xu Lian and Xue Yu Li
23   Jia-7     Handwritten note, Keng   156
               Ming Guo, Ren Xu Lian
24             and Xue Yu Li
```

| | | | |
|---|---|---|---|
| 1 | Jia-8 | Printout from website, 2 pages | 184 |
| 2 | | | |
| 3 | Jia-9 | Taishan Ceiling and Wall System, Bates stamped TG 0025132 | 219 |
| 4 | | through TG 0025151, TG 0025155 through TG | |
| 5 | | 0025158, TG 0025216 through TG 0025218, TG | |
| 6 | | 0025253 through TG 0025255, TG 0025275, | |
| 7 | | TG 0025329 through TG 0025332, TG 0025344 | |
| 8 | | through TG 0025349, and TG 0025397 and TG | |
| 9 | | 0025398 | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

1                    -  -  -
2            DEPOSITION SUPPORT INDEX
3                    -  -  -
4

     Direction to Witness Not to Answer
5

                 Page Line
6
7
8
9

     Request for Production of Documents
10

                 Page Line
11

                 98   18
12               110  19
13
14
15              Stipulations
16               Page Line
17
18
19        Questions/Objections Marked
20               Page Line
21               96   22
                 99   7
22               99   16
                 151  11
23               261  4
24

1                    - - -

2              MR. SPANO: This is Frank

3         Spano appearing on behalf of

4         Taishan Gypsum Company Limited and

5         Tai'an Taishan Plasterboard

6         company.

7              In advance of the deposition

8         or at the deposition right now, we

9         are producing a few pages of

10        additional responsive documents

11        that we located just yesterday.

12        It's only a few pages, and

13        generally speaking, it consists of

14        a trademark license agreement

15        between TG and TTP and a few pages

16        of sales contract documents

17        relating to sales of equipment

18        between TG and TTP.  The witness

19        will be prepared to address any

20        questions about these documents

21        and describe them in more detail

22        as you wish.

23             MR. SEEGER:  The only thing

24        I'll note for the record is that

1       I'm only getting these documents,

2       obviously, now, and it appears to

3       me to be, I don't know, 40

4       pages --

5               MR. SPANO:  No, no.  It is

6       four to five pages.  What you are

7       looking at here is 15 sets.

8               MR. SEEGER:  So, a handful

9       of pages.  Until we get them

10      translated, I obviously can't ask

11      questions about them.

12              MR. SPANO:  Would you care

13      to pass them around.

14              (Handing over documents.)

15              MR. CYR:  This is Joe Cyr

16      from Hogan Lovells representing

17      the witness today.

18              Is there anyone on the line

19      who is not a counsel for one of

20      the parties in the litigation?

21              (No response.)

22              MR. CYR:  Thank you.

23              THE VIDEOTAPE TECHNICIAN:

24      We are now going on the record.

1           The date today is April 4, 2011.

2           The time now is approximately 9:07

3    a.m.

4           This is the 30(b)(6)

5    deposition of Tai'an Taishan

6    Plasterboard taken through its

7    representative Tongchun Jia taken

8    in reference to the Chinese

9    Manufactured Drywall Products

10   Liability Litigation.

11          The deposition today is

12   being held in Hong Kong.

13          My name is Melissa Bardwell,

14   videographer representing Golkow

15   Technologies, and the court

16   reporter today is Linda Golkow.

17          Would counsel and all

18   present please introduce

19   themselves and state their

20   affiliations for the record.

21          MR. CYR:  My name is Joe

22   Cyr.  I'm from Hogan Lovells, and

23   I represent -- we represent

24   Taishan Gypsum as well as, I will

1          refer to the plasterboard company

2          as TTP.

3               And if it's okay with

4          counsel for the plaintiffs, I

5          would like to respectfully correct

6          the videographer in that Mr. Jia

7          is here in a 30(b)(6) deposition

8          on behalf of Taishan Gypsum for

9          several designated areas, and he's

10         here on behalf of TTP only with

11         respect to three designated areas.

12         I'll defer to plaintiffS' counsel

13         for the identification of those

14         areas if you would like to do that

15         in the interest of time.

16               Thank you.

17               MR. SEEGER:  Thanks.  We'll

18         get back to the introductions now.

19               Chris Seeger representing

20         the Plaintiffs' Steering Committee

21         in the Chinese Drywall Litigation

22         MDL.

23               MR. GRAND: Jeff Grand from

24         Seeger Weiss on behalf of the MDL.

1          MR. MONTOYA:  Patrick

2     Montoya on behalf of the PSC in

3     the Federal and State coordinated

4     litigation.

5          MS. BASS: Hilarie Bass from

6     Greenberg Traurig on behalf of the

7     Home Builders Steering Committee.

8          MR. SLAUGHTER: Brian

9     Slaughter.  I represent multiple

10     Virginia builders, developers and

11     installers.  I'm here appearing

12     subject to our jurisdictional

13     defenses and motions that we have

14     previously filed, and we've also

15     filed a third-party claim against

16     Taishan in the Allen litigation in

17     Virginia.

18          MR. HARDT: My name is

19     Kenneth Hardt.  I represent

20     Venture Supply, Inc. and the

21     Porter-Blaine Corporation, making

22     a special appearance in the

23     Germano class action in which we

24     have cross-noticed these

1      depositions as well.

2           MR. BRENNER: I'm Ted

3      Brenner.  I'm here for Tobin

4      Trading Company, making a special

5      appearance  in the Germano case as

6      well.

7           MR. CLARK:  Matthew Clarke

8      representing Southern Homes.

9           MS. EISELEN: Carlina Eiselen

10     for Interior/Exterior.

11          MR. BLACK:  David Black for

12     the State of Louisiana.  We

13     reserve our rights as set forth in

14     the remand motion that's pending.

15          MR. PANAYOTOPOULOS: Nick

16     Panayotopoulos on behalf of

17     certain Banner entities, and we

18     obviously reserve our objections

19     as we have in the past.

20          MR. SERPE: Richard Serpe for

21     the Germano plaintiffs.

22          MR. CHEN: Eugene Chen of

23     Hogan Lovells on behalf of Taishan

24     Gypsum and TTP.

1             MS. WONG:  Una Wong, check

2        interpreter.

3             MS. GARCIA: Renee Garcia of

4        Hogan Lovells for TG and TTP.

5             MR. DONG:  Jingtian &

6        Gongchen, Chungang Dong.

7             MR. STATMAN: Eric Statman

8        for Hogan Lovells on behalf of

9        Taishan Gypsum and TTP.

10            MR. SPANO: Frank Spano.  You

11       already have my appearance.

12                  -  -  -

13            (STEPHANIE CHIN, OFFICIAL

14       INTERPRETER, INTERPRETER 1, was

15       duly sworn to interpret Chinese

16       into English and English into

17       Chinese.)

18                  -  -  -

19            TONGCHUN JIA, after having

20       been duly sworn through the

21       interpreter, was examined and

22       testified as follows:

23                  -  -  -

24            (UNA WONG, CHECK

1          INTERPRETER, INTERPRETER 2, was

2          duly sworn to interpret Chinese

3          into English and English into

4          Chinese.)

5                    -  -  -

6          MR. CYR:  Mr. Seeger, the

7          only other thing that I had was

8          that we preserve our right to

9          review and correct the transcript.

10         Thank you.

11                   -  -  -

12              EXAMINATION

13                   -  -  -

14  BY MR. SEEGER:

15         Q.   Good morning, Mr. Jia.

16              MR. SEEGER:  You can

17         translate that if you want.

18  BY MR. SEEGER:

19         Q.   Have you ever been deposed

20  before?

21         A.   No.

22         Q.   So, you understand that the

23  court reporter asked you to take an oath.

24  Is there any reason why you could not

1    fulfill your oath to tell the truth here

2    today?

3            A.    I don't understand what you

4    mean.

5            Q.    Does he understand that the

6    oath that he's been asked to take

7    requires him to tell the complete truth

8    on any subject we ask him questions of,

9    subject to his attorney telling him not

10   to answer a question?

11           A.    I understand.

12           Q.    Thank you.

13                 Also, I would like to say

14   that because he's never been deposed

15   before, if there's anything I do that he

16   interprets as disrespectful in any way,

17   it's not intended.  I'm just here to ask

18   questions and try to get some answers.

19           A.    I understand.

20           Q.    Okay.  Thank you.

21                 So, tell us what your

22   current job position is as you sit here

23   today.

24           A.    My position is the chairman

1    of the board of directors and the

2    managing director of the Taishan Gypsum

3    Company Limited.

4          Q.    And when did you begin this

5    position, at this position?

6                INTERPRETER 2:  The check

7                interpreter need to check the

8                official interpreter.  The witness

9                did say that also general manager.

10               INTERPRETER 1:  No.  He said

11               managing director, MD.  MD,

12               managing director.  Chairman of

13               the board of director and MD.

14               INTERPRETER 2:  Because the

15               witness say he -- I am the Taishan

16               Gypsum's chairman of the board of

17               director and general manager.

18               INTERPRETER 1:  I used the

19               title MD.  She's using the general

20               manager.  Let me clarify with the

21               witness.

22               (Interpreter clarification.)

23               INTERPRETER 2:  Managing

24               director.  The check interpreter

1           say that the general managers --

2           Chinese is dong shi ju.  MD,

3           managing directors, Chinese is

4           dong shi ju.

5               THE WITNESS:  I don't

6           understand English.  I agree with

7           the check interpreter.  I will go

8           for the title GM even though

9           there's many ways of interpreting.

10              MR. SEEGER:  Now I got a

11          little confused.  So, his answer

12          was he is the chairman of the

13          board and --

14              INTERPRETER 1:  Of directors

15          and a GM.

16              MR. SEEGER:  And GM, general

17          manager?

18              INTERPRETER 1:  Right, yeah.

19              MR. CYR:  Of Taishan Gypsum,

20          thank you.

21              MR. SEEGER:  Of Taishan

22          Gypsum?

23              INTERPRETER 1:  Yes.

24    BY MR. SEEGER:

1           Q.    What did you do to prepare
2    for your deposition today?
3           A.    I go through some of the
4    informations in my company.  I looked
5    through it so that I would be doing some
6    preparation.
7           Q.    Thank you.
8           MS. BASS:  We're all going
9           to have to speak louder because of
10          the air conditioning noise.  We
11          cannot hear anybody at this end of
12          the table, so if you would please
13          try and project your voice.
14          INTERPRETER 1:  Okay.
15          MS. BASS:  Thank you.
16          INTERPRETER 2:  Check
17          interpreter must jump in again.
18          The witness said, at the
19          counsel's advice, I did some
20          preparation.
21          MR. SEEGER:  Do you agree
22          with that?
23          INTERPRETER 1:  I did not
24          hear that.

1                THE WITNESS:  I check the

2           information inside my company, and

3           also under the guidance of my

4           lawyers, I read something.

5    BY MR. SEEGER:

6           Q.    I want to just tell him that

7    he should not give me any answers that

8    involve communications between him and

9    his attorney.

10          A.    Yes.

11          Q.    Okay.  Having said that,

12   could he tell me what information he

13   looked at to prepare himself?

14          A.    I read some of the

15   information regarding sales and

16   operations of my company, sales and

17   operation.

18          Q.    Could he be a little more

19   specific about what he looked at, the

20   name -- if he could identify what the

21   documents are, what the titles of the

22   documents are?

23          A.    I cannot recall about these

24   documents.

1          Q.    Does anything stand out in

2    his mind that he felt he needed to review

3    in order to give his deposition today?

4          A.    This is not totally like

5    this.  Some of the things I can respond

6    on my own.

7          Q.    Ask him if he looked at --

8    chose to look at any corporate

9    organizational-type documents?

10                   INTERPRETER 1:  You want to

11          repeat?

12    BY MR. SEEGER:

13          Q.    Ask him if he chose to look

14    at any corporate organizational-type

15    documents.

16                   INTERPRETER 2:  The check

17          interpreter may assist the

18          interpreter that the counsel said

19          corporate organizational-type

20          document.

21                   THE WITNESS:  Yes.

22    BY MR. SEEGER:

23          Q.    Specifically for which

24    companies?

1          A.     TG company.

2          Q.     That's the only company he

3     checked corporate organizational

4     documents for?

5          A.     This I'm more clear.

6     Regarding the others, I am not that

7     clear.

8          Q.     Well, did he look at

9     corporate organizational documents for

10    BNBM?  Let's see.  I'm trying to find it.

11    Here it is.

12         A.     I am not in too much contact

13    with this type of information.

14         Q.     Okay.  But the question was,

15    did he look at any corporate

16    organizational documents for Beijing New

17    Building Material Company?

18         A.     Some I have read.  Some for

19    sure I did not read.

20         Q.     Can he identify for us the

21    documents he read?

22         A.     I read a document of BNBM

23    and TG.

24         Q.     Can he tell me what the name

1  of the document is so that I could go

2  find it, for example?

3        A.    I don't know what kind of a

4  document you want me to talk about.

5        Q.    I want him to only talk

6  about the documents that he chose to read

7  to prepare himself for today.

8        A.    This I cannot recall.

9        Q.    Did he --

10             The documents that he looked

11  at from BNBM, where did he find those

12  documents?

13       A.    Sometimes from the Internet.

14       Q.    Does he have access to BNBM

15  documents from his office other than the

16  Internet?

17             MR. CYR:  When you say "BNBM

18        documents," you're referring to

19        documents generated by BNBM?

20             I'm sorry, could you

21        interpret that.

22             MR. SEEGER:  Related --

23        documents --

24             MR. CYR:  I'm sorry.  No,

1              Chris.  But she needs to interpret
2              everything that's said in the
3              room.
4                   MR. SEEGER:  Oh, I've got
5              you.  I've got you.
6                   MR. CYR:  I'll say it again.
7              I'm just trying to help.  When you
8              refer to "BNBM documents," are
9              these documents that are generated
10             by BNBM or documents that were in
11             the possession or control of BNBM?
12   BY MR. SEEGER:
13             Q.   I'm asking --
14                  The question I'm asking is,
15   if he wants to look at any documents that
16   are related to BNBM, anything, where
17   would he go to find those other than the
18   Internet?
19             A.   I didn't particularly pay
20   attention to look at these types of BNBM
21   document.
22             Q.   But if he wanted to look at
23   BNBM documents, other than the Internet,
24   where would he go to get those?

1           A.    I did not particularly make
2     an effort to look for them.
3                 INTERPRETER 2:  The check
4           interpreter objects to that
5           interpretation.  The witness said,
6           I did not consciously go to look
7           for these BNBM documents.
8                 INTERPRETER 1:  I think it
9           is a gray area of interpretation.
10          You can also interpret it as
11          intentionally or make an effort.
12          I think it is all the same.
13    BY MR. SEEGER:
14          Q.    Let me ask the question --
15    let me ask another question.
16                If he wanted to find BNBM
17    documents, are they available in his
18    computer files?
19                MR. CYR:  Objection that
20          it's vague, but he can try to
21          answer.
22                THE WITNESS:  I did not
23          really aware of whether I would be
24          able to find these documents from

1          my computer or not.

2    BY MR. SEEGER:

3          Q.    So, as part of your job as

4    chairman and general manager of TG,

5    you're saying you're not aware if you

6    have even computer access to documents

7    for BNBM?

8          A.    Yes.

9          Q.    Do you receive annual

10   reports from BNBM?

11         A.    I did not receive the annual

12   report from BNBM, but every year, there

13   is a meeting for the Board of Directors

14   that I would be able to see this report.

15   That is after the year 2008.

16         Q.    After the year 2008.  Okay.

17               Do you receive this

18   information before the board meets so you

19   can review it and think about it?

20         A.    I don't understand what you

21   mean.

22         Q.    The BN -- let's get a couple

23   of things clear.

24               The board meeting he's

1    talking about is TG, correct?

2            A.    No.

3            Q.    What board of what companies

4    is he talking about?

5            A.    BNBM.

6            Q.    He's on the board of BNBM is

7    what you're saying?

8            A.    Yes.

9            Q.    And he's on the board, and

10   he has no idea on how to find -- he has

11   no access to documents regarding BNBM.

12   Is that his testimony?

13           A.    No.

14           Q.    Then what access does he

15   have to BNBM documents?  Let me ask it

16   that way.

17           A.    Every year there is a

18   meeting for the annual reports.  So, they

19   would put out all these documents on the

20   table.  I would just go through them and

21   leave it there.  If this -- to our

22   companies, if these documents don't have

23   too much relevance to us, we won't keep

24   it.

1          INTERPRETER 2:  The check

2      interpreter objects to the

3      interpretation.  The witness said

4      company, not companies.

5          MR. SEEGER:  Do you agree

6      with that?

7          INTERPRETER 1:  Off the

8      record.  I need to clarify with

9      the witness because there's no

10     Chinese word company or companies.

11     It's the same word.  In Chinese,

12     it's the same word.

13         (Interpreter clarification

14     with the witness.)

15         INTERPRETER 1:  It's the

16     same word.

17         THE WITNESS:  I'm referring

18     to the annual report related to

19     BNBM and also to TG.  If they are

20     not -- if there's not much

21     relevance to me, I won't pay

22     attention -- his -- two companies.

23         INTERPRETER 2:  No.  The

24     check --

```
 1                INTERPRETER 1:  Two
 2         companies.  Because TG is another
 3         company.
 4                INTERPRETER 2:  No.  The
 5         check interpreter objects to the
 6         interpretation.  The witness --
 7         the rendition of the check
 8         interpreter of the witness's
 9         statement was that the document
10         from BNBM was not relevant to TG.
11                MR. SEEGER:  You're the
12         official translator.
13                INTERPRETER 1:  No.
14                MR. SEEGER:  So, I would
15         like to have what you say.  What's
16         the final word?  What do you say
17         it is?
18                INTERPRETER 1:  Can you
19         repeat what you said?  I want also
20         to have a screen in front of me.
21                MR. SEEGER:  Is your
22         interpretation companies?  Is your
23         interpretation of what he said
24         that he meant more than one
```

1          company or one company?

2               INTERPRETER 1:  No.  He did

3          not say that.  He said BNBM, the

4          annual report related to BNBM and

5          TG.  TG is another company.

6          That's what I assume.

7               MR. SEEGER:  I'm going to

8          take that.  And if you want to

9          flag it, you can flag it.

10              INTERPRETER 1:  So, I think

11         --

12              MR. CYR:  It's all on the

13         record.

14              INTERPRETER 1: So I think I

15         will let the attorney to make the

16         decision.

17              MR. SEEGER:  That's what

18         we're doing right now.

19              INTERPRETER 1:  Yeah, right.

20              MR. CYR:  I think that the

21         uncertainty is reflected in the

22         record.  And while I'm speaking,

23         I'd just like to take this

24         opportunity to say that when we

1          get to significant, what I

2          consider to be significant

3          matters, I'm going to ask the

4          interpreter to interpret and not

5          to examine the witness, and that

6          we would have to proceed with you

7          asking the questions and the

8          interpreter actually just

9          interpreting.

10              MR. SEEGER:  I thought

11         that's what she was doing.

12              MR. CYR:  I think she was

13         trying to help out in conducting a

14         little examination on the company

15         and the companies, and that was

16         fine, so we can get beyond this.

17         But when we get to what I consider

18         to be significant matters, I'm

19         just saying that I'm going to ask

20         her just simply to interpret what

21         you're saying.

22              INTERPRETER 1:  Well, what I

23         was doing --

24              MR. SEEGER:  (Addressing the

1          interpreter.)

2                Wait, time out.  Just wait a

3          second.  I want to be clear on

4          this, because what you're saying

5          is very important.  Okay?

6                My understanding, just I'm

7          asking you, is that you're

8          translating my question and his

9          answer?

10               INTERPRETER 1:  Right,

11         right.

12               MR. SEEGER:  Are you adding

13         anything more to it than that?

14               INTERPRETER 1:  No.  I am

15         doing verbatim.

16               MR. SEEGER:  Okay.

17               INTERPRETER 1:  And I'm not

18         the one who make judgment.  That's

19         why I -- you answered.  I said,

20         why don't the lawyers make the

21         judgment.  I am not trying to

22         understand it.  If I don't

23         understand it, then I will just

24         state it the way it is.  If you

1          don't understand it, you can

2          follow up with another question to

3          clarify.  I am not clarifying.

4              And another thing I want to

5          point out is that the interpreter

6          was not provided with any

7          documents.  I don't know the

8          background on anything.  So, today

9          is going to be more difficult for

10         me than tomorrow after I make the

11         proper arrangement.  So I hope

12         that you can understand.

13             MR. SEEGER:  First of all, I

14         want you to know, I think you're

15         doing a great job.

16             INTERPRETER 1:  Yeah, right.

17             MR. SEEGER:  So don't

18         misunderstand anything we're

19         saying.

20             INTERPRETER 1:  I don't take

21         it personally.  No personal

22         feeling.  No hard feeling.  Just

23         communication to let you know that

24         I only do verbatim.

1           MR. SEEGER:  Yes.

2           INTERPRETER 1:  If the

3    interpretation comes out to be

4    unclear, that's the way it is.

5           MR. SEEGER:  Okay.  Just let

6    us know if you follow up, if any

7    part of your question to the

8    witness -- because we don't speak

9    Chinese.

10           INTERPRETER 1:  Right.

11           MR. SEEGER:  If any part of

12    the question is you clarifying my

13    question or clarifying his answer,

14    we just need to know that;

15    otherwise, it needs to be

16    verbatim.

17           INTERPRETER 1:  I think it

18    is not my job to do any

19    clarification.

20           MR. SEEGER:  Thank you.

21           INTERPRETER 1:  But the

22    reason I was clarifying at the

23    very beginning, I said, sometimes

24    I cannot hear him.  Occasionally

1          he has an accent.  So I might need
2          to clarify with him.  I did ask,
3          is it okay for me to go off the
4          record for me to clarify?
5               MR. SEEGER:  Okay.  No.
6          Let's do everything on the record.
7          But you understand, you're doing a
8          verbatim translation.  That's
9          fine.
10              INTERPRETER 1:  I am doing
11         verbatim, but at the same time,
12         sometimes if I don't hear it
13         clearly due to accent or whatever,
14         I might clarify with my ability to
15         understand or to listen to him,
16         you know, but not to try to make a
17         judgment.
18              MR. CYR:  Mr. Seeger, may I?
19              MR. SEEGER:  All right. Do
20         you have something you want to
21         add?
22              MR. CYR:  Yeah.  I just
23         wanted to say that with respect to
24         what I don't consider to be

1          significant matters, I don't mind

2          a brief little exchange where she

3          asks him to clarify what she said,

4          just so we can get a very accurate

5          transcript.  And it's just a

6          judgment call as we go forward,

7          but I have to admit that I thought

8          that it was appropriate for me to

9          provide that warning to her as we

10         go forward.  That's all.

11              MR. SEEGER:  All right.

12              INTERPRETER 1:  Thank you.

13              MR. SEEGER:  You are the

14         official translator today.

15              INTERPRETER 1:  Right.

16              MR. SEEGER:  You are going

17         to be the final word on this from

18         my perspective.  There could be an

19         objection.  We're going to deal

20         with that later, and that doesn't

21         affect you.

22              But both sides did agree to

23         this interpreter, right?  There's

24         no dispute?

1            MR. CYR:  There's no dispute
2       about that.
3            And then the other thing I
4       just thought I'd mention is that
5       generally, of course everything
6       that's said is interpreted, so
7       that everybody in the room,
8       regardless of what language they
9       can speak, understands the
10      proceedings, including the
11      witness.  But in the interest of
12      time, I'm, you might say, waiving
13      our rights to that with respect to
14      the dialogue that just happened,
15      because we'd be here for another
16      hour.
17           MR. SEEGER:  My concern is
18      that we agreed to an official
19      translator, and you have every
20      right to bring a check translator.
21      It's not a problem.  It becomes a
22      problem if the check translator
23      challenges every word and we're
24      going to be here all day with this

1          back and forth.

2                  MR. CYR:  And I'm with you

3          on that.

4                  MR. SEEGER:  Because then we

5          want you to do it.

6                  MR. CYR:  I'm with you on

7          that.  And so let's -- I recommend

8          that you proceed.  And then I

9          think that the check interpreter

10         is doing a great job, but we want

11         to make sure that it's productive

12         and not disruptive.

13                 MR. SEEGER:  I think

14         everyone is doing a great job

15         today.

16                 INTERPRETER 1:  I have no

17         hard feeling with the check

18         interpreter.

19                 MR. SEEGER:  You're doing

20         fine.

21                 INTERPRETER 1: We're

22         colleagues, you know.

23                 MR. SEEGER:  You're doing

24         fine.

1            Linda, I forgot where we

2       were.

3                 - - -

4            (Whereupon, the following

5       portion of the transcript was read

6       by the court reporter:

7            "Q.    Then what access does

8       he have to BNBM documents?  Let me

9       ask it that way.

10           A.   Every year there is a

11      meeting for the annual reports.

12      So, they would put out all these

13      documents on the table.  I would

14      just go through them and leave it

15      there.  If this -- to our

16      companies, if these documents

17      don't have too much relevance to

18      us, we won't keep it.")

19                - - -

20  BY MR. SEEGER:

21           Q.   So, my next question is,

22  what do you understand your role to be as

23  a board member of BNBM?

24           A.   One of the directors.

1          Q.    What does he understand the
2    role of a director of BNBM to be?  Does
3    he have management responsibility, for
4    example?
5                MR. CYR:  I'm sorry.  I'm
6                just going to have to state just
7                to preserve for the record that it
8                was compound and vague, but please
9                try to answer, Mr. Jia.
10               MR. SEEGER:  He was getting
11               on me that time, not you.
12               INTERPRETER 1:  I feel like
13               I'm used to it.
14               MR. CYR:  I tried to
15               restrain myself, but who knows
16               what he's going to say, so I
17               needed to say that.
18               INTERPRETER 1:  Do I need to
19               translate what you say?
20               MR. CHEN:  Translate the
21               objection, please.
22               INTERPRETER 1:  So do I need
23               to translate this, between you?  I
24               usually don't.

```
 1                    MR. SEEGER:  Yeah.  If he
 2          objects, his witness is entitled
 3          to hear his objection, so you can
 4          tell him what his attorney said.
 5   BY MR. SEEGER:
 6          Q.   Okay.  He can answer the
 7   question.
 8                    MR. CYR:  Please try to
 9          answer, Mr. Jia.
10                    THE WITNESS:  I don't have
11          any duties for management at BNBM.
12   BY MR. SEEGER:
13          Q.   So, as a member of the board
14   of BNBM, what does he understand his
15   responsibilities to BNBM to be?
16          A.   I only -- I am only
17   responsible for the operation of TG.
18          Q.   Does he have an e-mail
19   account?
20          A.   I don't understand.
21          Q.   Does he use e-mail?
22          A.   I have e-mail.
23          Q.   What's his e-mail address?
24          A.   I am not familiar with
```

1    computer.  I usually don't use a computer

2    for work.  Sometimes there might be a few

3    documents in the computer.  I only -- in

4    the e-mail, I open -- I usually open it

5    up.  Usually I don't use this method to

6    work.  It is only for making contact to

7    the outside.

8          Q.    What about distributions of

9    information or correspondence within TG,

10   is that done by e-mail?

11         A.    For sure, some of the

12   documents would be through e-mail.

13         Q.    And what is his e-mail

14   address?

15         A.    I cannot recall my e-mail

16   address, but my lawyer did receive my

17   e-mails, so he would have it.

18               INTERPRETER 2:  The check

19         interpreter objects because the

20         witness said, my lawyer sent me

21         e-mail to my address.

22               (Interpreter clarification.)

23               MR. CYR:  Mr. Seeger,

24         since -- I'm sorry.  I'm not sure

1             what we're doing here.

2                    MR. SEEGER:  I don't know

3             what's being said.

4                    MR. CYR:  Mr. Seeger's in

5             charge here.

6                    MR. SEEGER:  (Addressing the

7             interpreter.)

8                    Did you resolve the issue

9             with the check interpreter?

10                   (Interpreter clarification

11            with witness.)

12                   THE WITNESS:  I don't know

13            how to send e-mail.

14     BY MR. SEEGER:

15            Q.    And he doesn't -- and I want

16     to be clear.  He does not know his e-mail

17     address?

18            A.    Yes.

19            Q.    Does he have a secretary?

20            A.    Yes.

21            Q.    Does she know his e-mail

22     address?

23            A.    She should know.

24            Q.    Does she read his e-mails?

1          A.    She should read it.

2          Q.    Does she send e-mails for

3    him?

4                MR. PANAYOTOPOULOS:  May I

5          state an objection for the record,

6          please.

7                I've got an objection on the

8          record.  I'm a little confused

9          about the questions.  When you say

10         "his," are you addressing the

11         interpreter or are you addressing

12         the witness?

13               MR. SEEGER:  No.  I don't

14         care about the interpreter's

15         e-mail.

16               MR. PANAYOTOPOULOS:  For the

17         record, the record is going to

18         read that you're addressing this

19         witness, and I just want to make

20         sure we're all talking about the

21         same thing.  It's this witness

22         that we're asking.

23               MR. SEEGER:  No offense, you

24         can give me your e-mail later, but

1          I would really rather know his.

2               All right.  Look, let me

3          just make this clear.

4               MR. CYR:  You do appreciate

5          the nature of his objection?  A

6          lot of your --

7               MR. SEEGER:  I --

8               MR. CYR: If I can just

9          finish.  A lot of your questions

10          are to her saying, ask him if she

11          would do it.  I mean, you can ask

12          him that way if you want to as far

13          as I'm concerned, but he's

14          registered an objection to that.

15               MR. SEEGER:  I'm going to

16          ask the questions to him from now

17          on, and you'll interpret them, to

18          make it really clear.

19               INTERPRETER 1:  Yes.

20               MR. PANAYOTOPOULOS:  Thank

21          you.

22               INTERPRETER 2:  The check

23          interpreter objects to the

24          interpretation.  The witness said,

1               she send e-mail for me.

2                        -   -   -

3               (Whereupon, the following

4          portion of the transcript was read

5          by the court reporter:

6               "Q.  Does she read his

7          e-mails?

8               A.  She should read it.

9               Q.  Does she send e-mails

10         for him?")

11                       -   -   -

12     BY MR. SEEGER:

13          Q.    Mr. Jia, does your secretary

14     send e-mails for you?

15          A.    Sometimes for sure, but it

16     is not the main way that we do

17     communication.

18          Q.    Mr. Jia, what is your

19     secretary's name?

20          A.    I don't have something

21     concrete as a secretary, but I have an

22     office.

23               INTERPRETER 2:  The check

24          interpreter object to the

1    interpretation.  The check

2    interpreter's rendition is I don't

3    have a specific secretary, but I

4    have an office.

5        INTERPRETER 1:  Shi ti is

6    something concrete.

7        MR. SEEGER:  I have to be

8    honest.  I don't really see the

9    difference between what the check

10   interpreter said and what you

11   said.

12       INTERPRETER 1:  I think

13   she's too tedious in this whole

14   case.  She's check against gray

15   area instead of something

16   important.  And, you know, the

17   understanding, the background of

18   understanding a case would make a

19   difference in terms of the

20   interpretation.

21       MR. SEEGER:  Time out.

22       INTERPRETER 1:  So, we're

23   not doing that job.  And also --

24       MR. SEEGER:  Wait, no, no,

1          no.  Time, time.

2                INTERPRETER 1:  Okay.

3                MR. SEEGER:  You're not

4          defending yourself here.  You have

5          to understand, all you have to do

6          is translate.  You don't have to

7          defend yourself against the check

8          interpreter or anybody here today.

9          So, just all you have to do is

10         accurately ask him my question in

11         Chinese and then translate to

12         English for me.  And that's it.

13         And you don't have to worry about

14         it.

15               INTERPRETER 1:  Can I ask

16         you to do me a favor?

17               MR. SEEGER:  Yeah.

18               INTERPRETER 1:  Can you

19         instruct the witness to break down

20         his answers, like don't go on for

21         too long, and pause once in a

22         while so I don't miss out

23         anything.

24               MR. SEEGER:  I don't think

```
 1              we're going to give him --
 2                   MR. CYR:  I'll leave that
 3         one alone.
 4                   MR. SEEGER: Yes, we're all
 5         going to leave that one alone.
 6                   Let's just try to do the
 7         best we can.
 8                   INTERPRETER 1:  Yeah, sure.
 9                   MR. SEEGER:  Okay.
10                   INTERPRETER 1: Thank you.
11    BY MR. SEEGER:
12         Q.   So, Mr. Jia, you had
13    identified earlier a person in your
14    office who reviewed your e-mails and from
15    time to time sent e-mails for you.  Who
16    is that person?
17         A.   I did mention earlier that
18    we have many persons in the office.
19    Whoever that is available that would send
20    the e-mail.
21         Q.   Mr. Jia, please identify for
22    us any person that either reviews your
23    e-mail account or sends e-mails for you.
24         A.   Zhang Jian Chun.
```

1              INTERPRETER 1:  The

2         interpreter does not translate

3         legal names because -- specific

4         names because there are many ways

5         of translating one name.  So, I'm

6         asking the witness to write it

7         down in Chinese.

8              MR. SEEGER:  Very good.

9         Thank you.

10             INTERPRETER 1:  The witness

11        has written down three names:

12        Zhang Jian Chun, Chen Xin Hua,

13        Zhao Xiu Yun.

14   BY MR. SEEGER:

15        Q.   Would you also ask him to

16   write beside their name what their job

17   title is.

18             THE WITNESS:  Can I take a

19        break?

20             MR. SEEGER:  Yeah.  Could we

21        just read this into the record?

22        I'm going to mark it as an

23        exhibit, and then we'll take a

24        break.

```
 1              INTERPRETER 1:  The witness
 2       has written down on the note next
 3       to Zhang Jian Chun, he or she is
 4       the secretary of the board of
 5       directors of TG.
 6              Chen Xin Hua is the general
 7       staff.
 8              Zhao Xiu Yun, an engineer.
 9              MR. SEEGER:  Then Linda,
10       could you mark this as Exhibit 1.
11              INTERPRETER 1:  The
12       interpreter can write down in
13       English the titles.
14              MR. SEEGER:  If you could do
15       that, we'll mark it as an exhibit.
16              Would you like to have your
17       person take a quick look, before
18       we mark it, on her translation?
19              MR. CYR:  No.
20              MR. SEEGER:  Thank you.
21       You're merciful.
22                     -  -  -
23              (Whereupon, Deposition
24       Exhibit Jia-1, Handwritten note,
```

```
1        Zhang Jiaiu Chun, Chen Xinghua,
2        and Zhao Siuyun, was marked for
3        identification.)
4                    -  -  -
5            MR. SEEGER:  So, you've just
6        marked that as Exhibit 1?
7            THE COURT REPORTER:  Yes.
8            MR. SEEGER: Okay.  We can
9        take a break.
10           THE VIDEOTAPE TECHNICIAN:
11       The time now is approximately 9:58
12       a.m., and we're now off the
13       record.
14                   -  -  -
15           (Whereupon, a recess was
16       taken from 9:58 a.m. until
17       10:14 a.m.)
18                   -  -  -
19           THE VIDEOTAPE TECHNICIAN:
20       This is the beginning of Tape 2 of
21       the videotape deposition of Mr.
22       Tongchun Jia.  The time now is
23       approximately 10:15 a.m., and
24       we're back on the record.
```

1              MR. SEEGER:  It's really a

2       question I have of the

3       interpreter.  I'm asking on the

4       record just so we know.

5            You were able to provide

6       interpretations of the job titles.

7       Can you put an English

8       interpretation of the name?  Can

9       you do that on Exhibit 1?

10             INTERPRETER 1:  Let me see.

11      I --

12             MR. SEEGER:  If you need

13      time, we can do it during a break.

14      I just want to know if you're

15      capable of it.

16             INTERPRETER 1:  I'll do it

17      during the break, because there's

18      so many ways of translating names,

19      we usually don't do it, but I'll

20      try my best.  I will give it back

21      to you later.  Sure.

22             MR. SEEGER:  And if you want

23      to have the check interpreter take

24      a look and see if you can agree on

1          it --

2                    INTERPRETER 1:  Probably

3          I'll ask the attorney.  They will

4          know that better.

5                    MR. SEEGER:  All right.  So

6          I want to go back to questioning.

7     BY MR. SEEGER:

8          Q.    Mr. Jia, I want to go back

9     to your presence at board meetings of

10    BNBM.  Okay?

11         A.    The concept of the board of

12    directors, in China, we rarely use this

13    concept.  With this concept, I did not

14    have contact with this contact before.

15                   INTERPRETER 2:  The check

16         interpreter objects to the

17         interpretation of the interpreter.

18         The witness stated that dong shi

19         ju, it's the Chinese word for

20         board of directors.  However, it

21         is a dialect of Cantonese

22         pronunciation.  In Mainland China,

23         typically it would say dong shi

24         hui.  Then the check interpreter

1          raised that because it is the same

2          meaning.  However, the dialect is

3          different.  So, perhaps the

4          witness would not understand dong

5          shi ju.  Maybe the interpreter can

6          consider to rephrase it into dong

7          shi hui.

8               MR. SEEGER:  Well, he's

9          hearing it.  So, do you want to

10         ask it?

11              INTERPRETER 1:  Are you

12         asking board of directors, of

13         board of director meetings?  She

14         translated into board of director

15         meetings.  That is dong shi hui.

16              MR. SEEGER:  What was it the

17         other way?

18              INTERPRETER 1:  I was doing

19         dong shi hui, board of directors.

20              MR. SEEGER:  Strike the

21         question.  I'm going to ask a new

22         question.

23              INTERPRETER 1:  Okay.

24    BY MR. SEEGER:

1          Q.    When he attends --

2                Mr. Jia, when you attend the

3    board of director meetings for BNBM, do

4    you report on the business of TG?

5          A.    I don't do it.

6          Q.    What do you do?  What do you

7    do, Mr. Jia, at the BNBM meetings?

8          A.    I will listen to the report

9    by the GM.

10         Q.    What is the business

11   relationship between BNBM and TG?

12                MR. CYR:  Object.  I'm

13          sorry.

14                Objection on the grounds

15          that "business relationship" is

16          vague, but, Mr. Jia, please try to

17          answer.

18                I'm sorry, ma'am, but it

19          really would be great if you could

20          speak louder so that everybody in

21          the room could hear you.

22                INTERPRETER 1:  Yeah, sure.

23          I'll try my best.

24                MR. SEEGER:  How many people

1          speak Chinese in the room?  They
2          can all hear.  You guys can hear.
3                MR. CHEN:  We can't hear
4          very well.
5                MR. SEEGER: Go ahead.  Did
6          you --
7                THE WITNESS:  Can you repeat
8          your question?
9                      -  -  -
10               (Whereupon, the following
11         portion of the transcript was read
12         by the court reporter:
13               "Q.  What is the business
14         relationship between BNBM and
15         TG?")
16                     -  -  -
17               THE WITNESS:  The
18         relationship between TG and BNBM
19         is the investor, the one being
20         invested.
21   BY MR. SEEGER:
22         Q.   BNBM is an investor in TG.
23   Is that what you said, Mr. Jia?
24         A.   Yes.

1          Q.    BNBM is a major shareholder

2   in TG, correct?

3          A.    A major shareholder of more

4   than 50 percent.

5          Q.    And you are the chairman of

6   the board of TG, correct?

7                INTERPRETER 2:  The check

8          interpreter must raise this.  The

9          interpreter interpret that you are

10         the director of the board of

11         directors.

12               INTERPRETER 1:  No.  I said

13         chairman.

14               INTERPRETER 2:  The chairman

15         of the board of director is dong

16         shi zhang not zhu xi.

17               MR. SEEGER:  I'm going to

18         have to say this for the record.

19         Respectfully, this isn't really

20         working with the check

21         interpreter.  So, I think, Joe, in

22         fairness to you, you have every

23         right to object if she wants to

24         relay these to you, but I'm not

1           hearing material differences here

2           between the two of them.  This

3           woman here is our official

4           interpreter.  So, this isn't

5           useful for me really.  Is it

6           useful for you to continue this?

7               MR. CYR:  Yes, it's very

8           useful, because I do find, having

9           listened to this this morning,

10          that there's some serious

11          questions about the

12          interpretation.  And it's

13          difficult for the check

14          interpreter to know what's

15          significant or not significant.

16          And her instructions are very

17          similar to the instructions we

18          gave the interpreter, and that is,

19          to listen to see if the

20          interpretation is accurate, and if

21          it's not accurate, to state a

22          brief objection.

23              I'm totally with you in that

24          we don't want to spend a whole lot

1    of time having an exchange about

2    the nuances of the Chinese

3    language as you try to interpret

4    it, but it's very difficult for

5    her to know what to do as far as

6    check interpretation.

7         I recommend that we try to

8    proceed and that the check

9    interpreter appreciates that

10   sometimes a slight nuance or a

11   slight difference might be

12   insignificant and not necessary to

13   raise, and that is something that

14   I mentioned to her during the

15   break.

16        MR. SEEGER:  Look, you know,

17   I mean, the official interpreter

18   is who we have here.  If we could

19   somehow limit this to a

20   substantial, as you just said, I

21   mean, something a little more than

22   a nuance.  And you're speaking --

23   you know, the check interpreter

24   has been speaking to, I assume,

1          attorneys who speak Chinese.  So,

2          maybe if they could consult before

3          these objections quickly and see

4          if it's worth it, that might move

5          things along today.

6                    MR. CYR:  I have no

7          objection to the check interpreter

8          consulting with Mr. Chen, for

9          example, but let's --

10                   MR. SEEGER:  I'm also

11         sitting here today -- and Joe, I'm

12         not going to be difficult about

13         it.  It's the last thing I want to

14         say on it.  I wasn't even aware,

15         showing up today, that there was

16         going to be a check interpreter.

17         I thought we had agreed on one

18         interpreter.  So I didn't come

19         here today -- I don't like to

20         interfere with the way people do

21         things, but at the same time, I

22         don't want my accommodating

23         something that, you know, we

24         really didn't provide for in

1     advance to be a real hindrance

2     here.  And I mean that

3     respectfully to you.

4          MR. CYR:  Let me just say,

5     and I hate to take up the time or

6     the record with this, but this is

7     one of the reasons why I sent the

8     e-mail yesterday to plaintiffs'

9     counsel, which I believe that you

10    were copied on the reply, where I

11    offered to have a telephone call

12    yesterday to address any

13    outstanding issues.  And I think

14    that in the e-mail, I even

15    reflected relating to interpreters

16    or translators, is because it's

17    precisely this kind of issue that

18    takes up time in a deposition, and

19    frankly, I have no -- as a human

20    being, I have no reason to want to

21    delay this unnecessarily.  That's

22    what I wanted to talk about during

23    the call, which you guys thought

24    was not necessary.

1           MR. SEEGER:  I think we were

2       on a plane.

3           MR. GRAND:  In all fairness,

4       there weren't any outstanding

5       issues.  From our perspective, we

6       agreed to, you interviewed an

7       official interpreter on the

8       telephone conference, which you

9       insisted on doing.  We have an

10      agreed-to official interpreter.

11      What is now happening is you have

12      brought a second interpreter, who

13      is directly challenging her

14      interpretations, interacting with

15      her, and, frankly, interfering

16      with the deposition.

17          MR. SEEGER:  It's like every

18      question.

19          MR. GRAND:  She should be

20      discussing it with you, and if you

21      want to raise an objection or even

22      just state objection to have it on

23      the record, that's fine.  But why

24      is she engaging with the

1          interpreter?

2                  MR. CYR:  Let me just say,

3          there's two issues before us.

4                  One is whether or not there

5          was an opportunity for you to

6          appreciate that we might bring a

7          check interpreter, and then the

8          second is the procedures.

9                  With respect to the first, I

10         just have to say that I'm stunned

11         that you would think that in an

12         important deposition like this

13         that we would show up without a

14         check interpreter.  The only issue

15         that I thought we needed to

16         address during the call was the

17         process that we're now struggling

18         with.  And Frank shares with me

19         that in some fashion you actually

20         had notice that we were going to

21         bring a check interpreter.

22                 And Frank, I welcome if you

23         --

24                 MR. GRAND:  We have a check

1          interpreter agreement too.  That's

2          not my issue.

3               MR. CYR:  Okay.

4               MR. GRAND:  I'm not

5          surprised you have one. What --

6               MR. CYR:  Well, here we're

7          on just number one --

8               MR. GRAND:  What I'm

9          surprised is that she's

10         interrupting and, frankly,

11         instructing the official

12         interpreter to clarify,

13         reinterpret, ask additional

14         questions of the witness.  And to

15         me, that is not the role of your

16         check interpreter.  If she wants

17         to raise an objection to you and

18         then you want to put an objection

19         on the record, please do so.  But

20         this is our official interpreter,

21         and she has the last word on the

22         witness's -- on his questions,

23         your objections and the witness's

24         testimony.

1            MR. CYR:  So, Chris, it

2       seems to me that we have now

3       overcome this concern you had

4       about not being on notice for the

5       check interpreter to be here.  We

6       seem to all be in agreement that

7       it was something that was actually

8       noticed and also reasonably

9       expected.

10           With respect to the process

11      and the procedure, we want to

12      cooperate with you.

13           MR. SEEGER:  So let's do

14      this.  First of all, this is a

15      first to me, having a check

16      interpreter objecting as she's

17      doing.  And I've been through

18      these before.  But just because

19      it's a first for me didn't mean I

20      would interfere with it.  It just

21      seems now, an hour and several

22      minutes in, it's a challenge of

23      every question.

24           MR. CYR:  Yes.

1           MR. SEEGER:  And we do have

2       one interpreter that we both have

3       agreed to.  So we were -- you're

4       right.  It wasn't that I didn't

5       know a check interpreter was going

6       to be here.  I didn't understand

7       that she'd have the role that

8       she's playing today or that you

9       wanted her to play this role.  And

10      I think I really have allowed this

11      to go for a while.  I don't know

12      if other people in the room feel

13      differently about it, but for me,

14      it's become --

15          MR. CYR:  I'm not saying

16      that your reaction to what's

17      occurred is an unreasonable one.

18      What I'm saying is that we are

19      going to ask our check interpreter

20      to continue listening to the

21      interpretation and to register an

22      objection to significant errors

23      that she believes the interpreter

24      has made and to do that briefly so

1          that it's reflected on the record

2          and that you could proceed with

3          your questioning.

4                MR. SEEGER:  Right.  And it

5          won't be necessary, going forward,

6          for the check interpreter to say

7          the check interpreter objects to

8          the question.  Just let her state

9          what the dispute is.

10               MR. CYR:  I think that's

11         true.  That's fine.

12               (Addressing the check

13         interpreter.)

14               You don't need to give an

15         introduction to your objection.

16         You can just look for your

17         opportunity to say and then just

18         say what you think the witness

19         said or that the lawyer said.

20         Okay?

21               INTERPRETER 2:  Yes.

22               INTERPRETER 1:

23         (Indicating.)

24               MR. SEEGER:  Is this really

1          important?  Because I want to get

2          back to the deposition.  Go ahead.

3                INTERPRETER 1:  Yes, it is.

4                To be fair, I'm not

5          attacking or defending anything.

6          I'm just saying, to be fair, when

7          you open up a dictionary, there's

8          so many choices for the

9          definition.  That's what I call

10         the gray area.  Many times I

11         choose one definition, she choose

12         another one.  They're very close

13         enough and similar.  And also like

14         a lot of upside down grammar, I

15         might be doing upside down, she

16         might be doing straightforward.

17         They are both correct.  I think

18         those challenges are irrelevant,

19         and I hope that we can eliminate

20         those.

21               MR. SEEGER:  Well, that's

22         what I'm hoping too.  I'm hoping

23         we are going to limit --

24               INTERPRETER 1:  Limit it to

```
 1              a major mistake.
 2                   MR. SEEGER:  Right.  I'm
 3              hoping we can limit it to a major
 4              mistake, because then we'll have
 5              a --
 6                   INTERPRETER 1:  Just like
 7              the title GM or MD.  In China,
 8              they use both.
 9                   MR. SEEGER:  Okay.  Well,
10              look.  At the end of the day,
11              you're the interpreter, both
12              parties have agreed to you, and
13              you're going to be doing it.  So
14              let's get back to the deposition.
15                   What was my last question,
16              Linda?
17                        -  -  -
18                   (Whereupon, the following
19              portion of the transcript was read
20              by the court reporter:
21                   "Q.  And you are the
22              chairman of the board of TG,
23              correct?")
24                        -  -  -
```

1              MR. SEEGER:  (Addressing the

2         interpreter.)

3              Would you please ask him

4         again that question.

5              (Interpreter repeats the

6         question.)

7              THE WITNESS:  I'm the

8         director of the board of directors

9         of TG.

10   BY MR. SEEGER:

11        Q.   Mr. Jia, your answer is you

12   are the director of the board of

13   directors for TG?  I want to make sure

14   we're clear on what the title is.

15              MR. CYR:  I feel the need to

16         state for the record that I think

17         on two or three occasions now he

18         said that he's the chairman of the

19         board of the board of directors

20         for Taishan Gypsum.

21              MR. SEEGER:  Did he answer

22         that?

23              THE WITNESS:  TG does not

24         have dong shi ju, the board of

```
 1        directors.  We only have dong shi
 2        hui, the board of directors.  It
 3        is a different term -- it is the
 4        same English term that could be
 5        they call it dong shi ju or don
 6        shi hui.
 7             INTERPRETER 1: Because I
 8        don't have the background
 9        documents, so I don't know which
10        words to use, dong shi ju or dong
11        shi hui.  So, the English is the
12        same.  Dong shi hui and dong shi
13        ju is board of directors.  It's
14        the same.
15             (Addressing the witness.)
16             I need to clarify.
17             MR. CYR:  I'm sorry, ma'am.
18        Please don't talk to the witness.
19             MR. SEEGER:  Hold on.  We're
20        going to resolve this right now.
21             Can we mark what I'm handing
22        you as Exhibit 2.
23                  -  -  -
24             (Whereupon, Deposition
```

```
 1              Exhibit Jia-2, Document entitled
 2              "Shangdong Taihe Dongxin Co.,
 3              Ltd.," 12 pages, was marked for
 4              identification.)
 5                        -  -  -
 6   BY MR. SEEGER:
 7          Q.    Tell the witness to take a
 8   look at the document.  Mr. Jia -- I'm
 9   going to say it, speak to him.
10              Mr. Jia, take a look at the
11   document we have just marked as Exhibit
12   2, and can you identify what this
13   document is for the record?
14              MS. BASS:  Is there a Bates
15         Number?
16              MR. SEEGER:  No,
17         unfortunately.
18              MR. SERPE:  Chris, 25133.
19              MR. SEEGER:  That's the
20         Bates number?  Was that on there?
21         What is it?
22              MR. SERPE:  When they
23         produced it to us.
24              MR. SEEGER:  What is it?
```

1          MR. SERPE:  25133.

2          (Witness reviewing

3     document.)

4  BY MR. SEEGER:

5          Q.   Mr. Jia, can you identify

6  this document?

7          A.    It is a document of TG,

8  Taishan -- of TG -- of TG, a shareholding

9  company introduced about the -- giving

10  introductions about the -- introducing

11  the company and also introducing the

12  products.

13          Q.   And can you give me an

14  approximate time frame of when this

15  document was created?

16              I'm sorry, let me restate

17  that.

18              Mr. Jia, can you give me a

19  time frame of when this document was

20  created?

21          A.   This document should be

22  before the year 2008.

23          Q.   Mr. Jia, how do you know

24  that it should be before the year 2008?

1              A.    Because the title of this

2    document is the Shandong Taihe Dongxin

3    Company Limited.  It was the title that

4    we used before the year 2008.

5                    INTERPRETER 1:  Off the

6    record.

7                    The interpreter did not have

8    the list of the names of all the

9    companies, so, I did not look at this

10   document.  When he was saying Taishan

11   Shigao Guifen, what I have here on my

12   notes is TG.  But when I look at the

13   document, it should be Shandong Taihe

14   Dongxin Company Limited.  The --

15                    MR. SEEGER:  Wait a second.

16           Time out.  No, no, no.  Time out.

17                    What was his answer?  I just

18           need his answer.  What was his

19           answer?

20                    INTERPRETER 1:  I finish

21           the -- I finished the answer.  I'm

22           raising the question as an

23           interpreter myself.

24                    MR. SEEGER:  Okay.  But can

1    you hold off on your question,

2    because I'm getting really

3    confused.

4         What was his answer?  When I

5    asked him --

6         INTERPRETER 1:  Okay.

7    Before I say "off the record"

8    was --

9         MR. SEEGER:  No.  Before

10    that, what was -- I want to know

11    how he described the document.

12         INTERPRETER 1:  Yeah, right.

13              - - -

14         (Whereupon, the following

15    portion of the transcript was read

16    by the court reporter:

17         "Q.  Mr. Jia, how do you

18    know that it should be before the

19    year 2008?

20         "A.  Because the title of

21    this document is the Shandong

22    Taihe Dongxin Company Limited.  It

23    was the title that we used before

24    the year 2008.")

1                    - - -

2              MR. SEEGER:  Is that his

3    answer?

4              INTERPRETER 1:  Right.

5              Off the record.  Because

6    there --

7              MR. SEEGER:  There is no off

8    the record.

9              INTERPRETER 1:  Okay.  Can

10   I -- okay.  Because if I find a

11   problem and I need the attorney to

12   help me, because the interpreter

13   walk into this room with no list

14   of the names of all the companies

15   and all the parties.  So, when I

16   heard he was saying the Taishan

17   Guifen (speaking in Chinese).  So,

18   I got confused about a company

19   name, and I say TG.  Now I read

20   the document, it says Shandong

21   Taihe, I want to clarify that.

22   And also, I want to have a --

23             MR. SEEGER:  No.  Did he say

24   TG or did he say this name on the

1      document?  I need his answer.

2            INTERPRETER 1:  Because he

3      say it in Chinese, I don't know

4      which Chinese name is matching

5      with which English name.  So it is

6      the problem of the interpreter,

7      not his problem.  The problem with

8      me is that I walk in with no list

9      of all the company names and all

10     parties.  I don't want to guess.

11     That's why I --

12            MR. GRAND:  You're not

13     guessing.  You're just stating his

14     testimony.

15            MR. SEEGER:  See, and that's

16     why if you -- if what you're

17     saying -- if his answer was one

18     thing and you just repeated his

19     answer, we'd be fine.  But if

20     you're saying that you heard him

21     say something and you interpreted

22     it wrong for some reason, yes, we

23     need to know that.

24            So, when I asked him whose

1          document it was and he said it was
2          TG, was that the answer he gave or
3          did he say the other name?
4               INTERPRETER 1:  He was
5          saying -- okay.  Why don't I just
6          give the Chinese name instead of
7          reinterpreting the name, because
8          I'm not sure about the name now.
9               MR. SEEGER:  We have to go
10         off the record for a second.
11              THE VIDEOTAPE TECHNICIAN:
12         The time now is approximately
13         10:40 a.m., and we're now off the
14         record.
15                    -  -  -
16              (Whereupon, a recess was
17         taken from 10:40 a.m. until
18         10:44 a.m.)
19                    -  -  -
20              THE VIDEOTAPE TECHNICIAN:
21         This begins Tape 3 of the
22         videotape deposition of Mr.
23         Tongchun Jia.  The time now is
24         approximately 10:44 a.m., and

```
 1           we're back on the record.
 2                MR. SEEGER:  So look, I
 3           think that Mr. Cyr and I are going
 4           to agree on what I'm about to tell
 5           you.  Okay?  So this is what we'd
 6           like you to do to make your life
 7           easy.
 8                INTERPRETER 1:  Thank you.
 9                MR. SEEGER:  When I ask him
10           a question, interpret it to the
11           best of your ability.  When he
12           answers, whatever that answer is,
13           I don't care if you look at the
14           document and it looks like it's a
15           different name, please do the best
16           you can to just give me whatever
17           answers come out of his lips as
18           best as you can.  If there's a
19           problem at that point, I think
20           then that the check interpreter
21           will bring it to Mr. Cyr's
22           attention, and we'll raise it that
23           way.  But if nobody is
24           complaining, if nobody's -- if the
```

1          check interpreters aren't saying

2          there's a problem with your

3          interpretation, let's just keep it

4          going.  We don't want you to

5          interpret --

6               INTERPRETER 1:  Thank you.

7               MR. SEEGER:  We don't want

8          you to struggle for answers.

9               INTERPRETER 1:  I don't want

10         to guess at anything.  That's why

11         I bring this out.

12              MR. SEEGER:  It's either

13         clear or it's not.

14              Don't guess at anything.

15         Just whatever he says, repeat it.

16              INTERPRETER 1:  I don't

17         guess.  I do verbatim.

18              MR. SEEGER: Yes.

19              INTERPRETER 1:  The only

20         issue is that because before I

21         come into this room, I did not

22         have a list of the Chinese

23         names --

24              MR. SEEGER:  But you've said

1          that now ten times, and everybody

2          here understands that you have

3          not -- there's a reason you

4          haven't been given those

5          documents.  You have to just trust

6          in that.  So you have to do the

7          best you can.

8               INTERPRETER 1:  No problem.

9               MR. SEEGER:  What was the

10          last question and answer?

11                    -  -  -

12               (Whereupon, the following

13          portion of the transcript was read

14          by the court reporter:

15               "Q.  Mr. Jia, how do you

16          know that it should be before the

17          year 2008.

18               "A.  Because the title of

19          this document is the Shandong

20          Taihe Dongxin Company Limited.  It

21          was the title that we used before

22          the year 2008.")

23                    -  -  -

24     BY MR. SEEGER:

1           Q.    The title on this document,
2    Mr. Jia, Shandong Taihe Dongxin Company,
3    was the name of TG -- used to be the name
4    of TG, correct?
5           A.    Yes.
6           Q.    Mr. Jia, turn to Page 2 of
7    this document, please.
8           A.    (Witness complies.)
9           Q.    Mr. Jia, there's a
10   photograph in the upper left-hand corner
11   of this document.  Who is that photograph
12   of?
13          A.    Me.
14          Q.    It's a good photo, by the
15   way.
16                And underneath this
17   photograph, what does it describe you as?
18          A.    Chairman of the board,
19   general manager.
20          Q.    Are you comfortable with
21   those titles, sir?
22                MR. CYR:  He might not
23          understand what you mean by
24          "comfortable," but...

1                    THE WITNESS:  I don't

2          understand what you're saying.

3    BY MR. SEEGER:

4          Q.    Strike the question.

5                Now, I want to go back to

6    the BNBM meetings, the board meetings,

7    whatever meeting.  I don't want to

8    characterize them as anything.  Whatever

9    meetings, Mr. Jia, you attend at BNBM, I

10   want to ask you a question about them.

11   Who gives reports in those meetings

12   regarding TG?

13         A.    At the meetings for BNBM, I

14   do not make report on behalf of TG.

15         Q.    Who does?  Who makes the

16   report at --

17                INTERPRETER 2:  The --

18                MR. CYR:  (Addressing the

19         check interpreter.)

20                I'm sorry, state it briefly.

21                INTERPRETER 2:  The witness

22         said TG did not give report at

23         BNBM meeting.

24                INTERPRETER 1:  No.  He

1           said, I was not the one who do
2           report for -- on behalf of TG.
3                MR. SEEGER:  All right.
4           We're going to go with the
5           interpreter on this one.  Mr. Cyr
6           can object.
7                MR. CYR:  To help out, is
8           that on most matters, we'll be
9           happy with the registering of the
10          objection and then continuing.
11               MR. SEEGER:  Let's do that.
12               MR. CYR:  Yes.  Where it
13          would present a problem is if the
14          further questioning would go in
15          what we would consider the wrong
16          direction because of some kind of
17          a definitional thing.  But most of
18          the things that have happened so
19          far, we make our objection, she
20          doesn't need to defend herself,
21          boom, you go back with your
22          question.  That's our
23          recommendation.
24     BY MR. SEEGER:

1          Q.    Mr. Jia, who gives the
2    report at the BNBM meetings about TG?
3                INTERPRETER 1:  I want to
4          clarify with the witness.
5                (Interpreter clarification
6          with the witness.)
7                THE WITNESS:  Any one of the
8          TG would not make a report at the
9          meetings of BNBM.
10   BY MR. SEEGER:
11         Q.    So, to be clear, you're the
12   chairman of the board of TG, you attend
13   meetings with BNBM, and you say nothing.
14   Is that correct?
15               MR. CYR:  I'm sorry.
16         Could -- interpreter.
17               I object that that
18         mischaracterizes his testimony.
19               MR. SEEGER:  He has to
20         answer now.
21               INTERPRETER 1:  I want to
22         clarify.
23               THE WITNESS:  I myself at
24         the BNBM board of director

1          meetings, I will read the report

2          from the general manager, and I

3          will give my opinion regarding

4          this report.

5     BY MR. SEEGER:

6          Q.   And who is the general

7     manager that you're referring to at these

8     meetings?

9          MR. CYR:  Currently?

10         MR. SEEGER:  Well, whoever

11         he is referring to.  Let me first

12         get that.  Whoever he had in mind.

13         I just want to get that person.

14         MR. CYR:  I'm not sure he

15         had anybody in mind.  He referred

16         conceptually that he listens to

17         the general manager at the

18         meeting.  Now you're asking for a

19         name.

20         MR. SEEGER:  Joe --

21         MR. CYR:  I think it's

22         confusing.

23         MR. SEEGER:  I know, but,

24         you know, it's going to be -- I

1          mean, I can just tell you, having

2          dealt with a few cases with Judge

3          Fallon and in this case, he's

4          really not big on speaking

5          objections.  I'm not going to make

6          a crazy objection like you can't

7          say anything, but you can't give

8          these long objections.

9                    Go ahead.  I would like an

10         answer to my question.

11                   THE WITNESS:  What time

12         period?

13    BY MR. SEEGER:

14         Q.    Present.

15         A.    Chen Yu.

16         Q.    Who does Chen Yu work for?

17    The name you just gave, who does Chen Yu

18    work for?

19         A.    He works for BNBM.

20         Q.    How does Chen Yu get

21    information about TG?

22                   MR. CYR:  I object on the

23         grounds that the question assumes

24         that this fellow gets information

 1            about Taishan Gypsum.

 2                 MR. SEEGER:  I want to mark

 3            that objection.  I'm going to mark

 4            that objection.  Just make a note

 5            next to it.  I want to show that

 6            to Judge Fallon and get a ruling

 7            if he thinks that's an appropriate

 8            objection.

 9                 Go ahead.

10                 INTERPRETER 1:  I did

11            interpret it already.

12                 MR. SEEGER:  So we need an

13            answer then.

14                 THE WITNESS:  At the annual

15            operation, information of TG and

16            also the auditing report will be

17            reported to BNBM every year in

18            Feb -- between -- around

19            February -- between February and

20            March.

21      BY MR. SEEGER:

22            Q.    And who at TG is responsible

23      for providing these reports to BNBM?

24            A.    The secretary of the board

```
 1    of directors.
 2                MR. SEEGER:  I'm sorry.
 3                    -  -  -
 4                (Whereupon, the following
 5           portion of the transcript was read
 6           by the court reporter:
 7                "A.  The secretary of the
 8           board of directors.")
 9                    -  -  -
10    BY MR. SEEGER:
11           Q.    Of which company?
12           A.    I don't understand your
13    question.
14           Q.    The secretary of the board
15    of directors of TG, is that who he's
16    referring to?
17           A.    Yes.
18                MR. SEEGER:  At this point,
19           I just want to call for the
20           production of any annual reports
21           and auditing statements by TG to
22           BNBM or any other company, because
23           they haven't been produced as far
24           as we know.
```

 1   BY MR. SEEGER:

 2          Q.    Does BNBM make -- strike

 3   that.

 4                Does anyone on the board of

 5   directors of BNBM make recommendations

 6   regarding TG's business?

 7                MR. CYR:  Objection on the

 8          grounds that the question is

 9          vague.  It doesn't indicate

10          recommendations to whom or in what

11          context.

12                MR. SEEGER:  I'm just going

13          to object again, because it's

14          sufficient to say objection.  If

15          you want to say vague, it's fine.

16                MR. CYR:  You're wasting

17          your time giving me speeches about

18          that.  You can just take it to the

19          judge.

20                MR. SEEGER: Well, I'll --

21                MR. CYR:

22                (Addressing the

23          interpreter.)

24                Please interpret what I

```
 1          said.  Let's take it one step at a
 2          time.
 3                  Interpreter, please
 4          interpret what I said.
 5                  Now, I suggest you mark the
 6          record and then ask your next
 7          question.
 8                  MR. SEEGER:  Don't tell me
 9          what to do.  Just do your job,
10          I'll do mine, because now you're
11          pushing it with me.  All right?
12                  MR. CYR:  This is what I'm
13          telling you.
14                  MR. SEEGER:  Don't tell me
15          what to do.
16                  MR. CYR:  Mark the record
17          and ask a question.
18                  MR. SEEGER:  Mark that for
19          my objection.  I'll raise it with
20          Judge Fallon in the morning.
21                  Okay.  So, where were we?
22          We had we left off?
23                          -  -  -
24                  (Whereupon, the following
```

```
 1            portion of the transcript was read
 2            by the court reporter:
 3                 "Q.  Does anyone on the
 4            board of directors of BNBM make
 5            recommendations regarding TG's
 6            business?")
 7                      -  -  -
 8                 THE WITNESS:  I don't
 9            understand your question.  I don't
10            understand Cantonese, and please
11            say it in Mandarin.
12                 MR. SEEGER:  Let me ask the
13            witness a question.
14       BY MR. SEEGER:
15            Q.   Does the witness
16       understand -- ask him --
17                 Mr. Jia, do you understand
18       the questions or the interpretations
19       being presented to you by the
20       interpreter?
21            A.   I did not understand the
22       earlier question.
23            Q.   But is it an interpretation
24       problem?  Is there a dialect problem
```

1    between the two of you?  I need Mr. Jia

2    to tell me.

3         A.    My mother tongue is Chinese,

4    but I have a strong Shandong accent.

5         Q.    But Mr. Jia, do you

6    understand the interpreter?  Are you

7    having any problem understanding the

8    interpreter?

9         A.    I can understand the

10   interpreter.

11        Q.    You're comfortable, Mr. Jia,

12   with us going forward with this

13   interpreter?

14        A.    How can I say it?  I don't

15   know how to say it.

16        Q.    Is he satisfied -- never

17   mind.  Strike that.

18             MR. SEEGER:  What was my

19             last question, Linda?

20                  -  -  -

21             (Whereupon, the following

22             portion of the transcript was read

23             by the court reporter:

24             "Q.  Does anyone on the

1          board of directors of BNBM make

2          recommendations regarding TG's

3          business.

4               A.  I don't understand your

5          question.  I don't understand

6          Cantonese, and please say it in

7          Mandarin.")

8                    -  -  -

9  BY MR. SEEGER:

10         Q.    Mr. Jia, does the

11  interpreter speak Cantonese?  Is that

12  what you're trying to say?

13         A.    Yeah.  Has a Cantonese

14  accent, sometimes I cannot understand,

15  and I find it tiring.

16         Q.    Let me ask a question.

17               Mr. Jia, other than

18  yourself, are there any board members of

19  BNBM who are also on the board of TG?

20         A.    Yes.

21         Q.    Who?

22         A.    Me and another one, Wang

23  Bin. Wang Bin and another one.  Wang Bin.

24         Q.    I don't understand that

 1    answer.

 2         A.    I and another one.

 3         Q.    Okay.  And one other person,

 4    right, Mr. Jia?

 5              And the name of that other

 6    person is what?

 7              INTERPRETER 1:  Wang Bin.

 8    BY MR. SEEGER:

 9         Q.    How would you spell that?

10         A.    (Witness writes name on

11    paper.)

12         Q.    Wang Bin.

13              Could you also write next to

14    his name, Mr. Jia, his title?

15         A.    What period?

16         Q.    Let's start with the

17    present.

18         A.    (Witness writes down

19    answer.)

20         Q.    Hold on, keep that in front

21    of him.

22              Mr. Jia, what did you just

23    write on that piece of paper?

24         A.    Chairman of the board of

1    BNBM, Wang Bin.

2         Q.    Then prior to that title,

3    what was Wang Bin's title before that?

4    And if you could write the dates.

5         A.    I cannot recall the exact

6    date, but he was originally the chairman

7    of the board of directors of BNBM.

8              MR. CYR:  Objection.

9              INTERPRETER 2:  General

10             manager, not the chairman of the

11             board of directors.

12   BY MR. SEEGER:

13        Q.    Mr. Jia, was --

14             MR. CYR:  We're ready for

15             the next question.

16             MR. SEEGER:  Well, I don't

17             know if we can resolve that one.

18             MR. CYR:  You can spend time

19             trying to resolve that if you'd

20             like.  I'm just saying that we're

21             comfortable now going with the

22             next question.

23   BY MR. SEEGER:

24        Q.    Prior to his --

1                What you wrote on that piece

2    of paper, Mr. Jia, is that that person is

3    the chairman of the board during what

4    time frame?  I want to make sure we got

5    that down.

6            A.    I cannot recall the time

7    frame.

8            Q.    Do you have a rough idea?

9    Was it --

10               You now serve in that

11   capacity for TG, don't you?

12           A.    Me?

13           Q.    Yes.

14           A.    Yes.

15           Q.    So, when did you become

16   chairman?

17           A.    Are you referring to before

18   the company changed the name or after the

19   company changed the name?

20           Q.    I'm talking, when did you

21   get the title that that person had there?

22               MR. CYR:  I'm sorry.

23               THE WITNESS:  I did not get

24           this title.

1              MR. CYR:  Off the record.

2              I just think there's some

3        confusion.  It seems to me that

4        you think that Mr. Wang was the

5        chairman of Taishan Gypsum, and

6        that's not his testimony so far.

7              INTERPRETER 2:  Also --

8              MR. CYR:  All right.  Let's

9        let him go.

10             MR. SEEGER:  Appreciate

11       that.

12             How do you say this guy's

13       last name, since we're off the

14       record?

15             MR. CYR:  Wang, W-A-N-G.

16  BY MR. SEEGER:

17       Q.    Mr. Jia, Wang Bin is the --

18  that is his title.  He's an employee of

19  BNBM; is that correct?

20       A.    He is the chairman of the

21  board of BNBM.

22       Q.    I got you.  Okay.

23             INTERPRETER 1:  Do you want

24       me to translate the title?

1   BY MR. SEEGER:

2          Q.   So, this individual, Mr.

3   Wang, is also on the board of TG; is that

4   correct?

5          A.   Yes.

6          Q.   Mr. Jia, other than your

7   involvement with TG and BNBM, what other

8   companies do you have a business

9   relationship with?

10         A.   I don't understand this

11  question.

12         Q.   I would like to know, do you

13  have any job responsibilities for any

14  other companies other than TG and BNBM?

15         A.   Besides TG and BNBM, the

16  subsidiaries under TG, I have positions.

17         Q.   And could you please name

18  the subsidiaries that he has positions

19  with and his title with those companies?

20         A.   There are so many

21  subsidiaries under TG, I cannot recall

22  what positions of what.

23         Q.   Okay.  Let's start with the

24  subsidiaries that he has.  Put aside his

1    title for now.  Let's just start with,

2    Mr. Jia, tell us the subsidiaries under

3    TG that you have any kind of job

4    responsibilities for?

5          A.    I have position, but I don't

6    know what responsibility is referring to.

7          Q.    Tell us the subsidiaries

8    that he has under TG that he has a

9    relationship with?

10         A.    Mostly I would be the

11   chairman of the board of the subsidiaries

12   of the TG.  But some companies, I'm not

13   the chairman of the board.

14         Q.    First, all I want to do, Mr.

15   Jia, is tell me what subsidiaries under

16   TG you have any relationship with, any

17   involvement, any relationship with.  Just

18   name the subsidiaries, please.

19         A.    Many companies just like

20   Jiangyin Taishan, Jiangyin Taishan.

21               INTERPRETER 1:  The witness

22         has written down on a piece of

23         paper Jiangyin Taishan Company

24         Limited.

1   BY MR. SEEGER:

2        Q.    Are there any other

3   subsidiaries that you're involved with

4   other than the one you just wrote down?

5        A.    Henan Taishan Company

6   Limited.

7                INTERPRETER 1:  The

8            interpreter is trying to translate

9            the names of the company.  But

10           just looking at it, I cannot

11           guarantee its accuracy.

12               THE WITNESS:  Hubei Taishan

13           Company Limited.

14               Shanxi Taishan Company

15           Limited.

16               And also Jiangsu Pizhou

17           Company Limited.

18               And there are many more.

19               MR. SEEGER:  So, at this

20           point, Joe, can you provide us

21           with a list of all the

22           subsidiaries that Mr. Jia has any

23           kind of job responsibility with?

24           It will save a lot of time as

1          opposed to doing it this way.

2                MR. CYR:  Mr. Spano points

3          out to me that in our production,

4          there is a list of all the

5          subsidiaries, and I believe that

6          you have a translation of that.

7          But in addition to that, although

8          I'd like to confer with my

9          colleagues, I don't think there

10         would be any problem in providing

11         you a list of those entities in

12         which Mr. Jia holds some kind of

13         position.

14               MR. SEEGER:  Okay.

15         Appreciate it.

16               MR. GRAND:  We have a list

17         of the companies, but we don't

18         know his role in those companies.

19               MR. SEEGER:  Right.

20               MR. CYR:  Just -- I think so

21         far on the record, what you do

22         have from him is that he's a

23         director in some of the

24         subsidiaries, and he's not a

 1          director in others, but it's up to

 2          you.

 3              MR. SEEGER:  He said that,

 4          and maybe you can also give us --

 5          would you indicate what his title

 6          is in those?  And then we could

 7          save a lot of time.

 8              MR. CYR:  (Indicating.)

 9              MR. SEEGER:  He shook his

10          head yes.  Did you put that down?

11              THE COURT REPORTER: Yes.

12                  -  -  -

13          (Whereupon, Deposition

14          Exhibit Jia-3, Handwritten note in

15          Chinese, was marked for

16          identification.)

17                  -  -  -

18    BY MR. SEEGER:

19          Q.    Mr. Jia, do you have any

20    responsibilities with TTP?

21          A.    I don't know what is the

22    concept of responsibility.

23          Q.    Do you have a job title for

24    TTP?

1            A.    I don't have any positions

2    with TTP.

3            Q.    Do you provide any services?

4    Do you do anything for TTP at all,

5    provide consulting services, financial

6    services, anything like that?

7            A.    Which company is TTP?  Can

8    you tell me first?

9            Q.    I believe it's pronounced

10   Tai'an Taishan Plasterboard.

11           A.    We don't have a company

12   called Tai'an Taishan.  TTP Shareholding

13   Company Limited.  We only have a Tai'an

14   Taishan TTP.

15               INTERPRETER 1:  I need the

16               assistance from the lawyers to get

17               the names correct.  I cannot make

18               out the names here at this point.

19               He's telling me two names.

20               MR. SEEGER:  Okay.  What two

21               names?  Translate the two names he

22               gave you, if you don't mind.

23               INTERPRETER 1:  As a legal

24               interpreter, we don't translate

1          the names, first of all.  And

2          also, there's ten ways to

3          interpret any name, and so I --

4          it's a very tedious difference

5          between the two names.

6                    I need help.

7                    (Discussion amongst Mr.

8          Chen, the interpreters and witness

9          in Chinese.)

10                   MR. CHEN:  If you could

11         just -- I guess you could put on

12         the record colloquy in Chinese.

13         I'm just trying to clarify for

14         you.

15                   MR. CYR:  We're trying to

16         help out here.

17                   MR. CHEN:  It's just Company

18         Limited.  It's Limited Company.

19                   INTERPRETER 1:  So there is

20         a TTP Company, not a Shareholding

21         Limited Company, but it is a TTP

22         Limited Company.

23    BY MR. SEEGER:

24         Q.    I'm going to ask a question.

1    It may not make sense because I'm not

2    really clear on what the confusion is

3    here, but, you know, does he recognize

4    the name Tai'an, and you may have to put

5    it in proper Chinese, Tai'an Taishan

6    Plasterboard?

7              Mr. Jia, do you recognize

8    that name as a company that you're

9    involved with, Tai'an Taishan

10   Plasterboard?

11             MR. CYR:  I'm just -- I

12        don't think he said he was

13        involved in it, but --

14             MR. SEEGER:  No.  I'm asking

15        him if he recognizes it.

16             MR. CYR:  I just want to

17        state for the record that I

18        believe that he's already

19        testified that he doesn't hold a

20        position at TTP.  I just want to

21        make sure.

22             MR. SEEGER:  I don't even

23        know what he's testified to

24        regarding, because he hasn't

1          acknowledged he knows what that is

2          yet.  So let's first see if we can

3          identify what the name of that

4          company is.

5               THE WITNESS:  What do you

6          mean?

7    BY MR. SEEGER:

8          Q.    Mr. Jia, you have been asked

9    to give testimony today for two

10   companies.  One is TG, and the other one

11   is Tai'an Taishan Plasterboard.  Do you

12   understand that to be correct or not?

13         A.    I want to clarify what kind

14   of company is TTP so that I will be able

15   to answer your question.

16         Q.    Okay.  We have a problem.

17              Do you understand that you

18   were asked to come and give testimony for

19   two companies today, Mr. Jia?

20         A.    Yes.

21         Q.    What two companies?

22         A.    Tai'an Taishan Gypsum

23   Company Limited.

24              INTERPRETER 1:  The

1           interpreter cannot guarantee the

2           accuracy of these formal names,

3           and I would ask you for help.  Was

4           that correct?

5                MR. SEEGER:  Are you going

6           to interpret what he said?  Okay.

7                INTERPRETER 2:  The witness

8           said yes, I understand.  I come to

9           testify for TG Shareholding

10          Company Limited and TTP Company

11          Limited.

12     BY MR. SEEGER:

13          Q.    What do the letters TTP

14     stand for in the second company that

15     you're testifying for, Mr. Jia?

16                MR. CYR:  Are you finished?

17                INTERPRETER 1:  Yes.

18                MR. CYR:  Objection on the

19          grounds that it assumes that

20          somehow when you translate it into

21          Chinese that it would necessarily

22          makes sense that it's TTP.  That

23          might not be true.  To try to

24          advance things, though, I do

1          believe that Mr. Jia is familiar

2          with the reference TTP that we use

3          in English to refer to Tai'an, the

4          plasterboard company.

5               You can mark the transcript

6          if you'd like.

7               MR. SEEGER:  No, no.

8          Actually, that was helpful.  I'm

9          trying to move this along.

10              MR. CYR:  The others were

11         intended to be helpful to you.

12              MR. MONTOYA:  Can she

13         translate that?

14              MR. SEEGER:  Can we get her

15         to translate that?

16              MR. CYR:  Sure.  He knows

17         what TTP is.

18              MR. SEEGER:  Okay.

19    BY MR. SEEGER:

20         Q.   Mr. Jia, what do you

21    understand TTP to be?

22         A.   Tai'an Taishan

23    Plasterboard -- let me see.

24         Q.   Let's ask him this.

1            (Discussion in Chinese.)

2            MR. CHEN:  She's asking me

3       to clarify.

4            MR. CYR:  May I make --

5            INTERPRETER 1:  Company

6       Limited.

7            MR. SEEGER:  Let me tell you

8       what my problem is.  If I don't

9       get from his lips, you know, the

10      companies he's here for, you know,

11      we can all speculate.  I just need

12      him to say that he understands TTP

13      is Tai'an Taishan Plasterboard.

14      If you guys want to coach him on

15      that particular point so we can

16      move on and --

17            INTERPRETER 1:  Okay.  Let

18      me try again.

19            INTERPRETER 2:  The witness

20      did say that.

21            MR. CYR:  Excuse me, ma'am,

22      could you just wait for us.

23            Yes.

24            MR. SEEGER:  We'll just

1          stipulate that TTP is Tai'an

2          Taishan Plasterboard?  Are you

3          okay with that?

4                  MR. CHEN:  He already

5          answered that.  It was just a

6          matter of translation.

7                  MR. CYR:  I understand that.

8          Okay.

9                  INTERPRETER 1:  I will try

10          again.

11                  MR. SEEGER:  No.  We got it.

12          We resolved it.  You don't have to

13          worry about it.  We took care of

14          it.

15  BY MR. SEEGER:

16          Q.    Just ask Mr. Jia if he's

17  comfortable if I use the letters TTP for

18  the second company he's testifying for?

19          A.    I understand.

20          Q.    Thank you.

21                  Do you hold a title or

22  position with TTP, Mr. Jia?

23          A.    I don't understand.  What

24  does it mean by the title?

1          Q.    Do you have any involvement
2    with the company TTP?
3          A.    Involvement?  I am not sure
4    about this concept.
5          Q.    Do you work for TTP?
6          A.    I am leading all the work of
7    TTP.  TTP has its own people for
8    management and also for the organization.
9               MR. CYR:  We have an
10              objection.
11              INTERPRETER 2:  The witness
12              stated, I'm leading TG.  TTP has
13              its own management.
14              INTERPRETER 1:  Management
15              people and also for the
16              organization.
17   BY MR. SEEGER:
18         Q.    Mr. Jia, why are you a
19   corporate representative today for TTP if
20   you hold no position or title with TTP?
21         A.    I have no position at TTP.
22         Q.    So, are you the best person
23   to give testimony regarding the business
24   of -- I'm sorry, strike that.

1                  Are you the best person to

2    give testimony regarding the business of

3    TTP?

4          A.    Once again, there would be

5    people testifying on behalf of TTP

6    regarding its operation and situation.

7          Q.    So, I just want to be clear.

8    Are you the best person for us to talk to

9    about TTP and its business practices?

10         A.    Some things regarding TTP

11   that I know, I'm willing to satisfy your

12   need here now.

13         Q.    Tell us what those things

14   are about TTP that you're the best person

15   to talk to.

16         A.    For example, the objective

17   for the establishment of this company,

18   that would be more appropriate.

19         Q.    For Mr. Jia?

20         A.    Yes.

21         Q.    Any other topics about TTP

22   that would be more appropriate for you?

23         A.    I cannot be sure what would

24   be better.

1          Q.    So, with regard to the

2    information of TTP regarding its

3    objective of the company, why is it that

4    you're the best person to talk to on that

5    topic?  How do you know that?

6          A.    Because I, myself, have

7    personally organized people from the

8    company to talk about this topic.

9          Q.    I'm sorry?

10         A.    I personally organize people

11   in the company to talk about this topic,

12   organize.

13         Q.    Do you have personal

14   knowledge on that topic regarding TTP,

15   about the objective for establishing the

16   company?

17         A.    Yes.

18         Q.    And why is that?

19         A.    TG is a company that

20   utilized the industrial waste by-products

21   to produce plasterboard so it can enjoy

22   the value-added tax, VAT.

23         Q.    Oh, VAT, value-added tax.

24               What is the relationship

1    between TG and TTP specifically?

2           A.    Investor and being the

3    invested.

4           Q.    Who is the investor and who

5    is the invested?

6           A.    TG is the investor, and TTP

7    is the one being invested.

8           Q.    And do you personally hold

9    any position at TTP?

10          A.    I did answer.  I have no

11   position.

12          Q.    So, who would be the best

13   person to talk about --

14                Regarding TTP, who would be

15   the best person to talk to regarding

16   dealings between TTP and, let's say, you

17   know, Morgan Stanley or J.P. Morgan?

18                MR. CYR:  Objection on the

19          grounds that the question

20          improperly assumes that there were

21          dealings with Morgan Stanley and

22          J.P. Morgan.

23                Please answer the question,

24          Mr. Jia.

1              THE WITNESS:  I did not

2         understand your question.

3    BY MR. SEEGER:

4         Q.   We were told, Mr. Jia, that

5    you were here to speak on three topics

6    involving TTP.

7              MR. SEEGER:  (Addressing the

8         interpreter.)

9              Could you just tell him

10        that, and then I'll tell him what

11        the three topics are.

12   BY MR. SEEGER:

13        Q.   Okay.  The three topics were

14   the purpose and function of related

15   entities or other entities with employees

16   in the United States.

17             MR. SEEGER:  (Addressing the

18        interpreter.)

19             Could you do your best to

20        repeat that.

21             INTERPRETER 1:  Why don't

22        you do one at a time.

23             COURT REPORTER:  It's right

24        here on the screen.  Just read it

1           from the screen.

2                       -   -   -

3                   (Whereupon, the follow

4           portion of the transcript was read

5           by the court reporter:

6                   "Q:    The three topics were

7           the purpose and function of

8           related entities or other entities

9           with employees in the United

10          States.")

11                      -   -   -

12                  THE WITNESS:   Can you repeat

13          the question?

14   BY MR. SEEGER:

15          Q.    Let me try to do this

16   quickly so we can get us out of here for

17   lunch.

18                  There were three topics that

19   Mr. Jia was supposed to testify about

20   regarding TTP.

21                  MR. SEEGER:   (Addressing the

22          interpreter.)

23                  Give him that so far.

24   BY MR. SEEGER:

1        Q.    The first topic was TTP and

2    any companies related to TTP with

3    employees in the United States.  That's

4    topic 1.  My question is, are you the

5    best person to talk about, to testify

6    with regard to that topic?

7        A.    Yes.

8        Q.    Okay.  And then with regard

9    to the second topic is whatever

10   proprietary interests, government

11   ownership or any commercial relationship

12   between TTP and its related companies and

13   the People's Republic of China.  Are you

14   the best person to testify on that topic?

15       A.    I can answer a part of it,

16   but regarding whether I'm the best person

17   or not, I cannot be sure.

18             MR. CHEN:  He said, I might

19        be the best person.

20             INTERPRETER 1:  I might be

21        the best person.  I am not sure,

22        but I might be.

23   BY MR. SEEGER:

24       Q.    The third and last topic

1    you're here to testify about on TTP is

2    dealings, whether they exist or not, with

3    Morgan Stanley and J.P. Morgan.  Are you

4    the best person to testify on that topic?

5            A.    It should be the case.

6            Q.    I want to be clear.  So, ask

7    him this.

8                  Mr. Jia, it should be the

9    case that you are the best person to

10   testify on that topic?

11           A.    Regarding this topic, I

12   should -- I should know about it.  But

13   whether I am the best or not, that I am

14   not sure.

15           Q.    Just one more question and

16   we can take a lunch break.

17                 How is it that --

18                 On the three topics we just

19   talked about, how is it that you are

20   competent to testify on those subjects or

21   capable of testifying on those subjects?

22           A.    Okay.  I am the chairman of

23   TG, of the board of TG, and TTP is the

24   subsidiary of TG and is 100 percent owned

1    by TG.  So, a lot of the important

2    matters and a lot of things that I know.

3           Q.    Just a last question.

4                 Mr. Jia, do you speak any

5    English at all?

6           A.    No.  I never learn.

7                 MR. SEEGER:  We can take a

8           lunch break.

9                 THE VIDEOTAPE TECHNICIAN:

10          The time now is approximately --

11                MR. CYR:  What time do we

12          come back?

13                MR. SEEGER:  Hold on.  Let's

14          just stay on for a second.

15                What do you want to do?  Do

16          you want to do an hour?

17                MR. CYR:  Is an hour

18          sufficient?

19                MR. SEEGER:  Look,

20          whatever -- I apologize for going

21          over 11:30.  I didn't understand

22          all the issues.

23                MR. CYR:  Two issues.  One

24          is to do whatever is appropriate

```
1           for him for lunch; but two, to get
2           back so we can convene.  Is an
3           hour sufficient?
4                 MR. CHEN:  I think so.
5           We'll eat fast.
6                 MR. SEEGER:  We're breaking
7           at a quarter to 12:00.  We'll be
8           back at a quarter to 1:00 if that
9           works?
10                MR. CYR:  Should we just say
11          1:00?
12                MR. SEEGER:  I was going to
13          say, give or take five minutes.
14          It doesn't matter.
15                THE VIDEOTAPE TECHNICIAN:
16          The time now is approximately
17          11:44 a.m., and we're now off the
18          record.
19                      -  -  -
20                (Whereupon, a luncheon
21          recess was taken from 11:45 p.m.
22          until 12:56 p.m.)
23                      -  -  -
24                THE VIDEOTAPE TECHNICIAN:
```

1          This begins Tape 4 of today's
2          deposition.  The time now is
3          approximately 12:59 p.m., and
4          we're back on the record.
5    BY MR. SEEGER:
6          Q.    Mr. Jia, who at TTP reports
7    to you?
8          A.    TTP has its own board of
9    directors, has its own management.  So,
10   every time after the board meetings, they
11   report to me.
12         Q.    And whose responsibility,
13   who specifically has the responsibility
14   of reporting to you what occurs in those
15   meetings?
16         A.    I don't understand what you
17   mean.
18         Q.    Well, how is the information
19   regarding business at TTP reported to
20   you?  Who is it reported to you by?  Are
21   you given written reports?  Describe in
22   your own words how you get that
23   information.
24         A.    Regarding the operation of

1    TTP, every month there is a report sent

2    to my office.  We don't have anyone

3    specific to make a report to me.

4          Q.    How is the information given

5    to you?  I mean, are you given written

6    reports?  Is information conveyed to you

7    verbally?

8          A.    Normally they give me the

9    written report.  When it is necessary,

10   the directors will do some exchange with

11   me.

12         Q.    And regarding the directors

13   that do exchange with you, how is that

14   done?  Is that done verbally, through

15   e-mail communication?

16         A.    Verbally.

17         Q.    And then which directors?

18   Can you identify them by name that you

19   have these verbal interactions with at

20   TTP?

21         A.    Pang Shi Liang.  Pang Shi

22   Liang.

23         Q.    Okay.

24               And how often do you speak

1    with or meet with this person you've just
2    identified?
3         A.    Usually it is once a month,
4    but it is irregular.
5         Q.    Are there times when it can
6    be more than once a month?
7         A.    Yes.
8         Q.    And with regard to the
9    written reports that you receive from
10   TTP, do you know who prepares those
11   reports?
12        A.    I don't know.
13        Q.    Okay.
14              And the reports contain what
15   type of information?  Is it financial
16   information, accounting information?
17        A.    Mainly it's about the
18   products and the sales and how much sales
19   for the plasterboards.
20              INTERPRETER 2:  The witness
21        says mainly the production and
22        sales.
23              MR. SEEGER:  Production and
24        sales.

1              INTERPRETER 1:  It's the
2        same.
3              MR. SEEGER:  I thought that
4        was the same.  That's what I
5        thought you said.
6              MR. CHEN:  The record says
7        products and sales.
8              MR. SEEGER:  Oh, okay.  I
9        thought I heard -- I wasn't
10       looking at this.  Okay.
11             INTERPRETER 1:  The
12       products --
13             MR. SEEGER:  She said
14       production and sales.
15             INTERPRETER 1:  No
16       production.
17             MR. SEEGER:  Did you say
18       that?  That's what I thought
19       you --
20             (Discussion between
21       interpreter and witness in
22       Chinese.)
23             INTERPRETER 1:  Production.
24       Production.

1           MR. SEEGER:  Did you not

2       want her to clarify?

3           MR. CYR:  I just didn't want

4       her asking him questions.  That's

5       all.

6           INTERPRETER 1:  I am not

7       asking the question.  I'm

8       clarifying.  I stated to --

9           MR. SEEGER:  You don't have

10      to defend yourself.  This is just

11      lawyer stuff.  Don't worry about

12      it.

13  BY MR. SEEGER:

14      Q.    How often do you get the

15  written reports?

16      A.    I don't understand.

17      Q.    How often?  When do you get

18  these written reports that you just

19  testified to?

20      A.    Usually I can see it once a

21  month.

22      Q.    Do you also get audited

23  financial statements from TTP?  Would

24  they go to you?

1          A.      Can you speak louder?

2                  I can see it.

3          Q.      How often do you get audited

4    financial statements from TTP?

5          A.      Usually I can see it every

6    month.

7          Q.      Do you know the people at

8    TTP who would be involved in putting

9    together audited financial statements?

10         A.      I don't understand.  What do

11   you mean?

12         Q.      The people who are actually

13   involved in preparing audited financial

14   statements for TTP, do you know who those

15   people are?

16         A.      They should be the finance

17   people of TTP.

18                 MR. SEEGER:  The what

19         people?

20                 INTERPRETER 1:  Finance.

21   BY MR. SEEGER:

22         Q.      Can you identify any of

23   those people by name?

24         A.      I cannot recall.

1          MR. SEEGER:  Also, can you

2     translate -- to the interpreter,

3     can you translate what he wrote in

4     Chinese, that person's name, into

5     English, so we can mark that as an

6     exhibit.

7          INTERPRETER 1:  The

8     translator will try her best to

9     translate, but she cannot

10     guarantee the accuracy, because we

11     are not authorized to do

12     translation of legal names.

13          MR. SEEGER:  We'll show it

14     to Mr. Cyr and see if he has a

15     problem.

16          (Discussion between the

17     witness and interpreter in

18     Chinese.)

19          MR. CYR:  No, no.  Please

20     don't ask the witness questions,

21     ma'am.

22          MR. SEEGER:  You have to do

23     your best on that.

24          INTERPRETER 1:  I am doing

1        my best, but I cannot guarantee

2        the accuracy.

3              MR. SEEGER:  Okay.

4              Just tell us what name you

5        wrote.

6              INTERPRETER 1:  Pang Shi

7        Liang.

8              MR. CYR:  Can I just help

9        out to see if can get an accurate

10       record?

11             INTERPRETER 1:  Okay.  Let

12       me --

13             MR. SEEGER:  It's okay.

14             INTERPRETER 1:  Pang Shi

15       Liang.

16             MR. SEEGER:  Just mark that

17       as Exhibit 4.

18                   -  -  -

19             (Whereupon, Deposition

20       Exhibit Jia-4, Handwritten note,

21       Pang Shi Liang, was marked for

22       identification.)

23                   -  -  -

24    BY MR. SEEGER:

1          Q.    Okay.

2                I want to switch back to a

3     few questions to BNBM.  Do you report to

4     anyone at BNBM regarding your activities

5     at TG or TTP?

6          A.    We don't have any formal

7     report.  Sometimes we make phone calls to

8     refresh the situation of TG.

9          Q.    Okay.

10                And when you make those

11     phone calls to BNBM, who most often do

12     you make them to?

13          A.    Now it is Mr. Chen Yu.

14                MR. SEEGER:  Why don't you

15          have him write it, and we'll spell

16          it again.

17                THE WITNESS:  I have written

18          down the name already.

19     BY MR. SEEGER:

20          Q.    Okay.  Thank you.

21                And he is with BNBM,

22     correct?

23          A.    Correct.

24          Q.    Is there anybody else other

1    than this individual that you deal with

2    at BNBM on a regular or irregular basis?

3         A.    Regularly, it is Mr. Chen

4    Yu.  Irregularly, that I cannot recall.

5    Sometimes in Beijing we may just drink

6    tea, but I cannot recall.

7         Q.    So, there are some

8    individuals at BNBM that you have once in

9    a while meetings with, have tea, but you

10   don't recall who they are and what are

11   their names?

12        A.    That is not what I mean.

13        Q.    Okay.

14              That's why I asked the

15   question.  I'd like to know what he

16   means.  Maybe you can explain it.

17        A.    Many people in management of

18   BNBM are my good friends.

19        Q.    Could you identify some of

20   the individuals in management who are

21   your friends by name?

22        A.    For example, Mr. Zhou Wan.

23        Q.    And what is that

24   individual's title at BNBM now?

1          A.     The vice GM of BNBM.

2          Q.     Okay.

3                 And could he just write that

4     next to his name, please.

5          A.     (Witness complies.)

6          Q.     Now, is this -- Mr. Jia, is

7     this individual also involved with TG in

8     any respect?

9          A.     No.

10         Q.     Are there other individuals

11    besides the person you've identified in

12    this piece of paper in front of you that

13    we'll mark as Exhibit 4 that you deal

14    with or that are good friends of yours at

15    BNBM?

16         A.     Yes.

17         Q.     Could you please -- I'm

18    sorry.  I didn't mean to interrupt.

19                MR. CYR:  There's no

20                question.  He said yes.  Next

21                question.

22                MR. SEEGER:  Calm down,

23                everybody.

24    BY MR. SEEGER:

1          Q.    Could you please write on
2    that piece of paper the names, other
3    names of individuals who are your good
4    friends at BNBM.
5          A.    Wu Fa De, vice GM.
6          Q.    What is the name of the
7    second individual?
8          A.    Wu Fa De.
9          Q.    We'll take care of the
10   translation.
11               Now, are either -- I'm sorry
12   to ask you this again.  I may have with
13   the first individual.
14               Are any of these two
15   individuals you've identified involved
16   with either TG or TTP in any way?
17         A.    They definitely were not
18   involved with TG or TTP business.
19         Q.    Okay.
20               And would any of these two
21   individuals that you've identified on the
22   paper, would they be involved with any TG
23   subsidiaries other than TTP?
24         A.    I don't understand what you

1    mean.

2         Q.    The two individuals that

3    you've listed on this piece of paper, do

4    they have any involvement in any business

5    capacity with any TG subsidiaries?

6         A.    Not even so.

7         Q.    Okay.

8               Now, when you meet for tea

9    with these two individuals on the paper

10   in front of you, do you discuss TG

11   business with them?

12        A.    So we usually talk about

13   family and society, that type of

14   questions.

15        Q.    Okay.

16              So, are you saying it's your

17   testimony that you do not discuss TG

18   business with these two individuals?

19        A.    Yes.

20        Q.    Okay.

21              Tell us about your history

22   with TG, how you got involved with TG.

23        A.    I don't understand what you

24   mean.

1        Q.   Well, how did you first
2    learn about TG?  How did you first get
3    your job with TG?  Just your history with
4    the company.
5        A.   Are you talking about TG
6    history or TTP history or BNBM history?
7        Q.   I'm first asking about how
8    he became involved with TG.
9             MR. CYR:  Please don't ask
10        him questions.
11             INTERPRETER 1:  I'm
12        repeating so that I make sure I
13        hear accurately, because he has an
14        accent.
15             MR. CHEN:  She just asked
16        him to repeat.
17             INTERPRETER 1:  I am not
18        making a discussion.
19             MR. CYR:  Go ahead.
20             THE WITNESS:  In the year
21        2002, the board of directors
22        selected me as the GM and the
23        chairman of the board of the
24        Shandong Taihe Dongxin Company

1          Limited.

2    BY MR. SEEGER:

3          Q.    Okay.

4                And how were you first

5    introduced to the board of directors back

6    in 2002?  How did they learn about you?

7          A.    I have always been working

8    for Tai'an -- Tai'an --

9                INTERPRETER 1:  Off the

10               record.

11               I'm assuming Tai'an is an

12               abbreviation in Chinese in the

13               standing of TTP.  I want to

14               verify.

15               MR. CHEN:  Tai'an is a

16               location.  I have always been

17               working in Tai'an.

18               INTERPRETER 1:  Oh, okay.  I

19               need to clarify that.

20               MR. CHEN:  Tai'an is a

21               location.  I have always been

22               working in Tai'an.

23               THE WITNESS:  In Tai'an, I

24               have always been working in

1           Tai'an.  And, actually, the

2           headquarter of the enterprise was

3           in Tai'an, and I study

4           construction material.  And I have

5           been working in the industry for

6           many years, and they believe that

7           I am qualified to do the job well,

8           therefore, they recommended me as

9           the GM and the chairman of the

10          board.

11   BY MR. SEEGER:

12          Q.    Do you recall who at the

13   company from the board of directors you

14   met with when you were hired?  Did you

15   meet with the entire board or certain

16   board members?

17          A.    Some of the members of the

18   board and some of the representative of

19   the board, and I cannot recall all of

20   them because it was a long time ago.

21          Q.    Tell me which names --

22          INTERPRETER 2:  And also

23          shareholders meeting.

24   BY MR. SEEGER:

1          Q.    Tell me who you remember

2    meeting with from the board.

3          A.    For example, a Mr. Ren Xu

4    Lian.

5                INTERPRETER 1:  The witness

6          has written down two names.  One

7          is Mr. Ren Xu Lian and a Mr. Xue

8          Yuli.

9    BY MR. SEEGER:

10         Q.    Okay.

11               Are those two individuals

12   still with TG to the present?

13         A.    Mr. Xue, he has retired.

14   Mr. Ren Xu Lian is still working for TG.

15         Q.    And what is his title

16   currently?

17         A.    He is now the vice general

18   manager.

19               MR. SEEGER: A vice general

20         manager?

21               INTERPRETER 1:  Yes.

22               INTERPRETER 2:  Of TG.

23               MR. SEEGER:  Of TG.  I

24         understand.  Thank you.

 1    BY MR. SEEGER:

 2         Q.    How often do you have

 3    dealings with the individual, I'm sorry,

 4    I can't pronounce the name, but the

 5    current vice general manager of TG?  How

 6    often does he deal with him?

 7         A.    Now almost like whenever he

 8    is in Tai'an, we would meet.

 9                   -  -  -

10         (Whereupon, Deposition

11         Exhibit Jia-5, Handwritten note,

12         Zhou Wan and Wu Fade, was marked

13         for identification.)

14                   -  -  -

15         (Whereupon, Deposition

16         Exhibit Jia-6, Handwritten note,

17         Ren Xu Lian and Xue Yu Li, was

18         marked for identification.)

19                   -  -  -

20              INTERPRETER 1:  The

21         interpreter is translating the

22         names, but she cannot guarantee

23         the accuracy.

24              MR. SEEGER:  Show it to Mr.

1          Cyr to make sure it is accurate.

2                MR. CHEN:  The Chinese is

3          going to be correct.

4                MR. SEEGER:  The English

5          translation, do we have an issue

6          with it?

7                MR. CHEN:  Can I say

8          something briefly?

9                MR. CYR:  Sure.  Again, the

10         main thing is that when Mr. Jia is

11         asked questions about a man, that

12         he knows who the man is.

13               MR. CHEN:  I will just say

14         that in China, there's a typical

15         Romanization protocol called

16         pinyin.  These terms are not

17         pinyin, because it's not used in

18         Hong Kong.  And so these are not

19         names that most people in China

20         would recognize if you saw that.

21               MR. SEEGER:  I've got you.

22               MR. CYR:  Do you believe

23         that Mr. Jia knows the names, I

24         mean, will recognize -- when she

1          says the names in Chinese, he

2          knows who she's talking about?

3                MR. CHEN:  The Chinese

4          characters will be recognizable.

5          The English will not be.

6                MR. CYR:  Thank you.

7     BY MR. SEEGER:

8          Q.    Okay.

9                So, let me just go back to

10    the time before you were hired at TG.

11    Where did you work?

12                INTERPRETER 1:  The witness

13          is giving out a Chinese name, and

14          the interpreter will try her best

15          to translate, but she cannot

16          guarantee the accuracy.

17                MR. SEEGER:  You don't have

18          to say it.  We're going to assume

19          that for every name.

20                THE WITNESS:  Taishan Glass

21          Fiber Company.

22    BY MR. SEEGER:

23          Q.    Is that a company that is

24    owned or affiliated with TG in any way?

1          A.    Not related.

2          Q.    Do you have an employment

3    contract?

4          A.    I don't have any contracts

5    for hiring, but I have an appointment

6    letter from the board of directors.

7          Q.    Okay.

8                And do you have an

9    appointment letter from the board of

10   directors at TTP?

11              MR. CYR:  I just object.  It

12              seems to assume that he had some

13              kind of position at TTP, and his

14              testimony has been to the

15              contrary.

16              MR. SEEGER:  That was a good

17              coach, but I'm just asking him if

18              he has a contract.

19              MR. CYR:  (Addressing the

20              interpreter.)

21              Could you interpret what I

22              said.

23              MR. SEEGER:  Mark that one

24              for...

 1                    - - -
 2                    (Whereupon, the requested
 3           portion of the transcript was read
 4           by the court reporter as follows:
 5                    "Q.  And do you have an
 6           appointment letter from the board
 7           of directors at TTP?")
 8                    - - -
 9                    THE WITNESS:  I don't
10           understand.
11    BY MR. SEEGER:
12           Q.    He had testified he has an
13    employment letter, I believe, from TG,
14    right?
15                    INTERPRETER 1:  Right.
16                    MR. SEEGER:  No, ask him
17           that.
18                    MR. CHEN:  He said for TG.
19                    INTERPRETER 2:  The question
20           was asking for the appointment
21           letter from TG.
22                    MR. SEEGER:  Yes.
23                    INTERPRETER 2: The question
24           was the appointment letter from

1          TG.  The interpreter interpreted

2          appointment letter of TTG -- TTP.

3                INTERPRETER 1:  No, it is --

4          I read it from the screen.  It

5          says TTP.

6                MR. SEEGER:  Let me ask it

7          again.

8                INTERPRETER 1:  Okay.

9    BY MR. SEEGER:

10         Q.    The witness, Mr. Jia, you

11   testified earlier you had an appointment

12   letter from TG, correct?

13         A.    No.  I said when I worked

14   for the Taishan Glass Fiber Company, I

15   had an appointment letter.

16         Q.    Okay.

17               Do you currently have an

18   appointment letter from TG?

19         A.    I don't have an appointment

20   letter, but I have this result from the

21   election.

22         Q.    Could he please describe

23   what he means by the "result from the

24   election"?  I don't understand that.

1          A.     In the year 2002, when TG

2    was established, they selected me as the

3    chairman of the board and the GM.

4          Q.     But is there anything in

5    writing that reflects that appointment?

6    Is there a contract, an appointment

7    letter, anything like that?

8          A.     There was a document.  The

9    document was about the result of this

10   election.

11         Q.     Okay.

12                And who at TG evaluates your

13   performance?

14         A.     I don't know what kind -- in

15   what aspect of the performance are you

16   referring to?

17         Q.     Your job performance, how

18   you're performing as a chairman and a

19   general manager.  Are you evaluated by

20   anyone at TG?

21         A.     Yes.

22         Q.     And who would that be?

23         A.     Yeah.  The board of

24   directors and the board of shareholders

1    of TG.

2            Q.    There's no specific

3    individual; is that correct?

4            A.    The representative of the

5    board of shareholders and the members of

6    the board of directors.

7            Q.    And who is the

8    representative of the board of

9    shareholders?

10           A.    In what period?

11           Q.    In 2002.

12           A.    The representative of the

13   shareholders, the board of shareholders

14   in the year 2002, are you talking about

15   names?

16           Q.    Yes.

17           A.    It was too long ago.  I

18   cannot recall.  But I can state a few

19   names.

20           Q.    Okay.

21                 Please, if you can state the

22   names and the time frame, that would be

23   useful.

24                 MR. SEEGER:  Oh, I'm sorry,

1          I thought you were writing.

2               MR. CYR:  He hasn't been

3     asked to write.  You asked him to

4     state the names.

5               MR. SEEGER:  Yeah, why don't

6     we just -- we've been doing this

7     exercise.  It works well.  Give

8     him a piece of paper, and if you

9     could please write on the paper

10    the name of the representative on

11    the board of shareholders that you

12    recall and the timeframe.

13               (Witness complies.)

14               MR. SEEGER:  We'll mark this

15    as Exhibit 7.

16                    -  -  -

17               (Whereupon, Deposition

18    Exhibit Jia-7, Handwritten note,

19    Keng Ming Guo, Ren Xu Lian and Xue

20    Yu Li, was marked for

21    identification.)

22                    -  -  -

23               THE WITNESS:  I can only

24    remember these names.

1                    MR. SEEGER:  Okay.

2                    Could you state for the

3          record --

4                    The interpreter, can you

5          read into the record in English

6          whatever, what those names are.

7                    INTERPRETER 1:  I can only

8          try my best.  I cannot guarantee

9          any accuracy.

10                   MR. SEEGER: Well, I

11         understand.  Write it down, and

12         then we will ask counsel to take a

13         look at it and see if he agrees

14         with the translation.

15                   THE WITNESS:  Keng Ming Guo.

16                   MR. SEEGER:  Why don't you

17         show it to Mr. Cyr, please.

18                   INTERPRETER 1:  (Handing

19         over Exhibit 7.)

20                   MR. CHEN:  I can't agree

21         with these English writings,

22         because, as I said, this is not

23         the normal form used in China.

24                   MR. CYR:  Okay.

1              So, we will just go with it.

2         I just would like to ask Mr. Dong

3         to look at these.

4              MR. SEEGER:  Can we just

5         identify for the record who the

6         individual looking at the document

7         is?  But go ahead and say his

8         name.  Mr. Dong?

9              MR. CYR:  Mr. Dong, yes,

10        D-O-N-G.

11             And for the record, I just

12        wanted him to have an opportunity

13        to see the names so that we don't

14        have an inaccurate transcript,

15        because it's my understanding,

16        based on what's happened so far,

17        that those names purport to be the

18        names of people who held the

19        position of secretary or some kind

20        of representative of the

21        shareholders during the relevant

22        time period.  I'm not sure that we

23        actually have that.  But you're

24        not asked to testify, Mr. Dong.  I

1           just wanted you to see the names.

2                MR. SEEGER:  Mr. Dong is an

3           attorney here in Hong Kong for the

4           company, I take it?

5                MR. CYR:  He is an attorney

6           in China for the company.

7                MR. SEEGER:  For the

8           company.  Is he in-house counsel

9           or is he --

10                MR. CYR:  No, he's not.

11                MR. SEEGER:  -- outside.

12                INTERPRETER 1:  And, also,

13           if we have time to go with the

14           computer, we can get that pingyin

15           more accurately.  But we don't

16           have the time to do that now.

17                MR. SEEGER:  We're going to

18           be fine.

19                MR. CYR:  We're good.  We're

20           ready.

21   BY MR. SEEGER:

22           Q.    Okay.

23                So, would you now please ask

24   Mr. Jia to look at what we've now marked

```
 1    as Exhibit 7 and just tell me if any of
 2    these three people are or were at any
 3    time employees of BNBM?
 4          A.    No.
 5          Q.    Were they now or at any
 6    point in the past, that he knows of,
 7    employees of CNBM?  I'll give you the
 8    name.
 9          A.    No.
10          Q.    Thank you.
11                Okay.  Now, I want to focus
12    on the present.  What are your current
13    job responsibilities for TG?
14          A.    I am responsible for the
15    normal operation and development of TG.
16          Q.    I'm sorry.  Can I just focus
17    your attention, Mr. Jia, on Exhibit 7
18    again.  Are any of the people on that
19    list employees or were they ever
20    employees of TG?
21          A.    Mr. Ren Xu Lian and Xue Yu
22    Li, they are the employees of TG.  But
23    Mr. Xue has now retired.
24          Q.    I'm sorry.  I'm going to go
```

1    back to your other answer.

2              You answered that you're

3    involved with the normal operation and

4    development of TG.  Could you please

5    elaborate on that?  Tell us specifically

6    what your job entails.

7         A.    My job responsibility is to

8    help the departments of TG and also to

9    advise the general managers to

10   effectively and most effectively to

11   operate normally.

12        Q.    Are you involved in all

13   major financial decisions for TG?

14              MR. CYR:  Objection as

15        vague.

16              You may answer, Mr. Jia.

17              THE WITNESS:  What do you

18        mean by "financial decisions"?

19        What do you mean by "major"?  That

20        I am not sure.

21   BY MR. SEEGER:

22        Q.    Well, if TG were to borrow

23   or loan money, would you be involved in

24   the decision-making there?

1          A.     Yes, I would participate.

2          Q.     If TG were to get involved

3     in investing money in either existing

4     product lines or new product lines, would

5     you be involved in that decision?

6          A.     I will involved.

7          Q.     If TG were to get involved

8     in strategic alliances with other

9     companies, either joint ventures,

10     mergers, purchase of other companies,

11     would those decisions go through you?

12          A.     I don't understand the

13     concept of "strategic."

14          Q.     Okay.

15                 What if TG were to purchase

16     another company?

17                 MR. CYR:  Would you

18          participate in that decision?

19                 THE WITNESS:  Yes, I will

20          participate.

21     BY MR. SEEGER:

22          Q.     What if it were to joint

23     venture or partner with another company

24     with regard to current or new product

1    lines, would that decision go through

2    you?

3            A.    It is not to go through me.

4    It is through a discussion with the board

5    of shareholders and the board of

6    directors.

7            Q.    And would he participate in

8    that discussion?

9            A.    Yes.

10           Q.    Would you have to bring any

11   decision like that, acquiring a new

12   company or a joint venture with another

13   company, to the board of BNBM?

14           A.    It would not be brought up

15   to the board of BNBM.

16           Q.    Would it be reported to the

17   board --

18                 If a decision were made one

19   way or another regarding buying a company

20   or joint venturing, would it be -- at

21   what point would that be shared with

22   BNBM?

23           A.    I don't understand the word

24   "shared."

1          Q.    That information would be

2     shared.

3               INTERPRETER 2:  (Addressing

4          Interpreter 1 in Chinese.)

5               MR. SEEGER:  Can you --

6               MR. CHEN:  There is an issue

7          with the translation of the

8          Chinese, and so she's giving --

9          she's helping the interpreter.

10              MR. SEEGER:  Oh, you're

11         speaking to the interpreter?

12              MR. CHEN:  I don't think she

13         was --

14              INTERPRETER 1:  She's just

15         helping seeing in her way whether

16         he can understand it better or

17         not.  No objection from my side.

18              MR. CYR:  I shared your --

19         we were aligned on that moment.

20              MR. SEEGER:  Okay.

21              Did that help you, what she

22         said?

23              INTERPRETER 2:  I haven't

24         finished.

```
 1                    MR. SEEGER:  I'm going to
 2          withdraw the question.
 3                    INTERPRETER 1:  Yeah, okay.
 4          Thank you.
 5   BY MR. SEEGER:
 6          Q.    BNBM sits on the board of
 7   TG, correct?
 8          A.    Yes.
 9          Q.    At TG, do you sit on any
10   particular committees, if they exist?
11          A.    I don't understand what you
12   mean.
13          Q.    Management committees?
14          A.    No.
15          Q.    Are there any formal -- that
16   he's aware of,are there any formal
17   committees at TG that he would
18   specifically participate in, to his
19   knowledge?
20          A.    TG only has the board of
21   shareholders and a board of directors.
22   We don't have any other management
23   committee.
24                    MR. CYR:  Excuse me.
```

1           THE WITNESS:  I want to take

2     a break.

3           MR. SEEGER:  Not a problem.

4     Any time.

5           MR. CYR:  We can do this, I

6     think, when we get back here in

7     ten minutes.

8           MR. SEEGER:  Do you have

9     something you wanted to add to

10    what we did?

11          MR. CYR:  No, no.  Just how

12    long should the break be?

13          MR. SEEGER:  If we can keep

14    it to ten minutes, just because we

15    lose so much.

16          THE VIDEOTAPE TECHNICIAN:

17    The time now is approximately

18    1:56 p.m., and we are now off the

19    record.

20                 -  -  -

21          (Whereupon, a recess was

22    taken from 1:56 p.m. until

23    2:02 p.m.)

24                 -  -  -

1           MR. CHEN:  Chris, the

2           interpreter had asked us to give

3           English transliterations of these

4           various exhibits, which we're

5           happy to do, but I don't want to

6           write on the exhibit itself.

7           INTERPRETER 1:  The thing

8           is, because they have the

9           computer, they will check the --

10           MR. SEEGER:  Let's not do

11           that just yet unless, again, if

12           you see, you know, how you noticed

13           a character was off, if you see a

14           glaring problem.  If it is just a

15           question of it could be a little

16           bit this, a little bit that, I say

17           leave it, if that's okay with you.

18           INTERPRETER 1:  Because we

19           initially don't want to do the

20           translation of any of the names.

21           MR. SEEGER:  I know.  I

22           know.  And I don't think any of us

23           really care that much about this.

24           THE VIDEOTAPE TECHNICIAN:

1          This begins Tape 5 of today's

2          deposition.  The time now is

3          approximately 2:14 p.m., and we

4          are back on the record.

5     BY MR. SEEGER:

6          Q.    Okay.  Where were we, and do

7     we want to go back there?

8               Mr. Jia, do you sit on

9     boards of any --

10              Other than TG and BNBM, do

11    you sit on the boards of any other

12    companies?

13         A.    I did answer already.  In

14    the subsidiaries of TG, in some of them,

15    I have position.

16         Q.    Oh, I'm sorry.

17              And he identified, I think

18    he wrote out four or five companies for

19    us; is that right?

20         A.    Yes.

21         Q.    Okay.  Thank you.

22              Do TG and TPP share any

23    facilities together?

24         A.    Share, what is the concept

1    of share?

2         Q.    Do TG and TPP make any of

3    the same types of products?

4         A.    Yes.

5         Q.    Okay.

6              Name a product that they

7    make that's similar.

8         A.    The production of the

9    plasterboards.

10        Q.    Okay.

11             Do TG and TPP share

12   facilities regarding the production of

13   plasterboard?

14             MR. CYR:  I'm sorry.  I

15        refrained from objecting just

16        because I didn't want to take

17        time, but I'm afraid that you're

18        now about to go down a road that

19        it might create a misleading

20        record, in that we don't have the

21        time period with respect to when

22        TTP was manufacturing the product.

23        Thank you.

24             MR. SEEGER:  Okay.  I'm

1    going to take note of that

2    objection and ask some follow-up

3    questions.  Well, I'm going to ask

4    some follow-up questions, so

5    maybe --

6         MR. CYR:  She just needs

7    to -- I mean, I'm not trying to

8    educate the witness, but I think

9    it's proper for her to interpret

10    what I said.

11  BY MR. SEEGER:

12         Q.    I'm going to ask the

13  question differently, Mr. Jia.

14         At any time, at any time at

15  all, did TPP and TG share the same

16  facilities for the manufacture of

17  plasterboard?

18         A.    No.

19         Q.    At no time, you're saying,

20  did they share facilities for the

21  manufacture of plasterboard?

22         A.    No.

23         Q.    Did they share warehouses

24  where that plasterboard is stored?  Did

1   TG and TPP share a warehouse where

2   plasterboard is stored?

3          A.    No.

4          Q.    Do they share factories

5   where it's manufactured?

6          A.    No.

7          Q.    At any time did TG and TPP

8   share office space?

9          A.    No.

10         Q.    At any time did TG and TPP

11   share employees?

12         A.    No.

13         Q.    How about, let me ask the

14   questions this way.  Did Shandong --

15               MR. SEEGER:  How do you

16         pronounce the other company,

17         Shandong?

18               INTERPRETER 1:  Shandong

19         Taihe.

20   BY MR. SEEGER:

21         Q.    Did Shandong and TPP ever

22   share facilities in the production of

23   plasterboard?

24               INTERPERTER 1:  Shandong?

```
 1                MR. SEEGER:  It's on the
 2         document.
 3                INTERPRETER 1:  Are you
 4         talking about Shandong Taihe
 5         Dongxin?
 6                MR. SEEGER:  Yes, yes.
 7                THE WITNESS:  I did answer
 8         this question already.
 9  BY MR. SEEGER:
10         Q.    Did he answer it by
11  answering for TG?  Is that what he means?
12         A.    I don't understand.
13         Q.    Okay.
14               I didn't ask you --
15               I never asked him the
16  question specifically relating to
17  Shandong, but if he was answering the
18  questions interpreting TG to also be
19  Shandong, then I understand his answer.
20  I'm just trying to be clear on what he's
21  saying.
22         A.    I still don't understand
23  your question.
24         Q.    Let me ask you this.
```

 1                    When you say "TG," when I'm

 2      asking you a question involving TG, are

 3      you including in that its predecessor

 4      Shandong when you give me answers?  It's

 5      the same company?

 6           A.    Yes.

 7           Q.    All right.

 8                 So, if I say "TG," are we

 9      okay that I'm also including Shandong?

10           A.    Do you mean at any time?  At

11      any time?

12           Q.    Yes.

13           A.    (In Chinese.)

14                 MR. SEEGER:  What does that

15           mean?

16                 INTERPRETER 1:  Fine.

17                 MR. SEEGER: You spoke

18           Chinese to me.

19                 INTERPRETER 1:  I'm sorry.

20                 MR. SEEGER:  That's all

21           right, but thank you for the

22           lesson.

23                 INTERPRETER 1:  You're

24           welcome.

1    BY MR. SEEGER:

2         Q.    Has TG ever sold or leased

3    equipment to TPP?

4         A.    We did sell.

5              MR. SEEGER:  Is that his

6         answer?

7              INTERPRETER 1:  (Nodding.)

8    BY MR. SEEGER:

9         Q.    Okay.

10             Has TG ever sold or leased

11   product lines to TTP?

12             INTERPRETER 1:  Product

13        line, right?

14             MR. SEEGER:  Uh-huh.

15             MR. CYR:  I just object in

16        that there might be some confusion

17        in his response with respect to

18        product lines.  He might think

19        you're talking about different

20        kinds of product as opposed to a

21        line for production.

22             MR. SEEGER:  Actually, I'm

23        going to strike the question and

24        ask it better that way.

1    BY MR. SEEGER:

2         Q.    Has TG sold or leased

3    production lines to TTP?

4         A.    I did answer, yeah, we did

5    sell.

6         Q.    Okay.

7               Has TG rented factory space

8    to TTP?

9         A.    We did rent it.

10         Q.    And has TG leased the

11   Taishan brand name to TTP?

12         A.    Authorized them to produce.

13         Q.    Using -- let me just add to

14   it.

15               Authorized to produce using

16   the Taishan name, correct?

17         A.    I don't understand.

18         Q.    Well, has TG allowed TTP to

19   use the Taishan name, the brand name?

20         A.    We did authorize them to

21   use.

22         Q.    Who is the Taihe Group,

23   Taihe?

24               INTERPRETER 2:  Taihe.

1           MR. SEEGER:  Can you say it?

2           INTERPRETER 2:  Taihe.

3           MR. SEEGER:  Taihe?

4           INTERPRETER 2:  Taihe.

5           INTERPRETER 1:  Taihe,

6     you're right.

7  BY MR. SEEGER:

8     Q.    Who is the Taihe Group?

9     A.    Taihe is a very early name.

10    Q.    For?

11    A.    It is a name very early on.

12    Q.    And what was it used for?

13          MR. CYR:  What company?

14          THE WITNESS:  At that time,

15    all the factories in that area is

16    called Taihe.  It is not a legal

17    entity.

18  BY MR. SEEGER:

19    Q.    And what time frame are you

20  referring to, Mr. Jia?

21    A.    All the time.

22    Q.    Okay.

23          Are there any --

24          Is TG a part of the Taihe

1    Group?

2                    MR. SEEGER:  I'm sorry, I'm

3         not saying it right.  How do you

4         say it again?

5                    INTERPRETER 1:  Taihe.

6    BY MR. SEEGER:

7         Q.    Is TG part of the Taihe

8    Group?

9         A.    Yes.

10        Q.    Are there any other entities

11   or companies related to TG that are part

12   of the Taihe Group?

13        A.    I don't understand what you

14   mean.

15        Q.    Is TTP a part of the Taihe

16   Group?

17        A.    It is an area, a district

18   called a Taihe, or a company here

19   referred to as Taihe, but it doesn't have

20   any relationship with the resources.

21        Q.    Does TG refer to itself as

22   being a part of the Taihe Group?

23                    INTERPRETER 1:  I want to

24        clarify with you.  When you talk

1           about the Taihe Group, are you

2           referring to the Shandong Taihe

3           Dongxin Company Limited?

4                   MR. SEEGER:  No.

5                   INTERPRETER 1:  Because

6           Taihe is a geographic place.  It's

7           a district called Taihe.  So, I

8           want to clarify when you say Taihe

9           whether you are referring to the

10          district of Taihe or the company

11          called Taihe.

12   BY MR. SEEGER:

13          Q.   Let me ask the witness a

14   question.

15                  Ask Mr. Jia if he

16   understands if there's a website for the

17   Taihe Group?

18          A.   There may be such a thing,

19   but I cannot recall the details.

20          Q.   Well, then, let me ask him

21   this question, because I don't know if

22   this is going to be helpful.  I would

23   like to ask my question I asked before.

24                  Does TG hold itself out as

1    being part of the Taihe Group?

2              INTERPRETER 1:  Counsel, I

3         want to clarify.  When you're

4         talking about Taihe Group, you are

5         talking about a company, a group,

6         the company?

7              MR. SEEGER:  A group of

8         companies.

9              MR. CYR:  Excuse me, ma'am.

10             INTERPRETER 1:  But he is --

11        when the witness is referring to

12        Taihe, he's referring to a lot of

13        different --

14             MR. SEEGER:  Time out.

15        There's one little thing I have to

16        tell you.  It's an important

17        protocol.  Whether I agree or

18        disagree with him, most of the

19        time I'm going to disagree with

20        him, but if Mr. Cyr says

21        something, he's usually saying it

22        for a reason, because he's

23        concerned.  He has to interrupt

24        you, and he isn't meaning it to

1          be --

2                    INTERPRETER 1:  No problem.

3          No problem at all.

4                    MR. CYR:  Right.  And I say

5          this respectfully, ma'am.  But it

6          does appear to me as though you're

7          trying to figure out what the

8          lawyer is saying, and I think your

9          job is just to interpret what he

10         said.

11                   INTERPRETER 1:  Of course.

12                   MR. CYR:  In this case, you

13         just need to say the words "Taihe

14         Group" in Chinese.

15                   MR. SEEGER:  He's right.  I

16         know you're getting confused by

17         the names of other things, but Mr.

18         Cyr is right.

19                   INTERPRETER 1:  Off the

20         record.  The reason is that

21         because he's also talking about

22         Taihe Group is referring to a

23         totally different thing.

24                   MR. CYR:  Okay.

1            INTERPRETER 1:  It is a
2        scattering of different companies
3        in this area called Taihe.  So I
4        want to clarify what it is --
5            MR. CYR:  No, he's --
6            INTERPRETER 1:  If I can
7        differentiate the two, then I
8        can --
9            MR. SEEGER:  No.  But you
10        know what?  By answering the
11        questions, I probably should --
12            INTERPRETER 1:  Of course
13        I'm doing verbatim, but with
14        verbatim, understanding the
15        background --
16            MR. SEEGER:  That's not what
17        I'm going to say.  Trust us on
18        this.  Okay?  I know that you're
19        concerned about a
20        miscommunication, and you have a
21        right to be, but I have to hear it
22        and then I'll ask a better
23        question.  But I think Mr. Cyr is
24        right that he's concerned that

```
 1              you're interpreting it, and he
 2              doesn't want you --
 3                   INTERPRETER 1:  I'm not
 4              trying --
 5                   MR. SEEGER:  Great.
 6                   INTERPRETER 1:  No, no, no.
 7              It is not my job.  I have never
 8              done this in the 20 years of my
 9              career.
10                   MR. SEEGER:  Okay.  No, no,
11              no.  You're doing a great job.
12                   INTERPRETER 1:  I just want
13              to clarify the concepts sort of --
14                   MR. SEEGER:  He wants to
15              make sure his witness testifies,
16              that's all.
17                   INTERPRETER 1:  Okay.  Good.
18      BY MR. SEEGER:
19           Q.   Okay.  Let me -- I'm going
20      to back up.  Okay?  When I refer to --
21              Tell the witness when I
22      refer in my questions to the Taihe Group,
23      I'm referring to a group of companies.
24      Is that his understanding?
```

```
 1              A.    Yes.
 2              Q.    Okay.
 3                    Is he aware of TG marketing
 4    itself as being a part of the Taihe
 5    Group?
 6              A.    Sometimes they did mention
 7    it like this.
 8              Q.    And why?  Why would TG
 9    mention itself in this way, so we
10    understand?
11              A.    This I also don't
12    understand, because more than ten years
13    ago, before I come, they did not do it
14    before.  After I come, I gradually,
15    they -- they don't call it this way.
16              Q.    Is it called anything at the
17    present?
18              A.    Taishan Gypsum.
19              Q.    Were there other --
20                    Other than TG, were there
21    other companies that he could identify
22    for us that were part of the Taihe Group
23    when it was known as the Taihe Group?
24              A.    I cannot say.
```

1          Q.     You cannot say?

2                 Are you aware that there is

3     currently still up a website that uses

4     the name Taihe Group, and it also, you

5     know, it shows it as -- I'm going to mark

6     it.  It's in English, though.  He's not

7     going to be able to read it.

8                 MR. CYR:  I don't mind you

9            asking him that question if you

10           want to do it that way.

11                        -  -  -

12                (Whereupon, Deposition

13           Exhibit Jia-8, Printout from

14           website, 2 pages, was marked for

15           identification.)

16                        -  -  -

17                MR. SEEGER:  I'm sorry, were

18           you talking to the witness?

19                INTERPRETER 1:  I'm

20           translating the question.  I never

21           talk to him.

22                MR. SEEGER:  I think we got

23           off track, that's all.

24                MR. CYR:  Yes.  I just want

1          to state for the record that as

2          you're asking him the question,

3          are you aware that there's a

4          website, and then you're handing

5          him a document that he can't read,

6          there is a suggestion to him that

7          the document that is being handed

8          to him somehow evidences the

9          website.  I'm hoping that you can

10         get through the questions without

11         doing that.

12              MR. SEEGER:  I'll tell you

13         what.  I don't really even have a

14         pending question on it.  I'm just

15         going to ask him.

16    BY MR. SEEGER:

17         Q.    So, ask Mr. Jia to please

18    take a look at what we've just marked as

19    Exhibit 8.

20         A.    (Witness complies.)

21         Q.    Now, Mr. Jia, you don't read

22    any English, right?

23         A.    I cannot read it.

24         Q.    Do you understand --

1                    Can you read the name
2    Taishan Gypsum in English if you saw it?
3    Would you understand that?
4            A.    It seems like to be it, but
5    I cannot be sure.
6            Q.    If you'd just point him to
7    the very first two words of the first
8    paragraph, would he understand that to
9    mean Taishan Gypsum?  Right, the very
10   first two words?
11           A.    I only recognize Taishan,
12   but I don't recognize the other words.
13           Q.    Could you go to the next
14   page, please, Mr. Jia.
15           A.    (Witness complies.)
16           Q.    And if you'd look at this
17   paragraph right here, the second
18   paragraph, Mr. Cyr, do you see your name
19   in that paragraph, Mr. Jia?
20           A.    Yes, I can see it.
21           Q.    Now, would you have any
22   understanding, sitting here today, as to
23   whether or not this is still up on the --
24   still available on the Internet, on the

1   website?  I mean, if I represent to you

2   that I just got this off the website a

3   couple days ago --

4           MR. CYR:  I'm okay with

5       that.

6           MR. SEEGER:  Okay.

7   BY MR. SEEGER:

8       Q.    -- would you dispute that I

9   was able to find this?

10      A.    I don't know.

11          MR. SEEGER:  I'm sorry, what

12      was the problem?

13          MR. CHEN:  The actual

14      question didn't get translated.

15          MR. SEEGER:  Okay.  So did

16      you get my whole question?  Would

17      you repeat it to Mr. Jia?

18          INTERPRETER 1:  I did

19      translate your --

20          MR. SEEGER:  Oh, Linda

21      missed it?

22          THE COURT REPORTER:  I'm

23      sorry, it's right here.

24                  -  -  -

1              (Whereupon, the requested

2         portion of the transcript was read

3         by the court reporter as follows:

4              "Q.   If I represent to you

5         that I just got this off the

6         website a couple days ago, would

7         you dispute that I was able to

8         find this?")

9                   -  -  -

10             MR. SEEGER:  That's the

11        question.

12             THE WITNESS:  I don't

13        understand English, and I have no

14        recollection of this.  I don't

15        know what is being written there.

16   BY MR. SEEGER:

17        Q.    But you do recognize -- I

18   know it's in English, but you recognize

19   your name on the second page, right, sir?

20        A.    Yes.

21        Q.    And it describes you on

22   this -- it's in English, but it describes

23   you as the general manager and chairman

24   of the board, so it accurately reflects

1    your name and title, correct?

2              MR. CYR:  I'm going to

3         object.  The witness has already

4         said he doesn't understand

5         English.

6              MR. SEEGER:  Would you let

7         him answer that, though?

8              MR. CYR:  Sure.

9              MR. SEEGER:  If he can.

10   BY MR. SEEGER:

11        Q.    You can answer.

12        A.    Well, what do I have to

13   answer?  I'm not sure.

14        Q.    Okay.

15              Let me back up and ask you

16   questions I asked earlier, but I wasn't

17   sure if we really answered.

18              Does TTP market itself, as

19   far as you know, as part of the Taihe

20   Group?

21        A.    According to my

22   understanding, everything, the TTP, TG,

23   Tai'an, and all the other companies under

24   Tai'an, they are all in general being

1    called Taihe.  And originally there is a

2    Taihe Dongxin -- originally they have --

3    there is a Taihe Dongxin, but later on

4    they deleted the word "Dongxin."

5          Q.    Do you know, Mr. Jia, if

6    BNBM marketed itself at any point as part

7    of the Taihe Group?

8          A.    It has never been the case.

9          Q.    Do BNBM and TG share any

10   production lines or facilities?

11         A.    Please repeat it.

12               MR. SEEGER:  (Addressing the

13         interpreter.)

14               Well, you can go ahead.  I

15         think that related more to you.

16         I'm off the hook on that one.

17               (Interpreter repeats

18         question.)

19               THE WITNESS:  No.

20   BY MR. SEEGER:

21         Q.    At any time, to your

22   knowledge, did BNBM and TG ever share any

23   employees?

24         A.    No.

1          Q.    To your knowledge, have

2     there been any loans or other financial

3     arrangements between BNBM and TG?

4          A.    No loan.

5                MR. SEEGER:  Excuse me?

6                INTERPRETER 1:  No loan.

7     BY MR. SEEGER:

8          Q.    I'm not sure I understand

9     the answer.

10                Are there any other

11     financial arrangements other than loans

12     between BNBM and TG?

13          A.    Financial arrangement, if

14     you translated it directly, I don't

15     understand.

16          Q.    Do BNBM -- I'm sorry, strike

17     it.

18                Does BNBM guarantee loan

19     obligations to banks on behalf of TG?

20          A.    Yes.

21          Q.    Has BNBM loaned money to TG?

22          A.    No.

23                MR. SEEGER:  I'm sorry, what

24          was the answer?

 1                    INTERPRETER 1:  No.

 2                    MR. SEEGER:  Excuse me.

 3    BY MR. SEEGER:

 4         Q.    Does TG guarantee loan

 5    obligations to any banks for TTP?

 6         A.    No.

 7         Q.    Does TG loan money to TTP?

 8         A.    I did answer before, no.

 9         Q.    Does TG continue to invest

10    money in TTP?

11         A.    No.

12         Q.    Does BNBM invest money --

13    continue to -- let me strike that.

14                    Does BNBM invest money in

15    TG?

16         A.    I don't understand the

17    question.

18         Q.    Okay.

19                    For any point in time, has

20    BNBM invested money in TG?

21         A.    It did buy shares from TG.

22         Q.    Was that the extent of its

23    investment?

24                    INTERPRETER 2:  The check

1    interpreter believes the

2    interpretation should be zhe shi

3    fou ni men de, tou zi, tg sou you

4    de tou zi.

5           INTERPRETER 1:  What the

6    check interpreter was interpreting

7    was that all of the investment to

8    TG.  I thought it was not the

9    question.  I disagree with the

10   check interpreter.

11          MR. SEEGER:  The question

12   that I asked -- you understood --

13   I don't even remember what the --

14                - - -

15          (Whereupon, the requested

16   portion of the transcript was read

17   by the court reporter as follows:

18          "Q.  For any point in time,

19   has BNBM invested money in TG?

20          A.  It did buy shares from

21   TG.

22          Q.  Was that the extent of

23   its investment?")

24                - - -

1              MR. CHEN:  My issue was the

2         translation of that last question.

3              MR. SEEGER:  Okay.  Okay.

4              So ask that question again.

5         Let me just see what the -- you

6         guys listen in.  Okay?  Ask the

7         same question.

8                   - - -

9              (Whereupon, the requested

10        portion of the transcript was read

11        by the court reporter as follows:

12             Q.   Was that the extent of

13        its investment?")

14                  - - -

15             THE WITNESS:  I don't

16        understand what you want me to

17        answer.

18   BY MR. SEEGER:

19        Q.   Other than purchasing the

20   shares, did BNBM invest any other money

21   in TG?  Did it provide it with money in

22   any other way?

23        A.   No.

24        Q.   And I'm going to reask the

1    question, because I think when I did ask

2    it, I didn't do a good job.

3         MR. CYR:  As you can see, I

4         don't have problems with you

5         asking the same question more than

6         once, because we do have some

7         uncertainties with respect to the

8         language.

9         MR. SEEGER:  And I'm

10        definitely signaling, I think I

11        asked it, but I'm not sure I asked

12        it the right way.

13   BY MR. SEEGER:

14        Q.   At any point in time, has TG

15   loaned money to TTP?  At any point in

16   time?

17        A.   No.

18        Q.   I'm going to ask another

19   series of questions.

20             Are there any employees,

21   including shareholders, officers or

22   directors of TG, that are paid or

23   compensated by BNBM?

24        A.   No.

1          Q.    Are there any employees,

2    shareholders, officers or directors of

3    TTP that are paid or compensated in any

4    way by TG?

5          A.    Please repeat it.

6                (The interpreter repeats the

7    question.)

8                No.

9          Q.    All right.

10                Do BNBM and TG share any

11    plants, factories or production lines?

12          A.    No.

13          Q.    Do BNBM and TG share any

14    operations together at all?

15          A.    Can you give me the

16    definition of the word "operation"?

17          Q.    Factory operations for the

18    production of plasterboard, let's say.

19          A.    No.

20          Q.    Do they share --

21                Does BNBM and TG share any

22    mining operations or mines from which

23    gypsum is mined?

24          A.    What mine?

1          Q.    You tell me.  That's my

2    question.  I'm asking if BNBM and TG

3    share the same mines for mining gypsum.

4          A.    No.

5          Q.    Do BNBM and TG share any of

6    the same product lines?  Do they make the

7    same products?

8          A.    No.

9                MR. CHEN:  Let me just

10          clarify.  The question translated

11          referred to production lines, not

12          product lines.

13                MR. SEEGER:  Production

14          lines, not what?

15                MR. CHEN:  Not product

16          lines.

17                MR. SEEGER:  Oh, I was

18          asking about products, specific

19          products.

20    BY MR. SEEGER:

21          Q.    Do they sell --

22                Do they make and sell

23    similar products?

24          A.    I don't understand.

1        Q.    Well, TG makes and sells
2    plasterboard.  Does BNBM make and sell
3    plasterboard?
4        A.    I don't understand the
5    meaning.
6        Q.    Which meaning?
7        A.    I don't understand your
8    concept, the meaning of what you're
9    talking about.
10       Q.    Does BNBM make and sell
11   products?
12       A.    Yes.
13       Q.    TG makes and sells products
14   also, correct?
15       A.    Yes.
16       Q.    Do they make and sell
17   similar products?
18       A.    What do you mean by -- what
19   is the concept "similar"?
20       Q.    Well, TG makes and sells
21   plasterboard, correct?
22       A.    TG has its own brand to sell
23   the plasterboard.
24       Q.    Okay.

1                    Does BNBM have their own

2    brand of plasterboard?

3         A.    Yes.

4         Q.    Are there any other

5    products, even though they have different

6    brand names, that TG makes that BNBM also

7    makes?

8         A.    No.

9         Q.    So, BNBM is a shareholder in

10   TG, correct?  I think we established

11   that.

12        A.    Yes.

13        Q.    How does BNBM get paid on

14   their investment in TG?

15        A.    Through the profit sharing

16   of dividends.

17        Q.    And is there a specific

18   agreement between BNBM and TG regarding

19   dividends, how they're paid, profit

20   sharing, anything of that nature?

21        A.    No agreement.

22        Q.    So then, how are they paid?

23   How does it work?

24        A.    Usually around March and

1    April, we would have dividends for the

2    year before.

3         Q.    And who determines what the

4    dividend is?

5         A.    So the dividend based on

6    like the TG dividend depends on every

7    year, how much profits they make, and

8    also how much TG would require for the

9    expansion of production.  So, they add up

10   all these factors to make a decision.

11        Q.    Is it a formula that gets

12   applied year after year the same way or

13   does it change from year to year?

14        A.    So, we have been doing this

15   with this method since we started the

16   joint venture.

17        Q.    But my question is, is it a

18   formula that is applied exactly the same

19   year, or does the formula determining

20   what the dividend is, you know, how much

21   they need to hold back, is that the same

22   every year?

23        A.    Yes.

24        Q.    Yes to which part?

1          A.    The procedures that you just

2    mentioned.

3          Q.    It's the same?  He's saying

4    it's the same every year?

5          A.    Yes.

6                MR. CYR:  I just want to

7          state for the record that saying

8          that the procedure is the same

9          every year is different than

10          saying that they use the same

11          formula every year.

12                MR. SEEGER:  Oh, I

13          understand that.

14    BY MR. SEEGER:

15          Q.    So, let me ask that question

16    of the witness.

17                So, although the procedures

18    are the same, does that require that the

19    formula change year to year?

20          A.    I did mention it.  Starting

21    from the year 2005 when we started to

22    cooperate, we have been operating like

23    this, and we have been doing the dividend

24    with this method.

1          MR. CHEN:  One moment.  Just
2     the term "fangshi" I think means
3     more of a way or a pattern.  Fang
4     shi is more a formula, as in a
5     mathematical formula.
6          MR. SEEGER:  Which one are
7     you using?
8          MR. CHEN:  You were using
9     way or pattern.
10          INTERPRETER 1:  No, no.  I
11     did use formula.  I did write it
12     down here even, sir.  Formula, I
13     did translate formula as formula
14     in Chinese.
15          But when he responded, he
16     said fangshi.  That's the method
17     or the way, fangshi.
18          MR. CHEN:  So, his response
19     was referring to the method or
20     pattern, not necessarily a
21     mathematical formula.
22          MR. SEEGER:  Okay.
23          INTERPRETER 1:  But I did
24     ask him the word "formula."

1    BY MR. SEEGER:

2              Q.    Mr. Jia, in answering a

3    couple of these questions, you referred

4    to the relationship between TG and BNBM

5    once as cooperative and another time as a

6    joint venture.  Can you explain what you

7    mean by that?

8              A.    Okay.  Let me say, to me,

9    cooperation and joint venture is the same

10   concept.

11             Q.    Okay.

12                   And I'm asking you if you

13   could elaborate on what you mean by a

14   joint venture between TG and BNBM.

15             A.    Okay.  After the procurement

16   of the shares of TG by BNBM, that

17   relationship, I call it a joint venture

18   or cooperation.

19             Q.    Can you explain --

20                   When you use the words

21   "cooperation" or "joint venture,"

22   whatever you're more comfortable with,

23   could you give me examples of the

24   relationship between BNBM and TG as a way

1    best to describe that cooperation or

2    joint venture between the two?

3           A.    Okay.  After BNBM procured

4    the shares from TG, according to my

5    understanding, that forms a relationship

6    of a joint venture.  And I was a

7    shareholder of TG before.  And even

8    earlier, I was a shareholder of BM.

9    According to my understanding, it become

10   a joint venture.

11              MR. CYR:  Is that accurate?

12              INTERPRETER 2:  The check

13         interpreter believes that after

14         BNBM purchased TG's shares, my

15         understanding is that it is a

16         cooperation relationship.  And I

17         was TG shareholder.  And before

18         that, I was BNBM shareholder.  So,

19         to me, it's like a joint venture.

20              INTERPRETER 1:  But he used

21         the joint venture in both times,

22         he zi instead of he zuo.  He zi is

23         cooperation.  I have he zuo both

24         times, so I disagree with the

1           check interpreter.

2                   MR. CYR:  When it's

3           convenient for you, I think it's

4           time for a break.

5                   MR. SEEGER:  Can I go five

6           more minutes?

7                   MR. CYR:  Yes.

8    BY MR. SEEGER:

9           Q.    Mr. Jia, do you own any

10   shares or stock in TG?

11          A.    I have shares.

12          Q.    Can you tell me what

13   percentage of the outstanding shares he

14   owns?

15                  MR. PANAYOTOPOULOS:

16          Objection to the form.

17                  MR. SEEGER:  You're right.

18          Let me rephrase it.  Okay?  Let me

19          ask the question again.

20   BY MR. SEEGER:

21          Q.    Mr. Jia, what percentage of

22   the outstanding shares of TG do you own?

23          A.    5 percent.

24          Q.    What percentage of the

1    outstanding shares of TTP do you own?

2          A.    I don't have any.

3          Q.    And do you own any shares in

4    BNBM?

5          A.    I don't.

6                MR. SEEGER:  Do you want to

7          take a break?

8                MR. CYR:  Yes.

9                THE VIDEOTAPE TECHNICIAN:

10         The time now is approximately

11         3:13 p.m., and we are now off the

12         record.

13                    -  -  -

14                (Whereupon, a recess was

15         taken from 3:13 p.m. until

16         3:30 p.m.)

17                    -  -  -

18                THE VIDEOTAPE TECHNICIAN:

19         This begins Tape 6 of today's

20         videotape deposition.  The time

21         now is approximately 3:30 p.m.,

22         and we're back on the record.

23    BY MR. SEEGER:

24         Q.    Mr. Jia, I think you

1    acknowledged this in your earlier

2    testimony, that TTP is an important asset

3    of TG.  Is that fair to say?

4            A.    Unfair.

5            Q.    Unfair?

6                  INTERPRETER 1:  Yes.

7    BY MR. SEEGER:

8            Q.    Does he want me to ask him

9    the question a different way?

10           A.    It is more appropriate to

11   say is it an important subsidiary.

12                 MR. SEEGER:  Okay.

13                 MS. BASS:  An important

14        what?

15                 MR. SEEGER:  Subsidiary.

16        I'll rephrase the question that

17        way.

18   BY MR. SEEGER:

19           Q.    You would acknowledge that

20   TTP is an important subsidiary of TG,

21   correct?

22           A.    Correct.

23           Q.    Who at TG is responsible for

24   overseeing the business and the

1    management of TTP, if anyone?

2           A.    The director.

3           Q.    And can you identify that

4    person by name?

5           A.    Peng Shi Liang.

6           Q.    Why don't we go ahead with

7    the piece of paper and have him write it

8    down.  Can you give him a piece of paper,

9    please?

10          A.    I have written down that

11   name.

12          Q.    Okay.

13                Could you tell me which

14   exhibit his name is on?  We've got a few

15   here.

16          A.    This one.

17                MR. SEEGER:  Okay.

18                Just tell me the exhibit

19         number.

20                INTERPRETER 1:  Exhibit

21         Number 4.

22   BY MR. SEEGER:

23          Q.    Okay.

24                And how long has this

1    gentleman been in this position as a

2    director?

3           A.    Since the establishment of

4    TTP, he has been in this position.

5                 MR. SEEGER:  Are you done?

6                 INTERPRETER 1:  Yes.

7    BY MR. SEEGER:

8           Q.    So, this person, the

9    director -- I'm sorry, what is his name

10   again?

11                INTERPRETER 1:  Peng Shi

12          Liang.  P-E-N-G, S-H-I, L-I-A-N-G.

13   BY MR. SEEGER:

14          Q.    This person, Peng Shi Liang,

15   his name is noted on Exhibit 4, he has

16   been a director at TG, I'm sorry, for how

17   long?  I lost track.

18          A.    He has always been in this

19   position.

20          Q.    Okay.

21                I'm sorry.  I'm asking him

22   the question again, because some of us --

23   and I'm not even clear if I was clear in

24   my question.

1          The person listed on Exhibit

2   4, Peng Shi Liang, is he a director of TG

3   or TTP?

4          A.    He is a chairman of the

5   board of TTP.

6          Q.    What I was asking, and I

7   want to be clear on this.  I would like

8   to know who, if anyone, is the person at

9   TG who takes on, you know, not day-to-day

10   responsibilities, but is responsible for

11   monitoring the business and activities of

12   TTP.

13          A.    No.  He's responsible for

14   everyday activities.

15          Q.    Who is the "he" in that

16   sentence?

17          A.    Peng Shi Liang.

18          Q.    He is an employee also with

19   TG?

20          A.    Yes.

21          Q.    And he's an employee with

22   TTP?

23          A.    Yes.  He is.

24          MR. CYR:  I just want to

1       state for the record, there could
2       be some confusion.  I believe he's
3       testified that he was a director
4       at TTP.  I'm not sure that his
5       testimony really is that he was an
6       employee.  Thank you.
7            You don't need to translate.
8       I'm not trying to educate the
9       witness.
10           MR. SEEGER:  It was your
11      witness that was speaking.
12                -  -  -
13           (Whereupon, there was an
14      off-the-record discussion between
15      the witness and his counsel.)
16                -  -  -
17           MR. SEEGER:  I just want to
18      note for the record, there's a
19      dialogue going on between the
20      witness and some of the attorneys.
21           MR. CYR:  It might be
22      helpful in that Mr. Jia is
23      concerned that some of your
24      questions and some of his answers

1     might not have the -- the time

2     period might be a factor in what

3     the answers are.

4          I have been listening to the

5     questions.  They seem to be asking

6     questions about the current time

7     period, and so I've been

8     comfortable with that.  But he is

9     concerned, he wants to make sure

10    he's giving you accurate answers

11    with respect to the time period

12    that you're referring to.

13         MR. SEEGER:  All right.

14    Fair enough.  I mean, I just want

15    to note that several times I have

16    asked Mr. Jia some questions, and

17    he had corrected me and asked me

18    for a time frame.  He didn't do it

19    this time.  But I accept -- if

20    that's what he's asking for now,

21    I'm happy to do it.  But he didn't

22    ask for that in response to this

23    question before the dialogue with

24    counsel, so --

1            MR. CYR:  I'm sorry.  I have

2       no idea what the purpose of that

3       comment was.  We have a witness

4       here who is trying to make sure

5       that his answers are accurate, and

6       he's actually helping out.  If you

7       think there was some attempt --

8            MR. SEEGER:  Well, you must

9       have the impression I accused you

10       of something.  I didn't accuse you

11       of anything.

12            MR. CYR:  It sounds like

13       you're suggesting there was some

14       manipulation.  It was quite to the

15       contrary.

16            We're ready for your next

17       question.

18            MR. SEEGER:  I don't think

19       you should be so defensive.  I

20       think all I'm stating is that you

21       had a dialogue and now you're

22       saying the witness needs some

23       clarification of the question.

24       That's all.  That's what happened.

1          MR. CYR:  We're ready.

2          MR. SEEGER:  So, I'm not

3     sure where to go with this.  Do

4     you want -- does the witness want

5     to ask me a question?

6          MR. CYR:  No.  The witness

7     is ready for your next question.

8          MR. SEEGER:  Okay.  Thank

9     you.

10  BY MR. SEEGER:

11      Q.   Mr. Jia, does CNBM, and just

12  to be clear, when I refer to CNBM, I'm

13  referring to China National Building

14  Material Company Limited, own an interest

15  in BNBM?

16          INTERPRETER 2:  The check

17     interpreter may raise that in

18     Chinese?

19          MR. SEEGER:  Could you tell

20     me -- could you state for all us

21     of what the issue is?

22          INTERPRETER 2:  Interest,

23     the interpreter's interpretation

24     of interest is clearly purely

1          benefit, but the interest may be

2          an equity.

3               INTERPRETER 1:  It is not

4          for us to make that judgment.  I'm

5          just doing verbatim.

6               MR. CYR:  Thank you very

7          much.  We're ready to proceed.

8               MR. SEEGER:  I'm going to

9          change the question.

10    BY MR. SEEGER:

11          Q.    Mr. Jia, does CNBM, and by

12    that I mean, you know, I want to be clear

13    for the question, China National Building

14    Material Company Limited, own shares in

15    BNBM?

16          A.    Yes, it owns.

17          Q.    Does CNBM own shares in TG?

18          A.    No.

19          Q.    Does TG sell or market

20    drywall to the U.S.?

21          A.    This I cannot confirm.

22          Q.    Can you tell me why you

23    cannot confirm it?

24          A.    In the year 2005, around the

1    end of that year, people who are in

2    charge of the sales told me there's a

3    possibility for some U.S. customers to

4    come for orders where we'll produce some

5    of the drywall for them.  But when -- how

6    they are going to sell it, whether they

7    are going to sell it to the United States

8    or they're going to sell it to outside

9    the United States, that I don't know.

10            Q.    But you do know --

11                  MR. CHEN:  Objection.  I

12            just want to note that the

13            interpretation is all in the

14            plural relating to customers,

15            orders and such, and the answer

16            was -- didn't reflect -- Chinese

17            doesn't clearly reflect either

18            plural or singular.

19                  INTERPRETER 1:  So it is up

20            to the judgment of the lawyers or

21            follow up with another question.

22            We are not going to make that

23            judgment.

24                  MR. SEEGER:  Well, you've

1           noted that.  You know, you have
2           the errata.
3                MR. CYR:  That's all we're
4           asking to do.  And we're ready.
5  BY MR. SEEGER:
6           Q.    Okay.
7                But my question, to be
8  clear, is that TG did market for the sale
9  of drywall in the U.S., correct?  They
10  marketed in the U.S.?  Is that correct or
11  not?
12                MR. CYR:  Objection.  The
13           question is leading.
14                INTERPRETER 1:  I haven't
15           finished translating the question
16           yet.
17                MR. CYR:  Objection.  The
18           question is leading.
19                You may try to answer the
20           question, Mr. Jia.
21                THE WITNESS:  We produced
22           the drywall.  It is of --
23                MR. SEEGER:  I'm sorry, was
24           he finished with his question,

1    because he --

2         INTERPRETER 1:  I want him

3    to pause so I don't miss anything.

4    I want him to pause.

5         MR. SEEGER:  Okay.

6         But you have to go back and

7    let him finish his answer.

8         INTERPRETER 1:  Yeah, right.

9    True.

10        THE WITNESS:  We produced

11   the drywall.  And it is a very

12   heavy item, and they have to ship

13   it to a very far away places.  The

14   costs would be very high.  If

15   there is a customer tell us that

16   they want to sell it to the United

17   States, I wouldn't believe it,

18   because the cost would be too

19   high.  We have no plan to enter

20   the U.S. market.

21   BY MR. SEEGER:

22        Q.   All right.

23              -  -  -

24        (Whereupon, Deposition

1    Exhibit Jia-9, Taishan Ceiling and

2    Wall System, Bates stamped TG

3    0025132 through TG 0025151, TG

4    0025155 through TG 0025158, TG

5    0025216 through TG 0025218, TG

6    0025253 through TG 0025255, TG

7    0025275, TG 0025329 through TG

8    0025332, TG 0025344 through TG

9    0025349, and TG 0025397 and TG

10   0025398, was marked for

11   identification.)

12                  -  -  -

13       MR. CYR:  I need one in

14   English, right?

15       MR. GRAND:  It is actually

16   both.

17       MR. CYR:  Excuse me.  Is it

18   both?

19       MS. BASS:  What are we

20   marking, please?

21       MR. SEEGER:  For the record,

22   the document I believe we've just

23   marked as Exhibit 9 is Bates

24   stamped TG 0025132 through --

1           MS. BASS:  25132?

2           MR. SEEGER:  Right.  Through

3      398.

4   BY MR. SEEGER:

5           Q.    The cover says "Taishan

6   Ceiling and Wall System," and there's

7   some Chinese, and below it is the

8   trademark for Taishan Gypsum Company Ltd.

9           Mr. Jia, do you recognize

10  this document?  Can you identify it by

11  the record as a company document -- for

12  the record as a company document?

13          A.    That is an introduction of

14  our company, a brief introduction.  It is

15  also an introduction of our products, a

16  basic introduction of our product.

17          Q.    Okay.

18          And you do acknowledge, this

19  is a document created by the company?

20  It's a Taishan -- it's a TG-created

21  document, correct?

22          A.    Yes.

23          Q.    And if you'd look on the

24  second page, that's -- again, that's your

1    picture there, right?

2         A.    Yes.

3         Q.    Now, I was asking you

4    questions about the company marketing in

5    the U.S.  Do you recall those questions?

6         A.    Yes.

7         Q.    And the document I put in

8    front of you is both in Chinese and

9    English.  You see that, correct?

10        A.    Yes.

11        Q.    I want to just point out to

12   you where I'll be reading so you can find

13   it.  I'm going to be reading in this area

14   here.  So, you can find the Chinese that

15   goes along with it.

16             MR. CYR:  If you could just

17        hold for a minute.

18             MR. SEEGER:  Sure.

19             MR. CYR:  Eugene, could you

20        tell Mr. Jia just to read this

21        last paragraph here and then get

22        ready for the question.

23             MR. CHEN:  Can we tell him

24        which paragraph you are starting

1        with?

2              MR. SEEGER:  The one in

3        English.  Yeah, that's it.

4              MR. CYR:  This one here,

5        which I imagine is this here.

6              MR. CHEN:  It's the last

7        paragraph?

8              MR. SEEGER:  Yeah.

9              MR. CYR:  Tell us when he's

10       ready for the lawyer's next

11       question.

12             Ready?  Thank you.

13             MR. SEEGER:  No problem.

14   BY MR. SEEGER:

15       Q.    Mr. Jia, if you can look at

16   the paragraph where you were, about

17   halfway through it, I'll read the English

18   portion, maybe --

19             MR. SEEGER:  I don't know

20       how you want to help him find it

21       in Chinese, but I don't mind if

22       one of your people want to point.

23             MR. CYR:  I think the best

24       way is to have the interpreter

1          interpret what you say.

2                    MR. SEEGER:  And let him try

3           to find it in the paragraph.  If

4           he can't, I don't have a problem

5           with somebody pointing it out.

6     BY MR. SEEGER:

7           Q.    There's a section here where

8     it says, "We have a self-supported" --

9     right where your pen is.  I'm going to be

10    reading right in this area.  It says, it

11    starts off, "We have a self-supported

12    import and export."

13                    Do you see where I am?

14          A.    Yes.

15          Q.    Read along with me.

16                    For the record, it says, "We

17    have a self-supported import and export

18    approval, our products not only sell well

19    in our domestic market also export to

20    many countries," for example, "U.A.E.,

21    Indonesia, India, Russia, U.S.A., etc.

22    'Taishan' series gypsum board has

23    passed," and it talks about "ISO9001-2000

24    quality system authorization and

1    certificate of 'Green Building

2    Material,'" so on and so forth.

3                MR. SEEGER:  Can you point

4          out in Chinese the area where I

5          was reading?

6                INTERPRETER 1:  I have to

7          find it.

8                MR. CYR:  I just want to

9          say, I think he's just read that

10         paragraph, so he's comfortable --

11               MR. SEEGER:  He's okay with

12         that?

13               MR. CYR:  I think we can go

14         with your question.

15               MR. SEEGER:  The document,

16         does it -- well, it's hard for me

17         to ask if what I just read

18         accurately, but --

19   BY MR. SEEGER:

20         Q.    What I would like him to --

21   if you can point out to him the part in

22   Chinese that I read, I want -- my

23   question to him is, is that an accurate

24   statement of the company's efforts for

1    marketing and selling product in the

2    U.S.?

3              MR. CYR:  Excuse me.  I

4         don't know what she's doing.  I'm

5         not sure what the contribution

6         here is.

7              MR. SEEGER:  She's just

8         verbatim reading it.

9              MR. CYR:  I'm sorry.  I'm

10        going to have to object to this.

11        One question would be whether or

12        not that's an accurate translation

13        in English.  A separate question,

14        which is the one I think you

15        asked, is whether or not this

16        accurately reflects Taishan

17        Gypsum's marketing efforts and

18        things like that.  And I just want

19        to --

20             MR. SEEGER:  In the U.S.

21             MR. CYR:  Yeah, in the U.S.

22             And, again, we don't need to

23        interpret what I've just said.

24        I'm not trying to manipulate

1        anything.

2              MR. SEEGER:  Fair enough.

3    BY MR. SEEGER:

4        Q.    Let me ask the question this

5    way.

6              The paragraph that Mr. Jia

7    was asked to read, Mr. Jia, can you tell

8    me if that accurately reflects the

9    company's marketing and selling practices

10   with regard to the United States?

11       A.    Do I have to answer?

12       Q.    Yes.  I'm sorry.

13       A.    This document was printed

14   after the year 2009.  It reflects the

15   current situation of TG.

16       Q.    Okay.

17             So, that document was

18   produced in 2000 -- I'm sorry, after

19   2009?

20             INTERPRETER 1:  After 2009,

21        right.

22   BY MR. SEEGER:

23       Q.    Could you take a look at

24   what we've marked as Exhibit 2, Mr. Jia,

1    and tell me what time frame that document

2    covers?

3            A.    It is possible that this

4    document was before the year 2008.

5            Q.    And it's possible --

6                  Is it possible that it could

7    have gone back as far as 2005?

8                  Could you ask -- I'm sorry,

9    Mr. Jia, is it possible that that could

10   go back as far as 2005?

11                 MR. CYR:  Objection, asking

12          the witness to speculate.

13                 THE WITNESS:  But I cannot

14          confirm what time period it is for

15          this document.

16   BY MR. SEEGER:

17           Q.    Do you have an opinion, can

18   you express an opinion, and if you can't,

19   that's fine, but can you express an

20   opinion as to the earliest that document

21   might go back?

22                 MR. CYR:  Same objection.

23                 You can answer, Mr. Jia.

24                 THE WITNESS:  Okay.  At the

1          end of the year 2007, Shandong

2          Taihe Dongxin Company Limited

3          changed the name into TG.  All the

4          original documents for external

5          use has to be updated, because the

6          name is no longer matching.

7     BY MR. SEEGER:

8          Q.    So but the document that's

9     marked as Exhibit 2, Mr. Jia, shows the

10    current name -- I'm sorry, shows the

11    former name, correct, of the company?

12         A.    Yes.

13         Q.    And is it possible that that

14    was still the name of the company when

15    that document was created?

16         A.    I don't understand what you

17    mean.

18         Q.    Is it possible that that

19    document could be dated prior to the name

20    change?

21         A.    Yes.

22         Q.    And it's got the logo, the

23    Taihe Group logo, up at the upper

24    left-hand corner, right?

1          A.     Yes.

2          Q.     Sir -- I'm sorry, I didn't

3    mean to cut you off.

4               Mr. Jia, would you please go

5    to Page 2 of the document that's in front

6    of you, Exhibit 2.  And can you find on

7    that page in Chinese -- and I know that

8    that's not a great copy.  I have a better

9    copy in front of me, in fact, if you'd

10   like to look at the better copy.

11              MR. CYR:  Let's do that.

12              MR. SEEGER:  This is

13         somebody else's.  If you could

14         just --

15              MR. GRAND:  We can replace

16         it.

17              MR. SEEGER:  I'll replace

18         it.  So, we'll leave this as the

19         exhibit for now, if that's okay.

20              MR. CYR:  Yeah.  I just want

21         to be able to read.

22              MR. SEEGER:  Yeah, exactly.

23         And this is a better copy for him.

24   BY MR. SEEGER:

```
 1              Q.    Now, in Exhibit 2, which is
 2   a document that you acknowledge could be
 3   dated, you know, could be back from the
 4   time when the company had a different
 5   name, which was Shandong Taihe Dongxin,
 6   do you find the same language I just read
 7   to you as Exhibit 9?
 8              INTERPRETER 1:  Counsel, I
 9         don't understand what you mean by
10         "find the same language."
11   BY MR. SEEGER:
12              Q.    Exhibit 2, do you see
13   exactly --
14              The identical language that
15   we read in Exhibit 9 with regard to
16   marketing and selling in the U.S., don't
17   you see the identical language in Exhibit
18   2?
19              MR. CYR:  I know you didn't
20         intend to.  I'm just going to
21         object in that I'm not sure that
22         the words here are consistent with
23         your phrase "marketing and selling
24         in the U.S."  There's no -- I have
```

1           no need for the interpreter to

2           interpret what I just said except

3           for to say that, Mr. Jia, you can

4           try to answer the question.

5               MR. SEEGER:  Okay.

6               Would you also tell him that

7           he should feel free to put Exhibit

8           9 and Exhibit 2 in front of him,

9           and he can check the language in

10          both if he'd like.

11              MR. CYR:  I say this

12          respectfully in the interest of

13          advancing time, but the documents

14          do speak for themselves.  And

15          having him give his opinion about

16          whether or not it is the same

17          language, I'm just questioning

18          whether that's the best use of our

19          time.

20              MR. SEEGER:  Well, since

21          it's my time --

22              MR. CYR:  It's your time.

23              THE WITNESS:  I am finished

24          looking at it.

```
 1    BY MR. SEEGER:
 2         Q.    It's pretty much the same
 3    language in both documents, correct,
 4    regarding exporting drywall to the U.S.?
 5         A.    Yes.
 6         Q.    Actually, there's one other
 7    part of this, Mr. Jia, I want to ask you
 8    about.  I'm sorry.
 9              Again, I'm showing you
10    what's been marked as Exhibit 2.  Could
11    you please take a look at -- and I have
12    no problem if your team wants to help him
13    with this.  In English, the paragraph
14    starts with, "It is abundant in raw
15    gypsum resources."  The Chinese portion,
16    if you can point out to him.
17              MR. CYR:  So, right now
18         we're asking Mr. Jia to read --
19         excuse me, ma'am.
20              Right now we're asking Mr.
21         Jia to read this paragraph to
22         prepare for the next question.
23              (Mr. Chen translated to the
24         witness.)
```

1          MR. CYR:  He doesn't seem to

2     understand.

3          MR. CHEN:  You asked him to

4     read, right, to prepare for the

5     next question?

6          MR. CYR:  Yes.

7          Why is she talking with him?

8          MR. CHEN:  I don't know.

9          MR. SEEGER:  They gave him

10     the instruction.  It's okay.

11          INTERPRETER 1:  He wants to

12     clarify.  Does that mean just look

13     at it or to read it out, say it

14     out loud?

15          MR. SEEGER:  You tell him to

16     read it.  He doesn't understand.

17          THE WITNESS:  I finished

18     reading it.

19  BY MR. SEEGER:

20          Q.    Mr. Jia, in that paragraph,

21  in the English version, it says, and, you

22  know, I'm just -- there's a small part at

23  the end, but I have to read it to put it

24  into a context.  "It is abundant in raw

1    gypsum resources, the products 'Taishan'

2    series plasterboard can be used as

3    partition and ceiling material...have

4    advantages:  Fire-proof, sound

5    insulation, heat preservation,

6    quakeproof, and good for health."

7              And could you tell me where

8    your company -- what your company means

9    by the drywall being "good for health"

10   and why that was used here, if you can?

11              MR. CYR:  Before you get to

12         that, are you done?

13              INTERPRETER 1:  Yes.

14              MR. CYR:  I guess I have an

15         objection based on it seems like

16         it's outside the scope of the

17         designated areas for the

18         deposition.

19              MR. SEEGER:  It is a

20         statement made by the company.

21         That's my one question on this

22         document.

23              Did you have another issue?

24              MR. CYR:  Well, let's not

1          skirt over my issue so quickly.

2                MR. SEEGER:  I don't think

3          you can stop him from answering

4          that, and rather than argue with

5          you, I figured I'd just --

6                MR. CYR:  What I was going

7          to suggest is that I just wanted

8          to make sure that it didn't become

9          a habit.  It's clearly outside the

10         scope of this deposition.  I have

11         no problems with his answering

12         this question.

13               MR. SEEGER:  Okay.

14               MR. CYR:  But generally, we

15         would like to stay on the

16         jurisdictional issues and the

17         other issues of the designated

18         areas that you've been covering

19         all day.

20               Go ahead.

21               MR. CHEN:  I'll also note

22         that the interpreter was

23         translating from your statement

24         rather than referring to the

1        actual text here, referenced here.

2             MR. SEEGER:  So --

3             MR. CYR:  We didn't mean to

4        slow you down.  Go ahead.

5             MR. SEEGER:  No, that's

6        actually -- I just don't

7        understand.

8             When I was reading it, was

9        she reading it to him?

10            MR. CHEN:  No.  Just now

11       when you asked the question, she

12       did a verbatim translation rather

13       than referring to what is written

14       in the Chinese.

15            MR. SEEGER:  Okay.  Because

16       I was reading the English portion

17       into the record.  Okay.  So,

18       that's okay.  We'll fix it.  That

19       was my fault.

20            MR. GRAND:  Just to your

21       statement, your objection, the

22       witness has been designated to

23       testify about marketing plans for

24       Taishan Gypsum.  This is a

1           statement in a marketing document.

2           It contains marketing statements

3           about its exports to the U.S.  So,

4           we don't believe it's -- I

5           appreciate that we're not -- I

6           appreciate your position about it

7           being outside the scope, but we

8           think it's fair balance within a

9           statement that he has given.

10              MR. CYR:  We disagree, but

11          I'm allowing the witness to answer

12          the question.

13   BY MR. SEEGER:

14          Q.    Okay.

15              So, here's where we are.  I

16   read into the record, Mr. Jia, the part

17   in English.  You've already looked at the

18   part in Chinese.  There's a statement in

19   there about plasterboard being good for

20   the health, and I'm asking you if you

21   have any understanding of why that

22   statement's in there and what the company

23   meant by it?

24              MR. CHEN:  I'm going to

```
 1          object again.  She's translating
 2          "good for your health" as opposed
 3          to referring to what's in the
 4          actual text.  "Good for your
 5          health."  So --
 6               MR. SEEGER:  Well, let me
 7          ask you a question.  Does the
 8          Chinese say the same thing?
 9               INTERPRETER 1:  Yes.
10          Because I was telling him --
11               MR. CYR:  I'm sorry, he
12          asked him a question.  Ma'am,
13          ma'am, he asked him a question.
14               MR. SEEGER:  She's just
15          trying to help.  Okay.
16               MR. CHEN:  She's not
17          giving -- she's not reading the
18          text in the document.  She's doing
19          a separate translation.
20               MR. SEEGER:  But he read it
21          already, and you objected when we
22          asked him to read it.  So, that's
23          why I didn't ask him to do it
24          again.
```

1           MR. CHEN:  Right.  But what
2      I'm noting is, you're asking now
3      about what certain text means.
4           MR. SEEGER:  Right.
5           MR. CHEN:  And instead of
6      referring to the text, she is
7      translating separately the words
8      that you're using.
9           MR. SEEGER:  Okay.  Do me a
10      favor.  I'm going to ask him my
11      question, but just show him the
12      language in the document in
13      Chinese.
14  BY MR. SEEGER:
15      Q.    And my question is, what is
16  the company -- what is his understanding
17  of the basis for making the statement
18  that plasterboard is good for your
19  health?  But just show him the Chinese
20  language in the document and ask him that
21  question that way.
22           INTERPRETER 1:  I was doing
23      verbatim.
24           MR. SEEGER:  Okay.  I

1          believe you.

2                  INTERPRETER 1:  Because he

3          read it before.  He read it.

4                  Okay.  Counsel, would you

5          mind help me, where does it begin?

6          Because I didn't have the document

7          in front of me when both of you

8          were reading.  I did not have the

9          document in front of me when both

10         of you were reading.  Do you want

11         to help me where?

12                 MR. SEEGER:  It's this one.

13                 THE WITNESS:  (Indicating.)

14                 MR. SEEGER:  Yes.  He knows

15         where it is.

16    BY MR. SEEGER:

17         Q.    My question is, what was the

18    basis, what's the company's basis, based

19    on his understanding, for making the

20    statement that plasterboard is good for

21    the health?

22                 MR. CHEN:  Objection again.

23         She's translating verbatim, and

24         she's not referring to the text in

1          the document.

2                    INTERPRETER 1:  That is what

3          a legal interpreter is supposed to

4          be doing.  She's supposed to do

5          verbatim, nothing more.  If

6          there's anything unclear, it's up

7          to the lawyers to follow up.  I

8          don't add or drop anything from

9          what I hear.

10                   MR. CYR:  Can I help?

11                   INTERPRETER 1:

12         Particularly, I don't have the

13         document in front of me.

14                   MR. CYR:  Excuse me, ma'am.

15         Could you ask Mr. Jia if he's able

16         to answer the question?

17                   THE WITNESS:  I can totally

18         be able to answer.

19                   MR. CYR:  Please do before I

20         shoot myself.

21    BY MR. SEEGER:

22         Q.   Go ahead, answer.

23                   INTERPRETER 1:  Because of

24         the accent personally, I need to

1          clarify.  SIR, we have different

2          accent.

3               THE WITNESS:  Regarding the

4          material in China that I can't --

5          I will be able to be in context

6          regarding the introduction of the

7          material of the drywall regarding

8          the characteristic referring to

9          some chemical components.

10         Regarding the drywall, a main

11         component is CASO4.2H2O.

12         CASO4.2H2O is neutral.  It's

13         either acid or alkaline of the

14         drywall.  The wall made out of it,

15         when it is in contact with the

16         human skin, it doesn't affect the

17         skin like the cemented walls

18         affect the human beings because of

19         the acid and the alkaline nature.

20         And also with the drywall, it

21         contained, too, crystalized H2O.

22         Inside the drywall, there is 17

23         percent of the H2O, and when the

24         temperature is high, the water

1          dissipated.  So, when the

2          temperature is low, it absorbed

3          humidities from the air.

4               So, because of this nature,

5          because of this phenomena,

6          therefore, it can adjust to

7          humidity and also the temperatures

8          inside this room regarding the

9          air.  Therefore, in general,

10         people believe that the houses

11         built with the drywall is more

12         suitable for human accommodation.

13         That is the reason why for more

14         than 100 years that the developed

15         country and the poor country, they

16         use the drywall.  Well, in my

17         opinion, the way we write down

18         this document, we did not

19         exaggerate.

20              MR. CYR:  Can we take a

21         break?

22              MR. SEEGER:  Yeah.

23              THE VIDEOTAPE TECHNICIAN:

24         The time now is --

1            MR. CYR:  Let's have it be a

2       short one, because we're going to

3       finish up at 5:00, so we'll be

4       back in seven, eight minutes, just

5       to go to the bathroom.

6            THE VIDEOTAPE TECHNICIAN:

7       The time now is approximately

8       4:20 p.m., and we are now off the

9       record.

10                    - - -

11            (Whereupon, a recess was

12       taken from 4:20 p.m. until

13       4:35 p.m.)

14                    - - -

15            THE VIDEOTAPE TECHNICIAN:

16       This begins Tape 7 of today's

17       deposition.  The time now is

18       approximately 4:35 p.m., and we're

19       back on the record.

20  BY MR. SEEGER:

21       Q.    Mr. Jia, do you know who

22  Peng Wenlong is?

23       A.    I know.

24       Q.    Could you tell me who he is,

1    what his role is at TG?

2         A.    He is now the manager of the

3    foreign trade company of TG.

4                   INTERPRETER 2:  The check

5              interpreter believes the witness

6              said foreign trade department.

7                   THE WITNESS:  To me, it is

8              the same thing.

9    BY MR. SEEGER:

10        Q.    As far as you know, has he

11   held any other positions in TG?

12                   At any point in time, do you

13   know the other positions he may have

14   held?

15        A.    I cannot recall, but there

16   should be none.

17        Q.    Does Peng Wenlong hold any

18   positions with TTP?

19        A.    He was -- probably worked

20   for the sales of foreign trade.

21        Q.    For TTP, correct?

22        A.    Yes.

23        Q.    And are you aware of him

24   having a formal title at TTP?

```
 1              A.    I don't recall.
 2              Q.    Do you know how long Mr.
 3   Peng Wenlong has been at TTP as an
 4   employee or an officer, director,
 5   whatever his title is?
 6              A.    I cannot tell exactly.  It's
 7   around more than one year.
 8              Q.    And how long, if you know,
 9   how long has he been an employee of TG?
10              A.    I cannot tell exactly how
11   long.  It's around more than five years.
12              Q.    Do you know who Bill Cher
13   is?  Do you know who Bill Cher is?
14              A.    I don't know who you're
15   referring to.
16              Q.    Do you know who Apollo Yang
17   is?
18              A.    I know who he is.
19              Q.    Could you identify him?  Who
20   is he, what is his role?
21              A.    He is one of the employees
22   of the company, but I'm not sure what
23   role he plays.
24              Q.    Is the company that he's
```

```
 1    referring to TG?
 2           A.    He did work for TG company.
 3           Q.    Do you know if he worked for
 4    TTP?
 5           A.    That I am not sure.
 6           Q.    Do you know who the --
 7                 Do you know the company Rich
 8    Well?  Does he know that company?
 9           A.    I don't know.
10                 MR. CHEN:  She gave the
11           English name of Rich Well.
12                 MR. SEEGER:  Right.
13                 MR. CYR:  I would ask it
14           again.
15                 MR. SEEGER:  I trust him.
16                 MR. CHEN:  Well, no, because
17           it doesn't have a...
18                 MR. CYR:  You can either ask
19           him again now or I'll ask him at
20           the end of the day tomorrow.  It's
21           up to you.
22                 MR. SEEGER:  I'll clear it
23           up now.
24                 MR. CHEN:  Rich Well has a
```

1              Chinese name.
2                      MR. SEEGER: I got it from a
3              website.  So what is the --
4                      MR. CHEN:  The Chinese name
5              is Yu He.
6   BY MR. SEEGER:
7              Q.   Does he know of the company
8   Yu He?
9                      INTERPRETER 2:  The check
10             interpreter can tell, Rich Well's
11             Chinese name is Yu He, Y-U H-E.
12                     THE WITNESS:  I know, but
13             I'm not familiar with the overall
14             of this company.
15  BY MR. SEEGER:
16             Q.   Are you familiar with any
17  products that they make?
18             A.   He has been one of the
19  shareholders of our company called Jiang
20  Yin Taishan Company.
21                     MR. CYR:  They can give her
22             the proper spelling if you'd like.
23                     MR. SEEGER:  I appreciate
24             that.  I just didn't understand

1           the answer, if you don't mind

2           giving it to me from the

3           beginning.

4                        -   -   -

5           (Whereupon, the requested

6           portion of the transcript was read

7           by the court reporter as follows:

8           "A.   He has been one of the

9           shareholders of our company called

10          Jiang Yin Taishan Company.")

11                       -   -   -

12   BY MR. SEEGER:

13          Q.   Which company?  I don't

14   understand.  When he says he has been a

15   shareholder -- I'm sorry.  I couldn't get

16   the answer.  Let me follow up.  Give me a

17   second.  "He has been one of the

18   shareholders" --

19          MR. CHEN:  The translation

20          should have been "it" has been one

21          of the shareholders, not "he."

22   BY MR. SEEGER:

23          Q.   Who is the "it" in the

24   sentence, "it has been one of the

1    shareholders" of our company?

2              MR. CYR:  Rich Well.

3              MR. SEEGER:  Rich Well.

4              MR. CYR:  Yes.  And that is

5         a company.

6    BY MR. SEEGER:

7         Q.    So, Rich Well is a

8    shareholder in TG; is that correct?

9              MR. CYR:  No.

10             MR. SEEGER:  That's why I'm

11        confused.

12             MR. CYR:  I think the best

13        way to do it is to refer to this

14        company, my recommendation would

15        be, with the spelling that Eugene

16        just gave.

17             MR. CHEN:  Taishan Jiang

18        Yin.  You can call it that.

19             MR. SEEGER:  Taishan Jiang

20        Yin.

21             MR. CHEN:  Then the Chinese

22        name of Rich Well is Yu He, Y-U

23        H-E.

24             MR. SEEGER:  I want to try

1    to get this all in one spot, and

2    I'm a little confused.

3         He's writing it down.

4         INTERPRETER 1:  The witness

5    has written down the name of a

6    company called Jiang Yin Taishan

7    Company Limited.

8         MR. CYR:  We're ready for

9    the next question.

10   BY MR. SEEGER:

11        Q.   The question I have is, I

12   just want to be clear on his answer, and

13   I'm not.  Could you please clarify what

14   you mean by Rich Well is a shareholder in

15   which company?  I just want to be clear.

16        A.   Our company, TG, under TG,

17   there is a company called Jiang Yin

18   Taishan Company Limited.  It is possible

19   in certain time it holds certain shares.

20        Q.   That Rich Well would own

21   certain shares in the subsidiary to TG?

22   Okay.

23        A.   A small share.

24        Q.   What interest in Jiang Yin

1    Taishan Company Limited does TG own?

2              MR. CYR:  Today?

3              MR. SEEGER:  Yes.  Let's go

4         with today.

5              INTERPRETER 1:  Counsel, the

6         word "interest" can be interpreted

7         in many ways.  Can you be more

8         specific?

9              MR. SEEGER:  I'm sorry?

10              INTERPRETER 1:  The word

11         "interest" can be interpreted in

12         many ways.

13              MR. SEEGER:  I'll do it

14         again.

15              INTERPRETER 2:  Can the

16         check interpreter help?

17              MR. SEEGER:  Yes.

18              INTERPRETER 2:  In Chinese?

19              MR. SEEGER:  Whatever gets

20         us through this.

21              (Interpreter discussion in

22         Chinese.)

23              INTERPRETER 1:  The check

24         interpreter is not doing a

1          verbatim.  She was digesting and

2          rephrasing it in her own ways to

3          help the witness to understand.

4          That is not what a legal

5          interpreter is supposed to do.  A

6          legal interpreter is supposed to

7          do only verbatim.  We don't

8          supposed to --

9     BY MR. SEEGER:

10         Q.    So just let me ask the

11    question again.  Okay?

12              What shares in Jiang Yin

13    Taishan Company Limited does TG own, and

14    how many shares does Rich Well own, if he

15    knows?

16         A.    I cannot tell exactly the

17    amount, but TG owns most of the shares of

18    Jiang Yin Taishan.

19         Q.    Is that the end of his

20    answer?

21              Do you know how many shares

22    Rich Well owns in Jiang Yin Taishan?

23         A.    I can't recall.

24         Q.    Now, Rich Well is a

1  competitor, actually, to TG.  Isn't that

2  fair to say?

3          MR. CYR:  Objection as

4      leading.

5          Please try to answer, Mr.

6      Jia.

7          THE WITNESS:  I never feel

8      that it is one of our competitors.

9  BY MR. SEEGER:

10      Q.   It sells plasterboard, Rich

11  Well sells plasterboard like TG sells

12  plasterboard, correct?

13      A.   I am not sure whether they

14  sell drywall or not.

15      Q.   Do you know if Rich Well has

16  ever distributed or imported Taishan

17  plasterboard?

18      A.   I don't know.

19      Q.   Do you know who would know

20  the answer to that question, who I would

21  be able to ask?

22      A.   Peng Wenlong should know

23  about it.

24          MR. SEEGER:  I'm sorry,

1          could you give me that --

2                 INTERPRETER 1:  Peng

3          Wenlong.

4    BY MR. SEEGER:

5          Q.   Do you know if BNBM owns an

6    interest in Rich Well?  Correct that to

7    say "owns shares."  I'm sorry.

8                 INTERPRETER 2:  The check

9          interpreter --

10                INTERPRETER 1:  He said

11         strike that.

12                MR. SEEGER:  I rephrased it.

13                INTERPRETER 2:  The check

14         interpreter believed that the

15         interpreter -- the two names has

16         been --

17                MR. CYR:  Were flipped

18         around?

19                INTERPRETER 2:  Were flipped

20         around, yeah.

21                MR. SEEGER:  Could you fix

22         that without me?

23                INTERPRETER 1:  Let me see.

24         I don't think I did it wrong.  I

1           think it was correct.

2     BY MR. SEEGER:

3           Q.    Let me ask the question.

4                 Do you know if BNBM owns

5     stock or shares in Rich Well?

6           A.    I'm not sure whether you're

7     talking about BNBM owning shares in Rich

8     Well or the other way around.  It seems

9     that -- it seems to be the contrary.  I

10    am not sure.

11          Q.    Well, let me break it up.

12    So, do you have any understanding if BNBM

13    owns stock in Rich Well?  Yes or no?

14          A.    According to my opinion, I

15    think they don't have it.  But that is

16    not under my supervision.  That is not

17    what I should know.

18          Q.    Okay.  But do you know?

19    Does he know one way or another?

20          A.    I don't know.

21          Q.    Do you know if BNBM owns

22    stock in Jiang Yin Taishan Company

23    Limited?

24          A.    Owns its shares.

1          Q.    Owns shares.  BNBM owns

2     shares in that company.  Okay.

3               Can you tell me if Rich Well

4     helps TG source waste paper from the U.S.

5     for drywall paper?

6               INTERPRETER 2:  The check

7          interpreter believes it is not a

8          correct interpretation, and the

9          correct interpretation --

10         (Discussion between

11         interpreters in Chinese.)

12              MR. CYR:  Is it okay with

13         you if we just ask him if he can

14         answer the question?  He might be

15         confused by the word "source."

16              MR. SEEGER:  So, let's ask

17         him if he can answer the question

18         the way it's been asked by you.

19              THE WITNESS: I can

20         understand basically what you

21         mean.

22              INTERPRETER 1:  He's

23         referring to me.

24              MR. SEEGER:  Okay.  So do

1           you --
2                 I mean, he doesn't
3           understand how you're asking him
4           in Chinese?  Is that what --
5                 INTERPRETER 1:  He
6           understand -- he say he understand
7           what I am saying.
8                 MR. SEEGER:  He does
9           understand?
10                INTERPRETER 1:  I understand
11          what you are saying.  He was
12          pointing at me.
13                MR. SEEGER:  Let him answer
14          the question.
15                MR. CHEN:  But what she
16          asked is very different from what
17          you asked is the point, is the
18          objection.  What she interpreted
19          in Chinese, the question is very
20          different from the question you
21          asked in English.
22                INTERPRETER 1:  So if he got
23          a wrong answer, you follow up with
24          another question to clarify.

1            MR. SEEGER:  Let me hear his

2        answer.  Can we hear his answer?

3        Because you understand it in both

4        languages.

5   BY MR. SEEGER:

6        Q.   Go ahead.

7        A.   TG has a production line

8   that produce -- that make papers.  They

9   have the necessity to purchase waste

10  paper from the United States.  Whether it

11  is from -- whether they buy it or they

12  don't buy it, that I don't know.

13       Q.   Do you know who --

14            Would Peng Wenlong be the

15  person to ask that question of?

16       A.   I am not sure whether Peng

17  Wenlong know about it totally.

18       Q.   Is Peng Wenlong employed by

19  Jiang Yin Taishan Company Limited?

20       A.   No.  It has never been the

21  case.

22       Q.   Who in TG is responsible for

23  supervising the marketing plans, what

24  specific person?  Marketing.

1          A.     What time period?

2          Q.     From 2005 to the present.

3          A.     Around the time before and

4    after 2009, it was in charge by a Mr. Xue

5    Yu Li.  Now it is a Mr. Fu Ting Huan.

6               MR. SEEGER:  Can you write

7          down those two names.

8               INTERPRETER 1:  2005 before,

9          and I said 2005, not 9.

10               MR. SEEGER: You said 2009.

11               INTERPRETER 1:  2005, I did

12          say that.  It was a typo, not me.

13          It was a typo.

14   BY MR. SEEGER:

15          Q.    Are we getting those names

16   down?  Have Mr. Jia write those two names

17   down.  Let's be clear.

18               Before and after 2005, Xue

19   Yu Li.  And then at some later date, and

20   can you give us the date when the second

21   name, the guy with the second name, Fu

22   Ting Huan, when he started doing the

23   marketing plans?

24          A.    I cannot recall exact date.

1          Q.    Would both of these people

2     have had responsibility for marketing

3     plans in Asia as well as the U.S.?

4               MR. CYR:  Objection on the

5               grounds that it suggests there

6               were marketing plans for the U.S.,

7               and the witness has already

8               testified that there were not.

9               MR. SEEGER:  Mark that one.

10              MR. CYR:  Mr. Jia, you may

11              try to answer the question.

12              THE WITNESS:  I did not

13              understand the question.

14              MR. SEEGER:  That was a lot

15              of work for that answer.

16              Can you just maybe read --

17              you have to ask.  Maybe it's your

18              translation.

19                      -  -  -

20              (Whereupon, the requested

21              portion of the transcript was read

22              by the court reporter as follows:

23              "Q.   Would both of these

24              people have had responsibility for

1           marketing plans in Asia as well as

2           the U.S.?")

3                    -  -  -

4               THE WITNESS:  TG produced

5           the plasterboard.  They are very

6           heavy.  So, we don't have any plan

7           to sell it to foreign countries.

8           Plasterboard, they are regional

9           materials, and I cannot imagine to

10          sell it to foreign countries.

11          Therefore, these two gentlemen,

12          they did not open up the market

13          outside in Asia or outside of

14          Asia, and they did not have any

15          plan.

16     BY MR. SEEGER:

17          Q.    Just to move it along, Mr.

18     Jia, because we're going to wrap up, take

19     a look at the page I've marked on Exhibit

20     2.  It's the second page from the last.

21     Could you read at the very top what that

22     says in Chinese, and then could you

23     translate it for me.

24               MR. CYR:  He wants you to

1           read this, (indicating.)

2                   (Witness complies.)

3   BY MR. SEEGER:

4           Q.    What does that mean?

5                   INTERPRETER 1:  To have the

6           foundation in China and move

7           forward to the world or also can

8           mean to establish in China and to

9           move forward to the world.

10  BY MR. SEEGER:

11          Q.    Do you see where China is

12  represented in the inner circle?  What

13  does that represent there, the line

14  that's drawn from China to that point

15  where I'm pointing to?  What does that

16  say?

17          A.    United States.

18                  MR. SEEGER:  We can wrap up

19          there.

20                  THE VIDEOTAPE TECHNICIAN:

21          The time now is approximately 5:09

22          p.m.  Today's portion of Mr.

23          Tongchun Jia's deposition is

24          concluded.

1                    -   -   -

2                (Whereupon, the deposition

3          adjourned at 5:09 p.m.)

4                    -   -   -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1            C E R T I F I C A T E
 2
 3
                I, LINDA L. GOLKOW, a
 4   Registered Diplomate Reporter, Certified
     Court Reporter and Notary Public, do
 5   hereby certify that, pursuant to notice,
     the deposition of TONGCHUN JIA was duly
 6   taken on April 4, 2011 at 9:05 a.m.
     before me.
 7
 8              The said TONGCHUN JIA was
     duly sworn by me through the interpreter
 9   according to law to tell the truth, the
     whole truth and nothing but the truth and
10   thereupon did testify as set forth in the
     above transcript of testimony.  The
11   testimony was taken down stenographically
     by me.
12
13              I do further certify that
     the above deposition is full, complete
14   and a true record of all the testimony
     given by the said witness.
15
16
17         Linda L. Golkow
           Registered Diplomate Reporter
18         Certified Realtime Reporter
19
20              (The foregoing certification
     of this transcript does not apply to any
21   reproduction of the same by any means,
     unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24
```

1              INSTRUCTIONS TO WITNESS

2

3

4              Please read your deposition

5    over carefully and make any necessary

6    corrections.  You should state the reason

7    in the appropriate space on the errata

8    sheet for any corrections that are made.

9

10             After doing so, please sign

11   the errata sheet and date it.  It will be

12   attached to your deposition.

13

14             It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

```
 1                - - - - - -

                  E R R A T A

 2                - - - - - -

 3   PAGE  LINE  CHANGE

 4   _____ _____ _____

 5      REASON: _____

 6   _____ _____ _____

 7      REASON: _____

 8   _____ _____ _____

 9      REASON: _____

10   _____ _____ _____

11      REASON: _____

12   _____ _____ _____

13      REASON: _____

14   _____ _____ _____

15      REASON: _____

16   _____ _____ _____

17      REASON: _____

18   _____ _____ _____

19      REASON: _____

20   _____ _____ _____

21      REASON: _____

22   _____ _____ _____

23      REASON: _____

24
```

1
2              ACKNOWLEDGMENT OF DEPONENT
3
                    I,_____, do
4    hereby certify that I have read the
     foregoing pages, 1 through 269 and that
5    the same is a correct transcription of
     the answers given by me to the questions
6    therein propounded, except for the
     corrections or changes in form or
7    substance, if any, noted in the attached
     Errata Sheet.
8
9    _____
     TONGCHUN JIA                 DATE
10
11
12
13
14
15
16   Subscribed and sworn
     to before me this
17   _____ day of _____, 20_____.
18   My commission expires:_____
19

     _____
20   Notary Public
21
22
23
24

1                    LAWYER'S NOTES

2     PAGE   LINE

3     _____  _____   _____

4     _____  _____   _____

5     _____  _____   _____

6     _____  _____   _____

7     _____  _____   _____

8     _____  _____   _____

9     _____  _____   _____

10    _____  _____   _____

11    _____  _____   _____

12    _____  _____   _____

13    _____  _____   _____

14    _____  _____   _____

15    _____  _____   _____

16    _____  _____   _____

17    _____  _____   _____

18    _____  _____   _____

19    _____  _____   _____

20    _____  _____   _____

21    _____  _____   _____

22    _____  _____   _____

23    _____  _____   _____

24    _____  _____   _____

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2

———————————————————
3                          §  MDL NO. 2047
   IN RE:                  §
4  CHINESE-                §  SECTION: L
   MANUFACTURED            §
5  DRYWALL PRODUCTS        §  JUDGE FALLON
   LIABILITY               §
6  LITIGATION              §  MAGISTRATE
   ———————————————————     §  JUDGE WILKINSON
7

                 -  -  -
8
     CROSS NOTICED IN VARIOUS OTHER ACTIONS
9
                 -  -  -
10
                April 5, 2011
11
                 -  -  -
12
       CONFIDENTIAL - SUBJECT TO FURTHER
13            CONFIDENTIALITY REVIEW
14               -  -  -
15        Videotaped deposition of TONGCHUN
   JIA, held at 3 Pedder Street, Central,
16 Hong Kong, China, commencing at 9:03
   a.m., on the above date, before Linda L.
17 Golkow, Certified Court Reporter,
   Registered Diplomate Reporter, Certified
18 Realtime Reporter and Notary Public.
19
                 -  -  -
20

21

22        GOLKOW TECHNOLOGIES, INC.
      ph 877.370.3377 | fax 917.591.5672
23            deps@golkow.com
24

```
 1    APPEARANCES:
 2
 3       SEEGER WEISS LLP
         BY:  CHRISTOPHER A. SEEGER, ESQUIRE
 4       BY:  JEFFREY S. GRAND, ESQUIRE
         One William Street
 5       New York, New York 10004
         (212) 584-0700
 6       cseeger@seegerweiss.com
         jgrand@seegerweiss.com
 7       Representing the Plaintiffs' Steering
         Committee
 8
 9
         COLSON HICKS EIDSON
10       BY:  PATRICK S. MONTOYA, ESQUIRE
         255 Alhambra Circle
11       Penthouse
         Coral Gables, Florida 33134
12       (305) 476-7400
         patrick@colson.com
13       Representing Plaintiffs' Steering
         Committee in the Federal and State
14       Coordinated Actions
15
16       LAW OFFICES OF RICHARD SERPE, P.C.
         BY:  RICHARD J. SERPE, ESQUIRE
17       580 East  Main Street
         Suite 310
18       Norfolk, Virginia 23510
         (757) 233-0009
19       rserpe@serpefirm.com
         Representing the MDL Plaintiffs and
20       the Germano Plaintiffs
21
22
23              -  -  -
24
```

1    APPEARANCES (CONTINUED):
2
3       HOGAN LOVELLS US LLP
        BY:  JOE CYR, ESQUIRE
4       BY:  FRANK T. SPANO, ESQUIRE
        BY:  ERIC D. STATMAN, ESQUIRE
5       BY:  RENEE GARCIA, ESQUIRE
        875 Third Avenue
6       New York, New York 10022
        (212) 918-3000
7       joe.cyr@hoganlovells.com
        frank.spano@hoganlovells.com
8       renee.garcia@hoganlovells.com
        eric.statman@hoganlovells.com
9       Representing Taishan Gypsum Co.
        Ltd. and Tai'an Taishan
10      Plasterboard Company Ltd. and the
        Witness, Tongchun Jia
11
12
        HOGAN LOVELLS INTERNATIONAL LLP
13      BY:  EUGENE CHEN, ESQUIRE
        18th Floor, Park Place
14      1601 Nanjing Road West
        Shanghai, China 200040
15      (86 21) 6122 3800
        eugene.chen@hoganlovells.com
16      Representing Taishan Gypsum Co.
        Ltd. and Tai'an Taishan
17      Plasterboard Company Ltd. and the
        Witness, Tongchun Jia
18
19
        JIGTIAN & GONGCHENG
20      BY:  CHUNGANG DONG, ESQUIRE
        34/F, Tower 3, China Central Place
21      77 Jianguo Road -  Chaoyang District
        Beijing, China  200040
22      (86 10) 5809 1016
        Representing Taishan Gypsum Company
23      Limited and Tai'an Taishan
        Plasterboard Company
24

```
 1    APPEARANCES (CONTINUED):
 2
 3        GREENBERG TRAURIG, LLP
          BY:  HILARIE BASS, ESQUIRE
 4        1221 Brickell Avenue
          Miami, Florida 33131
 5        (305) 579-0745
          bassh@gtlaw.com
 6        Representing the Home Builders
          Steering Committee
 7
 8
          GALLOWAY JOHNSON TOMPKINS BURR and
 9        SMITH
          BY:  CARLINA C. EISELEN, ESQUIRE
10        One Shell Square
          701 Poydras Street, 40th Floor
11        New Orleans, Louisiana 70139
          (504) 525-6802
12        ceiselen@gjtbs.com
          Representing Interior/Exterior
13        Building Supply
14
15        PERKINS COIE LLP
          BY:  DAVID L. BLACK, ESQUIRE
16        1899 Wynkoop Street - Suite 700
          Denver, Colorado 80202
17        (303) 291-2300
          DBlack@perkinscoie.com
18        Representing the State of Louisiana
19
20        WEINBERG, WHEELER, HUDGINS, GUNN &
          DIAL, LLC
21        BY:  NICHOLAS P. PANAYOTOPOULOS, ESQ.
          3344 Peachtree Road, NE
22        Suite 2400
          Atlanta, Georgia 30326
23        (404) 876-2700
          npanayo@wwhgd.com
24        Representing Various Banner
```

     1    APPEARANCES (CONTINUED):
     2
     3        BRENNER, EVANS & MILLMAN, P.C.
              BY:   THEODORE I. BRENNER, ESQUIRE
     4        411 East Franklin Street
              Suite 200
     5        Richmond, Virginia 23218
              (804) 644-1300
     6        Representing Tobin Trading Company
     7
     8        McKENRY, DANCIGERS, DAWSON &
              LAKE, P.C.
     9        BY:  J. BRIAN SLAUGHTER, ESQUIRE
              192 Ballard Court - Suite 400
    10        Virginia Beach, Virginia 23462
              (757) 461-2500
    11        Jbslaughter@va-law.org
              Representing Atlantic Homes LLC and
    12        Multiple Other Virginia-Based
              Defendants
    13
    14
              SHER GARNER CAHILL RICHTER KLEIN &
    15        HILBERT, L.L.C.
              BY:   MATTHEW C. CLARK, ESQUIRE
    16        909 Poydras Street - Suite 2800
              New Orleans, Louisiana 70112
    17        (504) 299-2100
              mclark@shergarner.com
    18        Representing the Southern Home
              Defendants
    19
    20
              SINNOTT, NUCKOLS & LOGAN, PC
    21        BY:  KENNETH F. HARDT, ESQUIRE
              13811 Village Mill Drive
    22        Midlothian, Virginia 23114
              (804) 378-7600
    23        khardt@snllaw.com
              Representing Venture Supply, Inc. and
    24        Porter-Blaine Corp.

```
 1    APPEARANCES VIA TELEPHONE:
 2
 3      KUCHLER POLK SCHELL WEINER &
        RICHESON LLC
 4      BY:  FRANCIS X. deBLANC, III,
        1615 Poydras Street
 5      Suite 1300
        New Orleans, Louisiana 70112
 6      (504) 592-0691
        slauricella@kuchlerpolk.com
 7      Representing Creola Ace Hardware and
        Thomas Gould Inc. in the MDL
 8
 9
        HUNTON & WILLIAMS LLP
10      BY:  A. TODD BROWN, ESQUIRE
        Bank of America Plaza
11      101 South Tryon Street
        Suite 3500
12      Charlotte, North Carolina  28280
        (704) 378-4700
13      Representing Stock Building Supply,
        LLC
14
15
        JONES, WALKER, WAECHTER, POITEVENT,
16      CARRERE & DENEGRE LLP
        BY:  MEGAN E. DONOHUE, ESQUIRE
17      600 Jefferson Street, Suite 1600
        Lafayette, Louisiana 70501
18      (337) 262-9062
        mdonohue@joneswalker.com
19      Representing Fireman's Fund Insurance
        Company
20
21
22
23
24
```

```
 1    APPEARANCES VIA TELEPHONE (CONTINUED):
 2
 3       DUPLASS ZWAIN BOURGEOIS PFISTER &
         WEINSTOCK
 4       BY:  PHILIP WATSON, ESQUIRE
         3838 N. Causeway Boulevard
 5       Suite 2900
         Metairie, Louisiana 70002
 6       (504) 832-3700
         pwatson@duplass.com
 7       Representing R&H Masonry, Inc., and
         Swedberg Enterprises, Inc.
 8
 9
         RUMBERGER, KIRK & CALDWELL, P.A.
10       BY:  ABIGAIL ROBERTS, ESQUIRE
         Brickell Bayview Centre, Suite 3000
11       80 Southwest 8th Street
         Miami, Florida 33130
12       (305) 358-5577
         aroberts@rumberger.com
13       Representing Defendants' Liaison
         Counsel for  Installers
14
15
         HAYNSWORTH SINKLER BOYD, P.A.
16       BY:  CHRISTOPHER B. MAJOR, ESQUIRE
         75 Beattie Place - 11th Floor
17       Greenville, South Carolina 29601
         (864) 240-3200
18       cmajor@hsblawfirm.com
         Representing USG Corporation and L&W
19       Supply Corporation
20
21       PHELPS DUNBAR LLP
         BY:  MITCHELL P. HASENKAMPF, ESQUIRE
22       Canal Place
         365 Canal Street, Suite 2000
23       New Orleans, Louisiana 70130-6534
         (504) 584-9249
24       mitchell.hasenkampf@phelps.com
```

```
 1   APPEARANCES VIA TELEPHONE (CONTINUED):
 2
 3
     FULMER LEROY ALBEE BAUMANN
 4   BY:  MICHAEL P. MCCAHILL, ESQUIRE
     2866 East Oakland Park Boulevard
 5   Ft. Lauderdale, Florida 33306
     (954) 707-4430
 6   mmccahill@fulmerleroy.com
     Representing Independent Builders
 7   Supply Association (IBSA)
 8
 9   THOMPSON COE COUSINS & IRONS, L.L.P.
     BY:  SUZANNE M. PATRICK, ESQUIRE
10   One Riverway, Suite 1600
     Houston, Texas 77056
11   (713) 403-8210
     spatrick@thompsoncoe.com
12   Representing The North River
     Insurance Company
13
14
     BERNARD, CASSISA, ELLIOTT & DAVIS,
15   APLC
     BY:  CAROLINE E. ELLIOTT, ESQUIRE
16   1615 Metairie Road
     Metairie, Louisiana 70005
17   (504) 834-2612
     elliottc@bernard-cassisa.com
18   Representing  Phillips Abita Lumber
     Company, Inc.
19
20
21
22
23
24
```

```
 1    APPEARANCES VIA STREAM:
 2
 3        BECNEL LAW FIRM, L.L.C.
          BY:  ROBERT BECNEL, ESQUIRE
 4        106 W. 7th Street
          Reserve, Louisiana 70084
 5        (985) 536-1186
          robbecnel@aol.com
 6        Representing the Plaintiffs'
          Steering Committee
 7
 8
          QUINN EMANUEL URQUHART & SULLIVAN,
 9        LLP
          BY: CLINTON DOCKERY
10        51 Madison Avenue, 22nd Floor
          New York, New York 10010
11        (212) 849-7000
          clintondockery@quinnemanuel.com
12        Representing Chartis Select Insurance
          Company and Related Chartis Insurers
13
14
          JONES, WALKER, WAECHTER, POITEVENT,
15        CARRERE & DENEGRE LLP
          BY:  MEGAN E. DONOHUE, ESQUIRE
16        600 Jefferson Street, Suite 1600
          Lafayette, Louisiana 70501
17        (337) 262-9062
          mdonohue@joneswalker.com
18        Representing Fireman's Fund Insurance
          Company
19
20
21
22
23
24
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2

 3         WOODLEY WILLIAMS LAW FIRM
           BY:  DONALD C. BROWN, ESQUIRE
 4         1 Lakeshore Drive
           Suite 1750
 5         Lake Charles, Louisiana 70629
           (337) 433-6328
 6         dcbrown@woodleywilliams.com
           Representing Devon International,
 7         Inc. Formerly, Devon International
           Trading, Inc.
 8
 9
           DEUTSCH, KERRIGAN & STILES
10         BY:  MELISSA M. SWABACKER, ESQUIRE
           755 Magazine St.
11         New Orleans, Louisiana  70130
           (504) 581-5141
12         mswabacker@dkslaw.com
           Representing Landmark American
13         Insurance Company
14
15         KUCHLER POLK SCHELL WEINER &
           RICHESON LLC
16         BY:  SOPHIA L. LAURICELLA, ESQUIRE
           1615 Poydras Street
17         Suite 1300
           New Orleans, Louisiana 70112
18         (504) 592-0691
           slauricella@kuchlerpolk.com
19         Representing Creola Ace Hardware and
           Thomas Gould Inc. in the MDL
20
21
22
23
24
```

```
 1   APPEARANCES VIA STREAM (CONTINUED):
 2
 3      TAYLOR WALKER, P.C.
        BY:  CHRISTOPHER J. WIEMKEN, ESQUIRE
 4      555 E. Main Street
        Suite 1300
 5      Norfolk, Virginia 23510
        (757) 625-7300
 6      Cwiemken@taylorwalkerlaw.com
 7
 8   ALSO PRESENT:
 9
10   Stephanie Chin, Official Interpreter
     (Interpreter 1)
11
12   Una Wong, Check Interpreter
     (Interpreter 2)
13
14
15                  -  -  -
16
17
18
19
20
21
22
23
24
```

```
 1                    -  -  -
 2                 I N D E X
 3                    -  -  -
 4
 5    Testimony of:   TONGCHUN JIA
 6     By Mr. Seeger                   283
       By Mr. Montoya                  407
 7     By Ms. Bass                     437
       By Mr. Hardt                    456
 8     By Mr. Brenner                  482
 9
                       -  -  -
10
                  E X H I B I T S
11
                       -  -  -
12
13     NO.              DESCRIPTION        PAGE
14     Jia-10     Translation of TG        284
                  0020401, Bates Nos.
15                TTRNSL0071 through
                  TTRNSL0073
16
       Jia-11     Taishan Gypsum Co.       322
17                Ltd. Manufacturer
                  Profile Form, Bates
18                Nos. DPF-TAISHAN
                  GYPSUM CO LTD-1-00001
19                through
                  DPF-TAISHANGYPSUM CO
20                LTD-1-00014
21     Jia-12     Tai'an Taishan           408
                  Plasterboard Co. Ltd.
22                Manufacturer Profile
                  Form
23
24
```

```
 1                    -  -  -
 2           DEPOSITION SUPPORT INDEX
 3                    -  -  -
 4
       Direction to Witness Not to Answer
 5
                     Page Line
 6
                     350 7
 7                   356 18
 8
 9
       Request for Production of Documents
10
                     Page Line
11
12
13
                   Stipulations
14
                     Page Line
15
16
17
18
19       Questions/Objections Marked
20               Page Line
21               318  16
                 319  17
22               336  12
                 452  7
23
24
```

1                    -   -   -

2              THE VIDEOTAPE TECHNICIAN:

3         This begins Tape 1 of Day 2 of the

4         deposition of Mr. Tongchun Jia.

5         The time now is 9:03 a.m., and we

6         are back on the record.

7              Mr. Jia, I want to remind

8         you that you are still under oath

9         from yesterday.

10                    -   -   -

11              TONGCHUN JIA, after having

12         been previously sworn through the

13         interpreter, was examined and

14         testified as follows:

15                    -   -   -

16              EXAMINATION

17                    -   -   -

18    BY MR. SEEGER:

19         Q.   Good morning, Mr. Jia.  I'm

20    going to continue the questioning for you

21    this morning.

22              MR. SEEGER:  Linda, I would

23         like to mark this as Exhibit 10.

24                    -   -   -

```
 1              (Whereupon, Deposition
 2         Exhibit Jia-10, Translation of TG
 3         0020401, Bates Nos. TTRNSL0071
 4         through TTRNSL0073, was marked for
 5         identification.)
 6                  -  -  -
 7    BY MR. SEEGER:
 8         Q.    Mr. Jia, would you take a
 9    look at what we've just marked as Exhibit
10    10.
11         A.    (Witness reviewing
12    document.)
13         Q.    And would you just take a
14    moment to look through it and tell me if
15    there's any inaccuracies or if that
16    accurately reflects the positions you
17    hold with entities related to Taishan, to
18    TG.
19         A.    I don't understand English.
20    Would you mind to translate it for me.
21              MR. CYR:  May I just state
22         for the record, Mr. Seeger, that I
23         believe that this Exhibit Number
24         10, that is a document that we've
```

1    provided you this morning in

2    response to your request yesterday

3    for the positions that Mr. Jia

4    holds with subsidiaries of Taishan

5    Gypsum.  And it's in English.

6         MR. SEEGER:  You are

7    completely right.  When you're

8    going without sleep and you're

9    jetlagged, I forgot he doesn't

10   speak English or read it.

11        Okay, well, thank you.  Mr.

12   Cyr was kind enough to provide

13   this list that we've marked as

14   Exhibit 10 of Mr. Jia's positions

15   with TG-related entities.

16        Is that a fair

17   characterization of this?

18        MR. CYR:  Yes.

19        MR. SEEGER:  You can put it

20   aside.

21        MR. CYR:  The only thing I

22   feel compelled to say is that you

23   all have defined the phrase

24   "related entities" in a certain

1         way, I believe, that arguably

2         would include BNBM.  Yesterday he

3         testified that at some point in

4         time that he's a director of BNBM.

5         Exhibit 10 does not purport to

6         reflect that.

7              MR. SEEGER:  That's fine.

8         Okay.  Subject to that.

9    BY MR. SEEGER:

10        Q.    Let me just add, I

11   understand that Mr. Jia does not --

12            Mr. Jia, I understand you do

13   not speak or read English, but were you

14   involved, as best as you know, with the

15   creation of the document that's marked as

16   Exhibit 10?

17        A.    I did not participate.

18        Q.    And has --

19            Without getting into any

20   discussions you've had with anybody, has

21   anybody described Exhibit 10 to you prior

22   to you seeing it now?

23        A.    I'm not -- I cannot be sure,

24   but my feeling tells me that a lot of the

1    content is related to my subsidiaries.

2         Q.    That's fine.  You can put it

3    aside.

4              MR. CYR:  And just to offer,

5         we're happy to state that this

6         information was obtained from the

7         books and records of the companies

8         and that we can confer with Mr.

9         Jia during a break to see if he

10        has any information that it's

11        inaccurate in any respect.

12             MR. SEEGER:  Okay.  So, I'm

13        just asking, Counsel, you have not

14        yet had an opportunity to do that

15        before we marked it?

16             MR. CYR:  No.

17             MR. SEEGER:  Okay.  Why

18        don't we do that.  We can always

19        mark it up.

20             MR. CYR:  Whatever you want

21        to do.

22             MR. SEEGER:  That's fine.

23        We'll move on.

24    BY MR. SEEGER:

1            Q.    Mr. Jia, do you review or

2    consult in the creation of marketing

3    materials for the company?

4            A.    I did see this material, but

5    I did not pay too much attention.  I did

6    not pay too much attention.

7            Q.    Mr. Jia, without regard to

8    any specific materials, do you generally

9    review or consult in the creation of

10   marketing materials for the company, for

11   TG?

12           A.    I don't understand the

13   concept of "consult."

14           Q.    Okay.  Do you review

15   marketing materials created by anyone --

16   let me strike that.

17                 Do you review marketing

18   materials that are created for the use of

19   TG in the marketing of drywall anywhere?

20   Strike that too.  That's awful.

21                 Do you generally review --

22   why do I keep asking the same question?

23                 What is your role at TG with

24   regard to the reviewing of marketing

1    materials?

2          A.    Some of the marketing

3    materials, for example, those materials

4    that we saw yesterday, usually we would

5    have discussions among the department of

6    the sales, the production and also some

7    people from the office, they discuss it.

8    And then they would look for a print

9    shop.  Then they do the layout.  After

10   that, they come to me.  And I didn't

11   really pay much attention to this type of

12   things, and I would just say, okay, okay,

13   go ahead and print it.  So usually this

14   is the way how things are done.  Unless

15   these are very significant, major issues,

16   then I will really pay attention to take

17   care of it.

18          Q.    And then, Mr. Jia, with

19   regard to marketing, what would you

20   consider a significant or major issue

21   that would require your attention?

22          A.    I would like to tell you

23   some of the basic way, fundamental way,

24   of how a Chinese company operate.

1          Q.     Please do.

2          A.     Therefore, it will be

3    beneficial for you to understand some of

4    the information of our company.

5          Q.     Go ahead.  Please tell us.

6          A.     Okay.  After China entered

7    the WTO, the Chinese government requires

8    the economy to go forward globally, and

9    it also requires opening of the policy

10   and reform of the policies.

11               Therefore, people always say

12   that our company is an open company.  We

13   are embracing the whole world.  We are

14   using the language that is being used by

15   the WTO and to apply to our marketing

16   material.  If we don't make this type of

17   statements, other people might

18   consider -- when they look at it, they

19   might consider our company, is it too

20   small, is it too backward.

21               So the information that you

22   saw yesterday, it had a statement called

23   based in China but move forward towards

24   the world.  This is how we come up with

1    that imagination under that situation, we
2    come up with this slogan.
3          Q.   So, expanding globally, Mr.
4    Jia, would include expanding into U.S.
5    markets as well, correct?
6                MR. CYR:  Objection on the
7          grounds that the question is
8          leading the witness.
9                You may try to answer, Mr.
10         Jia.
11               MR. SEEGER:  Just to cure
12         that, Joe, and I don't care, you
13         can insert it, but because I'm
14         cross-examining him in a sense, I
15         can lead.  You can object to that.
16               I'm sorry.  You can ask
17         him -- repeat the question, and if
18         you want your objection to it,
19         that's fine.
20               (Interpreter repeats the
21         question.)
22               THE WITNESS:  No.  We never
23         planned to expand in the U.S.
24         market or to promote our work in

1              the United States.

2      BY MR. SEEGER:

3              Q.    Okay.  So, the sales

4      materials that reflect that you are

5      marketing and selling and exporting to

6      the U.S., those were false, correct, Mr.

7      Jia?

8              MR. CYR:  Objection as to

9              form.

10     BY MR. SEEGER:

11             Q.    Mr. Jia, can you answer the

12     question.

13             A.    I consider the term false,

14     is inappropriate of how you use it when

15     you're referring to our behavior.  We

16     never have any plan to do the sales in

17     the United States, and in reality, we

18     have not done any marketing in the United

19     States.

20             Q.    So, then, my follow-up

21     question is, and you can take another

22     look at the exhibits if you'd like, Mr.

23     Jia, but Exhibit 2 and Exhibit 9, the

24     statements regarding the global growth of

1    the company and exporting drywall to the

2    United States, are they true or false

3    statements in those documents?

4                    MR. CYR:  You may answer the

5             question, Mr. Jia.

6                    INTERPRETER 1:  I cannot

7             speculate what the witness wants

8             to say.

9                    MR. SEEGER:  Did he answer?

10            Did he give you an answer?

11                   INTERPRETER 1:  He did not.

12            He was using body language.  You

13            might instruct him not to use body

14            language, and he has to say --

15                   MR. CYR:  I'm sorry, but the

16            interpreter, you know, giving you

17            lessons on what to do in the

18            deposition, she should just

19            interpret.

20                   INTERPRETER 1:  No, no.  I'm

21            requesting -- he was doing body

22            language, so I am asking the

23            counsel to help me to instruct him

24            in that I cannot interpret his

1         using the body language.  Thank
2         you.
3              MR. PANAYOTOPOULOS:  Can we
4         get a body language interpreter?
5              INTERPRETER 1:  He has to do
6         it verbally before I can
7         interpret.
8              MR. SEEGER:  If you comment
9         for a long time, I'm going to lose
10        my time.  I've got you.
11             INTERPRETER 1:  Thank you.
12             MR. SEEGER:  Thank you.
13             Please repeat my question.
14   BY MR. SEEGER:
15        Q.   Mr. Jia, I would like the
16   interpreter to repeat the question to
17   you, and please answer it, if you can.
18        A.   Some of our drywall, it is
19   possible to have been exported to the
20   United States.  In the United States,
21   many of the company -- some of the
22   company that come to China to buy the
23   drywall.  In order we try to fulfill all
24   the requirement of the customers, so,

1    these companies, they sell our drywalls

2    to the United States.  Regarding where

3    they ship these drywalls to, we don't

4    want to find out, and we also don't want

5    to know.

6              MR. CHEN:  If you could just

7         clarify.  I thought he said, we

8         don't care.  But if you could

9         just -- if you can clarify with

10        him to make sure you are

11        comfortable with it.

12             MR. SEEGER:  It's your call.

13        You're the interpreter.

14             (Interpreter discussion with

15        witness in Chinese.)

16             INTERPRETER 1:  It was

17        correct.  It was correct.

18             THE WITNESS:  The people

19        working for our company, they

20        produced the drywall according to

21        some of the requirements of some

22        U.S. customers.  They want to ship

23        it to the United States.  They

24        based it on this type of saying to

1          print out this type of documents.
2          However, we are very sure for 100
3          percent we don't have any plan to
4          sell to the United States.
5                 INTERPRETER 2:  The check
6          interpreter believed that the
7          witness said, we did not have any
8          plan to market the drywalls in the
9          U.S.
10                THE WITNESS:  We also don't
11         have any actual actions in reality
12         to sell in the United States.
13    BY MR. SEEGER:
14         Q.    Is that current?  That
15    answer he just gave, is that currently or
16    at any time?
17         A.    Any time.
18         Q.    Mr. Jia, did TG salespeople
19    or sales personnel promote the sale of TG
20    drywall to U.S. distributors at any time?
21                MR. CYR:  Objection.  The
22         question is vague.
23                Mr. Jia, please try to
24         answer.

1                    THE WITNESS:  No.

2    BY MR. SEEGER:

3         Q.    Okay.

4               Mr. Jia, yesterday you

5    testified that TG had a foreign sales

6    department.  Why do you have a foreign

7    sales department?

8               MR. CHEN:  Objection.

9               Dui wai tui xia is outward

10         marketing --

11              INTERPRETER 1:  It is just a

12         difference in the translation --

13              MR. SEEGER: Wait, you have

14         to let him say his objection.

15         Stop, stop.

16              THE COURT REPORTER:  Please

17         repeat what you said.

18              MR. CHEN:  The words "dui

19         wai tui xiao" in Chinese mean

20         outward marketing.  And so the

21         term yesterday used for foreign

22         trade department was wei mou bu.

23              MR. PANAYOTOPOULOS:  I'm

24         going to object to the speaking

1          objection.

2                    MR. SEEGER:  You're the

3          final call on the translation.  I

4          just wanted you to hear what he

5          said.

6                    INTERPRETER 1:  I heard what

7          he said.  Well, it is very close

8          enough.  Because we are not in the

9          legal position to define legal --

10                   MR. SEEGER:  That's all you

11         have to say.

12                   So where are we on his

13         answer?

14                        -  -  -

15                   (Whereupon, the following

16         portion of the transcript was read

17         by the court reporter:

18                   "Q.  Mr. Jia, yesterday you

19         testified that TG had a foreign

20         sales department.  Why do you have

21         a foreign sales department?")

22                        -  -  -

23                   THE WITNESS:  This foreign

24         sales department, we do not sell

1    department to the outside.  This

2    foreign sales department is for

3    purpose of to deal with foreign

4    business that they come,

5    occasionally or miscellaneously

6    they come to buy the drywalls.

7         INTERPRETER 2:  The check

8    interpreter believes that the

9    witness says the foreign trade

10   department -- the establishment of

11   foreign trade department was not

12   to market or sell products to

13   overseas.  It is -- the

14   establishment of it is only to

15   service the odd times when foreign

16   buyers come to purchase our

17   product.

18        INTERPRETER 1:  It's the

19   same.

20        MR. SEEGER:  I think it's

21   the same thing.  That's my view.

22        MR. CYR:  I agree.

23   BY MR. SEEGER:

24        Q.   Mr. Jia, let me ask you a

1    question.  We have looked at a couple of

2    documents.  One I want to put in front of

3    you is Exhibit 2.

4              Just for the record, one

5    more time, would you read from the second

6    to the last page of Exhibit 2 what that

7    statement at the top of the page says in

8    Chinese.

9              MR. CYR:  I'm sorry.

10             MR. SEEGER:  I'm just asking

11        him to read this.  I don't know

12        how far he went.  Just this.

13             MR. CYR:  Interpreter, could

14        you just --

15             THE WITNESS:  I did read it

16        before.  I did it to based in

17        China and moved forward to the

18        world.

19             MR. CYR:  I'm sorry, there's

20        no question before you, I don't

21        believe.

22             MR. SEEGER:  He's right.

23        Tell him I'm going to now ask a

24        question.

```
 1                MR. CYR:  There's no
 2         question.
 3    BY MR. SEEGER:
 4         Q.    Is that a true or a false
 5    statement in your document?  First
 6    question is, that is a TG document,
 7    correct, sir?
 8         A.    Yes.
 9         Q.    And it's in Chinese as well
10    as English, correct, sir?
11         A.    Yes.
12         Q.    Is the statement at the top
13    of that page, the second to the last page
14    of Exhibit 2, is that a true or a false
15    statement?
16         A.    Which statement?
17         Q.    (Indicating.)
18         A.    (Indicating.)
19                MR. CYR:  No, just this,
20         (indicating.)
21    BY MR. SEEGER:
22         Q.    Just that at the top.
23         A.    I just explained this
24    earlier.  Well, in China, the companies,
```

1    they use this type of material like this.

2    It is very popular.  It doesn't matter

3    whether they have this statement or not.

4    You can go to the other cities in China

5    to take a look.  They will say that we

6    are in China and also we are in the world

7    and da, da, da.  I think this phenomena

8    happens very often a lot.  I think it is

9    a cultural difference between China and

10   the United States.

11          Q.   I just have a simple

12   question, Mr. Jia.  Does the statement at

13   the top of that page about China moving

14   forward to the world accurately reflect

15   the sentiments of the company or does it

16   not accurately reflect the sentiments of

17   the company?

18               MR. CYR:  At what time?

19               MR. SEEGER:  At the time it

20          was printed.

21               MR. CHEN:  She needs to

22          translate the colloquy that you

23          guys just had, the attorneys just

24          had about the time.

1           INTERPRETER 1:  I did at the

2     very beginning.  I do it upside

3     down.

4           MR. CHEN:  At the very

5     beginning, you said at any time,

6     and that's not what Mr. Seeger's

7     comment was.

8           INTERPRETER 1:  No.  He was

9     saying at any time --

10          MR. SEEGER:  At the time it

11    was printed.

12          INTERPRETER 1:  So I put it

13    at the beginning, so it's the

14    same.

15          MR. CHEN:  You said --

16          MR. SEEGER:  I can't really

17    have the interpreter fighting with

18    people.  If she says she said

19    it --

20          INTERPRETER 1:  I said it.

21          MR. SEEGER:  Please ask the

22    witness to answer.

23          INTERPRETER 1:  At the time

24    it was written.

```
 1                    THE WITNESS:  Can you repeat
 2          the question.
 3                    MR. SEEGER:  That's the
 4          problem with all the
 5          interruptions.  And for the
 6          record, it's not any fault of
 7          yours, I'm not accusing you, but
 8          it's a difficulty in getting this
 9          done.  But we've got a lot of
10          people here jumping in.  So please
11          do it one more time.  Repeat the
12          question with that thing that I
13          said about it's true at the time.
14                    (Interpreter repeats
15          question.)
16                    THE WITNESS:  Well, this is
17          the way I'll put it.  I consider
18          this statement reflects the true
19          sentiment of Taihe.  I made a
20          mistake.  I myself made a mistake
21          with the name.
22                    INTERPRETER 1:  He's saying
23          that.
24     BY MR. SEEGER:
```

1          Q.    You made a mistake.  Tell
2    him to clarify.
3          A.    I made a mistake with the
4    name.
5          Q.    Mr. Jia, clarify what you
6    mean.  I don't know what you mean by you
7    made a mistake with the name.
8          A.    When I say "Taihe," I made a
9    mistake with this Taihe.  I made a
10   mistake with the name.
11         Q.    What did he mean to say?
12         A.    Let me repeat it again.  Let
13   me do it again.
14               With drywall, if for sure it
15   is exported, then it is moving forward
16   towards the world.  It is how we consider
17   this.  Our experience tells us that some
18   of our products has already been outside
19   of China.  Therefore, we consider that we
20   have already moved forward to the world.
21         Q.    Okay.  And if you could, Mr.
22   Jia, if you would take a look at the
23   exhibit -- do you need a break?
24         A.    Yes.  I want to take a

1    break.

2              THE VIDEOTAPE TECHNICIAN:

3         The time now is approximately 9:42

4         a.m., and we are now off the

5         record.

6                   -  -  -

7              (Whereupon, a recess was

8         taken from 9:42 a.m. until

9         9:57 a.m.)

10                  -  -  -

11             THE VIDEOTAPE TECHNICIAN:

12        This begins Tape 2 of today's

13        portion of our deposition.  The

14        time now is approximately 9:57

15        a.m., and we're back on the

16        record.

17             MR. SEEGER:  Let me just

18        state for the record, Mr. Cyr,

19        we've asked your team if we can

20        have one person, whoever it is

21        going to be, I don't care if it's

22        Gene or the check interpreter,

23        maybe have one person make the

24        objection if there's any issues on

1          the interpretation, if that's okay

2          with you.

3                    MR. CYR:  That sounds very

4          reasonable.  Why don't you just

5          decide.

6                    INTERPRETER 2:  Counsel, do

7          you mind if the check interpreter

8          to raise a few words in here in

9          the record so that everyone would

10         know that what we are objecting

11         about.  The term marketing, sales,

12         these are the main words that we

13         have issues with because the check

14         -- the interpreter interpret

15         market into tui xiao, but in

16         Mainland China, the most commonly

17         used term in market will be ying

18         xiao, which is -- so that

19         sometimes if people use tui xiao

20         in front of a Chinese Mainlander,

21         they may not know what you mean by

22         if you are using tui xiao.

23         Essentially the check interpreter

24         agree that they are the same

1        meaning, but one is a Cantonese

2        meaning, one is a Mainland,

3        Beijing, the most part of China's

4        meaning.  If you're using one term

5        instead of the other, the

6        Mainlander may not understand what

7        you are talking about.

8              And another is -- and

9        another is sales it is not just

10       mai.  Sales is xiao shou.  So, I

11       mean, they probably mean the same

12       thing, but if you are telling the

13       Mainlander one way, but not the

14       way that they are used to, they

15       may not understand it.  That is

16       what we are very concerned with.

17             MR. SEEGER:  Okay.

18             MR. CYR:  Thank you for

19       letting us register that.  We're

20       prepared now to continue.

21             INTERPRETER 1:  I want to

22       respond.

23             MR. SEEGER:  Wait a second.

24             You have to stop.  There's a

1      reason for it.  It has nothing to
2      do with you.  You don't have to
3      respond.  You do not have to
4      defend yourself.
5          INTERPRETER 1:  I am not
6      defending myself.  Mr. Jia used a
7      third term.
8          MR. SEEGER:  No, no, no,
9      that's fine.  They're just noting
10     it for the record.  Don't worry
11     about it.
12         One other thing I have to
13     raise, and I'm not going to call
14     anybody out by name.  Somebody on
15     the team, I believe, has attempted
16     to ask the interpreter off the
17     record if she could standardize
18     certain terms.  I'm not alleging
19     any wrongdoing.  I'm just saying,
20     if you could just inform your
21     team, you know, lawyers or
22     non-lawyers, that they shouldn't
23     do that with the interpreter off
24     the record.  Just raise it with

1    us, and we'll deal with it here.

2         MR. CYR:  That's a very

3    reasonable request, and we'll

4    honor it.

5         MR. SEEGER:  Thank you.  Now

6    we are going to get back to work,

7    right?  Okay.  We're all set.

8    Everyone is doing great.

9  BY MR. SEEGER:

10        Q.    Mr. Jia, in the document --

11        MR. SEEGER:  Where's the

12   document, the readable version?

13   We have to substitute it.  Where's

14   your version?

15        MR. CHEN:  I'm sorry, Chris.

16        MR. SEEGER:  Did you take it

17   back?

18        MR. CHEN:  Chris, if I may

19   say just one more thing.  There

20   were a set of agreed-upon terms,

21   and so the term that Ms. Wong just

22   mentioned that was a proper PRC

23   term was the agreed-upon term

24   between both sides and provided to

1           the interpreter.  So, while I

2           understand that there are

3           different ways of saying certain

4           terms, at least on some of them we

5           had an agreed-upon usage.  So, if

6           the interpreter can try and use

7           that, what both sides agreed on, I

8           think it would be preferable.

9                   INTERPRETER 1:  I want to

10          state on the record, the

11          suggestion of the translation of

12          the terms "marketing," the terms

13          that I choose and the terms that

14          the check interpreter choose, they

15          are both not the wording the

16          witness choose.  The witness

17          choose the word xunchun, a third

18          one.  So, neither I nor Una is

19          correct in this case because the

20          word as chosen by Mr. Jia is a

21          third one called xunchun.  And the

22          word sales, sales are mai.  Mr.

23          Jia also choose my terms

24          occasionally, just like drywall,

1          gypsum and the --

2                    MR. SEEGER:  I've got it.

3                    INTERPRETER 1:  --  what do

4          you call it?  The plasterboard.

5          They are all the same thing.

6                    MR. SEEGER:  Okay.  Listen,

7          both of you interpreters, I'm

8          going to yell at both of the

9          interpreters.  It's not about you

10         guys.  We've got to ask questions

11         here.  We can't waste this time.

12                   MR. CYR:  We're prepared to

13         continue.

14                   MR. PANAYOTOPOULOS:  Excuse

15         me.  I have an objection for the

16         record.  I just wish for the

17         process to go on, the questioner

18         ask the questions, and we move on.

19         I wish for the translators to stop

20         talking, please.

21                   MR. SEEGER:  You have to.  I

22         want to move on to a question.

23    BY MR. SEEGER:

24         Q.   Mr. Jia, I want to put in

1    front of you what's been marked as

2    Exhibit 2 and ask you to just take a

3    quick look at the language in yellow.

4    That's in English.  Give it back to me.

5    That's okay.  Strike that question.

6                   I want to ask you some

7    questions.

8                   Mr. Jia, is this true or

9    false, that TG has a self-supported

10   import and export system?

11        A.    Yes.

12        Q.    Is this true or false, that

13   your products, TG's products, not only

14   sell well in the domestic market, but

15   also export to many countries, including

16   the USA?

17        A.    Would you mind repeating it.

18                   (Interpreter repeats

19   question.)

20        A.    The TG product sells very

21   well in China, but it is outside of

22   China, the quantity would be very small,

23   because this product is very heavy, so,

24   it is very difficult to sell it outside

1  of the country.

2            MR. SEEGER:  Is that the

3      end?

4            INTERPRETER 1:  Yes.

5  BY MR. SEEGER:

6        Q.    Mr. Jia, my question is

7  this:  Is it a true statement or false?

8  If you could just give me a one-word

9  answer, I would appreciate it.  TG's

10 products not only sell well in the

11 domestic market but also export to many

12 countries including the United States.

13 Is that a true or false statement?

14       A.    Exporting to the United

15 States, from what we can see now, we do

16 have some products exported outside to --

17 outside of the country.  If it sells well

18 in the United States, it is not the

19 reality.

20       Q.    Mr. Jia, what do you mean by

21 "if it sells well in the United States,

22 it's not the reality"?  I don't

23 understand.

24       A.    It is not a reality that it

1    sells well in the United States.

2            Q.    Do you keep track in your

3    company, in TG, of sales volume in Asia

4    and outside of Asia?

5            A.    The sales volume to be

6    exported outside of China is very small,

7    and the market is small, very few amount

8    the volume of products of TG.

9            Q.    Mr. Jia, respectfully,

10   that's not my question.  Do you know how

11   much you sell outside of China?  Do you

12   know how much drywall you ship to the

13   United States, for example, in any given

14   year?  Do you know what that would be?

15                MR. CYR:  Mr. Seeger, I'm

16           going to object.  I know you

17           didn't intend to, but I think you

18           asked two or three questions at

19           the same time.  And you also asked

20           him how much was shipped to the

21           United States, which is contrary

22           to the record.

23                There's no need to interpret

24           this unless Mr. Seeger wants to

1          have it interpreted, because I

2          have no intent here to suggest

3          anything to the witness, but I

4          think the question was improper.

5               MR. SEEGER:  Would you mind

6          if I allow him to go ahead and

7          answer that, and let's see what

8          his answer is.  And I'll decide if

9          I have to follow up.

10              MR. CYR:  I'm not

11         instructing the witness not to

12         answer, but any answer you get I

13         think would be meaningless.

14              THE WITNESS:  Can you repeat

15         the question.

16    BY MR. SEEGER:

17         Q.   Yes.  Would you know, can

18    you go back to some place in the company

19    and tell us, for example, how much

20    drywall you ship to the United States in

21    a given year, in any year?

22              MR. CYR:  Same objection.

23              Mr. Jia, you can try to

24         answer the question.

1              THE WITNESS:  The

2         plasterboard that our company

3         shipped to the United States, it

4         would be very difficult for me to

5         give you the figure.  I am unable

6         to provide you with the figure

7         because some of our customers from

8         the United States, they applied

9         the products to be shipped out,

10        but how, what is the result or

11        where they are being shipped to,

12        that I don't know.

13   BY MR. SEEGER:

14        Q.    Would you be able to tell us

15   what your sales figures are for drywall

16   sold outside of China?

17        A.    What time period?

18        Q.    From 2005 to present.

19        A.    We have the data, but

20   regarding the figure of our company, I

21   cannot be sure about this data, because

22   some of the product, whether they have

23   actually been shipped outside of China or

24   not, I cannot be sure.  And some of the

1    customer, it is possible that they buy

2    the products and then they sell in China,

3    or they may not actually export it to

4    somewhere outside of China, and the

5    product comes back to China.  With this

6    kind of situation, I cannot do a

7    statistics, therefore, I cannot decide

8    the amount for the total sales.

9         Q.    Mr. Jia, do you realize that

10   in connection with the litigation that's

11   going on in the United States, you have

12   signed off on statements regarding the

13   amount of drywall that's been exported to

14   certain distributors?  Are you aware of

15   that?

16             MR. CYR:  Mr. Seeger, I have

17        to object because I'm not aware of

18        what the statements are that

19        you're referring to.  Would it be

20        best to just show them?  And I

21        just want to point out for the

22        record to save time that Mr. Jia

23        may have signed the manufacturing

24        profile form for Taishan Gypsum,

1       but I think that you'll find, if

2       you ask him, that he did not sign

3       the manufacturing profile form for

4       TTP.

5              MS. BASS:  Let me just

6       object on the record to the

7       speaking objection.  Let the

8       witness answer the question.

9              MR. SEEGER:  Do I have an

10      answer to the last question I

11      asked?

12             MR. CYR:  No.

13             MS. BASS:  No, you don't.

14             MR. SEEGER:  I would like to

15      have an answer to the question

16      then.

17             MR. CYR:  I object that the

18      question misleads the witness and

19      that the witness should be shown

20      whatever documents you're

21      referring to.

22             Please interpret that.

23             MS. BASS:  For the record,

24      my objection to his second

1             objection to the same question.

2                  MR. SEEGER:  Do me a favor.

3             Mark the record for a ruling on

4             that.  I'm not necessarily at this

5             point looking at anything.  I

6             would just like the witness to

7             answer that question, if he could.

8                  THE WITNESS:  I can't

9             recall.

10    BY MR. SEEGER:

11         Q.    Do you recall signing off on

12    any documents that are being used in the

13    litigation that's going on in the United

14    States regarding defective drywall

15    shipped from China?

16         A.    I don't recall.

17         Q.    Do you recall signing off on

18    manufacturers profile sheets?  I don't

19    know how you would translate that in

20    Chinese.

21                  INTERPRETER 2:  Maybe the

22             check interpreter help.

23                  THE WITNESS:  Can I look at

24             the document?

1    BY MR. SEEGER:

2            Q.    Well, I'm just asking if you

3    have --

4                  Before I show you, and I

5    will talk to you about the document, do

6    you have any independent recollection,

7    Mr. Jia, of signing off on a

8    manufacturers' profile sheet to be used

9    in litigation in the United States

10   regarding defective Chinese drywall?

11           A.    I don't recall.

12           Q.    Sir, is it generally your

13   practice before you sign a document to

14   try to read it and understand it?

15   Obviously it has to be in Chinese, but is

16   it your practice before you sign a

17   document to read it and then understand

18   it?

19           A.    Every day I sign off a lot

20   of documents.  So this is a document many

21   years ago.  I cannot recall whether I

22   have signed it or not.

23               MR. SEEGER:  Let me mark

24           this.

```
 1                   -  -  -
 2              (Whereupon, Deposition
 3         Exhibit Jia-11, Taishan Gypsum Co.
 4         Ltd. Manufacturer Profile Form,
 5         Bates Nos. DPF-TAISHAN GYPSUM CO
 6         LTD-1-00001 through
 7         DPF-TAISHANGYPSUM CO LTD-1-00014,
 8         was marked for identification.)
 9                   -  -  -
10              MR. SEEGER:  Joe, do you
11         mind looking on with the witness
12         for this one, because I only have
13         one copy, and I'm going to work
14         from that.
15              MS. BASS:  Is that a
16         composite of both?
17              MR. SEEGER:  Yes.  There's
18         the Chinese version and then
19         there's the English version.
20    BY MR. SEEGER:
21         Q.   Mr. Jia, would you take a
22    look at what we just marked as Exhibit
23    11.  Are you looking at the Chinese
24    version?
```

1          MR. CHEN:  I'm telling him
2      to look at the document.
3          MR. CYR:  We don't need to
4      share with him what we're saying
5      to our client.
6          MR. SEEGER:  I want to make
7      sure he's not telling the
8      witness what to do.
9          MR. CYR:  I'll take care of
10     that.
11         MR. SEEGER:  You want me to
12     just trust you?
13         MR. CYR:  We will talk to
14     our client whenever we want to.
15         MR. SEEGER:  Not during a
16     question.  Now I need to ask a
17     question.  Is that okay?
18         MR. CYR:  We're just giving
19     him a chance to look at the
20     document for the record.
21         MR. SEEGER:  It may be
22     actually easier if I tell him what
23     I'm looking for, and then he can
24     look at it.

1                MR. CYR:  Great.

2    BY MR. SEEGER:

3         Q.    Mr. Jia, did you sign this

4    document?

5         A.    Yes, I did sign on this

6    document.  These are -- these words are

7    written by me.

8         Q.    Okay.  And is there --

9               On the document that you

10   signed, did you notice that there was a

11   declaration or something called a

12   certification before your signature

13   requiring you to answer or sign under the

14   penalty of perjury?

15        A.    Yes.

16        Q.    And you stand by your

17   signature on that document, correct, sir?

18        A.    Yes.

19        Q.    In section -- and I hope

20   this works for the Chinese, but in

21   section 2 of this document, there's a

22   representation about how much drywall was

23   shipped to a company called Venture

24   Supply.  Could you tell me if you can

1    find that part of the document?  I

2    believe it's on Page 2 or 3.  Section 2.

3    It's in section 2.

4                MR. CYR:  I believe the

5            question is referring to section

6            3, subsection 2 on Page 3, Mr.

7            Jia.

8                MR. SEEGER:  You're right.

9            You're right.

10                MR. CYR:  Please interpret

11            what I said.

12                MR. SEEGER:  He's right.

13            It's section Roman III, and I

14            don't know how it's reflected on

15            the Chinese version, Paragraph 2.

16                THE WITNESS:  What do you

17            want me to answer?  I'm not sure.

18    BY MR. SEEGER:

19        Q.    How did you go about finding

20    the information that allowed you to

21    answer the question about how much

22    drywall was shipped to Venture Supply?

23                MR. CYR:  I have to object.

24            I don't see any reference to

1             shipments to Venture Supply.

2                  MR. SEEGER:  I'm sorry.  Let

3             me make the correction.

4        BY MR. SEEGER:

5             Q.    Sold to Venture Supply.

6                  Actually, I want to strike

7        that.  I want to strike that, because I'm

8        reading the language, and I don't know if

9        the Chinese version says the same thing.

10                 But the English version of

11       this document says that the February 24,

12       2006 and July 20, 2006 shipments of

13       drywall by Venture Supply to the United

14       States contained 153,912 sheets of

15       drywall respectively.  And it is also in

16       the section that says "Amount of drywall

17       exported."  Could you please tell me

18       where you found the information to answer

19       that question.

20             A.    This information is true.

21       The data and the amount contained in this

22       document is also true.

23             Q.    Well, if you don't know how

24       much you shipped outside of Asia, then

1    how do you know those figures are true,

2    Mr. Jia?

3          A.    I'm referring to this

4    company.

5                INTERPRETER 1:  The witness

6          is pointing to the name of this

7          company, Venture Supply.

8                THE WITNESS:  I don't know

9          how to call this company.  And

10         what I am saying is true, is that

11         TG sold the plasterboard to this

12         company is true.

13   BY MR. SEEGER:

14         Q.    So, you do -- he's not

15   finished.

16         A.    We exported a lot of

17   plasterboards, of all the plasterboard.

18   They turn around and be sold in China,

19   that I don't know.  Therefore, these two

20   facts I just stated, they are not

21   contrary.

22         Q.    Mr. Jia, the statement in

23   the document in English says that there

24   were shipments of drywall to Venture

1    Supply to the United States.  Does it say

2    a similar thing in the document in

3    Chinese?

4              MR. CYR:  I'm sorry,

5          Counsel, where are you reading

6          that?

7              MR. SEEGER:  I'm in that

8          same section, Roman III, 2.  It's

9          the section that says "Amount of

10         drywall exported."  And then next

11         to it, I'm taking the words there

12         where it says "Shipments of

13         drywall by Venture Supply to the

14         United States."

15             MR. CYR:  What's the

16         question?

17             MR. SEEGER:  The question

18         is, does it say exactly the same

19         thing in the document in Chinese

20         in front of you?

21             MR. CYR:  Thank you.

22             THE WITNESS:  I don't know

23         English, therefore, to check the

24         Chinese against the correctness of

1          the English, whether the English

2          has made a mistake or Chinese made

3          a mistake, I cannot do it.

4   BY MR. SEEGER:

5          Q.   That's not my question, Mr.

6   Jia, respectfully.

7               My question is, in the

8   Chinese version of this document, in

9   section III(2) where it says "Amount of

10  drywall exported," does it say

11  essentially the same thing in the Chinese

12  document, that there were shipments of

13  drywall by Venture Supply to the United

14  States of TG drywall?  Does it basically

15  say that in the Chinese version or not?

16         A.   In this document in Chinese,

17  it says this plasterboard was shipped to

18  the United States.

19         Q.   Okay.  So, you do know in

20  TG, you can tell us exactly how much

21  plasterboard was shipped to the U.S.,

22  correct?  You can find that information,

23  can't you?

24               MR. CYR:  Objection.  The

1          question is vague.

2                    You can try to answer.

3                    THE WITNESS:  Incorrect.

4     BY MR. SEEGER:

5          Q.    Explain why.  Why am I

6     incorrect?

7          A.    Because TG also including

8     all the subsidiaries, the sales for every

9     year is very large.  So, the amount is

10    too large.  It is impossible for me to

11    know of every single contract.  That is

12    impossible.  Even as a GM, I cannot do

13    it.

14         Q.    So, you were able to find

15    information regarding drywall exported to

16    Venture Supply in the United States, but

17    you're saying you can't do that for

18    everyone you've exported to?  Is that

19    your answer?

20                   MR. CYR:  Objection on two

21              grounds.  One is it might be

22              unclear whether or not you're

23              referring to Mr. Jia personally or

24              the company Taishan Gypsum just

1          because of the language

2          difference.  And then secondly,

3          your use of the phrase "shipped to

4          Venture Supply in the United

5          States."

6                No need to interpret that

7          unless Mr. Seeger would like to.

8                MR. SEEGER:  No.  He can

9          answer my question.

10               MS. BASS:  Once again, let

11          me just note an objection to the

12          speaking objection.

13               MR. SEEGER:  So he's not

14          asking you to read the objection

15          to the witness.  He's just asking

16          you to read my question.

17               THE WITNESS:  Yes.

18     BY MR. SEEGER:

19          Q.    Where in the company did you

20     go or did whoever works for you go to

21     find the information that's reflected on

22     this exhibit in front of you regarding

23     Venture Supply?  Where in the company

24     would you go to find that?

1          A.    Of course they have it in

2    the foreign sales department.

3          Q.    Does the foreign sales

4    department keep their records on a

5    computer?

6          A.    We require this to be done.

7    I can recall that originally I requested

8    my staff to do this.

9          Q.    Who specifically on your

10   staff was asked to do this for you, Mr.

11   Jia?

12         A.    The manager of the foreign

13   sales department, Peng Wenlong.  I think

14   he should know of this type of

15   information.

16         Q.    Do your financial auditors

17   for TG review your sales records?

18              INTERPRETER 2:  The check

19         interpreter believe that the

20         interpreter did not put TG into

21         her interpretation.

22              MR. SEEGER:  Please ask it

23         with TG.

24              INTERPRETER 1:  It says

1           "your sales record."

2                MR. SEEGER:  Is it my

3      mistake?

4                INTERPRETER 1:  Yeah.

5                MR. SEEGER:  Was it my

6      mistake?

7                INTERPRETER 1:  I mean my

8      mistake.

9                MR. SEEGER:  Okay.  So, will

10      you ask it the way I asked it.

11               Go ahead.  You want him to

12      ask the question the way I asked

13      it.

14               (Interpreter repeats the

15      question.)

16               THE WITNESS:  I, myself,

17      personally, don't have a sales

18      record.

19  BY MR. SEEGER:

20      Q.   Do the financial auditors

21  for the company, for TG, review sales

22  records?

23      A.   We have a finance

24  department.  The finance department will

1    make the record.  They will have the

2    information regarding the sales.

3          Q.    Does your financial

4    department have information regarding

5    shipping records?

6          A.    No.

7          Q.    Who has the information

8    regarding shipping records, which

9    department?

10         A.    The shipment record should

11   be with the foreign sales department.

12         Q.    So, the foreign sales

13   department would have the shipping

14   records, correct?

15         A.    Yes.

16         Q.    Is that also kept on

17   computer?

18         A.    I'm not sure.  Not

19   necessarily.  In the computer maybe you

20   can also find it somewhere else.

21         Q.    Let me just ask, for

22   example, when you signed off on this

23   particular document that's been marked as

24   an exhibit, the manufacturers profile

1    sheet, did you look to see where the

2    information came from regarding sales and

3    shipping in this instance?

4            A.    I did not delete this

5    document, and it would be impossible for

6    me to delete this document.  I also don't

7    know about this document.

8                MR. CHEN:  (Addressing the

9            interpreter.)

10               Objection.

11               It's the reference to delete

12           this information, not delete this

13           document, for the interpreter's

14           suggestion or consideration.

15               INTERPRETER 1:  He did

16           answer and also flip flop between

17           the word zhi liao and wenjian.

18               MR. SEEGER:  So what's your

19           interpretation of his answer?  Let

20           me just have it one more time.

21                    -  -  -

22               (Whereupon, the following

23           portion of the transcript was read

24           by the court reporter:

```
 1                    "A.  I did not delete this
 2             document, and it would be
 3             impossible for me to delete this
 4             document.  I also don't know about
 5             this document.")
 6                        -  -  -
 7    BY MR. SEEGER:
 8             Q.   Is it possible, Mr. Jia,
 9    that there were other TG sales of gypsum
10    board to the U.S. that are not accounted
11    for in this document?  Is that possible?
12                    MR. CYR:  Objection on the
13             grounds that the question is vague
14             and assumes a fact not in the
15             record.
16                    Please interpret that.
17                    MR. SEEGER:  Mark that.
18                    INTERPRETER 2:  The check
19             interpreter believes the
20             interpreter did not complete the
21             interpretation.
22                    INTERPRETER 1:  I am
23             interpreting the objection.
24                    MR. CYR:  It's okay.  The
```

1          English version, I'm sure, is

2          captured on the record.

3                You may proceed.  Thank you.

4                MR. SEEGER:  I think we're

5          just waiting on an answer.

6                You can tell him the

7          question again if you want, but he

8          needs to answer the question that

9          we asked.

10               (Interpreter repeats the

11         question.)

12               THE WITNESS:  I don't

13         understand the way you ask the

14         question.

15               MR. SEEGER:  I've forgotten

16         the question.

17               MS. BASS:  Is it possible

18         there were other sales in the U.S.

19         that were not included in this

20         document?

21               MR. SEEGER:  There you go.

22    BY MR. SEEGER:

23         Q.   I just want to know in this

24    document that he's looking at -- I'm

1    sorry.

2                    Mr. Jia, the document that

3    you're looking at, this exhibit in front

4    of you, reflects your knowledge of all

5    shipments and exports of drywall to the

6    United States.  Is it possible that you

7    have shipments of drywall or exports of

8    drywall to the United States that are not

9    reflected in this document?

10                   MR. CYR:  Same objection.

11                   Mr. Jia, please try to

12          answer the question if you can.

13                   THE WITNESS:  I still don't

14          understand -- I still don't

15          understand what you are asking

16          about.

17   BY MR. SEEGER:

18          Q.    Mr. Jia, is it possible that

19   you sold drywall to distributors who

20   brought the drywall to the United States

21   that are not reflected in this document?

22          A.    Are you talking about TG or

23   TTP?

24          Q.    Let's start with TG.

1           A.    TG is a company.  It has

2    signed an agreement and also a contract

3    for implementation.  This has already

4    been implemented.

5           Q.    What contract is he

6    referring to?

7           A.    Venture Supply.  Is it

8    called Venture Supply?

9           Q.    Yes, yes.

10                MR. SEEGER:  So, what's his

11          answer?

12                INTERPRETER 1:  That's the

13          answer.

14                THE WITNESS:  So, the

15          agreement that we signed with

16          them, we have implemented that.

17   BY MR. SEEGER:

18          Q.    So, you're saying --

19                Is it possible that you

20   could have sold drywall to any other

21   distributor that was brought into the

22   United States?  Is that possible?

23          A.    I cannot speculate.

24          Q.    Other than Venture Supply,

1    are you aware of TG selling gypsum board

2    to any customers in the United States?

3         A.    No.

4         Q.    Mr. Jia, since the

5    litigation in the U.S. regarding

6    defective Chinese Drywall, have your

7    sales been affected, the shipments of

8    drywall, regarding selling drywall?

9              MR. CYR:  I'm going to

10             object in that the question

11             appears to me at first glance to

12             be outside the designated areas.

13             It's your time.  I'm not

14             instructing the witness not to

15             answer.

16             MR. SEEGER:  Since you're

17             not instructing him, I'm not going

18             to get --  I have a basis for

19             asking.  We think it's within the

20             scope.  But that's fine.  You can

21             answer.

22             INTERPRETER 2:  May the

23             check interpreter give the

24             rendition of the Chinese

1              interpretation to the witness?

2                   MR. SEEGER:  No, not to the

3              witness.  If you want to make an

4              objection, if your lawyers want to

5              make an objection for the record,

6              that's fine.

7                   MR. CHEN:  State the

8              objection.

9                   INTERPRETER 2:  I just don't

10             think the interpreter's

11             interpretation is understandable

12             to the witness.  That's all.

13    BY MR. SEEGER:

14        Q.   Mr. Jia, did you understand

15    the question that was -- did we even ask

16    him the question yet?

17                  Mr. Jia, do you understand

18    the question that was just asked of you

19    by the interpreter?

20        A.   I have forgotten what you

21    asked.

22        Q.   That's understandable.

23                  MR. SEEGER:  Could you ask

24             him the question again.

1                    - - -

2                    (Whereupon, the following

3          portion of the transcript was read

4          by the court reporter:

5                    "Q.  Mr. Jia, since the

6          litigation in the U.S. regarding

7          defective Chinese Drywall, have

8          your sales been affected, the

9          shipments of drywall, regarding

10         selling drywall?")

11                   - - -

12                   THE WITNESS:  I don't

13         understand your concept and what

14         is the meaning of the shipment of

15         the drywall and being affected.  I

16         don't understand.

17  BY MR. SEEGER:

18         Q.    Mr. Jia, do you understand

19  that there's litigation going on in the

20  United States that drywall shipped by

21  your company is defective, correct?

22         A.    Incorrect.

23         Q.    But you understand that

24  there is litigation stating, alleging

1    that your drywall is defective, correct?

2              A.    Yes.

3              Q.    Now, when you answered

4    before and you said incorrect, did you

5    mean to say it's incorrect that the

6    drywall is defective?  Was that what your

7    answer was?

8              A.    Yes.

9              Q.    Have you reviewed any

10   studies or reports issued by the U.S.

11   government regarding drywall shipped by

12   your company?

13             MR. CYR:  I guess we're

14             going to have to have a discussion

15             about what designated area you

16             believe this falls under.

17             MR. SEEGER:  Marketing.

18             Ultimately I'm asking him

19             questions regarding the marketing

20             and sales of the drywall from the

21             time frame of 2005 to present.

22             And this all occurred during that

23             time frame.

24             MR. CYR:  Excuse me.  I

1           don't understand.  But maybe just
2           help me out.  I don't understand
3           --
4               THE WITNESS:  Can I take a
5           break.
6               MR. CYR:  -- how questions
7           about whether or not he reviewed
8           certain reports relate to --
9               MR. SEEGER:  Because I want
10          to ask him questions about sales.
11          That's where I'm going.
12              MR. CYR:  You want to ask
13          him questions about --
14              MR. SEEGER:  Yes, sales,
15          business.
16              MR. CYR:  I'm sorry, but
17          sales is different than marketing.
18              MR. SEEGER:  Let me just
19          answer, because one of the
20          categories that we asked for him
21          to be here for were business
22          plans, marketing plans, budgets
23          for TG and other companies.
24              MR. CYR:  Right.

1                    MR. SEEGER:  This would go

2            to marketing plans, business plans

3            and budgets.

4                    MR. CYR:  I strongly

5            disagree.  If you want to take

6            time out to call the judge about

7            this, which would be very

8            unfortunate --

9                    MR. SEEGER:  Not at this

10           hour.

11                   MR. CYR:  There's two issues

12           really.  Is that in my view, this

13           is clearly outside the scope of

14           the designated area.  The second,

15           I should just state for the

16           record, is that I would welcome

17           the opportunity on a personal

18           level for the witness to be able

19           to address these kinds of issues,

20           but that's not why we're here.

21           And the other thing is, there's a

22           bunch of other lawyers who are

23           anxious to ask questions, and I'm

24           just going to share with you now,

1           is that, in my view, we spent a

2           lot of time yesterday working

3           things out between plaintiffs'

4           counsel and the interpreter and

5           then also addressing questions

6           with respect to BNBM, which you

7           are allowed to ask, but I think

8           that it's a colossal waste of time

9           with respect to the jurisdictional

10          issues.  So, we're going to wrap

11          things up today at 5:00, and you

12          need to manage your time together.

13              MR. SEEGER:  Thank you for

14          that.

15              MS. BASS:  Excuse me.  Let

16          me just note for the record that

17          we had a specific discussion

18          yesterday about the fact that

19          holding to 5:00 end time today was

20          unrealistic and would likely

21          inevitably result in this witness

22          having to be called back.  So, I

23          suggest we not waste any more time

24          arguing about a single question of

1          the questioner.  Let's move

2          forward, but I'm going to

3          strenuously object if you suggest

4          that you are going to pull the

5          witness at 5:00.

6               MR. CYR:  Your suggestion is

7          rejected.  And I would like to

8          just emphasize again that we're

9          stopping at 5:00 today.  So, you

10         guys need to manage your time.

11              MR. SEEGER:  I appreciate

12         the thing about managing your

13         time.  I do support Hilarie in

14         this.  If we need the witness for

15         a little extra time, you ought to

16         make him available.

17              MR. CYR:  I indicated

18         yesterday that we would be

19         reasonable in that regard.  Now

20         we're talking minutes, not hours,

21         with respect to 5:00.  So if

22         there's a lawyer here that

23         traveled all the way to Hong Kong

24         and only gets his or her turn at

1          quarter to 5:00, we're not going

2          to ring the bell at 5:00.  We're

3          going to proceed reasonably.  But

4          you're spending time questioning

5          the witness now --

6                    MR. SEEGER:  I've only asked

7          one question so far, in fairness

8          to me.

9                    MR. CYR:  Why don't you go a

10         little bit further.  I'm not

11         waiving any rights with respect to

12         the designated areas here.

13                   MR. SEEGER:  Can he answer

14         the question that I asked

15         previously?

16                   INTERPRETER 1:  The witness

17         has asked to take a break.

18                   MR. SEEGER:  I really would

19         like to get an answer since we

20         have a pending question and not

21         take a break.

22                   (Interpreter repeats the

23         question.)

24                   THE WITNESS:  I did not

1          receive any report issued by the

2          U.S. government.  I did not

3          receive it nor did I see any.  I

4          only saw a little something from

5          the media, from the media.

6    BY MR. SEEGER:

7          Q.    Did the report that you saw

8    in the media discuss in any way reports

9    issued by the U.S. government regarding

10   defective drywall sold by your company?

11   Strike that.

12          Are you aware, sitting here

13   today, that there is a U.S. government

14   report, there's several reports,

15   regarding defective Chinese drywall sold

16   by your company?

17          A.    The medias in the United

18   States reported that the drywall sold by

19   TG company has some problems, but I don't

20   believe it is true.

21          Q.    And you have not personally

22   reviewed the reports issued by the U.S.

23   government regarding defective Chinese

24   drywall sold by your company; is that

1    correct?

2              A.    Correct.

3              Q.    Are you interested in seeing

4    those reports issued by the U.S.

5    government regarding your -- defective

6    drywall sold by your company?

7              MR. CYR:  I'm going to

8         object.  Unless you can persuade

9         me how this falls in a designated

10        area, I'm so reluctant to do it,

11        but I'm going to have to instruct

12        the witness not to answer.

13             I regret the judge is not

14        available now either, because I'm

15        confident that he would agree with

16        me.

17             MR. SEEGER:  So, on that

18        question, you're instructing the

19        witness not to answer?

20             MR. CYR:  I'd welcome some

21        --

22             MR. SEEGER:  I don't know if

23        I can say a lot more to convince

24        you about why I think this comes

1            within marketing, sales, business

2            plans.  I've made the pitch.  I

3            think it is a mistake to instruct

4            him not to answer, because you

5            jeopardize him having to be

6            deposed again, but that's your

7            call.  And I assume you've

8            considered that?

9                 MR. CYR:  I do.  I just

10            don't see any connection at all.

11            I'm sorry.

12    BY MR. SEEGER:

13            Q.    Mr. Jia, your attorney has

14    instructed you not to answer the question

15    I just asked.  Are you willing to answer

16    it despite that instruction or not?

17            A.    I am not willing to answer

18    this question.

19            Q.    Let me ask you another

20    question, one or two more, and we can

21    take a break.

22            A.    I need to take a break right

23    now immediately.

24                 MR. SEEGER:  I can't stop

```
 1           you.

 2                THE VIDEOTAPE TECHNICIAN:

 3           The time now is approximately

 4           11:05 a.m., and we are now off the

 5           record.

 6                     -  -  -

 7                (Whereupon, a recess was

 8           taken from 11:05 a.m. until

 9           11:23 a.m.)

10                     -  -  -

11                MR. PANAYOTOPOULOS:  Can we

12           get a clarification about what

13           time we're going to break?  I

14           would like to keep going as long

15           as possible since we just took a

16           break.

17                MR. CYR:  Let's ask Mr. Jia

18           if he can go until noon rather

19           than 11:30.  It makes sense, since

20           it's close to 11:30 already.

21                Break at noon.

22                MR. SEEGER:  Noon until

23           1:00.

24                THE VIDEOTAPE TECHNICIAN:
```

1           This begins Tape 3 of today's

2           portion of our deposition.  The

3           time now is approximately 11:25

4           a.m., and we're back on the

5           record.

6    BY MR. SEEGER:

7           Q.    Mr. Jia, yesterday you had

8    given us some testimony about the health

9    benefits of the drywall that you sell.

10   What have you done to test the drywall in

11   light of the allegations regarding the

12   fact that it could be unhealthy and

13   statements in the media?

14             MR. CYR:  I guess, once

15          again, we're going to have to have

16          a discussion about why this is in

17          one of the designated areas.

18          Which designated area does this

19          question fall under?

20             MR. SEEGER:  It goes into

21          sales and marketing.  We're still

22          under sales and marketing.  There

23          are allegations that the drywall

24          is defective, potentially

1          unhealthy.  He says he saw them in

2          the media.  What's he done?

3                MR. CYR:  How is that

4          relevant to jurisdiction at all?

5                MR. SEEGER:  Because I'm

6          going to connect it.  If you give

7          me a few questions and you let him

8          answer a few questions, I'll

9          connect it up for you.

10                MR. CYR:  I'm sorry to have

11          to spend some time on this on the

12          record, but I see no connection

13          whatsoever between whatever

14          Taishan Gypsum has done subsequent

15          to the litigation, subsequent to

16          the filing of the Complaint with

17          respect to checking tests and how

18          that conceivably could be related

19          to the jurisdictional questions in

20          this case.  And unless there's

21          some showing of a connection

22          that's persuasive, I, regretfully,

23          I have to instruct the witness not

24          to answer.

1          MR. SEEGER:  I'm going to

2          let Jeff address it because he's

3          been more involved with the

4          discovery, but I don't really

5          think it's proper for you to ask

6          me for a showing.  I don't think I

7          have to make a showing on it, but

8          go ahead.

9          MR. GRAND:  I'm going to say

10         that this witness has been

11         designated by Taishan Gypsum to

12         speak to business plans, marketing

13         plans and budgets for Taishan

14         Gypsum and related or other

15         entities.  In connection with

16         that, we reviewed yesterday

17         promotional materials created by

18         Taishan that contained promotional

19         statements about that the gypsum

20         board was good for health.  We are

21         entitled to ask him whether he's

22         taken any steps to ensure that

23         those statements are still true

24         and whether the marketing

1           materials are still true.  Those

2           marketing materials are still out

3           there.

4                MR. CYR:  And how does that

5           relate to the jurisdictional

6           issues in this case?

7                MR. GRAND:  While you may

8           disagree, it is our contention

9           that your client markets this

10          globally, marketed into the United

11          States.

12               MR. CYR:  What time period

13          do you think is relevant for the

14          jurisdictional issues in this

15          case?

16               MR. GRAND:  I think right up

17          to the present.

18               MR. CYR:  Based on that

19          dialogue, I'm very comfortable in

20          instructing the witness not to

21          answer.

22               We're ready for your next

23          question.

24     BY MR. SEEGER:

```
 1            Q.    Mr. Jia, your counsel has
 2    instructed you not to answer the question
 3    that I've asked.  Are you going to follow
 4    counsel's instructions or would you like
 5    to answer the question?
 6            MR. PANAYOTOPOULOS:  I'm
 7        sorry.
 8    BY MR. SEEGER:
 9            Q.    Mr. Jia can answer.
10            A.    I don't want to answer this
11    question.
12            MR. PANAYOTOPOULOS:  Let me
13        just state for the record that
14        Banner joins in the question.  And
15        the position is, from what I
16        understand yesterday, this witness
17        testified at length about the
18        basis that he and the company had
19        to make statements in their
20        marketing materials that the
21        drywall that they produced has
22        certain benefits for the
23        customers.  This was included in
24        marketing material that I believe
```

1          is out today.  I think that for

2          cross-examination purposes, we

3          certainly have a basis to test

4          whether those are true statements.

5          And the witness volunteered

6          yesterday with counsel present and

7          went on and on about the basis

8          that the company had to make those

9          statements.  We'd like to verify

10         and check on the extent of that

11         basis, and now the witness is

12         being instructed not to answer.

13         So, we join in, and we again would

14         like an answer to that question.

15              MS. EISELEN:  For the

16         record, Interior/Exterior also

17         joins in that objection.

18              MR. CYR:  Before I respond,

19         I want to give everybody an

20         opportunity to join in.

21              MR. BLACK:  We also join on

22         behalf of the State of Louisiana.

23              We also note that topic

24         number 19, footnote 3, which

1           indicates you're not producing

2           anybody with respect to the

3           category that's indicated in

4           footnote 3, someone to testify

5           about the design, development,

6           testing, inspection, performance

7           of drywall manufactured by TG or

8           TTP, you're not producing anyone,

9           that the involvement of TG or TTP

10          in determining performance and/or

11          inspection of the drywall that

12          they manufactured during the

13          period of time in question goes to

14          jurisdiction.

15               MR. CYR:  Anyone else?

16               MR. PANAYOTOPOULOS:  I also

17          have not seen any objections to

18          the Notice of Deposition

19          especially within the time frame

20          provided under the Federal Rules.

21               MR. CYR:  Anyone else?

22               MS. CLARK:  Southern Homes

23          joins in the objections of

24          Interior/Exterior, State of

1        Louisiana and Banner.

2              MR. HARDT:  So does Venture

3        Supply and Porter-Blaine in the

4        Germano action.

5              MR. SLAUGHTER:  Likewise,

6        Atlantic Homes.

7              MS. BASS:  Likewise, the

8        Home Builders Steering Committee.

9              MR. BRENNER:  Same for

10       Tobin.

11             MR. MONTOYA:  On behalf of

12       plaintiffs' liaison counsel from

13       Florida as well.

14             MR. CYR:  Just very briefly,

15       I do think that when The Court

16       looks at the transcript of

17       yesterday, when the question was

18       asked with respect to the brochure

19       and the reference to health, that

20       I registered my concerns.  I

21       indicated that although I was

22       going to allow the witness to

23       answer that question, that I was

24       preserving the right to object to

1           any further questions relating to

2           that issue or other issues

3           relating to the drywall itself and

4           the liability issues, and that's

5           precisely what I've done today.

6                Of course, as we all know,

7           Mr. Jia was not designated for

8           topic number 19, and so that is an

9           issue for Mr. Peng's deposition.

10               And then finally, I just

11          want to emphasize that we have

12          studied very carefully the

13          designated areas, and we

14          appreciate your ability to ask

15          questions about business plans and

16          marketing plans and budgets, but

17          not for a moment do I believe that

18          The Court intended for you to ask

19          questions about Mr. Jia's actions

20          during 2011 with respect to

21          reviewing the liability issues and

22          the defectiveness issues in this

23          case.  I'm very confident that the

24          judge will agree with me when he

1          reads the transcript.

2              I suggest that after all of

3          this that we continue with the

4          deposition in the designated

5          areas.

6              MR. HARDT:  On behalf of

7          Venture Supply and Porter-Blaine

8          in the Germano action, if I can

9          say one more thing.  There's

10         considerable case law out there

11         that suggests that instructing the

12         witness not to answer the

13         question, if it's not a privilege

14         objection, is not the proper

15         procedure to handle the matter.

16         It's outside the scope of the

17         rules, instructing the witness not

18         to answer the question not on the

19         basis of privilege.

20             So, I think proceeding this

21         way, you know, you just run the

22         risk that we're going to have to

23         revisit this with this witness

24         after the ruling.

```
 1              MR. CYR:  Thank you very
 2         much, Counselor, and that's why I
 3         allowed the questions yesterday,
 4         because, frankly, I think this is
 5         the first time I've ever
 6         instructed a witness not to answer
 7         questions during the deposition.
 8         But this line of questioning runs
 9         so far afoul of not only the terms
10         of the designated areas, but also
11         I'm extremely confident that if
12         the judge was here, that he would
13         emphasize that you should be
14         asking questions relating to the
15         jurisdictional issues.  That's why
16         he allowed this all to unfold.
17              So, thanks for the warning.
18         I wish we could get the judge on
19         the phone now, but that's
20         unrealistic.
21              MR. SEEGER:  I'm going to
22         ask a question.
23    BY MR. SEEGER:
24         Q.   Mr. Jia, since the news
```

1    reports in the media regarding defective

2    drywall, what have you done to reassure

3    your customers that the drywall is not

4    defective?

5              MR. SEEGER:  That's sales.

6         That's sales.  I've changed it.

7         It's sales.  I'm not asking him --

8         I'm asking him what he's done to

9         reassure his customers.

10             MR. CYR:  Where is sales,

11        Chris?

12             MR. SEEGER:  Sales,

13        marketing.  I mean, there are news

14        reports that are out there.

15             MR. PANAYOTOPOULOS:  Topic

16        14.

17             MR. SEEGER:  There are news

18        reports that are out there, and

19        asking him what he's doing from a

20        marketing perspective to reassure

21        his customer base I think is

22        clearly, clearly a fair question.

23             MR. CYR:  And how does that

24        relate to jurisdictional issues in

1           this case?

2                MS. BASS:  How about the

3           obvious?

4                MR. GRAND:  Do we have to go

5           back and forth on this?  This is

6           wasting time.

7                MS. BASS:  We're wasting

8           valuable time, but, obviously, who

9           he considers his customers, who he

10          perceives the need to communicate

11          with about a problem with his

12          drywall, assuming it is defective,

13          goes directly to the

14          jurisdictional issues.  Your

15          choice of narrowly viewing each of

16          these questions is not something

17          that you have the right to do in a

18          deposition.  He has the right to

19          explore broadly based on the

20          categories that he has been

21          designated to testify about.

22          That's what he's doing.

23                MR. CYR:  Do you have any

24          case law at all with respect to

1          any of the jurisdictions that
2          reflects that a defendant's
3          actions after the complaint has
4          been filed are relevant to
5          jurisdictional issues?
6               MS. BASS:  Let me ask you
7          this.  If he perceives his
8          customers are in the United States
9          and he perceives the need to
10          communicate with them about a
11          defect in some product that his
12          company has sold in the United
13          States, you are going to suggest
14          that's not relevant to
15          jurisdiction?
16               MR. SEEGER:  That's exactly
17          where I'm going with this line of
18          questioning.
19               MR. CYR:  Maybe you guys are
20          missing the point here, is that
21          it's my understanding that with
22          respect to jurisdictional issues,
23          that the time period that's
24          relevant, and courts differ, it's

1    at the time of the filing of the

2    complaint, or some reasonable

3    period thereto.  Some courts

4    disagree.  They have different

5    views about what that time period

6    should be.  But one thing that's

7    very clear, almost in every case

8    that I've seen in every state, and

9    that is that actions by defendants

10   after the filing of the Complaint.

11          MR. SEEGER:  It's not after.

12   That's not my question, Joe.  You

13   misunderstood the question.

14          MR. CYR:  Oh, I'm sorry.

15          MR. GRAND:  It is not after.

16          MR. CYR:  I'm sorry.

17          MR. SEEGER:  I said since

18   the news in the media.  There was

19   news in the media before we filed

20   the complaint.  So, he said --

21   your witness has testified he's

22   only seen what's in the media.  He

23   hasn't seen U.S. government

24   reports.  So, it is since the news

1          in the media.

2                    MR. CYR:  I can help out

3          here to save time, because I

4          really want to do the right thing

5          here.

6                    Just for the record, it

7          seems to me that there's some

8          chance that the question could

9          relate to Taishan Gypsum's

10         activities before certain of the

11         complaints in this litigation have

12         been served or filed such as the

13         Gross or Wilkes case, and so I'm

14         going to allow the witness to

15         answer the most recent question.

16                   MR. SEEGER:  Thank you.

17                   Could you read the question

18         that I asked.

19                   (Interpreter repeats the

20         question.)

21                   THE WITNESS:  Okay.  First

22         of all, TG went over the complaint

23         records regarding the production

24         of drywall for many years.  We did

1          not discover the problems as

2          discussed -- reported in the

3          media, reflected in the media or

4          reflected by some of the

5          customers.  Our government also

6          take this matter seriously.  It

7          draw a large amount of samples

8          from our company.  Our government

9          did not say the products that we

10         produce has the problems similar

11         to those reflected by the U.S.

12         consumers.  We strongly believe

13         that the quality of our drywall is

14         good.

15    BY MR. SEEGER:

16         Q.    Mr. Jia, did you do any

17    testing to confirm that?  Did the company

18    do any testing independent to confirm

19    that?

20              MR. CYR:  I just want to

21         state for the record that I'm

22         going to allow the witness to

23         answer for the reason that I

24         mentioned before, but I'm not

1          waiving my rights to insist that

2          we stay with the designated areas.

3          And, sincerely, I do think that

4          this is a decision y'all are

5          making with respect to managing

6          the time that you have.

7                    No need to interpret that.

8                    Please answer the question,

9          Mr. Jia.

10                   THE WITNESS:  Our company

11         also built a building.  It is all

12         of our products.  There is no

13         phenomena like what is being

14         claimed by the U.S. media.  We

15         also made a survey along the

16         coastal line to do an

17         investigation with our customers.

18         We did not find similar problems.

19    BY MR. SEEGER:

20         Q.    So, Mr. Jia, the testing you

21    did, to be clear, is you built a building

22    for which you put your products in it,

23    and you did a survey of your customers.

24    Did I understand the answer correctly?

1           INTERPRETER 2:  The check

2      interpreter did not think the

3      interpreter accurately interpret

4      the question asked by the counsel.

5      Because the interpreter did not

6      ask the witness the test, whether

7      the test is build the building and

8      also survey the coastal -- the

9      customer along the coastal line.

10     The interpreter did not interpret

11     the test.

12          INTERPRETER 1:  Objection.

13     The check interpreter is not doing

14     verbatim.  She digested and

15     rephrased it.  I was doing

16     verbatim to every word --

17          MR. SEEGER:  Did you ask the

18     question the way I asked it?

19          INTERPRETER 1:  Yes.

20          MR. SEEGER:  Okay.  That's

21     all.

22          INTERPRETER 2:  I was doing

23     verbatim.  I don't try to rephrase

24     it.  She is trying to rephrase

1          herself.

2                    MR. SEEGER:  You don't have

3          to defend yourself.  Can the

4          witness answer the question?  Ask

5          him my question.  I want to make

6          sure he answers my question.

7                    INTERPRETER 1:  Okay.  Let

8          me go back to that question.

9                    THE WITNESS:  There's some

10         discrepancies regarding your

11         understanding.  I can add on to

12         it.

13    BY MR. SEEGER:

14         Q.    Whatever tests --

15               Mr. Jia, whatever testing

16    you've done regarding -- since the media

17    reports of the problem with the drywall,

18    we would like to know about it.  So,

19    please give me a complete answer.

20         A.    I did answer.

21         Q.    Okay.  If he's answered,

22    that's fine.

23               Did he want to add anything

24    to his answer?

1          A.    I just stated it.  If you
2    don't understand it, then I can restate
3    it.
4          Q.    No, it's not necessary.
5    Thank you.
6                Mr. Jia, where can we find
7    these complaints that you relied upon to
8    form your belief that, you know -- strike
9    that.
10               The complaints that you
11   referenced in your answer regarding your
12   product, where would those complaints be?
13         A.    Our company has a file for
14   complaints.
15         Q.    And if you needed to, you
16   would know where to find that, Mr. Jia?
17         A.    Yes.  We have a service
18   department for after sales.
19         Q.    And the survey that you did
20   of your customers, is that also someplace
21   where if you needed to find it, you could
22   find it?
23         A.    Yes.
24         Q.    Okay.

1                    And where would that be
2    within the company?
3            A.    The department for after
4    sales, they have the file.
5            Q.    Okay.
6                    And did you mention this
7    testing that you've done in any of your
8    marketing materials to assure your
9    customers that the product is safe and
10   performing properly?
11           A.    Yes.
12           Q.    Okay.
13                   And where could we find
14   those marketing materials?
15           A.    I don't know what type of
16   marketing material you are referring to.
17           Q.    Well, the question that I
18   had asked earlier is, did you mention the
19   testing that you've done in any of your
20   marketing materials to assure your
21   customers that the product was safe and
22   performing properly?  And he answered
23   yes.  So, my question now is, where are
24   those marketing materials?

1          A.    Well, the understanding that

2    you had earlier, I feel that there were

3    misunderstanding.  The testing

4    information, we did not put it inside our

5    marketing material.

6          Q.    Now, the testing information

7    that the Chinese government did, does the

8    company have that?  Does TG have that

9    information?

10          A.    According to the government

11    standard, TG, and also according to

12    relevant standard, TG will follow these

13    standards to check every product.  And it

14    also has the testing report.

15          Q.    Where is that testing

16    report?  Who at TG has the testing report

17    from the Chinese government?

18          A.    So, all of our subsidiaries

19    would have this report, testing report,

20    and every batch of our products would

21    have this report, testing report.

22          Q.    I want to make sure that

23    we're communicating to each other.

24                Are you talking about ASTM

1    certifications or are you talking about

2    testing done specifically by the Chinese

3    government to determine whether there was

4    a defect in the drywall?

5         A.    We don't have any defected

6    products released from the factory.

7         Q.    Okay.

8              I want to go back to the

9    testing that you testified earlier, Mr.

10   Jia, that the Chinese government did

11   testing of your product.  Where is the

12   results of that testing?  Where would

13   that be right now?

14        A.    This information is now with

15   the government in a bureau.

16             INTERPRETER 1:  The

17             interpreter do not have the

18             English translation for this

19             bureau.  Do you think Eugene or

20             the check interpreter can help?

21             Guojia ji jian.

22             MR. SEEGER:  Just give me

23             his answer, and then I'll deal

24             with what the --

1                    INTERPRETER 1:  Okay.

2                    MR. SEEGER:  Okay.

3                    THE WITNESS:  It is in a

4          government bureau, in the hands

5          of -- of the Chinese government.

6                    INTERPRETER 1:  And the

7          interpreter does not have the

8          English name for it.

9                    MR. SEEGER:  You have to

10         take yourself out of it.  What is

11         his answer?  Give me his exact

12         answer.

13                   INTERPRETER 1:  That's the

14         answer.  That's the answer.

15   BY MR. SEEGER:

16         Q.    Okay.

17               Have you seen the results of

18   the test yourself, Mr. Jia?

19         A.    No.

20         Q.    Do you know what tests they

21   performed specifically?

22         A.    They draw samples of our

23   drywall and take it to the laboratories

24   for testing.  Concretely, what methods

1    that they use for testing is up to the

2    scientist, not me.

3          Q.    Well, do you care, Mr. Jia,

4    what the results of those tests are?

5          A.    I care very much.

6          Q.    And have you sought to get

7    the results of those tests from the

8    Chinese government?

9          A.    I did request it from the

10   government, and relevant department

11   informed us that you can continue to

12   produce, there is no problem.

13         Q.    Have you asked for a

14   specific -- strike that.

15               MR. CYR:  There's no

16         question.

17   BY MR. SEEGER:

18         Q.    Okay.

19               So, then, other than

20   assuring you verbally, I take it, Mr.

21   Jia, that there's no problem, you have

22   not been provided with any reports from

23   the Chinese government showing specific

24   tests and the results of those tests?

1          A.    I did not obtain the report.

2   But the government definitely would have

3   obtained the report.

4          Q.    Mr. Jia, sitting here today,

5   do you have a specific understanding

6   about what the specific allegation is

7   that's wrong with the Chinese drywall

8   that's been shipped and used in many

9   homes in the United States?

10              MR. CYR:  Which designated

11         area does that question fall

12         under?

13              MR. SEEGER:  Well, I mean, I

14         just want to make sure that he has

15         a basic understanding of at least

16         what the allegation is that the

17         defect is before I can ask him

18         what have you done to assure your

19         customers, what marketing efforts

20         have you done to, you know, tell

21         your customers anything about the

22         product?  So, you know, I mean,

23         this is just sort of foundational

24         stuff.  That's all.  I just want

1           to know what his understanding is.

2           Does he understand the defect?

3           There can't be anything wrong with

4           answering that one, Joe.

5               MR. CYR:  I'm going to let

6           the witness answer this question

7           even though it doesn't fall in one

8           of the designated areas.

9               MR. SEEGER:  You can answer.

10              THE WITNESS:  Can you

11          interpret it in a continuous way

12          so, therefore, I can have a better

13          concept?

14  BY MR. SEEGER:

15      Q.    Okay.

16          You know there's been a lot

17  of testing of your drywall in the U.S.

18  regarding high sulfur levels.  Do you

19  have an understanding that high sulfur

20  levels is part of the problem with the

21  drywall that's been shipped to the United

22  States?  Yes or no, one way or another?

23              MR. CYR:  I'm going to

24          object to that question and

1          instruct the witness not to answer

2          that one.  What I have said is

3          that I'm allowing the witness to

4          answer the question you previously

5          asked with respect to his

6          awareness of the allegations in

7          the complaints.

8               MR. SEEGER:  That's not how

9          I asked it.  But he asked for

10         clarification.  I just narrowed

11         the question down to make it

12         easier for the witness.  So, I

13         don't see the difference.  The two

14         questions really go together.

15              MR. CYR:  I'm allowing the

16         witness to answer your question

17         with respect to his awareness of

18         the allegations in the complaints.

19              MR. SEEGER:  Okay.

20    BY MR. SEEGER:

21         Q.   So, Mr. Jia, do you have a

22    specific understanding of what the

23    alleged defect is with your product

24    that's been used in the United States?

1         A.    Regarding the defective
2   drywall, I only find this out from the
3   media or from the allegation documents.
4         Q.    Okay.  With regard to -- oh,
5   I'm sorry.  Did you want to complete?
6              MR. SEEGER:  I think he
7         wanted to answer more.
8              THE WITNESS:  At the
9         earliest time, the media in the
10        United States -- not the media.
11        Strike United States.
12              At the earliest time, the
13        media mention about the drywall in
14        the -- drywall made in China has a
15        high content of sulfur.
16   BY MR. SEEGER:
17        Q.    Mr. Jia, have you done
18   anything to test that?
19        A.    Therefore, it is that the
20   Chinese Drywall has a problem.  Now I
21   also see a lot of reports from the media.
22   It is not related to a field fatal event.
23   I also see some reports by some medias
24   that all the reports of the CPSC, it

1    claims that it would not be unsafe to the

2    human body.  I don't understand why do

3    they sue me -- sue us, why do they sue

4    us?

5            MR. CYR:  Can we break?  Go

6         ahead if you have a couple more,

7         but I mean, it is after --

8            MR. SEEGER:  Okay.  If you

9         give me just a little bit of

10        leeway here.

11           MR. CYR:  Sure.

12   BY MR. SEEGER:

13        Q.   Mr. Jia, what have you

14   done -- strike that.

15           In response to the CPSC

16   study that you referenced, what have you

17   done internally in the company to test

18   the product?  Have you done anything, has

19   the company done anything to test its own

20   product?

21        A.   Along the coastal line,

22   there are a lot of customers they use our

23   drywalls.  No laboratories would be

24   better than the laboratory we put it such

1    as the customer that they are using our

2    products along the coastal line.  We got

3    into that laboratory.  Any laboratory

4    testing would not be as accurate as the

5    site testing, on-site testing.  The

6    Chinese customers have never had that

7    problem.  Isn't that the best testing?

8         Q.    Mr. Jia --

9              INTERPRETER 2:  In the

10         world.  The check interpreter

11         believed the witness said, isn't

12         that the best testing in the

13         world?

14              MR. SEEGER:  Thank you.

15    BY MR. SEEGER:

16         Q.    Mr. Jia, if you could just

17    tell me before we break for lunch the

18    specifics of the testing you've done in

19    the homes of the Chinese people who live

20    along the coastal region, what specific

21    testing?

22         A.    No odor.  No decay.

23         Q.    Other than testing for odor

24    and decay, did you do any scientific

1   testing in any of those homes for sulfur

2   levels?

3           A.    I find that testing in that

4   location is the most scientific testing.

5           Q.    How many homes did you test

6   in?

7           A.    All of our customers, they

8   answer like that.

9           Q.    How many?  How many?

10          A.    I can't tell.

11          Q.    More than 100?

12          A.    We have too many, too many

13  customers.

14          Q.    Would it be more than 10,000

15  customers?

16          A.    Well, our survey would never

17  have that large figure, but no customer

18  have that problem, and also we don't have

19  the complaint.

20          Q.    Okay.

21                Can you give me just a rough

22  number of how many?

23                INTERPRETER 1:  He wants to

24          go for lunch.

1              THE WITNESS:  I have already

2         given you the figure.  I don't

3         have more.

4              MR. CYR:  Before we break

5         for lunch, I just want to register

6         a standing objection to the whole

7         line of questioning.  I don't

8         think it has anything to do with

9         the designated areas or the

10        jurisdictional issues.  I think

11        that it's been abusive of Mr.

12        Jia's time and all of our time.  I

13        hope you don't do it this

14        afternoon.

15             MR. SEEGER:  I have to

16        respond, because I've never been

17        accused of abusing the witness,

18        so, I know you don't mean to use

19        that word.

20             MR. CYR:  Just abusing his

21        time.

22             MR. SEEGER:  You made a

23        mistake on that one.  I'm not

24        abusing his time.  It's my time.

1          MR. CYR:  Well, I believe it

2      is his time as well.

3          MR. SEEGER:  He's here for

4      two days whether he wants to be.

5          THE VIDEOTAPE TECHNICIAN:

6      The time now is approximately

7      12:12 p.m., and we are now off the

8      record.

9              -  -  -

10         (Whereupon, a luncheon

11     recess was taken from 12:12 p.m.

12     until 1:22 p.m.)

13             -  -  -

14         THE VIDEOTAPE TECHNICIAN:

15     This begins Tape 4 of today's

16     portion of our deposition.  The

17     time now is approximately

18     1:22 p.m., and we're back on the

19     record.

20  BY MR. SEEGER:

21     Q.    Mr. Jia, why are you no

22  longer selling drywall to U.S.

23  distributors?

24         MR. CYR:  Objection as to

1          form.

2                    THE WITNESS:  Now there's no

3          U.S. customer that comes to our

4          company to buy the plasterboard,

5          the drywall.

6     BY MR. SEEGER:

7          Q.    Mr. Jia, is this a --

8                    Would you agree that this is

9     a true statement, that TG is one of the

10    key enterprises of China National

11    Building Material Group Corporation?

12          A.    CNBM Group is a shareholder

13    of the CNBM Company Limited by share.

14                    INTERPRETER 1:  Or

15          shareholding company, whichever

16          way.  I am not sure how to

17          translate that.

18                    THE WITNESS:  CNBM Company

19          Limited by sharing, or translated

20          as shareholding company, is a

21          listed company.  One of the

22          shareholder of BNBM is CNBM.  One

23          of the major shareholder of --

24          BNBM is one of the major

 1          shareholders of TG.

 2     BY MR. SEEGER:

 3          Q.    So, just if you can answer

 4     yes or no.  If you can't, that's fine.

 5               Would you agree that TG is a

 6     key enterprise of CNBM?

 7          A.    I disagree with this

 8     statement.

 9          Q.    Could you tell me why you

10     disagree with it?

11          A.    CNBM is a very large

12     company.  Regarding its production, the

13     drywall is only a small part of it.

14     Regarding the plaster, the manufacturing

15     of the plasterboard, for sure, we are the

16     largest company in China.

17          Q.    Is he referring to TG when

18     he says "we are the largest company in

19     China"?

20               INTERPRETER 2:  TG.

21               MR. SEEGER:  No, TG.

22               THE WITNESS:  TG including

23          all the subsidiaries under.

24     BY MR. SEEGER:

1          Q.    So, TG including --

2                If I were to ask the

3    question this way, TG including its

4    subsidiaries are a key enterprise of

5    CNBM, would you agree with that?

6          A.    I don't understand your

7    question.

8          Q.    Just to be clear, Shandong

9    Taihe Dongxin Company Ltd. is the same

10   thing as TG, correct?

11         A.    Yes.

12         Q.    Okay.

13               And you would disagree with

14   the statement if I were to say TG is a

15   key enterprise of CNBM, you disagree with

16   that statement?  I just want to be clear.

17         A.    The main concept that I

18   understand is different from the concept

19   that you understand.

20         Q.    Okay.

21               But can he answer the

22   question, does he agree or disagree that

23   TG is a key enterprise of CNBM?

24               MR. CHEN:  I'm sorry, you

1           should actually translate the

2           response, not give an explanation

3           of it.

4                MR. SEEGER:  Okay.  Just

5           tell me his response.  Just tell

6           me his response.

7                THE WITNESS:  I don't

8           understand.  What do you mean by

9           the key concept?

10   BY MR. SEEGER:

11           Q.   Not key concept, key

12   enterprise.

13                INTERPRETER 1:  Key

14           enterprises.  I put it in Chinese

15           as major concepts, or I can put it

16           as an important enterprise.

17                MR. SEEGER:  Put it as an

18           important enterprise.  I'll ask

19           the question that way so we have a

20           clean record.

21   BY MR. SEEGER:

22           Q.   Would he agree that TG is an

23   important enterprise of CNBM?

24           A.   I agree with this statement

1    that TG is a subsidiary company under

2    CNBM mainly producing plasterboards.

3                    INTERPRETER 2:  The check

4            interpreter believes that the

5            witness said, I agree with that

6            statement, that is, TG is a key

7            subsidiary under CNBM.

8                    MR. SEEGER:  Are you okay

9            with that answer?

10                   MR. CYR:  Yeah.  I'm ready

11           to continue.  It sounded close.

12                   INTERPRETER 1:  It's the

13           same.  The same.

14   BY MR. SEEGER:

15           Q.    Mr. Jia, are you aware that

16   BNBM issued a press release in May of

17   2010 discussing the allegations made

18   against Taishan Gypsum?  I just want to

19   know if you are aware of that.

20           A.    I don't understand your

21   question.

22           Q.    Okay.  I'll start over.

23                   Are you aware that BNBM

24   issued a press release in May of 2010

1  discussing the allegations regarding --

2  made in the U.S. regarding Taishan

3  Gypsum, TG?

4        A.    I know.

5        Q.    Were you involved or did you

6  participate in any way in the creation of

7  that press release?

8        A.    BNBM is a listed company.

9  They should make announcement for major

10  incidents.  We go through some channels

11  to reflect this to BNBM.  BNBM, based on

12  the condition to make such an

13  announcement, the content of the

14  announcement, I am not very sure.

15        Q.    So, just to be very clear,

16  I'm not sure if the answer is in what you

17  just gave us, so I want to be clear.

18              Did you in any way

19  participate in drafting the statement,

20  approving the statement made by BNBM?

21        A.    I did not participate.

22        Q.    What do you know about

23  BNBM's U.S. operations, Mr. Jia?

24        A.    Please repeat the question.

1                    MR. SEEGER:  (Addressing the

2          interpreter.)

3                    Could you do that?

4                    (Interpreter repeats the

5          question.)

6                    THE WITNESS:  I don't know.

7     BY MR. SEEGER:

8          Q.    Your testimony is you don't

9     know anything about BNBM's U.S.

10    operations?

11         A.    Yes.

12         Q.    Do you know who Cao Jiang

13    Lin is?  I don't know if I'm saying it

14    right.

15         A.    I don't know this person.

16         Q.    Does he know who the

17    chairman of BNBM is?

18                    INTERPRETER 1:  Chairman

19          could be interpreted in two ways

20          in Chinese, dong shi ju or dong

21          shi hui.

22                    THE WITNESS:  What time

23          period?

24    BY MR. SEEGER:

1          Q.    Let's start with the

2   present.

3          A.    Wang, the last name is Wang.

4   Wang Bin is the chairman of BNBM.

5          Q.    How about back in 2007?

6          A.    I cannot be sure who that

7   is, but I know during the earlier period.

8          Q.    What name from the earlier

9   period does he know?

10         A.    Cao Jiang Lin.

11         Q.    That's the name I was trying

12  to write.  I knew I wasn't pronouncing it

13  correctly, but I figured we'd get there

14  somehow.

15              INTERPRETER 1:  That's close

16         enough.

17  BY MR. SEEGER:

18         Q.    Do you know who Cao Jiang

19  Lin is?

20         A.    I know.

21         Q.    Do you know what his current

22  position is with BNBM?

23         A.    I don't know.

24         Q.    Do you know if he's

1    currently still with BNBM?

2          A.    I don't know.

3          Q.    Do you know if he has a

4    position with CNBM?

5          A.    According to my knowledge,

6    he has no positions with CNBM.

7          Q.    In all the time that you

8    have been on the board of BNBM, you don't

9    recall any presentations regarding BNBM

10   business in the U.S.?

11         A.    I don't know.

12               MR. CHEN:  Objection.  The

13               way it was translated was did you

14               know of any business in the U.S.,

15               not do you recall any

16               presentations regarding business

17               in the U.S.

18               MR. SEEGER:  So, he answered

19               the one do you know of any

20               business?  That's the one he

21               answered?

22               MR. CHEN:  I believe so.

23               MR. SEEGER:  Okay.

24   BY MR. SEEGER:

1           Q.    Let me ask the question

2    again so we have a question and answer.

3                In all your time on the

4    board at BNBM, do you recall

5    presentations or information provided to

6    board members regarding BNBM business in

7    the United States?

8                INTERPRETER 1:  Counsel, the

9           word "presentation" is very

10          difficult to translate accurately.

11          Do you mind to help me?

12               MR. SEEGER:  Discussions.

13          Use discussions instead of

14          presentations.

15               INTERPRETER 1:  Discussions,

16          okay.  Good.

17               THE WITNESS:  I don't

18          understand.  I don't know what you

19          are talking about the business in

20          the United States of the BNBM.

21   BY MR. SEEGER:

22          Q.    Well, do you have an

23   understanding that BNBM does business in

24   the U.S. at all one way or another?

1          A.    I don't know.

2          Q.    Are you aware if BNBM has

3    any U.S. subsidiaries?

4          A.    No.

5          Q.    Have you ever heard of BNBM

6    of America Inc.?

7          A.    I have never heard of it.

8          Q.    Do you have any

9    understanding if Cao Jiang Lin held any

10   positions at CNBM as well as BNBM?

11         A.    I don't know.

12         Q.    Do you know who Peng Shou

13   is?

14              INTERPRETER 1:  P?

15              MR. SEEGER:  It's P-E-N-G,

16         and in English spelled S-H-O-U.

17              THE WITNESS:  I met this

18         person.

19   BY MR. SEEGER:

20         Q.    And how did you meet him?

21         A.    I cannot recall how I met

22   him, but he gave me a name card.

23         Q.    Do you know if Peng Shou has

24   any position with BNBM?

1          A.     No.

2          Q.     No, he doesn't, or you don't

3    know?  I just want to be clear on the

4    answer.

5          A.     He did not have a position.

6          Q.     Do you know who Song Zhi

7    Ping is?  SHO -- I'm sorry.  I'm going to

8    spell it for you, Stephanie.  It's

9    spelled in English S-O-N-G, then Z-H-I,

10   P-I-N-G.  Do you know who that is?

11         A.     I know.

12         Q.     And who is that?

13         A.     What time period?

14         Q.     If you can give me a time

15   from 2005 to the present.

16         A.     He's the chairman of the

17   board of CNBM group.

18         Q.     During that time frame?

19         A.     According to my knowledge,

20   he has been on this position since 2002

21   until now.

22              THE VIDEOTAPE TECHNICIAN:

23         The time now is approximately

24         1:49 p.m., and we are now going

# FILED UNDER SEAL

**CERTAIN EXCERPTS OF THIS TRANSCRIPT HAVE BEEN DESIGNATED "HIGHLY CONFIDENTIAL" AND HAVE BEEN FILED UNDER SEAL, PURSUANT TO PRE-TRIAL ORDER NO. 16**

1    between TG and CNBM?

2         A.    I don't know what type

3    documents are you referring to.

4         Q.    Are there any distribution

5    agreements?

6         A.    No.

7         Q.    Any joint venture

8    agreements?

9         A.    Will you mind explain the

10   concept of joint venture?

11        Q.    It was a word he used

12   yesterday.

13        A.    Joint venture, according to

14   my concept, that is an agreement of the

15   shares between TG and BNBM.

16        Q.    Does any agreement like that

17   exist between TG and CNBM?

18        A.    No.

19        Q.    Okay.

20              Mr. Jia, are you aware that

21   CNBM lists TG in its financial statements

22   as part of its building materials

23   sector -- section, sorry?

24        A.    I don't understand.  What do

1   you mean?

2          Q.    Have you ever reviewed

3   financial statements prepared by CNBM?

4          A.    They did not give it to me,

5   and I did not see it.

6          Q.    So, you're not aware,

7   sitting here today, that CNBM lists TG in

8   its financial statement as part of its

9   building materials section?

10         A.    CNBM and CNBM shareholding

11  companies or translated as CNBM Company

12  Limited by share, these are two separate

13  companies.  I don't know which company

14  are you referring to.

15         Q.    Okay.

16               Are you aware of TG being

17  listed -- okay.

18               MR. CHEN:  The first

19         reference should have been CNBM

20         group and CNBM shareholding

21         company.

22               MR. SEEGER:  Okay.

23               INTERPRETER 1:  He did not

24         say the word "group."

1            MR. SEEGER:  I'm going to

2        ask a different question to make

3        it easy.

4            INTERPRETER 1:  Okay.

5    BY MR. SEEGER:

6        Q.   Mr. Jia, are you aware that

7    TG is listed in the financial statements

8    of China National Building Material

9    Company Limited in their financial

10   statements under the building materials

11   section?

12       A.   Your question is still not

13   clear.  I still don't know which company

14   you are referring to.

15       Q.   Are you aware of TG being

16   listed in the financial statements of any

17   CNBM company?

18       A.   I did not see it, but I

19   consider this should be listed.

20           MR. SEEGER:  I'm going to

21       pass Mr. Jia.

22           MR. CYR:  Do you want to

23       take a break?

24           MR. SEEGER:  Yes.

```
 1                THE VIDEOTAPE TECHNICIAN:
 2          The time now is approximately
 3          2:07 p.m., and we are now off the
 4          record.
 5                    -  -  -
 6              (Whereupon, a recess was
 7          taken from 2:07 p.m. until
 8          2:23 p.m.)
 9                    -  -  -
10                THE VIDEOTAPE TECHNICIAN:
11          This begins Tape 5 of today's
12          portion of our deposition.  The
13          time now is approximately
14          2:23 p.m., and we're back on the
15          record.
16                    -  -  -
17                  EXAMINATION
18                    -  -  -
19   BY MR. MONTOYA:
20          Q.   Good afternoon, Mr. Jia.  My
21   name is Patrick Montoya.  I also
22   represent the plaintiffs in this matter.
23   I'll be asking you a few questions today.
24              I'm handing the witness what
```

```
 1   we've marked as Exhibit 12.  It is a
 2   Tai'an Taishan Plasterboard manufacturer
 3   profile form.
 4               MR. MONTOYA:  I'm going to
 5           hand a copy to counsel.
 6               MR. CYR:  Thanks.
 7                    -  -  -
 8           (Whereupon, Deposition
 9           Exhibit Jia-12, Tai'an Taishan
10           Plasterboard Co. Ltd. Manufacturer
11           Profile Form, was marked for
12           identification.)
13                    -  -  -
14               MR. CHEN:  I'm sorry.  Could
15           I ask the interpreter, you only
16           translated part of the name of the
17           company.  So you only did Tai'an
18           Taishan.
19               INTERPRETER 1:  I did
20           translate the whole thing, because
21           that is what it is, how he said.
22           Tai'an Taishan Plasterboard
23           manufacturer profile form.  I did
24           not add anything.  It is not my
```

1              job to clarify if it is not

2              considered to be clear enough by

3              the other interpreters.

4                   MR. MONTOYA:  That's quite

5              all right.  I'll clear it up.

6    BY MR. MONTOYA:

7         Q.    Mr. Jia, the Exhibit 12 that

8    I've handed you, there's a yellow

9    Post-it.  Do you recognize in the title

10   that's the company we know as TTP?

11        A.    I recognize it.

12        Q.    I'll also ask you to turn to

13   the page where it's marked with the pink

14   note.  Can you tell me who signed that

15   document?

16        A.    Mr. Song Qinghai.

17        Q.    Who is Mr. Song Qinghai?

18        A.    Mr. Song Qinghai is the

19   senior official managing the production

20   for TTP.

21        Q.    How long has Mr. Qinghai

22   been managing production for TTP?

23                   INTERPRETER 1:  Qinghai is

24              the first name.

1                    THE WITNESS:  He has always

2          been responsible for the

3          production of TTP and the process

4          of production.

5    BY MR. MONTOYA:

6          Q.    Since what year?

7          A.    I cannot recall exactly what

8    year.

9          Q.    What year was TTP formed?

10          A.    At the beginning of early

11    2006.

12                    MR. MONTOYA:  Is it

13          appropriate for me to refer to him

14          as Song or Qinghai?

15                    INTERPRETER 1:  Mr. Song is

16          the last name.  The Chinese put

17          the last name first.

18    BY MR. MONTOYA:

19          Q.    How long --

20                Does Mr. Song have any

21    employment responsibilities at TG?

22          A.    Mr. Song Qinghai, before the

23    establishment of TTP, he was the employee

24    of TG.

1          Q.     Which entity pays Mr. Song?

2          A.     What time period?

3          Q.     Between 2002 to 2010, has he

4    always been paid by the same entity?

5          A.     No.

6          Q.     Which entities paid him for

7    which years?

8          A.     Before the establishment of

9    TTP, TG paid for him.  After the

10   establishment of TTP, TTP paid him.

11         Q.     Did you direct Mr. Song to

12   fill out Exhibit 12?

13         A.     I don't understand what you

14   mean.

15         Q.     Did you ask Mr. Song to sign

16   Exhibit 12?

17         A.     I did not tell him.

18         Q.     Who did?

19         A.     I don't know who, but it

20   should be someone from TTP.

21         Q.     Does Mr. Song report to you?

22         A.     Mr. Song did not report to

23   me.

24         Q.     Has Mr. Song ever reported

1  to you from 2002 until 2010?

2          A.    I need to separate this into

3  two time periods.  Before 2006, sometimes

4  I bump into him and we say hello.  He did

5  not report to me.  He also did not report

6  to me after the year 2006.  In 2008,

7  after TTP stopped production, he went to

8  work for another company under TG.

9          Q.    What company did he go work

10  for?

11              MR. CYR:  I'm sorry.  Was

12          the witness finished his answer?

13              INTERPRETER 1:  Yes.

14              MR. CYR:  Sorry.

15  BY MR. MONTOYA:

16          Q.    What company did Mr. Song go

17  to work for after 2008?

18          A.    He is now working for a

19  company called Anhui Tongling Taishan

20  Plasterboards.

21          Q.    Is that company in the

22  family of Taishan companies?

23          A.    It is a subsidiary of TG.

24          Q.    Is it a 100 percent owned

1    subsidiary of TG?

2         A.    I cannot recall, but it

3    should be a shareholding.

4         Q.    Was Mr. Song terminated or

5    was he transferred?

6         A.    The new company hired him by

7    the company called Tongling Taishan.

8         Q.    Did TTP terminate Mr. Song

9    in 2008?

10        A.    Terminated.

11        Q.    Why was he terminated?

12        A.    Because TTP stopped

13   production, therefore, he has no more

14   work.

15        Q.    Why did TTP stop production?

16        A.    TTP terminated the

17   production because TG, when they

18   established TTP, it was for the purpose

19   to fulfill the need of the customer for

20   VAT, value added tax.

21        Q.    What do you mean when you

22   say "to fulfill the need of the customer

23   for VAT"?  What do you mean by fulfilling

24   the customer's need for VAT?

1            A.     If I need to explain this,
2     it takes a long time.
3            Q.     Does it have anything to do
4     with the production of synthetic gypsum?
5            A.     Yes.
6            Q.     Was there an incentive for
7     TTP to produce synthetic gypsum because
8     it was using fertilizer waste for gypsum
9     production?
10                  MR. CYR:  Objection as to
11            form.
12                  Mr. Jia, please try to
13            answer the question.
14                  THE WITNESS:  I'm very
15            willing to answer this question.
16            If I make this clear, it takes a
17            very long time.
18     BY MR. MONTOYA:
19            Q.     Let me see if I can help
20     you, if I may.
21            A.     And sometimes it might be
22     very difficult for translation, too.
23            Q.     Let me stop him and let me
24     see if I can assist him.

1          A.    Fine.

2          Q.    I understand that you, Mr.

3    Jia, helped start the process of learning

4    how to produce synthetic gypsum yourself;

5    is that correct?

6              MR. CYR:  Objection as to

7          form.

8              THE WITNESS:  I want to help

9          to give you a more thorough

10         picture of the production of

11         synthetic gypsum in China.

12   BY MR. MONTOYA:

13         Q.    I understand that, but I

14   need to ask you my questions.

15         A.    Yes.  I'm going to answer.

16   Please complete your question.

17         Q.    You or your company helped

18   start the production of synthetic gypsum

19   in China; is that correct?

20         A.    Yes.

21             MR. CYR:  I'm sorry.  I need

22         to object.  You don't need to

23         interpret this, but I do think

24         that the transcript will be

1          confusing.  I believe that counsel

2          intended to ask a question with

3          respect to drywall using synthetic

4          gypsum, and that's not the way

5          that the transcript currently

6          reads.

7              We're ready for your next

8          question.

9     BY MR. MONTOYA:

10         Q.    Sir, when we're talking

11    about synthetic gypsum, I'm talking about

12    for the production of drywall.  Do you

13    understand that?

14         A.    Yes.

15         Q.    From 2005 until 2008, did

16    TTP and TG use synthetic gypsum for

17    making drywall?

18         A.    We did.

19         Q.    And TTP and TG believed

20    synthetic gypsum was a safe product and

21    marketed it that way; is that correct?

22         A.    Yes.

23         Q.    The synthetic gypsum product

24    that was manufactured by TG and TTP

1    between 2005 and 2008 was the drywall

2    product that eventually ended up in the

3    United States, correct?

4              A.    I don't understand your

5    question.

6              Q.    Do you know whether the

7    drywall that was produced by TG or TTP

8    that ended up in the United States was

9    made with synthetic gypsum?

10              A.    Now I know some of our

11    drywalls has ended up in the United

12    States.  Before May 2009, I did not know

13    how many drywall ended up in the United

14    States.  Our company based our

15    requirement of the customers to use the

16    materials.

17              Q.    Did the customers from the

18    United States request synthetic gypsum?

19              A.    I cannot tell for sure what

20    gypsums the U.S. customer requires.

21              Q.    TTP stopped doing business

22    in 2008, correct?

23              A.    Yes.

24              Q.    Between 2008 to today, has

1    TTP done any business?

2          A.    No.

3          Q.    Are they currently doing

4    business?  Is TTP currently doing

5    business?

6          A.    No.

7          Q.    Between 2005 and 2008, who

8    at TTP reported to you?

9          A.    Peng Shi Liang.

10               INTERPRETER 1:  Peng is the

11               last name.

12   BY MR. MONTOYA:

13         Q.    Where is Peng Shi Liang now?

14         A.    Peng Shi Liang is now

15   working in a subsidiary under TG.

16         Q.    Is it common for -- strike

17   that.

18               Did the employees that used

19   to work at TTP, when they stopped doing

20   business, get transferred to other TG

21   entities?

22         A.    Not to transfer, but to

23   rehire.

24         Q.    Is it common for the

1    companies that are within the Taishan

2    family to transfer employees between the

3    different companies?

4          A.    It always happen like this,

5    but not necessarily.

6                MR. CHEN:  Objection.  It

7          often happens like this, not

8          always.

9                INTERPRETER 1:  Uh-huh.

10                MR. MONTOYA:  Okay.

11   BY MR. MONTOYA:

12          Q.    Did TG and TTP have the same

13   production standards for drywall?

14                MR. CYR:  Objection on the

15          grounds that the question is

16          vague.

17   BY MR. MONTOYA:

18          Q.    You can answer, sir.

19                MR. CYR:  Please try to

20          answer, Mr. Jia.

21                THE WITNESS:  Regarding this

22          question, I don't know what

23          standard you're referring to.

24   BY MR. MONTOYA:

1          Q.    When TG and TTP made

2     drywall, they had a standard for

3     production, correct?

4          A.    I don't understand what you

5     mean.

6          Q.    Quality standards?

7          A.    The quality standard is

8     according to the state standard.  It

9     doesn't matter whether it is the TG, TTP

10    or subsidiaries of TG or other

11    competitors.  After all, all the

12    companies in China, they have to follow

13    the government standard.

14         Q.    Does that standard come from

15    CNBM?

16         A.    No.

17         Q.    Does it come from BNBM?

18         A.    No.

19         Q.    Does the state require CNBM

20    to have certain production standards?

21                INTERPRETER 1:  The

22              interpreter is trying to translate

23              a Chinese government bureau from

24              Chinese into English, but she does

1           not have the standard translation.

2           She only try her best.

3                THE WITNESS:  The State

4           Bureau for Monitoring and

5           Inspection of Quality organize the

6           enterprises and experts related to

7           the UN to formulate certain

8           standard within certain period of

9           time to set up a standard

10          requiring different enterprises to

11          implement.  The enterprises have

12          to follow this quality standard.

13   BY MR. MONTOYA:

14          Q.   Do the manufacturers of

15   drywall in China participate in the state

16   bureau that makes the requirements for

17   the production of drywall?

18          A.   Many of the very important

19   manufacturers, they have to participate.

20          Q.   Does that include you, sir?

21          A.   Including TG.

22          Q.   Do you participate

23   personally on behalf of TG?

24                INTERPRETER 1:  I'm

1          clarifying with the accent.

2                    MR. CYR:  That's okay.

3                    THE WITNESS:  Because it

4          requires many discussions.

5          Therefore, I participated once.

6     BY MR. MONTOYA:

7          Q.    In what year?

8          A.    I don't recall.

9          Q.    Do you recall if it was in

10    between 2005 and the present day?

11         A.    Seems to be even earlier.

12         Q.    Did you direct TTP to

13    produce drywall according to the state

14    standards from 2005 until 2008?

15         A.    Most of the products

16    produced inside China, they follow this

17    standard.

18         Q.    I understand.

19                But my question is, did you,

20    on behalf of TG, direct anyone at TTP to

21    produce drywall according to the state

22    standard?

23         A.    I don't understand what you

24    mean.

1          Q.    What I'm trying to
2    understand is, there's a state required
3    production standard, right?
4          A.    Yes.
5          Q.    And you have, in your
6    capacity at TG, you require TTP to
7    produce drywall according to that state
8    standard?
9               MR. CYR:  Objection as to
10         form.
11              Please try to answer, Mr.
12         Jia.
13              THE WITNESS:  I feel that I
14         don't understand this question.
15   BY MR. MONTOYA:
16         Q.    The state standard that's
17   required for drywall production, you've
18   asked TTP -- you asked TTP to produce
19   drywall according to that standard,
20   correct?
21         A.    No.
22         Q.    So, who required TTP to
23   produce drywall according to the state
24   standard?

     1              A.    We have to produce the
     2    drywall according to the state standard.
     3    That is something that we don't need to
     4    say.
     5              Q.    But you directed it anyway,
     6    right?
     7              MR. CYR:  Objection as to
     8         form.  It's also contrary to what
     9         he said.
    10              THE WITNESS:  It is
    11         impossible.
    12    BY MR. MONTOYA:
    13              Q.    Let me ask you it this way.
    14              You made sure that TTP
    15    produced drywall according to the state
    16    standard, right, because to be out of
    17    that standard would be wrong?
    18              INTERPRETER 1:  How do you
    19         say cm?
    20              MR. CHEN:  Millimeter.
    21              INTERPRETER 1:  Okay.
    22              THE WITNESS:  When we
    23         produced the drywall, if the
    24         customer require drywall thicker

1           than 16 mm, then it must follow

2           the state standard.

3               MR CHEN:  I think it was 12.

4           Maybe you can confirm with him.  I

5           thought it was --

6               THE WITNESS:  12 mm.

7               INTERPRETER 1:  Thank you.

8               MR. MONTOYA:  Is that his

9           complete answer?

10              INTERPRETER 1:  Yes.

11  BY MR. MONTOYA:

12      Q.    Is it your testimony that

13  you did not set the standard for the

14  drywall production at TTP?

15      A.    I don't understand what you

16  mean.

17      Q.    By quality standards?

18      A.    To produce the two types of

19  products, you must -- it must follow the

20  state standard.

21              INTERPRETER 1:  The

22          interpreter does not understand

23          what does he mean by the two

24          types.  I'm afraid I may not be

1              correctly translating.

2                    MR. CHEN:  I'll interject

3              with an objection and clarify,

4              it's two dimensions of product.

5                    THE WITNESS:  Two type of

6              thickness of the product.

7    BY MR. MONTOYA:

8         Q.    Aside from, I think you

9    testified before that the formula for the

10   drywall produced by TG and TTP was the

11   same between 2005 and 2008; is that

12   correct?

13                   MR. CHEN:  Clarification.

14             The question was formula, not

15             dimensions.  And the translation

16             referred to dimensions in Chinese.

17                   MR. MONTOYA:  I asked for

18             formula.  That's correct.  If you

19             need to reask the question, that's

20             fine.

21                   INTERPRETER 1:  The formula,

22             what do you prefer?

23                   MR. MONTOYA:  I mean the

24             chemical composition, and I will

1           reask the question.

2                 INTERPRETER 1:  Okay.  Good.

3                 MR. CYR:  I'm sorry.  Were

4           you going to ask the question

5           again?

6                 MR. MONTOYA:  I'll reask the

7           question.

8                 INTERPRETER 1:  I will go

9           back to the question.

10                MR. MONTOYA:  Wait.  Let me

11          reask the question.

12     BY MR. MONTOYA:

13          Q.    Sir, I believe you testified

14     before that the formula for the drywall,

15     and I mean the chemical composition of

16     the drywall, produced by TG and TTP was

17     the same between 2005 and 2008; is that

18     correct?

19          A.    I don't understand.  What do

20     you mean by the formula for the chemical

21     components?

22          Q.    How the drywall is made.

23          A.    The drywall is made out of

24     the raw material of drywall and paper,

1    combine them together.

2              MR. CHEN:  Of gypsum.

3              INTERPRETER 1:  Of gypsum.

4         Gypsum and drywall is the same

5         thing.  To my lawyers, the same

6         thing.  I clarify that to them.

7              MR. MONTOYA:  You just need

8         to do the translation.  That's

9         okay.  That's your ability.

10             INTERPRETER 1:  He hasn't

11        finished yet.

12             MR. MONTOYA:  Yes.  Let him

13        finish.

14             THE WITNESS:  So the raw

15        material of the gypsum after the

16        factory buy them, they mix it

17        together, and then they ground it

18        up, become dust, and then they mix

19        it together.  And then they put it

20        inside a kiln to burn it.

21             I haven't finished yet.

22             MR. MONTOYA:  Proceed.

23   BY MR. MONTOYA:

24        Q.   Were you finished?  Are you

1  finished?

2          A.    No, not yet.  I haven't

3  finished yet.

4                We put it in a warehouse to

5  store it, and then we take it out to do

6  measurement.  And then we add the

7  adhesive and water.  And then we mix it

8  together.  And in the mixing procedure,

9  we'll add paper.  After it is formulated,

10  then we cut it.  And then -- and then

11  we'll put it in another kiln to burn it

12  again.  And then we will take it out and

13  then we will work on the edge.  And then

14  we would package it and then store it.

15          Q.    That whole process you've

16  just described is uniform at TG and TTP

17  from 2005 to 2008, correct?

18          A.    The whole world is the same.

19          Q.    That whole production

20  process you just described was controlled

21  by TG for TTP, correct?

22                MR. CYR:  Objection as to

23          form.

24  BY MR. MONTOYA:

1          Q.    You can answer, sir.

2          A.    I don't understand the word

3    "control."

4          Q.    It means that TG gave the

5    order to TTP on how to produce the

6    drywall.

7          A.    The knowledge of how to

8    produce drywall, everyone knows about.

9    There's no need for one company to order

10   another company regarding how to produce

11   it.

12         Q.    But TG did that for TTP,

13   right?

14               MR. CYR:  Objection as to

15         form.

16   BY MR. MONTOYA:

17         Q.    Is the process a trade

18   secret?

19         A.    It doesn't exist.

20         Q.    From 2005 until 2008, the

21   drywall produced by TG and TTP, was any

22   of it mined naturally?  Was the gypsum

23   mined?

24         A.    Yes.

1          Q.    Synthetic gypsum is made

2    through a process called flue gas

3    desulfurization.  Do you know that term?

4                INTERPRETER 1:  Let me see,

5          we might have it.  How to spell

6          it?  Can we check on the computer?

7                MR. MONTOYA:  Don't worry.

8          You know what, i'll go back to

9          that.  I'm sorry.  I'll move on to

10         another question.

11               INTERPRETER 1:  Okay.

12               MR. MONTOYA:  I'm going to

13         move on to another question.

14               INTERPRETER 1:  Okay.

15   BY MR. MONTOYA:

16         Q.    Did TG and TTP use gypsum

17   from the same mines, M-I-N-E-S?

18         A.    Not necessarily.

19         Q.    Which mines?

20         A.    Well, TG and TTP -- well, TG

21   produce a large quantity of drywalls,

22   therefore, the materials come from

23   different mines.  For example, Tai'an is

24   closer to TTP and TG.  Some other mines

1    might be further away.

2            Q.    Did the two companies share

3    mines or use the same mines?

4            A.    There's no difference.

5    Sometimes they use the same mines.

6    Sometimes they use the synthetic gypsum.

7    Sometimes they use an ordinary mine.  The

8    mine, the local mine in Tai'an is small.

9    One mine does not fulfill all the

10   requirement for such a large quantity for

11   TG.  Therefore, to produce other

12   products, it is not possible to use it

13   from only one location.

14                  I want to take a break.

15                  MR. MONTOYA:  That's fine.

16                  THE VIDEOTAPE TECHNICIAN:

17           The time now is approximately

18           3:17 p.m., and we are now off the

19           record.

20                      -  -  -

21                  (Whereupon, a recess was

22           taken from 3:17 p.m. until

23           3:27 p.m.)

24                      -  -  -

# FILED UNDER SEAL

**CERTAIN EXCERPTS OF THIS TRANSCRIPT HAVE BEEN DESIGNATED "HIGHLY CONFIDENTIAL" AND HAVE BEEN FILED UNDER SEAL, PURSUANT TO PRE-TRIAL ORDER NO. 16**

1          A.    Yes.

2          Q.    Who were they?

3          A.    Each company has an after

4    sales department inside of sales.  I know

5    that department in TG, but I don't know

6    that department in TTP.

7          Q.    Are you familiar with the

8    ASTM standards?

9          A.    My attorney informed me

10   before I answer this -- before I answer

11   this question, my attorney inform me that

12   one of the terms that you translated for

13   me needs to be corrected.  I want to

14   correct it now.

15             MS. BASS:  There's no

16        question.

17             MR. MONTOYA:  I would like

18        him to answer the question and

19        then he can correct it.

20             MR. CYR:  I object to that.

21        If the witness indicates he wants

22        to say something, I think we

23        should let him say it.

24             MS. BASS:  You want him to

1          say it.

2                    MR. MONTOYA:  I just want

3          him to answer the question, and he

4          can correct whatever he wants, or

5          you can do it on your direct.

6                    MR. CYR:  I don't think we

7          need to quibble about it.

8                    Interpreter, could you ask

9          Mr. Jia to answer the lawyer's

10          question first and then say

11          whatever he wants to say.

12                    THE WITNESS:  Fine.

13                    I am not familiar with the

14          ASTM standard.  Here is the

15          ratification of the terminology.

16          So, earlier when I talk about

17          material for TG, it comes from

18          different mines.  It also come

19          from different electrical plans.

20          And it is not -- it is a

21          different -- these are different

22          materials, but the interpretation

23          translated in ordinary material.

24          I am saying difference, not

1          ordinary.  Putong and putong.  So,

2          it sounds very similar.

3    BY MR. MONTOYA:

4          Q.    Are you aware that TG

5    claimed to pass the ASTM standards for

6    drywall?

7          A.    I don't understand what you

8    mean.

9          Q.    Did you know that TG or TTP

10   alleged to have passed the ASTM

11   specifications for the manufacturing of

12   drywall?

13         A.    When we produced the

14   drywalls, usually in general we follow

15   the state standard.  If the customer has

16   special requirement, then we follow the

17   specific standard.

18         Q.    Do you know that the "A" in

19   ASTM stands for American?

20         A.    I don't know.

21         Q.    Do you think that passing

22   the American Society for Testing

23   Materials standards would be useful for

24   marketing in the United States?

1            A.    I know about this, but our
2    company did not do this.
3            MR. MONTOYA:  Unfortunately,
4        sir, my time with you is done
5        today, but I look forward to
6        meeting you again.
7            I pass the witness.
8        MR. CYR:  Thank you.
9            -  -  -
10            EXAMINATION
11            -  -  -
12    BY MS. BASS:
13        Q.    Good afternoon.  My name is
14    Hilarie Bass, and I represent the Home
15    Builders Steering Committee in the
16    litigation in the United States.
17            INTERPRETER 1:  Home
18        Builders, is it an organization or
19        a company, Hilarie?
20        MS. BASS:  Excuse me?
21            INTERPRETER 1:  Home
22        Builders, would you mind to help
23        me.  Is Home Builders an
24        organization or --

1              MS. BASS:  No.  It is a

2         committee of the Multi-District

3         Litigation.

4    BY MS. BASS:

5         Q.    Why don't we simply say

6    this.  I'm here representing Lennar, one

7    of the Home Builders in the litigation in

8    the United States.

9              Following up on the line of

10   questioning that we just completed, you

11   were aware that some of your customers

12   requested that drywall be produced in

13   conformity with certain specifications,

14   were you not?

15        A.    I don't understand.  What do

16   you mean?

17        Q.    You previously stated that

18   customers would come to you with specific

19   specifications for the product they were

20   purchasing from you?

21             MR. CYR:  That's a question,

22        I believe.

23             MS. BASS:  Yes.

24   BY MS. BASS:

1          Q.     Isn't that correct?

2          A.     When a customer come to us

3    from commercial products, if they have

4    specific requirements, we need to fulfill

5    it.

6          Q.     Were you aware that certain

7    of your customers requested that you

8    comply with the ASTM standards?

9          A.     These customers were handled

10   by our foreign sales department.  I did

11   not directly in touch with these

12   customer, therefore, I cannot answer this

13   question.

14         Q.     Okay.

15                So, you don't have any

16   personal knowledge as to whether or not

17   certain of your customers requested that

18   your drywall meet specifications required

19   for the United States?

20         A.     I don't know anything about

21   this regarding what are requirement,

22   regarding what customer.  I have never

23   participated in even one incidence of the

24   negotiation.

1        Q.    So, as far as you know,

2    there could have been hundreds of

3    American customers purchasing from your

4    company and demanding that the drywall be

5    built and be manufactured in compliance

6    with American standards because you don't

7    know?

8        A.    I don't know how many

9    customers come to China, but come to us

10    to do the purchase or they did make the

11    inquiries.  I did not participate in any

12    process of the negotiation.  I did not

13    know about a requirement of the

14    customers.

15        Q.    So, the best person to tell

16    us what amount of drywall of your company

17    was purchased for use in the United

18    States would be representatives of your

19    foreign sales department, not you; isn't

20    that correct?

21        A.    Yes.  People from the

22    foreign sales department, they understand

23    the export situations the best.

24        Q.    You previously testified

1    that you could not speculate whether

2    there were additional sales to the United

3    States by TG; isn't that correct?

4            A.    I don't understand.  What do

5    you mean?

6            Q.    You previously testified

7    that you could not speculate about

8    whether there were additional sales to

9    the United States of TG plasterboard

10   other than those identified in your

11   profile form; isn't that correct?

12                MR. CYR:  Objection as to

13          form.

14                Mr. Jia, you can try to

15          answer the question.

16                THE WITNESS:  I still don't

17          understand the concept.

18   BY MS. BASS:

19           Q.    Isn't it correct that you

20   don't have personal knowledge as to how

21   many other American customers purchased

22   drywall from your company?

23           A.    Yes.

24           Q.    Isn't it also correct that

1    you don't know -- that you don't have

2    personal knowledge about how many other

3    customers spoke to people in your foreign

4    sales department and expressly described

5    to them that they were purchasing drywall

6    for use in the United States?

7              A.    I don't understand.

8              Q.    Do you have personal

9    knowledge of conversations that your

10   customers had with representatives of the

11   foreign sales department wherein they

12   described that they were purchasing

13   drywall from your company for specific

14   use in the United States?

15             A.    I don't know.

16             Q.    Isn't it true that you have

17   no personal knowledge of sales to

18   customers in the United States that were

19   made by BNBM?

20             A.    I am not sure.

21             Q.    You don't know what sales --

22             INTERPRETER 1:  I haven't

23        finished yet.

24             MS. BASS:  I'm so sorry.

1                    THE WITNESS:  I am not clear

2          of the products BNBM sells to the

3          United States.

4   BY MS. BASS:

5          Q.    In the monthly reports of

6   TTP that you previously testified you

7   reviewed, was it disclosed, the amount of

8   product TTP was selling to customers in

9   the United States?

10                   MR. CYR:  Objection on the

11         use of the phrase "customers in

12         the United States."

13                   THE WITNESS:  I don't know.

14         I don't know which drywall is for

15         the U.S. customers or for other

16         customers.

17  BY MS. BASS:

18         Q.    So, you don't know what

19  amount of drywall TTP was selling to

20  customers in the United States; isn't

21  that true?

22         A.    So, every month we have a

23  monthly report.  It will tell us the

24  specifics of the production and also the

1    volume of the sales.  But regarding which

2    customer it was sold to, because TG has

3    too many, many customers, more than

4    10,000 customers, so, this type of

5    information would not come to me.

6           Q.    Have you reviewed the

7    manufacturers profile form filed in this

8    litigation by TTP?

9           A.    Are you referring to the

10   form signed by Mr. Song that we talk

11   about earlier?

12          Q.    Yes.

13          A.    I just saw it.

14          Q.    You just saw it for the

15   first time?

16          A.    Yes.

17          Q.    Are you familiar with the

18   exhibit to that profile form that lists

19   sales to customers in the United States?

20              MR. CYR:  There's no need to

21              interpret this, but I do object

22              again to this phrase.  You're

23              insisting on using the phrase

24              "customers in the United States."

1            It is just totally inconsistent
2            with the record.
3                   Mr. Jia, you can answer the
4            question.
5                   THE WITNESS:  I am not
6            familiar.
7       BY MS. BASS:
8            Q.    Are you familiar with
9       whether or not TTP was authorized to use
10      TG's name on their product?
11           A.    Yes.
12           Q.    Are you familiar with
13      whether or not TG's name was used on any
14      of the sales of products that are
15      described on Exhibit A to the TTP
16      manufacturers profile form?
17           A.    I don't understand.  What do
18      you mean?
19           Q.    Do you know whether or not
20      TTP used TG's brand on any of the sales
21      that are described on Exhibit A to the
22      TTP manufacturers profile form?
23           A.    I don't know.
24           Q.    Did TG ever license the name

1    brand Taishan to be used by TTP?

2                INTERPRETER 2:  The check

3         interpreter believes that -- can

4         the check interpreter supply the

5         Chinese interpretation?

6                INTERPRETER 1:  But he did

7         not say he did not understand.

8                INTERPRETER 2:  The question

9         is that TG license the Taishan

10        name to TTP?

11               MS. BASS:  Correct.

12               INTERPRETER 2:  So, I would

13        like to interpret it like that in

14        Chinese.  Is that okay?

15               MS. BASS:  That's fine.

16               INTERPRETER 1:  The brand

17        name.  She said the brand.  It's

18        the same.

19               MR. CYR:  I'm sorry.  Let's

20        wait for the lawyer to ask what's

21        next.

22               MS. BASS:  The question

23        that's been posed.  I'm waiting

24        for an answer.

1           THE WITNESS:  I don't
2      understand.  What do you mean by
3      "our name"?
4  BY MS. BASS:
5           Q.   Was there a license
6  agreement between TTP and TG by which TG
7  agreed that TTP could use its brand name
8  on its products?
9           MR. CHEN:  Objection.  For
10      the interpreter's consideration, I
11      think license, you are using zhi
12      jao as in a driver's license, and
13      I think hsuke bwould be more
14      appropriate for your
15      consideration.
16           INTERPRETER 1:  Okay.  No
17      objection.  It is good.
18           THE WITNESS:  TG has a lot
19      of brands.  This brand is not
20      using its name.  TG did authorize
21      TTP and other companies to use its
22      brand.
23  BY MS. BASS:
24           Q.   Is that brand known as the

1   Taishan brand?

2          A.    Besides Taishan, there are

3   also other brands.

4          Q.    Were those other brands also

5   licensed for use by TTP?

6          A.    Yes.

7          Q.    What was the time frame for

8   the license of use of the brand by TTP?

9          A.    I cannot recall exactly the

10  time period.

11         Q.    Can you tell me

12  approximately?

13         A.    I don't recall

14  approximately, but it should be around

15  the year 2006.

16         Q.    During the time frame of

17  that license, was TG and TTP both using

18  the same brands?

19         A.    Sometimes it is the same

20  brand.

21         Q.    During the time frame of

22  that license, does that mean that drywall

23  manufactured by TTP could conceivably

24  have the same brand name on it as

1    plasterboard manufactured by TG?

2         A.    Yes.

3         Q.    Other than what you've

4    previously testified to regarding sales

5    to U.S. customers by TG, did TG sell any

6    other products which it believes were

7    eventually utilized by customers in the

8    United States?

9         A.    I don't know.

10        Q.    So, you don't know whether

11   or not, for example, TG manufactured

12   metal studs that might have been

13   eventually utilized in the United States?

14             INTERPRETER 1:  Counsel,

15        would you mind explaining what is

16        metal studs?  I have translation

17        difficulty with metal studs.

18             MS. BASS:  Well, I sure

19        can't help her.

20             MR. MONTOYA:  I didn't know

21        if you heard her.

22             MR. CYR:  I have no comment

23        on that matter.

24             INTERPRETER 1:  She's

 1              looking in the dictionary.

 2                   MS. BASS:  That's fine.

 3                   (Discussion in Chinese

 4              between interpreters.)

 5                   THE WITNESS:  Regarding the

 6              metal studs, we have very few

 7              production, and also the sales is

 8              very small, therefore, I don't pay

 9              attention of the quantity.  I also

10              don't know whether we have any

11              U.S. customers or not.

12   BY MS. BASS:

13         Q.    Once again, would we need to

14   ask someone in the foreign sales

15   department to obtain that information?

16         A.    It should be the case.

17         Q.    Does TG stand behind its

18   products if there is a problem with them?

19         A.    I don't understand.  What do

20   you mean by "stand behind"?

21         Q.    Assuming there was a defect

22   in a product manufactured by TG, would TG

23   be prepared to remedy that defect in

24   their product?

1          A.    TG has no responsibility to

2    make remedy to the defects for the

3    products of TTP.

4          Q.    My question was, will TG

5    remedy defects in the products that TG

6    manufacturers?

7                MR. CHEN:  Hold one moment.

8                THE WITNESS:  TG concerning

9          its own product?

10   BY MS. BASS:

11         Q.    Yes.  That's the question.

12               INTERPRETER 2:  Perhaps the

13         check interpreter believes the

14         word "remedy," the interpreter may

15         have interpreted it as like a

16         repair.  But perhaps it should be

17         like some measures to help.

18               INTERPRETER 1:  It's the

19         same.  Fix it.

20               MS. BASS:  Just ask the

21         witness to please answer the

22         question.

23               THE WITNESS:  Yes.

24   BY MS. BASS:

1           Q.    Would that be the case

2    wherever that product was utilized?

3                 INTERPRETER 1:  The word

4           "utilized" cannot be interpreted

5           very clearly.

6    BY MS. BASS:

7           Q.    Used.  Wherever the product

8    was used, would they stand behind a

9    defective product that they manufactured?

10                MR. CYR:  What designated

11          area does this relate to?

12                MS. BASS:  Jurisdiction.

13                You can answer the question.

14                MR. CYR:  No, not yet.

15                MS. BASS:  If you have an

16          objection, note it for the record.

17          I would like the witness to answer

18          the question.

19                MR. CYR:  I understand that.

20          You don't want to engage in any

21          dialogue about what designated

22          area this is?

23                MS. BASS:  It goes directly

24          to the issue of jurisdiction.

1           MR. CYR:  How is that?

2           MS. BASS:  I don't have to

3      go through an explanation for you.

4           MR. CYR:  Yeah, okay.

5           MS. BASS:  If you want to

6      instruct the witness not to answer

7      whether or not he will remedy,

8      he's prepared to stand behind

9      products that are defective,

10     wherever they are, you give that

11     instruction, and we'll bring it to

12     Judge Fallon, and we'll be back

13     here with him answering that

14     question sometime in the future.

15     It's your choice.

16          MR. CYR:  Are you finished?

17          MS. BASS:  I am.

18          MR. CYR:  I instruct the

19     witness not to answer.

20          Next question, please.

21          MS. BASS:  Fine.  Please

22     note it for the record.

23          MR. CYR:  No answer.

24   BY MS. BASS:

1          Q.    If there were specific

2    requests by customers for particular

3    labeling on TG products, would you be

4    aware of those?

5          A.    I am aware of this

6    situation.

7          Q.    Okay.

8                So, each time a customer,

9    for example, requested a specific brand

10   or a specific type of tape, you would

11   have personal knowledge of those?

12         A.    Some customers, they may

13   require a special label.  In general, our

14   company would have no objection to this

15   practice.  But it doesn't mean every

16   customer, when they have any requirement,

17   we would follow.  And it also doesn't

18   mean that every demand of every customer

19   I would know.

20         Q.    So, there could be certain

21   requests made by your customers for a

22   particular brand marking on drywall that

23   you would not be aware of?

24         A.    I just mentioned that we

1    allow this condition to exist.  But

2    regarding which customer putting on which

3    label, that I don't know.

4         Q.    Who within your company

5    would have knowledge of those type of

6    specialized requests?

7         A.    My customer, we need to

8    check our file in order to find out.

9         Q.    Was there a particular

10   person within your company that such

11   requests would have to be made to?

12        A.    A Mr. Peng Wenlong, he is --

13   during a certain period of time, he was

14   working for the foreign sales department.

15   He would know.  He should be able to

16   check out the exported products.  We also

17   have a lot of this type of customers in

18   China.  Mr. Peng Wenlong may not be able

19   to find out.

20             MS. BASS:  I'm going to pass

21        the witness to make sure everybody

22        else has an opportunity.

23             MR. CYR:  Can we take ten

24        minutes and then try to give

1           everybody a chance?

2                 THE VIDEOTAPE TECHNICIAN:

3           The time now is approximately

4           4:17 p.m., and we are now off the

5           record.

6                    -   -   -

7                 (Whereupon, a recess was

8           taken from 4:17 p.m.  until

9           4:33 p.m.)

10                   -   -   -

11                THE VIDEOTAPE TECHNICIAN:

12          This begins Tape 7 of today's

13          portion of our deposition.  The

14          time now is approximately

15          4:35 p.m., and we're back on the

16          record.

17                   -   -   -

18                EXAMINATION

19                   -   -   -

20     BY MR. HARDT:

21          Q.   Mr. Jia, good afternoon.  My

22     name is Ken Hardt.  I represent Venture

23     Supply, the company that actually

24     purchased drywall from Shandong Taihe

1    Dongxin Limited -- Company Limited.

2                    Can you translate that for

3    me, please.

4                    During my questioning, I may

5    refer to Shandong Taihe Dongxin Company

6    Limited as just Shandong.  Is that okay

7    with you?

8         A.    When you say "Shandong," I

9    don't understand.

10        Q.    It's just a shortcut.

11   Rather than pronounce the whole word, the

12   whole name, Shandong Taihe Dongxin

13   Company Limited, I'm just going to refer

14   to them as Shandong.  So, if I say

15   Shandong, I'm referring to Shandong Taihe

16   Dongxin Company Limited.  Is that okay?

17        A.    When you refer to Shandong,

18   in this place called Shandong, there are

19   so many, many factories that manufacture

20   drywalls, and some, they might also

21   produce it for the United -- produce it

22   for the United States.

23        Q.    Okay.  I'll try to use the

24   full name then.

1              INTERPRETER 2:  Mr. Jia did

2        say that how about use TG.

3              INTERPRETER 1:  Did he say

4        that?  I did not hear that.

5              MR. CHEN:  He did mention it

6        briefly.

7              INTERPRETER 1:  I did not

8        hear that.

9              MR. CHEN:  Counsel, I'll

10        just briefly state.  Shandong is a

11        large province.  It would be like

12        calling something just U.S.

13        instead of U.S. something or

14        other.  Maybe if you could --

15              MR. HARDT:  I'll just use TG

16        then.

17              INTERPRETER 1:  I disagree

18        because I did not hear the witness

19        say that.

20              MR. HARDT:  I was just

21        trying to differentiate between

22        the name change, but okay.

23              INTERPRETER 1:  I did not

24        hear the witness say TG.

1    BY MR. HARDT:

2        Q.    Okay.  I will use TG.

3        A.    I hope to use TG.

4        Q.    The contracts that were

5    signed between my client and TG were in

6    late 2005.  Were you aware of that?

7        A.    Now I know.

8        Q.    Well, the first contract was

9    for the purchase of 100,000 sheets of

10   drywall.  Were you aware of that?

11       A.    Now I know.

12       Q.    Did you know at the time?

13       A.    At that time, I did not

14   know.

15       Q.    I've seen affidavits.  I've

16   seen -- I've heard your testimony earlier

17   on.  The sales to Venture Supply, my

18   client, were the only U.S. sales that TG

19   made; is that correct?

20            MR. CYR:  I'm not asking the

21        interpreter to interpret, but I

22        think you just accidentally

23        referred to U.S. sales, and that's

24        inconsistent with the record.

1               MR. HARDT:  He can answer.

2               INTERPRETER 2:  The check

3     interpreter also doesn't think the

4     interpreter's interpretation

5     reflects the question.

6               MR. HARDT:  Can I get an

7     answer?

8               INTERPRETER 1:  I disagree.

9               MR. HARDT:  He disagrees?

10              INTERPRETER 1:  I disagree

11    with the check interpreter.

12              MR. HARDT:  Please just ask

13    him to answer the question.

14              THE WITNESS:  Please repeat

15    the question.

16              (Interpreter repeats the

17    question.)

18              THE WITNESS:  What I saw

19    earlier was written down as such.

20    BY MR. HARDT:

21         Q.   Okay.  And so this was the

22    first sale to a U.S. importer by TG of

23    drywall; is that correct?

24         A.   Around 2005 or 2006, I do

1    not exactly recall the exact time, and a

2    representative from the foreign trade

3    department of TG come to tell me one of

4    the customers from the United States,

5    they say that they want to buy the

6    drywall from TG.  After they purchase it,

7    they are going to ship it to the United

8    States.

9         Q.    So, you were aware of this

10   back in 2005, late -- early 2006?

11        A.    That is not my concept.

12   That is not the concept I am talking

13   about.

14        Q.    What concept are you talking

15   about?

16        A.    The manager of the foreign

17   sales department told me.  But after

18   that, I did not believe that our product

19   would be able to sell outside of the

20   country, would be able to sell to the

21   United States.

22        Q.    That's not what I asked you.

23   I asked you, you were aware of this

24   particular sale to my client back around

1    the time it was made; is that correct?

2              A.    When it was made, that I was

3    not sure.  Now I am sure.

4              Q.    But you heard something back

5    in late 2005/2006 that a U.S. importer

6    wanted to buy your drywall, TG's drywall,

7    and import it back into the United

8    States; is that correct?

9              A.    Yes.

10             Q.    And when you were made aware

11   of this purchase by a US importer, did

12   you consider that significant for your

13   country -- I mean, for your company?

14             A.    I did not consider this to

15   be significant.

16             Q.    At the time, this was your

17   first sale of drywall to a U.S. importer;

18   is that correct?

19             A.    I don't know whether this

20   was the first time or not.

21             Q.    Well, had you made any sales

22   prior to this time to a US importer?

23             A.    This is not my concept.

24             Q.    What is your concept?

1          A.     I'm referring to the sales

2     of the drywall by TTG when they sell

3     it -- TTP when they sell it to -- when

4     they sell it outside of the country.  I

5     am not sure whether this was earlier than

6     the sales of TG that sold it to TG or

7     not, and I was not sure about who sold it

8     first, who had the first time.

9          Q.     Okay.  We'll get there in a

10    second.  I asked about TG.  This was the

11    first sale to a US importer by TG itself?

12         A.     Yes.

13               MR. CHEN:  Objection to the

14         translation.  She did not

15         translate this was the first sale

16         to a US importer.  She translated,

17         this was the first sale to the US.

18               MR. HARDT:  I'm happy with

19         the answer.

20               MR. CYR:  We're happy with

21         the objection.

22               MR. HARDT:  Go ahead and

23         stand by your objection.

24    BY MR. HARDT:

1          Q.    At the time that you were
2    made aware of this first sale by your
3    company, TG, to a US importer, were you
4    also made aware that other US importers
5    were making inquiries about buying
6    drywall from TG?
7          A.    Can you repeat this
8    question?  It is not clear.
9               MR. HARDT:  You'll just have
10          to read it back to him.
11               (Interpreter repeats
12          question.)
13               THE WITNESS:  At that time,
14          I did not know that the drywall
15          was sold to the United States.  I
16          also did not know how many
17          customers came to our company to
18          make inquiries.  I also did not
19          know where it was being sold.
20    BY MR. HARDT:
21          Q.    So, TG is making its first
22    sale to a US importer, and there are --
23    the documents will show there are
24    inquiries being made by other US

1    importers of TG to purchase drywall for

2    importation into the United States.  Do

3    you think as general manager of TG, you

4    should have been made aware of that?

5          A.    Because if the contract is

6    really big, they would tell me.  If the

7    contract is very small, they won't tell

8    me.

9                Regarding the contract,

10   well, there's someone.  Probably it was

11   Mr. Peng Wenlong.  He told me that there

12   was one customer coming to our company

13   who buy the drywall.  Whether they did it

14   or not, whether they sold it or not, at

15   that point I did not know it.  I know it

16   about -- I know about it now.

17         Q.    Is that somebody different

18   than Venture that you're talking about,

19   this customer?

20                INTERPRETER 1:  Counsel, by

21         "Venture," do you mean by Venture

22         Supply?

23                MR. HARDT:  Yes, Venture

24         Supply.

1                    THE WITNESS:  I don't know

2             about the company now you

3             represent.  I have no recollection

4             of it.  I don't know English;

5             therefore, I have no recollection,

6             and I cannot recall clearly of the

7             companies in English -- in the

8             English name.

9    BY MR. HARDT:

10            Q.    Were you aware that other

11   companies around the 2005/2006 time frame

12   were approaching TG, and by "other

13   companies," I mean other US importers,

14   were approaching TG to purchase TG

15   drywall to import to the United States?

16            A.    I don't know.  What I am

17   sure is that the drywalls are very heavy,

18   therefore, the cost is very high.  It is

19   impossible to sell it to the United

20   States.

21            Q.    That's not the question I

22   asked you.

23                  I asked you, were you aware

24   back in 2005/2006 of other companies

1    approaching TG, other US importers

2    approaching TG, to purchase your drywall

3    to import into the United States?  That's

4    the question I want an answer to, please.

5             A.    I do not know whether

6    there's any customer that come to TG and

7    who purchased the products for the United

8    States.

9             Q.    If that had occurred, if

10   customers, US importers were coming to

11   your company in 2005/2006 to talk about

12   purchasing TG product to import into the

13   United States, would you have expected

14   your director of foreign sales, Mr. Peng,

15   to inform you of that, Peng Wenlong?

16            A.    I don't understand.  What do

17   you mean by "expect"?  What?

18            Q.    Who did Mr. Peng Wenlong

19   report to?

20                  INTERPRETER 2:  The check

21            interpreter doesn't believe that

22            the interpreter's interpretation

23            was correct.  The question was who

24            did Peng Wenlong report to?  The

1          interpreter interpreted did Peng

2          Wenlong tell you that?

3     BY MR. HARDT:

4          Q.    No.  I was asking basically,

5     who was the direct supervisor of Peng

6     Wenlong?

7                    INTERPRETER 1:  Off the

8          record.

9                    MR. HARDT:  Ask that

10         question.  Ask him that question,

11         please.  Ma'am, please, I'm asking

12         a different question.

13                   INTERPRETER 1:  Okay.

14    BY MR. HARDT:

15         Q.    Who was the direct

16    supervisor of Mr. Peng Wenlong back in

17    the 2005/2006 time frame?

18                   INTERPRETER 1:  Interpreter

19         oppose the check interpreter to

20         interpreting a question.  The

21         interpreter did not have a chance

22         to interpret first.

23                   MR. HARDT:  Ma'am, I do not

24         need that.  I've asked him --

1                     Interpreter, please.  I've

2          asked a new question.

3                     INTERPRETER 1:  Okay.

4     BY MR. HARDT:

5          Q.    The new question is, who was

6     the direct supervisor of Peng Wenlong in

7     the 2005/2006 time frame?

8                     MR. HARDT:  Can you ask him

9          that question, please.

10                    THE WITNESS:  I don't

11         recall.

12    BY MR. HARDT:

13         Q.    As the director of foreign

14    sales, would he report directly to you,

15    the general manager?

16         A.    Usually Peng Wenlong would

17    report to the other leaderships that they

18    have the division of the task of

19    management.  Sometimes when we -- when I

20    bump into him when we say hello, he will

21    tell me related matters.  But this does

22    not happen often.

23                    MR. CYR:  Counsel, I just

24         want to state for the record, I

1           think we've reached the 5:00 time

2           period, but as we've discussed,

3           we're flexible about that, and we

4           appreciate you've come a long way,

5           and you're answering questions.

6           And I think there's at least one

7           other lawyer who would like to ask

8           questions.  We would just

9           appreciate your consideration.

10          Thank you.

11                  MR. HARDT:  I understand.  I

12          have significantly cut back my

13          questions, but if I could get a

14          straight answer, we might go a

15          long way.

16      BY MR. HARDT:

17          Q.    Mr. Jia, back in the

18      2005/2006 time frame, were you also or

19      were you made aware that US importers

20      were coming to your company and asking to

21      be your company's exclusive distributor

22      in the United States for your product?

23                  INTERPRETER 1:  The word

24          "exclusive" I use it as specific

1              distributor in Chinese --

2                   MR. HARDT:  Sole.  Only.

3                   THE WITNESS:  TG, they would

4         not allow any sole distributor

5         either inside China or outside of

6         China.

7    BY MR. HARDT:

8         Q.    But were you made aware that

9    people were trying to be your United

10   States sole distributor back in the

11   2005/2006 time frame?

12        A.    I don't know.

13        Q.    As general manager of TG,

14   would you have expected to be made aware

15   of that information if it was occurring?

16        A.    I don't understand what you

17   mean.

18        Q.    As general manager of TG,

19   would you have liked to have known that

20   information, that people wanted to be

21   your sole distributor in the United

22   States?

23        A.    Whether the people wanted to

24   do it or not, I don't know.  But I don't

1    have such a wish.  I would not take the

2    initiative to have such a wish to make

3    the United States to become our market.

4    It is impossible.  That is something that

5    TG cannot do.

6            Q.    Well, I will tell you, there

7    are documents that show that around that

8    2005/2006 time frame that there were US

9    importers anxious, making inquiries to

10   buy your product and import it into the

11   United States, and there were also US

12   importers making inquiry to be your sole

13   distributor in the United States.  And

14   your testimony as you sit here today is

15   you were not made aware of that?

16              MR. CYR:  Objection on the

17          grounds the question is compound

18          and confusing.

19              Mr. Jia, you may try to

20          answer the question.

21              THE WITNESS:  I don't know

22          how they think.

23              MR. HARDT:  I don't know

24          what?

1               INTERPRETER 1:  I don't know
2          how they think.
3      BY MR. HARDT:
4          Q.    All right.
5               Now, according to an
6      affidavit that you have submitted and
7      actually your testimony today, this was
8      the only sale -- well, these two sales to
9      my client, Venture Supply, were the only
10     sales of drywall by TG; is that correct?
11              MR. CYR:  Objection as to
12         form.  Objection as to form.
13              Please try to answer, Mr.
14         Jia.
15              THE WITNESS:  I don't
16         understand.  What do you mean?
17     BY MR. HARDT:
18         Q.    Well, it's your testimony
19     that the only sale to a US importer of TG
20     drywall was made to Venture Supply and
21     that's it; is that correct?
22         A.    I'm unable to answer your
23     questions, but I insist that my affidavit
24     is correct.  I insist that it is correct.

1          Q.    And the affidavit says that

2     the only sale to a US importer by TG was

3     to Venture Supply, correct?

4          A.    Yes.

5          Q.    And I will tell you for the

6     purposes of my next question that the

7     contracts for those sales were in late

8     2005.  All right?

9               MR. HARDT:  Please translate

10          that.

11               THE WITNESS:  Yes.

12     BY MR. HARDT:

13          Q.    And my understanding is that

14     TTP was formed in February of 2006 as a

15     subsidiary of TG; is that correct?

16          A.    Yes.

17          Q.    And it was in February of

18     2006, I think it's February 20, 2006 that

19     the license was entered into between TG

20     and TTP to allow TTP to use TG's brand

21     name; is that correct?

22          A.    Yes.

23          Q.    And also on February 20th of

24     2006, there was an equipment sale by TG

1    to TTP; is that correct?

2           A.    Yes.

3           Q.    And was that production

4    equipment?

5           A.    Yes.

6           Q.    And then after February of

7    2006 -- well, take that back.

8                 TG never made a sale to

9    another US importer of TG drywall; is

10   that correct?

11                MR. PANAYOTOPOULOS:

12          Objection to form.

13                MR. HARDT:  (Addressing the

14          interpreter.)

15                You can ask the question.

16                MR. CYR:  I object as to

17          form, and also I think it's the

18          fourth or fifth time you've asked

19          the same question, and it is 15

20          after 5:00.  And so I guess --

21                MR. HARDT:  I was going

22          somewhere with this.

23                MR. CYR:  Please don't

24          interrupt me.

1          I guess I would like to say,
2     respectfully, that we have another
3     ten minutes, and then we're going
4     to call it an evening.
5          Thank you.
6          MR. HARDT:  I don't
7     appreciate the artificial
8     timeline, but I'm trying to get
9     answers from this gentleman.
10          MS. BASS:  Are you
11     suggesting he has ten minutes
12     or --
13          MR. CYR:  No, no.  We're
14     going to be all done in ten
15     minutes.
16          MR.  BRENNER:  So, you're
17     suggesting that those of us that
18     have come from wherever to ask the
19     few questions that we have will be
20     unable to ask questions after ten
21     minutes?
22          MR. CYR:  What I am
23     suggesting is that you are now 15
24     minutes beyond the time limit that

1          was allocated for the depositions,

2          that I've repeatedly warned the

3          entire group of plaintiffs'

4          counsel who are here that you need

5          to manage your time so that

6          everybody has an opportunity to

7          ask the questions.  In my view,

8          we've spent a lot of time asking

9          questions that weren't even in the

10         designated areas and don't even

11         relate to jurisdiction.  You've

12         made these choices.  We're now 15

13         minutes beyond 5:00.  He's just

14         asked the same question for the

15         fourth or fifth time.

16              We're going to wrap it up in

17         ten minutes, and you can complain

18         to the Judge.

19              MS. BASS:  Let me just note

20         for the record that I have never

21         before been in a deposition where

22         out of every hour, 15 minutes is

23         taken as a break by the witness,

24         oftentimes in excess of 15

1    minutes.  So the timeline of the

2    deposition will speak for itself.

3    But I do suggest that you

4    reconsider the number of people

5    who are here having flown 20,000

6    miles to ask their questions.

7         MR. HARDT:  Can I continue

8    to ask questions, please.

9         MR. CYR:  I do appreciate

10   that.

11        MR. HARDT:  If you're going

12   to cut it off in ten minutes,

13   let's get through what we can get

14   through.

15        MR. CYR:  And I appreciate

16   that we just spent a few minutes

17   talking about it, and so the ten

18   minutes -- we have to have -- I

19   don't mean to be Draconian, but we

20   have to have some expectation of

21   when it's going to stop.  So, why

22   don't we say -- first of all, the

23   sensitivity with respect to that

24   issue was displayed yesterday.

1       That was the right time for it,

2       but not now.  Let's go until 5:30.

3               Thank you.

4               MR. PANAYOTOPOULOS:  I just

5       want to note for the record that

6       on behalf of my client, I have not

7       had an opportunity to ask any

8       questions, and we will attempt to

9       ask that this deposition gets

10      continued if it gets cut off by

11      counsel I guess at 5:30.

12              MS. EISELEN:  Likewise for

13      Interior/Exterior.

14              MR. CYR:  What is your

15      suggestion with respect to how

16      we're supposed to conduct these

17      depositions?  I don't understand.

18      Do you just think we're just going

19      to go to midnight?

20              MR. PANAYOTOPOULOS:  The

21      same way that every other

22      deposition gets conducted.  If we

23      don't have an opportunity, we'll

24      need to come back at another time.

1         If we can do it later today, I'm

2         willing to stay as late as we need

3         to.

4              MR. CYR:  No.  We're going

5         to wrap it up at 5:30.  I'm sorry.

6         Go ahead, sir.

7              MR.  BRENNER:  I'll note the

8         same objection.  I have maybe ten

9         minutes worth of questions.

10              MR. BLACK:  I want to make

11         the objection for the State of

12         Louisiana.  Same objection.

13              MR. PANAYOTOPOULOS:

14         Reservation of rights.

15              MS. EISELEN:  Same.

16              MR. HARDT:  Can I ask a

17         question?

18     BY MR. HARDT:

19         Q.    Let me ask you this.

20              Was TTP formed as a

21     subsidiary of TG to sell drywall to US

22     importers?

23         A.    No.

24         Q.    Can you explain for me why

1    after the formation of TTP in February of

2    2006 that only TTP made sales to US

3    importers and TG did not?

4             A.    In the year 2006, the

5    department -- the tax department, they

6    inform us that we cannot issue invoice

7    for VAT.  That's value-added tax.  But

8    there were a lot of the customers of TG,

9    they were -- they are asking for the

10   issuing of invoice for VAT.  So, under

11   the suggestions of the tax bureau,

12   therefore, all the customers, they wanted

13   to use VAT invoices.  They would go to

14   TTP.  We will use TTP to do the

15   production.  That is for the convenience

16   of the management of that tax, because

17   most of the customers that sold for --

18   that buy the products to be sold to

19   somewhere outside of China for the

20   drywall, most of them, they require the

21   invoice of the VAT.  Therefore, the

22   products produced by TTP, they would have

23   a lot of the products sold outside of

24   China.  TG has very few of them.

1           MR. HARDT:  I wish I had

2      time to delve into that answer,

3      but I'm going to pass the witness.

4           MR. CYR:  (Addressing Mr.

5      Chen.)

6           Mr. Jia has complained about

7      the time.  Could you ask him if we

8      can go until 5:30.

9           Okay.

10                    -  -  -

11               EXAMINATION

12                    -  -  -

13  BY MR. BRENNER:

14      Q.   Mr. Jia, I represent Tobin

15  Trading, Incorporated.

16           Did you ever meet with any

17  representative of Tobin Trading,

18  Incorporated?

19      A.   I have never seen any.

20      Q.   The product that TG sold to

21  Venture Supply, where was the factory

22  located that produced the product?

23      A.   In the city called Tai'an in

24  the province of Shandong.

1          Q.     Was the product that was
2     sold by TG to Venture Supply produced in
3     one factory or more than one factory?
4          A.     I don't understand.
5                 That I'm not sure.
6          Q.     The place where the product
7     was produced that was sold to Venture
8     Supply, is there a paper factory nearby?
9          A.     Whose factory?
10          Q.     Was there a paper factory
11     nearby that supplied the paper for use in
12     the drywall that was produced for Venture
13     Supply?
14          A.     I don't understand what
15     factories you're referring to.  In
16     Tai'an, there are a lot of paper
17     factories.
18          Q.     Was there more than one
19     paper factory that produced the paper
20     that was used to make the drywall that
21     was sold to Venture Supply?
22          A.     There is no paper factories
23     would be specifically to produce papers
24     for specific enterprise.

1           Q.    Where was the paper that was
2     used to produce the drywall recycled or
3     manufactured?  That's a bad question.
4     Strike that question.
5                 Did TG own any of the
6     factories or paper factories used to
7     either produce or recycle the paper used
8     for drywall production by TG?
9           A.    TG has one paper factory,
10    but the scale of this factory is very
11    small.  The paper it produced is for the
12    use of drywall for TG.  TG also purchase
13    a large amount of paper from other
14    companies.
15          Q.    Where is the paper factory
16    that you've referred to located?
17          A.    Are you talking about the TG
18    factory?
19          Q.    Yes.
20          A.    In Tai'an, Shandong.
21                MR. CYR:  I've got 5:30.
22                MR.  BRENNER:  I've got
23          three, maybe four questions.  It's
24          not long.  Just two more areas to

 1          cover.

 2     BY MR. BRENNER:

 3          Q.    How far is the distance

 4     between the paper factory and the nearest

 5     drywall manufacturing plant?

 6          A.    It's approximately about

 7     1,000 meters.

 8          Q.    Are all of the --

 9               Were all of the employees in

10     2005 and 2006 of the paper plant

11     employees of TG?

12          A.    The employees for the paper

13     factories are the employees of TG.

14          Q.    Were there any workers --

15     and then I've got two more quickies

16     because I know --

17               Were there any workers in

18     the TG paper factory -- strike that.

19               Did the workers in the TG

20     paper factory wear uniforms?

21               INTERPRETER 1:  Wear

22          uniforms?

23               MR.  BRENNER:  Yes.

24               THE WITNESS:  Our country

1           take the matter of the safeties of

2           the laborers very seriously.

3           Without a uniform, they cannot

4           enter the factory.

5                MR. CYR:  One more question,

6           please, sir.

7    BY MR. BRENNER:

8           Q.    Do you know a company called

9    THBM?

10          A.    I know.

11               MR. CYR:  Thank you very

12          much.

13               MR.  BRENNER:  You're not

14          going to let him answer questions

15          about the business of THBM?

16               MR. CYR:  No, I'm not.

17          Thank you very much.

18               MR.  BRENNER:  All right.

19          I'll object for the record for

20          having my questions cut off

21          arbitrarily, and we reserve the

22          right to ask the judge to order

23          Mr. Jia to come back for a few

24          questions, and we will ask The

1      Court to impose costs.

2           MR. PANAYOTOPOULOS:  On

3      behalf of Banner, we're not

4      agreeing that the deposition is

5      terminated.  As far as we're

6      concerned, it's continued because

7      counsel for the defendant chose to

8      terminate it, to stop it at this

9      point.  So, we're just reserving

10     all of our rights and objecting to

11     the unilateral termination.

12          MS. EISELEN:

13     Interior/Exterior also reserves

14     its rights.

15          MR. BLACK:  The State of

16     Louisiana joins.

17          MR. CLARK:  Southern Homes

18     also joins.  It objects to the

19     termination of this deposition

20     without having asked questions of

21     this witness and reserves its

22     right to so ask questions of this

23     witness.

24          MR. CYR:  And on behalf of

1           Taishan Gypsum and TTP, I would

2           just like to say that everything

3           that I said during the very first

4           part of the first day and then

5           repeatedly throughout the

6           deposition holds true for now.

7                Thank you very much.

8                MR. HARDT:  I would like to

9           say on behalf of Venture and

10          Porter-Blaine that I arbitrarily

11          cut off my questioning of this

12          witness due to defense counsel

13          saying that he was going to cut

14          the deposition short to give

15          somebody else a chance to ask

16          questions, but I reserve my right

17          also to ask The Court to reopen

18          this deposition at the cost of

19          Taishan and in the United States.

20               MR. SLAUGHTER:  Atlantic

21          Homes joins in the objections of

22          the other defendants.

23               THE VIDEOTAPE TECHNICIAN:

24          The time now is approximately 5:35

1         p.m.  Today's portion of our

2         deposition consisting of seven

3         tapes is now concluded.

4                   -  -  -

5              (Whereupon, the deposition

6         adjourned at 5:35 p.m.)

7                   -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1              C E R T I F I C A T E.
2

3

              I, LINDA L. GOLKOW, a
4    Registered Diplomate Reporter, Certified
     Court Reporter and Notary Public, do
5    hereby certify that, pursuant to notice,
     the deposition of TONGCHUN JIA was duly
6    taken on April 5, 2011 at 9:03 a.m.
     before me.
7
8              The said TONGCHUN JIA was
     duly sworn by me through the interpreter
9    according to law to tell the truth, the
     whole truth and nothing but the truth and
10   thereupon did testify as set forth in the
     above transcript of testimony.  The
11   testimony was taken down stenographically
     by me.
12
13             I do further certify that
     the above deposition is full, complete
14   and a true record of all the testimony
     given by the said witness.
15

16

17        Linda L. Golkow
          Registered Diplomate Reporter
18        Certified Realtime Reporter
19
20             (The foregoing certification
     of this transcript does not apply to any
21   reproduction of the same by any means,
     unless under the direct control and/or
22   supervision of the certifying reporter.)
23

24

1                INSTRUCTIONS TO WITNESS

2

3

4                Please read your deposition

5     over carefully and make any necessary

6     corrections.  You should state the reason

7     in the appropriate space on the errata

8     sheet for any corrections that are made.

9

10                After doing so, please sign

11    the errata sheet and date it.  It will be

12    attached to your deposition.

13

14                It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24

```
 1                    - - - - - -

                   E  R  R  A  T  A

 2                    - - - - - -

 3    PAGE   LINE   CHANGE

 4    ____   ____   _____

 5       REASON: _____

 6    ____   ____   _____

 7       REASON: _____

 8    ____   ____   _____

 9       REASON: _____

10    ____   ____   _____

11       REASON: _____

12    ____   ____   _____

13       REASON: _____

14    ____   ____   _____

15       REASON: _____

16    ____   ____   _____

17       REASON: _____

18    ____   ____   _____

19       REASON: _____

20    ____   ____   _____

21       REASON: _____

22    ____   ____   _____

23       REASON: _____

24
```

1
2                    ACKNOWLEDGMENT OF DEPONENT
3
                     I,_____, do
4    hereby certify that I have read the
     foregoing pages, 270 through 494 and that
5    the same is a correct transcription of
     the answers given by me to the questions
6    therein propounded, except for the
     corrections or changes in form or
7    substance, if any, noted in the attached
     Errata Sheet.
8
9    _____
     TONGCHUN JIA                   DATE
10
11
12
13
14
15
16   Subscribed and sworn
     to before me this
17   _____ day of _____, 20_____.
18   My commission expires:_____
19

     _____
20   Notary Public
21
22
23
24

```
 1                    LAWYER'S NOTES

 2     PAGE   LINE

 3     ____   ____   _____

 4     ____   ____   _____

 5     ____   ____   _____

 6     ____   ____   _____

 7     ____   ____   _____

 8     ____   ____   _____

 9     ____   ____   _____

10     ____   ____   _____

11     ____   ____   _____

12     ____   ____   _____

13     ____   ____   _____

14     ____   ____   _____

15     ____   ____   _____

16     ____   ____   _____

17     ____   ____   _____

18     ____   ____   _____

19     ____   ____   _____

20     ____   ____   _____

21     ____   ____   _____

22     ____   ____   _____

23     ____   ____   _____

24     ____   ____   _____
```



Transcript of the Testimony of:  **Tongchun Jia**

01/09/2012

Chinese Drywall

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2

 _____
3                                § MDL NO. 2047
   IN RE:                        §
4  CHINESE-                      § SECTION: L
   MANUFACTURED                  §
5  DRYWALL PRODUCTS              § JUDGE FALLON
   LIABILITY                     §
6  LITIGATION                    § MAGISTRATE
   _____      § JUDGE WILKINSON
7
                    -  -  -
8
      CROSS NOTICED IN VARIOUS OTHER ACTIONS
9
                    -  -  -
10
                 January 9, 2012
11
                    -  -  -
12
        CONFIDENTIAL - SUBJECT TO FURTHER
13            CONFIDENTIALITY REVIEW
14                  -  -  -
15        Continued videotaped deposition of
   TONGCHUN JIA, held at the Executive
16 Centre, Level 3, Three Pacific Place, One
   Queen's Road East, Hong Kong, China,
17 commencing at 8:52 a.m., on the above
   date, before Linda L. Golkow, Certified
18 Court Reporter, Registered Diplomate
   Reporter, Certified Realtime Reporter and
19 Notary Public.
                    -  -  -
20
21
22
23        GOLKOW TECHNOLOGIES, INC.
      877.370.3377 ph | 917.591.5672 fax
24           deps@golkow.com

```
 1   BEFORE:
 2           HONORABLE ELDON E. FALLON
             UNITED STATES FEDERAL COURT -
 3           EASTERN DISTRICT OF LOUISIANA
 4
 5   APPEARANCES:
 6
 7       SEEGER WEISS LLP
         BY:  CHRISTOPHER A. SEEGER, ESQUIRE
 8       BY:  SCOTT A. GEORGE, ESQUIRE
         One William Street
 9       New York, New York 10004
         (212) 584-0700
10       cseeger@seegerweiss.com
         Sgeorge@seegerweiss.com
11       Representing the Plaintiffs'
         Steering Committee
12
13       HERMAN HERMAN KATZ & COTLAR, LLP
         BY:  LEONARD A. DAVIS, ESQUIRE
14       820 O'Keefe Avenue
         New Orleans, Louisiana 70113
15       (504) 581-4892
         Ldavis@hhkc.com
16       Representing the Plaintiffs'
         Steering Committee
17
18       COLSON HICKS EIDSON
         BY:  ERVIN GONZALEZ, ESQUIRE
19       BY:  PATRICK S. MONTOYA, ESQUIRE
         255 Alhambra Circle
20       Penthouse
         Coral Gables, Florida 33134
21       (305) 476-7400
         Ervin@colson.com
22       Patrick@colson.com
         Representing Plaintiffs' Steering
23       Committee in the Federal and State
         Coordinated Actions
24
```

```
 1   APPEARANCES (CONTINUED):
 2
         LEVIN, FISHBEIN, SEDRAN & BERMAN
 3       BY:  ARNOLD LEVIN, ESQUIRE
         510 Walnut Street
 4       Suite 500
         Philadelphia, Pennsylvania 19106
 5       (215) 592-1500
         Alevin@lfsblaw.com
 6       Representing the Plaintiffs'
         Steering Committee
 7
 8       GAINSBURGH, BENJAMIN, DAVID, MEUNIER
         & WARSHAUER, L.L.C.
 9       BY:  GERALD E. MEUNIER, ESQUIRE
         2800 Energy Centre
10       1100 Poydras Street
         New Orleans, Louisiana 70163
11       (504) 522-2304
         gmeunier@gainsben.com
12       Representing the Plaintiffs'
         Steering Committee
13
14       HOGAN LOVELLS US LLP
         BY:  JOE CYR, ESQUIRE
15       BY:  FRANK T. SPANO, ESQUIRE
         875 Third Avenue
16       New York, New York 10022
         (212) 918-3000
17       joe.cyr@hoganlovells.com
         frank.spano@hoganlovells.com
18       Representing Taishan Gypsum Co.
         Ltd. and Taian Taishan
19       Plasterboard Company Ltd. and the
         Witness, Tongchun Jia
20
21
22
23
24
```

```
 1   APPEARANCES (CONTINUED):
 2
 3       HOGAN LOVELLS
         BY:  ALLAN LEUNG, ESQUIRE
 4       11th Floor, One Pacific Place
         88 Queensway
 5       Hong Kong
         (852) 2219 0888
 6       allan.leung@hoganlovells.com
         Representing Taishan Gypsum Co.
 7       Ltd. and Taian Taishan
         Plasterboard Company Ltd. and the
 8       Witness, Tongchun Jia
 9
         HOGAN LOVELLS INTERNATIONAL LLP
10       BY:  EUGENE CHEN, ESQUIRE
         BY:  JIENI JI, ESQUIRE
11       18th Floor, Park Place
         1601 Nanjing Road West
12       Shanghai, China 200040
         (86 21) 6122 3800
13       eugene.chen@hoganlovells.com
         Representing Taishan Gypsum Co.
14       Ltd. and Taian Taishan
         Plasterboard Company Ltd. and the
15       Witness, Tongchun Jia
16
         GREENBERG TRAURIG, LLP
17       BY:  HILARIE BASS, ESQUIRE
         1221 Brickell Avenue
18       Miami, Florida 33131
         (305) 579-0745
19       bassh@gtlaw.com
         Representing the Home Builders
20       Steering Committee
21       PERKINS COIE LLP
         BY:  DAVID L. BLACK, ESQUIRE
22       1899 Wynkoop Street - Suite 700
         Denver, Colorado 80202
23       (303) 291-2300
         DBlack@perkinscoie.com
24       Representing the State of Louisiana
```

```
 1    APPEARANCES (CONTINUED):
 2
      BRENNER, EVANS & MILLMAN, P.C.
 3    BY:  THEODORE I. BRENNER, ESQUIRE
      411 East Franklin Street
 4    Suite 200
      Richmond, Virginia 23218
 5    Tbrenner@beylaw.com
      (804) 644-1300
 6    Representing Tobin Trading Company
 7
 8    McKENRY, DANCIGERS, DAWSON & LAKE, P.C.
      BY:  J. BRIAN SLAUGHTER, ESQUIRE
 9    192 Ballard Court
      Suite 400
10    Virginia Beach, Virginia 23462
      (757) 461-2500
11    Jbslaughter@va-law.org
      Representing Atlantic Homes LLC and
12    Multiple Other Virginia-Based
      Defendants
13
14    QUINN EMANUEL URQUHART & SULLIVAN,LLP
      BY:  JANE M. BYRNE, ESQUIRE
15    BY:  JULIA BESKIN, ESQUIRE
      51 Madison Avenue, 22nd Floor
16    New York, New York 10010
      (212) 849-7000
17    Janeburne@quinnemanuel.com
      Juliabeskin@Quinnemanuel.Com
18    Representing Chartis Select Insurance
      Company and Related Chartis Insurers
19
20    WEINBERG, WHEELER, HUDGINS, GUNN &
      DIAL, LLC
21    BY:  MICHAEL SEXTON, ESQUIRE
      3344 Peachtree Road, NE
22    Suite 2400
      Atlanta, Georgia 30326
23    (404) 876-2700
      msexton@wwhgd.com
24    Representing Various Banner Defendants
```

1

APPEARANCES (CONTINUED):

2

3

SINNOTT, NUCKOLS & LOGAN, PC

4      BY:   KENNETH F. HARDT, ESQUIRE

13811 Village Mill Drive

5      Midlothian, Virginia 23114

(804) 378-7600

6      khardt@snllaw.com

Representing Venture Supply, Inc. and

7      Porter-Blaine Corp.

8

9   ALSO PRESENT:

10      SUNNY WANG, INTERPRETER

11

12

- - -

13

14

15

16

17

18

19

20

21

22

23

24

```
 1   APPEARANCES VIA TELEPHONE:
 2
 3       GALLOWAY JOHNSON TOMPKINS BURR and SMITH
         BY:  CARLINA C. EISELEN, ESQUIRE
 4       One Shell Square
         701 Poydras Street, 40th Floor
 5       New Orleans, Louisiana 70139
         (504) 525-6802
 6       ceiselen@gjtbs.com
         Representing Interior/Exterior
 7       Building Supply
 8
         HUNTON & WILLIAMS LLP
 9       BY:  A. TODD BROWN, ESQUIRE
         Bank of America Plaza
10       101 South Tryon Street
         Suite 3500
11       Charlotte, North Carolina  28280
         (704) 378-4700
12       Representing Stock Building Supply, LLC
13
14       JONES, WALKER, WAECHTER, POITEVENT,
         CARRERE & DENEGRE LLP
15       BY:  MEGAN E. DONOHUE, ESQUIRE
         600 Jefferson Street, Suite 1600
16       Lafayette, Louisiana 70501
         (337) 262-9062
17       mdonohue@joneswalker.com
         Representing Fireman's Fund Insurance
18       Company
19
         DUPLASS ZWAIN BOURGEOIS PFISTER &
20       WEINSTOCK
         BY:  PHILIP WATSON, ESQUIRE
21       3838 N. Causeway Boulevard
         Suite 2900
22       Metairie, Louisiana 70002
         (504) 832-3700
23       pwatson@duplass.com
         Representing R&H Masonry, Inc., and
24       Swedberg Enterprises, Inc.
```

```
 1   APPEARANCES VIA TELEPHONE (CONTINUED):
 2
     FULMER LEROY ALBEE BAUMANN
 3   BY:  CANDACE MOSS, ESQUIRE
     BY:  MICHAEL P. McCAHILL, ESQUIRE
 4   2866 East Oakland Park Boulevard
     Ft. Lauderdale, Florida 33306
 5   (954) 707-4430
     mosscandace@fulmerleroy.com
 6   mmccahill@fulmerleroy.com
     Representing Independent Builders
 7   Supply Association (IBSA)
 8
     WEINBERG, WHEELER, HUDGINS, GUNN &
 9   DIAL, LLC
     BY:  P. SHANE O'NEILL, ESQUIRE
10   3344 Peachtree Road, NE
     Suite 2400
11   Atlanta, Georgia 30326
     (404) 876-2700
12   soneill@wwhgd.com
     Representing Various Banner
13   Defendants
14
     WRIGHT, FULFORD, MOORHEAD & BROWN,
15   P.A.
     BY:  DORYK B. GRAF, JR., ESQUIRE
16   145 N. Magnolia Ave.
     Orlando, Florida 32801
17   (407) 425-0234
     dgraf@wfmblaw.com
18   Representing West Construction, Inc.
19
20   QUINN EMANUEL URQUHART & SULLIVAN, LLP
     BY: CLINTON DOCKERY, ESQUIRE
21   51 Madison Avenue, 22nd Floor
     New York, New York 10010
22   (212) 849-7000
     clintondockery@quinnemanuel.com
23   Representing Chartis Select Insurance
     Company and Related Chartis Insurers
24
```

 1   APPEARANCES VIA TELEPHONE (CONTINUED):
 2

         BUCHANAN INGERSOLL & ROONEY P.C.
 3       BY:  C. ROBERT ZAPPALA, ESQUIRE
         One Oxford Centre
 4       301 Grant Street, 20th Floor
         Pittsburgh, Pennsylvania 15219
 5       (412) 562-1041
         bobby.zappala@bipc.com
 6       Representing 84 Lumber Company, LP
 7

         MEIROSE & FRISCIA, P.A.
 8       BY: JASON A. LUBLINER, ESQUIRE
         5550 W. Executive Drive
 9       Suite 250
         Tampa, Florida 33609
10       (813) 289-8800
         groot@meirosefriscia.com
11       Representing Central Florida
         Finishers and LTL Construction, Inc.
12
13
14
15
16
17
18
19
20
21
22
23
24

```
 1    APPEARANCES VIA STREAM:
 2
      BECNEL LAW FIRM, L.L.C.
 3    BY:  ROBERT BECNEL, ESQUIRE
      106 W. 7th Street
 4    Reserve, Louisiana 70084
      (985) 536-1186
 5    robbecnel@aol.com
      Representing the Plaintiffs'
 6    Steering Committee
 7
      PARKER WAICHMAN ALONSO LLP
 8    BY:  JORDAN L. CHAIKIN, ESQUIRE
      3301 Bonita Beach Road
 9    Bonita Springs, Florida 34134
      (239) 390-1000
10    Jchaikin@yourlaywer.com
      Representing Plaintiffs' Steering
11    Committee
12
      MORGAN & MORGAN
13    BY:  PETE V. ALBANIS, ESQUIRE
      12800 University Drive
14    Suite 600
      Fort Myers, Florida 33907
15    (877) 667-4265
      Representing the Plaintiffs
16
17    IRPINO LAW FIRM
      BY:  ANTHONY IRPINO, ESQUIRE
18    2216 Magazine Street
      New Orleans, Louisiana 70130
19    Airpino@irpinolaw.com
      (504) 525-1500
20    Representing the Plaintiffs
21
22
23
24
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3        GALLOWAY JOHNSON TOMPKINS BURR and SMITH
          BY:  CARLINA C. EISELEN, ESQUIRE
 4        One Shell Square
          701 Poydras Street, 40th Floor
 5        New Orleans, Louisiana 70139
          (504) 525-6802
 6        ceiselen@gjtbs.com
          Representing Interior/Exterior
 7        Building Supply
 8
          HEARD & MEDACK, P.C.
 9        BY:  JAMES DAVIS, ESQUIRE
          9494 Southwest Freeway, Suite 700
10        Houston, Texas 77074
          (713) 772-6400
11        jdavis@heardmedackpc.com
          Representing CastleRock Communities, L.P.
12
13
          HUNTON & WILLIAMS LLP
14        BY:  A. TODD BROWN, ESQUIRE
          Bank of America Plaza
15        101 South Tryon Street
          Suite 3500
16        Charlotte, North Carolina  28280
          (704) 378-4700
17        tbrown@hunton.com
          Representing Stock Building Supply, LLC
18
19
          SHER GARNER CAHILL RICHTER KLEIN &
20        HILBERT, L.L.C.
          BY:  MATTHEW C. CLARK, ESQUIRE
21        909 Poydras Street
          Suite 2800
22        New Orleans, Louisiana 70112
          (504) 299-2100
23        mclark@shergarner.com
          Representing the Southern Home
24        Defendants
```

```
 1   APPEARANCES VIA STREAM (CONTINUED):
 2
 3       QUINN EMANUEL URQUHART & SULLIVAN, LLP
         BY: CLINTON DOCKERY, ESQUIRE
 4       51 Madison Avenue, 22nd Floor
         New York, New York 10010
 5       (212) 849-7000
         clintondockery@quinnemanuel.com
 6       Representing Chartis Select Insurance
         Company and Related Chartis Insurers
 7
 8       JONES, WALKER, WAECHTER, POITEVENT,
         CARRERE & DENEGRE LLP
 9       BY:  MEGAN E. DONOHUE, ESQUIRE
         600 Jefferson Street, Suite 1600
10       Lafayette, Louisiana 70501
         (337) 262-9062
11       mdonohue@joneswalker.com
         Representing Fireman's Fund Insurance
12       Company
13
         DEUTSCH, KERRIGAN & STILES
14       BY:  MELISSA M. SWABACKER, ESQUIRE
         755 Magazine St.
15       New Orleans, Louisiana  70130
         (504) 581-5141
16       mswabacker@dkslaw.com
         Representing Landmark American
17       Insurance Company
18
19
20                   -   -   -
21
22
23
24
```

```
 1                   -  -  -
 2                I N D E X
 3   WITNESS                    PAGE NO.
 4   TONGCHUN JIA
 5
 6    By Mr. Cyr                      529
 7    By Mr. Seeger                   672
 8    By Mr. Gonzalez                 784
 9
10                   -  -  -
11              E X H I B I T S
12
     NO.           DESCRIPTION        PAGE NO.
13
14    Jia            Document in        545
                     Chinese, Bates
15    Defendant's-1  stamped TG
                     0026001 and TG
16                   0026002
17    Jia            Shandong           545
      Defendant's-1A Province
18                   Department of
                     Finance
19                   Documents, Bates
                     stamped TG
20                   0026001 and TG
                     0026002
21
      Jia            Document in
22    Defendant's-2  Chinese, Bates
                     stamped TG
23                   0020582 through
                     TG 0020584
24
```

| | | | |
|---|---|---|---|
| 1 | Jia | Shandong Taihe | |
| | Defendant's-2A | Dongxin Co., | 548 |
| 2 | | Ltd., | |
| | | Shareholder | |
| 3 | | List, Bates | |
| | | stamped TG | |
| 4 | | 0020582 through | |
| | | TG 0020584 | |
| 5 | | | |
| | Jia | Document in | 553 |
| 6 | Defendant's-3 | Chinese, Bates | |
| | | stamped TG | |
| 7 | | 0020630 through | |
| | | TG 0020633 | |
| 8 | | | |
| | Jia | Stock Transfer | 553 |
| 9 | Defendant's-3A | Agreement, Bates | |
| | | stamped TG | |
| 10 | | 0020630 through | |
| | | TG 0020633 | |
| 11 | | | |
| | Jia | Document in | 555 |
| 12 | Defendant's-4 | Chinese, Bates | |
| | | stamped TG | |
| 13 | | 0020634 through | |
| | | TG 0020637 | |
| 14 | | | |
| | Jia | Document in | 568 |
| 15 | Defendant's-5 | Chinese, Bates | |
| | | stamped 0020638 | |
| 16 | | through 0020642 | |
| 17 | Jia | Document in | 572 |
| | Defendant's-6 | Chinese, Bates | |
| 18 | | stamped TG | |
| | | 0020598 through | |
| 19 | | TG 0020600 | |
| 20 | Jia | Shandong Taihe | 572 |
| | Defendant's-6A | Dongxin Co., | |
| 21 | | Ltd. Resolutions | |
| | | of the General | |
| 22 | | Meeting of | |
| | | Shareholders, | |
| 23 | | Bates stamped TG | |
| | | 0020598 through | |
| 24 | | TG 0020600 | |

| | | | |
|---|---|---|---|
| 1 | Jia | Document in | 579 |
| 2 | Defendant's-7 | Chinese, Bates stamped TG | |
| 3 | | 0020647 through TG 0020649 | |
| 4 | Jia | Comparison Chart | 579 |
| 5 | Defendant's-7A | of Registered Capital Before and After | |
| 6 | | Changes, Bates stamped TG | |
| 7 | | 0020647 through TG 0020649 | |
| 8 | | | |
| 9 | Jia Defendant's-8 | Document in Chinese, Bates stamped TG | 583 |
| 10 | | 0020601 and TG 0020602 | |
| 11 | | | |
| 12 | Jia Defendant's-8A | Resolutions of the General Meeting of | 583 |
| 13 | | Shareholders, Bates stamped TG | |
| 14 | | 0020601 and TG 0020602 | |
| 15 | | | |
| 16 | Jia Defendant's-9 | Document in Chinese, Bates stamped TG | 589 |
| 17 | | 0020608 through TG 0020629 | |
| 18 | | | |
| 19 | Jia Defendant's-9A | Shandong Taihe Dongxin Co., | 589 |
| 20 | | Ltd. Articles of Incorporation, | |
| 21 | | Bates stamped TG 0020608 through TG 0020629 | |
| 22 | | | |
| 23 | Jia Defendant's-10 | Document in Chinese, Bates stamped 20384 | 591 |
| 24 | | through 20390 | |

| | | | |
|---|---|---|---|
| 1 | Jia Defendant's-10A | Shandong Taihe Dongxin Co., Ltd. Summary of Asset Valuation Report, Bates stamped TG 0020384 through TG 0020390 | 591 |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | Jia Defendant's-11 | Document in Chinese, Bates stamped TG 0020686 through TG 0020789 | 592 |
| 7 | | | |
| 8 | | | |
| 9 | Jia Defendant's-11A | Articles of Association of Shandong Taihe Dongxin Co., Ltd., Bates stamped TG 0020686 through TG 0020789 | 592 |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | Jia Defendant's-12 | Document in Chinese, Bates stamped TG 0020725 through TG 0020748 | 600 |
| 14 | | | |
| 15 | | | |
| 16 | Jia Defendant's-12A | Articles of Association of Tai Shan Gypsum Co., Ltd., Bates stamped TG 0020725 through TG 0020748 | 600 |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | Jia Defendant's-13 | Document in Chinese, Bates stamped TG 0020722 through TG 0020724 | 601 |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

| | | | |
|---|---|---|---|
| 1 | Jia Defendant's-13A | Shandong Taihe Dongxin Co., Ltd. Resolutions of the 2006 Annual General Meeting of Shareholders, Bates stamped TG 0020722 through TG 0020724 | 601 |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | Jia Defendant's-14 | Document in Chinese, Bates stamped TG 0020715 through TG 0020717 | 603 |
| 8 | | | |
| 9 | | | |
| 10 | Jia Defendant's-14A | Datasheet of the Directors, Supervisors and Manager of Shandong Taihe Dongxin Co., Ltd., Bates stamped TG 0020715 through TG 0020717 | 603 |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | Jia Defendant's-15 | Document in Chinese, Bates stamped TG 0020795 through TG 0020798 | 605 |
| 16 | | | |
| 17 | | | |
| 18 | Jia Defendant's-15A | Taishan Gypsum Co., Ltd. 2008 Annual General Meeting, Bates stamped TG 0020795 through TG 0020798 | 605 |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | Jia Defendant's-16 | Document in Chinese, Bates stamped TG 0020799 and TG 0020800 | 618 |
| 23 | | | |
| 24 | | | |

| | | | |
|---|---|---|---|
| 1 | Jia | | |
| 2 | Defendant's-16A | Amendment to the Articles of | 618 |
| 3 | | Association of Taishan Gypsum | |
| 4 | | Co., Ltd., Bates stamped TG | |
| 5 | | 0020799 and TG 0020800 | |
| 6 | Jia Defendant's-17 | Document in Chinese, Bates | 620 |
| 7 | | stamped TG 0025887 and TG | |
| 8 | | 0025888 | |
| 9 | Jia Defendant's-17A | Resolution of the Shandong | 620 |
| 10 | | Taihe Dongxin Co., Ltd. | |
| 11 | | Shareholder Meeting, Bates | |
| 12 | | stamped TG 0025887 and TG | |
| 13 | | 0025888 | |
| 14 | Jia Defendant's-18 | Document in Chinese, Bates | 621 |
| 15 | | stamped TG 0025889 through | |
| 16 | | TG 0025891 | |
| 17 | Jia Defendant's-18A | Shandong Taihe Dongxin Co., | 621 |
| 18 | | Ltd. 2005 Annual Shareholder | |
| 19 | | Meeting Resolution, | |
| 20 | | Bates stamped TG 0025889 through | |
| 21 | | TG 0025891 | |
| 22 | Jia Defendant's-19 | Document in Chinese, Bates | 622 |
| 23 | | stamped TG 0025892 and TG | |
| 24 | | 0025893 | |

| | | | |
|---|---|---|---|
| 1 | Jia Defendant's-19A | Shandong Taihe Dongxin Co., | 622 |
| 2 | | Ltd. 2006 Annual Shareholder | |
| 3 | | Meeting Resolution, | |
| 4 | | Bates stamped TG 0025892 and TG | |
| 5 | | 0025893 | |
| 6 | Jia Defendant's-20 | Document in Chinese, Bates | 623 |
| 7 | | stamped TG 0025894 through | |
| 8 | | TG 0025896 | |
| 9 | Jia Defendant's-20A | Shandong Taihe Dongxin Co., | 623 |
| 10 | | Ltd. 2007 Annual Shareholder | |
| 11 | | Meeting Resolution, | |
| 12 | | Bates stamped TG 0025894 through | |
| 13 | | TG 0025896 | |
| 14 | Jia Defendant's-21 | Document in Chinese, Bates | 624 |
| 15 | | stamped TG 0025897 through | |
| 16 | | TG 0025899 | |
| 17 | Jia Defendant's-21A | Shandong Taihe Dongxin Co., | 624 |
| 18 | | Ltd. 2008 Annual Shareholder | |
| 19 | | Meeting Resolution, | |
| 20 | | Bates stamped TG 0025897 through | |
| 21 | | TG 0025899 | |
| 22 | Jia Defendant's-22 | Document in Chinese, Bates | 626 |
| 23 | | stamped TG 0025900 through | |
| 24 | | TG 0025902 | |

| | | | |
|---|---|---|---|
| 1 | Jia<br>Defendant's-22A | Shandong Taihe<br>Dongxin Co., | 626 |
| 2 | | Ltd. Third | |
| 3 | | Meeting of the<br>Third Board of | |
| 4 | | Directors<br>Resolutions, | |
| 5 | | Bates stamped TG<br>0025900 through | |
| 6 | | TG 0025902 | |
| 7 | Jia<br>Defendant's-23 | Document in<br>Chinese, Bates<br>stamped TG | 628 |
| 8 | | 0025903 through<br>TG 0025905 | |
| 9 | | | |
| 10 | Jia<br>Defendant's-23A | Shandong Taihe<br>Dongxin Co., | 628 |
| 11 | | Ltd. Fourth<br>Meeting of the | |
| 12 | | Third Board of<br>Directors | |
| 13 | | Resolutions,<br>Bates stamped TG | |
| 14 | | 0025903 through<br>TG 0025905 | |
| 15 | Jia<br>Defendant's-24 | Document in<br>Chinese, Bates | 629 |
| 16 | | stamped TG<br>0025906 through | |
| 17 | | TG 0025908 | |
| 18 | Jia<br>Defendant's-24A | Shandong Taihe<br>Dongxin Co., | 629 |
| 19 | | Ltd. Fifth<br>Meeting of the | |
| 20 | | Third Board of<br>Directors | |
| 21 | | Resolutions,<br>Bates stamped TG | |
| 22 | | 0025906 through<br>TG 0025908 | |
| 23 | | | |
| 24 | | | |

| | | | |
|---|---|---|---|
| 1 | Jia | Document in | 630 |
| 2 | Defendant's-25 | Chinese, Bates stamped TG | |
| 3 | | 0025913 through TG 0025919 | |
| 4 | Jia | A Report | 630 |
| 5 | Defendant's-25A | Regarding Overall Work | |
| 6 | | Summary for 2005 and Work | |
| 7 | | Arrangement for 2006, Bates | |
| 8 | | stamped TG 0025913 through | |
| 9 | | TG 0025919 | |
| | Jia | Document in | 630 |
| 10 | Defendant's-26 | Chinese, Bates stamped TG | |
| 11 | | 0025920 through TG 0025926 | |
| 12 | | | |
| | Jia | 2006 Chief | 631 |
| 13 | Defendant's-26A | Executive Officer's Work | |
| 14 | | Report, Bates stamped TG | |
| 15 | | 0025920 through TG 0025926 | |
| 16 | | | |
| | Jia | Document in | 631 |
| 17 | Defendant's-27 | Chinese, Bates stamped TG | |
| 18 | | 0025927 through TG 0025933 | |
| 19 | | | |
| | Jia | 2007 Chief | 631 |
| 20 | Defendant's-27A | Executive Officer's Work | |
| 21 | | Report, Bates stamped TG | |
| 22 | | 0025927 through TG 0025933 | |
| 23 | | | |
| 24 | | | |

| | | | |
|---|---|---|---|
| 1 | Jia Defendant's-28 | Document in Chinese, Bates stamped TG 0025934 through TG 0025941 | 631 |
| 2 | | | |
| 3 | | | |
| 4 | Jia Defendant's-28A | 2008 Chief Executive Officer's Work Report, Bates stamped TG 0025934 through TG 0025941 | 631 |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | Jia Defendant's-29 | Document in Chinese, Bates stamped TG 0025958 through TG 0025961 | 636 |
| 9 | | | |
| 10 | | | |
| 11 | Jia Defendant's-29A | Shandong Taihe Dongxin Company Limited Accounting Statement, Bates stamped TG 0025958 through TG 0025961 | 636 |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | Jia Defendant's-30 | Document in Chinese, Bates stamped TG 0025971 through TG 0025974 | 636 |
| 17 | | | |
| 18 | | | |
| 19 | Jia Defendant's-30A | Shandong Taihe Dongxin Company Limited Accounting Statement, Bates stamped TG 0025971 through TG 0025974 | 636 |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

```
 1    Jia              Document in        641
      Defendant's-31   Chinese, Bates
 2                     stamped TG
                       0025984 through
 3                     TG 0025987
 4    Jia              2007 Financial     641
      Defendant's-31A  Statements of
 5                     Taishan Gypsum
                       Company Limited,
 6                     Bates stamped TG
                       0025984 through
 7                     TG 0025987
 8    Jia              Document in        642
      Defendant's-32   Chinese, Bates
 9                     stamped TG
                       0025997 through
10                     TG 0026000
11    Jia              2008 Financial     642
      Defendant's-32A  Statements of
12                     Taishan Gypsum
                       Company Limited,
13                     Bates stamped TG
                       0025997 through
14                     TG 0026000
15    Jia              Document in        649
      Defendant's-33   Chinese, Bates
16                     stamped TG
                       0020808 and TG
17                     0020809
18    Jia              Incorporation      650
      Defendant's-33A  Registration
19                     Review Form,
                       Bates stamped TG
20                     0020808 and TG
                       0020809
21
      Jia              Document in        650
22    Defendant's-34   Chinese, Bates
                       stamped TG
23                     0020817 through
                       TG 0020824
24
```

| | | | |
|---|---|---|---|
| 1 | Jia | Articles of | 651 |
| 2 | Defendant's-34A | Association of Tai'an Taishan Plasterboard | |
| 3 | | Co., Ltd., Bates stamped TG | |
| 4 | | 0020817 through TG 0020824 | |
| 5 | | | |
| 6 | Jia Defendant's-35 | Document in Chinese, Bates stamped TG | 652 |
| 7 | | 0020825 and TG 0020826 | |
| 8 | | | |
| 9 | Jia Defendant's-35A | Tai'an Taishan Plasterboard Co., Ltd. | 652 |
| 10 | | Director Appointment | |
| 11 | | Document, Bates stamped TG | |
| 12 | | 0020825 and TG 0020826 | |
| 13 | | | |
| 14 | Jia Defendant's-36 | Document in Chinese, Bates stamped TG | 654 |
| 15 | | 0020827 and TG 0020828 | |
| 16 | | | |
| 17 | Jia Defendant's-36A | Tai'an Taishan Plasterboard Co., Ltd. Legal | 654 |
| 18 | | Representative Appointment | |
| 19 | | Document, Bates stamped TG | |
| 20 | | 0020827 and TG 0020828 | |
| 21 | | | |
| 22 | Jia Defendant's-37 | Document in Chinese, Bates stamped TG | 655 |
| 23 | | 0020850 and TG 0020851 | |
| 24 | | | |

| | | | |
|---|---|---|---|
| 1 | Jia Defendant's-37A | Capital Verification Descriptions, Bates stamped TG 0020850 and TG 0020851 | 655 |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | Jia Defendant's-38 | Document in Chinese, Bates stamped TG 0020855 | 656 |
| 6 | | | |
| 7 | Jia Defendant's-38A | Shareholder Decisions, Bates stamped TG 0020855 | 656 |
| 8 | | | |
| 9 | | | |
| 10 | Jia Defendant's-39 | Document in Chinese, Bates stamped TG 0020856 through TG 0020864 | 657 |
| 11 | | | |
| 12 | | | |
| 13 | Jia Defendant's-39A | Articles of Association of Tai'an Taishan Plasterboard Co., Ltd., Bates stamped TG 0020856 through TG 0020864 | 658 |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | Jia Defendant's-40 | Document in Chinese, Bates stamped TG 0025446 | 659 |
| 18 | | | |
| 19 | | | |
| 20 | Jia Defendant's-40A | Lease Agreement, Bates stamped TG 0025446 | 659 |
| 21 | | | |
| 22 | Jia Defendant's-41 | Document in Chinese, Bates stamped TG 0025412 | 660 |
| 23 | | | |
| 24 | | | |

| | | | |
|---|---|---|---|
| 1 | Jia | Trademark Use | 661 |
| | Defendant's-41A | Authorization, | |
| 2 | | Bates stamped TG | |
| | | 0025412 | |
| 3 | | | |
| | Jia | Document in | 662 |
| 4 | Defendant's-42 | Chinese, Bates | |
| | | stamped TG | |
| 5 | | 0025413 | |
| 6 | Jia | Purchase and | 662 |
| | Defendant's-42A | Sale Agreement, | |
| 7 | | Bates stamped TG | |
| | | 0025413 | |
| 8 | | | |
| | Jia | Document in | 663 |
| 9 | Defendant's-43 | Chinese, Bates | |
| | | stamped TG | |
| 10 | | 0025415 | |
| 11 | Jia | Lease Agreement, | 663 |
| | Defendant's-43A | Bates stamped TG | |
| 12 | | 0025415 | |
| 13 | Jia | Document in | 665 |
| | Defendant's-44 | Chinese, Bates | |
| 14 | | stamped TG | |
| | | 0025414 | |
| 15 | | | |
| | Jia | Purchase and | 665 |
| 16 | Defendant's-44A | Sale Agreement, | |
| | | Bates stamped TG | |
| 17 | | 0025414 | |
| 18 | Jia | Document in | 667 |
| | Defendant's-45 | Chinese, Bates | |
| 19 | | stamped TG | |
| | | 0026004 through | |
| 20 | | TG 0026006 | |
| 21 | Jia | 2006 Financial | 667 |
| | Defendant's-45A | Statement of | |
| 22 | | Taian Taishan | |
| | | Plasterboard | |
| 23 | | Co., Ltd., Bates | |
| | | stamped TG | |
| 24 | | 0026004 through | |

| | | | |
|---|---|---|---|
| 1 | Jia | Document in | 667 |
| 2 | Defendant's-46 | Chinese, Bates stamped TG |  |
| 3 | | 0026007 through TG 0026009 |  |
| 4 | Jia | Balance Sheet, | 667 |
| 5 | Defendant's-46A | Bates stamped TG 0026007 through |  |
| 6 | | TG 0026009 |  |
| 7 | Jia Defendant's-47 | Document in Chinese, Bates stamped TG | 667 |
| 8 | | 0026010 through TG 0026012 |  |
| 9 | | | |
| 10 | Jia Defendant's-47A | 2008 Financial Statement of Taian Taishan | 667 |
| 11 | | Plasterboard Co., Ltd. |  |
| 12 | | Balance Sheet, Bates stamped TG |  |
| 13 | | 0026010 through TG 0026012 |  |
| 14 | | | |
| 15 | Plaintiff's Jia-13 | Sole Agency Agreement, 4 | 683 |
| 16 | | pages |  |
| 17 | Plaintiff's Jia-14 | Affidavit of Jia Tongchun, 11 | 693 |
| 18 | | pages |  |
| 19 | Plaintiff's Jia-15 | E-mail chain, top one dated | 700 |
| 20 | | 2/10/2007, Bates stamped TG |  |
| 21 | | 0000011 |  |
| 22 | Plaintiff's Jia-16A | E-mail chain, top one dated | 705 |
| 23 | | 10/15/2005, Bates stamped TG |  |
| 24 | | 0019813 and TG 0019814 |  |

| | | | |
|---|---|---|---|
| 1 | | | |
| 2 | Plaintiff's Jia-16B | Translation of E-mail chain, top one dated 10/15/2005, Bates stamped TG 0019813 and TG 0019814 | 706 |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | Plaintiff's Jia-17 | E-mail dated July 5, 2007, Bates stamped TG 0025216 through TG 0025218 | 713 |
| 7 | | | |
| 8 | | | |
| 9 | Plaintiff's Jia-18 | E-mail chain, top one dated 5/12/2006, Bates stamped TG 0000415 | 716 |
| 10 | | | |
| 11 | | | |
| 12 | Plaintiff's Jia-19A | E-mail in Chinese dated May 11, 2007, Bates stamped TG 0022728 | 721 |
| 13 | | | |
| 14 | | | |
| 15 | Plaintiff's Jia-19B | E-mail dated May 11, 2007, Bates stamped TG 0022728 | 721 |
| 16 | | | |
| 17 | Plaintiff's Jia-20 | Brochure of Shandong Taihe Dongxin Co., Ltd. | 731 |
| 18 | | | |
| 19 | Plaintiff's Jia-21 | Brochure of Taishan Ceiling and Wall System, Bates stamped TG 0025132 through TG 0025151 | 734 |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | Plaintiff's Jia-22A | Document in Chinese, Bates stamped TG 0020682 through TG 0020685 | 748 |
| 24 | | | |

```
 1
 2    Plaintiff's      Resolution of      748
      Jia-22B          the 4th
 3                     Extraordinary
                       General Meeting
 4                     of Shareholders
                       for the Year of
 5                     2005 of Shandong
                       Taihe Dongxin
 6                     Co., Ltd., Bates
                       stamped TG
 7                     0020682 through
                       TG 0020685
 8    Plaintiff's      China National     762
      Jia-23           Building
 9                     Material Company
                       Limited Overseas
10                     Regulatory
                       Announcement,
11                     Bates stamped
                       Q000155 through
12                     Q000223
13    Plaintiff's      China National     771
      Jia-24           Building
14                     Material Co. Ltd
                       Connected
15                     Transaction,
                       Acquisition of
16                     the Entire
                       Equity Interest
17                     in Taian
                       Donglian
18                     Investment
                       Trading Company
19                     Limited;
                       Connected
20                     Transaction,
                       Provision of
21                     Financial
                       Assistance to
22                     Taian State
                       Owned Assets
23                     Management
                       Group, Bates
24                     stamped Q000010 through Bates
```

| | | | |
|---|---|---|---|
| 1 | | stamped Q000012 | |
| 2 | Plaintiff's Jia-25 | China National Building Material Company | 775 |
| 3 | | Limited Overseas Regulatory | |
| 4 | | Announcement, Bates stamped | |
| 5 | | Q000975 through Q000981 | |
| 6 | | | |
| 7 | Plaintiff's Jia-26 | Taishan 2006 STRUCTURE - Pre Global Offering, | 781 |
| 8 | | August 4, 2011 Mtg., Bates | |
| 9 | | stamped Q000953 and Q000954 | |
| 10 | | | |
| 11 | Plaintiff's Jia-27 | Contract, Bates stamped TG 0001482 through | 789 |
| 12 | | TG 0001484 | |
| 13 | Plaintiff's Jia-28 | E-mail chain, top one dated | 803 |
| 14 | | February 25, 2007, Bates | |
| 15 | | stamped TG 0021643 through | |
| 16 | | TG 0021644 and TG 0023843 and | |
| 17 | | TG 0026019 | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

1                    - - -

2              THE VIDEOTAPE TECHNICIAN:

3        We are now on the record.  My name

4        is Dan Lawlor.  I'm the

5        videographer for Golkow

6        Technologies.

7              Today's date is January 9,

8        2012, and the time is 8:52 a.m.

9              This video deposition is

10       being held in Hong Kong, China in

11       the matter of Chinese Drywall

12       Litigation, for the U.S. District

13       Court, Eastern District of

14       Louisiana, MDL Number 2047, and

15       cross-noticed in various other

16       actions.

17              Counsel, starting with Your

18       Honor, please identify yourselves

19       and all those present.

20              THE COURT:  Eldon Fallon,

21       United States District Judge for

22       the Eastern District of Louisiana.

23              MR. SEEGER:  Chris Seeger,

24       Seeger Weiss, on behalf of

1          plaintiffs.  With me is Scott

2          George from Seeger Weiss.

3               MS. BASS:  Hilarie Bass from

4          Greenberg Traurig on behalf of the

5          Home Builders Steering Committee.

6               MR. GONZALEZ:  Good morning.

7          Ervin Gonzalez and Patrick Montoya

8          on behalf of the PSC and the MDL

9          State Liaison Group.

10              MR. HARDT:  Good morning.

11         Ken Hardt on behalf of Venture

12         Supply appearing in the Germano

13         action and in the Alexander state

14         court action in which this was

15         cross-noticed.

16              MR. BRENNER:  I'm Ted

17         Brenner for Tobin Trading Company

18         appearing in the Germano

19         litigation.

20              MR. SLAUGHTER:  Good

21         morning.  This is Brian Slaughter.

22         I represent Atlantic Homes, LLC in

23         the MDL and Virginia proceedings.

24              MR. MEUNIER:  Gerry Meunier

1           appearing for the PSC in the MDL.

2                MS. BESKIN:  Julia Beskin

3           appearing for Chartis.

4                MR. SEXTON:  Mike Sexton for

5           various Banner Supply entities.

6                MR. BLACK:  David Black for

7           the State of Louisiana, reserving

8           the positions set forth in our

9           pending motion to remand.

10                MR. LEVIN:  Arnold Levin on

11           behalf of the Plaintiffs' Steering

12           Committee.

13                MR. DAVIS:  Leonard Davis on

14           behalf of Plaintiffs' Liaison

15           Counsel for the Plaintiffs'

16           Steering Committee.

17                MS. BYRNE:  Jane Byrne,

18           Quinn, Emanuel, Urquhart, Oliver &

19           Sullivan on behalf of the Chartis

20           Insurance Group.

21                MS. JI:  Jieni Ji on behalf

22           of Taishan Gypsum.

23                MR. SPANO:  Frank Spano,

24           Allan Leung, Eugene Chen, Joe Cyr,

1          Hogan Lovells for defendants

2          Taishan Gypsum and TTP.

3                    INTERPRETER:  Sunny Wang,

4          court certified Mandarin

5          interpreter.

6                    THE VIDEOTAPE TECHNICIAN:

7          The deponent today is Tongchun

8          Jia.

9                    THE COURT:  Mr. Jia, would

10         you stand again, please, sir.

11                        -  -  -

12                   TONGCHUN JIA, after having

13         been duly sworn, was examined and

14         testified as follows:

15                        -  -  -

16                   THE WITNESS:  Yes, I do.

17                   THE COURT:  Be seated,

18         please, and give us your name.

19                   THE WITNESS:  Jia Tongchun,

20         J-I-A, last name Jia, first name,

21         Tongchun, T-O-N-G-C-H-U-N.

22                   THE COURT:  Ms. Interpreter,

23         you have had a chance to speak to

24         the witness in his native

1          language?

2                    INTERPRETER:  Yes, Your

3          Honor.

4                    THE COURT:  Do you

5          understand him, and are you

6          confident that he understands you?

7                    INTERPRETER:  Yes, I do.

8                    THE COURT:  Let's begin,

9          please.  It is now three minutes

10         to 9:00 Hong Kong time.

11                   MR. CYR:  May I begin, Your

12         Honor?

13                   THE COURT:  Yes, please.

14                        -  -  -

15                     EXAMINATION

16                        -  -  -

17    BY MR. CYR:

18         Q.    Good morning, Mr. Jia.  Do

19    you hold a position with Taishan Gypsum?

20         A.    Can you repeat that?

21         Q.    Do you hold a position with

22    Taishan Gypsum?

23         A.    Yes.

24         Q.    What is that position?

```
 1              A.    Director of the board of
 2   directors and general manager.
 3              Q.    Did you hold those positions
 4   with its predecessor company, Shandong
 5   Taihe Dongxin?
 6              A.    Yes.
 7              Q.    What year did you first
 8   become the general manager of Shandong
 9   Taihe Dongxin?
10              A.    You mean Shandong Taihe
11   Dongxin?
12              Q.    Yes.
13              A.    Yes.
14              Q.    What year did you first
15   assume the position of general manager of
16   Shandong Taihe Dongxin?
17              A.    Since the year 2002, it
18   became Taishan Dongxin Corporation,
19   Incorporated.
20              Q.    Just to make sure that the
21   record is clear, is it since 2002, he
22   became the general manager of Shandong
23   Taihe Dongxin?
24              A.    Yes.
```

1          Q.    Did he also assume the

2    position of Chairman of the Board of

3    Directors of Shandong Taihe Dongxin in

4    2002?

5          A.    Yes.

6          Q.    Do you recall having your

7    deposition taken in April of 2011 by the

8    plaintiffs' counsel who are here today?

9          A.    Yes.

10         Q.    Did you answer the questions

11   truthfully during that deposition?

12              MR. GONZALEZ:  Object to

13         form.

14              INTERPRETER:  I'm sorry, can

15         you repeat your objection?

16              MR. GONZALEZ:  Form.

17              From time to time, we will

18         be making objections.  Generally

19         to not to be difficult, we just

20         say object to form or form, and

21         what I request is that an

22         objection by one of us be deemed

23         an objection by all of us.

24              THE COURT:  One moment.  If

1    we're taking this deposition for

2    discovery purposes, that's one

3    thing.  If we're taking it for

4    trial purposes or for all

5    purposes, then I'll rule on the

6    objections.

7         MR. SEEGER:  That was my

8    understanding, Your Honor.

9         MR. CYR:  Your Honor, two

10   quick points.  One is we ask Your

11   Honor to consider the possibility

12   of limiting the number of

13   plaintiffs' counsel who are

14   allowed to make objections.  I

15   didn't know that we would offer

16   that up to all 20 of those who are

17   present, but that's your decision.

18        The main point that I would

19   like to make is that, based on

20   Your Honor's comments in the

21   September 9 decision, we are

22   approaching this deposition as if

23   it's a part of the record in the

24   hearing before Your Honor with

1          respect to the jurisdiction

2          issues.  And so we welcome Your

3          Honor's ruling on any objections

4          that are made.  We don't want to

5          slow down the process, but we do

6          want this to be -- this deposition

7          to be admissible before Your Honor

8          in the hearing.

9              THE COURT:  With objections

10         to form of the question, the

11         question, of course, is whether or

12         not the person who is questioning

13         an individual under direct can

14         lead the person.  Form objections

15         is objection as to leading.  They

16         can be corrected by the questioner

17         at that time.

18             So, the difficulty in this

19         type of situation is that we're

20         dealing with an interpreter, and

21         some leeway has to be given to

22         counsel in that regard.

23             First, with regard to people

24         asking questions, I need to limit

1           that to the person that's going to
2           be asking questions.  We have a
3           room full of lawyers, and I don't
4           want the lawyers to -- all the
5           lawyers to object.  Those who are
6           going to ask questions of this
7           witness have the right to object.
8           The rest do not have the right to
9           object.  So, if you're going to be
10          questioning the witness, you have
11          a right to object.  If not, you
12          don't.
13              So, let's proceed.  You can
14          reframe the question if you'd
15          like.
16  BY MR. CYR:
17      Q.   Mr. Jia, when you were asked
18  questions in your deposition in
19  approximately April of 2011, did you
20  answer those questions truthfully?
21              MR. GONZALEZ:  Object to
22          form, Your Honor.
23              THE WITNESS:  Truthfully,
24          yes.

1              THE COURT:  Overrule the

2         objection.

3    BY MR. CYR:

4         Q.    Mr. Jia, I would like to

5    address your attention to the time period

6    of 2005 through 2008.  During that period

7    of time, did either TG or TTP engage in

8    business in the United States?

9              MR. SEEGER:  Objection,

10        calls for a legal conclusion, Your

11        Honor.

12             THE COURT:  I sustain the

13        objection.  It's too broad.  It

14        has legal ramifications which this

15        witness is not able to deal with.

16        Factually, I'll allow it.  Legal

17        inferences, I won't.

18             Restate the question.

19   BY MR. CYR:

20        Q.    During that period of time,

21   did either TG or TTP ever have any real

22   property or personal property in the

23   United States?

24        A.    No.

1          Q.    During that period of time,
2    did either TG or TTP ever have any bank
3    accounts in the United States?
4          A.    No.
5          Q.    All of the questions that
6    I'm about to ask you are going to relate
7    to that same period of time during 2005
8    through 2008, but I'm not going to repeat
9    that each time to save time.  Do you
10   understand that, Mr. Jia?
11         A.    I understand.
12         Q.    Did either TG or TTP have a
13   business registration anywhere in the
14   United States?
15         A.    No.
16         Q.    Did either TG or TTP, were
17   either of them incorporated or organized
18   under the laws of any state in the United
19   States?
20         A.    No.
21         Q.    Did either TG or TTP have
22   any corporate books or records in the
23   United States?
24         A.    No.

1          Q.    Did either TG or TTP ever

2    have a mailing address or telephone

3    number in the United States?

4          A.    No.

5          Q.    Did either TG or TTP have an

6    agent to accept service of process in the

7    United States?

8          A.    No.

9          Q.    Did either TG or TTP have

10   any officers, directors, employees or

11   agents present in the United States?

12         A.    No.

13         Q.    Did the officers, directors,

14   employees or agents of TG or TTP ever

15   visit the United States on business, to

16   your knowledge?

17         A.    No.

18         Q.    Did either TG or TTP have an

19   ownership interest in any corporation or

20   business located in the United States?

21         A.    Can you repeat the question,

22   please?  I don't understand.

23         Q.    Did either TG or TTP have an

24   ownership interest in any corporation or

1   business located in the United States?

2          A.    No.

3          Q.    Did either TG or TTP have a

4   license agreement with any US companies

5   during that time?

6                INTERPRETER:  Interpreter

7          clarification.  "License," you

8          mean business license?

9                MR. CYR:  Licensing

10         agreement, an agreement where you

11         license a property interest of

12         some kind.

13               THE WITNESS:  No.

14  BY MR. CYR:

15         Q.    Did either TG or TTP ever

16  have any property interest or assets of

17  any kind located in the United States?

18         A.    No assets in America.

19         Q.    Did either TG or TTP have

20  any US patents or US trademarks?

21         A.    No.

22         Q.    Mr. Jia, during that period

23  of time, did either TG or TTP ever target

24  the United States for the sale of its

1    drywall?

2          A.    No.

3          Q.    During that period of time,

4    did either TG or TTP ever target the

5    State of Virginia for the sale of its

6    drywall?

7          A.    No.

8          Q.    During that period of time,

9    did either TG or TTP ever target the

10   State of Florida for the sale of its

11   drywall?

12         A.    No.

13         Q.    During that period of time,

14   did either TG or TTP ever target the

15   State of Louisiana for the sale of its

16   drywall?

17         A.    No.

18         Q.    During that period of time,

19   did either TG or TTP ever target the

20   State of Alabama for the sale of its

21   drywall?

22         A.    No.

23         Q.    During that period of time,

24   did either TG or TTP target any other

1    state in the United States for the sale

2    of its drywall?

3         A.    No.

4         Q.    During that period of time,

5    did either TG or TTP ever sell any

6    drywall with the knowledge or the

7    expectation that it would be used in the

8    State of Virginia?

9              MR. GONZALEZ:  Objection,

10         compound.  Objection, compound,

11         also calls for speculation.

12             THE COURT:  Let's break down

13         the question.

14             MR. CYR:  Yes, Your Honor.

15    BY MR. CYR:

16         Q.    Mr. Jia, to your knowledge,

17    during that period of time, did either TG

18    or TTP ever sell drywall with the

19    knowledge that it would be used in the

20    State of Virginia?

21             MR. GONZALEZ:  Object to

22         foundation.

23             MR. HARDT:  Your Honor, I

24         also object, too, because this

1          witness has been identified not to

2          testify as a corporate

3          representative dealing with sales.

4          So, he's being asked questions

5          about sales.  That's not what he's

6          designated as.

7               THE COURT:  He's answering

8          what is within his knowledge and

9          also the knowledge of the company

10         insofar as that is relevant in

11         that area.  That's what he's being

12         asked.

13              MR. GONZALEZ:  I object to

14         foundation on his knowledge of the

15         company, Your Honor.  No

16         establishment of such knowledge or

17         how he obtained it.

18              THE COURT:  You want to

19         respond to that?

20              MR. CYR:  Yes, Your Honor.

21              This direct examination is

22         based on the assumption that the

23         deposition that was taken in April

24         is a part of the record, and so,

1           therefore, we're trying to proceed

2           as efficiently as possible.  I

3           hope you appreciate that.  I'm

4           happy to ask a lot of the same

5           questions that were asked last

6           April that are already a part of

7           the record, but I believe that

8           that would be an unnecessary use

9           of everyone's time.

10              I believe that transcript

11          reflects that Mr. Jia is the

12          general manager of Shandong Taihe

13          Dongxin and Taishan Gypsum and had

14          very thorough knowledge of its

15          operations.

16              THE COURT:  I'll overrule

17          the objection and allow it to be

18          dealt with, if necessary, in a

19          cross-examination.

20              MR. CYR:  Your Honor, I'll

21          reask the question so that the

22          interpreter doesn't have to go

23          back and look into the record.

24   BY MR. CYR:

1          Q.    Mr. Jia, during that period
2    of time, did either TG or TTP, to your
3    knowledge, ever sell drywall with the
4    knowledge that it would be used in
5    Virginia?
6          A.    I do not know.
7          Q.    Mr. Jia, to your
8    knowledge --
9          Do you have any information,
10   Mr. Jia, that reflects that during that
11   time either TG or TTP sold drywall with
12   the knowledge that it would be used in
13   Virginia?
14         A.    No.
15         Q.    Do you have any knowledge
16   that during that period of time either TG
17   or TTP ever sold drywall with the
18   knowledge that it would be used in the
19   State of Florida?
20         A.    No.
21         Q.    Do you have any knowledge
22   that during that period of time either TG
23   or TTP sold drywall with the knowledge
24   that it would be used in the State of

1    Louisiana?

2         A.    No.

3         Q.    Do you have any knowledge

4    that during that period of time either TG

5    or TTP sold drywall with the knowledge

6    that it would be used in the State of

7    Alabama?

8         A.    No.

9         Q.    Do you have any knowledge

10   that, during that period of time, either

11   TG or TTP sold drywall with the knowledge

12   that it would be used in any other state

13   in the United States?

14        A.    No.

15             MR. CYR:  Your Honor, at

16             this time, I would like to begin

17             showing Mr. Jia some documents

18             that had been premarked as

19             exhibits, Jia Defendant's

20             Exhibits, January 9, 2012, 1

21             through 47.  And so that the

22             record is clear, we have

23             translations of most of those

24             exhibits, and they are marked with

1           the number with an A.  So, for

2           example, the translation of

3           Exhibit Number 1 is marked Exhibit

4           1A.

5                Although the parties have

6           made some progress in coming to an

7           agreement with respect to the

8           translations, it's my

9           understanding that we haven't

10          reached any final agreement with

11          respect to the translations, and

12          so both sides have reserved the

13          opportunity and the right to

14          address the accuracy of the

15          translations after the

16          depositions.

17               MR. SEEGER:  That's fine.

18                    -  -  -

19               (Whereupon, Deposition

20          Exhibit Jia Defendant's-1,

21          Document in Chinese, Bates stamped

22          TG 0026001 and TG 0026002, and

23          Deposition Exhibit Jia

24          Defendant's-1A, Shandong Province

1           Department of Finance Documents,

2           Bates stamped TG 0026001 and TG

3           0026002, were marked for

4           identification.)

5                      -  -  -

6     BY MR. CYR:

7           Q.    At this time Mr. Jia, I'm

8     asking you to take a look at a document

9     that has been premarked as Jia

10    Defendant's Exhibit Number 1 and ask you

11    to look at that document.

12          MS. BASS:  Would it be

13          possible to identify for the

14          record the Bates of that document?

15          MR. CYR:  The Bates stamps

16          numbers?

17          MS. BASS:  Yes, please.

18          Since not everybody in the room is

19          aware of what the exhibit number

20          is.

21          THE COURT:  That's a good

22          idea.

23          MR. CYR:  I'll try to reach

24          a protocol for the introduction of

1          each of the exhibits that

2          satisfies Your Honor, as well as

3          all of plaintiffs' counsel, in an

4          efficient manner.

5              And the -- this document has

6          the Bates stamp numbers of TG

7          26001 through TG 26002.  And for

8          the record, I'm going to try to

9          indicate the date that appears in

10         the document, but obviously if

11         plaintiffs' counsel disagrees with

12         that, you will have an opportunity

13         to register that.  This document

14         appears to be dated July 22, 2002.

15    BY MR. CYR:

16         Q.    The question for you, Mr.

17    Jia, is, what is this document?

18         A.    This is a document reflects

19    Shandong Province Department of Finance

20    to approve Shandong Taihe Dongxin

21    Company, Limited to assign its stocks to

22    the following companies.

23         Q.    Could you please indicate

24    the companies to which the stock was

1    assigned?

2          A.   Yes.  Part of the stocks

3    were to be transferred to Taian

4    State-Owned Asset Management Company,

5    Limited.  And part of the stocks were

6    assigned to me, myself, and 15 other

7    individuals.

8          Q.   Could you describe the

9    transaction that this was a part of?

10              INTERPRETER:  Interpreter

11         clarification.

12              THE WITNESS:  Is to withdraw

13         the state ownership of the company

14         and to introduce the private

15         ownership into the company.

16                   -  -  -

17              (Whereupon, Deposition

18         Exhibit Jia Defendant's-2,

19         Document in Chinese, Bates stamped

20         TG 0020582 through TG 0020584, and

21         Deposition Exhibit Jia

22         Defendant's-2A, Shandong Taihe

23         Dongxin Co., Ltd., Shareholder

24         List, Bates stamped TG 0020582

1          through TG 0020584, were marked

2          for identification.)

3                    - - -

4     BY MR. CYR:

5          Q.    I would like to direct your

6     attention to Jia Defendant's Exhibit

7     Number 2.  If it's okay with everyone,

8     I'm going to leave the January 9, 2012

9     date out each time I recite the document.

10    This is Bates stamps number 20582 through

11    20584, and it appears to have the date

12    August 10, 2002 at the bottom of the box

13    on the first page.

14              Mr. Jia, could you tell The

15    Court and plaintiffs' counsel what this

16    document is?

17         A.    This is a form indicates the

18    benefits of the shareholders.

19         Q.    When you say "benefit," are

20    you referring to the amount of

21    shareholder interest in the company

22    Shandong Taihe Dongxin?

23         A.    The ownership of shares.

24         Q.    Could you describe what the

1    ownership of -- withdrawn.

2              Mr. Jia, what is the date of

3    this document?

4         A.    August the 10th, 2002.

5         Q.    Based on this document, Mr.

6    Jia, what was the shareholder interest in

7    Shandong Taihe Dongxin as of August of

8    2002?

9         A.    Do you mean for myself?  I

10   don't understand.

11        Q.    No.  For each of the

12   shareholders starting with Taian City

13   State-Owned Asset Management Company and

14   then the shareholder association and then

15   the others.  But he doesn't need to

16   recite the names of the individuals.  He

17   can just characterize that as the

18   individual shareholders.

19        A.    Taian City State-Owned

20   Assets Management Company had 30 percent

21   of the stock.  The rest of them were

22   owned by individuals.

23        Q.    Did Shandong Taihe Group

24   Employee Shareholder Association own

1   shares in Shandong Taihe Dongxin in

2   August of 2002?

3        A.    Yes.

4        Q.    How much?

5        A.    Isn't it 33.73 percent?

6        Q.    For the record, the

7   translation that I have says 33.33

8   percent.

9        A.    Yes.  33.

10       Q.    Is that what it says in

11  Chinese?

12       A.    Yes, yes.

13       Q.    Could you describe for us

14  what the, I'm going to refer to it as the

15  Shareholder Association, what that was?

16       A.    It is a joint association of

17  the employees of Shandong Taihe Dongxin

18  Shareholder Incorporation, because they

19  each contributed certain shares.

20       Q.    Could you tell us what the

21  Taian City State-Owned Asset Management

22  Company is?  What was that?

23       A.    Taian City State-Owned Asset

24  Management Company is a state-owned

 1   company.

 2              INTERPRETER:  Interpreter

 3         clarification.

 4              THE WITNESS:  These shares

 5         were held by the Taian city

 6         government.

 7   BY MR. CYR:

 8         Q.    Is that the same as SASAC?

 9         A.    I don't understand.

10         Q.    Is the Taian City

11   State-Owned Asset Management Company,

12   Limited, is that a part of SASAC?

13              MR. CHEN:  Let me just note,

14         SASAC is a defined term.

15         S-A-S-A-C.

16              THE WITNESS:  It is not part

17         of SASAC.

18   BY MR. CYR:

19         Q.    Mr. Jia, continuing to look

20   at Exhibit Number -- Defendant's Exhibit

21   Number 2, you've indicated that it

22   reflects that the Taian City State-Owned

23   Asset Management Company owned 30

24   percent, that the Shareholder Association

1    owned 33.33 percent.  Who owned the

2    remaining percent of Shandong Taihe

3    Dongxin in August of 2002?

4         A.    It was owned by me and many

5    other company's executives.

6         Q.    I would like to --

7               Do you recall how much --

8    what percentage you had at that time, Mr.

9    Jia?

10        A.    5 percent.

11                   -  -  -

12              (Whereupon, Deposition

13              Exhibit Jia Defendant's-3,

14              Document in Chinese, Bates stamped

15              TG 0020630 through TG 0020633, and

16              Deposition Exhibit Jia

17              Defendant's-3A, Stock Transfer

18              Agreement, Bates stamped TG

19              0020630 through TG 0020633, were

20              marked for identification.)

21                   -  -  -

22   BY MR. CYR:

23        Q.    Please look at Jia

24   Defendant's Exhibit Number 3, which has

1    the Bates stamp numbers 20630 through

2    20632.  It appears as though this

3    document has the date at the top, March

4    24, 2005.  Could you briefly describe

5    what this document is, Mr. Jia?

6           A.    It is a stock transfer

7    agreement.

8           Q.    Could you describe from

9    whom, to whom?

10          A.    It was transferred from the

11   transferer, Shandong Taihe Employee

12   Shareholders Association, to the

13   transferee, Taian Donglian Investment and

14   Trade Company, Limited.

15          Q.    I'm going to refer to that

16   company as Donglian for the record.  Do

17   you understand that, Mr. Jia?

18          A.    Yes.

19          Q.    Does this document reflect

20   that as of and after March 24, 2005 that

21   the shares in Shandong Taihe that had

22   been owned by the Shareholders

23   Association were then owned by Donglian?

24                MR. GONZALEZ:  Objection,

1          leading, calls for a legal

2          conclusion and also lack of

3          foundation.

4               THE COURT:  Sustain the

5          objection.

6                    -   -   -

7               (Whereupon, Deposition

8          Exhibit Jia Defendant's-4,

9          Document in Chinese, Bates stamped

10         TG 0020634 through TG 0020637, was

11         marked for identification.)

12                   -   -   -

13    BY MR. CYR:

14         Q.   Mr. Jia, could you take a

15    look at Exhibit Number 4.  It bears the

16    stamp TG 20634 through TG 20637.

17              MR. CYR:  For the record, we

18         don't have a translation of this

19         document at this time, so,

20         plaintiffs' counsel are at a

21         disadvantage.  We'll try to

22         address that in the way that Mr.

23         Jia describes the document.

24              MR. SEEGER:  Excuse me.

1          Wait.  I think -- Your Honor, I
2          think it's one thing to say that
3          we'll resolve differences in
4          translation after, it is another
5          thing to say we can't even -- we
6          have no idea what the substance of
7          the document is.  I wouldn't know
8          how to begin to follow the truth
9          or the veracity of his answers.
10              MR. CYR:  Well, in response,
11         not to be argumentative, but you
12         might recall that we provided
13         this, identified this document for
14         you on December 2 to be used in
15         this deposition, only a couple of
16         days after the conference with the
17         judge.
18              MR. SEEGER:  But you didn't
19         provide us with a translation of
20         it, right?
21              MR. CYR:  We haven't been
22         able to find a translation if one
23         was prepared by either side.
24              MR. SEEGER:  I mean, Mr.

```
1          Cyr, you don't speak Chinese, so
2          what document, what are you
3          working off of to ask your
4          questions?
5              MR. CYR:  Well, the good
6          news is, is that I'm not answering
7          the questions, and that Mr. Jia
8          is.  And so he can answer the
9          questions based on the Chinese
10         document, if you want a clear
11         record, which is all we're trying
12         to do.
13             MR. SEEGER:  So, do you
14         understand what the document says
15         that you're asking questions
16         about?
17             MR. CYR:  Well, I'm not sure
18         that's proper for you to ask me,
19         but I'm happy to volunteer --
20             MR. SEEGER:  I'll work off
21         what you're working off of.
22             MR. CYR:  I'm happy to
23         volunteer that I have discussed
24         this document with Mr. Jia, and I
```

1    happen to know -- think what his

2    answer is.

3         MR. SEEGER:  I wasn't going

4    there.  I'm simply saying, if you

5    are working off a translation,

6    I'll work off your translation of

7    the document for now, and we'll

8    fix it later.

9         MR. CYR:  If I had a

10   translation, I would have provided

11   it to you.

12        MR. DAVIS:  Your Honor --

13        THE COURT:  What's the

14   problem?

15        MR. DAVIS:  Your Honor, I

16   was just going to explain and make

17   our record, in that we have

18   attempted, with the thousands and

19   thousands and thousands of

20   documents produced, to try to get

21   translations.  We have worked as

22   quickly as possible with those

23   that were identified, and the

24   understanding was that we were

1          going to exchange translations,

2          which we have done as best as

3          possible.  But even to this date,

4          we still don't have full

5          translations because of the

6          magnitude of documents.  It's not

7          humanly possible, quite frankly,

8          to have them all.  Had we known

9          that this document was going to be

10         used, we would have certainly

11         asked for that translation, which

12         we did on all documents that we

13         were going to use, and we thought

14         we would get them provided and

15         would have attempted to do so.

16         But not knowing until just

17         recently that it was going on a

18         list provided to us, there's no

19         way to get all the translations

20         done, and, in fact, not all the

21         translations are done.

22              MR. CYR:  In response, Your

23         Honor, just for the record, I

24         would like to say that from what I

1          observed, that plaintiffs' counsel

2          has cooperated and worked

3          intensely on the translations, and

4          we acknowledge that.  We also have

5          tried very hard.  I do believe

6          that we identified this document

7          in early December to be used, and

8          I don't know why we don't have a

9          translation.  It's a very quick

10          response on his part, if you want

11          it on the record.

12              THE COURT:  All right.

13              This is going to be my

14          ruling.  I'll allow the document

15          to be used with the understanding

16          that the plaintiffs may well have

17          an opportunity later on to ask

18          questions at another time of Mr.

19          Jia on this particular document.

20          Now, I don't know how we deal with

21          that, whether we have Mr. Jia

22          reappear again, which is a

23          possibility, or we do it in some

24          other way.  But if you do use the

1           document, I'll allow you to do it,

2           but I'll also keep open the

3           opportunity for the plaintiffs to

4           cross-examine on that document if

5           and when they get a translation.

6           Absent that, I may exclude the

7           aspect of the testimony dealing

8           with this document, but I will

9           allow you to go into it at this

10          time.

11                MR. SEEGER:  Thank you, Your

12          Honor.

13   BY MR. CYR:

14          Q.    Mr. Jia, does this document

15   have a date on it?

16          A.    Yes.

17          Q.    What is it?

18          A.    March 24, 2005.

19          Q.    What does this document

20   reflect?

21          A.    This is a stock transfer

22   agreement which stock was to be

23   transferred by Xue Yuli Guobiao --

24                THE INTERPRETER:  I'll spell

1           it out for you.

2                 MR. CYR:  Excuse me.  If I

3           may, to save time, excuse me,

4           ma'am, could you tell Mr. Jia

5           that, unless plaintiffs' counsel

6           wants him to, it's not necessary

7           to mention the individual names,

8           and just describe generally what

9           the transfer is from the

10          individuals to what.

11                MR. SEEGER:  You see, I

12          would object to that, because if

13          the witness wants -- if the

14          witness is going to answer it,

15          again, we have the objection on

16          the document, but if he's going to

17          answer, we should let the witness

18          answer the way he wants to answer

19          rather than guidance from counsel.

20                THE COURT:  I agree with

21          that.  Sustain the objection.  Let

22          the witness talk.

23                MR. CYR:  Excuse me, ma'am.

24          The judge has indicated that Mr.

1           Jia should proceed to answer the

2           question the way that he had

3           planned to answer the question,

4           not the way that I was suggesting.

5                THE COURT:  So, let's

6           restate the question, and then

7           he'll answer it.

8      BY MR. CYR:

9           Q.   Could you describe what the

10     transfer is that the document reflects,

11     Mr. Jia?

12                MR. GONZALEZ:  Your Honor --

13                THE COURT:  Yes.

14                THE WITNESS:  It is a stock

15           transfer agreement.

16                MR. GONZALEZ:  I'm sorry.

17                THE WITNESS:  Transfer of

18           stocks from some of the employees

19           of Shandong Taihe Dongxin Company

20           Limited to Taian Donglian Company.

21                MR. GONZALEZ:  Your Honor,

22           normally documents speak for

23           themselves, and witnesses are not

24           allowed to read them out.  I don't

1        know if The Court wants to suspend

2        those rules for purposes of this

3        document which has not been

4        translated, but I have concerns

5        over the witness reading a

6        document.

7             THE COURT:  I think that's a

8        valid concern.  And so if the

9        document is going to be admitted

10       or stipulated as admissible under

11       901 as a valid document, then the

12       document does speak for itself.

13       The witness may be cross-examined

14       on the document, but not simply

15       regurgitate what the document

16       says.  So, he has a right to

17       explain what the document is, but

18       then the document speaks for

19       itself.

20            MR. CYR:  Well, at this

21       time, then, Your Honor, I would

22       ask, do plaintiffs agree to the

23       admissibility into evidence of all

24       of Defendant's Exhibits 1 through

1          47?

2                    MR. SEEGER:  No.  I mean, we

3          have an objection to documents

4          that are in Chinese.  We have no

5          idea what they say.  It would be

6          impossible to stipulate to their

7          admission.  Besides, these are

8          documents you produced, so, I

9          mean, what type of stipulation --

10         what specific stipulation are you

11         looking for?  Admissibility, what?

12         You want me to waive hearsay,

13         everything possible?

14                   MR. CYR:  Let me restate the

15         question based on the fact that a

16         couple of the documents don't have

17         any translations on them.

18                   Do plaintiffs agree to the

19         admissibility into evidence of all

20         of the Defendant's Exhibits 1

21         through 47, except for the couple,

22         I believe it's two or three, that

23         do not have any translations?

24                   MR. SEEGER:  Are you

1           prepared to enter into the same

2           stipulation on all the documents

3           we are going to use?

4                MR. CYR:  No.

5                MR. SEEGER:  Okay.  Then the

6           answer is no.

7                MR. CYR:  So I'm going to

8           proceed asking questions about the

9           documents.

10                MR. GONZALEZ:  Your Honor,

11           just so we're clear, the

12           foundation for a document to go

13           into evidence are threefold.  One,

14           authenticity, it is what it

15           purports to be; two, there is some

16           relevance to the document; and,

17           three, it is either not hearsay or

18           an exception to the hearsay rule.

19           Those are the types of questions

20           that would be appropriate, but not

21           the regurgitation of what the

22           document says.  So, we stand on

23           our objections.

24                THE COURT:  Well, I think

1          everybody here knows about the

2          documents from the standpoint of

3          how to introduce documents.  The

4          witness is asked whether or not

5          it's an authentic document, as

6          just counsel said, what is it,

7          whether he recognizes it, and I

8          don't want him or any witness

9          simply to read the document to us.

10         That's not really helpful.

11         Explaining it is helpful, what it

12         is, is helpful.  And he can

13         explain it.  But let's try to

14         minimize what the document says in

15         Paragraph 2 or 3 or something of

16         that sort.  That's the kind of

17         questions that I expect on cross,

18         but not on direct.

19              MR. CYR:  Yes, Your Honor.

20              THE COURT:  I'll deal with

21         it one at a time, but let's go on.

22              MR. CYR:  I guess that's

23         what I thought I was doing, I was

24         asking for a short description of

1           the document.

2                THE COURT:  Restate your

3           question, and let's take it by

4           steps.

5     BY MR. CYR:

6           Q.    Could you briefly describe

7     the transaction that this exhibit

8     reflects, Mr. Jia?

9           A.    The description of the

10    transaction is as follows:  After the

11    passing of China's company law, China no

12    longer allows any employee association to

13    invest in the company, but, rather, they

14    need to form another company if they want

15    to invest in the company.  Therefore,

16    this is an agreement that combined the

17    employee association and other individual

18    stock, and it formed a company, which is

19    Donglian Anxin Company, to invest in the

20    company.

21                    -  -  -

22                (Whereupon, Deposition

23           Exhibit Jia Defendant's-5,

24           Document in Chinese, Bates stamped

1          0020638 through 0020642, was

2          marked for identification.)

3                    -  -  -

4     BY MR. CYR:

5          Q.   Could you look at

6     Defendant's Exhibit Number 5, Mr. Jia?

7               MR. SEEGER:  Mr. Cyr, we're

8          going to just state for the record

9          the same objections to the last

10         document and the fact that it's a

11         Chinese document.

12              THE COURT:  It's the same

13         observation that I have.  I will

14         allow you to go into it with the

15         understanding that the plaintiffs

16         may have a right to cross-examine

17         if and when the document becomes

18         translated, and we may have to

19         deal with that at another time.

20         But I'll allow you to go into it.

21              MS. BASS:  Could you provide

22         the Bates stamp number?

23              MR. CYR:  Sorry.  This is

24         Bates number 27703 through 27707.

1    BY MR. CYR:

2         Q.    What's the date of this

3    document, Mr. Jia?

4         A.    The date of the document is

5    March 24, 2005.

6              MR. CYR:  For the record, I

7         made a mistake.  The Bates numbers

8         are 20638 through 20642.

9    BY MR. CYR:

10        Q.    Mr. Jia, could you briefly

11   describe what this document reflects?

12        A.    The same as the document we

13   saw before.  This document was made also

14   for the purposes of transferring the

15   individuals' investment to other

16   investment into the two companies,

17   Donglian and Anxin, as an investment

18   company.

19        Q.    Could you tell us what the

20   company --

21              MR. SEEGER:  Excuse me.  I'm

22         sorry to object in the middle of

23         your question.  This particular

24         document doesn't seem to be on our

1          list of documents that were
2          supposed to be disclosed in
3          advance.  Am I missing something?
4          Maybe it is the Bates number?
5              MR. CYR:  To my knowledge,
6          I'm not using any documents that
7          weren't on Schedules A and B that
8          we gave you, but I could be
9          mistaken.  I'm sorry.
10             MR. SEEGER:  It's not on A
11         or B.  I mean, Judge, we'll
12         just -- I mean, he can go ahead
13         and question him, but we'll just
14         have the objection that it wasn't
15         disclosed.
16             THE COURT:  All right.
17             MR. CYR:  We'll check into
18         that.
19             MR. SEEGER:  Okay.
20    BY MR. CYR:
21         Q.   I believe the question I was
22    about to ask was, could you tell us all
23    what the company Anxin is?  A-N-X-I-N was
24    part of the name of that company.

1          A.    Anxin is a complete private

2    invested company.

3                    -  -  -

4                (Whereupon, Deposition

5          Exhibit Jia Defendant's-6,

6          Document in Chinese, Bates stamped

7          TG 0020598 through TG 0020600, and

8          Deposition Exhibit Jia

9          Defendant's-6A, Shandong Taihe

10         Dongxin Co., Ltd. Resolutions of

11         the General Meeting of

12         Shareholders, Bates stamped TG

13         0020598 through TG 0020600, were

14         marked for identification.)

15                    -  -  -

16   BY MR. CYR:

17         Q.    Could you look at

18   Defendant's Exhibit Number 6, Mr. Jia.

19   This has the Bates stamp number of 20598

20   through 20600.  And on the first line, it

21   appears to be dated March 24, 2005.

22   Could you tell us what this document is,

23   Mr. Jia?

24         A.    This is resolution of the

1    meeting of shareholders of Shandong Taihe

2    Dongxin Company, Limited.

3          Q.    On what date?

4          A.    March 24, 2005 was the date.

5          Q.    I would like to direct your

6    attention to the second page and ask you

7    if that accurately represents your

8    recollection of the shareholder interest

9    in Shandong Taihe Dongxin as of March 24,

10   2005?

11         A.    It reflects the new

12   shareholders of Shandong Taihe Dongxin

13   Company after March 24, 2005.

14         Q.    I'm going to refer to the

15   Beijing New Building Materials Company as

16   BNBM throughout my questions, Mr. Jia.

17   Do you understand that?

18               INTERPRETER:  BNB?

19               MR. CYR:  BNBM.

20               THE WITNESS:  I don't think

21         that's appropriate.

22   BY MR. CYR:

23         Q.    What would you like me to

24   call the company Beijing New Building

1   Materials Company Limited during the

2   questions that I ask you?

3        A.    Beijing Shareholding

4   Company.  Because in China, there are two

5   BNBMs.

6        Q.    What is the other BNBM in

7   China?

8        A.    It's another company in

9   Beijing.

10        Q.    Is it BNBM Group that you're

11   referring to?

12             INTERPRETER:  Excuse me.

13             MR. CYR:  Can we go off the

14        record for just a second?

15             THE COURT:  Yes.

16             MR. CYR:  Excuse me, ma'am.

17        Unless the judge directs you to,

18        I'm suggesting that you don't

19        interpret what I'm about to say,

20        because we're just going to try to

21        resolve some logistics here, and

22        Mr. Jia doesn't need to know about

23        it unless the judge wants him to.

24             THE COURT:  No, that's fine.

```
 1          You're off -- we're off the record
 2     at this point.
 3          INTERPRETER:  Okay.
 4          THE VIDEOTAPE TECHNICIAN:
 5     We're going off the record.  The
 6     time is 9:54.
 7               -  -  -
 8          (A discussion off the record
 9     occurred.)
10               -  -  -
11          THE VIDEOTAPE TECHNICIAN:
12     Back on the video record at 9:53.
13          THE COURT:  There was some
14     concern about the reference to a
15     particular company because there
16     apparently are two companies that
17     have the same or similar names.
18     Off the record, counsel have
19     reached an agreement as to how to
20     deal with that problem.  I'll
21     allow them at this time to explain
22     the agreement.
23          MR. SEEGER:  My
24     understanding is, going forward,
```

1          we are going to refer to Beijing

2          New Building Material Company,

3          Limited as BNBM, and Beijing New

4          Building Material Group Company,

5          Limited as BNBM Group.  We're

6          going to say it that way, or we're

7          going to say BNBMG?  I don't care.

8               MR. CYR:  I think it's

9          better to refer to it as BNBM

10          Group.

11               MR. SEEGER:  Okay.  I'm okay

12          with that.

13               THE COURT:  The parties seem

14          to have reached an agreement.

15          Let's continue.

16               MR. SEEGER:  Ervin, you

17          okay?

18               MR. GONZALEZ:  Fine.

19               MR. SEEGER:  All right.

20          We're good.

21     BY MR. CYR:

22          Q.   Mr. Jia, could you describe

23     for everyone how did BNBM come to own 42

24     percent of the total equity of Shandong

1    Taihe Dongxin in March of 2005?

2          A.    In the year 2005, the demand

3    for the drywall produced by Taishan

4    Gypsum Company was great, however, we

5    were short of fundings.  It was not

6    enough for the money that we have earned

7    and for the bank fundings to be put into

8    investment.  So, we resolved the problem

9    by this channel of funding.  BNBM was

10   willing to invest fundings for us.  At

11   the time, our shareholders agreed.

12   However, we were not willing to have the

13   company as a big shareholder.  So other

14   shareholders only allowed BNBM to invest

15   42 of the shares -- 42 percent of the

16   shares.  That was about it.

17         Q.    Could you describe how the

18   purchase price was arrived at, the

19   purchase price for BNBM?

20               INTERPRETER:  Interpreter

21         clarification.

22               THE WITNESS:  1.8 RMB per

23         share.

24   BY MR. CYR:

1          Q.    How did you reach that

2    purchase price?  How was it determined?

3          A.    Based on the consideration

4    of the market, of the bargain and of the

5    profit of Shandong Taihe Dongxin Company.

6          Q.    Would you please look at Jia

7    Defendant's Number 7, please?

8                INTERPRETER:  You mean page

9          number 7 or Exhibit Number 7?  I'm

10         sorry.

11               MR. CYR:  Jia Exhibit Number

12         7.  And that has --

13               INTERPRETER:  Just one

14         moment, please.  I want to put

15         back the old exhibit.

16               MR. CYR:  I think if we can

17         avoid taking the book apart,

18         that's a good idea, but we'll do

19         whatever Mr. Jia wants.

20               Judge, we'll look at this

21         book later on to make sure it

22         maintains its integrity.

23               THE COURT:  All right.

24         Let's give the Bates number also.

1              MR. CYR:  Bates Number TG

2         20647 through TG 20649.

3              -  -  -

4              (Whereupon, Deposition

5         Exhibit Jia Defendant's-7,

6         Document in Chinese, Bates stamped

7         TG 0020647 through TG 0020649, and

8         Deposition Exhibit Jia

9         Defendant's-7A, Comparison Chart

10        of Registered Capital Before and

11        After Changes, Bates stamped TG

12        0020647 through TG 0020649, were

13        marked for identification.)

14             -  -  -

15   BY MR. CYR:

16        Q.   Mr. Jia, could you tell us

17   what this document is?

18        A.   It is a comparison chart of

19   the shareholders' brief before and after

20   the change.

21        Q.   I would like to direct your

22   attention to the bottom left-hand corner

23   of the first page that reads "Prepared by

24   Taian Zhongcheng Certified Public

1    Accounting Firm."

2              And the question I have is,

3    do you know who they were?

4         A.    This is the CPA firm based

5    on partnership.

6         Q.    Was this the accounting firm

7    that worked for Shandong Taihe Dongxin in

8    about April of 2005?

9         A.    Correct.

10             INTERPRETER:  Interpreter

11             clarification.

12             THE WITNESS:  This is

13             independent third-party CPA firm.

14   BY MR. CYR:

15        Q.    Did that third-party CPA

16   firm work for Taian -- Shandong Taihe

17   Dongxin in about April of 2005?

18        A.    We do not hire them as a

19   long-term CPA firm, but we hired them at

20   a certain stage.

21        Q.    Did you hire them at this

22   stage in April of 2005 to perform this

23   work?

24        A.    Yes.

1          Q.    I would like to direct your

2    attention to the last page, Mr. Jia.

3    Does it accurately reflect the

4    shareholding interest of BNBM, Anxin and

5    Donglian as 42, 16 and 21, as of April

6    25, 2005?

7                MR. GONZALEZ:  Objection,

8           leading and hearsay.

9                THE COURT:  I'll overrule

10          the objection and allow it under

11          611(a).  I don't think it is

12          substantive.  It's just

13          introduction and explanation of

14          the document.

15    BY MR. CYR:

16          Q.    You can answer the question,

17    Mr. Jia.  Are those accurate figures?

18          A.    They're correct.

19          Q.    I would like to direct your

20    attention to the first page, Mr. Jia,

21    where it indicates that, as of April 25,

22    2005, you owned a 5 percent of Shandong

23    Taihe Dongxin; is that accurate?

24                MR. GONZALEZ:  Document

 1          speaks for itself.

 2               THE COURT:  I'll overrule

 3          the objection and allow it.

 4               THE WITNESS:  I owned 5

 5          percent of Shandong Taihe Dongxin

 6          Company.

 7     BY MR. CYR:

 8          Q.   I would like to direct your

 9     attention to the first page above the

10     entry for the 5 percent entry for you.

11     And on the Chinese version, it's

12     blackened.  And I just would like to

13     confirm for the record what your

14     testimony and our understanding of

15     mathematics leads us to conclude, and

16     that is that as of that time, Mr. Jia, is

17     it true that the Shareholders Association

18     owns 0 percentage and that the Taian

19     State-Owned Asset Management Company,

20     Limited owned 16 percent?

21          A.   Correct.

22                    -  -  -

23               (Whereupon, Deposition

24          Exhibit Jia Defendant's-8,

1           Document in Chinese, Bates stamped

2           TG 0020601 and TG 0020602, and

3           Deposition Exhibit Jia

4           Defendant's-8A, Resolutions of the

5           General Meeting of Shareholders,

6           Bates stamped TG 0020601 and TG

7           0020602, were marked for

8           identification.)

9                    -  -  -

10   BY MR. CYR:

11          Q.    Could you look at

12   Defendant's Exhibit Number 8, please.

13   For the record, it is Bates stamp number

14   TG 20601 through 20602.  And it appears

15   as though it's dated April 25, or it

16   reflects it's dated and reflects an event

17   on April 25, 2005.  Could you tell us

18   what this document is, Mr. Jia?

19          A.    It is the shareholders'

20   resolution -- it's the shareholders'

21   general meeting resolution for Shandong

22   Taihe Dongxin Company.

23          Q.    Directing your attention to

24   the first paragraph, does that accurately

1    reflect who the seven directors of

2    Shandong Taihe were as a result of that

3    shareholders' meeting on April 25, 2005?

4         A.    The reflection is accurate.

5         Q.    With respect to Mr. Bing

6    Wang, the first director who is listed,

7    could you tell us if he had a position

8    with BNBM?

9         A.    Currently Wang Bing is the

10   director of the board of directors of

11   BNBM.  At the time, his position perhaps

12   was the general manager.

13        Q.    The general manager of BNBM?

14        A.    Correct.

15        Q.    As of --

16              In April of 2005, did Mr.

17   Jianjun Jia hold a position with BNBM?

18        A.    He was the secretary of the

19   board of directors of BNBM.

20        Q.    Could you tell us if Mr.

21   Jinyu Hu held a position with BNBM in

22   April of 2005?

23        A.    At the time, Hu Jinyu was

24   the general accountant of BNBM.

1           Q.    Could you tell us what
2    position Xulian Ren held at the time of
3    April of 2005?
4           A.    Ren Xulian was the vice
5    general manager of Shandong Taihe Dongxin
6    Company.
7           Q.    Could you tell us what
8    position Xinghu Xu had in April of 2005?
9           A.    Xu Xinghu was the director
10   of board of directors of Taian City Asset
11   Management Company, Limited.
12          Q.    Is the next person listed
13   Tongchun Jia you?  Is that you?
14          A.    Yes.
15          Q.    Did there come a time, Mr.
16   Jia, when you received the title of
17   deputy general manager of BNBM?
18          A.    Yes.
19          Q.    Do you recall when that was?
20          A.    Perhaps it was in the second
21   half year of 2005.
22          Q.    How long did you hold the
23   title of deputy general manager of BNBM?
24          A.    Perhaps I am still on the

1    position.

2            Q.    Could you describe what

3    duties or responsibilities or activities

4    you engaged in, have engaged in as the

5    deputy general manager of BNBM?

6            A.    I am only in charge of the

7    work of Taishan Gypsum Company.  I am not

8    responsible for any work at Taihe

9    Dongxin --

10                INTERPRETER:  I'm sorry,

11                interpreter needs explanation.

12                THE WITNESS:  I am not

13                involved with the work of BNBM.

14                And I have never attended their

15                executive meetings either.  It is

16                only an honorary position, an

17                honorary position.

18    BY MR. CYR:

19            Q.    Could you tell us what

20    position Yuli Xue had in April of 2005?

21                MR. SEEGER:  Objection.

22                Just maybe if you can lay a

23                foundational basis for how he

24                knows these people so we don't

1              have to ask those.

2                   MR. CYR:  Sure.

3    BY MR. CYR:

4         Q.   Do you happen to know who

5    Yuli Xue was in April of 2005, Mr. Jia?

6                   INTERPRETER:  Counsel, you

7              mean Xue Yuli, right?

8                   MR. CYR:  The last name

9              after Mr. Jia's name.

10                  THE WITNESS:  Xue Yuli is my

11             colleague.  I have been working

12             with this person for more than ten

13             years.  I'm very familiar with

14             Xue.

15   BY MR. CYR:

16        Q.   I understand, Mr. Jia.

17                  Could you tell us what

18   position he had in April of 2005?

19        A.   The deputy general manager

20   of Taishan Gypsum Company.

21        Q.   At the time, the name was

22   Shandong Taihe Dongxin, right?

23        A.   Correct.

24        Q.   I would like to direct your

1    attention to the second paragraph, which

2    appears to refer to the board of

3    supervisors.  Could you tell us what the

4    board of supervisors was?

5         A.    The board of supervisors is

6    a management organization of Taishan

7    Gypsum.

8              THE COURT:  Let's take a

9              break in five minutes so that you

10             can pace yourself accordingly.

11             MR. CYR:  Would you tell Mr.

12             Jia we're going to take a break in

13             about four or five minutes.

14             THE WITNESS:  No problem.

15   BY MR. CYR:

16        Q.    Just a few more questions.

17              Could you describe for

18   everyone what the function was of the

19   board of supervisors in April of 2005?

20        A.    According to China's company

21   law, each company is required to have a

22   board of supervisors.  They are to

23   supervise the directors board and the

24   executives of company, whether they are

1    working according to the shareholders'

2    resolution.

3                        -   -   -

4                   (Whereupon, Deposition

5             Exhibit Jia Defendant's-9,

6             Document in Chinese, Bates stamped

7             TG 0020608 through TG 0020629, and

8             Deposition Exhibit Jia

9             Defendant's-9A, Shandong Taihe

10            Dongxin Co., Ltd. Articles of

11            Incorporation, Bates stamped TG

12            0020608 through TG 0020629, were

13            marked for identification.)

14                       -   -   -

15   BY MR. CYR:

16          Q.    I would like to direct your

17   attention now to Exhibit Number 9, and

18   the Bates stamp numbers are 20608 through

19   20629.

20                And my question for you, Mr.

21   Jia, is, what is that document?

22          A.    It is Articles of

23   Incorporation of Shandong Taihe Dongxin

24   Company, Limited.

1           THE COURT:  Let's take a
2       break at this time.  We'll come
3       back at 15 minutes, 10:30.
4           THE VIDEOTAPE TECHNICIAN:
5       We're going off the record.  This
6       is the end of Tape Number 1.  The
7       time is 10:14.
8                  -  -  -
9           (Whereupon, a recess was
10      taken from 10:14 a.m. until
11      10:30 a.m.)
12                 -  -  -
13          THE VIDEOTAPE TECHNICIAN:
14      Back on the record at 10:30.
15  BY MR. CYR:
16      Q.   Mr. Jia, you were looking at
17  Exhibit Number 9, and I would like to
18  direct your attention to the last page.
19  Is it dated April 25, 2005?
20      A.   Yes.
21      Q.   Did you sign this document?
22      A.   Yes.
23                 -  -  -
24          (Whereupon, Deposition

1           Exhibit Jia Defendant's-10,

2           Document in Chinese, Bates stamped

3           20384 through 20390, and

4           Deposition Exhibit Jia

5           Defendant's-10A, Shandong Taihe

6           Dongxin Co., Ltd. Summary of Asset

7           Valuation Report, Bates stamped TG

8           0020384 through TG 0020390, were

9           marked for identification.)

10                    -   -   -

11   BY MR. CYR:

12           Q.   Would you look at

13   Defendant's Exhibit Number 10, please.

14   It has Bates Number 20384 through 20390.

15           Could you tell us what this

16   document is?

17           A.   This is the asset valuation

18   report of Taihe Dongxin Company, Limited.

19           Q.   Who prepared it?

20           A.   It was prepared by

21   Zhongcheng, LLC.

22           Q.   What's the date?

23           A.   May 26.

24           Q.   What year?

1          A.     2006.

2          Q.     Why was this report

3    prepared, if you know?

4          A.     We valuate the assets of

5    Shandong Taihe Dongxin Company regularly.

6          Q.     Was it prepared at the

7    request of Shandong Taihe Dongxin?

8          A.     Correct.

9                      -  -  -

10                (Whereupon, Deposition

11                Exhibit Jia Defendant's-11,

12                Document in Chinese, Bates stamped

13                TG 0020686 through TG 0020789, and

14                Deposition Exhibit Jia

15                Defendant's-11A, Articles of

16                Association of Shandong Taihe

17                Dongxin Co., Ltd., Bates stamped

18                TG 0020686 through TG 0020789,

19                were marked for identification.)

20                      -  -  -

21    BY MR. CYR:

22          Q.     Could I direct your

23    attention to Exhibit Number 11.  It has

24    Bates stamps numbers TG 20686 through TG

1    20709.  And the last page has the date on

2    it, August 8, 2006.

3              A.    Yes.

4              Q.    What is that document?

5              A.    It is the Article of

6    Incorporation of the company.

7              Q.    Is it a revision of the

8    Articles of Association of the Shandong

9    Taihe Dongxin Company, Limited?

10             A.    Yes.

11             Q.    I would like to direct your

12   attention to Article 17.

13             A.    Chapter 17 or Clause 17?

14             Q.    It happens to be Article 17

15   in Chapter III entitled "The Shares."

16   It's the article relating to the

17   shareholder interest.

18             A.    I got it.

19             Q.    At the time that these

20   articles of incorporation were revised in

21   August of 2006, Mr. Jia, who owned

22   Donglian?

23             A.    In this period of time,

24   perhaps it was owned by BNBM.

1        Q.    Is it your recollection that

2   at some point in 2006 BNBM acquired

3   Donglian?

4        A.    Correct.

5        Q.    Could you describe for the

6   judge and plaintiffs' counsel what you

7   know about BNBM's acquisition of

8   Donglian?

9        A.    In the year 2006, while the

10   house price was relatively cheap, many of

11   the individual shareholders showed

12   willingness to sell their stocks in

13   exchange of cash in order to buy houses.

14   At the same time, BNBM showed willingness

15   of increase its shares, therefore, they

16   reached an agreement, and Donglian was

17   acquired by BNBM at RMB 3.2 per share.

18        Q.    I would like to direct your

19   attention now to Articles 39 through 41.

20        A.    I got it.

21        Q.    I'm pausing to allow

22   plaintiffs' counsel to glance at those

23   articles.

24             Mr. Jia, I'm now going to

1    just ask you a very simple question.  Did

2    there ever come a time when BNBM had the

3    ability to vote two-thirds of the shares

4    of Taian Dongxin -- Shandong Taihe

5    Dongxin?

6          A.    No.

7          Q.    Could you describe why, if

8    you know, why that is?

9          A.    I don't understand.

10          Q.    Did you participate in the

11    discussions or deliberations about how

12    much of an interest BNBM would have,

13    either directly or indirectly, in

14    Shandong Taihe?

15          A.    I participated in the

16    discussion.

17          Q.    And could you describe, if

18    you know, why it is that they reached the

19    level of 65 percent direct and indirect

20    ownership but not 66?

21          A.    When the shareholders,

22    including myself, of Taihe Dongxin

23    Company, discussed about the shares that

24    BNBM should hold, we discussed not only

1    about the price, even though we did have

2    several rounds of discussions in

3    consideration of different factors, and

4    finally reached 3.2 RMB as the price of

5    share to sell Donglian.  We have also

6    discussed about management of Taihe

7    Dongxin Company in the future and the

8    protection of the small shareholders'

9    right.

10                   We diligently studied and

11   referred to the company law.  The company

12   law clearly stated if a shareholder has

13   more than two-third of the voting right

14   of the company, who would have the right

15   to make decisions on different affairs of

16   the company, while below two-third, the

17   shareholder would not have the right to

18   make decisions on important matters.

19   Having 65 percent of the share would not

20   allow the company to get involved in

21   everything of the company.  According to

22   the law, there was the protection of

23   small shareholders' rights.  Therefore,

24   we believe owning 65 percent of Taihe

1    Dongxin Company's share would not make

2    BNBM the controlling shareholder of Taihe

3    Dongxin Company.

4                    In order to increase the

5    efficiency of the company, we made a

6    partial list of important issues of the

7    company and also made a partial list of

8    small matters of the company.  For the

9    small matters, can reach agreement

10   whenever there are half of the approval

11   of the shareholders were present.  For

12   principal and substantial matters,

13   two-third of all the shareholders had to

14   be approved, which guaranteed the

15   independent operation of Taihe Dongxin

16   Company.

17            Q.    Mr. Jia, did there come a

18   time when BNBM received a pledge of

19   Shandong Taihe Dongxin securities in

20   exchange for a loan?

21            A.    I'm aware of that, yes.

22            Q.    Could you describe what you

23   know to the judge and plaintiffs'

24   counsel?  And start off with your general

1    recollection of approximately when that

2    occurred.

3         A.    This happened in

4    approximately the second half year of

5    2006.  Taian City Asset Management

6    Company is one of the shareholders of

7    Taihe Dongxin Company.  Its director of

8    the board of directors is called Xinghu

9    Xu --

10              INTERPRETER:  Interpreter

11         clarified gender.

12              THE WITNESS:  He told me

13         that there was a difficulty in his

14         company's operation.  He would

15         like to borrow some money.  He

16         said he would need to borrow 50

17         million RMB and asked me if Taihe

18         Dongxin Company was willing to

19         lend him the money.  I said Taihe

20         Dongxin Company cannot lend any

21         money to any shareholders, but you

22         could check with BNBM and see if

23         they have the money.

24              After his communication with

```
1          BNBM, he found that he could

2          indeed borrow money from BNBM.

3          BNBM worried about the ability of

4          return the fund from Taian Asset

5          Management Company.  So, they

6          required Taian Asset Management

7          Company to pledge the 16 percent

8          of the stock share interest that

9          it owned with Taihe Dongxin

10         Company.  After it had given 16

11         percent of the share it had owned

12         as a security pledge, the company

13         received the loan.  The

14         transaction is now completed.  The

15         pledge has already been redempted.

16         Taian Asset Management Company has

17         still the 16 percent of the share

18         interest.

19             During the period of

20         security pledge, Taian Asset

21         Management Company had the voting

22         right and all other rights of the

23         company.

24    BY MR. CYR:
```

1          Q.    I would like to direct your

2    attention to the last page of Exhibit

3    Number 11.  Did you sign this document,

4    Mr. Jia?

5          A.    Yes.

6                   -  -  -

7                (Whereupon, Deposition

8           Exhibit Jia Defendant's-12,

9           Document in Chinese, Bates stamped

10          TG 0020725 through TG 0020748, and

11          Deposition Exhibit Jia

12          Defendant's-12A, Articles of

13          Association of Tai Shan Gypsum

14          Co., Ltd., Bates stamped TG

15          0020725 through TG 0020748, were

16          marked for identification.)

17                   -  -  -

18    BY MR. CYR:

19          Q.    Could you look at

20    Defendant's Exhibit 12, please.  This is

21    Bates stamped number TG 20725 through TG

22    20748.  And could you tell us what that

23    document is, Mr. Jia?

24          A.    This is a new article of

1   incorporation of Taihe Dongxin Company

2   dated on June the 20th, 2007.

3           Q.    What's the date?

4           A.    June the 20th, 2007.

5           Q.    And I direct your attention

6   to the last page.

7                 Did you sign this document?

8           A.    I did, but there were also

9   signatures of other shareholders.

10          Q.    Can I direct your attention

11  now to Exhibit Number 13, please.

12                      -   -   -

13                (Whereupon, Deposition

14                Exhibit Jia Defendant's-13,

15                Document in Chinese, Bates stamped

16                TG 0020722 through TG 0020724, and

17                Deposition Exhibit Jia

18                Defendant's-13A, Shandong Taihe

19                Dongxin Co., Ltd. Resolutions of

20                the 2006 Annual General Meeting of

21                Shareholders, Bates stamped TG

22                0020722 through TG 0020724, were

23                marked for identification.)

24                      -   -   -

1          MR. CYR:  This is Bates

2     stamp number 20722 through 20724.

3     The last page is dated June 20,

4     2007.

5 BY MR. CYR:

6     Q.    And while we're on the last

7 page, Mr. Jia, did you sign this

8 document?

9     A.    I did, together with other

10 representatives of shareholders.

11     Q.    Could you tell us what this

12 document is?

13     A.    This is a resolution of 2006

14 Shandong Taihe Company's shareholder

15 meeting.

16     Q.    I direct your attention to

17 Paragraph 5, and I'm asking if this is

18 approximately the time that the name of

19 Shandong Taihe Dongxin was changed to

20 Taishan Gypsum?

21     A.    In that meeting, we made a

22 decision to change the name of Shandong

23 Taihe Dongxin Company into Taishan Gypsum

24 Company.

```
 1                  -  -  -
 2              (Whereupon, Deposition
 3         Exhibit Jia Defendant's-14,
 4         Document in Chinese, Bates stamped
 5         TG 0020715 through TG 0020717, and
 6         Deposition Exhibit Jia
 7         Defendant's-14A, Datasheet of the
 8         Directors, Supervisors and Manager
 9         of Shandong Taihe Dongxin Co.,
10         Ltd., Bates stamped TG 0020715
11         through TG 0020717, were marked
12         for identification.)
13                  -  -  -
14  BY MR. CYR:
15         Q.   Could you please look at
16  Exhibit Number 14, please.  It's Bates
17  stamped number TG 20715 through 20717.
18  Could you tell us what this document is?
19         A.   This is a resolution of a
20  temporary shareholders' meeting of
21  Shandong Taihe Dongxin Company.
22         Q.   Could you tell us what was
23  done at that shareholders' meeting?
24         A.   In the meeting, an agreement
```

1   for modifying the article of

2   incorporation was reached, and also in

3   the meeting, we changed or removed some

4   of the directors.

5           Q.    As of --

6                 What's the date of this

7   document, Mr. Jia?

8           A.    June 20th, 2007.

9           Q.    As of June 2007, was the

10  number of the members of the board of

11  directors of Taishan Gypsum changed from

12  seven to five?

13          A.    Yes.

14          Q.    Did BNBM have the ability to

15  appoint three of those five directors as

16  of that time?

17          A.    Yes.

18          Q.    Who had the power to appoint

19  the other two directors?

20          A.    One was recommended by Taian

21  City Asset Management Company.  Another

22  one was recommended by Taishan -- by

23  Taihe Dongxin Company and myself.

24          Q.    Can I direct your attention

1    to Defendant's Exhibit Number 15, please.

2                         -   -   -

3                    (Whereupon, Deposition

4            Exhibit Jia Defendant's-15,

5            Document in Chinese, Bates stamped

6            TG 0020795 through TG 0020798, and

7            Deposition Exhibit Jia

8            Defendant's-15A, Taishan Gypsum

9            Co., Ltd. 2008 Annual General

10           Meeting, Bates stamped TG 0020795

11           through TG 0020798, were marked

12           for identification.)

13                        -   -   -

14                   THE WITNESS:  I have it.

15                   MS. BASS:  Bates number,

16           please?

17                   MR. CYR:  Sorry.  Bates

18           Number TG 20795 through TG

19           20797 -- I'm sorry -- 798.

20   BY MR. CYR:

21           Q.    Let me direct your attention

22   to the last page, Mr. Jia.  What's the

23   date of this document?

24           A.    May the 18th, 2009.

1          Q.    Is that your signature on

2    that page at the bottom?

3          A.    Yes.

4          Q.    Can I refer you to the first

5    page and ask you, what does the title

6    read?

7          A.    It is Taishan Gypsum

8    Company, Limited 2008 Annual Shareholders

9    Meeting Resolution.

10          Q.    And on the first line, it

11    begins with the date.  Could you tell us

12    what that date is?

13          A.    May 18, 2009.

14          Q.    Based on your familiarity

15    with the annual shareholders' meetings,

16    Mr. Jia, does this reflect the end of

17    shareholders' meeting for 2008 or 2009?

18          A.    2008.

19          Q.    Can I direct your attention

20    to Article IX.  There's a reference to a

21    loan guarantee from BNBM.  Do you see

22    that?

23          A.    Yes.

24          Q.    Could you tell everyone what

1    you know about that loan guarantee and

2    what the circumstances were surrounding

3    it?

4         A.    According to the market,

5    Taian Gypsum Company was planning to

6    quickly build up some production mines

7    out of the city.  The profits at the time

8    that we had was not sufficient for us to

9    build so many production mines for

10   gypsum.  We had to obtain a loan from the

11   bank.  The bank required a guarantor when

12   we applied the loan.  BNBM provided the

13   guarantee for us, but the shareholder was

14   very stingy.  They asked for the

15   guarantee fee.

16             INTERPRETER:  Interpreter

17        clarify gender.

18             THE WITNESS:  BNBM,

19        therefore, had been taking our

20        guarantee fee throughout the

21        entire guarantee period.  And they

22        also required a reverse guarantee

23        from other shareholders.  For

24        that, I myself was not very happy

1           with that shareholder.  But in

2           order to develop, we had to do

3           that.

4      BY MR. CYR:

5           Q.   Mr. Jia, I'm going to ask

6      you a few questions unrelated to the

7      documents.  Has BNBM or any of its --

8      withdrawn.

9               Has BNBM ever served as an

10     agent for Taishan Gypsum or its

11     predecessors in the United States?

12          A.   No.

13          Q.   Has BNBM --

14              Have you ever heard of the

15     company BNBM USA, aside from preparing

16     for your deposition?

17          A.   No.

18          Q.   Have you ever heard of the

19     name David Wei, aside from preparing for

20     your deposition?

21          A.   What was that name?

22          Q.   W-E-I is the family name in

23     English.

24          A.   I don't understand English

1    concept real well.

2           Q.    Let me ask a different

3    question.

4           A.    Okay.

5           Q.    Have either you or Taishan

6    Gypsum or its predecessors ever entered

7    into an agreement with BNBM whereby you

8    shared the liabilities of anything with

9    BNBM?

10          A.    No.  We operate according to

11   the articles of incorporation and the

12   company law.

13          Q.    Have either you or Taishan

14   Gypsum or its predecessors ever entered

15   into an agreement with BNBM whereby each

16   of you would be bound by the acts of each

17   other?

18          A.    No.

19          Q.    Has CNBM ever acted as an

20   agent for Taishan Gypsum or its

21   predecessors in the United States?

22              MR. GONZALEZ:  Objection,

23          calls for a legal conclusion.

24              INTERPRETER:  Interpreter

1              clarification.  You said CNBM?

2                   MR. CYR:  CNBM.

3                   THE COURT:  Overrule the

4         objection.

5    BY MR. CYR:

6         Q.    You can answer the question.

7         A.    I forgot your question.

8         Q.    Has CNBM ever acted as an

9    agent for Taishan Gypsum or its

10   predecessors in the United States?

11        A.    What company is CNBM?

12        Q.    Have you ever heard of a

13   company called CNBM?

14        A.    I want to confirm what that

15   company is.  I'm afraid if they are

16   company of the same name.

17        Q.    I'll come back to that, Mr.

18   Jia, in the interest of time.

19                MR. SEEGER:  You want to

20        just refer to the -- well, I wrote

21        on this a little bit, but she

22        should have it in the glossary

23        under C, China National Building

24        Material Group Corporation.

1           THE WITNESS:  I have not
2      heard of this company.
3           MR. CYR:  May I see that,
4      please?
5           INTERPRETER:  Yes.
6           (Handing over document.)
7           Yes.
8           MR. CYR:  I think there's
9      just been a mistake.  We want to
10      make sure we have accurate
11      testimony here.
12           Could you please ask him if
13      he's ever heard of this company
14      here?
15           MR. SEEGER:  Just for the
16      record, you are pointing to what,
17      just so we're clear?
18           MR. CYR:  The one that says
19      CNBM next to it.
20           MR. SEEGER:  Okay.  That's
21      the one I pointed out to you,
22      Interpreter.
23           MR. CYR:  She may have made
24      a mistake.

1                    THE WITNESS:  That I know.

2    BY MR. CYR:

3          Q.    Has that company, CNBM, ever

4    served as an agent or a representative of

5    any kind of Taishan Gypsum or its

6    predecessors in the United States?

7                    MR. GONZALEZ:  Object to

8          form.

9                    THE COURT:  Sustain the

10         objection.  It's too broad.

11   BY MR. CYR:

12         Q.    Mr. Jia, has CNBM ever

13   served as an agent for Taishan Gypsum or

14   its predecessors in the United States?

15         A.    No.

16         Q.    Do BNBM and Taishan Gypsum

17   compete with one another for the sale of

18   drywall?

19         A.    No.

20         Q.    Do BNBM and Taishan Gypsum

21   sell drywall in the same geographical

22   markets within China?

23         A.    Please repeat your question.

24         Q.    Do BNBM and Taishan Gypsum

1    sell drywall in the same geographical

2    markets within China?

3         A.    Yes.

4         Q.    Do they sell to the same

5    class of purchasers?

6         A.    Some of them are.  Some of

7    them are not.

8         Q.    Well, before when I asked

9    you whether or not BNBM and Taishan

10   Gypsum competed, you said no.  I'm not

11   sure whether or not you understood the

12   question.  But I would like you now just

13   to explain to the Court and plaintiffs'

14   counsel whether or not BNBM and Taishan

15   Gypsum tried to sell drywall to the same

16   customers?

17             THE COURT:  Sustain the

18        objection and move -- also I

19        sustain the motion to strike

20        counsel's comments.

21             MR. SEEGER:  Exactly.  You

22        shouldn't direct the witness.

23             MR. CYR:  I'm sorry, I

24        didn't understand the last part.

1      And also I think we need to give

2      the interpreter a chance to

3      interpret what people are saying.

4           THE COURT:  Well, you

5      said -- you testified that the

6      witness didn't understand the

7      question.  That's the testimony of

8      the attorney and not the witness.

9           MR. GONZALEZ:  Your Honor,

10     before that's translated, I do

11     have a concern if that's

12     translated for the benefit of the

13     witness.  So, I would ask that The

14     Court rule that that editorial

15     statement from counsel not be

16     translated to the witness.

17          MR. CYR:  That's fine, Your

18     Honor.

19          THE COURT:  I agree with

20     that.

21          MR. CYR:  I'm just going to

22     try my best to get what I

23     understand to be the truthful

24     testimony of the witness.

1              THE COURT:  I know you're

2         trying.

3    BY MR. CYR:

4         Q.    Mr. Jia, could you describe

5    for The Court and plaintiffs' counsel the

6    types of customers within China that

7    Taishan Gypsum and BNBM sell drywall to?

8         A.    Yes.  The drywall market in

9    China can be categorized as high end,

10   medium and low end.  There's a general

11   understanding that BNBM, Lafarge, Knauf,

12   BPB had the high-end market, while

13   Taishan Gypsum Company and others has the

14   markets in the category of medium and low

15   end.  But regardless of medium or low end

16   or high end, all products have to be

17   produced according to the state standard,

18   and they all had to be in compliance with

19   the state's regulation in order to

20   produce and to sell the products -- to

21   produce and to sell the product.  Because

22   the quality is consistent, many consumers

23   do not feel there is a difference in the

24   quality, nobody wants to invest more

1    money to buy so-called high end products.

2              So in recent seven and eight

3    years, the market for medium- and low-end

4    products had increased tremendously,

5    while the increase of the market for the

6    four companies, BNBM, Lafarge, Knauf, BPB

7    was rather slow, or there was no increase

8    at all.  Many of the production lines

9    stopped in using.  The usage rate was

10   very low.  In order to change the

11   circumstance, they have already started,

12   or starting from five, six years ago, to

13   enter into medium- and low-end market.

14   They enter the market with a new way,

15   which is to register and change their

16   brand into another brand.

17              BNBM produced products

18   branded Dragon and branded BNBM.  The

19   brand of Dragon had a higher price, while

20   the BNBM brand had a lower price.

21              For the company Lafarge, not

22   only to produce products with the brand

23   name Lafarge, but also the brand Baili,

24   literally translated B-A-I-L-I.  I will

1   not list all other companies at this

2   time.

3              There was a great impact

4   from BNBM brand competing with the

5   drywall produced by Taishan Gypsum

6   Company.  We are an active competitor

7   with BNBM in the market.  Please

8   investigate on our competition in the

9   market with BNBM.  I have negative view

10  of the drywall that are produced by BNBM.

11             THE COURT:  Let's ask a

12        question.  Let's ask questions

13        now.

14             MR. CYR:  We're happy if you

15        want to strike that from the

16        record.

17             MR. SEEGER:  I think we'll

18        leave that one.

19             MR. CYR:  I have another

20        question, Your Honor.

21             THE COURT:  Please ask

22        questions.

23                  -  -  -

24             (Whereupon, Deposition

1           Exhibit Jia Defendant's-16, Document

2           in Chinese, Bates stamped TG 0020799

3           and TG 0020800, and Deposition Exhibit

4           Jia Defendant's-16A, Amendment to the

5           Articles of Association of Taishan

6           Gypsum Co., Ltd., Bates stamped TG

7           0020799 and TG 0020800, were

8           marked for identification.)

9                    - - -

10  BY MR. CYR:

11          Q.   Mr. Jia, would you please

12  look at Defendant's 16.  That is TG 20799

13  through 20800.

14               INTERPRETER:  Is this the

15          one?

16               MR. CYR:  May I look at the

17          tabs?

18               MR. DAVIS:  What number

19          exhibit?  I'm sorry.

20               THE COURT:  16.

21  BY MR. CYR:

22          Q.   Could you tell us what that

23  is, Mr. Jia?

24          A.   This is the amendment of the

1    Articles of Incorporation of Taishan

2    Gypsum Company.

3         Q.    Could you look at the last

4    page?  It's dated May 18, 2009; is that

5    correct?

6         A.    Correct.

7         Q.    Is that your signature at

8    the bottom?

9         A.    Yes.

10        Q.    And just looking at the

11   front page, and also to the extent that

12   you can recollect, what was the change

13   that required this revision to the

14   Articles of Incorporation for Taishan

15   Gypsum?

16        A.    Taian Donglian Company was

17   changed to Beixin Donglian Company.  That

18   was the main amendment.

19             THE COURT:  That's Bates

20        Number 20799 and 20800?

21             MR. CYR:  Yes, Your Honor.

22        Sorry if I forgot.

23                  -  -  -

24             (Whereupon, Deposition

1          Exhibit Jia Defendant's-17,

2          Document in Chinese, Bates stamped

3          TG 0025887 and TG 0025888, and

4          Deposition Exhibit Jia

5          Defendant's-17A, Resolution of the

6          Shandong Taihe Dongxin Co., Ltd.

7          Shareholder Meeting, Bates stamped

8          TG 0025887 and TG 0025888, were

9          marked for identification.)

10                  -   -   -

11   BY MR. CYR:

12          Q.    Could you look at

13   Defendant's 17, please.  That is Bates

14   stamped number TG 25887 through 25888.

15   Could you tell us what that is, Mr. Jia?

16          A.    This is the stockholders

17   meeting resolution of Shandong Taihe

18   Dongxin Company.

19          Q.    If you could look at the

20   last page, is it dated March 24, 2005?

21          A.    Yes.

22          Q.    Did you sign it?

23          A.    I believe the shareholders

24   sign on it, me, too.

1          Q.    Well, just to be clear, do

2    you see your signature on the Chinese

3    version?

4          A.    No.

5                    -  -  -

6                (Whereupon, Deposition

7          Exhibit Jia Defendant's-18,

8          Document in Chinese, Bates stamped

9          TG 0025889 through TG 0025891, and

10         Deposition Exhibit Jia

11         Defendant's-18A, Shandong Taihe

12         Dongxin Co., Ltd. 2005 Annual

13         Shareholder Meeting Resolution,

14         Bates stamped TG 0025889 through

15         TG 0025891, were marked for

16         identification.)

17                    -  -  -

18    BY MR. CYR:

19         Q.    Let's look at Defendant's

20    Exhibit 18.  That's Bates stamp number TG

21    25889 through TG 25891.  It's dated April

22    15, 2006 on the last page.

23         A.    Yes.  April the 15th.

24         Q.    What is this document?

1          A.    This is the resolution of

2    stockholders' meeting.

3          Q.    For what day?

4          A.    April 15, 2006.

5          Q.    And is it accurate then that

6    this was the shareholders' meeting for

7    2005, as reflected in the title?

8          A.    Correct.

9                    -   -   -

10              (Whereupon, Deposition

11              Exhibit Jia Defendant's-19,

12              Document in Chinese, Bates stamped

13              TG 0025892 and TG 0025893, and

14              Deposition Exhibit Jia

15              Defendant's-19A, Shandong Taihe

16              Dongxin Co., Ltd. 2006 Annual

17              Shareholder Meeting Resolution,

18              Bates stamped TG 0025892 and TG

19              0025893, were marked for

20              identification.)

21                    -   -   -

22    BY MR. CYR:

23          Q.    Could you look at

24    Defendant's Exhibit 19, please, TG 25892

1    through TG 25893.  The last page is dated

2    June 20, 2007?

3            A.    Yes.

4            Q.    First page refers to the

5    date June 20, 2007.  What is this

6    document, Mr. Jia?

7            A.    This is a resolution of the

8    shareholders' meeting for the year 2006,

9    which was held in June the 20th, 2007.

10                   -  -  -

11               (Whereupon, Deposition

12            Exhibit Jia Defendant's-20,

13            Document in Chinese, Bates stamped

14            TG 0025894 through TG 0025896, and

15            Deposition Exhibit Jia

16            Defendant's-20A, Shandong Taihe

17            Dongxin Co., Ltd. 2007 Annual

18            Shareholder Meeting Resolution,

19            Bates stamped TG 0025894 through

20            TG 0025896, were marked for

21            identification.)

22                   -  -  -

23    BY MR. CYR:

24            Q.    Could you look at

1    Defendant's Exhibit 20, please.  It's TG

2    25894 through 25896, dated May 20, 2008

3    on the last page.  First line refers to

4    May 20, 2008.  What is this document, Mr.

5    Jia?

6          A.    This is the resolution of

7    shareholders' meeting for the year 2007.

8                      -  -  -

9                (Whereupon, Deposition

10          Exhibit Jia Defendant's-21,

11          Document in Chinese, Bates stamped

12          TG 0025897 through TG 0025899, and

13          Deposition Exhibit Jia

14          Defendant's-21A, Shandong Taihe

15          Dongxin Co., Ltd. 2008 Annual

16          Shareholder Meeting Resolution,

17          Bates stamped TG 0025897 through

18          TG 0025899, were marked for

19          identification.)

20                      -  -  -

21    BY MR. CYR:

22          Q.    Would you look at

23    Defendant's Exhibit 21, please, TG 25897

24    through TG 25899.  Last date has May 18,

1    2009?

2          A.    Correct.

3          Q.    What is this document?

4          A.    This is the resolution of

5    shareholders' meeting for the year 2008

6    which was held in May the 18th.

7          Q.    Mr. Jia, during the period

8    2005 through 2008, did Taishan Gypsum

9    hold the annual shareholders' meetings as

10   required by Chinese law and the articles

11   of incorporation?

12         A.    The Article of Incorporation

13   requires us to have an annual

14   stockholders' meeting.  In special

15   circumstances, when shareholders would

16   like to discuss some special matters, we

17   would call for temporary shareholders'

18   meeting.  But that was rare.

19         Q.    During the period 2005

20   through 2008, did Taishan Gypsum hold the

21   annual shareholders' meetings that it was

22   required to have by the Articles of

23   Incorporation?

24         A.    Yes, normally.

1          Q.    Was there a year that it did
2    not have the annual shareholders'
3    meeting?
4          A.    According to my
5    recollection, no.
6          Q.    During the period 2005
7    through 2008, did the Taishan board of
8    directors hold the meetings that it was
9    supposed to have according to the Taishan
10   Gypsum Articles of Incorporation?
11         A.    Yes.
12         Q.    Please look at Defendant's
13   Exhibit 22, please.
14                    -  -  -
15              (Whereupon, Deposition
16         Exhibit Jia Defendant's-22,
17         Document in Chinese, Bates stamped
18         TG 0025900 through TG 0025902, and
19         Deposition Exhibit Jia
20         Defendant's-22A, Shandong Taihe
21         Dongxin Co., Ltd. Third Meeting of
22         the Third Board of Directors
23         Resolutions, Bates stamped TG
24         0025900 through TG 0025902, were

1          marked for identification.)

2                          -  -  -

3          MR. CYR:  TG 25900 through

4          TG 25902.  This document is dated

5          April 15, 2006 on the last page.

6          And on the first page, there's a

7          reference on the first line to

8          April 15, 2006.

9     BY MR. CYR:

10          Q.    What is this document, Mr.

11    Jia?

12          A.    This is resolution of the

13    board of directors.

14          Q.    For what day?  For what

15    date?

16          A.    It was held in April the

17    15th, 2006.

18          Q.    Could you tell us what the

19    title of the document says at the top?

20          A.    It is the "Third Meeting of

21    the Third Board of Directors Resolution"

22    for Taihe Dongxin Company, Limited.

23          Q.    What is meant by the phrase

24    "third board of directors"?

1              A.    We have a board of directors

2    every three years.  Just like the

3    America's 50 president, 51st president.

4              Q.    Let's look at Exhibit 23.

5                         -  -  -

6              (Whereupon, Deposition

7              Exhibit Jia Defendant's-23,

8              Document in Chinese, Bates stamped

9              TG 0025903 through TG 0025905, and

10             Deposition Exhibit Jia

11             Defendant's-23A, Shandong Taihe

12             Dongxin Co., Ltd. Fourth Meeting

13             of the Third Board of Directors

14             Resolutions, Bates stamped TG

15             0025903 through TG 0025905, were

16             marked for identification.)

17                         -  -  -

18    BY MR. CYR:

19             Q.    It is Taishan Gypsum 25903

20    through TG 25905 dated June 20, 2007.

21    There's a reference on the first line to

22    June 20, 2007.

23                   What's this document, Mr.

24    Jia?

1            A.    This is fourth meeting's

2    resolution of the third board of

3    directors of Shandong Taihe Dongxin

4    Company.

5            Q.    For what date?

6            A.    June 20, 2007.

7            Q.    Please look at Defendant's

8    24.

9                    -  -  -

10                (Whereupon, Deposition

11            Exhibit Jia Defendant's-24,

12            Document in Chinese, Bates stamped

13            TG 0025906 through TG 0025908, and

14            Deposition Exhibit Jia

15            Defendant's-24A, Shandong Taihe

16            Dongxin Co., Ltd. Fifth Meeting of

17            the Third Board of Directors

18            Resolutions, Bates stamped TG

19            0025906 through TG 0025908, were

20            marked for identification.)

21                    -  -  -

22    BY MR. CYR:

23            Q.    TG 25906 through TG 25908.

24    And it's dated May 20, 2008 on the last

1    page, and there's a reference to the date

2    May 20, 2008 on the first line.

3                What's this document, Mr.

4    Jia?

5         A.    This was a meeting held May

6    20, 2008.  It is a resolution of the

7    fifth meeting of the third board of

8    directors.

9         Q.    For what day?  I'm sorry.

10   Withdrawn.

11                    -   -   -

12                (Whereupon, Deposition

13            Exhibit Jia Defendant's-25,

14            Document in Chinese, Bates stamped

15            TG 0025913 through TG 0025919;

16            Deposition Exhibit Jia

17            Defendant's-25A, A Report

18            Regarding Overall Work Summary for

19            2005 and Work Arrangement for

20            2006, Bates stamped TG 0025913

21            through TG 0025919; Deposition

22            Exhibit Jia Defendant's-26,

23            Document in Chinese, Bates stamped

24            TG 0025920 through TG 0025926;

1          Deposition Exhibit Jia

2          Defendant's-26A, 2006 Chief

3          Executive Officer's Work Report,

4          Bates stamped TG 0025920 through

5          TG 0025926; Deposition Exhibit Jia

6          Defendant's-27, Document in

7          Chinese, Bates stamped TG 0025927

8          through TG 0025933; Deposition

9          Exhibit Jia Defendant's-27A, 2007

10         Chief Executive Officer's Work

11         Report, Bates stamped TG 0025927

12         through TG 0025933; Deposition

13         Exhibit Jia Defendant's-28,

14         Document in Chinese, Bates stamped

15         TG 0025934 through TG 0025941, and

16         Deposition Exhibit Jia

17         Defendant's-28A, 2008 Chief

18         Executive Officer's Work Report,

19         Bates stamped TG 0025934 through

20         TG 0025941, were marked for

21         identification.)

22                    -   -   -

23   BY MR. CYR:

24         Q.    Mr. Jia, could you look at

1    the following exhibits now, Defendant's

2    25, which is TG 25913 through 25919, as

3    well as Defendant's Exhibit 26, which is

4    TG 25920 through TG 25926, and

5    Defendant's Exhibit 27, which is TG 25927

6    through TG 25933, and Defendant's Exhibit

7    28, which is TG 25934 through TG 25941.

8    And could you tell us one at a time,

9    starting with Defendant's Exhibit 25,

10   what these documents are?

11        A.    This is a report that I made

12   to the board of directors and the board

13   of stockholders for the year prior and

14   for the year that is coming regarding the

15   summary of the work was done.

16        Q.    Is this the report -- well,

17   withdrawn.

18              With respect to this

19   particular report at Exhibit 25, what was

20   the prior year that you're reporting on?

21        A.    2004.

22        Q.    With respect to the upcoming

23   year, was that the work assignments that

24   you were reporting that the plan was for

1    2006?

2         A.    I'm sorry.  I made a

3    mistake.  It should be 2005.

4         Q.    And with respect to the

5    coming year, was this report reporting

6    the work assignments that you planned for

7    the year 2006?

8         A.    Yes.

9         Q.    Did you typically prepare

10   this report at approximately the same

11   time every year?

12        A.    Yes.

13        Q.    And what time was that?

14        A.    Usually we started preparing

15   the report in November, and it should be

16   completed by March the next year.  And

17   then we would call for a meeting.  But if

18   all the directors were busy, usually the

19   meeting would be postponed to as late as

20   May or June.

21        Q.    Was this report with respect

22   to the previous year, as well as the plan

23   for the next year, did it relate simply

24   to Taishan Gypsum, or did it also include

1    the subsidiaries of Taishan Gypsum?

2         A.    It includes the

3    subsidiaries.

4         Q.    During the period 2006

5    through 2008, did your reports include

6    the performance as well as the plans for

7    TTP?

8         A.    It is considered all

9    together.

10        Q.    Could you look at

11   Defendant's Exhibit 26 and tell us what

12   that is?

13        A.    This is the general

14   manager's work report for the year 2006.

15        Q.    And does it include plans

16   for and work arrangements for 2007?

17        A.    Yes.

18        Q.    Did you prepare this report?

19        A.    Yes.

20        Q.    Could you look at

21   Defendant's 27, please.  Could you tell

22   us what that document is?

23        A.    It is my work report for the

24   year 2007 made to the board of directors

1    and the board of stockholders.

2            Q.    Did it also include the work

3    arrangements planned for 2008?

4            A.    Correct.

5            Q.    Could you look at

6    Defendant's 28, please.  Could you tell

7    us what that is?  I'm sorry.

8            A.    This is my work report for

9    the year 2007 made to the board of

10   directors and the board of shareholders.

11           Q.    Did you prepare the report

12   that you just looked at on Defendant's

13   Exhibit 28?

14           A.    Yes.

15           Q.    Did you prepare this report

16   that you're looking at -- I'm sorry.  I

17   made a mistake in reference to the

18   previous document.  The previous document

19   was Defendant's Exhibit 27.

20                 Mr. Jia, could you go back

21   and look at Defendant's 27.  Sorry.

22                 Did you prepare that

23   document?

24           A.    Yes.

1          Q.    Did you prepare the document

2    at Defendant's Exhibit 28?

3          A.    Yes.

4                    -   -   -

5                (Whereupon, Deposition

6          Exhibit Jia Defendant's-29,

7          Document in Chinese, Bates stamped

8          TG 0025958 through TG 0025961;

9          Deposition Exhibit Jia

10         Defendant's-29A, Shandong Taihe

11         Dongxin Company Limited Accounting

12         Statement, Bates stamped TG

13         0025958 through TG 0025961;

14         Deposition Exhibit Jia

15         Defendant's-30, Document in

16         Chinese, Bates stamped TG 0025971

17         through TG 0025974, and Deposition

18         Exhibit Jia Defendant's-30A,

19         Shandong Taihe Dongxin Company

20         Limited Accounting Statement,

21         Bates stamped TG 0025971 through

22         TG 0025974, were marked for

23         identification.)

24                    -   -   -

1    BY MR. CYR:

2            Q.    Could you please look at

3    Defendant's 29 and 30?  Let's go one at a

4    time.

5            Could you look at

6    Defendant's 29, which is 25958 through TG

7    25961.  Could you tell The Court and

8    plaintiffs' counsel what that document

9    is?

10           A.    Until what page?

11           Q.    All of the pages in that

12   particular exhibit of Defendant's 29,

13   could you just look at all of them.  And

14   if you need to describe different pages,

15   go ahead.

16           A.    Let me take a look.

17           THE COURT:  Stop right now

18           and change the tape.

19           MR. CYR:  Okay.

20           THE COURT:  Let's do that.

21           THE VIDEOTAPE TECHNICIAN:

22           This is the end of Tape Number 2.

23           We're going off the record.  The

24           time is 11:42.

1                    -   -   -

2                    (A recess occurred from

3            11:42 a.m. to 11:44 a.m.)

4                    -   -   -

5                    THE VIDEOTAPE TECHNICIAN:

6            We're going back on the record.

7            This is the beginning of Tape

8            Number 3.  The time is 11:44.

9    BY MR. CYR:

10           Q.    Mr. Jia, I was asking you to

11   look at Defendant's 29.  Could you tell

12   The Court and plaintiffs' counsel what

13   that document is?

14           A.    This is the annual

15   accounting statements for Taishan Gypsum

16   Company.

17           Q.    What year is this one for?

18   I direct your attention to the second

19   page.  There's a date at the top.

20           A.    This is for the year 2005.

21           Q.    Who prepared the annual

22   financial statements for Taishan Gypsum

23   or its predecessor Taihe Dongxin?

24           A.    It was prepared by the

1    third-party independent accounting firm.

2           Q.    Was it prepared by that

3    third-party independent accounting firm

4    at the request of Taishan Gypsum or

5    Shandong Taihe?

6           A.    All Chinese companies are

7    required to provide accounting statements

8    by a third-party independent accounting

9    firm.

10          Q.    And did Taishan Gypsum and

11   Shandong Taihe Dongxin comply with that

12   obligation by requesting the accounting

13   firms to prepare these financial

14   statements during the period 2005 through

15   2008?

16          A.    Our company, including

17   Dongxin and Taishan Company, had always

18   been in compliance with such a regulation

19   and provide an accounting report prepared

20   by a third-party independent accounting

21   firm.

22          Q.    What information was

23   provided, if any, to -- withdrawn.

24                Did Taishan Gypsum or

1    Shandong Taihe Dongxin provide any

2    information to the third-party accounting

3    firms for their preparation of these

4    reports?

5         A.    Yes.

6         Q.    Could you describe that

7    process, please?

8         A.    Usually their employees and

9    our employees will go to the site, which

10   means the production line, the raw

11   material site, the warehouse, the

12   financial department and financial record

13   department to do relevant auditing and

14   investigating.  The duration is rather

15   long.  Usually it takes about one month,

16   sometimes as long as three months.

17        Q.    Could you please look at

18   Defendant's 30.  It's TG 25971 through

19   25974.

20             Could you tell us what that

21   document is?

22        A.    This is the financial report

23   for Taihe Dongxin Company in the year

24   2006.

1                    -  -  -

2                    (Whereupon, Deposition

3          Exhibit Jia Defendant's-31,

4          Document in Chinese, Bates stamped

5          TG 0025984 through TG 0025987, and

6          Deposition Exhibit Jia

7          Defendant's-31A, 2007 Financial

8          Statements of Taishan Gypsum

9          Company Limited, Bates stamped TG

10         0025984 through TG 0025987, were

11         marked for identification.)

12                   -  -  -

13   BY MR. CYR:

14         Q.   Could you look at

15   Defendant's 32, please?

16              MS. BASS:  31.

17              MR. CYR:  I'm sorry.

18   BY MR. CYR:

19         Q.   That's TG 25984 through TG

20   25987.

21              MR. GONZALEZ:  When you say

22         984 to 987, are you referring to

23         31?

24              THE COURT:  It is 31,

1          Exhibit Number 31.

2               MR. GONZALEZ:  Thank you.

3    BY MR. CYR:

4          Q.    What's that document, Mr.

5    Jia?

6          A.    This is an accounting report

7    of the Taishan Gypsum Company in the year

8    2007.

9          Q.    Were the accounting reports

10   that you just looked at for the years

11   2006 and 2007 at Exhibits 30 and 31, were

12   they prepared by an outside independent

13   accounting firm in the manner that you

14   described for Defendant's 29?

15         A.    Yes.

16                    -  -  -

17              (Whereupon, Deposition

18              Exhibit Jia Defendant's-32,

19              Document in Chinese, Bates stamped

20              TG 0025997 through TG 0026000, and

21              Deposition Exhibit Jia

22              Defendant's-32A, 2008 Financial

23              Statements of Taishan Gypsum

24              Company Limited, Bates stamped TG

1          0025997 through TG 0026000, were

2          marked for identification.)

3                         -   -   -

4      BY MR. CYR:

5          Q.    Please look at Defendant's

6      Exhibit 32, which is TG 25997 through

7      26000, and tell us what that is?

8          A.    This is the accounting

9      report for Taishan Gypsum Company for the

10     year 2008.

11         Q.    Was it prepared by an

12     outside accounting firm in the manner

13     that you've described?

14         A.    Yes.

15         Q.    I'm going to ask you some

16     questions now that don't relate to the

17     documents, Mr. Jia.

18         A.    Uh-huh.

19         Q.    Are you familiar with the

20     company TTP?

21         A.    Yes.

22         Q.    Do you recall when it was

23     established?

24         A.    I believe the company was

1    established in the first half year of

2    2006.

3         Q.    Could you describe for The

4    Court and plaintiffs' counsel why TTP was

5    established?

6         A.    The establishment of TTP was

7    to fulfill the requirements for the

8    purpose of taxation.

9              INTERPRETER:  Just one

10             moment.  Interpreter needs to

11             check a definition.

12             (Discussion between

13             interpreter and Mr. Chen in

14             Chinese.)

15             INTERPRETER:  Thank you.

16             THE WITNESS:  Since 2002,

17             Taishan Gypsum Company and its

18             prior company, before the name

19             change, produced FGD synthetic

20             gypsum.

21             INTERPRETER:  Interpreter

22             clarification.

23             THE WITNESS:  According to

24             China's regulation, if we use such

1          gypsum as raw material at a rate

2          of 30 percent of more, the

3          company -- the country would

4          exempt our value added tax.

5          Taishan Gypsum could indeed enjoy

6          such a favorable policy; however,

7          there is another state regulation

8          which says if our value added tax

9          was exempt, we could not use the

10         value added invoice.  However,

11         some of our clients did require us

12         to issue them value added invoice.

13         In order to satisfy the

14         requirements of these customers,

15         after a discussion with the tax

16         bureau, after our discussion, the

17         tax bureau suggested that we

18         should establish another company.

19         This company could issue value

20         added invoice; however, it could

21         not enjoy all the favorable

22         exemption of value added policy.

23         They have also reminded us that we

24         must have independent accounting,

1          also independent raw material and

2          independent employees.  If not, we

3          will not be able to meet the

4          requirement of taxation.  We

5          accepted their suggestion and

6          established TTP.

7              After its establishment,

8          according to the requirement of

9          the tax bureau, as well as the

10         company law, we operated

11         independently.  And the tax bureau

12         had efficiently supervised the

13         operation of TTP.  This is the

14         reason for the establishment of

15         TTP.

16    BY MR. CYR:

17         Q.   During the period 2000 --

18    early 2006 and until today, has Taishan

19    Gypsum owned 100 percent of the shares of

20    TTP, Mr. Jia?

21         A.   Yes.

22         Q.   In early 2006, who was

23    assigned to be the general manager of

24    TTP?

1        A.     Peng Shiliang, last name,

2    P-E-N-G, first name, S-H-I-L-I-A-N-G.

3        Q.     Who was assigned to be the

4    production manager of TTP in early 2006?

5        A.     Song Qinghai.  Last name,

6    S-O-N-G, first name, Q-I-N-G-H-A-I.

7        Q.     Did TTP have employees who

8    handled sales for TTP?

9        A.     I don't understand your

10    question.

11        Q.     Did TTP have employees who

12    entered into the sales transactions on

13    behalf of TTP?

14        A.     Yes.

15        Q.     Who were they, to the best

16    of your recollection?

17        A.     It's a subsidiary of Taishan

18    Gypsum.  It has been so long, I do not

19    quite remember all the employees and

20    departments in that company.

21        Q.     When TTP was established,

22    Mr. Jia, did TTP have its own offices?

23        A.     Yes.

24        Q.     Could you describe where

1    they were in relation to the TG

2    headquarters?

3            A.    Is located to the east of

4    Taishan Gypsum headquarter.  There was a

5    wall in between this company and Taishan

6    Gypsum Company's headquarter.  The

7    distance between the two company is about

8    1,000 meters.

9            Q.    Did TTP have its own

10   factory?

11           A.    Yes.

12           Q.    Could you describe where

13   that factory was in relation to TTP's

14   offices?

15           A.    TTP's factory and its office

16   are together.  The factory was purchased

17   by -- from Taishan Gypsum Company.

18           Q.    Were you involved with that

19   purchase transaction, Mr. Jia, you,

20   personally?

21           A.    I did.

22           Q.    Could you describe the

23   transaction for The Court and plaintiffs'

24   counsel?

1          A.    First of all, according to

2    China's company law, we registered in the

3    business license registration department.

4    The business license department requires

5    a company to have an office, a

6    manufacturer's site and a scope of

7    business and a third-party asset

8    evaluation report to see whether the

9    principal capital had been provided.

10   According to all the above requirements,

11   TTP registered with the business

12   licensing department.  TTP, according to

13   the requirements, had purchased some

14   equipment from Taishan Gypsum Company and

15   rented some manufacturer's site from the

16   Taishan Gypsum Company and bought office

17   from the Taishan Gypsum Company.  My

18   answer would be it.

19                   -  -  -

20              (Whereupon, Deposition

21         Exhibit Jia Defendant's-33,

22         Document in Chinese, Bates stamped

23         TG 0020808 and TG 0020809, and

24         Deposition Exhibit Jia

1           Defendant's-33A, Incorporation

2           Registration Review Form, Bates

3           stamped TG 0020808 and TG 0020809,

4           were marked for identification.)

5                        -  -  -

6     BY MR. CYR:

7           Q.     Mr. Jia, we're going to go

8     back to the documents, and I'm going to

9     ask you just one or two questions with

10    respect to each of the following

11    documents.  Let's start with Defendant's

12    Exhibit 33, and that's Taishan Gypsum

13    20808 through 2809.

14           Mr. Jia, prior to preparing

15    for the deposition, do you recall ever

16    seeing this document before?

17           A.     No.

18           Q.     Please look at Defendant's

19    34.

20                        -  -  -

21           (Whereupon, Deposition

22           Exhibit Jia Defendant's-34,

23           Document in Chinese, Bates stamped

24           TG 0020817 through TG 0020824, and

1          Deposition Exhibit Jia

2          Defendant's-34A, Articles of

3          Association of Tai'an Taishan

4          Plasterboard Co., Ltd., Bates

5          stamped TG 0020817 through TG

6          0020824, were marked for

7          identification.)

8                    -  -  -

9    BY MR. CYR:

10          Q.    That's Taishan Gypsum 20817

11   through 20824.  It's dated June 20, 2006.

12   Mr. Jia, I'm just going to ask you, am I

13   reading the title correctly?  It says

14   "Articles of Association of Tai'an

15   Taishan Plasterboard"?

16          A.    Correct.

17          Q.    I would like to direct your

18   attention to the last page.

19                Did you sign these -- did

20   you sign this document as the legal

21   representative for Shandong Taihe?

22          A.    Correct.

23          Q.    What is this document?

24          A.    This is the Article of

1    Incorporation of TTP.

2         Q.    Could you please look at

3    Defendant's Exhibit 35.

4                   -  -  -

5              (Whereupon, Deposition

6         Exhibit Jia Defendant's-35,

7         Document in Chinese, Bates stamped

8         TG 0020825 and TG 0020826, and

9         Deposition Exhibit Jia

10        Defendant's-35A, Tai'an Taishan

11        Plasterboard Co., Ltd. Director

12        Appointment Document, Bates

13        stamped TG 0020825 and TG 0020826,

14        were marked for identification.)

15                   -  -  -

16             MR. CYR:  I have TG 20825

17        through 20826.

18    BY MR. CYR:

19        Q.    The first question for you,

20    Mr. Jia, is to look at the second page,

21    which has the date February 10, 2006.

22    Did you sign this document?

23        A.    Yes.

24        Q.    Did you sign on behalf of

1    the shareholder Shandong Taihe Dongxin?

2         A.    Yes.

3         Q.    What is this document?

4         A.    This is director's

5    appointment document for Taishan

6    Plasterboard Company, Limited, which is

7    TTP.

8         Q.    Is Peng Shiliang the person

9    who you identified as the general manager

10   of TTP?

11        A.    He is the general manager of

12   TTP, and later he was also a director of

13   the board of directors.

14        Q.    When you say "later," you

15   mean as of the date of this document?

16        A.    Yes.

17        Q.    Were Messrs. Fu and Wang,

18   were they also officers of TG?

19        A.    At the time, Fu Tinghuan and

20   Wang Fengqin were both the medium-level

21   executives of the company.

22        Q.    When you say "the company,"

23   the company you're referring to is

24   Shandong Taihe Dongxin?

```
 1          A.    Correct.
 2          Q.    Could you please look at
 3   Defendant's Exhibit 36.
 4                    -  -  -
 5                (Whereupon, Deposition
 6           Exhibit Jia Defendant's-36,
 7           Document in Chinese, Bates stamped
 8           TG 0020827 and TG 0020828, and
 9           Deposition Exhibit Jia
10           Defendant's-36A, Tai'an Taishan
11           Plasterboard Co., Ltd. Legal
12           Representative Appointment
13           Document, Bates stamped TG 0020827
14           and TG 0020828, were marked for
15           identification.)
16                    -  -  -
17   BY MR. CYR:
18          Q.    That is 20827 through 20828.
19   On the second page, it's dated February
20   10, 2006.  On that page, there's a
21   signature, Mr. Jia.  Is that your
22   signature on that page?
23          A.    Which page?
24          Q.    On the second page of
```

1    Exhibit 36, is that your signature or

2    someone else's signature?

3            A.    It's not my signature.

4            Q.    Do you happen to recognize

5    that signature?

6            A.    Peng Shiliang and Fu

7    Tinghuan and Wang Fengqin, the three of

8    them.

9            Q.    Look at Defendant's Exhibit

10   37, please, TG 20850 through TG 20851.

11                 -  -  -

12                (Whereupon, Deposition

13                Exhibit Jia Defendant's-37,

14                Document in Chinese, Bates stamped

15                TG 0020850 and TG 0020851, and

16                Deposition Exhibit Jia

17                Defendant's-37A, Capital

18                Verification Descriptions, Bates

19                stamped TG 0020850 and TG 0020851,

20                were marked for identification.)

21                 -  -  -

22   BY MR. CYR:

23            Q.    Mr. Jia, could you tell us

24   what this document is, if you know?

1          INTERPRETER:  Is this the

2     one you are talking about?

3          MR. CYR:  Exhibit 37, yes.

4  BY MR. CYR:

5     Q.    Let me just ask you, Mr.

6  Jia -- I'm sorry.

7          Prior to preparing for the

8  deposition, do you recall ever seeing

9  this document before?

10         A.    No.

11              -  -  -

12         (Whereupon, Deposition

13         Exhibit Jia Defendant's-38,

14         Document in Chinese, Bates stamped

15         TG 0020855, and Deposition Exhibit

16         Jia Defendant's-38A, Shareholder

17         Decisions, Bates stamped TG

18         0020855, were marked for

19         identification.)

20              -  -  -

21  BY MR. CYR:

22         Q.    Please look at Defendant's

23  Exhibit 38.  It is 20855.  It's dated

24  June 22, 2006.  Is that your signature,

1    Mr. Jia?

2          A.    Yes.

3          Q.    Could you tell us what that

4    document is?

5          A.    It is the decision of

6    company shareholders.

7          Q.    What was the decision?

8          A.    Is to add 7 million to TTP.

9          Q.    Do you recall why it was

10   determined to add that amount of money to

11   TTP?

12         A.    At the time, TTP had a

13   rather big scale and also its debt was

14   big in scale.  So, we decided to input

15   capital to relieve its financial

16   pressure.

17         Q.    Please look at Defendant's

18   Exhibit 39, which is TG 20856 through

19   20864.

20                     -  -  -

21               (Whereupon, Deposition

22               Exhibit Jia Defendant's-39,

23               Document in Chinese, Bates stamped

24               TG 0020856 through TG 0020864, and

```
 1              Deposition Exhibit Jia

 2              Defendant's-39A, Articles of

 3              Association of Tai'an Taishan

 4              Plasterboard Co., Ltd., Bates

 5              stamped TG 0020856 through TG

 6              0020864, were marked for

 7              identification.)

 8                        -  -  -

 9   BY MR. CYR:

10              Q.    And please look at the last

11   page, which is dated June 22, 2006.  The

12   first question is, did you sign that as

13   the legal representative of Shandong

14   Taihe Dongxin?

15              A.    Yes.

16              Q.    Please return to the first

17   page and tell us what this document is?

18              A.    This is TTP's Article of

19   Incorporation.

20              Q.    Was it revised in June of

21   2006?

22              A.    Yes.

23              Q.    Do you recall why?

24              A.    Because we had input more
```

1    capital.  According to the requirements

2    of the Article For Incorporation, it has

3    to be reflected on the Article of

4    Incorporation.

5                    -  -  -

6                    (Whereupon, Deposition

7            Exhibit Jia Defendant's-40,

8            Document in Chinese, Bates stamped

9            TG 0025446, and Deposition Exhibit

10           Jia Defendant's-40A, Lease

11           Agreement, Bates stamped TG

12           0025446, were marked for

13           identification.)

14                   -  -  -

15   BY MR. CYR:

16           Q.   Please look at Defendant's

17   40, TG 25446.  It's dated February 10,

18   2006.

19                What's this document, Mr.

20   Jia?

21           A.   This is a lease agreement.

22           Q.   Could you describe the

23   agreement?  Who is it from, who is it to,

24   what's it for?

1          A.    This is agreement that I

2    entrusted deputy general manager Xue Yuli

3    to sign, last name X-U-E, first name,

4    Y-U-L-I.  Because TTP needed a

5    manufacturing site, therefore, I

6    entrusted Xue Yuli to sign for me.

7          Q.    What is being leased in this

8    lease agreement?

9          A.    A manufacturer site.

10         Q.    Is it the facility that he

11    described before for TTP?

12         A.    Yes.

13         Q.    What was the amount of your

14    rent?

15         A.    According to the earliest

16    agreement, it was 80,000.

17         Q.    How was that figure arrived

18    at, if you know?

19         A.    It's based on the local

20    rental pricing at the time.

21                      -  -  -

22              (Whereupon, Deposition

23         Exhibit Jia Defendant's-41,

24         Document in Chinese, Bates stamped

1           TG 0025412, and Deposition Exhibit

2           Jia Defendant's-41A, Trademark Use

3           Authorization, Bates stamped TG

4           0025412, were marked for

5           identification.)

6                      -  -  -

7    BY MR. CYR:

8           Q.    Could you please look at

9    Defendant's Exhibit 41.  It is TG 25412,

10   and it's dated February 20, 2006.

11   There's a signature on behalf of Shandong

12   Taihe Dongxin.  Whose signature is that?

13          A.    It's the official seal of

14   TG.

15          Q.    Thank you.

16                What is this document, Mr.

17   Jia, if you know?

18          A.    Because the ownership of

19   Taishan trademark belongs to TG, TTP had

20   to have the authorization from TG in

21   order to use such a trademark.

22                      -  -  -

23                (Whereupon, Deposition

24          Exhibit Jia Defendant's-42,

1               Document in Chinese, Bates stamped

2               TG 0025413, and Deposition Exhibit

3               Jia Defendant's-42A, Purchase and

4               Sale Agreement, Bates stamped TG

5               0025413, were marked for

6               identification.)

7                         -   -   -

8    BY MR. CYR:

9               Q.    Defendant's-42, please.  And

10   it is TG 25413.  It's dated February 20,

11   2006.

12              Could you briefly describe

13   this document, Mr. Jia?

14              A.    This is a sales transaction

15   agreement between TG and TTP for

16   production line.

17              Q.    When you say "production

18   line," are you referring to certain

19   equipment as indicated in Article 3?

20              A.    Yes.

21              Q.    Is that your signature at

22   the bottom of the page?

23              A.    Yes.

24              Q.    Do you happen to recollect

1    how the purchase price was arrived at?

2          A.    I remember the price was

3    agreed upon based on the reference of the

4    cost of similar production line.

5          Q.    Could you please look at

6    Defendant's Exhibit 43, TG 25415, dated

7    February 20, 2006.

8                    -  -  -

9              (Whereupon, Deposition

10             Exhibit Jia Defendant's-43,

11             Document in Chinese, Bates stamped

12             TG 0025415, and Deposition Exhibit

13             Jia Defendant's-43A, Lease

14             Agreement, Bates stamped TG

15             0025415, were marked for

16             identification.)

17                    -  -  -

18   BY MR. CYR:

19         Q.    Is that your signature, Mr.

20   Jia?

21         A.    Yes.

22         Q.    Could you tell us what it is

23   and also tell us if it's any different

24   than Exhibit 40?

1              A.    This is a lease agreement

2    leasing TG's manufacturing facility.

3    There is a big difference on price

4    compared to the manufacture facility

5    leasing agreement we mentioned before.

6    One is 400,000.  The other one is 70,000.

7    The reason for the difference was, at the

8    time, we were in a hurry to establish TTP

9    according to the requirement of business

10   licensing department, therefore, the

11   lease agreement was reached without

12   detailed consideration and calculation of

13   the pricing, therefore, we only had

14   80,000 on the agreement.  But afterwards,

15   based on the evaluation and calculation

16   of the accounting department, we reached

17   a more reasonable leasing price of over

18   400,000.

19              Q.    And just for the record,

20   Defendant's Exhibit 40 is dated February

21   10, 2006, and Defendant's 43 is dated

22   February 20, 2006.

23              Could you look at

24   Defendant's 44, Mr. Jia.  That's TG

```
 1    25414.

 2                        -   -   -

 3                 (Whereupon, Deposition

 4          Exhibit Jia Defendant's-44,

 5          Document in Chinese, Bates stamped

 6          TG 0025414, and Deposition Exhibit

 7          Jia Defendant's-44A, Purchase and

 8          Sale Agreement, Bates stamped TG

 9          0025414, were marked for

10          identification.)

11                        -   -   -

12    BY MR. CYR:

13          Q.    And it has the date January

14    1, 2008.  Is that your signature on the

15    bottom right-hand side signing as the

16    legal representative for --

17          A.    Yes.

18          Q.    Are you signing as the legal

19    representative for Taishan Gypsum?

20          A.    Yes.

21          Q.    Peng Shiliang signed as the

22    legal representative for TTP?

23          A.    Yes.

24          Q.    What's this document?
```

1          A.    This is equipment sales

2    agreement.

3          Q.    From whom, to whom, for

4    what, Mr. Jia?

5          A.    This is an agreement for the

6    equipment sold from TTP to TG.

7          Q.    Is it the same equipment

8    that TTP had purchased from TG in early

9    2006?

10         A.    Correct.

11         Q.    Please look at Defendant's

12   45, 46 and 47 now, Mr. Jia.

13               For the record, Defendant's

14   45 is TG 26004 through --

15               MS. BASS:  Repeat that.

16               MR. CYR:  TG -- I'm sorry.

17         Defendant's 45 is TG 26004 through

18         TG 26006.

19               Defendant's 46 is TG 26007

20         through TG 26009.

21               Defendant's 47 is TG 26010

22         through TG 26012.

23                     -  -  -

24               (Whereupon, Deposition

 1          Exhibit Jia Defendant's-45,

 2          Document in Chinese, Bates stamped

 3          TG 0026004 through TG 0026006;

 4          Deposition Exhibit Jia

 5          Defendant's-45A, 2006 Financial

 6          Statement of Taian Taishan

 7          Plasterboard Co., Ltd., Bates

 8          stamped TG 0026004 through TG

 9          0026006.

10               (Whereupon, Deposition

11          Exhibit Jia Defendant's-46,

12          Document in Chinese, Bates stamped

13          TG 0026007 through TG 0026009;

14          Deposition Exhibit Jia

15          Defendant's-46A, Balance Sheet,

16          Bates stamped TG 0026007 through

17          TG 0026009.

18               (Whereupon, Deposition

19          Exhibit Jia Defendant's-47,

20          Document in Chinese, Bates stamped

21          TG 0026010 through TG 0026012, and

22          Deposition Exhibit Jia

23          Defendant's-47A, 2008 Financial

24          Statement of Taian Taishan

1           Plasterboard Co., Ltd. Balance

2           Sheet, Bates stamped TG 0026010

3           through TG 0026012, were marked

4           for identification.)

5                      -  -  -

6               MR. SEEGER:  Joe, we're just

7           going to object to the use of

8           these based on the fact that these

9           were also produced late, and we

10          didn't have them on the schedule,

11          but I guess we can deal with those

12          objections later.

13              MR. CYR:  That's true, Your

14          Honor, they were produced late.

15          And so whatever accommodation we

16          need to make for plaintiffs'

17          counsel for them to effectively

18          address these issues, we're all

19          for it.

20              THE COURT:  All right.

21          Let's do it.  Let's continue with

22          that understanding.

23              MR. SEEGER:  Thank you.

24    BY MR. CYR:

1          Q.    Mr. Jia, could you tell us
2    what Defendant's 45 is?
3          A.    This is TTP's balance sheet
4    and accounting report.
5          Q.    Do you know who prepared
6    this balance sheet and accounting report
7    for TTP?
8          A.    I don't know.
9          Q.    Could you look at
10   Defendant's 46, please?  Could you tell
11   us what that is?
12         A.    This is also TTP's financial
13   report.
14         Q.    For what year?
15         A.    (Pause.)
16         Q.    That's okay, Mr. Jia.
17         A.    I'm not sure.
18         Q.    Just take a brief look at
19   the very first page at the top, and if
20   that doesn't tell you, we'll move on.
21         A.    Oh, it's for the year of
22   2007.
23         Q.    And could you --
24               Have you ever seen this

1  document before we prepared for the

2  deposition, Mr. Jia?

3         A.    No.

4         Q.    Look at Defendant's 47.

5  Have you ever seen that document before

6  we prepared for this deposition?

7         A.    No.

8              MR. CYR:  Your Honor, I'm

9              finished with my questions of Mr.

10             Jia.  I do need to state for the

11             record that, for some reason, I do

12             have English translations of 45,

13             46 and 47.  If you don't have them

14             in your red books --

15             MR. SEEGER:  No, we have the

16             English.  The documents themselves

17             are not on the schedules that we

18             were provided, Schedule A and B.

19             MR. CYR:  Okay.  But you

20             have the English translations?

21             MR. SEEGER:  And we'll deal

22             with it.

23             MR. CYR:  I just wanted to

24             make sure the record reflected

1        that they have the English

2        translations.

3               Thank you very much.

4               THE COURT:  Okay.

5               We'll stop here and come

6        back.  Can we get back in an hour?

7               Eugene, I would like you to

8        look into whether or not we can

9        get some sandwiches sent up here

10       for the rest of the week.  It

11       would save us time.  We'll split

12       the amount, but we can't have

13       everybody going out for lunch.

14       We'll never get finished.

15              THE VIDEOTAPE TECHNICIAN:

16       This is the end of Videotape

17       Number 3.  We're off the record at

18       12:33.

19                     -  -  -

20              (Whereupon, a luncheon

21       recess was taken from 12:33 p.m.

22       until 1:32 p.m.)

23                     -  -  -

24              THE VIDEOTAPE TECHNICIAN:

1              This is the beginning of Tape

2              Number 4.  We're going back on the

3              record.  The time is 1:28.

4                        -  -  -

5                    EXAMINATION

6                        -  -  -

7    BY MR. SEEGER:

8         Q.    Good afternoon, Mr. Jia.  I

9    met you last time when I was in Hong

10   Kong.  I know you are a busy man.  Thank

11   you for being here.

12             Mr. Jia --

13        A.    You're welcome.

14        Q.    -- I'm not going to mark

15   this as an exhibit, but I want to know if

16   you can identify, if you can tell me if

17   you recognize the number on that piece of

18   paper as your identification number at

19   TG?

20        A.    It is my ID number.

21        Q.    Great.  Thank you.  I'll

22   take that back.  Thank you very much.

23             Do you know who Bill Che is?

24             INTERPRETER:  Can you write

1           it down for me?  There's probably

2           no Chinese translation for that.

3                MR. SEEGER:  I'll find out.

4                THE WITNESS:  I'm not sure

5           who exactly that is, but I may

6           know this person, may not.

7      BY MR. SEEGER:

8           Q.   All right.

9                I'll find his Chinese name,

10     and I'll come back to it later.  Thank

11     you.

12               Mr. Jia, I want to just

13     clarify a couple of things.  Can you go

14     back to the red binder in front of you to

15     Exhibit 37?

16          A.   I see it.

17          Q.   Mr. Jia, on the first page

18     of that document, there's a name of a

19     public accounting firm.  Do you see that

20     in the Chinese version?

21          A.   Yes.

22          Q.   Can you identify for the

23     record the name of that certified public

24     accounting firm?

 1          A.    It is an accounting firm

 2    which is called Tai'an City Zhongcheng

 3    Accounting Firm.

 4          Q.    Mr. Jia, to be clear, the

 5    document we're looking at is a document

 6    that was created in connection with the

 7    creation of TTP, correct?

 8                MR. CYR:  Objection.  I

 9          think he's testified he doesn't

10          recall seeing this document prior

11          to preparing for the deposition.

12                MR. GONZALEZ:  Object to the

13          speaking objection, Your Honor.

14                THE COURT:  You don't need

15          to translate that.  The objection

16          is an objection.  So, clarify

17          that.

18                MR. SEEGER:  I'm not sure

19          what the objection is, Your Honor.

20                THE COURT:  He said he

21          hadn't seen it before.

22                MR. SEEGER:  Well, he asked

23          him questions about it.  He had

24          him read portions of it into the

1          record.  Now that he has seen

2          it --

3                MR. CYR:  I don't believe

4          that's true, Chris.  Go ahead and

5          ask him a question.

6                THE COURT:  Let's do it this

7          way.  You've made your objection.

8          I'll overrule the objection.

9          Let's proceed.

10   BY MR. SEEGER:

11        Q.    You can answer the question.

12   Do you remember what I asked you?

13        A.    The document was not

14   created, but the accounting firm verified

15   the capital funding for it.

16        Q.    For TTP, correct, sir?

17        A.    Correct.

18        Q.    That's the same accounting

19   firm that does accounting work for TG,

20   correct?

21                MR. CYR:  Objection.

22          Objection.  No time period

23          specified.

24                THE COURT:  All right.

1           Let's ask about the time period.

2    BY MR. SEEGER:

3           Q.    I'm trying to find the date

4    on this document.  This document is from

5    2006.  So, was that the same accounting

6    firm that did work for TG in 2006?

7           A.    It is not.

8           Q.    What accounting firm did

9    work for TG in 2006?

10          A.    This is the one.

11   Zhongcheng.

12          Q.    It's the same one, correct?

13          A.    It is the same.

14          Q.    Could you go to Tab 41,

15   please.  Tell me when you are there, Mr.

16   Jia.

17          A.    I've got it.

18          Q.    Sir, this is the use -- this

19   is an agreement between TTP and TG

20   regarding the use of the Taishan brand,

21   which is TG's trademark, correct?

22          A.    Yes.

23          Q.    There's no compensation

24   reflected in this agreement, is there,

1    sir?

2           A.    Correct.

3           Q.    Mr. Jia, I believe early in

4    the day, your attorney asked you whether

5    there were any employees or agents

6    whether -- I'm sorry, let me strike that.

7                 Your attorney asked you

8    whether TG or TTP had any employees or

9    agents doing business on their behalf in

10   the United States.  Do you recall those

11   questions?

12                MR. CYR:  Objection,

13         misstates the record.

14                THE COURT:  Overrule the

15         objection.

16   BY MR. SEEGER:

17          Q.    Do you recall?

18          A.    Can you repeat the question?

19          Q.    Yes.

20                Your attorney asked you

21   questions related to whether TG or TTP

22   had any employees or agents doing

23   business on their behalf in the United

24   States.  Do you recall that question and

1    your answer?

2              A.    I remember that.

3              Q.    Mr. Jia, you took some time

4    to prepare for your deposition today;

5    isn't that fair?

6                   MR. CYR:  Objection, vague.

7    BY MR. SEEGER:

8              Q.    How much time did you spend

9    with your attorneys?

10                  MR. CYR:  I'm sorry.  The

11                  interpreter needs to interpret my

12                  objection, unless the Judge

13                  instructs her not to.

14                  THE COURT:  You can

15                  interpret it, but I'm going to

16                  overrule the objection.  Let's go.

17                  INTERPRETER:  Your Honor, do

18                  I interpret all the -- just like

19                  in the morning, all the objections

20                  and talkings?

21                  THE COURT:  You don't need

22                  to.

23                  MR. CYR:  Yes, unless the

24                  judge instructs you not to.

1              THE COURT:  You can

2         interpret the objection that

3         counsel makes.  Now, in that

4         regard, both of you all with

5         objections, I just need the fact

6         that it's objected and maybe one

7         word, whether it's leading or give

8         me the evidence number, and I'll

9         rule on it.  I don't want any

10        objections and speeches from

11        either side.

12             MR. CYR:  Understood.

13             INTERPRETER:  What was the

14        question again?

15   BY MR. SEEGER:

16        Q.    Mr. Jia, how much time did

17   you spend with your attorneys preparing

18   for your testimony today?

19        A.    You mean last deposition or

20   this one?

21        Q.    This one.

22        A.    Over a day.

23        Q.    During that time, you looked

24   at documents.  Is that fair to say?

1          A.     Under the guidance of the

2     attorney, yes, I did see some documents.

3          Q.     Mr. Jia, to be clear, you

4     are the Chairman of the Board of TG, and

5     you're the general manager; isn't that

6     fair?

7          A.     I am the director of the

8     board of director and general manager of

9     TG.

10         Q.     And you understand you are

11    here to be the spokesman for the company

12    in this deposition today, correct?

13         A.     I'm the spokesperson for TG

14    and TTP.

15         Q.     So, then, Mr. Jia, you know

16    it's not true that you don't have agents

17    acting on your behalf in the United

18    States?  Isn't that true?

19              MR. CYR:  Objection.

20              THE COURT:  With regard to

21              questions, let's be conscious of

22              the fact that -- I know he's under

23              cross-examination, but let's show

24              the same deference and respect for

1                the witness that you would like

2                shown to you.

3                      MR. SEEGER:  Will do, Your

4                Honor.

5       BY MR. SEEGER:

6                Q.    And I apologize if -- well,

7       I don't think the question was read to

8       him, so I will strike the question and

9       ask it again.

10                     MR. CYR:  May I just make a

11               comment that's not interpreted?

12                     MR. SEEGER:  Sure.

13                     MR. CYR:  The nature of my

14               objection was the double negative.

15               It might be confusing if it is

16               translated.

17                     MR. SEEGER:  I'm going to

18               strike the question.

19                     INTERPRETER:  Your Honor,

20               earlier you said that I didn't

21               have to interpret the

22               conversation, but now if I do

23               that, I have no problem with that,

24               because I did that in the morning.

1              Do you want me to interpret

2              everything that's being said

3              between you, you and Your Honor?

4                    MR. SEEGER:  I don't require

5              it.

6                    THE COURT:  Let's do it

7              unless I tell you not to.

8                    MR. BRENNER:  Could the

9              translator speak up a little?  We

10             are having a hard time hearing

11             her.

12                         -   -   -

13             (A discussion off the record

14             occurred.)

15                         -   -   -

16   BY MR. SEEGER:

17             Q.    Mr. Jia, let me ask you the

18   question this way.  Before you would give

19   testimony that you were sure there were

20   no employees or agents acting on your

21   behalf in the United States, you would

22   satisfy yourself, wouldn't you, that that

23   was correct?

24             A.    It is accurate.

1                    -  -  -

2                    (Whereupon, Deposition

3              Exhibit Jia-13, Sole Agency

4              Agreement, 4 pages, was marked for

5              identification.)

6                    -  -  -

7    BY MR. SEEGER:

8         Q.    I'm going to mark for the

9    record, and we're -- this is Jia-13, is a

10   document that was obtained from the

11   public records in the United States in

12   Florida.

13              MS. BYRNE:  Chris, that's

14         Exhibit 13?

15              MR. SEEGER:  Yes.

16              MR. CYR:  Could you describe

17         for the record what part of the

18         exhibits that you identified for

19         the depositions that this was in?

20              MR. SEEGER:  This is a

21         document that is now being used

22         for impeachment purposes.  It was

23         not disclosed prior to the

24         deposition.

1           MR. CYR:  Was that

2      authorized by The Court?

3           MR. SEEGER:  I don't know.

4      You will have to ask Lenny.

5           THE COURT:  Yes.  They had a

6      conference with -- you weren't

7      present, but a representative of

8      your group was present, and I

9      indicated to both sides that if

10      they had documents, which I hoped

11      they didn't have a lot of, but if

12      they did have documents that were

13      solely for impeachment, each side

14      would have to give them to me so I

15      could look at them before they

16      would be used.  I did look at,

17      there's two documents, I think,

18      I'm not quite sure, that I

19      reviewed only from the plaintiffs.

20      I didn't receive anything from the

21      defendants.

22  BY MR. SEEGER:

23           Q.   Mr. Jia, I will, with the

24  help of the interpreter, will try to

1   identify this document for you.  At the

2   very top it says "Sole Agency Agreement."

3              MR. CYR:  What's the

4         question?

5              MR. SEEGER:  I'm identifying

6         the document right now.

7   BY MR. SEEGER:

8         Q.    Do you see that, sir?

9         A.    I understand the Chinese

10   part but not the English part.

11        Q.    Okay.  That's fine.  That's

12   why I'm trying to identify it for you.

13             It's dated October 20, 2006.

14   Do you see that, Mr. Jia?

15        A.    I don't see it because I

16   don't understand English, so, I don't

17   know what date you're talking about.

18             MR. SEEGER:  (Addressing the

19        interpreter.)  I was hoping that

20        you could point that out to him

21        just to show him it's there.  It's

22        on the first page.

23             MR. CYR:  Let's ask him the

24        questions.  Excuse me, ma'am, he

```
1        needs to ask the witness a

2        question.

3              THE COURT:  I agree with

4        that, yeah.

5              MR. SEEGER:  Well, the first

6        question --

7              THE COURT:  Is this the

8        Chinese or not?

9              INTERPRETER:  So when you

10       want me to point, do you want me

11       to point --

12             MR. CYR:  Excuse me, ma'am.

13       I think we wait for the judge to

14       ask the questions.

15             MR. SEEGER:  Joe, let me ask

16       some questions.  You've asked me

17       to do that.

18             MR. CYR:  I think the judge

19       asked a question.

20             MR. SEEGER:  Yeah.  The

21       judge asked if that was the

22       Chinese version, and I was about

23       to show her -- tell her to

24       instruct the witness to go to that
```

1           page.

2   BY MR. SEEGER:

3           Q.   You can show him the Chinese

4   version.  Can he explain to you what he's

5   reading?

6                   INTERPRETER:  First let me

7           verify if this is the correct

8           Chinese translation.  Let me see

9           the Chinese translation of that.

10                  MR. SEEGER:  Sure.

11                  INTERPRETER:  I don't see a

12          Chinese translation.  I only see

13          the English.

14                  MR. SEEGER:  I think it's

15          Page 3.

16                  MR. CYR:  Just state for the

17          record that the document that was

18          handed to me does not have a

19          Chinese version.

20                  INTERPRETER:  Oh, yes, there

21          it is.

22                  MR. CYR:  But there is some

23          Chinese written on the third page

24          of this document, but it does not

1           appear to be a Chinese translation

2           of the document.

3                   MR. SEEGER:  All right.

4           Let's start over again.  Excuse

5           me, Miss Inter -- hold -- it's

6           okay.  I've got it.

7                   INTERPRETER:  Yes.

8                   MR. SEEGER:  I'm going to

9           explain it and you tell him what

10          I'm reading.  Okay?

11  BY MR. SEEGER:

12          Q.   On the first page of the

13  document, please explain to the witness

14  at the top it says, "Sole Agency

15  Agreement."  Below that is the date of

16  October 20, 2006.  In the place below

17  that where it says "The seller," it says,

18  "Taian Taishan Plasterboard Co., Ltd."

19  Under that where it says "The buyer" is

20  "Oriental Trading Company, LLC."

21               Do you know who the Oriental

22  Trading Company is, Mr. Jia?

23          A.   I don't know.

24          Q.   Below that where it says

1    "Goods Description For Sole Sales," it

2    describes -- I'll read it, and you can

3    read it to him.  "The gypsum board

4    manufactured by" the "seller with the

5    thickness of 1/2 inch or 5/8 inch, the

6    width of 4 feet, the length of 8 feet, 9

7    feet, 10 feet or 12 feet, under the brand

8    name of 'DUN' showing as in the seller's

9    catalogue only."

10              Now, Mr. Jia, those sizes

11    described in that first paragraph, those

12    are sizes used in the United States,

13    correct?

14         A.    Not necessarily.

15         Q.    Are they used -- are those

16    sizes used in the United States, yes or

17    no, Mr. Jia?

18         A.    Not necessarily.  As far as

19    I know, in countries other than America

20    also use these sizes of gypsum board.

21         Q.    Fair enough.

22              Now, in item 2 right below

23    that where it says "Sole Sales Area,"

24    would you read -- go ahead -- it says

1    "Limited to the territory of the USA."

2            MR. CYR:  What's the

3        question?

4            THE COURT:  What's the

5        question?

6            MR. SEEGER:  I'm just

7        reading it for him.  I want him to

8        see what's in the document.

9            MR. CYR:  I just want to

10       state the obvious objection, and

11       that is if you wanted to let him

12       see what was in the document, you

13       could have had it translated.  So,

14       I object to the entire line of

15       questioning.

16           THE COURT:  I understand the

17       objection.  I'll overrule the

18       objection.

19   BY MR. SEEGER:

20       Q.   If you go to the second

21   page, Mr. Jia.  At the very bottom where

22   it says "The seller."  Under where it

23   says "Taian Taishan Plasterboard Co.,

24   Ltd.," do you recognize that signature?

1        A.    I know this person Che Gang,

2   but I'm not sure whether it's his

3   signature.

4        Q.    Would you know if that's the

5   same individual who also uses the name

6   Bill Cher?

7             MR. CYR:  Object to form.

8             THE WITNESS:  I don't know.

9   BY MR. SEEGER:

10       Q.    Have you ever seen this

11  document before, Mr. Jia?

12       A.    No.

13       Q.    Mr. Jia, you also --

14            MR. SEEGER:  Do you have

15        this, Scott?

16            MR. GEORGE:  Your Honor,

17        this is in Volume 3 of the

18        binders, Tab 4.  Let me get it for

19        you.

20            MR. SEEGER:  It's his

21        affidavit.  Hilarie, it's his

22        affidavit.

23  BY MR. SEEGER:

24       Q.    By the way, Mr. Jia, there

1    is one more question I want to ask you

2    about this document.  The person you

3    identified who signed on behalf of TTP --

4              MR. CYR:  Objection,

5         objection.

6              THE COURT:  He didn't

7         identify it.  Let's restate the

8         question.

9              MR. SEEGER:  Well, Your

10        Honor, it says, "I know this

11        person Che Gang, but I'm not sure"

12        if "it's his signature."

13             THE COURT:  Yes.  Okay.

14   BY MR. SEEGER:

15        Q.    Let me strike the question

16   and reask it this way.

17             You said you know the person

18   Che Gang.  This person, Che Gang, does he

19   work for TTP or did he during that time

20   frame?

21        A.    I don't remember.

22        Q.    Mr. Jia, we've marked an

23   affidavit that you have provided in this

24   litigation as Jia Exhibit 14.

```
 1                    -  -  -
 2                 (Whereupon, Deposition
 3           Exhibit Jia-14, Affidavit of Jia
 4           Tongchun, 11 pages, was marked for
 5           identification.)
 6                    -  -  -
 7                 MR. SEEGER:  Do you need a
 8           copy of it?
 9                 MR. CYR:  Let's see.  It's
10           okay, Lenny.  We'll see if I need
11           it.
12    BY MR. SEEGER:
13           Q.   Do you recognize this, Mr.
14    Jia?
15           A.   Yes.
16           Q.   Actually, just because we --
17    I'm sorry.
18                 You signed this document in
19    connection with this litigation, correct,
20    sir?
21           A.   Yes.
22           Q.   And the answers you give
23    here in this affidavit, are they -- let
24    me ask you specifically.  Like item 9
```

1    where it says, "Taishan sells drywall

2    exclusively in China," did you mean that

3    response for TG as well as TTP?

4              MR. CYR:  Excuse me.  I'm

5         sorry.  I think I need to see a

6         copy of the document.

7              MR. GEORGE:  (Handing over

8         document.)

9              MR. CYR:  Just for the

10        record, Paragraph 2 of this

11        document states that he's the

12        Chairman of the Board and general

13        manager of Taishan Gypsum.  And

14        Taishan Gypsum is then defined as

15        Taishan throughout the

16        declaration.  So, now counsel has

17        referred the witness to Paragraph

18        9 that says "Taishan sells drywall

19        exclusively in China."  I object

20        in that that's misleading.  Please

21        don't do that, Mr. Seeger.

22              THE COURT:  Let's restate

23        the question and ask whether or

24        not it's -- the other one does

```
 1          business.
 2               MR. SEEGER:  Well, Your
 3          Honor, I was actually going to get
 4          to this, but counsel doesn't
 5          really give me an opportunity to
 6          get through any questions.
 7               So, Item 26 in this
 8          affidavit, which I assume was
 9          written by the attorney, says, "In
10          2006, Taishan's subsidiary, Tai'an
11          Taishan Plasterboard...was formed.
12          TTP also manufactures and sells
13          drywall exclusively in China."
14               So, what I want to be clear
15          is if these representations relate
16          to both.  So I'll ask.
17               MR. CYR:  I suggest you go
18          to Paragraph 26.
19               THE COURT:  He's under
20          cross.  I'll let counsel handle
21          it.  Make your objections, I'll
22          rule on them, and let's continue
23          on, folks.
24     BY MR. SEEGER:
```

1          Q.    Mr. Jia, item 9 where it

2    says, "Taishan sells drywall exclusively

3    in China," would you intend to make that

4    same representation for TTP?

5          A.    Yes.

6          Q.    Mr. Jia, where it says,

7    "Taishan never...sold drywall in

8    Louisiana," would you make that same

9    representation for TTP?

10              INTERPRETER:  Counsel, you

11         mean Number 10?  Can you repeat

12         your question, please?

13   BY MR. SEEGER:

14         Q.    In item 11, it says,

15   "Taishan never...sold drywall in

16   Louisiana."  I want to know if, Mr. Jia,

17   if you would make the same representation

18   for TTP?

19         A.    Correct.

20         Q.    And "Taishan

21   never...marketed its drywall in

22   Louisiana," would you make that same

23   representation for TTP?

24         A.    Yes.

1          Q.    Item 13, "Taishan

2    never...distributed its drywall in

3    Louisiana," would you make that same

4    representation for TTP?

5          A.    Yes.

6                MR. SEEGER:  Joe, the

7          document I'm going to mark as

8          Jia-15 is Bates stamped TG

9          00919813 through 14.  I think you

10         have it.

11               MR. CYR:  Not for

12         interpretation, but just for

13         logistics, is your plan to hand me

14         a copy of the documents you are

15         handing the witness or is that not

16         the plan?

17               MR. SEEGER:  I can do that.

18         I thought we provided them to you.

19               MR. CYR:  No.  You provided

20         about 500 documents, and we didn't

21         know which ones you were going to

22         use in the deposition, so --

23               MR. SEEGER:  I'll get you a

24         copy.

1           THE COURT:  Let's do it this
2      way.  Whenever you show the
3      witness a document, give a copy
4      also to counsel.
5           MR. SEEGER:  I thought he
6      had a binder.  I'll do that,
7      Judge.
8           MR. CYR:  Mr. Seeger, I'm
9      not sure this is my business or
10     not, but the judge seems to have a
11     black binder with a lot of
12     exhibits in it.  Did plaintiffs'
13     counsel give that binder to the
14     judge?
15          MR. DAVIS:  Just so it's
16     clear, from a logistics
17     standpoint, those are the
18     documents that were provided to
19     counsel in the index that were
20     exchanged early on, and then our
21     e-mails back and forth.  My
22     appreciation was that you would
23     have a complete set.  However, I'm
24     happy to give you my set of

1          binders if you'd like it.

2               MR. CYR:  That's great.  I

3          think we should have whatever

4          you've given the judge.

5               THE COURT:  I have a red

6          tabbed document that the

7          defendants have given to me, and I

8          have here on the floor a number of

9          folders that the plaintiffs have

10         placed there.  I haven't looked at

11         them yet.  Whatever I have, let's

12         give to the defendants, please.

13              MR. CYR:  Just so that the

14         record is clear, Mr. Davis has

15         given me three binders.  I take it

16         these three binders have already

17         been given to the judge.  And now

18         we have four.

19              MR. DAVIS:  And the witness

20         has one.  You should have five

21         binders at this point.

22              MR. BRENNER:  Chris, can you

23         identify the document?

24              MR. SEEGER:  Yeah, I'm going

1           to do that right now.  We're just

2           having a hard time finding it.

3                        -  -  -

4                (Whereupon, Deposition

5           Exhibit Jia-15, E-mail chain, top

6           one dated 2/10/2007, Bates stamped

7           TG 0000011, was marked for

8           identification.)

9                        -  -  -

10   BY MR. SEEGER:

11           Q.    So, what I'm marking as

12   Jia-15 is TG 11 --

13                MR. CYR:  Off the record.

14                        -  -  -

15                (Whereupon, an

16           off-the-record discussion was

17           held.)

18                        -  -  -

19   BY MR. SEEGER:

20           Q.    Mr. Jia, do you recognize at

21   the very top there's an e-mail address

22   that says "Peng"?  Do you see where I'm

23   looking?  The "From" line.

24           A.    I don't understand English.

1          Q.    Do you know who Peng Wenlong

2    is, Peng Wenlong?

3          A.    I know that.

4          Q.    Who is that?

5          A.    His position before or now?

6          Q.    Let's start with his

7    position in 2007?

8          A.    He used to be the

9    international business department

10   director or deputy director of TG.  I'm

11   not sure which one was he.

12         Q.    And when was --

13               When did you testify earlier

14   that TTP was formed?

15         A.    It was formed in 2006.  I

16   don't remember the exact month.

17         Q.    And my question is, Peng

18   Wenlong in February 10 of 2007, would he

19   have been an employee of TG or TTP?

20         A.    TTP's employee.

21         Q.    Okay.

22               He would be TTP's employee,

23   Mr. Jia.  So, why, on this e-mail, if you

24   look below where he's written an e-mail

 1   to this person Melvyn, do you see where

 2   it says "Yours faithfully, Frank"?

 3              MR. CYR:  Objection in that

 4         the witness has testified that he

 5         cannot read English.  And in

 6         addition, you are asking him to

 7         speculate about why somebody else

 8         did something.

 9              MR. SEEGER:  I was trying to

10         identify where on the document I

11         was about to go.

12              THE COURT:  Just a moment.

13         I understand -- maybe you didn't

14         understand what I said, but I

15         don't need an explanation.

16              MR. CYR:  Sorry.

17              THE COURT:  You just make

18         the word "objection," I got it,

19         and I'll rule on it.

20              MR. CYR:  I got it.  I

21         apologize.

22              THE COURT:  It's okay.

23              Overrule the objection.

24   BY MR. SEEGER:

1          Q.    Mr. Jia, my question is -- I

2    know this is in English, and you don't

3    speak English or read it.  Beneath the

4    name here of this TTP employee, he signs

5    off as being from the Taihe Group.  The

6    Taihe Group is TG, correct?

7          A.    Not necessarily.

8          Q.    Who is the Taihe Group?

9          A.    The businesses in the

10   surrounding, sometimes they're all called

11   Taihe Group.

12         Q.    I would like to point to

13   your attention, this does not relate to

14   Louisiana.  I finally found the e-mail I

15   want to show you for that.  But you also

16   testified earlier that you never shipped

17   or distributed drywall in Alabama.  Do

18   you recall that testimony?

19              MR. CYR:  Objection.

20              THE COURT:  Overrule the

21         objection.

22   BY MR. SEEGER:

23         Q.    Do you recall giving that

24   testimony, Mr. Jia?

1          A.     Can you repeat?

2          Q.     Do you recall testifying

3   earlier that you never shipped or

4   distributed drywall to Alabama?

5               MR. CYR:  Objection.

6               THE COURT:  Overruled.

7               THE WITNESS:  Correct.

8   BY MR. SEEGER:

9          Q.     Yet here is an employee, and

10  the interpreter will translate, where he

11  says, "We have a customer in America, who

12  need us to ship about 400000 sheets of

13  gypsumboard to Mobile," Alabama.

14              MR. CYR:  What's the

15         question?

16  BY MR. SEEGER:

17         Q.     Were you unaware that your

18  company was shipping drywall to Mobile,

19  Alabama?

20              MR. CYR:  Objection.

21              THE COURT:  I'll sustain

22         that objection.  Restate the

23         question.

24  BY MR. SEEGER:

 1          Q.    Mr. Jia -- let me think how

 2    to ask this.

 3          Mr. Jia, did you have an

 4    understanding one way or another as to

 5    whether your company, prior to your

 6    testimony today, shipped drywall to

 7    Alabama?

 8          MR. CYR:  Objection.

 9          THE COURT:  Overruled.

10    BY MR. SEEGER:

11          Q.    You can answer, Mr. Jia.

12          A.    Repeat the question.

13          (Interpreter repeats the

14          question to the witness.)

15          I know that my company had

16    never shipped products to Alabama.

17          Q.    So this would be 16 and that

18    16A.

19                    -  -  -

20          (Whereupon, Deposition

21          Exhibit Jia-16A, E-mail chain, top

22          one dated 10/15/2005, Bates

23          stamped TG 0019813 and TG 0019814,

24          and Deposition Exhibit Jia-16B,

1              Translation of E-mail chain, top

2              one dated 10/15/2005, Bates

3              stamped TG 0019813 and TG 0019814,

4              were marked for identification.)

5                        -  -  -

6    BY MR. SEEGER:

7         Q.    All right.

8              I'm going to mark this as

9    16A.  For the record, we're marking as

10   Jia Exhibit 16A TG 0019813 through 814.

11   16B is TG 0019813.

12             Mr. Jia --

13             MR. CYR:  Excuse me.  Is

14        there -- I'm sorry, withdrawn.

15   BY MR. SEEGER:

16        Q.    Mr. Jia, can you tell me who

17   Apollo Yang is, if that a name that rings

18   a bell?

19        A.    We have never seen this

20   person.

21        Q.    You don't recognize him as

22   an employee of TG or TTP?

23        A.    I don't understand English,

24   so, I don't know who this person you are

1    referring to.

2              Q.    Well, Mr. Jia, you're aware

3    that certain Chinese employees of TG and

4    TTP have anglicized names as well as

5    Chinese names, correct?

6              A.    Yes.

7              Q.    Okay.

8                    And the only one I have on

9    this document is the name of Apollo Yang,

10   but you're saying you don't recognize

11   that name, correct?

12             A.    I don't know this name.

13             Q.    The date of the e-mail, as

14   you can see at the top, is October 15,

15   2005.  Can you just point that out for

16   him, please.  Mr. Jia, I'm sorry to

17   interrupt.  I think we just found the

18   Chinese version of Mr. Yang's name.  It's

19   Yang Jiapo.  Does that name ring a bell?

20             A.    I know this name.

21             Q.    Could you identify who he

22   is, what company he worked for?

23                   MR. CYR:  Objection, time

24        period.

1           MR. SEEGER:  In the time
2      frame of the document, 2005.
3           THE WITNESS:  I'm aware of a
4      person with this name.  But I'm
5      not sure which company he's worked
6      at, TTP or TG.  I know this person
7      later resigned.
8  BY MR. SEEGER:
9      Q.    Mr. Jia, I need to ask you
10 this.  You recall that I had asked you
11 questions back in April, correct?  Do you
12 remember we were here for your
13 deposition?
14     A.    I forgot.
15          MR. SEEGER:  Mr. Cyr, do you
16     have the prior transcript nearby
17     that you can refer to?  I want to
18     refer to his transcript.
19          MR. CYR:  My hotel room is
20     nearby.  The answer to your
21     question is yes.  But I'm
22     comfortable in proceeding with
23     your accurately reading from the
24     transcript.

 1                    MR. SEEGER:  Thank you.

 2                    MS. BASS:  Do you need a

 3          copy?

 4                    MR. SEEGER:  If we can give

 5          it to Mr. Cyr.

 6    BY MR. SEEGER:

 7          Q.    Mr. Jia, when we last

 8    deposed you, I asked you this question,

 9    and you gave me this answer.  It's on

10    page -- for the record, it's Page 246,

11    and it's line 16 through 18.

12                    I asked you, "Do you know

13    who Apollo Yang is?"  That was the

14    question.

15                    The answer is, "I know who

16    he is.

17                    "Question:  Could you

18    identify him?  Who" he is, "what is his

19    role?

20                    "Answer:  He is one of the

21    employees of the company, but I'm not

22    sure what role he plays."

23                    Do you recall being asked

24    those questions and giving those answers?

1           A.    I don't recall this

2    question, but since you read it, I

3    believe what I said at the time was the

4    truth.

5           Q.    So, Mr. Jia, the exhibit

6    we're looking at now that's in front of

7    you --

8              MR. CYR:  I'm sorry.  I do

9              need to say something for the

10             record, just so that the reader of

11             the transcript appreciates that

12             when Mr. Seeger read in English

13             the name Apollo Yang, of course,

14             that reflected questioning that

15             had been interpreted in Chinese.

16             MR. SEEGER:  That's

17             incorrect.  I asked the name

18             Apollo Yang.  That's the way it

19             was asked.

20             THE COURT:  Whatever the

21             transcript is, that's what it is.

22    BY MR. SEEGER:

23           Q.    Now, the question I have on

24    the exhibit in front of you, Mr. Jia, is,

1   can you see that this is -- can you

2   identify for him this is an e-mail from

3   Apollo Yang to a Wenny Yin?  The subject

4   matter of the e-mail is "New Gypsum Board

5   quotation."

6            Mr. Yang writes, "We have

7   been attempting to finalize the bulk

8   carrier and" haven't "received any

9   feedback.  Currently we have the

10  information on" the "bulk carrier and

11  would like to make the quotation for your

12  reference, as follows:  Regular gypsum

13  board," and there's some measurements

14  there, "CNF New Orleans Port."

15           Now, my question, Mr. Jia,

16  is, prior to giving your testimony today,

17  did you have an understanding or not as

18  to whether you had shipped drywall to New

19  Orleans?

20       A.    I don't know.

21            MR. SEEGER:  For the record,

22       the next exhibit we'll go to will

23       be TG 0025216 through 218.

24            MR. CYR:  Excuse me,

1          25 what?

2               MR. SEEGER:  I'm sorry, it's

3          25216 through 25218.

4               INTERPRETER:  Give this back

5          to you.

6               MR. SEEGER:  You can leave

7          those right there.  Why don't we

8          put them here for now.  That one

9          too.  Let's keep it all together.

10         You can throw them right in that

11         pile.  I'll sort them out.

12              THE COURT:  Let's make sure

13         he has a copy of it, Counsel.

14              MR. SEEGER:  He's got it in

15         front of him, Judge.

16              MR. CYR:  You have to give

17         us a second to find the document.

18              MR. SEEGER:  Go ahead.  Go

19         ahead.

20              MR. CYR:  Thank you.  We

21         found it.

22    BY MR. SEEGER:

23         Q.   Mr. Jia, if you could take a

24    look at what we've just marked as Exhibit

1   17.

2                     -   -   -

3              (Whereupon, Deposition

4         Exhibit Jia-17, E-mail dated July

5         5, 2007, Bates stamped TG 0025216

6         through TG 0025218, was marked for

7         identification.)

8                     -   -   -

9   BY MR. SEEGER:

10        Q.    Let me just represent to you

11   that the e-mail address at the top, the

12   "From," I don't expect you to recognize

13   that, but I'll start by asking you if you

14   do.

15        A.    I only see some numbers.  I

16   don't know what they represent.

17        Q.    Fair enough.

18              I'll represent to you,

19   subject to your attorney confirming, that

20   that is the e-mail address of Frank Clem,

21   also known as Peng Wenlong.

22              MR. CYR:  I have no

23         objection for you to continue with

24         your questions.

1                    MR. SEEGER:  Thank you.

2    BY MR. SEEGER:

3         Q.    If you look below, there's

4    an e-mail exchange between Frank Clem or

5    Peng Wenlong and another individual at a

6    company called SINA, S-I-N-A.

7                    MR. CYR:  What's the

8         question?

9    BY MR. SEEGER:

10        Q.    The question is, do you know

11   who that company is, SINA?

12        A.    I don't know.

13        Q.    Below that, there's a

14   conversation going on between this

15   individual and Frank Clem where it says,

16   "I have located a buyer who would like to

17   receive sheetrock in New Orleans,

18   Louisiana, and also in Philadelphia,

19   Pennsylvania."

20                   INTERPRETER:  Interpreter

21        needs to check the definition of

22        sheetrock.

23                   THE COURT:  Drywall.

24                   MR. SEEGER:  Drywall.

1                    THE COURT:  What's the

2           question?

3    BY MR. SEEGER:

4           Q.    To be clear, I want to be

5    clear, is it your testimony that you had

6    no understanding of your company shipping

7    drywall to New Orleans or Philadelphia,

8    Pennsylvania?

9                    MR. CYR:  Objection.

10                   THE COURT:  Overrule the

11          objection.

12                   THE WITNESS:  I don't know.

13          I don't know where our gypsum

14          board were shipped to, and I also

15          don't know where were they used

16          at.

17   BY MR. SEEGER:

18          Q.    Well, you understand, Mr.

19   Jia, that your people made arrangements

20   to ship drywall to places in the United

21   States, correct?

22                   MR. CYR:  Objection.

23                   THE COURT:  I'll sustain the

24          objection.

1    BY MR. SEEGER:

2           Q.    Do you have an understanding

3    one way or another as to whether

4    employees of your company made

5    arrangements to ship drywall to the

6    United States?

7           A.    I don't know.

8                 MR. SEEGER:  For the record,

9           what we're about to look at is TG

10          415.

11                MR. CYR:  415, that sounds

12          like Binder Number 1.

13                MR. SEEGER:  That's probably

14          right.

15                      -  -  -

16                (Whereupon, Deposition

17          Exhibit Jia-18, E-mail chain, top

18          one dated 5/12/2006, Bates stamped

19          TG 0000415, was marked for

20          identification.)

21                      -  -  -

22                MR. SEEGER:  Do you have it?

23                MR. CYR:  Yes, sir.

24    BY MR. SEEGER:

1            Q.    Mr. Jia, this e-mail that

2    I'm going to refer to is the one in the

3    middle of the page.  And it's dated May

4    12, 2006.  I'll represent to you, it's an

5    e-mail exchange between a Mr. Darren and

6    Frank Clem or Peng Wenlong.  Mr. Peng

7    says, "First, we are exporting our gypsum

8    board to the USA with quantity of 600000

9    sheets every month.  We have much

10    experience on exporting to the USA."

11            MR. SEEGER:  Could you

12        translate that, please?

13            INTERPRETER:  Sure.

14    BY MR. SEEGER:

15            Q.    Based on your understanding

16    of your company, is that a true

17    statement?

18            A.    No.

19            Q.    And the sizes that are

20    referenced, if you look at the paragraph

21    right below that, it says "Second, we can

22    produce" it says 4 by 8 by 1/2, 4 by 12

23    by 1/2 and so on.

24            MR. CYR:  What's the

1           question?

2    BY MR. SEEGER:

3           Q.    Those are all sizes used in

4    the United States, correct?

5           A.    Not necessarily.

6           Q.    But in addition to the

7    places you're referencing, they are also

8    sizes used in the United States, correct?

9           A.    Yes.

10          Q.    And it says, "But at this

11   moment."  Do you see that?  "But at this

12   moment we normally produce" half inch

13   "gypsum board, and we have get the test

14   report according to ASTM standard."

15               Mr. Jia, what country uses

16   the ASTM standards?

17          A.    I know that ASTM standard is

18   a standard used in America for gypsum

19   board.  Many countries have gypsum board

20   standard.  Many Chinese customers would

21   require the product to be produced

22   according to American standard.

23               MR. CYR:  Chris, when you're

24          ready, we're ready.

 1              THE WITNESS:  As far as I

 2         know, Canada, Australia and many

 3         other countries also require to

 4         produce gypsum board in accordance

 5         with American standard.  Many

 6         countries who are small and have

 7         difficulties in producing their

 8         own standard, therefore, they are

 9         required to use standard of other

10         countries.  The ASTM American

11         standard not only serve the people

12         of the United States but serve

13         also the people worldwide.  This

14         is a general common sense in

15         gypsum board industry.  Every

16         gypsum board manufacturer would

17         digest and absorb the standard of

18         another country to see whether

19         they are able to produce their

20         drywall according to that

21         standard.  It is a simple matter.

22    BY MR. SEEGER:

23         Q.   Are you finished your

24    answer?

1      A.    Yes.

2            MR. SEEGER:  You said you

3      needed --

4            MR. CYR:  Can we take a

5      break?

6            MR. SEEGER:  You have to ask

7      the Judge.

8            THE COURT:  Yes.  You want

9      to take a break?  Sure.

10           THE VIDEOTAPE TECHNICIAN:

11     Going off the record.  The time is

12     2:27.

13                    -  -  -

14           (Whereupon, a recess was

15     taken from 2:27 p.m. until

16     2:36 p.m.)

17                    -  -  -

18           THE VIDEOTAPE TECHNICIAN:

19     This is the beginning of Tape

20     Number 5.  We're going back on the

21     record.  The time is 2:36.

22           MR. SEEGER:  Your Honor and

23     Joe, the next exhibits we're going

24     to look at are TG 22728.

```
 1            Actually, it is only a one-page
 2       exhibit.
 3            THE COURT:  It is in the
 4       first volume, first volume.
 5            MR. CYR:  It is the second
 6       part of the first volume; is that
 7       right?
 8            MR. SEEGER:  Yes.
 9            MR. CYR:  And it is 227.
10            MR. SEEGER:  22728.
11            MR. CYR:  I hate to slow
12       things down, but I'll peak at Mr.
13       Jia's once we go forward here.
14            MR. SEEGER:  Thanks.  I
15       appreciate that.
16                 -  -  -
17            (Whereupon, Deposition
18       Exhibit Jia-19A, E-mail in Chinese
19       dated May 11, 2007, Bates stamped
20       TG 0022728, and Deposition Exhibit
21       Jia-19B, E-mail dated May 11,
22       2007, Bates stamped TG 0022728,
23       were marked for identification.)
24                 -  -  -
```

1   BY MR. SEEGER:

2          Q.   Mr. Jia, can you take a look

3   at, you can see there is a Chinese

4   version of this e-mail.  It is dated May

5   11, 2007.

6              Just to make sure we're

7   looking at the right e-mail, you see that

8   this is written from Frank Clem or Peng

9   Wenlong, correct?

10         A.   Reflected by the document

11  itself, yes, it was written by Peng

12  Wenlong.

13         Q.   Okay, thank you.

14             In May of 2007, TTP was

15  already up and running for close to two

16  years, correct?

17             MR. CYR:  Objection.

18             THE COURT:  I'll overrule

19      the objection.

20             Can you answer the question?

21             THE WITNESS:  Can you repeat

22      it, please?

23  BY MR. SEEGER:

24         Q.   At the time this e-mail was

1   written, TTP was already in existence and

2   doing business?

3          A.    Yes.

4          Q.    At the bottom of the Chinese

5   version of this e-mail where it says

6   "Yours faithfully, Frank," what company

7   does Frank Clem or Peng Wenlong, what

8   company name appears below his signature?

9          A.    I don't understand what is

10  written here.

11         Q.    Okay, because it's in

12  English.

13                Well, you understand this is

14  an e-mail that came from Frank Clem, Peng

15  Wenlong, correct?

16                MR. CYR:  Objection.

17  BY MR. SEEGER:

18         Q.    Right, Mr. Jia?

19                You understand this to be

20  true?

21                MR. CYR:  Has the judge

22         ruled?

23                THE COURT:  Restate it.

24  BY MR. SEEGER:

1        Q.    Mr. Jia, you understand this
2   is an e-mail from Frank Clem?
3        A.    I don't understand what you
4   said about the sender of the e-mail.
5        Q.    I'm asking you now, do you
6   understand this to be an e-mail from
7   Frank Clem?  I thought you already
8   testified that you did.
9        A.    It's hard for me to
10  understand the concept in English, the
11  conversion from English to Chinese.  You
12  said Frank.  I don't know who is Frank.
13       Q.    Do you understand Peng
14  Wenlong also used the name Frank Clem?
15       A.    This is my first time
16  hearing that.
17       Q.    How long have you known Peng
18  Wenlong?
19       A.    Many years.
20       Q.    And you've never heard that
21  he goes by the name Frank Clem?
22       A.    No.
23       Q.    I'll ask you some other
24  questions.

1                    In May of 2007, we agree

2    that TTP was already doing business,

3    correct?

4          A.    What was the time?

5          Q.    In May of 2007.

6          A.    You mean TTP?

7          Q.    Was already doing business

8    in May of 2007, correct?

9          A.    Correct.

10          Q.    If you read the e-mail, and

11    you can read the Chinese version, Mr.

12    Clem is discussing Shandong Taihe Dongxin

13    Company?

14                MR. CYR:  Is there a

15          question?

16    BY MR. SEEGER:

17          Q.    Do you see that?

18                MR. CYR:  Objection.

19                THE COURT:  I'll overrule

20          the objection.  He sees it.

21          What's the question?

22                THE WITNESS:  Yes, I see it.

23    BY MR. SEEGER:

24          Q.    Just to be clear, Shandong

1    Taihe Dongxin, that's TG, that is not

2    TTP, correct?

3          A.    Correct.

4          Q.    So he's saying here that TG

5    is a national key manufacturer of new

6    building materials, correct?

7              MR. CYR:  Objection.

8              THE COURT:  Overruled,

9          overruled.

10             THE WITNESS:  Yes.

11   BY MR. SEEGER:

12         Q.    Do you see at the lower part

13   of the e-mail he discusses "Products of

14   our company have been sold to Southeast

15   Asia, Middle East, the United States" so

16   on and so forth.  Do you see that?

17         A.    That's what is written.

18         Q.    And that's true?  That's a

19   true statement, correct?

20         A.    I believe it is a true

21   statement.

22         Q.    Then beneath that it says,

23   "The export of gypsum boards to the

24   United States last year was 18 million

1   square meters"?

2          A.    This is not true.

3          Q.    That's a false statement?

4          A.    I believe the lease is

5   inaccurate.

6          Q.    Was it a bigger number, a

7   smaller number?

8          A.    That's not what I meant.

9          Q.    Okay.

10              Do you also see where below

11  that it says that "The board has passed

12  the US Professional ASTM Inspection"?

13              MR. CYR:  He's asking if you

14          see it.

15              THE WITNESS:  I see it.

16  BY MR. SEEGER:

17          Q.    Do you understand that to be

18  a true statement, that the board exported

19  to the United States had passed US

20  professional ASTM inspection?

21          A.    This is inaccurate.

22          Q.    What aspect of that is

23  inaccurate, Mr. Jia?

24          A.    The company that export

1   gypsum board to America is Taihe Dongxin

2   Company, including TTP, not only Taihe

3   Dongxin.  The export volume is also

4   inaccurate.  They are inaccurate as of

5   whether the gypsum board had indeed

6   shipped to America or where were they

7   used at.  It is inaccurate as its

8   statement of that it has passed the U.S.

9   professional ASTM inspection.  No

10  professional institution in America has

11  performed inspection for our gypsum

12  board.  It's only that some of the

13  customers of ours required us to be

14  inspected according to American ASTM

15  standard.  For those requests of the

16  customer, we say we're unable to go to

17  America to be examined by their

18  professional institutions.  Therefore,

19  those customers appointed an inspection

20  institution in Hangzhou for the

21  inspection.  Upon the inspection of such

22  institution in Hangzhou, they notified

23  that our gypsum board are up to the

24  standard which met the requirement of the

1    customers.  That is the process.

2           Q.    So, your board, at some

3    point in time, you had arranged for your

4    board to pass ASTM, US ASTM inspection

5    protocols, correct?

6           A.    I have not arranged such

7    things.

8           Q.    Not you, Mr. Jia, the

9    company, TG?

10          A.    My company, according to the

11   requirement of some of the customers, had

12   brought our products to some Hangzhou

13   inspecting institutions for inspection.

14   Our company have not voluntarily had our

15   product inspected.  They have always been

16   upon the request of the customers.

17          Q.    Mr. Jia, your company, TG

18   I'm specifically referring to, has in the

19   past prepared marketing materials over

20   the years advertising your brand, who you

21   ship to, where you export to, things like

22   that, correct?

23          A.    Yes.  Similar

24   advertisements.

1          Q.    And, in fact, I'm going to

2    mark and show to you, if you can just

3    show the judge.

4                MR. GEORGE:  It is also

5          Jia-2 in the first deposition?

6                MR. CYR:  Was this shown in

7          the April deposition, Mr. Seeger?

8                MR. GEORGE:  Yes.  It is

9          Jia-2, a much clearer copy than we

10         had then.

11               MR. CYR:  Are you going to

12         ask different questions?

13               MR. SEEGER:  I'm going to

14         ignore your question to me unless

15         the judge instructs me to answer

16         it.

17               THE COURT:  Let's ask

18         questions, please.  What's the

19         question?

20               MR. SEEGER:  Do you have a

21         copy?

22               THE COURT:  I do.

23                    -  -  -

24               (Whereupon, Deposition

```
 1              Exhibit Jia-20, Brochure of

 2              Shandong Taihe Dongxin Co., Ltd.,

 3              was marked for identification.)

 4                      -  -  -

 5   BY MR. SEEGER:

 6         Q.   Mr. Jia, take a look at what

 7   we've just marked as Jia Exhibit 20.  Mr.

 8   Jia, the name on this, what we marked as

 9   Exhibit 20, is Shandong Taihe Dongxin

10   Co., Ltd., which probably indicates this

11   was prepared sometime at or before 2007;

12   is that fair?

13              MR. CYR:  Objection.

14              THE COURT:  I'll overrule

15        the objection.

16              THE WITNESS:  I believe so.

17   BY MR. SEEGER:

18         Q.   Mr. Jia, if you'd take a

19   look at the second page of this document,

20   toward the bottom, and this document, by

21   the way, is in Chinese and English.  So,

22   I'll just point out to the interpreter

23   the English portion.  I'm going read

24   where it's highlighted.
```

1                   From these marketing

2    materials from Exhibit 20, Mr. Jia, it

3    says "We," meaning this is the

4    predecessor to TG, "have a self-supported

5    import and export ability, our products

6    not only sell well in our domestic

7    market" but "also export to many

8    countries," for example, "U.A.E.,

9    Indonesia, India, Russia, U.S.A.," et

10   cetera.

11                  Did I read that correctly?

12        A.    It is not necessarily

13   completely accurate, but most of it

14   reflects the true situation of Taishan.

15        Q.    And on Page 15 of this

16   marketing document, Mr. Jia, if you could

17   go to Page 15.  It's the second to last

18   page.

19                MR. CYR:  Chris, would you

20           state for the record where the

21           highlighting came from?

22                MR. SEEGER:  That was

23           probably somebody in my office.

24   BY MR. SEEGER:

1            Q.    Mr. Jia, right here.  Do you

2    see there is a map of the world on that

3    page?  For the record, it's the second to

4    the last page of this document.  Do you

5    agree that's a map of the world?

6            MR. GEORGE:  Can we switch

7       these two?

8            MR. SEEGER:  Yeah, I'm

9       sorry.  We'll substitute them.

10            THE WITNESS:  It's blurry.

11    BY MR. SEEGER:

12            Q.    Do you recognize it to be a

13    map of the world or not, Mr. Jia?

14            A.    I believe so.

15            Q.    Yeah.  I mean, I know this

16    isn't your first time seeing it, because

17    I showed this to you in April.  Do you

18    remember?

19            A.    That one is much more

20    clearer than this one.

21            Q.    Mr. Jia, what do you

22    recognize this to be, this dot I'm

23    pointing to on that map?

24            A.    Korea.

1          Q.    You don't recognize that to

2    be China?

3          A.    Beijing.

4          Q.    And then from that point in

5    Beijing there's a line that goes to here.

6    (Indicating.)   What does that say?

7          A.    America.

8          Q.    Thanks.

9                Mr. Jia, I've also marked

10   Jia Exhibit 21.

11                     -  -  -

12                (Whereupon, Deposition

13                Exhibit Jia-21, Brochure of

14                Taishan Ceiling and Wall System,

15                Bates stamped TG 0025132 through

16                TG 0025151, was marked for

17                identification.)

18                     -  -  -

19   BY MR. SEEGER:

20          Q.    Now, this marketing brochure

21   says "Taishan Gypsum Company," correct?

22                MR. CYR:  Let us find it,

23                Chris, real quickly.

24                MR. SEEGER:  It is on the

1           front page.

2                MR. CYR:  Excuse me?

3                MR. SEEGER:  On the front

4           page.

5                MR. CYR:  25132.

6                MR. SEEGER:  Sorry about

7           that.  I didn't understand it.

8      BY MR. SEEGER:

9           Q.   Mr. Jia, the fact this says

10     Taishan Gypsum on it indicates to us,

11     even though there isn't a date, that this

12     was created on or after 2007, when they

13     had the name change, correct?

14          A.   Yes.

15          Q.   And if you'd take a moment

16     to look at this document, I don't want to

17     waste a lot of time on this, Page 2 has

18     the exact same language as the exhibit we

19     just reviewed, doesn't it?

20                MR. CYR:  Objection.

21                THE COURT:  That's the

22           question.  If he doesn't

23           understand it, he can say it.

24                I'll overrule the objection.

1           MR. CYR:  I would ask that

2      the witness be given an

3      opportunity to see the previous

4      exhibit so he can compare them and

5      then testify whether or not it's

6      exactly the same.

7           THE COURT:  That's fair.

8      That's fair.

9           MR. SEEGER:  So, ask him if

10      he can find the language that's

11      highlighted in Exhibit 20.

12           THE WITNESS:  I don't

13      understand that language.

14           MR. SEEGER:  (Addressing the

15      interpreter.)

16           Let me do it a different

17      way.  I'm going to mark on here,

18      if you can read this to him.

19      Would you please read to him in

20      Chinese the language I bracketed.

21           For people reading this in

22      English, the language I just asked

23      the interpreter to read from this

24      brochure on the second page is,

1           "We have a self-supported import

2           and export approval, our products

3           not only sell well in our domestic

4           market also export to many

5           countries" including -- I'm sorry,

6           for example, "U.A.E., Indonesia,

7           India, Russia, U.S.A.," et cetera.

8    BY MR. SEEGER:

9           Q.    It is more or less the same

10   language that we read from the prior

11   exhibit, correct, Mr. Jia?

12          A.    Yes.

13          Q.    Thank you.

14                Mr. Jia, on the second to

15   last page to this later created marketing

16   document, if you go to the second to last

17   page of this one, okay, that's the same

18   map that we looked at from the prior

19   document where it shows a line drawn from

20   China to America, correct?

21          A.    Yes.

22          Q.    Thank you, Mr. Jia.

23                Now, Mr. Jia, let me ask you

24   some questions on a different subject.

1    Who, if you know, is the controlling

2    party in CNBM?

3              MR. CYR:  Objection.

4              THE COURT:  It is a question

5         of who, if he knows.  I'll

6         overrule the objection.

7              THE WITNESS:  What is the

8         Chinese name of the complete name

9         in Chinese?

10             MR. SEEGER:  (Addressing the

11        interpreter.)

12             You have the glossary.  I

13        think we did this earlier on CNBM.

14        So, if you go to C.  I forgot.

15             MR. CYR:  You may need to

16        restate the question for him.

17             THE WITNESS:  I know this

18        company.

19   BY MR. SEEGER:

20        Q.   Do you know who owns the

21   controlling interest in CNBM?

22             MR. CYR:  Objection.

23             THE WITNESS:  I don't know

24        who are the controlling party of

1            the share of the company.

2    BY MR. SEEGER:

3            Q.    Did you ever hold any

4    positions in the past with CNBM?

5            A.    No.

6            Q.    Now, BNBM owns a majority

7    interest in TG, correct?

8            A.    I don't understand your

9    concept of majority interest.  I only

10   know numbers.

11           Q.    Okay.

12                 So, of all the stock

13   outstanding in TG, BNBM owns the majority

14   stake?

15                 MR. CYR:  Objection.

16                 THE COURT:  Why don't you

17           ask him the percentage.  It is 65

18           percent, as I understand it.

19                 MR. CYR:  I just want to --

20           just to be clear for the record,

21           Your Honor, as I believe that the

22           records reflect and his testimony

23           reflects that BNBM has owned 43

24           percent of the stock since April

1         of 2005, and then in the summer of

2         2006 --

3              MR. GONZALEZ:  Your Honor --

4              MR. CYR:  Excuse me.  Excuse

5         me.

6              MR. GONZALEZ:  I'm sorry to

7         interrupt.

8              MR. CYR:  In the summer of

9         2006 --

10             MR. GONZALEZ:  These

11        speeches are inappropriate.

12             THE COURT:  No.  I'm not

13        going to --

14             MR. CYR:  In the summer of

15        2006, they purchased the stock of

16        Donglian, and so they have an

17        indirect interest in that 23

18        percent.  Thank you.

19             THE COURT:  All right.  You

20        don't need to translate that.

21             MR. CYR:  (Addressing Mr.

22        Gonzalez.)

23             Don't interrupt me when I'm

24        talking.

```
 1                  MR. GONZALEZ:  Your Honor --

 2                  THE COURT:  Wait, wait,

 3          wait.

 4                  MR. GONZALEZ:  That's

 5          getting out of hand.

 6                  THE COURT:  Yes, look.

 7          Let's not talk to each other,

 8          please.  Talk to me.

 9                  Ask the question.

10   BY MR. SEEGER:

11          Q.    BNBM owns 42 percent of TG.

12   Is that what the testimony was, Mr. Jia?

13          A.    Yes.

14          Q.    And BNBM also owns 100

15   percent interest in another company

16   that -- BNBM owns 100 percent interest in

17   Taian Donglian, who also owns an interest

18   in TG, correct, Mr. Jia?

19          A.    I don't understand.  Can you

20   repeat?

21          Q.    Yes.

22                  BNBM also owns 100 percent

23   of Taian Donglian Investment Trading

24   Company, correct?
```

1          A.    Taian Donglian?  This

2    company has already been relocated to

3    Beijing and changed its name.

4          Q.    But BNBM owns 100 percent of

5    this company, correct, Mr. Jia?

6          A.    I believe that was before

7    2008.

8          Q.    Do you have an understanding

9    that that is different today, that BNBM

10   does not own 100 percent of Taian

11   Donglian?

12         A.    No, that's not what I meant.

13         Q.    So I just want -- just for

14   the record, I just want to be clear, sir.

15   I'm going to do it again.

16               BNBM owns 42 percent, I

17   believe, or 43 percent of TG, correct?

18         A.    BNBM owns 42 percent of TG.

19         Q.    Taian Donglian owns 23

20   percent of TG, correct?

21         A.    In the year 2008, that's

22   correct.

23         Q.    And BNBM owns 100 percent of

24   Taian Donglian, correct?

1        A.     Before 2008, that's correct.

2        Q.     Now, how has it changed

3   since 2008?

4        A.     It's moved, it's relocated

5   to Beijing.  After it's relocated

6   Beijing, I'm not sure whether it sold its

7   share or sold its share partially.

8        Q.     You don't know one way or

9   another?  I just want to be clear.

10        A.     Or they did not share their

11   share at all.  I knew none of those.

12        Q.     You're not sure?  I just

13   want to be clear on what you testified

14   to.

15        A.     I'm not sure.

16        Q.     Now, TG owns 100 percent of

17   TTP and always has, correct?

18        A.     Can you repeat?

19        Q.     TG owns 100 percent of TTP

20   and always has?

21        A.     Correct.

22        Q.     And BNBM, during the time

23   frame of, let's say, 2006 to 2009, was

24   able to elect -- of a five-person board

1    in TG, BNBM got to pick three of the

2    board members, correct?

3            A.      Three what?

4            Q.      Board members.

5            A.      No.

6            Q.      Okay.  So, tell me how it

7    works then.

8            A.      You mean three directors or

9    three shareholders?

10           Q.      I think I understand the

11   confusion now.

12                   TG has a board of five

13   directors, correct?

14           A.      Yes.

15           Q.      BNBM gets to pick three of

16   those five directors, correct, Mr. Jia?

17           A.      Yes.

18           Q.      One of the --

19                   Of the two remaining

20   directors, you get to pick one of the

21   remaining directors, right?

22           A.      No, I didn't pick that one.

23           Q.      You don't get to pick any of

24   the board members on TG?  Or directors,

1    let's use the word "directors."

2           A.    No.

3           Q.    I thought you testified

4    earlier that one director gets appointed

5    by you and TG together?

6           A.    It was the Taian Asset

7    Management Company in TG picked one of

8    the directors.  The person is called Xu

9    Xinghu at the time, and later it was

10   changed to Shang Zianming.  And then it

11   is changed to Zhon Chanxing.  It has

12   changed three times.

13          Q.    So, that accounts for four

14   directors.  How does the fifth director

15   get picked?

16          A.    Anxin Investment Company and

17   I myself had picked me as the director.

18          Q.    And you hold the position on

19   the board of BNBM and on TG, correct, Mr.

20   Jia?

21               MR. CYR:  Objection, vague.

22          Wait for the judge to rule.

23               THE COURT:  I'll overrule

24          that.  I don't see that being

1              vague.

2                   THE WITNESS:  For a period

3              of time, yes.

4    BY MR. SEEGER:

5         Q.    Tell us the period of time

6    that you're referring to?

7         A.    I have been the director for

8    BNBM and TG ever since the second half

9    year of 2006 up to today.

10        Q.    Okay.  Thank you, Mr. Jia.

11              I want to be clear also

12   about some earlier testimony you gave.  I

13   believe you had testified that TG's

14   drywall is a low to middle end product,

15   whereas BNBM makes a high end product.

16   Do I have that testimony correctly?

17                   INTERPRETER:  Interpreter

18              clarification.

19                   THE WITNESS:  There are not

20              much differences among high end,

21              middle -- medium end and low end

22              products.  They all had to pass

23              the national standard to be

24              delivered.

1              BNBM, together with Lafarge,

2        Knauf and BPB, had been one of the

3        earliest companies that produced

4        gypsum board, so, in the view of

5        the customers, they had better

6        products.  In the general view of

7        the customers, that the products

8        produced by other companies

9        afterwards were medium-end or

10        low-end products.

11   BY MR. SEEGER:

12        Q.    But, Mr. Jia, BNBM and TG

13   actually own plasterboard production

14   plants together, don't they?

15              INTERPRETER:  Interpreter

16        clarification.  You said plastic

17        board?

18              MR. SEEGER:  Plasterboard.

19        Drywall.

20              THE COURT:  Drywall.

21              MR. SEEGER:  Drywall, sorry.

22              MR. CYR:  Objection.

23              THE COURT:  During which

24        area, during which time?

1    BY MR. SEEGER:

2           Q.    Let's say 2005 to 2007.

3           A.    What do you mean by that?

4           Q.    Well, BNBM and TG are

5    actually joint venture partners in

6    certain drywall production plants; isn't

7    that true?

8           A.    No.

9           Q.    That's not true?

10          A.    No.

11          Q.    So, for your attorney, we're

12   going to look at -- oh, here it is.  The

13   English version is TG 0020682 through

14   685.

15                       -   -   -

16                (Whereupon, Deposition

17          Exhibit Jia-22A, Document in

18          Chinese, Bates stamped TG 0020682

19          through TG 0020685, and Deposition

20          Exhibit Jia-22B, Resolution of the

21          4th Extraordinary General Meeting

22          of Shareholders for the Year of

23          2005 of Shandong Taihe Dongxin

24          Co., Ltd., Bates stamped TG

```
 1          0020682 through TG 0020685, were

 2          marked for identification.)

 3                    -  -  -

 4          MR. SEEGER:  It's 22.  22A

 5      and B.  Sorry.

 6          MR. CYR:  So, is it okay if

 7      we just show him --

 8          MR. SEEGER:  I'm going to

 9      give him the Chinese and the...

10          (Handing over document.)

11          MR. CYR:  There's no need to

12      interpret this unless the judge

13      orders you to.  Just so the record

14      is clear, what number exhibit are

15      we now looking at?

16          MR. SEEGER:  What I just

17      marked as 22A and B is what you've

18      got in your hand, right?  It

19      should be the Resolution of the

20      4th Extraordinary General Meeting

21      of Shareholders for the year 2005

22      of Shandong Taihe Dongxin.  22A

23      and B.

24          MR. CYR:  For 22A and B that
```

1          he was shown this morning, it says

2          the third meeting of the third

3          board of directors?

4               MR. SEEGER:  I'm not looking

5          at your exhibits.

6               MR. CYR:  That's what I'm

7          trying to clarify.

8               MR. SEEGER:  Oh, no, no, no.

9          This is our exhibit.  We marked

10         this.  Yeah, I see.  You already

11         premarked it.  I gotcha.  No, I

12         just marked it again.

13              MR. CYR:  Sorry.

14              MR. SEEGER:  That's okay.

15              MR. CYR:  We're ready to go.

16              MR. SEEGER:  We're all good?

17              Judge, do you have it?

18              THE COURT:  Yes.

19              MR. SEEGER:  All right.

20    BY MR. SEEGER:

21         Q.   Mr. Jia, please take a

22    moment to familiarize yourself with this.

23    Can I just ask you a clarifying question

24    before you look at this?

1                    Do you have any marketing

2    materials that you have either produced

3    in the litigation or that you have

4    anywhere where you describe BNBM as a

5    competitor to TG in the sale of drywall?

6            A.    I have not made such

7    statements in documents, because in doing

8    so would affect the relationship among

9    the shareholders.

10           Q.    So, Mr. Jia, let's take a

11   look at what we just marked, which is the

12   "Resolution of the 4th Extraordinary

13   General Meeting of Shareholders."  Mr.

14   Jia, you attend these meetings, right?

15           A.    Yes.

16           Q.    By the way, just by way of

17   reference, does this document tell you

18   where this meeting occurred?  It's on the

19   top.

20           A.    BNBM conference room.

21           Q.    So, this is a meeting of the

22   TG shareholders, correct?

23           A.    Yes.  Original name was

24   that.

1          Q.    It is in a conference room

2    at BNBM, just to be clear?

3          A.    Yes.  It was a temporary

4    shareholders' meeting once.

5          Q.    Only once?

6          A.    I don't recall exactly how

7    many times have we held meeting.

8          Q.    It is more than once,

9    though, right, Mr. Jia?

10         A.    I'm not sure.

11         Q.    Mr. Jia, just take a moment

12   to refresh your recollection of this

13   document, but this indicates a couple of

14   joint venture projects between BNBM and

15   TG, correct?

16         A.    Uh-huh.

17         Q.    "Uh-huh" means yes?

18         A.    I see it.  I see it.

19         Q.    Okay.  Thank you.

20               And the projects that are

21   being described, the way they are

22   described in this document is "to

23   construct the annual 10 million square

24   meters plasterboard production Project in

1    Tianping Town," and then it describes it

2    is in the Yunnan Province, correct?

3          A.    Yes.

4          Q.    And it indicates that Taihe,

5    which is TG, is going to pay 80 percent

6    of the costs, and BNBM will pay 20

7    percent of the costs, correct?

8          A.    That's not the expense.

9    That's the investment percentage.

10         Q.    Okay.  Thank you for the

11   correction.

12               And then the second project,

13   it says, will "construct the annual 12

14   million square meters plasterboard

15   production project in Xiantgan City."

16               And again, this is divided,

17   the percentages are divided 80 percent to

18   TG, 20 percent to BNBM, correct?

19         A.    Correct.

20         Q.    Now, if you go to the

21   signature page of this document, you see

22   where it says "For BNBM," there's a

23   signature of somebody by the name of Cao

24   Jianglin.  Did I read that correctly,

1   sir?

2          A.    Rather it should be Cao

3   Jianglin, C-A-O, last name, first name,

4   J-I-A-N-G-L-I-N.

5          Q.    Correct, thank you.

6                Now, Mr. Cao was a signatory

7   for BNBM on this document, correct?

8          A.    Not Mr. Cao, but Mr. Cao.

9          Q.    Oh, I'm sorry.  I'm sorry.

10  Mr. Cao.

11               INTERPRETER:  C-A-O, Cao.

12          Cao is spelled C-A-O, C-A-O.

13               MR. SEEGER:  I'm going to

14          show the interpreter, Judge, if

15          it's okay, because we have the

16          translation.  I just want to make

17          sure I've got the --  see how the

18          translator here --

19               INTERPRETER:  It is Cao.

20          The Chinese pronunciation is Cao,

21          not Cao.  The C is pronounced

22          as --

23  BY MR. SEEGER:

24          Q.    Can we just confirm that

1    that is, in fact, the same person that

2    signed in Chinese?  I don't know if

3    that's the right -- could that be the

4    same person?

5          A.    According to the Chinese

6    phonetics, yes.

7          Q.    So, I should say Cao

8    Jianglin?

9          A.    Cao.

10          Q.    Got it.  I apologize.

11                Mr. Cao Jianglin signed for

12    BNBM in this document, correct, sir?

13          A.    Correct.

14          Q.    Mr. Cao Jianglin at one time

15    also served on the board of TG; isn't

16    that true?

17          A.    No.

18          Q.    Was he ever a supervisor?

19          A.    Of course not.

20          Q.    Did he hold any --

21                MR. CHEN:  Are you using

22          "supervisor" as the term from

23          board of supervisors?  Because

24          that's a defined term, as opposed

```
 1          to just a supervisor meaning

 2          somebody who is --

 3                MR. SEEGER:  I gotcha.

 4          Okay.

 5  BY MR. SEEGER:

 6          Q.    Let me ask it this way.

 7                Mr. Jia, did Mr. Cao ever

 8  hold a position with TG that you know of?

 9          A.    Yes.

10          Q.    What position was that, sir?

11          A.    The chief supervisor of the

12  board of supervisors.

13          Q.    And Mr. Cao also at some

14  point had held a position with CNBM,

15  correct?

16          A.    What company was that?

17          Q.    CNBM.

18                MR. SEEGER:  You have the

19          guide there.

20                THE WITNESS:  Yes.

21  BY MR. SEEGER:

22          Q.    Mr. Cao at one point in time

23  also held a position with BNBM America,

24  correct, Mr. Jia?
```

1           A.     I don't know.

2           Q.     Mr. Jia, you signed here on

3    behalf of yourself, correct?

4           A.     Yes.

5           Q.     And you signed on behalf of

6    Taian Anxin Investment & Trade Company,

7    correct?

8           A.     Yes.  Anxin Company, rather.

9           Q.     Thank you for the

10   correction.

11                 Now, with regard to these

12   joint venture projects that BNBM and TG

13   did together, did they share the

14   production in plasterboard or drywall

15   that came out of those plants?

16                 MR. CYR:  Objection.  Don't

17           answer until the judge rules.

18                 THE COURT:  I'll overrule

19           the objection.  If he doesn't

20           understand it, he can say, and you

21           can clarify it on redirect.

22                 THE WITNESS:  Can you

23           clarify?  I don't quite

24           understand.

1    BY MR. SEEGER:

2         Q.   So, these joint venture

3    projects that BNBM and TG had gone into

4    together that's referenced in the

5    resolution, did both companies share in

6    the production or get the benefit from

7    these plasterboard production plants?

8              MR. CYR:  Same objection.

9              You can answer, Mr. Jia.

10             THE COURT:  Overrule the

11        objection.

12             THE WITNESS:  They share the

13        benefit together, but they did not

14        produce together.  TG was in

15        charge of the production

16        management.

17             I would like to take this

18        opportunity to further explain, if

19        I may, Your Honor, and attorneys.

20             THE COURT:  You can do so.

21             THE WITNESS:  In the year

22        2005, the company law of China

23        remained the same, which was no

24        change.  The old company law

1           states that no company can have

2           100 percent of a limited company's

3           share.  It has to be shared by two

4           or more shareholders.  So, when we

5           established two subsidiaries, we

6           had to find two shareholders.  Of

7           course, the company itself should

8           have the majority of stocks.  The

9           company TG --

10              INTERPRETER:  Interpreter

11          clarification.

12              THE WITNESS:  One company

13          was established by TG.  In other

14          such, in the background of the

15          law, it was not beneficial to

16          attract other investors.  So, we

17          attracted investment from BNBM for

18          a 20 percent share and a 5 percent

19          share.  As far as I can remember,

20          the new company law was issued in

21          2008.  The new company law states

22          that it is okay to establish a 100

23          percent exclusively-owned company

24          owned by one shareholder.

1                    I would like to make a

2          correction.  Perhaps as after the

3          year 2006, for one stockholder to

4          share 100 percent of a certain

5          company became approved.  After

6          that time, all the companies

7          Taishan Gypsum had established had

8          been exclusive invested company.

9          That explains why TTP has been a

10         100 percent owned, exclusive owned

11         company, but not the companies

12         before that time.  According to

13         the document, the two companies'

14         production sales and their

15         combined report has always been

16         under the control of TG.

17                    THE COURT:  Let's ask

18         another question.

19    BY MR. SEEGER:

20         Q.    Now, Mr. Jia, you

21    understand, don't you, that when -- that

22    BNBM from time puts out like an annual

23    report of its financial situation.  Are

24    you aware of that?

1               MR. CYR:  Objection.

2               THE COURT:  You want to put

3          in time?

4    BY MR. SEEGER:

5          Q.   I mean, since 2006, each and

6    every year, BNBM reports its financial

7    status to the corporate world?

8               MR. CYR:  Objection.

9               THE COURT:  I'll overrule

10          the objection.

11              THE WITNESS:  Can you

12          clarify your question?  I don't

13          understand.

14   BY MR. SEEGER:

15         Q.   Yes.  For example -- I'll

16   try to get you an example of what I'm

17   talking about.

18              THE COURT:  Let's take a

19          break at this time, and we can

20          find our material.  Fifteen

21          minutes.

22              THE VIDEOTAPE TECHNICIAN:

23          We're going off the record.  The

24          time is 3:33 p.m.

```
 1                    -  -  -

 2              (Whereupon, a recess was

 3         taken from 3:33 p.m. until

 4         3:46 p.m.)

 5                    -  -  -

 6              THE VIDEOTAPE TECHNICIAN:

 7         We're back on the record.  The

 8         time is 3:46.  This is the

 9         beginning of Tape Number 6.

10                    -  -  -

11              (Whereupon, Deposition

12         Exhibit Jia-23, China National

13         Building Material Company Limited

14         Overseas Regulatory Announcement,

15         Bates stamped Q000155 through

16         Q000223, was marked for

17         identification.)

18                    -  -  -

19   BY MR. SEEGER:

20         Q.    Mr. Jia, I'm marking Jia

21   Exhibit Number 23, which I'm going to

22   hand to you.  It is an announcement by

23   CNBM of BNBM's financial results for

24   2009.
```

1              MR. HARDT:  Do you have a

2         Bates number?

3              MR. SEEGER:  There isn't a

4         Bates number.

5              MR. GEORGE:  Q 155.

6              MR. SEEGER:  Oh, is that how

7         they did it?

8    BY MR. SEEGER:

9         Q.    As far as I know, there

10   isn't -- when these are made, they are

11   not made in Chinese.  They are published

12   in English by CNBM.

13             Mr. Jia, this document

14   purports to be CNBM's announcement of

15   BNBM's financial status as of 2009.  It

16   is the summary of the 2009 annual report,

17   if that can be pointed out to you.

18             MR. CYR:  What's the

19        question?

20   BY MR. SEEGER:

21        Q.    Now, Mr. Jia, are you aware

22   that CNBM reports the financial results

23   of BNBM?

24        A.    I don't know.

1          Q.    And, I mean, would it help

2    or would you know that when those results

3    are reported, they also report TG's

4    financial status as being part of

5    BNBM's -- you know, under BNBM's

6    financial umbrella?

7                MR. CYR:  Objection.

8                THE COURT:  Do you

9          understand the question?

10                THE WITNESS:  No.

11                THE COURT:  Restate it.

12    BY MR. SEEGER:

13          Q.    So, Mr. Jia, what I'm saying

14    is, do you have an understanding one way

15    or another that when CNBM reports BNBM's

16    financial results, they also report TG's

17    drywall production and, you know, their

18    financial results as well?

19                MR. CYR:  Objection.

20                THE COURT:  I'll overrule

21          the objection and let him answer

22          if he knows.

23                THE WITNESS:  I'm not sure.

24          But what I do know is that CNBM

1          owns 52 percent of BNBM's share.

2          I'm not sure about their financial

3          arrangements.

4     BY MR. SEEGER:

5          Q.    But what I'm asking you is,

6     are you aware that when CNBM reports

7     BNBM's financial status, they include in

8     that TG's financial status as well?

9          A.    I'm not sure about that.

10          Q.    Okay.

11          Because, Mr. Jia, the reason

12     I ask you this is because you also sit

13     on, you are a board member in BNBM,

14     correct?

15          A.    Like I said before, I'm only

16     an honorary deputy general manager or

17     director of BNBM.  And I had no share

18     with BNBM nor had any individual assets

19     with BNBM.  So, I'm not concerned about

20     the business of BNBM.  For a long period

21     of time, my focus was Taian TG Company

22     which headquarter is located in Taian,

23     which is far away from Beijing.  So, I

24     rarely participate in the business of

1    BNBM, even though I might have attended

2    the board of directors meeting once or

3    so.

4            Q.    Your testimony today,

5    because I asked you about this in April,

6    is that you attended one BNBM board

7    meeting?  I just want to be clear.

8            A.    Correct.

9            Q.    One BNBM board meeting.

10   Okay.

11              But you attend all the board

12   meetings of TG, correct?

13           A.    Yes.

14           Q.    And so BNBM is the -- we

15   established this earlier -- has a

16   significant position within TG as a

17   shareholder and in appointing board

18   members, correct?

19           A.    I don't quite understand

20   you.

21           Q.    Mr. Jia, who is reporting

22   TG's financial information to BNBM, if

23   you know, so that it can be reported by

24   CNBM?

```
 1           A.    Our financial department.

 2           Q.    But you're the chairman of

 3    TG also, correct, sir?

 4           A.    Yes.

 5           Q.    So this isn't being done

 6    behind your back, you're aware that

 7    financial information is being provided

 8    to BNBM, correct, sir?

 9                MR. CYR:  Objection.

10                THE COURT:  Overrule the

11                objection.

12                THE WITNESS:  As the

13                chairman of the board of

14                directors, I prepare annual report

15                for the board of directors and the

16                board of shareholders for the

17                Taishan Gypsum Company for its

18                performance of the year before and

19                to make an introduction of the

20                upcoming year's plan in order to

21                gain support of the shareholders.

22    BY MR. SEEGER:

23           Q.    And, Mr. Jia, are you aware

24    that the results that you provide to BNBM
```

1    are reflected in their own financial

2    statements?

3                    INTERPRETER:  Interpreter

4              clarification.  Reflected in their

5              own --

6                    MR. SEEGER:  In BNBM's

7              financial statements.

8                    THE WITNESS:  I'm not a

9              financial expert.  I started off

10             as an engineer.  I think the

11             director of finance should know

12             the information.

13   BY MR. SEEGER:

14        Q.    Doesn't that person report

15   to you, Mr. Jia, the director of finance?

16        A.    This director of finance

17   reports to me annually of the costs and

18   profit, but he does not report to me how

19   does the profit and other matters of TG

20   reflects on the financial report of

21   CNBM -- BNBM.

22        Q.    Are you -- go ahead.  I'm

23   sorry.

24                    INTERPRETER:  Interpreter

1           clarification.

2                THE WITNESS:  BNBM owns 42

3           percent of Taishan Gypsum Company

4           and Donglian, which is part of

5           BNBM, owns TG's 23 percent of the

6           share.  And BNBM -- CNBM, excuse

7           me, owns BNBM's 52 percent of the

8           share.  I believe you should check

9           with a financial expert as of how

10          they combine the financial report

11          together.

12     BY MR. SEEGER:

13          Q.   Mr. Jia, what

14     responsibility, what role do you play in

15     the preparation of financial statements

16     or financial information that go to BNBM?

17          A.   I'm not responsible for it.

18          Q.   But what role do you play,

19     if any?  You participate in the

20     preparation of the statements.  Do you

21     review them?  What role?

22          A.   I don't play any role at

23     all.

24          Q.   So, the chairman of the

1    company plays no role in reporting

2    financial information to the owner of the

3    company?

4              MR. CYR:  Objection.

5              THE COURT:  I'll allow it.

6         Overruled.  And let's move on

7         after this.

8              THE WITNESS:  I think this

9         is a rather vague question I

10        cannot answer.

11   BY MR. SEEGER:

12        Q.   Mr. Jia, one last thing.

13             Would you agree with the

14   statement where BNBM reports Taishan

15   Gypsum Company as a holding subsidiary of

16   BNBM?  Do you agree with that?

17        A.   Yes.

18             MR. SEEGER:  For the record,

19        I'm marking Q 10.

20             MR. CYR:  Is this the new

21        one?

22             MR. GEORGE:  No.

23             MR. CYR:  We're good to go.

24             MR. SEEGER:  For the record,

1          we've marked Jia-24.  That's Q 10.

2                    -  -  -

3               (Whereupon, Deposition

4          Exhibit Jia-24, China National

5          Building Material Company Limited

6          Connected Transaction, Acquisition

7          of the Entire Equity Interest in

8          Taian Donglian Investment Trading

9          Company Limited; Connected

10         Transaction, Provision of

11         Financial Assistance to Taian

12         State Owned Assets Management

13         Group, Bates stamped Q000010

14         through Bates stamped Q000012, was

15         marked for identification.)

16                    -  -  -

17  BY MR. SEEGER:

18         Q.    Mr. Jia, do you, from time

19  to time, review statements like this made

20  by CNBM about, you know, acquisitions or

21  business that involves TG?

22         A.    I have never seen this

23  document before.

24         Q.    Let me ask you if you agree

1  with this statement in this announcement

2  by CNBM.  It says, "Following BNBM's

3  acquisition of the 42% equity interest of

4  Taihe, the Company has become the largest

5  producer of gypsum boards in the PRC.

6  The acquisition also has enhanced the

7  Company," meaning BNBM's, "ability to

8  serve a broader base of customers.  The

9  directors of the Company," BNBM, "believe

10  that the Acquisition will enable CNBM

11  Group to further enhance its

12  competitiveness and consolidate its

13  leading position in the PRC gypsum board

14  market as it will participate more

15  actively in the daily operations and

16  management of Taihe" -- what does that

17  say there?

18           MR. GEORGE:  "With a view"?

19  BY MR. SEEGER:

20      Q.    -- "with a view to improving

21  its" productivity -- "profitability."

22           MR. SEEGER:  I know that's a

23           long one, but you will have to

24           translate for him.

1            MR. CHEN:  No.  That's CNBM

2        Group, not CNBM.  The second one.

3        CNBMG, CNBM Group.

4            THE INTERPRETER:  This is

5        the second?

6            MR. CYR:  No.  This one.  It

7        says the Group, (indicating), the

8        one that has the G there.

9            Objection.

10            THE COURT:  I'll overrule

11        it.

12  BY MR. SEEGER:

13        Q.    Do you agree with the

14  statement that was just read to you, made

15  by CNBM?

16        A.    I disagree.

17        Q.    Just as the chairman of TG,

18  how would you handle this disagreement

19  that you have with a public statement

20  made by CNBM about your company?

21            MR. CYR:  Objection.

22            THE COURT:  What's the

23        question?  How would he handle it?

24            MR. SEEGER:  Yes.  I mean,

1          he says he disagrees with a public

2          statement made by a company about

3          TG.  I mean, is it --

4                  MR. CYR:  The judge needs to

5          rule on the objection.

6                  THE COURT:  I'll overrule

7          the objection.

8                  What's your answer?

9                  THE WITNESS:  This report is

10         an advertisement serving the

11         purpose of attracting the eyeballs

12         of the shareholders to buy their

13         share.  After BNBM had purchased

14         42 percent of TG's share, it is

15         nothing but only a shareholder.

16         In the production and operation of

17         the business, all of it should be

18         in accordance with company law.

19         Since 2005 up until today,

20         Taishan's business operation has

21         been in compliance with company

22         law to have management and

23         decision-making people.  As it

24         says that they have control of the

```
 1        daily operation, it is neither

 2        legal nor reasonable, and also it

 3        is impossible to do.  I called to

 4        raise my objection to this.

 5   BY MR. SEEGER:

 6        Q.    Who did you call, Mr. Jia?

 7        A.    Cao Jianglin.

 8        Q.    Was anything done about it?

 9        A.    No.

10             MR. SEEGER:  I just have a

11        couple more questions, Judge, if

12        you can tolerate a little bit

13        here.

14                  -  -  -

15             (Whereupon, Deposition

16        Exhibit Jia-25, China National

17        Building Material Company Limited

18        Overseas Regulatory Announcement,

19        Bates stamped Q000975 through

20        Q000981, was marked for

21        identification.)

22                  -  -  -

23   BY MR. SEEGER:

24        Q.    Mr. Jia, I want to hand to
```

1   you to what we just marked as Jia Exhibit

2   25.  For the record, it's Q 975 through

3   981.

4              Mr. Jia, I want to ask you

5   just a few more questions, all right, and

6   then we'll leave you alone.

7              When I asked you questions

8   back in April, you testified that you

9   could not calculate the amount of drywall

10  that had been exported to the US by TG.

11  Do you recall that testimony?

12         A.    I said I was not sure about

13  it.  I was not sure.

14         Q.    Well, we can find your

15  testimony.

16             MR. SEEGER:  (Addressing

17         co-counsel.)  Why don't you dig

18         that out.

19  BY MR. SEEGER:

20         Q.    But let me move on to my

21  point.  What I've just marked as an

22  exhibit in front of you is an

23  announcement again by CNBM on behalf of

24  BNBM and TG regarding the litigation in

1    the U.S. over Chinese drywall.  Have you

2    ever seen this before in either English

3    or Chinese?

4            A.    No.

5            Q.    Has anybody ever brought

6    this to your attention in preparation for

7    your deposition, this announcement?

8            A.    No.

9            Q.    In this report, in this

10   announcement by CNBM, on behalf of BNBM

11   and TG, they specifically state the

12   amount of drywall that was shipped to the

13   US.  And my question to you is, as the

14   chairman of TG, how did they get this

15   information, if not from you?

16               MR. CYR:  Objection.

17               THE COURT:  If he knows, he

18          can testify.  If he doesn't know,

19          he just has to say I don't know.

20               THE WITNESS:  I cannot

21          speculate.

22   BY MR. SEEGER:

23          Q.    Is there anybody in TG who

24   could answer that question, how BNBM gets

 1   this information?

 2          A.    I'm not sure for now.

 3          Q.    You signed off on the fact

 4   sheet that was produced in this

 5   litigation on behalf of TG.  It's your

 6   signature on that fact sheet, correct?

 7               MR. SEEGER:  I don't know

 8          how you explain it to him.

 9   BY MR. SEEGER:

10          Q.    It's a manufacturer's

11   profile form.

12          A.    What form?  I'm not aware of

13   that.

14          Q.    That's all right.  Strike

15   it.

16               MR. SEEGER:  Judge, if I

17          could take like a five-minute

18          break, I can probably boil this

19          down to another five minutes, or a

20          two-minute break.

21               THE COURT:  Let's take just

22          a couple-minute break.

23               THE VIDEOTAPE TECHNICIAN:

24          Going off the record.  The time is

1           4:12.

2                    -   -   -

3              (Whereupon, a recess was

4         taken from 4:12 p.m. until

5         4:17 p.m.)

6                    -   -   -

7              THE VIDEOTAPE TECHNICIAN:

8         This is the beginning of Tape

9         Number 7.  We're going back on the

10        record at 4:17.

11   BY MR. SEEGER:

12        Q.   Mr. Jia, let me ask you to

13   take one more -- I just have a couple of

14   follow-up questions about Exhibit Jia-13.

15              MR. SEEGER:  Now, Ms.

16        Interpreter, can you turn to the

17        page where there's Chinese

18        writing?  I think it's the third

19        page.

20   BY MR. SEEGER:

21        Q.   Mr. Jia, there's Chinese

22   writing at the top, and below it there's

23   writing in English.  And I want you to

24   tell me if you agree that the English --

 1   that the Chinese version that's on there

 2   says what the English version says.  In

 3   English, it says, "TAIAN TAISHAN

 4   PLASTERBOARD CO., LTD. certifies that

 5   ORIENTAL TRADING Company, LLC as its

 6   exclusive agency for the DUN brand in the

 7   United States of America."

 8              Does it say that in Chinese?

 9        A.    That's what it says in the

10   Chinese.

11        Q.    Thank you.  I'm done with

12   that.

13              Mr. Jia, from the time frame

14   of 2006 to the present, TG has maintained

15   a website, correct?

16        A.    Our company has a website

17   for others to obtain information from.

18        Q.    About your products,

19   correct, sir?

20        A.    Correct.

21        Q.    Mr. Jia, I just have a few

22   more questions for you.

23              MR. SEEGER:  Let's mark

24         these.

```
 1                    - - -
 2              (Whereupon, Deposition
 3         Exhibit Jia-26, Taishan 2006
 4         STRUCTURE - Pre Global Offering,
 5         August 4, 2011 Mtg., Bates stamped
 6         Q000953 and Q000954, was marked
 7         for identification.)
 8                    - - -
 9   BY MR. SEEGER:
10         Q.   Mr. Jia, I want to hand you
11   an organizational chart.  The words on
12   the chart are in English.  The names of
13   the companies are in English, but in the
14   glossary of terms, we have the Chinese
15   names.  I would like to know if you can
16   tell me if this is consistent with your
17   understanding of the organizational
18   structure that I'm showing you.
19              I'm marking this as Jia-26,
20   and it is Q 953 through 954.
21              INTERPRETER:  Do you want me
22         to interpret it to Mr. Jia?
23              MR. SEEGER:  If you can,
24         yeah.  And you have the glossary
```

1          of names there?

2                    INTERPRETER:  Yes.

3                    MR. CHEN:  I'll note for the

4          interpreter this actually says

5          BNBM Group, not BNBM.

6                    INTERPRETER:  BNBM --

7                    MR. CHEN:  Group.

8                    MR. CYR:  And state for the

9          record your point.

10                    MR. CHEN:  For the record,

11          I'm pointing to the third line,

12          the small square on the far left.

13                    MR. BLACK:  What's the Bates

14          number on this one?

15                    MR. GEORGE:  Q 953.

16                    INTERPRETER:  Where does it

17          say trading company?  Is it import

18          and export company, is this the

19          trading company?

20                    MR. CHEN:  CNBM Trading is

21          actually not on the defined list.

22                    MR. GEORGE:  The trading

23          company?

24                    INTERPRETER:  Mr. Chen, is

```
 1              Cinda, Cinda -- China Cinda Asset
 2              Management Company, is it the same
 3              company as shown on the glossary?
 4                   MR. CHEN:  I don't know for
 5              sure, actually.  I'm just looking
 6              at this document.
 7                   MR. SEEGER:  Hold on.  This
 8              looks like it's turning into a big
 9              complicated thing.  I think
10              that we could -- can we submit
11              this to you in the form of
12              Interrogatories and just get
13              answers from you that way after
14              the deposition?  That might be the
15              easiest way to do it than to sit
16              here with the witness and make
17              them look at it.
18                   MR. CYR:  Based on the
19              information that's recently
20              available to TG or TTP, yes.
21                   MR. SEEGER:  We'll accept
22              that.  That's fine.  We can take
23              that.  Ervin, do you want to sit
24              down there or you want to stay
```

1          there?

2                  Thanks for your patience.

3          Thank you, Mr. Jia.  Thank you,

4          Mr. Cyr.

5                  THE COURT:  Ready?

6                  MR. GONZALEZ:  Yes.

7                  THE COURT:  You may proceed.

8                     -  -  -

9                  EXAMINATION

10                    -  -  -

11  BY MR. GONZALEZ:

12          Q.   Good afternoon, sir.  I'm

13  Ervin Gonzalez on behalf of the MDL

14  liaison states.  Pleasure to meet you.

15                  Mr. Jia, my understanding is

16  that since 2006 to the present, you have

17  been on the board of directors of TG and

18  BNBM; is that correct?

19          A.   Starting from what time?

20          Q.   2006.

21          A.   Yes.

22          Q.   And currently you're being

23  presented as a spokesperson on behalf of

24  TG and TTP, correct?

1          A.     Yes.

2          Q.     TTP and TG have the same

3     address, correct?

4          A.     What's the definition of

5     address?

6          Q.     The information you put on

7     an envelope when you want to mail

8     something to one of the companies would

9     be the same?

10          A.     Correct.

11          Q.     And they both have the same

12     phone number, correct?

13          A.     I don't think they have the

14     same phone number.

15          Q.     Can you look at Exhibit 20,

16     please.

17               THE COURT:  Does he have the

18          exhibit?

19               MR. GONZALEZ:  Exhibit 20.

20               MR. CYR:  We just found one

21          version of -- is this the

22          document, sir, that you're looking

23          for?

24               MR. GONZALEZ:  Yeah.

1           Exhibit 20.

2                  MR. MONTOYA:  Yes.  That

3           would be the last version -- last

4           page.

5    BY MR. GONZALEZ:

6           Q.    If you could look at the

7    last page, this is the -- looking under

8    Shandong Taihe Dongxin, which is now

9    known as TG, correct?

10          A.    Yes.

11          Q.    The phone number listed here

12   is 0086-538-8812017, correct?

13          A.    Yes.

14          Q.    And if you'd look at Exhibit

15   15, do you have the e-mail?  If you'll

16   look at the e-mail number there,

17   underneath, it says, "From:  Peng."  And

18   Peng worked for TTP in 2007, correct?

19          A.    What time?

20          Q.    2007.

21          A.    Yes.

22          Q.    And if you look at the

23   number underneath where it says "Yours

24   faithfully, Frank, Taihe Group," the

1    number is 0086-538-8812017, correct?

2        A.    Yes.

3        Q.    That's the same number that

4    we had for TG, correct?

5        A.    Not completely same.

6        Q.    Okay.

7              It says 88, and I'm looking

8    now at Exhibit 20, and the phone number

9    is 8812017, correct?

10       A.    Part of their phone numbers

11   are the same, not in its entirety.

12       Q.    All right, sir.

13             The first four digits for

14   both are 0086, correct?

15       A.    Yes.

16       Q.    The next three digits for

17   both of them are 53 and 8, correct?

18       A.    Yes.

19       Q.    The final numbers for both

20   of them are 8811077, correct?  I'm sorry,

21   8812017?

22       A.    You have only read the same

23   number.  You have not read the different

24   numbers.

1          Q.    Sir, I'm reading the only

2    number that's listed as -- what exhibit

3    number is this?

4                The only number listed for

5    Exhibit 15 is 00865388812017, right, sir?

6          A.    Yes.

7          Q.    And that is with respect to

8    an e-mail from Mr. Peng, correct?

9          A.    It's in English.  I don't

10   understand.  But I believe it should be

11   him.

12         Q.    All right, sir.

13               And the first number that's

14   listed under the first exhibit that we

15   were discussing together, that is the

16   Shandong Taihe Dongxin Company, which is

17   now known as TG, Exhibit 20, is

18   0086-538-8812017, right, sir?

19         A.    Correct.

20         Q.    All right.

21               So, those numbers are the

22   same, right, sir?

23         A.    They have the same phone

24   numbers.  But this one has only one phone

1   number while the other one has a few

2   numbers.  After TTP was established, part

3   of the phone numbers have been separated

4   to the other company, which is natural.

5   There's nothing unnatural about that.

6           Q.   And if you'd look at Bates

7   stamp number TG 001482, which we'll mark

8   as the next exhibit number.

9               MR. BLACK:  What's the Bates

10          number again?

11              MR. GONZALEZ:  Bates stamp

12          number is TG 0001482.

13              MR. BLACK:  Thank you.

14                  -  -  -

15              (Whereupon, Deposition

16          Exhibit Jia-27, Contract, Bates

17          stamped TG 0001482 through TG

18          0001484, was marked for

19          identification.)

20                  -  -  -

21   BY MR. GONZALEZ:

22          Q.   This is a contract between

23   TTP and Wood Nation, Inc., and if you'd

24   turn to the back page, do you recognize

1  whose signature that is under Taian

2  Taishan Plasterboard?

3         A.    Yang Jaipo.

4         Q.    And he worked for TTP?

5         A.    I'm not sure in what period

6  had this person worked for TTP.

7         Q.    At some point in time, he

8  did work for TTP?

9              INTERPRETER:  Interpreter

10         clarify gender.

11              THE WITNESS:  Because of his

12         level and my level are very

13         different, so, I cannot be sure of

14         that.  I do not want to speculate.

15  BY MR. GONZALEZ:

16         Q.    Do you know if he worked for

17  TTP?

18         A.    I don't know.

19         Q.    How do you know him?

20         A.    Because when he get on --

21  when he got on and off his car, people

22  would greet him as Yang Jiapo.  He

23  purchased his own car, which is rare in

24  our company.  That's why I am aware of

1    this person.

2         Q.    So, you know him from seeing

3    him at work?

4         A.    Yes.  Because I've heard

5    other people saying that Yang Jiapo got

6    his own car.  Our company is poor.  He

7    was the first one who got his own car.

8    That's why I knew him.

9         Q.    So, if you look at the first

10   page of this Exhibit Number 27, please,

11   and you look at the telephone number, it

12   says 0086-538-8812002, correct?

13             MR. CYR:  Objection.

14             THE COURT:  If he doesn't

15        understand it, he can tell us.

16        Otherwise, I'm going to overrule

17        the objection.

18             THE WITNESS:  I understand

19        the Arab numerals.  Yes, that's

20        the correct number.

21   BY MR. GONZALEZ:

22        Q.    If you go back to Exhibit

23   Number 20, to the same page we were

24   looking at before, and you look under the

1    telephone number for Shandong Taihe

2    Dongxin now known as TG, you have the

3    number 8812002 listed under that,

4    correct?

5            A.    Yes.

6            Q.    So, the same phone number is

7    listed in Exhibit 20 as it is -- for TG

8    as it is for Exhibit 27 for TTP, correct?

9            A.    Yes.

10           Q.    And then looking at Exhibit

11   27, there's a slash, and then it says

12   2017, correct?

13           A.    Yes.

14           Q.    And if you go back to

15   Exhibit Number 20, the first number

16   listed under Shandong Taihe Dongxin now

17   known as TG is 8812017, correct?

18           A.    Yes.

19           Q.    Have you seen this contract

20   before, Exhibit 27?

21           A.    No.

22           Q.    Were you aware of its

23   existence?

24           A.    Which one?

1          Q.    Exhibit 20.  Were you aware

2    of its existence?

3                INTERPRETER:  20?

4                MR. GONZALEZ:  I'm sorry.

5          My apologies.

6    BY MR. GONZALEZ:

7          Q.    Were you aware of the

8    existence of Exhibit 27, the contract

9    between the Taian Taishan Plasterboard as

10   the seller, and Wood Nation Inc. as the

11   buyer?

12         A.    No.

13         Q.    Were you aware that drywall

14   in the amount of 1,386,000 US dollars

15   were being sold by TTP for discharge in

16   Tampa, Florida, United States of America?

17                MR. CYR:  This question

18         doesn't relate to this document.

19                INTERPRETER:  Oh, it's not

20         on the document?

21                THE WITNESS:  I don't know.

22   BY MR. GONZALEZ:

23         Q.    Were you aware that 500 40-

24   foot high cube container loads, each

 1   containing 660 pieces of drywall, were

 2   shipped to Tampa, Florida for product

 3   made by Taian Taishan Plasterboard?

 4              INTERPRETER:  Each container

 5         contained 660 pieces?

 6   BY MR. GONZALEZ:

 7         Q.    660 pieces, 500 40-foot high

 8   cube containers each containing 660

 9   pieces.

10         A.    I don't know.  Who are you

11   referring to when you say "Taishan"?

12         Q.    TTP.

13         A.    I don't know.

14         Q.    Is there a difference

15   between the drywall made by TTP in terms

16   of quality as the drywall made by

17   Taishan -- I'm sorry -- by TG?

18              MR. CYR:  Objection, time

19         period.

20   BY MR. GONZALEZ:

21         Q.    You may answer.

22              THE COURT:  Wait.  One

23         moment.

24              MR. GONZALEZ:  I'm sorry.  I

1          forgot The Court is here.

2                    THE COURT:  Let's put the

3          time in.

4    BY MR. GONZALEZ:

5          Q.    During the existence of the

6    corporation TTP, which I believe was

7    incorporated in 2007; is that right?

8          A.    No.  I believe it was 2006.

9          Q.    2006.  TTP is a wholly-owned

10   company by TG, correct?

11         A.    TG is the only shareholder

12   of TTP.  I don't understand what you

13   meant by "solely owned."

14         Q.    The only owner?

15         A.    Correct.

16         Q.    Taishan created -- I'm

17   sorry, TG created TTP to benefit from VAT

18   credits, right?

19                    INTERPRETER:  Interpreter

20         clarification.  To benefit from

21         what credits?

22   BY MR. GONZALEZ:

23         Q.    From VAT credits?

24                    INTERPRETER:  Value added

1          tax?

2                    MR. GONZALEZ:  Yes.

3                    THE WITNESS:  No.

4     BY MR. GONZALEZ:

5          Q.    I thought you testified

6     earlier that Taishan was created as a

7     result of having discussions with

8     individuals with the state government

9     that advised you that you could benefit

10    from VAT credits in terms of exemptions

11    if you created a corporation such as TTP?

12         A.    I don't think you have a

13    clear understanding of my prior answer.

14    You just said that the purpose of

15    establishing TTP is for TG to enjoy the

16    tax benefits.  That's not what I meant.

17                   MR. GONZALEZ:  Did you get

18         all of that?

19                   INTERPRETER:  Yeah.  Just

20         one moment.

21                   MR. CHEN:  FGD.

22                   INTERPRETER:  FGD.  Well,

23         I'll have to ask him to repeat.

24                   THE WITNESS:  Since 2006, TG

1           started using FGD synthetic gypsum

2           as the raw material to make gypsum

3           board.  From 2002, it enjoyed the

4           VAT benefit, but the taxation

5           institution did not allow TG to

6           issue VAT invoice even though it

7           enjoys the benefit of VAT.  But

8           some of the customers do request

9           the issuing of VAT invoices.  In

10          order to satisfy these customers,

11          we formed TTP, because TTP was

12          able to issue VAT invoices.  I

13          don't know if I explained myself

14          well.

15     BY MR. GONZALEZ:

16          Q.    Thank you.

17                MR. CYR:  Sir, may I make a

18          statement that's not interpreted

19          just to help?

20                MR. GONZALEZ:  Sure.

21                MR. CYR:  I think that your

22          original question related to the

23          difference between TG and TTP's

24          drywall.  I objected to it because

1          of the time period, and it's

2          already in the record, I believe,

3          in the previous deposition that

4          TTP presently doesn't produce

5          drywall.  That's all I was trying

6          to protect in the record.  And

7          we're happy for you to continue if

8          you wanted to go back to that

9          question during the time period

10         that TTP produced drywall.  Thank

11         you.

12    BY MR. GONZALEZ:

13         Q.    During the period that TTP

14    produced drywall, you would agree with me

15    that it was the same product that TG was

16    making, correct?

17         A.    I don't understand your

18    question.

19         Q.    TTP's drywall was the same

20    as Taishan's drywall during the years

21    that TTP was making drywall, correct?

22         A.    What do you mean, "the

23    same"?  How do you define "the same"?

24         Q.    I define "the same" by

1    meaning the same product with the same

2    ingredients made the same way.

3         A.    Not in this entirety.

4         Q.    How were they similar?  Tell

5    me every way they were similar, please.

6         A.    TTP's gypsum board was

7    produced according to the requirement of

8    TG's customer to customers, while TTP's

9    gypsum board were produced according to

10   the requirement of TTP's customers.

11        Q.    Other than -- oh, I'm sorry.

12   Were you done?

13        A.    Sometimes TTP shares the

14   same customers of TG.  Sometimes they

15   have different customers.  For the same

16   customers, the production procedure are

17   basically the same.  When they are

18   different requirements, the production

19   procedures are not necessarily the same.

20   I would like to also stress that each

21   gypsum board production line has its

22   difference from the others.  For even the

23   two production lines of TTP company has

24   difference process.  When you were

1    talking about the same, this would be my

2    response.

3         Q.    If a customer is the same

4    customer for TG and TTP requesting the

5    same specifications, both TG and TTP

6    would provide the same product to that

7    customer, correct?

8              MR. CYR:  Objection.

9              THE COURT:  Can you answer

10        the question?  Do you understand

11        it?

12             THE WITNESS:  Like I

13        explained earlier, two production

14        lines may not produce the exact

15        same products.  They only meet

16        requirements and certain standard

17        of the product.  Just like the

18        fingerprint of one person, it's

19        impossible to be the same of

20        another person's.

21   BY MR. GONZALEZ:

22        Q.    What brand did TTP sell of

23   drywall from 2006 until it stopped making

24   the drywall?

 1          A.    As far as I know, it would
 2   be Taishan brand.
 3          Q.    How about Dun, D-U-N?
 4          A.    There's no production for
 5   that.
 6          Q.    What is Dun, D-U-N?
 7          A.    That's another brand.
 8          Q.    Who makes Dun?
 9          A.    TG is able to produce Dun
10   brand, product.
11          Q.    Is TG the only one that
12   manufactured Dun products, to your
13   knowledge?
14          A.    Not necessarily.
15          Q.    Who else produces Dun
16   product?
17          A.    For example, Yunnan or
18   Qinhuangdao and other subsidiaries that
19   TG could authorize to manufacture this
20   product.
21                INTERPRETER:  Interpreter
22          clarification.
23                THE WITNESS:  Many of the
24          subsidiaries of Taishan company

1              had received such authorization.

2    BY MR. GONZALEZ:

3         Q.    Including TTP, correct?

4              MR. CYR:  I'm sorry, go

5         ahead.

6              THE WITNESS:  As far as I

7         know, TTP did not have the

8         authorization.  Therefore, it has

9         not produced Dun brand gypsum

10        board.

11   BY MR. GONZALEZ:

12        Q.    If we look at Exhibit Number

13   20, which you have in front of you, one

14   of the pages shows the Dun brand logo,

15   correct?  Is that the Dun brand logo?

16        A.    Yes.

17        Q.    That's one of the brands

18   that was prepared -- manufactured by TG,

19   correct?

20        A.    Yes.

21              MR. GONZALEZ:  This will be

22        Exhibit 28.

23                   -  -  -

24              (Whereupon, Deposition

1                Exhibit Jia-28, E-mail chain, top

2                one dated February 25, 2007, Bates

3                stamped TG 0021643 through TG

4                0021644 and TG 0023843 and TG

5                0026019, was marked for

6                identification.)

7                        -  -  -

8                    MR. GONZALEZ:  This is Bates

9                stamp number TG 0021643 through

10               21644, and TG 23843 and TG 02619.

11               It will be composite Exhibit

12               Number 28.

13   BY MR. GONZALEZ:

14           Q.   This is e-mails with an

15   attachment.  It's a series from Ivan

16   Gonima with Oriental Trading.  It's

17   IvanGonima@gonimaconstructors.com to

18   Wuyu.  Do you know who Wuyu is?

19           A.   I don't know who that person

20   is.

21           Q.   Do you know who Bill Cher

22   is?

23           A.   Can you say it in Chinese?

24           Q.   Che Gang?

```
 1              INTERPRETER:  I think you'd
 2         better write it down so I can
 3         pronounce it.
 4              MR. MONTOYA:  C-H-E,
 5         G-A-N-G.
 6              MR. GONZALEZ:  Che Gang.
 7              INTERPRETER:  Che Gang.
 8              MR. GONZALEZ:  Che Gang.
 9         Sorry.
10    BY MR. GONZALEZ:
11         Q.    Che Gang.
12         A.    Yes, I do.  I know that
13    person.
14         Q.    This is in English.  But the
15    third page of the document indicates the
16    use of the product, the distributor is
17    Dun with labeling, and I'm going to show
18    you this document, but, in essence,
19    they're discussing the use of the Dun
20    product for Mr. Gonima in the United
21    States through Oriental Trading Company.
22    Were you aware of that?
23              INTERPRETER:  Interpreter
24         clarification.
```

1           THE WITNESS:  I think Che

2      Gang made a mistake.  TTP did not

3      authorize him to produce Dun

4      product in the United States.

5  BY MR. GONZALEZ:

6      Q.    If you look --

7      A.    He himself made the decision

8  and came up with such a letter of

9  entrustment.  After he was aware of that,

10  we -- the production of gypsum board was

11  never a reality.  In fact, TTP had never

12  produced Dun brand gypsum board.

13      Q.    So, you were aware of this

14  then?

15      A.    Now I know.

16      Q.    But you knew it then because

17  you told them not to do it, right?

18      A.    No, I didn't know.  I don't

19  know how you got that information.

20      Q.    Mr. Che worked for TTP,

21  correct?

22      A.    Yes.

23      Q.    You didn't work for TTP,

24  correct?

1          A.     Correct.

2          Q.     You were shown previously

3   Exhibit 13.  Right, sir, you were shown

4   Exhibit 13?

5               MR. CYR:  You need to show

6          it to him so he can answer.

7               MR. GONZALEZ:  I'm going to

8          show you another copy that's a

9          little cleaner.

10  BY MR. GONZALEZ:

11         Q.     This is in English.  It

12  says, "Sole Agency Agreement" on the top.

13  And the seller is TTP, and it's dated

14  October 20, 2006.  The buyer is Oriental

15  Trading Company.  This is the predicate

16  to the question.  The sole sales area for

17  the sole agency agreement between TTP and

18  Oriental Trading Company is listed as the

19  territory of the USA and the --

20              INTERPRETER:  I'm sorry,

21         Counsel.  Where are you reading

22         from?

23              MR. GONZALEZ:  Here,

24         (Indicating), paragraph 2.

1              (Indicating).  2.

2                   INTERPRETER:  Can you read

3         it again, please?

4                   MR. GONZALEZ:  Yes.

5    BY MR. GONZALEZ:

6         Q.    The sole sales area on this

7    sole agency agreement is listed in

8    Paragraph 2 as the territory of the

9    United States of America.  And if you'd

10   turn to the signature line, you told us

11   previously that it appeared to be the

12   signature of Mr. Yang; is that correct?

13   Is that Che Gang?

14        A.    Che Gang.

15        Q.    Che Gang?

16        A.    Yes, it is the signature of

17   Che Gang.

18        Q.    That's the same individual

19   that we were referring to in Exhibit 27,

20   correct, or 28?

21                  INTERPRETER:  Where is 28?

22        This is 27?

23                  MR. GONZALEZ:  I'm sorry,

24        27.

1          MR. CYR:  Objection.

2          THE COURT:  Let's get the

3     right one.

4          MR. GONZALEZ:  28.

5          MR. CYR:  Objection.

6          INTERPRETER:  Where is 28?

7          THE COURT:  Just rephrase

8     the question so we know which is

9     the exhibit number.  I'm confused

10    whether it is 20, 27 or 28.

11         MR. GONZALEZ:  It's 28,

12    Judge, and I apologize.

13 BY MR. GONZALEZ:

14    Q.   Referring to Exhibit Number

15 28, Mr. Bill Cher, also known as Che

16 Gang?  Known as Che Gang?

17         MR. CYR:  Objection.

18         THE WITNESS:  What?  Can I

19    take a look?

20 BY MR. GONZALEZ:

21    Q.   Yes.  But my question is, is

22 Mr. Che Gang --

23    A.   Let me take a look.

24    Q.   Yes.  But my question first

1    is, Mr. Che Gang is also known as Bill

2    Cher, correct?

3              MR. CYR:  Objection, asked

4         and answered.

5              THE COURT:  That's what he

6         said before.

7              MR. GONZALEZ:  Right.

8              THE COURT:  So let's show

9         him the document.

10             THE WITNESS:  I don't see

11        Che Gang here.  I don't

12        understand.

13   BY MR. GONZALEZ:

14        Q.   Do you see the name Bill

15   Cher?  Turn to TG 0023842, please.  Right

16   here, second page of Exhibit 28.  Do you

17   see that name there (indicating)?

18        A.   Yes, I know this name.

19        Q.   What is it?

20        A.   Che Gang.

21        Q.   Underneath that it says Bill

22   Cher, correct?

23             MR. CYR:  Objection.  He

24        doesn't read English.  He's

1          testified about that several

2          times.

3   BY MR. GONZALEZ:

4          Q.    All right.

5                There's a Chinese language

6   signature as Che Gang, correct?

7          A.    Yes.

8                MR. GONZALEZ:  Madam

9          Interpreter, can you please read

10         the name in English underneath

11         that?

12               INTERPRETER:  Bill Cher.

13  BY MR. GONZALEZ:

14         Q.    If we'd turn to now Exhibit

15  13 under the sole agency agreement

16  signed -- I'm sorry -- between the

17  seller, TTP, and the buyer, Oriental

18  Trading Company, dated October 20, 2006,

19  it is signed by Che Gang, correct?

20         A.    Yes.

21         Q.    And if you'd go to the last

22  page, please, of the same exhibit, it

23  says "Certificate."  There's some Chinese

24  language.  The first two sentences or

1   paragraphs appear to be Chinese.  Can you

2   please read to us in Chinese what that

3   says from the top?

4           A.    It says, "Taian Taishan

5   Plasterboard Company Limited certifies

6   that" -- it is in English.  I don't

7   understand.

8           Q.    And the word in English is

9   Oriental Trading Company, LLC?

10          A.    Oriental Trading Company,

11  LLC is the general agent, agency in

12  America for Dun brand of Taishan -- Taian

13  Taishan Plasterboard Company Limited

14  products.

15          Q.    What does it say here on the

16  top?

17          A.    TTP.

18          Q.    And then there, at the

19  bottom of that page, there's also a

20  signature of Che Gang, correct?

21              INTERPRETER:  Counsel, he

22          read only one paragraph.  Do you

23          want me to -- just to let you

24          know.

```
 1              MR. GONZALEZ:  Yes, but
 2         let's -- we'll go back.  Thank
 3         you.  I appreciate that, but let's
 4         go back to --
 5   BY MR. GONZALEZ:
 6         Q.    This is signed by Che Gang?
 7         A.    Yes.
 8         Q.    Can you read the next
 9   paragraph, please?
10         A.    It says, "This agreement
11   will take force upon the signatures, and
12   this is to certify that its effectiveness
13   and legal effectiveness should be in
14   accordance with the terms and conditions
15   in the exclusive agency agreements made
16   by both parties (SDTH" -- oh, I'm sorry.
17   For this part, it's in English.  I don't
18   understand.
19         Q.    And then the words after
20   that?
21         A.    Can I further explain?
22         Q.    Let me just finish with
23   this, please.
24              What are the words after --
```

1            MR. CYR:  I'm sorry.  Your

2       Honor, should the witness be

3       allowed to further explain?

4            THE COURT:  Yeah, let him

5       explain what he was saying, and

6       let's make it brief.

7            MR. GONZALEZ:  Your Honor,

8       if I may, I only asked him to read

9       the Chinese, and we're not done

10      with that yet.  There's nothing to

11      explain in the reading.

12           THE COURT:  I understand.

13           MR. GONZALEZ:  All right,

14      Your Honor.

15           MR. CYR:  You can explain.

16           THE WITNESS:  I have

17      stressed it repeatedly.  This

18      agreement was signed under the

19      circumstance that Che Gang was not

20      aware whether TTP was authorized

21      to produce Dun brand products.

22           Number two, TTP had never

23      manufactured Dun brand products.

24      TTP had neither produced nor sold

1          Dun brand gypsum board.

2          Therefore, I believe this

3          agreement had never really came

4          into force.

5   BY MR. GONZALEZ:

6          Q.    After the English letters

7   and numbers, there's another phrase in

8   Chinese.  Can you tell us what that says?

9               INTERPRETER:  Where is it?

10              MR. GONZALEZ:  Right here.

11         (Indicating.)

12              INTERPRETER:  This is

13         included in the sentence before.

14  BY MR. GONZALEZ:

15         Q.    Did you read it accurately?

16         A.    After which?  What?

17         Q.    I asked you to read

18  everything in Chinese to us in this

19  contract, and I'm asking you if you read

20  it accurately?

21         A.    It is accurate.

22         Q.    And it says it takes effect

23  when signed by both parties, correct?

24         A.    Yes.

1          Q.    Looking at this document,

2    there seems to be two signatures there,

3    correct?

4          A.    Yes.

5          Q.    One of them from Che Gang,

6    who worked for TTP?

7                MR. CYR:  Objection.  This

8          is the third time.

9                THE COURT:  It's all right.

10         I'll allow it.

11   BY MR. GONZALEZ:

12         Q.    Right?

13         A.    It is Che Gang.

14         Q.    And in October of -- it says

15   it takes effect on the date of the

16   contract, correct?

17         A.    That's what it says.

18         Q.    And the date of the contract

19   is October 20, 2006, correct?

20         A.    Yes.  But it had never been

21   performed.

22         Q.    The contract has some stamps

23   on it, correct?

24         A.    Yes.

1          Q.    Can you tell us what the

2    stamp with the star is?

3          A.    The stamp with the star is

4    the contract stamp of TTP.  It is not the

5    company's stamp.

6          Q.    What does the contract's

7    stamp say in Chinese?

8          A.    TTP Company in Chinese.

9          Q.    How do you know it's the

10   contract stamp for TTP?

11         A.    Chinese clearly stated that.

12   I understand Chinese.

13         Q.    And you've seen it before?

14         A.    No, I have not seen it

15   before.

16         Q.    That's what it says?  Is

17   that what it says?

18              MR. CYR:  Objection.  It's

19         the third time.

20              THE COURT:  The question

21         that I don't understand is that

22         when you say he didn't see it

23         before, are you talking about the

24         stamp or the contract?

 1                    MR. GONZALEZ:  I'm talking

 2           about the stamp.

 3     BY MR. GONZALEZ:

 4           Q.    And I'll clarify the

 5     question.

 6                    Have you seen this stamp

 7     before?  Not necessarily in this

 8     document, but that stamp?

 9           A.    I don't have TG's stamp,

10     neither do I have TTP's stamp.  So, I

11     have never seen those stamps.  This is

12     the first time I've seen this document

13     today.

14           Q.    I'm talking about the

15     particular stamp.  Have you ever seen

16     that stamp anywhere else in any document

17     ever?

18           A.    I've never seen TTP's stamp,

19     and I rarely pay attention to contract

20     stamp like this for TG Company also.

21           Q.    The stamp that is over Che

22     Gang's name has a star on it, correct?

23           A.    Yes.

24           Q.    And then there's some

1    Chinese language all around it in a

2    circle, correct?

3         A.    I have already replied to

4    you.  I understand all of them because

5    they are in Chinese.

6         Q.    Now, I want you to read me

7    exactly what it says, because I don't

8    understand Chinese.

9         A.    Taian Taishan Plasterboard

10   Company Limited especially used for

11   contract.

12        Q.    Then there's some Chinese

13   language down there in parentheses.  What

14   does that say?

15        A.    Signature, Che Gang.

16        Q.    And if we go back to Exhibit

17   Number 20, the Dun symbol that we looked

18   at before, that you previously told us

19   was made by TG, is what's being referred

20   to in Exhibit 13, correct?

21        A.    I don't know.  What is

22   Exhibit 13?

23        Q.    The contract.  Exhibit 13 is

24   the contract we're looking at.  It refers

1    to Dun in Chinese, correct?

2          A.    Yes.

3          Q.    And Exhibit Number 20, which

4    is the TG catalog that we were referring

5    to before, has the Dun symbol, correct?

6          A.    TG has it.

7          Q.    Is Dun still made today?

8          A.    Yes.

9          Q.    Now, you were telling us

10   before that companies that are authorized

11   by TG to make the Dun product are allowed

12   to do so.  What companies during the

13   years 2005 through 2008 were making the

14   Dun brand with TG's authority?

15         A.    I know that TG authorized

16   some companies, but I don't know the

17   detailed names of the company, because

18   I'm the general manager of TG, I'm in

19   charge of 7,000 employees.  It's

20   impossible for me to know every details.

21   If necessary, I can check and come back

22   with you through my attorney after I go

23   home.

24         Q.    Okay.  That's fine.

1          Which ones do you remember,

2    as you sit here today, as having

3    authority from TG to make the Dun brand?

4          A.    I don't want to make

5    guesses.

6          Q.    Were they subsidiaries of

7    TG?

8          A.    Of course.  TG only

9    authorized to its subsidiaries.

10          MR. GONZALEZ:  Do you want

11          to take a break, Judge?

12          THE COURT:  Well, it's about

13          5:30.

14          MR. GONZALEZ:  All right.

15          THE COURT:  We'll stop here

16          and come back tomorrow.  How are

17          we doing time wise, folks?  How

18          much longer do you have?

19          MR. GONZALEZ:  I don't think

20          more than an hour, Your Honor.

21          THE COURT:  How about you?

22          MS. BASS:  I'll have less

23          than an hour.

24          MR. CYR:  So that means --

1          THE COURT:  We don't need to

2     go on the record with this.  It's

3     just logistics.  Go ahead.

4          THE VIDEOTAPE TECHNICIAN:

5     We're off the record.  The time is

6     5:25.  This is the end of Tape

7     Number 7.

8               -  -  -

9          (Whereupon, the deposition

10    adjourned at 5:25 p.m.)

11              -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

1              C E R T I F I C A T E
2
3

              I, LINDA L. GOLKOW, a
4    Registered Diplomate Reporter, Certified
     Court Reporter and Notary Public, do
5    hereby certify that, pursuant to notice,
     the deposition of TONGCHUN JIA was duly
6    taken on January 9, 2012 at 8:52 a.m.
     before me.
7
8              The said TONGCHUN JIA was
     duly sworn by The Court according to law
9    to tell the truth, the whole truth and
     nothing but the truth and thereupon did
10   testify as set forth in the above
     transcript of testimony.  The testimony
11   was taken down stenographically by me.
12
               I do further certify that
13   the above deposition is full, complete
     and a true record of all the testimony
14   given by the said witness.
15
16
          Linda L. Golkow
17        Registered Diplomate Reporter
          Certified Realtime Reporter
18
19
20             (The foregoing certification
     of this transcript does not apply to any
21   reproduction of the same by any means,
     unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24

```
 1              INSTRUCTIONS TO WITNESS

 2

 3

 4              Please read your deposition

 5   over carefully and make any necessary

 6   corrections.  You should state the reason

 7   in the appropriate space on the errata

 8   sheet for any corrections that are made.

 9

10              After doing so, please sign

11   the errata sheet and date it.  It will be

12   attached to your deposition.

13

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

```
 1              - - - - - -

             E R R A T A

 2              - - - - - -

 3   PAGE   LINE   CHANGE

 4   _____  _____  _____

 5     REASON:  ____ _____

 6   _____  _____  _____

 7     REASON:  _____ _____

 8   _____  _____  _____

 9     REASON:  _____ _____

10   _____  _____  _____

11     REASON:  _____ _____

12   _____  _____  _____

13     REASON:  _____ _____

14   _____  _____  _____

15     REASON:  _____ _____

16   _____  _____  _____

17     REASON:  _____ _____

18   _____  _____  _____

19     REASON:  _____ _____

20   _____  _____  _____

21     REASON:  _____ _____

22   _____  _____  _____

23     REASON:  _____ _____

24
```

1
2              ACKNOWLEDGMENT OF DEPONENT
3
              I,_____, do
4    hereby certify that I have read the
     foregoing pages, 495-826, and that the
5    same is a correct transcription of the
     answers given by me to the questions
6    therein propounded, except for the
     corrections or changes in form or
7    substance, if any, noted in the attached
     Errata Sheet.
8
9    _____
     TONGCHUN JIA                DATE
10
11
12
13
14
15
16   Subscribed and sworn
     to before me this
17   _____ day of _____, 20____.
18   My commission expires:_____
19

     _____
20   Notary Public
21
22
23
24

```
 1                    LAWYER'S NOTES

 2     PAGE   LINE

 3     _____  _____   _____

 4     _____  _____   _____

 5     _____  _____   _____

 6     _____  _____   _____

 7     _____  _____   _____

 8     _____  _____   _____

 9     _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____
```



Transcript of the Testimony of:  **Tongchun Jia**

01/10/2012

Chinese Drywall

1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF LOUISIANA
2

3    _____    § MDL NO. 2047
     IN RE:                     §
4    CHINESE-                   § SECTION: L
     MANUFACTURED               §
5    DRYWALL PRODUCTS           § JUDGE FALLON
     LIABILITY                  §
6    LITIGATION                 § MAGISTRATE
     _____    § JUDGE WILKINSON
7
                    -  -  -
8
       CROSS NOTICED IN VARIOUS OTHER ACTIONS
9
                    -  -  -
10
                  January 10, 2012
11
                    -  -  -
12
         CONFIDENTIAL - SUBJECT TO FURTHER
13           CONFIDENTIALITY REVIEW
14                  -  -  -
15        Continued videotaped deposition of
     TONGCHUN JIA, held at the Executive
16   Centre, Level 3, Three Pacific Place, One
     Queen's Road East, Hong Kong, China,
17   commencing at 8:57 a.m., on the above
     date, before Linda L. Golkow, Certified
18   Court Reporter, Registered Diplomate
     Reporter, Certified Realtime Reporter and
19   Notary Public.
                    -  -  -
20

21
22        GOLKOW TECHNOLOGIES, INC.
      877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com
24

```
 1   BEFORE:
             HONORABLE ELDON E. FALLON
 2           UNITED STATES FEDERAL COURT -
             EASTERN DISTRICT OF LOUISIANA
 3
 4   APPEARANCES:
 5
 6       SEEGER WEISS LLP
         BY:  CHRISTOPHER A. SEEGER, ESQUIRE
 7       BY:  SCOTT A. GEORGE, ESQUIRE
         One William Street
 8       New York, New York 10004
         (212) 584-0700
 9       cseeger@seegerweiss.com
         Sgeorge@seegerweiss.com
10       Representing the Plaintiffs'
         Steering Committee
11
12       HERMAN HERMAN KATZ & COTLAR, LLP
         BY:  LEONARD A. DAVIS, ESQUIRE
13       820 O'Keefe Avenue
         New Orleans, Louisiana 70113
14       (504) 581-4892
         Ldavis@hhkc.com
15       Representing the Plaintiffs'
         Steering Committee
16
17       COLSON HICKS EIDSON
         BY:  ERVIN GONZALEZ, ESQUIRE
18       BY:  PATRICK S. MONTOYA, ESQUIRE
         255 Alhambra Circle
19       Penthouse
         Coral Gables, Florida 33134
20       (305) 476-7400
         Ervin@colson.com
21       Patrick@colson.com
         Representing Plaintiffs' Steering
22       Committee in the Federal and State
         Coordinated Actions
23
24   APPEARANCES (CONTINUED):
```

```
 1
        LEVIN, FISHBEIN, SEDRAN & BERMAN
 2      BY:  ARNOLD LEVIN, ESQUIRE
        510 Walnut Street
 3      Suite 500
        Philadelphia, Pennsylvania 19106
 4      (215) 592-1500
        Alevin@lfsblaw.com
 5      Representing the Plaintiffs'
        Steering Committee
 6
 7
        GAINSBURGH, BENJAMIN, DAVID, MEUNIER
 8      & WARSHAUER, L.L.C.
        BY:  GERALD E. MEUNIER, ESQUIRE
 9      2800 Energy Centre
        1100 Poydras Street
10      New Orleans, Louisiana 70163
        (504) 522-2304
11      gmeunier@gainsben.com
        Representing the Plaintiffs'
12      Steering Committee
13
14      HOGAN LOVELLS US LLP
        BY:  JOE CYR, ESQUIRE
15      BY:  FRANK T. SPANO, ESQUIRE
        875 Third Avenue
16      New York, New York 10022
        (212) 918-3000
17      joe.cyr@hoganlovells.com
        frank.spano@hoganlovells.com
18      Representing Taishan Gypsum Co.
        Ltd. and Taian Taishan
19      Plasterboard Company Ltd. and the
        Witness, Tongchun Jia
20
21
22
23
24   APPEARANCES (CONTINUED):
```

```
 1
        HOGAN LOVELLS
 2      BY:  ALLAN LEUNG, ESQUIRE
        11th Floor, One Pacific Place
 3      88 Queensway
        Hong Kong
 4      (852) 2219 0888
        allan.leung@hoganlovells.com
 5      Representing Taishan Gypsum Co.
        Ltd. and Taian Taishan
 6      Plasterboard Company Ltd. and the
        Witness, Tongchun Jia
 7
 8      HOGAN LOVELLS INTERNATIONAL LLP
        BY:  EUGENE CHEN, ESQUIRE
 9      BY:  JIENI JI, ESQUIRE
        18th Floor, Park Place
10      1601 Nanjing Road West
        Shanghai, China 200040
11      (86 21) 6122 3800
        eugene.chen@hoganlovells.com
12      Representing Taishan Gypsum Co.
        Ltd. and Taian Taishan
13      Plasterboard Company Ltd. and the
        Witness, Tongchun Jia
14
15      GREENBERG TRAURIG, LLP
        BY:  HILARIE BASS, ESQUIRE
16      1221 Brickell Avenue
        Miami, Florida 33131
17      (305) 579-0745
        bassh@gtlaw.com
18      Representing the Home Builders
        Steering Committee
19
20      PERKINS COIE LLP
        BY:  DAVID L. BLACK, ESQUIRE
21      1899 Wynkoop Street - Suite 700
        Denver, Colorado 80202
22      (303) 291-2300
        DBlack@perkinscoie.com
23      Representing the State of Louisiana
24   APPEARANCES (CONTINUED):
```

```
 1
        BRENNER, EVANS & MILLMAN, P.C.
 2      BY:  THEODORE I. BRENNER, ESQUIRE
        411 East Franklin Street
 3      Suite 200
        Richmond, Virginia 23218
 4      Tbrenner@beylaw.com
        (804) 644-1300
 5      Representing Tobin Trading Company
 6
        McKENRY, DANCIGERS, DAWSON &
 7      LAKE, P.C.
        BY:  J. BRIAN SLAUGHTER, ESQUIRE
 8      192 Ballard Court
        Suite 400
 9      Virginia Beach, Virginia 23462
        (757) 461-2500
10      Jbslaughter@va-law.org
        Representing Atlantic Homes LLC and
11      Multiple Other Virginia-Based
        Defendants
12
13      QUINN EMANUEL URQUHART & SULLIVAN,LLP
        BY:  JANE M. BYRNE, ESQUIRE
14      BY:  JULIA BESKIN, ESQUIRE
        51 Madison Avenue, 22nd Floor
15      New York, New York 10010
        (212) 849-7000
16      Janeburne@quinnemanuel.com
        Juliabeskin@Quinnemanuel.Com
17      Representing Chartis Select Insurance
        Company and Related Chartis Insurers
18
19      WEINBERG, WHEELER, HUDGINS, GUNN &
        DIAL, LLC
20      BY:  MICHAEL SEXTON, ESQUIRE
        3344 Peachtree Road, NE
21      Suite 2400
        Atlanta, Georgia 30326
22      (404) 876-2700
        msexton@wwhgd.com
23      Representing Various Banner
        Defendants
24
```

1

2     SINNOTT, NUCKOLS & LOGAN, PC
       BY:  KENNETH F. HARDT, ESQUIRE

3     13811 Village Mill Drive
       Midlothian, Virginia 23114

4     (804) 378-7600
       khardt@snllaw.com

5     Representing Venture Supply, Inc. and
       Porter-Blaine Corp.

6

7

  ALSO PRESENT:

8

      SUNNY WANG, INTERPRETER

9

10

11             -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1   APPEARANCES VIA TELEPHONE:
 2
 3       GALLOWAY JOHNSON TOMPKINS BURR and SMITH
         BY:  CARLINA C. EISELEN, ESQUIRE
 4       One Shell Square
         701 Poydras Street, 40th Floor
 5       New Orleans, Louisiana 70139
         (504) 525-6802
 6       ceiselen@gjtbs.com
         Representing Interior/Exterior
 7       Building Supply
 8
         HUNTON & WILLIAMS LLP
 9       BY:  A. TODD BROWN, ESQUIRE
         Bank of America Plaza
10       101 South Tryon Street - Suite 3500
         Charlotte, North Carolina  28280
11       (704) 378-4700
         Tbrown@hunton.com
12       Representing Stock Building Supply, LLC
13
14       JONES, WALKER, WAECHTER, POITEVENT,
         CARRERE & DENEGRE LLP
15       BY:  MEGAN E. DONOHUE, ESQUIRE
         600 Jefferson Street, Suite 1600
16       Lafayette, Louisiana 70501
         (337) 262-9062
17       mdonohue@joneswalker.com
         Representing Fireman's Fund Insurance
18       Company
19
         DUPLASS ZWAIN BOURGEOIS PFISTER &
20       WEINSTOCK
         BY:  PHILIP WATSON, ESQUIRE
21       3838 N. Causeway Boulevard
         Suite 2900
22       Metairie, Louisiana 70002
         (504) 832-3700
23       pwatson@duplass.com
         Representing R&H Masonry, Inc., and
24       Swedberg Enterprises, Inc.
```

```
 1   APPEARANCES VIA TELEPHONE (CONTINUED):
 2
     FULMER LEROY ALBEE BAUMANN
 3   BY:  CANDACE MOSS, ESQUIRE
     BY:  MICHAEL P. McCAHILL, ESQUIRE
 4   2866 East Oakland Park Boulevard
     Ft. Lauderdale, Florida 33306
 5   (954) 707-4430
     mosscandace@fulmerleroy.com
 6   mmccahill@fulmerleroy.com
     Representing Independent Builders
 7   Supply Association (IBSA)
 8
     WEINBERG, WHEELER, HUDGINS, GUNN &
 9   DIAL, LLC
     BY:  P. SHANE O'NEILL, ESQUIRE
10   3344 Peachtree Road, NE
     Suite 2400
11   Atlanta, Georgia 30326
     (404) 876-2700
12   soneill@wwhgd.com
     Representing Various Banner
13   Defendants
14
     WRIGHT, FULFORD, MOORHEAD & BROWN,
15   P.A.
     BY:  DORYK B. GRAF, JR., ESQUIRE
16   145 N. Magnolia Ave.
     Orlando, Florida 32801
17   (407) 425-0234
     dgraf@wfmblaw.com
18   Representing West Construction, Inc.
19
20   QUINN EMANUEL URQUHART & SULLIVAN, LLP
     BY: CLINTON DOCKERY, ESQIURE
21   51 Madison Avenue, 22nd Floor
     New York, New York 10010
22   (212) 849-7000
     clintondockery@quinnemanuel.com
23   Representing Chartis Select Insurance
     Company and Related Chartis Insurers
24
```

1    APPEARANCES VIA TELEPHONE (CONTINUED):

2

     BUCHANAN INGERSOLL & ROONEY PC
3    BY:  C. ROBERT ZAPPALA, ESQUIRE
     One Oxford Centre
4    301 Grant Street, 20th Floor
     Pittsburgh, Pennsylvania 15219
5    (412) 562-1041
     bobby.zappala@bipc.com
6    Representing 84 Lumber Company, LP

7

     MEIROSE & FRISCIA, P.A.
8    BY: JASON A. LUBLINER, ESQUIRE
     5550 W. Executive Drive
9    Suite 250
     Tampa, Florida 33609
10   (813) 289-8800
     groot@meirosefriscia.com
11   Representing Central Florida
     Finishers and LTL Construction, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1    APPEARANCES VIA STREAM:
 2
      BECNEL LAW FIRM, L.L.C.
 3    BY:  ROBERT BECNEL, ESQUIRE
      106 W. 7th Street
 4    Reserve, Louisiana 70084
      (985) 536-1186
 5    robbecnel@aol.com
      Representing the Plaintiffs'
 6    Steering Committee
 7
      PARKER WAICHMAN ALONSO LLP
 8    BY:  JORDAN L. CHAIKIN, ESQUIRE
      3301 Bonita Beach Road
 9    Bonita Springs, Florida 34134
      (239) 390-1000
10    Jchaikin@yourlaywer.com
      Representing Plaintiffs' Steering
11    Committee
12
      MORGAN & MORGAN
13    BY:  PETE V. ALBANIS, ESQUIRE
      12800 University Drive
14    Suite 600
      Fort Myers, Florida 33907
15    (877) 667-4265
      Representing the Plaintiffs
16
17    IRPINO LAW FIRM
      BY:  ANTHONY IRPINO, ESQUIRE
18    2216 Magazine Street
      New Orleans, Louisiana 70130
19    Airpino@irpinolaw.com
      (504) 525-1500
20    Representing the Plaintiffs
21
22
23
24
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
      GALLOWAY JOHNSON TOMPKINS BURR and SMITH
 3    BY:  CARLINA C. EISELEN, ESQUIRE
      One Shell Square
 4    701 Poydras Street, 40th Floor
      New Orleans, Louisiana 70139
 5    (504) 525-6802
      ceiselen@gjtbs.com
 6    Representing Interior/Exterior
      Building Supply
 7
      HEARD & MEDACK, P.C.
 8    BY:  JAMES DAVIS, ESQUIRE
      9494 Southwest Freeway, Suite 700
 9    Houston, Texas 77074
      (713) 772-6400
10    jdavis@heardmedackpc.com
      Representing CastleRock Communities, L.P.
11
12
      HUNTON & WILLIAMS LLP
13    BY:  A. TODD BROWN, ESQUIRE
      Bank of America Plaza
14    101 South Tryon Street
      Suite 3500
15    Charlotte, North Carolina  28280
      (704) 378-4700
16    tbrown@hunton.com
      Representing Stock Building Supply, LLC
17
18
      SHER GARNER CAHILL RICHTER KLEIN &
19    HILBERT, L.L.C.
      BY:  MATTHEW C. CLARK, ESQUIRE
20    909 Poydras Street
      Suite 2800
21    New Orleans, Louisiana 70112
      (504) 299-2100
22    mclark@shergarner.com
      Representing the Southern Home
23    Defendants
24
```

```
 1   APPEARANCES VIA STREAM (CONTINUED):
 2
 3       QUINN EMANUEL URQUHART & SULLIVAN, LLP
         BY: CLINTON DOCKERY, ESQUIRE
 4       51 Madison Avenue, 22nd Floor
         New York, New York 10010
 5       (212) 849-7000
         clintondockery@quinnemanuel.com
 6       Representing Chartis Select Insurance
         Company and Related Chartis Insurers
 7
 8       JONES, WALKER, WAECHTER, POITEVENT,
         CARRERE & DENEGRE LLP
 9       BY:  MEGAN E. DONOHUE, ESQUIRE
         600 Jefferson Street, Suite 1600
10       Lafayette, Louisiana 70501
         (337) 262-9062
11       mdonohue@joneswalker.com
         Representing Fireman's Fund Insurance
12       Company
13
         DEUTSCH, KERRIGAN & STILES
14       BY:  MELISSA M. SWABACKER, ESQUIRE
         755 Magazine St.
15       New Orleans, Louisiana  70130
         (504) 581-5141
16       mswabacker@dkslaw.com
         Representing Landmark American
17       Insurance Company
18
19
                      -  -  -
20
21
22
23
24
```

```
 1                    -  -  -
 2                  I N D E X
 3   WITNESS                      PAGE NO.
 4   TONGCHUN JIA
 5
 6    By Mr. Gonzalez                841
 7    By Ms. Bass                    883
 8    By Mr. Brenner                 913
 9    By Mr. Black                   922
10    By Mr. Sexton                  933
11    By Mr. Cyr                     935
12
13                    -  -  -
14                E X H I B I T S
15
     NO.              DESCRIPTION        PAGE NO.
16
17    Plaintiff's   E-mail chain, top    850
                     one dated
18    Jia-29        12/12/2005, Bates
                     stamped TG 0019840
19                   and TG 0019841
20    Plaintiff's   Translation of       851
      Jia-29A       e-mail chain, top
21                   one dated
                     12/12/2005, Bates
22                   stamped TG 0019840
                     and TG 0019841
23    Plaintiff's   Contract, Bates      852
      Jia-30        stamped TG 0019854
24                   through TG 0019857
```

| | | | |
|---|---|---|---|
| 1 | | | |
| 2 | Plaintiff's Jia-31 | E-mail chain, top one dated 7/27/2006, Bates stamped TG 0019348 through TG 0019352 | 860 |
| 3 | | | |
| 4 | | | |
| 5 | Plaintiff's Jia-32 | E-mail chain, top one dated 8/2/2006, Bates stamped TG 0019381 and TG 0019382 | 867 |
| 6 | | | |
| 7 | | | |
| 8 | Plaintiff's Jia-33 | E-mail dated 1/27/2009, Bates stamped TG 0019356 | 899 |
| 9 | | | |
| 10 | Plaintiff's Jia-34 | E-mail and attachment dated August 15, 2009, Bates stamped TG 0025155 through TG 0025158 | 903 |
| 11 | | | |
| 12 | | | |
| 13 | Plaintiff's Jia-35 | E-mail dated 8/17/2009, Bates stamped TG 0019235 and TG 0019236 | 906 |
| 14 | | | |
| 15 | | | |
| 16 | Plaintiff's Jia-36 | Document partly in Chinese, "Chinese Drywall Default Ruling shows Need to Hold Foreign Manufacturers Accountable in U.S. Justice System," Bates stamped TG 0025352 through TG 0025355 | 909 |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

1                 - - -

2                 THE VIDEOTAPE TECHNICIAN:

3          We are now on the record.  My name

4          is Dan Lawlor.  I'm a videographer

5          for Golkow Technologies.

6               Today's date is January 10,

7          2012, and the time is 8:57 a.m.

8               This is the continuation of

9          the deposition of Tongchun Jia.

10              Your Honor, you may proceed.

11

12                - - -

13              TONGCHUN JIA, after having

14         been previously sworn, was

15         examined and testified as follows:

16                - - -

17              THE COURT:  Mr. Jia, you are

18         still under oath, sir.

19              You may proceed, Counsel.

20                - - -

21                EXAMINATION

22                - - -

23  BY MR. GONZALEZ:

24         Q.   Good morning, Mr. Jia.

1          A.    Good morning.

2          Q.    Mr. Jia, were you aware that

3    Mr. Che Gang was previously an employee

4    of TG?

5          A.    Yes.

6          Q.    Before he began his

7    employment with TTP, he was an employee

8    of TG.  Is that your understanding?

9          A.    Yes.

10              THE COURT:  Try to keep your

11         voice up, please.

12              MR. GONZALEZ:  Sure.

13    BY MR. GONZALEZ:

14         Q.    Is it also your

15    understanding that Mr. Peng Wenlong was

16    also an employee of TG before he became

17    an employee of TTP?

18              THE INTERPRETER:  Peng

19         Wenlong?

20              MR. GONZALEZ:  Peng Wenlong.

21         My pronunciation is awful.  I

22         apologize.

23              THE INTERPRETER:  Can you

24         write it down for me?

 1              MR. GONZALEZ:  P-E-N-G,

 2         W-E-N-L-O-N-G.

 3              THE INTERPRETER:  He doesn't

 4         know.  If you can write it down

 5         for him, it would be great.

 6              MR. GONZALEZ:  (Attorney

 7         complies.)

 8              THE WITNESS:  Yes.

 9    BY MR. GONZALEZ:

10         Q.    Before he worked for TTP, he

11    was an employee of TG, correct?

12         A.    Yes.

13         Q.    And do you know how they

14    became employees of TTP?

15         A.    After the establishment of

16    TTP, they were hired by TTP.

17         Q.    Who made the decision to

18    hire them by TTP?

19         A.    The decision to hire was by

20    the board of directors.

21         Q.    Of what company?

22         A.    TTP's.

23         Q.    But here's my question.

24    They were employees of TG, and then they

1   became employees of TTP.  How was the

2   decision made, okay, you're not going to

3   work any more for TG, now you're going to

4   work for TTP?

5           A.    They personally agreed to

6   work for TTP, as the board of directors

7   hired them to work for TTP, and as a big

8   shareholder, also agreed for them to work

9   for TTP.

10          Q.    Meaning the "big

11  shareholder" being TG?

12          A.    Yes.

13          Q.    So with the agreement of TG

14  and the agreement of TTP?

15          A.    There was no agreement.

16          Q.    Can you explain to me, you

17  said that the TG board had authorized

18  them to work for TTP.  That's my

19  understanding.  Tell me what you meant.

20          A.    TTP intended to hire these

21  gentlemen to work for TTP.

22          Q.    So they stopped working for

23  TG and began working for TTP?

24          A.    Correct.

1    Q.    Was TG okay with that?

2    A.    TG respected their personal

3  opinions.

4    Q.    The personal opinions of

5  TTP?

6    A.    No.  Their own personal

7  opinions.

8    Q.    The employees?

9    A.    Right.

10    Q.    When they began working at

11  TTP, they worked in the same address?

12    A.    No.

13    Q.    They drove to the same

14  parking lot?

15    A.    They didn't have their own

16  cars.

17    Q.    Oh.  I thought you told me

18  that Che Gang had his own car yesterday?

19    A.    I didn't mention that Che

20  Gang had his own car, but I said Yang

21  Jiapo had his own car.

22    Q.    Yang Jiapo, I apologize.

23          In 2006, the TG board agreed

24  to invest $7 million in TTP?

1          A.     You mean TG?

2          Q.     Yes.

3          A.     Correct.

4          Q.     That was done to relieve the

5    financial pressure on TTP at that time,

6    correct?

7          A.     Correct.

8          Q.     Can you tell us what

9    countries TG exports to, other than the

10   United States, where 5/8 inch or half

11   inch sizes are used?

12         A.     I'm not sure about the

13   details.  You may ask Peng Wenlong.  We

14   know that for this size of gypsum, we had

15   also sold a lot in China.

16         Q.     My question is, outside of

17   China, what is your recollection of the

18   countries that purchased those sizes from

19   TG, let's say from 2005 through 2008?

20         A.     I can't take a guess.  I

21   don't know the details.  I would suggest

22   you to have Mr. Peng Wenglong answer the

23   questions.

24         Q.     And I will ask him.  And the

1    reason for my question is when I heard

2    you discussing the sizes of the drywall

3    at 5/8 inch and half inches, I heard you

4    mention to my colleague that there were

5    other countries that were purchasing

6    those sizes from TG, and I'm asking you

7    to explain that answer a little more to

8    the best of your ability.  If you can

9    remember, what can you remember about

10   those countries -- customers in those

11   countries that would purchase?

12          A.    I don't think you had a full

13   understanding of my statement yesterday.

14   I said the gypsum board using US ASTM

15   standard not only serve the people of

16   America but the people of the world.  As

17   far as I know, Canada and some countries

18   in South America also need these gypsum

19   boards.  I did not say yesterday that TG

20   had provided these sizes of gypsum board

21   to other countries other than America.

22   Neither did I deny that we have sold

23   these sizes of gypsum board to other

24   countries.  I'm not able to give you a

1    detailed answer to your question.  I

2    apologize.

3         Q.    No need to.

4               The ASTM standards, do you

5    know what those letters stand for?

6         A.    No.  I know ASTM standard is

7    a standard that was made by some standard

8    associations in America, but as of what

9    ASTM stand for, I do not know.

10        Q.    American Society for Testing

11   and Materials.  Have you ever read those

12   standards?

13             MR. CYR:  Objection.

14             THE COURT:  I'll let him

15        answer.  Overrule the objection.

16             THE WITNESS:  I'm an

17        executive started as an engineer.

18        I did ask my colleague to bring me

19        the ASTM standard, and I read it.

20        But I may not understand to a full

21        extent.

22   BY MR. GONZALEZ:

23        Q.    Who on behalf of TG would

24   make sure that the products that are

1    going to be shipped internationally would

2    meet ASTM standards?

3         A.    The standard that we use is

4    in accordance with the requirements of

5    the customers.  We would always try our

6    best.  Sometimes the requirement of the

7    customers of certain standard that we

8    could not accommodate, then we would not

9    produce.

10        Q.    My question is, who on

11   behalf of TG would be the individual or

12   individuals that would determine whether

13   the standards, for example, if an

14   American company were to request drywall

15   from TG and request that it meet the ASTM

16   standards, who on behalf of TG would be

17   the person or persons responsible for

18   determining whether the specifications

19   were met?

20        A.    We don't have such

21   representative in TG.  But we would take

22   our products to Hangzhou Institution for

23   testing.  That is the requirement of the

24   customer.  As long as the institution in

1   Hangzhou believe that we met the ASTM

2   standard, and when we send the data to

3   the client, they would agree, then the

4   deal was done.  And Taishan Gypsum

5   Company strictly followed the standard of

6   ASO 14000 in quality.  It also has its

7   own quality control department.

8          Q.    Same questions for TTP.  Was

9   it the same process that was used by TG?

10  In other words, did TTP use the same

11  process of assurance with American

12  Society for Testing Materials for product

13  that was being sent to the United States

14  as TG?

15         A.    I'm not sure whether the

16  products are for America, but we have

17  indeed produced products according to

18  these specifications and in accordance

19  with the same process.

20                    -  -  -

21              (Whereupon, Deposition

22         Exhibit Jia-29, E-mail chain, top

23         one dated 12/12/2005, Bates

24         stamped TG 0019840 and TG 0019841,

1          and Deposition Exhibit Jia-29A,

2          Translation of e-mail chain, top

3          one dated 12/12/2005, Bates

4          stamped TG 0019840 and TG 0019841,

5          was marked for identification.)

6                    -  -  -

7               MR. GONZALEZ:  I'm going to

8          show you what's been marked as

9          Exhibit 29, and 29A being the

10         translation.  It is a document

11         dated December 12, 2005 from Leon

12         Liu to Yang Jiapo.  That's the top

13         e-mail address.  The Bates stamp

14         number is 19840 and 19841.

15              MS. BYRNE:  What's the

16         Exhibit Number?

17              MR. GONZALEZ:  29 and 29A.

18              MR. CYR:  The exhibit is

19         before the witness.

20              MR. GONZALEZ:  Thank you.

21    BY MR. GONZALEZ:

22         Q.    Have you seen this document

23    before?

24         A.    No.

 1          Q.   According to this document,
 2    samples were sent to American customers
 3    of drywall, and at some point, the
 4    decision was made not to send any more
 5    samples because too many Americans were
 6    requesting samples, and the needs could
 7    not be satisfied.  Were you aware that
 8    your company was sending samples to the
 9    United States of drywall?
10          A.   If there had been many
11    customers asked for samples from our
12    company, I do not deny that we might have
13    sent the samples to those customers.
14          Q.   Were you aware that so many
15    samples were being sent to American
16    customers that you couldn't send any more
17    to satisfy the needs of American
18    customers requesting drywall samples from
19    your company?
20          A.   I'm not aware of that.
21                   -  -  -
22          (Whereupon, Deposition
23          Exhibit Jia-30, Contract, Bates
24          stamped TG 0019854 through TG

1          0019857, was marked for

2          identification.)

3                    -  -  -

4          MR. GONZALEZ:  Next one will

5          be Exhibit 30.  It's Bates stamp

6          number TG 19854 through TG 19857.

7          It is a contract dated December

8          16, 2005.  The seller is Shandong

9          Taihe Dongxin Co., Ltd., the

10         buyer, Venture Supply, Inc., with

11         an address of Norfolk, Virginia.

12         MR. CYR:  The exhibit is

13         before the witness.

14         THE WITNESS:  I don't

15         understand.

16   BY MR. GONZALEZ:

17         Q.    Mr. Jia, I know you were a

18   high-ranking officer in your company and

19   you may not be aware of the day-to-day

20   details, but were you aware that Shandong

21   Taihe Dongxin, now known as TG, sold

22   drywall to Venture Supply for delivery in

23   Virginia, the United States of America?

24         MR. CYR:  Objection.

1           THE COURT:  I'll overrule

2      the objection.  He's under cross.

3      I'll allow it.

4           THE WITNESS:  I don't know

5      that.  I would like to further

6      explain.  Some of the customers

7      came to our company and requested

8      us to manufacture products for

9      them.  Some of the customer might

10     say that they would send our

11     products to America or to certain

12     places in America.  However, we do

13     not know whether those products

14     had indeed be shipped to America

15     or be used in any areas in

16     America.  We have no way of

17     knowing that, and we do not know

18     that information.  America is an

19     advanced commercial country.

20     There are many business

21     transactions.  Some of the

22     customers may claim they're from

23     the United States, but in the end,

24     they ship their products to Canada

1           or other places, which we didn't

2           care, and we have never asked.

3               Mr. Counsel just mentioned

4           that I am a high-level executive

5           in Taishan.  That's true.  I do

6           have extensive understanding of

7           gypsum board.  I have worked with

8           this company for over ten years.

9           I had contributed greatly for the

10          company started from when it was

11          rather small to where it is right

12          now.  I understand basic

13          commercial common senses.

14              INTERPRETER:  Interpreter

15          clarification.

16              THE WITNESS:  The product

17          gypsum board is a heavy product.

18          To export such a product for a

19          long period of time is an action

20          that's inimaginable.  The shipping

21          cost is very expensive.  To ship

22          our products to somewhere tens of

23          thousand kilometers away, it is

24          not very economical.  Common sense

1         tells us that it is impossible for

2         us to have long-lasting sales in

3         American market.  Under the

4         guidance of my theory, it is

5         impossible for us to have any plan

6         to occupy American market.

7                 America is a country that

8         invented gypsum board and also is

9         a country who had produced gypsum

10        board as the earliest.  America

11        has great capability of

12        manufacturing gypsum boards.  And

13        the biggest gypsum board

14        manufacturer is in America. Our

15        company as a company that had only

16        established for over ten years, we

17        did not have sufficient

18        experience.  It is inimaginable

19        for us to challenge the US gypsum

20        board manufacturers.  Neither had

21        we ever had the plan of selling

22        our gypsum boards to America or to

23        establish a plant in America.

24        This is the most simple and basic

1           fact.  I don't understand why you

2           have such an unfair understanding

3           of our company.

4                 May I go to the restroom.

5                 THE VIDEOTAPE TECHNICIAN:

6           We're going off the record.  The

7           time is 9:26.

8                       -  -  -

9                 (Whereupon, a recess was

10          taken from 9:26 a.m. until 9:30

11          a.m.)

12                      -  -  -

13                THE VIDEOTAPE TECHNICIAN:

14          We're back on the record.  The

15          time is 9:30.

16                THE COURT:  Before you

17          start, Mr. Jia, please listen

18          closely to the question and answer

19          the question.  Don't assume that

20          anyone is expressing any opinion

21          about your company.  They're just

22          asking questions, and please

23          answer the question.

24                THE WITNESS:  Okay.

1           THE COURT:  You may proceed,

2      Counsel.

3  BY MR. GONZALEZ:

4      Q.    If you could please turn to

5  the second page of Bates 30.

6           MR. CYR:  Do you mean

7      Exhibit 30?

8           MR. GONZALEZ:  I'm sorry.

9      Exhibit 30, second page.

10  BY MR. GONZALEZ:

11      Q.    There's some Chinese writing

12  underneath or around the signature.  And

13  can you tell us what the Chinese writing

14  says?

15      A.    This is one of our company

16  seals.

17      Q.    What does it say?  No, the

18  Chinese writing inside?

19      A.    Our company's name.

20      Q.    Can you read it for us in

21  Chinese?

22      A.    Taihe Dongxin Company

23  Limited.

24      Q.    And who signed it?

1        A.    I can't see it very clearly.

2        Q.    Do you recognize the

3   signature?

4        A.    I have rarely seen this

5   signature.

6        Q.    Can you make out the name?

7        A.    I'm not sure for now.

8        Q.    Who had the authority to

9   sign contracts on behalf of the company

10  at that time?

11            MR. CYR:  In December of

12       2005?

13            MR. GONZALEZ:  Yes.

14            THE WITNESS:  You mean

15       December 2005?

16  BY MR. GONZALEZ:

17       Q.    Yes.  What level of employee

18  would have the authority to sign

19  contracts?

20       A.    I can't be very sure about

21  it, but at the time, it should be a

22  person called Fu Tinghuan.

23       Q.    What position would that

24  individual have in the company?

1          A.    This person was the sales

2    manager of TG.

3          Q.    Did TG have an international

4    sales department?

5          A.    Yes.

6          Q.    Was that in 2005?

7          A.    2005.  I can't recall.

8    Perhaps because it's been too long.

9          Q.    And would that also be true

10   in 2006?

11         A.    We kept the department in

12   2006.

13         Q.    And how about 2007?

14         A.    Yes.

15         Q.    And finally in 2008?

16         A.    Yes.

17               MR. GONZALEZ:  I show you a

18               document which will be Exhibit 31

19               and 31A.  It is just 31.  Bates

20               stamp number TG 0019348 through TG

21               0019352.

22                      -  -  -

23               (Whereupon, Deposition

24               Exhibit Jia-31, E-mail chain, top

1            one dated 7/27/2006, Bates stamped

2            TG 0019348 through TG 0019352, was

3            marked for identification.)

4                      -  -  -

5    BY MR. GONZALEZ:

6            Q.    And the top says from

7    Tanader Tang to Wuyu, and the date is

8    July 27, 2006.  First page has Chinese

9    writing on it apparently.  Mr. Jia, have

10   you seen this document before?

11           A.    No.

12           Q.    It's regarding, if you look

13   at the Chinese -- the e-mail in Chinese,

14   it's regarding the purchase and sale of

15   drywall from Taihe to be sent to Fort

16   Lauderdale, Florida, correct?

17           A.    I cannot be sure of that.

18           Q.    If you read the Chinese on

19   the first two pages, it's regarding the

20   purchase and sale of drywall from Taihe

21   to be sent to Fort Lauderdale, Florida,

22   correct?

23           A.    I don't see that.

24           Q.    Do you see the Chinese

1    language where it says "Re:" and it says

2    "Taihe drywall"?

3         A.    I don't understand English

4    though.

5         Q.    No.  No.  In Chinese -- oh,

6    I'm sorry.  Yeah, it does say Taihe.

7    What is this language here, sir?

8         A.    Subject.

9         Q.    And I apologize for

10   pointing.

11              So next to "subject,"

12   there's some English language, and you

13   can translate the word Taihe drywall?

14        A.    I don't know what is

15   drywall.

16        Q.    You don't know what is meant

17   by drywall there?

18        A.    I know what is drywall.

19        Q.    All right.  And then it

20   discusses the purchase and sale of

21   drywall and the dimensions, correct?

22   That's in Chinese?

23        A.    Not in its entirety.  These

24   are only some specifications.

1          Q.    What does the first sentence

2    say starting with the name?  And I

3    apologize for pointing.

4          A.    Manager Tang:  Hello, your

5    e-mail has been received in accordance

6    with your request.  Here is our response.

7          Q.    And what is the response?

8          A.    The response is that we can

9    manufacture the gypsum board according to

10    these specifications.  It also states FOB

11    Qingdao.

12          Q.    And then it has the price in

13    US dollars, right, sir?

14          A.    Oh, yes, the price is in US

15    dollars.  But on the document, it does

16    not describe where would the product be

17    shipped to or where would the product be

18    used at.

19          Q.    And we'll get to that.

20                If you go to the second

21    page, and I'll show you here so I don't

22    have to reach over.  Can you tell us what

23    this says (indicating)?

24          A.    It says, the above

1    information is for your reference.

2            Q.    And by whom is it signed?

3            A.    Che Gang.

4            Q.    Che Gang?  At that time, did

5    Che Gang work for Taihe or TG?

6            A.    I'm not sure about the time

7    period, but if the time was in 2005, I

8    believe this person worked for TG.

9            Q.    And if you'd turn to the

10   next Bates stamp number or the next page,

11   19350, this one is in English.  If the

12   translator will read under subject, it

13   says "Taihe:  Drywall."

14                 And it states, if you look

15   at the grid, the dimensions, the type of

16   drywall, where it's coming from, where it

17   says Qingdao, the pieces, and the

18   estimated shipment costs, Qingdao to Port

19   Everglades in Fort Lauderdale, Florida.

20   Do you see where it says "Fort

21   Lauderdale, Florida"?

22                 MR. CYR:  Objection.  He

23        doesn't read English.

24                 MR. GONZALEZ:  I understand

1          that.  I had the interpreter show
2          him where it is.
3                THE COURT:  What's the
4          question?
5                MR. CYR:  So, she's
6          testifying.
7                THE COURT:  What is the
8          question?
9    BY MR. GONZALEZ:
10          Q.   Were you aware that this
11   document included this shipment to Fort
12   Lauderdale, Florida?
13                MR. CYR:  Objection.
14                THE COURT:  I'll overrule
15          the objection.  If he doesn't
16          understand it, he can ask.
17                THE WITNESS:  Number one, I
18          don't understand English.  If the
19          English and the Chinese version
20          are the same in content, then I
21          will answer a question.
22   BY MR. GONZALEZ:
23          Q.   Were you aware that the
24   goods were being sent to Fort Lauderdale,

1    Florida at that time, July of 2006?

2           A.    I don't know.  I would like

3    to further explain.  Taihe is not exactly

4    TG.  Taihe is the general name of our

5    area.  I'm not sure at the time Che Gang

6    responded to this e-mail.  Did he respond

7    on behalf of TG or TTP?  Also, this is

8    only a quotation.  I do not know whether

9    the transaction was actually went through

10   or not.

11              THE COURT:  Let's ask

12         another question.

13   BY MR. GONZALEZ:

14         Q.    This is your business

15   record, correct, of the company?

16              MR. CYR:  Objection.

17              THE COURT:  Take business

18         out and ask the question, company

19         record.

20   BY MR. GONZALEZ:

21         Q.    This is a company record,

22   correct?

23         A.    I don't know whether it is

24   the company record of TTP's or TG's.

1           Q.    I show you what's been

2    previously marked in Mr. Peng's

3    deposition as Exhibit Number 8, and it

4    will be marked as Exhibit 32.  It's Bates

5    stamp numbers TG 19381, TG 19382.

6                     -   -   -

7                (Whereupon, Deposition

8           Exhibit Jia-32, E-mail chain, top

9           one dated 8/2/2006, Bates stamped

10          TG 0019381 and TG 0019382, was

11          marked for identification.)

12                    -   -   -

13   BY MR. GONZALEZ:

14          Q.    And the e-mail on the top

15   says from Grace Wei, W-E-I, to SDth818,

16   and there's some Chinese language in the

17   top.  Do you know who Grace Wei is?

18                THE INTERPRETER:  Can I take

19          a look?

20                MR. CYR:  His question has

21          nothing to do with this document.

22          He's just asking.

23                INTERPRETER:  I need to

24          refer that to --

1           THE COURT:  She just wanted

2       to look at the name.

3           INTERPRETER:  Because it is

4       here, so I did not write

5       everything down.

6           THE WITNESS:  Wei?  I don't

7       know who that person is.

8   BY MR. GONZALEZ:

9       Q.   Can you read that little

10  paragraph here in the top that's in

11  response to the English e-mail on the

12  bottom?

13          MR. CYR:  Objection.

14  BY MR. GONZALEZ:

15      Q.   Let me put it in context,

16  and I'll restate the question.  Put it in

17  context, and I'm going to ask you next

18  what the response was.  But the e-mail

19  below states, "Our customers would like

20  to get a letter from Shandong Taihe

21  Dongxin Co. on there company letter head.

22          "Stating:

23          "Shandong Taihe Dongxin Co.

24  Gypsum board that is in the 12 containers

1    (listed below) that were shipped last

2    week are made to ASTM C-1396 standards

3    and it is the best quality gypsum board

4    that Taihe makes and is the same quality

5    that Taihe sends to other customer in the

6    United States.  Shandong Taihe Dongxin

7    Co. stands 100% behind our gypsum board

8    and if any quality problems were detected

9    with he gypsum board Taihe will replace

10   the board at no cost to the customer."

11                  And can you tell us what the

12   response was in Chinese?

13                  MR. CYR:  He wants you to

14        read the Chinese.

15                  THE WITNESS:  I don't know

16        who is responding to who in here.

17   BY MR. GONZALEZ:

18        Q.    Can you please read the

19   Chinese language for us so we can

20   understand what it says.

21        A.    Manager Wei, Manager Peng,

22   hello.  Please look at the e-mail below,

23   which is the e-mail from the customer.

24   He requested that you would need to write

1  a verification with your company's

2  letterhead and to have your executives

3  sign and put a stamp on it.  He also said

4  that it would be the best if you could

5  list one or two company names of American

6  company who purchased gypsum board from

7  you.  This will strongly prove that our

8  products have no quality problems.  Thank

9  you.  Wei Dongling.

10            I don't understand this.

11       Q.   To your knowledge, was a

12  certification letter sent by Shandong

13  Taihe Dongxin Company as was requested?

14       A.   I don't know.

15            THE COURT:  Let's see if we

16       can get through this quickly.

17            MR. GONZALEZ:  Yes, Your

18       Honor.

19  BY MR. GONZALEZ:

20       Q.   Mr. Jia, can you tell us why

21  you traveled to Japan in 2010?

22       A.   I went to Japan for

23  business.

24       Q.   Drywall business?  The

1    drywall business?

2            A.    No.

3            Q.    What type of business?

4                  MR. CYR:  Objection.

5                  THE COURT:  I sustain that

6            objection.  If it has to do with

7            drywall, it's one thing.  If it's

8            something else, it's not relevant.

9    BY MR. GONZALEZ:

10           Q.    Just so we're clear, did you

11   travel to Japan for business involving

12   drywall in 2010?

13           A.    No.

14           Q.    Did you travel for business

15   in 2007 to Russia involving drywall?

16           A.    No.

17           Q.    In 2006, your trip to Japan,

18   was that involving drywall business?

19           A.    When was that?

20           Q.    2006?

21           A.    No.

22           Q.    In your trip to Thailand in

23   2006, was that for drywall business?

24                 MR. CYR:  Objection.

1           THE COURT:  I'll overrule

2      the objection.

3           THE WITNESS:  No.

4  BY MR. GONZALEZ:

5      Q.    In 2005, your trip to United

6  Arab Emirates, was that involving the

7  drywall business?

8      A.    Yes.

9      Q.    Who did you meet with in

10  2005 in the United Arab country?

11      A.    I don't recall.

12      Q.    Were you able to sell

13  drywall to the United Arab countries at

14  that time or thereafter?

15      A.    I sold some.

16      Q.    What years did those

17  transactions cover?

18      A.    Well, I don't recall the

19  exact period of time, but we did sell

20  some of our gypsum board to United Arab.

21      Q.    Do you remember the last

22  date, in other words, the year you

23  started and the year you finished, unless

24  you're still selling?

1             A.    I don't recall.  But you

2      could ask Che Gang or our Manager Peng,

3      my colleagues.  Perhaps they could

4      remember.

5             Q.    Che Gang is one of your

6      colleagues?

7             A.    Right now, yes.  He's my

8      subordinate.

9             Q.    Your trip in 2004 to

10     Germany, did that involve business

11     involving drywall?

12            A.    No.

13            Q.    Your trip to Korea and

14     Thailand in 2002, did that involve the

15     business of drywall?

16            A.    Which year was that?

17            Q.    2002?

18            A.    No.

19            Q.    Did you meet with Knauf at

20     any time after 2006 to discuss drywall

21     matters?

22                  INTERPRETER:  Interpreter

23          clarify gender.

24                  THE WITNESS:  They did want

1           to make an appointment to meet us,

2           but we did not meet them.

3   BY MR. GONZALEZ:

4           Q.    You've never spoken with any

5   Knauf representatives to discuss drywall

6   matters from 2006 through the present?

7   Is that true?

8           A.    No.

9           Q.    Does the Knauf gypsum plant

10  operate 24 hours a day?

11              MR. CYR:  Objection.

12              THE COURT:  If he knows.

13              THE WITNESS:  It is

14          impossible for me to know whether

15          another company is operating.  But

16          I know they have not yet filed

17          bankruptcy.

18  BY MR. GONZALEZ:

19          Q.    My question is whether TG

20  operates 24 hours a day?

21          A.    Sometimes.  What do you mean

22  by that?  Do you mean production line

23  works 24 hours or do you mean everybody's

24  heartbeat beats 24 hours?

1           Q.    The business is working 24

2    hours.

3                 MR. CYR:  Objection.

4                 THE COURT:  It's a little

5           too broad, production.

6    BY MR. GONZALEZ:

7           Q.    The manufacturing of drywall

8    in the TG plant occurs 24 hours a day?

9           A.    What are the manufacturers

10   referring to here?

11          Q.    Making of drywall.

12          A.    There are many plants that

13   manufacture gypsum board.  Some operate

14   24 hours a day.  Some operate once in a

15   few months.  It depends on the demand of

16   the market.  I don't know what you're

17   referring to here.

18          Q.    And when you're operating 24

19   hours a day, you have three shifts of

20   employees that work seven days a week?

21          A.    They do have different

22   shifts because the production line of

23   gypsum board is very special.  Sometimes

24   they work 24 hours, but when they operate

1    three to four days, sometimes they would

2    need to stop for maintenance and repair.

3    And the employees take turn to take rest.

4         Q.    From 2005 through 2008, TG

5    employed about 2,000 workers, correct?

6         A.    Including or not including

7    the employees in the subsidiaries?

8         Q.    Total.

9         A.    There are many subsidiaries

10   for TG.  I don't know employees you're

11   referring to, employees on the production

12   lines of TG or the employees on the

13   production lines of TG's subsidiaries.

14        Q.    Between the years 2005 and

15   2008, given your level in the company,

16   are you aware of the number of employees

17   that TG employed?

18        A.    If you can limit your scope,

19   I would be able to give you a clear

20   answer.

21        Q.    I want to know for all the

22   company, all of TG, do you know the

23   number of employees that TG employed

24   during those years, 2005 to 2008?

1            MR. CYR:  Objection.

2            THE COURT:  Including

3        subsidiaries?

4            MR. GONZALEZ:  Yes.

5            THE WITNESS:  If that

6        includes the companies that we

7        have shares in and the companies

8        that we hold 100 percent of share

9        from the year 2002 and 2008, I'd

10       say about 4,000 to 5,000 employees

11       because the people are floating.

12       So, I cannot for sure give you an

13       accurate number.

14   BY MR. GONZALEZ:

15       Q.    And sometimes they worked

16   for TG, and sometimes they worked for TTP

17   during that time, correct, depending on

18   the needs?

19           MR. CYR:  Objection.

20           THE COURT:  Let's be a

21       little more precise as to  --

22   BY MR. GONZALEZ:

23       Q.    During the years 2006, after

24   TTP was created, through the date that

1    TTP stopped doing business, TG and its

2    related companies often shared employees

3    with TTP as needed, correct?

4         A.    We have never shared

5    employees.

6         Q.    You had a strategic alliance

7    and used each other's employees as needed

8    during those dates?

9              MR. CYR:  Objection.

10             THE COURT:  Yeah.  That's

11             already asked and answered.  We

12             have to move on.

13   BY MR. GONZALEZ:

14        Q.    Is your phone number

15   0538-8811449?

16        A.    I used to have this number.

17        Q.    Was it your cell phone

18   number?

19        A.    Not my cell phone number.

20        Q.    What number was it, for your

21   home or your business?

22        A.    It is a land line.

23        Q.    For your home or business?

24        A.    Business.

1          Q.    And what about the number

2    13853881569, was that your cell phone,

3    home or business number?

4          A.    Can you repeat the phone

5    number again?  I don't remember clearly.

6          Q.    Yes, sir.  13853881569.

7          A.    Yes.

8          Q.    And was it your business,

9    cell phone or home number?

10          A.    It is my cell phone number,

11    which I have used for over ten years.

12          Q.    I won't call you.

13          THE COURT:  Anything

14          further?

15          MR. GONZALEZ:  Yes, Your

16          Honor.

17          THE WITNESS:  I don't wish

18          that you would call me.

19    BY MR. GONZALEZ:

20          Q.    Did you attend or a

21    representative of TG attend the Global

22    Drywall Conference in Shanghai in 2007?

23          A.    Representing which company?

24          Q.    Any of the companies that

1    are part of the TG family?

2         A.    I don't remember which year

3    was it, but there was a global drywall

4    conference held in Shanghai which I

5    participated.

6         Q.    Did you meet with any Knauf

7    representatives at that conference?

8         A.    No.

9         Q.    Do you recall who was sent

10   on behalf of TG to the drywall conference

11   held in Orlando, Florida in 2006?

12        A.    In my impression, we did not

13   participate in that conference.

14        Q.    You don't recall

15   participating in the conference?

16        A.    No.

17        Q.    You spoke before of having

18   an honorary position with BNBM, I believe

19   you said.  Is that correct?

20        A.    Correct.

21        Q.    Is that position compensated

22   for, without telling us the amount?

23        A.    No.

24        Q.    Do you have a business card

 1   with you today?

 2           A.    I do not have a business

 3   card with me today.

 4           Q.    Do you have more than -- I

 5   know you don't have one on you today, but

 6   when you have a business card, do you

 7   have more than one?  And to be clear, I

 8   don't mean the same card many times, I

 9   mean, do you have different cards with

10   different positions?

11                 INTERPRETER:  Interpreter

12           clarification.

13                 THE COURT:  Are you about

14           finished?

15                 MR. GONZALEZ:  Yes.  One way

16           or the other.

17                 THE WITNESS:  I don't like

18           the fact that many people carry

19           many name cards as many of

20           so-called scholars in China do.

21           That's not myself.

22   BY MR. GONZALEZ:

23           Q.    What does your business card

24   indicate as your title and for what

1    company?

2           A.    General manager and the

3    director of the board of directors of TG.

4    The general manager and director of the

5    board of directors of TG and an engineer.

6                 MR. GONZALEZ:  Thank you,

7           sir.  I appreciate your patience

8           and your cooperation with our

9           questions.

10                THE COURT:  We'll take a

11          15-minute break at this time.

12                THE VIDEOTAPE TECHNICIAN:

13          Off the record.  This is the end

14          of Tape Number 2.

15                       -  -  -

16          (Whereupon, a recess was

17          taken from 10:13 a.m. until 10:25

18          a.m.)

19                       -  -  -

20                THE VIDEOTAPE TECHNICIAN:

21          We're going back on the video

22          record.  The time is 10:25.

23

24

1                    -   -   -

2                  EXAMINATION

3                    -   -   -

4    BY MS. BASS:

5         Q.    Good morning, Mr. Jia.  My

6    name is Hilarie Bass, and I represent the

7    Home Builders Steering Committee in the

8    United States litigation.

9              When did you first become

10   aware that litigation had been filed

11   against either TG or TTP in the United

12   States?

13        A.    I don't remember the exact

14   time, but perhaps it was in the second

15   half year of 2009.

16        Q.    Do you recall receiving a

17   Chinese translation of the lawsuits that

18   were filed against your company?

19        A.    I have received several

20   documents.  I don't know which one you

21   are referring to.

22        Q.    Do you recall receiving what

23   is described as a Complaint?

24        A.    I have received several

1    during that period of time.  Because I

2    don't understand English, I don't know

3    whether they are complaints or judgments.

4    I just don't know.

5           Q.    Did you receive copies of

6    documents that had been translated into

7    Chinese?

8           A.    Perhaps, but I don't know

9    which one you're referring to.

10          Q.    In August of 2009, do you

11   recall having received a Chinese

12   translation of a document that was filed

13   in the State of Florida courts against

14   your company?

15          A.    I don't recall.

16          Q.    If you received such a

17   document, would you have reviewed it?

18          A.    I would.

19          Q.    Would you have spoken to an

20   attorney about what it was you had

21   received?

22          A.    I would have had my other

23   assistants such as Peng Wenlong to handle

24   it.

1          Q.    Do you recall having asked

2    Peng Wenlong to review documents you

3    received from the United States courts?

4          A.    I'm sure they have been

5    reviewed, but I do not recall the content

6    of the documents.

7          Q.    Did you as head of the board

8    of directors of your company arrange to

9    retain counsel to assist you with the US

10   litigation?

11         A.    Usually after received

12   documents of American litigation, we

13   would meet and find legal consultant to

14   consult about them.

15         Q.    Did you undertake that

16   effort in this case?

17         A.    I'm sure I did.

18         Q.    Do you recall when you made

19   an effort to retain counsel with

20   reference to the US litigation regarding

21   drywall?

22         A.    I would like to know your

23   definition of retention of counsel.  Does

24   it mean that after we signed a retainer

1    agreement or does it mean that I just

2    make phone calls to consult the counsel?

3         Q.    I will try and clarify.

4               When did you first contact

5    counsel to discuss the lawsuit, without

6    disclosing the contents of your

7    conversation?

8         A.    Which law firm are you

9    referring to?

10        Q.    Any law firm.

11        A.    We had a legal counsel, and

12   we did not receive all the documents of

13   the American litigation in one period of

14   time.  I consulted a lawyer from Taian

15   for the documents we first received

16   regarding the litigation.

17               INTERPRETER:  Interpreter

18        clarify gender.

19               THE WITNESS:  Because he had

20        a limit on his ability, so he also

21        contacted his American attorney

22        friends to further inquire

23        information about the litigation.

24        After such inquiry, because we

1       take this litigation very

2       seriously, we don't feel that's

3       sufficient.  We have consulted a

4       law firm called Chinese phonetic,

5       according to Chinese phonetic

6       pronunciation, Ao Rui, perhaps

7       A-O, R-U-I.  During that period of

8       time, many American law firms sent

9       us letters.  Some of them send

10      their representatives in China to

11      come to our company to give us

12      some advices and to try to win our

13      retainer.

14              INTERPRETER:  Your name in

15      Chinese he just said.

16              MR. CYR:  I don't know what

17      it is in Chinese, but last name is

18      C-Y-R in English.

19  BY MS. BASS:

20      Q.    Hogan Lovells?

21              MR. CYR:  The law firm is

22      Hogan Lovells, H-O-G --

23              INTERPRETER:  Hogan Lovells,

24      is it?

1          MR. CYR:  H-O-G-A-N, new

2    word, L-O-V-E-L-L-S.

3          THE WITNESS:  After

4    discussion of our directors, we

5    had made a final decision to

6    choose Hogan Lovells as our

7    counsel.  This is the whole

8    process of our seeking of legal

9    counsel.

10  BY MS. BASS:

11       Q.   Is it correct that it took

12  almost a full year to retain Hogan

13  Lovells after you had been served with

14  processing the American lawsuits?

15       A.   Yes.  Less than a year.

16       Q.   11 months to be exact?

17       A.   Pretty much.

18       Q.   Does your company have any

19  attorneys on staff?

20       A.   I don't know what is the

21  definition of attorney on staff.

22       Q.   An employee of your company

23  who is also an attorney?

24       A.   No.

1           Q.    Do you recall how long after

2    you received the Chinese translation of

3    the American lawsuit it took before you

4    contacted the Chinese lawyer in your

5    local area?

6           A.    Very quick.

7           Q.    Did there come a time when

8    you learned that a default had been

9    entered against your company both in the

10   Federal Court in Louisiana and the State

11   Court in Florida?

12          A.    I really don't know how many

13   default judgments were there.

14          Q.    When was the first time you

15   became aware that any default judgment

16   had been entered against your company?

17          A.    I remember there was a

18   judgment of 260,000.  I'm not sure what

19   was the name of the case though, but I

20   believe it was Judge Fallon who had given

21   me the judgment.

22          Q.    Do you recall when you

23   received a copy of that judgment?

24          A.    I don't recall.

1          Q.    Do you recall filing an

2    affidavit in the state court action in

3    Miami, Dade County, Florida?

4          A.    I did submit an affidavit.

5          Q.    Do you recall stating in

6    that affidavit the following: "No

7    employee at Taishan has sufficient

8    mastery of the English language to read

9    and understand legal documents written in

10   English"?

11         A.    Yes.

12         Q.    Additionally you said, "As a

13   result, no legal document sent to Taishan

14   only in English underwent meaningful

15   review."

16         A.    No.

17         Q.    That is not what you said in

18   your affidavit?

19         A.    No, that's not what I meant.

20   You understood it incorrectly.  Yes.

21         Q.    What did you mean to say in

22   your affidavit?

23         A.    I don't understand.

24         Q.    Mr. Jia, in your affidavit,

1      I believe you stated that you did not

2   understand the consequences of responding

3   to the Complaint because you did not read

4   English.  Do you recall having made that

5   statement?

6              A.    Yes.

7              Q.    In fact, you did receive a

8   copy of the Complaints filed against your

9   company translated into Chinese?

10                 MR. CYR:  Objection.

11                 THE COURT:  If he doesn't

12            understand it, he can ask.

13            Overrule the objection.

14                 THE WITNESS:  I don't know

15            what circumstance you're talking

16            about here.

17   BY MS. BASS:

18              Q.    Do you recall having

19   received copies of the Complaints filed

20   against your company translated into the

21   Chinese language?

22                 MR. CYR:  Objection.

23                 THE COURT:  Be more specific

24            as to the State or Federal Court.

1                MS. BASS:  Okay.

2    BY MS. BASS:

3         Q.    Do you recall having been

4    served with a copy of a Complaint that

5    was filed against your company in the

6    State Court of Miami-Dade, Florida on or

7    about August 3rd of 2009 translated into

8    Chinese?

9         A.    I don't recall, but I do not

10   deny that I may have received it.

11        Q.    When was the first time you

12   became aware that there were complaints

13   about Taishan-manufactured drywall that

14   had been utilized in the United States?

15               MR. CHEN:  Can you please

16          clarify if you mean Complaints as

17          in legal pleadings, because that's

18          how the translation is.

19               MR. CYR:  Thank you, Eugene.

20               MS. BASS:  I'll restate the

21          question.

22   BY MS. BASS:

23        Q.    When was the first time you

24   became aware that customers were unhappy

 1  with the Taishan drywall that had been

 2  utilized in their homes in the United

 3  States?

 4      A.    I believe there was a media

 5  coverage in about June or July of 2009.

 6      Q.    Did you take any steps at

 7  that time to investigate whether there

 8  was a problem with drywall your company

 9  had manufactured?

10      A.    At the time, I did not

11  believe the media's report.  When I first

12  received the Complaint, I felt that there

13  might be a problem.  The company might be

14  in trouble.  The problem I just said was

15  not a problem as of a problem in quality

16  of our gypsum board but a problem of our

17  company, the trouble.

18          The first step we took was

19  to inquire legal services.  On the other

20  hand, we underwent investigation and

21  verification of the quality of our

22  products.  We believed that our quality

23  had no problem.

24      Q.    Did you undertake any

1    testing of your board to determine

2    whether it had elevated levels of sulfur?

3          A.    We had an investigation of

4    all the customers, especially important

5    customers that we had over the years, and

6    none of those customers ever had reported

7    problem as reflected with the American

8    media report.  The gypsum mine and the

9    gypsum raw material, all that, and the

10   production of gypsum board were in

11   accordance with the requirements of the

12   customers.  We had performed the

13   requirements of the contract between us

14   and our customers.

15                Up to today, no customers

16   who claim to be American customers nor

17   distributors in China had ever complained

18   that the gypsum board that we

19   manufactured had the problem as depicted

20   in the American media.  In other words,

21   in the past 20 years during our

22   production of gypsum board, no customers

23   had ever said that there were problems

24   with the gypsum board that we

1    manufactured.

2         Q.    Did you undertake any

3    testing to determine whether your gypsum

4    board had elevated levels of sulfur?

5         A.    We did have the test.

6         Q.    Was that a test that was

7    undertaken by employees of TG or TTP?

8         A.    Those companies did the

9    test.

10        Q.    Can you identify the names

11   of the employees who underwent -- who

12   supervised those tests?

13        A.    I can't.

14        Q.    Is there a report of the

15   results of that test?

16        A.    The raw material to produce

17   gypsum board has sulfur level.  It is not

18   only the fact for the manufacturers in

19   China but also a fact for the

20   manufacturers in America.

21             INTERPRETER:  Interpreter

22        needs a moment to check

23        dictionary.

24             (Discussion with interpreter

1           and Mr. Chen in Chinese.)

2                   MR. CHEN:  I'm sorry, I

3           don't know how to translate that.

4           It's a technical term.

5                   INTERPRETER:  Give me a

6           minute, please.

7                   The interpreter is asking

8           the witness to repeat what he

9           said.

10                  THE WITNESS:  All raw

11          materials has element of calcium

12          sulfate.

13  BY MS. BASS:

14          Q.    Is there a written report

15  reflecting the results of the testing

16  undertaken by your company?

17          A.    If we have it, I could get

18  it for you.

19          Q.    Do you recall when that

20  testing was undertaken?

21          A.    I don't recall the time.

22          Q.    Do you recall specifically

23  what they were testing for when those

24  tests were undertaken?

1          A.    It is impossible for me to

2    know every detail.

3          Q.    Do you know generally

4    whether or not the testing endeavored to

5    determine whether there was off-gassing

6    from the gypsum that would deteriorate

7    copper or silver?

8                INTERPRETER:  Interpreter

9          needs clarification.

10                THE WITNESS:  I'm an

11          engineer.  I know that it is

12          impossible to have the result as

13          you just described.

14    BY MS. BASS:

15          Q.    Is it your view that it is

16    impossible for gypsum board to cause

17    deterioration in copper and silver?

18                MR. CYR:  Objection.

19                THE COURT:  You are asking

20          him for an opinion.  Let's restate

21          the question.

22                MS. BASS:  Okay.

23    BY MS. BASS:

24          Q.    Did the testing undertaken

1  by your company attempt to determine

2  whether or not off-gassing of your gypsum

3  could cause deterioration in copper or

4  silver?

5        A.    I don't think your question

6  is clear.

7        Q.    Do you know what the purpose

8  of the testing undertaken by your company

9  was?

10       A.    After we became aware of the

11 reports, we discussed the problem with

12 some people.  In the results, we felt

13 that there was no relevancy.

14       Q.    It is your view that your

15 gypsum board was not in any way

16 defective?

17       A.    That's my belief.

18             MS. BASS:  Can I have marked

19        as Exhibit 33.  This is a document

20        that is in your notebook.  It is

21        TG 0019356.

22             MR. CYR:  Okay.

23                   -  -  -

24             (Whereupon, Deposition

1          Exhibit Jia-33, E-mail dated

2          1/27/2009, Bates stamped TG

3          0019356, was marked for

4          identification.)

5                          -  -  -

6          MS. BASS:  This is an e-mail

7          dated 1/27/2009 from a reporter at

8          the South Florida Business

9          Journal.

10  BY MS. BASS:

11          Q.   My first question for the

12  witness is, can he identify the e-mail

13  recipients that are noted in this e-mail.

14          THE COURT:  Counsel, do you

15          want to see that?

16          MR. CYR:  I can look at it

17          at the same time.

18          THE WITNESS:  I don't know.

19  BY MS. BASS

20          Q.   You don't recognize the

21  e-mail address of Frank Clem?

22          A.   I don't know.

23          Q.   Were you informed by any

24  employees of your company that a reporter

1    from a business journal in Miami, Florida

2    had inquired as to complaints about odor

3    and other defects in your gypsum board?

4         A.    I've heard of such reports,

5    but I'm not sure whether it's from Miami

6    or what newspaper was it from.

7         Q.    Did someone, one of your

8    employees, communicate to you back in

9    January of '09 that they had been

10   contacted regarding complaints about

11   Taishan-manufactured gypsum board that

12   was being utilized in Miami, Florida.

13        A.    I'm not sure about the exact

14   time, but there were some employees who

15   reported that to me.  I'm not sure

16   whether their report was about Miami or

17   other places.

18        Q.    Did you undertake any

19   investigation to determine whether or not

20   there was an unusual odor coming from

21   Taishan Gypsum board that had been

22   imported into the United States?

23        A.    We firmly believe that our

24   gypsum board has no problem.

1          Q.    Did you undertake any type

2    of testing to determine whether or not

3    there was an unusual odor coming from the

4    gypsum board that your company had

5    manufactured and had been utilized in the

6    United States?

7          A.    Taishan Gypsum board did not

8    undertake such tests.

9          Q.    The testing that you

10   previously referred to as having been

11   undertaken by your company, is that

12   testing separate and apart from the

13   testing of the Chinese government about

14   which you testified in your last

15   deposition?

16         A.    You asked me whether our

17   company had underwent any tests, but as a

18   company, our capability is limited.  It

19   is impossible for us to have such a lab

20   to undergo tests in the big scale.  We

21   only did some local tests.

22         Q.    Could you please describe

23   what type of local tests you undertook?

24   And when I say "you," I mean your

1    company?

2         A.    For example, we bought the

3    raw materials, and we analyzed the

4    elements, different elements in the

5    material.  That's something we could do.

6         Q.    Is there any documentation

7    within the records of your company

8    reflecting this type of testing that

9    you're referring to?

10        A.    I can go back and check.

11             MS. BASS:  I would ask that

12             those documents be produced

13             because it's the first time we've

14             been informed that such testing

15             occurred.  And we, to the best of

16             my knowledge, have not received

17             any documentation reflecting that

18             such testing occurred.

19             MR. CYR:  We can discuss it

20             with the judge.  I object because

21             I don't understand the relevance

22             to the jurisdiction.

23             THE COURT:  I'll deal with

24             that at another time.

1                   MS. BASS:  Yes.

2      BY MS. BASS:

3           Q.    Mr. Jia, were you aware that

4      the CPSC of the United States government

5      issued questions to your company

6      regarding the quality of your gypsum in

7      August of 2009?

8           A.    No.

9                   MS. BASS:  Can I show you a

10                  document that's been marked as TG

11                  0025155, which we will mark for

12                  the purposes of this deposition as

13                  Exhibit Number 34.

14                        -  -  -

15                  (Whereupon, Deposition

16                  Exhibit Jia-34, E-mail and

17                  attachment dated August 15, 2009,

18                  Bates stamped TG 0025155 through

19                  TG 0025158, was marked for

20                  identification.)

21                        -  -  -

22      BY MS. BASS:

23           Q.    Could you please look at the

24      document that has been marked as Exhibit

1   34 and let us know whether or not you

2   have seen this document before?

3               MS. BASS:  It is within your

4         binders.

5               MR. CYR:  Right.  I'm trying

6         to save time.

7               MS. BASS:  No problem.

8               The document is TG 25155

9         through 158.

10              MR. CYR:  It's a different

11        translation.

12              MS. BASS:  I don't know what

13        document you're looking at, Mr.

14        Cyr.

15              MR. CYR:  It's a part of the

16        document you handed the witness.

17              MS. BASS:  No.  No, it's

18        not.  That is not the document

19        before the witness.  That's not

20        been marked as Exhibit 34.

21              MR. CYR:  I won't argue with

22        you.  It's just that it's the only

23        way I got it in my hands.

24   BY MS. BASS:

1          Q.    The question, Mr. Jia, is

2    simply whether you have seen this

3    document before?

4          A.    I have not seen this

5    document before.

6          Q.    Were you aware of inquiries

7    from the United States CPSC regarding the

8    quality of the drywall manufactured by

9    your company?

10          A.    I don't know.

11          Q.    Did you participate in a

12    tour of your factory with representatives

13    of the CPSC of the US government?

14          A.    I participated.

15          Q.    Do you recall when that tour

16    took place?

17          A.    I don't remember the exact

18    date, but perhaps it is in mid 2009.

19          Q.    What did you understand was

20    the reason that the CPSC was coming to

21    tour your factory?

22          A.    I don't know the reason for

23    it, but I received them warmly.

24          Q.    Did anyone from the CPSC

1    inform you about concerns that they had

2    about the quality of the drywall that had

3    been manufactured by your plant and was

4    being utilized in the United States?

5            A.    No.

6                  MS. BASS:  I would next like

7            to have marked as 35 a document

8            which has been Bated as TG 19235

9            through 236 and ask you whether or

10           not you're familiar with the

11           e-mail address of the recipient of

12           this document.

13                    -   -   -

14                  (Whereupon, Deposition

15           Exhibit Jia-35, E-mail dated

16           8/17/2009, Bates stamped TG

17           0019235 and TG 0019236, was marked

18           for identification.)

19                    -   -   -

20                  THE WITNESS:  I only know

21           the character of Che Gang.

22   BY MS. BASS:

23           Q.    And Che Gang is an employee

24   of TTP in August of 2009, correct?

1          A.    Yes.  What did you say, 2009

2    or 2008?

3          Q.    The date of this e-mail is

4    August of 2009.

5          A.    He was not an employee of

6    TTP at that time.

7          Q.    Do you know what entity

8    employed Mr. Che as of August of 2009?

9          A.    TG.

10          Q.    Did Mr. Che inform you that

11    he had received information about claims

12    relating to Chinese drywall that had --

13    claims of Chinese drywall that had been

14    tied to corrosion of metal components,

15    foul smells and complaints by homeowners

16    of health issues?

17          A.    Not only Che Gang reported

18    me that issue but also other employees

19    who referred the media report to me for

20    review.

21          Q.    In fact, this document

22    references that the CPSC was coming to

23    visit China beginning on August 17, 2009.

24    Does that help refresh your recollection

1    as to when the CPSC toured your factory?

2          A.    I don't remember the exact

3    date.  As I mentioned, perhaps it was in

4    mid 2009.  That day was very hot.

5          Q.    Did you discuss with any

6    representatives of the CPSC during their

7    tour of your factory their concern that

8    your drywall was causing corrosion of

9    metal components in homes in the United

10   States?

11         A.    We did not discuss that.

12         Q.    Are you aware of anyone else

13   who was employed by your company that

14   engaged in discussions with the CPSC

15   regarding their concerns about the

16   quality of your drywall?

17         A.    No.  Let me give you a brief

18   of the tour.  May I?

19         Q.    Yes.

20         A.    It was about 10:30 in the

21   morning accompanied by some government

22   officials.  I was told that there were

23   about four or five people from CPSC were

24   planning to come to our manufacturer for

1  a tour.  I led them for tour in every

2  place in our factory.  And we sampled our

3  products, and I was told it was for

4  analysis and testing.   They stayed in

5  our company for about 25 or around 30

6  minutes, less than 30 minutes.  We

7  didn't actually sit down like we're

8  sitting down today for discussions.

9  After we saw them off, it all ended.  We

10  never again saw anybody from CPSC.

11        MS. BASS:  I would like to

12        next mark as Exhibit 36 a document

13        which has been Bated as TG 0025352

14        through 55.

15             -  -  -

16        (Whereupon, Deposition

17        Exhibit Jia-36, Document partly in

18        Chinese, "Chinese Drywall Default

19        Ruling shows Need to Hold Foreign

20        Manufacturers Accountable in U.S.

21        Justice System," Bates stamped TG

22        0025352 through TG 0025355, was

23        marked for identification.)

24             -  -  -

1    BY MS. BASS:

2           Q.    And ask the witness if you

3    can recall having seen that document

4    before?

5           A.    Let me take a look.

6           Q.    Please.

7                 MR. BLACK:  Could you read

8           the Bates Numbers again.

9                 MS. BASS:  TG 25352 through

10          55.

11                MR. BLACK:  Thank you.

12                (Reviewing document.)

13                THE WITNESS:  I got an idea.

14   BY MS. BASS

15          Q.    Do you recall being informed

16   around September of 2009 that a default

17   had been entered against your company for

18   its failure to respond to a lawsuit filed

19   against it in the State of Louisiana in

20   Federal Court?

21          A.    Yes.

22          Q.    Were you aware of the

23   consequences of what a default meant

24   against your company in the US legal

1    proceedings?

2           A.    No.

3           Q.    Is it correct that it was --

4    a motion and your affidavit were not

5    filed in the legal proceedings in the

6    United States until September of 2010?

7           A.    I don't recall that.

8           Q.    Are you aware that at some

9    point your counsel filed a motion to

10   vacate the default that is referenced in

11   Exhibit 36?

12          A.    Yes.

13          Q.    And that that motion was not

14   filed until sometime in September of

15   2010, more than a year after you -- after

16   this news report regarding the entry of

17   the default?

18               MR. CYR:  Objection,

19          different default.

20               THE COURT:  Let's restate it

21          then.

22   BY MS. BASS:

23          Q.    Are you aware of how long

24   after your notice of the default entered

1    against you in Federal Court in New

2    Orleans it took for your company to file

3    a motion to vacate in that proceeding?

4              MR. CYR:  Objection, vague.

5              THE COURT:  Why don't the

6         records just speak for itself?

7         What difference does it make?

8              MS. BASS:  That's fine, Your

9         Honor.

10             THE COURT:  Anything

11        further?

12             MS. BASS:  No, Your Honor,

13        thank you.

14             THE COURT:  Anybody else?

15             THE VIDEOTAPE TECHNICIAN:

16        Going off the video record at

17        11:23.

18                  -  -  -

19             (Whereupon, a recess was

20        taken from 11:23 a.m. until 11:25

21        a.m.)

22                  -  -  -

23             THE VIDEOTAPE TECHNICIAN:

24        This is the beginning of Tape

1          Number 4.  Going on the record at

2          11:25.

3                    THE COURT:  Go ahead.

4                      -  -  -

5                    EXAMINATION

6                      -  -  -

7     BY MR. BRENNER:

8          Q.    Good morning, Mr. Jia.  My

9     name is Theodore Brenner.  I represent

10    Tobin Trading in the Germano action.

11                   THE COURT:  Keep your voice

12         up, please, so they can hear you.

13    BY MR. BRENNER:

14         Q.    Are you familiar, sir, with

15    the company known as THBM?

16         A.    Yes.

17         Q.    What is the business of

18    THBM?

19         A.    THBM is abbreviation of

20    Taihe Dongxin Company, Limited.  This is

21    the name that we usually use.  I'm not

22    sure if it is legally binding.

23         Q.    So, do you have before you,

24    Mr. Jia, the document that is marked --

1    has been marked as Exhibit Number 20?

2          A.    Yes.

3          Q.    This is a document that is

4    marketing materials -- excuse me.

5               Is this a document that is a

6    marketing material published by the

7    Shandong Taihe Dongxin Company?

8          A.    Yes.

9          Q.    Is it your testimony that

10   the references within this material to

11   THBM are references to the Shandong Taihe

12   Dongxin Company?

13         A.    For the convenience of

14   communication, you can say that for now.

15         Q.    I don't think I understand

16   your answer to my question, Mr. Jia.

17   If you will look through Exhibit Number

18   20, you will see references to THBM,

19   specifically on the second and third page

20   and on the sixth and seventh pages?

21         A.    Like I said, these four

22   letters are not especially for Taishan

23   Gypsum board.

24               INTERPRETER:  Interpreter

1           correction.  Taishan Gypsum.

2           Delete the "board," please.

3    BY MR. BRENNER:

4           Q.    Isn't it your testimony that

5    THBM is the same entity or the same

6    reference as Shandong Taihe Dongxin

7    Company?

8           A.    Not necessarily.

9           Q.    Please explain any

10   differences between THBM and Shandong

11   Taihe Dongxin Company?

12          A.    Taihe Dongxin Company used

13   to be the name of Taishan Gypsum.  For

14   the convenience of communication and

15   identification, we used initial of each

16   of the English letters of the characters.

17   But for some of the companies in Taian,

18   they also abbreviated their company name

19   as THBM.  Therefore, THBM is not only for

20   Taishan.

21          Q.    In Exhibit 20 that's before

22   you on pages 6 and 7, it appears to say

23   "THBM is widely used and much popular."

24   Is that accurate, Mr. Jia?

1          A.     Where is it?

2                 MR. CYR: (Indicating.)

3                 THE WITNESS:  This says

4          Taihe Building Material is wide

5          used and much popular.

6     BY MR. BRENNER:

7          Q.     Is it your testimony that

8     THBM as used in this marketing material

9     does not refer to TG?

10         A.     It is TG.

11         Q.     Did THBM maintain any sales

12    offices?

13         A.     THBM, Taihe Dongxin Company

14    Limited does have its sales office.

15         Q.     Does it have more than one

16    sales office, more than one geographical

17    location?

18         A.     I don't understand what you

19    mean by that.

20         Q.     I want to know whether THBM

21    maintained more than one sales office?

22         A.     What time period?

23         Q.     2005/2006.

24         A.     I don't think the number one

1   office or two offices have the same

2   concept between you and me.  Maybe you

3   can use square meter.

4        Q.    My question to you, sir,

5   involves offices in more than one

6   location.

7        A.    One location?

8        Q.    Let me ask another question.

9   Did THBM have an agent, a sales agent in

10  Guangzhou, China in 2005/2006?

11            INTERPRETER:  Sir, do you

12       mean Guangzhou?

13  BY MR. BRENNER:

14       Q.    (Handing over spelling.)

15       A.    We have about 400 TG

16  salespeople who are located in all over

17  China with offices and residence in their

18  respective geographic location.  It is

19  common for them to have office and

20  residence in other locations.

21       Q.    Were all of those 400

22  salespeople -- strike that.

23            In 2005/2006, were all of

24  those 400 salespeople employees of TG?

1             A.     Part of them are the

2      employees of TG.  Part of them were the

3      employees of TTP.  And many of them

4      are -- many others were the employees of

5      other subsidiaries.

6             Q.     For those who were employees

7      of TTP -- of TG, were they authorized to

8      make sales and make quotations for

9      purchase on behalf of TG?

10            A.     Yes.

11            Q.     In 2005 and 2006, TG owned a

12     paper factory used to make paper involved

13     in the drywall production process.  Is

14     that true?

15            A.     TG has a workshop that's

16     manufactured the paper that is involved

17     in making the drywall.

18            Q.     And is it true that the

19     waste paper purchased for use in that

20     workshop was purchased from the United

21     States?

22            A.     Not all of them.

23            Q.     Is it true with respect to

24     some of the paper that was used in that

1   workshop?

2          A.    Yes.

3          Q.    And the paper that was

4   purchased in the United States for use in

5   that workshop was shipped from the United

6   States to China; is that true?

7          A.    I'm not sure about the

8   detailed business process.

9          Q.    Which TG employee or

10  employees were in charge of the paper

11  purchased from the United States for use

12  in the TG workshop?

13         A.    Purchasing department.

14         Q.    Do you know the names of any

15  of the persons in the purchasing

16  department that were so involved?

17         A.    Usually there are three to

18  five people involved in this process.

19         Q.    Can you provide us today

20  with any of the names of the three to

21  five people that were involved in this

22  process in the year 2005/2006?

23         A.    Zhang Jijun.

24         Q.    Do you know the names of any

1    of the other people so involved?

2            A.    It's been six or seven

3    years, so, I do not recall exactly the

4    names of other people, but I'm sure that

5    this person is still participating in the

6    process.

7            Q.    To your knowledge, has Mr.

8    Zhang ever traveled to the United States

9    for the purpose of purchasing paper for

10   use in the TG workshop?

11           A.    No.

12           Q.    To your knowledge, has any

13   employee of TG or any agent of TG

14   traveled to any of the states in the

15   United States to participate in the

16   acquisition of paper for use in the TG

17   workshop?

18           A.    No.

19           Q.    In the years 2005/2006, did

20   TG have any contracts or agreements with

21   persons to act as its agent in the United

22   States to serve as a supplier of paper

23   used in the workshop?

24           A.    I'm not sure about this.

1          Q.    Who would know?

2          A.    The importing of the paper

3    in the most part was processed in the

4    transaction in China.  We regularly asked

5    for bidding from the sellers in the

6    United States and elsewhere.  It is still

7    the case today.

8          Q.    And who is the person within

9    TG that would know the information for

10   the years 2005/2006 regarding the

11   purchase of paper in the United States

12   and the shipment of the paper from the

13   United States to China for TG?

14         A.    Zhang Jijun.

15         Q.    The same individual that you

16   identified before?

17         A.    Yes.

18              MR.  BRENNER:  Thank you,

19         sir, for answering my questions.

20              THE COURT:  Let's take a

21         five-minute break at this time.

22              THE VIDEOTAPE TECHNICIAN:

23         We're going off the record at

24         11:45.

```
 1                    -  -  -
 2                  (Whereupon, a recess was
 3          taken from 11:45 a.m. until 11:53
 4          a.m.)
 5                    -  -  -
 6                  THE VIDEOTAPE TECHNICIAN:
 7          We are back on the record.  The
 8          time is 11:53.
 9                  THE COURT:  You may proceed,
10          Counsel.
11                    -  -  -
12                  EXAMINATION
13                    -  -  -
14  BY MR. BLACK:
15          Q.    Good morning.  I'm David
16  Black.  I represent the State of
17  Louisiana.
18                  Yesterday your counsel asked
19  you some questions about Louisiana.  You
20  know where Louisiana is located, do you
21  not, Mr. Jia?
22          A.    No.
23          Q.    Do you know that there were
24  storms in Louisiana in 2005 that caused
```

1  great property damage there?

2        A.    I don't know that.  I only

3  know there is a place called New Orleans

4  that has suffered damage.   I don't know

5  which state does New Orleans belong to.

6        Q.    New Orleans is in the State

7  of Louisiana.  I'll represent that to

8  you.  And for you in the materials

9  business, storms provide a sales

10  opportunity, do they not?

11        A.    Not all disasters in nature

12  would provide such opportunities.

13        Q.    Disasters which destroy

14  property and destroy houses provide that

15  opportunity, don't they?

16        A.    Not opportunities to all

17  manufacturers.

18        Q.    They provide those

19  opportunities to you, do they not?

20        A.    No.

21        Q.    Mr. Jia, you report --

22            Yesterday you described your

23  reports on the business activities of TG

24  each year?

```
 1          A.    Yes.

 2          Q.    And your counsel marked your

 3    reports for the years 2005, 2006, 2007

 4    and 2008 and maybe 2009, correct?

 5          A.    Yes.

 6          Q.    And in those reports, you

 7    not only report on the activities of the

 8    past year, but you set forth work

 9    assignments for the next year, correct?

10               INTERPRETER:  Interpreter

11          clarification.

12               THE WITNESS:  I think I

13          made -- there were statements in

14          the report.

15    BY MR. BLACK:

16          Q.    You make these reports to

17    the board of directors, correct, of TG?

18          A.    And also shareholders'

19    conference.

20          Q.    And you make these reports

21    as truthful as you can make them,

22    correct?

23          A.    Correct.

24          Q.    When you --
```

1             Before you make the reports,

2   you gather information from within your

3   company; do you not?

4        A.   Yes.

5        Q.   From whom do you gather

6   information with respect to the sales of

7   TG's products?

8             MR. CYR:  Objection, vague.

9             THE COURT:  Let's be a

10            little more precise time-wise and

11            otherwise.

12   BY MR. BLACK:

13        Q.   From whom did you gather the

14   information concerning the sales of TG's

15   products in 2006 in your report on that

16   date?

17        A.   I receive information on

18   sales daily.

19        Q.   And you receive information

20   from the sales department?

21        A.   Not entirely from the sales

22   department.

23        Q.   Where else do you receive

24   information?

1          A.     Some of the customers

2    directly contact me to provide

3    information.

4          Q.     Do you receive information

5    with respect to foreign sales?

6          A.     No.

7          Q.     So, your information is

8    limited to sales only in China?

9          A.     Most of the time, yes.

10         Q.     But sometimes you receive

11   information concerning sales outside of

12   China, correct?

13         A.     Yes.

14         Q.     When did your company first

15   set up a website presence?

16         A.     I don't know. I forgot.

17         Q.     In your 2006 report which

18   you marked as -- which we marked as

19   Exhibit Number 26, you described as one

20   of your strategies to intensify online

21   sales.  What did you mean by

22   "intensifying online sales"?

23         A.     "Intensify online sales"

24   refers to that online sales can serve the

1    customers more directly and conveniently.

2         Q.    So, you had an online

3    presence in 2006 then, correct?

4         A.    I believe so.

5         Q.    Under your leadership, was

6    the first online presence set up for TG?

7         A.    I'm not sure whether it was

8    in 2006, 2003 or 2005, but we do have a

9    website that reflects our company as a

10   window of our company.

11        Q.    As a leader of the company,

12   who did you direct to set up that

13   presence?

14        A.    I don't know who set up the

15   website.

16        Q.    Who maintains the website

17   for your company Taishan or its

18   predecessor?

19        A.    Maybe the office, but I

20   don't know how to explain it clearly now.

21        Q.    Your company monitors

22   responses from your websites, does it

23   not?

24        A.    I don't know.

1          Q.    Well, if you're intensifying

2    online sales, you're --

3                What did you mean by the

4    term "intensify online sales"?

5          A.    Other enterprises also

6    emphasizes on to intensify online sales.

7    It is a very popular term, therefore, in

8    my report, I also stressed on intensify

9    online sales.  That's all to the meaning

10   of it.  There was no detailed arrangement

11   in that regard.

12         Q.    You wanted to have more

13   sales by using your online presence, did

14   you not?

15         A.    Yes.

16         Q.    And you knew that people

17   around the world read your website,

18   correct?

19              MR. CYR:  Objection,

20         speculation.

21              THE COURT:  Yes, it is

22         speculation.  What was his intent?

23   BY MR. BLACK:

24         Q.    Did you receive --

1                    What was your intent in

2    setting up your website?

3          A.    The reason for setting up

4    the website is to have more people know

5    Taishan Gypsum.

6          Q.    And buy Taishan Gypsum's

7    product, correct?

8          A.    I don't exclude that

9    intention.

10          Q.    And you tracked sales as it

11    relates to your website presence, did you

12    not?

13          A.    I am not familiar with

14    websites.  I am illiterate of websites.

15          Q.    Well, in your Exhibit 27,

16    which was your report on the year 2007,

17    under the heading "Sales work reached new

18    breakthrough," you stated that one of the

19    reasons was "the advantage of a strong

20    online market."  Correct?

21          A.    Yes.

22          Q.    And you also described for

23    2007 that one of the reasons for that was

24    that you refined your website, correct?

 1          A.    Yes.

 2          Q.    And you gave directions to

 3    those in your company who was handling

 4    the online presence to make it more

 5    accessible to people for sales, correct?

 6          A.    And also for the people who

 7    would have the opportunity to contact our

 8    company in the future.

 9          Q.    And you knew that --

10          You knew from your contacts

11    with the sales department that people

12    from America contacted you through your

13    website presence, did you not?

14          A.    I don't know.

15          Q.    And that those people were

16    searching for drywall from your company?

17          MR. CYR:  Objection.

18          THE COURT:  How would he

19          know that?  I sustain the

20          objection.

21    BY MR. BLACK:

22          Q.    Who within your sales

23    department was responsible for responding

24    to online requests for sales?

 1          A.    I don't know who would be

 2    responsible for that.

 3          Q.    Who is responsible for your

 4    sales of Taishan Gypsum products in the

 5    years 2005, 6, 7 and 8?

 6          A.    Fu Tinghuan.

 7          Q.    And he is here to testify

 8    this week, is he not?

 9          A.    I believe you are notified

10    of that.

11          Q.    And you would refer

12    inquiries concerning the role of Internet

13    sales in growth of your gypsum sales to

14    Mr. Fu?

15          A.    No.

16          Q.    Who would you refer those

17    inquiries to?

18          A.    Well, I've only heard the

19    word "website sales," therefore, I used

20    it in my report.  I'm not very familiar

21    with computer.  Because of my busy work

22    schedule, I don't really use computer

23    that much.  I only use computer for the

24    purpose of reading the news.  Therefore,

1    I have not arranged Manager Fu for any

2    detailed responses for the website sales.

3              Q.    You wrote your reports that

4    your counsel marked for Exhibits 25

5    through 29 with the idea that people

6    would believe what you said in your

7    reports, correct?

8              A.    Yes.

9              Q.    You were truthful when you

10   wrote those reports, were you not?

11             A.    Yes.

12             Q.    And you wrote these reports

13   to the board of directors and to the

14   shareholders, correct?

15                   MR. CYR:  Objection.  That's

16        the third time.

17                   THE COURT:  Yes.  We've gone

18        through this already.

19   BY MR BLACK:

20             Q.    You intended that the board

21   of directors and the shareholders rely on

22   those reports, did you not?

23             A.    Yes.

24             Q.    And the board of directors

1    accepted those reports, correct?

2            A.    Yes.

3                   MR. BLACK:  I have nothing

4         further.

5                   THE COURT:  Any redirect?

6                   MR. CYR:  Yes, Your Honor,

7         just very briefly.

8                   MR. SEXTON:  I have less

9         than five minutes.

10                  THE COURT:  All right.

11        Let's try to do it in three.

12                      -  -  -

13                   EXAMINATION

14                      -  -  -

15   BY MR. SEXTON:

16           Q.    Good afternoon, sir.  My

17   name is Mike Sexton.

18                  Have you heard of a company

19   called Rothchilt International, Limited

20   possibly out of Taiwan?

21           A.    You pronounce this name in

22   English.  I wish you could pronounce it

23   in Chinese.

24           Q.    Me too.

1          A.    Because I'm not sure which

2    company you're referring to.

3          Q.    Have you dealt with any

4    brokers of drywall or other products

5    based in Taiwan?

6          A.    No.

7          Q.    Have you ever heard of a

8    company called La Suprema?

9          A.    No.

10          Q.    And finally, sir, have you

11    heard of my client, Banner Supply?

12          A.    I have not heard of it.

13          Q.    And to the best of your

14    knowledge today, you are not aware of TG

15    or TTP selling any drywall that

16    ultimately landed in the hands of Banner

17    Supply, correct?

18          A.    I don't know.

19              MR. SEXTON:  Thank you very

20          much.

21              THE COURT:  Any redirect?

22                  -  -  -

23              EXAMINATION

24                  -  -  -

1    BY MR. CYR:

2         Q.    Mr. Jia, you were asked some

3    questions about whether or not you

4    received compensation as a result of your

5    honorary position with BNBM.  Do you

6    recall that question?

7         A.    I remember.

8         Q.    Do you remember that you

9    answered the question, no, that you did

10   not receive any compensation?

11        A.    Yes.

12        Q.    Will you please clarify your

13   answer?

14        A.    Yes.  I have not received a

15   penny for the position that I have with

16   BNBM as it deputy general manager.  My

17   salary is all from TG.  The position as a

18   director in BNBM, that led to 25,000 RMB

19   that I received.  In China, we call it

20   the fee of vehicle and horses.  Because I

21   shouldn't ask for reimbursement when I go

22   for the board of directors meeting from

23   TG.  The directors of the board of

24   director of BNBM had a stipulation that

1    for all directors, the fee of vehicle and

2    horses is set to be 25,000 RMB.  That's

3    all.

4          Q.    Mr. Jia, I'm going to show

5    you what has been marked as Defendant's

6    22 and ask you if you recall the

7    questions that Mr. Seeger asked you with

8    respect to the projects that are

9    reflected in that document?

10         A.    Yes.

11         Q.    Just so that the record is

12   clear, were separate subsidiaries

13   established for the purposes of those

14   projects?

15              MR. SEEGER:  Objection,

16         leading, Your Honor.

17              THE COURT:  I'll allow it in

18         view of the translation and the

19         difficulty in doing it.

20              THE WITNESS:  I don't quite

21         understand your question.

22   BY MR. CYR:

23         Q.    Were separate subsidiaries

24   established for the purposes of the

 1    projects reflected in the exhibit?

 2         A.    I don't quite understand.

 3    What do you mean by "subsidiaries"?

 4         Q.    Companies.

 5         A.    I understand now companies.

 6         Q.    Were separate companies

 7    established for the purpose of the

 8    projects reflected in the exhibit?

 9         A.    Yes.

10         Q.    Were Shandong Taihe and BNBM

11    shareholders in those companies?

12         A.    Yes.

13         Q.    Have either TG or TTP ever

14    been in a joint venture agreement with

15    BNBM?

16         A.    I don't understand your

17    concept of joint venture.

18         Q.    Mr. Seeger referred to these

19    projects as joint ventures between BNBM

20    and Shandong Taihe.  Do you recall that?

21    Do you recall that?

22         A.    You're asking me?

23         Q.    Yes.  Do you recall that?

24         A.    Yes, yes.

1          Q.    Do you have familiarity with

2   the concept of a joint venture under

3   Chinese law?

4          A.    Under Chinese law, whenever

5   there are two or more stockholders to

6   invest in one enterprise, that would be

7   called joint venture.  If the share is

8   one percent, that would also be

9   considered as joint venture.  A joint

10  venture is a concept that whenever there

11  are two or more shareholders investing in

12  one company, the company is completely

13  separately operated.  The joint venture

14  concept is a concept of shareholders.

15              MR. CYR:  I have no further

16          questions, Your Honor.

17              THE COURT:  All right.

18          We'll end here, and we'll come

19          back at 1:30.  We'll stand in

20          recess until 1:30.

21              THE VIDEOTAPE TECHNICIAN:

22          This concludes the deposition of

23          Tongchun Jia.  The total number of

24          tapes used today is four.  We're

1           going off the record at 12:27.

2                     -  -  -

3                 (Whereupon, the deposition

4           concluded at 12:27 p.m.)

5                     -  -  -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          C E R T I F I C A T E
2
3

            I, LINDA L. GOLKOW, a
4    Registered Diplomate Reporter, Certified
     Court Reporter and Notary Public, do
5    hereby certify that, pursuant to notice,
     the deposition of TONGCHUN JIA was duly
6    taken on January 10, 2012 at 8:57 a.m.
     before me.
7
8            The said TONGCHUN JIA was
     duly sworn by the Court according to law
9    to tell the truth, the whole truth and
     nothing but the truth and thereupon did
10   testify as set forth in the above
     transcript of testimony.  The testimony
11   was taken down stenographically by me.
12
             I do further certify that
13   the above deposition is full, complete
     and a true record of all the testimony
14   given by the said witness.
15
16
             Linda L. Golkow
17           Registered Diplomate Reporter
             Certified Realtime Reporter
18
19
20           (The foregoing certification
     of this transcript does not apply to any
21   reproduction of the same by any means,
     unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24

1                INSTRUCTIONS TO WITNESS

2

3

4                Please read your deposition

5    over carefully and make any necessary

6    corrections.  You should state the reason

7    in the appropriate space on the errata

8    sheet for any corrections that are made.

9

10                After doing so, please sign

11   the errata sheet and date it.  It will be

12   attached to your deposition.

13

14                It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

```
 1                   - - - - - -

                 E   R   R   A   T   A

 2                   - - - - - -

 3    PAGE   LINE   CHANGE

 4    ____   ____   _____

 5       REASON:   ____  _____

 6    ____   ____   _____

 7       REASON:   _____  _____

 8    ____   ____   _____

 9       REASON:   _____  _____

10    ____   ____   _____

11       REASON:   _____  _____

12    ____   ____   _____

13       REASON:   _____  _____

14    ____   ____   _____

15       REASON:   _____  _____

16    ____   ____   _____

17       REASON:   _____  _____

18    ____   ____   _____

19       REASON:   _____  _____

20    ____   ____   _____

21       REASON:   _____  _____

22    ____   ____   _____

23       REASON:   _____  _____

24
```

1
2              ACKNOWLEDGMENT OF DEPONENT
3

             I,_____, do
4    hereby certify that I have read the
     foregoing pages, 827-944 through 494 and
5    that the same is a correct transcription
     of the answers given by me to the
6    questions therein propounded, except for
     the corrections or changes in form or
7    substance, if any, noted in the attached
     Errata Sheet.
8
9    _____

     TONGCHUN JIA                DATE
10
11
12
13
14
15
16   Subscribed and sworn
     to before me this
17   _____ day of _____, 20_____.
18   My commission expires:_____
19

     _____
20   Notary Public
21
22
23
24

1                    LAWYER'S NOTES

2    PAGE  LINE

3    _____  _____   _____

4    _____  _____   _____

5    _____  _____   _____

6    _____  _____   _____

7    _____  _____   _____

8    _____  _____   _____

9    _____  _____   _____

10   _____  _____   _____

11   _____  _____   _____

12   _____  _____   _____

13   _____  _____   _____

14   _____  _____   _____

15   _____  _____   _____

16   _____  _____   _____

17   _____  _____   _____

18   _____  _____   _____

19   _____  _____   _____

20   _____  _____   _____

21   _____  _____   _____

22   _____  _____   _____

23   _____  _____   _____

24   _____  _____   _____

# 公 证 书

**中华人民共和国山东省泰安市岱岳公证处**

– – – – – – –

# E R R A T A

## DEPOSITION OF TONGCHUN JIA

### 错误更正表

### 贾同春庭外供述

– – – – – – –

| PAGE<br>页 | LINE(S)<br>行 | CHANGE<br>更正 |
|---|---|---|
| 25 | 2 | "managing director" to "general manager" |
| REASON:<br>理由 | | 证人供称："总经理"。<br>Translation error<br>翻译错误。 |
| 27 | 3 | Add "At counsel's advice" before "I go through . . ." |
| REASON:<br>理由 | | 添加"在律师的指导下做了"。<br>Translation error<br>翻译错误。 |
| 33 | 1 | "particularly" to "consciously" |
| REASON:<br>理由 | | 证人供称："有意识"。<br>Translation error<br>翻译错误。 |

| <u>PAGE</u><br>页 | <u>LINE(S)</u><br>行 | <u>CHANGE</u><br>更正 |
|---|---|---|
| 35 | 22 | "companies" to "company" |
| | | 证人供称："公司"。 |
| REASON:<br>理由 | | Translation error |
| | | 翻译错误。 |
| 35 | 23 | "us, we won't" to "TG, I would not" |
| | | 证人供称："TG，我就不会"。 |
| REASON:<br>理由 | | Translation error and clarification |
| | | 翻译错误与澄清。 |
| 36 | 19-22 | Replace "If they are not – if there's not much relevance to me, I won't pay attention – his – two companies" with "Documents from BNBM were not relevant to TG." |
| | | 证人供称："北新的就是 BNBM 的有关资料和泰山石膏股份公司没有相关性的东西"。 |
| REASON:<br>理由 | | Translation error |
| | | 翻译错误。 |
| 50 | 16-17 | "my lawyer did receive my e-mails" to "my lawyers once searched my email box so they might have recorded it." |
| | | 证人供称："律师曾经搜过我的邮箱，他可能记起来这个地址了" |
| REASON:<br>理由 | | Translation error |
| | | 翻译错误。 |
| 54 | 20-21 | "something concrete as a" to "a specific" |
| | | 证人供称："具体的"。 |
| REASON: | | Translation error |

2

| PAGE | LINE(S) | CHANGE |
|------|---------|--------|
| 页 | 行 | 更正 |

理由 翻译错误。

| 79 | 8 | "Director of the Board" to "Chairman of the Board" |

REASON: 证人供称："董事长"。

Translation error

理由 翻译错误。

| 121 | 14-16 | "management people and also for the organization" to "I'm leading TG. TTP has its own board of directors and management." |

REASON: 证人供称："我领导整个 TG 的工作。TTP 有自己的董事会 和管理人员"

Translation error

理由 翻译错误。

| 133 | 18 | "products" to "production" |

REASON: 证人供称："生产"。

Translation error

理由 翻译错误。

| 204 | 9-10 | "became a joint venture" to "it is like a joint venture" |

REASON: 证人供称："我们就和 BNBM 合资了"。

Translation error.

理由 翻译错误

| 248 | 18 | "He has been" to "It was" |

REASON: 证人供称："它是"。

Translation error.

3

| PAGE<br>页 | LINE(S)<br>行 | | CHANGE<br>更正 |
|---|---|---|---|

理由        翻译错误。

---

259    11      "from --" to "from Richwell"

---

REASON:    证人供称："从裕和"。

            Transcript omission.

理由        笔录上省略

---

296    4      "sell to the United States" to "plan to market in the U.S."

---

REASON:    证人供称："在美国推销的计划"。

            Translation error

理由        翻译错误。

---

317    8      "applied" to "claimed"

---

REASON    Translation error

理由:      翻译错误。

---

313    11      "Yes" to "True"

---

REASON:    证人供称："是的"。

            Language translation difficulty

理由        中英文翻译困难。

---

317    10      "but how, what is the result or where are they being shipped to, I don't know" to "but whether the drywall was actually shipped to the US or where in the US exactly the drywalls was shipped to, I don't know."

证人供称："但是真正运到美国去，还是运到美国什么地方去，我不知道。"

4

| PAGE<br>页 | LINE(S)<br>行 | CHANGE<br>更正 |
|---|---|---|

| REASON:<br>理由 | Translation Error |
| | 翻译错误。 |

| 392 | 1 | Add "key" before "subsidiary" |
| | | 证人供称："卜面的生产石膏板的主要公司"。 |

| REASON:<br>理由 | Translation error |
| | 翻译错误。 |

| 405 | 10 | Add "Group" after first "CNBM" |
| | | 证人供称:"中国建材集团"。 |

| REASON:<br>理由 | Translation error |
| | 翻译错误。 |

| 409 | 18 | "is" to "was" |
| | | 证人供称:"是"。 |

| REASON:<br>理由 | Translation Difficulty |
| | 中英文翻译困难。 |

| 419 | 4 | "always" to "often" |
| | | 证人供称:"常常"。 |

| REASON:<br>理由 | Translation error |
| | 翻译错误。 |

| 419 | 5 | "necessarily" to "always" |
| | | 证人供称:"全部"。 |

| REASON:<br>理由 | Translation error |

| PAGE<br>页 | LINE(S)<br>行 | CHANGE<br>更正 |
|---|---|---|

翻译错误。

| 425 | 1 | "16" to "12" |
|---|---|---|

证人供称："十二"。
Translation error

REASON:
理由

翻译错误。

| 435 | 19 | "plans" to "plants" |
|---|---|---|

证人供称："厂"。
Translation error

REASON:
理由

翻译错误。

| 461 | 11-13 | "my concept.  That is not the concept I am talking about" to "what I meant" |
|---|---|---|

证人供称："我不是这个概念"。

Language translation difficulty

REASON:
理由

中英文翻译困难。

| 463 | 2 | "TTG" to "TTP" |
|---|---|---|

证人供称："TTP"。

REASON:
理由

Translation error or typographical error.

中英文翻译困难。

证人宣誓书

我贾同春特此证实，我已经阅读过上述第 1 页至第 269 页；并且除开在"错误更正表"中关于的形式或实体上被更正的项目外，该第 1 页至第 269 页是我所被问及之各个问题之答复的正确笔录记载。

_____          2011.5.26

贾同春                                    日期


兹于        年        月        日，
在本人前宣誓后作成本宣誓书
本人公证资格有效截止日期为            年        月        日


（公证人签名）

1
2       ACKNOWLEDGMENT OF DEPONENT
3

       I,_____, do
4 hereby certify that I have read the
foregoing pages, 1 through 269 and that
5 the same is a correct transcription of
the answers given by me to the questions
6 therein propounded, except for the
corrections or changes in form or
7 substance, if any, noted in the attached
Errata Sheet.

8
9 _____
    TONGCHUN JIA        DATE
10
11
12
13
14
15
16 Subscribed and sworn
to before me this
17 \_\_\_\_\_ day of _____, 20\_\_\_\_.
18 My commission expires:_____
19

_____
20 Notary Public
21
22
23
24

# 公　证　书

（2011）泰岱岳证外字第 366 号

　　兹证明贾同春（男，一九六0年二月八日出生，身份证号：370902196002081514，现住山东省泰安市泰山区文化路欣欣家园 10 号楼 2 单元 302 室）于二0一一年五月二十六日在泰山石膏股份有限公司办公室，在我的面前，在前面的《证人宣誓书》上签名。

　　　　　　　　　　中华人民共和国山东省泰安市岱岳公证处

　　　　　　　公证员　张卫众

　　　　　　　　　　　　二0一一年五月二十七日

XM3710425

# NOTARIAL CERTIFICATE

(2011)Tai Daiyue Zheng Wai Zi No.366

This is to certify that Jia Tongchun (male, born on February 8, 1960, ID card number:370902196002081514, now residing in Room 302, Unit 2, Building 10, Xinxinjiayuan, Wenhua Road, Taishan District, Taian City, Shandong Province) on Taishan Gypsum Co., Ltd. Office on May 26, 2011 and with the presence of the under-mentioned notary signed on the *ACKNOWLEDGMENT OF DEPONENT.*

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

May 27, 2011

# 证 明 书

（2011）泰岱岳证外字第 367 号

　　兹证明前面的（2011）泰岱岳证外字第 366 号《公证书》的英文译本内容与该公证书中文原本相符。

中华人民共和国山东省泰安市岱岳公证处

公证员　张卫兵

二 0 一一年五月二十七日

# NOTARIAL   CERTIFICATE

(2011)Tai Daiyue Zheng Wai Zi No.367

This is to certify that the English translation contents of the (2011) Tai Daiyue Zheng Wai Zi No.366 *NOTARIAL CERTIFICATE* agree with the Chinese contents of that.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

May 27, 2011

证人宣誓书

我贾同春特此证实，我已经阅读过上述第 270 页至第 494 页；并且除开在"错误更正表"中关于的形式或实体上被更正的项目外，该第 270 页至第 494 页是我所被问及之各个问题之答复的正确笔录记载。

_贾同春_                              2011.526

贾同春                                    日期

兹于         年        月        日，
在本人前宣誓后作成本宣誓书
本人公证资格有效截止日期为        年        月        日

（公证人签名）

1
2       ACKNOWLEDGMENT OF DEPONENT
3

        I,_____, do
4 hereby certify that I have read the
foregoing pages, 270 through 494 and that
5 the same is a correct transcription of
the answers given by me to the questions
6 therein propounded, except for the
corrections or changes in form or
7 substance, if any, noted in the attached
Errata Sheet.

8
9 _____
   TONGCHUN JIA          DATE
10
11
12
13
14
15
16 Subscribed and sworn
to before me this
17 _____ day of _____, 20____.
18 My commission expires:_____
19

_____
20 Notary Public
21
22
23
24

# 公 证 书

（2011）泰岱岳证外字第 368 号

　　兹证明贾同春（男，一九六０年二月八日出生，身份证号：370902196002081514，现住山东省泰安市泰山区文化路欣欣家园 10 号楼 2 单元 302 室）于二０一一年五月二十六日在泰山石膏股份有限公司办公室，在我的面前，在前面的《证人宣誓书》上签名。

中华人民共和国山东省泰安市岱岳公证处

公证员　　张卫众

二０一一年五月二十七日

# NOTARIAL CERTIFICATE

(2011)Tai Daiyue Zheng Wai Zi No.368

This is to certify that Jia Tongchun (male, born on February 8, 1960, ID card number:370902196002081514, now residing in Room 302, Unit 2, Building 10, Xinxinjiayuan, Wenhua Road, Taishan District, Taian City, Shandong Province) on Taishan Gypsum Co., Ltd. Office on May 26, 2011 and with the presence of the under-mentioned notary signed on the *ACKNOWLEDGMENT OF DEPONENT*.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

May 27, 2011

# 证　明　书

（2011）泰岱岳证外字第 369 号

　　兹证明前面的（2011）泰岱岳证外字第 368 号《公证书》的英文译本内容与该公证书中文原本相符。

中华人民共和国山东省泰安市岱岳公证处

公证员　

二〇一一年五月二十七日

# NOTARIAL    CERTIFICATE

(2011)Tai Daiyue Zheng Wai Zi No.369

This is to certify that the English translation contents of the (2011) Tai Daiyue Zheng Wai Zi No.368 *NOTARIAL CERTIFICATE* agree with the Chinese contents of that.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

May 27, 2011

# 公 证 书

中华人民共和国山东省泰安市岱岳公证处

# Errata Sheet of Transcript of the Testimony of: Tongchun Jia

## 贾同春证人证言勘误表

### January 9 2012

### 2012 年 1 月 9 日

| Page: Line(s) 页码：行数 | Change from 原文 | Change to 更正 | Reason 原因 |
|---|---|---|---|
| 510:11-12 | "stamped TG 0020686 through TG 0020789"<br><br>"盖章的 TG 0020686 至 TG 0020789" | "stamped TG 0020686 through TG 0020709"<br><br>"盖章的 TG 0020686 至 TG 0020709" | Bates number correction<br><br>贝茨编号校正 |
| 530:1 | "Director"<br><br>"董事" | "Chairman"<br><br>"董事长" | Translation correction<br><br>翻译校正 |
| 551:9 | "33"<br><br>"33" | "33.33"<br><br>"33.33" | Clarification<br><br>具体说明 |
| 553:4-5 | "many other company's executives"<br><br>"许多其他公司高管" | "many other of the company's executives"<br><br>"公司高管中的其他多人" | Translation correction<br><br>翻译校正 |
| 561:22-23 | "which stock was to be transferred by Xue Yuli Guobiao –"<br><br>"薛玉利 、Guobiao 转让的股票 – " | "under which Taihe Dongxin's stocks were to be transferred from Xue Yuli, Gao Yubao, Zhu Jinghua, Zhang Jianchun and Mi Weimin to Taian Donglian Investment Trading Company Limited"<br><br>"泰和东新的股票由薛玉利、高玉宝、朱经华、张建春及米为民转让给泰安东联投资贸易有限公司" | Translation correction<br><br>翻译校正 |
| 578:4 | "bargain"<br><br>"bargain" | "bargaining"<br><br>"bargaining" | Translation correction<br><br>翻译校正 |
| 579:19 | "shareholders' brief"<br><br>"股东书面文件" | "shareholders' registered capital"<br><br>"股东注册资本" | Translation correction<br><br>翻译校正 |
| 592:13 | "TG 0020789"<br><br>"TG 0020789" | "TG 0020709"<br><br>"TG 0020709" | Bates number correction |

| | | | 贝茨编号校正 |
|---|---|---|---|
| 592:18 | "TG 0020789"<br><br>"TG 0020789" | "TG 0020709"<br><br>"TG 0020709" | Bates number correction<br><br>贝茨编号校正 |
| 593:1 | "TG 0020789"<br><br>"TG 0020789" | "TG 0020709"<br><br>"TG 0020709" | Bates number correction<br><br>贝茨编号校正 |
| 596:15 | "different"<br><br>"不同的" | "important"<br><br>"重要的" | Clarification<br><br>具体说明 |
| 599:4 | "fund"<br><br>"资金" | "funds"<br><br>"资金（复数）" | Clarification<br><br>具体说明 |
| 604:23 | "Taihe Dongxin Company"<br><br>"泰和东新公司" | "Taihe Anxin Investment & Trading Company"<br><br>"泰和安信投资贸易公司" | Translation correction<br><br>翻译校正 |
| 607:22 | "reverse guarantee"<br><br>"反向担保" | "counter guarantee"<br><br>"反担保" | Translation correction<br><br>翻译校正 |
| 612:16-19 | "no"<br><br>"否" | "yes"<br><br>"是" | Clarification<br><br>具体说明 |
| 617:9-10 | "I have negative view of the drywall that are produced by BNBM"<br><br>"我不看好北新建材所生产的石膏板印象" | "I am very agitated by the fact that drywall is produced by BNBM"<br><br>"我对北新建材所生产石膏板一事感到十分反感" | Translation correction<br><br>翻译校正 |
| 625:17 | "temporary"<br><br>"临时" | "ad hoc"<br><br>"临时（特指针对会议）" | Clarification<br><br>具体说明 |
| 628:2 | "every three years"<br><br>"每三年一次" | "for three-year term"<br><br>"三年一届" | Translation correction<br><br>翻译校正 |
| 644:16-20 | "produced FDG synthetic gypsum"<br><br>"生产脱硫石膏板" | "produced drywall with FDG synthetic gypsum raw material"<br><br>"用脱硫石膏板原料生产石膏板" | Clarification<br><br>具体说明 |
| 645:9 | "use" | "issue" | Clarification |

| | "采用" | "出具" | 具体说明 |
|---|---|---|---|
| 645:10 | "value added invoice"<br><br>"增值发票" | "value added tax invoice"<br><br>"增值税发票" | Translation correction<br><br>翻译校正 |
| 645:12 | "value added invoice"<br><br>"增值发票" | "value added tax invoice"<br><br>"增值税发票" | Translation correction<br><br>翻译校正 |
| 645:19-20 | "value added invoice"<br><br>"增值发票" | "value added tax invoice"<br><br>"增值税发票" | Translation correction<br><br>翻译校正 |
| 649:7-8 | "asset evaluation"<br><br>"资产评估" | "asset valuation"<br><br>"资产估价" | Translation correction<br><br>翻译校正 |
| 653:12 | "director"<br><br>"董事" | "chairman"<br><br>"董事长" | Translation correction<br><br>翻译校正 |
| 664:8-14 | "we were in a hurry to establish TTP according to the requirement of business licensing department, therefore, the lease agreement was reached without detailed consideration and calculation of the pricing, therefore, we only had 80,000 on the agreement"<br><br>"我们急于依照业务许可部门的要求成立泰山纸面石膏板，因此租赁协议签署时并未达成具体对价及定价方式，因而我们在协议中只取得八万元。" | "we were in a rush to establish TTP. The Administration for Industry and Commerce required a manufacturing facility lease agreement when TTP was registered. Therefore, we did not think too much about the calculation of the pricing and reported the figure of 80,000 to the Administration for Industry and Commerce"<br><br>"我们成立泰山纸面石膏板比较匆忙。工商局要求泰山纸面石膏板注册时提交生产设施租赁协议。因此我们对租金并没有考虑太多，向工商局报的价格为八万元。" | Clarification<br><br>具体说明 |
| 680:7-9 | "I am the director of the board of director and the general manager of TG."<br><br>"我是泰山石膏的董事兼总经理。" | "I am the general manager and the chairman of the board of directors of TG"<br><br>"我是泰山石膏的总经理兼董事长" | Translation correction<br><br>翻译校正 |
| 701:9-10 | "international business department director or deputy director of TG" | "either deputy director or director of the international trade department of TG" | Translation correction |

| | | | |
|---|---|---|---|
| | "泰山石膏国际业务部部长或副部长" | "泰山石膏国际贸易部的副部长或部长" | 翻译校正 |
| 706:19 | "We"<br><br>"我们" | "I"<br><br>"我" | Clarification<br><br>具体说明 |
| 711:20 | "I don't know."<br><br>"我不知道。" | "I did not have that understanding."<br><br>"我当时并不这样认为。" | Clarification<br><br>具体说明 |
| 721:12 | "peak"<br><br>"山顶" | "peek"<br><br>"瞄" | Spelling error<br><br>拼写错误 |
| 727:4-5 | "I believe the lease is inaccurate."<br><br>"我认为租约不确切。" | I believe, at least, it is inaccurate."<br><br>"我认为这至少是不确切的。" | Spelling error<br><br>拼写错误 |
| 727:24-728:1-3 | "The company that export gypsum board to America is Taihe Dongxin Company, including TTP, not only Taihe Dongxin."<br>"向美国出口石膏板的公司是泰和东新公司，包括泰山纸面石膏板，并不仅仅是泰和东新。" | "By saying the company exported gypsum board to America, it is meant that Taihe Dongxin, including TTP, exported. It does not mean only Taihe Dongxin did."<br><br>"我所指的向美国出口石膏板的公司是泰和东新，包括泰山纸面石膏板都有出口，并非只有泰和东新有出口。" | Clarification<br><br>具体说明 |
| 743:10 | "share"<br><br>"分享" | "sell"<br><br>"出售" | Translation correction<br><br>翻译校正 |
| 745:7 | "in"<br><br>"在……里" | "and"<br><br>"和" | Clarification<br><br>具体说明 |
| 745:10 | "Shang Zianming"<br><br>"Shang Zianming" | Shang Jianming<br><br>"Shang Jianming" | Spelling error<br><br>拼写错误 |
| 745:11 | "Zhon Chanxing"<br><br>"Zhon Chanxing" | Zhou Changxing<br><br>"Zhou Changxing" | Spelling error<br><br>拼写错误 |
| 752:3 | "temporary"<br><br>"临时" | "ad hoc"<br><br>"临时（特指针对会议）" | Clarification<br><br>具体说明 |
| 753:15 | "Xiantgan" | "Xiangtan" | Spelling error |

| Page: Line | Change from | Change to | Reason |
|---|---|---|---|
| | "Xiantgan"<br>"Xiantgan" | "Xiangtan（湘潭）"<br>"Xiangtan（湘潭）" | 拼写错误 |
| 765:17-18 | "And I had no share with BNBM"<br>"并且我在北新建材并无股份" | "And I have no shares of BNBM"<br>"并且我在北新建材并没有任何股份" | Clarification<br>具体说明 |
| 790:3 | "Yang Jaipo"<br>"Yang Jaipo" | "Yang Jiapo"<br>"Yang Jiapo（杨家坡）" | Spelling error<br>拼写错误 |
| 796:24 | "2006"<br>"2006" | "2002"<br>"2002" | Translation correction<br>翻译校正 |
| 797:6 | "even though"<br>"尽管" | "because"<br>"因为" | Clarification<br>具体说明 |
| 799:6 | "TTP"<br>"泰山纸面石膏板" | "TG"<br>"泰山石膏" | Translation correction<br>翻译校正 |
| 799:8 | "TG's customer to customers"<br>"泰山石膏的客户对客户" | "TG's customers"<br>"泰山石膏的客户" | Clarification<br>具体说明 |
| 805:19 | "you"<br>"你" | "he"<br>"他" | Translation correction<br>翻译校正 |
| 813:19-20 | "Che Gang was not aware whether TTP was authorized"<br>"车刚并不知道泰山纸面石膏板是否获得授权" | "Che Gang was not aware that TTP was not authorized"<br>"车刚并不知道泰山纸面石膏板并未获得授权" | Translation correction<br>翻译校正 |
| 814:21 | "It is accurate."<br>"正确。" | "I read it accurately."<br>"我没看错。" | Clarification<br>具体说明 |

**January 10 2012**

**2012 年 1 月 10 日**

| Page: Line | Change from | Change to | Reason |
|---|---|---|---|
| 页码：行数 | 原文 | 更正 | 原因 |

| 844:5-9 | "They personally agreed to work for TTP, as the board of directors hired them to work for TTP, and as a big shareholder, also agreed for them to work for TTP."<br><br>"由于董事会雇其为泰山纸面石膏板工作，他们个人同意为泰山纸面石膏板工作，作为大股东，也同意他们为泰山纸面石膏板工作。" | "They made a personal decision and agreed to work for TTP. The board of directors of TTP decided to recruit them. As a large shareholder, I also supported them to work for TTP."<br><br>"他们个人决定并同意为泰山纸面石膏板工作。泰山纸面石膏板董事会决定聘用他们。作为大股东，我也支持他们为泰山纸面石膏板工作。" | Clarification<br><br>具体说明 |
|---|---|---|---|
| 850:6 | "ASO"<br><br>"ASO" | "ISO"<br><br>"ISO" | Spelling error<br><br>拼写错误 |
| 855:20 | "inimaginable"<br><br>"inimaginable" | "unimaginable"<br><br>"unimaginable（难以想象的）" | Spelling error<br><br>拼写错误 |
| 856:18 | "inimaginable"<br><br>"inimaginable" | "unimaginable"<br><br>"unimaginable（难以想象的）" | Spelling error<br><br>拼写错误 |
| 862:15 | "drywall"<br><br>"石膏板" | "drywall [the English word]"<br><br>"石膏板[英语单词]" | Clarification<br><br>具体说明 |
| 868:21 | "there"<br><br>"那里" | "their"<br><br>"他们的" | Spelling error<br><br>拼写错误 |
| 869:9 | "he"<br><br>"he（他）" | "the"<br><br>"the（定冠词）" | Spelling error<br><br>拼写错误 |
| 874:8 | "no"<br><br>"没" | "no meeting"<br><br>"没有会议" | Clarification<br><br>具体说明 |
| 877:11 | "people are floating"<br><br>"人员变动" | "employee count fluctuates"<br><br>"员工人数经常变动" | Translation correction<br><br>翻译校正 |
| 888:14 | "processing"<br><br>"processing" | "process in"<br><br>"process in" | Spelling error<br><br>拼写错误 |
| 889:18 | "260,000"<br><br>"260,000" | "2,600,000"<br><br>"2,600,000" | Translation correction<br><br>翻译校正 |

| 893:14-17 | "The problem I just said was not a problem as of a problem in quality of our gypsum board but a problem of our company, the trouble."<br><br>"我刚才所说的问题并非石膏板质量问题，而是公司所存在的问题、麻烦。" | "The problem I just said was not a problem as in a problem with quality of our gypsum board, but a trouble for our company."<br><br>"我刚才所说的问题并非石膏板质量问题，而是我们公司的麻烦。" | Clarification<br><br>具体说明 |
| --- | --- | --- | --- |
| 909:2 | "we sampled our products, and I was told it was for analysis and testing"<br><br>"我们对产品采用，有人告诉我这是用来分析和测试的" | "we took samples from our products for them to conduct testing and analysis"<br><br>"我们从我们产品中采样供其测试、分析" | Translation correction<br><br>翻译校正 |
| 927:19 | "the office"<br><br>"办公室" | "the administrative office"<br><br>"行政办公室" | Clarification<br><br>具体说明 |

Page 824

```
 1        ------
          E R R A T A
 2        ------
 3   PAGE LINE CHANGE
 4   ____  ____ _____
 5   REASON: ___ _____
 6   ____  ____ _____
 7   REASON: ___ _____
 8   ____  ____ _____
 9   REASON: ___ _____
10   ____  ____ _____
11   REASON: ___ _____
12   ____  ____ _____
13   REASON: ___ _____
14   ____  ____ _____
15   REASON: ___ _____
16   ____  ____ _____
17   REASON: ___ _____
18   ____  ____ _____
19   REASON: ___ _____
20   ____  ____ _____
21   REASON: ___ _____
22   ____  ____ _____
23   REASON: ___ _____
24
```

Page 826

```
 1        LAWYER'S NOTES
 2   PAGE LINE
 3
 4   ___ ___ _____
 5   ___ ___ _____
 6   ___ ___ _____
 7   ___ ___ _____
 8   ___ ___ _____
 9   ___ ___ _____
10   ___ ___ _____
11   ___ ___ _____
12   ___ ___ _____
13   ___ ___ _____
14   ___ ___ _____
15   ___ ___ _____
16   ___ ___ _____
17   ___ ___ _____
18   ___ ___ _____
19   ___ ___ _____
20   ___ ___ _____
21   ___ ___ _____
22   ___ ___ _____
23   ___ ___ _____
24
```

Page 825

```
 1
 2   ACKNOWLEDGMENT OF DEPONENT
 3
            I, _____, do
 4   hereby certify that I have read the
     foregoing pages, 495-826, and that the
 5   same is a correct transcription of the
     answers given by me to the questions
 6   therein propounded, except for the
     corrections or changes in form or
 7   substance, if any, noted in the attached
     Errata Sheet.
 8        2012. 3.13
 9   _____
     TONGCHUN JIA          DATE
10
11
12
13
14
15
16   Subscribed and sworn
     to before me this
17   _____ day of _____, 20____.
18   My commission expires:_____
19
20   _____
     Notary Public
21
22
23
24
```

证人宣誓书

我贾同春特此证实，我已经阅读过上述第 495 页至第 826 页，并且除在勘误表中关于的形式或实体上被更正的内容外，该第 495 页至第 826 页是我被问及各个问题的答复的正确笔录记载。

_贾同春_                  _2012. 3.13_

贾同春                 日期

兹于      年      月      日

在本人前宣誓后成作本宣誓书

本人公证资格有效截止日期为      年      月      日

（公证人签名）

# 公　证　书

（2012）泰岱岳证外字第 198 号

申请人：贾同春，男，一九六〇年二月八日出生，公民身份号码：370902196002081514。

公证事项：签名

兹证明贾同春于二〇一二年三月十三日在泰山石膏股份有限公司办公室，在本公证员的面前，在前面的《证人宣誓书》上签名。

中华人民共和国山东省泰安市岱岳公证处

公证员　张卫兵

二〇一二年三月十三日

XW37106356

# NOTARIAL    CERTIFICATE

(2012)Tai Daiyue Zheng Wai Zi No.198

Applicant: Jia Tongchun, male, born on February 8, 1960, citizen ID No.:370902196002081514.

Issue under notarization: Signature.

This is to certify that Jia Tongchun on Taishan Gypsum Co., Ltd Office on March 13, 2012 and with the presence of the under-mentioned notary signed on the *ACKNOWLEDGMENT OF DEPONENT*.

Notary: Zhang Weibing
Daiyue Notary Public Office
Taian City, Shandong Province
The People's Republic of China
March 13, 2012

XW 37106383

# 公　证　书

（2012）泰岱岳证外字第 199 号

　　申请人：贾同春，男，一九六〇年二月八日出生，公民身份号码：370902196002081514。

　　公证事项：译本与原本相符

　　兹证明前面的（2012）泰岱岳证外字第 198 号《公证书》的英文译本内容与该公证书中文原本相符。

中华人民共和国山东省泰安市岱岳公证处

公证员　

二〇一二年三月十三日

XW37106357

# NOTARIAL   CERTIFICATE

(2012) Tai Daiyue Zheng Wai Zi No.199

Applicant: Jia Tongchun, male, born on February 8, 1960, citizen ID No.:370902196002081514.

Issue under notarization: The translation is in conformity with the original copy.

This is to certify that the English translation content of (2012) Tai Daiyue Zheng Wai Zi No.198 *NOTARIAL CERTIFICATE* is in conformity with the Chinese original copy of that.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

March 13, 2012

XW37106395

# 公 证 书

中华人民共和国山东省泰安市岱岳公证处

**Errata Sheet of Transcript of the Testimony of: Tongchun Jia**

贾同春证人证言勘误表

**January 10 2012**

**2012 年 1 月 10 日**

| Page: Line<br><br>页码：行数 | Change from<br><br>原文 | Change to<br><br>更正 | Reason<br><br>原因 |
|---|---|---|---|
| 844:5-9 | "They personally agreed to work for TTP, as the board of directors hired them to work for TTP, and as a big shareholder, also agreed for them to work for TTP."<br><br>"由于董事会雇其为泰山纸面石膏板工作，他们个人同意为泰山纸面石膏板工作，作为大股东，也同意他们为泰山纸面石膏板工作。" | "They made a personal decision and agreed to work for TTP.   The board of directors of TTP decided to recruit them.   As a large shareholder, I also supported them to work for TTP."<br><br>"他们个人决定并同意为泰山纸面石膏板工作。泰山纸面石膏板董事会决定聘用他们。作为大股东，我也支持他们为泰山纸面石膏板工作。" | Clarification<br><br>具体说明 |
| 850:6 | "ASO"<br><br>"ASO" | "ISO"<br><br>"ISO" | Spelling error<br><br>拼写错误 |
| 855:20 | "inimaginable"<br><br>"inimaginable" | "unimaginable"<br><br>"unimaginable（难以想象的）" | Spelling error<br><br>拼写错误 |
| 856:18 | "inimaginable"<br><br>"inimaginable" | "unimaginable"<br><br>"unimaginable（难以想象的）" | Spelling error<br><br>拼写错误 |
| 862:15 | "drywall"<br><br>"石膏板" | "drywall [the English word]"<br><br>"石膏板[英语单词]" | Clarification<br><br>具体说明 |

| 868:21 | "there"<br><br>"那里" | "their"<br><br>"他们的" | Spelling error<br><br>拼写错误 |
|---|---|---|---|
| 869:9 | "he"<br><br>"he（他）" | "the"<br><br>"the（定冠词）" | Spelling error<br><br>拼写错误 |
| 874:8 | "no"<br><br>"没" | "no meeting"<br><br>"没有会议" | Clarification<br><br>具体说明 |
| 877:11 | "people are floating"<br><br>"人员变动" | "employee count fluctuates"<br><br>"员工人数经常变动" | Translation correction<br><br>翻译校正 |
| 888:14 | "processing"<br><br>"processing" | "process in"<br><br>"process in" | Spelling error<br><br>拼写错误 |
| 889:18 | "260,000"<br><br>"260,000" | "2,600,000"<br><br>"2,600,000" | Translation correction<br><br>翻译校正 |
| 893:14-17 | "The problem I just said was not a problem as of a problem in quality of our gypsum board but a problem of our company, the trouble."<br><br>"我刚才所说的问题并非石膏板质量问题，而是公司所存在的问题、麻烦。" | "The problem I just said was not a problem as in a problem with quality of our gypsum board, but a trouble for our company."<br><br>"我刚才所说的问题并非石膏板质量问题，而是我们公司的麻烦。" | Clarification<br><br>具体说明 |
| 909:2 | "we sampled our products, and I was told it was for analysis and testing"<br><br>"我们对产品采用，有人告诉我这是用来分析和测试的" | "we took samples from our products for them to conduct testing and analysis"<br><br>"我们从我们产品中采样供其测试、分析" | Translation correction<br><br>翻译校正 |

| 927:19 | "the office" | "the administrative office" | Clarification |
|--------|--------------|------------------------------|---------------|
|        | "办公室"      | "行政办公室"                  | 具体说明       |

Confidential - Subject to Further Confidentiality Review

Page 940

```
 1        C E R T I F I C A T E
 2
 3
 4        I, LINDA L. GOLKOW, a
     Registered Diplomate Reporter, Certified
 5   Court Reporter and Notary Public, do
     hereby certify that, pursuant to notice,
 6   the deposition of TONGCHUN JIA was duly
     taken on January 10, 2012 at 8:57 a.m.
     before me.
 7
 8        The said TONGCHUN JIA was
     duly sworn by the Court according to law
 9   to tell the truth, the whole truth and
     nothing but the truth and thereupon did
10   testify as set forth in the above
     transcript of testimony.  The testimony
11   was taken down stenographically by me.
12
         I do further certify that
13   the above deposition is full, complete
     and a true record of all the testimony
14   given by the said witness.
15
16
         Linda L. Golkow
17       Registered Diplomate Reporter
         Certified Realtime Reporter
18
19
20       (The foregoing certification
     of this transcript does not apply to any
21   reproduction of the same by any means,
     unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24
```

Page 942

```
 1        - - - - - -
 2        E R R A T A
 3   PAGE LINE CHANGE
 4   _____
 5   REASON: _____
 6
 7   REASON: _____
 8
 9   REASON: _____
10
11   REASON: _____
12
13   REASON: _____
14
15   REASON: _____
16
17   REASON: _____
18
19   REASON: _____
20
21   REASON: _____
22
23   REASON: _____
24
```

Page 941

```
 1      INSTRUCTIONS TO WITNESS
 2
 3
 4        Please read your deposition
 5   over carefully and make any necessary
 6   corrections.  You should state the reason
 7   in the appropriate space on the errata
 8   sheet for any corrections that are made.
 9
10        After doing so, please sign
11   the errata sheet and date it.  It will be
12   attached to your deposition.
13
14        It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24
```

Page 943

```
 1
 2   ACKNOWLEDGMENT OF DEPONENT
 3
 4        I, _____, do
     hereby certify that I have read the
 5   foregoing pages, 827-944 through 494 and
     that the same is a correct transcription
 6   of the answers given by me to the
     questions therein propounded, except for
 7   the corrections or changes in form or
     substance, if any, noted in the attached
 8   Errata Sheet.
 9                              2017.3.13
     _____          _____
10   TONGCHUN JIA              DATE
11
12
13
14
15
16   Subscribed and sworn
     to before me this
17   ____ day of _____, 20___.
18   My commission expires:_____
19
20   Notary Public
21
22
23
24
```

30 (Pages 940 to 943)

Golkow Technologies, Inc. - 1.877.370.DEPS

证人宣誓书

我贾同春特此证实，我已经阅读过上述第 494 页，第 827 至第 944 页，并且除在勘误表中关于的形式或实体上被更正的内容外，该第 494 页，第 827 至第 944 页是我被问及各个问题的答复的正确笔录记载。

_____                    2012. 3. 13
贾同春                                      日期


兹于          年          月          日

在本人前宣誓后成作本宣誓书

本人公证资格有效截止日期为          年          月          日




（公证人签名）

# 公 证 书

（2012）泰岱岳证外字第 208 号

申请人：贾同春，男，一九六〇年二月八日出生，公民身份号码：370902196002081514。

公证事项：签名

兹证明贾同春于二〇一二年三月十三日在泰山石膏股份有限公司办公室，在本公证员的面前，在前面的《证人宣誓书》上签名。

中华人民共和国山东省泰安市岱岳公证处

公证员　张卫岳

二〇一二年三月十三日

XW37108376

# NOTARIAL    CERTIFICATE

(2012)Tai Daiyue Zheng Wai Zi No.208

Applicant: Jia Tongchun, male, born on February 8, 1960, citizen ID No.:370902196002081514.

Issue under notarization: Signature.

This is to certify that Jia Tongchun on Taishan Gypsum Co., Ltd Office on March 13, 2012 and with the presence of the under-mentioned notary signed on the *ACKNOWLEDGMENT OF DEPONENT*.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

March 13, 2012

XW37106404

# 公 证 书

（2012）泰岱岳证外字第 209 号

　　申请人：贾同春，男，一九六〇年二月八日出生，公民身份号码：370902196002081514。

　　公证事项：译本与原本相符

　　兹证明前面的（2012）泰岱岳证外字第 208 号《公证书》的英文译本内容与该公证书中文原本相符。


　　　　　　中华人民共和国山东省泰安市岱岳公证处

　　　　　公证员　

　　　　　　　　　　二〇一二年三月十三日

XW37106378

# NOTARIAL CERTIFICATE

(2012) Tai Daiyue Zheng Wai Zi No.209

Applicant: Jia Tongchun, male, born on February 8, 1960, citizen ID No.:370902196002081514.

Issue under notarization: The translation is in conformity with the original copy.

This is to certify that the English translation content of (2012) Tai Daiyue Zheng Wai Zi No.208 *NOTARIAL CERTIFICATE* is in conformity with the Chinese original copy of that.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

March 13, 2012

XW37106406

# 山东省财政厅文件

鲁财国股〔2002〕67号

## 关于山东泰和东新股份有限公司
## 国有股权转让有关问题的批复

泰安市国有资产管理局：

你局《关于转让山东泰和东新股份有限公司国有股股权的请示》（泰国资企〔2002〕16号）收悉。根据国家有关规定，现就有关问题批复如下：

一、同意山东泰和泰山纸面石膏板总厂（集团）全部转让其持有的山东泰和东新股份有限公司（以下简称"泰和东新"）5000万股国有法人股，其中2490万股转让给泰安市国有资产经营有限公司，2510万股分别转让给贾同春等16位自然人。

股权转让后，泰和东新的总股本仍为8300万股，其中泰安

Jia Def 1/9/12
EXHIBIT NO. 1
L GOLKOW

市国有资产经营有限公司持有国家股 2490 万股，占总股本的
30%。

二、泰和东新的资产评估项目已经我厅合规性审核。根据中
介机构出具的评估报告，截至 2001 年 7 月 31 日，该公司净资产
为 7988.7 万元。根据股权转让协议和企业实际情况，确定本次
股权转让价格为每股 0.96 元，股权转让收入为 4800 万元，由山
东泰和泰山纸面石膏板总厂（集团）收取。

经核实，泰和东新评估基准日至 2002 年 6 月 30 日实现的净
利润共计 1976.99 万元，其中山东泰和泰山纸面石膏板总厂（集
团）应享有 1190.94 万元，在本次股权转让时一并收取。

三、请你局负责监督本次国有股权转让收入的收缴工作，督
促国家股股东尽快办理国有股权变更登记手续，并报我厅备案。

四、本次股权转让后，请你局负责监督泰和东新办理相关的
变更手续。

二〇〇二年〇月二〇二日

主题词：股份制　国有股　转让　批复

抄报：省政府。

抄送：省体改办、省工商局、泰安市国有资产经营有限公司、
山东泰和泰山纸面石膏板总厂（集团）、山东泰和东新股份有
限公司。

山东省财政厅办公室　　　　　　　2002 年 7 月 22 日印发

**Updated Jia Tr. Def's Ex. 1A**

**(English Translation of Jia Tr. Def's Ex. 1)**

# Shandong Province Department of Finance Documents

Luzheng Guogu [2002] No. 67

## Reply Concerning Issues Related to the Transfer of
## State-Owned Shares of Shandong Taihe Dongxin Co., Ltd.

To the Taian State-Owned Assets Administration Bureau:

Your "Request for instructions concerning the transfer of state-owned shares of Shandong Taihe Dongxin Co., Ltd." (Tai Guozi Qi [2002] No. 16) has been received. In accordance with applicable regulations, our reply to your related questions is as follows:

1. The full and complete transfer of the 50 million state-owned shares in Shandong Taihe Dongxin Co., Ltd. (hereinafter referred to as "Taihe Dongxin") currently held by Shandong Taihe Taishan Plasterboard Main Factory (Group) has been approved, with 24.9 million shares being transferred to Taian State-Owned Asset Management Co., Ltd. and 25.1 million shares being transferred to Mr. Tongchun Jia and 15 other individuals.

Following the aforementioned stock transfer, the total capitalization of Taihe Dongxin shall be 83 million shares, of which 24.9 million, or 30% of the total, shall be held by Taian State-Owned Asset Management Co., Ltd.

2.  We have completed the regulation compliance review with respect to the asset evaluation of Taihe Dongxin. Based on the evaluation reports issued by intermediary organizations, the net assets of Taihe Dongxin totaled RMB 79.887 million yuan as of July 31, 2001. In accordance with the stock transfer agreement and actual market conditions, we have determined the stock transfer price to be RMB 0.96 yuan per share and the total stock transfer proceeds, as collected by Shandong Taihe Taishan Plasterboard Main Factory (Group), to be RMB 48 million yuan.

Upon verification, the net profits realized by Taihe Dongxin during the period from the base date of evaluation to June 30, 2002 were RMB 19,769,900 Yuan, including the RMB 11,909,400 Yuan payable to Shandong Taihe Taishan Plasterboard Main Factory (Group), which shall be collected by it together in this stock transfer.

3.  We respectfully request that your bureau be responsible for supervising the collection work in connection with the transfer of the state-owned shares, for monitoring and ensuring that the holders of the state-owned shares perform the necessary registration procedures with respect to the transfer as soon as possible, and for reporting to us for record-keeping purposes.

4.  Following the aforementioned transfer, we also request that your bureau be responsible for supervising the related registration procedures to be performed by Taihe Dongxin.

July 22, 2002

[*seal: Shandong Province Department of Finance*]

Key Words:  Share System   State-Owned Shares   Transfer   Reply

Copy:  Shandong Provincial Government

cc:    Office of the Provincial Economic System Reform Commission, Provincial Trade and Industry Bureau, Taian State-Owned Asset Management Co., Ltd., Shandong Taihe Taishan Plasterboard Main Factory (Group), Shandong Taihe Dongxin Co., Ltd.

山东泰和... 公司股东（发起人）名录

(A企业法人)

| 法人名称 | 法定代表人 | 出资额（万元） | 百分比（%） | 住所 | 备注 |
|---|---|---|---|---|---|
| 泰安市闰信投资咨询有限公司 | 张岩东 | 2490 | 30 | 泰安市财源大街10号 | |
| 山东泰和集团职工持股者协会 | 张建春 | 2800 | 33.73 | 泰安市财源路大街10 | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

谨此确认，本表所填内容不含虚假成份。

申请人签字：张岩东 　年 8 月 10 日 　联系电话：0538-8341579

注：①"本表"包括写下述罗列人。A.企业法人，B.社会团体法人，C.事业法人，D.国家投资的部门。
　　②"名称"栏只填省、市（县）名。
　　③本表不够填写时，可复印续填，并加盖印章。

109

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020583

公司股东（发起人）名录

（B：自然人）

| 姓 名 | 性别 | 住 所 | 身份证号码 | 出资额(万元) | 百分比(%) |
|---|---|---|---|---|---|
| 贾同春 | 男 | 泰安市泰山大街268号 | 370902620020815I | 445 | 4 |
| 薛立利 | 男 | 泰安市泰山大街268号 | 370911631104212 | 197 | 2.37 |
| 任靖远 | 男 | 泰安市泰山大街268号 | 370902630052919 | 195 | 2.35 |
| 高小军 | 男 | 泰安市泰山大街264号 | 37071053104421 | 194 | 2.34 |
| 朱培华 | 男 | 泰安市泰山大街1号 | 370710804421 | 188 | 2.27 |
| 吕文军 | 男 | 泰安市泰山大街264号 | 37012620800991 | 183 | 2.21 |
| 张建春 | 男 | 泰安市城区花盆楼2单元 | 37123060422183 | 178 | 2.14 |
| 贾元利 | 男 | 泰安市泰山大街263号 | 37070630420123 | 178 | 2.14 |
| 赵建刚 | 男 | 泰安市泰山区龙潭路74-7号 | 37070603120611 | 175 | 2.11 |
| 李作义 | 男 | 泰安市泰山大街264号 | 37070626404858 | 174 | 2.10 |
| 钱魁 | 男 | 泰安市泰山大街264号 | 37011260122000 | 164 | 1.98 |

特此确认，本表所填内容不含虚假成份。

申请人签字 _____ 　年 9 月 10 日 　　联系电话 0538-8011577

注：本表不够填时，可复印续填，粘贴于后。

110

山东□□科技有限公司股东（发起人）名录

（B：自然人）

| 姓名 | 性别 | 住所 | 身份证号码 | 出资额（万元） | 百分比（%） |
|---|---|---|---|---|---|
| 段振清 | 男 | 泰安市泰山大街265号 | 37092319701013063 | 162 | 6.18 |
| 佐星年 | 男 | 泰安市□街263号 | 370910103123 | 158 | 5.96 |
| 宋腾高 | 男 | 泰安市城区□路接洋元 | 3709410704246160 | 147 | 5.89 |
| 张吝全 | 男 | 泰安市城区□路接洋元 | 3704040040306 | 142 | 5.85 |
| 宋为民 | 女 | 泰安市城区科技街门阿接洋元 | 370402400013 | 140 | 5.69 |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

谨此确认，本表所填内容不含虚假成份。

申请人签字： □□□　□月 17日　　联系电话0538·8891137

注：表格不够填时，可复印续填，粘贴于后。

**Updated Jia Tr. Def's Ex. 2A**

**(English Translation of Jia Tr. Def's Ex. 2)**

Shandong Taihe Dongxin Co., Ltd. Shareholder Incorporators List

[Seal - illegible]

[Seal - illegible]

(A: Legal entity)

| Name of the Legal Entity | Legal Representative | Funding Amount (RMB0000) | % | Address | Remarks |
|---|---|---|---|---|---|
| Taian City State Owned Asset Management Co., Ltd. | Zhang Ruidong | 2490 | 30 | No. 12 Wusong Blvd., Taian City. | |
| Shangdong Taihe Group Employee Shareholder Association | Zhang Jianchun | 2800 | 33.33 | Dawenkou, Daiyue District, Taian City | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| It is hereby confirmed that the content in this application is truthful. The applicant's signature: [signature Wang [illegible] August 10, 2002, Tel: 0538-884328] | | | | | |

[Partial seal - illegible]

[Partial seal - illegible]

Notes:
(1) In the Remarks column, please fill out the following letters. A. Business Entity; B. Social group legal entity; C. Corporate entity; D. Department authorized by China.
(2) For the address column, please only fill out the name of the province and city (town).
(3) In case of insufficient space, please copy this form and attach to the back.

109

[Seal – Shandong Taihe Dongxin Co., Ltd.]

## Shandong Taihe Dongxin Shareholder (Incorporators) List

(B: Natural person)

| Name | Gender | Address | ID No. | Funding Amount (RMB0000) | (%) |
|------|--------|---------|--------|--------------------------|-----|
| Jia Tongchun | Male | 265 Taishanda Street, Taian City | 370902500308151 | 415 | + |
| Xue Yuli | Male | 265 Taishanda Street, Taian City | 370921953123452 | 197 | 2.37 |
| Ren Xulian | Male | 265 Taishanda Street, Taian City | 370902500527157 | 195 | 2.35 |
| Gao Yubao | Male | 265 Taishanda Street, Taian City | 370911534504521 | 194 | 2.34 |
| Zhu Jinghua | Male | 265 Taishanda Street, Taian City | 370911563304521 | 188 | 2.27 |
| Lu Wenyang | Male | 265 Taishanda Street, Taian City | 370902574826091 | 183 | 2.21 |
| Zhang Jianchun | Male | 265 Taishanda Street, Taian City | 370722691222185 | 178 | 2.14 |
| Jia Yuanli | Male | 265 Taishanda Street, Taian City | 370911531106523 | 178 | 2.14 |
| Zhao Jiangang | Male | 265 Taishanda Street, Taian City | 370902650212061 | 175 | 2.11 |
| Li Zuoyi | Male | 265 Taishanda Street, Taian City | 37090570614525 | 174 | 2.10 |
| Qian Kai | Male | 265 Taishanda Street, Taian City | 210112651280018 | 164 | 1.98 |

It is hereby confirmed that the content in this application is truthful.

The applicant's signature:  [signature Wang [illegible]  August 10, 2002, Tel: 0538-8011377]

Notes:  In case of insufficient space, please copy this form and attach to the back.

[Partial seal]

[Partial seal]

110

Translation of TG 0020583
TRANSLATIONS PROVIDED BY TAISHAN - FINAL

[Seal – Shandong Taihe Dongxin Co., Ltd.]

## Shandong Taihe Dongxin Incorporators List

(B: Natural person)

| Name | Gender | Address | ID No. | Funding Amount (RMB0000) | (%) |
|---|---|---|---|---|---|
| Duan Zhentao | Male | 265 Taishanda Street, Taian City | 3709012230502063 | 162 | 1.95 |
| Ren Xianhua | Male | 265 Taishanda Street, Taian City | 370911651023523 | 158 | 1.90 |
| Zhu Tenggao | Male | Changhu Tongqu, Building 20, Suite 2, Taian City | 37030419602260630 | 157 | 1.89 |
| Zhang Canxiu | Male | Changhudong District, Building 20, Suite 1, Taian City | 37030459071036376 | 152 | 1.83 |
| Zhu Weiming | Female | Feixing Street, Building 5, Suite 3, Taihe District, Taian City | 370902196405101140 | 140 | 1.69 |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

It is hereby confirmed that the content in this application is truthful.

The applicant's signature:  [signature Wang [illegible]  August 10, 2002, Tel: 0538-8011377]

Notes:  In case of insufficient space, please copy this form and attach to back.

[Partial seal]

110

# 股权转让协议书

本协议由下列双方于二〇〇五年三月二十四日在泰安签署。

转让方：山东泰和集团职工持股者协会（以下简称"甲方"）

住　　所：泰安市岱岳区大汶口

法定代表人：贾同春

受让方：泰安市东联投资贸易有限公司(以下简称"乙方")

住　　所：泰安高新区明天光彩工业园管理中心

法定代表人：贾同春

鉴于：

1、甲方是泰安市民政局注册的社会法人团体，注册资金人民币1000万元；

2、乙方是泰安市工商行政管理局注册的有限责任公司，注册资本人民币1500万元；

3、山东泰和东新股份有限公司(简称"东新公司")是在山东省工商行政管理局注册的股份有限公司，注册资本8300万元。甲方现时持有东新公司33.73%的股权，计2800万股；

4、甲方同意向乙方出让33.73%的股权；

5、乙方同意受让甲方上述33.73%的股权。

甲、乙双方依照有关法律、行政法规的规定，从有利于山东泰和东新股份有限公司发展出发，经过友好协商，达成股权转让协议如下：

第一条　甲方作为山东泰和东新股份有限公司的股东，合法持有该公司33.73%的股权(简称"该等股权")，计2800万股，现同意将该等

V.6

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020630



股权及相关权益、义务以协议方式全部转让给乙方。

第二条　乙方同意受让该等股权。

第三条　双方同意本次股权转让价格按每股1.80元作价，为人民币伍仟零肆拾万元（小写：¥50400000元）。

第四条　上述转让金额支付时间为：

受让方应于本协议生效之日起三月内，向转让方支付全部转让价款。

第五条　支付方式为银行转帐，乙方按甲方要求将转让价款存入甲方指定帐户，甲方应于收到乙方支付的前述转让价款之日向乙方开具正式收据。

第六条　甲方声明、保证和承诺：

1、甲方合法持有该等股权，保证其持有的山东泰和东新股份公司股权的洁净性，拟转让的该等股权不存在任何质押或担保和第三者的权益，或第三人向该股份主张权利的可能性；

2、甲方转让该等股权与其和任何第三方签署的合同、协议等法律性文件无任何法律冲突；

3、甲方履行本协议项下的义务不存在其他法律障碍；

4、甲方保证在收到付款之10日内，将其持有的该等股权出资证明书（股权证）交付乙方；

5、甲方将尽一切努力配合乙方依法完成有关股权转让的过户登记等全部法律手续。

第七条　乙方声明、保证和承诺：

1、乙方具有合法资格受让该等股权；

2

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020631

2、乙方保证按本协议之约定支付转让价款。

第八条　本次股权转让，按照有关法律、行政法规或部门规定应缴纳之税费或规费，由缴纳义务人进行缴纳。

第九条　双方承诺：

1、在本次股权转让正式公告之前，除双方指定人员之外，不得以任何方式、向任何人披露本次股权转让之信息。法律、法规另有规定时除外；

2、在此次股权转让过程中，按照国家关于股份公司股权转让的有关规定尽快办理过户、更名等有关手续。

第十条　任何一方违反本协议项下之约定或声明、保证和承诺，即构成违约。由违约方按协议金额的5%向守约方支付违约金（或按违约部分金额的每日万分之三支付违约金）；由于任何一方违约给另一方造成损失时，违约方还应按照实际损失，给予守约方赔偿。

由于有关致府主管部门不予批准等原因导致无法履本协议，不视为违约。但甲方应负责将已收上述股权转让款项本息（利息按照中国人民银行同期存款利率计算）返还给乙方。

第十一条　不可抗力。双方同意以下事实为不可抗力：

1、签署本协议时不能预见、不能避免、不能克服的，且导致本协议不能履行或者不能按时履行的客观情况；

2、国家政策法律的变更导致本协议无效；

3、除前款外双方或者一方的任何情况，诸如但不限于人员变动、决策变化等等，都不属于不可抗力；

4、任何一方因不可抗力而没有履行本协议的，无须承担违约责任，

3

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020632

但应当在不可抗力发生之日起十日内通知对方并提供经律师见证的有关证明。

    第十二条　因本协议或履行本协议而导致的任何争议，双方应首先努力通过协商解决；如协商而不成时，提交泰安市仲裁委员会仲裁。

    第十三条　本协议经甲、乙双方盖章或法定代表人（或授权代表）签字生效。

    第十四条　本协议正本一式八份，甲乙双方各持二份，股份公司存档一份，申报办理有关过户手续用二份，八份具有同等法律效力。

甲方：山东泰和集团职工持股者协会

法定代表人：

乙方：泰安市东联投资贸易有限公司

法定代表人：

2005年3月24日

**Updated Jia Tr. Def's Ex. 3A**

**(English Translation of Jia Tr. Def's Ex. 3)**

# Stock Transfer Agreement

This agreement was signed by the following parties in Taian on March 24, 2005.

Transferor: Shandong Taihe (Group) Employee Shareholders Association (hereinafter referred to as the "Transferor")

Domicile: Dawenkou, Daiyue District, Taian

Legal Representative: Tongchun Jia

Transferee: Taian Donglian Investment and Trade Co., Ltd. (hereinafter referred to as the "Transferee")

Domicile: Mingtian Guangcai Industrial Park Management Center, Gaoxin District, Taian

Legal Representative: Tongchun Jia

WHEREAS:

1. The Transferor is a social legal entity registered with the Taian Municipal Civil Affairs Bureau, with registered capital of RMB 10 million yuan;

2. The Transferee is a limited liability company registered with the Taian Industry and Business Administration Bureau, with registered capital of RMB 15 million yuan;

3. Shandong Taihe Dongxin Co., Ltd. (hereinafter referred to as "Dongxin Co., Ltd.") is a joint stock corporation registered with the Shandong Provincial Administration of Industry and Commerce, with registered capital of RMB 83 million yuan. The Transferor currently holds 33.73%, or 28 million shares, of Dongxin Co., Ltd. stock.

4. The Transferor agrees to transfer its 33.73% equity to the Transferee; and

5. The Transferee agrees to receive the aforementioned 33.73% equity from the Transferor.

NOW, THEREFORE, in accordance with the provisions of applicable laws and administrative regulations, in the interests of the development of Dongxin Co., Ltd. and through mutual and friendly consultation, the parties hereby enter into the following stock transfer agreement (hereinafter referred to as the "Agreement"):

**Article 1.**   As shareholder and lawful owner of 33.73% of the equity issued by Dongxin Co., Ltd., or a total of 28 million shares (hereinafter referred to as the "Shares"), the Transferor hereby agrees to transfer all of the Shares, along with the interests and obligations attached thereto, to the Transferee.

1

**Article 2.**    The Transferee hereby agrees to receive the Shares.

**Article 3.**    The parties agree that the transfer price for this transaction shall be RMB 1.80 yuan per share, for a total of RMB 50.4 million (50,400,000) yuan.

**Article 4.**    Payment of the aforementioned transfer amount shall be made as follows:

Within three (3) months of the effective date of the Agreement, the Transferee shall pay the full amount of the transfer price to the Transferor.

**Article 5.**    Payment shall be made via bank transfer, with the Transferee submitting the full amount of the transfer price into an account to be specified by the Transferor, in accordance with the Transferor's demands. Upon receipt of the aforementioned transfer payment from the Transferee, the Transferor shall issue an official receipt to the Transferee.

**Article 6.**    Declarations, Warranties and Obligations of the Transferor:

1.    As the lawful owner of the Shares, the Transferor warrants that its equity stake in Dongxin Co., Ltd. is free and clear of any encumbrances, and that the transfer of the Shares shall not be subject to any pledges, guarantees, third-party interests, or the possibility of any third-party claims;

2.    The transfer of the Shares by the Transferor does not conflict with any agreements, contracts, or other legal documents entered into by the Transferor with any third party;

3.    The Transferor's performance of its obligations under the Agreement is not subject to any other legal impediments;

4.    The Transferor warrants that it shall provide the Transferee with investment certificates (stock warrants) for the Shares within ten (10) days of receipt of payment;

5.    The Transferor shall use its best efforts to assist the Transferee with the completion of the registration process and other legal formalities in connection with the transfer of the Shares in accordance with the law.

**Article 7.**    Declarations, Warranties and Obligations of the Transferee:

1.    The Transferee is legally entitled to receive the Shares;

2.    The Transferee warrants that it shall pay the transfer price in accordance with the requirements of the Agreement.

Translation of TG 0020631

TRANSLATIONS PROVIDED BY TAISHAN - FINAL

**Article 8.** Any and all taxes or fees required by applicable laws, administrative regulations, or departmental provisions in connection with the transfer of the Shares shall be paid by the party obligated to do so.

**Article 9.** Obligations of the Parties

1. Prior to the official announcement of the stock transfer, and with the exception of personnel designated by both parties, neither party shall disclose information regarding the transfer to any third party by any means, unless otherwise mandated by applicable laws or regulations;

2. During the course of the stock transfer, and in accordance with national regulations governing stock transfer transactions, both parties shall use their best efforts to complete the relevant procedures governing such matters as the transfer process and name change in an expeditious manner.

**Article 10.** The failure of either party to uphold the guarantees, statements, warranties and obligations set forth herein shall constitute breach of the Agreement. In such case, the breaching party shall pay the non-breaching party liquidated damages equal to 5% of the Agreement amount (or liquidated damages equal to 0.03% of the Agreement amount for each day it remains in breach of the Agreement). In the event either party's breach results in losses to the other, the breaching party shall compensate the non-breaching party in accordance with its actual losses.

The failure of either party to perform its obligations under the Agreement as a result of its inability to secure approvals from relevant governmental departments shall not constitute breach of the Agreement. However, the Transferor shall be responsible for returning to the Transferee the principal and interest of the aforementioned transfer payment already received (calculation of interest shall be based on the deposit rates offered by the People's Bank of China at the time).

**Article 11.** Force Majeure. The parties agree that the following circumstances shall constitute force majeure:

1. Objective circumstances that cannot be foreseen at the time the Agreement is signed, that cannot be avoided or overcome, and that render performance, or timely performance, of the Agreement impossible;

2. Changes in national policies or laws that render the Agreement invalid;

3. Any circumstances involving one or both parties other than those set forth in the above provisions, including but not limited to personnel or policy changes, shall not constitute force majeure;

3

4.   In the event either party fails to perform its obligations under the Agreement as a result of force majeure, it shall not be subject to liability for breach of the Agreement, but shall be required to notify the other party and provide relevant proof, as witnessed by counsel, within ten (10) days of the occurrence of the event.

**Article 12.**   The parties shall use their best efforts to resolve any disputes arising out of the Agreement or its performance through mutual consultation. In the event such consultation fails, the dispute shall be submitted for arbitration before the Taian Arbitration Commission.

**Article 13.**   The Agreement shall become effective upon the seal of both parties or the signature of their legal (or authorized) representatives.

**Article 14.**   The Agreement shall be executed in eight (8) original copies, two for the Transferor and Transferee, respectively, one (1) for the joint stock corporation, and two (2) for use in the related transfer procedures, with each copy having equal force and effect.

Transferor: Shandong Taihe (Group) Employee Shareholders Association
[*seal: Shandong Taihe (Group) Employee Shareholders Association*]

Legal Representative:  [*signature*]

Transferee: Taian Donglian Investment and Trade Co., Ltd.
[*seal: Taian Donglian Investment and Trade Co., Ltd.*]

Legal Representative: [*signature*]

March 24, 2005

4

# 股权转让协议书

本协议由下列双方于二○○五年三月二十四日在泰安签署。

转让方：薛玉利　　　　　身份证号：370911195312305212

　　　　高玉宝　　　　　身份证号：370911530504521

　　　　朱经华　　　　　身份证号：370911561104521

　　　　张建春　　　　　身份证号：370728691222185

　　　　米为民　　　　　身份证号：370902196405101540

（以下简称"甲方"）

受让方：泰安市东联投资贸易有限公司（以下简称"乙方"）

住　　所：泰安高新区明天光彩工业园管理中心

法定代表人：贾同春

鉴于：

1、甲方是具有完全民事行为能力的中华人民共和国公民；

2、乙方是泰安市工商行政管理局注册的有限责任公司，注册资本人民币1500万元；

3、山东泰和东新股份有限公司（简称"东新公司"）是在山东省工商行政管理局注册的股份有限公司，注册资本8300万元。甲方现时持有东新公司10.81%的股权，计897万股，其中薛玉利197万股，占股权的2.37%；高玉宝194万股，占股权的2.34%；朱经华188万股，占股权的2.27%；张建春178万股，占股权的2.14%；米为民140万股，占股权的1.69%；

48

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

Jia Def 1/9/12
EXHIBIT NO. 4
L. GOLKOW

4、甲方同意向乙方出让 5.64% 的股权；

5、乙方同意受让甲方上述 5.64% 的股权。

甲、乙双方依照有关法律、行政法规的规定，从有利于山东泰和东新股份有限公司发展出发，经过友好协商，达成股权转让协议如下：

第一条　甲方作为山东泰和东新股份有限公司的股东，合法持有该公司 10.81% 的股权，共计 897 万股，现同意将其持有的该公司其中 5.64% 的股权（简称"该等股权"），计 468.125 万股及相关权益、义务以协议方式转让给乙方，其中薜玉利转让 117 万股；高玉宝转让 114 万股；朱绍华转让 80 万股；张建春转让 97.125 万股；米为民转让 60 万股。

第二条　乙方同意受让该等股权。

第三条　双方同意本次股权转让价格按每股 1.80 元作价，为人民币捌佰肆拾贰万陆仟贰佰伍拾元（小写：¥8426250 元）。

第四条　上述转让金额支付时间为：

受让方应于本协议生效之日起三月内，向转让方支付全部转让价款。

第五条　支付方式为货币资金支付，甲方应于收到乙方支付的前述转让价款之日向乙方开具正式收据。

第六条　甲方声明、保证和承诺：

1、甲方合法持有该等股权，保证其持有的山东泰和东新股份公司股权的洁净性，拟转让的该等股权不存在任何质押或担保和第三者的权益，或第三人向该股份主张权利的可能性；

2、甲方转让该等股权与其和任何第三方签署的合同、协议等法律性文件无任何法律冲突；

3、甲方履行本协议项下的义务不存在其他法律障碍；

2

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020635

4、甲方保证在收到付款之 10 日内，将其持有的该等股权出资证明书（股权证）交付乙方；

5、甲方将尽一切努力配合乙方依法完成有关股权转让的过户登记等全部法律手续。

第七条　乙方声明、保证和承诺：

1、乙方具有合法资格受让该等股权；

2、乙方保证按本协议之约定支付转让价款。

第八条　本次股权转让，按照有关法律、行政法规或部门规定应缴纳之税费或规费，由缴纳义务人进行缴纳。

第九条　双方承诺：

1、在本次股权转让正式公告之前，除双方指定人员之外，不得以任何方式、向任何人披露本次股权转让之信息。法律、法规另有规定时除外；

2、在此次股权转让过程中，按照国家关于股份公司股权转让的有关规定尽快办理过户、更名等有关手续。

第十条　任何一方违反本协议项下之约定或声明、保证和承诺，即构成违约。由违约方按协议金额的 5%向守约方支付违约金（或按违约部分金额的每日万分之三支付违约金）；由于任何一方违约给另一方造成损失时，违约方还应按照实际损失，给予守约方赔偿。

由于有关政府主管部门不予批准等原因导致无法履行本协议，不视为违约。但甲方应负责将已收上述股权转让款项本息（利息按照中国人民银行同期存款利率计算）返还给乙方。

第十一条　不可抗力。双方同意以下事实为不可抗力：

3

1、签署本协议时不能预见、不能避免、不能克服的，且导致本协议不能履行或者不能按时履行的客观情况；

2、国家政策法律的变更导致本协议无效；

3、除前款外双方或者一方的任何情况，诸如但不限于人员变动、决策变化等等，都不属于不可抗力；

4、任何一方因不可抗力而没有履行本协议的，无须承担违约责任，但应当在不可抗力发生之日起十日内通知对方并提供经律师见证的有关证明。

第十二条　因本协议或履行本协议而导致的任何争议，双方应首先努力通过协商解决；如协商不成时，提交泰安市仲裁委员会仲裁。

第十三条　本协议经甲、乙双方盖章或法定代表人（或授权代表）签字生效。

第十四条　本协议正本一式八份，甲乙双方各持二份，股份公司存档一份，申报办理有关过户手续用二份，八份具有同等法律效力。

甲方：

乙方：泰安市东联投资贸易有限公司

法定代表人：

2005年3月24日

.51

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

# 股权转让协议书

本协议由下列双方于二○○五年三月二十四日在泰安签署。

转让方：薛玉利　　　　身份证号：370911195312305212

任绪连　　　　身份证号：370902600527157

高玉宝　　　　身份证号：370911530504521

朱经华　　　　身份证号：370911561104521

吕文洋　　　　身份证号：370902570826091

张建春　　　　身份证号：370728691222185

贾元利　　　　身份证号：370911531106523

赵建刚　　　　身份证号：370902630812061

李作义　　　　身份证号：370911570624525

钱　凯　　　　身份证号：210112651220043

段振涛　　　　身份证号：370902195301020637

任显华　　　　身份证号：370911651023523

朱腾高　　　　身份证号：370304196702260636

张彦修　　　　身份证号：37030419671103063X

米为民　　　　身份证号：370902196405101540

（以下简称"甲方"）

受让方：泰安市安信投资贸易有限公司(以下简称"乙方")

住　　所：泰安高新区 7 号路（通远机械公司院内）

法定代表人：贾同春

鉴于：

1、甲方是具有完全民事行为能力的中华人民共和国公民；

1

52

20638

Jia Def 19/12

EXHIBIT NO. 5

L. GOLKOW

2、乙方是泰安市工商行政管理局注册的有限责任公司，注册资本人民币1500万元；

3、山东泰和东新股份有限公司(简称"东新公司")是在山东省工商行政管理局注册的股份有限公司，注册资本8300万元。甲方现时持有东新公司31.27%的股权，计2595万股，其中薛玉利197万股，占股权的2.37%；任绪连195万股，占股权的2.35%；高玉宝194万股，占股权的2.34%；朱经华188万股，占股权的2.27%；吕文洋183万股，占股权的2.21%；张建春178万股，占股权的2.14%；贾元利178万股，占股权的2.14%；赵建刚175万股，占股权的2.11%；李作义174万股，占股权的2.1%；钱凯164万股，占股权的1.98%；段振涛162万股，占股权的1.95%；任显华158万股，占股权的1.9%；朱腾高157万股，占股权的1.89%；张彦修152万股，占股权的1.83%；米为民140万股，占股权的1.69%；

4、甲方同意向乙方出让25.625%的股权；

5、乙方同意受让甲方上述25.625%的股权。

甲、乙双方依照有关法律、行政法规的规定，从有利于山东泰和东新股份有限公司发展出发，经过友好协商，达成股权转让协议如下：

第一条　甲方作为山东泰和东新股份有限公司的股东，合法持有该公司31.265%的股权共计2595万股，现同意将其持有的该公司其中25.625%的股权(简称"该等股权")，计2126.875万股及相关权益、义务以协议方式转让给乙方，其中薛玉利转让80万股；任绪连转让195万股；高玉宝转让80万股；朱经华转让108万股；吕文洋转让183万股；贾元利转让178万股；赵建刚转让175万股；李作义转让174万股；钱凯转让164万股；段振涛转让162万股；任显华转让158万股；朱腾高转让157万股；张彦修转让152万股；张建春转让80.875万股；米为民转让80万股。

第二条　乙方同意受让该等股权。

2

第三条　双方同意本次股权转让价格按每股 1.80 元作价，为人民币叁仟捌佰贰拾捌万叁仟柒佰伍拾元（小写：¥38283750 元）。

第四条　上述转让金额支付时间为：

受让方应于本协议生效之日起三月内，向转让方支付全部转让价款。

第五条　支付方式为货币资金支付，甲方应于收到乙方支付的前述转让价款之日向乙方开具正式收据。

第六条　甲方声明、保证和承诺：

1、甲方合法持有该等股权，保证其持有的山东泰和东新股份公司股权的洁净性，拟转让的该等股权不存在任何质押或担保和第三者的权益，或第三人向该股份主张权利的可能性；

2、甲方转让该等股权与其和任何第三方签署的合同、协议等法律性文件无任何法律冲突；

3、甲方履行本协议项下的义务不存在其他法律障碍；

4、甲方保证在收到付款之 10 日内，将其持有的该等股权出资证明书（股权证）交付乙方；

5、甲方将尽一切努力配合乙方依法完成有关股权转让的过户登记等全部法律手续。

第七条　乙方声明、保证和承诺：

1、乙方具有合法资格受让该等股权；

2、乙方保证按本协议之约定支付转让价款。

第八条　本次股权转让，按照有关法律、行政法规或部门规定应缴纳之税费或规费，由缴纳义务人进行缴纳。

第九条　双方承诺：

3

1、在本次股权转让正式公告之前，除双方指定人员之外，不得以任何方式、向任何人披露本次股权转让之信息。法律、法规另有规定时除外；

2、在此次股权转让过程中，按照国家关于股份公司股权转让的有关规定尽快办理过户、更名等有关手续。

第十条　任何一方违反本协议项下之约定或声明、保证和承诺，即构成违约。由违约方按协议金额的5%向守约方支付违约金（或按违约部分金额的每日万分之三支付违约金）；由于任何一方违约给另一方造成损失时，违约方还应按照实际损失，给予守约方赔偿。

由于有关政府主管部门不予批准等原因导致无法履行本协议，不视为违约。但甲方应负责将已收上述股权转让款项本息（利息按照中国人民银行同期存款利率计算）返还给乙方。

第十一条　不可抗力。双方同意以下事实为不可抗力：

1、签署本协议时不能预见、不能避免、不能克服的，且导致本协议不能履行或者不能按时履行的客观情况；

2、国家政策法律的变更导致本协议无效；

3、除前款外双方或者一方的任何情况，诸如但不限于人员变动、决策变化等等，都不属于不可抗力；

4、任何一方因不可抗力而没有履行本协议的，无须承担违约责任，但应当在不可抗力发生之日起十日内通知对方并提供经律师见证的有关证明。

第十二条　因本协议或履行本协议而导致的任何争议，双方应首先努力通过协商解决；如协商不成时，提交泰安市仲裁委员会仲裁。

第十三条　本协议经甲、乙双方盖章或法定代表人（或授权代表）签字生效。

第十四条　本协议正本一式八份，甲乙双方各持二份，股份公司存档一份，申报办理有关过户手续用二份，八份具有同等法律效力。

甲方：　　　　　　　乙方：泰安市安信投资贸易有限公司

法定代表人：

二〇〇五年3月24日

CHRON 027703 - Fifteen (15) individual shareholders, Xue, Yuli et al, agreed to transfer their shares (totaling 21.26 mm shares) to An Xin Investment Co

# 山东泰和东新股份有限公司股东大会决议

2005 年 3 月 24 日，山东泰和东新股份有限公司在公司总部会议室召开了 2005 年第一次临时股东大会，会议应到股东 18 人，实到 15 人。泰安市国有资产经营有限公司委派康荫国出席，山东泰和集团职工持股者协会委派贾同春出席，自然人股东贾同春、薛玉利、高玉宝、朱经华、任绪连、张建春、米为民、任显华、段振涛、赵建刚、李作义、钱凯、张彦俊出席，自然人股东吕文洋、朱腾高、贾元利委托贾同春出席，与会股东代表股份 8300 万股，占总股本 8300 万股的 100%，符合《公司法》和《公司章程》的有关规定，形成的决议有效。董事杨辉苔、张仁杰、监事杨军列席会议。会议由公司董事长贾同春主持。

与会股东经过充分讨论，审议通过了《关于增资扩股、股权转让及与北新建材合作的议案》。

与会股东一致同意公司增资扩股，筹集资金，加快项目建设促进企业发展。同意公司与北新建材合作，强强联合，优势互补，整合中国石膏板行业，提高品牌价值，避免重复建设。同意北新建材以认购新赠股份的方式进入泰和东新公司。同意通过职工持股者协会和自然人股东的股权转让，对现有股权结构进行适当调整，以进一步优化公司法人治理结构。具体方案如下：

泰和东新公司增发新股 7262.5 万股，每股面值人民币 1 元，认购价格为每股人民币 1.80 元。其中，北新建材认购 6536.25 万股，认缴人民币 11765.25 万元；自然人贾同春认购 363.125 万股（加上原持有的 415 万股，合计持有 778.125 万股），认缴人民币 653.625 万元；泰安市安信投资贸易有限公司认购 363.125 万股，认缴人民币

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER



Jia Def 1/9/12
EXHIBIT NO. 6
L. GOLKOW

653.625 万元。本次增资完成后，公司总股本为 15562.5 万股，注册资本为 15562.5 万元。

在增发新股的同时，职工持股会将持有的 2800 万股股份转让给泰安市东联投资贸易有限公司。除贾同春以外的其他自然人股东将持有的 2126.875 万股股份转让给泰安市安信投资贸易有限公司、468.125 万股股份转让给泰安市东联投资贸易有限公司。转让价格每股人民币 1.80 元。国资公司持有的 2490 万股不变。

在本次增资扩股和股权转让完成后，泰和东新公司股权结构变更为：总股本 15562.5 万股，其中：

北新集团建材股份有限公司持有 6536.25 万股，占公司总股本的 42%；

泰安市东联投资贸易有限公司持 3268.125 万股，占公司总股本的 21%；

泰安市安信投资贸易有限公司持有 2490 万股，占公司总股本的 16%；

泰安市国有资产经营有限公司持有 2490 万股，占公司总股本的 16%；

贾同春持有 778.125 万股，占公司总股本的 5%。

特 此 决 议



山东泰和东新股份有限公司

2005 年 3 月 24 日

2

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020599

（签字页　此页无正文）

与会股东签名：

泰安市国有资产经营有限公司　　　山东泰和集团职工持股会

2005年3月29日

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020600

**Updated Jia Tr. Def's Ex. 6A**

**(English Translation of Jia Tr. Def's Ex. 6)**

# Shandong Taihe Dongxin Co., Ltd.
## Resolutions of the General Meeting of Shareholders

On March 24, 2005, Shandong Taihe Dongxin Co., Ltd. convened the 2005 first extraordinary general meeting of shareholders in the headquarters conference room. In attendance were 15 of the 18 shareholders: Yinguo Kang, on behalf of Taian State-Owned Asset Management Co., Ltd.; Tongchun Jia, on behalf of Shandong Taihe (Group) Employee Shareholders Association; individual shareholders, including Tongchun Jia, Yuli Xue, Yubao Gao, Jinghua Zhu, Xulian Ren, Jianchun Zhang, Weimin Mi, Xianhua Ren, Zhentao Duan, Jiangang Zhao, Zuoyi Li, Kai Qian and Yanxiu Zhang; and individual shareholders Wenyang Lu, Tenggao Zhu and Yuanli Jia, as represented by Mr. Tongchun Jia. With attendees representing 83 million shares, or 100% of the total equity of the company, as required by applicable provisions of the *Company Law of the People's Republic of China* and the *Articles of Association* of the Company, the resolutions issued at the meeting were valid and effective. Director Huicang Yang, Renjie Zhang, and Supervisor Jun Yang also observed at the meeting, which was presided over by Chairman Jia.

Following extensive deliberation among the shareholders, the "Motion to increase capital, enlarge stock, transfer shares, and collaborate with Beijing New Building Materials Co., Ltd." was passed.

The shareholders in attendance unanimously agreed to increase capital, enlarge stock and accelerate project development so as to promote the growth of the company. In an effort to integrate China's gypsum board industry, augment the value of the brand, and prevent unnecessary duplicate construction, they also agreed to a mutually beneficial collaboration with Beijing New Building Materials Co., Ltd. whereby it would enter into Taihe Dongxin Co., Ltd. by purchasing newly issued shares. It was also agreed to adjust the outstanding equity structure of the company through the transfer of stock among the Shandong Taihe (Group) Employee Shareholders Association and the individual shareholders, so as to further optimize the corporate governance structure. The specific arrangements are as follows:

Taihe Dongxin Co., Ltd. shall issue an additional 72,625,000 million new shares, with each share assigned a face value of RMB 1 yuan and a subscription price of RMB 1.80 yuan. Of these additional shares, Beijing New Building Materials Co., Ltd. shall purchase 65,362,500 shares at a subscription price of RMB 117,652,500 yuan; Tongchun Jia shall purchase 3,631,250 shares (which in addition to the 4.15 million shares already held by him will comprise a portfolio totaling 7,781,250 shares) at a subscription price of RMB 6,536,250 yuan; and Taian Anxin Trust & Investment Co., Ltd. shall purchase 3,631,250 shares at a subscription price of RMB 6,536,250 yuan. Following the completion of this capital increase, the total equity of the company shall be 155,625,000 shares and total registered capital shall be RMB 155,625,000 yuan.

1

TRANSLATIONS PROVIDED BY TAISHAN - FINAL

In addition to the issuance of new shares, the 28 million shares held by the Shandong Taihe (Group) Employee Shareholders Association shall be transferred to Taian Donglian Investment and Trade Co., Ltd. 21,268,750 of the shares held by the individual shareholders other than Tongchun Jia shall then be transferred to Taian Anxin Trust & Investment Co., Ltd., and 4,681,250 transferred to Taian Donglian Investment and Trade Co., Ltd. The transfer price shall be RMB 1.80 yuan per share. Ownership of the 24.9 million state-owned shares in the company shall not change.

Following the completion of the capital stock increase and stock transfer transaction, the equity structure of Taihe Dongxin Co., Ltd. shall consist of a total of 155,625,000 shares, of which:

Beijing New Building Materials Co., Ltd. shall hold 65,362,500 shares, or 42% of the total equity of the company;

Taian Donglian Investment and Trade Co., Ltd shall hold 32,681,250 shares, or 21% of the total equity of the company;

Taian Anxin Trust & Investment Co., Ltd. shall hold 24,900,000 shares, or 16% of the total equity of the company;

Taian State-Owned Asset Management Co., Ltd. shall hold 24,900,000 shares, or 16% of the total equity of the company; and

Tongchun Jia shall hold 7,781,250 shares, or 5% of the total equity of the company.

It is hereby resolved.

Shandong Taihe Dongxin Co., Ltd.
[*seal: Shandong Taihe Dongxin Co., Ltd.*]

March 24, 2005

(Signature Page   This page does not contain any text)

Shareholder Signatures:

Taian State-Owned Asset Management Co., Ltd.     Shandong Taihe (Group) Employee Shareholders Assn.

[*seal*: *Taian State-Owned*                              [*seal*: *Shandong Taihe (Group) Employee*
*Asset Management Co., Ltd.*]                         *Shareholders Association*]

[*signatures*]

March 24, 2005

Translation of TG 0020600
TRANSLATIONS PROVIDED BY TAISHAN - FINAL

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020647

Jia Def 1/9/12
EXHIBIT NO. 7
L. GOLKOW

附件 1-表 (2)

山东泰和东新股份有限公司监事会签字

# 注 册 资 本 变 更 前 后 对 照 表

被审验单位名称: 山东泰和东新股份有限公司　　截止: 2005年4月25日

货币单位: 人民币万元

| 股东名称 | 认缴注册资本 | | | | 实缴注册资本 | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 变更前 | | 变更后 | | 变更前 | | 本次增加 | 变更后 | |
| | 金额 | 比例(%) | 金额 | 比例(%) | 金额 | 比例(%) | 配股转让 | 金额 | 比例(%) |
| 山东泰和集团职工持股协会 | 2800 | 33.73 | 0.00 | 0.00 | 2800 | 33.73 | -2800 | 0.00 | 0.00 |
| 泰安市国有资产经营有限公司 | 2490 | 30 | 2490 | 16 | 2490 | 30 | 0.00 | 2490 | 5 |
| 贾同春 | 415 | 5 | 778.125 | 5 | 415 | 2.37 | 363.125 | 778.125 | 5 |
| 薛玉利 | 197 | 2.37 | 0.00 | 0.00 | 197 | 2.35 | -197 | 0.00 | 0.00 |
| 任娥志 | 195 | 2.35 | 0.00 | 0.00 | 195 | 2.34 | -195 | 0.00 | 0.00 |
| 商玉宝 | 194 | 2.34 | 0.00 | 0.00 | 194 | 2.27 | -194 | 0.00 | 0.00 |
| 朱经华 | 188 | 2.27 | 0.00 | 0.00 | 188 | 2.21 | -188 | 0.00 | 0.00 |
| 吕文洋 | 183 | 2.21 | 0.00 | 0.00 | 183 | 2.14 | -183 | 0.00 | 0.00 |
| 张建春 | 178 | 2.14 | 0.00 | 0.00 | 178 | 2.14 | -178 | 0.00 | 0.00 |
| 本页小计 | 6840 | 82.41 | 3268.125 | 21 | 6840 | 82.41 | -3571.875 | 3268.125 | 21 |

编制单位: 泰安大华会计师事务所

备注: 我们末审计贵公司注册资本变更及原投权人变更前后的会计报表

中国注册会计师:

电话: 0538-8214434
地址: 泰山大街24号

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020648

山东泰阳未制股份公司审验资料

附件一表（2）：

# 注册资本变更前后对照表

截止：2005年4月25日　　货币单位：人民币万元

被审验单位名称：山东泰阳未制束制股份有限公司

| 股东名称 | 认缴注册资本 | | | | 实缴注册资本 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 变更前 | | 变更后 | | 变更前 | | 本次增减 | 变更后 | | |
| | 金额 | 比例(%) | 金额 | 比例(%) | 金额 | 比例(%) | 减转让 | 金额 | 比例(%) | |
| 贾元利 | 178 | 2.14 | 0.00 | 0.00 | 178 | 2.14 | -178 | 0.00 | 0.00 | |
| 焦建刚 | 175 | 2.11 | 0.00 | 0.00 | 175 | 2.11 | -175 | 0.00 | 0.00 | |
| 李作义 | 174 | 2.1 | 0.00 | 0.00 | 174 | 2.1 | -174 | 0.00 | 0.00 | |
| 钱凯 | 164 | 1.98 | 0.00 | 0.00 | 164 | 1.98 | -164 | 0.00 | 0.00 | |
| 段振涛 | 162 | 1.95 | 0.00 | 0.00 | 162 | 1.95 | -162 | 0.00 | 0.00 | |
| 任昆华 | 158 | 1.9 | 0.00 | 0.00 | 158 | 1.9 | -158 | 0.00 | 0.00 | |
| 朱鹏高 | 157 | 1.89 | 0.00 | 0.00 | 157 | 1.89 | -157 | 0.00 | 0.00 | |
| 张春普 | 152 | 1.83 | 0.00 | 0.00 | 152 | 1.83 | -152 | 0.00 | 0.00 | |
| 米为民 | 140 | 1.69 | 0.00 | 0.00 | 140 | 1.69 | -140 | 0.00 | 0.00 | |
| 本页小计/合计 | 1459 | 17.59 | 0.00 | 0.00 | 1460 | 17.59 | -1460 | 0.00 | 0.00 | |

中国注册会计师

编制单位：泰安大华会计师事务所

备注：我们未审计本公司增资及股权转让前的会计报表

地址：泰明东路24号

发证公司资本束会计师事务所

传真：0539-8214414

附件1-表(3)2：

# 注 册 资 本 变 更 前 后 对 照 表

被审验单位名称：山东泰和东新股份有限公司　　截止：2005年4月25日

货币单位：人民币万元

| 股东名称 | 认缴注册资本 | | | | 实缴注册资本 | | | | 本次增加或转让 | 变更后 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 变更前 | | 变更后 | | 变更前 | | | | | | |
| | 金额 | 比例(%) | 金额 | 比例(%) | 金额 | 比例(%) | | | | 金额 | |
| 北新集团建材股份有限公司 | 0.00 | 0.00 | 6536.25 | 42 | 0.00 | 0.00 | | | 6536.25 | 6536.25 | 42 |
| 泰安市安信投资贸易有限公司 | 0.00 | 0.00 | 2490 | 16 | 0.00 | 0.00 | | | 2490 | 2490 | 16 |
| 泰安市东联投资贸易有限公司 | 0.00 | 0.00 | 3268.125 | 21 | 0.00 | 0.00 | | | 3268.125 | 3268.125 | 21 |
| 本页小计 | 0.00 | 0.00 | 12294.375 | 79 | 0.00 | 0.00 | | | 12294.375 | 12294.375 | 79 |
| 合计 | 8300 | 100 | 15662.5 | 100 | 8300 | 100 | | | 7262.5 | 15662.5 | 100 |

编制单位：泰安众诚有限责任公司

备注：我们只审计贵公司增资及股权转让完成后的会计报表

中国注册会计师：

地址：泰城东岳大街24号

电话：(0538)8214434

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

**Updated Jia Tr. Def's Ex. 7A**

**(English Translation of Jia Tr. Def's Ex. 7)**

Appendix 1 –Table (2)

## Comparison Chart of Registered Capital Before and After Changes

Entity name:  Shandong Taihe Dongxin Co., Ltd.                    As of:  April 25, 2005                    Currency:  renminbi (yuan)

| Shareholder Name | Subscribed Registered Capital | | | | Paid-In Registered Capital | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Before Change | | After Change | | Before Change | | Increase or Transfer | After Change | |
| | Amount | Perc. (%) | Amount | Perc. (%) | Amount | Perc. (%) | | Amount | Perc. (%) |
| Shandong Taihe (Group) Employee Shareholders Assn. | 2800 | 33.73 | 0.00 | 0.00 | 2800 | 33.73 | -2800 | 0.00 | [?] |
| Taian State-Owned Asset Management Co., Ltd. | 2490 | 30 | 2490 | 16 | 2490 | 30 | 0.00 | 2490 | [?] |
| Tongchun Jia | 415 | 5 | 778.125 | 5 | 415 | 5 | 363.125 | 778.125 | 5 |
| Yuli Xue | 197 | 2.37 | 0.00 | 0.00 | 197 | 2.37 | -197 | 0.00 | 0.00 |
| Xulian Ren | 195 | 2.35 | 0.00 | 0.00 | 195 | 2.35 | -195 | 0.00 | 0.00 |
| Yubao Gao | 194 | 2.34 | 0.00 | 0.00 | 194 | 2.34 | -194 | 0.00 | 0.00 |
| Jinghua Zhu | 188 | 2.27 | 0.00 | 0.00 | 188 | 2.27 | -188 | 0.00 | 0.00 |
| Wenyang Lu | 183 | 2.21 | 0.00 | 0.00 | 183 | 2.21 | -183 | 0.00 | 0.00 |
| Jianchun Zhang | 178 | 2.14 | 0.00 | 0.00 | 178 | 2.14 | -178 | 0.00 | 0.00 |
| Subtotal for this Page | 6840 | 82.41 | 3268.125 | 21 | 6840 | 82.41 | -3571.875 | 3268.125 | 21 |

Prepared by:  Taian Zhongcheng Certified Public Accounting Firm                    China Certified Public Accountant:  [*signature*]
[*seal: Taian Zhongcheng Certified Public Accounting Firm*]

Remarks:  We have not yet completed audit reports for the periods before and after the capital increase and stock transfer of the company._____

Taian Zhongcheng Certified Public Accounting Firm                    Address:  No. 24 Yingxuan Avenue, Taian
                                                                                                   Telephone:  0538-8214434

Appendix 1 –Table (2)

# Comparison Chart of Registered Capital Before and After Changes

Entity name:  Shandong Taihe Dongxin Co., Ltd.                    As of: April 25, 2005                    Currency:  renminbi (yuan)

| Shareholder Name | Subscribed Registered Capital | | | | Paid-In Registered Capital | | | | |
| | Before Change | | After Change | | Before Change | | Increase or Transfer | After Change | |
| | Amount | Perc. (%) | Amount | Perc. (%) | Amount | Perc. (%) | | Amount | Perc. (%) |
|---|---|---|---|---|---|---|---|---|---|
| Yuanli Jia | 178 | 2.14 | 0.00 | 0.00 | 178 | 2.14 | -178 | 0.00 | 0.00 |
| Jiangang Zhao | 175 | 2.11 | 0.00 | 0.00 | 175 | 2.11 | -175 | 0.00 | 0.00 |
| Zuoyi Li | 174 | 2.1 | 0.00 | 0.00 | 174 | 2.1 | -174 | 0.00 | 0.00 |
| Kai Qian | 164 | 1.98 | 0.00 | 0.00 | 164 | 1.98 | -164 | 0.00 | 0.00 |
| Zhentao Duan | 162 | 1.95 | 0.00 | 0.00 | 162 | 1.95 | -162 | 0.00 | 0.00 |
| Xianhua Ren | 158 | 1.9 | 0.00 | 0.00 | 158 | 1.9 | -158 | 0.00 | 0.00 |
| Tenggao Zhu | 157 | 1.89 | 0.00 | 0.00 | 157 | 1.89 | -157 | 0.00 | 0.00 |
| Yanxiu Zhang | 152 | 1.83 | 0.00 | 0.00 | 152 | 1.83 | -152 | 0.00 | 0.00 |
| Wemin Mi | 140 | 1.69 | 0.00 | 0.00 | 140 | 1.69 | -140 | 0.00 | 0.00 |
| Subtotal for this Page | 1460 | 17.59 | 0.00 | 0.00 | 1460 | 17.59 | -1460 | 0.00 | 0.00 |

Prepared by:  Taian Zhongcheng Certified Public Accounting Firm                    China Certified Public Accountant:  [*signature*]
[*seal: Taian Zhongcheng Certified Public Accounting Firm*]

Remarks:  We have not yet completed audit reports for the periods before and after the capital increase and stock transfer of the company.

Translation of TG 0020648
TRANSLATIONS PROVIDED BY TAISHAN - FINAL

Appendix 1 –Table (2)

# Comparison Chart of Registered Capital Before and After Changes

Entity name:  Shandong Taihe Dongxin Co., Ltd.          As of:  April 25, 2005          Currency:  renminbi (yuan)

| Shareholder Name | Subscribed Registered Capital | | | | Paid-In Registered Capital | | | | |
| | Before Change | | After Change | | Before Change | | Increase or Transfer | After Change | |
| | Amount | Perc. (%) | Amount | Perc. (%) | Amount | Perc. (%) | | Amount | Perc. (%) |
|---|---|---|---|---|---|---|---|---|---|
| Beijing New Building Materials Co., Ltd. | 0.00 | 0.00 | 6536.25 | 42 | 0.00 | 0.00 | 6536.25 | 6536.25 | 42 |
| Taian Anxin Trust & Investment Co., Ltd. | 0.00 | 0.00 | 2490 | 16 | 0.00 | 0.00 | 2490 | 2490 | 16 |
| Taian Donglian Investment and Trade Co., Ltd. | 0.00 | 0.00 | 3268.125 | 21 | 0.00 | 0.00 | 3268.125 | 3268.125 | 21 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Subtotal for this Page | 0.00 | 0.00 | 12294.375 | 79 | 0.00 | 0.00 | 12294.375 | 12294.375 | 79 |
| Total | 8300 | 100 | 15562.5 | 100 | 8300 | 100 | 7262.5 | 15562.5 | 100 |

Prepared by:  Taian Zhongcheng Certified Public Accounting Firm          China Certified Public Accountant:  [*signature*]
[*seal: Taian Zhongcheng Certified Public Accounting Firm*]

Remarks:  We have not yet completed audit reports for the periods before and after the capital increase and stock transfer of the company.

Translation of TG 0020649
TRANSLATIONS PROVIDED BY TAISHAN - FINAL

# 股 东 大 会 决 议

　　二〇〇五年四月二十五日，山东泰和东新股份有限公司在公司总部会议室召开了二〇〇五年第二次临时股东大会。出席会议的股东代表5人，代表公司股份15562.5万股，占公司总股本的100%，符合《公司法》及《公司章程》的规定。会议由公司董事长贾同春主持。与会股东代表一致同意并通过了如下决议：

　　一、董事组成人数由9人变为7人，免去康菊国、杨辉苍、张仁杰、朱经华、商玉宝、张建春的董事职务。选举王兵、贾建军、胡金玉、徐兴虎为公司董事。董事会由王兵、贾建军、胡金玉、任绪连、徐兴虎、贾同春、薛玉利7人组成。

　　二、免去李其法、杨军的监事职务，选举曹江林、付廷环为公司监事。监事会由曹江林、吕文洋、付廷环3人组成。

　　三、同意修改并签署修改后的《公司章程》；

　　特此决议。

2005 年 4 月 25 日

7

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020601

Jia Def 1/9/12
EXHIBIT NO. 8
L. GOLKOW

此页无正文，为山东泰和东新股份有限公司二〇〇
五年第一次临时股东大会决议股东签字页

股东签字：

北新集团建材股份有限公司



代表签字：

泰安市国有资产经营有限公司

代表签字：

泰安市安信投资咨询有限公司

代表签字：

泰安市东联投资咨询有限公司

代表签字：

贾同春（签字）

二〇〇五年四月二十五日

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

**Updated Jia Tr. Def's Ex. 8A**

**(English Translation of Jia Tr. Def's Ex. 8)**

# Resolutions of the General Meeting of Shareholders

On April 25, 2005, Shandong Taihe Dongxin Co., Ltd. convened the 2005 second temporary general meeting of shareholders in the headquarters conference room. In attendance were five shareholder representatives, representing 155,625,000 shares, or 100% of the total equity of the company, as required by the provisions of the *Company Law of the People's Republic of China* and the *Articles of Association* of the company. As presided over by Chairman Tongchun Jia, the following resolutions were unanimously agreed upon and passed:

1. The number of members on the Board of Directors shall be changed from 9 to 7, with the positions currently held by Yinguo Kang, Huicang Yang, Renjie Zhang, Jinghua Zhu, Yubao Gao, and Jianchun Zhang to be eliminated, and Bing Wang, Jianjun Jia, Jinyu Hu and Xinghu Xu to be elected as members of the Board. Accordingly, the Board of Directors shall now be comprised of the following 7 individuals: Bing Wang, Jianjun Jia, Jinyu Hu, Xulian Ren, Xinghu Xu, Tongchun Jia, and Yuli Xue.

2. The supervisory duties held by Qifa Li and Jun Yang shall be eliminated, and Jianglin Cao and Tinghuan Fu shall be elected as Supervisors of the company. Accordingly, the Board of Supervisors shall now be comprised of the following 3 individuals: Jianglin Cao, Wenyang Lu, and Tinghuan Fu.

3. The *Articles of Association* of the company shall be amended and signed.

It is hereby resolved.

April 25, 2005

This page is reserved for the shareholder signatures for the resolutions of the 2005 first extraordinary general shareholder meeting of Shandong Taihe Dongxin Co., Ltd., and does not contain any text.

Shareholder Signatures:

Beijing New Building Materials Co., Ltd.
[*seal: Beijing New Building Materials Co., Ltd.*]

Signature of representative: [*signature*]

Taian State-Owned Asset Management Co., Ltd.
[*seal: Taian State-Owned Asset Management Co., Ltd.*]

Signature of representative: [*signature*]

Taian Anxin Trust & Investment Co., Ltd.
[*seal: Taian Anxin Trust & Investment Co., Ltd.*]

Signature of representative: [*signature*]

Taian Donglian Investment and Trade Co., Ltd.
[*seal: Taian Donglian Investment and Trade Co., Ltd.*]

Signature of representative: [*signature*]

Tongchun Jia
[*signature*]

April 25, 2005





# 山东泰和东新股份有限公司章程

9

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

Jia Def 1/9/12
EXHIBIT NO. 9
L. GOLKOW

# 目　录

第一章　总　则………………………………………………2

第二章　经营宗旨和范围……………………………………2

第三章　股　　份……………………………………………3

第四章　股东和股东大会……………………………………4

第五章　董事会………………………………………………9

第六章　经　　理……………………………………………14

第七章　监事会………………………………………………15

第八章　财务会议制度、利润分配和审计…………………17

第九章　合并、分立、解散和清算…………………………18

第十章　修改章程……………………………………………21

第十一章　附　　则…………………………………………21

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020609

本章程于二〇〇五年四月二十五日由公司二〇〇五年第一次临时股东大会以特别决议通过。

## 第一章　总　则

第一条　为维护公司、股东和债权人的合法权益，规范公司的组织和行为，根据《中华人民共和国公司法》（以下简称《公司法》）和其他有关规定，制订本章程。

第二条　山东泰和东新股份有限公司系依照《公司法》和其他有关规定成立的股份有限公司（以下简称"公司"）。

公司经山东省经济体制改革委员会《关于同意设立山东泰和东新股份有限公司的函》（鲁体改函字[1998]第49号）批准，以发起方式设立，在山东省工商行政管理局注册登记，取得营业执照。

第三条　公司注册名称：山东泰和东新股份有限公司

第四条　公司住所：山东省泰安市岱岳区大汶口镇。邮政编码 271026

第五条　公司注册资本为人民币贰亿伍千伍佰陆拾贰万伍千元。

第六条　公司为永久存续的股份有限公司。

第七条　董事长为公司的法定代表人。

第八条　公司全部资产分为等额股份，股东以其所持股份为限对公司承担责任，公司以其全部资产对公司的债务承担责任。

第九条　本公司章程自生效之日起，即成为规范公司的组织与行为、公司与股东、股东与股东之间权利义务关系的、具有法律约束力的文件。股东可以依据公司章程起诉公司；公司可以依据公司章程起诉股东、董事、监事、经理（包括：总经理、副总经理，以下合称经理人员、经理）和其他高级管理人员；股东可以依据公司章程起诉股东；股东可以依据公司章程起诉公司的董事、监事、经理和其他高级管理人员。

第十条本章程所称其他高级管理人员是指公司的董事会秘书、财务负责人、总工程师、总经济师、总会计师。

## 第二章　经营宗旨和范围

第十一条　公司的经营宗旨：建立高效的经营管理机制，使企业稳健的发

2

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

展，使股东获得满意的经济回报，为社会繁荣和人类进步尽企业的责任。

第十二条　经公司登记机关核准，公司经营范围是：纸面石膏板、石膏制品、石材、轻钢龙骨、建筑材料、装饰材料及新型建筑材料生产、销售；腐蚀品（磷酸）、磷酸副产品磷石膏、建筑五金、陶瓷制品、机电产品、家具、家用电器、日用百货、矿山机械配件销售；汽车配件销售；废纸箱收购；玉石雕刻；装饰装修，许可证范围国内普通货运（限分支机构经营）。

## 第三章　股　份

### 第一节　股份发行

第十三条　公司的股份采取股票的形式。

第十四条　公司发行的所有股份均为普通股。

第十五条　公司股份的发行，实行公开、公平、公正的原则，同股同权，同股同利。

第十六条　公司发行的股票，以人民币标明面值。

第十七条　公司的总股本为15562.5万股。其中：

1、北新集团建材股份有限公司持有6536.25万股，占公司总股本的42%；

2、泰安市东联投资贸易有限公司持有3268.125万股，占公司总股本的21%；

3、泰安市国有资产经营有限公司持有2490万股，占公司总股本的16%；

4、泰安市安信投资贸易有限公司持有2490万股，占公司总股本的16%；

5、贾同睾持有778.125万股，占公司总股本的5%。

### 第二节　股份增减和回购

第十八条　公司根据经营和发展的需要，依照法律、法规的规定，经股东大会分别作出决议，可以采用下列方式增加资本：

（一）向现有股东配售股份；

（二）向现有股东派送红股；

（三）以公积金转增股本；

（四）法律、行政法规规定批准的其他方式。

公司增加股份时，北新集团建材股份有限公司在同等条件下对新增加的股份有优先认购权。

第十九条　根据公司章程的规定，公司可以减少注册资本。公司减少注册资

3

本，按照《公司法》以及其他有关规定和公司章程规定的程序办理。

### 第三节　股份转让

第二十条　股东持有的股份可以依法转让。公司其他股东转让所持公司股份时，北新集团建材股份有限公司在同等条件下有优先购买权。

第二十一条　发起人持有的公司股票，自公司成立之日起三年以内不得转让。

## 第四章　股东和股东大会

### 第一节　　股东

第二十二条　公司股东为依法持有公司股份的人。

股东按其所持有股份的种类享有权利，承担义务；持有同一种类股份的股东，享有同等权利，承担同种义务。

第二十三条　股东名册是证明股东持有公司股份的充分证据。公司应建立股东名册。

第二十四条　公司股东享有下列权利：

（一）依照其所持有的股份额获得股利和其他形式的利益分配；

（二）参加或者委派股东代理人参加股东会议；

（三）依照其所持有的股份额行使表决权；

（四）对公司的经营行为进行监督，提出建议或者质询；

（五）依照法律、行政法规及公司章程的规定转让、赠与或质押其所持有的股份；

（六）依照法律、公司章程的规定获得有关信息，包括查阅公司章程和文件；

（七）公司终止或者清算时，按其所持有的股份额参加公司剩余财产的分配；

（八）法律、行政法规及公司章程所赋予的其他权利。

第二十五条　股东大会、董事会的决议违反法律、行政法规，侵犯股东合法权益的，股东有权向人民法院提起要求停止该违法行为和侵害行为的诉讼。

第二十六条　公司股东承担下列义务：

（一）遵守公司章程；

（二）依其所认购的股份和入股方式缴纳股金；

4

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020612

（三）除法律、法规规定的情形外，不得退股；

（四）法律、行政法规及公司章程规定应当承担的其他义务。

第二十七条　股东将其持有的股份进行质押的，需由公司股东会以特别决议审批通过后方可进行。

## 第二节　股东大会

第二十八条　股东大会是公司的最高权力机构，依法行使下列职权：

（一）决定公司经营方针和投资计划；

（二）选举和更换董事，决定有关董事的报酬事项；

（三）选举和更换由股东代表出任的监事，决定有关监事的报酬事项；

（四）审议批准董事会的报告；

（五）审议批准监事会的报告；

（六）审议批准公司的年度财务预算方案、决算方案；

（七）审议批准公司的利润分配方案和弥补亏损方案；

（八）对公司增加或者减少注册资本作出决议；

（九）对发行公司债券作出决议；

（十）对公司合并、分立、解散和清算等事项作出决议；

（十一）修改公司章程；

（十二）对股东将其所持公司股份进行质押作出决议；

（十三）审议法律、法规和公司章程规定应当由股东大会决定的其他事项。

第二十九条　股东大会分为股东年会和临时股东大会。股东年会每年召开一次，并应于上一个会计年度完结之后的六个月之内举行。

第三十条　有下列情形之一的，公司在事实发生之日起两个月以内召开临时股东大会：

（一）董事人数不足《公司法》规定的法定最低人数，或者少于章程所定人数的 2/3 时；

（二）公司未弥补的亏损达股本总额的 1/3 时；

（三）单独或者合并持有公司有表决权股份总数 10%(不含投票代理权)以上的股东书面请求时；

（四）董事会认为必要时；

（五）监事会提议召开时；

5

（六）公司章程规定的其他情形。

第三十一条　临时股东大会只对通知中列明的事项作出决议。

第三十二条　股东大会会议由董事会依法召集，由董事长主持。董事长因故不能履行职务时，由董事长指定的其它董事主持；董事长不能出席会议，也未指定人选的，由董事会指定一名董事主持会议；董事会未指定会议主持人的，由出席会议的股东共同推举一名股东主持会议。

第三十三条　公司召开股东大会，董事会应当在会议召开 30 日以前以书面方式（传真有效）通知公司股东。经公司全体股东同意，上述 30 日通知时限可以豁免或适当缩短。

第三十四条　股东可以亲自出席股东大会，也可以委托代理人代为出席和表决。股东应当以书面形式委托代理人，由委托人签署或者由其以书面形式委托的代理人签署；委托人为法人的，应当加盖法人印章或者由其正式委任的代理人签署。

第三十五条　股东出具的委托他人出席股东大会的授权委托书应当载明下列内容：

（一）代理人的姓名；

（二）是否具有表决权；

（三）分别对列入股东大会议程的每一事项投赞成、反对或弃权票的指示；

（四）对可能纳入股东大会议程的临时提案是否有表决权，如果有表决权应行使何种表决权的具体指示；

（五）委托书签发日期和有效期限；

（六）委托人签名（或盖章）。委托人为法人股东的，应加盖法人单位印章。

委托书应当注明如果股东不作具体指示，股东代理人是否可以按自己的意思表决。

第三十六条　出席会议人员的签名册由公司负责制作。签名册应载明参加会议人员姓名（或单位名称）、身份证号码、住所地址、持有或者代表有表决权的股份数额、该代理人姓名（或单位名称）等事项。

第三十七条　监事会或者股东要求召集临时股东大会的，应当按照下列程序办理：

（一）签署一份或者数份同样格式内容的书面要求，提请董事会召集临时股东大会，并载明会议议题。董事会在收到前述书面要求后，应当尽快发出召集临时

6

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020614

股东大会的通知。

　　(二)如果董事会在收到前述书面要求后三十日内没有发出召集会议的通知，提出召集会议的监事会或者股东可以在董事会收到该要求后三个月内自行召集临时股东大会。召集的程序应当尽可能与董事会召集股东会议的程序相同。监事会或者股东因董事会未应前述要求举行会议而自行召集并举行会议的，由公司给予监事会或者股东必要协助，并承担会议费用。

　　第三十八条　股东大会召开的会议通知发出后，除有不可抗力或者其它意外事件等原因，董事会不得变更股东大会召开的时间。

　　第三十九条　董事会人数不足《公司法》规定的法定最低人数，或者少于章程规定人数的三分之二，或者公司未弥补亏损额达到股本总额的三分之一，董事会未在规定期限内召集临时股东大会的，监事会或者股东可以按照本章程规定的程序自行召集临时股东大会。

### 第三节　股东大会提案

　　第四十条　公司召开股东大会，持有或者合并持有公司有表决权股份总数的百分之五以上的股东，有权向公司提出新的提案。

　　第四十一条　股东大会提案应当符合下列条件：

　　(一)内容与法律、法规和章程的规定不相抵触，并且属于公司经营范围和股东大会职责范围；

　　(二)有明确议题和具体决议事项；

　　(三)以书面形式提交或送达董事会。

　　第四十二条　公司董事会应当以公司和股东的最大利益为行为准则，按照本节第四十一条的规定对股东大会提案进行审查。

　　第四十三条　董事会决定不将股东大会提案列入会议议程的，应当在该次股东大会上进行解释和说明。

### 第四节　股东大会决议

　　第四十四条　股东(包括股东代理人)以其所代表的有表决权的股份数额行使表决权，每一股份享有一票表决权。

　　第四十五条　股东大会决议分为普通决议和特别决议。

　　股东大会作出普通决议，应当由出席股东大会的股东(包括股东代理人)所持

7

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

表决权的二分之一以上通过。

股东大会作出特别决议，应当由出席股东大会的股东(包括股东代理人)所持表决权的三分之二以上通过。

第四十六条 下列事项由股东大会以普通决议通过：

(一)董事会和监事会的工作报告；

(二)公司年度预算方案、决算方案；

(三)公司年度报告；

(四)董事会拟定的利润分配方案和弥补亏损方案；

(五)董事会和监事会成员的任免及其报酬和支付方法；

(六)除法律、行政法规规定或者公司章程规定应当以特别决议通过以外的其他事项。

第四十七条 下列事项由股东大会以特别决议通过：

(一)公司增加或者减少注册资本；

(二)发行公司债券；

(三)公司的分立、合并、解散和清算；

(四)公司章程的修改；

(五)回购本公司股票；

(六)股东将其所持股份进行质押；

(七)公司章程规定和股东大会以普通决议认定会对公司产生重大影响的、需要以特别决议通过的其他事项。

第四十八条 非经股东大会以特别决议批准，公司不得与董事、经理和其它高级管理人员以外的人订立将公司全部或者重要业务的管理交予该人负责的合同。

第四十九条 董事、监事候选人名单以提案的方式提请股东大会决议。

董事会应当向股东提供候选董事、监事的简历和基本情况。

第五十条 董事、股东代表担任的监事的提名及选举按以下程序进行：

(一) 董事、股东代表担任的监事由股东按本章程第六十七条和第一百零二条的规定提名，并经股东大会选举确定。

(二) 董事、监事的提名人在提名前应当征得被提名人的同意。提名人应当充分了解被提名人职业、学历、职称、详细的工作经历、全部兼职等情况。

公司应当在股东大会召开前披露董事、监事候选人的详细资料，保证股东在投

8

票时对候选人有足够的了解。

（三）公司应和董事签订转任合同，明确公司和董事之间的权利义务、董事的任期、董事违反法律法规和公司章程的责任以及公司因故提前解除合同的补偿等内容。

第五十一条　股东大会采取记名方式投票表决或举手表决，并由清点人代表当场公布表决结果。

第五十二条　会议主持人根据表决结果决定股东大会的决议是否通过，并应当在会上宣布表决结果。决议的表决结果载入会议记录。

第五十三条　会议主持人如果对提交表决的决议结果有任何怀疑，可以对所投票数进行点算；如果会议主持人未进行点算，出席会议的股东或者股东代理人对会议主持人宣布结果有异议的，有权在宣布表决结果后立即要求点票，会议主持人应当即时点票。

第五十四条　除涉及公司商业秘密不能在股东大会上公开外，董事会和监事会应当对股东的质询和建议作出答复或说明。

第五十五条　股东大会应有会议记录。会议记录载以下内容：

（一）出席股东大会的有表决权的股份数，占公司总股份的比例；

（二）召开会议的日期、地点；

（三）会议主持人姓名、会议议程；

（四）各发言人对每个审议事项的发言要点；

（五）每一表决事项的表决结果；

（六）股东的质询意见、建议及董事会、监事会的答复或说明等内容；

（七）股东大会认为和公司章程规定应当载入会议记录的其他内容。

第五十六条　股东大会记录由出席会议的股东和记录员签名，并作为公司档案由董事会秘书保存。股东大会会议记录的保管期限为永久性保存。

第五十七条　股东大会到会人数、参会股东持有的股份数额、授权委托书、每一表决事项的表决结果、会议记录、会议程序的合法性等事项，可以进行公证。

# 第五章　董事会

## 第一节　董事

9

第五十八条　公司董事为自然人。董事无需持有公司股份。

第五十九条　《公司法》第57条、第58条规定的人员不得担任公司的董事。

第六十条　董事由股东大会选举或更换，任期三年。董事任期届满，可连选连任。董事在任期届满以前，股东大会不得无故解除其职务。

董事任期从股东大会决议通过之日起计算，至本届董事会任期届满时为止。

第六十一条　董事应当遵守法律、法规和公司章程的规定，忠实履行职责，维护公司利益。当其自身的利益与公司和股东的利益相冲突时，应当以公司和股东的最大利益为行为准则，并保证：

（一）在其职责范围内行使权利，不得越权；

（二）除经公司章程规定或者股东大会在知情的情况下批准，不得同本公司订立合同或者进行交易；

（三）不得利用内幕信息为自己或他人谋取利益；

（四）不得自营或者为他人经营与公司同类的营业或者从事损害本公司利益的活动；

（五）不得利用职权收受贿赂或者其他非法收入，不得侵占公司的财产；

（六）不得挪用资金或者将公司资金借贷他人；

（七）不得利用职务便利为自己或他人侵占或者该受本应属于公司的商业机密；

（八）未经股东会在知情的情况下批准，不得接受与公司交易有关的佣金；

（九）不得将公司资产以其个人名义或者以其他个人名义开立账户储存；

（十）不得以公司资产为本公司的股东或者其他个人债务提供担保；

（十一）未经股东大会在知情下同意，不得泄漏在任职期间内所获得的涉及本公司的机密信息；但在下列情形下，可以向法院或者其他政府主管机关披露该信息：

1、法律有规定；

2、公众利益有要求；

3、该董事本身的合法利益有要求；

第六十二条　董事应当谨慎、认真、勤勉地行使公司所赋予的权利，以保证：

（1）公司的商业行为符合国家的法律、行政法规以及国家各项经济政策的要求，商业活动不超越营业执照规定的业务范围；

10

（2）公平对待所有股东；

（3）认真阅读公司的各项商务、财务报告，及时了解公司业务经营管理状况；

（4）亲自行使被合法赋予的公司管理处置权，不得受他人操纵；非经法律、行政法规允许或者得到股东大会在知情的情况下批准，不得将其处置权转授他人行使；

（5）接受监事会对其履行职责的合法监督和合理建议。

第六十三条　董事可以在任期届满以前提出辞职。董事辞职应当向董事会提交书面辞职报告。

第六十四条　任职尚未结束的董事，对因其擅自离职使公司造成的损失，应当承担赔偿责任。

第六十五条　本节有关董事义务的规定，适用于公司监事、经理和其他高级管理人员。

### 第二节　董事会

第六十六条　公司设董事会，对股东大会负责。

第六十七条　董事会由七名董事组成，设董事长一人。其中，北新集团建材股份有限公司提名 4 名董事，泰安市国有资产经营有限公司提名 1 名董事，泰安市东联投资贸易公司、泰安市安信投资贸易有限公司及贾同瑞共同提名 2 名董事。

第六十八条　董事会行使下列职权：

（一）负责召集股东大会，并向大会报告工作；

（二）执行股东大会的决议；

（三）决定公司的经营计划和投资方案；

（四）制订公司的年度财务预算方案、决算方案；

（五）制订公司的利润分配方案和弥补亏损方案；

（六）制订公司增加或者减少注册资本、发行债券或其他证券及上市方案；

（七）拟订公司重大收购、回购本公司股票或者合并、分立和解散方案；

（八）在股东大会授权范围内，决定公司的风险投资、资产抵押及其他担保

11.

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

事项：

（九）决定公司内部管理机构的设置；

（十）聘任或者解聘公司经理、董事会秘书、公开招聘的财务负责人；根据经理的提名，聘任或者解聘公司副经理等高级管理人员；并决定上述人员的报酬事项和奖惩事项；

（十一）制订公司的基本管理制度；

（十二）制订公司章程的修改方案；

（十三）听取公司经理的工作汇报并检查经理的工作；

（十四）法律、法规或公司章程规定，以及股东大会授予的其他职权。

第六十九条　董事会制定董事会议事规则，以确保董事会的工作效率和科学决策。

第七十条　董事长由公司董事担任，以全体董事中的过半数选举产生和罢免。

第七十一条　董事长行使下列职权：

（一）主持股东大会和召集、主持董事会会议；

（二）督促、检查董事会决议的执行；

（三）签署公司股票、公司债券及其他有价证券；

（四）签署董事会重要文件和其他应由公司法定代表人签署的其他文件；

（五）行使法定代表人的职权；

（六）在发生特大自然灾害等不可抗力的紧急情况下，对公司事务行使符合法律规定和公司利益的特别处置权，并在事后向公司董事会和股东大会报告；

（七）董事会授予的其他职权。

第七十二条　董事长不能履行职权时，董事长应当指定一名董事代行其职权。

第七十三条　董事会每年至少召开两次会议，由董事长召集，于会议召开十日以前书面通知全体董事。

第七十四条　有下列情形之一的，董事长应在十个工作日内召集临时董事会会议：

（一）董事长认为必要时；

（二）1/3以上董事联名提议时；

（三）监事会提议时；

12

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020620

(四)经理提议时。

第七十五条 董事会召开临时董事会会议的通知方式可以为专人送出或传真通知；通知时限为会议召开前七日前通知。

如有本章七十四条第(二)、(三)、(四)项规定的情形，董事长不能履行职责时，应当指定一名董事代其召集临时董事会会议；董事长无故不履行职责，亦未指定具体人员代其行使职责的，可由1/2以上的董事共同推举一名董事负责召集会议。

第七十六条 董事会会议应当由1/2以上的董事出席方可举行。每一董事享有一票表决权。董事会作出决议，必须经全体董事的过半数通过。

第七十七条 董事会临时会议在保障董事充分表达意见的前提下，可以用传真方式进行并作出决议，并由参会董事签字。

第七十八条 董事会会议应当由董事本人出席，董事因故不能出席的，可以书面委托其他董事代为出席。

第七十九条 委托书应当载明代理人的姓名，代理事项、权限和有效期限，并由委托人签名或盖章。

第八十条 代为出席会议的董事应当在授权范围内行使董事的权利。董事未出席董事会会议，亦未委托代表出席的，视为放弃在该次会上的投票权。

第八十一条 董事会决议表决方式为记名式投票表决。每名董事有一票表决权。

第八十二条 董事会会议应当有记录，出席会议的董事和记录人，应当在会议记录上签名。出席会议的董事有权要求在记录上对其在会议上的发言作出说明性记载。董事会会议记录作为公司档案由董事会秘书保存，董事会会议记录的保管期限为永久性保存。

第八十三条 董事会会议记录包括以下内容：

(一)会议召开的日期、地点和召集人姓名；

(二)出席董事的姓名以及受他人委托出席董事会的董事(代理人)姓名；

(三)会议议程；

(四)董事发言要点；

(五)每一决议事项的表决方式和结果(表决结果应当载明赞成、反对或弃权的票数)。

第八十四条 董事应当在董事会决议上签字并对董事会的决议承担责任。

13

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

董事会决议违反法律、法规或者章程，致使公司遭受损失的，参与决议的董事对公司负赔偿责任。但经证明在表决时曾表明异议并记载于会议记录的，该董事可以免除责任。

### 第三节 董事会秘书

第八十五条 董事会设董事会秘书。董事会秘书是公司高级管理人员，对董事会负责。

第八十六条 董事会秘书应当具有必备的专业知识和经验，由董事会委任。本章程第五十九条规定不得担任公司董事的情形适用于董事会秘书。

第八十七条 董事会秘书的主要职责是：

(一)准备和递交国家有关部门要求的董事会和股东大会出具的报告和文件；

(二)筹备董事会会议和股东大会，并负责会议的记录和会议文件、记录的保管；

(三)负责公司信息披露事务，保证公司信息披露的及时、准确、合法、真实和完整；

(四)保证有权得到公司有关记录和文件的人及时得到有关文件和记录。

第八十八条 董事或者其他高级管理人员可以兼任公司董事会秘书。

第八十九条 董事会秘书由董事长提名，经董事会聘任或者解聘，董事兼任董事会秘书的，如某一行为需由董事、董事会秘书分别作出时，则该兼任董事及公司董事会秘书的人不得以双重身份作出。

### 第六章 经 理

第九十条 公司设经理一名，由董事会聘任或解聘。董事可受聘兼任经理、副经理或者其他高级管理人员。

第九十一条 《公司法》第57条、第58条规定的人员不得担任公司的经理。

第九十二条 经理每届任期三年，经理连聘可以连任。

第九十三条 经理对董事会负责，行使下列职权：

(一)主持公司的生产经营管理工作，并向董事会报告工作；

(二)组织实施董事会决议、公司年度计划和投资方案；

14

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020622

（三）拟订公司内部管理机构设置方案；

（四）拟订公司的基本管理制度；

（五）制订公司的具体规章；

（六）提请董事会聘任或者解聘公司副经理以及除财务负责人以外的其他高级管理人员；

（七）聘任或者解聘除应由董事会聘任或者解聘以外的管理人员；

（八）拟定公司职工的工资、福利、奖惩，决定公司职工的聘用和解聘；

（九）提议召开董事会临时会议；

（十）公司章程或董事会授予的其他职权。

第九十四条　经理列席董事会会议，非董事经理在董事会上没有表决权。

第九十五条　经理应当根据董事会或者监事会的要求，向董事会或者监事会报告公司重大合同的签订、执行情况，资金运用情况和盈亏情况。经理必须保证该报告的真实性。

第九十六条　经理拟定有关职工工资、福利、安全生产以及劳动保护、劳动保险、解聘（或开除）公司职工等涉及职工切身利益的问题时，应当事先听取职工会和职代会的意见。

第九十七条　公司经理应当遵守法律、行政法规和公司章程的规定，履行诚信和勤勉的义务。

第九十八条　经理可以在任期届满以前提出辞职，有关经理辞职的具体程序和办法由经理与公司之间的劳务合同规定。

第九十九条　公司应当建立经理人员和其他高级管理人员的薪酬与公司绩效和个人业绩相联系的激励机制，以吸引人才，保持该等人员的稳定。

第一百条　公司对经理人员和其他高级管理人员的绩效评价应成为确定该等人员薪酬以及其他激励方式的依据。

第一百零一条　经理人员和其他高级管理人员违反法律、法规和公司章程规定，致使公司遭受损失的，公司董事会应积极采取措施追究其法律责任。

第七章　监事会

第一节　监　事

第一百零二条　监事由股东代表和公司职工代表担任。北新集团建材股份有

15

限公司提名1名监事，其他股东共同提名1名监事，公司职工代表担任的监事1名。

第一百零三条 《公司法》第57条、第58条规定的人员不得担任公司的监事。

董事、经理和财务负责人不得兼任监事。

监事应具有法律、会计等方面的专业知识或工作经验；监事会的人员和结构应确保监事会能够独立有效地行使对董事、经理人员和其他高级管理人员及公司财务的监督和检查。

第一百零四条 监事每届任期三年。股东担任的监事由股东大会选举或更换，职工担任的监事由公司职工民主选举产生或更换，监事连选可以连任。

第一百零五条 监事可以在任期届满以前提出辞职，章程第五章有关监事辞职的规定，适用于监事。

第一百零六条 监事应当遵守法律、行政法规和公司章程的规定，履行诚信和勤勉的义务。

## 第二节 监事会

第一百零七条 公司设监事会。监事会由三名监事组成，设监事长一名。监事长不能履行职权时，由监事长指定一名监事代行其职权。

第一百零八条 监事会行使下列职权：

（一）检查公司的财务；

（二）对董事、经理和其他高级管理人员执行公司职务时违反法律、法规或者章程的行为进行监督；

（三）当董事、经理和其他高级管理人员的行为损害公司的利益时，要求其予以纠正，必要时向股东大会或国家有关主管机关报告；

（四）提议召开临时股东大会；

（五）列席董事会会议；

（六）公司章程规定或股东大会授予的其他职权。

第一百零九条 监事会可要求公司董事、经理及其他高级管理人员、内部及外部审计人员出席监事会会议，回答所关注的问题。监事会发现董事、经理和其他高级管理人员存在违反法律、法规或公司章程的行为，可以向董事会、股东大会反映，也可以直接向有关部门报告。监事会行使职权时，必要时可以聘

16

请律师事务所、会计师事务所等专业性机构给予帮助，由此发生的费用由公司承担。

第一百一十条　监事会每年至少召开二次会议。会议通知应当在会议召开十日以前书面送达全体监事。

### 第三节　监事会决议

第一百一十一条　监事会会议应当由监事本人出席。监事会决议的表决方式采取记名方式投票表决。

第一百一十二条　监事会的表决程序为：监事会会议应当由二分之一以上的监事出席方可举行。每一监事享有一票表决权。监事会作出决议，必须经全体监事的二分之一以上通过。

第一百一十三条　监事会会议应有记录，出席会议的监事和记录人，应当在会议记录上签名。监事有权要求在记录上对其在会议上的发言作出某种说明性记载。监事会会议记录作为公司档案由董事会秘书保存。监事会会议纪录保管期限为永久性保存。

### 第八章　财务会议制度、利润分配和审计

#### 第一节　财务会计制度

第一百一十四条　公司依照法律、行政法规和国家有关部门的规定，建立公司的财务、会计制度。

第一百一十五条　公司在每一会计年度终了时编制公司年度财务报告，并依法审查验证。

第一百一十六条　公司年度财务报告，包括下列内容：

(1)资产负债表；

(2)利润表及利润分配表；

(3)现金流量表；

(4)会计报表附注。

第一百一十七条　年度财务报告按照有关法律、法规的规定进行编制。

第一百一十八条　公司除法定的会计帐册外，不另立会计帐册。公司的资产，不以任何个人名义开立帐户存储。

第一百一十九条　公司交纳所得税后的利润，按下列顺序分配：

17

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020625

(1)弥补上一年度的亏损；

(2)提取法定公积金 10%；

(3)提取法定公益金 5%—10%；

(4)提取任意公积金；

(5)支付股东股利。

公司法定公积金累计额为公司注册资本的 50% 以上的，可以不再提取。提取法定公积金、公益金后，是否提取任意公积金由股东大会决定。公司不在弥补公司亏损和提取法定公积金、公益金之前向股东分配利润。

第一百二十条 股东大会决议将公积金转为股本时，按股东原有股份比例派送新股。但法定公积金转为股本时，所留存的该项公积金不得少于注册资本的 25%。

第一百二十一条 公司股东大会对利润分配方案作出决议后，公司董事会须在股东大会召开后两个月内完成股利(或股份)的派发事项。

第一百二十二条 公司可以采取现金或者股票方式分配股利。

### 第二节 内部审计

第一百二十三条 公司实行内部审计制度，配备专、兼职审计人员，对公司财务收支和经济活动进行内部审计监督。

第一百二十四条 公司内部审计制度和审计人员的职责，应当经董事会批准后实施。审计负责人向董事会负责并报告工作。

## 第九章 合并、分立、解散和清算

### 第一节 合并或分立

第一百二十五条 公司可以依法进行合并或者分立。公司合并可以采取吸收合并和新设合并两种形式。

第一百二十六条 公司合并或者分立，按照下列程序办理：

(一)董事会拟订合并或者分立方案；

(二)股东大会依照章程的规定作出决议；

(三)各方当事人签订合并或者分立合同；

18

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

(四)依法办理有关审批手续;

(五)处理债权、债务等各项合并或者分立事宜;

(六)办理解散登记或者变更登记。

第一百二十七条  公司合并或者分立,合并或者分立各方应当编制资产负债表及财产清单。公司自股东大会作出合并或者分立决议之日起十日内通知债权人,并于三十日内公告三次。

第一百二十八条  债权人自接到通知书之日起三十日内,未接到通知书的自第一次公告之日起九十日内,有权要求公司清偿债务或者提供相应的担保。公司不能清偿债务或者提供相应担保的,不进行合并或者分立。

第一百二十九条  公司合并或者分立时,公司董事会应当采取必要的措施保护反对公司合并或者分立的股东的合法权益。

第一百三十条  公司合并或者分立各方的资产、债权、债务的处理,通过签订合同加以明确规定。

公司合并后,合并各方的债权、债务,由合并后存续的公司或者新设的公司承继。

公司分立前的债务按所形成的协议由分立后的公司承担。

第一百三十一条  公司合并或者分立,登记事项发生变更的,依法向公司登记机关办理变更登记;公司解散的,依法办理公司注销登记;设立新公司的,依法办理公司设立登记。

### 第二节  解散和清算

第一百三十二条  有下列情形之一的,公司应当解散并依法进行清算:

(一)营业期限届满;

(二)股东大会决议解散;

(三)因合并或者分立而解散;

(四)不能清偿到期债务依法宣告破产;

(五)违反法律、法规被依法责令关闭。

第一百三十三条  公司因有本节前条第(一)、(二)项情形而解散的,应当在十五日内成立清算组。清算组人员由股东大会以特别决议的方式选定。

公司因有本节前条第(三)项情形而解散的,清算工作由合并或者分立各方当事人依照合并或者分立时签订的合同办理。

19

公司因有本节前条(四)项情形而解散的，由人民法院依照有关法律的规定，组织股东、有关机关及专业人员成立清算组进行清算。

公司因有本节前条(五)项情形而解散的，由有关主管机关组织股东，有关机关及专业人员成立清算组进行清算。

第一百三十四条　清算组成立后，董事会、经理的职权立即停止，清算期间，公司不得开展新的经营活动。

第一百三十五条　清算组在清算期间行使下列职权：

(一)通知或者公告债权人；

(二)清理公司财产、编制资产负债表和财产清单；

(三)处理公司未了结的业务；

(四)清缴所欠税款；

(五)清理债权、债务；

(六)处理公司清偿债务后的剩余财产；

(七)代表公司参与民事诉讼活动。

第一百三十六条　清算组应当自成立之日起十日内通知债权人，并于六十日内公告三次。

第一百三十七条　债权人应当在章程规定的期限内向清算组申报其债权。债权人申报债权时，应当说明债权的有关事项，并提供证明材料。清算组应当对债权进行登记。

第一百三十八条　清算组在清理公司财产、编制资产负债表和财产清单后，应当制定清算方案，并报股东大会或者有关主管机关确认。

第一百三十九条　公司财产按下列顺序清偿：

(一)支付清算费用；

(二)支付公司职工工资和劳动保险费用；

(三)交纳所欠税款；

(四)清偿公司债务；

(五)按股东持有的股份比例进行分配。

公司财产未按前款第(一)至(四)项规定清偿前，不分配给股东。

第一百四十条　清算组在清理公司财产、编制资产负债表和财产清单后，认为公司财产不足清偿债务的，应当向人民法院申请宣告破产。公司经人民法院宣告破产后，清算组应当将清算事务移交给人民法院。

20

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020628



此页无正文，为《山东泰和东新股份有限公司章程》股东签字页

北新集团建材股份有限公司

代表签字：

泰安市国有资产经营有限公司

代表签字：

泰安市安信投资贸易有限公司

代表签字：

泰安市东联投资贸易有限公司

代表签字：

贾同春（签字）

二〇〇五年四月二十五日

23

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020629

**Updated Jia Tr. Def's Ex. 9A**

**(English Translation of Jia Tr. Def's Ex. 9)**

[Seal – Shandong Province Industrial & Commercial Administration Bureau]

[Seal – Shandong Province Industrial & Commercial Administration Bureau]

# Shandong Taihe Dongxin Co., Ltd. Articles of Incorporation

[Partial seal]

9

Translation of TG 0020608
TRANSLATIONS PROVIDED BY TAISHAN - FINAL

# Index

Chapter 1        General Principle                                                    2

Chapter 2        Business Goal and Scope                                              2

Chapter 3        Shares                                                                3

Chapter 4        Shareholder and Shareholder Meeting                                  4

Chapter 5        Board of Directors                                                   9

Chapter 6        Management                                                          14

Chapter 7        Board of Supervisors                                                15

Chapter 8        Financial Meeting System, Profit Distribution and Auditing          17

Chapter 9        Merger, Division, Dissolution and Liquidation                       18

Chapter 10       Amendment of Articles of Incorporation                              21

Chapter 11       Supplementary Provisions                                            21

1

10

This Articles of Incorporation has been approved by the first extraordinary general shareholder meeting in 2005 on April 25, 2005 by a special resolution.

## Chapter 1    General Principle

Article 1:    To safeguard the legal rights and interests of the Company, shareholder and creditor, and to standardize the Company's organization and behavior, this Articles of Incorporation is hereby drawn up according to the <Company Law of the People's Republic of China> (hereinafter referred to as the <Company Law>) and other relevant provisions.

Article 2    Shangdon Taihe Dongxin Co., Ltd. is a joint stock limited company incorporated according provisions of the <Company Law> and other regulations (hereinafter referred to the "Company").

The Company has been approved by Shandong Province Economic System Reform Commission <Letter regarding  approval to incorporate Shandong Taihe Dongxin Co., Ltd.> (Lu-Sys-Reform-[1998] #49) in the form of , and has been registered at Shandong Province Industrial & Commercial Administration Bureau and has obtained a business license.

Article 3    The name registered by the Company:  Shangdon Taihe Dongxin Co., Ltd.

Article 4    The Company's address:  Dawenkou Town,  Daiyue District, , Taian City, Shandong Postal code 271026

Article 5    The Company's registered capital is RMB155,625,000.

Article 6    The Company is a joint stock  limited company with permanent existence.

Article 7    The Chairman is the Company's legal representative.

Article 8    The Company's total assets have been divided into equal shares.  The shareholder shall assume responsibility to the Company, and the Company shall assume responsibility to its debt with the Company's total assets.

Article 9    From the date the Company's Articles of Incorporation becomes effective, it shall become a legally binding document to regulate the Company's organization and conduct, the rights and obligation relationship between the Company and the shareholder and between shareholder and shareholder.  The shareholder may file a lawsuit against the Company according to the Articles of Incorporation, and the Company may file a lawsuit against the shareholder, Director, Supervisor, management (including:  the General Manager, Deputy General Manager, hereinafter referred to as "managerial personnel" of the "Manager") and other high-level management.  Shareholder may file a lawsuit against another shareholder according to the Articles of Incorporation, and shareholder may file a lawsuit against the Company's Director and Supervisor, the Manager and other high-level management personnel.

Article 10    The high-level management personnel alleged in the Articles of Incorporation means the secretary for the Company's Board of Directors, Chief financial officer, Chief Engineer, Chief Economist and Chief Accountant.

## Chapter 2    Business Goal and Scope

Article 11:    The Company's business goal:  to establish a highly efficient operation management system so that the Company may experience stable development which shall cause

the shareholder to receive satisfactory economic returns so that it can contribute to the prosperity of the society and human progress.

Article 12     As approved by the Company's registration agency, the Company's business scope is: the production and sale of gypsum board, gypsum products, stone material, light steel keel, building material, decorating material and modern building material; corrosive substance (phosphate), phosphoric by-product phosphoric gypsum, construction hardware, ceramic products, electrical products, furniture, home appliances, general merchandise, the sale of mining equipment accessories; the sale of automotive accessories; the purchase of waste paper box, jade carving, decorating and general transportation within the permitted business license (may only be operated by its branch organization).


## Chapter 3     Shares

### Section 1     Issuance of Shares

Article 13     The Company's shares shall take the form of stock.

Article 14     All shares issued by the Company shall be common stock.

Article 15     The issuance of the Company's stock shall be open, fair and impartial, each share shall have the same rights and each share shall receive the same benefit.

Article 16     Stock issued by the Company shall be denominated in RMB.

Article 17     The Company's total equity shall be RMB155625000 shares, of which:

1.     Beijing New Building Material Co., Ltd. holds 65362500 shares or 42% of the Company's total equity;
2.     Taian City Donglian Investment & Trading Co., Ltd. holds 32681250 shares or 21% of the Company's total equity;
3.     Taian City National Asset Management Co., Ltd holds 24900000 shares or 16% of the Company's total equity;
4.     Taian City Anxin Investment & Trading Co., Ltd. holds 24900000 shares of 16% of the Company's total equity;
5.     Jia Tongchun holds 7781250 shares or 5% of the Company's total equity.


### Section 2     The Increase and Decrease in Shares and Repurchase

Article 18     Based on its operational and development needs and according to provisions of the laws and regulations and after resolution reached by the shareholder meeting, the Company may increase its capital in the following ways:

(1)     To distribute and sell shares to the current shareholder;
(2)     To distribute  bonus shares to the current shareholder;
(3)     To convert the reserve fund into capital stock;
(4)     Other ways approved by provisions of the laws and regulations.

When the Company increases its capital stock,  Beijing New Building Material Co., Ltd. shall have priority in purchasing the newly issued shares under the same terms and conditions.

Article 19     According to provisions of the Company's Articles of Incorporation, the Company may reduce its registered capital which shall be handled according to the relevant

3

Translation of TG 0020611

TRANSLATIONS PROVIDED BY TAISHAN - FINAL

provisions under the <Company Law> and the procedure stipulated by the Company's Articles of Incorporation.

Section 3       Equity Transfer

Article 20       Shares held by the shareholder may be legally transferred.  When the Company's other shareholder transfers the Company's shares,  Beijing New Building Material Co., Ltd. shall have priority in purchasing the newly added shares under the same terms and conditions.

Article 21       Shares of the Company held by the sponsor may not be transferred within three years.

Chapter 4       Shareholder and Shareholder Meeting

Section 1       Shareholder

Article 22       The Company's shareholder shall be the person who legally holds the Company's stock.

The shareholder shall enjoy rights and undertake obligations according to the types of share he holds.  Shareholders who hold the same type of stock shall enjoy the same rights and undertake the same obligation.

Article 23       The shareholder register  shall be sufficient evidence to prove that the shareholder holds the Company's stock.  The Company shall compile a shareholder  register.

Article 24       The Company's shareholder shall be entitled to the following rights:

    (1)       To receive dividend and distribution in other forms according to the number of shares he holds;

    (2)       To attend or designate a shareholder representative to attend the shareholder meeting;

    (3)       To cast vote according to the number of shares he owns;

    (4)       To supervise the Company's business operation and to submit proposal or inquiry:

    (5)       To transfer,  donate or pledge the shares he holds according to provisions of the laws, administrative regulations and the Company's Articles of Incorporation;

    (6)       To receive relevant information including review the Company's Articles of Incorporation and documents according to provisions of the laws and the Company's Articles of Incorporation;

    (7)       In the event of the Company's termination and liquidation, to participate in the distribution of the Company's remaining assets according to the number of shares he holds;

    (8)       Other rights stipulated by provisions of the laws, administrative regulations and the Company's Articles of Incorporation.

Article 25       In the event resolution reached by the shareholder meeting and the Board of Directors is in violation of provisions of the laws, administrative regulations, and   will infringe upon the shareholder's legal rights and interests, the shareholder shall have the right to file a lawsuit with the People's Court to stop such illegal behavior and violation.

Article 26       The Company's shareholder shall undertake the following obligations:

    (1)       To comply with the Company's Articles of Incorporation;

    (2)       To pay for the shares based on his subscription and investment approach;

4

(3)      Shall not withdraw shares except stipulated in the laws and administrative regulations;

(4)      The laws and administrative regulations shall stipulate other obligations he shall undertake.

Article 27      The pledging of the shares held by the shareholder shall be allowed after review and approval by the Company's shareholder meeting.

## Section 2      Shareholder Meeting

Article 28      The shareholder meeting holds the highest authority at the Company, and shall exercise the following authority:

(1)      To decide the Company's management goal and investment plan;

(2)      To elect and replace Director, to decide the compensation for the Director;

(3)      To elect and replace Supervisor which is served by a representative of the shareholder, to decide the compensation for the Supervisor;

(4)      To review and approve report presented by the Board of Directors;

(5)      To review and approve report presented by the Board of Supervisors;

(6)      To review and approve the Company's annual financial budget and accounting;

(7)      To review and approve the Company's profit distribution plan and plan to make up for the loss;

(8)      To reach resolution on the Company's increase or decrease in registered capital;

(9)      To reach resolution on the issuance of the Company's bonds;

(10)    To reach resolution on the Company's merger, division, dissolution, liquidation or to change the Company's corporate status;

(11)    To amend the Company's Articles of Incorporation.

(12)    To reach resolution regarding the pledging of the Company's shares by a shareholder;

(13)    Other matters to be decided by the shareholder meeting after reviewing the laws and regulations and the Company's Articles of Incorporation.

Article 29      Shareholder meetings shall be divided into annual meeting and extraordinary general meeting. Annual meeting shall be held once a year and shall be held within six months after the end of the fiscal year.

Article 30      Under one of the following conditions, an extraordinary general meeting shall be held within two months:

1.      The number of Director fails to reach the quorum as stipulated in the <Company Law> or fails to reach the two-thirds as stipulated in this Articles of Incorporation;

2.      The Company's outstanding loss has reached one-third of the total equity;

3.      When request is made by a shareholder who owns more then 10% (exclude proxy voting) of the Company's stock held individually or in combination;

4.      When the Board of Directors deems necessary;

5.      When the Board of Supervisors proposes to call a meeting;

Translation of TG 0020613
TRANSLATIONS PROVIDED BY TAISHAN - FINAL

6.  Other conditions stipulated in the Company's Articles of Incorporation.

Article 31  An  extraordinary general meeting shall only reach resolution on the matters listed in the notification.

Article 32  Shareholder meeting shall be called and chaired by the Chairman of the Board.  In the event the Chairman  is unable to perform his duty for cause, the Chairman shall designate another Director to chair the meeting.  In the event the Chairman  is unable to attend the meeting and  fails to designate a replacement, the Board of Directors shall designate a Director to chair the meeting.  In the event the Board of Directors  is unable to appoint some one to chair the meeting, the shareholders present shall jointly recommend one shareholder to chair the meeting.

Article 33  When the Company  calls a shareholder meeting, shareholders shall be notified thirty (30) days before the meeting date in writing (fax is a valid means).  After approval by all shareholders of the Company, the 30-day notice may be waived or properly shortened.

Article 34  The shareholder may attend the shareholder meeting in person and may designate a representative to attend the meeting and cast vote on his behalf.  The shareholder shall designate a representative in writing to be signed by the shareholder or the designee.  When the shareholder  is a legal entity, the legal entity's seal shall be affixed or shall be signed by the designee.

Article 35  The power of attorney issued by the shareholder to attend the shareholder meeting shall state the following:

(1)  The name of the  representative;
(2)  Whether the  representative has voting rights;
(3)  Instructions on whether to cast "in favor", "against" or "abstain" votes for each matter under review;
(4)  Specific instructions on whether the shareholder shall have the right to vote on the proposal which may be included in the shareholder meeting agenda and how to vote if he shall have the right to vote;
(5)  The date of execution of the Power of Attorney and the effective period;
(6)  Signature (or seal) of the shareholder.  When the shareholder is a legal entity, the legal entity's seal shall be affixed,

The Power of Attorney shall indicate that in the event the shareholder shall fail to provide specific instructions, whether the shareholder representative may vote according to his own views.

Article 36  The shareholder meeting attendee's signature log shall be prepared by the Company.  The signature log shall list the name of the attendee (or legal entity), ID card number, address, the number of shares held or voted by the representative, the representative's name (or the name of the legal entity) etc.

Article 37  When the Board of Supervisors or the shareholder meeting wants to call an extraordinary general  meeting, it shall be handled according to the following procedure:

(1)  To sign one or several written request in the same format to submit to the Board of Directors to call an  extraordinary general meeting which shall describe the meeting agenda. After receiving the above written request, the Board of Director shall

Translation of TG 0020614
TRANSLATIONS PROVIDED BY TAISHAN – FINAL

promptly issue notification on holding an extraordinary general meeting.

(2) In the event the Board of Directors fails to issue a notification on holding a meeting within 30 days after receiving the above-mentioned written request, the Board of Supervisors or shareholders who have submitted such a request may call an extraordinary general meeting on his own within three months after the notification is received by the Board of Directors. The procedure for calling a meeting shall be as close as possible to the procedure for the Board of Directors to call a shareholder meeting. The Board of Supervisors or shareholder may call a meeting on his own when the Board of Directors fails to call such a meeting, the Company shall provide the necessary assistance to the Supervisors or the shareholder and shall bear the cost of the meeting.

Article 38    After the notification for calling a meeting has been sent out, except for force majeure or other accidents, the Board of Directors shall not change the time of the meeting.

Article 39    If the number of Directors fails to reach the quorum as stipulated under the "Company Law" or is less than the two-thirds quorum as provided in the Articles of Incorporation, or the Company's outstanding loss has reached one-third of the total equity and the Board of Directors fails to convene an extraordinary general meeting within the prescribed period, the Board of Supervisors or the shareholders may call an extraordinary general meeting on his own according to provisions under the Articles of Incorporation.

Section 3    Shareholder Meeting Proposal

Article 40    When the Company calls a shareholder meeting, shareholder who holds more than 5% of the total votes, individually or jointly, shall have the right to make new proposal to the Company.

Article 41    A Shareholder meeting proposal shall meet the following conditions:

(1) The content shall not be in conflict with provisions of the laws, regulations and the Articles of Incorporation, and shall fall within the Company's business scope and the shareholder meeting's authority;

(2) Shall have clear topic and specific matters for vote;

(3) Shall be submitted or sent to the Board of Directors in written format.

Article 42    As the code of conduct, the Company's Board of Directors shall act in the best interest of the Company and the shareholder, and shall review the shareholder meeting proposal according to provisions under Article 41 of this section.

Article 43    In the event the Board of Directors decides not to include the shareholder meeting proposal into the agenda, it shall provide explanations and description at the shareholder meeting.

Section 4    Shareholder Meeting Resolution

Article 44    Shareholder (including shareholder representative) shall cast vote for the shares he represents. Each share shall have one vote.

Article 45    The shareholder meeting resolution shall be divided into ordinary resolution and special resolution.

The ordinary resolution reached by the shareholder meeting shall have shareholder present (including shareholder representative) representing over one-half of the total shares.

7

Translation of TG 0020615
TRANSLATIONS PROVIDED BY TAISHAN - FINAL

The special resolution reached by the shareholder meeting shall have shareholder present (including shareholder representative) representing over two-thirds of the total shares.

Article 46     The following resolution shall be approved by the shareholder meeting as ordinary resolution:

(1)     Report by the Board of Directors and the Board of Supervisors;
(2)     The Company's annual budget and final accounting;
(3)     The Company's annual report;
(4)     The profit distribution plan and plan to make up for the loss drawn up by the Board of Directors;
(5)     The appointment and dismissal of the member of the Board of Directors and Board of Supervisors, and their compensation and payment method;
(6)     Other matters which shall be approved as a special resolution as stipulated by provisions of the laws, administrative regulations or the Company's Articles of Incorporation.

Article 47     The following matters shall be approved by the shareholder meeting as special resolutions:

(1)     To increase or decrease the Company's registered capital;
(2)     The issuance of the Company's bonds;
(3)     The Company's division, merger, dissolution and liquidation;
(4)     To amend the Company's Articles of Incorporation;
(5)     To repurchase the Company's shares;
(6)     Pledge the Company's stock held by shareholder;
(7)     Other matters stipulated by the Articles of Incorporation and shareholder meeting resolution to have important impact on the Company which shall be approved by the shareholder meeting as special resolution.

Article 48     Without a special resolution by the shareholder meeting, the Company may not enter into a contract with people other than the Director, Manager and other high-level management personnel which shall give such person to right to handle the Company's entire or important business operation.

Article 49     The list of candidates for the position of Director or Supervisor shall be submitted to the shareholder meeting for resolution as a proposal.

The Board of Directors shall provide the resume and basic information on the candidate for the position of Director or Supervisor to the shareholder meeting.

Article 50     The nomination and election of Director and Supervisor which is served by a shareholder shall be handled according to the following procedure:

(1)     Director and Supervisor served by a shareholder shall be nominated according to Article 67 and 102 of the Articles of Incorporation and elected by the shareholder meeting.
(2)     The candidate for the position of Director and Supervisor shall agree to the nomination beforehand.  The  nominator shall fully understand the candidates' profession, education, title, detailed work experience and part-time positions held.

The Company shall disclose detailed information on the candidate for the position of Director

8

17

and Supervisor before the shareholder meeting to ensure that shareholder fully understands the candidate before casting vote.

  (3)  The Company shall enter into employment contract with the Director to clarify the rights and obligations between the Company and the Director, the Director's term, responsibility for violating the laws, regulations and the Company's Articles of Incorporation, and compensation if the Company shall terminate the contract for cause.

Article 51  The shareholder meeting shall vote by registered ballot or by raising hands and results shall be announced on the spot.

Article 52  According to voting results, the moderator of the meeting shall decide whether a resolution has been approved by the shareholder meeting and shall announce the result on the spot. The resolution's voting result shall be recorded in the meeting minutes.

Article 53  In the event of doubt regarding the resolution's voting result, the moderator of the meeting may count the votes. In the event the moderator of the meeting does not count the votes, when there is objection to the results announced by the moderator of the meeting, the shareholder or shareholder representative shall have the right to immediately request vote count and the moderator of the meeting shall proceed with vote count immediately.

Article 54  Except for the Company's business secret which shall not be disclosed in the shareholder meeting, the Board of Directors and the Board of Supervisors shall answer or explain to shareholder's inquiry and suggestion.

Article 55  The shareholder meeting shall keep meeting minutes to record the following:

  (1)  The number of shares present at the shareholder meeting and the percentage to the Company's total number of shares;

  (2)  The meeting's date and location;

  (3)  The moderator's name and the meeting agenda;

  (4)  Key points on the matter under review by shareholder spoken at the meeting;

  (5)  The voting result for each matter that requires resolution;

  (6)  The shareholder's inquiry, suggestion and response or explanation by the Board of Director and the Board of Supervisors;

  (7)  Other content which deemed by the shareholder meeting and stipulated by the Company's Articles of Incorporation that should be recorded in the meeting minutes.

Article 56  Shareholder meeting minutes shall be signed by the shareholder attending the meeting and the person keeping the minutes and to be kept in the Company's files and kept secretly by the Board of Directors. The shareholder meeting minutes shall be kept permanently.

Article 57  Matters such as the number of shareholder attending the shareholder meeting, the number of shares held by them, the power of attorney, voting result for each matter, meeting minutes, the legality of the meeting procedure etc. may be notarized.

Chapter 5  Board of Directors

Section 1  Director

9

18

Article 58    The Company's Director shall be a natural person.  The Director is not required to own the Company's shares.

Article 59    People stipulated under Article 57 and 58 of the <Company Law> shall not serve as the Company's Director.

Article 60    The Director shall be elected or replaced by the shareholder meeting and shall have a term of three years.  After the expiration of the term, the Director may serve consecutive terms.  Before the expiration of the term, the Director may not be dismissed without cause.

Article 61    The  Directors shall comply with the provisions of the laws, regulations and the Company's Articles of Incorporation to faithfully carry out his duties and to safeguard the Company's interests.  When there  is a conflict between his personal interest and the interest of the Company and the shareholder, the code of conduct shall be to maintain the maximum interest of the Company and the shareholder, and shall guarantee:

(1)    To exercise authority within the scope of his duty and shall not overstep his authority;

(2)    Shall not enter into contract or conduct business transaction with the Company except when stipulated in the Company's Articles of Incorporation and when it is known and approved by the shareholder meeting;

(3)    Shall not seek to benefit himself or other people with inside information;

(4)    Shall not operate for himself or for other people any business similar to the Company's business or to engage in activity which shall damage the Company's interest;

(5)    Shall not use his authority to accept bribes or other illegal income, shall not embezzle the Company's property;

(6)    Shall not misappropriate fund  or loan the Company's funds to others;

(7)    Shall not use his authority to make it easy for himself or for others to embezzle or accept business secret which shall belong to the Company;

(8)    Without being known or approved by the shareholder meeting, shall not accept commission related to transaction with the Company;

(9)    Shall not deposit the Company's assets in account opened under his own name or under other people's name;

(10)   Shall not use the Company's assets to provide guarantee to the Company's shareholder or other individual;

(11)   Without being known and approved by the shareholder meeting, shall not disclose the confidential information about the Company obtained during his employment period. However, under the following conditions, such confidential information may be disclosed to the Court of Law or other governing agency:

1.    When Stipulated by law;

2.    When required by public interest;

3.    When required by the Board of Director's legal interest.

Article 62    The Director shall exercise his authority given by the Company carefully, seriously and diligently to ensure:

(1)    The Company's commercial activity shall be in compliance with the requirement of China's laws, administrative regulations and China's various economic policies. Commercial activity shall not overstep the business scope stipulated in the business license;

10

TRANSLATIONS PROVIDED BY TAISHAN – FINAL

(2)      All shareholder shall be equitably treated;

(3)      To carefully read the Company's various business and financial report and to understand the Company's business operation management conditions;

(4)      To personally exercise his management and disposition rights legally granted without being manipulated by others. Shall not delegate his disposition rights to be used by others without permission under the laws and administrative regulations or being known and approved by the shareholder meeting.

(5)      When performing his duties, to accept the legal supervision and reasonable suggestion by the Board of Supervisors.

Article 63      The Director may resign before the expiration of his term. The Director's resignation shall be submitted to the Board of Directors in writing.

Article 64      For the Director whose term is not year over and whose unauthorized departure shall cause damage to the Company, shall be liable to the Company.

Article 65      Stipulation in this section regarding the Director's obligation shall be applicable to the Company's Supervisor, Manager and other high-level management.

## Section 2      Board of Directors

Article 66      The Company shall have a Board of Directors to be held responsible to the shareholder meeting.

Article 67      The Company's Board of Directors shall consist of 7 Directors, with one Chairman of the Board. Among them, Beijing New Building Material Co., Ltd. shall nominate four Directors, Taian State-owned Asset Management Co., Ltd. shall nominate one Director, Taian Donglian Investment & Trading Co., Ltd., Taian Anxin Investment & Trading Co., Ltd. and Jia Tongchun shall jointly nominate two Directors.

Article 68      The Board of Directors shall exercise the following authority:

(1)      To call the shareholder meeting and present report to the shareholder meeting;

(2)      To implement the shareholder meeting's resolutions;

(3)      To decide the Company's business plan and investment plan;

(4)      To make the Company's annual financial budget and final accounting plan;

(5)      To make the Company's profit distribution plan and plan on making up the loss;

(6)      To make the plan for the Company to increase or decrease registered capital, to issue bonds or other securities and public listing;

(7)      To draft the Company's plan for major acquisition, to repurchase the Company's stock or merger, division and dissolution;

(8)      To decide the Company's risk investment, asset pledge and other guarantees within the scope authorized by the shareholder meeting;

Translation of TG 0020619
TRANSLATIONS PROVIDED BY TAISHAN – FINAL

(9)    To decide the establishment of the Company's internal management;

(10)   To appoint  or dismiss the Company's Manager, secretary to the Board of Directors, and to openly hire financial officer.  To hire or dismiss the Company's high-level management such as the  Deputy Manager based on the Manager's nomination, and to decide the compensation and reward and punishment of the above-mentioned personnel;

(11)   To  formulate the Company's basic management system;

(12)   To  formulate the amendment of the Company's Articles of Incorporation;

(13)   To hear the Company Manager's report and to inspect the Manager's work;

(14)   Other authorities stipulated by laws, regulations and the Company's Articles of Incorporation and granted by the shareholder meeting.

Article 69    The Board of Directors shall  formulate the procedure for the Board to ensure the Board of Directors' efficiency and scientific decision making.

Article 70    The Chairman of the Board shall be served by a Company's Director, to be elected and dismissed by the majority of the Board of Directors.

Article 71    The Chairman of the Board shall exercise the following authority:

(1)    To chair the shareholder meeting and call and chair the Board of Directors meeting;

(2)    To supervise and inspect the implementation of the Board of Directors resolutions;

(3)    To sign the Company's stock, the Company's bonds and other marketable securities;

(4)    To sign important documents for the Board of Directors and other documents which shall be signed by the Company's legal representative;

(5)    To exercise the authority as the legal representative;

(6)    Without the occurrence of emergencies such as war or major natural disaster, to exercise special disposition rights on the Company's matters, and report shall be made to the shareholder meeting and the Board of Directors afterwards.

(7)    Other authority granted by the Board of Directors.


Article 72    In the event the Chairman  is unable to perform his duty, the Chairman shall designate one Director to perform his duty on his behalf.

Article 73    The Board of Directors shall hold meeting twice a year to be called by the Chairman and all Directors shall be notified in writing 10 days prior to the meeting.

Article 74    Under one of the following conditions, the Chairman shall call an  extraordinary board meeting within ten working days:

(1)    When the Chairman shall deem necessary;

(2)    Joint proposal submitted by over one-third of the Director;

(3)    When proposed by the Board of Supervisors;

Translation of TG 0020620
TRANSLATIONS PROVIDED BY TAISHAN – FINAL

(4)      When proposed by the Manager.

Article 75      Notification method for the extraordinary board meeting called by the Board of Directors may be sent by a messenger or by fax within seven days before the meeting.

In the event there are conditions under Article 74 (2), (3) and (4), the Chairman shall be unable to perform his duty, one Director shall be designated to call an extraordinary board meeting on his behalf. When the Chairman fails to perform his duty without cause and also fails to designate a specific person to perform his duty on his behalf, over one-half of the Director may jointly recommend a Director to call the meeting.

Article 76      The Board of Directors meeting shall be held only when over one-half of the Directors are present. Each Director shall have one vote. The Board of Directors meeting resolution shall be approved by the majority of the entire Board.

Article 77      Under the premise that the Director shall be allowed to fully express their opinion, extraordinary board meeting may reach a resolution by fax, to be signed by the Directors present at the meeting.

Article 78      The Board of Directors meeting shall be attended by the Director in person. In the event a Director is unable to attend with cause, he may designate another Director to attend the meeting on his behalf.

Article 79      The power of attorney shall clearly state the representative's name, matter to act on, authority and effective period, to be signed or affixing seal by the Director.

Article 80      The Director attending the meeting as a representative shall exercise the Director's rights within the scope of authorization. The Director who fails to attend the Board of Directors meeting without designating a representative to attend the meeting on his behalf shall be deemed to give up his voting rights at such meeting.

Article 81      The Board of Directors resolution shall be in registered ballot. Each Director shall have one vote.

Article 82      Record shall be kept for the Board of Directors meeting which shall be signed by the Directors present and by the person keeping the record. The Directors present at the meeting shall have the right to request the addition of explanatory notes for the statements he makes at the meeting. The Board of Directors meeting minutes shall be kept on file at the Company and kept secretly by the Board of Directors. The Board of Directors meeting minutes shall be kept permanently.

Article 83      The Board of Directors meeting minutes shall include the following:

     (1)     The meeting date, location and the person calling the meeting;
     (2)     The name of the Director attending the meeting and the name of the Director (representative) who designated a representative to attend the meeting;
     (3)     The meeting agenda;
     (4)     Important points expressed by each Director;
     (5)     The vote and the result for each resolution (the voting result shall indicate the number of votes in favor, against or abstain) .

Article 84      Director shall sign on the Board of Directors meeting minutes and to assume responsibility for the Board of Directors' resolution. In the event the Board of Directors'

13

22

resolution shall be in violation of provisions of China's laws, regulations and the Articles of Incorporation which shall cause serious damage to the Company, the Directors participating in reaching the resolution shall be liable to the Company.  However, a Director shall be found not liable to the Company if proven that he has objected to the matter in the voting process which has been recorded in the meeting minutes.

Section 3        Secretary to the Board of Directors

Article 85        The Board of Directors shall have a secretary.  The secretary shall be the Company's high-level management and held responsible to the Board of Directors.

Article 86        The secretary to the Board of Directors shall have the necessary professional knowledge and experience, to be appointed by the Board of Directors.   Article 59 of the Articles of Incorporation where a person shall not serve as the Company's Director shall be applicable to the secretary to the Board of Directors.

Article 87        Major responsibility for the secretary to the Board of Directors:

(1)        To prepare and  submit report and document issued by the Board of Directors and shareholder meeting as requested by China's relevant departments;

(2)        To arrange the Board of Directors meeting and shareholder meeting and to be responsible for the meeting minutes and the safekeeping of the meeting minutes, meeting documents and records;

(3)        To be responsible for the Company's information disclosure, and to ensure the timeliness, accuracy, legality, truthfulness and completeness of the Company's information disclosure.

(4)        Shall guarantee the person who has the right to receive the Company's relevant records and documents  can receive the relevant documents and records in a timely manner.

Article 88        The Director  or other high-level management may hold the position of the secretary to the Company's Board of Directors concurrently.

Article 89        The secretary to the Board of Directors shall be nominated by the Chairman, to be hired or dismissed by the Board of Directors.  In the event a Director  serves as the secretary to the Board of Directors, if certain action shall be taken by the Director and the secretary to the Board of Directors separately, the person holding the position of Director and the secretary to the Board of Director concurrently may not use both identities.

Chapter 6        Manager

Article 90        The Company shall have one Manager, to be hired and dismissed by the Board of Directors.  A Director may be hired for the Manager,  Deputy Manager or other high-level management positions.

Article 91        Person who falls under provisions of Article 57  or Article 58 of the <Company Law> may not serve as the Company's Manager.

Article 92        The Manager shall have a term of three years and may serve consecutive terms.

Article 93        The Manager shall be held responsible to the Board of Directors to exercise the following authority:

(1)        To handle the Company's production operation management and to report to the Board of Directors;

(2)        To organize the implementation of the Board of Directors resolution, the Company's annual plan the investment plan;

14

TRANSLATIONS PROVIDED BY TAISHAN - FINAL

(3)     To draft the Company's internal management organization plan;
(4)     To draft the Company's basic management system;
(5)     To  formulate the Company's specific regulations;
(6)     To propose the appointment or dismissal of the Company's Deputy General Manager and other senior managers than the chief financial officer;
(7)     To decide the appointment or dismissal of the Company's management personnel other than those that shall be decided by the Board of Directors;
(8)     To draft the Company's wage, benefits, reward and punishment, and to decide on The hiring and dismissal of the Company's employee;
(9)     To propose the holding of the  extraordinary board meeting;
(10)    Other duties authorized by the Company's Articles of Incorporation or the Board of Directors.

Article 94     The Manager shall attend the Board of Directors meeting.  The non-Director Manager shall not have voting rights at the Board of Directors meeting.
Article 95     Based on the request by the Board of Directors or the Board of Supervisors, the Manager shall report to the Board of Directors or the Board of Supervisors regarding the signing of major contracts, the execution, the use of funds and profits and losses.  The Manager shall be responsible for the report's truthfulness.
Article 96     When drafting rules regarding employee's wage, benefits, safety production and labor protection, labor insurance, dismissal (or termination) of the Company's employee which involves the employee's vital interests, the Manager shall first listen to the opinion of the labor union and the employee association.
Article 97     The Company's Manager shall comply with the laws, regulations and the Company's Articles of Incorporation, and to perform his obligation faithfully and diligently.
Article 98     The Manager may resign before the expiration of his term.  The specific procedure and method on the Manager's resignation shall be stipulated in the employment contract between the Manager and the Company.
Article 99     The Company shall establish an incentive and reward program for the managerial personnel and other high-level management's wage and the Company's performance and the individual performance in order to attract talents and to maintain the stability of such personnel.
Article 100    The Company's performance evaluation of the managerial personnel and other high-level management shall be the basis for determining such person's wage and other rewards.
Article 101    In the event the Manager and other high-level management is in violation of the laws, regulations and the Company's Articles of Incorporation which causes damage to the Company, the Company's Board of Directors shall proactively adopting measures to determine his legal liability.

Chapter 7      Board of Supervisors
Section 1      Supervisor

Article 102    The Supervisor shall be served by the representative of shareholders or employees.  Beijing New Building Material Co., Ltd. shall nominate one Supervisor, other

Translation of TG 0020623
TRANSLATIONS PROVIDED BY TAISHAN - FINAL

shareholders shall jointly nominate one Supervisor, and the Company's employee representative shall serve as one Supervisor.

Article 103    Person who falls under provisions of Article 57 and Article 58 of the Company Law may not serve as the Company's Supervisor.

The Director, Manager and Chief financial officer shall not hold the position of Supervisor concurrently.

The Supervisor shall have professional knowledge and working experience in the legal and accounting fields.  The member and organization of the Board of Supervisors shall ensure that the Board of Supervisors  can supervise and inspect the Director, Manager and other high-level management and the Company's finance independently and effectively.

Article 104    The Supervisor shall have a term of three years.  A shareholder serving as a Supervisor shall be elected and replaced by the shareholder meeting.  An employee serving as a Supervisor shall be elected and replaced by the Company's employee democratically.  The Supervisor may serve consecutive terms.

Article 105    The Supervisor may resign before the expiration of his term.  Provisions regarding the Director's resignation in Chapter 5 of the Articles of Incorporation shall be applicable to the Supervisor.

Article 106    The Supervisor shall comply with provisions of the laws, administrative regulations and the Company's Articles of Incorporation to perform his obligations faithfully and diligently.

Section 2    Board of Supervisors

Article 107    The Company shall have a Board of Supervisors.  The Board of Supervisors shall consist of three members with one member being the Chairman.  In the event the Chairman of the Board of Supervisors  is unable to perform his duties, the Chairman shall designate one Supervisor to perform his duties on his behalf.

Article 108    The Board of Supervisors shall exercise the following authority:

(1)    To review the Company's finances;

(2)    To supervise the action of the Director and the General Manager in performing his duties whether their action is in violation of the laws, regulations and the Company's Articles of Incorporation;

(3)    To correct the Director and the General Manager's action when their conduct shall damage the Company's interest;

(4)    To present proposal on holding an extraordinary general meeting;

(5)    To  observe the Board of Directors meeting;

(6)    Other authority granted by the Company's Articles of Incorporation or the shareholder meeting.

Article 109    The Board of Supervisors may request the Company's Director, Manager and other high-level management, internal and external auditor to  observe the Board of Supervisors meeting to answer questions of concern.  When the Board of Supervisors  discovers that the Director, Manager and other high-level management  have conduct which is in violation of the laws, regulations and the Company's Articles of Incorporation, it may report to the Board of Directors and the shareholder meeting and may also report directly to the relevant departments. When exercising its authority, the Board of Supervisors may hire professional organizations such

as law firms, certified public accountants to provide assistance.  The expenses thus incurred shall be borne by the Company.

Article 110     The Board of Supervisors shall hold meeting twice a year.  Meeting notification shall be delivered to all Supervisors ten days prior to the meeting date.


Section 3        Board of Supervisors Resolution


Article 111     The Board of Supervisors meeting shall be attended by the Supervisor in person. The Board of Supervisors' voting shall be registered ballot.

Article 112     The voting procedure is:  The Board of Supervisors meeting may be held only when over one-half of the Supervisors are present.  Each Supervisor shall have one vote. Resolution reached by the Board of Supervisors shall be approved by more than one-half of all Supervisors.

Article 113     Record shall be kept for the Board of Supervisors meeting which shall be signed by the Supervisors present and by the person keeping the record.  The Supervisors present at the meeting shall have the right to request the addition of explanatory notes for the statements he makes at the meeting.  The Board of Supervisors meeting minutes shall be kept on file at the Company and kept secretly by the Board of Directors.  The Board of Directors meeting minutes shall be kept permanently.


Chapter 8        The Financial Accounting System, Profit Distribution and Audit


Section 1        The Financial Accounting System


Article 114     According to the relevant provisions of China's laws, regulations and policies, the Company shall establish its financial and accounting system.

Article 115     At the end of each fiscal year, the Company shall prepare financial report which shall be reviewed and verified as required by law.

Article 116     The Company's annual financial report shall include the following:
  (1)     The Assets and Liabilities Statement;
  (2)     Income Statement and profit distribution chart:
  (3)     Cash flow statement;
  (4)     Accounting report footnotes.


Article 117     The annual financial report shall be compiled based on provisions of the relevant laws, regulations.

Article 118      Except the legally required accounting records, the Company shall not prepare other accounting record separately.  The Company's assets shall not be deposited in an account opened under any individual's name.

Article 119     The Company's after-tax profit shall be distributed in the following order:

17

26

TRANSLATIONS PROVIDED BY TAISHAN - FINAL

1. To make up for prior year's loss;
2. To set aside the 10% statutory surplus reserve (no need to set it aside when the accumulated statutory surplus reserve shall reach 50% of the Company's registered capital);
3. To set aside the 5%-10% statutory public welfare fund;
4. To set aside the discretionary fund;
5. To pay dividend to the shareholder.

In the event the Company's surplus reserve fund is more than 50% of the Company's registered capital, there shall be no need to set it aside again. After setting aside the statutory and public welfare fund, the shareholder meeting shall decide whether there is a need to set aside discretionary surplus reserve. The Company shall not make dividend distribution to the shareholder before making up for the Company's loss and setting aside the statutory surplus reserve.

Article 120    The shareholder meeting shall reach resolution to convert the Company's statutory surplus reserve into the Company's capital, and new shares shall be distributed according to the shareholder's original shareholding percentage. But when converting the statutory surplus reserve into capital, the remaining surplus reserve shall not be less than 25% of the registered capital.

Article 121    After the Company's shareholder meeting reaches resolution on profit distribution, the Company's Board of Directors shall complete the dividend (or equity) distribution within two months after the shareholder meeting.

Article 122    The Company may make dividend distribution with cash or stock.

## Section 2    Internal Auditing

Article 123    The Company shall set up an internal auditing system and assign full-time and part-time audit personnel to audit and monitor the Company's financial income and expenses, and economic activities internally.

Article 124    The responsibility of the Company's internal auditing system and the audit staff shall be implemented after approval by the Board of Directors. The lead auditor shall report to and be held responsible to the Board of Directors.

## Chapter 9    Merger, Division, Dissolution and Liquidation

## Section 1    Merger and Division

Article 125    The Company may engage in merger or division. The Company's merger may be in the form of absorption or creation.

Article 126    The Company's merger or division shall be handled according to the following procedure:

(1) The Board of Directors shall draft the merger or division plan;
(2) The shareholder meeting shall reach resolution according to provisions of the Company's Articles of Incorporation;
(3) Each party to the transaction shall enter into a merger agreement or division agreement;

TRANSLATIONS PROVIDED BY TAISHAN – FINAL

(4)    The relevant review and approval procedure shall be handled according to provisions of the law;

(5)    To handle matters in the merger or division such as claims and debt;

(6)    To handle dissolution registration or change in registration.

Article 127    For the Company's merger and division, each party to the merger or division shall compile assets and liabilities statement and property inventory.  After the shareholder meeting reaches resolution regarding merger or division, the Company shall notify the creditor within ten days, and shall make public announcement three times within thirty days.

Article 128    Within thirty days after receiving notification, or within 90 days since the first public announcement for those who did not receive the notification, the creditor shall have the right to request the Company to pay off its debt or to provide proper collateral.  In the event the Company is unable to pay off the debt or to provide collateral, merger or division shall not proceed.

Article 129    When the Company is merged or divided, the Company's Board of Directors shall adopt the necessary measure to protect the legal rights and interests of shareholder who are against the merger or division.

Article 130    The handling of assets, claims, debt for each party to the merger or division shall be done through contracts so that they can be clearly defined.

After the Company's merger, each party's claims and debt shall be assumed by the going concern or the newly incorporated entity after the merger.

Debt before the Company's division shall be assumed by the company after the division according to the agreement.

Article 131    Due to the Company's merger or division, for changes in registration, the Company shall register the change in registration as required by law.  In the event of dissolution, the Company shall cancel the registration.  In the event of setting up a new company, the Company shall be registered.

Section 2    Dissolution and Liquidation

Article 132    With any of the following conditions, the Company shall be dissolved and liquidated according to provisions of the law:

(1)    The operating period has expired;

(2)    The shareholder meeting reaches resolution on dissolution;

(3)    The Company is dissolved due to merger of division;

(4)    The Company is unable to pay off its debt when due and declares bankruptcy according to provisions of the law;

(5)    When in violation of the laws and regulations and have been ordered to close according to provisions of the law.

Article 133    In the event the Company is dissolved according provisions under (1) and (2) above, a liquidation team shall be set up within fifteen days.  Members of the liquidation team shall be elected by a special resolution.

In the event the Company is dissolved according provisions under (3) above, liquidation shall be handled by parties to the merger or division according to the agreement executed at the time of merger or division.

19

In the event the Company is dissolved according provisions under (4) above, the People's Court shall organize the shareholders, the relevant agencies and the professionals to form a liquidation team to proceed with liquidation.

In the event the Company is dissolved according provisions under (5) above, the relevant government agencies shall organize the shareholder, the relevant agencies and the professionals to form a liquidation team to proceed with liquidation.

Article 134    After the liquidation team is set up, the Board of Directors and Manager's authority shall be stopped immediately.  During the period of liquidation, the Company may not engage in new business operations.

Article 135    The liquidation team shall exercise the following authority during the liquidation period:

    (1)    To notify or make public announcement to the creditor;

    (2)    To liquidate the Company's assets, to compile assets and liabilities statement and property inventory;

    (3)    To handle the Company's unfinished business;

    (4)    To pay taxes owed;

    (5)    To liquidate claims and debt;

    (6)    To dispose of the Company's remaining assets after paying off debt;

    (7)    To participate in civil litigation on behalf of the Company.

Article 136    The liquidation team shall notify the creditor in ten days from the date it is set up, and shall make three public announcements in sixty days.

Article 137    The creditor shall file claims to the liquidation team in the period stipulated in the Company's Articles of Incorporation.  When filing claims, the creditor shall explain the relevant matters regarding the claims and shall provide proof and the liquidation team shall register the claims.

Article 138    When liquidating the Company's assets and compiling assets and liabilities statements and property inventory, the liquidation team shall compile a liquidation plan, to be confirmed by the shareholder meeting or the relevant governing agency.

Article 139    The Company's assets shall be liquidated in the following order:

    (1)    To pay the liquidation expenses;

    (2)    To pay the Company employee's wage and labor insurance premium;

    (3)    To pay taxes owed;

    (4)    To pay off the Company's debt;

    (5)    To make distribution according to shareholder's shareholding percentage.

Before liquidating the Company's assets according to (1) to (4) above, shareholder shall not receive distribution.

Article 140    After liquidating the Company's assets, and compiling assets and liabilities statement and property inventory, the liquidation team deems the Company's assets  insufficient to pay off the debt, bankruptcy petition shall be filed with the People's Court.  After the Company  has been declared bankrupt, the liquidation team shall transfer the liquidation matters to the People's Court.

Translation of TG 0020628
TRANSLATIONS PROVIDED BY TAISHAN - FINAL

There is no text on this page.  This is the shareholders' signature page for the Shandong Taihe Dongxin Co., Ltd. Articles of Incorporation


 Beijing New Building Material Co., Ltd.
Signature by the Representative:  [Signature - illegible]
[Seal - Beijing New Building Material Co., Ltd.]


Taian  State-owned Asset Management Co., Ltd.
Signature by the Representative:  [Signature - Xu [illegible]]
[Seal - Taian  State-owned Asset Management Co., Ltd.]


Taian  Anxin Investment & Trading Co., Ltd.
Signature by the Representative:  [Signature Jia Tongchun]
[Seal - Taian  Anxin Investment & Trading Co., Ltd.]


Taian  Donglian Investment & Trading Co., Ltd.
Signature by the Representative:  [Signature – Wan [illegible]]
[Seal - Taian  Donglian Investment & Trading Co., Ltd.]


Jia Tongchun (signature)   Jia Tongchun


April 25, 2005


23

# 山东泰和东新股份有限公司
# 资产评估报告书摘要

泰众诚评报字（2006）第020号

　　泰安众诚有限责任会计师事务所接受山东泰和东新股份有限公司的委托，根据国家有关资产评估的规定，对山东泰和东新股份有限公司拟对外投资提供作价依据所涉及的机器设备进行了评估。本次评估基准日为2006年3月31日，我所在实地勘察、评定估算的基础上于2006年5月26日出具了资产评估报告书，评估结果如下：

　　委估资产的评估值为723.49万元。

　　本评估结果按国家规定自评估基准日起一年内有效（自2006年3月31日至2007年3月30日）。

　　以上内容摘自资产评估报告书，欲了解本评估项目的全面情况，应认真阅读资产评估报告书全文。

　　资产评估机构法定代表人：

　　评估项目负责人：

　　评估报告复核人：

　　泰安众诚有限责任会计师事务所

　　二○○六年五月二十六日

-1-

泰安众成会计师事务所

20384

Jia Def 1/9/12
EXHIBIT NO. 10
L. GOLKOW

# 山东泰和东新股份有限公司
# 资产评估报告书

泰众诚评报字(2006)第 020 号

　　泰安众诚会计师事务所接受山东泰和东新股份有限公司的委托，根据国家有关资产评估的规定，本着客观、独立、公正、科学的原则，按照公认的资产评估方法，对山东泰和东新股份有限公司拟对外投资提供作价依据而涉及的机器设备进行了评估工作。本所评估人员按照必要的评估程序对委托评估的资产实施了实地查勘、市场调查与询证，并对其在 2006 年 3 月 31 日所表现的市场价值作出了公允的反映。现将资产评估情况及评估结果报告如下：

　　一、委托方及资产占有方

　　委托方及资产占有方均为山东泰和东新股份有限公司。

　　山东泰和东新股份有限公司位于泰安市岱岳区大汶口，法定代表人贾同春，注册资金 15562.5 万元，主要经营范围：纸面石膏板、石膏制品、石材、轻钢龙骨、建筑材料、装饰材料及新型建筑材料的生产、销售；腐蚀品、磷酸副产品磷石膏、建筑五金、陶瓷制品、机电产品、家具、家用电器、日用百货、矿山机械配件销售；汽车配件销售；废纸、废纸箱收购、销售；玉石雕刻；装饰装修；许可证范围内普通货运（限分支机构经营）；备案范围内进出口业务。

　　二、评估目的

　　对于山东泰和东新股份有限公司委托的为其拟对外投资

泰安众成会计师事务所

20385

提供作价依据之目的的资产在评估基准日所表现的市场价值作出公允反映。

三、评估范围和对象

纳入本次评估范围的资产为机器设备 2 项，账面原值 9,867,403.03 元，账面净值 7,521,321.70 元。

本次评估范围与该公司委托的资产评估范围一致。

四、评估基准日

本项目评估基准日为 2006 年 3 月 31 日。

一切取价标准均为评估基准日的有效价格标准。评估基准日的确定，是因为与评估目的实现日比较接近且易于评估操作，然后商得被评估方同意。

五、评估原则

1、遵循独立性原则，维护有关各方的合法权益；

2、遵循客观性原则，从实际出发，选择与评估目的相匹配的标准和方法；

3、遵循科学性原则，选用规范的评估程序和方法，用资产评估基本原理指导评估操作；

4、遵循持续经营原则，充分考虑资产的可变现性，合理选用评估的依据和参数。

六、评估依据

（一）行为依据

资产评估业务委托书。

（二）法规依据

1、国务院 1991 年第 91 号令《国有资产评估管理办法》；

2、原国家国有资产管理局 1996 年转发的《资产评估操作规范意见（试行）的通知》；

3、财政部财评字（1999）91 号《资产评估报告基本内容与格式的暂行规定》。

（三）产权依据

设备购置发票。

（四）取价依据

1、物贸快讯；

2、机械工业出版社出版的《2005 机电产品报价手册》；

3、机电产品价格查询光盘；

4、北京科学技术出版社出版的《资产评估常用数据与参数手册》第二版；

5、评估人员实地勘察及市场调查咨询资料；

6、资产占有方提供的资产清查评估明细表及其他资料。

七、评估方法

由于委估资产的二级市场交易资料难以取得且预期收益不易预测，本项目不适合采用现行市价法及收益现值法评估，根据委估资产的实际情况，我们采用了重置成本法。

机器设备采用重置成本法，以机器设备现行市场购买价加合理运杂费、安装调试费等综合确定重置成本，根据其经济寿命年限和现场查看设备的实际状况综合评定成新率，然后计算得出评估值。

公式：评估净值＝评估原值×成新率

八、评估过程

本次评估工作自 2006 年 5 月 23 日开始，至 2006 年 5 月 26 日全部完成，整个评估工作分为四个阶段。

（一）接受委托

1、我们接受山东泰和东新股份有限公司的委托，首先对该评估项目进行前期调查，并与该公司相关人员进行了沟通，明确评估的目的、范围及对象，确定评估基准日。同时深入现场，对委估资产现状进行初步了解，在此基础上结合我所评估专业人员的结构和专业情况，进行人员分工调配。

2、结合该项目的具体情况，拟定初步评估计划，包括各类资产拟采用的评估方法，各类评估人员的配置和时间进度，同时根据评估工作的需要，按照资产评估规范的要求，现场指导了该公司的资产清查和填报工作，并搜集了相关资料。

（二）资产清查

根据该公司提报的财产清查资料、资产评估明细表等相关资料我们进行了验证审核，审核结果相符。在此基础上评估人员对机器设备与申报表逐项进行了核实验证。

（三）评定估算

我们对照资产占有方申报的资产评估清查表，在现场逐项进行了勘察和鉴定，并对有关资产实施了检测，同时收集了相关的现场评估资料，按照法定的产权界定原则，对该公司提交的资产清单进行了必要的市场调查和交易价格的比较，确定适当的评估方法，根据国家有关规定，区别不同的资产类型，进行

了评定估算。

（四）评估汇总，出具报告

1、项目负责人对评估结果进行汇总、分析、修改。

2、撰写资产评估报告书。

3、内部逐级进行复核。

4、根据复核意见，修正评估报告并出具正式报告书。

九、评估结论

委估资产账面原值 9,867,403.03 元，账面净值 7,521,321.70 元，评估原值 8,578,000.00 元，评估净值 7,234,900.00 元，评估增值-286,421.70 元，增值率-3.81%。评估结论详细情况见评估明细表。

十、评估报告评估基准日期后重大事项

1、评估基准日的期后事项将影响评估结论，因此如发生评估基准日的期后事项，不能直接使用本评估结论；

2、评估基准日后至评估报告出具日前评估人员未发现可能影响评估结论的重大事项发生；

3、评估基准日后有效期以内资产数量发生变化时，应根据原评估方法对评估值进行相应调整；如果资产价格标准发生变化并对资产评估结果产生明显影响时，委托方应聘请评估机构重新评估。

十一、特别事项说明

无特别事项说明。

十二、评估报告的法律效力

1、评估报告成立的前提条件和假设条件

泰安众成会计师事务所

本次评估依据国家法律法规的有关规定发生法律效力。评估结论是对委估资产在评估基准日所表现的市场价值的公允反映，没有考虑特殊交易方式可能追加付出的价格等对评估价值的影响，也未考虑国家宏观经济政策发生变化以及遇有自然力和其他不可抗力对资产价格的影响。当前述条件以及评估中遵循的持续经营原则等前提发生变化时，评估结论将会失效。

2、本评估结论按照国家规定自评估基准日起一年内有效，即基准日至二〇〇七年三月三十日内有效。

3、本评估结论仅供山东泰和东新股份有限公司拟进行对外投资使用，不得用于其它目的。评估报告书的使用权归委托方所有，未经委托方许可，评估机构不会随意向他人提供或公开。

十三、评估报告提出日期

二〇〇六年五月二十六日

资产评估机构法定代表人：

评估项目负责人：

评估报告复核人：

地址：迎暄大街24号        泰安众成有限责任会计师事务所

电话：8234374             二〇〇六年五月二十六日

**Updated Jia Tr. Def's Ex. 10A**

**(English Translation of Jia Tr. Def's Ex. 10)**

Shagdong Taihe Dongxin Co., Ltd.
Summary of Asset Valuation Report

Tai-Zhong-Cheng-Report (2006) No. 20

Taian Zhong Cheng LLC Certified Public Accountants has accepted the engagement from Shandong Taihe Dongxin Co., Ltd. to assess the value of the machinery and equipment of Shandong Taihe Dongxin Co., Ltd. which will serve as the basis of pricing for the outbound investment being considered according to China's rules and regulations regarding asset valuation. The base date for this valuation is March 31, 2006. After on-site inspection to determine the basis of valuation, we issued the Asset Valuation Report on May 26, 2006 with the following results:

The valuation for the assets assessed is RMB 7,234,900.

According to China's regulations, the valuation result shall be effective for one year (from March 31, 2006 to March 30, 2007).

The above information is extracted from the Asset Valuation Report. To get a complete picture of this valuation project, please read the entire Asset Valuation Report carefully.

Asset Valuation Organization Legal Representative: [Signature illegible]
[Seal – Zhao Yanjie]

Person in Charge of the Asset Valuation Project: [Signature illegible]

Asset Valuation Report Reviewed By: [Signature illegible]

Taian Zhong Cheng LLC Certified Public Accountants
May 26, 2006

[Seal - Taian Zhong Cheng LLC Certified Public Accountants]

- 1 -

Taian Zhong Cheng Certified Public Accountants

Translation of TG 0020384
TRANSLATIONS PROVIDED BY TAISHAN - FINAL

Shangdong Taihe Dongxing Co., Ltd.

Summary of Asset Valuation Report

Tai-Zhong-Cheng-Report (2006) No. 20

Taian Zhong Cheng LLC Certified Public Accountants has accepted the engagement from Shandong Taihe Dongxin Co., Ltd. to assess the value of the machinery and equipment of Shandong Taihe Dongxin Co., Ltd. which will serve as the basis of pricing for the outbound investment being considered according to China's rules and regulations regarding valuation, and based on the principles of objectivity, independence, fairness and science and employing publicly recognized valuation methods. According to the necessary valuation procedure, our valuation personnel performed on-site inspection, market research and verification and has made a fair representation on the market value as of March 31, 2006. Now we present the valuation process and results as follows:

I. The client and the holder of the asset

The client and the holder of the asset are both Shandong Taihe Dongxin Co., Ltd.

Shandong Taihe Dongxin Co., Ltd. is located in Dawen Kou, Diayue District, Taian City. The company's legal representative is Jia Tongchun and it has a registered capital of RMB155.625 million. Its principal business areas are: gypsum boards, plaster products, stone material, light steel keel, construction material, decorating material and the production and sale of new construction material, corrosive material, phosphoric acid by-product phosphoric plaster, construction hardware, ceramic products, electrical products, furniture, home appliances, general merchandise, the sale of mining machinery accessories, automobile accessories, the purchase and sale of waste paper, waste paper boxes, jade carving, decoration; general transportation within the scope of the license (only when managed by its branch organization); and import and export business as reported.

II. Purpose of the valuation

We were engaged by Shandong Taihe Dongxin Co., Ltd. to make a fair assessment on the market value of assets which will serve as the basis of pricing for the outbound investment being considered on the valuation base date.

- 2 -

Taian Zhong Cheng Certified Public Accountants

Translation of TG 0020385

TRANSLATIONS PROVIDED BY TAISHAN - FINAL

III.    The scope of assessment and subject

Assets included in this assessment are two pieces of machinery with an original book value of RMB9,867,403.03 and a net book value of RMB7,521,321.70.

The scope of this valuation is the same as of the scope of valuation authorized by the company.

IV.     Valuation base date

This project's valuation base date is March 31, 2006.

All pricing standards are the effective pricing standards on the valuation base date.  The determination of the base date is due to the closeness of the date to the realization of the purpose of the valuation and also because it is easier for the valuation operation.  Consent was then obtained from the valuation assessor.

V.      Valuation principle

1.      To follow the principle of independence to maintain all parties' legal rights;
2.      To follow the principle of objectivity, to start from reality and to select standards and methods matching the purpose of the valuation;
3.      To follow the principle of science to select standardized procedure and method and to use the basic principle on asset valuation to guide the assessment operations;
4.      To follow the principle of going concern to fully consider the liquidity of the assets, and to reasonably select the basis and reference of valuation.

VI.     Valuation basis

(1) Basis on conduct

Asset valuation service engagement letter.

- 3 -

Taian Zhong Cheng Certified Public Accountants

Translation of TG 0020386
TRANSLATIONS PROVIDED BY TAISHAN - FINAL

(2) Legal basis

1.    The State Council 1991 Order No. 91 <State-Owned Asset Valuation and Management Measure>
2.    < Notification on Asset Valuation Operation Standardized Advice (Interim)> forwarded by the original State-owned Asset Administration Bureau;
3.    Ministry of Finance Fin-Eva (1999) No. 91 <Asset Valuation Report Basic Elements and Format (Interim) Provisions>.

(3) Basis on property rights

Invoice from equipment purchase.

(4) Basis on pricing

1.    Service and trade alert;
2.    <2005 Electrical Product Price Guide> published by Mechanical Engineering Industry Press;
3.    Electrical Product Price Inquiry disk;
4.    <Asset Valuation Commonly Used Data and Reference Guide> 2nd edition published by Beijing Science & Technology Press
5.    Information obtained through on-site inspection and market research and inquiry;
6.    Asset inventory valuation detailed listing and other information provided by the holder of the asset;

VII.    Valuation method

Since it would be difficult to obtain transaction information on the assets being assessed in the secondary market and it would be difficult to project the return, it would not be appropriate to use the current market value method and the present value of future benefits method for this project.  Based on the actual condition of the assets to be assessed, we use the replacement cost method.

The replacement cost method is used on machinery and equipment by adding the reasonable transportation and miscellaneous expenses, installation and adjustment costs to the current market purchase price to determine the replacement cost, and consolidate the years of economic life and actual condition from on-site inspection to determine where it stands in its life cycle to arrive at an assessed value.

- 4 -

Taian Zhong Cheng Certified Public Accountants

Translation of TG 0020387
TRANSLATIONS PROVIDED BY TAISHAN - FINAL

Formula:  The assessed net value = the assessed original value x % of how new the equipment is

VIII.  Valuation process

This valuation project was started on May 23, 2006 and completed on May 26, 2006.  There are four stages in the valuation work.

(1)  Accepting the engagement

1.  When we accepted the engagement from Shandong Taihe Dongxin Co., Ltd., we commenced the early stage investigation on the valuation project and communicated with the relevant personnel at the company to determine the purpose, scope and subject of the valuation and to determine the base date.  At the same time, we visited the site to gain preliminary understanding of the current condition of the assets to be assessed.  On this basis and combing the structure and skills of our valuation professional, we made decisions on the division of labor and the deployment of our personnel.
2.  Based on the specific condition of the project, we developed our preliminary valuation plan including valuation methods intended to be used on different kinds of assets, the deployment of various valuation personnel and the schedule of progress, and at the same time according to the needs of the valuation work and the requirement under asset valuation specifications, to provide on-site guidance on the company's asset inventory and reporting.  Relevant information has also been collected.

(2)  Asset inventory

Based on the relevant information such as data on property inventory and asset valuation detailed listing provided by the company, we performed verification and audit and the results match.  On this basis, the valuation personnel performed verification and authentication on the machinery and equipment and the report.

(3)  Valuation estimate

Based on the asset valuation inventory list reported by the holder of the asset, we conducted on-site inspection and identification and performed testing on the relevant assets, and also collected relevant on-site valuation material.  Based on the statutory principle on the definition of property rights, we performed the necessary market research and comparison of transaction prices on the list of assets provided by the company to determine the appropriate valuation method and to distinguish different asset types to conduct valuation assessment according to the relevant provisions of the law.

- 5 -

Taian Zhong Cheng Certified Public Accountants

Translation of TG 0020388
TRANSLATIONS PROVIDED BY TAISHAN - FINAL

(4) Summary of valuation and the issuance of report

1.   The valuation results are summarized, analyzed and modified by the person in charge of this project.
2.   To compile the asset valuation report.
3.   Internal review of the report at each level.
4.   To amend the valuation report and to compile the formal report according to the opinion gathered from the review.

IX.   Valuation conclusion

The assets to be valued have an original book value of RMB9,867,403.03, a net book value of RMB7,521.321.70 and an assessed original value of RMB8,578,000.00 and an assessed net value of RMB7,234,900.00 which represents an increase in value of RMB-286,421.70 or -3.81%. For detailed discussion of the valuation conclusion, please see the detailed valuation listing.

X.   Major developments after the valuation base date in the valuation report

1.   Major developments after the valuation base date will impact the conclusion of the valuation, therefore, this valuation conclusion may not be used if major developments occur after the valuation base date;
2.   After the valuation base date and before the valuation report is issued, the valuation personnel did not discover any major development which may impact the valuation conclusion;
3.   If there is change in the quantity of the assets during the effective period after the valuation base date, corresponding adjustment should be made to the valuation according to the original valuation method; if there is change in the asset pricing standard which created significant impact on the asset valuation result, the client should engage another valuation organization to perform the valuation again.

XI.   Special items

There are no special items that need explanation.

XII.   The legal effect of the evaluation report

1.   The prerequisites and assumptions for the valuation report

Taian Zhong Cheng Certified Public Accountants

Translation of TG 0020389
TRANSLATIONS PROVIDED BY TAISHAN - FINAL

This valuation report has legal effect according to the provisions of China's laws and regulations.  The valuation conclusion is a fair representation of the market value on the valuation base date on the assets to be assessed without considering the impact of special transaction method on the valuation which may increase the price paid or the impact on the asset value as a result of change in the country's macroeconomic policy and the occurrence of natural forces and other force majeure.  When there are changes in the aforementioned conditions and the prerequisite such as the principle of going concern we followed in performing the valuation before, the valuation conclusion will become invalid.

2.     According to the provisions of the law, this valuation conclusion will be effective for one year from the valuation base date, which means it will be effective before March 30, 2007.

3.     This valuation conclusion is only provided for Shandong Taihe Dongxin Co., Ltd. to use for its foreign investment being considered and may not be used for other purpose.  The right to use the valuation report belongs to the client and the valuation organization may not provide this report to other party or release the report without the permission of the client.

XIII.   The date the valuation report was presented

May 26, 2006

Asset Valuation Organization Legal Representative:  [Signature illegible]
[Seal – Zhao Yanjie]

Person in Charge of the Asset Valuation Project:  [Signature illegible]

Asset Valuation Report Reviewed By:  [Signature illegible]

Taian Zhong Cheng LLC Certified Public Accountants
May 26, 2006

[Seal - Taian Zhong Cheng LLC Certified Public Accountants]

- 7 -

Taian Zhong Cheng Certified Public Accountants

Translation of TG 0020390
TRANSLATIONS PROVIDED BY TAISHAN - FINAL