1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA

2

   _____

3                          § MDL NO. 2047
   IN RE:                  §
4  CHINESE-                § SECTION: L
   MANUFACTURED            §
5  DRYWALL PRODUCTS        § JUDGE FALLON
   LIABILITY               §
6  LITIGATION              § MAGISTRATE
   _____   § JUDGE WILKINSON

7
                    - - -

8
      CROSS NOTICED IN VARIOUS OTHER ACTIONS

9
                    - - -

10
                 April 7, 2011

11
                    - - -

12
       CONFIDENTIAL - SUBJECT TO FURTHER
13          CONFIDENTIALITY REVIEW
14                  - - -
15         Videotaped deposition of WENLONG
   PENG, held at 3 Pedder Street, Central,
16 Hong Kong, China, commencing at 8:59
   a.m., on the above date, before Linda L.
17 Golkow, Certified Court Reporter,
   Registered Diplomate Reporter, Certified
18 Realtime Reporter and Notary Public.
19
20                  - - -
21
22         GOLKOW TECHNOLOGIES, INC.
      ph 877.370.3377 | fax 917.591.5672
23            deps@golkow.com
24

```
 1    APPEARANCES:
 2
 3       SEEGER WEISS LLP
         BY:  CHRISTOPHER A. SEEGER, ESQUIRE
 4       BY:  JEFFREY S. GRAND, ESQUIRE
         One William Street
 5       New York, New York 10004
         (212) 584-0700
 6       cseeger@seegerweiss.com
         jgrand@seegerweiss.com
 7       Representing the Plaintiffs' Steering
         Committee
 8
 9
10       COLSON HICKS EIDSON
         BY:  PATRICK S. MONTOYA, ESQUIRE
11       255 Alhambra Circle
         Penthouse
12       Coral Gables, Florida 33134
         (305) 476-7400
13       patrick@colson.com
         Representing Plaintiffs' Steering
14       Committee in the Federal and State
         Coordinated Actions
15
16
17       LAW OFFICES OF RICHARD SERPE, P.C.
         BY:  RICHARD J. SERPE, ESQUIRE
18       580 East  Main Street
         Suite 310
19       Norfolk, Virginia 23510
         (757) 233-0009
20       rserpe@serpefirm.com
         Representing the MDL Plaintiffs and
21       the Germano Plaintiffs
22
                      -  -  -
23
24
```

 1
    APPEARANCES (CONTINUED):
 2
 3
        HOGAN LOVELLS US LLP
 4      BY:  FRANK T. SPANO, ESQUIRE
        BY:  RENEE GARCIA, ESQUIRE
 5      875 Third Avenue
        New York, New York 10022
 6      (212) 918-3000
        Renee.garcia@hoganlovells.com
 7      frank.spano@hoganlovells.com
        Representing Taishan Gypsum Co.
 8      Ltd. and Tai'an Taishan
        Plasterboard Company Ltd. and the
 9      Witness, Wenlong Peng
10
11      HOGAN LOVELLS INTERNATIONAL LLP
        BY:  EUGENE CHEN, ESQUIRE
12      18th Floor, Park Place
        1601 Nanjing Road West
13      Shanghai, China 200040
        (86 21) 6122 3800
14      eugene.chen@hoganlovells.com
        Representing Taishan Gypsum Co.
15      Ltd. and Tai'an Taishan
        Plasterboard Company Ltd. and the
16      Witness, Wenlong Peng
17
18      HOGAN LOVELLS INTERNATIONAL LLP
        BY:  STACY YUAN, ESQUIRE
19      31st Floor - Tower 3
        China Central Place
20      Beijing, China 100025
        (86 10) 6582 9488
21      stacy.yuan@hoganlovells.com
        Representing Taishan Gypsum Co.
22      Ltd. and Tai'an Taishan
        Plasterboard Company Ltd. and the
23      Witness, Wenlong Peng
24

1

APPEARANCES (CONTINUED):

2

3

4 GREENBERG TRAURIG, LLP
 BY: HILARIE BASS, ESQUIRE
5 1221 Brickell Avenue
 Miami, Florida 33131
6 (305) 579-0745
 bassh@gtlaw.com
7 Representing the Home Builders
 Steering Committee

8

9

 GALLOWAY JOHNSON TOMPKINS BURR and
10 SMITH
 BY: CARLINA C. EISELEN, ESQUIRE
11 One Shell Square
 701 Poydras Street, 40th Floor
12 New Orleans, Louisiana 70139
 (504) 525-6802
13 ceiselen@gjtbs.com
 Representing Interior/Exterior
14 Building Supply

15

16 PERKINS COIE LLP
 BY: CRAIG M.J. ALLELY, ESQUIRE
17 1899 Wynkoop Street - Suite 700
 Denver, Colorado 80202
18 (303) 291-2300
 callely@perkinscoie.com
19 Representing the State of Louisiana

20

21

22

23

24

```
 1    APPEARANCES (CONTINUED):
 2
 3        WEINBERG, WHEELER, HUDGINS, GUNN &
          DIAL, LLC
 4        BY:  NICHOLAS P. PANAYOTOPOULOS, ESQ.
          3344 Peachtree Road, NE
 5        Suite 2400
          Atlanta, Georgia 30326
 6        (404) 876-2700
          npanayo@wwhgd.com
 7        Representing Various Banner
          Defendants
 8
 9
          BRENNER, EVANS & MILLMAN, P.C.
10        BY:  THEODORE I. BRENNER, ESQUIRE
          411 East Franklin Street
11        Suite 200
          Richmond, Virginia 23218
12        (804) 644-1300
          Representing Tobin Trading Company
13
14
          McKENRY, DANCIGERS, DAWSON &
15        LAKE, P.C.
          BY:  J. BRIAN SLAUGHTER, ESQUIRE
16        192 Ballard Court
          Suite 400
17        Virginia Beach, Virginia 23462
          (757) 461-2500
18        Jbslaughter@va-law.org
          Representing Atlantic Homes LLC and
19        Multiple Other Virginia-Based
          Defendants
20
21
22
23
24
```

```
 1    APPEARANCES (CONTINUED):
 2
 3        SHER GARNER CAHILL RICHTER KLEIN &
          HILBERT, L.L.C.
 4        BY:  MATTHEW C. CLARK, ESQUIRE
          909 Poydras Street
 5        Suite 2800
          New Orleans, Louisiana 70112
 6        (504) 299-2100
          mclark@shergarner.com
 7        Representing the Southern Home
          Defendants
 8
 9
          SINNOTT, NUCKOLS & LOGAN, PC
10        BY:  KENNETH F. HARDT, ESQUIRE
          13811 Village Mill Drive
11        Midlothian, Virginia 23114
          (804) 378-7600
12        khardt@snllaw.com
          Representing Venture Supply, Inc. and
13        Porter-Blaine Corp.
14
15
16
17
18
19
20
21
22
23
24
```

1    APPEARANCES VIA TELEPHONE:

2

3    KUCHLER POLK SCHELL WEINER &
     RICHESON LLC
4    BY:  FRANCIS X. deBLANC, III,
     1615 Poydras Street
5    Suite 1300
     New Orleans, Louisiana 70112
6    (504) 592-0691
     slauricella@kuchlerpolk.com
7    Representing Creola Ace Hardware and
     Thomas Gould Inc. in the MDL

8

9
     HUNTON & WILLIAMS LLP
10   BY:  A. TODD BROWN, ESQUIRE
     Bank of America Plaza
11   101 South Tryon Street
     Suite 3500
12   Charlotte, North Carolina  28280
     (704) 378-4700
13   Representing Stock Building Supply,
     LLC

14

15
     JONES, WALKER, WAECHTER, POITEVENT,
16   CARRERE & DENEGRE LLP
     BY:  MEGAN E. DONOHUE, ESQUIRE
17   600 Jefferson Street, Suite 1600
     Lafayette, Louisiana 70501
18   (337) 262-9062
     mdonohue@joneswalker.com
19   Representing Fireman's Fund Insurance
     Company

20

21

22

23

24

```
 1    APPEARANCES VIA TELEPHONE (CONTINUED):
 2
 3         DUPLASS ZWAIN BOURGEOIS PFISTER &
           WEINSTOCK
 4         BY:  PHILIP WATSON, ESQUIRE
           3838 N. Causeway Boulevard
 5         Suite 2900
           Metairie, Louisiana 70002
 6         (504) 832-3700
           pwatson@duplass.com
 7         Representing R&H Masonry, Inc., and
           Swedberg Enterprises, Inc.
 8
 9
           RUMBERGER, KIRK & CALDWELL, P.A.
10         BY:  ABIGAIL ROBERTS, ESQUIRE
           Brickell Bayview Centre
11         Suite 3000
           80 Southwest 8th Street
12         Miami, Florida 33130
           (305) 358-5577
13         aroberts@rumberger.com
           Representing Defendants' Liaison
14         Counsel for  Installers
15
16         FULMER LEROY ALBEE BAUMANN
           BY:  MICHAEL MCCAHILL, ESQUIRE
17         2866 East Oakland Park Boulevard
           Ft. Lauderdale, Florida 33306
18         (954) 707-4430
           mosscandace@fulmerleroy.com
19         Representing Independent Builders
           Supply Association (IBSA)
20
21
22
23
24
```

1    APPEARANCES VIA TELEPHONE (CONTINUED):

2

3

     THOMPSON COE COUSINS & IRONS, L.L.P.

4    BY:  SUZANNE M. PATRICK, ESQUIRE

     One Riverway, Suite 1600

5    Houston, Texas 77056

     (713) 403-8210

6    spatrick@thompsoncoe.com

     Representing The North River

7    Insurance Company

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1    APPEARANCES VIA STREAM:
 2
 3       BECNEL LAW FIRM, L.L.C.
         BY:  ROBERT BECNEL, ESQUIRE
 4       106 W. 7th Street
         Reserve, Louisiana 70084
 5       (985) 536-1186
         robbecnel@aol.com
 6       Representing the Plaintiffs'
         Steering Committee
 7
 8
         JONES, WALKER, WAECHTER, POITEVENT,
 9       CARRERE & DENEGRE LLP
         BY:  MEGAN E. DONOHUE, ESQUIRE
10       600 Jefferson Street, Suite 1600
         Lafayette, Louisiana 70501
11       (337) 262-9062
         mdonohue@joneswalker.com
12       Representing Fireman's Fund Insurance
         Company
13
14
         HAYNSWORTH SINKLER BOYD, P.A.
15       BY:  CHRISTOPHER B. MAJOR, ESQUIRE
         75 Beattie Place - 11th Floor
16       Greenville, South Carolina 29601
         (864) 240-3200
17       cmajor@hsblawfirm.com
         Representing USG Corporation and L&W
18       Supply Corporation
19
20       DEUTSCH, KERRIGAN & STILES
         BY:  MELISSA M. SWABACKER, ESQUIRE
21       755 Magazine St.
         New Orleans, Louisiana  70130
22       (504) 581-5141
         mswabacker@dkslaw.com
23       Representing Landmark American
         Insurance Company
24
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2

      KUCHLER POLK SCHELL WEINER &
 3    RICHESON LLC
      BY:   SOPHIA L. LAURICELLA, ESQUIRE
 4    1615 Poydras Street - Suite 1300
      New Orleans, Louisiana 70112
 5    (504) 592-0691
      slauricella@kuchlerpolk.com
 6    Representing Creola Ace Hardware and
      Thomas Gould Inc. in the MDL
 7
 8
 9
10    ALSO PRESENT:
11
      Stephanie Chin, Official Interpreter
12    (Interpreter 1)
13
      Una Wong, Check Interpreter
14    (Interpreter 2)
15                    -  -  -
16
17
18
19
20
21
22
23
24
```

```
 1                    -  -  -
 2                 I N D E X
 3                    -  -  -
 4
 5    Testimony of:   WENLONG PENG
 6     By Mr. Seeger                      21
 7
                       -  -  -
 8
                  E X H I B I T S
 9
                       -  -  -
10
11    NO.              DESCRIPTION        PAGE
12    Peng-1     Handwritten note,        26
                 English name of
13               witness
14    Peng-2     Handwritten note,        93
                 Company name
15
      Peng-3     E-mail chain, top one    120
16               dated 5/12/2006, Bates
                 stamped TG 0000415
17
      Peng-4     E-mail chain, top one    148
18               dated 2/10/2007, Bates
                 stamped TG 0000011
19
      Peng-5     Document entitled        169
20               "Advance Products
                 International, LLC,"
21               dated 10-31-06, Bates
                 stamped TG 0019376
22
      Peng-6     E-mail dated October     174
23               9, 2007, Bates stamped
                 TG 0022650
24
```

| 1 | Peng-7 | Document entitled | 185 |
| | | "Translation of TG | |
| 2 | | 0000463," June 8, | |
| | | 2006, Bates stamped | |
| 3 | | TTRSNL0026 and TG | |
| | | 000463 | |
| 4 | | | |
| | Peng-8 | E-mail dated 8/2/2006, | 197 |
| 5 | | Bates stamped TG | |
| | | 0019381 and TG 0019382 | |
| 6 | | | |
| | Peng-9 | E-mail dated August | 215 |
| 7 | | 15, 2009, Bates | |
| | | stamped TG 0025155 | |
| 8 | | through TG 0025158 | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

1                    -  -  -
2           DEPOSITION SUPPORT INDEX
3                    -  -  -
4

     Direction to Witness Not to Answer
5

                 Page Line
6
7
8
9

     Request for Production of Documents
10

                 Page Line
11
12
13
14

                 Stipulations
15

                 Page Line
16
17
18
19
20           Question Marked
21               Page Line
22
23
24

1                    -   -   -

2              THE VIDEOTAPE TECHNICIAN:

3         We are now going on the record.

4         The date today is April 7, 2011.

5         The time now is approximately 8:59

6         a.m.

7              This is the videotape

8         deposition of Mr. Peng Wenlong

9         taken in reference to the Chinese

10        Manufactured Drywall Products

11        Liability Litigation.

12             The deposition is being held

13        in Hong Kong.

14             My name is Melissa Bardwell,

15        videographer representing Golkow

16        Technologies, and the court

17        reporter today is Linda Golkow.

18                    -   -   -

19             (Interpreters, STEPHANIE

20        CHIN, Official Interpreter, and

21        UNA WONG, Check Interpreter, were

22        sworn to interpret Chinese into

23        English and English into Chinese.)

24                    -   -   -

1               WENLONG PENG, after having

2        been duly sworn, was examined and

3        testified as follows:

4                     -  -  -

5               MR. SEEGER:  Mr. Spano,

6        yesterday the witness wanted an

7        affirmation as opposed to the oath

8        that was just given to this

9        witness.  Does this witness have a

10        preference as to whether it's an

11        affirmation or an oath under God?

12        I would like to just make sure we

13        get that out of the way.  He said

14        yes.

15               MR. SPANO:  I think we can

16        just leave it as is.

17               MR. SEEGER:  Linda, because

18        people, counsel have been coming

19        in and out of the room the last

20        couple of days, could we just

21        really quickly go around the table

22        and have counsel note their

23        appearance.

24               THE COURT REPORTER:  Yes.

1                    MR. SEEGER: Chris Seeger,

2          Seeger Weiss, New York, on behalf

3          of the Plaintiffs' Steering

4          Committee.  With me is Jeff Grand

5          from Seeger Weiss.

6                    MR. MONTOYA: Patrick Montoya

7          on behalf of the Plaintiffs'

8          Liaison Counsel in the Miami-Dade

9          County Chinese Drywall Litigation.

10                    MS. BASS: Hilarie Bass,

11          Greenberg Traurig, on behalf of

12          the Home Builders Steering

13          Committee and Lennar.

14                    MR. HARDT: Kenneth Hardt on

15          behalf of Venture Supply and the

16          Porter-Blaine Corporation in the

17          Germano class action.

18                    MR. SLAUGHTER: Brian

19          Slaughter representing Atlantic

20          Homes LLC.

21                    MR. BRENNER: Theodore

22          Brenner representing Tobin Trading

23          in Germano.

24                    MR. SERPE:  Richard Serpe

1        representing the PSC and the

2        Germano plaintiffs.

3              MS. EISELEN:  Carlina

4        Eiselen representing

5        Interior/Exterior Building Supply

6        and Interior/Exterior.

7              MR. CLARK: Matthew Clark

8        representing Southern Homes.

9              MR. PANAYOTOPOULOS: Nick

10       Panayotopoulos here on behalf of

11       certain Banner entities.

12             MR. ALLELY: I'm Craig Allely

13       on behalf of the State of

14       Louisiana.

15             MR. SPANO:  Frank Spano,

16       Hogan Lovells, on behalf of

17       Taishan Gypsum Company Limited and

18       Tai'an Taishan Plasterboard

19       Company Limited.

20             Just for the record, I just

21       want to note that by agreement,

22       we're starting Mr. Peng's 30(b)(6)

23       deposition a day ahead of time,

24       and this deposition will conclude

1       at 5:00 p.m. tomorrow.

2               MR. CHEN:  Eugene Chen,

3       Hogan Lovells, on behalf of

4       Taishan Gypsum Company Limited and

5       Tai'an Taishan Plasterboard

6       Company Limited.

7               INTERPRETER 2:  Una Wong,

8       check interpreter.

9               MS. YUAN: Stacy Yuan, Hogan

10      Lovells, on behalf of Taishan

11      Gypsum Co. Limited and Tai'an

12      Taishan Plasterboard Limited.

13              MS. GARCIA: Renee Garcia,

14      Hogan Lovells, on behalf of

15      Taishan Gypsum and Tai'an Taishan

16      Plasterboard.

17              MR. STATMAN: Eric Statman,

18      Hogan Lovells, on behalf of

19      Taishan Gypsum and Tai'an Taishan

20      Plasterboard.

21              MR. SEEGER:  Just to save

22      time, Mr. Dong has been here the

23      last couple of days.  Do you

24      expect him to come back?

1                    MR. SPANO:  No.

2                    MR. SEEGER:  If people

3        enter --

4                    INTERPRETER 1:  I --

5                    MR. SEEGER:  Hold on,

6        Stephanie.  I'm talking.

7                    If people enter, attorneys,

8        I'd like to just try to pick them

9        up so that we know that they are

10       here.

11                   By the way, on what you

12       raise, Mr. Spano, we do appreciate

13       the accommodation of moving the

14       witness up a day and accommodating

15       everybody's schedule.  As to the

16       issue about ending at 5:00, we

17       would hope you'd reconsider that

18       if we're in the middle of

19       questioning.  People have flown 15

20       hours halfway across the world.

21       If we need a little time at the

22       end of the day tomorrow, we hope

23       you will accommodate that, and we

24       will deal with that tomorrow.

```
 1              MR. SPANO:  I understand
 2        your point.
 3                   -  -  -
 4              EXAMINATION
 5                   -  -  -
 6   BY MR. SEEGER:
 7        Q.     Good morning, Mr. Peng.
 8        A.     Good morning.
 9        Q.     Did I pronounce your name
10   correctly?  If I call you Mr. Peng, is
11   that a correct pronunciation of your
12   name?
13        A.     Peng.
14        Q.     Okay.  Mr. Peng.
15              Mr. Peng, what other names
16   have you used in your business career
17   other than Mr. Peng?
18        A.     I also use another name,
19   Frank Clem, F-R-A-N-K, one word, C-L-E-M,
20   another word.
21        Q.     Mr. Clem, I would just like
22   to note for the record that you've
23   written the name that's on the paper in
24   front of you in English.  Correct, sir?
```

1          A.    Yes.

2          Q.    And you do speak a little

3    English, right, Mr. Peng?

4          A.    The level of my English is

5    not good.  A lot of time I am relying on

6    handwriting.  My verbal English level is

7    very, very bad, and I have to handwrite a

8    little by a little.

9          Q.    So, are you saying, Mr.

10   Peng, that you can write a little bit in

11   English but verbally you don't speak

12   English very well?

13         A.    I rarely speak -- my

14   speaking level is really bad.

15         Q.    How about, does he

16   understand English, like does he

17   understand --

18              I'm sorry.

19              Mr. Peng, do you understand

20   the questions I'm asking you in English?

21         A.    I don't understand.

22         Q.    When I ask a question in

23   English, do you understand it without

24   having the interpreter interpret it in

1    Chinese for you?

2          A.    I won't understand, and

3    also, I don't know -- I cannot express

4    myself, and I am unable to understand.

5          Q.    I appreciate that.  And Mr.

6    Peng, you have a right to an interpreter.

7    I just want to know how much English you

8    understand in terms of the questions I'm

9    asking you.

10              MR. SPANO:  Objection to

11         form.

12              THE WITNESS:  (Addressing

13         Mr. Spano.)  What do you mean?

14              MR. SEEGER:  He wants to

15         understand, I think, what you just

16         did.

17              MR. SPANO:  I'm making an

18         objection to the form of the

19         question for the record.  You may

20         answer the question.

21              THE WITNESS:  I have

22         forgotten about the earlier

23         question.  Would you mind

24         repeating that question?

1    BY MR. SEEGER:

2         Q.    No problem.

3              MR. SEEGER:  I've forgotten

4         my earlier question.

5              Linda, can you read it back,

6         and Stephanie, interpret it.

7                        -  -  -

8              (Whereupon, the requested

9         portion of the transcript was read

10        by the court reporter.)

11                       -  -  -

12             THE WITNESS:  It is very

13        difficult to say.  I might be able

14        to pick up single words, but for

15        the whole sentence, I would not be

16        able to understand in particular

17        in a very serious occasion like

18        this, very solemn occasion like

19        this.

20   BY MR. SEEGER:

21        Q.    I appreciate that, Mr. Peng.

22             Can you read English?

23        A.    Depends on the English, in

24   what area.  If the English is very

1    difficult, that would be difficult for

2    me.  If it is simple or very simple

3    English, then I might understand it.  For

4    the professional English or for the

5    English in some other area, it might

6    become very difficult to me or I don't

7    understand it at all.

8            Q.    Can you read an English

9    language newspaper, for example, Mr.

10   Peng?

11           A.    English newspapers?

12           Q.    An English language

13   newspaper.

14           A.    No, I don't understand.

15           Q.    You don't understand the

16   question or he doesn't understand -- you

17   can't read --

18                 Mr. Peng, you don't

19   understand the question I just asked you,

20   or no, you can't read a newspaper in

21   English?

22           A.    This question I understand.

23   What I mean is that I cannot understand

24   the English newspaper.

```
 1            Q.     Okay.
 2                   Mr. Peng, the name that you
 3   wrote on the paper that we're going to
 4   mark as Exhibit 1 in front of you.
 5                   MR. SEEGER:  We'll call this
 6            Peng Exhibit 1.
 7                        -   -   -
 8            (Whereupon, Deposition
 9            Exhibit Peng-1, Handwritten note,
10            English name of witness, was
11            marked for identification.)
12                        -   -   -
13   BY MR. SEEGER:
14            Q.     Mr. Peng, the name that you
15   wrote on the paper in front of you that
16   we've marked as Exhibit 1, why do you use
17   that name?  Why did you choose the name
18   Frank Clem?
19            A.     This name was given to me by
20   my teacher when I went to school.
21            Q.     And where did you go to
22   school, Mr. Peng?
23            A.     When you say going to
24   school, what are you referring to?
```

1    Elementary school, high school,

2    university or any other?

3            Q.    I was trying to be

4    consistent with --

5                  Mr. Peng, I was following up

6    to your last answer.  The teacher who

7    gave you this name, what school was that

8    at?

9            A.    I understand now.

10                 INTERPRETER 1:  Mr. Peng

11               gave out the name of his

12               university in Chinese.  The

13               interpreter is going to translate,

14               but before she translate, Counsel,

15               can I ask the witness to help me

16               if he knows the English name of

17               his school.

18                 MR. SEEGER:  That's fine

19               with me.  I don't know if his

20               counsel -- are you okay with that?

21               She wants to pronounce in English

22               the name of his school.  So if he

23               knows the name of his school in

24               English, she's asking if it's okay

1          that he correct her?

2               MR. SPANO:  Okay.

3               THE WITNESS:  I cannot

4          recall exactly the name in

5          English.

6               INTERPRETER 1:  The

7          interpreter is going to translate

8          best she can, not guarantee the

9          accuracy.

10               Shandong Construction

11          Material Industrial College.

12     BY MR. SEEGER:

13          Q.    Mr. Peng, do you have an

14     understanding as to why your teacher at

15     this school would give you an anglicized

16     name like Frank Clem?

17          A.    When we go to school, I

18     think it is for the convenience and also

19     to help the teacher to transmit the

20     knowledge to us.  I don't think it is for

21     any particular reason, because other

22     people also got an English name.  I think

23     this way people will feel closer to each

24     other.  Well, for the young people, I

1    think it is a trend that is popular.  Do

2    you understand what I'm saying?

3           Q.   If I understand it or not,

4    it's not important, it's just what his

5    testimony is.

6           A.   I understand.

7           Q.   Were you given this name by

8    this teacher at the Shandong Construction

9    Material College with the idea that you

10   were supposed to use this in your

11   business life?

12              MR. SPANO:  Objection to

13         form.

14              THE WITNESS:  Do I still

15         need to answer this question?

16         What do you mean?

17   BY MR. SEEGER:

18         Q.   Let me ask you another

19   question, Mr. Peng.  It was your decision

20   to continue to use the name Frank Clem in

21   your business life, correct?

22              MR. SPANO:  Objection to

23         form.

24              THE WITNESS:  I didn't

1          particularly try to use this name

2          for business purpose.  When I went

3          to school, my teacher gave me this

4          name.  So, it's like a marking, a

5          recognition for me, either it is

6          English or Chinese name.

7   BY MR. SEEGER:

8          Q.    Mr. Peng, does your family

9   call you Frank?

10         A.    No.  My family member, they

11  don't know English.

12         Q.    Do your closest friends in

13  China call you Frank?

14         A.    Yes, my friends, my

15  schoolmates.

16         Q.    What about friends that

17  aren't part of your construction life, do

18  they call you Frank?

19              MR. SPANO:  Objection to

20         form.

21              INTERPRETER 1:  Counsel,

22         "construction life," do you mean

23         when he works for the industry of

24         construction?

1              MR. SEEGER:  Let me strike

2         it.  I'm going to ask it

3         differently, Stephanie.

4    BY MR. SEEGER:

5         Q.    What about friends that are

6    not part of your business life, do they

7    call you Frank?

8              MR. SPANO:  Note my

9         objection.

10              THE WITNESS:  I did mention

11         earlier, my friends, my

12         schoolmates, they have no

13         relationship with my business.

14         They call me Frank.

15    BY MR. SEEGER:

16         Q.    Wait.  Your schoolmates call

17    you Frank?  I'm just confused.  I want to

18    clarify, Mr. Peng.  You're saying your

19    schoolmates call you Frank?

20         A.    I have many schoolmates.  It

21    depends on how they like it.  Some, they

22    used to call me Peng Wenlong.  Some, they

23    used to call me Frank.  So, whatever way

24    they do it, they do it both ways.

1        Q.    What does Mr. Jia call you?

2        A.    Mr. Jia call me Peng

3    Wenlong.

4        Q.    The school that you went to

5    in Shandong, the construction school, did

6    you speak English in the classes there?

7        A.    At school, when we have the

8    English lessons like during the senior

9    year, the fourth year, we might speak a

10   little English, but basically the main

11   language is Chinese.  My mother tongue is

12   also Chinese.

13       Q.    How about the school

14   materials that you studied, the

15   textbooks, articles and things that would

16   be handed to you by your teachers at the

17   school, were they in Chinese or were they

18   in English?

19            MR. SPANO:  Objection to

20        form.

21            THE WITNESS:  Which period

22        are you referring to?

23   BY MR. SEEGER:

24       Q.    Just throughout -- let's

1  start generally throughout his school

2  years at Shandong Construction Material

3  College.

4          A.    Mainly it is in Chinese or

5  we call it Hanyu, the language of Han

6  Dynasty.  We have a little English or

7  sometimes English and Chinese

8  bilingually.

9          Q.    When you say English and

10  Chinese bilingually, was that, Mr. Peng,

11  in specific classes, or was that

12  generally?  I just want to be really

13  clear.

14          A.    For special classes, for

15  special teaching materials, they are in

16  English and Chinese.

17          Q.    Mr. Peng, what's the

18  teacher's name that gave you the name

19  Frank Clem?

20          A.    When I went to school, it

21  was in the year 1999.  It was many years

22  ago.  It was 12 years ago.  Up to today,

23  I don't recall.

24          Q.    I want to be clear.  Mr.

1    Peng, you don't recall the teacher's

2    name, but you kept the name to use --

3    ever since you were given that name, you

4    kept that name to use from and after the

5    date it was given to you, correct?

6              MR. SPANO:  Objection to

7         form.

8              THE WITNESS:  I didn't

9         intentionally or subjectively

10         trying to use this name.  I just

11         keep this name.  I did mention

12         about this earlier.  Well, it is a

13         marking.  I remember this name.  I

14         use this name.  I did not

15         particularly try to use it or

16         subjectively take the initiative

17         try to use it.  Well, I may

18         remember the name, so, I use the

19         name.

20    BY MR. SEEGER:

21         Q.    Did anybody force you to use

22    the name, Mr. Peng?

23         A.    No one forced me.  This is

24    the freedom of everyone.

1          Q.    So, you chose to continue to

2     use this name after it was given to you

3     by this teacher in school, correct?

4          A.    I did not take the

5     initiative subjectively trying to use

6     this.  I did mention about this earlier.

7     I did not particularly try to make an

8     effort to use it.  Well, it is very

9     normal, it is like a marking of me.

10    Well, if I want to use it, I use it.  I

11    would not take the initiative and try

12    hard to push it to tell other people, and

13    I would not introduce this name to other

14    people or to recommend other people to

15    use this name.

16         Q.    Did the name Frank Clem help

17    you when you dealt with English-speaking

18    customers, Mr. Peng?

19              MR. SPANO:  Objection to

20         form.

21              THE WITNESS:  Well,

22         regarding whether it is helpful to

23         the customer or not, it would be

24         very difficult to say, and it is

1          very difficult for me to

2          speculate.  And sometimes when the

3          customers, they call me Peng

4          Wenlong, they find it not very

5          convenient and they are not used

6          to it, and they find it very

7          difficult to call a Chinese name.

8          So, they will choose a name which

9          is simple, easy.  So, they would

10         call this name Frank Clem.

11    BY MR. SEEGER:

12         Q.    And you communicated the

13    name Frank Clem to your English-speaking

14    customers to make it easier for them,

15    correct, sir?

16              MR. SPANO:  Objection to

17         form.

18              THE WITNESS:  I find you put

19         it this way, it is inappropriate.

20    BY MR. SEEGER:

21         Q.    But can he answer the

22    question?

23         A.    I myself did not take the

24    initiative subjectively trying to use

1    this name to communicate with the

2    customers.

3         Q.    Well, how did your

4    English-speaking customers, Mr. Peng,

5    know that you used the name Frank Clem?

6    Were they in school with you?

7              MR. SPANO:  Objection to

8         form and...

9              THE WITNESS:  Well, that is

10         impossible, for the customers to

11         go to school together with me.

12         That is not possible.  That is

13         totally impossible.  And when a

14         customer come to the company to

15         talk business to us, I will tell

16         them my full name, and then they

17         might find out that it is

18         difficult.  How should I put it?

19         They would find it difficult to

20         call my full Chinese name.  Then

21         they would request, is there a

22         name easy and simple, a simple and

23         easy name to call me?  They

24         requested this.

1   BY MR. SEEGER:

2        Q.    Okay.

3              Mr. Peng, have you ever

4   traveled to the US?

5        A.    No.

6        Q.    Have you ever traveled to

7   England?

8        A.    No.

9        Q.    What other names have you

10  used in your business life other than Mr.

11  Peng and Frank Clem?

12       A.    I did not use any other

13  name.

14       Q.    Mr. Peng, who is Owen Li,

15  L-I?

16       A.    Can you tell me how do you

17  do the Pinyin and how to spell it, how to

18  write it.

19       Q.    Yeah.  I'm going to write it

20  on a piece of paper.

21             Mr. Peng, I'm going to hand

22  you a piece of paper on which I wrote

23  Owen, O-W-E-N, Li, L-I.

24             MR. SPANO:  Are we going to

1          mark that as an exhibit?

2                  MR. SEEGER:  Only if you

3          want to.

4                  MR. SPANO:  Please do.

5                  MR. SEEGER:  Sure.

6                  INTERPRETER 1:  Is this N or

7          what?

8    BY MR. SEEGER:

9          Q.    Let me do this.

10                 Mr. Peng, what I've put in

11   front of you is O-W-E-N, second name,

12   L-I.

13         A.    I cannot recall this English

14   name.

15                 MR. SEEGER:  Mr. Spano, you

16         asked me to mark it.  I'm not

17         going to mark it at this point

18         because he doesn't know the name.

19         If you want to when you follow up,

20         you're free to mark it as an

21         exhibit.

22                 If you can give it back to

23         me, please.

24                 (Handing over document.)

1          MR. SEEGER:  Thank you, Mr.

2     Peng.

3  BY MR. SEEGER:

4          Q.   So, Mr. Peng, other than the

5  name in front of you, I just want to be

6  really clear, and I may have asked you

7  this.  And if I did, I apologize.

8               Is that the only name other

9  than Peng Wenlong that you used in your

10 business life?

11         MR. SPANO:  Objection to

12    form, asked and answered.

13         THE WITNESS:  I did not

14    use -- I do not use any other

15    name.

16 BY MR. SEEGER:

17         Q.   Thank you.

18              Mr. Peng, how old are you?

19         A.   Are you talking about my

20 age?

21         Q.   Yes.

22         A.   This year.  This year, I am

23 30 years of age.

24         Q.   Did the fact that you could

1    read some English make it easier for you

2    to communicate with your English-speaking

3    customers, Mr. Peng?

4              A.     I understand.

5                     I did mention about this

6    earlier.  I know English, but I only know

7    very simple English.  My English level is

8    really bad, but I have no choice when I

9    have to deal with English-speaking

10   customers.  These customers, they don't

11   understand and they don't speak Chinese.

12   So, when we are communicating, it is

13   necessary.  To me, it's very, very

14   difficult for me, difficult for me that

15   my job require me to do this.  I can only

16   do a little by little with single words

17   with the assistance of a dictionary to

18   communicate.  I haven't finished yet.

19                     In fact, many of our

20   customers, they bring their own

21   interpreters.  They have interpreters or

22   they have -- or they let the people from

23   the office of the agents to come to our

24   company to talk to me.  This is more

1    comfortable to me.  This makes me happy.

2                    INTERPRETER 2:  The check

3              interpreter believes the witness

4              said agents in China.

5                    INTERPRETER 1:  He did not

6              say that.  The agent's office.

7                    INTERPRETER 2:  In China.

8                    INTERPRETER 1:  In China.  I

9              believe I don't have that in my

10             notes.  I believe that the

11             checking interpreter is trying to

12             help.

13                   MR. SEEGER:  Trying to help

14             the witness?

15                   INTERPRETER 1:  With the

16             definition of the office of the

17             agent.

18                   MR. SEEGER:  Well, thank

19             you.

20                   INTERPRETER 2:  The witness

21             did say agent office in China.

22                   MR. CHEN:  I concur with

23             that as well.

24                   MR. SEEGER:  Okay.  It is

1           what it is, and we've got it on
2           video if anybody wants to listen
3           to it.
4                Thank you.
5     BY MR. SEEGER:
6           Q.   Mr. Peng, when you studied
7     at the Shandong Construction Material
8     College, what specific areas did you
9     study, if you can tell us?
10          A.   The subject I studied was
11    English for economic trade.
12          Q.   And did you have a sort of
13    --
14               Was that your major area of
15    study?  Did you have minor areas of study
16    as well?
17               MR. SPANO:  Objection.
18               THE WITNESS:  I do have a
19          minor.
20               MR. SPANO:  Please note my
21          objection to the form of the
22          question.
23    BY MR. SEEGER:
24          Q.   Mr. Peng, what was your

1  minor?

2         A.    My minor was the classes in

3  public affairs, but I never taken any

4  position in this -- with this type of

5  position.  I only have certain

6  understanding of this type of knowledge.

7  I study sociology to have an

8  understanding of this knowledge.

9         Q.    Mr. Peng, did you receive a

10  degree from Shandong Construction

11  Material College?

12         A.    Degree, yes.

13         Q.    Could you tell us what it's

14  called?

15         A.    English literature.

16         Q.    Mr. Peng, what did you do to

17  prepare yourself for your deposition here

18  today?

19         A.    Under the guidance of my

20  attorney, I read some material, I checked

21  some materials.

22         Q.    And I'm not going to ask you

23  about any discussions you had with your

24  attorneys, Mr. Peng.  I'll give you that

1    caution.  I'm sure your attorney has as

2    well.  But I want to follow up on that.

3              Mr. Peng, other than your

4    attorneys, who did you speak with at the

5    company to prepare yourself for your

6    testimony today?

7         A.    My company?  What company

8    are you talking to?

9         Q.    What company are you

10   employed by, Mr. Peng?

11        A.    The company hiring me now is

12   TG.

13        Q.    Who at TG did you speak

14   with, if anyone, to prepare for your

15   testimony today?

16        A.    Are you talking about -- the

17   question is, are you asking me about I

18   talked to my colleagues regarding

19   discussion about the issue or talking

20   about that I have to come to testify

21   today?

22        Q.    That's a fair correction,

23   Mr. Peng.

24              I want to know that in

1    connection with the testimony that you've

2    been asked to come here and give, have

3    you gone to speak to your colleagues

4    about some of the subjects you're

5    testifying about?

6          A.    Are you asking about I spoke

7    to my colleagues about the content that I

8    am testifying?

9          Q.    Yes.  And who?

10          A.    I don't know the definition

11    of colleagues.  Would my leaders be

12    included as a member of my colleagues?

13          Q.    Yes, Mr. Peng.  Please

14    answer.

15          A.    I did talk to Mr. Jia

16    Tongchun about testifying.

17          Q.    Anybody else, Mr. Peng?

18          A.    I also talk to Zhang

19    Jianchun, my colleague.

20          Q.    Anyone else, Mr. Peng?

21          A.    No, no more.

22          Q.    Other than somebody that you

23    would call a leader at your company, did

24    you speak to anyone else other than these

1    two individuals?

2              MR. SPANO:  Objection to

3         form.

4              THE WITNESS:  No.

5              MR. CHEN:  The objection

6         didn't get translated.

7              MR. SEEGER:  Please

8         translate the objection.

9              Well, if it's on the record,

10        do you still -- he answered the

11        question.

12             MR. SPANO:  I would like the

13        default to be that all objections

14        get translated.

15             MR. SEEGER:  Stephanie?

16             MR. SPANO:  Do I need to

17        tell her that?

18             MR. SEEGER:  I was just

19        going to say, Stephanie, when Mr.

20        Spano objects, relay it to him as

21        he does it.  Okay?  It's okay.

22        Let's just make sure we do it

23        because things are moving quickly

24        so you may forget.

```
 1                   INTERPRETER 1:  I did
 2          translate his objection already.
 3                   MR. SEEGER:  Okay.
 4   BY MR. SEEGER:
 5          Q.    Mr. Peng, you gave us the
 6   name, and if I don't say it correctly, I
 7   apologize, Zhang Jianchun.  Did I say
 8   that correctly?
 9                   MR. SEEGER:  Mr. Who?  What
10          name would I say?  He was
11          yesterday's witness.
12                   MR. CHEN:  She gave the
13          other witness' name.  If you just
14          look here, the name, if you look
15          on the record, the name of the  --
16                   MR. SEEGER:  Strike the
17          question.  Let me ask it again.
18          Gene, can you help me on this?
19          Did yesterday's witness, Mr. Who?
20                   MR. CHEN:  She accidentally
21          gave the name of the first
22          witness.
23                   MR. SEEGER:  No.  I'm asking
24          you a question, because I want to
```

1          make this easier, just to save

2          time, because I'm going to screw

3          the name up, I'm sure.

4                    MR. CHEN:  Zhang, Jianchun.

5                    MR. SEEGER:  So I would say

6          Mr. Who?

7                    MR. CHEN:  Zhang.

8                    INTERPRETER 1:  I want to

9          clarify with the witness.

10                   MR. SEEGER:  No, no.  Hold

11         on.  There's no question.  I

12         struck it.

13                   INTERPRETER 1:  The name may

14         not be what I heard.

15                   THE WITNESS:  The first one

16         I mentioned was Jia Tongchun.  The

17         second one I mentioned was Zhang

18         Jianchun.

19  BY MR. SEEGER:

20         Q.    Mr. Zhang, the second name

21  you mentioned, Mr. Peng, does he go by

22  any other name than the name you just

23  gave us?

24                   INTERPRETER 1:  Mr. Zhang or

 1          Mr. Jia?  Counsel, you said Jia or
 2          Zhang?
 3               MR. SEEGER: I meant to say
 4          Mr. Zhang, the second name he
 5          gave.
 6               INTERPRETER 1:  Because they
 7          sound so similar.
 8               THE WITNESS:  I don't know,
 9          but if he does have another name,
10          that I don't know.  I don't
11          understand his situation, but
12          according to my understanding, he
13          only got this one name, but I
14          don't know his situation.
15  BY MR. SEEGER:
16          Q.   How about Mr. Jia, does he
17  go by, as far as you know, an anglicized
18  name or another name other than Mr. Jia?
19               MR. SPANO:  Objection to the
20          form.
21               INTERPRETER 2:  The
22          interpreter did not interpret
23          anglicized name.
24               MR. SEEGER:  Repeat the

1        question.  It's easier to do it

2        that way, Stephanie.

3                INTERPRETER 2:  The

4        interpreter mix up the question.

5        You were asking that apart from

6        Mr. Jia, the name, does Mr. Jia

7        goes by any other name such as

8        anglicized name?

9                MR. SEEGER:  I'm going to

10       ask it again.  Let me ask the

11       question again, Stephanie.

12  BY MR. SEEGER:

13       Q.   Does Mr. Jia, as far as Mr.

14  Peng knows, go by any name other than Mr.

15  Jia?

16       A.   His name is Jai Tongchun,

17  Jai Tongchun.

18       Q.   When were you first employed

19  by TG, Mr. Peng?

20       A.   The first time when I start

21  working for TG, it was in July of the

22  year 2003.

23       Q.   Mr. Peng, I'm sorry, I want

24  to go back to something I forgot to

1    follow up on.

2              In preparing for your

3    testimony today, you said you met with

4    Mr. Jia and Mr. Zhang.  How many times

5    did you meet with them?

6         A.    I want to clarify your

7    question.  I am not clear about your

8    question.

9         Q.    I was asking you questions

10   earlier about people you met with at the

11   company to prepare yourself for your

12   testimony, and you told me you met with

13   Mr. Jia and Mr. Zhang.  How many times

14   did you meet with them to discuss what

15   you'd be testifying about?

16        A.    I spoke to Mr. Jia, and Mr.

17   Jia talk about this matter.  Mainly we

18   talk about the itinerary, talking about

19   the air tickets, how to go back and forth

20   and talk about arrangement of

21   transportation.

22        Q.    Did you read the deposition

23   testimony of either Mr. Jia or Mr. Zhang?

24        A.    I did not see any document.

1    I did not see any document, but there is

2    lawyer that our company hire.  His name

3    is Huo Jin Lu Wei.

4              MR. CHEN:  I will note

5          that's the Chinese name for Hogan

6          Lovells.

7              THE WITNESS:  Huo Jin Lu

8          Wei.  We made preparations for the

9          questions under the guidance of

10          the attorney Huo Jin Lu Wei.

11             INTERPRETER 2:  Not the

12          questions.  We make preparation

13          for the deposition under the

14          guidance of Hogan and Lovells.

15             INTERPRETER 1:  The check

16          interpreter changed the word to

17          help the witness to understand.

18          It is not the job of the

19          interpreter.  It is the job of --

20             MR. SEEGER:  She's just

21          noting it for the record.  We're

22          going to move on.  Don't worry

23          about.

24             INTERPRETER 1:  She change

1           the word.

2                   MR. SEEGER:  Do you want

3           them talking?

4                   THE WITNESS:   I have a

5           question.  Can I bring it up?

6                   MR. SEEGER:  He asked her.

7           I think he has a question he wants

8           to ask.

9                   MR. SPANO:  Okay.

10                  THE WITNESS:  Can I go to

11          the bathroom?

12                  MR. SEEGER:  Of course.  I'm

13          sure you're not alone.

14                  THE VIDEOTAPE TECHNICIAN:

15          The time now is approximately

16          10:03 a.m., and we are now off the

17          record.

18                          -  -  -

19                  (Whereupon, a recess was

20          taken from 10:03 a.m. until

21          10:16 a.m.)

22                          -  -  -

23                  THE VIDEOTAPE TECHNICIAN:

24          This begins tape 2 of today's

1           deposition.  The time now is

2           approximately 10:16 a.m., and

3           we're back on the record.

4    BY MR. SEEGER:

5           Q.    Mr. Peng, before we broke, I

6    was asking you if you had any

7    conversations with Mr. Jia and Mr. Zhang.

8    Did you listen in by telephone to the

9    depositions that we've had the last few

10   days?

11          A.    No.

12          Q.    Okay.  Let's go back to your

13   work experience at TG.  What is your

14   current title at TG?

15          A.    The manager of the, I can

16   translate into either foreign sales or

17   foreign trade department.

18          Q.    How long have you held that

19   position, Mr. Peng?

20          A.    Are you referring to how

21   long have I been in this position

22   recently or in total how long have I been

23   in that position?

24          Q.    Mr. Peng, how long have you

1    been the manager of foreign sales or

2    trade at TG?

3              MR. SPANO:  Objection to

4         form.

5              THE WITNESS:  I am the

6         foreign trade, not a foreign trade

7         company.

8    BY MR. SEEGER:

9         Q.    I don't understand.

10             INTERPRETER 2:  The check

11        interpreter believes that the

12        witness said, we have foreign

13        trade department, not a foreign

14        trade company.

15             MR. SEEGER:  Let me ask my

16        question again.

17   BY MR. SEEGER:

18        Q.    Mr. Peng, how long have you

19   held the title -- strike that.

20             Mr. Peng, you described your

21   current position with TG as the manager

22   of foreign sales or the manager of

23   foreign trade.  Do I have that correct?

24             INTERPRETER 1:  Foreign

1           sales or foreign trade is the

2           translator's choice of word.  I

3           don't know whether it should be

4           translated into sales or trade.

5                 MR. SEEGER:  Let me ask a

6           question based on that.

7      BY MR. SEEGER:

8           Q.    Mr. Peng, how long have you

9      been the manager at TG of foreign sales?

10                MR. SPANO:  Objection to

11          form.

12                INTERPRETER 2:  Counsel, the

13          check interpreter believes that

14          when you are asking the question

15          the foreign trade department, then

16          the interpreter interpret into --

17          you were saying foreign sale, and

18          the interpreter interpret into

19          foreign trade, then the witness

20          will be answering according to the

21          word foreign trade instead of

22          foreign sale.  Because sale and

23          trade, after all, in Chinese would

24          be different.

1           MR. SEEGER:  What word in

2       Chinese should reflect the word

3       sales?  You tell me.

4           INTERPRETER 2:  Xiao shou.

5           MR. SEEGER:  Do me a favor.

6       Ask the question that I asked with

7       that word, and then we're going to

8       ask it with trade.  So let's first

9       use the word she just gave.

10  BY MR. SEEGER:

11      Q.   How long have you been the

12  manager at TG of foreign sales?

13          MR. SEEGER:  Use the word

14      she just gave you, Stephanie.

15          INTERPRETER 1:  Foreign

16      sales or foreign trade department

17      translate in Chinese in the same

18      word wai mao bu.  That's no

19      differences.

20          MR. SEEGER:  Stephanie, just

21      use the word she gave you if you

22      don't mind.  I want to do it both

23      ways.

24          INTERPRETER 1:  The word she

1          use is still the same Chinese word

2          I use, both the same, wai mao bu,

3          still the same.

4                    MR. SEEGER:  But I want to

5          ask the question both ways so I

6          have an answer.  Do me a favor and

7          do it that way.  Ask the question

8          with the word she just gave.  It's

9          okay.

10                    INTERPRETER 1:  The word she

11         use and the word I use are the

12         same.  It's wai mao bu.

13                    MR. SEEGER:  Would you do

14         that for me, would you please ask

15         the question with that word.

16                    INTERPRETER 1:  Yes, I did

17         already.  I just let you know that

18         the word is the same in Chinese.

19                    MR. SPANO:  At this point, I

20         think the record is a little

21         unclear about what the outstanding

22         question is.

23                    MR. SEEGER:  I agree with

24         you.  I'm going to ask it again.

 1                    MS. BASS:  Try how long has

 2          he held his current position?

 3     BY MR. SEEGER:

 4          Q.     Mr. Peng, how long have you

 5     held your current position?

 6                    MR. SEEGER:  Ask that

 7          question.

 8                    THE WITNESS:  Let me think.

 9          More than three years.

10     BY MR. SEEGER:

11          Q.     What position did you hold

12     prior to the position you currently hold?

13          A.     I work for another company.

14     I was doing sales.

15          Q.     Give me the year that you

16     were first employed by TG.  I'm just

17     confused.  What year were you employed by

18     TG?

19          A.     I did not hear the question

20     clearly.

21                    MR. SEEGER:  Ask it again.

22                    (Interpreter repeats the

23          question.)

24                    THE WITNESS:  The first time

1          I enter TG to work for them was in

2          the year 2003.

3     BY MR. SEEGER:

4          Q.    What was your title in 2003

5     at TG?

6          A.    I did not have a title.  I

7     was a general staff.

8          Q.    When was your first

9     promotion, and what title did you receive

10    in your first promotion?

11         A.    If I have to explain this, I

12    need some time.

13         Q.    Well, how much time do you

14    need?

15         A.    For me to answer this

16    question, it is not a simple question.  I

17    cannot answer you just simply by saying

18    yes or no.  In order to respond to this

19    question to make explanation, it would

20    require maybe a longer time.

21         Q.    I'm not asking you, Mr.

22    Peng, a yes or no question, but I'd like

23    to have an answer to when you received

24    your first promotion and what job title

```
 1   you were given at that time.  You can

 2   answer it any way you think is

 3   appropriate.

 4              MR. SPANO:  Objection to the

 5         form of the question, and it's

 6         compound.

 7              THE WITNESS:  In the year

 8         2005, I enter TG.  I worked for

 9         them.

10              INTERPRETER 2:  The check

11         interpreter believe the witness

12         said 2003.

13              INTERPRETER 1:  2003, yes.

14              MR. SEEGER:  In the year

15         2003?

16              INTERPRETER 1:  Yes, 2003.

17   BY MR. SEEGER:

18         Q.   Go ahead.  Let him continue.

19         A.   From 2003 until the end of

20   2005 -- or at the end of 2004 or 2005, I

21   cannot recall exactly the time, they did

22   not give me any fixed position.  My

23   responsibility every day there was like

24   to do the cleaning up, to take care of
```

```
 1    the plants and the flowers and also to do
 2    the logistics.  They did not arrange any
 3    formal work or higher position-type work
 4    for me.  So, that job at that time was
 5    quite boring.  I did not want to -- I
 6    didn't want to continue to do the work
 7    that I mentioned earlier.  At this time,
 8    I wanted to change this job.  But at that
 9    point, TG did not want me to go.  I told
10    them that it is okay for me to stay, but
11    I don't want to do this type of work.
12    Later on, we did communicate with the
13    leaders at TG.  They asked me, what are
14    your specialties, what type of work do
15    you want to do.  At that time, I told
16    them that I want to do a job with more
17    stable responsibility and also I want to
18    do some more challenging work.  For
19    example, I want to do sales.  At that
20    time, they have quite a lot of
21    salespeople.  They did not have a vacancy
22    for me at that time.  At that point, the
23    leader, they saw that I studied
24    commercial English.  They saw that.  At
```

1    that time, they set up a department for

2    me, and then they say, okay, let us call

3    it foreign trade department.  Okay.  Then

4    we will let you, Peng Wenlong, to become

5    the manager of this foreign trade

6    department.  So, I cannot recall exactly

7    the time, but it would be at the time

8    around the year '05.  Of course after I

9    become the manager of this department

10   called foreign trade department, of

11   course my salary is higher.  So, this

12   bring me back to the question, Mr.

13   Attorney, you asked me earlier.  So, from

14   the year '05, I started to take up this

15   position.

16          Q.   In 2005, when you received

17   this position, how many employees were

18   under your supervision at TG?

19               MR. SPANO:  Objection to

20          form.

21               THE WITNESS:  Can you define

22          the word "employees"?

23               INTERPRETER 2:  The witness

24          said, can you please tell me what

1           it means the employee underneath

2           me?

3    BY MR. SEEGER:

4           Q.    How many employees at that

5    time, if any, were under your direction

6    where you would actually tell them what

7    to do, give them job assignments, things

8    like that?

9           A.    Well, I did mention about

10   this earlier.  After I have taken up this

11   position, I still don't have much working

12   experience.  I don't have much working

13   history.  When I first take up this

14   position, I myself give instruction to

15   myself.  That's it.

16          Q.    Mr. Peng, at the time you

17   received this position, how many other

18   people could call themselves managers of

19   foreign trade at TG?  Was there anyone

20   else?

21          A.    No one -- nobody call me by

22   this position.  They either call me Xiao

23   Peng, that means little Peng, or call my

24   name.

1          MR. CHEN:  I will just note

2          that the way that the question was

3          translated into Chinese was how

4          many people called you manager of

5          foreign trade at TG as opposed to

6          the exact question that was

7          phrased.

8          MR. SEEGER:  I'll leave it

9          as an objection because, Gene, you

10         are not interpreting.

11         INTERPRETER 1:  I did not

12         hear he say --

13         MR. SEEGER:  Stephanie,

14         that's okay.  That was for the

15         record.

16         INTERPRETER 1:  I was doing

17         verbatim.

18    BY MR. SEEGER:

19         Q.   I would like an answer to

20    this question.

21              You told us that your title

22    was manager of foreign trade.  You

23    received that in 2005.  Did anybody else

24    at the company share that title?  That's

1    really all I want to know.

2                    INTERPRETER 2:  The --

3                    MR. SEEGER:  Did you finish

4         translating?

5                    INTERPRETER 1:  I haven't

6         finished yet.

7                    MR. SEEGER:  You can't jump

8         in yet while she's translating.

9                    INTERPRETER 1:  I haven't

10        finished yet.  I am still reading.

11                   THE WITNESS:  Sharing that

12        title, are you talking about the

13        title of the manager of foreign

14        trade?

15   BY MR. SEEGER:

16        Q.    Yes.

17        A.    To be accurate, that title

18   was given to me was for the purpose of

19   asking me to stay there.  That's why they

20   gave me that position.  According to my

21   understanding at that time, no one had --

22   no one else has that title.

23        Q.    Thank you.

24                   How many employees in total

1    work in the foreign trade department?

2                    MR. SPANO:  Objection to

3          form.

4                    THE WITNESS:  Which period

5          of time are you referring to?

6    BY MR. SEEGER:

7          Q.    2005.

8          A.    I did mention about this

9    earlier.  At the beginning, I was the

10   only one.

11         Q.    In 2006?

12         A.    In the year 2006, I worked

13   for another company.  I did not work for

14   TG Company.

15         Q.    Where did you go?

16         A.    I went to work for TTP.

17         Q.    What's the relationship

18   between TTP and TG, Mr. Peng?

19                    MR. SPANO:  Objection to

20         form.

21                    THE WITNESS:  That I'm not

22         sure.

23   BY MR. SEEGER:

24         Q.    How long were you with TTP?

1          A.    Around two years.

2          Q.    Mr. Peng, do you know that

3    TTP is a company that is owned by TG?  Do

4    you know that or do you not know that?

5               MR. SPANO:  Objection to

6          form.

7               MR. SEEGER:  Hold on.

8          What's the objection?  I want to

9          know.  I'm curious.  I want to fix

10         the question.  Do you want to

11         share with me the basis?  What was

12         wrong about the question that you

13         would like me to fix?

14              MR. SPANO:  Both the time

15         frame and the imprecision of the

16         word "owned" in this context, I

17         think it's misleading.

18              MR. SEEGER:  Okay.  I'm

19         going to stick with my question.

20              Ask him my question,

21         Stephanie.

22              Let me strike it.  Ask it

23         this way.

24              Strike the question.

1  BY MR. SEEGER:

2      Q.   Mr. Peng, when you were with

3  TTP in 2006, did you understand that TTP

4  was a company owned by TG?

5          MR. SPANO:  Note my

6      objection.

7          THE WITNESS:  I don't know.

8          MR. SPANO:  Note my

9      objection, and it is beyond the

10     scope of the witness' designation.

11  BY MR. SEEGER:

12     Q.   Does that objection change

13  your answer, Mr. Peng, or is it the same

14  answer, you don't know?

15     A.   I still insist on my

16  original answer.

17     Q.   Mr. Peng, when you went to

18  work for TTP in 2006, did you move to a

19  new office?

20     A.   I did move.

21     Q.   Was that office in the same

22  building?

23     A.   No.

24     Q.   Where was it?

1          A.     Inside TTP.

2          Q.     Where was TTP relative to

3     TG?  A different city?

4               MR. SPANO:  Objection to

5          form, compound.  Objection to

6          form, compound.

7               THE WITNESS:  I did not

8          understand your question.  What do

9          you mean?

10               MR. SEEGER:  Did you hear

11          what I heard?  Did it sound the

12          same to you like it sounded to me?

13          There was a distraction.  We heard

14          a noise.  Strike it.  Let me ask

15          you a different question.

16     BY MR. SEEGER:

17          Q.     Was your office at TTP in a

18     different town or city than your office

19     at TG?

20          A.     A different location.

21          Q.     What was the name of the

22     location that you were at for TTP?

23               MR. SEEGER:  Hold up.  We

24          may mark that.  Thank you.

1           THE WITNESS:  It is in a

2           town called Dawenkou, Dawenkou,

3           the town Dawenkou, the district of

4           Daiyue, the city of Tai'an, the

5           province of Shandong.  And there

6           is a village.  I cannot recall the

7           name of the village.

8  BY MR. SEEGER:

9           Q.    When you went to work at

10  TTP, who at -- strike that.

11           When you went to work at

12  TTP, who did you report to, what person?

13           A.    I report to the manager of

14  TTP.

15           Q.    What's his name?

16           A.    His name is Peng Shiliang.

17           Q.    In preparation for your

18  testimony today, did you speak with this

19  individual that you just mentioned to go

20  over any of the topic areas that you're

21  going to testify about?

22           MR. SPANO:  Objection.  In

23           answering the question, don't

24           reveal any meetings or discussions

1           in the presence of counsel.

2                THE WITNESS:  I did not

3           communicate with Mr. Peng Shiliang

4           regarding this issue.

5                INTERPRETER 2:  The check

6           interpreter believes that the

7           witness also stated alone.  I did

8           not discuss with Peng Shiliang

9           alone on this matter.

10               INTERPRETER 1:  I did not

11          hear that.  It was not being said.

12               INTERPRETER 2:  The witness

13          stated the word "don du."

14               MR. SEEGER:  Let's not argue

15          about it.  That answer is fine for

16          it.  I'll respond to that answer.

17     BY MR. SEEGER:

18          Q.    Did you have any meetings

19     with this individual -- and do not tell

20     me about any discussions, but did you

21     have any meetings with this individual in

22     preparation for your testimony where the

23     attorneys were present?

24          A.    I got confused now.  I don't

1    know what you're asking.

2         Q.    Did you have any meetings

3    with Peng Shiliang to prepare for your

4    testimony today where the attorneys were

5    present?  Just a yes or no answer to that

6    question.

7         A.    I still did not hear the

8    question clearly.  What type of

9    information are you asking?

10        Q.    I'm asking if he had any

11   meetings with Peng Shiliang and attorneys

12   to prepare for his testimony today?

13        A.    The attorney, Mr. --

14             MR. CHEN:  Hogan Lovells.

15             THE WITNESS:  Was in charge.

16        Under him being in charge of the

17        meeting, I met Mr. Peng, but I

18        cannot recall what was the content

19        of that meeting.

20   BY MR. SEEGER:

21        Q.    All right.

22             In 2006, what was your title

23   with TTP?

24        A.    No title.  I was only doing

1    sales.

2           Q.    So, what was your title?

3    Did you have any official title or not?

4           A.    I did not have an office or

5    title.

6           Q.    Did you have an official

7    title with TTP in 2007?

8           A.    I want to make sure.  When

9    you refer to TTP, are you referring to

10   the company in the Chinese name called

11   Taishan Tai'an Zhi Mian Shi Gao Ban Xian

12   Gong Si.

13          Q.    Mr. Peng, you have no

14   understanding of what TTP means, what

15   company that relates to?

16                MR. SPANO:  Objection to

17          form.

18                MR. SEEGER:  Let him answer

19          before you object.

20                MR. CHEN:  I'll let him

21          answer, and then I'm going to make

22          a state -- say something.

23   BY MR. SEEGER:

24          Q.    You can answer the question.

1           A.    I just want to make sure.

2                 MR. CHEN:  If I could just

3           briefly note.  During the course

4           of this deposition, Mr. Peng has

5           been giving the full name of

6           Taishan Gypsum and TTP in his

7           responses.  The interpretation has

8           used TG and TTP, which we didn't

9           object to, because that was

10          something that we've established

11          over the course of the past

12          several days.  But his answers

13          have been giving the full name of

14          each company.

15                MR. SEEGER:  To move this

16          along, Gene, does he understand

17          TTP -- I'm going to ask him this,

18          but I want to know.  Is he going

19          to understand TTP to mean Tai'an

20          Taishan Plasterboard?

21                MR. CHEN:  Let me just --

22          for your assistance, on the

23          agreed-upon translation glossary,

24          the translator can just read

1        directly the English and Chinese

2        names back and forth, and that

3        should help out.  Because right

4        now, I think she's also

5        translating by term.

6              MR. SEEGER:  Okay.

7              MR. CHEN:  So, there was --

8              INTERPRETER 1:  The

9        interpreter is looking at the

10        glossary.  Actually, the

11        translation into English is just

12        TTP.

13  BY MR. SEEGER:

14        Q.    Ask him if he understands --

15              What company does he think

16  the English letters TTP relates to?

17        A.    My understanding is that it

18  is only three alphabets.

19              MR. SEEGER:  Gene, let's

20        save some time here, all right?

21        You can ask him in Chinese if you

22        want.  It is on the video.  I want

23        to just cut through this.  I want

24        to use TTP for the company we've

 1          been talking about for the last

 2          three days.

 3                  MR. CHEN:  So, we just want

 4          to establish that TTP refers to

 5          that company?

 6                  MR. SEEGER:  To that company

 7          we've been talking about here for

 8          three days.

 9                  (Discussion between the

10          witness and Mr. Chen in Chinese.)

11   BY MR. SEEGER:

12          Q.    I'm going to use TTP for the

13   company that his attorney just talked to

14   him about.  Just tell him that.

15          A.    Now I understand.

16          Q.    Okay.  Thank you.

17                Did you have a job title in

18   2007 at TTP?

19          A.    In the year 2007, I did not

20   have an office or title.

21          Q.    During 2006 and 2007, were

22   you paid by a check?  How were you paid

23   by the company?  I want to know, was it a

24   check, a wire transfer, what method?

1           MR. SPANO:  Objection to
2     form.
3           INTERPRETER 2:  The check
4     interpreter believes the
5     interpreter --
6           MR. CHEN:  Let her finish.
7           INTERPRETER 2:  Sorry.
8           INTERPRETER 1:  I haven't
9     finished, and also I did translate
10    the objection before the question.
11          INTERPRETER 2:  No, no, no.
12    It's just that --
13          MR. SEEGER:  Stephanie, did
14    you finish asking the question of
15    the witness?  And if you were
16    interrupted, then ask it again.
17          INTERPRETER 1:  Yes, I
18    finished.
19          MR. SEEGER:  Okay.
20          INTERPRETER 2:  Because the
21    interpreter interpret during --
22    before 2006, not between 2006 and
23    2007.
24          INTERPRETER 1:  Objection.

1          Objection.  She heard me wrong.  I

2          did interpret it during 2006 and 7

3          because I was reading from the

4          screen.

5               MR. SEEGER:  Okay.  Can the

6          witness answer the question the

7          way you asked it?  Go ahead.  I

8          want his answer.

9               THE WITNESS:  I am sorry.  I

10         cannot recall the question.  Would

11         you mind to repeat.

12    BY MR. SEEGER:

13         Q.    During 2006 and 2007, what

14    method was he paid by?  Did he receive a

15    check?  Was he paid by check?

16              MR. SPANO:  Objection to

17         form.

18              THE WITNESS:  We don't have

19         a check.  I did not receive a

20         check.

21    BY MR. SEEGER:

22         Q.    Okay.  How was he paid?

23         A.    I have a bank account book.

24    TTP would just put this amount of money

1    into my bank account book.

2         Q.    Does he have receipts for

3    every time he got paid, his salary?

4         A.    No receipt.

5         Q.    Was it done by electronic

6    transfer of money?

7         A.    I don't know what method

8    they used to transfer that money.  The

9    only I concern of is that they did

10   transfer the money to my account and that

11   I did receive the money.

12        Q.    When he received bank

13   statements on his own personal account,

14   would it show how much was transferred

15   and who it was transferred by?

16        A.    I don't understand.  What do

17   you mean by "personal account"?

18        Q.    The bank account that he

19   uses to pay his rent or his mortgage or

20   buy groceries.

21             INTERPRETER 2:  The check

22        interpreter believes the

23        interpreter use the term hu kou to

24        describe an account, but hu kou in

1          China does not mean bank account.

2          It means an identity profile.  So,

3          in China, bank account is zhang

4          hu, zhang hu.

5               INTERPRETER 1:  It is the

6          same because account can be

7          translated in ten different ways.

8          I said bank account.

9               MR. CHEN:  I will note that

10         there's a defined term bank

11         account on the glossary and agreed

12         by both sides.  The interpreter

13         should use that term.

14              MR. SEEGER:  Stephanie, ask

15         the question with that term,

16         please.

17              INTERPRETER 1:  The witness

18         did answer the question earlier

19         when I used that term.

20              MR. SEEGER:  Okay.  But I

21         want to make sure we have a clean

22         record.  So, ask the question one

23         more time with the agreed-upon

24         term.

1                    INTERPRETER 1:  I need to

2          look at the glossary.

3              I apologize.  The glossary

4          under word "account," it

5          translated as kuai ji cai mu.  It

6          did not say the -- provide the

7          term that I heard earlier.  So,

8          it's a third and a fourth

9          translation of the word account.

10             MR. SEEGER:  Stephanie,

11         wait, wait, wait.  Stop.  Where's

12         the word?  Where's the word?

13             MR. CHEN:  It's under bank

14         account.

15             MR. SEEGER:  Look under bank

16         account.

17                 INTERPRETER 1:  Oh, okay.

18             Let me go back to the

19         question.

20             MR. SEEGER:  Just ask it

21         using that word.

22             MR. SPANO:  Objection,

23         counsel.

24             Could you please reask the

1          question in English so we can have

2          that question translated, because

3          it's several questions ago now.

4                MR. SEEGER:  Linda, can you

5          read my question back, the one

6          that was pending.

7                -  -  -

8          (Whereupon, the requested

9          portion of the transcript was read

10        by the court reporter as follows:

11          "Q.  When he received bank

12        statements on his own personal

13        account, would it show how much

14        was transferred and who it was

15        transferred by?

16            A.  I don't understand.

17        What do you mean by "personal

18        account"?

19           Q.  The bank account that

20        he uses to pay his rent or his

21        mortgage or buy groceries.")

22                -  -  -

23          MR. SEEGER:  Strike it.  I'm

24        going to ask another question.

1    BY MR. SEEGER:

2         Q.    I want to know when he gets

3    a statement from the bank on his own

4    personal bank account if it shows how

5    much was transferred and who the money

6    was transferred by.  That's the question.

7         A.    I did earlier mention, well,

8    regarding the procedures, well, I have

9    the bank card, I have the bank account

10   book.  I cannot check the details.  If I

11   have to check the details, I have to go

12   to the bank to have the printout in my

13   bank account book that would indicate

14   what time and what amount was being

15   transferred.

16        Q.    And would it say who

17   transferred the money?

18        A.    We cannot tell -- we cannot

19   see who transferred that money.

20        Q.    So, if I transferred $100 to

21   your account, Mr. Peng, you would just

22   see that I transferred you $100, but you

23   wouldn't know it came from me?

24              MR. SPANO:  Objection to the

1          form of the question.

2                    THE WITNESS:  I cannot see.

3     BY MR. SEEGER:

4          Q.    Is there any way for him to

5     find out who is transferring him the

6     money?

7                    MR. SPANO:  Objection.

8                    THE WITNESS:  Whoever was to

9          transfer money to my bank, they

10          would tell me in advance, and then

11          they would tell me the amount that

12          they are going to transfer to my

13          account.  Then I would go to check

14          if the amount and the time is

15          correct, then I personally would

16          consider that to be correct.

17    BY MR. SEEGER:

18          Q.    But that's not my question.

19                My question is, is there a

20    way for him to find out exactly from what

21    bank account the money to his account is

22    being transferred from and the name on

23    the account that's transferring the money

24    to him?

1           MR. SPANO:  Objection to

2      form.

3           THE WITNESS:  I never

4      checked that before.  I also don't

5      know how to find that out.

6  BY MR. SEEGER:

7      Q.    During 2006 and 2007, did

8  you have business cards for both TTP and

9  TG?

10          MR. SPANO:  Objection to

11     form.

12          THE WITNESS:  I had no name.

13     I have never made any name card at

14     TTP.

15 BY MR. SEEGER:

16     Q.    Did he carry a TG business

17 card in 2006/2007?

18     A.    Well, how can I put it?  The

19 time when I was working for TTP, when I

20 mainly deal with the local people, we

21 rarely use a name card, therefore, we did

22 not print it.  On some special occasions

23 when starting in the regions that I don't

24 know, then I would just randomly find a

1   name card that I used before for them.

2          Q.    The card from TG, correct?

3          A.    We use the name card of TG

4   that was printed before.

5          Q.    Why exactly did you leave TG

6   to go to work -- let me strike that.

7                Why did you go to work for

8   TTP in 2006?

9          A.    I did mention that earlier.

10  I always want to do the work related to

11  sales.  In the year 2006, someone told me

12  there is a company.  The people at this

13  company's name is Tai'an -- I'm sorry.

14                INTERPRETER 1:  Let me do it

15          again.

16  BY MR. SEEGER:

17          Q.    Go ahead.

18                INTERPRETER 1:  I want to do

19          it in a different way so that it

20          can be more clear.  Tai'an Shi

21          Taishan Zhi Mian Shi Gao Company

22          Limited.  Or another way, I will

23          try my best to translate, but I

24          cannot guarantee accuracy, is TG

```
 1              Co., Tai'an City.  I'm not sure
 2              how to translate because an
 3              interpreter is not in a position
 4              to translate official names or
 5              legal names.  I'm only trying my
 6              best.
 7                   MR. CHEN:  For the
 8              interpreter, is it the same
 9              company as listed as TTP that he's
10              written down?
11                   THE WITNESS:  No, no, no.
12              He's saying -- no, it's different,
13              because I did ask him, is it the
14              same?  He said no.  He wrote down
15              to me it is called Tai'an Shi.
16   BY MR. SEEGER:
17         Q.   Ask the witness to write
18   down the name of the company that you're
19   trying to translate.
20                   INTERPRETER 1:  In English?
21                   MR. SEEGER:  No.  Tell him
22              to write it down in Chinese.
23                   INTERPRETER 1:  He did.
24                   MR. SEEGER:  And you're
```

1          translating now the English name
2          that he wrote down?
3                    INTERPRETER 1:  Yes.  I'm
4          translating in two ways because --
5          and I cannot guarantee accuracy.
6                    MR. SEEGER:  Got it.
7                    INTERPRETER 1:  It is called
8          Tai'an Shi, S-H-I.  Tai'an is one
9          word, S-H-I, Taishan, T-A-S-H-A-N
10         Plasterboard Company Limited.  And
11         another way I'm trying to
12         translate is TTP quote (Tai'an
13         City.)
14                   MR. SEEGER:  Stephanie, put
15         the name of the company in front
16         of Mr. Peng because I want to ask
17         him a question about it.
18    BY MR. SEEGER:
19         Q.    Mr. Peng, the name of the
20    company that you were describing to the
21    interpreter, could you write it in
22    English, what you understand that to mean
23    in Chinese?
24                   MR. SPANO:  Objection to the

1          form of the question.  And I

2          object to you asking him to write

3          things in English for the reasons

4          he's stated, that he has very

5          limited capability with the

6          English language.

7               MR. SEEGER:  Okay.

8               THE WITNESS:  It is very

9          difficult.  It is very difficult

10         for me to write that.

11    BY MR. SEEGER:

12         Q.    Do you know how to write it

13    down in English or do you not know how to

14    write it down in English?

15         A.    Will you mind repeating the

16    question.

17         Q.    Mr. Peng, you have a degree

18    in English literature.  I'm just asking

19    you if you know how to write in English.

20    Don't worry about the spelling.  Can you

21    write in English the name of the company

22    that you have in front of you that's in

23    Chinese?

24               MR. SPANO:  I object to the

1           form of the question, and I also

2           object to offhand comments or

3           remarks to the witness that are

4           not part of the question.

5                MR. SEEGER:  Okay.

6                MR. CHEN:  She should

7           translate the objection.

8                MR. SPANO:  Yes.

9                MR. SEEGER:  Okay, then mark

10          it for a ruling.

11               Go ahead, you have to

12          translate his objection.

13               MR. SPANO: Just for the

14          record --

15               MS. BASS:  Let her

16          translate.

17               MR. SPANO:  Just for the

18          record, I objected.  I did not

19          instruct him not to answer the

20          question.

21               MR. SEEGER:  I know that.  I

22          appreciate that.  We were all just

23          making a record.

24     BY MR. SEEGER:

1          Q.     Do you need a read back of
2     the question that I asked, Mr. Peng?
3          A.     Please repeat that.  I
4     cannot recall the question.
5          Q.     Mr. Peng, can you write in
6     English, and don't worry about spelling,
7     the name of the company that's in front
8     of you that you wrote in Chinese?
9          A.     Yeah, okay, let me try to
10    write it down, but I'm still not very
11    self-confident.
12         Q.     Thank you.
13         A.     I'm sorry, the Chinese name,
14    I miss out one word.  I have written this
15    down.
16         Q.     Thank you.
17                MR. SEEGER:  Can we mark
18         that as Exhibit 2.
19                    -  -  -
20                (Whereupon, Deposition
21         Exhibit Peng-2, Handwritten note,
22         Company name, was marked for
23         identification.)
24                    -  -  -

1             MR. SPANO:  Let me see it.

2             MR. SEEGER:  Sorry.

3             (Handing over document.)

4    BY MR. SEEGER:

5         Q.    Now, Mr. Peng, when you

6    began working with TTP in 2006, did your

7    salary change?

8         A.    What do you mean by

9    "change"?

10        Q.    Did you get paid exactly the

11   same thing when you began working for TTP

12   as you did when you were working with TG?

13        A.    This I cannot recall.

14        Q.    You don't remember if you

15   got paid more money when you began

16   working for TTP in 2006?

17        A.    Well, when I work for TTP,

18   the objective was that at that point, I

19   saw that job, I felt I liked that job

20   better.  But exactly how much salary, I

21   don't recall for sure.  It won't be less,

22   but I cannot be sure of how much.

23   Regarding the change of how much of the

24   salary being changed, I cannot recall,

1    but I liked that job more.  I did not

2    really care how much was the change of my

3    salary.  I did not care about how much

4    more they would be paying.  I cannot

5    recall this.

6             Q.    In 2006, did any other TG

7    employees begin working at TTP other than

8    you?

9             MR. SPANO:  Objection to

10          form.

11             THE WITNESS:  I am still not

12          sure about the question.  Can you

13          make the question clear to me?

14  BY MR. SEEGER:

15             Q.    Mr. Peng, in 2006, you began

16   working for TTP.  Did anybody else with

17   TG begin working with TTP as well?

18             A.    Besides of me, regarding

19   other people, I have no understanding.  I

20   did not have sufficient information to

21   know about other people.  But according

22   to my knowledge, there were a Mr. Yang, a

23   Mr. Che.

24             INTERPRETER 2:  The --

1                    THE WITNESS:  Mr. Che and

2           Mr. Yang.

3                    MR. CHEN:  C-H-E, Y-A-N-G.

4    BY MR. SEEGER:

5           Q.    Mr. Che and Mr. Yang were

6    also employees of TG that moved over to

7    TTP, correct, Mr. Peng?

8                    INTERPRETER 2:  The

9           interpreter may try to say the

10          word Che instead of Cha, just Mr.

11          Che.

12                   MR. SEEGER:  Ask the witness

13          if he understands the question and

14          can answer it.

15                   THE WITNESS:  Mr. Che, Mr.

16          Yang, they joined Tai'an City

17          Taishan Plasterboard Company at a

18          different time.  One go earlier,

19          one go later.  And I cannot recall

20          the exact time, but for sure, it's

21          not on the same day as around that

22          period of time.

23   BY MR. SEEGER:

24          Q.    Okay.  Mr. Che and Mr. Yang

1    were employees of TG that also went to

2    work at TTP?  Can you answer that yes or

3    no?

4            MR. SPANO:  Object to form

5        of the question.

6            MR. CHEN:  Can she translate

7        the objection.

8            INTERPRETER 2:  The check

9        interpreter believed that the

10       interpreter did not use the

11       appropriate term to interpret to

12       work for and went to TTP.

13           MR. SEEGER:  I'm just going

14       to note for the record that right

15       now the interpreter seems to be

16       getting instructions from one of

17       the attorneys to assert this

18       objection, and it is a very simple

19       question.  I would really just

20       like an answer.

21   BY MR. SEEGER:

22       Q.   Can you answer it?

23           MR. SPANO:  I reiterate my

24       objection.

1          MR. SEEGER:  Can he answer

2       the question, Stephanie?

3          THE WITNESS:  Sorry.  Would

4       you mind to repeat the question?

5          MR. SEEGER:  We have one

6       minute left on the videotape.

7       It's 11:30.  I would like to get

8       an answer to this question,

9       frankly.  So, I don't know how to

10      do this.  You want to switch the

11      tape really quick.

12  BY MR. SEEGER:

13      Q.    I would like an answer to

14  this question.  Mr. Che and Mr. Yang were

15  employees of TG that also went to work at

16  TTP?  Yes or no?

17         MR. SPANO:  Object again.

18      It's vague and misleading.

19         THE WITNESS:  These two

20      people, they join this company

21      called Tai'an (City) Taishan

22      Plasterboard Company.

23  BY MR. SEEGER:

24      Q.    Mr. Peng, it's TTP.  Are you

1    okay with TTP for that company; yes or

2    no?

3         A.    I am not used to it, but

4    I'll try my best to do it.

5         Q.    Thank you.

6               Could you answer the

7    question now?

8         A.    Mr. Che and Mr. Yang,

9    originally they worked for TG, and then

10   they joined to work for TTP.

11              MR. SEEGER:  Okay.  We've

12         been taking lunch at 11:30.  Do

13         you want to take your lunch break

14         now?

15              MR. SPANO:  It sounds like a

16         good stopping point.  Yes.

17              THE VIDEOTAPE TECHNICIAN:

18         The time now is approximately

19         11:37 a.m. and we're now off the

20         record.

21                    -  -  -

22              (Whereupon, a luncheon

23         recess was taken from 11:37 a.m.

24         until 12:47 p.m.)

1                    -   -   -

2              THE VIDEOTAPE TECHNICIAN:

3        This begins Tape 3 of today's

4        deposition.  The time now is

5        approximately 12:47 p.m., and

6        we're back on the record.

7              MR. CHEN:  This is Eugene

8        Chen.  I just wanted to make a

9        very brief statement.

10              At various times this

11        morning and right after we broke

12        for lunch, there were some

13        suggestions, I think, that we are

14        trying to coach the witness either

15        through the check interpreter or

16        through certain objections, and

17        there was the allegation that the

18        witness was coached to say certain

19        things in response to specific

20        objections.  I want to just note

21        for the record that that is

22        absolutely not true.  I think that

23        that would be, frankly, unethical,

24        and that's certainly not any kind

1            of conduct I would ever engage in

2            or I would ever let Ms. Yuan, who

3            is not here anymore, engage in.

4                I will note that at various

5            times throughout the past several

6            days of deposition, sometimes

7            you've asked me to help out,

8            sometimes you've asked me to limit

9            my comments through the check

10           interpreter.  And so we have

11           flagged for the check interpreter

12           certain issues where we think

13           interpretation issues

14           fundamentally change the nature of

15           the English question to the

16           Chinese.  This is not any kind of

17           accusation about the interpreter,

18           I realize interpretation is a

19           difficult task.  But there are

20           times when we believe that the

21           meaning has been fundamentally

22           changed from Chinese or from

23           Chinese back to English, and we're

24           only trying to note those in order

1           to clean the record and make sure

2           that it's an accurate record for

3           everybody.  There's no effort to

4           coach the witness, nor is there

5           any effort to deliberately delay

6           the depositions.  I just wanted to

7           make that very clear for the

8           record.

9               And I'll also just add, I

10          would never try to tell you how to

11          run the deposition, but as I noted

12          yesterday, the longer and the more

13          complicated sentences are, if

14          there are lots of clauses, then

15          the Chinese interpretation, I

16          think everybody, all the

17          interpreters will agree, becomes

18          very difficult, particularly

19          because there's involving

20          switching order.  I think the

21          interpreters refer to upside down

22          grammar.  I know that you're doing

23          it to try and make clear questions

24          and try to address objections, but

1          to the extent that questions can

2          be shorter, then I think that

3          will actually -- and more direct,

4          I think that will help speed up

5          the process.  That's just my

6          suggestion.

7                    MR. SEEGER:  I knew you made

8          that suggestion yesterday, I

9          appreciate it.  I've taken it to

10         heart.  I mean, nobody has

11         perfected the process of the

12         perfect question, but, you know,

13         we're trying to do what we can do.

14                   On the other point you make,

15         though, Gene, I have to tell you,

16         and I'm actually surprised you're

17         raising it for the record, because

18         your understanding is based upon

19         you, obviously, overhearing a

20         conversation that occurred amongst

21         counsel off the record and in the

22         hallway.  But since you've raised

23         it, I'll say this.  I don't see a

24         point -- and I would not have

1            raised this for the record, but

2            since we're on the record -- I

3            don't see a point in making an

4            objection to every single

5            question.  Now, that's every

6            attorney's right, and I have never

7            criticized you for it.  I don't

8            think we've argued over it.  But

9            when you have a witness that

10           doesn't understand English and you

11           want the words "object to form"

12           relayed to the witness who doesn't

13           understand English in his

14           language, it does leave one to

15           speculate, and I think you've

16           heard this speculation, about why

17           that's even necessary.  Because it

18           has to have meaning to him other

19           than the word objection,

20           otherwise, just to let him know

21           his attorney has objected, but you

22           guys have wanted everything

23           translated, not just objection,

24           but you want objection, form, and

1           then when you give speaking

2           objections, which we've objected

3           to and marked the record numerous

4           times, you want those relayed to

5           the witness also in his native

6           tongue so he understands what the

7           attorney said.  Frankly, unless

8           there's some purpose for it, I

9           just don't see the reason for it.

10          But, you know, again, it was

11          something I would not have called

12          you out on on the record, but you

13          raised it, and that's how I feel

14          about it.

15               MR. CHEN:  Actually, let me

16          just note, I did not overhear any

17          conversations.

18               MR. SEEGER:  Nobody said

19          anything on the record that you're

20          responding to.  So, I don't know

21          what you're responding to.  I'm a

22          little confused by that.

23               MR. CHEN:  There was a

24          reference earlier by the

1          interpreter that we are coaching

2          the witness through Ms. Wong, the

3          check interpreter.  I'm addressing

4          that comment.  And there were

5          comments made over the break that

6          we clearly coached the witness to

7          say specific things in response to

8          certain objections.

9               MR. SEEGER:  I wasn't aware

10          of that.  But I will say this

11          again since you've raised it.  I

12          think the confusion here, if

13          there's any, is because you speak

14          Chinese, Gene, there's another

15          attorney from Hogan Lovells that

16          speaks Chinese, and you have a

17          check interpreter.  Your check

18          interpreter from time to time

19          weighs in.  From time to time

20          you've weighed in.  Now you have a

21          third person in the room that I

22          see -- frankly, this is what I

23          see -- passing notes to the check

24          interpreter comparing

```
 1              translations.  You've got to make
 2              the call as to what you want to
 3              do.  If you guys want to muddy the
 4              waters on your check interpreter,
 5              that's totally your call.  But
 6              that's what you're doing, the way
 7              I see it.  Otherwise, it would
 8              just be our interpreter, who both
 9              sides have agreed to is highly
10              qualified, nobody has challenged
11              her qualifications, and the check
12              interpreter from time to time
13              weighing in.  That's really how it
14              should have been.  We've all been
15              very lenient.  I have received,
16              actually, some criticism, I think,
17              because of the amount of leniency
18              I've had with allowing you to
19              weigh in, and then we have other
20              people weighing in, Mr. Spano
21              objects, he has every right, he's
22              with the witness, but, you know,
23              you've got a few people on your
24              side weighing in.  So there's a
```

1          lot of confusion being created by

2          that in my view.

3               MR. CHEN:  The simple issue

4          is that at times, you've asked me

5          to jump in.  At times, you've

6          asked me to channel my comments

7          through the check interpreter.

8          There are times when I believe

9          that the question and the answers

10         have been fundamentally changed

11         such that there is an incorrect

12         record or where I think a lot of

13         what you perceive as delay is

14         actually issues with

15         understanding.  And to the extent

16         that I can try and help, I'm

17         trying now to channel my comments

18         through the check interpreter.  If

19         you think that passing notes to

20         her suggests that I'm somehow

21         muddying the waters --

22               MR. SEEGER:  No, not you.

23         It wasn't even you I was referring

24         to.  It was the woman attorney

1          that was sitting behind you.

2               MR. CHEN:  Right.  Exactly.

3          I asked her not to make any

4          comments on the record.  I asked

5          her if there's anything you catch

6          that is a material mistake -- and

7          let me also say there are a lot of

8          issues that I think can be

9          objected to in the interpretation,

10         and, again, this is not a personal

11         attack, it's just the nature of

12         the translation process.  We have,

13         in an effort to try and speed

14         things up, not objected to a lot

15         of things.  We've tried to focus

16         our comments and our objections on

17         what I think are really material

18         issues that really confuse the

19         record.  And so I just wanted to

20         make clear that that's what we're

21         trying to do.

22              MR. SEEGER:  Look, I

23         disagree with that.  But I've got

24         to tell you, it's difficult when

1          both sides have agreed to an

2          interpreter, and you speak

3          Chinese, and another colleague

4          from your law office speaks

5          Chinese, then you have a check

6          interpreter, everybody wants to

7          weigh in on a word.  I haven't

8          really yet heard a material

9          disagreement except one or two

10         times.

11              You know, the other part

12         I've asked you to help on,

13         frankly, is your witness comes in

14         after three days of deposing two

15         other witnesses and acts like he

16         doesn't know what TTP means.  And

17         I think we all know that that's

18         disingenuous.  So, I said to you,

19         can you just correct it, just

20         correct it once and for all so we

21         don't have to waste any time on

22         it.

23              MR. CHEN:  Let me just note

24         that on Page 54 of the record,

1        which was about 10, 15 minutes

2        into the last round, I actually

3        tried to correct that issue.

4              MR. SEEGER:  You did.  I

5        appreciate it.

6              MR. CHEN:  And the check

7        interpreter stepped in and said

8        no, no, no, he specifically said

9        it's different.  And I don't

10       believe that he actually ever said

11       that.  Obviously we can check the

12       video record.  But 10 minutes into

13       the last round, I think that issue

14       would have been quite resolved.

15             I don't think we need to

16       debate this issue.  I just wanted

17       to make it clear on the record

18       that we're not trying to instruct

19       the witness, we're not trying to

20       delay or muddy the record.  In

21       fact, we're trying to make it

22       clearer and make it accurate.

23             MR. SEEGER:  That's your

24       position on it, Gene, and I

1              appreciate it.

2    BY MR. SEEGER:

3              Q.    Mr. Peng, would you tell us

4    who exactly Apollo Yang is and what

5    position he held in 2006 with TTP?

6              A.    Salesperson.

7              Q.    And what about Bill Che?

8              A.    Also a salesperson.

9              Q.    So, at this time in 2006,

10   it's you, Mr. Yang and Mr. Che.  Are you

11   the sales and trade department of TTP at

12   this point or are there others involved

13   in sales and trade?

14             A.    In the year 2006, the three

15   of us, we were not the department of

16   foreign trade, and the three of us were

17   also doing all the sales.

18             Q.    Mr. Peng, what is your

19   current e-mail address?  Please write it

20   on a piece of paper.

21             A.    Do I have to write it?

22             Q.    Yes.  And Mr. Peng, would

23   you please, if you could, write it both

24   in Chinese and English.

```
 1            A.     My e-mail is only got
 2     numbers.
 3            Q.     Okay.  Do you know it?
 4            A.     I can write that.
 5            Q.     Thank you.
 6                   May I see it?
 7            A.     (Handing over document.)
 8            Q.     For the record, it is
 9     8812017538@163.com.
10                   How long has this been your
11     e-mail address, Mr. Peng?
12            A.     More than three years.
13            Q.     More than three years?
14            A.     Around three years regarding
15     the concrete time.  Finish.
16            Q.     Mr. Peng, is it more than
17     four years?  I'm just trying to get a
18     rough sense.  You said more than three
19     years.  Could it be more than four years?
20            A.      It is difficult to say, and
21     to be accurate, I don't recall.
22            Q.     When you've used the name
23     Frank Clem, has that been the same e-mail
24     address as the one you've written on that
```

 1   piece of paper?

 2        A.    I did not hear clearly the

 3   question.

 4             MR. SEEGER:  Can you just

 5        repeat it to him.

 6             (Interpreter repeats the

 7        question.)

 8             THE WITNESS:  In this

 9        e-mail, I will use this name.

10   BY MR. SEEGER:

11        Q.    I don't understand his

12   answer.

13             When he uses the name Frank

14   Clem in business dealings, does he use

15   the e-mail address that he just wrote on

16   this piece of paper?  That's my question.

17        A.    I don't understand the

18   question.

19        Q.    Mr. Peng, I'm going to put

20   in front of you an e-mail address.  I

21   would like you to identify what this is,

22   if you can.  For the record, it is

23   CLEMPW1123@163.com.  Could you please

24   tell us what that is?

```
 1              A.    It is an e-mail that I used.
 2    I used it.
 3              Q.    During what time period?
 4              A.    I used this e-mail address
 5    before the other e-mail I just wrote
 6    down.
 7              Q.    When did you start using the
 8    e-mail address that I put in front of
 9    you, which spells out Clem, and then it's
10    got some other characters there?
11              A.    Is it this one,
12    (indicating)?
13              Q.    Yes.
14              A.    I've been using this since I
15    went to school.
16              Q.    And do you currently use the
17    address, the one that's in front of you,
18    with the word Clem spelled out?  Do you
19    currently use that address?
20              A.    I don't use it now.
21              Q.    Did you use the address
22    that's in front of you, the one that has
23    Clem spelled out in it, for business
24    purposes?
```

1           A.      I did.

2           Q.      Have you used it in

3    connection with business that you've done

4    as an employee of TG?

5           A.      When I worked for TG, I

6    did -- I had used this e-mail address

7    before.

8           Q.      And you used it while you

9    worked at TTP as well, in 2006 and 2007,

10   correct?

11          A.      This I don't recall.

12          Q.      Mr. Clem, while you were

13   with TTP, you were involved in shipping a

14   lot of drywall -- involved with either

15   the shipping or the sale of a lot of

16   drywall to the United States?  Wouldn't

17   that be a fair characterization?

18          A.      This question to me, it

19   doesn't seem to be very clear.

20          Q.      Well, your job while you

21   were with TG and TTP was to sell drywall

22   to foreign companies, correct?

23          A.      When I work for TTP, mainly

24   I did the sales including mainly for the

1    Chinese companies or for the companies in

2    China.  Of course when foreign companies

3    come to buy, I also do it.  Finished.

4         Q.    Mr. Peng, you marketed, you

5    personally marketed the company you

6    worked for in 2006 and 2007 as having a

7    lot of experience selling drywall in the

8    United States.  Isn't that true?

9              MR. SPANO:  Objection to

10             form.

11             INTERPRETER 1:  Counsel, the

12             word "marketed" can be translated

13             like the last time into at least

14             more than three different ways.

15             So, I'm trying to use all three

16             different ways to --

17             MR. SEEGER:  I want to use

18             it in almost like the advertising

19             sense.

20             INTERPRETER 1:  Okay.

21             THE WITNESS:  I did not

22             do -- I did not market.

23   BY MR. SEEGER:

24        Q.    You promoted --

1                You, yourself, promoted your

2    company as having a lot of experience

3    selling drywall in the United States.

4    Isn't that true, Mr. Peng?

5          A.    I don't recall I said that.

6          Q.    I'm not asking you if you

7    said that specifically.  I'm asking you

8    if you were engaged in the activity of

9    promoting, actively promoting your

10   company for sales of drywall in the

11   United States?

12               INTERPRETER 1:  Counsel, the

13          word "in" is difficult to

14          translate in the United States.  I

15          did it in two different ways.

16               THE WITNESS:  I did not do

17          that.

18   BY MR. SEEGER:

19          Q.    Mr. Peng, if you were

20   selling 600,000 sheets of drywall every

21   month in 2006 to companies in the U.S.,

22   would you think that that's selling a lot

23   of drywall?

24          A.    What time period are you

1    referring to?

2          Q.    It's the same time period,

3    2006.

4                MR. SEEGER: (Addressing the

5          interpreter.)

6                Did you say that in my

7          question?  Because I said it in

8          the question.

9                INTERPRETER 1:  In 2006 to

10         the United States, to companies in

11         the United States.  You did say

12         that.

13               MR. SEEGER:  So, tell him

14         2006.

15               THE WITNESS:  That is not a

16         very big number.

17   BY MR. SEEGER:

18         Q.    600,000 sheets a month is

19   not a big number?  I just want to be

20   clear on his answer.

21               INTERPRETER 2:  The

22         interpreter did not include

23         600,000 sheets a month, monthly.

24               MR. SEEGER:  Please,

1        Stephanie, repeat the question to

2        him the way I said it.

3              (Interpreter repeats the

4        question.)

5              THE WITNESS:  To sell this

6        much, that is not a small number.

7              INTERPRETER 2:  The witness

8        said, monthly sales of this number

9        is not a small number.

10             INTERPRETER 1:  It is the

11       same.

12             MR. SEEGER:  Would you

13       please mark this as Exhibit 3.

14                   -  -  -

15             (Whereupon, Deposition

16       Exhibit Peng-3, E-mail chain, top

17       one dated 5/12/2006, Bates stamped

18       TG 0000415, was marked for

19       identification.)

20                   -  -  -

21   BY MR. SEEGER:

22       Q.   Mr. Peng, I would like you

23   to take a quick look at an e-mail that

24   I've marked as Peng Exhibit 3.

1            MS. BASS:  Bates.

2            MR. SEEGER:  It's Bates

3       number TG 0000415.

4            MS. BASS:  Thank you.

5  BY MR. SEEGER:

6            Q.   Now, Mr. Peng, I see you

7  looking this e-mail over.  You can read

8  that e-mail, right?

9            A.   Yes, I can.  But if I have

10  to look at it, I would have to make an

11  effort -- would require some time, and I

12  would have to look at it little by

13  little.

14            Q.   Mr. Peng, you wrote this

15  e-mail, didn't you?

16            A.   According to the information

17  in this e-mail, it reflected that it was

18  written by me.  But as a matter of fact,

19  inside my brain, I don't have such a

20  recollection.

21            Q.   Who is Darren Dai, D-A-I?

22            A.   This person, I have no

23  recollection.  But basing on this e-mail,

24  this person wrote to me they want to buy

1  drywall and -- but now I don't have a

2  recollection.

3      Q.    So, you were --

4            Just to be clear for the

5  record, Mr. Peng, you were able to read

6  and understand what this e-mail in

7  English says in front of you, right?

8      A.    I can read something simple

9  or maybe I can read some words, but I

10 need dictionaries or I may need help from

11 other people.

12           MR. PANAYOTOPOULOS:

13           Objection, nonresponsive.

14 BY MR. SEEGER:

15     Q.    Mr. Peng, let me ask you

16 this.

17           Well, first let me ask you

18 this.  Just answer me yes or no if you

19 can.  If you need to explain, let me

20 know.  You can read this e-mail that you

21 wrote in English, can't you, sir?

22     A.    This question I cannot

23 respond to you as yes or no for the

24 concrete situation.  I need to explain.

1      Q.    Let me ask you a different

2   question.  In what countries do you sell

3   drywall that's this size, 4 feet by 8

4   feet by half inch?

5      A.    Regarding drywall of this

6   measurement, we trade this in the

7   factories in China, I mean, the domestic

8   market.  I don't know exactly where can

9   this be shipped to, and I don't know

10  which country can this be shipped to.

11     Q.    Mr. Peng, in light of that

12  answer, I want to ask you if you can read

13  what you wrote to Mr. Darren Dai in this

14  e-mail for the record in English where it

15  starts right here.  Could you read from

16  here to here, (indicating)?  Would you be

17  able to do that?

18     A.    To read it right now?

19     Q.    Yes.  Would you be able to

20  read this for the record in English, the

21  e-mail that he wrote?

22            INTERPRETER 1:  Read it now?

23            MR. SEEGER:  Yes.

24            INTERPRETER 1:  Because the

1      Chinese word "read" can be
2      translated as look at it --
3           MR. SEEGER:  No.
4           INTERPRETER 1:  -- or to
5      read it out loud.
6           MR. SEEGER:  I would like to
7      read it out loud.
8           MR. SPANO:  Objection.  I
9      think it's unwarranted to subject
10     the witness to that kind of
11     embarrassment and harassment, to
12     ask him to read out loud in
13     English.  And what he can read out
14     loud in English is utterly
15     irrelevant to anything that's
16     under discussion here.  I think
17     the inquiry into his level of
18     understanding, whether he
19     understands what he read, whether
20     he understands what he wrote, I
21     think is perfectly appropriate,
22     but I feel it's humiliating to ask
23     someone with his faulty English to
24     read something into the record.

1           It's not pertinent at all.

2               I haven't made any speaking

3       objections yet today, but I have a

4       serious problem with that.

5               MR. SEEGER:  Mr. Spano, I

6       hear you.  The problem that we're

7       going to have with your objection

8       is the fact that your client wrote

9       this e-mail in English.  I don't

10      think it's unreasonable to ask a

11      man, anybody who writes an e-mail

12      in English, to read it.  Now, he

13      has a right to say, I'm not going

14      to read it.  I think we all know

15      he can read it.  But it's the

16      witness's call.

17              MR. SPANO:  Again, I didn't

18      instruct him --

19              MR. SEEGER:  I will say

20      this --

21              MR. SPANO:  I didn't

22      instruct him not to answer, but I

23      think it's highly inappropriate,

24      and I don't think it's pertinent

1          to the issues that I acknowledge

2          you have the right to establish

3          through your question.

4               MR. SEEGER:  I think saying

5          it's highly inappropriate to ask

6          somebody to read an e-mail they

7          wrote is hyperbole.  But having

8          said that, there's no effort on my

9          part to harass this man or to

10         humiliate him in any way.  I'm

11         asking him to read an e-mail he

12         wrote for the record.  I can read

13         it, but I'm asking him to read it.

14              MR. SPANO:  Ms. Stephanie,

15         if you haven't interpreted all of

16         that, you don't have to, just as

17         long as my objection is on the

18         record.

19    BY MR. SEEGER:

20         Q.   Would you ask the witness

21    again if he would read the e-mail in

22    English out loud?

23         A.   Are you asking me to read

24    out now of this document, or are you

1    asking am I able to read this?

2         Q.    I am asking Mr. Peng if he

3    would read this -- if he's capable of and

4    would he be willing to read this e-mail

5    that he wrote out loud so we all can hear

6    what the content is right now?

7         A.    Okay.  When I wrote this, I

8    rely on the dictionary.  I might be able

9    to read it, but, first of all, it was a

10   very long time ago.  Secondly, at that

11   time, I was relying on other tools,

12   therefore, reading it would be difficult.

13   But if I must try to push myself to read

14   it, maybe, but reading it, I still have

15   difficulty.

16        Q.    Just tell him I'm asking,

17   respectfully, if he would mind trying to

18   read it in English for the record.  If he

19   doesn't, I'm more than happy to read it.

20        A.    I still -- in order to save

21   time, I find that it is very difficult --

22   I still have difficulty reading it.  Why

23   don't you, Mr. Attorney, to read it.

24        Q.    Okay.  I will read it.

1    Please follow along with me, Mr. Peng,

2    the e-mail that you wrote.

3              This e-mail is written on

4    May 12, 2006.  It says, "Dear...Darren.

5    Thank you very much for your enquiry on

6    gypsum board.  It is our hope to get" an

7    "agreement with you at the earliest

8    time."

9         A.    Can you read it slowly.

10        Q.    Oh, yes.

11             "As requested, I would like

12   to reply you as following:

13             "First," we're "exporting

14   our gypsum board to the USA with quantity

15   of 600000 sheets every month.  We have

16   much experience on exporting to the USA.

17             "Second, we can produce" 4

18   by 8 by half inch and 4 by 12 by half

19   inch and 4 by 8 by 5/8ths and 4 by 12 by

20   5/8ths "gypsum board.  But at this

21   moment, we normally produce half inch

22   gypsum board, and we have get the test

23   report according to ASTM standard.

24             "Third, we usually export

1    gypsum board both by container of 40 HQ

2    and break bulk.  If your order less than

3    100000 sheets for each shipment, I

4    suggest you take container of 40 HQ.

5                    "Thank you and best wishes!

6                    "Yours faithfully, Frank."

7                    Mr. Peng, were you able to

8    follow along with me?

9                    MR. SPANO:  Objection to

10              form.  I'm objecting to the extent

11              that you misquoted the document.

12                    MR. SEEGER:  Would you

13              please point out where I misquoted

14              the document?

15                    MR. SPANO:  I don't want to

16              take time to do that.

17                    MR. SEEGER:  No.  That's an

18              important one, because you're

19              suggesting I misread something.  I

20              don't think I did.  I'm more than

21              happy to take the correction and

22              fix the record right now.

23                    MR. SPANO:  If you insist, I

24              will.

1              MR. SEEGER:  Mr. Spano, you

2         made an objection that I misquoted

3         the document.  Now you want to go

4         back and read what I said and read

5         the document.  You can't do that.

6         You have to have something in mind

7         when you made the objection.  What

8         was it?

9              MR. SPANO:  Yes.  You

10        shortened "we are" to "we're."

11        You said the dimensions "by"

12        when --

13             MR. SEEGER:  Instead of the

14        little star that was there?

15             MR. SPANO:  Right.  So, my

16        suggestion is that the document

17        will speak for itself.  It's

18        marked as an exhibit.  I didn't

19        want to waste time on these little

20        things, but I was just making an

21        objection.

22             MR. SEEGER:  I just wanted

23        to make sure it wasn't something

24        material, but, again, the record

 1            is what it is.

 2                  I have a pending question, I

 3            think.

 4                  What was the pending

 5            question, Linda?

 6                        -  -  -

 7                  (Whereupon, the requested

 8            portion of the transcript was read

 9            by the court reporter as follows:

10                  "Q.  Mr. Peng, were you able

11            to follow along with me?")

12                        -  -  -

13                  THE WITNESS:  I could not

14            follow up with the speed that you

15            read it.

16  BY MR. SEEGER:

17            Q.    What about the statement

18  that you made in this document about your

19  "much experience on exporting to the"

20  United States?  Those were your words at

21  that time, correct, sir?

22            A.    This sentence, I got it from

23  the teaching material when I went to

24  school.  I got it from that material and

1    revised that.

2          Q.   So, you couldn't remember

3    ever making this statement, but now you

4    remember exactly where you got it from.

5    Is that what you want us to believe, Mr.

6    Peng?

7                MR. SPANO:  Objection to

8           form.

9                THE WITNESS:  Looking at

10          this e-mail, I am sure at that

11          time my English level was not able

12          to write down this type sentence,

13          this level of English.  Therefore,

14          I check it out from the teaching

15          materials when I went to school.

16          I got this content from the

17          teaching material.  I use it to

18          express what I wanted to say.

19   BY MR. SEEGER:

20          Q.   Mr. Peng, when you made the

21   statement that you have much experience

22   exporting drywall to the United States,

23   was that a true or a false statement?

24          A.   Well, when this was written,

1    it is the meaning like this.  Under the

2    condition at that time, some of the

3    customers, they purchased the drywall

4    from our company, and then they reflected

5    to us, they told us sometimes they ship

6    it to the United States.

7            Q.    At the time, you said, "We

8    have much experience." In May of 2006,

9    when you said, "We have much experience

10   on exporting to the" United States, was

11   that a true or a false statement at that

12   time, Mr. Peng?

13           A.    In May of 2006, at that

14   point, I was only saying I realized the

15   drywall for the thickness of 12.7

16   millimeters, it was possible that it was

17   able to be used in the United States.

18   Regarding this type of drywall, if the

19   customers, they require this kind of

20   measurement, we relatively familiar with

21   in terms of the packaging and the

22   shipment.  If the customers, they require

23   this kind of measurement of drywall, we

24   can do it for them.

1          Q.    What customers outside of
2    the United States asked for measurements
3    in feet as opposed to millimeters or
4    centimeters or meters?
5          A.    Customers from Canada, from
6    Panama, from Africa, they will ask the
7    kind of measurement in feet or in inches.
8          Q.    Mr. Peng, where in this
9    e-mail do you mention customers from
10   Canada, Panama or Africa?
11         A.    In this e-mail?
12         Q.    Uh-huh.
13         A.    I did not say that -- I did
14   not say I mention this in this e-mail.
15   What I mean is that this kind of
16   measurement by the inch, by the feet, I
17   was responding to your earlier question.
18   You were asking about what other
19   countries would be using the measurement
20   of feet and inches.  I answer you -- I
21   answer to your question to tell you the
22   answer.  I did not say that it was in
23   this e-mail.
24         Q.    Thank you.

1          Mr. Peng, when was TTP

2    formed, what year and month, if you know?

3          A.    According to my

4    recollection, it was in the year 2006 in

5    the month of February.

6          Q.    So, Mr. Peng, from February

7    2006 to May of 2006, you formed all this

8    experience in exporting to the United

9    States that's referenced in your e-mail?

10   Is that what your recollection is?

11         A.    I just mentioned earlier

12   that my level was very limited.  And in

13   this e-mail where I was not very good to

14   express my meaning -- I mean in terms of

15   expressing what I want to say, it was not

16   accurate.  It was not objective.  It

17   requires me to give explanation of what I

18   want to express in this sentence of what

19   I said.  Do you want me to give an

20   explanation?

21         Q.    I would like to ask a

22   different question at this point, and

23   then if he wants to come back, he should

24   remind me, and I'm okay with that.  But

1    let me ask a different question.

2              Mr. Peng, this e-mail says

3    that you say we're "exporting...gypsum

4    board to the" U.S. with a "quantity of

5    600,000 sheets every month."  My question

6    to you is, three months after TTP

7    started, it was already shipping 600,000

8    boards of gypsum a month to the USA; is

9    that correct?

10        A.    That is not what I meant.

11        Q.    But your e-mail says you're

12   shipping 600,000 boards a month in May of

13   2006.  Was that also a false statement?

14             MR. SPANO:  Objection to

15        form, mischaracterizes.

16             MR. SEEGER:  I'm going to

17        strike that question.

18   BY MR. SEEGER:

19        Q.    Your e-mail says you were

20   shipping 600,000 sheets of e-mail every

21   month.  Was that true or false?

22             MR. SPANO:  Objection to the

23        form, mischaracterizes the e-mail

24        again.

1          THE WITNESS:  What I mean in
2          this e-mail was our company has --
3          can produce this amount of drywall
4          with the thickness of 12.7 mm.  If
5          you have such a requirement, we
6          can produce it.
7          MR. PANAYOTOPOULOS:
8          Objection, nonresponsive.  I would
9          appreciate a yes or no, and then
10          he can explain, but we're not
11          getting any responsive answers
12          from this witness.
13     BY MR. SEEGER:
14          Q.   Can the witness answer my
15     question yes or no?
16          MR. SEEGER: What did he say?
17          INTERPRETER 1:  Both -- he
18          was saying no, no, but the first
19          "no" and the second "no" are using
20          different Chinese words.
21          MR. SEEGER:  Did he mean
22          something different by those two
23          "nos"?
24     BY MR. SEEGER:

1          Q.    Mr. Peng, you used two

2    different ways in Chinese of saying "no."

3    Is there a reason for that?

4          A.    I said "no."  To me, two

5    "nos" has no differences.

6          Q.    Mr. Peng --

7                MR. PANAYOTOPOULOS:  I'm

8          sorry, which question was he

9          answering, your question on

10         whether he can answer your

11         question or your original

12         question?

13               MR. SEEGER:  He gave two

14         "nos."  I interpreted one no, but

15         how do you want to do this?

16               Was he answering my question

17         with the "no"?

18               INTERPRETER 1:  He was

19         saying that both "no," the

20         expression that he used has the

21         same meaning.

22    BY MR. SEEGER:

23         Q.    Let me ask it again.

24         A.    Can I have a drink of

1    some --

2         Q.    Scotch?

3         A.    No.  Can I drink some water?

4         Q.    (Handing over water.)

5         A.    Thank you.

6         Q.    You're welcome.

7               Mr. Peng, let's try this one

8    more time.

9               When you said in your e-mail

10   that "We are exporting...gypsum board to

11   the" US at the "quantity of 600000 sheets

12   every month," is that a true or a false

13   statement?

14        A.    Are you asking me true or

15   false of this statement or the fact we

16   are expect -- the matter we are exporting

17   gypsum board to the United States at a

18   quantity of 600,000 sheets every month to

19   be true or false?

20        Q.    I'm asking you if in May of

21   2006, when you wrote to this gentleman

22   that you are exporting gypsum board to

23   the USA with a quantity of 600,000 sheets

24   every month, I'm asking you if you told

1    him the truth or you told him something

2    that wasn't true?

3           A.    I did talk about it earlier.

4    Let me explain to you now.

5           Q.    If he can answer yes or no

6    to my question, I'd appreciate it.

7           A.    Okay.  Let me say this.  The

8    situation at that point, according to

9    this question, is like this.  My company

10   did not export this amount each month.

11   But if you want me to tell you the

12   meaning of this sentence, I can explain

13   this.

14          Q.    No, thank you.

15                When you said, "We have...

16   experience" -- "We have much

17   experience" -- I'm sorry, strike that.

18                When you said, "We have much

19   experience on exporting to the USA," was

20   that a true statement at that time or was

21   that not a true statement at that time?

22          A.    To respond to this question

23   where there are concepts, the word

24   "experience," what do you mean by the

1   so-called experience?  We mean we were

2   relatively familiar with the details of

3   production and packaging of drywall of

4   this type of measurement.  But when I

5   look at it now, we did not try to express

6   the opinion that we had a lot of

7   experience to export to the United

8   States.

9               MR. PANAYOTOPOULOS:  I'm

10          sorry, I couldn't hear that

11          answer.  Was that a yes or a no?

12               THE WITNESS:  Do you want me

13          to repeat my answer?

14               MR. SEEGER:  No.

15               MR. PANAYOTOPOULOS:  No.

16          Was it true or false?

17               MR. SEEGER:  Hold on, Nick.

18          Nick, you'll get a chance to --

19               MR. PANAYOTOPOULOS:  I'm

20          sorry.

21   BY MR. SEEGER:

22          Q.   Let me follow up.

23               Mr. Peng, why don't we make

24   this a little easier.  The experience

1    that you're referring to in this e-mail,

2    the shipments of 600,000 a month, you're

3    really referring to the experience and

4    the shipment history of TG and not TTP

5    here; isn't that true?

6              MR. SPANO:  Objection to

7         form, mischaracterizes the

8         document.

9              THE WITNESS:  I was

10         referring to the company of TTP.

11    BY MR. SEEGER:

12         Q.   So, Mr. Peng, why did you

13    use your TG e-mail address while you were

14    communicating here?

15              MR. SPANO:  Objection to

16         form.

17              THE WITNESS:  It is my

18         personal e-mail address that I use

19         for the company, which has nothing

20         to do with what company -- has

21         nothing to do with which company

22         for this address.  I apply for

23         this e-mail address myself when I

24         went to school, and now I'm using

1           this e-mail address for TTP.  In

2           the future, when I go to another

3           company, I may also use the same

4           e-mail.  Whatever e-mail that I

5           use has no -- it's not related to

6           the issue of the company.

7    BY MR. SEEGER:

8           Q.    So, let's just be clear

9    though.  You used the same e-mail address

10   for TG and for TTP; isn't that right?

11                MR. SPANO:  Objection to

12           form.

13                THE WITNESS:  Because at

14           that point when I joined TTP --

15           after I joined TTP, I haven't yet

16           applied for a new address,

17           therefore, I used another e-mail.

18           According to my own personal

19           habit, I used the e-mail that I

20           apply before.

21   BY MR. SEEGER:

22           Q.    So, the answer is, you used

23   the same e-mail address when you did work

24   for TG as well as doing work for TTP?

1    Can you answer that yes or no?

2         A.    Yes -- no, I said no.

3         Q.    Now I'm confused.  What's

4    his answer?

5         A.    No.

6         Q.    He did not use the same

7    e-mail address?  That's what he's saying?

8         A.    After I work for TTP, during

9    the earlier -- during the early period, I

10   use the same e-mail as the one for TG.

11   But later on, I used a new e-mail address

12   as I wrote it down.

13              Can I take a break?

14        Q.    What?

15        A.    Can I take a break?

16              MR. SEEGER:  Did he finish

17        his answer?

18              THE WITNESS:  Yes, I finish.

19   BY MR. SEEGER:

20        Q.    One last question and we'll

21   take a break.

22              The second e-mail address

23   that you got while working at TTP, you

24   now use that same e-mail address working

1    for TG, don't you?

2              A.    I also use the e-mail

3    address that applied -- apply at TTP now.

4                       -   -   -

5              (The court reporter repeated

6         the answer.)

7                       -   -   -

8              INTERPRETER 1:  No.  Let me

9         clarify that.  It was not clear.

10        Let me do it all over again.

11             THE WITNESS:  Now I also

12        used the e-mail address that I

13        applied at TTP.

14   BY MR. SEEGER:

15             Q.    And he uses it now, yes?

16   I've got the answer.

17             A.    Yes, I use it now.

18             MR. SEEGER:  Would you like

19        to take a break?

20             THE WITNESS:  Yes.

21             THE VIDEOTAPE TECHNICIAN:

22        The time now is approximately 2:03

23        p.m., and we are now off the

24        record.

1                      - - -

2                      (Whereupon, a recess was

3              taken from 2:03 p.m. until

4              2:14 p.m.)

5                      - - -

6                      THE VIDEOTAPE TECHNICIAN:

7              This begins tape 4 of today's

8              deposition.  The time now is

9              approximately 2:14 p.m., and we

10             are back on the record.

11     BY MR. SEEGER:

12             Q.    Mr. Peng, what are ASTM

13     standards?

14             A.    I am not sure about exactly

15     the content of it, but I think that it is

16     referring to the drywall.  They have

17     specific -- they have specific

18     requirement, and also they ask about the

19     specific details, and they have certain

20     requirements.

21             Q.    Okay.  And ASTM standards

22     apply to which country's standards?

23             A.    Some people told me that it

24     is for the United States.

1          Q.     Who told you that?

2          A.     I cannot recall.  I think it

3     was some customer, when he come to our

4     company to buy drywall.

5          Q.     Did you ever make drywall in

6     accordance with ASTM standards?

7               MR. SPANO:  Objection to

8          form.

9               THE WITNESS:  According to

10          my knowledge, there were standard

11          requirements for the drywall

12          called a C1396 and C36.  The

13          drywall made by TTP passed the

14          standard inspection, and I am

15          referring to the 12.7 mm thickness

16          drywall passed the ASTM standard

17          inspection.

18     BY MR. SEEGER:

19          Q.     Are those ASTM standards

20     you're referring to, Mr. Peng?

21          A.     I mean ASTM C1396 and C36

22     standards.

23          Q.     Did TG make drywall in

24     accordance with the ASTM standards?

 1          A.    TG made -- had made drywall

 2    with the thickness of 12.7 mm, but it did

 3    not send the product for inspection.  It

 4    did not send it to the center for

 5    inspection, to do inspection.

 6                        -  -  -

 7               (Whereupon, Deposition

 8          Exhibit Peng-4, E-mail chain, top

 9          one dated 2/10/2007, Bates stamped

10          TG 0000011, was marked for

11          identification.)

12                        -  -  -

13    BY MR. SEEGER:

14          Q.    Mr. Peng, I'm going to hand

15    to you what we've just marked as Exhibit

16    4.  I'll identify it for the record as TG

17    0000011.  It's an e-mail.  Who is Melvyn

18    Quek?

19          A.    Which line is it?  I can't

20    find it.

21          Q.    Well, do you know that name?

22          A.    I'm sorry.  Would you mind

23    to tell me what name?

24          Q.    Melvyn Quek, Q-U-E-K.

1           A.    Let me take a look.  Yes, I
2    see the name.
3                 From my recollection, this
4    person is an agent for the shipping
5    company.
6           Q.    Excuse me.  Oh, I can read
7    it.
8           A.    This person is an agent --
9           Q.    It is somebody you are very
10   close with, right?
11          A.    -- for the shipping company.
12                I am not very familiar with
13   him.
14          Q.    You are not very familiar
15   with him?  Mr. Peng, he refers to you as
16   "big bro" in this e-mail.  Do you see
17   that?
18          A.    This is the way he called
19   me.
20          Q.    Well, you remember he called
21   you big bro, you have a recollection of
22   that?
23          A.    What does it mean, "big
24   bro"?

1          Q.    What do you think it means?
2    Would you venture a guess, Mr. Peng, or
3    no?
4          A.    I know what this mean by
5    big, but I don't know what this mean by
6    bro.
7          Q.    Bro is short for brother.
8          A.    I know now.  Maybe as a
9    matter of courtesy, he just call it.  I
10   don't know him that well.
11         Q.    Do you see at the very top
12   of this e-mail, Mr. Peng, a part of this
13   is cut off, but it is an e-mail from you
14   at the very top, Peng.  Do you recognize
15   your e-mail address at the top?
16         A.    Are you referring to the top
17   one?
18         Q.    Is that your e-mail address?
19         A.    Yes, it is my e-mail.
20         Q.    That's what I'm talking
21   about.  Do you see it is to Melvyn?
22         A.    Yes.
23         Q.    And the date is February 10,
24   2007, and the subject is "Gypsum ship to"

 1   the "USA."  Do you see that?

 2           A.    Yes.   The subject is written

 3   there as such.

 4           Q.    Some of this is cut off.

 5   I'll do the best I can.  If you can fill

 6   in the blanks, please do that.

 7                MR. SEEGER:  Say that to

 8           him, and then I'll read it.

 9   BY MR. SEEGER:

10           Q.    It says "Fast times fly.  I

11   hope you and your business go very well.

12   Have a customer in America who need us to

13   ship about" 400 "sheets of gypsumboard to

14   Mobile USA.  So we need to find a ship to

15   Mobile.  Could you please offer any

16   relative shipping information?

17                "Looking forward to your

18   early reply.

19                "Happy spring festival!

20                "Yours" --

21           MS. BASS:  400,000.

22           MR. SEEGER:  I said 400,000.

23       What did I say?

24           MS. BASS:  400.

1                    MR. SEEGER:  I did?

2                    MS. BASS:  Yes.

3    BY MR. SEEGER:

4         Q.    Let me start over again so

5    we can make this clear.  Tell him I'm

6    going to start from the beginning.

7                    MR. SEEGER:  Thank you for

8         the catch.

9    BY MR. SEEGER:

10        Q.    "Fast times fly.  I hope you

11   and your business go very well.  Have a

12   customer in America, who need us to ship

13   about 400000 sheets of gypsumboard to

14   Mobile USA.  So we need to find a ship to

15   Mobile."  Can "you please offer any

16   relative shipping information?

17                   "Looking forward to your

18   early reply.

19                   "Happy spring festival!

20                   "Yours faithfully, Frank,

21   Taihe Group."

22                   Were you able to follow

23   along with me, Mr. Peng?

24        A.    I haven't finished reading

 1  yet.

 2          Q.    Okay.

 3          A.    Please wait for a second.

 4          Q.    Take your time.

 5          A.    I finished reading it.

 6          Q.    Do you see where the

 7  reference Taihe Group is?  Under his

 8  name.

 9          A.    (Indicating.)

10          Q.    Correct.  Right where you're

11  pointing.

12          A.    Yes.  I see this Taihe

13  Group.  What question do you have for

14  this?

15          Q.    Taihe Group, that's TG,

16  isn't it?

17          A.    No.

18          Q.    Are you sure about that?

19          A.    Taihe Group is the way that

20  society or the people call it.  It is not

21  a formal way to call it.

22          Q.    What is the "it" in the

23  sentence that you're talking about?  What

24  do you mean society's way to call it?

 1    What is the "it"?

 2              A.    What I mean is that the

 3    people in the neighborhood and the local

 4    residents, the people around the area,

 5    they work on the drywall, they call it

 6    that.  I think that is the way they call

 7    it being passed down in the society.

 8                    INTERPRETER 2:  The witness

 9              say that that is what people

10              around that neighborhood call the

11              drywall companies in that area as

12              Taihe Group.

13                    INTERPRETER 1:  It is the

14              same -- it means the same thing.

15    BY MR. SEEGER:

16              Q.    Mr. Peng, why did you put

17    Taihe Group under your name in this

18    e-mail?  I'm not asking about people in

19    the neighborhood.  I'm asking about you.

20              A.    I do not understand the

21    question.

22              Q.    You wrote that e-mail,

23    right, Mr. Peng?

24              A.    Yes, I wrote it down.

1          Q.     Why did you put Taihe Group

2    under your name?

3          A.     No, because when I was

4    writing the e-mail, I did not try

5    intentionally to write it like this.  I

6    was just telling the other party, we are

7    the factories making drywall from

8    Shandong Tai'an.

9          Q.     Is that something that just

10   is automatically put under your name by

11   the e-mail system you use?

12         A.     During certain time period,

13   it would be written like this.  It would

14   be changed once in a while.  Sometimes we

15   did not pay attention to it, it would be

16   kept.  We did not intentionally write it

17   like this.

18         Q.     Who would add this to the

19   e-mail?  Was there a programming person?

20   Was there somebody else that would do

21   this besides you?

22              MR. SPANO:  Objection, form.

23              THE WITNESS:  Inside the

24         e-mail system, there is a program,

1          a very simple program.  You can

2          set it up like this.

3     BY MR. SEEGER:

4          Q.    Did you set the program up?

5          A.    Yes, I set it up.

6                INTERPRETER 2:  This is my

7          mailbox, so, I set it up.

8                MR. SEEGER:  That's fine.

9                INTERPRETER 1:  No.  I

10        asked --

11                MR. SEEGER: It's fine.

12                INTERPRETER 1:  -- the

13        witness a second time.  That was

14        how he responded the second time.

15                MR. SEEGER:  It's okay.

16    BY MR. SEEGER:

17          Q.    Mr. Peng, have you actually

18    taken the time to take a look at the

19    Taihe website?

20          A.    What time period?

21          Q.    How about in the time frame

22    when you wrote this e-mail, 2007?

23          A.    Can you tell me which

24    website are you referring to as "the

1    Taihe website"?

2         Q.    Do you know if there's a

3    website called the Taihe Group website?

4    Are you familiar with that?

5         A.    Yes, I know this website.

6         Q.    Have you ever --

7              Have you looked at the

8    website is what I'm asking you actually?

9         A.    I rarely pay attention.  I

10   rarely browse about this.

11        Q.    Well, you're aware that the

12   website the Taihe Group is a website for

13   TG?  Are you not aware of that?

14        A.    I know the website for TG

15   was being set up like this.

16        Q.    And who is the chairman of

17   TG?

18              INTERPRETER 1:  Chairman of

19         the board?

20              MR. SEEGER:  I'll tell you.

21         Hold on a second.

22   BY MR. SEEGER:

23        Q.    Who is the Chairman of the

24   Board of TG?

1          A.     What time period?

2          Q.     2007.

3          A.     I am not sure.  It should be

4     Mr. Jia.

5          Q.     Was Mr. Jia ever the

6     chairman or an employee or an officer or

7     a director of TTP as far as you know?

8               INTERPRETER 1:  Counsel, the

9               title chairman or officer has many

10              ways to translate.

11              MR. SEEGER:  Strike the

12              question.  Strike the question.

13    BY MR. SEEGER:

14         Q.     Was Mr. Jia ever the

15    chairman of the board or an employee or a

16    manager or a director of TTP as far as

17    you know?

18         A.     Mr. Jia, you're talking

19    about Mr. Jia Tongchun?

20         Q.     Yes.

21         A.     From my recollection, Mr.

22    Jia did not take up the position at TTP

23    as what you refer to as the Chairman of

24    the Board or the other titles that now I

1    cannot recall of what you said.

2           Q.    I'm asking him if he knows

3    if Mr. Jia ever held the position as

4    chairman of the board, manager or a

5    director of TTP?

6           A.    According to my knowledge,

7    no.

8           Q.    Mr. Peng, the next e-mail

9    right below the one at the top that we

10   were looking at, can you take a look in

11   the middle of the page?

12          A.    I can see the middle.

13          Q.    Do you see where it says --

14   and it's another e-mail.  It's from you

15   to Melvyn.  It's dated December 2, 2006,

16   and the subject says "Metal Studs to

17   USA."

18               MR. SEEGER:  Just point out

19         where I am, Stephanie, for him,

20         please.

21   BY MR. SEEGER:

22          Q.    I'm going to read the

23   e-mail.  It says, "Dear...Melvyn, How are

24   you doing now!  We have a customer who

1  want to ship metal studs from China to
2  USA."  Do you see where I am?
3       A.    Yes, I can see that.
4       Q.    Now, you wrote this e-mail
5  also, right, Mr. Peng?
6       A.    Yes, I look at the e-mail.
7  Yes, I wrote this.
8       Q.    And do you see your name
9  right below that where you say "Yours
10  faithfully, Frank"?  It says "Shandong
11  Taihe Dongxin Company, Ltd."  Do you see
12  that?
13       A.    I see that.
14       Q.    Mr. Peng, that's TG, isn't
15  it?
16       A.    Because the name was changed
17  to TG, it was called Shandong Taihe
18  Dongxin Company Limited.
19       Q.    Right.  Mr. Peng, the name
20  you just gave, Shandong Taihe Dongxin
21  Company Limited, is the same company as
22  TG, correct?
23       A.    This name was the name
24  before they changed the name into TG.  I

1   did mention earlier, what was written

2   under the signature, it was being set up

3   by the program.  If we did not change it,

4   it would be put there.

5          Q.    Mr. Peng, this is an e-mail,

6   and in two instances where your name is,

7   in neither of those instances did you

8   represent yourself as an employee of TTP,

9   did you?

10         A.    When I wrote this e-mail, I

11  have already worked for TTP, and also

12  subjectively, I consider myself working

13  for T -- this was the work that I do for

14  TTP.  But just like what I mentioned

15  earlier, what this is under the

16  signature --

17         Q.    We don't have a complete

18  answer from the last --

19              MR. SEEGER:  Stephanie, your

20         voice, you have to keep it loud,

21         because I'll tell you, you said,

22         "subjectively I consider myself

23         working for," and there's a blank

24         there.  Did he say TG?

1           THE WITNESS:  Working for

2           TTP.  This was the business I did

3           for TTP, just like what I

4           mentioned earlier.  Those wordings

5           under my signature, they were the

6           settings from the program.  If I

7           did not pay attention after a long

8           time, if I did not bother with it,

9           then what was being set up by the

10          program would remain.

11  BY MR. SEEGER:

12          Q.    You set up, you did these

13  settings from the program yourself,

14  right, Mr. Peng?

15          A.    Yes, I set this up, but I

16  did not pay attention to it every day.

17  Sometimes when I think about it or after

18  a long time, I did not really pay

19  attention to it.

20          Q.    Well, two months apart, in

21  one instance you put your name under the

22  company Shandong Taihe Dongxin Group,

23  which we agree is TG, and then two months

24  later, you sign off as Frank from Taihe

```
 1    Group.  That's correct, right?
 2          A.    It is being written down in
 3    this e-mail.
 4          Q.    Mr. Peng, TTP only
 5    manufactured drywall; isn't that right?
 6          A.    Yes.
 7          Q.    TG sold metal studs,
 8    correct, sir?
 9          A.    Incorrect.
10          Q.    TG never sold metal studs?
11          A.    What was referring to by
12    this e-mail was by TTP.  This is the
13    information of TTP.
14          Q.    I was just asking, did TTP
15    manufacture and sell metal studs?
16              MR. SPANO:  Objection to
17              form.  Note my objection.
18              THE WITNESS:  I don't know
19              about what you're saying about
20              production -- manufacturing and
21              sale.  Would you mind to make it
22              simple?  Do you mean to
23              manufacture it and sell it or to
24              manufacture this and also sell
```

 1          this.

 2    BY MR. SEEGER:

 3          Q.    I just want to know, did TTP

 4    manufacture metal studs?  Let's go with

 5    that.

 6          A.    No.  According to my

 7    knowledge, no.

 8          Q.    TG manufactured metal studs,

 9    right?

10          A.    Yes.  A subsidiary under TG

11    manufacture metal studs.

12          Q.    And which subsidiary is

13    that?

14          A.    I cannot recall the exact

15    name, but roughly I can remember a name.

16    Shandong Tai'an Jindun Construction

17    Material, roughly the name like this.

18               INTERPRETER 1:  We are

19          clarifying the name now.  Counsel,

20          the witness has written down the

21          name in Chinese.  Do you mind if I

22          ask him to help me with the Pinyin

23          or the English name?

24               MR. SEEGER:  No.  You don't

1          have to have him translate it.

2          Just leave it there for now.

3    BY MR. SEEGER:

4          Q.    Mr. Peng, I want to show you

5    what was marked as Exhibit 2 in Mr. Jia's

6    deposition.  Do you recognize that

7    brochure?

8          A.    I saw this document.

9          Q.    Could you please turn to the

10   page that I marked with a paper clip.

11   I'm sorry, go to the first page, the

12   cover page.  Do you see the name of the

13   company at the bottom?

14         A.    Yes, I saw this name.

15         Q.    That's what TG used to be

16   called, right?  That company is now

17   called TG.  Can we agree on that?

18         A.    Yes.  This company, later

19   on, they change the name into TG.

20         Q.    Could you turn to the page

21   that I clipped with the paper clip, the

22   metal paper clip.  Tell me what product

23   is displayed on that page as a TG

24   product?

1          A.     Let me take a look.

2                 MR. SPANO:  Objection to

3          form.

4                 (Witness reviewing

5          document.)

6                 THE WITNESS:  Do you want me

7          to read all the contents?

8    BY MR. SEEGER:

9          Q.     I want to know, does this

10   page show that TG sells both drywall and

11   metal studs?

12         A.     This page indicate to them

13   Shandong Taihe Dongxin Company Limited

14   can provide the products of drywall and

15   metal studs.

16         Q.     So, the business that you're

17   discussing in the e-mail that we have in

18   front of you, which is marked as Exhibit

19   4, is you discussing the business of

20   selling metal studs to Melvyn -- with

21   Melvyn?  I'm sorry, with Melvyn?

22         A.     This e-mail, it tells

23   Melvyn, we have a customer, TTP company

24   has a customer.  They want to ship light

 1    steel metal studs to the United States.

 2                    INTERPRETER 2:  From China.

 3    BY MR. SEEGER:

 4          Q.    Where does it say in that

 5    e-mail TTP?

 6          A.    During this period of time,

 7    I was working on behalf of TTP.

 8          Q.    How would anybody know that

 9    by looking at that e-mail?  Where do you

10    mention anywhere in that e-mail that you

11    work for TTP?

12                    MR. SPANO:  Objection to

13          form.

14                    THE WITNESS:  It is

15          impossible for me, for everybody

16          that I talk to or for the

17          customer, before we made a deal,

18          to tell him who I worked for.  I

19          was as an individual on my own to

20          tell Melvyn, there is a customer

21          they want to ship from China to

22          the United States.

23    BY MR. SEEGER:

24          Q.    Mr. Peng, this is your own

1    personal e-mail account.  You could have

2    just as easily written TTP under your

3    name as opposed to Shandong or Taihe

4    Group, couldn't you?

5         A.   Would you mind to repeat

6    that question.

7              MR. SEEGER:  Repeat the

8         question.

9              (Interpreter repeats the

10        question.)

11             THE WITNESS:  Of course.

12        This e-mail is my personal e-mail

13        account.

14             Well, I mentioned earlier

15        about the setup of the format in

16        the e-mail for the Shandong Taihe

17        or for TTP.  I did not

18        particularly try to do it.  I did

19        not really concern much about

20        this.  There is a possibility that

21        I did not change it for long time.

22        I keep on using it for long time,

23        and although by that time I have

24        already worked for TTP.

# FILED UNDER SEAL

**CERTAIN EXCERPTS OF THIS TRANSCRIPT HAVE BEEN DESIGNATED "HIGHLY CONFIDENTIAL" AND HAVE BEEN FILED UNDER SEAL, PURSUANT TO PRE-TRIAL ORDER NO. 16**

```
 1              Q.    Well, Mr. Peng, I just need
 2    you to delay your break for five minutes,
 3    and then I'll let you take a break, if
 4    that's okay.  I have to ask you some
 5    follow-up questions.
 6                   Thank you.
 7                      -  -  -
 8              (Whereupon, Deposition
 9         Exhibit Peng-6, E-mail dated
10         October 9, 2007, Bates stamped TG
11         0022650, was marked for
12         identification.)
13                      -  -  -
14    BY MR. SEEGER:
15              Q.    Mr. Peng, would you take a
16    look at what I've just marked as Peng
17    Exhibit 6.  For the record, it's Bates
18    stamped TG 0022650, and it's an e-mail
19    dated October 9, 2007.
20                   Mr. Peng, at the very top of
21    this e-mail, do you see that's a
22    different e-mail address than we've been
23    looking at, correct, sir?
24              A.    Different from which one?
```

1      Q.    Well, we've been looking at

2   your old e-mail address.  Different from

3   that, yes.

4      A.    Yes, they are not the same.

5      Q.    This is the new e-mail

6   address that you told us about earlier

7   that's 8812017538@163.com, correct?

8      A.    Yes.

9      Q.    That's the new e-mail

10  address you got while you were at TTP,

11  correct?

12     A.    Yes.

13     Q.    And even here in this e-mail

14  from you to Jacky Yu regarding, again,

15  the shipment of metal studs, you hold

16  yourself out as "Frank," "Taishan Gypsum

17  Company, Ltd."  Did I read that

18  correctly?

19            INTERPRETER 2:  It is

20        Taishan Gypsum Limited.

21            INTERPRETER 1:  It's the

22        same.

23            INTERPRETER 2:  The

24        interpreter did not interpret the

 1         full name.
 2             INTERPRETER 1:  I did.
 3             MR. SEEGER:  I want to get a
 4         question from -- I want the
 5         witness to answer.  I don't want
 6         to fight with the interpreters.
 7         It's fine.  She has her objection.
 8             Could the witness answer?
 9             THE WITNESS: Can you repeat
10         the question?  I got interrupted.
11                     -  -  -
12             (Whereupon, the requested
13         portion of the transcript was read
14         by the court reporter as follows:
15             "Q.   And even here in this
16         e-mail from you to Jacky Yu
17         regarding, again, the shipment of
18         metal studs, you hold yourself out
19         as "Frank," "Taishan Gypsum
20         Company, Ltd."  Did I read that
21         correctly?")
22                     -  -  -
23             (Interpreter repeats
24         question.)

 1                    THE WITNESS: It is the

 2           e-mail I wrote to Mr. Jacky Yu.

 3     BY MR. SEEGER:

 4           Q.    This is a year-and-a-half

 5     after you started with TTP, correct, sir?

 6           A.    Yes.

 7           Q.    And you're talking about one

 8     of your customers in this e-mail?  This

 9     is your e-mail, you're writing it about

10     your customer, which is OEG Building

11     Material from Brooklyn, New York,

12     correct?

13                    MR. SPANO:  Objection to

14           form.

15                    THE WITNESS:  It is being

16           written down in an e-mail as such,

17           but I need to explain.

18     BY MR. SEEGER:

19           Q.    (Indicating.)

20           A.    Being written in this

21     e-mail, our customer is OEG.  Well, that

22     is, TTP's customer is OEG.  And then Mr.

23     Jacky Yu, I know this Mr. Yu comes from

24     Shanghai, China.  He come to our company,

1    wanted to buy the product of light steel

2    metal studs.

3         Q.    Mr. Peng, TTP never made or

4    sold metal studs, right?

5         A.    TTP did not manufacture.  It

6    purchased from this company called

7    Shandong Tai'an Jindun Construction

8    Material Company Limited.  And then it

9    sold in China to OEG company.

10                MR. SPANO:  Off the record.

11                    -  -  -

12                (Whereupon, an

13                off-the-record discussion was

14                held.)

15                    -  -  -

16    BY MR. SEEGER:

17         Q.    Mr. Peng, the subject on

18    this e-mail is metal stud customer,

19    right?  Did I read that correctly?

20         A.    Who are you talking about?

21    Who are you referring to?

22         Q.    The e-mail that's marked as

23    Exhibit 6 in front of you, the subject

24    line at the top, it says, "metal stud

 1    customer."  It refers to this person as a

 2    metal stud customer, correct?

 3              INTERPRETER 2:  She did not

 4         interpret "refer to."

 5              MR. SEEGER:  Did you finish?

 6              INTERPRETER 1:  Yes.

 7    BY MR. SEEGER:

 8         Q.   Can you answer?

 9         A.   Here, we write down here as

10    metal stud customer.

11              MR. SEEGER:  Okay.  Take

12         your break.

13              THE VIDEOTAPE TECHNICIAN:

14         The time now is approximately 3:26

15         p.m., and we are now off the

16         record.

17                   -  -  -

18         (Whereupon, a recess was

19         taken from 3:27 p.m. until 3:41

20         p.m.)

21                   -  -  -

22              THE VIDEOTAPE TECHNICIAN:

23         This begins Tape 5 of today's

24         deposition.  The time now is

1           approximately 3:41 p.m., and we're
2           back on the record.
3    BY MR. SEEGER:
4           Q.    Mr. Peng, do you recognize
5    the name David Wei, W-E-I?
6           A.    Would you mind to write it
7    down for me?
8           Q.    (Writes name down.)
9           A.    I know a gentleman by the
10   name Mr. Wei Chun Shan, C-H-U-N, S-H-A-N.
11          Q.    Who is he?
12          A.    I am not sure whether it is
13   the same person or not.
14          Q.    Yes, it is.
15                Can you identify --
16                Assuming that that's the
17   same person, who do you understand him to
18   be?
19          A.    Yes.  I met him.  He did
20   bring customers to our factories.  But I
21   did not know much about him.
22          Q.    What company is he with?
23          A.    He would take customers to
24   our company as an individual.  I don't

1    know what company he worked for.

2          Q.    Sitting here today, you have

3    no understanding of who David Wei or Wei

4    Chun Shan, what company he worked for; is

5    that what you are saying?

6          A.    I only know that he comes

7    from Beijing.  I don't know which company

8    he belongs.

9          Q.    Is it customary in China

10   with businesses or business people that

11   you deal with for you to exchange

12   business cards?

13         A.    Depends on the habit of how

14   individual works.

15         Q.    Well, I mean -- so, I'm

16   asking you, that's my question.  In

17   China, is it custom that when you do

18   business or you meet somebody in the

19   business world that you exchange business

20   cards or does that not always happen?

21         A.    It depends on the

22   individuals.  It also depends on the

23   concrete situation of the business.

24         Q.    So, you're saying there is

 1   no -- your testimony is there is no

 2   custom, and it's an individualized thing?

 3   People do it if they want to; if they

 4   don't want to, if they don't do it.

 5            A.    It is my understanding.

 6            Q.    Are you familiar with a

 7   company called BNBM?

 8                 MR. SPANO:  Objection to

 9                 form.

10                 THE WITNESS:  I know a

11                 company in Beijing has a name.

12                 INTERPRETER 1:  The witness

13                 gave the interpreter a long

14                 Chinese name.  I'm going to ask

15                 him to write it down.  And it

16                 might be possible to be written

17                 down in abbreviation, but I cannot

18                 recall exactly how it was being --

19                 how to write this.

20   BY MR. SEEGER:

21            Q.    Well, ask him if he

22   recognizes the name Beijing New Building

23   Materials.  Let's go there.

24            A.    I know.

1          Q.    Do you understand the

2    abbreviation for that company to be BNBM?

3          A.    I heard people mention it,

4    but I am not sure about a formal name or

5    how they call it officially.

6          Q.    And I just want to be clear

7    on something.  Mr. Peng, you said that

8    your title -- you said that you never

9    held an official title while you were at

10   TTP.  Is that correct?

11         A.    First of all, I did not have

12   the name card of TTP, and I did not have

13   a title for the long-term or a title that

14   is stable.  It depends on the concrete

15   situation.  Under certain circumstances,

16   there might be certain possibility they

17   might give me a contemporary title.

18               INTERPRETER 2:  Temporary,

19        not contemporary.

20               MR. SEEGER:  Temporary,

21        we'll go with temporary.

22               INTERPRETER 1:  Yes, thank

23        you.

24   BY MR. SEEGER:

 1          Q.    I think you testified
 2    earlier that the only time you had held
 3    the title of manager is when you were
 4    with TG, correct, sir?
 5          A.    I did not hear the question
 6    clearly.
 7               MR. SEEGER:  (Addressing the
 8          interpreter.)
 9               He's talking to you.
10               (Interpreter repeats the
11          question.)
12               THE WITNESS:  When I was
13          with TG, I did have the title of
14          the manager of the foreign trade
15          department.
16    BY MR. SEEGER:
17          Q.    And Mr. Peng, how extensive
18    were your dealings with BNBM USA?
19               MR. SPANO:  Objection to
20          form, no foundation.
21               THE WITNESS:  I don't know
22          this company.
23                    -  -  -
24               (Whereupon, Deposition

1           Exhibit Peng-7, Document entitled
2           "Translation of TG 0000463," June
3           8, 2006, Bates stamped TTRSNL0026
4           and TG 000463, was marked for
5           identification.)
6                      -  -  -
7                MR. SEEGER:  Jeff is going
8           to identify it for the record,
9           because it's a translated
10          document, and I'm not sure how we
11          were doing that.  I'll hand it to
12          the witness so he can start
13          looking at it.
14               MR. GRAND:  This document
15          has been marked by plaintiffs as
16          TTRNSL0026 and is a translation of
17          what was produced by Taishan
18          Gypsum as TG 0000463.  Pursuant to
19          our agreement with defendants,
20          this translation, which is the
21          first page, of the second page,
22          which is the original document
23          produced by TG, was previously
24          provided to Taishan in advance of

```
 1            this deposition.
 2                 MR. SPANO:  That's fine.  I
 3            just want to say when you question
 4            the witness --
 5                 MR. SEEGER:  I want to give
 6            you a copy.  Sorry.
 7                 MR. SPANO:  -- about
 8            documents like this, I would like
 9            you to question him about the
10            document, not about the
11            translation.
12                 MR. SEEGER:  Yes.  That's
13            fair.
14                 MR. GRAND:  Yes.  The
15            translation is for your benefit.
16                 MR. SPANO:  Yes, I
17            appreciate that.
18   BY MR. SEEGER:
19        Q.    Mr. Peng, would you please
20   take a look at the document we've just
21   marked as Exhibit 7.  At the very top,
22   it's got the name of David Wei.  Do you
23   see that?
24        A.    Are you talking about
```

1    English version or the Chinese?

2           Q.    You may look at the Chinese

3    version if you'd like.  And the Chinese

4    version, his name may be Wei Chun Shan as

5    you described him.  I'm not sure.  Who is

6    the letter in the Chinese version from?

7    Identify who it is from, please.

8           A.    Let me look at the Chinese

9    version.

10          Q.    It's right there,

11   (indicating).

12          A.    The Chinese version is

13   written by Mr. Wei Chun Shan.

14          Q.    What's his e-mail address?

15          A.    It is in the e-mail, I see

16   it.

17          Q.    Could you please read out

18   loud what his e-mail address is?

19          A.    You want me to read out his

20   e-mail address, right?

21          Q.    I'll make it easy.  I'll

22   read it, and you tell me if I read it

23   correctly.  Okay?  BNBMUSA@msn.com.  Did

24   I read that correctly?

1          A.     Correct.

2          Q.     Does this help refresh your

3    recollection of having dealings with BNBM

4    USA?

5          A.     I did not understand this

6    company.  I also did not do any dealings

7    with this company.

8          Q.     And you also testified

9    earlier --

10                 INTERPRETER 2:  The

11            interpreter need to say that the

12            transaction, I did not have any

13            transaction with this company.  It

14            is not I didn't have dealings with

15            this company.

16                 INTERPRETER 1:  It is the

17            same.  It can be translated in

18            many ways.

19   BY MR. SEEGER:

20         Q.     Mr. Peng, you had also

21   testified earlier that the only time you

22   had a title manager is when you were with

23   TG, correct?

24         A.     You can say that.

1          Q.    You said it, right, Mr.
2   Peng?
3          A.    Yes, I say that.
4          Q.    And yet how are you
5   identified in this e-mail by Mr. Wei Chun
6   Shan?  What does he call you when he
7   addresses this to you?
8          A.    Here he address me as
9   Manager Peng, but it is a Chinese custom
10  that anyone can be called manager like
11  Manager Wong, manager so and so.  As long
12  as you put the last name in front of the
13  word manager, then you can have Manager
14  Young or manager so and so.
15               INTERPRETER 2:  It is just
16          as Mr. Wang, Mr. Peng, just like
17          Mr.
18               MR. SEEGER:  Is that what
19          he's saying or are you adding
20          that?
21               INTERPRETER 2:  Yes, that is
22          what the witness says.
23               INTERPRETER 1:  I did not
24          hear that.

1   BY MR. SEEGER:

2       Q.   Mr. Peng, Mr. Wei Chun Shan

3   brought you customers from the United

4   States; isn't that true?

5       A.   Mr. Wei brought this person

6   indicated in the letter -- in the e-mail.

7   Mr. Peng was pointing as the name Richard

8   Hannam.  He took him to our factory.

9       Q.   Mr. Peng, you've testified

10  earlier you had several dealings with Mr.

11  Wei, correct?

12           INTERPRETER 1:  Counsel, the

13       word "dealings" can be interpreted

14       in many ways.  Can you help me?

15           MR. SEEGER:  Use -- say how

16       about you had a business

17       relationship or no?

18           Let me look at my question.

19       Hold on.

20           INTERPRETER 1:  I'll go back

21       to that question.

22           MR. SEEGER:  Hold on a

23       second.  I'm going to strike that

24       and restate it.

1              MR. CHEN:  Counsel, if it's

2         helpful, the term that she used in

3         translation can be used as

4         contacts, several contacts, if

5         that's what you want to go with.

6              MR. SEEGER:  Let's go with

7         that.  Go ahead, ask it that way,

8         please.

9              (Interpreter repeats the

10        question.)

11             THE WITNESS:  I did mention

12        that I did contact -- I did have

13        contact with Mr. Wei, but I did

14        not say I had several contacts

15        with Mr. Wei.

16   BY MR. SEEGER:

17        Q.    And in more than one

18   instance, he introduced you to business

19   customers from the United States?  Isn't

20   that true?

21        A.    I don't understand the

22   question.

23        Q.    Mr. Wei introduced you on

24   several occasions to US business people,

1    correct, Mr. Peng?

2         A.    I can only recall this

3    customer indicated in this e-mail.

4         Q.    And this is -- I'm sorry.

5              This is a US customer,

6    correct, sir?

7         A.    I recall that he took the

8    customer to our factories, and then he

9    mentioned about there is a possibility

10   for the shipment.  He was saying that the

11   customer will buy it in China from -- to

12   buy it from TTP and ship it to the United

13   States.  And the customer mentioned about

14   the -- did mention about something like

15   this.  Whether they are a US company or

16   not, we cannot confirm that.

17        Q.    Did you often take foreign

18   customers to your factory to show them,

19   you know, your operations?  Was that

20   something you did often?

21        A.    I don't understand when you

22   mention about often.  What kind of

23   concept do you have?

24              MR. SEEGER: (Addressing the

1          interpreter.)

2              What word did you use in

3          Chinese?  Did it translate the

4          same way?  The word used in

5          Chinese, did it translate the same

6          way, often.

7              INTERPRETER 1:  Yes, often,

8          the same.

9    BY MR. SEEGER:

10          Q.    Mr. Peng, I don't understand

11   what about question you don't understand.

12          A.    Okay.  Some customer, after

13   they come to TTP to talk about business,

14   some of the customers, they requested to

15   go to the factories, and we will take

16   them there.  And some customer, they did

17   not have such a request, then we wouldn't

18   take them to the factories.  It all

19   depends on the request of the customers.

20          Q.    Mr. Peng, do you recognize

21   Richard Hannam as working for a company

22   called Wood Nation?

23          A.    The person that you

24   mentioned about the name, he is that

1    person.  That person Wei Chun Shan took

2    him to our company.  While we were

3    talking about business, he told us about

4    his company name.

5         Q.    What do you recall from the

6    conversation you had with him?

7         A.    That conversation -- or let

8    me put it another way, conversation.  Are

9    you referring to the time -- to the

10   matter when they come to our company,

11   they do exchange of the business?  Is

12   that what you are talking about?

13        Q.    Yes.

14        A.    I was only talking to Mr.

15   Wei, and that foreigner that you just

16   mentioned, we only talk briefly.  He

17   mentioned about wanting to buy the

18   drywall.  We did not talk too much.  And

19   for the rest of the business, it was a

20   Mr. Apollo Yang to talk to them.

21        Q.    I didn't get the name, the

22   name of the person that you just

23   identified.  Is this person that you just

24   identified in Chinese, is that Apollo

 1    Yang, the same person?

 2          A.    Yes, yes.

 3          Q.    Mr. Peng, did you meet Jim

 4    Scudder through somebody at BNBM?

 5          A.    Do you mind to write down

 6    the name of this person.

 7          Q.    I wrote it down for you

 8    earlier.  Do you still have it there?

 9          A.    Which one?

10          Q.    She's got it right there.

11    It's on the screen.  Point to it on the

12    screen.  I'll write it if it makes it

13    easier.

14          A.    Yes, I can see it now.  I'm

15    sorry about this.  Would you mind to

16    repeat the question.

17                MR. SEEGER:  You have the

18          question, Stephanie, right?

19                INTERPRETER 1:  Yes.

20                (Interpreter repeats the

21          question.)

22                MR. SPANO:  Objection to

23          form.

24                THE WITNESS:  I don't recall

1           the concrete details of this

2           customer.

3    BY MR. SEEGER:

4           Q.    Mr. Peng, when you dealt

5    with people in 2006 --

6                 When you dealt with foreign

7    customers in 2006 and 2007, did you even

8    disclose to them at all that you worked

9    for a company called TTP?

10          A.    Many of the foreign

11   customers, they will bring the agents

12   from the agents in China or they will

13   bring their own interpreters to come to

14   TTP to do the business, and of course we

15   introduce to them about the condition of

16   the company and also the products of the

17   company.

18          Q.    Yes, but my question, Mr.

19   Peng, is, during this time frame of

20   2006/2007, did you even yourself mention

21   or disclose to any of the agents or

22   foreign customers that you worked for TTP

23   and not TG?

24          A.    I will if they ask.  And I

# FILED UNDER SEAL

**CERTAIN EXCERPTS OF THIS TRANSCRIPT HAVE BEEN DESIGNATED "HIGHLY CONFIDENTIAL" AND HAVE BEEN FILED UNDER SEAL, PURSUANT TO PRE-TRIAL ORDER NO. 16**

 1          something like that?

 2   BY MR. SEEGER:

 3          Q.    Yes.

 4          A.    During the second half of

 5   the year 2009, a few people come to our

 6   factories.  They said they were from

 7   CPSC.

 8          Q.    Did they meet with you?

 9          A.    A few people, yes, we met.

10   We met.

11          Q.    You were there yourself in

12   the meeting?

13          A.    Yes, I was there.  Not only

14   me, many people.

15          Q.    Could you identify some of

16   the other people who were there with you?

17          A.    Mr. Jia was there.  And also

18   from the local government, a government

19   bureau called ge li jian yi ju.

20                INTERPRETER 1:  The

21                interpreter does not have the

22                formal English name, but she will

23                try.

24                THE WITNESS:  For the bureau

```
 1              for inspection --
 2                   INTERPRETER 1:  We are
 3              discussing how to translate that.
 4                   INTERPRETER 2:  Quarantine?
 5                   INTERPRETER 1:  I don't
 6              know.  I cannot be sure.  We
 7              haven't decided yet.
 8                   MR. CHEN:  That is right.
 9              It is quarantine.  Yes, the term
10              is quarantine.
11    BY MR. SEEGER:
12         Q.   Okay.  Thank you.
13         A.   The bureau for inspection
14    and quarantine from the local government.
15                   INTERPRETER 1:  Not finished
16              yet.
17                   Another bureau that the
18              interpreter is trying her best to
19              translate --
20                   THE WITNESS:  State Quality
21              Inspection Bureau.  Another one is
22              for the Bureau of Economic and
23              Trading or the Committee of
24              Economic and Trading that I cannot
```

1            recall exactly.  And also about

2            five or six people coming from

3            CPSA, we did not exactly check the

4            identity.  We did not find out

5            which organization or which

6            workplace they come from.

7                    MR. SEEGER:  Are you

8            finished?

9                    INTERPRETER 1:  I am, yeah.

10                    THE WITNESS:  And I, myself,

11            also follow along this tour when

12            they visit our company.

13   BY MR. SEEGER:

14            Q.   Who else from his company

15   was there -- I'm sorry.

16                    Mr. Peng, who else from your

17   company was there besides you?

18            A.   Let me think.  To be honest,

19   I don't recall.

20            Q.   Who was there from BNBM?

21            A.   Nobody.

22            Q.   Anyone from CNBM?

23            A.   No.

24            Q.   Do you know what information

1   was provided to the CPSC by your company,

2   if any?

3         A.    They only visited our

4   factory, and -- they only visited the

5   factories, so they were doing exchanges.

6   When they wanted to obtain information or

7   whatever, they did it during the visit.

8   And so I did not know what exactly they

9   were talking about.  When they needed

10  information, they directly talked to the

11  interpreter, and I was unable to follow

12  up on this.  They did not sit down to

13  talk face-to-face.  They were talking

14  about this while -- when they were doing

15  the visit, and I follow them all the way

16  in the back.  There were so many people,

17  therefore, I was not very sure what was

18  happening.

19        Q.    Did you have any

20  conversations with anyone that day in

21  English?

22        A.    It seems like I was saying

23  two or three words like yes or no.  And

24  exactly I was unable to communicate.

1           Q.    Mr. Peng, you do communicate

2    from time to time in English verbally

3    with some of your customers in the U.S.,

4    don't you?

5           A.    "From time to time," what do

6    you mean?  What time period?

7           Q.    I'm sorry.  At any time

8    period.  I'm asking you generally, over

9    the past several years, if you've needed

10   to speak English with a customer in the

11   U.S., you've had verbal conversations

12   with people, haven't you, over the phone?

13                MR. SPANO:  Objection to

14           form.

15                THE WITNESS:  Some of the

16           customers, when they come to our

17           companies where we were doing

18           exchanges, most of them, they

19           would bring their own interpreters

20           or they will bring the agents with

21           them.  Therefore, there's no need

22           for English.  Well, but in some

23           very rare occasions in this very

24           rare occasions, I will speak and

 1            then write.  And on the telephone

 2            to communicate with the customers,

 3            I need to make a draft first.

 4                       -   -   -

 5            (Whereupon, Deposition

 6            Exhibit Peng-9, E-mail dated

 7            August 15, 2009, Bates stamped TG

 8            0025155 through TG 0025158, was

 9            marked for identification.)

10                       -   -   -

11   BY MR. SEEGER:

12       Q.    Mr. Peng, let me hand you

13   what we've just marked as Exhibit 9, and

14   it's Bates stamped TG 0025155 through

15   158.

16            Mr. Peng, to save a little

17   time, these are questions asked by the

18   CPSC of your company.  Are you

19   comfortable with that description of

20   this?

21            MR. SPANO:  Objection to

22            form of the question.

23            THE WITNESS:  I think you

24            describe it this way.  It is

1              inappropriate.

2    BY MR. SEEGER:

3         Q.    I think I know what you guys

4    are all jumping around about.  It is CPSC

5    questions to AQSIQ August 2009.  Do you

6    know who AQSIQ is?  Let me ask my

7    question.  Mr. Peng, who sent this to

8    you?

9         A.    Mr. Liu Bin.

10         Q.    Can you let him write that

11    name down on a piece of paper?

12         A.    I only know this gentleman.

13    His name is Liu Bin.  I only know exactly

14    the word Liu, but Bin, I don't know which

15    Bin he uses.

16         Q.    Is he with TG?

17         A.    No.

18         Q.    What company is he with?

19         A.    He does not belong to any

20    company.  He come from the Bureau of

21    Inspection and Quarantine.

22         Q.    Why did he send this to you?

23         A.    He belongs to the government

24    department.  He wanted us to read this

1    document.

2              MR. SEEGER:  We've got like

3         30 seconds left on the videotape,

4         so you might as well take a break

5         right now.

6              THE VIDEOTAPE TECHNICIAN:

7         The time now is approximately 5

8         p.m. and we are now off the

9         record.

10                  -  -  -

11             (Whereupon, the deposition

12        adjourned at 5:00 p.m.)

13                  -  -  -

14

15

16

17

18

19

20

21

22

23

24

```
 1              C E R T I F I C A T E
 2
 3
                I, LINDA L. GOLKOW, a
 4   Registered Diplomate Reporter, Certified
     Court Reporter and Notary Public, do
 5   hereby certify that, pursuant to notice,
     the deposition of WENLONG PENG was duly
 6   taken on April 7, 2011 at 8:59 a.m.
     before me.
 7
 8              The said WENLONG PENG was
     duly sworn by me through the interpreter
 9   according to law to tell the truth, the
     whole truth and nothing but the truth and
10   thereupon did testify as set forth in the
     above transcript of testimony.  The
11   testimony was taken down stenographically
     by me.
12
13              I do further certify that
     the above deposition is full, complete
14   and a true record of all the testimony
     given by the said witness.
15
16
17         Linda L. Golkow
           Registered Diplomate Reporter
18         Certified Realtime Reporter
19
20              (The foregoing certification
     of this transcript does not apply to any
21   reproduction of the same by any means,
     unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24
```

1              INSTRUCTIONS TO WITNESS

2

3

4              Please read your deposition

5    over carefully and make any necessary

6    corrections.  You should state the reason

7    in the appropriate space on the errata

8    sheet for any corrections that are made.

9

10             After doing so, please sign

11   the errata sheet and date it.  It will be

12   attached to your deposition.

13

14             It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

```
 1                    - - - - - -

                    E R R A T A

 2                    - - - - - -

 3    PAGE   LINE   CHANGE

 4    ____   ____   _____

 5       REASON: _____

 6    ____   ____   _____

 7       REASON: _____

 8    ____   ____   _____

 9       REASON: _____

10    ____   ____   _____

11       REASON: _____

12    ____   ____   _____

13       REASON: _____

14    ____   ____   _____

15       REASON: _____

16    ____   ____   _____

17       REASON: _____

18    ____   ____   _____

19       REASON: _____

20    ____   ____   _____

21       REASON: _____

22    ____   ____   _____

23       REASON: _____

24
```

1
2              ACKNOWLEDGMENT OF DEPONENT
3
                    I,_____, do
4    hereby certify that I have read the
     foregoing pages, 1 through 222 and that
5    the same is a correct transcription of
     the answers given by me to the questions
6    therein propounded, except for the
     corrections or changes in form or
7    substance, if any, noted in the attached
     Errata Sheet.
8
9    _____
     WENLONG PENG                    DATE
10
11
12
13
14
15
16   Subscribed and sworn
     to before me this
17   _____ day of _____, 20_____.
18   My commission expires:_____
19

     _____
20   Notary Public
21
22
23
24

1                    LAWYER'S NOTES

2    PAGE  LINE

3    _____  _____  _____

4    _____  _____  _____

5    _____  _____  _____

6    _____  _____  _____

7    _____  _____  _____

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24   _____  _____  _____

1          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF LOUISIANA
2

     _____
3                              §  MDL NO. 2047
     IN RE:                    §
4    CHINESE-                  §  SECTION: L
     MANUFACTURED              §
5    DRYWALL PRODUCTS          §  JUDGE FALLON
     LIABILITY                 §
6    LITIGATION                §  MAGISTRATE
     _____ §  JUDGE WILKINSON
7
                    - - -
8
      CROSS NOTICED IN VARIOUS OTHER ACTIONS
9
                    - - -
10
                  April 8, 2011
11
                    - - -
12
        CONFIDENTIAL - SUBJECT TO FURTHER
13            CONFIDENTIALITY REVIEW
14                  - - -
15        Videotaped deposition of WENLONG
     PENG, held at 3 Pedder Street, Central,
16   Hong Kong, China, commencing at 9:02
     a.m., on the above date, before Linda L.
17   Golkow, Certified Court Reporter,
     Registered Diplomate Reporter, Certified
18   Realtime Reporter and Notary Public.
19
20                  - - -
21
          GOLKOW TECHNOLOGIES, INC.
22     ph 877.370.3377 | fax 917.591.5672
              deps@golkow.com
23
24

```
 1    APPEARANCES:
 2
 3        SEEGER WEISS LLP
          BY:   CHRISTOPHER A. SEEGER, ESQUIRE
 4        BY:   JEFFREY S. GRAND, ESQUIRE
          One William Street
 5        New York, New York 10004
          (212) 584-0700
 6        cseeger@seegerweiss.com
          jgrand@seegerweiss.com
 7        Representing the Plaintiffs' Steering
          Committee
 8
 9
          COLSON HICKS EIDSON
10        BY:   PATRICK S. MONTOYA, ESQUIRE
          255 Alhambra Circle
11        Penthouse
          Coral Gables, Florida 33134
12        (305) 476-7400
          patrick@colson.com
13        Representing Plaintiffs' Steering
          Committee in the Federal and State
14        Coordinated Actions
15
16
          LAW OFFICES OF RICHARD SERPE, P.C.
17        BY:  RICHARD J. SERPE, ESQUIRE
          580 East  Main Street
18        Suite 310
          Norfolk, Virginia 23510
19        (757) 233-0009
          rserpe@serpefirm.com
20        Representing the MDL Plaintiffs and
          the Germano Plaintiffs
21
22                     -   -   -
23
24
```

```
 1   APPEARANCES (CONTINUED):
 2
 3       HOGAN LOVELLS US LLP
         BY:  FRANK T. SPANO, ESQUIRE
 4       BY:  RENEE GARCIA, ESQUIRE
         875 Third Avenue
 5       New York, New York 10022
         (212) 918-3000
 6       frank.spano@hoganlovells.com
         Renee.garcia@hoganlovells.com
 7       Representing Taishan Gypsum Co.
         Ltd. and Tai'an Taishan
 8       Plasterboard Company Ltd. and the
         Witness, Wenlong Peng
 9
10
         HOGAN LOVELLS INTERNATIONAL LLP
11       BY:  EUGENE CHEN, ESQUIRE
         18th Floor, Park Place
12       1601 Nanjing Road West
         Shanghai, China 200040
13       (86 21) 6122 3800
         eugene.chen@hoganlovells.com
14       Representing Taishan Gypsum Co.
         Ltd. and Tai'an Taishan
15       Plasterboard Company Ltd. and the
         Witness, Wenlong Peng
16
17
18       GREENBERG TRAURIG, LLP
         BY:  HILARIE BASS, ESQUIRE
19       1221 Brickell Avenue
         Miami, Florida 33131
20       (305) 579-0745
         bassh@gtlaw.com
21       Representing the Home Builders
         Steering Committee
22
23
24
```

```
 1   APPEARANCES (CONTINUED):
 2

 3       GALLOWAY JOHNSON TOMPKINS BURR and
         SMITH
 4       BY:  CARLINA C. EISELEN, ESQUIRE
         One Shell Square
 5       701 Poydras Street, 40th Floor
         New Orleans, Louisiana 70139
 6       (504) 525-6802
         ceiselen@gjtbs.com
 7       Representing Interior/Exterior
         Building Supply
 8

 9
         PERKINS COIE LLP
10       BY:  CRAIG M.J. ALLELY, ESQUIRE
         1899 Wynkoop Street - Suite 700
11       Denver, Colorado 80202
         (303) 291-2300
12       callely@perkinscoie.com
         Representing the State of Louisiana
13

14
         WEINBERG, WHEELER, HUDGINS, GUNN &
15       DIAL, LLC
         BY:  NICHOLAS P. PANAYOTOPOULOS, ESQ.
16       3344 Peachtree Road, NE - Suite 2400
         Atlanta, Georgia 30326
17       (404) 876-2700
         npanayo@wwhgd.com
18       Representing Various Banner
         Defendants
19

20
         BRENNER, EVANS & MILLMAN, P.C.
21       BY:  THEODORE I. BRENNER, ESQUIRE
         411 East Franklin Street -  Suite 200
22       Richmond, Virginia 23218
         (804) 644-1300
23       Representing Tobin Trading Company
24
```

```
 1    APPEARANCES (CONTINUED):
 2
 3        McKENRY, DANCIGERS, DAWSON &
          LAKE, P.C.
 4        BY:  J. BRIAN SLAUGHTER, ESQUIRE
          192 Ballard Court
 5        Suite 400
          Virginia Beach, Virginia 23462
 6        (757) 461-2500
          Jbslaughter@va-law.org
 7        Representing Atlantic Homes LLC and
          Multiple Other Virginia-Based
 8        Defendants
 9
10        SHER GARNER CAHILL RICHTER KLEIN &
          HILBERT, L.L.C.
11        BY:  MATTHEW C. CLARK, ESQUIRE
          909 Poydras Street
12        Suite 2800
          New Orleans, Louisiana 70112
13        (504) 299-2100
          mclark@shergarner.com
14        Representing the Southern Home
          Defendants
15
16
          SINNOTT, NUCKOLS & LOGAN, PC
17        BY:  KENNETH F. HARDT, ESQUIRE
          13811 Village Mill Drive
18        Midlothian, Virginia 23114
          (804) 378-7600
19        khardt@snllaw.com
          Representing Venture Supply, Inc. and
20        Porter-Blaine Corp.
21
22
23
24
```

```
 1    APPEARANCES VIA TELEPHONE:
 2
 3    KUCHLER POLK SCHELL WEINER &
      RICHESON LLC
 4    BY:  FRANCIS X. deBLANC, III,
      1615 Poydras Street
 5    Suite 1300
      New Orleans, Louisiana 70112
 6    (504) 592-0691
      slauricella@kuchlerpolk.com
 7    Representing Creola Ace Hardware and
      Thomas Gould Inc. in the MDL
 8
 9
      HUNTON & WILLIAMS LLP
10    BY:  A. TODD BROWN, ESQUIRE
      Bank of America Plaza
11    101 South Tryon Street
      Suite 3500
12    Charlotte, North Carolina  28280
      (704) 378-4700
13    Representing Stock Building Supply,
      LLC
14
15
      JONES, WALKER, WAECHTER, POITEVENT,
16    CARRERE & DENEGRE LLP
      BY:  MEGAN E. DONOHUE, ESQUIRE
17    600 Jefferson Street, Suite 1600
      Lafayette, Louisiana 70501
18    (337) 262-9062
      mdonohue@joneswalker.com
19    Representing Fireman's Fund Insurance
      Company
20
21
22
23
24
```

```
 1    APPEARANCES VIA TELEPHONE (CONTINUED):
 2
 3         DUPLASS ZWAIN BOURGEOIS PFISTER &
           WEINSTOCK
 4         BY:  PHILIP WATSON, ESQUIRE
           3838 N. Causeway Boulevard
 5         Suite 2900
           Metairie, Louisiana 70002
 6         (504) 832-3700
           pwatson@duplass.com
 7         Representing R&H Masonry, Inc., and
           Swedberg Enterprises, Inc.
 8
 9
           RUMBERGER, KIRK & CALDWELL, P.A.
10         BY:  ABIGAIL ROBERTS, ESQUIRE
           Brickell Bayview Centre
11         Suite 3000
           80 Southwest 8th Street
12         Miami, Florida 33130
           (305) 358-5577
13         aroberts@rumberger.com
           Representing Defendants' Liaison
14         Counsel for  Installers
15
16         FULMER LEROY ALBEE BAUMANN
           BY:  CANDACE ROSS, ESQUIRE
17         2866 East Oakland Park Boulevard
           Ft. Lauderdale, Florida 33306
18         (954) 707-4430
           mosscandace@fulmerleroy.com
19         Representing Independent Builders
           Supply Association (IBSA)
20
21
22
23
24
```

1    APPEARANCES VIA TELEPHONE (CONTINUED):

2

3

       THOMPSON COE COUSINS & IRONS, L.L.P.

4      BY:  SUZANNE M. PATRICK, ESQUIRE

       One Riverway, Suite 1600

5      Houston, Texas 77056

       (713) 403-8210

6      spatrick@thompsoncoe.com

       Representing The North River

7      Insurance Company

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1   APPEARANCES VIA STREAM:
 2
 3       BECNEL LAW FIRM, L.L.C.
         BY:  ROBERT BECNEL, ESQUIRE
 4       106 W. 7th Street
         Reserve, Louisiana 70084
 5       (985) 536-1186
         robbecnel@aol.com
 6       Representing the Plaintiffs'
         Steering Committee
 7
 8
         JONES, WALKER, WAECHTER, POITEVENT,
 9       CARRERE & DENEGRE LLP
         BY:  MEGAN E. DONOHUE, ESQUIRE
10       600 Jefferson Street, Suite 1600
         Lafayette, Louisiana 70501
11       (337) 262-9062
         mdonohue@joneswalker.com
12       Representing Fireman's Fund Insurance
         Company
13
14
         HAYNSWORTH SINKLER BOYD, P.A.
15       BY:  CHRISTOPHER B. MAJOR, ESQUIRE
         75 Beattie Place - 11th Floor
16       Greenville, South Carolina 29601
         (864) 240-3200
17       cmajor@hsblawfirm.com
         Representing USG Corporation and L&W
18       Supply Corporation
19
20
21
22
23
24
```

```
 1   APPEARANCES VIA STREAM (CONTINUED):
 2
 3
     DEUTSCH, KERRIGAN & STILES
 4   BY:  MELISSA M. SWABACKER, ESQUIRE
     755 Magazine St.
 5   New Orleans, Louisiana  70130
     (504) 581-5141
 6   mswabacker@dkslaw.com
     Representing Landmark American
 7   Insurance Company
 8
 9   KUCHLER POLK SCHELL WEINER &
     RICHESON LLC
10   BY:  SOPHIA L. LAURICELLA, ESQUIRE
     1615 Poydras Street
11   Suite 1300
     New Orleans, Louisiana 70112
12   (504) 592-0691
     slauricella@kuchlerpolk.com
13   Representing Creola Ace Hardware and
     Thomas Gould Inc. in the MDL
14
15
16   ALSO PRESENT:
17
18   Stephanie Chin, Official Interpreter
     (Interpreter 1)
19
20   Una Wong, Check Interpreter
     (Interpreter 2)
21
22
23                   -  -  -
24
```

```
 1                    -  -  -
 2                  I N D E X
 3                    -  -  -
 4
 5    Testimony of:  WENLONG PENG
 6     By Mr. Seeger                    236
       By Mr. Montoya                   277
 7     By Ms. Bass                      310
       By Mr. Hardt                     364
 8     By Mr. Brenner                   383
       By Ms. Eiselen                   408
 9     By Mr. Clark                     418
10
                      -  -  -
11
                 E X H I B I T S
12
                      -  -  -
13
14     NO.             DESCRIPTION        PAGE
15    Peng-10    E-mail with              244
                 translation, May 11,
16               2007, Translation of
                 TG 0022728 and TG
17               0022728
18    Peng-11    E-mail dated September   294
                 21, 2007, Bates
19               stamped TG 0021226
20    Peng-12    E-mail dated June 18,    376
                 2009, with attachments
21
      Peng-13    Report in Chinese by     398
22               Pen Wenlong dated July
                 27, 2009, Bates
23               stamped TG 0025222
                 through TG 0025223
24
```

```
 1    Peng-14    Translation of Exhibit   404
                 13, "Taishan Gypsum
 2               Co., Ltd. Export
                 Report"
 3
      Peng-15    E-mail dated 5/24/2006   412
 4               with attachment, Bates
                 stamped INT/EXT 01180
 5               through INT/EXT 01182
 6    Peng-16    Invoice, Taian Taishan   425
                 Plasterboard Co.,
 7               Ltd., dated July 3,
                 2006, Bates stamped TG
 8               001936
 9    Peng-17    Document entitled        430
                 "Counterfoil, Taian
10               Shandong Province
                 Special Invoice for
11               Export," Bates stamped
                 TG 0020107
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1                    -  -  -
 2            DEPOSITION SUPPORT INDEX
 3                    -  -  -
 4
        Direction to Witness Not to Answer
 5
                   Page Line
 6
 7
 8
 9
        Request for Production of Documents
10
                   Page Line
11
12
13
14
                   Stipulations
15
                   Page Line
16
17
18
19
                  Question Marked
20
                   Page Line
21
22
23
24
```

1                 - - -

2                 THE VIDEOTAPE TECHNICIAN:

3           This begins Day 2, Tape Number 1

4           of the deposition of Mr. Peng

5           Wenlong.

6                 The time now is

7           approximately 9:02 a.m., and we're

8           now back on the record.

9                 - - -

10                WENLONG PENG, after having

11          been previously sworn through the

12          interpreter, was examined and

13          testified as follows:

14                - - -

15                EXAMINATION

16                - - -

17   BY MR. SEEGER:

18          Q.    Good morning, Mr. Peng.  I

19   just want to remind you that you're still

20   under oath, the oath that the court

21   reporter administered to you yesterday.

22   Do you understand that?

23          A.    I understand.

24                MR. SPANO:  Before we

1           proceed, I just want to reiterate

2           that we reserve reading and

3           signing of all of the transcripts

4           of our client's depositions.

5                    MR. SEEGER:  Thank you.

6     BY MR. SEEGER:

7           Q.     Mr. Peng, I just have a

8     couple of questions from where we left

9     off yesterday.

10                   Who besides you were at the

11    meetings with the CPSC and other

12    government officials at your factory?

13          A.     Yesterday I did mention

14    about this.  CPSC, after they went to our

15    factory, they did not have a meeting.

16    They pay a visit.  Of course, besides me,

17    from what I can recall, we have a Mr. Jia

18    Tongchun.

19          Q.     Anyone else from the

20    company?

21          A.     The other people, including

22    some of the security people, that I don't

23    recognize them.  I don't know them.

24                   INTERPRETER 2:  Correction.

1           The witness said safety assurance.

2                   INTERPRETER 1:  Security and

3           safety is the same.

4    BY MR. SEEGER:

5           Q.    Do you know why the CPSC was

6    not permitted to visit the mines where TG

7    mined their gypsum?

8                   MR. SPANO:  Objection to

9           form.

10                  THE WITNESS:  Can you repeat

11          it?  I don't understand.

12                  MR. SEEGER:  Can you try

13          repeating the question, Stephanie.

14                  (Interpreter repeated the

15          question.)

16                  INTERPRETER 2:  Correction.

17          The question should be like why

18          were they not permitted.

19                  MR. CHEN:  If I can just

20          say, I believe the question was

21          interpreted to say, at the time TG

22          was mining their gypsum, why was

23          CPSC not permitted to visit.

24                  MR. SEEGER:  Yes.

1            MR. CHEN:  I don't think

2       that's the timeline you were

3       asking about, when they were

4       actually mining.

5            MR. SEEGER:  No.

6            MR. CHEN:  Maybe we can have

7       it reclarified.

8            INTERPRETER 1:  I do not see

9       the word "time."

10           MR. SEEGER:  Stephanie, I'm

11      just going to strike it.  I want

12      to make sure the question is clear

13      for everybody, so, I'm going to

14      ask it again.

15 BY MR. SEEGER:

16      Q.   When the CPSC was

17 investigating complaints about defective

18 drywall shipped by TG, they wanted to see

19 the mines or visit the mines where TG

20 mined the gypsum.  Do you know why they

21 weren't permitted?

22           That's a long question.

23           MR. SPANO:  Objection to

24      form.

1                    THE WITNESS:  First of all,

2          I want to say, the drywall of TG

3          has no problem.

4                    Number 2, TG also does not

5          have a mine to mine for the

6          gypsum -- the natural gypsum for

7          themselves.

8                    Number 3, regarding why the

9          mine for the gypsum were not being

10         allowed to visit, that is their

11         matter.  We don't know.

12    BY MR. SEEGER:

13         Q.    Who is the "their" in that

14    sentence?

15         A.    The mine of the gypsum.

16         Q.    Where does TG get its

17    natural gypsum?

18                    MR. SPANO:  Objection to

19          form.

20                    THE WITNESS:  What time

21          period?

22    BY MR. SEEGER:

23         Q.    In the time frame, let's

24    say, from 2005 to 2008.

```
 1              MR. SPANO:  Allow me to make
 2         my objection, please, if you're
 3         done translating.
 4              INTERPRETER 1:  Yes.
 5              MR. SPANO:  I'm objecting to
 6         this question as now going beyond
 7         the scope of the 30(b)(6)
 8         designations.  We're giving a
 9         deposition related to personal
10         jurisdiction.  We're not going to
11         be going into the mining and
12         manufacturing process for the
13         gypsum.  This is not a merits
14         deposition.
15              MR. SEEGER:  It's my last
16         question on it.
17              MR. GRAND:  He was
18         designated for that specific
19         topic.
20              MR. SEEGER:  All right.  But
21         I don't think I have that much
22         more.
23              MR. SPANO:  Actually, no, if
24         you read my letter, you'll see the
```

1          reservation of qualifications, so,

2          you're wrong.

3              MR. SEEGER:  You're not

4          instructing him not to answer that

5          question?

6              MR. SPANO:  No.

7              INTERPRETER 1:  Do you want

8          me to translate the very long

9          objection?

10             MR. SPANO:  No.  You don't

11         have to translate the objection.

12         I just want it on the record.

13             MR. SEEGER:  So, he needs to

14         just answer the question.

15                   -  -  -

16             (Whereupon, the requested

17         portion of the transcript was read

18         by the court reporter:

19             "Q.  Where does TG get its

20         natural gypsum in the time frame,

21         let's say, from 2005 to 2008?")

22                   -  -  -

23             THE WITNESS:  Mainly from

24         the gypsum mine in the

```
 1            neighborhood of Shandong province.
 2    BY MR. SEEGER:
 3            Q.    Just a quick followup, does
 4    he know the name of the mine?
 5            A.    I don't recall this mine.
 6            Q.    Is he familiar with the
 7    Nueng mine?  Let me show it to you in
 8    English.  See where I put a little blue
 9    mark?
10            A.    I can't tell from reading
11    the English, but I can tell from the
12    Chinese.  From the Chinese, it is called
13    Luneng.  Is it a misspelling in the
14    English?
15            Q.    It's not important if it's a
16    misspelling.  He understands what mine
17    that's referring to, correct?
18            A.    What is the question?
19            Q.    The first question is, does
20    he understand what mine that that name
21    refers to?  Is he familiar with that
22    mine, Luneng?
23            A.    I heard of the name of this
24    mine, but I am not familiar with this
```

1    mine.  I also have not been to this mine.

2             Q.    Would he know who owns the

3    mine?

4             A.    I don't know.  I just heard

5    of the name of this mine, and I don't

6    know who owns it.

7                     -   -   -

8             (Whereupon, Deposition

9             Exhibit Peng-10, E-mail with

10            translation, May 11, 2007,

11            Translation of TG 0022728 and TG

12            0022728, was marked for

13            identification.)

14                    -   -   -

15            MR. SEEGER:  For the record,

16            I'm marking as Exhibit 10,

17            Peng-10, which is -- the Bates

18            stamp is TG 0022728.

19            MR. GRAND:  The top sheet is

20            a translation that was provided by

21            defendants to plaintiffs.

22            MR. SEEGER:  I would like to

23            just point out one thing about

24            this, Mr. Spano.

1               So, this translation that

2          we've just marked as Peng Exhibit

3          10 was a translation provided by

4          defense counsel to us.  I have no

5          idea who did the translation on

6          your side or how it was done, but

7          I do have to note for the record

8          that there is -- there's

9          something, what I think is very

10         important missing from the

11         translation, and that is, if you

12         look under -- and Eugene speaks

13         and reads Chinese, so he can look

14         at it and tell me if we're reading

15         it wrong.  But under Mr. Peng's

16         name on the Chinese version, it

17         says "Taihe Dongxin Company Ltd."

18         In the version that's translated

19         into English, that was omitted.

20         To me, it is a material omission,

21         and it is something I have to

22         raise.  If you guys want to

23         address it, you can.  Gene, if you

24         would like to take a look and see

1        if we're misunderstanding, that's

2        fine.  But I guess for the record,

3        I would like to say, if you're

4        going to provide us with

5        translations, they have to be real

6        translations.  They have to be

7        something we can rely upon.

8              MR. SPANO:  We agreed to

9        exchange the translations we had.

10       We have made no representations as

11       to the completeness or accuracy of

12       the translations.  There were

13       errors in your translations, there

14       may be errors in ours.  The

15       translations are for the lawyers.

16       They're work product that was

17       exchanged on an agreement that

18       there would be no waiver of

19       privilege.  And as I said

20       yesterday, the questioning of the

21       witness is going to be questioned

22       on the discovery documents we

23       produced.  We're not going to

24       permit any questions to the

 1          witness regarding the translations

 2          themselves.  So, your observation

 3          about the translation is noted for

 4          the record.  I don't disagree with

 5          what you said, but it is what it

 6          is.

 7                    MR. SEEGER:  Okay.

 8     BY MR. SEEGER:

 9          Q.    Mr. Peng, have you had an

10     opportunity to look at what I've just

11     marked as Exhibit 10?

12          A.    There are two pages.  Which

13     page are you referring to?

14          Q.    Well, there's an English

15     translation, and then there's a

16     Chinese -- English translation of the

17     Chinese e-mail.  I believe you're looking

18     at the Chinese e-mail, right, Mr. Peng?

19          A.    Yes.

20          Q.    And the English version

21     that's provided to you, that was provided

22     to us by your counsel, just for your

23     information.

24          A.    Understand.

1              Do you want me to also read
2    the English version?
3         Q.    No.  You can read whatever
4    version.  Let me ask you questions and
5    you decide.
6              MR. SEEGER:  You can tell
7         him that.
8    BY MR. SEEGER:
9         Q.    Mr. Peng, what's your
10   testimony as to when you rejoined TG?
11   What date is that?
12        A.    Rejoined?
13        Q.    Strike that question.  I'm
14   sorry, I apologize.
15             The date of this e-mail is
16   May 11, 2007.  It's your testimony that
17   you were working for TTP during that time
18   frame, correct?
19        A.    Yes, I worked for TTP.
20        Q.    We would just note, if you'd
21   take a look with me, Mr. Peng, at the
22   subject line.  It says "Taishan gypsum
23   boards."  Do you see that?
24        A.    I see that.

1          Q.    This is an e-mail that's
2    written by you, right, Mr. Peng?
3          A.    Yes, I wrote it.
4          Q.    And who is Mr. Zhang, the
5    person that you've addressed this e-mail
6    to?
7          A.    I don't recall who this Mr.
8    Zhang is.
9          Q.    Take a look at the Chinese
10   version, Mr. Peng.  In here, you refer to
11   the company that you're selling gypsum
12   board from as Shandong Taihe Dongxin
13   Company, correct?
14               MR. SPANO:  Objection to
15          form.
16               THE WITNESS:  I did not hear
17          clearly of your question.  Would
18          you mind to repeat it.
19               MR. SEEGER:  (Addressing the
20          interpreter.)
21               I think he's talking to you.
22               (Interpreter repeated the
23          question.)
24               THE WITNESS:  This is not

1          what I meant.  I was just trying

2          to introduce to Mr. Zhang this

3          company Shandong Taihe Dongxin.

4      BY MR. SEEGER:

5          Q.    Mr. Peng --

6              INTERPRETER 1:  He's not

7          finished.

8              MR. SEEGER:  I'm sorry.

9              THE WITNESS:  Because at

10         this company, Taihe Dongxin has

11         been existing for a long time, a

12         lot of the customers in China,

13         they know about it.  And sometimes

14         they might request me to introduce

15         the situation about Taihe Dongxin,

16         because I do the work and I need

17         to respect our customers,

18         therefore, I would introduce about

19         the Taihe Dongxin sometimes,

20         although at that time I worked for

21         TTP.

22     BY MR. SEEGER:

23         Q.    But Mr. Peng, I just want

24     you to focus on my questions then.

 1                    In the e-mail that you wrote

 2   to Mr. Zhang, you refer to yourself as

 3   Shandong Taihe Dongxin Company, correct,

 4   not TTP?

 5                    MR. SPANO:  Objection to

 6          form.

 7                    THE WITNESS:  I disagree

 8          with what you said.  I worked for

 9          TTP.

10                    MR. PANAYOTOPOULOS:

11          Objection, nonresponsive.

12   BY MR. SEEGER:

13          Q.   But the e-mail that you

14   wrote, Mr. Peng, references a company --

15   strike that.

16                    The e-mail that you wrote,

17   Mr. Peng --

18                    In the e-mail you wrote, Mr.

19   Peng, you reference Shandong Taihe,

20   correct?  You are not mentioning TTP

21   anywhere in this e-mail, are you?

22                    INTERPRETER 1:  Counsel, the

23          interpreter did translate your

24          question, but the word

1          "references," I try to interpret

2          it in two, three ways because that

3          is a word that can be translated

4          in many ways.

5              MR. SEEGER:  Strike the

6          question then.  I don't want to

7          have that.  Just let me know if

8          you me need to, and I can always

9          rephrase the question.

10             INTERPRETER 1:  With

11         reference --

12             MR. SEEGER:  No.  I'm going

13         to strike it.  I just don't want

14         to waste time because we only have

15         one more day with the witness.

16         I'm sorry, but I've just got to

17         move it along.

18  BY MR. SEEGER:

19     Q.   Mr. Peng, you do not

20  reference TTP anywhere in this e-mail, do

21  you?

22             INTERPRETER 1:  Counsel,

23         would you mind to help me with the

24         word "reference"?  It can be

 1          translated into --

 2    BY MR. SEEGER:

 3          Q.    Mr. Peng, you do not write

 4    the words "TTP" or the name of that

 5    company anywhere in this e-mail, do you?

 6          A.    I did not write TTP on this

 7    e-mail, but I did mention earlier,

 8    according to the requirement of the

 9    customers, the customers, they want to

10    have understanding of Taihe Dongxin, and

11    the customer asked for some explanations.

12    I was only making some introductions

13    according to the requirements of the

14    customers.

15          Q.    Mr. Peng, what company name

16    did you write under your name in the

17    Chinese version of this e-mail?

18              MR. SPANO:  Objection to

19         form.

20              THE WITNESS:  Under my name,

21         it was written as Taihe Dongxin

22         Company Limited.  That is being

23         set up by the program.  This is

24         not what I wrote down.

 1   BY MR. SEEGER:

 2           Q.    Mr. Peng, in May of 2007,

 3   did you work for Taihe Dongxin Company

 4   Ltd.?

 5                 MR. SPANO:  Objection to

 6           form.

 7                 THE WITNESS:  At that point,

 8           I was working for TTP company.

 9   BY MR. SEEGER:

10           Q.    So, this is a false

11   statement in your e-mail, correct?

12                 MR. SPANO:  Objection to

13           form.

14                 THE WITNESS:  I don't

15           understand what statement you are

16           saying that is incorrect.

17   BY MR. SEEGER:

18           Q.    Mr. Peng, would you look on

19   your e-mail there.  Do you see that you

20   provided the customer in this case with a

21   telephone number?

22           A.    Yes, there is a telephone

23   number.

24           Q.    Was that your telephone

1    number in May of 2007?

2                    MR. SPANO:  Objection to

3         form.

4                    THE WITNESS:  Are you

5         talking about the telephone number

6         at the bottom of this e-mail?

7    BY MR. SEEGER:

8         Q.    I'm talking about the

9    telephone number at the bottom of the

10   e-mail below his name, correct.

11        A.    I used this telephone

12   number.  It is the telephone number I

13   use.

14        Q.    At that time in May of 2007,

15   correct?

16        A.    Yes.

17        Q.    Mr. Peng, would it surprise

18   you to know that that number is

19   registered to TG?

20                   MR. SPANO:  Objection to

21        form.

22                   THE WITNESS:  Regarding this

23        telephone number, I need a few

24        minutes to explain.  Is that okay?

 1   BY MR. SEEGER:

 2          Q.    It's your deposition.  Yes.

 3          A.    It is the number when I

 4   first work for TG, and here this number

 5   0086 is a country code.  And 0538 is the

 6   area code.  And 8812017 is the telephone

 7   number.  In the year 2006, after I joined

 8   TTP, because in the new office of TTP,

 9   they did not have a new telephone number,

10   they did not have a line.  At that time,

11   we tried to apply for local telephone

12   services from a supplier that I cannot

13   recall.  It could be Zhong Guo Wang Tong

14   China Internet something or Zhong Guo

15   Dian Xin.

16                  INTERPRETER 2:  China

17          Telecom.

18                  THE WITNESS:  China Telecom

19          that I cannot recall.  At that

20          point, they help to adjust the

21          telephone to my office or

22          transfer.

23                  INTERPRETER 2:  Correction.

24          The office of TTP.

 1                    INTERPRETER 1:  I did not

 2           have that TTP word in my notes.

 3  BY MR. SEEGER:

 4           Q.    Okay.  So --

 5                    THE WITNESS:  I haven't

 6           finished yet.  Therefore, when I

 7           worked for TTP, the telephone

 8           number was still (00 86) 5388

 9           812017.  Finished.

10  BY MR. SEEGER:

11           Q.    Mr. Peng, in the e-mail that

12  you wrote in Chinese, you tell the

13  customer in this case that Shandong Taihe

14  Dongxin exports gypsum board to the

15  United States in about 18 million square

16  meters.  Isn't that what you say?

17                    MR. SPANO:  Objection to

18           form.

19                    THE WITNESS:  Are you

20           referring to this statement here?

21           (Indicating.)

22                    INTERPRETER 1:  The witness

23           is pointing to this sentence

24           saying "the export of gypsum

```
 1            boards to the United States last
 2            year was 18 million square
 3            meters."
 4    BY MR. SEEGER:
 5            Q.    Correct.
 6            A.    In this case, let me
 7    explain.  Number one --
 8            Q.    Well, actually -- go ahead.
 9            A.    Exporting to the United
10    States referred to as the company in
11    China talking to customer in China
12    regarding they talk about it, negotiation
13    or talk and also signing the contracts
14    and also producing for the customers.  We
15    talk about this in China.  We also
16    collect the money in China.  We also make
17    the dealings in China of the products.
18                  INTERPRETER 2:  Correction.
19            The transaction was regarded in
20            China.
21                  INTERPRETER 1:  Transaction
22            and dealings are the same.  We
23            have many words that we can choose
24            from.  Interpreter, I hope you
```

1              don't play games with similar
2              words anymore.  It's a waste of
3              time and unprofessional.
4                    MR. SEEGER:  Stephanie,
5              you're the official interpreter.
6              Let's not have a back and forth.
7              Let her say what she says and
8              then --
9                    MR. CHEN:  If I may
10             interject, because that was quite
11             a serious accusation.  And let me
12             refer the interpreter again to the
13             agreed-upon list where the term
14             that was used is translated as
15             transaction.  That was used by
16             both sides and agreed upon.  And
17             so before she makes accusations
18             about manipulation of terms, she
19             should use what was actually
20             provided to her in terms of
21             agreed-upon terms.
22                    MR. SEEGER:  It's fair
23             enough.  No more back and forth.
24             Just let her make her objection.

1          You don't have to respond to her

2          objection or defend your

3          interpretation.

4                    INTERPRETER 1:  Thank you.

5                    MR. SEEGER:  No, but use the

6          terms that were provided, if you

7          can.  So let's just go forward.

8                    MR. PANAYOTOPOULOS:  Let me

9          make an objection, please, as

10          nonresponsive.

11    BY MR. SEEGER:

12          Q.    Did he finish his answer?

13          A.     I haven't finished yet.

14          Q.    He can finish.  I'm going to

15    let him finish.  I just want him to know,

16    he's not answering my question.  Does he

17    want to answer the question I asked or

18    does he want to finish the speech?

19    Whatever he wants.

20                    MR. SPANO:  I object to that

21          question and that characterization

22          of his answer.  There is a

23          foundation in this deposition that

24          this witness has limited English

```
 1          language reading and writing
 2          ability.  And when you're
 3          confronting him with his writing,
 4          he's entitled to explain what he
 5          meant.  So, ask questions if you
 6          want, but don't insult him and
 7          don't characterize his testimony.
 8          Next question.
 9               MR. SEEGER:  You'd better
10          lower your voice.
11               MS. BASS:  Let me just
12          object to the speaking objection.
13               MR. SEEGER:  You'd better
14          lower your voice or I'll put the
15          camera on you the rest of the
16          deposition.  I'm not going to have
17          you scream at me from across the
18          table.
19               MR. SPANO:  I apologize.
20               MR. SEEGER:  It's accepted.
21               MR. SPANO:  I apologize, but
22          that was an unwarranted attack on
23          the witness, who is trying to
24          explain what he wrote.  And you
```

1      questioned him for an hour

2      yesterday about his English

3      ability, and he's laid a strong

4      foundation that he has problems

5      with English, that he sits for

6      hours with dictionaries before he

7      writes words, and you're sticking

8      documents --

9            MR. SEEGER:  It's his

10     document, Frank.  He wrote it.

11           MR. SPANO:  You're sticking

12     documents in front of his eyes and

13     saying gotcha because he used

14     certain words.

15           MR. SEEGER:  No.

16           MR. SPANO:  So, under those

17     circumstances, it's reasonable and

18     appropriate for him to explain

19     what he meant.

20           MR. SEEGER:  Frank, the

21     answer was so obviously coached,

22     it's like off the charts that you

23     really want to have this

24     discussion.  Let's let the record

1           speak for itself.  You've made

2           your objection.  I accept your

3           apology for yelling at me.  I will

4           not be yelling at you.  Let's move

5           on.

6      BY MR. SEEGER:

7           Q.    All right.  I would like to

8      ask him and try to get an answer to the

9      question I'm asking, which is simple, and

10     counsel can object to it if he likes.

11     And he can instruct him not to answer, do

12     whatever he wants.

13               But in the e-mail that you

14     wrote, Mr. Peng, to Mr. Zhang, you said,

15     "The export of gypsum boards to the

16     United States last year" referring to

17     2006, "was 18 million square meters."

18     Did you write that or did you not write

19     that?

20          A.    The e-mail wrote down 18

21     million square meters, but I need to

22     explain the situation.  We have new

23     customers, they want to buy drywalls.

24     And the customers, they want to

1    understand the company, therefore, we can

2    come to an agreement, the same

3    agreement -- the same opinion, the same

4    opinion.  The 18 million square meter,

5    that's not implied, the actual production

6    of 18 million square meters, or we did

7    have the transaction of 18 million square

8    meters at that --

9                    INTERPRETER 1:  I asked the

10              witness to pause, and let me

11              finish the part that I can finish,

12              and I will ask him to help me, to

13              repeat to me what I missed.

14                    THE WITNESS:  At that time,

15              the customers, they made

16              inquiries, and they want to place

17              the order, and they want to get

18              the quotation for that order.  The

19              customer made an expression of how

20              much they wanted to buy.  During

21              the process when we were talking

22              about business with our customers,

23              they expressed that they have a

24              very big ability to buy.  It is

1           how much they can buy and also it

2           is how much they hope to buy from

3           our company.  Of course this 18

4           million was the preliminary

5           statistics.  It is not very

6           concrete.  Finished.

7     BY MR. SEEGER:

8           Q.    When you write e-mails to

9     your customers, do you make an effort to

10    be truthful, Mr. Peng?

11          A.    Yeah, I would try my best to

12    be truthful.

13          Q.    Mr. Peng, you also in this

14    e-mail referenced to this customer that

15    you -- that the 127 millimeter gypsum

16    board has passed US professional ASTM

17    inspection, correct?  You wrote that?

18                INTERPRETER 1:  Counsel, is

19          it 12.7 millimeter?

20                MR. SEEGER:  127 millimeter.

21          127.

22                I'm sorry.  I'm looking at

23          the Chinese version.  It is 12.7

24          millimeter.

1           THE WITNESS:  I did write

2      down in my e-mail that the 12.7

3      millimeter gypsum board has passed

4      US professional ASTM inspection.

5  BY MR. SEEGER:

6      Q.   Mr. Peng, in the board that

7  you shipped to the US, you would for

8  customers do private labeling, correct?

9  You would allow customers to put a

10 different name on the board or change the

11 color of the tape and do things like

12 that, correct?

13          MR. SPANO:  Objection to

14      form.

15          THE WITNESS:  Mr. Attorney,

16      I want to know when you refer to

17      the word "tape," is it what we

18      call the tape to seal the edges?

19 BY MR. SEEGER:

20     Q.   Yes.

21          MR. SPANO:  Are you done

22      with this exhibit?

23          MR. SEEGER:  Yes.

24          THE WITNESS:  When we

1          produce it or when we were talking

2          about business, I mean, when we

3          were dealing with the orders for

4          the 12.7 millimeter boards, we

5          would do it according to the

6          requirements of the customers for

7          the tapes.  Then we would design

8          the tape and design -- and to make

9          different designs according to the

10         requirements of the customers.

11  BY MR. SEEGER:

12         Q.    And you would actually --

13  I'm sorry.

14         A.    I haven't finished yet.

15                Of course the requirement

16  coming from the customer has to be --

17  must be legal, not to infringe, no

18  infringement, and do not violate the law,

19  and also, according to the capacity of

20  our production.  And also, these are the

21  requirements that we are able to do, then

22  we would do it according to the

23  requirements of the customers.  Finished.

24         Q.    Thank you.

1                    Mr. Peng, you would also
2      ship -- for the purpose of promoting your
3      brand in the United States, you would
4      ship samples to companies in the US of
5      your gypsum board, correct?
6                    MR. SPANO:  Objection to
7              form.
8                    THE WITNESS:  First of all,
9              we did not think about sending
10             samples to the United States for
11             promotion.  Secondly --
12                   INTERPRETER 2:  Correction.
13             We do not want to promote in the
14             US.
15                   MR. SEEGER:  Time out.  Let
16             her finish the answer, and then --
17                   Go ahead, finish the answer,
18             please.
19                   THE WITNESS:  And secondly,
20             some of the customers, they want
21             to have the samples to be shipped
22             to the United States.  They
23             require that.  And the customers,
24             they agree that the cost for the

1          shipment would be paid by they

2          themselves.  And the customers,

3          they expressed that they

4          themselves would pay, and they

5          themselves come to our company to

6          talk about the business, and they

7          said it would be very inconvenient

8          for them to bring it to the United

9          States, and they want us to ship

10         it for them.  And the customer

11         would agree that they pay for the

12         fee of the shipment, then we would

13         ship it for them.  Finished.

14    BY MR. SEEGER:

15         Q.   So, the simple answer is,

16    yes, you shipped samples into the U.S.,

17    correct, Mr. Peng?

18              MR. SPANO:  Objection to

19         form.

20              THE WITNESS:  If the

21         customer make such a requirement,

22         if the customer agree to pay for

23         the cost of the shipment, then we

24         would ship the samples according

1          to the requirement of the

2          customers.

3    BY MR. SEEGER:

4          Q.    And you would arrange

5    shipping on behalf of US customers also,

6    correct?

7          A.    I don't understand.  Are you

8    referring to the shipment of the product

9    or the shipment of the sample?

10          Q.    I'm sorry.  I switched.

11    You're right.  Shipment of the product.

12    Thank you, Mr. Peng.

13                MR. SPANO:  Object to the

14          form of the question.

15                THE WITNESS:  We are not

16          responsible for shipment.  We are

17          only responsible for dealings, or

18          another word, interactions,

19          transactions of the drywalls in

20          China.  Under certain

21          circumstances, the customer would

22          express to us that they cannot

23          find the shipment company.  They

24          asked us to provide the

1    information about shipment.  At

2    this point, we would provide

3    necessary information regarding

4    shipment to our customers.  Also,

5    under extremely individual cases,

6    and also the customer would

7    express to us that the shipping

8    costs, if they have to pay in the

9    United States, would pay much more

10    expensive than if it is paid in

11    China.  Under the request of the

12    customer, then we would pay the

13    fee of shipment in China on behalf

14    of the customer.

15         INTERPRETER 2:  Correction.

16    The witness mentioned sea freight,

17    the cost of sea freight.

18         INTERPRETER 1:  Sea freight

19    and shipment is the same.

20         THE WITNESS:  Can I take a

21    break?

22         MR. SEEGER:  (Addressing the

23    interpreter.) You?  Oh, Mr. Peng.

24    Yes.

```
 1                    THE VIDEOTAPE TECHNICIAN:
 2           The time now is approximately
 3           10:03 a.m., and we are off the
 4           record.
 5                         -  -  -
 6                (Whereupon, a recess was
 7           taken from 10:03 a.m. until 10:13
 8           a.m.)
 9                    THE VIDEOTAPE TECHNICIAN:
10           This begins Tape 2 of today's
11           portion of our deposition.  The
12           time now is approximately 10:13
13           a.m., and we're back on the
14           record.
15    BY MR. SEEGER:
16           Q.    Mr. Peng, who is Frona Shiu?
17    Does that name ring a bell?  Here, I
18    wrote it down.
19                (Handing over document.)
20                Just let the record reflect
21    that I wrote the name in English, and I'm
22    showing it to the witness.
23           A.    I don't know.  I have no
24    recollection of such a person.
```

1          Q.    Is he familiar with the

2   company called Rich Well?  Just for the

3   record, I've written the word "Rich Well"

4   on a piece of paper.

5          A.    I heard of this company.

6          Q.    Did this company promote the

7   Taishan brand in the United States?

8          A.    I don't know.  I have only

9   heard of this name, and I really did not

10  try to make (the witness paused) and I

11  did not have any understanding.  I did

12  not know what kind of behavior they did.

13         Q.    Mr. Peng, have you attended

14  any trade shows in the United States?

15         A.    Trade show, does it mean the

16  exhibition show or trade?

17         Q.    Yes.

18         A.    What do you mean?

19         Q.    Exhibition shows, for

20  example.

21               MR. SEEGER:  You're asking

22         me or is he asking?

23               INTERPRETER 1:  He's asking.

24               INTERPRETER 2:  The check

 1           interpreter mention the trade show

 2           term, it is on the glossary.

 3                    MR. SEEGER:  Thank you.

 4                    INTERPRETER 1:  That's what

 5           I give.  I use that term.

 6                    THE WITNESS:  I did not.

 7    BY MR. SEEGER:

 8           Q.    Did anybody at TG attend

 9    trade shows or exhibition shows in the

10    United States?

11                    MR. SEEGER:  Please use the

12           same term, Stephanie.

13                    THE WITNESS:  No.

14    BY MR. SEEGER:

15           Q.    Have you ever attended any

16    business meetings of any nature in the

17    United States, you, personally?

18           A.    I did not hear the question

19    clearly.

20                    MR. SEEGER:  (Addressing the

21           interpreter.)

22                    That's you.

23                    (Interpreter repeated the

24           question.)

```
 1                THE WITNESS:  Are you
 2         talking about in the United
 3         States?
 4   BY MR. SEEGER:
 5         Q.    Yes.
 6         A.    No.
 7         Q.    Anybody from TG attend any
 8   business meetings, as far as you know, in
 9   the United States?
10         A.    According to my knowledge,
11   no.
12         Q.    Besides you, Mr. Che and Mr.
13   Yang, what other TG employees, as far as
14   you know, began working for TTP around
15   2006?
16                INTERPRETER 2:  Correction.
17         It is TG.  Other TG employees
18         working for TTP.
19                MR. SEEGER:  Yeah.  Did you
20         see the question I asked,
21         Stephanie?
22                INTERPRETER 1:  Yes.
23                MR. SEEGER:  Why don't you
24         reask it with that correction.
```

1              INTERPRETER 1:  Okay.

2              (Interpreter repeated the

3         question.)

4              THE WITNESS:  I did mention

5         about this yesterday.  In the year

6         2006, the three of us joined TTP

7         to work.  I don't know about

8         any -- I don't know the business

9         of other people.

10              MR. SEEGER:  Mr. Spano, I'm

11         going to stop questioning the

12         witness at this point.  I'm not

13         really passing him in the formal

14         sense in that I'm giving up my

15         right to ever ask him questions

16         again in a deposition.  It's our

17         belief that he'll be deposed

18         again, but I'm going to

19         discontinue my questioning for now

20         and pass him to the next

21         questioner.

22              MR. SPANO:  I understand

23         your position.

24              MR. SEEGER:  Thank you, Mr.

1          Peng.

2                    -  -  -

3                 EXAMINATION

4                    -  -  -

5    BY MR. MONTOYA:

6          Q.    Good morning, sir.  My name

7    is Patrick Montoya.

8          A.    How are you?

9          Q.    I'm sorry I'm so far across

10   the table from you.  I apologize.

11         A.    But we have an interpreter.

12         Q.    Sir, you never told any

13   customer from the United States that

14   drywall was too heavy to ship to the

15   United States, did you?

16         A.    When I was communicating

17   with the customers and the customers

18   would ask us how heavy it is, and we will

19   tell them truthfully how heavy it is.

20               According to our opinion, we

21   would consider the cost for sea freight

22   to be too high.  First of all, the

23   drywall is very heavy; and secondly, the

24   shipment is very -- the cost for shipment

 1    is very high, and the cost for shipment

 2    for the drywall would be very high.

 3    Finished.

 4           Q.    Sir, you never wrote to a

 5    customer in the United States that the

 6    drywall was too heavy to ship to the

 7    United States, did you?

 8           A.    So, when the customer come

 9    to us to ask about in the factory, that

10    means when we talk about it face-to-face,

11    and when we were talking about business,

12    then they would ask us something related

13    to this issue.  Finished.

14           Q.    Sir, my question was, did

15    you ever write in an e-mail or in a

16    letter to a customer in the United States

17    that the drywall was too heavy to ship?

18               MR. SPANO:  Objection to

19          form.

20               THE WITNESS:  This I don't

21          recall.

22    BY MR. MONTOYA:

23           Q.    Sir, did you ever refuse to

24    sell drywall to a customer in the United

1    States because the drywall was too heavy

2    to ship?

3            A.    Mainly we will base on the

4    requirement of the customers.  We will

5    tell them the truth, tell the customer

6    how heavy the drywall is.  And it is

7    according -- it is according to their

8    will, to see whether they're willing to

9    or whether they consider this to be

10   suitable to ship.  And this is their

11   option.

12           Q.    Sir, did you ever tell a

13   customer from the United States that you

14   would not ship drywall to them because it

15   was too heavy?

16           A.    I don't understand the

17   question.

18           Q.    Sir, selling drywall to the

19   United States was good for your business,

20   right?

21               MR. SPANO:  Objection to

22          form, lack of foundation.

23   BY MR. MONTOYA:

24           Q.    You can answer, sir.

1              A.    I did mention about this

2    earlier.  We did not sell drywall in the

3    United States.  We did the transaction,

4    or another word, dealings, in China.  In

5    order to save time, I'm not going to

6    repeat my answer.

7              Q.    Sir, developing a market in

8    the United States for drywall was

9    important to your company; is that

10    correct?

11                  MR. SPANO:  Objection to

12            form.

13                  THE WITNESS:  We did not

14            have any objective to -- we don't

15            have any objective to develop the

16            market in the United States.  This

17            is not important to us.

18    BY MR. MONTOYA:

19              Q.    Sir, was it important to

20    your business from 2006 to 2008 to

21    develop a market for the sale of drywall

22    in the United States?

23                  MR. SPANO:  Objection to

24            form, lack of foundation.

1                    -  -  -

2                    (Whereupon, the following

3            portion of the transcript was read

4            by the court reporter:

5                    "Q.  Sir, was it important

6            to your business from 2006 to 2008

7            to develop a market for the sale

8            of drywall in the United States?")

9                    -  -  -

10                   MR. CHEN:  Objection.  She's

11           still translating the mistaken

12           portion.

13                   MR. MONTOYA:  I'll ask the

14           question again to make it easier.

15   BY MR. MONTOYA:

16           Q.   Sir, was it important to

17   your business from 2006 to 2008 to

18   develop a market for the sale of drywall

19   in the United States?

20                   MR. SPANO:  Objection.

21   BY MR. MONTOYA:

22           Q.   You can answer.

23           A.   Can you make the question

24   shorter?  You confused me.

1          Q.    Sir, one of the goals of the

2    Foreign Trade Office at your company from

3    2006 to 2008 was to develop a market in

4    the United States for the sale of

5    drywall, correct?

6          A.    The "company," what company

7    are you referring to?

8          Q.    The company you worked for

9    from 2006 to 2008.

10         A.    During the year 2006 and

11    2007, TTP did not establish a department

12    called department of foreign trade.

13              INTERPRETER 1:  Or during

14         the first three days of the

15         deposition, it was translated as

16         department of foreign sales.

17              INTERPRETER 2:  Correction.

18         The witness said, in 2006 and

19         2007, I worked for TTP, and TTP

20         did not have foreign trade -- was

21         not established a foreign trade

22         department.

23              INTERPRETER 1:  What?

24              MR. MONTOYA:  I'm going to

1          move on to my next question.

2                    THE WITNESS:  I haven't

3          finished yet.  I need to continue

4          with my answer.

5    BY MR. MONTOYA:

6          Q.    Please do so.

7          A.    We also did not go to the

8    United States to do marketing and to do

9    the sales.

10          Q.    Did your company have a

11    website that reached the United States

12    from 2006 to 2008?

13                    MR. SPANO:  Objection to

14          form.

15                    THE WITNESS:  TTP has never

16          had -- made such a website.

17    BY MR. MONTOYA:

18          Q.    Finished?

19          A.    According to my

20    understanding, TG did have a website.

21    Finished.

22          Q.    Did you develop any sales or

23    promotional materials on the Internet

24    when you worked from 2006 to 2008?

1           A.    I don't understand.  Are you

2    referring to me as an individual or are

3    you referring to the company?

4           Q.    Let's start with you as an

5    individual.

6           A.    No.

7           Q.    How about the company?

8                 MR. SPANO:  Objection to

9           form.

10                THE WITNESS:  I'm sorry.  I

11          don't recall the question.  Can

12          you repeat it?

13   BY MR. MONTOYA:

14          Q.    Yes.

15                Did your company develop any

16   sales or promotional materials on the

17   Internet when you worked from 2006 to

18   2008?

19                MR. SPANO:  Objection to

20          form.

21   BY MR. MONTOYA:

22          Q.    You can answer.

23          A.    First of all, just like what

24   I mentioned earlier, TTP did not have a

 1   website.  Number two, TG has a website.

 2   According to my understanding, they give

 3   a very brief introduction of the

 4   situation or condition.

 5        Q.   When your TTP customers

 6   asked you for a website to look at

 7   regarding your product from 2006 to 2008,

 8   you had them look at the TG website,

 9   correct?

10             MR. SPANO:  Objection.

11             THE WITNESS:  It was the

12        case of between 2006 and 2007.

13   BY MR. MONTOYA:

14        Q.   Did you ever send product

15   catalogs to customers in the United

16   States by e-mail from 2006 to 2008?

17             INTERPRETER 1:  Counsel, the

18        word "product catalogs" has many

19        different wordings for it, and I'm

20        trying my best.

21             MR. MONTOYA:  I'll point out

22        "catalog" is a defined term on the

23        glossary that we've agreed to, if

24        you could use that, please.

 1                INTERPRETER 1:  No problem.

 2                MR. CHEN:  As is product

 3        catalog.  That specific term is

 4        defined.

 5                MR. MONTOYA:  Use product

 6        catalog, please.

 7                INTERPRETER 1:  Okay.

 8                THE WITNESS:  Do you mean

 9        have I ever introduced our

10        products to our customers through

11        the product catalog?  Is that what

12        you mean?

13                INTERPRETER 2:  By e-mail,

14        via e-mail.

15                THE WITNESS:  By e-mail?

16   BY MR. MONTOYA:

17        Q.   Yes.  And did you ever send

18   that catalog by e-mail to the United

19   States?

20        A.   According to my knowledge,

21   no.

22        Q.   Do you know if Mr. Che ever

23   sent the product catalog to a customer in

24   the United States by e-mail?

1          A.      That I don't recall.

2          Q.      How about Mr. Yang, do you

3    know if he ever sent product catalogs to

4    customers in the United States by e-mail?

5          A.      I also am not sure.  I can't

6    recall.

7          Q.      When you and Mr. Che and Mr.

8    Yang worked together, did you have sales

9    meetings?

10         A.      We communicate -- sorry.

11   I'll do it again.

12                 We communicate any time,

13   therefore, it would be convenient for our

14   exchange.

15         Q.      But did you ever have

16   periodic meetings, say, once a month,

17   once a week, regarding sales?

18         A.      We don't have a fixed

19   timetable.  I just mentioned it earlier.

20   When this is necessary, we would

21   communicate at any time.

22         Q.      Did you ever take notes when

23   you spoke with Mr. Che or Mr. Yang

24   regarding sales to the United States?

1              MR. SPANO:  Objection to

2         form.

3    BY MR. MONTOYA:

4         Q.    You can answer.

5         A.    We would talk about exact

6    business, the concrete business, but the

7    business talks, we don't have any

8    records, for example, the requirement of

9    the customers or whether we are capable

10   of fulfilling the requirement of the

11   customers.

12        Q.    How old is Mr. --

13              How old is Bill Che or Bill

14   Che.  I keep mispronouncing his name.

15        A.    How old is Bill Che?

16        Q.    Yes.

17        A.    I think he is about three or

18   four years older than me.

19        Q.    And Mr. Yang, how old is he?

20        A.    His age is similar to Mr.

21   Che.

22        Q.    Did you go to school with

23   either of them?

24        A.    Go to school together?

1          Q.     Yes.

2          A.     No.

3          Q.     Do you know if Bill Che or

4    Mr. Yang studied English like you did?

5          A.     They did not study English.

6    What I mean is that they did not learn --

7    they did not study professional English.

8    They might know something like A,B,C.

9          Q.     Did you ever use any

10   services to get customers in the United

11   States, referral services?

12               Let me start my question

13   again.

14               Did you ever use any

15   referral services to get customers in the

16   United States?

17               INTERPRETER 1:  Counsel,

18          "referral service," you mean the

19          middlemen?

20               MR. MONTOYA:  Yes.

21               MR. SPANO:  Objection to

22          form.

23   BY MR. MONTOYA:

24          Q.   You can answer, sir.

1          A.    I don't understand the

2    question.  Can you explain it to me?

3          Q.    Sure.  I'll ask you another

4    question to make it easier.

5                Are you familiar with a

6    website called Alibaba.com?

7          A.    I know this website.

8          Q.    Tell me about the website.

9                MR. SPANO:  Objection.

10                THE WITNESS:  I know that it

11             is a Chinese website -- it's a

12             website in China.  People can

13             release information through this

14             website.

15    BY MR. MONTOYA:

16          Q.    What did you use the website

17    for?

18          A.    What do -- I don't quite

19    remember well --

20                INTERPRETER 1:  The witness

21             paused.

22                THE WITNESS:  In the year

23             '06 and '07, I use the website to

24             release some information, product

1         information.

2    BY MR. MONTOYA:

3         Q.    For what company?

4         A.    This information was not put

5    out by me.  I don't recall exact content.

6         Q.    For what product?

7         A.    It should be the drywall.

8         Q.    And I didn't get an answer

9    to my other question.  I asked you for

10   what company?

11             MR. SPANO:  Objection to

12        form.  He did answer the question.

13        He said he didn't know the

14        content.

15             MR. MONTOYA:  Please don't

16        argue with me, Counsel.

17             MR. SPANO:  You made a

18        comment on the record that wasn't

19        part of the question.  So, if you

20        can do it, I can do it.

21             MR. MONTOYA:  I will read

22        the question.

23             It says, "For what company?"

24             "Answer.  This information

1          was not put out by me.  I don't

2          recall exact content."

3               I asked him for what

4          company.  He did not answer the

5          question.  I will ask him the

6          question again.

7     BY MR. MONTOYA:

8          Q.    Sir, for what company did

9     you use the website Alibaba for?

10               INTERPRETER 1:  I'm sorry.

11          The transcript on the screen was

12          not clear.

13                    -  -  -

14               (Whereupon, the requested

15          portion of the transcript was read

16          by the court reporter as follows:

17               "Q.    Sir, for what company

18          did you use the website Alibaba

19          for?")

20                    -  -  -

21               THE WITNESS:  I myself

22          personally did not use it.  I am

23          not in particularly to use this

24          for any company.  TTP did not use

1           this website.  TG, there is a
2           possibility that they have used
3           it, but I am not sure.
4    BY MR. MONTOYA:
5           Q.    Sir, in September of 2007,
6    you were working for TTP, correct?
7           A.    Yes.
8           Q.    Did you know if TG or TTP
9    sold a product called Illuminated, and
10   I'll spell it, I-L-L-U-M-I-N-A-T-E-D,
11   Columns, C-O-L-U-M-N-S?
12                MR. MONTOYA:  I don't think
13          it is a translated term.
14                INTERPRETER 1:  Can the
15          interpreter try, but I'm not sure.
16                The interpreter is trying to
17          help the witness to understand --
18                MR. MONTOYA:  That's okay.
19          I'll make it easier for you.
20                INTERPRETER 1:  -- the word
21          Illuminated Column, but he said --
22                MR. MONTOYA:  Stephanie,
23          that's okay.  I'll ask another
24          question.

 1            MR. CHEN:  She should at

 2       least translate what he said.

 3            MR. MONTOYA:  That's fine.

 4            THE WITNESS:  Would you mind

 5       to tell me exactly what it is?

 6            MR. MONTOYA:  Yes, sir, I

 7       will.

 8            Translate that.

 9            THE WITNESS:  Please.

10            MR. MONTOYA:  Linda, what's

11       the next exhibit?

12            THE COURT REPORTER:  11.

13                 -  -  -

14            (Whereupon, Deposition

15       Exhibit Peng-11, E-mail dated

16       September 21, 2007, Bates stamped

17       TG 0021226, was marked for

18       identification.)

19                 -  -  -

20  BY MR. MONTOYA:

21       Q.    Sir, I'm going to hand you

22  Exhibit 11 to your deposition, and a copy

23  to your counsel as well.  The Bates

24  Number is TG --

 1                    MR. MONTOYA:  You need to

 2         swap that.

 3   BY MR. MONTOYA:

 4         Q.    TG 21226 is the Bates label

 5   number.

 6         A.    Are you referring to this

 7   product, (indicating)?

 8                    INTERPRETER 1:  The witness

 9         is pointing to "Illuminated

10         Columns."

11   BY MR. MONTOYA:

12         Q.    Yes, sir.  If you could

13   please turn the document to the camera

14   and point to what you're reading.  Are

15   you reading "illuminated roman towers"?

16                    MR. MONTOYA:  If you can

17         translate that, please.

18   BY MR. MONTOYA:

19         Q.    If you can just hold it up

20   and point to it so we understand where

21   you're reading.

22         A.    Is it okay like this?

23         Q.    Sure, that's fine.

24                    MR. CHEN:  The translation

```
 1              was to just sit up and face the
 2              camera, not turn around and show
 3              us where you are pointing.
 4                   MR. MONTOYA:  That's okay.
 5              Thank you.  Don't worry about it.
 6                   INTERPRETER 1:  No.  I would
 7              not translate what was written not
 8              being said.  It is not my job.
 9    BY MR. MONTOYA:
10         Q.    That's okay.
11              What's an illuminated roman
12    tower?  That's my question.
13         A.    I don't know.
14         Q.    Is that your e-mail address
15    at the top of Exhibit 11,
16    8812017538@163.com?
17         A.    Yes, it is my e-mail
18    address.
19         Q.    And the e-mail starts, it
20    says "Dear Owen Li."  Do you see that?
21         A.    I see that.
22         Q.    Who is Owen Li?
23         A.    According to my
24    understanding, he is a staff of TG.
```

1              Q.    This is an inquiry from a

2    customer in the United States, correct?

3              MR. SPANO:  Objection to

4         form.

5              THE WITNESS:  This is an

6         e-mail from Alibaba to my e-mail.

7         It is the website of Alibaba, an

8         advertisement.  They do it for

9         themselves.  They send me this

10        e-mail.  I don't understand this

11        e-mail, and I don't know why they

12        send me this e-mail.  A lot of

13        this advertisement company or

14        companies, they want to do

15        promotion, including company such

16        as Alibaba.  They would dispatch

17        e-mails as a group, group dispatch

18        to do promotion for themselves.  I

19        usually call this junk mail.

20   BY MR. MONTOYA:

21             Q.    You know that this e-mail

22   was sent by someone in the United States,

23   correct?

24             MR. SPANO:  Objection to

1          form, lack of foundation,

2          mischaracterizes the document.

3          Other than that, it's fine.

4    BY MR. MONTOYA:

5          Q.    You can answer, sir.

6          A.    I said I saw this e-mail,

7    but this kind of e-mail is meaningless to

8    us.  Is that what you mean?  Today I see

9    this e-mail.  Is that what you mean?

10         Q.    No.  What I meant was that

11   the e-mail was sent by someone in the

12   United States?

13             INTERPRETER 2:  Correction.

14         The witness asked is that -- do

15         you want to know how I feel when I

16         see this e-mail today?

17             INTERPRETER 1:  Objection.

18   BY MR. MONTOYA:

19         Q.    You can answer my question,

20   sir.

21             MR. MONTOYA:  It's okay.

22             INTERPRETER 1:  Ratification

23         of the question by the check

24         interpreter.

1    BY MR. MONTOYA:

2         Q.    Please answer my question.

3    My question was, was the e-mail sent by

4    somebody in the United States?

5         A.    This e-mail was sent to my

6    e-mail by Alibaba.

7         Q.    Did anybody follow up on the

8    inquiry from Alibaba?

9              MR. SPANO:  Objection to

10             form.

11             THE WITNESS:  I said this is

12             the junk mail.  We don't

13             understand it, and we are unable

14             to reply to it.

15             MR. CHEN:  Objection.  What

16             he said was, we don't understand

17             what this product is, and we're

18             unable to respond to it.

19             INTERPRETER 1:  Objection.

20             He did not say that.

21             MR. CHEN:  Well, it's on the

22             video, so, that's fine.

23             MR. MONTOYA:  Let's move on.

24    BY MR. MONTOYA:

1        Q.    Did you or anyone else at

2   TTP subscribe to any other services like

3   Alibaba.com for customer referrals?

4        A.    I don't understand the

5   question.

6        Q.    What was Owen Li's job at

7   TG?

8        A.    This I'm not sure, but

9   according to what I know, he is a

10  salesperson.

11       Q.    Did you work with him?

12       A.    We don't work together.

13       Q.    Did you ever --

14             While you were working at

15  TTP, did you ever meet with any

16  salespeople at TG?

17       A.    Yes.  This happened.

18       Q.    Who did you meet with?

19       A.    Seems like I met this Owen

20  Li.  And also there is another person by

21  the last name Zhang.  I don't remember

22  the name.

23       Q.    When you communicated with

24  salespeople at TG, did you ever use

1    instant messaging at all?

2            A.    I do not understand the

3    question.

4                    MR. MONTOYA:  If I can ask

5            for some help.  What is the term

6            for instant messaging?  Does he

7            understand what instant messaging

8            is?

9                    INTERPRETER 1:  I will try

10           my best, but I'm not sure about

11           the standard form.

12                   MR. CHEN:  It's a text, but

13           it is not necessarily -- or you

14           might -- maybe if you give an

15           example like MSN.  It's up to you,

16           though.

17                   INTERPRETER 1:  That would

18           be better if you do that.

19                   MR. MONTOYA:  That's fine.

20    BY MR. MONTOYA:

21           Q.    Did you ever communicate

22    with salespeople at TG using MSN?

23           A.    Sometimes we do.

24                   Can I take a break?

1           MR. MONTOYA:  Yes.

2           THE VIDEOTAPE TECHNICIAN:

3      The time now is approximately

4      11:08 a.m., and we are now off the

5      record.

6              -   -   -

7           (Whereupon, a recess was

8      taken from 11:13 a.m. until

9      11:15 a.m.)

10              -   -   -

11           THE VIDEOTAPE TECHNICIAN:

12      This begins Tape 3 of today's

13      deposition.  The time now is

14      approximately 11:15 a.m., and

15      we're back on the record.

16 BY MR. MONTOYA:

17      Q.   Sir, was your personal

18 compensation from 2006 to 2008 based on

19 the amount of drywall that you helped to

20 sell?

21           INTERPRETER 1:  Counsel, the

22      word "compensation," what do you

23      mean by it?

24           MR. MONTOYA:  Salary.

 1                INTERPRETER 1:  Salary.

 2         Right.

 3                THE WITNESS:  Okay.  My

 4         salary is related to the sales of

 5         drywall, but it is not being

 6         determined by this matter.

 7    BY MR. MONTOYA:

 8         Q.    If you sold more drywall

 9    from 2006 to 2008, did you make more

10    money?

11         A.    You can say that overall,

12    but that is not according to -- it's not

13    according to the scale of that.  That

14    means I don't get paid more if I sell

15    more or I get paid less if I sell less.

16         Q.    Were you paid --

17                INTERPRETER 2:  The check

18         interpreter -- correction.  The

19         witness says, generally, you can

20         say that.  However, I sell more

21         does not mean that proportionately

22         I would get paid more.

23                MR. CHEN:  Or if I sell

24         less, then I would proportionately

1           get paid less.

2                    INTERPRETER 1:  The scale

3           means proportionately.  And also

4           objection, the word "literally"

5           was revised by the check

6           interpreter.  The witness said,

7           you can say that overall.  I

8           checked two times with the witness

9           for that wording.

10  BY MR. MONTOYA:

11          Q.    Do you agree with me that

12  from 2006 until 2008, if you helped to

13  sell more drywall, you made more money?

14          A.    I feel this question is the

15  same question just like you asked

16  earlier.  I already answered.

17          Q.    Please answer it.

18          A.    I will repeat the answer for

19  the last question.  Is that okay?

20          Q.    Yes.

21          A.    Overall speaking, my

22  personal income is related to how much

23  drywall I sell, but you cannot say that.

24  You cannot say if I sell more drywall, my

1    salary will go up in that scale to make

2    or, in other words, proportionately make

3    more, that if I sell more drywall, I make

4    more, or if I -- opposite, if I sell

5    less, my salary would not go down.  That

6    means if I sell less, my -- I would not

7    make less in my salary.

8                    INTERPRETER 2:  Correction.

9            Proportionately, I would not make

10           less if the proportional to the --

11           if the sale of drywall goes down.

12                   INTERPRETER 1:  He did not

13           say the second half of the answer.

14           You added to his mouth.

15   BY MR. MONTOYA:

16           Q.    What did you try to do to

17   increase drywall sales for 2006 to 2008?

18           A.    I would do my best to

19   fulfill the requirement of the customers.

20   I will do well in the followings:  I

21   mean, I will do well in the services, in

22   the packaging.  I will also, according to

23   the requirement to do the shipment and

24   follow the timetable, I would do all of

1   this and try to let my customers to

2   appreciate me and so that they will

3   continue to take orders from me.

4              Of course, these matters,

5   first of all, has to be the things that I

6   am able to do, I'm capable of doing, and

7   also, it is being permitted within the

8   scope of the company.

9        Q.   Sir, from 2006 to 2008, you

10  helped to promote and market TTP as a

11  global company, correct?

12              MR. SPANO:  Objection to

13         form.

14  BY MR. MONTOYA:

15       Q.   You may answer.

16       A.   I did not do that.

17       Q.   Did anybody promote TTP as a

18  global company from 2006 to 2008?

19       A.   According to my

20  understanding, no.

21       Q.   How did customers in the

22  United States learn about TTP?

23       A.   I did mention about this.

24  The U.S. companies, some of the customers

1    of the U.S. companies, they come to

2    China, and they will look for agents and

3    interpreters.  These people would bring

4    them to our factory.

5           Q.    How did those customers know

6    to come to China?

7           A.    It is the customer's choice

8    and the customer's option.  That I don't

9    know.

10          Q.    Were there trade fairs

11   organized to attract customers in the

12   United States?

13                MR. SPANO:  Objection to

14          form.

15   BY MR. MONTOYA:

16          Q.    You can answer.

17          A.    No.

18          Q.    How did you promote the

19   Taishan brand of drywall?

20          A.    I mention it earlier.  I did

21   not promote.

22          Q.    What did you do?

23                MR. SPANO:  Objection to

24          form.

1                    THE WITNESS:  I don't know.

2          What is your question?

3    BY MR. MONTOYA:

4          Q.    What did you do to increase

5    the sales of Taishan brand drywall?

6          A.    I would not intentionally

7    or, in other words, deliberately trying

8    to pursue the objective to increase the

9    sales of Taishan drywall.

10                   MR. CHEN:  I believe the

11              reference was Taishan Gypsum

12              drywall.  I believe he said that

13              in Chinese, if you want to clarify

14              it.  I don't know.

15                   MR. MONTOYA:  That's fine.

16              I'm going to leave that.

17                   At this time, I would pass

18              the witness to the next

19              questioner.

20                   And sir, I appreciate your

21              time and courtesy today.

22                   If you would translate that,

23              please.

24                   THE WITNESS:  Thank you.

1           MR. SPANO:  Can we go off

2       the record.

3           THE VIDEOTAPE TECHNICIAN:

4       The time now is approximately

5       11:30 a.m., and we are now off the

6       record.

7                - - -

8           (Whereupon, a recess was

9       taken from 11:30 a.m. until

10      11:31 a.m.)

11               - - -

12          THE VIDEOTAPE TECHNICIAN:

13      The time now is approximately

14      11:31 a.m., and we are back on the

15      record.

16          MR. SPANO:  We conferred

17      with the witness off the record,

18      and he would like to break at noon

19      if that's okay.

20          MS. BASS:  That's fine.  No

21      problem at all.

22               - - -

23            EXAMINATION

24               - - -

1    BY MS. BASS:

2         Q.    Good morning.  My name is

3    Hilarie Bass.

4         A.    How are you?

5         Q.    Very well, thank you.

6               I represent home builders in

7    the United States whose homes were built

8    with Taishan Gypsum drywall.  So, we are

9    here today to try and understand how it

10   is that defective drywall manufactured by

11   your company ended up in their homes.

12               MR. SPANO:  Counsel, could

13          you please limit your introductory

14          remarks and ask questions.

15               MS. BASS:  I'm done with my

16          introductory remarks.

17               MR. SPANO:  Thank you.

18   BY MS. BASS:

19        Q.    Mr. Peng, I understand your

20   testimony is that you majored in English

21   literature; is that correct?

22        A.    I mentioned about this

23   yesterday.  My degree is in English

24   literature.

1          Q.    And in your Chinese
2    university, did you read the English
3    literature required for your degree in
4    English?
5                 MR. SPANO:  Objection to
6          form, lack of foundation.
7                 THE WITNESS:  I did mention
8          about this yesterday.  At
9          universities in China, when we
10         learn English, there are two ways.
11         Number one, it would be at the
12         teacher's college or we call it
13         the Normal school, college, Normal
14         University.  Another type of
15         English is that any type of
16         English you learn, it will be
17         called English literature.
18         Yesterday I did mention about when
19         I went to university, my
20         professional learning was economic
21         trade English or it could also be
22         translated as English in economic
23         and trading.  According to the
24         educational system in China,

1    ultimately the degree that I

2    received as to what I mentioned

3    earlier, the degree for English

4    besides the degrees -- that that

5    type of degrees in English that I

6    mentioned earlier before, there is

7    no third type of degree in

8    English.

9         INTERPRETER 2:  Correction.

10   The witness says, in China, apart

11   from the teaching English degree

12   or the English literature degree,

13   which is any kind of English

14   learning, there is no third

15   kind -- there is no third kind of

16   English degree in China.

17        INTERPRETER 1:  Objection.

18   The checking interpreter is trying

19   to fix the answer by adding the

20   words besides teaching English and

21   the other type of English.  That

22   was what he gave during the

23   earlier part of the answer.  As an

24   interpreter, we only do verbatim.

1         We don't add anything extra that

2         he did not say on to the script.

3         We don't fix the witness

4         testimony.

5              MS. BASS:  Thank you.

6              THE WITNESS:  When I went to

7         school, when I was learning the

8         curriculum of the English, we were

9         learning about elementary level of

10        the curriculum.  I went to college

11        in the year 1995.  The

12        universities that I entered, the

13        name was Shandong Construction

14        Material Industrial College.  But

15        during the time when I graduated,

16        the school's name has already

17        changed.  It is -- it was called

18        Jinan University.  And the school

19        has already changed the name.  It

20        was in the year 2003.

21   BY MS. BASS:

22        Q.   I would ask that you direct

23   the witness to limit his responses to the

24   question that I have asked.

1                    Mr. Peng, for

2    representatives of the United States jury

3    who might be watching this videotape, my

4    question to you is, are you suggesting

5    that you can get a degree from a Chinese

6    university in English trade -- in English

7    for economics and trade and not be able

8    to read or speak any English?

9                    MR. SPANO:  Objection to

10            form.

11                   THE WITNESS:  I did mention

12            about this earlier.  I can speak

13            simple English, and I can also

14            write simple English.  I did not

15            say I don't know any English.

16   BY MS. BASS:

17            Q.   Did you review any documents

18   in preparation for your deposition today?

19            A.   Under the guidance of my

20   attorney, I did read some documents.

21            Q.   Did you review any of the

22   e-mails that you wrote that were produced

23   to counsel in this litigation?

24            A.   I did browse about this.

1          Q.    Do you have an estimate of

2    how many e-mails have been produced to

3    counsel in this case that you wrote, Mr.

4    Peng, in English?

5          A.    Are you talking about how

6    many e-mails that I produced to my

7    counsel?

8          Q.    I am asking if you are aware

9    of how many e-mails were produced to your

10   counsel that reflect that they were

11   written by you in the English language?

12               MR. SPANO:  Objection.

13          Objection.  In answering this

14          question, do not reveal any

15          communications with counsel or any

16          information regarding documents

17          exchanged with counsel.

18               INTERPRETER 1:  Let me do it

19          again, because sometimes I need to

20          do it upside down.

21               THE WITNESS:  When I

22          produced the e-mail to my counsel,

23          I did not produce it in one batch.

24          Any time he ask for it, then I

```
 1          will produce, and I don't recall
 2          how many e-mails I produced to
 3          him.
 4   BY MS. BASS:
 5          Q.   Isn't it correct, Mr. Peng,
 6   that you wrote scores of e-mails to
 7   American customers in the English
 8   language?
 9               INTERPRETER 1:  Counsel,
10          "wrote scores," you mean many?
11               MS. BASS:  Many.  Many,
12          many.
13               INTERPRETER 1:  Counsel, I'm
14          trying to avoid the wording --
15               MS. BASS:  I appreciate
16          that.
17   BY MS. BASS:
18          Q.   Isn't it correct that you
19   wrote many, many, many e-mails to
20   American customers in English?
21               MR. SPANO:  Objection to
22          form, and also it's a harassing
23          question.
24               THE WITNESS:  I don't
```

1          understand.  What do you mean by

2          "many, many, many"?

3    BY MS. BASS:

4          Q.    In excess of 50.

5          A.    I do not recall.  I do not

6    recall exactly whether this is in excess

7    of 50 or not.  But it should be more than

8    10.

9          Q.    Okay.  Fine.

10              Isn't it true that you wrote

11   in excess of 10 e-mails to American

12   customers regarding the sales of gypsum

13   drywall by TTP and TG in English?

14              MR. SPANO:  Objection to

15          form.

16              THE WITNESS:  These e-mails

17          are mainly communications with the

18          customers regarding the

19          followings:  The design, the

20          packaging, the timetable for

21          production, the timetable for

22          delivery, and the concrete time.

23          This is what these e-mails are

24          about.

1    BY MS. BASS:

2         Q.    Isn't it true that you wrote

3    e-mails to American customers in English

4    confirming shipments of Chinese drywall

5    to cities in the United States?

6              MR. SPANO:  Objection to

7              form.

8              THE WITNESS:  We did not

9              ship Chinese drywall to cities in

10             the United States.  We made a

11             transaction or, in other words,

12             dealings in China.  Sometimes when

13             the customer wanted us to do

14             this -- when the customers do the

15             shipment and they asked us to pay

16             for the fee of the shipment on

17             their behalf, that is only under

18             very special conditions.  And I

19             did explain about this yesterday.

20   BY MS. BASS:

21        Q.    Under certain circumstances,

22   Mr. Peng, isn't it correct that you

23   assisted in shipping your drywall from

24   China to the Port of Tampa in Florida?

1               MR. SPANO:  Objection to

2          form.

3               THE WITNESS:  I'm not sure,

4          and also, I have no obligation to

5          try to understand or to know where

6          the customers ship -- which port

7          these customers ship it to.

8          Sometimes customers, they may ask

9          us for information, asking us for

10         the shipment information.  Then we

11         will provide -- when they request,

12         we will provide the contact

13         information for shipment.

14    BY MS. BASS:

15         Q.   Isn't it true, Mr. Peng,

16    that you've assisted in arranging for

17    shipment of drywall to Tampa, Florida?

18              MR. SPANO:  Excuse me.  We

19         have a correction.

20              MS. BASS:  Don't interrupt,

21         please.

22              MR. SPANO:  He wasn't

23         finished with his answer.  It's

24         not complete because it was

1          mistranslated, so we're completing

2          the answer.

3              MS. BASS:  Don't interrupt

4          the translator.  When the

5          translator is finished, you can

6          make whatever objection you feel

7          is appropriate.  Thank you.

8              THE WITNESS:  I finished.

9              MR. CHEN:  I'll just note,

10         it's actually an issue with

11         transcription.  I believe in line

12         64, 9, it is, we will provide the

13         contact information, not the

14         content information.

15                   -  -  -

16             (Whereupon, the following

17         portion of the transcript was read

18         by the court reporter:

19             "Q.   Isn't it true, Mr.

20         Peng, that you've assisted in

21         arranging for shipment of drywall

22         to Tampa, Florida?")

23                   -  -  -

24    BY MS. BASS:

```
 1              Q.    I would ask the witness to
 2    give a yes or no answer, and then he can
 3    provide whatever explanation he believes
 4    is necessary.
 5              MR. SPANO:  Objection to the
 6              form and asked and answered.
 7              THE WITNESS:  This question
 8              I cannot answer by simply saying
 9              yes or no.
10              According to my
11              understanding, minority of the
12              customers, where it occurred two
13              times.  The customers require us
14              to help.  They said they are not
15              familiar with the sea freight, and
16              they hope that we can help them
17              with the shipment to certain
18              ports.  The customer required us
19              to pay the sea freight fee on
20              their behalf, and the customer
21              requested that we contact the sea
22              freight company, but I don't
23              recall what port it was for.
24              INTERPRETER 2:  The
```

1           interpreter just says container.

2                    INTERPRETER 1:  It's about

3           two to three containers.

4    BY MS. BASS:

5           Q.    It's your testimony under

6    oath, Mr. Peng, that you have no

7    knowledge of having assisted in the

8    shipment of Chinese drywall to the Port

9    of Tampa?  Is that your testimony under

10   oath today?

11                   MR. SPANO:  Objection to

12          form and mischaracterizes his

13          testimony.

14                   THE WITNESS:  I did explain

15          to you the actual situation at

16          that time.

17   BY MS. BASS:

18          Q.    Are you aware that Chinese

19   drywall that you sold in China was going

20   to be utilized in the state of Florida?

21                   MR. SPANO:  Objection to

22          form.

23                   THE WITNESS:  I don't know

24          where they would utilize it in the

1            United States or used.

2    BY MS. BASS:

3            Q.    Are you aware that Chinese

4    drywall that you sold in China was going

5    to be transported to the Tampa Port in

6    Florida?

7                 MR. SPANO:  Objection to

8            form.

9                 THE WITNESS:  Sometimes it

10           will go through the agent of the

11           shipment company appointed by the

12           customer.  Or in minority of the

13           time, very few times the customer

14           would tell us where it is possible

15           or where they want it to ship to.

16           But it is not our concern.  We

17           also don't pay attention to where

18           they are going to ship this to.

19    BY MS. BASS:

20           Q.    For the purpose of Chinese

21    tax records, does your company have to

22    maintain records of where product is

23    being shipped to?

24           A.    Our company would not have a

1    record regarding where it will be shipped

2    to, but according to the tax law in

3    China, by law, they require by the tax

4    bureau -- the tax bureau would have a

5    format for invoicing -- for the invoice.

6    And there is a column, there is one

7    column the tax bureau require us to fill

8    in to fill out where it is going to ship

9    to.  Of course this requirement is not

10   very prudent or very accurate, very tight

11   to -- the requirement is not very tight

12   or very serious or --

13                INTERPRETER 1:  Many words

14           for the Chinese word that he was

15           trying to express.

16                THE WITNESS:  It is not very

17           accurate. Just like what I

18           mentioned earlier, that we will

19           make a phone call to the agent

20           appointed by the customer to ask

21           them where it is going to be

22           shipped to.  I will put down what

23           they told us.  Or sometimes we

24           just put down a country.

```
 1   BY MS. BASS:

 2          Q.    Does your company maintain

 3   copies of these invoices which reflects

 4   this information that the tax bureau

 5   requires you to maintain?

 6                MR. SPANO:  Objection to

 7          form, lack of foundation.

 8                Also, are you almost done

 9          with this line of questioning,

10          because it is after noon?

11                MS. BASS:  Let him finish

12          this question, please.

13                (Interpreter repeated the

14          question.)

15                THE WITNESS:  Usually we

16          keep it, but exactly how they keep

17          it, I don't know.  It is possible

18          that we keep it between one or two

19          year, but exactly, I'm not sure.

20          And I have already produced these

21          invoices to my attorney under the

22          guidance of my attorney.

23   BY MS. BASS:

24          Q.    One last question before we
```

1    break.

2              What is the name of the

3    individual who would have responsibility

4    for maintaining those records at your

5    company?

6         A.    The finance staff in the

7    company, they handle this.

8              MS. BASS:  We can break here

9         if you'd like.

10             MR. CHEN:  The

11        transcription, I believe, it's the

12        finance staff, not the filing

13        staff.

14             INTERPRETER 1:  The finance

15        staff, he said the people of the

16        finance.

17             MS. BASS:  Thank you.

18             THE VIDEOTAPE TECHNICIAN:

19        The time now is approximately

20        12:09 p.m., and we are now off the

21        record.

22                  -  -  -

23             (Whereupon, a luncheon

24        recess was taken from 12:09 p.m.

1        until 1:19 p.m.)

2                        -   -   -

3              THE VIDEOTAPE TECHNICIAN:

4        This begins tape four of today's

5        portion of our deposition.  The

6        time now is approximately 1:19

7        p.m., and we're back on the

8        record.

9   BY MS. BASS:

10       Q.    Mr. Peng, before we broke

11  for lunch, you indicated that on

12  occasion, customers would tell you where

13  they wanted the drywall to be shipped to.

14  Do you recall a customer ever telling you

15  that they wanted to ship to Florida?

16       A.    That I don't recall.  When

17  the customers tell us, first of all, only

18  some of the customer would tell us.

19  Secondly, we don't care about it,

20  therefore, we don't recall.

21       Q.    So, your testimony under

22  oath is you have no recollection of ever

23  discussing with the customer their

24  intentions to utilize the gypsum they

1    were purchasing from you in Florida?

2              MR. SPANO:  Objection to

3         form and mischaracterizes the

4         testimony.

5              THE WITNESS:  I said some of

6         the customer, they would tell us

7         where they wish these products to

8         be shipped to where.  We don't try

9         to make efforts to remember what

10        he said or what the customer said

11        exactly which port they want to

12        ship it to.  Where they are going

13        to use this drywall, we wouldn't

14        know it.

15   BY MS. BASS:

16        Q.    So, the answer to my

17   question is no, you have no recollection

18   of ever discussing with the customer the

19   fact that they were going to ship the

20   drywall they purchased from you to

21   Florida?  And I believe it's a yes or no

22   answer.

23              MR. SPANO:  Objection to

24        form.

1              THE WITNESS:  I cannot

2         answer this question simply by

3         putting it as yes or no.  I

4         mention about this earlier, and I

5         stated the fact that what we did,

6         and I don't want to repeat my

7         answer in order to save time.

8    BY MS. BASS:

9         Q.   Do you have a recollection

10   of ever discussing with the customer the

11   fact that they were going to be utilizing

12   the drywall they purchased from you in

13   Florida?  I've heard your prior

14   testimony.  I believe I'm entitled to an

15   answer to this question.

16              MR. SPANO:  Objection to

17         form.  Objection, asked and

18         answered.  And don't make speeches

19         to the witness.  Don't make

20         comments.  Ask the question, you

21         get an answer.  If you don't like

22         the answer, move on.

23              MS. BASS:  I will continue

24         to ask the question until I get an

1        answer.  The witness has been

2        nonresponsive.  The question is

3        does he have a recollection.  I

4        believe it can be answered with a

5        yes or a no.

6              MR. SPANO:  Well, that's

7        your belief.

8              MS. BASS:  I'm entitled to

9        it, Mr. Spano, and he can then

10        respond to it.

11              MR. SPANO:  You've stated

12        your belief.

13              MS. BASS:  Excuse me.

14        Please don't talk at the same time

15        I'm talking.

16              MR. SPANO:  Stop speaking

17        while I'm speaking.

18              MS. BASS:  I thought you

19        finished your objection.  I'm

20        entitled to a yes or no answer.

21        He can then explain.  Shall I ask

22        the witness yet again the

23        question?  It asks very simply if

24        he has a recollection.  I believe

1          I'm entitled to a yes or no

2          answer.

3               MR. SPANO: You asked --

4               MS. BASS: Please repeat the

5          question for the witness.

6               MR. SPANO:  You asked the

7          question, I made an objection to

8          your ad hominum remarks as part of

9          the question.  What you believe is

10         not part of the question.

11              MS. BASS:  Can the witness

12         answer the question now?

13              MR. SPANO:  Of course.

14              MS. BASS:  Thank you.

15              INTERPRETER 1:  Let me go

16         back to the question.  I haven't

17         translated the question yet.

18              MS. BASS:  There's no need

19         to translate the colloquy between

20         counsel.

21              MR. SPANO:  I agree.

22              INTERPRETER 1: Let me go

23         back to that question.

24              (Interpreter repeats the

1          question.)

2                  THE WITNESS:  I don't

3          recall.

4     BY MS. BASS:

5          Q.    Do you have a recollection

6     of ever having been told by a customer

7     that the gypsum they were purchasing from

8     you would be used in Virginia?

9          A.    I remembered it was a

10    gentleman, he said he is from Virginia.

11    His name is Phillips, Perry.  Maybe that

12    is the way to spell it, Phillips,

13    P-E-R-Y, Perry.  It is possible how it is

14    being spelled.

15         Q.    Did Mr. Perry tell you that

16    the gypsum he was purchasing from you

17    would be used in Virginia?

18         A.    He did not say he might use

19    it in Virginia.  He did say probably.  He

20    is shipping the drywall to Virginia.

21         Q.    Did any customer ever tell

22    you that they were --

23                  INTERPRETER 2:  Correction.

24                  MS. BASS:  I'm sorry.

 1                    INTERPRETER 2:  The witness

 2            says he only said that he would

 3            set -- ship the gypsum to the port

 4            of Virginia.

 5    BY MS. BASS:

 6            Q.    Did any --

 7                    INTERPRETER 1:  No.  He did

 8            not state the port of Virginia.

 9    BY MS. BASS:

10            Q.    Did any customer ever tell

11    you that they were going to be shipping

12    the drywall they purchased from you to

13    the port of New Orleans?

14                    MR. CHEN:  She was

15            translating, I think, some earlier

16            part of the transcript.  If we

17            could just go over that.

18                    INTERPRETER 1:  No.  Off the

19            record.  I haven't translated this

20            question regarding New Orleans,

21            the port of New Orleans.

22                    MS. BASS:  Please translate

23            that now.

24                    INTERPRETER 1:  Let me

1        translate that.  The word "port"

2        is in this question and I haven't

3        translated.

4             THE WITNESS:  Some of the

5        customers, it would be possible

6        that they did mention about

7        probably they wanted to ship it to

8        the city of New Orleans, but

9        exactly who says that, I cannot

10        recall.

11   BY MS. BASS:

12        Q.   Did any of your customers

13   ever tell you that they were going to be

14   shipping the drywall they purchased from

15   you to the port of Miami?

16        A.   Miami, I don't recall.

17        Q.   Did any of your customers

18   ever tell you that they were going to be

19   shipping the drywall they purchased from

20   you to the port of Tampa?

21        A.   I don't recall.

22        Q.   Do you have a recollection

23   of any of your customers ever telling you

24   they were going to be shipping to any

1    other port in the United States other

2    than those that you've already testified

3    about?

4              MR. SPANO:  Objection to

5         form.

6              THE WITNESS:  As I mentioned

7         earlier, we don't pay attention,

8         we don't care about where they

9         ship it to, therefore, I have no

10        recollection of where did the

11        customer want to ship the products

12        to.

13   BY MS. BASS:

14        Q.   Was your company the first

15   to use containers to export drywall board

16   to the United States?

17             MR. SPANO:  Objection to

18        form.

19             THE WITNESS:  I don't

20        understand.  What do you mean by

21        "the first"?

22   BY MS. BASS:

23        Q.   Did your company use

24   containers to export gypsum board to the

1    United States?

2                INTERPRETER 2:  Correction.

3          Container, can you use the

4          Mainland Chinese container term

5          instead of the Cantonese.

6                INTERPRETER 1:  Yes.  The

7          one I am using it is also

8          Mainland.  If you have another

9          term, the same for container,

10         would you mind to tell me.

11               INTERPRETER 2:  Ji zhuang

12         xiang.

13               INTERPRETER 1:  Paper boxes

14         for containing things.

15               INTERPRETER 2:  No, no, no.

16               INTERPRETER 1:  Can you say

17         it.

18               INTERPRETER 2:  Ji zhuang

19         xiang.  It's container for

20         Mainland Chinese.

21               INTERPRETER 1:  I don't

22         think that is a Mainland Chinese

23         term that you're providing, but I

24         will use your term.

```
 1                    THE WITNESS:  TTP, according
 2           to the requirement of the
 3           customers, they did use the
 4           containers to ship to the United
 5           States, the big containers of 40
 6           square feet, the big container
 7           with the length of 40 feet.
 8    BY MS. BASS:
 9           Q.    Isn't it also true that the
10    company, TG, used containers to ship
11    gypsum board from China to the U.S.?
12           A.    I did mention about this
13    before.  Both TG and TTP, they did not
14    ship gypsum board to the United States.
15    Maybe it was arranged by the customers.
16           Q.    Isn't it true, Mr. Peng,
17    that you represented to US customers that
18    TG was capable of using containers to
19    export gypsum board to the United States?
20                    MR. SPANO:  Objection to
21           form.
22                    THE WITNESS:  The way you
23           say it is incorrect.  I represent
24           the company who said we can do it
```

1              according to the requirement of

2              the customers to do packaging for

3              the containers.

4    BY MS. BASS:

5         Q.    For shipment to the United

6    States; isn't that correct?

7                   MR. SPANO:  Objection.

8                   THE WITNESS:  Can you repeat

9              the question.

10   BY MS. BASS:

11        Q.    Isn't it correct that you

12   represented to customers of TG that TG

13   could use containers to export gypsum

14   board to the United States from China?

15                  MR. SPANO:  Objection.

16                  THE WITNESS:  You cannot say

17             that.  I did explain this.

18   BY MS. BASS:

19        Q.    So, if you made such a

20   statement, it would have been a

21   misrepresentation?

22                  MR. SPANO:  Objection to

23             form.

24                  INTERPRETER 1:  Counsel,

1          would you mind to help me with the
2          word misrepresentation?
3                    MS. BASS:  A lie.
4                    MR. CHEN:  Hold on.  Hold
5          on.
6                    He asked for an explanation,
7          and I think the explanation should
8          come from counsel, not from the
9          interpreter.
10                    INTERPRETER 1:  I did not.
11                    MS. BASS:  I said --
12                    INTERPRETER 1:  I'm not
13          giving an explanation.  I was
14          translating the question.
15                    MR. CHEN:  He made a comment
16          in Chinese asking what, and I
17          think that should be translated,
18          and then you can handle that, how
19          you feel appropriate, as opposed
20          to having the interpreter explain
21          further the question.
22                    INTERPRETER 1:  Excuse me.
23          I was doing verbatim translating
24          the question.  I was not doing the

1          explanation.  I was looking at the

2          screen translating the question

3          from the screen in verbatim.  I

4          did not do any explanation.  That

5          was not my job.

6                    MS. BASS:  Can you please

7          ask the witness to answer the

8          question.

9                    THE WITNESS:  I was

10          interrupted.  Would you mind to

11          say it again.

12     BY MS. BASS:

13          Q.    Mr. Peng, if you made a

14     representation to a US customer

15     indicating, quote, we are the first to

16     use container to export gypsum board to

17     USA in China, would that have been a lie?

18                    INTERPRETER 2:  Correction.

19          The term "representation," meaning

20          to tell, but the interpreter may

21          have interpreted it into

22          representing.

23                    MS. BASS:  That's fine.

24                    MR. SPANO:  Objection to

1          form.

2                    THE WITNESS:  I don't

3          understand.  What is the question

4          you are asking?

5     BY MS. BASS:

6          Q.   Did he make such a

7     representation to American customers?

8                    INTERPRETER 1:  Counsel, the

9          word "representation," would you

10         mind to help me, because there are

11         more than one way of translating

12         it.

13    BY MS. BASS:

14         Q.   Did he make a statement to

15    American customers stating that his

16    company was the first to use containers

17    to export gypsum board to the United

18    States in China?

19                   MR. SPANO:  Objection to

20         form.

21                   THE WITNESS:  I don't

22         recall.

23    BY MS. BASS:

24         Q.   Mr. Peng, did you review the

1    profile form filed on behalf of TTP in

2    this litigation?

3                    INTERPRETER 1:  Manufacturer

4            profile form?

5                    MS. BASS:  Yes.

6                    MR. CHEN:  Objection.  The

7            translation referred to when he

8            was representing TTP.

9                    INTERPRETER 1:  Counsel,

10           would you mind to help me with the

11           word "on behalf of"?

12   BY MS. BASS:

13           Q.    Did you review the profile

14   form filed by TTP in this litigation?

15           A.    Under the guidance of my --

16   of our attorney, I saw it.

17           Q.    Did you assist in the

18   preparation of the exhibit attached to

19   the profile form listing the exports of

20   Chinese drywall into the United States?

21                   MR. SPANO:  Objection to

22           form and mischaracterizes the

23           document.

24                   INTERPRETER 1:  Let me

1           translate once more because I need

2           to translate upside down to make

3           it clear to him.

4                THE WITNESS:  According to

5           the requirements and guidance of

6           our attorney, I did make

7           preparation, and I did make

8           inquiries to my company about

9           technical information of the 12.7

10          millimeter drywall.  I did not

11          make preparation to the attorney

12          of the information, what you

13          mentioned just earlier, that the

14          drywall information -- the

15          information of the drywall from

16          China shipped to the United

17          States, I mentioned about this

18          earlier.  There is no exports for

19          us to the United States.

20     BY MS. BASS:

21          Q.   Are you aware, Mr. Peng,

22     that 1.7 million sheets of drywall

23     produced by TTP were shipped into the

24     United States?

1                    MR. SPANO:  Objection to

2          form.

3                    THE WITNESS:  Can you repeat

4          the question?  I don't understand

5          it.

6                    MS. BASS:  Please ask the

7          witness the same question that I

8          previously posed.

9                    (Interpreter repeats the

10         question.)

11                   THE WITNESS:  I did provide

12         to our attorney, to my attorney

13         for the drywall of 12.7 mm

14         thickness that were produced by

15         TTP company.  I'm not sure whether

16         this drywall was shipped to the

17         United States or not.  We also

18         cannot say this.

19    BY MS. BASS:

20         Q.    Are you suggesting, Mr.

21    Peng, that the document filed by your

22    attorneys in the MDL proceeding

23    reflecting 1.7 million sheets of drywall

24    manufactured by TTP ending up in the

1    United States is not accurate?

2              MR. CHEN:  For the

3         interpreter, MDL is actually a

4         defined term that you could use as

5         well.

6              INTERPRETER 1:  Let me see

7         what is MDL.  I just state MDL to

8         the witness.  I don't find MDL in

9         the glossary.

10             MR. CHEN:  Multi-District

11        Litigation.  You have circled MDL.

12             INTERPRETER 1:  Let me see.

13             MR. CHEN:  It is under

14        multi.

15             INTERPRETER 1:  It is under

16        multi not MLD.

17             Thank you.

18             THE WITNESS:  Would you mind

19        to repeat the question.  I don't

20        recall it.

21             MR. SPANO:  Objection to

22        form, lacks foundation and

23        mischaracterizes the document.

24             (Interpreter repeats the

1          question.)

2                    THE WITNESS:  We collect

3          this type of information, this

4          type of the table with information

5          in it.  I did it according to the

6          requirement and the guidance of my

7          attorney.  And now the problems

8          that you're referring to, I am

9          unable to make judgment, and also

10         I don't have any authority to make

11         this judgment.

12    BY MS. BASS:

13         Q.    Do you believe the list

14    attached as Exhibit A to the TTP profile

15    form is accurate?

16         A.    I don't know what document

17    you're referring to.  Would you mind to

18    let me take a look?

19         Q.    Mr. Peng, didn't you just

20    tell me you had reviewed the TTP profile

21    form?

22         A.    Yes, I did browse it.

23         Q.    Okay.  And now my question

24    to you is, is it accurate?

 1          A.     The table is -- no, the list
 2    is accurate.
 3          Q.     And all of the sales of
 4    drywall that are reflected on Exhibit A
 5    would have been transactions undertaken
 6    by you and your colleagues at TTP,
 7    correct?
 8          A.     The question, I raised it
 9    earlier, was, would you mind to let me
10    take a look at the attachments that you
11    mentioned?
12          Q.     I'd be happy to.  Since it's
13    in English, I'm sure you'll be able to
14    follow along.  Here is the document
15    that's Exhibit A to the TTP profile form.
16    Please review it.
17               MR. SPANO:  No.  If you're
18    questioning him about an English language
19    document that he did not prepare, you
20    have to use the Chinese translation.
21               MS. BASS:  Mr. Spano, please
22          don't throw documents at me.
23               MR. SPANO:  I'm not throwing
24          them.  I passed it back to you.

1           MS. BASS:  That was hardly a

2     passing, but the record will speak

3     for itself.

4           MR. SPANO:  Yes, it will.

5           MS. BASS:  This is the

6     document the witness asked me to

7     provide to him.

8           MR. SPANO:  No, it's not.

9           MS. BASS:  Let's not argue.

10    I'm handing you the document that

11    is the Exhibit A to the profile

12    form --

13          MR. SPANO:  That's not the

14    complete Exhibit A.

15          MS. BASS:  Can I please

16    finish, Mr. Spano.  Please don't

17    interrupt me.  It's common

18    courtesy.  If you would like to

19    provide your witness some other

20    document, you are welcome to do

21    so.  This is the document he's

22    asked me to provide him.

23          MR. SPANO:  Wrong.  It's not

24    the Exhibit A that was filed with

1           the translation, and he's not

2           going to answer questions about

3           this document without the

4           translation.

5               MS. BASS:  Do you have the

6           copy of the translation you'd like

7           to provide him, Mr. Spano?

8               MR. SPANO:  This is your

9           deposition.  If you're going to

10          ask him questions about a

11          document, use the proper document.

12              MS. BASS:  I'm not asking

13          him questions about a document.  I

14          asked him about his recollection

15          as to whether or not that document

16          was accurate, because he testified

17          under oath he'd reviewed it.

18              MR. SPANO:  That's a

19          question.  You asked him -- you're

20          improperly asking him to follow

21          along on an English language

22          document that you know full well

23          there's a Chinese translation of.

24          So, please don't play games, okay?

1          MS. BASS:  I won't even

2      respond to that suggestion, Mr.

3      Spano.

4          Here's a copy of the same

5      document in Chinese.  You are

6      welcome to provide it to the

7      witness.

8          (Handing over document.)

9          MR. SPANO:  Would you like

10     to mark it as an exhibit.

11         MS. BASS:  There's no need

12     to mark it as an exhibit.  You're

13     welcome to have him take a look at

14     it.  It's a document filed of

15     record in the case.  There's no

16     need to have it marked as a

17     separate Deposition Exhibit.

18         MR. SPANO:  There's no

19     pending question at this point.

20         MS. BASS:  He asked me to

21     look at this document.  Would you

22     like him to look at it?

23         MR. SEEGER:  I think she

24     just gave it to you to give him.

1          MS. BASS:  I'm giving you
2          the courtesy of giving it to you
3          first to provide to your witness.
4          MR. SPANO:  What is this
5          document?  Since you are not
6          marking it as an exhibit, what is
7          this document?
8          MS. BASS:  It is the
9          document he requested, which is
10         Exhibit A to a filing in the MDL
11         proceeding --
12         MR. SPANO:  Is this a
13         complete copy of Exhibit A to
14         TTP's manufacturer profile form?
15         MS. BASS:  Yes.
16         MR. SPANO:  Okay.  I want
17         the record to reflect the document
18         you're putting in front of the
19         witness.
20         (Witness reviewing
21         document.)
22         THE WITNESS:  I did see it.
23         May I know what question do you
24         have.

1                    -  -  -

2                    (Whereupon, the following

3              portion of the transcript was read

4              by the court reporter:

5                    "Q.   And all of the sales

6              of drywall that are reflected on

7              Exhibit A would have been

8              transactions undertaken by you and

9              your colleagues at TTP, correct?")

10                   -  -  -

11                   THE WITNESS:  These

12             transactions were handled by me

13             and my colleagues.

14       BY MS. BASS:

15             Q.    Thank you.

16                   Are you also familiar with

17       the profile form filed on behalf of TG in

18       the MDL proceeding?

19             A.    Under the guidance of my

20       counsel, I did see the manufacturer

21       profile form of TG.

22             Q.    Isn't it also correct, Mr.

23       Peng, that you and your colleagues were

24       responsible for completing the

1    transactions that are referenced in the

2    TG manufacturer's profile form?

3              MR. SPANO:  Objection to

4              form.

5              THE WITNESS:  Under the

6              guidance of TG, the transaction

7              referred to in this manufacturer

8              profile form was done by me.  This

9              transaction carry out in China.

10   BY MS. BASS:

11        Q.    So, you were responsible for

12   the sales of Taishan Gypsum board to

13   Venture Supply that are reflected in the

14   manufacturer's profile form of TG,

15   correct?

16        A.    When you refer to Taishan,

17   what do you mean?

18        Q.    My question was whether or

19   not you were responsible for the sales of

20   Taishan Gypsum board to Venture Supply

21   that are reflected on the manufacturer's

22   profile form of TG?

23              MR. CHEN:  Counsel, for your

24              information, I think the confusion

1        is you're referring to Taishan

2        Gypsum board.  Perhaps if you said

3        Taishan gypsum plasterboard or

4        gypsum board, then the translation

5        would be more accurate, because

6        it's translating right now in

7        Chinese as just Taishan

8        plasterboard.

9              INTERPRETER 1:  I'm supposed

10        to be doing verbatim.

11              MS. BASS:  You can ask the

12        question again with that

13        clarification, Taishan Gypsum

14        plasterboard.

15              INTERPRETER 1:  No problem.

16        Thank you.

17              (Interpreter repeats the

18        question.)

19              THE WITNESS:  TG Company

20        with the manufacturer profile form

21        being written and that recorded

22        that transaction was the

23        transaction when the

24        representative of Venture Supply

1          came to TG Company.  It was me to

2          be responsible to communicate with

3          Mr. Phillip Perry that I referred

4          to earlier.  I was responsible to

5          communicate with him and also to

6          assist him to complete this

7          transaction.

8     BY MS. BASS:

9          Q.    Did you also assist Mr.

10    Perry in creating a legend to be stamped

11    on the board, on the plasterboard?

12              INTERPRETER 1:  Counsel,

13          would you mind me to help -- help

14          me with the word "a legend to be

15          stamped on the board."

16              MS. BASS:  You can use the

17          word brand.

18              INTERPRETER 1:  Brand, okay.

19              MR. SPANO:  Objection to

20          form.

21              THE WITNESS:  We did it

22          according to the requirement of --

23          according to the request of

24          Venture Supplies to put labeling

1          and packaging for the

2          plasterboards.

3               Can I take a break?

4               MS. BASS:  That's fine.

5               THE VIDEOTAPE TECHNICIAN:

6          The time now is approximately 2:14

7          p.m., and we are now off the

8          record.

9                    -  -  -

10              (Whereupon, a recess was

11         taken from 2:14 p.m. until

12         2:22 p.m.)

13                   -  -  -

14              THE VIDEOTAPE TECHNICIAN:

15         This begins tape 5 of today's

16         deposition.  The time now is

17         approximately 2:23 p.m., and we're

18         back on the record.

19   BY MS. BASS:

20         Q.   Mr. Peng, before we broke,

21   we were discussing transactions to

22   Venture Supply.  My question to you is,

23   were you aware that the gypsum board

24   being purchased by Venture Supply was

1    going to be shipped to the port in

2    Norfolk, Virginia?

3                    MR. SPANO:  Objection to

4            form.

5                    THE WITNESS:  Mr. Phillip

6            Perry told me that it is possible

7            that they would ship it to the

8            state of Virginia, but I did not

9            know whether it is for fact that

10           they did ship it there or not.

11   BY MS. BASS:

12           Q.    Isn't it correct, Mr. Peng,

13   that you assisted Mr. Perry in arranging

14   the shipment of the gypsum board

15   purchased by Venture Supply for shipment

16   to the United States?

17                   MR. SPANO:  Objection to

18           form.

19                   THE WITNESS:  Regarding the

20           order placed by Venture Supply

21           from my company regarding the

22           shipment, I and Mr. Phillip

23           together, I did provide some

24           information regarding to make

1          contact to the agent of the

2          shipping company.  Mr. Phillip

3          told me he wanted to find some

4          shipping company, wanted to find

5          some methods where the shipping

6          costs would be lower, and he

7          wanted me to help him.

8    BY MS. BASS:

9          Q.    Did you provide that

10   assistance to Mr. Phillip?

11         A.    I did mention earlier, I did

12   help him with some of the information

13   regarding making contact with shipping

14   company under his request.

15         Q.    Mr. Peng, as the 30(b)(6)

16   representative for TG and TTP regarding

17   indirect shipments of building materials

18   to the United States, did you review

19   shipping invoices issued by those two

20   companies during the period of 2006 to

21   2008 to prepare yourself for this

22   deposition?

23              MR. SPANO:  Objection to

24         form.

1          THE WITNESS:  I did not hear

2      the question clearly.

3          INTERPRETER 1:  Let me

4      translate it again.

5          (Interpreter repeats the

6      question.)

7          INTERPRETER 2:  Correction.

8      The shipment invoice.  The

9      interpreter should interpret

10     shipment invoice in her

11     interpretation.

12         INTERPRETER 1:  I don't see

13     it on the transcript.  I see it as

14     shipments of building materials to

15     the United States, did you review

16     shipping, I know, issued by those

17     during the period.  I don't see

18     the word "invoice" in there.

19     There is some confusion with the

20     transcript.

21         MS. BASS:  Wait one moment.

22     Let her repair the transcript and

23     then you can --

24         INTERPRETER 1:  Thank you

1           very much.  Thank you.  Good.

2                (Interpreter repeats the

3           question.)

4                THE WITNESS:  Regarding this

5           question, I don't understand what

6           you're referring to as the

7           document 30 bracketed something.

8           I also don't understand what do

9           you mean by "the shipping invoices

10          issued by."

11   BY MS. BASS:

12          Q.   As the witness designated by

13   TTP and TG to testify regarding indirect

14   sales by those companies of gypsum board

15   to the United States, did you review the

16   invoices for sales to US customers in

17   preparation for this deposition?

18                INTERPRETER 2:  Correction.

19          The interpreter, indirect sales,

20          can I help with that term for the

21          interpreter?

22                INTERPRETER 1:  Yes.

23                INTERPRETER 2:  Jian jie.

24                INTERPRETER 1:  She's using

1          the word "indirect."  Yeah, we are

2          using different words, different

3          wordings for indirect.

4    BY MS. BASS:

5          Q.    The question to the witness

6    remains the same.

7                Did he review sales invoices

8    of TG and TTP in preparation for this

9    deposition?

10         A.    Invoices, yes.  Under the

11   guidance of my attorney, yes, I did see

12   the invoices.

13         Q.    In your review of the

14   invoices, did you make note of the

15   locations within the United States to

16   which the Taishan Gypsum board

17   plasterboard was to be shipped?

18               MR. SPANO:  Objection to the

19         form of the question, and the

20         answer to this question should not

21         reveal communications with counsel

22         or any information prepared by

23         counsel or at the request of

24         counsel.

```
 1                    THE WITNESS:  This invoices
 2              has to do with our company.  After
 3              they sell the drywall to the
 4              customers in China, they have to
 5              issue the invoices because of the
 6              requests by the tax bureau.  We
 7              don't care which country or which
 8              port they were being shipped to.
 9    BY MS. BASS:
10         Q.    My question to you, Mr.
11    Peng, was not what you choose to care
12    about.  My question was whether or not
13    you are aware of what the invoices
14    reflected were the eventual destination
15    of the TG and TTP drywall being shipped
16    to the US?
17                    MR. SPANO:  Objection to
18              form.
19                    THE WITNESS:  I did mention
20              about this earlier.  Some of the
21              customers, it is possible for them
22              to tell us for where they shipped
23              this drywall to or the agent of
24              the shipping company appointed by
```

1          the customers, and they would have

2          invoices indicating the

3          destination.  We don't know where

4          these drywalls were being shipped

5          to, and we don't know whether this

6          drywalls were shipped to the

7          United States or not.

8     BY MS. BASS:

9          Q.    Even when the invoices

10    reflected that they were being shipped to

11    the United States, is that your

12    testimony?

13              MR. SPANO:  I object to the

14          form of the question.

15              THE WITNESS:  What I meant

16          is that this information that you

17          refer to, what I mean is that when

18          we get it from the agents of the

19          shipping company appointed by the

20          customers or when the tax bureau

21          requested us to fill out the

22          invoices, we would ask the agent

23          of the shipping company appointed

24          by the customers regarding where

1          they will ship this to.  Regarding

2          where it is shipping to, regarding

3          whether this is true or not, we

4          don't care.  We also don't pay

5          attention to it.

6               MS. BASS:  I'm going to pass

7          the witness at this point.

8                    -  -  -

9               EXAMINATION

10                   -  -  -

11   BY MR. HARDT:

12        Q.    Mr.  Peng, good afternoon.

13   I represent Venture Supply and the

14   Porter-Blaine Corporation, and I'm making

15   an appearance at these depositions in the

16   Germano class action.

17               Mr. Peng, I have a couple of

18   follow-up questions.

19               In 2005, when you were the

20   director of foreign sales at TG, who did

21   you report to?

22               INTERPRETER 1:  Counsel,

23          would you mind to help me?  Is it

24          director or manager?

1            MR. HARDT:  I think he

2       testified he was director of

3       foreign sales, director of the

4       foreign sales department.

5            MR. CHEN:  Counsel, I think

6       there's confusion over the use of

7       the word "director," and that's

8       what the interpreter was asking

9       about.

10            MR. HARDT:  Everybody's been

11       using that.

12            MR. CHEN:  She's translating

13       director as board of directors.

14            MR. HARDT:  Manager is fine.

15            INTERPRETER 1:  Thank you

16       for the clarification.

17  BY MR. HARDT:

18       Q.    Mr. Peng, in 2005, when you

19  were the manager of foreign sales at TG,

20  who did you report to?

21       A.    When I worked for TG, I

22  reported to the manager of the sales

23  department.

24       Q.    And who was that?

1          A.    His name is Mr. Fu, that's

2    the last name, Ting Huan, the first name.

3          Q.    Who did he report to?

4          A.    I don't know who he reported

5    to.  He was my leader.

6          Q.    You don't know if he

7    reported directly to Mr. Jia?

8          A.    I don't know whether he has

9    made the -- he has made a report or not.

10         Q.    You talked before about the

11   sale with Venture Supply, and you dealt

12   with Mr. Phillip Perry; is that correct?

13         A.    Mr. Phillip came to our

14   company to meet us.

15         Q.    And he met with you, right?

16         A.    Yes, in the office.  Yes, I

17   met with him.

18         Q.    And Mr. Perry didn't speak

19   Chinese, did he?

20         A.    He did not speak Chinese.

21         Q.    So, when you dealt with Mr.

22   Perry, you dealt with him in English?

23         A.    At the beginning, we did

24   very simple exchanges.  Sometimes we have

1    to write it down on a piece of paper.

2    Later on, I don't know where he hire this

3    interpreter that he brings.  I did not

4    know where he hire this interpreter.

5             Q.    So, it's your testimony that

6    Mr. Perry brought an interpreter with him

7    at some point in time to talk with you?

8             A.    Yes, he brought an

9    interpreter to come to our company.

10            Q.    How many times did you meet

11   directly with Mr. Perry?

12            A.    How many times, it is very

13   difficult to say.  Sometimes he stays

14   for -- sometimes he stayed for three days

15   and he came over every single day.  Well,

16   maybe I should say more than two times.

17            Q.    How many times did he meet

18   with you with an interpreter?

19            A.    From my recollection, well,

20   maybe one time or two times.  I cannot

21   recall.

22            Q.    And then all the other

23   times, he met with you without an

24   interpreter; is that correct?

1            A.    Yes.

2            Q.    And you talked in English

3    with Mr. Perry; is that correct?

4            A.    I did mention about this

5    earlier.  Yes, we did some simple

6    exchanges verbally.  With things that are

7    more complicated that I'm not able to say

8    it, I would rely on a piece of paper that

9    I handwrite on it.

10            Q.    And you handwrite, what, in

11    English?  I don't understand.

12            A.    Yes.  Whatever that I am

13    unable to express verbally, I would write

14    it down.  I would write single words or

15    short sentences.

16            Q.    In English?

17            A.    Yes, English.

18            Q.    You even spoke on the

19    telephone with Mr. Perry a number of

20    times, didn't you?

21            MR. CHEN:  Hold on one

22            second.  She added into the

23            translation "in English, right?"

24            I don't believe that was in your

1          original question.

2                    MR. HARDT:  No, it wasn't.

3          That was in the second question.

4     BY MR. HARDT:

5          Q.    You spoke on the telephone a

6     number of times with Mr. Perry, didn't

7     you?

8                    MR. HARDT:  That's my

9          question.

10                   THE WITNESS:  Mr. Perry,

11         yes, we did communicate over the

12         phone.

13    BY MR. HARDT:

14         Q.    And that was in English; is

15    that correct?

16         A.    It was in English, but to

17    tell you the truth, I did not totally

18    understand what he was saying, and also,

19    when I talk to him, I was unable to

20    express completely what I wanted to say.

21         Q.    In fact, you spoke to my

22    client's president, Sam Porter, by

23    telephone, didn't you?

24         A.    I cannot recall exactly, but

1    I remember under the guidance of Mr.

2    Phillip, I talked to his colleagues or

3    leaders in the United States a few times

4    over the phone very few times.

5            Q.    And again, that was in

6    English, correct?

7            A.    Yes, English.  Simple and

8    limited exchanges.

9            Q.    Okay.

10                 Now, you recall that there

11   were two contracts with my client,

12   Venture Supply.  Do you recall that?

13           A.    Yeah.  We signed with

14   Venture Supply company for two contracts.

15   They were both signed in China inside our

16   factory.

17           Q.    And there were two separate

18   shipments of drywall to the United

19   States, weren't there?

20                 MR. SPANO:  Objection to

21           form.

22                 THE WITNESS:  Well, we

23           deliver goods to Venture Supply

24           two times, but regarding where it

1           was being sent to, we did not

2           follow up.  We also did not know.

3           We signed the contract in China.

4           We also collect the money for the

5           goods in China, and we also

6           completed the transaction in

7           China.

8     BY MR. HARDT:

9           Q.    You were aware the first

10    shipment went to Virginia, aren't you?

11                MR. SPANO:  Objection to

12          form.

13                THE WITNESS:  When I

14          communicate with Mr. Phillip, he

15          said he came from Virginia, and he

16          told us that he planned to ship

17          the drywalls to Virginia.  But

18          ultimately, where these drywalls

19          were shipped to, we have no

20          knowledge.  These were arranged by

21          Mr. Phillip and the shipping

22          company, they confirm it, and they

23          make the arrangement, and we did

24          not know what happened.

1    BY MR. HARDT:

2         Q.    Do you remember with the

3    second shipment, Mr. Perry was having

4    trouble finding a ship that went directly

5    to Norfolk, Virginia?

6         A.    At that point, I know he has

7    difficulty finding shipment facilities.

8    They were unable to find a shipping

9    company for appropriate ships.

10   Therefore, the products that we produce

11   for them were stored in our storage for a

12   long time.

13        Q.    And you assisted him during

14   the second -- I mean --

15             After the first shipment, in

16   between the first shipment and the second

17   shipment, you assisted him with trying to

18   find a shipper, didn't you?

19        A.    I did mention about earlier

20   that Mr. Phillip, they were unable to

21   find a ship appropriate, so until very

22   late, they were unable to ship it, and

23   they told me that they were unable to

24   find a ship to ship it and, therefore, we

1    tried to push them and tell them to ship

2    it as soon as possible because they have

3    been storing the products in our storage.

4    At this point, Mr. Phillip told us and

5    they asked us to help them to find an

6    agent doing shipment in China to help

7    them to ship it.

8         Q.    And you provided that

9    assistance, right?  You provided that

10   help, right?

11        A.    I did provide the

12   information, how to make contact with the

13   agent of the shipping company.  For the

14   rest of the matter, he handle it himself.

15        Q.    Did you, yourself, first

16   contact the shipping agent and tell them

17   that you had a customer that needed

18   assistance?

19        A.    I would find some agents of

20   the shipping companies.  All these agents

21   are in China, the agents in China, the

22   agents of the shipping companies in

23   China.

24        Q.    And you would contact these

1    agents of the shipping companies in China

2    and tell them that you had a customer

3    that needed assistance; is that correct?

4              MR. SPANO:  Objection to

5         form.

6              THE WITNESS:  Yes.  I would

7         tell the agents of the shipping

8         company something like this.

9    BY MR. HARDT:

10        Q.    Do you recall discussions

11   with Mr. Perry about the possibility of

12   Venture Supply becoming the exclusive

13   agent for distribution of your company's

14   products in the United States?

15        A.    I recall Mr. Phillip did

16   mention about this.  But to ask me

17   consider this impossible, this cannot be

18   realized.  Mr. Phillip just do this

19   because he wanted to have a better price.

20   We did not agree to this requirement, and

21   we also did not sign any agreement with

22   him.

23        Q.    I understand you didn't sign

24   an agreement with him, but were there

1    discussions with him about the

2    possibility of Venture being the

3    exclusive agent?

4            MR. SPANO:  Objection, asked

5        and answered.

6            THE WITNESS:  I did answer

7        this question already.

8            MR. HARDT:  I'll let the

9        record reflect that.

10           MR. PANAYOTOPOULOS:  I'll

11       object.  The question was asked.

12       The witness did not answer.

13           MR. HARDT:  I agree.  The

14       witness didn't answer.

15   BY MR. HARDT:

16       Q.   Can you answer my question?

17       A.   Yes.  Mr. Phillip did bring

18   up to us with such a request, but we

19   consider this request to be unrealistic

20   and also we don't think this can be

21   actualized.

22           MR. HARDT:  Let me show you

23       a document we'll have marked.

24                       -  -  -

     1                    (Whereupon, Deposition
     2          Exhibit Peng-12, E-mail dated June
     3          18, 2009, with attachments, was
     4          marked for identification.)
     5                    -  -  -
     6                    MS. BASS:  Bates Number.
     7                    MR. HARDT:  There isn't a
     8          Bates Number.  This was a document
     9          that was provided with Venture and
    10          Porter-Blaine's profile forms in
    11          the MDL.
    12                    MR. SPANO:  It is these four
    13          pages, five?
    14                    MR. HARDT:  Six.
    15   BY MR. HARDT:
    16          Q.    The first thing, Mr. Peng, I
    17   would like you to do is look at the first
    18   page of Exhibit 12, and the e-mail
    19   addresses the "Tos."  Do you recognize
    20   any of those e-mail addresses?
    21          A.    I see this e-mail.
    22          Q.    Do you recognize any of the
    23   addresses?
    24          A.    I'm not sure.  It seems like

1    the first one seems to be one of the

2    mailboxes of TG.  I'm not sure, because I

3    never used it, and I don't recall.

4            Q.    How about the second one, is

5    that Mr. Bill Che's?

6            A.    I know Mr. Che has a mailbox

7    with 1623, but I don't know whether Mr.

8    Che, he has actually used this e-mail or

9    not.

10           Q.    So, you don't know one way

11   or the other whether this is his e-mail

12   address?

13           A.    I don't know.

14           Q.    How about the last three?

15           A.    "The last three," what do

16   you mean?

17           Q.    The last three on the "To"

18   line.

19           A.    According to my

20   understanding, we used the e-mail address

21   with the number 1623 or 126.  I'm not

22   sure about the e-mail of hotmail because

23   our colleagues, they used the e-mail of

24   163 or 126.

 1           Q.    So, is the answer you don't

 2    recognize those last three e-mail

 3    addresses on the "To" line?

 4           A.    I am unable to be sure.  I

 5    cannot be sure who's e-mail addresses

 6    these are.

 7           Q.    Okay.  Have you ever seen

 8    either the e-mail or the attachments

 9    before today?

10                MR. SPANO:  Objection to go

11           form.

12                THE WITNESS:  What are you

13           talking about?  Are you talking

14           about this e-mail?

15    BY MR. HARDT:

16           Q.    And its attachment, the

17    letter and the contracts.

18           A.     Are you sure these two

19    pages, the two pages that are with this,

20    is holding in his hand, are the two pages

21    are holding in his hand.  But regarding

22    the other documents, I need some time to

23    look at it.  Do you want me to look at it

24    now or when?

1          Q.    I'm not going to ask you any
2     questions about what's in it.  But I will
3     tell you, I sent this e-mail and these
4     attachments.  I'm just trying to find out
5     if in this form you saw these before, not
6     what's in it, just if you saw it in this
7     form?
8                    MR. SPANO:  Objection.
9                    INTERPRETER 1:  Counsel,
10              what form can mean the table or
11              the format?
12                    MR. HARDT:  Format.
13                    THE WITNESS:  I have never
14              seen this format before,
15              therefore, I would like to take
16              some time to take a look before I
17              can decide whether I have seen
18              this before or not.
19     BY MR. HARDT:
20          Q.    Okay.  Take a minute.
21          A.    Can I take a break?
22          Q.    If you would take a look at
23     that document on the break, I don't see a
24     problem with taking a break.

 1             MR. SPANO:  Off the record.

 2             THE VIDEOTAPE TECHNICIAN:

 3        The time now is approximately 3:19

 4        p.m., and we are now off the

 5        record.

 6                  -  -  -

 7             (Whereupon, a recess was

 8        taken from 3:19 p.m. until 3:31

 9        p.m.)

10                  -  -  -

11             THE VIDEOTAPE TECHNICIAN:

12        This begins Tape 6 of our

13        deposition.  The time now is

14        approximately 3:31 p.m., and we're

15        back on the record.

16   BY MR. HARDT:

17        Q.    Mr. Peng, Exhibit 12, my

18   question to you is, have you ever seen

19   this document before?

20        A.    I have never seen this

21   document before.

22        Q.    Mr. Peng, were you aware at

23   the time that Venture Supply made its

24   purchase of drywall from TG that there

1    was a shortage of drywall in the United

2    States?

3         A.    I didn't know.

4         Q.    You never had a discussion

5    with any of your US customers that they

6    were having trouble finding drywall made

7    in the United States?

8         A.    I did not understand the

9    question.

10              INTERPRETER 2:  The check

11         interpreter correction.  The

12         interpreter said to find drywall

13         in the U.S., did not say having to

14         find drywall made in the U.S.

15              MR. HARDT:  Made in the U.S.

16         (Addressing the

17         interpreter.)

18              Can you ask the question

19         that I asked.

20                   -  -  -

21         (Whereupon, the following

22         portion of the transcript was read

23         by the court reporter:

24              "Q.  You never had a

1          discussion with any of your US

2          customers that they were having

3          trouble finding drywall made in

4          the United States?")

5                    -  -  -

6              THE WITNESS:  I don't have

7          such a recollection.

8  BY MR. HARDT:

9      Q.    Did you make any inquiry

10  into why US importers were coming to your

11  company to try to buy drywall?

12      A.    Yes.  Some of the Chinese

13  companies, when they come to our company

14  to buy drywalls, they will mention about

15  different types of situations.  They

16  would mention about -- these companies,

17  they would mention about in the U.S. that

18  there has been strong winds or

19  hurricanes, this type of situation, but I

20  don't have too much recollection.

21      Q.    The interpreter said Chinese

22  companies.  Did you mean US companies, it

23  was the U.S. companies that were

24  mentioning problems like high winds and

1    those kinds of things?

2          A.    What I meant was, most of

3    the customers that come to our company,

4    TTP company, to buy drywalls are Chinese

5    customers.  Only very small part -- only

6    very small number of the companies are

7    foreign companies.  Whether these

8    companies, they have mention about this

9    kind of situation or not, I have no

10   recollection.

11         Q.    All right.

12         MR. HARDT:  Well, based upon

13         the time limits that I did not

14         agree to but that I understand are

15         in place, I'm going to let others

16         ask questions of you, but I

17         reserve my right to ask you

18         questions at another time.

19              -  -  -

20              EXAMINATION

21              -  -  -

22   BY MR. BRENNER:

23         Q.    Good afternoon, Mr. Peng.

24         A.    How are you?

1          Q.      Well.

2                  My name is Theodore Brenner.

3    I represent Tobin Trading in the Germano

4    case.

5                  Were you an employee of TG

6    during the entire year 2005?

7          A.      I was the employee of TG.

8          Q.      And were you the employee of

9    TG at the beginning of 2006 until

10   February of 2006?

11         A.      Yes.  During this period of

12   time, I was the employee of TG.

13         Q.      And in February 2006, did

14   you cease your employment with TG and

15   begin your employment with TTP?

16         A.      In February 2006, I joined

17   TTP company to work for them.  So, in

18   February 2006, I worked for TTP, but

19   there was some work with TG I haven't

20   finished yet, I mean, the work left over

21   when I was working for TG.  Therefore, if

22   time allowed, I will spend a little time

23   trying to finish those work.  I mean, it

24   was I did not work for -- I did not spend

1  all the time only for TTP.  Of course,

2  this has to do with my respect to TG and

3  also this is I, myself, a way that I feel

4  that I can protect my reputation.

5          Q.    When you joined TTP in

6  February 2006, what work for TG remained

7  for you to do?

8          A.    I remember at that time some

9  of the work regarding the orders from

10 Venture Supplies, I mean about the later

11 stage work of Venture Supply that I did

12 not finish handling.

13         Q.    And how long did it take for

14 you to complete the work that you had to

15 do for TG after you joined TTP?

16         A.    I spend very little time on

17 this.  What I can say is that I will try

18 my best depending on the requirement of

19 the work.  And I try to complete this

20 type of work as soon as possible, and I

21 also try to be able to completely devote

22 myself to the work of TTP, because I

23 understand that if I spend too much time

24 on this, the managers of TTP would not be

 1    happy with me, and it would also impact

 2    my work at TTP.

 3         Q.    Had you completed the

 4    remaining TG work by August 2006?

 5         A.    Completed already.

 6         Q.    By what month did you

 7    complete the remaining TG work?

 8         A.    It is difficult to say.  I

 9    don't recall.

10         Q.    Except it was certainly

11    completed by August of 2006; is that

12    correct?

13         A.    You can say that.

14         Q.    My question is, is that your

15    testimony?

16         A.    Yes.

17         Q.    Is it true that -- strike

18    that question.

19               When did you stop being an

20    employee of TTP?

21         A.    December 2007.

22         Q.    Between August 26, 2006 and

23    December 2007, is all of the sales work

24    that you performed performed as an

1    employee of TTP?

2          A.    Well, I need to give an

3    explanation to this situation because

4    when I work for TG, the customer -- some

5    of the customers, they have already

6    gotten my contact.  Therefore, when I

7    joined TTP, this customer continue to

8    contact me, therefore, if it is

9    necessary, if this has no violation to my

10   work, I will try my best to provide

11   assistance.  All of these things that I

12   do would not affect my work at TTP.

13   Finished.

14          Q.    The assistance that you just

15   described, is that assistance that would

16   benefit TG?

17                MR. SPANO:  Objection, form.

18                THE WITNESS:  I don't know

19          whether this benefit TG or not,

20          but this has to do with my

21          personal respect to the customer.

22          I mentioned earlier, so, these are

23          a very small amount and the

24          necessary help that assist my

1          customer for the respect of them.

2   BY MR. BRENNER:

3          Q.   Mr. Peng, did you know that

4   Venture Supply offices were located in

5   Virginia in the United States of America?

6               MR. SPANO:  Objection to

7               form.

8               THE WITNESS:  Mr. Phillip,

9               he did tell me that Venture Supply

10              was located in Virginia.

11  BY MR. BRENNER:

12         Q.   Isn't it also true, Mr.

13  Peng, that you received letters from

14  Venture Supply with their address printed

15  on them showing their location in

16  Virginia?

17         A.   I remember I received faxes

18  from Venture Supply, but I don't recall

19  what addresses was on it.  I also don't

20  recall the content of the fax.  I roughly

21  remember that I did receive the faxes.

22         Q.   Did anyone else in the TG

23  sales office have dealings with Venture

24  Supply other than yourself?

1          A.    I don't understand.  What do
2     you mean by "dealings"?
3          Q.    Conversations or
4     communication of any sort.
5          A.    From my recollection, no,
6     none.
7          Q.    After the contracts with
8     Venture Supply were signed, were all
9     follow up requests or discussions with
10    Venture Supply done by you as a
11    representative of TG?
12               MR. SPANO:  Objection.
13               THE WITNESS:  In reality,
14          regarding the follow-up, it's like
15          this.  When Mr. Phillip was in
16          China, we immediately do the
17          communication, and we immediately
18          resolve the issue.  After we
19          deliver the goods in China, we did
20          not follow up on the goods.
21    BY MR. BRENNER:
22          Q.    After you delivered the
23    goods in China, did you ever follow up
24    with Venture Supply to ask for feedback

1    on how the product was received by

2    customers?

3         A.    At that point --

4              INTERPRETER 1: Well, at

5         certain occasions, the witness

6         paused.

7              THE WITNESS: Because I met

8         with Mr. Phillip, I was familiar

9         with him sometimes in order to

10        complete the responsibility for

11        our future sales that Mr. Phillip

12        will ask for the drywalls, and

13        during that time for sure, we

14        would ask this type of

15        information.  But I cannot recall

16        exactly what that is.  Finished.

17   BY MR. BRENNER:

18        Q.    By using the phrase

19   "responsibility for our future sales,"

20   are you talking about discussions of

21   additional drywall to be shipped?

22              MR. SPANO:  Objection to

23        form.

24              THE WITNESS:  Well, at that

1          time, the situation was like this.

2          I was asking Mr. Phillip to come

3          to our company again, to come to

4          our company to buy more drywall.

5                    INTERPRETER 2:  And

6          correction.  The witness says I

7          know Mr. Philip relatively better.

8          He did not say I know him -- I'm

9          familiar with him well.

10                    INTERPRETER 1:  What does it

11          mean by relatively better?  What

12          is difference between familiar and

13          know him better?  It is the same

14          word.

15                    MR. CHEN:  The objection is

16          on the record by the check

17          interpreter.

18                    INTERPRETER 1:  Written in

19          Chinese notes, I have the word

20          familiar in Chinese.

21     BY MR. BRENNER:

22          Q.   Did you ask Mr. Perry to

23     come to your company again to buy more

24     drywall in a conversation by telephone,

1    in a communication by facsimile or by

2    some other type of communication?

3            A.    I don't recall because it

4    was too long ago.

5            Q.    Did you initiate the

6    conversation to ask Mr. Perry to come

7    back to your factory to discuss future

8    sales of drywall?

9            A.    Can you repeat that?

10           Q.    Let me ask a different

11   question.

12                 Was the invitation that you

13   made to Mr. Perry to come back to your

14   company to discuss future drywall sales

15   made after October 2006?

16           A.    I don't recall the exact

17   time because Mr. Phillip, Mr. Perry, he

18   came, we met.  I am familiar with him.

19                 INTERPRETER 1: Or we can

20           also translate it as I know him

21           well after a few dealings or

22           translated as interaction.

23                 THE WITNESS:  We become

24           friends.  We communicate many

1           times as friends.  Well, I said I

2           recall during the first few years,

3           every year on his birthday, I wish

4           him happy birthday.

5                MR. CHEN:  By the way, just

6           for the record, in this last

7           answer, I think the comments "we

8           can also translate it as" or

9           "translated as," I think that was

10          the translator making

11          clarification.  It's not part of

12          the answer itself.  I think she's

13          making different terms that could

14          be used in English.

15               INTERPRETER 1:  I'm not

16          making clarification, I'm

17          indicating that it is a term that

18          could be translated.  There are

19          many ways to translate it.  So, I

20          could put it this way or that way

21          for the same Chinese term.

22               MR. CHEN:  Right.  But I'm

23          just noting that it was the

24          interpreter's --

1          INTERPRETER 1:  It is not

2     clarification.  I am putting two

3     similar words.

4          MR. SERPE:  Noted.

5          MR. CHEN:  Thank you.

6          INTERPRETER 1:  Thank you.

7  BY MR. BRENNER:

8     Q.   Is it true that after

9  October 2006, you frequently requested

10  Venture Supply to place follow up orders

11  for drywall?

12     A.   I don't understand the

13  question.

14     Q.   Is it true that after

15  October 2006, you requested that Venture

16  Supply place another order for drywall?

17     A.   The situation was like this.

18  After we completed the two orders placed

19  by Venture Supply, after that, we had

20  more contacts, but by that time, we did

21  exchanges as an individual, as friends.

22  You cannot say I asked Venture Supply to

23  place more orders.  I mean the word

24  "request," you cannot use the word

1    "request."  The word "request" is

2    inappropriate.  When I exchange with Mr.

3    Phillip, I did ask him, maybe it is

4    possible that I asked him is he going to

5    buy more drywalls from our company.

6                    INTERPRETER 2:  Correction.

7                    INTERPRETER 1:  I haven't

8          finished yet.

9                    THE WITNESS:  I can only say

10         from my recollection, we did have

11         some exchanges, but I cannot make

12         it exactly -- I cannot exactly

13         recall how we say it and what was

14         being exchanged.

15   BY MR. BRENNER:

16         Q.    Did you make reports of your

17   sales efforts to anyone at TG or TTP?

18                    MR. SPANO:  Objection to

19         form.

20                    THE WITNESS:  I did not

21         understand the question.

22   BY MR. BRENNER:

23         Q.    Did you report to anyone at

24   TG or TTP about discussions that you had

1    with Venture Supply or its representative

2    about possible future drywall sales?

3           A.    I am not sure about this

4    question.  I want to clarify.  Are you

5    referring to me talking to the

6    representative of my company or the

7    representative of Venture Supply?

8           Q.    To the representative of

9    your company.

10          A.    I did not.  Regarding the

11   dealings with Venture Supply, I did not

12   make reports to the representative of the

13   company.  I did not make a complete or a

14   thorough report to the representative of

15   the company or specifically report this

16   matter.  But I, myself, as an individual,

17   I cannot exclude the possibility of other

18   people, during the conversation, they

19   might briefly bring up the matter related

20   to the orders from Venture Supply.

21          Q.    Did Mr. Perry tell you that

22   the plasterboard purchased from your

23   company had arrived at the destination in

24   Norfolk, Virginia?

1           A.    Mr. Phillip did say about

2    this when he was doing business in our

3    factory, he did mention about he wanted

4    to ship this to certain ports in

5    Virginia.

6           Q.    That is not my question, Mr.

7    Peng.  My question is, did Mr. Perry tell

8    you that the plasterboard purchased from

9    your company had arrived at the

10   destination, Norfolk, Virginia?

11          A.    Regarding this, I don't

12   recall whether he has said this or not.

13          Q.    Mr. Peng, I'm going to hand

14   you a document that is Bates numbered TG

15   0025222 through TG 0025223.

16               MR. SPANO:  Do you have the

17          translation?

18               MR.  BRENNER:  (Handing over

19          document.)

20               I've got my translation.

21               THE WITNESS:  I see that.

22               MR. BRENNER:  Let me place

23          on the front page Exhibit Number

24          13.

```
 1                    -  -  -
 2                 (Whereupon, Deposition
 3         Exhibit Peng-13, Report in Chinese
 4         by Peng Wenlong dated July 27,
 5         2009, Bates stamped TG 0025222
 6         through TG 0025223, was marked for
 7         identification.)
 8                    -  -  -
 9  BY MR. BRENNER:
10         Q.    This is an exhibit produced
11  by your counsel in the litigation.
12              MR.  BRENNER:  Translate
13         that.
14              THE WITNESS:  What do you
15         mean?
16  BY MR. BRENNER:
17         Q.    Your lawyers produced this
18  document in the current litigation.
19         A.    This is a document we
20  produced to our attorney under the
21  guidance of our attorney.
22         Q.    Did you prepare this
23  document, Mr. Peng?
24         A.    Yes, I prepare this.
```

1         Q.    Turn to the second page of

2    the document, sir.

3         A.    After this question, is it

4    possible for me to go to the bathroom, or

5    let me go now, or after I finish

6    answering this question, either way.

7              MR.  BRENNER:  I'd like a

8         discussion with Mr. Spano.  I'm

9         happy to let him take a bathroom

10        break provided there's no

11        discussion between the witness and

12        counsel during the bathroom break.

13             MR. SPANO:  Fine.

14             MR.  BRENNER:  Is that

15        agreed?

16             MR. SPANO:  Sure.

17             THE VIDEOTAPE TECHNICIAN:

18        The time now is approximately 4:22

19        p.m., and we are now off the

20        record.

21             THE WITNESS:  I understand.

22        I understand.

23                    -  -  -

24             (Whereupon, a recess was

 1              taken from 4:22 p.m. until

 2              4:28 p.m.)

 3                        -   -   -

 4                   THE VIDEOTAPE TECHNICIAN:

 5              This begins Tape 7 of today's

 6              deposition.  The now is

 7              approximately 4:28 p.m., and we're

 8              back on the record.

 9         BY MR. BRENNER:

10              Q.    Mr. Peng, you have Exhibit

11         13 before you?

12              A.    I see that.

13              Q.    You prepared this report

14         July 27, 2009?

15              A.    Yes.

16              Q.    At the time, you were an

17         employee of TG?

18              A.    I was an employee of TG

19         Company.

20              Q.    And is it true, sir, that

21         the title of this report is "Taishan

22         Gypsum Company Limited Export Report"?

23              A.    This report, the meaning for

24         this report is, this is a report that we

 1    send to the city of Tai'an for the Bureau

 2    of Inspection and Quarantine.  This

 3    report mainly is to introduce about TG

 4    Company on the following matters, the

 5    production --

 6              MR.  BRENNER:  I'm going to

 7         object.  Excuse me.

 8              THE WITNESS:  -- the

 9         production, the delivery of the

10         goods of the 12.7 mm drywall of

11         the situation.

12              MR. BRENNER:  And I'm going

13         to object to the witness further

14         answering.

15    BY MR. BRENNER:

16         Q.    My question, sir, is, was

17    the title of this report "Taishan Gypsum

18    Company Limited Export Report"?  That's

19    my only question to you.

20         A.    Then I will briefly answer

21    your question.  So, this is a report for

22    the Bureau of Inspection and Quarantine

23    in the city of Tai'an.  This report is

24    about our company regarding the

1    production, the sales of the 12.7 mm

2    drywalls.  This is the content.

3         Q.    Mr. Peng, answer my

4    question.  Is the title of this report

5    Taishan Gypsum Company Limited Export

6    Report?  That question asks for a yes or

7    a no answer.

8         A.    The title of this report is

9    like this, but the content of this report

10   is like what I mentioned earlier.

11        Q.    Mr. Peng, in preparing this

12   report for the Bureau of Inspection and

13   Quarantine in the city of Tai'an, did you

14   realize that it was important for you to

15   prepare an accurate report?

16        A.    For sure.  I make

17   preparations seriously.

18        Q.    If you would turn to the

19   second page of the report, starting at

20   the fourth line.

21        A.    I see that.

22        Q.    You reported that after

23   October 2006, you repeatedly requested

24   Venture Supply to place follow-on order.

1    Is that correct?

2            A.    In this report, yes, this is

3    the way I wrote it in Chinese.

4            Q.    And is it also true that in

5    this report, you stated that "Mr. Phillip

6    Perry replied that our plasterboard after

7    arriving at the destination" of

8    "(Norfolk, Virginia) was well received by

9    the market"?

10           A.    Well, just like what I

11   mentioned earlier, I also hope the

12   Venture Supply company can buy more goods

13   from my company.  Mr. Phillip said after

14   our goods arrived to the port that is

15   Norfolk, Virginia, I put a bracket

16   inside, we got this information from the

17   agent of the shipping company.  After we

18   got this information, I put this

19   inside -- this information inside the

20   letter with a bracket.  This statement

21   I'm making, I'm just trying to say that

22   there's no -- we don't have any bad

23   response from our customers.  Sorry.  We

24   don't have any response from our

```
 1   customers that are no good.

 2              MR.  BRENNER:  I'm going to

 3         offer the translation of Exhibit

 4         13 into evidence as Exhibit 14.

 5                    -  -  -

 6         (Whereupon, Deposition

 7         Exhibit Peng-14, Translation of

 8         Exhibit 13, "Taishan Gypsum Co.,

 9         Ltd. Export Report," was marked

10         for identification.)

11                    -  -  -

12   BY MR. BRENNER:

13         Q.    Mr. Peng, is it true that

14   you informed Mr. Perry that if Venture

15   Supply would purchase 300,000 sheets of

16   drywall a month that it would be

17   considered as an exclusive dealership for

18   TG in the United States?

19              MR. SPANO:  Objection.  I

20         would like to reserve our

21         objections to the admission of

22         Exhibit 14.

23              INTERPRETER 2:  Correction.

24         The interpreter interpret
```

```
 1              "dealership" into "agent."

 2              INTERPRETER 1:  "Sole agent"

 3         and "exclusive dealership," it's

 4         the same word in Chinese.

 5              MR. CHEN:  We just wanted to

 6         make sure that was what you were

 7         asking.

 8              MR. SERPE:  That's close

 9         enough.

10              INTERPRETER 1:  Exactly the

11         same word in Chinese.  So, when I

12         --

13              MS. BASS:  Okay.

14              MR. SERPE:  That's fine.

15              MR.  BRENNER:  Has the

16         witness answered the question?

17              THE COURT REPORTER:  No.

18                   -  -  -

19              (Whereupon, the following

20         portion of the transcript was read

21         by the court reporter:

22              "Q.   Mr. Peng, is it true

23         that you informed Mr. Perry that

24         if Venture Supply would purchase
```

```
1         300,000 sheets of drywall a month
2         that it would be considered as an
3         exclusive dealership for TG in the
4         United States?")
5                    -  -  -
6              (Interpreter repeats the
7         question.)
8              THE WITNESS:  Mr. Phillip
9         Perry, when he was in my company
10        talking about business, he did
11        mention he wanted --
12             INTERPRETER 1:  The witness
13        pause.
14             THE WITNESS:  -- could
15        Venture Supply become the agent of
16        TG?  At that point, we consider,
17        first of all, that is because the
18        customer wants to have a lower
19        price that is for the purpose to
20        complete the deal.  At that time,
21        we consider it would be impossible
22        for us to set up, to have an agent
23        in the United States.  We also did
24        not want to do this.  But because
```

```
 1            (pause) but also we cannot say
 2            (pause) we are not an agency
 3            company (pause) if we did not give
 4            that to Mr. Phillip, probably that
 5            order of Mr. Phillip (pause) he
 6            would not purchase that order from
 7            us.
 8   BY MR. BRENNER:
 9       Q.    My last question to you, Mr.
10   Peng.
11            Is it true that the samples
12   that were shipped by TG to Venture
13   Supply, the shipping of the samples was
14   paid by TG?
15            MR. SPANO:  Objection to
16            form, lack of foundation.
17            THE WITNESS:  I remember,
18            Mr. Phillip bring up the request
19            for the sample, but at that time,
20            Mr. Phillip was unable to go back
21            to the United States immediately,
22            therefore, he requested that we
23            ship it.  At that time, the
24            request from us was that the
```

1           shipment fee would be paid by

2           Venture Supply.  But eventually

3           who pay for that shipment cost, I

4           don't recall.

5                MR.  BRENNER:  Mr. Peng, I

6           have many other questions for you,

7           but as Mr. Hardt said, in the

8           interest of allowing others to ask

9           questions, I will pass the witness

10          for now and reserve my rights to

11          continue.

12                      -  -  -

13                EXAMINATION

14                      -  -  -

15     BY MS. EISELEN:

16          Q.   Good afternoon.  Mr. Peng.

17     My name is Carlina Eiselen.  I represent

18     a company called Interior/Exterior.

19          A.   Good afternoon.

20          Q.   Good afternoon.

21                Yesterday you told us that

22     customers in Canada, Panama and Africa

23     requested drywall in the measurements of

24     feet and inches.

```
1                    MR. SPANO:  Objection to

2            form, mischaracterizes the

3            testimony.

4                    THE WITNESS:  I insist on my

5            answer yesterday.

6    BY MS. EISELEN:

7            Q.    That's fine.

8                    Can you tell me which

9    customers in Canada requested

10   measurements in feet and inches of

11   drywall?

12                   MR. SPANO:  And note my

13           objection to the form of the

14           question.

15                   THE WITNESS:  Regarding

16           this, I cannot recall exactly

17           which company in Canada.  I was

18           saying that it is possible for

19           customers in Canada, in Panama and

20           Africa to use the measurement of

21           feet for the drywall.  It is the

22           information I obtained through the

23           communications with the companies

24           in China and with the import and
```

1         export companies.  After

2         communicating with these

3         companies -- I mean, after the

4         communications, after the

5         exchange, therefore, we concluded

6         that these companies are possible

7         to use the measurement by the feet

8         for the drywalls.  Finish.

9    BY MS. EISELEN:

10        Q.    Sir, do you know a company

11   called Metro Resources Corporation?

12        A.    I don't know.

13        Q.    Do you know a gentleman by

14   the name David Zhang or Zhang, Z-H-A-N-G?

15             INTERPRETER 1:  Z-H-A-N-G,

16        right?

17             MS. EISELEN: Z-H-A-N-G, yes.

18             INTERPRETER 1:  Zhang can be

19        translated in many ways, but one

20        of the ways -- do you mind I

21        tell -- I'm not speculating.  I'm

22        just stating there are many.

23             THE WITNESS:  This name is

24        very common.  I don't know who

1          you're referring to exactly.

2     BY MS. EISELEN:

3          Q.    Fair enough.

4               Do you know if TTP ever gave

5     a David Zhang of Metro Resources quality

6     reports on ASTM standards?

7          A.    Okay.  During the period

8     between 2006 to 2007, during that time

9     when we were producing and selling 12.7

10    mm drywalls, at that time, we would

11    provide the inspection report of ASTM

12    1396 to the customer according to the

13    request of the customer.  I mean, these

14    reports are provided by TTP.  When the

15    customers, they make such a request for

16    this inspection report, we would provide.

17    But for sure, I am unable to recall to

18    which company, to which person we provide

19    this inspection report.

20               MS. EISELEN:  Is he

21          finished?

22               THE WITNESS:  Finished.

23                    -  -  -

24               (Whereupon, Deposition

```
 1            Exhibit Peng-15, E-mail dated
 2            5/24/2006 with attachment, Bates
 3            stamped INT/EXT 01180 through
 4            INT/EXT 01182, was marked for
 5            identification.)
 6                      -  -  -
 7     BY MS. EISELEN:
 8            Q.    Sir, I'm going to hand you
 9     what I'm going to label as Exhibit 15.
10                 MR. EISELEN: This is, for
11            the record, Interior/Exterior
12            01180 through 01182.
13                 Counsel, for your record.
14                 (Handing over document.)
15     BY MS. EISELEN:
16            Q.    Sir, the first page is an
17     original e-mail from David Zhang to my
18     client, Jim Geary of Interior/Exterior.
19     And it says on the subject line, "quality
20     report."  And for your understanding, the
21     message of the e-mail says, "Jim:
22     Attached testing report is for your
23     reference.  If Chinese plant couldn't
24     pass this test, they couldn't stamp 'MADE
```

1    IN CHINA, MEET OR EXCEED ASTM C1396 04

2    STANDARD.'  This testing report expiring

3    date is on February 15, 2007.  Regards,

4    David."

5              A.    Let me look at it.

6                    MR. SERPE:  I would like the

7              record to reflect that the witness

8              has requested the opportunity to

9              read the Exhibit 15, which has

10             been placed in front of him,

11             which, as the document will speak

12             for itself, is plainly written in

13             English.

14                   (Witness reviewing

15             document.)

16                   MR. CHEN:  I also note that

17             the interpreter has not translated

18             the contents that Ms. Eiselen read

19             on to the record.

20                   MS. EISELEN:  Stephanie,

21             would you please translate.

22                   THE WITNESS:  I finished

23             reading these statements.

24                   INTERPRETER 1:  He finished

 1              reading.  Do I still need to

 2              translate?

 3                   MS. EISELEN: No, it's okay.

 4     BY MS. EISELEN:

 5              Q.    Mr. Peng, attached to this

 6     e-mail was two inspection certificates.

 7     If you'll turn to Page 2, the second

 8     page.  This is the test report from

 9     Tai'an Taishan Plasterboard, and it has a

10     delivery date of February 12, 2006?

11              A.    I see this.  Is there any

12     question?

13              Q.    Do you know how David Zhang

14     of Metro Resources received this, these

15     two certificates?

16                   MR. CHEN:  By the way, these

17              two -- I just wanted to note that

18              your earlier comment beforehand

19              was not translated either.  But

20              now go ahead, please.

21                   INTERPRETER 1:  The witness

22              testified before the interpreter

23              had a chance to interpret it.

24              Therefore, I did not have a chance

1          because the answer was provided

2          already.

3                    -  -  -

4          (Whereupon, the following

5          portion of the transcript was read

6          by the court reporter:

7          "Q.  Do you know how David

8          Zhang of Metro Resources received

9          this, these two certificates?")

10                   -  -  -

11         MR. SPANO:  Object to the

12         form of the question and the lack

13         of foundation.

14         THE WITNESS:  I don't know.

15  BY MS. EISELEN:

16         Q.    Mr. Peng, you earlier

17  testified that TTP was established in

18  February 2006; is that correct?

19         A.    On the business license, the

20  date was February 2006.

21         Q.    Did TTP begin actual

22  production of drywall on February 1st of

23  2006?

24         A.    I did not hear the question

1    clearly.

2              MS. EISELEN:  Stephanie,

3         would you mind repeating the

4         question.

5              INTERPRETER 1:  Sure.

6              (Interpreter repeats

7         question.)

8              THE WITNESS:  When TTP was

9         established (pause) on the

10        business license, license was the

11        date February 1st.  After that

12        date, we go to the Bureau of

13        Industry and Commerce to apply to

14        use this name.  And the Bureau of

15        Industry and Commerce approved us

16        to use this name.  During this

17        period of time, the production

18        lines of TTP were under

19        adjustment.  So, during this

20        adjustment period for production

21        line, we did produce different

22        measurements of the product.  For

23        example, 9.0, 9.5 or 12 or 12.7

24        mm, of course these are parts of

1          products.  I cannot tell all these

2          products, different length and

3          different width.

4                    MS. EISELEN:  Is he

5          finished?

6                    THE WITNESS:  Finished.

7                    MR. SPANO:  Counsel, it is

8          after 5:00.  How much more do you

9          have?

10                   MR. EISELEN:  Just a few.

11         And I understand that my other

12         colleagues have been waiting quite

13         a while, and so I will wrap my

14         questioning up very quickly.

15                   MR. SPANO:  We have limited

16         time, so...

17    BY MS. EISELEN:

18         Q.    Mr. Peng, it's my

19    understanding that TG sold its production

20    line on February 20th, 2006 to TTP or

21    there was a transfer of the production

22    line on February 20, 2006 to TTP.  Is

23    that your understanding?

24         A.    Regarding all these matters

1    between TTP and TG, I did not have any

2    information.  I did not participate.  I

3    did not know, and I'm not sure.

4              MS. EISELEN:  Mr. Peng, I'm

5         going to pass, and I thank you for

6         your time.  I'm going to pass the

7         witness to my colleagues.  I do

8         object to the termination of this

9         and reserve all of my rights and

10        Interior/Exterior's rights for

11        later on.  Thank you, Mr. Peng.

12                  -  -  -

13                EXAMINATION

14                  -  -  -

15   BY MR. CLARK:

16        Q.    Hello, Mr. Peng.  My name is

17   Matthew Clark.  I represent Southern

18   Homes, a Louisiana home builder.

19        A.    How are you?

20        Q.    Very well, thank you.

21              Are you aware of a hurricane

22   named Katrina that struck the United

23   States and particularly Louisiana?

24              MR. SPANO:  Objection to

1          form.

2                    THE WITNESS:  I don't know

3          about the situation that you're

4          talking about, but I did hear

5          about at that time that there had

6          to be a hurricane or the high

7          winds, but I did not have much

8          understanding, I did not know the

9          name, and I did not know the

10          impact.

11  BY MR. CLARK:

12          Q.    Did anyone tell you about a

13  need for drywall or other TTP products

14  that came from Hurricane Katrina?

15                    MR. SPANO:  Objection to

16          form.

17                    THE WITNESS:  I am not clear

18          about the question.  I did not

19          hear clearly.

20                    (Interpreter repeats the

21          question.)

22                    THE WITNESS:  How do you say

23          this, a need for drywall or other

24          TTP products?

1    BY MR. CLARK:

2         Q.   Hurricane Katrina caused

3    property damage in Louisiana, homes were

4    destroyed.  In order to rebuild homes,

5    drywall was needed.  Are you aware of

6    that need?

7              MR. SPANO:  I object to the

8         form of the question.  It's also

9         beyond the scope of his --

10             THE WITNESS:  I am not sure.

11             MR. SPANO:  -- deposition

12        designations.  It's almost a

13        quarter after 5.  We need to

14        conclude the deposition by around

15        5:30.  So, let's stick to

16        questions that are relevant to the

17        issues of personal jurisdiction.

18             MR. HARDT:  That's relevant

19        to sales clearly, what he's

20        designated to testify to.

21   BY MR. CLARK:

22        Q.   Did you contact anyone in

23   Louisiana about selling drywall after

24   2005?

1              MR. CHEN:  Objection to the

2         translation.  Stephanie, the way

3         it's asked is, "did you contact

4         anyone?"  And the way that she's

5         translated is, "did you have

6         contact with anyone?"  One is

7         suggesting him affirmatively

8         contacting, the other suggesting

9         any kind of contact, just for note

10        of clarification.

11             MR. CLARK:  I'm not sure how

12        to correct it in Chinese, but if

13        you --

14             INTERPRETER 1:  Objection.

15        The Chinese doesn't have that type

16        of grammar that you're referring

17        to.

18             MR. CHEN:  I think you're

19        wrong, but in any case --

20             MR. CLARK:  Can you give her

21        a helpful suggestion she can

22        consider.

23             MR. CHEN:  What are you

24        trying to ask is the question?

 1              MR. CLARK:  I'm trying to

 2        ask him if he contacted any

 3        American company.

 4              MR. CHEN:  Then for the

 5        interpreter's consideration, I

 6        would suggest ni you mei you lian

 7        luo guo and so on.

 8              MR. CLARK:  Would you please

 9        try it again with his suggestion.

10              INTERPRETER 1:  No problem.

11        It is the same word.  I am more

12        than happy to use that.

13              (Interpreter repeats the

14        question.)

15              MR. CHEN:  Objection.  She

16        used the same term she used

17        originally.

18              INTERPRETER 1:  Thank you.

19        Yeah, I used the word provided by

20        Mr. Chen.

21              MR. CLARK:  Can you just ask

22        him to answer the question, if he

23        can, please.

24              MR. SPANO:  Object to the

1                form of the question.

2                     THE WITNESS:  I did not take

3                the initiative to contact those

4                people of that state, that

5                Louisiana.  I did not contact the

6                people there.  After the year

7                2009, it was certain that some

8                people from foreign countries come

9                to our company.  They were from

10               the United States, but I cannot

11               recall where from the United

12               States.

13                    INTERPRETER 2:  Correction.

14               The witness said after 2005.

15                    INTERPRETER 1:  What?

16                    INTERPRETER 2:  The witness

17               said after 2005.

18                    INTERPRETER 1:  I did say

19               that.

20                    MR. CLARK:  You said 2009.

21                    INTERPRETER 1:  2005.  I

22               have it on my notes.

23                    THE COURT REPORTER:  You

24               said 9.

 1                    INTERPRETER 1:  I'm sorry.

 2          I have 5.

 3   BY MR. CLARK:

 4          Q.    Who contacted you?

 5                    MR. SPANO:  Objection to

 6          form.

 7                    THE WITNESS:  I don't

 8          understand "contact."  I don't

 9          understand.  Can you tell me more

10          concretely.

11   BY MR. CLARK:

12          Q.    You testified earlier that

13   someone mentioned to you Hurricane

14   Katrina or the high winds that we've been

15   discussing.  Who did that?

16                    MR. SPANO:  Objection to

17          form.  It mischaracterizes the

18          testimony also.

19                    THE WITNESS:  I know that

20          there has been the blowing of the

21          wind, but I don't know which

22          name -- which one or what name.

23   BY MR. CLARK:

24          Q.    Earlier you testified that

1  shipping invoices would have been written

2  by TTP for purposes of tax reporting in

3  China.  I'm going to show you an invoice

4  and ask that you tell me whether this is

5  such an invoice?

6         MR. CLARK:  I'll mark it as

7     16.

8               -  -  -

9         (Whereupon, Deposition

10    Exhibit Peng-16, Invoice, Tai'an

11    Taishan Plasterboard Co., Ltd.,

12    dated July 3, 2006, Bates stamped

13    TG 001936, was marked for

14    identification.)

15              -  -  -

16         MS. BASS:  Is there a Bates

17    Number?

18         THE WITNESS:  There was some

19    background noise.  I cannot hear

20    clearly.

21         INTERPRETER 1:  The

22    interpreter says she will repeat

23    it to him.

24         (Interpreter repeats

1        question.)

2              MR. SPANO:  Object to the

3        form of the question, and it

4        mischaracterizes the testimony.

5              MR. CLARK:  For the record,

6        this is document number TG 001936.

7              THE WITNESS:  I see this

8        document.

9              MR. CLARK:  Is he finished?

10             THE WITNESS:  Not finished

11        yet.

12             (Witness reviewing

13        document.)

14             THE WITNESS:  I finish

15        reading this.

16    BY MR. CLARK:

17        Q.    Is it a TTP document?

18        A.    According to the content of

19    the document, it should be made by TTP.

20        Q.    Is this the type of document

21    that TTP would write for tax reporting

22    purposes?

23        A.    No.  This is mainly for the

24    customers.  It is for the customers to

1    look -- this is according to the request

2    of the customers.  This is for the

3    purpose of them to receive the goods.

4              INTERPRETER 2:  Correction.

5          For the purpose of the customer

6          when they pick up the product.

7              INTERPRETER 1:  No.  Purpose

8          of them.

9              MR. CLARK:  It's okay.  I

10         have another question.

11             INTERPRETER 1:  The same

12         thing.

13   BY MR. CLARK:

14         Q.   So, that document reflects a

15   TTP sale, correct?

16         A.   This is an invoice issued

17   according to the requirement of the

18   customers.  Of course, on this invoice,

19   we would have the details of the

20   description of the goods and the quantity

21   and the price.  Any other information, we

22   would write or make it clear according to

23   the requirement of the customers,

24   according to different customers.

 1    Finished.

 2            Q.    Does that document represent

 3    a completed sale?

 4            A.    You cannot say that.  Do you

 5    need me to explain?

 6            Q.    Another question.

 7                  Did TTP issue that document

 8    for the purpose of being paid?

 9            A.    You cannot say that.  This

10    is not accurate.

11            Q.    Did TTP issue that document

12    after drywall was shipped?

13                  MR. SPANO:  Objection to

14            form.

15                  It's 5:30, we need to

16            conclude this.  How much more do

17            you have?

18                  MR. CLARK:  I have one other

19            type of form that I would like him

20            to explain to me because I don't

21            know what it is.

22                  MR. SPANO:  Then that will

23            be it.

24                  THE WITNESS:  This type of

1           invoice, sometimes we would issue

2           it before the transaction was

3           completed.  This is to show to the

4           customer the price, the

5           description of the product, and

6           certain information for

7           references.  Sometimes during the

8           transaction, we would issue this

9           according to the requirement of

10          the government, the customs or

11          different departments.  And

12          sometimes after the transaction is

13          finished for the convenience of

14          the customers to pick up the

15          goods, we would also issue these

16          type of documents.

17   BY MR. CLARK:

18          Q.    Finished?

19          A.    Finished.

20                MR. CLARK: One other

21          document to show you.  For the

22          record, it's Bates labeled TG

23          0020107.  It's called a

24          counterfoil.  I've marked it

 1              Exhibit 17.

 2                        -   -   -

 3                   (Whereupon, Deposition

 4              Exhibit Peng-17, Document

 5              entitled, "Counterfoil, Tai'an

 6              Shandong Province Special Invoice

 7              for Export," Bates stamped TG

 8              0020107, was marked for

 9              identification.)

10                        -   -   -

11                   MR. SPANO:  The record

12              should reflect that this piece of

13              paper is partially obscured.

14                   MR. CLARK:  That's how it

15              was produced.

16         BY MR. CLARK:

17              Q.   Would you ask him to please

18         take a look at the document and describe

19         to me the purpose of it.

20              A.   (Witness reviewing

21         document.)

22                   I see this document.  Mr.

23         Attorney, what is your question?

24              Q.   What is the purpose of that

1    document, and is it a TTP document?

2              MR. SPANO:  Objection to

3         form.

4              THE WITNESS:  Yes, this is a

5         TTP document.  However, I cannot

6         see everything here, and I think

7         it should be the case, but I

8         cannot make -- I cannot be sure.

9    BY MR. CLARK:

10        Q.   Is this a common type of

11   document that TTP would write?

12             MR. SPANO:  Objection to

13        form.  Objection.

14             THE WITNESS:  This type of

15        document, this is according to the

16        requirement of our local tax

17        bureau that we issue this type of

18        invoice.  This type of invoice has

19        a fixed format.  This format comes

20        from the tax bureau, and we cannot

21        change it.  We filled in the

22        content according to the format of

23        this invoice.

24   BY MR. CLARK:

1          Q.    Is he finished?

2          A.    Finished.

3          Q.    Do you recognize the

4    purchaser listed on that form?

5               MR. SPANO:  Objection to

6          form.

7               THE WITNESS:  I don't

8          recognize the purchaser.  But

9          under the guidance of my attorney,

10         I did have an understanding of

11         this type of knowledge.  This

12         customer was being led by an

13         agent, a middleman in Hangzhou

14         city of China.  This middleman

15         bring this customer to our

16         company, TTP, to talk business.

17         Finished.

18   BY MR. CLARK:

19         Q.    Which of your colleagues at

20   TTP handled transactions with that

21   customer?

22               MR. SPANO:  Objection to

23         form.

24               THE WITNESS:  I don't recall

1          whether it is manager, Mr. Che, or

2          manager, Mr. Yang.

3                    MR. SPANO:  That's it.

4          We're done.

5                    THE VIDEOTAPE TECHNICIAN:

6          The time now is approximately 5 --

7                    MR. CLARK:  Thank you for

8          your time.  I have several more

9          questions for you, but it looks

10         like those will be reserved for

11         another day.

12                   MR. SPANO:  Off the record.

13                   MR. PANAYOTOPOULOS:  Are you

14         terminating the deposition?

15                   MR. SPANO:  This deposition

16         is concluded as agreed.

17                   MR. PANAYOTOPOULOS:  Agreed

18         by whom?

19                   MR. SPANO:  As agreed by us

20         and the PSC.

21                   MR. PANAYOTOPOULOS:  I'm not

22         on the PSC, and I've not had an

23         opportunity to ask any questions

24         on behalf of my client.  I

1           understand you guys unilaterally

2           are terminating this deposition.

3           I thought I was going to get a

4           chance to at least ask some

5           questions so we get somewhere and

6           get started.  I knew I wouldn't be

7           able to finish it tonight, but I'd

8           just note for the record my

9           client, on behalf of my client, I

10          have not had a chance to ask a

11          single question.

12                MR. ALLELY:  I'm Greg Allely

13          on behalf of the State of

14          Louisiana.  I have a few questions

15          to ask.  I hoped that I'd be able

16          to have a chance to ask them

17          today.  We did come many thousands

18          of miles here, and not to be able

19          to ask any questions at all when

20          the deposition was noticed to

21          continue until completed the

22          entire week even into Saturday is

23          unreasonable and unfair.  I would

24          ask that you reconsider and allow

```
1           us to ask ten minutes of questions
2           on my behalf.
3               MR. SERPE:  Anyone else?
4               MR. HARDT:  Lastly, I'm Ken
5       Hardt on behalf of Venture and
6       Porter-Blaine.  I'm here in the
7       Germano action.  I noticed these
8       depositions separately in the
9       Germano action.  I wasn't a part
10      of the agreement between the PSC
11      and Taishan on these depositions.
12      My notice of deposition said
13      beginning, I believe, April 4th,
14      which was the first day of
15      depositions, until completed.  A
16      lot of folks have come a lot of
17      way, and we had no control over
18      the PSC and the amount of time
19      they took in questioning the
20      witnesses.  So, the fact that this
21      is being unilaterally terminated
22      by Taishan, at least as far as
23      we're concerned, gives us grounds
24      to move to reopen these
```

1          depositions at the cost of Taishan

2          in the United States.

3                MS. EISELEN:  This is

4          Carlina Eiselen.  I represent

5          Interior/Exterior.  I also

6          cross-noticed this deposition in

7          the MDL.  I am not part of the

8          Plaintiffs' Steering Committee.  I

9          don't have an agreement with

10         Taishan, and I note that I object

11         to the conclusion of this

12         deposition and expect to be able

13         to come back and question Taishan

14         at a later time.

15                MR. SERPE:  On behalf of the

16         PSC, I don't want our silence to

17         be an assent to the concept that

18         we agree that the deposition is

19         concluded.  We feel that there

20         have been inadequacies with

21         document productions and other

22         problems with the deposition.  We

23         reserve our rights to reopen the

24         deposition as well.

1          MS. BASS:  Similarly, on

2     behalf of the Home Builders

3     steering committee, in light of

4     the fact that there were documents

5     that were just produced and never

6     translated just prior to the

7     deposition, contrary to the

8     outstanding Request for

9     Production, we also object and

10     reserve our rights to come back or

11     to have the witness brought to the

12     United States so we have the

13     opportunity to complete our

14     deposition.

15          MR.  BRENNER:  On behalf of

16     Tobin, as stated on the record,

17     there are many more questions that

18     went directly to the issue of

19     jurisdiction that we were not able

20     to ask out of the understanding

21     that others would need to ask some

22     questions before Taishan

23     terminated this deposition.

24          MR. SLAUGHTER:  This is

```
 1          Brian Slaughter for Atlantic
 2          Homes, and without belaboring it,
 3          we join in the objections raised
 4          via the parties.  We, likewise,
 5          are not a part of the PSC and have
 6          no control over that, and we
 7          object to these being terminated
 8          at this time, and we will reserve
 9          all our rights.
10              MR. SPANO:  On behalf of the
11          defendants Taishan Gypsum Company
12          Limited and Tai'an Taishan
13          Plasterboard, we have a lot to say
14          in response to these statements,
15          and we'll do so at the appropriate
16          time.  But at this point, we'll
17          just state that we've made our
18          clients available for six days of
19          depositions, and there was ample
20          opportunity for all questions
21          relevant to personal jurisdiction.
22          This deposition is now concluded,
23          and I thank everyone and wish them
24          all a safe flight home.
```

1           MR. PANAYOTOPOULOS:  I just

2      want to make sure.  You are not

3      disagreeing with any of the

4      statements that I made on the

5      record about us having no

6      agreement that you could

7      unilaterally terminate the

8      deposition without me asking

9      questions?  You are not -- you

10      agree that we have not -- we do

11      not have the agreement that you

12      can unilaterally terminate the

13      deposition or that I agree to any

14      particular term, right?

15           MR. SPANO:  I don't agree.

16           MR. PANAYOTOPOULOS:  You're

17      saying that we have had some

18      agreement?

19           MR. SPANO:  I'm not

20      discussing it further.

21           MR. PANAYOTOPOULOS:  Well, I

22      just want to make sure that the

23      record is clear.  I've never

24      agreed to anything, and you never

1          even discussed that issue with me.

2          We've separately noticed it.  I

3          don't want any arguments later.

4          You believe that we've got some

5          agreement?

6                    MR. SPANO:  What I do

7          believe is that the Court

8          contemplated that there would be

9          one jurisdictional deposition by

10         our client in these matters.

11         That's --

12                   MR. PANAYOTOPOULOS:  That's

13         fine.  I just want to make sure

14         that you didn't dispute what I was

15         saying about us not having --

16                   MR. SPANO:  That's where I

17         part company with you.

18                   MR. PANAYOTOPOULOS:  We

19         disagree, but I understand.  That

20         makes sense.

21                   THE VIDEOTAPE TECHNICIAN:

22         The time now is approximately 5:43

23         p.m.  Today's portion of our

24         deposition consisting of 7 tapes

1           is now concluded.

2                       -  -  -

3                  (Whereupon, the deposition

4           concluded at 5:43 p.m.)

5                       -  -  -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                C E R T I F I C A T E
2
3
                 I, LINDA L. GOLKOW, a
4    Registered Diplomate Reporter, Certified
     Court Reporter and Notary Public, do
5    hereby certify that, pursuant to notice,
     the deposition of WENLONG PENG was duly
6    taken on April 8, 2011 at 9:02 a.m.
     before me.
7
8                The said WENLONG PENG was
     duly sworn by me through the interpreter
9    according to law to tell the truth, the
     whole truth and nothing but the truth and
10   thereupon did testify as set forth in the
     above transcript of testimony.  The
11   testimony was taken down stenographically
     by me.
12
13               I do further certify that
     the above deposition is full, complete
14   and a true record of all the testimony
     given by the said witness.
15
16
17        Linda L. Golkow
          Registered Diplomate Reporter
18        Certified Realtime Reporter
19
20               (The foregoing certification
     of this transcript does not apply to any
21   reproduction of the same by any means,
     unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24

1               INSTRUCTIONS TO WITNESS

2

3

4               Please read your deposition

5    over carefully and make any necessary

6    corrections.  You should state the reason

7    in the appropriate space on the errata

8    sheet for any corrections that are made.

9

10               After doing so, please sign

11   the errata sheet and date it.  It will be

12   attached to your deposition.

13

14               It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

```
1              - - - - - -

           E R R A T A

2              - - - - - -

3    PAGE  LINE  CHANGE

4    ____  ____  _____

5      REASON: _____

6    ____  ____  _____

7      REASON: _____

8    ____  ____  _____

9      REASON: _____

10   ____  ____  _____

11     REASON: _____

12   ____  ____  _____

13     REASON: _____

14   ____  ____  _____

15     REASON: _____

16   ____  ____  _____

17     REASON: _____

18   ____  ____  _____

19     REASON: _____

20   ____  ____  _____

21     REASON: _____

22   ____  ____  _____

23     REASON: _____

24
```

1
2          ACKNOWLEDGMENT OF DEPONENT
3
              I,_____, do
4    hereby certify that I have read the
     foregoing pages, 223 through 446 and that
5    the same is a correct transcription of
     the answers given by me to the questions
6    therein propounded, except for the
     corrections or changes in form or
7    substance, if any, noted in the attached
     Errata Sheet.
8
9    _____
     WENLONG PENG                DATE
10
11
12
13
14
15
16   Subscribed and sworn
     to before me this
17   _____ day of _____, 20_____.
18   My commission expires:_____
19

     _____
20   Notary Public
21
22
23
24

```
 1                      LAWYER'S NOTES

 2      PAGE   LINE

 3      ____   ____   _____

 4      ____   ____   _____

 5      ____   ____   _____

 6      ____   ____   _____

 7      ____   ____   _____

 8      ____   ____   _____

 9      ____   ____   _____

10      ____   ____   _____

11      ____   ____   _____

12      ____   ____   _____

13      ____   ____   _____

14      ____   ____   _____

15      ____   ____   _____

16      ____   ____   _____

17      ____   ____   _____

18      ____   ____   _____

19      ____   ____   _____

20      ____   ____   _____

21      ____   ____   _____

22      ____   ____   _____

23      ____   ____   _____

24      ____   ____   _____
```



Transcript of the Testimony of:  **Wenlong Peng**

01/13/2012

Chinese Drywall

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2

   _____
3                              §  MDL NO. 2047
   IN RE:                      §
4  CHINESE-                    §  SECTION: L
   MANUFACTURED                §
5  DRYWALL PRODUCTS            §  JUDGE FALLON
   LIABILITY                   §
6  LITIGATION                  §  MAGISTRATE
   _____    §  JUDGE WILKINSON
7

                    -  -  -
8

      CROSS NOTICED IN VARIOUS OTHER ACTIONS
9
                    -  -  -
10
                 January 13, 2012
11
                    -  -  -
12

       CONFIDENTIAL - SUBJECT TO FURTHER
13           CONFIDENTIALITY REVIEW
14                  -  -  -
15        Continued videotaped deposition of
   WENLONG PENG, held at the Executive
16 Centre, Level 3, Three Pacific Place, One
   Queen's Road East, Hong Kong, China,
17 commencing at 8:32 a.m., on the above
   date, before Ann Marie Mitchell,
18 Certified Court Reporter, Registered
   Diplomate Reporter, Certified Realtime
19 Reporter and Notary Public.
                    -  -  -
20
21
          GOLKOW TECHNOLOGIES, INC.
22     877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
23
24

```
 1   BEFORE:
 2          HONORABLE ELDON E. FALLON
            UNITED STATES FEDERAL COURT -
 3          EASTERN DISTRICT OF LOUISIANA
 4
 5   APPEARANCES:
 6
        GAINSBURGH, BENJAMIN, DAVID, MEUNIER
 7      & WARSHAUER, L.L.C.
        BY:  GERALD E. MEUNIER, ESQUIRE
 8      2800 Energy Centre
        1100 Poydras Street
 9      New Orleans, Louisiana 70163
        (504) 522-2304
10      gmeunier@gainsben.com
        Representing the Plaintiffs'
11      Steering Committee
12
        HERMAN HERMAN KATZ & COTLAR, LLP
13      BY:  LEONARD A. DAVIS, ESQUIRE
        820 O'Keefe Avenue
14      New Orleans, Louisiana 70113
        (504) 581-4892
15      Ldavis@hhkc.com
        Representing the Plaintiffs'
16      Steering Committee
17
        COLSON HICKS EIDSON
18      BY:  ERVIN GONZALEZ, ESQUIRE
        BY:  PATRICK S. MONTOYA, ESQUIRE
19      255 Alhambra Circle
        Penthouse
20      Coral Gables, Florida 33134
        (305) 476-7400
21      Ervin@colson.com
        Patrick@colson.com
22      Representing Plaintiffs' Steering
        Committee in the Federal and State
23      Coordinated Actions
24
```

```
 1    APPEARANCES (CONTINUED):
 2
      LEVIN, FISHBEIN, SEDRAN & BERMAN
 3    BY:  ARNOLD LEVIN, ESQUIRE
      510 Walnut Street - Suite 500
 4    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 5    Alevin@lfsblaw.com
      Representing the Plaintiffs'
 6    Steering Committee
 7
      SEEGER WEISS LLP
 8    BY:  SCOTT A. GEORGE, ESQUIRE
      One William Street
 9    New York, New York 10004
      (212) 584-0700
10    Sgeorge@seegerweiss.com
      Representing the Plaintiffs'
11    Steering Committee
12
      HOGAN LOVELLS US LLP
13    BY:  FRANK T. SPANO, ESQUIRE
      875 Third Avenue
14    New York, New York 10022
      (212) 918-3000
15    frank.spano@hoganlovells.com
      Representing Taishan Gypsum Co.
16    Ltd. and Taian Taishan
      Plasterboard Company Ltd. and the
17    Witness, Wenlong Peng
18
      HOGAN LOVELLS INTERNATIONAL LLP
19    BY:  EUGENE CHEN, ESQUIRE
      BY:  JIENI JI, ESQUIRE
20    18th Floor, Park Place
      1601 Nanjing Road West
21    Shanghai, China 200040
      (86 21) 6122 3800
22    eugene.chen@hoganlovells.com
      Representing Taishan Gypsum Co.
23    Ltd. and Taian Taishan Plasterboard
      Company Ltd. and the Witness, Wenlong
24    Peng
```

```
 1    APPEARANCES (CONTINUED):
 2
      GREENBERG TRAURIG, LLP
 3    BY:  HILARIE BASS, ESQUIRE
      1221 Brickell Avenue
 4    Miami, Florida 33131
      (305) 579-0745
 5    bassh@gtlaw.com
      Representing the Home Builders
 6    Steering Committee
 7
      PERKINS COIE LLP
 8    BY:  DAVID L. BLACK, ESQUIRE
      1899 Wynkoop Street
 9    Suite 700
      Denver, Colorado 80202
10    (303) 291-2300
      DBlack@perkinscoie.com
11    Representing the State of Louisiana
12
      THOMPSON COE COUSINS & IRONS, L.L.P.
13    BY:  KEVIN F. RISLEY, ESQUIRE
      One Riverway
14    Suite 1600
      Houston, Texas 77056
15    (713) 403-8210
      krisley@thompsoncoe.com
16    Representing The North River
      Insurance Company
17
18    BRENNER, EVANS & MILLMAN, P.C.
      BY:  THEODORE I. BRENNER, ESQUIRE
19    411 East Franklin Street
      Suite 200
20    Richmond, Virginia 23218
      Tbrenner@beylaw.com
21    (804) 644-1300
      Representing Tobin Trading Company
22
23
24
```

```
 1   APPEARANCES (CONTINUED):
 2
 3       McKENRY, DANCIGERS, DAWSON & LAKE, P.C.
         BY:  J. BRIAN SLAUGHTER, ESQUIRE
 4       192 Ballard Court
         Suite 400
 5       Virginia Beach, Virginia 23462
         (757) 461-2500
 6       Jbslaughter@va-law.org
         Representing Atlantic Homes LLC and
 7       Multiple Other Virginia-Based
         Defendants
 8
 9       QUINN EMANUEL URQUHART & SULLIVAN,LLP
         BY:  JANE M. BYRNE, ESQUIRE
10       BY:  JULIA BESKIN, ESQUIRE
         51 Madison Avenue
11       22nd Floor
         New York, New York 10010
12       (212) 849-7000
         Janeburne@quinnemanuel.com
13       Juliabeskin@Quinnemanuel.Com
         Representing Chartis Select Insurance
14       Company and Related Chartis Insurers
15
         WEINBERG, WHEELER, HUDGINS, GUNN &
16       DIAL, LLC
         BY:  MICHAEL SEXTON, ESQUIRE
17       3344 Peachtree Road, NE
         Suite 2400
18       Atlanta, Georgia 30326
         (404) 876-2700
19       msexton@wwhgd.com
         Representing Various Banner
20       Defendants
21
22
23
24
```

1    APPEARANCES (CONTINUED):

2

     SINNOTT, NUCKOLS & LOGAN, PC

3    BY:  KENNETH F. HARDT, ESQUIRE

     13811 Village Mill Drive

4    Midlothian, Virginia 23114

     (804) 378-7600

5    khardt@snllaw.com

     Representing Venture Supply, Inc. and

6    Porter-Blaine Corp.

7

   ALSO PRESENT:

8

     SUNNY WANG, INTERPRETER

9

10

11                    -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1   APPEARANCES VIA TELEPHONE:
 2
 3       GALLOWAY JOHNSON TOMPKINS BURR and SMITH
         BY:  CARLINA C. EISELEN, ESQUIRE
 4       One Shell Square
         701 Poydras Street, 40th Floor
 5       New Orleans, Louisiana 70139
         (504) 525-6802
 6       ceiselen@gjtbs.com
         Representing Interior/Exterior
 7       Building Supply
 8
         HUNTON & WILLIAMS LLP
 9       BY:  A. TODD BROWN, ESQUIRE
         Bank of America Plaza
10       101 South Tryon Street
         Suite 3500
11       Charlotte, North Carolina  28280
         (704) 378-4700
12       Representing Stock Building Supply, LLC
13
14       JONES, WALKER, WAECHTER, POITEVENT,
         CARRERE & DENEGRE LLP
15       BY:  MEGAN E. DONOHUE, ESQUIRE
         600 Jefferson Street, Suite 1600
16       Lafayette, Louisiana 70501
         (337) 262-9062
17       mdonohue@joneswalker.com
         Representing Fireman's Fund Insurance
18       Company
19
         FULMER LEROY ALBEE BAUMANN
20       BY:  MICHAEL P. McCAHILL, ESQUIRE
         2866 East Oakland Park Boulevard
21       Ft. Lauderdale, Florida 33306
         (954) 707-4430
22       mosscandace@fulmerleroy.com
         mmccahill@fulmerleroy.com
23       Representing Independent Builders
         Supply Association (IBSA)
24
```

```
 1   APPEARANCES VIA TELEPHONE (CONTINUED):
 2
 3       WRIGHT, FULFORD, MOORHEAD & BROWN, P.A.
         BY:  DORYK B. GRAF, JR., ESQUIRE
 4       145 N. Magnolia Ave.
         Orlando, Florida 32801
 5       (407) 425-0234
         dgraf@wfmblaw.com
 6       Representing West Construction, Inc.
 7
 8       QUINN EMANUEL URQUHART & SULLIVAN, LLP
         BY: CLINTON DOCKERY, ESQUIRE
 9       51 Madison Avenue, 22nd Floor
         New York, New York 10010
10       (212) 849-7000
         clintondockery@quinnemanuel.com
11       Representing Chartis Select Insurance
         Company and Related Chartis Insurers
12
13       RUMBERGER, KIRK & CALDWELL, P.A.
         BY:  MONICA C. SEGURA, ESQUIRE
14       Brickell Bayview Centre, Suite 3000
         80 Southwest 8th Street
15       Miami, Florida 33130
         (305) 358-5577
16       Representing several defendants and
         Defendants' Liaison Counsel for
17       Installers
18
         BUCHANAN INGERSOLL & ROONEY
19       BY:  C. ROBERT ZAPPALA, ESQUIRE
         One Oxford Centre
20       301 Grant Street, 20th Floor
         Pittsburgh, Pennsylvania 15219
21       (412) 392-2135
         bobby.zappala@bipc.com
22       Representing 84 Lumber
23
24
```

```
 1    APPEARANCES VIA STREAM:
 2
      BECNEL LAW FIRM, L.L.C.
 3    BY:  ROBERT BECNEL, ESQUIRE
      106 W. 7th Street
 4    Reserve, Louisiana 70084
      (985) 536-1186
 5    robbecnel@aol.com
      Representing the Plaintiffs'
 6    Steering Committee
 7
      PARKER WAICHMAN ALONSO LLP
 8    BY:  JORDAN L. CHAIKIN, ESQUIRE
      3301 Bonita Beach Road
 9    Bonita Springs, Florida 34134
      (239) 390-1000
10    Jchaikin@yourlaywer.com
      Representing Plaintiffs' Steering
11    Committee
12
      MORGAN & MORGAN
13    BY:  PETE V. ALBANIS, ESQUIRE
      12800 University Drive
14    Suite 600
      Fort Myers, Florida 33907
15    (877) 667-4265
      Representing the Plaintiffs
16
17    IRPINO LAW FIRM
      BY:  ANTHONY IRPINO, ESQUIRE
18    2216 Magazine Street
      New Orleans, Louisiana 70130
19    Airpino@irpinolaw.com
      (504) 525-1500
20    Representing the Plaintiffs
21
22
23
24
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3       GALLOWAY JOHNSON TOMPKINS BURR and SMITH
         BY:  CARLINA C. EISELEN, ESQUIRE
 4       One Shell Square
         701 Poydras Street, 40th Floor
 5       New Orleans, Louisiana 70139
         (504) 525-6802
 6       ceiselen@gjtbs.com
         Representing Interior/Exterior
 7       Building Supply
 8
         HEARD & MEDACK, P.C.
 9       BY:  JAMES DAVIS, ESQUIRE
         9494 Southwest Freeway, Suite 700
10       Houston, Texas 77074
         (713) 772-6400
11       jdavis@heardmedackpc.com
         Representing CastleRock Communities, L.P.
12
13
         HUNTON & WILLIAMS LLP
14       BY:  A. TODD BROWN, ESQUIRE
         Bank of America Plaza
15       101 South Tryon Street
         Suite 3500
16       Charlotte, North Carolina  28280
         (704) 378-4700
17       tbrown@hunton.com
         Representing Stock Building Supply, LLC
18
19
         SHER GARNER CAHILL RICHTER KLEIN &
20       HILBERT, L.L.C.
         BY:  MATTHEW C. CLARK, ESQUIRE
21       909 Poydras Street
         Suite 2800
22       New Orleans, Louisiana 70112
         (504) 299-2100
23       mclark@shergarner.com
         Representing the Southern Home
24       Defendants
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3        QUINN EMANUEL URQUHART & SULLIVAN, LLP
          BY: CLINTON DOCKERY, ESQUIRE
 4        51 Madison Avenue, 22nd Floor
          New York, New York 10010
 5        (212) 849-7000
          clintondockery@quinnemanuel.com
 6        Representing Chartis Select Insurance
          Company and Related Chartis Insurers
 7
 8        JONES, WALKER, WAECHTER, POITEVENT,
          CARRERE & DENEGRE LLP
 9        BY:  MEGAN E. DONOHUE, ESQUIRE
          600 Jefferson Street, Suite 1600
10        Lafayette, Louisiana 70501
          (337) 262-9062
11        mdonohue@joneswalker.com
          Representing Fireman's Fund Insurance
12        Company
13
          DEUTSCH, KERRIGAN & STILES
14        BY:  MELISSA M. SWABACKER, ESQUIRE
          755 Magazine St.
15        New Orleans, Louisiana  70130
          (504) 581-5141
16        mswabacker@dkslaw.com
          Representing Landmark American
17        Insurance Company
18
          WEINBERG, WHEELER, HUDGINS, GUNN &
19        DIAL, LLC
          BY:  SHUBHRA MASHELKAR, ESQUIRE
20        3344 Peachtree Road, NE
          Suite 2400
21        Atlanta, Georgia 30326
          (404) 876-2700
22        Smashelkar@wwhgd.com
          Representing Various Banner
23        Defendants
24
```

```
 1                    -  -  -
                     I N D E X
 2                    -  -  -
 3   Testimony of:  WENLONG PENG
 4    By Mr. Seeger                  464, 544
      By Ms. Bass                    510
 5    By Mr. Hardt                   517
      By Ms. Beskin                  523
 6    By Mr. Spano                   526
 7
                     -  -  -
 8
                   E X H I B I T S
 9
                     -  -  -
10
11   NO.             DESCRIPTION        PAGE
12   Peng-18  E-mail chain, top one    466
                dated November 20,
13              2006, Bates stamped TG
                0022595 and TG 0022596
14
     Peng-19  E-mail in Chinese        482
15              dated May 11, 2007,
                Bates stamped TG
16              0022728
17   Peng-19A E-mail in Chinese        482
                dated May 11, 2007,
18              Bates stamped TG
                0022728
19
     Peng-20  E-mail chain, top one    488
20              dated August 30, 2007,
                Bates stamped TG
21              0021369 through TG
                0021372
22
23
24
```

```
 1     Peng-21   E-mail chain, top one   500
                 dated August 6, 2007,
 2               Bates stamped TG
                 0021964, TG 0021966
 3               and TG 0021991
 4     Peng-22   E-mail chain, top one   505
                 dated 6/3/2006, Bates
 5               stamped TG 0001377 and
                 TG 0001378
 6
       Peng-23   E-mail dated October    507
 7               9, 2007, Bates stamped
                 TG 0022650
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1                    -  -  -
2              DEPOSITION SUPPORT INDEX
3                    -  -  -
4

    Direction to Witness Not to Answer
5
                    Page Line
6
7
8
9

    Request for Production of Documents
10
                    Page Line
11
12
13
14
                    Stipulations
15
                    Page Line
16
17
18
19
20              Question Marked
21                  Page Line
22
23
24

1          VIDEOTAPE TECHNICIAN:  We

2     are on the record.  My name is Dan

3     Lawlor.  I'm a videographer for

4     Golkow Technologies.  Today's date

5     is January 13, 2012, and the time

6     is 8:32 a.m.  This video

7     deposition is being held in Hong

8     Kong, China in the matter of

9     Chinese Drywall Litigation, for

10    the United States District Court,

11    Eastern District of Louisiana, MDL

12    Number 2047 and cross-noticed in

13    various other actions.  The

14    deponent today is Peng Wenlong.

15         Will Your Honor and all

16    present state your appearances for

17    the record.

18         THE COURT:  Judge Eldon

19    Fallon, United States District

20    Court, Eastern District of

21    Louisiana.

22         MR. SEEGER:  Chris Seeger,

23    Seeger Weiss, on behalf of the PSC

24    and plaintiffs.  With me is Scott

1           George from my office.

2                MS. BASS:  Hilarie Bass, on

3           behalf of the Home Builders

4           Steering Committee.

5                MR. GONZALEZ:  Good morning.

6           Ervin Gonzalez and Patrick Montoya

7           on behalf of the PSC and MDL

8           states' liaison counsel.

9                MR. HARDT:  Good morning.

10          Ken Hardt on behalf of Venture

11          Supply in the Germano action and

12          the Alexander state court action.

13               MR. BRENNER:  Theodore

14          Brenner on behalf of Tobin Trading

15          in the Germano action.

16               MR. SLAUGHTER:  Brian

17          Slaughter here on behalf of

18          Atlantic Homes, LLC and the

19          Commonwealth of Virginia matters

20          and the MDL.

21               MR. SEXTON:  Mike Sexton on

22          behalf of certain Banner Supply

23          entities.

24               MR. LEVIN:  Arnold Levin,

1    lead counsel, PSC.

2         MR. DAVIS:  Leonard Davis on

3    behalf of the Plaintiffs' Steering

4    Committee and Plaintiffs' Liaison

5    Counsel.

6         MR. BLACK:  David Black on

7    behalf of the State of Louisiana,

8    preserving our rights set forth in

9    our pending remand motion.

10        MR. MEUNIER:  Gerry Meunier

11   for the PSC and the MDL.

12        MS. BYRNE:  Jane Byrne and

13   Julia Beskin from Quinn Emanuel

14   for the Chartis Group of insurance

15   companies.

16        MR. RISLEY:  Kevin Risley

17   for the North River Insurance

18   Company.

19        MR. SPANO:  Frank Spano,

20   Eugene Chen and Jieni Ji, Hogan

21   Lovells, for the defendants TG and

22   TTP.

23        VIDEOTAPE TECHNICIAN:  The

24   court reporter today is Ann Marie

```
 1              Mitchell.  And, Your Honor, please
 2              proceed.
 3                    -  -  -
 4              WENLONG PENG, after having
 5         been duly sworn, was examined and
 6         testified as follows:
 7                    -  -  -
 8              THE COURT:  You may proceed,
 9         Counsel.
10              MR. SEEGER:  Thank you, Your
11         Honor.
12                    -  -  -
13                EXAMINATION
14                    -  -  -
15    BY MR. SEEGER:
16         Q.    Good morning, Mr. Peng.
17    Good to see you again.
18         A.    Hello.
19         Q.    I questioned you in April.
20         A.    That's correct, the last
21    time.
22         Q.    I've got some exhibits I
23    want to go through, and we should be able
24    to get through this relatively quickly
```

1    today, from my perspective.

2              Mr. Peng, did you have an

3    opportunity to review your testimony from

4    April?

5         A.    With the direction of Hogan

6    Lovells' attorney, I did review the

7    testimony.

8         Q.    Is there anything about that

9    testimony you'd like to start off with

10   correcting, or are you satisfied with

11   your testimony?

12        A.    I believe with the

13   instruction of my attorney, I did make

14   some corrections.

15             MR. SEEGER:  Frank, were

16        those provided to us?

17             MR. SPANO:  Yes.  There was

18        an errata sheet filed.

19             MR. SEEGER:  Just that.

20        Okay.

21   BY MR. SEEGER:

22        Q.    Thank you, Mr. Peng.

23             Mr. Peng, I'd like to start

24   off by marking an exhibit that I'd like

1    to ask you some questions about.

2                    For the record, we are

3    marking this as Peng Exhibit 18.  It's

4    Bates stamped TG 22595 through 22623.

5                    Hold on one second.  Let me

6    just check.

7                    No.  I'm sorry.  Let me

8    correct this.  There's two extra pages on

9    this.  It's TG 22595 and 596.

10                        -  -  -

11                   (Deposition Exhibit No.

12                   Peng-18, E-mail chain, top one

13                   dated November 20, 2006, Bates

14                   stamped TG 0022595 and TG 0022596,

15                   was marked for identification.)

16                        -  -  -

17   BY MR. SEEGER:

18          Q.    Mr. Peng, first of all, I

19   want to start off, this is your e-mail.

20   Correct?

21          A.    Yes.  The sender of the

22   e-mail, according to what appears here,

23   is mine.

24          Q.    So at the top, it's an

1    e-mail from you to Owen Li; is that

2    correct?

3            A.    Yes.   That's the e-mail I

4    sent to Owen Li.

5            Q.    Owen Li is a TG employee at

6    this time.   Right?

7            A.    Yes.   At the time, he was

8    the employee of TG.

9            Q.    And in this time frame,

10   which is November of 2006, you were an

11   employee for TTP.   Correct?

12           A.    Yes.

13           Q.    Okay.

14                 So just to be clear, at the

15   very top, the e-mail exchange at the top

16   of the e-mail is from you and Owen Li,

17   who is with TG?

18           A.    Yes.   It is an e-mail that I

19   sent to Mr. Li.

20           Q.    Thank you.

21                 Mr. Peng, if you look

22   further down on this exhibit --

23                 First of all, this is an

24   e-mail that you wrote in English.

1    Correct, sir?

2            A.    This is an e-mail that I

3    forwarded.

4            Q.    But the e-mail below, you

5    see the further down -- let me just point

6    it out to you.  Right there.  Let's go to

7    that one.

8            A.    Yes.  That's the e-mail I

9    forwarded.

10            Q.    So that e-mail exchange

11    further down the page is between you and

12    a Walter Yu; is that correct?

13            A.    Correct.

14            Q.    And it's November 18, 2006,

15    while you were a TTP employee.  Correct?

16            A.    At the time Mr. Yu was

17    hoping to purchase product from TG, but

18    at the time I worked for TTP, therefore,

19    I forwarded the e-mail to a Mr. Li in TG.

20            Q.    So the e-mail -- now I'm

21    focused on the one between you and Walter

22    Yu -- it's in English.  Correct?  It was

23    originally drafted in English?

24            A.    Actually, I copied some

1    formats from the Internet and put it

2    there, and through the help of some

3    tools, such as dictionaries and plus some

4    corrections had been made, I have done a

5    lot of work, and then I put the e-mail

6    together like this.

7         Q.    But just to answer my

8    question, Mr. Peng, if you can, just to

9    make it simple, this e-mail that is in

10   English, no matter how you put it

11   together, was composed by you.  Correct,

12   sir?

13        A.    Yes, it is in English.  But

14   I've spent a lot of time in preparing for

15   this e-mail.

16        Q.    Okay.  Well, thank you.  I

17   appreciate that.

18             Mr. Peng, it starts off by

19   saying that it was nice to talk -- it

20   suggests you had a phone discussion with

21   this Mr. Walter Yu and yourself.

22             Was that discussion in

23   English?

24        A.    I don't recall.

1           Q.    And it discusses the sale of

2    gypsum board and metal stud.

3           Do you see that at the

4    beginning of the e-mail?

5           A.    Yes.  That what -- that's

6    what the e-mail appears to be.

7           Q.    At this time frame, TTP sold

8    gypsum board.  Correct, sir?

9           A.    Right.  In that period of

10   time, TTP did produce and sell gypsum

11   board.

12          Q.    TTP did not sell metal

13   studs.  Correct, Mr. Peng?

14          A.    But at the time, if the

15   customer would like to ask for quotation

16   or purchase from TTP the metal stud, it

17   is possible that we would purchase the

18   product from someone else and in turn

19   sell it to the customer.  However, in my

20   recollection and in our record, we did

21   not make any transaction with this Mr.

22   Yu.

23          Q.    Well, Mr. Peng, if you could

24   just try not to anticipate future

1    questions and just answer the one I'm

2    asking, it will go a lot faster, if you

3    don't mind.

4         A.    I was not anticipating.

5    Looking at the e-mail, I thought about

6    that and then I just spoke out.

7         Q.    Thank you.  I didn't mean to

8    be rude with that correction.  I'm trying

9    to move it along.

10         A.    I understand.

11         Q.    Thank you, Mr. Peng.

12              The question I have is, did

13    TTP manufacture and sell metal studs in

14    this time frame?

15              MR SPANO:  Objection,

16         compound.

17    BY MR. SEEGER:

18         Q.    I'm going to restate the

19    question, Mr. Peng.

20              In the time frame of this

21    e-mail, did TTP manufacture metal studs?

22         A.    In this time frame, TTP did

23    not.

24         Q.    Thank you.

1                    Did TTP sell metal studs in

2      this time frame?

3           A.    In approximately the same

4      time frame, TTP, in my recollection, did

5      sell the metal stud, but I'm not sure the

6      exact time frame.  I'd say in between

7      2006 and 2007.  Perhaps in between 2006

8      and 2007, in the time frame of two years.

9      But I'm not sure it falls into the exact

10     date as stated here.

11          Q.    And you mentioned earlier

12     that you would buy metal studs from

13     another manufacturer.

14                    Typically that would be a

15     manufacturer of metal studs that was

16     either TG or owned by TG.  Correct, sir?

17          A.    That's not so.  If the

18     customer would like to purchase metal

19     stud from TTP, and we would ask for

20     quotations from all the companies under

21     the umbrella of TG and other companies,

22     because we would like to have the lowest

23     price possible to sell it to a customer.

24     The precondition would be that the

1    quotation we have has to meet the

2    requirement of the customer.

3              Q.    And, Mr. Peng, let's

4    continue to read your e-mail.

5                    Right below where it says

6    gypsum board and metal stud, it said, "I

7    would like to take this opportunity to

8    introduce our company and products."

9    Then it says, "Shandong Taihe Dongxin

10   Co., Ltd. is one of the biggest"

11   companies "which is devoting in gypsum

12   board and relative products in China."

13                   Did I read that correctly?

14             A.    That's what it says in

15   e-mail.

16             Q.    Just to be clear, Shandong

17   Taihe Dongxin Company, Ltd. is TG.

18   Correct?

19             A.    Correct.  TG's name was

20   changed from this company, Shandong Taihe

21   company.

22             Q.    Before the name change, TG

23   was referred to as Shandong Taihe Dongxin

24   Company, Ltd.  Correct?

1          A.     You can say that.

2          Q.     Well, you say that, right,

3     Mr. Peng, in your e-mail?

4          A.     What do you mean?

5          Q.     It's okay.  Strike it.

6     We'll go to another question.

7                 And then Sunny, if you can

8     find this spot, further down in the

9     middle of the e-mail, it says, "Our" half

10    inch "board passes."

11                THE INTERPRETER:  Yes.

12    BY MR. SEEGER:

13         Q.     "Our" half inch "board

14    passes the ASTM C1396 and ASTM C36 test."

15                Do you see that, Mr. Peng?

16         A.     That's what I wrote in the

17    e-mail, but I would like to further

18    explain.  In that circumstance, the

19    reason I wrote it was because TTP's

20    product was sent to China Building

21    Materials Testing Center, and a testing

22    report was then produced.  Even though TG

23    did not have the report, but I personally

24    think at that time frame that the product

1    of TG and TTP had not much difference,

2    and it should be able to meet the

3    requirement on the testing report.

4              Q.    Mr. Peng, and if we --

5              The ASTM standards that

6    we're looking at in the e-mail, those are

7    US standards for gypsum board.  Correct,

8    sir?

9              A.    I don't think so.  From our

10   understanding, the standard was nothing

11   but an organization called ASTM, which

12   stipulated on the specifications and

13   standards of gypsum board.  It is public,

14   it is international.  I think if you say

15   it is an American standard, it is

16   inappropriate and it is wrong.

17             Q.    Okay.

18             Mr. Peng, further down in

19   that e-mail, it says, "We largely."

20             MR. SEEGER:  Sunny, are you

21        able to find that?  The sentence

22        that starts, "We largely."

23             THE INTERPRETER:  Next

24        paragraph?  Oh, yes, I got it.

1    BY MR. SEEGER:

2         Q.    See it?  Okay.

3              Mr. Peng, will you read

4    along with the translator.

5              It says, "We largely and

6    steadily export our gypsum boards to the

7    U.S.A."

8              Did I read that correctly?

9              MR. SPANO:  Objection.  Can

10        you please read the entire

11        sentence?

12             MR. SEEGER:  If you think

13        it's relevant.

14             Want me to read it, Judge?

15             THE COURT:  Yeah, sure.

16   BY MR. SEEGER:

17        Q.    I'll read it again.

18             "We largely and steadily

19   export our gypsum boards to the U.S.A.,

20   Southeast Asia, Middleeast, Russia,"

21   Ukraine "and so on."

22             Did I read that correctly,

23   Mr. Peng?

24        A.    That is what is written in

1    the e-mail, but at the time, what I was

2    trying to express was, in that

3    circumstance, we did have many customers,

4    but gypsum board from our company, and

5    those buyers might have shipped the

6    product to different places.

7          Q.    Thank you, Mr. Peng.

8                And then if you look further

9    down, it says "We have."  It says, "We

10   have already," it says "expored," I think

11   you mean exported, "more than 15 million

12   square meters of gypsum board to the USA

13   since the beginning of this year."

14               That's what it says.  Right,

15   sir?

16         A.    It's like what I have

17   explained to you earlier.  In fact, TG

18   and TTP, neither had shipped product

19   directly to America.  It's only that a

20   customer shipped the product to places

21   outside of China.  We call it export.

22         Q.    And, Mr. Peng, the next

23   sentence I'm going to read to you, my

24   question is simply going to be, is that

1    what you wrote in your e-mail?  So if you

2    can answer that yes or no, I'd appreciate

3    it.

4                    I'm going to read.  "We are

5    the first."

6                    MR. SEEGER:  Do you see

7             that, Sunny?

8    BY MR. SEEGER:

9             Q.    "We are the first who use

10   container to export gypsum board to USA

11   in China, we have the professional

12   salespersons and workers for USA market."

13                   You wrote that.  Right?

14            A.    To be accurate, I don't

15   recall the exact content of the e-mail.

16   But according to the address of the

17   e-mail, I believe that I wrote this

18   e-mail.  And like I said, I used many

19   tools in order to write this e-mail at

20   the time.  Perhaps my expressions were

21   hard to be expressed, and they were not

22   accurate.

23                   Like I said, there were many

24   buyers came to our company and bought our

1    gypsum board.  And according to the

2    requirement of the buyers, we packed them

3    and we shipped them according to their

4    requirements.  Our understanding at the

5    time was very limited.  From the gypsum

6    board companies that we knew at the time,

7    we were the first company that was able

8    to pack the gypsum board according to

9    customers' requirements.

10                   THE COURT:  Let me make --

11                   Mr. Peng, I'm the judge who

12            is presiding over this case.

13            We're trying to get out of here

14            today.  Please listen to the

15            question and answer the question.

16            If you need to explain yourself,

17            I'll give you an opportunity or

18            your attorney can ask you later on

19            to explain yourself.  But please

20            try to answer the question.

21                   THE WITNESS:  Okay.  Thank

22            you, Judge.

23    BY MR. SEEGER:

24            Q.    Thank you, Mr. Peng.

```
 1                    Mr. Peng, this isn't the
 2   first e-mail you wrote to customers in
 3   English.  Correct, sir?
 4           A.    I don't have a clear
 5   recollection of that.
 6           Q.    Well, we could say you wrote
 7   more than one e-mail in English to
 8   customers or potential customers.  Right,
 9   sir?
10           A.    Accurately, beside this one,
11   I should have written others as well.
12           Q.    Mr. Peng, I think we
13   established from your deposition in April
14   that you graduated school with an English
15   literature degree.  Right, sir?
16           A.    Correct.  My study subject
17   was English in college.
18           Q.    Thank you.
19                 And if you go to the next
20   page of this e-mail, my last question,
21   where you sign off, you sign off "Yours
22   faithfully, Export manager, Frank."
23   Correct, sir?
24           A.    I remember in my deposition
```

1    in April, I already explained it to you,

2    which was a set format in a computer.

3           Q.    Right.  And, Mr. Peng, just

4    to be clear, I'm asking you that the

5    words on this page, you agree that in

6    your e-mail, it signs off, "Yours

7    faithfully, Export manager, Frank."

8    Correct, sir?

9           A.    Yes.  That's what appears in

10   the e-mail.

11          Q.    And that name Frank is a

12   name that you had used from time to time,

13   Frank Clem, in addition to your own

14   Chinese name.  Correct, sir?

15          A.    Correct.

16          Q.    Thank you, Mr. Peng.  That's

17   all I have on that one.

18                I'm going to mark the next

19   exhibit.

20                For the record, I'm marking

21   Exhibits 19 and 19A.  19 is Bates stamped

22   TG 0022728.  That's the Chinese version.

23   And 19A is the English translation of

24   22728.

1                  - - -

2                  (Deposition Exhibit No.

3         Peng-19, E-mail in Chinese dated

4         May 11, 2007, Bates stamped TG

5         0022728, and Deposition Exhibit

6         No. Peng-19A, E-mail in Chinese

7         dated May 11, 2007, Bates stamped

8         TG 0022728, were marked for

9         identification.)

10                 - - -

11                THE WITNESS:  Should I take

12        a look at the Chinese version

13        first?

14   BY MR. SEEGER:

15        Q.    Absolutely.  Just tell me

16   when you're ready, Mr. Peng.

17        A.    I'm reading it.

18        Q.    Okay.

19        A.    I'm done reading the Chinese

20   version.

21        Q.    Mr. Peng, this is an

22   e-mail -- I'm working off the English

23   translation, sir.  And you should feel

24   free to look back at the Chinese version

 1    to check the English translation if you

 2    feel the need.

 3              This e-mail is dated May 11,

 4    2007.  Correct?

 5         A.    Correct.

 6         Q.    And at this time, you're

 7    an employee --

 8         A.    It was written at that time.

 9         Q.    I'm sorry.  I didn't mean to

10    interrupt.

11              At this time, you're an

12    employee of TTP also.  Correct, sir?

13         A.    Correct.

14         Q.    And the subject line on the

15    English version, just confirm the Chinese

16    says it, it says "Taishan gypsum boards."

17    Is that correct?

18         A.    That's what it says on the

19    subject line.

20         Q.    Okay.

21              Do you see who the e-mail is

22    going to?  Because there's only an e-mail

23    address there.

24         A.    There is a Mr. Zhang under

1    that, but I'm not sure exactly who that

2    person is.

3            Q.    And then again in this

4    e-mail, Mr. Peng, you describe -- the

5    company you're describing as a key

6    national manufacturer is Shandong Taihe

7    Dongxin.  Correct, sir?  That's TG?

8            A.    The e-mail, especially the

9    first paragraph, was introduction that I

10   did to the client upon their request.

11   Usually before placing order, the buyers

12   would like to know something about the

13   manufacturer.  They would request -- they

14   would require us to give background

15   introduction of the company, some basic

16   information.

17                 As a salesperson at the

18   time, in order to reach a deal, and try

19   our best to keep the customer, we would

20   give an introduction of our company.  At

21   the time I worked for TTP, TTP was a

22   newly founded company.  Usually the

23   customer would request us to introduce

24   the background of TTP and whether we have

1    any support.  So our -- and what is the

2    superior company of this company.  Under

3    that circumstance, I would introduce

4    Shandong Taihe Dongxin Company to the

5    customer, to indicate that TTP company

6    has a strong background.  Of course, for

7    production and sales of TTP, it had

8    always been carried on, carried out by

9    TTP itself.

10              The second paragraph of this

11   e-mail was a quotation for gypsum board

12   that I made.  That's what I see the

13   e-mail is about.

14              THE COURT:  One moment.

15              MR. SPANO:  Your Honor, may

16         I, with the Court's permission,

17         have a moment with the witness?

18              THE COURT:  Yes.  Let's take

19         a ten-minute break at this time,

20         please.

21              VIDEOTAPE TECHNICIAN:  Going

22         off the record.  The time is 9:06.

23                   -  -  -

24              (A recess was taken from

1             9:06 a.m. until 9:14 a.m.)

2                         -  -  -

3             VIDEOTAPE TECHNICIAN:  Going

4        back on the video record.  The

5        time is 9:14.

6    BY MR. SEEGER:

7        Q.    Mr. Peng, the background of

8    the company that you're giving in this

9    e-mail is for TG.  Correct, sir?

10       A.    Yes.  I did mention TG.

11       Q.    And TTP is not specifically

12   mentioned in this e-mail anywhere, is it,

13   sir?

14       A.    No, it was not specifically

15   mentioned.

16       Q.    In fact, if you look on the

17   Chinese version and if you look at the

18   English version and you put that in front

19   of you, under your name on the Chinese

20   version, it says, "Taihe Dongxin Co.,

21   Ltd.," under your name on the Chinese

22   version.  Correct, sir?

23       A.    Like I said earlier, it is a

24   fixed format produced by the computer.

1    It has always been there.

2              Q.    But Mr. Peng, just to be

3    clear that I'm reading it correctly,

4    "Taihe Dongxin Co., Ltd.," which appears

5    beneath your name on the Chinese version,

6    that's not TTP.  Correct, sir?

7              A.    It does not appear to be

8    TTP.

9              Q.    Then my question also for

10   you is, do you know who did the English

11   translation of the Chinese version of

12   this e-mail?

13             A.    I don't know.

14                   MR. SPANO:  Objection.

15                   MR. SEEGER:  I just asked

16        him if he knew.

17                   MR. SPANO:  Do you mean for

18        purposes of the litigation?

19                   MR. SEEGER:  I just wanted

20        to know if he knew who did the

21        translation.

22                   MR. SPANO:  I object on work

23        product grounds.

24                   MR. SEEGER:  Okay.  I'll go

1          to the next question, Your Honor.

2    BY MR. SEEGER:

3          Q.    To be clear, Mr. Peng,

4    beneath your name on the Chinese version

5    it says "Taihe Dongxin Co., Ltd.," but

6    that does not appear in the English

7    translation, does it, sir?

8          A.    Let me take a look.

9          Q.    Go ahead.

10          A.    The English version does not

11    appear to have the company's name.

12          Q.    You can put that aside.

13    Thank you, Mr. Peng.

14          For the record, what I've

15    marked as Exhibit Peng-20 is TG 0021369

16    through 21372.

17                    -  -  -

18          (Deposition Exhibit No.

19          Peng-20, E-mail chain, top one

20          dated August 30, 2007, Bates

21          stamped TG 0021369 through TG

22          0021372, was marked for

23          identification.)

24                    -  -  -

1    BY MR. SEEGER:

2         Q.    You can go ahead and take a

3    look at this, Mr. Peng.

4              Mr. Peng, you wrote this

5    e-mail, the portions of this e-mail that

6    you wrote, you wrote in English.

7    Correct, sir?

8         A.    Yes.  I wrote a couple of

9    sentences in English.

10        Q.    And if we go to -- if you go

11   to about the third page on this --

12             MR. SEEGER:  Judge, do you

13        want me to wait?

14             THE COURT:  No, that's okay.

15   BY MR. SEEGER:

16        Q.    If you go to the third page

17   of the e-mail, so we can go back in time.

18             You receive an e-mail on

19   August 28, 2007 from a Jacky Yu.

20   Correct, sir?

21        A.    Yes.  On August 28, 2007, I

22   see Jacky Yu here.  I did write, but

23   however, I do not see who is the e-mail

24   written to.

1          Q.    It says, "Hi Mr. Peng" right

2    below that.

3               Right here, sir?

4          A.    Yes, that's what it says.

5          Q.    Are you satisfied that's

6    you, Mr. Peng?

7          A.    But I do not see who the

8    e-mail was sent to in this e-mail, so I

9    can't be sure.

10          Q.    Let's start with Jacky Yu.

11               Do you know the company

12    Metal Sourcing Specialist - Asia?

13          A.    In my impression that Jacky

14    Yu came to our company.  However, I am --

15    I do not have a lot of impression about

16    his company name.

17          Q.    Okay.

18               If we look at the paragraph

19    that starts "Right now," on this date,

20    Mr. Yu writes to you, "Right now I am

21    searching for some new potential

22    suppliers which specialize in making

23    metal stud and truck" -- it says "truck,"

24    I think it means track.  "As a USA

1    company we mainly deal in North America

2    Market, so it is necessary that

3    you...have business experience with US

4    customer.  Would you" please "introduce

5    me" to "your company such as how big your

6    company?  How long...you in biz with US?

7    Who are the top 5 customers?"

8                    Did I read that correctly,

9    sir?

10          A.    That's what it says in the

11   e-mail.

12          Q.    Thank you.

13                 Now, if you go, if you turn

14   forward one page to August 29th.

15                 Sorry.  I was trying to

16   help.

17                 Now, this e-mail at the top

18   is from you to Jacky Yu.  Correct, sir?

19   Do you see that?

20          A.    What it appears to be me and

21   Jacky Yu, not Yu.

22          Q.    Sorry.  I apologize.  I'm

23   going to mess a lot of names up in this

24   deposition, so I apologize in advance.

1                    And the date is August 29,

2    2007.  Right, sir?

3          A.    Yes.

4          Q.    And you were a TTP employee

5    at this time.  Correct, sir?

6          A.    Correct.

7          Q.    And the subject line is

8    "Metal stud."

9                    Do you see that?

10         A.    Yes.  Correct.

11         Q.    And your response is,

12   starting with the second sentence, "I

13   would like to take this opportunity to

14   introduce our company and products as

15   following."

16                   And the first name in the

17   next paragraph is the predecessor name

18   for TG.  Correct, sir?

19         A.    Yes.

20         Q.    And then further down where

21   it says "We export," it says, "We export

22   the metal frame especially to USA such as

23   New York and Norfolk."  Correct, sir?

24   Does it say that?

1          A.     That's what it says in the

2     e-mail.

3          Q.     The following sentence says,

4     "Any further information please visit,"

5     and it gives a website address, doesn't

6     it?

7          A.     Correct.

8          Q.     It's www.taihegroup.com?

9          A.     Correct.

10          Q.     Now, this is the site that

11     you would refer customers to, US

12     customers or anywhere in the world.

13     Correct, sir?

14          A.     No.

15          Q.     This is the site you

16     referred to in this e-mail to this

17     potential US customer.  Correct, sir?

18          A.     This e-mail is only for Mr.

19     Yu upon his request.

20          Q.     And you understood that Mr.

21     Yu was looking for a supplier of drywall

22     and metal studs for USA customers.

23     Correct, sir?

24          A.     I only know that he was

1    willing to buy some metal stud product.

2              Q.    For US customers.  Correct,

3    sir?  That's what he says in his e-mail

4    to you?

5              A.    That's what it says in Mr.

6    Yu's e-mail.

7              Q.    Thank you.

8                    Now, the site, do you know

9    when this site, www.taihegroup.com, first

10   became active, the year?

11             A.    I don't know when did it set

12   up and run, but at least it was before I

13   joined the company, I joined TG.

14             Q.    You joined TG, was it 2003?

15             A.    Correct.  2003 I joined the

16   company.

17             Q.    And it was an English

18   version of this website.  Correct, sir?

19             A.    The website was in --

20   majority of the website is in Chinese,

21   and the details are in Chinese.  For the

22   frames of the e-mail and the subject of

23   the e-mail are in English.

24             Q.    Who developed the English

1    version of the site, the portions that

2    were in English, do you know?

3         A.    I'm not sure.

4         Q.    And Mr. Peng, I'm going to

5    ask you just a few questions about the

6    website, because you're actually

7    designated as the person to speak for the

8    company about the Taihe Group website.

9         A.    Yes.  Go ahead, please.

10         Q.    Do you feel prepared to

11    answer questions about the website?

12         A.    Under the instruction of the

13    attorney, I got to know some of the

14    information.

15         Q.    Okay.  That's fine.

16              Do you know when -- I think

17    I might have asked you this.

18              Do you know who would

19    provide content to the website in

20    English, who did the English language

21    stuff?

22         A.    At the time we entrusted a

23    third-party company to design and format

24    the website.

1          Q.     What's the name of that
2     company?
3          A.     As far as I know, one is --
4     one is called Taian Jinchao company.
5          Q.     Who at your company
6     interacted with this third-party vendor?
7          A.     We don't have a designated
8     person to do the work.  In many
9     circumstances, it was those newly
10    graduate, who just graduated from college
11    and came to our factory to work.  Perhaps
12    a new students -- graduated students came
13    to our company to work for about two,
14    three months, and then they change their
15    post or resigned and then they no longer
16    contact with the web designer.  And we
17    always have new colleagues to take over
18    the job, to make the job continuous,
19    continue.  That's the basic information.
20    Sometimes perhaps there was a period of
21    time that nobody actually did this job.
22         Q.     Was the website under the
23    direction of any particular department?
24    Was it under foreign trade, for example,

1    your department?

2            A.    Foreign trade department did

3    not direct the work.

4            Q.    Then what department did?

5            A.    Generally TG company has a

6    department called office, which is

7    equivalent to a department of an

8    executive office.

9            Q.    And do you know who in that

10   office or in that executive office

11   directed these college students with

12   regard to content that was put on the

13   website?

14           A.    We call this person office

15   manager.  There is no such a designated

16   person as the office manager.

17           Q.    What are some of the names

18   of the people who fulfilled this position

19   as manager with regard to the website?

20           A.    Like I said, the office

21   manager is a position in different period

22   of time.  There were different people who

23   held the position.

24           Q.    Can you identify who they

1    were from, let's say, from 2006 through

2    2008?

3            A.    I'm not sure.  At the time

4    it should be a Qin Qingwen.

5            Q.    Anyone else you can think

6    of?

7            A.    I'm not sure about the other

8    people.

9            Q.    My last question on this

10   topic, did TTP ever have its own

11   dedicated website?

12           A.    TTP had not been established

13   for long.  It does not have its own

14   designated website.

15           Q.    Mr. Peng, if you go to the

16   first page of this e-mail, I want to

17   refer you to the bottom half.  It's dated

18   August 30, 2007.  And this is from Jacky

19   Yu to you.  It says, "Thank you for your

20   info Frank.  I have sent your

21   introduction to US counterpart today."

22               Did I read that correctly?

23           A.    Yes, I see.  That's what it

24   says in the e-mail.

1    Q.    And then in your response,

2  which is the top half of the e-mail, I'm

3  sorry --

4    A.    I'd like to further explain.

5    Q.    Go ahead.

6    A.    The e-mail dated August the

7  30th, I do not see who received the

8  e-mail.

9    Q.    I agree with you, sir, but

10  it does say "Thank you for your info

11  Frank."

12          And that's you.  Right?

13    A.    Yes.  That's what it says in

14  the e-mail.  I admit that.

15    Q.    The top half of the e-mail,

16  which is your response, once again, you

17  say, "Yours faithfully, Frank, Taihe

18  Dongxin Co., Ltd."

19          You don't say TTP.  Correct,

20  sir?

21    A.    I've already responded to

22  this question earlier.  The ending of the

23  e-mail is what it is.  But it was a

24  computer set formality.

1          Q.     Thank you.

2                 Mr. Peng, from time to time,

3     you personally were involved with

4     handling shipping arrangements of your

5     product to customers in the US.  Correct,

6     sir?

7          A.     We were not in charge of

8     shipping the product to US.  Sometimes

9     upon the request of the customers, we do

10    some necessary contacts.

11         Q.     Okay.

12                But you yourself made

13    arrangements from time to time for

14    shipping for customers.  Is that fair to

15    say or not?

16         A.     It's not fair.  It's not

17    accurate.

18         Q.     Mr. Peng, what we've marked

19    as Peng Exhibit 21.

20                      -  -  -

21                (Deposition Exhibit No.

22                Peng-21, E-mail chain, top one

23                dated August 6, 2007, Bates

24                stamped TG 0021964, TG 0021966 and

 1              TG 0021991, was marked for

 2              identification.)

 3                      -  -  -

 4      BY MR. SEEGER:

 5              Q.    It's TG 0021964.  Actually,

 6      I'm just going to refer to 264.

 7                   This is a discussion, an

 8      e-mail, between you and Joe Weiss from a

 9      USA company.  Correct, sir?

10              A.    Correct.

11              Q.    And you wrote this in

12      English?

13              A.    That's the e-mail that I

14      wrote to the customer.  Correct.  It was

15      written in English.

16              Q.    Here the subject is

17      "Schedule," and you're informing the US

18      customer who is in the USA.  Correct?

19      Joe Weiss is located in the USA?

20              A.    The customer came to our

21      company once, and he did say that he was

22      from the United States.

23              Q.    So you knew you were

24      speaking with the US customer in this

1    e-mail.  Correct, sir?  I mean, look at

2    his e-mail address.

3              MR. SPANO:  Objection to

4         form.

5              THE WITNESS:  Yes.  Like I

6         answered you earlier, this

7         customer came to our company and

8         claimed to be from America.

9    BY MR. SEEGER:

10        Q.    That's all I have on that.

11             MR. SEEGER:  Judge, I got

12        15, 20 minutes.  Can I keep going

13        or --

14             THE COURT:  Yes.

15   BY MR. SEEGER:

16        Q.    Now, what working

17   relationship, if any, did you personally

18   have with BNBM?

19        A.    We have no working

20   relationship.

21        Q.    You personally have dealt

22   with BNBM USA.  Correct, sir?

23        A.    As you mention it, there was

24   a Mr. Wei who was from Beijing.  He

1    brought a buyer to come to our company to

2    purchase our product.  But he introduced

3    that customer personally on his own

4    behalf.  At the time, he said that he had

5    a friend that needed to purchase our

6    product.  But I have no impression and no

7    recollection whatsoever of BNBM that Mr.

8    Attorney had just mentioned.  The e-mail

9    address of Mr. Wei is BNBM USA.

10           Q.    I'm sorry.  I didn't mean to

11   interrupt.

12           A.    What I'm trying to say is,

13   because Mr. Wei introduced a friend on

14   his own behalf to our company, therefore,

15   I do not know anything about the company

16   of Mr. Wei, BNBM USA as Mr. Attorney had

17   just mentioned.

18           Q.    Right.

19                 But this was -- you didn't

20   have one singular dealing with BNBM USA;

21   you had several dealings with BNBM USA.

22   Correct, sir?

23           A.    Mr. Wei introduced one

24   customer at that time.

1          Q.    And you were copied on

2    e-mails between the customer and Mr. Wei.

3    Correct, sir?

4          A.    Sometimes.

5          Q.    And you made arrangements

6    for the customer to come visit your

7    factory through BNBM USA.  Correct, sir?

8          A.    I don't understand your

9    question.

10         Q.    Did you make arrangements

11   for the US customer, through BNBM USA, to

12   come visit your factory?

13         A.    It is a wrong statement.  At

14   the time it was Mr. Wei who took American

15   customer to come to our company.  It was

16   Mr. Wei who make the arrangement.

17         Q.    Well, it was Mr. Wei asking

18   you to make arrangements for the US

19   customer.  Correct, sir?

20         A.    The whole process was

21   arranged by Mr. Wei, but Mr. Wei asked me

22   to arrange lodging and transportation for

23   the customer once the customer arrived in

24   our plant.

1          Q.    And you did that.  Right?

2          A.    Correct.  I arranged the

3    local hotel in Taian, according to the

4    request of Mr. Wei.  And I arranged the

5    transportation between the customer and

6    our company.

7                I mean, the transportation

8    between the hotel where the customer

9    stayed and our plant.  I do not know

10   anything outside of Taian.  Neither had I

11   arranged anything for anywhere else out

12   of Taian.

13         Q.    I think I'm down to my last

14   exhibit.

15                      -  -  -

16              (Deposition Exhibit No.

17              Peng-22, E-mail chain, top one

18              dated 6/3/2006, Bates stamped TG

19              0001377 and TG 0001378, was marked

20              for identification.)

21                      -  -  -

22              MR. SEEGER:  Do you know

23              what this was previously marked in

24              his earlier deposition?

```
 1                    -  -  -
 2              (A discussion off the record
 3         occurred.)
 4                    -  -  -
 5    BY MR. SEEGER:
 6         Q.    Mr. Peng, for the record,
 7    I'm going to be showing you Peng
 8    Exhibit 23, which is TG 22650.  I only
 9    have a couple questions for that.
10              MR.  CHEN:  I'm sorry, what
11         was that?  Which one was Peng-22?
12              MR.  SEEGER:  Did --
13              MR.  CHEN:  Did you actually
14         mark Peng-22?
15              MR.  SEEGER: I marked one and
16         I didn't use it, so I'm going to
17         change this to 22.
18              Thank you.
19              I'm going to go ahead and
20         put this in.
21              Peng-22, let me identify
22         that first.  It's TG 0001377 and
23         1378, which I'll just mark and
24         we're not going to ask you
```

1          questions.

2              And now I'm marking Peng-23,

3          which is TG 0022650.

4                  -  -  -

5              (Deposition Exhibit No.

6          Peng-23, E-mail dated October 9,

7          2007, Bates stamped TG 0022650,

8          was marked for identification.)

9                  -  -  -

10    BY MR. SEEGER:

11         Q.    Mr. Peng, I just have a

12    couple questions about what we've just

13    marked.  I think we already know because

14    we've been here for a week who OEG

15    Building Material is.

16             That was a building material

17    supplier from Brooklyn, New York.

18    Correct?

19         A.    That's your attorney's

20    position.  That's the information your

21    attorneys received.  I'm not very sure

22    about that.

23             THE INTERPRETER:

24             Interpreter clarification.

1                THE WITNESS:  TOV company

2           did purchase something -- product

3           from our company.

4    BY MR. SEEGER:

5           Q.    That's fair enough.  It's

6    the same company.  Right?

7                A couple questions.

8                Mr. Peng, this is an e-mail

9    you wrote to Mr. Yu in English.  Correct?

10          A.    Which one?  This is not the

11   one?

12               MR. SPANO:  23.

13               MR. SEEGER:  Oh, here it is.

14          Frank had it.

15               We're looking at this one.

16          I'm sorry.

17               MR. DAVIS:  Just so our

18          record is clear, do we have an

19          Exhibit 22?

20               MR. SEEGER:  Yes.  I just

21          marked it.

22               THE COURT:  1377.

23               MR. DAVIS:  Thank you.

24               MR. SEEGER:  That was my

1          fault.  Sorry, Len.

2     BY MR. SEEGER:

3          Q.    So my question to you is --

4     I forgot my question.

5               Anyway, the subject line on

6     this e-mail is "metal stud customer."

7     Correct, sir?

8          A.    Yes.  That's what it said on

9     the subject line.

10         Q.    And at this time frame,

11    you're a TTP employee.  Correct?  That's

12    your testimony?

13         A.    That's right.  In that time

14    frame, I was TTP's employee.

15         Q.    You wrote this e-mail in

16    English.  Correct, sir?

17         A.    Yes.  This is the e-mail

18    that I wrote.

19         Q.    You sign off, "Frank,

20    Taishan Gypsum Co., Ltd."  Correct, sir?

21         A.    Yes.  That's a sign-off of

22    the e-mail.

23               MR. SEEGER:  Judge, I'll

24         just save whatever I have for

1          recross after Frank.

2                    THE COURT:  Anybody else on

3          the questions today?

4                    MR. SEEGER:  Thank you, Mr.

5          Peng.

6                    THE WITNESS:  Thank you.

7                    THE COURT:  You want to take

8          a short break, Hilarie?

9                    MS. BASS:  Yes.  Two

10         minutes.

11                   THE COURT:  Let's do a

12         ten-minute break.

13                   VIDEOTAPE TECHNICIAN:  Going

14         off the record.  The time is 9:49.

15                        -  -  -

16                   (A recess was taken from

17         9:49 a.m. to 9:59 a.m.)

18                        -  -  -

19                   VIDEOTAPE TECHNICIAN:  Back

20         on the record.  The time is 9:59.

21                        -  -  -

22                   EXAMINATION

23                        -  -  -

24    BY MS. BASS:

1          Q.      Good morning.

2          A.      Hello.

3          Q.      I'd like you to take a look

4     at a document previously marked in the

5     Jia deposition as Exhibit 33.

6                  Is that your e-mail address

7     in the "To" reference?

8          A.      When I apply for MSN, it

9     gave automatically an e-mail address.

10    But usually I don't use this e-mail

11    address.

12         Q.      So clempwl@hotmail.com,

13    that's not an e-mail address that you

14    utilize?

15         A.      Like I said, I applied for

16    MSN.  But this is like a byproduct that

17    was given to me, which is an e-mail

18    address.  Basically, I could say that I

19    usually don't use it at all.

20         Q.      Did you receive this e-mail

21    from Paul Brinkmann of the South Florida

22    Business Journal on or about January 27,

23    2009?

24         A.      It appears to me that this

1    person send the e-mail to those people

2    that are on the "to" line, sent to those

3    e-mail addresses.  But like I explained

4    earlier, usually I don't even check the

5    e-mail.

6         Q.    Did you receive a copy of

7    this inquiry from the South Florida

8    Business Journal asking about your

9    knowledge about odors and other problems

10   associated with your drywall product?

11        A.    Like I said earlier, the

12   document does say that the e-mail was

13   sent to those e-mail addresses, but I

14   didn't check.  I didn't use this e-mail

15   address.

16        Q.    So that means the answer to

17   my question is no, you did not receive

18   it?

19        A.    I've never checked this

20   e-mail address.

21        Q.    Were you informed by any of

22   the other recipients of this e-mail

23   regarding this inquiry?

24        A.    Other recipients?  Can you

1    ask again?  I'm not clear about that.

2         Q.    Yes.

3               Do you know who else

4    received this e-mail?

5         A.    It appears to be e-mail

6    address of Manager Che and e-mail address

7    of Manager Yang Jiapo.

8         Q.    Did either of those

9    individuals inform you that there was an

10   investigative reporter from the South

11   Florida Business Journal inquiring into

12   complaints about your drywall product?

13        A.    I have not received report

14   from them.

15        Q.    Are you aware of whether

16   they received this e-mail?

17        A.    I don't know whether they

18   have seen this e-mail address or not, or

19   whether they understood the e-mail or

20   not.

21        Q.    I'd like you to take a look

22   at the document that was previously

23   marked as Exhibit 22 to this deposition.

24               THE COURT:  Do you have a

1                Bates number?

2                     MS. BASS:  Yes, I'm sorry.

3                This is TG -- I have it as 461,

4                but I believe the marked copy is a

5                different Bates number.

6                     MR. SPANO:  1377.

7                     MS. BASS:  Thank you.  It is

8                TG 1377.

9     BY MS. BASS:

10               Q.    This e-mail requests that

11    gypsum board be produced by TTP with a

12    specification of a contact phone number

13    and then Tampa, Florida.

14               Do you see that as part of

15    that e-mail?

16          A.    Where is it?

17          Q.    Do you see that reference?

18          A.    Is this the one?

19          Q.    Yes.

20          A.    This is the e-mail sent from

21    Mr. Richard to Mr. Wei regarding some

22    requirements of the marks of the gypsum

23    board.

24          Q.    And did you agree to stamp

1    Tampa, Florida on the back of the gypsum

2    board you were going to be producing?

3         A.    That's a requirement of the

4    customer, and also it is something that I

5    could do.  We would stamp it for the

6    customer.  Of course, the precondition

7    would be it is not illegal, not against

8    any regulations.

9         Q.    Did you in fact produce

10   drywall with the stamp Tampa, Florida on

11   the back?

12        A.    Well, I don't recall, but

13   according to the common sense that I

14   have, usually we would stamp a line of

15   marks on the back of the gypsum board.

16   But I'm afraid we couldn't do it in this

17   case, because from what appears here,

18   there are quite a few lines.  Our

19   technology only allow one line to be

20   produced.

21        Q.    But you are aware that the

22   request was that you stamp your board

23   with the designation Tampa, Florida on

24   it.  Correct?

1          A.    I only know that the
2     customer did have the request, which is
3     to mark the gypsum board according to the
4     request.
5          Q.    Thank you.
6               I only have one last set of
7     questions, and that relates to an
8     agreement that was discussed at length
9     over the last few days between TTP and
10     Oriental Trading Company.
11               Mr. Peng Wenlong, it is
12     correct, is it not, that you did receive
13     a $100,000 deposit from Oriental Trading
14     Company?
15          A.    Oriental company did wire
16     this amount of money to TTP company.
17          Q.    And that was part of your
18     ongoing relationship to sell gypsum board
19     to Oriental Trading, was it not?
20          A.    You can't say that.  It was
21     only that there was intention of the
22     Oriental company to purchase gypsum board
23     from our company.  And they -- in turn,
24     they wired a part of the money to us.

1   There's no difference from what our

2   common practice is when we want to make a

3   purchase.

4           MS. BASS:  Thank you.  I

5       have nothing further.

6           THE WITNESS:  Thank you.

7               -  -  -

8           EXAMINATION

9               -  -  -

10  BY MR. HARDT:

11          Q.   Good morning, Mr. Peng.  My

12  name is Ken Hardt, and I represent

13  Venture Supply.  I met you last time in

14  April.

15          A.   Hello.

16          Q.   Do you recall that there was

17  two separate contracts with Venture

18  Supply and TG for the sale of drywall?

19          A.   Correct.  At the time, we

20  signed two contracts.

21          Q.   Right.

22               And there was two separate

23  shipments of drywall to Venture Supply.

24  Correct?

1          A.    The two contracts are what

2   we call two orders.

3          Q.    Right.

4                And there was two separate

5   shipments of drywall to Venture Supply.

6   Correct?

7          A.    Yes.  Venture Supply company

8   placed order for two shipments, but for

9   the detailed shipment, it was the

10  arrangement of Venture Supply.

11         Q.    Okay.  There was two

12  separate ships.

13                That's all I'm asking you?

14                THE COURT:  Shipments.

15                THE WITNESS:  We shipped the

16           product in two separate times to

17           the designated port by Mr. Phillip

18           to a port called Lianyungang,

19           China.

20  BY MR. HARDT:

21         Q.    Right.

22                And in the first shipment of

23  drywall to Venture Supply, do you recall

24  being told that some of the product was

1    damaged during the shipment?

2         A.    I remember Mr. Phillip

3    mentioned that to me, the product was

4    damaged during unloading.

5         Q.    Right.

6              And you worked with Mr.

7    Phillip, Mr. Phillip Perry, that's who

8    we're talking about.  Right?

9         A.    It has always been Mr.

10   Phillip who contacted us.

11        Q.    But he was Venture's agent

12   over -- dealing with TG; is that right?

13        A.    The circumstance then was

14   that Mr. Phillip came to our company.

15   And he, on behalf of Venture Company, had

16   some detailed communication with our

17   company.

18        Q.    Right.

19              After you were told that

20   there was damaged product during the

21   first shipment, you worked with Mr.

22   Phillip on how to better secure or pack

23   the drywall for the second shipment.

24   Right?

1            A.    Like I said, Mr. Phillip

2    mentioned that during the unloading of

3    the product, the first shipment, so that

4    he requested to have some improvement on

5    the packaging of second shipment.

6            Q.    And that involved the use of

7    wooden pallets.  Correct?

8            A.    Correct.  Phillips -- Mr.

9    Phillip mentioned that some plate wood

10   bracket or protection bracket I would

11   call them should be used for that

12   shipment.

13           Q.    And that also involved

14   slings?  Do you remember the term

15   "sling"?

16                 THE INTERPRETER:  How do you

17         spell sling?

18                 MR. HARDT:  S-L-I-N-G.

19                 THE INTERPRETER:  Give me a

20         minute, please.

21   BY MR. HARDT:

22           Q.    Straps that they would use.

23           A.    Yes.  As mentioned by Mr.

24   Phillip, we called it hanging belt.

1          Q.    Okay.

2                And TG ended up selling both

3    wooden pallets and the hanging belts to

4    Venture Supply for the second shipment,

5    didn't it?

6          A.    They did not specifically

7    sold that product, but according to the

8    requirement of the customer, it was part

9    of the package, of course, because of

10   that.  The price was calculated into the

11   product price.

12         Q.    There were separate invoices

13   issued by TG for the sale of the

14   pallet -- the wooden pallets and the

15   slings or the hanging belts.  Right?

16         A.    I had explained earlier we

17   did not sell these packaging tools

18   separately to Venture company.  The

19   circumstance was -- I like to use more

20   time to explain.  I'll try to do it as

21   fast as possible.

22         Q.    Okay.

23         A.    May I?

24         Q.    Yeah.  Go ahead.

1              A.    At the time of signing of

2      the second contract by Mr. Phillip, he

3      planned to purchase 100,000 pieces of

4      gypsum board.  But in the end, he did not

5      actually purchase the entire 100,000

6      pieces of gypsum board.  We prepared

7      those packing tools for 100,000 piece of

8      gypsum board.  Therefore, when we deliver

9      the product according to the second

10     contract to Mr. Phillip, he requested us

11     to also ship him all the packaging tools.

12             Q.    And TG itself --

13             A.    That was it.

14             Q.    -- paid for half of the

15     costs of the hanging belts; isn't that

16     right?

17             A.    Half and half for two

18     companies.

19             Q.    So TG paid half --

20             A.    Versus Mr. Phillip.

21             Q.    I'm sorry.  Were you done?

22     I'm sorry.

23                   So TG paid half and Venture

24     paid half?

1                A.    Correct.

2                     MR. HARDT:  That's all the

3           questions I have.  Thank you, Mr.

4           Peng.

5                     THE COURT:  Anyone else?

6                     MS. BYRNE:  Yeah.  We just

7           have a few questions, Your Honor.

8                     VIDEOTAPE TECHNICIAN:  Going

9           off the video record at 10:19.

10                         -  -  -

11                (A discussion off the record

12           occurred.)

13                         -  -  -

14                     VIDEOTAPE TECHNICIAN:  Back

15           on the video record at 10:19.

16                         -  -  -

17                     EXAMINATION

18                         -  -  -

19      BY MS. BESKIN:

20                Q.    Good morning.  My name is

21      Julia Beskin.  I'm just going to have a

22      few questions for you this morning.

23                A.    Go ahead, please.

24                Q.    Have you ever heard of a

1    company called Rothchilt International,

2    spelled R-O-T-H-C-H-I-L-T International?

3         A.    I have not seen this before

4    this time.

5         Q.    Have you ever heard of a

6    gentleman named Sunny Jawahar, last name

7    spelled J-A-W-A-H-A-R?

8         A.    I don't know this person.

9         Q.    Have you ever heard of a

10   company called La Suprema, L-A, new word,

11   S-U-P-R-E-M-A?

12        A.    I have not heard of this

13   company.

14        Q.    Have you ever heard of a

15   gentleman named Soloman Abadi,

16   S-O-L-O-M-A-N, next word, A-B-A-D-I?

17        A.    I have not heard of this

18   person.

19        Q.    Have you ever heard of a

20   company called Banner Supply Company?

21        A.    No.

22        Q.    Have you ever visited the

23   United States?

24        A.    I have not.

1           MS. BESKIN:  Just one

2      moment, please.

3   BY MS. BESKIN:

4           Q.    Have you ever heard of C&K

5      board?

6           A.    C&K, I'm not sure.  Perhaps

7      there is a gypsum board factory.  It may

8      be called this name in Shandong.  Maybe

9      this company produce certain brand of

10     gypsum board.  I'm not sure.

11          Q.    What's the name of the

12     company that produces this C&K board?

13          A.    I'm not sure, but I

14     personally think perhaps it's located at

15     Shandong Linyi.

16          Q.    This company that you're

17     thinking of that produce C&K board, is it

18     affiliated with Taishan Gypsum?

19          A.    They're both gypsum board

20     manufacturers, but they don't have any

21     specific relationships in terms of

22     company relationships.  I personally

23     believe they're competitors.

24               MS. BESKIN:  No further

1           questions.

2                   THE COURT:  Anyone else?

3           Questions?

4                   Okay.  Then, Frank, you're

5           on cross-examination, any cross.

6                       -  -  -

7                   EXAMINATION

8                       -  -  -

9      BY MR. SPANO:

10          Q.    Good morning, Mr. Peng.

11                  Did Taishan Gypsum ship

12     either of the two orders sold to Venture

13     Supply to the State of Virginia?

14          A.    No.  Taishan Gypsum board

15     company only shipped the shipment to

16     Lianyungang port, China.  The rest of the

17     matter was handled by Mr. Phillip.

18          Q.    Is that true for both of the

19     Venture Supply orders, that TG delivered

20     them to the Lianyungang port in China?

21          A.    We shipped to Lianyungang

22     port according to the requirement of the

23     customer, and we give the shipment to the

24     buyer in that location.

1           Q.    At any time prior to

2    delivering Venture Supply's drywall to

3    the port in China, did Venture or its

4    representative, Mr. Perry, inform TG

5    about anyone to whom Venture planned to

6    resell the drywall?

7           A.    We don't know.  He didn't

8    mention that.

9           Q.    Did Mr. Perry or anyone from

10   Venture Supply mention to TG prior to

11   when TG delivered the drywall to the port

12   where Venture expected the drywall it was

13   purchasing would be used in the US?

14          A.    He did not.

15          Q.    Did TG use Venture Supply as

16   a distributor of its drywall in Virginia?

17          A.    No.  Venture Supply only

18   came to our company to purchase gypsum

19   board.  Venture Supply company was only a

20   buyer while we are only a seller.

21          Q.    Did TG advertise its drywall

22   in Virginia?

23                THE INTERPRETER:  I'm sorry?

24   BY MR. SPANO:

1           Q.     Did TG advertise its drywall

2    in Virginia?

3           A.     No.

4           Q.     I'm going to show the

5    witness now what was marked yesterday as

6    Defendant's Che-2, which is the TTP

7    manufacturer's profile form.

8                  Mr. Peng, could you look at

9    Exhibit A to the TTP MPF in Chinese,

10   entry number 177 related to Wood Nation?

11          A.     Where is it?

12          Q.     Can you find entry number

13   177?

14                 MR. SEEGER:  Excuse me.

15                 Before the questions start, are

16                 you going to lay a foundational

17                 basis for why he's referring to

18                 this exhibit?  I won't make any

19                 objections after that, I just --

20                 is there a foundational basis for

21                 him doing this?

22                 MR. SPANO:  Yes.

23                 MR. SEEGER:  I would like

24                 that to be --

1                THE COURT:  Yes.  That's

2        good.

3  BY MR. SPANO:

4        Q.    Mr. Peng, before I ask you

5  particular questions about the

6  manufacturer's profile form, are you

7  familiar with the information contained

8  in this document?

9        A.    I'm not very familiar with

10  it.  I have only collected this

11  information upon the request of the

12  attorney.

13        Q.    Did you prepare --

14  withdrawn.

15              Is it correct that you

16  provided information to the attorneys

17  that they used to prepare this document?

18        A.    Upon the requirement of the

19  attorney, I have collected and compiled

20  and provided this information.

21        Q.    Do you understand that

22  you're testifying as a corporate

23  representative of TG and TTP with respect

24  to the manufacturer's profile forms?

1          A.     The attorney told me that.

2          Q.     Can you explain generally

3     how you compiled the information that you

4     provided to the attorneys to use in

5     preparing these forms?

6          A.     First of all, I consulted

7     the sales handler regarding the different

8     sales information.  And then I reviewed

9     invoices, contracts and documents in

10    relevant departments.  And I compiled the

11    document according to the format provided

12    by counsel.

13         Q.     Do the manufacturer's

14    profile forms of TG and TTP contain all

15    of the company's information on the

16    subject matters addressed in those

17    documents?

18              MR. SEEGER:  I have to

19              object to that, Judge, because the

20              witness testified that he helped

21              prepare portions of it.  Maybe

22              it's easier to just figure out

23              what portions he prepared and then

24              I won't have to object anymore.

1          THE COURT:  I'll let counsel

2      handle it.  He's got the witness.

3          MR. SPANO:  I'll withdraw

4      the question.

5  BY MR. SPANO:

6      Q.    Have you reviewed the

7  manufacturer's profile forms of TG and

8  TTP in this litigation?

9      A.    Under the guidance and upon

10  the request of the attorney, yes, I did

11  review them.

12      Q.    And based upon your review,

13  to the best of the company's knowledge,

14  both TG and TTP, is the information

15  contained in their profile forms accurate

16  and complete?

17      A.    For all the information I

18  could possibly collect, and according to

19  our recollection, I think it is complete

20  and accurate.

21      Q.    Could we look now at entry

22  number 177 related to Wood Nation.

23      A.    I see this entry.

24      Q.    Do you recall answering

 1    counsel's questions regarding the

 2    markings on the drywall sold to Wood

 3    Nation?

 4         A.    You mean just now?

 5         Q.    In this deposition earlier.

 6         A.    Yes, I remember.

 7         Q.    Do you see the column

 8    entitled "Product Markings"?

 9         A.    Yes, I see it.

10         Q.    And I'm going to read into

11    the record what is written there

12    regarding the product markings on the

13    drywall sold to Wood Nation.

14              "Taian Taishan Plasterboard

15    Co., Gypsum Drywall Per ASTM C 1396 04

16    Contact:  813-994-6499."

17         A.    That's what it appears to

18    be.

19         Q.    To the best of TTP's

20    knowledge, was that the information that

21    was marked on the drywall sold to Wood

22    Nation?

23         A.    From what we have collected

24    and compiled, that should be the case.

1          Q.    Do you recall counsel

2    earlier showing you an e-mail,

3    Exhibit 22, where Mr. Hannam from Wood

4    Nation requested also the notation Tampa,

5    Florida to be put on the drywall?

6          A.    Yes.  That's what the

7    attorney had asked me earlier.

8          Q.    To the best of the company's

9    knowledge, was Tampa, Florida marked on

10   the drywall sold to Wood Nation?

11         A.    According to the information

12   we collected, these were not written

13   there.

14         Q.    Why was it that this

15   information requested by the customer in

16   May 2006 wasn't put on the drywall

17   exactly as they asked?

18         A.    As I explained, our

19   technology did not allow us to print

20   three lines of the mark that customer

21   requested.  Our technology only allowed

22   us to put one line of mark on it.  That's

23   why.  With approval of the customer, we

24   make the mark according to our ordinary

1    process.

2         Q.    What were the terms of sale

3    to Wood Nation related to shipment?

4         A.    Our sales term regarding

5    shipment to Wood Nation was to deliver

6    the product to a Chinese port to the

7    shipping agent of Wood Nation.  To that

8    point, we have completed our work and

9    performed our duties.

10        Q.    As a matter of fact, is that

11   what occurred?  In other words, did TTP

12   deliver the product to the shipping agent

13   of Wood Nation in China?

14        A.    Can you repeat it?  I didn't

15   get it clearly.

16             THE COURT:  Why don't you

17        read it again?

18             Can she just read it, Frank?

19             MR. SPANO:  Oh, yes, yes.

20             THE WITNESS:  Correct.  We

21        indeed delivered our product to

22        the shipping agent of Wood Nation

23        in Chinese port.

24   BY MR. SPANO:

1           Q.    After TTP delivered the

2    product to the shipping agent of Wood

3    Nation in the Chinese port, did it have

4    any further contact with the drywall sold

5    to Wood Nation?

6           A.    There was no more contact.

7    We had no obligation to do so.

8           Q.    Did TTP ship the drywall it

9    sold to Wood Nation to Tampa, Florida?

10          A.    TTP did not.  Like I said,

11   after the product was delivered to the

12   shipping agent of client, it was the

13   work of -- it was the client's work to

14   decide what to do next.

15          Q.    Did David Wei or Wood Nation

16   prior to when TG delivered -- I'll

17   withdraw that.

18                Did David Wei or Wood

19   Nation, prior to when TTP delivered the

20   drywall to the port in China, inform TTP

21   about who Wood Nation planned to resell

22   the drywall?

23          A.    They did not mention that.

24          Q.    Did David Wei or Wood Nation

1    mention where they expected the drywall

2    Wood Nation was purchasing would be used?

3            A.    They did not mention that

4    either.

5            Q.    Did David Wei ever tell you

6    that he was employed by a company called

7    BNBM USA?

8            A.    He didn't say that.  He only

9    said that he introduced his friend to

10    come and purchase our product.

11            Q.    At the time of the Wood

12    Nation sale, were you aware -- I'll

13    withdraw that.

14                 At the time of the Wood

15    Nation sale, were either TG or TTP aware

16    that there was a company called BNBM USA?

17            A.    No.

18            Q.    Have either TG or TTP ever

19    sold drywall to a company called BNBM

20    USA?

21            A.    No.

22            Q.    19.  We can use our copy.

23    It's all right.

24                 MR. SEEGER:  Is it 20 you're

1          looking for?  Oh, 19?  Is this it?

2                    MR. SPANO:  20.

3                    MR. SEEGER:  Let me give you

4          both.  Here you go.

5                    MR. SPANO:  Thank you.

6                    MR. SEEGER:  You're welcome.

7     BY MR. SPANO:

8          Q.    Mr. Peng, do you recall

9     answering counsel's questions regarding

10    your exchange of e-mails with someone

11    called Jacky Yu, Y-U, as shown on Peng

12    Exhibit 20?

13         A.    Yes.  I did answer the

14    question just now.

15         Q.    Did TG or TTP ever sell

16    drywall to Jacky Yu or his company?

17         A.    No.

18         Q.    Do you see the e-mail dated

19    August 30, 2007 from Mr. Yu to you which

20    makes reference to US counterpart?

21         A.    Yes, I do see the e-mail.

22         Q.    Did Jacky Yu ever inform TG

23    or TTP of who the US counterpart was?

24         A.    No, no.

1          Q.     Could you look at the second

2     page of the exhibit, which is your e-mail

3     dated August 29, 2007, to Jacky Yu.

4          A.     I see this e-mail.

5          Q.     Is it correct that as of

6     August 29, 2007, you were an employee of

7     TTP?

8          A.     Yes, I was an employee of

9     TTP.

10          Q.     Were you at the same time an

11     employee of TG?

12          A.     No.  I was only employee of

13     TTP at the time.

14          Q.     If you were only an employee

15     of TTP, why does this e-mail discuss an

16     introduction of Shandong Taihe Dongxin,

17     which we understand is TG?

18          A.     Because the customer, the

19     buyer, would like to know some basic

20     information of our -- of us before making

21     a purchase.  So the buyer would require

22     us to provide the greater background of

23     our company in order to show the customer

24     that we're a big company.  So I wrote

1    Taihe Dongxin.

2         Q.    In this e-mail, did you

3    provide Mr. Yu with any information

4    concerning TTP?

5         A.    Not in the e-mail.

6         Q.    Why didn't you do that?

7         A.    Because this is only a

8    general introduction.  Mr. Yu asked me to

9    give a background and summary

10   introduction of the company.  For

11   details, Mr. Yu would call me directly to

12   inquire.

13        Q.    Could you look at the third

14   paragraph of the e-mail.

15             Do you see the statement

16   here, "We export the metal frame

17   especially...such as New York and

18   Norfolk"?

19             What company was the "we"

20   that you were referring to in that

21   sentence?

22        A.    We here refers to TTP, that

23   TTP had exported the metal stud.  TTP has

24   sold its product to OEG company, and OEG

```
 1    shipped the product to America.

 2         Q.    Did TTP export metal frame

 3    to Norfolk?

 4         A.    I'm not sure about the

 5    details, because we had only shipped the

 6    product to the delivery port.

 7         Q.    Did TTP sell metal studs to

 8    any other customer besides OEG?

 9         A.    You mean TTP?

10         Q.    Yes.

11         A.    If other customer would want

12    to buy the metal studs, we would also

13    sell it to them.

14         Q.    As a matter of fact, were

15    there any other customers who actually

16    bought metal studs from TTP other than

17    OEG?

18         A.    In China, there were some

19    buyers who bought the product.  Sometimes

20    the buyers would need the metal stud to

21    be used in certain projects, and they

22    also would need to purchase the gypsum

23    board.  So they bought the metal stud as

24    well.
```

1          Q.    Did TTP sell metal studs to

2     any company that claimed to come from the

3     US besides OEG?

4          A.    No.

5          Q.    Do you recall the reason you

6     mentioned export to Norfolk in this

7     e-mail?

8          A.    I don't have specific

9     recollection of that.

10          Q.    Do you recall answering

11     questions from counsel regarding the

12     Taihe Group website?

13          A.    Yes, I did answer the

14     attorney's question regarding the

15     website.

16          Q.    Is it correct that the

17     website was partially in English as far

18     back as 2003?

19          A.    I'm not sure about 2003.

20          Q.    Do you recall if when you

21     started at TG, the website had some

22     English language portions?

23          A.    Yes.  There were part --

24     there were parts that were in English.

1          Q.    And did the website have

2    parts of it in English for some time

3    before TG made any sales to any customer

4    from the US?

5          A.    Yes.  At the time that I

6    joined the company, part of the website

7    was already in English.

8          Q.    And you joined the company

9    approximately when?

10         A.    In approximately July 2003

11   that I joined Taishan Gypsum board --

12   Gypsum Company.  At the time, it was

13   called Shandong Taihe Dongxin Company.

14         Q.    Do you understand what it

15   means for a website to be interactive?

16         A.    As far as I know,

17   interactive means that you can

18   communicate on the website.

19         Q.    Communicate with who?

20         A.    Anybody.

21         Q.    In the case of the Taihe

22   group website, was it possible for a user

23   to communicate with anybody on the

24   website?

1           A.    I don't think so.

2           Q.    Was it possible for someone

3    to order products on the website or

4    through the website?

5           A.    No.

6                 MR. SPANO:  Tender the

7           witness.

8                 THE COURT:  Let's take a

9           ten-minute break here and then

10          we'll come back and finish the

11          redirect.

12                VIDEOTAPE TECHNICIAN:  Going

13          off the video record.  The time is

14          11:03.

15                       -  -  -

16                (A recess was taken from

17          11:03 a.m. to 11:12 a.m.)

18                       -  -  -

19                VIDEOTAPE TECHNICIAN:  We're

20          back on the video record.  The

21          time is 11:12.

22                       -  -  -

23                EXAMINATION

24                       -  -  -

1    BY MR. SEEGER:

2          Q.    Mr. Peng, I think I have one

3    or two questions.

4                I want to refer you back to

5    Exhibit 22, but before I do that, you

6    were asked a question by your attorney if

7    David Wei identified himself to you as

8    being from BNBM USA.

9                Do you recall that?

10         A.    I'm not very clear about

11   your question.

12               Can you just summarize it

13   again?

14         Q.    Sure.  I appreciate that.

15               Your attorney asked you if

16   David Wei ever identified himself from

17   being from BNBM USA, and you said he had

18   not.

19               Do you recall that?

20         A.    I remember that my attorney

21   asked me that question.

22         Q.    Do you remember your answer

23   being that he did not identify himself as

24   being from BNBM USA?

1           A.    I said I don't have a

2    recollection of that.  I said that I only

3    know David Wei is from Beijing and he

4    brought his friend to us.

5           Q.    Mr. Peng, take a look at

6    Exhibit 22 and tell me what David Wei's

7    e-mail address is?

8           A.    This should be his address.

9           Q.    What is it?  Could you state

10   for the record what it says very clearly

11   on that e-mail what his address is?

12          A.    Second line, David Wei

13   bnbmusa@msn.com.  David Wei

14   bnbmusa@msn.com.

15              MR. SEEGER:  I have no more

16              questions.  Thank you for being

17              here, Mr. Peng.

18              THE COURT:  Anybody else?

19              Any other questions?

20              Okay.  This completes the

21              depositions then.  I appreciate

22              everybody's work.

23              But before we -- this is off

24              the record.

1                   VIDEOTAPE TECHNICIAN:  Going

2          off the video record.  The time is

3          11:14 a.m.

4                   (Witness excused.)

5                   (Deposition concluded at

6          approximately 11:14 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    C E R T I F I C A T E

2

3

    I, ANN MARIE MITCHELL, a

4 Registered Diplomate Reporter, Certified

  Court Reporter and Notary Public, do

5 hereby certify that, pursuant to notice,

  the deposition of PENG WENLONG was duly

6 taken on January 13, 2012 at 8:32 a.m.

  before me.

7

8    The said PENG WENLONG was

  duly sworn by The Court according to law

9 to tell the truth, the whole truth and

  nothing but the truth and thereupon did

10 testify as set forth in the above

  transcript of testimony.  The testimony

11 was taken down stenographically by me.

12

    I do further certify that

13 the above deposition is full, complete

  and a true record of all the testimony

14 given by the said witness.

15

16

  Ann Marie Mitchell

17 Registered Diplomate Reporter

  Certified Realtime Reporter

18

19

20    (The foregoing certification

  of this transcript does not apply to any

21 reproduction of the same by any means,

  unless under the direct control and/or

22 supervision of the certifying reporter.)

23

24

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4                    Please read your deposition

 5    over carefully and make any necessary

 6    corrections.  You should state the reason

 7    in the appropriate space on the errata

 8    sheet for any corrections that are made.

 9

10                    After doing so, please sign

11    the errata sheet and date it.  It will be

12    attached to your deposition.

13

14                    It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24
```

```
 1                - - - - - -

                  E R R A T A

 2                - - - - - -

 3    PAGE   LINE   CHANGE

 4    _____  _____  _____

 5       REASON:  ____  _____

 6    _____  _____  _____

 7       REASON:  _____  _____

 8    _____  _____  _____

 9       REASON:  _____  _____

10    _____  _____  _____

11       REASON:  _____  _____

12    _____  _____  _____

13       REASON:  _____  _____

14    _____  _____  _____

15       REASON:  _____  _____

16    _____  _____  _____

17       REASON:  _____  _____

18    _____  _____  _____

19       REASON:  _____  _____

20    _____  _____  _____

21       REASON:  _____  _____

22    _____  _____  _____

23       REASON:  _____  _____

24
```

1
2         ACKNOWLEDGMENT OF DEPONENT
3

          I,_____, do
4 hereby certify that I have read the
foregoing pages, 447-551, and that the
5 same is a correct transcription of the
answers given by me to the questions
6 therein propounded, except for the
corrections or changes in form or
7 substance, if any, noted in the attached
Errata Sheet.

8
9    _____

   WENLONG PENG            DATE
10
11
12
13
14
15
16 Subscribed and sworn
to before me this
17 _____ day of _____, 20____.
18 My commission expires:_____
19

   _____
20 Notary Public
21
22
23
24

1                    LAWYER'S NOTES

2     PAGE   LINE

3     _____  _____   _____

4     _____  _____   _____

5     _____  _____   _____

6     _____  _____   _____

7     _____  _____   _____

8     _____  _____   _____

9     _____  _____   _____

10    _____  _____   _____

11    _____  _____   _____

12    _____  _____   _____

13    _____  _____   _____

14    _____  _____   _____

15    _____  _____   _____

16    _____  _____   _____

17    _____  _____   _____

18    _____  _____   _____

19    _____  _____   _____

20    _____  _____   _____

21    _____  _____   _____

22    _____  _____   _____

23    _____  _____   _____

24    _____  _____   _____

# 公 证 书

中华人民共和国山东省泰安市岱岳公证处

– – – – – – –

# E R R A T A

## DEPOSITION OF WENLONG PENG

## 错误更正表

## 彭文龙庭外供述

– – – – – – –

| PAGE<br>页 | LINE(S)<br>行 | CHANGE<br>更正 |
|---|---|---|
| 36 | 18-19 | "I find you put it this way" to "I find the way you put it" |

| | | |
|---|---|---|
| | | 证人供称："我觉得这样说"。 |
| REASON: | | Language translation difficulty |
| 理由 | | 中英文翻译困难。 |

| 41 | 23 | "office of the agents" to "office of an agent in China" |
|---|---|---|

| | | |
|---|---|---|
| | | 证人供称："在中国的代理或办事处"。 |
| REASON: | | Translation error |
| 理由 | | 翻译错误。 |

| 45 | 11 | "hiring" to "employing" |
|---|---|---|

| | | |
|---|---|---|
| | | 证人供称："聘用"。 |
| REASON: | | Translation error |
| 理由 | | 翻译错误。 |

| PAGE<br>页 | LINE(S)<br>行 | CHANGE<br>更正 |
|---|---|---|

| 53 | 9-10 | "questions under the guidance of the attorney" to "deposition under the guidance of Hogan Lovells" |
|  |  | 证人供称："在霍金路伟律师的指导下准备过这些问题"。 |
| REASON: |  | Translation error |
| 理由 |  | 翻译错误。 |

| 55 | 15-17 | Delete "I can translate into either foreign sales or" |
|  |  | 删除 "I can translate into either foreign sales or" |
| REASON: |  | Translation includes translator commentary |
| 理由 |  | 翻译内容是翻译人的评论。 |

| 56 | 5-6 | "I am the foreign trade, not a foreign trade company" to "We are a foreign trade department, not a foreign trade company." |
|  |  | 证人供称："我们是外贸部，不是外贸公司"。 |
| REASON: |  | Translation error |
| 理由 |  | 翻译错误。 |

| 62 | 8 | "2005" to "2003" |
|  |  | 证人供称："2003 年"。 |
| REASON: |  | Translation error |
| 理由 |  | 翻译错误。 |

| 73 | 3 | Add "alone" after "Peng Shiliang" |
|  |  | 在"彭世亮"前添加"单独和"。 |
| REASON: |  | Translation error |
| 理由 |  | 翻译错误。 |

2

| <u>PAGE</u><br>页 | <u>LINE(S)</u><br>行 | <u>CHANGE</u><br>更正 |
|---|---|---|
| 74 | 15 | Add "Hogan Lovells" before "was" |
| | | 在 "是" 前添加 "霍金路伟"。 |
| REASON:<br>理由 | | Translation error<br>翻译错误。 |
| 96 | 21 | "it's not on the same day as" to "they each joined on different days" |
| | | 证人供称："并不是指同一天同一时间"。 |
| REASON:<br>理由 | | Translation error<br>翻译错误。 |
| 120 | 6 | "To sell this much, that is not a small number" to "Monthly sales of this number is not a small number." |
| | | 在 "不小" 之前添加 "在一个月内"。 |
| REASON:<br>理由 | | Translation error<br>翻译错误。 |
| 143 | 20 | "apply" to "signed up to" |
| | | 证人供称："申请"。 |
| REASON:<br>理由 | | Language translation difficulty<br>中英文翻译困难。 |

| PAGE<br>页 | LINE(S)<br>行 | CHANGE<br>更正 |
|---|---|---|

| 145 | 13 | "applied" to 'signed up to" |

REASON:   证人供称：申请"。
          Language translation difficulty

理由   中英文翻译困难。

| 154 | 4-6 | "the people around the area, they work on the drywall, they call it that" to "call the drywall companies in that area as Taihe Group" |

证人供称："叫那一带做石膏板的都叫那个名字"。

REASON:   Translation error

理由   翻译错误。

| 156 | 5 | "Yes, I set it up." to "This is my mailbox, so I set it up" |

证人供称："我的邮箱是我设定的"。

REASON:   Translation error

理由   翻译错误。

| 161 | 13 | Add "TP" after "T" |

在字母"T"后添加"TP"。

REASON:   Language translation difficulty

理由   中英文翻译困难。

| 167 | 1 | Add "from China" before "to" |

在"到"之前添加"从中国"。

REASON:   Translation error

理由   翻译错误。

| PAGE<br>页 | LINE(S)<br>行 | CHANGE<br>更正 |
|---|---|---|

| 172 | 11 | After "TTP" add "I did not have a business card printed at that time." |
| | | 在 TTP 之后添加"当时我没带印制的名片"。 |
| REASON: | | Translation error |
| 理由 | | 翻译错误。 |

| 188 | 6 | "not do any dealings" to "not engage in any transactions" |
| | | 证人供称："没和这家公司做过交易"。 |
| REASON: | | Translation error |
| 理由 | | 翻译错误。 |

| 189 | 14 | Add at end of line: "It is just as Mr. Wang, Mr. Peng, just like Mr" |
| | | 添加"和王先生，彭先生一个意思"。 |
| REASON: | | Translation error |
| 理由 | | 翻译错误。 |

| 215 | 3 | Add "would" before "need" |
| | | 添加"要"。 |
| REASON: | | Language translation difficulty |
| 理由 | | 中英文翻译困难。 |

| 256 | 14-15 | "Zhong Guo Dian Xin" to "China Telecom" |
| | | 证人供称："中国电信"。 |
| REASON: | | Incomplete translation |
| 理由 | | 翻译不完整 |

| PAGE<br>页 | LINE(S)<br>行 | CHANGE<br>更正 |
|---|---|---|

256   22   Add "transfer" to "switch the number to the office of TTP"

证人供称："调到我在 TTP 的办公室"

REASON:   Translation error

理由   翻译错误。

268   9-11   "We did not think about sending samples to the United States for promotion" to "We did not want to promote in the United States."

证人供称："我们没有想在美国宣传"

REASON:   Translation error

理由   翻译错误。

271   13   "shipment" to "sea freight"

证人供称："海运费用"。

REASON:   Translation error

理由   翻译错误。

298   8-9   "Today I see this e-mail. Is that what you mean" to "Do you want to know how I feel when I see this e-mail today?"

证人供称："你是不是只是让我回答问题, 我今天看这个邮件我什么感觉?

REASON:   Translation error

理由   翻译错误。

| | | |
|---|---|---|
| 299 | 12:14 | "We don't understand it, and we are unable to reply to it." to "We don't understand what this product is, and we're unable to respond to it" |

证人供称："我们看不懂它说的产品。我们就根本无法回复"

REASON:　　　Translation error

理由　　　　翻译错误。

| | | |
|---|---|---|
| 303 | 11-15 | "that overall, but that is not according to – it's not according to the scale of that. That means I don't get paid more if I sell or I get paid less if I sell less." to "that. However, even if I increase my sales it does not mean that I get paid proportionately more. Or that if I made fewer sales that I would get paid proportionately less" |

证人供称："但是并不是按比例的。我多卖了然后就是比例的…或少卖了，工资就会减少"

REASON:　　　Translation error

理由　　　　翻译错误。

| | | |
|---|---|---|
| 305 | 4-7 | "if I sell less, my salary would not go down. That means if I sell less, my – I would not make less in salary." to "If I sold less drywall, I would not make proportionately less in salary" |

证人供称："我卖石膏板销量减少了，我工资并不会随着卖石膏板数量减少的比例，减少我的工资"

REASON:　　　Translation error

理由　　　　翻译错误。

| | | |
|---|---|---|
| 308 | 9 | "Taishan" to "Taishan Gypsum" |

证人供称："泰山石膏"。

REASON:　　　Translation error

理由　　　　翻译错误。

| PAGE 页 | LINE(S) 行 | CHANGE 更正 |
|---|---|---|
| 312 | 4-8 | "Besides the degrees – that that type of degrees in English that I mentioned earlier before, there is no third type of degree in English" to "apart from the teaching English degree or the English literature degree, which is any type of English literature degree, there is no third kind of English degree in China" |
| | | 证人供称： "在中国没有其他我说过的那两种英语学位之外，没有第三种学位" |
| REASON: 理由 | | Translation error 翻译错误。 |
| 332 | 19-20 | "He did say probably. He is shipping the drywall to Virginia." to "He did say probably he would ship the gypsum to the port of Virginia" |
| | | 证人供称： "他可能只说过他会把石膏板运到维吉尼亚州的港口" |
| REASON: 理由 | | Translation error 翻译错误。 |
| 423 | 7 | "2009" to "2005" |
| | | 证人供称： "2005"。 |
| REASON 理由 | | Translation error 翻译错误。 |
| 427 | 3 | "of them to receive the goods" to "of the customer when they pick up the product" |
| | | 证人供称： "客户提货用的"。 |
| REASON 理由 | | Translation error 翻译错误。 |

8

证人宣誓书

我彭文龙特此证实，我已经阅读过上述第 1 页至第 222 页；并且除开在"错误更正表"中关于的形式或实体上被更正的项目外，该第 1 页至第 222 页是我所被问及之各个问题之答复的正确笔录记载。

彭文龙                              2011.5.26

彭文龙                              日期


兹于          年          月          日，

在本人前宣誓后作成本宣誓书

本人公证资格有效截止日期为          年          月          日


（公证人签名）

1
2            ACKNOWLEDGMENT OF DEPONENT
3
              I,_____, do
4     hereby certify that I have read the
      foregoing pages, 1 through 222 and that
5     the same is a correct transcription of
      the answers given by me to the questions
6     therein propounded, except for the
      corrections or changes in form or
7     substance, if any, noted in the attached
      Errata Sheet.

8
9     _____
      WENLONG PENG              DATE
10
11
12
13
14
15
16    Subscribed and sworn
      to before me this
17    _____ day of _____, 20____.
18    My commission expires:_____
19

      _____
20    Notary Public
21
22
23
24

# 公　证　书

（2011）泰岱岳证外字第 372 号

　　兹证明彭文龙（男，一九八一年九月二十九日出生，身份证号：370923198109291512，现住山东省泰安市岱岳区花园洲小区 3 号楼 2 单元 201 室）于二０一一年五月二十六日在泰山石膏股份有限公司办公室，在我的面前，在前面的《证人宣誓书》上签名。

中华人民共和国山东省泰安市岱岳公证处

公证员　张卫忠

二０一一年五月二十七日

# NOTARIAL  CERTIFICATE

(2011)Tai Daiyue Zheng Wai Zi No.372

This is to certify that Peng Wenlong (male, born on September 29, 1981, ID card number:370923198109291512, now residing in Room 201, Unit 2, Building 3, Huayuanzhou Residential Quarters, Daiyue District, Taian City, Shandong Province) on Taishan Gypsum Co., Ltd. Office on May 26, 2011 and with the presence of the under-mentioned notary signed on the *ACKNOWLEDGMENT OF DEPONENT*.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

May 27, 2011

# 证　明　书

（2011）泰岱岳证外字第 373 号

　　兹证明前面的（2011）泰岱岳证外字第 372 号《公证书》
的英文译本内容与该公证书中文原本相符。

中华人民共和国山东省泰安市岱岳公证处

公证员　

二０一一年五月二十七日

# NOTARIAL    CERTIFICATE

(2011)Tai Daiyue Zheng Wai Zi No.373

This is to certify that the English translation contents of the (2011) Tai Daiyue Zheng Wai Zi No.372 *NOTARIAL CERTIFICATE* agree with the Chinese contents of that.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

May 27, 2011

证人宣誓书

我彭文龙特此证实，我已经阅读过上述第 223 页至第 446 页；并且除开在"错误更正表"中关于的形式或实体上被更正的项目外，该第 223 页至第 446 页是我所被问及之各个问题之答复的正确笔录记载。

彭文龙 _____          2011.5.26 _____

彭文龙                                                 日期


兹于              年              月              日，

在本人前宣誓后作成本宣誓书

本人公证资格有效截止日期为              年              月              日


（公证人签名）

1
2        ACKNOWLEDGMENT OF DEPONENT
3

          I,_____, do
4    hereby certify that I have read the
     foregoing pages, 223 through 446 and that
5    the same is a correct transcription of
     the answers given by me to the questions
6    therein propounded, except for the
     corrections or changes in form or
7    substance, if any, noted in the attached
     Errata Sheet.

8
9    _____
     WENLONG PENG                DATE
10
11
12
13
14
15
16   Subscribed and sworn
     to before me this
17   _____ day of _____, 20_____.
18   My commission expires:_____
19

     _____
20   Notary Public
21
22
23
24

# 公　证　书

（2011）泰岱岳证外字第 374 号

　　兹证明彭文龙（男，一九八一年九月二十九日出生，身份证号：370923198109291512，现住山东省泰安市岱岳区花园洲小区 3 号楼 2 单元 201 室）于二0一一年五月二十六日在泰山石膏股份有限公司办公室，在我的面前，在前面的《证人宣誓书》上签名。

中华人民共和国山东省泰安市岱岳公证处

公证员　　张卫东

二0一一年五月二十七日

# NOTARIAL   CERTIFICATE

(2011)Tai Daiyue Zheng Wai Zi No.374

This is to certify that Peng Wenlong (male, born on September 29, 1981, ID card number:370923198109291512，now residing in Room 201, Unit 2, Building 3, Huayuanzhou Residential Quarters, Daiyue District, Taian City, Shandong Province) on Taishan Gypsum Co., Ltd. Office on May 26, 2011 and with the presence of the under-mentioned notary signed on the *ACKNOWLEDGMENT OF DEPONENT*.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

May 27, 2011

# 证 明 书

（2011）泰岱岳证外字第 375 号

　　兹证明前面的（2011）泰岱岳证外字第 374 号《公证书》的英文译本内容与该公证书中文原本相符。

中华人民共和国山东省泰安市岱岳公证处

公证员　张卫兵

二〇一一年五月二十七日

# NOTARIAL    CERTIFICATE

(2011)Tai  Daiyue  Zheng  Wai  Zi  No.375

This is to certify that the English translation contents of the (2011) Tai Daiyue Zheng Wai Zi No.374 *NOTARIAL CERTIFICATE* agree with the Chinese contents of that.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

May 27, 2011

# 公 证 书

中华人民共和国山东省泰安市岱岳公证处

# Errata Sheet of Transcript of the Testimony of: Wenlong Peng

彭文龙证人证言勘误表

## January 13 2012

2012 年 1 月 13 日

| Page: Line(s) 页码：行数 | Change from 原文 | Change to 更正 | Reason 原因 |
|---|---|---|---|
| 485:2 | "superior company" "上级公司" | "upstream company" "上游公司" | Translation correction 翻译校正 |
| 490:13 | "impression" "感觉" | "recollection" "回忆" | Clarification 具体说明 |
| 490:15 | "impression" "感觉" | "recollection" "印象" | Clarification 具体说明 |
| 494:22 | "email" "电子邮件" | "website" "网站" | Clarification 具体说明 |
| 494:23 | "email" "电子邮件" | "website" "网站" | Clarification 具体说明 |
| 499:24 | "set formality" "设定的手续" | "set form" "设定的形式" | Clarification 具体说明 |
| 513:18 | "email address" "电子邮件地址" | "email" "电子邮件" | Clarification 具体说明 |

1

2           ACKNOWLEDGMENT OF DEPONENT

3

          I, _____, do

4 hereby certify that I have read the
foregoing pages, 447-551, and that the

5 same is a correct transcription of the
answers given by me to the questions

6 therein propounded, except for the
corrections or changes in form or

7 substance, if any, noted in the attached
Errata Sheet.

8

9 _____     2012-3. 13
   WENLONG PENG           DATE

10

11

12

13

14

15

16 Subscribed and sworn
to before me this

17 _____ day of _____, 20_____.

18 My commission expires:_____

19

_____

20 Notary Public

21

22

23

24

证人宣誓书

我彭文龙特此证实，我已经阅读过上述第 447 页至第 551 页，并且除在勘误表中关于的形式或实体上被更正的内容外，该 447 页至第 551 页是我被问及各个问题的答复的正确笔录记载。

彭文龙                                          2012. 3. 12.

彭文龙                                          日期


签于              年          月          日

在本人前宣誓后成作本宣誓书

本人公证资格有效截止日期为              年          月          日


（公证人签名）

# 公 证 书

（2012）泰岱岳证外字第 202 号

　　申请人：彭文龙，男，一九八一年九月二十九日出生，公民身份号码：370923198109291512。

　　公证事项：签名

　　兹证明彭文龙于二〇一二年三月十三日在泰山石膏股份有限公司办公室，在本公证员的面前，在前面的《证人宣誓书》上签名。

中华人民共和国山东省泰安市岱岳公证处

公证员 

二〇一二年三月十三日

# NOTARIAL    CERTIFICATE

(2012)Tai Daiyue Zheng Wai Zi No.202

Applicant: Peng Wenlong, male, born on September 29, 1981, citizen ID No.:370923198109291512.

Issue under notarization: Signature.

This is to certify that Peng Wenlong on Taishan Gypsum Co., Ltd Office on March 13, 2012 and with the presence of the under-mentioned notary signed on the *ACKNOWLEDGMENT OF DEPONENT*.

Notary: Zhang Weibing
Daiyue Notary Public Office
Taian City, Shandong Province
The People's Republic of China
March 13, 2012

XW37106392

# 公 证 书

（2012）泰岱岳证外字第 203 号

申请人：彭文龙，男，一九八一年九月二十九日出生，公民身份号码：370923198109291512。

公证事项：译本与原本相符

兹证明前面的（2012）泰岱岳证外字第 202 号《公证书》的英文译本内容与该公证书中文原本相符。

中华人民共和国山东省泰安市岱岳公证处

公证员　张卫岳

二〇一二年三月十三日

XW37106366

# NOTARIAL   CERTIFICATE

(2012) Tai Daiyue Zheng Wai Zi No.203

Applicant: Peng Wenlong, male, born on September 29, 1981, citizen ID No.:370923198109291512.

Issue under notarization: The translation is in conformity with the original copy.

This is to certify that the English translation content of (2012) Tai Daiyue Zheng Wai Zi No.202 *NOTARIAL CERTIFICATE* is in conformity with the Chinese original copy of that.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

March 13, 2012

Frank Clem

PENG

EXHIBIT NO. 1

4-7-11
L. GOLKOW

山东省泰安市岱岳口大

汶口镇?村

泰安市泰山纸面石膏有

限公司

TAIAN (CITY) TAISHAN
PLASTRE BOARD COM
COMPANY

PCNC

EXHIBIT NO. 2

4-7-11

L. GOLKOW

| From: | darren dai <darren_dai@eupusa.com> |
| To: | 'peng' <clempwl123@163.com> |
| Sent: | 5/12/2006 10:11:05 AM |
| Subject: | 答复: sheetrock business |

Thanks Peng.
Would you pls share with me for the cost 4'*12' 1/2'' and 4'*8'*1/2 gypsum board and the containerization for that?

By the way, do you provide Door To Door service (Including all things, freight, duty and what ever)?
Thanks

Darren

---

发件人: peng [mailto:clempwl123@163.com]
发送时间: 2006年5月12日 19:57
收件人: darren dai
主题: Re: sheetrock business

Dear Mr Darren.
    Thank you very much for your enquiry on gypsum board. It is our hope to get agreement with you at the earliest time.
    As requested, I would like to reply you as following:
First, we are exporting our gypsum board to the USA with quqntity of 600000 sheets every month. We have much experience on exporting to the USA.

Second, we can produce 4'*8'*1/2'' and 4'*12'*1/2'', 4'*8'*5/8'' and 4'*12'*5/8'' gypsum board. But at this moment we normally produce 1/2'' gypsum board, and we have get the test report according to ASTM standard.

Thrid, we usually export gypsum board both by container of 40 HQ and break bulk.If your order less than 100000 sheets for each shippment, I suggest you take container of 40 HQ.

    Thank you and best wishes!

Yours faithfully
Frank

-----原始邮件-----
发件人:"darren dai"
发送时间:2006-05-12 11:06:03
收件人:""
抄送:""
主题:sheetrock business

Hi,

This is Darren from EUPUSA, Suzhou office.



EXHIBIT NO. 3
4-7-11
L. GOLKOW

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

| From: | peng <clempwl123@163.com> |
|---|---|
| To: | Melvyn <melvyn@lnsteamship.com.sg> |
| Sent: | 2/10/2007 10:15:02 PM |
| Subject: | Re gypsum ship to USA |

..r Sir,

    w fast times fly. I hope you and your business go very well.
    ..ave a customer in America, who need us to ship about 400000 sheets of gypsumboard to Mobile USA. So we need to find a ship to Mobile. Could you please offer any relative shipping information?

    looking forward to your early reply.

    Happy spring festival!


Yours faithfully
Frank
Taihe Group
0086-538-8812017


在2006-12-03, Melvyn <melvyn@lnsteamship.com.sg> 写道:

Dear Mr Frank

Of course big bro, tks vm for the introduction. Will contact them on mon.

Sincerely hope to meet up soonest.

rgs / melvyn

-----Original message-----
From: "peng" clempwl123@163.com
Date: Sat, 02 Dec 2006 10:48:01 +0800
To: "melvyn quek" melvyn@lnsteamship.com.sg
Subject: [Spam] Re: Metal Studs to USA

>
> Dear Mr. Melvyn,
>    How are you doing now!
>    We have a customer who want to ship metal studs from China to USA. Plea> se contact them if you are interested in it. Their emai
>
>    Thank you and best wishes!
>
> Yours faithfuly
> Shandong Taihe Dongxin Co., Ltd
>  Frank
>
>
>
>
> ??2006-11-13??"Melvyn Quek" <melvyn@lnsteamship.com.sg> ???> ???
>
>
>
>
>
> Fm: LN Steamship Pte Ltd
>       Direct Line: 65-63761038, Fax: 65-62339033
>       Mobile phone: 65-96741382
>       Email: melvyn@lnsteamship.com.sg
>
> Dear Chartering Dept
> Direct/Close owrs looking for part cgo to Damietta / Ravenna with 10000mt>  stl pdts
> 1) VESSEL PARTICULAR
> - MV FORTUNE BRIGHT
>   HONGKONG FLG   2003 BUILT 53,343MT DWT ON 12.16M SSW  LOA/BEAM  189/32 > M 5/5 H/H  4 x 30T CRANES
> 2) LOADPORT ROTATION
>  - ETA/D SHANGHAI   : 21st/23th NOV, - ETA/D CHANGSHU  : 24th/29th NO> V, - ETA/D LIANYUNGANG  : 01st-05th DEC (IAGW.WP.WOG)
> Other ports subj to cgo inducment
> Rgs / Melvyn
>

想加入吗?了1.9亿用户正在使用网易邮箱 www.126.com



CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0000011

**PENG EXHIBIT 5
FILED UNDER SEAL**

| **From:** | 8812017538 <8812017538@163.com> |
|---|---|
| **Sent:** | Tuesday, October 9, 2007 9:01 AM (GMT) |
| **To:** | Jacky Yu <jyu@industriaplex.com> |
| **Subject:** | metal stud customer |

Dear Mr. Yu,
  Thank you very much for your kindly attention.

  Our customer is OEG BUILDING MATERIAL, (16th Ave. Suit #334 Brooklyn NY). I was told that they moved to new address, I am not very sure about the exact address. I will try to get the new address, and will inform you then.

  Thank you and best wishes!

--

*Yours faithfully*

*Frank*

*TAISHAN GYPSUM CO., LTD.*

*(TAIHE DONGXIN)*

*8812017538@163.com*

*TEL:0086-538-8812017*

在2007-09-30, "Jacky Yu" <jyu@industriaplex.com> 写道：

> Taking On National Holiday from 1to7/Oct.Returning office on Oct8.I will check my email periodically.Urgent case pls
> reach my cell phone at +0086-139-1608-8932,Thank you!


把爱心注入牛奶，共同凝聚这份力量
快来参加蒙牛免费赠奶爱心行动


PENG
EXHIBIT NO. 6
4-7-11
L. GOLKOW

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

Translation of TG 0000463

From: David Wei bnbmusa@msn.com.

To: Peng clempw123@163.com?; Yang Jiapo<yjp09@hotmail.com

Sent: June 8, 2006

Subject:


Hi Manager Yang and Manager Peng,

The trip of me and our client Mr. RICHARD HANNAM is scheduled as follows:

Arrive at Jinan Airport at June 9th 22:05 PM, Flight MU5138 Beijing – Jinan;

Please pick up us at the airport and send us to a hotel nearby your company (please help

us to reserve two rooms, either four start or five star is okay, but it should be clean and

close to your company;

You can arrange our meeting at June 10th 9:30 AM;

Our return flight will take off from Jinan at June 10th 20:35PM, please arrange to send us

to the airport.

Please contact me immediately if any problem.


Thank you!

Wei Chunshan

June 6th, 2006



杨经理, 彭经理:您们好！

我和客户RICHARD HANNAM先生的行程安排如下:

6月9日晚22:05到达济南机场 航班 MU5138 从北京到济南
请您接我们到你们公司附近的酒店(请帮我们预定两个房间, 四星、五星酒店都行, 关键是干净和离你们公司比较近最好)

6月10日9:30分左右我们可以安排见面。

6月10日晚, 我们的飞机是20:35从济南起飞, 请您安排送我们到机场。

如有任何问题请及时与我联系。

谢谢

魏春山

2006年6月8日

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

**PENG EXHIBIT 8
FILED UNDER SEAL**

| From: | 13583817238lb <13583817238lb@163.com> |
| Sent: | Saturday, August 15, 2009 1:57 AM (GMT) |
| To: | 8812017538 <8812017538@163.com> |
| Subject: | 美方有关问题及行程 |
| Attach: | CPSC_Questions_to_AQSIQ_Aug_2009_中英[1].doc; 接待方案2[1].doc |

彭经理你好：

现将美方有关问题及行程传给你，请做好准备，如有问题请及时联系。

没有广告的终身免费邮箱,www.yeah.net



CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0025155

## CPSC Questions to AQSIQ—August 2009

1. Will you provide us a copy in English of China Standard GB/T9775-1999?
   你愿意提供中国标准 GB/T9775-1999 的英文版本吗？

2. Is there a more recent version of this standard?
   这个标准有最新的版本吗？

3. Have you estimated the total mass of commercial-grade gypsum that is available from the Pingyi and Lu Nueng Mines? How much gypsum has been mined to date? When did you begin mining gypsum from these mines? Did you mine or are you currently mining other materials at these mines?

   你是否已经估算了从平邑和鲁能矿出产的商业级石膏的总重量？目前为止已经开采了多少石膏？你们是什么时候从这些矿里开采石膏的？你们在这些矿里曾经开采过或者现在还在开采其它材料吗？

4. Are there other mines (either active or former) in the area of the Pingyi and Lu Nueng Mines? What materials were/are extracted from these other mines?

   在平邑和鲁能矿区域还有其它的矿吗（无论是目前活跃的或从前有过的）？在这些矿里开采的是什么材料呢？

5. Can you tell us how the gypsum deposits associated with these mines appear to have formed?

   你能告诉我们这些与矿山有关系的石膏矿床是如何形成的嘛？

6. Have you determined the geologic age of these gypsum deposits?

   你们是否已经确定了这些石膏矿床的地质年代？

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

7. Can you describe the occurrence of the gypsum in these mines? For example, how many gypsum layers [*or beds, or strata*] have your mining engineers identified? How many of these layers have been (or are) actively mined? How thick are the gypsum layers that have been (or are being) mined? What is the areal extent of these gypsum layers? How deep are the gypsum layers that have been (or are being) mined? What is the orientation of these layers [*i.e., are these layers horizontal or are they tilted*]? What other types of materials [*e.g., shale, clay layers, mudstones, etc.*] are found in association with the gypsum layers? Are these non-gypsum materials [*e.g., shale, clay layers, mudstones, etc.*] found in separate, distinct layers in between the gypsum layers, or are these materials intermixed with the gypsum?

你能否描述这些矿里石膏的情况？例如，你们的采矿工程师已经鉴定有多少石膏层（或者床、或者岩层）。这些岩层里有多少是已经或者正在被开采？已经或正在开采的石膏层有多厚？这些是高层的面积有多大？这些石膏层已经被开采多深？这些石膏层的方向（例如，这些层的水平方向或倾角）？发现的其它类型材料与石膏层结合的情况（例如，页岩，粘土层，泥石等）？这些发现的非石膏材料（例如：页岩，粘土层，泥石等）是与石膏层分开的还是混合在一起的？

8. Does there appear be a biogenic component to the depositional history of the geologic materials found at these two mines? That is, can you tell whether any of the non-gypsum layers may either reflect that deposition of organic material(s) or were formed as a result of a biologic process (e.g., the action of sulfur-reducing bacteria)?

在那两个矿里是否发现生物成因地质材料的沉积历史？你能不能告诉是否有任何非石膏层可以反映这一沉积的有机物质形成由于生物过程（例如，硫还原菌的作用）

9. Have you done any physical or chemical testing to assess the purity of the gypsum from the Lu Nueng Mine? If so, can you tell us about this testing? Can you tell us how these analyses were conducted? How frequently was this testing performed? Were the

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

testing results compared to certain specifications? If so, can you provide these specifications? Were statistical methods used to guide the comparison of the testing results with the appropriate specifications? What happened if the testing showed that some of the gypsum did not meet the appropriate specifications or standards?

你们是否已经做了来评估鲁能矿出产石膏纯度的物理和化学测试？如果做了，你能告诉我们有关测试的情况吗？你能告诉我这些分析是怎么做的吗？这些测试多长时间做一次？这些测试结果与某些性能规范对照过吗？如果对照过，你能提供这些性能规范吗？这些统计方法过去常常用来与性能规范做测试结果的比较吗？如果测试结果显示这些石膏矿没有达到性能规范或者标准，会如何处理？

10. Do you have any maps, diagrams, boring logs, reports, or other materials that you can share with us to help us understand the geology of both mines?

你是否有任何的地图、图表、钻井记录、报告或者其它材料能够与我们分享，来帮助我们理解这些矿的地质学信息。

11. The team wishes to visit the Pingyi Plant that produces the board. How does the Pingyi Plant mark their production boards?

代表团希望拜访平邑的石膏板厂。平邑石膏板厂是如何标注他们生产的板的？

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

**Updated Peng Tr. Pl's Ex. 10**

**(English Translation)**

From: 8812017538<8812017538@163.com>
Sent: Friday, May 11, 2007 10:00 AM (GMT)
To: zhyg_869@163.com
Subject: Taishan gypsum boards
Attach: 100 0584.JPG

Hello, Mr Zhang! Its' very nice to contact with you.

Shandong Taihe Dongxin Co., Ltd. is a national key manufacturer of new building materials, one of the largest production base of paper-faced gypsum boards, one of top hundred enterprises in building materials industry of china, and one of top ten enterprises in the world. The company has a dozen of branch companies distributed in Shandong, Jiangsu, Shanxi, Hebei, Hubei, Xinjiang and other provinces. Its annual output of gypsum boards is 280 million square meters, and the domestic market share is 35%, "Taishan" gypsum boards successively win titles of "China Top-brand Product" and "China Well-known Trademark product". Products of our company have been sold to Southeast Asia, Middle East, the United States, Ukraine, South Africa and other countries and regions. The export of gypsum boards to the United States last year was 18 million square meters, and the 127mm gypsum board has passed the US Professional ASTM Inspection. Based on your requests, I can provide you with the quotation as follows:

Standard paper-faced gypsum board 12. 7*1220*3660 76 sheets/item 5.8 yuan/m2 (containing plywood pallet, protective gypsum board, plastic gowns and steel strapping). The package drawing is seen attached, please refer to it.

Contact me if you have any questions!

Peng Wen-Long
Yours faithfully
Frank

8812017538@63.com
TEL: 0086-538-8812017

Play the demo of 2006 China best online game - Fantasy Westward Journey

| From: | 8812017538 <8812017538@163.com> |
| Sent: | Friday, May 11, 2007 10:00 AM (GMT) |
| To: | zhyg_869@163.com |
| Subject: | 泰山石膏板 |
| Attach: | 100_0584.JPG |

张先生：

您好！十分高兴与您联系.

山东泰和东新股份有限公司是国家重点新型建材生产企业, 国内最大的纸面石膏板生产基地, 中国建材百强企业, 世界十强之一。公司拥有十几个分公司, 分布于山东、江苏、山西、河北、湖北、新疆等省。年产2.6亿平方米石膏板, 国内市场占有率达35%, "泰山"牌石膏板先后获得"中国名牌产品"、"中国驰名商标产品"。我公司产品远销到东南亚、中东、美国、俄罗斯、乌克兰、南非等国家和地区。去年出口美国石膏板1800万平方米, 12.7㎜石膏板业已通过美国专业ASTM检验。根据您要求, 报价如下：

普通纸面石膏板12.7*1220*3660mm 76张/件 5.8元/平方(含包装胶合板托架、石膏护板、塑料罩衣、钢带捆扎)。附件另附包装图, 请参阅。

如有疑问, 敬请联系！


彭文龙

*Yours faithfully*

*Frank*

**TAIHE DONGXIN CO., LTD**

*8812017538@163.com*

*TEL:0086-538-8812017*

---

免费试玩2006中国最佳网络游戏--梦幻西游

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER