

Transcript of the Testimony of:  **Shiliang Peng**

01/11/2012

Chinese Drywall

```
 1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
 2

    _____
 3                          §  MDL NO. 2047
    IN RE:                  §
 4  CHINESE-                §  SECTION: L
    MANUFACTURED            §
 5  DRYWALL PRODUCTS        §  JUDGE FALLON
    LIABILITY               §
 6  LITIGATION              §  MAGISTRATE
    _____     §  JUDGE WILKINSON
 7

                    -  -  -
 8

      CROSS NOTICED IN VARIOUS OTHER ACTIONS
 9
                    -  -  -
10
                  January 11, 2012
11
                    -  -  -
12

       CONFIDENTIAL - SUBJECT TO FURTHER
13            CONFIDENTIALITY REVIEW
14                  -  -  -
15         Videotaped deposition of
    SHILIANG PENG, held at the Executive
16  Centre, Level 3, Three Pacific Place, One
    Queen's Road East, Hong Kong, China,
17  commencing at 8:30 a.m., on the above
    date, before Linda L. Golkow, Certified
18  Court Reporter, Registered Diplomate
    Reporter, Certified Realtime Reporter and
19  Notary Public.
                            -  -  -
20

21

22         GOLKOW TECHNOLOGIES, INC.
       877.370.3377 ph | 917.591.5672 fax
23              deps@golkow.com
24
```

Confidential - Subject to Further Confidentiality Review

```
 1   BEFORE:
 2         HONORABLE ELDON E. FALLON
           UNITED STATES FEDERAL COURT -
 3         EASTERN DISTRICT OF LOUISIANA
 4
 5   APPEARANCES:
 6
        GAINSBURGH, BENJAMIN, DAVID, MEUNIER
 7      & WARSHAUER, L.L.C.
        BY:  GERALD E. MEUNIER, ESQUIRE
 8      2800 Energy Centre
        1100 Poydras Street
 9      New Orleans, Louisiana 70163
        (504) 522-2304
10      gmeunier@gainsben.com
        Representing the Plaintiffs'
11      Steering Committee
12
        HERMAN HERMAN KATZ & COTLAR, LLP
13      BY:  LEONARD A. DAVIS, ESQUIRE
        820 O'Keefe Avenue
14      New Orleans, Louisiana 70113
        (504) 581-4892
15      Ldavis@hhkc.com
        Representing the Plaintiffs'
16      Steering Committee
17
        COLSON HICKS EIDSON
18      BY:  ERVIN GONZALEZ, ESQUIRE
        BY:  PATRICK S. MONTOYA, ESQUIRE
19      255 Alhambra Circle
        Penthouse
20      Coral Gables, Florida 33134
        (305) 476-7400
21      Ervin@colson.com
        Patrick@colson.com
22      Representing Plaintiffs' Steering
        Committee in the Federal and State
23      Coordinated Actions
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (CONTINUED):
 2
      LEVIN, FISHBEIN, SEDRAN & BERMAN
 3    BY:  ARNOLD LEVIN, ESQUIRE
      510 Walnut Street - Suite 500
 4    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 5    Alevin@lfsblaw.com
      Representing the Plaintiffs'
 6    Steering Committee
 7
      SEEGER WEISS LLP
 8    BY:  SCOTT A. GEORGE, ESQUIRE
      One William Street
 9    New York, New York 10004
      (212) 584-0700
10    Sgeorge@seegerweiss.com
      Representing the Plaintiffs'
11    Steering Committee
12
      HOGAN LOVELLS US LLP
13    BY:  JOE CYR, ESQUIRE
      875 Third Avenue
14    New York, New York 10022
      (212) 918-3000
15    Joe.cyr@hoganlovells.com
      Representing Taishan Gypsum Co.
16    Ltd. and Taian Taishan
      Plasterboard Company Ltd. and the
17    Witness, Shiliang Peng
18
      HOGAN LOVELLS INTERNATIONAL LLP
19    BY:  EUGENE CHEN, ESQUIRE
      18th Floor, Park Place
20    1601 Nanjing Road West
      Shanghai, China 200040
21    (86 21) 6122 3800
      eugene.chen@hoganlovells.com
22    Representing Taishan Gypsum Co.
      Ltd. and Taian Taishan Plasterboard
23    Company Ltd. and the Witness,
      Shiliang Peng
24
```

```
 1    APPEARANCES (CONTINUED):
 2
      GREENBERG TRAURIG, LLP
 3    BY:  HILARIE BASS, ESQUIRE
      1221 Brickell Avenue
 4    Miami, Florida 33131
      (305) 579-0745
 5    bassh@gtlaw.com
      Representing the Home Builders
 6    Steering Committee
 7
      PERKINS COIE LLP
 8    BY:  DAVID L. BLACK, ESQUIRE
      1899 Wynkoop Street
 9    Suite 700
      Denver, Colorado 80202
10    (303) 291-2300
      DBlack@perkinscoie.com
11    Representing the State of Louisiana
12
      THOMPSON COE COUSINS & IRONS, L.L.P.
13    BY:  KEVIN F. RISLEY, ESQUIRE
      One Riverway
14    Suite 1600
      Houston, Texas 77056
15    (713) 403-8210
      krisley@thompsoncoe.com
16    Representing The North River
      Insurance Company
17
18    BRENNER, EVANS & MILLMAN, P.C.
      BY:  THEODORE I. BRENNER, ESQUIRE
19    411 East Franklin Street
      Suite 200
20    Richmond, Virginia 23218
      Tbrenner@beylaw.com
21    (804) 644-1300
      Representing Tobin Trading Company
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (CONTINUED):
 2
         McKENRY, DANCIGERS, DAWSON &
 3       LAKE, P.C.
         BY:  J. BRIAN SLAUGHTER, ESQUIRE
 4       192 Ballard Court
         Suite 400
 5       Virginia Beach, Virginia 23462
         (757) 461-2500
 6       Jbslaughter@va-law.org
         Representing Atlantic Homes LLC and
 7       Multiple Other Virginia-Based
         Defendants
 8
 9       QUINN EMANUEL URQUHART & SULLIVAN,LLP
         BY:  JANE M. BYRNE, ESQUIRE
10       BY:  JULIA BESKIN, ESQUIRE
         51 Madison Avenue
11       22nd Floor
         New York, New York 10010
12       (212) 849-7000
         Janeburne@quinnemanuel.com
13       Juliabeskin@Quinnemanuel.Com
         Representing Chartis Select Insurance
14       Company and Related Chartis Insurers
15
16       WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
         BY:  MICHAEL SEXTON, ESQUIRE
17       3344 Peachtree Road, NE
         Suite 2400
18       Atlanta, Georgia 30326
         (404) 876-2700
19       msexton@wwhgd.com
         Representing Various Banner
20       Defendants
21
22
23
24
```

```
 1        APPEARANCES (CONTINUED):

 2

          SINNOTT, NUCKOLS & LOGAN, PC

 3        BY:  KENNETH F. HARDT, ESQUIRE

          13811 Village Mill Drive

 4        Midlothian, Virginia 23114

          (804) 378-7600

 5        khardt@snllaw.com

          Representing Venture Supply, Inc. and

 6        Porter-Blaine Corp.

 7

     ALSO PRESENT:

 8

          SUNNY WANG, INTERPRETER

 9

10

11                    -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1    APPEARANCES VIA TELEPHONE:
 2
 3       GALLOWAY JOHNSON TOMPKINS BURR and SMITH
         BY:  CARLINA C. EISELEN, ESQUIRE
 4       One Shell Square
         701 Poydras Street, 40th Floor
 5       New Orleans, Louisiana 70139
         (504) 525-6802
 6       ceiselen@gjtbs.com
         Representing Interior/Exterior
 7       Building Supply
 8
         HUNTON & WILLIAMS LLP
 9       BY:  A. TODD BROWN, ESQUIRE
         Bank of America Plaza
10       101 South Tryon Street
         Suite 3500
11       Charlotte, North Carolina  28280
         (704) 378-4700
12       Representing Stock Building Supply, LLC
13
14       JONES, WALKER, WAECHTER, POITEVENT,
         CARRERE & DENEGRE LLP
15       BY:  MEGAN E. DONOHUE, ESQUIRE
         600 Jefferson Street, Suite 1600
16       Lafayette, Louisiana 70501
         (337) 262-9062
17       mdonohue@joneswalker.com
         Representing Fireman's Fund Insurance
18       Company
19
         FULMER LEROY ALBEE BAUMANN
20       BY:  MICHAEL P. McCAHILL, ESQUIRE
         2866 East Oakland Park Boulevard
21       Ft. Lauderdale, Florida 33306
         (954) 707-4430
22       mosscandace@fulmerleroy.com
         mmccahill@fulmerleroy.com
23       Representing Independent Builders
         Supply Association (IBSA)
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA TELEPHONE (CONTINUED):
 2
 3        WRIGHT, FULFORD, MOORHEAD & BROWN, P.A.
          BY:  DORYK B. GRAF, JR., ESQUIRE
 4        145 N. Magnolia Ave.
          Orlando, Florida 32801
 5        (407) 425-0234
          dgraf@wfmblaw.com
 6        Representing West Construction, Inc.
 7
 8        QUINN EMANUEL URQUHART & SULLIVAN, LLP
          BY: CLINTON DOCKERY, ESQUIRE
 9        51 Madison Avenue, 22nd Floor
          New York, New York 10010
10        (212) 849-7000
          clintondockery@quinnemanuel.com
11        Representing Chartis Select Insurance
          Company and Related Chartis Insurers
12
13        RUMBERGER, KIRK & CALDWELL, P.A.
          BY:  MONICA C. SEGURA, ESQUIRE
14        Brickell Bayview Centre, Suite 3000
          80 Southwest 8th Street
15        Miami, Florida 33130
          (305) 358-5577
16        Representing several defendants and
          Defendants' Liaison Counsel for
17        Installers
18
          BUCHANAN INGERSOLL & ROONEY
19        BY:  C. ROBERT ZAPPALA, ESQUIRE
          One Oxford Centre
20        301 Grant Street, 20th Floor
          Pittsburgh, Pennsylvania 15219
21        (412) 392-2135
          bobby.zappala@bipc.com
22        Representing 84 Lumber
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES VIA STREAM:
 2
     BECNEL LAW FIRM, L.L.C.
 3   BY:  ROBERT BECNEL, ESQUIRE
     106 W. 7th Street
 4   Reserve, Louisiana 70084
     (985) 536-1186
 5   robbecnel@aol.com
     Representing the Plaintiffs'
 6   Steering Committee
 7
     PARKER WAICHMAN ALONSO LLP
 8   BY:  JORDAN L. CHAIKIN, ESQUIRE
     3301 Bonita Beach Road
 9   Bonita Springs, Florida 34134
     (239) 390-1000
10   Jchaikin@yourlaywer.com
     Representing Plaintiffs' Steering
11   Committee
12
     MORGAN & MORGAN
13   BY:  PETE V. ALBANIS, ESQUIRE
     12800 University Drive
14   Suite 600
     Fort Myers, Florida 33907
15   (877) 667-4265
     Representing the Plaintiffs
16
17   IRPINO LAW FIRM
     BY:  ANTHONY IRPINO, ESQUIRE
18   2216 Magazine Street
     New Orleans, Louisiana 70130
19   Airpino@irpinolaw.com
     (504) 525-1500
20   Representing the Plaintiffs
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3        GALLOWAY JOHNSON TOMPKINS BURR and SMITH
          BY:  CARLINA C. EISELEN, ESQUIRE
 4        One Shell Square
          701 Poydras Street, 40th Floor
 5        New Orleans, Louisiana 70139
          (504) 525-6802
 6        ceiselen@gjtbs.com
          Representing Interior/Exterior
 7        Building Supply
 8
          HEARD & MEDACK, P.C.
 9        BY:  JAMES DAVIS, ESQUIRE
          9494 Southwest Freeway, Suite 700
10        Houston, Texas 77074
          (713) 772-6400
11        jdavis@heardmedackpc.com
          Representing CastleRock Communities, L.P.
12
13
          HUNTON & WILLIAMS LLP
14        BY:  A. TODD BROWN, ESQUIRE
          Bank of America Plaza
15        101 South Tryon Street
          Suite 3500
16        Charlotte, North Carolina  28280
          (704) 378-4700
17        tbrown@hunton.com
          Representing Stock Building Supply, LLC
18
19
          SHER GARNER CAHILL RICHTER KLEIN &
20        HILBERT, L.L.C.
          BY:  MATTHEW C. CLARK, ESQUIRE
21        909 Poydras Street
          Suite 2800
22        New Orleans, Louisiana 70112
          (504) 299-2100
23        mclark@shergarner.com
          Representing the Southern Home
24        Defendants
```

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3        QUINN EMANUEL URQUHART & SULLIVAN, LLP
          BY: CLINTON DOCKERY, ESQUIRE
 4        51 Madison Avenue, 22nd Floor
          New York, New York 10010
 5        (212) 849-7000
          clintondockery@quinnemanuel.com
 6        Representing Chartis Select Insurance
          Company and Related Chartis Insurers
 7
 8        JONES, WALKER, WAECHTER, POITEVENT,
          CARRERE & DENEGRE LLP
 9        BY:  MEGAN E. DONOHUE, ESQUIRE
          600 Jefferson Street, Suite 1600
10        Lafayette, Louisiana 70501
          (337) 262-9062
11        mdonohue@joneswalker.com
          Representing Fireman's Fund Insurance
12        Company
13
          DEUTSCH, KERRIGAN & STILES
14        BY:  MELISSA M. SWABACKER, ESQUIRE
          755 Magazine St.
15        New Orleans, Louisiana  70130
          (504) 581-5141
16        mswabacker@dkslaw.com
          Representing Landmark American
17        Insurance Company
18        PUGH, ACCARDO, HAAS, RADECKER, CAREY
          & HYMEL, LLC
19        BY:  DONNA M. YOUNG, ESQUIRE
          1100 Poydras Street
20        Suite 3200
          New Orleans, Louisiana 70163
21        Dyoung@pugh-law.com
          (504) 799-4500
22        Representing Stock Building Supply
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM (CONTINUED):

 2

 3        WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
          BY:   SHUBHRA MASHELKAR, ESQUIRE
 4        3344 Peachtree Road, NE
          Suite 2400
 5        Atlanta, Georgia 30326
          (404) 876-2700
 6        Smashelkar@wwhgd.com
          Representing Various Banner
 7        Defendants

 8
                        -   -   -
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -
 2                  I N D E X
 3   WITNESS                          PAGE NO.
 4   SHILIANG PENG
 5    By Mr. Meunier                     19
 6    By Ms. Bass                        112
 7    By Mr. Cyr                         116
 8    By Mr. Meunier                     124
 9
10
11                   -  -  -
12                E X H I B I T S
13
     NO.              DESCRIPTION        PAGE NO.
14
15    Peng S.-1     E-mail chain, top    51
                    e-mail in English
16                  dated August 03,
                    2006, Bates stamped
17                  TG 0019798 through
                    TG 0019800
18
      Peng S.-2     E-mail chain, top    56
19                  one dated
                    12/12/2005, Bates
20                  stamped TG 0019840
                    and TG 0019841
21
      Peng S.-3     E-mail chain, top    59
22                  one dated
                    10/15/2005, Bates
23                  stamped TG 0019813
                    and TG 0019814
24
```

| 1 | Peng S.-4 | Invoice dated July 03, 2006, Bates stamped TG 0020090 | 80 |
| 2 | | | |
| 3 | Peng S.-5 | Taian Taishan Plasterboard Co., Ltd., Packing List dated July 03, 2006, Bates stamped TG 0019366 | 83 |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| | Peng S.-6 | Taian Taishan Plasterboard Co., Ltd., Invoice dated July 20, 2006, Bates stamped TG 00120091 | 88 |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | Peng S.-7 | Taian Taishan Plasterboard Co., Ltd., Invoice dated July 20, 2006, Bates stamped TG 00120092 | 88 |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| | Peng S.-8 | Taian Shandong Province Special Invoice for Export, Bates number TG 0001657, TG 0001658, TG 0001661, TG 0001663 through TG 0001670, and TG 0001680 through TG 0001682 | 91 |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | Peng S.-9 | Settlement and Release Agreement, Bates stamped TG 0020118 through TG 0020122 | 100 |
| 20 | | | |
| 21 | | | |
| 22 | Peng S.-10 | Contract, Bates stamped TG 0001704 through TG 0001706 | 112 |
| 23 | | | |
| 24 | | | |

```
 1    Jia              Document in Chinese, 122
      Defendant's 45 Bates stamped TG
 2                     0026004 through TG
                       0026006
 3
      Jia              2006 Financial     122
 4    Defendant's 45A Statement of Taian
                       Taishan Plasterboard
 5                     Co., Ltd., Bates
                       stamped TG 0026004
 6                     through TG 0026006667
 7    Jia              Document in Chinese, 123
      Defendant's 46   Bates stamped TG
 8                     0026007 through TG
                       0026009
 9
      Jia              Balance Sheet, Bates 123
10    Defendant's 46A stamped TG 0026007
                       through TG 0026009
11
      Jia              Document in Chinese, 123
12    Defendant's 47  Bates stamped TG
                       0026010 through TG
13                     0026012
14    Jia              2008 Financial     123
      Defendant's 47A Statement of Taian
15                     Taishan Plasterboard
                       Co., Ltd. Balance
16                     Sheet, Bates stamped TG
                       0026010 through TG
17                     0026012
18
19
20
21
22
23
24
```

```
 1                 -  -  -

 2            THE VIDEOTAPE TECHNICIAN:

 3        We are now on the record.  My name

 4        is Dan Lawlor.  I'm a videographer

 5        for Golkow Technologies.  Today's

 6        date is January 11, 2012 and the

 7        time is 8:30 a.m.

 8            This video deposition is

 9        being held in Hong Kong, China in

10        the matter of Chinese Drywall

11        Litigation for the United States

12        District Court, Eastern District

13        of Louisiana, MDL Number 2047 and

14        cross-noticed in various other

15        actions.

16            The deponent today is

17        Shiliang Peng.  Will Your Honor

18        and all those present please state

19        your presence for the record.

20            THE COURT:  Judge Eldon

21        Fallon, Eastern District of

22        Louisiana.

23            MR. MEUNIER:  Gerry Meunier

24        appearing for the Plaintiffs'
```

```
 1              Steering Committee in the MDL.

 2                   MR. DAVIS:  Leonard Davis on

 3              behalf of the Plaintiffs' Steering

 4              Committee and Plaintiffs' Liaison

 5              Counsel.

 6                   MS. BASS:  Hilarie Bass on

 7              behalf of Home Builders Steering

 8              Committee.

 9                   MR. GONZALEZ:  Good morning.

10              Ervin Gonzalez and Patrick Montoya

11              on behalf of the PSC and the MDL

12              liaison states.

13                   MR. HARDT:  Good morning,

14              Ken Hardt on behalf of Venture

15              Supply in the Germano action and

16              the Alexander state court action.

17                   MR. BRENNER:  Theodore

18              Brenner on behalf of Tobin Trading

19              in the Germano action.

20                   MR. SLAUGHTER:  Brian

21              Slaughter.  I'm here on behalf of

22              Atlantic Homes, LLC both in the

23              Commonwealth of Virginia and in

24              the MDL matters.
```

```
 1              MR. SEXTON:  Mike Sexton on

 2         behalf of certain Banner Supply

 3         entities.

