UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE MANUFACTURED | * | MDL No. 2047 |
| DRYWALL PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | JOSEPH C. WILKINSON, JR. |
| | * | |

* * * * * * * * * * * * ** * * * * * ** * * * * * * ** * *

**THIS DOCUMENT RELATES TO:** *Wiltz v. Beijing New Building Materials Public Ltd. Co. et al.*, **Case No. 10-361**

**MEMORANDUM OF DEFENDANTS TAISHAN GYPSUM CO. LTD.
AND TAIAN TAISHAN PLASTERBOARD CO., LTD.
IN SUPPORT OF THEIR MOTION PURSUANT
TO RULE 12(B)(2) TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

PROCEDURAL BACKGROUND.........................................................................2

FACTUAL BACKGROUND .................................................................................5

    A.    TG Never Has Conducted Business In Louisiana Or Elsewhere In The U.S. ...................................................................................................5

    B.    TTP Operated Independently Of TG ...........................................................8

        1.    TTP Observed Corporate Formalities. ........................................... 9

        2.    TTP's Daily Operations Were Managed Independently Of TG. ......................................................................................... 10

        3.    TTP's Facilities And Employees Were Independent Of TG ................... 11

        4.    TTP Ceased Operations In 2008 For Economic Reasons. ........................ 12

    C.    TTP Never Has Conducted Business In Louisiana Or Elsewhere In The U.S. .................................................................................................13

        1.    Overview Of TTP's Sales Of Drywall .................................... 13

        2.    Most Of TTP's Sales Were To Chinese Trading Companies ................... 14

        3.    TTP Made Two Isolated Sales In China To Companies That Advised TTP They Intended To Ship To Louisiana......................... 14

            a.    APIC .................................................................... 15

            b.    GD Distributors ..................................................... 16

    D.    BNBM's Arm's-Length Relationship With TG ...................................................17

        1.    TG Observed All Required Corporate Formalities ................................... 18

        2.    TG's Day-To-Day Business Was Operated By TG's Officers ..................................................................... 19

3.　　BNBM And TG Were Operated Independently ...................................... 20

E.　　Relationship Between TG And Other Upstream Affiliates ................... 22

Argument ....................................................................................................................... 23

I.　　THE DUE PROCESS CLAUSE PRECLUDES THIS COURT'S
EXERCISE OF JURISDICTION OVER EITHER TG OR TTP ...................................... 23

A.　　Plaintiffs Cannot Establish That Either TG Or TTP Had Minimum
Contacts With Louisiana. ........................................................................ 24

1.　　Plaintiffs Cannot Prove That Either TG Or TTP
Purposefully Availed Itself Of The Louisiana Market Based
On Its Alleged Awareness Of Sales In Louisiana ..................................... 42

2.　　Plaintiffs Cannot Prove That TG Or TTP's Isolated Sales
Of Drywall In China Constituted Purposeful Availment
Under Fifth Circuit Or Louisiana Law ...................................................... 43

B.　　Plaintiffs Cannot Prove That Their Causes Of Action Arose Out Of
Or Resulted From TG Or TTP's Contacts With Louisiana ................... 50

C.　　The Exercise Of Jurisdiction Over TG Or TTP Would Be
Unreasonable And Would Offend Traditional Notions Of Fair Play
And Substantial Justice. .......................................................................... 53

II.　　THE ACTIVITIES OF OTHER ENTITIES CANNOT BE ATTRIBUTED
TO TG. ...................................................................................................................... 58

1.　　TTP's Separate Corporate Personhood Should Be
Respected Under Chinese Law ................................................................. 60

2.　　TTP's Separate Corporate Personhood Would Be
Respected Under Louisiana Law .............................................................. 64

A.　　TTP Was Not TG's Agent ...................................................................... 66

B.　　No Upstream Entities' Activities Should Be Attributed To TG ........... 67

CONCLUSION ................................................................................................................ 70

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adm'rs of Tulane Educ. Fund v. Biomeasure, Inc.*,
    687 F. Supp. 2d 620 (E.D. La. 2009) .................................................................................... 66

*Ainsworth v. Cargotec USA, Inc.*,
    No. 10-236, 2011 WL 4443626 (S.D. Miss. Dec. 15, 2011), *leave to appeal granted*,
    No. 1190052 (5th Cir. Mar. 1, 2012) .................................................................................... 36

*Asahi Metal Corp., Ltd. v. Superior Court*,
    480 U.S. 102 (1987) ............................................................................................................ passim

*Benjamin v. W. Boat Bldg. Corp.*,
    472 F.2d 723 (5th Cir. 1973). ............................................................................................. 45

*Big Easy Energy, LLC v. Conglomerate Gas*,
    No. 09-3231, 2010 WL 1038225 (E.D. La. Mar. 17, 2010) ................................................ 48

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ............................................................................................................ passim

*Calder v. Jones*,
    465 U.S. 783 (1984) ........................................................................................................... 57

*Cannon Mfg. Co. v. Cudahy Packing Co.*,
    267 U.S. 333 (1925) ........................................................................................................... 64

*Charia v. Cigarette Racing Team, Inc.*,
    583 F.2d 184 (5th Cir. 1978) ..................................................................................... 44, 45, 46

*Command-Aire Corp. v. Ontario Mech. Sales & Serv. Inc.*,
    963 F.2d 90 (5th Cir. 1992) ............................................................................................... 43

*Davis v. Dempster*,
    790 So. 2d 43 (La. App. 3d Cir. 2000) .............................................................................. 64

*De James v. Magnificence Carriers, Inc.*,
    654 F.2d 280 (3d Cir. 1981) ............................................................................................... 30

*De Reyes v. Marine Mgmt. & Consulting, Ltd.*,
    586 So. 2d 103 (La. 1991) ................................................................................................. 49

*Dickson Marine Inc. v. Panalpina, Inc.*,
    179 F.3d 331 (5th Cir. 1999) ........................................................................................ 65, 67

*Dow Chem. Canada ULC v. Superior County*,
   202 Cal. App. 4th 170 (Ca. 2011) ........................................................................37

*DP Solutions, Inc. v. Rollins, Inc.*,
   34 Fed. App'x 150 (5th Cir. 2002) ........................................................................64

*Felch v. Transportes Lar-Mex SA DE CV*,
   92 F.3d 320 (5th Cir. 1996) ...................................................................................24

*Fricke v. Owens-Corning Fiberglass Corp.*,
   647 So. 2d 1260 (La. App. 4th Cir. 1994) .............................................................49

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   131 S. Ct. 2846 (2011) .....................................................................................27, 52

*Gray v. Riso Kagaku Corp.*,
   82 F.3d 410, 1996 WL 181488 (4th Cir. Apr. 17, 1996) .......................................54

*Growden v. Ed Bowlin & Assocs., Inc.*,
   733 F.2d 1149 (5th Cir. 1984) ...............................................................................45

*Guzman v. Memorial Hermann Hosp. Sys.*,
   No. 07-3973, 2008 WL 5273713 (S.D. Tex. Dec. 17, 2008)..................................51

*Hanson v. Denckla*,
   357 U.S. 235 (1958)..........................................................................................26, 34

*Hargrave v. Fibreboard Corp.*,
   710 F.2d 1154,1159 (5th Cir. 1983) ......................................................................64

*Helicopteros Nacionales de Columbia, S.A. v. Hall*,
   466 U.S. 408 & 9 (1984)..................................................................................27, 44

*Highlands Fuel Delivery, LLC v. Am. Ins. Co.*,
   No. 2011-00291, 2011 WL 7110393 (N.H. Super. Ct. Nov. 29, 2011)...................37

*Hunt v. Schult Homes Corp.*,
   657 So. 2d 124 (La. App. 3d Cir. 1995) ............................................................... 49

*Hydrokinetics, Inc. v. Alaska Mech., Inc.*,
   700 F.2d 1026 (5th Cir. 1983) ...............................................................................46

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
   MDL No. 2046, 2011 WL 1232352 (S.D. Tex. March 31, 2011) ...........................23

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945)................................................................................... passim

*J. Wilton Jones Co. v. Touche Ross & Co.*,
   556 So. 2d 67 (La. App. 4th Cir. 1989) ...................................................................49

*Jackson v. Tanfoglio Giuseppe, S.R.L.*,
   615 F.3d 579 (5th Cir. 2010) ...................................................................................65

*Johnston v. Multidata Sys. Int'l Corp.*,
   523 F.3d 602 (5th Cir. 2008) ...................................................................................44

*Juelich v. Yamazaki Mazak Optonics Corp.*,
   682 N.W.2d 565 (Minn. 2004) ..................................................................................29

*Kawasaki Steel Corp. v. Middleton*,
   699 S.W.2d 199 (Tex. 1985) ....................................................................................29

*Keeton v Hustler Magazine, Inc.*,
   465 U.S. 770 (1984) .................................................................................................29

*Kelly v. Syria Shell Petroleum Dev. B.V.*,
   213 F.3d 841 (5th Cir. 2000) .............................................................................51, 64

*Keranos, LLC v. Analog Devices, Inc.*,
   No. 10-CV-207, 2011 WL 4027427 (E.D. Tex. Sept. 12, 2011) .............................36

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
   313 U.S. 487 (1941) .................................................................................................58

*LTA, Inc. v. Breeck*,
   2011 WL 3841374 (S.D. Miss. Aug. 26, 2011) ........................................................46

*Luv N' Care, Ltd. v. Insta-Mix, Inc.*,
   438 F.3d 465 (5th Cir. 2006) .............................................................................32, 45

*May v. Osako & Co.*,
   No. CL08002245-00, 2011 WL 4544889 (Va. Cir. Ct. Sept. 12, 2011) ..................37

*McGee v. Int'l Life Ins. Co.*,
   355 U.S. 220 (1957) .................................................................................................27

*Moncrief Oil Int'l Inc. v. OAO Gazprom*,
   481 F.3d 309 (5th Cir. 2007) ...................................................................................47

*Mullins v. TestAmerica Inc.*,
   564 F.3d 386 (5th Cir. 2009) .............................................................................23, 49

*N. Ins. Co. of New York v. Constr. Navale Bordeaux*,
   No. 11-60462, 2011 WL 2682950 (S.D. Fla. July 11, 2011)...................................36

*Nelson v. Park Indus., Inc.*,
    717 F.2d 1120 (7th Cir. 1983) ............................................................................29

*Nicastro v. J. McIntyre Machinery, Ltd.*,
    131 S. Ct. 2780 (2011) ................................................................................. passim

*Nolan v. Boeing Co.*,
    736 F. Supp. 120 (E.D. La. 1990) ......................................................................67

*NTE Aviation, Ltd. v. LIAT (1974) Ltd.*,
    561 F. Supp. 2d 687 (E.D. Tex. 2007) ................................................................46

*OMI Holding, Inc. v. Royal Ins. Co. of Canada*,
    149 F.3d 1086 (10th Cir. 1998) ..........................................................................56

*Osorio v. Dole Food Co.*,
    No. 07-22693, 2009 WL 48189 (S.D. Fla. Jan. 5, 2009) ....................................53

*Oticon v. Sebotek Hearing Sys., LLC*,
    No. 08-5498, 2011 WL 3703423 (D.N.J. Aug. 22, 2011) ....................................37

*Patin v. Thoroughbred Power Boats, Inc.*,
    294 F.3d 640 (5th Cir. 2002) ..............................................................................59

*Petroleum Helicopters, Inc. v. Alco Corp.*,
    513 So. 2d 1188 (La. 1987) .................................................................................24

*Prejean v. Sonatrach, Inc.*,
    652 F.2d 1260 (5th Cir. 1981) ............................................................................50

*Prototype Prods., Inc. v. Reset, Inc.*,
    No. 11-196, 2011 WL6960617 (E.D. Va. Oct. 14, 2011)....................................30

*Ritzmann v. Nalu Kai, Inc.*,
    523 F. Supp. 2d 564 (S.D. Tex. 2007) ................................................................51

*Ruckstuhl v. Owens Corning Fiberglass Corp.*,
    731 So. 2d 881 (La. 1999) ...................................................................................29

*Ruston Gas Turbines, Inc. v. Donaldson Co. Inc.*,
    9 F.3d 415 (5th Cir. 1993) ..................................................................................32

*Seiferth v. Helicopteros Atuneros, Inc.*,
    472 F.3d 266 (5th Cir. 2006) ..........................................................................24, 50

*Singletary v. B.R.X., Inc.*,
    828 F.2d 1135 (5th Cir. 1987) ............................................................................45

*Smith v. Teledyne Cont'l. Motors, Inc.*,
  No. 10-02152, 2012 WL 10836 (D.S.C. Jan. 3, 2012) ...........................................37

*Spartan Motors, Inc. v. Lube Power, Inc.*,
  786 N.E.2d 613 (Ill. 2003) ...........................................................................................29

*Stuart v. Spademan*,
  772 F.2d 1185 (5th Cir. 1985) .....................................................................................47

*Thompson v. Chrysler Motors Corp.*,
  755 F.2d 1162 (5th Cir. 1985) .......................................................................................6

*Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*,
  517 F.3d 235 (5th Cir. 2008) ...............................................................................5, 24

*Windsor v. Spinner Indus. Co.*,
  No. 10-114, 2011 WL 5005199 (D. Md. Oct. 20, 2011) ...........................................36

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980).......................................................................................... passim

**OTHER STATUTES**

La. Rev. Stat. § 13:3201................................................................................................23

**RULES**

Fed. R. Civ. P.12(b)(2)....................................................................................................1

Fed. R. Civ. P. 44.1........................................................................................................59

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Amendment XIV, § 1 ...............................................................................25

Defendants Taishan Gypsum Co. Ltd. ("TG") and Tai'an Taishan Plasterboard Co., Ltd. ("TTP") (collectively, the "Taishan Defendants") submit this memorandum in support of their motion for an order pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure dismissing this action for lack of personal jurisdiction.

## INTRODUCTION

The Complaint must be dismissed because the Court cannot exercise personal jurisdiction over either TG or TTP consistent with the Due Process Clause of the Fourteenth Amendment of the United States Constitution.  The parties have conducted extensive jurisdictional discovery, demonstrating that TG did not sell drywall to any customer from Louisiana or any customer that advised TG it intended to market drywall in Louisiana.  TTP was an independent subsidiary of TG.  TTP made a few isolated sales of drywall *in China* to two companies that advised TTP they intended to ship the drywall they purchased to Louisiana.  TTP was not aware that those companies would later market the drywall in Louisiana.

Neither TG nor TTP had the requisite contacts with Louisiana, the forum State of this directly-filed MDL action, required by Due Process in order for the Court to exercise personal jurisdiction.  There is also no basis to disregard the separate corporate existences of the companies and impute any contacts TTP allegedly had with Louisiana to TG.  Finally, even if Plaintiffs[1] could establish that TG or TTP had minimum contacts with Louisiana and that their causes of action arose from such alleged contacts, the Court's exercise of jurisdiction would be unfair and unreasonable, in violation of Due Process.

---

[1] The term "Plaintiffs" encompasses the named Plaintiffs in the original complaint as well as all subsequent Intervenor-Plaintiffs.  A full listing of all Plaintiffs is contained in Schedule A to this memorandum.

The other defendants in this lawsuit include Beijing New Building Material Public Limited Co. ("BNBM"), China National Building Materials Co., Ltd. ("CNBM") and certain subsidiaries of CNBM ("CNBM Group") (for purposes of this memorandum, collectively the "Upstream Entities").  Although Plaintiffs have not alleged that the contacts of any of the Upstream Entities should be imputed to one or both of the Taishan Defendants for jurisdictional purposes, the allegations in the Complaint and the discovery sought thereunder suggest that the Plaintiffs may make such arguments.  The evidence, however, shows BNBM was nothing more than a major shareholder of TG and there is no basis in the record to disregard the separate corporate existence of TG and BNBM.  TG also had little or no interaction with any other Upstream Entities.  Therefore, there is also no basis to disregard the separate corporate existence of TG, BNBM, or any of the other Upstream Entities and impute any contacts the Upstream Entities may have had with Louisiana to TG or TTP.  Consequently, attributing the activities of any Upstream Entity to TG would not provide a basis for the Court to exercise personal jurisdiction over TG or TTP.

## PROCEDURAL BACKGROUND

Over 500 Plaintiffs (more, if spouses are included) purportedly, "individually, and on behalf of others similarly situated" (the "Wiltz Plaintiffs") commenced this action on February 10, 2010 by filing a "Class Action Complaint" in the Eastern District of Louisiana.[2]  Plaintiffs filed an Amended Omnibus Class Action Complaint on March 15, 2010 ("Complaint" or "Compl.").  (R. Doc. No. 1747).  This putative class action is brought on behalf of every homeowner in the United States and seeks damages allegedly incurred as a result of defective drywall installed in Plaintiffs' homes that was manufactured by one of 12 manufacturer

---

[2] *Wiltz v. Beijing New Building Materials Public Ltd. Co. et al.*, Case No. 10-361 (E.D. La.) at R. Doc. 1.

defendants.  The list of manufacturers includes TG and TTP.[3]  The Complaint also identifies 219 subclasses of distributors, suppliers, importers, exporters, brokers, builders, developers, contractors and installers for their alleged "role in the design, manufacture, importing, distributing, delivery, supply, marketing, inspecting, installing or sale" of the allegedly defective drywall manufactured by the manufacturer defendants.

Of the 520 properties complained of in the original complaint, 312 allegedly contain drywall manufactured by TG or TTP.

Plaintiffs allege that TG and TTP are subject to jurisdiction because each is "doing business in several states, including but not limited to Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina and Virginia."  (Complaint ¶¶ 507-508).  Plaintiffs further allege that TG and TTP each, "together with its affiliates and/or actual or apparent agents, manufactured, sold, distributed, marked and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various states . . ."; that TG and TTP each "continuously and systematically distributed and sold drywall to numerous purchasers in the United States . . ."; and that TG and TTP each "manufactured and sold, directly and indirectly, to certain suppliers in the United States."  (*Id.*). The Complaint also alleges that TTP is a subsidiary of TG.  (Compl. ¶ 509.)

The Complaint also asserts claims against Beijing New Building Materials Public Co. Ltd ("BNBM").  Plaintiffs allege*, inter alia*, that BNBM "together with its affiliates and/or actual or apparent agents, manufactured, sold, distributed, marked and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various states . . .".  (Compl. ¶ 506).

