# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL | ) | MDL NO. 2047 |
| PRODUCTS LIABILITY LITIGATION | ) | |
| _____ | ) | SECTION: L |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | JUDGE FALLON |
| ALL CASES | ) | MAG. JUDGE WILKINSON |
| | ) | |
| _____ | ) | |

## DECLARATION OF JAMES V. FEINERMAN
### JAMES M. MORITA PROFESSOR OF ASIAN LEGAL STUDIES
### GEORGETOWN UNIVERSITY LAW CENTER

This is a declaration being made in accordance with and pursuant to 28 U.S.C. § 1746.

Professor James V. Feinerman, being duly sworn, deposes and says:

## I.   **Introduction**

1.   I am the James M. Morita Professor of Asian Legal Studies at Georgetown University

Law Center and have been admitted as an attorney to practice before the courts of New York.  I

have been retained by counsel for the Plaintiffs' Steering Committee ("PSC") in the above-

captioned action.  I submit this affidavit in support of the PSC's contentions with respect to the

conduct and contacts of two Chinese companies, Taishan Gypsum Co., Ltd. ("TG") and Taian

Taishan Plasterboard Co. Ltd. ("TTP") for the purposes of maintaining jurisdiction over both in

proceedings in the United States. TG is the sole shareholder of its subsidiary, TTP. The PSC

requested an opinion regarding the doctrine of corporate veil piercing under the corporate law of

1

China, and whether the analyses of Bing Cheng and Dr. Liu Junhai represented the authoritative interpretation of the existing Chinese law.

*Scope of Engagement*

2. Although I was invited by Herman, Herman & Katz LLP on behalf of the PSC to opine on the scope of analysis of piercing corporate veil in the context of Chinese law, my statements are impartial, honest and true to the best of my knowledge and expertise.

3. I am being compensated by the PSC for my work in this matter at an hourly rate of $350.00. Payment is not contingent on the conclusion that I reach in this declaration.

## II.    Qualifications

4. I briefly summarize below my education, training and relevant experience.  I began studying the Chinese language as a high school sophomore in 1965, which subsequently led to a lifelong involvement with China.  Following a B.A. in Chinese Studies at Yale College, I spent two years teaching and studying in Hong Kong at the Chinese University of Hong Kong, 1971-73.  In ensuing years, I earned a Ph.D. in East Asian Languages and Literature at Yale University and a J.D. from the Harvard Law School, where I specialized in East Asian Legal Studies.  During 1979-80, I was a participant in the national student exchange program sponsored by the Committee on Scholarly Communication with the People's Republic of China (CSCPRC, renamed "Committee on Scholarly Communication with China" - CSCC).  For one year, I studied at Peking University and received a post-graduate certificate; in the fall of 1980, I spent an additional four months as a Visiting Scholar at the Institute of Law of the Chinese Academy of Social Sciences.  I speak fluent Mandarin and Cantonese dialect of Chinese and can also read and write Chinese.

5. I have taught at Georgetown, and also as a visitor at Harvard and Yale Law Schools, for over twenty-five years.  Among other courses, I teach a course in Chinese Law.  I

have also taught every year one or more courses in Corporations and Corporate Finance, which was the focus of my practice as an associate attorney in the New York law firm, Davis Polk & Wardwell.

6.    In addition to my work as a professor of law, I served as Editor-in-Chief of the China Law Reporter, a publication of the American Bar Association's Section of International Law and Practice, from 1986-1998; as Chair of the Committee on Legal Education Exchange with China, from 1993-1997; as Chair of the Asia Law Forum, of the Association for Asian Studies, from 1991-1996; and have been a Trustee of the Yale-China Association and the Lingnan Foundation.

7.    From 1993-1995, I served as Director of the Committee on Scholarly Communication with China, Washington, D.C., the national organization sponsoring official academic exchange between the United States and China, sponsored by the National Academy of Sciences, the American Council of Learned Societies and the Social Science Research Council. In 1982-83, I taught as a Fulbright Lecturer on Law at the Peking University Law Department, Peking, People's Republic of China.  From 1983-1985, I served as Administrative Director and Fellow of the East Asian Legal Studies Program at Harvard Law School, Cambridge, Massachusetts.  In 2006, I taught as Fulbright Distinguished Senior Lecturer on Law at the Law School of Tsinghua University, Beijing, People's Republic of China.  I have attached my curriculum vitae as Exhibit A to this declaration.

