# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L |
| THIS DOCUMENT RELATES TO: | JUDGE FALLON MAG. JUDGE WILKINSON |
| *Gross, et al. v. Knauf Gips KG, et al.*, Case No. 2:09-cv-6690 (E.D. La.) | |
| *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Case No. 2:10-cv-00361 (E.D. La.) | |

## THE PLAINTIFFS' STEERING COMMITTEE'S RESPONSE IN OPPOSITION TO TAISHAN'S MOTIONS PURSUANT TO RULE 12(B)(2) TO DISMISS THE COMPLAINTS

## TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION.................................................................... 1

II.  PROCEDURAL HISTORY...................................................... 2

    A.  The *Gross* Class Action Proceedings............................ 2

    B.  The *Wiltz* Class Action Proceedings............................ 5

III.  ARGUMENT...................................................................... 6

    A.  The Appropriate Choice of Law Analysis................................. 7

    B.  Personal Jurisdiction Over Taishan Requires an
        Analysis of the Louisiana Long-Arm Statute as Delimited
        by the Due Process Clause............................................. 8

        1.  Jurisdiction Exists over TG and TTP because
            Each is the Instrument of the Other................................ 8

        2.  Personal Jurisdiction is Available Under the
            Louisiana Long-Arm Statute.............................................. 11

        3.  The Due Process Analysis Confirms that Personal
            Jurisdiction Attaches Due.................................................. 20

            a.  Plaintiffs' Causes of Action Exist Because
                of Taishan's Forum-Related Activities...................... 22

                i.  The Wiltz Plaintiffs' Claims Arise Out
                    of Taishan's Contacts with Louisiana.............. 22

                ii.  The *Gross* Plaintiffs Have Adequately Alleged
                    That Their Claims Arise Out of Taishan's
                    Contacts with Louisiana.................................... 23

IV.  CONCLUSION.................................................................... 27

# TABLE OF CITATIONS

**Page(s)**

*Adm'rs of Tulane Educ. Fund v. Biomeasure, Inc.*, 687 F. Supp. 2d 620
(E.D. La. 2009).................................................................................. 10

*Allred v. Moore & Peterson*, 117 F.3d 278 (5th Cir. 1997)....................................... 7

*Asahi Metal Industry Co., Ltd. v. Superior Court of California*,
480 U.S. 102 (1987)........................................................................... 21

*Bass v. Stryker Corp.*, 669 F.3d 501 (5th Cir. 2012).................................................. 23

*Bean Dredging Corp. v. Dredge Tech. Corp*, 744 F.2d 1081 (5th Cir. 1984).......... 12

*Bhatia v. Dischino*, 2011 WL 3820825 (N.D. Tex. Aug. 29, 2011)......................... 7

*Case v. Merck & Co.*, 2002 WL 31478219 (E.D. La. Nov. 5, 2002)...................... 27

*C.F. Morrison v. YTB Int'l, Inc.*, 649 F.3d 533 (7th Cir. 2011)............................ 7

*Dahmes v. Champagne Elevators, Inc.*, 869 So.2d 904
(La. App. 4th Cir. 2004)..................................................................... 12

*Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331 (5th Cir. 1999)................... 10

*Employers Nat. Ins. Co. v. Second Injury Bd.*, 693 So.2d 1274
(La. Ct. App. 1997)............................................................................. 8

*Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327
(5th Cir. 2004).................................................................................... 10

*Fruge v. Amerisure Mut. Ins. Co.*, 663 F.3d 743 (5th Cir. 2011)............................ 26

*George v. Hous. Auth. of New Orleans*, 906 So. 2d 1282 (La. Ct. App. 2005)....... 25

*Gould v. Hous. Auth. of New Orleans*, 595 So. 2d 1238 (La. Ct. App. 1992)......... 26

*Hamilton v. Accu-Tek*, 32 F. Supp. 2d 47 (E.D.N.Y. 1998).................................... 25

*Hargrave v. Fibreboard Corp.*, 710 F.2d 1154 (5th Cir. 1983)................................ 9, 11

*Hoover v. Fla. Hydro, Inc.*, 2009 WL 1380619 (E.D. La. May 14, 2009).............. 25

*In re Chinese Manufactured Drywall Products Liab. Litig.*, 706 F.
 Supp. 2d 655 (E.D. La. 2010)............................................................................. 22

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 767 F.
 Supp. 2d 649 (E.D. La. 2011)........................................................................ 7, 13

*In re Ikon Office Solutions, Inc., Sec. Litig.*, 86 F. Supp. 2d 481
 (E.D. Pa. 2000)................................................................................................... 7

*In re Korean Airlines Disaster of September 1, 1983*, 829 F.2d 1171
 (D.C. Cir. 1987)................................................................................................. 7

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*
 *["MTBE"]*, 379 F. Supp. 2d 348 (S.D.N.Y. 2005)................................... 25, 26

*In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480 (D. Del. 2001).............................. 7

*International Shoe Co. v. State of Washington*, 326 U.S. 310 (1945).................... 11

*Jefferson v. Lead Indus. Ass'n*, 930 F. Supp. 241 (E.D. La. 1996).......................... 27

*J. McIntyre Machinery Ltd. v. Nicastro*, 131 S.Ct. 2780 (2011)............................ passim

*Menowitz v. Brown*, 991 F.2d 36 (2nd Cir. 1993)................................................... 7

*Moore v. BASF Corp.*, 2011 WL 5869597 (E.D. La. Nov. 21, 2011).................... 24

*Moses v. Universal Ogden Svcs.*, 16 F. Supp. 2d 680 (E.D. La. 1998).................. 12

*Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640 (5th Cir. 2002)................ 8

*Perez v. Brown & Williamson Tobacco Corp.*, 967 F. Supp. 920
 (S.D. Tex. 1997).................................................................................................. 8

*Point Landing Inc. v. Omni Capital Int'l Ltd.*, 795 F.2d 415 (5th Cir. 1986),
 *aff'd sub. nom.*, *Omni Capital Int'l, Ltd. v. Rudolph Wolff & Co.*,
 484 U.S. 97 (1987).............................................................................................. 11

*Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415
 (5th Cir. 1993)..................................................................................................... 13

*Schewe v. USAA Cas. Ins. Co.*, 2007 WL 2174588
  (E.D. La. July 7, 2007) ........................................................................... 9

*Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266 (5th Cir. 2006)..................... 22

*Smith v. Cotton Fleet Serv., Inc.*, 500 So.2d 759 (La. 1987).................................... 8

*Stripling v. Jordan Prod. Co.*, 234 F.3d 863 (5th Cir. 2000).................................... 7

*Town of Haynesville, Inc. v. Entergy Corp.*, 956 So. 2d 192
  (La. Ct. App.  2007)................................................................................. 9

*Walk Haydel & Associates, Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235
  (5th Cir. 2008)...................................................................................... 13

## STATUTES, RULES AND REGULATIONS

28 U.S.C. §1332(d)(2).............................................................................. 7

28 U.S.C. § 1711................................................................................... 7

Fed.R.Civ.P. 24(b)................................................................................. 4

Florida Statutes Section 718.203................................................................. 4, 5

LSA-R.S. 13:3201(A)(8)............................................................................ 12

LSA-R.S. 13:3201(B)............................................................................... 11

## I.    **INTRODUCTION**

While Taishan Gypsum Co. Ltd. ("TG") and Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan") argue in their 12(b)(2) motions to dismiss the *Gross* and *Wiltz* complaints that they are not subject to jurisdiction in any of the states where they have been sued to date (California, Florida, Louisiana, and Virginia), the discovery in this litigation demonstrates otherwise.  Taishan not only imported in excess of 85.99 million square feet of Chinese Drywall to the United States but also specifically targeted customers in Louisiana, selling samples of drywall and more than 600,000 square feet of drywall to those customers with the expectation that the drywall would be delivered to addresses within this jurisdiction.

With respect to the *Gross* and *Wiltz* actions, which were directly filed in this Court, the Plaintiffs' Steering Committee's ("PSC") discovery to date establishes that Taishan purposefully targeted sales of its drywall to customers in Louisiana following Hurricanes Katrina and Rita.  Taishan sold its drywall to APIC Building Materials ("APIC") and GD Distributors, LLC ("GD Distributors") and shipped its products directly to those customers in Louisiana.  Taishan also directed numerous communications to customers and prospective customers located in the state of Louisiana with the objective of generating additional sales.  In these communications, Taishan consistently held itself out as doing business in the state of Louisiana and represented that it would arrange shipments of its drywall into the state.

