Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2

 3   _____    § MDL NO. 2047
     IN RE:                   §
 4   CHINESE-                 § SECTION: L
     MANUFACTURED             §
 5   DRYWALL PRODUCTS         § JUDGE FALLON
     LIABILITY                §
 6   LITIGATION               § MAGISTRATE
     _____    § JUDGE WILKINSON
 7
                     -  -  -
 8
        CROSS NOTICED IN VARIOUS OTHER ACTIONS
 9
                     -  -  -
10
                   April 4, 2011
11
                     -  -  -
12
        CONFIDENTIAL - SUBJECT TO FURTHER
13            CONFIDENTIALITY REVIEW
14                   -  -  -
15        Videotaped deposition of TONGCHUN
     JIA, held at 3 Pedder Street, Central,
16   Hong Kong, China, commencing at 9:05
     a.m., on the above date, before Linda L.
17   Golkow, Certified Court Reporter,
     Registered Diplomate Reporter, Certified
18   Realtime Reporter and Notary Public.
19
20                   -  -  -
21
22        GOLKOW TECHNOLOGIES, INC.
        ph 877.370.3377 | fax 917.591.5672
23             deps@golkow.com
24
```

Confidential - Subject to Further Confidentiality Review

Page 2

1  APPEARANCES:
2
3
4  SEEGER WEISS LLP
   BY: CHRISTOPHER A. SEEGER, ESQUIRE
   BY: JEFFREY S. GRAND, ESQUIRE
5  One William Street
   New York, New York 10004
6  (212) 584-0700
   cseeger@seegerweiss.com
7  jgrand@seegerweiss.com
   Representing the Plaintiffs' Steering
8  Committee
9
10 COLSON HICKS EIDSON
   BY: PATRICK S. MONTOYA, ESQUIRE
11 255 Alhambra Circle
   Penthouse
12 Coral Gables, Florida 33134
   (305) 476-7400
13 patrick@colson.com
   Representing Plaintiffs' Steering
14 Committee in the Federal and State
   Coordinated Actions
15
16
17 LAW OFFICES OF RICHARD SERPE, P.C.
   BY: RICHARD J. SERPE, ESQUIRE
18 580 East Main Street
   Suite 310
19 Norfolk, Virginia 23510
   (757) 233-0009
20 rserpe@serpefirm.com
   Representing the MDL Plaintiffs and
21 the Germano Plaintiffs
22
23
          - - -
24

Page 3

1  APPEARANCES (CONTINUED):
2
3  HOGAN LOVELLS US LLP
   BY: JOE CYR, ESQUIRE
4  BY: FRANK T. SPANO, ESQUIRE
   BY: ERIC D. STATMAN, ESQUIRE
5  BY: RENEE GARCIA, ESQUIRE
   875 Third Avenue
6  New York, New York 10022
   (212) 918-3000
7  joe.cyr@hoganlovells.com
   frank.spano@hoganlovells.com
8  renee.garcia@hoganlovells.com
   eric.statman@hoganlovells.com
9  Representing Taishan Gypsum Co.
   Ltd. and Tai'an Taishan
10 Plasterboard Company Ltd. and the
   Witness, Tongchun Jia
11
12
13 HOGAN LOVELLS INTERNATIONAL LLP
   BY: EUGENE CHEN, ESQUIRE
14 18th Floor, Park Place
   1601 Nanjing Road West
15 Shanghai, China 200040
   (86 21) 6122 3800
16 eugene.chen@hoganlovells.com
   Representing Taishan Gypsum Co.
17 Ltd. and Tai'an Taishan
   Plasterboard Company Ltd. and the
18 Witness, Tongchun Jia
19
20 JIGTIAN & GONGCHENG
   BY: CHUNGANG DONG, ESQUIRE
21 34/F, Tower 3, China Central Place
   77 Jianguo Road - Chaoyang District
22 Beijing, China 200040
   (86 10) 5809 1016
23 Representing Taishan Gypsum Company
   Limited and Tai'an Taishan
24 Plasterboard Company

Page 4

1  APPEARANCES (CONTINUED):
2
3
4  GREENBERG TRAURIG, LLP
   BY: HILARIE BASS, ESQUIRE
5  1221 Brickell Avenue
   Miami, Florida 33131
6  (305) 579-0745
   bassh@gtlaw.com
7  Representing the Home Builders
   Steering Committee
8
9  GALLOWAY JOHNSON TOMPKINS BURR and
   SMITH
10 BY: CARLINA C. EISELEN, ESQUIRE
   One Shell Square
11 701 Poydras Street, 40th Floor
   New Orleans, Louisiana 70139
12 (504) 525-6802
   ceiselen@gjtbs.com
13 Representing Interior/Exterior
   Building Supply
14
15
16 PERKINS COIE LLP
   BY: DAVID L. BLACK, ESQUIRE
17 1899 Wynkoop Street - Suite 700
   Denver, Colorado 80202
18 (303) 291-2300
   DBlack@perkinscoie.com
19 Representing the State of Louisiana
20
21
22
23
24

Page 5

1  APPEARANCES (CONTINUED):
2
3  WEINBERG, WHEELER, HUDGINS, GUNN &
   DIAL, LLC
4  BY: NICHOLAS P. PANAYOTOPOULOS, ESQ.
   3344 Peachtree Road, NE
5  Suite 2400
   Atlanta, Georgia 30326
6  (404) 876-2700
   npanayo@wwhgd.com
7  Representing Various Banner
   Defendants
8
9
10 BRENNER, EVANS & MILLMAN, P.C.
   BY: THEODORE I. BRENNER, ESQUIRE
11 411 East Franklin Street
   Suite 200
12 Richmond, Virginia 23218
   (804) 644-1300
13 Representing Tobin Trading Company
14
15 McKENRY, DANCIGERS, DAWSON &
   LAKE, P.C.
16 BY: J. BRIAN SLAUGHTER, ESQUIRE
   192 Ballard Court
17 Suite 400
   Virginia Beach, Virginia 23462
18 (757) 461-2500
   Jbslaughter@va-law.org
19 Representing Atlantic Homes LLC and
   Multiple Other Virginia-Based
20 Defendants
21
22
23
24

Page 6

1 APPEARANCES (CONTINUED):
2
3 SHER GARNER CAHILL RICHTER KLEIN &
   HILBERT, L.L.C.
4 BY:  MATTHEW C. CLARK, ESQUIRE
   909 Poydras Street
5 Suite 2800
   New Orleans, Louisiana 70112
6 (504) 299-2100
   mclark@shergarner.com
7 Representing the Southern Home
   Defendants
8
9
   SINNOTT, NUCKOLS & LOGAN, PC
10 BY:  KENNETH F. HARDT, ESQUIRE
   13811 Village Mill Drive
11 Midlothian, Virginia 23114
   (804) 378-7600
12 khardt@snllaw.com
   Representing Venture Supply, Inc. and
13 Porter-Blaine Corp.
14
15
16
17
18
19
20
21
22
23
24

Page 7

1 APPEARANCES VIA TELEPHONE:
2
3 KUCHLER POLK SCHELL WEINER &
   RICHESON LLC
4 BY:  FRANCIS X. deBLANC, III,
   1615 Poydras Street
5 Suite 1300
   New Orleans, Louisiana 70112
6 (504) 592-0691
   slauricella@kuchlerpolk.com
7 Representing Creola Ace Hardware and
   Thomas Gould Inc. in the MDL
8
9
   HUNTON & WILLIAMS LLP
10 BY:  A. TODD BROWN, ESQUIRE
   Bank of America Plaza
11 101 South Tryon Street
   Suite 3500
12 Charlotte, North Carolina  28280
   (704) 378-4700
13 Representing Stock Building Supply,
   LLC
14
15
   JONES, WALKER, WAECHTER, POITEVENT,
16 CARRERE & DENEGRE LLP
   BY:  MEGAN E. DONOHUE, ESQUIRE
17 600 Jefferson Street, Suite 1600
   Lafayette, Louisiana 70501
18 (337) 262-9062
   mdonohue@joneswalker.com
19 Representing Fireman's Fund Insurance
   Company
20
21
22
23
24

Page 8

1 APPEARANCES VIA TELEPHONE (CONTINUED):
2
3 DUPLASS ZWAIN BOURGEOIS PFISTER &
   WEINSTOCK
4 BY:  PHILIP WATSON, ESQUIRE
   3838 N. Causeway Boulevard
5 Suite 2900
   Metairie, Louisiana 70002
6 (504) 832-3700
   pwatson@duplass.com
7 Representing R&H Masonry, Inc., and
   Swedberg Enterprises, Inc.
8
9
   RUMBERGER, KIRK & CALDWELL, P.A.
10 BY:  ABIGAIL ROBERTS, ESQUIRE
   Brickell Bayview Centre, Suite 3000
11 80 Southwest 8th Street
   Miami, Florida 33130
12 (305) 358-5577
   aroberts@rumberger.com
13 Representing Defendants' Liaison
   Counsel for Installers
14
15
   HAYNSWORTH SINKLER BOYD, P.A.
16 BY:  CHRISTOPHER B. MAJOR, ESQUIRE
   75 Beattie Place - 11th Floor
17 Greenville, South Carolina 29601
   (864) 240-3200
18 cmajor@hsblawfirm.com
   Representing USG Corporation and L&W
19 Supply Corporation
20
   PHELPS DUNBAR LLP
21 BY:  MITCHELL P. HASENKAMPF, ESQUIRE
   Canal Place
22 365 Canal Street, Suite 2000
   New Orleans, Louisiana 70130-6534
23 (504) 584-9249
   mitchell.hasenkampf@phelps.com
24 Representing State Farm

Page 9

1 APPEARANCES VIA TELEPHONE (CONTINUED):
2
3 FULMER LEROY ALBEE BAUMANN
   BY:  CANDACE MOSS, ESQUIRE
4 2866 East Oakland Park Boulevard
   Ft. Lauderdale, Florida 33306
5 (954) 707-4430
   mosscandace@fulmerleroy.com
6 Representing Independent Builders
   Supply Association (IBSA)
7
8
   THOMPSON COE COUSINS & IRONS, L.L.P.
9 BY:  SUZANNE M. PATRICK, ESQUIRE
   One Riverway, Suite 1600
10 Houston, Texas 77056
   (713) 403-8210
11 spatrick@thompsoncoe.com
   Representing The North River
12 Insurance Company
13
   BERNARD, CASSISA, ELLIOTT & DAVIS,
14 APLC
   BY:  CAROLINE E. ELLIOTT, ESQUIRE
15 1615 Metairie Road
   Metairie, Louisiana 70005
16 (504) 834-2612
   elliottc@bernard-cassisa.com
17 Representing  Phillips Abita Lumber
   Company, Inc.
18
19
20
21
22
23
24

Page 10

1  APPEARANCES VIA STREAM:
2
3     BECNEL LAW FIRM, L.L.C.
      BY:  ROBERT BECNEL, ESQUIRE
4     106 W. 7th Street
      Reserve, Louisiana 70084
5     (985) 536-1186
      robbecnel@aol.com
6     Representing the Plaintiffs'
      Steering Committee
7
8
      QUINN EMANUEL URQUHART & SULLIVAN,
9     LLP
      BY: CLINTON DOCKERY
10    51 Madison Avenue, 22nd Floor
      New York, New York 10010
11    (212) 849-7000
      clintondockery@quinnemanuel.com
12    Representing Chartis Select Insurance
      Company and Related Chartis Insurers
13
14
      JONES, WALKER, WAECHTER, POITEVENT,
15    CARRERE & DENEGRE LLP
      BY:  MEGAN E. DONOHUE, ESQUIRE
16    600 Jefferson Street, Suite 1600
      Lafayette, Louisiana 70501
17    (337) 262-9062
      mdonohue@joneswalker.com
18    Representing Fireman's Fund Insurance
      Company
19
20
21
22
23
24

Page 11

1  APPEARANCES VIA STREAM (CONTINUED):
2
3     WOODLEY WILLIAMS LAW FIRM
      BY:  DONALD C. BROWN, ESQUIRE
4     1 Lakeshore Drive
      Suite 1750
5     Lake Charles, Louisiana 70629
      (337) 433-6328
6     dcbrown@woodleywilliams.com
      Representing Devon International,
7     Inc. Formerly, Devon International
      Trading, Inc.
8
9
      DEUTSCH, KERRIGAN & STILES
10    BY:  MELISSA M. SWABACKER, ESQUIRE
      755 Magazine St.
11    New Orleans, Louisiana  70130
      (504) 581-5141
12    mswabacker@dkslaw.com
      Representing Landmark American
13    Insurance Company
14
15    KUCHLER POLK SCHELL WEINER &
      RICHESON LLC
16    BY:  SOPHIA L. LAURICELLA, ESQUIRE
      1615 Poydras Street
17    Suite 1300
      New Orleans, Louisiana 70112
18    (504) 592-0691
      slauricella@kuchlerpolk.com
19    Representing Creola Ace Hardware and
      Thomas Gould Inc. in the MDL
20
21
22
23
24

Page 12

1  APPEARANCES VIA STREAM (CONTINUED):
2
3     TAYLOR WALKER, P.C.
      BY:  CHRISTOPHER J. WIEMKEN, ESQUIRE
4     555 E. Main Street
      Suite 1300
5     Norfolk, Virginia 23510
      (757) 625-7300
6     Cwiemken@taylorwalkerlaw.com
7
8  ALSO PRESENT:
9
10 Stephanie Chin, Official Interpreter
   (Interpreter 1)
11
12 Una Wong, Check Interpreter
   (Interpreter 2)
13         - - -
14
15
16
17
18
19
20
21
22
23
24

Page 13

1          - - -
2        I N D E X
3          - - -
4
5  Testimony of:  TONGCHUN JIA
6  By Mr. Seeger              23
7
8          - - -
8
        E X H I B I T S
9
10         - - -
10
11 NO.          DESCRIPTION      PAGE
12 Jia-1   Handwritten note,     59
           Zhang Jiaiu Chun, Chen
13         Xinghua, and Zhao
           Siuyun
14
   Jia-2   Document entitled      81
15         "Shangdong Taihe
           Dongxin Co., Ltd.," 12
16         pages
17 Jia-3   Handwritten note in    112
           Chinese
18
   Jia-4   Handwritten note, Pang 138
19         Shi Liang
20 Jia-5   Handwritten note, Zhou 148
           Wan and Wu Fade
21
   Jia-6   Handwritten note, Ren  148
22         Xu Lian and Xue Yu Li
23 Jia-7   Handwritten note, Keng 156
           Ming Guo, Ren Xu Lian
24         and Xue Yu Li

Confidential - Subject to Further Confidentiality Review

Page 14

1  Jia-8    Printout from website,  184
          2 pages
2
   Jia-9    Taishan Ceiling and    219
3           Wall System, Bates
            stamped TG 0025132
4           through TG 0025151, TG
            0025155 through TG
5           0025158, TG 0025216
            through TG 0025218, TG
6           0025253 through TG
            0025255, TG 0025275,
7           TG 0025329 through TG
            0025332, TG 0025344
8           through TG 0025349,
            and TG 0025397 and TG
9           0025398
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 15

1               - - -
2       DEPOSITION SUPPORT INDEX
3               - - -
4
   Direction to Witness Not to Answer
5
            Page Line
6
7
8
9
   Request for Production of Documents
10
            Page Line
11
            98  18
12          110  19
13
14
15      Stipulations
16          Page Line
17
18
19   Questions/Objections Marked
20          Page Line
21       96  22
         99  7
22       99  16
         151  11
23       261  4
24

Page 16

1            - - -
2       MR. SPANO: This is Frank
3   Spano appearing on behalf of
4   Taishan Gypsum Company Limited and
5   Tai'an Taishan Plasterboard
6   company.
7       In advance of the deposition
8   or at the deposition right now, we
9   are producing a few pages of
10  additional responsive documents
11  that we located just yesterday.
12  It's only a few pages, and
13  generally speaking, it consists of
14  a trademark license agreement
15  between TG and TTP and a few pages
16  of sales contract documents
17  relating to sales of equipment
18  between TG and TTP.  The witness
19  will be prepared to address any
20  questions about these documents
21  and describe them in more detail
22  as you wish.
23      MR. SEEGER:  The only thing
24  I'll note for the record is that

Page 17

1   I'm only getting these documents,
2   obviously, now, and it appears to
3   me to be, I don't know, 40
4   pages --
5       MR. SPANO: No, no.  It is
6   four to five pages.  What you are
7   looking at here is 15 sets.
8       MR. SEEGER:  So, a handful
9   of pages.  Until we get them
10  translated, I obviously can't ask
11  questions about them.
12      MR. SPANO:  Would you care
13  to pass them around.
14      (Handing over documents.)
15      MR. CYR:  This is Joe Cyr
16  from Hogan Lovells representing
17  the witness today.
18      Is there anyone on the line
19  who is not a counsel for one of
20  the parties in the litigation?
21      (No response.)
22      MR. CYR:  Thank you.
23      THE VIDEOTAPE TECHNICIAN:
24  We are now going on the record.

Confidential - Subject to Further Confidentiality Review

Page 18

1  The date today is April 4, 2011.
2  The time now is approximately 9:07
3  a.m.
4      This is the 30(b)(6)
5  deposition of Tai'an Taishan
6  Plasterboard taken through its
7  representative Tongchun Jia taken
8  in reference to the Chinese
9  Manufactured Drywall Products
10  Liability Litigation.
11      The deposition today is
12  being held in Hong Kong.
13      My name is Melissa Bardwell,
14  videographer representing Golkow
15  Technologies, and the court
16  reporter today is Linda Golkow.
17      Would counsel and all
18  present please introduce
19  themselves and state their
20  affiliations for the record.
21      MR. CYR:  My name is Joe
22  Cyr.  I'm from Hogan Lovells, and
23  I represent -- we represent
24  Taishan Gypsum as well as, I will

Page 19

1  refer to the plasterboard company
2  as TTP.
3      And if it's okay with
4  counsel for the plaintiffs, I
5  would like to respectfully correct
6  the videographer in that Mr. Jia
7  is here in a 30(b)(6) deposition
8  on behalf of Taishan Gypsum for
9  several designated areas, and he's
10  here on behalf of TTP only with
11  respect to three designated areas.
12  I'll defer to plaintiffS' counsel
13  for the identification of those
14  areas if you would like to do that
15  in the interest of time.
16      Thank you.
17      MR. SEEGER:  Thanks.  We'll
18  get back to the introductions now.
19  Chris Seeger representing
20  the Plaintiffs' Steering Committee
21  in the Chinese Drywall Litigation
22  MDL.
23      MR. GRAND: Jeff Grand from
24  Seeger Weiss on behalf of the MDL.

Page 20

1      MR. MONTOYA:  Patrick
2  Montoya on behalf of the PSC in
3  the Federal and State coordinated
4  litigation.
5      MS. BASS: Hilarie Bass from
6  Greenberg Traurig on behalf of the
7  Home Builders Steering Committee.
8      MR. SLAUGHTER:  Brian
9  Slaughter.  I represent multiple
10  Virginia builders, developers and
11  installers.  I'm here appearing
12  subject to our jurisdictional
13  defenses and motions that we have
14  previously filed, and we've also
15  filed a third-party claim against
16  Taishan in the Allen litigation in
17  Virginia.
18      MR. HARDT: My name is
19  Kenneth Hardt.  I represent
20  Venture Supply, Inc. and the
21  Porter-Blaine Corporation, making
22  a special appearance in the
23  Germano class action in which we
24  have cross-noticed these

Page 21

1  depositions as well.
2      MR. BRENNER: I'm Ted
3  Brenner.  I'm here for Tobin
4  Trading Company, making a special
5  appearance  in the Germano case as
6  well.
7      MR. CLARK:  Matthew Clarke
8  representing Southern Homes.
9      MS. EISELEN: Carlina Eiselen
10  for Interior/Exterior.
11      MR. BLACK:  David Black for
12  the State of Louisiana.  We
13  reserve our rights as set forth in
14  the remand motion that's pending.
15      MR. PANAYOTOPOULOS: Nick
16  Panayotopoulos on behalf of
17  certain Banner entities, and we
18  obviously reserve our objections
19  as we have in the past.
20      MR. SERPE: Richard Serpe for
21  the Germano plaintiffs.
22      MR. CHEN: Eugene Chen of
23  Hogan Lovells on behalf of Taishan
24  Gypsum and TTP.

Confidential - Subject to Further Confidentiality Review

Page 22

1    MS. WONG:  Una Wong, check
2  interpreter.
3    MS. GARCIA: Renee Garcia of
4  Hogan Lovells for TG and TTP.
5    MR. DONG:  Jingtian &
6  Gongchen, Chungang Dong.
7    MR. STATMAN: Eric Statman
8  for Hogan Lovells on behalf of
9  Taishan Gypsum and TTP.
10    MR. SPANO: Frank Spano.  You
11  already have my appearance.
12    - - -
13    (STEPHANIE CHIN, OFFICIAL
14  INTERPRETER, INTERPRETER 1, was
15  duly sworn to interpret Chinese
16  into English and English into
17  Chinese.)
18    - - -
19    TONGCHUN JIA, after having
20  been duly sworn through the
21  interpreter, was examined and
22  testified as follows:
23    - - -
24    (UNA WONG, CHECK

Page 23

1  INTERPRETER, INTERPRETER 2,  was
2  duly sworn to interpret Chinese
3  into English and English into
4  Chinese.)
5    - - -
6    MR. CYR:  Mr. Seeger, the
7  only other thing that I had was
8  that we preserve our right to
9  review and correct the transcript.
10  Thank you.
11    - - -
12    EXAMINATION
13    - - -
14  BY MR. SEEGER:
15    Q.   Good morning, Mr. Jia.
16    MR. SEEGER:  You can
17  translate that if you want.
18  BY MR. SEEGER:
19    Q.   Have you ever been deposed
20  before?
21    A.   No.
22    Q.   So, you understand that the
23  court reporter asked you to take an oath.
24  Is there any reason why you could not

Page 24

1  fulfill your oath to tell the truth here
2  today?
3    A.   I don't understand what you
4  mean.
5    Q.   Does he understand that the
6  oath that he's been asked to take
7  requires him to tell the complete truth
8  on any subject we ask him questions of,
9  subject to his attorney telling him not
10  to answer a question?
11    A.   I understand.
12    Q.   Thank you.
13    Also, I would like to say
14  that because he's never been deposed
15  before, if there's anything I do that he
16  interprets as disrespectful in any way,
17  it's not intended.  I'm just here to ask
18  questions and try to get some answers.
19    A.   I understand.
20    Q.   Okay.  Thank you.
21    So, tell us what your
22  current job position is as you sit here
23  today.
24    A.   My position is the chairman

Page 25

1  of the board of directors and the
2  managing director of the Taishan Gypsum
3  Company Limited.
4    Q.   And when did you begin this
5  position, at this position?
6    INTERPRETER 2:  The check
7  interpreter need to check the
8  official interpreter.  The witness
9  did say that also general manager.
10    INTERPRETER 1:  No.  He said
11  managing director, MD.  MD.
12  managing director.  Chairman of
13  the board of director and MD.
14    INTERPRETER 2:  Because the
15  witness say he -- I am the Taishan
16  Gypsum's chairman of the board of
17  director and general manager.
18    INTERPRETER 1:  I used the
19  title MD.  She's using the general
20  manager.  Let me clarify with the
21  witness.
22    (Interpreter clarification.)
23    INTERPRETER 2:  Managing
24  director.  The check interpreter

Page 26

1 say that the general managers --
2 Chinese is dong shi ju.  MD,
3 managing directors, Chinese is
4 dong shi ju.
5        THE WITNESS:  I don't
6 understand English.  I agree with
7 the check interpreter.  I will go
8 for the title GM even though
9 there's many ways of interpreting.
10        MR. SEEGER:  Now I got a
11 little confused.  So, his answer
12 was he is the chairman of the
13 board and --
14        INTERPRETER 1:  Of directors
15 and a GM.
16        MR. SEEGER:  And GM, general
17 manager?
18        INTERPRETER 1:  Right, yeah.
19        MR. CYR:  Of Taishan Gypsum,
20 thank you.
21        MR. SEEGER:  Of Taishan
22 Gypsum?
23        INTERPRETER 1:  Yes.
24 BY MR. SEEGER:

Page 27

1        Q.   What did you do to prepare
2 for your deposition today?
3        A.   I go through some of the
4 informations in my company.  I looked
5 through it so that I would be doing some
6 preparation.
7        Q.   Thank you.
8        MS. BASS:  We're all going
9 to have to speak louder because of
10 the air conditioning noise.  We
11 cannot hear anybody at this end of
12 the table, so if you would please
13 try and project your voice.
14        INTERPRETER 1:  Okay.
15        MS. BASS:  Thank you.
16        INTERPRETER 2:  Check
17 interpreter must jump in again.
18        The witness said, at the
19 counsel's advice, I did some
20 preparation.
21        MR. SEEGER:  Do you agree
22 with that?
23        INTERPRETER 1:  I did not
24 hear that.

Page 28

1        THE WITNESS:  I check the
2 information inside my company, and
3 also under the guidance of my
4 lawyers, I read something.
5 BY MR. SEEGER:
6        Q.   I want to just tell him that
7 he should not give me any answers that
8 involve communications between him and
9 his attorney.
10        A.   Yes.
11        Q.   Okay.  Having said that,
12 could he tell me what information he
13 looked at to prepare himself?
14        A.   I read some of the
15 information regarding sales and
16 operations of my company, sales and
17 operation.
18        Q.   Could he be a little more
19 specific about what he looked at, the
20 name -- if he could identify what the
21 documents are, what the titles of the
22 documents are?
23        A.   I cannot recall about these
24 documents.

Page 29

1        Q.   Does anything stand out in
2 his mind that he felt he needed to review
3 in order to give his deposition today?
4        A.   This is not totally like
5 this.  Some of the things I can respond
6 on my own.
7        Q.   Ask him if he looked at --
8 chose to look at any corporate
9 organizational-type documents?
10        INTERPRETER 1:  You want to
11        repeat?
12 BY MR. SEEGER:
13        Q.   Ask him if he chose to look
14 at any corporate organizational-type
15 documents.
16        INTERPRETER 2:  The check
17        interpreter may assist the
18        interpreter that the counsel said
19        corporate organizational-type
20        document.
