Confidential - Subject to Further Confidentiality Review

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
2

3    _____
                                    §  MDL NO. 2047
     IN RE:                         §
4    CHINESE-                       §  SECTION: L
     MANUFACTURED                   §
5    DRYWALL PRODUCTS               §  JUDGE FALLON
     LIABILITY                      §
6    LITIGATION                     §  MAGISTRATE
                                    §  JUDGE WILKINSON
7    _____

                      -  -  -
8

       CROSS NOTICED IN VARIOUS OTHER ACTIONS
9
                      -  -  -
10
                   April 5, 2011
11
                      -  -  -
12
        CONFIDENTIAL - SUBJECT TO FURTHER
13           CONFIDENTIALITY REVIEW
14                    -  -  -
15        Videotaped deposition of TONGCHUN
     JIA, held at 3 Pedder Street, Central,
16   Hong Kong, China, commencing at 9:03
     a.m., on the above date, before Linda L.
17   Golkow, Certified Court Reporter,
     Registered Diplomate Reporter, Certified
18   Realtime Reporter and Notary Public.
19
                      -  -  -
20

21

22         GOLKOW TECHNOLOGIES, INC.
        ph 877.370.3377 | fax 917.591.5672
23             deps@golkow.com
24

Page 271

APPEARANCES:

SEEGER WEISS LLP
BY: CHRISTOPHER A. SEEGER, ESQUIRE
BY: JEFFREY S. GRAND, ESQUIRE
One William Street
New York, New York 10004
(212) 584-0700
cseeger@seegerweiss.com
jgrand@seegerweiss.com
Representing the Plaintiffs' Steering
Committee

COLSON HICKS EIDSON
BY: PATRICK S. MONTOYA, ESQUIRE
255 Alhambra Circle
Penthouse
Coral Gables, Florida 33134
(305) 476-7400
patrick@colson.com
Representing Plaintiffs' Steering
Committee in the Federal and State
Coordinated Actions

LAW OFFICES OF RICHARD SERPE, P.C.
BY: RICHARD J. SERPE, ESQUIRE
580 East Main Street
Suite 310
Norfolk, Virginia 23510
(757) 233-0009
rserpe@serpefirm.com
Representing the MDL Plaintiffs and
the Germano Plaintiffs

- - -

Page 272

APPEARANCES (CONTINUED):

HOGAN LOVELLS US LLP
BY: JOE CYR, ESQUIRE
BY: FRANK T. SPANO, ESQUIRE
BY: ERIC D. STATMAN, ESQUIRE
BY: RENEE GARCIA, ESQUIRE
875 Third Avenue
New York, New York 10022
(212) 918-3000
joe.cyr@hoganlovells.com
frank.spano@hoganlovells.com
renee.garcia@hoganlovells.com
eric.statman@hoganlovells.com
Representing Taishan Gypsum Co.
Ltd. and Tai'an Taishan
Plasterboard Company Ltd. and the
Witness, Tongchun Jia

HOGAN LOVELLS INTERNATIONAL LLP
BY: EUGENE CHEN, ESQUIRE
18th Floor, Park Place
1601 Nanjing Road West
Shanghai, China 200040
(86 21) 6122 3800
eugene.chen@hoganlovells.com
Representing Taishan Gypsum Co.
Ltd. and Tai'an Taishan
Plasterboard Company Ltd. and the
Witness, Tongchun Jia

JIGTIAN & GONGCHENG
BY: CHUNGANG DONG, ESQUIRE
34/F, Tower 3, China Central Place
77 Jianguo Road - Chaoyang District
Beijing, China 200040
(86 10) 5809 1016
Representing Taishan Gypsum Company
Limited and Tai'an Taishan
Plasterboard Company

Page 273

APPEARANCES (CONTINUED):

GREENBERG TRAURIG, LLP
BY: HILARIE BASS, ESQUIRE
1221 Brickell Avenue
Miami, Florida 33131
(305) 579-0745
bassh@gtlaw.com
Representing the Home Builders
Steering Committee

GALLOWAY JOHNSON TOMPKINS BURR and
SMITH
BY: CARLINA C. EISELEN, ESQUIRE
One Shell Square
701 Poydras Street, 40th Floor
New Orleans, Louisiana 70139
(504) 525-6802
ceiselen@gjtbs.com
Representing Interior/Exterior
Building Supply

PERKINS COIE LLP
BY: DAVID L. BLACK, ESQUIRE
1899 Wynkoop Street - Suite 700
Denver, Colorado 80202
(303) 291-2300
DBlack@perkinscoie.com
Representing the State of Louisiana

WEINBERG, WHEELER, HUDGINS, GUNN &
DIAL, LLC
BY: NICHOLAS P. PANAYOTOPOULOS, ESQ.
3344 Peachtree Road, NE
Suite 2400
Atlanta, Georgia 30326
(404) 876-2700
npanayo@wwhgd.com
Representing Various Banner

Page 274

APPEARANCES (CONTINUED):

BRENNER, EVANS & MILLMAN, P.C.
BY: THEODORE I. BRENNER, ESQUIRE
411 East Franklin Street
Suite 200
Richmond, Virginia 23218
(804) 644-1300
Representing Tobin Trading Company

McKENRY, DANCIGERS, DAWSON &
LAKE, P.C.
BY: J. BRIAN SLAUGHTER, ESQUIRE
192 Ballard Court - Suite 400
Virginia Beach, Virginia 23462
(757) 461-2500
Jbslaughter@va-law.org
Representing Atlantic Homes LLC and
Multiple Other Virginia-Based
Defendants

SHER GARNER CAHILL RICHTER KLEIN &
HILBERT, L.L.C.
BY: MATTHEW C. CLARK, ESQUIRE
909 Poydras Street - Suite 2800
New Orleans, Louisiana 70112
(504) 299-2100
mclark@shergarner.com
Representing the Southern Home
Defendants

SINNOTT, NUCKOLS & LOGAN, PC
BY: KENNETH F. HARDT, ESQUIRE
13811 Village Mill Drive
Midlothian, Virginia 23114
(804) 378-7600
khardt@snllaw.com
Representing Venture Supply, Inc. and
Porter-Blaine Corp.

Page 275

1   APPEARANCES VIA TELEPHONE:
2
3       KUCHLER POLK SCHELL WEINER &
        RICHESON LLC
4       BY: FRANCIS X. deBLANC, III,
        1615 Poydras Street
5       Suite 1300
        New Orleans, Louisiana 70112
6       (504) 592-0691
        slauricella@kuchlerpolk.com
7       Representing Creola Ace Hardware and
        Thomas Gould Inc. in the MDL
8
9       HUNTON & WILLIAMS LLP
10      BY: A. TODD BROWN, ESQUIRE
        Bank of America Plaza
11      101 South Tryon Street
        Suite 3500
12      Charlotte, North Carolina 28280
        (704) 378-4700
13      Representing Stock Building Supply,
        LLC
14
15      JONES, WALKER, WAECHTER, POITEVENT,
16      CARRERE & DENEGRE LLP
        BY: MEGAN E. DONOHUE, ESQUIRE
17      600 Jefferson Street, Suite 1600
        Lafayette, Louisiana 70501
18      (337) 262-9062
        mdonohue@joneswalker.com
19      Representing Fireman's Fund Insurance
        Company
20
21
22
23
24

Page 276

1   APPEARANCES VIA TELEPHONE (CONTINUED):
2
3       DUPLASS ZWAIN BOURGEOIS PFISTER &
        WEINSTOCK
4       BY: PHILIP WATSON, ESQUIRE
        3838 N. Causeway Boulevard
5       Suite 2900
        Metairie, Louisiana 70002
6       (504) 832-3700
        pwatson@duplass.com
7       Representing R&H Masonry, Inc., and
        Swedberg Enterprises, Inc.
8
9       RUMBERGER, KIRK & CALDWELL, P.A.
10      BY: ABIGAIL ROBERTS, ESQUIRE
        Brickell Bayview Centre, Suite 3000
11      80 Southwest 8th Street
        Miami, Florida 33130
12      (305) 358-5577
        aroberts@rumberger.com
13      Representing Defendants' Liaison
        Counsel for Installers
14
15
16      HAYNSWORTH SINKLER BOYD, P.A.
        BY: CHRISTOPHER B. MAJOR, ESQUIRE
17      75 Beattie Place - 11th Floor
        Greenville, South Carolina 29601
18      (864) 240-3200
        cmajor@hsblawfirm.com
19      Representing USG Corporation and L&W
20      Supply Corporation
21      PHELPS DUNBAR LLP
        BY: MITCHELL P. HASENKAMPF, ESQUIRE
22      Canal Place
        365 Canal Street, Suite 2000
23      New Orleans, Louisiana 70130-6534
        (504) 584-9249
24      mitchell.hasenkampf@phelps.com

Page 277

1   APPEARANCES VIA TELEPHONE (CONTINUED):
2
3
        FULMER LEROY ALBEE BAUMANN
4       BY: MICHAEL P. MCCAHILL, ESQUIRE
        2866 East Oakland Park Boulevard
5       Ft. Lauderdale, Florida 33306
        (954) 707-4430
6       mmccahill@fulmerleroy.com
        Representing Independent Builders
7       Supply Association (IBSA)
8
9       THOMPSON COE COUSINS & IRONS, L.L.P.
10      BY: SUZANNE M. PATRICK, ESQUIRE
        One Riverway, Suite 1600
11      Houston, Texas 77056
        (713) 403-8210
12      spatrick@thompsoncoe.com
        Representing The North River
13      Insurance Company
14
15      BERNARD, CASSISA, ELLIOTT & DAVIS,
        APLC
16      BY: CAROLINE E. ELLIOTT, ESQUIRE
        1615 Metairie Road
17      Metairie, Louisiana 70005
        (504) 834-2612
18      elliottc@bernard-cassisa.com
        Representing Phillips Abita Lumber
19      Company, Inc.
20
21
22
23
24

Page 278

1   APPEARANCES VIA STREAM:
2
3       BECNEL LAW FIRM, L.L.C.
        BY: ROBERT BECNEL, ESQUIRE
4       106 W. 7th Street
        Reserve, Louisiana 70084
5       (985) 536-1186
        robbecnel@aol.com
6       Representing the Plaintiffs'
        Steering Committee
7
8
9       QUINN EMANUEL URQUHART & SULLIVAN,
        LLP
10      BY: CLINTON DOCKERY
        51 Madison Avenue, 22nd Floor
11      New York, New York 10010
        (212) 849-7000
12      clintondockery@quinnemanuel.com
        Representing Chartis Select Insurance
13      Company and Related Chartis Insurers
14
15      JONES, WALKER, WAECHTER, POITEVENT,
        CARRERE & DENEGRE LLP
16      BY: MEGAN E. DONOHUE, ESQUIRE
        600 Jefferson Street, Suite 1600
17      Lafayette, Louisiana 70501
        (337) 262-9062
18      mdonohue@joneswalker.com
        Representing Fireman's Fund Insurance
19      Company
20
21
22
23
24

Page 279

APPEARANCES VIA STREAM (CONTINUED):

WOODLEY WILLIAMS LAW FIRM
BY:  DONALD C. BROWN, ESQUIRE
1 Lakeshore Drive
Suite 1750
Lake Charles, Louisiana 70629
(337) 433-6328
dcbrown@woodleywilliams.com
Representing Devon International,
Inc. Formerly, Devon International
Trading, Inc.


DEUTSCH, KERRIGAN & STILES
BY:  MELISSA M. SWABACKER, ESQUIRE
755 Magazine St.
New Orleans, Louisiana  70130
(504) 581-5141
mswabacker@dkslaw.com
Representing Landmark American
Insurance Company

KUCHLER POLK SCHELL WEINER &
RICHESON LLC
BY:  SOPHIA L. LAURICELLA, ESQUIRE
1615 Poydras Street
Suite 1300
New Orleans, Louisiana 70112
(504) 592-0691
slauricella@kuchlerpolk.com
Representing Creola Ace Hardware and
Thomas Gould Inc. in the MDL

Page 280

APPEARANCES VIA STREAM (CONTINUED):

TAYLOR WALKER, P.C.
BY:  CHRISTOPHER J. WIEMKEN, ESQUIRE
555 E. Main Street
Suite 1300
Norfolk, Virginia 23510
(757) 625-7300
Cwiemken@taylorwalkerlaw.com

ALSO PRESENT:

Stephanie Chin, Official Interpreter
(Interpreter 1)

Una Wong, Check Interpreter
(Interpreter 2)

       - - -

Page 281

       - - -
       I N D E X
       - - -

Testimony of:  TONGCHUN JIA
By Mr. Seeger            283
By Mr. Montoya           407
By Ms. Bass              437
By Mr. Hardt             456
By Mr. Brenner           482

       - - -

       E X H I B I T S

       - - -

NO.          DESCRIPTION        PAGE
Jia-10   Translation of TG        284
           0020401, Bates Nos.
           TTRNSL0071 through
           TTRNSL0073

Jia-11   Taishan Gypsum Co.       322
           Ltd. Manufacturer
           Profile Form, Bates
           Nos. DPF-TAISHAN
           GYPSUM CO LTD-1-00001
           through
           DPF-TAISHANGYPSUM CO
           LTD-1-00014
Jia-12   Tai'an Taishan           408
           Plasterboard Co. Ltd.
           Manufacturer Profile
           Form

Page 282

       - - -
   DEPOSITION SUPPORT INDEX
       - - -

Direction to Witness Not to Answer

       Page Line

         350 7
         356 18


Request for Production of Documents

       Page Line




       Stipulations

       Page Line




   Questions/Objections Marked
       Page Line
         318  16
         319  17
         336  12
         452  7

Confidential - Subject to Further Confidentiality Review

Page 283

1           - - -
2        THE VIDEOTAPE TECHNICIAN:
3    This begins Tape 1 of Day 2 of the
4    deposition of Mr. Tongchun Jia.
5    The time now is 9:03 a.m., and we
6    are back on the record.
7        Mr. Jia, I want to remind
8    you that you are still under oath
9    from yesterday.
10          - - -
11       TONGCHUN JIA, after having
12   been previously sworn through the
13   interpreter, was examined and
14   testified as follows:
15          - - -
16       EXAMINATION
17          - - -
18   BY MR. SEEGER:
19       Q.  Good morning, Mr. Jia.  I'm
20   going to continue the questioning for you
21   this morning.
22       MR. SEEGER:  Linda, I would
23   like to mark this as Exhibit 10.
24          - - -

Page 284

1        (Whereupon, Deposition
2    Exhibit Jia-10, Translation of TG
3    0020401, Bates Nos. TTRNSL0071
4    through TTRNSL0073, was marked for
5    identification.)
6           - - -
7    BY MR. SEEGER:
8        Q.  Mr. Jia, would you take a
9    look at what we've just marked as Exhibit
10   10.
11       A.  (Witness reviewing
12   document.)
13       Q.  And would you just take a
14   moment to look through it and tell me if
15   there's any inaccuracies or if that
16   accurately reflects the positions you
17   hold with entities related to Taishan, to
18   TG.
19       A.  I don't understand English.
20   Would you mind to translate it for me.
21       MR. CYR:  May I just state
22   for the record, Mr. Seeger, that I
23   believe that this Exhibit Number
24   10, that is a document that we've

Page 285

1    provided you this morning in
2    response to your request yesterday
3    for the positions that Mr. Jia
4    holds with subsidiaries of Taishan
5    Gypsum.  And it's in English.
6        MR. SEEGER:  You are
7    completely right.  When you're
8    going without sleep and you're
9    jetlagged, I forgot he doesn't
10   speak English or read it.
11       Okay, well, thank you.  Mr.
12   Cyr was kind enough to provide
13   this list that we've marked as
14   Exhibit 10 of Mr. Jia's positions
15   with TG-related entities.
16       Is that a fair
17   characterization of this?
18       MR. CYR:  Yes.
19       MR. SEEGER:  You can put it
20   aside.
21       MR. CYR:  The only thing I
22   feel compelled to say is that you
23   all have defined the phrase
24   "related entities" in a certain

Page 286

1    way, I believe, that arguably
2    would include BNBM.  Yesterday he
3    testified that at some point in
4    time that he's a director of BNBM.
5    Exhibit 10 does not purport to
6    reflect that.
7        MR. SEEGER:  That's fine.
8    Okay.  Subject to that.
9    BY MR. SEEGER:
10       Q.  Let me just add, I
11   understand that Mr. Jia does not --
12       Mr. Jia, I understand you do
13   not speak or read English, but were you
14   involved, as best as you know, with the
15   creation of the document that's marked as
16   Exhibit 10?
17       A.  I did not participate.
18       Q.  And has --
19       Without getting into any
20   discussions you've had with anybody, has
21   anybody described Exhibit 10 to you prior
22   to you seeing it now?
23       A.  I'm not -- I cannot be sure,
24   but my feeling tells me that a lot of the

Confidential - Subject to Further Confidentiality Review

Page 287

1 content is related to my subsidiaries.
2     Q.   That's fine.  You can put it
3 aside.
4         MR. CYR:  And just to offer,
5 we're happy to state that this
6 information was obtained from the
7 books and records of the companies
8 and that we can confer with Mr.
9 Jia during a break to see if he
10 has any information that it's
11 inaccurate in any respect.
12        MR. SEEGER:  Okay.  So, I'm
13 just asking, Counsel, you have not
14 yet had an opportunity to do that
15 before we marked it?
16        MR. CYR:  No.
17        MR. SEEGER:  Okay.  Why
18 don't we do that.  We can always
19 mark it up.
20        MR. CYR:  Whatever you want
21 to do.
22        MR. SEEGER:  That's fine.
23 We'll move on.
24 BY MR. SEEGER:

Page 288

1     Q.   Mr. Jia, do you review or
2 consult in the creation of marketing
3 materials for the company?
4     A.   I did see this material, but
5 I did not pay too much attention.  I did
6 not pay too much attention.
7     Q.   Mr. Jia, without regard to
8 any specific materials, do you generally
9 review or consult in the creation of
10 marketing materials for the company, for
11 TG?
12     A.   I don't understand the
13 concept of "consult."
14     Q.   Okay.  Do you review
15 marketing materials created by anyone --
16 let me strike that.
17        Do you review marketing
18 materials that are created for the use of
19 TG in the marketing of drywall anywhere?
20 Strike that too.  That's awful.
21        Do you generally review --
22 why do I keep asking the same question?
23        What is your role at TG with
24 regard to the reviewing of marketing

Page 289

1 materials?
2     A.   Some of the marketing
3 materials, for example, those materials
4 that we saw yesterday, usually we would
5 have discussions among the department of
6 the sales, the production and also some
7 people from the office, they discuss it.
8 And then they would look for a print
9 shop.  Then they do the layout.  After
10 that, they come to me.  And I didn't
11 really pay much attention to this type of
12 things, and I would just say, okay, okay,
13 go ahead and print it.  So usually this
14 is the way how things are done.  Unless
15 these are very significant, major issues,
16 then I will really pay attention to take
17 care of it.
18     Q.   And then, Mr. Jia, with
19 regard to marketing, what would you
20 consider a significant or major issue
21 that would require your attention?
22     A.   I would like to tell you
23 some of the basic way, fundamental way,
24 of how a Chinese company operate.

