**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L |
| THIS DOCUMENT RELATES TO: Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al., Case No. 2:09-cv-6687 (E.D. La.) | JUDGE FALLON MAG. JUDGE WILKINSON |
| The Mitchell Co., Inc. v. Knauf Gips KG, et al., Case No. 09-4115 (E.D. La.) | |
| Wiltz v. Beijing New Building Materials Public Ltd. Co., et al., Case No. 10-361 (E.D. La.) | |
| Gross v. Knauf Gips KG, et al., 2:09-cv-06690 (E.D. La.) | |

**THE PLAINTIFFS' STEERING COMMITTEE'S GLOBAL MEMORANDUM OF LAW IN OPPOSITION TO: (1) TAISHAN'S RENEWED MOTIONS TO VACATE THE DEFAULT JUDGMENTS AND DISMISS THE COMPLAINTS IN GERMANO AND MITCHELL AND (2) TAISHAN'S MOTIONS TO DISMISS THE COMPLAINTS IN GROSS AND WILTZ[1]**

---

[1]  This Global Memorandum of Law addresses common legal issues raised in Taishan's renewed motions to vacate the default judgments and dismiss the complaints in *Germano* [Rec. Doc. No. 13490] and *Mitchell* [Rec. Doc. No. 13566] and in Taishan's motions to dismiss the complaints in *Gross* [Rec. Doc. No. 13590] and *Wiltz* [Rec. Doc. No. 13591] (collectively, "Taishan's jurisdictional motions").  In order to avoid duplication of the record and for the convenience of the Court and the parties, the Plaintiffs' Steering Committee ("PSC") incorporates this Global Memorandum of Law into each response to Taishan's individual jurisdictional motions, as if fully set forth therein.

## TABLE OF CONTENTS

Table of Authorities................................................................. ii

I.     INTRODUCTION................................................................ 1

II.    ARGUMENT..................................................................... 4

    A.   This Court May Exercise Jurisdiction over Taishan Because it Purposefully Sold its Drywall Products to Customers in the United States with the Expectation They Would Be Delivered to Virginia, Florida, Louisiana, California and Other States........................... 4

        1.   *Taishan Is Subject to Personal Jurisdiction of this Court under the Due Process Clause of the Fourteenth Amendment.* ...................................... 6

        2.   *Taishan's Activities Directed at Sales in Virginia, Florida and Louisiana Constitute "Minimum Contacts"*..................................................... 7

        3.   *McIntyre Does Not Change the Conclusion That Jurisdiction Over Taishan Is Proper*........................... 14

        4.   *Fair Play and Substantial Justice Permit the Exercise of Jurisdiction Over Taishan*........................... 22

    B.   The Corporate Personalities of TG and TTP Have Been Commingled and TTP's Separate Personhood Can be Disregarded Under Chinese Law................................................. 25

        1.   *The Doctrine of Corporate Veil Piercing Under Chinese Corporate Law*..................................... 26

        2.   *Taishan Can Neither Prove the Separateness of TG and TTP Nor Defend TG's Abuse of the Corporate Form.*.................................................. 31

            a.   Article 64 - TG and TTP Were Commingled. ............... 31

            b.   Article 20(3) - TG Abused the Corporate Form. ............. 34

    C.   Plaintiffs' Right to Pursue the Upstream Entities Should Be Preserved, Since They Were Precluded from Taking Any Discovery From CNBM and BNBM.................................... 35

III.   CONCLUSION. ............................................................... 36

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Ainsworth v. Cargotec USA, Inc.*, 2011 WL 4443626 (S.D. Miss. Sept. 23, 2011),
    *mot. to certify appeal granted*, 2011 WL 6291812 (S.D. Miss. Dec. 15, 2011). . . . . 18, 20

*Asahi Metal Industry Co., Ltd. v. Superior Court of California*,
    480 U.S. 102 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Bean Dredging Corp. v. Dredge Technology Corp.*,
    744 F.2d 1081 (5th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11, 12

*Bearry v. Beech Aircraft Corp.*, 818 F.2d 370 (5th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Bhatia v. Dischino*, 2011 WL 3820825 (N.D. Tex. Aug. 29, 2011). . . . . . . . . . . . . . . . . . . 4

*Brooks & Baker, LLC v. Flambeau*, 2011 WL 4591905 (E.D. Tex. Sept. 30, 2011). . . . . . . 18, 20

*Bullion v. Gillespie*, 895 F.2d 213 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985). . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8, 9

*Conax Fla. Corp. v. Astrium, Ltd.*, 49 F. Supp. 2d 1287, 1294 (M.D. Fla. 2007). . . . . . . . . . . . 6

*Coulter v. Sears, Roebuck & Co.*, 426 F.2d 1315 (5th Cir. 1970). . . . . . . . . . . . . . . . . . . . . . 12

*D.J. Investments, Inc. v. Metzler Motorcycle Tire Agent Gregg, Inc.*,
    754 F.2d 542 (5th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Dalton v. R & W Marine, Inc.*, 897 F.2d 1359 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . 16

*Dram Technologies, LLC v. America II Group, Inc.*,
    2011 WL 4591902 (E.D. Tex. Sept. 30, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*Fond du Lac County v. Mentzel*, 195 Wis.2d 313 , 536 N.W.2d 160 (Wisc. Ct. App. 1995) . . . 17

*Frito-Lay N. Am., Inc. v. Medallion Foods, Inc.*,
    2012 WL 1108427 (E.D. Tex. Mar. 30, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Good v. Prudential Ins. Co. of Am.*, 5 F. Supp. 2d 804 (N.D. Cal. 1998). . . . . . . . . . . . . . . . . 24

*Graham v. Hamilton*, 2012 WL 893748 (W.D. La. Mar. 15, 2012). . . . . . . . . . . . . . . . . . . . . 18

*Ham v. La Cienega Music Co.*, 4 F.3d 413 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

*Hedrick v. Daiko Shoji Co., Ltd., Osaka*, 715 F.2d 1355 (9th Cir. 1983). . . . . . . . . . . . . . . . . . 25

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1994). . . . . . . . . . . . . . . . 6, 7

*In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig.*,
424 F. Supp. 504 (J.P.M.L. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 767 F. Supp. 2d
649 (E.D. La. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re General American Life Ins. Co. Sales Practice Litig.*,
391 F.3d 907 (8th Cir. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re Ikon Office Solutions, Inc. Sec. Litig.*, 86 F. Supp. 2d 481 (E.D. Pa. 2000). . . . . . . . . . . . . 4

*In re Korean Airlines Disaster of September 1, 1983*, 829 F.2d 1171 (D.C. Cir. 1987). . . . . . . . 4

*In re Managed Care Litig.*, 298 F. Supp. 2d 1259 (S.D. Fla. 2003). . . . . . . . . . . . . . . . . . . . . . . 4

*In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480 (D. Del. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . 4

*International Shoe Co. v. State of Washington*, 326 U.S. 310 (1945). . . . . . . . . . . . . . . . . . . . 6, 7

*Irving v. Owens-Corning Fiberglas Corp.*, 864 F.2d 383 (5th Cir.),
*cert. denied*, 493 U.S. 823 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*ITL International, Inc. v. Constenla, S.A.*, 669 F.3d 493 (5th Cir. 2012). . . . . . . . . . . . . . . . . . 23

*J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011). . . . . . . . . . . . . . . . . . . . passim

*Londo v. Medtronic, Inc.*, 2008 WL 94768 (W.D. La. Jan. 4, 2008). . . . . . . . . . . . . . . . . . . . . . 24

*Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465 (5th Cir. 2006). . . . . . . . . . . . . . . . 5, 14, 21, 22

*Marks v. United States*, 430 U.S. 188 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*McFadden v. Fuyao North Am., Inc.*, 2012 WL 1230046 (E.D. Mich. Apr. 12, 2012). . . . . . . . . 20

*McFadin v. Gerber*, 587 F.3d 753 (5th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*McGee v. Int'l Life Ins. Co.*, 355 U.S. 220 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Menowitz v. Brown*, 991 F.2d 36 (2nd Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Nuovo Pignone, SpA v. Storman Asia M/V*, 310 F.3d 374 (5th Cir. 2002). . . . . . . . . . . . . 8, 10, 14

*Oswalt v. Scripto, Inc.*, 616 F.2d 191 (5th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . 26

*Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809 (5th Cir. 2006). . . . . . . . . . . . . . . . . 4, 14

*Ruston Gas Turbines, Inc. v. Donaldson Company, Inc.*,
  9 F.3d 415 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . 7

*Shaffer v. Heitner*, 433 U.S. 186 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Stabilisierungsfonds Fur Wein v. Kaiser, Stuhl Wine Distributors Pty. Ltd.*,
  647 F.2d 200 (D.C. Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Travelers Health Assn. v. Virginia*, 339 U.S. 643 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*UTC Fire & Sec. Americas Corp. v. NCS Power, Inc.*,
  2012 WL 423349 (S.D.N.Y. Feb. 10, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*Van Dusen v. Barrak*, 376 U.S. 612 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Walk Haydel & Associates, Inc. v. Coastal Power Prod. Co.*,
  517 F.3d 235 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208 (5th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980). . . . . . . . . . . . . . . . . . . . passim

*Wyatt v. Kaplan*, 686 F.2d 276 (5th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Statutes**

28 U.S.C. § 1407. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**Rules**

Rule 12(b)(2) of the Federal Rules of Civil Procedure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**Other Authorities**

Alan L. Farkas, "Trimming the Claws of the Internet's Jurisdictional Reach,"
  46:3 TORT TRIAL & INSURANCE PRACTICE LAW J. 779 (Spring-Summer 2011). . . . . . . . 18

I.     **INTRODUCTION**

Taishan took advantage of the tremendous opportunity to sell its Chinese Drywall and related building materials in this country following Hurricanes Katrina and Rita in 2005, and the resulting critical shortage of domestic plasterboard available for the reconstruction of homes lost in the storms.  This Chinese manufacturer was aware of the drywall needs in the United States at the time and specifically targeted the Gulf Coast states, the East Coast, California and Nevada to sell its products.  From 2005 through 2009, Taishan sold more than 85.99 million square feet of Chinese Drywall and related products to customers in Virginia, Florida, Louisiana, New York, California, North Carolina, and other states.[2]  These sales totaled more than $8.52 million.[3]

The evidence amassed during these proceedings, as set forth in the Affidavit of Russ M. Herman, demonstrates clearly that Taishan targeted the United States generally, and Virginia, Florida, and Louisiana, in particular, for sales of its Chinese Drywall, knowing that the drywall would be used to build homes.  Taishan's efforts to reach the jurisdictions in question include all of the following activities, in combination:

•       Taishan promoted itself as a worldwide export company, advertising its products on the Internet through its own company website and through Alibaba.com and in product brochures[4];

---

[2]  *See* Exs. 1 & 164 to the Affidavit of Russ M. Herman ("Herman Aff."), attached as Exhibit A to the PSC's Global Statement of Facts ("PSC Global SOF"), filed herewith.  These sales figures are based on TG's and TTP's profile forms as well as the invoices that Taishan produced in discovery. Taishan's documents, however, indicate that Taishan exported to the U.S. tens of millions of additional square feet of drywall that were never disclosed in Taishan's profile forms.  For example, Taishan's correspondence reveals that in 2006 alone, this company exported 18 million square meters (*i.e.*, >193 million square feet) of drywall to the United States.  *See* Herman Aff. Exs. 10 (TG22595) & 16 (TG22728).  Taishan did not produce any invoices or export reports for this additional drywall in spite of this Court's discovery Orders.

