# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L |
| THIS DOCUMENT RELATES TO: Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al., Case No. 2:09-cv-6687 (E.D. La.) | JUDGE FALLON MAG. JUDGE WILKINSON |
| The Mitchell Co., Inc. v. Knauf Gips KG, et al., Case No. 09-4115 (E.D. La.) | |
| Wiltz v. Beijing New Building Materials Public Ltd. Co., et al., Case No. 10-361 (E.D. La.) | |
| Gross v. Knauf Gips KG, et al., 2:09-cv-06690 (E.D. La.) | |

## THE PLAINTIFFS' STEERING COMMITTEE'S GLOBAL STATEMENT OF FACTS IN OPPOSITION TO: (1) TAISHAN'S RENEWED MOTIONS TO VACATE THE DEFAULT JUDGMENTS AND DISMISS THE COMPLAINTS IN GERMANO AND MITCHELL AND (2) TAISHAN'S MOTIONS TO DISMISS THE COMPLAINTS IN GROSS AND WILTZ[1]

---

[1]  This Global Statement of Facts addresses common factual issues raised in Taishan's renewed motions to vacate the default judgments and dismiss the complaints in *Germano* [Rec. Doc. No. 13490] and *Mitchell* [Rec. Doc. No. 13566] and in Taishan's motions to dismiss the complaints in *Gross* [Rec. Doc. No. 13590] and *Wiltz* [Rec. Doc. No. 13591] (collectively, "Taishan's jurisdictional motions").  In order to avoid duplication of the record and for the convenience of the Court and the parties, the Plaintiffs' Steering Committee ("PSC") incorporates this Global Statement into each response to Taishan's individual jurisdictional motions, as if fully set forth therein.

## TABLE OF CONTENTS

Table of Exhibits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.      Taishan Is a Self-Proclaimed Worldwide Export Company That
                Aggressively Targeted the United States for Sales of its Chinese
                Drywall and Related Building Materials. . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.      In the Wake of Hurricanes Katrina and Rita, Taishan Sought Out
                New Customers in the United States Through an Exclusive Agent
                and by Offering Competitive Pricing, Custom Manufacturing,
                Drywall Samples, Factory Tours, and Arrangements for Shipping
                and Freight to the U.S.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                1.      *Taishan offered the "lowest price" in order to
                        obtain long-term contracts with U.S. customers.* . . . . . . . . . . . . . . . . 14

                2.      *Taishan manufactured its drywall to meet U.S.
                        standards and specific customer needs.* . . . . . . . . . . . . . . . . . . . . . . 16

                3.      *Taishan availed itself of the United States Postal
                        Service, Federal Express, DHL and other carriers
                        to send samples of its drywall directly to customers
                        in the United States.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                4.      *Taishan invited potential customers to visit its
                        factories.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                5.      *Taishan arranged for shipping and freight of its
                        drywall to specific cities in the United States.* . . . . . . . . . . . . . . . . . . 22

                6.      *Taishan offered and sold a wide array of
                        construction products to the United States.* . . . . . . . . . . . . . . . . . . . . 26

        C.      Taishan Successfully Targeted Customers in Virginia and
                Customized its Chinese Drywall to Meet Their Specifications. . . . . . . . . . . . . 30

        D.      Taishan Successfully Targeted Customers in Florida, Shipping its
                Drywall to Miami, Tampa and Orlando. . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        E.      Taishan Targeted Customers in Louisiana After Hurricane Katrina. . . . . . . . . . 44

        F.      Taishan Targeted Customers in California, Shipping Samples of
                Drywall and Product to Them. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

-i-

G.    Taishan Targeted Customers in Other States Including Texas, Nevada, Alabama, and New York. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

H.    Taishan Continued to Follow Up With Its American Customers in Order to Secure Additional Sales and Maintain Customer Relations. . . . . . . . . 51

I.    Taishan Gypsum Co. Is Responsible for the Acts of its Wholly-Owned Subsidiary Taian Taishan Plasterboard Co., and Vice Versa. . . . . . . . . 52

    1.    *TTP used TG's drywall brands as its own without payment*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    2.    *TTP & TG ignored corporate form and have taken responsibility for each other's acts and omissions and settled claims and debts on behalf of each other.* . . . . . . . . . . . . . . . . 56

        a.    Guardian settlement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

        b.    TG orchestrated a settlement with OTC on behalf of TG, even though all sales to OTC were allegedly made by TTP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

    3.    *The employees of TG and TTP were interchangeable and sold drywall for both entities without distinction.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

    4.    *TG and TTP interchanged employees and directors, and there was no interview or hiring process for TG or TTP to switch companies.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

    5.    *TG & TTP shared phones and facsimile numbers, yet claim they do not share offices*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

    6.    *TG and TTP failed to observe other corporate formalities regarding assets and other property in addition to the brand names Taishan and DUN.* . . . . . . . . . . . . . . . . . . 68

J.    Taishan Has Additional Ties Within the United States Through its Upstream Entities CNBM and BNBM.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

III.    PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

    A.    Chinese Drywall Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

    B.    Jurisdictional Discovery.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

1.      *Taishan.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

2.      *CNBM, BNBM and the Luneng Mine.* . . . . . . . . . . . . . . . . . . . . . . . . . 88

IV.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

**TABLE OF EXHIBITS**

**Exhibit A**     **Affidavit of Russ M. Herman**

Ex. 1         Chart summarizing Taishan's sales of drywall in the United States, by State

Ex. 2         Deposition of Fu Tinghuan dated 1/10/2012

Ex. 3         Regulatory Announcement of China National Building Material Company
              Limited, 2010-009 (Q000975-981)

Ex. 4         Deposition of Peng Wenlong dated 4/7-8/2011

Ex. 5         Taishan marketing and product brochure (Plaintiffs' Ex. 20 to Deposition of Jia
              Tongchun dated 1/9-10/2012)

Ex. 6         Deposition of Che Gang dated 1/11-12/2012

Ex. 7         Quotes for drywall, metal track, metal studs, screws, joining tape (Ex. 4 to
              Deposition of Che Gang dated 1/11-12/2012)

Ex. 8         Quotes for metal studs (TG0019683-684) (Ex. 27 to Deposition of Che Gang
              dated 1/11-12/2012)

Ex. 9         Deposition of Ivan Gonima dated 12/13/2011

Ex. 10        Emails dated 11/18-20/2006 between Frank Clem and Walter Yu (TG0022595-
              596) (Ex. 18 to Deposition of Peng Wenlong dated 1/13/2012)

Ex. 11        Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011

Ex. 12        Email dated 6/28/2006 from Bill Cher to Ernest Teitelbaum of TOV Trading and
              OEG (TG0001026) (Ex. 9 to Deposition of Joseph Weiss of OEG Building
              Materials dated 2/16/2011)

Ex. 13        Contract dated 6/6/2006 (TH0606001) for the sale of drywall and metal studs to
              TOV Trading New York, USA ) (TG0000897-898) (Ex. 4 to Deposition of Joseph
              Weiss of OEG Building Materials dated 2/16/2011)

Ex. 14        Contract dated 10/23/2006 (SDTH061023) for metal studs to TOV Trading Co.
              (TG0001135) (Ex. 33 to Deposition of Joseph Weiss of OEG Building Materials
              dated 2/16/2011)

Ex. 15        Emails dated 9/6/2006 between Bill Cher and Ernest Teitelbaum re metal studs
              (TG0000713) (Ex. 25 to Deposition of Joseph Weiss of OEG Building Materials
              dated 2/16/2011)

Ex. 16          Email dated 5/11/2007 from Peng Wenlong to Mr. Zhang touting Taishan's export capabilities (TG0022728 & translation) (Ex. 10 to Deposition of Peng Wenlong dated 4/7-8/2011)

Ex. 17          Emails dated 8/28-30/2007 between Peng Wenlong (Frank) to Jacky Yu (TG0021369-372) (Ex. 20 to Deposition of Peng Wenlong dated 1/13/2012)

Ex. 18          Email dated 6/3/2006 from Richard Hannam to David Wei, cc to Peng Wenlong, with revisions to custom labels for shipment to Wood Nation (TG0001377-378) (Ex. 22 to Deposition of Peng Wenlong dated 1/13/2012)

Ex. 19          Manufacturer Profile Forms for Taishan Gypsum Co., Ltd. and Taian Taishan Plasterboard Co., Ltd.

Ex. 20          Sole Agency Agreement between Taishan and Oriental Trading Co., with Apostille attached (Ex. 4 to Deposition of Ivan Gonima dated 2/14/2012)

Ex. 21          Instant message discussions from 12/8/2007 to 12/9/2007 between Che Gang (Bill Cher) and Ivan Gonima (Ex. 3 to Deposition of Ivan Gonima dated 2/14/2012)

Ex. 22          Taishan's archived Web Page of Jan. 28, 2005

Ex. 23          Deposition of Carlos Rios, President Carn Construction Corporation dated 12/8/2011

Ex. 24          Deposition of Yongzhi (Charley) Yang of Stone Pride International Corporation dated 2/21/2012

Ex. 25          Deposition of Darrin Steber, GD Distributors, LLC, dated 12/30/2011

Ex. 26          Articles of Organization for Florida Limited Liability Company Oriental Trading Company, LLC (Ex. 7 to Deposition of Ivan Gonima dated 2/14/2012)

Ex. 27          Instant message discussions from 2/6/2007 to 10/11/2007 between Che Gang (Bill Cher) of Taishan and Ivan Gonima of OTC (Ex. 2 to Deposition of Ivan Gonima dated 2/14/2012)

Ex. 28          Emails between Ivan Gonima and Bill Cher regarding sales of Taishan drywall to potential customers in the U.S. and freight costs (TG0000521-526) (Ex. 8 to Deposition of Che Gang dated 1/11-12/2012)

Ex. 29          Email between Che Gang and Ivan Gonima (TG0000532-536) (Ex. 5 to Deposition of Ivan Gonima dated 12/13/2011)

Ex. 30          2007 Limited Liability Annual Report for Oriental Trading Company (Ex. 8 to Deposition of Ivan Gonima dated 2/14/2012)

Ex. 31        Emails dated 5/12/2006 between Peng Wenlong and Darren Dai (TG0000415) (Ex. 3 to Deposition of Peng Wenlong dated 4/7-8/2011)

Ex. 32        Email dated 1/28/2007 from Bill Cher to Joseph Weiss of OEG USA (TG0019701) (Ex. 28 to Deposition of Che Gang dated 1/11-12/2012)

Ex. 33        Emails dated 11/21/2006 through 1/9/2007 between Bill Cher and Charley Yang (TG0025303-306) (Ex. 3 to Deposition of Yongzhi (Charley) Yang of Stone Pride International Corporation dated 2/21/2012)

Ex. 34        Email dated 8/23/2006 from Ernest Teitelbaum to Bill Cher (TG0000745) (Ex. 19 to Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011)

Ex. 35        Emails dated 8/24/2006 between Ernest Teitelbaum and Frank Clem regarding ASTM reports (TG0022448) (Ex. 20 to Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011)

Ex. 36        Email dated 1/10/2007 from Ivan Gonima to Bill Cher (TG0000628) (Ex. 9 to Deposition of Che Gang dated 1/11-12/2012)

Ex. 37        Certificates showing that Taishan's drywall meets ASTM standards (Ex. 27 to Deposition of Wood Nation, Inc. dated 2/14/2011)

Ex. 38        Draft affidavit of Richard Hannam, President of Wood Nation, Inc. (Ex. 4 to Deposition of Richard Hannam dated 2/13/2012)

Ex. 39        Deposition of Richard Hannam dated 2/13/2012

Ex. 40        Taishan invoice to GD Distributors for 1320 sheets of drywall & ASTM certificates (Ex. 2 to Deposition of GD Distributors dated 12/30/2011)

Ex. 41        Email dated 8/3/2006 from Bill Cher to Ernest Teitelbaum (TG0000733) (Ex. 16 to Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011)

Ex. 42        Exhibit contrasting Original Taishan Dun Logo (from Taishan's product brochure-Plaintiffs' Ex. 20 to Deposition of Jia Tongchun dated 1/9-10/2012) with Redesigned red, white and blue logo for American customers (TG0026019-Plaintiffs' Ex. 28 to Deposition of Jia Tongchun dated 1/9-10/2012)

Ex. 43        Email dated 2/21/2007 from Ivan Gonima to Bill Che and file showing art for red/white/blue labels for binding tape (TG0023841 & TG0023843) (Ex. 9 to Deposition of Ivan Gonima dated 12/13/2011)

Ex. 44        Email dated 11/16/2005 from Phillip Perry to Frank Clem with instructions for custom label (V002541) (Ex. 81 to Deposition of Samuel G. Porter dated 12/16-17/2009)

Ex. 45      Email dated 6/27/2006 from Bill Cher to OEG (TG0001007) (Ex. 8 to Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011)

Ex. 46      Email exchange dated 1/9/2007 between Ivan Gonima and Bill Cher (TG0000566) (Ex. 14 to Deposition of Ivan Gonima dated 12/13/2011)

Ex. 47      Email dated 5/30/2006 from Richard Hannam to David Wei (Wei Chunshan) of BNBM USA, forwarded to Peng Wenlong (Frank Clem), requesting custom labels printed in English for shipment to Wood Nation (TG0000460) (Ex. 9 to Deposition of Wood Nation, Inc. dated 2/14/2011)

Ex. 48      Email dated 6/3/2006 from Richard Hannam to David Wei, cc to Peng Wenlong, with revisions to custom labels for shipment to Wood Nation (TG0000461) (Ex. 8 to Deposition of Wood Nation, Inc. dated 2/14/2011)

Ex. 49      Email dated 9/22/2006 from Ivan Gonima to Che Gang (TG0000527-28) (Ex. 6 to Deposition of Ivan Gonima dated 12/13/2011, at p. 1)

Ex. 50      Email dated 12/11/2005 from Yang Jiapo to Leon Liu (translation of TG0019840) (Plaintiffs' Ex. 29A to Deposition of Jia Tongchun dated 1/9-10/2012)

Ex. 51      Emails dated 7/10&16/2006 from Bo Zhou to Bill Cher (TG0000631 & TG0000633) (Ex. 18 to Deposition of Che Gang dated 1/11-12/2012)

Ex. 52      Photos of actual Taishan drywall samples (Exs. 4 & 5 to Deposition of GD Distributors dated 12/30/2011)

Ex. 53      Email dated 11/23/2005 requesting that Taishan's drywall be shipped to Carn Construction in Florida via Federal Express (TG0001409 & translation) (Ex. 3 to Deposition of Carn Construction Corporation dated 12/8/2011)

Ex. 54      Email dated 12/14/2005 requesting that additional samples of Taishan's drywall be sent to Carn Construction for testing (TG0024162) (Ex. 4 to Deposition of Carn Construction Corporation dated 12/8/2011)

Ex. 55      Email dated 1/20/2007 from Charley Yang to Bill Cher (TG0025300) (Ex. 6 to Deposition of Yongzhi (Charley) Yang of Stone Pride International Corporation dated 2/21/2012)

Ex. 56      Email dated 1/29/2007 from Bill Cher to Charley Yang (TG0025295-297) (Ex. 7 to Deposition of Yongzhi (Charley) Yang of Stone Pride International Corporation dated 2/21/2012)

Ex. 57      Email dated 12/29/2006 from Che Gang to Ivan Gonima (TG0000616-617) (Ex. 8 to Deposition of Ivan Gonima dated 12/13/2011)

Ex. 58    Translation of email dated 6/8/2006 from David Wei to Peng Wenlong, making arrangements for Wood Nation to visit Taishan in China (TG0000463 & TTRNSL0026) (Ex. 7 to Deposition of Peng Wenlong dated 4/7-8/2011)

Ex. 59    Email dated 8/2/2006 from Bill Che to Ernest Teitelbaum regarding his trip to China (TG0000779) (Ex. 15 to Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011)

Ex. 60    Deposition of Ivan Gonima dated 2/14/2012

Ex. 61    Email dated 5/10/2007 from Ivan Gonima to Bill Cher (TG0000902) (Ex. 11 to Deposition of Che Gang dated 1/11-12/2012)

Ex. 62    Emails dated 4/13-17/2007 between Bill Cher and Ivan Gonima (TG0000915-918) (Ex. 10 to Deposition of Ivan Gonima dated 12/13/2011)

Ex. 63    Emails from 4/6/2007 to 4/10/2007 between Bill Cher and broker Rafael Sardi (TG0000514) (Ex. 24 to Deposition of Che Gang dated 1/11-12/2012)

Ex. 64    Emails dated 4/12-17/2007 between Ivan Gonima and Bill Cher (TG0000915-920) (Ex. 2 to Deposition of Che Gang dated 1/11-12/2012)

Ex. 65    Email dated 4/17/2007 from Bill Cher to Ivan Gonima (TG0000913-914) (Ex. 10 to Deposition of Che Gang dated 1/11-12/2012)

Ex. 66    Email dated 1/10/2006 from Chegang (Bill Cher) to Mike Westbrook, providing freight quote from Qingdao to LA (TG0000907-908) (Ex. 15 to Deposition of Che Gang dated 1/11-12/2012)

Ex. 67    Email dated 7/14/2007 from Bill Cher to Joseph Weiss (TG0021997) (Ex. 29 to Deposition of Che Gang dated 1/11-12/2012)

Ex. 68    Email dated 7/27/2006 from Bill Cher to Ernest Teitelbaum (TG0001182) (Ex. 12 to Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011)

Ex. 69    Official Tai Shan Gypsum Co., Ltd Export Report and Translation (TG0025222-223) (Exs. 13 & 14 to Deposition of Peng Wenlong dated 4/7-8/2011)

Ex. 70    Email dated 11/30/2005 from Frank Clem to Phillip Perry (V002471)

Ex. 71    Fax dated 12/2/2005 from Taishan representative Frank Clem to Venture Supply owner Sam Porter (V000386)

Ex. 72    Deposition of Samuel G. Porter/Venture Supply Company and Porter/Blaine Corp. dated 12/16-17/2009

Ex. 73    Email dated 11/7/2005 from Phillip Perry to Sam Porter and Venture Supply employee (V002703)

Ex. 74          Email dated 11/10/2005 from Phillip Perry to Frank Clem (V002608)

Ex. 75          Email dated 12/14/2005 from Sam Porter to Frank Clem (V002358-361) (Ex. 22
                to Deposition of Samuel G. Porter dated 12/16-17/2009)

Ex. 76          Instant message discussion dated 12/15/2005 between Frank Clem and Phillip
                Perry (V002371-372)

Ex. 77          Emails between various U.S. merchants and Venture Supply regarding the
                distribution of Taishan's products in Virginia, Texas, New York (V002282,
                V002344, V002430, V002488)

Ex. 78          Email dated 12/15/2005 from Frank Clem to Phillip Perry (V002368-370)

Ex. 79          Letter of Credit Application for Venture Supply (V001811-818) (Ex. 39 to
                Deposition of Samuel G. Porter dated 12/16-17/2009)

Ex. 80          Contract dated 11/17/2005 between Taishan and Venture Supply for 100,000
                sheets of drywall (TG0001684-685) (Ex. 3 to Deposition of Fu Tinghuan dated
                1/10/2012)

Ex. 81          Contract dated 12/16/2005 between Taishan and Venture Supply for 100,000
                sheets of drywall (TG0019854-855) (Ex. 4 to Deposition of Fu Tinghuan dated
                1/10/2012)

Ex. 82          Letter dated 12/1/2005 from Sam Porter to Whom It May Concern confirming
                appointment of Phillip W. Perry of Tobin Trading, Inc. as Agent of Venture
                Supply with authority to sign contracts up to $450,000 (Tob00057) (Ex. 69 to
                Deposition of Samuel G. Porter dated 12/16-17/2009)

Ex. 83          Email dated 11/24/2005 from Phillip Perry to Zhang, cc Frank Clem regarding
                shipment to Norfolk, Virginia (V002507) (Ex. 84 to Deposition of Samuel G.
                Porter dated 12/16-17/2009)

Ex. 84          Invoice dated 12/30/2006 from Taishan to OTC (TG0000619)

Ex. 85          Invoices and Special Invoices for Export (TG0001657-658, TG0001661,
                TG0001663-670, TG0001680-682) (Ex. 8 to Deposition of Peng Shiliang dated
                1/11/2012)

Ex. 86          Taishan's contract (SDTH0600902) dated 9/2/2006 with B. America Corporation
                (TG0021705 & TG0021695) (Exs. 19 & 20 to Deposition of Che Gang dated
                1/11-12/2012)

Ex. 87          Contract (SDTH0601123) dated 11/23/2006 canceling contract dated 9/2/2006
                (Ex. 2 to Deposition of Rafael Sardi, owner of Onyx Gbh Corporation, dated
                2/9/2012)

| | |
|---|---|
| Ex. 88 | Taishan invoice dated 4/7/2007 to B. America (Ex. 16 to Deposition of Delmar Logistics Georgia dated 12/22/2011) |
| Ex. 89 | Taishan Packing List dated 4/7/2007 for shipment to B. America (Ex. 17 to Deposition of Delmar Logistics Georgia dated 12/22/2011) |
| Ex. 90 | Email dated 4/10/2007 from Bill Cher to Rafael Sardi regarding shipment to B. America (TG0000510) (Ex. 2 to Deposition of Delmar Logistics Georgia dated 12/22/2011) |
| Ex. 91 | Taishan Bill of Lading for transport of drywall to R & R Building Materials (Ex. 19 to Deposition of Delmar Logistics Georgia dated 12/22/2011) |
| Ex. 92 | Delmar Logistics Georgia invoice to B. America for 6/11/2007 custom entry fee, duty and inland freight (Ex. 7 to Deposition of Delmar Logistics Georgia dated 12/22/2011) |
| Ex. 93 | Tracking sheet for shipment to Onyx/B. America with ETA 6/11 (Ex. 5 to Deposition of Delmar Logistics Georgia dated 12/22/2011) |
| Ex. 94 | Delivery order to Port Everglades Terminal for R & R Building Materials (Ex. 11 to Deposition of Delmar Logistics Georgia dated 12/22/2011) |
| Ex. 95 | Entry summary for U.S. Customs and Border Protection showing Taishan delivery to Miami (Ex. 14 to Deposition of Delmar Logistics Georgia dated 12/22/2011) |
| Ex. 96 | Arrival notice for shipment to Miami (Ex. 20 to Deposition of Delmar Logistics Georgia dated 12/22/2011) |
| Ex. 97 | Deposition of Rafael Sardi, owner of Onyx Gbh Corporation, dated 2/9/2012 |
| Ex. 98 | Cargo Transportation Insurance Policy (Ex. 18 to Deposition of Delmar Logistics Georgia dated 12/22/2011) |
| Ex. 99 | Email dated 4/15/2008 from Bill Cher to B. America (TG0000843) (Ex. 25 to Deposition of Che Gang dated 1/11-12/2012) |
| Ex. 100 | Sales Contract (WN7350) dated 6/10/2006 between Taishan and Wood Nation, Inc. (TG0001482-484) (Ex. 13 to Deposition of Wood Nation, Inc. dated 2/14/2011) |
| Ex. 101 | Deposition of Wood Nation, Inc. dated 2/14/2011 |
| Ex. 102 | Invoices for sales of Taishan's drywall to Wood Nation, Inc. (TG0001545-546) (Ex. 15 to Deposition of Wood Nation, Inc. dated 2/14/2011) |

Ex. 103        Emails and related documents regarding shipments to Wood Nation and revised
               contract (77 pages) (Ex. 28 to Deposition of Wood Nation, Inc. dated 2/14/2011)

Ex. 104        Banner Distributor Profile Forms

Ex. 105        Emails dated 7/18-27/2006 between Bill Che and Tanader Tang re prices for
               drywall to be shipped from Qingdao, China to Port Everglades in Fort Lauderdale,
               Florida (TG0019348-352) (Plaintiffs' Ex. 31 to Deposition of Jia Tongchun dated
               1/9-10/2012)

Ex. 106        Emails dated 10/15/2005 between Peng Shiliang and Wenny Yin regarding quotes
               for shipping drywall to Jacksonville Port, Florida and New Orleans, Louisiana
               (TG0019813-814) (Ex. 3 to Deposition of Peng Shiliang dated 1/11/2012)

Ex. 107        Invoice dated 12/30/2006 for 20,100 sheets of Taishan's drywall for delivery to
               Miami, Florida (TG0000619) (Ex. 7 to Deposition of Ivan Gonima dated
               12/13/2011)

Ex. 108        Email dated 1/5/2006 from Jing Zhang to Bill Cher (TG0000886) (Ex. 14 to
               Deposition of Che Gang dated 1/11-12/2012)

Ex. 109        Taishan Special Invoice for Export to GD Distributors (TG0019962) (Ex. 7 to
               Deposition of GD Distributors dated 12/30/2011)

Ex. 110        Deposition of Peng Shiliang dated 1/11/2012

Ex. 111        Packing List dated 7/3/2006 from Taishan to APIC Building Materials for Invoice
               No. SDTH0622 re 132 Pkgs of drywall to be shipped to New Orleans, Louisiana
               (TG0019366) (Ex. 5 to Deposition of Peng Shiliang dated 1/11/2012)

Ex. 112        Invoice No. SDTH0622 dated 7/3/2006 from Taishan to APIC Building Materials
               for 5,676 pieces (272,448 square feet) of drywall with a value of $24,123
               (TG0020090) (Ex. 4 to Deposition of Peng Shiliang dated 1/11/2012)

Ex. 113        Letter dated 10/31/2006 from Advance Products International, LLC to Frank
               Clem (TG0019376) (Ex. 17 to Deposition of Che Gang dated 1/11-12/2012)

Ex. 114        Email dated 7/3/2006 from Jim Scudder to Grace, Andy (TG0019383) (Ex. 16 to
               Deposition of Che Gang dated 1/11-12/2012)

Ex. 115        Packing List and Invoice dated 11/20/2006 for 2,640 sheets of drywall to Stone
               Pride, Irvine, California) (Ex. 2 to Deposition of Yongzhi (Charley) Yang of
               Stone Pride International Corporation dated 2/21/2012)

Ex. 116        Email dated 11/28/2005 from Phillip Perry to Sam Porter (V002487)

Ex. 117        Email dated 12/13/2005 from Phillip Perry to Sam Porter (V002400)

Ex. 118     Emails dated 12/11-12/2005 between Peng Shiliang and Leon Liu regarding quotes for drywall to NY/NJ and Savannah, Georgia (TG0019840-841) (Ex. 2 to Deposition of Peng Shiliang dated 1/11/2012)

Ex. 119     Invoice dated 6/21/2006 to TOV Trading New York, USA for 23,120 sheets of drywall to U.S.A. (TG0001138-139) (Ex. 5 to Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011)

Ex. 120     Emails dated 7/3/2006 between Bill Cher and Ernest Teitelbaum regarding request for pricing (TG0001161) (Ex. 10 to Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011)

Ex. 121     Email dated 8/2/2006 from Ernest Teitelbaum to Bill Cher requesting additional 25,000 sheets of drywall (TG0000747) (Ex. 13 to Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011)

Ex. 122     Emails dated 8/3/2006 between Bill Cher and Ernest Teitelbaum regarding additional 25,000 sheets of drywall (TG0000813) (Ex. 14 to Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011)

Ex. 123     Contract dated 8/4/2006 (SDTH06080401) for the sale of 28,400 sheets of drywall to TOV Trading New York, USA & invoice (TG0000734-736, TG0000738) (Ex. 17 to Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011)

Ex. 124     Emails dated 8/18/2006 between Bill Cher and Ernest Teitelbaum regarding shipment of drywall (TG0001142) (Ex. 18 to Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011)

Ex. 125     Email dated 7/18/2006 from OEG to Bill Cher regarding wire transfer (TG0001052) (Ex. 11 to Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011)

Ex. 126     Email dated 8/31/2006 from Bill Cher to Ernest Teitelbaum (TG0000750-754) (Ex. 23 to Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011)

Ex. 127     Email dated 2/10/2007 from Frank Clem to Melvyn of LN Steamship Pte Ltd. (TG0000011) (Ex. 4 to Deposition of Peng Wenlong dated 4/7-8/2011)

Ex. 128     Email dated 11/18/2008 from Bill Cher to OEG (TG0019341) (Ex. 46 to Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011)

Ex. 129     Email dated 2/23/2009 from Bill Cher to Joseph Weiss (TG0021469) (Ex. 30 to Deposition of Che Gang dated 1/11-12/2012)

