# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| _____ | * | |
| IN RE: CHINESE-MANUFACTURED | * | MDL NO. 2047 |
| DRYWALL PRODUCTS LIABILITY | * | SECTION: L |
| LITIGATION | * | |
| _____ | * | |
| | * | |
| THIS DOCUMENT RELATES TO: | * | JUDGE: FALLON |
| Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a | * | MAG. JUDGE: WILKINSON |
| Shandong Taihe Dongxin Co. Ltd., et al., | * | |
| Case No. 2:09-cv-6687 (E.D. La.) | * | |
| _____ | * | |
| | * | |
| The Mitchell Co., Inc. v. Knauf Gips KG, et al., | * | |
| Case No. 09-4115 (E.D. La.) | * | |
| _____ | * | |
| | * | |
| Wiltz v. Beijing New Building Materials Public | * | |
| Ltd. Co., et al., Case No. 10-361 (E.D. La.) | * | |
| _____ | * | |
| | * | |
| Gross v. Knauf Gips KG, et al., 2:09-cv-06690 | * | |
| (E.D. La.) | * | |
| _____ | * | |

## AFFIDAVIT OF RUSS M. HERMAN IN SUPPORT OF
## THE PLAINTIFFS' STEERING COMMITTEE'S GLOBAL STATEMENT OF
## FACTS AND MEMORANDUM OF LAW IN OPPOSITION TO: (1) TAISHAN'S
## RENEWED MOTIONS TO VACATE THE DEFAULT JUDGMENTS AND
## DISMISS THE COMPLAINTS IN GERMANO AND MITCHELL AND (2)
## TAISHAN'S MOTIONS TO DISMISS THE COMPLAINTS IN GROSS AND WILTZ

STATE OF LOUISIANA       :
                                        SS
PARISH OF ORLEANS      :

      BEFORE ME, the undersigned Notary Public, in and for the Parish of Orleans, State of

Louisiana, personally came and appeared:

                            RUSS M. HERMAN

who, after being duly sworn, stated that:

1.   I am an attorney admitted to practice before the bar of the Supreme Court of the United States, the United States Courts of Appeals for the Fifth Circuit, the United States District Courts for the Eastern District of Louisiana and the Supreme Court of the State of Louisiana, among others.  I received my L.L.B. from Tulane University Law School in 1966.

2.   I make this affidavit in my capacity as the Court-appointed Plaintiffs' Liaison Counsel.  The purpose of this affidavit is to provide the Court with the information obtained by the Plaintiffs' Steering Committee ("PSC"), via formal and informal discovery, regarding Taishan Gypsum Co., Ltd., along with its wholly-owned subsidiary Taian Taishan Plasterboard Co., Ltd.

3.   Taishan Gypsum, formerly known as Shandong Taihe Dongxin Co., Ltd., is referred to in company documents and by customers as The Taishan Group, Taian Taishan Plasterboard Co., Ltd. ("TTP") and Taihe. Taishan Gypsum ("TG") and TTP shared the same employees, the same address, the same phone number, and used the same website, among other things. As such, TG and TTP are considered alter egos and referred to interchangeably herein, collectively, as Taishan.

4.   At the end of the summer of 2005, two devastating hurricanes, Katrina and Rita, made landfall on the Gulf Coast of the United States, killing more than 1,800 people and demolishing thousands of homes, commercial buildings and other property.  In the aftermath of these deadly disasters that caused massive destruction, there was a critical shortage of drywall in this country for the reconstruction and refurbishing of the damaged properties. The traditional domestic sources for drywall in the United States dried up, leading numerous businesses to look to foreign sources for their needs.  This shortage of gypsum board opened

up an excellent opportunity for Chinese companies to sell their plasterboard and related construction materials in the United States.

5.  In response to this increased demand for drywall, beginning in the fall of 2005 and continuing through 2007, hundreds of millions of square feet of gypsum wallboard manufactured in China ("Chinese Drywall") were exported to the United States with the intention and expectation that they would be installed in thousands of American properties, primarily along the East Coast and in the Gulf Coast states in Florida, Louisiana, Mississippi, Alabama, Georgia, Texas, Virginia and New York.  The Gypsum Association reported that 320 million square feet of Chinese Drywall were imported into the United States between 2005 - 2007.  *See* Gypsum Association Comments archived at http://web.archive.org/web/20101216021748/http://gypsum.org/pdf/Gypsum_Association _Comments_on_Chinese_Wallboard_Issue.pdf.

6.  Taishan took advantage of this opportunity to increase sales of its drywall and related construction products to customers in the United States.  *See* Chart summarizing Taishan's sales of drywall in the United States, by State (Ex. "1" attached hereto); Deposition of Fu Tinghuan dated 1/10/2012 ("Fu Dep.") (Ex. "2" attached hereto) at 22:19-23:7; Regulatory Announcement of China National Building Material Company Limited, 2010-009 (Q000975- 981) (Ex. "3" attached hereto) at p. 3 ("According to China Building Materials Daily reports, a total of 580,000 tonnes and 430,000 tonnes of gypsum boards were exported to the US by companies in the PRC in 2006 and 2007 respectively."); Invoice showing Taishan shipped 110,800 sheets of drywall to Tampa, FL (GBP000873)(Ex. "151" attached herreto); Invoice showing Taishan shipped 96,120 sheets of drywall to Wilmington, NC (GBP000879)(Ex.

"152" attached hereto).

7.      Taishan was not only aware of the need for drywall in the U.S. following Hurricanes Katrina and Rita, it also actively targeted potential customers in the Gulf Coast States, along the East Coast, California and Nevada. Taishan availed itself of the U.S. Postal Service, Federal Express, DHL and other carriers to send numerous samples of its drywall to potential customers. Taishan then sold its drywall to customers in those states and arranged for the shipping and freight all the way to the nearest port and beyond within the United States.

8.      If necessary to actualize the sale, Taishan even paid for the shipping from China.  *See* Deposition of Peng Wenlong dated 4/7-8/2011 ("Peng I Dep.") (Ex. "4" attached hereto) at 270:4-271:14, 320:19-321:23 ("The customer required us to pay the sea freight fee on their behalf, and the customer requested that we contact the sea freight company").

9.      Taishan promoted itself to the world as one of the "key enterprises in producing new building materials in China," having "14 branch factories," "plasterboard production capacity reach[ing] 300 million $m_2$ per year," and "capital assets of 1.2 billion Yuan [>$190,000,000]." *See* Plaintiffs' Ex. 20 to Deposition of Jia Tongchun dated 1/9-10/2012 ("Jia II Dep.") (Taishan marketing and product brochure - 16 pages total) (Ex. "5" attached hereto) at p. 2.  Approximately 6.3 Chinese Yuan equal $1.

10.     Taishan's business is not limited to drywall. It manufactures more than 60 types of building products, including standard plasterboard, metal track and studs used to frame and support the drywall, metal screws and joining tape. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.* (*Germano*), 706 F. Supp. 2d 655, 663 (E.D. La. 2010) (Findings of Fact and Conclusions of Law); Deposition of Che Gang dated 1/11-12/2012 ("Che Dep.") (Ex. "6"

attached hereto) at 77:21-78:8, 316:9-18; Ex. 4 to Che Dep. (quotes for drywall, metal track, metal studs, screws, joining tape) (Ex. "7" attached hereto); Ex. 27 to Che Dep. (quotes for metal studs) (TG0019683-684) (Ex. "8" attached hereto); Deposition of Ivan Gonima dated 12/13/2011 ("Gonima I Dep.") (Ex. "9" attached hereto) at 47:24-48:11; Ex. 18 to Deposition of Peng Wenlong dated 1/13/2012 ("Peng II Dep.") (emails dated 11/18-20/2006 between Frank Clem and Walter Yu) (TG0022595-596) (Ex. "10" attached hereto); Deposition of Joseph Weiss of OEG Building Materials dated 2/16/2011 ("OEG Dep.") (Ex. "11" attached hereto) at 19:11-18, 93:9-94:7, 129:2-14, 133:8-136:16; Ex. 9 to OEG Dep. (email dated 6/28/2006 from Bill Cher to Ernest Teitelbaum of TOV Trading and OEG) (TG0001026) (Ex. "12" attached hereto); Ex. 4 to OEG Dep. (contract dated 6/6/2006 (TH0606001) for the sale of drywall and metal studs to TOV Trading New York, USA) (TG0000897-898) (Ex. "13" attached hereto); Ex. 33 to OEG Dep. (contract dated 10/23/2006 (SDTH061023) for metal studs to TOV Trading Co.) (TG0001135) (Ex. "14" attached hereto); Ex. 25 to OEG Dep. (emails dated 9/6/2006 between Bill Cher and Ernest Teitelbaum re metal studs) (TG0000713) (Ex. "15" attached hereto).

11. Taishan is proud of its worldwide export capabilities, advertising on the Internet, in its brochures and to potential customers that its "products not only sell well in [Taishan's] domestic market [but] also export to many countries e.g. U.A.E., Indonesia, India, Russia, **U.S.A.** etc." *See* Plaintiffs' Ex. 20 to Jia II Dep. (Ex. "5" attached hereto) (emphasis added); Ex. 10 to Peng I Dep. (email dated 5/11/2007 from Peng Wenlong to Mr. Zhang touting Taishan's export capabilities: "The export of gypsum boards to the United States last year was 18 million square meters, and the 127mm gypsum board has passed the US Professional

ASTM Inspection.") (TG0022728 & translation) (Ex. "16" attached hereto); Ex. 20 to Peng II Dep. (Ex. "17" attached hereto) (email dated 8/29/2007 from Peng Wenlong (Frank) to Jacky Yu) (TG0021370); Ex. 22 to Peng II Dep. (TG0001377-378) (Ex. "18" attached hereto); Ex. 18 to Peng II Dep. (email dated 11/18/2006 from Frank Clem to Walter Yu).

12.     Taishan's invoices and Manufacturer Profile Forms produced in this litigation evidence that from 2005 to 2008, Taishan sold **more than 85.99 million square feet** of Chinese Drywall to customers in the United States.  *See* Chart summarizing Taishan's sales of drywall in the United States, by State (Ex. "1" attached hereto); *see also* Manufacturer Profile Forms ("MPFs") for Taishan Gypsum Co., Ltd. and TTP (Ex. "19" attached hereto).  These sales totaled **$8,526,722.68**, using current conversion rates from Chinese Yuan to U.S. Dollars. *Id.*

13.     Taishan actively employed a multi-pronged approach that was targeted to achieve sales in the American market and with specific customers along the Gulf Coast, the East Coast and California. This sales strategy involved: (i) use of the worldwide Internet; (ii) solicitation of U.S. customers through its marketing materials; (iii) hosting visitors from the U.S., offering factory tours and VIP services; (iv) exclusive agency agreements for sales of Taishan's Chinese Drywall throughout the United States - *see* Ex. 4 to Deposition of Ivan Gonima dated 2/14/2012 ("Gonima II Dep.") (Sole Agency Agreement between Taishan and OTC, with Apostille Attached) (Ex. "20" attached hereto); (v) sending samples of its Chinese Drywall to potential customers located in the U.S., and specifically in Louisiana, Florida, California and New York; (vi) providing competitive pricing quotes in U.S. Dollars for entities in the United States interested in purchasing Taishan's wallboard and other building

products; (vii) investigating shipping options and assisting in the freight of Taishan's plasterboard to the U.S., and specifically to Florida, Virginia, Louisiana, Mississippi, New York, California, Nevada, Georgia, North Carolina and South Carolina; (viii) insuring delivery of Taishan's Chinese Drywall to the U.S.; and (ix) maintaining U.S. customer relations by following up on complaints and other matters.

14. Taishan announced through its marketing materials that its plasterboard could "be used as partition and ceiling material," with the following "advantages": "fire-proof, sound insulation, heat preservation, quakeproof and good for health." *See* Plaintiffs' Ex. 20 to Jia II Dep. (Ex. "5" attached hereto).

15. Once installed, however, Taishan's drywall causes harm and damages to homes and their residents by emitting various reduced sulfur gases and creating noxious odors. *See Germano*, 706 F. Supp. 2d at 663.

16. Taishan claims it is a Chinese company that allegedly made "only two sales" of drywall "to a U.S. company . . . based in Virginia." *Germano* Br. at 7. Taishan claims that although its wholly-owned subsidiary TTP allegedly made "a few isolated sales of drywall in China to two companies that advised TTP they intended to ship the drywall they purchased to Louisiana[,] TTP was not aware that those companies would later market the drywall in Louisiana. *Wiltz* Br. at 1. Additionally, Taishan contends that it "did not sell drywall to any customer who claimed to be from Florida or to any customer that indicated it intended to ship drywall to Florida." *Mitchell* Br. at 1.

17. The PSC has uncovered a plethora of competent evidence to refute Taishan's assertion that it was completely "unaware" that its drywall would be used in Virginia, Florida, Louisiana,

or anywhere in the U.S., for that matter. Contrary to Taishan's feigned surprise that more than 86 million square feet of its drywall somehow ended up installed in thousands of properties in this country, Taishan targeted the United States with the intention to sell its products here and make a profit. Basically, as long as there is an opportunity for profit to be made, Taishan will export any product, even if it has nothing to do with construction, to the United States. *See* Ex. 3 to Gonima II Dep. (instant message dated 12/8/2007 from Che Gang (Bill Cher) of Taishan to Ivan Gonima of OTC) ("we have established the i[m]port and export company. We are planning to operate all kinds of goods [referring to electronics] which can bring profit for us.") (Ex. "21" attached hereto). It does not matter who the customer is, "as long as [Taishan] get[s] the money." *See* Che Dep. (Ex. "6" attached hereto) at 103:11-16. Taishan's Deputy General Manager and Director of Sales confirmed that "[a]s long as . . . I get the payment, I will ship out the product for you." *See* Fu Dep. (Ex. "2" attached hereto) at 57:23-58:5.

