# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED DRYWALL     MDL DOCKET: 2047
      PRODUCTS LIABILITY LITIGATION

                                        SECTION: L

                                        JUDGE FALLON
                                        MAG. JUDGE WILKINSON

THIS DOCUMENT RELATES TO:

*The Mitchell Co., Inc. v. Knauf Gips KG, et al.*,
**Case No. 09-4115**
_____/

**CERTAIN FLORIDA HOMEBUILDERS'** *AMICUS CURIAE* **RESPONSE TO TAISHAN
GYPSUM CO. LTD.'S  RENEWED MOTION PURSUANT TO RULES 55(C) AND
12(B)(2) TO VACATE THE ENTRY OF DEFAULT AND DISMISS THIS ACTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................ iii

I.      INTRODUCTION ............................................................................................................. 1

II.     PROCEDURAL BACKGROUND ................................................................................... 4

   A. THE U.S. LITIGATION AGAINST TG .................................................................................... 4
      1.   U.S. Companies and Homeowners File Suit against TG. ............................................. 4
      2.   TG Fails to Respond to Lawsuits in the United States and Litigants Obtain Default Judgments. .............. 5
      3.   TG Seeks to Vacate the Defaults Entered Against It. ................................................... 7
   B. TAISHAN HAS NOT COOPERATED IN DISCOVERY ................................................................ 8
      1.   Taishan's Document Productions and Discovery Responses. ...................................... 8
      2.   The Initial Depositions of Taishan Representatives. .................................................. 10
      3.   The Second Round of Depositions of the Taishan Representatives. ........................... 11
      4.   Taishan Files Extensive Errata Sheets. ...................................................................... 12

III.    FACTUAL BACKGROUND ......................................................................................... 13

   A. TG AND TTP OPERATED AS A SINGLE BUSINESS ............................................................. 13
      1.   TG is a "Key Enterprise" in Manufacturing Drywall and Exporting its Goods to "Many Countries Such
           as the U.S.A." ........................................................................................................... 13
      2.   TG Created TTP to Enhance its Export Business. ...................................................... 14
      3.   TG and TTP's Employees were Interchangeable. ...................................................... 14
      4.   TTP Used TG's Equipment to Manufacture Drywall. ................................................ 16
      5.   TTP Used the TG Logo without Restriction or Compensation to TG. ........................ 17
      6.   TTP Used the TG Name and Marketing Materials to Sell Drywall. ........................... 19
      7.   TG Settled the Debts of TTP and Vice Versa. ........................................................... 21
           a.   Guardian Building Products .............................................................................. 21
           b.   Oriental Trading Company ................................................................................ 22
   B. TAISHAN TARGETED THE UNITED STATES AND, PARTICULARLY, FLORIDA FOR THE SALE OF ITS DRYWALL ..... 23
      1.   Drywall Shortages in the U.S. ................................................................................... 25
      2.   Taishan Capitalized on this Opportunity for U.S Sales. ............................................ 26
      3.   Taishan Hosted Potential U.S. Customers at its Facility in China. ........................... 26
      4.   TTP Granted "Sole Agent" Rights to a Florida Supplier for Nationwide Sales of Taishan's Drywall. .... 29
      5.   Taishan Manufactured its Drywall to U.S Specifications and Standards .................... 30
      6.   Taishan Shipped Samples of its Drywall to Potential Customers in Florida. .............. 34
      7.   Taishan Sold Drywall Directly to Suppliers in Florida. ............................................ 35
           a.   Wood Nation ..................................................................................................... 36
           b.   B. America Corporation .................................................................................... 36
           c.   Oriental Trading ............................................................................................... 37
      8.   Taishan Made Direct Sales to Customers in Other States as Well. ............................ 40
      9.   Taishan Cannot Plausibly Claim Ignorance of Other Shipments to Florida. .............. 42

IV.     LEGAL ARGUMENT ................................................................................................... 45

   A. TTP ACTED AS TG'S AGENT AND ITS ACTIONS ARE IMPUTED TO TG FOR PURPOSES OF EVALUATING
      PERSONAL JURISDICTION. ................................................................................................. 46
      1.   Florida law applies in determining whether TTP acted as TG's agent. ...................... 46
      2.   Under Florida law, TTP acted as TG's agent and its actions are imputed to Taishan. .......... 48
   B. THE COURT MAY ASSERT PERSONAL JURISDICTION UNDER THE FLORIDA LONG ARM STATUTE. ............... 52
      1.   The Court may assert jurisdiction over Taishan because Taishan was carrying on a business in Florida,
           because Taishan committed tortious acts in Florida, and because Taishan's drywall caused injury to
           Florida customers while Taishan sought to serve the Florida market with those products. .................. 53
           a.   Taishan carried on a business by targeting customers in the Florida market with its drywall. ........... 53
           b.   Taishan committed tortious acts while targeting customers in the Florida market with its drywall. ...... 58

TABLE OF CONTENTS
(Continued)

  c.  Taishan caused injury to Florida customers while targeting those customers in the Florida market with its drywall. .................................................................................................................................... 59

  2.  *Taishan's argument that Plaintiff's claims do not arise from its activities in the Florida market is contrary to Florida law.* .................................................................................................................. 60

 C. THE COURT MAY ASSERT PERSONAL JURISDICTION UNDER THE DUE PROCESS CLAUSE. ................................ 62

  1.  *Under Supreme Court precedent, a court may assert either specific or general jurisdiction over a foreign defendant where the defendant has "purposefully established minimum contacts in the forum State."* .................................................................................................................................... 62

  2.  *The Court may assert specific jurisdiction over Taishan because Taishan has purposefully availed itself of the benefits and protections of Florida law, and the Amended Complaint's allegations arise out of Taishan's intent to serve the Florida market.* ............................................................................. 64

   a.  Under either approach articulated in Asahi, the principal inquiry is whether Taishan purposefully directed its activities at, and sought to serve customers in, the Florida market. .................................................... 66

   b.  The evidence shows that Taishan sought to serve, and did serve, customers in the Florida market, and that the allegations in the Amended Complaint arise out of and relate to Taishan's efforts to serve the Florida market. . 68

   c.  Taishan's argument that the Court should deny specific jurisdiction based on the Supreme Court's decision in McIntyre should be rejected. .................................................................................................... 75

  3.  *The Court may assert general jurisdiction over Taishan because Taishan's contacts and sales in Florida evidence a "continuous and systematic" course of conduct in Florida.* ............................................ 77

 D. PLAINTIFFS HAVE NOT BEEN ALLOWED TO OBTAIN DISCOVERY FROM TAISHAN'S UPSTREAM ENTITIES. ........ 81

**V. CONCLUSION** .......................................................................................................... **81**

# TABLE OF AUTHORITIES

**Page**

## Cases

*3M Innovative Props. Co. v. InFocus Corp.*, No. Civ. 04-0009
   2005 WL 361494 (D. Minn. Feb. 9, 2005) ............................................................. 79

*Ainsworth v. CargoTec USA, Inc.*, No. 2:10-CV-236-KS-MTP
   2011 WL 6291812 (S.D. Miss. Dec. 15, 2011) ...................................... 65, 67, 76, 77

*Asahi Metal Industry Co., Ltd. v. Superior Court of California*
   480 U.S. 102 (1987) ........................................................................... 62, 64, 66, 74

*Baker v. Raymond Int'l, Inc.*
   656 F.2d 173 (5th Cir. 1981) .......................................................................... 48

*Benson v. Seestrom*
   409 So. 2d 172 (Fla. 2d DCA 1982) ............................................................... 49

*Brooks & Baker, LLC v. Flambeau, Inc.*, No. 2:10-cv-146-TJW-CE
   2011 WL 4591905 (E.D. Tex. Sept. 30, 2011) ............................................. 76, 77

*Bullion v. Gillespie*
   895 F.2d 213 (5th Cir. 1990) .......................................................................... 46

*Burger King v. Rudzewicz*
   471 U.S. 462 (1985) ......................................................................... 62, 63, 67, 73

*Cable/Home Commc'n Corp. v. Network Prods., Inc.*
   902 F.2d 829 (11th Cir. 1990) ....................................................................... 58

*Cal-Mar Indus. Inc. v. Wilson Research Corp.*
   442 F. Supp. 796 (S.D. Fla. 1977) ................................................................. 54

*Carr v. Pouilloux, S.A.*
   947 F. Supp. 393 (C.D. Ill. 1996) ................................................................. 68

*Citicorp. Ins. Brokers (Marine), Ltd. v. Charman*
   635 So. 2d 79 (Fla. 1st DCA 1994) ..................................................... 54, 58, 61

*City. Nat. Bank of Detroit v. Basic Food Indus., Inc.*
   520 F.2d 336 (5th Cir. 1975) .................................................................... 49, 51

*Conax Fla. Corp. v. Astrium, Ltd.*
   49 F. Supp. 2d 1287 (M.D. Fla. 2007) ........................................................... 53

# TABLE OF AUTHORITIES
## (Continued)

**Page**

*D.J. Invs., Inc. v. Metzler Motorcycle Tire Agent Gregg, Inc.*
   754 F.2d 542 (5th Cir. 1985) ................................................................. 46

*Damoth v. Reinitz*
   485 So. 2d 881 (Fla. 2d DCA 1986) ...................................................... 61

*Davis v. Pyrofax Gas Corp.*
   492 So. 2d 1044 (Fla. 1986) ...................................................... 53, 59, 61

*Dram Techs. LLC v. Am. II Group, Inc.*, No. 2:10-CV-45-TJW
   2011 WL 4591902 (E.D. Tex. Sept. 30, 2011) ........................... 65, 68, 77

*Eli Lilly and Co. v. Mayne Pharma (USA) Inc.*
   504 F. Supp. 2d 387 (S.D. Ind. 2007) ............................................. 78, 79

*Empire Indus., Inc. v. Kaplan*
   695 So. 2d 919 (Fla. 4th DCA 1997) ..................................................... 57

*Execut-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*
   752 So. 2d 582 (Fla. 2000) .................................................................... 58

*Fanimation Design & Mfg., Inc. v. Nicor, Inc.*, IP 02-0576-C-M/S
   2003 WL 21766572 (S.D. Ind. July 17, 2003) ................................. 78, 79

*Gillins v. Trotwood Corp.*
   682 So.2d 693 (Fla. 5th DCA 1996) ...................................................... 56

*Goodyear Dunlop Tires Operations, S.A. v. Brown*
   131 S. Ct. 2846 (2011) .......................................................................... 78

*Graham v. Hamilton* No. 3:11-609
   2012 WL 893748 (W.D. La. Mar. 12, 2012) ........................... 65, 66, 73, 75

*Ham v. La Cienega Music Co.*
   4 F.3d 413 (5th Cir. 1993) .................................................................... 45

*Hanson v. Denckla*
   357 U.S. 235 (1958) .............................................................................. 62

*Helicopteros Nacionales de Columbia, S.A. v. Hall*
   466 U.S. 408 (1994) .............................................................................. 63

## TABLE OF AUTHORITIES
(Continued)

**Page**

*Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*
421 F.3d 1162 (11th Cir. 2005) ......................................................................... 58

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.* (Germano)
706 F. Supp. 2d 655 (E.D. La. 2010).................................................................. 6

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*
767 F. Supp. 2d 649 (E.D. La. 2011).................................................. 46, 62, 63, 74

*In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*, No. 1:00-1898, MDL 1358(SAS), M21-88
2005 WL 106936 (S.D.N.Y. Jan. 18, 2005) ......................................................... 64

*Int'l Shoe Co. v. Washington*
326 U.S. 310 (1945)....................................................................................... 62, 78

*Irving v. Owens-Corning Fiberglass Corp.*
864 F.2d 383 (5th Cir.),
*cert. denied*, 493 U.S. 823 (1989)........................................................ 45, 65, 67, 68

*J. McIntyre Machinery, Ltd. v. Nicastro*
131 S. Ct. 2780 (2011)............................................................................... passim

*John Scott, Inc. v. Munford, Inc.*
670 F. Supp. 344 (S.D. Fla. 1987) ...................................................................... 50

*Kernel Records Oy v. Mosley*
No. 09-21597-Civ., 2010 WL 2812565 (S.D. Fla. July 5, 2010) ........................... 47

*Kravitz v. Gebrueder Pletscher Druck-Gusswaremfabrik*
442 So. 2d 985 (Fla. 3rd DCA 1983)................................................................... 61

*LSI Indus., Inc. v. Hubbell Lighting, Inc.*
232 F.3d 1369 (Fed. Cir. 2000) .......................................................................... 80

*Luv N'Care, Ltd. v. Insta-Mix, Inc.*
438 F.3d 465 (5th Cir. 2006) ........................................................................ 55, 73

*Marks v. United States*
430 U.S. 188 (1977).......................................................................................... 65

*Mass. Inst. of Tech. v. Micron Tech, Inc.*
508 F. Supp. 2d 112 (D. Mass. 2007) ................................................................. 80

**TABLE OF AUTHORITIES**
(Continued)

**Page**

*McHugh v. Kenyon*
    547 So. 2d 318 (Fla. 4th DCA 1989) ............................................................. 57

*Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*
    288 F.3d 1264 (11th Cir. 2002) ........................................................... 50, 52

*North Star Int'l Seafood Co., Inc. v. Banner Beef and Seafood Co., Inc.*
    677 So. 2d 1003 (Fla. 3d DCA 1996) ............................................................. 59

*Nuovo Pignone, SpA v. Storman Asia M/V*
    310 F.3d 374 (5th Cir. 2002) .......................................................... 73, 75

*Osorio v. Dole Food Co.*, No. 07-22693-CIV
    2009 WL 48189 (S.D. Fla. Jan. 5, 2009) ........................................................ 66

*Pappalardo v. Richfield Hospitality Servs., Inc.*
    790 So. 2d 1226 (Fla. 4th DCA 2001) ............................................................. 48

*Parsley Bros. Constr. Co. v. Humphrey*
    136 So. 2d 257 (Fla. 2d DCA 1962) ............................................................. 49

*Posner v. Essex Ins. Co.*
    178 F.3d 1209 (11th Cir. 1999) ............................................................. 58

*Promex, LLC v. Perez Distrib. Fresno, Inc.* No. 09-22285-CIV
    2012 WL 3452341 (S.D. Fla. Sept. 1, 2010) ...................................................... 58

*Provident Nat'l Bank v. California Fed. Savings & Loan Ass'n*
    819 F.2d 434 (3d Cir. 1987) ............................................................. 80

*Psarianos v. Standard Marine, Ltd., Inc.*
    728 F. Supp. 438 (E.D. Tex. 1989) ............................................................. 73

*Roessler v. Novak*
    858 So. 2d 1158 (Fla. 2d DCA 2003) ............................................................. 51

*Ruston Gas Turbines, Inc. v. Donaldson Company, Inc.*
    9 F.3d 415 (5th Cir. 1993) .......................................................... passim

*Seltzer Sister Bottling Co., Inc. v. Source Perrier, S.A.*, No. C-90-1468 MHP
    1991 WL 279273 (N.D. Cal. May 1, 1991) ......................................................... 67

**TABLE OF AUTHORITIES**
(Continued)

**Page**

*Stairmaster Sports/Med. Prods., Inc. v. Pac. Fitness Corp.*
   916 F. Supp. 1049 (W.D. Wash. 1996),
   *aff'd*, 78 F.3d 602 (Fed. Cir. 1996) .................................................................. 79

*State v. Am. Tobacco Co.*
   707 So. 2d 851 (Fla. 1st DCA 1998) ................................................. 48

*Stokes v. L. Geismar, S.A.*
   815 F. Supp. 904 (E.D. Va. 1993) ....................................................... 68

*Trierweiler v. Croxton & Trench Holding Corp.*
   90 F.3d 1523 (10th Cir. 1996) ............................................................. 79

*Vandelune v. 4B Elevator Components Unlimited*
   148 F.3d 943 (8th Cir. 1998) ............................................................... 68

*Vermeulen v. Renault, U.S.A., Inc.*
   985 F.2d 1534 (11th Cir. 1993) ........................................................... 66

*Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*
   517 F.3d 235 (5th Cir. 2008) ............................................................... 46

*Wetzel v. Fisherman's Wharf of Pompano Beach, Inc.*
   771 So. 2d 1195 (Fla. 4th DCA 2000) ................................... 55, 59, 60, 66

*Wien Air Alaska, Inc. v. Brandt*
   195 F.3d 208 (5th Cir. 1999) ............................................................... 74

*World-Wide Volkswagen v. Woodson*
   444 U.S. 286 (1980) ....................................................... 66, 67, 76, 77

**Statutes**

§ 48.193(1)(a), Fla. Stat. (2011) ........................................................ 53, 59

§ 48.193(1)(b), Fla. Stat. (2011) ............................................................. 58

§ 48.193(1)(f)(2), Fla. Stat. (2011) ........................................................ 61

§ 48.193(1)(f), Fla. Stat. (2011) ......................................................... 59, 60

§ 48.193, Fla. Stat. (2011) ..................................................................... 52

28 U.S.C. § 1407 ................................................................................... 4

## TABLE OF AUTHORITIES
(Continued)

**Page**

**Other Authorities**

Restatement (Second) Conflict of Laws § 302 ............................................................................ 47

Certain Florida Homebuilders ("Homebuilders"), as *amicus curiae*, respectfully submit this Response (the "Response") to Taishan Gypsum Co. Ltd.'s ("TG") Renewed Motion Pursuant to Rules 55(c) And 12(b)(2) to Vacate the Entry of Default Judgment and Dismiss this Action [Rec. Doc. No. 13566] (the "Renewed Motion").[1]

## I.   <u>INTRODUCTION</u>

The evidence uncovered during jurisdictional discovery makes clear that TG directly and indirectly, through its agent and wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (TG and TTP are referred to collectively herein as "Taishan"), aggressively and purposefully sought to target and serve the general Florida market, and specific Florida customers, during the relevant time period.  It sought to sell its drywall to Florida customers, and it did sell its drywall to Florida customers, exporting millions of square feet of drywall to Florida and elsewhere in the U.S., intending and understanding that its drywall would be sold in Florida and installed in Florida homes.[2]

In the face of overwhelming evidence to the contrary, Taishan insists in the

---

[1]  The homebuilders joining in this Motion include: Lennar Corporation; Lennar Homes, LLC; U.S. Home Corporation (collectively, "Lennar"); Meritage Homes of Florida, Inc.; G.L. Building Corporation; Boynton Beach Associates XVI, LLLP; G.L. Homes of Davie Associates II, Ltd.; and G.L. Homes of Davie IV Corporation.  This Motion is filed without waiver of any defenses these Homebuilders have, including without limitation, defenses to jurisdiction or venue in the Eastern District of Louisiana.

[2]  For the convenience of the Court, and to avoid the introduction of duplicate exhibits, the Homebuilders have, where possible, made reference to the exhibits from the Affidavit of Russ Herman (the "Herman Affidavit") (Rec Doc. No. 14215-3) that was filed with the Plaintiffs' Steering Committee's Global Statement of Facts in Opposition to: (1) Taishan's Renewed Motions to Vacate the Default Judgments and Dismiss the Complaints in Germano and Mitchell and (2) Taishan's Motions to Dismiss the Complaints in Gross and Wiltz  ("PSC Global Facts") (Rec. Doc. No. 14215-2).  Accordingly, all references to exhibits in this memorandum are references to the exhibits to the Herman Affidavit, unless otherwise noted.  For exhibits referenced in this Response that were not attached to the Herman Affidavit, see the Affidavit of Hilarie Bass dated May 18, 2012 ("Bass Affidavit"), a copy of which is attached hereto as Exhibit A.

1

Memorandum in support of its Renewed Motion ("Taishan MOL") that it did not know where its drywall was being sold, essentially, disclaiming any responsibility for the millions of square feet of its drywall shipped to Florida during the relevant time period.  In so doing, Taishan relies on three misguided arguments.

First, Taishan argues that that the acts and contacts with Florida of TG's wholly-owned subsidiary, TTP, cannot be attributed to TG.  Under Florida law, however, TTP's actions are attributable and should be imputed to TG for the purpose of establishing personal jurisdiction over TG, because TTP acted, with actual and apparent authority, as TG's agent.

Second, Taishan argues that Florida's long-arm statute does not permit the exercise of jurisdiction in this case because Taishan was not "carrying on a business," and even if it was, the Plaintiffs' claims do not relate to Taishan's business activities.  The facts, however, demonstrate otherwise.  Taishan's activities – specifically, its efforts to solicit Florida customers, its engagement of an exclusive sales agent in Florida, its direct sales to Florida customers, its knowledge that drywall it sold would be delivered to Florida, and its specific efforts to customize its drywall shipments to comply with U.S. and Florida regulations, as well as its accommodation of specific requests from U.S. and Florida customers – clearly and unequivocally fall within the reach of Florida's long-arm statute.

Third, Taishan contends that, following Justice Kennedy's opinion in *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011), the Plaintiffs may not rely on the Fifth Circuit's "stream-of-commerce" jurisprudence and, therefore, cannot establish the minimum contacts necessary to obtain personal jurisdiction over Taishan.  This argument is misplaced.  To begin with, Justice Kennedy's plurality opinion did not command a majority of five Justices, so it is not binding on this Court, and, even if it was, the evidence here heavily weighs in favor of a

finding of specific jurisdiction under *McIntyre*'s modified "stream of commerce plus" test.

Indeed, Taishan cannot avoid the virtually undisputed facts demonstrating that, during the relevant time period, Taishan purposefully and systematically targeted the Florida market with its drywall.[3]  As set forth below, the evidence in this litigation reflects a strong, targeted effort by Taishan to sell its drywall in the U.S., and particularly in Florida.  These efforts were a result of the overwhelming demand for drywall and other materials following a housing boom and destruction from significant hurricanes that impacted the Southeast region of the U.S. in 2005-2008.  Seeking to capitalize on this opportunity, Taishan established a brand new entity, TTP, for the purpose of serving its customers that were seeking to export drywall to countries, such as the U.S.  Furthermore, Taishan solicited and engaged customers in Florida by, among other things, entering into an exclusive agency agreement with a Florida-based company to market and sell Taishan's drywall, sending product samples to Florida, hosting Florida customers at Taishan's facilities in China, manufacturing drywall to U.S. and, in some instances, Florida specifications, and selling drywall directly to suppliers in Florida.  These efforts proved quite successful, as Taishan sold at least 85,000,000 square feet of drywall to the U.S.  Taishan sold drywall to Florida customers through direct transactions, as well as through intermediaries who kept Taishan updated on the status of these shipments to Miami and other Florida ports.  Taishan was fully aware and intended that significant amounts of its drywall would be delivered to Florida.  Based on this clear evidence and under well-settled precedent, Taishan is subject to personal jurisdiction in Florida and, therefore, TG's Renewed Motion should be denied.

