IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT, IN AND FOR MIAMI-
DADE COUNTY, FLORIDA 09 01 CA23

CASE NO.  09 - 0 7 9 0 1

LENNAR HOMES, LLC f/k/a LENNAR
HOMES, INC., a Florida limited liability
company, and U.S. HOME CORPORATION,
a Delaware corporation,

       Plaintiffs,

v.

KNAUF GIPS KG, a German corporation, KNAUF
PLASTERBOARD (TIANJIN) CO., LTD., a Chinese
limited liability corporation, TAISHAN GYPSUM
CO. LTD. f/k/a SHANDONG TAIHE DONGXIN
CO. LTD., a Chinese limited liability corporation,
USG CORPORATION, a foreign corporation,
L&W SUPPLY CORPORATION d/b/a SEACOAST
SUPPLY, a foreign corporation, BANNER SUPPLY CO.,
a Florida corporation, LA SUPREMA TRADING, INC.,
a Florida corporation, LA SUPREMA ENTERPRISE, INC.,
a Florida corporation, BLACK BEAR GYPSUM SUPPLY,
INC., a Florida corporation, INDEPENDENT BUILDERS
SUPPLY ASSOCIATION, INC., a foreign corporation,
ROTHCHILT INTERNATIONAL LTD., a foreign
corporation, BILL PFANNKUCH FRAMING INC.,
a Florida corporation, BMD, INC.,  a Florida corporation,
RESIDENTIAL DRYWALL, INC., a Florida corporation,
J.D.M. BUILDERS INC., a Florida corporation,
MDW DRYWALL, INC. f/k/a MCCOY DRYWALL, INC.,
a Florida corporation, NORTHEAST DRYWALL CO.,
a Florida corporation, FLORIDA STYLE SERVICES, INC.,
a Florida corporation, OCEAN CONSTRUCTION, INC.,
a Florida corporation, B&B STUCCO, INC., a Florida
corporation, HARRELL'S DRYWALL, INC.,
a Florida corporation, S.D. & ASSOCIATES, INC.,
a Florida corporation, and ALL COUNTY DRYWALL
SERVICE, INC., a Florida corporation

       Defendants,

_____/



## COMPLAINT

Plaintiffs, Lennar Homes, LLC, formerly known as Lennar Homes, Inc. (**"Lennar Homes"**) and U.S. Home Corporation (**"U.S. Home"**) (collectively, **"Lennar"**), hereby sue Defendants, Knauf Gips KG (**"Knauf Gips"**); Knauf Plasterboard (Tianjin) Co., Ltd. (**"Knauf Tianjin"**); Taishan Gypsum Co. Ltd. f/k/a as Shandong Taihe Dongxin Co. Ltd. (**"Taishan"**); USG Corporation (**"USG"**); L&W Supply Corporation d/b/a Seacoast Supply (**"Seacoast"**); Banner Supply Co. (**"Banner"**); La Suprema Trading, Inc. (**"La Suprema Trading"**); La Suprema Enterprise, Inc. (**"La Suprema Enterprise"**); Black Bear Gypsum Supply, Inc. (**"Black Bear"**); Independent Builders Supply Association, Inc. (**"IBSA"**); Rothchilt International Ltd. (**"Rothchilt"**); Bill Pfannkuch Framing Inc. (**"Pfannkuch"**); BMD, Inc. (**"BMD"**); Residential Drywall, Inc. (**"Residential"**); J.D.M. Builders Inc. (**"J.D.M."**); MDW Drywall, Inc., f/k/a as McCoy Drywall, Inc. (**"McCoy"**); Northeast Drywall Co. (**"Northeast"**); Florida Style Services, Inc. (**"Florida Style"**); Ocean Construction, Inc. (**"Ocean"**); B&B Stucco, Inc. (**"B&B Stucco"**); Harrell's Drywall, Inc. (**"Harrell's Drywall"**); S.D. & Associates, Inc. (**"S.D.A."**); and All County Drywall Service, Inc. (**"All County Drywall"**), and allege as follows:

### The Parties, Jurisdiction and Venue

1.     This is an action for damages in excess of $150,000.00, exclusive of interest, costs, and attorneys' fees.

2.     Lennar Homes is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.  U.S. Home is a Delaware corporation authorized to do and doing business in the State of Florida.

3.     Both Lennar Homes and U.S. Home are affiliates of Lennar Corporation, one of the nation's leading builders of quality homes.  Lennar Corporation and its affiliates (like Lennar

2

Homes and U.S. Home) have built homes in seventeen states, including Arizona, California, Colorado, Florida, Delaware, Illinois, Maryland, Nevada, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin. Since its founding in 1954, Lennar Corporation and its affiliates have built over 700,000 homes in hundreds of communities across the United States. In addition to home construction, Lennar also offers services in such related areas as financial services, mortgages, title insurance, insurance, real estate development and planning, and residential community planning and development.

4.     Both Lennar Homes and U.S. Home are developers of homes in numerous communities throughout the State of Florida.

5.     Defendant Knauf Gips is a German corporation doing business in the State of Florida. One of Knauf Gips' affiliates, Gebr. Knauf Verwaltungsgsellschaft KG, owns a substantial stake in USG. Knauf Gips is a leading manufacturer of building materials and systems. Knauf Gips, together with its affiliates, including Knauf Tianjin, provides building materials and systems to customers in over 50 countries, including the United States. Upon information and belief, at all material times hereto, Knauf Gips supervised, operated, trained and otherwise exercised control and/or had the right to control the operations of Knauf Tianjin, and its agents, apparent agents, and employees.

6.     Among other things, in 1995, Knauf Gips introduced its advanced production techniques and technology into China. From 1997 through 2001, Knauf Gips invested in China and established three plasterboard plants which are located in Wuhu, Tianjin and Dongguan. The product quality of all Knauf Gips' plants in China, including Knauf Tianjin, are strictly controlled according to the requirements of Knauf Gips' headquarters in Germany. Moreover, Knauf Gips' sales and technical support teams support Knauf Gips' businesses throughout the

3

world, including Knauf Tianjin in China. Knauf Tianjin and its employees are the actual and/or apparent agents of Knauf Gips.

7.     Upon information and belief, Knauf Gips, together with its affiliates and/or actual or apparent agents, including Knauf Tianjin, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within the State of Florida. Upon information and belief, Knauf Gips and/or Knauf Tianjin has continuously and systematically distributed and sold drywall to numerous purchasers in the State of Florida and their drywall is installed in numerous homes in Florida. As discussed more fully below, Knauf Gips and/or Knauf Tianjin manufactured and sold, directly and indirectly, to certain suppliers in the State of Florida, including Defendants USG, Seacoast, Banner, La Suprema Trading, La Suprema Enterprise, Black Bear, IBSA and/or Rothchilt, defective gypsum drywall that was installed in homes being built by Lennar, thereby causing substantial damage to Lennar in Florida. Moreover, Knauf Gips and/or Knauf Tianjin purposefully availed themselves of the jurisdiction of this Court by selling and shipping substantial quantities of drywall into the State of Florida and by hiring agents within the State of Florida to investigate the very allegations at issue in this lawsuit.

8.     Defendant Knauf Tianjin is a Chinese corporation doing business in the State of Florida. Knauf Tianjin is involved in the manufacturing and sale of gypsum drywall. Knauf Tianjin is the actual agent and/or apparent agent of Knauf Gips. Upon information and belief, Knauf Tianjin, individually and/or together with and at the direction and control of its principal, Knauf Gips, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by

4

thousands of consumers, if not more, within the State of Florida. Knauf Tianjin and/or Knauf Gips has continuously and systematically distributed and sold drywall to numerous purchasers in the State of Florida and their drywall is installed in numerous homes in Florida. As discussed more fully below, Knauf Tianjin and/or Knauf Gips manufactured and sold, directly and indirectly, to certain suppliers in the State of Florida, including Defendants USG, Seacoast, Banner, La Suprema Trading, La Suprema Enterprise, Black Bear, IBSA and/or Rothchilt, defective gypsum drywall that was installed in homes being built by Lennar, thereby causing substantial damage to Lennar in Florida. Moreover, Knauf Tianjin and/or Knauf Gips purposefully availed themselves of the jurisdiction of this Court by selling and shipping substantial quantities of drywall into the State of Florida and by hiring agents within the State of Florida to investigate the very allegations at issue in this lawsuit.

9.      Defendant Taishan is a Chinese corporation doing business in the State of Florida. Taishan is involved in the manufacturing and sale of gypsum drywall. Upon information and belief, Taishan manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within the State of Florida. Taishan has continuously and systematically distributed and sold drywall to numerous purchasers in the State of Florida and Taishan's drywall is installed in numerous homes in Florida. As discussed more fully below, and upon information and belief, Taishan manufactured and sold to certain suppliers in the State of Florida, defective gypsum drywall that was installed in homes being built by Lennar, thereby causing substantial damage to Lennar in Florida. Moreover, Taishan purposefully availed itself of the jurisdiction of this Court by selling and shipping substantial quantities of drywall into the State of Florida.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

10.     This Court has personal jurisdiction over Defendants Knauf Gips, Knauf Tianjin, and Taishan under Florida Statutes § 48.193(2) because they are "engaged in substantial and not isolated activity within this state." *See* Fla. Stat. § 48.193(2).  Additionally, Lennar's causes of action arise from Knauf Gips, Knauf Tianjin, and Taishan personally or through their agents, causing injury to property within the State of Florida arising out of acts or omissions of Knauf Gips, Knauf Tianjin, and Taishan outside the State of Florida, and at the time of the injury, products, materials, or things manufactured by Knauf Gips, Knauf Tianjin, and Taishan were used and consumed within the State of Florida in the ordinary course of commerce, trade, or use. *See* Fla. Stat. § 48.193(1)(f)(2).

11.     Defendant USG is a Delaware corporation authorized to do and doing business in the State of Florida.  USG, together with its various affiliates, including Seacoast, is the nation's largest distributor of drywall and related building products.

12.     Defendant Seacoast is a Delaware corporation authorized to do and doing business in the State of Florida.  Seacoast has numerous supply centers in the State of Florida, including in Miami-Dade County, Florida.  Seacoast is a subsidiary of USG.

13.     Defendant Banner is a Florida corporation, having its principal place of business in Miami-Dade County, Florida.

14.     Defendant La Suprema Trading is a Florida corporation, having its principal place of business in Miami-Dade County, Florida.

15.     Defendant La Suprema Enterprise is a Florida corporation, having its principal place of business in Miami-Dade County, Florida.

16.     Defendant Black Bear is a Florida corporation, having its principal place of business in Largo, Florida.

6

17.     Defendant IBSA is a member owned buying organization with its principal place of business in Smithfield, North Carolina, and is authorized to do and doing business in the State of Florida.

18.     Defendant Rothchilt is a foreign corporation doing business in the State of Florida.  Rothchilt exports products, including gypsum drywall, to customers in the United States, including the State of Florida.  Upon information and belief, Rothchilt sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within the State of Florida.  Rothchilt has continuously and systematically distributed and sold drywall to numerous purchasers in the State of Florida and the drywall supplied by Rothchilt is installed in numerous homes in Florida.  As discussed more fully below, and upon information and belief, Rothchilt supplied defective gypsum drywall that was installed in homes being built by Lennar in the State of Florida, thereby causing substantial damage to Lennar in Florida.  Moreover, Rothchilt purposefully availed itself of the jurisdiction of this Court by selling and shipping substantial quantities of drywall into the State of Florida.

19.     This Court has personal jurisdiction over Rothchilt under Florida Statutes § 48.193(2) because it is "engaged in substantial and not isolated activity within this state." *See* Fla. Stat. § 48.193(2).  Additionally, Lennar's causes of action arise from Rothchilt personally or through its agents, causing injury to property within the State of Florida arising out of acts or omissions of Rothchilt outside the State of Florida, and at the time of the injury, products, materials, or things processed by Rothchilt were used and consumed within the State of Florida in the ordinary course of commerce, trade, or use. *See* Fla. Stat. § 48.193(1)(f)(2).

20.     Defendant Pfannkuch, at all material times hereto, was a Florida corporation

7

conducting business as a construction contractor in the State of Florida, having its principal place of business in Englewood, Florida.

21.     Defendant BMD is a Florida corporation conducting business as a construction contractor in the State of Florida, having its principal place of business in North Port, Florida.

22.     Defendant Residential Drywall is a Florida corporation conducting business as a construction contractor in the State of Florida, having its principal place of business in Tampa, Florida.

23.     Defendant J.D.M. at all material times hereto, was a Florida corporation conducting business as a construction contractor in the State of Florida, having its principal place of business in Lee County, Florida.

24.     Defendant McCoy is a Florida corporation conducting business as a construction contractor in the State of Florida, having its principal place of business in Sarasota, Florida.

25.     Defendant Northeast is a Florida corporation conducting business as a construction contractor in the State of Florida, having its principal place of business in Lutz, Florida.

26.     Defendant Florida Style is a Florida corporation conducting business as a construction contractor in the State of Florida, having its principal place of business in Lee County, Florida.

27.     Defendant Ocean is a Florida corporation conducting business as a construction contractor in the State of Florida, having its principal place of business in Lee County, Florida.

28.     Defendant B&B Stucco is a Florida corporation conducting business as a construction contractor in the State of Florida, having its principal place of business in Lee County, Florida.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

29.     Defendant Harrell's Drywall is a Florida corporation conducting business as a construction contractor in the State of Florida, having its principal place of business in Lee County, Florida.

30.     Defendant S.D.A. is a Florida corporation conducting business as a construction contractor in the State of Florida, having its principal place of business in Broward County, Florida.

31.     Defendant All County Drywall is a Florida corporation conducting business as a construction contractor in the State of Florida, having its principal place of business in Plant City, Florida.

32.     Venue in this action is proper because, among other things, at least one of the Defendants resides in Miami-Dade County, Florida, and at least one of the causes of action accrued in Miami-Dade County, Florida.

33.     Lennar has retained the law firm of Greenberg Traurig, P.A. to represent it in this action, and has agreed to pay the firm its reasonable attorneys' fees and costs. Lennar has incurred fees and costs in bringing this action.

34.     All conditions precedent to bringing this action have been waived, excused, performed, or have otherwise occurred.

<b><u>General Allegations</u></b>

35.     In connection with the construction of homes in the State of Florida, Lennar entered into separate subcontracts with Defendants Pfannkuch, BMD, Residential, J.D.M., McCoy, Northeast, Florida Style, Ocean, B&B Stucco, Harrell's Drywall, S.D.A., and All County Drywall (collectively, the **"Installers"**) for the installation of gypsum drywall in certain of the homes.

9

36.     In performing the subcontracts, the Installers purchased gypsum drywall, either directly or indirectly, from various suppliers, including, but without limitation, Defendants USG, Seacoast, Banner, La Suprema Trading, La Suprema Enterprise, Black Bear, IBSA, and/or Rothchilt (collectively, the "**Suppliers**").

37.     Upon information and belief, the Suppliers purchased, directly and/or indirectly, gypsum drywall that was manufactured in China by Defendants Knauf Gips, Knauf Tianjin, and Taishan, and possibly other unknown Chinese manufacturers (collectively, the "**Manufacturers**").

38.     Because of Lennar's commitment to delivering quality, value and service, Lennar monitors every repair request in all of its homes.  In so doing, Lennar noticed an unusual number of HVAC system problems in the homes in certain of its communities in the State of Florida.  As a result, Lennar began an extensive investigation into the source of the problem.

39.     As part of its investigation into the problem, and in an effort to address any questions and concerns its homeowners may have, Lennar retained expert consultants from ENVIRON International Corporation ("**ENVIRON**") -- an international consulting firm with substantial experience in a multitude of complex environmental and human health issues -- to, among other things, conduct necessary scientific testing and analysis to determine the cause of the HVAC issues affecting Lennar's homeowners.

40.     Through this extensive investigation, Lennar and its expert consultants discovered that certain gypsum drywall installed in a small percentage of Lennar's homes in the State of Florida (the "**Affected Homes**") is latently defective.[1]

---

[1] In order to protect the privacy of Lennar's homeowners, the addresses of the Affected Homes are not disclosed herein.  Undersigned counsel will, however, upon request, immediately provide any of the named Defendants with a list of the presently identified Affected Homes.

10

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

41.     The defective drywall in the Affected Homes was provided and installed by the Installers, who, in turn, had purchased the defective drywall from the Suppliers. Upon information and belief, the Suppliers received the defective drywall directly or indirectly from the Manufacturers, who manufactured the defective drywall in China.

42.     Through scientific testing and analysis, Lennar's expert consultants determined that the unreasonably defective drywall, because of its defective nature, appears to be interacting with other conditions and elements, causing damage to other property within the Affected Homes, including, but not limited to, HVAC coils, certain electrical and plumbing components, and other affected materials and items (the "**Other Property**"). This corrosion and damage is observable as a black surface accumulation on the Other Property.