 4              MR. BLACK:  David Black on

 5         behalf of the State of Louisiana

 6         reserving the positions set forth

 7         in our pending remand motion.

 8              MR. LEVIN:  Arnold Levin,

 9         lead counsel, Plaintiffs' Steering

10         Committee.

11              MR. GEORGE:  Scott Alan

12         George, Seeger Weiss, PSC.

13              MS. BESKIN:  Julia Beskin

14         from Quinn, Emanuel Urquhart &

15         Sullivan for the Chartis insurance

16         group.

17              MR. RISLEY:  Kevin Risley on

18         behalf of North River Insurance

19         Company.

20              MR. CYR:  Eugene Chen and

21         Joe Cyr of Hogan Lovells on behalf

22         of Defendants Taishan Gypsum and

23         TTP.

24              THE COURT:  Would you rise,
```

```
 1              please, sir.

 2                      -  -  -

 3              SHILIANG PENG, after having

 4         been duly sworn, was examined and

 5         testified as follows:

 6                      -  -  -

 7              THE COURT:  Have a seat,

 8         please.

 9              You may begin, Counsel.

10                      -  -  -

11              EXAMINATION

12                      -  -  -

13    BY MR. MEUNIER:

14         Q.    Good morning.

15         A.    Hello.

16         Q.    Would you please state your

17    name and business address.

18         A.    My name is Peng Shiliang,

19    last name, P-E-N-G, first name,

20    S-H-I-L-I-A-N-G.

21              I don't quite understand

22    what you mean by business address.

23         Q.    What address or addresses do

24    you use in order to conduct your
```

```
 1   business?
 2          A.     When I do my business?
 3          Q.     Do you have an office?
 4          A.     What period of time?
 5          Q.     Today.
 6          A.     Today I don't have an
 7   office.
 8          Q.     By whom are you employed?
 9          A.     I don't have an office right
10   now.
11          Q.     By whom are you employed?
12          A.     I don't understand from the
13   beginning.  What do you mean by business
14   address?
15          Q.     I'm asking a different
16   question now.  Who do you work for?
17          A.     Currently I work for TG.
18          Q.     In your work for TG, do you
19   work in an office?
20          A.     I work in the manufacture.
21          Q.     You work at a manufacturing
22   plant?
23          A.     Correct.  I work in a
24   manufacture plant.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Please give us the address
 2    of that plant.
 3               INTERPRETER:  Interpreter
 4          clarification.
 5               In Lucheng city,
 6          L-U-C-H-E-N-G, Shanxi province,
 7          S-H-A-N-X-I.
 8    BY MR. MEUNIER:
 9          Q.    Does the plant manufacture
10    drywall?
11          A.    There is a plant that
12    manufacture drywall.
13          Q.    Is the plant where you work
14    owned by TG?
15          A.    Yes.
16          Q.    What is your job position?
17          A.    I'm the manager of this
18    plant.
19          Q.    What are the duties and
20    responsibilities of the manager of the
21    plant?
22          A.    My duties are to be in
23    charge of the daily operation of the
24    plant to ensure its normal operation.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Who is the boss that you

 2   report to?

 3          A.    I report to the executives

 4   of TG.

 5          Q.    And who are they?

 6          A.    Mr. Jia Tongchun.

 7          Q.    Anyone else?

 8          A.    And also Mr. Ren Xulian,

 9   R-E-N, last name, first name,

10   X-U-L-I-A-N.

11          Q.    What is the job position of

12   Mr. Ren Xulian?

13          A.    Deputy general manager of

14   TG.

15          Q.    Which employees at the plant

16   report to you as their boss?

17          A.    Deputy production general

18   manager and the people in charge in

19   financial department and supply

20   department.

21          Q.    Please give me the names of

22   those people.

23          A.    Production manager, Mr. Chen

24   Zhongjian, last name, C-H-E-N, first
```

Confidential - Subject to Further Confidentiality Review

```
 1    name, Z-H-O-N-G-J-I-A-N.

 2           Q.    Who in the financial

 3    department reports to you?

 4           A.    Dai Zhiming, D-A-I, last

 5    name, first name, Z-H-I-M-I-N-G.

 6           Q.    Who in the support

 7    department reports to you?  I'm sorry.

 8    Who in the supply department reports to

 9    you?

10           A.    Sun Qingli, last name,

11    S-U-N, first name, Q-I-N-G-L-I.

12           Q.    Are you in your current job

13    involved in the marketing or sale of

14    gypsum board?

15           A.    I have not participated in

16    marketing and sales activities.

17           Q.    How long have you held your

18    current position?

19           A.    Since April 2009 until

20    today.

21           Q.    What was your position with

22    TG before April of 2009?

23                 MR. CYR:  Objection.

24                 THE COURT:  What's the
```

```
 1          objection for?

 2               MR. CYR:  The question

 3          assumes that he worked for TG

 4          prior to April of 2009.

 5               THE COURT:  Let's clarify

 6          that, please.

 7  BY MR. MEUNIER:

 8          Q.   Did you work for TG before

 9  2009, Mr. Peng?

10          A.   I did not work for TG before

11  that.

12          Q.   Who did you work for before

13  that?

14          A.   Before that, I worked for

15  TTP.

16          Q.   Is it true you started

17  working for TTP when that company was

18  created in February 2006?

19          A.   Yes, absolutely correct.

20          Q.   Tell me the job positions

21  you held with TTP between April 2006 and

22  April 2009.

23               MR. CYR:  That would be

24          February 2006.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. MEUNIER:  I'm sorry,

 2         February 2006 and April 2009.

 3              THE WITNESS:  My position in

 4         TTP while I worked there were

 5         Chairman of the Board of Directors

 6         and general manager.

 7    BY MR. MEUNIER:

 8         Q.    In that position, were you

 9    in charge of the daily operations of TTP?

10         A.    In that position, I was in

11    charge of the daily operation of TTP.

12         Q.    TTP was owned 100 percent by

13    TG; is that correct?

14         A.    Can you repeat that?

15         Q.    TTP was owned 100 percent by

16    TG; is that correct?

17         A.    TG is the only shareholder

18    of TTP.

19         Q.    When you were the manager of

20    TTP, did you report to any of the

21    executives of TG?

22         A.    As the manager of TTP, I

23    worked independently.  I did not report

24    to the executives of TG.
```

Confidential - Subject to Further Confidentiality Review

```
1          Q.    Who reported to you as boss

2    during the time you were manager of TTP?

3          A.    TTP's production manager and

4    other relevant department managers in TTP

5    reported to me.

6          Q.    Please give me their names

7    and job positions.

8          A.    Song Qinghai, Mr. Song

9    Qinghai, last name, S-U-N-G, first name,

10   Q-I-N-G-H-A-I.

11              MR. CHEN:  Pardon me, just

12         for clarification, the Pinyin is

13         S-O-N-G, not S-U.

14   BY MR. MEUNIER:

15         Q.    Was he the production

16   manager at TTP?

17         A.    Correct.  He was the

18   production manager of TTP.

19         Q.    Who were the other relevant

20   employees who reported to you at TTP?

21         A.    Mr. Peng Wenlong at sales

22   department.

23         Q.    Was he in charge of the

24   sales department at TTP?
```

```
 1            A.     He was in charge of the

 2    sales department in TTP.

 3            Q.     Who else reported to you?

 4            A.     Zhang Min in financial

 5    department.  Last name, Z-H-A-N-G, first

 6    name, M-I-N.

 7            Q.     Who worked under Mr. Peng

 8    Wenlong in the sales department of TTP?

 9            A.     There were about seven or

10    eight employees under him and worked for

11    him.

12            Q.     Can you give me the names of

13    those you remember?

14            A.     Mr. Che Gang, Mr. Yang

15    Jiapo.  I can't remember the rest of the

16    names.

17            Q.     Are you a member of the

18    board of directors of TG?

19            A.     I am a member of TG's board

20    of directors.

21            Q.     For how long have you been a

22    member?

23            A.     Since its establishment in

24    February 2006 until today.
```

```
 1            Q.     I was asking about you being
 2     a member of the board of directors of TG
 3     not TTP?
 4            A.     I am not a member of the
 5     board of directors in TG.
 6            Q.     Have you ever been a member
 7     of the board of directors of either
 8     Shandong Taihe Dongxin or Taishan Gypsum?
 9            A.     Neither.
10            Q.     Who did you work for before
11     TTP was created in February 2006?
12            A.     Before the establishment of
13     TTP in the year 2006, I worked at a
14     workshop in -- manufacturer workshop in
15     TG.
16            Q.     Were you employed by TG when
17     the name of the company was Shandong
18     Taihe Dongxin?
19            A.     Can you repeat the question?
20            Q.     Were you employed by a
21     company named Shandong Taihe Dongxin?
22            A.     Yes, correct.
23            Q.     When did you start working
24     for that company?
```

1          A.     In 1991.

2          Q.     Did you continue to work for

3     that company after it changed its name to

4     Taishan Gypsum?

5          A.     Can you repeat it?

6          Q.     When did Shandong Taihe

7     Dongxin change its name to Taishan

8     Gypsum?

9          A.     I don't recall that.

10          Q.     Did you work for Shandong

11     Taihe Dongxin until February 2006?

12          A.     Yes.

13          Q.     And then after TTP --

14                 After you left TTP in April

15     of 2009, you went back to work for the

16     company which at that time was called

17     Taishan Gypsum; is that true?

18          A.     Correct.  At the time, it

19     was already Taishan Gypsum Company.

20          Q.     Tell me all the positions

21     you held at Shandong Taihe Dongxin

22     between 1991 and February 2006?

23          A.     I did not have a position in

24     TG.

Confidential - Subject to Further Confidentiality Review

```
1          Q.    No.  I was asking about

2    Shandong Taihe Dongxin.  When you --

3    shall I ask it again?

4          A.    I was only an ordinary

5    employee at TG.

6          Q.    What job positions did you

7    have at Shandong Taihe Dongxin from 1991,

8    when you started, until February of 2006,

9    when you went to work for TTP?

10          A.    I was only a director of one

11    of TG's production manufacturer workshop.

12          Q.    Were you the director of

13    that production workshop from 1991 until

14    February 2006?

15          A.    Yes.

16          Q.    Which production facility

17    did you direct?

18          A.    It is just one of TG's

19    gypsum board workshop.

20              MR. MEUNIER:  Madam

21          Interpreter, I'm not clear about

22          the meaning of the word

23          "workshop."  Maybe you can help.

24              THE COURT:  Well, ask the
```

```
 1              witness.
 2    BY MR. MEUNIER:
 3              Q.    Is a workshop a
 4    manufacturing facility?
 5              A.    Workshop is a manufacturer
 6    facility.
 7              Q.    Did you direct the same
 8    manufacturing facility from 1991 until
 9    February 2006?
10              A.    Yes, I directed that one
11    workshop.
12              Q.    Please give me the location
13    of that facility.
14              A.    It's located in Dawenkou
15    Town, Taian.
16              Q.    What product or products
17    does the facility manufacture?
18              A.    Those workshops produce and
19    only produce paper-faced gypsum board.
20              Q.    Who reported to you as boss
21    when you directed that facility from 1991
22    to February 2006?
23              A.    The deputy director of the
24    workshop reported to me.
```

```
 1            Q.    Who was the deputy director?

 2            A.    The deputy director was Hou

 3     Yanyun, last name, H-O-U, first name,

 4     Y-A-N-Y-U-N.

 5            Q.    Who did you report to as

 6     your boss when you were the director of

 7     that facility?

 8            A.    I reported to, at the time I

 9     reported to Mr. Duan Zhentao, D-U-A-N,

10     first name, Z-H-E-N-T-A-O.

11            Q.    What was his position?

12            A.    Production manager.

13            Q.    Who were the sales employees

14     involved in the sale of gypsum board

15     manufactured at that facility between

16     1991 and February 2006?

17            A.    I was only in charge of the

18     production in the workshop.  I'm not sure

19     about the detailed sales employees.

20            Q.    Who was in charge of the

21     sales employees for the gypsum board

22     manufactured by that facility when you

23     were the director?

24            A.    Like I said, I was only in
```

Confidential - Subject to Further Confidentiality Review

1   charge of the production of the workshop.

2   I'm not sure who was in charge of the

3   sales.

4           Q.    You don't know who

5   supervised the sales personnel for the

6   gypsum board made at that facility when

7   you were the director?

8           A.    I was not in charge of the

9   sales.  I was only in charge of the

10  production of the workshop.

11          Q.    I understand you were not in

12  charge.  My question is, do you know who

13  was in charge of the sales personnel?

14          A.    TG was in charge of the

15  sales.

16          Q.    Who at TG?

17          A.    I had minimal contact with

18  the sales part.  As of now, I really

19  can't remember who was the person in

20  charge of sales.

21          Q.    How often did the board of

22  directors of TTP meet when you were chair

23  of the board from February 2006 to April

24  2009?

Confidential - Subject to Further Confidentiality Review

1          A.     The board of directors

2     meeting in TTP was held irregularly,

3     usually once a year.

4          Q.     Were reports made at the

5     board of directors meetings concerning

6     the marketing or sale of gypsum board?

7          A.     Sometimes at a board of

8     directors meeting, these words were

9     discussed.

10         Q.     Who made the report at the

11    board of directors meetings on marketing

12    and sales at TTP?

13         A.     Can you repeat the question?

14         Q.     Who made the report on

15    drywall marketing and sales at the board

16    of directors meetings for TTP?

17         A.     Usually I would make the

18    report for the board of directors.

19         Q.     How did you gather

20    information on the marketing and sale of

21    gypsum board in order to make that

22    report?

23         A.     The report was only a simple

24    summary of our productions and sales.

1       Q.      How did you get the summary

2   on sales?

3       A.      I requested the balancing

4   between the production and sales lower

5   the product payments risk to provide good

6   service for the customers.

7       Q.      How did you learn the total

8   volume of drywall sales as director of

9   TTP?

10      A.      TTP's financial department

11  would have the statistics.

12      Q.      Were the reports on the

13  volume of drywall sales from the

14  financial department made in writing?

15      A.      It was in written form.

16      Q.      What was the name of the

17  written form?

18      A.      It was only a very simple

19  production and sales statistic report.

20      Q.      Is that the name of the

21  report, sales and statistic report?

22      A.      There wasn't a detailed name

23  for that report.  It's only reflected as

24  a form of form.

Confidential - Subject to Further Confidentiality Review

1        Q.    Did the report contain

2   information on foreign sales?

3              MR. CYR:  Objection.

4              THE COURT:  Can you ask him

5        for the time frame.

6   BY MR. MEUNIER:

7        Q.    During the time these

8   reports were made between February 2006

9   and April 2009 at TTP, did the reports

10  contain information on sales to foreign

11  customers?

12       A.    Like I just said, it was

13  only a very simple statistic form.

14  Because our company, TTP, did not do

15  direct exporting, therefore, the form was

16  not reflected on that.

17       Q.    What do you mean "The

18  company did not do direct exporting," Mr.

19  Peng?

20       A.    Hasn't Mr. Attorney asked me

21  the question regarding exporting to other

22  countries?

23       Q.    Did TTP sell drywall to

24  foreign customers?

```
 1              INTERPRETER:  Interpreter
 2         clarification.
 3              THE WITNESS:  To sell the
 4         drywall to who?
 5    BY MR. MEUNIER:
 6         Q.    Did the purchasers of TTP
 7    drywall between February 2006 and April
 8    2009 include businesses outside of China?
 9         A.    All the paper-faced drywall
10    that TTP produced had transactions within
11    China.
12         Q.    Is it your testimony that no
13    foreign customers purchased drywall
14    manufactured by TTP between February 2006
15    and April 2009?
16         A.    Like I said, all the
17    transactions regarding our products were
18    within China.
19         Q.    Do you deny that Peng
20    Wenlong, Che Gang and Yang Jiapo all
21    dealt and did business with foreign
22    customers when they were sales personnel
23    of TTP?
24         A.    You said deny?
```

```
 1              Q.    Is it true that the sales

 2    personnel, Peng Wenlong, Che Gang and

 3    Yang Jiapo, did business with foreign

 4    customers when they were sales employees

 5    of TTP?

 6              A.    I would like to repeat.

 7    Number one, all our transactions were

 8    within China.  Number two, some of our

 9    sales employees did sign some contracts

10    with the trading companies in China.

11                   MR. MEUNIER:  Your Honor, I

12              would like to move on, but I don't

13              think I'm getting a response to

14              the question.  I'll try one more

15              time.

16                   MR. CYR:  I agree, Counsel.

17    BY MR. MEUNIER:

18              Q.    Did Peng Wenlong, Che Gang

19    and Yang Jiapo, as sales employees of

20    TTP, between February 2006 and April

21    2009, do business with foreign purchasers

22    of drywall, by that I mean, purchasers

23    who were not in China?

24              A.    I don't have an impression
```

```
 1   of that.

 2             May I use the restroom?

 3             THE COURT:  Yes.

 4             THE VIDEOTAPE TECHNICIAN:

 5        Going off the record.  The time is

 6        9:20.

 7             THE COURT:  Let's take a

 8        10-minute break at this time.

 9                  -   -   -

10             (Whereupon, a recess was

11        taken from 9:20 a.m. until 9:34

12        a.m.)

13                  -   -   -

14             THE VIDEOTAPE TECHNICIAN:

15        Going back on the record,

16        beginning of Tape Number 2.  The

17        time is 9:34.

18   BY MR. MEUNIER:

19        Q.    Mr. Peng, what documents did

20   you review in order to prepare for this

21   deposition?

22        A.    In order to prepare for

23   today's deposition, I have, together with

24   my attorney, reviewed relevant
```

1    information about TTP.

2         Q.    What relevant information

3    did you review?

4         A.    Most of the information are

5    about the article of incorporation of TTP

6    and the resolution of the meeting of

7    board of directors.

8         Q.    What did the resolution deal

9    with?

10        A.    One is at the establishment

11   of TTP, the purchasing of TTP from TG of

12   the two production lines.  And another

13   resolution was about TTP decided to sell

14   the two production lines to TG.

15        Q.    Does that refer to the sale

16   of TTP assets to TG when TTP stopped

17   doing business in April 2009?

18        A.    Correct.

19        Q.    What other documents, if

20   any, did you review?

21        A.    That's all I can name for

22   now.

23        Q.    How many meetings have you

24   had with your attorney in order to

1    prepare for this deposition?

2         A.    I didn't really pay

3    attention, so, I can't really tell.

4         Q.    What do you mean you didn't

5    pay attention?

6         A.    I didn't really pay

7    attention how many times we met.

8              INTERPRETER:  Correction.

9              THE WITNESS:  I met with my

10             attorney.

11             MR. CHEN:  I'm sorry.  I

12             don't think the word "cuee" is

13             being translated.

14             MR. DAVIS:  Excuse me, Your

15             Honor.  We have a translator.

16             THE COURT: That's all right.

17             But do you understand?

18             MR. CHEN:  This is just a

19             recommendation for the interpreter

20             to accept or reject.

21             THE COURT:  Go ahead.

22             What's the problem?

23             MR. CHEN:  I think he's

24             saying I didn't specifically pay

Confidential - Subject to Further Confidentiality Review

```
 1          attention to that matter, and

 2          that's just my suggestion to you

 3          whether to accept it.

 4               THE COURT:  Let's get a

 5          clarification.  What do you mean?