---

[3] TG and TTP are referred to in the Complaint as "Taishan" and constitute Class No. 11.

After the Complaint was filed, four additional sets of Plaintiffs claiming to be absent class members filled motions to intervene in this action. (R. Doc. Nos. 3099, 4347, 5669, 6649). On June 1, 2010, the Court permitted Alan and Annette Goddard to intervene, which resulted in the filing of the *Goddard* Intervenor-Complaint. (R. Doc. Nos. 3451, 3476). On September 16, 2010 the Court permitted a group of additional Plaintiffs to intervene, which resulted in the filing of the *Burke* Intervenor-Complaint the same day. (R. Doc. Nos. 5559, 5576). On December 3, 2010, the Court permitted another group of additional Plaintiffs to intervene in this action, which resulted in the filing of the *Amorin* Intervenor-Complaint on December 6, 2010. (R. Doc. Nos. 6565, 6567). Finally, on January 22, 2011, the Court granted the motion by Clifford Abromatts and Janice Worobec, *et al.* to intervene in this action, which led to the filing of the *Abromatts* Intervenor-Complaint on January 24, 2011. (R. Doc. Nos. 7133, 7182). (The Plaintiffs listed in the *Goddard, Burke*, *Amorin* and *Abromatts* Intervenor-Complaints are referred to as "Intervenor-Plaintiffs"). As a result, another 1,064 Intervenor-Plaintiffs were added to this action, complaining of 684 homes. 811 of the 1,064 Intervenor-Plaintiffs have asserted claims against TG and TTP.

Although the first named Plaintiffs in this action, Kenneth and Barbara Wiltz, allege that they are residents of Louisiana and that drywall was installed in their home in Louisiana, most of the other Plaintiffs are not residents of Louisiana and their claims relate to homes outside of Louisiana.[4] Only 52 out of a total of 1306 Plaintiffs who have asserted claims against TG and TTP complain of property located in Louisiana. The rest complain of property in other States. None of the Plaintiffs in this action has served TG or TTP in any other action, with the exception of those plaintiffs who are also plaintiffs in the *Germano* action.

---

[4] The Plaintiffs who do not reside in Louisiana, and who make claims for allegedly defective drywall in homes outside of Louisiana are referred to as the "Foreign Plaintiffs".

On June 10, 2010 TG and TTP filed Notices of Appearance in this action.  (R. Doc. No. 3668).  Under the Court's pre-trial orders, TG and TTP are not required to answer, move or otherwise respond to the Complaint in this action until 30 days after the Plaintiffs certify that they have completed amending their pleadings, which they have not done.[5]

Beginning in October 2010, the Court ordered the parties to engage in discovery for the purpose of determining whether there is personal jurisdiction over TG or TTP in the multi-district litigation before this Court in which one or both of them has been served. (Doc. No. 6006).  Over the next approximately 18 months, the parties conducted extensive jurisdictional discovery.  The Taishan Defendants produced more than 26,000 pages of documents and produced six witnesses for a total of approximately two weeks of depositions in Hong Kong.  In addition, the Plaintiffs' Steering Committee (the "PSC") has conducted document discovery and depositions of numerous other parties and witnesses.  The PSC has continued to take jurisdictional discovery through March 2012.

By this motion, TG and TTP request that the claims of all Plaintiffs who assert claims against TG and TTP be dismissed on the ground of lack of personal jurisdiction.

### FACTUAL BACKGROUND

### A.    TG Never Has Conducted Business In Louisiana Or Elsewhere In The U.S.

TG is a Chinese company with its principal place of business in Tai'an City, Shandong Province, People's Republic of China.[6]  (Jia Aff. ¶¶ 4).  TG has manufactured drywall since

---

[5] In the event that Plaintiffs subsequently amend their pleading, the Taishan Defendants reserve the right to request the Court's permission to make a further submission addressing any issues raised in such amendments.

[6] The facts relevant to this motion are set forth in documents and depositions attached to the accompanying declaration of Frank T. Spano, dated April 6, 2012 ("Spano Decl.").  On January 6, 2012, the Court entered an Order Regarding Authenticity and Admissibility of Certain Documents Identified by Parties for Use at Depositions in Hong Kong during the week of January 9, 2012 (Doc. 12126) (the "Admissibility Stipulation").  All of the documents relied upon by TG and TTP in support of their motion are admissible for purposes of the hearing on this motion based upon deposition testimony and other applicable law as well as the Admissibility Stipulation.  *See Walk*

1992.  (*Id.* ¶ 6). Prior to June 2007, TG did business under the name Shandong Taihe Donxing

Co. ("Shandong Taihe"). TG manufactures and sells drywall exclusively in China.  (*Id.* ¶¶ 7, 9).

The evidence shows that TG has not engaged in any activities in Louisiana:

- TG never has manufactured, marketed, sold or distributed drywall in Louisiana. (Jia Aff. ¶¶ 10-13).

- TG never has shipped any drywall to Louisiana.  (*Id.*).

- TG never has advertised in Louisiana or performed any services there.  (Jia Aff. ¶¶ 14-15).[7]

- TG has had a website since approximately 2003, some parts of which are in English.[8]

- TG's website is entirely passive; customers cannot purchase drywall or any other products through the website, nor can customers communicate with TG through the website.[9]  (*See* Peng Tr. 542:14-543:5).

---

*Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008) ("When the defendant disputes the factual bases for jurisdiction . . . the court may receive interrogatories, depositions, or 'any combination of the recognized methods of discovery' to help it resolve the jurisdictional issue.") (citing *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985)) (emphasis added).

Attached to the Spano Decl. as Exhibit 1 is a true and correct copy of the Affidavit of Jia Tongchun ("Jia"), Chairman, General Manager and Senior Engineer of Taishan ("Jia Aff."), dated September 16, 2010, which was filed in support of TG and TTP's original motion to dismiss in the matter of *Southern Homes, LLC et al. v. Interior/Exterior Bldg. Supply, LP et al.*, No 2009-6564 (La. Civ. Dist. Ct.) in September 2010.  The extensive jurisdictional discovery conducted since the filing of that motion has substantiated the facts stated in the Jia Aff.

[7] *See* transcript of the deposition of Jia Tongchun, which took place on April 4 and 5, 2011 and January 9 and 10, 2012 ("Jia Tr.") at 539:13-17, a copy of which, including Plaintiffs' Exhibits 1 through 36 and Defendants' Exhibits 1 through 47A, is attached to the Spano Decl. as Exhibit 2.  Some of the testimony and exhibits from the Jia Tr., and from transcripts of the other witnesses set forth below, have been designated "Highly Confidential" and will be filed under seal, in accordance with Pre-trial Order No. 16.

[8] *See* transcript of the deposition of Peng Wenlong, which took place on April 7 and 8, 2011 and January 13, 2012 ("Peng Tr.")  at 542:14-543:5, a copy of which, including Exhibits 1 through 23, is attached to the Spano Decl. as Exhibit 3.  Peng Wenlong was the manager of the foreign sales department at TG from the second half of 2004 to February 2006 and oversaw sale activities of TTP between February 2006 and January 2008.

[9] *See* transcript of the deposition of Fu Tinghuan, which took place on January 10, 2012 ("Fu Tr.") at 78:12-18, a copy of which, including Exhibits 1 through 4, is attached to the Spano Decl. as Exhibit 6.  Fu Tinghuan was the manager of sales at TG.

- TG never has registered to do business nor had an office, bank account or agent appointed to accept service of process in Louisiana. (Jia Aff. ¶¶ 16-17, 19-20, 23; Jia Tr. 536:1-4, 536:12-15, 537:5-8).

- TG never has paid taxes nor had a mailing address in Louisiana. (Jia Aff. ¶¶ 18; Jia Tr. 537:1-4).

- TG never has owned or leased any real or personal property in Louisiana. (Jia Aff. ¶ 16; Jia Tr. 535:20-24, 538:15-18).

- TG never has been registered to do business in Louisiana. (Jia Aff. ¶¶ 19-20; Jia Tr. 536:12-15).

- No employee, officer, director or agent of TG ever has maintained a place of business or resided in Louisiana, or visited Louisiana. (Jia Aff. ¶¶ 24-25; Jia Tr. 537:13-17; Peng Tr. 38:3-5; 275:7-11).[10]

- None of TG's employees ever has attended a trade show or exhibition in the U.S. (*See* Peng Tr. 273:13:274:13).

TG made only two sales of drywall to a company based in the U.S.[11]  On both occasions, TG sold drywall in China to a Virginia company, Venture Supply, Inc. ("Venture Supply").[12]  Each sale was pursuant to a contract that required payment in full in China and specified China as the arbitral forum in which any disputes would be resolved. (*See* Spano Decl. Ex. 10.)  Each delivery was FOB[13] a Chinese port.  The Bills of Lading furnished to TG by Venture Supply's shipping agent indicate that Venture Supply shipped its first order to Norfolk, Virginia and the second to Camden, New Jersey.  (*See* Jia *Germano* Decl. ¶ 34; Spano Decl. Ex. 11).

---

[10] *See* transcript of the deposition of Zhang Jianchun, which took place on April 6, 2011 ("Zhang Tr.") at 83:7-17, a copy of which, including Exhibits 13 through 17, is attached to the Spano Decl. as Exhibit 4.

[11] *See* ¶¶ 36, 38 to the Declaration of Jia Tongchun, dated August 15, 2010 originally submitted in support of TG's September 10, 2010 Motion to Vacate the Default and Dismiss the Complaint in the matter of *Germano et. al. v.Taishan Gypsum Co.*, Case No. 09-6687 (E.D. La.). ("Jia *Germano* Decl.").

[12] *See* TG's Manufacturer's Profile Form, dated October 13, 2010 ("TG MPF"), a copy of which is attached to the Spano Decl. as Exhibit 9.

[13] "FOB" stands for "Free on Board".  See INVESTOPEDIA, definition of "Free on Board – FOB", available at http://www.investopedia.com/terms/f/fob.asp#axzz1quo6ICYd (last visited April 2, 2012).  "Free on Board" is a "trade term requiring the seller to deliver goods on board a vessel designated by the buyer.  The seller fulfills its obligations to deliver when the goods have passed over the ship's rail."

B.   **TTP Operated Independently Of TG.**

For environmental reasons, the Chinese government has encouraged industries to utilize recycled materials in manufacturing; one form of which was to give companies an exemption from value added tax ("VAT").  By 2005, TG was utilizing a sufficient percentage of recycled material in its drywall to qualify for a VAT exemption.  Nevertheless, certain domestic Chinese customers desired to pay VAT for tax and accounting purposes.  (*See* Jia Tr. 480:24-481:24, 644:3-646:15; Zhang Tr. 141:24-142:21; Fu Tr. 109:4-22).  In 2005, however, the Chinese government informed TG that it could not continue its former practice of issuing VAT invoices to customers, without jeopardizing its exemption from VAT.  (*Id.*)

The Chinese tax bureau advised TG in 2005 that TG had to establish a <u>completely independent</u> company if it wanted to issue VAT invoices to its customers.  As a result, TG established TTP.  (*See* Jia Tr. 480:24-481:24, 644:3-646:15; Zhang Tr. 141:24-142:21; Fu Tr. 109:4-22.)  As all of the evidence shows, TG did not form TTP for the purpose of selling drywall to U.S. importers (*See* Jia Tr. 480:20-23), although it recognized that sales would primarily be made to companies who would ship the goods outside of China.[14]  While TTP was operational, TG maintained its own international sales department.  (*See* Jia Tr. 860:3-16; Fu Tr. 108:8-109:2).  As TG manager of sales, Fu Tinghuan, explained, TG and TTP did not work together. (Fu Tr. 110:2-4.

---

[14] "Most of the customers that . . . buy the products to be sold somewhere outside of China for the drywall, most of them, they require the invoice of the VAT.  Therefore, the products produced by TTP, they would have a lot of the products sold outside of China."  (Jia Tr. 480:24-481:24; *see also* Zhang Tr. 140:5-142:21).

1.      **TTP Observed Corporate Formalities.**

TG scrupulously observed corporate formalities when it established TTP.  TTP's founding documents were executed on February 10, 2006.  (*See* Jia Tr., Def.'s Ex. 34A).[15]  First, in accordance with Chinese law, TG was registered in the business license department.  (*See* Jia Tr., Def.'s Ex. 33A).  As the business license department requires a company to have an office, a manufacturer's site, a scope of business declaration, and a third-party asset evaluation report, TG sold equipment to TTP, leased a manufacturing site to TTP, and made a capital contribution to TTP.  (*See* Jia Tr. 648:22-649:18, Def.'s Exs. 37A, 40A, 42A and 43A).[16]

As is shown by TTP's Capital Verification Description, TG initially contributed 15 million RMB to TTP's capital account.  (*See* Jia Tr., Defs's Ex. 37A).  When TTP sought additional operating capital from TG, TTP provided information to a third-party accounting firm, which issued a Capital Verification Description.[17]  (*See* Jia Tr., Def.'s Ex. 37A).

On February 10, 2006, TG entered into a lease agreement with TTP for the property TTP used as its manufacturing site.  (*See* Jia Tr., Def.'s Ex. 40A).  TTP's business was located three kilometers from TG's business.  (Fu Tr. 111:2-7).  TTP paid 80,000 RMB, which it believed to be the market value, for the leased property.  (*See* Jia Tr. 659:16-660:20).[18]

Additionally, on February 20, 2006, TG and TTP entered into a written agreement

---

[15] In most cases, where a deposition exhibit is in Chinese, the English translation was marked as an exhibit with the same number, but with the suffix "A".  For example, Def.'s Ex. 34 to the Jia Tr. is a Chinese language document.  Its English translation is Def.'s Ex. 34A.  For the convenience of the English-speaking Court and parties, citations will point to English translations.

[16] On July 22, 2006, the shareholders of TTP decided to make an additional capital contribution of 7 million RMB to TTP.  (Jia Tr. 656:22-657:16, Defs Ex. 38A).  To reflect the additional capital contribution, TTP was required to revise its Articles of Incorporation.  (Jia Tr. 658:10-659, Def.'s Ex. 39A).

[17] *See* transcript of the deposition of Peng Shiliang taken on January 11, 2012 ("Shiliang Tr.") at 120:9-121:11, a copy of which, including Exhibits 1 through 10, is attached to the Spano Decl. as Exhibit 7.

[18] The original agreement to lease TG's manufacturing facility was revised on February 20, 2006 to reflect an increase in the lease rate that was more reasonable.  (Jia Tr. 663:5-664:18, Def.'s Ex. 43A).

whereby TG sold manufacturing equipment to TTP.  (*See* Jia Tr. 174:2-175:5, 474:23-475:5, 662:12-20, Def.'s Ex. 42A; Zhang Tr. 149:24-151:4).  The purchase price was based on market value.  (*See* Jia Tr. 662:24-663:4).  On February 20, 2006, TG licensed the use of the trademark "Taishan" to TTP; TG's authorization was required in order for TTP to use TG's trademarks. (*See* Jia Tr. 175:10-20, 445:8-448:15, 661:8-21, Def.'s Ex 41A; Zhang Tr. 149:4-9).

TG also created Articles of Incorporation for TTP, signed by Jia as TG's legal representative.  (*See* Jia Tr. 651:10-652:1, Def.'s Ex. 34A).  TTP documented the appointment of Messrs. Peng Shiliang, Fu and Wang as the three members of its Board of Directors (as specified in the Article of Incorporation).  (*See* Jia Tr. 652:19-653:21, Def.'s Ex. 35A).  TTP's senior officers were Peng Shiliang, its general manager, and Song Qinghai, its production manager. (*See* Jia Tr. 646:22-647:6; Zhang Tr. 78:24-79:7).  TTP did not share any directors or managers with TG.  (*See* Zhang Tr. 80:21-81:10).[19]  TTP provided information to third party accounting firms for the purposes of preparing financial statements for the years 2006, 2007 and 2008.  (*See* Shiliang Tr. 123:22-124:12; Jia Tr., Def.'s Exs. 45A, 46A and 47A).

### 2.    TTP's Daily Operations Were Managed Independently Of TG.

TTP maintained operational independence from TG.  Peng Shiliang was responsible for the everyday operations of TTP.  (*See* Shiliang Tr. 24:20-25:11).  He, not the Board of Directors, had the right to hire and fire employees in his role as general manager.  (Fu Tr. 115:18-116:4; Jia Tr. 210:6-17)  The department managers of TTP reported to Peng Shiliang (*See* Shiliang Tr. 26:1-27:6), and in his capacity as general manager he did not report to TG's executives. (*See* Shiliang Tr. 25:19-24). About once per month, TTP sent a written report to Jia's office.  (*See* Jia Tr. 131:18-132:16).  When necessary, TTP's directors would verbally communicate with Jia.

---

[19] Jia was never a director or officer of TTP.  (Jia Tr. 112:23-113:2; Peng Tr. 158:21-159:1).  Indeed, Jia was unaware of TTP's sales policies and operations. (Jia Tr. 122:1-24).

(*Id.*).  The reports would provide the specifics of production and the volume of sales, but they did not provide information regarding the identity of customers.  (*See* Jia Tr. 443:18-444:5; *see also* Jia Tr. 133:17-19).   TG and TTP had no cost-sharing agreements.   Instead, "[w]hen TG provide[s] assistance or help to TTP, TTP has to pay a fee to TG." (*See* Zhang Tr. 113:11-114:6).

### 3.   TTP's Facilities And Employees Were Independent Of TG.

TTP operated as a separate entity from TG.  It had its own production facility and did not use or share TG's production facility.  (*See* Jia Tr. 170:14-18; Shiliang Tr. 118:21-119:5).   TTP purchased its own equipment, supplies and materials including production equipment, lab equipment and computers.  (*See* Shiliang Tr. 119:6-10; Zhang Tr. 110:13-111:10).   TTP had its own, separate offices (*See* Jia Tr. 171:7-9, 647:21-23; Peng Tr. 70:17-20; Zhang Tr. 126:21-127:7), its own factory, which it leased from TG (*See* Jia Tr. 171:4-6, 175:7-9, 648:9-17, Def.'s Exs. 40A, 43A) and its own warehouse.  (*See* Jia Tr. 170:23-171:3).