## III.    Documents Reviewed in Connection with This Opinion

8.   In preparation of this Declaration, I reviewed and considered the following laws, regulations, rules and articles, which relate to the legal status of Chinese business entities, including but not limited to:

- General Principles of Civil Law of People's Republic of China of 1986 (GPCL) *(Minfa Tongze),* effective as of January I, 1987;

- Company Law *(Gongsi Fa)* (adopted by the Fifth Session of the Standing Committee of the Eighth National People's Congress, 19 December 1993), effective 1 July 1994, revised at the 18th Meeting of the Standing Committee of the Tenth National People's Congress, 27 October 2005, effective as of January 1, 2006;

- Provisions of the Supreme People's Court on Several Issues concerning the Application of the Company Law of the People's Republic of China (I) of (2006), (II) of 2008 and (III) of 2011 *(Zuigaorenminfayuan Guanyu Shiyong <Zhonghua renmin gongheguo gongsifa> Ruogan Wenti de Guiding).* These three provisions of Company Law issued by the Peoples' Supreme Court respectively in 2006, 2008, 2011, are all still effective and also have the same binding force as the Company Law for corporate entities created under Chinese law;

- Civil Procedure Law of the People's Republic of China *(Minshi Susong Fa)* (adopted at the 30th Meeting of the Standing Committee of the Tenth National People's Congress of the People's Republic of the China on October 28, 2007), effective as of April I, 2008;

- Law of the People's Republic of China on Chinese-Foreign Equity Joint Ventures (*Zhongwai Hezi Jingying Qiye Fa*) (adopted at the Fourth Session of the Ninth National People's Congress of the People's Republic of China on 15 March 2001) amended on March 15,2001;

- Notice of the Supreme People's Court on Strengthening Commercial Adjudication (Fa (Yan) Fa (1985) No.28) (*Zuigaorenminfayuan guanyu jiaqiang jingji shenpan*

*gongzuo de tongzhi*);

- •        Chao Xi, "Piercing the Corporate Veil in China: How Did We Get There?" *Journal of Business Law,* No. 5,  p. 413 (2011);

- •        Chen Jianlin, "Clash of Corporate Personality Theories: A Comparative Study of One-Member Companies in Singapore and China," *Hong Kong Law Journal,* Vol. 38, pp.425-452 (2008);

- •        Cindy A. Schipani and Liu Junhai, "Corporate Governance in China: Then and Now," Dec. 5, 2007,  <u>://www.chinasymposium.com/lawupdate_cl_view.asp?Id=67</u> (accessed May 5, 2012);

- •        Comment, "Piercing China's Corporate Veil: Open Questions from the New Company Law," 117 *Yale Law Journal*  329-338 (2007);

- •        Huang Hui, "An Empirical Study on the Veil-piercing System in China," *Chinese Journal of Law*, Vol.34, No.1, January 2012, pp. 3-16.

- •        The Declarations of Cheng Bing (including the Facts Provided by the PSC ("Facts Provided")), Dr. Liu Junhai (including the Facts Provided), and Dr. Zhu Yan.

### III.        <u>Chinese Corporate Law Development and the Rise of Limited Liability Companies</u>

9.   The post-Mao era in modern China has seen – among other historic changes in that formerly socialist command economy – the construction of a legal infrastructure for a rule-based market system, in which distinctions between state and non-state actors, as well as between Chinese and foreign actors, were gradually eroded. A much fuller range of vehicles for business organization became available to both public and private investors.

10.     In 1992, the State Commission on Reform of the Economic System promulgated a proto-corporate law in the form of two "normative opinions" on joint-stock companies and limited liability companies, and these vehicles were formalized in the 1993 Company Law passed the following year, the first corporate law promulgated since the founding of the People's Republic of China in 1949.

11.     While the business vehicles of the Company Law were largely designed for restructuring China's state-owned enterprises ("SOEs"), they were also intended to be used by private businesses. Changes in China's foreign investment regime have gradually opened up these business forms to foreign investors, who are no longer confined to joint ventures and wholly foreign-owned enterprises. Regulations on stock issuance and trading were promulgated in 1993, followed by the higher-status NPC-promulgated statute – the Securities Law – in 1998. A Partnership Law was also passed in 1997, providing an additional vehicle for small businesses, as did the 1999 Law on Individual Wholly Owned Enterprises, although neither law provided limited liability for investors.