Taishan's efforts to minimize the significance of its sales to APIC and GD Distributors should be disregarded.  First, Taishan had direct knowledge that the drywall it sold to these entities would be delivered into the state of Louisiana, because Taishan arranged for and controlled the shipping.  Second, while Taishan attempts to characterize these transactions as involving just a few isolated sales, the PSC's discovery establishes that Taishan shipped multiple samples of its drywall to customers in Louisiana and that there were actually three sales of

1

drywall to Louisiana. Taishan completely ignore the scope of these shipments (*i.e.*, 12,756 sheets of drywall, which is enough material to build over 67 homes that are 2,500 square feet).[1] This case involves a manufacturer that repeatedly sold thousands of sheets of drywall, enough to build an entire community, with the knowledge and understanding that such drywall would be installed in homes and other properties located in the state of Louisiana, and several other states.

For all of the reasons set forth in this memorandum and in the Plaintiffs' Steering Committee's Global Statement of Facts and Global Memorandum of Law In Opposition to: (1) Taishan's Renewed Motions to Vacate the Default Judgments and Dismiss the Complaints in *Germano* and *Mitchell* and (2) Taishan's Motions to Dismiss the Complaints in *Gross* and *Wiltz* (which are incorporated herein by reference and hereafter referred to as "PSC Global SOF" and "PSC Global MOL," respectively), and based on the affidavit of Plaintiffs' Liaison Counsel Russ M. Herman, filed as Exhibit A to the PSC's Global SOF, and the evidence attached thereto, Taishan's motions to dismiss the *Gross* and *Wiltz* complaints for lack of personal jurisdiction should be denied.

## II.   PROCEDURAL HISTORY

### A.   The *Gross* Class Action Proceedings.

Plaintiffs, David Gross, Cheryl Gross, and Louis Velez, the representative plaintiffs in *Gross*, filed their class action complaint on October 7, 2009 (hereafter the "Indeterminate Defendant Complaint" or "IDC Complaint").[2] The representative plaintiffs in the IDC Complaint represent owners of properties with defective Chinese Drywall that was manufactured,

---

[1] *See* Chart Summarizing Taishan's Sales of Drywall in the United States, by State (Ex. 1 to the Affidavit of Russ M. Herman dated 5/7/2012).

[2] Rec. Doc. No. 1 (*Gross* docket). The IDC Complaint asserts claims against defendants for negligence, negligence per se, breach of express and/or implied warranties, private nuisance, negligent discharge of a corrosive substance, unjust enrichment, violation of Consumer Protection Acts, and for equitable injunctive and medical monitoring.

2

imported, exported, brokered, distributed, delivered, supplied, marketed, inspected, and/or sold by "indeterminate defendants." These indeterminate defendants fraudulently concealed their identity leaving plaintiffs unable to identify the manufacturer(s) and/or non-manufacturing parties in the chain of distribution of the defective drywall installed in their homes. Examples of the unidentifiable product at issue in the *Gross* action can be observed in Plaintiffs' and Defendants' Joint Submission of Chinese Drywall Identification Photographs Pursuant to Pre-Trial Order 10. *See* Joint Submission at Nos. 15-25 and 32-35. *See* http://www.laed.uscourts.gov/Drywall/DrywallMarkings.htm. The IDC Complaint did not name builders and contractors/installers as defendants.

The IDC Complaint names TG and TTP and ninety-one (91) other domestic and foreign defendants who were involved in the manufacture, importing, exporting, brokering, distribution, delivery, supply, marketing, inspection, and/or sale of the defective drywall at issue in this litigation.[3] The IDC Complaint asserts an industry-wide alternative liability theory against the named indeterminate defendants and requests that these defendants be held liable in proportion to their relative market share. The IDC Complaint was amended on October 19, 2009, to include additional defendants.[4]

---

[3] The PSC has also filed protective actions that are designed to perfect claims against TG and TTP as well as other related entities such as BNBM and CNBM. These actions name many of the same defendants who were sued in the IDC complaint. The PSC has filed such actions in California, Florida, Louisiana, and Virginia. The PSC directly filed one of these actions, *Amorin, et al. v. Taishan Gypsum Co. Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, 11-cv-1395 (E.D. La.), in this Court on June 13, 2011. The PSC filed similar actions that have been transferred to this Court from the Central District of California, *see Abner, et al. v. Taishan Gypsum Co. Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, 11-cv-3094 (E.D. La.), the Southern District of Florida, *see Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, 11-cv-1672 (E.D. La.), and the Eastern District of Virginia, *see Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd. et al.*, 11-cv-1673 (E.D. La.). The PSC is in the process of serving each of these complaints on the named defendants. *See* Mickow affidavit at ¶¶ 7-11 (Herman Aff. Ex. 199).

[4] Rec. Doc. No. 366.

Shortly after filing the amended IDC Complaint, Plaintiffs commenced serving the amended complaint on each of the named defendants. With respect to the foreign defendants, Plaintiffs commenced serving them consistent with the requirements of the Hague Convention. Since the filing of the amended complaint on October 19, 2009, Plaintiffs received notice that service of process was perfected on TG and TTP on February 4, 2010.[5] Each of these defendants have been served with the amended complaint and a summons.

Subsequent to the filing of the IDC Complaint, Plaintiffs, *Mary Anne Benes, et al.*, moved pursuant to Fed.R.Civ.P. 24(b) to intervene in the *Gross* proceedings.[6] That motion was granted by Order dated March 17, 2010.[7] Like the class representative plaintiffs in the IDC Complaint, the *Benes* Intervenors have been unable to identify the manufacturer(s) of the drywall in their homes. Unlike the original *Gross* plaintiffs, however, certain of the *Benes* Intervenors were successful in identifying some of the non-manufacturing parties in the chain of distribution of the defective drywall in their homes. For this reason, the *Benes* Intervenors filed Plaintiff, Mary Anne Benes' Substituted and Amended Omnibus Class Action Complaint in Intervention (III) (hereafter the "Omnibus III Complaint") on March 23, 2010,[8] wherein they joined the industry-wide alternative liability theory against the indeterminate defendants (*i.e.*, the defendants named in the IDC Complaint) and asserted subclass claims against identifiable non-manufacturing

---

[5]  Documents evidencing service of the amended IDC Complaint on TG and TTP are attached hereto as Exhibit "A."

[6]  Rec. Doc. No. 1712.

[7]  Rec. Doc. No. 1776.

[8]  The Omnibus III Complaint asserts claims against defendants for negligence, negligence per se, strict liability, breach of express and/or implied warranty, breach of implied warranty of fitness and merchantability pursuant to Florida Statutes Section 718.203, breach of implied warranty of habitability, breach of contract, violation of the Louisiana New Home Warranty Act, redhibition, Louisiana Product Liability Act, private nuisance, negligent discharge of corrosive substance, unjust enrichment, violation of the Consumer Protection Acts, and for equitable and injunctive relief and medical monitoring.

parties (*i.e.*, builders and contractors/installers).[9]

Shortly after filing the Omnibus III Complaint, Plaintiffs commenced serving the complaint on each of the named defendants.  Plaintiffs commenced serving the foreign defendants consistent with the requirements of the Hague Convention.  Plaintiffs received notice that service of process was perfected on TG and TTP on June 11, 2011.[10]  Each of these defendants have been served with the Omnibus III Complaint and a summons.

**B.    The *Wiltz* Class Action Proceedings.**

Plaintiffs, Kenneth and Barbara Wiltz, and hundreds of other representative plaintiffs in *Wiltz*, commenced this action on February 10, 2010, by filing a complaint directly in the MDL court.[11]  The *Wiltz* plaintiffs own properties containing Chinese Drywall that was manufactured and distributed by the manufacturing defendants named in the Plaintiffs' Amended Omnibus Class Action Complaint (II) (the "Complaint"),[12] *i.e.*, TG, TTP, and several other Non-Knauf manufacturing defendants.  The *Wiltz* plaintiffs reside in several Gulf coast states, including Louisiana and Florida.  The *Wiltz* plaintiffs have asserted claims against the manufacturers, distributors, suppliers, importers, exports, brokers, builders, developers, and contractor/installers of the defective Chinese Drywall installed in their homes and other properties.