21        THE WITNESS:  Yes.
22 BY MR. SEEGER:
23        Q.   Specifically for which
24 companies?

Confidential - Subject to Further Confidentiality Review

Page 30

1    A.   TG company.
2    Q.   That's the only company he
3 checked corporate organizational
4 documents for?
5    A.   This I'm more clear.
6 Regarding the others, I am not that
7 clear.
8    Q.   Well, did he look at
9 corporate organizational documents for
10 BNBM?  Let's see.  I'm trying to find it.
11 Here it is.
12    A.   I am not in too much contact
13 with this type of information.
14    Q.   Okay.  But the question was,
15 did he look at any corporate
16 organizational documents for Beijing New
17 Building Material Company?
18    A.   Some I have read.  Some for
19 sure I did not read.
20    Q.   Can he identify for us the
21 documents he read?
22    A.   I read a document of BNBM
23 and TG.
24    Q.   Can he tell me what the name

Page 31

1 of the document is so that I could go
2 find it, for example?
3    A.   I don't know what kind of a
4 document you want me to talk about.
5    Q.   I want him to only talk
6 about the documents that he chose to read
7 to prepare himself for today.
8    A.   This I cannot recall.
9    Q.   Did he --
10       The documents that he looked
11 at from BNBM, where did he find those
12 documents?
13    A.   Sometimes from the Internet.
14    Q.   Does he have access to BNBM
15 documents from his office other than the
16 Internet?
17       MR. CYR:  When you say "BNBM
18    documents," you're referring to
19    documents generated by BNBM?
20       I'm sorry, could you
21    interpret that.
22       MR. SEEGER:  Related --
23    documents --
24       MR. CYR:  I'm sorry.  No,

Page 32

1 Chris.  But she needs to interpret
2 everything that's said in the
3 room.
4       MR. SEEGER:  Oh, I've got
5    you.  I've got you.
6       MR. CYR:  I'll say it again.
7    I'm just trying to help.  When you
8    refer to "BNBM documents," are
9    these documents that are generated
10    by BNBM or documents that were in
11    the possession or control of BNBM?
12 BY MR. SEEGER:
13    Q.   I'm asking --
14       The question I'm asking is,
15 if he wants to look at any documents that
16 are related to BNBM, anything, where
17 would he go to find those other than the
18 Internet?
19    A.   I didn't particularly pay
20 attention to look at these types of BNBM
21 document.
22    Q.   But if he wanted to look at
23 BNBM documents, other than the Internet,
24 where would he go to get those?

Page 33

1    A.   I did not particularly make
2 an effort to look for them.
3       INTERPRETER 2:  The check
4    interpreter objects to that
5    interpretation.  The witness said,
6    I did not consciously go to look
7    for these BNBM documents.
8       INTERPRETER 1:  I think it
9    is a gray area of interpretation.
10       You can also interpret it as
11    intentionally or make an effort.
12    I think it is all the same.
13 BY MR. SEEGER:
14    Q.   Let me ask the question --
15 let me ask another question.
16       If he wanted to find BNBM
17 documents, are they available in his
18 computer files?
19       MR. CYR:  Objection that
20    it's vague, but he can try to
21    answer.
22       THE WITNESS:  I did not
23    really aware of whether I would be
24    able to find these documents from

Confidential - Subject to Further Confidentiality Review

Page 34

1    my computer or not.
2  BY MR. SEEGER:
3      Q.   So, as part of your job as
4  chairman and general manager of TG,
5  you're saying you're not aware if you
6  have even computer access to documents
7  for BNBM?
8      A.   Yes.
9      Q.   Do you receive annual
10 reports from BNBM?
11     A.   I did not receive the annual
12 report from BNBM, but every year, there
13 is a meeting for the Board of Directors
14 that I would be able to see this report.
15 That is after the year 2008.
16     Q.   After the year 2008.  Okay.
17         Do you receive this
18 information before the board meets so you
19 can review it and think about it?
20     A.   I don't understand what you
21 mean.
22     Q.   The BN -- let's get a couple
23 of things clear.
24         The board meeting he's

Page 35

1  talking about is TG, correct?
2      A.   No.
3      Q.   What board of what companies
4  is he talking about?
5      A.   BNBM.
6      Q.   He's on the board of BNBM is
7  what you're saying?
8      A.   Yes.
9      Q.   And he's on the board, and
10 he has no idea on how to find -- he has
11 no access to documents regarding BNBM.
12 Is that his testimony?
13     A.   No.
14     Q.   Then what access does he
15 have to BNBM documents?  Let me ask it
16 that way.
17     A.   Every year there is a
18 meeting for the annual reports.  So, they
19 would put out all these documents on the
20 table.  I would just go through them and
21 leave it there.  If this -- to our
22 companies, if these documents don't have
23 too much relevance to us, we won't keep
24 it.

Page 36

1      INTERPRETER 2:  The check
2  interpreter objects to the
3  interpretation.  The witness said
4  company, not companies.
5      MR. SEEGER:  Do you agree
6  with that?
7      INTERPRETER 1:  Off the
8  record.  I need to clarify with
9  the witness because there's no
10 Chinese word company or companies.
11 It's the same word.  In Chinese,
12 it's the same word.
13     (Interpreter clarification
14 with the witness.)
15     INTERPRETER 1:  It's the
16 same word.
17     THE WITNESS:  I'm referring
18 to the annual report related to
19 BNBM and also to TG.  If they are
20 not -- if there's not much
21 relevance to me, I won't pay
22 attention -- his -- two companies.
23     INTERPRETER 2:  No.  The
24 check --

Page 37

1      INTERPRETER 1:  Two
2  companies.  Because TG is another
3  company.
4      INTERPRETER 2:  No.  The
5  check interpreter objects to the
6  interpretation.  The witness --
7  the rendition of the check
8  interpreter of the witness's
9  statement was that the document
10 from BNBM was not relevant to TG.
11     MR. SEEGER:  You're the
12 official translator.
13     INTERPRETER 1:  No.
14     MR. SEEGER:  So, I would
15 like to have what you say.  What's
16 the final word?  What do you say
17 it is?
18     INTERPRETER 1:  Can you
19 repeat what you said?  I want also
20 to have a screen in front of me.
21     MR. SEEGER:  Is your
22 interpretation companies?  Is your
23 interpretation of what he said
24 that he meant more than one

Confidential - Subject to Further Confidentiality Review

Page 38

1 company or one company?
2 INTERPRETER 1: No. He did
3 not say that. He said BNBM, the
4 annual report related to BNBM and
5 TG. TG is another company.
6 That's what I assume.
7 MR. SEEGER: I'm going to
8 take that. And if you want to
9 flag it, you can flag it.
10 INTERPRETER 1: So, I think
11 --
12 MR. CYR: It's all on the
13 record.
14 INTERPRETER 1: So I think I
15 will let the attorney to make the
16 decision.
17 MR. SEEGER: That's what
18 we're doing right now.
19 INTERPRETER 1: Yeah, right.
20 MR. CYR: I think that the
21 uncertainty is reflected in the
22 record. And while I'm speaking,
23 I'd just like to take this
24 opportunity to say that when we

Page 39

1 get to significant, what I
2 consider to be significant
3 matters, I'm going to ask the
4 interpreter to interpret and not
5 to examine the witness, and that
6 we would have to proceed with you
7 asking the questions and the
8 interpreter actually just
9 interpreting.
10 MR. SEEGER: I thought
11 that's what she was doing.
12 MR. CYR: I think she was
13 trying to help out in conducting a
14 little examination on the company
15 and the companies, and that was
16 fine, so we can get beyond this.
17 But when we get to what I consider
18 to be significant matters, I'm
19 just saying that I'm going to ask
20 her just simply to interpret what
21 you're saying.
22 INTERPRETER 1: Well, what I
23 was doing --
24 MR. SEEGER: (Addressing the

Page 40

1 interpreter.)
2 Wait, time out. Just wait a
3 second. I want to be clear on
4 this, because what you're saying
5 is very important. Okay?
6 My understanding, just I'm
7 asking you, is that you're
8 translating my question and his
9 answer?
10 INTERPRETER 1: Right,
11 right.
12 MR. SEEGER: Are you adding
13 anything more to it than that?
14 INTERPRETER 1: No. I am
15 doing verbatim.
16 MR. SEEGER: Okay.
17 INTERPRETER 1: And I'm not
18 the one who make judgment. That's
19 why I -- you answered. I said,
20 why don't the lawyers make the
21 judgment. I am not trying to
22 understand it. If I don't
23 understand it, then I will just
24 state it the way it is. If you

Page 41

1 don't understand it, you can
2 follow up with another question to
3 clarify. I am not clarifying.
4 And another thing I want to
5 point out is that the interpreter
6 was not provided with any
7 documents. I don't know the
8 background on anything. So, today
9 is going to be more difficult for
10 me than tomorrow after I make the
11 proper arrangement. So I hope
12 that you can understand.
13 MR. SEEGER: First of all, I
14 want you to know, I think you're
15 doing a great job.
16 INTERPRETER 1: Yeah, right.
17 MR. SEEGER: So don't
18 misunderstand anything we're
19 saying.
20 INTERPRETER 1: I don't take
21 it personally. No personal
22 feeling. No hard feeling. Just
23 communication to let you know that
24 I only do verbatim.

Confidential - Subject to Further Confidentiality Review

Page 42

1     MR. SEEGER: Yes.
2         INTERPRETER 1: If the
3  interpretation comes out to be
4  unclear, that's the way it is.
5         MR. SEEGER: Okay. Just let
6  us know if you follow up, if any
7  part of your question to the
8  witness -- because we don't speak
9  Chinese.
10         INTERPRETER 1: Right.
11         MR. SEEGER: If any part of
12  the question is you clarifying my
13  question or clarifying his answer,
14  we just need to know that;
15  otherwise, it needs to be
16  verbatim.
17         INTERPRETER 1: I think it
18  is not my job to do any
19  clarification.
20         MR. SEEGER: Thank you.
21         INTERPRETER 1: But the
22  reason I was clarifying at the
23  very beginning, I said, sometimes
24  I cannot hear him. Occasionally

Page 43

1  he has an accent. So I might need
2  to clarify with him. I did ask,
3  is it okay for me to go off the
4  record for me to clarify?
5         MR. SEEGER: Okay. No.
6  Let's do everything on the record.
7  But you understand, you're doing a
8  verbatim translation. That's
9  fine.
10         INTERPRETER 1: I am doing
11  verbatim, but at the same time,
12  sometimes if I don't hear it
13  clearly due to accent or whatever,
14  I might clarify with my ability to
15  understand or to listen to him,
16  you know, but not to try to make a
17  judgment.
18         MR. CYR: Mr. Seeger, may I?
19         MR. SEEGER: All right. Do
20  you have something you want to
21  add?
22         MR. CYR: Yeah. I just
23  wanted to say that with respect to
24  what I don't consider to be

Page 44

1  significant matters, I don't mind
2  a brief little exchange where she
3  asks him to clarify what she said,
4  just so we can get a very accurate
5  transcript. And it's just a
6  judgment call as we go forward,
7  but I have to admit that I thought
8  that it was appropriate for me to
9  provide that warning to her as we
10  go forward. That's all.
11         MR. SEEGER: All right.
12         INTERPRETER 1: Thank you.
13         MR. SEEGER: You are the
14  official translator today.
15         INTERPRETER 1: Right.
16         MR. SEEGER: You are going
17  to be the final word on this from
18  my perspective. There could be an
19  objection. We're going to deal
20  with that later, and that doesn't
21  affect you.
22         But both sides did agree to
23  this interpreter, right? There's
24  no dispute?

Page 45

1         MR. CYR: There's no dispute
2  about that.
3         And then the other thing I
4  just thought I'd mention is that
5  generally, of course everything
6  that's said is interpreted, so
7  that everybody in the room,
8  regardless of what language they
9  can speak, understands the
10  proceedings, including the
11  witness. But in the interest of
12  time, I'm, you might say, waiving
13  our rights to that with respect to
14  the dialogue that just happened,
15  because we'd be here for another
16  hour.
17         MR. SEEGER: My concern is
18  that we agreed to an official
19  translator, and you have every
20  right to bring a check translator.
21  It's not a problem. It becomes a
22  problem if the check translator
23  challenges every word and we're
24  going to be here all day with this

Confidential - Subject to Further Confidentiality Review

Page 46

1  back and forth.
2       MR. CYR:  And I'm with you
3  on that.
4       MR. SEEGER:  Because then we
5  want you to do it.
6       MR. CYR:  I'm with you on
7  that.  And so let's -- I recommend
8  that you proceed.  And then I
9  think that the check interpreter
10 is doing a great job, but we want
11 to make sure that it's productive
12 and not disruptive.
13      MR. SEEGER:  I think
14 everyone is doing a great job
15 today.
16      INTERPRETER 1:  I have no
17 hard feeling with the check
18 interpreter.
19      MR. SEEGER:  You're doing
20 fine.
21      INTERPRETER 1: We're
22 colleagues, you know.
23      MR. SEEGER:  You're doing
24 fine.

Page 47

1       Linda, I forgot where we
2  were.
3            - - -
4       (Whereupon, the following
5  portion of the transcript was read
6  by the court reporter:
7       "Q.   Then what access does
8  he have to BNBM documents?  Let me
9  ask it that way.
10      A.  Every year there is a
11 meeting for the annual reports.
12 So, they would put out all these
13 documents on the table.  I would
14 just go through them and leave it
15 there.  If this -- to our
16 companies, if these documents
17 don't have too much relevance to
18 us, we won't keep it.")
19           - - -
20 BY MR. SEEGER:
21      Q.   So, my next question is,
22 what do you understand your role to be as
23 a board member of BNBM?
24      A.  One of the directors.

Page 48

1       Q.   What does he understand the
2  role of a director of BNBM to be?  Does
3  he have management responsibility, for
4  example?
5       MR. CYR:  I'm sorry.  I'm
6  just going to have to state just
7  to preserve for the record that it
8  was compound and vague, but please
9  try to answer, Mr. Jia.
10      MR. SEEGER:  He was getting
11 on me that time, not you.
12      INTERPRETER 1:  I feel like
13 I'm used to it.
14      MR. CYR:  I tried to
15 restrain myself, but who knows
16 what he's going to say, so I
17 needed to say that.
18      INTERPRETER 1:  Do I need to
19 translate what you say?
20      MR. CHEN:  Translate the
21 objection, please.
22      INTERPRETER 1:  So do I need
23 to translate this, between you?  I
24 usually don't.

Page 49

1       MR. SEEGER:  Yeah.  If he
2  objects, his witness is entitled
3  to hear his objection, so you can
4  tell him what his attorney said.
5  BY MR. SEEGER:
6       Q.   Okay.  He can answer the
7  question.
8       MR. CYR:  Please try to
9  answer, Mr. Jia.
10      THE WITNESS:  I don't have
11 any duties for management at BNBM.
12 BY MR. SEEGER:
13      Q.   So, as a member of the board
14 of BNBM, what does he understand his
15 responsibilities to BNBM to be?
16      A.  I only -- I am only
17 responsible for the operation of TG.
18      Q.   Does he have an e-mail
19 account?
20      A.  I don't understand.
21      Q.   Does he use e-mail?
22      A.  I have e-mail.
23      Q.   What's his e-mail address?
24      A.  I am not familiar with

Confidential - Subject to Further Confidentiality Review

Page 50

1 computer. I usually don't use a computer
2 for work. Sometimes there might be a few
3 documents in the computer. I only -- in
4 the e-mail, I open -- I usually open it
5 up. Usually I don't use this method to
6 work. It is only for making contact to
7 the outside.
8    Q.   What about distributions of
9 information or correspondence within TG,
10 is that done by e-mail?
11    A.   For sure, some of the
12 documents would be through e-mail.
13    Q.   And what is his e-mail
14 address?
15    A.   I cannot recall my e-mail
16 address, but my lawyer did receive my
17 e-mails, so he would have it.
18       INTERPRETER 2:  The check
19 interpreter objects because the
20 witness said, my lawyer sent me
21 e-mail to my address.
22       (Interpreter clarification.)
23       MR. CYR:  Mr. Seeger,
24 since -- I'm sorry. I'm not sure

Page 51

1 what we're doing here.
2       MR. SEEGER:  I don't know
3 what's being said.
4       MR. CYR:  Mr. Seeger's in
5 charge here.
6       MR. SEEGER:  (Addressing the
7 interpreter.)
8       Did you resolve the issue
9 with the check interpreter?
10       (Interpreter clarification
11 with witness.)
12       THE WITNESS:  I don't know
13 how to send e-mail.
14 BY MR. SEEGER:
15    Q.   And he doesn't -- and I want
16 to be clear. He does not know his e-mail
17 address?
18    A.   Yes.
19    Q.   Does he have a secretary?
20    A.   Yes.
21    Q.   Does she know his e-mail
22 address?
23    A.   She should know.
24    Q.   Does she read his e-mails?

Page 52

1    A.   She should read it.
2    Q.   Does she send e-mails for
3 him?
4       MR. PANAYOTOPOULOS:  May I
5 state an objection for the record,
6 please.
7       I've got an objection on the
8 record. I'm a little confused
9 about the questions. When you say
10 "his," are you addressing the
11 interpreter or are you addressing
12 the witness?
13       MR. SEEGER:  No. I don't
14 care about the interpreter's
15 e-mail.
16       MR. PANAYOTOPOULOS:  For the
17 record, the record is going to
18 read that you're addressing this
19 witness, and I just want to make
20 sure we're all talking about the
21 same thing. It's this witness
22 that we're asking.
23       MR. SEEGER:  No offense, you
24 can give me your e-mail later, but

Page 53

1 I would really rather know his.
2       All right. Look, let me
3 just make this clear.
4       MR. CYR:  You do appreciate
5 the nature of his objection? A
6 lot of your --
7       MR. SEEGER:  I --
8       MR. CYR:  If I can just
9 finish. A lot of your questions
10 are to her saying, ask him if she
11 would do it. I mean, you can ask
12 him that way if you want to as far
13 as I'm concerned, but he's
14 registered an objection to that.
15       MR. SEEGER:  I'm going to
16 ask the questions to him from now
17 on, and you'll interpret them, to
18 make it really clear.
19       INTERPRETER 1:  Yes.
20       MR. PANAYOTOPOULOS:  Thank
21 you.
22       INTERPRETER 2:  The check
23 interpreter objects to the
24 interpretation. The witness said,

Confidential - Subject to Further Confidentiality Review

Page 54

1  she send e-mail for me.
2        - - -
3        (Whereupon, the following
4  portion of the transcript was read
5  by the court reporter:
6        "Q. Does she read his
7  e-mails?
8        A. She should read it.
9        Q. Does she send e-mails
10 for him?")
11        - - -
12 BY MR. SEEGER:
13    Q. Mr. Jia, does your secretary
14 send e-mails for you?
15    A. Sometimes for sure, but it
16 is not the main way that we do
17 communication.
18    Q. Mr. Jia, what is your
19 secretary's name?
20    A. I don't have something
21 concrete as a secretary, but I have an
22 office.
23        INTERPRETER 2: The check
24 interpreter object to the

Page 55

1  interpretation. The check
2  interpreter's rendition is I don't
3  have a specific secretary, but I
4  have an office.
5        INTERPRETER 1: Shi ti is
6  something concrete.
7        MR. SEEGER: I have to be
8  honest. I don't really see the
9  difference between what the check
10 interpreter said and what you
11 said.
12        INTERPRETER 1: I think
13 she's too tedious in this whole
14 case. She's check against gray
15 area instead of something
16 important. And, you know, the
17 understanding, the background of
18 understanding a case would make a
19 difference in terms of the
20 interpretation.
21        MR. SEEGER: Time out.
22        INTERPRETER 1: So, we're
23 not doing that job. And also --
24        MR. SEEGER: Wait, no, no,

Page 56

1  no. Time, time.
2        INTERPRETER 1: Okay.
3        MR. SEEGER: You're not
4  defending yourself here. You have
5  to understand, all you have to do
6  is translate. You don't have to
7  defend yourself against the check
8  interpreter or anybody here today.
9  So, just all you have to do is
10 accurately ask him my question in
11 Chinese and then translate to
12 English for me. And that's it.
13 And you don't have to worry about
14 it.
15        INTERPRETER 1: Can I ask
16 you to do me a favor?
17        MR. SEEGER: Yeah.
18        INTERPRETER 1: Can you
19 instruct the witness to break down
20 his answers, like don't go on for
21 too long, and pause once in a
22 while so I don't miss out
23 anything.
24        MR. SEEGER: I don't think

Page 57

1  we're going to give him --
2        MR. CYR: I'll leave that
3  one alone.
4        MR. SEEGER: Yes, we're all
5  going to leave that one alone.
6        Let's just try to do the
7  best we can.
8        INTERPRETER 1: Yeah, sure.
9        MR. SEEGER: Okay.
10        INTERPRETER 1: Thank you.
11 BY MR. SEEGER:
12    Q. So, Mr. Jia, you had
13 identified earlier a person in your
14 office who reviewed your e-mails and from
15 time to time sent e-mails for you. Who
16 is that person?
17    A. I did mention earlier that
18 we have many persons in the office.
19 Whoever that is available that would send
20 the e-mail.
21    Q. Mr. Jia, please identify for
22 us any person that either reviews your
23 e-mail account or sends e-mails for you.
24    A. Zhang Jian Chun.

Page 58

1    INTERPRETER 1: The
2  interpreter does not translate
3  legal names because -- specific
4  names because there are many ways
5  of translating one name. So, I'm
6  asking the witness to write it
7  down in Chinese.
8    MR. SEEGER: Very good.
9  Thank you.
10    INTERPRETER 1: The witness
11  has written down three names:
12  Zhang Jian Chun, Chen Xin Hua,
13  Zhao Xiu Yun.
14  BY MR. SEEGER:
15    Q.  Would you also ask him to
16  write beside their name what their job
17  title is.
18    THE WITNESS: Can I take a
19  break?
20    MR. SEEGER: Yeah. Could we
21  just read this into the record?
22  I'm going to mark it as an
23  exhibit, and then we'll take a
24  break.

Page 59

1    INTERPRETER 1: The witness
2  has written down on the note next
3  to Zhang Jian Chun, he or she is
4  the secretary of the board of
5  directors of TG.
6    Chen Xin Hua is the general
7  staff.
8    Zhao Xiu Yun, an engineer.
9    MR. SEEGER: Then Linda,
10  could you mark this as Exhibit 1.
11    INTERPRETER 1: The
12  interpreter can write down in
13  English the titles.
14    MR. SEEGER: If you could do
15  that, we'll mark it as an exhibit.
16    Would you like to have your
17  person take a quick look, before
18  we mark it, on her translation?
19    MR. CYR: No.
20    MR. SEEGER: Thank you.
21  You're merciful.
22    - - -
23    (Whereupon, Deposition
24  Exhibit Jia-1, Handwritten note,

Page 60

1  Zhang Jiaiu Chun, Chen Xinghua,
2  and Zhao Siuyun, was marked for
3  identification.)
4    - - -
5    MR. SEEGER: So, you've just
6  marked that as Exhibit 1?
7    THE COURT REPORTER: Yes.
8    MR. SEEGER: Okay. We can
9  take a break.
10    THE VIDEOTAPE TECHNICIAN:
11  The time now is approximately 9:58
12  a.m., and we're now off the
13  record.
14    - - -
15    (Whereupon, a recess was
16  taken from 9:58 a.m. until
17  10:14 a.m.)
18    - - -
19    THE VIDEOTAPE TECHNICIAN:
20  This is the beginning of Tape 2 of
21  the videotape deposition of Mr.
22  Tongchun Jia. The time now is
23  approximately 10:15 a.m., and
24  we're back on the record.

Page 61

1    MR. SEEGER: It's really a
2  question I have of the
3  interpreter. I'm asking on the
4  record just so we know.
5    You were able to provide
6  interpretations of the job titles.
7  Can you put an English
8  interpretation of the name? Can
9  you do that on Exhibit 1?
10    INTERPRETER 1: Let me see.
11  I --
12    MR. SEEGER: If you need
13  time, we can do it during a break.
14  I just want to know if you're
15  capable of it.
16    INTERPRETER 1: I'll do it
17  during the break, because there's
18  so many ways of translating names,
19  we usually don't do it, but I'll
20  try my best. I will give it back
21  to you later. Sure.
22    MR. SEEGER: And if you want
23  to have the check interpreter take
24  a look and see if you can agree on

Confidential - Subject to Further Confidentiality Review

Page 62

1  it --
2      INTERPRETER 1: Probably
3  I'll ask the attorney. They will
4  know that better.
5      MR. SEEGER: All right. So
6  I want to go back to questioning.
7  BY MR. SEEGER:
8      Q. Mr. Jia, I want to go back
9  to your presence at board meetings of
10  BNBM. Okay?
11     A. The concept of the board of
12  directors, in China, we rarely use this
13  concept. With this concept, I did not
14  have contact with this contact before.
15     INTERPRETER 2: The check
16  interpreter objects to the
17  interpretation of the interpreter.
18  The witness stated that dong shi
19  ju, it's the Chinese word for
20  board of directors. However, it
21  is a dialect of Cantonese
22  pronunciation. In Mainland China,
23  typically it would say dong shi
24  hui. Then the check interpreter

Page 63

1  raised that because it is the same
2  meaning. However, the dialect is
3  different. So, perhaps the
4  witness would not understand dong
5  shi ju. Maybe the interpreter can
6  consider to rephrase it into dong
7  shi hui.
8      MR. SEEGER: Well, he's
9  hearing it. So, do you want to
10  ask it?
11     INTERPRETER 1: Are you
12  asking board of directors, of
13  board of director meetings? She
14  translated into board of director
15  meetings. That is dong shi hui.
16     MR. SEEGER: What was it the
17  other way?
18     INTERPRETER 1: I was doing
19  dong shi hui, board of directors.
20     MR. SEEGER: Strike the
21  question. I'm going to ask a new
22  question.
23     INTERPRETER 1: Okay.
24  BY MR. SEEGER:

Page 64

1      Q. When he attends --
2      Mr. Jia, when you attend the
3  board of director meetings for BNBM, do
4  you report on the business of TG?