Page 290

1     Q.   Please do.
2     A.   Therefore, it will be
3 beneficial for you to understand some of
4 the information of our company.
5     Q.   Go ahead.  Please tell us.
6     A.   Okay.  After China entered
7 the WTO, the Chinese government requires
8 the economy to go forward globally, and
9 it also requires opening of the policy
10 and reform of the policies.
11        Therefore, people always say
12 that our company is an open company.  We
13 are embracing the whole world.  We are
14 using the language that is being used by
15 the WTO and to apply to our marketing
16 material.  If we don't make this type of
17 statements, other people might
18 consider -- when they look at it, they
19 might consider our company, is it too
20 small, is it too backward.
21        So the information that you
22 saw yesterday, it had a statement called
23 based in China but move forward towards
24 the world.  This is how we come up with

Confidential - Subject to Further Confidentiality Review

Page 291

1 that imagination under that situation, we
2 come up with this slogan.
3     Q.   So, expanding globally, Mr.
4 Jia, would include expanding into U.S.
5 markets as well, correct?
6         MR. CYR:  Objection on the
7     grounds that the question is
8     leading the witness.
9         You may try to answer, Mr.
10     Jia.
11         MR. SEEGER:  Just to cure
12     that, Joe, and I don't care, you
13     can insert it, but because I'm
14     cross-examining him in a sense, I
15     can lead.  You can object to that.
16         I'm sorry.  You can ask
17     him -- repeat the question, and if
18     you want your objection to it,
19     that's fine.
20         (Interpreter repeats the
21     question.)
22         THE WITNESS:  No.  We never
23     planned to expand in the U.S.
24     market or to promote our work in

Page 292

1     the United States.
2 BY MR. SEEGER:
3     Q.   Okay.  So, the sales
4 materials that reflect that you are
5 marketing and selling and exporting to
6 the U.S., those were false, correct, Mr.
7 Jia?
8         MR. CYR:  Objection as to
9     form.
10 BY MR. SEEGER:
11     Q.   Mr. Jia, can you answer the
12 question.
13     A.   I consider the term false,
14 is inappropriate of how you use it when
15 you're referring to our behavior.  We
16 never have any plan to do the sales in
17 the United States, and in reality, we
18 have not done any marketing in the United
19 States.
20     Q.   So, then, my follow-up
21 question is, and you can take another
22 look at the exhibits if you'd like, Mr.
23 Jia, but Exhibit 2 and Exhibit 9, the
24 statements regarding the global growth of

Page 293

1 the company and exporting drywall to the
2 United States, are they true or false
3 statements in those documents?
4         MR. CYR:  You may answer the
5     question, Mr. Jia.
6         INTERPRETER 1:  I cannot
7     speculate what the witness wants
8     to say.
9         MR. SEEGER:  Did he answer?
10     Did he give you an answer?
11         INTERPRETER 1:  He did not.
12     He was using body language.  You
13     might instruct him not to use body
14     language, and he has to say --
15         MR. CYR:  I'm sorry, but the
16     interpreter, you know, giving you
17     lessons on what to do in the
18     deposition, she should just
19     interpret.
20         INTERPRETER 1:  No, no.  I'm
21     requesting -- he was doing body
22     language, so I am asking the
23     counsel to help me to instruct him
24     in that I cannot interpret his

Page 294

1 using the body language.  Thank
2     you.
3         MR. PANAYOTOPOULOS:  Can we
4     get a body language interpreter?
5         INTERPRETER 1:  He has to do
6     it verbally before I can
7     interpret.
8         MR. SEEGER:  If you comment
9     for a long time, I'm going to lose
10     my time.  I've got you.
11         INTERPRETER 1:  Thank you.
12         MR. SEEGER:  Thank you.
13         Please repeat my question.
14 BY MR. SEEGER:
15     Q.   Mr. Jia, I would like the
16 interpreter to repeat the question to
17 you, and please answer it, if you can.
18     A.   Some of our drywall, it is
19 possible to have been exported to the
20 United States.  In the United States,
21 many of the company -- some of the
22 company that come to China to buy the
23 drywall.  In order we try to fulfill all
24 the requirement of the customers, so,

Confidential - Subject to Further Confidentiality Review

Page 295

1  these companies, they sell our drywalls
2  to the United States. Regarding where
3  they ship these drywalls to, we don't
4  want to find out, and we also don't want
5  to know.
6          MR. CHEN: If you could just
7  clarify. I thought he said, we
8  don't care. But if you could
9  just -- if you can clarify with
10  him to make sure you are
11  comfortable with it.
12          MR. SEEGER: It's your call.
13  You're the interpreter.
14          (Interpreter discussion with
15  witness in Chinese.)
16          INTERPRETER 1: It was
17  correct. It was correct.
18          THE WITNESS: The people
19  working for our company, they
20  produced the drywall according to
21  some of the requirements of some
22  U.S. customers. They want to ship
23  it to the United States. They
24  based it on this type of saying to

Page 296

1      print out this type of documents.
2      However, we are very sure for 100
3      percent we don't have any plan to
4      sell to the United States.
5          INTERPRETER 2: The check
6      interpreter believed that the
7      witness said, we did not have any
8      plan to market the drywalls in the
9      U.S.
10          THE WITNESS: We also don't
11      have any actual actions in reality
12      to sell in the United States.
13  BY MR. SEEGER:
14      Q.  Is that current? That
15  answer he just gave, is that currently or
16  at any time?
17      A.  Any time.
18      Q.  Mr. Jia, did TG salespeople
19  or sales personnel promote the sale of TG
20  drywall to U.S. distributors at any time?
21          MR. CYR: Objection. The
22      question is vague.
23          Mr. Jia, please try to
24      answer.

Page 297

1          THE WITNESS: No.
2  BY MR. SEEGER:
3      Q.  Okay.
4          Mr. Jia, yesterday you
5  testified that TG had a foreign sales
6  department. Why do you have a foreign
7  sales department?
8          MR. CHEN: Objection.
9          Dui wai tui xia is outward
10      marketing --
11          INTERPRETER 1: It is just a
12      difference in the translation --
13          MR. SEEGER: Wait, you have
14      to let him say his objection.
15      Stop, stop.
16          THE COURT REPORTER: Please
17      repeat what you said.
18          MR. CHEN: The words "dui
19      wai tui xiao" in Chinese mean
20      outward marketing. And so the
21      term yesterday used for foreign
22      trade department was wei mou bu.
23          MR. PANAYOTOPOULOS: I'm
24      going to object to the speaking

Page 298

1  objection.
2          MR. SEEGER: You're the
3  final call on the translation. I
4  just wanted you to hear what he
5  said.
6          INTERPRETER 1: I heard what
7      he said. Well, it is very close
8      enough. Because we are not in the
9      legal position to define legal --
10          MR. SEEGER: That's all you
11      have to say.
12          So where are we on his
13      answer?
14          - - -
15          (Whereupon, the following
16      portion of the transcript was read
17      by the court reporter:
18          "Q. Mr. Jia, yesterday you
19      testified that TG had a foreign
20      sales department. Why do you have
21      a foreign sales department?")
22          - - -
23          THE WITNESS: This foreign
24      sales department, we do not sell

Page 299

1 department to the outside. This
2 foreign sales department is for
3 purpose of to deal with foreign
4 business that they come,
5 occasionally or miscellaneously
6 they come to buy the drywalls.
7        INTERPRETER 2: The check
8 interpreter believes that the
9 witness says the foreign trade
10 department -- the establishment of
11 foreign trade department was not
12 to market or sell products to
13 overseas. It is -- the
14 establishment of it is only to
15 service the odd times when foreign
16 buyers come to purchase our
17 product.
18        INTERPRETER 1: It's the
19 same.
20        MR. SEEGER: I think it's
21 the same thing. That's my view.
22        MR. CYR: I agree.
23 BY MR. SEEGER:
24    Q.   Mr. Jia, let me ask you a

Page 300

1 question. We have looked at a couple of
2 documents. One I want to put in front of
3 you is Exhibit 2.
4        Just for the record, one
5 more time, would you read from the second
6 to the last page of Exhibit 2 what that
7 statement at the top of the page says in
8 Chinese.
9        MR. CYR: I'm sorry.
10        MR. SEEGER: I'm just asking
11 him to read this. I don't know
12 how far he went. Just this.
13        MR. CYR: Interpreter, could
14 you just --
15        THE WITNESS: I did read it
16 before. I did it to based in
17 China and moved forward to the
18 world.
19        MR. CYR: I'm sorry, there's
20 no question before you, I don't
21 believe.
22        MR. SEEGER: He's right.
23 Tell him I'm going to now ask a
24 question.

Page 301

1        MR. CYR: There's no
2 question.
3 BY MR. SEEGER:
4    Q.   Is that a true or a false
5 statement in your document? First
6 question is, that is a TG document,
7 correct, sir?
8    A.   Yes.
9    Q.   And it's in Chinese as well
10 as English, correct, sir?
11    A.   Yes.
12    Q.   Is the statement at the top
13 of that page, the second to the last page
14 of Exhibit 2, is that a true or a false
15 statement?
16    A.   Which statement?
17    Q.   (Indicating.)
18    A.   (Indicating.)
19        MR. CYR: No, just this,
20 (indicating.)
21 BY MR. SEEGER:
22    Q.   Just that at the top.
23    A.   I just explained this
24 earlier. Well, in China, the companies,

Page 302

1 they use this type of material like this.
2 It is very popular. It doesn't matter
3 whether they have this statement or not.
4 You can go to the other cities in China
5 to take a look. They will say that we
6 are in China and also we are in the world
7 and da, da, da. I think this phenomena
8 happens very often a lot. I think it is
9 a cultural difference between China and
10 the United States.
11    Q.   I just have a simple
12 question, Mr. Jia. Does the statement at
13 the top of that page about China moving
14 forward to the world accurately reflect
15 the sentiments of the company or does it
16 not accurately reflect the sentiments of
17 the company?
18        MR. CYR: At what time?
19        MR. SEEGER: At the time it
20 was printed.
21        MR. CHEN: She needs to
22 translate the colloquy that you
23 guys just had, the attorneys just
24 had about the time.

Confidential - Subject to Further Confidentiality Review

Page 303

1    INTERPRETER 1: I did at the
2  very beginning. I do it upside
3  down.
4    MR. CHEN: At the very
5  beginning, you said at any time,
6  and that's not what Mr. Seeger's
7  comment was.
8    INTERPRETER 1: No. He was
9  saying at any time --
10   MR. SEEGER: At the time it
11 was printed.
12   INTERPRETER 1: So I put it
13 at the beginning, so it's the
14 same.
15   MR. CHEN: You said --
16   MR. SEEGER: I can't really
17 have the interpreter fighting with
18 people. If she says she said
19 it --
20   INTERPRETER 1: I said it.
21   MR. SEEGER: Please ask the
22 witness to answer.
23   INTERPRETER 1: At the time
24 it was written.

Page 304

1    THE WITNESS: Can you repeat
2  the question.
3    MR. SEEGER: That's the
4  problem with all the
5  interruptions. And for the
6  record, it's not any fault of
7  yours, I'm not accusing you, but
8  it's a difficulty in getting this
9  done. But we've got a lot of
10 people here jumping in. So please
11 do it one more time. Repeat the
12 question with that thing that I
13 said about it's true at the time.
14   (Interpreter repeats
15 question.)
16   THE WITNESS: Well, this is
17 the way I'll put it. I consider
18 this statement reflects the true
19 sentiment of Taihe. I made a
20 mistake. I myself made a mistake
21 with the name.
22   INTERPRETER 1: He's saying
23 that.
24 BY MR. SEEGER:

Page 305

1    Q.  You made a mistake. Tell
2  him to clarify.
3    A.  I made a mistake with the
4  name.
5    Q.  Mr. Jia, clarify what you
6  mean. I don't know what you mean by you
7  made a mistake with the name.
8    A.  When I say "Taihe," I made a
9  mistake with this Taihe. I made a
10 mistake with the name.
11   Q.  What did he mean to say?
12   A.  Let me repeat it again. Let
13 me do it again.
14     With drywall, if for sure it
15 is exported, then it is moving forward
16 towards the world. It is how we consider
17 this. Our experience tells us that some
18 of our products has already been outside
19 of China. Therefore, we consider that we
20 have already moved forward to the world.
21   Q.  Okay. And if you could, Mr.
22 Jia, if you would take a look at the
23 exhibit -- do you need a break?
24   A.  Yes. I want to take a

Page 306

1  break.
2    THE VIDEOTAPE TECHNICIAN:
3  The time now is approximately 9:42
4  a.m., and we are now off the
5  record.
6      - - -
7    (Whereupon, a recess was
8  taken from 9:42 a.m. until
9  9:57 a.m.)
10     - - -
11   THE VIDEOTAPE TECHNICIAN:
12 This begins Tape 2 of today's
13 portion of our deposition. The
14 time now is approximately 9:57
15 a.m., and we're back on the
16 record.
17   MR. SEEGER: Let me just
18 state for the record, Mr. Cyr,
19 we've asked your team if we can
20 have one person, whoever it is
21 going to be, I don't care if it's
22 Gene or the check interpreter,
23 maybe have one person make the
24 objection if there's any issues on

Confidential - Subject to Further Confidentiality Review

Page 307

1 the interpretation, if that's okay
2 with you.
3 　　MR. CYR: That sounds very
4 reasonable. Why don't you just
5 decide.
6 　　INTERPRETER 2: Counsel, do
7 you mind if the check interpreter
8 to raise a few words in here in
9 the record so that everyone would
10 know that what we are objecting
11 about. The term marketing, sales,
12 these are the main words that we
13 have issues with because the check
14 -- the interpreter interpret
15 market into tui xiao, but in
16 Mainland China, the most commonly
17 used term in market will be ying
18 xiao, which is -- so that
19 sometimes if people use tui xiao
20 in front of a Chinese Mainlander,
21 they may not know what you mean by
22 if you are using tui xiao.
23 Essentially the check interpreter
24 agree that they are the same

Page 308

1 meaning, but one is a Cantonese
2 meaning, one is a Mainland,
3 Beijing, the most part of China's
4 meaning. If you're using one term
5 instead of the other, the
6 Mainlander may not understand what
7 you are talking about.
8 　　And another is -- and
9 another is sales it is not just
10 mai. Sales is xiao shou. So, I
11 mean, they probably mean the same
12 thing, but if you are telling the
13 Mainlander one way, but not the
14 way that they are used to, they
15 may not understand it. That is
16 what we are very concerned with.
17 　　MR. SEEGER: Okay.
18 　　MR. CYR: Thank you for
19 letting us register that. We're
20 prepared now to continue.
21 　　INTERPRETER 1: I want to
22 respond.
23 　　MR. SEEGER: Wait a second.
24 　　You have to stop. There's a

Page 309

1 reason for it. It has nothing to
2 do with you. You don't have to
3 respond. You do not have to
4 defend yourself.
5 　　INTERPRETER 1: I am not
6 defending myself. Mr. Jia used a
7 third term.
8 　　MR. SEEGER: No, no, no,
9 that's fine. They're just noting
10 it for the record. Don't worry
11 about it.
12 　　One other thing I have to
13 raise, and I'm not going to call
14 anybody out by name. Somebody on
15 the team, I believe, has attempted
16 to ask the interpreter off the
17 record if she could standardize
18 certain terms. I'm not alleging
19 any wrongdoing. I'm just saying,
20 if you could just inform your
21 team, you know, lawyers or
22 non-lawyers, that they shouldn't
23 do that with the interpreter off
24 the record. Just raise it with

Page 310

1 us, and we'll deal with it here.
2 　　MR. CYR: That's a very
3 reasonable request, and we'll
4 honor it.
5 　　MR. SEEGER: Thank you. Now
6 we are going to get back to work,
7 right? Okay. We're all set.
8 Everyone is doing great.
9 BY MR. SEEGER:
10 Q. Mr. Jia, in the document --
11 　　MR. SEEGER: Where's the
12 document, the readable version?
13 We have to substitute it. Where's
14 your version?
15 　　MR. CHEN: I'm sorry, Chris.
16 　　MR. SEEGER: Did you take it
17 back?
18 　　MR. CHEN: Chris, if I may
19 say just one more thing. There
20 were a set of agreed-upon terms,
21 and so the term that Ms. Wong just
22 mentioned that was a proper PRC
23 term was the agreed-upon term
24 between both sides and provided to

Page 311

1 the interpreter. So, while I
2 understand that there are
3 different ways of saying certain
4 terms, at least on some of them we
5 had an agreed-upon usage. So, if
6 the interpreter can try and use
7 that, what both sides agreed on, I
8 think it would be preferable.
9     INTERPRETER 1: I want to
10 state on the record, the
11 suggestion of the translation of
12 the terms "marketing," the terms
13 that I choose and the terms that
14 the check interpreter choose, they
15 are both not the wording the
16 witness choose. The witness
17 choose the word xunchun, a third
18 one. So, neither I nor Una is
19 correct in this case because the
20 word as chosen by Mr. Jia is a
21 third one called xunchun. And the
22 word sales, sales are mai. Mr.
23 Jia also choose my terms
24 occasionally, just like drywall,

Page 312

1 gypsum and the --
2     MR. SEEGER: I've got it.
3     INTERPRETER 1: -- what do
4 you call it? The plasterboard.
5 They are all the same thing.
6     MR. SEEGER: Okay. Listen,
7 both of you interpreters, I'm
8 going to yell at both of the
9 interpreters. It's not about you
10 guys. We've got to ask questions
11 here. We can't waste this time.
12     MR. CYR: We're prepared to
13 continue.
14     MR. PANAYOTOPOULOS: Excuse
15 me. I have an objection for the
16 record. I just wish for the
17 process to go on, the questioner
18 ask the questions, and we move on.
19 I wish for the translators to stop
20 talking, please.
21     MR. SEEGER: You have to. I
22 want to move on to a question.
23 BY MR. SEEGER:
24     Q. Mr. Jia, I want to put in

Page 313

1 front of you what's been marked as
2 Exhibit 2 and ask you to just take a
3 quick look at the language in yellow.
4 That's in English. Give it back to me.
5 That's okay. Strike that question.
6     I want to ask you some
7 questions.
8     Mr. Jia, is this true or
9 false, that TG has a self-supported
10 import and export system?
11     A. Yes.
12     Q. Is this true or false, that
13 your products, TG's products, not only
14 sell well in the domestic market, but
15 also export to many countries, including
16 the USA?
17     A. Would you mind repeating it.
18     (Interpreter repeats
19 question.)
20     A. The TG product sells very
21 well in China, but it is outside of
22 China, the quantity would be very small,
23 because this product is very heavy, so,
24 it is very difficult to sell it outside

Page 314

1 of the country.
2     MR. SEEGER: Is that the
3 end?
4     INTERPRETER 1: Yes.
5 BY MR. SEEGER:
6     Q. Mr. Jia, my question is
7 this: Is it a true statement or false?
8 If you could just give me a one-word
9 answer, I would appreciate it. TG's
10 products not only sell well in the
11 domestic market but also export to many
12 countries including the United States.
13 Is that a true or false statement?
14     A. Exporting to the United
15 States, from what we can see now, we do
16 have some products exported outside to --
17 outside of the country. If it sells well
18 in the United States, it is not the
19 reality.
20     Q. Mr. Jia, what do you mean by
21 "if it sells well in the United States,
22 it's not the reality"? I don't
23 understand.
24     A. It is not a reality that it

Confidential - Subject to Further Confidentiality Review

Page 315

1 sells well in the United States.
2     Q.  Do you keep track in your
3 company, in TG, of sales volume in Asia
4 and outside of Asia?
5     A.  The sales volume to be
6 exported outside of China is very small,
7 and the market is small, very few amount
8 the volume of products of TG.
9     Q.  Mr. Jia, respectfully,
10 that's not my question. Do you know how
11 much you sell outside of China? Do you
12 know how much drywall you ship to the
13 United States, for example, in any given
14 year? Do you know what that would be?
15         MR. CYR: Mr. Seeger, I'm
16     going to object. I know you
17     didn't intend to, but I think you
18     asked two or three questions at
19     the same time. And you also asked
20     him how much was shipped to the
21     United States, which is contrary
22     to the record.
23         There's no need to interpret
24     this unless Mr. Seeger wants to

Page 316

1     have it interpreted, because I
2     have no intent here to suggest
3     anything to the witness, but I
4     think the question was improper.
5         MR. SEEGER: Would you mind
6     if I allow him to go ahead and
7     answer that, and let's see what
8     his answer is. And I'll decide if
9     I have to follow up.
10         MR. CYR: I'm not
11     instructing the witness not to
12     answer, but any answer you get I
13     think would be meaningless.
14         THE WITNESS: Can you repeat
15     the question.
16 BY MR. SEEGER:
17     Q.  Yes. Would you know, can
18 you go back to some place in the company
19 and tell us, for example, how much
20 drywall you ship to the United States in
21 a given year, in any year?
22         MR. CYR: Same objection.
23         Mr. Jia, you can try to
24     answer the question.

Page 317

1         THE WITNESS: The
2     plasterboard that our company
3     shipped to the United States, it
4     would be very difficult for me to
5     give you the figure. I am unable
6     to provide you with the figure
7     because some of our customers from
8     the United States, they applied
9     the products to be shipped out,
10     but how, what is the result or
11     where they are being shipped to,
12     that I don't know.
13 BY MR. SEEGER:
14     Q.  Would you be able to tell us
15 what your sales figures are for drywall
16 sold outside of China?
17     A.  What time period?
18     Q.  From 2005 to present.
19     A.  We have the data, but
20 regarding the figure of our company, I
21 cannot be sure about this data, because
22 some of the product, whether they have
23 actually been shipped outside of China or
24 not, I cannot be sure. And some of the

Page 318

1 customer, it is possible that they buy
2 the products and then they sell in China,
3 or they may not actually export it to
4 somewhere outside of China, and the
5 product comes back to China. With this
6 kind of situation, I cannot do a
7 statistics, therefore, I cannot decide
8 the amount for the total sales.
9     Q.  Mr. Jia, do you realize that
10 in connection with the litigation that's
11 going on in the United States, you have
12 signed off on statements regarding the
13 amount of drywall that's been exported to
14 certain distributors? Are you aware of
15 that?
16         MR. CYR: Mr. Seeger, I have
17     to object because I'm not aware of
18     what the statements are that
19     you're referring to. Would it be
20     best to just show them? And I
21     just want to point out for the
22     record to save time that Mr. Jia
23     may have signed the manufacturing
24     profile form for Taishan Gypsum,

Confidential - Subject to Further Confidentiality Review

Page 319

1  but I think that you'll find, if
2  you ask him, that he did not sign
3  the manufacturing profile form for
4  TTP.
5      MS. BASS:  Let me just
6  object on the record to the
7  speaking objection.  Let the
8  witness answer the question.
9      MR. SEEGER:  Do I have an
10  answer to the last question I
11  asked?
12      MR. CYR:  No.
13      MS. BASS:  No, you don't.
14      MR. SEEGER:  I would like to
15  have an answer to the question
16  then.
17      MR. CYR:  I object that the
18  question misleads the witness and
19  that the witness should be shown
20  whatever documents you're
21  referring to.
22      Please interpret that.
23      MS. BASS:  For the record,
24  my objection to his second

Page 320

1  objection to the same question.
2      MR. SEEGER:  Do me a favor.
3  Mark the record for a ruling on
4  that.  I'm not necessarily at this
5  point looking at anything.  I
6  would just like the witness to
7  answer that question, if he could.
8      THE WITNESS:  I can't
9  recall.
10  BY MR. SEEGER:
11      Q.  Do you recall signing off on
12  any documents that are being used in the
13  litigation that's going on in the United
14  States regarding defective drywall
15  shipped from China?
16      A.  I don't recall.
17      Q.  Do you recall signing off on
18  manufacturers profile sheets?  I don't
19  know how you would translate that in
20  Chinese.
21      INTERPRETER 2:  Maybe the
22  check interpreter help.
23      THE WITNESS:  Can I look at
24  the document?