[3]  *Id*.

[4]  PSC Global SOF at 8-10; Herman Aff. Exs. 5 & 22.

1

•        Taishan entered into a sole agency contract with Oriental Trading Company in Florida, with a territory that included the entire United States.[5]  Taishan also contracted with Venture Supply Company in Virginia to sell Taishan's products in Virginia and nationwide[6];

•        Apart from its agency contracts, Taishan welcomed potential customers from America to visit its plants in China so that they could get a tour of the facilities, providing them with ASTM reports and assurances that Taishan's drywall could be manufactured using American as opposed to metric measurements[7];

•        Taishan agreed to custom manufacture its drywall to: include the customers' names and/or location on the drywall label and bonding tape[8]; alter the Taishan DUN brand logo to appear in the red-white-and-blue colors of the American flag[9]; and add U.S. bar codes for ease of check-out in American stores[10];

•        Taishan custom manufactured metal studs for use with its drywall, which included the customer's name on the studs[11];

•        Taishan availed itself of the U.S. postal service, Federal Express and DHL to ship actual drywall samples to customers in Louisiana, Florida, California and New York[12];

•        Taishan provided potential customers in the United States with price quotes in

---

[5]  PSC Global SOF at 11-14; Herman Aff. Ex. 20.

[6]  PSC Global SOF at 30-34; Herman Aff. Exs. 80 & 81.

[7]  PSC Global SOF at 16-18, 20-22 & n.89-94, n.97; Herman Aff. Ex. 57-59.

[8]  PSC Global SOF at 17-18 & n.74, n.75, n.76.

[9]  PSC Global SOF at 17 & n.72, n.73.

[10]  PSC Global SOF at 18 & n.77.

[11]  PSC Global SOF at 49 & n.226.

[12]  PSC Global SOF at 19-20; Herman Aff. Exs. 34-35, 49-56.

U.S. Dollars for its drywall and related products[13];

•        Taishan researched shipping costs for customers to final destinations in Florida, Virginia, Louisiana, Mississippi, New York, California, Nevada, Georgia, North Carolina and South Carolina[14];

•        Taishan contracted with customers directly in Virginia, Florida, Louisiana, California, and New York for sales of its drywall[15];

•        Taishan made the arrangements for its drywall to be shipped from China to Virginia, Florida, Louisiana, California, New York and elsewhere, and included wooden pallets and hanging belts for the shipping and even paid for the freight and insurance on occasion[16]; and

•        Taishan followed up with its American customers to resolve disputes and maintain customer relations.[17]

Plaintiffs have plainly shown that Taishan targeted the jurisdictions of Virginia, Florida, Louisiana and others, with the intention of selling its products there; Taishan entered into contracts with customers in those jurisdictions (often for made-to-order drywall and supplies); and then Taishan shipped its drywall directly to the targeted cities and ports in the United States. Taishan's defense consists of a disclaimer that the company had no idea where its drywall would end up, because:  "We don't really know where exactly was the destination of the customer. . . . [and] we don't really know exactly where the shipment was shipped to."[18]  This contention is

---

[13]  Herman Aff. Exs. 7, 8, 31, 33; PSC Global SOF at 3 n.8, 15-16.

[14]  PSC Global SOF at 22-23 & n.100-105, 50 & n.232; Herman Aff. Exs. 61-66, 106, 118, 127.

[15]  *See* Herman Aff. Ex. 1, 13, 14, 80, 81, 86, 100, 103, 123, 157, 164.

[16]  PSC Global SOF at 22-25 & n.106-109, 38-39 & n.167-168; Herman Aff. Exs. 67-68, 91-98.

[17]  PSC Global SOF at 51, 56-61.

[18]  Herman Aff. Ex. 6 (Deposition of Che Gang dated 1/11-12/2012) at 69:15-20.  *See also id*. at 326:18-19, 392:20-24, 401:9-403:16.

without merit and contrary to all the evidence demonstrating Taishan's intention to sell more drywall in the United States, to customers in Virginia, Louisiana, and Florida, following Hurricanes Katrina and Rita.  Accordingly, on this basis alone Taishan's jurisdictional motions should be denied.[19]

## II.   ARGUMENT

### A.   This Court May Exercise Jurisdiction over Taishan Because it Purposefully Sold its Drywall Products to Customers in the United States with the Expectation They Would Be Delivered to Virginia, Florida, Louisiana, California and Other States.

A federal court sitting in diversity may exercise *in personam* jurisdiction over a foreign defendant if:  "(1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) the exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution."  *Ruston Gas Turbines, Inc. v. Donaldson Company, Inc.*, 9 F.3d 415, 418 (5th Cir. 1993); *Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 812 (5th Cir. 2006).[20]  On a motion to dismiss for lack of personal jurisdiction, the

---

[19]  Further, as this Court is aware, Plaintiffs have been precluded from taking any formal discovery of Taishan's upstream entities CNBM and BNBM, as set forth in Russ Herman's Affidavit and the PSC's Global Statement of Facts (at 88-89).  However, based on public records obtained by the Plaintiffs, it is fair to infer that Taishan has additional ties to the United States through the complex series of interrelated companies and groups created by and through China National Building Material Company, Limited ("CNBM") and Beijing New Building Materials, Ltd. ("BNBM"), which appear to control Taishan.  *See* PSC Global SOF at 71-77; Herman Aff. Exs. 130-144, 185-187, Rec. Doc. No. 9568.

[20]  As the transferee court in this  MDL proceeding, this Court follows a prescribed analysis attending the choice of law for actions subject to transfer here.  For diversity actions originally filed in another jurisdiction, the state law of the transferor jurisdiction in which the case was originally filed applies.  *Van Dusen v. Barrak*, 376 US 612 (1964); *In re General American Life Ins. Co. Sales Practice Litig.*, 391 F.3d 907, 911 (8th Cir. 2004); *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1297 (S.D. Fla. 2003).  The transferee court, however, applies the federal law of the Circuit Court in which the transferee court resides.  *Menowitz v. Brown*, 991 F.2d 36, 40 (2nd Cir. 1993).  *See In re Korean Airlines Disaster of September 1, 1983*, 829 F.2d 1171, 1175 (D.C. Cir. 1987); *In re Ikon Office Solutions, Inc.*, *Sec. Litig.*, 86 F. Supp. 2d 481, 484 (E.D. Pa. 2000); *In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 501 (D. Del. 2001); *Bhatia v. Dischino*, 2011 WL 3820825, *5 (N.D. Tex. Aug. 29, 2011).  As this Court explained earlier in this litigation: "It appears to be reasonably well established, given the plethora of cases on the point, that in actions in which a federal court would be guided or governed by state law, the

Plaintiffs need only make a *prima facie* showing that jurisdiction lies over the defendant where the motion is predicated "solely on affidavits and depositions," as is the case with Taishan's four jurisdictional motions.  *See Irving v. Owens-Corning Fiberglas Corp.*, 864 F.2d 383, 384 (5th Cir.), *cert. denied*, 493 U.S. 823 (1989); *Ham v. La Cienega Music Co.,* 4 F.3d 413, 415 & n.4 (5th Cir. 1993).  The Fifth Circuit Court of Appeals has held that "on a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of determining whether a *prima facie* case for personal jurisdiction exists." *Ruston Gas*, 9 F.3d at 418 n.3; *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990), *quoting*, *D.J. Investments, Inc. v. Metzler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 546 (5th Cir. 1985); *accord Wyatt v. Kaplan*, 686 F.2d 276, 280 (5th Cir. 1982); *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006).[21]

Then, "[o]nce a plaintiff establishes minimum contacts between the defendant and the forum state, the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable." *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999).

---

transferee court is bound to apply the law that the transferor court would follow. . . . in cases involving federal questions, the transferee court follows the interpretation of federal law that has been established by its own court of appeals."  *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 767 F. Supp. 2d 649, 656 n.2 (E.D. La. 2011) (citations omitted).

[21]  Taishan suggests that Plaintiffs have the burden of proving personal jurisdiction by a preponderance of the evidence standard since, they contend, the Court is conducting an evidentiary hearing on their motion to dismiss.  While personal jurisdiction must be established by a preponderance of the evidence following an evidentiary hearing, *see Walk Haydel & Associates, Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241-42 (5th Cir. 2008), Taishan's jurisdictional motions are currently set for oral argument as opposed to an evidentiary hearing.  Thus, only a *prima facie* showing by the Plaintiffs is required.  Furthermore, although some jurisdictional discovery has been completed with respect to Taishan, the completion of this discovery does not elevate the burden of proving personal jurisdiction by a preponderance of the evidence.  Under analogous circumstances involving motions to dismiss by comprehensive general liability insurers, this Court applied a *prima facie* standard even though the parties had completed jurisdictional discovery.  *See Chinese Drywall*, 767 F. Supp. 2d at 656.  In any event, Plaintiffs contend that the evidence presented in their response meets the higher standard proposed by Taishan, even though that is not required under the law.

At that point, the defendant must make a "compelling case." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

Each of the long-arm statutes applicable to the jurisdictions impacted by Taishan's motions to dismiss – Virginia (*Germano*), Florida (*Mitchell*) and Louisiana (*Gross/Wiltz*) – extends personal jurisdiction over a non-resident defendant to the extent permitted by Due Process. *See, e.g.*, *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002), *cert. denied*, 8 U.S. 1035 (2003) (Virginia); *Bean Dredging Corp. v. Dredge Technology Corp.*, 744 F.2d 1081, 1083 (5th Cir. 1984) ("The Louisiana Long-Arm Statute is to be interpreted liberally in favor of finding jurisdiction . . . and is to extend to the full limits of due process under the fourteenth amendment."); *Conax Fla. Corp. v. Astrium, Ltd.*, 49 F. Supp. 2d 1287, 1294 (M.D. Fla. 2007). Under the Fourteenth Amendment, this Court may exercise *in personam* jurisdiction over Taishan.