Ex. 130     Chart summarizing Taishan's 2006 Structure Post-March 16, 2006 Global Offering (Q000955-956)

Ex. 131       CNBM Global Offering (Q000438-952)

Ex. 132       Articles of Association to ShandongTaihe Dongxin Co., Ltd., August 8, 2006,
              Article 17) (TG0020686-709) (Defendants' Ex. 11A to Deposition of Jia
              Tongchun dated 1/9-10/2012)

Ex. 133       Summary of BNBM 2006 Annual Report (54 pages)

Ex. 134       August 28, 2006 CNBM Public Regulatory Announcement "Connected
              Transaction Acquisition of the Entire Equity Interest in Taian Donglian
              Investment and Trading Company Limited" (Q000010-12)

Ex. 135       First Extraordinary General Meeting of Shareholders for the Year 2007 of
              Shandong Taihe Dongxin Co., Ltd. (TG0020715)

Ex. 136       2005 Annual Shareholders Meeting (TG0020677), item 5(2)

Ex. 137       2006 BNBM Bylaws (TG0020686-709)

Ex. 138       CNBM May 2010 Overseas Regulatory Announcement (Q000975-981)

Ex. 139       2009 BNBM Annual Report (Q000155-223)

Ex. 140       Summary of BNBM 2008 Annual Report (Q000091-154)

Ex. 141       State of California Business Entity Detail for CNBM (USA) Corp. dated
              3/31/2011 (Q000982)

Ex. 142       2003 For Profit Corporation Uniform Business Report (Florida Secretary of State)
              and Articles of Incorporation for BNBM of America, Inc. in Tampa, Florida (Ex.
              1 to Deposition of Wood Nation, Inc. dated 2/13/2012)

Ex. 143       Deposition of John Gunn/Guardian Building Products dated 7/22/2011

Ex. 144       Letter dated 10/13/2010 from James L. Stengel to Arnold Levin

Ex. 145       Letter dated 11/23/2011 from Joe Cyr to Leonard Davis

Ex. 146       Letter dated 11/30/2011 from J. Cyr to Hon. Eldon Fallon

Ex. 147       Declaration of Jia Tongchun dated November 16, 2011

Ex. 148       Email chain dated 3/23/2012 between Tom Owen and Lenny Davis

Ex. 149       Email dated 3/22/2012 from Tom Owen to Lenny Davis

Ex. 150       Chart showing Taishan's Waste Paper Purchases

Ex. 151      Invoice showing Taishan shipped 110,800 sheets of drywall to Tampa, Florida (GBP000873)

Ex. 152      Invoice showing Taishan shipped 96,120 sheets of drywall to Wilmington, North Carolina (GPB000879)

Ex. 153      TG Articles of Association, February 2006 (TG0020817-824) (Defendants' Ex. 34A to Deposition of Jia Tongchun dated 1/9-10/2012)

Ex. 154      Shareholder Decisions of TG (TG0020855)

Ex. 155      TG Articles of Association, revised June 2006 (TG0020856-864)

Ex. 156      Photocopy of business card for Apollo Yang (GBP001255) (Exhibit 2 to Deposition of John Gunn dated 7/22/2011)

Ex. 157      Sales Contract and Application and Agreement for Documentary Credit (GBP002102-105) (Ex. 16 to Deposition of John Gunn dated 7/22/2011)

Ex. 158      Settlement and Release Agreement (GBP001130-133) (Ex. 27 to Deposition of John Gunn dated 7/22/2011)

Ex. 159      Email dated 5/27/2010 from Bill Cher to Ivan Gonima (TG0000869-870) (Ex. 12 to Deposition of Ivan Gonima dated 12/13/2011)

Ex. 160      Taishan marketing brochure (Ex. 3 to Deposition of Ivan Gonima dated 12/13/2011)

Ex. 161      Email dated 10/24/2006 (GBP002309-310) (Ex. 25 to Deposition of John Gunn dated 7/22/2011)

Ex. 162      Deposition of Zhang Jianchun dated 4/6/2011

Ex. 163      Email dated 5/11/2007 from Frank at Taihe Dongxin Co., Ltd. (TG0022728) (Ex. 19 to Deposition of Peng Wenlong dated 1/13/2012)

Ex. 164      Chart showing Taishan's Sales of Other Products in the United States

Ex. 165      Deposition of Robert Scharf, President of Devon International Trading, dated 3/24/2011

Ex. 166      Purchase order dated 2/8/2006 from Devon International to North Pacific for 485,044 sheets of Chinese Drywall (DEVON 00949-950)

Ex. 167      Sales order confirmation from Shandong Taihe Dongxin Company, Ltd. dated 3/30/2006 to Devon International for 485,044 sheets of Taishan drywall (DEVON 00016-017)

Ex. 168        Photographs (DEVON 00438, 00449, 00450, 00452, 00645, 00658, 00663)

Ex. 169        Letter dated 7/21/2006 from North Pacific to Devon International (DEVON 00951)

Ex. 170        Port of Pensacola discharge sheet, bill of lading (DEVON 00571-577, DEVON 00581-586)

Ex. 171        Resolution of the 4th Extraordinary Meeting of 2005 (TG0020682-685)

Ex. 172        Deposition of Ruth Wu, Vice President of Devon International Trading, dated 2/25/2011

Ex. 173        Incorporation Registration Review Form for TTP (Translation of TG0020808-809) (Defendants' Ex. 33A to Deposition of Jia Tongchun dated 1/9-10/2012)

Ex. 174        Trademark Use Authorization (TG25412) (Defendants' Ex. 41A to Deposition of Jia Tongchun dated 1/9-10/2012)

Ex. 175        Purchase and Sale Agreement (TG25413) (Defendants' Ex. 42A to Deposition of Jia Tongchun dated 1/9-10/2012)

Ex. 176        2006 Financial Statement of TTP (TG0026004-006) (Defendants' Ex. 45A to Deposition of Jia Tongchun dated 1/9-10/2012)

Ex. 177        Purchase and Sale Agreement (TG25414) (Defendants' Ex. 44A to Deposition of Jia Tongchun dated 1/9-10/2012)

Ex. 178        2008 Financial Statement of TTP (TG0026010-012) (Defendants' Ex. 47A to Deposition of Jia Tongchun dated 1/9-10/2012)

Ex. 179        Lease Agreement (Translation of TG0025446) (Defendants' Ex. 40A to Deposition of Jia Tongchun dated 1/9-10/2012)

Ex. 180        Lease Agreement (TG25415) (Defendants' Ex. 43A to Deposition of Jia Tongchun dated 1/9-10/2012)

Ex. 181        Capital Verification Report of TTP (Translation of TG0020850-851) (Defendants' Ex. 37A to Deposition of Jia Tongchun dated 1/9-10/2012)

Ex. 182        Shareholders Decisions dated 6/22/2006 (Translation of TG0020855) (Defendants' Ex. 38A to Deposition of Jia Tongchun dated 1/9-10/2012)

Ex. 183        Taian Taishan Gypsum Co., Ltd. Capital Verification Report dated 2/13/2006 (TG0020833-39)

Ex. 184        Shandong Taihe Dongxin Co., Ltd. Capital Verification Report (Translation of TG0020647-649) (Ex. 7A to Deposition of Jia Tongchun dated 1/9-10/2012)

Ex. 185 Resolutions of the General Meeting of Shareholders dated 4/25/2005 (Translation of TG0020601-602) (Defendants' Ex. 8A to Deposition of Jia Tongchun dated 1/9-10/2012)

Ex. 186 2010 CNBM Annual Report (Q000224-437)

Ex. 187 Resolution of the First Extraordinary General Meeting of 2006 (TG0020675)

Ex. 188 CPSC Investigation of Imported Drywall Status Update August 2009

Ex. 189 CPSC Investigation of Imported Drywall Status Update October 2009 – Imported Drywall Fact Sheet dated September 2009

Ex. 190 PSC FOIA request dated 7/17/2009

Ex. 191 PSC FOIA request dated 7/20/2009

Ex. 192 PSC correspondence to CPSC dated 11/2/2009 re: FOIA request #09-F-00902

Ex. 193 U.S. Consumer Products Safety Commission letter dated 11/3/2009 re: FOIA request #09-F-00902

Ex. 194 PSC correspondence to CPSC dated 12/3/2009 re: FOIA request #09-F-00902

Ex. 195 Deposition of Mark Patrick Norris dated 11/11/2010

Ex. 196 TTP Balance Sheet, Income Statement and Cash Flow Statement (TG0026007-009) (Ex. 46A to Deposition of Jia Tongchun dated 1/9-10/2012)

Ex. 197 Letter dated 7/1/2011 from Frank T. Spano to Lenny Davis

Ex. 198 Invoice dated 7/20/2006 from Taishan to Triax Trading & Logistics for 5,760 pieces (276,480 square feet) of drywall with a value of $24,998.40 (TG0020091)

Ex. 199 Affidavit of Ann Mickow, Civil Action Group/APS International, Ltd., dated 5/4/2012

Ex. 200 Deposition of Jia Tongchun dated 1/9-10/2012

Ex. 201 Deposition of Peng Wenlong dated 1/13/2012

Ex. 202 Deposition of James Martin Alexander, Delmar Logistics, dated 12/22/2011

I.      **INTRODUCTION**

At the end of the summer of 2005, two devastating hurricanes, Katrina and Rita, made

landfall on the Gulf Coast of the United States, killing more than 1,800 people and demolishing

thousands of homes, commercial buildings and other property.[2]  In the aftermath of these deadly

disasters that caused massive destruction, there was a critical shortage of drywall in this country

for the reconstruction and refurbishing of the damaged properties.  The traditional domestic

sources for drywall in the United States dried up, leading numerous businesses to look to foreign

sources for their needs.  This shortage of gypsum board opened up an excellent opportunity for

Chinese companies to sell their plasterboard and related construction materials in the United

States.

In response to this increased demand for drywall, beginning in the fall of 2005 and

continuing through 2007, hundreds of millions of square feet of gypsum wallboard manufactured

in China ("Chinese Drywall") were exported to the United States with the intention and

expectation that they would be installed in thousands of American properties, primarily along the

East Coast and in the Gulf Coast states in Florida, Louisiana, Mississippi, Alabama, Georgia,

Texas, Virginia and New York.[3]  Taishan Gypsum Co., Ltd., along with its wholly-owned

subsidiary Taian Taishan Plasterboard Co., Ltd. (collectively, "Taishan")[4] took advantage of this

---

[2]  http://www.ncdc.noaa.gov/oa/reports/tech-report-200501z.pdf.

[3]  The Gypsum Association reported that 320 million square feet of Chinese Drywall were
imported to the United States between 2005-2007.  *See* Gypsum Association Comments, archived at
http://web.archive.org/web/20101216021748/http://gypsum.org/pdf/Gypsum_Association_Comments_on
_Chinese_Wallboard_Issue.pdf.

[4]  As set forth in more detail in Section II.I, *infra*, Taishan Gypsum, formerly known as Shandong
Taihe Dongxin Co., Ltd., is referred to in company documents and by customers as The Taishan Group,
Taian Taishan Plasterboard Co., Ltd. ("TTP") and Taihe.  Taishan Gypsum ("TG") and TTP shared the
same employees, the same address, the same phone number, and used the same website, among other
things.  As such, TG and TTP are considered alter egos and referred to interchangeably herein,
collectively, as Taishan.  *See* Affidavit of Russ M. Herman dated May 7, 2012 ("Herman Aff."), attached

opportunity to increase sales of its drywall and related construction products to customers in the United States.[5]  Taishan was not only aware of the need for drywall in the U.S. following Hurricanes Katrina and Rita, but this company actively targeted potential customers in the Gulf Coast States, along the East Coast, California and Nevada.  Taishan availed itself of the U.S. Postal Service, Federal Express, DHL and other carriers to send numerous samples of its drywall to potential customers.  Taishan then sold its drywall to customers in those states and arranged for the shipping and freight all the way to the nearest port and beyond within the United States. If necessary to actualize the sale, Taishan even paid for the shipping from China.[6]  In furtherance of its aim to sell to the United States, Taishan fostered close relationships with its American customers, exchanging hundreds of emails and instant text messages, often multiple times a day, all written in English.

Taishan promoted itself to the world as one of the "key enterprises in producing new building materials in China," having "14 branch factories," "plasterboard production capacity reach[ing] 300 million $m^2$ per year," and "capital assets of 1.2 billion Yuan [>$190,000,000]."[7] Taishan's business is not limited to drywall.  It manufactures more than 60 types of building

---

hereto as Exhibit "A."

[5]  *See* Chart summarizing Taishan's sales of drywall in the United States, by State (Herman Aff. Ex. "1"); Deposition of Fu Tinghuan dated 1/10/2012 ("Fu Dep.") (Herman Aff. Ex. "2") at 22:19-23:7; Regulatory Announcement of China National Building Material Company Limited, 2010-009 (Q000975-981) (Herman Aff. Ex. "3") at p. 3 ("After Hurricane Katrina, demand for gypsum boards surged significantly, resulting in a short period of shortage in gypsum board supply in the US and thus the import of a portion of gypsum boards from China. According to China Building Materials Daily reports, a total of 580,000 tonnes and 430,000 tonnes of gypsum boards were exported to the US by companies in the PRC in 2006 and 2007 respectively.").

[6]  *See* Deposition of Peng Wenlong dated 4/7-8/2011 ("Peng I Dep.") (Herman Aff. Ex. "4") at 270:4-271:14, 320:19-321:23 ("The customer required us to pay the sea freight fee on their behalf, and the customer requested that we contact the sea freight company").

[7]  Plaintiffs' Ex. 20 to Deposition of Jia Tongchun dated 1/9-10/2012 ("Jia II Dep.") (Taishan marketing and product brochure) (Herman Aff. Ex. "5") at p. 2.  Approximately 6.3 Chinese Yuan equal $1.

products, including standard plasterboard, metal track and studs used to frame and support the drywall, metal screws and joining tape.[8]  Taishan is proud of its worldwide export capabilities, advertising on the Internet, in its brochures and to potential customers that its "products not only sell well in [Taishan's] domestic market [but] also <u>export to many countries</u> e.g. U.A.E., Indonesia, India, Russia, **<u>U.S.A.</u>** etc."[9]

Taishan's invoices and Manufacturer Profile Forms produced in this litigation evidence that from 2005 to 2008, Taishan sold **more than 85.99 million square feet** of Chinese Drywall to customers in the United States.[10]  The invoices show that Taishan shipped this drywall directly to Virginia, Florida, Louisiana, California, New York, North Carolina and other states.  These

---

[8]  *In re Chinese-Manufactured Drywall Prods. Liab. Litig.* (*Germano*), 706 F. Supp. 2d 655, 663 (E.D. La. 2010) (Findings of Fact and Conclusions of Law); Deposition of Che Gang dated 1/11-12/2012 ("Che Dep.") (Herman Aff. Ex. "6") at 77:21-78:8, 316:9-18; Ex. 4 to Che Dep. (quotes for drywall, metal track, metal studs, screws, joining tape) (Herman Aff. Ex. "7"); Ex. 27 to Che Dep. (quotes for metal studs) (TG0019683-684) (Herman Aff. Ex. "8"); Deposition of Ivan Gonima dated 12/13/2011 ("Gonima I Dep.") (Herman Aff. Ex. "9") at 47:24-48:11; Ex. 18 to Deposition of Peng Wenlong dated 1/13/2012 ("Peng II Dep.") (emails dated 11/18-20/2006 between Frank Clem and Walter Yu) (TG0022595-596) (Herman Aff. Ex. "10"); Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011 ("OEG Dep.") (Herman Aff. Ex. "11") at 19:11-18, 93:9-94:7, 129:2-14, 133:8-136:16; Ex. 9 to OEG Dep. (email dated 6/28/2006 from Bill Cher to Ernest Teitelbaum of TOV Trading and OEG) (TG0001026) (Herman Aff. Ex. "12"); Ex. 4 to OEG Dep. (contract dated 6/6/2006 (TH0606001) for the sale of drywall and metal studs to TOV Trading New York, USA) (TG0000897-898) (Herman Aff. Ex. "13"); Ex. 33 to OEG Dep. (contract dated 10/23/2006 (SDTH061023) for metal studs to TOV Trading Co.) (TG0001135) (Herman Aff. Ex. "14"); Ex. 25 to OEG Dep. (emails dated 9/6/2006 between Bill Cher and Ernest Teitelbaum re metal studs) (TG0000713) (Herman Aff. Ex. "15").

[9]  Plaintiffs' Ex. 20 to Jia II Dep. (emphasis added); Ex. 10 to Peng I Dep. (email dated 5/11/2007 from Peng Wenlong to Mr. Zhang touting Taishan's export capabilities: "The export of gypsum boards to the United States last year was 18 million square meters, and the 127mm gypsum board has passed the US Professional ASTM Inspection.") (TG0022728 & translation) (Herman Aff. Ex. "16"); Ex. 20 to Peng II Dep. (Herman Aff. Ex. "17") (email dated 8/29/2007 from Peng Wenlong (Frank) to Jacky Yu) (TG0021370); Ex. 22 to Peng II Dep. (TG0001377-378) (Herman Aff. Ex. "18"); Ex. 18 to Peng II Dep. (email dated 11/18/2006 from Frank Clem to Walter Yu).

[10]  *See* Chart summarizing Taishan's sales of drywall in the United States, by State; *see also* Manufacturer Profile Forms ("MPFs") for Taishan Gypsum Co., Ltd. and TTP (Herman Aff. Ex. "19").

3

sales totaled **$8,526,722.68**, using current conversion rates from Chinese Yuan to U.S. Dollars.[11] Taishan's defense to all of this is that the company had no idea where its products would end up: "We don't really know where exactly was the destination of the customer. . . . [and] we don't really know exactly where the shipment was shipped to."[12]  According to Taishan, customers might say "they would want to ship the stuff to New York," but the company has no idea whether or not that is true.[13]  Taishan's incredible claims belie the facts before this Court.  The overwhelming evidence of Taishan's communications in English with American customers via text messages and emails, Taishan's shipping records, invoices, export reports, bills of lading, and confirmations of shipments reaching their final destination, paint a much different picture.

Taishan actively employed a multi-pronged approach that was targeted to achieve sales in the American market and with specific customers along the Gulf Coast, the East Coast and California.  This sales strategy involved:  (i) use of the worldwide Internet; (ii) solicitation of U.S. customers through its marketing materials; (iii) hosting visitors from the U.S., offering factory tours and VIP services; (iv) exclusive agency agreements for sales of Taishan's Chinese Drywall throughout the United States[14]; (v) sending samples of its Chinese Drywall to potential customers located in the U.S., and specifically in Louisiana, Florida, California and New York; (vi) providing competitive pricing quotes in U.S. Dollars for entities in the United States interested in purchasing Taishan's wallboard and other building products; (vii) investigating shipping options and assisting in the freight of Taishan's plasterboard to the U.S., and specifically to Florida, Virginia, Louisiana, Mississippi, New York, California, Nevada, Georgia,

---

[11]  *Id.*

[12]  Che Dep. at 69:15-20.  *See also id.* at 326:18-19, 392:20-24, 401:9-403:16.

[13]  *See id.* at 208:13-19.

[14]  *See* Ex. 4 to Deposition of Ivan Gonima dated 2/14/2012 ("Gonima II Dep.") (Sole Agency Agreement between Taishan and OTC) (Herman Aff. Ex. "20").

North Carolina and South Carolina; (viii) insuring delivery of Taishan's Chinese Drywall to the U.S.; and (ix) maintaining U.S. customer relations by following up on complaints and other matters.

Taishan announced through its marketing materials that its plasterboard could "be used as partition and ceiling material," with the following "advantages": "fire-proof, sound insulation, heat preservation, quakeproof and good for health."[15] Once installed, however, Taishan's drywall causes harm and damages to homes and their residents by emitting various reduced sulfur gases and creating noxious odors.[16] The sulfur gas emissions from Chinese Drywall are corrosive to metals, particularly copper and silver.[17] This causes damage to the structural, mechanical and plumbing systems in the home, such as the framing, heating, air-conditioning and ventilation ("HVAC") units, refrigeration coils, copper tubing, faucets, metal surfaces, electrical wiring, and computer wiring, as well as personal and other property, such as microwaves, utensils, electronic appliances, jewelry, and other household and personal property items.[18] Additionally, some individuals have alleged that they have suffered bodily injury as a result of exposure to Taishan's Chinese Drywall.[19]

United States Government agencies have found Chinese Drywall to be defective.[20] The Remediation Guidance of the Department of Housing and Urban Development ("HUD") and the U.S. Consumer Product Safety Commission ("CPSC") recommend that all problematic drywall

---

[15]  Plaintiffs' Ex. 20 to Jia II Dep. at p. 2 (emphasis added).

[16]  *See Germano*, 706 F. Supp. 2d at 663.

[17]  *Id*. at 664.

[18]  *See id*. at 664-66.

[19]  Order appointing Special Master [Rec. Doc. No. 505 at 1].

[20]  *See id*.; *see also In re Chinese-Manufactured Drywall Prods. Liab. Litig.* (*Hernandez*), 2010 WL 1710434, *8-9 (E.D. La. Apr. 27, 2010) (Findings of Fact and Conclusions of Law).

be removed from affected properties. Additionally, fire safety alarm devices, electrical distribution components (including receptacles, switches and circuit breakers), gas service piping and fire suppression sprinkler systems must be removed as well, in order to properly remediate homes and other structures.[21]

Thousands of homeowners have sued Taishan and others in the Taishan supply chain in several of the omnibus class actions filed in these MDL Chinese Drywall proceedings and in various state courts in Virginia, Florida, Louisiana, California, Alabama, and Washington.[22] Since the commencement of these MDL proceedings in June, 2009,[23] a default judgment in the amount of $2,758,356.20 was entered against Taishan in *Germano*, following a bellwether trial,[24] and a preliminary entry of default was also entered against Taishan in the *Mitchell* class action.[25]

Taishan has filed renewed motions to vacate the default judgments in *Germano* and

---

[21]  *See* CPSC's Remediation Guidance for Homes with Corrosion from Problem Drywall as of March 18, 2011, published at http://www.cpsc.gov/info/drywall/Remediation031811.pdf.

[22]  *See, e.g., Payton, et al. v. Knauf Gips, KG, et al.*, Case No. 2:09-cv-07628 (E.D. La.) (Omnibus I, I(A), I(B), I(C)); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Case No. 2:10-cv-00361 (E.D. La.) (Omnibus II, II(A), II(B), II(C)); *Gross, et al. v. Knauf Gips, KG, et al.*, Case No. 2:09-cv-06690 (E.D. La.) (original complaint, Omnibus III, III(A)); *Rogers, et al. v. Knauf Gips, KG, et al.*, Case No. 2:10-cv-00362 (E.D. La.) (Omnibus IV, IV(A), IV(B), IV(C)); *Amato, et al. v. Liberty Mutual Insurance Company*, Case No. 2:10-cv-00932 (E.D. La.) (Omnibus V); *Hernandez, et al. v. AAA Ins., et al.*, Case No. 2:10-cv-03070 (E.D. La.) (Omnibus VI); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Case No. 2:11-cv-00080 (E.D. La.) (Omnibus VII); *Abreu, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*, Case No. 2:11-cv-00252 (E.D. La.) (Omnibus VIII); *Haya, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, Case No. 2:11-cv-01077 (E.D. La.) (Omnibus IX); *Block, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*, Case No. 11-cv-1363 (E.D. La.) (Omnibus X); *Benoit, et al. v. Lafarge S.A., et al.*, Case No. 11-cv-1893 (E.D. La.) (Omnibus XI); *Arndt, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*, Case No. 11-cv-2349 (E.D. La.) (Omnibus XII); *Cassidy, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*, Case No. 11-cv-3023 (E.D. La.) (Omnibus XIV); *see* PSC's 19th Status Report Pursuant to PTO 1H [Rec. Doc. No. 14072].

[23]  *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 626 F. Supp. 2d 1346 (J.P.M.L. 2009) [Rec. Doc. No. 1].

[24]  Rec. Doc. No. 3013.

[25]  *See* Entry of Default dated 9/23/2009 [Rec. Doc. No. 277].

*Mitchell* and dismiss the complaints in those cases for lack of personal jurisdiction.  Taishan has also filed motions to dismiss the complaints in *Gross* and *Wiltz* for lack of personal jurisdiction. Taishan bases its motions to dismiss on the grounds that Taishan is a Chinese company that allegedly made "only two sales" of drywall "to a U.S. company . . . based in Virginia."[26]  Taishan further claims that although its wholly-owned subsidiary TTP allegedly made "a few isolated sales of drywall in China to two companies that advised TTP they intended to ship the drywall they purchased to Louisiana[,] TTP was not aware that those companies would later market the drywall in Louisiana."[27]  Incredibly, Taishan contends that it "did not sell drywall to any customer who claimed to be from Florida or to any customer that indicated it intended to ship drywall to Florida."[28]  According to Taishan there are insufficient contacts with Virginia (*Germano*), Florida (*Mitchell*), and Louisiana (*Gross* and *Wiltz*) to subject the Chinese company to personal jurisdiction before this Court.

The PSC, however, has uncovered a plethora of competent evidence to refute Taishan's assertion that it was completely "unaware" that its drywall would be used in Virginia, Florida, Louisiana, or anywhere in the U.S., for that matter.  Contrary to Taishan's feigned surprise that more than 85.99 million square feet of its drywall somehow ended up installed in thousands of properties in this country, Taishan targeted the United States with the intention to sell its products here and make a profit.  For Taishan, it did not matter where its drywall was sold in the United States, as long as the company made money.  According to Taishan's Manager of

---

[26] *Germano* Br. at 7.

[27] *Wiltz* Br. at 1.

[28] *Mitchell* Br. at 1.

International Trading, "the more product [Taishan] sell[s], the better it is for the company."[29]  It does not matter who the customer is, "as long as [Taishan] get[s] the money."[30]  Taishan's Deputy General Manager and Director of Sales confirmed that "[a]s long as . . . I get the payment, I will ship out the product for you."[31]

Regardless of Taishan's disclaimer that the exact destination of its products was unimportant to the company, there cannot be any doubt that Taishan expected its drywall to reach the jurisdictions in question, because Taishan arranged for the shipping and freight to the customers' locations in Florida, Virginia, Louisiana, California, New York, and elsewhere, as evidenced by invoices, bills of lading, export reports, shipping and freight documents, deposition testimony, emails and text messages.  Thus, there is a sufficient basis to hold Taishan liable for the judgments entered against it and to keep Taishan in these cases to answer the allegations of the Plaintiffs.[32]  For these reasons, Taishan's jurisdictional motions should be denied.

## II.   STATEMENT OF FACTS

### A.   Taishan Is a Self-Proclaimed Worldwide Export Company That Aggressively Targeted the United States for Sales of its Chinese Drywall and Related Building Materials.

For years, Taishan knowingly and deliberately has held itself out to the world as one of the "key enterprises" in China "producing new building materials" for export to the United States

---

[29]   *See* Che Dep. at 103:3-10; *see also* Gonima I Dep. at 33:19-36:7.  Basically, as long as there is an opportunity for profit to be made, Taishan will export any product, even if it has nothing to do with construction, to the United States.  *See* Ex. 3 to Gonima II Dep. (instant message dated 12/8/2007 from Che Gang (Bill Cher) of Taishan to Ivan Gonima of OTC) ("we have established the i[m]port and export company.  We are planning to operate all kinds of goods [referring to electronics] which can bring profit for us.") (Herman Aff. Ex. "21").

[30]   Che Dep. at 103:11-16.

[31]   Fu Dep. at 57:23-58:5.

[32]   *See*, *generally*, Herman Aff. and exhibits attached thereto.

and other world markets.[33]  Taishan set up its website on the Internet in order "to have more people know Taishan[,]" so that they would "buy Taishan Gypsum's product."[34]  Indeed, Taishan proclaimed proudly on in its website and on the Alibaba website where it also advertises that Taishan's building products, including Chinese Drywall, are "exported to many countries such as the U.S.A."[35]  In its brochures Taishan boasts:

> We have a self-supported import and export ability, our products not only sell well in our domestic market [but] **also export to many countries e.g.** U.A.E., Indonesia, India, Russia, **U.S.A.** etc.[36]

The adage "a picture is worth 1,000 words" aptly applies to this illustration prominently featured in Taishan's marketing brochure, connecting China to the United States by way of a red arrow on a world map:[37]



---

[33]  Plaintiffs' Ex. 20 to Jia II Dep. at p. 2; Ex. 20 to Peng II Dep. (email dated 8/29/2007 from Peng Wenlong (Frank) to Jacky Yu advertising Taishan's export capabilities to the USA) (TG0021370-371).