18. Taishan is a self-proclaimed worldwide export company that aggressively targeted the United States for sales of its Chinese Drywall and related building materials.

19. For years, Taishan knowingly and deliberately has held itself out to the world as one of the "key enterprises" in China "producing new building materials" for export to the United States and other world markets. *See* Plaintiffs' Ex. 20 to Jia II Dep. (Ex. "5" attached hereto) at p. 2; Ex. 20 to Peng II Dep. (email dated 8/29/2007 from Peng Wenlong (Frank) to Jacky Yu advertising Taishan's export capabilities to the USA) (Ex. "17" attached hereto).

20. In its brochures Taishan boasts: "We have a self-supported import and export ability, our products not only sell well in our domestic market [but] **also export to many countries e.g.**

U.A.E., Indonesia, India, Russia, **U.S.A.** etc." *See* Plaintiffs' Ex. 20 to Jia II Dep. (Ex. "5" attached hereto) at p. 2 (emphasis added).

21.     Taishan proclaimed proudly on in its website and on the Alibaba website where it also advertises that Taishan's building products, including Chinese Drywall, are "exported to many countries such as the U.S.A." *See* Taishan's archived Web Page of Jan. 28, 2005 (Ex. "22" attached hereto). *See also* Deposition of Carn Construction Corporation / Carlos Rios dated 12/8/2011 ("Carn Construction Dep.") (Ex. "23" attached hereto) at 17:17-24; Deposition of Yongzhi (Charley) Yang / 30(b)(6) of Stone Pride International Corporation dated 2/21/2012 ("Stone Pride Dep.") (Ex. "24" attached hereto) at 79:14-81:10.

22.     The use of the Alibaba website was a success for Taishan, as it resulted in sales of Taishan's drywall to companies in the United States, which found Taishan through that site. *See* Deposition of Darrin Steber / 30(b)(6) of GD Distributors, LLC dated 12/30/2011 ("GD Distributors Dep.") (Ex. "25" attached hereto) at 15:18-17:4; Stone Pride Dep. (Ex. "24" attached hereto) at 79:14-81:10.

23.     In the wake of hurricanes Katrina and Rita, Taishan sought out new customers in the United States through an exclusive agent and by offering competitive pricing, custom manufacturing, drywall samples, factory tours, and arrangements for shipping and freight to the United States.

24.     Following Hurricanes Katrina and Rita and the devastation of housing along the Gulf Coast of the United States, Taishan stepped in to fill the void of drywall materials in this country. On October 20, 2006, Taishan entered into a written non-transferable, sole agency agreement with Oriental Trading Company, LLC ("OTC"), based out of Miami, Florida. *See* Ex. 7 to

Gonima II Dep. (Articles of Organization for Florida Limited Liability Company Oriental Trading Company, LLC) (Ex. "26" attached hereto).  This contract was for the sale of more than 1 million sheets of its "DUN" brand Chinese Drywall in the United States.  *See* Ex. 4 to Gonima II Dep.; Che Dep. at 36:23-40:8. *See also* Che Dep. at 43:21-46:2 (verifying signature on behalf of Taishan and corporate certificate).

25.    As part of their agreement, Taishan required OTC to keep Taishan apprised of U.S. market prices and market forecasts (Ex. 4 to Gonima II Dep. at ¶ 5),  demonstrating Taishan's interest in and awareness of the success of its drywall sales in this country.

26.    Taishan's Manager of International Trading, Mr. Che Gang (also known as Bill Cher and Bill Che) kept in close, often daily, contact with OTC's Manager, Ivan Gonima (Gonima I Dep. at 13:10-13; Ex. 7 to Gonima II Dep.), initiating and exchanging hundreds of instant messages and emails in English about the price of drywall and other matters related to the promotion and sales of Taishan's drywall in the United States.  *See*, *e.g.*, Ex. 2 to Gonima II Dep. (instant message discussion dated 5/22/2007 between Ivan Gonima and Che Gang) (Ex. "27" attached hereto); Ex. 3 to Gonima II Dep. (instant message discussion dated 12/8/2007 between Ivan Gonima and Che Gang).

27.    Mr. Gonima informed Taishan that he was "[w]orking hard with customers to get sales." *See* Ex. 2 to Gonima II Dep. at p. 13 (instant message dated 3/5/2007 from Ivan Gonima to Che Gang); see also Ex. 8 to Che Dep. (email dated 11/8/2006 from Ivan Gonima to Bill Cher) (TG0000521) (Ex. "28" attached hereto).

28.    Mr. Gonima "contacted several potential customers along the East Coast of the United States . . . [as well as] customers on the West Coast" that looked promising, and he made sure to

keep Taishan apprised of his progress.  *See* Ex. 5 to Gonima I Dep. (Ex. "29" attached hereto) at p. 3 (email dated 9/2/2006 from Ivan Gonima to Bill Che) (TG0000534).

29.    Mr. Gonima discussed with Taishan various prospects in "the New Orleans, Biloxi area," Texas, Reno, Las Vegas, Atlanta, New York, and Englewood, New Jersey.  *See* Gonima I Dep. at 79:16-80:25.

30.    In order to sell Taishan's drywall, Che Gang (Bill Cher) kept in close contact with Mr. Gonima, providing detailed pricing quotes in U.S. dollars for each of the company's drywall and related building products.  *See* Ex. 5 to Gonima I Dep. at p. 1 (email dated 9/5/2006 from Bill Cher to Ivan Gonima) (TG0000532); Ex. 8 to Che Dep. (email dated 11/6/2006 from Bill Che to Ivan Gonima and Jorge Arevalo (VP of OTC, *see* Ex. 8 to Gonima II Dep. (Ex. "30" attached hereto)) (TG0000522-525); Ex. 4 to Che Dep. (quotes for drywall, metal track, metal studs, screws, joining tape); Ex. 27 to Che Dep. (quotes for metal studs).

31.    Taishan also responded promptly with quotes for drywall, in response to a request from Darren Dai, of EUPUSA, who was interested in "Door to Door service (including all things, freight, duty and whatever)." *See* Ex. 3 to Peng I Dep. (emails dated 5/12/2006 between Peng Wenlong and Darren Dai (TG0000415) (Ex. "31" attached hereto).

32.    Taishan did everything possible to stay competitive and maintain its sales in the U.S.  When the cost of production for steel belt went up in January, 2007, for example, due to increased prices for steel, Taishan let its American customers know that "[i]n order to build up the long time business cooperation and support you to compete in USA market, we will swallow the increased cost; we will offer the same price as [previous] containers."  *See* Ex. 28 to Che Dep. (email dated 1/28/2007 from Bill Cher to Joseph Weiss of OEG Building Materials

USA) (TG0019701) (Ex. "32" attached hereto).

33.    Bill Cher worked closely with other contacts in America as well to provide a competitive bid in order to attract new customers.  When Yongzhi (Charley) Yang from Stone Pride International Corporation ("Stone Pride") told Mr. Cher that his price quotes for drywall were too high for a potential new customer, and asked Taishan to "try to give the client a bit more concession[,]" Mr. Cher replied, "[g]ive me a quantity and I will make [the] calculations again."  *See* Ex. 3 to Stone Pride Dep. (emails dated 11/21/2006 - 1/9/2007 between Bill Cher and Charley Yang) (TG0025303-306) (Ex. "33" attached hereto).  These price negotiations resulted in sales of drywall to Stone Pride.  *Id.*, at TG0025303.

34.    Taishan knew that its drywall had to meet proper U.S. codes and regulations in order for its sales efforts to be successful. In fact, Taishan's customers insisted on proof of compliance with those government regulations.

35.    OEG Building Materials, for example, let Taishan know early on that testing was important. On August 23, 2006, Ernest Teitelbaum, President of OEG, wrote to Bill Cher with the following request: "I would like you to please take 5 good sheets [of drywall] that you produce and send it to me by air as soon as possible so I can submit samples for testing to get the required government approvals so I should be able to sell it to more clients, and **make sure that the sheets that you send me are good so they can pass all the different tests that the government requires**."  *See* Ex. 19 to OEG Dep. (email dated 8/23/2006 from Ernest Teitelbaum to Bill Cher) (TG0000745) (emphasis added) (Ex. "34" attached hereto); Ex. 20 to OEG Dep. (email dated 8/24/2006 from Ernest Teitelbaum to Frank Clem, reiterating "I need to have these [ASTM] test reports for my clients it is very important that

-12-

you send it to me as soon as possible.") (TG0022448) (Ex. "35" attached hereto).

36. Similarly, on January 1, 2007, Ivan Gonima of OTC wrote to Bill Cher to inform him that: "we need test reports supporting that all test[s] required by American Codes & Standards are passed. . . . our clients want to see them before placing a big order." *See* Ex. 9 to Che Dep. (email dated 1/10/2007 from Ivan Gonima to Bill Cher) (TG0000628) (Ex. "36" attached hereto); *see also* Peng I Dep. at 146:12-24.

37. Accordingly, Taishan customized its manufacturing to meet American Society for Testing and Materials ("ASTM") standards and provided an ASTM certificate to customers as part of its sales efforts. *See* Gonima I Dep. at 141:23-142:2; Carn Construction Dep. at 53:4-7, 53:11-14; Ex. 27 to Deposition of Wood Nation, Inc. dated 2/14/2011 ("Wood Nation I Dep.") (certificates showing that Taishan's drywall meets ASTM standards) (Ex. "37" attached hereto); Ex. 4 to Deposition of Wood Nation, Inc. dated 2/13/2012 ("Wood Nation II Dep.") (draft affidavit of Richard Hannam, President of Wood Nation) at ¶¶ 7-9 (Ex. "38" attached hereto); Wood Nation II Dep. (Ex. "39" attached hereto) at 94:8-98:11; Ex. 2 to GD Distributors Dep. (ASTM testing certificates) (Ex. "40" attached hereto); GD Distributors Dep. at 27:23-28:10, 54:25-58:19; OEG Dep. at 63:10-64:10; Ex. 16 to OEG Dep. (email dated 8/3/2006 from Bill Cher to Ernest Teitelbaum) (TG0000733) (Ex. "41" attached hereto); Ex. 20 to OEG Dep. (email dated 8/24/2006 from Frank Clem to Ernest Teitelbaum) (TG0022448).

38. In order to obtain and facilitate a base of customers in the United States, Taishan was willing to further customize its drywall to meet specific customer needs, even if that meant altering the Taishan "DUN" brand logo to appear in all-American red-white-and-blue colors. *See* Ex.

2 to Gonima II Dep. at pp. 5-7 (instant message discussion dated 2/25/2007 between Ivan Gonima and Che Gang regarding the redesign of the DUN logo in the colors of the American flag); *see also* Exhibit contrasting original Taishan Dun logo with redesigned red, white and blue logo for American customers (Ex. "42" attached hereto).  As American customer, Ivan Gonima, explained to Che Gang, "[w]e want to use BLUE RED and WHITE because those are the colors of the American Flag."  *Id*. at p. 7; Ex. 9 to Gonima I Dep. (email dated 2/21/2007 from Ivan Gonima to Bill Che) (TG0023841) & file showing art for red, white, and blue labels for binding tape) (TG0023843) (Ex. "43" attached hereto); Gonima I Dep. at 128:20-129:18, 130:8-15, 131:21-23.

39.     Taishan readily obliged made-to-order requests for large orders, including:

a)      The addition of the customer's name (Venture Supply, Inc. or Marathon Construction, *e.g.*) to the label, *See* Peng I Dep. at 355:9-356:2; Gonima I Dep. at 50:4-9; Ex. 2 to Gonima II Dep. at pp. 1-2 (instant message discussion dated 2/7/2007 between Ivan Gonima and Che Gang); Ex. 19 to OEG Dep. (email dated 8/23/2006 from Ernest Teitelbaum to Bill Cher regarding customized bonding tape for the drywall) (TG0000745); Ex. 81 to Porter Dep. (email dated 11/16/2005 from Phillip Perry to Frank Clem with instructions for custom label) (V002541) (Ex. "44" attached hereto).

b)      Adding the words "Tampa, Florida" to the label.  *See* Deposition of Peng Wenlong dated 1/13/2012 ("Peng II Dep.") (Ex. "201" attached hereto) at 514:10-516:4.

c)      Including specific colors on the label or bonding tape. *See* Ex. 8 to OEG Dep. (email dated 6/27/2006 from Bill Cher to OEG) (TG0001007) (Ex. "45" attached hereto).

d)      Affixing an American UPC bar code for identification in the United States. *Germano*, 706 F. Supp. 2d at 662; Ex. 2 to Gonima II Dep. at pp. 1-2 (instant message discussion dated 2/7/2007 between Ivan Gonima and Che Gang); Ex. 9 to Gonima I Dep. (bar codes desired for binding tape) (TG0023843); Ex. 14 to Gonima I Dep. (email exchange dated 1/9/2007 between Ivan Gonima and Bill Cher) (TG0000566) (Ex. "46" attached hereto); Gonima I Dep. at 113:22-114:24, 128:20-129:18; Carn Construction Dep. at 38:17-39:14; Che Dep. at 193:11-194:15, 199:5-21; Ex. 9 to OEG Dep. (email dated 6/28/2006 from Bill Cher to Ernest Teitelbaum of TOV Trading and OEG) (TG0001026); OEG Dep. at 91:10-92:8.