---

[3] This Response will focus on the many facts proving that Taishan sought to serve the Florida market and will not recite each of the innumerable facts illustrating Taishan's attempts to serve other U.S. markets.

II.     **PROCEDURAL BACKGROUND**

    A.     **THE U.S. LITIGATION AGAINST TG**

    1.     **U.S. Companies and Homeowners File Suit against TG.**

Beginning in late December 2008, problems began to surface relating to the defective nature of certain drywall manufactured in China.[4]  Although many homebuilders immediately acknowledged the Chinese-manufactured drywall issues and committed to repair their homes that contained the defective product, other parties in the distribution chain that supplied this drywall refused to take responsibility for or – in the case of Taishan – even admit that a problem existed.[5]  Ultimately, litigation ensued, with homeowners and homebuilders filing suit against the Chinese manufacturers and others.

Because of the commonality of facts in the various federal court cases, this litigation was designated as a multidistrict litigation pursuant to 28 U.S.C. § 1407.  The U.S. Judicial Panel on Multidistrict Litigation issued a Transfer Order on June 15, 2009, transferring to the U.S. District Court, Eastern District of Louisiana, all federal cases involving Chinese drywall for the purpose of consolidated pretrial proceedings.[6]  In the nearly three years since this MDL was created, the

---

[4] Consumer Product Safety Commission, Investigation of Imported Drywall, Status Update, October 2009, available at http://www.cpsc.gov/info/drywall/oct2009status.pdf (last visited May 18, 2012) (Bass Affidavit Exh. 1) ("In late December 2008, CPSC first received complaints from consumers related to the presence of drywall produced in China.").

[5] Deposition of Jia Tongchun dated Apr. 4-5, 2011 ("Jia I Dep.) (Rec Doc. No. 14208-3) at 349:7-20 ("The medias in the United States reported that the drywall sold by TG company has some problems, but I don't believe it is true.").

[6] Transfer Order, *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL 2047 (E.D. La. Jun 15, 2009) (Rec. Doc. No. 1).

Court has conducted several bellwether trials[7] and encouraged and overseen settlement discussions that have resulted in the materialization and preliminary approval of several important settlement agreements.[8]

**2.   TG Fails to Respond to Lawsuits in the United States and Litigants Obtain Default Judgments.**

While this Court and the various other parties before it were persistent in moving this litigation towards resolution, Taishan quietly – but consciously and conspicuously – observed much of the process from the sideline.  By remaining silent and failing to respond to various lawsuits filed against it, Taishan defaulted in several actions.

The first such action was filed by Lennar on January 30, 2009 in Miami-Dade County, Florida against TG and other parties responsible for the defective Chinese-manufactured drywall that was installed in certain Lennar homes in Florida.[9]  Lennar later filed an Amended Complaint and, after completing the costly and time-consuming process of translating the Amended Complaint and submitting it to the Central Authority in China for service pursuant to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Service Convention"), Lennar obtained service on TG on

---

[7] *See Germano, et al. v. Taishan Gypsum Co., Ltd.*, et al., Case No. 2:09-cv-06687 (E.D. Va. May 11, 2010) (Rec. Doc. No. 3013); and *Hernandez v. Knauf Gips, KG, et al.*, Case No. 2:09-cv-06050 (E.D. La. May 11, 2010) (Rec. Doc. No. 3012).

[8] *See* Orders preliminarily approving: (1) Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047 (Rec. Doc. No. 12138]); (2) Settlement Agreement Regarding Claims Against Interior-Exterior in MDL No. 2047 (Rec. Doc. No. 8818); (3) Amended Stipulation and Agreement of Settlement [Rec. Doc. No. 10064]; and (4) Class Action Settlement Agreement Regarding KPT Drywall Claims Against USG and L&W in MDL No. 2047.

[9] Complaint, *Lennar Homes, et al. v. Knauf Gips KG, et al.*, Case No. 09-07901 (11th Jud. Cir., Miami-Dade County, Fla. Jan. 30, 2009) (Bass Affidavit Exh. 2).

August 3, 2009.[10]  On February 8, 2010, Lennar moved the Circuit Court in Miami, Florida for entry of a default against TG.[11]  On February 18, 2010, Judge Joseph Farina entered a default against TG.[12]

A few months after Lennar filed its lawsuit, The Mitchell Company ("Mitchell") filed an action against TG and others in the United States District Court for the Northern District of Florida.  Thereafter, Mitchell filed an amended complaint directly in the MDL and, after TG failed to respond, moved for entry of default.  On September 23, 2009, the Court entered a preliminary default against TG.[13]  It was not until over eight months later, on June 10, 2010, that TG first appeared in that action.

After the commencement of Mitchell's lawsuit, the *Germano* action was filed against TG and others in the United States District Court in and for the Eastern District of Virginia, on behalf of a putative class of homeowners.[14]  That case was later transferred to the Eastern District of Louisiana, as part of MDL 2047.[15]  When TG failed to respond to the complaint in

---

[10] Certificate of Service on Taishan Gypsum Co. Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., *Lennar Homes, et al. v. Knauf Gips KG, et al.*, Case No. 09-07901 (11th Jud. Cir.., Miami-Dade County, Fla. Aug. 21, 2009) (Bass Affidavit Exh. 3).

[11] Motion for Default, *Lennar Homes, et al. v. Knauf Gips KG, et al.*, Case No. 09-07901 (11th Jud. Cir.., Miami-Dade County, Fla. Feb. 8, 2010) (Bass Affidavit Exh. 4).

[12] Default Against Defendant Taishan Gypsum Co. Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd, *Lennar Homes, et al. v. Knauf Gips KG, et al.*, Case No. 09-07901 (11th Jud. Cir.., Miami-Dade County, Fla. Feb. 18, 2010) (Bass Affidavit Exh. 5).

[13] Entry of Default, *In re Chinese Manufactured Drywall Products Liability Litigation* (The Mitchell Co.), MDL 2047 (E.D. La. Sep. 23, 2009) (Rec. Doc. No. 277).

[14] *In re Chinese-Manufactured Drywall Prods. Liab. Litig.* (Germano), 706 F. Supp. 2d 655, 659 (E.D. La. 2010) (Findings of Fact and Conclusions of Law).

[15] *Id.*

*Germano*, the Court entered a preliminary default[16] and later conducted a four day trial on damages from February 19 through February 22, 2010.  The Court entered a default judgment against TG for an amount in excess of $2.7 million dollars, which represented the claims of the owners of seven homes containing defective drywall manufactured by TG.[17]

   **3.**      **TG Seeks to Vacate the Defaults Entered Against It.**

TG first appeared in the MDL on June 10, 2010, when it appealed the final default judgment entered by this Court in the *Germano* action to the Fifth Circuit.[18]  It was not until several months later, on September 3, 2010, that TG moved to vacate the default judgment and to dismiss the *Germano* action for lack of personal jurisdiction.[19]  This Court denied that motion, concluding that it lacked jurisdiction over the motion as a result of the pending appeal in the Fifth Circuit.[20]

One week later, on September 10, 2010, TG filed another motion seeking, among other things, remand from the Fifth Circuit to consider the issue of personal jurisdiction over TG.[21] The Court granted that motion, in part, concluding that it "would benefit from additional

---

[16]  Entry of Default, *In re Chinese Manufactured Drywall Products Liability Litigation* (Germano), MDL 2047 (E.D. La. Nov. 20, 2009) (Rec. Doc. No. 487).

[17]  Default Judgment, *In re Chinese Manufactured Drywall Products Liability Litigation* (Germano), MDL 2047 (E.D. La. May 11, 2010) (Rec. Doc. No. 3013).

[18]  Notice of Appeal, *In re Chinese Manufactured Drywall Products Liability Litigation* (Germano), MDL 2047 (E.D. La. June 10, 2010) (Rec. Doc. No. 3670) (5th Cir. Dkt. 10-30568).

[19]  Motion to Vacate the Default Judgment and Dismiss the Action, *In re Chinese Manufactured Drywall Products Liability Litigation* (Germano), MDL 2047 (E.D. La. Sep. 3, 2010) (Rec. Dec. No. 5436).

[20]  Order, *In re Chinese Manufactured Drywall Products Liability Litigation* (Germano), MDL 2047 (E.D. La. Sep. 9, 2010) (Rec. Doc. No. 5504).

[21]  Motion to Vacate the Default Judgment, Dismiss this Action, and to Seek Remand from the Court of Appeals, *In re Chinese Manufactured Drywall Products Liability Litigation* (Germano), MDL 2047 (E.D. La. Sep. 10, 2010) (Rec. Dec. No. 5515).

consideration" on the issue of personal jurisdiction "prior to determination of the appeal[] pending before the United States Fifth Circuit Court of Appeal[s]."[22]  On November 17, 2010, the Fifth Circuit remanded the *Germano* case so that this Court could determine whether there were sufficient grounds for the Court to exercise personal jurisdiction over TG.[23]

More than three months after appearing in the MDL, on September 21, 2010, TG moved to vacate the default judgment entered against it in the *Mitchell* action.  In support thereof, TG, among other things, argued that the Court did not have personal jurisdiction over it and suggested that it acted expeditiously in seeking to vacate the default.

On September 30, 2010 – exactly twenty months after Lennar filed its *Lennar v. Knauf* lawsuit and more than six months after a default was entered – TG appeared and moved to set aside the default.  In its motion, TG argued that the Florida state court lacked personal jurisdiction over TG and that, in any event, TG's inaction was excusable because TG "could not understand how the litigation could involve TG due to its extremely limited connection to the United States."[24]  TG's motion to vacate remains pending.

### B.    TAISHAN HAS NOT COOPERATED IN DISCOVERY

### 1.    <u>Taishan's Document Productions and Discovery Responses.</u>

Since Taishan appeared in the MDL, the parties have been focused on the issue of personal jurisdiction over Taishan.  Indeed, various parties served Taishan with interrogatories

---

[22] Order, *In re Chinese Manufactured Drywall Products Liability Litigation* (Germano), MDL 2047 (E.D. La. Oct. 25, 2010) (Rec. Doc. No. 6101).

[23] Order, *In re Chinese Manufactured Drywall Products Liability Litigation* (Germano), MDL 2047 (E.D. La. Nov. 19, 2010) (Rec. Doc. No. 6400); 5th Cir. Dkt. 10-30568, Doc. #00511296381.

[24] Motion to Vacate the Entry of Default, at p. 20, *Lennar Homes, LLC, et al. v. Knauf Gips KG, et al.*, Case No. 09-07901 (Miami-Dade County, Fla. Sep. 30, 2010) (Bass Affidavit Exh. 6).

and requests for production in the MDL and parallel state court proceedings, seeking to discover the facts related to Taishan's efforts to sell drywall to the U.S.  Taishan has repeatedly objected to the scope of this discovery and sought to limit the information it must produce.

Ultimately, Taishan produced approximately 26,000 pages of documents in response to various requests for production.[25]  A majority of that production, however, was Taishan's records of its purchase of waste paper from the U.S.[26]  Taishan produced thousands of pages of invoices, shipping records, and photographs for waste paper that it exported from the U.S. from 2006 through 2010.[27]

Although Taishan's production is certainly notable for what was produced, it is also notable for what was not produced.  Taishan  unilaterally limited its production to the records of those drywall shipments that are reflected on the profile forms that TG and TTP prepared in this litigation.[28]  Taishan has not, however, produced documentation from numerous other sales of drywall that were targeted and delivered to the U.S. and, particularly, Florida.  For example, Taishan only disclosed on its profile forms the sale of 34,000 sheets of drywall to Oriental Trading Company ("Oriental Trading").[29]  However, as Ivan Gonima testified, Oriental Trading

---

[25]  *See, e.g.*, Notice of Document Production, *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL 2047 (E.D. La. Dec. 9, 2011) (Rec. Doc. No. 11739).

[26]  *See* Chart showing Taishan's Waste Paper Purchases (Herman Affidavit Exh. 150).

[27]  *Id*.

[28]  Transcript of June 9, 2011 Status Conference, at p. 17, *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL 2047 (E.D. La. June 10, 2011) (Rec. Doc. No. 9429) (TG's counsel represented to the court that all of the documents underlying the transactions on the MPF have been produced and "there is nothing more for Taishan Gypsum to provide.  There is nothing else.").

[29]  Manufacturer Profile Forms for Taishan Gypsum Co., Ltd. and Taian Taishan Plasterboard Co., Ltd. ("Taishan Profile Forms") (Herman Affidavit Exh. 19).

purchased 60,000 sheets of drywall from Taishan.[30]  This is just one of what is many examples of shipments of Taishan drywall to the U.S. for which Taishan has not turned over the relevant documents.

    **2.**       **The Initial Depositions of Taishan Representatives.**

In April of 2011, several attorneys representing various parties in the MDL and parallel state court litigation travelled to Hong Kong to take the depositions of Taishan's corporate representatives.  In response to an Order from the Court, Taishan designated Peng Wenlong, Jia Tongchun, and Zhang Jianchun as the company's representatives for various topics.[31]  However, these witnesses (i) were not the people with the most knowledge concerning the majority of the proposed deposition topics, (ii) were woefully unprepared to testify concerning these matters, and/or (iii) purposefully evaded the questions presented to them.  As this Court has acknowledged, those depositions were, for the most part, a waste of time, energy, and expense.[32]  Indeed, the Court stated "the depositions that are taken are no help to me in that.  It's just a blank hole.  I mean, you've taken depositions but the depositions were of no value."[33]

As a result, the Homebuilders' Steering Committee ("HSC") and the Plaintiffs' Steering Committee ("PSC") each filed motions to compel further discovery from Taishan, including additional depositions, and for sanctions as a result of Taishan's conduct during these

---

[30] Deposition of Ivan Gonima dated Dec. 13, 2011 ("Gonima I Dep.") (Herman Affidavit Exh. 9) at 77:25 - 78:9.

[31] Minute Entry, *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL 2047 (E.D. La. Feb. 16, 2011) (Rec. Doc. No. 7511).

[32] Order, *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL 2047 (E.D. La. Sep. 9, 2011) (Rec. Doc. No. 10269).

[33] *Id.*

depositions.[34]  The Court granted these motions in part, requiring Taishan to make its witnesses available for a second set of depositions, instructing Taishan to ensure that the witnesses were knowledgeable and prepared to testify as to the designated deposition topics, and indicating that the Court would supervise the depositions to resolve any disputes that might arise during those depositions.[35]

### 3.    The Second Round of Depositions of the Taishan Representatives.

Shortly before the second round of depositions were scheduled to begin, Taishan's counsel informed the Court that its clients would not agree to comply with the Court's Order that required their participation and cooperation in the second round of depositions.  Thereafter, on November 23, 2011, Taishan's attorneys advised the Court and the other parties that Taishan would, in fact, participate in these depositions and make a "good faith" effort to comply with the Court's direction to make the witnesses Taishan had identified available for these depositions.[36] However, three of the previously-identified witnesses had now refused to testify at the upcoming deposition.[37]

Ultimately, the depositions of five Taishan representatives proceeded in Hong Kong, under the Court's supervision.  Although these depositions were more successful than the first go-around, the Taishan representatives were similarly evasive to many questions.  In fact, during

---

[34] *See*, *e.g*., HSC's Motion to Compel Additional Jurisdictional Depositions, *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL 2047 (E.D. La. May 3, 2011) (Rec. Doc. No. 8696).

[35] Order, *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL 2047 (E.D. La. May 11, 2011) (Rec. Doc. No. 8800); Minute Entry, *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL 2047 (E.D. La. May 26, 2011) (Rec. Doc. No. 9107).

[36] Letter dated Nov. 23, 2011 from Joe Cyr to Leonard Davis (Herman Affidavit. Exh. 145).

[37] *Id*.

the course of three of the five depositions, the Court admonished the witnesses of the importance of answering the questions asked of them and providing truthful and candid testimony.[38]

### 4. **Taishan Files Extensive Errata Sheets.**

Following the second round of depositions, Taishan's counsel filed extensive errata sheets, purporting to "correct" portions of the transcripts from these depositions.[39]   However, these proposed corrections went well beyond seeking to clarify transcription errors and other allowable grounds for correcting the testimony of a witness, let alone a party-deponent.  Indeed, Taishan sought to make wholesale substantive edits to the testimony, such as changing a response of "no" to "yes," and editing certain portions of these transcripts that would completely change the meaning of the testimony.[40]   These proposed changes are contrary to the rules of discovery and reflect a continuing effort from Taishan to obstruct and delay the ability of litigants before this Court to discover the facts that support a finding that Taishan is subject to personal jurisdiction as a result of its extensive sales and marketing efforts in Florida and elsewhere.[41]

---

[38] Deposition of Che Gang dated 1/11-12/2012 ("Che Dep.") (Herman Affidavit Exh. 6) at 98:5-99:21; Deposition of Peng Wenlong dated 1/13/2012 ("Peng II Dep.") (Herman Affidavit Exh. 201) at 479:10-22; Deposition of Peng Shiliang dated 1/11/2012 ("Peng S. Dep.") (Herman Affidavit Exh. 110) at 44:8-45:5 and 87:21 - 88:7.

[39] Motion to Strike Taishan's Errata Sheets, at Exh. H, *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL 2047 (E.D. La. Mar. 21, 2012) (Rec. Doc. Nos. 13154-47, 13154-48, and 13154-49).

[40] *Id.*

[41]  Taishan ultimately agreed to reduce these "erratas" significantly after discussions with the Court and the PSC.  *See* Letter from Courtney Colligan to Herman Herman Katz & Cotlar, LLP dated May 17, 2012 (Bass Affidavit Exh. 7).

III.   **FACTUAL BACKGROUND**

A.   **TG AND TTP OPERATED AS A SINGLE BUSINESS**

1.   **TG is a "Key Enterprise" in Manufacturing Drywall and Exporting its Goods to "Many Countries Such as the U.S.A."**

TG is a Chinese building materials manufacturer that touts itself as a $190 million company and one of the "key enterprises in producing new building materials in China."[42]  TG marketed itself through its website as a company whose products are "exported to many countries such as the U.S.A."[43]  Although it sells a variety of products, TG primarily focuses on the production of plasterboard, which is commonly referred to in the U.S. as drywall.  Indeed, TG represents itself as having a "plasterboard producing capacity reach[ing] 300 million $m^2$ per year."[44]

TG was formerly known as Shandong Taihe Dongxin Co., Ltd. ("Taihe").  In 2007, it changed its name to Taishan Gypusm Co., Ltd.[45]  For purposes of conducting its business, TG and its employees used the "Taishan" and "Taihe" names interchangeably.[46]  Even today, the TG website is located at http://www.taihegroup.com and TG uses the same recognizable logo that

---

[42]   Plaintiffs' Exh. 20 to Deposition of Jia Tongchun dated 1/9-1/10/2012 ("Jia II Dep.") (Taishan marketing and product brochure) (Herman Affidavit Exh. 5) ("The 14 branch factories hold the total capital assets of 1.2 billion Yuan.").

[43]   Archived TG webpage from Jan. 28, 2005 (Herman Affidavit Exh. 22).

[44]   *Supra*, n.42.

[45]   *See*, *e.g.*, TG Articles of Association, February 2006 (TG0020817-824) (Defendants' Exh. 34A to Jia II Dep. dated 1/9-10/2012) (Herman Affidavit Exh. 153); Shareholder Decisions of TG (TG0020855) (Herman Affidavit Exh. 154); TG Articles of Association, revised June 2006 (TG0020856-864) (Herman Affidavit Exh. 155).

[46]   *See*, *e.g.*, Gonima I Dep. at 26:19-27:6.

was formerly used by Taihe.[47]   Therefore, for purposes of this Response, TG can be referred to synonymously with "Taihe."

### 2.    TG Created TTP to Enhance its Export Business.

In February 2006, TG created TTP, a new business entity that would act as TG's wholly-owned subsidiary.  TG was the sole shareholder of TTP.[48]  The focus of the business of each entity was the same, namely the manufacture and sale of drywall.

According to the testimony of TG's Chairman of the Board, Jia Tongchun, TG created TTP to assist TG's existing customers in avoiding the payment of value-added taxes ("VAT") to the Chinese government.[49]  While TG had been able to qualify for a VAT exemption through its use of recycled materials in its drywall manufacturing process, certain customers that were purchasing and exporting TG's drywall requested VAT invoices.[50]  These customers were able to offset the amount of taxes they otherwise would pay on those goods through these VAT invoices. TG admittedly intended for sales from this newly-created subsidiary, TTP, to "primarily be made to companies who would ship the goods outside of China."[51]

### 3.    TG and TTP's Employees were Interchangeable.

In form and in function, TTP was TG.  The staff of TTP was made up entirely of individuals that, until that point, had been working for TG.  Specifically, the foreign sales force

---

[47] *Compare* Taishan website, available at http://www.taihegroup.com (last visited on May 18., 2012) (Bass Affidavit Exh. 8) *with* Taishan marketing brochure (Exh. 3 to Gonima I Dep.) (Herman Affidavit Exh. 160).

[48] Jia II Dep. (Herman Affidavit Exh. 200) at 646:17-21.

[49] Jia I Dep. at 480:24-481:24; Jia II. Dep. at 644:3-646:15; Deposition of Zhang Jianchun dated 4/6/2011 ("Zhang Dep.") (Herman Affidavit Exh. 162) at 141:24-142:21; Deposition of Fu Tinghuan dated 1/10/2012 ("Fu Dep.") (Herman Affidavit Exh. 2) at 109:4-22.

[50] *Id.*

[51] *See* Jia I Dep. at 480:24-481:24; *see also* Zhang Dep. at 140:5-142:21.

for TTP consisted of Peng Wenlong (Frank Peng), Che Gang (Bill Cher), and Yang Jiapo (Apollo Yang).[52]   Each of these employees worked for TG prior to the creation of TTP. According to Taishan, these individuals simply "volunteered" to leave TG and begin working for TTP when this new entity was formed.  There was no application, interviewing, or hiring process when these individuals all decided to "leave" TG and begin to work for TTP.