43.     Lennar's expert consultants further determined through, among other ways, electron microscopy, that the corrosion of HVAC coils in the Affected Homes was occurring to the point that the copper surface of the HVAC coil had pitted deeply enough to cause holes in the coil, which in turn caused the coils to fail. This breakthrough explained the unusual number of HVAC system problems Lennar had experienced.

44.     Moreover, by recreating the conditions in the Affected Homes in a test chamber, Lennar's expert consultants confirmed that the defective drywall had in fact damaged the Other Property. Specifically, Lennar's expert consultants placed samples of the defective drywall in a sealed container with segments of a clean copper plumbing pipe. After just four weeks in the test chamber, the copper plumbing pipe had the same observable black surface accumulation as the Other Property in the Affected Homes. After several additional weeks, Lennar's expert consultants analyzed the surface of the copper plumbing pipe with an electron microscope and

11

confirmed that the surface of the pipe corroded and pitted in the same manner as the Other Property in the Affected Homes.

45.     In addition to definitively identifying the sources of the problems in the Affected Homes, Lennar's expert consultants have, to date, conducted air sampling in approximately 100 Lennar homes. In each instance, Lennar's expert consultants at ENVIRON have confirmed that there is no indication that the conditions in the homes would result in any adverse human health effects.

46.     Thereafter, ENVIRON provided written assurances to all of the affected homeowners that the conditions identified in their homes would not result in any adverse human health effects.   ENVIRON has also personally addressed Lennar's affected homeowners' questions or concerns, and provided affected homeowners with the actual air sampling results from their homes, which were processed and prepared by an accredited independent laboratory.

47.     In addition to addressing Lennar's affected homeowners' questions and concerns, ENVIRON briefed various county, state, and federal agencies, including the Florida Department of Health and the U.S. E.P.A. During this briefing, ENVIRON provided the agency participants with a detailed presentation summarizing ENVIRON's results, findings, and conclusions to date.

48.     Thereafter, ENVIRON provided these agencies with a written memorandum summarizing ENVIRON's findings and conclusion that there is no indication that the conditions identified in the Affected Homes would result in any adverse health outcomes. ENVIRON also provided the agency officials with all air sampling results performed as of that date.

49.     To this day, ENVIRON continues to work with and brief, among others, the Florida Department of Health. At Lennar's request, ENVIRON also continues to inspect and perform air sampling in Affected Homes.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

50.     Lennar has also undertaken an intensive effort to notify and engage all responsible parties, demanding that they not only assist Lennar in finding alternative solutions to remedy the problem, but also to commit to doing precisely what Lennar has committed to doing for its homeowners -- standing behind its product.

51.     Just by way of example, for many months, Lennar has been in regular communication with one of the primary culprits of this defective drywall, Knauf Gips and/or Knauf Tianjin, which have themselves engaged experts and consultants in the State of Florida to investigate Lennar's claims regarding the defective drywall.  Among other things, Knauf Gips and/or Knauf Tianjin have inspected several of the Affected Homes, and have witnessed firsthand the effects of its defective drywall on, among other things, the Affected Homes' HVAC coils, electrical wiring, and plumbing.  Lennar has also allowed Knauf Gips and/or Knauf Tianjin to test alternative solutions in one of Lennar's model homes in Florida (which, too, has been affected by the defective drywall).  Despite all of this, and repeated requests for Knauf Gips and/or Knauf Tianjin to provide a firm commitment that they will stand behind their product, Knauf Gips and/or Knauf Tianjin have thus far been steadfast in their refusal to take responsibility for their defective product and agree to fully repair or replace the defective drywall and Other Property.

52.     All named defendants with whom Lennar has communicated have similarly refused to take responsibility.  Lennar, on the other hand, has accepted responsibility and stands behind its homes and its homeowners.

53.     At the same time, Lennar stands alongside its homeowners as a victim of the Manufacturers, Suppliers, and Installers, who unfortunately allowed this defective drywall to be manufactured, supplied and installed in the Affected Homes.  Lennar remains committed to fully

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

rectify these problems and otherwise address its homeowners' concerns and the real harm that this defective drywall has caused them. Indeed, Lennar has already begun the expensive and time-consuming process of repairing the Affected Homes. While at the same time investigating potentially less disruptive solutions for its homeowners, Lennar has already started to temporarily relocate some of its homeowners so that it can remove and replace all of the defective gypsum drywall and repair or replace the Other Property and other materials and items damaged as a result of the defective drywall. In order to repair or replace the Other Property, Lennar has also been forced to remove other buildings materials from the Affected Homes, including certain defective and non-defective gypsum drywall.

54.     While many of its homeowners have praised Lennar's proactive response and commitment, the defective drywall has caused substantial damage to Lennar's goodwill and business reputation.

## COUNT I
## (Against Knauf Gips for Vicarious Liability)

55.     Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

56.     This is an action for vicarious liability against Knauf Gips for the negligent and wrongful acts of its actual and/or apparent agent, Knauf Tianjin.

57.     Knauf Gips was responsible for introducing its advanced production technology into China, and for establishing Knauf Tianjin in China. Knauf Gips exercises strict control over Knauf Tianjin's operations, and is responsible for implementing and supervising the quality control measures to be used by Knauf Tianjin. Indeed, the product quality of all Knauf Gips' plants in China, including Knauf Tianjin, are strictly controlled according to the requirements of Knauf Gips' headquarters in Germany.

14

58.    By establishing Knauf Tianjin in China, and by exercising strict control over Knauf Tianjin's conduct and operations, Knauf Gips acknowledged that Knauf Tianjin would act on its behalf as its actual and/or apparent agent.

59.    Knauf Tianjin accepted the undertaking to act on Knauf Gips' behalf.

60.    Upon information and belief, Knauf Gips supervises, monitors, and controls Knauf Tianjin's daily conduct and operations, including the manufacturing, distribution, marketing, and sale of Knauf Tianjin's drywall products.   Moreover, upon information and belief, Knauf Gips is responsible for establishing, implementing, supervising, and maintaining the quality control mechanisms utilized by Knauf Tianjin.

61.    As such, Knauf Gips is vicariously liable for all of the damages caused by the negligent and wrongful conduct of its actual and/or apparent agent, Knauf Tianjin.  As a result of Knauf Gips' and/or Knauf Tianjin's wrongful conduct, Lennar has been damaged.   These damages include, but are not limited to, the cost to fully repair the Affected Homes, which may include replacing the defective gypsum drywall and repairing and replacing the damage to the Other Property in the Affected Homes as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

**WHEREFORE**, Lennar demands judgment for damages against Knauf Gips in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

15

**COUNT II**
**(Against Knauf Gips and Knauf Tianjin for Common Law Indemnity)**

62.     Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as is fully set forth herein.

63.     This is an action for common law indemnity against Knauf Gips and Knauf Tianjin.

64.     Knauf Gips and/or Knauf Tianjin manufactured the defective gypsum drywall that was installed in certain of the Affected Homes.

65.     The deficient and defective gypsum drywall manufactured by Knauf Gips and/or Knauf Tianjin has caused damage to Other Property within the Affected Homes.

66.     Because of the defective drywall installed in the Affected Homes, Lennar has been forced to undertake an expensive and time consuming process to thoroughly and completely repair the Affected Homes, which may include replacing the defective gypsum drywall and repairing or replacing the Other Property and other materials damaged as a result of the defective drywall.

67.     Lennar has incurred and will continue to incur monetary damages from the repair and replacement of defective drywall and Other Property in the Affected Homes.

68.     Lennar is entirely without fault for the damage to the Affected Homes and Other Property.

69.     As the manufacturers of the defective gypsum drywall, Knauf Gips and/or Knauf Tianjin are wholly at fault and responsible for all damages resulting from the defective gypsum drywall.

70.     As a result of Knauf Gips' and/or Knauf Tianjin's wrongful conduct, Lennar has been damaged.  These damages include, but are not limited to, the cost to fully repair the

16

Affected Homes, which may include replacing the defective gypsum drywall and repairing and replacing the damage to the Other Property in the Affected Homes as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

71.    Because Lennar, through no fault of its own, is vicariously, constructively, derivatively, or technically responsible -- and unlike Knauf Gips and/or Knauf Tianjin has already taken responsibility -- for the defective gypsum drywall manufactured by Knauf Gips and/or Knauf Tianjin and installed in the Affected Homes, a special relationship exists between Lennar and Knauf Gips and/or Knauf Tianjin pursuant to which Lennar has the right to be indemnified for all damages sustained as a result of Knauf Gips' and/or Knauf Tianjin's defective gypsum drywall, including all attorneys' fees and costs incurred in connection with this lawsuit.

**WHEREFORE**, Lennar demands judgment against Knauf Gips and/or Knauf Tianjin for damages in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

### COUNT III
### (Against Knauf Gips and Knauf Tianjin for Products Liability)

72.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

73.    This is an action for products liability against Knauf Gips and Knauf Tianjin.

74.    Knauf Gips and/or Knauf Tianjin manufactured the defective gypsum drywall that was installed in certain of the Affected Homes.

17

75.     The defective gypsum drywall manufactured by Knauf Gips and/or Knauf Tianjin is unreasonably defective because it has caused damages to Other Property in the Affected Homes.

76.     Knauf Gips and/or Knauf Tianjin expected the defective gypsum drywall to reach the Affected Homes without substantial change affecting its condition, and the defective gypsum drywall did in fact reach the Affected Homes without substantial change affecting that condition.

77.     The defective gypsum drywall manufactured by Knauf Gips and/or Knauf Tianjin directly and proximately caused damage to the Other Property in the Affected Homes including, but not limited to, copper HVAC coils, certain electrical and plumbing components, and other affected materials and items.

78.     As a result, Lennar has been damaged.  These damages include, but are not limited to, the cost to repair or replace the damage to the Other Property in the Affected Homes.

**WHEREFORE,** Lennar demands judgment for damages against Knauf Gips and/or Knauf Tianjin in an amount to be determined at trial, plus attorneys' fees and costs and for such further and other relief as the Court deems just and proper.

## COUNT IV
### (Against Knauf Gips and Knauf Tianjin for Negligence)

79.     Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as is fully set forth herein.

80.     This is an action for negligence against Knauf Gips and Knauf Tianjin.

81.     Knauf Gips and/or Knauf Tianjin manufactured the defective gypsum drywall that was installed in certain of the Affected Homes.

82.     Lennar was a foreseeable user of the gypsum drywall being manufactured, distributed and sold by Knauf Gips and/or Knauf Tianjin.  As such, Knauf Gips and/or Knauf

18

Tianjin owed a duty to Lennar to exercise reasonable care in the manufacturing, distribution and sale of gypsum drywall and to ensure that the gypsum drywall was free of defects.

83. Knauf Gips and/or Knauf Tianjin breached this duty by negligently manufacturing, distributing and selling gypsum drywall that was defective, and failing to warn its customers that the drywall was defective. Moreover, Knauf Gips and/or Knauf Tianjin failed to implement proper quality control mechanisms for detecting defects in the gypsum drywall they were manufacturing, distributing and selling.

84. The defective gypsum drywall negligently manufactured by Knauf Gips and/or Knauf Tianjin directly and proximately caused damage to the Other Property in the Affected Homes including, but not limited to, copper HVAC coils, certain electrical and plumbing components, and other affected materials and items.

85. As a result, Lennar has been damaged. These damages include, but are not limited to, the cost to repair or replace the damage to the Other Property in the Affected Homes.

**WHEREFORE,** Lennar demands judgment for damages against Knauf Gips and/or Knauf Tianjin in an amount to be determined at trial, plus attorneys' fees and costs and for such further and other relief as the Court deems just and proper.

### COUNT V
### (Against Taishan for Common Law Indemnity)

86. Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

87. This is an action for common law indemnity against Taishan.

88. Upon information and belief, Taishan manufactured the defective gypsum drywall that was installed in certain of the Affected Homes.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

89.     The deficient and defective gypsum drywall manufactured by Taishan has caused damage to Other Property within the Affected Homes.

90.     Because of the defective drywall installed in the Affected Homes, Lennar has been forced to undertake an expensive and time consuming process to thoroughly and completely repair the Affected Homes, which may include replacing the defective gypsum drywall and repairing or replacing the Other Property and other materials damaged as a result of the defective drywall.

91.     Lennar has incurred and will continue to incur monetary damages from the repair and replacement of defective drywall and Other Property in the Affected Homes.

92.     Lennar is entirely without fault for the damage to the Affected Homes and Other Property.

93.     As the manufacturer of the defective gypsum drywall, Taishan is wholly at fault and responsible for all damages resulting from the defective gypsum drywall.

94.     As a result of Taishan's wrongful conduct, Lennar has been damaged. These damages include, but are not limited to, the cost to fully repair the Affected Homes, which may include replacing the defective gypsum drywall and repairing and replacing the damage to the Other Property in the Affected Homes as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

95.     Because Lennar, through no fault of its own, is vicariously, constructively, derivatively, or technically responsible – and indeed has already taken responsibility -- for the defective gypsum drywall manufactured by Taishan and installed in the Affected Homes, a

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

special relationship exists between Lennar and Taishan pursuant to which Lennar has the right to be indemnified for all damages sustained as a result of Taishan's defective gypsum drywall, including all attorneys' fees and costs incurred in connection with this lawsuit.

**WHEREFORE**, Lennar demands judgment for damages against Taishan in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

### COUNT VI
### (Against Taishan for Products Liability)

96.     Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

97.     This is an action for products liability against Taishan.

98.     Upon information and belief, Taishan manufactured the defective gypsum drywall that was installed in certain of the Affected Homes.

99.     The defective gypsum drywall manufactured by Taishan is unreasonably defective because it has caused damage to Other Property in the Affected Homes.

100.     Taishan expected the defective gypsum drywall to reach the Affected Homes without substantial change affecting its condition, and the defective gypsum drywall did in fact reach the Affected Homes without substantial change affecting that condition.

101.     The defective gypsum drywall manufactured by Taishan directly and proximately caused damage to the Other Property in the Affected Homes including, but not limited to, copper HVAC coils, certain electrical and plumbing components, and other affected materials and items.

102.     As a result, Lennar has been damaged. These damages include, but not are limited to, the cost to repair or replace the damage to the Other Property in the Affected Homes.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

**WHEREFORE,** Lennar demands judgment for damages against Taishan in an amount to be determined at trial, plus attorneys' fees and costs and for such further and other relief as the Court deems just and proper.

## COUNT VII
### (Against Taishan for Negligence)

103.   Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as is fully set forth herein.

104.   This is an action for negligence against Taishan.

105.   Upon information and belief, Taishan manufactured the defective gypsum drywall that was installed in certain of the Affected Homes.

106.   Lennar was a foreseeable user of the gypsum drywall being manufactured by Taishan.   As such, Taishan owed a duty to Lennar to exercise reasonable care in the manufacturing, distribution and sale of gypsum drywall and to ensure that the gypsum drywall was free of defects.

107.   Taishan breached this duty by negligently manufacturing, distributing and selling gypsum drywall that was defective, and failing to warn its customers or end users that the drywall was defective.

108.   The defective gypsum drywall negligently manufactured by Taishan directly and proximately caused damage to the Other Property in the Affected Homes including, but not limited to, copper HVAC coils, certain electrical and plumbing components, and other affected materials and items.

109.   As a result, Lennar has been damaged.   These damages include, but are not limited to, the cost to repair or replace the damage to the Other Property in the Affected Homes.

**WHEREFORE,** Lennar demands judgment for damages against Taishan in an amount to

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

be determined at trial, plus attorneys' fees and costs and for such further and other relief as the Court deems just and proper.

## COUNT VIII
### (Against USG and Seacoast for Breach of the Implied Warranty of Merchantability Under Common Law and/or Florida Statute Section 672.314)

110. Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

111. This is an action against USG and Seacoast for breach of the implied warranty of merchantability under the common law and/or Florida Statute § 672.314.

112. USG and/or Seacoast are merchants of gypsum drywall.

113. Upon information and belief, some of the defective drywall installed in the Affected Homes was sent from the Manufacturers to USG.

114. Some or all of the Installers entered into contracts with USG and/or Seacoast to purchase gypsum drywall that was to be installed in the Affected Homes.

115. Lennar is an intended third party beneficiary of those contracts because it was the clear and manifest intent of the Installers and USG and/or Seacoast that the contracts were to primarily and directly benefit Lennar.

116. Pursuant to Florida Statute Section 672.314 and/or common law, USG and/or Seacoast warranted that the gypsum drywall was merchantable and reasonably fit for the ordinary purpose for which gypsum drywall is used.

117. USG and/or Seacoast breached the implied warranty of merchantability by selling certain gypsum drywall that was defective and not reasonably fit for the ordinary purpose for which gypsum drywall is used.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

118.    Specifically, certain of the drywall supplied by USG and/or Seacoast and installed in the Affected Homes is defective because it has caused damage to Other Property in the Affected Homes.

119.    Lennar timely notified USG and/or Seacoast of the defective gypsum drywall, but USG and/or Seacoast have failed to repair or replace the defective gypsum drywall.