 6          Ask him the question again, what

 7          do you mean by that.

 8     BY MR. MEUNIER:

 9          Q.    When you said you didn't pay

10     attention, what do you mean by that?

11          A.    Which is that I did not

12     remember how many times I met with my

13     attorney.

14          Q.    Did you meet with anyone

15     else besides your attorney in order to

16     prepare for this deposition?

17          A.    Beside my attorney, I've

18     also met with Mr. Jia Tongchun and Mr.

19     Peng Wenlong.  Jia Tongchun spelling is

20     J-I-A, first name, T-O-N-G-C-H-U-N.

21          Q.    Were any attorneys present

22     when you met with Mr. Jia and Mr. Peng

23     Wenlong?

24          A.    No.
```

1          Q.    What did you discuss with

2    them?  First Mr. Jia, tell me everything

3    you remember discussing with Mr. Jia.

4          A.    It's hard for me to remember

5    and to say what exactly we have said at

6    the time.  I don't remember clearly.

7          Q.    When did you meet with Mr.

8    Jia?

9          A.    I'm not sure about the time.

10         Q.    Was it yesterday?

11         A.    Not yesterday.

12         Q.    Was it within the last week?

13         A.    We came together.  Of course

14   we met within the week.

15         Q.    Did Mr. Jia talk to you

16   about this case?

17         A.    In this process, we did not

18   talk about the case.

19         Q.    Did he give you advice how

20   to answer questions today?

21         A.    Like I said, in this

22   process, we did not talk about this

23   issue, so, we did not communicate about

24   this.

Confidential - Subject to Further Confidentiality Review

```
 1            Q.    You told me you met with him

 2    to get ready for the deposition.  What

 3    did you mean by that?

 4            A.    We came together by car.  If

 5    I had come by myself, I wouldn't be

 6    familiar with the route and the agenda.

 7    It would be safer that way.

 8                  THE COURT:  Let me interrupt

 9            and say something.

10                  Sir, I am the Judge who will

11            decide the issues in this case.

12            One thing I do when I make that

13            decision, I listen to the

14            testimony and I evaluate the

15            credibility of the truthfulness of

16            the witnesses.  I listen closely

17            to what people say, and it's

18            important for you to listen to the

19            question and to answer the

20            question, if you can.  Do you

21            understand that?

22                  THE WITNESS:  I understand.

23                  THE COURT:  Because if I get

24            the impression that you are not
```

Confidential - Subject to Further Confidentiality Review

```
 1          answering the question

 2          intentionally, I will discount

 3          your testimony and not believe it.

 4               Do you understand that?

 5               THE WITNESS:  I understand.

 6               THE COURT:  Now let's

 7          continue with the deposition, and

 8          keep that in mind, please.

 9     BY MR. MEUNIER:

10          Q.    Mr. Peng, when you met with

11     Mr. Jia to get ready for this deposition,

12     what did you and Mr. Jia discuss?

13               MR. CYR:  Objection, asked

14          and answered.

15               THE COURT:  The reason that

16          I'm going to allow it is because I

17          think it was asked, but I'm not

18          sure it was answered.  So I'll

19          overrule the objection.

20               THE WITNESS:  Can you repeat

21          your question?

22     BY MR. MEUNIER:

23          Q.    When you met with Mr. Jia to

24     get ready for this deposition, what did
```

Confidential - Subject to Further Confidentiality Review

1    you and Mr. Jia talk about?

2         A.    Mr. Jia and I checked on

3    some information of TTP.

4         Q.    What information?

5         A.    Like I just mentioned, such

6    as TTP's Article of Incorporation and

7    resolution of the board of directors

8    meeting.

9         Q.    Anything else besides that?

10        A.    Nothing else.

11        Q.    You did not talk about sales

12   to foreign customers?

13        A.    We did not talk about the

14   sales.  We did not sell to foreign

15   customers.  Our transaction has always

16   been within China, so, we cannot talk

17   about that.

18        Q.    Did Mr. Jia advise you to

19   say that today?

20        A.    No, no.

21        Q.    When you and Mr. Peng

22   Wenlong met in order for you to prepare

23   for this deposition, what did you and he

24   discuss?

 1          A.      We talked about, as I said,

 2    the Article of Incorporation and the

 3    resolution of TG.  We also talked about

 4    the aspects of sales.

 5          Q.      Explain what you mean by

 6    that, "aspects of sales."

 7          A.      Because Mr. Peng Wenlong was

 8    in charge of the sales in TTP.

 9    Therefore, I asked him for information

10    regarding TTP's sales.

11          Q.      What information did you ask

12    him for, and what information did he give

13    you?

14          A.      He told me how the sales of

15    our gypsum board went about.

16          Q.      What exactly did he tell

17    you?

18          A.      Him and I only simply tried

19    to remember the sales work at TTP and how

20    we dealt with customers.

21          Q.      And what did you and he

22    remember about that?

23          A.      One is how much have we

24    produced and how much have we sold.

```
 1          Q.    And how much was produced
 2   and sold?
 3          A.    From the establishment of
 4   the company in 2006 until we stopped
 5   doing business, we had all together
 6   produced over 60 million square meter of
 7   the product.
 8          Q.    And how much was sold?
 9          A.    We've sold them all.
10   There's a balance between production and
11   sales.
12          Q.    How much was sold to
13   customers outside of China?
14                MR. CYR:  Objection.
15                THE COURT:  Ask him first
16          whether or not any was.
17   BY MR. MEUNIER:
18          Q.    Were any of the 60 square
19   meters -- I'm sorry -- 6 --
20                INTERPRETER:  Million.
21   BY MR. MEUNIER:
22          Q.    -- 6 million square meters
23   sold to customers outside of China?
24          A.    All the transactions of our
```

Confidential - Subject to Further Confidentiality Review

1    productions were taking place in China.

2    Perhaps some trading companies sold them

3    to outside of China.

4           Q.    How many of the purchasers

5    were outside of China?

6           A.    I was not in charge of the

7    detailed sales work, and it has been too

8    long.  I could not say exactly how much.

9           Q.    What is your best estimate

10   of how much?

11          A.    I could not give such an

12   estimation because all our products were

13   delivered in China.  As of how much had

14   the trading companies sold to us out of

15   China, I could not possibly know.

16          Q.    Why did TTP sales personnel

17   provide price and shipping cost

18   information for TTP gypsum board to

19   customers in the United States?

20          A.    I was not in charge of the

21   specific sales work.  For that question,

22   you should ask Mr. Peng Wenlong.

23          Q.    Do you believe sales

24   personnel for TTP provided price and

1    shipping cost information for gypsum

2    board to customers in the United States?

3         A.    I don't know about that.

4         Q.    Did they do that?

5         A.    Like I said, I really don't

6    know.

7         Q.    Did they have authority to

8    do that?

9         A.    They will decide themselves

10   how will they sell, in what way did they

11   make the sales.

12        Q.    Did they have authority to

13   provide this information even for a

14   specific construction project located in

15   the United States of America?

16        A.    Because TTP had established

17   for a short period of time, I don't think

18   in that respect they had much experience

19   to do such job.

20        Q.    Did they have the authority

21   to do this?

22        A.    Whether they could do it or

23   not, I'm not sure.

24               MR. MEUNIER:  Let me show

Confidential - Subject to Further Confidentiality Review

```
 1          you documents that have been

 2          marked TG 19798 through 19800, and

 3          I'll mark that as Peng Exhibit 1.

 4                    -  -  -

 5               (Whereupon, Deposition

 6          Exhibit Peng S.-1, E-mail chain,

 7          top e-mail in English dated August

 8          03, 2006, Bates stamped TG 0019798

 9          through TG 0019800, was marked for

10          identification.)

11                    -  -  -

12   BY MR. MEUNIER:

13          Q.    Mr. Peng, at the bottom of

14   Page 19798, continuing to the top of

15   19799, is an e-mail of August 1, 2006

16   from Josephine Wang to Yang Jiapo in

17   which Josephine Wang tells Mr. Yang she

18   is interested in learning more about his

19   product and doing business with him and

20   advises him that her company is currently

21   building in Philadelphia a project called

22   South Bridge.  She then asks Mr. Yang to

23   forward information about how he sells

24   abroad.
```

```
 1                  Please listen as the

 2      translator reads the reply from Mr. Yang

 3      to Ms. Wang by e-mail dated August 3rd,

 4      2006 at 3:11 a.m.  It is in the middle of

 5      Page 19798.

 6                  MR. MEUNIER:  (Addressing

 7      the interpreter.)  Would you please read

 8      it in English for us?

 9                  INTERPRETER:  I'm sorry.

10           You mean the one in the middle?

11                  MR. MEUNIER:  Yes.

12                  INTERPRETER:  Ms. Wang,

13           hello.  I'm glad to have received

14           your e-mail and now I'm sending

15           you all the information.  Please

16           take a look.  Normal gypsum board

17           4 by 12 by half, FOB Qingdao USD

18           4.15/PCS 660 PCS/40 FCL 26.5

19           tons/40 FCL.

20                  A new line.  4 by 8 by 1 and

21           a half -- I'm sorry.  Let me try

22           again.

23                  4 by 8 by half USD

24           2.77/PCS 960 PCS/40 FCL.
```

Confidential - Subject to Further Confidentiality Review

```
 1              Skip a line.  A new line.  4
 2        by 12 by half FOB LIANYUNGANG USD
 3        4.2/PCS 76 PCS/tray.
 4              A new line.  4 by 8 by
 5        half USD 2.8/PCS 76 PCS/tray.
 6              A new line.  Our company is
 7        the biggest gypsum board
 8        production facility.  Please take
 9        heart for the product quality and
10        volume.
11              Skip line.  Best wishes!
12              Skip three or four lines.
13        Yang Jiapo, 2006.8.2.
14   BY MR. MEUNIER:
15        Q.    Did Mr. Yang in this e-mail
16   provide to this person accurate and
17   truthful information concerning TTP
18   prices and shipping information?
19        A.    The detailed sales employees
20   would be in charge of the detailed
21   handling of specific sales in the process
22   of sales.  As Chairman of the Board of
23   Directors and general manager of the
24   company, I did not participate in that.
```

Confidential - Subject to Further Confidentiality Review

1    Therefore, I have never seen this -- the

2    content of this document.

3         Q.    Mr. Peng, as long as TTP got

4    paid, was it okay with you as director

5    that the company sold its gypsum board to

6    be used in a construction project in

7    Philadelphia, Pennsylvania?

8         A.    The sales principle of our

9    company is to ensure production and sales

10   balancing and also to decrease the risk

11   that comes with the payment.  Therefore,

12   it doesn't matter who we sell the

13   products to, the collection of payment

14   has to be ensured.

15        Q.    Is it true that export

16   sales, when you were an employee of

17   Shandong, increased in the second half of

18   2005?

19        A.    Can you repeat it?

20        Q.    Is it true that export

21   sales, when you were employed at

22   Shandong, increased in the second half of

23   2005?

24        A.    Shandong?

Confidential - Subject to Further Confidentiality Review

1        Q.      Yes.

2        A.      Employee of Shandong?

3        Q.      No, sir.  I'm referring to

4    when you worked for Shandong in the

5    second half of 2005.

6                Shandong Taihe Dongxin, when

7    you worked for that company in the second

8    half of 2005, is it true that export

9    sales of gypsum board increased?

10       A.      Like I said, in the year

11   2005, I was only a director of a

12   production workshop in TG.  I was not in

13   charge of the sales work.  Therefore, I

14   would not specifically collect

15   informations about this.  Therefore, I do

16   not know whether the exporting sales

17   increased.

18       Q.      Before they went to work for

19   TTP, Peng Wenlong, Che Gang and Yang

20   Jiapo were all sales employees of

21   Shandong Taihe Dongxin, true?

22       A.      That's true.  They were all

23   salespeople in TG.

24       Q.      In the second half of 2005,

1    as sales employees of Shandong Taihe

2    Dongxin, is it true they provided price

3    and shipping costs information to

4    customers in the United States of

5    America?

6         A.    I insist on my prior

7    statement.  I was only a director of a

8    production workshop.  I was not aware of

9    the detailed sales work.

10        Q.    Let me show you an example

11   of what I mean.

12             MR. MEUNIER:  I show you a

13             document which is Bates numbered

14             TG 19840 and 19841, and I will

15             mark that as Peng Number 2.

16                     -  -  -

17             (Whereupon, Deposition

18             Exhibit Peng S.-2, E-mail chain,

19             top one dated 12/12/2005, Bates

20             stamped TG 0019840 and TG 0019841,

21             was marked for identification.)

22                     -  -  -

23   BY MR. MEUNIER:

24        Q.    Mr. Peng, at the bottom of

1  19840, continuing to the top of 19841, is

2  an e-mail of December 12, 2005 to Mr.

3  Yang Jiapo from Leon Liu, L-I-U, in which

4  Mr. Liu asked for pricing information on

5  32,000 boards for delivery in the Port of

6  New York/New Jersey and pricing

7  information on an additional 32,000

8  boards for delivery to the Port of

9  Savannah, Georgia.  In his e-mail to Mr.

10  Liu of December 11, 2005, which is in the

11  middle of 19840, please read Mr. Yang's

12  response.  And I'll ask the interpreter

13  to please read it in English for the

14  record.

15          INTERPRETER:  Here

16      (indicating)?

17          THE WITNESS:  (Reading in

18      Chinese.)

19          Mr. Liu, hello.  Regarding

20      to the port pricing, in this

21      e-mail, we have not received the

22      pricing of the port.  We can only

23      give you a pricing -- FOB pricing

24      for the customer's reference.

Confidential - Subject to Further Confidentiality Review

```
 1              A new line.  4 by 12 by half
 2         ordinary gypsum board: FOB USD
 3         3.68/PCS.
 4              A new line.  Response can be
 5         provided for other requirements as
 6         well.
 7              A new line.  For the matter
 8         of samples, our company currently
 9         has a rule that our company will
10         not bear any cost for samples over
11         200 RMB because right now there
12         are too many American customers
13         that ask for samples, we do not
14         want to get a special approval.
15         We apologize.  I'm sorry.
16              A new line.  Thank you.
17              A new line.  Jiapo.
18              A new line.  2005.12.12.
19    BY MR. MEUNIER:
20         Q.    Mr. Peng, as the director of
21    Shandong Taihe Dongxin gypsum board
22    manufacturing facility in December of
23    2005, was it okay with you if the drywall
24    produced there was sold for delivery to
```

```
 1    ports in the United States of America as

 2    long as the company got paid?

 3         A.    I insist on my prior

 4    statement that I was only a director of

 5    the production workshop.  As of the

 6    requirements for the salespeople, I

 7    really did not know.  I'm very sorry.

 8         Q.    Let me show you one other

 9    example, and then we'll move to a

10    different subject.  This is a document

11    Bates numbered TG 19813 and 19814 which I

12    will mark as Peng Number 3.

13                   -  -  -

14              (Whereupon, Deposition

15         Exhibit Peng S.-3, E-mail chain,

16         top one dated 10/15/2005, Bates

17         stamped TG 0019813 and TG 0019814,

18         was marked for identification.)

19                   -  -  -

20    BY MR. MEUNIER:

21         Q.    Mr. Peng, in this document,

22    there is an e-mail at the bottom of 19813

23    addressed to Mr. Yang Jiapo from Wenny

24    Yin, Y-I-N, dated October 15, 2005.  And
```

```
 1    in this e-mail, Ms. Yin requests

 2    information on certain pieces of gypsum

 3    board to be sent to the Port of

 4    Jacksonville, Florida, 100,000 pieces,

 5    and an additional 100,000 pieces to the

 6    Port of New Orleans, Louisiana.  Will you

 7    please read quietly to yourself Mr.

 8    Yang's e-mail reply of October 15, 2005

 9    at the top of 19813, and I will ask the

10    court reporter to read it in English for

11    the record.

12              THE COURT:  You mean the

13         interpreter?

14              MR. MEUNIER:  I'm sorry, the

15         interpreter.

16              THE WITNESS:  You mean

17         quietly reading it, meaning do not

18         read it out loud?

19              MR. MEUNIER:  Correct.  But

20         I would ask the interpreter to

21         please read it out loud in English

22         for the record.

23              INTERPRETER:  Dear Wenny

24         Yin, hello.  I have been following
```

```
 1          up on the cargo ship for

 2          individual cargos, and I have not

 3          received a response.  Finally, I

 4          have received information

 5          regarding the ship, therefore, I

 6          will give you the price.  Please

 7          take a look.  Ordinary gypsum

 8          board 3660 by 1220 by 12.7

 9          mm CNFNEW ORLEANS PORT USD

10          7.22/PCS.

11                A new line.  Package, gypsum

12          board tray, 60 pieces/tray,

13          plastic inner membrane untie

14          humidity.

15                INTERPRETER:  Interpreter

16          needs clarification.

17                (Discussion of interpreter

18          and Mr. Chen in Chinese.)

19                MR. CHEN:  I think either is

20          fine.

21                INTERPRETER:  Waterproof

22          exterior gypsum board protection,

23          horizontal and vertical steel

24          belts packaging.
```

```
 1              A new line.  Term of
 2         payment, LC, instant payment, L/C.
 3              A new line.  In addition,
 4         there is no ship to Jacksonville
 5         port.
 6              Skip a few lines.  Thank
 7         you.  Please reply if you have any
 8         questions.
 9              Skip a few lines.  Jiapo.
10              A new line.  2005.10.15.
11  BY MR. MEUNIER:
12         Q.    Mr. Peng, when Mr. Yang and
13  other employees became sales personnel
14  for TTP, did they provide this same type
15  of detailed information about cargo and
16  shipping to the United States when they
17  dealt with customers?
18         A.    Salespeople were in charge
19  of detailed sales process in respect to
20  different circumstances.  Therefore, I
21  don't know whether they would do that or
22  not.
23         Q.    So, as the manager of TTP,
24  you left that up to the sales personnel?
```

Confidential - Subject to Further Confidentiality Review

1    Is that true?

2           A.    Correct.

3           Q.    One more question, Mr. Peng,

4    about this e-mail.  You'll notice that

5    information is requested on October 15,

6    2005 for 100,000 pieces of gypsum board

7    to go to the New Orleans port.  Were you

8    aware that only six weeks before that, a

9    major storm had destroyed property in the

10   New Orleans area, creating a great need

11   for rebuilding?

12          A.    Orleans, you mean Orleans?

13   Is that how should I put it?

14          Q.    New Orleans is good.

15          A.    New Orleans.  I have read

16   the news about the storm in New Orleans.

17   What was your question again?

18          Q.    Were you aware that this

19   storm in New Orleans, which was six weeks

20   before the e-mail we just read, created a

21   need for significant rebuilding in the

22   New Orleans area?

23          A.    Like I said, I have read the

24   news about the old New Orleans storm from

```
 1    media, and I know about it, but I don't

 2    know how they rebuilt the houses.

 3              MR. MEUNIER:  Your Honor, I

 4         have about an hour left, but this

 5         might be a good breaking point for

 6         me.

 7              THE COURT:  All right.

 8         Let's take a 15-minute break at

 9         this time.

10              THE VIDEOTAPE TECHNICIAN:

11         Going off the record.  This is the

12         end of Tape Number 2.  The time is

13         10:33.

14                   -  -  -

15              (Whereupon, a recess was

16         taken from 10:33 a.m. until 10:50

17         a.m.)