TTP had its own separate bank accounts, an independent financial department, and paid its own employees.  (*See* Jia Tr. 196:1-8; Zhang Tr. 42:4-6; Shiliang Tr. 119:11-20).   TG never loaned money to TTP (*See* Jia Tr. 192:7-8, 195:14-17), and TG did not guarantee loan obligations to banks for TTP. (*See* Jia Tr. 192:4-6).   TG and TTP had separate after-sales departments (s*ee* Jia Tr. 433:15-434:6), and independent quality control departments.   (*See* Zhang Tr. 138:13-139:7).  TG had no responsibility to remedy any defects in TTP products.  (*See* Jia Tr. 451:1-3).   TTP was inspected by the Department of Business Licensing and the Department of Taxation, among others, to ensure its independent operation.  (*See* Shiliang Tr. 119:21-120:8).

TTP hired 260 employees, none of whom were shared with TG.   (*See* Shiliang Tr. 118:11-20; Jia Tr. 171:10-12, 877:23-878:5).   While some of TTP's employees had been

11

previously employed by TG,[20] there is no record of exactly how many.[21]  These employees were not assigned or seconded to TTP.  (*See* Jia Tr. 844:5-845:9).  Rather, after TTP was established, TTP put up a hiring notice.  (*See* Che Tr. 20:19-24).  Che, one of the TG employees who left TG to work for TTP, testified that he volunteered to work for TTP.  (Che Tr. 21:18-5).  Che explained that he had a discussion with a few TG employees, and they decided that TTP had a "bigger development space," so they requested to work for TTP.  (Che Tr. 147:8-13; *see also* Fu Tr. 116:15-24).

### 4.   TTP Ceased Operations In 2008 For Economic Reasons.

TTP's last sale to a U.S. company was in July 2007.[22]  TTP ceased the production of drywall in 2008 "for the consideration of economic interests" (Zhang Tr. 151:16-19), because fewer customers required VAT invoices.  (Zhang Tr. 152:4-154:20).  The decision to shut down TTP was made "together by the Board of Directors of Taishan and TTP."  (Zhang Tr. 155:3-5).

On January 1, 2008, TTP entered into a written agreement whereby it re-sold to TG the equipment it had purchased from TG.  (*See* Jia Tr. 665:24-666:10, Def.'s Ex. 44A).  Although TTP was not wound up, TTP currently has no income for its operations.  (*See* Zhang Tr. 66:1-3). It still has some assets, however, including factories and equipment, and accounts.  (*See* Zhang Tr. 57:7-23).

---

[20] *See* Transcript of the deposition of Che Gang, taken January 11 and 12, 2012 (Che Tr.), at 22:8-25:14, a complete copy of which, with Defendants' Exhibits Def.'s 1 and 2 and Plaintiffs' Exhibits 1 through 32, is attached to the Spano Decl. as Exhibit 5.

[21] In approximately February 2006, salesmen Peng, Jaipo and Che transferred from TG to TTP to work on foreign sales for TTP.  (See Peng Tr. 384:13-17; Che Tr. 20:2-9, 23:14-18).

[22] *See* TTP's Manufacturer's Profile Form, dated October 14, 2010 ("TTP's MPF"), a copy of which is attached to the Spano Decl. as Exhibit 12.

### C.     TTP Never Has Conducted Business In Louisiana Or Elsewhere In The U.S.

TTP manufactured drywall between 2006 and 2008 exclusively in China.  (*See* Jia Aff. ¶ 26; *see also* TTP's MPF).   The evidence shows TTP never engaged in any activities in Louisiana:

- TTP did not manufacture, market, sell or distribute drywall in Louisiana.  (*Id.*; *see also* Peng Tr. 282:10-283:9).

- TTP never had its own website and did not develop any sales or promotional materials on the internet.  (Peng Tr. 283:15-284:6, 306:9-20).

- TG's website does not mention TTP.  (*See* Peng Tr. 283:10-16).

- TTP did not have an office, bank account or agent appointed to accept service of process in Louisiana.

- TTP never has paid taxes nor had a mailing address in Louisiana.

- TTP never has owned or leased any real or personal property in Louisiana.

- No employees, officers, directors or agents of TTP ever have maintained a place of business, resided in or visited Louisiana.  (*See* Zhang Tr. 82:6-25; Peng Tr. 275:7-11).

- No TTP employee ever attended a trade show or exhibition in the U.S.  (*See e.g.* Peng Tr. 273:13-274:6).

- TTP did not have any trademarks or other intellectual property registered in the U.S.

#### 1.     Overview Of TTP's Sales Of Drywall

TTP sold drywall for a relatively short period of time, between approximately March 2006 and July 2007.   TTP's MPF identifies each sale of drywall that TTP made in the dimensions commonly used in the U.S.  (*See* Spano Decl., Ex. 12).   The MPF lists sales to both Chinese and foreign customers.  (*Id.*).   The information set forth in TTP's MPF was collected from a variety of sources, including contracts, invoices, shipping documents and correspondence.  (*See* Peng Tr. 342:17-343:19, 529:4-531:20).   TTP sold drywall on a made-to-order, OEM basis.

TTP marked the drywall as instructed by its customers.  (*See e.g.*, Che Tr. 358:22-359:23). Unless requested by a customer, TTP did not put any markings on the drywall that could identify it as the manufacturer.  (*See* TTP's MPF; Che Tr. 358:22-359:23).

### 2. Most Of TTP's Sales Were To Chinese Trading Companies.

The vast majority of TTP's sales were to Chinese trading companies.  (*See* TTP's MPF). The Chinese trading companies were competitors of TTP and each other.  They rarely disclosed to TTP the identity of any customer to whom they were re-selling the drywall or where they were shipping it.[23]  (*See* Shiliang Tr. 94:22–96:4, 126:17-127:16).  Because the Chinese trading companies paid for the drywall in advance and usually took delivery of the drywall at TTP's factory in China, TTP did not require this information.  (*Id.*).  TTP did not ship any drywall it sold to Chinese trading companies anywhere outside of China.  (*See* Shiliang Tr. 94:22-95:8; Che Tr. 32:20-33:3, 83:8-15, 196:6-12; Fu Tr. 87:6-14, 121:8-16).

As shown on TTP's MPF, some of the Chinese trading companies ordered drywall with English-language markings, including statements to the effect that the drywall met ASTM standards.  (*See generally* TTP's MPF).  No Chinese trading company, however, ever advised TTP that the drywall it purchased would end up being re-sold in Louisiana or used by consumers in Louisiana.  (*See* Jia Tr. 543:21-544:2).

### 3. TTP Made Two Isolated Sales In China To Companies That Advised TTP They Intended To Ship To Louisiana.

TTP did not actively market to foreign customers.  Potential foreign customers typically initiated contact with TTP directly or through their representatives in China.  (*See*, *e.g.*, Spano Decl. Ex. 13).  As the record shows, TTP was contacted by numerous potential foreign

---

[23] A rare exception was TTP's sale to Shenzhen Yongfeng Investment Co., Ltd.  ("Shenzhen").  Shenzhen reportedly shipped the drywall it purchased from TTP to New York.  (TTP's MPF Nos. 229-230, 232-233).

customers seeking information concerning TTP's ability to supply drywall.  TTP responded to these requests with pricing, shipping cost and other information that was requested.  (*Id.*).  While there were many communications of this nature, very few resulted in actual sales to foreign customers.  Eventually, two companies – Advanced Products International Corp. ("APIC") and GD Distributors LLC ("GD Distributors) – a purchased drywall from TTP in China and advised TTP that they intended to ship the drywall they purchased to Louisiana.  (*See* TTP MPF at Nos. 178, 218).  TTP had no other customers who advised that they planned to ship to Louisiana.

TTP completed its sales to the three companies in China and delivered the drywall to the port in China they selected.  TTP did not ship any of the drywall it sold to APIC or GD Distributors – or to anyone else – to Louisiana.[24]  Sometimes, when requested by a customer, TTP would assist with shipping arrangements.  (*See* Peng Tr. 270:1-271:14, 318:21-319:17, 321:7-23); s*ee also* Sections a & b below).  This typically involved TTP contacting shipping agents in China who would provide price quotes for shipping, locate available ships, and arrange for storage at the port and loading on the ship, always at the customer's expense.  (*See* Che Tr. 201:3-202:1, 241:1-246:5, Pl.'s Exs. 2, 8, 10; Peng Tr. 500:2-10).  However, regardless of the extent to which TTP assisted with shipping arrangements, the customer always decided where to ship the product, when to ship it, and by what means.  The customer was always responsible for the cost of shipping.  (*See* Fu Tr. 121:8-16).

### a.    APIC

APIC, based in California, contacted TTP through APIC's representative in China, Grace Wei.  (*See* Che Tr. 269:12-24). APIC purchased drywall from TTP, FOB a Chinese port.  (*See*

---

[24] Separate from actual drywall sales, at the request of particular customers, TTP would provide small samples of drywall if the factory had them available and the customer pre-paid for the cost of shipping them.  (*See* Che Tr. 285:4-286:2, 287:19-288:18, 376:15-19,  Ex. 18; Peng Tr. 267:23-269:13; *see also* Shiliang Tr., Ex. 2).

Shiliang Tr., Exs. 4, 6, 7).  TTP did not ship APIC's drywall to New Orleans or anywhere else in the U.S.  (*See* Che Tr. 370:13-371:4; Shiliang Tr. 84:16-85:5).  Wei informed TTP that Triax Trading in New Orleans was the intended destination for the drywall APIC was purchasing, and Wei prepared a packing list and pro forma invoice reflecting APIC's intended destination.  (*See* Che Tr. 271:8:272:10, 371:5-372:11; Shiliang Tr. Exs. 4-7).  In accordance with the FOB term, TTP delivered the drywall to the Chinese port.  (*See* Che Tr. 371:5-11).  Once TTP did so, the transaction was complete.  At the time of sale, neither APIC, Wei, or Triax Trading informed TTP that the drywall being purchased from TTP in China would be marketed in Louisiana.

### b.      GD Distributors

There is little evidence or documentation available about TTP's one sale to GD Distributors.  Darrin Steber, owner of GD Distributors, testified that he found TTP through an online source and, after a series of communications with TTP, decided to visit TTP's factory in China.[25]  It is unclear from the testimony whether GD Distributors negotiated the contract terms before, during or after Steber's visit to China, but the parties ultimately agreed that GD Distributors would purchase 1,320 sheets of drywall from TTP, "CIF" New Orleans.  (Steber Tr. 37:13-41:22, 43:1-8; Spano Decl. Ex. 15).  In a CIF sale, TTP delivered the drywall to the port in China and surrendered possession of the drywall to the customer's shipment agent.  The customer selected the destination and directed the shipping arrangements made on its behalf, just as in the case of an FOB sale.  (*See* Che Tr. 368:6-369:9; Sardi Tr. 28:2-8).  In accordance with the CIF term, GD Distributors paid in advance the cost of shipping and insurance by having it included in the purchase price of the drywall.  (*See* Steber Tr. 22:18-21).  GD Distributors paid 50 percent of the purchase price in advance and the remaining 50 percent upon delivery at the

---

[25] *See* deposition of Darrin Steber, taken December 30, 2011 ("Steber Tr.") at 16:15-17:20, relevant excerpts of which are attached to the Spano Decl. as Exhibit 14.

port in China.  (*See* Steber Tr. 22:6-21, 43:1-8; Spano Decl. Exs. 16).  GD Distributors informed TTP of the selected destination for the drywall it purchased and TTP made arrangements with a shipping agent on GD Distributors' behalf.  (*See* Steber Tr. 21:17-25).

TTP then delivered the drywall to the Chinese port.  Once TTP did so, the transaction was complete.  As of the time of sale, GD Distributors had not informed TTP that the drywall it was purchasing in China would be marketed in Louisiana.  (*See* Jia Tr. 543:21-544:2).

### D.   BNBM's Arm's-Length Relationship With TG

BNBM owns shares of TG directly and indirectly; however, as the evidence shows, it does not control TG.  BNBM first acquired an interest in TG in March 2005 because TG needed funding to support its sales of drywall.  (*See* Jia Tr. 577:2-5).  BNBM was willing to invest in TG (*see* Jia Tr. 577:9-10), but TG's shareholders were only willing to allow BNBM to acquire a minority interest in TG.  (*See* Jia Tr. 577:13-16.)  On March 24, 2005, BNBM agreed to purchase 42% of the shares of TG at the price of 1.8 RMB per share.  The price was based on market considerations, the bargain, and TG's profits.  (*See* Jia Tr. 576:22-578:5, Def.'s Ex. 3A).

After BNBM acquired this interest in TG, it appointed a majority of the directors to TG's Board, and some of them were BNBM officers or directors.  (*See* Jia Tr. 583:23-585:14, Def.'s Ex. 8A).  The shareholders also agreed to replace two of the three members of the separate Board of Supervisors with new members selected by BNBM.  (*See* Jia Tr., Def.'s Ex. 8A).[26]  On that same day, TG also adopted new Articles of Incorporation.  (Jia Tr., Def.'s Ex. 9A).

In June 2006, BNBM purchased Taian Donglian Investment and Trade Company,

---

[26] A board of supervisors is required by Chinese company law.  The Board of Supervisors oversees the financial affairs of the company and provides corporate oversight.  It may propose removal of any director or senior manager who violates any law, administration, regulation, articles of incorporation or any resolution of the shareholders meeting.  The board of supervisors may also demand that any director or senior manager make corrections if his or her actions have injured the interest of the company.  The board of supervisors is comprised of representatives of the shareholders and of the employees, as prescribed in the articles of incorporation.  *See* accompanying Declaration of Zhu Yan, dated March 30, 2012 ("Zhu Decl.") at ¶ 34.

Limited ("Donglian"), which held 23% of TG's shares.  (*See* Jia Tr. 594:1-4, Pl.'s Ex. 24).

BNBM thus increased its ownership of Taishan, direct and indirect, to 65% of Taishan's shares.

(*Id.*).  The price paid was 3.2 RMB per share.  (*See* Jia Tr. 595:17-596:5).  As Jia explained,

TG's shareholders had decided to let BNBM increase its interest in TG as long as its interest

remained below two-thirds of the shares.  (*See* Jia Tr. 596:10-597:16).   This level of

shareholding by BNBM assured that TG could continue to operate independently, as TG's

Articles of Incorporation provided that a vote of two-thirds (66.66%) of the shares was required

to make decisions on important matters affecting the company.  (*See* Jia Tr. 595:17-597:16,

Def.'s Exs. 11A).[27]  As Mr. Jia testified,

> "[W]e made a partial list of important issues of the company and
> also made a partial list of small matters of the company.  In small
> matters, we can reach agreement whenever there are half of the
> approval of the stockholders are present.   For principal and
> substantial materials, two-thirds of all the shareholders had to be
> approved, which guaranteed the independent operation of [TG]."

(Jia Tr. 597:5-16).

### 1.        TG Observed All Required Corporate Formalities.

For the period 2005-2008, TG observed all required corporate formalities.  It held annual

shareholder meetings in accordance with the requirements of its Articles of Incorporation.  (*See*

Jia Tr., Def.'s Exs. 18A-21A).  At the 2006 annual meeting of shareholders, held on June 20,

2007, Shandong Taihe's shareholders decided to change the company name to TG.  (*See* Jia Tr.

602:11-24, Def.'s Ex. 13A).  On that same date, TG's shareholders agreed to reduce the number

---

[27] According to TG's Articles of Association in effect as of June 2006, two thirds of a shareholder vote was required
to approve the following actions by TG:

    a.   Increase or reduce registered TG's registered capital;
    b.   Issue corporate bonds;
    c.   Devise, merge, dissolve or liquidate TG;
    d.   Amend the Articles of Association;
    e.   Redeem shares of TG.

(Jia Tr., Def.'s Ex. 11A at Ch. IV, Sec. 4)

of directors from seven to five.  These changes were reflected in revisions to TG's Articles of Incorporation.  (*See* Jia Tr. 592:22-593:10, 603:15-604:13, Def.'s Exs. 11A and14A).  BNBM had the ability to appoint three of the five directors, and some of its appointees were officers of BNBM;[28] the other two were appointed by Taian City and Jia.  (*See* Jia Tr. 604:14-23).

In accordance with TG's Articles of Incorporation, its Board of Directors met annually between 2005-2008 and issued written resolutions.  (*See* Jia Tr. 625:7-626:5, Def.'s Exs. 22A-24A).  Additionally, in his capacity as General Manager of TG, Jia prepared a yearly report of TG's operations from the previous year and work assignments for the coming year.  The report was provided to the Board of Directors and the shareholders.  (*See* Jia Tr. 631:24-632:15, Def.'s Exs. 25A-28A).  In accordance with Chinese law, a third-party independent accounting firm prepared annual financial statements for TG.  (*See* Jia Tr. 638:10-639:21, Def.'s Exs. 29A-32A).

## 2.    TG's Day-To-Day Business Was Operated By TG's Officers.

The record evidence establishes that TG's day-to-day business was conducted by its officers independently of BNBM.  The responsibility for TG's long-term and daily operations rested with Jia, in his role as general manager of TG.  Jia has been the general manager of TG since 2002.  (Jia Tr. 24:21-25:9, 154:1-3).  As general manager, he is "responsible for the normal operation and development of TG."[29]  (Jia Tr. 160:14-15).  "My job responsibility is to help the departments of TG and also to advise the general managers to effectively and most effectively to

---

[28] The only TG employee who is a director of BNBM is Jia.  He was appointed to BNBM's board in 2008, after TG and TTP stopped selling drywall in US dimensions.  Thus, Jia's seat on BNBM's board is irrelevant to the question of whether BNBM controlled TG (or TTP) during the relevant time period, from 2005 to the end of 2007.  Further, while Jia is a director of BNBM (Jia Tr. 35:6-8), he does not own any shares in BNBM (Jia Tr. 206:3-5) and he views his position as "largely ceremonial."  (Jia Tr. 586:12-17).  He is "only responsible for the operation of TG." (Jia Tr. 49:16-17).  He did not receive or maintain annual reports from BNBM because "these documents don't have too much relevance to [TG]." (Jia Tr. 34:9-35:24).  When Jia visits with management of BNBM, they do not discuss TG business.  (Jia Tr. 140:19-143:19).  At BNBM board meetings, Jia does not report on the business of TG, but rather, listens to the report by BNBM's general manager regarding BNBM's business operations.  (Jia 64:2-9).