12.     The legal regime governing business organization was substantially revised in the middle of the previous decade. Both the Company Law and the Securities Law were substantially revised in October 2005, as were the Partnership Law and the Bankruptcy Law in August 2006.  These revisions were attempts by Chinese legislators and legal reformers to remedy certain deficiencies that had become apparent in the original legislation due to the unfamiliarity of the Chinese system with various features of market-economy legal orders as well as their determination to borrow and to add best practices brought back from countries where many Chinese legal reformers had worked and studied.

IV.   **Chinese Corporate Veil-Piercing Doctrine and Single-Member Limited Liability Companies**

9.      Before the Chinese legislature, the Standing Committee of National People's Congress (NPC), enacted a revised version of the Company Law on October 27, 2005, it was not clear whether the doctrine of "piercing the corporate veil" or disregarding corporate legal personality in certain circumstances was recognized by China's Company Law as initially enacted in 1993.

10.      Article 3 of the original Company Law recognized a shareholder's limited liability in very clear language. Under that law, the shareholders in a limited liability corporation "shall assume liability towards the corporation to the extent of their respective capital contributions, and the corporation shall be liable for its debts to the extent of all its assets."

11.      Thus, as a general principle, that provision of Chinese corporate law promised limited liability for investors in limited liability companies *(youxian zeren gongsi),* shareholders in companies limited by shares *(gufen youxian gongsi),* and investors in foreign-invested enterprises.  Once incorporated, a company organized under Chinese law has independent legal personality separate from those of its shareholders. The protection of limited liability means that shareholders are not responsible for the company's debts and liabilities beyond their investment in the company.

12.      Chinese corporate law also makes provision for formation of single-member limited liability companies. Section 3 of Chapter 2, Articles 58 to 64, of the Company Law specifically designates this kind of  limited liability company.  Article 58(2) of the Company Law defines a single-member limited liability company as a limited liability company with only

one natural person or legal person as a shareholder. Chinese corporate law also extends limited liability to investors in single-member limited liability companies.

13.     Within a few years after the enactment of China's Company Law in the mid-1990s, Chinese commentators and government authorities noticed that the privilege of shareholder's limited liability not only encouraged investment in the new corporate forms but also allowed some unscrupulous shareholders to abuse their limited liability privileges and the legal personality of the corporation in practice. Without clear guidance as to whether it would be possible to pierce the corporate veil, dishonest shareholders – especially controlling shareholders – were able to defraud creditors of Chinese corporations.  This threatened the security of corporate transactions and became a great concern to many creditors.

14.     Considering numerous cases in which some shareholders, especially those controlling companies, abused their limited liability, China's Company Law was amended in 2005 to make it clear that limited liability is not absolute under Chinese law.  The 2005 amendment to the Company Law, effective as of January 1, 2006, formally and clearly embraced the doctrine of "piercing the corporate veil."

15.     Chinese veil-piercing doctrine is delineated in two separate provisions of the Company Law, Article 20(3) and Article 64. Article 20(3), the general veil-piercing provision, provides as follows:

> Where any of the shareholders of a company evades the payment of its debts by abusing the independent status of juridical person or the shareholders' limited liabilities, and thus seriously damages the interest of any creditor, it shall bear the joint and several liabilities for the debts of the company….

16.     Article 64 is a special provision applying only to single-member limited liability companies, providing: "If the shareholder of a single-member limited liability company is unable to prove that the property of the single-member limited liability

8

company is independent from his own property, he shall bear joint and several liabilities

for the debts of the company…."

17.    Article 20(3) requires plaintiffs to bear the burden of proof when

attempting to establish that the shareholder should be held jointly and severally liable for

the debts of the shareholder's company. Article 64, however, adopts a presumption of that

single-member limited liability companies present a situation ripe for abuse of the

independent status of such a company.  As a result, it reverses the burden of proof

contained in Article 20(3) with respect to ordinary limited liability companies and

requires the sole shareholder to prove that it should not assume joint and several liability

for the debts of the single-member limited liability company by clear and convincing

evidence which establishes that the property of the single-member limited liability

company is separate from shareholder's own property.

18.    Since single-member limited liability companies are believed to pose a

greater risk to creditors of fraud and other abuses of the corporate form, Article 64 shifts

the burden of proof to the shareholder to establish that its property has been kept

"independent" from the single-member limited liability company's property.  If the

shareholder cannot prove that its property was independent, then the shareholder's

company shall be jointly and severally liable for the debts of the single-member limited

liability company.