The Complaint asserts claims against defendants for negligence, negligence per se, strict liability, breach of express and/or implied warranty, breach of implied warranty of fitness and merchantability pursuant to Florida Statutes Section 718.203, breach of implied warranty of

---

[9]   Rec. Doc. No. 2187.

[10]   Documents evidencing service of the Omnibus III Complaint on TG and TTP are attached hereto as Exhibit "B."

[11]   Rec. Doc. No. 1 (*Wiltz* docket).

[12]   Rec. Doc. No. 1747.

habitability, breach of contract, violation of the Louisiana New Home Warranty Act, redhibition, Louisiana Product Liability Act, private nuisance, negligent discharge of corrosive substance, unjust enrichment, violation of the Consumer Protection Acts, and for equitable and injunctive relief and medical monitoring.

Shortly after filing the Complaint, the *Wiltz* plaintiffs commenced serving the Complaint on each of the named defendants. The *Wiltz* plaintiffs undertook to serve the foreign defendants consistent with the requirements of the Hague Convention. Since the filing of the amended complaint on March 23, 2010, Plaintiffs received notice that service of process was perfected on TG and TTP on September 25, 2010.[13] Each of these defendants have been served with the amended complaint and a summons.[14]

## III.   ARGUMENT

Taishan's Rule 12(b)(2) motions to dismiss the *Gross* and *Wiltz* complaints are based on two arguments: (1) that personal jurisdiction is lacking because Taishan does not have the requisite minimum contacts with Louisiana; and (2) that the Plaintiffs in *Gross* have failed to adequately allege that their claims arise out of TG's and/or TTP's contacts with Louisiana, since

---

[13]   Documents evidencing service of the amended complaint on TG and TTP are attached hereto as Exhibit "C."

[14]   Thus far, the PSC has only managed to serve TG and TTP with complaints in the *Gross* and *Wiltz* proceedings. The PSC's process server, APS International, Ltd. ("APS"), has not yet attempted to serve TG or TTP with the other Omni complaints involving these defendants, because attempting to serve multiple complaints in China would actually impede service of the PSC's complaints. The PSC's various intervention complaints involving the *Gross* and *Wiltz* actions have not yet been served on the Taishan defendants for this reasons. APS has recommended that the PSC's complaints be served in consecutive order since the Chinese authorities responsible for service of process under the Hague Convention frequently become confused when they are presented with multiple complaints involving the same or similar plaintiffs and/or defendants. *See* Mickow Affidavit at ¶¶ 7 and 8 (Herman Aff. Ex. 199). This confusion frequently results in circumstances where the Central Authority either misplaces documents or otherwise fails to serve them on the Chinese defendant in question. *Id.* Accordingly, APS has staggered the service of the PSC's complaints in China, which has resulted in some delay in serving TG and TTP. *Id.* at ¶¶ 9 and 10. The current status of service as to each of the PSC's complaints involving TG and TTP is set forth in the Mickow Affidavit at ¶ 11.

these Plaintiffs have been unable to identify the manufacturer of the drywall in their homes or other properties.[15]  As set forth below, as well as for those reasons set forth in the PSC Global SOF and the PSC Global MOL, each of these arguments lacks merit, warranting denial of Taishan's motions to dismiss.

A.      **The Appropriate Choice of Law Analysis.**

Since these actions were directly filed in this Court, this Court may exercise jurisdiction over TG and TTP to the extent permitted by Louisiana's long-arm statute as interpreted by Louisiana state courts. *See Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 869 (5th Cir. 2000); *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir. 1997).  Although federal courts defer to the forum state's interpretation of its long-arm statute, Fifth Circuit law will control whether the exercise of personal jurisdiction comports with federal due process. *See Menowitz v. Brown*, 991 F.2d 36, 40 (2nd Cir. 1993). *See In re Korean Airlines Disaster of September 1, 1983*, 829 F.2d 1171, 1175 (D.C. Cir. 1987); *In re Ikon Office Solutions, Inc., Sec. Litig.*, 86 F. Supp. 2d 481, 484 (E.D. Pa. 2000); *In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 501 (D. Del. 2001); *Bhatia v. Dischino*, 2011 WL 3820825, *5 (N.D. Tex. Aug. 29, 2011).  Thus, this Court should defer to Louisiana law for purposes of interpreting its long-arm statute and to Fifth Circuit precedent for purposes of determining whether the exercise of personal jurisdiction offends due process. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 767 F. Supp. 2d 649, 656 n.2 (E.D. La.

---

[15]  In addition to contesting personal jurisdiction, Taishan seemingly challenges the jurisdictional basis for the filing of the *Gross* and *Wiltz* complaints, inclusive of all intervention complaints, in this MDL forum based on the number of non-Louisiana plaintiffs participating in each of these actions. *See Gross* Br. at 4; *Wiltz* Br. at 4.  Subject matter jurisdiction, which Taishan opaquely contests, over both of these actions exists by virtue of 28 U.S.C. §1332(d)(2) and the Class Action Fairness Act ("CAFA"), *see* 28 U.S.C. § 1711, *et seq*.  Plaintiffs and certain of the Defendants in these actions are citizens of different states and the amounts in controversy in these actions exceed five million dollars ($5,000,000), exclusive of interest and costs.  CAFA plainly confers subject matter jurisdiction over the *Gross* and *Wiltz* actions notwithstanding that a number of non-Louisiana plaintiffs are participating in each of these actions. *C.F. Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 535-36 (7th Cir. 2011) (determining out of state plaintiffs have standing to assert claims under the Illinois Consumer Protection Act).

2011) (citations omitted); *Perez v. Brown & Williamson Tobacco Corp.*, 967 F. Supp. 920, 925

(S.D. Tex. 1997).

### B. Personal Jurisdiction Over Taishan Requires an Analysis of the Louisiana Long-Arm Statute as Delimited by the Due Process Clause.

#### 1. Jurisdiction Exists over TG and TTP because Each is the Instrument of the Other.

As a threshold matter, TG contends that the jurisdictional contacts of its wholly-owned

subsidiary, TTP, should not be attributed to it for purposes of establishing personal jurisdiction.

This argument should be rejected since personal jurisdiction exists over TG and TTP based on

the extensive control that the former has exercised over the latter. Ample evidence demonstrates

that TTP is TG's alter ego or, alternatively, has functioned as its agent.

Taishan takes the position that the determination of whether TTP is the alter ego of TG

should be determined in accordance with Chinese law. Because TTP was incorporated in China,

and was a Chinese company, Chinese Corporate law guides the Courts analysis. *Patin v.*

*Thoroughbred Power Boats Inc.*, 294 F.3d 640, 646 (5th Cir. 2002) (applying the law of the state

of incorporation). For all of the reasons set forth in the PSC Global MOL (at 26-35), the actions

of TTP can be attributed to TG, and vice versa. In addition, analysis of Louisiana law establishes

that there are grounds for piercing the corporate veil.

Louisiana courts will disregard the legal fiction of a separate corporate existence for

equitable reasons, such as "to defeat public convenience, justify wrong, protect fraud, or defend

crime." *See Smith v. Cotton Fleet Serv., Inc.*, 500 So.2d 759, 762 (La. 1987). They will also

disregard the separate corporate existence and impute the knowledge of a parent company to a

closely affiliated subsidiary if the parent company acquired its knowledge while acting on the

subsidiary's behalf. *See Employers Nat. Ins. Co. v. Second Injury Bd.*, 693 So.2d 1274, 1278-79

(La. Ct. App. 1997) (imputing parent company's knowledge of employee's disability to

8

subsidiary when parent company conducted hiring process for subsidiary and referred disabled employee to subsidiary). Conversely, courts are reluctant to impute a parent company's knowledge to a subsidiary if the parent did not participate in the transaction giving rise to the dispute. *E.g.*, *Schewe v. USAA Cas. Ins. Co.*, 2007 WL 2174588, at *9 (E.D. La. July 7, 2007) (parent-subsidiary relationship insufficient evidence for court "to conclude that notice to the parent company, who had not even been named in the suit at that time, imputes notice to its subsidiary company").