5      A. I don't do it.
6      Q. What do you do? What do you
7  do, Mr. Jia, at the BNBM meetings?
8      A. I will listen to the report
9  by the GM.
10     Q. What is the business
11  relationship between BNBM and TG?
12     MR. CYR: Object. I'm
13  sorry.
14     Objection on the grounds
15  that "business relationship" is
16  vague, but, Mr. Jia, please try to
17  answer.
18     I'm sorry, ma'am, but it
19  really would be great if you could
20  speak louder so that everybody in
21  the room could hear you.
22     INTERPRETER 1: Yeah, sure.
23  I'll try my best.
24     MR. SEEGER: How many people

Page 65

1  speak Chinese in the room? They
2  can all hear. You guys can hear.
3      MR. CHEN: We can't hear
4  very well.
5      MR. SEEGER: Go ahead. Did
6  you --
7      THE WITNESS: Can you repeat
8  your question?
9          - - -
10     (Whereupon, the following
11  portion of the transcript was read
12  by the court reporter:
13     "Q. What is the business
14  relationship between BNBM and
15  TG?")
16          - - -
17     THE WITNESS: The
18  relationship between TG and BNBM
19  is the investor, the one being
20  invested.
21  BY MR. SEEGER:
22     Q. BNBM is an investor in TG.
23  Is that what you said, Mr. Jia?
24     A. Yes.

Confidential - Subject to Further Confidentiality Review

Page 66

1      Q.   BNBM is a major shareholder
2  in TG, correct?
3      A.   A major shareholder of more
4  than 50 percent.
5      Q.   And you are the chairman of
6  the board of TG, correct?
7           INTERPRETER 2:  The check
8  interpreter must raise this.  The
9  interpreter interpret that you are
10 the director of the board of
11 directors.
12          INTERPRETER 1:  No.  I said
13 chairman.
14          INTERPRETER 2:  The chairman
15 of the board of director is dong
16 shi zhang not zhu xi.
17          MR. SEEGER:  I'm going to
18 have to say this for the record.
19 Respectfully, this isn't really
20 working with the check
21 interpreter.  So, I think, Joe, in
22 fairness to you, you have every
23 right to object if she wants to
24 relay these to you, but I'm not

Page 67

1  hearing material differences here
2  between the two of them.  This
3  woman here is our official
4  interpreter.  So, this isn't
5  useful for me really.  Is it
6  useful for you to continue this?
7           MR. CYR:  Yes, it's very
8  useful, because I do find, having
9  listened to this this morning,
10 that there's some serious
11 questions about the
12 interpretation.  And it's
13 difficult for the check
14 interpreter to know what's
15 significant or not significant.
16 And her instructions are very
17 similar to the instructions we
18 gave the interpreter, and that is,
19 to listen to see if the
20 interpretation is accurate, and if
21 it's not accurate, to state a
22 brief objection.
23          I'm totally with you in that
24 we don't want to spend a whole lot

Page 68

1  of time having an exchange about
2  the nuances of the Chinese
3  language as you try to interpret
4  it, but it's very difficult for
5  her to know what to do as far as
6  check interpretation.
7           I recommend that we try to
8  proceed and that the check
9  interpreter appreciates that
10 sometimes a slight nuance or a
11 slight difference might be
12 insignificant and not necessary to
13 raise, and that is something that
14 I mentioned to her during the
15 break.
16          MR. SEEGER:  Look, you know,
17 I mean, the official interpreter
18 is who we have here.  If we could
19 somehow limit this to a
20 substantial, as you just said, I
21 mean, something a little more than
22 a nuance.  And you're speaking --
23 you know, the check interpreter
24 has been speaking to, I assume,

Page 69

1  attorneys who speak Chinese.  So,
2  maybe if they could consult before
3  these objections quickly and see
4  if it's worth it, that might move
5  things along today.
6           MR. CYR:  I have no
7  objection to the check interpreter
8  consulting with Mr. Chen, for
9  example, but let's --
10          MR. SEEGER:  I'm also
11 sitting here today -- and Joe, I'm
12 not going to be difficult about
13 it.  It's the last thing I want to
14 say on it.  I wasn't even aware,
15 showing up today, that there was
16 going to be a check interpreter.
17 I thought we had agreed on one
18 interpreter.  So I didn't come
19 here today -- I don't like to
20 interfere with the way people do
21 things, but at the same time, I
22 don't want my accommodating
23 something that, you know, we
24 really didn't provide for in

Confidential - Subject to Further Confidentiality Review

Page 70

1 advance to be a real hindrance
2 here. And I mean that
3 respectfully to you.
4      MR. CYR: Let me just say,
5 and I hate to take up the time or
6 the record with this, but this is
7 one of the reasons why I sent the
8 e-mail yesterday to plaintiffs'
9 counsel, which I believe that you
10 were copied on the reply, where I
11 offered to have a telephone call
12 yesterday to address any
13 outstanding issues. And I think
14 that in the e-mail, I even
15 reflected relating to interpreters
16 or translators, is because it's
17 precisely this kind of issue that
18 takes up time in a deposition, and
19 frankly, I have no -- as a human
20 being, I have no reason to want to
21 delay this unnecessarily. That's
22 what I wanted to talk about during
23 the call, which you guys thought
24 was not necessary.

Page 71

1      MR. SEEGER: I think we were
2 on a plane.
3      MR. GRAND: In all fairness,
4 there weren't any outstanding
5 issues. From our perspective, we
6 agreed to, you interviewed an
7 official interpreter on the
8 telephone conference, which you
9 insisted on doing. We have an
10 agreed-to official interpreter.
11 What is now happening is you have
12 brought a second interpreter, who
13 is directly challenging her
14 interpretations, interacting with
15 her, and, frankly, interfering
16 with the deposition.
17      MR. SEEGER: It's like every
18 question.
19      MR. GRAND: She should be
20 discussing it with you, and if you
21 want to raise an objection or even
22 just state objection to have it on
23 the record, that's fine. But why
24 is she engaging with the

Page 72

1 interpreter?
2      MR. CYR: Let me just say,
3 there's two issues before us.
4      One is whether or not there
5 was an opportunity for you to
6 appreciate that we might bring a
7 check interpreter, and then the
8 second is the procedures.
9      With respect to the first, I
10 just have to say that I'm stunned
11 that you would think that in an
12 important deposition like this
13 that we would show up without a
14 check interpreter. The only issue
15 that I thought we needed to
16 address during the call was the
17 process that we're now struggling
18 with. And Frank shares with me
19 that in some fashion you actually
20 had notice that we were going to
21 bring a check interpreter.
22      And Frank, I welcome if you
23 --
24      MR. GRAND: We have a check

Page 73

1 interpreter agreement too. That's
2 not my issue.
3      MR. CYR: Okay.
4      MR. GRAND: I'm not
5 surprised you have one. What --
6      MR. CYR: Well, here we're
7 on just number one --
8      MR. GRAND: What I'm
9 surprised is that she's
10 interrupting and, frankly,
11 instructing the official
12 interpreter to clarify,
13 reinterpret, ask additional
14 questions of the witness. And to
15 me, that is not the role of your
16 check interpreter. If she wants
17 to raise an objection to you and
18 then you want to put an objection
19 on the record, please do so. But
20 this is our official interpreter,
21 and she has the last word on the
22 witness's -- on his questions,
23 your objections and the witness's
24 testimony.

Confidential - Subject to Further Confidentiality Review

Page 74

1    MR. CYR: So, Chris, it
2  seems to me that we have now
3  overcome this concern you had
4  about not being on notice for the
5  check interpreter to be here. We
6  seem to all be in agreement that
7  it was something that was actually
8  noticed and also reasonably
9  expected.
10    With respect to the process
11  and the procedure, we want to
12  cooperate with you.
13    MR. SEEGER: So let's do
14  this. First of all, this is a
15  first to me, having a check
16  interpreter objecting as she's
17  doing. And I've been through
18  these before. But just because
19  it's a first for me didn't mean I
20  would interfere with it. It just
21  seems now, an hour and several
22  minutes in, it's a challenge of
23  every question.
24    MR. CYR: Yes.

Page 75

1    MR. SEEGER: And we do have
2  one interpreter that we both have
3  agreed to. So we were -- you're
4  right. It wasn't that I didn't
5  know a check interpreter was going
6  to be here. I didn't understand
7  that she'd have the role that
8  she's playing today or that you
9  wanted her to play this role. And
10  I think I really have allowed this
11  to go for a while. I don't know
12  if other people in the room feel
13  differently about it, but for me,
14  it's become --
15    MR. CYR: I'm not saying
16  that your reaction to what's
17  occurred is an unreasonable one.
18  What I'm saying is that we are
19  going to ask our check interpreter
20  to continue listening to the
21  interpretation and to register an
22  objection to significant errors
23  that she believes the interpreter
24  has made and to do that briefly so

Page 76

1  that it's reflected on the record
2  and that you could proceed with
3  your questioning.
4    MR. SEEGER: Right. And it
5  won't be necessary, going forward,
6  for the check interpreter to say
7  the check interpreter objects to
8  the question. Just let her state
9  what the dispute is.
10    MR. CYR: I think that's
11  true. That's fine.
12    (Addressing the check
13  interpreter.)
14    You don't need to give an
15  introduction to your objection.
16  You can just look for your
17  opportunity to say and then just
18  say what you think the witness
19  said or that the lawyer said.
20  Okay?
21    INTERPRETER 2: Yes.
22    INTERPRETER 1:
23  (Indicating.)
24    MR. SEEGER: Is this really

Page 77

1  important? Because I want to get
2  back to the deposition. Go ahead.
3    INTERPRETER 1: Yes, it is.
4    To be fair, I'm not
5  attacking or defending anything.
6  I'm just saying, to be fair, when
7  you open up a dictionary, there's
8  so many choices for the
9  definition. That's what I call
10  the gray area. Many times I
11  choose one definition, she choose
12  another one. They're very close
13  enough and similar. And also like
14  a lot of upside down grammar, I
15  might be doing upside down, she
16  might be doing straightforward.
17  They are both correct. I think
18  those challenges are irrelevant,
19  and I hope that we can eliminate
20  those.
21    MR. SEEGER: Well, that's
22  what I'm hoping too. I'm hoping
23  we are going to limit --
24    INTERPRETER 1: Limit it to

Confidential - Subject to Further Confidentiality Review

Page 78

1  a major mistake.
2       MR. SEEGER: Right. I'm
3  hoping we can limit it to a major
4  mistake, because then we'll have
5  a --
6       INTERPRETER 1: Just like
7  the title GM or MD. In China,
8  they use both.
9       MR. SEEGER: Okay. Well,
10 look. At the end of the day,
11 you're the interpreter, both
12 parties have agreed to you, and
13 you're going to be doing it. So
14 let's get back to the deposition.
15      What was my last question,
16 Linda?
17           - - -
18      (Whereupon, the following
19 portion of the transcript was read
20 by the court reporter:
21      "Q. And you are the
22 chairman of the board of TG,
23 correct?")
24           - - -

Page 79

1       MR. SEEGER: (Addressing the
2  interpreter.)
3       Would you please ask him
4  again that question.
5       (Interpreter repeats the
6  question.)
7       THE WITNESS: I'm the
8  director of the board of directors
9  of TG.
10 BY MR. SEEGER:
11      Q. Mr. Jia, your answer is you
12 are the director of the board of
13 directors for TG? I want to make sure
14 we're clear on what the title is.
15      MR. CYR: I feel the need to
16 state for the record that I think
17 on two or three occasions now he
18 said that he's the chairman of the
19 board of the board of directors
20 for Taishan Gypsum.
21      MR. SEEGER: Did he answer
22 that?
23      THE WITNESS: TG does not
24 have dong shi ju, the board of

Page 80

1  directors. We only have dong shi
2  hui, the board of directors. It
3  is a different term -- it is the
4  same English term that could be
5  they call it dong shi ju or don
6  shi hui.
7       INTERPRETER 1: Because I
8  don't have the background
9  documents, so I don't know which
10 words to use, dong shi ju or dong
11 shi hui. So, the English is the
12 same. Dong shi hui and dong shi
13 ju is board of directors. It's
14 the same.
15      (Addressing the witness.)
16      I need to clarify.
17      MR. CYR: I'm sorry, ma'am.
18 Please don't talk to the witness.
19      MR. SEEGER: Hold on. We're
20 going to resolve this right now.
21      Can we mark what I'm handing
22 you as Exhibit 2.
23           - - -
24      (Whereupon, Deposition

Page 81

1  Exhibit Jia-2, Document entitled
2  "Shangdong Taihe Dongxin Co.,
3  Ltd.," 12 pages, was marked for
4  identification.)
5           - - -
6  BY MR. SEEGER:
7       Q. Tell the witness to take a
8  look at the document. Mr. Jia -- I'm
9  going to say it, speak to him.
10      Mr. Jia, take a look at the
11 document we have just marked as Exhibit
12 2, and can you identify what this
13 document is for the record?
14      MS. BASS: Is there a Bates
15 Number?
16      MR. SEEGER: No,
17 unfortunately.
18      MR. SERPE: Chris, 25133.
19      MR. SEEGER: That's the
20 Bates number? Was that on there?
21 What is it?
22      MR. SERPE: When they
23 produced it to us.
24      MR. SEEGER: What is it?

Confidential - Subject to Further Confidentiality Review

Page 82

1    MR. SERPE:  25133.
2    (Witness reviewing
3    document.)
4 BY MR. SEEGER:
5    Q.   Mr. Jia, can you identify
6 this document?
7    A.   It is a document of TG,
8 Taishan -- of TG -- of TG, a shareholding
9 company introduced about the -- giving
10 introductions about the -- introducing
11 the company and also introducing the
12 products.
13    Q.   And can you give me an
14 approximate time frame of when this
15 document was created?
16    I'm sorry, let me restate
17 that.
18    Mr. Jia, can you give me a
19 time frame of when this document was
20 created?
21    A.   This document should be
22 before the year 2008.
23    Q.   Mr. Jia, how do you know
24 that it should be before the year 2008?

Page 83

1    A.   Because the title of this
2 document is the Shandong Taihe Dongxin
3 Company Limited.  It was the title that
4 we used before the year 2008.
5    INTERPRETER 1:  Off the
6 record.
7    The interpreter did not have
8 the list of the names of all the
9 companies, so, I did not look at this
10 document.  When he was saying Taishan
11 Shigao Guifen, what I have here on my
12 notes is TG.  But when I look at the
13 document, it should be Shandong Taihe
14 Dongxin Company Limited.  The --
15    MR. SEEGER:  Wait a second.
16 Time out.  No, no, no.  Time out.
17    What was his answer?  I just
18 need his answer.  What was his
19 answer?
20    INTERPRETER 1:  I finish
21 the -- I finished the answer.  I'm
22 raising the question as an
23 interpreter myself.
24    MR. SEEGER:  Okay.  But can

Page 84

1 you hold off on your question,
2 because I'm getting really
3 confused.
4    What was his answer?  When I
5 asked him --
6    INTERPRETER 1:  Okay.
7 Before I say "off the record"
8 was --
9    MR. SEEGER:  No.  Before
10 that, what was -- I want to know
11 how he described the document.
12    INTERPRETER 1:  Yeah, right.
13    - - -
14    (Whereupon, the following
15 portion of the transcript was read
16 by the court reporter:
17    "Q.  Mr. Jia, how do you
18 know that it should be before the
19 year 2008?
20    "A.  Because the title of
21 this document is the Shandong
22 Taihe Dongxin Company Limited.  It
23 was the title that we used before
24 the year 2008.")

Page 85

1    - - -
2    MR. SEEGER:  Is that his
3 answer?
4    INTERPRETER 1:  Right.
5    Off the record.  Because
6 there --
7    MR. SEEGER:  There is no off
8 the record.
9    INTERPRETER 1:  Okay.  Can
10 I -- okay.  Because if I find a
11 problem and I need the attorney to
12 help me, because the interpreter
13 walk into this room with no list
14 of the names of all the companies
15 and all the parties.  So, when I
16 heard he was saying the Taishan
17 Guifen (speaking in Chinese).  So,
18 I got confused about a company
19 name, and I say TG.  Now I read
20 the document, it says Shandong
21 Taihe, I want to clarify that.
22 And also, I want to have a --
23    MR. SEEGER:  No.  Did he say
24 TG or did he say this name on the

Confidential - Subject to Further Confidentiality Review

Page 86

1    document?  I need his answer.
2        INTERPRETER 1:  Because he
3    say it in Chinese, I don't know
4    which Chinese name is matching
5    with which English name.  So it is
6    the problem of the interpreter,
7    not his problem.  The problem with
8    me is that I walk in with no list
9    of all the company names and all
10   parties.  I don't want to guess.
11   That's why I --
12       MR. GRAND:  You're not
13   guessing.  You're just stating his
14   testimony.
15       MR. SEEGER:  See, and that's
16   why if you -- if what you're
17   saying -- if his answer was one
18   thing and you just repeated his
19   answer, we'd be fine.  But if
20   you're saying that you heard him
21   say something and you interpreted
22   it wrong for some reason, yes, we
23   need to know that.
24       So, when I asked him whose

Page 87

1    document it was and he said it was
2    TG, was that the answer he gave or
3    did he say the other name?
4        INTERPRETER 1:  He was
5    saying -- okay.  Why don't I just
6    give the Chinese name instead of
7    reinterpreting the name, because
8    I'm not sure about the name now.
9        MR. SEEGER:  We have to go
10   off the record for a second.
11       THE VIDEOTAPE TECHNICIAN:
12   The time now is approximately
13   10:40 a.m., and we're now off the
14   record.
15            - - -
16       (Whereupon, a recess was
17   taken from 10:40 a.m. until
18   10:44 a.m.)
19            - - -
20       THE VIDEOTAPE TECHNICIAN:
21   This begins Tape 3 of the
22   videotape deposition of Mr.
23   Tongchun Jia.  The time now is
24   approximately 10:44 a.m., and

Page 88

1    we're back on the record.
2        MR. SEEGER:  So look, I
3    think that Mr. Cyr and I are going
4    to agree on what I'm about to tell
5    you.  Okay?  So this is what we'd
6    like you to do to make your life
7    easy.
8        INTERPRETER 1:  Thank you.
9        MR. SEEGER:  When I ask him
10   a question, interpret it to the
11   best of your ability.  When he
12   answers, whatever that answer is,
13   I don't care if you look at the
14   document and it looks like it's a
15   different name, please do the best
16   you can to just give me whatever
17   answers come out of his lips as
18   best as you can.  If there's a
19   problem at that point, I think
20   then that the check interpreter
21   will bring it to Mr. Cyr's
22   attention, and we'll raise it that
23   way.  But if nobody is
24   complaining, if nobody's -- if the

Page 89

1    check interpreters aren't saying
2    there's a problem with your
3    interpretation, let's just keep it
4    going.  We don't want you to
5    interpret --
6        INTERPRETER 1:  Thank you.
7        MR. SEEGER:  We don't want
8    you to struggle for answers.
9        INTERPRETER 1:  I don't want
10   to guess at anything.  That's why
11   I bring this out.
12       MR. SEEGER:  It's either
13   clear or it's not.
14       Don't guess at anything.
15   Just whatever he says, repeat it.
16       INTERPRETER 1:  I don't
17   guess.  I do verbatim.
18       MR. SEEGER:  Yes.
19       INTERPRETER 1:  The only
20   issue is that because before I
21   come into this room, I did not
22   have a list of the Chinese
23   names --
24       MR. SEEGER:  But you've said

Confidential - Subject to Further Confidentiality Review

Page 90

1  that now ten times, and everybody
2  here understands that you have
3  not -- there's a reason you
4  haven't been given those
5  documents.  You have to just trust
6  in that.  So you have to do the
7  best you can.
8      INTERPRETER 1:  No problem.
9      MR. SEEGER:  What was the
10 last question and answer?
11          - - -
12     (Whereupon, the following
13 portion of the transcript was read
14 by the court reporter:
15     "Q.  Mr. Jia, how do you
16 know that it should be before the
17 year 2008.
18     "A.  Because the title of
19 this document is the Shandong
20 Taihe Dongxin Company Limited.  It
21 was the title that we used before
22 the year 2008.")
23          - - -
24 BY MR. SEEGER:

Page 91

1      Q.   The title on this document,
2  Mr. Jia, Shandong Taihe Dongxin Company,
3  was the name of TG -- used to be the name
4  of TG, correct?
5      A.   Yes.
6      Q.   Mr. Jia, turn to Page 2 of
7  this document, please.
8      A.   (Witness complies.)
9      Q.   Mr. Jia, there's a
10 photograph in the upper left-hand corner
11 of this document.  Who is that photograph
12 of?
13     A.   Me.
14     Q.   It's a good photo, by the
15 way.
16         And underneath this
17 photograph, what does it describe you as?
18     A.   Chairman of the board,
19 general manager.
20     Q.   Are you comfortable with
21 those titles, sir?
22     MR. CYR:  He might not
23 understand what you mean by
24 "comfortable," but...

Page 92

1      THE WITNESS:  I don't
2  understand what you're saying.
3  BY MR. SEEGER:
4      Q.   Strike the question.
5         Now, I want to go back to
6  the BNBM meetings, the board meetings,
7  whatever meeting.  I don't want to
8  characterize them as anything.  Whatever
9  meetings, Mr. Jia, you attend at BNBM, I
10 want to ask you a question about them.
11 Who gives reports in those meetings
12 regarding TG?
13     A.   At the meetings for BNBM, I
14 do not make report on behalf of TG.
15     Q.   Who does?  Who makes the
16 report at --
17     INTERPRETER 2:  The --
18     MR. CYR:  (Addressing the
19 check interpreter.)
20     I'm sorry, state it briefly.
21     INTERPRETER 2:  The witness
22 said TG did not give report at
23 BNBM meeting.
24     INTERPRETER 1:  No.  He

Page 93

1  said, I was not the one who do
2  report for -- on behalf of TG.
3      MR. SEEGER:  All right.
4  We're going to go with the
5  interpreter on this one.  Mr. Cyr
6  can object.
7      MR. CYR:  To help out, is
8  that on most matters, we'll be
9  happy with the registering of the
10 objection and then continuing.
11     MR. SEEGER:  Let's do that.
12     MR. CYR:  Yes.  Where it
13 would present a problem is if the
14 further questioning would go in
15 what we would consider the wrong
16 direction because of some kind of
17 a definitional thing.  But most of
18 the things that have happened so
19 far, we make our objection, she
20 doesn't need to defend herself,
21 boom, you go back with your
22 question.  That's our
23 recommendation.
24 BY MR. SEEGER:

Page 94

1    Q.   Mr. Jia, who gives the
2  report at the BNBM meetings about TG?
3          INTERPRETER 1:  I want to
4  clarify with the witness.
5          (Interpreter clarification
6  with the witness.)
7          THE WITNESS:  Any one of the
8  TG would not make a report at the
9  meetings of BNBM.
10 BY MR. SEEGER:
11    Q.   So, to be clear, you're the
12 chairman of the board of TG, you attend
13 meetings with BNBM, and you say nothing.
14 Is that correct?
15         MR. CYR:  I'm sorry.
16 Could -- interpreter.
17         I object that that
18 mischaracterizes his testimony.
19         MR. SEEGER:  He has to
20 answer now.
21         INTERPRETER 1:  I want to
22 clarify.
23         THE WITNESS:  I myself at
24 the BNBM board of director

Page 95

1    meetings, I will read the report
2    from the general manager, and I
3    will give my opinion regarding
4    this report.
5  BY MR. SEEGER:
6     Q.   And who is the general
7  manager that you're referring to at these
8  meetings?
9          MR. CYR:  Currently?
10         MR. SEEGER:  Well, whoever
11 he is referring to.  Let me first
12 get that.  Whoever he had in mind.
13 I just want to get that person.
14         MR. CYR:  I'm not sure he
15 had anybody in mind.  He referred
16 conceptually that he listens to
17 the general manager at the
18 meeting.  Now you're asking for a
19 name.
20         MR. SEEGER:  Joe --
21         MR. CYR:  I think it's
22 confusing.
23         MR. SEEGER:  I know, but,
24 you know, it's going to be -- I

Page 96

1    mean, I can just tell you, having
2    dealt with a few cases with Judge
3    Fallon and in this case, he's
4    really not big on speaking
5    objections.  I'm not going to make
6    a crazy objection like you can't
7    say anything, but you can't give
8    these long objections.
9          Go ahead.  I would like an
10 answer to my question.
11         THE WITNESS:  What time
12 period?
13 BY MR. SEEGER:
14    Q.   Present.
15    A.   Chen Yu.
16    Q.   Who does Chen Yu work for?
17 The name you just gave, who does Chen Yu
18 work for?
19    A.   He works for BNBM.
20    Q.   How does Chen Yu get
21 information about TG?
22         MR. CYR:  I object on the
23 grounds that the question assumes
24 that this fellow gets information

Page 97

1    about Taishan Gypsum.
2          MR. SEEGER:  I want to mark
3    that objection.  I'm going to mark
4    that objection.  Just make a note
5    next to it.  I want to show that
6    to Judge Fallon and get a ruling
7    if he thinks that's an appropriate
8    objection.
9          Go ahead.
10         INTERPRETER 1:  I did
11 interpret it already.
12         MR. SEEGER:  So we need an
13 answer then.
14         THE WITNESS:  At the annual
15 operation, information of TG and
16 also the auditing report will be
17 reported to BNBM every year in
18 Feb -- between -- around
19 February -- between February and
20 March.
21 BY MR. SEEGER:
22    Q.   And who at TG is responsible
23 for providing these reports to BNBM?
24    A.   The secretary of the board

Page 98

1  of directors.
2       MR. SEEGER:  I'm sorry.
3           - - -
4       (Whereupon, the following
5  portion of the transcript was read
6  by the court reporter:
7       "A.  The secretary of the
8  board of directors.")
9           - - -
10 BY MR. SEEGER:
11      Q.   Of which company?
12      A.   I don't understand your
13 question.
14      Q.   The secretary of the board
15 of directors of TG, is that who he's
16 referring to?