Page 321

1  BY MR. SEEGER:
2      Q.  Well, I'm just asking if you
3  have --
4      Before I show you, and I
5  will talk to you about the document, do
6  you have any independent recollection,
7  Mr. Jia, of signing off on a
8  manufacturers' profile sheet to be used
9  in litigation in the United States
10  regarding defective Chinese drywall?
11      A.  I don't recall.
12      Q.  Sir, is it generally your
13  practice before you sign a document to
14  try to read it and understand it?
15  Obviously it has to be in Chinese, but is
16  it your practice before you sign a
17  document to read it and then understand
18  it?
19      A.  Every day I sign off a lot
20  of documents.  So this is a document many
21  years ago.  I cannot recall whether I
22  have signed it or not.
23      MR. SEEGER:  Let me mark
24  this.

Page 322

1      - - -
2      (Whereupon, Deposition
3  Exhibit Jia-11, Taishan Gypsum Co.
4  Ltd. Manufacturer Profile Form,
5  Bates Nos. DPF-TAISHAN GYPSUM CO
6  LTD-1-00001 through
7  DPF-TAISHANGYPSUM CO LTD-1-00014,
8  was marked for identification.)
9      - - -
10      MR. SEEGER:  Joe, do you
11  mind looking on with the witness
12  for this one, because I only have
13  one copy, and I'm going to work
14  from that.
15      MS. BASS:  Is that a
16  composite of both?
17      MR. SEEGER:  Yes.  There's
18  the Chinese version and then
19  there's the English version.
20  BY MR. SEEGER:
21      Q.  Mr. Jia, would you take a
22  look at what we just marked as Exhibit
23  11.  Are you looking at the Chinese
24  version?

Confidential - Subject to Further Confidentiality Review

Page 323

1          MR. CHEN:  I'm telling him
2     to look at the document.
3          MR. CYR:  We don't need to
4     share with him what we're saying
5     to our client.
6          MR. SEEGER:  I want to make
7     sure he's not telling the
8     witness what to do.
9          MR. CYR:  I'll take care of
10    that.
11         MR. SEEGER:  You want me to
12    just trust you?
13         MR. CYR:  We will talk to
14    our client whenever we want to.
15         MR. SEEGER:  Not during a
16    question.  Now I need to ask a
17    question.  Is that okay?
18         MR. CYR:  We're just giving
19    him a chance to look at the
20    document for the record.
21         MR. SEEGER:  It may be
22    actually easier if I tell him what
23    I'm looking for, and then he can
24    look at it.

Page 324

1          MR. CYR:  Great.
2     BY MR. SEEGER:
3          Q.   Mr. Jia, did you sign this
4     document?
5          A.   Yes, I did sign on this
6     document.  These are -- these words are
7     written by me.
8          Q.   Okay.  And is there --
9          On the document that you
10    signed, did you notice that there was a
11    declaration or something called a
12    certification before your signature
13    requiring you to answer or sign under the
14    penalty of perjury?
15         A.   Yes.
16         Q.   And you stand by your
17    signature on that document, correct, sir?
18         A.   Yes.
19         Q.   In section -- and I hope
20    this works for the Chinese, but in
21    section 2 of this document, there's a
22    representation about how much drywall was
23    shipped to a company called Venture
24    Supply.  Could you tell me if you can

Page 325

1     find that part of the document?  I
2     believe it's on Page 2 or 3.  Section 2.
3     It's in section 2.
4          MR. CYR:  I believe the
5     question is referring to section
6     3, subsection 2 on Page 3, Mr.
7     Jia.
8          MR. SEEGER:  You're right.
9     You're right.
10         MR. CYR:  Please interpret
11    what I said.
12         MR. SEEGER:  He's right.
13    It's section Roman III, and I
14    don't know how it's reflected on
15    the Chinese version, Paragraph 2.
16         THE WITNESS:  What do you
17    want me to answer?  I'm not sure.
18    BY MR. SEEGER:
19         Q.   How did you go about finding
20    the information that allowed you to
21    answer the question about how much
22    drywall was shipped to Venture Supply?
23         MR. CYR:  I have to object.
24    I don't see any reference to

Page 326

1     shipments to Venture Supply.
2          MR. SEEGER:  I'm sorry.  Let
3     me make the correction.
4     BY MR. SEEGER:
5          Q.   Sold to Venture Supply.
6          Actually, I want to strike
7     that.  I want to strike that, because I'm
8     reading the language, and I don't know if
9     the Chinese version says the same thing.
10         But the English version of
11    this document says that the February 24,
12    2006 and July 20, 2006 shipments of
13    drywall by Venture Supply to the United
14    States contained 153,912 sheets of
15    drywall respectively.  And it is also in
16    the section that says "Amount of drywall
17    exported."  Could you please tell me
18    where you found the information to answer
19    that question.
20         A.   This information is true.
21    The data and the amount contained in this
22    document is also true.
23         Q.   Well, if you don't know how
24    much you shipped outside of Asia, then

Confidential - Subject to Further Confidentiality Review

Page 327

1  how do you know those figures are true,
2  Mr. Jia?
3      A.  I'm referring to this
4  company.
5          INTERPRETER 1:  The witness
6      is pointing to the name of this
7      company, Venture Supply.
8          THE WITNESS:  I don't know
9      how to call this company.  And
10     what I am saying is true, is that
11     TG sold the plasterboard to this
12     company is true.
13 BY MR. SEEGER:
14     Q.   So, you do -- he's not
15 finished.
16     A.   We exported a lot of
17 plasterboards, of all the plasterboard.
18 They turn around and be sold in China,
19 that I don't know.  Therefore, these two
20 facts I just stated, they are not
21 contrary.
22     Q.   Mr. Jia, the statement in
23 the document in English says that there
24 were shipments of drywall to Venture

Page 328

1  Supply to the United States.  Does it say
2  a similar thing in the document in
3  Chinese?
4          MR. CYR:  I'm sorry,
5      Counsel, where are you reading
6      that?
7          MR. SEEGER:  I'm in that
8      same section, Roman III, 2.  It's
9      the section that says "Amount of
10     drywall exported."  And then next
11     to it, I'm taking the words there
12     where it says "Shipments of
13     drywall by Venture Supply to the
14     United States."
15         MR. CYR:  What's the
16     question?
17         MR. SEEGER:  The question
18     is, does it say exactly the same
19     thing in the document in Chinese
20     in front of you?
21         MR. CYR:  Thank you.
22         THE WITNESS:  I don't know
23     English, therefore, to check the
24     Chinese against the correctness of

Page 329

1      the English, whether the English
2      has made a mistake or Chinese made
3      a mistake, I cannot do it.
4  BY MR. SEEGER:
5      Q.   That's not my question, Mr.
6  Jia, respectfully.
7          My question is, in the
8  Chinese version of this document, in
9  section III(2) where it says "Amount of
10 drywall exported," does it say
11 essentially the same thing in the Chinese
12 document, that there were shipments of
13 drywall by Venture Supply to the United
14 States of TG drywall?  Does it basically
15 say that in the Chinese version or not?
16     A.   In this document in Chinese,
17 it says this plasterboard was shipped to
18 the United States.
19     Q.   Okay.  So, you do know in
20 TG, you can tell us exactly how much
21 plasterboard was shipped to the U.S.,
22 correct?  You can find that information,
23 can't you?
24         MR. CYR:  Objection.  The

Page 330

1      question is vague.
2          You can try to answer.
3          THE WITNESS:  Incorrect.
4  BY MR. SEEGER:
5      Q.   Explain why.  Why am I
6  incorrect?
7      A.   Because TG also including
8  all the subsidiaries, the sales for every
9  year is very large.  So, the amount is
10 too large.  It is impossible for me to
11 know of every single contract.  That is
12 impossible.  Even as a GM, I cannot do
13 it.
14     Q.   So, you were able to find
15 information regarding drywall exported to
16 Venture Supply in the United States, but
17 you're saying you can't do that for
18 everyone you've exported to?  Is that
19 your answer?
20         MR. CYR:  Objection on two
21     grounds.  One is it might be
22     unclear whether or not you're
23     referring to Mr. Jia personally or
24     the company Taishan Gypsum just

Confidential - Subject to Further Confidentiality Review

Page 331

1  because of the language
2  difference.  And then secondly,
3  your use of the phrase "shipped to
4  Venture Supply in the United
5  States."
6      No need to interpret that
7  unless Mr. Seeger would like to.
8      MR. SEEGER:  No.  He can
9  answer my question.
10     MS. BASS:  Once again, let
11 me just note an objection to the
12 speaking objection.
13     MR. SEEGER:  So he's not
14 asking you to read the objection
15 to the witness.  He's just asking
16 you to read my question.
17     THE WITNESS:  Yes.
18 BY MR. SEEGER:
19     Q.   Where in the company did you
20 go or did whoever works for you go to
21 find the information that's reflected on
22 this exhibit in front of you regarding
23 Venture Supply?  Where in the company
24 would you go to find that?

Page 332

1      A.   Of course they have it in
2  the foreign sales department.
3      Q.   Does the foreign sales
4  department keep their records on a
5  computer?
6      A.   We require this to be done.
7  I can recall that originally I requested
8  my staff to do this.
9      Q.   Who specifically on your
10 staff was asked to do this for you, Mr.
11 Jia?
12     A.   The manager of the foreign
13 sales department, Peng Wenlong.  I think
14 he should know of this type of
15 information.
16     Q.   Do your financial auditors
17 for TG review your sales records?
18     INTERPRETER 2:  The check
19 interpreter believe that the
20 interpreter did not put TG into
21 her interpretation.
22     MR. SEEGER:  Please ask it
23 with TG.
24     INTERPRETER 1:  It says

Page 333

1  "your sales record."
2      MR. SEEGER:  Is it my
3  mistake?
4      INTERPRETER 1:  Yeah.
5      MR. SEEGER:  Was it my
6  mistake?
7      INTERPRETER 1:  I mean my
8  mistake.
9      MR. SEEGER:  Okay.  So, will
10 you ask it the way I asked it.
11     Go ahead.  You want him to
12 ask the question the way I asked
13 it.
14     (Interpreter repeats the
15 question.)
16     THE WITNESS:  I, myself,
17 personally, don't have a sales
18 record.
19 BY MR. SEEGER:
20     Q.   Do the financial auditors
21 for the company, for TG, review sales
22 records?
23     A.   We have a finance
24 department.  The finance department will

Page 334

1  make the record.  They will have the
2  information regarding the sales.
3      Q.   Does your financial
4  department have information regarding
5  shipping records?
6      A.   No.
7      Q.   Who has the information
8  regarding shipping records, which
9  department?
10     A.   The shipment record should
11 be with the foreign sales department.
12     Q.   So, the foreign sales
13 department would have the shipping
14 records, correct?
15     A.   Yes.
16     Q.   Is that also kept on
17 computer?
18     A.   I'm not sure.  Not
19 necessarily.  In the computer maybe you
20 can also find it somewhere else.
21     Q.   Let me just ask, for
22 example, when you signed off on this
23 particular document that's been marked as
24 an exhibit, the manufacturers profile

Confidential - Subject to Further Confidentiality Review

Page 335

1 sheet, did you look to see where the
2 information came from regarding sales and
3 shipping in this instance?
4      A.   I did not delete this
5 document, and it would be impossible for
6 me to delete this document.  I also don't
7 know about this document.
8           MR. CHEN:  (Addressing the
9 interpreter.)
10          Objection.
11          It's the reference to delete
12 this information, not delete this
13 document, for the interpreter's
14 suggestion or consideration.
15          INTERPRETER 1:  He did
16 answer and also flip flop between
17 the word zhi liao and wenjian.
18          MR. SEEGER:  So what's your
19 interpretation of his answer?  Let
20 me just have it one more time.
21          - - -
22          (Whereupon, the following
23 portion of the transcript was read
24 by the court reporter:

Page 336

1           "A.  I did not delete this
2 document, and it would be
3 impossible for me to delete this
4 document.  I also don't know about
5 this document.")
6           - - -
7 BY MR. SEEGER:
8      Q.   Is it possible, Mr. Jia,
9 that there were other TG sales of gypsum
10 board to the U.S. that are not accounted
11 for in this document?  Is that possible?
12          MR. CYR:  Objection on the
13 grounds that the question is vague
14 and assumes a fact not in the
15 record.
16          Please interpret that.
17          MR. SEEGER:  Mark that.
18          INTERPRETER 2:  The check
19 interpreter believes the
20 interpreter did not complete the
21 interpretation.
22          INTERPRETER 1:  I am
23 interpreting the objection.
24          MR. CYR:  It's okay.  The

Page 337

1 English version, I'm sure, is
2 captured on the record.
3           You may proceed.  Thank you.
4           MR. SEEGER:  I think we're
5 just waiting on an answer.
6           You can tell him the
7 question again if you want, but he
8 needs to answer the question that
9 we asked.
10          (Interpreter repeats the
11 question.)
12          THE WITNESS:  I don't
13 understand the way you ask the
14 question.
15          MR. SEEGER:  I've forgotten
16 the question.
17          MS. BASS:  Is it possible
18 there were other sales in the U.S.
19 that were not included in this
20 document?
21          MR. SEEGER:  There you go.
22 BY MR. SEEGER:
23      Q.   I just want to know in this
24 document that he's looking at -- I'm

Page 338

1 sorry.
2           Mr. Jia, the document that
3 you're looking at, this exhibit in front
4 of you, reflects your knowledge of all
5 shipments and exports of drywall to the
6 United States.  Is it possible that you
7 have shipments of drywall or exports of
8 drywall to the United States that are not
9 reflected in this document?
10          MR. CYR:  Same objection.
11          Mr. Jia, please try to
12 answer the question if you can.
13          THE WITNESS:  I still don't
14 understand -- I still don't
15 understand what you are asking
16 about.
17 BY MR. SEEGER:
18      Q.   Mr. Jia, is it possible that
19 you sold drywall to distributors who
20 brought the drywall to the United States
21 that are not reflected in this document?
22      A.   Are you talking about TG or
23 TTP?
24      Q.   Let's start with TG.

Page 339

1     A.  TG is a company.  It has
2  signed an agreement and also a contract
3  for implementation.  This has already
4  been implemented.
5     Q.  What contract is he
6  referring to?
7     A.  Venture Supply.  Is it
8  called Venture Supply?
9     Q.  Yes, yes.
10        MR. SEEGER:  So, what's his
11  answer?
12        INTERPRETER 1:  That's the
13  answer.
14        THE WITNESS:  So, the
15     agreement that we signed with
16     them, we have implemented that.
17  BY MR. SEEGER:
18     Q.   So, you're saying --
19        Is it possible that you
20  could have sold drywall to any other
21  distributor that was brought into the
22  United States?  Is that possible?
23     A.  I cannot speculate.
24     Q.  Other than Venture Supply,

Page 340

1  are you aware of TG selling gypsum board
2  to any customers in the United States?
3     A.  No.
4     Q.  Mr. Jia, since the
5  litigation in the U.S. regarding
6  defective Chinese Drywall, have your
7  sales been affected, the shipments of
8  drywall, regarding selling drywall?
9        MR. CYR:  I'm going to
10     object in that the question
11     appears to me at first glance to
12     be outside the designated areas.
13     It's your time.  I'm not
14     instructing the witness not to
15     answer.
16        MR. SEEGER:  Since you're
17     not instructing him, I'm not going
18     to get -- I have a basis for
19     asking.  We think it's within the
20     scope.  But that's fine.  You can
21     answer.
22        INTERPRETER 2:  May the
23     check interpreter give the
24     rendition of the Chinese

Page 341

1  interpretation to the witness?
2        MR. SEEGER:  No, not to the
3     witness.  If you want to make an
4     objection, if your lawyers want to
5     make an objection for the record,
6     that's fine.
7        MR. CHEN:  State the
8     objection.
9        INTERPRETER 2:  I just don't
10     think the interpreter's
11     interpretation is understandable
12     to the witness.  That's all.
13  BY MR. SEEGER:
14     Q.  Mr. Jia, did you understand
15  the question that was -- did we even ask
16  him the question yet?
17        Mr. Jia, do you understand
18  the question that was just asked of you
19  by the interpreter?
20     A.  I have forgotten what you
21  asked.
22     Q.  That's understandable.
23        MR. SEEGER:  Could you ask
24     him the question again.

Page 342

1        - - -
2        (Whereupon, the following
3     portion of the transcript was read
4     by the court reporter:
5     "Q.  Mr. Jia, since the
6     litigation in the U.S. regarding
7     defective Chinese Drywall, have
8     your sales been affected, the
9     shipments of drywall, regarding
10     selling drywall?")
11        - - -
12        THE WITNESS:  I don't
13     understand your concept and what
14     is the meaning of the shipment of
15     the drywall and being affected.  I
16     don't understand.
17  BY MR. SEEGER:
18     Q.  Mr. Jia, do you understand
19  that there's litigation going on in the
20  United States that drywall shipped by
21  your company is defective, correct?
22     A.  Incorrect.
23     Q.  But you understand that
24  there is litigation stating, alleging

Confidential - Subject to Further Confidentiality Review

Page 343

1  that your drywall is defective, correct?
2      A.   Yes.
3      Q.   Now, when you answered
4  before and you said incorrect, did you
5  mean to say it's incorrect that the
6  drywall is defective?  Was that what your
7  answer was?
8      A.   Yes.
9      Q.   Have you reviewed any
10 studies or reports issued by the U.S.
11 government regarding drywall shipped by
12 your company?
13         MR. CYR:  I guess we're
14 going to have to have a discussion
15 about what designated area you
16 believe this falls under.
17         MR. SEEGER:  Marketing.
18 Ultimately I'm asking him
19 questions regarding the marketing
20 and sales of the drywall from the
21 time frame of 2005 to present.
22 And this all occurred during that
23 time frame.
24         MR. CYR:  Excuse me.  I

Page 344

1  don't understand.  But maybe just
2  help me out.  I don't understand
3  --
4          THE WITNESS:  Can I take a
5  break.
6          MR. CYR:  -- how questions
7  about whether or not he reviewed
8  certain reports relate to --
9          MR. SEEGER:  Because I want
10 to ask him questions about sales.
11 That's where I'm going.
12         MR. CYR:  You want to ask
13 him questions about --
14         MR. SEEGER:  Yes, sales,
15 business.
16         MR. CYR:  I'm sorry, but
17 sales is different than marketing.
18         MR. SEEGER:  Let me just
19 answer, because one of the
20 categories that we asked for him
21 to be here for were business
22 plans, marketing plans, budgets
23 for TG and other companies.
24         MR. CYR:  Right.

Page 345

1          MR. SEEGER:  This would go
2  to marketing plans, business plans
3  and budgets.
4          MR. CYR:  I strongly
5  disagree.  If you want to take
6  time out to call the judge about
7  this, which would be very
8  unfortunate --
9          MR. SEEGER:  Not at this
10 hour.
11         MR. CYR:  There's two issues
12 really.  Is that in my view, this
13 is clearly outside the scope of
14 the designated area.  The second,
15 I should just state for the
16 record, is that I would welcome
17 the opportunity on a personal
18 level for the witness to be able
19 to address these kinds of issues,
20 but that's not why we're here.
21 And the other thing is, there's a
22 bunch of other lawyers who are
23 anxious to ask questions, and I'm
24 just going to share with you now,

Page 346

1  is that, in my view, we spent a
2  lot of time yesterday working
3  things out between plaintiffs'
4  counsel and the interpreter and
5  then also addressing questions
6  with respect to BNBM, which you
7  are allowed to ask, but I think
8  that it's a colossal waste of time
9  with respect to the jurisdictional
10 issues.  So, we're going to wrap
11 things up today at 5:00, and you
12 need to manage your time together.
13         MR. SEEGER:  Thank you for
14 that.
15         MS. BASS:  Excuse me.  Let
16 me just note for the record that
17 we had a specific discussion
18 yesterday about the fact that
19 holding to 5:00 end time today was
20 unrealistic and would likely
21 inevitably result in this witness
22 having to be called back.  So, I
23 suggest we not waste any more time
24 arguing about a single question of

Confidential - Subject to Further Confidentiality Review

Page 347

1 the questioner. Let's move
2 forward, but I'm going to
3 strenuously object if you suggest
4 that you are going to pull the
5 witness at 5:00.
6 　　MR. CYR: Your suggestion is
7 rejected. And I would like to
8 just emphasize again that we're
9 stopping at 5:00 today. So, you
10 guys need to manage your time.
11 　　MR. SEEGER: I appreciate
12 the thing about managing your
13 time. I do support Hilarie in
14 this. If we need the witness for
15 a little extra time, you ought to
16 make him available.
17 　　MR. CYR: I indicated
18 yesterday that we would be
19 reasonable in that regard. Now
20 we're talking minutes, not hours,
21 with respect to 5:00. So if
22 there's a lawyer here that
23 traveled all the way to Hong Kong
24 and only gets his or her turn at

Page 348

1 quarter to 5:00, we're not going
2 to ring the bell at 5:00. We're
3 going to proceed reasonably. But
4 you're spending time questioning
5 the witness now --
6 　　MR. SEEGER: I've only asked
7 one question so far, in fairness
8 to me.
9 　　MR. CYR: Why don't you go a
10 little bit further. I'm not
11 waiving any rights with respect to
12 the designated areas here.
13 　　MR. SEEGER: Can he answer
14 the question that I asked
15 previously?
16 　　INTERPRETER 1: The witness
17 has asked to take a break.
18 　　MR. SEEGER: I really would
19 like to get an answer since we
20 have a pending question and not
21 take a break.
22 　　(Interpreter repeats the
23 question.)
24 　　THE WITNESS: I did not

Page 349

1 receive any report issued by the
2 U.S. government. I did not
3 receive it nor did I see any. I
4 only saw a little something from
5 the media, from the media.
6 BY MR. SEEGER:
7 　　Q. Did the report that you saw
8 in the media discuss in any way reports
9 issued by the U.S. government regarding
10 defective drywall sold by your company?
11 Strike that.
12 　　Are you aware, sitting here
13 today, that there is a U.S. government
14 report, there's several reports,
15 regarding defective Chinese drywall sold
16 by your company?
17 　　A. The medias in the United
18 States reported that the drywall sold by
19 TG company has some problems, but I don't
20 believe it is true.
21 　　Q. And you have not personally
22 reviewed the reports issued by the U.S.
23 government regarding defective Chinese
24 drywall sold by your company; is that