> **1.   *This Court May Exercise Jurisdiction over Taishan under the Due Process Clause of the Fourteenth Amendment.***

The Due Process Clause of the Fourteenth Amendment limits the Court's power to assert *in personam* jurisdiction over a non-resident by guaranteeing that no federal court may assume jurisdiction over a foreign defendant unless the defendant has meaningful "contacts, ties, or relations" with the forum state. *International Shoe Co. v. State of Washington*, 326 U.S. 310, 319 (1945); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413-14 (1994). The "constitutional touchstone" of the inquiry to determine whether this Court may exercise personal jurisdiction over Taishan is whether the defendant "purposefully established minimum contacts in the forum State." *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 108-09 (1987), *quoting Burger King*, 471 U.S. at 474.

Jurisdiction may be general or specific. When a defendant's contacts with the forum are "continuous and systematic," a federal court may exercise "general" jurisdiction over any action

brought against that defendant regardless of its relation to the contacts in the forum. *Helicopteros*, 466 U.S. at 414 n.9 & 415.  Where contacts are less pervasive, the court may still exercise "specific" jurisdiction "in a suit arising out of or related to the defendant's contacts with the forum."  *Id.* at 414 n.8; *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987). Here, Plaintiffs contend only that specific jurisdiction exists.  All of the alleged causes of action before this Court arise out of and are related to Taishan's activities directed to sales of its Chinese Drywall and other drywall products to customers in Virginia, Florida, Louisiana, California, and other states.

Under these circumstances, the Fifth Circuit has adopted a three-step inquiry to determine whether the Court may exercise specific jurisdiction over Taishan.  In adjudicating this issue, this Court must determine:

(1) whether the defendant has minimum contacts with the forum state, *i.e.*, whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there;

(2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and

(3) whether the exercise of personal jurisdiction is fair and reasonable.

*See Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006), *citing Burger King*, 471 U.S. 462, 474 (1985); *International Shoe*, 326 U.S. at 316-19.  *See also Ruston Gas*, 9 F.3d at 419.  If each of these elements are met, the Court may exercise jurisdiction over the foreign defendant.

> **2.      *Taishan's Activities Directed at Sales in Virginia, Florida, and Louisiana Constitute "Minimum Contacts."***

A court may exercise "specific jurisdiction" over a non-resident defendant when the lawsuit arises from or relates to the defendant's contacts with the forum state.  The "minimum

contacts" test for specific jurisdiction is satisfied by actions, or even just a single act, where the non-resident defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Ruston Gas*, 9 F.3d at 419, *quoting Burger King*, *supra*. The non-resident's "purposeful availment" must be such that the defendant "should reasonably anticipate being haled into court" in the forum state. *Id.*, *quoting World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

In *World-Wide Volkswagen*, the Supreme Court recognized that placing a product into the stream of commerce with knowledge that the product will be used in the forum state is enough to constitute minimum contacts. *World-Wide Volkswagen*, 444 US at 297-98 ("if the sale of a product of a manufacturer . . . arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its products in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others."). Provided a corporation "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State," *id.*, a court may properly exercise personal jurisdiction over the defendant.

"The Fifth Circuit is among the circuits that have interpreted *World-Wide Volkswagen* to hold that 'mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce." *Ruston Gas*, 9 F.3d at 419 (citations omitted). Thus, even just "[a] single act by the defendant *directed at the forum state* . . . can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Ruston Gas*, 9 F.3d at 419 (emphasis added); *Bearry*, 818 F.2d at 374 ("In specific jurisdiction cases, the defendant may have, at a minimum, one contact with the forum state - the product or conduct that caused injury there."); *Nuovo Pignone, SpA v. Storman Asia M/V*, 310 F.3d 374, 379 (5th Cir. 2002); *Ham*, 4 F.3d 413, 415-16 (5th Cir. 1993); *Dalton v. R & W Marine, Inc.*, 897 F.2d 1359, 1361 (5th Cir. 1990).

Even if the defendant does not physically enter a state, the purposeful negotiation of a contract with a business entity in the forum state may subject the defendant to personal jurisdiction within that state. *Burger King*, 471 U.S. at 472; *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222-23 (1957). In *Burger King*, a Michigan franchisee negotiated a contract with a Florida franchisor, Burger King. After the Michigan franchisee breached its agreement with Burger King, the franchisor sued it in federal court in Florida. "[W]ith respect to interstate contractual obligations," the Supreme Court ruled that parties who "'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Id.* at 473, *quoting Travelers Health Assn. v. Virginia*, 339 U.S. 643, 647 (1950).

In today's modern age, Due Process does not require that the defendant physically enter the forum or know the identity of the ultimate user of the product. The Supreme Court has recognized that:

> [a]lthough territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Burger King*, 471 U.S. at 476; *see also Asahi*, 480 U.S. at 117 ("A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State and indirectly benefits from the State's laws that regulate and facilitate commercial activity.") (Brennan, J., concurring in part and concurring in the judgment); *Irving*, 864 F.2d at 386 ("Personal jurisdiction does not require certain knowledge of the user's identity. . . . even a nonresident defendant's out-of-state activities can establish the necessary minimum

contacts if those activities have 'reasonably foreseeable consequences' within the forum state.");
*Nuovo Pignone*, 310 F.3d at 380 ("As a voluntary member of the economic chain that brought
the [product] to Louisiana, [the defendant] purposely has availed itself of the privilege of
conducting business in that state.").

In *Asahi*, 480 U.S. 102 (1987), a Japanese component manufacturer of valve stems
(Asahi) was brought into an action in a California state court as a third-party defendant on an
indemnity claim by a Taiwanese tire manufacturer.  Asahi claimed that it never contemplated that
its sales of component parts to the tire manufacturer in Taiwan would subject it to litigation in
California.  A splintered Supreme Court agreed that fair play and substantial justice would be
offended by requiring Asahi to defend itself against indemnity claims in California over sales that
occurred strictly between Japan and Taiwan.  *Id*. at 116 (Brennan, J., concurring).  However, due
to the fractured panel, the Supreme Court upheld the *World-Wide Volkswagen* principle that
placing a product into the stream of commerce *with the expectation* that the product will go to a
particular jurisdiction is sufficient to confer personal jurisdiction over a person.  *Id*. at 120
(emphasis added).  The Supreme Court maintained that the regular and anticipated flow of a
product in the stream of commerce, with awareness that such product is marketed in the forum
state, is enough for a defendant to expect to be haled into court in that forum.  *Id*. at 116.

The concurring opinion in *Asahi* focused upon the fact that Asahi was aware that the tires
at issue were being distributed in the forum state, that Asahi knew it benefited economically from
these sales, and that the tire manufacturer was making regular and extensive sales of the final
product in the forum state.  480 U.S. at 121.  Four members of the Court in *Asahi*, in the plurality
opinion written by Justice O'Conner, proposed that due process requires more.  The plurality
suggested that "additional conduct" must be presented through "an action of the defendant
purposefully directed towards the forum state."  *Id*. at 112.  The plurality posited that mere
awareness of a product's possible entry into the forum state through the stream of commerce was

insufficient to invoke jurisdiction.  *Id.*  The plurality's "stream-of-commerce-plus" analysis

provided examples of additional conduct that would suffice to meet the test:  (1) showing an

intent or purpose to serve the market in the forum state; (2) designing the product for that state's

market; (3) advertising in the forum state; (4) establishing channels to provide regular advice to

customers in the forum state; or (5) marketing the product through a distributor-agent in the

forum state.  *Id.*

> In interpreting *Asahi*, the Fifth Circuit in *Ruston Gas* stated:

>> In the years after *Asahi*, **the Fifth Circuit has continued to follow the original "stream-of-commerce" theory established in the majority opinion of *World-Wide Volkswagen*, and has rejected the "stream-of-commerce-plus" theory advocated by the *Asahi* plurality**.  *Irving v. Owens-Corning Fiberglass Corp.*, 864 F.2d 383, 386 (5th Cir.), *cert. denied sub nom. Jugometal Enters for Import and Export of Ores and Metals v. Irving*, 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 49 370, 375 (5th Cir.1987) (noting that "[t]he dimension of the 'stream of commerce' doctrine now divides the Supreme Court" and referring to the "uncertainty" evident in *Asahi*).  In *Irving*, 864 F.2d at 386, this circuit stated:

>>> "Because the [Supreme] Court's splintered view of minimum contacts in *Asahi* provides no clear guidance on this issue, we continue to gauge [the non-resident defendant]'s contacts with Texas by the stream of commerce standard as described in *World-Wide Volkswagen* and embraced in this circuit."

9 F.3d at 420 (emphasis added).

> However, well-established 5th Circuit precedent would support exercising personal

jurisdiction over Taishan in this case, regardless of whether the *World-Wide Volkswagen* or *Asahi*

plurality standard were followed:

> In *Bean Dredging*, 744 F.2d 1081, for example, the Fifth Circuit held that where a

component manufacturer based in Washington state put its steel castings into the stream of

commerce and two of those castings were incorporated into cylinders that became the subject of

a defective dredge in Louisiana, sufficient contacts with Louisiana existed to justify the exercise

of jurisdiction over the Washington defendant.  *Bean Dredging*, 744 F.2d at 1085.  In that case, the component manufacturer:  (1) never knew where the two castings were used; (2) "had no knowledge of the end-product into which the castings would be incorporated"; (3) "never sold directly to a company in Louisiana"; (4) "did not know whether any castings went to Louisiana"; (5) "never sold its products directly to any Louisiana company nor did Louisiana personnel travel to Washington to negotiate with [the company]"; (6) "did not solicit business in Louisiana"; and (7) "did not own property in the state."  *Id*. at 1082.  Notably, the president of the component manufacturer in *Bean Dredging* acknowledged that "once [the castings] entered the stream of commerce, [they] might go virtually anywhere" in the United States.  *Id.*

The Fifth Circuit upheld jurisdiction over a foreign manufacturer of lighters in *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 199-200 (5th Cir. 1980) under similar circumstances.  There, the defendant company delivered millions of lighters to a distributer in the United States and "[t]here [wa]s nothing in th[e] record to indicate that [the manufacturer] attempted in any way to limit the states in which the lighters could be sold.  To the contrary, the record show[ed] that [the manufacturer] had every reason to believe its product would be sold to a nation-wide market."  *See also Coulter v. Sears, Roebuck & Co.*, 426 F.2d 1315, 1318 (5th Cir. 1970) ("When a manufacturer voluntarily chooses to sell his product in a way in which it will be resold from dealer to dealer, transferred from hand to hand and transported from state to state, he cannot reasonably claim that he is surprised at being held to answer in any state for the damage the product causes.  Nor can he deny the substantial interest of the injured person's state in providing a convenient forum for its citizens.").