[34]  Jia II Dep. (Herman Aff. Ex. "200") at 929:1-9.

[35]  *See* Taishan's archived Web Page of Jan. 28, 2005 (Herman Aff. Ex. "22").  *See also* Deposition of Carn Construction Corporation dated 12/8/2011 ("Carn Construction Dep.") (Herman Aff. Ex. "23") at 17:17-24; Deposition of Yongzhi (Charley) Yang of Stone Pride International Corporation dated 2/21/2012 ("Stone Pride Dep.") (Herman Aff. Ex. "24") at 79:14-81:10.

[36]  Plaintiffs' Ex. 20 to Jia II Dep. at p. 2 (emphasis added).

[37]  *See id*. at p. 15.  Taishan has since removed the red arrow connecting China to the United States on its website, but this does not negate the connections Taishan sought to make and was successful in making in the U.S. in order to sell its products here.  *See* http://www.taihegroup.com/english/channels/64.html.

In addition to its own company website, Taishan advertised its drywall products on Alibaba, which is an internet site used as a means of promotion, similar to eBay or Craigslist.[38] Alibaba explains on its opening page that:

> Alibaba.com makes it easy for millions of buyers and suppliers around the world to do business online mainly through three marketplaces: a global trade platform (www.alibaba.com) for importers and exporters; a Chinese platform (www.1688.com) for domestic trade in China; and a transaction-based wholesale platform on the global site (www.aliexpress.com) geared for smaller buyers seeking fast shipment of small quantities of goods. Together, these marketplaces form a community of close to 76.3 million registered users in more than 240 countries and regions.[39]

Indeed, there are tips to selling products to North America on Alibaba's main web page.[40]  The use of the Alibaba website was a success for Taishan, as it resulted in sales of Taishan's drywall to companies in the United States, which found Taishan through that site.[41]

In response to the increased demand for much-needed drywall in the United States following Hurricanes Katrina and Rita, Taishan aggressively pursued a greater share of the U.S. market.  Taishan promoted itself as having "14 branch factories," "plasterboard production capacity reach[ing] 300 million $m^2$ per year," and "capital assets of 1.2 billion Yuan [>$190,000,000]."[42]  Taishan predicted that its production output would reach "one billion square meter[s]" within five years.[43]  In order to reach this country more effectively, Taishan entered

---

[38]  *See* Carn Construction Dep. at 31:23-32:25.

[39]  http://www.alibaba.com/about/en/AboutOurCompany/about.html.

[40]
http://resources.alibaba.com/topic/801105660/Marketing_tip_How_to_sell_to_North_Americans.htm.

[41]  *Id.*; Deposition of Darrin Steber, GD Distributors, LLC, dated 12/30/2011 ("GD Distributors Dep.") (Herman Aff. Ex. "25") at 15:18-17:4; Stone Pride Dep. at 79:14-81:10.

[42]  Plaintiffs' Ex. 20 to Jia II Dep. at p. 2.

[43]  *Id.*

into exclusive agency contracts for nationwide distributorship of its Chinese Drywall in the U.S. and engaged in a variety of targeted activities designed to sell its products throughout the United States.

These efforts included customizing its Chinese Drywall to meet ASTM standards and producing the gypsum boards on a made-to-order basis by altering the size of the board and placing U.S. customer labels on each piece.  Taishan even altered its own "DUN" brand logo to appear in the red-white-and-blue colors of the American flag.  Taishan invited sales agents to visit its factories, giving them the VIP treatment upon their arrival.  Following these visits, Taishan shipped actual samples of its wallboard to potential customers in the U.S. and investigated various shipping options for delivery of the final product to individual customer destinations in Virginia, Florida, Louisiana, Mississippi, California, Nevada, Georgia, North Carolina, and South Carolina.  Taishan further arranged for the freight of its Chinese Drywall to the United States and sometimes insured the product as well.

Taishan's U.S. marketing efforts paid off handsomely.  Far from engaging in only a few isolated sales of its drywall to the United States, from 2005-2008, Taishan shipped **more than 85.99 million square feet** of its Chinese Drywall to customers in Virginia, Florida, Louisiana, New York, California, North Carolina, and other states.  These sales amounted to more than **$8.52 million** in revenue to the company.

       **B.**      **In the Wake of Hurricanes Katrina and Rita, Taishan Sought Out New Customers in the United States Through an Exclusive Agent and by Offering Competitive Pricing, Custom Manufacturing, Drywall Samples, Factory Tours, and Arrangements for Shipping and Freight to the U.S.**

Following Hurricanes Katrina and Rita and the devastation of housing along the Gulf Coast of the United States, Taishan stepped in to fill the void of drywall materials in this country. On October 20, 2006, Taishan entered into a written non-transferable, sole agency agreement

with Oriental Trading Company, LLC ("OTC"), based out of Miami, Florida,[44] for the sale of more than 1 million sheets of its "DUN" brand Chinese Drywall in the United States.[45]  The contract designated OTC's "Sole Sales Area" as covering the entire "territory of the USA."[46] Taishan did not attempt to limit that territory in any way.[47]  On the contrary, Taishan was willing to sell its products to any customer in any state as long as a profit could be made.  As Bill Cher put it, "the more product [Taishan] sell[s], the better it is for the company."[48]  In fact, when Bill Cher was asked by Plaintiffs' counsel at his deposition this year on January 12, 2012:  "If I want to buy drywall from you today and take it back to New Orleans, Louisiana, would you be happy to make those arrangements with me?"[49]  Bill Cher responded emphatically on behalf of Taishan: **"Don't tell me where you're sending the goods to.  Just give me money.  You can take it wherever you want to."**[50]

The terms of Taishan's sole agency agreement with OTC provided that Taishan would sell its "DUN" brand gypsum board in 1/2" or 5/8" thickness, 4' wide by 8', 9', 10' or 12' long. Under the contract, OTC was required to purchase no less than 20,000 sheets of DUN board during the first four months of the agreement, from November, 2006 through February, 2007, and at least 1 million additional sheets during the next 12 months.  If these sales targets were met, the

---

[44]  Ex. 7 to Gonima II Dep. (Articles of Organization for Florida Limited Liability Company Oriental Trading Company, LLC) (Herman Aff. Ex. "26").

[45]  *See* Ex. 4 to Gonima II Dep.; Che Dep. at 36:23-40:8.  Attached to this contract is an Apostille from the Florida Department of State certifying the notarized signature on the contract on behalf of OTC. *See also* Che Dep. at 43:21-46:2 (verifying signature on behalf of Taishan and corporate certificate).

[46]  Ex. 4 to Gonima II Dep. at ¶ 2.

[47]  *See* Gonima I Dep. at 70:13-24, 71:17-75:8, 137:13-19, 140:23-141:22.

[48]  *See* Che Dep. at 103:3-16; *see also* Gonima I Dep. at 33:19-36:7.

[49]  Che Gang Dep. at 195:5-8; *see also* Che Gang Dep. at 194:16-196:12.

[50]  Che Gang Dep. at 195:9-12; *see also* Che Gang Dep. at 194:16-196:12.

sole agency contract could be renewed.  Taishan had to right to cancel this contract if the sales volumes were not met, but Taishan never did so.[51]

As part of their agreement, Taishan required OTC to keep Taishan apprised of U.S. market prices and market forecasts,[52] demonstrating Taishan's interest in and awareness of the success of its drywall sales in this country.  Taishan's Manager of International Trading, Mr. Che Gang (also known as Bill Cher and Bill Che) kept in close, often daily, contact with OTC's Manager, Ivan Gonima,[53] initiating and exchanging hundreds of instant messages and emails in English about the price of drywall and other matters related to the promotion and sales of Taishan's drywall in the United States.[54]  On May 22, 2007, Mr. Gonima wrote to Mr. Che suggesting that:

> [I]t is time for both of us (OTC and Taihe) to try to come together with a plan for marketing your product strongly here in the USA. What do you think? We have everything ready and we will keep placing orders but we have to check the market together.[55]

After discussing the rising price of materials in China, the falling price of drywall in the U.S. and the exchange rate between RMB (Chinese Yuan) and U.S. Dollars, Mr. Gonima wrote again to Mr. Che:

> . . . I also know we need to work closely as partners in this deal. Once the prices in USA go up again it is going to be great[,] but right now we are facing serious moment and I think you have to

---

[51] Che Dep. at 53:15-55:14.

[52] Ex. 4 to Gonima II Dep. at ¶ 5.

[53] Gonima I Dep. at 13:10-13; Ex. 7 to Gonima II Dep.

[54] *See*, *e.g.*, Ex. 2 to Gonima II Dep. (instant message discussion dated 5/22/2007 between Ivan Gonima and Che Gang) (Herman Aff. Ex. "27"); Ex. 3 to Gonima II Dep. (instant message discussion dated 12/8/2007 between Ivan Gonima and Che Gang).

[55] Ex. 2 to Gonima II Dep. at pp. 31-32 (instant message exchanges dated 5/22/2007 between Ivan Gonima and Che Gang).

13

consider it [a joint marketing plan].[56]

Mr. Che responded: "ok, my friend, I will do [it]."[57]

Taishan used a variety of means to foster relationships with potential customers in order

sell its products in the U.S., including offering competitive pricing with discounts for long-term

contracts, custom manufacturing its drywall to meet customers' needs, sending samples of its

drywall to potential customers, and arranging for the shipping and freight of its drywall to U.S.

ports and beyond.  Taishan's records show that these efforts were successful, resulting in more

than $8.52 million in sales of Taishan's drywall in Florida, Virginia, Louisiana, California, New

York, North Carolina, and elsewhere.

### 1.   *Taishan offered the "lowest price" in order to obtain long-term contracts with U.S. customers.*

Mr. Gonima informed Taishan that he was "[w]orking hard with customers to get

sales."[58]  He "contacted several potential customers along the East Coast of the United States . . .

[as well as] customers on the West Coast" that looked promising, and he made sure to keep

Taishan apprised of his progress.[59]  Ivan Gonima discussed with Taishan various prospects in

"the New Orleans, Biloxi area," Texas, Reno, Las Vegas, Atlanta, New York, and Englewood,

New Jersey.[60]  In order to sell Taishan's drywall, Che Gang (Bill Cher) kept in close contact with

Mr. Gonima, providing detailed pricing quotes in U.S. dollars for each of the company's drywall

---

[56]  *Id*.

[57]  *Id*.

[58]  Ex. 2 to Gonima II Dep. at p. 13 (instant message dated 3/5/2007 from Ivan Gonima to Che Gang); Ex. 8 to Che Dep. (email dated 11/8/2006 from Ivan Gonima to Bill Cher) (TG0000521) (Herman Aff. Ex. "28").

[59]  Ex. 5 to Gonima I Dep. (Herman Aff. Ex. "29") at p. 3 (email dated 9/2/2006 from Ivan Gonima to Bill Che) (TG0000534).

[60]  Gonima I Dep. at 79:16-80:25.

14

and related building products.[61]

At some point in the process, Mr. Gonima made Taishan aware that "[s]ome customers [are] asking us what discount we can give them if they sign a long term contract with us."[62] Eager to offer incentives "[i]n order to set up long term business relation[s]" with customers in the United States, Taishan assured Mr. Gonima that for long-term contracts, customers would get "the lowest price."[63]  Indeed, Taishan did everything possible to stay competitive and maintain its sales in the U.S.  When the cost of production for steel belt went up in January, 2007, for example, due to increased prices for steel, Taishan let its American customers know that "[i]n order to build up the long time business cooperation and support you to compete in USA market, we will swallow the increased cost; we will offer the same price as [previous] containers."[64]

Bill Cher worked closely with other contacts in America as well to provide a competitive bid in order to attract new customers.  When Yongzhi (Charley) Yang from Stone Pride International Corporation ("Stone Pride") told Mr. Cher that his price quotes for drywall were too high for a potential new customer and he asked Taishan to "try to give the client a bit more

---

[61]  Ex. 5 to Gonima I Dep. at p. 1 (email dated 9/5/2006 from Bill Cher to Ivan Gonima) (TG0000532); Ex. 8 to Che Dep. (email dated 11/6/2006 from Bill Che to Ivan Gonima and Jorge Arevalo (VP of OTC, *see* Ex. 8 to Gonima II Dep. (Herman Aff. Ex. "30")) (TG0000522-525); Ex. 4 to Che Dep. (quotes for drywall, metal track, metal studs, screws, joining tape); Ex. 27 to Che Dep. (quotes for metal studs).

Taishan also responded promptly with quotes for drywall, in response to a request from Darren Dai, of EUPUSA, who was interested in "Door to Door service (including all things, freight, duty and whatever)."  *See* Ex. 3 to Peng I Dep. (emails dated 5/12/2006 between Peng Wenlong and Darren Dai (TG0000415) (Herman Aff. Ex. "31").

[62]  Ex. 2 to Gonima II Dep. at p. 2 (instant message discussion dated 2/7/2007 between Ivan Gonima and Che Gang).

[63]  *Id.*

[64]  Ex. 28 to Che Dep. (email dated 1/28/2007 from Bill Cher to Joseph Weiss of OEG Building Materials USA) (TG0019701) (Herman Aff. Ex. "32").

concession[,]" Mr. Cher replied, "[g]ive me a quantity and I will make [the] calculations again."[65]
These price negotiations resulted in sales of drywall to Stone Pride.[66]

### 2. *Taishan manufactured its drywall to meet U.S. standards and specific customer needs.*

Taishan knew that its drywall had to meet proper U.S. codes and regulations in order for its sales efforts to be successful. In fact, Taishan's customers insisted on proof of compliance with those government regulations. OEG Building Materials, for example, let Taishan know early on that testing was important. On August 23, 2006, Ernest Teitelbaum, President of OEG, wrote to Bill Cher with the following request:

> I would like you to please take 5 good sheets [of drywall] that you produce and send it to me by air as soon as possible so I can submit samples for testing to get the required government approvals so I should be able to sell it to more clients, and **make sure that the sheets that you send me are good so they can pass all the different tests that the government requires**.[67]

Mr. Teitelbaum told Taishan that the sample boards would be sent to "testing labs [] in New York." Similarly, on January 1, 2007, Ivan Gonima of OTC wrote to Bill Cher to inform him that: "we need test reports supporting that all test[s] required by American Codes & Standards are passed. . . . our clients want to see them before placing a big order"[68]

Accordingly, Taishan customized its manufacturing to meet American Society for Testing

---

[65] Ex. 3 to Stone Pride Dep. (emails dated 11/21/2006 between Bill Cher and Charley Yang) (TG0025303-306) (Herman Aff. Ex. "33").

[66] *Id*. at TG0025303.

[67] Ex. 19 to OEG Dep. (email dated 8/23/2006 from Ernest Teitelbaum to Bill Cher) (TG0000745) (emphasis added) (Herman Aff. Ex. "34"); Ex. 20 to OEG Dep. (email dated 8/24/2006 from Ernest Teitelbaum to Frank Clem, reiterating "I need to have these [ASTM] test reports for my clients it is very important that you send it to me as soon as possible.") (TG0022448) (Herman Aff. Ex. "35").

[68] *See also* Ex. 9 to Che Dep. (email dated 1/10/2007 from Ivan Gonima to Bill Cher) (TG0000628) (Herman Aff. Ex. "36"); Peng I Dep. at 146:12-24.

and Materials ("ASTM")[69] standards and provided an ASTM certificate to customers as part of

its sales efforts.[70]  Taishan also manufactured its boards for American customers in inches rather

than using the metric system.[71]

In order to obtain and facilitate a base of customers in the United States, Taishan was

willing to further customize its drywall to meet specific customer needs, even if that meant

altering the Taishan "DUN" brand logo to appear in all-American red-white-and-blue colors.[72]

As American customer, Ivan Gonima, explained to Che Gang, "[w]e want to use BLUE RED and

WHITE because those are the colors of the American Flag."[73]

Taishan readily obliged made-to-order requests for large orders, ranging from the addition

of the customer's name (Venture Supply, Inc. or Marathon Construction, *e.g.*) to the label,[74]

---

[69]  ASTM International (formerly known as the American Society for Testing and Materials) is the recognized leader in the development and establishment of voluntary consensus standards. http://www1.astm.org/ABOUT/aboutASTM.html#.

[70]  *See* Gonima I Dep. at 141:23-142:2; Carn Construction Dep. at 53:4-7, 53:11-14; Ex. 27 to Deposition of Wood Nation, Inc. dated 2/14/2011 ("Wood Nation Dep.") (certificates showing that Taishan's drywall meets ASTM standards) (Herman Aff. Ex. "37"); Ex. 4 to Deposition of Wood Nation, Inc. dated 2/13/2012 ("Richard Hannam Dep.") (draft affidavit of Richard Hannam, President of Wood Nation) at ¶¶ 7-9 (Herman Aff. Ex. "38"); Richard Hannam Dep. (Herman Aff. Ex. "39") at 94:8-98:11; Ex. 2 to GD Distributors Dep. (ASTM testing certificates) (Herman Aff. Ex. "40"); GD Distributors Dep. at 27:23-28:10, 54:25-58:19; OEG Dep. at 63:10-64:10; Ex. 16 to OEG Dep. (email dated 8/3/2006 from Bill Cher to Ernest Teitelbaum) (TG0000733) (Herman Aff. Ex. "41"); Ex. 20 to OEG Dep. (email dated 8/24/2006 from Frank Clem to Ernest Teitelbaum) (TG0022448).

[71]  *See* Gonima I Dep. at 43:10-24; Carn Construction Dep. at 24:8-25:9; OEG Dep. at 45:18-46:11.

[72]  *See* Ex. 2 to Gonima II Dep. at pp. 5-7 (instant message discussion dated 2/25/2007 between Ivan Gonima and Che Gang regarding the redesign of the DUN logo in the colors of the American flag); *see also* Exhibit contrasting original Taishan Dun logo with redesigned red, white and blue logo for American customers (Herman Aff. Ex. "42").

[73]  *Id*. at p. 7; Ex. 9 to Gonima I Dep. (email dated 2/21/2007 from Ivan Gonima to Bill Che) (TG0023841) & file showing art for red, white, and blue labels for binding tape) (TG0023843) (Herman Aff. Ex. "43"); Gonima I Dep. at 128:20-129:18, 130:8-15, 131:21-23.

[74]  Peng I Dep. at 355:9-356:2; Gonima I Dep. at 50:4-9; Ex. 2 to Gonima II Dep. at pp. 1-2 (instant message discussion dated 2/7/2007 between Ivan Gonima and Che Gang); Ex. 19 to OEG Dep.

adding the words "Tampa, Florida" to the label,[75] including specific colors on the label or bonding tape,[76] and affixing an American UPC bar code for identification in the United States.[77] The President of Taishan's New York customer, OEG, acknowledged the reason why the customization of Taishan's boards was so important for its customers:  "Taishan was generating the boards with the end tape with OEG, knowing that it was to be used for American customers to be able to read [our] name and have the American barcode on there."[78]  According to Mr. Gonima, "Taishan was happy to do a custom label for [its customers],"[79] as this would only increase the company's sales.

---

(email dated 8/23/2006 from Ernest Teitelbaum to Bill Cher regarding customized bonding tape for the drywall) (TG0000745); Ex. 81 to Porter Dep. (email dated 11/16/2005 from Phillip Perry to Frank Clem with instructions for custom label) (V002541) (Herman Aff. Ex. "44").

[75]  Peng II Dep. (Herman Aff. Ex. "201") at 514:10-516:4.

[76]  *See* Ex. 8 to OEG Dep. (email dated 6/27/2006 from Bill Cher to OEG) (TG0001007) (Herman Aff. Ex. "45").

[77]  *Germano*, 706 F. Supp. 2d at 662; Ex. 2 to Gonima II Dep. at pp. 1-2 (instant message discussion dated 2/7/2007 between Ivan Gonima and Che Gang); Ex. 9 to Gonima I Dep. (bar codes desired for binding tape) (TG0023843); Ex. 14 to Gonima I Dep. (email exchange dated 1/9/2007 between Ivan Gonima and Bill Cher) (TG0000566) (Herman Aff. Ex. "46"); Gonima I Dep. at 113:22-114:24, 128:20-129:18; Carn Construction Dep. at 38:17-39:14; Che Dep. at 193:11-194:15, 199:5-21; Ex. 9 to OEG Dep. (email dated 6/28/2006 from Bill Cher to Ernest Teitelbaum of TOV Trading and OEG) (TG0001026); OEG Dep. at 91:10-92:8.

[78]  OEG Dep. at 116:23-117:5, 133:8-136:16 (there was "not even a question" that "Taishan understood they were generating [customized] metal studs for sale to OEG and that OEG was going to be selling them in the New York metropolitan area.").

[79]  Gonima I Dep. at 51:1-3; *see* Ex. 9 to Wood Nation Dep. (email dated 5/30/2006 from Richard Hannam, President of Wood Nation, to David Wei (Wei Chunshan) of BNBM USA, forwarded to Peng Wenlong (Frank Clem), requesting custom labels printed in English for shipment to Wood Nation) (TG0000460) (Herman Aff. Ex. "47"); Ex. 8 to Wood Nation Dep. (email dated 6/3/2006 from Richard Hannam to David Wei, cc Peng Wenlong, with revisions to custom labels for shipment to Wood Nation) (TG0000461) (Herman Aff. Ex. "48"); *see also* Ex. 22 to Peng II Dep.; Peng I Dep. at 355:9-356:2.

      **3.**     ***Taishan availed itself of the United States Postal Service, Federal Express, DHL and other carriers to send samples of its drywall directly to customers <u>in the United States.</u>***

To further solicit sales, Taishan regularly shipped samples of its products to various customers in the United States as a marketing tool.[80]  Taishan availed itself of the United States Postal Service, Federal Express, DHL and other carriers to provide potential customers with an actual sample of its drywall in order to secure the sale of its products.[81]

- In July, 2006, Jeff (a/k/a/ Bo) Zhou from TP Construction, Inc. in Louisiana requested that samples of Taishan's drywall be sent to Jefferson, Louisiana.  Bill Cher quickly responded.[82]

- Similarly, Taishan shipped sample boards to New Orleans when GD Distributors needed them.[83]

- When Carlos Rios, President of Carn Construction Corp., a Florida company, asked for samples of Taishan's drywall, Taishan shipped three different types of drywall to him in Florida via Federal Express.  The company sent additional

---

[80]  *See* Ex. 2 to Gonima II Dep. at p. 31 (instant message discussion dated 5/22/2007 between Ivan Gonima and Che Gang) (Che Gang agreed to ship samples of fireproof drywall sheets to Ivan Gonima); Ex. 6 to Gonima I Dep. (email dated 9/22/2006 from Che Gang to Ivan Gonima) (TG0000527-528) (Herman Aff. Ex. "49"); Gonima I Dep. at 109:20-110:5; Peng I Dep. at 269:15-270:2; Che Dep. at 312:6-313:6 ("For the handling of samples sent to the customers, it was that customer would tell us the specification and models that they needed.  If we happened to have such samples with us, and the customer would willing to pay for the postage, the shipping cost, then we would provide the sample in accordance with their requirements.").  At some point, the company decided not to send the samples for free, "[b]ecause there are too many Americans wanting samples[.]"  Plaintiffs' Ex. 29A to Jia II Dep. (email dated 12/11/2005 from Yang Jiapo (Apollo Yang) to Leon Liu) (translation of TG0019840) (Herman Aff. Ex. "50"); Jia II Dep. at 852:10-13.

[81]  *See* Che Dep. at 288:9-290:11.

[82]  Ex. 18 to Che Dep. (emails dated 7/10&16/2006 from Bo Zhou to Bill Cher) (TG0000631 & TG0000633) (Herman Aff. Ex. "51").

[83]  Exs. 4 & 5 to GD Distributors Dep. (photos of actual Taishan drywall samples) (Herman Aff. Ex. "52").

samples a month later so that Carn Construction could perform testing on the material.[84]

• The same is true of Stone Pride, which requested that samples of Taishan's drywall be sent express mail to Irvine, California. Charley Yang told Bill Cher that: "We recently have become ready to promote your plasterboard at full strength, and need to prepare a batch of samples."[85] He followed this up with instructions to "prepare 10 [samples] of each kind [of drywall] and send it via express mail directly to the United States [to Stone Pride in Irvine, California]."[86] Bill Cher responded with the amount of the shipping "expense to the United States."[87] And then, Bill Cher confirmed that the samples had arrived in the U.S.[88]

• OEG Building Materials told Taishan on numerous occasions it needed samples of the drywall for testing in New York labs.

**4.    *Taishan invited potential customers to visit its factories.***

As part of its marketing efforts to reach the United States, Taishan extended warm

---

[84]  Carn Construction Dep. at 25:13-22; Ex. 3 to Carn Construction Dep. (email dated 11/23/2005 requesting that Taishan's drywall be shipped to Carn Construction in Florida via Federal Express) (TG0001409 & translation) (Herman Aff. Ex. "53"); Ex. 4 to Carn Construction Dep. (email dated 12/14/2005 requesting that additional samples of Taishan's drywall be sent to Carn Construction for testing) (TG0024162) (Herman Aff. Ex. "54").

[85]  Ex. 6 to Stone Pride Dep. (email dated 1/20/2007 from Charley Yang to Bill Cher) (TG0025300) (Herman Aff. Ex. "55").

[86]  *Id*. (email dated 1/21/2007 from Charley Yang to Bill Cher).

[87]  *Id*. (email dated 1/23/2007 from Bill Cher to Charley Yang).

[88]  Ex. 7 to Stone Pride Dep. (email dated 1/29/2007 from Bill Cher to Charley Yang) (TG0025295-297) (Herman Aff. Ex. "56").

invitations to potential customers to visit Taishan's factories.[89]  In the case of OTC, Taishan picked Ivan Gonima up at his hotel to take him for a personal tour.[90]  While at the factory, Taishan handed out its marketing brochures and showed its visitors the entire operation, including the manufacturing line, the packing, and the shipping for the drywall, as well as the framing, frame studs and screws.[91]  Then, they talked about pricing terms and shipping.[92]

When Wood Nation, Inc., a company located in Tampa, Florida, was interested in purchasing drywall from Taishan, Mr. David Wei (Wei Chunshan) from BNBM USA took it upon himself to accompany Wood Nation's President, Richard Hannam, to China to visit Taishan's operations.  Mr. Wei wrote to Taishan's Chief of its Foreign Trade Department Peng Wenlong (also known as Frank Clem and Peng Frank)[93] prior to the visit to make sure all of the VIP arrangements were in order for "our client":

> The trip of me and our client Mr. RICHARD HANNAM is scheduled . . . Please pick us up at the airport and send us to a hotel nearby your company (please help us to reserve two rooms, either four star[] or five star is okay, but it should be clean and close to your company. . . . [For] [o]ur return flight . . ., please arrange to send us to the airport.[94]

---

[89]  *E.g.*, Ex. 2 to Gonima II Dep. at p. 34; Ex. 8 to Gonima I Dep. (email dated 12/29/2006 from Mr. Che Gang to Ivan Gonima) ("I warmly welcome you to visit our factory.") (TG0000616-617) (Herman Aff. Ex. "57"); Ex. 20 to Peng II Dep. (email dated 8/30/2007 from Peng Wenlong (Frank) to Jacky Yu:  "You are welcome to our factory anytime.") (TG0021369).

[90]  *See* Gonima I Dep. at 40:19-42:13.

[91]  *See* Gonima I Dep. at 32:3-7, 44:9-21, 89:7-10.

[92]  Gonima I Dep. at 45:15-46:11.

[93]  Mr. Peng Wenlong has a college degree in English literature.  Peng I Dep. at 44:9-15.  His supervisor, Fu Tinghuan, testified that Peng Wenlong [has] the authority to enter into contracts involving export sales without [Mr. Fu's] approval."  *See* Fu Dep. at 23:17-25:16.

[94]  Ex. 7 to Peng I Dep. (Translation of email dated 6/8/2006 from David Wei to Peng Wenlong, making arrangements for Wood Nation to visit Taishan in China) (TG0000463 & TTRNSL0026) (emphasis added) (Herman Aff. Ex. "58").