40.    According to Mr. Gonima, "Taishan was happy to do a custom label for [its customers]," as this would only increase the company's sales.  *See* Gonima I Dep. at 51:1-3; *see* Ex. 9 to Wood Nation I Dep. (email dated 5/30/2006 from Richard Hannam, President of Wood Nation, to David Wei (Wei Chunshan) of BNBM USA, forwarded to Peng Wenlong (Frank Clem), requesting custom labels printed in English for shipment to Wood Nation) (TG0000460) (Ex. "47" attached hereto); Ex. 8 to Wood Nation I Dep. (email dated 6/3/2006 from Richard Hannam to David Wei, cc Peng Wenlong, with revisions to custom labels for shipment to Wood Nation) (TG0000461) (Ex. "48" attached hereto); *see also* Ex. 22 to Peng II Dep.; Peng I Dep. at 355:9-356:2.

41.    Taishan availed itself of the United States Postal Service, Federal Express, DHL and other carriers to send samples of its drywall directly to customers in the United States.

42.    To further solicit sales, Taishan regularly shipped samples of its products to various customers in the United States as a marketing tool.  *See* Ex. 2 to Gonima II Dep. at p. 31

(instant message discussion dated 5/22/2007 between Ivan Gonima and Che Gang) (Che Gang agreed to ship samples of fireproof drywall sheets to Ivan Gonima); Ex. 6 to Gonima I Dep. (email dated 9/22/2006 from Che Gang to Ivan Gonima) (TG0000527-528) (Ex. "49" attached hereto); Gonima I Dep. at 109:20-110:5; Peng I Dep. at 269:15-270:2; Che Dep. at 312:6-313:6 ("For the handling of samples sent to the customers, it was that customer would tell us the specification and models that they needed.  If we happened to have such samples with us, and the customer would willing to pay for the postage, the shipping cost, then we would provide the sample in accordance with their requirements.").  At some point, the company decided not to send the samples for free, "[b]ecause there are too many Americans wanting samples[.]"  Plaintiffs' Ex. 29A to Jia II Dep. (email dated 12/11/2005 from Yang Jiapo (Apollo Yang) to Leon Liu) (translation of TG0019840) (Ex. "50" attached hereto); *see also* 1/9-10/2012 deposition of Tongchun Jia ("Jia II Dep.") (Ex. "200" attached hereto) at 852:10-13.

43.   Taishan availed itself of the United States Postal Service, Federal Express, DHL and other carriers to provide potential customers with an actual sample of its drywall in order to secure the sale of its products.  *See* Che Dep. at 288:9-290:11.

44.   In July, 2006, Jeff (a/k/a/ Bo) Zhou from TP Construction, Inc. in Louisiana requested that samples of Taishan's drywall be sent to Jefferson, Louisiana.  Bill Cher quickly responded. *See* Ex. 18 to Che Dep. (emails dated 7/10&16/2006 from Bo Zhou to Bill Cher) (TG0000631 & TG0000633) ( Ex. "51" attached hereto).

45.   Taishan shipped sample boards to New Orleans when GD Distributors needed them.  See Exs. 4 & 5 to GD Distributors Dep. (photos of actual Taishan drywall samples) (Ex. "52"

attached hereto).

46.    When Carlos Rios, President of Carn Construction Corp., a Florida company, asked for samples of Taishan's drywall, Taishan shipped three different types of drywall to him in Florida via Federal Express. The company sent additional samples a month later so that Carn Construction could perform testing on the material. *See* Carn Construction Dep. at 25:13-22; Ex. 3 to Carn Construction Dep. (email dated 11/23/2005 requesting that Taishan's drywall be shipped to Carn Construction in Florida via Federal Express) (TG0001409 & translation) (Ex. "53" attached hereto); Ex. 4 to Carn Construction Dep. (email dated 12/14/2005 requesting that additional samples of Taishan's drywall be sent to Carn Construction for testing) (TG0024162) (Ex. "54" attached hereto).

47.    The same is true of Stone Pride, which requested that samples of Taishan's drywall be sent express mail to Irvine, California. Charley Yang told Bill Cher that: "We recently have become ready to promote your plasterboard at full strength, and need to prepare a batch of samples." *See* Ex. 6 to Stone Pride Dep. (email dated 1/20/2007 from Charley Yang to Bill Cher) (TG0025300) (Ex. "55" attached hereto). He followed this up with instructions to "prepare 10 [samples] of each kind [of drywall] and send it via express mail directly to the United States [to Stone Pride in Irvine, California]." *Id.* (email dated 1/21/2007 from Charley Yang to Bill Cher). Bill Cher responded with the amount of the shipping "expense to the United States." *Id.* (email dated 1/23/2007 from Bill Cher to Charley Yang). And then, Bill Cher confirmed that the samples had arrived in the U.S. *See* Ex. 7 to Stone Pride Dep. (email dated 1/29/2007 from Bill Cher to Charley Yang) (Ex. "56" attached hereto).

48.    As part of its marketing efforts to reach the United States, Taishan extended warm invitations

to potential customers to visit Taishan's factories.  *See, e.g.* Ex. 2 to Gonima II Dep. at p. 34; Ex. 8 to Gonima I Dep. (email dated 12/29/2006 from Mr. Che Gang to Ivan Gonima) ("I warmly welcome you to visit our factory.") (Ex. "57" attached hereto); Ex. 20 to Peng II Dep. (email dated 8/30/2007 from Peng Wenlong (Frank) to Jacky Yu:  "You are welcome to our factory anytime.") (TG0021369).

49.    When Wood Nation, Inc., a company located in Tampa, Florida, was interested in purchasing drywall from Taishan, Mr. David Wei (Wei Chunshan) from BNBM USA took it upon himself to accompany Wood Nation's President, Richard Hannam, to China to visit Taishan's operations.  Mr. Wei wrote, as follows, to Taishan's Chief of its Foreign Trade Department Peng Wenlong (also known as Frank Clem and Peng Frank) prior to the visit to make sure all of the VIP arrangements were in order: "The trip of me and our client Mr. RICHARD HANNAM is scheduled . . . Please pick us up at the airport and send us to a hotel nearby your company (please help us to reserve two rooms, either four star[] or five star is okay, but it should be clean and close to your company. . . . [For] [o]ur return flight . . ., please arrange to send us to the airport." *See* Ex. 7 to Peng I Dep. (Translation of email dated 6/8/2006 from David Wei to Peng Wenlong, making arrangements for Wood Nation to visit Taishan in China) (TG0000463 & TTRNSL0026) (emphasis added) (Ex. "58" attached hereto).

50.    In some cases, Taishan hosted its customers for multiple visits and multiple days.  For example, Joseph Weiss of OEG Building Materials from New York visited Taishan for three days the first time he went there.  *See* OEG Dep. at 40:10-22. Mr. Weiss was picked up at the airport by Taishan and put in a nice hotel during his visit.  *Id*., at 35:10-36:24,

38:1-39:13; *see also* Ex. 15 to OEG Dep. (email dated 8/2/2006 from Bill Che to Ernest Teitelbaum regarding his trip to China) (TG0000779) (Ex. "59" attached hereto).

51.    Taishan made it easy for OTC to sell its Chinese Drywall in the United States, and arranged for "everything," including "the shipping arrangements" to the intended customer.  See Gonima II Dep. (Ex. "60" attached hereto) at 58:1-60:21.

52.    On numerous occasions, Mr. Gonima asked Bill Cher to provide quotes for shipping Taishan's drywall from China to various U.S. cities, including:  Miami, Florida; Orlando, Florida; West Palm Beach, Florida; Tampa, Florida; Gulf Port, Mississippi; New Orleans, Louisiana; Houston, Texas; Norfolk, Virginia; Long Beach, California; Los Angeles, California; Las Vegas, Nevada; Savannah, Georgia; Atlanta, Georgia; Charleston, South Carolina; Wilmington, North Carolina; New York, New, York; Newark, New Jersey; and San Juan, Puerto Rico.  *See* Ex. 10 to Gonima I Dep. at p. 3 (email dated 4/15/2007 from Ivan Gonima to Bill Cher) (TG0000917); Gonima I Dep. at 138:5-15, 140:23-141:22; Che Dep. at 64:12-19, 66:7-9; Ex. 8 to Che Dep. (email dated 11/8/2006 from Ivan Gonima to Bill Cher) (TG0000522); Ex. 11 to Che Dep. (email dated 5/10/2007 from Ivan Gonima to Bill Cher) (TG0000902) (Ex. "61" attached hereto).

53.    Bill Cher extensively researched shipping costs from China to specific customer locations in United States and even offered to "book the shipping space" and "operate" the freight for Taishan's American customers.  *See*, *e.g.* Ex. 5 to Gonima I Dep. at p. 1 (email dated 9/5/2006 from Che Gang to Ivan Gonima) (TG0000532); Ex. 10 to Gonima I Dep. (Ex. "62" attached hereto) at pp. 2 & 4 (emails dated 4/13&16/2007 from Bill Cher to Ivan Gonima)

(TG0000916-918); Ex. 24 to Che Dep. (emails dated 4/10/2007 from Bill Cher to broker Rafael Sardi: "we will arrange production and ship[p]ing" "to Miami Port") (TG0000514) (Ex. "63" attached hereto); Gonima I Dep. at 140:19-22.

54.     On November 8, 2006, Bill Cher gave Ivan Gonima a quote via email for shipping Taishan's drywall to Miami.  *See* Ex. 8 to Che Dep. (email dated 11/8/2006 from Bill Cher to Ivan Gonima quoting freight costs from China to Miami) (TG0000521); Ex. 2 to Che Dep. (Ex. "64" attached hereto) (email dated 4/13/2007 from Bill Cher to Ivan Gonima quoting freight costs from Qingdao, China to Miami and New York) (TG0000918).

55.     On April 17, 2007, Bill Cher sent another email to Ivan Gonima with price quotes for shipping Taishan's drywall from China to the following expanded list of American cities: Gulf Port, Mississippi; New Orleans, Louisiana; Long Beach, California; Las Vegas, Nevada; Savannah, Georgia; Atlanta, Georgia; Charleston, South Carolina; Wilmington, North Carolina; and San Juan, Puerto Rico.  *See* Ex. 10 to Che Dep. (email dated 4/17/2007 from Bill Cher to Ivan Gonima) (TG0000913-914) (Ex. "65" attached hereto).

56.     For the coastal U.S. cities, Taishan's shipping quote was port to port (CY - CY), but for inland cities, the quote was port to door (CY - DR).  *See* Ex. 15 to Che Dep. (email dated 1/10/2006 from Chegang (Bill Cher) to Mike Westbrook, providing freight quote from Qingdao to LA) (TG0000907-908) (Ex. "66" attached hereto); Ex. 5 to Gonima I Dep. at p. 1 (email dated 9/5/2006 from Bill Cher to Ivan Gonima) (TG0000532); *see* Ex. 3 to Peng I Dep. (Taishan responded promptly with quotes for drywall to a request from Darren Dai, of EUPUSA, who was interested in "Door to Door service (including all things, freight, duty

-20-

and whatever).").

57.     Taishan provided recommendations as to the use of particular shipping companies for shipment of its Chinese drywall to the United States.  *See*, *e.g.*, Ex. 29 to Che Dep. (email dated 7/14/2007 from Bill Cher to Joseph Weiss, suggesting that ZIM shipping company be used over OCCI) (TG0021997) (Ex. "67" attached hereto); Ex. 2 to Che Dep. (email dated 4/16/2007 from Bill Cher to Ivan Gonima suggesting ZIM shipping company) (TG0000916).

58.     Taishan provided recommendations as to the method for shipment of its Chinese drywall to the United States.  *See* Ex. 12 to OEG Dep. (email dated 7/27/2006 from Bill Cher to Ernest Teitelbaum) (TG0001182) (Ex. "68" attached hereto); OEG Dep. at 100:15-101:8.

59.     There is evidence that Taishan received confirmation that its shipments reached the United States.  *See*, *e.g.*, Exs. 13 & 14 to Peng I Dep. - Official Tai Shan Gypsum Co., Ltd. Export Report (TG0025222 - 25223) and Translation (Ex. "69" attached hereto).

60.     As part of its business, Taishan marketed itself to sell a wide variety of products.  Taishan's promotional materials and sales to the United States demonstrate the wide range of products Taishan was willing to sell.  *See* Plaintiffs' Ex. 20 to Jia II Dep.; Exs. 4 & 27 to Che Dep.; Exs. 4, 25 & 33 to OEG Dep.; Exs. 2 & 3 to Gonima II Dep.

61.     TTP made extensive sales of metal studs to OEG Building Materials in New York that totaled over $150,000.  *See* Chart showing Taishan's sales of other products in the United States (Ex. "164" attached hereto).  In addition to the metal stud sales, TG also sold over $50,000 of plywood to Venture Supply and a paper machine to a company in Ohio.  *Id.*

62.     From February 2006 through June 2010, Taishan also did millions of dollars of business in the United States in a material other than drywall: waste paper.  *See* Chart showing Taishan's

-21-

purchases of waste paper from the United States for use in the manufacture of its drywall (Ex. "150" attached hereto).