When these employees "volunteered" to begin working for TTP, they used the same telephone and facsimile numbers[53] and email addresses as those they used while employed by TG.[54]  In addition, the directors and managers of TTP were also employees or directors of TG. Mr. Fu Tinghuan, a director of TTP, also served as the Deputy General Manager and Director of Sales for TG.[55]   Zhang Jianchun served as the Secretary of the Board of Directors for TTP.[56]

---

[52] Peng II Dep. at 509:8-21; Che. Dep at 20:2-18; Peng S. Dep. at 55:18-23; Fu Dep. at 39:4-40:3, 108:4-7, 110:13-20.

[53] Plaintiffs' Exh. 20 to Jia II Dep. (Herman Affidavit. Exh. 5) at p. 16 (Taishan marketing and product brochure listing phone number for TG); Exh. 4 to Deposition of Peng Wenlong dated 4/7-8/2011 ("Peng I Dep.") (email dated Feb. 10, 2007 from Frank Clem to Melvyn of LN Steamship Pte Ltd.) (TG0000011) (Herman Affidavit Exh. 127) (same phone number for TTP); Plaintiffs' Exh. 20 to Jia II Dep. (Taishan marketing and product brochure) (Herman Affidavit Exh. 5) (indicating phone number for TG); Exh. 13 to Deposition of Wood Nation, Inc. dated Feb. 14, 2011 ("Wood Nation Dep.") (sales contract (WN7350) dated June 10, 2006 between Taishan and Wood Nation, Inc.) (TG0001482-484) (Herman Affidavit Exh. 100) (same phone number for TTP).

[54] Compare Email from Bill Cher dated Nov, 8, 2006 (Herman Affidavit Exh. 28) with Email from Bill Cher dated May 27, 2010 from same email address (Herman Affidavit Exh. 159).  Jia Tongchun, the Chairman of TG, when shown clear evidence that these employees were using the same exact phone numbers while employed with each entity, denied that TG and TTP employees shared offices or phone numbers.  *See* Jia II Dep. at 785:11 - 787:5 (confirming that Wenlong Peng, while an employee of TTP in 2007, used same telephone number as that listed on TG's marketing materials).

[55] Fu Dep. at 29:11-34:6.

[56] Zhang Dep. at 20:1-23, 22:21-24, 23:1-5.

From 2002 through the present, Mr Zhang also served as the Secretary of the Board of Directors for TG.[57]  Mr. Peng Shiliang, an employee of TG, served as the Director and the Chair of TTP.[58]

Later, when TTP ceased operations in 2008, these employees all returned immediately to jobs that were waiting for them at TG.[59]  In addition, when these employees returned to work for TG in 2008, they continued to service the exact same customers they had worked with while at TTP.[60]

### 4. TTP Used TG's Equipment to Manufacture Drywall.

When TTP began its operations in 2006, TTP started to produce drywall in a TG facility, using a production line and equipment that belonged to TG.  In order to document the "transition" of these operations, on February 10, 2006, TG provided funds to TTP through an initial "capital investment"[61] and simultaneously entered into a lease agreement to collect rent from TTP for the use of the drywall manufacturing facility.[62]  Although the annual rent was initially set at 100,000 Yuan,[63] which TG Chairman Jia testified was based on the "local rental rate," TG unilaterally increased the rent to 420,000 Yuan just a few days later.[64]  TG also entered

---

[57] Id.

[58] Peng S. Dep. at 74:21-76:22.  To this date, while Mr. Peng remains the sole employee of TTP, he is not paid by TTP, but rather by another Taishan subsidiary that also produces drywall.  Id.

[59] See Fu Dep. at 110:13-20; Peng S. Dep. at 29:10-19, 55:18-23.

[60] Deposition of John Gunn/Guardian Building Products dated July 22, 2011 ("Guardian Dep.") (Herman Affidavit Exh. 143) at 120:21 - 123:21; Gonima I Dep. at 145:17-147:10; 153:12-154:14; Exh. 12 to Gonima I Dep. (Herman Affidavit Exh. 159).

[61] Incorporation Registration Review Form for TTP (Translation of TG0020808-809) (Defendants' Exh. 33A to Jia II Dep.) (Herman Affidavit Exh. 173).

[62] Lease Agreement (Translation of TG0025446) (Defendants' Exh. 40A to Jia II. Dep.) (Herman Affidavit Exh. 179).

[63] Id.

[64] Lease Agreement (TG25415) (Defendants' Exh. 43A to Jia II. Dep.) (Herman Affidavit Exh. 180).

into an agreement to sell certain equipment to TTP.[65]  Although the purchase and sale agreement that documented this transaction indicated a sales price of 35,727,650.75 Yuan, the TTP financial statements do not reflect full payment from TTP to TG for this equipment.[66] Throughout TTP's two-year existence, it occupied TG's facilities and used TG's production lines, equipment, and employees.

When TTP ceased operations in the beginning of 2008, TTP returned its manufacturing facility and production line to TG.[67]   TTP immediately stopped paying rent to TG, notwithstanding the fact that there is nothing in the documentation provided by Taishan to suggest that TG released TTP of its obligation to pay rent over the remaining duration of the lease.  Nor is there any evidence that TTP paid any damages to TG for its early surrender of the leased premises.  Furthermore, when TTP closed, it promptly returned its equipment to TG. However, in the documents produced by Taishan, there is no record that TG actually made any payment to TTP for the return purchase of the equipment.

**5.    TTP Used the TG Logo without Restriction or Compensation to TG.**

When TTP began its operations and started to produce drywall, it hit the ground running with a sales force in place of the "former" TG sales representatives.[68]  Additionally, as TTP was created to service existing TG customers, TTP already had a solid customer base.[69]  When TTP

---

[65] Purchase and Sale Agreement (TG25413) (Defendants' Exh. 42A to Jia II. Dep.) (Herman Affidavit Exh. 175).

[66] 2006 Financial Statement of TTP (TG0026004-006) (Defendants' Exh. 45A to Jia II Dep.) (Herman Affidavit Exh. 176).

[67] Defendants' Exh. 44A to Jia II Dep. (Purchase and Sale Agreement) (TG25414) (Herman Affidavit Exh. 177).

[68] *Supra* at pp. 14-16.

[69] Jia I Dep. at 480:24-481:24; Jia II Dep. at 644:3-646:15; Zhang Dep. at 141:24-142:21; Fu Dep. at 109:4-22.

needed a brand to sell, it did not have far to look either.  TG entered into an authorization agreement with TTP, under which TTP was approved to sell "Taishan brand" drywall to "its" customers.[70]  The authorization allowed TTP to sell Taishan brand drywall for at least five years. In exchange for this authorization, TTP paid nothing to TG.[71]  In addition, TTP was not subject to any restrictions or limitations in its ability to sell drywall branded with the Taishan name.[72]

TTP also entered into a "Sole Agency Agreement" with a Miami, Florida-based building materials importer and supplier, Oriental Trading, pursuant to which TTP agreed to give Oriental Trading the exclusive U.S. rights to sell "DUN" drywall, a brand owned by TG.[73]  However, the license agreement – pursuant to which TG purported to authorize TTP to sell "Taishan brand" drywall – did not give TTP the right to also sell "DUN" brand drywall.  Furthermore, Taishan failed to provide any other documents suggesting that TTP was also licensed to sell TG's DUN brand.[74]  To the contrary, when TG's Chairman, Mr. Jia, was asked about TTP's sale of DUN drywall, Mr. Jia testified that TTP never sold DUN drywall, and was never authorized to sell DUN drywall.[75]  Despite Mr. Jia's testimony, the Sole Agency Agreement and related invoices clearly indicate that Oriental Trading purchased 60,000 sheets of DUN brand drywall from TTP.[76]

---

[70] Trademark Use Authorization (TG25412) (Defendants' Exh. 41A to Jia II. Dep.) (Herman Affidavit Exh. 174).

[71] Jia II Dep. at 676:14-677:2.

[72] *Supra* at n.70.

[73] Exh. 4 to Deposition of Ivan Gonima dated Feb. 14, 2012 ("Gonima II Dep.") (Sole Agency Agreement between Taishan and Oriental Trading) ("Sole Agency Agreement") (Herman Affidavit. Exh. 20).

[74] *Supra* at p.18 n.70.

[75] Jia II Dep. at 800:22-801:10, 802:6-10, 804:14-805:12.

[76] Gonima I. Dep. at 77:25 - 78:9.

In addition, when Oriental Trading engaged in negotiations to purchase the DUN brand drywall, TTP agreed to design and stamp each sheet of drywall with a custom label.[77]  Oriental Trading asked TTP to print the label in a red, white, and blue color scheme, consistent with the colors of the American flag.[78]  Although Taishan did not produce any documents to show that TG approved – or was even asked about – this request for a custom DUN label, TTP gladly complied, without providing any compensation to TG.[79]

### 6.  TTP Used the TG Name and Marketing Materials to Sell Drywall.

When TTP communicated with its potential customers to sell drywall, it regularly used the Taishan name and marketed the products, capabilities, and reputation of the Taishan brand.[80]  For example, when a representative from Guardian Building Supplies ("Guardian"), a South Carolina company, travelled to China to purchase drywall, it met with individuals who represented themselves as TG employees, and visited the Taishan manufacturing facility.[81]  John Gunn, the Guardian representative, met with Apollo Yang at the Taishan factory, and was given a business card reflecting that Mr. Yang worked as the "Chief of the Foreign Trade Department" for TG, and not TTP.[82]  Nevertheless, when Guardian ultimately entered into an agreement to purchase the drywall, the invoice indicated that the seller was Taian Taigao Tading Co., Ltd., a separate Taishan subsidiary that was responsible for exporting and shipping the drywall.  Later,

---

[77] Exh. 2 to Gonima II Dep. (instant message discussion dated May 22, 2007 between Ivan Gonima and Che Gang) (Herman Affidavit. Exh. 27) at pp. 5-7.

[78] *Id.*

[79] *Id.*

[80] *See, e.g.*, Peng I Dep. (Herman Affidavit. Exh. 4) at 87:7-88-4.

[81] Guardian Dep. at 49:1 - 52:16.

[82] Photocopy of business card for Apollo Yang (GBP001255) (Exhibit 2 to Guardian Dep.) (Herman Affidavit Exh. 156).

when Guardian complained about the quality of the drywall, TTP – not TG or the Taishan exporting subsidiary – entered into a settlement agreement with Guardian.[83]

Additionally, when Oriental Trading negotiated for the rights to become the "sole agent" of TG's DUN brand drywall in the U.S., Oriental Trading ultimately signed an agreement with TTP. However, when Ivan Gonima, the representative for Oriental Trading, travelled to China to meet the seller, he understood from representations from the Taishan sales people that he was negotiating with "Taihe" or "Taishan," which he never knew to be separate companies from TTP.[84] Peng Wenlong (Frank Clem) and Che Gang (Bill Cher), formally employed by TTP at that time, presented Mr. Gonima with a Taishan brochure, directed him to the Taishan website, and represented to Mr. Gonima that their company was "part of a huge building materials group producer."[85] TTP's sales representative, Wenlong Peng, also admitted that TTP would regularly use TG's "Taishan" name and refer to the marketing and sales materials of Taishan when giving an introduction of his company.[86] Although "TTP was a newly founded company," Mr. Peng wanted to represent to his potential customers "that TTP company has a strong background," obviously relying on the longstanding reputation of TG.[87]

Furthermore, TTP sold products from all of the various Taishan companies and affiliates to accommodate requests from its customers.[88] For example, when a customer asked Peng for

---

[83] Settlement and Release Agreement (Exh. 27 to Guardian Dep.) (GBP001130-133) (Herman Affidavit Exh. 158).

[84] Gonima I Dep. at 26:10-28:6.

[85] Gonima I Dep. at 44:9-21, 89:7-10, 96: 11-25; Exh. 3 to Gonima I Dep. (Taishan marketing brochure) (Herman Affidavit Exh. 160).

[86] Peng II Dep. at 484:17 - 485:9.

[87] *Id*.

[88] *Id*. at 472:11 - 473:2.

pricing on metal studs – which TTP admittedly did not manufacture – he would simply provide pricing from other "companies under the umbrella of TG."[89]   Because TTP and TG acted as a single business enterprise, it did not matter which of the companies under the Taishan umbrella manufactured the products and which ultimately sold them.

### 7.   TG Settled the Debts of TTP and Vice Versa.

Despite Taishan's insistence during this litigation that TG and TTP operated as separate entities, the companies themselves did little to demonstrate this separateness during the course of TTP's limited existence.   Indeed, on at least two occasions, the entities negotiated to settle each other's debts with U.S. customers.

### a.   *Guardian Building Products*

In 2005 and 2006, Guardian negotiated with Taishan representatives for the purchase of drywall that was to be shipped to the U.S.   In order to secure this sale, Taishan told Guardian that it had customers in Florida and had shipped drywall to Florida previously.[90]   Ultimately, Guardian received delivery of approximately 1,000,000 square feet of drywall.   This drywall was delivered to locations in North Carolina, Virginia, and Florida.[91]   Throughout the course of these negotiations, Guardian was in communications with Apollo Yang (Yang Yiapo), a TG employee who later "volunteered" to join TTP when that entity was organized.[92]   Guardian was provided

---

[89] *Id*.

[90] Guardian Dep. (Herman Affidavit Exh. "143") at 54:20-59:10.

[91] *Id*. at 79:7-25.

[92] *Id*. at 49:1 - 52:16.

business cards,[93] marketing materials and other documentation[94] suggesting that it was dealing with TG.

Later, in 2006, Guardian began to receive complaints from its own customers that the Taishan drywall was defective.[95]  When Guardian contacted Taishan to address these complaints, Guardian learned for the first time that it was a Taishan subsidiary – Taian Taigao Trading Co., Ltd. – and not TG that was the signatory to the contract under which Guardian was purchasing this drywall.  Nevertheless, when Guardian notified Taishan of the defective drywall, it was Mr. Jia, the Chairman of TG, that responded to these complaints.[96]  Nearly two years later, in October 2008, Guardian finally was able to resolve this issue.  However it was neither TG nor Taian Taigao Trading Co., Ltd. that settled this matter with Guardian.  Rather it was TTP – through Mr. Jia, who evidently had authority to bind both TG and TTP – that agreed to pay Guardian the sum of US $380,000.00 to settle its claims.[97]

### b.   *Oriental Trading Company*

TG and TTP's dealings with Oriental Trading is another example where companies under the Taishan umbrella assumed the liabilities of one another.  When Oriental Trading entered into a Sole Agency Agreement with TTP to become the exclusive distributor of Taishan's DUN-brand drywall in the U.S., TTP required a $100,000.00 deposit from Oriental Trading.[98]  After it

---

[93] Photocopy of business card for Apollo Yang (GBP001255) (Exhibit 2 to Guardian Dep.) (Herman Affidavit Exh. 156.)

[94] Plaintiffs' Exh. 20 to Jia II Dep. (Herman Affidavit Exh. 5.)

[95] Guardian Dep. at 135:19 - 136:5.

[96] Guardian Dep. at 238:15-239:3.

[97] Settlement and Release Agreement (GBP001130-133) (Ex. 27 to Guardian Dep.) (Herman Affidavit Exh. 158).

[98] Sole Agency Agreement (Herman Affidavit Exh. 20).

no longer made economic sense for Oriental Trading to continue purchasing drywall from TTP, Oriental Trading requested the return of its deposit.[99]

Bill Cher – who was first an employee of TG and later entered into the Sole Agency Agreement with Oriental Trading on behalf of TTP – was the person responsible for responding to Oriental Trading's demand for the return of its deposit. However, TTP ceased its operations prior to the time Oriental Trading was able to resolve this claim. Therefore, Mr. Cher continued to negotiate with Oriental Trading over this dispute after he returned to work for TG.[100] Mr. Cher, now wearing his TG hat, attempted to convince Oriental Trading to purchase additional materials from TG in exchange for the $100,000.00 deposit that Oriental Trading had paid to TTP.[101] Yet again, in a transaction that was negotiated by one entity (in this case TTP), the other entity (TG) stepped in to attempt to resolve the dispute that arose from that transaction.

### B. TAISHAN TARGETED THE UNITED STATES AND, PARTICULARLY, FLORIDA FOR THE SALE OF ITS DRYWALL

In 2005 and 2006, the combination of a housing boom and widespread damage from significant hurricanes led to a shortage of building materials, including drywall, in the Southeast region of the U.S.[102] When U.S. manufacturers could not keep up with the demand, foreign manufacturers, such as Taishan, saw an opportunity to capitalize on the U.S. drywall shortage. In fact, TG and its wholly-owned subsidiary, TTP, made substantial efforts to market and sell their drywall to customers in the United States.

---

[99] Che Dep. at 79:4-81:6.

[100] Gonima I Dep. at 145:17-147:10; 153:12-154:!4; Exh. 12 to Gonima I Dep. (Herman Affidavit Exh. 159).

[101] *Id.*

[102] *Germano*, 706 F. Supp. 2d at 659.

Although Taishan is now attempting to downplay its involvement in the sale of drywall to the United States, the evidence that has been uncovered in this litigation tells the true story. From 2005 through 2008, Taishan was actively targeting the sale of its drywall to companies in Florida and elsewhere in the U.S.  Through these marketing efforts, Taishan represented itself as a company whose "products not only sell well in [Taishan's] domestic market [but] also export to many countries e.g. U.A.E., Indonesia, India, Russia, **U.S.A.** etc."[103]  Now, however, Taishan claims that its sales representatives were not truthful when they boasted their experience exporting materials to the U.S.  As TG's Deputy General Manager Fu Tinghuan explained: "In China, we exaggerate a little bit. Exaggerate a little bit, that's allowed."[104]

If, as Taishan claims, it was previously "exaggerating" about its ability to service the U.S. market during its sales pitches, it is now being too modest.  Taishan's efforts to target its products to the U.S. market involved more than just a "few isolated sales."[105]  Indeed, from 2005 through 2008, Taishan: (i) invited and hosted several potential U.S. customers to its drywall manufacturing facilities in China; (ii) targeted and entered into agreements with U.S. companies to act as Taishan's "sole agent" for the distribution of Taishan brand drywall in the U.S.; (iii) manufactured and marketed their drywall in an effort to comply with U.S. standards and specifications; (iv) sent drywall samples to its potential U.S. customers; and (v) ultimately

---

[103] Plaintiffs' Exh. 20 to Jia II Dep. (emphasis added) (Herman Affidavit Exh. 5); *see also* Exh. 10 to Peng I Dep. (email dated 5/11/2007 from Peng Wenlong to Mr. Zhang touting Taishan's export capabilities: "The export of gypsum boards to the United States last year was 18 million square meters, and the 127mm gypsum board has passed the US Professional ASTM Inspection.") (TG0022728 & translation) (Herman Affidavit Exh. 16).

[104] Fu Dep. at 86:14-15.

[105] Taishan MOL, at pp. 1-2.

manufactured and sold in excess of 85,000,000 square feet of drywall that was exported to customers in the U.S.

1.   **Drywall Shortages in the U.S.**

In 2004 through 2006, a major building boom – particularly in the housing industry – occurred in the United States.[106]   Although the housing market exploded across the entire country, some of the most significant activity was in Florida.   In addition, several significant hurricanes struck Florida and the Gulf Coast of the U.S., destroying several thousand homes.[107]   As a result of these overlapping events, U.S. manufacturers were unable to satisfy U.S. builders' demand for building materials, including drywall.[108]

Because U.S. manufacturers could not produce enough drywall to keep up with the demand, U.S. building materials suppliers had to look elsewhere.   Specifically, companies from Canada, Mexico and, most notably, China,[109] seized the opportunity to step in and fulfill the U.S. drywall requirements.   In 2006 alone, more than 218,000 metric tons of Chinese-manufactured drywall were imported into the U.S.[110]

---

[106] *Germano*, 706 F. Supp. 2d at 659.

[107] *Id.*

[108] *Id.*

[109] *See* United States Consumer Product Safety Commission, May 25, 2010, CPSC Identifies Manufacturers of Problem Drywall Made in China, Release #10-243, available at http://www.cpsc.gov/cpscpub/prerel/prhtml10/10243.html (Bass Affidavit Exh. 9); U.S. Geological Survey, Mineral Commodity Summaries, January 2011 ("USGS Summary"), available at http://minerals.usgs.gov/minerals/pubs/commodity/gypsum/mcs-2011-gypsu.pdf (Bass Affidavit Exh. 10).

[110] *See* USGS Summary.  By comparison, only 300 metric tons of Chinese-manufactured drywall were imported into the U.S. in 2010, which represented less than 1% of total 2010 gypsum imports, or 0.14% of the amount of Chinese-manufactured drywall imported in 2006.  *Id.*

### 2.   Taishan Capitalized on this Opportunity for U.S Sales.

Taishan recognized this opportunity to capitalize on the increased demand in the U.S. drywall market and set out on a concerted and targeted marketing campaign to sell its drywall in the U.S.  The Taishan sales representatives used "Western names" and communicated with U.S. customers in English.[111]  On the "Introduction" page on its website, Taishan advertised that its "products are exported to many countries such as the U.S.A."[112]  Taishan also marketed its drywall manufacturing capabilities through a popular global trade website, Alibaba.[113]

### 3.   Taishan Hosted Potential U.S. Customers at its Facility in China.

In order to further solicit U.S. business, Taishan invited and hosted representatives of several U.S. companies to visit its manufacturing facilities in China.  During these visits, Taishan made the hotel and travel arrangements, hosted tours of Taishan's manufacturing facilities, provided marketing materials on Taishan's full product line, and discussed pricing and shipment terms.[114]  These visits proved fruitful, resulting in multiple sales of drywall from Taishan to the U.S.

In 2005, Taishan hosted Phillip Perry, a representative of Venture Supply, at its manufacturing facility in China to discuss the possibility of selling Taishan drywall to the U.S.[115]

---

[111] Che Dep. at 18:22-19:10.

[112] Taishan's archived Web Page of Jan. 28, 2005 (Herman Affidavit Exh. 22).

[113] Deposition of Carn Construction Corporation dated Dec. 8, 2011 (Herman Affidavit Exh. 23) at 15:17-24; Deposition of Yongzhi Yang of Stone Pride International Corporation dated Feb. 21, 2012 (Herman Affidavit Exh. 24) at 79:14-81:10.  Alibaba is an online marketplace that connects buyers and sellers of Chinese goods through a network of "more than 79.7 million registered users in more than 240 countries and regions."  *See* http://news.alibaba.com/specials/aboutalibaba/aligroup/index.html (Alibaba website) (last visited May 18, 2012) (Bass Affidavit Exh. 11).