120.    As a result of USG's and/or Seacoast's breaches of the implied warranty of merchantability, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

**WHEREFORE,** Lennar demands judgment for damages against USG and/or Seacoast in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

**COUNT IX**
**(Against USG and Seacoast for Breach of the Implied Warranty of Fitness for a Particular Purpose Under Common Law and/or Florida Statute Section 672.315)**

121.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

122.    This is an action against USG and Seacoast for breach of the implied warranty of fitness for a particular purpose under common law and/or Florida Statute § 672.315.

123.    USG and/or Seacoast are suppliers of gypsum drywall.

24

124.   Upon information and belief, some of the defective drywall installed in the Affected Homes was sent from the Manufacturers to USG.

125.   Some or all of the Installers entered into contracts with USG and/or Seacoast to purchase gypsum drywall that was to be installed in the Affected Homes.

126.   Lennar is an intended third party beneficiary of those contracts because it was the clear and manifest intent of the Installers and USG and/or Seacoast that the contracts were to primarily and directly benefit Lennar.

127.   At the time USG and/or Seacoast entered into the contracts with the Installers, USG and/or Seacoast had reason to know that the Installers were purchasing gypsum drywall for the particular purpose of being installed in residential homes being built by Lennar, including the Affected Homes, and that the Installers were relying on USG's and/or Seacoast's skill and judgment to select and furnish to the Installers gypsum drywall that was suitable for this particular purpose.

128.   The Installers relied on USG's and/or Seacoast's judgment in furnishing to the Installers gypsum drywall that was suitable for the particular purpose of being installed in residential homes, including the Affected Homes.

129.   Pursuant to Florida Statute § 672.315 and/or common law, USG and/or Seacoast warranted that the gypsum drywall was fit for the particular purpose of being installed in residential homes, including the Affected Homes.

130.   USG and/or Seacoast breached the implied warranty of fitness for a particular purpose by selling certain gypsum drywall that was defective and not fit for the particular purpose of being installed in the Affected Homes.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

131.   Specifically, certain of the drywall supplied by USG and/or Seacoast and installed in the Affected Homes is defective because it has caused damage to Other Property in the Affected Homes.

132.   Lennar timely notified USG and/or Seacoast of the defective gypsum drywall, but USG and/or Seacoast have failed to repair or replace the defective gypsum drywall.

133.   As a result of USG's and/or Seacoast's breaches of the implied warranty of fitness for a particular purpose, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

WHEREFORE, Lennar demands judgment for damages against USG and/or Seacoast in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT X
### (Against USG for Products Liability)

134.   Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

135.   This is an action for products liability against USG.

136.   The defective gypsum drywall installed in the Affected Homes was supplied by, among other suppliers, Defendant USG.  Upon information and belief, some of the defective drywall installed in the Affected Homes was sent from the Manufacturers to USG.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

137.    The defective gypsum drywall supplied by USG is unreasonably defective because it has caused damage to Other Property in the Affected Homes.

138.    USG expected the defective gypsum drywall to reach the Affected Homes without substantial change affecting its condition, and the defective gypsum drywall did in fact reach the Affected Homes without substantial change affecting that condition.

139.    The defective gypsum drywall supplied by USG directly and proximately caused damage to the Other Property in the Affected Homes including, but not limited to, copper HVAC coils, certain electrical and plumbing components, and other affected materials and items.

140.    As a result, Lennar has been damaged.  These damages include, but are not limited to, the cost to repair or replace the damage to the Other Property in the Affected Homes.

**WHEREFORE,** Lennar demands judgment for damages against USG in an amount to be determined at trial, plus attorneys' fees and costs and for such further and other relief as the Court deems just and proper.

## COUNT XI
### (Against Seacoast for Products Liability)

141.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

142.    This is an action for products liability against Seacoast.

143.    The defective gypsum drywall installed in the Affected Homes was supplied by, among other suppliers, Defendant Seacoast.

144.    The defective gypsum drywall supplied by Seacoast is unreasonably defective because it has caused damage to Other Property in the Affected Homes.

27

145. Seacoast expected the defective gypsum drywall to reach the Affected Homes without substantial change affecting its condition, and the defective gypsum drywall did in fact reach the Affected Homes without substantial change affecting that condition.

146. The defective gypsum drywall supplied by Seacoast directly and proximately caused damage to the Other Property in the Affected Homes including, but not limited to, copper HVAC coils, certain electrical and plumbing components, and other affected materials and items.

147. As a result, Lennar has been damaged. These damages include, but are not limited to, the cost to repair or replace the damage to the Other Property in the Affected Homes.

**WHEREFORE,** Lennar demands judgment for damages against Seacoast in an amount to be determined at trial, plus attorneys' fees and costs and for such further and other relief as the Court deems just and proper.

### COUNT XII
### (Against Banner for Breach of the Implied Warranty of Merchantability Under Common Law and/or Florida Statute Section 672.314)

148. Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

149. This is an action against Banner for breach of the implied warranty of merchantability under the common law and/or Florida Statute § 672.314.

150. Banner is a merchant of gypsum drywall.

151. Some or all of the Installers entered into contracts with Banner to purchase gypsum drywall that was to be installed in the Affected Homes.

152. Lennar is an intended third party beneficiary of those contracts because it was the clear and manifest intent of the Installers and Banner that the contracts were to primarily and directly benefit Lennar.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

153.   Pursuant to Florida Statute Section 672.314 and/or common law, Banner warranted that the gypsum drywall was merchantable and reasonably fit for the ordinary purpose for which gypsum drywall is used.

154.   Banner breached the implied warranty of merchantability by selling certain gypsum drywall that was defective and not reasonably fit for the ordinary purpose for which gypsum drywall is used.

155.   Specifically, certain of the drywall supplied by Banner and installed in the Affected Homes is defective because it has caused damage to Other Property in the Affected Homes.

156.   Lennar timely notified Banner of the defective gypsum drywall, but Banner has failed to repair or replace the defective gypsum drywall.

157.   As a result of Banner's breaches of the implied warranty of merchantability, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

**WHEREFORE,** Lennar demands judgment for damages against Banner in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

## COUNT XIII
### (Against Banner for Breach of the Implied Warranty of Fitness for a Particular Purpose Under Common Law and/or Florida Statute Section 672.315)

158.  Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

159.  This is an action against Banner for breach of the implied warranty of fitness for a particular purpose under the common law and/or Florida Statute § 672.315.

160.  Banner is a supplier of gypsum drywall.

161.  Some or all of the Installers entered into contracts with Banner to purchase gypsum drywall that was to be installed in the Affected Homes.

162.  Lennar is an intended third party beneficiary of those contracts because it was the clear and manifest intent of the Installers and Banner that the contracts were to primarily and directly benefit Lennar.

163.  At the time Banner entered into the contracts with the Installers, Banner had reason to know that the Installers were purchasing gypsum drywall for the particular purpose of being installed in residential homes being built by Lennar, including the Affected Homes, and that the Installers were relying on Banner's skill and judgment to select and furnish to the Installers gypsum drywall that was suitable for this particular purpose.

164.  The Installers relied on Banner's judgment in furnishing to the Installers gypsum drywall that was suitable for the particular purpose of being installed in residential homes, including the Affected Homes.

165.  Pursuant to Florida Statute § 672.315 and/or common law, Banner warranted that the gypsum drywall was fit for the particular purpose of being installed in residential homes, including the Affected Homes.

30

166.    Banner breached the implied warranty of fitness for a particular purpose by selling certain gypsum drywall that was defective and not fit for the particular purpose of being installed in residential homes, including the Affected Homes.

167.    Specifically, certain of the drywall supplied by Banner and installed in the Affected Homes is defective because it has caused damage to Other Property in the Affected Homes.

168.    Lennar timely notified Banner of the defective gypsum drywall, but Banner has failed to repair or replace the defective gypsum drywall.

169.    As a result of Banner's breaches of the implied warranty of fitness for a particular purpose, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

**WHEREFORE,** Lennar demands judgment for damages against Banner in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

### COUNT XIV
### (Against Banner for Products Liability)

170.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

171.    This is an action for products liability against Banner.

31

172.    The defective gypsum drywall installed in the Affected Homes was supplied by, among other suppliers, Defendant Banner.

173.    The defective gypsum drywall supplied by Banner is unreasonably defective because it has caused damage to Other Property in the Affected Homes.

174.    Banner expected the defective gypsum drywall to reach the Affected Homes without substantial change affecting its condition, and the defective gypsum drywall did in fact reach the Affected Homes without substantial change affecting that condition.

175.    The defective gypsum drywall supplied by Banner directly and proximately caused damage to the Other Property in the Affected Homes including, but not limited to, copper HVAC coils, certain electrical and plumbing components, and other affected materials and items.

176.    As a result, Lennar has been damaged.  These damages include, but are not limited to, the cost to repair or replace the damage to the Other Property in the Affected Homes.

**WHEREFORE,** Lennar demands judgment for damages against Banner in an amount to be determined at trial, plus attorneys' fees and costs and for such further and other relief as the Court deems just and proper.

### COUNT XV
### (Against La Suprema Trading for Product Liability)

177.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

178.    This is an action for products liability against La Suprema Trading.

179.    The defective gypsum drywall installed in the Affected Homes was supplied by, among other suppliers, Defendant La Suprema Trading.

180.    The defective gypsum drywall supplied by La Suprema Trading is unreasonably defective because it has caused damage to Other Property in the Affected Homes.

32

181.    La Suprema Trading expected the defective gypsum drywall to reach the Affected Homes without substantial change affecting its condition, and the defective gypsum drywall did in fact reach the Affected Homes without substantial change affecting that condition.

182.    The defective gypsum drywall supplied by La Suprema Trading directly and proximately caused damage to the Other Property in the Affected Homes including, but not limited to, copper HVAC coils, certain electrical and plumbing components, and other affected materials and items.

183.    As a result, Lennar has been damaged.   These damages include, but are not limited to, the cost to repair or replace the damage to the Other Property in the Affected Homes.

**WHEREFORE,** Lennar demands judgment for damages against La Suprema Trading in an amount to be determined at trial, plus attorneys' fees and costs and for such further and other relief as the Court deems just and proper.

## COUNT XVI
### (Against La Suprema Enterprise for Product Liability)

184.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

185.    This is an action for products liability against La Suprema Enterprise.

186.    The defective gypsum drywall installed in the Affected Homes was supplied by, among other suppliers, Defendant La Suprema Enterprise.

187.    The defective gypsum drywall supplied by La Suprema Enterprise is unreasonably defective because it has caused damage to Other Property in the Affected Homes.

188.    La Suprema Enterprise expected the defective gypsum drywall to reach the Affected Homes without substantial change affecting its condition, and the defective gypsum drywall did in fact reach the Affected Homes without substantial change affecting that condition.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

189. The defective gypsum drywall supplied by La Suprema Enterprise directly and proximately caused damage to the Other Property in the Affected Homes including, but not limited to, copper HVAC coils, certain electrical and plumbing components, and other affected materials and items.

190. As a result, Lennar has been damaged. These damages include, but are not limited to, the cost to repair or replace the damage to the Other Property in the Affected Homes.

**WHEREFORE,** Lennar demands judgment for damages against La Suprema Enterprise in an amount to be determined at trial, plus attorneys' fees and costs and for such further and other relief as the Court deems just and proper.

## COUNT XVII
### (Against Black Bear for Breach of the Implied Warranty of Merchantability Under Common Law and/or Florida Statute Section 672.314)

191. Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

192. This is an action against Black Bear for breach of the implied warranty of merchantability under the common law and/or Florida Statute § 672.314.

193. Black Bear is a merchant of gypsum drywall.

194. Some or all of the Installers entered into contracts with Black Bear to purchase gypsum drywall that was to be installed in the Affected Homes.

195. Lennar is an intended third party beneficiary of those contracts because it was the clear and manifest intent of the Installers and Black Bear that the contracts were to primarily and directly benefit Lennar.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

196.    Pursuant to Florida Statute Section 672.314 and/or common law, Black Bear warranted that the gypsum drywall was merchantable and reasonably fit for the ordinary purpose for which gypsum drywall is used.

197.    Black Bear breached the implied warranty of merchantability by selling certain gypsum drywall that was defective and not reasonably fit for the ordinary purpose for which gypsum drywall is used.

198.    Specifically, certain of the drywall supplied by Black Bear and installed in the Affected Homes is defective because it has caused damage to Other Property in the Affected Homes.

199.    Lennar timely notified Black Bear of the defective gypsum drywall, but Black Bear has failed to repair or replace the defective gypsum drywall.

200.    As a result of Black Bear's breaches of the implied warranty of merchantability, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

**WHEREFORE,** Lennar demands judgment for damages against Black Bear in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

**COUNT XVIII**
**(Against Black Bear for Breach of the Implied Warranty of Fitness for a Particular Purpose Under Common Law and/or Florida Statute Section 672.315)**

201.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

202.    This is an action against Black Bear for breach of the implied warranty of fitness for a particular purpose under the common law and/or Florida Statute § 672.315.

203.    Black Bear is a supplier of gypsum drywall.

204.    Some or all of the Installers entered into contracts with Black Bear to purchase gypsum drywall that was to be installed in the Affected Homes.

205.    Lennar is an intended third party beneficiary of those contracts because it was the clear and manifest intent of the Installers and Black Bear that the contracts were to primarily and directly benefit Lennar.

206.    At the time Black Bear entered into the contracts with the Installers, Black Bear had reason to know that the Installers were purchasing gypsum drywall for the particular purpose of being installed in residential homes being built by Lennar, including the Affected Homes, and that the Installers were relying on Black Bear's skill and judgment to select and furnish to the Installers gypsum drywall that was suitable for this particular purpose.

207.    The Installers relied on Black Bear's judgment in furnishing to the Installers gypsum drywall that was suitable for the particular purpose of being installed in residential homes, including the Affected Homes.

208.    Pursuant to Florida Statute § 672.315 and/or common law, Black Bear warranted that the gypsum drywall was fit for the particular purpose of being installed in residential homes, including the Affected Homes.

36

209. Black Bear breached the implied warranty of fitness for a particular purpose by selling certain gypsum drywall that was defective and not fit for the particular purpose of being installed in residential homes, including the Affected Homes.

210. Specifically, certain of the drywall supplied by Black Bear and installed in the Affected Homes is defective because it has caused damage to Other Property in the Affected Homes.

211. Lennar timely notified Black Bear of the defective gypsum drywall, but Black Bear has failed to repair or replace the defective gypsum drywall.

212. As a result of Black Bear's breaches of the implied warranty of fitness for a particular purpose, Lennar has been damaged. These damages include, but are not limited to, the costs of fully repairing the Affected Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Homes as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

**WHEREFORE,** Lennar demands judgment for damages against Black Bear in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT XIX
### (Against Black Bear for Products Liability)

213. Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

214. This is an action for products liability against Black Bear.

37

215.    The defective gypsum drywall installed in the Affected Homes was supplied by, among other suppliers, Defendant Black Bear.

216.    The defective gypsum drywall supplied by Black Bear is unreasonably defective because it has caused damage to Other Property in the Affected Homes.

217.    Black Bear expected the defective gypsum drywall to reach the Affected Homes without substantial change affecting its condition, and the defective gypsum drywall did in fact reach the Affected Homes without substantial change affecting that condition.

218.    The defective gypsum drywall supplied by Black Bear directly and proximately caused damage to the Other Property in the Affected Homes including, but not limited to, copper HVAC coils, certain electrical and plumbing components, and other affected materials and items.

219.    As a result, Lennar has been damaged.  These damages include, but are not limited to, the cost to repair or replace the damage to the Other Property in the Affected Homes.

**WHEREFORE,** Lennar demands judgment for damages against Black Bear in an amount to be determined at trial, plus attorneys' fees and costs and for such further and other relief as the Court deems just and proper.

### COUNT XX
### (Against IBSA for Products Liability)

220.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

221.    This is an action for products liability against IBSA.

222.    The defective gypsum drywall installed in the Affected Homes was supplied by, among other suppliers, Defendant IBSA.

223.    The defective gypsum drywall supplied by IBSA is unreasonably defective because it has caused damage to Other Property in the Affected Homes.

38

224.   IBSA expected the defective gypsum drywall to reach the Affected Homes without substantial change affecting its condition, and the defective gypsum drywall did in fact reach the Affected Homes without substantial change affecting that condition.

225.   The defective gypsum drywall supplied by IBSA directly and proximately caused damage to the Other Property in the Affected Homes including, but not limited to, copper HVAC coils, certain electrical and plumbing components, and other affected materials and items.

226.   As a result, Lennar has been damaged.   These damages include, but are not limited to, the cost to repair or replace the damage to the Other Property in the Affected Homes.

**WHEREFORE,** Lennar demands judgment for damages against IBSA in an amount to be determined at trial, plus attorneys' fees and costs and for such further and other relief as the Court deems just and proper.