18                   -  -  -

19              THE COURT:  Sir, you are

20         still under oath.

21              THE VIDEOTAPE TECHNICIAN:

22         Going back on the video record,

23         the time is 10:50.  This is the

24         beginning of Tape Number 3.
```

```
 1    BY MR. MEUNIER:

 2          Q.    Mr. Peng, when you were

 3    manager of TTP, did you prepare a general

 4    manager's annual report of the company's

 5    work?

 6          A.    Our TTP's annual report has

 7    always been issued by our accounting

 8    firm.

 9          Q.    Did you approve and sign the

10    annual report?

11          A.    The annual report was

12    completed by the third party independent

13    accounting firm.

14          Q.    Let me refer you to exhibits

15    Jia 26 and 27, Defendant Jia Exhibits 26

16    and 27, which are the general manager

17    reports of TG for the years 2006 and

18    2007.  Have you seen those documents

19    before?

20          A.    I've heard in the general

21    manager's meeting for annual report, but

22    let me take a look.

23                (Reviewing documents.)

24                I have not seen these two
```

Confidential - Subject to Further Confidentiality Review

1    reports.  I have not.

2         Q.    Did TTP prepare annual

3    reports that were similar to those

4    reports?

5         A.    TTP have not prepared

6    reports that are similar to these.

7         Q.    You said you have not seen

8    those reports, but that you heard reports

9    at certain meetings.  Is that correct?

10         A.    I can't recall now.  I'm

11    very sorry.

12         Q.    Well, what meetings were you

13    talking about?

14         A.    These two reports, I do not

15    remember that I have seen these two

16    reports.

17         Q.    Do I understand, Mr. Peng,

18    that you have never been a member of the

19    board of directors of either Shandong

20    Taihe Dongxin or Taishan Gypsum?

21         A.    Correct.  I'm not a member

22    of TG's board of directors.

23         Q.    And you never have been?

24         A.    I have never been a member

Confidential - Subject to Further Confidentiality Review

1   of TG's board of directors.

2           Q.    And you have never been a

3   member of the board of directors of

4   Shandong Taihe Dongxin?

5           A.    No, I have not been a member

6   of the board of directors of Shandong

7   Taihe Dongxin.

8           Q.    Is it true that TTP was

9   created for reasons related to value

10  added taxes?

11          A.    The purpose of TTP's

12  establishment was to be able to provide

13  value added tax invoices to the customers

14  who had such requests.

15          Q.    Was there any difference in

16  the nature of the drywall business

17  conducted by TG and TTP?

18                MR. CYR:  Objection, vague.

19                MR. MEUNIER:  I wanted to be

20          general, but...

21                THE COURT:  I think that's a

22          valid objection.  I sustain it.

23  BY MR. MEUNIER:

24          Q.    Can you tell us if there are

1    any differences, Mr. Peng, between the

2    drywall manufacturing process used by TG

3    or Shandong and the process used by TTP?

4          A.    The manufacturing process

5    for manufacturing paper-faced drywall are

6    pretty much the same.

7          Q.    And TG, even when it was

8    called Shandong Taihe Dongxin,

9    manufactured certain brand names of

10   drywall such as Five Star and Dun; is

11   that true?

12         A.    I don't recall clearly as of

13   what brand of product the TG manufactured

14   at the time.

15         Q.    Did TG and TTP manufacture

16   drywall under the same brand names?

17         A.    TG authorized TTP to use the

18   brand Taishan and Taishan Wang.

19         Q.    Did TTP manufacture under

20   the brand names Five Star and Dun?

21         A.    We did not produce these two

22   brand's products.  The authorized

23   products -- the authorized brands were

24   Taishan and Taishan Wang, and also we

Confidential - Subject to Further Confidentiality Review

```
 1    manufactured according to the

 2    requirements of the customers.

 3          Q.    Do you know of any

 4    differences between TG and TTP in how

 5    they marketed and sold their drywall?

 6          A.    Well, I have not analyzed

 7    the differences between the two.  The

 8    sales principle of TTP were to keep the

 9    balance between production and sales, to

10    lower the risk of payment collection, to

11    make sure to provide good services for

12    our customers.

13                INTERPRETER:  Interpreter

14          clarification.

15                THE WITNESS:  To have a

16          better control of the pricing.

17    BY MR. MEUNIER:

18          Q.    And those are the same

19    principles that applied to Shandong Taihe

20    Dongxin and TG, true?

21          A.    These are the principles

22    applied to TTP.  As of TG's sales

23    principles, they must have had their own.

24    I'm not sure whether the principles are
```

1    the same as TTP's.

2         Q.    As far as you know, when

3    sales employees of Shandong Taihe Dongxin

4    became sales employees of TTP, were they

5    given any new or different rules or

6    guidelines for how they conducted sales?

7         A.    I don't understand your

8    question.

9         Q.    As far as you know, were the

10   sales employees of TTP given any rules or

11   guidelines that were different from the

12   rules and guidelines they had as sales

13   employees of Shandong Taihe Dongxin?

14        A.    They would summarize on the

15   experiences in TG.  But as for TG's

16   special circumstances, they should base

17   their principles on TG's circumstances.

18        Q.    But as far as you know, the

19   rules they followed were the same, true?

20        A.    The same as to who?

21        Q.    Shandong Taihe Dongxin.

22             INTERPRETER:  Interpreter

23        clarification.

24             THE WITNESS:  TTP's sales

Confidential - Subject to Further Confidentiality Review

```
 1             employees only follow the rules

 2             and principles of sales of TTP's.

 3    BY MR. MEUNIER:

 4        Q.    Can you tell me how those

 5    rules and principles were different from

 6    the rules and principles for sales

 7    employees of Shandong Taihe Dongxin?

 8        A.    TTP had its own sales

 9    principle, while TG had its own

10    principle.  Whether the two principles

11    were the same, I'm not sure.

12        Q.    TTP stopped operating in

13    what year?

14        A.    TTP stopped operating in

15    January 2008.

16        Q.    Why?

17        A.    Through the two years

18    operation of TTP, the customers who

19    requested value added invoices were not

20    that much -- not that many.  However, TTP

21    had two paper-faced gypsum production

22    lines of 2 by 20 million.

23             According to the regulation

24    of our country, for those enterprises
```

Confidential - Subject to Further Confidentiality Review

1    that had reached the production volume of

2    20 million paper-faced gypsum board would

3    be able to enjoy half of the value added

4    tax benefit.  So TTP's board of directors

5    and its shareholders had decided to stop

6    the operation of TTP.  That's the reason

7    behind TTP's stop of operating.

8          Q.    But you remained an employee

9    of TTP until April of 2009?

10         A.    You mean TTP's employee or I

11   myself?

12         Q.    You told us earlier that you

13   worked for TTP until April 2009, true?

14         A.    Correct, yes.

15         Q.    If TTP stopped operations in

16   January of 2008, please explain what you

17   did as its employee between January 2008

18   and April 2009?

19         A.    Even though during this

20   period of time, TTP had stopped its

21   operation, but there were still some

22   relevant assets and accountings that

23   needed to be handled.

24         Q.    Did the company earn any

1   revenue or income between January 2008

2   and April 2009?

3       A.    There were a little bit of

4   profit in that period of time, which were

5   the gypsum board that were left and also

6   some raw materials that were left.

7       Q.    Who paid your salary between

8   January 2008 and April 2009?

9       A.    During that period of time,

10  I still got paid from TTP.

11      Q.    Were you paid the same

12  salary as before January 2008?

13      A.    I'm very sorry.  That's my

14  privacy.  Can I not answer that question?

15      Q.    I'm not asking you for the

16  dollar amount.  I'm just asking if the

17  salary stayed the same?

18              MR. CYR:  I think the Judge

19          wants to rule.

20              MR. MEUNIER:  I want to make

21          sure he understands that I don't

22          want his dollar amount.

23              THE COURT:  I don't want you

24          to say how much.  The question is

```
 1              whether it's the same.

 2                   THE WITNESS:  Not the same.

 3   BY MR. MEUNIER:

 4         Q.    How different?

 5                   THE COURT:  More or less?

 6                   THE WITNESS:  Because TTP

 7         had stopped its operations at the

 8         time, the salary that I received

 9         was less than when it was operated

10         normally.

11   BY MR. MEUNIER:

12         Q.    Is it true you have kept an

13   office at TTP?

14         A.    You mean right now?

15         Q.    As of April 6, 2011, is it

16   true you still kept an office at TTP?

17         A.    Right now, the people

18   left -- I'm sorry.

19              Right now, the people that

20   remained in TTP still is working there.

21         Q.    But you are no longer

22   employed by TTP; is that true?

23         A.    According to TTP's company

24   law, the election is to be held every
```

1    three years.  But there was no election

2    after three years, but I am still the

3    legal person of TTP.

4            Q.    You are today an employee of

5    Taishan Gypsum, true?

6            A.    Yes, I am right now an

7    employee of Taishan Gypsum.

8            Q.    And your entire salary is

9    paid by Taishan Gypsum, true?

10           A.    My current salary is paid by

11   the company located in Shanxi, Lucheng.

12           Q.    Which company is that, sir?

13           A.    That's a subsidiary of TG

14   located in Shandong, Liaocheng to produce

15   paper-faced gypsum board.

16           Q.    That is a different

17   subsidiary than TTP, true?

18           A.    Correct.  This is only a

19   branch company.

20           Q.    What is the name of that

21   company?

22           A.    Shanxi Lucheng Taishan

23   Gypsum.  Shanxi Lucheng Taishan Gypsum,

24   Lucheng branch office.

```
 1          Q.    But even though you are an
 2   employee of Taishan Gypsum and your
 3   salary is paid by a different subsidiary
 4   of Taishan Gypsum, it is true that you
 5   still keep an office at TTP?  Is that
 6   true?
 7          A.    Where is it?
 8          Q.    Do you still keep an office
 9   at a TTP location, sir?
10          A.    TTP has office.
11          Q.    And you still have an office
12   at that location, don't you?
13          A.    Which location?
14          Q.    At the location of TTP.  At
15   any location of TTP, is it true that you
16   have an office?
17          A.    I have my own office in TTP.
18          Q.    So, you have an office at
19   TTP, and you also have an office at the
20   Taishan Gypsum factory in Lucheng,
21   correct?
22          A.    Correct.
23          Q.    Tell me the percentages of
24   time you spend at those two offices.  How
```

Confidential - Subject to Further Confidentiality Review

1    much at one office versus the other?

2            A.    Because TTP had stopped its

3    production and business and it does not

4    have much business right now, and also

5    there were remaining personnels working

6    at TTP.  Therefore, my time is basically

7    being spent at the office in Shanxi,

8    Lucheng branch office.

9            Q.    But you do spend some time

10   at the TTP office, don't you?

11           A.    I basically do not stay at

12   TTP.

13           Q.    But you keep an office there

14   and do go there sometimes, don't you, Mr.

15   Peng?

16           A.    Because there are still

17   remaining people work at the office right

18   now, if there is any issue, we

19   communicate through telephone.  My main

20   job right now is at Lucheng's branch

21   office.

22           Q.    But you still hold the title

23   of director or manager of TTP, don't you?

24                 MR. CYR:  Objection.

Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT:  What's the basis

 2         of the objection?  Asked and

 3         answered?

 4              MR. CYR:  And I recommend

 5         that the interpreter not interpret

 6         my statement.

 7              THE COURT:  Right.

 8              MR. CYR:  I believe that

 9         he's testified that he terminated

10         his position at TTP in April of

11         2009.  The record is clear about

12         that.  What the record is not

13         clear about, in my opinion, is

14         that he continues to hold the

15         position of, quote, legal

16         representative, closed quote, of

17         TTP today, and that has been the

18         misunderstanding during your

19         dialogue during the last five

20         minutes.

21              MR. MEUNIER:  Well, I'll

22         change my question based on

23         counsel's direction, Judge.

24   BY MR. MEUNIER:
```

Confidential - Subject to Further Confidentiality Review

```
 1           Q.    Do you still hold a title

 2    with TTP today, namely, legal

 3    representative, is that true?

 4           A.    I am a legal person of TTP

 5    right now.

 6           Q.    That is why from time to

 7    time you have to talk on the phone or

 8    work with the people who remain at TTP?

 9    Is that true?

10           A.    Correct.

11           Q.    But your entire salary for

12    all work activity, including that, is

13    today paid by a different subsidiary of

14    Taishan Gypsum; isn't that true?

15           A.    Correct.

16           Q.    Do you sometimes refer to

17    this group of customers as the Taishan

18    Group?  Group of companies, rather, as

19    the Taishan Group?

20           A.    No.

21           Q.    Is it true, Mr. Peng, that

22    in July of 2006, TTP sold more than

23    11,000 pieces of gypsum board to a

24    company called Advanced Products or APIC
```

1    for shipment to New Orleans, Louisiana in

2    the United States of America?

3         A.    I'm not sure about the

4    English name of that company you just

5    said.

6         Q.    Have you ever heard of

7    American -- I'm sorry -- Advanced

8    Products or APIC Building Materials?

9         A.    I don't recall the name of

10   these two companies.

11              MR. MEUNIER:  I show you a

12              document which has been stamped TG

13              20090, and I'll mark that as Peng

14              Number 4.  And the title of it is

15              "Taian Taishan Plasterboard

16              Company, Limited invoice."

17                   -  -  -

18              (Whereupon, Deposition

19              Exhibit Peng S.-4, Invoice dated

20              July 03, 2006, Bates stamped TG

21              0020090, was marked for

22              identification.)

23                   -  -  -

24   BY MR. MEUNIER:

Confidential - Subject to Further Confidentiality Review

1          Q.    Are you familiar with this

2     invoice form?

3          A.    I'm not familiar with this

4     invoice form.

5          Q.    Are you familiar with the

6     company Triax Trading & Logistics, LLC?

7          A.    I'm not familiar with this

8     name.

9               MR. MEUNIER: I show you

10              another document which I'll mark

11              as Peng Number 5, which is Bates

12              numbered 19366 entitled Taian

13              Taishan Plasterboard Company,

14              Limited "Packing List."

15                   -  -  -

16              (Whereupon, Deposition

17              Exhibit Peng S-5, Taian Taishan

18              Plasterboard Co., Ltd., Packing

19              List dated July 03, 2006, Bates

20              stamped TG 0019366, was marked for

21              identification.)

22                   -  -  -

23    BY MR. MEUNIER:

24         Q.    Are you familiar with this

Confidential - Subject to Further Confidentiality Review

```
 1   form?

 2            MR. CHEN:  I'm sorry,

 3        Counsel.  I have in my binder it

 4        goes from 19364 to 374.  You said

 5        366?

 6            MR. MEUNIER:  366.  Let me

 7        state for the record for The Court

 8        and for counsel that there does

 9        appear to be duplicate stamping on

10        these documents.  For example, the

11        invoice I refer to of July 3, '06

12        is Bates Number 20090.  It's also

13        Bates numbered 19365.  They appear

14        to be the same documents.

15            MR. CYR:  Can I just see it?

16            MR. MEUNIER:  (Handing over

17        document.)

18            What I have marked as Fu --

19        I'm sorry, Peng Number 4 is

20        actually two Bates Numbers.  19365

21        and 20090.

22            And what I have marked as

23        Peng Number 5 is Bates numbered

24        19366, and I submit that it's
```

Confidential - Subject to Further Confidentiality Review

```
 1          clear they deal with the same

 2          transaction, which is what I

 3          intended to clarify.

 4     BY MR. MEUNIER:

 5          Q.    Mr. Peng, my question now

 6     is, are you familiar with the packing

 7     list form, which is Peng Number 5?

 8          A.    I'm not familiar with this

 9     document.

10          Q.    If both of the documents I'm

11     showing you, Peng 4 and 5, have the same

12     invoice number, which is SDTH0622, and

13     the same date of July 3, 2006, is it fair

14     to say they both deal with the same

15     transaction?

16          A.    I'm not clear about that.  I

17     can't be sure of that.

18          Q.    The invoice refers to a

19     quantity of 5,676 pieces of gypsum board

20     at a cost in US dollars of $4.25 each for

21     a total amount of $24,123 being shipped

22     from Qingdao to New Orleans, Louisiana.

23     Did TTP sell this gypsum board on July

24     3rd, 2006 as indicated on the invoice and
```

1  packing list?

2      A.    I'm sure the gypsum board

3  was sold, but I really am not sure about

4  the process.

5      Q.    Would you, though, as

6  director, approve the sale of TTP gypsum

7  board at that price to be shipped to New

8  Orleans, Louisiana in July of 2006?

9      A.    The price of gypsum board

10 was specifically discussed and determined

11 by the sales department.

12     Q.    And if the price was right,

13 it was okay that the board was being

14 shipped to New Orleans, Louisiana in the

15 United States, true?

16     A.    After the price was

17 determined, I am not sure where exactly

18 the gypsum board was shipped to.

19     Q.    But TTP authorized the

20 shipment of board purchased at this price

21 to New Orleans, Louisiana in the United

22 States, true?

23     A.    Our gypsum board, which is

24 the gypsum board that produced by TTP,

1    has always been delivered in China.

2    Whether it would be shipped to that

3    location or how was it shipped to that

4    location, I am not sure about the

5    process.

6          Q.    But from TTP's own sales

7    documents, including these invoices and

8    packing lists, TTP knew that the gypsum

9    board was being delivered to New Orleans,

10   Louisiana, correct?

11              MR. CYR:  Objection.

12              THE COURT:  Ask him about

13         the invoices.

14   BY MR. MEUNIER:

15         Q.    Do you agree the invoice and

16   packing list of your company, TTP at that

17   time, indicated that this gypsum board

18   being sold by TTP was being delivered to

19   New Orleans, Louisiana?

20         A.    Please repeat your question.

21              THE COURT:  Why don't you

22         read it back to him.