[29] As Fu testified, neither the directors nor supervisors have responsibility for the operations of the company they serve.  (Fu Tr. 88:19-90:23)

operate normally." (Jia Tr. 161:7-11). Jia is involved in major financial decisions, borrowing, and loaning money, investing, new product lines, joint ventures, mergers, alliances and purchases of other companies. (*See* Jia Tr. 161:22-163:9). TG does not need approval from the board of BNBM "to acquire a new company or a joint venture with another company." (Jia Tr. 163:10-15). Jia is evaluated by TG's board of supervisors and members of the Board of Directors. (*See* Jia Tr. 154:17-155:01).

### 3.   BNBM And TG Were Operated Independently.

Additionally, the facts show that BNBM and TG operated as separate entities. BNBM and TG have never shared employees (*see* Jia Tr. 190:21-24) and BNBM does not compensate any of TG's employees, shareholders, officers or directors. (*See* Jia Tr. 195:20-24). BNBM and TG have never shared any production lines or facilities. (*See* Jia Tr. 190:9-19, 196:10-12, 197:5-8). In fact, as Mr. Jia testified, BNBM and TG have separate brands of plasterboard (Jia Tr. 198:10-199:3), and competed for sales in the drywall market.[30] (Jia Tr. 617:3-10).

BNBM has not loaned money to TG. (*See* Jia 191:21-22). Other than purchasing shares in TG, BNBM has not invested or provided TG with money in any other way. (*See* Jia 194:19-23). BNBM is paid on its investment in TG "through the profit sharing of dividends." (*See* Jia Tr. 199:13-16). Dividends are determined at the annual board meeting of TG. (*See* Jia Tr. 199:17-201:5).

BNBM has never served as an agent to TG in the United States, and TG and BNBM have never shared liabilities. (*See* Jia Tr. 608:9-12, 609:5-12). TG and BNBM have never agreed to be legally bound by or accountable for the acts of one another. (*See* Jia Tr. 609:13-18).

---

[30] Sometimes TG, TTP, and all other companies in Tai'an referred to themselves as being part of the Taihe Group (Jia Tr. 183:3-24, 189:18-190:4) to indicate they were all companies from the same region. (*See* Jia Tr. 177:10-20). BNBM has never marketed itself as being part of the Taihe Group. (Jia Tr. 190:5-8).

TG knows nothing about BNBM's U.S. operations, if any.  (*See* Jia Tr. 393:22-394:15).  Jia does not recall any presentations or information provided to the BNBM Board regarding BNBM doing business in the U.S.  (*See* Jia Tr. 396:7-11).  Jia does not know if BNBM does any business in the U.S.  (*See* Jia Tr. 397:22-398:1).  Jia is not aware of and does not know if BNBM has any U.S. subsidiaries.  (*See* Jia Tr. 398:2-4).

Other than BNBM's ownership of shares in TG, and the appurtenant right to appoint directors to TG's board, TG's and BNBM's business and financial affairs remained entirely separate, subject to two minor exceptions.  First, in 2005, TG established two subsidiaries.  As Chinese law at the time did not allow for 100% share ownership of an independent corporation, for each of the two subsidiaries, TG acquired the vast majority of the shares, and BNBM a small minority.  (*See* Jia Tr. 758:2-759:24).  As Jia explained, he referred to TG and BNBM as joint venturers in the two subsidiaries because under his understanding of Chinese law, "whenever two or more stockholders invest in one enterprise, that would be called joint venture.  If the share is one percent that would also be considered as [a] joint venture.  A joint venture is a concept that whenever there are two or more shareholders investing in one company, the company is completely separately operated."  (Jia Tr. 937:18-938:13).[31]

Second, in 2008, TG was planning to build some production lines, but did not have sufficient funds.  TG obtained a bank loan, and the bank required a guarantor.  BNBM provided the guarantee, but asked TG for a guarantee fee.  (*See* Jia Tr. 606:19-608:3, Def.'s Ex. 15A; Spano Decl. Ex. 17).  As Mr. Jia testified, "[T]he shareholder was very stingy."  (*See* Jia Tr. 607:13-14).

---

[31] As Jia stated, "The relationship between TG and BNBM is the investor, the one being invested." (Jia Tr. 65:17-20).  Jia described his understanding of a "joint venture" as follows: "After BNBM procured the shares from TG, according to my understanding, that forms a relationship of a joint venture."  (Jia Tr. 204:3-6).

**E.**     **Relationship Between TG And Other Upstream Affiliates.**

There is no evidence that any entities upstream of BNBM had any relationship with TG other than through their interest in BNBM.  CNBM owns shares in BNBM, but not in TG.  (*See* Jia Tr. 215:11-18).  There are no agreements of any kind between TG and CNBM.  (*See* Jia Tr. 403:23-404:18).  TG has never reviewed financial statements of CNBM.  (*See* Jia Tr. 405:2-5).

**ARGUMENT**

**I.     THE DUE PROCESS CLAUSE PRECLUDES THIS COURT'S EXERCISE OF JURISDICTION OVER EITHER TG OR TTP.**

The Taishan Defendants anticipate that Plaintiffs may argue that (1) TG is subject to personal jurisdiction based on its prior contacts with Louisiana; (2) TTP is subject to this Court's jurisdiction based on its own contacts with Louisiana, and, in addition, (3) even if TG lacked minimum contacts with Louisiana, TTP's and/or BNBM's contacts should be attributed to TG in order to provide a basis for this Court to exercise personal jurisdiction over TG.  As explained below, the evidence would not support these assertions.  Plaintiffs cannot meet their burden of proving the Court may exercise personal jurisdiction over either TG or TTP consistent with the requirements of Due Process.

Governing Law

A federal court sitting in diversity may exercise personal jurisdiction over a non-resident defendant (1) as allowed under the state's long-arm statute and (2) to the extent permitted by the Due Process Clause of the Fourteenth Amendment."  *Mullins v. TestAmerica Inc.*, 564 F.3d 386, 398 (5th Cir. 2009).[32]  Jurisdiction over a nonresident defendant is governed by the Louisiana long-arm statute, La. Rev. Stat. § 13:3201, which provides in relevant part:

> Personal jurisdiction over nonresidents
>
> B. In addition to the provisions of Subsection A, a court of this state may exercise personal jurisdiction over a nonresident on any basis consistent with the constitution of this state and of the Constitution of the United States.

As Section B indicates, the limits of the Louisiana long-arm statute are "co-extensive

---

[32] In a direct filed case in an MDL proceeding, the court must determine whether the forum has jurisdiction over each plaintiff's claim, not whether the plaintiff could have sued in a different state and then filed a tag-along motion to transfer the case to the MDL.  *See In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, MDL No. 2046, 2011 WL 1232352 (S.D. Tex. March 31, 2011).

with the limits of constitutional due process." *Walk Haydel & Assocs.*, 517 F.3d at 242-43. *See also Petroleum Helicopters, Inc. v. Alco Corp.*, 513 So. 2d 1188, 1192 (La. 1987) ("When the constitutional requirements of due process have been met . . . there is no longer a need to inquire whether the defendant's conduct falls within the reach of the long-arm statute. Now, under the express wording of the present Louisiana Long-Arm Statute, the sole inquiry into jurisdiction over a non-resident is a one-step analysis of the constitutional due process requirements.").

<u>Plaintiffs Have The Burden Of Proof.</u>

Plaintiffs have the burden of establishing that the exercise of jurisdiction over the Taishan Defendants is proper. *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 270 (5th Cir. 2006). Plaintiffs have the burden of proving: (1) that each Taishan Defendant has minimum contacts with the forum state, *i.e.*, that it "purposely directed its activities toward the forum state or purposely availed itself of the privilege of conducting activities there, [and that] (2) the plaintiff's cause of action arises out of or results from that defendant's forum-related contacts." 472 F.3d at 271. If Plaintiff satisfy those elements, the burden then shifts to the Taishan Defendant to prove that the exercise of personal jurisdiction is not fair and reasonable. *Id.* Where, as here, the Court is conducting an evidentiary hearing, Plaintiffs must establish jurisdiction by a preponderance of the evidence. *See Walk Haydel & Assoc., Inc.*, 517 F.3d at 241-42 (citing *Felch v. Transportes Lar-Mex SA DE CV*, 92 F.3d 320, 326 (5th Cir. 1996)).

A.    **<u>Plaintiffs Cannot Establish That Either TG Or TTP Had Minimum Contacts With Louisiana.</u>**

Plaintiffs cannot meet their burden of proving by a preponderance of the evidence that either TG or TTP (1) had minimum contacts with Louisiana; and (2) Plaintiffs' causes of action arose out of or resulted from TG's or TTP's alleged contacts with Louisiana. Furthermore, even if Plaintiffs could establish that TG or TTP had minimum contacts and their

causes of action arose out of or resulted from those contacts, the Court's exercise of personal jurisdiction over either defendant would not be fair and reasonable, in violation of Due Process.

<u>Due Process Requires Minimum Contacts With The Forum State.</u>

The Due Process clause of the Fourteenth Amendment of the U.S. Constitution provides: "[N]or shall any State deprive any person of life, liberty or property, without due process of law . . ."  U.S. Const. Amend. XIV, §1.  To satisfy the constitutional due process requirement, a defendant must have sufficient "minimum contacts" with the forum state such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation and citation omitted).  The *Int'l Shoe* test has two elements, requiring (1) a claim that arises out of or relates to actions by the defendant himself directed toward forum residents and (2) circumstances where jurisdiction would not otherwise offend "fair play and substantial justice."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 477 (1985).

The first element – minimum contacts – is required because Due Process "does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations."  *Int'l Shoe*, 326 U.S. at 319.[33]  Jurisdiction can only be exercised where the defendant's contacts have created a "substantial connection" with the forum State.  *Burger King*, 471 U.S. at 475.  Thus, regardless

---

[33] The current Justices of the Supreme Court have expressed different views about the underlying rationale for the requirement of minimum contacts with a particular State forum.  According to Justices Kennedy, Roberts, Scalia and Thomas, the four Justices who comprised the plurality in the Supreme Court's recent ruling in *Nicastro v. J. McIntyre Machinery, Ltd.*, 131 S. Ct. 2780 (2011), the requirement of minimum contacts exists mainly to ensure that any person subject to jurisdiction has done purposeful acts sufficient to submit himself to the forum State's sovereign power.  *Id.* at 2787-88.  Justice Breyer, in his concurring opinion joined by Justice Alito, did not discuss limitations on sovereignty as the main rationale for requiring purposeful minimum contacts.  Instead, Justice Breyer focused on the Court's prior explanations of minimum contacts as having been centered on whether "it is fair, in light of the defendants contacts with that forum, to subject the defendant to suit there." *Id.* at 2793 (emphasis in original).  The dissent, written by Justice Ginsburg, with whom Justices Sotomayor and Kagan joined, viewed the constitutional limits on the adjudicatory authority of a court in a particular state as a protection of individual liberty, not a question of submission to state sovereignty.  *Id.*

of how convenient the forum might be to the plaintiff, or how strong the forum State's interest in applying its law to the controversy, Due Process does not permit a court to exercise jurisdiction over a defendant who does not have the requisite level of minimum contacts with the forum State.  *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 294 (1980).  Nevertheless, even if minimum contacts are present, the second element – requiring an assertion of jurisdiction be constitutionally fair and reasonable – may be absent, requiring the Court to decline exercise jurisdiction despite the existence of minimum contacts.  *See Burger King*, 471 U.S. at 476-477. These considerations of fairness and their application to this case are discussed in Section I.C, *infra*.  Thus, the Supreme Court's precedents have consistently required both minimum contacts with a particular State forum as well as circumstances that render the assertion of jurisdiction fair and reasonable.

Plaintiffs Must Show Purposeful Availment Of The Forum State.

To satisfy the requirement of minimum contacts, "purposeful availment" of the forum State must be shown.  "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws."  *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), (citing *Int'l Shoe*, 326 U.S. at 319).  In addition to showing that the defendant purposefully directed his activities at the residents of the forum, a plaintiff must also demonstrate that his cause of action "arise[s] out of" those activities.  *Burger King*, 417 U.S. at 472 (citation and quotation omitted).  The purposeful availment requirement ensures that the defendant is not "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts."  *Id.* at 475 (quotations and citations omitted).  It also protects a defendant from having to defend himself in a forum where he should not have anticipated being sued.  *See World-Wide Volkswagen*, 444 U.S. at  297.

26

There are two forms of personal jurisdiction: general and specific.  General jurisdiction is necessary to adjudicate claims that are not related to a defendant's contacts with the forum state. *See Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 nn.8 & 9 (1984).  "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State."  *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 131 S. Ct. 2846, 2851 (2011) (citing *Int'l Shoe*, 326 U.S. at 317). Specific jurisdiction is a more limited form of jurisdiction which can be asserted for disputes that "arise out of or are connected with the activities within the state" by the defendant.  *Int'l Shoe Co.*, 326 U.S. at 319; *Helicopteros Nacionales*, 466 U.S. at 414 n.9.

A plaintiff may establish a basis for specific jurisdiction if it can prove that the out-of-state defendant "purposefully directed his activities at the residents of the forum" and that plaintiff's claim "arise[s] out of those activities."  *Burger King,* 471 U.S. at 472.  (internal quotations and citations omitted).  The "purposeful availment" requirement for specific jurisdiction may be satisfied "where the contacts proximately result from actions by the defendant *himself* that create a *substantial connection* with the forum State.  *Id.* (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)) (emphasis is in original).  However, "some single or occasional acts" related to a forum State may not be sufficient to establish minimum contacts if "their nature and quality and the circumstances of their commission" create only an attenuated connection between the defendant and the forum State.  *Int'l Shoe*, 326 U.S. at 318. Additionally, the conduct of other parties cannot establish purposeful availment by the defendant of the forum State.  A defendant will not be haled into a jurisdiction as a result of the "unilateral activity of those who claim some relationship with a nonresident defendant."  *Helicopteros*

*Nacionales*, 466 U.S. at 417.  As summarized below, the Supreme Court has provided guidance on the application of the Due Process requirement to questions of specific jurisdiction.[34]

<u>World-Wide Volkswagen</u>

In *World-Wide Volkswagen*, the Supreme Court reiterated the purposeful availment requirement and explained that it is not satisfied merely because a defendant who sold a product outside of the State could have foreseen that the product might cause injury in the State.  The Court held that a New York automobile retailer and distributor were not subject to jurisdiction in Oklahoma even though it was *foreseeable* that the purchaser might bring the automobile to Oklahoma.  "It is argued, however, that . . . it was 'foreseeable' that the Robinson's Audi would cause injury in Oklahoma.  Yet 'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process clause."  *World-Wide Volkswagen.,* 444 U.S. at 295. Instead, "the foreseeability that is critical to due process analysis . . . is that the *defendant's conduct and connection with the forum State* are such that he should reasonably anticipate being haled into court there."  *Id.*  at 297 (emphasis added).

The Supreme Court further explained, in *dicta*, that the requirement of purposeful availment may be satisfied if "a corporation . . . delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state."  *Id.* at 298-99.  For example, if sales of a defendant's products in the State are not an isolated occurrence but are a result of its efforts to serve the market in the State, it may have an "expectation" that its products would be purchased in the State, and should reasonably anticipate

---

[34] Plaintiffs' allegations in the Complaint may be read to encompass claims that TG and TTP are subject to both general and specific jurisdiction.  In any case, as discussed below, neither TG's isolated sales to a Virginia company in China or TTP's isolated sale to two companies who indicated they would ship the drywall to Louisiana are sufficient to establish minimum contacts for specific jurisdiction in Louisiana.  The Taishan Defendants' activities are even farther below the level of continuous and systematic contacts with Louisiana that are necessary to establish general jurisdiction.

being subject to suit there. *Id.* at 297-298.[35]

<u>Burger King</u>

In *Burger King,* the Supreme Court considered whether Due Process permitted personal jurisdiction in Florida over a Florida franchisor's breach of contract suit against its Michigan franchisee. Apart from the franchise agreements at issue, the Michigan franchisee had no contacts with Florida. The franchisee, however, regularly communicated with the franchisor's Miami headquarters both in forming the agreements and in seeking resolution of disputes and paid all monthly fees to the franchisor in Miami.

The Supreme Court held that Due Process embodies a "fair warning requirement" that is satisfied "if the defendant has 'purposefully directed' his activities at residents of the forum." *Burger King,* 471 U.S. at 472 (citing *Keeton v Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). The Court also explained the weight to be given to a contract with a forum State resident:

> If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.

471 U.S. at 478 (emphasis in original).

Applying these principles to the Michigan franchisee, the Supreme Court found Due Process was satisfied because the franchise relationship had a "substantial connection" with Florida. The franchisee had "deliberately 'reach[ed] out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise;" the franchise was "a carefully

---

[35] Numerous courts have recognized that this assertion was *dicta*. See *e.g., Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1124-25 (7th Cir. 1983); *Spartan Motors, Inc. v. Lube Power, Inc.*, 786 N.E.2d 613, 620 (Ill. 2003); *Ruckstuhl v. Owens Corning Fiberglass Corp.*, 731 So. 2d 881, 887 (La. 1999); *Juelich v. Yamazaki Mazak Optonics Corp.*, 682 N.W.2d 565, 571, n.4 (Minn. 2004); *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 201 (Tex. 1985).

structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida, which included a choice of Florida law in the franchise agreement."  *Id.* at 479-480.  (internal citations omitted)

Asahi

A few years later, in *Asahi Metal Corp., Ltd. v. Superior Court*, 480 U.S. 102, 109, 116-117 (1987), the Supreme Court addressed Due Process in the context of a "stream of commerce" case.[36]  The Court unanimously held that a Japanese tire valve manufacturer's sale of hundreds of thousands of tire valves to a Taiwanese motorcycle tire manufacturer that incorporated the valves into tires shipped to California, was not subject to personal jurisdiction in California in the tire manufacturer's indemnification suit.  The Supreme Court explained that "[c]onsidering the international context, the heavy burden on the alien defendant, and the slight interests of the plaintiff and the forum State, the exercise of personal jurisdiction by a California court over *Asahi* in this instance would be unreasonable and unfair."  *Id.* at 116.