19.  Given this shift of the burden of proof for single-member limited liability

companies, TG would be required to submit sufficient evidence to prove that its assets

have actually been maintained separately from TTP's.  Mere documentation such as

separate articles of association for TG and TTP or other similar paper records should not

provide sufficient proof that TG and TTP remained "independent" from each other.

20. In a veil-piercing determination pursuant to Article 64 in the case of parent and subsidiary companies whereby the subsidiary is organized as a single-member limited liability company, Chinese courts will consider a broad range of factors to assess whether the single-member limited liability company's property has been maintained separately from its shareholder's property.

21.  Such factors include but are not limited to the following:

- Undercapitalization;

- Failure to observe corporate formalities;

- Excessive shareholder interference with management of company;

- Failure to engage in arm's-length transactions or diversion of corporate assets for shareholders' personal use, such as without payment, prior agreement or below market value;

- Commingling of shareholder's assets with those of the single-member limited liability company;

- Overlapping management team, legal representatives and employees;

- Sharing the same accountants and auditors;

- Commingling of business activities, e.g., coordinating purchase of raw materials or advertisements and public relations campaigns; and

- Commingling or failing to properly account for joint business activities.

22.  Most importantly, this  list of factors considered by Chinese courts is non-exhaustive and parties may proffer any other relevant factors relating to whether a single-member limited liability company's property has been kept "independent" to argue for piercing the corporate veil.  Key factors considered by Chinese courts are whether

the shareholder and the single-member limited liability company commingled assets or finances, including, but not limited to, shared equipment and lease costs; use of each others' trademarks, marketing or sales materials, and other intellectual property without proper authorization or the payment of adequate consideration; shareholder payment for the salaries of employees working for the one-person limited liability company; and repayment of each others' debts.

23.     Such analysis is guided by appreciation of the unique facts of each case in determining whether corporate separateness was, in fact, maintained.  If the shareholder of a single-member limited liability company cannot prove that its assets and operations were independent from those of the single-member limited liability company (i.e., the assets and operations were commingled), then the independent corporate personalities may be disregarded.

24.     Should Article 64 not be applicable or the single-shareholder establish the requisite independence of the corporation, Chinese courts would then apply the general provision of Article 20(3) to a veil-piercing claim. This article requires the creditors to bear the burden of proof to make the case that the corporate veil should be pierced. While Article 64 is employed to determine whether a shareholder of a single-member limited liability company can establish that company's separate and independent status, Article 20(3) applies much more broadly to any Chinese limited liability company, taking account of other factors which might demonstrate abuse of the corporate form, regardless of the number of shareholders.  As with Article 64, the scope of Article 20(3) and the factors courts should use in determining whether to pierce the corporate veil are not specified in the statute itself.

25.     Chinese courts have applied Article 20(3) to pierce the corporate veil in a variety of contexts. The factors Chinese courts consider when evaluating a veil-piercing claim under Article 20(3) are the same kinds of factors that are relevant to a determination under Article 64.  As with the application of Article 64, Chinese courts are not restricted to any precise list of factors when determining whether a corporate veil should be pierced.  Rather, Chinese courts consider the unique facts of each case.

## V.   No Requirement to Prove "Intentional and Malicious Abuse" Pursuant to Articles 20(3) & 64

26. It has been suggested that a creditor who seeks to pierce the corporate veil under Article 20(3) must show that the shareholders "intentionally and maliciously" abused the corporate form in order to evade the company's debts.  See Declaration of Zhu Yan, dated March 30, 2012, at 48 ("Zhu Declaration").  However, there is no basis under Chinese law for requiring creditors to prove an intentional and malicious element in order to succeed on a veil-piercing claim pursuant to Article 20(3) or 64.

27.     Neither China's national legislature, the NPC, which promulgates statutory laws, nor the State Council, which issues administrative regulations, has made any such provision in any statute or regulation pertaining to the Company Law or, in particular, Articles 20(3) or 64 of that law.  No executive or administrative branch of the State Council has issued any pertinent regulations relating to those articles.