"The determination of whether the corporate veil has been pierced and the corporation is merely the 'alter ego' of the shareholder is made by considering the totality of the circumstances." *Town of Haynesville, Inc. v. Entergy Corp.*, 956 So. 2d 192, 197 (La. Ct. App. 2007) (citation and internal quotation marks omitted). Courts consider five factors:  (1) commingling of corporate and shareholder funds, (2) failure to follow statutory formalities for incorporating and transacting corporate affairs, (3) undercapitalization, (4) failure to maintain separate bank accounts and bookkeeping records, and (5) failure to hold regular shareholder and director meetings. *Id*. at 198. For contacts of a subsidiary to be imputed to a parent corporation, there must be "proof of control by the parent over the internal business operations and affairs of the subsidiary." *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983).

Here, it is evident that TTP is the alter ego of TG. For instance, TG allowed TTP to sell its brand of drywall even where TTP did not have express permission to do so (*i.e.*, DUN brand drywall), *see* PSC Global SOF at 53-56, TG and TTP ignored corporate formalities with respect to various settlements where one Taishan entity paid damages for a dispute involving another Taishan entity (*i.e.*, the Guardian and Oriental Trading Company settlements), *see* PSC Global SOF at 56-61, the employees of TG and TTP were interchangeable and sold drywall for both entities without distinction, *see* PSC Global SOF at 61-65, TG and TTP interchanged employees

9

and directors, and there were no interviews or hiring process, *see* PSC Global SOF at 65-67, TG and TTP shared phones and facsimile numbers and likely also shared office space, *see* PSC Global SOF 67-68, and TG and TTP failed to observe other corporate formalities regarding assets and other property in addition to the brand names Taishan and DUN, *see* PSC Global SOF at 68-70.

Notwithstanding that TTP is the alter ego of TG, "[a]s a general rule . . . the proper exercise of personal jurisdiction over a nonresident corporation may not be based solely upon the contacts in the forum state of another corporate entity with which the defendant may be affiliated." *Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 345 (5th Cir. 2004); *accord Adm'rs of Tulane Educ. Fund v. Biomeasure, Inc.*, 687 F. Supp. 2d 620, 625 (E.D. La. 2009) ("Courts presume the institutional independence of related corporations, such as a parent and its subsidiary, when they determine if one corporation's contacts with a forum can be the basis of jurisdiction over a related corporation."). A showing of "clear evidence" that one corporation has control over the internal business operations and affairs of another corporation is required before the two may be fused together for jurisdictional purposes. *Id.*

The Fifth Circuit has identified at least seven factors relevant to the jurisdictional analysis: (1) the amount of stock owned by the parent of the subsidiary; (2) whether the two corporations have separate headquarters; (3) whether they have common officers and directors; (4) whether they observe corporate formalities; (5) whether they maintain separate accounting systems; (6) whether the parent exercises complete authority over general policy; and (7) whether the subsidiary exercises complete authority over daily operations. *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 339 (5th Cir. 1999). While the totality of the circumstances regarding corporate similarity must be examined, "[t]he degree of control exercised by the parent must be greater than that normally associated with common ownership and directorship."

10

*Hargrave*, 710 F.2d at 1160.

Here, the evidence shows that TG exercises a level of control over TTP that goes well beyond the normal relationship between corporate parent and subsidiary. The degree of control exercised by TG over TTP is sufficient for purposes of attributing TTP's jurisdictional contacts to TG. For starters, TG controls 100% of TTP's stock. *See* PSC Global SOF at 52. It is also believed that both TG and TTP share the same headquarters since they share the same phone and facsimile numbers. It is also evident that TG and TTP observed few, if any, corporate formalities and that they operated as one entity. In light of these facts, as well as the existence of common officer and directors in both TG and TTP, *see* PSC Global SOF at 65-67, it is clear that TG had complete authority over the general policy and day-to-day operations of TTP. For instance, a director and chair of TTP, Peng Shiliang, was also an employee of TG. Accordingly, it is clear that the jurisdictional contacts of TTP should be attributed to TG under Louisiana law.

### 2.    Personal Jurisdiction is Available Under the Louisiana Long-Arm Statute.

A federal court may assert jurisdiction over a defendant who is subject to the jurisdiction of the court of the state in which the court sits. *Point Landing Inc. v. Omni Capital Int'l Ltd.*, 795 F.2d 415, 427 (5th Cir. 1986) ("absent specific congressional authority, a federal district court has no personal jurisdiction over a defendant who cannot be reached by the long-arm statute of the state in which the district court sits."), *aff'd sub. nom.*, *Omni Capital Int'l, Ltd. v. Rudolph Wolff & Co.*, 484 U.S. 97 (1987).

The Louisiana long-arm statute was passed in 1964 to afford personal jurisdiction to the fullest extent allowed pursuant to the U.S. Supreme Court decision in *International Shoe Co. v. State of Washington*, 326 U.S. 310 (1945). That statute purports generally to extend in personam jurisdiction over a nonresident "on any basis consistent with the constitution of [Louisiana] and . . . the Constitution of the United States." LSA-R.S. 13:3201(B), and comment (a). But more

11

specifically, in cases such as this where claims are made against foreign manufacturers based on damages caused by their products, the statute authorizes personal jurisdiction over a defendant, "acting directly or by an agent," if the cause of action arises out of the:

> [m]anufacturing of a product or component thereof which caused damage or injury in this state, if at the time of placing the product into the stream of commerce, the manufacturer could have <u>foreseen</u>, realized, expected, or anticipated that the product may eventually be found in this state <u>by reason of its nature and the manufacturer's marketing practices</u>.

LSA-R.S. 13:3201(A)(8) [emphasis added].

Subsections 3201(A)(8) and (B) of Louisiana's statute have been jurisprudentially interpreted to extend personal jurisdiction over nonresident manufacturers when the ultimate product was used in Louisiana, its defects surfaced in Louisiana, resulting economic injury had befallen Louisiana residents, and the State had a legitimate interest in this controversy. *See, e.g.*, *Bean Dredging Corp. v. Dredge Tech. Corp*, 744 F.2d 1081 (5th Cir. 1984); *Moses v. Universal Ogden Svcs.*, 16 F. Supp. 2d 680 (E.D. La. 1998); *Dahmes v. Champagne Elevators, Inc.*, 869 So.2d 904 (La. App. 4th Cir. 2004). By all such indicia, the same result obtains here. Yet it is the application of the long-arm statute's express provisions which most clearly guides this Court to exercise jurisdictional authority over these defendant manufacturers. As noted *supra*, section 3201(A)(8) requires not simply foreseeability that a product would be found or used in Louisiana based on the nature of the product itself (*e.g.*, a "mobile" product placed in the general stream of commerce), but additionally demands more specific foreseeability of product location in the forum, based on the manufacturer's "marketing practices." The relevant question becomes whether such practices suffice to demonstrate that the manufacturer purposefully availed itself of the benefits of doing business in the forum.

Taishan relies upon the U.S. Supreme Court holding in *J. McIntyre Machinery Ltd. v. Nicastro*, 131 S.Ct. 2780 (2011), to support its argument for the lack of personal jurisdiction,

even though the facts in *McIntyre* regarding a defendant manufacturer's contacts with the forum are radically different from the facts which constitute this record. However, even if applied, the holding of *McIntyre* proceeds within a framework for analysis which is utterly consistent with the constitutional reach of Louisiana's long-arm statute. Specifically, the discussion of a foreseeability test for jurisdiction in *McIntyre* is not dispositive when addressing the foreseeability requirement of Louisiana's statute, given a clear distinction between what may be called "stream-of-commerce foreseeability" and "marketing practice foreseeability."