17      A.   Yes.
18          MR. SEEGER:  At this point,
19 I just want to call for the
20 production of any annual reports
21 and auditing statements by TG to
22 BNBM or any other company, because
23 they haven't been produced as far
24 as we know.

Page 99

1  BY MR. SEEGER:
2       Q.   Does BNBM make -- strike
3  that.
4       Does anyone on the board of
5  directors of BNBM make recommendations
6  regarding TG's business?
7           MR. CYR:  Objection on the
8       grounds that the question is
9       vague.  It doesn't indicate
10      recommendations to whom or in what
11      context.
12          MR. SEEGER:  I'm just going
13      to object again, because it's
14      sufficient to say objection.  If
15      you want to say vague, it's fine.
16          MR. CYR:  You're wasting
17      your time giving me speeches about
18      that.  You can just take it to the
19      judge.
20          MR. SEEGER: Well, I'll --
21          MR. CYR:
22          (Addressing the
23      interpreter.)
24          Please interpret what I

Page 100

1  said.  Let's take it one step at a
2  time.
3       Interpreter, please
4  interpret what I said.
5       Now, I suggest you mark the
6  record and then ask your next
7  question.
8           MR. SEEGER:  Don't tell me
9  what to do.  Just do your job,
10 I'll do mine, because now you're
11 pushing it with me.  All right?
12          MR. CYR:  This is what I'm
13 telling you.
14          MR. SEEGER:  Don't tell me
15 what to do.
16          MR. CYR:  Mark the record
17 and ask a question.
18          MR. SEEGER:  Mark that for
19 my objection.  I'll raise it with
20 Judge Fallon in the morning.
21      Okay.  So, where were we?
22 We had we left off?
23          - - -
24      (Whereupon, the following

Page 101

1  portion of the transcript was read
2  by the court reporter:
3       "Q.  Does anyone on the
4  board of directors of BNBM make
5  recommendations regarding TG's
6  business?")
7           - - -
8           THE WITNESS:  I don't
9  understand your question.  I don't
10 understand Cantonese, and please
11 say it in Mandarin.
12          MR. SEEGER:  Let me ask the
13 witness a question.
14 BY MR. SEEGER:
15      Q.   Does the witness
16 understand -- ask him --
17      Mr. Jia, do you understand
18 the questions or the interpretations
19 being presented to you by the
20 interpreter?
21      A.   I did not understand the
22 earlier question.
23      Q.   But is it an interpretation
24 problem?  Is there a dialect problem

Confidential - Subject to Further Confidentiality Review

Page 102

1  between the two of you?  I need Mr. Jia
2  to tell me.
3      A.   My mother tongue is Chinese,
4  but I have a strong Shandong accent.
5      Q.   But Mr. Jia, do you
6  understand the interpreter?  Are you
7  having any problem understanding the
8  interpreter?
9      A.   I can understand the
10  interpreter.
11      Q.   You're comfortable, Mr. Jia,
12  with us going forward with this
13  interpreter?
14      A.   How can I say it?  I don't
15  know how to say it.
16      Q.   Is he satisfied -- never
17  mind.  Strike that.
18          MR. SEEGER:  What was my
19      last question, Linda?
20              - - -
21          (Wherefore, the following
22      portion of the transcript was read
23      by the court reporter:
24      "Q.   Does anyone on the

Page 103

1      board of directors of BNBM make
2      recommendations regarding TG's
3      business.
4          A.  I don't understand your
5      question.  I don't understand
6      Cantonese, and please say it in
7      Mandarin.")
8              - - -
9  BY MR. SEEGER:
10      Q.   Mr. Jia, does the
11  interpreter speak Cantonese?  Is that
12  what you're trying to say?
13      A.   Yeah.  Has a Cantonese
14  accent, sometimes I cannot understand,
15  and I find it tiring.
16      Q.   Let me ask a question.
17          Mr. Jia, other than
18  yourself, are there any board members of
19  BNBM who are also on the board of TG?
20      A.   Yes.
21      Q.   Who?
22      A.   Me and another one, Wang
23  Bin. Wang Bin and another one.  Wang Bin.
24      Q.   I don't understand that

Page 104

1  answer.
2      A.   I and another one.
3      Q.   Okay.  And one other person,
4  right, Mr. Jia?
5          And the name of that other
6  person is what?
7          INTERPRETER 1:  Wang Bin.
8  BY MR. SEEGER:
9      Q.   How would you spell that?
10      A.   (Witness writes name on
11  paper.)
12      Q.   Wang Bin.
13          Could you also write next to
14  his name, Mr. Jia, his title?
15      A.   What period?
16      Q.   Let's start with the
17  present.
18      A.   (Witness writes down
19  answer.)
20      Q.   Hold on, keep that in front
21  of him.
22          Mr. Jia, what did you just
23  write on that piece of paper?
24      A.   Chairman of the board of

Page 105

1  BNBM, Wang Bin.
2      Q.   Then prior to that title,
3  what was Wang Bin's title before that?
4  And if you could write the dates.
5      A.   I cannot recall the exact
6  date, but he was originally the chairman
7  of the board of directors of BNBM.
8          MR. CYR:  Objection.
9          INTERPRETER 2:  General
10      manager, not the chairman of the
11      board of directors.
12  BY MR. SEEGER:
13      Q.   Mr. Jia, was --
14          MR. CYR:  We're ready for
15      the next question.
16          MR. SEEGER:  Well, I don't
17      know if we can resolve that one.
18          MR. CYR:  You can spend time
19      trying to resolve that if you'd
20      like.  I'm just saying that we're
21      comfortable now going with the
22      next question.
23  BY MR. SEEGER:
24      Q.   Prior to his --

Confidential - Subject to Further Confidentiality Review

Page 106

1 What you wrote on that piece
2 of paper, Mr. Jia, is that that person is
3 the chairman of the board during what
4 time frame? I want to make sure we got
5 that down.
6 A. I cannot recall the time
7 frame.
8 Q. Do you have a rough idea?
9 Was it --
10 You now serve in that
11 capacity for TG, don't you?
12 A. Me?
13 Q. Yes.
14 A. Yes.
15 Q. So, when did you become
16 chairman?
17 A. Are you referring to before
18 the company changed the name or after the
19 company changed the name?
20 Q. I'm talking, when did you
21 get the title that that person had there?
22 MR. CYR: I'm sorry.
23 THE WITNESS: I did not get
24 this title.

Page 107

1 MR. CYR: Off the record.
2 I just think there's some
3 confusion. It seems to me that
4 you think that Mr. Wang was the
5 chairman of Taishan Gypsum, and
6 that's not his testimony so far.
7 INTERPRETER 2: Also --
8 MR. CYR: All right. Let's
9 let him go.
10 MR. SEEGER: Appreciate
11 that.
12 How do you say this guy's
13 last name, since we're off the
14 record?
15 MR. CYR: Wang, W-A-N-G.
16 BY MR. SEEGER:
17 Q. Mr. Jia, Wang Bin is the --
18 that is his title. He's an employee of
19 BNBM; is that correct?
20 A. He is the chairman of the
21 board of BNBM.
22 Q. I got you. Okay.
23 INTERPRETER 1: Do you want
24 me to translate the title?

Page 108

1 BY MR. SEEGER:
2 Q. So, this individual, Mr.
3 Wang, is also on the board of TG; is that
4 correct?
5 A. Yes.
6 Q. Mr. Jia, other than your
7 involvement with TG and BNBM, what other
8 companies do you have a business
9 relationship with?
10 A. I don't understand this
11 question.
12 Q. I would like to know, do you
13 have any job responsibilities for any
14 other companies other than TG and BNBM?
15 A. Besides TG and BNBM, the
16 subsidiaries under TG, I have positions.
17 Q. And could you please name
18 the subsidiaries that he has positions
19 with and his title with those companies?
20 A. There are so many
21 subsidiaries under TG, I cannot recall
22 what positions of what.
23 Q. Okay. Let's start with the
24 subsidiaries that he has. Put aside his

Page 109

1 title for now. Let's just start with,
2 Mr. Jia, tell us the subsidiaries under
3 TG that you have any kind of job
4 responsibilities for?
5 A. I have position, but I don't
6 know what responsibility is referring to.
7 Q. Tell us the subsidiaries
8 that he has under TG that he has a
9 relationship with?
10 A. Mostly I would be the
11 chairman of the board of the subsidiaries
12 of the TG. But some companies, I'm not
13 the chairman of the board.
14 Q. First, all I want to do, Mr.
15 Jia, is tell me what subsidiaries under
16 TG you have any relationship with, any
17 involvement, any relationship with. Just
18 name the subsidiaries, please.
19 A. Many companies just like
20 Jiangyin Taishan, Jiangyin Taishan.
21 INTERPRETER 1: The witness
22 has written down on a piece of
23 paper Jiangyin Taishan Company
24 Limited.

Page 110

BY MR. SEEGER:

1 Q. Are there any other
subsidiaries that you're involved with
other than the one you just wrote down?

A. Henan Taishan Company
Limited.

INTERPRETER 1: The
interpreter is trying to translate
the names of the company. But
just looking at it, I cannot
guarantee its accuracy.

THE WITNESS: Hubei Taishan
Company Limited.

Shanxi Taishan Company
Limited.

And also Jiangsu Pizhou
Company Limited.

And there are many more.

MR. SEEGER: So, at this
point, Joe, can you provide us
with a list of all the
subsidiaries that Mr. Jia has any
kind of job responsibility with?
It will save a lot of time as

Page 111

opposed to doing it this way.

MR. CYR: Mr. Spano points
out to me that in our production,
there is a list of all the
subsidiaries, and I believe that
you have a translation of that.
But in addition to that, although
I'd like to confer with my
colleagues, I don't think there
would be any problem in providing
you a list of those entities in
which Mr. Jia holds some kind of
position.

MR. SEEGER: Okay.
Appreciate it.

MR. GRAND: We have a list
of the companies, but we don't
know his role in those companies.

MR. SEEGER: Right.

MR. CYR: Just -- I think so
far on the record, what you do
have from him is that he's a
director in some of the
subsidiaries, and he's not a

Page 112

director in others, but it's up to
you.

MR. SEEGER: He said that,
and maybe you can also give us --
would you indicate what his title
is in those? And then we could
save a lot of time.

MR. CYR: (Indicating.)

MR. SEEGER: He shook his
head yes. Did you put that down?

THE COURT REPORTER: Yes.

- - -

(Whereupon, Deposition
Exhibit Jia-3, Handwritten note in
Chinese, was marked for
identification.)

- - -

BY MR. SEEGER:

Q. Mr. Jia, do you have any
responsibilities with TTP?

A. I don't know what is the
concept of responsibility.

Q. Do you have a job title for
TTP?

Page 113

A. I don't have any positions
with TTP.

Q. Do you provide any services?
Do you do anything for TTP at all,
provide consulting services, financial
services, anything like that?

A. Which company is TTP? Can
you tell me first?

Q. I believe it's pronounced
Tai'an Taishan Plasterboard.

A. We don't have a company
called Tai'an Taishan. TTP Shareholding
Company Limited. We only have a Tai'an
Taishan TTP.

INTERPRETER 1: I need the
assistance from the lawyers to get
the names correct. I cannot make
out the names here at this point.
He's telling me two names.

MR. SEEGER: Okay. What two
names? Translate the two names he
gave you, if you don't mind.

INTERPRETER 1: As a legal
interpreter, we don't translate

Page 114

1  the names, first of all.  And
2  also, there's ten ways to
3  interpret any name, and so I --
4  it's a very tedious difference
5  between the two names.
6       I need help.
7       (Discussion amongst Mr.
8  Chen, the interpreters and witness
9  in Chinese.)
10      MR. CHEN:  If you could
11  just -- I guess you could put on
12  the record colloquy in Chinese.
13  I'm just trying to clarify for
14  you.
15      MR. CYR:  We're trying to
16  help out here.
17      MR. CHEN:  It's just Company
18  Limited.  It's Limited Company.
19      INTERPRETER 1:  So there is
20  a TTP Company, not a Shareholding
21  Limited Company, but it is a TTP
22  Limited Company.
23  BY MR. SEEGER:
24      Q.   I'm going to ask a question.

Page 115

1  It may not make sense because I'm not
2  really clear on what the confusion is
3  here, but, you know, does he recognize
4  the name Tai'an, and you may have to put
5  it in proper Chinese, Tai'an Taishan
6  Plasterboard?
7       Mr. Jia, do you recognize
8  that name as a company that you're
9  involved with, Tai'an Taishan
10  Plasterboard?
11      MR. CYR:  I'm just -- I
12  don't think he said he was
13  involved in it, but --
14      MR. SEEGER:  No.  I'm asking
15  him if he recognizes it.
16      MR. CYR:  I just want to
17  state for the record that I
18  believe that he's already
19  testified that he doesn't hold a
20  position at TTP.  I just want to
21  make sure.
22      MR. SEEGER:  I don't even
23  know what he's testified to
24  regarding, because he hasn't

Page 116

1  acknowledged he knows what that is
2  yet.  So let's first see if we can
3  identify what the name of that
4  company is.
5       THE WITNESS:  What do you
6  mean?
7  BY MR. SEEGER:
8       Q.   Mr. Jia, you have been asked
9  to give testimony today for two
10  companies.  One is TG, and the other one
11  is Tai'an Taishan Plasterboard.  Do you
12  understand that to be correct or not?
13      A.   I want to clarify what kind
14  of company is TTP so that I will be able
15  to answer your question.
16      Q.   Okay.  We have a problem.
17      Do you understand that you
18  were asked to come and give testimony for
19  two companies today, Mr. Jia?
20      A.   Yes.
21      Q.   What two companies?
22      A.   Tai'an Taishan Gypsum
23  Company Limited.
24      INTERPRETER 1:  The

Page 117

1  interpreter cannot guarantee the
2  accuracy of these formal names,
3  and I would ask you for help.  Was
4  that correct?
5       MR. SEEGER:  Are you going
6  to interpret what he said?  Okay.
7       INTERPRETER 2:  The witness
8  said yes, I understand.  I come to
9  testify for TG Shareholding
10  Company Limited and TTP Company
11  Limited.
12  BY MR. SEEGER:
13      Q.   What do the letters TTP
14  stand for in the second company that
15  you're testifying for, Mr. Jia?
16      MR. CYR:  Are you finished?
17      INTERPRETER 1:  Yes.
18      MR. CYR:  Objection on the
19  grounds that it assumes that
20  somehow when you translate it into
21  Chinese that it would necessarily
22  makes sense that it's TTP.  That
23  might not be true.  To try to
24  advance things, though, I do

Confidential - Subject to Further Confidentiality Review

Page 118

1  believe that Mr. Jia is familiar
2  with the reference TTP that we use
3  in English to refer to Tai'an, the
4  plasterboard company.
5      You can mark the transcript
6  if you'd like.
7      MR. SEEGER:  No, no.
8  Actually, that was helpful.  I'm
9  trying to move this along.
10      MR. CYR:  The others were
11  intended to be helpful to you.
12      MR. MONTOYA:  Can she
13  translate that?
14      MR. SEEGER:  Can we get her
15  to translate that?
16      MR. CYR:  Sure.  He knows
17  what TTP is.
18      MR. SEEGER:  Okay.
19  BY MR. SEEGER:
20      Q.   Mr. Jia, what do you
21  understand TTP to be?
22      A.   Tai'an Taishan
23  Plasterboard -- let me see.
24      Q.   Let's ask him this.

Page 119

1      (Discussion in Chinese.)
2      MR. CHEN:  She's asking me
3  to clarify.
4      MR. CYR:  May I make --
5      INTERPRETER 1:  Company
6  Limited.
7      MR. SEEGER:  Let me tell you
8  what my problem is.  If I don't
9  get from his lips, you know, the
10  companies he's here for, you know,
11  we can all speculate.  I just need
12  him to say that he understands TTP
13  is Tai'an Taishan Plasterboard.
14  If you guys want to coach him on
15  that particular point so we can
16  move on and --
17      INTERPRETER 1:  Okay.  Let
18  me try again.
19      INTERPRETER 2:  The witness
20  did say that.
21      MR. CYR:  Excuse me, ma'am,
22  could you just wait for us.
23      Yes.
24      MR. SEEGER:  We'll just

Page 120

1  stipulate that TTP is Tai'an
2  Taishan Plasterboard?  Are you
3  okay with that?
4      MR. CHEN:  He already
5  answered that.  It was just a
6  matter of translation.
7      MR. CYR:  I understand that.
8  Okay.
9      INTERPRETER 1:  I will try
10  again.
11      MR. SEEGER:  No.  We got it.
12  We resolved it.  You don't have to
13  worry about it.  We took care of
14  it.
15  BY MR. SEEGER:
16      Q.   Just ask Mr. Jia if he's
17  comfortable if I use the letters TTP for
18  the second company he's testifying for?
19      A.   I understand.
20      Q.   Thank you.
21      Do you hold a title or
22  position with TTP, Mr. Jia?
23      A.   I don't understand.  What
24  does it mean by the title?

Page 121

1      Q.   Do you have any involvement
2  with the company TTP?
3      A.   Involvement?  I am not sure
4  about this concept.
5      Q.   Do you work for TTP?
6      A.   I am leading all the work of
7  TTP.  TTP has its own people for
8  management and also for the organization.
9      MR. CYR:  We have an
10  objection.
11      INTERPRETER 2:  The witness
12  stated, I'm leading TG.  TTP has
13  its own management.
14      INTERPRETER 1:  Management
15  people and also for the
16  organization.
17  BY MR. SEEGER:
18      Q.   Mr. Jia, why are you a
19  corporate representative today for TTP if
20  you hold no position or title with TTP?
21      A.   I have no position at TTP.
22      Q.   So, are you the best person
23  to give testimony regarding the business
24  of -- I'm sorry, strike that.

Confidential - Subject to Further Confidentiality Review

Page 122

1      Are you the best person to
2 give testimony regarding the business of
3 TTP?
4      A.   Once again, there would be
5 people testifying on behalf of TTP
6 regarding its operation and situation.
7      Q.   So, I just want to be clear.
8 Are you the best person for us to talk to
9 about TTP and its business practices?
10      A.   Some things regarding TTP
11 that I know, I'm willing to satisfy your
12 need here now.
13      Q.   Tell us what those things
14 are about TTP that you're the best person
15 to talk to.
16      A.   For example, the objective
17 for the establishment of this company,
18 that would be more appropriate.
19      Q.   For Mr. Jia?
20      A.   Yes.
21      Q.   Any other topics about TTP
22 that would be more appropriate for you?
23      A.   I cannot be sure what would
24 be better.

Page 123

1      Q.   So, with regard to the
2 information of TTP regarding its
3 objective of the company, why is it that
4 you're the best person to talk to on that
5 topic?  How do you know that?
6      A.   Because I, myself, have
7 personally organized people from the
8 company to talk about this topic.
9      Q.   I'm sorry?
10      A.   I personally organize people
11 in the company to talk about this topic,
12 organize.
13      Q.   Do you have personal
14 knowledge on that topic regarding TTP,
15 about the objective for establishing the
16 company?
17      A.   Yes.
18      Q.   And why is that?
19      A.   TG is a company that
20 utilized the industrial waste by-products
21 to produce plasterboard so it can enjoy
22 the value-added tax, VAT.
23      Q.   Oh, VAT, value-added tax.
24      What is the relationship

Page 124

1 between TG and TTP specifically?
2      A.   Investor and being the
3 invested.
4      Q.   Who is the investor and who
5 is the invested?
6      A.   TG is the investor, and TTP
7 is the one being invested.
8      Q.   And do you personally hold
9 any position at TTP?
10      A.   I did answer.  I have no
11 position.
12      Q.   So, who would be the best
13 person to talk about --
14      Regarding TTP, who would be
15 the best person to talk to regarding
16 dealings between TTP and, let's say, you
17 know, Morgan Stanley or J.P. Morgan?
18      MR. CYR:  Objection on the
19      grounds that the question
20      improperly assumes that there were
21      dealings with Morgan Stanley and
22      J.P. Morgan.
23      Please answer the question,
24      Mr. Jia.

Page 125

1      THE WITNESS:  I did not
2      understand your question.
3 BY MR. SEEGER:
4      Q.   We were told, Mr. Jia, that
5 you were here to speak on three topics
6 involving TTP.
7      MR. SEEGER:  (Addressing the
8      interpreter.)
9      Could you just tell him
10      that, and then I'll tell him what
11      the three topics are.
12 BY MR. SEEGER:
13      Q.   Okay.  The three topics were
14 the purpose and function of related
15 entities or other entities with employees
16 in the United States.
17      MR. SEEGER: (Addressing the
18      interpreter.)
19      Could you do your best to
20      repeat that.
21      INTERPRETER 1:  Why don't
22      you do one at a time.
23      COURT REPORTER:  It's right
24      here on the screen.  Just read it

Confidential - Subject to Further Confidentiality Review

Page 126

1    from the screen.
2              - - -
3         (Whereupon, the follow
4    portion of the transcript was read
5    by the court reporter:
6         "Q:   The three topics were
7    the purpose and function of
8    related entities or other entities
9    with employees in the United
10   States.")
11             - - -
12        THE WITNESS: Can you repeat
13   the question?
14   BY MR. SEEGER:
15        Q.   Let me try to do this
16   quickly so we can get us out of here for
17   lunch.
18        There were three topics that
19   Mr. Jia was supposed to testify about
20   regarding TTP.
21        MR. SEEGER:  (Addressing the
22   interpreter.)
23        Give him that so far.
24   BY MR. SEEGER:

Page 127

1         Q.   The first topic was TTP and
2    any companies related to TTP with
3    employees in the United States.  That's
4    topic 1.  My question is, are you the
5    best person to talk about, to testify
6    with regard to that topic?
7         A.   Yes.
8         Q.   Okay.  And then with regard
9    to the second topic is whatever
10   proprietary interests, government
11   ownership or any commercial relationship
12   between TTP and its related companies and
13   the People's Republic of China.  Are you
14   the best person to testify on that topic?
15        A.   I can answer a part of it,
16   but regarding whether I'm the best person
17   or not, I cannot be sure.
18        MR. CHEN:  He said, I might
19   be the best person.
20        INTERPRETER 1:  I might be
21   the best person.  I am not sure,
22   but I might be.
23   BY MR. SEEGER:
24        Q.   The third and last topic

Page 128

1    you're here to testify about on TTP is
2    dealings, whether they exist or not, with
3    Morgan Stanley and J.P. Morgan.  Are you
4    the best person to testify on that topic?
5         A.   It should be the case.
6         Q.   I want to be clear.  So, ask
7    him this.
8         Mr. Jia, it should be the
9    case that you are the best person to
10   testify on that topic?
11        A.   Regarding this topic, I
12   should -- I should know about it.  But
13   whether I am the best or not, that I am
14   not sure.
15        Q.   Just one more question and
16   we can take a lunch break.
17        How is it that --
18        On the three topics we just
19   talked about, how is it that you are
20   competent to testify on those subjects or
21   capable of testifying on those subjects?
22        A.   Okay.  I am the chairman of
23   TG, of the board of TG, and TTP is the
24   subsidiary of TG and is 100 percent owned

Page 129

1    by TG.  So, a lot of the important
2    matters and a lot of things that I know.
3         Q.   Just a last question.
4         Mr. Jia, do you speak any
5    English at all?
6         A.   No.  I never learn.
7         MR. SEEGER:  We can take a
8    lunch break.
9         THE VIDEOTAPE TECHNICIAN:
10   The time now is approximately --
11        MR. CYR:  What time do we
12   come back?
13        MR. SEEGER:  Hold on.  Let's
14   just stay on for a second.
15        What do you want to do?  Do
16   you want to do an hour?
17        MR. CYR:  Is an hour
18   sufficient?
19        MR. SEEGER:  Look,
20   whatever -- I apologize for going
21   over 11:30.  I didn't understand
22   all the issues.
23        MR. CYR:  Two issues.  One
24   is to do whatever is appropriate

Confidential - Subject to Further Confidentiality Review

Page 130

1   for him for lunch; but two, to get
2   back so we can convene.  Is an
3   hour sufficient?
4       MR. CHEN:  I think so.
5   We'll eat fast.
6       MR. SEEGER:  We're breaking
7   at a quarter to 12:00.  We'll be
8   back at a quarter to 1:00 if that
9   works?
10      MR. CYR:  Should we just say
11  1:00?
12      MR. SEEGER:  I was going to
13  say, give or take five minutes.
14  It doesn't matter.
15      THE VIDEOTAPE TECHNICIAN:
16  The time now is approximately
17  11:44 a.m., and we're now off the
18  record.
19          - - -
20      (Whereupon, a luncheon
21  recess was taken from 11:45 p.m.
22  until 12:56 p.m.)
23          - - -
24      THE VIDEOTAPE TECHNICIAN:

Page 131

1   This begins Tape 4 of today's
2   deposition.  The time now is
3   approximately 12:59 p.m., and
4   we're back on the record.
5   BY MR. SEEGER:
6       Q.   Mr. Jia, who at TTP reports
7   to you?
8       A.   TTP has its own board of
9   directors, has its own management.  So,
10  every time after the board meetings, they
11  report to me.
12      Q.   And whose responsibility,
13  who specifically has the responsibility
14  of reporting to you what occurs in those
15  meetings?
16      A.   I don't understand what you
17  mean.
18      Q.   Well, how is the information
19  regarding business at TTP reported to
20  you?  Who is it reported to you by?  Are
21  you given written reports?  Describe in
22  your own words how you get that
23  information.
24      A.   Regarding the operation of

Page 132

1   TTP, every month there is a report sent
2   to my office.  We don't have anyone
3   specific to make a report to me.
4       Q.   How is the information given
5   to you?  I mean, are you given written
6   reports?  Is information conveyed to you
7   verbally?
8       A.   Normally they give me the
9   written report.  When it is necessary,
10  the directors will do some exchange with
11  me.
12      Q.   And regarding the directors
13  that do exchange with you, how is that
14  done?  Is that done verbally, through
15  e-mail communication?
16      A.   Verbally.
17      Q.   And then which directors?
18  Can you identify them by name that you
19  have these verbal interactions with at
20  TTP?
21      A.   Pang Shi Liang.  Pang Shi
22  Liang.
23      Q.   Okay.
24          And how often do you speak

Page 133

1   with or meet with this person you've just
2   identified?