Page 350

1 correct?
2 　　A. Correct.
3 　　Q. Are you interested in seeing
4 those reports issued by the U.S.
5 government regarding your -- defective
6 drywall sold by your company?
7 　　MR. CYR: I'm going to
8 object. Unless you can persuade
9 me how this falls in a designated
10 area, I'm so reluctant to do it,
11 but I'm going to have to instruct
12 the witness not to answer.
13 　　I regret the judge is not
14 available now either, because I'm
15 confident that he would agree with
16 me.
17 　　MR. SEEGER: So, on that
18 question, you're instructing the
19 witness not to answer?
20 　　MR. CYR: I'd welcome some
21 --
22 　　MR. SEEGER: I don't know if
23 I can say a lot more to convince
24 you about why I think this comes

Confidential - Subject to Further Confidentiality Review

Page 351

1 within marketing, sales, business
2 plans. I've made the pitch. I
3 think it is a mistake to instruct
4 him not to answer, because you
5 jeopardize him having to be
6 deposed again, but that's your
7 call. And I assume you've
8 considered that?
9     MR. CYR: I do. I just
10 don't see any connection at all.
11 I'm sorry.
12 BY MR. SEEGER:
13     Q.   Mr. Jia, your attorney has
14 instructed you not to answer the question
15 I just asked. Are you willing to answer
16 it despite that instruction or not?
17     A.   I am not willing to answer
18 this question.
19     Q.   Let me ask you another
20 question, one or two more, and we can
21 take a break.
22     A.   I need to take a break right
23 now immediately.
24     MR. SEEGER: I can't stop

Page 352

1 you.
2     THE VIDEOTAPE TECHNICIAN:
3 The time now is approximately
4 11:05 a.m., and we are now off the
5 record.
6        - - -
7     (Whereupon, a recess was
8 taken from 11:05 a.m. until
9 11:23 a.m.)
10        - - -
11     MR. PANAYOTOPOULOS: Can we
12 get a clarification about what
13 time we're going to break? I
14 would like to keep going as long
15 as possible since we just took a
16 break.
17     MR. CYR: Let's ask Mr. Jia
18 if he can go until noon rather
19 than 11:30. It makes sense, since
20 it's close to 11:30 already.
21     Break at noon.
22     MR. SEEGER: Noon until
23 1:00.
24     THE VIDEOTAPE TECHNICIAN:

Page 353

1 This begins Tape 3 of today's
2 portion of our deposition. The
3 time now is approximately 11:25
4 a.m., and we're back on the
5 record.
6 BY MR. SEEGER:
7     Q.   Mr. Jia, yesterday you had
8 given us some testimony about the health
9 benefits of the drywall that you sell.
10 What have you done to test the drywall in
11 light of the allegations regarding the
12 fact that it could be unhealthy and
13 statements in the media?
14     MR. CYR: I guess, once
15 again, we're going to have to have
16 a discussion about why this is in
17 one of the designated areas.
18 Which designated area does this
19 question fall under?
20     MR. SEEGER: It goes into
21 sales and marketing. We're still
22 under sales and marketing. There
23 are allegations that the drywall
24 is defective, potentially

Page 354

1 unhealthy. He says he saw them in
2 the media. What's he done?
3     MR. CYR: How is that
4 relevant to jurisdiction at all?
5     MR. SEEGER: Because I'm
6 going to connect it. If you give
7 me a few questions and you let him
8 answer a few questions, I'll
9 connect it up for you.
10     MR. CYR: I'm sorry to have
11 to spend some time on this on the
12 record, but I see no connection
13 whatsoever between whatever
14 Taishan Gypsum has done subsequent
15 to the litigation, subsequent to
16 the filing of the Complaint with
17 respect to checking tests and how
18 that conceivably could be related
19 to the jurisdictional questions in
20 this case. And unless there's
21 some showing of a connection
22 that's persuasive, I, regretfully,
23 I have to instruct the witness not
24 to answer.

Confidential - Subject to Further Confidentiality Review

Page 355

1      MR. SEEGER:  I'm going to
2  let Jeff address it because he's
3  been more involved with the
4  discovery, but I don't really
5  think it's proper for you to ask
6  me for a showing.  I don't think I
7  have to make a showing on it, but
8  go ahead.
9      MR. GRAND:  I'm going to say
10  that this witness has been
11  designated by Taishan Gypsum to
12  speak to business plans, marketing
13  plans and budgets for Taishan
14  Gypsum and related or other
15  entities.  In connection with
16  that, we reviewed yesterday
17  promotional materials created by
18  Taishan that contained promotional
19  statements about that the gypsum
20  board was good for health.  We are
21  entitled to ask him whether he's
22  taken any steps to ensure that
23  those statements are still true
24  and whether the marketing

Page 356

1  materials are still true.  Those
2  marketing materials are still out
3  there.
4      MR. CYR:  And how does that
5  relate to the jurisdictional
6  issues in this case?
7      MR. GRAND:  While you may
8  disagree, it is our contention
9  that your client markets this
10  globally, marketed into the United
11  States.
12      MR. CYR:  What time period
13  do you think is relevant for the
14  jurisdictional issues in this
15  case?
16      MR. GRAND:  I think right up
17  to the present.
18      MR. CYR:  Based on that
19  dialogue, I'm very comfortable in
20  instructing the witness not to
21  answer.
22      We're ready for your next
23  question.
24  BY MR. SEEGER:

Page 357

1      Q.  Mr. Jia, your counsel has
2  instructed you not to answer the question
3  that I've asked.  Are you going to follow
4  counsel's instructions or would you like
5  to answer the question?
6      MR. PANAYOTOPOULOS:  I'm
7   sorry.
8  BY MR. SEEGER:
9      Q.  Mr. Jia can answer.
10     A.  I don't want to answer this
11  question.
12      MR. PANAYOTOPOULOS:  Let me
13   just state for the record that
14   Banner joins in the question.  And
15   the position is, from what I
16   understand yesterday, this witness
17   testified at length about the
18   basis that he and the company had
19   to make statements in their
20   marketing materials that the
21   drywall that they produced has
22   certain benefits for the
23   customers.  This was included in
24   marketing material that I believe

Page 358

1  is out today.  I think that for
2  cross-examination purposes, we
3  certainly have a basis to test
4  whether those are true statements.
5  And the witness volunteered
6  yesterday with counsel present and
7  went on and on about the basis
8  that the company had to make those
9  statements.  We'd like to verify
10  and check on the extent of that
11  basis, and now the witness is
12  being instructed not to answer.
13  So, we join in, and we again would
14  like an answer to that question.
15      MS. EISELEN:  For the
16  record, Interior/Exterior also
17  joins in that objection.
18      MR. CYR:  Before I respond,
19  I want to give everybody an
20  opportunity to join in.
21      MR. BLACK:  We also join on
22  behalf of the State of Louisiana.
23      We also note that topic
24  number 19, footnote 3, which

Confidential - Subject to Further Confidentiality Review

Page 359

1 indicates you're not producing
2 anybody with respect to the
3 category that's indicated in
4 footnote 3, someone to testify
5 about the design, development,
6 testing, inspection, performance
7 of drywall manufactured by TG or
8 TTP, you're not producing anyone,
9 that the involvement of TG or TTP
10 in determining performance and/or
11 inspection of the drywall that
12 they manufactured during the
13 period of time in question goes to
14 jurisdiction.
15         MR. CYR:  Anyone else?
16         MR. PANAYOTOPOULOS:  I also
17 have not seen any objections to
18 the Notice of Deposition
19 especially within the time frame
20 provided under the Federal Rules.
21         MR. CYR:  Anyone else?
22         MS. CLARK:  Southern Homes
23 joins in the objections of
24 Interior/Exterior, State of

Page 360

1 Louisiana and Banner.
2         MR. HARDT:  So does Venture
3 Supply and Porter-Blaine in the
4 Germano action.
5         MR. SLAUGHTER:  Likewise,
6 Atlantic Homes.
7         MS. BASS:  Likewise, the
8 Home Builders Steering Committee.
9         MR. BRENNER:  Same for
10 Tobin.
11         MR. MONTOYA:  On behalf of
12 plaintiffs' liaison counsel from
13 Florida as well.
14         MR. CYR:  Just very briefly,
15 I do think that when The Court
16 looks at the transcript of
17 yesterday, when the question was
18 asked with respect to the brochure
19 and the reference to health, that
20 I registered my concerns.  I
21 indicated that although I was
22 going to allow the witness to
23 answer that question, that I was
24 preserving the right to object to

Page 361

1 any further questions relating to
2 that issue or other issues
3 relating to the drywall itself and
4 the liability issues, and that's
5 precisely what I've done today.
6         Of course, as we all know,
7 Mr. Jia was not designated for
8 topic number 19, and so that is an
9 issue for Mr. Peng's deposition.
10         And then finally, I just
11 want to emphasize that we have
12 studied very carefully the
13 designated areas, and we
14 appreciate your ability to ask
15 questions about business plans and
16 marketing plans and budgets, but
17 not for a moment do I believe that
18 The Court intended for you to ask
19 questions about Mr. Jia's actions
20 during 2011 with respect to
21 reviewing the liability issues and
22 the defectiveness issues in this
23 case.  I'm very confident that the
24 judge will agree with me when he

Page 362

1 reads the transcript.
2         I suggest that after all of
3 this that we continue with the
4 deposition in the designated
5 areas.
6         MR. HARDT:  On behalf of
7 Venture Supply and Porter-Blaine
8 in the Germano action, if I can
9 say one more thing.  There's
10 considerable case law out there
11 that suggests that instructing the
12 witness not to answer the
13 question, if it's not a privilege
14 objection, is not the proper
15 procedure to handle the matter.
16 It's outside the scope of the
17 rules, instructing the witness not
18 to answer the question not on the
19 basis of privilege.
20         So, I think proceeding this
21 way, you know, you just run the
22 risk that we're going to have to
23 revisit this with this witness
24 after the ruling.

Page 363

1     MR. CYR: Thank you very
2  much, Counselor, and that's why I
3  allowed the questions yesterday,
4  because, frankly, I think this is
5  the first time I've ever
6  instructed a witness not to answer
7  questions during the deposition.
8  But this line of questioning runs
9  so far afoul of not only the terms
10  of the designated areas, but also
11  I'm extremely confident that if
12  the judge was here, that he would
13  emphasize that you should be
14  asking questions relating to the
15  jurisdictional issues. That's why
16  he allowed this all to unfold.
17     So, thanks for the warning.
18  I wish we could get the judge on
19  the phone now, but that's
20  unrealistic.
21     MR. SEEGER: I'm going to
22  ask a question.
23 BY MR. SEEGER:
24  Q.   Mr. Jia, since the news

Page 364

1  reports in the media regarding defective
2  drywall, what have you done to reassure
3  your customers that the drywall is not
4  defective?
5     MR. SEEGER: That's sales.
6  That's sales. I've changed it.
7  It's sales. I'm not asking him --
8  I'm asking him what he's done to
9  reassure his customers.
10     MR. CYR: Where is sales,
11  Chris?
12     MR. SEEGER: Sales,
13  marketing. I mean, there are news
14  reports that are out there.
15     MR. PANAYOTOPOULOS: Topic
16  14.
17     MR. SEEGER: There are news
18  reports that are out there, and
19  asking him what he's doing from a
20  marketing perspective to reassure
21  his customer base I think is
22  clearly, clearly a fair question.
23     MR. CYR: And how does that
24  relate to jurisdictional issues in

Page 365

1  this case?
2     MS. BASS: How about the
3  obvious?
4     MR. GRAND: Do we have to go
5  back and forth on this? This is
6  wasting time.
7     MS. BASS: We're wasting
8  valuable time, but, obviously, who
9  he considers his customers, who he
10  perceives the need to communicate
11  with about a problem with his
12  drywall, assuming it is defective,
13  goes directly to the
14  jurisdictional issues. Your
15  choice of narrowly viewing each of
16  these questions is not something
17  that you have the right to do in a
18  deposition. He has the right to
19  explore broadly based on the
20  categories that he has been
21  designated to testify about.
22  That's what he's doing.
23     MR. CYR: Do you have any
24  case law at all with respect to

Page 366

1  any of the jurisdictions that
2  reflects that a defendant's
3  actions after the complaint has
4  been filed are relevant to
5  jurisdictional issues?
6     MS. BASS: Let me ask you
7  this. If he perceives his
8  customers are in the United States
9  and he perceives the need to
10  communicate with them about a
11  defect in some product that his
12  company has sold in the United
13  States, you are going to suggest
14  that's not relevant to
15  jurisdiction?
16     MR. SEEGER: That's exactly
17  where I'm going with this line of
18  questioning.
19     MR. CYR: Maybe you guys are
20  missing the point here, is that
21  it's my understanding that with
22  respect to jurisdictional issues,
23  that the time period that's
24  relevant, and courts differ, it's

Confidential - Subject to Further Confidentiality Review

Page 367

1 at the time of the filing of the
2 complaint, or some reasonable
3 period thereto. Some courts
4 disagree. They have different
5 views about what that time period
6 should be. But one thing that's
7 very clear, almost in every case
8 that I've seen in every state, and
9 that is that actions by defendants
10 after the filing of the Complaint.
11 MR. SEEGER: It's not after.
12 That's not my question, Joe. You
13 misunderstood the question.
14 MR. CYR: Oh, I'm sorry.
15 MR. GRAND: It is not after.
16 MR. CYR: I'm sorry.
17 MR. SEEGER: I said since
18 the news in the media. There was
19 news in the media before we filed
20 the complaint. So, he said --
21 your witness has testified he's
22 only seen what's in the media. He
23 hasn't seen U.S. government
24 reports. So, it is since the news

Page 368

1 in the media.
2 MR. CYR: I can help out
3 here to save time, because I
4 really want to do the right thing
5 here.
6 Just for the record, it
7 seems to me that there's some
8 chance that the question could
9 relate to Taishan Gypsum's
10 activities before certain of the
11 complaints in this litigation have
12 been served or filed such as the
13 Gross or Wilkes case, and so I'm
14 going to allow the witness to
15 answer the most recent question.
16 MR. SEEGER: Thank you.
17 Could you read the question
18 that I asked.
19 (Interpreter repeats the
20 question.)
21 THE WITNESS: Okay. First
22 of all, TG went over the complaint
23 records regarding the production
24 of drywall for many years. We did

Page 369

1 not discover the problems as
2 discussed -- reported in the
3 media, reflected in the media or
4 reflected by some of the
5 customers. Our government also
6 take this matter seriously. It
7 draw a large amount of samples
8 from our company. Our government
9 did not say the products that we
10 produce has the problems similar
11 to those reflected by the U.S.
12 consumers. We strongly believe
13 that the quality of our drywall is
14 good.
15 BY MR. SEEGER:
16 Q. Mr. Jia, did you do any
17 testing to confirm that? Did the company
18 do any testing independent to confirm
19 that?
20 MR. CYR: I just want to
21 state for the record that I'm
22 going to allow the witness to
23 answer for the reason that I
24 mentioned before, but I'm not

Page 370

1 waiving my rights to insist that
2 we stay with the designated areas.
3 And, sincerely, I do think that
4 this is a decision y'all are
5 making with respect to managing
6 the time that you have.
7 No need to interpret that.
8 Please answer the question,
9 Mr. Jia.
10 THE WITNESS: Our company
11 also built a building. It is all
12 of our products. There is no
13 phenomena like what is being
14 claimed by the U.S. media. We
15 also made a survey along the
16 coastal line to do an
17 investigation with our customers.
18 We did not find similar problems.
19 BY MR. SEEGER:
20 Q. So, Mr. Jia, the testing you
21 did, to be clear, is you built a building
22 for which you put your products in it,
23 and you did a survey of your customers.
24 Did I understand the answer correctly?

Confidential - Subject to Further Confidentiality Review

Page 371

1      INTERPRETER 2: The check
2 interpreter did not think the
3 interpreter accurately interpret
4 the question asked by the counsel.
5 Because the interpreter did not
6 ask the witness the test, whether
7 the test is build the building and
8 also survey the coastal -- the
9 customer along the coastal line.
10 The interpreter did not interpret
11 the test.
12      INTERPRETER 1: Objection.
13 The check interpreter is not doing
14 verbatim. She digested and
15 rephrased it. I was doing
16 verbatim to every word --
17      MR. SEEGER: Did you ask the
18 question the way I asked it?
19      INTERPRETER 1: Yes.
20      MR. SEEGER: Okay. That's
21 all.
22      INTERPRETER 2: I was doing
23 verbatim. I don't try to rephrase
24 it. She is trying to rephrase

Page 372

1 herself.
2      MR. SEEGER: You don't have
3 to defend yourself. Can the
4 witness answer the question? Ask
5 him my question. I want to make
6 sure he answers my question.
7      INTERPRETER 1: Okay. Let
8 me go back to that question.
9      THE WITNESS: There's some
10 discrepancies regarding your
11 understanding. I can add on to
12 it.
13 BY MR. SEEGER:
14      Q.   Whatever tests --
15      Mr. Jia, whatever testing
16 you've done regarding -- since the media
17 reports of the problem with the drywall,
18 we would like to know about it. So,
19 please give me a complete answer.
20      A.   I did answer.
21      Q.   Okay. If he's answered,
22 that's fine.
23      Did he want to add anything
24 to his answer?

Page 373

1      A.   I just stated it. If you
2 don't understand it, then I can restate
3 it.
4      Q.   No, it's not necessary.
5 Thank you.
6      Mr. Jia, where can we find
7 these complaints that you relied upon to
8 form your belief that, you know -- strike
9 that.
10      The complaints that you
11 referenced in your answer regarding your
12 product, where would those complaints be?
13      A.   Our company has a file for
14 complaints.
15      Q.   And if you needed to, you
16 would know where to find that, Mr. Jia?
17      A.   Yes. We have a service
18 department for after sales.
19      Q.   And the survey that you did
20 of your customers, is that also someplace
21 where if you needed to find it, you could
22 find it?
23      A.   Yes.
24      Q.   Okay.

Page 374

1      And where would that be
2 within the company?
3      A.   The department for after
4 sales, they have the file.
5      Q.   Okay.
6      And did you mention this
7 testing that you've done in any of your
8 marketing materials to assure your
9 customers that the product is safe and
10 performing properly?
11      A.   Yes.
12      Q.   Okay.
13      And where could we find
14 those marketing materials?
15      A.   I don't know what type of
16 marketing material you are referring to.
17      Q.   Well, the question that I
18 had asked earlier is, did you mention the
19 testing that you've done in any of your
20 marketing materials to assure your
21 customers that the product was safe and
22 performing properly? And he answered
23 yes. So, my question now is, where are
24 those marketing materials?

Page 375

1  A.  Well, the understanding that
2  you had earlier, I feel that there were
3  misunderstanding.  The testing
4  information, we did not put it inside our
5  marketing material.
6  Q.  Now, the testing information
7  that the Chinese government did, does the
8  company have that?  Does TG have that
9  information?
10  A.  According to the government
11  standard, TG, and also according to
12  relevant standard, TG will follow these
13  standards to check every product.  And it
14  also has the testing report.
15  Q.  Where is that testing
16  report?  Who at TG has the testing report
17  from the Chinese government?
18  A.  So, all of our subsidiaries
19  would have this report, testing report,
20  and every batch of our products would
21  have this report, testing report.
22  Q.  I want to make sure that
23  we're communicating to each other.
24  Are you talking about ASTM

Page 376

1  certifications or are you talking about
2  testing done specifically by the Chinese
3  government to determine whether there was
4  a defect in the drywall?
5  A.  We don't have any defected
6  products released from the factory.
7  Q.  Okay.
8  I want to go back to the
9  testing that you testified earlier, Mr.
10  Jia, that the Chinese government did
11  testing of your product.  Where is the
12  results of that testing?  Where would
13  that be right now?
14  A.  This information is now with
15  the government in a bureau.
16  INTERPRETER 1:  The
17  interpreter do not have the
18  English translation for this
19  bureau.  Do you think Eugene or
20  the check interpreter can help?
21  Guojia ji jian.
22  MR. SEEGER:  Just give me
23  his answer, and then I'll deal
24  with what the --

Page 377

1  INTERPRETER 1:  Okay.
2  MR. SEEGER:  Okay.
3  THE WITNESS:  It is in a
4  government bureau, in the hands
5  of -- of the Chinese government.
6  INTERPRETER 1:  And the
7  interpreter does not have the
8  English name for it.
9  MR. SEEGER:  You have to
10  take yourself out of it.  What is
11  his answer?  Give me his exact
12  answer.
13  INTERPRETER 1:  That's the
14  answer.  That's the answer.
15  BY MR. SEEGER:
16  Q.  Okay.
17  Have you seen the results of
18  the test yourself, Mr. Jia?
19  A.  No.
20  Q.  Do you know what tests they
21  performed specifically?
22  A.  They draw samples of our
23  drywall and take it to the laboratories
24  for testing.  Concretely, what methods

Page 378

1  that they use for testing is up to the
2  scientist, not me.
3  Q.  Well, do you care, Mr. Jia,
4  what the results of those tests are?
5  A.  I care very much.
6  Q.  And have you sought to get
7  the results of those tests from the
8  Chinese government?
9  A.  I did request it from the
10  government, and relevant department
11  informed us that you can continue to
12  produce, there is no problem.
13  Q.  Have you asked for a
14  specific -- strike that.
15  MR. CYR:  There's no
16  question.
17  BY MR. SEEGER:
18  Q.  Okay.
19  So, then, other than
20  assuring you verbally, I take it, Mr.
21  Jia, that there's no problem, you have
22  not been provided with any reports from
23  the Chinese government showing specific
24  tests and the results of those tests?