In *Irving*, 864 F.2d 383, the Fifth Circuit reversed on jurisdictional grounds a lower court's dismissal of an action brought against a Yugoslavian seller/distributor of asbestos by workers exposed to the asbestos at a Texas plant.  *See id.* at 388.  In that case, the foreign seller/distributor had obtained the raw asbestos from a mine in Yugoslavia and then hired an

American broker that distributed the product and sold it to the Texas plant.  There was no evidence in that case to "indicate[] that [the Yugoslavian seller], which was not qualified to do business in Texas and solicited no asbestos sales directly in Texas, knew [the Texas plant] was the ultimate purchaser.  [The seller] kept no offices, employees or property in Texas."  *Id.* at 384. Likewise, the seller did not know the injured Texan workers.  Yet, the Fifth Circuit found that its contacts with Texas were sufficient to confer jurisdiction over the company because:  (1) it "conveyed the asbestos to a freight forwarder for shipment to Houston"; (2) it "shared the cost of quality-control testing by a Houston lab"; (3) it "received [the broker's] debits for ... bag-cleaning charges of another Houston company"; and most importantly, (4) the seller "accepted payments for the asbestos and stored it."  *Id.* at 386.

In *Ruston Gas*, 9 F.3d at 419, the Fifth Circuit reversed a lower court decision dismissing for lack of personal jurisdiction a Minnesota third-party subcontractor component manufacturer for an air-infiltration system, which was brought into litigation in Texas on an indemnity/ contribution claim.  In that case, in an effort to avoid the Texas suit the component manufacturer alleged that it:  (1) "does not conduct business or maintain a place of business in Texas"; (2) "does not employ or maintain a sales representative or manufacturer representative in Texas"; (3) "has not recruited any employees in Texas"; (4) "has not designated a registered agent for service of process in Texas"; (5) "has not contracted by mail with any Texas resident whereby the contract was to be performed in whole or part in Texas"; and (6) "has not committed a tort in Texas."  *Id.*, 9 F.3d at 417.  In addition, the company claimed that:  "all of its actions related to its contract with [the principal manufacturing defendant] occurred in Minnesota"; its product was "shipped FOB Waseca, Minnesota"; and "it had no direct contract with [the ultimate buyer] and no verbal, written, or any other communication with [the buyer] regarding the sale of the equipment at issue."  *Id.*  Further, the component manufacturer contended that "its only communications were with [the principal manufacturing defendant in Minnesota and] none of its

13

employees communicated with or performed any work with persons in Texas in fabricating, manufacturing or delivering the equipment." *Id*.

Nevertheless, the Fifth Circuit held in *Ruston Gas* that due process was satisfied in Texas where the Minnesota component company had knowledge that its parts would be shipped to Texas and that a Texas company would purchase the systems into which they were placed. *Id*. In addition, there was evidence that the component manufacturer had shipped its parts on other occasions to additional customers in Texas. *Id*. at 417-18.

Other Fifth Circuit jurisprudence is consistent with the foregoing. *See*, *e.g.*, *Paz*, 445 F.3d at 813 (finding jurisdiction in Mississippi over non-resident defendant even though all relevant transactions "took place entirely in California and [defendant] conduct[ed] no activity whatsoever in Mississippi," since defendant was aware that its product would be used in the forum state); *Luv n' care*, 438 F.3d at 470-71 (finding jurisdiction in Louisiana over Colorado company that manufactured bottles sold to retailer, even though retailer purchased and picked up bottles in Colorado for delivery to distribution centers and their agreement never mentioned any distribution to forum state; fact that employees had no actual knowledge that product was destined for Louisiana did not shield manufacturer from jurisdiction when electronic purchase orders mentioned the forum state); *Nuovo Pignone*, 310 F.3d at 379, 381 (agreement to provide product that was ultimately destined for forum state of Louisiana sufficient to confer jurisdiction even though defendant's obligations under contract were performed in Italy and defendant never contracted with any entity from Louisiana but with only third-party intermediaries).

### 3.   *McIntyre Does Not Change the Conclusion That Jurisdiction Over Taishan Is Proper in this Case.*

Taishan contends that the Supreme Court's recent decision in *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011), uprooted Fifth Circuit "stream of commerce" jurisprudence. Taishan further contends that, post-*McIntyre*, there is no personal jurisdiction

over a foreign defendant absent evidence that the defendant was actively in the forum state marketing or selling its products.  Taishan's arguments should be rejected because:  1) *McIntyre*'s plurality opinion is not binding and, therefore, cannot be held to have changed Fifth Circuit law, which supports the exercise of jurisdiction over Taishan; 2) the jurisdictional "minimum contacts" that the plurality and the concurrence held were lacking in *McIntyre*, are present in this case; 3) a majority of the *McIntyre* Court – the two Justices in the concurrence and the three dissenters – all expressly rejected the rule espoused by Taishan; and 4) the concurrence in *McIntyre* left open the question of whether a foreign defendant could be subject to suit in a state where it marketed its products *via* the internet.

The Supreme Court's plurality decision in *McIntyre*[22] reversed a judgment of the New Jersey Supreme Court, which held that federal "courts can exercise jurisdiction over a foreign manufacturer of a product so long as the manufacturer 'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states.'"  *Id*. at 2785 (emphasis added).  In the case of J. McIntyre Machinery, the British manufacturing defendant did not market its machinery in New Jersey where the accident occurred, and did not ship any of its machines to New Jersey.  In fact, only one of the defendant's machines ever found its way to New Jersey, and that was the unit that caused plaintiff's injury.  The foreign manufacturer's representatives did attend annual conventions in the United States for the scrap metal industry to advertise its machines, but never in New Jersey; and the company contracted with an independent distributor in Ohio to sell its product in the United States.  *Id*. at 2786.

The plurality opinion, penned by Justice Kennedy, framed the issue as:

> Whether a person or entity is subject to the jurisdiction of a state

---

[22]  Only four Justices joined in the plurality opinion; two other Justices joined in the outcome based on the specific facts at issue, but not the reasoning of the plurality; and three Justices dissented.

> court despite not having been present in the State either at the time
> of suit or at the time of the alleged injury, and despite not having
> consented to the exercise of jurisdiction[.]

*McIntyre*, 131 S.Ct. at 2785.  Consistent with traditional Supreme Court jurisprudence on personal jurisdiction, the plurality observed that "[i]n products-liability cases like this one, it is the defendant's purposeful availment that makes jurisdiction consistent with 'traditional notions of fair play and substantial justice.'"  *Id*. (citations omitted).  The plurality explained that purposeful availment occurs "through contact with and activity directed at a sovereign[, which] may justify specific jurisdiction 'in a suit arising out of or related to the defendant's contacts with the forum.'"  *Id.* at 2788 (citations omitted).  Under the plurality opinion, "[t]he defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State."  *Id.*  However, "a defendant may in an appropriate case be subject to jurisdiction without entering the forum – itself an unexceptional proposition – as where manufacturers or distributors 'seek to serve' a given State's market.  The principal inquiry in cases of this sort is whether the defendant's activities manifest an intention to submit to the power of a sovereign."  *Id.* (citations omitted).  One example of this, as the plurality noted, occurs when the defendant sends its goods directly to the targeted forum:  "Sometimes a defendant [purposefully avails itself of the forum] by sending its goods rather than its agents."  *Id.*

The facts of *McIntyre*, which are in stark contrast to the factual scenario involving Taishan and its sales of Chinese Drywall in the United States, compelled the Court to rule that jurisdiction did not lie over the British defendant in that case.  Significantly, the record in the New Jersey trial court had established that the "<u>defendant does not have a single contact with New Jersey short of the machine in question ending up in this state</u>."  *Id.* (citing trial court slip. op.) (emphasis added).  Thus, the plurality concluded there was no jurisdiction, absent evidence

16

that the defendant "engage[d] in activities in New Jersey that reveal an intent to invoke or benefit from the protection of its laws." *Id*. at 2791.

Under the "narrowest grounds" approach, when analyzing a plurality decision of the Supreme Court, the narrowest rationale proffered by one of the concurring Justices is deemed to be the de facto "holding."[23]  A majority of the Court in *McIntyre* could not agree on the rationale espoused by Justice Kennedy – namely, that something more than defendant's physical presence or direct activities in the forum state is necessary for asserting personal jurisdiction.  Justice Breyer's concurrence expressly rested on Supreme Court precedent, characterizing the rule as one that "limit[s] jurisdiction when a defendant does not 'inten[d] to submit to the power of a sovereign' and cannot 'be said to have targeted the forum.'"  *See id.* at 2793 (Breyer, J., concurring).  The concurrence pointed out that Supreme Court precedent has long held that "a single sale to a customer who takes an accident-causing product *to* a different State (where the accident takes place) is not a sufficient basis for asserting jurisdiction."  *Id*. at 2792, *citing World-Wide Volkswagen*, 444 U.S. 286 (1980).  Moreover, the Supreme Court previously "has strongly suggested that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place."  *Id*., *citing Asahi*, 480 U.S. at 111, 112 (opinion of O'Connor, J.) (requiring "something more" than simply placing "a product into the stream of commerce," even if defendant is "awar[e]" that the stream "may or will sweep the product into the forum State"); *id.*, at 117 (Brennan, J., concurring in part and concurring in judgment) (jurisdiction should lie where a sale in a State is part of "the regular

---

[23]   *E.g.*, *Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."); *Fond du Lac County v. Mentzel*, 195 Wis.2d 313, 326, 536 N.W.2d 160 (Wisc. Ct. App. 1995) ("the narrowest ground is found when a concurring opinion articulates a legal standard with which a majority of the court from that case would agree.").

and anticipated flow" of commerce into the State, but not where that sale is only an "edd[y]," *i.e.*, an isolated occurrence); *id.*, at 122 (Stevens, J., concurring in part and concurring in judgment) (indicating that "the volume, the value, and the hazardous character" of a good may affect the jurisdictional inquiry and emphasizing Asahi's "regular course of dealing").