In some cases, Taishan hosted its customers for multiple visits and multiple days.  Peng Wenlong testified that Venture Supply, Inc. ("Venture Supply") representative Phillip W. Perry, from Virginia, visited Taishan "more than two times" and "stayed for three days and he came over every single day."[95]  Joseph Weiss of OEG Building Materials from New York visited Taishan for three days the first time he went there.[96]  He, too, was picked up at the airport by Taishan and put in a nice hotel during his visit.[97]

**5.**     ***Taishan arranged for shipping and freight of its drywall to specific cities in the United States.***

Taishan made it easy for OTC to sell its Chinese Drywall in the United States.  According to Ivan Gonima, the only thing OTC had to do was "place[] the order and that was it."[98]  Taishan arranged for "everything," including "the shipping arrangements" to the intended customer.[99] The evidence supports this testimony.  On numerous occasions, Mr. Gonima asked Bill Cher to provide quotes for shipping Taishan's drywall from China to various U.S. cities, including: Miami, Florida; Orlando, Florida; West Palm Beach, Florida; Tampa, Florida; Gulf Port, Mississippi; New Orleans, Louisiana; Houston, Texas; Norfolk, Virginia; Long Beach, California; Los Angeles, California; Las Vegas, Nevada; Savannah, Georgia; Atlanta, Georgia; Charleston, South Carolina; Wilmington, North Carolina; New York, New, York; Newark, New Jersey; and San Juan, Puerto Rico.[100]  Mr. Gonima made it clear to Taishan that for inland cities,

---

[95]  Peng I Dep. at 366:10-367:16.

[96]  OEG Dep. at 40:10-22.

[97]  *Id*. at 35:10-36:24, 38:1-39:13; *see also* Ex. 15 to OEG Dep. (email dated 8/2/2006 from Bill Che to Ernest Teitelbaum regarding his trip to China) (TG0000779) (Herman Aff. Ex. "59").

[98]  Gonima I Dep. at 35:5-9.

[99]  *Id*. at 35:10-18, 46:24-47:1; Gonima II Dep. (Herman Aff. Ex. "60") at 58:1-60:21.

[100]  Ex. 10 to Gonima I Dep. at p. 3 (email dated 4/15/2007 from Ivan Gonima to Bill Cher) (TG0000917) (Herman Aff. Ex. "62"); Gonima I Dep. at 138:5-15, 140:23-141:22; Che Dep. at 64:12-19,

such as Orlando, the freight costs had to also include the costs of ground shipping from the closest U.S. port.[101]

Bill Cher readily complied.  He researched extensively shipping costs from China to specific customer locations in United States and even offered to "book the shipping space" and "operate" the freight for Taishan's American customers.[102]  On November 8, 2006, Bill Cher gave Ivan Gonima a quote via email for shipping Taishan's drywall to Miami.[103]  On April 17, 2007, Bill Cher sent another email to Ivan Gonima with price quotes for shipping Taishan's drywall from China to the following expanded list of American cities:  Gulf Port, Mississippi; New Orleans, Louisiana; Long Beach, California; Las Vegas, Nevada; Savannah, Georgia; Atlanta, Georgia; Charleston, South Carolina; Wilmington, North Carolina; and San Juan, Puerto Rico.[104]  For the coastal cities, Taishan's shipping quote was port to port (CY - CY), but for inland cities, the quote was port to door (CY - DR).[105]  Peng Wenlong also testified that he

---

66:7-9; Ex. 8 to Che Dep. (email dated 11/8/2006 from Ivan Gonima to Bill Cher) (TG0000522); Ex. 11 to Che Dep. (email dated 5/10/2007 from Ivan Gonima to Bill Cher) (TG0000902) (Herman Aff. Ex. "61").

[101]  Ex. 8 to Che Dep. (email dated 11/8/2006 from Ivan Gonima to Bill Cher) (TG0000522).

[102]  *See, e.g.* Ex. 5 to Gonima I Dep. at p. 1 (email dated 9/5/2006 from Che Gang to Ivan Gonima) (TG0000532); Ex. 10 to Gonima I Dep. at pp. 2 & 4 (emails dated 4/13&16/2007 from Bill Cher to Ivan Gonima) (TG0000916-918); Ex. 24 to Che Dep. (emails dated 4/10/2007 from Bill Cher to broker Rafael Sardi: "we will arrange production and ship[p]ing" "to Miami Port") (TG0000514) (Herman Aff. Ex. "63"); Gonima I Dep. at 140:19-22.

[103]  Ex. 8 to Che Dep. (email dated 11/8/2006 from Bill Cher to Ivan Gonima quoting freight costs from China to Miami) (TG0000521); Ex. 2 to Che Dep. (Herman Aff. Ex. "64") (email dated 4/13/2007 from Bill Cher to Ivan Gonima quoting freight costs from Qingdao, China to Miami and New York) (TG0000918).

[104]  Ex. 10 to Che Dep. (email dated 4/17/2007 from Bill Cher to Ivan Gonima) (TG0000913-914) (Herman Aff. Ex. "65").

[105]  *Id*.; *see also* Ex. 15 to Che Dep. (email dated 1/10/2006 from Chegang (Bill Cher) to Mike Westbrook, providing freight quote from Qingdao to LA) (TG0000907-908) (Herman Aff. Ex. "66"); Ex. 5 to Gonima I Dep. at p. 1 (email dated 9/5/2006 from Bill Cher to Ivan Gonima) (TG0000532); *see* Ex. 3 to Peng I Dep. (Taishan responded promptly with quotes for drywall to a request from Darren Dai, of

assisted customers with all of the shipping arrangements, and, if necessary, Taishan included

wooden pallets and hanging belts for the shipping and even paid for the freight itself to the

United States.[106]

      Not only did Taishan provide quotes for shipping, but the company also made

recommendations as to the use of particular shipping companies,[107] the method of shipping,[108]

and the means of delivery of its drywall to specific locations.  For example, in its dealings with

OTC, Taishan suggested which ports and other means of transportation to use to get the drywall

deliveries inland to the ultimate consumer.  When asked about deliveries to a specific destination

port in the U.S., Ivan Gonima testified as follows:

> Q. How about the destination port in the US for the drywall, did
> Oriental Trading decide on which port to use?
>
> A. It was -- it was a -- it was a -- I would say that at the end we had
> the final decision, but -- but it was kind of an agreement between
> both parts, and let me tell you why.  Let's say that we were talking
> to a huge development that was taking place in Vegas, and there
> we were talking to another one in Biloxi or Jackson, somewhere in
> Mississippi, Biloxi, I think, it was close to Biloxi, but anyways, we
> said, "Okay, guys, we, being in Florida, the place for us to get the
> drywall would be the Everglades."  We were even considering
> Jacksonville or Miami, but finally we said the Everglades.  "But
> we probably have customers in Vegas."  Then they [Taishan/Bill
> Cher] suggested, like, **"Okay, why don't you use Long Beach
> and from Long Beach you take it by train to Vegas?"**  Or
> another time -- and when we were talking about Texas, New

EUPUSA, who was interested in "Door to Door service (including all things, freight, duty and
whatever).").

    [106]  Peng I Dep. at 320:19-321:23, 356:20-358:14, 372:13-374:8; Peng II Dep. at 519:19-521:11
(Taishan included wooden pallets and hanging belts for shipment of drywall).

    [107]  *See*, *e.g.*, Ex. 29 to Che Dep. (email dated 7/14/2007 from Bill Cher to Joseph Weiss,
suggesting that ZIM shipping company be used over OCCI) (TG0021997) (Herman Aff. Ex. "67"); Ex. 2
to Che Dep. (email dated 4/16/2007 from Bill Cher to Ivan Gonima suggesting ZIM shipping company)
(TG0000916).

    [108]  Ex. 12 to OEG Dep. (email dated 7/27/2006 from Bill Cher to Ernest Teitelbaum)
(TG0001182) (Herman Aff. Ex. "68"); OEG Dep. at 100:15-101:8.

> Orleans, they -- they suggested Biloxi in the Gulf of -- in the Gulf of Mexico.  What other?  Savannah, Georgia.  So it was -- we were not the ones saying, "You have to ship it to this place."  So if they were saying, "Hey, Ivan, if you -- Bill Cher, basically.  When I say "they" it's Bill Cher, because he was the only guy at first talking to me, so if he says, **"Ivan, I think it's better if you go through Savannah for that shipment to Atlanta, it's going to be cheaper,"** and if the price was better, we would do it.  So it was not that we were just close to a port, a specific port in the states.[109]

In light of this uncontroverted evidence, it is disingenuous for Taishan to contend it had no idea where its products would end up.[110]

Taishan relies on the fact that its deliveries were FOB or CIF, which, according to Taishan, means that the company "was not responsible for shipping the drywall anywhere beyond the Chinese port."[111]   When asked whether "[u]nder the FOB term, TTP was responsible for delivering the drywall onboard ship in the Chinese port," however, Ivan Gonima clarified that:

> FOB means free on board, and technically what you are saying is right.  Now, **they [Taishan] were in charge of finding the shipping company, they were in charge of making the deal with the shipping company**, and we were to pay, because they said that they could get a better price through their connections in China.  And we did some research here in the states, and the prices they offered us for the shipping that they gathered from some shipping companies or brokers in China, they were a little bit better than the ones that we got here in the states, so we went with them, uh huh.  So, yes, it was free on board, but **the price they were giving us was free on board, but they were the ones hiring or making the arrangements for the shipping.**[112]

Taishan's American customers operated with the understanding that Taishan participated in and was integrally involved with the shipping arrangements for delivery of Taishan's drywall to

---

[109]  Gonima II Dep. at 59:17-60:21 (emphasis added); *see also* Gonima I Dep. at 81:12-82:6.

[110]  Moreover, there is evidence that Taishan received confirmation that its shipments reached the United States.  *See, e.g.*, Exs. 13 & 14 to Peng I Dep. (Official Tai Shan Gypsum Co., Ltd. Export Report and Translation) (TG0025222-223) (Herman Aff. Ex. "69").

[111]  *E.g.*, *Mitchell* Br. at 17; *Germano* Br. at 8-9; *Wiltz* Br. at 16-17.

[112]  Gonima II Dep. at 58:1-19 (emphasis added).

25

specific destinations within the United States, in Virginia, in Florida, in Louisiana, in California, and elsewhere.

**6.      *Taishan offered and sold a wide array of
construction products to the United States.***

Taishan is a full-service building materials company that aggressively marketed and sold itself as worldwide export company:

> Q. Page 37. 8/15/2007 is the date. The time is 10:55:20. The statement from Ivan to Mr. Che Gang and response by Mr. Che Gang to Ivan.  Statement from Mr. Ivan, "We are looking for a very long commercial relationship."   Answer from Che Gang at 10:55:52 on the same date, "You can success."  Do you recall that, sir?
> A. First of all, let me tell you that the stuff on MSN, as I had also explained to Mr. Judge as well as explained to you, that I do not recall clearly about it. But from the form that appears here, it should be a polite response only. There's no substantial meaning to that.
> Q. Well, let me ask you this, sir. You agree with me that the more product you sell, the better it is for the company. Correct?
> A. For sure.
> Q. And the more product you sell, the better it is for you?
> A. It's better for me.
> Q. You would have no objection to selling a lot of product to Ivan Gonima or Oriental Trading. Correct?
> A. It is the same. It doesn't matter who I sell it to, as long as I get the money.
> Q. That's right. They have to pay you?
> A. And then they get the goods.
> Q. Right?
> A. Therefore, it doesn't matter who I sell it to.
> Q. In fact, if you look at the promotional materials that your company, TTP, had during the time of its existence, it bragged about the fact that it sold to the United States of America. Correct?
> A. I don't know what are the materials you're referring to here.
> Q. The company held itself out as a worldwide company. Correct?
> A. That's only a way for marketing.[113]

As part of its business, Taishan marketed itself to sell a wide variety of products.  Taishan's promotional materials and sales to the United States demonstrate the wide range of products

---

[113]   Che Dep. at 102:9-104:10 (emphasis supplied).

Taishan was willing to sell.[114]  For example, Taishan provided quotes for a wide range of building products in addition to drywall, such as steel belting, metal studs, metal tracks, screws and joining tape, to its U.S. customers.[115]  Taishan demonstrated its desire to do further business selling not just drywall but a broad array of related products in the United States, when it reached out to OTC, its sole agent and distributor in the United States, to sell metal studs, metal tracks, screws and joining tape:

> Q. And you have -- The quotation you provided was for gypsum board, metal studs, metal tracks, screws and joining tape. Correct?
> A. These are all the requests of the client.
> Q. These are products that Taishan Gypsum sells. Correct?
> A. In this period of time, we could sell these products at Taishan Gypsum.[116]

> Q. Page 34, August the 15th, 2007, again, metal studs.  Do you recall writing to Mr. Che Gang that you on behalf of your company were exporting metal studs to the United States of America?
> A. Where is it?
> Q. August the 15th, 2007, 10:33 53 seconds from Mr. Che Gang to Ivan [of OTC], "We can operate some metal studs."  Answer from Ivan, "Sure, we can do that and it will help." Statement from you at 10:34:14, Mr. Che Gang to Ivan, "We are exporting to USA."  Do you see that, sir?
> A. I am looking at it now.
> Q. Do you recall that conversation on August of 2007 by MSN messaging?
> A. That's what appears to be here.[117]

In fact, when TTP was obligated to return to OTC a $100,000 deposit it had prepaid for Taishan's drywall, TG tried to sell OTC metal studs and drywall screws in exchange for the

---

[114]  Plaintiffs' Ex. 20 to Jia II Dep.; Exs. 4 & 27 to Che Dep.; Exs. 4, 25 & 33 to OEG Dep.; Exs. 2 & 3 to Gonima II Dep.

[115]  *Id*.

[116]  Che Dep. at 77:21-78:8 (emphasis supplied); Ex. 4 to Che Dep. (quotes for drywall, metal track, metal studs, screws, joining tape).

[117]  *Id*. at 101:1-22 (emphasis supplied).

$100,000 deposit:

> A. [...] At the time we owed Oriental Trading Company $100,000 when I worked for TTP.  So all these was suggestions about how should we handle that $100,000. So all these shipments you're seeing here were suggestions about that issue. Don't only look at the titles.
>
> ***
>
> Q. Thank you, sir. That's very helpful.  So what you're trying to do is to pay your debt to Oriental Trading through providing some goods as listed in this invoice or quotation from Taishan Gypsum; is that correct?
>
> A. I don't understand.
>
> Q. Why don't you tell me again why it is that you are providing this quotation to Ivan Gonima as a representative of Oriental Trading as it relates to the $100,000 that TTP owed it?
>
> A. The customer requested us to prepare this quotation, but as I reminded you earlier, do not only look at the title.
>
> Q. Yes. You were explaining to me how you were providing this information with respect to monies that were owed to Oriental Trading as a result of transactions done with TTP.  Please explain exactly what you meant by that.
>
> A. In this period of time, the company where I worked at had already become TG.  However, I had to handle the money that I owed to him. Therefore, as I said earlier, do not only look at the title. This is only a form that I randomly grabbed. The content of it was for the purpose of handling the $100 of Oriental Trading Company. This is a fact.
>
> Q. $100,000. Correct?
>
> A. Correct.
>
> Q. And it was owed by TTP.  Correct?
>
> A. Correct.
>
> Q. To Oriental Trading. Correct?
>
> A. Correct.[118]

TTP also made extensive sales of metal studs to OEG Building Materials in New York that totaled over $150,000.[119]  As to the sales of metal studs to OEG, Mr. Che testified:

> Q. Did there come a time when TTP began selling not only drywall but also metal studs to OEG Building Materials?
>
> A. Yes. Yes. At the time not only we provided the customers with

---

[118] *Id*. at 79:4-81:6; Ex. 4 to Che Dep.

[119] *See* Chart showing Taishan's sales of other products in the United States (Herman Aff. Ex. "164").

gypsum board, but also later we purchased from Golden Shield company in accordance with request of the customer the metal stud and then sent to OEG.[120]

Taishan also sold steel belts to OEG:

> Q. In your e-mail reply of January 28, 2007, and I refer you to the second paragraph. I'll read it as follows: "Actually the price of steel belt has increased by about 6%. We tried our best to persuade the steel belt factory to keep the same price for us," but "we have a long time and steady demand on steel belt. Finally the steel factory offered the price 3% higher than last delivery in the case that we pay 50% of full amount in advance in four days.  In order to build up the long time business cooperation and support you to compete in USA market, we will swallow the increased cost; we will offer the same price as last 16  containers."  Is that what you said in your e-mail of January 28, 2007 to Joseph Weiss of OEG?
> A. This is what I said in the e-mail. But my expression meant that the customer could give us new orders as soon as possible, because the raw materials price is increasing, because our price that had been handled was FOB Chinese port delivery. We didn't really care about anything else.[121]

 In addition to the metal stud sales, TG also sold over $50,000 of plywood to Venture Supply and a paper machine to a company in Ohio.[122]

From February 2006 through June 2010, in addition to its sales of drywall to the U.S., Taishan purchased millions of dollars of waste paper from the U.S.[123]  Today, Taishan still imports waste paper from this country for use in the manufacturing of its drywall.[124]  Taishan either on its own or through related entities imported over $17,000,000 dollars of waste paper from various states, including:  Florida, Virginia, California, New York, Massachusetts, North

---

[120]   Che Dep. at 316:9-18.

[121]   *Id*. at 321:18-322:21 (emphasis supplied); Ex. 28 to Che Dep. (email dated 1/28/2007 from Bill Cher to Joseph Weiss of OEG USA (TG0019701).

[122]   Chart of Taishan's sales of other products in the United States (Herman Aff. Ex. "164").

[123]   *See* Chart showing Taishan's purchases of waste paper from the United States for use in the manufacture of its drywall (Herman Aff. Ex. "150").

[124]   Jia II Dep. at 920:19-921:7.

Carolina, Maryland, Washington, Hawaii, New Jersey, Texas and South Carolina.[125]  Taishan imported this waste paper from the United States and recycled the waste paper in its paper factory that it owns in China for use in the drywall it manufactured and exported back to the United States.[126]  Thus, the circle is complete between Taishan and the United States:  Taishan imported U.S. waste paper for use in the drywall that it sold to the United States along with an entire line of construction products ranging from drywall, to metal studs, screws, joint tape and steel belts.  Moreover, as late as 2010, Taishan wanted to do more business with the United States, including importing electronics and other items.[127]

> C.    **Taishan Successfully Targeted Customers in Virginia and Customized its Chinese Drywall to Meet Their Specifications.**

Taishan manufactured and sold its Chinese Drywall to Venture Supply, a company from Norfolk, Virginia, for installation in homes in Virginia.  Correspondence obtained from Venture Supply and other documents produced in discovery evidence a specific intent on the part of Taishan to custom manufacture its drywall boards with made-to-order specifications for Venture Supply for use in Virginia.  Contrary to Taishan's claim that it sold only two shipments of drywall to Venture Supply in the United States, throughout their dealings, Taishan and Venture Supply were actively seeking to expand the sales and distribution of Taishan's drywall in the United States.  The documents produced by Venture Supply are replete with examples of Taishan's efforts in this regard.  Peng Wenlong (Frank Clem/Frank Peng), who was in charge of export sales for Taishan,[128] wrote to Venture Supply's representative Phillip Perry expressing

---

[125]   Chart showing Taishan's purchases of waste paper from the United States (Herman Aff. Ex. "150").

[126]   Jia II Dep. at 918:11-17.

[127]   Gonima II Dep. at 86:12-89:11.

[128]   Che Dep. at 60:8-14.

Taishan's intent to sell its products in this country: "First, it is our hope to cooperate with you to enlarge the market at your end."[129]  Again, Taishan emphasized its goal to become "one of the biggest gypsum board producing factor[ies]" for the U.S. market:

> It is our hope to cooperate with you especially in the field of gypsum board.  **We know that you are one of the powerful companies to deal with the gypsum products in your country**. And we would like to introduce ourself as one of the biggest gypsum board producing factory with the annual production of more than 200 million square meters.  We are confident that there is a bright future for our cooperation by joint efforts.[130]

Taishan's enthusiastic desire to expand its market in the United States quickly manifested into a plan for Venture Supply to serve as Taishan's representative in this country so it could broker deals with other suppliers across the U.S.  In furtherance of that plan, Peng Wenlong hosted Venture Supply's representative Phillip Perry in China on several occasions, for multiple days, to seal the deal.[131]  During those meetings in China, they even called Venture Supply's owner Sam Porter to keep him apprised of the talks.[132]  After Phillip Perry's trip to Taishan, he reported to Mr. Porter:

> They [Taishan] said that a lot of American companies have made enquiries, but I was the first to show enough interest to make the trip.  If we continue this size purchases or increase the volume, they will make us the USA representative.[133]

---

[129] *See* Email dated 11/30/2005 from Frank Clem to Phillip Perry (V002471-473) (Herman Aff. Ex. "70").

[130] *See* Fax dated 12/2/2005 from Taishan representative Frank Clem to Venture Supply owner Sam Porter (emphasis added) (V000386) (Herman Aff. Ex. "71").

[131] Peng I Dep. at 366:10-367:16.

[132] *Id*. at 369:21-370:8; Deposition of Samuel G. Porter/Venture Supply Company and Porter/Blaine Corp. dated 12/16-17/2009 ("Porter Dep.") (Herman Aff. Ex. "72") at 345:1-16.

[133] *See* Email dated 11/7/2005 from Phillip Perry to Sam Porter and Venture Supply employee (V002703) (Herman Aff. Ex. "73").

Taishan cannot credibly deny its awareness of Venture Supply's efforts on Taishan's behalf to

sell Taishan's drywall in the United States, having received the following email:

> In that [Chinese Drywall installer] Porter/Blaine is going to be a
> major purchaser of your products, they have asked me to approach
> you with the idea of becoming the exclusive distributor of the
> Shandong Taihe Dongxin Co., LTD. in the USA.  This is an
> important priority with them.  Please give this serious
> consideration.[134]

Venture Supply wrote to Taishan to inform the manufacturer in specific terms how it

expected to sell Taishan's drywall in Virginia and beyond:

> We came to you all alone and at great expense to visit your factory
> and begin the process of buying boards for both our mutual
> benefits.  We were the first persons to make that trip to you in four
> years, and we sought you out in part because our research show[s]
> that you could produce the boards at an acceptable price for the
> competitive market here.
> ...
> Now the demand is for us to take 300K each and every month on a
> T/T payment to get the **sole rights to the USA.**
> ...
> We researched the market carefully and concluded that in our area
> it would need about 120K to be effective each and every month for
> a long period.
> **Other parts of the country would receive similar injections of**
> **materials in the 50K to 100K per month by us.**
> ...
> Earlier on I mentioned that we spent about 18 Million on product
> last year, and **we want to expand and we shall!** ... In this area
> where we reside and work, the market share we dominate is
> roughly 53% of product.  We know exactly how much can be sold
> here with out harm and how much to sell for a good profit.  **The**
> **other parts of our country will handle goods on a similar guide**
> **line**.  We want to expand but not burst the bubble.[135]

Taishan's numerous communications with Venture Supply, via instant messaging and email,

---

[134]  *See* Email dated 11/10/2005 from Phillip Perry to Frank Clem (V002608) (Herman Aff. Ex. "74").

[135]  Ex. 22 to Porter Dep. (email dated 12/14/2005 from Sam Porter to Frank Clem) (emphasis added) (V002358-361) (Herman Aff. Ex. "75").

demonstrate that Venture Supply was actively assisting Taishan to distribute its product

throughout the United States <u>without any geographic limitation</u>:

> Frank Peng [Taishan]: I would like to inform you that the company, **Certified products international Inc. also want to import our boards to the U.S.A.** I refused to produce for them. Would you please or let other people from your company contact them? But please do not let them know it is me to let you contact them.
>
> Phillip [Venture Supply]: yes, and thank you for the information...
>
> Frank Peng: They said they want to send the boards to Norfolk...
> Frank Peng: U just have the contact number of their China office. **I think it is better for you to contact their head office in the USA.**
>
> Phillip: sounds like a very good idea.
>
> Frank Peng: I am writing to you by e-mail. Please wait.[136]

Taishan expected and intended for its expansion into the United States to continue. Taishan's

representative expressed this desire to Venture Supply: "it is our hope to set up and keep a long

term and steady relationship with your company."[137]

In furtherance of Taishan's plan to sell its drywall to Venture Supply in Virginia, on

November 9, 2005, Venture Supply provided a letter of credit to Taishan in the amount of

$429,600.00.[138] This letter of credit was intended for the purchase of "120,000 sheets of drywall

---

[136] *See* Instant message discussion dated 12/15/2005 between Frank Clem and Phillip Perry (emphasis added) (V002371-372) (Herman Aff. Ex. "76"); *see also* Emails between various U.S. merchants and Venture Supply regarding the distribution of Taishan's products in Virginia, Texas, New York (V002282, V002344, V002430, V002488) (Herman Aff. Ex. "77").

[137] Email dated 12/15/2005 from Frank Clem to Phillip Perry (V002368-370) (Herman Aff. Ex. "78").

[138] *Germano*, 706 F. Supp. 2d at 661; Ex. 39 to Porter Dep. (Letter of Credit Application for Venture Supply) (V001811-818) (Herman Aff. Ex. "79").

to meet all USA ASTM ratings and fire rating standards."[139]  Taishan then formalized the plan for Venture Supply to sell Taishan's Chinese Drywall to The Porter-Blaine Corp. ("Porter/Blaine") for use in Virginia by way of two sales contracts.  Taishan agreed in each contract to custom manufacture 100,000 sheets of its drywall with an identification label on the edge binding showing that the gypsum board would be "DISTRIBUTED BY VENTURE SUPPLY, INC." and another label on the back of the board showing "**VENTURE SUPPLY, INC.** MFG. Shandong Taihe Dongxin, Co., Ltd., China."[140]  These customized labels were put on the end tabs for the drywall, along with Venture Supply's telephone number.[141]  The contracts specified a sales price in U.S. Dollars ($358,000 and $366,800, respectively).  Venture Supply's owner Samuel G. Porter executed the first contract dated November 17, 2005, in Norfolk, Virginia.  Mr. Porter's signature on the contract was then faxed to Taishan in China.  This contract specifically provided that "[t]he fax copies are regarded as valid."[142]  The second contract dated December 16, 2005, was executed by Venture Supply's representative Phillip Perry and Taishan's representative, Fu Tinghuan.[143]

---

[139]  *Id.*

[140]  *Germano*, 706 F. Supp. 2d at 662; Ex. 3 to Fu Dep. (contract dated 11/17/2005 between Taishan and Venture Supply for 100,000 sheets of drywall) (TG0001684-685) (Herman Aff. Ex. "80"); Ex. 4 to Fu Dep. (contract dated 12/16/2005 between Taishan and Venture Supply for 100,000 sheets of drywall) (TG0019854-855) (Herman Aff. Ex. "81"); Fu Dep. at 104:9-106:21; Ex. 81 to Porter Dep. (email dated 11/16/2005 from Phillip Perry to Frank Clem with instructions for custom label) (V002541). Taishan admits that "Taishan manufactured drywall to US dimensions on a made-to-order OEM basis on two isolated occasions for a U.S. purchaser, Venture Supply, Inc."  Taishan MPF at 2; *see also* TTP MPF at 2 (admitting that "TTP manufactured drywall to US dimensions on a made-to-order OEM basis").

[141]  Porter Dep. at 60:9-61:14; Ex. 81 to Porter Dep.

[142]  Ex. 3 to Fu Dep. (TG0001685).

[143]  Ex. 4 to Fu Dep.; Fu Dep. at 102:2-105:6; Ex. 69 to Porter Dep. (letter dated 12/1/2005 from Sam Porter to Whom It May Concern confirming appointment of Phillip W. Perry of Tobin Trading, Inc. as Agent of Venture Supply with authority to sign contracts up to $450,000) (Tob00057) (Herman Aff. Ex. "82").