63.     Taishan imported this waste paper from the United States and recycled the waste paper in its paper factory that it owns in China for use in the drywall it manufactured and exported back to the United States.  *See* Jia II Dep. (Ex. "200" attached hereto) at 918:11-17.

64.     Taishan manufactured and sold its Chinese Drywall to Venture Supply, a company from Norfolk, Virginia, for installation in homes in Virginia.  However, Taishan and Venture Supply were actively seeking to expand the sales and distribution of Taishan's drywall in the United States.

65.     Peng Wenlong (Frank Clem/Frank Peng), who was in charge of export sales for Taishan, wrote to Venture Supply's representative Phillip Perry expressing Taishan's intent to sell its products in this country:  "First, it is our hope to cooperate with you to enlarge the market at your end."  *See* Email dated 11/30/2005 from Frank Clem to Phillip Perry (V002471-473) (Ex. "70" attached hereto).

66.     Taishan emphasized its goal to become "one of the biggest gypsum board producing factor[ies]" for the U.S. market.  Frank Clem wrote to Venture Supply owner Sam Porter, stating: "It is our hope to cooperate with you especially in the field of gypsum board.  **We know that you are one of the powerful companies to deal with the gypsum products in your country**.  And we would like to introduce ourself as one of the biggest gypsum board producing factory with the annual production of more than 200 million square meters.  We are confident that there is a bright future for our cooperation by joint efforts."  *See* Fax dated 12/2/2005 from Taishan representative Frank Clem to Venture Supply owner Sam Porter

(emphasis added) (V000386) (Ex. "71" attached hereto).

67.     Taishan's enthusiastic desire to expand its market in the United States quickly manifested into a plan for Venture Supply to serve as Taishan's representative in this country so it could broker deals with other suppliers across the U.S.  In furtherance of that plan, Peng Wenlong hosted Venture Supply's representative Phillip Perry in China on several occasions, for multiple days, to seal the deal.  *See* Peng I Dep. at 366:10-367:16.  During the meetings in China between Peng Wenlong and Phillip Perry, they called Venture Supply's owner Sam Porter to keep him apprised of the talks.  *Id.*, at 369:21-370:8; Deposition of Samuel G. Porter / 30(b)(6) of Venture Supply and Porter-Blaine Corp. dated 12/16-17/2009 ("Porter Dep.") (Ex. "72" attached hereto) at 345:1-16.

68.     After Phillip Perry's trip to Taishan, he reported to Mr. Porter as follows: "They [Taishan] said that a lot of American companies have made enquiries, but I was the first to show enough interest to make the trip.  If we continue this size purchases or increase the volume, they will make us the USA representative."  *See* Email dated 11/7/2005 from Phillip Perry to Sam Porter and Venture Supply employee (V002703) (Ex. "73" attached hereto).

69.     Venture Supply's efforts on Taishan's behalf to sell Taishan's drywall in the United States, were made clear in the following email sent to Taishan: "In that [Chinese Drywall installer] Porter/Blaine is going to be a major purchaser of your products, they have asked me to approach you with the idea of becoming the exclusive distributor of the Shandong Taihe Dongxin Co., LTD. in the USA.  This is an important priority with them.  Please give this serious consideration."  *See* Email dated 11/10/2005 from Phillip Perry to Frank Clem (V002608) (Ex. "74" attached hereto).

-23-

70.     Venture Supply wrote to Taishan to inform the manufacturer in specific terms how it

expected to sell Taishan's drywall in Virginia and beyond, stating as follows:

> We came to you all alone and at great expense to visit your factory
> and begin the process of buying boards for both our mutual benefits.
> We were the first persons to make that trip to you in four years, and
> we sought you out in part because our research show[s] that you
> could produce the boards at an acceptable price for the competitive
> market here.
> ...
> Now the demand is for us to take 300K each and every month on a
> T/T payment to get the **sole rights to the USA.**
> ...
> We researched the market carefully and concluded that in our area
> it would need about 120K to be effective each and every month for
> a long period.
> **Other parts of the country would receive similar injections of
> materials in the 50K to 100K per month by us.**
> ...
> Earlier on I mentioned that we spent about 18 Million on product
> last year, and **we want to expand and we shall!** ... In this area
> where we reside and work, the market share we dominate is
> roughly 53% of product.  We know exactly how much can be sold
> here with out harm and how much to sell for a good profit.  **The
> other parts of our country will handle goods on a similar guide
> line**.  We want to expand but not burst the bubble.

*See* Ex. 22 to Porter Dep. (email dated 12/14/2005 from Sam Porter to Frank Clem)

(emphasis added) (V002358-361) (Ex. "75" attached hereto).

71.     Taishan's numerous communications with Venture Supply, via instant messaging and

email, demonstrate that Venture Supply was actively assisting Taishan to distribute its

product throughout the United States <u>without any geographic limitation</u>.  The following

instant messaging between Frank Peng and Phillip Perry evidences this assistance:

> Frank Peng [Taishan]:  I would like to inform you that the
> company, **Certified products international Inc. also want to
> import our boards to the U.S.A.**  I refused to produce for them.

-24-

Would you please or let other people from your company contact
them?  But please do not let them know it is me to let you contact
them.

Phillip [Venture Supply]:  yes, and thank you for the information...

Frank Peng:  They said they want to send the boards to Norfolk...
Frank Peng:  U just have the contact number of their China office.
**I think it is better for you to contact their head office in the
USA.**

Phillip:  sounds like a very good idea.

Frank Peng:  I am writing to you by e-mail.  Please wait.

*See* Instant message discussion dated 12/15/2005 between Frank Clem and Phillip Perry

(emphasis added) (V002371-372) (Ex. "76" attached hereto); *see also* Emails between

various U.S. merchants and Venture Supply regarding the distribution of Taishan's products

in Virginia, Texas, New York (V002282, V002344, V002430, V002488) (Ex. "77" attached

hereto).

72.     Taishan expected and intended for its expansion into the United States to continue.

Taishan's representative expressed this desire to Venture Supply, stating:  "it is our hope to

set up and keep a long term and steady relationship with your company."  *See* Email dated

12/15/2005 from Frank Clem to Phillip Perry (V002368-370) (Ex. "78" attached hereto).

73.     In furtherance of Taishan's plan to sell its drywall to Venture Supply in Virginia, on

November 9, 2005, Venture Supply provided a letter of credit to Taishan in the amount of

$429,600.00.  *Germano*, 706 F. Supp. 2d at 661; Ex. 39 to Porter Dep. (Letter of Credit

Application for Venture Supply) (V001811-818) (Ex. "79" attached hereto).

74.     Taishan then formalized the plan for Venture Supply to sell Taishan's Chinese Drywall to

The Porter-Blaine Corp. ("Porter/Blaine") for use in Virginia by way of two sales contracts. Taishan agreed in each contract to custom manufacture 100,000 sheets of its drywall with an identification label on the edge binding showing that the gypsum board would be "DISTRIBUTED BY VENTURE SUPPLY, INC." and another label on the back of the board showing "**VENTURE SUPPLY, INC.** MFG. Shandong Taihe Dongxin, Co., Ltd., China." *Germano*, 706 F. Supp. 2d at 662; Ex. 3 to Fu Dep. (contract dated 11/17/2005 between Taishan and Venture Supply for 100,000 sheets of drywall) (TG0001684-685) (Ex. "80" attached hereto); Ex. 4 to Fu Dep. (contract dated 12/16/2005 between Taishan and Venture Supply for 100,000 sheets of drywall) (TG0019854-855) (Ex. "81" attached hereto); Fu Dep. at 104:9-106:21; Ex. 81 to Porter Dep. (email dated 11/16/2005 from Phillip Perry to Frank Clem with instructions for custom label) (V002541).   Taishan admits that "Taishan manufactured drywall to US dimensions on a made-to-order OEM basis on two isolated occasions for a U.S. purchaser, Venture Supply, Inc." Taishan MPF at 2; *see also* TTP MPF at 2 (admitting that "TTP manufactured drywall to US dimensions on a made-to-order OEM basis").

75.     The contracts specified a sales price in U.S. Dollars ($358,000 and $366,800, respectively).   Venture Supply's owner Samuel G. Porter executed the first contract dated November 17, 2005, in Norfolk, Virginia.  Mr. Porter's signature on the contract was then faxed to Taishan in China.  The second contract dated December 16, 2005, was executed by Venture Supply's representative Phillip Perry and Taishan's representative, Fu Tinghuan.  *See* Ex. 4 to Fu Dep.; Fu Dep. at 102:2-105:6; Ex. 69 to Porter Dep. (letter dated 12/1/2005 from Sam Porter to Whom It May Concern confirming appointment of Phillip W. Perry of Tobin Trading, Inc.

as Agent of Venture Supply with authority to sign contracts up to $450,000) (Tob00057) (Ex. "82" attached hereto).

76.    Mr. Porter testified that he requested that the first shipment of Taishan's drywall be shipped to Norfolk, Virginia.  *See* Porter Dep. at 33:2-34:1; *see also* Ex. 84 to Porter Dep. (email dated 11/24/2005 from Phillip Perry to Zhang, cc Frank Clem regarding shipment to Norfolk, Virginia) (V002507) (Ex. "83" attached hereto).

77.    Taishan successfully targeted customers in Florida, shipping its drywall to Miami, Tampa and Orlando.  As part of its Florida efforts, Taishan entered into an exclusive agency contract with OTC, with offices in Miami and Orlando, Florida.  *See* Ex. 4 to Gonima II Dep.; Ex. 2 to Che Dep. (email dated 4/17/2007 from Ivan Gonima to Bill Cher asking Mr. Cher to include OTC's Orlando office manager on all emails) (TG0000916).

78.    Ivan Gonima testified under oath that he "let [Taishan] know" that OTC "want[ed] [Taishan's] drywall exported to Florida."  *See* Gonima I Dep. at 33:11-13, 33:16-18; Ex. 2 to Gonima II Dep. at pp. 25-26 (instant message discussion dated 4/14/2007 between Ivan Gonima and Che Gang).

79.    On April 12, 2007, Mr. Gonima sent Bill Cher an email providing Taishan with specific "directions for shipping" almost 1 million square feet (20,100 sheets) of its drywall to Florida.  *See* Ex. 2 to Che Dep. (email dated 4/12/2007 from Ivan Gonima to Bill Cher) (TG0000919); Invoice dated 12/30/2006 to OTC (TG0000619) (Ex. "84" attached hereto).

80.    Bill Cher provided Mr. Gonima with prices for freight from Qingdao, China to Miami, Florida, as well as to New York.  Mr. Cher also offered to operate the freight for OTC.  *See* Che Dep. at 60:23-62:6; *see also* Che Dep. at 209:18-23; Ex. 8 to Deposition of Peng

Shiliang dated 1/11/2012 ("Peng S. Dep.") (Ex. "85" attached hereto) (Taishan Special Invoices for Export for 20,100, 4,900, 5,880, 1,960, 4,900, 2,940, 2,010, 6,700, 6,700 pieces of drywall to OTC in Miami, Florida) (TG0001661, TG0001663-670, TG0001680-682); Peng S. Dep. at 95:9-96:15.

81.     Taishan did not rely solely on the efforts of OTC to sell Taishan product in Florida and elsewhere.  Bill Cher had direct contact with other organizations as well.  On September 2, 2006, Taishan entered into a contract with B. America Corporation for the sale of Taishan's drywall to be produced according to ASTM standards with delivery CFR to Miami, Florida. *See* Exs. 19 & 20 to Che Dep. (contract (SDTH0600902) dated 9/2/2006 with B. America Corporation) (TG0021705 & TG0021695) (Ex. "86" attached hereto).

82.     The Taishan/B. America Corporation contract was later canceled due to the fact that "both parties [could] not bear the dropped price in the American market."  *See* Ex. 2 to Deposition of Rafael Sardi, owner of Onyx Gbh Corporation, dated 2/9/2012 ("Onyx Dep.") (contract (SDTH0601123) dated 11/23/2006 canceling contract dated 9/2/2006) (Ex. "87" attached hereto).

83.     On April 7, 2007, Taishan prepared an invoice to B. America for delivery of 660 sheets of drywall to Miami Port.  *See* Ex. 16 to Deposition of James Martin Alexander (representative of shipping agent Delmar Logistics Georgia) dated 12/22/2011 ("Delmar Dep.") (Taishan invoice dated 4/7/2007 to B. America for $5,656.20, after taking into account a credit of $6,745.20 for undelivered drywall from a previous order) (Ex. "88" attached hereto); Ex. 17 to Delmar Dep. (Taishan packing list dated 4/7/2007 for shipment to B. America) (Ex. "89"

attached hereto); Ex. 2 to Delmar Dep. (email dated 4/10/2007 from Bill Cher to Rafael Sardi regarding shipment to B. America) (TG0000510) (Ex. "90" attached hereto).