[114] Gonima I Dep. at 45:15-46:11.

[115] Peng I Dep. at 366:10-367:16.

During this multiple-day meeting, Taishan discussed the possibility of making Venture Supply the "USA representative" for Taishan drywall.[116]   Taishan's sales pitch proved successful. Although Taishan was looking for a commitment from Venture Supply to purchase 300,000 sheets of its drywall every month,[117] Venture Supply ultimately agreed to  issue a letter of credit to Taishan for an initial purchase of  "120,000 sheets of drywall to meet all USA ASTM ratings and fire rating standards."[118]

In February 2006, Bob Scharf of Devon International traveled to the Taishan factory to locate drywall for his customers in the U.S.[119]  When Mr. Scharf visited the Taishan factory, the Taishan representatives gave him a tour of the facilities[120] and assurances that the Taishan drywall complied with American Society of Testing and Materials ("ASTM") requirements.[121] Soon thereafter, in March of 2006, Taishan agreed to ship 485,044 sheets of drywall to Devon, with delivery to Pensacola, Florida.

In June 2006, Peng Wenlog (also referred to as Frank Clem) made arrangements to host Richard Hannam of Wood Nation, a supplier from Tampa, Florida, at Taishan's facilities.[122] Accompanying Mr. Hannam on that visit was David Wei, a representative of BNBM USA, an

---

[116] *Id.*; *see also* Email dated 11/7/2005 from Phillip Perry to Sam Porter and Venture Supply employee (Herman Affidavit Exh. 73).

[117] Email dated 12/14/2005 from Sam Porter to Frank Clem (V002358-361) (Ex. 22 to Deposition of Samuel G. Porter dated 12/16-17/2009) (Herman Affidavit Exh. 75).

[118] Letter of Credit Application for Venture Supply (V001811-818) (Ex. 39 to Deposition of Samuel G. Porter dated 12/16-17/2009) (Herman Affidavit Exh. 79).

[119] Deposition of Robet Scharf, President of Devon International Trading dated Mar. 24, 2011 (Herman Affidavit Exh. 165) at 50:12-19 and 104:12-24.

[120] *Id.* at 113:16-114:6

[121] *Id.* at 63:6-9

[122] Exh. 7. to Peng I Dep. (Herman Affidavit Exh. 58).

affiliate of Beijing New Building Materials Public Limited Co.[123]  During the visit, Mr. Hannam indicated to Taishan that Wood Nation "was interested in purchasing 500 containers of drywall for shipment to the U.S. beginning June 2006 through December 2006."[124]  These negotiations were again successful for Taishan.  As a result of this visit, Taishan arranged the shipment of 40 containers of drywall to Wood Nation in Florida.[125]

A few months later, in October 2006, Taishan hosted Ivan Gonima from Oriental Trading at its manufacturing facility in China.[126]  When Mr. Gonima arrived in China, Bill Cher picked him up at his hotel, drove him to the factory, and gave him a tour of the drywall manufacturing facilities.[127]  Mr. Cher also provided brochures and marketing materials of various other Taishan products to Mr. Gonima.[128]  Mr. Cher then got down to business, discussing "the terms and the pricing and the shipping."[129]  Yet again, Taishan's hospitality led to profitable business, with Taishan shipping 30 containers of drywall to Oriental Trading, which amounted to a total of approximately 60,000 sheets of drywall being delivered to Florida.[130]

---

[123] *Id.*

[124] Deposition of Richard Hannam dated Feb. 13, 2012 ("Hannam Dep") at 94:8-98:11 (Herman Affidavit Exh. 38); Exh. 4 to Hannam Dep. (Herman Affidavit Exh. 39).

[125] Taishan Profile Forms (Herman Aff Exh. 19); *see also* Wood Nation Dep. (Herman Affidavit Exh. 101) at 82:6-83:5; Exh. 15 to Wood Nation Dep. (invoices for sales of Taishan's drywall to Wood Nation) (TG0001545-546) (Herman Affidavit Exh. 102); Exh. 28 to Wood Nation Dep. (emails and related documents regarding shipments to Wood Nation and revised contract) (Herman Affidavit Exh. 103); Exh. 4 to Richard Hannam Dep. at ¶ 10.

[126] Gonima II Dep. on Feb. 14, 2012 (Herman Affidavit Exh. 60) at 40:6-41:1.

[127] Gonima I Dep. on Dec. 13, 2011 (Herman Affidavit Exh. 9) at 40:19-42:13.

[128] *Id.* at 44:9-21.

[129] *Id.* at 45:15-46:11.

[130] *Id.* at 77:25 - 78:9.

In sum, Taishan disclosed through the documents it has produced in this litigation that, from 2005 through 2008, more than 85,000,000 square feet of Taishan drywall was exported to the U.S., which resulted in sales of more than $8.5 million in revenue to these companies. However, the actual amount of Taishan drywall that was ultimately delivered to the U.S. over these years was most certainly more than that.  Taishan boasted to potential U.S. customers that it exported approximately 194 million square feet of its drywall to the U.S. in 2006 alone.[131]

### 4.     TTP Granted "Sole Agent" Rights to a Florida Supplier for Nationwide Sales of Taishan's Drywall.

As further evidence of its efforts to target drywall sales in the U.S., Taishan negotiated with several American companies for the rights to be Taishan's "sole agent" for sales in the U.S. Indeed, as early as November of 2005, Frank Clem of Taishan was in negotiations with Venture Supply for the rights to be the exclusive distributor of Taishan drywall in the U.S.[132]  Taishan and Venture Supply never agreed, however, on terms of an exclusive distributor agreement.[133]

Later, however, on October 20, 2006, TTP entered into a "Sole Agency Agreement" with Oriental Trading, whereby Oriental Trading received the exclusive rights to sell Taishan's DUN-brand drywall in "the territory of the U.S.A."[134]  The Sole Agency Agreement was rather broad in scope, including 1/2" as well as 5/8" thick drywall, and lengths of 8, 9, 10, or 12 feet.[135]  In order to secure these "exclusive rights," Oriental Trading was required to maintain aggressive

---

[131] Email from Peng Wenlong to Owen Li dated Nov. 20, 2006 (TG0022595) (Herman Affidavit Exh. 10); Email from Peng Wenlog to Mr. Zhang dated May 11, 2007 (TG0022728) (Herman Affidavit Exh. 16).

[132] Deposition of Samuel Porter from Dec. 16, 2009 ("Porter Dep.") (Herman Affidavit Exh. 72) at 127:6-130:18.

[133] *Id*.

[134] Sole Agency Agreement (Herman Affidavit Exh. 20).

[135] *Id.*

sales goals of 20,000 sheets of drywall over the first three months of the agreement, and at least one million additional sheets in the following 12 months.[136]

### 5. Taishan Manufactured its Drywall to U.S Specifications and Standards.

Taishan suggests that it did not know that the drywall it was manufacturing was destined for the U.S. As a Taishan's sales representative suggested, "Don't tell me where you're sending the goods to. Just give me the money. You can take it wherever you want to."[137] However, the evidence that was been uncovered in this litigation is clearly at odds with Taishan's stated ignorance. The evidence shows Taishan: (i) manufactured its drywall to U.S. specifications, using English rather than metric measurements; (ii) obtained and provided its customers with documentation that its drywall complied with U.S. testing requirements, even stamping the applicable ASTM standards on the face of the product; (iii) agreed to print custom labels for its customers, including the words "Tampa, Florida" and a Tampa-area telephone number on the face of the drywall as requested by a Florida company; and (iv) was eager to accommodate a request from a Miami-based company to modify the DUN logo on its drywall to incorporate a red, white, and blue color scheme, "because those are the colors of the American Flag."[138]

---

[136] *Id.* The sole agency relationship was to continue in the event Oriental Trading satisfied these target volumes. If Oriental Trading did not reach these sales volumes, Taishan had the right to cancel the Sole Agency Agreement and Oriental Trading's exclusivity rights. However, no documents that have been produced in this litigation suggest that Taishan ever cancelled this agreement. Indeed, because the Sole Agency Agreement has not been cancelled, Oriental Trading, even today, arguably remains the sole agent for the sale of DUN brand drywall in the U.S.

[137] Che Dep. (Herman Affidavit Exh. 6) at 195:9-12; *see also* Che Dep. at 194:16-196:12.

[138] Exh. 2 to Gonima II Dep. (Instant message discussions from 2/6/2007 to 10/11/2007 between Che Gang (Bill Cher) of Taishan and Ivan Gonima of Oriental Trading) (Herman Affidavit at Exh. 27) at pp. 5-8; Exhibit contrasting Original Taishan Dun Logo (from Taishan's product brochure-Plaintiffs' Ex. 20 to Jia II Dep. with Redesigned red, white and blue logo for American customers (TG0026019); Plaintiffs' Ex. 28 to Jia II Dep. (Herman Affidavit Exh. 42).

Taishan ordinarily manufactures its drywall to metric dimensions.[139]  However, for its U.S. customers, Taishan gladly provided pricing for drywall that would be manufactured to typical U.S. sizes, with a thickness of either 1/2" or 5/8" and dimensions of 4 feet wide by 8, 9, 10, or 12 feet in length.[140]  Consistent with that pricing, Taishan ultimately manufactured the drywall that was sold to U.S. customers in dimensions used in the U.S. building construction industry.[141]

Additionally, Taishan knew that its customers in the U.S. would require evidence that Taishan's drywall complied with the applicable U.S. testing standards.[142]  Therefore, after Taishan first recognized the opportunity to sell its drywall to U.S. customers, it had testing performed on its drywall to assure its U.S. customers that the drywall complied with ASTM requirements.[143]  In fact, Taishan provided a copy of an ASTM certificate to nearly all of its U.S. customers as part of its marketing and sales efforts.[144]  In addition, Taishan included within its

---

[139]  *See*  http://www.taihegroup.com/english/contents/77/15.html  (Bass Affidavit Exh. 12) (Taishan's website, indicating the range of available sizes for its "standard gypsum board" in millimeters, but acknowledging that "We can produce by both Metric and Imperial systems.").

[140] Sole Agency Agreement (Herman Affidavit Exh. 20).

[141] Taishan Profile Forms (Herman Affidavit Exh. 19).

[142] Venture Supply, one of Taishan's initial U.S. customers in the 2005 through 2008 time period, made clear to Taishan that it was necessary to have test results indicating that the drywall complies with the requirements of the applicable ASTM standards for drywall.  *Germano*, 706 F. Supp. 2d at 661; Porter Dep. at 53:24-59:21; Exh. 39 to Porter Dep. (Letter of Credit Application for Venture Supply) (V001811-8118) (Herman Affidavit Exh. 79).

[143] *Id.*

[144] *See* Gonima I Dep. at 141:23-142:2; Deposition of Carn Construction dated Dec. 8, 2011 ("Carn Construction Dep.") (Herman Adffidavit Exh. 23) at 53:4-7, 53:11-14; Exh. 27 to Wood Nation Dep. (certificates showing that Taishan's drywall meets ASTM standards) (Herman Affidavit Exh. 37); Exh. 4 to Hannam Dep. (draft affidavit of Richard Hannam, President of Wood Nation) (Herman Affidavit Exh. 38) at ¶¶ 7-9; Hannam Dep. (Herman Affidavit Exh. 39) at 94:8-98:11; Exh. 2 to Deposition of GD Distributors, LLC dated Dec. 30, 2011 ("GD Distributors Dep.") (ASTM testing certificates) (Herman Affidavit Exh. 40); GD Distributors
(. . . Continued)

marketing materials statements that the Taishan drywall "is in accordance with ISO9001 standard ISO14001 standard and ASTM standard."[145]   And, when Taishan reached agreement with its U.S. customers to sell them drywall, the contracts specified that the drywall must comply with ASTM C-1396, the standard specification for "gypsum board."[146]

Taishan also accommodated requests from U.S. customers for custom labels or markings on the face and edge tape of the drywall.   Mr. Gonima, through his experience purchasing drywall from Taishan, acknowledged that "Taishan was happy to do a custom label."[147]   On several occasions, Taishan printed the U.S. supplier's name on the face of the drywall (Venture

---

(Continued . . .)

Dep. (Herman Affidavit Exh. 25) at 27:23-28:10, 54:25-58:19; Deposition of OEG dated Feb. 16, 2011 ("OEG Dep.") (Herman Affidavit Exh. 11) at 63:10-64:10; Exh. 16 to OEG Dep. (email dated 8/3/2006 from Bill Cher to Ernest Teitelbaum) (TG0000733) (Herman Affidavit Exh. 41); Exh. 20 to OEG Dep. (email dated 8/24/2006 from Frank Clem to Ernest Teitelbaum) (TG0022448) (Herman Affidavit Exh. 35).

[145] *See*, *e.g.*, Marketing Materials from Taishan Production (TG0024193-TG0024198) (Bass Affidavit Exh. 13).

[146] *See*, *e.g.*, Wood Nation Contract (Herman Affidavit Exh. 100) (TG0001482-TG0001484) ("'Regular' and 'Ceiling' products shall be produced to American Society for Testing and Materials ("ASTM") C 1396-04 Standards.  'ASTM C 1396-04' shall be stamped on the back of each piece."); Exh. 17 to OEG DEP (Herman Affidavit Exh. 123) (Contract dated 8/4/2006 (SDTH06080401) for the sale of 28,400 sheets of drywall to TOV Trading New York, USA & invoice) (TG0000734-736, TG0000738) ("the gypsum board should be produced as per the relative standard of ASTM C-1396"); Exhs. 19 & 20 to Che Dep. (Herman Affidavit Exh. 86) (Taishan's contract (SDTH0600902) dated 9/2/2006 with B. America Corporation) (TG0021705 & TG0021695) (same).

[147] Gonima I Dep. at 51:1-3; *see* Exh. 9 to Wood Nation Dep. (email dated 5/30/2006 from Richard Hannam, President of Wood Nation, to David Wei (Wei Chunshan) of BNBM USA, forwarded to Peng Wenlong (Frank Clem), requesting custom labels printed in English for shipment to Wood Nation) (TG0000460) (Herman Affidavit Exh. 47); Exh. 8 to Wood Nation Dep. (email dated 6/3/2006 from Richard Hannam to David Wei, cc Peng Wenlong, with revisions to custom labels for shipment to Wood Nation) (TG0000461) (Herman Affidavit Exh. 48); *see also* Email dated 6/3/2006 from Richard Hannam to David Wei, cc to Peng Wenlong, with revisions to custom labels for shipment to Wood Nation (TG0001377-378) (Ex. 22 to Peng II Dep.); Peng I Dep. at 355:9-356:2.

Supply. Inc., Marathon Construction, etc.).[148]  Taishan also printed American barcodes on their products at the request of their U.S. customers.[149]

Moreover, in response to a request from Wood Nation, Taishan agreed to print the words "Tampa, Florida" on the drywall it manufactured for that Florida customer.[150]  Ultimately, because Taishan's equipment in its manufacturing plant could not print that much text on the drywall, Taishan and Wood Nation agreed to modify the label to include the customer's telephone number, which referenced the local "813" area code for Tampa.[151]  In fact, the drywall included the following markings on the face:

# TAIAN TAISHAN PLASTERBOARD CO. GYPSUM DRYWALL PER ASTM C 1396 04 CONTACT: 813-994-6499.[152]

As this label clearly indicates, not only did Taishan advertise that its drywall was being sold in Florida, it also marketed that its products complied with the applicable ASTM requirements, and included a Florida contact number to reassure customers that there was a local contact with which these end users could address any inquiries or concerns.

Later, when Taishan agreed to offer Oriental Trading the right to be its "Sole Agent" in the U.S., it readily agreed to modify the DUN brand logo in accordance with Oriental Trading's

---

[148] Peng I Dep. at 355:9-356:2; Gonima I Dep. at 50:4-9; Exh. 2 to Gonima II Dep. (Herman Affidavit Exh. 27) at pp. 1-2; Exh. 19 to OEG Dep. (Herman Affidavit Exh. 34).

[149] OEG Dep. at 116:23-117:5, 133:8-136:16 (there was "not even a question" that "Taishan understood they were generating [customized] metal studs for sale to OEG and that OEG was going to be selling them in the New York metropolitan area.").

[150] Peng II Dep. at 514:10-516:4.

[151] Id. at 515:9-20; Taishan Profile Forms (Herman Affidavit Exh. 19).

[152] See Taishan Profile Forms (Herman Affidavit Exh. 19).

request.[153]  Oriental Trading provided a custom artwork file with a modified DUN logo to Che

Gang (Bill Cher), and asked that Taishan use that logo on the drywall it was manufacturing for

Oriental Trading.[154]  After confirming that he was using the right colors, Che Gang sent the

custom artwork to the Taishan factory for it to be implemented in the production line.[155]

Taishan's corporate representatives confirmed in their depositions, "[a]s long as . . . I get

the payment, I will ship the product" anywhere in the U.S.[156]  Indeed, "the more product

[Taishan] sell[s], the better it is for the company."  According to Taishan, "[i]t doesn't matter

who I sell [the drywall] to, as long as I get the money."  In order to make those sales, Taishan

would agree to print or stamp anything on their drywall, so long as "it is not illegal" and "not

against any regulations."[157]

### 6.      Taishan Shipped Samples of its Drywall to Potential Customers in Florida.

As part of Taishan's efforts to reach the Florida market, Taishan also shipped samples of

its drywall to potential customers in Florida and elsewhere in the U.S.[158]  When Taishan was just

beginning to gear up its efforts to sell drywall in Florida, a company from Weston, Florida

---

[153] Exhibit 2 to Gonima II Dep. (Herman Affidavit Exh. 27) at pp. 5-7; *see also* Exhibit contrasting original Taishan DUN logo with redesigned red, white and blue logo for Florida customer (Herman Affidavit Exh. 42).

[154] Exhibit 2 to Gonima II Dep. (Herman Affidavit Exh. 27) at pp. 5-7.

[155] *Id.*

[156] Fu. Dep. at 57:23-58:5.

[157] Peng II Dep. at 514:10-516:4.

[158] Che Dep. at 312:6-313:6 ("For the handling of samples sent to the customers, it was that customer would tell us the specification and models that they needed. If we happened to have such samples with us, and the customer would willing to pay for the postage, the shipping cost, then we would provide the sample in accordance with their requirements."). At some point, the company decided not to send the samples for free, "[b]ecause there are too many Americans wanting samples[.]" Plaintiffs' Exh. 29A to Jia II Dep. (email dated 12/11/2005 from Yang Jiapo (Apollo Yang) to Leon Liu) (translation of TG0019840) (Herman Affidavit Exh. 50); Jia II Dep. at 852:10-13; *see also* Peng I Dep. at 269:15-270:2.

requested samples of Taishan's drywall.[159]  Taishan complied, shipping three different types of samples to Carn Construction Corp. in Florida.[160]  Several weeks later, Taishan shipped additional samples to Carn Construction in Florida so that the company could perform testing on Taishan's drywall.[161]

Later, when Oriental Trading was in negotiations to acquire the exclusive rights to distribute Taishan's DUN brand drywall in the U.S., Ivan Gonima requested samples from his Taishan contact, Bill Cher.[162]  Taishan obliged and shipped these drywall samples to Mr. Gonima in Florida, who showed the samples to other potential customers in Florida.[163]

### 7.    <u>Taishan Sold Drywall Directly to Suppliers in Florida.</u>

Taishan communicated directly with U.S. companies to market and sell drywall in the U.S. and, particularly, in Florida.  On at least three occasions, Taishan arranged to sell its drywall

---

[159] Exh. 3 to Carn Construction Dep.(Herman Affidavit Exh. 53) (email dated 11/23/2005 requesting that Taishan's drywall be shipped to Carn Construction in Florida via Federal Express) (TG0001409 & translation).

[160] Carn Construction Dep. at 25:13-22.

[161] Exh. 4 to Carn Construction Dep. (Herman Affidavit Exh. 54) (email dated 12/14/2005 requesting that additional samples of Taishan's drywall be sent to Carn Construction for testing) (TG0024162).

[162] *See* Exh. 2 to Gonima II Dep. (Herman Affidavit Exh. 27) at p. 31 (instant message discussion dated 5/22/2007 between Ivan Gonima and Che Gang) (Che Gang agreed to ship samples of fireproof drywall sheets to Ivan Gonima); Exh. 6 to Gonima I Dep. (Herman Affidavit Exh. 49) (email dated 9/22/2006 from Che Gang to Ivan Gonima) (TG0000527- 528); Gonima I Dep. at 109:20-110:5.

[163] Exh. 6 to Gonima I Dep. (Herman Affidavit Exh. 49) (email dated 9/22/2006 from Ivan Gonima to Che Gang) (TG0000527- 528) ("First of all let me thank you for sending me the samples; I receicved them two days ago.  I am impressed with your quality and our customers having the opportunity of looking at them are as well.").

directly to suppliers in Florida: Wood Nation, B. America, and Oriental Trading.  These sales alone resulted in the importation of 9.4 million square feet of Taishan drywall in Florida.[164]

### a.     *Wood Nation*

In June 2006, Taishan entered into a contract with Wood Nation for the sale of 500 containers of drywall with delivery to Tampa, Florida, and each container holding 660 pieces.[165] Ultimately, Wood Nation ended up purchasing "40 containers of wallboard [that] were shipped to the Port of Tampa in two shipments, one in July 2006 and the other in August 2006."[166]

### b.     *B. America Corporation*

On September 2, 2006, shortly after Taishan shipped several containers of drywall to Wood Nation, Taishan entered into an agreement to sell its drywall to B. America Corporation.[167]  The contract required Taishan to produce drywall that complied with ASTM requirements and called for delivery in Miami, Florida.[168]  Although that initial invoice was later cancelled by the parties, Taishan ultimately sold drywall to B. America under a separate invoice, delivering 660 sheets of drywall to the Port of Miami.[169]  After that sale, Taishan continued to

---

[164] *See* Chart summarizing Taishan's sales of drywall in the U.S., by State. (Herman Affidavit Exh. 1.)

[165] Exh. 13 to Wood Nation Dep. (Herman Affidavit Exh. 100) (sales contract (WN7350) dated 6/10/2006 between Taishan and Wood Nation, Inc.) (TG0001482-484).