### COUNT XXI
### (Against Rothchilt for Product Liability)

227.   Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

228.   This is an action for products liability against Rothchilt.

229.   The defective gypsum drywall installed in the Affected Homes was supplied by, among other suppliers, Defendant Rothchilt.

230.   The defective gypsum drywall supplied by Rothchilt is unreasonably defective because it has caused damage to Other Property in the Affected Homes.

231.   Rothchilt expected the defective gypsum drywall to reach the Affected Homes without substantial change affecting its condition, and the defective gypsum drywall did in fact reach the Affected Homes without substantial change affecting that condition.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

232.    The defective gypsum drywall supplied by Rothchilt directly and proximately caused damage to the Other Property in the Affected Homes including, but not limited to, copper HVAC coils, certain electrical and plumbing components, and other affected materials and items.

233.    As a result, Lennar has been damaged.   These damages include, but are not limited to, the cost to repair or replace the damage to the Other Property in the Affected Homes.

**WHEREFORE,** Lennar demands judgment for damages against Rothchilt in an amount to be determined at trial, plus attorneys' fees and costs and for such further and other relief as the Court deems just and proper.

### COUNT XXII
### (Against Pfannkuch for Breach of Contract)

234.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

235.    This is an action for breach of contract against Pfannkuch.

236.    In connection with the construction of homes in the State of Florida, Lennar entered into certain Subcontract Agreements with Pfannkuch on including, but not limited, the following dates:  (i) February 2, 2006, (ii) June 2, 2006 and (iii) August 30, 2006 (collectively, the **"Pfannkuch Agreements"**).  Copies of the February 2, 2006, June 2, 2006, and August 30, 2006 Pfannkuch Agreements are attached hereto as Composite Exhibit "A" and incorporated herein.  Lennar believes in good faith that at least one additional Subcontract Agreement entered into between Lennar and Pfannkuch has been misplaced, lost or destroyed.  Upon information and belief, this agreement is substantially similar to the Pfannkuch Agreements attached hereto as Composite Exhibit "A."

237.    The Pfannkuch Agreements govern Pfannkuch's installation of gypsum drywall in the homes that it performed work in, some of which are at issue in this lawsuit.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

238.    The Pfannkuch Agreements specify Pfannkuch's obligations with respect to the performance and quality of the work in those homes as follows:

> **PERFORMANCE OF THE WORK**: Subcontractor agrees to furnish all labor, materials, equipment, supplies, supervision and other things necessary to efficiently perform and timely complete in strict accordance with the Plans and Specifications, in accordance with the HIGHEST TRADE PRACTICES and in a manner satisfactory to the Contractor, that portion of the Community referred to as work, as well as any amendments to this Contract, (herein collectively called the "Work"). Subcontractor, by acceptance of this Contract, shall guarantee the availability of all materials, labor and equipment necessary to complete the Work according to the established construction schedule of Contractor. . . .

(Pfannkuch Agreements, ¶ 1) (emphasis in original).

239.    The Pfannkuch Agreements also contain an express warranty pursuant to which Pfannkuch "guarantee[d] all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship." (Pfannkuch Agreements, ¶ 8). Specifically, the express warranty provides, in pertinent part,

> 8.  **WARRANTY:** Neither the final payment nor any provision in the Contract documents shall relieve Subcontractor of responsibility for faulty materials or workmanship. In addition to the specific guarantees required by the Scope of Work and the Specifications for the Work, Subcontractor guarantees all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship, at its own expense and without cost to Contractor, for a period beginning at the date Contractor conveys title to the subject of the work to a purchaser, and continuing from such date until the last of the following to occur: (1) one year, (2) the duration of any limited warranty given by Contractor to such purchaser, or (3) the duration of any applicable common law, state or federal statutory warranties. . . . With regard to non-Orientation warranty items, Subcontractor shall complete the corrective work within five (5) working days after receipt of the original notice. . . .

> > 8.2 **FAILURE TO PERFORM WARRANTY SERVICE.** In the event Subcontractor fails to repair or replace any work or materials after receiving reasonable notice of Contractor's request to repair or replace the same, Contractor may, at its sole option and discretion, elect to repair or replace such work or materials, and hold Subcontractor liable for such repair or replacement (including administrative costs incurred by Contractor), and may backcharge or withhold the cost of such repair or replacement from any account then payable by Contractor to Subcontractor. Nothing in the foregoing provision shall, in any manner,

41

diminish or defeat any legal right Contractor may have to proceed against Subcontractor, including, but not limited to the right to recover for latent defects.

(*Id.*, ¶¶ 8, 8.2).

240.   Although Pfannkuch warranted that the materials furnished under the Pfannkuch Agreements were of good quality and free of defects, the gypsum drywall provided and installed by Pfannkuch in certain of the homes was in fact deficient and defective.

241.   Specifically, the drywall provided and installed by Pfannkuch in certain of the homes is defective because it is has caused damage to Other Property in the homes (the "**Affected Pfannkuch Homes**").

242.   Upon discovery of the defective drywall, Lennar notified Pfannkuch of the defects and demanded that Pfannkuch repair or replace the defective drywall and the damage to the Other Property in the Affected Pfannkuch Homes in accordance with the Pfannkuch Agreements.

243.   Pfannkuch, however, has failed to honor its contractual obligation to repair and replace the defective drywall and the damage to the Other Property in the Affected Pfannkuch Homes.

244.   Based on the foregoing, Pfannkuch has breached the Pfannkuch Agreements by, among other things, (i) installing deficient and defective gypsum drywall, and (ii) failing and refusing to correct, repair, or replace the deficient and defective work as required by the Pfannkuch Agreements.

245.   As a result of Pfannkuch's breaches of the Pfannkuch Agreements, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Pfannkuch Homes, which may include replacing the defective gypsum drywall and

42

repairing or replacing the damage to the Other Property in the Affected Pfannkuch Homes as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Pfannkuch Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

246.    Pursuant to the Pfannkuch Agreements, Lennar is entitled to recover from Pfannkuch "any and all loss, damage or expense, directly or indirectly suffered by Contractor for such failure by Subcontractor," including reasonable attorneys' fees.    (Pfannkuch Agreements, ¶ 12).    Pfannkuch further agreed to "indemnify Contractor and its officers, directors, agents and employees for and hold Contractor and its officers, directors, agents and employees harmless from any damage, injury, loss, liability or expense (including, but not limited to, attorney and expert fees) incurred by Contractor as a direct or indirect result of the Work." (*Id.*, ¶ 13).

**WHEREFORE,** Lennar demands judgment for damages against Pfannkuch in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT XXIII
### (Against Pfannkuch for Breach of Express Warranty)

247.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 236 through 246 above as if fully set forth herein.

248.    This is an action for breach of express warranty against Pfannkuch.

249.    As discussed more fully above, the Pfannkuch Agreements contain an express warranty pursuant to which Pfannkuch "guarantee[d] all the work to be performed and all the

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

materials to be furnished under this Contract against defects in material or workmanship."
(Pfannkuch Agreements, ¶ 8).

250. Lennar relied on the express warranty in approving the Pfannkuch Agreements and allowing Pfannkuch to install gypsum drywall in the homes.

251. Pfannkuch breached its express warranty by providing and installing deficient and defective gypsum drywall in the Affected Pfannkuch Homes.

252. Lennar timely notified Pfannkuch of the defective gypsum drywall, but Pfannkuch has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

253. As a result of Pfannkuch's breaches of the express warranty, Lennar has been damaged. These damages include, but are not limited to, the costs of fully repairing the Affected Pfannkuch Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Pfannkuch Homes as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Pfannkuch Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the Pfannkuch Agreements.

**WHEREFORE,** Lennar demands judgment for damages against Pfannkuch in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

## COUNT XXIV
### (Against Pfannkuch for Breach of Implied Warranty)

254.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 236 through 246 above as if fully set forth herein.

255.    This is an action for breach of implied warranty against Pfannkuch.

256.    Pfannkuch, as the installer of the defective drywall in the Affected Pfannkuch Homes, warranted to Lennar that the drywall was reasonably fit for its ordinary use and fit for the particular purpose of being installed in the Affected Pfannkuch Homes.

257.    Lennar relied on these implied warranties in allowing Pfannkuch to provide and install drywall in the Affected Pfannkuch Homes.

258.    Pfannkuch breached its implied warranties to Lennar by providing and installing deficient and defective gypsum drywall in the Affected Pfannkuch Homes.  The defective gypsum drywall is not fit for the particular purpose of being installed in the Affected Pfannkuch Homes, nor is it reasonably fit for the general purpose for which gypsum drywall is used.

259.    Lennar timely notified Pfannkuch of the defective gypsum drywall, but Pfannkuch has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

260.    As a result of Pfannkuch's breaches of the implied warranties, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Pfannkuch Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Pfannkuch Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

Pfannkuch Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the Pfannkuch Agreements.

**WHEREFORE,** Lennar demands judgment for damages against Pfannkuch in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT XXV
### (Against BMD for Breach of Contract)

261.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

262.    This is an action for breach of contract against BMD.

263.    In connection with the construction of homes in the State of Florida, Lennar entered into certain Subcontract Agreements with BMD on including, but not limited to, the following dates:    (i) February 14, 1997, and (ii) June 2, 2006 (collectively, the **"BMD Agreements"**).  A copy of the June 2, 2006 Subcontract Agreement is attached hereto as Exhibit "B" and incorporated herein.   Lennar believes in good faith that the February 14, 1997 Subcontract Agreement between the parties has been misplaced, lost or destroyed.   Upon information and belief, this agreement is substantially similar to the June 2, 2006 Subcontract Agreement attached hereto as Exhibit "B."

264.    The BMD Agreements govern BMD's installation of gypsum drywall in the homes that it performed work in, some of which are at issue in this lawsuit.

265.    The BMD Agreements specify BMD's obligations with respect to the performance and quality of the work in those homes as follows:

**PERFORMANCE OF THE WORK:** Subcontractor agrees to furnish all labor, materials, equipment, supplies, supervision and other things necessary to efficiently perform and timely complete in strict accordance with the Plans and

46

> Specifications, in accordance with the HIGHEST TRADE PRACTICES and in a manner satisfactory to the Contractor, that portion of the Community referred to as work, as well as any amendments to this Contract, (herein collectively called the "Work"). Subcontractor, by acceptance of this Contract, shall guarantee the availability of all materials, labor and equipment necessary to complete the Work according to the established construction schedule of Contractor. . . .

(BMD Agreement, ¶ 1) (emphasis in original).

266.   The BMD Agreements also contain an express warranty pursuant to which BMD "guarantee[d] all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship." (BMD Agreements, ¶ 8). Specifically, the express warranty provides, in pertinent part,

> 8. **WARRANTY:** Neither the final payment nor any provision in the Contract documents shall relieve Subcontractor of responsibility for faulty materials or workmanship. In addition to the specific guarantees required by the Scope of Work and the Specifications for the Work, Subcontractor guarantees all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship, at its own expense and without cost to Contractor, for a period beginning at the date Contractor conveys title to the subject of the work to a purchaser, and continuing from such date until the last of the following to occur: (1) one year, (2) the duration of any limited warranty given by Contractor to such purchaser, or (3) the duration of any applicable common law, state or federal statutory warranties. . . . With regard to non-Orientation warranty items, Subcontractor shall complete the corrective work within five (5) working days after receipt of the original notice. . . .

> 8.2 **FAILURE TO PERFORM WARRANTY SERVICE**. In the event Subcontractor fails to repair or replace any work or materials after receiving reasonable notice of Contractor's request to repair or replace the same, Contractor may, at its sole option and discretion, elect to repair or replace such work or materials, and hold Subcontractor liable for such repair or replacement (including administrative costs incurred by Contractor), and may backcharge or withhold the cost of such repair or replacement from any account then payable by Contractor to Subcontractor. Nothing in the foregoing provision shall, in any manner, diminish or defeat any legal right Contractor may have to proceed against Subcontractor, including, but not limited to the right to recover for latent defects.

(*Id.*, ¶¶ 8, 8.2).

267.   Although BMD warranted that the materials furnished under the BMD Agreements were of good quality and free of defects, the gypsum drywall provided and installed by BMD in certain of the homes was in fact deficient and defective.

268.   Specifically, the drywall provided and installed by BMD in certain of the homes is defective because it has caused damage to Other Property in the homes (the "**Affected BMD Homes**").

269.   Upon discovery of the defective drywall, Lennar notified BMD of the defects and demanded that BMD repair or replace the defective drywall and the damage to the Other Property in the Affected BMD Homes in accordance with the BMD Agreements.

270.   BMD, however, has failed to honor its contractual obligation to repair and replace the defective drywall and the damage to the Other Property in the Affected BMD Homes.

271.   Based on the foregoing, BMD has breached the BMD Agreements by, among other things, (i) installing deficient and defective gypsum drywall, and (ii) failing and refusing to correct, repair, or replace the deficient and defective work as required by the BMD Agreements.

272.   As a result of BMD's breaches of the BMD Agreements, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected BMD Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected BMD Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected BMD Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

273.   Pursuant to the BMD Agreements, Lennar is entitled to recover from BMD "any

48

and all loss, damage or expense, directly or indirectly suffered by Contractor for such failure by Subcontractor," including reasonable attorneys' fees. (BMD Agreements, ¶ 12). BMD further agreed to "indemnify Contractor and its officers, directors, agents and employees for and hold Contractor and its officers, directors, agents and employees harmless from any damage, injury, loss, liability or expense (including, but not limited to, attorney and expert fees) incurred by Contractor as a direct or indirect result of the Work." (*Id.*, ¶ 13).

**WHEREFORE,** Lennar demands judgment for damages against BMD in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT XXVI
### (Against BMD for Breach of Express Warranty)

274.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 263 through 273 above as if fully set forth herein.

275.    This is an action for breach of express warranty against BMD.

276.    As discussed more fully above, the BMD Agreements contain an express warranty pursuant to which BMD "guarantee[d] all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship." (BMD Agreements, ¶ 8).

277.    Lennar relied on the express warranty in approving the BMD Agreements and allowing BMD to install gypsum drywall in the homes.

278.    BMD breached its express warranty by providing and installing deficient and defective gypsum drywall in the Affected BMD Homes.

279.    Lennar timely notified BMD of the defective gypsum drywall, but BMD has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

49

280.    As a result of BMD's breaches of the express warranty, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected BMD Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected BMD Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected BMD Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the BMD Agreements.

**WHEREFORE,** Lennar demands judgment for damages against BMD in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

**COUNT XXVII**
**(Against BMD for Breach of Implied Warranty)**

281.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 263 through 273 above as if fully set forth herein.

282.    This is an action for breach of implied warranty against BMD.

283.    BMD, as the installer of the defective drywall in the Affected BMD Homes, warranted to Lennar that the drywall was reasonably fit for its ordinary use and fit for the particular purpose of being installed in the Affected BMD Homes.

284.    Lennar relied on these implied warranties in allowing BMD to provide and install drywall in the Affected BMD Homes.

285.    BMD breached its implied warranties to Lennar by providing and installing deficient and defective gypsum drywall in the Affected BMD Homes.  The defective gypsum

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

drywall is not fit for the particular purpose of being installed in the Affected BMD Homes, nor is it reasonably fit for the general purpose for which gypsum drywall is used.

286.    Lennar timely notified BMD of the defective gypsum drywall, but BMD has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

287.    As a result of BMD's breaches of the implied warranties, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected BMD Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected BMD Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected BMD Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the BMD Agreements.

**WHEREFORE,** Lennar demands judgment for damages against BMD in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT XXVIII
### (Against Residential for Breach of Contract)

288.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

289.    This is an action for breach of contract against Residential.

290.    In connection with the construction of homes in the State of Florida, Lennar entered into certain Subcontract Agreements with Residential on including, but not limited to, June 2, 2006 (the "**Residential Agreements**").  A copy of the June 2, 2006 Residential Agreement is attached hereto as Exhibit "C" and incorporated herein.  Lennar believes in good

51

faith that at least one additional Subcontract Agreement entered into between the parties has been

misplaced, lost or destroyed. Upon information and belief, this agreement is substantially similar

to the Residential Agreement attached hereto as Exhibit "C."

291.    The Residential Agreements govern Residential's installation of gypsum drywall

in the homes that it performed work in, some of which are at issue in this lawsuit.

292.    The Residential Agreements specify Residential's obligations with respect to the

performance and quality of the work in those homes as follows:

> **PERFORMANCE OF THE WORK**:  Subcontractor agrees to furnish all labor,
> materials, equipment, supplies, supervision and other things necessary to
> efficiently perform and timely complete in strict accordance with the Plans and
> Specifications, in accordance with the HIGHEST TRADE PRACTICES and in a
> manner satisfactory to the Contractor, that portion of the Community referred to
> as work, as well as any amendments to this Contract, (herein collectively called
> the "Work").  Subcontractor, by acceptance of this Contract, shall guarantee the
> availability of all materials, labor and equipment necessary to complete the Work
> according to the established construction schedule of Contractor. . . .