23   BY MR. MEUNIER:

24         Q.    You agree that the invoice

```
1    and packing list I'm showing you, which

2    are your company's invoice and packing

3    list, show that this gypsum board that

4    you sold was shipped to New Orleans,

5    Louisiana, true?

6           A.    Because TTP produced the

7    gypsum board.

8                 THE COURT:  Let me see the

9           invoice.

10                THE WITNESS:  (Handing over

11          document.)

12                THE COURT:  The invoice

13          which is marked Exhibit Number 4,

14          which is invoice SDTH0622,

15          indicates that the material will

16          be delivered from -- is that O or

17          Q?

18                MR. MEUNIER:  Q.

19                THE COURT:  Q-I-N-G-D-A-O to

20          New Orleans, Louisiana.  It's

21          dated July 3rd, 2006.  Isn't that

22          correct, sir?

23                THE WITNESS:  The location

24          that is written on this invoice
```

```
 1          was marked by us according to the

 2          requirement of the customers.

 3   BY MR. MEUNIER:

 4          Q.   Did the company wish to make

 5   money from that sale?

 6               THE COURT:  Which company?

 7               MR. MEUNIER:  TTP.

 8               THE WITNESS:  As a

 9          manufacturing company, making

10          money is, of course, its main

11          purpose.

12   BY MR. MEUNIER:

13          Q.   And so TTP intended to make

14   money and did make money from the sale of

15   the gypsum board reflected on those

16   documents in front of you; is that true?

17          A.   To sell our paper-faced

18   gypsum board, we, of course, need to

19   concern about the cost and, of course,

20   the profit.

21               THE COURT:  I will take that

22          as an indication that the answer

23          is yes?

24               Now, I tell you again, sir,
```

```
 1              you took an oath today to tell the

 2              truth.  If I find that you did not

 3              tell the truth intentionally, that

 4              will be very bad for your company

 5              as well as you.  Do you understand

 6              that, sir?

 7                   THE WITNESS:  I understand.

 8                   THE COURT:  Any further

 9              questions?

10                   MR. MEUNIER:  Additional

11              documents, Your Honor.

12                        -   -   -

13                   (Whereupon, Deposition

14              Exhibit Peng S-6, Taian Taishan

15              Plasterboard Co., Ltd., Invoice

16              dated July 20, 2006, Bates stamped

17              TG 00120091, and Deposition

18              Exhibit Peng S-7, Taian Taishan

19              Plasterboard Co., Ltd., Invoice

20              dated July 20, 2006, Bates stamped

21              TG 00120092, were marked for

22              identification.)

23                        -   -   -

24   BY MR. MEUNIER:
```

```
 1            Q.    Mr. Peng, I show you an

 2   invoice which is Bates numbered TG 20091,

 3   which I'll mark as Peng-6, and an invoice

 4   Bates numbered 20092, which I'll mark as

 5   Peng-7.  And I will ask you to confirm

 6   that these invoices both refer to the

 7   sale of 5,760 pieces of drywall at the

 8   cost of $4.34 in US dollars on July 20,

 9   2006 with shipment from Qingdao, China to

10   New Orleans, Louisiana.

11            A.    I don't understand English.

12   I don't understand.

13            Q.    If the documents I put in

14   front of you reflect the sale of over

15   5,000 pieces of drywall priced in US

16   dollars and being shipped to New Orleans,

17   Louisiana, do you have any reason, as you

18   sit here today, to deny that the

19   documents are accurate in reflecting that

20   information?

21            A.    I do not deny.

22            Q.    The prices of the gypsum

23   board per sheet or per piece are

24   different in the July 3rd and July 20
```

1    sales transactions reflected by these

2    invoices.  Can you explain why?

3              THE COURT:  Do you have much

4         more?

5              MR. MEUNIER:  Your Honor,

6         I'm afraid I do.  I probably have

7         another 45 minutes.  I'm sorry.

8         It's going a little slower than I

9         thought.

10             MR. CYR:  You're showing him

11        documents he's never seen before.

12             MR. MEUNIER:  He's the

13        director of the company.

14             MR. CYR:  It's you and the

15        Judge are in charge.

16             THE COURT:  Folks, no.  He's

17        not in charge.  I'm in charge.

18             MR. MEUNIER:  I have another

19        maybe 30 to 45 minutes.

20             THE COURT:  We'll take a

21        break in ten minutes, and then

22        we'll come back.

23   BY MR. MEUNIER:

24        Q.   Why were the prices

```
 1    different in those invoices?

 2         A.    The price of the gypsum

 3    board sold is affected by volume, cost

 4    and shipping distance.  Therefore, it has

 5    some certain ups and downs in pricing.

 6    The specific salespeople are in charge of

 7    this operation.

 8         Q.    Mr. Peng, I want to show you

 9    a series of documents which are entitled

10    "Taian Shandong Province Special Invoice

11    for Export," which I'll mark as Peng-8 in

12    globo, Bates number TG 1657, 1658, 1661,

13    1663, 1664, 1665, 1666, 1667, 1668, 1669,

14    1670, 1680, 1681 and 1682.

15                   -  -  -

16              (Whereupon, Deposition

17         Exhibit Peng S.-8, Taian Shandong

18         Province Special Invoice for

19         Export, Bates number TG 0001657,

20         TG 0001658, TG 0001661, TG 0001663

21         through TG 0001670, and TG 0001680

22         through TG 0001682, was marked for

23         identification.)

24                   -  -  -
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. MEUNIER:

 2           Q.    Are you familiar with this

 3    form?

 4           A.    I have not seen these forms

 5    because I'm not a detailed financial

 6    personnel nor the detailed sales

 7    personnel.

 8           Q.    Do you deny that the forms

 9    all indicate that the exporter is Taian

10    Taishan Plasterboard Company, Limited?

11                 MR. CYR:  Objection.

12                 THE COURT:  Now, wait a

13           minute.  I sustain the objection.

14           They are what they are.  If he has

15           not seen them, how is he going to

16           testify about them?  They are what

17           they are.  This witness said he

18           hasn't seen them.

19    BY MR. MEUNIER:

20           Q.    Mr. Peng, were special forms

21    required by the local Shandong province

22    government for the export sale of gypsum

23    board by TTP?

24           A.    I'm not familiar in this
```

Confidential - Subject to Further Confidentiality Review

```
 1    part, because I'm not the person detailly

 2    operating the sales.

 3              THE COURT REPORTER:

 4         Detailed?

 5              INTERPRETER:  Detailly

 6         operating the sales.

 7    BY MR. MEUNIER:

 8         Q.    Although you're not familiar

 9    with the details, Mr. Peng, you do know,

10    don't you, that the government required

11    special invoice for the export of gypsum

12    board by TTP?

13         A.    I don't know whether special

14    invoices were used, but I know it had to

15    be approved and recorded by the foreign

16    trading department.

17         Q.    And you do not deny, do you,

18    that between 2006 and 2007, TTP made

19    export sales of gypsum board for delivery

20    to the United States, to New Orleans,

21    Louisiana, to Miami, Florida, and to New

22    York, New York?  You don't deny that, do

23    you?

24              MR. CYR:  Objection.
```

Confidential - Subject to Further Confidentiality Review

```
1              THE COURT:  What's the
2         basis, Joe?
3              MR. CYR:  (Addressing the
4         interpreter.)  Please don't
5         interpret.
6              It just seems to me that
7         it's going to be difficult in the
8         translation to distinguish between
9         not denying and actually knowing.
10        If you want to know if he knew
11        that, I think the better question
12        is whether or not he knew that.
13        I'm just afraid that you're going
14        to get a "yes" on don't deny.  I'm
15        not quite sure what it means.
16             THE COURT:  Ask him about
17        knowing.  I think that's a
18        legitimate observation.  If this
19        witness knows, he knows.  If he
20        doesn't know, he doesn't.
21   BY MR. MEUNIER:
22        Q.    Mr. Peng, do you know that
23   in 2006 and 2007, TTP, as reflected by
24   these invoices, sold gypsum board that
```

1    was delivered to New Orleans, Louisiana,

2    the USA, Miami, Florida, Miami/USA and

3    New York?

4         A.    All our gypsum boards were

5    delivered in China.  Whether some other

6    trading company had actually shipped them

7    over there or how were they shipped over

8    there, I'm not sure about that.

9         Q.    But you don't deny that

10   forms that TTP may have filled out for

11   export purposes indicate the shipping

12   destinations in the United States that I

13   have mentioned?  You do not dispute that,

14   do you?

15        A.    Let me put it this way.

16   Reflected in this document, the exporting

17   enterprise name is TTP.  This is in

18   accordance with the fixed form of the

19   special invoice for export.  Customers

20   will tell us where did they want us to

21   ship the products to according to the

22   invoice, then we would write down the

23   destination on the invoice.  As of

24   whether it had indeed shipped to that

Confidential - Subject to Further Confidentiality Review

```
 1    place, I am not sure.  Because this

 2    belongs to customer's business secret,

 3    therefore, we would neither ask nor

 4    speculate.

 5         Q.   Who filled out the

 6    information on these forms?

 7         A.   I'm not sure whether the

 8    information on the form was filled out by

 9    the financial department or the taxation

10    department.

11         Q.   But you would agree, all the

12    information on the forms was verified by

13    your company?

14         A.   This invoice does belong to

15    our company.

16              MR. MEUNIER:  Thank you,

17         sir.  I'll mark that as Peng

18         Number 8 in globo.

19              Your Honor, I have one final

20         area of questioning for this

21         witness which I think will take

22         about 30 minutes.  If The Court

23         would like me to do so after a

24         break, I will.
```

Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT:  What's your

 2         situation, Joe?  Do you want to go

 3         on or you want to take a break.

 4              MR. CYR:  I'm going to need

 5         20 minutes if Your Honor allows

 6         it.  So, I guess it's just a

 7         question of whether you decide

 8         that we have an early lunch now or

 9         break for lunch at 1.  If you only

10         go a half hour, I can finish

11         before 1:00.

12              THE COURT:  I don't have any

13         problem.  You have to get out of

14         here.  That's why --

15              MR. CYR:  No, no, no.  I

16         don't have to get out of here this

17         afternoon, Judge.  It is tomorrow

18         morning.

19              MR. MEUNIER:  But if we

20         delay lunch, the witness could be

21         free.

22              MR. CYR:  Yeah, yeah.  That

23         would be great.

24              MR. MEUNIER:  I don't know
```

Confidential - Subject to Further Confidentiality Review

```
 1            who else has questions, though.

 2                 MR. CYR:  So, if it's all

 3            right with the Judge, we can --

 4                 THE COURT:  You want to

 5            continue?  I don't have any

 6            problem.

 7                 MR. CYR:  Continue until

 8            1:00.

 9                 THE COURT:  Okay.  That's

10            fine.

11                 THE VIDEOTAPE TECHNICIAN:  I

12            do need to change tape though.

13                 THE COURT:  Let's change

14            tapes.

15                 THE VIDEOTAPE TECHNICIAN:

16            Going off the record.  This is the

17            end of Tape Number 3.  The time is

18            12:05.

19                      -  -  -

20                 (Whereupon, a recess was

21            taken from 12:05 p.m. until 12:20

22            p.m.)

23                      -  -  -

24                 THE VIDEOTAPE TECHNICIAN:
```

# FILED UNDER SEAL

**CERTAIN EXCERPTS OF THIS TRANSCRIPT HAVE BEEN DESIGNATED "HIGHLY CONFIDENTIAL" AND HAVE BEEN FILED UNDER SEAL, PURSUANT TO PRE-TRIAL ORDER NO. 16**

Confidential - Subject to Further Confidentiality Review

```
 1          please.

 2                    -  -  -

 3                    EXAMINATION

 4                    -  -  -

 5     BY MS. BASS:

 6          Q.    Good afternoon.  My name is

 7     Hilarie Bass, and I just have one quick

 8     set of questions for you.

 9               MS. BASS:  I would like to

10          have marked as the next exhibit

11          for this deposition, which I

12          believe is 10, a document with

13          Bates Number TG 1704.

14                    -  -  -

15               (Whereupon, Deposition

16          Exhibit Peng S-10, Contract, Bates

17          stamped TG 0001704 through TG

18          0001706, was marked for

19          identification.)

20                    -  -  -

21     BY MS. BASS:

22          Q.    The Bates Number of this

23     document is TG 1704 through 1706.  Please

24     take a moment and review the document.
```

1   My question is whether or not you can

2   recall having seen that document before?

3          A.    I haven't seen this

4   document.  I don't understand English

5   anyways.

6          Q.    Could you look at the third

7   page of the document, please, and

8   identify for us who on behalf of Taian

9   Taishan Plasterboard Company, Limited

10  signed this agreement?

11         A.    You mean the three

12  characters here?

13         Q.    Yes.

14         A.    Yang Jiapo.

15         Q.    And that individual was a

16  salesperson at TTP in June of 2006,

17  correct?

18         A.    He was a salesperson of TTP.

19         Q.    Were you aware of a

20  transaction in which TTP sold gypsum

21  board to Wood Nation, Inc. for delivery

22  in Tampa, Florida?

23         A.    I have only heard it from

24  Peng, Yang Jiapo, from TTP.  Can you

Confidential - Subject to Further Confidentiality Review

1    repeat your question?

2         Q.    Yes.

3               Were you aware of an

4    agreement by which TTP agreed to sell its

5    gypsum board to a company entitled Wood

6    Nation, Inc. based in Tampa, Florida?

7         A.    I've only heard that some of

8    our gypsum boards was sold in America.

9    But I'm not sure whether there was such a

10   transaction.

11        Q.    Would your approval have

12   been sought for a transaction which

13   contemplated 20 to 30 containers of

14   gypsum to be sold each week between June

15   2006 through December 2006 for delivery

16   at the port of Tampa, Florida?

17        A.    My sales principle is the

18   balancing of production and sales, which

19   is you should sell whatever volume that

20   we produce.  As of in what period of time

21   and to where were they sold to, they did

22   not need to report to me.

23        Q.    My last question is, can you

24   identify for us the seal of TTP on this

1    agreement?  It is spread over the three

2    pages?

3            A.    It says Taian City, Taishan

4    plaster stone.  Correction, Plasterboard

5    Company, Limited.

6            Q.    Can you identify that as the

7    seal of TTP?

8            A.    The seal of TTP was the seal

9    that I just read to you which says Taian

10   Taishan Plasterboard Company, Limited.

11           Q.    So, the answer to my

12   question is yes, this is the seal of TTP?

13               INTERPRETER:  Interpreter

14           clarification.  I think he meant

15           the one before.

16               MS. BASS:  That's why I'm

17           asking again.

18               THE WITNESS:  The seal is

19           different from the one before.  It

20           has English on it, but the other

21           seal does not have English on it.

22   BY MS. BASS:

23           Q.    Do you recognize having seen

24   this seal with both Chinese and English

```
 1    writing that states Taian Taishan

 2    Plasterboard Company?  It will be easier

 3    to read like this.

 4              (Handing over document.)

 5        A.    Yes, yes.  That's it.

 6              MS. BASS:  Thank you very

 7        much.

 8              THE COURT:  Anyone else?

 9              (No response.)

10              THE COURT:  Let's take a

11        break then at this time.  We'll

12        come back at 2:00, please.

13              MR. CYR:  If you want,

14        Judge, I can probably get through

15        it in 10, 15 minutes.

16              THE COURT:  Let's do that.

17        That's fine.

18              MR. CYR:  May I begin, Your

19        Honor?

20              THE COURT:  Yes, please.

21                   -  -  -

22                 EXAMINATION

23                   -  -  -

24    BY MR. CYR:
```

1        Q.    Mr. Peng, during the time

2   TTP was operating, did Peng Wenlong ever

3   tell you that some of TTP's customers

4   said they intended to ship the drywall to

5   the U.S.?

6        A.    Yes.

7        Q.    Did you have any knowledge

8   at that time where the drywall was

9   actually shipped?

10       A.    I didn't know where exactly

11  where the drywall is to be shipped to,

12  but according to Mr. Peng Wenlong, who

13  said that some of the customers might

14  ship the gypsum boards to the United

15  States.

16       Q.    Did you have any knowledge

17  where the drywall was actually used?

18       A.    We don't know exactly where

19  were they used at.

20       Q.    When the other lawyer was

21  asking you questions about your meeting

22  with Mr. -- discussions with Mr. Jia

23  about preparing for the deposition, you

24  indicated that you talked with Mr. Jia

Confidential - Subject to Further Confidentiality Review

1    about a few of the TTP documents.  Do you

2    remember that testimony?

3           A.    I remember that.

4           Q.    In your discussions with Mr.

5    Jia, did you discuss anything else

6    besides that?

7           A.    Nothing else.

8           Q.    Have I ever asked you that

9    question before?

10          A.    No.

11          Q.    How many employees did TTP

12   have?

13          A.    TTP, while it was in

14   production or in normal operation, it had

15   about 260 employees.

16          Q.    Did TTP ever share any of

17   its employees with TG?

18          A.    TTP's employees were its own

19   employees.  It did not share employees

20   with TG.

21          Q.    Did TTP have its own

22   production facility?

23          A.    TTP had its own facility,

24   its own office, and its own employees.

Confidential - Subject to Further Confidentiality Review

1          Q.     Did TTP share its production

2    facility with TG?

3          A.     TTP had its own production

4    facility.  It did not use the facility of

5    production of TG's.

6          Q.     Did TTP purchase its own

7    supplies for the gypsum board?

8          A.     TTP had its own production

9    and purchased its own raw material that

10   was needed for the production.

11         Q.     Did TTP have its own bank

12   accounts?

13         A.     TTP had an independent

14   financial department.  Of course it had

15   its own bank account.

16         Q.     Did TTP pay its own

17   employees?

18         A.     TTP's employees worked at

19   TTP.  Of course TTP would be the company

20   that paid them.

21         Q.     Was TTP ever inspected by a

22   government agency with respect to whether

23   or not it operated independently?

24         A.     Yes.  We had to register,

1    put in record and receive approval from

2    relevant institutions of the government.

3           Q.    What government agency

4    inspected TTP with respect to whether it

5    operated independently?

6           A.    The department of business

7    licensing, the department of taxation,

8    and other inspection institutions.

9           Q.    I would like to direct your

10   attention to Defendant's Exhibit 37.

11   Take a look at that and tell the Judge

12   and plaintiff's counsel what that

13   document is.

14              MR. HARDT:  Can you give us

15         the Bates Number?

16              MR. CYR:  Yes.  It's Bates

17         TG 20850, 20851.

18              THE COURT:  What's the

19         question?

20              MR. CYR:  Can we proceed?

21              THE COURT:  Yes, please do.

22   BY MR. CYR:

23           Q.    Could you tell the Judge and

24   plaintiffs' counsel what that document

 1   is?

 2          A.     It is a capital verification

 3   description issued by a third-party

 4   accounting firm to Shandong Taihe Dongxin

 5   Plasterboard Company, Limited.

 6          Q.     Was it prepared at the

 7   request of TTP?

 8          A.     Yes.  It was requested by

 9   TTP because Shandong TG Company was going

10   to add registered capital, therefore,

11   capital verification was needed.

12          Q.     Please look at Defendant's

13   Exhibit 45, 46 and 47.  While Mr. Jia is

14   looking at those documents, I'll quickly

15   cite the TG numbers.

16                 45 is TG 26004 through TG

17   26006.

18                 Defendant's Exhibit 46 is TG

19   26007 through TG 26009.

20                 And Defendant's 47 is TG

21          26010 through TG 26012.

22                 MS. BASS:  Are they being

23          separately marked in this?

24                 MR. CYR:  They have already

```
 1          been marked as Defendant's 45, 46

 2          and 47.

 3               MS. BASS:  So they are not

 4          being separately marked in this

 5          deposition?

 6               MR. CYR:  I believe that Ms.

 7          Bass correctly points out that

 8          although they were premarked, it

 9          hasn't been reflected in the

10          transcript of this deposition.

11          Thank you.

12                    -   -   -

13               (Whereupon, Deposition

14          Exhibit Jia Defendant's-45,

15          Document in Chinese, Bates stamped

16          TG 0026004 through TG 0026006;

17          Deposition Exhibit Jia

18          Defendant's-45A, 2006 Financial

19          Statement of Taian Taishan

20          Plasterboard Co., Ltd., Bates

21          stamped TG 0026004 through TG

22          0026006.

23                    -   -   -

24               (Whereupon, Deposition
```

Confidential - Subject to Further Confidentiality Review

```
 1              Exhibit Jia Defendant's-46,

 2              Document in Chinese, Bates stamped

 3              TG 0026007 through TG 0026009;

 4              Deposition Exhibit Jia

 5              Defendant's-46A, Balance Sheet,

 6              Bates stamped TG 0026007 through

 7              TG 0026009.

 8                        -  -  -

 9              (Whereupon, Deposition

10              Exhibit Jia Defendant's-47,

11              Document in Chinese, Bates stamped

12              TG 0026010 through TG 0026012, and

13              Deposition Exhibit Jia

14              Defendant's-47A, 2008 Financial

15              Statement of Taian Taishan

16              Plasterboard Co., Ltd. Balance

17              Sheet, Bates stamped TG 0026010

18              through TG 0026012, were marked

19              for identification.)