A majority of the Justices in *Asahi*, however, did not agree on whether the seller of the valves had purposefully availed itself of a California forum.  Four members of the court, in an opinion written by Justice O'Connor, held that taking into account the valve manufacturer's complete lack of activities directed at California and the fact that it did not create, control or employ the distribution system that brought its valves into California, the valve manufacturer had not purposely availed itself of a California forum, even assuming it was aware that some of its valves would be incorporated in tire tubes sold in California.  *See id.* at 113.  According to Justice O'Connor, Due Process required more than mere awareness of the product's possible

---

[36] The term "stream of commerce" refers to the commercial practice of selling a product to a third party for further sale to consumers.  *De James v. Magnificence Carriers, Inc.*, 654 F.2d 280, 285 (3d Cir. 1981); *Prototype Prods., Inc. v. Reset, Inc.*, No. 11-196, 2011 WL6960617 (E.D. Va. Oct. 14, 2011).

entry into the forum state through the stream of commerce:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State.  Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.  *But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State*.

480 U.S. at 112 (emphasis added).

Thus, Justice O'Connor's opinion required "something more" than "mere awareness that the manufacturer's product would be marketed in the forum State" and provided examples of affirmative conduct specifically targeting or directed to the forum State that might satisfy the requirement of purposeful availment.  Four justices, in a decision written by Justice Brennan, concluded that the valve manufacturer had purposefully availed itself of a California forum principally because it (1) was aware of the operation of the distribution system that resulted in the tires being sold in California, (2) knew it would benefit economically from the sale of tires in California, and (3) had made regular and extensive sales of its valves to a manufacturer it knew was making regular sales of the final product in California.  *See id.* at 121.  According to Justice Brennan, Due Process is satisfied when a defendant has a "regular and anticipated flow" of its products into the stream of commerce with an awareness that its products would be marketed in the forum State:

31

> The stream of commerce refers not to unpredictable currents or eddies, but to the *regular and anticipated flow of products* from manufacture to distribution to retail sale.  As long as a participant in this process is aware that the final product is being marketed in the forum state, the possibility of a lawsuit there cannot come as a surprise.

480 U.S. at 116 (emphasis added).

The concurring opinion of Justice Stevens in *Asahi*, with whom Justices White and Blackmun joined, would not reach the question of purposeful availment because of the conclusion that exercise of personal jurisdiction over the foreign manufacturer would be unfair and unreasonable, in violation of Due Process.  Nevertheless, Justice Stevens observed that the manufacturer had done something more than merely being aware that its products might be sold in California:  "I would be inclined to conclude that a regular course of dealing that results in deliveries of over 100,000 units annually over a period of several years would constitute 'purposeful availment.'"  *Id.* at 122 (Stevens, J. concurring in part and concurring in the judgment).[37]

A close reading of the other concurring opinions in *Asahi* also indicates that while each disagreed with Justice O'Connor's statement of the purposeful availment standard each also found the manufacturer had engaged in additional activity beyond simply just being aware its products might be re-sold in the forum State.  Justice Brennan found the requisite showing of

---

[37] Following *Asahi*, the circuits split on whether to follow Justice O'Connor's view, Justice Brennan's, or neither. The Fifth Circuit stated that it was bound by *World-Wide Volkswagen* and held that "mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum State while still in the stream of commerce."  *Ruston Gas Turbines, Inc. v. Donaldson Co. Inc.*, 9 F.3d 415, 419, 421 (5th Cir. 1993) (out-of-state component parts manufacturer for gas turbines reasonably anticipated suit in Texas where it *knew* its products were going to be delivered to a specific user in Texas; manufacturer had made 211 direct shipments to Texas, and manufacturer's employees visited Texas on several occasions to assist customers).  Over the years since *Ruston* the Fifth Circuit's view of the requirements of Due Process in stream of commerce cases has been called into question; indeed, in  *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465 (5th Cir. 2006), Judge DeMoss, the author of the *Ruston* opinion, specially concurring, questioned its constitutionality and advocated that the Fifth Circuit adopt Justice O'Connor's "stream of commerce plus" approach instead.  438 F.3d at 474-475.  The stream of commerce issue was addressed again by the Supreme Court in 2011, in *Nicastro*.

32

purposeful availment based on the manufacturer's awareness of the distribution system that resulted in its products being sold in California, the economic benefits it derived from sales in California, and its "regular and extensive sales of component parts to a manufacturer it knew was making regular sales of the final product in California." *Id.* at 121.

Nicastro

In June 2011, the Supreme Court issued its ruling in *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S.Ct. 2780 (2011). *Nicastro* was decided by a plurality of four Justices, with the concurrence of two Justices. A majority of the Court reiterated the requirement of purposeful availment of a particular state forum in stream of commerce cases, and rejected arguments that a defendant that has introduced its product into the stream of commerce can be subject to personal jurisdiction merely because it could foresee or expect that its product would be re-sold in the forum State.

In *Nicastro,* the plaintiff had injured his hand on a metal shearing machine installed at his New Jersey workplace. The metal shearing machine was manufactured by defendant, J. McIntyre Machinery, Ltd. ("McIntyre"), a company based in the United Kingdom. For several years prior to the accident, McIntyre had used McIntyre America, an Ohio-based company, as its exclusive U.S. distributor for its machines. Through its U.S. distributor, McIntyre had sold up to four machines that ended up in New Jersey. Between 1990 and 2005, McIntyre officials travelled to a number of industry conventions in various U.S. cities where McIntyre promoted sales of its machines. Plaintiff's employer attended at least one of the conventions, after which he purchased the McIntyre metal shear involved in the accident. 131 S. Ct. at 2786. McIntyre also advertised the machines on its website, held U.S. and U.K. patents on its technology, and referred to "American National Standards Institute Regulations" for the use of scrap metal processing equipment in its product brochure. *Id.* at 2795 (Ginsburg, J., dissenting opinion).

The New Jersey Supreme Court adopted Justice Brennan's *Asahi* test concluding it could exercise personal jurisdiction because McIntyre "knew or reasonably should have known that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states" and it had "failed to take some reasonable step to prevent the distribution of its products in this State."  131 S. Ct. at 2787 (internal quotation and citation omitted).  A majority of the U.S. Supreme Court justices rejected the standard applied by the New Jersey Supreme Court and held that a non-resident manufacturer's marketing efforts directed to the U.S. generally, rather than toward a specific state, fail to satisfy the requirement of purposeful availment of the privilege of conducting activities in the forum State.  *Id.* at 2790 (Kennedy, J., plurality opinion); *id.* at 2792-93 (Breyer, J., concurring in judgment).[38]

Contrary to Justice Brennan's concurring opinion in *Asahi*, a majority of the Supreme Court in *Nicastro* also rejected the proposition that the foreseeability of litigation in the forum State, based on an awareness that the product is being marketed in the forum State, is determinative of whether personal jurisdiction can be exercised consistent with Due Process.  As the plurality wrote:

> It was the premise of the [Justice Brennan] concurring opinion that the defendant's ability to anticipate suit renders the assertion of jurisdiction fair.  In this way, the opinion made foreseeability the touchstone of jurisdiction.
>
> *            *            *
>
> But Justice Brennan's concurrence, advocating a rule based on general notions of fairness and foreseeability, is inconsistent with

---

[38] As the plurality wrote, purposeful availment by the defendant allows the sovereign state to exercise the power to subject that defendant to judgment for its conduct.  *Nicastro,* 131 S. Ct. at 2783; *accord, Hanson,* 357 U.S. at 253; *see also Int'l Shoe,* 326 U.S. at 320 ("[The Due Process] clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties or relations.  But, to the extent that a corporation exercises the privileges of conducting activities within a state, it enjoys the benefits and protection of the laws of that state.  The exercise of that privilege may give rise to obligations. . . .").

> the premises of lawful judicial power.  *This Court's precedents
> make clear that it is the defendant's actions, not his expectations
> that empower a State's court to subject him to judgment*.

131 S. Ct. at 2788-89 (emphasis added).

Similarly, the concurrence rejected the New Jersey Supreme Court's "knows or reasonably should know" that the product might be sold in any state standard for purposeful availment.  As Justice Breyer wrote:

> [T]o adopt this view would abandon the heretofore accepted inquiry of whether, focusing upon the relationship between "the defendant, the *forum*, and the litigation," it is fair, in light of the defendant's contacts *with that forum*, to subject the defendant to suit there.  It would ordinarily rest jurisdiction instead upon no more than the occurrence of a product-based accident in the forum state.  But this Court has rejected the notion that a defendant's amenability to suit "travels with the chattel."

131 S. Ct. at 2793 (citations omitted).

Therefore, Justice Breyer found that "I cannot reconcile so automatic a rule [as adopted by the New Jersey Supreme Court] with the constitutional demand for 'minimum contacts' and 'purposefu[l] avail[ment]', each of which rests upon a particular notion of defendant-focused fairness."  *Id.* (citation omitted).

Considering the facts, Justice Breyer found that McIntyre neither purposefully availed itself of the State of New Jersey nor delivered its goods in the stream of commerce with the "expectation" that they would be purchased by New Jersey users.  *Id.* at 2792.  Thus, the Supreme Court in *Nicastro* found that "expectation" is not a variant of the requirement of "purposeful availment" in stream of commerce cases, but rather that the "expectation" necessary for personal jurisdiction was not satisfied by a sale into the stream of commerce unaccompanied

by specific efforts to sell to the forum State.[39]  *Id.*

A majority of the *Nicastro* Court thus resolved any doubt that "foreseeability" might be sufficient in stream of commerce cases.  The Supreme Court clearly has rejected the idea that foreseeability alone, or even awareness, that a defendant's products might end up in a forum State is sufficient to show purposeful availment of the forum State.

A growing number of courts recognize that a majority of the *Nicastro* court rejected the idea that Due Process can be satisfied if it is merely shown that a non-resident defendant "knew or should have known" that its product was distributed by a third party in the forum State. Courts have instead required a showing of conduct specifically directed toward the forum State to establish purposeful availment.  *See, e.g.*, *Keranos, LLC v. Analog Devices, Inc.*, No. 10-CV-207, 2011 WL 4027427, at *10 (E.D. Tex. Sept. 12, 2011) (ordering jurisdictional discovery to determine whether "new minimum contacts analysis announced in *McIntyre*" was met).  *But see Ainsworth v. Cargotec USA, Inc.*, No. 10-236, 2011 WL 4443626, at *2 (S.D. Miss. Dec. 15, 2011) (noting disagreement between courts as to whether Justice Breyer's opinion changed Fifth Circuit law, and certifying issue for appeal), *leave to appeal granted*, No. 1190052 (5th Cir. Mar. 1, 2012).[40]

---

[39] Justice Ginsburg's dissent argued that McIntyre had purposefully availed itself of the forum State through its contacts with the U.S. as a whole:

> "In sum, McIntyre UK, by engaging McIntyre America to promote and sell its machines in the United States, 'purposefully availed itself' of the United States market nationwide, not a market in a single State or a discrete collection of States.  McIntyre UK thereby availed itself of the market of all States in which its products were sold by its exclusive distributor."

131 S. Ct. at 2801.  It is worth noting, however, that even the dissent did not find purposeful availment based only on the defendant's mere awareness that its product might be re-sold in a forum State.  The dissent viewed McIntyre's regular attendance and exhibitions at industry conventions in the U.S. as a "purposeful step to reach customers for its products anywhere in the United States."  *Id.* at 2798.

[40] *See also N. Ins. Co. of New York v. Constr. Navale Bordeaux*, No. 11-60462, 2011 WL 2682950, at *5 (S.D. Fla. July 11, 2011) (finding that six Justices in *Nicastro* reiterated importance of "purposeful availment" requirement and requiring "something more" than "merely placing a product into the stream of commerce"; *Windsor v. Spinner Indus. Co.*, No. 10-114, 2011 WL 5005199, at *4 (D. Md. Oct. 20, 2011) ("*McIntyre* clearly rejects foreseeability as

<u>Undisputed Points</u>

Based upon the foregoing precedents, the following points of law cannot be disputed.

1.  Due Process requires purposeful availment of a particular State forum.

2.  A national marketing campaign as in *Nicastro* does not satisfy purposeful availment of any particular State forum.

3.  A sales contract between a foreign seller and a resident buyer is not sufficient in and of itself to show purposeful availment.

4.  A sale into the stream of commerce, unaccompanied by specific efforts to sell to the forum State, does not satisfy the requirement of purposeful availment, even when it is foreseeable that the product will end up in the forum State.

As explained below, applying the law to the evidence in this case compels the conclusion that the Court may not exercise jurisdiction over either TG or TTP.

<u>TG Lacked Minimum Contacts With Louisiana.</u>

TG never has been incorporated in Louisiana, kept any corporate records in Louisiana and is not registered to do business in Louisiana.  Likewise, TG has no officers, directors, employees, or agents in Louisiana.  None of TG's officers, directors, employees, or agents maintains a residence or place of business in Louisiana.  In fact, no officers, directors, employees, or agents of TG have ever visited Louisiana for business purposes.

---

the standard for personal jurisdiction . . . . That holding now commands the assent of six Justices of the Supreme Court, all on substantially the same grounds, and is therefore binding precedent."); *Smith v. Teledyne Cont'l. Motors, Inc.*, No. 10-02152, 2012 WL 10836 (D.S.C. Jan. 3, 2012) (six Justices in *Nicastro* agreed that Justice O'Connor's test should be applied, although the concurrence rejected the plurality's stricter approach emphasizing sovereignty); *Oticon v. Sebotek Hearing Sys., LLC*, No. 08-5498, 2011 WL 3703423, at *8-9 (D.N.J. Aug. 22, 2011) (the "plurality expressly rejected the test articulated by Justice Brennan in *Asahi*" and "Justice Breyer, in his concurrence, would not adopt as strict a rule as that enunciated by the plurality, but he too voiced his disagreement with the notion that mere foreseeability is the cornerstone of the stream of commerce jurisprudence"); *Dow Chem. Canada ULC v. Superior County*, 202 Cal. App. 4th 170 (Ca. 2011). ("In . . . *Nicastro* . . . the Supreme Court resolved . . .); *Highlands Fuel Delivery, LLC v. Am. Ins. Co.*, No. 2011-00291, 2011 WL 7110393 (N.H. Super. Ct. Nov. 29, 2011) ("The Supreme Court's decisions in *J. McIntyre* (plurality plus the concurrence) reflect that the majority of the court did not accept what was termed the stream-of-commerce theory of jurisdiction adopted by the New Jersey Supreme Court, but instead insisted that more needs to be shown for the purposeful availment factor to be satisfied in a particular case."); *May v. Osako & Co.*, No. CL08002245-00, 2011 WL 4544889 (Va. Cir. Ct. Sept. 12, 2011) ("In *Nicastro*, the Supreme Court of the United States strongly affirmed Justice O'Connor's substantial connection analysis set forth in *Asahi* . . . over Justice Brennan's foreseeability test.").

It is an understatement to say that TG's contacts with the forum State were substantially less than those of the non-resident manufacturer not subject to jurisdiction in *Nicastro*. McIntyre sold its products to its distributor in Ohio with the intention that its products be re-sold throughout the U.S., and some of its product was sold in New Jersey. TG, however, had no U.S. distributor. TG's only two sales to a U.S. company were to Venture Supply, FOB a China port. TG delivered to Venture Supply in China. Venture Supply informed TG that Venture Supply planned to ship the first order of drywall it purchased to Virginia and the second order to New Jersey, but TG had no control over where Venture Supply shipped the drywall. TG had no expectation whatsoever that its drywall would be re-sold in Louisiana. If some of the drywall ended up in Louisiana thereafter (a fact as to which there is no admissible evidence) it was not due to any intentional act on the part of TG and thus does not amount to minimum contacts with Louisiana. *See Nicastro*, 131 S. Ct. at 2788 ("The defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State."); (plurality) and *Id.* at 2792 ("Mr. Nicastro, who here bears the burden of proving jurisdiction, has shown no specific effort by the British Manufacturer to sell in New Jersey.") (Breyer, J. concurring opinion.)

<u>TTP Lacked Minimum Contacts With Louisiana.</u>

The Court must conduct a separate jurisdictional analysis with respect to TTP, a company that was separate from TG. The evidence shows TTP also lacked minimum contacts with Louisiana. TTP never has been incorporated in Louisiana, kept any corporate records in Louisiana and is not registered to do business in Louisiana. Likewise, TTP has no officers, directors, employees, or agents in Louisiana. None of TTP's officers, directors, employees, or agents maintains a residence or place of business in Louisiana. In fact, no officers, directors,

employees, or agents of TTP have ever visited Louisiana for business purposes.  TTP's two isolated sales in China to companies who informed TTP they intended to ship to Louisiana did not amount to purposeful availment of Louisiana by TTP.

TTP's forum State contacts also fall far short of even those of the manufacturer found not subject to jurisdiction in *Nicastro*.  McIntyre sold its products to a distributor located in Ohio, with the understanding that its products would be re-sold throughout the United States.  McIntyre attended conventions in the US along with its distributor to advertise its products.  McIntyre's US distributor structured its advertising and sales efforts with McIntyre's direction and guidance.  McIntyre sold some of its machines on consignment.  McIntyre held both U.S. and European patents on its technology.  As the plurality found, McIntyre "directed marketing and sales efforts at the United States."   As the concurrence wrote, McIntyre "permitted, indeed wanted its independent American Distributor to sell its machines to anyone in American willing to buy them . . ." Nonetheless, as the majority found, McIntyre had no office in New Jersey, did not pay taxes or own property to New Jersey, and neither advertised nor sent any employees in New Jersey; its only contact with New Jersey was that its distributor sent at least one and up to four machines there.  As the concurrence wrote, McIntyre had no "regular . . . flow" or "regular course" of sales in New Jersey, and there was no 'something more', such as state-related design, advertising, advice, marketing or anything else."  There was no showing of any specific effort to sell in New Jersey.  Thus, there was no showing that McIntyre had "'purposefully availed itself of the privilege of conducting activities' in New Jersey," or that McIntyre "delivered its goods in the stream of commerce 'with the expectation that they will be purchased' by New Jersey users."

Like McIntyre, TTP made no sales in the forum State, did not make any effort to market its products to the forum State, did not advertise there, and had no offices, employees or property

in the forum State.  Unlike McIntyre, TTP did not sell any products through a U.S. distributor or direct its marketing or sales efforts to the U.S.  TTP also never travelled to the U.S. to seek out customers as McIntyre did.  The sales of TTP's product to Louisiana companies occurred only after GD Distributors and APIC initiated contact with TTP and entered into contracts providing for the delivery of drywall to TTP in China, either FOB or CIF.