28. The Supreme People's Court, which in to adjudicating individual cases, also issues judicial interpretations (*sifa jieshi*) on the scope and application of certain NPC-promulgated laws, including the Company Law, has not yet issued any rules or judicial interpretations as to the scope of Article 20(3) or 64. In the absence of an amendment to

the Company Law or guidance on the scope of the Article 20(3) or 64 by the Supreme People's Court, there is no basis under Chinese law for adding an intentional and malicious element to a claim to pierce the corporate veil under Article 20(3) or 64. Indeed, there appear to be no cases where a Chinese court has required a creditor to prove that the shareholder intentionally and maliciously abused the corporate form in order to prevail on a claim to pierce the corporate veil. Therefore, there is no basis for Professor Zhu's assertion that Chinese courts require the creditor to prove that the shareholder intentionally and maliciously abused the corporate form in order to prevail on a claim to pierce the corporate veil.

## VI.  Conclusion

29.     As the previous discussion has demonstrated, China's Company Law contains ample authority for a Chinese court applying its provisions to pierce the corporate veil of a single-member limited liability company whose sole shareholder has failed to maintain the requisite separation and independence and to pierce the corporate veil of any limited liability company where there has been abuse of the corporate form, regardless of whether such abuse was intentional or malicious. The expert opinions of both a leading corporate law firm practitioner (Ms. Bing Cheng) and a noted academic authority in the field (Dr. Liu Junhai) set forth the authoritative interpretation of the Company Law and related regulations and case law and are fully consonant with my own understanding of Chinese law in this area, and their opinions are supported by the Facts Provided.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 7, 2012

James V. Feinerman
James V. Feinerman

**Name:**  James Vincent Feinerman

**Born:**  October 30, 1950

**Address:**  7824 Moorland Lane
          Bethesda, MD 20814
          Tel.:  (301) 951-1020

e-mail: <u>feinerma@law.georgetown.edu</u>

Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, DC 20001
      Tel.: (202) 662-9474
      Fax:  (202) 662-9487

**Education:**

Preparatory:  Loyola Academy, Wilmette, Illinois
                Graduated 1968

College:  Yale, B.A., 1971
      Course:  Chinese Studies
      Honors:  B.A. with honors
           Three NDFL/Ford Foundation Summer Fellowships
           (for Chinese Language Study:  1968, 1969 and 1970)
           Yale-in-China Fellowship, Hong Kong, 1971-1973

Graduate:  Yale University, 1973-1975; 1976-1977
            Department:  East Asian Languages and Literatures
            Degrees:  M.A., 1974; M. Phil., 1975; Ph.D., 1979
            Dissertation Title:  *The Poetry of Wang Wei*

Legal:  Harvard Law School, J.D., 1979
 Honors and Activities:  Board of Student Advisers
                  Editor, Harvard International Law Journal
                  Teaching Fellow, Prof. Fried  (First Year Contracts)
                  Robert A. Taft Scholarship
                  CSCPRC Fellowship for Study in the
                     People's Republic of China

**Employment Experience:**

| | |
|---|---|
| 1971-1973 | Tutor, Department of English |
| | The Chinese University of Hong Kong |
| 1973-1975 | Assistant to the Committee, |
| 1976-1977 | Yale College Undergraduate Admissions Office |
| 1976 | Summer Associate, Mayer, Brown & Platt |
| | Chicago, Illinois |

**James V. Feinerman**                    -2-

**Employment Experience (continued):**

1976-1977        Research Assistant, Prof. Jerome A. Cohen
                 Harvard Law School

1977             Summer Associate, Orrick, Herrington, Rowley & Sutcliffe
                 San Francisco, California

1978             Summer Associate, Davis Polk & Wardwell
                 New York, New York

1978-1979        Teaching Fellow, Contracts I, Prof. Charles Fried
                 Harvard Law School

1979-1983        Associate, Davis Polk & Wardwell
                 New York, New York
                 (on leave while studying in China)

1982-1983        Lecturer on Law, Peking University Law Department
                 Peking, People's Republic of China

1983-1985        Administrative Director and Fellow
                 East Asian Legal Studies Program
                 Harvard Law School, Cambridge, Massachusetts

1985-1986        Visiting Professor, Georgetown University Law Center

1986             Fulbright Visiting Researcher, Faculty of Law
                 Kyoto University, Kyoto, Japan
                 (Fulbright Research Award, Japan-U.S. Educational Commission)

1986-1992        Associate Professor, Georgetown University Law Center

1992-1997        Professor of Law, Georgetown University Law Center
                 [on leave of absence, July 1, 1993 - June 30, 1995]

1993-1995        Director, Committee on Scholarly Communication with China
                 Washington, DC