As in the analogous case of general and specific causation, the distinction is critical. Proof of general causation will not, while proof of the specific causation will, be a basis for recovery by an individual plaintiff alleging harm by the defendant's wrongdoing or product. That such wrongdoing or a product generally <u>could</u> give rise to the risk of plaintiff's harm is a necessary but not sufficient basis for recovery; the plaintiff also must show by a preponderance of the evidence that the wrongdoing or product caused specific injury. Likewise, defendants' argument that a general, stream-of-commerce foreseeability test no longer is viable in personal jurisdiction cases after *McIntyre*, overlooks the fact that Louisiana adopts a foreseeability test based upon not just stream-of-commerce placement but particular marketing practices.[16] Therefore, while some Justices in *McIntyre* suggested that foreseeability predicated merely on a product's placement in the stream of commerce will not suffice constitutionally for personal

_____

[16] The Court will review the record in these proceedings subject to a *prima facie* standard, until and unless an evidentiary hearing takes place, in which case a preponderance standard applies. *See Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 418 n.3 (5th Cir. 1993) (plaintiff has burden of establishing personal jurisdiction under a *prima facie* standard); *Walk Haydel & Associates, Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241-42 (5th Cir. 2008) (when a court conducts an evidentiary hearing to determine personal jurisdiction burden is elevated to a preponderance of the evidence standard). Under analogous circumstances involving motions to dismiss by comprehensive general liability insurers, this Court applied a *prima facie* standard even though the parties had completed jurisdictional discovery. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 767 F. Supp. 2d 649, 656 (E.D. La. 2011).

jurisdiction, the Louisiana long-arm statute which governs herein does not provide for jurisdiction based solely upon stream of commerce placement. It further requires a forum-specific foreseeability demonstrated by not just the nature of the mobile product but also by defendants' marketing activities. Plaintiffs submit that there effectively is no *McIntyre* limitation on the traditional application and interpretation of the Louisiana statute as written, and as applied.

Against this backdrop, there is ample evidence in the record through the deposition testimony of several third-party customers of Taishan to demonstrate business activity by this company which was specifically directed toward customers and product use in Louisiana. Taishan's most concrete connection to this forum is the three shipments of drywall that it purposefully directed to this state (comprised of some 12,756 sheets of drywall which is enough to build over 67 homes).[17] Taishan directed two of these shipments (comprised of 5,676 sheets and 5,760 sheets) to APIC. The other shipment of 1,320 sheets of drywall was directed to GD Distributors. In addition to these three shipments of drywall, Taishan's marketing practices clearly demonstrate that this manufacturer intended to direct business activity toward customers in Louisiana. Indeed, according to these customers, Taishan purposefully undertook to market, sell, and ship its drywall to the State of Louisiana.

Ivan Gonima, working on behalf of TG/TTP customer Best Sunshine Services, Inc., testified that it was his clear impression in dealing with these defendants that they could, and would, ship drywall to Louisiana.[18] Taishan expressly represented to him on more than one

---

[17] *See* Chart Summarizing Taishan's Sales of Drywall in the United States, by State (Ex. 1 to Herman Affidavit).

[18] *See* Gonima I Dep. at 70:13-25 (Herman Aff. Ex. 9).

14

occasion that it would ship drywall to New Orleans, Louisiana.[19]  In the course of his company's transactions with Taishan, Mr. Gonima was convinced that this manufacturer understood its drywall would be used in Louisiana, and specifically in New Orleans.[20]  E-mail correspondences were exchanged with Taishan regarding ocean freight rates, and Taishan provided the requested information necessary for this customer to purchase Taishan product and have the drywall shipped to New Orleans.[21]  At no time did Taishan express any objection to shipping the product to New Orleans, based on the purchase and shipping prices discussed.[22]  Mr. Gonima even had conversations with Taishan representatives regarding a specific project in New Orleans, and in this connection, discussed both pricing and the number of containers needed to ship the drywall.[23]

Another customer of Taishan, GD Distributors of Slidell, Louisiana, also had several communications with Taishan regarding the shipment of its drywall to the state.  Several invoices, created by TTP itself, specifically made reference to shipments to Louisiana, with delivery noted as "CIF New Orleans."[24]  Darrin Steber, the 30(b)(6) designee of GD Distributors confirmed in his deposition that his company purchased drywall from Taishan in 2006.[25]  Notably, TTP provided a

---

[19]  *See id.* at 72:16-18, 73:19-23, 74:2-6, 75:2-8.

[20]  *See id* at 79:23-80:1-4.

[21]  *See* emails dated 4/12-17/2007 between Ivan Gonima and Bill Cher (TG0000915-920) (Ex. 2 to Che Gang Dep.) (Herman Aff. Ex. 64); *see also* email dated 4/17/2007 from Bill Cher to Ivan Gonima (TG0000913-914) (Ex. 10 to Che Gang Dep.) (Herman Aff. Ex. 65).

[22]  *See* Gonima I Dep. at 140:19-141:21 (Herman Aff. Ex. 9).

[23]  *See id.* at 79:16-80:16.

[24]  *See* invoices and other shipping documents related to shipment of drywall from TTP to GD Distributors (Ex. 2 to GD Distributors Dep.) (Herman Aff. Ex. 40).

[25]  *See* GD Distributors Dep. at p. 43:1-44:1 (Herman Aff. Ex. 25).

drywall sample to GD Distributors in Louisiana during negotiations with this customer.[26]  TTP
ultimately sold and shipped, or arranged to ship, its drywall to this Louisiana company.[27]  The
transaction included two containers of 660 sheets of gypsum, a total of 1320 sheets; and a TTP
invoice identifying Qingdao, China as the port of origin and "New Orleans" as the port of
destination.[28]  Taishan also emailed Mr. Steber certain bank documents requesting that his
company's bank send payment to the Agricultural Bank of China, Taian Branch, with TTP as the
"beneficiary" of that payment.[29]  This was needed in order for Taishan to receive payment for
boards "they were shipping to the U.S."[30]  Notably, all banking directions for payment were sent in
English to the GD Distributors' address provided in Slidell, Louisiana, and did not even have to be
translated.[31]

      Mr. Yongzhi Yang of Stone Pride, another customer of Taishan, testified that Taishan
expressly represented to him that it exported drywall to Louisiana.[32]  Taishan mailed drywall
samples to Mr Yang.[33]  Mr. Yang's dealings were with Mr. Che Gang (a/k/a Bill Cher), one of the
defendant's key salesmen for drywall, and Yang understood him to be the head of the defendant's

---

[26] *See id.* at 35:3-12; Photos of actual Taishan drywall samples (Exs. 4 & 5 to GD Distributors Dep.) (Herman Aff. Ex. 52).

[27] *See* GD Distributors Dep. at 44:2-20 (Herman Aff. Ex. 25).

[28] *See id.* at 44:25-45:13; *see also* TTP invoice to GD Distributors dated 9/15/2006 (Ex. 7 to GD Distributors Dep.) (TG0019962) (Herman Aff. Ex. 109).

[29] *See* GD Distributors Dep. at 46:12-25.

[30] *See id.* at 46:12-47:4.

[31] *See* invoices and other shipping documents related to shipment of drywall from TTP to GD Distributors (Ex. 2 to GD Distributors Dep.) (Herman Aff. Ex. 40); *see also* GD Distributors Dep. at 47:21-48:15.

[32] *See* Stone Pride Dep. at 81:11-17 (Herman Aff. Ex. 24).

[33] *See id.* at 85:16.

16

"export department," a department which he further understood to be set up for the purpose of shipping goods outside of China, including to the U.S. and states like Louisiana.[34]

John Gunn of Guardian Building Products, another customer of the defendant, recalled in his dealings with Taishan that it held itself out as a business that exported to Louisiana, among other locations.[35]  In fact, Mr. Gunn discussed with Taishan's sales agent, Apollo Yang, the differences in the Chinese Drywall market and the U.S. market, particularly as this might affect Taishan's ability to produce a gypsum product compliant with the shipping weight and ASTM requirements of the U.S.[36]  Mr. Gunn discussed in his deposition, and identified for the record, an email to Taishan specifically referencing drywall to be purchased for shipment to Louisiana.[37]

One of the most active customers of Taishan in the United States was Venture Supply/Porter Blaine.  Most of the business with this customer involved shipments to Virginia.  However, in Sam Porter's deposition, he also identified emails which reference a shipment of drywall to New Orleans, Louisiana.[38]

In addition to these third-party depositions, key witness depositions testimony taken in Hong Kong from defendants' own sales personnel, further establishes that TG and TTP repeatedly conducted business activities for the marketing, sale and shipment of drywall to Louisiana, including to New Orleans.  As early as January 2006, Che Gang was aware that Louisiana was a location in the United States that could do substantial business with TTP.  In an email dated January 5, 2006, Jing Zhang (communicating on behalf of a company called API) wrote Gang Che

---

[34]  *See id.* at 85:6-86:6.

[35]  *See* Gunn Dep. at 55:22-25 (Herman Aff. Ex. 143).

[36]  *See id.* at 55:15-57:4.