3       A.   Usually it is once a month,
4   but it is irregular.
5       Q.   Are there times when it can
6   be more than once a month?
7       A.   Yes.
8       Q.   And with regard to the
9   written reports that you receive from
10  TTP, do you know who prepares those
11  reports?
12      A.   I don't know.
13      Q.   Okay.
14          And the reports contain what
15  type of information?  Is it financial
16  information, accounting information?
17      A.   Mainly it's about the
18  products and the sales and how much sales
19  for the plasterboards.
20          INTERPRETER 2:  The witness
21      says mainly the production and
22      sales.
23          MR. SEEGER:  Production and
24      sales.

Page 134

1    INTERPRETER 1:  It's the
2  same.
3    MR. SEEGER:  I thought that
4  was the same.  That's what I
5  thought you said.
6    MR. CHEN:  The record says
7  products and sales.
8    MR. SEEGER:  Oh, okay.  I
9  thought I heard -- I wasn't
10  looking at this.  Okay.
11    INTERPRETER 1:  The
12  products --
13    MR. SEEGER:  She said
14  production and sales.
15    INTERPRETER 1:  No
16  production.
17    MR. SEEGER:  Did you say
18  that?  That's what I thought
19  you --
20    (Discussion between
21  interpreter and witness in
22  Chinese.)
23    INTERPRETER 1:  Production.
24  Production.

Page 135

1    MR. SEEGER:  Did you not
2  want her to clarify?
3    MR. CYR:  I just didn't want
4  her asking him questions.  That's
5  all.
6    INTERPRETER 1:  I am not
7  asking the question.  I'm
8  clarifying.  I stated to --
9    MR. SEEGER:  You don't have
10  to defend yourself.  This is just
11  lawyer stuff.  Don't worry about
12  it.
13  BY MR. SEEGER:
14    Q.  How often do you get the
15  written reports?
16    A.  I don't understand.
17    Q.  How often?  When do you get
18  these written reports that you just
19  testified to?
20    A.  Usually I can see it once a
21  month.
22    Q.  Do you also get audited
23  financial statements from TTP?  Would
24  they go to you?

Page 136

1    A.  Can you speak louder?
2    I can see it.
3    Q.  How often do you get audited
4  financial statements from TTP?
5    A.  Usually I can see it every
6  month.
7    Q.  Do you know the people at
8  TTP who would be involved in putting
9  together audited financial statements?
10    A.  I don't understand.  What do
11  you mean?
12    Q.  The people who are actually
13  involved in preparing audited financial
14  statements for TTP, do you know who those
15  people are?
16    A.  They should be the finance
17  people of TTP.
18    MR. SEEGER:  The what
19  people?
20    INTERPRETER 1:  Finance.
21  BY MR. SEEGER:
22    Q.  Can you identify any of
23  those people by name?
24    A.  I cannot recall.

Page 137

1    MR. SEEGER:  Also, can you
2  translate -- to the interpreter,
3  can you translate what he wrote in
4  Chinese, that person's name, into
5  English, so we can mark that as an
6  exhibit.
7    INTERPRETER 1:  The
8  translator will try her best to
9  translate, but she cannot
10  guarantee the accuracy, because we
11  are not authorized to do
12  translation of legal names.
13    MR. SEEGER:  We'll show it
14  to Mr. Cyr and see if he has a
15  problem.
16    (Discussion between the
17  witness and interpreter in
18  Chinese.)
19    MR. CYR:  No, no.  Please
20  don't ask the witness questions,
21  ma'am.
22    MR. SEEGER:  You have to do
23  your best on that.
24    INTERPRETER 1:  I am doing

Confidential - Subject to Further Confidentiality Review

Page 138

1 my best, but I cannot guarantee
2 the accuracy.
3        MR. SEEGER:  Okay.
4        Just tell us what name you
5 wrote.
6        INTERPRETER 1:  Pang Shi
7 Liang.
8        MR. CYR:  Can I just help
9 out to see if can get an accurate
10 record?
11        INTERPRETER 1:  Okay.  Let
12 me --
13        MR. SEEGER:  It's okay.
14        INTERPRETER 1:  Pang Shi
15 Liang.
16        MR. SEEGER:  Just mark that
17 as Exhibit 4.
18              - - -
19        (Whereupon, Deposition
20 Exhibit Jia-4, Handwritten note,
21 Pang Shi Liang, was marked for
22 identification.)
23              - - -
24 BY MR. SEEGER:

Page 139

1    Q.    Okay.
2         I want to switch back to a
3 few questions to BNBM.  Do you report to
4 anyone at BNBM regarding your activities
5 at TG or TTP?
6    A.    We don't have any formal
7 report.  Sometimes we make phone calls to
8 refresh the situation of TG.
9    Q.    Okay.
10        And when you make those
11 phone calls to BNBM, who most often do
12 you make them to?
13    A.    Now it is Mr. Chen Yu.
14        MR. SEEGER:  Why don't you
15 have him write it, and we'll spell
16 it again.
17        THE WITNESS:  I have written
18 down the name already.
19 BY MR. SEEGER:
20    Q.    Okay.  Thank you.
21        And he is with BNBM,
22 correct?
23    A.    Correct.
24    Q.    Is there anybody else other

Page 140

1 than this individual that you deal with
2 at BNBM on a regular or irregular basis?
3    A.    Regularly, it is Mr. Chen
4 Yu.  Irregularly, that I cannot recall.
5 Sometimes in Beijing we may just drink
6 tea, but I cannot recall.
7    Q.    So, there are some
8 individuals at BNBM that you have once in
9 a while meetings with, have tea, but you
10 don't recall who they are and what are
11 their names?
12    A.    That is not what I mean.
13    Q.    Okay.
14        That's why I asked the
15 question.  I'd like to know what he
16 means.  Maybe you can explain it.
17    A.    Many people in management of
18 BNBM are my good friends.
19    Q.    Could you identify some of
20 the individuals in management who are
21 your friends by name?
22    A.    For example, Mr. Zhou Wan.
23    Q.    And what is that
24 individual's title at BNBM now?

Page 141

1    A.    The vice GM of BNBM.
2    Q.    Okay.
3        And could he just write that
4 next to his name, please.
5    A.    (Witness complies.)
6    Q.    Now, is this -- Mr. Jia, is
7 this individual also involved with TG in
8 any respect?
9    A.    No.
10    Q.    Are there other individuals
11 besides the person you've identified in
12 this piece of paper in front of you that
13 we'll mark as Exhibit 4 that you deal
14 with or that are good friends of yours at
15 BNBM?
16    A.    Yes.
17    Q.    Could you please -- I'm
18 sorry.  I didn't mean to interrupt.
19        MR. CYR:  There's no
20 question.  He said yes.  Next
21 question.
22        MR. SEEGER:  Calm down,
23 everybody.
24 BY MR. SEEGER:

Page 142

1    Q.   Could you please write on
2  that piece of paper the names, other
3  names of individuals who are your good
4  friends at BNBM.
5    A.   Wu Fa De, vice GM.
6    Q.   What is the name of the
7  second individual?
8    A.   Wu Fa De.
9    Q.   We'll take care of the
10  translation.
11       Now, are either -- I'm sorry
12  to ask you this again. I may have with
13  the first individual.
14       Are any of these two
15  individuals you've identified involved
16  with either TG or TTP in any way?
17    A.   They definitely were not
18  involved with TG or TTP business.
19    Q.   Okay.
20       And would any of these two
21  individuals that you've identified on the
22  paper, would they be involved with any TG
23  subsidiaries other than TTP?
24    A.   I don't understand what you

Page 143

1  mean.
2    Q.   The two individuals that
3  you've listed on this piece of paper, do
4  they have any involvement in any business
5  capacity with any TG subsidiaries?
6    A.   Not even so.
7    Q.   Okay.
8       Now, when you meet for tea
9  with these two individuals on the paper
10  in front of you, do you discuss TG
11  business with them?
12    A.   So we usually talk about
13  family and society, that type of
14  questions.
15    Q.   Okay.
16       So, are you saying it's your
17  testimony that you do not discuss TG
18  business with these two individuals?
19    A.   Yes.
20    Q.   Okay.
21       Tell us about your history
22  with TG, how you got involved with TG.
23    A.   I don't understand what you
24  mean.

Page 144

1    Q.   Well, how did you first
2  learn about TG? How did you first get
3  your job with TG? Just your history with
4  the company.
5    A.   Are you talking about TG
6  history or TTP history or BNBM history?
7    Q.   I'm first asking about how
8  he became involved with TG.
9       MR. CYR: Please don't ask
10  him questions.
11       INTERPRETER 1: I'm
12  repeating so that I make sure I
13  hear accurately, because he has an
14  accent.
15       MR. CHEN: She just asked
16  him to repeat.
17       INTERPRETER 1: I am not
18  making a discussion.
19       MR. CYR: Go ahead.
20       THE WITNESS: In the year
21  2002, the board of directors
22  selected me as the GM and the
23  chairman of the board of the
24  Shandong Taihe Dongxin Company

Page 145

1  Limited.
2  BY MR. SEEGER:
3    Q.   Okay.
4       And how were you first
5  introduced to the board of directors back
6  in 2002? How did they learn about you?
7    A.   I have always been working
8  for Tai'an -- Tai'an --
9       INTERPRETER 1: Off the
10  record.
11       I'm assuming Tai'an is an
12  abbreviation in Chinese in the
13  standing of TTP. I want to
14  verify.
15       MR. CHEN: Tai'an is a
16  location. I have always been
17  working in Tai'an.
18       INTERPRETER 1: Oh, okay. I
19  need to clarify that.
20       MR. CHEN: Tai'an is a
21  location. I have always been
22  working in Tai'an.
23       THE WITNESS: In Tai'an, I
24  have always been working in

Confidential - Subject to Further Confidentiality Review

Page 146

1    Tai'an.  And, actually, the
2    headquarter of the enterprise was
3    in Tai'an, and I study
4    construction material.  And I have
5    been working in the industry for
6    many years, and they believe that
7    I am qualified to do the job well,
8    therefore, they recommended me as
9    the GM and the chairman of the
10   board.
11 BY MR. SEEGER:
12   Q.  Do you recall who at the
13 company from the board of directors you
14 met with when you were hired?  Did you
15 meet with the entire board or certain
16 board members?
17   A.  Some of the members of the
18 board and some of the representative of
19 the board, and I cannot recall all of
20 them because it was a long time ago.
21   Q.  Tell me which names --
22       INTERPRETER 2:  And also
23   shareholders meeting.
24 BY MR. SEEGER:

Page 147

1    Q.  Tell me who you remember
2 meeting with from the board.
3    A.  For example, a Mr. Ren Xu
4 Lian.
5       INTERPRETER 1:  The witness
6    has written down two names.  One
7    is Mr. Ren Xu Lian and a Mr. Xue
8    Yuli.
9 BY MR. SEEGER:
10   Q.  Okay.
11      Are those two individuals
12 still with TG to the present?
13   A.  Mr. Xue, he has retired.
14 Mr. Ren Xu Lian is still working for TG.
15   Q.  And what is his title
16 currently?
17   A.  He is now the vice general
18 manager.
19      MR. SEEGER: A vice general
20   manager?
21      INTERPRETER 1:  Yes.
22      INTERPRETER 2:  Of TG.
23      MR. SEEGER:  Of TG.  I
24   understand.  Thank you.

Page 148

1 BY MR. SEEGER:
2    Q.  How often do you have
3 dealings with the individual, I'm sorry,
4 I can't pronounce the name, but the
5 current vice general manager of TG?  How
6 often does he deal with him?
7    A.  Now almost like whenever he
8 is in Tai'an, we would meet.
9       - - -
10      (Whereupon, Deposition
11   Exhibit Jia-5, Handwritten note,
12   Zhou Wan and Wu Fade, was marked
13   for identification.)
14      - - -
15      (Whereupon, Deposition
16   Exhibit Jia-6, Handwritten note,
17   Ren Xu Lian and Xue Yu Li, was
18   marked for identification.)
19      - - -
20      INTERPRETER 1:  The
21   interpreter is translating the
22   names, but she cannot guarantee
23   the accuracy.
24      MR. SEEGER:  Show it to Mr.

Page 149

1 Cyr to make sure it is accurate.
2       MR. CHEN:  The Chinese is
3 going to be correct.
4       MR. SEEGER:  The English
5 translation, do we have an issue
6 with it?
7       MR. CHEN:  Can I say
8 something briefly?
9       MR. CYR:  Sure.  Again, the
10 main thing is that when Mr. Jia is
11 asked questions about a man, that
12 he knows who the man is.
13      MR. CHEN:  I will just say
14 that in China, there's a typical
15 Romanization protocol called
16 pinyin.  These terms are not
17 pinyin, because it's not used in
18 Hong Kong.  And so these are not
19 names that most people in China
20 would recognize if you saw that.
21      MR. SEEGER:  I've got you.
22      MR. CYR:  Do you believe
23 that Mr. Jia knows the names, I
24 mean, will recognize -- when she

Confidential - Subject to Further Confidentiality Review

Page 150

1　says the names in Chinese, he
2　knows who she's talking about?
3　　　　MR. CHEN: The Chinese
4　characters will be recognizable.
5　The English will not be.
6　　　　MR. CYR: Thank you.
7　BY MR. SEEGER:
8　　　Q. Okay.
9　　　　So, let me just go back to
10　the time before you were hired at TG.
11　Where did you work?
12　　　　INTERPRETER 1: The witness
13　is giving out a Chinese name, and
14　the interpreter will try her best
15　to translate, but she cannot
16　guarantee the accuracy.
17　　　　MR. SEEGER: You don't have
18　to say it. We're going to assume
19　that for every name.
20　　　　THE WITNESS: Taishan Glass
21　Fiber Company.
22　BY MR. SEEGER:
23　　　Q. Is that a company that is
24　owned or affiliated with TG in any way?

Page 151

1　　　A. Not related.
2　　　Q. Do you have an employment
3　contract?
4　　　A. I don't have any contracts
5　for hiring, but I have an appointment
6　letter from the board of directors.
7　　　Q. Okay.
8　　　　And do you have an
9　appointment letter from the board of
10　directors at TTP?
11　　　　MR. CYR: I just object. It
12　seems to assume that he had some
13　kind of position at TTP, and his
14　testimony has been to the
15　contrary.
16　　　　MR. SEEGER: That was a good
17　coach, but I'm just asking him if
18　he has a contract.
19　　　　MR. CYR: (Addressing the
20　interpreter.)
21　　　　Could you interpret what I
22　said.
23　　　　MR. SEEGER: Mark that one
24　for...

Page 152

1　　　　　　- - -
2　　　　(Whereupon, the requested
3　portion of the transcript was read
4　by the court reporter as follows:
5　　"Q. And do you have an
6　appointment letter from the board
7　of directors at TTP?")
8　　　　　　- - -
9　　　　THE WITNESS: I don't
10　understand.
11　BY MR. SEEGER:
12　　　Q. He had testified he has an
13　employment letter, I believe, from TG,
14　right?
15　　　　INTERPRETER 1: Right.
16　　　　MR. SEEGER: No, ask him
17　that.
18　　　　MR. CHEN: He said for TG.
19　　　　INTERPRETER 2: The question
20　was asking for the appointment
21　letter from TG.
22　　　　MR. SEEGER: Yes.
23　　　　INTERPRETER 2: The question
24　was the appointment letter from

Page 153

1　TG. The interpreter interpreted
2　appointment letter of TTG -- TTP.
3　　　　INTERPRETER 1: No, it is --
4　I read it from the screen. It
5　says TTP.
6　　　　MR. SEEGER: Let me ask it
7　again.
8　　　　INTERPRETER 1: Okay.
9　BY MR. SEEGER:
10　　　Q. The witness, Mr. Jia, you
11　testified earlier you had an appointment
12　letter from TG, correct?
13　　　A. No. I said when I worked
14　for the Taishan Glass Fiber Company, I
15　had an appointment letter.
16　　　Q. Okay.
17　　　　Do you currently have an
18　appointment letter from TG?
19　　　A. I don't have an appointment
20　letter, but I have this result from the
21　election.
22　　　Q. Could he please describe
23　what he means by the "result from the
24　election"? I don't understand that.

Page 154

1    A.   In the year 2002, when TG
2 was established, they selected me as the
3 chairman of the board and the GM.
4    Q.   But is there anything in
5 writing that reflects that appointment?
6 Is there a contract, an appointment
7 letter, anything like that?
8    A.   There was a document.  The
9 document was about the result of this
10 election.
11    Q.   Okay.
12        And who at TG evaluates your
13 performance?
14    A.   I don't know what kind -- in
15 what aspect of the performance are you
16 referring to?
17    Q.   Your job performance, how
18 you're performing as a chairman and a
19 general manager.  Are you evaluated by
20 anyone at TG?
21    A.   Yes.
22    Q.   And who would that be?
23    A.   Yeah.  The board of
24 directors and the board of shareholders

Page 155

1 of TG.
2    Q.   There's no specific
3 individual; is that correct?
4    A.   The representative of the
5 board of shareholders and the members of
6 the board of directors.
7    Q.   And who is the
8 representative of the board of
9 shareholders?
10    A.   In what period?
11    Q.   In 2002.
12    A.   The representative of the
13 shareholders, the board of shareholders
14 in the year 2002, are you talking about
15 names?
16    Q.   Yes.
17    A.   It was too long ago.  I
18 cannot recall.  But I can state a few
19 names.
20    Q.   Okay.
21        Please, if you can state the
22 names and the time frame, that would be
23 useful.
24    MR. SEEGER:  Oh, I'm sorry,

Page 156

1 I thought you were writing.
2    MR. CYR:  He hasn't been
3 asked to write.  You asked him to
4 state the names.
5    MR. SEEGER:  Yeah, why don't
6 we just -- we've been doing this
7 exercise.  It works well.  Give
8 him a piece of paper, and if you
9 could please write on the paper
10 the name of the representative on
11 the board of shareholders that you
12 recall and the timeframe.
13    (Witness complies.)
14    MR. SEEGER:  We'll mark this
15 as Exhibit 7.
16        - - -
17    (Whereupon, Deposition
18 Exhibit Jia-7, Handwritten note,
19 Keng Ming Guo, Ren Xu Lian and Xue
20 Yu Li, was marked for
21 identification.)
22        - - -
23    THE WITNESS:  I can only
24 remember these names.

Page 157

1    MR. SEEGER:  Okay.
2    Could you state for the
3 record --
4    The interpreter, can you
5 read into the record in English
6 whatever, what those names are.
7    INTERPRETER 1:  I can only
8 try my best.  I cannot guarantee
9 any accuracy.
10    MR. SEEGER:  Well, I
11 understand.  Write it down, and
12 then we will ask counsel to take a
13 look at it and see if he agrees
14 with the translation.
15    THE WITNESS:  Keng Ming Guo.
16    MR. SEEGER:  Why don't you
17 show it to Mr. Cyr, please.
18    INTERPRETER 1:  (Handing
19 over Exhibit 7.)
20    MR. CHEN:  I can't agree
21 with these English writings,
22 because, as I said, this is not
23 the normal form used in China.
24    MR. CYR:  Okay.

Page 158

1 So, we will just go with it.
2 I just would like to ask Mr. Dong
3 to look at these.
4 MR. SEEGER: Can we just
5 identify for the record who the
6 individual looking at the document
7 is? But go ahead and say his
8 name. Mr. Dong?
9 MR. CYR: Mr. Dong, yes,
10 D-O-N-G.
11 And for the record, I just
12 wanted him to have an opportunity
13 to see the names so that we don't
14 have an inaccurate transcript,
15 because it's my understanding,
16 based on what's happened so far,
17 that those names purport to be the
18 names of people who held the
19 position of secretary or some kind
20 of representative of the
21 shareholders during the relevant
22 time period. I'm not sure that we
23 actually have that. But you're
24 not asked to testify, Mr. Dong. I

Page 159

1 just wanted you to see the names.
2 MR. SEEGER: Mr. Dong is an
3 attorney here in Hong Kong for the
4 company, I take it?
5 MR. CYR: He is an attorney
6 in China for the company.
7 MR. SEEGER: For the
8 company. Is he in-house counsel
9 or is he --
10 MR. CYR: No, he's not.
11 MR. SEEGER: -- outside.
12 INTERPRETER 1: And, also,
13 if we have time to go with the
14 computer, we can get that pingyin
15 more accurately. But we don't
16 have the time to do that now.
17 MR. SEEGER: We're going to
18 be fine.
19 MR. CYR: We're good. We're
20 ready.
21 BY MR. SEEGER:
22 Q. Okay.
23 So, would you now please ask
24 Mr. Jia to look at what we've now marked

Page 160

1 as Exhibit 7 and just tell me if any of
2 these three people are or were at any
3 time employees of BNBM?
4 A. No.
5 Q. Were they now or at any
6 point in the past, that he knows of,
7 employees of CNBM? I'll give you the
8 name.
9 A. No.
10 Q. Thank you.
11 Okay. Now, I want to focus
12 on the present. What are your current
13 job responsibilities for TG?
14 A. I am responsible for the
15 normal operation and development of TG.
16 Q. I'm sorry. Can I just focus
17 your attention, Mr. Jia, on Exhibit 7
18 again. Are any of the people on that
19 list employees or were they ever
20 employees of TG?
21 A. Mr. Ren Xu Lian and Xue Yu
22 Li, they are the employees of TG. But
23 Mr. Xue has now retired.
24 Q. I'm sorry. I'm going to go

Page 161

1 back to your other answer.
2 You answered that you're
3 involved with the normal operation and
4 development of TG. Could you please
5 elaborate on that? Tell us specifically
6 what your job entails.
7 A. My job responsibility is to
8 help the departments of TG and also to
9 advise the general managers to
10 effectively and most effectively to
11 operate normally.
12 Q. Are you involved in all
13 major financial decisions for TG?
14 MR. CYR: Objection as
15 vague.
16 You may answer, Mr. Jia.
17 THE WITNESS: What do you
18 mean by "financial decisions"?
19 What do you mean by "major"? That
20 I am not sure.
21 BY MR. SEEGER:
22 Q. Well, if TG were to borrow
23 or loan money, would you be involved in
24 the decision-making there?

Confidential - Subject to Further Confidentiality Review

Page 162

1    A.  Yes, I would participate.
2    Q.  If TG were to get involved
3 in investing money in either existing
4 product lines or new product lines, would
5 you be involved in that decision?
6    A.  I will involved.
7    Q.  If TG were to get involved
8 in strategic alliances with other
9 companies, either joint ventures,
10 mergers, purchase of other companies,
11 would those decisions go through you?
12    A.  I don't understand the
13 concept of "strategic."
14    Q.  Okay.
15       What if TG were to purchase
16 another company?
17       MR. CYR:  Would you
18    participate in that decision?
19       THE WITNESS:  Yes, I will
20    participate.
21 BY MR. SEEGER:
22    Q.  What if it were to joint
23 venture or partner with another company
24 with regard to current or new product

Page 163

1 lines, would that decision go through
2 you?
3    A.  It is not to go through me.
4 It is through a discussion with the board
5 of shareholders and the board of
6 directors.
7    Q.  And would he participate in
8 that discussion?
9    A.  Yes.
10    Q.  Would you have to bring any
11 decision like that, acquiring a new
12 company or a joint venture with another
13 company, to the board of BNBM?
14    A.  It would not be brought up
15 to the board of BNBM.
16    Q.  Would it be reported to the
17 board --
18       If a decision were made one
19 way or another regarding buying a company
20 or joint venturing, would it be -- at
21 what point would that be shared with
22 BNBM?
23    A.  I don't understand the word
24 "shared."

Page 164

1    Q.  That information would be
2 shared.
3       INTERPRETER 2:  (Addressing
4 Interpreter 1 in Chinese.)
5       MR. SEEGER:  Can you --
6       MR. CHEN:  There is an issue
7 with the translation of the
8 Chinese, and so she's giving --
9 she's helping the interpreter.
10       MR. SEEGER:  Oh, you're
11 speaking to the interpreter?
12       MR. CHEN:  I don't think she
13 was --
14       INTERPRETER 1:  She's just
15 helping seeing in her way whether
16 he can understand it better or
17 not.  No objection from my side.
18       MR. CYR:  I shared your --
19 we were aligned on that moment.
20       MR. SEEGER:  Okay.
21       Did that help you, what she
22 said?
23       INTERPRETER 2:  I haven't
24 finished.

Page 165

1       MR. SEEGER:  I'm going to
2 withdraw the question.
3       INTERPRETER 1:  Yeah, okay.
4 Thank you.
5 BY MR. SEEGER:
6    Q.  BNBM sits on the board of
7 TG, correct?
8    A.  Yes.
9    Q.  At TG, do you sit on any
10 particular committees, if they exist?
11    A.  I don't understand what you
12 mean.
13    Q.  Management committees?
14    A.  No.
15    Q.  Are there any formal -- that
16 he's aware of,are there any formal
17 committees at TG that he would
18 specifically participate in, to his
19 knowledge?
20    A.  TG only has the board of
21 shareholders and a board of directors.
22 We don't have any other management
23 committee.
24       MR. CYR:  Excuse me.

Confidential - Subject to Further Confidentiality Review

Page 166

1      THE WITNESS:  I want to take
2  a break.
3      MR. SEEGER:  Not a problem.
4  Any time.
5      MR. CYR:  We can do this, I
6  think, when we get back here in
7  ten minutes.
8      MR. SEEGER:  Do you have
9  something you wanted to add to
10  what we did?
11      MR. CYR:  No, no.  Just how
12  long should the break be?
13      MR. SEEGER:  If we can keep
14  it to ten minutes, just because we
15  lose so much.
16      THE VIDEOTAPE TECHNICIAN:
17  The time now is approximately
18  1:56 p.m., and we are now off the
19  record.
20          - - -
21      (Wherefore, a recess was
22  taken from 1:56 p.m. until
23  2:02 p.m.)
24          - - -

Page 167

1      MR. CHEN:  Chris, the
2  interpreter had asked us to give
3  English transliterations of these
4  various exhibits, which we're
5  happy to do, but I don't want to
6  write on the exhibit itself.