Confidential - Subject to Further Confidentiality Review

Page 379

1    A.   I did not obtain the report.
2  But the government definitely would have
3  obtained the report.
4    Q.   Mr. Jia, sitting here today,
5  do you have a specific understanding
6  about what the specific allegation is
7  that's wrong with the Chinese drywall
8  that's been shipped and used in many
9  homes in the United States?
10       MR. CYR:  Which designated
11   area does that question fall
12   under?
13       MR. SEEGER:  Well, I mean, I
14   just want to make sure that he has
15   a basic understanding of at least
16   what the allegation is that the
17   defect is before I can ask him
18   what have you done to assure your
19   customers, what marketing efforts
20   have you done to, you know, tell
21   your customers anything about the
22   product?  So, you know, I mean,
23   this is just sort of foundational
24   stuff.  That's all.  I just want

Page 380

1    to know what his understanding is.
2    Does he understand the defect?
3    There can't be anything wrong with
4    answering that one, Joe.
5        MR. CYR:  I'm going to let
6    the witness answer this question
7    even though it doesn't fall in one
8    of the designated areas.
9        MR. SEEGER:  You can answer.
10       THE WITNESS:  Can you
11   interpret it in a continuous way
12   so, therefore, I can have a better
13   concept?
14 BY MR. SEEGER:
15   Q.   Okay.
16       You know there's been a lot
17 of testing of your drywall in the U.S.
18 regarding high sulfur levels.  Do you
19 have an understanding that high sulfur
20 levels is part of the problem with the
21 drywall that's been shipped to the United
22 States?  Yes or no, one way or another?
23       MR. CYR:  I'm going to
24   object to that question and

Page 381

1    instruct the witness not to answer
2    that one.  What I have said is
3    that I'm allowing the witness to
4    answer the question you previously
5    asked with respect to his
6    awareness of the allegations in
7    the complaints.
8        MR. SEEGER:  That's not how
9    I asked it.  But he asked for
10   clarification.  I just narrowed
11   the question down to make it
12   easier for the witness.  So, I
13   don't see the difference.  The two
14   questions really go together.
15       MR. CYR:  I'm allowing the
16   witness to answer your question
17   with respect to his awareness of
18   the allegations in the complaints.
19       MR. SEEGER:  Okay.
20 BY MR. SEEGER:
21   Q.   So, Mr. Jia, do you have a
22 specific understanding of what the
23 alleged defect is with your product
24 that's been used in the United States?

Page 382

1    A.   Regarding the defective
2  drywall, I only find this out from the
3  media or from the allegation documents.
4    Q.   Okay.  With regard to -- oh,
5  I'm sorry.  Did you want to complete?
6        MR. SEEGER:  I think he
7    wanted to answer more.
8        THE WITNESS:  At the
9    earliest time, the media in the
10   United States -- not the media.
11   Strike United States.
12       At the earliest time, the
13   media mention about the drywall in
14   the -- drywall made in China has a
15   high content of sulfur.
16 BY MR. SEEGER:
17   Q.   Mr. Jia, have you done
18 anything to test that?
19   A.   Therefore, it is that the
20 Chinese Drywall has a problem.  Now I
21 also see a lot of reports from the media.
22 It is not related to a field fatal event.
23 I also see some reports by some medias
24 that all the reports of the CPSC, it

Page 383

1 claims that it would not be unsafe to the
2 human body. I don't understand why do
3 they sue me -- sue us, why do they sue
4 us?
5        MR. CYR: Can we break? Go
6     ahead if you have a couple more,
7     but I mean, it is after --
8        MR. SEEGER: Okay. If you
9     give me just a little bit of
10     leeway here.
11        MR. CYR: Sure.
12 BY MR. SEEGER:
13     Q.   Mr. Jia, what have you
14 done -- strike that.
15        In response to the CPSC
16 study that you referenced, what have you
17 done internally in the company to test
18 the product? Have you done anything, has
19 the company done anything to test its own
20 product?
21     A.   Along the coastal line,
22 there are a lot of customers they use our
23 drywalls. No laboratories would be
24 better than the laboratory we put it such

Page 384

1 as the customer that they are using our
2 products along the coastal line. We got
3 into that laboratory. Any laboratory
4 testing would not be as accurate as the
5 site testing, on-site testing. The
6 Chinese customers have never had that
7 problem. Isn't that the best testing?
8     Q.   Mr. Jia --
9        INTERPRETER 2: In the
10     world. The check interpreter
11     believed the witness said, isn't
12     that the best testing in the
13     world?
14        MR. SEEGER: Thank you.
15 BY MR. SEEGER:
16     Q.   Mr. Jia, if you could just
17 tell me before we break for lunch the
18 specifics of the testing you've done in
19 the homes of the Chinese people who live
20 along the coastal region, what specific
21 testing?
22     A.   No odor. No decay.
23     Q.   Other than testing for odor
24 and decay, did you do any scientific

Page 385

1 testing in any of those homes for sulfur
2 levels?
3     A.   I find that testing in that
4 location is the most scientific testing.
5     Q.   How many homes did you test
6 in?
7     A.   All of our customers, they
8 answer like that.
9     Q.   How many? How many?
10     A.   I can't tell.
11     Q.   More than 100?
12     A.   We have too many, too many
13 customers.
14     Q.   Would it be more than 10,000
15 customers?
16     A.   Well, our survey would never
17 have that large figure, but no customer
18 have that problem, and also we don't have
19 the complaint.
20     Q.   Okay.
21        Can you give me just a rough
22 number of how many?
23        INTERPRETER 1: He wants to
24     go for lunch.

Page 386

1        THE WITNESS: I have already
2     given you the figure. I don't
3     have more.
4        MR. CYR: Before we break
5     for lunch, I just want to register
6     a standing objection to the whole
7     line of questioning. I don't
8     think it has anything to do with
9     the designated areas or the
10     jurisdictional issues. I think
11     that it's been abusive of Mr.
12     Jia's time and all of our time. I
13     hope you don't do it this
14     afternoon.
15        MR. SEEGER: I have to
16     respond, because I've never been
17     accused of abusing the witness,
18     so, I know you don't mean to use
19     that word.
20        MR. CYR: Just abusing his
21     time.
22        MR. SEEGER: You made a
23     mistake on that one. I'm not
24     abusing his time. It's my time.

Confidential - Subject to Further Confidentiality Review

Page 387

1    MR. CYR: Well, I believe it
2  is his time as well.
3    MR. SEEGER: He's here for
4  two days whether he wants to be.
5    THE VIDEOTAPE TECHNICIAN:
6  The time now is approximately
7  12:12 p.m., and we are now off the
8  record.
9    - - -
10   (Whereupon, a luncheon
11  recess was taken from 12:12 p.m.
12  until 1:22 p.m.)
13   - - -
14   THE VIDEOTAPE TECHNICIAN:
15  This begins Tape 4 of today's
16  portion of our deposition. The
17  time now is approximately
18  1:22 p.m., and we're back on the
19  record.
20  BY MR. SEEGER:
21   Q.  Mr. Jia, why are you no
22  longer selling drywall to U.S.
23  distributors?
24   MR. CYR: Objection as to

Page 388

1  form.
2    THE WITNESS: Now there's no
3    U.S. customer that comes to our
4    company to buy the plasterboard,
5    the drywall.
6  BY MR. SEEGER:
7   Q.  Mr. Jia, is this a --
8    Would you agree that this is
9  a true statement, that TG is one of the
10  key enterprises of China National
11  Building Material Group Corporation?
12   A.  CNBM Group is a shareholder
13  of the CNBM Company Limited by share.
14   INTERPRETER 1:  Or
15  shareholding company, whichever
16  way. I am not sure how to
17  translate that.
18   THE WITNESS: CNBM Company
19  Limited by sharing, or translated
20  as shareholding company, is a
21  listed company. One of the
22  shareholder of BNBM is CNBM. One
23  of the major shareholder of --
24  BNBM is one of the major

Page 389

1  shareholders of TG.
2  BY MR. SEEGER:
3   Q.  So, just if you can answer
4  yes or no. If you can't, that's fine.
5    Would you agree that TG is a
6  key enterprise of CNBM?
7   A.  I disagree with this
8  statement.
9   Q.  Could you tell me why you
10  disagree with it?
11   A.  CNBM is a very large
12  company. Regarding its production, the
13  drywall is only a small part of it.
14  Regarding the plaster, the manufacturing
15  of the plasterboard, for sure, we are the
16  largest company in China.
17   Q.  Is he referring to TG when
18  he says "we are the largest company in
19  China"?
20   INTERPRETER 2: TG.
21   MR. SEEGER: No, TG.
22   THE WITNESS: TG including
23  all the subsidiaries under.
24  BY MR. SEEGER:

Page 390

1   Q.  So, TG including --
2    If I were to ask the
3  question this way, TG including its
4  subsidiaries are a key enterprise of
5  CNBM, would you agree with that?
6   A.  I don't understand your
7  question.
8   Q.  Just to be clear, Shandong
9  Taihe Dongxin Company Ltd. is the same
10  thing as TG, correct?
11   A.  Yes.
12   Q.  Okay.
13    And you would disagree with
14  the statement if I were to say TG is a
15  key enterprise of CNBM, you disagree with
16  that statement? I just want to be clear.
17   A.  The main concept that I
18  understand is different from the concept
19  that you understand.
20   Q.  Okay.
21    But can he answer the
22  question, does he agree or disagree that
23  TG is a key enterprise of CNBM?
24   MR. CHEN: I'm sorry, you

Confidential - Subject to Further Confidentiality Review

Page 391

1 should actually translate the
2 response, not give an explanation
3 of it.
4        MR. SEEGER: Okay. Just
5 tell me his response. Just tell
6 me his response.
7        THE WITNESS: I don't
8 understand. What do you mean by
9 the key concept?
10 BY MR. SEEGER:
11    Q.   Not key concept, key
12 enterprise.
13        INTERPRETER 1: Key
14 enterprises. I put it in Chinese
15 as major concepts, or I can put it
16 as an important enterprise.
17        MR. SEEGER: Put it as an
18 important enterprise. I'll ask
19 the question that way so we have a
20 clean record.
21 BY MR. SEEGER:
22    Q.   Would he agree that TG is an
23 important enterprise of CNBM?
24    A.   I agree with this statement

Page 392

1 that TG is a subsidiary company under
2 CNBM mainly producing plasterboards.
3        INTERPRETER 2: The check
4 interpreter believes that the
5 witness said, I agree with that
6 statement, that is, TG is a key
7 subsidiary under CNBM.
8        MR. SEEGER: Are you okay
9 with that answer?
10        MR. CYR: Yeah. I'm ready
11 to continue. It sounded close.
12        INTERPRETER 1: It's the
13 same. The same.
14 BY MR. SEEGER:
15    Q.   Mr. Jia, are you aware that
16 BNBM issued a press release in May of
17 2010 discussing the allegations made
18 against Taishan Gypsum? I just want to
19 know if you are aware of that.
20    A.   I don't understand your
21 question.
22    Q.   Okay. I'll start over.
23        Are you aware that BNBM
24 issued a press release in May of 2010

Page 393

1 discussing the allegations regarding --
2 made in the U.S. regarding Taishan
3 Gypsum, TG?
4    A.   I know.
5    Q.   Were you involved or did you
6 participate in any way in the creation of
7 that press release?
8    A.   BNBM is a listed company.
9 They should make announcement for major
10 incidents. We go through some channels
11 to reflect this to BNBM. BNBM, based on
12 the condition to make such an
13 announcement, the content of the
14 announcement, I am not very sure.
15    Q.   So, just to be very clear,
16 I'm not sure if the answer is in what you
17 just gave us, so I want to be clear.
18        Did you in any way
19 participate in drafting the statement,
20 approving the statement made by BNBM?
21    A.   I did not participate.
22    Q.   What do you know about
23 BNBM's U.S. operations, Mr. Jia?
24    A.   Please repeat the question.

Page 394

1        MR. SEEGER: (Addressing the
2 interpreter.)
3        Could you do that?
4        (Interpreter repeats the
5 question.)
6        THE WITNESS: I don't know.
7 BY MR. SEEGER:
8    Q.   Your testimony is you don't
9 know anything about BNBM's U.S.
10 operations?
11    A.   Yes.
12    Q.   Do you know who Cao Jiang
13 Lin is? I don't know if I'm saying it
14 right.
15    A.   I don't know this person.
16    Q.   Does he know who the
17 chairman of BNBM is?
18        INTERPRETER 1: Chairman
19 could be interpreted in two ways
20 in Chinese, dong shi ju or dong
21 shi hui.
22        THE WITNESS: What time
23 period?
24 BY MR. SEEGER:

Confidential - Subject to Further Confidentiality Review

Page 395

1    Q.   Let's start with the
2  present.
3        A.   Wang, the last name is Wang.
4  Wang Bin is the chairman of BNBM.
5    Q.   How about back in 2007?
6        A.   I cannot be sure who that
7  is, but I know during the earlier period.
8    Q.   What name from the earlier
9  period does he know?
10       A.   Cao Jiang Lin.
11   Q.   That's the name I was trying
12 to write. I knew I wasn't pronouncing it
13 correctly, but I figured we'd get there
14 somehow.
15       INTERPRETER 1:  That's close
16   enough.
17 BY MR. SEEGER:
18   Q.   Do you know who Cao Jiang
19 Lin is?
20       A.   I know.
21   Q.   Do you know what his current
22 position is with BNBM?
23       A.   I don't know.
24   Q.   Do you know if he's

Page 396

1  currently still with BNBM?
2        A.   I don't know.
3    Q.   Do you know if he has a
4  position with CNBM?
5        A.   According to my knowledge,
6  he has no positions with CNBM.
7    Q.   In all the time that you
8  have been on the board of BNBM, you don't
9  recall any presentations regarding BNBM
10 business in the U.S.?
11       A.   I don't know.
12       MR. CHEN:  Objection. The
13   way it was translated was did you
14   know of any business in the U.S.,
15   not do you recall any
16   presentations regarding business
17   in the U.S.
18       MR. SEEGER:  So, he answered
19   the one do you know of any
20   business? That's the one he
21   answered?
22       MR. CHEN:  I believe so.
23       MR. SEEGER:  Okay.
24 BY MR. SEEGER:

Page 397

1    Q.   Let me ask the question
2  again so we have a question and answer.
3        In all your time on the
4  board at BNBM, do you recall
5  presentations or information provided to
6  board members regarding BNBM business in
7  the United States?
8        INTERPRETER 1:  Counsel, the
9    word "presentation" is very
10   difficult to translate accurately.
11   Do you mind to help me?
12       MR. SEEGER:  Discussions.
13   Use discussions instead of
14   presentations.
15       INTERPRETER 1:  Discussions,
16   okay. Good.
17       THE WITNESS:  I don't
18   understand. I don't know what you
19   are talking about the business in
20   the United States of the BNBM.
21 BY MR. SEEGER:
22   Q.   Well, do you have an
23 understanding that BNBM does business in
24 the U.S. at all one way or another?

Page 398

1    A.   I don't know.
2    Q.   Are you aware if BNBM has
3  any U.S. subsidiaries?
4        A.   No.
5    Q.   Have you ever heard of BNBM
6  of America Inc.?
7        A.   I have never heard of it.
8    Q.   Do you have any
9  understanding if Cao Jiang Lin held any
10 positions at CNBM as well as BNBM?
11       A.   I don't know.
12   Q.   Do you know who Peng Shou
13 is?
14       INTERPRETER 1:  P?
15       MR. SEEGER:  It's P-E-N-G,
16   and in English spelled S-H-O-U.
17       THE WITNESS:  I met this
18   person.
19 BY MR. SEEGER:
20   Q.   And how did you meet him?
21       A.   I cannot recall how I met
22 him, but he gave me a name card.
23   Q.   Do you know if Peng Shou has
24 any position with BNBM?

Confidential - Subject to Further Confidentiality Review

Page 399

1     A.   No.

2     Q.   No, he doesn't, or you don't

3  know?  I just want to be clear on the

4  answer.

5     A.   He did not have a position.

6     Q.   Do you know who Song Zhi

7  Ping is?  SHO -- I'm sorry.  I'm going to

8  spell it for you, Stephanie.  It's

9  spelled in English S-O-N-G, then Z-H-I,

10  P-I-N-G.  Do you know who that is?

11     A.   I know.

12     Q.   And who is that?

13     A.   What time period?

14     Q.   If you can give me a time

15  from 2005 to the present.

16     A.   He's the chairman of the

17  board of CNBM group.

18     Q.   During that time frame?

19     A.   According to my knowledge,

20  he has been on this position since 2002

21  until now.

22          THE VIDEOTAPE TECHNICIAN:

23     The time now is approximately

24     1:49 p.m., and we are now going

Page 400

1     off the record.

2          - - -

3     (Whereupon, a recess was

4     taken from 1:49 p.m. until

5     1:53 p.m.)

6          - - -

7          THE VIDEOTAPE TECHNICIAN:

8     The time now is approximately

9     1:53 p.m., and we're back on the

10     record.

11  BY MR. SEEGER:



400:12-403:22

FILED UNDER SEAL

Confidential - Subject to Further Confidentiality Review

Page 403

23    Q.   Are there any documents that
24  exist that show the relationship, if any,

Page 404

1  between TG and CNBM?
2     A.   I don't know what type
3  documents are you referring to.
4     Q.   Are there any distribution
5  agreements?
6     A.   No.
7     Q.   Any joint venture
8  agreements?
9     A.   Will you mind explain the
10  concept of joint venture?
11     Q.   It was a word he used
12  yesterday.
13     A.   Joint venture, according to
14  my concept, that is an agreement of the
15  shares between TG and BNBM.
16     Q.   Does any agreement like that
17  exist between TG and CNBM?
18     A.   No.
19     Q.   Okay.
20         Mr. Jia, are you aware that
21  CNBM lists TG in its financial statements
22  as part of its building materials
23  sector -- section, sorry?
24     A.   I don't understand.  What do

Page 405

1  you mean?
2     Q.   Have you ever reviewed
3  financial statements prepared by CNBM?
4     A.   They did not give it to me,
5  and I did not see it.
6     Q.   So, you're not aware,
7  sitting here today, that CNBM lists TG in
8  its financial statement as part of its
9  building materials section?
10     A.   CNBM and CNBM shareholding
11  companies or translated as CNBM Company
12  Limited by share, these are two separate
13  companies.  I don't know which company
14  are you referring to.
15     Q.   Okay.
16         Are you aware of TG being
17  listed -- okay.
18         MR. CHEN:  The first
19     reference should have been CNBM
20     group and CNBM shareholding
21     company.
22         MR. SEEGER:  Okay.
23         INTERPRETER 1:  He did not
24     say the word "group."

Page 406

1         MR. SEEGER:  I'm going to
2     ask a different question to make
3     it easy.
4         INTERPRETER 1:  Okay.
5  BY MR. SEEGER:
6     Q.   Mr. Jia, are you aware that
7  TG is listed in the financial statements
8  of China National Building Material
9  Company Limited in their financial
10  statements under the building materials
11  section?
12     A.   Your question is still not
13  clear.  I still don't know which company
14  you are referring to.
15     Q.   Are you aware of TG being
16  listed in the financial statements of any
17  CNBM company?
18     A.   I did not see it, but I
19  consider this should be listed.
20         MR. SEEGER:  I'm going to
21     pass Mr. Jia.
22         MR. CYR:  Do you want to
23     take a break?
24         MR. SEEGER:  Yes.

Confidential - Subject to Further Confidentiality Review

Page 407

1      THE VIDEOTAPE TECHNICIAN:
2  The time now is approximately
3  2:07 p.m., and we are now off the
4  record.
5          - - -
6      (Whereupon, a recess was
7  taken from 2:07 p.m. until
8  2:23 p.m.)
9          - - -
10     THE VIDEOTAPE TECHNICIAN:
11  This begins Tape 5 of today's
12  portion of our deposition.  The
13  time now is approximately
14  2:23 p.m., and we're back on the
15  record.
16         - - -
17     EXAMINATION
18         - - -
19  BY MR. MONTOYA:
20     Q.   Good afternoon, Mr. Jia.  My
21  name is Patrick Montoya.  I also
22  represent the plaintiffs in this matter.
23  I'll be asking you a few questions today.
24     I'm handing the witness what

Page 408

1  we've marked as Exhibit 12.  It is a
2  Tai'an Taishan Plasterboard manufacturer
3  profile form.
4      MR. MONTOYA:  I'm going to
5  hand a copy to counsel.
6      MR. CYR:  Thanks.
7          - - -
8      (Whereupon, Deposition
9  Exhibit Jia-12, Tai'an Taishan
10  Plasterboard Co. Ltd. Manufacturer
11  Profile Form, was marked for
12  identification.)
13         - - -
14     MR. CHEN:  I'm sorry.  Could
15  I ask the interpreter, you only
16  translated part of the name of the
17  company.  So you only did Tai'an
18  Taishan.
19     INTERPRETER 1:  I did
20  translate the whole thing, because
21  that is what it is, how he said.
22  Tai'an Taishan Plasterboard
23  manufacturer profile form.  I did
24  not add anything.  It is not my

Page 409

1  job to clarify if it is not
2  considered to be clear enough by
3  the other interpreters.
4      MR. MONTOYA:  That's quite
5  all right.  I'll clear it up.
6  BY MR. MONTOYA:
7      Q.   Mr. Jia, the Exhibit 12 that
8  I've handed you, there's a yellow
9  Post-it.  Do you recognize in the title
10  that's the company we know as TTP?
11     A.   I recognize it.
12     Q.   I'll also ask you to turn to
13  the page where it's marked with the pink
14  note.  Can you tell me who signed that
15  document?
16     A.   Mr. Song Qinghai.
17     Q.   Who is Mr. Song Qinghai?
18     A.   Mr. Song Qinghai is the
19  senior official managing the production
20  for TTP.
21     Q.   How long has Mr. Qinghai
22  been managing production for TTP?
23         INTERPRETER 1:  Qinghai is
24     the first name.