Courts analyzing *McIntyre* have uniformly agreed that Justice Breyer's concurrence serves as the holding of the Court, and that it rests on prior precedent without enunciating a new rule of broad application. *See Ainsworth v. Cargotec USA, Inc.*, 2011 WL 4443626, at *6 (S.D. Miss. Sept. 23, 2011), *mot. to certify appeal granted*, 2011 WL 6291812 (S.D. Miss. Dec 15, 2011); *Graham v. Hamilton*, 2012 WL 893748, at *3-4 (W.D. La. Mar. 15, 2012); *Brooks & Baker, LLC v. Flambeau*, 2011 WL 4591905, at *4 (E.D. Tex. Sept. 30, 2011); *Dram Technologies, LLC v. America II Group, Inc.*, 2011 WL 4591902, *2 (E.D. Tex. Sept. 30, 2011); *UTC Fire & Sec. Americas Corp. v. NCS Power, Inc.*, 2012 WL 423349, at *8 (S.D.N.Y. Feb. 10, 2012); *see also* Alan L. Farkas, "Trimming the Claws of the Internet's Jurisdictional Reach," 46:3 TORT TRIAL & INSURANCE PRACTICE LAW J., at 779 (Spring-Summer 2011) ("the implication [of *McIntyre*] appears to be that traditional minimum contacts analysis will remain the guiding princip[le] regardless of the vehicle by which business is conducted.").

According to the concurrence, the particular facts of *McIntyre* did not warrant the exercise of personal jurisdiction over the foreign defendant, given that there was "no specific effort by the British Manufacturer to sell in New Jersey." *McIntyre*, 131 S. Ct at 2792. For example, there was no evidence of a "list of potential New Jersey customers who might, for example, have regularly attended trade shows." *Id*. Moreover, there was no evidence that the manufacturer "purposefully avail[ed] itself of the privilege of conducting activities within New Jersey, or that it delivered its goods in the stream of commerce with the expectation that they will be purchased by New Jersey users." *Id*. (internal quotations omitted). Thus, based *solely* on the particular facts of the case and *existing* Supreme Court precedent, the concurrence in *McIntyre*

18

held that there was no personal jurisdiction over the British company.  *See id*. at 2794 ("I would adhere strictly to our precedents and the limited facts found by the New Jersey Supreme Court.").

Moreover, the concurrence in *McIntyre* found that the facts at hand were "an unsuitable vehicle for making broad pronouncements that refashion basic jurisdictional rules."  *Id*. at 2793. In criticizing the plurality's strict approach to jurisdiction, the concurring Justices pointed out that:

> The plurality seems to state strict rules that limit jurisdiction where a defendant does not "inten[d] to submit to the power of a sovereign" and cannot "be said to have targeted the forum."  **But what do those standards mean when a company targets the world by selling products from its Web site?  And does it matter if, instead of shipping the products directly, a company consigns the products through an intermediary (say, Amazon.com) who then receives and fulfills the orders?  And what if the company markets its products through popup advertisements that it knows will be viewed in a forum?  <u>Those issues have serious commercial consequences but are totally absent in this case.</u>**

*Id*. (emphasis added).

Thus, the well-established, accepted inquiry for purposes of exercising personal jurisdiction over a foreign defendant continues to be:  "whether, focusing upon the relationship between the defendant, the forum, and the litigation, it is fair, in light of the defendant's contacts with that forum, to subject the defendant to suit there."  *Id*., *citing Shaffer v. Heitner*, 433 U.S. 186, 204 (1977) (emphasis added).  *McIntyre* does not change existing Supreme Court law on the exercise of personal jurisdiction over a foreign defendant (*World-Wide Volkswagen*).  Rather, it is a holding more properly limited to the particular facts at issue in that case.

Several courts have found, post-*McIntyre*, that jurisdiction over foreign companies is proper considering activities such as (1) use of sales or marketing agents whose contacts could be

19

attributed to the foreign defendant[24]; (2) marketing the product to customers or purchasers in the forum state[25]; or (3) contracting with a purchaser in the state and shipping the products to the forum state.[26]  All such activities are reflected in the record of this case.

Taishan plainly demonstrated an intent or purpose to serve the markets in Florida, Virginia, Louisiana, California, New York, and elsewhere.  The evidence overwhelmingly establishes that Taishan marketed its products to the those jurisdictions from its own website, as well as on the Alibaba.com website.[27]  Taishan negotiated exclusive sales contracts with Oriental Trading Company ("OTC") and with Venture Supply Company ("Venture Supply") to sell Taishan's drywall not only in Florida and Virginia, but throughout the entire United States.[28] Taishan reached out to potential customers in Florida, Louisiana, California, and New York,

---

[24]  *See, e.g.*, *Ainsworth*, 2011 WL 4443626, at *7 (repeated sales to exclusive distributor who continued to sell to Mississippi sufficient for personal jurisdiction); *UTC*, 2012 WL 423349, at *9 (use of exclusive distributor who sold units in New York on behalf of defendant and gave defendant right and opportunity to refuse to make sale was "agency agreement" rather than "independent distributorship" alleged in *McIntyre*); *Brooks & Baker*, 2011 WL 4591905, at *3 (finding agreement with exclusive distributor to market and sell products sufficient to attribute contacts).

[25]  *See, e.g.*, *Frito-Lay N. Am., Inc. v. Medallion Foods, Inc.*, 2012 WL 1108427, at *5-6 (E.D. Tex. Mar. 30, 2012) (finding jurisdiction based upon intentional marketing and sales for distribution in Texas); *Brooks & Baker*, 2011 WL 4591905, at *3 (marketing and selling product in the state satisfied purposeful availment standard); *Dram Techs.*, 2011 WL 4591902, at *3 ("Therefore, based on these facts, the Court holds that Plaintiff has proven by a preponderance of the evidence that (1) Defendant Elite Semiconductor purposefully directed activities at residents of the state of Texas by virtue of its accused memory chips being sold in incorporated products within the state of Texas; (2) Plaintiff's claim arises out of those allegedly infringing activities; and (3) the assertion of personal jurisdiction is reasonable and fair in this case."); *UTC*, 2012 WL 423349, at *9 (finding personal jurisdiction based upon contracts for sales of the product, to and within New York").

[26]  *See, e.g.*, *McFadden v. Fuyao North Am., Inc.*, 2012 WL 1230046, at *4 (E.D. Mich. Apr. 12, 2012) (finding personal jurisdiction over Chinese company in Michigan and distinguishing *McIntyre* on the grounds that "[t]he Supreme Court relied on the fact that the defendant neither marketed in, nor shipped its goods directly to New Jersey, rather its marketing and sales efforts were directed at the United States.  In contrast, Fuyao Glass has contracted with a Michigan corporation to furnish materials within the state.") (citations omitted).

[27]  PSC Global SOF at 8-10.

[28]  PSC Global SOF at 11-14, 30-34; Herman Aff. Exs. 20, 80 & 81.

sending samples of its drywall to customers in those states for their consideration and testing.[29]
The company specifically designed its drywall to comply with ASTM standards in order to meet
its American customers' needs for use in the jurisdictions in question.[30]  Taishan provided quotes
for its products in U.S. Dollars and assistance with the costs and means of freight to specific
locations in the United States, including to:  Miami, Florida; Gulf Port, Mississippi; New
Orleans, Louisiana; Long Beach, California; Las Vegas, Nevada; Savannah, Georgia; Atlanta,
Georgia; Charleston, South Carolina; Wilmington, North Carolina; and San Juan, Puerto Rico.[31]
Taishan then packaged and shipped its drywall to specific ports and cities listed on Taishan's
invoices, special export reports and bills of lading.  In total, Taishan shipped more than 85.99
million square feet of its drywall, along with customized metal studs and pallets for shipping the
drywall, to customers in the sovereign jurisdictions in question.  This conduct surely satisfies the
measure of the "minimum contacts" required to exercise jurisdiction over a foreign manufacturer
as such as defendant.

    At a minimum, Plaintiffs have made a *prima facie* showing that Taishan was actually
aware, beyond a theoretical foreseeability, that its products would enter Virginia, Florida and
Louisiana (the facts prove that Taishan in fact intended and ensured that its products would be
sold in and delivered to those jurisdictions).  Taishan's principal defense against such knowledge
or inference is that its responsibility for the drywall ended at the dock in China because it sold its
drywall to "FOB China."  That "technicality of when title passes," however, affords Taishan no
protection for present purposes.  *See Luv N'care*, 438 F.3d at 471.  "Jurisdiction may attach both
to manufacturers who supply their own delivery systems and to those that make use of the

---

[29]  PSC Global SOF at 19-20; Herman Aff. Exs. 34-35, 49-56.

[30]  PSC Global SOF at 16-18 & n.72-77, 20-22 & n.89-94, n.97; Herman Aff. Ex. 57-59.

[31]  Ex. 10 to Che Dep. (email dated 4/17/2007 from Bill Cher to Ivan Gonima) (TG0000913-914)
(Herman Aff. Ex. "65").

distribution systems of others." *Id.* In *Luv N'care*, the defendant sold to a retailer bottles infringing upon Luv N'care's design with a total value of less than $9,000. The defendant's invoices were "FOB Colorado Springs" but had a "send to" destination of the retailer's distribution center's address in Louisiana, where Luv N'care resides. Although the defendant maintained that the retailer had complete control over the destination of the goods once title passed, the Fifth Circuit rejected this argument. It concluded, "that a F.O.B. term does not prevent a court from exercising personal jurisdiction over a non-resident defendant where other factors, such as the quantity and regularity of shipments, suggest that jurisdiction is proper." *Id.* at 472.

Moreover, it is disingenuous for Taishan to assert that it had no knowledge or information concerning whether any of the drywall it supplied in China would be distributed in Virginia, Florida, Louisiana, and elsewhere. Taishan's disclaimer that it "never had a role in the distribution or installation of drywall" in the jurisdictions in question flies in the face of Taishan's own billing and shipping records evidencing that the company transacted to sell and deliver its products to customers in the states at issue. Taishan's claims are as inconsistent with the record as they are self-serving.[32] *See, e.g., Luv n' care*, 438 F.3d at 470-71, *supra*.