Mr. Porter testified that he requested that the first shipment of Taishan's drywall be shipped to Norfolk, Virginia.[144]  Although that shipment was destined for Norfolk, the ship was too deep to fit into the Bay at Lamberts Point. Accordingly, the cargo was diverted to Newport News, Virginia, where some of the drywall was unloaded, and then the remaining shipment of Taishan board was returned to Norfolk where it was unloaded.[145]

On December 25, 2005, pursuant to their contract Taishan shipped the second order of customized drywall to Venture Supply from the Chinese Port of Loading, Lianyungang.[146]  The shipment arrived in the United States in February, 2006.[147]  The shipment was offloaded in Camden, New Jersey.[148]  Thereafter, Venture Supply shipped Taishan's Chinese Drywall to each of the Intervening-Plaintiffs' homes in *Germano*, and Porter/Blaine installed the drywall in Plaintiffs' homes in Virginia.[149]

There can be no doubt that Taishan was aware that Venture Supply intended to use Taishan's drywall in Virginia.  When Taishan's Chief of its Foreign Trade Department Peng Wenlong was asked at his deposition whether Mr. Perry from Venture Supply ever told Taishan that "the gypsum he was purchasing from [Taishan] would be used in Virginia?," he replied:

---

[144]  Porter Dep. at 33:2-34:1; *see also* Ex. 84 to Porter Dep. (email dated 11/24/2005 from Phillip Perry to Zhang, cc Frank Clem regarding shipment to Norfolk, Virginia) (V002507) (Herman Aff. Ex. "83").

[145]  Porter Dep. at 33:2-34:1.

[146]  *Germano*, 706 F. Supp. 2d at 661.

[147]  *Id*. at 661-62.

[148]  *Id.*  Ultimately, "the second shipment of drywall was reduced to 53,912 sheets on 586 pallets, which was shipped onboard the M/V Atlantic Fortune from the Chinese Port of Loading, Lianyungang." *Id*.

[149]  *Id*., *citing* 2/19/2010 Trial Transcript, Vol. I at p. 17(9-14), p. 13(16-20), p. 16(22)-17(2), p. 20(17-24) (Herman Opening).

> [Mr. Perry] did not say he might use it in Virginia.  **He did say probably.  He is shipping the drywall to Virginia.**[150]

Consistent with this, Mr. Peng assisted Venture Supply with the research and making contact with the shipping company.[151]  Beyond this, Taishan had confirmation that not only did Venture Supply receive the drywall in Norfolk, Virginia, but Taishan's drywall was actually used in projects in Virginia.  Peng Wenlong stated in his official "Tai Shan Gypsum Co., Ltd. Export Report" that:

> Mr. Phillip Perry replied that our plasterboard after arriving at the destination (Norfolk, Virginia) was well received by the market and had already been used in the projects, without having any negative feedback.[152]

Taishan's efforts to sell its drywall in Virginia were undeniably successful.  It is undisputed that Taishan manufactured the Chinese Drywall installed in the homes of Intervening Plaintiffs in *Germano* in Virginia, which were the subject of a bellwether trial on the costs of remediation leading to the default judgment entered against Taishan.

## D. Taishan Successfully Targeted Customers in Florida, Shipping its Drywall to Miami, Tampa and Orlando.

As shown above, Taishan entered into an exclusive agency contract with OTC, with offices in Miami and Orlando, Florida.[153]  Ivan Gonima testified under oath that he "let [Taishan] know" that OTC "want[ed] [Taishan's] drywall exported to Florida."[154]  On April 12, 2007, Mr.

---

[150]  Peng I Dep. at 332:5-20 (emphasis added).

[151]  *Id*. at 356:20-358:14; 372:13-374:8.

[152]  Exs. 13 & 14 to Peng I Dep. (Official Tai Shan Gypsum Co., Ltd. Export Report and Translation).

[153]  *See* Ex. 4 to Gonima II Dep.; Ex. 2 to Che Dep. (email dated 4/17/2007 from Ivan Gonima to Bill Cher asking Mr. Cher to include OTC's Orlando office manager on all emails) (TG0000916).

[154]  Gonima I Dep. at 33:11-13, 33:16-18; Ex. 2 to Gonima II Dep. at pp. 25-26 (instant message discussion dated 4/14/2007 between Ivan Gonima and Che Gang).

36

Gonima sent Bill Cher an email providing Taishan with specific "directions for shipping" almost 1 million square feet (20,100 sheets) of its drywall to Florida.[155]  Mr. Gonima informed Taishan that:  "Half of this order will have Miami, FL as a destination; the other half will go to Orlando, FL. (50% of containers to Miami, FL and 50% of containers to Orlando, FL)."[156]  Because the shipment to Orlando required transportation inland in order to reach the customer, Mr. Gonima was careful to instruct Taishan regarding the maximum weight allowances on Florida roads:

> THIS IS VERY IMPORTANT: MAKE SURE THAT THE MAXIMUM LOAD YOU PUT IN A 40' CONTAINER IS 55,000 POUNDS.  According to the DOT (Department of Transportation) regulations, we cannot move [o]n Florida roads any load higher than that.[157]

Bill Cher acknowledged that the container would be "within the road-carrying weight limit."[158] And, he provided Mr. Gonima with prices for freight from Qingdao, China to Miami, Florida, as well as to New York.  Mr. Cher also offered to operate the freight for OTC.[159]

    In addition to this order for delivery to Miami and Orlando, Mr. Gonima asked Taishan to provide a quote for a much larger order of 2 million sheets of drywall for delivery to Golfport in

---

[155]  Ex. 2 to Che Dep. (email dated 4/12/2007 from Ivan Gonima to Bill Cher) (TG0000919); Invoice dated 12/30/2006 to OTC (TG0000619) (Herman Aff. Ex. "84").

[156]  Ex. 2 to Che Dep. (email dated 4/12/2007 from Ivan Gonima to Bill Cher) (TG0000919).

[157]  *Id*.

[158]  *Id*.

[159]  *Id*. (email dated 4/13/2007 from Bill Cher to Ivan Gonima) (TG0000918); Che Dep. at 60:23-62:6; *see also* Che Dep. at 209:18-23; Ex. 8 to Deposition of Peng Shiliang dated 1/11/2012 ("Peng S. Dep.") (Herman Aff. Ex. "85") (Taishan Special Invoices for Export for 20,100, 4,900, 5,880, 1,960, 4,900, 2,940, 2,010, 6,700, 6,700 pieces of drywall to OTC in Miami, Florida) (TG0001661, TG0001663-670); Peng S. Dep. at 95:9-96:15.

Florida.[160]  He emphasized that this quote was "VERY important" because the sheets "would be for the reconstruction of some cities destroyed by Hurricane Katrina."[161]  This was no problem for Taishan, as the company had plenty of experience and a track record of exporting its drywall and other products to customers in the United States.[162]  Mr. Che readily agreed "to confirm it quickly."[163]

Taishan did not rely solely on the efforts of OTC to sell Taishan product in Florida and elsewhere.  Bill Cher had direct contact with other organizations as well.  On September 2, 2006, Taishan entered into a contract with B. America Corporation for the sale of Taishan's drywall to be produced according to ASTM standards with delivery CFR to Miami, Florida.[164]  That contract was later canceled due to the fact that "both parties [could] not bear the dropped price in the American market."[165]  However, on April 7, 2007, Taishan prepared an invoice to B. America for delivery of 660 sheets of drywall to Miami Port.[166]  Taishan then prepaid the freight, arranged

---

[160]  Ex. 2 to Gonima II Dep. at p. 26 (instant message discussion dated 4/14/2007 between Ivan Gonima and Che Gang).

[161]  *Id.*

[162]  Plaintiffs' Ex. 20 to Jia II Dep. at p. 2; Gonima I Dep. at 32:18-33:1 (Taishan mentioned to Ivan Gonima that they "have been exporting to New York customer and sometimes to other states").

[163]  Ex. 2 to Gonima II Dep. at p. 26 (instant message discussion dated 4/14/2007 between Ivan Gonima and Che Gang).

[164]  Exs. 19 & 20 to Che Dep. (contract (SDTH0600902) dated 9/2/2006 with B. America Corporation) (TG0021705 & TG0021695) (Herman Aff. Ex. "86").

[165]  Ex. 2 to Deposition of Rafael Sardi, owner of Onyx Gbh Corporation, dated 2/9/2012 ("Onyx Dep.") (contract (SDTH0601123) dated 11/23/2006 canceling contract dated 9/2/2006) (Herman Aff. Ex. "87").

[166]  Ex. 16 to Deposition of James Martin Alexander (representative of shipping agent Delmar Logistics Georgia) dated 12/22/2011 ("Delmar Dep.") (Taishan invoice dated 4/7/2007 to B. America for $5,656.20, after taking into account a credit of $6,745.20 for undelivered drywall from a previous order)

for the product to be shipped to Miami and shipped the drywall to R&R Building Materials in

Miami, Florida, with notification to B. America, as set forth in Taishan's Bill of Lading.[167]  As

part of this transaction, Taishan took out insurance for the cargo, knowing it would be delivered

in Miami, Florida.[168]  The following year, Bill Cher wrote to Maria Muci of B. America

Corporation in Doral, Florida, and provided that company with price quotes for Taishan's

drywall.  Mr. Cher told B. America: "I hope we can establish business as soon as possible."[169]

In addition to B. America, Taishan entered into a sales contract with Wood Nation,

located in Tampa, Florida.  Wood Nation's President, Richard Hannam, testified that he traveled

to China to visit Taishan's plant and inspect Taishan's drywall because one of [Wood Nation's]

customers, Suncoast Building Materials, Inc., was interested in purchasing 500 containers of

---

(Herman Aff. Ex. "88"); Ex. 17 to Delmar Dep. (Taishan packing list dated 4/7/2007 for shipment to B. America) (Herman Aff. Ex. "89"); Ex. 2 to Delmar Dep. (email dated 4/10/2007 from Bill Cher to Rafael Sardi regarding shipment to B. America) (TG0000510) (Herman Aff. Ex. "90").

[167]   Ex. 19 to Delmar Dep. (Taishan Bill of Lading for transport of drywall to R & R Building Materials) (Herman Aff. Ex. "91"); Delmar Dep. (Herman Aff. Ex. "202") at 118:5-122:24; Ex. 7 to Delmar Dep. (Delmar invoice to B. America for 6/11/2007 custom entry fee, duty and inland freight) (Herman Aff. Ex. "92"); Ex. 5 to Delmar Dep. (tracking sheet for shipment to Onyx/B. America with ETA 6/11) (Herman Aff. Ex. "93"); Ex. 11 to Delmar Dep. (delivery order to Port Everglades Terminal for R & R Building Materials) (Herman Aff. Ex. "94"); Ex. 14 to Delmar Dep. (entry summary for U.S. Customs and Border Protection showing Taishan delivery to Miami) (Herman Aff. Ex. "95"); Delmar Dep. at 116:18-23; Ex. 20 to Delmar Dep. (arrival notice for shipment to Miami) (Herman Aff. Ex. "96"); *see also* Ex. 2 to Onyx Dep.; Onyx Dep. (Herman Aff. Ex. "97") at 63:19-64:15; Ex. 24 to Che Dep. (emails dated 4/10/2007 from Bill Cher to Rafael Sardi: "we will arrange production and ship[p]ing" "to Miami Port") (TG0000514).

[168]   Ex. 18 to Delmar Dep. (Cargo Transportation Insurance Policy) (Herman Aff. Ex. "98"); Onyx Dep. at 28:9-21, 69:19-70:19.

[169]   Ex. 25 to Che Dep. (email dated 4/15/2008 from Bill Cher to B. America) (TG0000843) (Herman Aff. Ex. "99").

drywall for shipment into the United States beginning June 2006 through December 2006."[170]

The Wood Nation agreement was for the sale of 500 40'-high containers, each holding 660 pieces

of Taishan's gypsum board, with a total value of $1,386,000.  The contract specified that the

drywall was to be delivered to "Tampa, Florida, USA."[171]  It also stipulated that the gypsum

drywall would be "produced to American Society for Testing and Materials ("ASTM") C

1396-04 Standards" and that "ASTM C 1396-04" would be stamped on the back of each

piece."[172]  Ultimately, the contract was revised, and only "40 containers of wallboard were

shipped [by Taishan] to the Port of Tampa in two shipments, one in July 2006 and the other in

August 2006."[173]  Suncoast Building Materials picked up both of Taishan's shipments at the Port

of Tampa.[174]

       Taishan also sold drywall to Devon International, for distribution in Florida and Alabama.

Beginning at least in 2004, Devon International was sourcing material from China, and Devon

International had employees who worked out of its office in Shanghai, China.[175]  At some point

prior to June 2006, Devon International was approached by North Pacific Group about arranging

---

[170]  *See* Richard Hannam Dep. at 94:8-98:11; Ex. 4 to Richard Hannam Dep. (draft affidavit of Richard Hannam).

[171]  Ex. 13 to Wood Nation Dep. (sales contract (WN7350) dated 6/10/2006 between Taishan and Wood Nation, Inc.) (TG0001482-484) (Herman Aff. Ex. "100").

[172]  *Id*. at ¶ 3.

[173]  *See* Wood Nation Dep. (Herman Aff. Ex. "101") at 82:6-83:5; Ex. 15 to Wood Nation Dep. (invoices for sales of Taishan's drywall to Wood Nation) (TG0001545-546) (Herman Aff. Ex. "102"); Ex. 28 to Wood Nation Dep. (emails and related documents regarding shipments to Wood Nation and revised contract) (Herman Aff. Ex. "103"); Ex. 4 to Richard Hannam Dep. at ¶ 10.

[174]  Ex. 4 to Richard Hannam Dep. at ¶ 12.

[175]  *See* Deposition of Robert Scharf, President of Devon International Trading, dated 3/24/2011 ("Scharf Dep.") (Herman Aff. Ex. "165") at 27:12-23, 31:13-33:24.

for the manufacturing of drywall from China.[176]  North Pacific provided Devon International with

plans and specifications for the drywall.[177]  After being approached by North Pacific, Devon

International looked into market prices for drywall that could be purchased in China to determine

if it could handle the order.[178]  Bob Scharf, President of Devon International, investigated drywall

prices, types, and specifications at local building supply companies in January and February 2006

to determine the economic viability of the transaction.[179]

      After determining that the transaction was possible, Bob Scharf traveled to China some

time between January 2006 and June 2006, for the purpose of arranging the sourcing of the

drywall.[180]  Scharf was accompanied to China by another Devon International employee, Julian

Chu.[181]

      Scharf inspected "three, perhaps four" factories in Shandong, China before he chose the

factory Devon International used to manufacture the drywall for North Pacific.[182]  Scharf testified

that the first factories they looked at "were not really very nice factories."[183]  Scharf further

testified that, when he arrived at these factories in China, he detected some sort of chemical odor

---

[176] *Id*. at 41:20-42:21.

[177] *Id*. at 77:9-80:3.

[178] *Id*. at 43:15-19.

[179] *Id*. at 43:20-45:23.

[180] *Id*. at 50:12-19.

[181] *Id*. at 60:10-17.

[182] *Id*. at 50:12-19.

[183] *Id*. at 50:20-51:2.

coming from the facilities, which he described as "horrible."[184]

However, when Scharf visited the Taishan factory he selected, he did not see those problems.[185]  This factory was about an hour apart from the other factories that Scharf visited.[186] Scharf chose this factory because it was the only factory big enough to handle the volume.[187] Scharf was given a tour of the Taishan factory.  He testified that the factory had a QC room and that he was shown it on the factory tour.[188]

On February 6, 2006, North Pacific gave Devon International Trading, Inc. a purchase order for 485,044 sheets of gypsum drywall "A" grade for arrival at Port in Pensacola, Florida.[189] Based on that purchase order, Devon International submitted an Order Request to Shandong Taihe Dongxin Company, Ltd. for 485,044 sheets of drywall on March 15, 2006.[190]  The destination on the order was originally Mobile, Alabama, but was changed to Pensacola, Florida.[191]

On March 30, 2006, Devon International received a sales confirmation from Taishan,

---

[184]  *Id*. at 51:3-53:11.

[185]  *Id*. at 57:2-18.

[186]  *Id*. at 59:21-60:2.

[187]  Deposition of Ruth Wu, Vice President of Devon International Trading, dated 2/25/2011 ("Wu Dep.") (Herman Aff. Ex. "172") at 75:5-16.

[188]  Scharf Dep. at 113:16-114:6.

[189]  *See* Purchase order dated 2/8/2006 from Devon International to North Pacific for 485,044 sheets of Chinese Drywall (DEVON00950) (Herman Aff. Ex. "166").

[190]  *See* Sales order confirmation from Shandong Taihe Dongxin Company, Ltd. dated 3/30/2006 to Devon International at pp. 15-16 (DEVON 00016-017) (Herman Aff. Ex. "167").

[191]  *Id*.

again indicating that the shipment was to be sent to Pensacola, Florida.[192]  The agreement

provided that the drywall would be packaged to include Devon Building Products' logo.  It

further provided that each sheet of the drywall would contain a statement that it "Meets or

Exceeds ASTM C139604 Standard."[193]

The drywall was manufactured and shipped to the United States aboard the Sanko Rally

to the Port of Pensacola.  The Sanko Rally experienced bad weather on the trip to Pensacola.

Because of the weather, the drywall was damaged in route from China to the Port of Pensacola.[194]

Consequently, because of the damage and the delay in shipment, NorPac did not purchase the

drywall when it arrived at the Port of Pensacola.[195]  After NorPac refused to purchase all of the

drywall, Devon International began selling the drywall to other customers.[196]  One of those

customers was Emerald Coast Building Supply.[197]  In turn, Mitchell Company acquired drywall

from Emerald Coast for some of its homes that it was constructing.

The remaining drywall was sold through various channels, including Mazer's Building

Supply in Birmingham, Alabama, Gulf Coast Shelter in Daphne, Alabama, and various

---

[192]  *Id*. at p. 16.

[193]  *See* Photographs (DEVON 00438, 00449, 00450, 00452, 00645, 00658, 00663) (Herman Aff. Ex. "168").

[194]  Scharf Dep. at 221:9-227:21.

[195]  *See* Letter dated 7/21/2006 from North Pacific to Devon International (DEVON 00951) (Herman Aff. Ex. "169"); Scharf Dep. at 222:15-223:24.

[196]  *Id*.

[197]  *See* Port of Pensacola discharge sheet, bill of lading (DEVON 00571-574) (Herman Aff. Ex. "170").

43

miscellaneous outlets.[198]

Discovery of other entities in this MDL, such as Banner Supply Company, has revealed additional sales of Taishan's drywall and metal framing in Florida.[199]  Taishan also responded to inquiries from Carn Construction, Tanader Tang from Bluefire International, and Wenny Yin from SCT Co., Ltd., expressing a willingness to ship product to Florida.[200]

In accordance with its expressed desire to sell more than 1 million sheets of its Chinese Drywall in the United States, Taishan shipped more than 9 million square feet of its plasterboard to Port Everglades in Fort Lauderdale, Orlando and Miami, Florida, having a value of $772,863.40.[201]

### E.    Taishan Targeted Customers in Louisiana After Hurricane Katrina.

Taishan was aware that "[a]fter Hurricane Katrina, the Great New Orleans area need[ed] rebuild[ing]" and the housing market in the United States was "very hot."[202]  Taishan availed

---

[198]  Scharf Dep. at 302:17-303:9.

[199]  *See, e.g.*, Banner Distributor Profile Forms (collectively, Herman Aff. Ex. "104"); *see also* Ex. 2 to Gonima II Dep. at p. 28 (instant message discussion dated 5/8/2007 between Ivan Gonima and Che Gang); Che Dep. at 101:1-22.

[200]  Carn Construction Dep. at 30:12-31:19; Plaintiffs' Ex. 31 to Jia II Dep. (emails dated 7/18-27/2006 between Bill Che and Tanader Tang re prices for drywall to be shipped from Qingdao, China to Port Everglades in Fort Lauderdale, Florida) (TG0019348-352) (Herman Aff. Ex. "105"); Che Gang Dep. at 157:22-159:22; Ex. 3 to Peng S. Dep. (emails dated 10/15/2005 between Peng Shiliang and Wenny Yin regarding quotes from shipping drywall to Jacksonville Port, Florida) (TG0019813-814) (Herman Aff. Ex. "106").

[201]  Gonima I Dep. at 35:19-36:2; Ex. 7 to Gonima I Dep. (invoice dated 12/30/2006 for 20,100 sheets of Taishan's drywall for delivery to Miami, Florida) (TG0000619) (Herman Aff. Ex. "107"); Chart summarizing Taishan's sales of drywall in the United States, by State.

[202]  Ex. 14 to Che Dep. (email dated 1/5/2006 from Jing Zhang to Bill Cher) (TG0000886) (Herman Aff. Ex. "108").

itself of the opportunity to sell its products to a variety of customers in Louisiana, including GD

Distributors, LLC. and APIC Building Materials.[203]   Darrin Steber, owner of GD Distributors,[204]

found Taishan on the Internet through the Alibaba website.[205]   The parties communicated through

emails "about price, sizes of the sheetrock, how to get it transported over."[206]   As part of the sales

process, Taishan provided GD Distributors with samples of its drywall and certificates showing

that the drywall met ASTM standards.[207]   These communications resulted in the sale of 1,320

sheets (comprising 63,360 square feet) of Taishan's drywall to GD Distributors.[208]   Mr. Steber

confirms that Taishan was aware and expected that sales of drywall to GD Distributors would be

shipped to New Orleans, Louisiana, because Mr. Steber told Taishan that's where he lived.[209]

Besides, Taishan was the one "who set up the shipment . . . they knew which port it was going to

---

[203]   *See* Ex. 2 to GD Distributors Dep. (Taishan invoice to GD Distributors for 1320 sheets of drywall); Ex. 7 to GD Distributors Dep. (Taishan Special Invoice for Export) (TG0019962) (Herman Aff. Ex. "109"); Deposition of Peng Shiliang dated 1/11/2012 ("Peng S. Dep.") (Herman Aff. Ex. "110") at 83:18-84:4; Ex. 5 to Peng S. Dep. (packing list for invoice No. SDTH0622 dated 7/3/2006 from Taishan to APIC Building Materials for drywall to be shipped to New Orleans, La.) (TG0019366) (Herman Aff. Ex. "111"); Ex. 4 to Peng S. Dep. (invoice No. SDTH0622 dated 7/3/2006 from Taishan to Triax Trading and Logistics, LLC for APIC Building Materials for 5,676 pieces (272,448 square feet) of drywall with a value of $24,123, to be shipped to New Orleans, La.) (TG0020090) (Herman Aff. Ex. "112"); Invoice dated 7/20/2006 from Taishan to Triax Trading & Logistics for 5,760 pieces (276,480 square feet) of drywall with a value of $24,998.40 (TG0020091) (Herman Aff. Ex. "198").

[204]   GD Distributors Dep. at 12:23-25.

[205]   *Id*. at 15:18-17:4.

[206]   *Id*. at 17:5-20.

[207]   *See* Exs. 4 & 5 to GD Distributors Dep. (photos of actual Taishan drywall samples); GD Distributors Dep. at 34:4-36:6; Ex. 2 to GD Distributors Dep. (ASTM testing certificates); GD Distributors Dep. at 27:23-28:10, 54:25-58:19.

[208]   Ex. 2 to GD Distributors Dep.; GD Distributors Dep. at 44:2-45:6, 46:12-47:4, 48:4-50:5.

[209]   GD Distributors Dep. at 21:17-25, 22:22-25.

go from and what port it was going to come to."[210]

Interested in multiple sales in Louisiana, in July 2006, Taishan shipped samples of its drywall to TP Construction, Inc. in Jefferson, Louisiana.[211] Jeff "Bo" Zhou thanked Taishan for these samples.[212] Taishan also responded to inquiries for pricing on shipping drywall to customers in Louisiana. On October 15, 2005, Peng Shiliang wrote to Wenny Yin of SCT Co., Ltd. with a quote for shipping drywall to New Orleans, Louisiana.[213] On January 5, 2006, Jing Zhang asked Bill Cher for additional pricing information on Taishan's drywall, seeking a "better price" in exchange for a "long term relationship with [Taishan]."[214]

### F. Taishan Targeted Customers in California, Shipping Samples of Drywall and Product to Them.

On multiple occasions, Taishan sold its drywall to Stone Pride in Irvine, California.[215] Taishan also shipped samples of its drywall to Stone Pride via express mail.[216] Charley Yang testified that Taishan let it be known to him that it had prior experience selling drywall to

---

[210] *Id*. at 21:3-16; *see also id*. at 22:6-21, 51:12-52:24.

[211] Ex. 18 to Che Dep. (emails dated 7/10&16/2006 from Jeff (a/k/a Bo) Zhou to Bill Cher) (TG0000631 & TG0000633).

[212] *Id*.

[213] Ex. 3 to Peng S. Dep. (emails dated 10/15/2005 between Peng Shiliang and Wenny Yin regarding quotes for shipping drywall to New Orleans, Louisiana) (TG0019813-814).

[214] *Id*.; *see also* Ex. 14 to Che Dep. (email dated 1/5/2006 from Jing Zhang to Bill Cher: "we are looking for [a] long term relationship with you") (TG0000886).

[215] Stone Pride Dep. at 10:25-11:5; Ex. 8 to Peng S. Dep. (Taishan Special Invoice for Export dated 2/2/2006 for 2,640 sheets of drywall for Stone Pride) (TG0001658); Peng S. Dep. at 95:9-96:15; Ex. 2 to Stone Pride Dep. (packing list and invoice dated 11/20/2006 for 2,640 sheets of drywall to Stone Pride, Irvine, California) (Herman Aff. Ex. "115").

[216] Ex. 6 to Stone Pride Dep.; Ex. 7 to Stone Pride Dep.

46

customers in Florida and Louisiana.[217]

Taishan's own documents evidence the extent of the company's relationship with

customers in California.  On October 31, 2006, James Scudder, Vice President of Advance

Products International, in National City, California, wrote to Frank Clem complaining about the

quality of Taishan's gypsum board:

> Advance Products International purchased gypsum board from
> your company and we were told and guaranteed that the gypsum
> board was ASTM standard gypsum board and complied to all
> regulations.  **The 12 containers of gypsum board we purchased**
> **form [sic] your company are not ASTM approved board**.  We
> shipped the gypsum/drywall to our customers and this has caused
> us great harm to our company.[218]

This was not the first time Taishan was advised of a problem concerning its drywall shipments to

California.  Earlier, on July 3, 2006, Mr. Scudder had complained about damages to the boards

during shipment:

> This is the load we just received and opened the doors on.  WHAT
> HAPPENED?  We can NOT ship the next 11 containers This way.
> HOW CAN WE FIX THIS?  Some of the drywall is broken on the
> corners.
>
> Need to discuss ASAP.[219]

**G.    Taishan Targeted Customers in Other States Including Texas,**
**Nevada, Alabama, and New York.**

Taishan's shipments of drywall and other products to the United States were not limited

---

[217]  *Id.* at 81:7-17.

[218]  Ex. 17 to Che Dep. (letter dated 10/31/2006 from Advance Products International to Frank
Clem) (TG0019376) (Herman Aff. Ex. "113").

[219]  Ex. 16 to Che Dep. (email dated 7/3/2006 from Jim Scudder to Grace, Andy) (TG0019383)
(Herman Aff. Ex. "114").

to Virginia, Florida, Louisiana, and California.  By November, 2005, Taishan was already selling

to other suppliers in the U.S., in addition to Venture Supply and OTC.  As Phillip Perry from

Venture Supply reported:

> I ran into another American from Texas at the factory.  He said he
> was from the HGC company.  Claimed he was the big buyer, but
> Frank [Clem] said he was only buying 1000 sheets and he wanted
> to use containers to ship.
>                         ...
> Frank was telling me about the many inquiries he has been getting,
> and I again suggested that these leads should be passed to us to
> investigate.  We are buying and the others may want to buy, but do
> not know how, do not have the financing to make a large enough
> purchase, or may just be put off by the idea of importing.  He said
> that he is thinking along those lines.  I will hit him again with
> this.[220]

Mr. Perry also stated that:

> Taihe was visited by Duxx International Trading, LLC, a Jorge
> James, VP manager, came to the office to make an offer .... they
> have an office in Dallas, TX and in Mexico.  The 2nd company is
> Holmanwood.com from Malaysia, the owner apparently showed up
> .... Both companies seemed to have offered to make the offered
> terms and agree to purchase 300,000 boards a month.  **The
> accepted party would then get a sole distributorship for USA.**
> after 3 months of compliance with the terms.  All referrals will be
> given to that company during the 3-month term.[221]

In December, 2005, Taishan was responding to requests for quotes for drywall to be

delivered to the Port of NY/NJ and the Port of Savannah, Georgia, in the United States.[222]

---

[220] Email dated 11/28/2005 from Phillip Perry to Sam Porter (V002487) (Herman Aff. Ex. "116").