84.     Taishan then prepaid the freight, arranged for the product to be shipped to Miami and shipped the drywall to R&R Building Materials in Miami, Florida, with notification to B. America, as set forth in Taishan's Bill of Lading. *See* Ex. 19 to Delmar Dep. (Taishan Bill of Lading for transport of drywall to R & R Building Materials) (Ex. "91" attached hereto); Deposition of James Martin Alexander, Delmar Logistics, dated 12/22/2011 ("Delmar Dep.") (Ex. "202" attached hereto) at 118:5-122:24; Ex. 7 to Delmar Dep. (Delmar invoice to B. America for 6/11/2007 custom entry fee, duty and inland freight) (Ex. "92" attached hereto); Ex. 5 to Delmar Dep. (tracking sheet for shipment to Onyx/B. America with ETA 6/11) (Ex. "93" attached hereto); Ex. 11 to Delmar Dep. (delivery order to Port Everglades Terminal for R & R Building Materials) (Ex. "94" attached hereto); Ex. 14 to Delmar Dep. (entry summary for U.S. Customs and Border Protection showing Taishan delivery to Miami) (Ex. "95" attached hereto); Delmar Dep. (Ex. "202" attached hereto) at 116:18-23; Ex. 20 to Delmar Dep. (arrival notice for shipment to Miami) (Ex. "96" attached hereto); *see also* Ex. 2 to Onyx Dep.; Onyx Dep. (Ex. "97" attached hereto) at 63:19-64:15; Ex. 24 to Che Dep. (emails dated 4/10/2007 from Bill Cher to Rafael Sardi: "we will arrange production and ship[p]ing" "to Miami Port") (TG0000514).

85.     As part of this transaction, Taishan took out insurance for the cargo, knowing it would be delivered in Miami, Florida. *See* Ex. 18 to Delmar Dep. (Cargo Transportation Insurance Policy) (Ex. "98" attached hereto); Onyx Dep. at 28:9-21, 69:19-70:19.

86.     The following year, Bill Cher wrote to Maria Muci of B. America Corporation in Doral,

Florida, and provided that company with price quotes for Taishan's drywall.  Mr. Cher told B. America: "I hope we can establish business as soon as possible."  *See* Ex. 25 to Che Dep. (email dated 4/15/2008 from Bill Cher to B. America) (TG0000843) (Ex. "99" attached hereto).

87.    In addition to B. America, Taishan entered into a sales contract with Wood Nation, located in Tampa, Florida.  The Wood Nation agreement was for the sale of 500 40'-high containers, each holding 660 pieces of Taishan's gypsum board, with a total value of $1,386,000.  The contract specified that the drywall was to be delivered to "Tampa, Florida, USA."  *See* Ex. 13 to Wood Nation I Dep. (sales contract (WN7350) dated 6/10/2006 between Taishan and Wood Nation, Inc.) (TG0001482-484) (Ex. "100" attached hereto).

88.    Ultimately, the Taishan/Wood Nation, Inc. contract was revised, and only "40 containers of wallboard were shipped [by Taishan] to the Port of Tampa in two shipments, one in July 2006 and the other in August 2006."  *See* Wood Nation I Dep. (Ex. "101" attached hereto) at 82:6-83:5; Ex. 15 to Wood Nation I Dep. (invoices for sales of Taishan's drywall to Wood Nation) (TG0001545-546) (Ex. "102" attached hereto); Ex. 28 to Wood Nation I Dep. (emails and other documents regarding shipments to Wood Nation and revised contract - 77 pages total) (Ex. "103" attached hereto); Ex. 4 to Wood Nation II Dep. at ¶ 10.

89.    Taishan also sold drywall to Devon International, for distribution in Florida and Alabama. Beginning at least in 2004, Devon International was sourcing material from China, and Devon International had employees who worked out of its office in Shanghai, China.  *See* Deposition of Robert Scharf, President of Devon International Trading, dated 3/24/2011 ("Scharf Dep.") (Ex. "165" attached hereto) at 27:12-23, 31:13-33:24.

90.    At some point prior to June 2006, Devon International was approached by North Pacific Group about arranging for the manufacturing of drywall from China. *See* Scharf Dep. (Ex. "165" attached hereto) at 41:20-42:21. North Pacific provided Devon International with plans and specifications for the drywall. *Id*. at 77:9-80:3. After being approached by North Pacific, Devon International looked into market prices for drywall that could be purchased in China to determine if it could handle the order. *Id*. at 43:15-19. Scharf inspected "three, perhaps four" factories in Shandong, China before he chose the factory Devon International used to manufacture the drywall for North Pacific. *Id*. at 50:12-19. Scharf further testified that, when he arrived at these factories in China, he detected some sort of chemical odor coming from the facilities, which he described as "horrible." *Id*. at 51:3-53:11. However, when Scharf visited the Taishan factory he selected, he did not see those problems. *Id*. at 57:2-18. Scharf chose this factory because it was the only factory big enough to handle the volume. *See* Deposition of Ruth Wu, Vice President of Devon International Trading, dated 2/25/2011 ("Wu Dep.") (Ex. "172" attached hereto) at 75:5-16.

91.    On February 6, 2006, North Pacific gave Devon International Trading, Inc. a purchase order for 485,044 sheets of gypsum drywall "A" grade for arrival at Port in Pensacola, Florida. *See* Purchase order dated 2/8/2006 from Devon International to North Pacific for 485,044 sheets of Chinese Drywall (DEVON00950) (Ex. "166" attached hereto).

92.    Based on the February 6, 2006 North Pacific purchase order, Devon International submitted an Order Request to Shandong Taihe Dongxin Company, Ltd. for 485,044 sheets of drywall on March 15, 2006. *See* Sales order confirmation from Shandong Taihe Dongxin Company, Ltd. dated 3/30/2006 to Devon International (DEVON 00016-017) (Ex. "167" attached

hereto).  The destination on the order was originally Mobile, Alabama, but was changed to Pensacola, Florida.  *Id*.

93.     On March 30, 2006, Devon International received a sales confirmation from Taishan, again indicating that the shipment was to be sent to Pensacola, Florida.  The agreement provided that the drywall would be packaged to include the Devon Building Products' logo.  *See* Photographs (DEVON 00438, 00449, 00450, 00452, 00645, 00658, 00663) (Ex. "168" attached hereto).

94.     Consistent with the March 30, 2006 sales confirmation, the drywall was manufactured by Taishan and shipped to the United States aboard the Sanko Rally to the Port of Pensacola. The Sanko Rally experienced bad weather on the trip to Pensacola.  Because of the weather, the drywall was damaged in route from China to the Port of Pensacola.  *See* Scharf Dep. at 221:9-227:21.

95.     Because of the damage aboard the Sanko Rally and the delay in shipment, NorPac did not purchase the drywall when it arrived at the Port of Pensacola.  *See* Letter dated 7/21/2006 from North Pacific to Devon International (DEVON 00951) (Ex. "169" attached hereto); Scharf Dep. at 222:15-223:24.  After NorPac refused to purchase all of the drywall, Devon International began selling the drywall to other customers.  *Id*.  One of those customers was Emerald Coast Building Supply.  *See* Port of Pensacola discharge sheet, bill of lading (DEVON 00571-577 & DEVON00581-586) (Ex. "170" attached hereto).

96.     Discovery of other entities in this MDL, such as Banner Supply Company, has revealed additional sales of Taishan's drywall and metal framing in Florida.  *See*, *e.g.*, Banner Distributor Profile Forms (collectively, Ex. "104" attached hereto); *see also* Ex. 2 to Gonima

II Dep. at p. 28 (instant message discussion dated 5/8/2007 between Ivan Gonima and Che Gang); Che Dep. at 101:1-22.

97.  Taishan also responded to inquiries from Carn Construction, Tanader Tang from Bluefire International, and Wenny Yin from SCT Co., Ltd., expressing a willingness to ship product to Florida.  *See* Carn Construction Dep. at 30:12-31:19; Plaintiffs' Ex. 31 to Jia II Dep. (emails dated 7/18-27/2006 between Bill Che and Tanader Tang re prices for drywall to be shipped from Qingdao, China to Port Everglades in Fort Lauderdale, Florida) (TG0019348-352) (Ex. "105" attached hereto); Che Gang Dep. at 157:22-159:22; Ex. 3 to Peng S. Dep. (emails dated 10/15/2005 between Peng Shiliang and Wenny Yin regarding quotes from shipping drywall to Jacksonville Port, Florida) (TG0019813-814) (Ex. "106" attached hereto).

98.  In accordance with its expressed desire to sell more than 1 million sheets of its Chinese Drywall in the United States, Taishan shipped more than 9 million square feet of its plasterboard to Port Everglades in Fort Lauderdale, Orlando and Miami, Florida, having a value of $772,863.40.  *See* Gonima I Dep. at 35:19-36:2; Ex. 7 to Gonima I Dep. (invoice dated 12/30/2006 for 20,100 sheets of Taishan's drywall for delivery to Miami, Florida) (Ex. "107" attached hereto); Chart summarizing Taishan's sales of drywall in the United States, by State.

99.  Taishan targeted customers in Louisiana after Hurricane Katrina.  Taishan was aware that "[a]fter Hurricane Katrina, the Great New Orleans area need[ed] rebuild[ing]" and the housing market in the United States was "very hot."  *See* Ex. 14 to Che Dep. (email dated 1/5/2006 from Jing Zhang to Bill Cher) (TG0000886) (Ex. "108" attached hereto).

100.   Taishan availed itself of the opportunity to sell its products to a variety of customers in

Louisiana, including GD Distributors, LLC. and APIC Building Materials.  *See* Ex. 2 to GD

Distributors Dep. (Taishan invoice to GD Distributors for 1320 sheets of drywall); Ex. 7 to

GD Distributors Dep. (Taishan Special Invoice for Export) (TG0019962) (Ex. "109" attached

hereto); Deposition of Peng Shiliang dated 1/11/2012 ("Peng S. Dep.") (Ex. "110" attached

hereto) at 83:18-84:4; Ex. 5 to Peng S. Dep. (packing list for invoice No. SDTH0622 dated

7/3/2006 from Taishan to APIC Building Materials for drywall to be shipped to New

Orleans, La.) (TG0019366) (Ex. "111" attached hereto); Ex. 4 to Peng S. Dep. (invoice No.

SDTH0622 dated 7/3/2006 from Taishan to Triax Trading and Logistics, LLC for APIC

Building Materials for 5,676 pieces, or 272,448 square feet, of drywall with a value of

$24,123, to be shipped to New Orleans, La.) (TG0020090) (Ex. "112" attached hereto);

Invoice dated 7/20/2006 from Taishan to Triax Trading & Logistics for 5,760 pieces

(276,480 square feet) of drywall with a value of $24,998.40 (TG0020091) (Ex. "198"

attached hereto).

101.   Taishan targeted customers in California, shipping samples of drywall and product to them.

On multiple occasions, Taishan sold its drywall to Stone Pride in Irvine, California.  *See*

Stone Pride Dep. at 10:25-11:5; Ex. 8 to Peng S. Dep. (Taishan Special Invoice for Export

dated 2/2/2006 for 2,640 sheets of drywall for Stone Pride) (TG0001658); Peng S. Dep. at

95:9-96:15; Ex. 2 to Stone Pride Dep. (packing list and invoice dated 11/20/2006 for 2,640

sheets of drywall to Stone Pride, Irvine, California) (Ex. "115" attached hereto).

102.   Taishan's own documents evidence the extent of the company's relationship with customers

in California.  On October 31, 2006, James Scudder, Vice President of Advance Products

International, in National City, California, wrote to Frank Clem complaining about the quality of Taishan's gypsum board, stating that: "Advance Products International purchased gypsum board from your company and we were told and guaranteed that the gypsum board was ASTM standard gypsum board and complied to all regulations. **The 12 containers of gypsum board we purchased form [sic] your company are not ASTM approved board**. We shipped the gypsum/drywall to our customers and this has caused us great harm to our company." *See* Ex. 17 to Che Dep. (letter dated 10/31/2006 from Advance Products International to Frank Clem) (TG0019376) (Ex. "113" attached hereto).

103.   This was not the first time Taishan was advised of a problem concerning its drywall shipments to California. Earlier, on July 3, 2006, Mr. Scudder had complained about damages to the boards during shipment:

> This is the load we just received and opened the doors on. WHAT HAPPENED? We can NOT ship the next 11 containers This way. HOW CAN WE FIX THIS? Some of the drywall is broken on the corners.
>
> Need to discuss ASAP.

*See* Ex. 16 to Che Dep. (email dated 7/3/2006 from Jim Scudder to Grace, Andy) (TG0019383) (Ex. "114" attached hereto).

104.   Taishan's shipments of drywall and other products to the United States were not limited to Virginia, Florida, Louisiana, and California. By November, 2005, Taishan was already selling to other suppliers in the U.S., in addition to Venture Supply and OTC. As Phillip Perry from Venture Supply reported:

> I ran into another American from Texas at the factory. He said he was from the HGC company. Claimed he was the big buyer, but

> Frank [Clem] said he was only buying 1000 sheets and he wanted to
> use containers to ship.
>             ...
> Frank was telling me about the many inquiries he has been getting,
> and I again suggested that these leads should be passed to us to
> investigate.  We are buying and the others may want to buy, but do
> not know how, do not have the financing to make a large enough
> purchase, or may just be put off by the idea of importing. He said that
> he is thinking along those lines.  I will hit him again with this.

*See* Email dated 11/28/2005 from Phillip Perry to Sam Porter (V002487) (Ex. "116" attached

hereto).  Mr. Perry also stated that:

> Taihe was visited by Duxx International Trading, LLC, a Jorge
> James, VP manager, came to the office to make an offer .... they have
> an office in Dallas, TX and in Mexico.  The 2nd company is
> Holmanwood.com from Malaysia, the owner apparently showed up
> .... Both companies seemed to have offered to make the offered terms
> and agree to purchase 300,000 boards a month.  **The accepted party
> would then get a sole distributorship for USA.** after 3 months of
> compliance with the terms.  All referrals will be given to that
> company during the 3-month term.