[166] *See* Wood Nation Dep. at 82:6-83:5; Exh. 15 to Wood Nation Dep. (Herman Affidavit Exh. 102) (invoices for sales of Taishan's drywall to Wood Nation) (TG0001545-546); Exh. 28 to Wood Nation Dep. (Herman Affidavit Exh. 103) (emails and related documents regarding shipments to Wood Nation and revised contract); Exh. 4 to Richard Hannam Dep. at ¶ 10 (Herman Affidavit Exh. 38).

[167] Exs. 19 & 20 to Che Dep. (contract (SDTH0600902) dated 9/2/2006 with B. America) (TG0021705 & TG0021695) (Herman Affidavit Exh. 86).

[168] *Id.*

[169] Exh. 16 to Deposition of James Martin Alexander (representative of shipping agent Delmar Logistics Georgia) dated 12/22/2011 ("Delmar Dep.") (Taishan invoice dated 4/7/2007 to B. America for $5,656.20, after taking into account a credit of $6,745.20 for undelivered drywall

(. . . Continued)

contact B. America in the hopes that its relationship with this Florida-based company would lead to additional sales.[170]

Interestingly, the shipment of drywall to B. America was not "FOB China," but rather CIF,[171] which refers to the seller paying the costs, insurance, and freight of bringing the goods to the port of destination, in this instance Miami.[172] Accordingly, Taishan not only arranged, but also paid the costs of, shipping from China to Florida.[173] Taishan was also responsible for insuring the goods while in transport from China to Miami, and obtained an insurance policy for that purpose.[174]

**c.** *Oriental Trading*

As set forth above, Taishan engaged in direct negotiations with Oriental Trading, a Florida company, regarding the rights to become the Sole Agent for Taishan's DUN brand in the

---

(Continued . . .)
from a previous order) (Herman Affidavit Exh. 88); Exh. 17 to Delmar Dep. (Taishan packing list dated 4/7/2007 for shipment to B. America) (Herman Affidavit Exh. 89); Exh. 2 to Delmar Dep. (email dated 4/10/2007 from Bill Cher to Rafael Sardi regarding shipment to B. America) (TG0000510) (Herman Affidavit Exh. 90).

[170] See Exh. 25 to Deposition of Che Dep.) (Herman Affidavit Exh. 99) (Email dated 4/15/2008 from Bill Cher to B. America (TG0000843)).

[171] Exh. 16 to Delmar Dep (Herman Affidavit Exh. 88) (Taishan invoice dated 4/7/2007 to B. America for $5,656.20, after taking into account a credit of $6,745.20 for undelivered drywall from a previous order).

[172] Onyx Dep. (Herman Affidavit Exh. 97) at 71:2-9.

[173] Exh. 14 to Delmar Dep. (Herman Affidavit Exh. 95) (entry summary for U.S. Customs and Border Protection showing Taishan delivery to Miami); Delmar Dep. at 116:18-23; Exh. 20 to Delmar Dep. (Herman Affidavit Exh. 96) (arrival notice for shipment to Miami); *see also* Exh. 2 to Onyx Dep.(Herman Affidavit Exh. 87); Onyx Dep. (Herman Affidavit Exh. 97) at 63:19-64:15; Exh. 24 to Che Dep. (Herman Affidavit Exh. 63) (emails dated 4/10/2007 from Bill Cher to Rafael Sardi: "we will arrange production and ship[p]ing" "to Miami Port") (TG0000514).

[174] Exh. 18 to Delmar Dep. (Herman Affidavit Exh. 98) (Cargo Transportation Insurance Policy); Onyx Dep. at 28:9-21, 69:19-70:19.

U.S.[175]   During these negotiations, Jorge Arevalo of Oriental Trading travelled from Florida to China to meet with Taishan's sales representatives.  Oriental Trading made it clear through these discussions with Taishan that it was looking to purchase drywall that would be exported to Florida.[176]

Oriental Trading and Taishan discussed the possibility of a relationship in which Taishan would sell large quantities of drywall to Oriental Trading.  In fact, in the Sole Agency Agreement, the parties discussed sales in the range of one million sheets of drywall per year.[177] The parties also discussed a specific sale of two million sheets of drywall that, as Oriental Trading explained to Taishan, would be used to reconstruct, among others, Florida homes damaged by Hurricane Wilma.[178]

As part of these discussions, Oriental Trading requested that Taishan handle the entire process, from manufacturing the drywall to making the shipping arrangements for delivery to Florida.[179]  In fact, on multiple occasions, Oriental Trading requested – and Taishan provided –

---

[175] Gonima I Dep. at 77:25 - 78:9.

[176] Gonima I Dep. at 33:11-13, 33:16-18; Exh. 2 to Gonima II Dep. (Herman Affidavit Exh. 27) at pp. 25-26.

[177] Sole Agency Agreenent (Herman Affidavit Exh. 20).

[178] Exh. 20 to Jia II Dep (Herman Affidavit Exh. 5); Exh. 2 to Gonima II Dep. (Herman Affidavit Exh. 27).

[179] *See*, *e.g.*, Exh. 5 to Gonima I Dep. (Herman Affidavit Exh. 29) at p. 1 (email dated 9/5/2006 from Che Gang to Ivan Gonima) (TG0000532); Exh. 10 to Gonima I Dep. (Herman Affidavit Exh. 62) at pp. 2 & 4 (emails dated 4/13&16/2007 from Bill Cher to Ivan Gonima) (TG0000916-918); Exh. 24 to Che Dep. (Herman Affidavit Exh. 63) (emails dated 4/10/2007 from Bill Cher to broker Rafael Sardi: "we will arrange production and ship[p]ing" "to Miami Port") (TG0000514); Gonima I Dep. at 140:19-22.

quotations for shipping the drywall to various Florida ports.[180]   Additionally, Taishan recommended specific shipping companies to Oriental Trading.[181]

Ultimately, Oriental Trading ended up purchasing 60,000 sheets of drywall from Taishan.[182]   Although the shipping terms for these orders were FOB China, Taishan was unquestionably involved with the drywall even after it reached the port in China.   As Ivan Gonima explained:

> FOB means free on board, and technically what you are saying is right. . . . [Taishan] was in charge of finding the shipping company, they were in charge of making the deal with the shipping company, and we were to pay, because they said that they could get a better price through their connections in China. . . . So, yes, it was free on board, the price they were giving us was free on board, but they were the ones hiring or making the arrangements for the shipping.[183]

Taishan's sales representatives also provided Oriental Trading price quotations to ship the drywall to several other U.S. ports, even suggesting the most economical ports for delivery to various inland destinations across the U.S.[184]

Taishan even took into consideration local Florida trucking regulations in its dealings with Oriental Trading.   On April 2, 2007, Ivan Gonima provided Bill Cher specific shipping

---

[180] *Id.*

[181] *See*, *e.g.*, Exh. 29 to Che Dep. (Herman Affidavit Exh. 67) (email dated 7/14/2007 from Bill Cher to Joseph Weiss, suggesting that ZIM shipping company be used for shipping drywall to the United States) (TG0021997); Exh. 2 to Che Dep. (Herman Affidavit Exh. 64) (email dated 4/16/2007 from Bill Cher to Ivan Gonima suggesting ZIM shipping company) (TG0000916).

[182] Gonima I Dep. at 77:25 - 78:9.

[183] Gonima II Dep. at 58:1-19.

[184] Exh. 10 to Che Dep. (Herman Affidavit Exh. 65) (email dated 4/17/2007 from Bill Cher to Ivan Gonima) (TG0000913-914); Gonima II Dep. at 59:17-60:21; Gonima I Dep. at 81:12-82:6.

instructions for a load of drywall that was destined for Orlando, Florida.[185]   However, because Oriental Trading would need to make arrangements to truck the drywall from the Port of Miami to Orlando, Taishan would need to limit the weight of each container.  In an email to Bill Cher, Mr. Gonima stated, "THIS IS VERY IMPORTANT: MAKE SURE THAT THE MAXIMUM LOAD YOU PUT IN A 40' CONTAINER IS 55,000 POUNDS. According to the DOT (Department of Transportation) regulations, we cannot move [o]n Florida roads any load higher than that."[186]   Taishan recognized these requirements and complied with the request of its Florida-based customer, agreeing that its containers would ship "within the road-carrying limit."[187]   For Taishan to suggest now that it never knew where the drywall was to be shipped (because the shipping terms were "FOB China" and "the customer always decided where to ship the product") is incredulous.[188]

### 8.    Taishan Made Direct Sales to Customers in Other States as Well.

While Taishan's sales efforts were heavily focused on Florida, it also sold its products directly to companies in other states.  For example, Taishan sold drywall directly to customers in Virginia, Louisiana, New York, and California.   Through these efforts to service the U.S., Taishan demonstrated that it was targeting sales anywhere in the U.S. that might lead to profits for the company.

---

[185] Exh. 2 to Che Dep. (Herman Affidavit Exh. 64) (email dated 4/12/2007 from Ivan Gonima to Bill Cher) (TG0000919); Invoice dated 12/30/2006 to Oriental Trading (Herman Affidavit Exh. 84) (TG0000619).

[186] Exh. 2 to Che Dep. (Herman Affidavit Exh. 64) (email dated 4/12/2007 from Ivan Gonima to Bill Cher) (TG0000919).

[187] *Id.*

[188] Taishan MOL at p. 15.

For example, Taishan made direct sales to the following companies: Venture Supply in Virginia;[189] GD Distributors, LLC in Louisiana;[190] TOV Trading in New York;[191] Shenzhen Yongfeng Investment Co., Ltd. in New York;[192] Stone Pride International Group in California;[193] and Triax Trading in California.[194]  As these records indicate, Taishan's relationship with U.S. customers was not merely a few isolated sales; rather, it reflects a continuous and systematic effort to service customers across the U.S.

---

[189] All of the drywall that Taishan sold to Venture Supply was marked with the following: "Venture Supply, Inc.  MFG. Shandong Taihe Dongxin, Co., Ltd., China."  *In re Chinese-Manufactured Drywall Prods. Liab. Litig*. (Germano), 706 F. Supp. 2d 655, 662 (E.D. La. 2010) (Findings of Fact and Conclusions of Law); Taishan Profile Forms (Herman Affidavit Exh. 19); Porter Dep. at 33:2-34:1.

[190] Taishan shipped 880 boards of its drywall to this customer in New Orleans in September 2006, which resulted in a sale of $11,601.22.  Exh. 2 to GD Distributors Dep. (Herman Affidavit Exh. 25); GD Distributors Dep. at 44:2-45:6, 46:12-47:4, 48:4-50:5

[191] Taishan's records reflect sales of more than 28,000 sheets of drywall to TOV Trading in New York, with a total sale price of nearly $80,000.00.  *See, e.g.*, Exh. 4 to OEG Dep. (Herman Affidavit Exh. 13) (contract dated 6/6/2006 (TH0606001) for the sale of drywall and metal studs to TOV Trading New York, USA) (TG0000897-898); Exh. 5 to OEG Dep. (Herman Affidavit Exh. 119) (invoice dated 6/21/2006 to TOV Trading New York, USA for 23,120 sheets of drywall to U.S.A.) (TG0001138-139); Exh. 17 to OEG Dep. (Herman Affidavit Exh. 123) (contract dated 8/4/2006 (SDTH06080401) for the sale of 28,400 sheets of drywall to TOV Trading New York, USA & invoice) (TG0000734-736, TG0000738).

[192] The direct shipments from Taishan to this customer in New York resulted in at least eight different shipments, totaling 34,690 pieces of drywall, at a value of more than $109,000.00.  *See* Taishan Profile Forms (Herman Affidavit Exh. 19).

[193] Taishan sold 2,640 sheets of drywall to Stone Pride November 20, 2006, with delivery to Irvine, California.  Stone Pride Dep. at 10:25-11:5; Exh. 8 to Peng S. Dep. (Herman Affidavit Exh. 85) (Taishan Special Invoice for Export dated 2/2/2006 for 2,640 sheets of drywall for Stone Pride) (TG0001658); Peng S. Dep. at 95:9-96:15; Exh. 2 to Stone Pride Dep. (Herman Affidavit Exh. 115).

[194] Taishan sold approximately 5,760 pieces of drywall (276,480 square feet) to Triax Trading on July 20, 2006, with a sales price of $24,998.40.  *See* Invoice dated 7/20/2006 from Taishan to Triax Trading & Logistics (TG0020091) (Herman Affidavit Exh. 198).

### 9. Taishan Cannot Plausibly Claim Ignorance of Other Shipments to Florida.

While Taishan attempts to distance itself from the millions of square feet of its defective drywall scattered throughout Florida by claiming that it made "isolated sales in China to three companies that advised TTP they intended to ship to Florida,"[195] the documentary evidence and testimony uncovered in this litigation demonstrates that Taishan knew full well of, not only its direct sales to Florida customers, but also dozens of other shipments, comprising hundreds of thousands of pieces of drywall, that were destined for Florida.

One of the major U.S. building materials suppliers that delivered Chinese-manufactured drywall to homes in Florida is Banner Supply Company and its related affiliates.[196] Banner acknowledged that the overwhelming majority of its Chinese-manufactured drywall (approximately 97 percent) was sourced through Rothchilt International, Ltd. ("Rothchilt") (the shipper from China) and La Suprema Enterprise, Inc. and La Suprema Trading, Inc. ("La Suprema") (the importer and wholesale distributor in the U.S.).[197] Banner explains on its profile form that the drywall it received through the La Suprema and Rothchilt distribution channel included drywall from Knauf Plasterboard (Tianjin) Co., Ltd. and from Taishan.[198]

As reflected on TTP's Manufacturer Defendant Profile Form, Taishan has record of having sold 84 shipments of drywall in 2006 to a company by the name of Beijing Building Materials Import & Export Co., Ltd. ("BBMIEC").[199] La Suprema has similar records of

---

[195] Taishan MOL, at p. 14.

[196] Banner Distributor Profile Forms (Herman Affidavit Exh. 104).

[197] *Id.* According to the Banner Distributor Profile Forms, the remaining three percent of the Chinese-manufactured drywall that Banner purchased came from another Chinese exporter.

[198] *Id.*

[199] Taishan Profile Forms (Herman Affidavit Exh. 19). It is curious that, while TTP's profile form lists the sales to BBMIEC, the actual documentation produced by Taishan reflects that TG,

(. . . Continued)

dealings with this company, indicating the purchase of in excess of one hundred shipments of drywall in 2006 that was supplied by BBMIEC and shipped by Rothchilt.[200]  This documentation clearly establishes the following stream of commerce: (i) Taishan sold its drywall to BBMIEC; (ii) BBMIEC in turn provided the drywall to Rothchilt for overseas shipping; (iii) Rothchilt shipped the drywall to La Suprema for import into Miami, Florida; and, finally, (iv) La Suprema sold the drywall to Banner, which delivered the drywall to homes across the State of Florida.

The Taishan shipments that were delivered to Banner in Florida can easily be traced back to Taishan through the records produced by Taishan and by La Suprema.  For example, in a contract dated March 31, 2006, between TG (as seller) and BBMIEC (as buyer), Taishan agreed to sell "Shandong Taihe" (Taishan) drywall to BBMIEC.[201]  On the copy of that contract produced from Taishan's records, there is a handwritten reference to B/L 556650013, which is a shipping company's bill of lading number.[202]  This specific bill of lading number also appears in documents produced by La Suprema.[203]  Indeed, La Suprema produced shipping documents and

---

(Continued . . .)

and not TTP, was the seller of those drywall shipments.  *See*, *e.g.*, Composite Exhibit of Shipping Documents and Invoices Related to Indirect Sale of Taishan Drywall to Florida ("Florida Shipping Documents") (Bass Affidavit Exh. 14) at Exh. 14A (TG0001493) (Purchase and Sale Contract between Taishan and BBMIEC, dated Mar. 31, 2006).

[200] Deposition of Solomon Abadi from Oct. 19, 2009 (Bass Affidavit Exh. 15) at 184:2-8; 253:8-254:10.

[201] Florida Shipping Documents at Exh. 14A (Purchase and Sale Contract between Taishan and BBMIEC, dated Mar. 31, 2006) (TG0001493) (with handwritten reference to B/L 556650013).

[202] *Id.*  A bill of lading is a document between the shipper and the carrier of the goods, which describes the type, quantity, and destination of the goods being carried.  *See* Florida Shipping Documents at Exh. 14D (Bill of Lading) (SUP EN 0001842- SUP EN 0001843).

[203] *See* Florida Shipping Documents at Exh. 14B (Revised Arrival Notice) (SUP EN 0001844 - SUP EN 0001845) (referencing B/L MAEU556650013 and DSLSTST0197273).

invoices that reference that same bill of lading number, with a corresponding reference to the freight forwarder, DSL Star Express's, bill of lading number of DSLSTST0197273.[204]

The DSL Star Express bill of lading, in turn, references the unique identification numbers for the containers included in that shipment.[205]  Those same container numbers are included on the commercial invoices and packing lists from Rothchilt to La Suprema,[206] as well as on the invoices between La Suprema and Banner.[207]  Therefore, it is clear that Taishan inquired about or otherwise was provided, and thus had specific knowledge regarding, the bills of lading for the shipments of drywall that were destined for sale to Banner in Miami.  In light of the fact that the bills of lading clearly indicate that the destination of Taishan's drywall was "Miami, Florida," Taishan's stated ignorance that these shipments were destined for Florida is just not credible.

Additionally, other email correspondence produced by Taishan clearly demonstrates that Taishan was familiar, not only with BBMIEC, but also with Rothchilt, the company that shipped the orders of drywall that BBMIEC purchased from Taishan.  On several occasions, Apollo Yang

---

[204] *Id*.; *see also* Florida Shipping Documents at Exh. 14C (Invoice) (SUP EN 0001836)

[205] *See* Florida Shipping Documents at Exh. 14D (Bill of Lading) (SUP EN 0001842 - SUP EN 0001843) (referencing container numbers CLHU8636623, GESU4894896, POCU7023735, PONU7484197, PONU7521177 and PONU7534343).

[206] *See* Florida Shipping Documents at Exh. 14E (Commercial Invoice from Rothchilt to La Suprema) (SUP EN 0003020); Florida Shipping Documents at Exh. 14F (Packing / Weight List from Rothchilt to La Suprema) (SUP EN 0001841).

[207] *See* Florida Shipping Documents at Exh. 14G (Invoice from La Suprema to Banner for delivery in Fort Myers, Florida) (SUP TR 0004684) (referencing container numbers CLHU8636623, GESU4894896, POCU7023735, PONU7484197, PONU7521177 and PONU7534343); *see also* Florida Shipping Documents at Exh. 14H (Invoice from La Suprema to Banner for delivery in Tampa, Florida) (SUP TR 003378) and Florida Shipping Documents at Exh. 13I (Invoice from La Suprema to Allsteel for delivery in Fort Lauderdale, Florida) (SUP EN 0003252).

at Taishan communicated directly with Rothchilt.[208]  Other documents produced by Taishan also reflect emails between Rothchilt and BBMIEC, on which Taishan was copied.[209]  The purpose of these communications, which contained several photos as attachments, was for Rothchilt to confirm for Taishan that Taishan's drywall had been loaded into containers, in preparation for shipment overseas.  Between the evidence confirming that Taishan was keeping record of the relevant bill of lading numbers, and that Rothchilt would notify Taishan when the drywall was loaded into containers, it is clear that Taishan wanted to be and, in fact, was updated on and fully aware of the status of these shipments of drywall to Florida.

## IV.   LEGAL ARGUMENT

In responding to a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a *prima facie* showing that jurisdiction lies over the defendant where, as here, the motion to dismiss is predicated on affidavits and depositions.  *See Irving v. Owens-Corning Fiberglass Corp.*, 864 F.2d 383, 384 (5th Cir.), *cert. denied*, 493 U.S. 823 (1989); *Ham v. La Cienega Music Co.*, 4 F.3d 413, 415 & n.4 (5th Cir. 1993).  A plaintiff's allegations must be taken as true where uncontroverted by the defendant, and in situations where there is a conflict between the parties' affidavits, the facts must be resolved in the plaintiff's favor. *Ruston Gas Turbines, Inc. v. Donaldson Company, Inc.*, 9 F.3d 415, 418 n.3 (5th Cir. 1993); *Bullion v. Gillespie*, 895 F.2d

---

[208] *See*, *e.g.*, Composite Exhibit of Email Communications between Rothchilt and Apollo Yang (Bass Affidavit Exh. 16) (TG0001739, TG0001740, TG0001749, TG0001750, TG0025045, TG0025070, TG0025106, TG0025116).

[209] *See*, *e.g.*, Composite Exhibit of Email Communications between Rothchilt, BBMIEC, and Taishan (Bass Affidavit Exh. 17) (TG0001741 and TG0025079).

213, 217 (5th Cir. 1990) (quoting *D.J. Invs., Inc. v. Metzler Motorcycle Tire Agent Gregg, Inc.*,
754 F.2d 542, 546 (5th Cir. 1985)).[210]

### A.   TTP ACTED AS TG'S AGENT AND ITS ACTIONS ARE IMPUTED TO TG FOR PURPOSES OF EVALUATING PERSONAL JURISDICTION.

In the Taishan MOL, Taishan admits that TTP solicited customers in the Florida market
and made direct sales into the Florida market.  Taishan also does not seriously contest the fact
that TTP sought to and did serve customers in the Florida market.  Instead, it argues that this
Court should not consider TTP's efforts to serve the Florida market, and may not assert
jurisdiction over TG based on those efforts, because TTP's activities and contacts with the
Florida market cannot be attributed to TG.  (Taishan MOL at 1.)  This argument should be
rejected.  Under Florida law, TTP acted as TG's agent and its actions should be imputed to TG.