(Residential Agreements, ¶ 1)  (emphasis in original).

293.    The Residential Agreements also contain an express warranty pursuant to which

Residential "guarantee[d] all the work to be performed and all the materials to be furnished

under this Contract against defects in material or workmanship."  (Residential Agreements, ¶ 8).

Specifically, the express warranty provides, in pertinent part,

> 8.  **WARRANTY:**  Neither the final payment nor any provision in the Contract
> documents shall relieve Subcontractor of responsibility for faulty materials or
> workmanship.  In addition to the specific guarantees required by the Scope of
> Work and the Specifications for the Work, Subcontractor guarantees all the work
> to be performed and all the materials to be furnished under this Contract against
> defects in material or workmanship, at its own expense and without cost to
> Contractor, for a period beginning at the date Contractor conveys title to the
> subject of the work to a purchaser, and continuing from such date until the last of
> the following to occur:  (1) one year, (2) the duration of any limited warranty
> given by Contractor to such purchaser, or (3) the duration of any applicable
> common law, state or federal statutory warranties. . . .  With regard to non-
> Orientation warranty items, Subcontractor shall complete the corrective work
> within five (5) working days after receipt of the original notice. . . .

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

8.2 **FAILURE TO PERFORM WARRANTY SERVICE**.  In the event Subcontractor fails to repair or replace any work or materials after receiving reasonable notice of Contractor's request to repair or replace the same, Contractor may, at its sole option and discretion, elect to repair or replace such work or materials, and hold Subcontractor liable for such repair or replacement (including administrative costs incurred by Contractor), and may backcharge or withhold the cost of such repair or replacement from any account then payable by Contractor to Subcontractor.  Nothing in the foregoing provision shall, in any manner, diminish or defeat any legal right Contractor may have to proceed against Subcontractor, including, but not limited to the right to recover for latent defects.

(*Id.*, ¶¶ 8, 8.2).

294.    Although Residential warranted that the materials furnished under the Residential Agreements were of good quality and free of defects, the gypsum drywall provided and installed by Residential in certain of the homes was in fact deficient and defective.

295.    Specifically, the drywall provided and installed by Residential in certain of the homes is defective because it has caused damage to Other Property in the homes (the "**Affected Residential Homes**").

296.    Upon discovery of the defective drywall, Lennar notified Residential of the defects and demanded that Residential repair or replace the defective drywall and the damage to the Other Property in the Affected Residential Homes in accordance with the Residential Agreements.

297.    Residential, however, has failed to honor its contractual obligation to repair and replace the defective drywall and the damage to the Other Property in the Residential Affected Homes.

298.    Based on the foregoing, Residential has breached the Residential Agreements by, among other things, (i) installing deficient and defective gypsum drywall, and (ii) failing and

53

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

refusing to correct, repair, or replace the deficient and defective work as required by the Residential Agreements.

299. As a result of Residential's breaches of the Residential Agreements, Lennar has been damaged. These damages include, but are not limited to, the costs of fully repairing the Affected Residential Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Residential Homes as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred in by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Residential Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

300. Pursuant to the Residential Agreements, Lennar is entitled to recover from Residential "any and all loss, damage or expense, directly or indirectly suffered by Contractor for such failure by Subcontractor," including reasonable attorneys' fees. (Residential Agreements, ¶ 12). Residential further agreed to "indemnify Contractor and its officers, directors, agents and employees for and hold Contractor and its officers, directors, agents and employees harmless from any damage, injury, loss, liability or expense (including, but not limited to, attorney and expert fees) incurred by Contractor as a direct or indirect result of the Work." (*Id.*, ¶ 13).

**WHEREFORE,** Lennar demands judgment for damages against Residential in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

## COUNT XXIX
## (Against Residential for Breach of Express Warranty)

301. Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 290 through 300 above as if fully set forth herein.

302. This is an action for breach of express warranty against Residential.

303. As discussed more fully above, the Residential Agreements contain an express warranty pursuant to which Residential "guarantee[d] all the work to be performed and the all materials to be furnished under this Contract against defects in material or workmanship." (Residential Agreements, ¶ 8).

304. Lennar relied on the express warranty in approving the Residential Agreements and allowing Residential to install gypsum drywall in the homes.

305. Residential breached its express warranty by providing and installing deficient and defective gypsum drywall in the Affected Residential Homes.

306. Lennar timely notified Residential of the defective gypsum drywall, but Residential has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

307. As a result of Residential's breaches of the express warranty, Lennar has been damaged. These damages include, but are not limited to, the costs of fully repairing the Affected Residential Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Residential Homes as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Residential Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the Residential Agreements.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

**WHEREFORE,** Lennar demands judgment for damages against Residential in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

### COUNT XXX
### (Against Residential for Breach of Implied Warranty)

308.   Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 290 through 300 above as if fully set forth herein.

309.   This is an action for breach of implied warranty against Residential.

310.   Residential, as the installer of the defective drywall in the Affected Residential Homes, warranted to Lennar that the drywall was reasonably fit for its ordinary use and fit for the particular purpose of being installed in the Affected Residential Homes.

311.   Lennar relied on these implied warranties in allowing Residential to provide and install drywall in the Affected Residential Homes.

312.   Residential breached its implied warranties to Lennar by providing and installing deficient and defective gypsum drywall in the Affected Residential Homes.  The defective gypsum drywall is not fit for the particular purpose of being installed in the Affected Residential Homes, nor is it reasonably fit for the general purpose for which gypsum drywall is used.

313.   Lennar timely notified Residential of the defective gypsum drywall, but Residential has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

314.   As a result of Residential's breaches of the implied warranties, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Residential Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Residential Homes as a result of the

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Residential Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the Residential Agreements.

**WHEREFORE,** Lennar demands judgment for damages against Residential in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

### COUNT XXXI
### (Against J.D.M. for Breach of Contract)

315.     Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

316.     This is an action for breach of contract against J.D.M.

317.     In connection with the construction of homes in the State of Florida, Lennar entered into a Subcontract Agreement with J.D.M. (the **"J.D.M. Agreement"**). Lennar believes in good faith that the J.D.M. Agreement has been misplaced, lost or destroyed. Upon information and belief, the J.D.M. Agreement is substantially similar to a 2007 Subcontract Agreement entered into between the parties, a copy of which is attached hereto as Exhibit "D."

318.     The J.D.M. Agreement governs J.D.M.'s installation of gypsum drywall in the homes that it performed work in, some of which are at issue in this lawsuit.

319.     The J.D.M. Agreement obligates J.D.M. to perform the work in those homes in strict accordance with the Plans and Specifications, in accordance with the highest trade practices, and in a manner satisfactory to Lennar.

320.     The J.D.M. Agreement also contains an express warranty pursuant to which J.D.M. guaranteed all the work to be performed and all the materials to be furnished under the

57

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

J.D.M. Agreement against defects in material or worksmanship for a period beginning at the date Lennar conveyed title to the specific home to the purchaser, and continuing from such date until the last of the following to occur: (i) one year, (ii) the duration of any limited warranty given by Lennar to such purchaser, or (iii) the duration of any applicable common law, state or federal statutory warranties.

321.    J.D.M. further agreed to complete all repairs within five (5) working days after receiving notice from Lennar.  In the event J.D.M. failed to repair or replace any work or materials after receiving notice from Lennar, J.D.M. agreed that Lennar may, at its sole option and discretion, repair or replace such work or materials, and hold J.D.M. liable for such repair or replacement.

322.    Although J.D.M. warranted that the materials furnished under the J.D.M. Agreement were of good quality and free of defects, the gypsum drywall provided and installed by J.D.M. in certain of the homes was in fact deficient and defective.

323.    Specifically, the drywall provided and installed by J.D.M. in certain of the homes is defective because it has caused damage to Other Property in the homes (the "**Affected J.D.M. Homes**").

324.    Upon discovery of the defective drywall, Lennar notified J.D.M. of the defects and demanded that J.D.M. repair or replace the defective drywall and the damage to the Other Property in the Affected J.D.M. Homes in accordance with the J.D.M. Agreement.

325.    J.D.M., however, has failed to honor its contractual obligation to repair and replace the defective drywall and the damage to the Other Property in the Affected J.D.M. Homes.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

326.     Based on the foregoing, J.D.M. has breached the J.D.M. Agreement by, among other things, (i) installing deficient and defective gypsum drywall, and (ii) failing and refusing to correct, repair, or replace the deficient and defective work as required by the J.D.M. Agreement.

327.     As a result of J.D.M.'s breaches of the J.D.M. Agreement, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected J.D.M. Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected J.D.M. Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected J.D.M. Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

328.     Pursuant to the J.D.M. Agreement, Lennar is entitled to recover from J.D.M. any and all loss, damage or expense, directly or indirectly suffered by Lennar because of J.D.M.'s breaches of the J.D.M. Agreement, including reasonable attorneys' fees.  J.D.M. further agreed to indemnify Lennar and its officers, directors, agents and employees for and hold Lennar and its officers, directors, agents and employees harmless from any damage, injury, loss, liability or expense (including, but not limited to, attorney and expert fees) incurred by Lennar as a direct or indirect result of the work performed by J.D.M.

**WHEREFORE,** Lennar demands judgment for damages against J.D.M. in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

## COUNT XXXII
### (Against J.D.M. for Breach of Express Warranty)

329.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 317 through 328 above as if fully set forth herein.

330.    This is an action for breach of express warranty against J.D.M.

331.    As discussed more fully above, the J.D.M. Agreement contains an express warranty pursuant to which J.D.M. guaranteed all the work to be performed and all the materials to be furnished under the J.D.M. Agreement against defects in material or workmanship.

332.    Lennar relied on the express warranty in approving the J.D.M. Agreement and allowing J.D.M. to install gypsum drywall in the homes.

333.    J.D.M. breached its express warranty by providing and installing deficient and defective gypsum drywall in the Affected J.D.M. Homes.

334.    Lennar timely notified J.D.M. of the defective gypsum drywall, but J.D.M. has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

335.    As a result of J.D.M.'s breaches of the express warranty, Lennar has been damaged. These damages include, but are not limited to, the costs of fully repairing the Affected J.D.M. Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected J.D.M. Homes as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected J.D.M. Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the J.D.M. Agreement.

60

**WHEREFORE,** Lennar demands judgment for damages against J.D.M. in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

### COUNT XXXIII
### (Against J.D.M. for Breach of Implied Warranty)

336.   Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 317 through 328 above as if fully set forth herein.

337.   This is an action for breach of implied warranty against J.D.M.

338.   J.D.M., as the installer of the defective drywall in the Affected J.D.M. Homes, warranted to Lennar that the drywall was reasonably fit for its ordinary use and fit for the particular purpose of being installed in the Affected J.D.M. Homes.

339.   Lennar relied on these implied warranties in allowing J.D.M. to provide and install drywall in the Affected J.D.M. Homes.

340.   J.D.M. breached its implied warranties to Lennar by providing and installing deficient and defective gypsum drywall in the Affected J.D.M. Homes.  The defective gypsum drywall is not fit for the particular purpose of being installed in the Affected J.D.M. Homes, nor is it reasonably fit for the general purpose for which gypsum drywall is used.

341.   Lennar timely notified J.D.M. of the defective gypsum drywall, but J.D.M. has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

342.   As a result of J.D.M.'s breaches of the implied warranties, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected J.D.M. Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected J.D.M. Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by

61

Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected J.D.M. Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the J.D.M. Agreement.

**WHEREFORE,** Lennar demands judgment for damages against J.D.M. in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT XXXIV
### (Against McCoy for Breach of Contract)

343.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

344.    This is an action for breach of contract against McCoy.

345.    On or about June 2, 2006, Lennar entered into a Subcontract Agreement with McCoy (the "**McCoy Agreement**"). A copy of the McCoy Agreement is attached hereto as Exhibit "E" and incorporated herein.

346.    The McCoy Agreement governs McCoy's installation of gypsum drywall in the homes that it performed work in, at least one of which is at issue in this lawsuit.

347.    The McCoy Agreement specifies McCoy's obligations with respect to the performance and quality of the work in those homes as follows:

> **PERFORMANCE OF THE WORK**: Subcontractor agrees to furnish all labor, materials, equipment, supplies, supervision and other things necessary to efficiently perform and timely complete in strict accordance with the Plans and Specifications, in accordance with the HIGHEST TRADE PRACTICES and in a manner satisfactory to the Contractor, that portion of the Community referred to as work, as well as any amendments to this Contract, (herein collectively called the "Work"). Subcontractor, by acceptance of this Contract, shall guarantee the availability of all materials, labor and equipment necessary to complete the Work according to the established construction schedule of Contractor. . . .

(McCoy Agreement, ¶ 1) (emphasis in original).

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

348.    The McCoy Agreement also contains an express warranty pursuant to which McCoy "guarantee[d] all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship."    (McCoy Agreement, ¶ 8). Specifically, the express warranty provides, in pertinent part,

> 8.  **WARRANTY:**  Neither the final payment nor any provision in the Contract documents shall relieve Subcontractor of responsibility for faulty materials or workmanship.  In addition to the specific guarantees required by the Scope of Work and the Specifications for the Work, Subcontractor guarantees all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship, at its own expense and without cost to Contractor, for a period beginning at the date Contractor conveys title to the subject of the work to a purchaser, and continuing from such date until the last of the following to occur:  (1) one year, (2) the duration of any limited warranty given by Contractor to such purchaser, or (3) the duration of any applicable common law, state or federal statutory warranties. . . .  With regard to non-Orientation warranty items, Subcontractor shall complete the corrective work within five (5) working days after receipt of the original notice. . . .
>
> > 8.2  **FAILURE TO PERFORM WARRANTY SERVICE**.  In the event Subcontractor fails to repair or replace any work or materials after receiving reasonable notice of Contractor's request to repair or replace the same, Contractor may, at its sole option and discretion, elect to repair or replace such work or materials, and hold Subcontractor liable for such repair or replacement (including administrative costs incurred by Contractor), and may backcharge or withhold the cost of such repair or replacement from any account then payable by Contractor to Subcontractor.  Nothing in the foregoing provision shall, in any manner, diminish or defeat any legal right Contractor may have to proceed against Subcontractor, including, but not limited to the right to recover for latent defects.

(*Id.*, ¶¶ 8, 8.2).

349.    Although McCoy warranted that the materials furnished under the McCoy Agreement were of good quality and free of defects, the gypsum drywall provided and installed by McCoy in at least one of the homes was in fact deficient and defective.

63

350.   Specifically, the drywall provided and installed by McCoy in at least one home is defective because it has caused damage to Other Property in the home (the "**Affected McCoy Home**").

351.   Upon discovery of the defective drywall, Lennar notified McCoy of the defects and demanded that McCoy repair or replace the defective drywall and the damage to the Other Property in the Affected McCoy Home in accordance with the McCoy Agreement.

352.   McCoy, however, has failed to honor its contractual obligation to repair and replace the defective drywall and the damage to the Other Property in the Affected McCoy Home.

353.   Based on the foregoing, McCoy has breached the McCoy Agreement by, among other things, (i) installing deficient and defective gypsum drywall, and (ii) failing and refusing to correct, repair, or replace the deficient and defective work as required by the McCoy Agreement.

354.   As a result of McCoy's breaches of the McCoy Agreement, Lennar has been damaged. These damages include, but are not limited to, the costs of fully repairing the Affected McCoy Home, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected McCoy Home as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to a suitable temporary housing facility while the Affected McCoy Home is undergoing such repairs, as well as damages for loss of goodwill and reputation.

355.   Pursuant to the McCoy Agreement, Lennar is entitled to recover from McCoy "any and all loss, damage or expense, directly or indirectly suffered by Contractor for such failure by Subcontractor," including reasonable attorneys' fees. (McCoy Agreement, ¶ 12). McCoy further agreed to "indemnify Contractor and its officers, directors, agents and employees

64

for and hold Contractor and its officers, directors, agents and employees harmless from any damage, injury, loss, liability or expense (including, but not limited to, attorney and expert fees) incurred by Contractor as a direct or indirect result of the Work." (*Id.*, ¶ 13).

**WHEREFORE,** Lennar demands judgment for damages against McCoy in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT XXXV
### (Against McCoy for Breach of Express Warranty)

356.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 345 through 355 above as if fully set forth herein.

357.    This is an action for breach of express warranty against McCoy.

358.    As discussed more fully above, the McCoy Agreement contains an express warranty pursuant to which McCoy "guarantee[d] all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship." (McCoy Agreement, ¶ 8).

359.    Lennar relied on the express warranty in approving the McCoy Agreement and allowing McCoy to install gypsum drywall in the homes.

360.    McCoy breached its express warranty by providing and installing deficient and defective gypsum drywall in the Affected McCoy Home.

361.    Lennar timely notified McCoy of the defective gypsum drywall, but McCoy has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

362.    As a result of McCoy's breach of the express warranty, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected McCoy Home, which may include replacing the defective gypsum drywall and repairing or

65

replacing the damage to the Other Property in the Affected McCoy Home as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to a suitable temporary housing facility while the Affected McCoy Home is undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the McCoy Agreement.