20                        -  -  -

21   BY MR. CYR:

22         Q.    Mr. Peng, could you tell The

23   Court and plaintiffs' counsel what these

24   documents are?
```

1          A.    These are the accounting

2    report provided by a third-party

3    accounting firm regarding TTP's

4    accounting report in the years of 2006,

5    2007 and 2008.

6          Q.    Did TTP provide information

7    to the independent accounting firm for

8    the purposes of their preparation of

9    those three reports?

10          A.    All the information provided

11    was through the independent financial

12    department of TTP.

13              MR. CYR:  Thank you, Your

14          Honor.  I have no further

15          questions.

16              THE COURT:  Any redirect?

17              MR. MEUNIER:  Briefly, Your

18          Honor.

19                  -   -   -

20              EXAMINATION

21                  -   -   -

22    BY MR. MEUNIER:

23          Q.    Mr. Peng, in response to

24    your attorney's questions, you say that

```
 1   Peng Wenlong did tell you that some TTP

 2   drywall was being sold and shipped to

 3   different locations in the USA; is that

 4   true?

 5              MR. CYR:  Objection.

 6         Misstates the record.

 7              THE COURT:  Sustain the

 8         objection.  Restate it.

 9   BY MR. MEUNIER:

10         Q.    Is it true that you knew

11   from Peng Wenlong that TTP drywall was

12   being shipped to the US?

13         A.    I've only heard it from Mr.

14   Peng Wenlong.  He said that some of the

15   trading customers might have shipped some

16   of the gypsum boards to the United

17   States.

18         Q.    Were the sales employees of

19   TTP allowed to enter into sales

20   agreements for TTP drywall which they

21   knew was being shipped to the United

22   States?

23         A.    They may sign such

24   agreements, but as far as I know, all
```

1    these products that was mentioned in the

2    agreements were transactioned through the

3    trading companies in China.

4         Q.    Did it matter to you where

5    TTP board was being shipped to and used

6    in the United States as long as TTP made

7    a profit on those sales?

8              MR. CYR:  Objection, vague.

9              THE COURT:  I don't see that

10        being vague.  I overrule the

11        objection.

12             MR. CYR:  Answer the

13        question, Mr. Peng.

14             THE WITNESS:  Can you repeat

15        the question?

16   BY MR. MEUNIER:

17        Q.    Did it matter to you where

18   the TTP board was being shipped to and

19   used in the United States as long as TTP

20   made a profit on those sales?

21        A.    We're not sure exactly where

22   would be our gypsum board be shipped to.

23        Q.    It was okay if it was

24   shipped to the US and used in the U.S. as

Confidential - Subject to Further Confidentiality Review

1    long as you made a profit; is that true?

2         A.    After entering into

3    agreements with our customers, I'm sure

4    our customers had their own benefits in

5    mind.  We would not take into

6    consideration where they would use the

7    product at.

8         Q.    So, it was okay if you made

9    sales agreements for the sale of drywall

10   that was shipped and used in the U.S.,

11   right?

12        A.    Our trading customers may

13   ship our gypsum board to the United

14   States, but as of where did they use the

15   gypsum board in, we don't have the right

16   to ask.

17             MR. MEUNIER:  I have no

18        further questions.

19             THE COURT:  We'll come back

20        at 2:30.

21             THE VIDEOTAPE TECHNICIAN:

22        That concludes today's deposition.

23        Going off the record at 1:24.

24                  -  -  -

```
1                    (Whereupon, the deposition

2           concluded at 1:24 p.m.)