The absence of TTP's minimum contacts is also reflected by the fact that TTP never attended conventions or trade shows in the U.S. and never marketed or advertised with any U.S. company.  Also, unlike McIntyre, TTP did not have any trademarks or other intellectual property registered in the U.S.  TTP did not purposefully avail itself of the benefits of a Louisiana forum; to the contrary, TTP purposefully avoided doing so, by completing its sales in China and not marketing in Florida.  *See World-Wide Volkswagen*, 444 U.S. at 297 (a nonresident may permissibly structure his primary conduct to avoid being haled into court in a particular state).  Thus, TTP cannot be subject to jurisdiction in Louisiana, for all the reasons McIntyre was not subject to jurisdiction in New Jersey, and then some.

Even if one were to speculate based on Justice Breyer's concurring opinion in *Nicastro* that "target[ing] the world by selling products from its Web site" or "consign[ing] the products through an intermediary (say, Amazon.com) who then receives and fulfills the orders," 131 S. Ct. at 2793, could be an element of showing purposeful availment, TTP did none of those things. TTP was willing to serve the export market outside China by passively selling to customers who approached TTP from other countries, including the U.S., but did not do anything that remotely approached "target[ing] the world."  In fact, TTP did not have its own website, and TG's website made no mention of TTP.  Furthermore, TTP never had an export marketing plan, let alone a marketing plan directed to Louisiana.  Nor did TTP ever "consign" its drywall to "an

intermediary" who received and fulfilled orders from customers in Louisiana. APIC and GD Distributors made isolated purchases from TTP in China in 2007 for their own account. Likewise, even under the *Nicastro* dissent's "purposeful avail[ment] . . . of the United States market nationwide" standard, TTP should not be subject to personal jurisdiction. *Nicastro*, 131 S. Ct. at 2801. TTP had no U.S. marketing plan or distributor, did not sell or advertise anywhere in the U.S., and did nothing to target the U.S. market, even generally.

To the extent there were any re-sales of TTP's drywall in Louisiana by APIC, GD Distributors or anyone else, they did not result from efforts by TTP to "seek to serve" the market in the forum State. *Nicastro*, 131 S. Ct. at 2788. Consequently, TTP did not have the type of "expectation" of re-sales in the forum State that the Supreme Court in *World-Wide Volkswagen* postulated could lead a non-resident to reasonably anticipate being sued in the forum State. *Id.* TTP did not purposefully avail itself of the benefits and protections of a Louisiana forum; to the contrary, by completing all its transactions in China and not exercising control over the destinations of its drywall, TTP purposefully avoided doing so. *See World-Wide Volkswagen*, 444 U.S. at 297 (a nonresident "may permissibly structure his primary conduct so as to avoid being haled into court in a particular state").

TTP's isolated sales to APIC and GD Distributors in China also stand in stark contrast to the purposeful activity of out-of-state franchisees in *Burger King*. TTP did not "reach out" to APIC or GD Distributors in Louisiana. Quite the opposite, the Louisiana companies or their representatives approached TTP in China. There was also nothing "long-term" about those companies' relationships with TTP; each only made one purchase. TTP did not control whether or not those companies re-sold the drywall in Louisiana and had no role in marketing in Louisiana. There were no "continuing and wide-reaching contacts" between TTP and Louisiana

– there were hardly any contacts at all.  TTP's sales to APIC and GD Distributors did not involve any payments, performance or other activities by TTP in Louisiana.  Consequently, the principles announced and applied in *Burger King* also dictate that TTP should not be subject to jurisdiction in this case.

> **1.     Plaintiffs Cannot Prove That Either TG Or TTP Purposefully Availed Itself Of The Louisiana Market Based On Its Alleged Awareness Of Sales In Louisiana.**

It would also be unavailing for Plaintiffs to argue that TG or TTP was "aware" of or could foresee that someone to whom they sold drywall in China would market it in Louisiana.  First, the *Nicastro* majority clearly rejected the "awareness that the product will be marketed in the forum State" standard that Justice Brennan advocated in *Asahi.* The Supreme Court's precedents indicate that <u>something more</u> is required, such as a "regular . . . flow" or "regular course" of sales by TG or TTP directed to Louisiana or "special state-related design, advertising, advice, or marketing" directed to Louisiana by TTP.  *Nicastro* 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment).  *See also Nicastro,* 131 S. Ct. at 2788 ("The Defendant's transmission of goods permits the exercise of jurisdiction only where the Defendant can be said to have targeted the forum; as a general rule, it is not enough that the Defendant might have predicted that its goods will reach the forum State.") (Kennedy, J., plurality opinion.)  None of those factors is even arguably present here.

*Second*, even if the Brennan test were applied, TG and TTP did not participate in a distribution process that resulted in the sale of its drywall in Louisiana and were not aware that those companies would market the drywall in Louisiana.  The Taishan Defendants' connection to the forum State, therefore, was even more attenuated than that of the manufacturer that was not held subject to personal jurisdiction in *Asahi*.  Unlike Asahi, neither TG nor TTP made "regular and extensive sales" to an entity they "knew was making regular sales" of its products in

the forum State, and furthermore, as the evidence also shows, the lawsuit came as a "surprise" to both TG and TTP.  *See Asahi,* 480 U.S. at 116, 121 (Brennan, J., concurring in part and concurring in the judgment).  Nor can it be said that either TG or TTP benefited economically from the sale of their products in the forum State, one of the factors Justice Brennan viewed as relevant to establishing minimum contacts.  *Asahi,* 480 U.S. at 121.  APIC and GD Distributors each paid TTP the purchase price prior to delivery of the drywall in China.  <u>TG and TTP, therefore, did not derive economic benefit from any re-sales of drywall in Louisiana.</u>  Accordingly, even if Justice Brennan's concurring opinion in *Asahi* (which is not governing law) is considered, neither TG nor TTP can be found to have purposely availed itself of the forum State of Louisiana.  The Court must conclude that TG, and separately TTP, lacked the minimum contacts with Louisiana that were required in order for the Court to exercise personal jurisdiction consistent with Due Process.

### 2.   **Plaintiffs Cannot Prove That TG Or TTP's Isolated Sales Of Drywall In China Constituted Purposeful Availment Under Fifth Circuit Or Louisiana Law.**

Neither the Fifth Circuit nor the state courts of Louisiana have ever abandoned "purposeful availment" as the touchstone of the due process analysis.  The decisions of courts that have considered whether a defendant "purposefully availed" itself of the forum State indicate that TG's or TTP's two isolated sales of drywall in China are insufficient to establish purposeful availment, and thus minimum contacts.

The place of performance of a contract is "a weighty consideration" in the analysis of minimum contacts.  *Command-Aire Corp. v. Ontario Mech. Sales & Serv. Inc.,* 963 F.2d 90, 94 (5th Cir. 1992).  Here, TG's sales to Venture Supply and TTP's sales to APIC and GD Distributors were performed entirely in China.  To the extent that any company bought drywall from either Taishan Defendant in China and subsequently marketed the drywall in Louisiana,

those activities cannot establish purposeful availment by TG or TTP.  The "fortuitous 'unilateral activity' of a third party" in a forum state does not subject a defendant to personal jurisdiction in that state.  *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 611 (5th Cir. 2008) (quoting *Helicopteros Nacionales*, 466 U.S. at 416-17).

Consistent with the Fifth Circuit's view that the place of performance is entitled to great weight in the analysis of personal jurisdiction, the Fifth Circuit has long held that FOB sales outside of the forum State do not constitute purposeful availment of the State even when the seller arranged for shipment of the product into forum.  *Charia v. Cigarette Racing Team, Inc.*, 583 F.2d 184 (5th Cir. 1978).  In *Charia*, the plaintiff was a Louisiana resident who had purchased a boat from a Florida-based boatbuilder.  *Charia*, 583 F.3d 184.  The defendant had sold four boats to Louisiana within a five-year period.  Plaintiff had seen advertisements that the defendant placed in several national magazines and had contacted the defendant to purchase a boat.  They had several conversations about the boat, agreed on a price, and the defendant arranged for delivery.  The manufacturer sold the boat FOB Florida.  The cost of shipping was added to the purchase price, and the manufacturer arranged to ship the boat from Florida to Louisiana.

The Fifth Circuit found that jurisdiction could not be exercised over the defendant in Louisiana consistent with Due Process.  *See Charia*, 583 F.2d at 189.  It found that neither advertising in national magazines nor exchanging phone calls amounted to significant contacts.  *Id.*  The Court also concluded that the place where the contract was completed was fortuitous, and what was more important was that the only face-to-face discussions about the sale occurred in Florida, indicating "that the locus of the contract was in Florida, where [the defendant's] activity, the building of the boat, was to take place."  *Id.* at 188.

Further, the court found that because the defendant sold the boat FOB Florida, it could not be argued under a "stream of commerce rationale" that it was indirectly shipping its product into Louisiana and could have reasonably foreseen that the sale would have effects in Louisiana. Moreover, the court held that Cigarette's sale of four boats to Louisiana residents over a five-year period were "isolated and sporadic" sales that "did not involve purposeful conduct within Louisiana so as to avail itself of the benefits and protections of Louisiana's laws."[41] *Charia* 583 F.2d at 189.   *See also, Benjamin v. W. Boat Bldg. Corp.*, 472 F.2d 723 (5th Cir. 1973). (Louisiana resident who initiated purchase of boat from Washington State boatbuilder and accepted delivery in Washington did not satisfy burden of proving minimum contacts of boatbuilder in Louisiana, notwithstanding communications regarding contract to plaintiff in Louisiana); *Singletary v. B.R.X., Inc.*, 828 F.2d 1135, 1136 (5th Cir. 1987) (finding that "contact was weakened even further by the fact that the sale was initiated by the buyer, and was shipped F.O.B. California, the seller's place of business"); *Growden v. Ed Bowlin & Assocs., Inc.*, 733 F.2d 1149 (5th Cir. 1984) (denying jurisdiction, based on *Charia*, over out-of-state used aircraft seller that sold to Louisiana resident but delivered aircraft outside state, notwithstanding seller's knowledge aircraft would be based in Louisiana and require repairs there).   *But see, Luv N'Care Ltd. v. Insta-Mix*, 438 F.3d 465, 471-72 (5th Cir. 2006) ("a F.O.B. term does not prevent a court from exercising personal jurisdiction over a non-resident defendant *where other factors*, such as the quantity and regularity of shipments, suggest that jurisdiction is proper") (emphasis added).[42]

---

[41]   *Charia* has added relevance because there the seller arranged for shipment of the product into the forum at the customer's request, as TTP did with its drywall in the case of its CIF sale to GD Distributors.

[42]   As noted above, the Supreme Court's decision in *Nicastro* has cast into doubt the continued validity of the Fifth Circuit's holding in *Luv N' Care,* insofar as it was based on the now discredited view that mere foreseeability of the product making its way into the forum State is sufficient to establish purposeful availment.  438 F.3d at 670.

*Charia* and *Benjamin* continue to be controlling in the Fifth Circuit.  Both were recently cited and relied upon in *LTA, Inc. v. Breeck*, 2011 WL 3841374 (S.D. Miss. Aug. 26, 2011), where the Court held that an Indiana boat manufacturer that sold and delivered a number of boats to Mississippi was not subject to personal jurisdiction with respect to claims of a Louisiana resident who had seen the defendants' national advertisements.  Likewise, in *NTE Aviation, Ltd. v. LIAT (1974) Ltd.*, 561 F. Supp. 2d 687, 690-91 (E.D. Tex. 2007), the Court relied upon *Charia* and *Benjamin* to find that a foreign defendant who leased a jet engine from a Texas lessor was not subject to personal jurisdiction in Texas; notwithstanding that the parties had exchanged telephone calls, payments, and correspondence in Texas.

Along the same lines as *Benjamin* and *Charia*, the Fifth Circuit has held in various factual contexts that contracting with a resident of the forum State is insufficient to subject the nonresident defendant to personal jurisdiction in that State when the defendant does not initiate the contact and is not required to perform the contract in the forum State.  In *Hydrokinetics, Inc. v. Alaska Mech., Inc.*, 700 F.2d 1026 (5th Cir. 1983), the Court held that personal jurisdiction in Texas was lacking over an Alaska corporation that agreed to purchase goods manufactured in Texas, agreed to pay for the goods in Texas, communicated extensively with the plaintiff before contracting, and even sent representatives to Texas twice, once to inspect the manufacturing facilities and once to resolve a dispute relating to the contract. *Id.* at 1028-29.  The Court found that defendant's activities did not constitute "purposeful availment". *Id.* at 1029.  Like TG and TTP, the defendant did not regularly engage in business outside of its home jurisdiction, the agreement to purchase was "initiated by and substantially negotiated" outside of the State, and the products were delivered outside of the State.  The *Hydrokinetics* Court also found that the fact that the contract there provided that it was to be governed by

Alaska law was evidence that the defendant had not purposefully availed itself of the Texas forum. *Id*. at 1030. Even more importantly, the defendant was not required to perform any part of the contract in Texas. *Id*.

In *Stuart v. Spademan*, 772 F.2d 1185 (5th Cir. 1985), the Court determined that a Texas court did not have personal jurisdiction over an individual defendant who entered into a single contract with a Texas resident, shipped goods into Texas for modification at the instigation of the plaintiff, sent letters and made telephone calls to the plaintiffs in Texas, received communications from the plaintiffs, agreed to a choice-of-law provision selecting Texas law, and mailed payments to Texas. *Id.* at 1192-1194. Based upon these activities – which clearly exceeded the level of either TG's and TTP's contacts with the forum State here – the Court concluded the nonresident defendant had not purposefully availed itself of the benefits of conducting business in Texas. The Court distinguished the defendant's conduct from the conduct in *Burger King*, finding that as defendant did not contemplate a long-term relationship with continuing obligations, he could not anticipate being haled into court in the forum state: "The random use of interstate commerce to negotiate and close a particular contract, the isolated shipment of goods to the forum at the instigation of the resident plaintiffs,…do not constitute the minimum contacts necessary to constitutionally exercise jurisdiction over [defendant]." *Id*. at 1194.

In *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309 (5th Cir. 2007), the plaintiff, a Texas corporation, filed suit in Texas against several Russia-based defendants for breach of contract. The contract was negotiated and executed in Russia and provided for arbitration in Russia, under Russia law. The plaintiff argued that the Russian defendants had established numerous contacts with Texas by (1) contracting with plaintiff with knowledge that plaintiff was

a Texas resident; (2) acknowledging and approving of plaintiff's substantial contract performance in Texas; and sending an executive to visit Texas. The Court rejected the plaintiff's argument. *Id.* In addition to the fact that the defendants were not actively engaged in any of the plaintiff's activities in Texas, "[t]he contract was silent as to location" and there was "no indication that the location of the performance mattered" or that the defendants had contracted with the plaintiff because of its Texas headquarters. *Id.* *Moncrief* underscores that APIC or GD Distributors' shipments or re-sales of drywall in Louisiana, whether or not foreseeable to TTP, do not constitute minimum contacts of TTP.

Similarly, in *Big Easy Energy, LLC v. Conglomerate Gas*, No. 09-3231, 2010 WL 1038225 (E.D. La. Mar. 17, 2010), an energy company hired a New Orleans based corporation to help it locate and purchase oil and gas properties in Texas. Plaintiff conducted its search from its New Orleans office and held a meeting with an out-of-state employee of a company with some holdings in Texas in the office. *Id.* at *4. The Court declined to give weight to those contacts, and wrote: "[a]lthough Defendants could have reasonably anticipated that Plaintiff, as a Louisiana entity, would perform its obligations under the contract in Louisiana, Plaintiff has not alleged that the contract contemplated performance within Louisiana. Thus, Plaintiff's performance was not a purposeful contact by Defendants, and its weight in the personal jurisdiction calculation is necessarily diminished." *Id.* (quotation and citation omitted).

Similarly, a number of Louisiana state court rulings applying the Louisiana long-arm statute to the full extent of Due Process have, along the lines expressed in *Nicastro*, have required conduct directed to the forum State to establish specific jurisdiction: "[T]he requirement of meaningful contacts is satisfied if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of

48

or relate to those activities." *De Reyes v. Marine Mgmt. & Consulting, Ltd.*, 586 So. 2d 103, 106 (La. 1991) (citations omitted).   Moreover, for cases involving allegedly defective products, "purposeful direction" requires more "than the mere placing of a product into the stream of commerce." *Hunt v. Schult Homes Corp.*, 657 So. 2d 124, 127-28 (La. App. 3d Cir. 1995); *but cf. Ruckstuhl*, 731 So. 2d at 889.[43]  *See also Fricke v. Owens-Corning Fiberglass Corp.*, 647 So. 2d 1260, 1265 (La. App. 4th Cir. 1994) (mere fact that product created by defendant "found its way to a Louisiana user, standing alone, cannot satisfy minimum due process standards").

*Hunt* presents a scenario analogous to TTP's isolated sales of drywall in China.  In *Hunt*, a Louisiana appellate court affirmed a district court's holding that it did <u>not</u> have personal jurisdiction over a Texas manufacturer of allegedly defective particle board.  The defendant had manufactured the particle board in Texas and delivered it to another Texas company that used it in the construction of mobile homes marketed in Louisiana, Texas, and Arkansas.  However, the manufacturer had no other contacts with Louisiana.  *Hunt*, 657 So. 2d at 128.  As the Court explained, "[w]hile it may have been foreseeable that [non-resident manufacturer's] products would find their way into the forum State of Louisiana through the stream of commerce, [the non-resident manufacturer's] conduct in this case and its lack of any significant connection with Louisiana are attenuated to the point that it should not have reasonably anticipated being haled into court here."  *Id.* at 128.  Moreover, even a direct sale and shipment to Louisiana may be insufficient to establish minimum contacts when that sale is not accompanied by the seller's purposeful conduct directed toward the state.  *See J. Wilton Jones Co. v. Touche Ross & Co.*, 556 So. 2d 67, 71 (La. App. 4th Cir. 1989) (nonresident distributor's two unsolicited sales to

---

[43] Louisiana state court determinations as to the reach of Due Process under the long-arm statute are part of the state law jurisprudence interpreting the Louisiana long-arm statute and are entitled to deference by a federal court sitting in diversity in Louisiana.   *See Mullins*, 564 F.3d at 398 (court sitting in diversity is required to apply state long arm statute).

Louisiana residents, together with advertisement in a national magazine and posting of its name in a publication distributed to computer dealers nationwide, did not constitute purposeful availment of Louisiana).