1997-present     James M. Morita Professor of Asian Legal Studies

2001-2005        Associate Dean, International and Graduate Programs

**James V. Feinerman**                 -3-

**Honors, Awards and Activities:**

1979-1980        CSCPRC Postgraduate Fellowships, Peking University and
                 Institute of Law, Chinese Academy of  Social Sciences
                 Peking, People's Republic of China

1982-1983        Fulbright Lecturer on Law, Peking University Law Department

1986             Fulbright Visiting Researcher, Faculty of Law
                 Kyoto University, Kyoto, Japan
                 (Fulbright Research Award, Japan-U.S. Educational Commission)

1986-1998        Editor-in-Chief, *China Law Reporter* [publication of the
                 ABA's Section of International Law and Practice]

1987-1998        Member, Committee on Legal Educational Exchange with China
                 Chair, 1993-1998

1987-1990        Member, Northeast Asia Advisory Committee, Council on
                 International Exchange of Scholars (Fulbright Program)

1989    Recipient, John D. and Catherine T. MacArthur Foundation
                 Award for Research and Writing in Peace and International Cooperation
                 Project:  "Post-Mao China and International Law"

1991-1995    Chair, Asian Law Forum, Association for Asian Studies

1991-1996;   Trustee, Yale-China Association, New Haven, Connecticut
1997-present

1991-present  Board of Governors, Washington Foreign Law Society
                 Chair, Jackson Award Committee [for Best Student

1992-1993        Fellow, Woodrow Wilson International Center for Scholars

1994-present  Trustee, Lingnan Foundation, New York, New York

1997-present  James M. Morita Professor of Asian Legal Studies
                 (First incumbent of newly established chair)

2005-2006        Fulbright Distinguished Senior Lecturer on Law, Tsinghua University
                 Law School
                 Peking, People's Republic of China

FEINERMAN PUBLICATIONS LIST                          June 2009

1.  Note, "The Arab Boycott and State Law:  The New York Anti-Boycott Statute,"  18 *Harvard International Law Journal*  343 (1977).

2.  Book Review, Ralph Clough's *Island China*, 20 *Harvard International Law Journal* 221 (1979).

3.  Ph.D. Dissertation, Yale University, *The Poetry of Wang Wei*, May 1979.

4.  Co-translator, "Lectures on the Criminal Law," in *Chinese Law and Government*, Vol. XIII, No. 2, Summer 1980.

5.  Book Reviews, Fox Butterfield's *China:  Alive in the Bitter Sea* and Edoarda Masi's *China Winter*, in *Worldview*, December 1982, p. 17.

6.  Translator, Liu Binyan's "People or Monsters?" in Perry Link, ed., *People or Monsters?*, Indiana University Press, 1983.

7.  Book Review, A. Doak Barnett's *China's Economy in Global Perspective*, 4 *Northwestern Journal of International Law and Business* 647 (1983).

8.  "China and the U.S.:  Five Years After Normalization," in *Worldview*, January 1984, p. 20.

9.  "New Patent Law Offers Basic Protection, But Questions Remain," *East Asian Executive Reports*, June 1984, p. 9.

10.  "An Overview of China's Patent Regulations," *East Asian Executive Reports*, April 1985, p. 9.

11.  Article, "The Disposition of Cases Involving Juveniles in the People's Republic of China,"  4 *U.C.L.A. Pacific Basin Law Journal* 1 (1985).

12.  Remarks, "The Hong Kong Accord As a Model for Dealing With Other Disputed Territories," *Proceedings of the Eightieth  Annual Meeting of the American Society of International Law*, April 9-12, 1986.

13.  Chapter, "Law and Legal Professionalism in the People's Republic of China," in M. Goldman, ed., *Chinese Intellectuals and the State:  the Search for a New Relationship*, Harvard University Press (1987).

14.  Co-author, Article, "The Role of Law in Economic Development: Lessons of the Recent Agrarian Reform in the PRC," 23 *Stanford International Law Journal* 319 (1987).

15.  Contributor, Colloquy:  *In Re Baby M*, "A Comparative Look at Surrogacy," 76 *Georgetown Law Journal* 1837 (1988).

16.  Article, "The Evolving Chinese Enterprise," 15 *Syracuse Journal of International Law and Commerce* 203 (1988).

17.  Book Review, Moser, ed., *Foreign Trade, Investment, and the Law in the People's Republic of China*, in 47 *Journal of Asian Studies* 866 (November 1988).