[37]  *See id.* at 84:22-85:2.

[38]  *See* Porter Dep. at 97:11-99:20 (Herman Aff. Ex. 72).

and advised, "[a]fter Hurricane Katrina, the Great New Orleans area need rebuild, and housing market in the USA is very hot these days. The both effects, we hope you and us can both take advantage from it."[39] A business opportunity in the New Orleans and Gulf Coast region had been created after the Katrina disaster, and defendants obviously stood ready to pursue it.

Mr. Che also identified emails between him and Ivan Gonima which include exchanges in which Mr. Gonima requested, and this Taishan agent provided, drywall shipment costs for specific U.S. cities inclusive of New Orleans, Louisiana.[40]

Perhaps one of the most concrete indicators that Taishan conducted marketing activity through Che Gang which targeted Louisiana and the New Orleans area specifically, was an email exchange between Mr. Che and Jeff ("Bo") Zhou, an agent for a construction business in Jefferson, Louisiana. In July 2006, Mr. Che was asked to send drywall samples to this construction company, and he readily did so, as indicated by an e-mail from Mr. Zhou in Louisiana acknowledging receipt of the sample. In the same exchange, Mr. Che also provided the costs of shipping the product to Jefferson, Louisiana.[41] Mr. Che did not deny using the mail system to send physical samples of drywall to Jefferson, Louisiana; in fact, he acknowledged that this was standard company practice.[42] He even demonstrated on camera during his videotaped deposition the physical sizes of

---

[39] *See* email dated 1/5/2006 from Jing Zhang to Bill Cher (TG0000886) (Ex. 14 to Che Gang Dep.) (Herman Aff. Ex. 108); Email dated 1/10/2006 from Chegang (Bill Cher) to Mike Westbrook, providing freight quote from Qingdao to LA (TG0000907-908) (Ex. 15 to Che Gang Dep.) (Herman Aff. Ex. 66).

[40] *See* emails dated 4/12-17/2007 between Ivan Gonima and Bill Cher (TG0000915-920) (Ex. 2 Che Gang Dep.) (Herman Aff. Ex. 64) and email dated 4/17/2007 from Bill Cher to Ivan Gonima (TG0000913-914) (Ex. 10 to Che Gang Dep.) (Herman Aff. Ex. 65).

[41] *See* emails dated 7/10&16/2006 from Bo Zhou to Bill Cher (TG0000631 & TG0000633) (Ex. 18 to Che Gang Dep.) (Herman Aff. Ex. 51); *See* Che Gang Dep. at 287:19-290:11 (Herman Aff. Ex. 6).

[42] *See* Che Gang Dep. at 291:5-18.

18

the samples he mailed.[43]

Another defendant salesman who dealt with customers in the U.S. was Peng Wenlong (a/k/a Frank Clem). Without being able to recall specific instances, he unequivocally acknowledged that he would advise customers about shipping drywall to New Orleans.[44]

A defendant employee who had supervision over sales personnel was Peng Shialang. In his deposition, he identified a number of defendant invoices and shipping documents which made express reference to New Orleans as a location for the purchased drywall.[45] Peng Shialang did not deny that such documents – created by the TTP – clearly identified Louisiana as both the location of the customer and as the shipping destination for the drywall.[46] Having prepared such shipping documents and invoices, Taishan is hardly in a position to deny that its purchase and shipping transactions targeted this jurisdiction.

Interpreted as necessary in light of *McIntyre,* and based on the present record, the Louisiana long-arm statute therefore extends this Court's jurisdiction over Taishan in these Louisiana actions. Through repeated marketing activity consisting of the customary mailing of samples, the provision of shipping cost quotations, and, ultimately, the targeted and documented sale and delivery of product to Louisiana, this manufacturer acted not only with foreseeability but with actual knowledge that its drywall product would be, in the language of the statute, "found" in this State.

---

[43] *See id.* at 287:19-292:24.

[44] *See* Peng Wenlong Dep. at 333:10-334:10 (Herman Aff. Ex. 4).

[45] *See* invoice No. SDTH0622 from Taishan to APIC Building Materials for 5,676 pieces, or 272,448 square feet, of drywall with a value of $24,123 (TG0020090) (Ex. 4 to Peng S. Dep.) (Herman Aff. Ex. 112); Packing List dated 7/3/2006 from Taishan to APIC Building Materials for Invoice No. SDTH0622 re 132 Pkgs of drywall to be shipped to New Orleans, Louisiana (TG0019366) (Ex. 5 to Peng S. Dep.) (Herman Aff. Ex. 11); Invoice No. SDTH0622 from Taishan to APIC Building Materials for 5,760 pieces of drywall with a value of $24,998.40 (TG0020091) (Herman Aff. Ex. 198); Ex. 27 to Gunn Dep. (Settlement and Release Agreement) (GBP001130-133) (Herman Aff. Ex. 158).

[46] *See* Peng S. Dep. at 89:13-21 (Herman Aff. Ex. 110).

19

Taishan's was far more than a foreseeability derived from product placement in the generalized stream of commerce. Rather Taishan undertook deliberate actions to assure that its drywall would be shipped to, used in, and "found" in the State of Louisiana, including in the New Orleans area where Taishan was advised that a need for drywall had arisen after Hurricane Katrina. This is a case of more than constructive foreseeability; this is a case of unambiguous and actual foreknowledge.

Product manufacturers cannot on the one hand purposely avail themselves of the benefits of doing business in this forum – taking advantage of the need to rebuild after Hurricane Katrina, for example, and using a mail system available in this State to forward product samples here – and then claim that it is unfair to hold them accountable for product-related harm under the forum's legal system. The Court's exercise of in personam jurisdiction in this case comports not only with *McIntyre*, and not only with the two-pronged foreseeability test of the Louisiana long-arm statute, but in the end with the underlying principles of due process and fundamental fairness which make the jurisdictional authority constitutional in its scope.

### 3.   **The Due Process Analysis Confirms that Personal Jurisdiction Attaches.**

The PSC has set forth a detailed analysis of the law applicable to a determination of whether this Court can exercise personal jurisdiction over TG and TTP consistent with the Due Process Clause in the PSC Global MOL. What is evident from the standards set forth by the United States Supreme Court and the Court of Appeals for the Fifth Circuit is that the facts of this case easily satisfy the personal jurisdiction requirements of Due Process.

In this case, Taishan advertised and targeted its products for sale in the United States. *See* PSC Global SOF at 8-11. The evidence shows that Taishan marketed its products to the United States both from Taishan's website, as well as on the Alibaba website. *Id.* at 9, n.35. Taishan also made it possible for American customers to place orders through intermediaries such as Oriental

20

Trading Co., through whom Taishan would consign and ship products to the builders and installers who ultimately purchased and used Taishan's products. *Id.* at 11-12. And most significantly, at the very least, Taishan promoted and sold its products to APIC and GD Distributors, in Louisiana and other states where Taishan's drywall boards were sold and shipped.

What is notable for this case is that, even under the *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987) and *McIntyre* pluralities' stream-of-commerce-plus analysis, Taishan's conduct demonstrates enough additional conduct to warrant assertion of personal jurisdiction here. Taishan plainly showed an intent or purpose to serve the Louisiana market. For starters, it is unequivocal that Taishan sold 12,756 sheets of drywall (enough to build a whole community) to APIC and GD Distributors, which Taishan knew would end up in Louisiana.[47] Additionally, during negotiations with customers and prospective customers, Taishan repeatedly represented it did business in Louisiana and that it would ship or arrange to ship drywall to Louisiana.[48] Taishan showed a clear awareness that its drywall would be used in Louisiana.[49] Taishan also mailed samples of its drywall to Louisiana on several occasions.[50] This conduct falls exactly within the measure of governing Fifth Circuit law on personal jurisdiction and even meets the *Asahi* plurality opinion's plus-factor analysis, and that of the *McIntyre* plurality.

Taishan's targeted efforts to sell drywall in Louisiana were successful. Given the extent of

---

[47] *See* Chart Summarizing Taishan's Sales of Drywall in the United States, by State (Herman Aff. Ex. 1).