7      INTERPRETER 1:  The thing
8  is, because they have the
9  computer, they will check the --
10      MR. SEEGER:  Let's not do
11  that just yet unless, again, if
12  you see, you know, how you noticed
13  a character was off, if you see a
14  glaring problem.  If it is just a
15  question of it could be a little
16  bit this, a little bit that, I say
17  leave it, if that's okay with you.
18      INTERPRETER 1:  Because we
19  initially don't want to do the
20  translation of any of the names.
21      MR. SEEGER:  I know.  I
22  know.  And I don't think any of us
23  really care that much about this.
24      THE VIDEOTAPE TECHNICIAN:

Page 168

1  This begins Tape 5 of today's
2  deposition.  The time now is
3  approximately 2:14 p.m., and we
4  are back on the record.
5  BY MR. SEEGER:
6      Q.  Okay.  Where were we, and do
7  we want to go back there?
8          Mr. Jia, do you sit on
9  boards of any --
10          Other than TG and BNBM, do
11  you sit on the boards of any other
12  companies?
13      A.  I did answer already.  In
14  the subsidiaries of TG, in some of them,
15  I have position.
16      Q.  Oh, I'm sorry.
17          And he identified, I think
18  he wrote out four or five companies for
19  us; is that right?
20      A.  Yes.
21      Q.  Okay.  Thank you.
22          Do TG and TPP share any
23  facilities together?
24      A.  Share, what is the concept

Page 169

1  of share?
2      Q.  Do TG and TPP make any of
3  the same types of products?
4      A.  Yes.
5      Q.  Okay.
6          Name a product that they
7  make that's similar.
8      A.  The production of the
9  plasterboards.
10      Q.  Okay.
11          Do TG and TPP share
12  facilities regarding the production of
13  plasterboard?
14      MR. CYR:  I'm sorry.  I
15  refrained from objecting just
16  because I didn't want to take
17  time, but I'm afraid that you're
18  now about to go down a road that
19  it might create a misleading
20  record, in that we don't have the
21  time period with respect to when
22  TTP was manufacturing the product.
23  Thank you.
24      MR. SEEGER:  Okay.  I'm

Confidential - Subject to Further Confidentiality Review

Page 170

1    going to take note of that
2    objection and ask some follow-up
3    questions. Well, I'm going to ask
4    some follow-up questions, so
5    maybe --
6        MR. CYR: She just needs
7    to -- I mean, I'm not trying to
8    educate the witness, but I think
9    it's proper for her to interpret
10   what I said.
11   BY MR. SEEGER:
12       Q. I'm going to ask the
13   question differently, Mr. Jia.
14       At any time, at any time at
15   all, did TPP and TG share the same
16   facilities for the manufacture of
17   plasterboard?
18       A. No.
19       Q. At no time, you're saying,
20   did they share facilities for the
21   manufacture of plasterboard?
22       A. No.
23       Q. Did they share warehouses
24   where that plasterboard is stored? Did

Page 171

1    TG and TPP share a warehouse where
2    plasterboard is stored?
3        A. No.
4        Q. Do they share factories
5    where it's manufactured?
6        A. No.
7        Q. At any time did TG and TPP
8    share office space?
9        A. No.
10       Q. At any time did TG and TPP
11   share employees?
12       A. No.
13       Q. How about, let me ask the
14   questions this way. Did Shandong --
15       MR. SEEGER: How do you
16   pronounce the other company,
17   Shandong?
18       INTERPRETER 1: Shandong
19   Taihe.
20   BY MR. SEEGER:
21       Q. Did Shandong and TPP ever
22   share facilities in the production of
23   plasterboard?
24       INTERPERTER 1: Shandong?

Page 172

1        MR. SEEGER: It's on the
2    document.
3        INTERPRETER 1: Are you
4    talking about Shandong Taihe
5    Dongxin?
6        MR. SEEGER: Yes, yes.
7        THE WITNESS: I did answer
8    this question already.
9    BY MR. SEEGER:
10       Q. Did he answer it by
11   answering for TG? Is that what he means?
12       A. I don't understand.
13       Q. Okay.
14       I didn't ask you --
15       I never asked him the
16   question specifically relating to
17   Shandong, but if he was answering the
18   questions interpreting TG to also be
19   Shandong, then I understand his answer.
20   I'm just trying to be clear on what he's
21   saying.
22       A. I still don't understand
23   your question.
24       Q. Let me ask you this.

Page 173

1        When you say "TG," when I'm
2    asking you a question involving TG, are
3    you including in that its predecessor
4    Shandong when you give me answers? It's
5    the same company?
6        A. Yes.
7        Q. All right.
8        So, if I say "TG," are we
9    okay that I'm also including Shandong?
10       A. Do you mean at any time? At
11   any time?
12       Q. Yes.
13       A. (In Chinese.)
14       MR. SEEGER: What does that
15   mean?
16       INTERPRETER 1: Fine.
17       MR. SEEGER: You spoke
18   Chinese to me.
19       INTERPRETER 1: I'm sorry.
20       MR. SEEGER: That's all
21   right, but thank you for the
22   lesson.
23       INTERPRETER 1: You're
24   welcome.

Confidential - Subject to Further Confidentiality Review

Page 174

1 BY MR. SEEGER:
2    Q.  Has TG ever sold or leased
3 equipment to TPP?
4    A.   We did sell.
5       MR. SEEGER:  Is that his
6 answer?
7       INTERPRETER 1:  (Nodding.)
8 BY MR. SEEGER:
9    Q.  Okay.
10       Has TG ever sold or leased
11 product lines to TTP?
12       INTERPRETER 1:  Product
13    line, right?
14       MR. SEEGER:  Uh-huh.
15       MR. CYR:  I just object in
16    that there might be some confusion
17    in his response with respect to
18    product lines.  He might think
19    you're talking about different
20    kinds of product as opposed to a
21    line for production.
22       MR. SEEGER:  Actually, I'm
23    going to strike the question and
24    ask it better that way.

Page 175

1 BY MR. SEEGER:
2    Q.  Has TG sold or leased
3 production lines to TTP?
4    A.   I did answer, yeah, we did
5 sell.
6    Q.  Okay.
7       Has TG rented factory space
8 to TTP?
9    A.   We did rent it.
10    Q.  And has TG leased the
11 Taishan brand name to TTP?
12    A.   Authorized them to produce.
13    Q.  Using -- let me just add to
14 it.
15       Authorized to produce using
16 the Taishan name, correct?
17    A.   I don't understand.
18    Q.  Well, has TG allowed TTP to
19 use the Taishan name, the brand name?
20    A.   We did authorize them to
21 use.
22    Q.  Who is the Taihe Group,
23 Taihe?
24       INTERPRETER 2:  Taihe.

Page 176

1       MR. SEEGER:  Can you say it?
2       INTERPRETER 2:  Taihe.
3       MR. SEEGER:  Taihe?
4       INTERPRETER 2:  Taihe.
5       INTERPRETER 1:  Taihe,
6    you're right.
7 BY MR. SEEGER:
8    Q.   Who is the Taihe Group?
9    A.   Taihe is a very early name.
10    Q.  For?
11    A.   It is a name very early on.
12    Q.  And what was it used for?
13       MR. CYR:  What company?
14       THE WITNESS:  At that time,
15    all the factories in that area is
16    called Taihe.  It is not a legal
17    entity.
18 BY MR. SEEGER:
19    Q.  And what time frame are you
20 referring to, Mr. Jia?
21    A.   All the time.
22    Q.  Okay.
23       Are there any --
24       Is TG a part of the Taihe

Page 177

1 Group?
2       MR. SEEGER:  I'm sorry, I'm
3    not saying it right.  How do you
4    say it again?
5       INTERPRETER 1:  Taihe.
6 BY MR. SEEGER:
7    Q.  Is TG part of the Taihe
8 Group?
9    A.   Yes.
10    Q.  Are there any other entities
11 or companies related to TG that are part
12 of the Taihe Group?
13    A.   I don't understand what you
14 mean.
15    Q.  Is TTP a part of the Taihe
16 Group?
17    A.   It is an area, a district
18 called a Taihe, or a company here
19 referred to as Taihe, but it doesn't have
20 any relationship with the resources.
21    Q.  Does TG refer to itself as
22 being a part of the Taihe Group?
23       INTERPRETER 1:  I want to
24    clarify with you.  When you talk

Confidential - Subject to Further Confidentiality Review

Page 178

1 about the Taihe Group, are you
2 referring to the Shandong Taihe
3 Dongxin Company Limited?
4        MR. SEEGER:  No.
5        INTERPRETER 1:  Because
6 Taihe is a geographic place.  It's
7 a district called Taihe.  So, I
8 want to clarify when you say Taihe
9 whether you are referring to the
10 district of Taihe or the company
11 called Taihe.
12 BY MR. SEEGER:
13    Q.    Let me ask the witness a
14 question.
15        Ask Mr. Jia if he
16 understands if there's a website for the
17 Taihe Group?
18    A.    There may be such a thing,
19 but I cannot recall the details.
20    Q.    Well, then, let me ask him
21 this question, because I don't know if
22 this is going to be helpful.  I would
23 like to ask my question I asked before.
24        Does TG hold itself out as

Page 179

1 being part of the Taihe Group?
2        INTERPRETER 1:  Counsel, I
3 want to clarify.  When you're
4 talking about Taihe Group, you are
5 talking about a company, a group,
6 the company?
7        MR. SEEGER:  A group of
8 companies.
9        MR. CYR:  Excuse me, ma'am.
10        INTERPRETER 1:  But he is --
11 when the witness is referring to
12 Taihe, he's referring to a lot of
13 different --
14        MR. SEEGER:  Time out.
15 There's one little thing I have to
16 tell you.  It's an important
17 protocol.  Whether I agree or
18 disagree with him, most of the
19 time I'm going to disagree with
20 him, but if Mr. Cyr says
21 something, he's usually saying it
22 for a reason, because he's
23 concerned.  He has to interrupt
24 you, and he isn't meaning it to

Page 180

1 be --
2        INTERPRETER 1:  No problem.
3 No problem at all.
4        MR. CYR:  Right.  And I say
5 this respectfully, ma'am.  But it
6 does appear to me as though you're
7 trying to figure out what the
8 lawyer is saying, and I think your
9 job is just to interpret what he
10 said.
11        INTERPRETER 1:  Of course.
12        MR. CYR:  In this case, you
13 just need to say the words "Taihe
14 Group" in Chinese.
15        MR. SEEGER:  He's right.  I
16 know you're getting confused by
17 the names of other things, but Mr.
18 Cyr is right.
19        INTERPRETER 1:  Off the
20 record.  The reason is that
21 because he's also talking about
22 Taihe Group is referring to a
23 totally different thing.
24        MR. CYR:  Okay.

Page 181

1        INTERPRETER 1:  It is a
2 scattering of different companies
3 in this area called Taihe.  So I
4 want to clarify what it is --
5        MR. CYR:  No, he's --
6        INTERPRETER 1:  If I can
7 differentiate the two, then I
8 can --
9        MR. SEEGER:  No.  But you
10 know what?  By answering the
11 questions, I probably should --
12        INTERPRETER 1:  Of course
13 I'm doing verbatim, but with
14 verbatim, understanding the
15 background --
16        MR. SEEGER:  That's not what
17 I'm going to say.  Trust us on
18 this.  Okay?  I know that you're
19 concerned about a
20 miscommunication, and you have a
21 right to be, but I have to hear it
22 and then I'll ask a better
23 question.  But I think Mr. Cyr is
24 right that he's concerned that

Confidential - Subject to Further Confidentiality Review

Page 182

1  you're interpreting it, and he
2  doesn't want you --
3      INTERPRETER 1:  I'm not
4  trying --
5      MR. SEEGER:  Great.
6      INTERPRETER 1:  No, no, no.
7  It is not my job.  I have never
8  done this in the 20 years of my
9  career.
10     MR. SEEGER:  Okay.  No, no,
11  no.  You're doing a great job.
12     INTERPRETER 1:  I just want
13  to clarify the concepts sort of --
14     MR. SEEGER:  He wants to
15  make sure his witness testifies,
16  that's all.
17     INTERPRETER 1:  Okay.  Good.
18 BY MR. SEEGER:
19     Q.   Okay.  Let me -- I'm going
20 to back up.  Okay?  When I refer to --
21     Tell the witness when I
22 refer in my questions to the Taihe Group,
23 I'm referring to a group of companies.
24 Is that his understanding?

Page 183

1      A.   Yes.
2      Q.   Okay.
3      Is he aware of TG marketing
4  itself as being a part of the Taihe
5  Group?
6      A.   Sometimes they did mention
7  it like this.
8      Q.   And why?  Why would TG
9  mention itself in this way, so we
10 understand?
11     A.   This I also don't
12 understand, because more than ten years
13 ago, before I come, they did not do it
14 before.  After I come, I gradually,
15 they -- they don't call it this way.
16     Q.   Is it called anything at the
17 present?
18     A.   Taishan Gypsum.
19     Q.   Were there other --
20     Other than TG, were there
21 other companies that he could identify
22 for us that were part of the Taihe Group
23 when it was known as the Taihe Group?
24     A.   I cannot say.

Page 184

1      Q.   You cannot say?
2      Are you aware that there is
3  currently still up a website that uses
4  the name Taihe Group, and it also, you
5  know, it shows it as -- I'm going to mark
6  it.  It's in English, though.  He's not
7  going to be able to read it.
8      MR. CYR:  I don't mind you
9  asking him that question if you
10 want to do it that way.
11      - - -
12     (Whereupon, Deposition
13 Exhibit Jia-8, Printout from
14 website, 2 pages, was marked for
15 identification.)
16      - - -
17     MR. SEEGER:  I'm sorry, were
18 you talking to the witness?
19     INTERPRETER 1:  I'm
20 translating the question.  I never
21 talk to him.
22     MR. SEEGER:  I think we got
23 off track, that's all.
24     MR. CYR:  Yes.  I just want

Page 185

1  to state for the record that as
2  you're asking him the question,
3  are you aware that there's a
4  website, and then you're handing
5  him a document that he can't read,
6  there is a suggestion to him that
7  the document that is being handed
8  to him somehow evidences the
9  website.  I'm hoping that you can
10 get through the questions without
11 doing that.
12     MR. SEEGER:  I'll tell you
13 what.  I don't really even have a
14 pending question on it.  I'm just
15 going to ask him.
16 BY MR. SEEGER:
17     Q.   So, ask Mr. Jia to please
18 take a look at what we've just marked as
19 Exhibit 8.
20     A.   (Witness complies.)
21     Q.   Now, Mr. Jia, you don't read
22 any English, right?
23     A.   I cannot read it.
24     Q.   Do you understand --

Confidential - Subject to Further Confidentiality Review

Page 186

1    Can you read the name
2 Taishan Gypsum in English if you saw it?
3 Would you understand that?
4    A.   It seems like to be it, but
5 I cannot be sure.
6    Q.   If you'd just point him to
7 the very first two words of the first
8 paragraph, would he understand that to
9 mean Taishan Gypsum? Right, the very
10 first two words?
11    A.   I only recognize Taishan,
12 but I don't recognize the other words.
13    Q.   Could you go to the next
14 page, please, Mr. Jia.
15    A.   (Witness complies.)
16    Q.   And if you'd look at this
17 paragraph right here, the second
18 paragraph, Mr. Cyr, do you see your name
19 in that paragraph, Mr. Jia?
20    A.   Yes, I can see it.
21    Q.   Now, would you have any
22 understanding, sitting here today, as to
23 whether or not this is still up on the --
24 still available on the Internet, on the

Page 187

1 website? I mean, if I represent to you
2 that I just got this off the website a
3 couple days ago --
4    MR. CYR:  I'm okay with
5    that.
6    MR. SEEGER:  Okay.
7 BY MR. SEEGER:
8    Q.   -- would you dispute that I
9 was able to find this?
10    A.   I don't know.
11    MR. SEEGER:  I'm sorry, what
12    was the problem?
13    MR. CHEN:  The actual
14    question didn't get translated.
15    MR. SEEGER:  Okay. So did
16    you get my whole question? Would
17    you repeat it to Mr. Jia?
18    INTERPRETER 1:  I did
19    translate your --
20    MR. SEEGER:  Oh, Linda
21    missed it?
22    THE COURT REPORTER:  I'm
23    sorry, it's right here.
24    - - -

Page 188

1    (Whereupon, the requested
2    portion of the transcript was read
3    by the court reporter as follows:
4    "Q.  If I represent to you
5    that I just got this off the
6    website a couple days ago, would
7    you dispute that I was able to
8    find this?")
9    - - -
10    MR. SEEGER:  That's the
11    question.
12    THE WITNESS:  I don't
13    understand English, and I have no
14    recollection of this. I don't
15    know what is being written there.
16 BY MR. SEEGER:
17    Q.   But you do recognize -- I
18 know it's in English, but you recognize
19 your name on the second page, right, sir?
20    A.   Yes.
21    Q.   And it describes you on
22 this -- it's in English, but it describes
23 you as the general manager and chairman
24 of the board, so it accurately reflects

Page 189

1 your name and title, correct?
2    MR. CYR:  I'm going to
3    object. The witness has already
4    said he doesn't understand
5    English.
6    MR. SEEGER:  Would you let
7    him answer that, though?
8    MR. CYR:  Sure.
9    MR. SEEGER:  If he can.
10 BY MR. SEEGER:
11    Q.   You can answer.
12    A.   Well, what do I have to
13 answer? I'm not sure.
14    Q.   Okay.
15    Let me back up and ask you
16 questions I asked earlier, but I wasn't
17 sure if we really answered.
18    Does TTP market itself, as
19 far as you know, as part of the Taihe
20 Group?
21    A.   According to my
22 understanding, everything, the TTP, TG,
23 Tai'an, and all the other companies under
24 Tai'an, they are all in general being

Confidential - Subject to Further Confidentiality Review

Page 190

1  called Taihe. And originally there is a
2  Taihe Dongxin -- originally they have --
3  there is a Taihe Dongxin, but later on
4  they deleted the word "Dongxin."
5      Q.  Do you know, Mr. Jia, if
6  BNBM marketed itself at any point as part
7  of the Taihe Group?
8      A.  It has never been the case.
9      Q.  Do BNBM and TG share any
10 production lines or facilities?
11     A.  Please repeat it.
12         MR. SEEGER: (Addressing the
13 interpreter.)
14         Well, you can go ahead. I
15 think that related more to you.
16 I'm off the hook on that one.
17         (Interpreter repeats
18 question.)
19         THE WITNESS: No.
20 BY MR. SEEGER:
21     Q.  At any time, to your
22 knowledge, did BNBM and TG ever share any
23 employees?
24     A.  No.

Page 191

1      Q.  To your knowledge, have
2  there been any loans or other financial
3  arrangements between BNBM and TG?
4      A.  No loan.
5         MR. SEEGER: Excuse me?
6         INTERPRETER 1: No loan.
7  BY MR. SEEGER:
8      Q.  I'm not sure I understand
9  the answer.
10         Are there any other
11 financial arrangements other than loans
12 between BNBM and TG?
13     A.  Financial arrangement, if
14 you translated it directly, I don't
15 understand.
16     Q.  Do BNBM -- I'm sorry, strike
17 it.
18         Does BNBM guarantee loan
19 obligations to banks on behalf of TG?
20     A.  Yes.
21     Q.  Has BNBM loaned money to TG?
22     A.  No.
23         MR. SEEGER: I'm sorry, what
24 was the answer?

Page 192

1         INTERPRETER 1: No.
2         MR. SEEGER: Excuse me.
3  BY MR. SEEGER:
4      Q.  Does TG guarantee loan
5  obligations to any banks for TTP?
6      A.  No.
7      Q.  Does TG loan money to TTP?
8      A.  I did answer before, no.
9      Q.  Does TG continue to invest
10 money in TTP?
11     A.  No.
12     Q.  Does BNBM invest money --
13 continue to -- let me strike that.
14         Does BNBM invest money in
15 TG?
16     A.  I don't understand the
17 question.
18     Q.  Okay.
19         For any point in time, has
20 BNBM invested money in TG?
21     A.  It did buy shares from TG.
22     Q.  Was that the extent of its
23 investment?
24         INTERPRETER 2: The check

Page 193

1  interpreter believes the
2  interpretation should be zhe shi
3  fou ni men de, tou zi, tg sou you
4  de tou zi.
5         INTERPRETER 1: What the
6  check interpreter was interpreting
7  was that all of the investment to
8  TG. I thought it was not the
9  question. I disagree with the
10 check interpreter.
11         MR. SEEGER: The question
12 that I asked -- you understood --
13 I don't even remember what the --
14         - - -
15         (Whereupon, the requested
16 portion of the transcript was read
17 by the court reporter as follows:
18         "Q.  For any point in time,
19 has BNBM invested money in TG?
20         A.  It did buy shares from
21 TG.
22         Q.  Was that the extent of
23 its investment?")
24         - - -

Page 194

1    MR. CHEN:  My issue was the
2  translation of that last question.
3    MR. SEEGER:  Okay.  Okay.
4  So ask that question again.
5  Let me just see what the -- you
6  guys listen in.  Okay?  Ask the
7  same question.
8    - - -
9    (Whereupon, the requested
10  portion of the transcript was read
11  by the court reporter as follows:
12    Q.  Was that the extent of
13  its investment?")
14    - - -
15    THE WITNESS:  I don't
16  understand what you want me to
17  answer.
18  BY MR. SEEGER:
19    Q.  Other than purchasing the
20  shares, did BNBM invest any other money
21  in TG?  Did it provide it with money in
22  any other way?
23    A.  No.
24    Q.  And I'm going to reask the

Page 195

1  question, because I think when I did ask
2  it, I didn't do a good job.
3    MR. CYR:  As you can see, I
4  don't have problems with you
5  asking the same question more than
6  once, because we do have some
7  uncertainties with respect to the
8  language.
9    MR. SEEGER:  And I'm
10  definitely signaling, I think I
11  asked it, but I'm not sure I asked
12  it the right way.
13  BY MR. SEEGER:
14    Q.  At any point in time, has TG
15  loaned money to TTP?  At any point in
16  time?
17    A.  No.
18    Q.  I'm going to ask another
19  series of questions.
20    Are there any employees,
21  including shareholders, officers or
22  directors of TG, that are paid or
23  compensated by BNBM?
24    A.  No.

Page 196

1    Q.  Are there any employees,
2  shareholders, officers or directors of
3  TTP that are paid or compensated in any
4  way by TG?
5    A.  Please repeat it.
6    (The interpreter repeats the
7  question.)
8    No.
9    Q.  All right.
10    Do BNBM and TG share any
11  plants, factories or production lines?
12    A.  No.
13    Q.  Do BNBM and TG share any
14  operations together at all?
15    A.  Can you give me the
16  definition of the word "operation"?
17    Q.  Factory operations for the
18  production of plasterboard, let's say.
19    A.  No.
20    Q.  Do they share --
21    Does BNBM and TG share any
22  mining operations or mines from which
23  gypsum is mined?
24    A.  What mine?

Page 197

1    Q.  You tell me.  That's my
2  question.  I'm asking if BNBM and TG
3  share the same mines for mining gypsum.
4    A.  No.
5    Q.  Do BNBM and TG share any of
6  the same product lines?  Do they make the
7  same products?
8    A.  No.
9    MR. CHEN:  Let me just
10  clarify.  The question translated
11  referred to production lines, not
12  product lines.
13    MR. SEEGER:  Production
14  lines, not what?
15    MR. CHEN:  Not product
16  lines.
17    MR. SEEGER:  Oh, I was
18  asking about products, specific
19  products.
20  BY MR. SEEGER:
21    Q.  Do they sell --
22    Do they make and sell
23  similar products?
24    A.  I don't understand.

Confidential - Subject to Further Confidentiality Review

Page 198

1    Q.   Well, TG makes and sells
2    plasterboard.  Does BNBM make and sell
3    plasterboard?
4        A.   I don't understand the
5    meaning.
6        Q.   Which meaning?
7        A.   I don't understand your
8    concept, the meaning of what you're
9    talking about.
10       Q.   Does BNBM make and sell
11   products?
12       A.   Yes.
13       Q.   TG makes and sells products
14   also, correct?
15       A.   Yes.
16       Q.   Do they make and sell
17   similar products?
18       A.   What do you mean by -- what
19   is the concept "similar"?
20       Q.   Well, TG makes and sells
21   plasterboard, correct?
22       A.   TG has its own brand to sell
23   the plasterboard.
24       Q.   Okay.

Page 199

1        Does BNBM have their own
2    brand of plasterboard?
3        A.   Yes.
4        Q.   Are there any other
5    products, even though they have different
6    brand names, that TG makes that BNBM also
7    makes?
8        A.   No.
9        Q.   So, BNBM is a shareholder in
10   TG, correct?  I think we established
11   that.
12       A.   Yes.
13       Q.   How does BNBM get paid on
14   their investment in TG?
15       A.   Through the profit sharing
16   of dividends.
17       Q.   And is there a specific
18   agreement between BNBM and TG regarding
19   dividends, how they're paid, profit
20   sharing, anything of that nature?
21       A.   No agreement.
22       Q.   So then, how are they paid?
23   How does it work?
24       A.   Usually around March and

Page 200

1    April, we would have dividends for the
2    year before.
3        Q.   And who determines what the
4    dividend is?
5        A.   So the dividend based on
6    like the TG dividend depends on every
7    year, how much profits they make, and
8    also how much TG would require for the
9    expansion of production.  So, they add up
10   all these factors to make a decision.
11       Q.   Is it a formula that gets
12   applied year after year the same way or
13   does it change from year to year?
14       A.   So, we have been doing this
15   with this method since we started the
16   joint venture.
17       Q.   But my question is, is it a
18   formula that is applied exactly the same
19   year, or does the formula determining
20   what the dividend is, you know, how much
21   they need to hold back, is that the same
22   every year?
23       A.   Yes.
24       Q.   Yes to which part?

Page 201

1        A.   The procedures that you just
2    mentioned.
3        Q.   It's the same?  He's saying
4    it's the same every year?
5        A.   Yes.
6            MR. CYR:  I just want to
7        state for the record that saying
8        that the procedure is the same
9        every year is different than
10       saying that they use the same
11       formula every year.