Page 410

1      THE WITNESS:  He has always
2      been responsible for the
3      production of TTP and the process
4      of production.
5  BY MR. MONTOYA:
6      Q.   Since what year?
7      A.   I cannot recall exactly what
8  year.
9      Q.   What year was TTP formed?
10     A.   At the beginning of early
11  2006.
12         MR. MONTOYA:  Is it
13     appropriate for me to refer to him
14     as Song or Qinghai?
15         INTERPRETER 1:  Mr. Song is
16     the last name.  The Chinese put
17     the last name first.
18  BY MR. MONTOYA:
19     Q.   How long --
20         Does Mr. Song have any
21  employment responsibilities at TG?
22     A.   Mr. Song Qinghai, before the
23  establishment of TTP, he was the employee
24  of TG.

Confidential - Subject to Further Confidentiality Review

Page 411

1    Q.   Which entity pays Mr. Song?
2    A.   What time period?
3    Q.   Between 2002 to 2010, has he
4  always been paid by the same entity?
5    A.   No.
6    Q.   Which entities paid him for
7  which years?
8    A.   Before the establishment of
9  TTP, TG paid for him.  After the
10  establishment of TTP, TTP paid him.
11    Q.   Did you direct Mr. Song to
12  fill out Exhibit 12?
13    A.   I don't understand what you
14  mean.
15    Q.   Did you ask Mr. Song to sign
16  Exhibit 12?
17    A.   I did not tell him.
18    Q.   Who did?
19    A.   I don't know who, but it
20  should be someone from TTP.
21    Q.   Does Mr. Song report to you?
22    A.   Mr. Song did not report to
23  me.
24    Q.   Has Mr. Song ever reported

Page 412

1  to you from 2002 until 2010?
2    A.   I need to separate this into
3  two time periods.  Before 2006, sometimes
4  I bump into him and we say hello.  He did
5  not report to me.  He also did not report
6  to me after the year 2006.  In 2008,
7  after TTP stopped production, he went to
8  work for another company under TG.
9    Q.   What company did he go work
10  for?
11       MR. CYR:  I'm sorry.  Was
12    the witness finished his answer?
13       INTERPRETER 1:  Yes.
14       MR. CYR:  Sorry.
15  BY MR. MONTOYA:
16    Q.   What company did Mr. Song go
17  to work for after 2008?
18    A.   He is now working for a
19  company called Anhui Tongling Taishan
20  Plasterboards.
21    Q.   Is that company in the
22  family of Taishan companies?
23    A.   It is a subsidiary of TG.
24    Q.   Is it a 100 percent owned

Page 413

1  subsidiary of TG?
2    A.   I cannot recall, but it
3  should be a shareholding.
4    Q.   Was Mr. Song terminated or
5  was he transferred?
6    A.   The new company hired him by
7  the company called Tongling Taishan.
8    Q.   Did TTP terminate Mr. Song
9  in 2008?
10    A.   Terminated.
11    Q.   Why was he terminated?
12    A.   Because TTP stopped
13  production, therefore, he has no more
14  work.
15    Q.   Why did TTP stop production?
16    A.   TTP terminated the
17  production because TG, when they
18  established TTP, it was for the purpose
19  to fulfill the need of the customer for
20  VAT, value added tax.
21    Q.   What do you mean when you
22  say "to fulfill the need of the customer
23  for VAT"?  What do you mean by fulfilling
24  the customer's need for VAT?

Page 414

1    A.   If I need to explain this,
2  it takes a long time.
3    Q.   Does it have anything to do
4  with the production of synthetic gypsum?
5    A.   Yes.
6    Q.   Was there an incentive for
7  TTP to produce synthetic gypsum because
8  it was using fertilizer waste for gypsum
9  production?
10       MR. CYR:  Objection as to
11    form.
12       Mr. Jia, please try to
13    answer the question.
14       THE WITNESS:  I'm very
15    willing to answer this question.
16    If I make this clear, it takes a
17    very long time.
18  BY MR. MONTOYA:
19    Q.   Let me see if I can help
20  you, if I may.
21    A.   And sometimes it might be
22  very difficult for translation, too.
23    Q.   Let me stop him and let me
24  see if I can assist him.

Confidential - Subject to Further Confidentiality Review

Page 415

1    A.   Fine.
2    Q.   I understand that you, Mr.
3  Jia, helped start the process of learning
4  how to produce synthetic gypsum yourself;
5  is that correct?
6         MR. CYR:  Objection as to
7    form.
8         THE WITNESS:  I want to help
9    to give you a more thorough
10    picture of the production of
11    synthetic gypsum in China.
12  BY MR. MONTOYA:
13    Q.   I understand that, but I
14  need to ask you my questions.
15    A.   Yes.  I'm going to answer.
16  Please complete your question.
17    Q.   You or your company helped
18  start the production of synthetic gypsum
19  in China; is that correct?
20    A.   Yes.
21         MR. CYR:  I'm sorry.  I need
22    to object.  You don't need to
23    interpret this, but I do think
24    that the transcript will be

Page 416

1    confusing.  I believe that counsel
2    intended to ask a question with
3    respect to drywall using synthetic
4    gypsum, and that's not the way
5    that the transcript currently
6    reads.
7         We're ready for your next
8    question.
9  BY MR. MONTOYA:
10    Q.   Sir, when we're talking
11  about synthetic gypsum, I'm talking about
12  for the production of drywall.  Do you
13  understand that?
14    A.   Yes.
15    Q.   From 2005 until 2008, did
16  TTP and TG use synthetic gypsum for
17  making drywall?
18    A.   We did.
19    Q.   And TTP and TG believed
20  synthetic gypsum was a safe product and
21  marketed it that way; is that correct?
22    A.   Yes.
23    Q.   The synthetic gypsum product
24  that was manufactured by TG and TTP

Page 417

1  between 2005 and 2008 was the drywall
2  product that eventually ended up in the
3  United States, correct?
4    A.   I don't understand your
5  question.
6    Q.   Do you know whether the
7  drywall that was produced by TG or TTP
8  that ended up in the United States was
9  made with synthetic gypsum?
10    A.   Now I know some of our
11  drywalls has ended up in the United
12  States.  Before May 2009, I did not know
13  how many drywall ended up in the United
14  States.  Our company based our
15  requirement of the customers to use the
16  materials.
17    Q.   Did the customers from the
18  United States request synthetic gypsum?
19    A.   I cannot tell for sure what
20  gypsums the U.S. customer requires.
21    Q.   TTP stopped doing business
22  in 2008, correct?
23    A.   Yes.
24    Q.   Between 2008 to today, has

Page 418

1  TTP done any business?
2    A.   No.
3    Q.   Are they currently doing
4  business?  Is TTP currently doing
5  business?
6    A.   No.
7    Q.   Between 2005 and 2008, who
8  at TTP reported to you?
9    A.   Peng Shi Liang.
10         INTERPRETER 1:  Peng is the
11    last name.
12  BY MR. MONTOYA:
13    Q.   Where is Peng Shi Liang now?
14    A.   Peng Shi Liang is now
15  working in a subsidiary under TG.
16    Q.   Is it common for -- strike
17  that.
18         Did the employees that used
19  to work at TTP, when they stopped doing
20  business, get transferred to other TG
21  entities?
22    A.   Not to transfer, but to
23  rehire.
24    Q.   Is it common for the

Confidential - Subject to Further Confidentiality Review

Page 419

1  companies that are within the Taishan
2  family to transfer employees between the
3  different companies?
4      A.  It always happen like this,
5  but not necessarily.
6          MR. CHEN:  Objection.  It
7      often happens like this, not
8      always.
9          INTERPRETER 1:  Uh-huh.
10         MR. MONTOYA:  Okay.
11  BY MR. MONTOYA:
12     Q.  Did TG and TTP have the same
13  production standards for drywall?
14         MR. CYR:  Objection on the
15     grounds that the question is
16     vague.
17  BY MR. MONTOYA:
18     Q.  You can answer, sir.
19         MR. CYR:  Please try to
20     answer, Mr. Jia.
21         THE WITNESS:  Regarding this
22     question, I don't know what
23     standard you're referring to.
24  BY MR. MONTOYA:

Page 420

1      Q.  When TG and TTP made
2  drywall, they had a standard for
3  production, correct?
4      A.  I don't understand what you
5  mean.
6      Q.  Quality standards?
7      A.  The quality standard is
8  according to the state standard.  It
9  doesn't matter whether it is the TG, TTP
10  or subsidiaries of TG or other
11  competitors.  After all, all the
12  companies in China, they have to follow
13  the government standard.
14     Q.  Does that standard come from
15  CNBM?
16     A.  No.
17     Q.  Does it come from BNBM?
18     A.  No.
19     Q.  Does the state require CNBM
20  to have certain production standards?
21         INTERPRETER 1:  The
22     interpreter is trying to translate
23     a Chinese government bureau from
24     Chinese into English, but she does

Page 421

1  not have the standard translation.
2  She only try her best.
3          THE WITNESS:  The State
4      Bureau for Monitoring and
5      Inspection of Quality organize the
6      enterprises and experts related to
7      the UN to formulate certain
8      standard within certain period of
9      time to set up a standard
10     requiring different enterprises to
11     implement.  The enterprises have
12     to follow this quality standard.
13  BY MR. MONTOYA:
14     Q.  Do the manufacturers of
15  drywall in China participate in the state
16  bureau that makes the requirements for
17  the production of drywall?
18     A.  Many of the very important
19  manufacturers, they have to participate.
20     Q.  Does that include you, sir?
21     A.  Including TG.
22     Q.  Do you participate
23  personally on behalf of TG?
24         INTERPRETER 1:  I'm

Page 422

1  clarifying with the accent.
2          MR. CYR:  That's okay.
3          THE WITNESS:  Because it
4      requires many discussions.
5      Therefore, I participated once.
6  BY MR. MONTOYA:
7      Q.  In what year?
8      A.  I don't recall.
9      Q.  Do you recall if it was in
10  between 2005 and the present day?
11     A.  Seems to be even earlier.
12     Q.  Did you direct TTP to
13  produce drywall according to the state
14  standards from 2005 until 2008?
15     A.  Most of the products
16  produced inside China, they follow this
17  standard.
18     Q.  I understand.
19         But my question is, did you,
20  on behalf of TG, direct anyone at TTP to
21  produce drywall according to the state
22  standard?
23     A.  I don't understand what you
24  mean.

Confidential - Subject to Further Confidentiality Review

Page 423

1    Q.   What I'm trying to
2  understand is, there's a state required
3  production standard, right?
4    A.   Yes.
5    Q.   And you have, in your
6  capacity at TG, you require TTP to
7  produce drywall according to that state
8  standard?
9        MR. CYR:  Objection as to
10  form.
11       Please try to answer, Mr.
12  Jia.
13       THE WITNESS:  I feel that I
14  don't understand this question.
15 BY MR. MONTOYA:
16    Q.   The state standard that's
17  required for drywall production, you've
18  asked TTP -- you asked TTP to produce
19  drywall according to that standard,
20  correct?
21    A.   No.
22    Q.   So, who required TTP to
23  produce drywall according to the state
24  standard?

Page 424

1    A.   We have to produce the
2  drywall according to the state standard.
3  That is something that we don't need to
4  say.
5    Q.   But you directed it anyway,
6  right?
7        MR. CYR:  Objection as to
8  form.  It's also contrary to what
9  he said.
10       THE WITNESS:  It is
11  impossible.
12 BY MR. MONTOYA:
13    Q.   Let me ask you it this way.
14       You made sure that TTP
15  produced drywall according to the state
16  standard, right, because to be out of
17  that standard would be wrong?
18       INTERPRETER 1:  How do you
19  say cm?
20       MR. CHEN:  Millimeter.
21       INTERPRETER 1:  Okay.
22       THE WITNESS:  When we
23  produced the drywall, if the
24  customer require drywall thicker

Page 425

1  than 16 mm, then it must follow
2  the state standard.
3        MR CHEN:  I think it was 12.
4  Maybe you can confirm with him.  I
5  thought it was --
6        THE WITNESS:  12 mm.
7        INTERPRETER 1:  Thank you.
8        MR. MONTOYA:  Is that his
9  complete answer?
10       INTERPRETER 1:  Yes.
11 BY MR. MONTOYA:
12    Q.   Is it your testimony that
13  you did not set the standard for the
14  drywall production at TTP?
15    A.   I don't understand what you
16  mean.
17    Q.   By quality standards?
18    A.   To produce the two types of
19  products, you must -- it must follow the
20  state standard.
21       INTERPRETER 1:  The
22  interpreter does not understand
23  what does he mean by the two
24  types.  I'm afraid I may not be

Page 426

1  correctly translating.
2        MR. CHEN:  I'll interject
3  with an objection and clarify,
4  it's two dimensions of product.
5        THE WITNESS:  Two type of
6  thickness of the product.
7  BY MR. MONTOYA:
8    Q.   Aside from, I think you
9  testified before that the formula for the
10  drywall produced by TG and TTP was the
11  same between 2005 and 2008; is that
12  correct?
13       MR. CHEN:  Clarification.
14  The question was formula, not
15  dimensions.  And the translation
16  referred to dimensions in Chinese.
17       MR. MONTOYA:  I asked for
18  formula.  That's correct.  If you
19  need to reask the question, that's
20  fine.
21       INTERPRETER 1:  The formula,
22  what do you prefer?
23       MR. MONTOYA:  I mean the
24  chemical composition, and I will

Confidential - Subject to Further Confidentiality Review

Page 427

1  reask the question.
2      INTERPRETER 1: Okay. Good.
3      MR. CYR: I'm sorry. Were
4  you going to ask the question
5  again?
6      MR. MONTOYA: I'll reask the
7  question.
8      INTERPRETER 1: I will go
9  back to the question.
10     MR. MONTOYA: Wait. Let me
11  reask the question.
12 BY MR. MONTOYA:
13     Q.  Sir, I believe you testified
14  before that the formula for the drywall,
15  and I mean the chemical composition of
16  the drywall, produced by TG and TTP was
17  the same between 2005 and 2008; is that
18  correct?
19     A.  I don't understand. What do
20  you mean by the formula for the chemical
21  components?
22     Q.  How the drywall is made.
23     A.  The drywall is made out of
24  the raw material of drywall and paper,

Page 428

1  combine them together.
2      MR. CHEN: Of gypsum.
3      INTERPRETER 1: Of gypsum.
4  Gypsum and drywall is the same
5  thing. To my lawyers, the same
6  thing. I clarify that to them.
7      MR. MONTOYA: You just need
8  to do the translation. That's
9  okay. That's your ability.
10     INTERPRETER 1: He hasn't
11  finished yet.
12     MR. MONTOYA: Yes. Let him
13  finish.
14     THE WITNESS: So the raw
15  material of the gypsum after the
16  factory buy them, they mix it
17  together, and then they ground it
18  up, become dust, and then they mix
19  it together. And then they put it
20  inside a kiln to burn it.
21     I haven't finished yet.
22     MR. MONTOYA: Proceed.
23 BY MR. MONTOYA:
24     Q.  Were you finished? Are you

Page 429

1  finished?
2      A.  No, not yet. I haven't
3  finished yet.
4      We put it in a warehouse to
5  store it, and then we take it out to do
6  measurement. And then we add the
7  adhesive and water. And then we mix it
8  together. And in the mixing procedure,
9  we'll add paper. After it is formulated,
10  then we cut it. And then -- and then
11  we'll put it in another kiln to burn it
12  again. And then we will take it out and
13  then we will work on the edge. And then
14  we would package it and then store it.
15     Q.  That whole process you've
16  just described is uniform at TG and TTP
17  from 2005 to 2008, correct?
18     A.  The whole world is the same.
19     Q.  That whole production
20  process you just described was controlled
21  by TG for TTP, correct?
22     MR. CYR: Objection as to
23  form.
24 BY MR. MONTOYA:

Page 430

1      Q.  You can answer, sir.
2      A.  I don't understand the word
3  "control."
4      Q.  It means that TG gave the
5  order to TTP on how to produce the
6  drywall.
7      A.  The knowledge of how to
8  produce drywall, everyone knows about.
9  There's no need for one company to order
10  another company regarding how to produce
11  it.
12     Q.  But TG did that for TTP,
13  right?
14     MR. CYR: Objection as to
15  form.
16 BY MR. MONTOYA:
17     Q.  Is the process a trade
18  secret?
19     A.  It doesn't exist.
20     Q.  From 2005 until 2008, the
21  drywall produced by TG and TTP, was any
22  of it mined naturally? Was the gypsum
23  mined?
24     A.  Yes.

Confidential - Subject to Further Confidentiality Review

Page 431

1    Q.   Synthetic gypsum is made
2  through a process called flue gas
3  desulfurization.  Do you know that term?
4         INTERPRETER 1:  Let me see,
5  we might have it.  How to spell
6  it?  Can we check on the computer?
7         MR. MONTOYA:  Don't worry.
8  You know what, i'll go back to
9  that.  I'm sorry.  I'll move on to
10  another question.
11         INTERPRETER 1:  Okay.
12         MR. MONTOYA:  I'm going to
13  move on to another question.
14         INTERPRETER 1:  Okay.
15  BY MR. MONTOYA:
16    Q.   Did TG and TTP use gypsum
17  from the same mines, M-I-N-E-S?
18    A.   Not necessarily.
19    Q.   Which mines?
20    A.   Well, TG and TTP -- well, TG
21  produce a large quantity of drywalls,
22  therefore, the materials come from
23  different mines.  For example, Tai'an is
24  closer to TTP and TG.  Some other mines

Page 432

1  might be further away.
2    Q.   Did the two companies share
3  mines or use the same mines?
4    A.   There's no difference.
5  Sometimes they use the same mines.
6  Sometimes they use the synthetic gypsum.
7  Sometimes they use an ordinary mine.  The
8  mine, the local mine in Tai'an is small.
9  One mine does not fulfill all the
10  requirement for such a large quantity for
11  TG.  Therefore, to produce other
12  products, it is not possible to use it
13  from only one location.
14         I want to take a break.
15         MR. MONTOYA:  That's fine.
16         THE VIDEOTAPE TECHNICIAN:
17  The time now is approximately
18  3:17 p.m., and we are now off the
19  record.
20             - - -
21         (Whereupon, a recess was
22  taken from 3:17 p.m. until
23  3:27 p.m.)
24             - - -

Page 433

1         THE VIDEOTAPE TECHNICIAN:
2  This begins Tape 6 of today's
3  portion of the deposition.  The
4  time now is approximately
5  3:27 p.m., and we're back on the
6  record.
7
8    433:7-14
9    FILED UNDER SEAL
10
11
12
13
14
15    Q.   Both TG and TTP used the
16  after sales department, correct?
17    A.   No.
18    Q.   Could you please explain?
19    A.   These are two different
20  companies; therefore, these are two
21  different departments.
22    Q.   Were there two different
23  people in charge of the after sales
24  departments for TG and TTP?

Page 434

1    A.   Yes.
2    Q.   Who were they?
3    A.   Each company has an after
4  sales department inside of sales.  I know
5  that department in TG, but I don't know
6  that department in TTP.
7    Q.   Are you familiar with the
8  ASTM standards?
9    A.   My attorney informed me
10  before I answer this -- before I answer
11  this question, my attorney inform me that
12  one of the terms that you translated for
13  me needs to be corrected.  I want to
14  correct it now.
15         MS. BASS:  There's no
16  question.
17         MR. MONTOYA:  I would like
18  him to answer the question and
19  then he can correct it.
20         MR. CYR:  I object to that.
21  If the witness indicates he wants
22  to say something, I think we
23  should let him say it.
24         MS. BASS:  You want him to

Confidential - Subject to Further Confidentiality Review

Page 435

1  say it.
2      MR. MONTOYA:  I just want
3  him to answer the question, and he
4  can correct whatever he wants, or
5  you can do it on your direct.
6      MR. CYR:  I don't think we
7  need to quibble about it.
8      Interpreter, could you ask
9  Mr. Jia to answer the lawyer's
10  question first and then say
11  whatever he wants to say.
12      THE WITNESS:  Fine.
13      I am not familiar with the
14  ASTM standard.  Here is the
15  ratification of the terminology.
16  So, earlier when I talk about
17  material for TG, it comes from
18  different mines.  It also come
19  from different electrical plans.
20  And it is not -- it is a
21  different -- these are different
22  materials, but the interpretation
23  translated in ordinary material.
24  I am saying difference, not

Page 436

1      ordinary.  Putong and putong.  So,
2      it sounds very similar.
3  BY MR. MONTOYA:
4      Q.   Are you aware that TG
5  claimed to pass the ASTM standards for
6  drywall?
7      A.   I don't understand what you
8  mean.
9      Q.   Did you know that TG or TTP
10  alleged to have passed the ASTM
11  specifications for the manufacturing of
12  drywall?
13      A.   When we produced the
14  drywalls, usually in general we follow
15  the state standard.  If the customer has
16  special requirement, then we follow the
17  specific standard.
18      Q.   Do you know that the "A" in
19  ASTM stands for American?
20      A.   I don't know.
21      Q.   Do you think that passing
22  the American Society for Testing
23  Materials standards would be useful for
24  marketing in the United States?