### 4. *Fair Play and Substantial Justice Permit the Exercise of Jurisdiction Over Taishan*

To determine fundamental fairness, courts examine: "(1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the

---

[32] *E.g., Germano* Br. at 3. *See also* Che Gang Dep. (Herman Aff. Ex. 6) at 98:5-99:5, wherein the Court admonished Taishan's witnesses: "I'm the judge who will preside and is presiding over this case. I listen very closely to the evidence and to the testimony, and I'm trying to understand it. It's important for me in doing that to also determine the credibility of the witness. I mention that to you because I'm listening to what you're saying, and I just want you to know that. If you don't understand a question, say it, and it will be restated. But I'm concerned about some of the comments that you're making. I mention that to you because I want you to understand this process, which you may not understand."

judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies." *Ruston Gas*, 9 F.3d at 421; *Asahi*, 480 U.S. at 112; *World-Wide Volkswagen*, 444 U.S. at 292; *Irving*, 864 F.2d at 387.  The exercise of personal jurisdiction does not affect traditional notions of fair play when there is a nexus between the defendant's conduct and plaintiff's injury.  *ITL International, Inc. v. Constenla*, S.A., 669 F.3d 493, 500 (5th Cir. 2012).  It is rare to find that jurisdiction is not met when minimum contacts are shown.  *McFadin v. Gerber*, 587 F.3d 753, 759-60 (5th Cir. 2009).

Where non-resident defendants put products into the stream of commerce and those products cause harm to plaintiffs in the forum state, courts have consistently found that the exercise of personal jurisdiction over non-resident defendants does not offend traditional notions of fair play.  *See Ruston*, *supra*.  It is indisputable that there is a nexus between Taishan's conduct and the Plaintiffs' injuries.  Plaintiffs are seeking to recover based on injuries they suffered based on the drywall that Taishan purposely directed to their home states.  This drywall is defective and has caused harm to Plaintiffs.

Here, thousands of Plaintiffs named in *Germano*, *Mitchell*, *Gross*, and/or *Wiltz* have a strong interest in obtaining efficient relief before this Court for the damages caused to their homes by the defective drywall manufactured by Taishan.  Each of their cases was either filed as a direct action before this Court or transferred by the Judicial Panel on Multidistrict Litigation to the MDL.

In addition to the omnibus class action complaints,[33] the PSC has also filed protective actions that are designed to perfect claims against TG and TTP as well as other  related entities

---

[33]  The PSC has used the omnibus complaints to aggregate the Chinese Drywall litigation before this Court.  This process has helped to fulfill the function of the MDL by making this Court the gravitas of the Chinese Drywall litigation.  The use of omnibus complaints has facilitated the Court in bringing about settlements with the Knauf defendants, as well as settlements with Banner, L&W, InEx, and potentially with the insurance carriers.

such as BNBM and CNBM.  The PSC has filed such actions in California, Florida, Louisiana, and Virginia.  The PSC directly filed one of these actions, *Amorin, et al. v. Taishan Gypsum Co. Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, 11-cv-1395 (E.D. La.), in this Court on June 13, 2011.  The PSC filed similar actions that have been transferred to this Court from the Central District of California, *see Abner, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, 11-cv-3094 (E.D. La.), the Southern District of Florida, *see Amorin, et al. v. Taishan Gypsum Co. Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, 11-cv-1672 (E.D. La.), and the Eastern District of Virginia, *see Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, 11-cv-1673 (E.D. La.).  The PSC is in the process of serving each of these complaints on the named defendants.[34]

Thus, this Court has a strong interest in adjudicating the causes of action against Taishan. In situations involving cases pending in different districts with common questions of fact, one of the principal purposes of MDL transfer pursuant to 28 U.S.C. § 1407 is "to further judicial economy and to eliminate the potential for conflicting pretrial rulings."  *Good v. Prudential Ins. Co. of Am.*, 5 F. Supp. 2d 804, 809 (N.D. Cal. 1998); *Londo v. Medtronic, Inc.*, 2008 WL 94768, *1 (W.D. La. Jan. 4, 2008) (purpose of § 1407 is "the promotion of the just and efficient administration of the litigation"); *In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig.*, 424 F. Supp. 504, 507 (J.P.M.L. 1976) ("Indeed, one of the purposes of coordinated or consolidated pretrial proceedings is to streamline the efforts of the parties and witnesses, their counsel and the judiciary in order to effectuate an overall savings of cost and a minimum of inconvenience to all concerned.).

Even though Taishan is a Chinese company, the Supreme Court has stated that "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum will

---

[34]  *See* Affidavit of Ann Mickow, Civil Action Group/APS International, Ltd., dated 5/4/2012, at ¶¶ 7-11 (Herman Aff. Ex. 199).

justify even the serious burdens placed on the alien defendant." *Asahi*, 480 U.S. at 114-15; *see also Irving*, 864 F.2d at 387; *Hedrick v. Daiko Shoji Co., Ltd., Osaka*, 715 F.2d 1355, 1358 (9th Cir. 1983), *opinion withdrawn in part on other grounds sub nom.*, *Hedrick v. Pine Oak Shipping, S.A.*, 733 F.2d 1335 (9th Cir. 1984) (defendant manufacturer subject to jurisdiction in Oregon "when it produced a splice that it knew was destined for ocean-going vessels serving United States ports, including those of Oregon."); *Stabilisierungsfonds Fur Wein v. Kaiser, Stuhl Wine Distributors Pty. Ltd.*, 647 F.2d 200, 203 (D.C. Cir. 1981) (personal jurisdiction existed in Washington D.C. over Australian defendants who "arranged for introduction of their wine into the United States stream of commerce with the expectation ... that their products w[ould] be shelved and sold at numerous local outlets in diverse parts of the country."); 2 Moore's Federal Practice 4.41-1[4.1] (1987).

When weighing the interests of the Plaintiffs and this Court's efficient management of the MDL against Taishan's burden of defending claims related to damages caused by products it deliberately shipped to the jurisdictions at issue, due process is not offended by this Court's exercise of personal jurisdiction over the defendant. Thus, Taishan's jurisdictional motions should be denied.

### B. The Corporate Personalities of TG and TTP Have Been Commingled and TTP's Separate Personhood Can be Disregarded Under Chinese Law.

TTP was created by TG in 2006 as little more than a convenience of its customers requiring VAT invoices, principally its foreign customers. From TTP's inception to its discontinuation by TG, TTP and TG commingled their operations, observing only superficial corporate formalities. TG's leadership and employees staffed TTP, TG and TTP shared property indifferently and often without payment, the foreign sales business of TG merely continued through TTP during its short existence and returned back again to TG when TG decided to wind

down TTP's operations in 2008.[35]

Accordingly, the acts of each corporation should be attributed to the other for the purposes of determining this Court's jurisdiction over Taishan.

1.     *The Doctrine of Corporate Veil Piercing Under Chinese Corporate Law.*

Because TTP was incorporated in China, and was a Chinese company, Chinese Corporate law guides the Courts analysis. *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 646 (5th Cir. 2002). To assist the Court in rendering a decision under Chinese Corporate law, Plaintiffs have provided the opinions of three experts of Chinese law: (1) Dr. Liu Junhai, Professor of Law at Renin University of China,[36] who practices in China and was instrumental in the 2005 amendments to Chinese Corporate law that are at issue in this motion; (2) Bing Cheng, a lawyer who practices business law in China[37]; and (3) Dr. James Vincent Feinerman, Professor of Law at Georgetown University Law Center.[38]

---

[35] Taishan states that TG still "maintained its own international sales department" even after TTP was established. *Wiltz* Br. at 8; *Gross* Br. at 8; *Mitchell* Br. at 8. However, this is not credible. As Taishan also concedes in footnote 14 on that same page of its briefs, most of the customers that purchased TG's goods for export from China required the kind of VAT invoice that TG established TTP to issue. Indeed, according to the very testimony of Fu Tinghuan cited by Taishan, only one member of his staff who had worked with TG's foreign customers, Zhang Nan, remained behind at TG and was "in charge of trading, not necessarily exports." Deposition of Fu Tinghuan dated 1/10/2012 ("Fu Dep."), Herman Aff. Ex. 2, at 108:8-20.

[36] This is the same University where Taishan's expert, Dr. Zhu Yan, teaches. A simple review of the qualifications of each expert shows Dr. Liu's eminent qualifications over the matter squarely before the Court. Dr. Liu has been a lawyer and a professor for more time than Dr. Zhu, and unlike Dr. Zhu, Dr. Liu has been instrumental in the formation and application of Chinese Corporate law, particularly as regards the provisions relating to corporate veil piercing. *See* Affidavit of Prof. Dr. Liu Junhai dated 5/4/2012 ("Prof. Liu Junhai Aff.") at ¶¶ 2-39, 46-48, 57-58, filed herewith.

[37] Bing Cheng is a full partner with the International Practice Group of Zhong Lun Law Firm, a commercial firm, and has extensive commercial experience. *See* Declaration of Bing Cheng dated 5/3/2012 ("Bing Cheng Decl.") at ¶ 11, filed herewith.

[38] Professor Feinerman is the James M. Morita Professor of Asian Legal Studies at Georgetown University Law Center. *See* Declaration of Dr. James V. Feinerman dated 5/7/2012 ("Prof. Feinerman Decl.") at ¶ 1, filed herewith; *see also id.* at ¶¶ 4-7.

There is no dispute that Chinese Corporate law recognizes the limited liability of shareholders, no more than there is that TTP was incorporated by TG, had bylaws and operated as a business.[39]  However, the limited liability of shareholders is just that, limited and conditional.[40]  The doctrine of piercing the corporate veil was introduced into Chinese Corporate law in 2005 in order to address the problem of abuse of the corporate form, which had become evident without the ability to look behind corporate formalities.[41]  Moreover, because of the unique risk of abuse posed by a single-shareholder corporation, such relationships were made subject to a heightened scrutiny by these 2005 amendments to Chinese Corporate law.[42]  Contrary to the conclusion of Taishan's expert, the doctrine examines the objective features of the creation and conduct of the corporation, and requires no showing of "intentional or malicious" abuse of the corporate form.[43]

Two Articles of Chinese Corporate law establish the doctrine of veil piercing: Article 20 and Article 64.[44]  Article 20, the general provision for the doctrine of piercing, provides in section 3:

> Where shareholders of a corporation abuse the corporate
> independent status or the limited liability of shareholders for the
> purpose of escaping the debts, and seriously injures the interests of

---

[39]  Taishan also endeavors to argue that the corporate veil between TG and BNBM is inviolable. However as discussed in the PSC's Global Statement of Facts (at pp. 88-89), this matter is not properly before the Court at this time because of the representations of Taishan's counsel and the inability of the PSC to obtain the requisite discovery upstream from TG.