[221] Email dated 12/13/2005 from Phillip Perry to Sam Porter (emphasis added) (V002400) (Herman Aff. Ex. "117").

[222] Ex. 2 to Peng S. Dep. (emails dated 12/11-12/2005 between Peng Shiliang and Leon Liu regarding quotes for drywall to NY/NJ and Savannah, Georgia) (TG0019840-841) (Herman Aff. Ex. "118").

Taishan proudly told potential customers interested in having Taishan's materials delivered to the United States: "We export metal frame especially to USA such as New York and Norfolk."[223]   Bill Cher also told Ivan Gonima from OTC that Taishan had a customer in New York.[224]   That customer was OEG Building Materials.  Taishan not only sold its drywall to OEG (through TOV Trading[225]), but it also made customized metal studs for the company with OEG imprinted on the product.[226]   Taishan was fully aware that the need for drywall in the U.S. was "so urgent at th[at] moment."[227]   Joseph Weiss of OEG testified that "Taishan understood, TTP understood that the board then would end up, after [OEG] sold it, being distributed into the New York metropolitan area."[228]   There was "not even a question" that "Taishan understood . . . that

---

[223]   Ex. 20 to Peng II Dep. (email dated 8/29/2007 from Frank Clem to Jacky Yu advertising the export capabilities of Taishan to the USA and elsewhere) (TG0021370); Peng II Dep. at 539:15-540:6.

[224]   Ex. 8 to Che Dep.; Che Dep. at 207:15-208:19.

[225]   OEG Dep. at 22:24-23:17.

[226]   *See* OEG Dep. at 136:2-8; Ex. 8 to Peng S. Dep. (Taishan Special Invoice for Export of 9,000, 14,000, 3,400, 2,000 pieces of drywall to TOV in New York) (TG0001680-682); Peng S. Dep. at 95:9-96:15; Ex. 4 to OEG Dep. (contract dated 6/6/2006 (TH0606001) for the sale of drywall and metal studs to TOV Trading New York, USA) (TG0000897-898); Ex. 5 to OEG Dep. (invoice dated 6/21/2006 to TOV Trading New York, USA for 23,120 sheets of drywall to U.S.A.) (TG0001138-139) (Herman Aff. Ex. "119"); Ex. 10 to OEG Dep. (emails dated 7/3/2006 between Bill Cher and Ernest Teitelbaum regarding request for pricing) (TG0001161) (Herman Aff. Ex. "120"); Ex. 13 to OEG Dep. (email dated 8/2/2006 from Ernest Teitelbaum to Bill Cher requesting additional 25,000 sheets of drywall) (TG0000747) (Herman Aff. Ex. "121"); Ex. 14 to OEG Dep. (emails dated 8/3/2006 between Bill Cher and Ernest Teitelbaum regarding additional 25,000 sheets of drywall) (TG0000813) (Herman Aff. Ex. "122"); Ex. 17 to OEG Dep. (contract dated 8/4/2006 (SDTH06080401) for the sale of 28,400 sheets of drywall to TOV Trading New York, USA & invoice) (TG0000734-736, TG0000738) (Herman Aff. Ex. "123"); Ex. 18 to OEG Dep. (emails dated 8/18/2006 between Bill Cher and Ernest Teitelbaum regarding shipment of drywall) (TG0001142) (Herman Aff. Ex. "124"); Ex. 11 to OEG Dep. (email dated 7/18/2006 from OEG to Bill Cher regarding wire transfer) (TG0001052) (Herman Aff. Ex. "125").

[227]   Ex. 23 to OEG Dep. (email dated 8/31/2006 from Bill Cher to Ernest Teitelbaum) (TG0000750) (Herman Aff. Ex. "126").

[228]   OEG Dep. at 76:10-14.

OEG was going to be selling [Taishan's customized metal studs] in the New York metropolitan area."[229]

In total, Taishan shipped 7,019,712 square feet of its drywall to customers in New York.[230]

There is also evidence that Taishan provided pricing quotes for potential customers in Nevada where there was the prospect of large volume sales.  Mr. Gonima told Taishan that "Construction is booming in Las Vegas and they need millions of pieces [of drywall]."[231]

Additionally, Taishan was making efforts to sell its drywall to a customer in Mobile, Alabama.  There is evidence that Frank Clem was seeking quotes from Steamship Pte Ltd. for the cost of shipping 400,000 sheets of Taishan's drywall from China to Mobile.  He wrote to Steamship Pte Ltd. on February 10, 2007:  "I have a customer in America, who need us to ship about 400000 sheets of gypsumboard to Mobile USA.  So we need to find a ship to Mobile. Could you please offer any relative shipping information?"[232]  As shown earlier, Mitchell Company resold Taishan's drywall to Mazer's Building Supply in Birmingham, Alabama, and to Gulf Coast Shelter in Daphne, Alabama.

---

[229]   OEG Dep. at 133:8-136:16.

[230]   Chart summarizing Taishan's sales of drywall in the United States, by State; Che Dep. at 321:18-323:10.

[231]   Ex. 2 to Gonima II Dep. at p. 11 (instant messages dated 3/4/2007 between Ivan Gonima and Che Gang).

[232]   *See* Ex. 4 to Peng I Dep. (email dated 2/10/2007 from Frank Clem to Melvyn of LN Steamship Pte Ltd.) (TG0000011) (Herman Aff. Ex. "127").

**H.** **Taishan Continued to Follow Up With Its American
Customers In Order to Secure Additional Sales and Maintain
Customer Relations.**

Taishan made sure to follow up with its American customers in order to maintain good

customer relations and also to secure additional sales of its products.  After completing its sales

transactions for customized drywall and metal studs for OEG in New York, Bill Cher reached out

to OEG executives on November 18, 2008, seeking to obtain more business from the company.

Mr. Cher let OEG know that steel belt prices in China were beginning to decrease, "so I think we

can start to be ready to operate the metal studs business [again].  I hope I can get your support."[233]

In other words, Taishan approached its New York customer in an effort to generate additional

sales.

Interestingly, Taishan's persistence to maintain a presence in this country continued even

after the problems arising from Chinese Drywall became apparent.  On February 23, 2009, Bill

Cher wrote the following email to Joseph Weiss of OEG USA:

> How are you doing, my old friend? . . . We received several
> inquiries on the gypsum board and metal studs from U.S.  You are
> one of our first-ten customers since we have a very good
> cooperation record.  So we prefer to restarting our U.S. business
> with you rather than others.  Please inform us if you are interested
> on it.
>
> Looking forward to your early reply!
>
> Best wishes to you and your family![234]

---

[233]  Ex. 46 to OEG Dep. (email dated 11/18/2008 from Bill Cher to OEG) (TG0019341) (Herman
Aff. Ex. "128"); OEG Dep. at 165:2-15.

[234]  Ex. 30 to Che Dep. (email dated 2/23/2009 from Bill Cher to Joseph Weiss) (TG0021469)
(Herman Aff. Ex. "129").

51

I.     **Taishan Gypsum Co. Is Responsible for the Acts of its Wholly-Owned Subsidiary Taian Taishan Plasterboard Co., and Vice Versa.**

TTP is a wholly owned subsidiary of TG, and TG is TTP's sole shareholder.  TG asserts that it created TTP for tax purposes in February, 2006.[235]  TG allegedly formed TTP in order to serve TG's existing customers.[236]  TG knew, at a minimum, that the existing customers it had were exporting goods outside of China, including the United States.[237]  In order to accommodate its existing customers, TG established TTP, and then TTP created a foreign sales office fully staffed with TG's employees to sell Tashan's products to the United States at exactly the time of the drywall shortage in the U.S.  TTP's foreign sales office was staffed by Peng Wenlong, Che Gang and Yang Jiapo (Apollo Yang).[238]  They all started at TG, but went to work for TTP when TTP was formed.  When TTP wound down business, these employees all went back to work for TG.  Mr. Peng Shiliang also went from TG to TTP and back to TG again.[239]

TG was the sole investor in TTP, and invested at least 22,000,000 Yuan (~$3.49 million) in TTP.[240]  Simply put, TG set up TTP in order to:  1) use TTP to "satisfy" TG's existing

---

[235]  *Mitchell* Br. at 8.

[236]  *Id.*

[237]  *See id.*; *see also* Ex. 20 to Jia II Dep. at p. 2.

[238]  Peng S. Dep. at 55:18-23; Fu Dep. at 39:4-40:3, 108:4-7, 110:13-20.

[239]  Peng S. Dep. at 29:10-19, 55:18-23.

[240]  Jia II Dep. at 845:23-846:7; Defendants' Ex. 34A to Jia II Dep. (TG Articles of Association, February 2006) (TG0020817-824) (Herman Aff. Ex. "153"); Shareholder Decisions of TG dated 6/22/2006 (TG0020855) (Herman Aff. Ex. "154"); TG Articles of Association, revised June 2006 (TG0020856-864) (Herman Aff. Ex. "155").

customers' needs for VAT invoices and to continue doing business with those same customers[241] and 2) sell drywall to the United States at a time of desperate need for U.S. consumers and the victims of Hurricanes Katrina and Rita.  There are multiple instances of TG ignoring corporate formalities and TG and TTP being one and the same for the purposes of imputing TTP's actions to those of TG, and vice versa.

1.  *TTP used TG's drywall brands as its own without payment*

TG gave TTP a formal written authorization to sell "Taishan" brand drywall for a "period of use tentatively set at five years."[242]  This authorization for use was made to TTP without payment and was subject to no conditions or limitations to protect the value of the "Taishan" brand.[243]

In addition, in the Sole Agency Agreement that TTP entered into with OTC on October 20, 2006, TTP contracted to sell TG's DUN brand of drywall to OTC, with OTC being the sole and exclusive agent for TTP in the United States.[244]  The "DUN" brand, however, was not TTP's to sell; it belonged to and was manufactured by TG.  It is undisputed that the DUN brand was TG's registered brand.[245]  According to Mr. Jia, TTP never sold DUN, and only TG made the

---

[241]  Jia II Dep. at 796:5-797:14; *see* Fu Dep. at 108:4-109:22.

[242]  Defendants' Ex. 41A to Jia II Dep. (Trademark Use Authorization) (TG25412) (Herman Aff. Ex. "174"); Jia II Dep. at 661:8-21.

[243]  Defendants' Ex. 41A to Jia II Dep.; Jia II Dep. at 676:14-677:2.

[244]  Ex. 4 to Gonima II Dep.

[245]  Plaintiffs' Ex. 20 to Jia II Dep.; Che Dep. at 40:9-42:16.  Despite Mr. Che testifying to the contrary that TTP did not sell TG's DUN brand, the record is clear by the invoices and the Sole Agency Agreement that TTP sold TG's DUN branded drywall to OTC.  This is further evidence of TG/TTP's lack of credibility, demonstrated by Mr. Che's testimony below:

DUN brand, and TTP did not have authorization to sell DUN brand.[246]  Mr. Jia testified that there

was "never" any production of the DUN brand by TTP,[247] meaning it was TG that manufactured

---

Q. With this agreement, you were going to sell gypsum board manufactured with a thickness of a ½ inch or 5/8 inch and the width of 4 feet, the length of 8 feet, 9 feet, 10 feet or 12 feet, under the brand name of Dun as referenced in the first paragraph. Correct?
A. This should be in accordance with the request of the customer.
**Q. And TTP was a seller of the Dun brand drywall. Correct?**
**A. No.**
**Q. It was not?**
**A. We have never sold that.**
**Q. TG sold it. Correct?**
**A. Correct.**
**Q. So you were selling TG's drywall in this contract. Correct?**
**A. No.**
Q. I'm going to show you Exhibit Number 20 to Mr. Jia's deposition. This is the Shandong Taihe Dongxin Company, Ltd.'s catalog, now known as TG. And I'd like you to turn to the page that has the registered trademarks for the products that it sells. And you see the Dun brand there, sir?
A. Yes.
Q. And that's spelled D-U-N. Correct?
A. Correct.
Q. And this contract is between TTP and Oriental Trading Company. That's Exhibit Number 1 to your deposition. Correct?
A. Can you repeat that?
Q. Yes. The seller under this contract, Exhibit Number 1, is Taian Taishan Plasterboard Company, Ltd.; is that correct?
A. Yes.
Q. And the buyer is Oriental Trading Company, LLC. Correct?
A. Yes.
Q. And if you look at paragraph number 1, it states, "The brand name of 'DUN' showing as in the seller's catalogue only"; is that correct, sir?
A. That's what it said here.
Q. And it's spelled D-U-N.  Correct?
A. Correct.
Che Dep. at 40:9-42:16 (emphasis supplied).

[246]  Jia II Dep. at 800:22-801:10, 802:6-10, 804:14-805:12.

[247]  *Id*. at 804:14-805:12.

the DUN brand drywall and TTP that sold it, under TTP's name on the invoices.[248]

The Sole Agency Agreement references the DUN brand "showing as in the seller's catalogue."[249]  The "seller" in the Sole Agency Agreement is defined as "TAIAN TAISHAN PLASTERBOARD CO., LTD," or TTP.[250]  TTP has never produced a "catalogue" in this litigation that has TTP's name on it with TTP's own product.  The only catalogue or sales brochures produced in this litigation listing the DUN brand is from TG (also known as Shandong Taihe Dongxin).[251]  DUN is TG's brand, yet TTP sold it, with no repercussions from TG, and TTP was paid for TG's drywall.  There is no record evidence of TG taking any action to enforce its rights to the DUN brand against TTP.  There is no record of any adverse employment action being taken against the TTP employees who sold TG's DUN drywall brand.  In fact, the same employees who sold the TG's DUN brand drywall under TTP's name, Mr. Che and Mr. Peng, were taken back as employees at TG once TTP wound up its business.[252]  Further demonstrating the lack of corporate formalities between TG and TTP, their cooperation and working together to sell to the United States, and TTP's agency for TTP, TTP went a step further and designed a custom label for the DUN brand, which was not TTP's to sell.[253]  Importantly, TTP never paid

---

[248]  Contrary to this documentary evidence, Mr. Jia testified that TTP "never sold that [DUN brand]."  *Id.*

[249]  Ex. 4 to Gonima II Dep. (Sole Agency Agreement between Taishan and OTC).

[250]  *Id.*

[251]  Plaintiffs' Ex. 20 to Jia II Dep. (Taishan marketing and product brochure).

[252]  Fu Dep. at 110:13-20.

[253]  *See* Ex. 2 to Gonima II Dep. at pp. 5-7 (instant message discussion dated 5/22/2007 between Ivan Gonima and Che Gang).

TG any compensation for its use of the DUN brand.[254]

>    **2.    *TTP & TG ignored corporate form and have taken responsibility for each other's acts and omissions and settled claims and debts on behalf of each other.***

>        **a.    Guardian settlement**

In late 2005 and into early 2006, Guardian Building Products ("Guardian"), a Greenville, South Carolina Company, conducted a visit to Taishan to investigate buying drywall for sale to the United States.  The TG drywall that Guardian purchased was shipped to Tampa, Florida, Wilmington, North Carolina, and Virginia.[255]  Mr. John Gunn, Guardian's representative, met with Mr. Apollo Yang (also known as Yang Jiapo) at TG's factory.[256]  During their meeting, Mr. Yang gave his business card to Mr. Gunn, which was printed in English on one side and in Chinese writing on the other side.[257]  Mr. Yang's business card showed that he worked for TG (then known as Shandong Taihe Dongxin), that his title was the "Chief of the Foreign Trade Department," and that the website for his company was www.taihegroup.com – the same website on TG's promotional materials.[258]  This is also the same website that Mr. Clem used, when TTP customers asked for a website to see TTP's product, even though it was TG's website.[259]

---

[254]  Jia II Dep. at 676:14-677:2.

[255]  Deposition of John Gunn dated 7/22/2011 ("Guardian Dep.") (Herman Aff. Ex. "143") at 79:7-25.

[256]  *Id*. at 49:1-52:16.

[257]  *Id*.; Ex. 2 to Guardian Dep. (photocopy of business card for Apollo Yang) (GBP001255) (Herman Aff. Ex. "156").

[258]  *Id*.; Plaintiffs' Ex. 20 to Jia II Dep. (Taishan marketing and product brochure).

[259]  Peng I Dep. at 285:5-12.

56

Mr. Gunn let TG know that the drywall Guardian was buying would be shipped to the East Coast of the United States, including Florida.[260]  In order to secure this additional American business, Mr. Yang told Mr. Gunn that TG had done other recent business in the United States, including with Venture Supply, and that TG had customers in Florida.[261]  Mr. Yang and Mr. Gunn discussed the differences between the U.S. and Chinese markets, including ASTM standards.  Mr. Yang let Mr. Gunn know that TG had the capability to produce drywall for sale in the U.S. – they discussed ASTM requirements, that TG had to lighten its drywall for sales in the United States and that the tapering requirement for the drywall would be different.[262]  TG advised Mr. Gunn that TG could meet ASTM requirements and manufacture the drywall to American measurements because TG had previously sold its drywall to other buyers in the United States.[263]

Throughout all of the negotiations, Mr. Gunn dealt with TG personnel using TG promotional materials and, understandably, he thought he had a contract with TG.[264]  It was only later, when TG's drywall proved to be defective, that Mr. Gunn discovered he was purchasing TG's drywall through a broker named Taian Taigao Trading Co., Ltd.[265]  The contract called for 200,000 sheets of TG drywall to be shipped to the U.S.[266]  Approximately 1,000,000 square feet

---

[260]  Guardian Dep. at 54:20-56:8.

[261]  *Id*.

[262]  *Id*. at 56:9-12, 56:20-57:7.

[263]  *Id*. at 58:9-12, 59:1-10.

[264]  *Id*. at 74:24-75:13.

[265]  *Id.* at 75:4-76:10, 166:6-8.

[266]  Ex. 16 to Guardian Dep. (Sales Contract and Application and Agreement for Documentary Credit (GBP002102-105) (Herman Aff. Ex. "157").

of TG drywall was purchased by Guardian.[267]  The shipment was offloaded in Tampa, Florida, Wilmington, North Carolina and Virginia, where Stock Building Supply picked up the drywall for sale in its stores.[268]

Within a month after the drywall was delivered to Tampa, Wilmington and Virginia and distributed by Stock Building Supply, Guardian started receiving complaints.[269]  While Mr. Gunn testified that the defects were due to the brittleness of the drywall, Mr. Gunn admitted that testing revealed that the TG drywall had a sulfur smell.[270]  When Guardian notified TG of this in May 2006, TG denied their drywall had a smell problem.[271]

As a result of the complaints, Guardian conducted a recall of the TG drywall.[272] Approximately 308 truckloads (thousands of tons) of Chinese Drywall and the majority of the TG drywall bought by Guardian, was sent to Lafarge Gypsum's drywall plant in Palatka, Florida for recycling.[273]  The defective TG drywall had to be retrieved by Guardian from four different areas in Florida, four locations in North Carolina, eight locations in South Carolina and from Wilmington, where it had been distributed after shipment from TG.[274]

---

[267]  Guardian Dep. at 182:24-183:1.

[268]  *Id*. at 79:7-25.

[269]  *Id*. at 135:19-136:5.

[270]  *Id*. at 119:24-120:20.

[271]  *Id*. at 120:21-121:21, 122:13-15.

[272]  *See id*. at 136:2-5.

[273]  *Id*. at 136:2-5, 162:12-163:24, 181:21-182-7; 183:17-24.

[274]  *Id*. at 163:25-164:11.

In October 2006, Mr. Gunn traveled to China to try and resolve the drywall problems with TG.  Mr. Gunn believed that Taian Taigao was a front, set up by TG to distance the company from its defective drywall.[275]  Mr. Gunn's belief proved correct.  Two years later, in 2008, TG still had not resolved the problem, continuing to deny any defects with the drywall.[276]  Ultimately, Guardian reached a settlement agreement with TTP regarding the defective drywall.[277]  But while the contract for TG's drywall listed Taian Taigao as the seller of TG's drywall, it was TTP and not TG that was the signatory to the settlement agreement.  TTP paid the consideration for the settlement to resolve Guardian's claims for TG's defective drywall and ultimately took responsibility for TG's defective product.[278]

> **b.**    **TG orchestrated a settlement with OTC on behalf of TG, even though all sales to OTC were allegedly made by TTP**

As part of its Sole Agency Agreement with TTP, OTC made a $100,000 deposit under the contract.  Eventually, OTC asked for this deposit back; however, instead of returning the deposit, Taishan wanted to do more business with OTC for more drywall.[279]  As late as June 2010, after TTP had wound down its business, it was TG, through Bill Cher (formerly with TG, then TTP),

---

[275]  *Id*. at 138:24-140:8.

[276]  *Id*. at 141:25-142:10, 143:13-21.

[277]  *Id*. at 173:16-177:12; Ex. 27 to Guardian Dep. (Settlement and Release Agreement) (GBP001130-133) (Herman Aff. Ex. "158").

[278]  *Id*.

[279]  Gonima I Dep. at 145:17-147:10.

that sought to exchange the $100,000 deposit with TTP for more business with TG.[280]  This fact

was made clear by Mr. Cher's testimony:

> Q. Thank you, sir. That's very helpful.  So what you're trying to do
> is to pay your [TTP's] debt to Oriental Trading through providing
> some goods as listed in this invoice or quotation from Taishan
> Gypsum; is that correct?
> A. I don't understand.
> Q. Why don't you tell me again why it is that you are providing
> this quotation to Ivan Gonima as a representative of Oriental
> Trading as it relates to the $100,000 that TTP owed it?
> A. The customer requested us to prepare this quotation, but as I
> reminded you earlier, do not only look at the title.
> Q. Yes. You were explaining to me how you were providing this
> information with respect to monies that were owed to Oriental
> Trading as a result of transactions done with TTP.  Please explain
> exactly what you meant by that.
> A. **In this period of time, the company where I worked at had
> already become TG. However, I had to handle the money that I
> owed to him. Therefore, as I said earlier, do not only look at
> the title. This is only a form that I randomly grabbed. The
> content of it was for the purpose of handling the $100 of
> Oriental Trading Company. This is a fact.**
> Q. **$100,000. Correct?**
> A. **Correct.**
> Q. **And it was owed by TTP.  Correct?**
> A. **Correct.**
> Q. **To Oriental Trading. Correct?**
> A. **Correct.**[281]

While TTP disputes the validity of the agreement, it is undisputed that TG stepped in to

settle its wholly-owned subsidiary's deposit to OTC.  This makes sense, because there is no

difference between TG and TTP; they are interchangeable.  TG and TTP share employees, office

space, production lines, and settle debts and disputes for one another, without regard to corporate

---

[280] Gonima I Dep. at 145:17-147:10, 153:12-154:14; Ex. 12 to Gonima I Dep. (email dated 5/27/2010 from Bill Cher to Ivan Gonima) (TG0000869-870) (Herman Aff. Ex. "159").

[281] Che Dep. at 79:4-81:6; Ex. 4 to Che Dep. (emphasis supplied).

form.

      **3.**      ***The employees of TG and TTP were***
                    ***interchangeable and sold drywall for both entities***
                    ***<u>without distinction.</u>***

The employees of TG and TTP were interchangeable, working for TG, then TTP and TG again.[282]  Mr. Gonima, who helped negotiate the OTC's Sole Agency Agreement with TTP, testified that on his visits to TG, he met with Peng Wenlong (Frank Clem) and Bill Cher, and he later emailed and exchanged numerous instant messages with Mr. Cher.[283]

By virtue of Mr. Clem's representations to Mr. Gonima and the promotional materials that were given to him, Mr. Gonima knew TG as "Taihe."  Mr. Clem never differentiated  or told Mr. Gonima that he was working for TTP and not TG.[284]  Mr. Peng  corroborated Mr. Gonima's testimony when he admitted that he did not mention or disclose to any foreign buyers or agents that he was working for TTP and not TG.[285]

Mr. Gonima also reviewed TG's brochure, TG's website and other promotional materials.[286]  TG represented itself to Mr. Gonima as being "part of a huge building materials group producer."[287]  TTP never had its own website.  TTP has never produced any marketing materials or brochures in this case.  Instead, TTP relied solely on TG's materials for marketing.

---

[282]  Fu Dep. at 110:13-20.

[283]  Gonima I Dep. at 26:10-28:6.

[284]  *Id*. at 26:19-27:6.

[285]  Peng I Dep. at 196:18-197:4.

[286]  Gonima I Dep. at 44:9-21, 89:7-10; Ex. 3 to Gonima I Dep. (Taishan marketing brochure) (Herman Aff. Ex. "160").

[287]  Gonima I Dep. at 96:11-25.

Yet, the contract that OTC signed was with TTP. In short, there was no distinction between the two entities. Mr. Clem and Mr. Cher demonstrated TG products, catalogs and the website to Mr. Gonima, yet sold him TG's DUN drywall under TTP's name, without distinction.

The inability of Taishan to keep any separateness between the entities is further demonstrated by Mr. Gonima. Mr. Gonima always believed he was dealing with TG. Yet, as late as June 2010, TG was trying to resolve TTP's debts with OTC regarding the $100,000 deposit and trying to exchange TG's product to satisfy Mr. Gonima:

> Q. We've gone through several exhibits, 11 exhibits, and starting with Exhibit 3, you had a color brochure that you received from Taihe?
> A. Taihe, yes, sir.
> Q. Which you understood to be Taishan, what you've always called Taishan?
> A. No, we always called it Taihe.
> Q. Taihe.
> A. Yeah.
> Q. Okay. But you understand is Taishan?
> A. It's the same company, yes.
> Q. Right. And then your invoices, the pro forma invoice, was from Taian Taishan Plasterboard, which we saw earlier?
> A. Yes, sir.
> Q. Which you also understood to be Taihe or Taishan?
> A. Yes, sir, the same company.
> Q. And in 2010 you've got a different company, Taishan Gypsum Co., Ltd.? [Price quote for materials by TG to resolve the $100,000 deposit]
> A. Yes, sir.
> Q. With a price quote from the same man, Bill Cher?
> A. Yes, sir, exactly.[288]

Mr. Cher's testimony demonstrates how TG, through Mr. Cher, stood in the place of and acted for TTP in resolving the dispute over $100,000 deposit with OTC:

---

[288] Gonima I Dep. at 152:11-153:11; *see also id*. at 153:12-154:20 (Gonima refused TG's offer of more product to satisfy the $100,000 deposit with TTP).

Q. Now, this letter, November 26, 2008, references the $100,000 that you were discussing before. Correct?

A. That's what it appears to be.

Q. What it states for reference is the letter to you as Mr. Bill Cher at Taian Taishan Plasterboard Company, Ltd. "Dear Mr. Bill Cher: According to the information sent by Denise Romano (owner of Oriental Trading Company) please we are formally requesting from you a full reimbursement of the ONE HUNDRED THOUSAND DOLLARS...we transferred several months ago (May 30th 2007) without using it yet. Please proceed to," and then they gave you the bank information, which is Bank of Wachovia Bank, City: Miami, Florida, United States of America. And it is signed by Leonardo Guzman, office manager for OTC, on behalf of United States -- U.S. DUN Distributors; is that correct?

A. It is not correct.

Q. It is not correct? What's not correct about it, sir?

A. Right. First of all, in 2008, I already worked at TG. And also as Dun Distributor, it had never taken effectiveness. It is only a document that the customer made himself.

Q. Sir, Dun is requesting $100,000 reimbursement. Correct? Let me clarify the question.  Leonard Guzman as the office manager for OTC on letterhead that states U.S. DUN Distributors is requesting from Taian Taishan Plasterboard, Attention: Bill Cher, reimbursement of $100,000.  Correct?

A. The request of reimbursement was the fact. However, the title - the title of this letter was made by the client.

Q. That's right. Because on November of 2008, Taian Taishan Plasterboard was no longer in existence. Correct?

A. It had stopped operation.

Q. And at the time you worked for TG. Correct?

A. Correct.

Q. And if you turn to the next page, you responded to Leonardo Guzman. And at the time, you worked for TG. Correct?

A. May I have the date of this e-mail?

Q. It's a response to an e-mail dated -- a letter dated November 26, 2008. And the notary date is December 1, 2008. So as of that date, you work for TG. Correct, sir?

MR. SPANO: Objection to form, to the mischaracterization of this as a response. There's no basis for that.