*See* Email dated 12/13/2005 from Phillip Perry to Sam Porter (emphasis added) (V002400)

(Ex. "117" attached hereto).

105.    In December, 2005, Taishan was responding to requests for quotes for drywall to be

delivered to the Port of NY/NJ and the Port of Savannah, Georgia, in the United States.  *See*

Ex. 2 to Peng S. Dep. (emails dated 12/11-12/2005 between Peng Shiliang and Leon Liu

regarding quotes for drywall to NY/NJ and Savannah, Georgia) (TG0019840-841) (Ex.

"118" attached hereto).

106.    Taishan proudly told potential customers interested in having Taishan's materials delivered

to the United States:  "We export metal frame especially to USA such as New York and

Norfolk."  *See* Ex. 20 to Peng II Dep. (email dated 8/29/2007 from Frank Clem to Jacky Yu

advertising the export capabilities of Taishan to the USA and elsewhere) (TG0021370); Peng
II Dep. (Ex. "201" attached hereto) at 539:15-540:6.

107.    Taishan not only sold its drywall to OEG (through TOV Trading), but it also made
customized metal studs for the company with OEG imprinted on the product.  *See* OEG Dep.
at 136:2-8; Ex. 8 to Peng S. Dep. (Taishan Special Invoice for Export of 9,000, 14,000,
3,400, 2,000 pieces of drywall to TOV in New York) (TG0001680-682); Peng S. Dep. at
95:9-96:15; Ex. 4 to OEG Dep. (contract dated 6/6/2006 (TH0606001) for the sale of drywall
and metal studs to TOV Trading New York, USA) (TG0000897-898); Ex. 5 to OEG Dep.
(invoice dated 6/21/2006 to TOV Trading New York, USA for 23,120 sheets of drywall to
U.S.A.) (TG0001138-139) (Ex. "119" attached hereto); Ex. 10 to OEG Dep. (emails dated
7/3/2006 between Bill Cher and Ernest Teitelbaum regarding request for pricing)
(TG0001161) (Ex. "120" attached hereto); Ex. 13 to OEG Dep. (email dated 8/2/2006 from
Ernest Teitelbaum to Bill Cher requesting additional 25,000 sheets of drywall) (TG0000747)
(Ex. "121" attached hereto); Ex. 14 to OEG Dep. (emails dated 8/3/2006 between Bill Cher
and Ernest Teitelbaum regarding additional 25,000 sheets of drywall) (TG0000813) (Ex.
"122" attached hereto); Ex. 17 to OEG Dep. (contract dated 8/4/2006 (SDTH06080401) for
the sale of 28,400 sheets of drywall to TOV Trading New York, USA & invoice)
(TG0000734-738) (Ex. "123" attached hereto); Ex. 18 to OEG Dep. (emails dated 8/18/2006
between Bill Cher and Ernest Teitelbaum regarding shipment of drywall) (TG0001142) (Ex.
"124" attached hereto); Ex. 11 to OEG Dep. (email dated 7/18/2006 from OEG to Bill Cher
regarding wire transfer) (TG0001052) (Ex. "125" attached hereto).

108.    Taishan was fully aware that the need for drywall in the U.S. was "so urgent at th[at]

moment."  *See* Ex. 23 to OEG Dep. (email dated 8/31/2006 from Bill Cher to Ernest Teitelbaum) (TG0000750) (Ex. "126" attached hereto).

109.  Taishan was making efforts to sell its drywall to a customer in Mobile, Alabama.  There is evidence that Frank Clem was seeking quotes from Steamship Pte Ltd. for the cost of shipping 400,000 sheets of Taishan's drywall from China to Mobile.  He wrote to Steamship Pte Ltd. on February 10, 2007:  "I have a customer in America, who need us to ship about 400000 sheets of gypsumboard to Mobile USA.  So we need to find a ship to Mobile.  Could you please offer any relative shipping information?"  *See* Ex. 4 to Peng I Dep. (email dated 2/10/2007 from Frank Clem to Melvyn of LN Steamship Pte Ltd.) (TG0000011) (Ex. "127" attached hereto).

110.  Taishan made sure to follow up with its American customers in order to maintain good customer relations and also to secure additional sales of its products.

111.  After completing its sales transactions for customized drywall and metal studs for OEG in New York, Bill Cher reached out to OEG executives on November 18, 2008, seeking to obtain more business from the company.  Mr. Cher let OEG know that steel belt prices in China were beginning to decrease, "so I think we can start to be ready to operate the metal studs business [again].  I hope I can get your support."  *See* Ex. 46 to OEG Dep. (email dated 11/18/2008 from Bill Cher to OEG) (TG0019341) (Ex. "128" attached hereto); OEG Dep. at 165:2-15.

112.  Taishan's persistence to maintain a presence in this country continued even after the problems arising from Chinese Drywall became apparent.  On February 23, 2009, Bill Cher wrote the following email to Joseph Weiss of OEG USA:

> How are you doing, my old friend? . . . We received several inquiries
> on the gypsum board and metal studs from U.S.  You are one of our
> first-ten customers since we have a very good cooperation record.  So
> we prefer to restarting our U.S. business with you rather than others.
> Please inform us if you are interested on it.
>
> Looking forward to your early reply!
>
> Best wishes to you and your family!

*See* Ex. 30 to Che Dep. (email dated 2/23/2009 from Bill Cher to Joseph Weiss)
(TG0021469) (Ex. "129" attached hereto).

113.  Taishan Gypsum Co. is responsible for the acts of its wholly-owned subsidiary Taian Taishan
Plasterboard Co., and vice versa.  In order to accommodate its existing customers, TG
established TTP, and then TTP created a foreign sales office fully staffed with TG's
employees to sell Tashan's products to the United States at exactly the time of the drywall
shortage in the U.S.  TTP's foreign sales office was staffed by Peng Wenlong, Che Gang and
Yang Jiapo (Apollo Yang).  *See* Peng S. Dep. at 55:18-23; Fu Dep. at 39:4-40:3, 108:4-7,
110:13-20.  They all started at TG, but went to work for TTP when TTP was formed.  When
TTP wound down business, these employees all went back to work for TG.  Mr. Peng
Shiliang also went from TG to TTP and back to TG again.  *Id.* at 29:10-19, 55:18-23.

114.  TG was the sole investor in TTP, and invested at least 22,000,000 Yuan (~$3.49 million) in
TTP.  *See* Jia II Dep. (Ex. "200" attached hereto) at 845:23-846:7; TG Articles of
Association, February 2006 (TG0020817-824) (Ex. "153" attached hereto); Shareholder
Decisions of TG (TG0020855) (Ex. "154" attached hereto); TG Articles of Association,
revised June 2006 (TG0020856-864) (Ex. "155" attached hereto).

115.  Simply put, TG set up TTP in order to:  1) use TTP to "satisfy" TG's existing customers'

needs for VAT invoices and to continue doing business with those same customers (Jia II Dep. (Ex. "200" attached hereto) at 796:5-797:14; *see* Fu Dep. at 108:4-109:22), and 2) sell drywall to the United States at a time of desperate need for U.S. consumers and the victims of Hurricanes Katrina and Rita.

116.   There are multiple instances of TG ignoring corporate formalities and TG and TTP being one and the same for the purposes of imputing TTP's actions to those of TG, and vice versa.

117.   TG gave TTP a formal written authorization to sell "Taishan" brand drywall for a "period of use tentatively set at five years." *See* Defendants' Ex. 41A to Jia II Dep. (Trademark Use Authorization) (TG25412) (Ex. "174" attached hereto); *see also* Jia II Dep. at (Ex. "200" attached hereto) 661:8-21.

118.   This authorization for use was made to TTP without payment and was subject to no conditions or limitations to protect the value of the "Taishan" brand. *See* Defendants' Ex. 41A to Jia II Dep. (Ex. "174" attached hereto); *see also* Jia II Dep. (Ex. "200" attached hereto) at 676:14-677:2.

119.   TTP contracted to sell TG's DUN brand of drywall to OTC, with OTC being the sole and exclusive agent for TTP in the United States. *See* Ex. 4 to Gonima II Dep. The "DUN" brand, however, was not TTP's to sell; it belonged to and was manufactured by TG. It is undisputed that the DUN brand was TG's registered brand. *See* Plaintiffs' Ex. 20 to Jia II Dep.; Che Dep. at 40:9-42:16. DUN is TG's brand, yet TTP sold it, with no repercussions from TG, and TTP was paid for TG's drywall.

119.   Further demonstrating the lack of corporate formalities between TG and TTP, their cooperation and working together to sell to the United States, and TTP's agency for TTP,

TTP went a step further and designed a custom label for the DUN brand, which was not TTP's to sell. *See* Ex. 2 to Gonima II Dep. at pp. 5-7 (instant message discussion dated 5/22/2007 between Ivan Gonima and Che Gang). Importantly, TTP never paid TG any compensation for its use of the DUN brand. *See* Jia II Dep. (Ex. "200" attached hereto) at 676:14-677:2.

120.   TTP & TG ignored corporate form, and have taken responsibility for each other's acts and omissions and settled claims and debts on behalf of each other.

121.   In late 2005 and into early 2006, Guardian Building Products ("Guardian"), a Greenville, South Carolina Company, conducted a visit to Taishan to investigate buying drywall for sale to the United States. The TG drywall that Guardian purchased was shipped to Tampa, Florida, Wilmington, North Carolina, and Virginia. *See* Deposition of John Gunn dated 7/22/2011 ("Guardian Dep.") (Ex. "143" attached hereto) at 79:7-25.

122.   Mr. John Gunn, Guardian's representative, met with Mr. Apollo Yang (also known as Yang Jiapo) at TG's factory. *See* Guardian Dep. (Ex. "143" attached hereto) at 49:1-52:16. During their meeting, Mr. Yang gave his business card to Mr. Gunn, which was printed in English on one side and in Chinese writing on the other side. *Id.*; *see also* Ex. 2 to Guardian Dep. (photocopy of business card for Apollo Yang) (GBP001255) (Ex. "156" attached hereto).

123.   Throughout all of the negotiations, Mr. Gunn dealt with TG personnel using TG promotional materials and, understandably, he thought he had a contract with TG. *See* Guardian Dep. at 74:24-75:13. It was only later, when TG's drywall proved to be defective, that Mr. Gunn discovered he was purchasing TG's drywall through a broker named Taian Taigao Trading

-41-

Co., Ltd. *Id.* at 75:4-76:10, 166:6-8. The contract called for 200,000 sheets of TG drywall to be shipped to the U.S. *See* Ex. 16 to Guardian Dep. (Sales Contract and Application and Agreement for Documentary Credit (GBP002102-105) (Ex. "157" attached hereto).

124. Approximately 1,000,000 square feet of TG drywall was purchased by Guardian. *See* Guardian Dep. at 182:24-183:1. The shipment was offloaded in Tampa, Florida, Wilmington, North Carolina and Virginia, where Stock Building Supply picked up the drywall for sale in its stores. *Id.* at 79:7-25.

125. Within a month after the drywall was delivered to Tampa, Wilmington and Virginia and distributed by Stock Building Supply, Guardian started receiving complaints. *See* Guardian Dep. at 135:19-136:5. In October 2006, Mr. Gunn traveled to China to try and resolve the drywall problems with TG. Mr. Gunn believed that Taian Taigao was a front, set up by TG to distance the company from its defective drywall. *Id.* at 138:24-140:8. Mr. Gunn's belief proved correct. Two years later, in 2008, TG still had not resolved the problem, continuing to deny any defects with the drywall. *Id.* at 141:25-142:10, 143:13-21.

126. Ultimately, Guardian reached a settlement agreement with TTP (not TG) regarding the defective drywall. *See* Guardian Dep. at 173:16-177:12; Ex. 27 to Guardian Dep. (Settlement and Release Agreement) (GBP001130-133) (Ex. "158" attached hereto). While the contract for TG's drywall listed Taian Taigao as the seller of TG's drywall, it was TTP and not TG that was the signatory to the settlement agreement. TTP paid the consideration for the settlement to resolve Guardian's claims for TG's defective drywall and ultimately took responsibility for TG's defective product. *Id.*

127. TG orchestrated a settlement with Oriental Trading Company, LLC ("OTC") on behalf of

-42-

TG, even though all sales to OTC were allegedly made by TTP.  As part of its Sole Agency Agreement with TTP, OTC made a $100,000 deposit under the contract.  Eventually, OTC asked for this deposit back; however, instead of returning the deposit, Taishan wanted to do more business with OTC for more drywall.  *See* Gonima I Dep. at 145:17-147:10.

128.  As late as June 2010, after TTP had wound down its business, it was TG, through Bill Cher (formerly with TG, then TTP), that sought to exchange the $100,000 deposit with TTP for more business with TG.  *See* Gonima I Dep. at 145:17-147:10, 153:12-154:14; Ex. 12 to Gonima I Dep. (email dated 5/27/2010 from Bill Cher to Ivan Gonima) (TG0000869-870) (Ex. "159" attached hereto).

129.  The employees of TG and TTP were interchangeable, working for TG, then TTP and TG again.  *See* Fu Dep. at 110:13-20.

130.  Mr. Gonima, who helped negotiate the OTC's Sole Agency Agreement with TTP, testified that on his visits to TG, he met with Peng Wenlong (Frank Clem) and Bill Cher, and he later emailed and exchanged numerous instant messages with Mr. Cher.  *See* Gonima I Dep. at 26:10-28:6.  Mr. Gonima also reviewed TG's brochure, TG's website and other promotional materials.  *Id*. at 44:9-21, 89:7-10; Ex. 3 to Gonima I Dep. (Taishan marketing brochure) (Ex. "160" attached hereto).