### 1.   Florida law applies in determining whether TTP acted as TG's agent.

As a threshold matter, Taishan argues that the Court should look to Chinese corporate
law to determine whether TTP's actions can be imputed to TG, but actually, Florida law governs
this analysis.  Taishan correctly notes that an MDL court sitting in diversity applies the choice of
law principles of the transferor court – here, the district court in Florida.  (*See* Taishan MOL at
45.)  However, Taishan incorrectly argues that Florida choice of law principles should lead the
Court to apply *Chinese* corporate law.  Contrary to Taishan's suggestion that "no Florida court

---

[210] Although Taishan suggests that this Court is "conducting an evidentiary hearing" (Taishan
MOL 25), it is well-settled that "even if the court receives discovery materials, unless there is *a
full and fair hearing*, it should not act as a fact finder and must construe all disputed facts in the
plaintiff's favor."  *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241
(5th Cir. 2008) (emphasis added).  "If the court determines that it will receive only affidavits or
affidavits plus discovery materials, these very limitations dictate that a plaintiff must make only
a prima facie showing of jurisdictional facts through the submitted materials in order to avoid a
defendant's motion to dismiss."  *Id.*; *see also In re Chinese-Manufactured Drywall Prods. Liab.
Litig.*, 767 F. Supp. 2d 649, 656 (E.D. La. 2011) (this Court applied the *prima facie* standard
following jurisdictional discovery).

has spoken directly to the issue" (Taishan MOL 46), a Florida district court recently made clear that Florida choice of law principles, applied to claims against a purported subsidiary company incorporated in a foreign country, favor application of Florida corporate law, rather than the foreign country's law.

In *Kernel Records Oy v. Mosley*, the district court in similar circumstances found that "[w]hen determining claims involving corporations both the Eleventh Circuit and the Florida state courts have … analyzed choice of law questions by looking to the Restatement (Second) of Conflict of Laws for guidance." No. 09-21597-Civ., 2010 WL 2812565, at *6 (S.D. Fla. July 5, 2010) (citations omitted). The *Mosley* court found that, under Restatement (Second) Conflict of Laws § 302, a court should consider whether a state other than the state of incorporation "has a more significant relationship to the occurrence and the parties, in which event the local law of the other will be applied." *Id.* (quoting Restatement (Second) Conflict of Laws § 302). In that instance, the *Mosley* court concluded that Florida law should apply because the foreign country (Canada) had minimal interest in applying its local law, but Florida and the U.S. had "'a significant interest in ensuring that international corporations do not engage in fraudulent conduct within our jurisdiction so as to shield themselves from liability," and thus concluded that Florida's corporate law should apply. *Id.* at *7.

The same analysis applies here. The U.S. and, more specifically, Florida, have a significant interest in ensuring that Taishan is not able to avoid the application of well-settled agency law and duck jurisdiction and responsibility for its actions. Accordingly, Florida law should apply.[211]

---

[211] If this Court instead finds that Chinese corporate law governs its analysis, the Homebuilders incorporate the analysis and accompanying affidavits provided by the Plaintiff's Steering (. . . Continued)

## 2. Under Florida law, TTP acted as TG's agent and its actions are imputed to Taishan.

The elements of an agency relationship under Florida law are "(1) acknowledgement by the principal that the agent will act for it, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *State v. Am. Tobacco Co.*, 707 So. 2d 851, 854 (Fla. 1st DCA 1998). The issue of control is "critical" to determining agency. *Id.* Indeed, "a principal (usually a parent company) may so dominate the activities of a corporation that it is necessary to treat the dominated corporation as an agent of the principal." *Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 180 (5th Cir. 1981); *see Pappalardo v. Richfield Hospitality Servs., Inc.*, 790 So. 2d 1226, 1228 (Fla. 4th DCA 2001) (finding parent corporation responsible for the acts of its subsidiaries where the two entities "were a confusing conglomerate," "essentially one and the same company").[212]

Florida agency law holds that an agent's acts may be deemed the acts of its principal if the agent acted within the scope of its authority, or appeared to act within the scope of its authority. *See City. Nat. Bank of Detroit v. Basic Food Indus., Inc.*, 520 F.2d 336, 337 (5th Cir.

---

(Continued . . .)

Committee in its Global Memorandum of Law In Opposition To: (1) Taishan's Renewed Motions To Vacate The Default Judgments And Dismiss The Complaints In *Germano* And *Mitchell* And (2) Taishan's Motions To Dismiss The Complaint In *Gross* And *Wiltz* (Rec. Doc. No. 14209) ("PSC Global MOL") and The Banner Entities' Memorandum of Law in Response to Taishan's Motions to Dismiss in *Gross* and *Wiltz*, and *Amicus* Memorandum of Law in Response to Taishan's Motion to Dismiss in *Mitchell* ("Banner MOL"). This analysis, and the affidavits provided by three separate experts in Chinese corporate law, make clear that under Chinese law, Taishan cannot prove the separateness of TG and TTP and, in fact, cannot rebut the overwhelming facts demonstrating that Taishan abused the purported corporate forms of the two entities. (*See* PSC Global MOL at 26-35.)

[212] The Homebuilders hereby incorporates the Plaintiff's Steering Committee's Response in Opposition To Taishan's Renewed Motion Pursuant To Rules 55(C) And 12(B)(2) To Vacate The Entry Of Default And To Dismiss And Amicus Brief On Florida Law Relating To Jurisdictional Issues Raised By Taishan (Rec. Doc. No. 14216) ("PSC Florida MOL").

1975) (applying Florida law and holding that "an agent's authority need not be conferred in express terms," instead, "[i]t is enough that the principal allows or causes others to believe that an agent possesses actual authority").  "[A] principal may be bound by the acts of his agent which are in the latter's apparent authority.  Apparent authority is that which the principal knowingly permits his agent to assume or which a principal by his actions or words holds the agent out as possessing." *Parsley Bros. Constr. Co. v. Humphrey*, 136 So. 2d 257, 258 (Fla. 2d DCA 1962).  Even if the principal has not authorized the specific act, the principal is nonetheless responsible "if the agent had the apparent authority to do the act." *Benson v. Seestrom*, 409 So. 2d 172, 173 (Fla. 2d DCA 1982).

Here, the facts show that TTP's activities were activities on behalf of TG, that TTP acted as an agent on behalf of TG, and that its acts are therefore imputable to TG.  Taishan admits that it formed TTP as a wholly-owned subsidiary of TG for the sole purpose of satisfying requests by its existing customers.  (*Supra* at p. 14.)  Taishan identifies no other business purpose for its subsidiary.

The facts make clear that, once TTP was formed, TG acted through TTP and used TTP as its agent to serve the Florida market.  (*Supra* at pp. 14-21, 26-40.)  The two entities commingled funds, admitted to responsibility for actions taken by one another, and paid debts owed by the other entity.  (*Supra* at pp. 21-23.)  The two entities shared employees – indeed, some employees jumped from TG to TTP and back to TG again – as well as phone and facsimile numbers. (*Supra* at pp. 14-16.)  The TTP "foreign sales office," in fact, was staffed fully with TG's employees to sell to customers in the U.S. at exactly the time of the drywall shortage in the U.S. Each of those employees, when TTP wound down its business, returned to work for TG.  (*Supra* at p. 16.)

49

Faced with these facts, this Court should find that TTP acted as TG's agent and, for the purposes of determining personal jurisdiction, should impute TTP's actions to TG. *See Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1272 (11th Cir. 2002) (holding that, where subsidiaries were "mere instrumentalities" of the principal corporation, the subsidiary's activities in Florida were imputed to the parent corporation); *John Scott, Inc. v. Munford, Inc.*, 670 F. Supp. 344, 347 (S.D. Fla. 1987) (agent's activities in Florida "may be attributed to [defendant] for purposes of satisfying due process"). There is evidence of numerous instances where TG acknowledged TTP's authority to act on TG's behalf and where TTP did, in fact, act on TG's behalf. (*See generally supra* at pp. 13-23.) Indeed, in one instance, a separate Taishan affiliate – Taian Taigao Trading Co. – sold drywall to Guardian, shipping those products to North Carolina, Virginia, and Florida. (*Supra* at p. 21.) This drywall was defective and recalled from a number of locations, including several locations in Florida. As a result of these defects, Guardian and TG negotiated a settlement for the defective drywall. However, the signatory on the settlement agreement was *TTP* (not TG); and *TTP* (not TG or the other Taishan affiliate that had entered into the original contract for sale) paid the consideration for the settlement. (*Supra* at pp. 21-22.)[213] In other words, TTP took responsibility for making payment under a settlement agreement that TG negotiated, but which arose from a defective product that one of TG's other affiliates had sold. By negotiating a settlement agreement on which TTP was the signatory, TG expressly acknowledged TTP's authority to act on its behalf.

In addition to the substantial evidence demonstrating that TTP acted with TG's *actual* authority, there is also evidence that TTP acted with TG's *apparent* authority. For example, TTP

---

[213] TG and TTP also shared responsibility for a settlement regarding drywall TTP shipped to Oriental Trading in Miami. (*See supra* at pp. 22-23.)

had formal written authorization from TG to sell TG's drywall product, and TTP entered into exclusive agency agreements with U.S. companies to sell TG's drywall – *even drywall that, according to Taishan's representatives, were sold only by TG*.  (*Supra* at pp. 30-31.)  TTP and TG used their employees and officers interchangeably, and their employees and officers would use the TTP and TG names interchangeably by conducting TTP business via email using the TG name and referring to the two purportedly separate entities as "us."  (*Supra* at pp. 15-16, 19-21.)  (TTP also shared phone and facsimile numbers, as well as other resources, with Taishan).)[214]  As a result of the fact that TG created the appearance that TTP acted on TG's behalf – and allowed TTP to hold itself out as possessing the authority of TG – TG is bound by TTP's Florida activities under the principle of apparent authority.  *See Basic Food Indus.*, 520 F.2d at 338 (finding that principal was bound by agent's actions where principal "held [agent] out as possessing broad managerial authority" and knew agent was negotiating on behalf of the principal); *Roessler v. Novak*, 858 So. 2d 1158, 1161 (Fla. 2d DCA 2003) (apparent authority exists where "a principal knowingly tolerates or permits" an agent to hold itself out as representing the principal).

---

[214] Taishan, in an effort to show that TTP did not act as TG's agent, makes a series of representations regarding the two entities' purported corporate formalities, their separate capitalization, and their separate office space.  (*See* Taishan MOL 8-12.)  As the PSC's memoranda of law demonstrate, however, most of these representations are unsupported or contradicted by other facts in the evidentiary record.  (*See* PSC Global MOL 25-34; PSC Florida MOL 12-15.)  In any event, these facts at most call into question whether TG and TTP were "alter-egos" of each other.  They do nothing to refute the facts demonstrating that TTP acted as Taishan's agent and that its actions should be imputed to TG for purposes of personal jurisdiction.

**B.   THE COURT MAY ASSERT PERSONAL JURISDICTION UNDER THE FLORIDA LONG ARM STATUTE.**

Based on the facts uncovered during jurisdictional discovery, this Court may assert personal jurisdiction over Taishan under Florida's long arm statute, Fla. Stat. § 48.193.  Indeed, the facts demonstrate that jurisdiction is proper under the following provisions of the Florida long-arm statute:

> (1)  Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
>> (a) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency.
>> (b) Committing a tortious act within the state.
>
> * * *
>
> (f) Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:
>> 1.  The defendant was engaged in solicitation or service activities within this state; or
>> 2.  Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

Jurisdiction may be established, independently, under each of these provisions through the activities of either TG or its agent, TTP.  *See Meier*, 288 F.3d at 1272 (jurisdiction through an agent or subsidiary may be established if "the subsidiary is merely an agent through which the parent company conducts business in a particular jurisdiction or its separate corporate status is formal only and without any semblance of individual identity") (quotation omitted).

1. **The Court may assert jurisdiction over Taishan because Taishan was carrying on a business in Florida, because Taishan committed tortious acts in Florida, and because Taishan's drywall caused injury to Florida customers while Taishan sought to serve the Florida market with those products.**

a. *Taishan carried on a business by targeting customers in the Florida market with its drywall.*

For the purposes of considering whether, under Fla. Stat. § 48.193(1)(a), a defendant is "engaged in or carrying on a business" in Florida, the activities of the defendant "must be considered collectively" to determine whether there is a "general course of business activity in the state for pecuniary benefit." *Conax Fla. Corp. v. Astrium, Ltd.*, 49 F. Supp. 2d 1287, 1294 (M.D. Fla. 2007) (citation omitted). There is no requirement that the specific product causing the plaintiff's injury be purchased as part of this general course of business activity. *Davis v. Pyrofax Gas Corp.*, 492 So. 2d 1044, 1046 (Fla. 1986) ("We do not read the statute as requiring that the specific item purchased by the plaintiff elsewhere and brought by him into Florida be brought in through the ordinary course of commerce."). If the defendant has availed himself of the privilege of serving customers in Florida, the Florida Supreme Court has held that it is unnecessary to show that the product causing injury or damages in Florida was sold in the state. *Id.* (defendant who "avails itself of the privilege of conducting solicitation activities and promoting or distributing its product line within the State of Florida should be amenable to a suit in Florida by one whose injury is occasioned by the use in Florida of the corporation's product purchased out of the state.").

The facts gleaned during discovery demonstrate that Taishan, during the relevant time period, was engaged in a general course of business activity in the state for its pecuniary benefit. Taishan sold more than nine (9) million square feet of drywall that ended up in Florida From May 2006 to July 2007, and approximately 194 million square feet to the United States in 2006 alone (*Supra* at pp. 29-30.) This was part of a comprehensive effort to serve customers in the

Florida market, an effort which included engaging an exclusive agent in Florida, providing samples to Florida customers interested in Taishan's drywall and offering its products to those customers, and customizing products for customers in the Florida market.

In 2006, Taishan (acting through TTP) executed the "Sole Agency Agreement" with Oriental Trading, a Miami-based company, for the purposes of selling "not less than 1,000,000 sheets of the [drywall] products mentioned in article 1 in the following 12 months." (*Supra* at pp. 29-30.) Oriental Trading's manager, Ivan Gonima, testified that he told Taishan that Oriental Trading wanted to export Taishan's drywall to Florida. As detailed in the Statement of Facts above, Taishan recognized that there was an increased demand for drywall in the U.S., and this agreement, by its terms, was executed to help facilitate Taishan's sales of its drywall in Florida and the rest of the U.S. (*See id.*)

Indeed, even before Taishan engaged an exclusive agent to sell its products in Florida, Taishan had already started to solicit Florida customers. *See Citicorp. Ins. Brokers (Marine), Ltd. v. Charman*, 635 So. 2d 79, 81 (Fla. 1st DCA 1994) (solicitation of customers "is one factor courts consider in deciding whether a company is conducting business in the state"); *Cal-Mar Indus. Inc. v. Wilson Research Corp.*, 442 F. Supp. 796, 799 (S.D. Fla. 1977) (jurisdiction proper under Florida long-arm statute where defendant shipped samples into Florida knowing that the samples would be used by a commercial entity). In November and December 2005, in response to a request, Taishan shipped drywall samples to Carn Construction Corp., a Florida company. (*Supra* at pp. 34-35.) Around this same time, Mr. Apollo Yang, Taishan's Chief of the Foreign Trade Department, told Guardian that Taishan had customers in Florida. (*Supra* at p. 21.) In mid-2006, Taishan learned that Wood Nation, a company based in Tampa, Florida, was interested in purchasing its drywall. As Taishan admits, Mr. David Wei (a representative from

BNBM) invited Richard Hannam, Wood Nation's President, to visit TTP's factory. (Taishan MOL 16.) Mr. Wei wrote to Taishan's Chief of its Foreign Trade Department prior to the visit to arrange VIP treatment for Mr. Hannam. (*Supra* at p. 27-28.) This solicitation worked. Wood Nation entered into a contract with TTP to buy its drywall. (*Id.*; *see also* Taishan MOL 16.)[215] Taishan sought out another Florida-based company, B. America, in 2008. Taishan had already contracted with B. America, in 2006, to sell its drywall to the Florida company (the contract was mutually cancelled by the parties), but continued to solicit this potential customer in the following years, writing in 2008, "I hope we can establish business as soon as possible." (*Supra* at pp. 36-37.)

Taishan continued to work with Oriental Trading and other Florida-based companies as it sought to serve the Florida market. Ivan Gonima, an Oriental Trading manager, traded emails with Taishan's international trading manager, Bill Cher, in 2006 and 2007 in which Gonima requested that Cher provide Oriental Trading with quotes for shipping drywall to various U.S.

---

[215] Taishan points out that, in its sale to the Florida company here, the goods were sold "FOB a Chinese port." (Taishan MOL 16.) Throughout its Memorandum of Law, Taishan notes that its goods were shipped to the U.S. "FOB China," suggesting that this designation is sufficient to avoid jurisdiction. The "FOB" designation is simply a technical shipping term used to allocate risk between buyers and sellers: The Fifth Circuit has expressly held that "a F.O.B. term will not prevent a court from exercising personal jurisdiction over a non-resident defendant where other factors, such as the quantity and regularity of shipments, suggest that jurisdiction is proper." *Luv N'Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 471 (5th Cir. 2006). In *Luv N'Care*, the defendant attempted to avoid jurisdiction by pointing to the fact that it sold its products "Free On Board" ("FOB") outside of the forum state. 438 F.3d at 471-72. The Fifth Circuit disagreed and found that the district court could assert specific jurisdiction regardless of the FOB designation, finding that "[j]urisdiction … does not depend on the technicalities of when title passes; rather, jurisdiction may attach both to manufacturers who supply their own delivery systems and to those that make use of the distribution systems of third parties." *Id.* (citations and quotations omitted). Here, the "FOB China" designations used by Taishan should not prevent this Court from asserting jurisdiction because the facts make clear that Taishan intended to and did serve customers in the Florida market, and was using that designation only to limit its shipping risk. *See id.*; *see also Wetzel v. Fisherman's Wharf of Pompano Beach, Inc.*, 771 So. 2d 1195, 1198-99 (Fla. 4th DCA 2000) (finding jurisdiction even though goods were shipped FOB Hong Kong).

cities – including cities in Florida – and Cher responded with the requested information and offered to help arrange the shipping and freight. (*Supra* at pp. 38-40.) These exchanges included quotes and estimates for orders as large as two (2) million sheets of drywall, which Taishan knew was intended for the reconstruction of Florida houses. (Ex. 20 to Jia II Dep.; Ex. 2 to Gonima II Dep.) Taishan responded to price inquiries from Carn Construction – the same company to which it had sent drywall samples – and other Florida-based companies, providing quotes for shipments of drywall to Florida. (*Supra* at p. 26 n.113.) As detailed in the Factual Background, Taishan also sold drywall to Devon International for shipment to Pensacola, Florida. (*Supra* at p. 27.)

The evidence shows that Taishan's efforts to serve customers in the Florida market even included customization for its Florida customers and attention to Florida-specific shipping specifications. *See Gillins v. Trotwood Corp.*, 682 So.2d 693, 694 (Fla. 5th DCA 1996) ("by undertaking to specifically manufacture equipment knowing its intended destination is a certain state, the manufacturer purposefully creates a connection with that state"). In one email exchange between Taishan and Oriental Trading, the two companies acknowledged and agreed that, pursuant to Florida Department of Transportation regulations, Taishan could not load their containers with more than 55,000 pounds of drywall. (*Supra* at pp. 39-40.) Taishan reassured Oriental Trading that its containers would ship "within the road-carrying weight limit." (*Id.*) In another example where Taishan customized its drywall for customers, Taishan's Chief of its Foreign Trade Department, received requests in 2006 from Wood Nation, another of its Florida customers, to create custom labels for its orders. (*Supra* at pp. 33-34.) Indeed, a number of documents from Taishan's production during jurisdictional discovery demonstrate a comprehensive understanding of U.S. and state-specific regulations and specifications (*supra* at

pp. 30-34, 39-40), and that Taishan had the capacity and intent to create drywall satisfying those specifications.

Taishan itself admits that three different companies – Wood Nation, Oriental Trading, and B. America – purchased drywall from Taishan and advised Taishan that they intended to ship the drywall they purchased to Florida.  (Taishan MOL 15.)  Based on this admission, Taishan cannot deny that it was "aware" that its products were being sold to customers in Florida and would be used in Florida.  Jurisdiction under the Florida long-arm statute is proper on this basis alone.  *See McHugh v. Kenyon*, 547 So. 2d 318, 319 (Fla. 4th DCA 1989) (jurisdiction exists where Taiwanese manufacturer had no physical contact with Florida but produced "hundreds of thousands of product units that [were] distributed over a five-year period in the U.S., of which at least 6,000 were marketed in Florida").

However, the evidence described above demonstrates much more than this.  Taishan was not simply selling its products to customers who might resell them in Florida; it was *actively serving* Florida-based customers, providing potential new customers with samples of its drywall, soliciting additional customers in Florida, and even looking to engage an exclusive agent to generate new sales in Florida.  On these facts, the Court should find that Taishan was "carrying on a business" and that it may assert jurisdiction over Taishan under the Florida long-arm statute.  *See Robert D. Harley Co. v. Global Force (H.K.) Ltd.*, No. 05-21177-CIV, 2007 WL 196854, at *5 (S.D. Fla. Jan. 23, 2007) (foreign company that contemplated that its products would be sold in Florida and arranged direct shipments to Florida "purposefully availed itself of Florida law"); *Empire Indus., Inc. v. Kaplan*, 695 So. 2d 919, 920-21 (Fla. 4th DCA 1997) (evidence that defendant entered into letter agreement with Florida licensee, and evidence of negotiations regarding products, "clearly establishes a business venture" under the Florida long-arm statute);

*Charman*, 635 So. 2d  at 81 (finding that soliciting customers and corresponding with agents satisfied Florida long-arm statute).

> **b.** ***Taishan committed tortious acts while targeting customers in the Florida market with its drywall.***

Personal jurisdiction may also be asserted by this Court under Fla. Stat. § 48.193(1)(b), which provides for jurisdiction where "the non-resident defendant committed a substantial aspect of the alleged tort in Florida," and "the activities in Florida were essential to the success of the tort." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 857-58 (11th Cir. 1990) (citations omitted); *Promex, LLC v. Perez Distrib. Fresno, Inc.*, No. 09-22285-CIV, 2012 WL 3452341, at *5 (S.D. Fla. Sept. 1, 2010) (same).  To satisfy this provision, it is not necessary that the foreign defendant was physically present in the state.  *See Network Prods., Inc.*, 902 F.3d at 857-58;  *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1216-17 (11th Cir. 1999).