**WHEREFORE,** Lennar demands judgment for damages against McCoy in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

### COUNT XXXVI
### (Against McCoy for Breach of Implied Warranty)

363.     Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 345 through 355 above as if fully set forth herein.

364.     This is an action for breach of implied warranty against McCoy.

365.     McCoy, as the installer of the defective drywall in the Affected McCoy Home, warranted to Lennar that the drywall was reasonably fit for its ordinary use and fit for the particular purpose of being installed in the Affected McCoy Home.

366.     Lennar relied on these implied warranties in allowing McCoy to provide and install drywall in the Affected McCoy Home.

367.     McCoy breached its implied warranties to Lennar by providing and installing deficient and defective gypsum drywall in the Affected McCoy Home. The defective gypsum drywall is not fit for the particular purpose of being installed in the Affected McCoy Home, nor is it reasonably fit for the general purpose for which gypsum drywall is used.

368.     Lennar timely notified McCoy of the defective gypsum drywall, but McCoy has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

Greenberg Traurig, P.A. ▪ Attorneys at Law ▪ 1221 Brickell Avenue ▪ Miami, FL 33131 ▪ Tel 305.579.0500 ▪ Fax 305.579.0717 ▪ www.gtlaw.com

369.    As a result of McCoy's breaches of the implied warranties, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected McCoy Home, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected McCoy Home as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to a suitable temporary housing facility while the Affected McCoy Home is undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the McCoy Agreement.

**WHEREFORE,** Lennar demands judgment for damages against McCoy in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

### COUNT XXXVII
### (Against Northeast for Breach of Contract)

370.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

371.    This is an action for breach of contract against Northeast.

372.    On or about April 6, 2006, Lennar entered into a Subcontract Agreement with Northeast (the **"Northeast Agreement"**).  A copy of the Northeast Agreement is attached hereto as Exhibit "F" and incorporated herein.

373.    The Northeast Agreement governs Northeast's installation of gypsum drywall in the homes that it performed work in, some of which are at issue in this lawsuit.

374.    The Northeast Agreement specifies Northeast's obligations with respect to the performance and quality of the work in those homes as follows:

67

**PERFORMANCE OF THE WORK**: Subcontractor agrees to furnish all labor, materials, equipment, supplies, supervision and all other things necessary to efficiently perform and timely complete in strict accordance with the Plans and Specifications, in accordance with the HIGHEST TRADE PRACTICES and in a manner satisfactory to the Contractor, that portion of the Community referred to as **Work**, as well as any amendments to this Contract, (herein collectively called the "Work"). Subcontractor, by acceptance of this Contract, shall guarantee the availability of all materials, labor and equipment necessary to complete the Work according to the established construction schedule of Contractor. . . .

(Northeast Agreement, ¶ 1) (emphasis in original).

375.   The Northeast Agreement also contains an express warranty pursuant to which Northeast "guarantee[d] all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship." (Northeast Agreement, ¶ 8). Specifically, the express warranty provides, in pertinent part,

8.   **WARRANTY:** Neither the final payment nor any provision in the Contract documents shall relieve Subcontractor of responsibility for faulty materials or workmanship.  In addition to the specific guarantees required by the Scope of Work and the Specifications for the Work, Subcontractor guarantees all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship, at its own expense and without cost to Contractor, for a period beginning at the date Contractor conveys title to the subject of the work to a purchaser, and continuing from such date until the last of the following to occur:  (1) one year, (2) the duration of any limited warranty given by Contractor to such purchaser, or (3) the duration of any applicable common law, state or federal statutory warranties. . . .  With regard to non-Orientation warranty items, Subcontractor shall complete the corrective work within five (5) working days after receipt of the original notice. . . .

8.2 **FAILURE TO PERFORM WARRANTY SERVICE.** In the event Subcontractor fails to repair or replace any work or materials after receiving reasonable notice of Contractor's request to repair or replace the same, Contractor may, at its sole option and discretion, elect to repair or replace such work or materials, and hold Subcontractor liable for such repair or replacement (including administrative costs incurred by Contractor), and may backcharge or withhold the cost of such repair or replacement from any account then payable by Contractor to Subcontractor.  Nothing in the foregoing provision shall, in any manner, diminish or defeat any legal right Contractor may have to proceed against Subcontractor, including, but not limited to the right to recover for latent defects.

Greenberg Traurig, P.A. ■ Attorneys at Law ■ 1221 Brickell Avenue ■ Miami, FL 33131 ■ Tel 305.579.0500 ■ Fax 305.579.0717 ■ www.gtlaw.com

(*Id.*, ¶¶ 8, 8.2).

376. Although Northeast warranted that the materials furnished under the Northeast Agreement were of good quality and free of defects, the gypsum drywall provided and installed by Northeast in at least one of the homes was in fact deficient and defective.

377. Specifically, the drywall provided and installed by Northeast in certain of the homes is defective because it has caused damage to Other Property in the homes (the "**Affected Northeast Homes**").

378. Upon discovery of the defective drywall, Lennar notified Northeast of the defects and demanded that Northeast repair or replace the defective drywall and the damage to the Other Property in the Affected Northeast Homes in accordance with the Northeast Agreement.

379. Northeast, however, has failed to honor its contractual obligation to repair and replace the defective drywall and the damage to the Other Property in the Affected Northeast Homes.

380. Based on the foregoing, Northeast has breached the Northeast Agreement by, among other things, (i) installing deficient and defective gypsum drywall, and (ii) failing and refusing to correct, repair, or replace the deficient and defective work as required by the Northeast Agreement.

381. As a result of Northeast's breaches of the Northeast Agreement, Lennar has been damaged. These damages include, but are not limited to, the costs of fully repairing the Affected Northeast Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Northeast Homes as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected

Greenberg Traurig, P.A. ▪ Attorneys at Law ▪ 1221 Brickell Avenue ▪ Miami, FL 33131 ▪ Tel 305.579.0500 ▪ Fax 305.579.0717 ▪ www.gtlaw.com

Northeast Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

382.    Pursuant to the Northeast Agreement, Lennar is entitled to recover from Northeast "any and all loss, damage or expense, directly or indirectly suffered by Contractor for such failure by Subcontractor," including reasonable attorneys' fees. (Northeast Agreement, ¶ 12). Northeast further agreed to "indemnify Contractor and its officers, directors, agents and employees for and hold Contractor and its officers, directors, agents and employees harmless from any damage, injury, loss, liability or expense (including, but not limited to, attorney and expert fees) incurred by Contractor as a direct or indirect result of the Work." (*Id.*, ¶ 13).

**WHEREFORE,** Lennar demands judgment for damages against Northeast in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

### COUNT XXXVIII
### (Against Northeast for Breach of Express Warranty)

383.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 372 through 382 above as if fully set forth herein.

384.    This is an action for breach of express warranty against Northeast.

385.    As discussed more fully above, the Northeast Agreement contains an express warranty pursuant to which Northeast "guarantee[d] all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship." (Northeast Agreement, ¶ 8).

386.    Lennar relied on the express warranty in approving the Northeast Agreement and allowing Northeast to install gypsum drywall in the homes.

Greenberg Traurig, P.A. ▪ Attorneys at Law ▪ 1221 Brickell Avenue ▪ Miami, FL 33131 ▪ Tel 305.579.0500 ▪ Fax 305.579.0717 ▪ www.gtlaw.com

387.     Northeast breached its express warranty by providing and installing deficient and defective gypsum drywall in the Affected Northeast Homes.

388.     Lennar timely notified Northeast of the defective gypsum drywall, but Northeast has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

389.     As a result of Northeast's breaches of the express warranty, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Northeast Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Northeast Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Northeast Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the Northeast Agreement.

**WHEREFORE,** Lennar demands judgment for damages against Northeast in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT XXXIX
### (Against Northeast for Breach of Implied Warranty)

390.     Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 372 through 382 above as if fully set forth herein.

391.     This is an action for breach of implied warranty against Northeast.

392.     Northeast, as the installer of the defective drywall in the Affected Northeast Homes, warranted to Lennar that the drywall was reasonably fit for its ordinary use and fit for the particular purpose of being installed in the Affected Northeast Homes.

71

393.    Lennar relied on these implied warranties in allowing Northeast to provide and install drywall in the Affected Northeast Homes.

394.    Northeast breached its implied warranties to Lennar by providing and installing deficient and defective gypsum drywall in the Affected Northeast Homes.  The defective gypsum drywall is not fit for the particular purpose of being installed in the Affected Northeast Homes, nor is it reasonably fit for the general purpose for which gypsum drywall is used.

395.    Lennar timely notified Northeast of the defective gypsum drywall, but Northeast has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

396.    As a result of Northeast's breaches of the implied warranties, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Northeast Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Northeast Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Northeast Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the Northeast Agreement.

**WHEREFORE,** Lennar demands judgment for damages against Northeast in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

### COUNT XL
### (Against Florida Style for Breach of Contract)

397.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

398.    This is an action for breach of contract against Florida Style.

72

399.     In connection with the construction of homes in the State of Florida, Lennar entered into a Subcontract Agreement with Florida Style (the **"Florida Style Agreement"**). Lennar believes in good faith that the Florida Style Agreement has been misplaced, lost or destroyed.  Upon information and belief, the Florida Style Agreement is substantially similar to the McCoy Agreement, a copy of which is attached hereto as Exhibit "E."

400.     The Florida Style Agreement governs Florida Style's provision of gypsum drywall in the homes that it performed work in, some of which are at issue in this lawsuit.

401.     The Florida Style Agreement obligates Florida Style to perform the work in those homes in strict accordance with the Plans and Specifications, in accordance with the highest trade practices, and in a manner satisfactory to Lennar.

402.     The Florida Style Agreement also contains an express warranty pursuant to which Florida Style guaranteed all the work to be performed and all the materials to be furnished under the Florida Style Agreement against defects in material or worksmanship for a period beginning at the date Lennar conveyed title to the specific home to the purchaser, and continuing from such date until the last of the following to occur:  (i) one year, (ii) the duration of any limited warranty given by Lennar to such purchaser, or (iii) the duration of any applicable common law, state or federal statutory warranties.

403.     Florida Style further agreed to complete all repairs within five (5) working days after receiving notice from Lennar.  In the event Florida Style failed to repair or replace any work or materials after receiving notice from Lennar, Florida Style agreed that Lennar may, at its sole option and discretion, repair or replace such work or materials, and hold Florida Style liable for such repair or replacement.

73

404.    Although Florida Style warranted that the materials furnished under the Florida Style Agreement were of good quality and free of defects, the gypsum drywall provided by Florida Style in certain of the homes was in fact deficient and defective.

405.    Specifically, the drywall provided by Florida Style in certain of the homes is defective because it has caused damage to Other Property in the homes (the "**Affected Florida Style Homes**").

406.    Upon discovery of the defective drywall, Lennar notified Florida Style of the defects and demanded that Florida Style repair or replace the defective drywall and the damage to the Other Property in the Affected Florida Style Homes in accordance with the Florida Style Agreement.

407.    Florida Style, however, has failed to honor its contractual obligation to repair and replace the defective drywall and the damage to the Other Property in the Affected Florida Style Homes.

408.    Based on the foregoing, Florida Style has breached the Florida Style Agreement by, among other things, (i) providing deficient and defective gypsum drywall, and (ii) failing and refusing to correct, repair, or replace the deficient and defective work as required by the Florida Style Agreement.

409.    As a result of Florida Style's breaches of the Florida Style Agreement, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Florida Style Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Florida Style Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while

74

the Affected Florida Style Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

410.   Pursuant to the Florida Style Agreement, Lennar is entitled to recover from Florida Style any and all loss, damage or expense, directly or indirectly suffered by Lennar because of Florida Style's breaches of the Florida Style Agreement, including reasonable attorneys' fees.   Florida Style further agreed to indemnify Lennar and its officers, directors, agents and employees for and hold Lennar and its officers, directors, agents and employees harmless from any damage, injury, loss, liability or expense (including, but not limited to, attorney and expert fees) incurred by Lennar as a direct or indirect result of the work performed by Florida Style.

**WHEREFORE,** Lennar demands judgment for damages against Florida Style in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

### COUNT XLI
### (Against Florida Style for Breach of Express Warranty)

411.   Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 399 through 410 above as if fully set forth herein.

412.   This is an action for breach of express warranty against Florida Style.

413.   As discussed more fully above, the Florida Style Agreement contains an express warranty pursuant to which Florida Style guaranteed all the work to be performed and all the materials to be furnished under the Florida Style Agreement against defects in material or workmanship.

414.   Lennar relied on the express warranty in approving the Florida Style Agreement and allowing Florida Style to provide gypsum drywall for the homes.

75

415.     Florida Style breached its express warranty by providing deficient and defective gypsum drywall for the Affected Florida Style Homes.

416.     Lennar timely notified Florida Style of the defective gypsum drywall, but Florida Style has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

417.     As a result of Florida Style's breaches of the express warranty, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Florida Style Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Florida Style Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Florida Style Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the Florida Style Agreement.

**WHEREFORE,** Lennar demands judgment for damages against Florida Style in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT XLII
### (Against Florida Style for Breach of Implied Warranty)

418.     Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 399 through 410 above as if fully set forth herein.

419.     This is an action for breach of implied warranty against Florida Style.

420.     Florida Style, as the provider of the defective drywall in the Affected Florida Style Homes, warranted to Lennar that the drywall was reasonably fit for its ordinary use and fit for the particular purpose of being installed in the Affected Florida Style Homes.

76

421.    Lennar relied on these implied warranties in allowing Florida Style to provide drywall for the Affected Florida Style Homes.

422.    Florida Style breached its implied warranties to Lennar by providing deficient and defective gypsum drywall for the Affected Florida Style Homes. The defective gypsum drywall is not fit for the particular purpose of being installed in the Affected Florida Style Homes, nor is it reasonably fit for the general purpose for which gypsum drywall is used.

423.    Lennar timely notified Florida Style of the defective gypsum drywall, but Florida Style has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

424.    As a result of Florida Style's breaches of the implied warranties, Lennar has been damaged. These damages include, but are not limited to, the costs of fully repairing the Affected Florida Style Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Florida Style Homes as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Florida Style Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the Florida Style Agreement.

**WHEREFORE,** Lennar demands judgment for damages against Florida Style in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

Greenberg Traurig, P.A. ▪ Attorneys at Law ▪ 1221 Brickell Avenue ▪ Miami, FL 33131 ▪ Tel 305.579.0500 ▪ Fax 305.579.0717 ▪ www.gtlaw.com

## COUNT XLIII
## (Against Ocean for Breach of Contract)

425.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

426.    This is an action for breach of contract against Ocean.

427.    In connection with the construction of homes in the State of Florida, Lennar entered into a Subcontract Agreement with Ocean (the "**Ocean Agreement**").  Lennar believes in good faith that it has misplaced, lost or destroyed the Ocean Agreement.  Upon information and belief, the Ocean Agreement is substantially similar to the September 5, 2007 Subcontract Agreement entered into between the parties, a copy of which is attached hereto as Exhibit "G."

428.    The Ocean Agreement governs Ocean's installation of gypsum drywall in the homes that it performed work in, some of which are at issue in this lawsuit.

429.    The Ocean Agreement obligates Ocean to perform the work in those homes in strict accordance with the Plans and Specifications, in accordance with the highest trade practices, and in a manner satisfactory to Lennar.

430.    The Ocean Agreement also contains an express warranty pursuant to which Ocean guaranteed all the work to be performed and all the materials to be furnished under the Ocean Agreement against defects in material or worksmanship for a period beginning at the date Lennar conveyed title to the specific home to the purchaser, and continuing from such date until the last of the following to occur: (i) one year, (ii) the duration of any limited warranty given by Lennar to such purchaser, or (iii) the duration of any applicable common law, state or federal statutory warranties.

431.    Ocean further agreed to complete all repairs within five (5) working days after receiving notice from Lennar.  In the event Ocean failed to repair or replace any work or

78

materials after receiving notice from Lennar, Ocean agreed that Lennar may, at its sole option and discretion, repair or replace such work or materials, and hold Ocean liable for such repair or replacement.

432.    Although Ocean warranted that the materials furnished under the Ocean Agreement were of good quality and free of defects, the gypsum drywall provided and installed by Ocean in certain of the homes was in fact deficient and defective.

433.    Specifically, the drywall provided installed by Ocean in certain of the homes is defective because it has caused damage to Other Property in the homes (the "**Affected Ocean Homes**").

434.    Upon discovery of the defective drywall, Lennar notified Ocean of the defects and demanded that Ocean repair or replace the defective drywall and the damage to the Other Property in the Affected Ocean Homes in accordance with the Ocean Agreement.

435.    Ocean, however, has failed to honor its contractual obligation to repair and replace the defective drywall and the damage to the Other Property in the Affected Ocean Homes.