3                    -   -   -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
1           C E R T I F I C A T E
2
3
                I, LINDA L. GOLKOW, a
4   Registered Diplomate Reporter, Certified
    Court Reporter and Notary Public, do
5   hereby certify that, pursuant to notice,
    the deposition of SHILIANG PENG was duly
6   taken on January 11, 2012 at 8:30 a.m.
    before me.
7
8               The said SHILIANG PENG was
    duly sworn by The Court according to law
9   to tell the truth, the whole truth and
    nothing but the truth and thereupon did
10  testify as set forth in the above
    transcript of testimony.  The testimony
11  was taken down stenographically by me.
12
                I do further certify that
13  the above deposition is full, complete
    and a true record of all the testimony
14  given by the said witness.
15
16
        Linda L. Golkow
17      Registered Diplomate Reporter
        Certified Realtime Reporter
18
19
20              (The foregoing certification
    of this transcript does not apply to any
21  reproduction of the same by any means,
    unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24
```

1            INSTRUCTIONS TO WITNESS

2

3

4            Please read your deposition

5    over carefully and make any necessary

6    corrections.  You should state the reason

7    in the appropriate space on the errata

8    sheet for any corrections that are made.

9

10            After doing so, please sign

11    the errata sheet and date it.  It will be

12    attached to your deposition.

13

14            It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24

Confidential - Subject to Further Confidentiality Review

1                    - - - - - -

                   E R R A T A

2                    - - - - - -

3    PAGE  LINE  CHANGE

4    _____  _____  _____

5      REASON:  ____ _____

6    _____  _____  _____

7      REASON:  _____ _____

8    _____  _____  _____

9      REASON:  _____ _____

10   _____  _____  _____

11     REASON:  _____ _____

12   _____  _____  _____

13     REASON:  _____ _____

14   _____  _____  _____

15     REASON:  _____ _____

16   _____  _____  _____

17     REASON:  _____ _____

18   _____  _____  _____

19     REASON:  _____ _____

20   _____  _____  _____

21     REASON:  _____ _____

22   _____  _____  _____

23     REASON:  _____ _____

24

1

2          ACKNOWLEDGMENT OF DEPONENT

3

          I,_____, do

4    hereby certify that I have read the

     foregoing pages, 1-132, and that the same

5    is a correct transcription of the answers

     given by me to the questions therein

6    propounded, except for the corrections or

     changes in form or substance, if any,

7    noted in the attached Errata Sheet.

8

     _____

9    SHILIANG PENG                    DATE

10

11

12

13

14

15

     Subscribed and sworn

16   to before me this

     _____ day of _____, 20_____.

17

     My commission expires:_____

18

19   _____

     Notary Public

20

21

22

23

24

1                        LAWYER'S NOTES

2      PAGE   LINE

3      _____  _____   _____

4      _____  _____   _____

5      _____  _____   _____

6      _____  _____   _____

7      _____  _____   _____

8      _____  _____   _____

9      _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____

# 公　证　书

中华人民共和国山东省泰安市岱岳公证处

**Errata Sheet of Transcript of the Testimony of: Shiliang Peng**

彭世亮证人证言勘误表

**January 11 2012**

2012 年 1 月 11 日

| Page: Line(s)  页码: 行数 | Change from  原文 | Change to  更正 | Reason  原因 |
|---|---|---|---|
| 34:1-2 | "the board of directors meeting in TTP was held irregularly"  "泰山纸面石膏板董事会不定期召开" | "the board of directors meeting in TTP was not always held at a designated time"  "泰山纸面石膏板董事会不总是在一个指定的时间召开" | Clarification  具体说明 |
| 35:3-6 | "I requested the balancing between the production and sales lower the product payments risk to provide good service for the customers."  "本人要求生产销售达到平衡，降低产品付款风险，以便为客户提供优质服务。" | "In terms of sales, I requested keeping a balance between production and sales, lower the payment risks, and provide good service for the customers."  "在销售方面，本人的要求是产销平衡、降低支付风险并为客户提供优质服务。" | Clarification  具体说明 |
| 49:14 | "the trading companies sold to us out of China"  "向我方在中国以外出售产品的贸易公司" | "the trading companies sold out of China"  "贸易公司向中国以外销售" | Translation correction  翻译校正 |
| 70:14-17 | "They would summarize on the experiences in TG. But as for TG's special circumstances, they should base their principles on TG's circumstances."  "他们将总结在泰山石膏的经验。但是就泰山石膏的特殊情况而言，他们将以泰山石膏的情况作为原则的依据。" | "They summarized rules based on their working experiences in TG. However, they also need to consider TTP's actual circumstances and to work based on TTP's sales rules."  "他们根据自己在泰山石膏的经验总结出了规律。但是，他们还须考虑泰山纸面石膏板的实际情况，且根据泰山纸面石膏板的销售规定开展工作。" | Translation correction  翻译校正 |
| 71:17-7 | "Through the two years operation of TTP, the customers who requested value added invoices were not that much – not that many.  However, TTP | "TTP was established so that it could issue value added tax invoices to clients who needed them.  It had two drywall production lines capable of producing 2 times | Clarification |

- 2 -

| 71:17-7 | "Through the two years operation of TTP, the customers who requested value added invoices were not that much – not that many.  However, TTP had two paper-faced gypsum production lines of 2 by 20 million. | "TTP was established so that it could issue value added tax invoices to clients who needed them.  It had two drywall production lines capable of producing 2 times 20 million square meters.  However, through its two years of operation, we realized that there were not that many customers who actually requested value added invoices. | Clarification |
|---|---|---|---|
| | "通过泰山纸面石膏板的两年运营，要求开增值税发票的客户不多——没那么多。不过，泰山纸面石膏板有两条产量为两千万的双面纸石膏板生产线。 | "设立泰山纸面石膏板的目的是为了能够向需要增值税发票的客户开具增值税发票。泰山纸面石膏板有两个产量为两千万平方米的石膏板生产线。然而，通过两年的运营，我们意识到并没有多少客户真的需要开增值税发票。 | |
| | According to the regulation of our country, for those enterprises that had reached the production volume of 20 million paper-faced gypsum board would be able to enjoy half of the value added tax benefit.  So TTP's board of directors and its shareholder had decided to stop the operation of TTP.  That's the reason behind TTP's stop of operating." | Our country later issued a new regulation that provided that enterprises with a production capacity of 20 million square meters of drywall were able to enjoy a tax benefit of 50% off value added tax.  Even with that benefit, however, TTP's production line capacity was double that target, and far more than the demand by customers for drywall with value added tax invoices, such that TTP had to pay 50% value added tax even in many transactions where customers did not need the VAT invoices. | |
| | 依照我国的法律规定，凡是产量达到两千万纸面石膏板的企业可享受增值税减半优惠。因此，泰山纸面石膏板的董事会及其股东决定停止泰山纸面石膏板的运营。这就是泰山纸面石膏板停止运营的背后原因。" | 我国后来颁布了一项新规定，规定石膏板产量超过两千万平方米的企业可以享受增值税减半优惠。但是，即使有这一优惠，泰山纸面石膏板生产线产量是该目标的两倍，远远超过了要求开具增值税发票客户的需求量，以至于泰山纸面石膏板不得不在客户不需要增值税发票的许多交易中支付 50%的增值税。 | |

- 3 -

| | | TTP's board of directors and its shareholder decided the expense of paying unnecessary value added tax was not financially sensible, and decided to cease the operation of TTP. That's the reason why TTP stopped operating." 泰山纸面石膏板的董事会和股东决定，支付没有必要的增值税从财务角度并不明智，故决定停止泰山纸面石膏板的运营。这就是泰山纸面石膏板停止运营的原因。" | |
|---|---|---|---|
| 75:3 | "legal person" "法人" | "legal representative" "法人代表" | Translation correction 翻译校正 |
| 75:7 | "employee of Taishan Gypsum" "泰山石膏员工" | "employee of a subsidiary of Taishan Gypsum" "泰山石膏某子公司员工" | Clarification 具体说明 |
| 75:14 | "Liaocheng" "聊城" | "Lucheng" "潞城" | Spelling 拼写错误 |
| 79:4 | "legal person" "法人" | "legal representative" "法人代表" | Translation correction 翻译校正 |
| 102:23 | "Yes that's the company." "是的，是公司。" | "Yes, it was TTP." "是的，是泰山纸面石膏板。" | Clarification 具体说明 |
| 106:9-107:10 | "Even though the claim was about the nail puncturing power, however, in each of the stages, transportation, storage, loading and usage, if there was improper handling, there would also be quality problem arise from it. "虽然索赔和钉子穿透力有关，但是在各个环节中，运输、存储、装货及使用，如果处理不当，也 | "Even though the claim was about the ability of the drywall to hold nails, in each of the stages of transportation, storage, loading, and usage, if there was improper handling, this could cause quality problems as well. The opposing party suggested we undertake an on-site investigation of the product, but given the great distance, this would have been costly and difficult to arrange. "即使索赔和石膏板抓钉力 | Clarification 具体说明 |

- 4 -

会产生质量问题。

The opposing party also suggested us to undertake an investigation on their using sites of the products, but because of the distance, which is rather great, and it's required great cost and personnel arrangements.

对方还建议我们对其使用产品的场所进行调查，但由于距离实在遥远，而且则需要大量的成本和人事安排。

And also based on the friendly cooperation relationship between TTP and Taigao Trading Company, and also in consideration of our capability of bearing such cost, it has to be within the limits of what we can bear. Even though we were sure that we had no such quality problems, however, based on the above points that I just mentioned, because TTP had already stopped its operation, we did not have sufficient energy nor financial capability to carry on, so that we reached such a settlement agreement."

另外，基于泰山纸面石膏板和泰高贸易公司之间的友好合作关系，也考虑到我们承受这些费用的能力，这应该在我们的承受范围之内。虽然我们肯定没有那些质量问题，但是，鉴于我提到的以上几点原因，因为泰山纸面石膏板早已停止运营，我们没有足够精力也没有财力

有关，但在运输、存储、装货及使用阶段如果处理不当，也会造成质量问题。对方建议我们对产品进行现场调查，但是考虑到路途遥远，这将花费大量金钱而且很难安排。

We considered the friendly and cooperative relationship between TTP and Taigao Trading Company and whether we could bear the cost. Even though we were certain our product had no quality problems, considering those points plus the fact that TTP had ceased operation such that we had neither the energy nor resources to carry on a fight, we reached a settlement."

我们考虑了泰山纸面石膏板和泰高贸易公司之间的友好合作关系以及能否承担费用。即使我们肯定自己的产品没有质量问题，但考虑到这些问题，加上泰山纸面石膏板已经停止运营，因此我们没有精力也没有资源掐架，我们达成了和解。"

- 5 -

| | | | |
|---|---|---|---|
| | 继续，因此我们达成了这一和解协议。" | | |
| 108:20-109:1 | "Q.  But it was a benefit to TTP to resolve all claims under both US and China law through this agreement, true?<br><br>"问：但通过这一协议解决在美国和中国法律项下的所有索赔，对泰山纸面石膏板是有利的，对吧？<br><br>A.  To be able to resolve the disputes of both parties, it is the purpose of our both parties."<br><br>答：能够解决双方的争议，这是我们双方的目的。" | "Q.  But it was a benefit to TTP to resolve all claims under both US and China law through this agreement, true?<br><br>"问：但通过这一协议解决在美国和中国法律项下的所有索赔，对泰山纸面石膏板是有利的，对吧？<br><br>A.  It was Guardian's attorney who prepared the draft of the Settlement and Release Agreement.  We did not pay particular attention to the specific language 'whether such claim arose in the US or in the PRC.'  Our only concern was to try and resolve the disputes of both parties as quickly as possible.  That was the purpose of both parties."<br><br>答：和解及放款协议是由 Guardian 的律师起草的。我们并未特别注意 "无论该索赔是在美国还是中国引起的" 这一具体说法。我们只想尽力尽快解决双方的争议，这是双方的目的。" | Clarification<br><br>具体说明 |
| 126:2 | "transactioned"<br><br>"transactioned"（交易，错误拼写） | "transacted"<br><br>"transacted"（交易） | Spelling error<br><br>拼写错误 |

Confidential - Subject to Further Confidentiality Review

1

2              ACKNOWLEDGMENT OF DEPONENT

3
          I,_____, do

4    hereby certify that I have read the
     foregoing pages, 1-132, and that the same

5    is a correct transcription of the answers
     given by me to the questions therein

6    propounded, except for the corrections or
     changes in form or substance, if any,

7    noted in the attached Errata Sheet.

8
     _____   2012. h. 12

9    SHILIANG PENG                DATE

10

11

12

13

14

15

     Subscribed and sworn

16   to before me this

     _____ day of _____, 20____.

17

     My commission expires:_____

18

19   _____

     Notary Public

20

21

22

23

24

证人宣誓书

我彭世亮特此证实，我已经阅读过上述第 1 页至第 132 页，并且除在勘误表中关于的形式或实体上被更正的内容外，该第 1 页至第 132 页是我被问及各个问题的答复的正确笔录记载。

_____                    2012. 5. 13
彭世亮                                    日期

签于              年          月          日

在本人前宣誓后成作本宣誓书

本人公证资格有效截止日期为              年          月          日

（公证人签名）

# 公　　证　　书

（2012）泰岱岳证外字第 206 号

申请人：彭世亮，男，一九七一年二月三日出生，公民身份号码：220621197102030735。

公证事项：签名

兹证明彭世亮于二〇一二年三月十三日在泰山石膏股份有限公司办公室，在本公证员的面前，在前面的《证人宣誓书》上签名。

中华人民共和国山东省泰安市岱岳公证处

公证员　张卫怠

二〇一二年三月十三日

XW37106372

# NOTARIAL    CERTIFICATE

(2012)Tai Daiyue Zheng Wai Zi No.206

Applicant: Peng Shiliang, male, born on February 3, 1971, citizen ID No.:220621197102030735.

Issue under notarization: Signature.

This is to certify that Peng Shiliang on Taishan Gypsum Co., Ltd Office on March 13, 2012 and with the presence of the under-mentioned notary signed on the *ACKNOWLEDGMENT OF DEPONENT*.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

March 13, 2012

XW37106400

# 公 证 书

（2012）泰岱岳证外字第 207 号

申请人：彭世亮，男，一九七一年二月三日出生，公民身份号码：220621197102030735。

公证事项：译本与原本相符

兹证明前面的（2012）泰岱岳证外字第 206 号《公证书》的英文译本内容与该公证书中文原本相符。

中华人民共和国山东省泰安市岱岳公证处

公证员 

二〇一二年三月十三日

# NOTARIAL   CERTIFICATE

(2012) Tai Daiyue Zheng Wai Zi No.207

Applicant: Peng Shiliang, male, born on February 3, 1971, citizen ID No.:220621197102030735.

Issue under notarization: The translation is in conformity with the original copy.

This is to certify that the English translation content of (2012) Tai Daiyue Zheng Wai Zi No.206 *NOTARIAL CERTIFICATE* is in conformity with the Chinese original copy of that.

Notary: Zhang Weibing

Daiyue Notary Public Office

Taian City, Shandong Province

The People's Republic of China

March 13, 2012

6.  石膏板4 x11x1/2完成品的价格

我对贵公司的产品十分有兴趣, 希望运用在我的工程里. 请您能尽快的回复我需要的数据

再次感谢您的帮忙!

祝

     商务顺利


王倩如


*Josephine Wang*
*Executive Vice President*
*Switzenbaum & Associates*
*200 South Broad Street*
*Sixth Floor*
*Philadelphia, PA 19102*
*215.772.1100 P*
*215.772.9520 F*
*josephine@switzenbaum.com*

This e-mail message may contain legally privileged and/or confidential information.  If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited.  If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

---

**From:** 杨甲坡 [mailto:yjp09@163.com]
**Sent:** Thursday, August 03, 2006 3:11 AM
**To:** josephine wang
**Cc:** josephinewang@comcast.net
**Subject:** Re: RE: Sheetrock


王小姐:
您好, 很高兴收到您的邮件现在把各种资料发与您, 请过目:
普通石膏板
4x12x1/2 FOBQINGDAO USD4.15/PCS 660PCS/40FCL 26.5吨/40FCL
4x8x1/2 USD2.77/PCS 960PCS/40FCL

4x12x1/2 FOBLIANYUNGANG USD4.2/PCS 76PCS/托盘
4x8x1/2 USD2.8/PCS 76PCS/托盘
我公司为亚洲最大的石膏板生产基地, 产品质量和数量请放心!

祝:
安好!



杨甲坡
2006.8.2

From: "Josephine Wang" <josephine@switzenbaum.com>
To: yjp09@163.com
Date: Tue, 1 Aug 2006 11:40:42 +0800 (CST)
Subject: RE: Sheetrock




PENG S.
EXHIBIT NO. 1
1-11-12
L. GOLKOW


>
> Dear Mr. Yang,
>
> It was nice talking to you.  I am interesting in learning more about your product and

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

possibly in doing business with you. Our company is currently building in Philadelphia, our project is called South Bridge. You can check out our website at www.southbridgephilly.com. Please forward me information about how you sale abroad. I need to understand your process, the lead time and the logistic of it in order to make it work. I will also need to have some references that I can verify your product and timeliness.

> 
> I lookforward in receiving your response.
> 
> Sincerely,
> 
> Josephine Wang
> Executive Vice President
> Switzenbaum & Associates
> 200 South Broad Street
> Sixth Floor
> Philadelphia, PA 19102
> USA
> 1.215.772.1100 phone
> 1.215.772.9520 fax
> josephine@switzenbaum.com
> 

--------------------------------

杨甲坡（apollo yang）
TEL：0086-538-8812002
FAX：0086-538-8811250
H P： 0086-13793836871
MSN：yjp09@hotmail.com

网 易 邮 箱 带 你 率 先 跨 入 3G 时 代 ！
3G 海 量 邮 箱 ，20 兆 超 大 附 件 ；网 络 记 事 本 ＋ RSS ＋ 大 容 量 网 盘 ，一 样 也 不 少

--------------------------------

杨甲坡（apollo yang） TEL：0086-538-8812002 FAX：0086-538-8811250 H P： 0086-13793836871
MSN：yjp09@hotmail.com

网 易 邮 箱 带 你 率 先 跨 入 3G 时 代 ！
3G 海 量 邮 箱 ，20 兆 超 大 附 件 ；网 络 记 事 本 ＋ RSS ＋ 大 容 量 网 盘 ，一 样 也 不 少

----------------------------

杨甲坡(apollo yang) TEL：0086-538-8812002 FAX：0086-538-8811250 H P：0086-13793836871
MSN：yjp09@hotmail.com

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0019799

网易邮箱带你率先跨入3G时代！
3G海量邮箱，20兆超大附件；网络记事本＋RSS＋大容量网盘，一样也不少

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0019800

| | |
|---|---|
| **From:** | Leon Liu <Leon@china-corporation.com> |
| **To:** | 杨甲坡 <yjp09@163.com> |
| **Sent:** | 12/12/2005 9:41:09 PM |
| **Subject:** | 答复: |

Hi Mr Yang,
Good mornig,
Can you afford the pricing and lead-time for the following(ASAP):

Volume: 64,000 or 100,000 or 200,000 Boards

Packaging: Break-bulk

Timing: Order to be placed in December 2005

Thickness: ½"

Dimensions: 12' x 4'

End Tape: Custom End Tape

Edge: Tapered

Thanks!

Leon

---

From: 杨甲坡 [mailto:yjp09@163.com]
Sent: 2005-12-11 (星期日) 19:54
To: Leon Liu
Subject: Re:

刘先生:

您好, 关于此邮件港口价格, 我们现在没有得到港口的价格, 只能先把FOB的价格发与您, 请与客户参考。

4x12x1/2普通石膏板:FOBUSD3.68/PCS

别的要求可以答复。

另外样品的事情, 因为现在公司有规定, 超过RMB200的样品费用公司一律不承担, 因为现在美国的客户要样品的太多了, 不敢特批, 请原谅, 对不起了。

谢谢

甲坡

2005.12.12

Hi Mr Yang,
Good afternoon,
Can you pricing on the following: (ASAP)

1.  Quantity: 32,000 Boards

    Dimensions: 12' x 4' x ½"



End Tape: Custom End Tape

Edge: Tapered

Packaging: Break-bulk

Delivery: Port of NY/NJ

2. Quantity: 32,000 Boards

Dimensions: 12' x 4' x ½"

End Tape: Custom End Tape

Edge: Tapered

Packaging: Break-bulk

Delivery: Port of Savannah, Georgia

Thanks,

Leon


----------------------------
杨甲坡（apollo yang）TEL：0086-538-8812002 FAX：0086-538-8811250 H P：0086-13793836871
MSN：yjp09@hotmail.com


需要一个2000兆的免费邮箱吗？
网易免费邮箱是中国最多人使用的电子邮箱。

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0019841

| From: | yjp09 <yjp09@163.com> |
| To: | wenny yin <wenny@sctchina.com.cn> |
| Sent: | 10/15/2005 3:03:02 AM |
| Subject: | Re: New Gypsum Board quotation |
| Attachments: | Dcp_8801在车上吊装船.jpg; Dcp_8802龙门吊装船.jpg; 石膏托架包装.jpg |

Dear wenny yin：

您好，一直在落实散货船的问题，一直没有答复，现在船的消息终于有了现在把价格报与您，请过目：

普通石膏板：

3660x1220x12.7mm CNFNEW ORLEANS PORT USD7.22/PCS

包装:石膏板托盘，60张/托盘，塑料内膜套装防潮，外面石膏板保护，纵横钢带捆扎。

付款方式:即期L/C,

另外:没有到JACKSONVILLE PORT 的船。


谢谢，有什么问题请回复。


甲坡

2005.10.15


> Dear Mr. Yang:
>
> As for the conversation between you and Mr. Boonsong, now we have another new quotation for you.
> Pls see the following information:
>
> Gypsum Board -Regular Type
> Size : 1/2" x 4" x 12" (inch)
>
> -- 100,000 pcs to Jacksonville port , Florida (abt 5,000 Mt )
> -- 100,000 pcs to New Orleans port (abt 5,000 Mt )
>
> Packing : To advise how's your packing
> Price : CNF FO ( by bulk vessel )
> Payment : by L/C
> Shipment : every 2 months
> Delivery : Nov 05
>
> Looking forward to your early reply
>
> Best Wishes
> Wenny Yin
> SCT co.,Ltd. (Guangzhou office)
> Tel: (20)-8365-2559 , 8333-8999 Ext.1217-1218
> Fax: (20)-8365-2595
> E-mail: wenny@sctchina.com.cn
> Web-side: www.scttrading.com
> ----------------------------
杨甲坡(apollo yang)
TEL：0086-538-8812002



CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

FAX：0086-538-8811250
H P：0086-13793836871
MSN：yjp09@hotmail.com

---

需要一个 2000 兆的免费邮箱吗？
网易免费邮箱是中国最多人使用的电子邮箱。

---

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0019814

# TAIAN TAISHAN PLASTERBOARD CO., LTD.

SOUTH SUBURB OF TAIAN, SHANDONG, CHINA

# INVOICE

INVOICE NO.: SDTH0622          DATE: JULY, 03, 2006

TO: TRIAX TRADING & LOGISTICS, LLC          TO:   NEW ORLEANS, LA

FROM: QINGDAO

| SHIPPING MARK | DESCRIPTION OF GOODS | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | | | FOB QINGDAO | |
| APIC BUILDING MATERIALS | 4FT X 12FT X1/2 IN GYPSUM BOARD | 5676PCS | USD4.25 | USD24123.00 |



PENG S.

EXHIBIT NO. 4

1-11-12

L. GOLKOW

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020090

## TAIAN TAISHAN PLASTERBOARD CO., LTD.

SOUTH SUBURB OF TAIAN, SHANDONG, CHINA

# PACKING LIST

SHIPPING MARK:                                          INVOICE NO. : SDTH0622
APIC BUILDING                                               DATE :JULY. 03, 2006
MATERIALS

FROM : QINGDAO, CHINA                          TO : NEW ORLEANS, LA

| DESCRIPTION OF GOODS | QUANTITY | NET WEIGHT | GROSS WEIGHT | VOLUME |
|---|---|---|---|---|
| 4FT X 12FT X1/2 IN GYPSUM BOARD | 132PKGS | 232,000KGS | 232,100KGS | 616CBM |

11X40`GP



PENG S.
EXHIBIT NO. 5
1-11-12
L. GOLKOW

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0019366

# TAIAN TAISHAN PLASTERBOARD CO., LTD

## SOUTH SUBURB OF TAIAN, SHANDONG, CHINA

# INVOICE

INVOICE NO.: SDTH0622          DATE: JUL. 20, 2006

TO: TRIAX TRADING & LOGISTICS, LLC, 3988 SAGE RIDGE, DRIVE YORBA LINDA, CA 91887 ATTN: GREGORY UNRUH, TEL: 858 822-8078 FAX: 858 883-2966

FROM: QINGDAO, CHINA          TO: NEW ORLEANS, LA

| SHIPPING MARK | DESCRIPTION OF GOODS | QUANTITY | UNIT PRICE FOB QINGDAO | AMOUNT |
|---|---|---|---|---|
| APIC BUILDING MATERIALS | 4FT X 12FT X1/2 IN. GYPSUM BOARD | 5760PCS | USD4.34 | USD24998.40 |



Penc S.
EXHIBIT NO. 6
1-11-12
L. GOLKOW

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020091

# TAIAN TAISHAN PLASTERBOARD CO., LTD

## SOUTH SUBURB OF TAIAN, SHANDONG, CHINA

# INVOICE

INVOICE NO.: SDTH0622        DATE: JUL. 20, 2006

TO: ADVANCE PRODUCTS INTERNATIONAL CORPORATION, 225 WEST 30TH STREET NATIONAL CITY, CA 91950 USA

FROM: QINGDAO, CHINA        TO: NEW ORLEANS, LA

| SHIPPING MARK | DESCRIPTION OF GOODS | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | | | FOB QINGDAO | |
| APIC BUILDING MATERIALS | 4FT X 12FT X1/2 IN GYPSUM BOARD | 5760PCS | USD4.34 | USD24998.40 |



Peter S.

EXHIBIT NO. 7

1 - 11 - 12

L. GOLKOW

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0020092

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出 口 专 用
Special Use for Export

存 根 联
Counterfoil

137090626307

No **00012416**

2006年    9月 15 日填制
Date 2006Y    9 M 15 D

| | | | | |
|---|---|---|---|---|
| 出口企业名称：泰安市泰山纸面石膏板有限公司 | | 出口企业税务登记证号： | | 370911785030460 |
| Exporter TAIAN TAISHAN PLASTERBOARD CO.,LTD | | Tax Registration No： | | 370911785030460 |
| 出口企业地址： 泰安市岱岳区 | | 电话： | 86-538-8811369 传真： | 86-538-8811369 |