In summary, neither TG nor TTP solicited customers in Louisiana.  TG had no customers from Louisiana; TTP made two sales to companies that approached it in China indicating they wished to ship to Louisiana.  Both TG's and TTP's sales were performed entirely in China, and neither engaged in any activities in Louisiana in connection with those sales.  TG and TTP sales activities fall squarely within the holding in *Charia* and the other cases cited above requiring more than out of state sales to establish purposeful availment.[44]  Plaintiffs cannot establish that TG, or separately TTP, purposefully availed itself of the benefits and protections of a Louisiana forum.

### B.      Plaintiffs Cannot Prove That Their Causes Of Action Arose Out Of Or Resulted From TG Or TTP's Contacts With Louisiana.

To satisfy their burden of proving that the Court may exercise personal jurisdiction over TG or TTP consistent with Due Process, in addition to showing that a Taishan Defendant had minimum contacts, Plaintiffs must show that their causes of action against TG or TTP  arose out of or resulted from that particular Defendant's alleged contacts with Louisiana.  *Seiferth*, 472 F.3d at 271.  *Int'l Shoe*, 326 U.S. at 319.[45]  There must be a close connection between a plaintiff's cause of action and the defendant's contacts with the forum to satisfy Due Process. *See Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1270 n.21 (5th Cir. 1981) (airplane charter

---

[44] Needless to say, the foregoing precedents also require the dismissal of TG, which never sold drywall to any Louisiana customers or even to any customer that indicated it intended to ship its drywall to Louisiana.  TG did not purposefully avail itself of Louisiana in any way.

[45] *See also* La. Rev. Stat. § 13:3201 (jurisdiction under long-arm statute only "as to a cause of action arising from any one of the following activities performed by a non-resident . . . .")

contract was "but for" causative factor of operative events giving rise to wrongful death claim from airplane crash); *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 855-856 (5th Cir. 2000) (Syrian companies not amenable to specific jurisdiction in Texas because wrongful death claims of workers killed in Syria were not closely related to the companies' recruiting activities in Texas) and *Guzman v. Memorial Hermann Hosp. Sys.*, No. 07-3973, 2008 WL 5273713, at *8-10 (S.D. Tex. Dec. 17, 2008) (no jurisdiction over foreign company that provided non-medical administrative support to hospital emergency room accused of medical malpractice; substantial connection between non-resident's forum contacts and operative facts of the litigation required); *but see Ritzmann v. Nalu Kai, Inc.*, 523 F. Supp. 2d 564, 568 (S.D. Tex. 2007) (cause of action must "relate to" defendants' contacts; however, where plaintiff can show that offending product was available in forum State he is not required to prove actual purchase of product in forum State).

In the case of TG, it is clear that TG sold drywall only to a Virginia entity, Venture Supply. Plaintiffs' claims against TG, if any, arose from drywall that was brought into Louisiana from elsewhere, and did not arise from TG's contacts with Louisiana. In the case of TTP, Plaintiffs must prove that the drywall they claim caused their damages is traceable to drywall that TTP sold to GD Distributors or APIC in China, which those companies then shipped to Louisiana. The mere presence of TTP's drywall in Plaintiffs' homes, however, is insufficient to establish the necessary relationship between their claims and TTP's alleged contacts with Louisiana. If Plaintiffs' drywall was obtained through another distribution channel, then Plaintiffs' damages have nothing to do with TTP's alleged contacts with Louisiana. Since Plaintiffs are unable to show the required nexus between their alleged injury and the shipment of a Taishan Defendant's drywall to Louisiana that is alleged to supply minimum contacts, the

Court should decline to exercise personal jurisdiction over either TG or TTP, even if it found that the particular Taishan Defendant had minimum contacts with Louisiana.

Even if the Court found a sufficient nexus between the Louisiana Plaintiffs' claims of unidentified defective drywall in their Louisiana homes and a Taishan Defendant's contacts with the state, that nexus would be completely absent from the Foreign Plaintiffs' claims. The Foreign Plaintiffs do not reside in Louisiana and do not claim injury from any drywall that TG sold that allegedly ended up in Louisiana. The Foreign Plaintiffs' claims did not arise from TG or TTP's alleged contacts with Louisiana, and therefore, the Court cannot exercise specific jurisdiction with respect to those claims.[46]

When the plaintiff is a non-resident and neither the defendant's alleged activities giving rise to the claims nor the claimed injuries occurred in or had any connection with the forum, the only possible basis for asserting jurisdiction is under a general jurisdiction theory. *Goodyear*, 131 S. Ct. at 2851. Thus, in order for the Court to exercise personal jurisdiction over a Taishan Defendant with respect to the Foreign Plaintiffs' claims, the Foreign Plaintiffs would be required to establish that TG or TTP is subject to general jurisdiction in Louisiana. There is, however, no evidence in the record which would support the Court's exercise of general jurisdiction over TG or TTP for non-forum related claims, such as those asserted by the Foreign Plaintiffs, because neither Taishan Defendant had the continuous and systematic contacts with Louisiana required for general jurisdiction. *Id.*

---

[46] Moreover, while Louisiana is the only relevant forum State for assessing personal jurisdiction in this case, there is no evidence in the record that either of the Taishan Defendants had minimum contacts with any of the other states where the Foreign Plaintiffs' reside.

### C.   The Exercise Of Jurisdiction Over TG Or TTP Would Be Unreasonable And Would Offend Traditional Notions Of Fair Play And Substantial Justice.

The Court cannot exercise personal jurisdiction over either TG or TTP if it would offend "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316.  As the Supreme Court has explained:

> Once it had been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'  Thus, courts in 'appropriate case[s]' may evaluate [1] 'the burden on the defendant,' [2] 'the forum State's interest in adjudicating the dispute,' [3] 'the plaintiff's interest in obtaining convenient and effective relief,' [4] 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and [5] the 'shared interest of the several States in furthering fundamental substantive social policies.'

*Burger King*, 471 U.S. at 476-77 (citations omitted and internal numbering added).

Justice Brennan, the author of the Court's opinion in *Burger King*, further explained that these considerations of fairness and reasonableness may be dispositive of the question of personal jurisdiction:  "Nevertheless, minimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has engaged in forum activities." *Id.* at 477-78 (citation omitted).  Conversely, even if the assertion of jurisdiction would be fair and reasonable, minimum contacts must still be present.  *See Prejean* 652 F.2d at 1269 n.15 (although forum's interest and relative convenience of parties can serve to enhance contacts with forum to a quality that justifies jurisdiction, they are never sufficient conditions to jurisdiction by themselves); *Osorio v. Dole Food Co.*, No. 07-22693, 2009 WL 48189, at *14 (S.D. Fla. Jan. 5, 2009) (refusing to enforce judgment against defendants as to whom court's jurisdiction was reasonable because they did not have requisite minimum contacts for exercise of jurisdiction to comport with Due Process).

Furthermore, the five fairness factors the Supreme Court has identified weigh against the assertion of personal jurisdiction over either of the Taishan Defendants.

The first factor – the burden on the defendant – is particularly compelling.  As the Supreme Court explained in *Asahi*, "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."  480 U.S. at 114; s*ee also Gray v. Riso  Kagaku Corp.*, 82 F.3d 410, 1996 WL 181488, at *4 (4th Cir. Apr. 17, 1996) (exercise of jurisdiction unreasonable over Japanese company due to language and cultural barriers and distance of South Carolina forum from Japan). The Supreme Court has cautioned that "[G]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi*, 480 U.S. at 115 (citation omitted).

In order to defend this lawsuit on its merits, TG and TTP would bear the extraordinarily unfair and unjust burden of having to travel around the world. Beyond sheer travel time, either or both would have to surmount logistical and bureaucratic difficulties in terms of transportation, voluminous translations, governmental approvals, and deep-seated cultural differences that would likely be prohibitively expensive to overcome.  *See Gray*, 1996 WL 181488, at *4. The Court's and the parties' experience with jurisdictional discovery dramatically illustrate the point. The difficulties of travel for Chinese nationals required that jurisdictional depositions be taken in Hong Kong, far from the Taishan Defendants' separate headquarters in Shandong Province, China and also a half a world away from this forum.  Enormous time and expense were also required for the translation of testimony and documents.  In addition, because of disputes regarding translations and other problems with discovery in international litigation, the Court ordered a second round of depositions in Hong Kong.  Altogether, jurisdictional discovery has

taken more than 16 months.  Needless to say, these burdens would increase exponentially if Defendants were required to defend on the merits.  The burdens imposed on TG or TTP would, therefore, be so severe as to be constitutionally unreasonable.  *See Burger King Corp.*, 471 U.S. at 478.  ("jurisdictional rules may not be employed in such a way as to make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent") (citation omitted).

The second factor, the interests of the forum State, also does not favor asserting jurisdiction over either TG or TTP.  The Taishan Defendants did not engage in any activities in Louisiana.  Consequently, Louisiana's interest would not be served by dragging either of them into this litigation with all the attendant expense, delay and uncertainty.  Instead, Louisiana's interest would be served by adjudicating Plaintiff's claims against parties they have identified as having been involved in supplying or installing the particular defective drywall in their homes and who, unlike TG and TTP, are subject to the Court's jurisdiction.

Similarly, the third factor – the interests of Plaintiff – are served by allowing the litigation to proceed against the multiple parties subject to the Court's jurisdiction whom Plaintiff alleges were in the chain of distribution of drywall installed in their homes.  In this manner, Plaintiff will likely be able to obtain relief without the delay, complexity and unfairness of dragging TG or TTP into this litigation from China.

The fourth factor – the judicial system's interest in efficient resolution of controversies – also suggests that jurisdiction over either TG or TTP is not appropriate, as the aforementioned difficulties of intercontinental, multi-lingual, cross-cultural adjudication would needlessly complicate and prolong these proceedings.

Finally, the shared interest of the "several states" in a case involving a foreign defendant

"calls for a court to consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction by [the forum State]." *Asahi*, 480 U.S. at 115-116.  In that assessment, "the procedural and substantive interests of other *nations* . . . as well as the Federal interest in Government's foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State." *Id. at* 115 (emphasis in original).

Here, China's substantive policies most assuredly do not weigh in favor of diluting the guarantee of Due Process so far as to allow jurisdiction over TG or TTP.  In addition, the interests of international comity indicate jurisdiction would be unreasonable.  TG and TTP sold and delivered drywall exclusively in China, and TTP's sales to companies that indicated they were shipping to Louisiana were an infinitesimal portion of TTP's business.  Subjecting TG or TTP to unexpected litigation half a world away would certainly defeat its reasonable expectations in those transactions and offend principles of international comity.  *OMI Holding, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1097 (10th Cir. 1998) (adjudication of dispute with Canadian defendants arising out of contract negotiated in Canada and governed under Canadian law would implicate Canada's sovereign interest in interpreting its laws and militated in favor of dismissal).

As noted above, in *Asahi*, all nine Justices agreed that it would not be fair and reasonable to assert jurisdiction over a Japanese tire valve manufacturer in a California case allegedly arising from its defective product, imported into California by a Taiwanese tire manufacturer. As Justice Ginsburg explained dissent in *Nicastro*:

> The decision was not a close call.  The Court had before it a foreign plaintiff, a Taiwanese manufacturer, and a foreign defendant, the Japanese valve-assembly maker, and the indemnification dispute concerned a transaction between those parties that occurred abroad.  All agreed on the bottom line:  The Japanese valve-assembly manufacturer was not reasonably brought into the California courts to litigate a dispute with another foreign party over a transaction that took place outside the United States.
>
> Given the confines of the controversy, the dueling opinions of Justice Brennan and Justice O'Connor were hardly necessary.  How the Court would have 'estimate[d] . . . the inconveniences,' . . . had the injured California originally sued Asahi is a debatable question.  Would this Court have given the same weight to the burdens on the foreign defendant had those been counterbalanced by the burdens litigating in Japan imposed on the local California plaintiff?  *Cf. Calder v. Jones*, 465 U.S. 783, 788 (1984) (a plaintiff's contacts with the forum "may be so manifold as to permit jurisdiction when it would not exist in their absence.")
>
> In any event, Asahi, unlike McIntyre UK, did not itself seek out customers in the United States, it engaged no distributor to promote its wares here, it appeared at no tradeshows in the United States, and, of course, it had no Web site advertising its products to the world.  Moreover, Asahi was a component part manufacturer with 'little control over the final destination of its products once they were delivered into the stream of commerce.'  It was important to the Court in *Asahi* that 'those who use Asahi components in their final products, and sell those products in California, [would be] subject to the application of California tort law.'  480 U.S. at 115, 107 S. Ct. 1026 (majority opinion).

131 S. Ct. at 2802-2803 (Ginsburg J. dissenting).  The decision in this case should also not be a close call.  TG and TTP's isolated sales in China were foreign transactions that took place entirely abroad.  TG, like TTP, and also like the Japanese valve manufacturer in *Asahi*, "did not . . . seek out customers in the United States, . . . engaged no distributor to promote [their] wares here, [and] appeared at no tradeshows in the United States."  TG and TTP also had "little control over the final destination of [their] products once they were delivered into the stream of commerce."

Furthermore, subjecting either of the Taishan Defendants to jurisdiction merely because Plaintiffs may allege that either TG or TTP could foresee some of their drywall might be re-sold in Louisiana, cannot be squared with traditional notions of fair play and substantial justice. "[T]he fact that the defendant is foreign, rather than a domestic, manufacturer makes the basic fairness of an absolute [foreseeability] rule yet more uncertain." *Nicastro* 131 S. Ct. at 2793-94 (Breyer, J. concurring).   In light of all of the foregoing considerations, exercising personal jurisdiction over TG or TTP would contravene "traditional notions of fair play and substantial justice," in violation of the Due Process Clause of Constitution.

## II.       THE ACTIVITIES OF OTHER ENTITIES CANNOT BE ATTRIBUTED TO TG.

Although Plaintiffs make no claims against or regarding TTP,[47] TG anticipates that Plaintiffs may argue that TTP's activities should be attributed to TG for the purpose of asserting jurisdiction over TG.  As is shown below, there is no basis for attributing TTP's activities to TG in the event Plaintiffs make such an argument.

### Louisiana Choice Of Law Rules Govern Whether TTP's Activities Can Be Attributed To TG.

A federal court sitting in diversity is required to apply the substantive law of the forum state including its choice of law provisions.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Accordingly, this Court should apply Louisiana choice of law rules to the question of whether to attribute the activities of one entity to another for purposes of personal jurisdiction.

### Chinese Law Should Apply.

In order to determine whether the acts of one entity may be attributed to another, at the very least it is essential first to understand the nature of that entity under the laws of the country

---

[47] The only allegation in the Complaint against TTP is that it allegedly "caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold."  (Compl. ¶ 143).

in which it was formed.  China has a comprehensive law "(Company Law") that it enacted to facilitate Chinese business growth and transition the Chinese economy from a communist planned economy to a more modern market economy.[48]  (Zhu Decl. ¶ 15).  Among other things, Chinese law regulates the relationship between shareholders and their companies and the relationship between companies and third parties. (*See generally, Zhu Decl.*).  TG and TTP were formed as separate and distinct legal entities pursuant to the Company Law and are subject to it. (*Id.* ¶¶ 49, 52; *see also* Jia Tr., Def.'s. Exs., 33A, 34A, 35A, 37A, 40A, 42A, 43A, 45A, 46A and 47A).

The Fifth Circuit has issued an opinion on the precise issue raised here, and held that the law of the place of incorporation, *i.e.* China, must govern.  *See Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640 (5th Cir. 2002).  *Patin* was a diversity case in which the defendant was a Florida corporation in an action brought in federal court in Louisiana.  The Fifth Circuit held that Louisiana conflicts of law rules applied to the issue of whether it is appropriate to impute the activities of a corporate subsidiary to its parent for the purposes of asserting jurisdiction over the parent.  *See Patin*, 294 F.3d at 647.  The *Patin* court further held that under Louisiana law the court must apply the law of the place of incorporation.  *Id.*  Thus, the *Patin* court applied Florida law to determine whether to impute the subsidiary's forum contacts to its parent.

Pursuant to *Patin*, as TG and TTP are companies formed under the law of China, Chinese law must apply to the issue of whether it is appropriate to impute TTP's forum contacts, if any, to TG.  Similarly, Chinese law governs the analysis of whether there is any basis to attribute the

---

[48]  Pursuant to Fed. R. Civ. P. 44.1, TG has previously provided the PSC with notice that it believes Chinese law should govern legal issues related to the attribution of contacts for jurisdictional purposes.  *See* Defendants' Memorandum in Support Of Motion For A Protective Order, January 14, 2011 (R. Doc. No. 7003-1) at 15, n. 7; and Supplemental Brief With Respect To Motions To Compel Further Jurisdictional Discovery, dated Aug. 22, 2011 (R. Doc. No. 10162) at 15 n.17, and Rule 44.1 Statement, dated February 17, 2012 (R. Doc. No. 12533).  Accordingly, TG submits the accompanying Zhu Declaration, describing the applicable Chinese law.

activities of BNBM or any other upstream entity to TG.  Moreover, as a matter of international comity, Chinese law should be respected and should determine when the integrity and separate corporate personhoods of Chinese companies such as TG and TTP should be recognized and when it should be ignored.

As shown below, under Chinese law, before the activities of one business entity will be imputed to the other, Plaintiffs must prove an abuse of the corporate form to evade the company's debt.  The evidence here shows, however, that TTP was operated independently of TG and for a legitimate business purpose, and thus its activities cannot be imputed to TG.  Even if Louisiana's arguably lesser standard applied, however, TTP's activities cannot be attributed to TG.

### 1.   TTP's Separate Corporate Personhood Should Be Respected Under Chinese Law.

As the Zhu Declaration states, TG is a company formed under the laws of China and, as such, is subject to Chinese law, *Gongsi Fa*, or "Company Law," which regulates the formation, operation and governance of all Chinese corporations.  (*See* Zhu Decl. ¶¶ 12, 15, 49).[49]  Under Chinese law, each Chinese corporation is, by definition, a limited liability business entity, which has its own independent personality such that it can, *inter alia*, make contracts, incur debts on its own behalf and sue and be sued in its own name.  (*See id.* ¶ 22).