18.  Article, "Backwards into the Future" (Securities Law in the People's Republic of China) 52 *Law and Contemporary Problems* 169 (Summer 1989).

19.  Article, "Human Rights in China," *Current History*, September, 1989, at 273.

20.  Book Review, "Taking Japanese Law Seriously," (F. Upham, *Law andSocial Change in Postwar Japan*) in 67 *Washington University Law Quarterly* 1219 (1989).

21.  Article, "Deteriorating Human Rights in China," *Current History*, September, 1990, at 265.

22.  Article, "Prospects for Democracy in the People's Republic of China," in *Update on Law-Related Education*, Vol. 14, No. 3 (Fall 1990), pp. 13-15, 46-48.

23.  Chapter, "Chinese Law Relating to Foreign Investment and  Trade: the Decade of Reform in Retrospect," in 1991 Joint Economic Committee, Congress of the United States, *China's Economic Dilemmas in the 1990s: The Problems of Reforms, Modernization, and Interdependence*, pp. 828-840.

24.  Article, "Economic and Legal Reform in the People's Republic of China, 1978-1991," in *Problems of Communism*, Sept.-Oct., 1991, pp. 62-75.

25. Article, "Enter the Dragon: Chinese Investment in the United States," in *Law and Policy in International Business*, Vol. 22, No. 3 (1991), pp. 547-569.

26.  Chapter, "Civil Appeals Procedure in the People's Republic of China," in Charles Platto, ed., *Civil Appeal Procedures Worldwide*, pp. 104-113 (International Bar Association 1992).

27.  Article, "Taiwan and the GATT," in *Columbia Business Law Review*, pp. 39-60 (January 1992).

28.  Article, "The Quest for GATT Membership: Will Taiwan Be Allowed to Enter before China?" in *China Business Review*, Vol. 19, (May-June 1992), pp. 24-27.

29. Book Review, of Amnesty International, *China: Punishment without Crime: Administrative Detention*, in *China Quarterly*, No. 130, pp. 436-438 (June 1992).

30.  Chapter, "The Meiji Reception of Western Law," in *Wege zum japanischen Recht: Festschrift fur Zentaro Kitagawa zum 60.Geburtstag am 5.April 1992* (Festschrift for Prof. Zentaro Kitagawa on the Occasion of his Sixtieth Birthday, April 5, 1992), pp. 93-105.

31.  Article, "A Criminal Case in the Chinese Courts," in Special Issue: "Law in World Cultures," of *Update on Law-Related Education*, Vol. 16, No. 3, pp. 21-27 (Fall 1992).

32.  Book Review, of Lawrence Beer, ed., *Constitutional Systems in Late Twentieth-Century Asia*, in *Journal of Asian Studies*, Vol. 52, No. 2   (May 1993).

33.  Article, "Sovereign Immunity in the Chinese Case and Its Implications for the Future of International Law," in R. St. J. Macdonald, ed., *Essays in Honour of Wang Tieya* (University of Toronto Festschrift for Professor Wang Tieya) (Kluwer Academic Publishers 1993).

34.  Chapter, "Legal Institution, Administrative Device or Foreign Import: The Roles of Contract in the People's Republic of China," in Pitman Potter, ed., *Domestic Law Reforms in Post-Mao China* (M.E. Sharpe, Inc. 1994).

35.  Chapters, "Taiwan and the GATT," and "Investment in the European Economic Community," in Mitchell A. Silk, ed., *Taiwan Trade and Investment Law* (Oxford University Press 1994).

36.  Chapter, "Introduction to Asian Legal Systems," in Danner and Bernal, eds., *Introduction to Foreign Legal Systems* (Oceana Publishers 1994).

37.  Article, "China's Evolving Securities Law," in *China Financial Review*, pp. 22-27 (June 1994).

38.  Book Review, of Pitman Potter, *The Economic Contract Law of China: Legitimation and Contract Autonomy in the PRC*, in Vol. 53, No.1, *Journal of Asian Studies*, pp. 206-207 (February 1995).

39.  Article, "Antagonistic Contradictions: Criminal Law and Human Rights in China," *China Quarterly*, Vol. 141, March 1995, pp. 135-154.

40.  Article, "Chinese Participation in the International Legal Order: Rogue Elephant or Team Player," *China Quarterly*, Vol. 141, March 1995, pp. 186-210.