[48] *See* Gonima I Dep. at 70:17-20, 72:16-18, 73:19-23, 74:2-6, 75:2-8 (Herman Aff. Ex. 9); Stone Pride Dep. at 81:11-17 (Herman Aff. Ex. 24); Gunn Dep. at 55:22-25 (Herman Aff. Ex. 143); Porter Dep. at 97:11-99:20 (Herman Aff. Ex. 72); Peng I Dep. at 333:10-334:10 (Herman Aff. Ex. 4).

[49] *See* Gonima I Dep. at 79:23-80:4 (Herman Aff. Ex. 9).

[50] See GD Distributors Dep. at 35:3-12 (Herman Aff. Ex. 25); Stone Pride Dep. at 85:16 (Herman Aff. Ex. 24); Ex. 18 to Che Dep. (emails dated 7/10&16/2006 from Jeff (a/k/a Bo) Zhou to Bill Cher) (TG0000631 & TG0000633) (Herman Aff. Ex. 51).

Taishan's marketing efforts towards Louisiana through its multiple sales of enormous quantities of drywall to APIC and GD Distributors, irrespective of any level of foreseeability necessary to assert personal jurisdiction, it is clear from these facts that Taishan purposely availed itself of a Louisiana forum.  Taishan targeted its business towards Louisiana, benefitted from doing business in Louisiana, and, in the final analysis, by extracting profits from Louisiana.  It is beyond peradventure and common sense to deny that Taishan should have expected that its actions would have a profound impact in Louisiana such that Taishan could reasonably expect to be hailed into court in Louisiana.  Under the Due Process clause, Taishan has purposely availed itself of the privilege of doing business in Louisiana.  Thus, Taishan's Motions to Dismiss *Gross* and *Wiltz* should be denied.

      **a.**    **Plaintiffs' Causes of Action Exist Because of Taishan's Forum-Related Activities.**

      **i. The Wiltz Plaintiffs' Claims Arise Out of Taishan's Contacts with Louisiana.**

But for the presence of Taishan's drywall in their properties, the *Wiltz* plaintiffs would not have any claims.  The drywall is plainly defective because "by any recognized standard, high levels of corrosive gases are present in the representative homes.  This condition is clearly irritating and harmful to residents and destructive to property." *In re Chinese-Manufactured Drywall Products Liab. Litig.*, 706 F. Supp. 2d 655, 671 (E.D. La. 2010).  The *Wiltz* plaintiffs' causes of action derive from the activities of Taishan to advertise, solicit, market, sell and ship its made-to-order drywall to Louisiana, knowing distributors intended to and probably would sell its defective drywall in Louisiana.[51]  These forum-related activities satisfy the second element of the analysis set forth in *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 276 (5th Cir. 2006) (defendant "transported the work platform to Mississippi and inspected it there.  Viewing all facts favorably

_____

[51] *See, e.g.*, PSC Global SOF at 44-46; Peng I Dep. at 332:5-20 (Herman Aff. Ex. 4).

towards jurisdiction, as we must, this is sufficient to find that the claims of failure to warn, negligence, and negligence per se arise out of Camus's Mississippi contacts.").

### ii. The *Gross* Plaintiffs Have Adequately Alleged That Their Claims Arise Out of Taishan's Contacts with Louisiana.

The *Gross* plaintiffs' claims also exist because of Taishan's forum-related contacts. Not surprisingly, however, Taishan argues that the *Gross* plaintiffs cannot establish personal jurisdiction because, for purposes of their alternative liability theory, they cannot allege whether TG or TTP were the manufacturers of the allegedly defective drywall, and thus cannot demonstrate that their causes of action arise out of TG's or TTP's contacts with Louisiana. *Gross* Br. at 50-51. That argument fails for several reasons.

As a threshold matter, Taishan's challenge to the *Gross* plaintiffs' claims is not properly framed as a challenge to personal jurisdiction. Rather, Taishan's challenge to the *Gross* plaintiffs' alternative liability theory is more properly stated as a Rule 12(b)(6) challenge based on failure to state a claim upon which relief can be granted. Dismissal on a Rule 12(b)(6) motion is "appropriate when the plaintiff has not alleged enough facts to state a claim to relief that is plausible on its face or has failed to raise his right to relief above the speculative level." *See Bass v. Stryker Corp.*, 669 F.3d 501, 506 (5th Cir. 2012). Determination of whether or not the *Gross* Plaintiffs have "alleged enough facts to state a claim to relief that is plausible on its face" is clearly not relevant to Taishan's motions to dismiss on personal jurisdiction grounds. Accordingly, Taishan's challenge to the *Gross* plaintiffs' alternative liability theory should be disregarded.

Even if the Court chooses to examine Taishan's improper substantive challenge to the *Gross* plaintiffs' alternative liability theory, the *Gross* plaintiffs independently allege, and the evidence shows, that their causes of action arose out of Taishan's contacts with Louisiana. *See*

23

Compl. at ¶¶ 37, 157-59, 161-64, 256-258.[52]  "Although[] a plaintiff's burden of proof against

multiple defendants in a long-latency case . . . is not relaxed or reduced because of the degree of

difficulty that might ensue in proving the contribution of each defendant's product to the plaintiff's

injury, . . . the focus of analysis here is the plausibility of plaintiffs' allegations taken as true."

*Moore v. BASF Corp.*, 2011 WL 5869597, at *5 (E.D. La. Nov. 21, 2011) (citation and internal

quotation marks omitted).

 Here, the *Gross* plaintiffs allege that TG "manufactured, sold, distributed, marketed and

placed within the stream of commerce gypsum drywall with the exception that the drywall would

be purchased by thousands of consumers, if not more, within the States, including, but not limited

to, Louisiana[.]" Compl. at ¶ 37.  They also allege that TTP "is a foreign corporation that is

responsible for the import/export of the drywall at issue . . . to the United States." *Id.* at ¶ 142.  In

addition, the Complaint alleges that:

> Defendants tortuously manufactured, exported, imported, distributed,
> delivered, supplied, inspected, marketed and/or sold the defective
> drywall, which was unfit for its intended purpose and unreasonably
> dangerous in its normal use in that the drywall caused corrosion and
> damage to personal property in Plaintiffs' and Class Members'
> homes, residences or structures and/or caused personal injury
> resulting in eye irritation, a sore throat and cough, nausea, fatigue,
> shortness of breath, fluid in the lungs, and/or neurological harm.

*Id.* at ¶ 158.  The *Gross* plaintiffs further allege that "Defendants recklessly, wantonly, and/or

negligently manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed

and/or sold the defective drywall at issue in this litigation." *Id.* at ¶ 159.  Finally, the Complaint

alleges that "[a]s a direct and proximate result of Defendants' actions and omissions, Plaintiffs'

and the Class Members' structures, personal property, and bodies have been exposed to

Defendants' defective and unfit drywall and the corrosive and harmful effects of the sulfide and

---

[52] Rec. Doc. No. 366.

other noxious gases being released from Defendants' defective drywall." *Id.* at ¶ 157; *see also id.* at ¶¶ 161-64, 256-258. "The allegations [and evidence] as a whole, if taken as true, suggest that Defendant[s] conducted a significant amount of business in Louisiana." *Hoover v. Fla. Hydro, Inc.*, 2009 WL 1380619, at *4 (E.D. La. May 14, 2009). As such, under Louisiana law, these allegations are adequate for Rule 12(b)(2) purposes.

Moreover, the *Gross* plaintiffs plead an alternative liability theory that passes muster under Louisiana law. The Complaint alleges that "the drywall at issue in this litigation is a fungible product." Compl. at ¶ 151. Louisiana courts have indicated or implied that where the allegations involve a fungible product, allegations that rely in part on a market share liability theory can suffice. *See George v. Hous. Auth. of New Orleans*, 906 So. 2d 1282, 1287 (La. Ct. App. 2005) (distinguishing that "[s]ince different smoke alarms by different manufacturers have different qualities, they cannot be deemed fungible products," and thus "plaintiffs [cannot] avail[] themselves of market share liability" theory) (footnote omitted). Other courts have reached a similar conclusion where the product at issue is fungible. *See Hamilton v. Accu-Tek*, 32 F. Supp. 2d 47, 52-53 (E.D.N.Y. 1998) (asserting personal jurisdiction over action brought against handgun manufacturers and distributors on behalf of shooting victims under market share jurisdictional analysis because handguns were fungible).