12           MR. SEEGER:  Oh, I
13       understand that.
14   BY MR. SEEGER:
15       Q.   So, let me ask that question
16   of the witness.
17           So, although the procedures
18   are the same, does that require that the
19   formula change year to year?
20       A.   I did mention it.  Starting
21   from the year 2005 when we started to
22   cooperate, we have been operating like
23   this, and we have been doing the dividend
24   with this method.

Confidential - Subject to Further Confidentiality Review

Page 202

1    MR. CHEN: One moment. Just
2  the term "fangshi" I think means
3  more of a way or a pattern. Fang
4  shi is more a formula, as in a
5  mathematical formula.
6    MR. SEEGER: Which one are
7  you using?
8    MR. CHEN: You were using
9  way or pattern.
10    INTERPRETER 1: No, no. I
11  did use formula. I did write it
12  down here even, sir. Formula, I
13  did translate formula as formula
14  in Chinese.
15    But when he responded, he
16  said fangshi. That's the method
17  or the way, fangshi.
18    MR. CHEN: So, his response
19  was referring to the method or
20  pattern, not necessarily a
21  mathematical formula.
22    MR. SEEGER: Okay.
23    INTERPRETER 1: But I did
24  ask him the word "formula."

Page 203

1  BY MR. SEEGER:
2    Q.  Mr. Jia, in answering a
3  couple of these questions, you referred
4  to the relationship between TG and BNBM
5  once as cooperative and another time as a
6  joint venture. Can you explain what you
7  mean by that?
8    A.  Okay. Let me say, to me,
9  cooperation and joint venture is the same
10  concept.
11    Q.  Okay.
12    And I'm asking you if you
13  could elaborate on what you mean by a
14  joint venture between TG and BNBM.
15    A.  Okay. After the procurement
16  of the shares of TG by BNBM, that
17  relationship, I call it a joint venture
18  or cooperation.
19    Q.  Can you explain --
20    When you use the words
21  "cooperation" or "joint venture,"
22  whatever you're more comfortable with,
23  could you give me examples of the
24  relationship between BNBM and TG as a way

Page 204

1  best to describe that cooperation or
2  joint venture between the two?
3    A.  Okay. After BNBM procured
4  the shares from TG, according to my
5  understanding, that forms a relationship
6  of a joint venture. And I was a
7  shareholder of TG before. And even
8  earlier, I was a shareholder of BM.
9  According to my understanding, it become
10  a joint venture.
11    MR. CYR: Is that accurate?
12    INTERPRETER 2: The check
13  interpreter believes that after
14  BNBM purchased TG's shares, my
15  understanding is that it is a
16  cooperation relationship. And I
17  was TG shareholder. And before
18  that, I was BNBM shareholder. So,
19  to me, it's like a joint venture.
20    INTERPRETER 1: But he used
21  the joint venture in both times,
22  he zi instead of he zuo. He zi is
23  cooperation. I have he zuo both
24  times, so I disagree with the

Page 205

1  check interpreter.
2    MR. CYR: When it's
3  convenient for you, I think it's
4  time for a break.
5    MR. SEEGER: Can I go five
6  more minutes?
7    MR. CYR: Yes.
8  BY MR. SEEGER:
9    Q.  Mr. Jia, do you own any
10  shares or stock in TG?
11    A.  I have shares.
12    Q.  Can you tell me what
13  percentage of the outstanding shares he
14  owns?
15    MR. PANAYOTOPOULOS:
16  Objection to the form.
17    MR. SEEGER: You're right.
18  Let me rephrase it. Okay? Let me
19  ask the question again.
20  BY MR. SEEGER:
21    Q.  Mr. Jia, what percentage of
22  the outstanding shares of TG do you own?
23    A.  5 percent.
24    Q.  What percentage of the

Confidential - Subject to Further Confidentiality Review

Page 206

1 outstanding shares of TTP do you own?
2      A.   I don't have any.
3      Q.   And do you own any shares in
4 BNBM?
5      A.   I don't.
6           MR. SEEGER:  Do you want to
7 take a break?
8           MR. CYR:  Yes.
9           THE VIDEOTAPE TECHNICIAN:
10 The time now is approximately
11 3:13 p.m., and we are now off the
12 record.
13           - - -
14      (Whereupon, a recess was
15 taken from 3:13 p.m. until
16 3:30 p.m.)
17           - - -
18           THE VIDEOTAPE TECHNICIAN:
19 This begins Tape 6 of today's
20 videotape deposition.  The time
21 now is approximately 3:30 p.m.,
22 and we're back on the record.
23 BY MR. SEEGER:
24      Q.   Mr. Jia, I think you

Page 207

1 acknowledged this in your earlier
2 testimony, that TTP is an important asset
3 of TG.  Is that fair to say?
4      A.   Unfair.
5      Q.   Unfair?
6           INTERPRETER 1:  Yes.
7 BY MR. SEEGER:
8      Q.   Does he want me to ask him
9 the question a different way?
10      A.   It is more appropriate to
11 say is it an important subsidiary.
12           MR. SEEGER:  Okay.
13           MS. BASS:  An important
14 what?
15           MR. SEEGER:  Subsidiary.
16 I'll rephrase the question that
17 way.
18 BY MR. SEEGER:
19      Q.   You would acknowledge that
20 TTP is an important subsidiary of TG,
21 correct?
22      A.   Correct.
23      Q.   Who at TG is responsible for
24 overseeing the business and the

Page 208

1 management of TTP, if anyone?
2      A.   The director.
3      Q.   And can you identify that
4 person by name?
5      A.   Peng Shi Liang.
6      Q.   Why don't we go ahead with
7 the piece of paper and have him write it
8 down.  Can you give him a piece of paper,
9 please?
10      A.   I have written down that
11 name.
12      Q.   Okay.
13           Could you tell me which
14 exhibit his name is on?  We've got a few
15 here.
16      A.   This one.
17           MR. SEEGER:  Okay.
18           Just tell me the exhibit
19 number.
20           INTERPRETER 1:  Exhibit
21 Number 4.
22 BY MR. SEEGER:
23      Q.   Okay.
24           And how long has this

Page 209

1 gentleman been in this position as a
2 director?
3      A.   Since the establishment of
4 TTP, he has been in this position.
5           MR. SEEGER:  Are you done?
6           INTERPRETER 1:  Yes.
7 BY MR. SEEGER:
8      Q.   So, this person, the
9 director -- I'm sorry, what is his name
10 again?
11           INTERPRETER 1:  Peng Shi
12 Liang.  P-E-N-G, S-H-I, L-I-A-N-G.
13 BY MR. SEEGER:
14      Q.   This person, Peng Shi Liang,
15 his name is noted on Exhibit 4, he has
16 been a director at TG, I'm sorry, for how
17 long?  I lost track.
18      A.   He has always been in this
19 position.
20      Q.   Okay.
21           I'm sorry.  I'm asking him
22 the question again, because some of us --
23 and I'm not even clear if I was clear in
24 my question.

Page 210

1 The person listed on Exhibit
2 4, Peng Shi Liang, is he a director of TG
3 or TTP?
4 A. He is a chairman of the
5 board of TTP.
6 Q. What I was asking, and I
7 want to be clear on this. I would like
8 to know who, if anyone, is the person at
9 TG who takes on, you know, not day-to-day
10 responsibilities, but is responsible for
11 monitoring the business and activities of
12 TTP.
13 A. No. He's responsible for
14 everyday activities.
15 Q. Who is the "he" in that
16 sentence?
17 A. Peng Shi Liang.
18 Q. He is an employee also with
19 TG?
20 A. Yes.
21 Q. And he's an employee with
22 TTP?
23 A. Yes. He is.
24 MR. CYR: I just want to

Page 211

1 state for the record, there could
2 be some confusion. I believe he's
3 testified that he was a director
4 at TTP. I'm not sure that his
5 testimony really is that he was an
6 employee. Thank you.
7 You don't need to translate.
8 I'm not trying to educate the
9 witness.
10 MR. SEEGER: It was your
11 witness that was speaking.
12 - - -
13 (Whereupon, there was an
14 off-the-record discussion between
15 the witness and his counsel.)
16 - - -
17 MR. SEEGER: I just want to
18 note for the record, there's a
19 dialogue going on between the
20 witness and some of the attorneys.
21 MR. CYR: It might be
22 helpful in that Mr. Jia is
23 concerned that some of your
24 questions and some of his answers

Page 212

1 might not have the -- the time
2 period might be a factor in what
3 the answers are.
4 I have been listening to the
5 questions. They seem to be asking
6 questions about the current time
7 period, and so I've been
8 comfortable with that. But he is
9 concerned, he wants to make sure
10 he's giving you accurate answers
11 with respect to the time period
12 that you're referring to.
13 MR. SEEGER: All right.
14 Fair enough. I mean, I just want
15 to note that several times I have
16 asked Mr. Jia some questions, and
17 he had corrected me and asked me
18 for a time frame. He didn't do it
19 this time. But I accept -- if
20 that's what he's asking for now,
21 I'm happy to do it. But he didn't
22 ask for that in response to this
23 question before the dialogue with
24 counsel, so --

Page 213

1 MR. CYR: I'm sorry. I have
2 no idea what the purpose of that
3 comment was. We have a witness
4 here who is trying to make sure
5 that his answers are accurate, and
6 he's actually helping out. If you
7 think there was some attempt --
8 MR. SEEGER: Well, you must
9 have the impression I accused you
10 of something. I didn't accuse you
11 of anything.
12 MR. CYR: It sounds like
13 you're suggesting there was some
14 manipulation. It was quite to the
15 contrary.
16 We're ready for your next
17 question.
18 MR. SEEGER: I don't think
19 you should be so defensive. I
20 think all I'm stating is that you
21 had a dialogue and now you're
22 saying the witness needs some
23 clarification of the question.
24 That's all. That's what happened.

Confidential - Subject to Further Confidentiality Review

Page 214

1    MR. CYR: We're ready.
2    MR. SEEGER: So, I'm not
3  sure where to go with this. Do
4  you want -- does the witness want
5  to ask me a question?
6    MR. CYR: No. The witness
7  is ready for your next question.
8    MR. SEEGER: Okay. Thank
9  you.
10 BY MR. SEEGER:
11   Q.  Mr. Jia, does CNBM, and just
12 to be clear, when I refer to CNBM, I'm
13 referring to China National Building
14 Material Company Limited, own an interest
15 in BNBM?
16     INTERPRETER 2: The check
17 interpreter may raise that in
18 Chinese?
19     MR. SEEGER: Could you tell
20 me -- could you state for all us
21 of what the issue is?
22     INTERPRETER 2: Interest,
23 the interpreter's interpretation
24 of interest is clearly purely

Page 215

1  benefit, but the interest may be
2  an equity.
3     INTERPRETER 1: It is not
4  for us to make that judgment. I'm
5  just doing verbatim.
6     MR. CYR: Thank you very
7  much. We're ready to proceed.
8     MR. SEEGER: I'm going to
9  change the question.
10 BY MR. SEEGER:
11   Q.  Mr. Jia, does CNBM, and by
12 that I mean, you know, I want to be clear
13 for the question, China National Building
14 Material Company Limited, own shares in
15 BNBM?
16   A.  Yes, it owns.
17   Q.  Does CNBM own shares in TG?
18   A.  No.
19   Q.  Does TG sell or market
20 drywall to the U.S.?
21   A.  This I cannot confirm.
22   Q.  Can you tell me why you
23 cannot confirm it?
24   A.  In the year 2005, around the

Page 216

1  end of that year, people who are in
2  charge of the sales told me there's a
3  possibility for some U.S. customers to
4  come for orders where we'll produce some
5  of the drywall for them. But when -- how
6  they are going to sell it, whether they
7  are going to sell it to the United States
8  or they're going to sell it to outside
9  the United States, that I don't know.
10   Q.  But you do know --
11     MR. CHEN: Objection. I
12 just want to note that the
13 interpretation is all in the
14 plural relating to customers,
15 orders and such, and the answer
16 was -- didn't reflect -- Chinese
17 doesn't clearly reflect either
18 plural or singular.
19     INTERPRETER 1: So it is up
20 to the judgment of the lawyers or
21 follow up with another question.
22 We are not going to make that
23 judgment.
24     MR. SEEGER: Well, you've

Page 217

1  noted that. You know, you have
2  the errata.
3     MR. CYR: That's all we're
4  asking to do. And we're ready.
5  BY MR. SEEGER:
6    Q.  Okay.
7    But my question, to be
8  clear, is that TG did market for the sale
9  of drywall in the U.S., correct? They
10 marketed in the U.S.? Is that correct or
11 not?
12     MR. CYR: Objection. The
13 question is leading.
14     INTERPRETER 1: I haven't
15 finished translating the question
16 yet.
17     MR. CYR: Objection. The
18 question is leading.
19    You may try to answer the
20 question, Mr. Jia.
21     THE WITNESS: We produced
22 the drywall. It is of --
23     MR. SEEGER: I'm sorry, was
24 he finished with his question,

Confidential - Subject to Further Confidentiality Review

Page 218

1 because he --
2 INTERPRETER 1: I want him
3 to pause so I don't miss anything.
4 I want him to pause.
5 MR. SEEGER: Okay.
6 But you have to go back and
7 let him finish his answer.
8 INTERPRETER 1: Yeah, right.
9 True.
10 THE WITNESS: We produced
11 the drywall. And it is a very
12 heavy item, and they have to ship
13 it to a very far away places. The
14 costs would be very high. If
15 there is a customer tell us that
16 they want to sell it to the United
17 States, I wouldn't believe it,
18 because the cost would be too
19 high. We have no plan to enter
20 the U.S. market.
21 BY MR. SEEGER:
22 Q. All right.
23 - - -
24 (Whereupon, Deposition

Page 219

1 Exhibit Jia-9, Taishan Ceiling and
2 Wall System, Bates stamped TG
3 0025132 through TG 0025151, TG
4 0025155 through TG 0025158, TG
5 0025216 through TG 0025218, TG
6 0025253 through TG 0025255, TG
7 0025275, TG 0025329 through TG
8 0025332, TG 0025344 through TG
9 0025349, and TG 0025397 and TG
10 0025398, was marked for
11 identification.)
12 - - -
13 MR. CYR: I need one in
14 English, right?
15 MR. GRAND: It is actually
16 both.
17 MR. CYR: Excuse me. Is it
18 both?
19 MS. BASS: What are we
20 marking, please?
21 MR. SEEGER: For the record,
22 the document I believe we've just
23 marked as Exhibit 9 is Bates
24 stamped TG 0025132 through --

Page 220

1 MS. BASS: 25132?
2 MR. SEEGER: Right. Through
3 398.
4 BY MR. SEEGER:
5 Q. The cover says "Taishan
6 Ceiling and Wall System," and there's
7 some Chinese, and below it is the
8 trademark for Taishan Gypsum Company Ltd.
9 Mr. Jia, do you recognize
10 this document? Can you identify it by
11 the record as a company document -- for
12 the record as a company document?
13 A. That is an introduction of
14 our company, a brief introduction. It is
15 also an introduction of our products, a
16 basic introduction of our product.
17 Q. Okay.
18 And you do acknowledge, this
19 is a document created by the company?
20 It's a Taishan -- it's a TG-created
21 document, correct?
22 A. Yes.
23 Q. And if you'd look on the
24 second page, that's -- again, that's your

Page 221

1 picture there, right?
2 A. Yes.
3 Q. Now, I was asking you
4 questions about the company marketing in
5 the U.S. Do you recall those questions?
6 A. Yes.
7 Q. And the document I put in
8 front of you is both in Chinese and
9 English. You see that, correct?
10 A. Yes.
11 Q. I want to just point out to
12 you where I'll be reading so you can find
13 it. I'm going to be reading in this area
14 here. So, you can find the Chinese that
15 goes along with it.
16 MR. CYR: If you could just
17 hold for a minute.
18 MR. SEEGER: Sure.
19 MR. CYR: Eugene, could you
20 tell Mr. Jia just to read this
21 last paragraph here and then get
22 ready for the question.
23 MR. CHEN: Can we tell him
24 which paragraph you are starting

Confidential - Subject to Further Confidentiality Review

Page 222

1  with?
2      MR. SEEGER:  The one in
3  English.  Yeah, that's it.
4      MR. CYR:  This one here,
5  which I imagine is this here.
6      MR. CHEN:  It's the last
7  paragraph?
8      MR. SEEGER:  Yeah.
9      MR. CYR:  Tell us when he's
10  ready for the lawyer's next
11  question.
12      Ready?  Thank you.
13      MR. SEEGER:  No problem.
14  BY MR. SEEGER:
15      Q.  Mr. Jia, if you can look at
16  the paragraph where you were, about
17  halfway through it, I'll read the English
18  portion, maybe --
19      MR. SEEGER:  I don't know
20  how you want to help him find it
21  in Chinese, but I don't mind if
22  one of your people want to point.
23      MR. CYR:  I think the best
24  way is to have the interpreter

Page 223

1  interpret what you say.
2      MR. SEEGER:  And let him try
3  to find it in the paragraph.  If
4  he can't, I don't have a problem
5  with somebody pointing it out.
6  BY MR. SEEGER:
7      Q.  There's a section here where
8  it says, "We have a self-supported" --
9  right where your pen is.  I'm going to be
10  reading right in this area.  It says, it
11  starts off, "We have a self-supported
12  import and export."
13      Do you see where I am?
14      A.  Yes.
15      Q.  Read along with me.
16      For the record, it says, "We
17  have a self-supported import and export
18  approval, our products not only sell well
19  in our domestic market also export to
20  many countries," for example, "U.A.E.,
21  Indonesia, India, Russia, U.S.A., etc.
22  'Taishan' series gypsum board has
23  passed," and it talks about "ISO9001-2000
24  quality system authorization and

Page 224

1  certificate of 'Green Building
2  Material,'" so on and so forth.
3      MR. SEEGER:  Can you point
4  out in Chinese the area where I
5  was reading?
6      INTERPRETER 1:  I have to
7  find it.
8      MR. CYR:  I just want to
9  say, I think he's just read that
10  paragraph, so he's comfortable --
11      MR. SEEGER:  He's okay with
12  that?
13      MR. CYR:  I think we can go
14  with your question.
15      MR. SEEGER:  The document,
16  does it -- well, it's hard for me
17  to ask if what I just read
18  accurately, but --
19  BY MR. SEEGER:
20      Q.  What I would like him to --
21  if you can point out to him the part in
22  Chinese that I read, I want -- my
23  question to him is, is that an accurate
24  statement of the company's efforts for

Page 225

1  marketing and selling product in the
2  U.S.?
3      MR. CYR:  Excuse me.  I
4  don't know what she's doing.  I'm
5  not sure what the contribution
6  here is.
7      MR. SEEGER:  She's just
8  verbatim reading it.
9      MR. CYR:  I'm sorry.  I'm
10  going to have to object to this.
11  One question would be whether or
12  not that's an accurate translation
13  in English.  A separate question,
14  which is the one I think you
15  asked, is whether or not this
16  accurately reflects Taishan
17  Gypsum's marketing efforts and
18  things like that.  And I just want
19  to --
20      MR. SEEGER:  In the U.S.
21      MR. CYR:  Yeah, in the U.S.
22  And, again, we don't need to
23  interpret what I've just said.
24  I'm not trying to manipulate

Confidential - Subject to Further Confidentiality Review

Page 226

1  anything.
2      MR. SEEGER: Fair enough.
3  BY MR. SEEGER:
4      Q.  Let me ask the question this
5  way.
6          The paragraph that Mr. Jia
7  was asked to read, Mr. Jia, can you tell
8  me if that accurately reflects the
9  company's marketing and selling practices
10 with regard to the United States?
11     A.  Do I have to answer?
12     Q.  Yes.  I'm sorry.
13     A.  This document was printed
14 after the year 2009.  It reflects the
15 current situation of TG.
16     Q.  Okay.
17         So, that document was
18 produced in 2000 -- I'm sorry, after
19 2009?
20         INTERPRETER 1:  After 2009,
21 right.
22 BY MR. SEEGER:
23     Q.  Could you take a look at
24 what we've marked as Exhibit 2, Mr. Jia,

Page 227

1  and tell me what time frame that document
2  covers?
3      A.  It is possible that this
4  document was before the year 2008.
5      Q.  And it's possible --
6          Is it possible that it could
7  have gone back as far as 2005?
8          Could you ask -- I'm sorry,
9  Mr. Jia, is it possible that that could
10 go back as far as 2005?
11         MR. CYR:  Objection, asking
12     the witness to speculate.
13         THE WITNESS:  But I cannot
14     confirm what time period it is for
15     this document.
16 BY MR. SEEGER:
17     Q.  Do you have an opinion, can
18 you express an opinion, and if you can't,
19 that's fine, but can you express an
20 opinion as to the earliest that document
21 might go back?
22         MR. CYR:  Same objection.
23     You can answer, Mr. Jia.
24         THE WITNESS:  Okay.  At the

Page 228

1  end of the year 2007, Shandong
2  Taihe Dongxin Company Limited
3  changed the name into TG.  All the
4  original documents for external
5  use has to be updated, because the
6  name is no longer matching.
7  BY MR. SEEGER:
8      Q.  So but the document that's
9  marked as Exhibit 2, Mr. Jia, shows the
10 current name -- I'm sorry, shows the
11 former name, correct, of the company?
12     A.  Yes.
13     Q.  And is it possible that that
14 was still the name of the company when
15 that document was created?
16     A.  I don't understand what you
17 mean.
18     Q.  Is it possible that that
19 document could be dated prior to the name
20 change?
21     A.  Yes.
22     Q.  And it's got the logo, the
23 Taihe Group logo, up at the upper
24 left-hand corner, right?

Page 229

1      A.  Yes.
2      Q.  Sir -- I'm sorry, I didn't
3  mean to cut you off.
4          Mr. Jia, would you please go
5  to Page 2 of the document that's in front
6  of you, Exhibit 2.  And can you find on
7  that page in Chinese -- and I know that
8  that's not a great copy.  I have a better
9  copy in front of me, in fact, if you'd
10 like to look at the better copy.
11         MR. CYR:  Let's do that.
12         MR. SEEGER:  This is
13     somebody else's.  If you could
14     just --
15         MR. GRAND:  We can replace
16     it.
17         MR. SEEGER:  I'll replace
18     it.  So, we'll leave this as the
19     exhibit for now, if that's okay.
20         MR. CYR:  Yeah.  I just want
21     to be able to read.
22         MR. SEEGER:  Yeah, exactly.
23     And this is a better copy for him.
24 BY MR. SEEGER:

Confidential - Subject to Further Confidentiality Review

Page 230

1    Q.   Now, in Exhibit 2, which is
2  a document that you acknowledge could be
3  dated, you know, could be back from the
4  time when the company had a different
5  name, which was Shandong Taihe Dongxin,
6  do you find the same language I just read
7  to you as Exhibit 9?
8          INTERPRETER 1:  Counsel, I
9  don't understand what you mean by
10  "find the same language."
11  BY MR. SEEGER:
12    Q.   Exhibit 2, do you see
13  exactly --
14          The identical language that
15  we read in Exhibit 9 with regard to
16  marketing and selling in the U.S., don't
17  you see the identical language in Exhibit
18  2?
19          MR. CYR:  I know you didn't
20      intend to.  I'm just going to
21      object in that I'm not sure that
22      the words here are consistent with
23      your phrase "marketing and selling
24      in the U.S."  There's no -- I have

Page 231

1      no need for the interpreter to
2      interpret what I just said except
3      for to say that, Mr. Jia, you can
4      try to answer the question.
5          MR. SEEGER:  Okay.
6          Would you also tell him that
7      he should feel free to put Exhibit
8      9 and Exhibit 2 in front of him,
9      and he can check the language in
10      both if he'd like.
11          MR. CYR:  I say this
12      respectfully in the interest of
13      advancing time, but the documents
14      do speak for themselves.  And
15      having him give his opinion about
16      whether or not it is the same
17      language, I'm just questioning
18      whether that's the best use of our
19      time.
20          MR. SEEGER:  Well, since
21      it's my time --
22          MR. CYR:  It's your time.
23          THE WITNESS:  I am finished
24      looking at it.

Page 232

1  BY MR. SEEGER:
2    Q.   It's pretty much the same
3  language in both documents, correct,
4  regarding exporting drywall to the U.S.?
5    A.   Yes.
6    Q.   Actually, there's one other
7  part of this, Mr. Jia, I want to ask you
8  about.  I'm sorry.
9          Again, I'm showing you
10  what's been marked as Exhibit 2.  Could
11  you please take a look at -- and I have
12  no problem if your team wants to help him
13  with this.  In English, the paragraph
14  starts with, "It is abundant in raw
15  gypsum resources."  The Chinese portion,
16  if you can point out to him.
17          MR. CYR:  So, right now
18      we're asking Mr. Jia to read --
19      excuse me, ma'am.
20          Right now we're asking Mr.
21      Jia to read this paragraph to
22      prepare for the next question.
23          (Mr. Chen translated to the
24      witness.)

Page 233

1          MR. CYR:  He doesn't seem to
2      understand.
3          MR. CHEN:  You asked him to
4      read, right, to prepare for the
5      next question?
6          MR. CYR:  Yes.
7          Why is she talking with him?
8          MR. CHEN:  I don't know.
9          MR. SEEGER:  They gave him
10      the instruction.  It's okay.
11          INTERPRETER 1:  He wants to
12      clarify.  Does that mean just look
13      at it or to read it out, say it
14      out loud?
15          MR. SEEGER:  You tell him to
16      read it.  He doesn't understand.
17          THE WITNESS:  I finished
18      reading it.
19  BY MR. SEEGER:
20    Q.   Mr. Jia, in that paragraph,
21  in the English version, it says, and, you
22  know, I'm just -- there's a small part at
23  the end, but I have to read it to put it
24  into a context.  "It is abundant in raw

Confidential - Subject to Further Confidentiality Review

Page 234

1 gypsum resources, the products 'Taishan'
2 series plasterboard can be used as
3 partition and ceiling material...have
4 advantages:  Fire-proof, sound
5 insulation, heat preservation,
6 quakeproof, and good for health."
7          And could you tell me where
8 your company -- what your company means
9 by the drywall being "good for health"
10 and why that was used here, if you can?