Page 437

1      A.   I know about this, but our
2  company did not do this.
3      MR. MONTOYA:  Unfortunately,
4      sir, my time with you is done
5      today, but I look forward to
6      meeting you again.
7      I pass the witness.
8      MR. CYR:  Thank you.
9      - - -
10      EXAMINATION
11      - - -
12  BY MS. BASS:
13      Q.   Good afternoon.  My name is
14  Hilarie Bass, and I represent the Home
15  Builders Steering Committee in the
16  litigation in the United States.
17      INTERPRETER 1:  Home
18      Builders, is it an organization or
19      a company, Hilarie?
20      MS. BASS:  Excuse me?
21      INTERPRETER 1:  Home
22      Builders, would you mind to help
23      me.  Is Home Builders an
24      organization or --

Page 438

1      MS. BASS:  No.  It is a
2      committee of the Multi-District
3      Litigation.
4  BY MS. BASS:
5      Q.   Why don't we simply say
6  this.  I'm here representing Lennar, one
7  of the Home Builders in the litigation in
8  the United States.
9      Following up on the line of
10  questioning that we just completed, you
11  were aware that some of your customers
12  requested that drywall be produced in
13  conformity with certain specifications,
14  were you not?
15      A.   I don't understand.  What do
16  you mean?
17      Q.   You previously stated that
18  customers would come to you with specific
19  specifications for the product they were
20  purchasing from you?
21      MR. CYR:  That's a question,
22      I believe.
23      MS. BASS:  Yes.
24  BY MS. BASS:

Confidential - Subject to Further Confidentiality Review

Page 439

1    Q.   Isn't that correct?
2    A.   When a customer come to us
3 from commercial products, if they have
4 specific requirements, we need to fulfill
5 it.
6    Q.   Were you aware that certain
7 of your customers requested that you
8 comply with the ASTM standards?
9    A.   These customers were handled
10 by our foreign sales department. I did
11 not directly in touch with these
12 customer, therefore, I cannot answer this
13 question.
14    Q.   Okay.
15       So, you don't have any
16 personal knowledge as to whether or not
17 certain of your customers requested that
18 your drywall meet specifications required
19 for the United States?
20    A.   I don't know anything about
21 this regarding what are requirement,
22 regarding what customer. I have never
23 participated in even one incidence of the
24 negotiation.

Page 440

1    Q.   So, as far as you know,
2 there could have been hundreds of
3 American customers purchasing from your
4 company and demanding that the drywall be
5 built and be manufactured in compliance
6 with American standards because you don't
7 know?
8    A.   I don't know how many
9 customers come to China, but come to us
10 to do the purchase or they did make the
11 inquiries. I did not participate in any
12 process of the negotiation. I did not
13 know about a requirement of the
14 customers.
15    Q.   So, the best person to tell
16 us what amount of drywall of your company
17 was purchased for use in the United
18 States would be representatives of your
19 foreign sales department, not you; isn't
20 that correct?
21    A.   Yes. People from the
22 foreign sales department, they understand
23 the export situations the best.
24    Q.   You previously testified

Page 441

1 that you could not speculate whether
2 there were additional sales to the United
3 States by TG; isn't that correct?
4    A.   I don't understand. What do
5 you mean?
6    Q.   You previously testified
7 that you could not speculate about
8 whether there were additional sales to
9 the United States of TG plasterboard
10 other than those identified in your
11 profile form; isn't that correct?
12       MR. CYR: Objection as to
13    form.
14       Mr. Jia, you can try to
15    answer the question.
16       THE WITNESS: I still don't
17    understand the concept.
18 BY MS. BASS:
19    Q.   Isn't it correct that you
20 don't have personal knowledge as to how
21 many other American customers purchased
22 drywall from your company?
23    A.   Yes.
24    Q.   Isn't it also correct that

Page 442

1 you don't know -- that you don't have
2 personal knowledge about how many other
3 customers spoke to people in your foreign
4 sales department and expressly described
5 to them that they were purchasing drywall
6 for use in the United States?
7    A.   I don't understand.
8    Q.   Do you have personal
9 knowledge of conversations that your
10 customers had with representatives of the
11 foreign sales department wherein they
12 described that they were purchasing
13 drywall from your company for specific
14 use in the United States?
15    A.   I don't know.
16    Q.   Isn't it true that you have
17 no personal knowledge of sales to
18 customers in the United States that were
19 made by BNBM?
20    A.   I am not sure.
21    Q.   You don't know what sales --
22       INTERPRETER 1: I haven't
23    finished yet.
24       MS. BASS: I'm so sorry.

Confidential - Subject to Further Confidentiality Review

Page 443

1    THE WITNESS:  I am not clear
2    of the products BNBM sells to the
3    United States.
4 BY MS. BASS:
5    Q.   In the monthly reports of
6 TTP that you previously testified you
7 reviewed, was it disclosed, the amount of
8 product TTP was selling to customers in
9 the United States?
10    MR. CYR:  Objection on the
11    use of the phrase "customers in
12    the United States."
13    THE WITNESS:  I don't know.
14    I don't know which drywall is for
15    the U.S. customers or for other
16    customers.
17 BY MS. BASS:
18    Q.   So, you don't know what
19 amount of drywall TTP was selling to
20 customers in the United States; isn't
21 that true?
22    A.   So, every month we have a
23 monthly report.  It will tell us the
24 specifics of the production and also the

Page 444

1 volume of the sales.  But regarding which
2 customer it was sold to, because TG has
3 too many, many customers, more than
4 10,000 customers, so, this type of
5 information would not come to me.
6    Q.   Have you reviewed the
7 manufacturers profile form filed in this
8 litigation by TTP?
9    A.   Are you referring to the
10 form signed by Mr. Song that we talk
11 about earlier?
12    Q.   Yes.
13    A.   I just saw it.
14    Q.   You just saw it for the
15 first time?
16    A.   Yes.
17    Q.   Are you familiar with the
18 exhibit to that profile form that lists
19 sales to customers in the United States?
20    MR. CYR:  There's no need to
21    interpret this, but I do object
22    again to this phrase.  You're
23    insisting on using the phrase
24    "customers in the United States."

Page 445

1    It is just totally inconsistent
2    with the record.
3    Mr. Jia, you can answer the
4    question.
5    THE WITNESS:  I am not
6    familiar.
7 BY MS. BASS:
8    Q.   Are you familiar with
9 whether or not TTP was authorized to use
10 TG's name on their product?
11    A.   Yes.
12    Q.   Are you familiar with
13 whether or not TG's name was used on any
14 of the sales of products that are
15 described on Exhibit A to the TTP
16 manufacturers profile form?
17    A.   I don't understand.  What do
18 you mean?
19    Q.   Do you know whether or not
20 TTP used TG's brand on any of the sales
21 that are described on Exhibit A to the
22 TTP manufacturers profile form?
23    A.   I don't know.
24    Q.   Did TG ever license the name

Page 446

1 brand Taishan to be used by TTP?
2    INTERPRETER 2:  The check
3    interpreter believes that -- can
4    the check interpreter supply the
5    Chinese interpretation?
6    INTERPRETER 1:  But he did
7    not say he did not understand.
8    INTERPRETER 2:  The question
9    is that TG license the Taishan
10    name to TTP?
11    MS. BASS:  Correct.
12    INTERPRETER 2:  So, I would
13    like to interpret it like that in
14    Chinese.  Is that okay?
15    MS. BASS:  That's fine.
16    INTERPRETER 1:  The brand
17    name.  She said the brand.  It's
18    the same.
19    MR. CYR:  I'm sorry.  Let's
20    wait for the lawyer to ask what's
21    next.
22    MS. BASS:  The question
23    that's been posed.  I'm waiting
24    for an answer.

Confidential - Subject to Further Confidentiality Review

Page 447

1      THE WITNESS: I don't
2  understand. What do you mean by
3  "our name"?
4  BY MS. BASS:
5      Q.   Was there a license
6  agreement between TTP and TG by which TG
7  agreed that TTP could use its brand name
8  on its products?
9      MR. CHEN: Objection. For
10  the interpreter's consideration, I
11  think license, you are using zhi
12  jao as in a driver's license, and
13  I think hsuke bwould be more
14  appropriate for your
15  consideration.
16      INTERPRETER 1: Okay. No
17  objection. It is good.
18      THE WITNESS: TG has a lot
19  of brands. This brand is not
20  using its name. TG did authorize
21  TTP and other companies to use its
22  brand.
23  BY MS. BASS:
24      Q.   Is that brand known as the

Page 448

1  Taishan brand?
2      A.   Besides Taishan, there are
3  also other brands.
4      Q.   Were those other brands also
5  licensed for use by TTP?
6      A.   Yes.
7      Q.   What was the time frame for
8  the license of use of the brand by TTP?
9      A.   I cannot recall exactly the
10  time period.
11      Q.   Can you tell me
12  approximately?
13      A.   I don't recall
14  approximately, but it should be around
15  the year 2006.
16      Q.   During the time frame of
17  that license, was TG and TTP both using
18  the same brands?
19      A.   Sometimes it is the same
20  brand.
21      Q.   During the time frame of
22  that license, does that mean that drywall
23  manufactured by TTP could conceivably
24  have the same brand name on it as

Page 449

1  plasterboard manufactured by TG?
2      A.   Yes.
3      Q.   Other than what you've
4  previously testified to regarding sales
5  to U.S. customers by TG, did TG sell any
6  other products which it believes were
7  eventually utilized by customers in the
8  United States?
9      A.   I don't know.
10      Q.   So, you don't know whether
11  or not, for example, TG manufactured
12  metal studs that might have been
13  eventually utilized in the United States?
14      INTERPRETER 1: Counsel,
15  would you mind explaining what is
16  metal studs? I have translation
17  difficulty with metal studs.
18      MS. BASS: Well, I sure
19  can't help her.
20      MR. MONTOYA: I didn't know
21  if you heard her.
22      MR. CYR: I have no comment
23  on that matter.
24      INTERPRETER 1: She's

Page 450

1  looking in the dictionary.
2      MS. BASS: That's fine.
3      (Discussion in Chinese
4  between interpreters.)
5      THE WITNESS: Regarding the
6  metal studs, we have very few
7  production, and also the sales is
8  very small, therefore, I don't pay
9  attention of the quantity. I also
10  don't know whether we have any
11  U.S. customers or not.
12  BY MS. BASS:
13      Q.   Once again, would we need to
14  ask someone in the foreign sales
15  department to obtain that information?
16      A.   It should be the case.
17      Q.   Does TG stand behind its
18  products if there is a problem with them?
19      A.   I don't understand. What do
20  you mean by "stand behind"?
21      Q.   Assuming there was a defect
22  in a product manufactured by TG, would TG
23  be prepared to remedy that defect in
24  their product?

Confidential - Subject to Further Confidentiality Review

Page 451

1    A.   TG has no responsibility to
2 make remedy to the defects for the
3 products of TTP.
4    Q.   My question was, will TG
5 remedy defects in the products that TG
6 manufacturers?
7        MR. CHEN:  Hold one moment.
8        THE WITNESS:  TG concerning
9 its own product?
10 BY MS. BASS:
11   Q.  Yes.  That's the question.
12       INTERPRETER 2:  Perhaps the
13 check interpreter believes the
14 word "remedy," the interpreter may
15 have interpreted it as like a
16 repair.  But perhaps it should be
17 like some measures to help.
18       INTERPRETER 1:  It's the
19 same.  Fix it.
20       MS. BASS:  Just ask the
21 witness to please answer the
22 question.
23       THE WITNESS:  Yes.
24 BY MS. BASS:

Page 452

1    Q.   Would that be the case
2 wherever that product was utilized?
3        INTERPRETER 1:  The word
4 "utilized" cannot be interpreted
5 very clearly.
6 BY MS. BASS:
7    Q.   Used.  Wherever the product
8 was used, would they stand behind a
9 defective product that they manufactured?
10       MR. CYR:  What designated
11 area does this relate to?
12       MS. BASS:  Jurisdiction.
13       You can answer the question.
14       MR. CYR:  No, not yet.
15       MS. BASS:  If you have an
16 objection, note it for the record.
17 I would like the witness to answer
18 the question.
19       MR. CYR:  I understand that.
20 You don't want to engage in any
21 dialogue about what designated
22 area this is?
23       MS. BASS:  It goes directly
24 to the issue of jurisdiction.

Page 453

1        MR. CYR:  How is that?
2        MS. BASS:  I don't have to
3 go through an explanation for you.
4        MR. CYR:  Yeah, okay.
5        MS. BASS:  If you want to
6 instruct the witness not to answer
7 whether or not he will remedy,
8 he's prepared to stand behind
9 products that are defective,
10 wherever they are, you give that
11 instruction, and we'll bring it to
12 Judge Fallon, and we'll be back
13 here with him answering that
14 question sometime in the future.
15 It's your choice.
16       MR. CYR:  Are you finished?
17       MS. BASS:  I am.
18       MR. CYR:  I instruct the
19 witness not to answer.
20       Next question, please.
21       MS. BASS:  Fine.  Please
22 note it for the record.
23       MR. CYR:  No answer.
24 BY MS. BASS:

Page 454

1    Q.   If there were specific
2 requests by customers for particular
3 labeling on TG products, would you be
4 aware of those?
5    A.   I am aware of this
6 situation.
7    Q.   Okay.
8        So, each time a customer,
9 for example, requested a specific brand
10 or a specific type of tape, you would
11 have personal knowledge of those?
12   A.   Some customers, they may
13 require a special label.  In general, our
14 company would have no objection to this
15 practice.  But it doesn't mean every
16 customer, when they have any requirement,
17 we would follow.  And it also doesn't
18 mean that every demand of every customer
19 I would know.
20   Q.   So, there could be certain
21 requests made by your customers for a
22 particular brand marking on drywall that
23 you would not be aware of?
24   A.   I just mentioned that we

Page 455

1 allow this condition to exist. But
2 regarding which customer putting on which
3 label, that I don't know.
4     Q.   Who within your company
5 would have knowledge of those type of
6 specialized requests?
7     A.   My customer, we need to
8 check our file in order to find out.
9     Q.   Was there a particular
10 person within your company that such
11 requests would have to be made to?
12     A.   A Mr. Peng Wenlong, he is --
13 during a certain period of time, he was
14 working for the foreign sales department.
15 He would know. He should be able to
16 check out the exported products. We also
17 have a lot of this type of customers in
18 China. Mr. Peng Wenlong may not be able
19 to find out.
20     MS. BASS:  I'm going to pass
21 the witness to make sure everybody
22 else has an opportunity.
23     MR. CYR:  Can we take ten
24 minutes and then try to give

Page 456

1 everybody a chance?
2     THE VIDEOTAPE TECHNICIAN:
3 The time now is approximately
4 4:17 p.m., and we are now off the
5 record.
6         - - -
7     (Whereupon, a recess was
8 taken from 4:17 p.m. until
9 4:33 p.m.)
10         - - -
11     THE VIDEOTAPE TECHNICIAN:
12 This begins Tape 7 of today's
13 portion of our deposition. The
14 time now is approximately
15 4:35 p.m., and we're back on the
16 record.
17         - - -
18     EXAMINATION
19         - - -
20 BY MR. HARDT:
21     Q.   Mr. Jia, good afternoon. My
22 name is Ken Hardt. I represent Venture
23 Supply, the company that actually
24 purchased drywall from Shandong Taihe

Page 457

1 Dongxin Limited -- Company Limited.
2     Can you translate that for
3 me, please.
4     During my questioning, I may
5 refer to Shandong Taihe Dongxin Company
6 Limited as just Shandong. Is that okay
7 with you?
8     A.   When you say "Shandong," I
9 don't understand.
10     Q.   It's just a shortcut.
11 Rather than pronounce the whole word, the
12 whole name, Shandong Taihe Dongxin
13 Company Limited, I'm just going to refer
14 to them as Shandong. So, if I say
15 Shandong, I'm referring to Shandong Taihe
16 Dongxin Company Limited. Is that okay?
17     A.   When you refer to Shandong,
18 in this place called Shandong, there are
19 so many, many factories that manufacture
20 drywalls, and some, they might also
21 produce it for the United -- produce it
22 for the United States.
23     Q.   Okay. I'll try to use the
24 full name then.

Page 458

1     INTERPRETER 2: Mr. Jia did
2 say that how about use TG.
3     INTERPRETER 1: Did he say
4 that? I did not hear that.
5     MR. CHEN: He did mention it
6 briefly.
7     INTERPRETER 1: I did not
8 hear that.
9     MR. CHEN: Counsel, I'll
10 just briefly state. Shandong is a
11 large province. It would be like
12 calling something just U.S.
13 instead of U.S. something or
14 other. Maybe if you could --
15     MR. HARDT: I'll just use TG
16 then.
17     INTERPRETER 1: I disagree
18 because I did not hear the witness
19 say that.
20     MR. HARDT: I was just
21 trying to differentiate between
22 the name change, but okay.
23     INTERPRETER 1: I did not
24 hear the witness say TG.

Confidential - Subject to Further Confidentiality Review

Page 459

1 BY MR. HARDT:
2    Q.   Okay.  I will use TG.
3    A.   I hope to use TG.
4    Q.   The contracts that were
5 signed between my client and TG were in
6 late 2005.  Were you aware of that?
7    A.   Now I know.
8    Q.   Well, the first contract was
9 for the purchase of 100,000 sheets of
10 drywall.  Were you aware of that?
11    A.   Now I know.
12    Q.   Did you know at the time?
13    A.   At that time, I did not
14 know.
15    Q.   I've seen affidavits.  I've
16 seen -- I've heard your testimony earlier
17 on.  The sales to Venture Supply, my
18 client, were the only U.S. sales that TG
19 made; is that correct?
20        MR. CYR:  I'm not asking the
21    interpreter to interpret, but I
22    think you just accidentally
23    referred to U.S. sales, and that's
24    inconsistent with the record.

Page 460

1        MR. HARDT:  He can answer.
2        INTERPRETER 2:  The check
3    interpreter also doesn't think the
4    interpreter's interpretation
5    reflects the question.
6        MR. HARDT:  Can I get an
7    answer?
8        INTERPRETER 1:  I disagree.
9        MR. HARDT:  He disagrees?
10        INTERPRETER 1:  I disagree
11    with the check interpreter.
12        MR. HARDT:  Please just ask
13    him to answer the question.
14        THE WITNESS:  Please repeat
15    the question.
16        (Interpreter repeats the
17    question.)
18        THE WITNESS:  What I saw
19    earlier was written down as such.
20 BY MR. HARDT:
21    Q.   Okay.  And so this was the
22 first sale to a U.S. importer by TG of
23 drywall; is that correct?
24    A.   Around 2005 or 2006, I do

Page 461

1 not exactly recall the exact time, and a
2 representative from the foreign trade
3 department of TG come to tell me one of
4 the customers from the United States,
5 they say that they want to buy the
6 drywall from TG.  After they purchase it,
7 they are going to ship it to the United
8 States.
9    Q.   So, you were aware of this
10 back in 2005, late -- early 2006?
11    A.   That is not my concept.
12 That is not the concept I am talking
13 about.
14    Q.   What concept are you talking
15 about?
16    A.   The manager of the foreign
17 sales department told me.  But after
18 that, I did not believe that our product
19 would be able to sell outside of the
20 country, would be able to sell to the
21 United States.
22    Q.   That's not what I asked you.
23 I asked you, you were aware of this
24 particular sale to my client back around

Page 462

1 the time it was made; is that correct?
2    A.   When it was made, that I was
3 not sure.  Now I am sure.
4    Q.   But you heard something back
5 in late 2005/2006 that a U.S. importer
6 wanted to buy your drywall, TG's drywall,
7 and import it back into the United
8 States; is that correct?
9    A.   Yes.
10    Q.   And when you were made aware
11 of this purchase by a US importer, did
12 you consider that significant for your
13 country -- I mean, for your company?
14    A.   I did not consider this to
15 be significant.
16    Q.   At the time, this was your
17 first sale of drywall to a U.S. importer;
18 is that correct?
19    A.   I don't know whether this
20 was the first time or not.
21    Q.   Well, had you made any sales
22 prior to this time to a US importer?
23    A.   This is not my concept.
24    Q.   What is your concept?

Page 463

1    A.   I'm referring to the sales
2  of the drywall by TTG when they sell
3  it -- TTP when they sell it to -- when
4  they sell it outside of the country.  I
5  am not sure whether this was earlier than
6  the sales of TG that sold it to TG or
7  not, and I was not sure about who sold it
8  first, who had the first time.
9    Q.   Okay.  We'll get there in a
10 second.  I asked about TG.  This was the
11 first sale to a US importer by TG itself?
12   A.   Yes.
13      MR. CHEN:  Objection to the
14   translation.  She did not
15   translate this was the first sale
16   to a US importer.  She translated,
17   this was the first sale to the US.
18      MR. HARDT:  I'm happy with
19   the answer.
20      MR. CYR:  We're happy with
21   the objection.
22      MR. HARDT:  Go ahead and
23   stand by your objection.
24 BY MR. HARDT:

Page 464

1    Q.   At the time that you were
2  made aware of this first sale by your
3  company, TG, to a US importer, were you
4  also made aware that other US importers
5  were making inquiries about buying
6  drywall from TG?
7    A.   Can you repeat this
8  question?  It is not clear.
9      MR. HARDT:  You'll just have
10   to read it back to him.
11      (Interpreter repeats
12   question.)
13      THE WITNESS:  At that time,
14   I did not know that the drywall
15   was sold to the United States.  I
16   also did not know how many
17   customers came to our company to
18   make inquiries.  I also did not
19   know where it was being sold.
20 BY MR. HARDT:
21   Q.   So, TG is making its first
22 sale to a US importer, and there are --
23 the documents will show there are
24 inquiries being made by other US

Page 465

1  importers of TG to purchase drywall for
2  importation into the United States.  Do
3  you think as general manager of TG, you
4  should have been made aware of that?
5    A.   Because if the contract is
6  really big, they would tell me.  If the
7  contract is very small, they won't tell
8  me.
9      Regarding the contract,
10 well, there's someone.  Probably it was
11 Mr. Peng Wenlong.  He told me that there
12 was one customer coming to our company
13 who buy the drywall.  Whether they did it
14 or not, whether they sold it or not, at
15 that point I did not know it.  I know it
16 about -- I know about it now.
17   Q.   Is that somebody different
18 than Venture that you're talking about,
19 this customer?
20      INTERPRETER 1:  Counsel, by
21   "Venture," do you mean by Venture
22   Supply?
23      MR. HARDT:  Yes, Venture
24   Supply.