[40]  *Compare* Prof. Liu Junhai Aff. at ¶¶ 43-48, 57-59, Bing Cheng Decl. at ¶¶ 15-17, and Prof. Feinerman Decl. at ¶¶ 11-16, *with* Declaration of Zhu Yan ("Zhu Decl.") at ¶¶ 15, 47-48.

[41]  Prof. Liu Junhai Aff. at ¶¶ 45-48, 57-59; Bing Cheng Decl. at ¶ 17; Prof. Feinerman Decl. at ¶¶ 13-14.

[42]  Prof. Liu Junhai Aff. at ¶¶ 57-59; Prof. Feinerman Decl. at ¶ 14.

[43]  Prof. Liu Junhai Aff. at ¶ 68; Bing Cheng Decl. at ¶¶ 27-31; Prof. Feinerman Decl. at ¶¶ 26-28.

[44]  Prof. Liu Junhai Aff. at ¶¶ 48-49, 57-59; Bing Cheng Decl. at ¶ 18; Prof. Feinerman Decl. at ¶ 15.

the creditors of the corporation, such shareholders shall be jointly and severally liable for the debts of the corporation.

As Dr. Liu explains, "abuse" encompasses a wide range of activity:

> The core element of the Article (3) is the definition of "abuse the corporate independent status or the limited liability of shareholders."  In my opinion, abuse of the corporate independent status or the limited liability of shareholders implies any forms of utilization or taking advantages of the corporate independent status or the limited liability of shareholders in violation of the principle of honesty, integrity or public policy.  The common abuses of the corporate independent status or the limited liability of shareholders could be classified as undercapitalization and commingling of legal personalities between the corporation and its shareholder. . . . Commingling of legal personalities between the corporation and its shareholder usually implies the collapse of the legal distinction between of the corporation and its shareholder, including but not confined to the failure to observe the due corporate governance rules and formalities.[45]

Accordingly, any analysis of whether there has been such "abuse" will entail examination of any fact relevant to determine if the shareholders and the corporation have "violated . . . the principle of honesty, integrity or public policy," and may include consideration of any or all of the following, non-exhaustive, factors:  (i) Commingling of assets including but not confined to cash, movables and immovable, intellectual property; (ii) Unreasonable overlapping of legal representatives, directors and senior executives; (iii) Commingling of corporate governance organs including general meeting of shareholders, board of directors, board of supervisors and the management; (iv) Sharing the same financial officers, accountants, banking accounts and auditors; (v) Commingling of business activities including failure to properly account for joint business activities; (vi) Other relevant factors, such as same logos, business cards, same office, same telephone number, same email address, same mail envelopes, same advertisements, etc.[46]

---

[45]  Prof. Liu Junhai Aff. at ¶¶ 53, 55.

[46]  Prof. Liu Junhai Aff. at ¶¶ 55, 56; Bing Cheng Decl. at ¶¶ 25, 26; Prof. Feinerman Decl. at ¶¶ 21, 25.

28

As Dr. Liu noted, application of the factors is vested to the discretion of the Court which should consider the facts in toto.[47]  Under the general standard of Article 20, the party challenging the corporate form carries the initial burden of proof.[48]

In the specific case of a single-shareholder corporation such as TG/TTP, however, the party arguing that the corporate veil should remain intact carries the initial burden of proof.[49]  As provided under Article 64:

> Where the shareholder of a one person limited liability corporation is unable to prove that the corporate property are independent from the single shareholder's own property, such shareholder shall be jointly and severally liable for the debts of the corporation. The single shareholder could be either individuals or legal persons.

As Dr. Liu notes, this Article creates the presumption of "abuse" in the case of single-shareholder corporations.[50]  Thus, TG must first establish that it kept its property separate from TTP and fully observed corporate formalities, before it defends any claim by the PSC under Article 20(3) that it abused this corporate form.[51]  Importantly, the "property" that TG must show was kept separate encompasses far more than ordinary corporate assets.  Rather, "'property' should be interpreted broadly enough to cover [all] reasonable arms length pecuniary relationships, especially in the business operations between the single shareholder and the corporation, as well as the conduct of governance and leadership."[52]

---

[47]  Prof. Liu Junhai Aff. at ¶ 56; *see also* Bing Cheng Decl. at ¶ 26; Prof. Feinerman Decl. at ¶ 22, 25.

[48]  Prof. Liu Junhai Aff. at ¶¶ 59, 72; Bing Cheng Decl. at ¶ 25; Prof. Feinerman Decl. at ¶ 24.

[49]  Prof. Liu Junhai Aff. at ¶¶ 60, 71; Bing Cheng Decl. at ¶ 21; Prof. Feinerman Decl. at ¶¶ 18-19.  While Taishan is clear to articulate the burdens on the PSC under the wider jurisdictional analysis, it is noticeably silent on the burdens it carries, such as under Article 64 to prove corporate separateness.

[50]  Prof. Liu Junhai Aff. at ¶ 57; *see also* Prof. Feinerman Decl. at ¶ 17.

[51]  Prof. Liu Junhai Aff. at ¶ 67; Bing Cheng Decl. at ¶ 19; Prof. Feinerman Decl. at ¶ 24.

[52]  Prof. Liu Junhai Aff. at ¶ 62; Bing Cheng similarly notes that a "key factor considered by Chinese courts is whether the shareholder and the one-person limited liability company commingled

To meet its burden under Article 64, TG "must show more than the existence of separate corporate governance documents, such as articles of incorporation and related corporate documents.  Such a shareholder must also show actual independence and separateness between the single shareholder and the one person corporation."[53]  As with Article 20, there is no single set of factors to be considered, although Chinese courts have generally applied the same kinds of factors as are used under Article 20(3).[54]  Again, the unique facts of each case are considered in toto, with discretion vested firmly with the Court.[55]  Only if Taishan successfully defends the separateness of TG and TTP under Article 64 (including consideration of the PSC's rebuttal) will the PSC's claims of abuse under Article 20 even be considered.[56]

Based on the very facts the PSC has established in their Global Statement of Facts (at 52-70) and which were provided to the each of the experts for the PSC, Dr. Liu Junhai, Bing Cheng and Dr. Feinerman have concluded that there is sufficient evidence for a court to determine that Taishan did not meet its burden to prove the separateness of TG and TTP under Article 64 and failed to adequately rebut the PSC's proof that TG abused the corporate form.[57]

---

assets or finances, including, but not limited to, shared equipment and lease costs; use of each others' trademarks, marketing or sales materials, and other intellectual property without proper authorization or the payment of adequate consideration; shareholder payment for the salaries of employees working for the one-person limited liability company; and repayment of each others' debts."  Bing Cheng Decl. at ¶ 22.

[53]  Prof. Liu Junhai Aff. at ¶ 61.  Professor Feinerman similarly notes "[m]ere documentation such as separate articles of association for TG and TTP or other similar paper records should not provide sufficient proof that TG and TTP remained 'independent' from each other."  Prof. Feinerman Decl. at ¶ 19.

[54]  Prof. Liu Junhai Aff. at ¶ 64; Bing Cheng Decl. at ¶ 22; Prof. Feinerman Decl. at ¶¶ 20-22.

[55]  Prof. Liu Junhai Aff. at ¶ 65; Bing Cheng Decl. at ¶ 22; Prof. Feinerman Decl. at ¶¶ 20, 22.

[56]  Prof. Liu Junhai Aff. at ¶ 67; Prof. Feinerman Decl. at ¶ 24.

[57]  Prof. Liu Junhai Aff. at ¶¶ 69-73; Bing Cheng Decl. at ¶¶ 32-35; Prof. Feinerman Decl. at ¶ 29.

2.     *Taishan Can Neither Prove the Separateness of
TG and TTP Nor Defend TG's Abuse of the
Corporate Form.*

a.     **Article 64 - TG and TTP Were Commingled**

Distinctly absent from Taishan's brief is recognition that <u>Taishan</u>, and not the PSC,

<u>carries the initial burden of proof under Article 64</u>.  Accordingly, Taishan offers superficial

claims of separateness that are window dressing in front of the actual business of TG and TTP,

which was little more than the provisional foreign sales department of TG.  Taishan bases its

argument on facts it says show separate entities dealing at arm's length with one another,

including:  observation of corporate formalities; adequate capitalization; leases and purchase

agreements between TG and TTP; separate offices for TG and TTP; and TG's formal

authorization to TTP to use of the "Taishan" brand.  However, each of these assertions does not

withstand examination.[58]  Rather the record shows active commingling of the property and

operations of TG and TTP.

Regarding corporate formalities, Taishan "must show more than the existence of separate

corporate governance documents, such as articles of incorporation."[59]  TTP had articles of

incorporation, but was not operated separately.  Tellingly, when discussing the operation of the

two companies, Taishan notes that TG's board of directors met regularly and kept minutes,[60] but

Taishan makes no assertion that TTP's board of directors (which TG picked) ever met at all.

Indeed, there is no record of any high-level decisions at TTP by the board of directors, only of

TG's decisions as shareholder to contribute capital and withdraw profits.  Similarly, while

---

[58]  *Wiltz* Br. at 63; *Gross* Br. at 62-63; *Mitchell* Br. at 49-50.

[59]  Prof. Liu Junhai Aff. at ¶ 61.

[60]  *Wiltz* Br. at 19; *Gross* Br. at 19.

31

Taishan offers the self-serving testimony of its employees to suggest that regular and separate books were maintained to prove the separate operation of TTP, the only financial records from TTP that were produced were very short, annual summaries.[61]  Importantly, one of the matters of dispute between the PSC and Taishan in advance of the second round of depositions in Hong Kong was the adequacy of the production of TTP's financial records.[62]  Finally, TTP's leadership simply came from TG (and returned to TG when it ceased TTP's operations).

Taishan's claim that TG adequately capitalized TTP is similarly empty.  It is not disputed that TG registered 22 million Yuan of capital investments in TTP, and that these 22 million Yuan were transferred to TTP.  Indeed, the Capital Verification Report for TTP, completed by the same accounting firm that did similar work for TG, expressly disclaimed any finding that the transfer was adequate, only that the value transferred was 22 million Yuan.  Taishan offers no record to support a finding that such investment was adequate to the risks and business needs of TTP. Importantly, TG made two registered capital investments in TTP, the second only four months after the initial investment because TTP was already under "financial pressure."[63]  Ultimately TG ceased operating TTP (which was for the convenience of TG's customers), with the last sale being made to a US company in July 2007, nearly a year to the day of the second capital contribution.[64]  Similarly, so far as the value of the "good will" inherited by TTP from TG for its customers, there appears to have been no valuation or payment.