BY MR. GONZALEZ:

Q. The question is, as of the date of December 1, 2008, you worked for TG?

A. December the 1st, 2008, I was working for TG at the time.

Q. All right, sir. If you turn to the second page of this document and look at a Bates stamp number 21502, you write the following: "Dear Mr. Guzman, I am glad to receive your information, I have informed you that I will send back your money, but I need your information to do documents for our government, you have send it to me today. I will make two contracts to you, please sign on them and send back to me. Please confirm the following information. Bank: Wachovia Bank, City: Miami, Florida, United States of America, Account...: Oriental Trading Company, LLC," and then you have the account number. And it's signed, "Thanks and best wishes! Yours faithfully," and then your name in Chinese, which is Che Gang. Correct?
A. The Chinese name, Che Gang, is my name.
Q. And the Bill Cher is your Anglo version. Correct?
A. It is correct that my English name is Bill Cher, but since this document has neither the title nor the bottom part, if you can for sure confirm that this is the correct document, then that's correct.
Q. Do you recall having sent this letter?
MR. SPANO: Objection to form.
THE WITNESS: I don't have a clear recollection of dates.
THE COURT: He answered, I'll allow it.[289]

The lack of corporate separateness between TG and TTP is also demonstrated by the sales to Guardian, set forth above.  When Mr. Gunn visited TG's drywall plant, he was introduced to Apollo Yang, who gave Mr. Gunn his TG business card as TG's "Chief of the Foreign Trade Department."  When the contract was signed with Guardian, despite having negotiated with Mr. Yang as TG's Chief of Foreign Trade, the seller was listed as Taian Taigao Trading Co., Ltd., and the brand of drywall being sold was specified as TG.[290]  When Guardian achieved a settlement for the defective drywall, the signatory to the settlement agreement was TTP, not TG,

---

[289]  Che Dep. at 113:13-118:3 (emphasis supplied).

[290]  Giving the business card of TG when working with TTP was commonplace in TTP's sales department.  When Mr. Clem went to work at TTP after working at TG, he continued to use his business cards from TG.  Peng I Dep. at 87-88.

even though Mr. Jia, TG's chairman, was involved in the negotiations.[291]  Guardian's

representative, Mr. Shao, met with TG's Chairman and President, Mr. Jia Tongchun on or about

October 24, 2006.[292]  TTP was formed in February 2006.[293]  When Chairman Jia negotiated the

Guardian settlement, he was wearing TG's Chairman hat, but it was TTP that signed the

settlement agreement with Guardian.  Mr. Jia's conduct was just like his employees, Messrs.

Yang, Clem and Cher, who frequently worked for both entities, or failed to distinguish which

Taishan entity they worked for.  Not surprisingly, when Mr. Jia testified, he was the

spokesperson for TG and TTP.[294]

**4.**      ***TG and TTP interchanged employees and***
***directors, and there was no interview or hiring***
***process for TG or TTP to switch companies.***

The leadership of TTP was also the leadership of TG throughout the creation, operation,

and winding down of TTP.[295]  Mr. Fu Tinghuan was Deputy General Manager and Director of

Sales at TG and he was also a member of TG's Board of Supervisors.[296]  He reported to Mr. Jia,

TG's General Manager.[297]  At the same time Mr. Fu was also a director for TTP, but he received

---

[291]  Guardian Dep. at 53:18-54:1, 156:1-158:12; Ex. 25 to Guardian Dep. (email dated 10/24/2006) (GBP002309-310) (Herman Aff. Ex. "161").

[292]  *Id.*

[293]  Jia II Dep. at 643:22-644:2; Defendants' Ex. 33A to Jia II Dep. (Incorporation Registration Review Form for TTP) (Translation of TG0020808-809) (Herman Aff. Ex. "173").

[294]  Jia II Dep. at 680:3-14.

[295]  Fu Dep. at 111:8-10 (Q. The directors that were established for TTP came from TG, right? A. Yes.).

[296]  Fu Dep. at 29:11-34:1.

[297]  *Id.*

65

no compensation from TTP as a director.[298]  Zhang Jianchun has been Secretary of TG's Board of Directors since 2002 and a Secretary of TTP's Board of Directors since August 2010.[299]  A Director and the Chair of TTP, Peng Shiliang, was also an employee of TG.  Mr. Peng remains the sole employee of TTP, is an employee of TG, but is paid by yet another subsidiary of TG.[300]  When TG created TTP for its own purposes, the directors of TTP came from TG.[301]  There was no hiring process or interview process for the new employees at TTP when TG formed it.  Instead, in remarkable testimony, when TG formed TTP, TG notified its employees that they could "volunteer" for jobs at TTP.[302]

TTP employees, such as Frank Clem, would promote TG, or act as if TTP was TG, without distinction.  Mr. Clem conducted TTP business with customers via email communications, while using TG's name and promoting TG.[303]  Mr. Clem liked to refer to using TG's name as the valediction on his email as a "computer set formality," when in fact he was supposed  to be working for TTP.[304]  Mr. Clem referred to TG and TTP as "us."[305]  In summary, Taishan employees did not differentiate between the two companies in their sales or

---

[298]  *Id*. at 115:4-17.

[299]  Deposition of Zhang Jianchun dated 4/6/2011 ("Zhang Dep.") at 20:1-23, 22:21-24, 23:1-5 (Herman Aff. Ex. "162").

[300]  Peng S. Dep. at 74:21-76:22.

[301]  Fu Dep. at 111:8-10.

[302]  *Id*. at 116:15-24.

[303]  Peng II Dep. at 486:7-487:18; Ex. 18 to Peng II Dep.; Ex. 19 to Peng II Dep. (email dated 5/11/2007 from Frank at Taihe Dongxin Co., Ltd.) (TG0022728) (Herman Aff. Ex. "163").

[304]  Peng II Dep. at 499:15-24.

[305]  *Id*. at 538:14-539:12.

correspondence.  There was no corporate separateness between TG and TTP in the employees'

conduct and their representations to drywall customers.

### 5. *TG & TTP shared phones and facsimile numbers,* <u>*yet claim they do not share offices.*</u>

TG and TTP share multiple phone numbers and facsimile numbers.  Remarkably, even

when faced with their own documents evidencing shared phone lines, they denied it, as high up at

TG's Chairman, Mr. Jia:

> Q. And they both have the same phone number, correct?
> A. I don't think they have the same phone number.
> Q. Can you look at Exhibit 20, please.
> ***
> Q. If you could look at the last page, this is the -- looking under
> Shandong Taihe Dongxin, which is now known as TG, correct?
> A. Yes.
> Q. The phone number listed here is <u>0086-538-8812017</u>, correct?
> A. Yes.
> Q. And if you'd look at Exhibit 15, do you have the e-mail? If
> you'll look at the e-mail number there, underneath, it says, "From:
> Peng." And Peng worked for TTP in 2007, correct?
> A. What time?
> Q. 2007.
> A. Yes.
> Q. And if you look at the number underneath where it says "Yours
> faithfully, Frank, Taihe Group," the number is <u>0086-538-8812017</u>,
> correct?
> A. Yes.
> Q. That's the same number that we had for TG, correct?
> A. Not completely same.[306]

Despite clear evidence that TG and TTP share the same phone and facsimile numbers, Taishan

---

[306]  Jia II Dep. at 785:11-787:5 (emphasis supplied); *cf.* Plaintiffs' Ex. 20 to Jia II Dep. at p. 16 to Ex. 4 to Peng I Dep. (same phone number); *see also* Jia II Dep. at 791:9-792:18 (compare to 785:11-14) & Plaintiffs' Ex. 20 to Jia II Dep.; Ex. 4 to Peng I Dep.; Ex. 13 to Wood Nation Dep.

still denies that TG and TTP do not share offices.[307]  This testimony is not credible, nor has

Taishan been able to explain how TG and TTP share phone lines, yet do not share offices.  The

sharing of phone lines alone demonstrates the lack of separateness between the companies.  The

refusal by TG and TTP to admit they share offices when faced with this evidence demonstrates

their lack of candor and a "win at all costs" attitude that should not be condoned by this Court.

      **6.**    ***TG and TTP failed to observe other corporate
formalities regarding assets and other property in
<u>addition to the brand names Taishan and DUN</u>***

From the outset, it was apparent that TTP was not formally separate from TG.  As noted

above, TTP was effectively the continuation of the foreign sales department of TG (which

returned to TG when TTP wound down), and used without compensation or limitation Taishan's

brands.  Moreover, even the more corporate formalities were not observed.  From its

capitalization through to the disposition of TTP's equipment when it ceased operations, TTP

looks more like a division of TG than an independent company.

TTP's production lines and equipment came from and were returned to TG, but these

transfers so not reflect arm's-length transactions between separate companies.  TG agreed to sell

to TTP certain heavy equipment for 35,727,650.75 Yuan (with payment within 3 months).[308]

However, the financial statements that were produced in this litigation reflect that a payment of

only 34,380,888 Yuan related to the "purchase of fixed assets," leaving over 1 million Yuan

---

[307]  Fu Dep. at 110:21-111:7.

[308]  Defendants' Ex. 42A to Jia II Dep. (Purchase and Sale Agreement) (TG25413) (Herman Aff.
Ex. "175").

unpaid by TTP.[309]  Then, when TG wound down the operations of TTP, it made an agreement to repurchase the same heavy equipment from TTP.  For this transaction, there is no record to support a finding that any payment of any kind was made.  On January 1, 2008, TTP agreed to sell the equipment back to TG for 31,453,579.80 Yuan (with payment within 6 months).[310]  However, TTP's financial statement for that year do not reflect any income related to the "sale of fixed assets. . . ."[311]  Lease of TG's production lines to TTP presents the same situation.  Initially, there is no clear record that any lease payments were made.  Moreover, the price set for the lease of these production appears to have been set by TG's caprice.  In a lease dated February 10, 2006, TG initially set the annual rate at 100,000 Yuan, which Jia Tongchun testified on direct was based on the local rental rate.[312]  Only ten days later, the rate was increased by TG (and without evident complaint by TTP) over four fold, to 420,000 Yuan.[313]

Even the capitalization of TTP by TG was a lax affair.  On February 10, 2006, TG made the initial capital investment of 15 million Yuan in TTP.[314]  On June 22, 2006, TG made a decision to increase the registered capital investment by nearly half, investing an additional

---

[309]  Defendants' Ex. 45A to Jia II Dep. (2006 Financial Statement of TTP) (TG0026004-006) (Herman Aff. Ex. "176").

[310]  Defendants' Ex. 44A to Jia II Dep. (Purchase and Sale Agreement) (TG25414) (Herman Aff. Ex. "177").

[311]  Defendants' Ex. 47A to Jia II Dep. (2008 Financial Statement of TTP) (TG0026010-012) (Herman Aff. Ex. "178").

[312]  Defendants' Ex. 40A to Jia II Dep. (Lease Agreement) (Translation of TG0025446) (Herman Aff. Ex. "179"); Jia II Dep. at 659:22-660:20.

[313]  Defendants' Ex. 43A to Jia II Dep. (Lease Agreement) (TG25415) (Herman Aff. Ex. "180").

[314]  Defendants' Ex. 33A to Jia II Dep.

7,234,900 Yuan, purportedly done by TG to relieve "financial pressure" on TTP.[315]  Any

questions about the adequacy of this capitalization will not even be answered by the accounting

firm that completed the capital verification report (with the addendum for the further

capitalization four months later).  The initial verification report stated flatly that "it is the

responsibility of the Company and its shareholders to provide true, legitimate information

concerning capital verification, and to ensure the security and integrity of the Company's assets.

Our responsibility is to issue a verification opinion as to the Company's paid-in registered

capital."[316]  Given the way that TG and TTP traded employees, brands, equipment and production

lines, there is no reason to trust the "security and integrity" of the capitalization.  Indeed, the

accounting firm completing both rounds of verification was the same company Taishan used to

value the shares of TG when BNBM was acquiring control of Taishan.[317]  Indeed, nowhere do

assets such as "good will" and the other value of ongoing concerns appear to have ever been

accounted for during capitalization, during the acquisition and use of Taishan's trademark rights,

during the sale and repurchase of assets, or at any time during the operation of TTP by TG.

---

[315]  Defendants' Ex. 37A to Jia II Dep. (Capital Verification Report of TTP) (Translation of TG0020850-851) (Herman Aff. Ex. "181"); Defendants' Ex. 38A to Jia II Dep. (Shareholders Decisions) (Translation of TG0020855) (Herman Aff. Ex. "182"); Jia II Dep. at 845:23-846:7.

[316] Taian Taishan Gypsum Co., Ltd. Capital Verification Report dated 2/13/2006 (TG0020833) (Herman Aff. Ex. "183").

[317]  Taian Taishan Gypsum Co., Ltd. Capital Verification Report dated 2/13/2006 (TG0020833-39); Ex. 7A to Jia II Dep. (Shandong Taihe Dongxin Co., Ltd. Capital Verification Report) (Translation of TG0020647-649) (Herman Aff. Ex. "184"); Jia II Dep. at 673:12-676:13; Ex. 37A to Jia II Dep.

**J.     Taishan Has Additional Ties Within the United States**
**Through its Upstream Entities CNBM and BNBM.**

In addition to all of the evidence demonstrating Taishan's direct sales of drywall and

related building products to customers in the United States, there is further evidence of Taishan's

connections and presence within the United States through its upstream entities – China

National Building Material Company, Limited ("CNBM") and Beijing New Building Materials,

Ltd. ("BNBM").

As this Court found during the bellwether trial in *Germano*, publicly available documents

show that in China, the State-owned Assets Supervision and Administration Commission

("SASAC") of the State Counsel of the People's Republic of China controls the "plasterboard"

manufacturing, exportation and certification industry and oversees and manages the state-owned

assets of companies involved in drywall production, including Taishan.[318]  SASAC exercises

strict and extensive control and influence over these companies.  For example, "SASAC assumes

the responsibility as the investor on behalf of the state; it supervises and manages the state-owned

assets and enterprises [SOEs]; controls the value preservation and increment of the state-owned

assets; guides and pushes forward the reform and restructuring of SOEs; appoints and removes

top executives of SOEs; is responsible for organizing SOEs to turn gains over to the state; is

responsible for urging SOEs to carry out laws and regulations for safety production; directs and

supervises the management work of local state-owned assets; and undertakes other tasks assigned

---

[318]  *Chinese Drywall*, 706 F. Supp. 2d at 662; *see* Chart summarizing Taishan's 2006 Structure
Post-March 16, 2006 Global Offering (Q000955-956) (Herman Aff. Ex. "130"); CNBM Global Offering
(Q000438-952) (Herman Aff. Ex. "131") at p. 100.

by the State Council."[319]   Furthermore, the "SASAC oversees and controls 150 large central

state-owned enterprises (SOEs), including China National Building Material Group Corporation

("CNBM Group")."[320]

SASAC owns 100% of the CNBM Group.[321]   The CNBM Group owned 63% (both

directly and through wholly owned subsidiaries) of CNBM, after that company's public offering

in March 2006, and thereby at least 60% of BNBM, which is the parent and majority owner of

Taishan.[322]   CNBM Group also owns 100% of CNBM Import and Export Co. (a/k/a CNBM

Trading), and 100% of the BNBM Group Co., Ltd.[323]   CNBM owned over 60% of BNBM at the

time it went public in 2006.[324]   CNBM is the parent of BNBM.[325]   BNBM advertises on its

website that it is a global company that looks "forward to building long term relationships with

customers all over the world."[326]

BNBM is a wholly State-owned corporation of China, and it "is the most important and

---

[319]  *Chinese Drywall*, 706 F. Supp. 2d at 662; *see also*
http://www.sasac.gov.cn/n2963340/n2963393/2965120.html;
http://www.sasac.gov.cn/n2963340/n2964727/n2974401/2976097.html; and
http://www.sasac.gov.cn/n2963340/n13933222/14125651.html.

[320]  *Id*. at 662-63; *see* Rec. Doc. No. 6245-3, at pp. 14-16; *see also*
http://en.wikipedia.org/wiki/State-owned_Assets_Supervision_and_Administration_Commission.

[321]  *Chinese Drywall*, 706 F. Supp. 2d at 663; *see* Chart summarizing Taishan's 2006 Structure
Post-March 16, 2006 Global Offering (Q000955-956).

[322]  *Id*.

[323]  *Id*.

[324]  *Id*.

[325]  Rec. Doc. No. 5075; *see* Chart summarizing Taishan's 2006 Structure Post-March 16, 2006
Global Offering (Q000955-956).

[326]  http://english.bnbm.com.cn/service/service.asp?lm=4.

integrated company of [CNBM Group]."[327]  On March 19, 2005, BNBM became the largest

shareholder of Taihe Dongxin (*i.e.*, Taishan) by purchasing forty-two percent (42%) of Taishan's

equity, and BNBM controlled 4 of the 7 members of the TG board.[328]  In 2006, BNBM acquired

an additional 23% of Taishan's shares, owning 65% of the company, when it acquired  Taian

City Donglian Investment and Trading Company.[329]  This acquisition was funded by a loan taken

out by BNBM using as collateral not its own assets, but those of a third company, the Taian City

State Owned Assets Management, which was a minority shareholder of Taishan.[330]  As CNBM

announced in a related regulatory announcement:

> Following BNBM's acquisition of 42% equity interest in Taihe, the
> Company (CNBM) has become the largest producer of gypsum
> board in the PRC . . . The Acquisition [by BNBM of the entire
> equity interest in Donglian] will enable the CNBM group to further
> enhance its competitiveness and consolidate its leading position in
> the PRC gypsum board market as it will participate more actively
> in the daily operations and management of Taihe with a view to
> improving profitability.[331]

With the acquisition of an additional 23% of Taishan's shares, and subsequent amendments to

---

[327]  http://english.bnbm.com.cn/.

[328]  CNBM Global Offering (Q000438-952) at p. 113; *see* Chart summarizing Taishan's 2006 Structure Post-March 16, 2006 Global Offering (Q000955-956).

[329]  *See* Jia II Dep. at 593:14-594:4; Defendants' Ex. 11A to Jia II Dep. (Articles of Association to Shandong Taihe Dongxin Co., Ltd., August 8, 2006, Article 17) (TG0020686-709) (Herman Aff. Ex. "132"); *see also* Summary of BNBM 2006 Annual Report (Herman Aff. Ex. "133") at pp. 16, 37.

[330]  August 28, 2006 CNBM Public Regulatory Announcement "Connected Transaction Acquisition of the Entire Equity Interest in Taian Donglian Investment and Trading Company Limited" (Q000010-12) (Herman Aff. Ex. "134").

[331]  *Id.*; *see also* CNBM Global Offering (Q000438-952) at p. 4 ("As BNBM has gained long-term control of Taihe's board of directors in connection with the acquisition, Taihe became a subsidiary consolidated with BNBM.").

73

the bylaws of TG, BNBM nominated 3 of the 5 members of Taishan's board.[332]

BNBM is the parent of Taishan with effective control over Taishan.[333]  With the purchase by BNBM of a majority share in Taishan, BNBM's parent (CNBM) stated at its public offering in March 2006, that when "BNBM gained long-term control of [Taishan's] board of directors in connection with the acquisition, [Taishan] became a subsidiary consolidated with BNBM."[334] Taishan and BNBM were "joint venturers"[335]:  they undertook several drywall related investments together,[336] BNBM maintained the right to purchase interest in all present and future subsidiaries of Taishan,[337] and their development strategies and production capacities were frequently reported as one.[338]

In addition to the efforts through Taishan to sell to the United States, CNBM and BNBM were themselves developing the United States market.  Both entities appeared at a 2007 trade

---

[332] First Extraordinary General Meeting of Shareholders for the Year 2007 of Shandong Taihe Dongxin Co., Ltd. (TG0020715) (Herman Aff. Ex. "135").  In addition, Jia Tongchun, a member of the board of BNBM, and the Chairman of TG, together with Taian Anxin Investments, nominated a fourth member of the board.  *See id*.

[333] *See* Rec. Doc. No. 5075; *see also* Chart summarizing Taishan's 2006 Structure Post-March 16, 2006 Global Offering (Q000955-956).

[334] CNBM Global Offering (Q000438-952) at p. 4.

[335] *See* Jia II Dep. at 203:2-204:10, 404:13-18.

[336] *See* 2005 Annual Shareholders Meeting (TG0020677), item 5(2) (Herman Aff. Ex. "136"); Resolution of the 4th Extraordinary Meeting of 2005 (TG0020682), item II, 1, 2 and 4 (Herman Aff. Ex. "171").

[337] *See* 2006 BNBM Bylaws (TG0020686), Chapter 3 (Herman Aff. Ex. "137").

[338] *See, e.g.*, CNBM May 2010 Overseas Regulatory Announcement (Q000975-981) (Herman Aff. Ex. "138") at p. 3; 2009 BNBM Annual Report (Q000155-223) (Herman Aff. Ex. "139") at p. 44; Summary of BNBM 2008 Annual Report (Q000091-154) (Herman Aff. Ex. "140") at pp. 27, 64; Summary of BNBM 2006 Annual Report, at pp. 14, 16, 17, 20, 37, 44.

74

show in Las Vegas, and were actively pursuing sales in the United States.[339]  Moreover, both companies established United States branches as part of this strategy.

CNBM (USA) Corporation was established in 2006 in the City of Industry, California, at the same time that Taishan sold its Chinese Drywall to Venture Supply.[340]  CNBM (USA) publicly announced that its "mission [is] to provide all kinds of building materials and services in the [U.S.] national market."[341]

BNBM ventured into the United States a little earlier, and prior to its acquisition of Taishan.  In 2000, BNBM set up BNBM of American, Inc. in Tampa, Florida.[342]  BNBM of America was the United States marketing arm of BNBM, selling primarily BNBM drywall, adding other building materials later.[343]  Throughout its existence, it sold over $1 million in drywall for BNBM.[344]  It wound down operations in 2005, just when BNBM was acquiring interest in Taishan.[345]

Just as with TG and TTP, these organizations shared leadership, including leaders all the

---

[339]  Deposition of John Gunn dated 7/22/2011 ("Guardian Dep.") (Herman Aff. Ex. "143") at 148:8-149:1, 154:2-6; *see also id*. at 34:23-35:6, 147:8-11.

[340]  *Chinese Drywall*, 706 F. Supp. 2d at 663; *see* Rec. Doc. No. 6245-4, at p.6; *see also* State of California Business Entity Detail for CNBM (USA) Corp. dated 3/31/2011 (Q000982) (Herman Aff. Ex. "141").

[341]  *Id.*

[342]  Richard Hannam Dep. at 16:7-14, 22:21-22, 24:11-19, 32:15-19, 74:8-32; Ex. 1 to Richard Hannam Dep. (2003 For Profit Corporation Uniform Business Report (Florida Secretary of State) and Articles of Incorporation for BNBM of America, Inc. in Tampa, Florida) (Herman Aff. Ex. "142").

[343]  Richard Hannam Dep. at 14:6-14.

[344]  *Id*. at 36:2-8.

[345]  *Id*. at 74:8-22.

way from BNBM of America and TG, up through CNBM to the parents of CNBM, and just short of the SASAC of the People's Republic of China.  For example:  Jianglin Cao was a director and officer of BNBM of America,[346] served on the Board of Supervisors of TG,[347] was a Chairman of BNBM,[348] served as the President and Executive Director of CNBM,[349] and held senior positions, including Directorships at BNBM Group and CNBM Group.[350]  Zhiping Song was also a director of BNBM of America,[351] was the Chairman of BNBM,[352] served as an Executive Director and Chairman at CNBM,[353] and held senior positions at BNBM Group and CNBM Group.[354]  Wang Bing was a Director of TG,[355] a Director, Chairman and General Manager at BNBM,[356] and a

---

[346]  Ex. 1 to Richard Hannam Dep. (2003 For Profit Corporation Uniform Business Report and Articles of Incorporation for BNBM of America, Inc.).

[347]  Defendants' Ex. 8A to Jia II Dep. (Resolutions of the General Meeting of Shareholders dated 4/25/2005) (Translation of TG0020601-602) (Herman Aff. Ex. "185").

[348]  Summary of BNBM 2006 Annual Report at pp. 2, 12; Summary of BNBM 2008 Annual Report at pp. 2, 12, 64 (Q000091-154); 2010 CNBM Annual Report (Q000224-437) (Herman Aff. Ex. "186") at p. 75

[349]  CNBM Global Offering at pp. 157, 188-89; CNBM 2010 Annual Report (Q000224-437) at pp. 4, 20, 43, 55, 75.

[350]  2006 Global Offering at p. 188; 2010 CNBM Annual Report at p. 75.

[351]  Ex. 1 to Richard Hannam Dep. (2003 For Profit Corporation Uniform Business Report and Articles of Incorporation for BNBM of America, Inc.).

[352]  2006 Global Offering at pp. 188-89; 2010 CNBM Annual Report at p. 74.

[353]  *Id*.

[354]  *Id*.

[355]  Defendants' Ex. 8A to Jia II Dep. (Resolutions of the General Meeting of Shareholders dated 4/25/2005) (Translation of TG0020601-602).

[356]  2010 CNBM Annual Report at p. 84.

Vice President at CNBM.[357]   Yanjun Yang was another Director at TG,[358] who held a variety of leadership roles at BNBM, including CFO and Deputy General Manager.[359]   Jinyu Hu was also a Director at TG[360] and served as a Supervisor at BNBM.[361]

The PSC attempted to bring both BNBM and CNBM into these proceedings by serving these defendants through the Hague Convention with the Complaints at issue.   However, both BNBM and CNBM defaulted.[362]   During these proceedings, CNBM (USA) entered its appearance in the litigation, but then instructed its counsel to withdraw as counsel of record.[363] As a result, the PSC has been unable to take formal discovery of Taishan's upstream entities, as set forth in more detail in Section III.B.2, *infra*.

---

[357]   *Id.*

[358]   Resolution of the First Extraordinary General Meeting of 2006 (TG0020675) (Herman Aff. Ex. "187").

[359]   Summary of BNBM 2006 Annual Report at pp. 13, 46; Summary of BNBM 2008 Annual Report at p. 13.

[360]   Defendants' Ex. 8A to Jia II Dep. (Resolutions of the General Meeting of Shareholders dated 4/25/2005) (Translation of TG0020601-602).

[361]   Summary of BNBM 2006 Annual Report at p. 13; Summary of BNBM 2008 Annual Report at p. 13.

[362]   *See* Rec. Doc. No. 5621.  At one point in time, as of October 13, 2010, BNBM had retained national counsel to represent them in these proceedings, *see* Letter dated 10/13/2010 from James L. Stengel to Arnold Levin (Herman Aff. Ex. "144"), however, neither BNBM nor CNBM ever entered their appearance in the litigation.

[363]   *See* Rec. Doc. No. 9568 (Ex Parte Motion to Withdraw as Counsel of Record for CNBM USA Corp.).

III.   **PROCEDURAL HISTORY**

A.   **Chinese Drywall Proceedings**

On June 15, 2009, the Judicial Panel on Multidistrict Litigation transferred all federal civil actions alleging damages from Chinese Drywall to the United States District Court for the Eastern District of Louisiana for coordinated and consolidated pretrial proceedings in MDL 2047 pursuant to 28 U.S.C. § 1407.[364]  Since the formation of this MDL almost three years ago, close to 2,000 Defendants that manufactured, imported, marketed, sold, distributed, supplied and/or installed Chinese Drywall, as well as their insurers and sureties, have been brought into these MDL proceedings.

The Court has worked tirelessly to oversee and manage this complex litigation in a myriad of ways.[365]  For example, the Court has:  (i) held regular monthly status conferences attended by hundreds of counsel; (ii) appointed a Special Master[366]; (iii) appointed a curator for *pro se* litigants[367]; (iv) appointed a mediator to assist with efforts to settle Chinese Drywall claims[368]; (v) appointed numerous committees to represent, organize and streamline the divergent interests involved in this case, including a Plaintiffs' Steering Committee ("PSC"), a Plaintiffs'

---

[364]  *See Chinese Drywall*, 626 F. Supp. 2d 1346.

[365]  *See*, *e.g.*, Minute Entry, 12/2/2010 [Rec. Doc. No. 6525].

[366]  Order Appointing Special Master [Rec. Doc. No. 505 at 4].

[367]  Rec. Doc. No. 11327.

[368]  *E.g.*, Rec. Doc. Nos. 7052, 7267.