131.  TG represented itself to Mr. Gonima as being "part of a huge building materials group producer."  *See* Gonima I Dep. at 96:11-25.  Yet, the contract that OTC signed was with TTP.  In short, there was no distinction between the two entities.  Mr. Clem and Mr. Cher demonstrated TG products, catalogs and the website to Mr. Gonima, yet sold him TG's DUN drywall under TTP's name, without distinction.

132.    The lack of corporate separateness between TG and TTP is also demonstrated by the dealings with Guardian.  When Guardian achieved a settlement for the defective drywall, the signatory to the settlement agreement was TTP, not TG, even though Mr. Jia, TG's chairman, was involved in the negotiations.  *See* Guardian Dep. at 53:18-54:1, 156:1-158:12; Ex. 25 to Guardian Dep. (email dated 10/24/2006) (GBP002309-310) (Ex. "161" attached hereto).

133.    When Chairman Jia negotiated the Guardian settlement, he was wearing TG's Chairman hat, but it was TTP that signed the settlement agreement with Guardian.  Guardian's representative, Mr. Shao, met with TG's Chairman and President, Mr. Jia Tongchun on or about October 24, 2006.  *See* Guardian Dep. at 53:18-54:1, 156:1-158:12.  TTP was formed in February 2006.  *See* Jia II Dep. at 643:22-644:2; Defendants' Ex. 33A to Jia II Dep. (Incorporation Registration Review Form for TTP) (Translation of TG0020808-809) (Ex. "173" attached hereto).

134.    The leadership of TTP was also the leadership of TG throughout the creation, operation, and winding down of TTP.  *See* Fu Dep. at 111:8-10 (Q. The directors that were established for TTP came from TG, right?  A. Yes.).

135.    Mr. Fu Tinghuan was Deputy General Manager and Director of Sales at TG and he was also a member of TG's Board of Supervisors.  *See* Fu Dep. at 29:11-34:1.  At the same time Mr. Fu was also a director for TTP, but he received no compensation from TTP as a director.  *Id*. at 115:4-17.

136.    Zhang Jianchun has been Secretary of TG's Board of Directors since 2002 and a Secretary of TTP's Board of Directors since August 2010.  *See* Deposition of Zhang Jianchun dated 4/6/2011 ("Zhang Dep.") at 20:1-23, 22:21-24, 23:1-5 (Ex. "162" attached hereto).

137.  A Director and the Chair of TTP, Peng Shiliang, was also an employee of TG.  Mr. Peng remains the sole employee of TTP, is an employee of TG, but is paid by yet another subsidiary of TG.  *See* Peng S. Dep. at 74:21-76:22.

138.  When TG created TTP for its own purposes, the directors of TTP came from TG.  *See* Fu Dep. at 111:8-10.  There was no hiring process or interview process for the new employees at TTP when TG formed it.  Instead, in remarkable testimony, when TG formed TTP, TG notified its employees that they could "volunteer" for jobs at TTP.  *Id.* at 116:15-24.

139.  TTP employees, such as Frank Clem, would promote TG, or act as if TTP was TG, without distinction.  Mr. Clem conducted TTP business with customers via email communications, while using TG's name and promoting TG.  *See* Peng II Dep. at 486:7-487:18; Ex. 18 to Peng II Dep.; Ex. 19 to Peng II Dep. (email dated 5/11/2007 from Frank at Taihe Dongxin Co., Ltd.) (TG0022728) (Ex. "163" attached hereto).

140.  TG and TTP share multiple phone numbers and facsimile numbers.  Remarkably, even when faced with their own documents evidencing shared phone lines, they denied it, as high up at TG's Chairman, Mr. Jia.  *See* Jia II Dep. (Ex. "200" attached hereto) at 785:11-787:5 (emphasis supplied); *cf.* Plaintiffs' Ex. 20 to Jia II Dep. at p. 16 to Ex. 4 to Peng I Dep. (same phone number); *see also* Jia II Dep. (Ex. "200" attached hereto) at 791:9-792:18 (compare to 785:11-14) & Plaintiffs' Ex. 20 to Jia II Dep.; Ex. 4 to Peng I Dep.; Ex. 13 to Wood Nation Dep.

141.  TG and TTP failed to observe other corporate formalities regarding assets and other property in addition to the brand names Taishan and DUN.  From its capitalization through to the disposition of TTP's equipment when it ceased operations, TTP looks more like a division

of TG than an independent company.

142.   TTP's production lines and equipment came from and were returned to TG, but these transfers so not reflect arm's-length transactions between separate companies.  TG agreed to sell to TTP certain heavy equipment for 35,727,650.75 Yuan [approximately $5,688,935 U.S. using current conversion rate of 6.2802] (with payment within 3 months).  *See* Defendants' Ex. 42A to Jia II Dep. (Purchase and Sale Agreement) (TG25413) (Ex. "175" attached hereto).  However, the financial statements that were produced in this litigation reflect that a payment of only 34,380,888 Yuan [approximately $5,474,489 U.S. using current conversion rate of 6.2802] related to the "purchase of fixed assets," leaving over 1 million Yuan [approximately $214,446 U.S.] unpaid by TTP.  *See* Defendants' Ex. 45A to Jia II Dep. (2006 Financial Statement of TTP) (TG0026004-006) (Ex. "176" attached hereto).

143.   On January 1, 2008, TTP agreed to sell the equipment back to TG for 31,453,579.80 Yuan [approximately $5,008,372 U.S. using current conversion rate of 6.2802] (with payment within 6 months).  *See* Defendants' Ex. 44A to Jia II Dep. (Purchase and Sale Agreement) (TG25414) (Ex. "177" attached hereto).  However, TTP's financial statement for that year do not reflect any income related to the "sale of fixed assets. . . ." *See* Defendants' Ex. 47A to Jia II Dep. (2008 Financial Statement of TTP) (TG0026010-012) (Ex. "178" attached hereto).

144.   Lease of TG's production lines to TTP presents the same situation.  Initially, there is no clear record that any lease payments were made.  Moreover, the price set for the lease of these production appears to have been set by TG's caprice.  In a lease dated February 10, 2006, TG

initially set the annual rate at 100,000 Yuan [approximately $15,923 U.S. using current conversion rate of 6.2802], which Jia Tongchun testified on direct was based on the local rental rate. *See* Defendants' Ex. 40A to Jia II Dep. (Lease Agreement) (Translation of TG0025446) (Ex. "179" attached hereto); Jia II Dep. (Ex. "200" attached hereto) at 659:22-660:20. Only ten days later, the rate was increased by TG (and without evident complaint by TTP) over four fold, to 420,000 Yuan [approximately $66,876.85 U.S. using current conversion rate of 6.2802]. *See* Defendants' Ex. 43A to Jia II Dep. (Lease Agreement) (TG25415) (Ex. "180" attached hereto).

145.     The capitalization of TTP by TG was a lax affair. On February 10, 2006, TG made the initial capital investment of 15 million Yuan [approximately $2,388,459 U.S. using current conversion rate of 6.2802] in TTP. *See* Defendants' Ex. 33A to Jia II Dep. On June 22, 2006, TG made a decision to increase the registered capital investment by nearly half, investing an additional 7,234,900 Yuan [approximately $1,152,017 U.S. using current conversion rate of 6.2802], purportedly done by TG to relieve "financial pressure" on TTP. *See* Defendants' Ex. 37A to Jia II Dep. (Capital Verification Report of TTP) (Translation of TG0020850-851) (Ex. "181" attached hereto); Defendants' Ex. 38A to Jia II Dep. (Shareholders Decisions dated 6/22/2006) (Translation of TG0020855) (Ex. "182" attached hereto); Jia II Dep. (Ex. "200" attached hereto) at 845:23-846:7.

146.     Any questions about the adequacy of this capitalization will not even be answered by the accounting firm that completed the capital verification report (with the addendum for the further capitalization four months later). The initial verification report stated flatly that "it is the responsibility of the Company and its shareholders to provide true, legitimate

information concerning capital verification, and to ensure the security and integrity of the Company's assets. Our responsibility is to issue a verification opinion as to the Company's paid-in registered capital." *See* Taian Taishan Gypsum Co., Ltd. Capital Verification Report dated 2/13/2006 (TG0020833) (Ex. "183" attached hereto).

147.   Given the way that TG and TTP traded employees, brands, equipment and production lines, there is no reason to trust the "security and integrity" of the capitalization.   Indeed, the accounting firm completing both rounds of verification was the same company Taishan used to value the shares of TG when BNBM was acquiring control of Taishan. *See* Taian Taishan Gypsum Co., Ltd. Capital Verification Report dated 2/13/2006 (TG0020833-39); Ex. 7A to Jia II Dep. (Shandong Taihe Dongxin Co., Ltd. Capital Verification Report) (Translation of TG0020647-649) (Ex. "184" attached hereto); Jia II Dep. (Ex. "200" attached hereto) at 673:12-676:13; Ex. 37A to Jia II Dep.

148.   In addition to all of the evidence demonstrating Taishan's direct sales of drywall and related building products to customers in the United States, there is further evidence of Taishan's connections and presence within the United States through its upstream entities –  China National Building Material Company, Limited ("CNBM") and Beijing New Building Materials, Ltd. ("BNBM").

149.   As this Court found during the bellwether trial in *Germano*, publicly available documents show that in China, the State-owned Assets Supervision and Administration Commission ("SASAC") of the State Counsel of the People's Republic of China controls the "plasterboard" manufacturing, exportation and certification industry and oversees and manages the state-owned assets of companies involved in drywall production, including

Taishan. *Chinese Drywall*, 706 F. Supp. 2d at 662; *see also* Chart summarizing Taishan's 2006 Structure Post-March 16, 2006 Global Offering (Q000955-956) (Ex. "130" attached hereto); CNBM Global Offering (Q000438-952) (Ex. "131" attached hereto) at p. 100.

150.   BNBM is a wholly State-owned corporation of China, and it "is the most important and integrated company of [CNBM Group].  http://english.bnbm.com.cn/.

151.   On March 19, 2005, BNBM became the largest shareholder of Taihe Dongxin (*i.e.*, Taishan) by purchasing forty-two percent (42%) of Taishan's equity, and BNBM controlled 4 of the 7 members of the TG board.  *See* CNBM Global Offering (Q000438-952) at p. 113; *see also* Chart summarizing Taishan's 2006 Structure Post-March 16, 2006 Global Offering (Q000955-956).

152.   In 2006, BNBM acquired an additional 23% of Taishan's shares, owning 65% of the company, when it acquired  Taian City Donglian Investment and Trading Company.  *See* Jia II Dep. (Ex. "200" attached hereto) at 593:14-594:4; Defendants' Ex. 11A to Jia II Dep. (Articles of Association to Shandong Taihe Dongxin Co., Ltd., August 8, 2006, Article 17) (TG0020686-709) (Ex. "132" attached hereto); *see also* Summary of BNBM 2006 Annual Report (Ex. "133" attached hereto) at pp. 16, 37.

153.   This acquisition of an additional 23% of Taishan shares was funded by a loan taken out by BNBM using as collateral not its own assets, but those of a third company, the Taian City State Owned Assets Management, which was a minority shareholder of Taishan.  *See* August 28, 2006 CNBM Public Regulatory Announcement "Connected Transaction Acquisition of the Entire Equity Interest in Taian Donglian Investment and Trading Company Limited" (Q000010-12) (Ex. "134" attached hereto).

154.   With the acquisition of an additional 23% of Taishan's shares, and subsequent amendments to the bylaws of TG, BNBM nominated 3 of the 5 members of Taishan's board.  *See* First Extraordinary General Meeting of Shareholders for the Year 2007 of Shandong Taihe Dongxin Co., Ltd. (TG0020715) (Ex. "135" attached hereto).  In addition, Jia Tongchun, a member of the board of BNBM, and the Chairman of TG, together with Taian Anxin Investments, nominated a fourth member of the board.  *Id*.

155.   BNBM is the parent of Taishan with effective control over Taishan.  *See* Rec. Doc. No. 5075; *see also* Chart summarizing Taishan's 2006 Structure Post-March 16, 2006 Global Offering (Q000955-956).

156.   With the purchase by BNBM of a majority share in Taishan, BNBM's parent (CNBM) stated at its public offering in March 2006, that when "BNBM gained long-term control of [Taishan's] board of directors in connection with the acquisition, [Taishan] became a subsidiary consolidated with BNBM.  *See* CNBM Global Offering (Q000438-952) at p. 4.

157.   Taishan and BNBM were "joint venturers."  *See* Jia II Dep. (Ex. "200" attached hereto) at 203:2-204:10, 404:13-18.

158.   Taishan and BNBM  undertook several drywall related investments together.  *See* 2005 Annual Shareholders Meeting (TG0020677), item 5(2)  (Ex. "136" attached hereto); Resolution of the 4th Extraordinary Meeting of 2005 (TG0020682-685) (Ex. "171" attached hereto).

159.   BNBM maintained the right to purchase interest in all present and future subsidiaries of Taishan.  *See* 2006 BNBM Bylaws (TG0020686-709), Chapter 3 (Ex. "137" attached hereto).