Florida-based plaintiffs in this MDL and in various Florida state court proceedings allege that Taishan committed common law and statutory torts.  A substantial aspect of those claims – including all of the damages therefrom – occurred in Florida.  *See Execut-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*, 752 So. 2d 582, 585 (Fla. 2000) (jurisdiction existed over Japanese corporation without a physical presence in Florida where violation of Florida law "was felt in Florida"); *Promex,* LLC, 2012 WL 3452341, at *5 (finding jurisdiction over defendant even though it "did not have a physical presence in Florida," where the "relevant injury [was] consumer confusion and deception upon purchasing Defendant's product," which occurred in Florida).  Accordingly, this Court may assert jurisdiction under Fla. Stat. § 48.193(1)(b).  *See id.*; *see also Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1168 (11th Cir. 2005) (out-of-state actions taken with the intent to deceive and defraud Florida customers created jurisdiction under the Florida long-arm statute).

      **c.**     ***Taishan caused injury to Florida customers while targeting those customers in the Florida market with its drywall.***

Separately, the facts here demonstrate that the Court may assert jurisdiction under Fla. Stat. § 48.193(1)(f).  Under that provision, the Court may assert jurisdiction over Taishan for the injuries it caused in Florida if, at or about the time of the injury, Taishan "was engaged in solicitation or service activities within the state," or products "processed, serviced, or manufactured by [Taishan] were used or consumed" with the ordinary course of business in Florida.  In applying Fla. Stat. § 48.193(1)(f), the Florida Supreme Court has explained:

> If a defendant has a relationship with Florida such that it is amenable to suit in Florida by a person who purchased its product in Florida, there is no logical reason to prohibit a plaintiff who purchased the same product elsewhere and was injured by it in Florida from maintaining an action in Florida.  A manufacturer or wholesaler that avails itself of the privilege of conducting solicitation activities and promoting or distributing its product line within the State of Florida should be amenable to a suit in Florida by one whose injury is occasioned by the use in Florida of the corporation's product purchased out of the state.

*Davis v. Pyrofax Gas Corp.*, 492 So. 2d 1044, 1046 (Fla. 1986).

The claims at issue – common law tort claims and statutory claims for breach of implied warranty and, in some cases, violations of the Florida Deceptive and Unfair Trade Practices Act – seek damages for injuries caused by Taishan's products, which entered the Florida market as part of Taishan's efforts to target and serve customers in Florida.  Indeed, the same facts that demonstrate Taishan was "carrying on a business" under Fla. Stat. § 48.193(1)(a), *see supra* at pp. 53-58, also support a conclusion that satisfies Fla. Stat. § 48.193(1)(f).  *See Wetzel v. Fisherman's Wharf of Pompano Beach, Inc.*, 771 So. 2d 1195, 1198-99 (Fla. 4th DCA 2000) (foreign company's product shipments to Florida customers satisfied Fla. Stat. § 48.193(1)(f) even though plaintiff was harmed by different products and even though foreign company had no physical contacts in Florida); *North Star Int'l Seafood Co., Inc. v. Banner Beef and Seafood Co., Inc.*, 677 So. 2d 1003, 1004 (Fla. 3d DCA 1996) (rejecting defendant's argument that jurisdiction

was improper under Fla. Stat. § 48.193(1)(f) where defendant had no "marketing scheme" directed at Florida, where defendant had received order from Florida plaintiff and fulfilled order).

> **2.**  **Taishan's argument that Plaintiff's claims do not arise from its activities in the Florida market is contrary to Florida law.**

Taishan argues that the Florida long-arm statute is not satisfied by the facts in this case because, it maintains, Plaintiff's claims did not "arise from" its activities in Florida.  (*See* Taishan MOL 27 ("Because Plaintiff did not purchase any drywall manufactured by TG, and TG did not engage in any activities in Florida that caused Plaintiff injury, TG cannot be subject to the long-arm statute.").)  Essentially, Taishan's argument is an attempt to evade responsibility for the injuries caused by its drywall by suggesting that the specific drywall that caused harm to Florida plaintiffs may not have been sold directly by Taishan to these parties in Florida.  Florida courts, however, have expressly rejected such arguments.

In *Wetzell v. Fisherman's Wharf of Pompano Beach, Inc.*, the defendant, a foreign corporation, attempted to avoid personal jurisdiction by arguing that the type of firework that caused the plaintiff's injury was different from the type of firework that it shipped into Florida (although it manufactured both).  *See* 771 So. 2d 1195, 1198 (Fla. 4th DCA 2000).  The Florida court held that it did not matter, for the purposes of the Florida long-arm statute, whether the specific product sold by the defendant could be linked to the plaintiff's injury.  *See* 771 So. 2d 1195, 1198 (Fla. 4th DCA 2000) ("[I]t does not matter that Wetzel's death was caused by a class B display firework and that Kwongyuen shipped only class C fireworks into Florida.").  What mattered, the court held – and what matters here – is that the defendant's activities seeking to serve customers in the Florida market could be linked to the claims at issue.  *See id.* ("A defendant's connection to Florida making it amenable to suit under the long-arm statute is

established by the defendant's 'business activities in Florida' and not by focusing solely on how the product causing injury entered the state."); *see also Charman*, 635 So. 2d at 82 ("The term 'arising from' is broad; it does not mean "proximately caused by," but only requires a "'direct affiliation,' 'nexus', or 'substantial connection'" to exist between the basis for the cause of action and the business activity.") (citing *Damoth v. Reinitz*, 485 So. 2d 881, 883 (Fla. 2d DCA 1986)).

Similarly, in *Kravitz v. Gebrueder Pletscher Druck-Gusswaremfabrik*, the defendant, also a foreign corporation, argued that the plaintiff's injury did not "arise from" its business activities because the product that caused the plaintiff's injury had been purchased in Illinois, not Florida. 442 So. 2d 985, 986 (Fla. 3rd DCA 1983). However, the evidence showed that the defendant conducted business activities in Florida, including selling certain other, identical products to an independent distributor in Florida. *Id.* The court held that the defendant's business activities in Florida satisfied the requirements of Fla. Stat. § 48.193(1)(f)(2), and that the plaintiff's claims arose from those activities, even though the particular product at issue was sold in another state. *Id.* at 987 ("The fact that the particular defective item which caused injury while in use in this state was purchased in other state does not render defendant – whose same product is distributed in the state – immune from the jurisdiction of the Florida court."). Accordingly, this Court should reject Taishan's argument and assert jurisdiction based on Taishan's activities in Florida. *See id.*; *see also Davis*, 492 So. 2d at 1046 ("If a defendant has a relationship with Florida such that it is amenable to suit in Florida by a person who purchased its product in Florida, there is no logical reason to prohibit a plaintiff who purchased the same product elsewhere and was injured by it in Florida from maintaining an action in Florida.").

## C.   THE COURT MAY ASSERT PERSONAL JURISDICTION UNDER THE DUE PROCESS CLAUSE.

### 1.   Under Supreme Court precedent, a court may assert either specific or general jurisdiction over a foreign defendant where the defendant has "purposefully established minimum contacts in the forum State."

After this Court finds that jurisdiction is proper under Florida law, it must consider whether its assertion of jurisdiction is proper under the Fourteenth Amendment's Due Process Clause.  The Supreme Court held in *Asahi Metal Industry Co., Ltd. v. Superior Court of California* that the Due Process Clause limits jurisdiction over a foreign defendant to cases where the defendant has "purposefully established minimum contacts in the forum state."  480 U.S. 102, 108-09 (1987) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 474 (1985)).  "As a general rule, the sovereign's exercise of power requires some act by which the defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'"  *McIntyre*, 131 S. Ct. at 1287 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).[216]

The Supreme Court has explained that, under the Due Process Clause, jurisdiction may be either specific or general.  Specific jurisdiction exists where a defendant "purposefully avails itself of the privilege of conducting activities" within a particular state, and a dispute "arise[s] out of or [is] connected with the activities within the state."  *McIntyre*, 131 S. Ct. at 2787 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).  As Justice Kennedy explains in the plurality opinion in *McIntyre*, 131 S. Ct. at 2788, "submission through contact with and

---

[216] The Homebuilders, rather than including a discussion of each of the several Supreme Court decisions on personal jurisdiction, hereby incorporate the legal arguments presented in the PSC Global MOL and the Banner MOL.  *See also In re Chinese Manufactured Drywall Prods. Liability Litig.*, 767 F. Supp. 2d 649, 656-61 (E.D. La. 2011) (discussing the Supreme Court's personal jurisdiction decisions).

activity directed at a sovereign may justify specific jurisdiction in a suit arising out of or related to the defendant's contacts with the forum."  (Quotations and citation omitted.)  A defendant's rights under the Due Process Clause are satisfied "if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King*, 471 U.S. at 472 (citations omitted).

A court may assert general jurisdiction over a defendant – allowing it to resolve any dispute against that defendant, whether or not the dispute occurred in the forum – where the defendant's contacts with the forum state are "continuous and systematic." *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 413-14 & n.9 (1994).  The Supreme Court held in *McIntyre* that general jurisdiction is proper where there are "circumstances, or a course of conduct, from which it is proper to infer an intention to benefit from and thus an intention to submit to the laws of the forum State."  131 S. Ct. at 2787; *see In re Chinese Manufactured Drywall Prods. Liability Litig.*, 767 F. Supp. 2d 649, 657 (E.D. La. 2011) (general jurisdiction requires "extensive contacts between a defendant and a forum"); *Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010) (general jurisdiction exists where there are "continuous and systematic contacts").  "General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." *Chinese Manufactured Drywall*, 767 F. Supp. 2d at 658 (citations and quotations omitted).

For the reasons provided below, this Court may and should assert specific jurisdiction over Taishan.  The facts make clear that Taishan purposefully availed itself of the benefits and protections of Florida law, that it intended to and did serve the Florida market and Florida customers, and that the claims in the Amended Complaint arise out of Taishan's targeting of the Florida market.  (*See supra* at pp. 23-45.)  Accordingly, this Court does not need to reach the

issue of whether it may also assert general jurisdiction over Taishan.  *See Ruston Gas*, 9 F.3d at 419 (holding that, because the court found specific jurisdiction, "[w]e do not decide today whether Corchran's contacts with Texas are sufficiently 'continuous and systematic' to support an exercise of general jurisdiction"); *In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*, No. 1:00-1898, MDL 1358(SAS), M21-88, 2005 WL 106936, at *11 & n.9 (S.D.N.Y. Jan. 18, 2005) (finding that, although the amount of sales made into the forum states may well be sufficient for the district court to exercise general jurisdiction, the court did not need to reach the issue "because each of the states may exercise jurisdiction on the basis of specific jurisdiction"). However, as explained *infra* at pp. 77-81, based on Taishan's engagement of an exclusive agent in Florida and the other facts in this case, not the least of which is the fact that Taishan systematically littered the State of Florida with millions of square feet of its defective drywall over a two-year period of time, it would be proper for the Court to find general jurisdiction over Taishan.

2. **The Court may assert specific jurisdiction over Taishan because Taishan has purposefully availed itself of the benefits and protections of Florida law, and the Amended Complaint's allegations arise out of Taishan's intent to serve the Florida market.**

The Supreme Court has not provided courts with a clear test for determining when to assert specific jurisdiction.  Indeed, the Supreme Court acknowledged as much in *McIntyre*, stating that "[t]he rules and standards for determining whether a State does or does not have [specific] jurisdiction over an absent party have been unclear because of decades-old questions left open in *Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)." *McIntyre*, 131 S. Ct at 2785.  In *Asahi*, Justice Brennan and Justice O'Connor, each writing with a plurality of justices – but neither writing for the majority of the Court – articulated two different theories for determining specific jurisdiction.

Justice Brennan's concurring opinion articulated a "stream of commerce" test, holding that a defendant that places its products into the "stream of commerce" is subject to specific jurisdiction as long as the defendant "is aware that the final product is being marketed in the forum State." *Asahi*, 480 U.S. at 117.  Justice O'Connor's concurring opinion adopted what the Fifth Circuit has referred to as the "stream of commerce-plus" theory, holding that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Id.* at 112.

The Supreme Court's recent decision in *McIntyre* did not resolve these competing approaches.  Justice Kennedy, writing for four Justices, disagreed with Justice Brennan's "stream of commerce" theory and favored the approach taken by Justice O'Connor, but Justice Breyer's concurring opinion – the binding opinion of the Court[217] – refused to "announce a rule of broad applicability" and thus left open the question of whether specific jurisdiction may be asserted on a "stream of commerce" theory.  *See* 131 S. Ct. at 2792 (Justice Breyer concluded that "on the record present here, resolving this case requires no more than adhering to our precedents").  Accordingly, and as set forth below, while this Court may assert specific jurisdiction over Taishan by applying the Fifth Circuit's "stream of commerce" test, *see Ruston Gas*, 9 F.3d at 420; *Irving v. Owens-Corning Fiberglass Corp*, 864 F.2d 383, 386 (5th Cir.), *cert. denied sub*

---

[217] Because there was no majority decision in *McIntyre* reflecting the opinion of five Justices, Justice Breyer's concurring opinion is considered the holding of the Court, as that opinion states the Court's ruling on the narrowest grounds.  *See Marks v. United States*, 430 U.S. 188, 193 (1977); *Ainsworth v. CargoTec USA, Inc.*, No. 2:10-CV-236-KS-MTP, 2011 WL 6291812, at *2 (S.D. Miss. Dec. 15, 2011).  Justice Kennedy's four-member plurality decision is not binding precedent.  *See id.*; *Graham v. Hamilton*, No. 3:11-609, 2012 WL 893748, at *3 (W.D. La. Mar. 12, 2012) (finding that Justice Kennedy's opinion "did not command a majority of the Justices and is not binding on this Court"); *Dram Techs. LLC v. Am. II Group, Inc.*, No. 2:10-CV-45-TJW, 2011 WL 4591902, at *2 (E.D. Tex. Sept. 30, 2011) ("Under the rule from *Marks*, the concurring opinion by Justice Breyer, which concurs in the Judgment on much narrower rounds, is the binding holding from the Supreme Court.")

*nom.*, *Jugometal Enters. for Import and Export of Ores and Metals v. Irving*, 493 U.S. 823 (1987), it need not decide between the two approaches articulated in *Asahi*, because the facts here support this Court's application of specific jurisdiction over Taishan under *either* approach.[218]

   **a.    Under either approach articulated in Asahi, the principal inquiry is whether Taishan purposefully directed its activities at, and sought to serve customers in, the Florida market.**

Under the Fifth Circuit's "stream of commerce" test, the Court only needs to find that Taishan purposefully availed itself of the Florida market by entering its products into the "stream of commerce," aware that those products could be sold in Florida.[219]   If the Court requires "something more" under Justice O'Connor's approach in *Asahi*, *see* 480 U.S. at 112, this Court still need only find that Taishan targeted the Florida market and "purposefully directed [its products] toward the forum State."   *Id.*   In either instance, the principal inquiry is whether Taishan purposefully availed itself of the privileges of Florida law by "seeking to serve" the Florida market.   *See World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 295 (1980) (finding

---

[218] The same result would follow under Eleventh Circuit and Florida law.  *See*, *e.g.*, *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1549 (11th Cir. 1993) (applying "stream-of-commerce" theory to assert specific jurisdiction over foreign manufacturer); *Osorio v. Dole Food Co.*, No. 07-22693-CIV, 2009 WL 48189, at *6 (S.D. Fla. Jan. 5, 2009) (noting that "[i]t is not clear which *Asahi* test, if any, has been adopted in the Eleventh Circuit," "but that in a circumstance where the contacts meet O'Connor's most stringent standard, there is no need to consider whether the contacts would meet the other standards"); *Wetzel*, 711 So. 2d at 1999 (holding that foreign manufacturer's shipment to Florida of fireworks "closely related to the type of firework causing the injury" and established minimum contacts under the Due Process Clause).

[219] In *Ruston Gas*, the Fifth Circuit noted that, after *Asahi*, the Fifth Circuit has continued to follow the original "stream-of-commerce" theory established in the majority opinion of *World-Wide Volkswagen*, and has rejected the "stream-of-commerce-plus" theory advocated by the *Asahi* plurality.  9 F.3d at 420; *see Graham*, 2012 WL 893748, at *3-*4 (finding that the court would continue to apply the Fifth's Circuit stream-of-commerce theory because Justice Kennedy's opinion in *McIntyre* was not binding).

that, because there was an isolated sale in a different market, the record did not show that the defendants "serve or seek to serve the Oklahoma market"); *McIntyre*, 131 S. Ct. at 2788 (Kennedy, J.) (finding that the court's opinion in *World-Wide Volkswagen* "merely observes that a defendant may in an appropriate case be subject to jurisdiction without entering the forum – itself an unexceptional proposition – as where manufacturers or distributors 'seek to serve' a given State's market"); *see id.* at 2793 (Breyer, J., concurring) (finding that existing precedent asks whether the defendant can "be said to have targeted the forum").

In determining whether a foreign defendant has sought to serve a forum state, the Supreme Court has made clear that physical contacts in the state *are not* necessary. *See Burger King*, 471 U.S. at 476 ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."). Indeed, the Fifth Circuit and district courts have stressed repeatedly that, where evidence shows that the defendant intended to serve the forum state, it does not matter that the defendant did not have physical contacts in the forum state. *Irving*, 864 F.2d at 386 ("Personal jurisdiction does not require certain knowledge of the user's identity."); *Ainsworth*, 2011 WL 6291812, at *1-*2 (court may assert specific jurisdiction although foreign defendant had no physical interaction with forum state); *see also Seltzer Sister Bottling Co., Inc. v. Source Perrier, S.A.*, No. C-90-1468 MHP, 1991 WL 279273, at *7 (N.D. Cal. May 1, 1991) (rejecting argument that plaintiff "is unable to prove any specific contacts" between defendant and the forum state, finding that there was sufficient evidence that defendant "clearly intended to serve the California market"). Along those same lines, where a defendant intends to serve customers in the forum state, federal courts have repeatedly held that it does not matter whether the defendant sold its products directly into the forum or whether it used

intermediaries that it knew would sell into the forum.  *See*, *e.g.*, *Ruston Gas*, 9 F.3d at 420-21 (defendant "not only *could have foreseen* that the products might end up in Texas, it *knew* as a fact that the products were going to be delivered to a specific user in Houston, Texas") (emphasis in original); *Irving*, 864 F.2d at 387 (finding that defendant was more than simply "aware" that its products could be sold in Texas, where it had a "fifteen-year history of bulk asbestos shipments to Houston, ties to the Houston testing laboratory, and knowledge that the shipping bags were cleaned in Houston").[220]

        **b.**     ***The evidence shows that Taishan sought to serve, and did serve, customers in the Florida market, and that the allegations in the Amended Complaint arise out of and relate to Taishan's efforts to serve the Florida market.***

The Fifth Circuit uses a three-part test to determine whether a foreign defendant has "sought to serve" the forum state, in which case a district court may exercise specific jurisdiction

---

[220] *See also Vandelune v. 4B Elevator Components Unlimited*, 148 F.3d 943, 948 (8th Cir. 1998) ("when a foreign manufacturer pours its products into a regional distribution with the expectation that the distributor will penetrate a discrete, multi-State trade area, the manufacturer has purposefully reaped the benefits of the laws of each State in that trade area for due process purposes") (citations and quotations omitted); *Dram Techs.*, 2011 WL 4591902, at *3 (finding specific jurisdiction although defendant sold its memory chips to major consumer electronics manufacturers outside United States, where the defendant "purposefully directed activities at the residents of the state of Texas").  Even if Taishan's representations that it did not know the exact final destinations for its products shipped to the U.S. – and the facts are contrary to those representations – it certainly knew that its products were headed to one of the several states that it had targeted for its drywall.  In analogous circumstances, like the circumstances in *Vandelune*, 148 F.3d at 948, described above, courts have asserted specific jurisdiction over a company that shipped products to regional distributors where the court sat in one of the states the company sought to serve.  *See Carr v. Pouilloux, S.A.*, 947 F. Supp. 393, 397-98 (C.D. Ill. 1996) (finding specific jurisdiction where "[t]he state of Illinois is unquestionably within the contractual distribution territory," and "although Pouilloux claims that it has never exercised any control over where the distributor sent [the products]," "there was no evidence that Pouilloux was completely unaware of the scope of the distributor's efforts"); *Stokes v. L. Geismar, S.A.*, 815 F. Supp. 904, 907 (E.D. Va. 1993) (finding specific jurisdiction where "Geismar did, to a great extent, create, control and employ the distribution system that brought its products to Virginia"); *see also McIntyre*, 131 S. Ct. at 2789-90 (Kennedy, J.) ("Furthermore, foreign corporations will often target or concentrate on particular States, subjecting them to specific jurisdiction in those forums.").

over a foreign defendant.  The test asks whether:  (1) the defendant purposefully availed itself of the privilege of acting in the forum; (2) the cause of action is "related to" or "arises from" the defendant's contacts with the forum; and (3) the defendant's acts or the consequences of those acts make the exercise of jurisdiction fair and reasonable.  *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006) (citing *Burger King*, 471 U.S. at 474); *Francosteel Corp. v. M/V Charm*, 19 F.3d 624, 629 (11th Cir. 1994) (same test for Eleventh Circuit).  All three parts of the test are satisfied here.

First, the evidence demonstrates that Taishan has, in fact, "purposefully availed" itself of the privilege of acting in Florida, and that it "purposefully directed" its activities towards serving customers in the Florida market.  As described above, Taishan was involved directly with the shipment of 9.4 million square feet of drywall to Florida, and significantly more than that through other sales that it knew were destined for Florida.  (*See supra* at pp. 27-29, 35-40, 42-45.)  These products were not shipped to Florida by happenstance; after demand for drywall increased in late 2005, Taishan systematically targeted the Florida market and its customers.  Taishan's strategy is detailed more fully above, *see supra* at pp. 23-45, but the salient facts show that Taishan engaged an exclusive agent to sell its products in Florida, solicited Florida customers both by sending samples to those customers and by inviting (in at least two instances) its Florida customers to its factories in China, provided quotes and shipping estimates to potential Florida customers, and showed an acute understanding of U.S. and Florida specifications and regulations regarding drywall product deliveries.  Taishan, in fact, admitted that three different Florida companies purchased its drywall and expressly advised it that they were shipping that drywall to Florida.  Moreover, the record is replete with evidence that Taishan

sought to develop the Florida market and represented to potential customers, both inside and outside of Florida, that it already served the Florida market.  *See id.*

Federal courts faced with similar facts have consistently held that specific jurisdiction may be asserted over a foreign defendant.  For example, courts have found that sales through intermediaries may still evidence an intent to serve a particular market.  *See*, *e.g.*, *Graham v. Hamilton*, 2012 WL 893748, at *4 ("Here, Plaintiffs have offered evidence demonstrating that GM Canada places over 800,000 vehicles into the U.S. market each year, indicating that many of GM Canada's vehicles' would likely be sold in Louisiana."); *Ainsworth*, 2011 WL 6291812, at *1-*2 (court found specific jurisdiction although foreign defendant had no physical interaction with forum state where evidence revealed that defendant had targeted the forum with its products, specifically, showing that "203 [of defendant's products] had been sold to customers in Mississippi over the past decade," making the case distinguishable from *McIntyre*); *Felty v. Conaway Processing Equip. Co.*, 738 F. Supp. 917, 920 (E.D. Pa. 1990) (finding that "[t]hrough Lindholst, its sole international marketing agent, Holland purposefully directed its machines toward the U.S., one of which, Pennsylvania, plays a significant role in the poultry processing industry"); *Seltzer Sister Bottling Co., Inc. v. Source Perrier, S.A.*, No. C-90-1468 MHP, 1991 WL 279273, at *7 (N.D. Cal. May 1, 1991) (discussing evidence "that Source Perrier clearly intended to serve the California market, and reap the financial benefits that such a high sales volume entailed").