436.    Based on the foregoing, Ocean has breached the Ocean Agreement by, among other things, (i) installing deficient and defective gypsum drywall, and (ii) failing and refusing to correct, repair, or replace the deficient and defective work as required by the Ocean Agreement.

437.    As a result of Ocean's breaches of the Ocean Agreement, Lennar has been damaged. These damages include, but are not limited to, the costs of fully repairing the Affected Ocean Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Ocean Homes as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by

Greenberg Traurig, P.A. ▪ Attorneys at Law ▪ 1221 Brickell Avenue ▪ Miami, FL 33131 ▪ Tel 305.579.0500 ▪ Fax 305.579.0717 ▪ www.gtlaw.com

Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Ocean Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

438.     Pursuant to the Ocean Agreement, Lennar is entitled to recover from Ocean any and all loss, damage or expense, directly or indirectly suffered by Lennar because of Ocean's breaches of the Ocean Agreement, including reasonable attorneys' fees. Ocean further agreed to indemnify Lennar and its officers, directors, agents and employees for and hold Lennar and its officers, directors, agents and employees harmless from any damage, injury, loss, liability or expense (including, but not limited to, attorney and expert fees) incurred by Lennar as a direct or indirect result of the work performed by Ocean.

**WHEREFORE,** Lennar demands judgment for damages against Ocean in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

### COUNT XLIV
### (Against Ocean for Breach of Express Warranty)

439.     Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 427 through 438 above as if fully set forth herein.

440.     This is an action for breach of express warranty against Ocean.

441.     As discussed more fully above, the Ocean Agreement contains an express warranty pursuant to which Ocean guaranteed all the work to be performed and all the materials to be furnished under the Ocean Agreement against defects in material or worksmanship.

442.     Lennar relied on the express warranty in approving the Ocean Agreement and allowing Ocean to install gypsum drywall in the homes.

443.   Ocean breached its express warranty by providing and installing deficient and defective gypsum drywall in the Affected Ocean Homes.

444.   Lennar timely notified Ocean of the defective gypsum drywall, but Ocean has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

445.   As a result of Ocean's breaches of the express warranty, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Ocean Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Ocean Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Ocean Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the Ocean Agreement.

**WHEREFORE,** Lennar demands judgment for damages against Ocean in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT XLV
### (Against Ocean for Breach of Implied Warranty)

446.   Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 427 through 438 above as if fully set forth herein.

447.   This is an action for breach of implied warranty against Ocean.

448.   Ocean, as the installer of the defective drywall in the Affected Ocean Homes, warranted to Lennar that the drywall was reasonably fit for its ordinary use and fit for the particular purpose of being installed in the Affected Ocean Homes.

Greenberg Traurig, P.A. ■ Attorneys at Law ■ 1221 Brickell Avenue ■ Miami, FL 33131 ■ Tel 305.579.0500 ■ Fax 305.579.0717 ■ www.gtlaw.com

449.   Lennar relied on these implied warranties in allowing Ocean to provide and install drywall in the Affected Ocean Homes.

450.   Ocean breached its implied warranties to Lennar by providing and installing deficient and defective gypsum drywall in the Affected Ocean Homes.  The defective gypsum drywall is not fit for the particular purpose of being installed in the Affected Ocean Homes, nor is it reasonably fit for the general purpose for which gypsum drywall is used.

451.   Lennar timely notified Ocean of the defective gypsum drywall, but Ocean has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

452.   As a result of Ocean's breaches of the implied warranties, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Ocean Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Ocean Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Ocean Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the Ocean Agreement.

**WHEREFORE,** Lennar demands judgment for damages against Ocean in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT XLVI
### (Against B&B Stucco for Breach of Contract)

453.   Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

454.   This is an action for breach of contract against B&B Stucco.

82

455.    On or about December 10, 2002, Lennar entered into a Subcontract Agreement with B&B Stucco (the "**B&B Stucco Agreement**"). A copy of the B&B Stucco Agreement is attached hereto as Exhibit "H" and incorporated herein.

456.    The B&B Stucco Agreement governs B&B Stucco's installation of gypsum drywall in the homes that it performed work in, some of which are at issue in this lawsuit.

457.    The B&B Stucco Agreement specifies B&B Stucco's obligations with respect to the performance and quality of the work in those homes as follows:

> Subcontractor agrees to provide all permits, if applicable, licenses, labor and materials, equipment, tools, machinery and supervision for the construction of work in and about the Project in accordance with the plans and specifications, addenda and authorized change orders for the Project. Subcontractor agrees to perform and complete the work in a good workman like manner and in compliance with applicable building codes, all other applicable governmental rules or regulations (even if not in the plans or specifications) and in accordance with this Agreement, at no additional charge . . . .
>
> \* \* \*
>
> Materials supplied and labor furnished shall be in strict accordance with the plans and specifications prepared for the Project, unless otherwise agreed upon in writing by Contractor. . . .

(B&B Stucco Agreement, ¶¶ 2.2, 2.3).

458.    The B&B Stucco Agreement also contains an express warranty pursuant to which B&B Stucco warranted all work performed against defects in worksmanship or materials. Specifically, the express warranty provides, in pertinent part,

> Subcontractor hereby warrants all work performed hereunder for twelve (12) months from the date of closing of each home or dwelling unit, unless a longer period is required by local Statutes, or by a third party warranty program such as the Home Buyers (2-10) Warranty Plan wherein the longer period shall apply for each building against defects in worksmanship or materials and in the event that such defect shall arise during the warranty period the cost of all labor or materials to correct the same shall be paid by Subcontractor but in no case shall warranty period for individual homes or dwelling units exceed thirty six (36) months from date of Certificate of Completion.   If Subcontractor does not make such

Greenberg Traurig, P.A. ▪ Attorneys at Law ▪ 1221 Brickell Avenue ▪ Miami, FL 33131 ▪ Tel 305.579.0500 ▪ Fax 305.579.0717 ▪ www.gtlaw.com

corrections promptly after notice of such defect, Contractor may cure such defect and Subcontractor thereof shall pay the cost immediately upon demand. Subcontractor shall also be liable for all costs and expenses, plus ten percent (10%) overhead charge, incurred by Contractor to enforce this Warranty against Subcontractor including reasonable attorney's fees. Amounts outstanding shall accrue interest after demand at the rate of 18% per annum.

(B&B Stucco Agreement, ¶ 2.9).

459.   Although B&B Stucco warranted that the materials furnished under the B&B Stucco Agreement were of good quality and free of defects, the gypsum drywall provided and installed by B&B Stucco in certain of the homes was in fact deficient and defective.

460.   Specifically, the drywall provided and installed by B&B Stucco in certain of the homes is defective because it has caused damage to Other Property in the homes (the "**Affected B&B Stucco Homes**").

461.   Upon discovery of the defective drywall, Lennar notified B&B Stucco of the defects and demanded that B&B Stucco repair or replace the defective drywall and the damage to the Other Property in the Affected B&B Stucco Homes in accordance with the B&B Stucco Agreement.

462.   B&B Stucco, however, has failed to honor its contractual obligation to repair and replace the defective drywall and the damage to the Other Property in the Affected B&B Stucco Homes.

463.   Based on the foregoing, B&B Stucco has breached the B&B Stucco Agreement by, among other things, (i) installing deficient and defective gypsum drywall, and (ii) failing and refusing to correct, repair, or replace the deficient and defective work as required by the B&B Stucco Agreement.

464.   As a result of B&B Stucco's breaches of the B&B Stucco Agreement, Lennar has been damaged. These damages include, but are not limited to, the costs of fully repairing the

84

Affected B&B Stucco Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected B&B Stucco Homes as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected B&B Stucco Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

465. Pursuant to the B&B Stucco Agreement, Lennar is entitled to recover from B&B Stucco "all costs and expenses" incurred by Lennar as a result of B&B Stucco's breaches, including reasonable attorneys' fees. (B&B Stucco Agreement, ¶ 2.9). B&B Stucco further agreed to "fully indemnify and save Contractor harmless from any liability, claims, suits or actions of any kind arising from any act or omission of the Subcontractors, its agents, servants, employees, sub-subcontractors, or suppliers, or anyone performing any part of the subcontract work, including all costs attached to same." (*Id.*, ¶ 2.12).

**WHEREFORE,** Lennar demands judgment for damages against B&B Stucco in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT XLVII
### (Against B&B Stucco for Breach of Express Warranty)

466. Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 455 through 465 above as if fully set forth herein.

467. This is an action for breach of express warranty against B&B Stucco.

468. As discussed more fully above, the B&B Stucco Agreement contains an express warranty pursuant to which B&B Stucco warranted all work performed against defects in worksmanship or material. (B&B Stucco Agreement, ¶ 2.9).

85

469.    Lennar relied on the express warranty in approving the B&B Stucco Agreement and allowing B&B Stucco to install gypsum drywall in the homes.

470.    B&B Stucco breached its express warranty by providing and installing deficient and defective gypsum drywall in the Affected B&B Stucco Homes.

471.    Lennar timely notified B&B Stucco of the defective gypsum drywall, but B&B Stucco has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

472.    As a result of B&B Stucco's breaches of the express warranty, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected B&B Stucco Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected B&B Stucco Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected B&B Stucco Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the B&B Stucco Agreement.

**WHEREFORE,** Lennar demands judgment for damages against B&B Stucco in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

### COUNT XLVIII
### (Against B&B Stucco for Breach of Implied Warranty)

473.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 455 through 465 above as if fully set forth herein.

474.    This is an action for breach of implied warranty against B&B Stucco.

86

475.     B&B Stucco, as the installer of the defective drywall in the Affected B&B Stucco Homes, warranted to Lennar that the drywall was reasonably fit for its ordinary use and fit for the particular purpose of being installed in the Affected B&B Stucco Homes.

476.     Lennar relied on these implied warranties in allowing B&B Stucco to provide and install drywall in the Affected B&B Stucco Homes.

477.     B&B Stucco breached its implied warranties to Lennar by providing and installing deficient and defective gypsum drywall in the Affected B&B Stucco Homes.  The defective gypsum drywall is not fit for the particular purpose of being installed in the Affected B&B Stucco Homes, nor is it reasonably fit for the general purpose for which gypsum drywall is used.

478.     Lennar timely notified B&B Stucco of the defective gypsum drywall, but B&B Stucco has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

479.     As a result of B&B Stucco's breaches of the implied warranties, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected B&B Stucco Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected B&B Stucco Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected B&B Stucco Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the B&B Stucco Agreement.

Greenberg Traurig, P.A. ■ Attorneys at Law ■ 1221 Brickell Avenue ■ Miami, FL 33131 ■ Tel 305.579.0500 ■ Fax 305.579.0717 ■ www.gtlaw.com

**WHEREFORE,** Lennar demands judgment for damages against B&B Stucco in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT XLIX
### (Against Harrell's Drywall for Breach of Contract)

480.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

481.    This is an action for breach of contract against Harrell's Drywall.

482.    In connection with the construction of homes in the State of Florida, Lennar entered into a Subcontract Agreements with Harrell's Drywall in 2006 (the "**Harrell's Drywall Agreement**"). A copy of the Harrell's Drywall Agreement is attached hereto as Exhibit "I" and incorporated herein.

483.    The Harrell's Drywall Agreement governs Harrell's Drywall's installation of gypsum drywall in the homes that it performed work in, some of which are at issue in this lawsuit.

484.    The Harrell's Drywall Agreement specifies Harrell's Drywall's obligations with respect to the performance and quality of the work in those homes as follows:

> **PERFORMANCE OF THE WORK**: Subcontractor agrees to furnish all labor, materials, equipment, supplies, supervision and other things necessary to efficiently perform and timely complete in strict accordance with the Plans and Specifications, in accordance with the HIGHEST TRADE PRACTICES and in a manner satisfactory to the Contractor, that portion of the Community referred to as work, as well as any amendments to this Contract, (herein collectively called the "Work"). Subcontractor, by acceptance of this Contract, shall guarantee the availability of all materials, labor and equipment necessary to complete the Work according to the established construction schedule of Contractor. . . .

(Harrell's Drywall Agreement, ¶ 1) (emphasis in original).

Greenberg Traurig, P.A. ■ Attorneys at Law ■ 1221 Brickell Avenue ■ Miami, FL 33131 ■ Tel 305.579.0500 ■ Fax 305.579.0717 ■ www.gtlaw.com

485.   The Harrell's Drywall Agreement also contains an express warranty pursuant to which Harrell's Drywall "guarantee[d] all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship." (Harrell's Drywall Agreement, ¶ 8). Specifically, the express warranty provides, in pertinent part,

> 8. **WARRANTY:** Neither the final payment nor any provision in the Contract documents shall relieve Subcontractor of responsibility for faulty materials or workmanship. In addition to the specific guarantees required by the Scope of Work and the Specifications for the Work, Subcontractor guarantees all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship, at its own expense and without cost to Contractor, for a period beginning at the date Contractor conveys title to the subject of the work to a purchaser, and continuing from such date until the last of the following to occur:  (1) one year, (2) the duration of any limited warranty given by Contractor to such purchaser, or (3) the duration of any applicable common law, state or federal statutory warranties. . . .  With regard to non-Orientation warranty items, Subcontractor shall complete the corrective work within five (5) working days after receipt of the original notice. . . .

>> 8.2 **FAILURE TO PERFORM WARRANTY SERVICE**. In the event Subcontractor fails to repair or replace any work or materials after receiving reasonable notice of Contractor's request to repair or replace the same, Contractor may, at its sole option and discretion, elect to repair or replace such work or materials, and hold Subcontractor liable for such repair or replacement (including administrative costs incurred by Contractor), and may backcharge or withhold the cost of such repair or replacement from any account then payable by Contractor to Subcontractor. Nothing in the foregoing provision shall, in any manner, diminish or defeat any legal right Contractor may have to proceed against Subcontractor, including, but not limited to the right to recover for latent defects.

(*Id.*, ¶¶ 8, 8.2).

486.   Although Harrell's Drywall warranted that the materials furnished under the Harrell's Drywall Agreement were of good quality and free of defects, the gypsum drywall provided and installed by Harrell's Drywall in certain of the homes was in fact deficient and defective.

Greenberg Traurig, P.A. ■ Attorneys at Law ■ 1221 Brickell Avenue ■ Miami, FL 33131 ■ Tel 305.579.0500 ■ Fax 305.579.0717 ■ www.gtlaw.com

487.    Specifically, the drywall provided and installed by Harrell's Drywall in certain of the homes is defective because it has caused damage to Other Property in the homes (the "**Affected Harrell's Drywall Homes**").

488.    Upon discovery of the defective drywall, Lennar notified Harrell's Drywall of the defects and demanded that Harrell's Drywall repair or replace the defective drywall and the damage to the Other Property in the Affected Harrell's Drywall Homes in accordance with the Harrell's Drywall Agreement.

489.    Harrell's Drywall, however, has failed to honor its contractual obligation to repair and replace the defective drywall and the damage to the Other Property in the Affected Harrell's Drywall Homes.

490.    Based on the foregoing, Harrell's Drywall has breached the Harrell's Drywall Agreement by, among other things, (i) installing deficient and defective gypsum drywall, and (ii) failing and refusing to correct, repair, or replace the deficient and defective work as required by the Harrell's Drywall Agreements

491.    As a result of Harrell's Drywall's breaches of the Harrell's Drywall Agreement, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Harrell's Drywall Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Harrell's Drywall Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Harrell's Drywall Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

90

492.    Pursuant to the Harrell's Drywall Agreement, Lennar is entitled to recover from Harrell's Drywall "any and all loss, damage or expense, directly or indirectly suffered by Contractor for such failure by Subcontractor," including reasonable attorneys' fees. (Harrell's Drywall Agreements ¶ 12).  Harrell's Drywall further agreed to "indemnify Contractor and its officers, directors, agents and employees for and hold Contractor and its officers, directors, agents and employees harmless from any damage, injury, loss, liability or expense (including, but not limited to, attorney and expert fees) incurred by Contractor as a direct or indirect result of the Work." (*Id.*, ¶ 13).

**WHEREFORE,** Lennar demands judgment for damages against Harrell's Drywall in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

### COUNT L
### (Against Harrell's Drywall for Breach of Express Warranty)

493.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 482 through 492 above as if fully set forth herein.

494.    This is an action for breach of express warranty against Harrell's Drywall.

495.    As discussed more fully above, the Harrell's Drywall Agreement contains an express warranty pursuant to which Harrell's Drywall "guarantee[d] all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship." (Harrell's Drywall Agreement, ¶ 8).

496.    Lennar relied on the express warranty in approving the Harrell's Drywall Agreement and allowing Harrell's Drywall to install gypsum drywall in the homes.

497.    Harrell's Drywall breached its express warranty by providing and installing deficient and  defective gypsum drywall in the Affected Harrell's Drywall Homes.

91

498.    Lennar timely notified Harrell's Drywall of the defective gypsum drywall, but Harrell's Drywall has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

499.    As a result of Harrell's Drywall's breaches of the express warranty, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Harrell's Drywall Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Harrell's Drywall Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Harrell's Drywall Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the Harrell's Drywall Agreement.