| Address： DAWENKOU TAI`AN CITY CHINA | | Tel： | 86-538-8811369 Fax： | 86-538-8811369 |
| 成交方式： CIF | 提单号： RCKI188QINNOL50 | | 合同号： | |
| Term of Delivery： CIF | B/L No： RCKI188QINNOL50 | | Contract No： | |
| 致： GD DISTRIBUTORS,LLC | | 付款方式： | CIF | |
| To： GD DISTRIBUTORS,LLC | | Payment： | CIF | |
| | | 装船口岸： 青岛 | 目的地： | 新奥尔良 |
| | | From： QINGDAO | To： | New Orleans |

| 唛头及号码 Mark | 品名及规格 Description | 数量 Quantity | 单价 UnitPrice | 金额 Amount |
|---|---|---|---|---|
| | GYPSUM BOARD 3660*1220*12.7 | 1320PCS | USD8.7888/PCS | USD11601.22 |

| | | | | |
|---|---|---|---|---|
| 合计： TOTAL： USD11601.22 | | | | |

单位名称：(盖章)
Signature
(本发票手写无效)

第一联：存根联（填票单位留存）

泰国税发泰字[2006]003 号 8 千 195×266.7×7 * 山东多利达印务有限公司 2006年元月印 *

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

Peng S.

EXHIBIT NO. 8
in 9106.

L. GOLKOW

山东省泰安市 Special for Export

山东省泰安市地方税务局普 通发票
Taian Shandong Province Special Invoice for Export

Special Use for Export

存 根 联
Counterfoil

发票代码137090626307
发票号码 **00017539**

2006年 月2 2日填制
Date 2006 M2 2D

| 出口企业名称: | 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号: | 370903785030460 |
|---|---|---|---|
| Exporter Name: | TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No: | 370903785030460 |

| 出口企业地址: | 泰安市岱岳区 | 电话: | 86-538-88110传真: | 86-538-8812679 |
|---|---|---|---|---|
| Address: | DAWENKOU TAI`AN CITY CHINA | Tel: | 86-538-88110Fax: | 86-538-8812679 |

| 成交方式: | FOB | 提单号: | UMSCFPPF3009 合同号: |
|---|---|---|---|
| Term of Delivery: | FOB | B/L No: | UMSCFPPF3009 Contract No: |

| 致: | STONE PRIDE INTERNATIONAL CORP | 付款方式: | | T/T |
|---|---|---|---|---|
| To: | STONE PRIDE INTERNATIONAL CORP | Payment: | | T/T |

| 装船口岸: | 青岛 | 目的地: | |
|---|---|---|---|
| From: | QINGDAO | To: | USA |

| 唛头及号码<br>Mark | 品名及规格<br>Description | 数 量<br>Quantity | 单 价<br>UnitPrice | 金 额<br>Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD<br>1220*3600*12.7mm | 2640SHEETS | USD3.80/SHEETS | USD10032.00 |

| 合 计:<br>TOTAL: | USD10032.00 |
|---|---|

单位名称:(盖章)
Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0001658

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出 口 专 用
Special Use for Export

存 根 联
Counterfoil

发票代码 137090726307
发票号码 00001188

Date 2007 年 4 月 3 日填制
2007 M 4 3D

| 出口企业名称： 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903785030460 |
|---|---|---|
| Exporter Name: TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No.: | 370903785030460 |
| 出口企业地址： 泰安市岱岳区 | 电话： | 86-538-8812679 |
| Address: DAWENKOU TAI`AN CITY CHINA | Tel: | 86-538-8812679 |

| 成交方式： FOB 提单号： PMSCHYHYQ2868 | 合同号： | |
|---|---|---|
| Term of Delivery: FOB B/L No: PMSCHYHYQ2868 | Contract No: | |
| 致： ORIENTAL TRADING COMPANY, LLC | 付款方式： | T/T |
| To: ORIENTAL TRADING COMPANY, LLC | Payment: | T/T |
| | 装船口岸： | 目的地： |
| | From: QINGDAO To: MIAMI |

| 唛头及号码 Mark | 品 名 及 规 格 Description | 数 量 Quantity | 单 价 UnitPrice | 金 额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 3660*1220*12.7mm | 20100PCS | USD3.85/PCS | USD77385.00 |

| 合 计： TOTAL: USD77385.00 | | | | |

单位名称：(盖章)
Signature
(本发票手写无效)

山东省泰安市出口商品专用发票

出 口 专 用

Taian Shandong Province Special Invoice for Export

Special Use for Export

## 存 根 联
### Counterfoil

发票代码 137090726307

发票号码 00001196

| 2007 | 月 5 | 照填制 |
| 2007 | 5 | 28 |
| Date | | |
| Y | M | D |

| 出口企业名称： | 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
| Exporter Name: | TAIAN TAISHAN PLASTERBOARD CO.,LTD. | Tax Registration No: | 370903720743873 |
| 出口企业地址： | 泰安市岱岳区 | 电话： | 86-538-8811077 | 传真： | 86-538-8812679 |
| Address: | DAWENKOU TAI`AN CITY CHINA | Tel: | 86-538-8811077 | Fax: | 86-538-8812679 |
| 成交方式： | FOB | 提单号 | PMSCHYVQ2973 | | |
| Term of Delivery: | FOB | B/L No: | PMSCHYVQ2973 | Contract No: | |
| 致： | ORIENTAL TRADING COMPANY,LLC | 付款方式： | T/T | | |
| To: | ORIENTAL TRADING COMPANY,LLC | Payment: | T/T | | |
| | | 装船口岸： | | 目的地： | |
| | | From: | QINGDAO | To: | MIAMI |

| 唛头及号码 Mark | 品 名 及 规 格 Description | 数 量 Quantity | 单 价 UnitPrice | 金 额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 1220*2440*12.7mm | 4900PCS | USD2.6000/PCS | USD12740.00 |

| 合 计： TOTAL: | USD12740.00 |

单位名称：(盖章)
Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

| 出 口 专 用 |
| Special Use for Export |

存　根　联
Counterfoil

发票代码 137090726307
发票号码 00001190

| | 2007 | 月 5 | 日填制 |
| Date | 2007 | M 5 | D 8 |

| 出口企业名称： | 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
| Exporter Name: | TAIAN TAISHAN PLASTERBOARD CO.,LTD. | Tax Registration No: | 370903720743873 |

| 出口企业地址： | 泰安市岱岳区 | 电话： | 86-538-8812679 |
| Address: | DAWENKOU TAI'AN CITY CHINA | Tel: | 86-538-8812679 |

| 成交方式： | FOB | 提单号： | PMSCHYVIQ3076 |
| Term of Delivery: | FOB | B/L No: | PMSCHYVIQ3076 |

| 致： | ORIENTAL TRADING COMPANY,LLC | 付款方式： | T/T |
| To: | ORIENTAL TRADING COMPANY,LLC | Payment: | T/T |

| 装船口岸： | 目的地： |
| From: | QINGDAO | To: | MIAMI |

| 唛头及号码<br>Mark | 品名及规格<br>Description | 数量<br>Quantity | 单价<br>UnitPrice | 金额<br>Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD<br>1220*2440*12.7mm | 5880PCS | USD2. 6000/PCS | USD15288. 00 |

| 合　计：<br>TOTAL： | USD15288. 00 |

单位名称：(盖章)
Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出 口 专 用
Special Use for Export

存 根 联
Counterfoil

发票代码 137090726307
发票号码 00001199

| | 2007 | 月 5 | 日填制 |
|---|---|---|---|
| Date | 2007 | M 5 | D 8 |

| 出口企业名称： 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
|---|---|---|
| Exporter Name：TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No： | 370903720743873 |

| 出口企业地址： 泰安市岱岳区 | 电话： | 86-538-8812679 |
|---|---|---|
| Address： DAWENKOU TAI`AN CITY CHINA | Tel： | 86-538-8812679 |

| 成交方式： FOB 提单号： PMSCHYQVQ2575 |
|---|
| Term of Delivery： FOB B/L No： PMSCHYQVQ2575 |

| 致： ORIENTAL TRADING COMPANY,LLC | 付款方式： T/T |
|---|---|
| To： ORIENTAL TRADING COMPANY,LLC | Payment： T/T |

| 装船口岸： | 目的地： |
|---|---|
| From： QINGDAO To： MIAMI |

第一联：存根联（填票单位留存）

| 唛头及号码 Mark | 品名及规格 Description | 数量 Quantity | 单价 UnitPrice | 金额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 1220*2440*12.7mm | 1960PCS | USD2.6000/PCS | USD5096.00 |

| 合 计： TOTAL： USD5096.00 |
|---|

单位名称:(盖章)
Signature
(本发票手写无效)

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出 口 专 用
Special Use for Export

存 根 联
Counterfoil

发票代码 137090726307
发票号码 00001200

2007 年 5 月 5 日
Date  Y 2007  M 5  D 8

| 出口企业名称： | 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
| Exporter Name | TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No: | 370903720743873 |
| 出口企业地址： | 泰安市岱岳区 | 电话： | 86-538-8811077 |
| Address | DAWENKOU TAI'AN CITY CHINA | Tel: | 86-538-8811077 | 传真 86-538-8812679 Fax: 86-538-8812679 |
| 成交方式 | FOB | 提单号： | PMSCHYKYO2974 | 合同号 |
| Term of Delivery | FOB  B/L No.: | PMSCHYKYO2974 | Contract No.: |
| 致： | ORIENTAL TRADING COMPANY,LLC | 付款方式： | T/T |
| To： | ORIENTAL TRADING COMPANY,LLC | Payment： | T/T |
| | | 装船口岸： | 目的地： |
| | | From: QINGDAO | To: MIAMI |

| 唛头及号码<br>Mark | 品名及规格<br>Description | 数量<br>Quantity | 单价<br>UnitPrice | 金额<br>Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD<br>1220*2440*12.7mm | 4900PCS | USD2.6000/PCS | USD12740.00 |

合 计：
TOTAL:  USD12740.00

单位名称:(盖章)
Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0001666

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出 口 专 用
Special Use for Export

存　根　联
Counterfoil

发票代码 137090726307
发票号码 00001202

| | | Date | 2007 | 年 | 月6 | 日填制 | |
|---|---|---|---|---|---|---|---|
| | | | 2007 | M6 | | 12 | |

| 出口企业名称： | 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
|---|---|---|---|
| Exporter Name: | TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No.: | 370903720743873 |

| 出口企业地址： | 泰安市岱岳区 | 电话： | 86-538-8811679 | 传真： | 86-538-8812679 |
|---|---|---|---|---|---|
| Address: | DAWENKOU TAI`AN CITY CHINA | Tel: | 86-538-8811679 | Fax: | 86-538-8812679 |

| 成交方式： | FOB | 提单号： | PMSCHYH507995 | | |
|---|---|---|---|---|---|
| Term of Delivery: | FOB | B/L No.: | PMSCHYH507995 | Contract No.: | |

| 致： | ORIENTAL TRADING COMPANY,LLC | 付款方式： | | T/T |
|---|---|---|---|---|
| To: | ORIENTAL TRADING COMPANY,LLC | Payment: | | T/T |
| | | 装船口岸： | | 目的地： |
| | | From: | QINGDAO | To: MIAMI |

| 唛头及号码<br>Mark | 品名及规格<br>Description | 数量<br>Quantity | 单价<br>UnitPrice | 金额<br>Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD<br>1220*2440*12.7mm | 2940sheets | USD2.6000/sheet | USD7644.00 |

| 合 计：<br>TOTAL: | USD7644.00 | | | |
|---|---|---|---|---|

单位名称：(盖章)
Signature
(本发票手写无效)

第一联：存根联（填票单位留存）

鲁国税发表字[2007]003 号 2.7 195×266.7×7 • 山东多利行业有限公司 2006 年 12 月产 •

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出 口 专 用
Special Use for Export

存 根 联
Counterfoil

发票代码 13709072630 7
发票号码 00001214

| | 2007年 7月 6日 填制 | |
| Date | 2007 M6 日 | |

| 出口企业名称： | 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
| Exporter Name | TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No： | 370903720743873 |
| 出口企业地址： | 泰安市岱岳区 | 电话： | 86-538-8811872 传真： 86-538-8812679 |
| Address： | DAWENKOU TAI AN CITY CHINA | Tel： | 86-538-8811872 Fax： 86-538-8812679 |
| 成交方式： | FOB    提单号： PMSCHYH403657 | | |
| Term of Delivery： | FOB    B/L No： PMSCHYH403657 | No： | . |

| 致： | ORIENTAL TRADING COMPANY,LLC | 付款方式： | T/T |
| | | Payment： | T/T |
| To： | ORIENTAL TRADING COMPANY,LLC | 装船口岸： | 目的地： |
| | | From： QINGDAO To： MIAMI | |

| 唛头及号码 Mark | 品 名 及 规 格 Description | 数 量 Quantity | 单 价 UnitPrice | 金 额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 3660*1220*12.7mm | 2010PCS | USD3. 8500/PCS | USD7738. 50 |

| 合 计： | |
| TOTAL： | USD7738. 50 |

单位名称：(盖章)
Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出　口　专　用
Special Use for Export

存　根　联
Counterfoil

发票代码 137090726307
发票号码 00001218

2007 年 7 月 3 日填制
Date　Y　M　D

370903720743873

出口企业名称： 泰安市泰山纸面石膏板有限公司
Exporter Name: TAIAN TAISHAN PLASTERBOARD CO.,LTD

出口企业税务登记证号：
Tax Registration No: 370903720743873

出口企业地址： 泰安市岱岳区
Address: DAWENKOU TAI AN CITY CHINA

电话： 86-538-8811077　传真： 86-538-8812679
Tel: 86-538-8811077　Fax: 86-538-8812679

成交方式： FOB　提单号 PMSCHYHYQ3055
Term of Delivery: FOB　B/L No: PMSCHYHYQ3055

合同号：
Contract No:

致： ORIENTAL TRADING COMPANY,LLC
To: ORIENTAL TRADING COMPANY,LLC

付款方式： T/T
Payment: T/T

装船口岸： QINGDAO　目的地： MIAMI/USA
From:　To:

| 唛头及号码 Mark | 品名及规格 Description | 数量 Quantity | 单价 UnitPrice | 金额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 1220*3660*12.7 | 6700PCS | USD3.8500/PCS | USD25795.00 |

合计：
TOTAL:　USD25795.00

单位名称：(盖章)
Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

TG 0001669

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

出口专用
Special Use for Export

存　根　联
Counterfoil

发票代码 137090726307
发票号码 00001219

Date 200年 月 3日填制
2007 M 3D

| 出口企业名称：泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号： | 370903720743873 |
|---|---|---|
| Exporter Name:TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No: | 370903720743873 |

| 出口企业地址：泰安市岱岳区 | 电话： | 86-538-8811077 | 传真： | 86-538-8812679 |
|---|---|---|---|---|
| Address: DAWENKOU TAI`AN CITY CHINA | Tel: | 86-538-8811077 | Fax: | 86-538-8812679 |

| 贸易方式： FOB | 提单号： PMSCHYHXQ0054 |
|---|---|
| Term of Delivery: FOB | B/L No: PMSCHYHXQ0054 Contract No: |

ORIENTAL TRADING COMPANY,LLC

ORIENTAL TRADING COMPANY,LLC

| 付款方式： | T/T |
|---|---|
| Payment: | T/T |

| 装船口岸： | 目的地： |
|---|---|
| From: QINGDAO | To: MIAMI/USA |

| 唛头及号码 Mark | 品名及规格 Description | 数量 Quantity | 单价 UnitPrice | 金额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 1220*3660*12.7 | 6700PCS | USD3.8500/PCS | USD25795.00 |

合计：
TOTAL:  USD25795.00

单位名称:(盖章)
Signature
(本发票手写无效)

Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

TG 0001670

山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

专用于出口
Special Use for Export

存 根 联
Counterfoil

137090626307
No 00013765

2006年 月0 5日填制
Date 2006  NO  5D

| 出口企业名称: 泰安市泰山纸面石膏板有限公司 | 出口企业税务登记证号: | 370911785030460 |
|---|---|---|
| Exporter Name: TAIAN TAISHAN PLASTERBOARD CO.,LTD | Tax Registration No: | 370911785030460 |
| 出口企业地址: 泰安市岱岳区 | 电话: | 86-538-88111传真: 86-538-8812679 |
| Address: DAWENKOU TAI`AN CITY CHINA | Tel: | 86-538-88110Fax: 86-538-8812679 |
| 成交方式: FOB  提单号: ZIMUQIN24-0388号 | 付款方式: | T/T |
| Term of Delivery: FOB  B/L No: ZIMUQIN24-0388 Contract No: | Payment: | T/T |
| 致: TOV TRADING NEW YORK,USA | 装船口岸: 青岛  目的地: 纽约 |  |
| To: TOV TRADING NEW YORK,USA | From: QINGDAO  To: NEW YORK |  |

| 唛头及号码 Mark | 品 名 及 规 格 Description | 数 量 Quantity | 单 价 UnitPrice | 金 额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD 2440*1220*12.7mm | 9000PCS | USD2.60/PCS | USD23400.00 |

| 合 计: TOTAL: USD23400.00 | | | 单位名称:(盖章) Signature (本发票手写无效) |
|---|---|---|---|

Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER



山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

特 殊 用 途
Special Use for Export

存 根 联
Counterfoil

137090626307
No 00013764

2006年 1月 5 日填制
Date 2006y 1M 5 D

| 出口企业名称：泰安市泰山纸面石膏板有限公司 | | 出口企业税务登记证号： | 370911785030460 |
| Exporter NESHAN TAISHAN PLASTERBOARD CO.,LTD | | Tax Registration No. | 370911785030460 |
| 出口企业地址： 泰安市岱岳区 | | 电话： | 86-538-8811077 |
| Address： DAWENKOU TAI`AN CITY CHINA | | Tel： 86-538-8811077 | 传真： 86-538-8812679 Fax： |
| 成交方式： FOB 提单号： ZIMUQIN294455 | | | |
| Term of Delivery： FOB B/L No： ZIMUQIN294455 | | 合同号： Contract No： | |
| 致： TOV TRADING NEW YORK,USA | | 付款方式： T/T | |
| To： TOV TRADING NEW YORK,USA | | Payment： T/T | |
| | | 装船口岸： 青岛 目的地：纽约 | |
| | | From： QINGDAO To： NEW YORK | |

| 唛头及号码 Mark | 品名及规格 Description | 数量 Quantity | 单价 UnitPrice | 金额 Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD | | | |
| | 2440*1220*12.7mm | 14000PCS | USD2.65/PCS | USD37100.00 |
| | 3660*1220*12.7mm | 3400PCS | USD4.0735/PCS | USD13850.00 |

合 计： USD50950.00
TOTAL：USD50950.00

单位名称：(盖章)
Signature
(本发票手写无效)

(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER



山东省泰安市出口商品专用发票
Taian Shandong Province Special Invoice for Export

存 根 联
Counterfoil

1370906263 07
No 00013763

2006年 月 5 日 填制
Date 2006 M 5 D

| 出口企业名称: 泰安市泰山纸面石膏板有限公司 | | 出口企业税务登记证号: | 370911785030460 |
|---|---|---|---|
| Exporter Name TAIAN TAISHAN PLASTERBOARD CO.,LTD | | Tax Registration No: | 370911785030460 |
| 出口企业地址: 泰安市岱岳区 | | 电话: 86-538-8811 | 传真: 86-538-8812679 |
| Address: DAWENKOU TAI`AN CITY CHINA | | Tel: 86-538-881107 | Fax: 86-538-8812679 |
| 成交方式: FOB 提单号: ZIMUQIN294453 | | 合同号: TDX06-RW041 | |
| Term of Delivery: FOB B/L No: ZIMUQIN294453 | | Contract No: TDX06-RW041 | |
| 至: TOV TRADING NEW YORK,USA | | 付款方式: T/T | |
| To: TOV TRADING NEW YORK,USA | | Payment: T/T | |
| | | 装船口岸: 青岛 目的地: 纽约 | |
| | | From: QINGDAO To: NEW YORK | |

| 唛头及号码<br>Mark | 品名及规格<br>Description | 数量<br>Quantity | 单价<br>UnitPrice | 金额<br>Amount |
|---|---|---|---|---|
| N/M | GYPSUM BOARD<br>2440*1220*12.7mm | 2000PCS | USD2. 60/PCS | USD5200. 00 |

合 计:
TOTAL: USD5200.00

单位名称:(盖章)
Signature
(本发票手写无效)

Signature
(本发票手写无效)

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

# PENG S/SHILIANG EXHIBIT 9
# FILED UNDER SEAL

# CONTRACT

**THE SELLERS:**   TAIAN TAISHAN PLASTERBOARD CO., LTD
DAWENKOU DAIYUE DISTRICT OF TAIAN
SHANDONG PROVINCE, CHINA 271026
TEL:0086-538-8812002 / 2017
FAX:0086-538-8812679
E-MAIL: clempwl123@163.com

**THE BUYERS:**   WOOD NATION, INC.
10740 PLANTATION BAY DRIVE
TAMPA, FLORIDA  33647
TEL: 813-994-6499
FAX: 813-994-4497
E-MAIL: woodnation@verizon.net

**CONTRACT NUMBER:**  WN7350

This contract is made by and between the Buyers and the Sellers, hereby the Buyers agree to buy and the Sellers agree to sell the under mentioned commodity according to the terms and conditions stipulated below:

1.   **COMMODITY:**  Gypsum Drywall (hereafter referred to as the "Product").

2.   **COUNTRY OF ORIGIN AND MANUFACTURERS:**  Peoples Republic of   China

3.   **SIZE SPECIFICATIONS:**  Shall be ½" in thickness, 4' in width and 12' in length.

4.   **GRADE STANDARDS:**  'Regular' and 'Ceiling' products shall be produced to American Society for Testing and Materials ("ASTM") C 1396-04 Standards. 'ASTM C 1396-04' shall be stamped on the back of each piece.

5.   **PACKING:**

   a)    To be packed in a manner suitable for long distance ocean container transportation.  The Sellers shall be liable for any damage of the commodity and expenses incurred on account of improper packing or improper protective measures taken by the Sellers in regard to the packing.

   b)    The 12 unitized portions shall consist of 40 piece units.  The remaining 180 pieces do not have to be unitized.

6.   **TIME OF SHIPMENT:**  Start June 2006 and ship through December 2006 at the rate of 20 to 30 containers per week.  Buyer shall advise Seller approximately 10 days in advance container availability for the next shipping segment.

7.   **QUANTITIES:**  Five hundred (500) forty foot (40') high cube container loads, each to contain six hundred and sixty (660) pieces).  'Regular' and 'Ceiling' products shall not be

*Richard Hannem*
6-10-2006

–26–



shipped in the same container.   The percentage ratio of 'Regular' vs 'Ceiling' shall be 66.6% 'Regular' and 33.3% 'Ceiling'.

8.   **PRICE:** USD $4.20 per piece for both Regular and Ceiling ½" 4'X12' FOB Qingdao, China.

9.   **TOTAL VALUE:** One million, three hundred and eighty six thousand dollars. (USD$1,386,000) +/- 2%.

10.  **PORT OF LOAD:** Qingdao, China

11.  **PORT OF DISCHARGE:** Tampa, Florida, USA

12.  **PAYMENT:** Within 10 working days of contract signing, Buyers shall open an irrevocable Letter of Credit (L/C) through "Bank of America, Trade Operations Office, USA" payable against Seller's draft drawn at sight on the Bank of America, Trade Operations Office, USA, accompanied by the commercial documents set out in paragraph 14. The L/C shall show 'Partial Shipments Allowed'. In addition, within 10 working days after signing of contract Buyer will place a USD100,000 security deposit with the Seller. This deposit shall be deducted from the final Seller's invoices. All bank charges at issuing bank are for the account of the applicant and all advising bank charges are for the account of the beneficiary. The L/C shall remain valid for negotiation freely at any bank until January 31, 2007.

13.  **CONTINGENCY:** If for any reason the container shipping rates increase to a prohibitive level, Buyer may choose to cancel, or delay shipments on this contract. This, with a thirty day written notice to the Seller from the Buyer. If Seller's costs increase to a prohibitive level, Seller shall give thirty days notice to the Buyer giving Buyer the option of increasing the cost of product, canceling or delaying shipments.

14.  **DOCUMENTS:**

     a)   Full set (i.e. 3/3 originals) of clean on board ocean bills of lading marked "Freight Collect" made out to order blank endorsed notifying Buyer. The bills of lading shall include the statement "NO SOLID WOOD PACKING MATERIAL".

     b)   Signed invoice in 4 originals indicating contract number, made out in details as per the relative contract.

     c)   Packing list in 4 originals, including piece count. The packing list shall state "NO SOLID WOOD PACKING MATERIAL".

     .e)   Certificate of Origin.

15.  **SHIPMENT:** December 31, 2006 or sooner.

16.  **SHIPPING ADVICE:** The Sellers shall, immediately upon the completion of the loading of the commodity, advise the Buyers by fax or e-mail of the contract no., commodity, quantity, trade term, invoiced value, container numbers and date of loading.

17.  **DELIVERY OF DOCUMENTS:** The Seller shall, within 21 working days after shipment, deliver the original documents specified above directly to the Buyer's bank.

-27-

*Richard Hannon*
6-10-2006

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER

18. **CLAIMS:** Within 30 days after the arrival of the commodity at destination, should the quality, specification, or quantity be found not in conformity with the stipulations of the contract, except those claims for which the insurance company or the carrier accept liability, the Buyers shall, on the strength of an inspection certificate, have the right to claim for replacement with new commodity, or for compensation.

19. **FORCE MAJEURE:** Should any of the following circumstances prevent either party from carrying out its obligations under the contract, namely: acts of civil or military authority; government acts, orders, or restrictions; earthquakes; or flood, the contract shall be extended for as long as the circumstances remain. In the event that these circumstances continue for more than 30 days, each party shall have the right to refuse to continue the performance of its obligations under the contract and, in such case, no party shall be entitled to indemnification from the other party for any loss it may sustain. In all cases, the party declaring force majeure is required to provide within 14 days acceptable documentation of the incident issued by the competent Government Authorities where the incident occurs as evidence thereof.

20. **CARGO DAMAGE AT SEA:** Sellers shall be liable for the full value of any product damaged due to improper stowing. Buyers shall carry ALL RISK cargo insurance.

21. **BANKING CHARGES:** All the banking charges incurred by the Buyers shall be borne by the Buyers while all the banking charges incurred by the Sellers shall be borne by the Sellers.

22. **GENERAL PROVISIONS:** This contract is subject to interpretation according INCOTERMS 2000. By signing this contract, previous correspondences and negotiations connected herewith shall be null and void. This contract comes into effect from signing date by fax; any amendment and additional clause to these conditions shall be valid only if made in written form and duly confirmed by both sides.

This contract shall come into effect immediately after each party has signed the contract (either by fax or original signature). It is the intent of both Buyers and Sellers to also sign two original copies; with each party holding one copy.

THE BUYERS:  WOOD NATION, INC.

BY: _Richard Hancan_         DATE: _June 10, 2006_

TITLE: _President_

THE SELLERS:  TAIAN TAISHAN PLASTERBOARD CO., LTD.

BY: _____         DATE: _06. 6. 10_

TITLE: _____

–28–

CONFIDENTIAL — SUBJECT TO
PROTECTIVE ORDER