Under the Company Law, a company[50] may establish subsidiary companies that are recognized as separate and distinct legal entities that, like their parent, must also comply with the Company Law.  (*See id.* ¶¶ 38-42).  Even though a parent company and subsidiary company are

---

[49]  In China, a corporation is referred to as a "company" and corporate law is referred to as "company law."  (*Id.* ¶ 11).

[50]  In 2005, the Company Law was amended to allow one corporation to own up to 100 percent of a subsidiary company – an arrangement that was prohibited in earlier forms of the Company Law.  (*See id.* ¶ 17).

distinct legal entities, the parent and subsidiary may, and, indeed, usually do, have common employees, officers, managers and/or directors.  (*See id.* ¶ 40).  The parent company, by virtue of its ownership and/or voting shares, will also often exert some level of control over the subsidiary, for example, by directing the subsidiary's marketing strategy and business operations. (*See id.* ¶ 41).  The type and extent of such control is normally provided for in the subsidiary's articles of incorporation in terms of shareholder's voting rights over important issues.[51]

As Zhu has opined, TG and TTP were duly organized under the laws of China.  Each company is separately registered as an individual independent legal person in accordance with Chinese law. (*See* Zhu Decl. ¶ 49).

Further, under Chinese law, TG and TTP are legally distinct from one another and the traits and acts of each are not attributable to the others for liability or jurisdictional purposes unless attribution is permissible under an alternative legal theory as described below. (*See id.* ¶ 54).

The Company Law contains two provisions that permit a court to disregard a company's separate legal personality:

> Where any of the shareholders of a company evades the payment of its debts by abusing the independent status of juridical person or the shareholder's limited liabilities, and thus seriously damages the interest of any creditor, it shall bear the joint and several liabilities for the debts of the company.

and

> If the shareholder of a one-person limited liability company[52] is

---

[51]The Company Law does, however, have some strict prohibitions regarding parent company's controlling power over the subsidiary.  For example, no company may, directly or through its subsidiary, lend money to any of its directors, supervisors, or senior managers and neither the controlling shareholder, nor the actual controller, nor any of the directors, supervisors or senior management of the company may injure the interests of the company by taking advantage of its connection to or relationship with the company.  (*See* Zhu Decl. ¶ 41 )

[52] In China, the term "one-person limited liability company" is a term used to describe a wholly owned subsidiary. (*See, e.g., id.* ¶ 37.)

> unable to prove that the property of the one-person limited liability
> company is independent from his own property, he shall bear joint
> and several liabilities for the debts of the company.

(*Id.* ¶ 47 (quoting Articles 34 and 20 of the Company Law)).  These two conditions are related in that both serve to ensure that creditors can differentiate what corporation they are doing business with and where corporate property exists that can satisfy a specific corporation's debt.

While the court will examine a variety of factors in assisting in its determination, in practice, Chinese courts will not disregard the separate corporate identity of parent and subsidiary companies unless a showing has been made of severe harm to a company's creditors caused by a shareholder's intentional and malicious abuse of the corporate form in order to evade company debt.  (*See* Zhu Decl. ¶ 48).   As is enumerated below, because the evidence shows that TG did not misuse TTP's corporate form to evade the payment of debt, and that TG's property was independent from TTP's, the acts of TTP are not attributable to TG under Chinese law.

<u>TG Did Not Abuse TTP's Corporate Form In Order To Evade Creditor Debt</u>

The facts set forth above (*See* pp. 8-12, *supra*), clearly establish that TG formed TTP for a valid business purpose, selling drywall to customers who wanted VAT invoices.  TG provided 22 million RMB to capitalize TTP, and therefore, there can be no claim that TTP was not adequately capitalized.  TTP owned its own manufacturing equipment, maintained its own bank accounts, and was operated independently, without the need for loans or financial assistance from TG. TTP ceased operating because the volume of its business did not justify the expense of its operations. Further, TTP ceased operations before any lawsuits concerning drywall were filed, and thus this corporate decision could not possibly have had anything to do with attempts to avoid liability in this litigation.   There is simply no evidence to suggest TG abused TTP's corporate form to evade payment of its debts.

<u>TG And TTP Are Legally Distinct Entities With Separate Corporate Property.</u>

TTP's property was independent from TG's.  (*See* pp. 8-12, *supra*).  To summarize, TG provided TTP with an initial capital contribution of 15 million RMB.  As is shown by TTP's Capital Verification Description, TG made the capital contribution as part of a structured business arrangement between two distinct entities – not through the unregulated commingling of funds.  TG made an additional capital contribution of 7 million RMB in 2006, and TTP revised its Article of Incorporation accordingly.  Each company kept its own financial records reflecting what property it owned by that particular company and the assets of each corporation were separately evaluated by an independent party.

TTP leased, at market value, the property it used as its manufacturing site, which was three kilometers from TG.  TTP had its own office facilities.  TTP purchased its own manufacturing equipment, at market price.  TTP licensed the use of TG's trademark.  TTP purchased its own supplies.   TG and TTP maintained separate bank accounts and TTP paid its own employees, none of whom worked for TG while working at TTP.

TTP never used any of TG's property as if it was its own, or vice versa.  From the inception of TTP, all of the business transactions between the two companies were at arm's length, and were thoroughly documented in accordance with Chinese law.  All of the above demonstrates that TTP's property was independent of TG's.

As the foregoing shows, the only two circumstances under which the juridical independence of parent and subsidiary corporations could be ignored under Chinese law are inapplicable here.  Thus, under Chinese corporate law, TTP's contacts cannot be imputed to TG.

2.     **TTP's Separate Corporate Personhood Would Be Respected Under Louisiana Law.**

Even if Louisiana law were to apply, TTP's activities could not be imputed to TG.  Under Louisiana and Fifth Circuit law, there is a presumption in the law that separate corporations are juridically independent.  *Kelly*, 213 F.3d at 856-57 ("typically, the corporate independence of companies defeats the assertion of jurisdiction over one by using contacts with the other.") (original citation omitted).  *See Davis v. Dempster*, 790 So. 2d 43, 50 (La. App. 3d Cir. 2000) (holding that a parent-subsidiary relationship alone does not allow the conduct of the subsidiary manufacturer to be imputed to the parent).

The Fifth Circuit has held that the activities of separate corporate entities cannot be imputed to one another for the purpose of exercising jurisdiction unless "they do not in reality constitute separate and distinct corporate entities."  *Hargrave v. Fibreboard Corp.*, 710 F.2d. 1154,1159 (5th Cir. 1983) (citing *Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333 (1925)), the *Hargrave* court wrote:

> *Cannon*, then, stands for the proposition that so long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other…. We have noted often that 100% stock ownership and commonality of officers and directors are not alone sufficient to establish an alter ego relationship between two corporations. Generally, **our cases demand proof of control by the parent over the internal business operations and affairs of the subsidiary in order to fuse the two for jurisdictional purposes**. **The degree of control exercised by the parent must be greater than that normally associated with common ownership and directorship**.

*Id.* (internal citations omitted) (emphasis added).  *Accord DP Solutions, Inc. v. Rollins, Inc.*, 34 Fed. App'x 150, at *5 (5th Cir. 2002), there must "be proof of control by the parent over the internal business operations and affairs of the subsidiary in order to fuse the two for jurisdictional purposes."

Subsequent to *Hargrave*, the Fifth Circuit developed a list of factors that are relevant when considering whether the activities of the entities are fused and the corporate veil can be pierced for the purpose of personal jurisdiction: (1) amount of stock owned by the parent of the subsidiary; (2) did the two corporations have separate headquarters; (3) did they have common officers and directors; (4) did they observe corporate formalities; (5) did they maintain separate accounting systems; (6) did the parent exercise complete authority over general policy; (7) did the subsidiary exercise complete authority over daily operations. *Dickson Marine Inc. v. Panalpina, Inc.,* 179 F.3d 331, 339 (5th Cir. 1999) (citation omitted).

The *Dickson* criteria were recently applied by the Fifth Circuit in *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 587 (5th Cir. 2010). There, the Court held that the two entities were not a "single business enterprise" for personal jurisdiction purposes despite far greater links between the entities than is present here: (1) both entities' brands and products were identical; (2) both entities shared office space and phone numbers; (3) they shared the exact same officers and directors; (4) employees testified they could not distinguish between the companies; and (5) intercompany debt where companies maintained corporate formalities and maintained separate funds and accounts. *Id.* at 587-88. The Fifth Circuit found, however, that the entities did not abuse the corporate form, and that they observed corporate formalities at all times. *Id.* at 588. Contributing to the Fifth Circuit's conclusion were the facts that the entities maintained separate books, had separate tax identification numbers, held separate shareholder meetings, and observed statutory formalities in both their formation and the liquidation of one of the entities. As the Court wrote:

> Even where some factors suggest that one entity is the alter ego of another, the maintenance of corporate formalities tips in favor of finding that the entities are not alter egos. *Id* at 588 (citation omitted).

*Jackson*, 615 F.3d at 588.  *See also*, *Adm'rs of Tulane Educ. Fund v. Biomeasure, Inc.*, 687 F. Supp. 2d 620, 627 (E.D. La. 2009) (refusing to impute contacts of subsidiary to parent where (1) parent owned 100% of subsidiary; (2) companies shared some officers and directors; and (3) parent exercised supervision over subsidiary's general policy decisions, but parent did not control daily operations of subsidiary and the companies observed corporate formalities).

Here, there is no evidence that TG controlled the business affairs of TTP in any way greater than that normally associated with a parent's ownership of a subsidiary. While TG formed TTP and owned 100% of TTP's shares, TG and TTP had separate headquarters, did not have common offices and directors, observed all corporate formalities, and maintained separate accounting systems.  TG and TTP did not share employees.  Thus, under Louisiana law, TTP was not TG's instrumentality.

Most importantly, TG did not exercise complete authority over general policy, and TTP exercised complete authority over its daily operations.   As the testimony establishes, Peng Shiliang was responsible for the daily operations of TTP; he had the right to hire and fire employees, and the department managers of TTP reported to him.  (*See* Shiliang Tr. 24:20-25:11, 26:1-27:6; Fu Tr. 115:23-116:1).  There is no evidence to the contrary.

## A.   TTP Was Not TG's Agent.

There also is no evidence to support the theory that TG could be subject to jurisdiction because TTP acted as its agent in Louisiana.[53]  To establish agency for the purpose of exercising personal jurisdiction over the principal, it must be shown that there was an express or apparent agreement of agency, and that the principal exercised control over the agent's actions. *Biomeasure*, 687 F. Supp.2d at 629.

---

[53] La. Rev. Stat. § 13:3201 allows a Court to exercise personal jurisdiction over a  non-resident who acts by an agent as to causes of action arising from activities enumerated in Subsection (1)-(8) of the statute.

While Plaintiffs here cannot establish any of the above elements of the agency test, [54] Fifth Circuit courts recognize that the analysis of the "control" element for agency is similar to the alter ego analysis and requires substantially more than a beneficial relationship or overlap in corporate structure. *See Biomeasure*, 687 F. Supp. 2d at 629 (to succeed on agency theory of personal jurisdiction, plaintiff must prevail under factors set forth in *Dickson Marine*,); *see also Dickson Marine*, 179 F.3d at 338 (subsidiary acting as "middleman" for parent's benefit "not enough" to establish prima facie case of control); *Nolan v. Boeing Co.*, 736 F. Supp. 120 (E.D. La. 1990) (organizational structure alone, including shared employees and shared offices not enough to impute jurisdiction based on agency theory).

As was shown above, there is no basis to conclude that TG inappropriately controlled TTP, and TTP's activities thus cannot be attributed to TG under an agency theory.[55]

## B.   No Upstream Entities' Activities Should Be Attributed To TG.

The Taishan Defendants also anticipate that Plaintiffs will contend that the activities of BNBM should be attributed to one or both of them.[56]   There is no evidence that such attribution would be proper under the law of China, however.   As is set forth in the Zhu Decl., although BNBM owns, directly and indirectly, 65% of TG's shares (Zhu. Decl. ¶ 50), BNBM, TG, and TTP are legally distinct from one another.   (Zhu Decl. ¶ 54).   The traits and acts of each are not

---

[54] The PSC has previously asserted that the contacts of one entity can be imputed to another under an "undertaker" theory. Section 324A of the Restatement (Second) of Torts describes the "undertaker" theory as imposing liability for physical harm  in certain situations  on "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things…" Nothing in the "undertaker" doctrine suggests that it can provide a basis for imputing the contacts of one entity to another for jurisdictional purposes, and, according to our research, no court has ever imputed contacts based on this doctrine.

[55] There is no basis to attribute the "knowledge" of TTP's employees to TG on some independent and lesser showing than the abuse of corporate forum standard which must be satisfied in order to attribute TTP's activities to TG.

[56] Plaintiffs allege, in vague and conclusory fashion, that BNBM "controlled" TG. (Compl. ¶ 38).

67

attributable to the others for jurisdictional purposes unless it can be shown that BNBM abused the corporate form of TG or TTP or that BNBM did not keep its property independent from TG or TTP. (*Id*. ¶¶ 45, 46, 54).  There is simply no evidence that BNBM abused the corporate form of TG or TTP to harm its creditors.  Among other things, TG and TTP operated independently of BNBM and BNBM did not participate in any of TG's or TTP's drywall transactions. Furthermore, the evidence shows BNBM's property was completely independent of TG's and TTP's.  (*See* pages 20-22, *supra*.)  Thus, BNBM's activities could not be attributed to TG or TTP under Chinese law.

Even if this Court were to apply Louisiana's law to this issue, there is no basis to attribute BNBM's forum contacts, if any, to TG or TTP.  The evidence shows that only two of the *Dickson* factors are satisfied: BNBM owned 65% of TG's shares, directly and indirectly, and BNBM appointed some of its officers and directors to be directors of TG. The two companies otherwise were completely independent.  They had separate headquarters, observed corporate formalities, and had separate accounting systems.

There is no evidence that BNBM and TG had anything but a typical relationship between a large shareholder and the company in which it invested.  Jia testified that BNBM did no more than own shares in TG.  BNBM did not share facilities or production lines with TG, did not share employees with TG, and did not provide any loans to TG.  (*see* pp. 20-22, *supra*).  The evidence further shows that these two companies scrupulously maintained corporate formalities and exerted minimal influence over each other's policies and daily operation. (*see* pp. 17-20, *supra*).

Most importantly, the evidence shows that BNBM did not exercise control over TG's general policies.  Obviously, beneficial ownership of a majority stake in a company may entitle the holder to appoint a majority of the board, but this does not establish that BNBM had control

or oversight over TG.[57] Instead, the facts show that BNBM did not control TG: BNBM did not own 66.67% of the shares, which were required to constitute a majority under TG's Article of Incorporation; Jia, as General Manager, directed TG's daily operations; and TG and BNBM operated independently. (*see* pages 18-21, *supra*).  Jia explicitly testified that BNBM did not control the operations of TG.  (Jia Tr. 163:10-15).

Further, BNBM had no role in TG's manufacturing or sale of drywall to U.S. dimensions.  (*See* Jia Tr. at 190:9-191:22; 196:10-197:4).   While the PSC has previously argued that BNBM participated with TTP in the drywall sale involving Wood Nation, the facts show otherwise.  Richard Hannam, the owner of Wood Nation, unequivocally and unambiguously[58] testified that BNBM did not participate with TTP in this transaction.  Although David Wei, an employee of a BNBM affiliate introduced Hannam to TTP, he did so as a friend, rather than in a business capacity, because BNBM did not want to do business with Wood Nation.  (*See* Hannam Tr. A 34:21-35:4, 36:17-37:1, 39:7-14).   As Hannam testified:

> Q:  So it was your understanding then that they [BNBM] were going to be involved behind the scenes in the transaction?
>
> A:  No, not at all.  No.
>
> Q:  So when you say it was pleasant because they knew what they were doing?
>
> A:  When I say they, BNBM would not have been involved.

(Hannam Tr. A 48:14-49:15; s*ee also* Hannam Tr. B 49:15-19, 53:6-15).

Lastly, although the PSC has claimed that BNBM and TG are a joint venture, that

---

[57] Although some officers of BNBM and CNBM were on TG's Board of Supervisors, as a matter of Chinese law  a "supervisor" has nothing to do with the operations of the business. (Zhu Decl. ¶ 34).

[58] The PSC deposed Hannam twice, on February 14, 2011 and February 13, 2012.  Relevant excerpts from the transcript of the deposition of Richard Hannam taken on February 14, 2011 ("Hannam Tr. A") are attached to the Spano Decl. as Exhibit 18.  Relevant excerpts from the transcript of the deposition of Richard Hannam taken on February 13, 2012 ("Hannam Tr. B") are attached to the Spano Decl. as Exhibit 19.

assertion was based solely on Jia's use of the term "joint venture" to describe the relationship between TG and BNBM.  Jia explained that what he meant by the term was that BNBM was a shareholder of TG, nothing more. (*See* Jia Tr. 937:18-938:13).   Moreover, Professor Zhu has explained that under Chinese law, the term "joint venture" may be used to describe a company in which two or more shareholders invest, regardless of the percentage of shares allocated between such shareholders.  (Zhu Decl. ¶ 27).  In other words, in China the term "joint venture" does not describe a partnership, it describes the relationship between shareholders.  Thus, there is no basis to attribute BNBM's forum contacts, if any, to TG.

## CONCLUSION

For all of the foregoing reasons, the Court should dismiss the action against TG and TTP.

Respectfully submitted,

Thomas P. Owen Jr.
Joe Cyr
Frank T. Spano
Eric Statman
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
Telephone: 212-918-3000
Facsimile: 212-918-3100
Joe.cyr@hoganlovells.com
Frank.spano@hoganlovells.com
Eric.statman@hoganlovells.com

Richard C. Stanley (La. Bar No. 8487)
Thomas P. Owen, Jr. (La. Bar No. 28181)
STANLEY, REUTER, ROSS, THORNTON &
ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: 504-523-1580
Facsimile: 504-524-0069
rcs@stanleyreuter.com
tpo@stanleyreuter.com

**Attorneys for Taishan Gypsum Co. Ltd.
and Tai'an Taishan Plasterboard Co., Ltd.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Memorandum In Support of Motion Pursuant to Rule 12(B)(2) to Dismiss the Complaint has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail and upon all parties by electronically uploading the same to Lexis Nexis File & Serve in accordance with the Pretrial Order No. 6, and that the foregoing was also electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 6th day of April, 2012.

<u>/s/ Thomas P. Owen, Jr.</u>