41.  Chapter, "The History and Development of China's Dispute Resolution System," in *Dispute Resolution in the PRC* (Hong Kong: Asia Law & Practice 1995), pp. 1-21.

42.  Chapter, "The Past and Future of Chinese Labor Law," U.S. Department of Labor, Bureau of International Labor Affairs, *Changes in China's Labor Market: Implications for the Future*, pp.119-134 (1996).

43.  Remarks, "China  Quest to Enter the GATT/WTO," on Panel, China and International Economic Institutions, *Proceedings of the Ninetieth  Annual Meeting of the American Society of International Law*, March 27-30, 1996.

44.  Chapter, Hong Kong Faces 1997: Legal and Constitutional Issues, in Cohen & Li, eds., *Hong  Kong Under Chinese Rule* (Cambridge: Cambridge University Press 1997).

45.  Article, The Rule of Law...with Chinese Socialist Characteristics, *Current History*, September, 1997, pp. 278-281.

46.  Article, The Give and Take of Central-Local Relations, *The China Business Review,* January-February 1998, pp. 16-21.

47.  Chapter, Japan: Consensus-Based Compliance, in Jacobson & Weiss, eds., *National Implementation and Compliance with International Environmental Accords* (Cambridge: MIT Press 1998).

48.  "Beware the Clinton Oversell," New York Times, Op-Ed Piece, November 27, 1999.

49. Book, Feinerman, Guy and Turner, eds., *The Limits of the Rule of Law in China* (Seattle: University of Washington Press 2000).

50.  Book, Feinerman and Peele, eds., *China and the WTO: What You Need to Know Now* (New York: Practicing Law Institute 2001).

51.  Testimony, Human Rights in China in the Context of the Rule of Law, Hearing before the Congressional-Executive Commission on China, One Hundred Seventh Congress, Second Session, February 7, 2002 (Statement, pp. 13-16; Prepared Statement, pp. 56-63).

52.  Testimony, Forum, Lawyers without Law: Prospects for the Rule of Law in China in the 21st Century, in *The Rule of Law in China: Lawyers Without Law?* Hearing before the Congressional-Executive Commission on China, One Hundred Eighth Congress, First Session, April 1, 2003.

53.  China's Small Steps of Progress, *Christian Science Monitor*, Op-ed Commentary, December 23, 2003.

54.  Chapter, The US-Korean Status of Forces Agreement as a Source of Continuing Korean Anti-American Attitudes, David I. Steinberg, ed., *Korean Attitudes Toward the United States: Changing Dynamics*, (2004) (Chapter in Conference Volume from Georgetown University Conference, February 2003, on Korean Anti-Americanism).

55.   Article, "Odious Debt, Old and New:  The Legal Intellectual History of an Idea," Vol. 70, Number 4,  *Law and Contemporary Problems*, pp. 193-220  (2007).

56. Article, "What Hope for Corporate Governance in China?" Vol. 191, *China Quarterly*, pp. 590-612, Autumn, 2007.

57.  Chapter, "Sovereignty Old and New:  Another Look at Taiwan's International Legal Status," in Lung-chu Chen, ed., *Membership for Taiwan in the United Nations* (2007).

58. Chapter, "Legal Aspects of Hong Kong SAR's First Ten Years:  What Went Wrong, What Went Right and What We Expected," in Carola McGiffert and James Tang, eds., *Hong Kong on the Move: 10 Years as the HKSAR* (edited by CSIS 2008).

59. Chapter, "What Hope for Corporate Governance in China?" in *China's Legal System: New Developments, New Challenges* (Cambridge University Press, 2008).

60. Testimony, *The UN Human Rights Council's Review of China's Record: Process and Challenges*, Roundtable Before the Congressional-Executive Commission on China, 111th Congress, 1st Session, Jan. 16, 2009

61. Testimony, Roundtable Before the Congressional-Executive Commission on China, 111th Congress, 1st Session,  July 10, 2009, "China's Human Rights Lawyers: Current Challenges and Prospects."

62. Testimony, U.S. China Economic and Security Review Commission, *Hearing on China's Information Control Practices and the Implications for the United States*, June 30, 2010.

63. Forthcoming, "The Death Penalty in China," Chapter from Catholic University, Columbus School of Law, Conference on the Death Penalty.

64.  Forthcoming, Legal Problems of Central-Local Relations in the People's Republic of China.