While Taishan suggests, without elaboration, that "Plaintiff's alternative liability theory" is legally insufficient to establish personal jurisdiction because Plaintiffs cannot "identify TG or TTP as the manufacturers of the allegedly defective drywall," *Gross* Br. at 50-51, Taishan's argument is misplaced because courts in this Circuit have "not predict[ed] how the Louisiana Supreme Court would rule when confronted with these theories of liability." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig. ["MTBE"]*, 379 F. Supp. 2d 348, 405-06 (S.D.N.Y. 2005); *id.* at 406 (declining to "reject these [collective liability] theories based solely on the absence of state case

25

law-especially if the Louisiana Supreme Court has not yet addressed the issue") (footnote omitted).

Where there is no controlling authority from the Louisiana Supreme Court, the Fifth Circuit has

instructed that the *Erie* rule requires courts "to predict how the Louisiana Supreme Court would

determine this issue and apply Louisiana law accordingly." *Fruge v. Amerisure Mut. Ins. Co.*, 663

F.3d 743, 749 (5th Cir. 2011).

      In this respect, intermediate Louisiana appellate courts have held that where, as here, the

allegations sufficiently indicate that defendants' products were the cause of the harm, the failure to

identify specifically which defendant's product caused the harm is not fatal. *See Gould v. Hous.*

*Auth. of New Orleans*, 595 So. 2d 1238, 1242, 1243 (La. Ct. App. 1992) (pleading that alleged that

each defendant's product was incorporated into paint applied in each apartment adequately alleged

products liability claims, and "trial court's insistence that [plaintiff] identify exactly which

producer's product was in each apartment as a condition of stating a cause of action was an

erroneous assumption which led to an erroneous judgment"). Here, the *Gross* plaintiffs allege that

Taishan was responsible for the manufacture and the shipping and importation of the defective

drywall into Louisiana, and that Taishan's drywall caused the *Gross* plaintiffs' harm. Although the

manufacturers in *Gould* argued that the plaintiff would never be able to prove whose product

caused their injuries, the *Gould* court concluded that had no bearing on whether the demand stated

a cause of action. *Id.* at 1242.

      Based on the Louisiana Court of Appeals' decision in *Gould*, and on facts alleging (similar

to here) that "*all* defendants have caused their injuries because defendants collectively put a

defective, fungible product on the market," federal courts have predicted that the Louisiana

Supreme Court would permit the pleading of an alternative liability theory. *MTBE*, 379 F. Supp.

2d at 407 (emphasis in original); *id.* at 407-08 ("Plaintiffs' ability to prove these allegations is a

matter properly left for summary judgment or trial of the merits. Alternatively, Louisiana would be

likely to find market share liability applicable to these . . . cases if it considers the factors outlined

in the Restatement (Third) of Torts-namely, fungibility, inability to identify, and causal nexus.

Therefore, plaintiffs' inability to identify specific tortfeasors at this juncture does not prevent them

from pursuing their claims.") (footnote omitted).

In addition, in the analogous context of a Rule 12(b)(6) motion, this Court has held where a

plaintiff alleges that each of the defendants manufactured, supplied, and sold the products that

caused their harm, such allegations suffice to state a claim, even if they fail to specifically allege

that the defendant's particular product caused their harm. In *Case v. Merck & Co.*, 2002 WL

31478219, at *5 (E.D. La. Nov. 5, 2002), the Court noted that the plaintiffs did not seek to recover

under a market share liability theory, but nonetheless observed that "unlike the plaintiff in

*Jefferson [v. Lead Indus. Ass'n*, 930 F. Supp. 241 (E.D. La. 1996) – who had not alleged that the

manufacturing defendants sold the product at issue in the forum or that the defendants' product

caused her harm], plaintiffs asserted that [Defendant Eli] Lilly supplied thimerosal for use in

vaccines made by other defendants." The court held that because they alleged that a contributory

cause of their injuries was the thimerosal manufactured, supplied, and sold by each of the

defendants, including Lilly, the plaintiffs' allegations stated a claim under the Louisiana Products

Liability Act.

In light of the foregoing, the *Gross* plaintiffs have adequately alleged, for Rule 12(b)(2)

purposes, that their causes of action arise out of Taishan's contacts with the forum, and therefore

personal jurisdiction attaches to TG and TTP.

## IV.  CONCLUSION

Taishan set out on a course to expand the sales of its drywall in the United States and has

admitted that it manufactured made-to-order gypsum boards that were used in the construction of

the Plaintiffs' homes at issue in *Gross* and *Wiltz*. Taishan purposefully directed the subject drywall

27

Case 2:09-md-02047-EEF-MBN   Document 14204   Filed 05/08/12   Page 33 of 36

to Louisiana by selling drywall to APIC and GD Distributors with knowledge that the drywall would be installed in the homes and other properties of individuals residing in the state. For these reasons and others expressed in the PSC's Global SOF and MOL, TG and TTP may be held accountable for their actions in this Court.

Accordingly, Taishan's motions to dismiss the *Gross* and *Wiltz* complaints should be denied.

Respectfully submitted,


Dated: May 8, 2012                     /s/ Russ M. Herman
                                       Russ M. Herman, Esquire (Bar No. 6819) (On the Brief)
                                       Leonard A. Davis, Esquire (Bar No. 14190) (On the Brief)
                                       Stephen J. Herman, Esquire (Bar No. 23129) (On the Brief)
                                       HERMAN, HERMAN & KATZ, LLP
                                       820 O'Keefe Avenue
                                       New Orleans, LA 70113
                                       Phone: (504) 581-4892
                                       Fax: (504) 561-6024
                                       LDavis@hhkc.com
                                       *Plaintiffs' Liaison Counsel in MDL 2047*

                                       Arnold Levin (On the Brief)
                                       Fred S. Longer (On the Brief)
                                       Sandra L. Duggan (On the Brief)
                                       Matthew C. Gaughan (On the Brief)
                                       LEVIN, FISHBEIN, SEDRAN & BERMAN
                                       510 Walnut Street, Suite 500
                                       Philadelphia, PA 19106
                                       Phone: (215) 592-1500
                                       Fax: (215) 592-4663
                                       Alevin@lfsblaw.com
                                       *Plaintiffs' Lead Counsel in MDL 2047*

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
BECNEL LAW FIRM, LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Robert C. Josefsberg
PODHURST ORSECK, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
rjosefsberg@podhurst.com

Bruce William Steckler
BARON & BUDD, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Ervin A. Gonzalez
COLSON, HICKS, EIDSON, COLSON
  MATTHEWS, MARTINEZ, GONZALES,
  KALBAC & KANE
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

Ben W. Gordon, Jr.
LEVIN, PAPANTONIO, THOMAS, MITCHELL
  ECHSNER & PROCTOR, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
LAMBERT AND NELSON
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Gerald E. Meunier (On the Brief)
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
  & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker
PARKER, WAICHMAN, ALONSO, LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Scott Wm. Weinstein
MORGAN & MORGAN
12800 University Drive, Suite 600
Ft. Myers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

29

James Robert Reeves
LUMPKIN & REEVES
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger (On the Brief)
Diogenes P. Kekatos (On the Brief)
James A. O'Brien, III (On the Brief)
SEEGER WEISS, LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Daniel K. Bryson
WHITFIELD BRYSON & MASON LLP
900 W. Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5035
dan@wbmllp.com

Richard J. Serpe
LAW OFFICES OF RICHARD J. SERPE
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
rserpe@serpefirm.com

Victor M. Diaz, Jr.
V.M. Diaz and Partners, LLC
119 Washington Ave., Suite 402
Miami Beach, FL 33139
Phone: (305) 704-3200
Fax: (305) 538-4928
victor@diazpartners.com

## OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

Richard S. Lewis
HAUSFELD LLP
1700 K Street, NW, Suite  650
Washington, DC 20006
Phone: (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com

Andrew A. Lemmon
LEMMON LAW FIRM, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Anthony D. Irpino
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Phone: (504) 525-1500
Fax: (504) 525-1501
airpino@irpinolaw.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing The Plaintiffs' Steering Committee's Response in Opposition to Taishan's Motions Pursuant to Rule 12(B)(2) to Dismiss the Complaints has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 8th day of May, 2012.

/s/ Leonard A. Davis
Leonard A. Davis, Esquire
Herman, Herman & Katz, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhkc.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*
*Co-counsel for Plaintiffs*