11          MR. CYR:  Before you get to
12 that, are you done?
13          INTERPRETER 1:  Yes.
14          MR. CYR:  I guess I have an
15 objection based on it seems like
16 it's outside the scope of the
17 designated areas for the
18 deposition.
19          MR. SEEGER:  It is a
20 statement made by the company.
21 That's my one question on this
22 document.
23          Did you have another issue?
24          MR. CYR:  Well, let's not

Page 235

1 skirt over my issue so quickly.
2          MR. SEEGER:  I don't think
3 you can stop him from answering
4 that, and rather than argue with
5 you, I figured I'd just --
6          MR. CYR:  What I was going
7 to suggest is that I just wanted
8 to make sure that it didn't become
9 a habit.  It's clearly outside the
10 scope of this deposition.  I have
11 no problems with his answering
12 this question.
13          MR. SEEGER:  Okay.
14          MR. CYR:  But generally, we
15 would like to stay on the
16 jurisdictional issues and the
17 other issues of the designated
18 areas that you've been covering
19 all day.
20          Go ahead.
21          MR. CHEN:  I'll also note
22 that the interpreter was
23 translating from your statement
24 rather than referring to the

Page 236

1 actual text here, referenced here.
2          MR. SEEGER:  So --
3          MR. CYR:  We didn't mean to
4 slow you down.  Go ahead.
5          MR. SEEGER:  No, that's
6 actually -- I just don't
7 understand.
8          When I was reading it, was
9 she reading it to him?
10          MR. CHEN:  No.  Just now
11 when you asked the question, she
12 did a verbatim translation rather
13 than referring to what is written
14 in the Chinese.
15          MR. SEEGER:  Okay.  Because
16 I was reading the English portion
17 into the record.  Okay.  So,
18 that's okay.  We'll fix it.  That
19 was my fault.
20          MR. GRAND:  Just to your
21 statement, your objection, the
22 witness has been designated to
23 testify about marketing plans for
24 Taishan Gypsum.  This is a

Page 237

1 statement in a marketing document.
2 It contains marketing statements
3 about its exports to the U.S.  So,
4 we don't believe it's -- I
5 appreciate that we're not -- I
6 appreciate your position about it
7 being outside the scope, but we
8 think it's fair balance within a
9 statement that he has given.
10          MR. CYR:  We disagree, but
11 I'm allowing the witness to answer
12 the question.
13 BY MR. SEEGER:
14      Q.   Okay.
15          So, here's where we are.  I
16 read into the record, Mr. Jia, the part
17 in English.  You've already looked at the
18 part in Chinese.  There's a statement in
19 there about plasterboard being good for
20 the health, and I'm asking you if you
21 have any understanding of why that
22 statement's in there and what the company
23 meant by it?
24          MR. CHEN:  I'm going to

Page 238

1  object again.  She's translating
2  "good for your health" as opposed
3  to referring to what's in the
4  actual text.  "Good for your
5  health."  So --
6      MR. SEEGER:  Well, let me
7  ask you a question.  Does the
8  Chinese say the same thing?
9      INTERPRETER 1:  Yes.
10  Because I was telling him --
11     MR. CYR:  I'm sorry, he
12  asked him a question.  Ma'am,
13  ma'am, he asked him a question.
14     MR. SEEGER:  She's just
15  trying to help.  Okay.
16     MR. CHEN:  She's not
17  giving -- she's not reading the
18  text in the document.  She's doing
19  a separate translation.
20     MR. SEEGER:  But he read it
21  already, and you objected when we
22  asked him to read it.  So, that's
23  why I didn't ask him to do it
24  again.

Page 239

1      MR. CHEN:  Right.  But what
2  I'm noting is, you're asking now
3  about what certain text means.
4      MR. SEEGER:  Right.
5      MR. CHEN:  And instead of
6  referring to the text, she is
7  translating separately the words
8  that you're using.
9      MR. SEEGER:  Okay.  Do me a
10  favor.  I'm going to ask him my
11  question, but just show him the
12  language in the document in
13  Chinese.
14 BY MR. SEEGER:
15     Q.   And my question is, what is
16  the company -- what is his understanding
17  of the basis for making the statement
18  that plasterboard is good for your
19  health?  But just show him the Chinese
20  language in the document and ask him that
21  question that way.
22     INTERPRETER 1:  I was doing
23  verbatim.
24     MR. SEEGER:  Okay.  I

Page 240

1  believe you.
2      INTERPRETER 1:  Because he
3  read it before.  He read it.
4      Okay.  Counsel, would you
5  mind help me, where does it begin?
6  Because I didn't have the document
7  in front of me when both of you
8  were reading.  I did not have the
9  document in front of me when both
10  of you were reading.  Do you want
11  to help me where?
12     MR. SEEGER:  It's this one.
13     THE WITNESS:  (Indicating.)
14     MR. SEEGER:  Yes.  He knows
15  where it is.
16 BY MR. SEEGER:
17     Q.   My question is, what was the
18  basis, what's the company's basis, based
19  on his understanding, for making the
20  statement that plasterboard is good for
21  the health?
22     MR. CHEN:  Objection again.
23  She's translating verbatim, and
24  she's not referring to the text in

Page 241

1  the document.
2      INTERPRETER 1:  That is what
3  a legal interpreter is supposed to
4  be doing.  She's supposed to do
5  verbatim, nothing more.  If
6  there's anything unclear, it's up
7  to the lawyers to follow up.  I
8  don't add or drop anything from
9  what I hear.
10     MR. CYR:  Can I help?
11     INTERPRETER 1:
12  Particularly, I don't have the
13  document in front of me.
14     MR. CYR:  Excuse me, ma'am.
15  Could you ask Mr. Jia if he's able
16  to answer the question?
17     THE WITNESS:  I can totally
18  be able to answer.
19     MR. CYR:  Please do before I
20  shoot myself.
21 BY MR. SEEGER:
22     Q.   Go ahead, answer.
23     INTERPRETER 1:  Because of
24  the accent personally, I need to

Page 242

1 clarify. SIR, we have different
2 accent.
3      THE WITNESS: Regarding the
4 material in China that I can't --
5 I will be able to be in context
6 regarding the introduction of the
7 material of the drywall regarding
8 the characteristic referring to
9 some chemical components.
10 Regarding the drywall, a main
11 component is CASO4.2H2O.
12 CASO4.2H2O is neutral. It's
13 either acid or alkaline of the
14 drywall. The wall made out of it,
15 when it is in contact with the
16 human skin, it doesn't affect the
17 skin like the cemented walls
18 affect the human beings because of
19 the acid and the alkaline nature.
20 And also with the drywall, it
21 contained, too, crystalized H2O.
22 Inside the drywall, there is 17
23 percent of the H2O, and when the
24 temperature is high, the water

Page 243

1 dissipated. So, when the
2 temperature is low, it absorbed
3 humidities from the air.
4      So, because of this nature,
5 because of this phenomena,
6 therefore, it can adjust to
7 humidity and also the temperatures
8 inside this room regarding the
9 air. Therefore, in general,
10 people believe that the houses
11 built with the drywall is more
12 suitable for human accommodation.
13 That is the reason why for more
14 than 100 years that the developed
15 country and the poor country, they
16 use the drywall. Well, in my
17 opinion, the way we write down
18 this document, we did not
19 exaggerate.
20      MR. CYR: Can we take a
21 break?
22      MR. SEEGER: Yeah.
23      THE VIDEOTAPE TECHNICIAN:
24 The time now is --

Page 244

1      MR. CYR: Let's have it be a
2 short one, because we're going to
3 finish up at 5:00, so we'll be
4 back in seven, eight minutes, just
5 to go to the bathroom.
6      THE VIDEOTAPE TECHNICIAN:
7 The time now is approximately
8 4:20 p.m., and we are now off the
9 record.
10      - - -
11      (Whereupon, a recess was
12 taken from 4:20 p.m. until
13 4:35 p.m.)
14      - - -
15      THE VIDEOTAPE TECHNICIAN:
16 This begins Tape 7 of today's
17 deposition. The time now is
18 approximately 4:35 p.m., and we're
19 back on the record.
20 BY MR. SEEGER:
21      Q.  Mr. Jia, do you know who
22 Peng Wenlong is?
23      A.  I know.
24      Q.  Could you tell me who he is,

Page 245

1 what his role is at TG?
2      A.  He is now the manager of the
3 foreign trade company of TG.
4      INTERPRETER 2: The check
5 interpreter believes the witness
6 said foreign trade department.
7      THE WITNESS: To me, it is
8 the same thing.
9 BY MR. SEEGER:
10      Q.  As far as you know, has he
11 held any other positions in TG?
12      At any point in time, do you
13 know the other positions he may have
14 held?
15      A.  I cannot recall, but there
16 should be none.
17      Q.  Does Peng Wenlong hold any
18 positions with TTP?
19      A.  He was -- probably worked
20 for the sales of foreign trade.
21      Q.  For TTP, correct?
22      A.  Yes.
23      Q.  And are you aware of him
24 having a formal title at TTP?

Confidential - Subject to Further Confidentiality Review

Page 246

1    A.   I don't recall.
2    Q.   Do you know how long Mr.
3  Peng Wenlong has been at TTP as an
4  employee or an officer, director,
5  whatever his title is?
6    A.   I cannot tell exactly.  It's
7  around more than one year.
8    Q.   And how long, if you know,
9  how long has he been an employee of TG?
10   A.   I cannot tell exactly how
11 long.  It's around more than five years.
12   Q.   Do you know who Bill Cher
13 is?  Do you know who Bill Cher is?
14   A.   I don't know who you're
15 referring to.
16   Q.   Do you know who Apollo Yang
17 is?
18   A.   I know who he is.
19   Q.   Could you identify him?  Who
20 is he, what is his role?
21   A.   He is one of the employees
22 of the company, but I'm not sure what
23 role he plays.
24   Q.   Is the company that he's

Page 247

1  referring to TG?
2    A.   He did work for TG company.
3    Q.   Do you know if he worked for
4  TTP?
5    A.   That I am not sure.
6    Q.   Do you know who the --
7      Do you know the company Rich
8  Well?  Does he know that company?
9    A.   I don't know.
10     MR. CHEN:  She gave the
11 English name of Rich Well.
12     MR. SEEGER:  Right.
13     MR. CYR:  I would ask it
14 again.
15     MR. SEEGER:  I trust him.
16     MR. CHEN:  Well, no, because
17 it doesn't have a...
18     MR. CYR:  You can either ask
19 him again now or I'll ask him at
20 the end of the day tomorrow.  It's
21 up to you.
22     MR. SEEGER:  I'll clear it
23 up now.
24     MR. CHEN:  Rich Well has a

Page 248

1  Chinese name.
2      MR. SEEGER:  I got it from a
3  website.  So what is the --
4      MR. CHEN:  The Chinese name
5  is Yu He.
6  BY MR. SEEGER:
7    Q.   Does he know of the company
8  Yu He?
9      INTERPRETER 2:  The check
10 interpreter can tell, Rich Well's
11 Chinese name is Yu He, Y-U H-E.
12     THE WITNESS:  I know, but
13 I'm not familiar with the overall
14 of this company.
15 BY MR. SEEGER:
16   Q.   Are you familiar with any
17 products that they make?
18   A.   He has been one of the
19 shareholders of our company called Jiang
20 Yin Taishan Company.
21     MR. CYR:  They can give her
22 the proper spelling if you'd like.
23     MR. SEEGER:  I appreciate
24 that.  I just didn't understand

Page 249

1  the answer, if you don't mind
2  giving it to me from the
3  beginning.
4        - - -
5      (Whereupon, the requested
6  portion of the transcript was read
7  by the court reporter as follows:
8      "A.  He has been one of the
9  shareholders of our company called
10 Jiang Yin Taishan Company.")
11       - - -
12 BY MR. SEEGER:
13   Q.   Which company?  I don't
14 understand.  When he says he has been a
15 shareholder -- I'm sorry.  I couldn't get
16 the answer.  Let me follow up.  Give me a
17 second.  "He has been one of the
18 shareholders" --
19     MR. CHEN:  The translation
20     should have been "it" has been one
21     of the shareholders, not "he."
22 BY MR. SEEGER:
23   Q.   Who is the "it" in the
24 sentence, "it has been one of the

Page 250

1  shareholders" of our company?
2        MR. CYR:  Rich Well.
3        MR. SEEGER:  Rich Well.
4        MR. CYR:  Yes.  And that is
5  a company.
6  BY MR. SEEGER:
7     Q.  So, Rich Well is a
8  shareholder in TG; is that correct?
9        MR. CYR:  No.
10       MR. SEEGER:  That's why I'm
11  confused.
12       MR. CYR:  I think the best
13  way to do it is to refer to this
14  company, my recommendation would
15  be, with the spelling that Eugene
16  just gave.
17       MR. CHEN:  Taishan Jiang
18  Yin.  You can call it that.
19       MR. SEEGER:  Taishan Jiang
20  Yin.
21       MR. CHEN:  Then the Chinese
22  name of Rich Well is Yu He, Y-U
23  H-E.
24       MR. SEEGER:  I want to try

Page 251

1     to get this all in one spot, and
2  I'm a little confused.
3        He's writing it down.
4        INTERPRETER 1:  The witness
5  has written down the name of a
6  company called Jiang Yin Taishan
7  Company Limited.
8        MR. CYR:  We're ready for
9  the next question.
10  BY MR. SEEGER:
11     Q.  The question I have is, I
12  just want to be clear on his answer, and
13  I'm not.  Could you please clarify what
14  you mean by Rich Well is a shareholder in
15  which company?  I just want to be clear.
16     A.  Our company, TG, under TG,
17  there is a company called Jiang Yin
18  Taishan Company Limited.  It is possible
19  in certain time it holds certain shares.
20     Q.  That Rich Well would own
21  certain shares in the subsidiary to TG?
22  Okay.
23     A.  A small share.
24     Q.  What interest in Jiang Yin

Page 252

1  Taishan Company Limited does TG own?
2        MR. CYR:  Today?
3        MR. SEEGER:  Yes.  Let's go
4  with today.
5        INTERPRETER 1:  Counsel, the
6  word "interest" can be interpreted
7  in many ways.  Can you be more
8  specific?
9        MR. SEEGER:  I'm sorry?
10       INTERPRETER 1:  The word
11  "interest" can be interpreted in
12  many ways.
13       MR. SEEGER:  I'll do it
14  again.
15       INTERPRETER 2:  Can the
16  check interpreter help?
17       MR. SEEGER:  Yes.
18       INTERPRETER 2:  In Chinese?
19       MR. SEEGER:  Whatever gets
20  us through this.
21       (Interpreter discussion in
22  Chinese.)
23       INTERPRETER 1:  The check
24  interpreter is not doing a

Page 253

1     verbatim.  She was digesting and
2  rephrasing it in her own ways to
3  help the witness to understand.
4  That is not what a legal
5  interpreter is supposed to do.  A
6  legal interpreter is supposed to
7  do only verbatim.  We don't
8  supposed to --
9  BY MR. SEEGER:
10     Q.  So just let me ask the
11  question again.  Okay?
12       What shares in Jiang Yin
13  Taishan Company Limited does TG own, and
14  how many shares does Rich Well own, if he
15  knows?
16     A.  I cannot tell exactly the
17  amount, but TG owns most of the shares of
18  Jiang Yin Taishan.
19     Q.  Is that the end of his
20  answer?
21       Do you know how many shares
22  Rich Well owns in Jiang Yin Taishan?
23     A.  I can't recall.
24     Q.  Now, Rich Well is a

Confidential - Subject to Further Confidentiality Review

Page 254

1 competitor, actually, to TG.  Isn't that
2 fair to say?
3        MR. CYR:  Objection as
4    leading.
5        Please try to answer, Mr.
6    Jia.
7        THE WITNESS:  I never feel
8    that it is one of our competitors.
9 BY MR. SEEGER:
10    Q.   It sells plasterboard, Rich
11 Well sells plasterboard like TG sells
12 plasterboard, correct?
13    A.   I am not sure whether they
14 sell drywall or not.
15    Q.   Do you know if Rich Well has
16 ever distributed or imported Taishan
17 plasterboard?
18    A.   I don't know.
19    Q.   Do you know who would know
20 the answer to that question, who I would
21 be able to ask?
22    A.   Peng Wenlong should know
23 about it.
24        MR. SEEGER:  I'm sorry,

Page 255

1    could you give me that --
2        INTERPRETER 1:  Peng
3    Wenlong.
4 BY MR. SEEGER:
5    Q.   Do you know if BNBM owns an
6 interest in Rich Well?  Correct that to
7 say "owns shares."  I'm sorry.
8        INTERPRETER 2:  The check
9    interpreter --
10        INTERPRETER 1:  He said
11    strike that.
12        MR. SEEGER:  I rephrased it.
13        INTERPRETER 2:  The check
14    interpreter believed that the
15    interpreter -- the two names has
16    been --
17        MR. CYR:  Were flipped
18    around?
19        INTERPRETER 2:  Were flipped
20    around, yeah.
21        MR. SEEGER:  Could you fix
22    that without me?
23        INTERPRETER 1:  Let me see.
24    I don't think I did it wrong.  I

Page 256

1    think it was correct.
2 BY MR. SEEGER:
3    Q.   Let me ask the question.
4        Do you know if BNBM owns
5 stock or shares in Rich Well?
6    A.   I'm not sure whether you're
7 talking about BNBM owning shares in Rich
8 Well or the other way around.  It seems
9 that -- it seems to be the contrary.  I
10 am not sure.
11    Q.   Well, let me break it up.
12 So, do you have any understanding if BNBM
13 owns stock in Rich Well?  Yes or no?
14    A.   According to my opinion, I
15 think they don't have it.  But that is
16 not under my supervision.  That is not
17 what I should know.
18    Q.   Okay.  But do you know?
19 Does he know one way or another?
20    A.   I don't know.
21    Q.   Do you know if BNBM owns
22 stock in Jiang Yin Taishan Company
23 Limited?
24    A.   Owns its shares.

Page 257

1    Q.   Owns shares.  BNBM owns
2 shares in that company.  Okay.
3        Can you tell me if Rich Well
4 helps TG source waste paper from the U.S.
5 for drywall paper?
6        INTERPRETER 2:  The check
7    interpreter believes it is not a
8    correct interpretation, and the
9    correct interpretation --
10        (Discussion between
11    interpreters in Chinese.)
12        MR. CYR:  Is it okay with
13    you if we just ask him if he can
14    answer the question?  He might be
15    confused by the word "source."
16        MR. SEEGER:  So, let's ask
17    him if he can answer the question
18    the way it's been asked by you.
19        THE WITNESS: I can
20    understand basically what you
21    mean.
22        INTERPRETER 1:  He's
23    referring to me.
24        MR. SEEGER:  Okay.  So do

Confidential - Subject to Further Confidentiality Review

Page 258

1     you --
2        I mean, he doesn't
3 understand how you're asking him
4 in Chinese? Is that what --
5        INTERPRETER 1: He
6 understand -- he say he understand
7 what I am saying.
8        MR. SEEGER: He does
9 understand?
10       INTERPRETER 1: I understand
11 what you are saying. He was
12 pointing at me.
13       MR. SEEGER: Let him answer
14 the question.
15       MR. CHEN: But what she
16 asked is very different from what
17 you asked is the point, is the
18 objection. What she interpreted
19 in Chinese, the question is very
20 different from the question you
21 asked in English.
22       INTERPRETER 1: So if he got
23 a wrong answer, you follow up with
24 another question to clarify.

Page 259

1       MR. SEEGER: Let me hear his
2 answer. Can we hear his answer?
3 Because you understand it in both
4 languages.
5 BY MR. SEEGER:
6    Q. Go ahead.
7    A. TG has a production line
8 that produce -- that make papers. They
9 have the necessity to purchase waste
10 paper from the United States. Whether it
11 is from -- whether they buy it or they
12 don't buy it, that I don't know.
13    Q. Do you know who --
14       Would Peng Wenlong be the
15 person to ask that question of?
16    A. I am not sure whether Peng
17 Wenlong know about it totally.
18    Q. Is Peng Wenlong employed by
19 Jiang Yin Taishan Company Limited?
20    A. No. It has never been the
21 case.
22    Q. Who in TG is responsible for
23 supervising the marketing plans, what
24 specific person? Marketing.

Page 260

1    A. What time period?
2    Q. From 2005 to the present.
3    A. Around the time before and
4 after 2009, it was in charge by a Mr. Xue
5 Yu Li. Now it is a Mr. Fu Ting Huan.
6       MR. SEEGER: Can you write
7 down those two names.
8       INTERPRETER 1: 2005 before,
9 and I said 2005, not 9.
10      MR. SEEGER: You said 2009.
11      INTERPRETER 1: 2005, I did
12 say that. It was a typo, not me.
13 It was a typo.
14 BY MR. SEEGER:
15    Q. Are we getting those names
16 down? Have Mr. Jia write those two names
17 down. Let's be clear.
18       Before and after 2005, Xue
19 Yu Li. And then at some later date, and
20 can you give us the date when the second
21 name, the guy with the second name, Fu
22 Ting Huan, when he started doing the
23 marketing plans?
24    A. I cannot recall exact date.

Page 261

1    Q. Would both of these people
2 have had responsibility for marketing
3 plans in Asia as well as the U.S.?
4       MR. CYR: Objection on the
5 grounds that it suggests there
6 were marketing plans for the U.S.,
7 and the witness has already
8 testified that there were not.
9       MR. SEEGER: Mark that one.
10      MR. CYR: Mr. Jia, you may
11 try to answer the question.
12      THE WITNESS: I did not
13 understand the question.
14      MR. SEEGER: That was a lot
15 of work for that answer.
16      Can you just maybe read --
17 you have to ask. Maybe it's your
18 translation.
19       - - -
20      (Whereupon, the requested
21 portion of the transcript was read
22 by the court reporter as follows:
23     "Q. Would both of these
24 people have had responsibility for

---

Page 262

1 marketing plans in Asia as well as
2 the U.S.?")
3         - - -
4      THE WITNESS:  TG produced
5 the plasterboard.  They are very
6 heavy.  So, we don't have any plan
7 to sell it to foreign countries.
8 Plasterboard, they are regional
9 materials, and I cannot imagine to
10 sell it to foreign countries.
11 Therefore, these two gentlemen,
12 they did not open up the market
13 outside in Asia or outside of
14 Asia, and they did not have any
15 plan.
16 BY MR. SEEGER:
17      Q.   Just to move it along, Mr.
18 Jia, because we're going to wrap up, take
19 a look at the page I've marked on Exhibit
20 2.  It's the second page from the last.
21 Could you read at the very top what that
22 says in Chinese, and then could you
23 translate it for me.
24      MR. CYR:  He wants you to

---

Page 263

1 read this, (indicating).
2      (Witness complies.)
3 BY MR. SEEGER:
4      Q.   What does that mean?
5      INTERPRETER 1:  To have the
6 foundation in China and move
7 forward to the world or also can
8 mean to establish in China and to
9 move forward to the world.
10 BY MR. SEEGER:
11      Q.   Do you see where China is
12 represented in the inner circle?  What
13 does that represent there, the line
14 that's drawn from China to that point
15 where I'm pointing to?  What does that
16 say?
17      A.   United States.
18      MR. SEEGER:  We can wrap up
19 there.
20      THE VIDEOTAPE TECHNICIAN:
21 The time now is approximately 5:09
22 p.m.  Today's portion of Mr.
23 Tongchun Jia's deposition is
24 concluded.

---

Page 264

1         - - -
2      (Whereupon, the deposition
3 adjourned at 5:09 p.m.)
4         - - -

---

Page 265

1      C E R T I F I C A T E
2
3      I, LINDA L. GOLKOW, a
4 Registered Diplomate Reporter, Certified
Court Reporter and Notary Public, do
5 hereby certify that, pursuant to notice,
the deposition of TONGCHUN JIA was duly
6 taken on April 4, 2011 at 9:05 a.m.
before me.
7
8      The said TONGCHUN JIA was
duly sworn by me through the interpreter
9 according to law to tell the truth, the
whole truth and nothing but the truth and
10 thereupon did testify as set forth in the
above transcript of testimony.  The
11 testimony was taken down stenographically
by me.
12
13      I do further certify that
the above deposition is full, complete
14 and a true record of all the testimony
given by the said witness.
15
16
17      Linda L. Golkow
Registered Diplomate Reporter
18      Certified Realtime Reporter
19
20      (The foregoing certification
of this transcript does not apply to any
21 reproduction of the same by any means,
unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24

---

Page 266

## INSTRUCTIONS TO WITNESS

1
2
3
4      Please read your deposition
5  over carefully and make any necessary
6  corrections.  You should state the reason
7  in the appropriate space on the errata
8  sheet for any corrections that are made.
9
10      After doing so, please sign
11  the errata sheet and date it.  It will be
12  attached to your deposition.
13
14      It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 268

## ACKNOWLEDGMENT OF DEPONENT

1
2
3
4      I,_____, do
   hereby certify that I have read the
   foregoing pages, 1 through 269 and that
5  the same is a correct transcription of
   the answers given by me to the questions
6  therein propounded, except for the
   corrections or changes in form or
7  substance, if any, noted in the attached
   Errata Sheet.
8
9  _____

   TONGCHUN JIA            DATE
10
11
12
13
14
15
16  Subscribed and sworn
   to before me this
17  _____ day of _____, 20_____.
18  My commission expires:_____
19
   _____
20  Notary Public
21
22
23
24

Page 267

        - - - - - -
       E R R A T A
2       - - - - - -
3  PAGE  LINE  CHANGE
4  ____  ____  _____
5    REASON:  _____
6  ____  ____  _____
7    REASON:  _____
8  ____  ____  _____
9    REASON:  _____
10  ____  ____  _____
11    REASON:  _____
12  ____  ____  _____
13    REASON:  _____
14  ____  ____  _____
15    REASON:  _____
16  ____  ____  _____
17    REASON:  _____
18  ____  ____  _____
19    REASON:  _____
20  ____  ____  _____
21    REASON:  _____
22  ____  ____  _____
23    REASON:  _____
24

Page 269

## LAWYER'S NOTES

1
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____