Page 466

1      THE WITNESS:  I don't know
2    about the company now you
3    represent.  I have no recollection
4    of it.  I don't know English;
5    therefore, I have no recollection,
6    and I cannot recall clearly of the
7    companies in English -- in the
8    English name.
9  BY MR. HARDT:
10   Q.   Were you aware that other
11 companies around the 2005/2006 time frame
12 were approaching TG, and by "other
13 companies," I mean other US importers,
14 were approaching TG to purchase TG
15 drywall to import to the United States?
16   A.   I don't know.  What I am
17 sure is that the drywalls are very heavy,
18 therefore, the cost is very high.  It is
19 impossible to sell it to the United
20 States.
21   Q.   That's not the question I
22 asked you.
23      I asked you, were you aware
24 back in 2005/2006 of other companies

Page 467

1 approaching TG, other US importers
2 approaching TG, to purchase your drywall
3 to import into the United States?  That's
4 the question I want an answer to, please.
5     A.   I do not know whether
6 there's any customer that come to TG and
7 who purchased the products for the United
8 States.
9     Q.   If that had occurred, if
10 customers, US importers were coming to
11 your company in 2005/2006 to talk about
12 purchasing TG product to import into the
13 United States, would you have expected
14 your director of foreign sales, Mr. Peng,
15 to inform you of that, Peng Wenlong?
16     A.   I don't understand.  What do
17 you mean by "expect"?  What?
18     Q.   Who did Mr. Peng Wenlong
19 report to?
20        INTERPRETER 2:  The check
21     interpreter doesn't believe that
22     the interpreter's interpretation
23     was correct.  The question was who
24     did Peng Wenlong report to?  The

Page 468

1     interpreter interpreted did Peng
2     Wenlong tell you that?
3 BY MR. HARDT:
4     Q.   No.  I was asking basically,
5 who was the direct supervisor of Peng
6 Wenlong?
7        INTERPRETER 1:  Off the
8     record.
9        MR. HARDT:  Ask that
10     question.  Ask him that question,
11     please.  Ma'am, please, I'm asking
12     a different question.
13        INTERPRETER 1:  Okay.
14 BY MR. HARDT:
15     Q.   Who was the direct
16 supervisor of Mr. Peng Wenlong back in
17 the 2005/2006 time frame?
18        INTERPRETER 1:  Interpreter
19     oppose the check interpreter to
20     interpreting a question.  The
21     interpreter did not have a chance
22     to interpret first.
23        MR. HARDT:  Ma'am, I do not
24     need that.  I've asked him --

Page 469

1     Interpreter, please.  I've
2     asked a new question.
3        INTERPRETER 1:  Okay.
4 BY MR. HARDT:
5     Q.   The new question is, who was
6 the direct supervisor of Peng Wenlong in
7 the 2005/2006 time frame?
8        MR. HARDT:  Can you ask him
9     that question, please.
10        THE WITNESS:  I don't
11     recall.
12 BY MR. HARDT:
13     Q.   As the director of foreign
14 sales, would he report directly to you,
15 the general manager?
16     A.   Usually Peng Wenlong would
17 report to the other leaderships that they
18 have the division of the task of
19 management.  Sometimes when we -- when I
20 bump into him when we say hello, he will
21 tell me related matters.  But this does
22 not happen often.
23        MR. CYR:  Counsel, I just
24     want to state for the record, I

Page 470

1     think we've reached the 5:00 time
2     period, but as we've discussed,
3     we're flexible about that, and we
4     appreciate you've come a long way,
5     and you're answering questions.
6     And I think there's at least one
7     other lawyer who would like to ask
8     questions.  We would just
9     appreciate your consideration.
10     Thank you.
11        MR. HARDT:  I understand.  I
12     have significantly cut back my
13     questions, but if I could get a
14     straight answer, we might go a
15     long way.
16 BY MR. HARDT:
17     Q.   Mr. Jia, back in the
18 2005/2006 time frame, were you also or
19 were you made aware that US importers
20 were coming to your company and asking to
21 be your company's exclusive distributor
22 in the United States for your product?
23        INTERPRETER 1:  The word
24     "exclusive" I use it as specific

Confidential - Subject to Further Confidentiality Review

Page 471

1  distributor in Chinese --
2      MR. HARDT: Sole. Only.
3      THE WITNESS: TG, they would
4  not allow any sole distributor
5  either inside China or outside of
6  China.
7  BY MR. HARDT:
8      Q.  But were you made aware that
9  people were trying to be your United
10 States sole distributor back in the
11 2005/2006 time frame?
12     A.  I don't know.
13     Q.  As general manager of TG,
14 would you have expected to be made aware
15 of that information if it was occurring?
16     A.  I don't understand what you
17 mean.
18     Q.  As general manager of TG,
19 would you have liked to have known that
20 information, that people wanted to be
21 your sole distributor in the United
22 States?
23     A.  Whether the people wanted to
24 do it or not, I don't know.  But I don't

Page 472

1  have such a wish.  I would not take the
2  initiative to have such a wish to make
3  the United States to become our market.
4  It is impossible.  That is something that
5  TG cannot do.
6      Q.  Well, I will tell you, there
7  are documents that show that around that
8  2005/2006 time frame that there were US
9  importers anxious, making inquiries to
10 buy your product and import it into the
11 United States, and there were also US
12 importers making inquiry to be your sole
13 distributor in the United States.  And
14 your testimony as you sit here today is
15 you were not made aware of that?
16     MR. CYR:  Objection on the
17     grounds the question is compound
18     and confusing.
19     Mr. Jia, you may try to
20     answer the question.
21     THE WITNESS:  I don't know
22     how they think.
23     MR. HARDT:  I don't know
24     what?

Page 473

1      INTERPRETER 1:  I don't know
2  how they think.
3  BY MR. HARDT:
4      Q.  All right.
5          Now, according to an
6  affidavit that you have submitted and
7  actually your testimony today, this was
8  the only sale -- well, these two sales to
9  my client, Venture Supply, were the only
10 sales of drywall by TG; is that correct?
11     MR. CYR:  Objection as to
12     form.  Objection as to form.
13     Please try to answer, Mr.
14     Jia.
15     THE WITNESS:  I don't
16     understand.  What do you mean?
17 BY MR. HARDT:
18     Q.  Well, it's your testimony
19 that the only sale to a US importer of TG
20 drywall was made to Venture Supply and
21 that's it; is that correct?
22     A.  I'm unable to answer your
23 questions, but I insist that my affidavit
24 is correct.  I insist that it is correct.

Page 474

1      Q.  And the affidavit says that
2  the only sale to a US importer by TG was
3  to Venture Supply, correct?
4      A.  Yes.
5      Q.  And I will tell you for the
6  purposes of my next question that the
7  contracts for those sales were in late
8  2005.  All right?
9      MR. HARDT:  Please translate
10     that.
11     THE WITNESS:  Yes.
12 BY MR. HARDT:
13     Q.  And my understanding is that
14 TTP was formed in February of 2006 as a
15 subsidiary of TG; is that correct?
16     A.  Yes.
17     Q.  And it was in February of
18 2006, I think it's February 20, 2006 that
19 the license was entered into between TG
20 and TTP to allow TTP to use TG's brand
21 name; is that correct?
22     A.  Yes.
23     Q.  And also on February 20th of
24 2006, there was an equipment sale by TG

Confidential - Subject to Further Confidentiality Review

Page 475

1  to TTP; is that correct?
2      A.   Yes.
3      Q.   And was that production
4  equipment?
5      A.   Yes.
6      Q.   And then after February of
7  2006 -- well, take that back.
8          TG never made a sale to
9  another US importer of TG drywall; is
10  that correct?
11         MR. PANAYOTOPOULOS:
12  Objection to form.
13         MR. HARDT:  (Addressing the
14  interpreter.)
15      You can ask the question.
16         MR. CYR:  I object as to
17  form, and also I think it's the
18  fourth or fifth time you've asked
19  the same question, and it is 15
20  after 5:00.  And so I guess --
21         MR. HARDT:  I was going
22  somewhere with this.
23         MR. CYR:  Please don't
24  interrupt me.

Page 477

1  was allocated for the depositions,
2  that I've repeatedly warned the
3  entire group of plaintiffs'
4  counsel who are here that you need
5  to manage your time so that
6  everybody has an opportunity to
7  ask the questions.  In my view,
8  we've spent a lot of time asking
9  questions that weren't even in the
10  designated areas and don't even
11  relate to jurisdiction.  You've
12  made these choices.  We're now 15
13  minutes beyond 5:00.  He's just
14  asked the same question for the
15  fourth or fifth time.
16      We're going to wrap it up in
17  ten minutes, and you can complain
18  to the Judge.
19         MS. BASS:  Let me just note
20  for the record that I have never
21  before been in a deposition where
22  out of every hour, 15 minutes is
23  taken as a break by the witness,
24  oftentimes in excess of 15

Page 476

1      I guess I would like to say,
2  respectfully, that we have another
3  ten minutes, and then we're going
4  to call it an evening.
5      Thank you.
6         MR. HARDT:  I don't
7  appreciate the artificial
8  timeline, but I'm trying to get
9  answers from this gentleman.
10         MS. BASS:  Are you
11  suggesting he has ten minutes
12  or --
13         MR. CYR:  No, no.  We're
14  going to be all done in ten
15  minutes.
16         MR. BRENNER:  So, you're
17  suggesting that those of us that
18  have come from wherever to ask the
19  few questions that we have will be
20  unable to ask questions after ten
21  minutes?
22         MR. CYR:  What I am
23  suggesting is that you are now 15
24  minutes beyond the time limit that

Page 478

1  minutes.  So the timeline of the
2  deposition will speak for itself.
3  But I do suggest that you
4  reconsider the number of people
5  who are here having flown 20,000
6  miles to ask their questions.
7         MR. HARDT:  Can I continue
8  to ask questions, please.
9         MR. CYR:  I do appreciate
10  that.
11         MR. HARDT:  If you're going
12  to cut it off in ten minutes,
13  let's get through what we can get
14  through.
15         MR. CYR:  And I appreciate
16  that we just spent a few minutes
17  talking about it, and so the ten
18  minutes -- we have to have -- I
19  don't mean to be Draconian, but we
20  have to have some expectation of
21  when it's going to stop.  So, why
22  don't we say -- first of all, the
23  sensitivity with respect to that
24  issue was displayed yesterday.

Page 479

1  That was the right time for it,
2  but not now.  Let's go until 5:30.
3      Thank you.
4      MR. PANAYOTOPOULOS:  I just
5  want to note for the record that
6  on behalf of my client, I have not
7  had an opportunity to ask any
8  questions, and we will attempt to
9  ask that this deposition gets
10  continued if it gets cut off by
11  counsel I guess at 5:30.
12      MS. EISELEN:  Likewise for
13  Interior/Exterior.
14      MR. CYR:  What is your
15  suggestion with respect to how
16  we're supposed to conduct these
17  depositions?  I don't understand.
18  Do you just think we're just going
19  to go to midnight?
20      MR. PANAYOTOPOULOS:  The
21  same way that every other
22  deposition gets conducted.  If we
23  don't have an opportunity, we'll
24  need to come back at another time.

Page 480

1  If we can do it later today, I'm
2  willing to stay as late as we need
3  to.
4      MR. CYR:  No.  We're going
5  to wrap it up at 5:30.  I'm sorry.
6  Go ahead, sir.
7      MR. BRENNER:  I'll note the
8  same objection.  I have maybe ten
9  minutes worth of questions.
10      MR. BLACK:  I want to make
11  the objection for the State of
12  Louisiana.  Same objection.
13      MR. PANAYOTOPOULOS:
14  Reservation of rights.
15      MS. EISELEN:  Same.
16      MR. HARDT:  Can I ask a
17  question?
18  BY MR. HARDT:
19      Q.  Let me ask you this.
20      Was TTP formed as a
21  subsidiary of TG to sell drywall to US
22  importers?
23      A.  No.
24      Q.  Can you explain for me why

Page 481

1  after the formation of TTP in February of
2  2006 that only TTP made sales to US
3  importers and TG did not?
4      A.  In the year 2006, the
5  department -- the tax department, they
6  inform us that we cannot issue invoice
7  for VAT.  That's value-added tax.  But
8  there were a lot of the customers of TG,
9  they were -- they are asking for the
10  issuing of invoice for VAT.  So, under
11  the suggestions of the tax bureau,
12  therefore, all the customers, they wanted
13  to use VAT invoices.  They would go to
14  TTP.  We will use TTP to do the
15  production.  That is for the convenience
16  of the management of that tax, because
17  most of the customers that sold for --
18  that buy the products to be sold to
19  somewhere outside of China for the
20  drywall, most of them, they require the
21  invoice of the VAT.  Therefore, the
22  products produced by TTP, they would have
23  a lot of the products sold outside of
24  China.  TG has very few of them.

Page 482

1      MR. HARDT:  I wish I had
2  time to delve into that answer,
3  but I'm going to pass the witness.
4      MR. CYR:  (Addressing Mr.
5  Chen.)
6      Mr. Jia has complained about
7  the time.  Could you ask him if we
8  can go until 5:30.
9      Okay.
10      - - -
11      EXAMINATION
12      - - -
13  BY MR. BRENNER:
14      Q.  Mr. Jia, I represent Tobin
15  Trading, Incorporated.
16      Did you ever meet with any
17  representative of Tobin Trading,
18  Incorporated?
19      A.  I have never seen any.
20      Q.  The product that TG sold to
21  Venture Supply, where was the factory
22  located that produced the product?
23      A.  In the city called Tai'an in
24  the province of Shandong.

Confidential - Subject to Further Confidentiality Review

Page 483

1    Q.   Was the product that was
2   sold by TG to Venture Supply produced in
3   one factory or more than one factory?
4    A.   I don't understand.
5        That I'm not sure.
6    Q.   The place where the product
7   was produced that was sold to Venture
8   Supply, is there a paper factory nearby?
9    A.   Whose factory?
10   Q.   Was there a paper factory
11  nearby that supplied the paper for use in
12  the drywall that was produced for Venture
13  Supply?
14   A.   I don't understand what
15  factories you're referring to.  In
16  Tai'an, there are a lot of paper
17  factories.
18   Q.   Was there more than one
19  paper factory that produced the paper
20  that was used to make the drywall that
21  was sold to Venture Supply?
22   A.   There is no paper factories
23  would be specifically to produce papers
24  for specific enterprise.

Page 484

1    Q.   Where was the paper that was
2   used to produce the drywall recycled or
3   manufactured?  That's a bad question.
4   Strike that question.
5        Did TG own any of the
6   factories or paper factories used to
7   either produce or recycle the paper used
8   for drywall production by TG?
9    A.   TG has one paper factory,
10  but the scale of this factory is very
11  small.  The paper it produced is for the
12  use of drywall for TG.  TG also purchase
13  a large amount of paper from other
14  companies.
15   Q.   Where is the paper factory
16  that you've referred to located?
17   A.   Are you talking about the TG
18  factory?
19   Q.   Yes.
20   A.   In Tai'an, Shandong.
21       MR. CYR:  I've got 5:30.
22       MR. BRENNER:  I've got
23  three, maybe four questions.  It's
24  not long.  Just two more areas to

Page 485

1   cover.
2   BY MR. BRENNER:
3    Q.   How far is the distance
4   between the paper factory and the nearest
5   drywall manufacturing plant?
6    A.   It's approximately about
7   1,000 meters.
8    Q.   Are all of the --
9        Were all of the employees in
10  2005 and 2006 of the paper plant
11  employees of TG?
12   A.   The employees for the paper
13  factories are the employees of TG.
14   Q.   Were there any workers --
15  and then I've got two more quickies
16  because I know --
17       Were there any workers in
18  the TG paper factory -- strike that.
19       Did the workers in the TG
20  paper factory wear uniforms?
21       INTERPRETER 1:  Wear
22  uniforms?
23       MR. BRENNER:  Yes.
24       THE WITNESS:  Our country

Page 486

1   take the matter of the safeties of
2   the laborers very seriously.
3   Without a uniform, they cannot
4   enter the factory.
5       MR. CYR:  One more question,
6   please, sir.
7   BY MR. BRENNER:
8    Q.   Do you know a company called
9   THBM?
10   A.   I know.
11      MR. CYR:  Thank you very
12  much.
13      MR. BRENNER:  You're not
14  going to let him answer questions
15  about the business of THBM?
16      MR. CYR:  No, I'm not.
17  Thank you very much.
18      MR. BRENNER:  All right.
19  I'll object for the record for
20  having my questions cut off
21  arbitrarily, and we reserve the
22  right to ask the judge to order
23  Mr. Jia to come back for a few
24  questions, and we will ask The

Confidential - Subject to Further Confidentiality Review

Page 487

1  Court to impose costs.
2      MR. PANAYOTOPOULOS:  On
3  behalf of Banner, we're not
4  agreeing that the deposition is
5  terminated.  As far as we're
6  concerned, it's continued because
7  counsel for the defendant chose to
8  terminate it, to stop it at this
9  point.  So, we're just reserving
10  all of our rights and objecting to
11  the unilateral termination.
12      MS. EISELEN:
13  Interior/Exterior also reserves
14  its rights.
15      MR. BLACK:  The State of
16  Louisiana joins.
17      MR. CLARK:  Southern Homes
18  also joins.  It objects to the
19  termination of this deposition
20  without having asked questions of
21  this witness and reserves its
22  right to so ask questions of this
23  witness.
24      MR. CYR:  And on behalf of

Page 488

1  Taishan Gypsum and TTP, I would
2  just like to say that everything
3  that I said during the very first
4  part of the first day and then
5  repeatedly throughout the
6  deposition holds true for now.
7      Thank you very much.
8      MR. HARDT:  I would like to
9  say on behalf of Venture and
10  Porter-Blaine that I arbitrarily
11  cut off my questioning of this
12  witness due to defense counsel
13  saying that he was going to cut
14  the deposition short to give
15  somebody else a chance to ask
16  questions, but I reserve my right
17  also to ask The Court to reopen
18  this deposition at the cost of
19  Taishan and in the United States.
20      MR. SLAUGHTER:  Atlantic
21  Homes joins in the objections of
22  the other defendants.
23      THE VIDEOTAPE TECHNICIAN:
24  The time now is approximately 5:35

Page 489

1  p.m.  Today's portion of our
2  deposition consisting of seven
3  tapes is now concluded.
4          - - -
5      (Whereupon, the deposition
6  adjourned at 5:35 p.m.)
7          - - -

Page 490

1      C E R T I F I C A T E.
2
3
4      I, LINDA L. GOLKOW, a
   Registered Diplomate Reporter, Certified
   Court Reporter and Notary Public, do
5  hereby certify that, pursuant to notice,
   the deposition of TONGCHUN JIA was duly
6  taken on April 5, 2011 at 9:03 a.m.
   before me.
7
8      The said TONGCHUN JIA was
   duly sworn by me through the interpreter
9  according to law to tell the truth, the
   whole truth and nothing but the truth and
10  thereupon did testify as set forth in the
   above transcript of testimony.  The
11  testimony was taken down stenographically
   by me.
12
13      I do further certify that
   the above deposition is full, complete
14  and a true record of all the testimony
   given by the said witness.
15
16
17      Linda L. Golkow
      Registered Diplomate Reporter
18      Certified Realtime Reporter
19
20      (The foregoing certification
   of this transcript does not apply to any
21  reproduction of the same by any means,
   unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

Confidential - Subject to Further Confidentiality Review

Page 491

INSTRUCTIONS TO WITNESS

1
2
3
4        Please read your deposition
5  over carefully and make any necessary
6  corrections.  You should state the reason
7  in the appropriate space on the errata
8  sheet for any corrections that are made.
9
10        After doing so, please sign
11  the errata sheet and date it.  It will be
12  attached to your deposition.
13
14        It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 493

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4        I,_____, do
   hereby certify that I have read the
   foregoing pages, 270 through 494 and that
5  the same is a correct transcription of
   the answers given by me to the questions
6  therein propounded, except for the
   corrections or changes in form or
7  substance, if any, noted in the attached
   Errata Sheet.
8
9  _____
   TONGCHUN JIA            DATE
10
11
12
13
14
15
16  Subscribed and sworn
   to before me this
17  _____ day of _____, 20_____.
18  My commission expires:_____
19
   _____
20  Notary Public
21
22
23
24

Page 492

1        - - - - - -
        E R R A T A
2        - - - - - -
3  PAGE  LINE  CHANGE
4  ____  ____  _____
5    REASON: _____
6  ____  ____  _____
7    REASON: _____
8  ____  ____  _____
9    REASON: _____
10  ____  ____  _____
11    REASON: _____
12  ____  ____  _____
13    REASON: _____
14  ____  ____  _____
15    REASON: _____
16  ____  ____  _____
17    REASON: _____
18  ____  ____  _____
19    REASON: _____
20  ____  ____  _____
21    REASON: _____
22  ____  ____  _____
23    REASON: _____
24

Page 494

1        LAWYER'S NOTES
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24