Regarding the purported leases and sales agreements, these also appear to be as meaningful as the supposed meetings of the TTP board of directors.  For the lease, TG set the

---

[61]  *See*, *e.g.*, Herman Aff. Ex. 196.

[62]  Herman Aff. Ex. 197, page 3, item 6.  Taishan's counsel reported that such production was complete.  *Id*.

[63]  PSC Global SOF at 70, *citing* Jia II Dep. at 845:23-846:7; *see also* Jia II Dep. at 656:22-657:16.

[64]  *Wiltz* Br. at 12; *Gross* Br. at 12; *Mitchell* Br. at 12.

price at the local rental rate and then, ten days later and without evidence, complaint, or consideration by TTP, quadrupled the price.  There is no record, however, of any payment ever being made under either lease.[65]  Similarly, the equipment purchase agreement and repurchase agreement may have been signed, but the record shows that the initial payment by TTP to TG for the equipment was over 1 million Yuan short, and TG reacquired the equipment without any payment to TTP.[66]

The matter of separate offices highlights the tension between the self-serving testimony offered by Taishan, through its employees, and the documents.  For example, even though TG's foreign sales department moved from TG to TTP (each witness testifying in unsolicited detail as to how far away the TTP offices were), the phone number that was in emails and other communications with customers remained the same.

Finally, the TG trademarks are some of the strongest evidence that the PSC has to show that TG and TTP were the same.  First, TTP sold TG's DUN brand of drywall, customized for the United States market, without any formal license from TG and with no evident complaint by TG.  Sales of DUN brand drywall included at least 87,980 sheets, for minimum sales of $125,670.00.[67]  Second, although there was a Trademark Authorization issued by TG to TTP for the "Taishan" brand, it is not the kind of license that is entered into between arm's-length parties.  First, there was no payment required for the Authorization.  Second, the license was unconditional, except for a contemplated initial five year term.  Indeed, the Authorization was

---

[65]  This property appears to be one TG readily lends to its subsidiaries.  The initial lease ran for a term of ten years.  Yet, TG appears to have leased out the same property to yet another subsidiary, the Taihe Branch.  Bing Cheng Decl. at ¶ 32, p. 13 (last bullet point).

[66]  PSC Global SOF at 68-69.

[67]  Herman Aff. Ex. 19.

not even proper under the trademark laws of China.[68]

In sum, Taishan failed to meet its burden to establish that TG, the sole shareholder of TTP, and TTP were separate and observed the requisite arm's length distance in their dealings. Rather, as discussed in the next section, their business operations were effectively the same, and TTP's business was simply TG's.

### b.    Article 20(3) - TG Abused the Corporate Form

Even if Article 64 did not apply, the corporate veil between TG and TTP should still be pierced under Article 20(3).  Initially, all of the above failures of TG and TTP to observe arm's-length formality fully support a finding that TG abused the corporate form of TTP.  The companies exchanged property (both intellectual and real) with little or no payment, lease terms were set capriciously, almost no financial records appear to have been kept, and it appeared the TG and not TTP's board made the actual decisions.  Moreover, as regards the abuse of the corporate form, this is founded also on the fact that the business of TTP was at all times TG's.

TTP was the foreign sales desk of TG during the time it needed to issue VAT invoices. TTP had the same employees who had served these same customers and customer line, sold the same brands, used the same contact information and phone numbers, and otherwise continued as TG.  From the customer's perspective, there was no TTP, only TG whose name TTP continued to use in its communications with customers.  Indeed, it is TG's website and marketing materials that were used by TTP.  When the business of TG ran into TTP's short life, TTP resolved disputes with TG's customers and accepted sales that had begun under TG.  And when, after TTP's short life, disputes arose with customers, TG stepped in where it had left off before TTP

---

[68]   The trademark laws require that contracts assigning trademark use to "others" contain basic information, such as a legal description of the manner the trademark will be presented.  *See* Bing Cheng Decl. at ¶ 32 n. 24 & Exhibit B thereto, Articles 2, 6.  TG's Authorization contemplates none of this. Moreover, to protect the interests of both parties, presumably dealing at arm's length, registration of such a contract is required.  *Id*. at Article 4.  There is no record that TG ever filed its Authorization with the government.  Bing Cheng Decl. at ¶ 32, p. 14 (first bullet point).

had been formed.

Therefore, this Court may pierce the corporate veil between TG and TTP.

**C.     Plaintiffs' Right to Pursue the Upstream Entities Should Be Preserved, Since They Were Precluded from Taking Any Discovery From CNBM and BNBM.**

Plaintiffs have been precluded from taking any formal discovery of Taishan's upstream entities – CNBM and BNBM.  At one point in time, BNBM retained national counsel to represent it in these proceedings[69]; however, neither BNBM nor CNBM ever entered their appearance in the litigation, and default judgments have been entered against them.[70]  CNBM (USA) entered its appearance in this case, but then instructed its counsel to withdraw as counsel of record.[71]

Taishan has asserted that "[t]he evidence . . . shows BNBM was nothing more than a major shareholder of TG and there is no basis in the record to disregard the separate corporate existence of TG and BNBM."[72]  Taishan further alleges that "TG also had little or no interaction with any other Upstream Entities.  Therefore, there is also no basis to disregard the separate corporate existence of TG, BNBM, or any of the other Upstream Entities and impute any contacts the Upstream Entities may have had with Louisiana to TG or TTP."[73]  Given that Taishan admittedly likes to exaggerate, because that's "allowed" in China,[74] Plaintiffs should be given the opportunity to take formal discovery of these upstream entities to obtain a clear picture of their

---

[69]  *See* Letter dated 10/13/2010 from James L. Stengel to Arnold Levin Herman Aff. Ex. 144.

[70]  *See* Rec. Doc. No. 5621.

[71]  *See* Rec. Doc. No. 9568 (Ex Parte Motion to Withdraw as Counsel of Record for CNBM USA Corp.).

[72]  *Gross* Br. at 2; *Wiltz* at 2.

[73]  *Id.*

[74]  Fu Dep. at 86:14-15.

35

connection with and control over Taishan.  The public information obtained through informal means suggests much more of a connection among Taishan, BNBM, CNBM, and their American arms.  This evidence would lend further support to the denial of Taishan's jurisdictional motions.

## III.    CONCLUSION

Taishan's documents, consisting of marketing materials, invoices, bills of lading, export reports, shipping and freight records, and hundreds of emails and test messages, along with the deposition testimony elicited from Taishan's employees and directors, Taishan's importers, distributors, suppliers and builders, make plain that Taishan's sales in the U.S. were not limited to only two sales of drywall to Venture Supply in Virginia and a "few isolated" sales in Louisiana.  Taishan set out on an aggressive course to expand the sales of its drywall in the United States by engaging an exclusive agent to find customers for Taishan nationwide, offering incentives to get long-term contracts, mailing through the U.S. Postal Service, Federal Express and DHL samples of its drywall to potential customers, and arranging to ship its products to specific customer destinations in a variety of American cities and/or to specific ports.  Taishan also has admitted that it manufactured made-to-order gypsum boards that were used in the construction of the Intervening-Plaintiffs' homes in *Germano*.  Taishan has also admitted it sold a large quantity of drywall to customers in Florida.  Similarly, Taishan's Manufacturer Profile Forms admit sales of drywall to customers in Louisiana, New York and California.  Discovery has uncovered sales of drywall in the U.S. that far exceed the amounts stated on Taishan's MPFs.[75]

For all of the reasons outlined above, Taishan's jurisdictional motions to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure should

---

[75] *See* Chart showing sales of Taishan's drywall by State (Herman Aff. Ex. 1).

be denied.

Respectfully submitted,

Dated: May 8, 2012

/s/ Russ M. Herman
Russ M. Herman, Esquire (Bar No. 6819) (On the Brief)
Leonard A. Davis, Esquire (Bar No. 14190) (On the Brief)
Stephen J. Herman, Esquire (Bar No. 23129) (On the Brief)
HERMAN, HERMAN & KATZ, LLP
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
LDavis@hhkc.com
*Plaintiffs' Liaison Counsel in MDL 2047*

Arnold Levin (On the Brief)
Fred S. Longer (On the Brief)
Sandra L. Duggan (On the Brief)
Matthew C. Gaughan (On the Brief)
Daniel C. Levin (On the Brief)
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel in MDL 2047*

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios (On the Brief)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
BECNEL LAW FIRM, LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Robert C. Josefsberg
PODHURST ORSECK, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
rjosefsberg@podhurst.com

Bruce William Steckler (On the Brief)
BARON & BUDD, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Ervin A. Gonzalez (On the Brief)
Patrick Montoya (On the Brief)
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

Ben W. Gordon, Jr.
LEVIN, PAPANTONIO, THOMAS, MITCHELL
 ECHSNER & PROCTOR, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
LAMBERT AND NELSON
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Gerald E. Meunier (On the Brief)
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
 & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker
PARKER, WAICHMAN, ALONSO, LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Scott Wm. Weinstein
MORGAN & MORGAN
12800 University Drive, Suite 600
Ft. Myers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

James Robert Reeves
LUMPKIN & REEVES
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger (On the Brief)
Scott Alan George (On the Brief)
SEEGER WEISS, LLP
77 Water Street, 26th Floor
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Daniel K. Bryson
WHITFIELD BRYSON & MASON LLP
900 W. Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5035
dan@wbmllp.com

Richard J. Serpe, Esquire
LAW OFFICES OF RICHARD J. SERPE
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
rserpe@serpefirm.com

Victor M. Diaz, Jr., Esquire
V.M. Diaz and Partners, LLC
119 Washington Ave, Suite 402
Miami Beach, FL 33139
Phone: (305) 704-3200
Fax: (305) 538-4928
victor@diazpartners.com

**OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE**

Richard S. Lewis
HAUSFELD LLP
1700 K Street, NW, Suite  650
Washington, DC 20006
Phone: (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com

Andrew A. Lemmon
LEMMON LAW FIRM, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Anthony D. Irpino (On the Brief)
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Phone: (504) 525-1500
Fax: (504) 525-1501
airpino@irpinolaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Plaintiffs' Steering Committee's Global Memorandum of Law in Opposition To: (1) Taishan's Renewed Motions to Vacate the Default Judgments and Dismiss the Complaints in Germano and Mitchell and (2) Taishan's Motions to Dismiss the Complaints in Gross and Wiltz has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 8th day of May, 2012.


/s/ Leonard A. Davis
Leonard A. Davis, Esquire
Herman, Herman & Katz, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhkc.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*
*Co-counsel for Plaintiffs*