Liaison Counsel ("PLC"),[369] a Defendants' Liaison Counsel,[370] a Homebuilders and Installers Liaison Counsel,[371] Plaintiffs' and Defendants' State and Federal Coordination Committees,[372] and an Insurer Steering Committee as well as Co-Lead Counsel for the First-Party Insurer Subcommittee[373]; (vi) interfaced with and consulted State Court and Federal jurists also adjudicating Chinese Drywall litigation; (vii) entered 25 separate Pretrial Orders, many with numerous sub-parts, as well as scores of other orders and minute entries; (viii) tried and/or resolved ten bellwether cases transferred from or originating in Virginia and Louisiana[374]; (ix) monitored the implementation of the Settlement Agreement for the Demonstration Remediation of Homes with KPT Drywall ("Pilot Program"), which has put more than 2,000 homes into the process of remediation to remove KPT Chinese Drywall from the properties, as of March 30, 2012; and (x) overseen the negotiation and culmination of the InEx, Banner, Knauf, and L&W class action settlements of Chinese Drywall claims.[375]

---

[369] *See* Pretrial Order No. 3 (appointing Plaintiffs' Liaison Counsel, Russ Herman); Pretrial Order No. 8 (creating the PSC and appointing Lead Counsel for Plaintiffs, Arnold Levin).

[370] *See* Pretrial Order No. 4.

[371] *See* Pretrial Order No. 18.

[372] *See* Pretrial Order No. 19.

[373] *See* Pretrial Order No. 20.

[374] *See Germano, et al. v. Taishan Gypsum Co., Ltd., et al.*, Case No. 2:09-cv-06687 (E.D. Va. May 11, 2010) (Rec. Doc. No. 3013) (seven cases); *Hernandez v. Knauf Gips, KG, et al.*, Case No. 2:09-cv-06050 (E.D. La. May 11, 2010) (Rec. Doc. No. 3012) (one case).  Two additional bellwether cases, *Campbell v. KPT, et al.*, Case No. 2:09-cv-7628 (E.D. La.) and *Clement v. KPT, et al.*, Case No. 2:09-cv-7628 (E.D. La.), were settled on the eve of trial on June 18, 2010.

[375] *See* Orders preliminarily approving:  (1) Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047 ("Knauf Class Settlement") [Rec. Doc. No. 12138]; (2) Settlement Agreement Regarding Claims Against Interior-Exterior in MDL No. 2047 ("InEx Class Settlement") [Rec. Doc. No. 8818]; (3) Amended Stipulation and Agreement of Settlement ("Banner Class

To date, more than 14,000 entries have been recorded on the docket in these MDL proceedings.  Significant achievements have resulted from these efforts.  The Court has granted preliminary approval to several interrelated class action settlements that will resolve claims brought against Chinese Drywall manufacturer-Knauf Plasterboard Tianjin Co. Ltd. ("KPT"), related Knauf entities and others in the KPT supply chain.[376]  A joint fairness hearing will be held to determine whether the Knauf Class Settlement, the Banner Class Settlement, the InEx Class Settlement and the L&W Class Settlement will receive final approval by the Court.

Despite these incredible achievements realized thus far towards global resolution of claims arising from the Chinese Drywall debacle, there remains litigation pending against Taishan that has not advanced beyond service of the complaints and certain discovery limited to personal jurisdiction issues.

B.    **Jurisdictional Discovery**

1.    ***Taishan***

The massive amount of evidence refuting Taishan's jurisdictional motions was obtained by the PSC through great effort and persistence, with the intervention of this Court.  This undertaking began on September 24, 2010, when the PSC propounded upon Taishan Plaintiffs' First Set of Interrogatories and Request for Production of Documents Concerning Jurisdictional Issues.[377]  Taishan responded to the discovery in an evasive and incomplete manner and

---

Settlement") [Rec. Doc. No. 10064]; and (4) Class Action Settlement Agreement Regarding KPT Drywall Claims Against USG and L&W in MDL No. 2047 ("L&W Class Settlement").

[376]  *Id.*

[377]  Rec. Doc. No. 6964, Exs. A & B.

repeatedly attempted to narrow the personal jurisdiction discovery in this case.

On January 12, 2011, the PSC filed its initial Motion Challenging the Adequacy and Completeness of Taishan's Discovery Responses and to compel Taishan depositions to begin in February 2011.[378]  Taishan opposed discovery, filing a Motion for Protective Order[379] and its opposition to the PSC's motion.[380]  The PSC filed a consolidated response to these filings.[381]  Thereafter, the Court heard oral argument on the PSC's Motion and Taishan's Motion for Protective Order on January 20, 2011, and denied Taishan's Motion for Protective Order and ordered the parties to proceed with 30(b)(6) depositions as soon as practicable.[382]

On February 9, 2011, the PSC filed a renewed Motion Challenging the Adequacy and Completeness of the Discovery Responses of TG and TTP and to Compel Discovery and Jurisdiction Depositions to Begin in February 2011,[383] due to the entry of a preliminary default judgment of numerous Taishan affiliates.[384]  The Court denied the PSC's renewed motion during

[378]  Rec. Doc. No. 6964.

[379]  Rec. Doc. No. 7003.

[380]  Rec. Doc. No. 7026.

[381]  Rec. Doc. No. 7051.

[382]  Rec. Doc. No. 7136.  The Court also denied the PSC's Motion Challenging the Adequacy and Completeness of Taishan's Discovery Responses, but gave the PSC the right to refile the same.  *Id*.

[383]  Rec. Doc. No. 7364.

[384]  Rec. Doc. No. 7302.  Taishan and its counsel took the untenable position that Taishan may make representations regarding its affiliates' activities related to personal jurisdiction discovery in this case, without being before the Court.  *See* Transcript of January 20, 2011 hearing, attached to Rec. Doc. 7364 as Ex. B.  The Court was appropriately concerned with Taishan's representations concerning its affiliates without those affiliates being properly before the Court.  *Id.*  Accordingly, the Court granted Taishan an additional week to file a Notice of Appearance for its affiliates.  *Id.*  The week passed and no Notice of Appearance was filed for the affiliates.  Accordingly, the Court entered a preliminary default judgment against the numerous Taishan affiliates on February 1, 2011, in *Gross v. Knauf Gips KG,* case

a February 16, 2011 status conference, but confirmed that the parties were to go forward with the Rule 30(b)(6) depositions in Hong Kong during April 2011, and that the depositions were to cover information regarding TG and TTP's affiliates.[385]  On February 17, 2011, the PSC renoticed the 30(b)(6) depositions of TG and TTP to take place in Hong Kong beginning on April 4, 2011.[386]  Other parties in the litigation, including Venture Supply and Porter/Blaine, also noticed these depositions.[387]

From April 4th to April 8th of 2011, twelve attorneys representing the PSC, homebuilders, suppliers, and other entities in the MDL litigation, conducted Rule 30(b)(6) depositions of TG and TTP, including the deposition of:  Peng Wenglong, Jia Tongchun, and Zhang Jianchun.  Due to lack of knowledge and/or responsiveness of the deponents as well as argument/disagreement among counsel and the translators, these depositions were essentially worthless.  As previously stated by the Court, these depositions degenerated into "chaos and old night."[388]

On May 3, 2011, the PSC filed a Motion to Compel Production of Documents and Further Jurisdictional Depositions of Taishan and a Motion for Sanctions.[389]  The HSC filed a

---

number 2:09-md-02047-EEF-JCW.  Rec. Doc. No. 7302.

[385]  Rec. Doc. No. 7511.

[386]  Rec. Doc Nos. 7549, 7550, 8297, 8298.

[387]  Rec. Doc Nos. 7564, 7566, 8351, 8352.

[388]  Rec. Doc. No. 10269 at p. 5.

[389]  Rec. Doc. No. 8685.

similar motion,[390] and several other parties joined in these motions.[391]  These motions were set

for hearing on May 26, 2011.[392]  The Court granted these motions in part and continued them in

part.[393]  Among other things, the Court ordered that the Rule 30(b)(6) depositions be retaken

under supervision of the Court, that the witnesses be knowledgeable and prepared to answer

questions regarding the topics, and that the parties mutually agree upon a single translator.[394]

The Court held a number of conferences with the parties in order to keep matters on track

and to solve discovery and deposition disputes.  At the June 23, 2011 conference, the Court

directed that the renewed Rule 30(b)(6) depositions take place in Hong Kong starting the week of

January 9, 2012.  While many of the discovery and deposition disputes were resolved through

various meet-and-confers and guidance from the Court, several issues still remained outstanding.

Accordingly, on August 12, 2011, the Court ordered the parties to submit supplemental briefing

on the record, in lieu of correspondence, regarding current written discovery disputes.[395]  The

parties complied with this order, and on August 30, 2011, the Court held a hearing on the

submitted briefs.  On September 9, 2011, the Court issued an Order & Reasons relative to these

outstanding discovery disputes, outlining appropriate parameters of relevant personal jurisdiction

---

[390]  Rec. Doc. No. 8695.

[391]  Rec. Doc Nos. 8755, 8758, 8768, 8792, 8805.

[392]  Rec. Doc. No. 8800.

[393]  Rec. Doc. No. 9107.

[394]  *Id.*

[395]  Rec. Doc. No. 10092.

discovery of Taishan.[396]  Among other things, the August 30, 2011 Order & Reasons directed that

Taishan must:  (a) produce discovery of upstream- and downstream-affiliated Taishan

Companies, (b) expand its ESI search, (c) produce documents regarding the Taishan entities'

marketing and sales efforts aimed at the United States, and (d) produce VAT-related

documents.[397]

On October 7, 2011, Taishan filed a motion for reconsideration of the Court's September

9, 2011 Order & Reasons concerning personal jurisdiction discovery.[398]  Taishan's motion for

reconsideration alleged that the Court based its ruling on unsupported allegations of the PSC, and

as such, the standard for allowing discovery into TG's relationship with BNBM was not satisfied.

*Id*.  The PSC/Questioners filed a response in opposition to Taishan's Motion, arguing that the

Court has already considered the facts and law, and thus, Taishan's Motion was an improper

attempt to relitigate these issues.[399]  On November 10, 2011, the Court issued an Order &

Reasons denying Taishan's motion for reconsideration.

Shortly after the November 10, 2011 Order & Reasons, counsel for Taishan informed the

Court and the parties that its clients were reluctant to participate in the Rule 30(b)(6) depositions

scheduled to commence in Hong Kong on January 9, 2012.  A telephone status conference was

held on November 21, 2011, where Taishan was directed to report to the Court, by November 28,

2011, as to whether the depositions would be proceeding and any other information relevant to

---

[396]  Rec. Doc. No. 10269.

[397]  *Id*.

[398]  Rec. Doc. No. 10799.

[399]  Rec. Doc. No. 10803.

the depositions.[400]  On November 23, 2011, counsel for Taishan reported to the Court and the parties that, after much discussion and deliberation, Taishan had decided to make a good faith effort to comply with the Court's direction to produce the six previously identified witnesses.[401] However, they also reported that three of the six previously identified witnesses (Messrs. Cao, Shiliang and Tinghuan) had refused to testify.  *Id*.  On November 30, 2011, counsel for Taishan sent a supplemental letter advising that their client has decided to continue participating in the litigation and would produce Messrs. Jia, Peng W., Che, Peng Shiliang and Fu for their depositions in January as previously scheduled.[402]

Following the Court's rulings on discovery, the PSC took a number of jurisdictional depositions of Taishan witnesses in Hong Kong.  The Court traveled to Hong Kong personally to oversee these depositions and rule on any objections arising during discovery.  In addition, the PSC deposed various shippers, importers and distributors of Taishan's drywall in the United States.  In total, 17 jurisdictional depositions were taken by the PSC.

| Deponent | Description | Date |
|---|---|---|
| Jia Tongchun  | General Manager, Director of Board of Directors, and 5% owner of TG (all times) Deputy General Manager of BNBM (2005-present) | 4/4-5/2011 1/9-10/2012 |
| Zhang Jianchun | Secretary of TG (all times) Secretary of TTP (2010 - present) | 4/6/2011 |

---

[400]  Rec. Doc. No. 11326.

[401]  *See* Letter dated 11/23/2011 from Joe Cyr to Leonard Davis (Herman Aff. Ex. "145").

[402]  Letter dated 11/30/2011 from J. Cyr to Hon. Eldon Fallon (Herman Aff. Ex. "146").

| Deponent | Description | Date |
|---|---|---|
| Peng Wenlong (Frank Clem)  | Manager of Foreign Trade Department at TG (2005)<br>Salesperson at TTP (2006 - 2007)<br>Manager of Foreign Trade Department at TG (2008 - present) | 4/7-8/2011<br>1/13/2012 |
| Peng Shiliang  | General Manager and Chairman of Board of Directors of TTP (2006-2009)<br>Employee of TTP (2009-present)<br>Plant Manager of TG (2009-2012) | 1/11/2012 |
| Che Gang (a/k/a Bill Cher)  | Manager of International Trading for Taishan<br>Salesperson at TG (2001-2006)<br>Salesperson at TTP (2006-2007)<br>Salesperson at TG (2008-2012) | 1/11-12/2012 |
| Fu Tinghuan  | Supervisor at TG (2005 - present)<br>Deputy General Manager at TG (2008 - present)<br>Director of TTP (2006 - present) | 1/10/2012 |
| James Martin Alexander | Representative of Delmar Logistics Georgia (shipping agent to Miami, Florida) | 12/22/2011 |
| Ivan Gonima | Manager and Registered Agent for Oriental Trading Company (Miami, Florida) | 12/13/2011<br>2/14/2012 |
| John Gunn | Vice President of Procurement for Guardian Building Products Distribution, Inc. | 7/22/2011 |
| Richard Hannam | President of Wood Nation, Inc. (Tampa, Florida) | 2/14/2011<br>2/13/2012 |

| Deponent | Description | Date |
|---|---|---|
| Samuel G. Porter | President, Venture Supply, Inc. (Norfolk, Virginia) | 12/16-17/2009 |
| Carlos Rios | President, Carn Construction Corporation (Florida Company) | 12/8/2011 |
| Rafael Sardi | Representative of Onyx GBH Corporation | 2/9/2012 |
| Darrin Steber | Owner of GD Distributors, LLC, (New Orleans, Louisiana) | 12/30/2011 |
| Joseph Weiss | OEG Building Materials, Inc. (New York, New York) | 2/16/2011 |
| Donald H. Wilson, Jr. | Representative of BNBM of America, Inc. | 12/12/2011 |
| Yongzhi (Charley) Yang | Representative of Stone Pride International Corporation | 2/21/2012 |

The Court informed the deponents in Hong Kong that:

> I am the Judge who will decide the issues in this case. One thing I do when I make that decision, I listen to the testimony and I evaluate the credibility of the truthfulness of the witnesses. I listen closely to what people say, and it's important for you to listen to the question and to answer the question, if you can. . . . Because if I get the impression that you are not answering the question intentionally, I will discount your testimony and not believe it.[403]

The jurisdictional deposition testimony elicited before the Court and the documents produced in this litigation by Taishan, its exclusive U.S. sales agents, American customers and others, demonstrate that Taishan:  (i) manufactured Chinese Drywall and other related building construction materials, custom-designed with red-white-and-blue labels matching the colors of the American flag, to meet American standards and American customer specifications; (ii) marketed

---

[403] Peng S. Dep. at 44:8-45:8.

its products on the Internet, through brochures and by sending samples of its drywall to the United

States, targeting Virginia, Florida, and Louisiana in particular, as well as New York, New Jersey,

Maryland, California, Nevada and Texas; (iii) entered into exclusive sales agreements with agents

in the U.S. to sell and distribute Taishan products in this country; (iv) invited sales agents to visit

Taishan factories, paying for their food, lodging and transportation and giving them the VIP

treatment; (v) used Federal Express, DHL and/or the U.S. Postal Service to send samples of its

drywall to potential customers in the United States; (vi) sold Taishan products to numerous

importers with the intention and expectation that those products would be installed in Plaintiffs'

homes in Virginia, Florida, Louisiana and other states in the United States; (vii) investigated

overseas shipping options and arranged for freight to the United States; and (viii) followed up with

customers in the United States to resolve customer complaints and to further customer relations.

### 2. *CNBM, BNBM, and the Luneng Mine*

The PSC's efforts to obtain discovery in this litigation regarding any of the upstream

entities, such as BNBM and CNBM, have been fruitless.  BNBM and CNBM are defaulting

defendants.  Only TG and TTP have entered their appearance in the litigation and became subject

to discovery in this matter.  The PSC propounded discovery on TG and TTP, seeking documents

relating to jurisdiction, which were in their control but which may be in the possession of BNBM

(the entity immediately upstream from Taishan).  Taishan resisted such discovery.  On November

September 9, 2011, the Court compelled production of such upstream documents finding that "the

Questioner's allegations . . . demonstrate sufficient 'control' to warrant the Taishan entities'

production of the requested BNBM discovery documents.  However, if Taishan diligently attempts

to obtain this discovery from BNBM yet is unsuccessful in procuring some or all of the documents,

Case 2:09-md-02047-EEF-MBN   Document 14215-2   Filed 05/08/12   Page 106 of 113

the Court directs Taishan to submit an affidavit under penalty of perjury and punitive action, stating unequivocally that such discovery is not within its control."[404]

On November 16, 2011, Jia Tongchun supplied an affidavit claiming that Taishan submitted to BNBM a request for the documents sought by the PSC, but that no documents were provided by BNBM and that Taishan has no control over these documents.[405]  With regard to U.S. affiliates of CNBM, the PSC filed a motion to compel and for sanctions for CNBM USA's failure to appear at a deposition on February 22, 2012, which has resulted in a grant of the PSC's motion to compel and for sanctions.[406]  Subsequently, the parties agreed that the jurisdictional contacts of upstream entities, such as BNBM and CNBM, would not be briefed as part of the analysis of the current motions regarding jurisdiction, but would be raised at a later date after jurisdiction over TG and TTP has been addressed by the Court.[407]

The PSC's efforts to obtain information regarding the Luneng mine in China have also been thwarted.  The Luneng mine appears to be the source of the contaminated gypsum or other material that was used in the manufacture of problematic Chinese Drywall that is the subject of this

---

[404]  Rec. Doc. No. 10269, at pp. 25-26.

[405]  Declaration of Jia Tongchun dated November 16, 2011, at ¶¶ 13-16 (Herman Aff. Ex. "147").

[406]  Rec. Doc. No. 13585.

[407]  In advance of the submission of Taishan's jurisdictional motions, Taishan's counsel "wanted to make sure that . . . while briefing the personal jurisdiction issues [the PSC] [would] not be contending that the jurisdictional contacts of the upstream entities (including CNBM and BNBM) should be imputed to TG and TTP. . . .  If that is the case, it will simplify the briefing for the Court."  Email dated 3/23/2012 from Tom Owen to Lenny Davis (Herman Aff. Ex. "148"); *see also* Email dated 3/22/2012 from Tom Owen to Lenny Davis ("In order to avoid any unnecessary briefing for the Court . . . I wanted to confirm the representation made at the meeting before the status conference today that the parties . . . will not be arguing . . . that the jurisdictional contacts of any entity upstream of Taishan Gypsum (including but not limited to CNBM and BNBM and their subsidiaries), should be imputed to either TG or TTP. . . .") (Herman Aff. Ex. "149").

litigation.  The Luneng mine is not believed to be owned by any of the manufacturers of the

drywall, including Knauf Plasterboard Tianjin or Taishan Gypsum.  The PSC is aware that the

CPSC made an investigation of Chinese Drywall within China.  The CPSC in its Investigation of

Imported Drywall Status Update August 2009 reported that it had received approval from the

Chinese for a visit to China and that it was working to arrange an investigative visit of several sites

it believed to be of interest beginning August 17, 2009.[408]  Thereafter, in the Investigation of

Imported Drywall Status Update September 2009, the CPSC reported that its "staff visited China

and met with Chinese government officials, as well as management from several sites that we

[CPSC] believe to be of interest" and that "[t]he team inspected gypsum mines and drywall

manufacturing plants in China with Chinese government officials."[409]  The CPSC also collected

samples from mines/manufacturing establishments and retailers, and met with China Building

Materials Academy, a state owned research and development institute.  The PSC was advised that

the CPSC attempted to make a visit to the Luneng mine, but the PSC understands that the CPSC

was denied access to the Luneng mine.  The PSC submitted FOIA requests to the CPSC which

proved to be fruitless.[410]  The PSC attempted on numerous times to secure the information from the

CPSC through FOIA requests, but no information regarding the Luneng mine has been

forthcoming.  Additionally, the PSC also attempted to obtain the information during the corporate

---

[408]  CPSC Investigation of Imported Drywall Status Update August 2009 (Herman Aff. Ex. "188").

[409]  CPSC Investigation of Imported Drywall Status Update October 2009 – Imported Drywall Fact Sheet dated September 2009 (Herman Aff. Ex. "189").

[410]  *See* PSC FOIA request dated 7/17/2009 (Herman Aff. Ex. "190"); PSC FOIA request dated 7/20/2009 (Herman Aff. Ex. "191"); PSC correspondence dated 11/2/2009 (Herman Aff. Ex. "192").  *See also* U.S. Consumer Products Safety Commission letter dated 11/3/2009 (Herman Aff. Ex. "193"); PSC correspondence dated 12/3/2009 (Herman Aff. Ex. "194").

30(b)(6) depositions of Taishan[411] and Knauf.[412]  The questioning during the depositions on issues regarding the Luneng mine were met with objections, non-responsiveness and imposition of the "Chinese State Secrets" law was invoked.  As a result, the PSC has been unable to discover this information properly.

## IV.   CONCLUSION

The sum of all of Taishan's activities, transactions and contacts beginning in 2005 and continuing through 2009, which were directed to sales of Taishan's problematic drywall and related building products in Virginia, Florida, Louisiana, California, and elsewhere in the United States, permit the exercise of jurisdiction over Taishan in these proceedings.  Taishan would like to avoid this litigation by suggesting (1) that "Taishan's two sales [of drywall] to Venture Supply [in Virginia]... are the only sales of drywall Taishan has made to any customer based in the United States"[413]; (2) that although "TTP made a few isolated sales of drywall in China to two companies that advised TTP they intended to ship the drywall they purchased to Louisiana[,] TTP was not aware that those companies would later market the drywall in Louisiana"[414]; and (3) that Taishan did not sell any drywall in Florida.[415]  These incredible claims, however, simply do not hold up in light of the overwhelming evidence, established through discovery and public records, of Taishan's

---

[411]  *See*, *e.g.*, Peng I Dep. at 238:5-244:6.

[412]  *See*, *e.g.*, Deposition of Mark Patrick Norris dated 11/11/2010 ("Norris Dep.") (Herman Aff. Ex. "195"), at 133:17-134:12, 135:7-10, 246:16-249:8, 330:24-333:5.

[413]  *See* Declaration of Jia Tongchun, Chairman, General Manager, and Senior Engineer of Taishan ("Jia Decl.") at ¶ 38, attached as Ex. 1 to declaration of Frank T. Spano, dated 4/2/2012 ("Spano Decl."), filed in support of Taishan's jurisdictional motion in *Germano*.

[414]  *Gross* Br. at 1.

[415]  *Mitchell* Br. at 1.

91

sales of millions of square feet of Chinese Drywall and related building materials to numerous customers in Florida, Virginia, Louisiana, California, and elsewhere.

Far from only two sales of drywall in Virginia, Taishan sold more than <u>7.3 million square feet</u> of drywall in Virginia, with a value of $564,549.22.  Rather than zero sales of drywall in Florida, Taishan sold more than <u>9 million square feet</u> of drywall in Florida, with a value of $772,863.40.  Taishan's "few isolated" sales in Louisiana totaled <u>612,288 square feet</u> of drywall, having a value of more than $60,000.  And, Taishan's sales to Stone Pride and Advanced Products International in California totaled 2,640 pieces, or <u>126,720 square feet</u> of drywall, with a value exceeding $10,000.  In addition, Taishan sold more than <u>7 million square feet</u> of drywall in New York, with a value of $413,191.64.  The evidence also shows that Taishan sold in excess of <u>4.6 million square feet</u> of drywall in North Carolina, having a value of $388,324.80.

Overwhelmingly, the evidence demonstrates that Taishan targeted the United States for sales of its Chinese Drywall and other building products, with the knowledge and expectation that those products would be delivered to customers in Virginia, Florida, Louisiana, California, and elsewhere.  It is disingenuous for Taishan to argue that it had no idea where its products would end up, since Taishan arranged for the freight and shipping and prepared the invoices, bills of lading, and export reports documenting the shipments of its products to the states in question.  However, it is not surprising that Taishan seeks to disavow this evidence.  Throughout these proceedings, Taishan's witnesses have made clear that in their opinion the printed or spoken word is not necessarily the entire truth.  As Taishan's Deputy General Manager Fu Tinghuan explained:  "In China, we exaggerate a little bit.  Exaggerate a little bit, that's allowed."[416]

---

[416] Fu Dep. at 86:14-15.

Under the law, Taishan should be held to answer for its actions that led to Plaintiffs' damages in this country. Accordingly, for all of the reasons set forth in this Global Statement of Facts and based on the affidavit of Plaintiffs' Liaison Counsel Russ M. Herman and the evidence attached thereto, Taishan's jurisdictional motions should be denied.

Respectfully submitted,


Dated: May 8, 2012              /s/ Russ M. Herman
                                _____
                                Russ M. Herman, Esquire (Bar No. 6819) (On the Brief)
                                Leonard A. Davis, Esquire (Bar No. 14190) (On the Brief)
                                Stephen J. Herman, Esquire (Bar No. 23129) (On the Brief)
                                HERMAN, HERMAN & KATZ, LLP
                                820 O'Keefe Avenue
                                New Orleans, LA 70113
                                Phone: (504) 581-4892
                                Fax: (504) 561-6024
                                LDavis@hhkc.com
                                *Plaintiffs' Liaison Counsel in MDL 2047*

                                Arnold Levin (On the Brief)
                                Fred S. Longer (On the Brief)
                                Sandra L. Duggan (On the Brief)
                                Matthew C. Gaughan (On the Brief)
                                Daniel C. Levin (On the Brief)
                                LEVIN, FISHBEIN, SEDRAN & BERMAN
                                510 Walnut Street, Suite 500
                                Philadelphia, PA 19106
                                Phone: (215) 592-1500
                                Fax: (215) 592-4663
                                Alevin@lfsblaw.com
                                *Plaintiffs' Lead Counsel in MDL 2047*

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios (On the Brief)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
BECNEL LAW FIRM, LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Robert C. Josefsberg
PODHURST ORSECK, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
rjosefsberg@podhurst.com

Bruce William Steckler (On the Brief)
BARON & BUDD, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Ervin A. Gonzalez (On the Brief)
Patrick Montoya (On the Brief)
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

Ben W. Gordon, Jr.
LEVIN, PAPANTONIO, THOMAS, MITCHELL
 ECHSNER & PROCTOR, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
LAMBERT AND NELSON
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Gerald E. Meunier (On the Brief)
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
 & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker
PARKER, WAICHMAN, ALONSO, LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Scott Wm. Weinstein
MORGAN & MORGAN
12800 University Drive, Suite 600
Ft. Myers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

James Robert Reeves
LUMPKIN & REEVES
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger (On the Brief)
Scott Alan George (On the Brief)
SEEGER WEISS, LLP
77 Water Street, 26th Floor
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Daniel K. Bryson
WHITFIELD BRYSON & MASON LLP
900 W. Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5035
dan@wbmllp.com

Richard J. Serpe, Esquire
LAW OFFICES OF RICHARD J. SERPE
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
rserpe@serpefirm.com

Victor M. Diaz, Jr., Esquire
V.M. Diaz and Partners, LLC
119 Washington Ave, Suite 402
Miami Beach, FL 33139
Phone: (305) 704-3200
Fax: (305) 538-4928
victor@diazpartners.com

## OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

Richard S. Lewis
HAUSFELD LLP
1700 K Street, NW, Suite  650
Washington, DC 20006
Phone: (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com

Andrew A. Lemmon
LEMMON LAW FIRM, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Anthony D. Irpino (On the Brief)
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Phone: (504) 525-1500
Fax: (504) 525-1501
airpino@irpinolaw.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiffs' Steering Committee's Global Statement of Facts in Opposition To: (1) Taishan's Renewed Motions to Vacate the Default Judgments and Dismiss the Complaints in Germano and Mitchell and (2) Taishan's Motions to Dismiss the Complaints in Gross and Wiltz has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 8th day of May, 2012.

/s/ Leonard A. Davis
Leonard A. Davis, Esquire
Herman, Herman & Katz, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhkc.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*
*Co-counsel for Plaintiffs*

96