160.   Taishan's and BNBM's development strategies and production capacities were frequently

reported as one. *See*, *e.g.*, CNBM May 2010 Overseas Regulatory Announcement (Q000975-981) (Ex. "138" attached hereto) at p. 3; 2009 BNBM Annual Report (Q000155-223) (Ex. "139" attached hereto) at p. 44; Summary of BNBM 2008 Annual Report (Q000091-154) (Ex. "140" attached hereto) at pp. 27, 64; Summary of BNBM 2006 Annual Report, at pp. 14, 16, 17, 20, 37, 44.

161. In addition to the efforts through Taishan to sell to the United States, CNBM and BNBM were themselves developing the United States market. Both entities appeared at a 2007 trade show in Las Vegas, and were actively pursuing sales in the United States. *See* Deposition of John Gunn/Guardian Building Products dated 7/22/2011 ("Guardian Dep.") (Ex. "143" attached hereto) at 148:8-149:1, 154:2-6; *see also id*. at 34:23-35:6, 147:8-11.

162. CNBM (USA) Corporation was established in 2006 in the City of Industry, California, at the same time that Taishan sold its Chinese Drywall to Venture Supply. *Chinese Drywall*, 706 F. Supp. 2d at 663; *see* Rec. Doc. No. 6245-4, at p.6; *see also* State of California Business Entity Detail for CNBM (USA) Corp. dated 3/31/2011 (Q000982) (Ex. "141" attached hereto). CNBM (USA) publicly announced that its "mission [is] to provide all kinds of building materials and services in the [U.S.] national market." *Id*.

163.  BNBM ventured into the United States a little earlier, and prior to its acquisition of Taishan. In 2000, BNBM set up BNBM of American, Inc. in Tampa, Florida. *See* Richard Hannam Dep. at 16:7-14, 22:21-22, 24:11-19, 32:15-19, 74:8-32; Ex. 1 to Richard Hannam Dep. (2003 For Profit Corporation Uniform Business Report (Florida Secretary of State) and Articles of Incorporation for BNBM of America, Inc. in Tampa, Florida) (Ex. "142" attached hereto).

164.  BNBM of America was the United States marketing arm of BNBM, selling primarily BNBM drywall, adding other building materials later.  *See* Richard Hannam Dep. at 14:6-14.  It wound down operations in 2005, just when BNBM was acquiring interest in Taishan.  *Id*. at 74:8-22.

165.  Just as with TG and TTP, these organizations shared leadership, including leaders all the way from BNBM of America and TG, up through CNBM to the parents of CNBM, and just short of the SASAC of the People's Republic of China.

166.  Jianglin Cao: was a director and officer of BNBM of America (*see* Ex. 1 to Richard Hannam Dep. (2003 For Profit Corporation Uniform Business Report and Articles of Incorporation for BNBM of America, Inc.)), served on the Board of Supervisors of TG, (s*ee* Defendants' Ex. 8A to Jia II Dep. (Resolutions of the General Meeting of Shareholders dated 4/25/2005) (Translation of TG0020601-602) (Ex. "185" attached hereto)), was Chairman of BNBM (*see* Summary of BNBM 2006 Annual Report at pp. 2, 12; Summary of BNBM 2008 Annual Report at pp. 2, 12, 64 (Q000091-154); 2010 CNBM Annual Report (Q000224-437) (Ex. "186" attached hereto) at p. 75)), served as the President and Executive Director of CNBM (*see* CNBM Global Offering at pp. 157, 188-89; CNBM 2010 Annual Report (Q000224-437) at pp. 4, 20, 43, 55, 75), and held senior positions, including Directorships at BNBM Group and CNBM Group.  *See* 2006 Global Offering at p. 188; 2010 CNBM Annual Report at p. 75.

167.  Zhiping Song: was a director of BNBM of America (*see* Ex. 1 to Richard Hannam Dep. (2003 For Profit Corporation Uniform Business Report and Articles of Incorporation for BNBM of America, Inc.)), was the Chairman of BNBM (*see* 2006 Global Offering at pp.

188-89; 2010 CNBM Annual Report at p. 74), served as an Executive Director and Chairman at CNBM (*Id.*), and held senior positions at BNBM Group and CNBM Group. *Id.*

168. Wang Bing: was a Director of TG (*see* Defendants' Ex. 8A to Jia II Dep. (Resolutions of the General Meeting of Shareholders dated 4/25/2005) (Translation of TG0020601-602)), a Director, Chairman and General Manager at BNBM (*see* 2010 CNBM Annual Report at p. 84), and a Vice President at CNBM. *Id.*

169. Yanjun Yang was another Director at TG (*see* Resolution of the First Extraordinary General Meeting of 2006 (TG0020675) (Ex. "187" attached hereto)), who held a variety of leadership roles at BNBM, including CFO and Deputy General Manager (*see* Summary of BNBM 2006 Annual Report at pp. 13, 46; Summary of BNBM 2008 Annual Report at p. 13).

170. The PSC attempted to bring both BNBM and CNBM into these proceedings by serving these defendants through the Hague Convention with the Complaints at issue. However, both BNBM and CNBM defaulted. *See* Rec. Doc. No. 5621. At one point in time, as of October 13, 2010, BNBM had retained national counsel to represent them in these proceedings, *see* Letter dated 10/13/2010 from James L. Stengel to Arnold Levin (Ex. "144" attached hereto), however, neither BNBM nor CNBM ever entered their appearance in the litigation. As a result, the PSC has been unable to take formal discovery of Taishan's upstream entities.

171. The massive amount of evidence refuting Taishan's jurisdictional motions was obtained by the PSC through great effort and persistence, with the intervention of this Court. Taishan has consistently attempted to delay and/or prevent discovery in this matter. For example, one of the matters of dispute between the PSC and Taishan in advance of the second round of depositions in Hong Kong was the adequacy of the production of TTP's financial records.

*See* Letter dated 7/1/2011 from Frank T. Spano to Lenny Davis (Ex. "197" attached hereto). Consequently, the only TTP financial records that were produced in this litigation were very short, annual summaries.  See TTP Balance Sheet, Income Statement and Cash Flow Statement (TG0026007-009)(Ex. 46A to Deposition of Jia Tongchun dated 1/9-10/2012)(Ex. "196" attached hereto).

172. Another example of Taishan attempting to prevent and/or delay discovery occurred recently with the scheduling of the January 2012 Taishan depositions. On November 23, 2011, counsel for Taishan reported to the Court and the parties that, after much discussion and deliberation, Taishan had decided to make a good faith effort to comply with the Court's direction to produce the six previously identified witnesses.  *See* Letter dated 11/23/2011 from Joe Cyr to Leonard Davis (Ex. "145" attached hereto).

173. On November 30, 2011, counsel for Taishan sent a supplemental letter advising that their client has decided to continue participating in the litigation and would produce Messrs. Jia, Peng W., Che, Peng Shiliang and Fu for their depositions in January as previously scheduled. *See* Letter dated 11/30/2011 from J. Cyr to Hon. Eldon Fallon (Ex. "146" attached hereto).

174. The PSC's efforts to obtain discovery in this litigation regarding any of the upstream entities, such as BNBM and CNBM, have been fruitless.  BNBM and CNBM are defaulting defendants.  Only TG and TTP have entered their appearance in the litigation and became subject to discovery in this matter.

175. On November 16, 2011, Jia Tongchun supplied an affidavit claiming that Taishan submitted to BNBM a request for the documents sought by the PSC, but that no documents were provided by BNBM and that Taishan has no control over these documents.  *See* Declaration

of Jia Tongchun dated November 16, 2011, at ¶¶ 13-16 (Ex. "147" attached hereto).

176.   With regard to U.S. affiliates of CNBM, the PSC filed a motion to compel and for sanctions for CNBM USA's failure to appear at a deposition on February 22, 2012, which has resulted in a grant of the PSC's motion to compel and for sanctions.  *See* Rec. Doc. No. 13585.

177.   Subsequently, the parties agreed that the jurisdictional contacts of upstream entities, such as BNBM and CNBM, would not be briefed as part of the analysis of the current motions regarding jurisdiction, but would be raised at a later date after jurisdiction over TG and TTP has been addressed by the Court.

178.   In advance of the submission of Taishan's jurisdictional motions, Taishan's counsel "wanted to make sure that . . . while briefing the personal jurisdiction issues [the PSC] [would] not be contending that the jurisdictional contacts of the upstream entities (including CNBM and BNBM) should be imputed to TG and TTP. . . .  If that is the case, it will simplify the briefing for the Court."  *See* Email chain dated 3/23/2012 between Tom Owen and Lenny Davis (Ex. "148" attached hereto); *see also* Email dated 3/22/2012 from Tom Owen to Lenny Davis ("In order to avoid any unnecessary briefing for the Court . . . I wanted to confirm the representation made at the meeting before the status conference today that the parties . . . will not be arguing . . . that the jurisdictional contacts of any entity upstream of Taishan Gypsum (including but not limited to CNBM and BNBM and their subsidiaries), should be imputed to either TG or TTP. . . .") (Ex. "149" attached hereto).

179.   The PSC's efforts to obtain information regarding the Luneng mine in China have also been thwarted.

180.   The PSC is aware that the U.S. Consumer Product Safety Commission ("CPSC") made an

investigation of Chinese Drywall within China.  The CPSC in its Investigation of Imported Drywall Status Update August 2009 reported that it had received approval from the Chinese for a visit to China and that it was working to arrange an investigative visit of several sites it believed to be of interest beginning August 17, 2009.  *See* CPSC Investigation of Imported Drywall Status Update August 2009 (Ex. "188" attached hereto).

181. Thereafter, in the Investigation of Imported Drywall Status Update September 2009, the CPSC reported that its "staff visited China and met with Chinese government officials, as well as management from several sites that we [CPSC] believe to be of interest" and that "[t]he team inspected gypsum mines and drywall manufacturing plants in China with Chinese government officials."  *See* CPSC Investigation of Imported Drywall Status Update October 2009 – Imported Drywall Fact Sheet dated September 2009 (Ex. "189" attached hereto).

182. The PSC was advised that the CPSC attempted to make a visit to the Luneng mine, but the PSC understands that the CPSC was denied access to the mine.  The PSC submitted FOIA requests to the CPSC which proved to be fruitless.  *See* PSC FOIA request dated 7/17/2009 (Ex. "190" attached hereto); PSC FOIA request dated 7/20/2009 (Ex. "191" attached hereto); PSC correspondence dated 11/2/2009 re: FOIA Request No. 09-F-00902 (Ex. "192" attached hereto).  *See also* U.S. Consumer Products Safety Commission letter dated 11/3/2009 re: FOIA Request No. 09-F-00902 (Ex. "193" attached hereto); PSC correspondence dated 12/3/2009 re: FOIA Request No. 09-F-00902 (Ex. "194" attached hereto).

183. The PSC attempted on numerous times to secure the information from the CPSC through FOIA requests, but no information regarding the Luneng mine has been forthcoming.  Additionally, the PSC also attempted to obtain the information during the corporate 30(b)(6)

depositions of Taishan (*see, e.g., Peng I Dep. at 238:5-244:6*), and Knauf (*see, e.g.,* Deposition of Mark Patrick Norris dated 11/11/2010 ("Norris Dep.") (Ex. "195" attached hereto), at 133:17-134:12, 135:7-10, 246:16-249:8, 330:24-333:5).

184.    In addition to the omnibus class action complaints, the PSC has also filed protective actions that are designed to perfect claims against TG and TTP as well as other related entities such as BNBM and CNBP. The PSC has filed such actions in California, Florida, Louisiana, and Virginai. The PSC directly filed one of these actions, *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, 11-cv-1395 (E.D. La.), in this Court on June 13, 2011. The PSC filed similar actions that have been transferred to this Court from the Central District of California, *see Abner, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, 11-cv-3094 (E.D. La.), the Southern District of Florida, *see Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, 11-cv-1672 (E.D. La.), and the Eastern District of Virginia, *see Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, 11-cv-1673 (E.D. La.). The PSC is in the process of serving each of these complaints on the named defendants. *See* Affidavit of Ann Mickow, Civil Action Group/APS International, Ltd., dated 5/4/2012 (Ex. "199" attached hereto).

185.    On January 5, 2012, this Court signed a stipulated Order regarding various documents produced in this litigation. Among other things, this January 5, 2012 Order identified and/or authenticated, within the meaning of Federal Rule of Evidence (FRE) 901(a), all potential deposition exhibits ("Examination Documents") relating to the January 2012 Depositions of Taishan. *See* Rec. Doc. No. 12126 at p. 1. Additionally, this January 5, 2012 Order declared

-57-

that, "[i]nsofar as they were originally authored or created by Taishan, the Examination Documents shall not be deemed inadmissible as hearsay, pursuant to the applicability of FRE 803(3), 803(5), 803(6), 803(8), 803(14), 803(15) and/or 803(17), and/or the applicability of FRE 807." *Id.* at p. 2.

186.  Based upon the formal and informal discovery conducted to date by the PSC and the documents received in connection with same, the statements herein are true and correct, and are made of my own personal knowledge, information and belief, and volition.

FURTHER AFFIANT SAYETH NOT

RUSS M. HERMAN
HERMAN, HERMAN & KATZ, L.L.P.

SWORN TO AND SUBSCRIBED
before me, this _____7ᵗʰ_____, day of
May, 2012

NOTARY PUBLIC
PARISH OF ORLEANS, STATE OF LOUISIANA
Printed Name: ___Jennifer J. Greene___
LA Bar#: ___30899___

Jennifer J. Greene
Notary Public
Orleans Parish
Notary ID 91905
Bar No. 30899
My Commission is for Life

-58-