In addition, courts have held that custom-manufactured goods, or goods designed to certain specifications, are evidence that a foreign defendant seeks to serve the forum state.  *See King v. General Motors Corp.*, No. 5:11-cv-2269-AKK, 2012 WL 1340066, at *7 (N.D. Ala. Apr. 18, 2012) ("there is no doubt that GM Canada 'seeks to serve' Alabama when it specifically

manufactures GM vehicles, in compliance with federal regulations, and designed by its parent corporation who actively sold these vehicles to an Alabama dealership");[221] *see also Vandelune*, 148 F.3d at 948 (noting that the products were specifically designed for the particular U.S. markets). Courts have also found that the use of internet websites to target customers – here, Taishan used the Alibaba website and could receive and respond to customer inquiries on that website, *see supra* at p. 27 – can demonstrate an intent to serve a given market. *See Furminator, Inc. v. Wahba*, No. 4:10CV01941 GF, 2011 WL 3847390, at *5 (E.D. Mo. Aug. 29, 2011) (the court applied *McIntyre* and held that it could assert specific jurisdiction over the defendants based, in part, on evidence that the defendants "knew that the product in question that they sold on eBay.com or Amazon.com were available to Missouri residents" and "were in fact sold to at least one Missouri resident (Plaintiff)").

The facts regarding TG's traceable shipments to Banner further demonstrate TG's intent to serve the Florida market and its delivery of goods to the Florida market. (*See supra* 42-45.) These facts show multiple sales of Taishan drywall to BBMIEC that are traceable to Florida, and thus further evidence Taishan's intent to target the Florida market. However, these facts deserve

---

[221] In *King*, the district court rejected the defendant's arguments that the specific jurisdiction could not be asserted consistent with the Supreme Court's decision in *McIntyre*, finding that the evidence clearly supported a finding that the defendant intended to serve the forum state:

> Here, GM Canada, the entity who built certain vehicles for GM Corporation to distribute specifically in the United States, including Alabama, cannot genuinely maintain that it does not serve the Alabama market. Stated differently, if not Alabama, what market does GM Canada serve? As one of these vehicles gave rise to the current cause of action, the economic realities of GM Canada and GM Corporation's commercial relationship establish sufficient 'minimum contacts' with Alabama to demonstrate a targeting of Alabama's commercial automobile market and evidence that GM Canada purposefully availed itself to the benefits and privileges of this market.

*King*, 2012 WL 1340066, at *8.

close attention for another reason:  the facts severely undermine – if not flatly contradict – TG's representation on its Profile Form that it made only one direct sale to the U.S. and that it is unaware of *any other sales* that were destined to the U.S.  (Herman Affidavit Exh. 19.)  TG produced documents during discovery showing that TG – *not TTP* – sold drywall to BBMIEC.  These are the transactions that are listed on *TTP's* Profile Form.  Either the representations in TG's profile form are untrue or the sales listed on TTP's profile form are misleading (because those were contracts entered into by TG, not TTP).  In any event, even if TTP is the party that ultimately sold the drywall that was delivered to BBMIEC, it was TG that contracted to sell those goods, which demonstrates conclusively that TTP was acting as TG's agent.

Therefore, under the Fifth Circuit's "stream-of-commerce" test, TG was clearly aware that its goods were being delivered in Florida; Taishan's receipt of information regarding the bills of lading and Taishan's communications with Rothchilt (the distributor shipping the goods for import in Florida) demonstrate as much.  (*Id.* at 42-45.)  And even under Justice Kennedy's stricter test articulated in *McIntyre*, the facts related to the Banner sales satisfy the requirements of the Due Process Clause.  Indeed, TG's specific knowledge of the bills of lading for drywall shipments with a Miami destination and its confirmations with Rothchilt that its drywall shipments were prepared and ready for shipment, combined with its ongoing solicitation of potential Florida customers and its representations to other customers that it already had customers in Florida, demonstrate that TG was purposefully targeting the Florida market through both direct and indirect sales.  *See Ruston Gas*, 9 F.3d at 420-21 (district court had personal jurisdiction over defendant that "intentionally placed its products into the stream of commerce by delivering them to a shipper destined for delivery in Texas," where defendant knew "as a fact that the products were going to be delivered to a specific user in Houston, Texas"); *Luv N'care*,

438 F.3d at 471 (finding jurisdiction was proper where "[i]t was eminently foreseeable that Insta-Mix's products would reach the market indicated on the company's invoices").[222]

Second, as explained above in the context of Florida's long-arm statute, *see supra* at pp. 52-61, the evidence shows that Plaintiff's claims arise from and relate to Taishan's intent to serve the Florida market. The "arise from or relate to" requirement is meant to give a defendant fair notice that its activities in the forum may subject it to specific jurisdiction in the forum. *See Burger King*, 471 U.S. at 472 (explaining the Due Process Clause's "fair warning" requirement).[223] That requirement is satisfied where, as here, the defendant seeks to serve a given market with its products, and it is those products, and the defendant's activities in serving those products, that cause the injuries underlying the plaintiff's claims. *See Graham*, 2012 WL 893748, at *4 ("Here, the products liability claim rests on injuries sustained due to the allegedly defective vehicles manufactured by GM Canada and subsequently sold in Louisiana. Therefore, the Court finds that the cause of action arises out of GM Canada's forum-related contacts."); *Rockwell*, 2011 WL 6965795, at *7 (finding that the cause of action "arose from defendant's

---

[222] Taishan's suggestion that it did not know that its products were sold to and used by Florida customers, because, it claims, it sold its products to distributors and middlemen (*see* Taishan MOL 1-2, 13-20, 63-64), should be rejected. Courts have consistently denied attempts by defendants to avoid responsibility for their products by using middlemen and independent distributors to market those products. *See Nuovo Pignone, SpA v. Storman Asia M/V*, 310 F.3d 374, 380 (5th Cir. 2002) (defendant "should not be permitted to escape personal jurisdiction by intertwining itself in a multi-layered contractual arrangement"); *King*, 2012 WL 134066, at *7 n.3 ("the court refuses to allow GM Canada to 'Pilate-like wash its hands of a product by having its independent distributors market it'") (quoting *McIntyre*, 131 S. Ct. at 2794 (Ginsberg, J., dissenting)); *Luv N'Care*, 438 F.3d at 471 (same).

[223] *See also Psarianos v. Standard Marine, Ltd., Inc.*, 728 F. Supp. 438, 444 (E.D. Tex. 1989) ("The central theme of due process is a determination of whether or not a non-resident defendant possesses a reasonable expectation that he could be sued in the forum state. This 'reasonable expectation' or 'fair warning' is satisfied in a 'specific jurisdiction' case when the defendant directs his activities and conduct at the forum state and residents in that state, such that he should reasonably expect a suit arising out of those activities.").

activity in the state" where "the malfunction and the injury indisputably occurred in the forum state"); *Source Perrier, S.A.*, 1991 WL 279273, at *7 ("If Source Perrier never directed its product to the California market, then Source Perrier could not cause injuries to competitors based upon any unfair trade practices utilized in capturing these markets.").

Third, and finally, the evidence demonstrates that the Court's application of personal jurisdiction over Taishan is fair and reasonable and does not, in any way, offend notions of fair play and substantial justice. This Court has observed that "[i]f a plaintiff demonstrates that the defendant has minimum contacts with the forum state, personal jurisdiction exists unless the defendant can make a compelling case that the exercise of jurisdiction would violate the traditional notions of fair play and substantial justice." *In re Chinese Manufactured Drywall*, 767 F. Supp. 2d at 658 (*citing Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)). Taishan does not come close to offering a "compelling case" to why personal jurisdiction should not be exercised here.

The Fifth Circuit has held that, in determining the fundamental fairness of asserting jurisdiction, a court "must examine (1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies." *Ruston Gas*, 9 F.3d at 421 (citing *Asahi*, 480 U.S. at 112); *see Asahi*, 480 U.S. at 114-15 ("[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum will justify even the serious burdens placed on the alien defendant"). Here, Taishan sought to serve customers in the Florida market and those customers suffered injuries caused by the products Taishan directed into the forum. Florida has an undeniably strong interest in allowing its citizens to obtain relief in the forum where they were injured, and

Taishan, an international company with a worldwide reach, can hardly claim that it would be burdened by litigating the action in Florida. Taishan has held itself out as a company that can ship and operate internationally and, as the facts show, operated throughout the U.S., selling millions of dollars of its drywall. Given the financial windfall it received throughout the relevant time period by operating in Florida, it should not be able to avoid jurisdiction now simply because it is a foreign company. *See Nuovo Pignone*, 310 F.3d at 382 (Louisiana's interest in redressing injuries incurred within its borders outweighed foreign country's interests); *Graham*, 2012 WL 893748, at *5 ("[B]ased on the financial benefits that accrue to GM Canada because of the availability of Louisiana as a market for its products, the proximity of Canada to Louisiana, and the absence of any contrary argument by GM Canada, the Court finds that exercising personal jurisdiction is fair and reasonable.").

**c.**     ***Taishan's argument that the Court should deny specific jurisdiction based on the Supreme Court's decision in McIntyre should be rejected.***

In support of its Renewed Motion, Taishan argues that the Supreme Court's decision in *McIntyre* should lead this Court to deny specific jurisdiction because, Taishan claims, the Supreme Court held in *McIntyre* that the "stream of commerce" test cannot be used to assert personal jurisdiction over a foreign defendant. (Taishan MOL 38-42.) Taishan's representation of *McIntyre*, however, is wrong, but even if it was correct, Taishan's argument that jurisdiction should be denied under *McIntyre* would fail.

As explained *supra* at p. 65 n.217, Justice Kennedy's plurality opinion discussing the "stream of commerce" theory is not binding on the Court. District courts in the Fifth Circuit deciding personal jurisdiction questions since *McIntyre* have noted correctly that the Supreme Court in *McIntyre* did *not* announce a new rule rejecting the "stream of commerce" test. *See*, *e.g.*, *Graham*, 2012 WL 893748, at *3 (finding that "Justice Breyer's concurrence, which is

75

binding … declined to adopt a new rule"); *Ainsworth*, 2011 WL 6291812, at *2 ("the Court must consider Justice Breyer's concurring opinion as the holding of the Court, as he concurred in the judgment on the narrowest grounds"); *Brooks & Baker, LLC v. Flambeau, Inc.*, No. 2:10-cv-146-TJW-CE, 2011 WL 4591905, at *4 (E.D. Tex. Sept. 30, 2011) (same).   Contrary to Taishan's argument, then, *McIntyre* did not announce a new rule of law or reject an existing rule of law: "the outcome of the case is determined by [existing] precedents," none of which had found that "a single isolated sale . . . is sufficient" to establish personal jurisdiction.  131 S. Ct. at 2791.

Justice Breyer's controlling opinion, then, limited *McIntyre* to its facts.  Those facts – that an American distributor had sold one machine to a New Jersey customer, that the British defendant had permitted its American distributor to sell its machines to any U.S. customer, and that the British manufacturer had attended trade shows in the U.S. – led the Supreme Court to find that there were not sufficient contacts with New Jersey, but those facts are distinguishable from the facts here.  In *McIntyre*, there were no facts in the record demonstrating an intent to serve the forum state, no facts showing that the defendant engaged an exclusive agent in the forum, no facts demonstrating any direct sales into the forum state, and nothing that comes close to the mountain of facts gathered during discovery that, as detailed *supra* at pp. 24-46, illustrate a comprehensive strategy to solicit customers in the forum state. Indeed, in *McIntyre,* there were no facts demonstrating "a single contact with New Jersey short of the machine in question ending up in [the] state."  131 S. Ct. at 2790 (quotations and citation omitted).

Unlike the facts presented in *McIntyre*, the evidence here does not show an "isolated occurrence" where a product sold by Taishan entered a market Taishan did not intend to serve. Instead, the evidence demonstrates that Taishan intended to and did serve the Florida market for drywall.  *See World-Wide Volkswagen*, 444 U.S. at 297 (where "the sale of a product … is not

simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in [several] States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others").[224]  Stated simply, the *McIntyre* ruling was decided on and limited to its facts and did not alter the Fifth Circuit's specific jurisdiction analysis.  In fact, courts deciding specific jurisdiction after *McIntyre* have continued to assert specific jurisdiction in the same circumstances present here.  *See Ainsworth*, 2011 WL 4443626, at *7 (specific jurisdiction over foreign company who sold to customers in forum through distributors); *Brooks & Baker*, 2011 WL 4591905, at *3 (distinguishing *McIntyre* because evidence demonstrated that the defendant "intended Texas consumers to purchase the products at issue in this lawsuit"); *Dram Techs.*, 2011 WL 4591902, at *3 (specific jurisdiction over foreign company that sold to international distributors knowing that its products would be incorporated into products sold in Texas).

### 3.    The Court may assert general jurisdiction over Taishan because Taishan's contacts and sales in Florida evidence a "continuous and systematic" course of conduct in Florida.

If this Court finds that it may assert specific jurisdiction over Taishan, it need not decide whether it could also assert general jurisdiction over Taishan.  *See Ruston Gas*, 9 F.3d at 419 (declining to decide general jurisdiction after finding that it could assert specific jurisdiction).  However, if the Court does consider the issue, it should find that general jurisdiction over

---

[224] Justice Breyer's concurring opinion in *McIntyre*, in fact, does little more than conclude that the isolated sale in that case is similar to the isolated sale in *World-Wide Volkswagen*:  "None of our precedents find that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient [to find minimum contacts]."  *McIntyre*, 131 S. Ct. at 2792.  This case is not a case involving an isolated sale of a product that winds its way into a different forum; instead, the evidence here reflects Taishan's intentional marketing and selling efforts in Florida, one of the most attractive markets during the relevant period for Taishan's products.

Taishan is permitted under Supreme Court precedent because Taishan's contacts and sales in Florida were "continuous and systematic."

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011) (citing *Int'l Shoe*, 326 U.S. at 317).[225]   Courts may find general jurisdiction over a foreign defendant where the defendant, although it does not maintain a physical presence in the state, actively solicits customers and sells products in the states. *See Eli Lilly and Co. v. Mayne Pharma (USA) Inc.*, 504 F. Supp. 2d 387, 394 (S.D. Ind. 2007) (asserting general jurisdiction over out-of-state defendant, and finding that "[r]egular business solicitation in the forum state, especially the solicitation of new customers, is an important aspect of the nature of the activity"); *Fanimation Design & Mfg., Inc. v. Nicor, Inc.*, IP 02-0576-C-M/S, 2003 WL 21766572, at *6 (S.D. Ind. July 17, 2003) (same).

Factors to consider when assessing a defendant's contacts include "(1) whether the corporation solicits business in the state through a local office or agents; (2) whether the corporation sends agents into the state on a regular basis to solicit business; (3) the extent to which the corporation holds itself out as doing business in the forum state, through advertisements, listing or bank accounts; and (4) the volume of business conducted in the state by the corporation." *3M Innovative Props. Co. v. InFocus Corp.*, No. Civ. 04-0009, 2005 WL

---

[225] As this Court has recognized, the Fifth Circuit "has consistently imposed the high standard set by the Supreme Court when ruling on general jurisdiction issues." *In re Chinese Manufactured Drywall*, 767 F. Supp. 2d at 660 (citation and quotations omitted).

361494, at *2 (D. Minn. Feb. 9, 2005) (citing *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1533 (10th Cir. 1996)).

Taishan's extensive efforts to market its drywall and solicit customers in Florida are detailed above.  (*See supra* at pp. 23-45.)  Taishan engaged an exclusive agent to secure sales of its drywall, and sent samples of its products to interested customers.  It responded to customer inquiries and even invited customers to its factories in China, representing to those customers that it already had clients in Florida and that it could ship its products anywhere.  *See Eli Lilly*, 504 F. Supp. 2d at 394 (finding that the defendant's "frequent and numerous sales visits and other marketing efforts," as well as the amount of sales into the forum, "also constitute continuous and systematic contacts which support an exercise of jurisdiction").   Although Taishan suggests that its sales were made to middlemen and brokers, federal courts have found general jurisdiction over out-of-state defendants even where their sales into the forum are conducted through distributors.  *Eli Lilly*, 504 F. Supp. 2d at 394 ("The presence of a wholesale 'middleman' does not insulate Mayne Pharma from its having purposefully availed itself of the forum state by generating millions of dollars worth of commercial activity in Indiana through its sales efforts."); *Fanimation*, 2003 WL 21766572, at *6 ("A company need not be selling directly to consumers to be doing business in the state.").

Moreover, Taishan ultimately was involved in the shipment of nearly 9.4 million square feet of drywall to Florida.  (*See supra* at p. 36.)  Courts have also held that "[t]he defendant's percentage of sales in the forum can be a relevant consideration in a general jurisdiction analysis."  *See InFocus Corp.*, 2005 WL 361494, at *2 (citing *Stairmaster Sports/Med. Prods., Inc. v. Pac. Fitness Corp.*, 916 F. Supp. 1049 (W.D. Wash. 1996), *aff'd*, 78 F.3d 602 (Fed. Cir. 1996); *Trizec Props., Inc. v. United States Mineral Prods. Co.*, No. 89-4133, 1990 WL 142017,

at *4 (finding general jurisdiction based, in part, on 1% of overall sales in forum, finding that "these statistics do not leave a definite and firm impression that U.S. Mineral's 1+ percent annual Louisiana sales are insignificant").  Other courts have noted that overall sales figures should be considered.  *See LSI Indus., Inc. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1375 (Fed. Cir. 2000) (finding that the district court could have asserted jurisdiction based on the amount of sales into the forum state); *Mass. Inst. of Tech. v. Micron Tech, Inc.*, 508 F. Supp. 2d 112, 121 (D. Mass. 2007) (finding general jurisdiction where, "[a]lthough these sales constitute only about 1% of Micron's national sales, the evidence indicates that they represent a substantial volume of product flowing into Massachusetts on a regular basis and a significant customer base"); *Provident Nat'l Bank v. California Fed. Savings & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987) (looking to total amount of sales in the forum state, not only as a percentage of the foreign company's overall sales).  In either instance, Taishan's sales in and directed to Florida constituted a considerable amount of its overall U.S. sales, and totaled several million dollars during the relevant time period.

Taishan's sales in Florida, combined with the evidence that it actively solicited Florida customers, provided shipping quotes and customized specifications to interested customers, and executed an agreement to engage an exclusive sales agent in Florida, demonstrate a pattern of continuous and systematic contact with Florida.  Accordingly, this Court may assert general jurisdiction over Taishan and, for the reasons explained above, should find that its assertion of jurisdiction over Taishan is fair and reasonable.  *See InFocus Corp.*, 2005 WL 361494, at *5 ("After a finding of minimum contacts, courts rarely conclude that an assertion of personal jurisdiction would be unreasonable unless the plaintiff's interests and the state's interest in

adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum.").

### D.   PLAINTIFFS HAVE NOT BEEN ALLOWED TO OBTAIN DISCOVERY FROM TAISHAN'S UPSTREAM ENTITIES.

Taishan's upstream entities, CNBM and BNBM, have not participated in this litigation, and default judgments have been entered against both entities.  [Rec. Doc. No. 5621.]  Plaintiffs have been unable to take any formal discovery to ascertain the relationship between Taishan and these entities, and, accordingly, this Court should ignore any suggestion by Taishan that it did not interact with its upstream entities.  As the PSC explains in its Global Memorandum of Law, Plaintiff should be allowed to take formal discovery of Taishan's upstream entities and to determine whether those entities control Taishan, to what extent they do so, and to what extent those entities have acted in concert with Taishan to serve customers in the Florida market.  (PSC Global MOL 35-36.)

### V.   <u>CONCLUSION</u>

For the foregoing reasons, the Homebuilders respectfully request that this Court deny Taishan's Motions pursuant to Rules 55(c) and 12(b)(2) to dismiss the default judgment and vacate the action.

81

Respectfully submitted,

**GREENBERG TRAURIG, P.A.**
*Lead Counsel for the HSC*
*Counsel for Lennar Corporation; Lennar*
*Homes, LLC; U.S. Home Corporation;*
*Meritage Homes of Florida, Inc.; G.L.*
*Building Corporation; Boynton Beach*
*Associates XVI, LLLP; G.L. Homes of Davie*
*Associates II, Ltd.; and G.L. Homes of Davie*
*Associates III, Ltd.*

333 Avenue of the Americas
(333 S.E. 2nd Avenue)
Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
Email: bassh@gtlaw.com

By:     /s/ Hilarie Bass
        HILARIE BASS
        Florida Bar No. 334323
        MARK A. SALKY
        Florida Bar No. 058221
        ADAM M. FOSLID
        Florida Bar No. 0682284

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 17, 2012, this document has been served on Plaintiffs' Liaison Counsel, Russ Herman, Esq., and Defendants' Liaison Counsel, Kerry Miller, Esq., and Homebuilders' Steering Committee Dorothy Wimberly and Insurer Defendants' Liaison Counsel, Judy Y. Barrasso, Esq. by U.S. mail and/or email or by hand delivery and I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and upon all parties by electronically uploading the same to Lexis/Nexis File & Serve in accordance with Pretrial Order No. 6.

/s/ Hilarie Bass
Hilarie Bass