**WHEREFORE,** Lennar demands judgment for damages against Harrell's Drywall in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT LI
### (Against Harrell's Drywall for Breach of Implied Warranty)

500.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 482 through 492 above as if fully set forth herein.

501.    This is an action for breach of implied warranty against Harrell's Drywall.

502.    Harrell's Drywall, as the installer of the defective drywall in the Affected Harrell's Drywall Homes, warranted to Lennar that the drywall was reasonably fit for its ordinary use and fit for the particular purpose of being installed in the Affected Harrell's Drywall Homes.

92

503.    Lennar relied on these implied warranties in allowing Harrell's Drywall to provide and install drywall in the Affected Harrell's Drywall Homes.

504.    Harrell's Drywall breached its implied warranties to Lennar by providing and installing deficient and defective gypsum drywall in the Affected Harrell's Drywall Homes. The defective gypsum drywall is not fit for the particular purpose of being installed in the Affected Harrell's Drywall Homes, nor is it reasonably fit for the general purpose for which gypsum drywall is used.

505.    Lennar timely notified Harrell's Drywall of the defective gypsum drywall, but Harrell's Drywall has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

506.    As a result of Harrell's Drywall's breaches of the implied warranties, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected Harrell's Drywall Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected Harrell's Drywall Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected Harrell's Drywall Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the Harrell's Drywall Agreement.

**WHEREFORE,** Lennar demands judgment for damages against Harrell's Drywall in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

93

## COUNT LII
### (Against S.D.A. for Breach of Contract)

507.     Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

508.     This is an action for breach of contract against S.D.A.

509.     On or about May 30, 2007, Lennar entered into a Subcontract Agreement with S.D.A. (the "**S.D.A. Agreement**").  A copy of the S.D.A. Agreement is attached hereto as Exhibit "J" and incorporated herein.

510.     The S.D.A. Agreement governs S.D.A.'s installation of gypsum drywall in the homes that it performed work in, some of which are at issue in this lawsuit.

511.     The S.D.A. Agreement specifies S.D.A.'s obligations with respect to the performance and quality of the work in those homes as follows:

> Subcontractor agrees to provide all permits, if applicable, licenses, labor and materials, equipment, tools, machinery and supervision for the construction of work in and about the Project in accordance with the plans and specifications, addenda and authorized change orders for the Project.  Subcontractor agrees to perform and complete the work in a good workman like manner and in compliance with applicable building codes, all other applicable governmental rules or regulations (even if not in the plans or specifications) and in accordance with both this Option Agreement and the Agreement(s) for improving real property, at no additional charge . . . .

> * * *

> Materials supplied and labor furnished shall be in strict accordance with the plans and specifications prepared for the Project, unless otherwise agreed upon in writing by Contractor. . . .

(S.D.A. Agreement, ¶¶ 2.1, 2.2).

512.     The S.D.A. Agreement also contains an express warranty pursuant to which S.D.A. warranted all work performed against defects in worksmanship or materials. Specifically, the express warranty provides, in pertinent part,

94

Subcontractor hereby warrants all work performed for twelve (12) months from the date of closing of each home or dwelling unit, unless a longer period is required by local Statutes, or by a third party warranty program such as the Home Buyers (2-10) Warranty Plan wherein the longer period shall apply for each building against defects in worksmanship or materials. In the event that defects arise during the warranty period the cost of all labor or materials to correct the defects shall be paid by Subcontractor. If Subcontractor does not make such corrections promptly after notice of such defect, Contractor may cure such defect(s) and the cost thereof shall be paid by Subcontractor immediately upon demand. Subcontractor shall also be liable for all costs and expenses, plus ten percent (10%) overhead charge, incurred by Contractor to enforce this Warranty against Subcontractor including reasonable attorney's fees. Amounts outstanding shall accrue interest after demand at the rate of 18% per annum.

(S.D.A. Agreement, ¶ 2.9).

513.    Although S.D.A. warranted that the materials furnished under the S.D.A. Agreement were of good quality and free of defects, the gypsum drywall provided and installed by S.D.A. in certain of the homes was in fact deficient and defective.

514.    Specifically, the drywall provided and installed by S.D.A. in certain of the homes is defective because it has caused damage to Other Property in the homes (the "**Affected S.D.A. Homes**").

515.    Upon discovery of the defective drywall, Lennar notified S.D.A. of the defects and demanded that S.D.A. repair or replace the defective drywall and the damage to the Other Property in the Affected S.D.A. Homes in accordance with the S.D.A. Agreement.

516.    S.D.A., however, has failed to honor its contractual obligation to repair and replace the defective drywall and the damage to the Other Property in the Affected S.D.A. Homes.

517.    Based on the foregoing, S.D.A. has breached the S.D.A. Agreement by, among other things, (i) installing deficient and defective gypsum drywall, and (ii) failing and refusing to correct, repair, or replace the deficient and defective work as required by the S.D.A. Agreement.

Greenberg Traurig, P.A. ▪ Attorneys at Law ▪ 1221 Brickell Avenue ▪ Miami, FL 33131 ▪ Tel 305.579.0500 ▪ Fax 305.579.0717 ▪ www.gtlaw.com

518. As a result of S.D.A.'s breaches of the S.D.A. Agreement, Lennar has been damaged. These damages include, but are not limited to, the costs of fully repairing the Affected S.D.A. Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected S.D.A. Homes as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected S.D.A. Homes are undergoing such repairs, as well as damages for loss of goodwill and reputation.

519. Pursuant to the S.D.A. Agreement, Lennar is entitled to recover from S.D.A. "all costs and expenses" incurred by Lennar as a result of S.D.A.'s breaches, including reasonable attorneys' fees. (S.D.A. Agreement, ¶ 2.9). S.D.A. further agreed to "indemnify Contractor and its officers, directors, agents and employees for and hold Contractor and its officers, directors, agents and employees harmless from any damage, injury, loss, liability or expense (including, but not limited to, attorney and expert fees) incurred by Contractor as a direct or indirect result of the Work" (*Id.*, ¶ 2.12B).

**WHEREFORE,** Lennar demands judgment for damages against S.D.A. in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT LIII
### (Against S.D.A. for Breach of Express Warranty)

520. Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 509 through 519 above as if fully set forth herein.

521. This is an action for breach of express warranty against S.D.A.

96

522.    As discussed more fully above, the S.D.A. Agreement contains an express warranty pursuant to which S.D.A. warranted all work performed against defects in worksmanship or material. (S.D.A. Agreement, ¶ 2.9).

523.    Lennar relied on the express warranty in approving the S.D.A. Agreement and allowing S.D.A. to install gypsum drywall in the homes.

524.    S.D.A. breached its express warranty by providing and installing deficient and defective gypsum drywall in the Affected S.D.A. Homes.

525.    Lennar timely notified S.D.A. of the defective gypsum drywall, but S.D.A. has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

526.    As a result of S.D.A.'s breaches of the express warranty, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected S.D.A. Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected S.D.A. Homes as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected S.D.A. Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the S.D.A. Agreement.

**WHEREFORE,** Lennar demands judgment for damages against S.D.A. in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

97

## COUNT LIV
## (Against S.D.A. for Breach of Implied Warranty)

527.     Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 509 through 519 above as if fully set forth herein.

528.     This is an action for breach of implied warranty against S.D.A.

529.     S.D.A., as the installer of the defective drywall in the Affected S.D.A. Homes, warranted to Lennar that the drywall was reasonably fit for its ordinary use and fit for the particular purpose of being installed in the Affected S.D.A. Homes.

530.     Lennar relied on these implied warranties in allowing S.D.A. to provide and install drywall in the Affected S.D.A. Homes.

531.     S.D.A. breached its implied warranties to Lennar by providing and installing deficient and defective gypsum drywall in the Affected S.D.A. Homes. The defective gypsum drywall is not fit for the particular purpose of being installed in the Affected S.D.A. Homes, nor is it reasonably fit for the general purpose for which gypsum drywall is used.

532.     Lennar timely notified S.D.A. of the defective gypsum drywall, but S.D.A. has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

533.     As a result of S.D.A.'s breaches of the implied warranties, Lennar has been damaged. These damages include, but are not limited to, the costs of fully repairing the Affected S.D.A. Homes, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected S.D.A. Homes as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to suitable temporary housing facilities while the Affected S.D.A. Homes are undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the S.D.A. Agreement.

98

**WHEREFORE,** Lennar demands judgment for damages against S.D.A. in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT LV
### (Against All County Drywall for Breach of Contract)

534.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 above as if fully set forth herein.

535.    This is an action for breach of contract against All County Drywall.

536.    In connection with the construction of homes in the State of Florida, Lennar entered into a Subcontract Agreement with All County Drywall in 2006 (the "**All County Drywall Agreement**").    A copy of the All County Drywall Agreement is attached hereto as Exhibit "K" and incorporated herein.

537.    The All County Drywall Agreement governs All County Drywall's installation of gypsum drywall in the homes that it performed work in, at least one of which is at issue in this lawsuit.

538.    The All County Drywall Agreement specifies All County Drywall's obligations with respect to the performance and quality of work in those homes as follows:

> **PERFORMANCE OF THE WORK**: Subcontractor agrees to furnish all labor, materials, equipment, supplies, supervision and other all things necessary to efficiently perform and timely complete in strict accordance with the plans and Specifications, in accordance with the HIGHEST TRADE PRACTICES and in a manner satisfactory to the Contractor, that portion of the Community referred to as work, as well as any amendments to this Contract, (herein collectively called the "Work"). Subcontractor, by acceptance of this Contract, shall guarantee the availability of all materials, labor and equipment necessary to complete the Work according to the established construction schedule of Contractor. . . .

(All County Drywall Agreement, ¶ 1) (emphasis in original).

99

539.    The All County Drywall Agreement also contains an express warranty pursuant to which All County Drywall "guarantee[d] all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship." (All County Drywall Agreement, ¶ 8). Specifically, the express warranty provides, in pertinent part,

> 8. **WARRANTY:** Neither the final payment nor any provision in the Contract documents shall relieve Subcontractor of responsibility for faulty materials or workmanship. In addition to the specific guarantees required by the Scope of Work and the Specifications for the Work, Subcontractor guarantees all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship, at its own expense and without cost to Contractor, for a period beginning at the date Contractor conveys title to the subject of the work to a purchaser, and continuing from such date until the last of the following to occur: (1) one year, (2) the duration of any limited warranty given by Contractor to such purchaser, or (3) the duration of any applicable common law, state or federal statutory warranties. . . . With regard to non-Orientation warranty items, Subcontractor shall complete the corrective work within five (5) working days after receipt of the original notice. . . .
>
> > 8.2 FAILURE TO PERFORM WARRANTY SERVICE. In the event Subcontractor fails to repair or replace any work or materials after receiving reasonable notice of Contractor's request to repair or replace the same, Contractor may, at its sole option and discretion, elect to repair or replace such work or materials, and hold Subcontractor liable for such repair or replacement (including administrative costs incurred by Contractor), and may backcharge or withhold the cost of such repair or replacement from any account then payable by Contractor to Subcontractor. Nothing in the foregoing provision shall, in any manner, diminish or defeat any legal right Contractor may have to proceed against Subcontractor, including, but not limited to the right to recover for latent defects.

(*Id.*, ¶¶ 8, 8.2).

540.    Although All County Drywall warranted that the materials furnished under the All County Drywall Agreement were of good quality and free of defects, the gypsum drywall provided and installed by All County Drywall in at least one of the homes is in fact deficient and defective.

100

541.    Specifically, the drywall provided and installed by All County Drywall in at least home is defective because it has caused damage to Other Property in the home (the "**Affected All County Drywall Home**").

542.    Upon discovery of the defective drywall, Lennar notified All County Drywall of the defects and demanded that All County Drywall repair or replace the defective drywall and the damage to the Other Property in the Affected All County Drywall Home in accordance with the All County Drywall Agreement.

543.    All County Drywall, however, has failed to honor its contractual obligation to repair and replace the defective drywall and the damage to the Other Property in the Affected All County Drywall Home.

544.    Based on the foregoing, All County Drywall has breached the All County Drywall Agreement by, among other things, (i) installing deficient and defective gypsum drywall, and (ii) failing and refusing to correct, repair, or replace the deficient and defective work as required by the All County Agreement.

545.    As a result of All County Drywall's breaches of the All County Drywall Agreement, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected All County Drywall Home, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected All County Drywall Home as a result of the deficient and defective gypsum drywall. These damages shall also include all costs incurred by Lennar in relocating its homeowners to a suitable temporary housing facility while the Affected All County Drywall Home is undergoing such repairs, as well as damages for loss of goodwill and reputation.

101

546.    Pursuant to the All County Drywall Agreements Lennar is entitled to recover from All County Drywall "any and all loss, damage or expense, directly or indirectly suffered by Contractor for such failure by Subcontractor," including reasonable attorneys' fees. (All County Drywall Agreement, ¶ 12). All County Drywall further agreed to "indemnify Contractor and its officers, directors, agents and employees for and hold Contractor and its officers, directors, agents and employees harmless from any damage, injury, loss, liability or expense (including, but not limited to, attorney and expert fees) incurred by Contractor as a direct or indirect result of the Work." (*Id.*, ¶ 13).

**WHEREFORE,** Lennar demands judgment for damages against All County Drywall in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

### COUNT LVI
### (Against All County Drywall for Breach of Express Warranty)

547.    Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 536 through 546 above as if fully set forth herein.

548.    This is an action for breach of express warranty against All County Drywall.

549.    As discussed more fully above, the All County Drywall Agreement contains an express warranty pursuant to which All County Drywall "guarantee[d] all the work to be performed and all the materials to be furnished under this Contract against defects in material or workmanship." (All County Drywall Agreement, ¶ 8).

550.    Lennar relied on the express warranty in approving the All County Drywall Agreement and allowing All County Drywall to install gypsum drywall in the homes.

551.    All County Drywall breached its express warranty by providing and installing deficient and defective gypsum drywall in the Affected All County Drywall Home.

102

552.   Lennar timely notified All County Drywall of the defective gypsum drywall, but All County Drywall has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

553.   As a result of All County Drywall's breach of the express warranty, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected All County Drywall Home, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected All County Drywall Home as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to a suitable temporary housing facility while the Affected All County Drywall Home is undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the All County Drywall Agreement.

**WHEREFORE**, Lennar demands judgment for damages against All County Drywall in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

## COUNT LVII
### (Against All County Drywall for Breach of Implied Warranty)

554.   Lennar reasserts and realleges the allegations in paragraphs 1 through 54 and 536 through 546 above as if fully set forth herein.

555.   This is an action for breach of implied warranty against All County Drywall.

556.   All County Drywall, as the installer of the defective drywall in the Affected All County Drywall Home, warranted to Lennar that the drywall was reasonably fit for its ordinary use and fit for the particular purpose of being installed in the Affected All County Drywall Home.

103

557.   Lennar relied on these implied warranties in allowing All County Drywall to provide and install drywall in the Affected All County Drywall Home.

558.   All County Drywall breached its implied warranties to Lennar by providing and installing deficient and defective gypsum drywall in the Affected All County Drywall Home. The defective gypsum drywall is not fit for the particular purpose of being installed in the Affected All County Drywall Home, nor is it reasonably fit for the general purpose for which gypsum drywall is used.

559.   Lennar timely notified All County Drywall of the defective gypsum drywall, but All County Drywall has failed to honor its contractual obligation to repair or replace the defective gypsum drywall.

560.   As a result of All County Drywall's breaches of the implied warranties, Lennar has been damaged.  These damages include, but are not limited to, the costs of fully repairing the Affected All County Drywall Home, which may include replacing the defective gypsum drywall and repairing or replacing the damage to the Other Property in the Affected All County Drywall Home as a result of the deficient and defective gypsum drywall.  These damages shall also include all costs incurred by Lennar in relocating its homeowners to a suitable temporary housing facility while the Affected All County Drywall Home is undergoing such repairs, damages for loss of goodwill and reputation, and attorneys' fees, expert fees and costs pursuant to the All County Drywall Agreement.

**WHEREFORE,** Lennar demands judgment for damages against All County Drywall in an amount to be determined at trial, plus attorneys' fees and costs, and for such further and other relief as the Court deems just and proper.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

## DEMAND FOR JURY TRIAL

Lennar demands a jury trial on all issues so triable.

Dated: January 30, 2009

Respectfully submitted,

**GREENBERG TRAURIG, P.A.**
*Attorneys for Lennar Homes, LLC and*
*U.S. Home Corporation*
1221 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
E-mail: bassh@gtlaw.com
E-mail: salkym@gtlaw.com
E-mail: foslida@gtlaw.com

By: _____

HILARIE BASS
Florida Bar No. 334323
MARK A. SALKY
Florida Bar No. 058221
ADAM M. FOSLID
Florida Bar No. 682284
JOSHUA R. ALHALEL
Florida Bar No. 0016320

105