**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

IN RE: CHINESE-MANUFACTURED     MDL DOCKET: 2047
DRYWALL PRODUCTS LIABILITY       SECTION: L
LITIGATION

                                     JUDGE FALLON
THIS DOCUMENT RELATES TO:        MAG. JUDGE WILKINSON

*Mitchell Co., Inc. v. Knauf Gips KG, et al.*,
**Case No. 2:09-cv-04115 (E.D. La.)**

*Wiltz v. Beijing New Building Materials*
*Public Ltd. Co., et al.*,
**Case No. 2:10-cv-00361 (E.D. La.)**

*Gross v. Knauf Gips KG, et al.*,
**Case No. 2:09-cv-06690 (E.D. La.)**
_____/

**THE BANNER ENTITIES' MEMORANDUM OF LAW IN RESPONSE TO TAISHAN'S**
**MOTIONS TO DISMISS IN *GROSS* AND *WILTZ*, AND AMICUS MEMORANDUM OF**
**LAW IN RESPONSE TO TAISHAN'S RENEWED MOTION**
**TO VACATE THE ENTRY OF DEFAULT AND DISMISS IN *MITCHELL***

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

I. FACTS .................................................................................................... 3

II. ARGUMENT ......................................................................................... 9

    A. TG's and TTP's Contacts With Florida Satisfy Three Separate Bases of
        The State's Long-Arm Statute ............................................................ 10

        1. TTP Is Subject to Personal Jurisdiction Under the Florida Long-
            Arm Statute ................................................................................ 10

            i. TTP-Manufactured Drywall Caused Injury to Property in
                Florida, Subjecting TTP to Jurisdiction Under Fla. Stat. §
                48.193(1)(f) ....................................................................... 10

            ii. TTP Carried on a General Course of Business Activity in
                Florida, Subjecting It to Jurisdiction under Fla. Stat. §
                48.193(1)(a) ...................................................................... 13

            iii. TTP Committed Torts in Florida, Subjecting It to
                Jurisdiction under Fla. Stat. § 48.193(1)(b) ................................. 14

        2. TG Independently Falls Within the Ambit of the Long-Arm Statute
            Because Its Drywall Caused Injury to Florida Property and
            Because TG Committed Torts in Florida ...................................... 15

        3. The Causes of Action Against Taishan Arise From Its Activities
            Under the Florida Long-Arm Statute ......................................... 17

        4. TTP and TG's Agency Relationship Provides an Alternative Basis
            for Satisfying the Requirements of Florida's Long-Arm Statute ........... 18

    B. TTP'S AND TG'S CONTACTS WITH FLORIDA MEET THE
        REQUIREMENTS OF THE DUE PROCESS CLAUSE .................................. 20

        1. The Stream of Commerce Standard Governs Minimum Contacts
            Analysis ...................................................................................... 21

            i. Fifth Circuit Law Applies ............................................... 21

            ii. Stream of Commerce Remains the Law of the Fifth Circuit ........ 22

        2. TTP Has the Requisite Minimum Contacts With Florida ....................... 24

i

i.      The Stream of Commerce Test is Satisfied .................................. 24

ii.     The Stream-of-Commerce-*Plus* Test Is Satisfied ......................... 25

iii.    Taishan's Attempts to Explain Away The Undeniable
        Jurisdictional Facts Fail ............................................................. 28

iv.     The Claims Against TTP Arise From Its Contacts With
        Florida ..................................................................................... 35

3.      TG Has the Requisite Minimum Contacts With Florida ........................... 36

4.      The Exercise of Personal Jurisdiction Over TG and TTP is Fair and
        Reasonable ........................................................................................... 37

        i.      Taishan Has Not Shown Any Exceptional Burden ...................... 38

        ii.     Florida Parties Have a Very Strong Interest in a Florida
                Forum ..................................................................................... 41

        iii.    Florida Has Significant Interests in Exercising Jurisdiction ........ 41

        iv.     The Judicial System's Interest In Efficient Resolution of
                the Controversies Is  Best Served by the Exercise of
                Personal Jurisdiction ............................................................... 42

        v.      The Shared Interest of The States Are Served By This
                MDL Court ............................................................................. 42

III.    TTP'S FLORIDA CONTACTS SHOULD BE ATTRIBUTED TO TG FOR
        PURPOSES OF PERSONAL JURISDICTION ............................................... 43

        A.      The Fifth Circuit's *Hargrave* Test Governs Alter Ego Determination ................ 43

        B.      Should the Court Reach the Substantive Issue of TTP and TG's Status as
                Independent Corporations, Chinese Law Applies and Would Disregard
                TTP's Separate Corporate Personhood ............................................................. 45

                1.      Florida Choice of Law Rules Govern Whether to Disregard TTP's
                        Separate Corporate Personhood ............................................................. 45

                2.      Claimants Have Made Adequate Showing That Chinese Law
                        Would Disregard TTP and TG's Separate Corporate Personhood .......... 47

                3.      Alternatively, Claimants Have Made Adequate Showing That
                        Florida Law Would Disregard TTP and TG's Corporate
                        Personality on an Agency Theory .......................................................... 49

      C.     The Exercise of Personal Jurisdiction on an Agency or Alter Ego Basis
             Comports with Constitutional Due Process ......................................................... 49

IV.    AN ADVERSE INFERENCE IS MERITED .................................................................. 49

V.     CONCLUSION ........................................................................................................................... 51

# TABLE OF AUTHORITIES

**Page**

## Cases

*Aetna Life & Cas. Co. v. Therm-O-Disc, Inc.*,
   511 So. 2d 992 (Fla. 1987) ........................................................................12

*Ainsworth v. Cargotec USA, Inc.*,
   No. 2:10-CV-236-KS-MTP, 2011 WL 4443626 (S.D. Miss. Sept. 23, 2011) ......................23

*Angelica Corp. v. Gallery Mfg. Corp.*,
   904 F. Supp. 993 (E.D. Mo. 1995)................................................................26

*Associated Transp. Line, Inc. v. Productos Fitosanitarios Proficol El Carmen, S.A.*,
   197 F.3d 1070 (11th Cir. 1999)..................................................................15

*In re Auto. Refinishing Paint Antitrust Litig.*,
   358 F.3d 288 (3d Cir. 2004) ....................................................................10

*Banton Indus., Inc. v. Dimatic Die & Tool Co.*,
   801 F.2d 1283 (11th Cir. 1986)..................................................................34

*Bean Dredging Corp. v. Dredge Tech. Corp.*,
   744 F.2d 1081 (5th Cir. 1984) ..............................................................40, 42

*Beliz v. W.H. McLeod & Sons Packing Co.*,
   765 F.2d 1317 (5th Cir. 1985) ..................................................................50

*Benitez-Allende v. Alcan Aluminio do Brasil, S.A.*,
   857 F.2d 26 (1st Cir. 1988)......................................................................32

*Blumberg v. Steve Weiss & Co., Inc.*,
   922 So. 2d 361 (Fla. Dist. Ct. App. 2006) ......................................................15

*Bradley v. United States*,
   161 F.3d 777 (4th Cir. 1998) ....................................................................21

*Bullion v. Gillespie*,
   895 F.2d 213 (5th Cir. 1990) ...............................................................28, 29

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ..........................................................................37, 38

*Chapman v. DePuy Orthopedics, Inc.*,
   760 F. Supp. 2d 1310 (M.D. Fla. 2011) ..........................................................45

*Charia v. Cigarette Racing Team*,
   583 F.2d 184 (5th Cir. 1978) ...............................................................32, 34

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
   626 F. Supp. 2d 1346 (J.P.M.L. 2009) ..........................................................10

iv

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
 767 F. Supp. 2d 649 (E.D. La. 2011) ..................................................................... 21, 38, 42

*City of New York v. A-1 Jewelry & Pawn, Inc.*,
 501 F. Supp. 2d 369 (E.D.N.Y. 2007) ................................................................................. 51

*Conwill v. Greenberg Traurig, L.L.P.*,
 No. 09-4365, 2009 WL 5178310 (E.D. La. Dec. 22, 2009) ................................................ 43

*Cooper v. Faith Shipping*,
 No. CIV.A.06-892, 2010 WL 2360668 (E.D. La. June 9, 2010) ......................... 25, 29, 40, 42

*CTS Corp. v. Dynamics Corp. of Am.*,
 481 U.S. 69 (1987) ........................................................................................................ 23, 46

*Delong Equip. Co. v. Washington Mills Abrasive Co.*,
 840 F.2d 843, 850 (11th Cir. 1988) .................................................................................... 40

*Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*,
 593 F.3d 1249 (11th Cir. 2010), *cert. denied*, 131 S. Ct. 158 (2010) .................................. 34

*DP Solutions, Inc. v. Rollins, Inc.*,
 34 Fed. App'x 150 (5th Cir. 2002) ...................................................................................... 44

*Enic, PLC v. F.F. South & Co., Inc.*,
 870 So. 2d 888 (Fla. Dist. Ct. App. 2004) .......................................................................... 19

*Estate of Scutieri v. Chambers*,
 386 Fed. App'x 951 (11th Cir. 2010) ................................................................................... 15

*Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*,
 752 So. 2d 582 (Fla. 2000) ................................................................................................. 10

*Garland v. Roy*,
 615 F.3d 391 (5th Cir. 2010) .............................................................................................. 23

*Golant v. German Shepherd Dog Club of Am., Inc.*,
 26 So. 3d 60 (Fla. Dist. Ct. App. 2010) .............................................................................. 13

*Good Hope Indus., Inc. v. Ryder Scott Co.*,
 378 Mass. 1 (1979) ............................................................................................................. 26

*Gray v. Riso Kagaku Corp.*,
 82 F.3d 410, 1996 WL 181488 (4th Cir. Apr. 17, 1996) ...................................................... 39

*Gulf Consol. Servs., Inc. v. Corinth Pipeworks, S.A.*,
 898 F.2d 1071 (5th Cir. 1990) ............................................................................................ 32

*Hamilton v. Accu-Tek*,
 32 F. Supp. 2d 47 (E.D.N.Y. 1998) ..................................................................................... 51

*Hargrave v. Fibreboard Corp.*,
 710 F.2d 1154 (5th Cir. 1983) ....................................................................................... 43, 44

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
   No. 4:09-md-02046, 2011 WL 1232352 (S.D. Tex. Mar. 31, 2011) ....................................9

*Hicks v. Gates Rubber Co.*,
   833 F.2d 1406 (10th Cir. 1987)........................................................................................50

*In re Hillsborough Holdings Corp.*,
   123 B.R. 1004 (Bankr. M.D. Fla. 1990) ...........................................................................46

*Hobbs v. Don Mealey Chevrolet*,
   642 So. 2d 1149 (Fla. Dist. Ct. App. 1994) ......................................................................46

*Home Decor of Elmwood Oaks, LLC v. Jiyou Arts & Frames Co.*,
   No. CIV.A. 08-0762, 2009 WL 273193 (E.D. La. Jan. 23, 2009)...................................28, 29

*Ins. Corp. of Ireland, Inc. v. Compagnie des Bauxites de Guinee*,
   456 U.S. 694 (1982) ........................................................................................................50

*Intercontinental Corp. v. Orlando Reg'l Med. Ctr., Inc.*,
   586 So. 2d 1191 (Fla. Dist. Ct. App. 1991) ......................................................................10

*Irving v. Owens-Corning Fiberglas Corp.*,
   864 F.2d 383 (5th Cir. 1989) ...........................................................................................31

*ITL Int'l, Inc. v. Constenla, S.A.*,
   No. 1:10CV467 LG-RHW, 2010 WL 4537931 (S.D. Miss. Nov. 2, 2010),
   *aff'd*, 669 F.3d 493 (5th Cir. 2012) .............................................................................38, 42

*J. McIntyre Machinery, Ltd. v. Nicastro*,
   131 S. Ct. 2780 (2011) ...........................................................................................*passim*

*Jacobs Chuck Mfg. Co. v. Shandong Weida Mach. Co., Ltd.*,
   No. 2:05-CV-185, 2005 WL 3299718 (E.D. Tex. Dec. 5, 2005)..........................................39

*Johnston v. Multidata Sys. Int'l Corp.*,
   523 F.3d 602 (5th Cir. 2008) .............................................................................................2

*Jones v. Jack Maxton Chevrolet, Inc.*,
   484 So. 2d 43 (Fla. Dist. Ct. App. 1986) ..........................................................................13

*K-V Pharm. Co. v. J. Uriach & CIA, S.A.*,
   648 F.3d 588 (8th Cir. 2011) ...........................................................................................28

*Kalb, Voorhis v. Am. Fin. Corp.*,
   8 F.3d 130 (2d Cir. 1993) ................................................................................................45

*Kaplan v. DaimlerChrysler*,
   99 F. Supp. 2d 1348 (M.D. Fla. 2000) ........................................................................16, 33

*Keeton v. Hustler Magazine, Inc.*,
   465 U.S. 770 (1984) ...................................................................................................41, 42

*Kinetic Concepts, Inc. v. Bluesky Med. Corp.*,
   No. SA–03–CA–832–RF, 2004 WL 2550586 (W.D. Tex. Sept. 24, 2004)...........................27

*Kinsella v. Belforte,*
    373 F. Supp. 2d 957 (S.D. Iowa 2005) ............................................................... 26, 33

*In re Korean Air Lines Disaster,*
    829 F.2d 1171 (D.C. Cir. 1987) ........................................................................21

*Koster v. (Am.) Lumbermens Mut. Cas. Co.,*
    330 U.S. 518 (1947) ..........................................................................................40

*Kravitz v. Gebrueder Pletscher Druck-Gusswaremfabrik,*
    442 So. 2d 985 (Fla. Dist. Ct. App. 1983) ................................................ 16, 18

*Kwik-Kopy Corp. v. Byers,*
    37 Fed. App'x 90, 2002 WL 1021889 (5th Cir. 2002) .....................................2

*Luv N' care, Ltd. v. Insta-Mix, Inc.,*
    438 F.3d 465 (5th Cir. 2006) .................................................. 22, 30, 31, 32

*McFadin v. Gerber,*
    587 F.3d 753 (5th Cir. 2009) ............................................................................21

*Menowitz v. Brown,*
    991 F.2d 36 (2d Cir. 1993) ..............................................................................21

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,*
    241 F.R.D. 435 (S.D.N.Y. 2007) .....................................................................22

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.,*
    84 F.3d 560 (2d Cir. 1996) ..............................................................................39

*Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc.,*
    30 F.3d 692 (6th Cir. 1994) ............................................................................50

*Milberg Factors, Inc. v. Greenbaum,*
    585 So. 2d 1089 (Fla. Dist. Ct. App. 1991) ....................................................14

*Morris v. SSE, Inc.,*
    843 F.2d 489 (11th Cir. 1988) .........................................................................41

*Murphy v. Fed. Deposit Ins. Corp.,*
    208 F.3d 959 (11th Cir. 2000) .........................................................................21

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.,*
    323 F. Supp. 2d 861 (S.D. Ohio 2004) ...........................................................22

*In re New England Mut. Life Ins. Co. Sales Practices Litig.,*
    324 F. Supp. 2d 288 (D. Mass. 2004) ..............................................................22

*Newton v. Thomason,*
    22 F.3d 1455 (9th Cir. 1994) ...........................................................................22

*Nw. Aircraft Capital Corp. v. Stewart,*
    842 So. 2d 190 (Fla. Dist. Ct. App. 2003) ......................................................12

*Nuovo Pignone, SpA v. STORMAN ASIA M/V*,
  310 F.3d 374 (5th Cir. 2002) ............................................................................12

*Osorio v. Dole Food Co.*,
  No. 07-22693, 2009 WL 48189 (S.D. Fla. Jan. 5, 2009) .................................32

*Oswalt v. Scripto*,
  616 F.2d 191 (5th Cir. 1980) .............................................................. 27, 29, 31

*Oyuela v. Seacor Marine (Nigeria), Inc.*,
  290 F. Supp. 2d 713 (E.D. La. 2003) ...............................................................44

*Pappalardo v. Richfield Hospitality Svcs., Inc.*,
  790 So. 2d 1226 (Fla Dist. Ct. App. 2001) .......................................................20

*Parti-Line Int'l, L.L.C. v. Bill Ferrell Co.*,
  CIV.A. 04-2417, 2005 WL 578777 (E.D. La. Mar. 4, 2005) ............................29

*Patin v. Thoroughbred Power Boats, Inc.*,
  294 F.3d 640 (5th Cir. 2002) .............................................................................49

*Pedi Bares, Inc. v. P & C Food Mkts., Inc.*,
  567 F.2d 933 (10th Cir. 1977) ..........................................................................33

*In re Perrier Bottled Water Litig.*,
  754 F. Supp. 264 (D. Conn. 1990) ....................................................................26

*Pritzker v. Yari*,
  42 F.3d 53 (1st Cir. 1994).................................................................................38

*Reed v. Biomet Orthopedics, Inc.*,
  No. CIV. 06-0544, 2008 WL 1735162 (W.D. La. Mar. 6, 2008) ................ 22, 32

*Renner v. Lanard Toys Ltd.*,
  33 F.3d 277 (3d Cir. 1994) ...............................................................................32

*Research Med., Inc. v. Canadian Cardiovascular Prods., Ltd.*,
  917 F. Supp. 767 (D. Utah 1996)................................................................ 26, 27

*Reul v. Sahara Hotel*,
  372 F. Supp. 995 (S.D. Tex. 1974) ...................................................................44

*Ritzman v. Nalu Kai, Inc.*,
  523 F. Supp. 2d 564 (S.D. Tex. 2007)......................................................... 36, 37

*Rogers v. Omni Solution, Inc.*,
  No. 10-21588-CIV, 2010 WL 4136145 (S.D. Fla. Oct. 19, 2010) ...................35

*Romero v. Cajun Stabilizing Boats, Inc.*,
  No. Civ. A.G. 05-483, 2006 WL 367871 (S.D. Tex. Feb. 14, 2006).................9

*Rolls-Royce Corp. v. Heros, Inc.*,
  576 F. Supp. 2d 765 (N.D. Tex. 2008) ..............................................................43

*Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*,
   9 F.3d 415 (5th Cir. 1993) ......................................................................... 22, 35

*Sehringer v. Big Lots, Inc.*,
   532 F. Supp. 2d 1335 (M.D. Fla. 2007) ....................................................... 19, 20

*Self v. M&M Chem. Co.*,
   177 F.3d 977, 1999 WL 195576 (5th Cir. Mar. 17, 1999) ................................... 9

*Shealy v. Challenger Mfg. Co.*,
   304 F.2d 102 (4th Cir. 1962) ............................................................................. 33

*In re Silica Prods. Liab. Litig.*,
   398 F. Supp. 2d 563 (S.D. Tex. 2005)......................................................... 21, 22

*Singletary v. B.R.X., Inc.*,
   828 F.2d 1135 (5th Cir. 1987) ...................................................................... 32, 36

*Sloss Indus. Corp. v. Eurisol*,
   488 F.3d 922 (11th Cir. 2007) ........................................................................... 34

*State v. Am. Tobacco Co.*,
   707 So. 2d 851 (Fla. Dist. Ct. App. 1998).................................................... 19, 49

*Stateline Power Corp. v. Kremer*,
   404 F. Supp. 2d 1373 (S.D. Fla. 2005)............................................................. 34

*Stripling v. Jordan Prod. Co.*,
   234 F.3d 863 (5th Cir. 2000) ............................................................................... 9

*Stuart v. Spademan*,
   772 F.2d 1185 (5th Cir. 1985) ........................................................................... 44

*Synergy, Inc. v. Manama Textile Mills, W.L.L.*,
   CIV. A. 06-4129, 2008 WL 6839033 (D.N.J. Feb. 19, 2008) ................................ 25, 26, 33

*In re Temporomandibular Joint Implants Prods. Liab. Litig.*,
   97 F.3d 1050 (8th Cir. 1996) ............................................................................. 21

*Travel Opportunities of Fort Lauderdale, Inc. v. Walter Karl List Mgmt. Inc.*,
   726 So. 2d 313 (Fla. Dist. Ct. App. 1998) ........................................................ 14

*Various Plaintiffs v. Various Defendants (Oil Field Cases)*,
   673 F. Supp. 2d 358 (E.D. Pa. 2009)................................................................ 21

*Vencedor Mfg. Co., Inc. v. Gougler Indus., Inc.*,
   557 F.2d 886 (1st Cir. 1977).............................................................................. 32

*Vermeulen v. Renault, U.S.A., Inc.*,
   985 F.2d 1534 (11th Cir. 1993)............................................................... 26, 31, 41

*In re Vitamins Antitrust Litig.*,
   120 F. Supp. 2d 58 (D.D.C. 2000) .................................................................... 51

*Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*,
   517 F.3d 235 (5th Cir. 2008) ................................................................................... 2

*Wetzel v. Fisherman's Wharf of Pompano Beach, Inc.*,
   771 So. 2d 1195 (Fla. Dist. Ct. App. 2000) ................................................... 13, 18

*In re World Vision Entm't, Inc.*,
   275 B.R. 641 (Bankr. M.D. Fla. 2002) .............................................................. 45

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980) ..................................................................................... 24, 39

## <u>Statutes</u>

28 U.S.C. § 1407 .......................................................................................................... 10

Fed. R. Civ. P. 37(b)(2)(A)(i) ..................................................................................... 50

Fla Stat. § 48.193(1) ............................................................................................ *passim*

## <u>Other Authorities</u>

R<small>ESTATEMENT</small> (S<small>ECOND</small>) <small>OF</small> C<small>ONFLICT OF</small> L<small>AWS</small> § 302 (1971).............................................45, 46

## PRELIMINARY STATEMENT

The current motion represents the latest attempt by Taian Taishan Plasterboard Co., Ltd. ("TTP") and Taishan Gypsum Co. ("TG") (collectively, "Taishan") to avoid responsibility for the millions of square feet of defective drywall they manufactured, which generated thousands of claims for property damage in Florida.  The facts demonstrate that Taishan actively targeted Florida's market for sale of its drywall and, when that effort was successful, sold millions of square feet of its defective drywall for use in Florida.  Taishan's own documents amply demonstrate that it knew that its product was being shipped to Florida ports and Florida distributors.  Unable to credibly deny these facts, Taishan attempts to avoid the jurisdiction of this Court by arguing that the wrong legal standards apply, citing inapposite and outdated case law.  By this opposition, the Banner entities[1] address why the Court should deny Taishan's motion and find Taishan subject to jurisdiction in Florida.[2]

The Banner entities are family-owned Florida corporations that have been in the business of distributing building products, including drywall, throughout the state of Florida for the past 58 years.  Banner has been sued by thousands of homeowners who claim that drywall distributed by Banner was defective.  On June 14, 2011, Banner entered a proposed class action settlement by tendering every dollar of its insurance coverage to attempt to remedy some of the damage caused by defective drywall manufactured by others.  While the majority of the defective drywall that passed through Banner's warehouses was made by Knauf, a substantial amount was manufactured by Taishan.  Like many small companies in the United States that innocently

---

[1]   The Banner entities are:  Banner Supply Co.; Banner Supply Co. Fort Myers, LLC; Banner Supply Co. Pompano, LLC; Banner Supply Co. Port St. Lucie, LLC; Banner Supply Co. Tampa, LLC; and Banner Supply International, LLC (collectively, "Banner").

[2]   As amicus to the Court, Banner demonstrates herein that the Court has jurisdiction over TG and TTP in the thousands of Florida claims brought in this MDL.

1

purchased and resold these products for use in construction, Banner cannot possibly satisfy all of the thousands of claims arising from these manufacturers' products.

The facts developed in discovery demonstrate that both TG and TTP are subject to this Court's jurisdiction and should be called to compensate homeowners for the damage their products have caused.  This is true whether the Court applies the *prima facie* standard that is applicable on a motion to dismiss, or the preponderance of the evidence standard that Taishan advances.[3]

TG and TTP each independently meet the requirements of three separate bases for jurisdiction under the Florida long-arm statute, which provides for specific personal jurisdiction over a defendant that (i) has manufactured a product that damages property if defendant's products are also used in the ordinary course of commerce, (ii) carried on a general course of business activity, and/or (iii) committed "tortious conduct," in the state.  Further, the claims against Taishan arise from Taishan's contacts with Florida, as they relate to the precise defective product Taishan placed into the stream of commerce when targeting Florida and other U.S. markets, as well as Taishan's other contacts with Florida, including delivery of samples to Florida and communications with Florida customers such as Oriental Trading Company ("OTC").

---

[3]   In the Fifth Circuit, "[u]nless there is a full and fair hearing, [the court] should not act as a fact finder and must construe all disputed facts in the plaintiff's favor and consider them along with the undisputed facts."  *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241-42 (5th Cir. 2008); *see also Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (same); *Kwik-Kopy Corp. v. Byers*, 37 Fed. App'x 90, 2002 WL 1021889, at *4 (5th Cir. 2002) ("[A]ffidavits plus discovery materials," including depositions, did not constitute full hearing).  Accordingly, this Court should apply a *prima facie* standard in determining whether jurisdiction lies over Taishan, under which uncontroverted allegations in the complaints in these actions must be taken as true, and conflicts in facts supported by evidence must be resolved in favor of jurisdiction.

Under Fifth Circuit law, Taishan is subject to jurisdiction if the facts demonstrate that it placed its product in the stream of commerce with knowledge that it would be distributed in Florida.  By sleight of hand, Taishan attempts to duck well-established Fifth Circuit law by claiming that Eleventh Circuit law governs the due process analysis.  Taishan is incorrect:  it is well-established that the law of the transferee court – here, the Fifth Circuit – applies to questions of federal constitutional law.  Applying the proper Fifth Circuit standard, the facts amply demonstrate that both TG and TTP are subject to personal jurisdiction in Florida (and therefore in this Court as the transferee forum).

This Court also has an independent basis for the exercise of personal jurisdiction over TG, because the facts demonstrate that it was the alter ego and/or agent of TTP for jurisdictional purposes.  As explained below in Section III, the Court need not reach the choice of law analysis undertaken by Taishan and the Plaintiffs' Steering Committee ("PSC").  Veil-piercing for jurisdictional purposes is a question of federal law.  Thus, the Fifth Circuit's five-factor test applies to determine whether TTP's contacts can be attributed to TG for purposes of exercising personal jurisdiction.  This test is less stringent than the test applied for veil-piercing for liability purposes, and is easily met here.  In the alternative, should the Court undertake the choice of law analysis and consider the veil-piercing standards under Chinese and Florida law, Banner agrees with the PSC and Taishan that Chinese law would apply.  Under Chinese law, veil-piercing is appropriate here.  Finally, even if Florida law were to apply, imputing contacts between TG and TTP is appropriate under an agency theory.

## I.    FACTS

Banner adopts and incorporates the PSC's global statement of facts, which demonstrate that TTP placed the drywall that gave rise to the claims in the *Wiltz, Gross* and *Mitchell* actions

in the stream of commerce with knowledge that it would be distributed in Florida.[4]  As the PSC has demonstrated, vast quantities of Taishan drywall were shipped into the United States.  TTP admits that it shipped more than 9,399,360 square feet of its drywall directly to buyers in Florida. *See* Global SOF 44, 92, 94; Herman Aff.[5] Ex. 1 (chart summarizing Taishan's sales into the U.S. by state, based on TG and TTP Manufacturer Profile Forms and document production). According to Taishan's own documents, the true amount is significantly larger.  TG's and TTP's Manufacturer Profile Forms ("MPF"), as well as the invoices produced in discovery, reflect the export by Taishan of approximately 86 million square feet of drywall into the United States from 2005-2008.  *See* Global SOF 3, n.10, Herman Aff. Ex. 19.  According to two contemporaneous emails sent by Export Manager Peng Wenlong, however, in 2006 alone Taishan exported nearly 200 million square feet of drywall to the U.S., considerably more than was disclosed in its MPFs for the entire period 2005-2008.  Mr. Wenlong reported in a November 2006 email that TG had exported 161 million square feet (15 million sq. meters)[6] of drywall to the U.S. for the year thus

---

[4]   In order to avoid duplication of the record and for the convenience of the Court and the parties, Banner incorporates the following filings of the PSC, which were filed on May 8, 2012, as if fully set forth herein:  Global Memorandum of Law in Opposition To: (1) Taishan's Renewed Motions to Vacate The Default Judgments and Dismiss the Complaints in Germano and Mitchell and (2) Taishan's Motions to Dismiss the Complaints in Gross and Wiltz (ECF No. 14209) (**"Global Br."**); Global Statement of Facts in Opposition To: (1) Taishan's Renewed Motions to Vacate The Default Judgments and Dismiss the Complaints in Germano and Mitchell and (2) Taishan's Motions to Dismiss the Complaints in Gross and Wiltz (ECF No. 14215-2) (**"Global SOF"**); "Response in Opposition to Taishan's Renewed Motion Pursuant to Rules 55(c) and 12(b)(2) to Vacate the Entry of Default and to Dismiss and Amicus Brief on Florida Relating to Jurisdictional Issues Raised by Taishan," filed in *Mitchell Co., Inc. v. Knauf Gips KG, et al.*, Case No. 2:09-cv-04115 (ECF No. 14216) ("**PSC's *Mitchell* Opp.**").

[5]   **"Herman Aff."** refers to the Affidavit of Russ M. Herman dated 5/7/2012 (ECF No. 14215-4), which is Exhibit A to the Global SOF.

[6]   One square meter ($m^2$) is the equivalent of 10.76 square feet ($ft^2$).

far, and reported in February 2007 that TG exported 193 square feet (18 million square meters).[7] *See* Global Br. 1 n.2; Herman Aff. Exs. 10, 16.

These shipments were not the result of happenstance, but were part of an effort by Taishan to target markets in the United States.  TG's and TTP's own documents demonstrate that Florida and other U.S. jurisdictions were specifically targeted for sale of Taishan-manufactured drywall.  "Special Invoices for Export" that Taishan provided to the Chinese government tax authorities[8] identify Taishan as the "exporter" for shipments to Florida, including Miami and Tampa, as well as to numerous other U.S. destinations.[9]  As part of this effort targeting Florida, TTP sent samples of its plasterboard via Federal Express to potential purchasers in Florida.[10]  It provided quotes for shipping drywall to various Florida cities, including Miami, Orlando, West Palm Beach and Tampa,[11] and solicited business by inviting Florida distributors to tour Taishan's manufacturing plant in China.[12]

---

[7]   Under a *prima facie* standard, this conflict in facts must be resolved against the parties seeking dismissal, thus bolstering the already voluminous evidence warranting exercise of jurisdiction over Taishan.  Even under a preponderance standard, given the lack of credibility of Taishan's witnesses, any conflict must similarly be resolved in favor of finding jurisdiction.

[8]   Herman Aff. Ex. 6 (Che 1/12/2012 Tr. 403:1-404:14) (referring to Herman Aff. Ex. 85).

[9]   *See, e.g.,* Herman Aff. Ex. 85 (Special Invoices for Export to Miami, New York, New Orleans and [unspecified] USA); *Id.* Ex. 102 (Special Invoices for Export to Tampa).

[10]   *See* Global SOF 19-20; Herman Aff. Ex. 49 (9/22/2006 email re: samples to Florida-based OTC); *Id.* Ex. 53 (11/23/2005 email re: samples to Florida-based Carn Construction), Ex. 54 (12/14/2005 email re: additional samples to Carn).

[11]   *See* Global SOF 22-23, 37-38, 44; Herman Aff. Ex. 64 (quote to OTC for shipment to Miami); Herman Aff. Ex. 27 at 26 (re: quote to OTC for shipment to Gulfport, FL); *Id.* Ex. 105 (quote for shipment to Port Everglades in Fort Lauderdale); *Id.* Ex. 106 (quote for shipment to Jacksonville Port).

[12]   *See* Global SOF 20-21; Herman Aff. Ex. 9 (Gonima 12/13/2011 Tr. at 32:3-7; 40:19-42:13; 44:9-21; 45:15-46:11; 89:7-10) (re: OTC visit to Taishan factory); *Id.* Ex. 8 (6/8/2006 email re: Wood Nation visit to Taishan factory).

Taishan's marketing efforts targeted at Florida were successful. In communications with potential customers, TG and TTP reported that it was experienced in exporting its drywall to the United States. *See, e.g.,* Herman Aff. Ex. 31 ("First we're exporting out gypsum board to the USA with quantity of 600,000 sheets every month. We have much experience on exporting to the USA."); Ex. 10 ("We are the first who use container to export gypsum board to USA in China, we have the professional salespersons and workers for USA market."). TTP had good cause to make such claims. From May 2006 to July 2007, TTP sold over 9 million square feet of drywall valued at $772,863 in 15 known transactions with Florida buyers.[13] It secured agreements with Wood Nation, a company located in Tampa, Florida, for the purchase of 500 containers of drywall, each container holding 660 pieces of Taishan's drywall (over 330,000 sheets);[14] and with another Florida corporation, B America Corporation, for the sale of 660 sheets of drywall to be shipped to Miami, Florida.[15] Likewise, TG sold 485,044 sheets of drywall on March 15, 2006 to Devon International in the Port of Pensacola.[16]

TTP also entered into an exclusive agency contract with a Florida distributor, OTC, which had offices in Miami and Orlando, Florida and contracted with OTC to sell more than 1

---

[13] *See* Herman Aff. Ex. 1.

[14] *See* Global SOF 39-40; Herman Aff. Ex. 100 (6/10/2006 sales contract between TTP and Wood Nation; *Id.* Ex. 38 (draft affidavit of Richard Hannam); *Id.* Ex. 39 (Hannam Tr. at 94:8-98:11).

[15] *See* Global SOF 38-39; Herman Aff. Ex. 88 (Taishan invoice to B America); Ex. 89 (Taishan packing list); Ex. 90 (Delmar Logisitics Ex. 2, 4/10/2007 email from Bill Cher to Rafael Sardi regarding B America shipment).

[16] Global SOF 40-43; Herman Aff. Ex. 167 (3/30/2006 sales order confirmation from TG to Devon International for 485,044 sheets of drywall (DEVON00016-17)); Herman Aff. Ex. 170 (Port of Pensacola discharge sheet, bill of lading (DEVON00571-77; DEVON 00581-86).

*million* sheets of Taishan's "DUN" brand Chinese Drywall. [17]   Taishan's Manager of International Trading, Che Gang, kept in close, often daily, contact with OTC's manager, Ivan Gonima, regarding matters relating to the sale of Taishan's drywall, U.S. market prices and market forecasts. [18]

Banner was targeted by OTC as a market for Taishan drywall. [19]  As discussed at length in the PSC's opposition brief in *Germano*, Venture Supply, Inc. ("Venture Supply"), a Virginia-based drywall company that purchased hundreds of thousands of sheets of drywall from Taishan, sold Taishan drywall to Banner in Florida on March 15, 2006.  *See* Global SOF 30-36; Mov. Br. 42 [20] ("the evidence establishes that TG made isolated sales of drywall in China to Venture Supply, and that after Venture Supply shipped the drywall to Virginia and New Jersey, Venture Supply sold some of it to Banner Supply in Florida"). [21]

Likewise, TG targeted and sold drywall to other Florida businesses operating in or serving the homebuilding industry.  TG sold 485,044 sheets of drywall on March 15, 2006 to

---

[17]   *See* Global SOF 11-12, 36; Herman Aff. Ex. 20 (Sole Agency Agreement); *Id.* Ex. 26 (OTC Articles of Organization); *Id.* Ex. 64 (4/17/2007 email from Gomina to Cher asking that OTC's Orlando office be included on all emails).

[18]   *See* Global SOF 13-14; Herman Aff. Ex. 20, 21, 26, 27.

[19]   *See* Herman Aff. Ex. 49 (Email from Gonima to Che Gang, dated 9/22/2006, indicating OTC was trying to sell Taishan drywall to Banner).

[20]   As used herein, **Moving Brief ("Mov. Br.")** refers to Taishan Gypsum Co. Ltd.'s Memorandum in Support of Its Renewed Motion Pursuant to Rules 55(c) and 12(b)(2) to Vacate the Entry of Default and Dismiss This Action, filed in *Mitchell Co., Inc. v. Knauf Gips KG, et al.*, Case No. 2:09-cv-4115 (ECF No. 13566-1).

[21]   *See also* Herman Aff. Exs. 80 & 81 (Contracts between Taishan and Venture Supply); *Id.* Ex. 72 at 139:6-140:2; 140:20-141:6 (Porter 12/16/2009 Tr.); *Id.* Ex. 19 (Taishan Gypsum Profile Form); Ex. 1 to Affidavit of Nicholas P. Panayotopoulos In Support of the Banner Entities' Memorandum of Law In Response to Taishan's Motion to Dismiss in *Gross* and *Wiltz*, and Amicus Memorandum of Law in Response to Taishan's Motion to Dismiss in *Mitchell* (Venture Supply Profile Form); *id.* Ex. 2 (3/15/2006 Venture Supply invoice to Banner for 2250 sheets trucked to Tampa area).

Devon International for delivery to the Port of Pensacola.[22]   In another transaction, TG sold over 34,000 sheets of drywall valued at over $858,000 to Beijing Building Materials Export and Import Corp ("BBMEIC").[23]   Handwritten notes on the copy of the contract Taishan produced in discovery demonstrate that TG was aware that the drywall it sold to BBMEIC was bound for Miami, FL.[24]

TG and TTP had highly intertwined parent and subsidiary drywall operations, and shared the common goal of exporting TG and/or TTP drywall to the United States for profit.   TTP is a wholly owned subsidiary of TG, and TG is TTP's sole shareholder.   Global Br. 52.   TG, which has been manufacturing drywall since 1992, was advised by the Chinese tax bureau in 2005 that it had to establish an independent company if it wanted to continue to issue VAT invoices to its drywall customers.   *See* Mov. Br. 5-9; Global Br. 52.   Accordingly, TG formed TTP in early 2006 in order to enable it to issue VAT invoices to its export customers.   Mov. Br. 8.   TG expressly recognized that TTP's sales would be primarily directed to companies for export outside of China, such as to the United States.   *Id.*

As set forth in the PSC's global statement of facts, TG and TTP ignored corporate formalities and had an alter ego relationship.   For example:  (1) TTP used TG's drywall brands as its own without payment (Global Br. 53); (2) TTP and TG took  responsibility for each other's acts and omissions and settled claims and debts on behalf of each other (*Id.* at 56-60); (3) TTP and TG used each other's employees interchangeably and sold drywall for both entities without

---

[22]   Global SOF 40-43; Herman Aff. Ex. 167 (3/30/2006 sales order confirmation from TG to Devon International for 485,044 sheets of drywall (DEVON 00016-17)); Herman Aff. Ex. 170 (Port of Pensacola discharge sheet, bill of lading (DEVON00571-77; DEVON 00581-86).

[23]   *See* Certain Homebuilders' *Amicus Curiae* Response (*Mitchell*) at Exs. 8A-8G (describing chain of documents, including contracts and bills of lading, demonstrating Taishan's awareness that TG-manufactured drywall was being delivered to Florida markets).

[24]   *See id.*

distinction (*Id.* at 61-65); (4) TTP and TG interchanged employees and directors (*Id.* at 65-66); and (5) TTP and TG shared telephone numbers, which indicates that they shared offices (*Id.* at 67-68).  Further, TG capitalized TTP with TG shareholder contributions of over 22 million RMB, then, in return for that same capital, "sold" equipment to TTP, leased a drywall manufacturing site and factory to TTP, and essentially provided TTP with everything TTP needed to operate TG's drywall manufacture and export segment of its business.  *See id.* at 9, 11, 69.

## II.   ARGUMENT

A federal court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) personal jurisdiction is conferred by the forum state's long-arm statute; and (2) the exercise of personal jurisdiction would be consistent with the due process requirements of the U.S. Constitution.  *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 869 (5th Cir. 2000); *see also* Global Br. 4 (setting forth this standard).  Here, the Florida long-arm statute confers jurisdiction over both TG and TTP, independently; and the exercise of personal jurisdiction over each defendant by Florida courts comports with constitutional due process.[25]  Additionally, because it

---

[25]  Of the actions in which Taishan filed renewed motions to dismiss, Banner is named as a co-defendant in only *Gross* and *Wiltz*, both of which are direct-filed actions in the Eastern District of Louisiana.  Banner, nonetheless, limits its analysis to Taishan's contacts with Florida for the following reasons: (1) As a Florida business, Banner has strong interests in this Court finding that Taishan is subject to the jurisdiction of Florida courts in *Mitchell* and other Florida-filed actions.  (2) Taishan's contacts with Florida are indirectly relevant to the jurisdictional inquiry in *Gross* and *Wiltz*.  Banner adopts the PSC's argument that Taishan's contacts with Louisiana are sufficient to allow the Court to exercise jurisdiction; however, should the Court disagree, *Gross* and *Wiltz* should be transferred to a venue in which jurisdiction may be proper.  *See In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, No. 4:09-md-02046, 2011 WL 1232352, at *14 (S.D. Tex. Mar. 31, 2011) (transferring direct-filed action in MDL to alternate federal forum to cure jurisdictional defect); *see also Self v. M&M Chem. Co.*, 177 F.3d 977, 1999 WL 195576, at *4 (5th Cir. Mar. 17, 1999) ("A district court in which a jurisdictionally improper case is filed is empowered . . . either to dismiss the case or, if it be in the interests of justice, to transfer it to another venue where jurisdiction may be had.") (citations omitted); *Romero v. Cajun Stabilizing Boats, Inc.*, No. Civ. A.G. 05-483, 2006 WL 367871, at *4-*5 (S.D. Tex. Feb.

served as TG's agent and/or alter ego, TTP's contacts may be attributed to TG for jurisdictional

purposes.

**A.    TG's and TTP's Contacts With Florida Satisfy Three Separate Bases of The State's Long-Arm Statute**

Florida's long-arm statute "bestows broad jurisdiction on Florida courts," *Execu-Tech*

*Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*, 752 So. 2d 582, 584 (Fla. 2000), and will hold

nonresidents accountable not only for acts within the state, but also for acts performed outside

the state that have repercussions within the state. *See Intercontinental Corp. v. Orlando Reg'l*

*Med. Ctr., Inc.*, 586 So. 2d 1191 (Fla. Dist. Ct. App. 1991).  As demonstrated in the PSC's

*Mitchell* opposition brief, and as further elaborated below, TTP's and TG's contacts with Florida

satisfy three separate bases of jurisdiction under the Florida long-arm statute:  Fla. Stat. §§

48.193(1)(a), (b), and (f).

**1.    TTP Is Subject to Personal Jurisdiction Under the Florida Long-Arm Statute**

**i.    TTP-Manufactured Drywall Caused Injury to Property in Florida, Subjecting TTP to Jurisdiction Under Fla. Stat. § 48.193(1)(f)**

TTP is subject to jurisdiction under Fla. Stat. § 48.193(1)(f), which confers jurisdiction

over defendants for any cause of action arising from acts:

---

14, 2006) (transferring case pursuant to 28 U.S.C. § 1631 where court lacked personal jurisdiction over defendant).  Taishan has significant contacts with Florida such that jurisdiction may be properly exercised.  Accordingly, a Florida district court is a potentially proper transfer venue.  However, in the event the case is transferred to a Florida venue, it would nonetheless be transferred back to this Court pursuant to 28 U.S.C. § 1407.  *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 626 F. Supp. 2d 1346 (J.P.M.L. 2009).  (3) The Court may avoid this civil procedure boomerang by considering Taishan's contacts with Florida in the instant motions concerning *Gross* and *Wiltz*.  Indeed, courts overseeing MDLs arising under federal question jurisdiction have considered contacts from all states in which individual actions had been brought in determining personal jurisdiction motions.  *See In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 297 (3d Cir. 2004) ("[P]ersonal jurisdiction should be assessed at least based on the appellants' contacts with the five states where the individual actions were brought, New Jersey, Ohio, Delaware, Kentucky, and Pennsylvania").

(f) Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:

    1. The defendant was engaged in solicitation or service activities within this state; or

    2. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

Florida's long-arm statute confers jurisdiction over TTP under subsection (f)(1) or (f)(2), as TTP's drywall caused injury to property in Florida while TTP was both engaged in solicitation or service activities within Florida, and the drywall it manufactured in China was used within Florida in the ordinary course of commerce, trade or use. *See* PSC's *Mitchell* Opp. 17-19.

Claimants' allegations have satisfied Section 48.193(1)(f)'s threshold condition that their claims arise from TTP-manufactured drywall "[c]ausing injury to persons or property" in Florida, *See* PSC *Mitchell* Opp. 18. Indeed, Taishan does not contest allegations its drywall caused injury to properties in Florida, but rather argues that jurisdiction is lacking in *Mitchell* because the named plaintiff is an Alabama corporation that suffered only "economic loss." *See* Moving Br. at 59. Taishan's argument that jurisdiction is lacking in *Mitchell* because the *named plaintiff* is an Alabama corporation that suffered only "economic loss" in Alabama is unavailing. *See* Mov. Br. 28. The named representative in *Mitchell* alleges "damage to houses and properties" – namely, that defective TTP-manufactured drywall damaged physical property by corroding metal components and fixtures in homes that the Mitchell Company constructed and requiring extensive repairs to remove the offending drywall. *See Mitchell* Compl. ¶¶ 19-20, 39. These damages are sufficient to meet the requirements of the authority cited by Taishan. *See Aetna Life & Cas. Co. v. Therm-O-Disc, Inc.*, 511 So. 2d 992, 994 (Fla. 1987) (holding that plaintiffs must allege some "personal injury or property damage" arising from the defective

product).  Moreover, *Mitchell* is a class action, and Taishan does not contest that TTP's defective drywall caused injury to property of potential class members on whose behalf *Mitchell* was brought.

The conjunction of TTP's Florida-directed activities and property damage arising from claims in *Mitchell* bring TTP within the ambit of either subsection (f)(1) or (f)(2).  *See Mitchell Opp. Br.* at 17-19.[26]

*First,* TTP's extensive efforts to solicit Florida companies to purchase its drywall bring TTP within the ambit of subsection (f)(1).  *Id.* 17-18 (describing broad range of solicitation and service activities, including, *inter alia*, TTP entering into sales contract with Florida-based company that would award exclusive distributorship upon the purchase of a specified amount of TTP drywall, shipping samples into Florida to aid in its customers' resale efforts, assisting with shipping arrangements, and customizing its labels in accordance with its customers' demands). Indeed, Florida courts have held that subsection (f)(1) confers long-arm jurisdiction over nonresidents on the basis of far less extensive solicitation and servicing activities than those evidenced here.  *See, e.g., Nw. Aircraft Capital Corp. v. Stewart*, 842 So. 2d 190 (Fla. Dist. Ct. App. 2003) (holding that passive advertisements satisfy "solicitation and service activities" requirement of subsection (f)(1)).

*Second*, subsection (f)(2) likewise confers jurisdiction over TTP.  *See PSC's Mitchell* Op. at 18.  Florida courts have repeatedly found  that subsection (f)(2) confers long-arm jurisdiction over foreign manufacturers like TTP, whose injury-causing products were offered for sale and used in the ordinary course of commerce.  *See, e.g.*, *Wetzel v. Fisherman's Wharf of Pompano Beach, Inc.*, 771 So. 2d 1195, 1198-99 (Fla. Dist. Ct. App. 2000) (holding that subsection (f)(2)

---

[26]   Similarly, any Florida-filed action alleging that defective TTP-manufactured drywall caused property damage will satisfy Section 48.193(1)(f)'s "injury to person or property" requirement.

conferred jurisdiction due to injury-causing goods used in ordinary course of commerce in Florida); *see also Jones v. Jack Maxton Chevrolet, Inc.*, 484 So. 2d 43, 44-45 (Fla. Dist. Ct. App. 1986) (subsection (f) "intended to provide jurisdiction over foreign manufacturers or dealers who place into the stream of commerce defective products which cause injury to persons or property within [Florida]").

### ii. TTP Carried on a General Course of Business Activity in Florida, Subjecting It to Jurisdiction under Fla. Stat. § 48.193(1)(a)

TTP is also subject to jurisdiction under § 48.193(1)(a), which confers jurisdiction for actions arising from TTP "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in [Florida]."  To invoke section 48.193(1)(a) long-arm jurisdiction, TTP's activities "must be considered collectively and show a general course of business activity in the State for pecuniary benefit." *Golant v. German Shepherd Dog Club of Am., Inc.*, 26 So. 3d 60, 63 (Fla. Dist. Ct. App. 2010) (citation omitted); *see also* PSC's *Mitchell* Opp. 7.

Here, the scope of TTP's business activities in Florida permits the Court to exercise long-arm jurisdiction under Section 48.193(1)(a). From May 2006 to July 2007, TTP sold over 9 million square feet of drywall valued at $772,863 in 15 known transactions with Florida buyers.[27]  These sales were the result of TTP's specific efforts to conduct business in Florida. For example, TTP entered into a contract designating Florida-based OTC as the "sole and exclusive agent" for distributing DUN brand drywall.[28]  The relationship between TTP and OTC yielded several shipments totaling approximately 58,000 sheets of drywall valued at over

---

[27]  *See* Herman Aff. Ex. 1.

[28]  The DUN trademark was the property of TG, but TTP represented to OTC that DUN was part of TTP's "catalogue." *See* Global Facts at 54-55.

$208,000.[29]  In processing orders from OTC, TTP assisted with arranging freight to Florida and also ensured that cargo containers were loaded so as to comply with regulations of the Florida Department of Transportation.[30]  TTP's Florida sales were not limited to OTC.  TTP entered into contracts with B America Corporation to deliver drywall to the Port of Miami, and with Wood Nation, of Tampa, Florida, to deliver drywall to the Port of Tampa.[31]  As explained in the PSC's *Mitchell* opposition brief, Florida courts have frequently exercised Section 48.193(1)(a) long-arm jurisdiction under analogous circumstances (*see* PSC's *Mitchell* Opp. 7 (citing cases)).

The cases Taishan cites to defeat personal jurisdiction under Fla. Stat. § 48.193(1)(a) are readily distinguishable because there were far fewer and less significant contacts with Florida than those of TTP.  In *Travel Opportunities of Fort Lauderdale, Inc. v. Walter Karl List Mgmt. Inc.*, 726 So. 2d 313 (Fla. Dist. Ct. App. 1998) and *Milberg Factors, Inc. v. Greenbaum*, 585 So. 2d 1089 (Fla. Dist. Ct. App. 1991), the court held that Section 48.193(1)(a) did not confer jurisdiction because, *inter alia*, the defendants did not solicit business in Florida.  In addition, in *Travel Opportunities,* the court relied upon the absence of "extensive business correspondence" from the defendant to the plaintiff.  726 So. 2d at 314.  Here, in contrast, TTP actively solicited business from Florida companies like OTC, offering exclusive distributorships in exchange for purchasing TTP drywall, sending samples, and exchanged extensive communications.  *See supra* at Section I.

        **iii.    TTP Committed Torts in Florida, Subjecting It to Jurisdiction under Fla. Stat. § 48.193(1)(b)**

---

[29]  *See* Herman Aff. Ex. 1 (totaling OTC-specific shipments).

[30]  *See* Ex. 2 to Che Dep. (e-mails exchanged between Ivan Gonima and Bill Cher).

[31]  *See* Global SOF 38-40.

As set forth in the PSC's *Mitchell* opposition brief, TTP committed substantial aspects of torts in Florida such that the Court may exercise long-arm jurisdiction under Section 48.193(1)(b). *See* PSC's *Mitchell* Opp. 15-16.

The three cases cited by Taishan in support of its position that TTP is not subject to long-arm jurisdiction under Section 48.193(1)(b) are readily distinguishable. *Estate of Scutieri v. Chambers*, 386 Fed. App'x 951 (11th Cir. 2010), concerns a conspiracy to commit fraud in which none of the essential elements took place in Florida. The plaintiff in *Associated Transp. Line, Inc. v. Productos Fitosanitarios Proficol El Carmen, S.A.*, 197 F.3d 1070 (11th Cir. 1999), failed to establish jurisdiction because it alleged no tortious act, but rather claimed that the defendant violated federal environmental law in Florida. Finally, *Blumberg v. Steve Weiss & Co., Inc.*, 922 So. 2d 361 (Fla. Dist. Ct. App. 2006) dismissed claims for lack of personal jurisdiction against a distributor (rather than a manufacturer such as TTP) where the distributor's sale of a synthetic form of ephedra to a Missouri nutritional supplement maker "did not directly cause damage" in Florida. *Id.* at 364. Unlike *Blumberg*, TTP's product directly caused property and economic loss in Florida.

## 2. TG Independently Falls Within the Ambit of the Long-Arm Statute Because Its Drywall Caused Injury to Florida Property and Because TG Committed Torts in Florida

TG is subject to long-arm jurisdiction under section 48.193(1)(f)(2) because "[p]roducts, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use." As shown by the distribution of TG-manufactured drywall by building suppliers such as Emerald Coast and Banner Supply (*see* PSC's *Mitchell* Opp. 43-44), TG's defective injury-causing drywall was "used or consumed . . . in the ordinary course of commerce."

15

Florida courts have repeatedly found that subsection (f)(2) confers long-arm jurisdiction over foreign manufacturers under circumstances analogous to the Venture Supply sales here. In *Kravitz v. Gebrueder Pletscher Druck-Gusswaremfabrik*, 442 So. 2d 985 (Fla. Dist. Ct. App. 1983), the court maintained that it had personal jurisdiction over a Swiss manufacturer of bicycle racks, one of which caused injury to the plaintiff in the state of Florida, notwithstanding that the plaintiff, an Illinois resident, purchased a bicycle rack in Illinois, and transported it to Florida. *Id.* at 986. The bicycle rack at issue had been manufactured in Switzerland by the defendant and shipped to an independent distributor in Illinois, which subsequently resold the racks in several U.S. states, including Florida. *Id.* The court rejected the Swiss manufacturer's argument that the injury-causing bicycle rack did not enter Florida in the "ordinary course of commerce or trade," holding that subsection (f)(2) was satisfied because the defendant's racks, the same type of which caused injury to the plaintiff within the state, were also sold in Florida. *Id.* at 986-87. *See also Kaplan v. DaimlerChrysler*, 99 F. Supp. 2d 1348, 1351 (M.D. Fla. 2000) (holding that foreign automobile manufacturer was subject to long-arm jurisdiction where product caused injury to plaintiff and was used within Florida in the ordinary course of commerce).

Section 48.193(1)(b) likewise provides a basis for long-arm jurisdiction over TG. As set forth in the PSC's *Mitchell* opposition brief, TG committed substantial aspects of torts in Florida such that the Court may exercise long-arm jurisdiction under Section 48.193(1)(b). *See* PSC's *Mitchell* Opp. 15-16. Similar to TTP, the off-gassing of TG-manufactured drywall caused significant property damage in Florida and TG failed to warn the named representative in *Mitchell* and other Florida consumers of the defect in its product.

16

3.   **The Causes of Action Against Taishan Arise From Its Activities Under the Florida Long-Arm Statute**

Florida's long-arm statute also establishes that specific personal jurisdiction may only be maintained "for any cause of action arising from the doing of any" such predicate acts. Fla. Stat. § 48.193(1). Florida courts have held that the "term 'arising from' is broad; it does not mean 'proximately caused by,' but only requires a ''direct affiliation,' 'nexus,' or 'substantial connection'' to exist between the basis for the cause of action and the business activity." *Citicorp Ins. Brokers (Marine), Ltd. v. Charman*, 635 So. 2d 79, 82 (Fla. Dist. Ct. App. 1994) (quoting *Damoth v. Reinitz*, 485 So. 2d 881, 883 (Fla. Dist. Ct. App. 1986)).

The core operative facts uniting all Florida Plaintiffs' causes of action are Taishan's manufacture, design, sale and distribution of Chinese Drywall to Florida and its failure to warn Floridians, businesses and homeowners of the hazardous effects of Defendants' Chinese drywall that caused serious property damage and personal injuries. *See* PSC's *Mitchell* Opp. 11-12. Contrary to Taishan's argument that "Plaintiff cannot establish that any drywall it used is traceable to any sales of drywall by TTP [or TG] that are alleged to supply its minimum contacts with Florida," Mov. Br. 44, 72, Florida courts interpreting Fla. Stat. § 48.193(1)(f) have consistently held that "[i]f a defendant has a relationship with Florida such that it is amenable to suit in Florida by a person who purchased its product in Florida, there is no logical reason to prohibit a plaintiff who purchased the same product elsewhere and was injured by it in Florida from maintaining an action in Florida." *Davis v. Pyrofax Gas Corp.*, 492 So. 2d 1044, 1046 (Fla. 1986); *see also id.* ("A manufacturer or wholesaler that avails itself of the privilege of conducting solicitation activities and promoting or distributing its product line within the State of Florida should be amenable to a suit in Florida by one whose injury is occasioned by the use in Florida of the corporation's product purchased out of the state. Under these circumstances the

17

defendant is by virtue of the statute on notice that because of its activities in Florida it may be called upon to defend in Florida."); *Kravitz*, 442 So. 2d at 987 ("[W]e hold that the defendant's activities in the state, *i.e.*, the sales to an independent Florida distributor of bicycle racks, the likes of which caused injury to a person within the state, constitute sufficient minimum contacts for the purpose of jurisdiction under Section 48.193(1)(f)2, Florida Statutes (1981), without offending traditional due process requirements . . . . The fact that the particular defective item which caused injury while in use in this state was purchased in another state does not render defendant – whose same product is distributed in the state – immune from the jurisdiction of the Florida court."); *cf. Wetzel*, 771 So. 2d at 1198 ("In applying section 48.193(1)(f)2, it does not matter that Wetzel's death was caused by a class B display firework and that [Defendant] shipped only class C fireworks into Florida.  A defendant's connection to Florida making it amenable to suit under the long-arm statute is established by the defendant's 'business activities in Florida' and not by focusing solely on how the product causing injury entered the state.") (citation omitted).  As such, no subset of Florida claimants may be denied justice simply because their Taishan drywall, which was otherwise available for purchase in Florida via the contacts of TG and TTP, entered the state via circuitous route.

### 4.   TTP and TG's Agency Relationship Provides an Alternative Basis for Satisfying the Requirements of Florida's Long-Arm Statute

The agency provisions of Florida's long-arm statute provide an independent basis for jurisdiction over TG.  Under Florida law, activities that subject an agent to long-arm jurisdiction supply a basis for jurisdiction over the principal.  *See* Fla. Stat. § 48.193(1) ("Any person . . . who personally or *through an agent* does any of the acts enumerated in this subsection thereby submits . . . to the jurisdiction of the courts of this state") (emphasis added).

To establish an agency relationship under Florida law, claimants must demonstrate each of the following elements: 1) acknowledgment by the principle that the agent will act for it; 2) the agent's acceptance of the undertaking; and 3) control by the principal over the action of the agent." *ENIC, PLC v. F.F. South & Co., Inc.*, 870 So. 2d 888, 891 (Fla. Dist. Ct. App. 2004). Of the three elements, "[t]he issue of control is critical to the determination of agency." *State v. Am. Tobacco Co.*, 707 So. 2d 851, 854 (Fla. Dist. Ct. App. 1998). In the context of a parent-subsidiary relationship, an agency relationship is established where claimants establish that the subsidiary's "separate corporate status is a formality" and "merely a vehicle through which [the parent] conducts business." *Sehringer v. Big Lots, Inc.*, 532 F. Supp. 2d 1335, 1346 (M.D. Fla. 2007) (applying Florida state agency law). Agency relationships have been found in the parent-subsidiary context where "the subsidiary 'manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation.'" *Id.* (quoting *Vantage View, Inc. v. Bali East Development Corp.*, 421 So. 2d 728 (Fla. Dist. Ct. App. 1982), *modified on other grounds by Dania Jai-Alai Palace v. Sykes*, 450 So. 2d 1114 (Fla. 1984)).

Here, the facts plainly establish that TTP functioned as an agent of TG. As a general matter, TTP had no separate corporate interests of its own. Indeed, the purpose for TTP's existence was to aid TG in achieving its export objectives and to help TG resolve its VAT-reporting issues. *See* Global SOF 52. A multitude of other factors lend further support to the notion that TTP's "separate corporate status was a formality" and that it was "merely a vehicle" through which TG, its sole shareholder, conducted business in Florida and elsewhere. For example, TTP and TG ignored corporate formalities in the use of trademarks. TG authorized TTP to sell only drywall bearing TG's "Taishan" brand, but TTP nonetheless contracted with Florida-based OTC to sell drywall bearing TG's "DUN" brand. *Id.* at 53. Yet there is no record

of TG taking any actions to enforce its rights in the "DUN" trademark. *Id.* at 54. On multiple occasions, TTP and TG settled each other's debts. *Id.* at 56-61 (describing TTP settling Guardian's claims against TG and TG attempting to settle TTP's debts with OTC). TTP and TG's financial records demonstrate that the purportedly separate corporations failed to engage in arms-length transactions. *Id.* at 68-69 (describing TG's failure to lease production lines at market rates and the absence of any records of payment from TG to TTP to repurchase equipment after TTP wound down its operations).

The full panoply of facts demonstrating that TTP's separate corporate status was an empty formality are set forth more completely in the PSC's global statement of facts. *See* Global SOF 52-68. Considered in their totality, the facts that have surfaced in jurisdictional discovery establish that TTP is merely a vehicle through which TG conducts its business in Florida and elsewhere. As such, TTP's contacts with Florida may be attributed to TG for the purposes of Florida's long-arm statute. *Sehringer*, 532 F. Supp. 2d at 1347; *see also Pappalardo v. Richfield Hospitality Servs., Inc.*, 790 So. 2d 1226, 1228 (Fla Dist. Ct. App. 2001) (using agency theory to maintain jurisdiction where parent and subsidiary "were a confusing conglomerate, and were essentially one and the same company both financially and structurally").

**B.    TTP'S AND TG'S CONTACTS WITH FLORIDA MEET THE REQUIREMENTS OF THE DUE PROCESS CLAUSE**

The Fifth Circuit has articulated a three-step analysis for specific jurisdiction: "(1) whether the defendant has minimum contacts with the forum state, *i.e.*, whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is

fair and reasonable." *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009); *see also* Global Br. 7. All three prongs are met here by each of TG and TTP.

### 1.      The Stream of Commerce Standard Governs Minimum Contacts Analysis

With respect to the first step (minimum contacts), Taishan's application of the stream-of-commerce-plus standard is erroneous, for two reasons.  First, Taishan has applied Eleventh Circuit law to its due process analysis, but Fifth Circuit law applies to federal questions of law. Second, Taishan has misconstrued the Supreme Court's decision in *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011) as imposing a stream-of-commerce-plus standard in the Fifth Circuit, when in fact Justice Breyer's concurrence (the controlling opinion of the divided court), and a long line of subsequent authority, make clear that it did no such thing.  In any event, as discussed *infra* at 24-28, even if the stream-of-commerce-plus approach embraced by the Eleventh Circuit is applicable here, that test too is met.

### i.      Fifth Circuit Law Applies

Notwithstanding that a transferee court generally applies the law of the transferor forum in determining issues of personal jurisdiction, *see* Mov. Br. 24 and Global Br. 4 n.20, "[i]n cases involving federal questions, the transferee court follows the interpretation of federal law that has been established by its own court of appeals."  *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 767 F. Supp. 2d 649, 656 n.2 (E.D. La. 2011) (citations omitted).  This principle, the rationale for which was articulated by then-Judge Bader Ginsburg in *In re Korean Air Lines Disaster*, 829 F.2d 1171 (D.C. Cir. 1987), has been adopted across district and circuit courts.[32]

---

[32]    *See, e.g.*, *Murphy v. Fed. Deposit Ins. Corp.*, 208 F.3d 959, 965–66 (11th Cir. 2000); *Bradley v. United States*, 161 F.3d 777, 782 n.4 (4th Cir. 1998); *In re Temporomandibular Joint Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996); *Newton v. Thomason*, 22 F.3d 1455, 1460 (9th Cir. 1994); *Menowitz v. Brown,* 991 F.2d 36, 40 (2d Cir. 1993); *Various Plaintiffs v. Various Defendants (Oil Field Cases)*, 673 F. Supp. 2d 358, 362-63 (E.D. Pa. 2009); *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 644 (S.D. Tex. 2005); *In re Nat'l Century Fin. Enters.,*

The application of the Due Process Clause of the Fourteenth Amendment is undoubtedly a question of federal law.  *See, e.g., In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 241 F.R.D. 435, 439 (S.D.N.Y. 2007) ("courts have held that the law of the transferee circuit controls pretrial issues such as whether the court has . . . personal jurisdiction over the action").  Taishan's application of Eleventh Circuit law to the issue of constitutional due process is therefore incorrect as a matter of law.  *See* Mov. Br. 42 n.45 & 66.  It follows that this Court must apply Fifth Circuit law to the issue of constitutional due process.

## ii.    Stream of Commerce Remains the Law of the Fifth Circuit

The Fifth Circuit is and has long been "among the circuits that have interpreted *World-Wide Volkswagen* to hold that 'mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce.'"  *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 419 (5th Cir. 1993) (alteration in original) (citation omitted); *see also* Global Br. 8-14.  "The Fifth Circuit has therefore declined to follow the suggestion of the plurality in *Asahi* . . . that some additional action on the part of the defendant, beyond foreseeability, is necessary . . . ."  *Reed v. Biomet Orthopedics, Inc.*, No. CIV. 06-0544, 2008 WL 1735162, at *4 (W.D. La. Mar. 6, 2008); *see also Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006).

For the reasons explained in the PSC's global brief, the Supreme Court's decision in *Nicastro* did not change the well-established law of this Circuit.  Global Br. 14-19.  As this Court previously held in this litigation, "Justice Breyer's concurrence, which constitutes the narrower holding controls."  *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, No. 2:09-md-

---

*Inc., Inv. Litig.* 323 F. Supp. 2d 861, 876 (S.D. Ohio 2004); *In re New England Mut. Life Ins. Co. Sales Practices Litig.*, 324 F. Supp. 2d 288, 297 (D. Mass. 2004).

02047-EEF-JCW, slip op. at 17 (E.D. La. Sept. 9, 2011) (citations and quotation marks omitted).[33]

As another court in this Circuit recently explained:

As Justice Breyer declined to choose between the *Asahi* plurality opinions, *Nicastro* is rather limited in its applicability. It does not provide the Court with grounds to depart from the Fifth Circuit precedents establishing Justice Brennan's *Asahi* opinion as the controlling analysis.

*Ainsworth v. Cargotec USA, Inc.*, No. 2:10-CV-236, 2011 WL 4443626, at *7 (S.D. Miss. Sept. 23, 2011), *mot. to certify app. granted*, No. 2:10-CV-236, 2011 WL 6291812 (S.D. Miss. Dec. 15, 2011). *Ainsworth* further elaborated on why *Nicastro* does not alter Fifth Circuit precedent:

Justice Breyer merely found that the plaintiff had failed to present evidence of purposeful availment under any of the Court's past opinions. He did not choose one of the *Asahi* plurality opinions as the controlling precedent, and **he did not reject the notion that 'mere foreseeability or awareness is a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce**.'

*Id.* (emphasis added).

In fact, Justice Breyer repeatedly cautioned against announcing a new rule of minimum contacts in *Nicastro*, stating that the case does not provide "a new approach to personal jurisdiction." 131 S. Ct. at 2794. Because *Nicastro* "is an unsuitable vehicle for making broad pronouncements that refashion basic jurisdictional rules," *id.* at 2793, Breyer thought "it unwise to announce a new rule of broad applicability." *Id.* at 2791. As the outcome of *Nicastro* was "determined by our precedents," *id.*, Breyer's concurrence "adhere[d] strictly to our precedents

---

[33] *See also CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 81 (1987) (a plurality decision of the Supreme Court is not binding); *Garland v. Roy*, 615 F.3d 391, 399 (5th Cir. 2010) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.").

and the limited facts found by the New Jersey Supreme Court," *id.* at 2794.  Although Taishan

has cobbled together various district and state court opinions purportedly concurring with their

interpretation of *Nicastro*, Mov. Br. 42 n.44, in fact the majority of courts that have considered

the issue have actually reached the opposite conclusion.  *See* Global. Br. 18 (collecting cases).[34]

Taishan's assertion that *Nicastro* eschewed the Fifth Circuit's stream of commerce

approach is thus without merit.   In this Circuit, placing a product into the stream of commerce

with the expectation that the product will go to a particular jurisdiction remains sufficient to

confer personal jurisdiction.   That standard is plainly met with respect to TTP and TG.  *See*

*generally*, Global Br. 8-14, 19-21.   Both TTP and TG independently satisfy the minimum

contacts requirement; moreover, the exercise of personal jurisdiction over TG as TTP's alter ego

satisfies constitutional due process.

### 2.      TTP Has the Requisite Minimum Contacts With Florida

#### i.      The Stream of Commerce Test is Satisfied

The installation of Taishan's drywall in Florida homes was in no way a random or

fortuitous event.  This is not a case where, as in *World-Wide Volkswagen Corp. v. Woodson*, 444

U.S. 286 (1980), a third party took TTP's product, and without its knowledge or awareness,

transported it to Florida.  TTP – like TG, as described *infra* at Section I – made a concerted effort

to serve the drywall market in Florida and had an expectation that its products would be

purchased in Florida.

---

[34]   *See also Lindsey v. Cargotec USA, Inc*., No. 4:09-CV-00071-JHM, 2011 WL 4587583 (W.D.
Ky. Sept. 30, 2011) ("Because the Supreme Court in [*Nicastro*] did not conclusively 'define the
breadth and scope of the stream of commerce theory, as there was not a majority consensus on a
singular test,' . . . and given Justice Breyer's decision to rely on current Supreme Court
precedents, the Court will continue to adhere to the Sixth Circuit's analysis of purposeful
availment.") (citation omitted)).

As TTP admits, it sold and shipped drywall to Florida on several occasions – including sales to OTC, Wood Nation, and B America – for distribution in Florida, availing itself of Florida's market for its goods.  Mov. Br. 15.   Further, with respect to the sale to B America, TTP paid for insurance and shipping to Florida.   Mov. Br. 22.  Having benefitted from Florida's drywall market, TTP cannot now credibly claim surprise that it is subject to suit in the state.  *See Cooper v. Faith Shipping,* No. CIV.A.06-892, 2010 WL 2360668, at *5 (E.D. La. June 9, 2010) (exercising personal jurisdiction where defendant paid for insurance and shipped into Louisiana, reasoning that because defendant was aware that "the products would be unloaded in Louisiana . . . it must have known that these products were capable of causing harm in that state"); *Synergy, Inc. v. Manama Textile Mills, W.L.L.*, No. CIV. A. 06-4129, 2008 WL 6839033, at *14 (D.N.J. Feb. 19, 2008) ("Based on Manama's customized production, and shipment of products, samples, and paperwork, the Court finds that Manama's conduct was neither 'random,' 'fortuitous,' or 'attenuated.'  Rather, it was deliberate, sustained, and significant, with the intent to furnish Synergy's New Jersey business with textiles, cotton, and finished goods, manufactured to Synergy's specifications, to the pecuniary benefit of Manama's growing enterprise.  Having purposefully pursued gain by the production and distribution of goods for New Jersey, Manama 'benefitt[ed] legally from the protection provided by the laws of the forum state for its products.'") (alterations in original) (citations omitted).

## ii.    The Stream-of-Commerce-*Plus* Test Is Satisfied

Assuming *arguendo* that Taishan is correct that the stream-of-commerce-plus test applies here, that test is satisfied as several "pluses" are evident from the facts.  *See* Global Br. 10 (describing "pluses" set forth by Justice O'Connor in *Asahi*).

*First*, Taishan modified its design for a U.S. market, by complying with ASTM standards, cutting its drywall boards in particular sizes that were measured in inches for U.S.

customers, adding U.S. bar codes, and customizing labels with, *inter alia* "the colors of the American flag" and "Tampa, FL."  Global SOF 17-18.  *See Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1549 (11th Cir. 1993) (finding minimum contacts under stream-of-commerce-plus approach where, *inter alia*, defendant modified its product "specifically to accommodate the American market" and "to promote the widest distribution of [its] products."); *In re Perrier Bottled Water Litig.*, 754 F. Supp. 264, 268 (D. Conn. 1990) (finding that Perrier designed its product for the United States market because Perrier's liquid containers bore liquid *ounce* markings rather than metric measure, and relying upon this fact in finding personal jurisdiction).

*Second*, Taishan engaged in extensive communications and relationships with U.S. customers over several years.  *See Research Med., Inc. v. Canadian Cardiovascular Prods., Ltd.*, 917 F. Supp. 767, 772 (D. Utah 1996) ("[T]he parties' course of dealing involved hundreds of faxes and mailings—modern technology's version of minimum contacts."); *Kinsella v. Belforte*, 373 F. Supp. 2d 957, 962 (S.D. Iowa 2005) (finding personal jurisdiction based in part on the numerous contacts between the parties); *Angelica Corp. v. Gallery Mfg. Corp.*, 904 F. Supp. 993, 997 (E.D. Mo. 1995) (defendant purposefully directed its activities at a Missouri resident when, *inter alia,* "it carried on an active correspondence with Angelica in Missouri via the telephone, fax, and mail"); *Good Hope Indus., Inc. v. Ryder Scott Co.*, 378 Mass. 1 (1979) (relying on the fact that "[f]or more than a year, the defendant maintained close contact with the plaintiffs in Massachusetts, initiating more than fifty telephone calls").

*Third*, Taishan sent samples and provided quotes to potential customers in Florida.  *See Angelica Corp. v. Gallery Mfg. Corp.*, 904 F. Supp. 993, 997 (E.D. Mo. 1995) (defendant purposefully directed its activities at a Missouri resident when, *inter alia*, "it sent samples to Angelica in Missouri"); *Manama Textile Mills,* 2008 WL 6839033, at *13 ("Manama's direct

shipment of samples into New Jersey also constitutes additional conduct rendering Manama amenable to jurisdiction. . . . [and] demonstrates that Manama knew that its agreements with Synergy contemplated manufacturing goods for use in New Jersey because Manama sent its samples to help facilitate its customized production of goods for Synergy's business.").

*Fourth*, Taishan marketed to the U.S. through Alibaba, and identified itself in its marketing materials as an exporter to the U.S. *See* Global SOF 8-10; Herman Aff. Exs. 5 & 22. "Even under a 'stream of commerce plus' theory, as long as the manufacturer in the stream of commerce is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Kinetic Concepts, Inc. v. Bluesky Med. Corp.*, No. SA-03-CA-832-RF, 2004 WL 2550586, at *6 (W.D. Tex. Sept. 24, 2004).

*Fifth*, Taishan entered into an exclusive distributor agreement with Florida-based OTC, and that agreement provided that the sales area covered the entire U.S. *See Oswalt v. Scripto*, 616 F.2d 191, 198 (5th Cir. 1980) (holding that Japanese manufacturer "did have reason to know or expect that the cigarette lighter [it manufactured] would reach Texas" because the manufacturer sold millions of lighters each year "to Scripto pursuant to a distribution system which made Scripto the exclusive distributor in the United States . . . ."); *Canadian Cardiovascular Products, Ltd.*, 917 F. Supp. at 772 (foreign defendant "eagerly entered an agreement that gave [it] the economic advantage of an exclusive relationship with a Utah manufacture for the distribution of Utah products. [Defendant] entered a potentially long-term relationship with RMI, knowing that RMI operated out of Utah, requiring CC to purchase a substantial amount of products from RMI in Utah. . . . Thus, CC knowingly and gladly accepted the benefits and protections of Utah's laws and economy by entering the Sales Agreement. CC

should not be surprised to find out that with those benefits came accompanying obligations in Utah.").

That the contracts were not consummated is not dispositive.  *See K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 594 (8th Cir. 2011) ("Although the record reflects that many of the above terms were never carried out because the contract was terminated . . . both these terms and the future consequences that the parties contemplated in fashioning them support personal jurisdiction. . . . Based on the level of involvement that Uriach actually had and could reasonably be expected to have in Missouri under this contract, it could reasonably anticipate being haled into court in Missouri in the event of an alleged breach.").

### iii.   Taishan's Attempts to Explain Away The Undeniable Jurisdictional Facts Fail

In the face of facts demonstrating that TTP placed drywall into the stream of commerce with the knowledge that the product would be delivered to Florida, Taishan resorts to arguments that are simply wrong as a matter of law and/or factually unsupportable.

The Amount and Number of Sales Supports Minimum Contacts

Taishan attempts to downplay the amount and number of TTP's sales into Florida.  *See, e.g.,* Mov. Br. 2.  However, the multiple shipments into Florida of at least 9 million square feet with a value of $772,863.40 over several years (Global SOF 44), is more than sufficient to satisfy minimum contacts – indeed, a *single* such shipment could have sufficed.  *See Bullion v. Gillespie*, 895 F.2d 213 (5th Cir. 1990) ("specific jurisdiction . . .may arise incident to the commission of a single act directed at the forum"); *Home Decor of Elmwood Oaks, LLC v. Jiyou Arts & Frames Co.*, No. CIV.A. 08-0762, 2009 WL 273193 (E.D. La. Jan. 23, 2009) (rejecting foreign defendant's argument that the court lacked personal jurisdiction because its shipment of goods to plaintiff "was the first and only time [it] has ever shipped any of its goods to Louisiana

or been in contact with any business in Louisiana," and holding that "**a single purposeful contact is sufficient to confer personal jurisdiction if the cause of action arises from the contact**") (emphasis added) (citation omitted).

The Absence of Offices, Property, Bank Accounts, Etc. Is Irrelevant

Taishan's reliance on such purported facts as that TTP never had an office, bank account or property in Florida, and its officers, directors and employees never visited Florida, Mov. Br. 5-6, is misplaced because "[i]t is well settled that specific jurisdiction may arise without the nonresident defendant's ever stepping foot upon the forum state's soil." *Bullion*, 895 F.2d at 216; *see also* Global Br. 9 (setting forth Supreme Court precedent establishing that due process does not require that the defendant physically enter the forum).

Not surprisingly, then, courts in this circuit have frequently rejected the very argument Taishan raises here. *See, e.g., Scripto*, 616 F.2d at 198 (holding Japanese manufacturer subject to personal jurisdiction despite lack of any office, place of business, servant, employee or director in the United States, and no evidence that the foreign manufacturer had ever done business in the United States); *Parti-Line Int'l, L.L.C. v. Bill Ferrell Co.*, CIV.A. 04-2417, 2005 WL 578777 (E.D. La. Mar. 4, 2005) (finding specific personal jurisdiction where the foreign defendant "(1) never owned, leased or rented property . . .; (2) never had any employees or agents . . .; (3) never operated any warehouses or had inventory . . .; and (4) never registered to do business in Louisiana"); *Faith Shipping*, 2010 WL 2360668, at *3 (finding personal jurisdiction over foreign defendant despite the purported fact that "it does no business and has no office or employees in the United States").

<u>TTP Knew or Should Have Known That Its Products Would Be Distributed in Florida</u>

TTP's claim that it was ignorant of the states in which its product would be distributed lacks credibility.  *See* Mov. Br. 3 (asserting that "TTP was not aware that any of the companies that purchased drywall from TTP in China would market that drywall in Florida").  TTP's incontrovertible documents demonstrate that TTP knew that Wood Nation, OTC and B America were located in Florida; it shipped samples to Florida; its invoices and other documentation of sales reflect Florida as the destination; and it arranged shipping to Florida ports.  *See supra* at Section I; *see also* Global Br. 3-4.  The notion that Taishan was unaware that drywall it was delivering to Florida businesses at ports in Florida would not be distributed in Florida defies logic.  Taishan's self-serving and implausible claim should be disregarded.[35]  *See Luv N' care*,

---

[35]  The same is true of Taishan's witnesses' repeated insistence that they never exported or sold drywall anywhere in the United States, and their attempts to explain away documentary evidence to the contrary.  *See, e.g.*, Herman Aff. Ex. 4 (Peng Tr.) 132:20-133:24 (testifying that his statement regarding "much experience" in exporting to the U.S. was "only saying that I realized the drywall for the thickness of 12.7 millimeters, it was possible that it was able to be used in the United States"); Herman Aff. Ex. 201 (Peng II Tr.) 527:1-20 (testifying that no one from Venture Supply mentioned to TG where Venture expected the drywall it purchased to be used); 535:1-14 (testifying that TTP did not ship the drywall it sold to Wood Nation to Tampa); Herman Aff. Ex. 6 (Che Tr.) 104:7-105:21 (testifying that statements regarding Taishan export experience were "only a way for marketing"); 205:23-207:24 (testifying that his statement that Taishan had a customer in New York was "only the way of sales and strategy of marketing"); 257:24-260:21 (testifying that his report to U.S. customer OTC of a conversation with his "boss" that did not take place "was only a way to do sales"); 320:9-323:10 (testifying that statement that Taishan "would swallow increased cost" to "support [U.S. customer OEG] to compete in USA market" was "the expression on the email, but in reality, it may not necessarily be the fact"); 364:4-20 (testifying that providing OTC with shipping costs to various U.S. cities did not indicate that TTP was willing to ship to those cities); Jia Tr. 288:1-299:22 (when asked whether Taishan marketing materials reflecting exports to U.S. was true or false, witness testified that other companies "sell our drywalls to the United States.  Regarding where they ship these drywalls to, we don't want to find out, and we also don't want to know.") (transcript excerpts provided to Court as Record Doc. No. 14208-4); Herman Aff. Ex. 2 (Fu Tr.) 80:2-81:9 (testifying that statement in Taishan brochure regarding exports to U.S. was not true, but "the way we do business in China"); 84:7-86:24 (testifying that map in Taishan brochure indicating exports to the U.S. did not accurately reflect the export activity of the company and that "[i]n China, we exaggerate a little bit . . . that's allowed").

438 F.3d at 471 (discounting defendant's claim that it did not know the destination of the products, which was "implausible and could not defeat jurisdiction even if true. **It is eminently foreseeable that [defendant's] products would reach the market indicated on the company's invoices**.") (emphasis added).

Even if Taishan had lacked actual knowledge as to the intended location of its drywall shipments to the U.S., for jurisdictional purposes there is no difference between a manufacturer who actually knows its product will reach the forum state and one who *should have known* in the exercise of "common sense" that would be the case. *See Scripto*, 616 F.2d at 198 (rejecting the defendant's argument that it had no actual knowledge that its product would reach the forum state); *Irving v. Owens-Corning Fiberglas Corp.*, 864 F.2d 383, 386 (5th Cir. 1989) ("Personal jurisdiction does not require certain knowledge of the user's identity.").

An FOB Shipping Term Does Not Render TTP Immune from Personal Jurisdiction

TTP's repeated reference to the fact that the shipping terms to Wood Nation and OTC were FOB China and that it "complete[d] its sales in China" is much ado about nothing.[36]  *See* Mov. Br. 63, 67.  An FOB term controls the timing of the transfer of title, and thus, its " primary purpose . . . is to allocate the risk of damage to goods between buyer and seller."  *Luv N' care*, 438 F.3d at 471-72.  As the PSC has explained, it is the well-settled law of this Circuit that

---

[36]  Taishan confusingly asserts that "[t]he law in the Eleventh Circuit is that FOB sales outside of the forum State do not constitute purposeful availment of the State even when the seller arranged for shipment of the product into the forum," and then cites only two *Fifth Circuit* cases in support of this proposition.  As demonstrated *supra* at 21-22, Fifth Circuit law applies to the issue of constitutional due process.  In any event, the law of the Eleventh Circuit likewise provides that the use of an FOB shipping term cannot insulate a defendant from personal jurisdiction.  *See Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1548 (11th Cir. 1993) (the fact that title passed in France "in no way determines the degree of contacts between the United States" and defendant).

"[j]urisdiction . . . 'does not depend on the technicalities of when title passes.'"  *Id.* (quoting *Scripto*, 616 F.2d at 197 n.8.); *see also* Global Br. 21-22.

Both of the cases cited by Taishan – *Charia v. Cigarette Racing Team*, 583 F.2d 184 (5th Cir. 1978)[37] and *Singletary v. B.R.X., Inc.*, 828 F.2d 1135, 1136 (5th Cir. 1987) – were decided before the Fifth Circuit's ruling in *Luv N' care*.  The Fifth Circuit has also called into question the precedential value of *Charia*, noting that it was decided before several watershed cases of the United States Supreme Court that refined the contours of personal jurisdiction.  *See Nuovo Pignone, SpA v. Storman Asia M/V*, 310 F.3d 347, 379 n.4 (5th Cir. 2002).  Taishan's scant authority is unsurprising given that the irrelevance of a FOB shipping term to a personal jurisdiction analysis has been reiterated by a long line of authority in other federal courts.[38]  *See Benitez-Allende v. Alcan Aluminio do Brasil, S.A.*, 857 F.2d 26, 30 (1st Cir. 1988) ("[t]he fact that title to the [product] passed in Brazil is beside the point"); *Vencedor Mfg. Co., Inc. v. Gougler Indus., Inc.*, 557 F.2d 886, 890 (1st Cir. 1977) ("If *International Shoe* stands for anything . . . it is that a truly interstate [or international] business may not shield itself from suit by a careful but formalistic structuring of its business dealings."); *see also Gulf Consol. Servs., Inc. v. Corinth Pipeworks, S.A.*, 898 F.2d 1071, 1073 (5th Cir. 1990) ("the simple fact that a sales transaction is consummated outside that jurisdiction does not prevent the sale from forming the basis of jurisdiction") (citation omitted); *Reed*, 2008 WL 1735162, at *9 (rejecting argument that

---

[37]   Taishan has also misrepresented the significance ascribed by the court in *Charia* to the fact that the product shipped into the putative forum state of Louisiana was shipped "FOB Florida." Mov. Br. 68.  There, the court did <u>not</u> hold that this fact *precluded* the application of a stream of commerce rationale, but rather rejected plaintiff's attempt to argue that this fact could be *relied upon* to satisfy minimum contacts under stream of commerce.  *See Charia v. Cigarette Racing Team*, 583 F.2d 184 (5th Cir. 1978).

[38]   Taishan's reliance on *World-Wide Volkswagen* in support of its FOB argument is misplaced, as "[n]othing in [that case] suggests that the fact that a foreign manufacturer or seller rids itself of title by a sale F.O.B. a foreign port is enough to insulate that manufacturer or seller from jurisdiction."  *Renner v. Lanard Toys Ltd.*, 33 F.3d 277, 282 (3d Cir. 1994).

the court lacked personal jurisdiction "because of the alleged transfer of title in Germany upon the sale of the products").[39]

### Whether Customers Initiated Contact With TTP Is Immaterial

Even accepting that TTP's "sales of [its] product to Florida companies came about only after Wood Nation, OTC and B America initiated contact with TTP," Mov. Br. 63, that purported fact is irrelevant for purposes of the jurisdictional analysis. As Taishan concedes, "TTP responded to these requests with pricing, shipping cost and other information that was requested," *id.* at 15, and TTP eventually shipped drywall to these customers directly into Florida. As the Fourth Circuit has explained:

> A foreign corporation, busily present in a state effecting direct deliveries of its wares to its customers, cannot escape the jurisdiction of the state upon the ground its orders were unsolicited. A seller's distribution of his wares may be a substantial activity whether the precedent contracts were solicited by the buyers or by the seller.

*Shealy v. Challenger Mfg. Co.*, 304 F.2d 102, 104 (4th Cir. 1962).[40]

### The Place of Performance of the Contract Is Immaterial in a Products Liability Case

TTP's reliance on the fact that the place of performance of the contract was in China is misplaced because, unlike the cases cited by Taishan, this is a products liability case, not a

---

[39]   *See also Kaplan v. DaimlerChrysler*, 99 F. Supp. 2d 1348, 1352 (M.D. Fla. 2000) (finding sufficient minimum contacts existed to satisfy Due Process, the Court noted that "[t]he fact that title to the Mercedes-Benz vehicles passe[d] . . . in Germany rather than in the United States in no way determines the degree of contacts between [the manufacturer] and the United States. . . . [a] truly international business may not shield itself from suit by well-crafted business restructuring."); *Synergy, Inc. v. Manama Textile Mills, W.L.L.*, No. CIV. A. 06-4129, 2008 WL 6839033, at *8 (D.N.J. Feb. 19, 2008) ("The substantial weight of authority makes clear that a passing of title and risk of loss provision is not dispositive for jurisdictional purposes.").

[40]   *See also Pedi Bares, Inc. v. P & C Food Mkts., Inc.*, 567 F.2d 933, 937 (10th Cir. 1977) ("Initial contact is not decisive. The subsequent conduct of P & C shows that it purposely availed itself of the privilege of carrying on activities to secure goods from a Kansas manufacturer and seller."); *Kinsella v. Belforte*, 373 F. Supp. 2d 957, 962 (S.D. Iowa 2005) ("While the initiating party may be a pivotal factor in some instances, it is but one factor in the analysis that is rendered less substantial as the matter so promptly became a matter of mutual interest.").

contracts case.  *See* Mov. Br. 70.  *Stateline Power Corp. v. Kremer*, 404 F. Supp. 2d 1373, 1378 (S.D. Fla. 2005) (reviewing long-arm statute and holding that section (1)(b) "provides for jurisdiction over a person who commits a tortious act that causes injury in the State of Florida, regardless of where that act took place").

Taishan's Authority Is Inapposite

As established by the PSC, the exercise of personal jurisdiction here is entirely consistent with long-standing Fifth Circuit precedent.  *See* Global Br. 11-14 (describing analogous Fifth Circuit precedents).  In contrast, Taishan strains to analogize this case to inapposite precedents. For example, *Charia* involved a comparatively insubstantial sale of a single item of small value. The contacts here also far exceed those in *Nicastro*, in which a mere four machines ended up in New Jersey.

As for *Banton Industries, Inc. v. Dimatic Die & Tool Co.*, 801 F.2d 1283 (11th Cir. 1986) (cited at Mov. Br. 68), in addition to being an Eleventh Circuit case that is not binding here, it was decided by a divided panel and has since been distinguished twice by the Eleventh Circuit in cases with facts analogous to those in the present case.  *See Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 931 (11th Cir. 2007) (noting that the panel in *Banton* was divided and distinguishing *Banton* in finding personal jurisdiction where, *inter alia*, defendant proposed an exclusive distributor relationship, sent a sample of product to the plaintiff, and "was involved in the shipment process."); *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1271 (11th Cir. 2010), *cert. denied*, 131 S. Ct. 158 (2010) (distinguishing on the basis that, *inter alia*, "[o]ther than merely accepting the order from the Alabama plaintiff, the transaction in *Banton* involved literally no contact with the proposed Alabama forum.").  As explained by the Southern District of Florida: "the Eleventh Circuit has clarified that *Banton* is a narrow holding. .

34

. . [that] stands for the proposition that a defendant who has absolutely no contacts with the forum state, other than contracting with a party in that state, does not have sufficient minimum contacts with the state to satisfy due process requirements." *Rogers v. Omni Solution, Inc.*, No. 10-21588-CIV, 2010 WL 4136145, at *6-*7 (S.D. Fla. Oct. 19, 2010) (citing *Diamond Crystal Brands*, 593 F.3d at 1271, and *Sloss Indus.*, 488 F.3d at 933).

Finally, *Osorio v. Dole Food Co.*, No. 07-22693, 2009 WL 48189, at *11-*13 (S.D. Fla. Jan. 5, 2009) is distinguishable on the face of Taishan's summary of the case. *See* Mov. Br. 69-70. In *Osorio*, the defendant did not sell or ship the product into the forum, but to neighboring states, and there was no evidence that it had knowledge that its product was being used in the forum. That is plainly not the case here, where TTP knowingly sold and shipped drywall directly to Florida.

### iv.    The Claims Against TTP Arise From Its Contacts With Florida

"A state exercises 'specific jurisdiction' over a nonresident defendant when the lawsuit arises from or relates to the defendant's contact with the forum state. A single act by the defendant directed at the forum state, therefore, can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Ruston Gas Turbines*, 9 F.3d at 418-19 (citations omitted). As explained by the PSC, there is a clear and demonstrated nexus between Taishan's conduct and the Plaintiffs' injuries: Plaintiffs are seeking to recover for injuries they suffered as a result of the defective drywall that Taishan purposely directed to their home states. *See* Global Br. 23.

Taishan erroneously attempts to import a tracing requirement into this analysis. *See* Mov. Br. 72. Within the Fifth Circuit, a "lawsuit 'relates to' the defendant's contacts when: (1) the plaintiff purchased the defendant's product outside of the forum state; (2) the plaintiff was injured in the forum state; and, (3) the defendant's products are **available in** the forum state."

*Ritzmann v. Nalu Kai, Inc.*, 523 F. Supp. 2d 564, 568 (S.D. Tex. 2007) (emphasis added) (citations omitted).  "Simply stated, where a plaintiff can show that the offending product was available for sale in the forum state, he is not required to prove that he actually purchased the product in the forum state."  *Id.*  The cases cited by TG and TTP in favor of granting dismissal for lack of personal jurisdiction over causes of action that do not arise from or relate to defendants' contacts with a forum state are easily distinguishable from the circumstances at issue in the present matter.[41]

### 3.      TG Has the Requisite Minimum Contacts With Florida

Like TTP, TG sold drywall directly to Florida distributors and delivered its product at ports in the state.  For the reasons set forth above, TG has thus satisfied the stream of commerce test applicable in the Fifth Circuit.

---

[41]    *See Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 854-55 (5th Cir. 2000) (stating in dicta, after holding that primary foreign defendant was not acting as agent for secondary foreign defendant for purposes of attributing forum contacts, that even assuming such contacts were attributable, wrongful death cause of action did not arise out of primary defendant's contract with Texas company to obtain goods and services from Texas for use in controlling well, but actually arose out of alleged negligence committed by primary foreign defendant in Syria); *Singletary v. B.R.X., Inc.*, 828 F.2d 1135, 1136-37 (5th Cir. 1987) (declining to assert specific personal jurisdiction when defendant's only connections to forum state were the sale of "one $33.00 part to a Louisiana resident . . . [that] had nothing to do with [plaintiff's] claim," and advertisements in national trade magazines where "no evidence in the record indicate[d] how widely and frequently the publications were circulated or the amount of business B.R.X. gained from the advertisements" and plaintiff "presented no evidence that [plaintiff's] claim arose out of or was related to these advertisements"); *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1270 n.21 (5th Cir. 1981) (declining to determine the constitutionality and statutory validity of asserting jurisdiction over Sonatrach, but denying Sonatrach's argument that "a tort suit cannot arise from a contractual contact"); *Guzman v. Mem'l Hermann Hosp. Sys.*, No. 07-3973, 2008 WL 5273713 (S.D. Tex. Dec. 17, 2008) (dismissing medical malpractice suit against foreign defendant that provided non-medical, administrative and support services to a limited liability partnership of emergency-room physicians where independent medical judgment of the self-employed health care providers was contractually precluded from being subjected to the supervision, direction or control of foreign defendant, and there was no allegation that template forms for documenting patient care provided by foreign defendant played any part in the case).

Taishan's entire argument regarding TG is premised upon the mistaken factual assumption that TG's drywall was *only* distributed in Florida "via TG's sale in China to a Virginia company without any awareness or expectation that the drywall would be marketed in Florida." Mov. Br. 41-42. But as set forth by the PSC, *see* PSC's *Mitchell* Opp. 2-5 and Global SOF 40-44, TG sold drywall to Devon International and arranged to ship it to the port of Pensacola. That drywall was installed in Florida homes. *Id.* And, as set forth in greater detail in the Homebuilders' *amicus* brief, TG shipped $858,000 worth of its drywall to the Port of Miami.[42]

Moreover, claims against TG in Florida courts regarding drywall that was purchased from Venture Supply and distributed in Florida also satisfy minimum contacts, because this was the very product that TG was placing into the stream of commerce in Florida. That some of that product went through Virginia first is immaterial from a jurisdictional perspective. *See Ritzman*, 523 F. Supp. 2d at 564 ("[W]here a plaintiff can show that the offending product was available for sale in the forum state, he is not required to prove that he actually purchased the product in the forum state.").

Moreover, even under the stream-of-commerce-plus approach, TG's contacts with Florida would satisfy minimum contacts, as several "pluses" are in evidence, including its marketing materials and use of Alibaba.com. *See* Global SOF 8-10.

4. **The Exercise of Personal Jurisdiction Over TG and TTP is Fair and Reasonable**

As minimum contacts are satisfied here, the burden of proof shifts to Taishan to "establish[] a compelling case that makes the exercise of jurisdiction unreasonable." *Burger*

---

[42]  *See* Certain Homebuilders' *Amicus Curiae* Response (*Mitchell*) at Exs. 8A-8G (describing chain of documents, including contracts and bills of lading, demonstrating Taishan's awareness that TG-manufactured drywall was being delivered to Florida markets).

*King Corp. v. Rudezewicz*, 471 U.S. 462, 477 (1985); *see also In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 767 F. Supp. 2d 649, 658 (E.D. La. 2011) (same).  Taishan has fallen far short of meeting this burden.

As explained in the PSC's global brief, the Fifth Circuit has articulated five factors relevant to this analysis.  Global Br. 22-23; *see also In re Chinese Manufactured Drywall Products Liab. Litig.*, 767 F. Supp. 2d 649, 658 (E.D. La. 2011) (listing factors).  Each of these factors militate in favor of exercising personal jurisdiction over both TG and TTP.[43]

### i.    Taishan Has Not Shown Any Exceptional Burden

Taishan rehashes the same rote arguments raised by most foreign defendants seeking to avoid a U.S. forum:  that it is too burdensome for a foreign entity to bear the travel time, expense, and logistical and bureaucratic difficulties of defending this case in a U.S. court.  Mov. Br. 75.  This assertion is insufficient as a matter of law.  Rather, Taishan must show some *exceptional* burden beyond the prototypical burden that any party would face litigating in a foreign forum.  *See Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994) ("staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly, . . . [so] this factor is only meaningful where a party can demonstrate some kind of special or unusual burden.") (alterations in original); *ITL Int'l, Inc. v. Constenla, S.A.*, No. 1:10CV467, 2010 WL 4537931, at *7 (S.D. Miss. Nov. 2, 2010), *aff'd*, 669 F.3d 493 (5th Cir. 2012) (defendant failed to allege *special or unusual* burdens presented by the prospect of litigation in the forum court).

No unusual burden is demonstrated here.  The time and expense cited by Taishan, *see* Mov. Br. 75, is no different from that encountered by any foreign defendant, including other

---

[43]   As the application of these factors is virtually indistinguishable vis-à-vis TG versus TTP, they are addressed together with respect to both entities.

foreign defendants in this MDL.[44] In any event, "due process limits on jurisdiction do not protect a defendant from all inconvenience of travel . . . and it would not be sensible to make the constitutional rule turn solely on the number of miles the defendant must travel to the courtroom." *World-Wide Volkswagen,* 444 U.S. at 301 (citation omitted).  As the Supreme Court recognized over 30 years ago, "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome." *Id.* at 294 (internal quotation marks omitted).  This statement is only more true today in light of technological advances:

> Although there may be some burden on [defendant] to travel from China to Texas to litigate this case . . . dramatic advances in transportation and communication technology have only further lessened the burden on foreign defendants, such as daily international commercial flights, express delivery services, fax machines, the Internet, teleconferencing, and videoconferencing. **The same technology that facilitates [defendant] conducting business with customers in eighty countries equally facilitates its ability to defend itself from claims of patent infringement in countries where its products arrive.**

*Jacobs Chuck Mfg. Co. v. Shandong Weida Mach. Co., Ltd.*, No. 2:05-CV-185, 2005 WL 3299718, at *9-*10 (E.D. Tex. Dec. 5, 2005).[45]  *See also Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 574 (2d Cir. 1996) ("[T]he conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago. Thus, while we believe this factor cuts slightly in favor of the defendant in the instant case, we recognize

---

[44]   The notion that it is Taishan who bore the burden of conducting depositions in Hong Kong strains credulity, where Taishan's witnesses flew approximately 1600 miles to a part of their own country, versus the 8100 miles of travel undertaken by the Questioners.

[45]   Taishan also cites *Gray v. Riso Kagaku Corp.*, 82 F.3d 410, 1996 WL 181488 (4th Cir. Apr. 17, 1996), for the proposition that the language and cultural barriers of a Florida forum would unduly burden Taishan.  But the court in *Gray* did not find minimum contacts, and thus it was not one of those "rare instances" in which considerations of fairness outweighed the existence of minimum contacts.  In any event, *Gray* is against the weight of authority in which the exercise of personal jurisdiction over Chinese defendants has been held fair and reasonable.  This consideration is also heavily outweighed by other factors, as discussed *infra* at 40.

that, taken alone, it falls short of overcoming the plaintiff's threshold showing of minimum contacts").

Moreover, Taishan is a large, sophisticated enterprise with worldwide sales and distribution, a fact which further ameliorates any purported burden. *See Bean Dredging Corp. v. Dredge Tech. Corp.*, 744 F.2d 1081, 1085 (5th Cir. 1984) ("Given the magnitude of the [defendant's] operations, the court is compelled to hold that it is not unreasonably inconvenient for [defendant] to defend the suit in Louisiana.").

In any event, any burden placed on Taishan is heavily outweighed by other considerations.   See Global Br. 24-25; *see also Faith Shipping*, 2010 WL 2360668, at \*11 ("although it may be burdensome, it is neither unfair nor unreasonable to ask Cisal to defend itself in a Louisiana court for damage allegedly caused by its products once Cisal placed them in the stream of commerce with the awareness that they would reach Louisiana"); *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947) ("In any balancing of conveniences, a real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown."); *Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 850, 854 (11th Cir. 1988) ("[A]ny inconvenience caused to [defendants] by subjecting them to the jurisdiction of the Northern District of Georgia is overridden by the greater inconvenience of requiring a Georgia plaintiff, injured in Georgia by the defendants' purposeful activity in and directed at Georgia, to pursue its cause of action in a foreign forum.").

While Taishan seeks to rely on the holding in *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102 (1987), that the exercise of personal jurisdiction would be unreasonable, Mov. Br. 73, this case is different in kind from *Asahi*.   *Asahi* was an indemnification case that

impacted only the two parties, *both of which* were foreign.  Here, claimants are thousands of Florida residents who seek relief for significant damages suffered as a result of Taishan's defective drywall.  The interests of Florida and this MDL Court in adjudicating this dispute are manifest, given the compelling interest in protecting Florida's citizens from unsafe products. *Morris v. SSE Inc.*, 843 F.2d 489, 495 (11th Cir. 1998); *see also Vermeulen*, 985 F.2d at 1551.

### ii.  Florida Parties Have a Very Strong Interest in a Florida Forum

The Florida residents with claims against Taishan have a strong interest in having this case litigated in their home forum, which is also the *situs* of their injuries.  As the PSC has explained, this MDL is the most efficient way for the claims against Taishan to be litigated.  *See* Global Br. 24.  Indeed, it would be extraordinarily inefficient and burdensome to force these parties to litigate this case in China; would deprive them of the efficiencies to be gained through inclusion in the MDL; and would only serve to splinter and further complicate this litigation. *See Vermeulen*, 985 F.2d at 1552 ("dismissal of [foreign defendant] . . . would not end the litigation, but would merely splinter it, leaving [plaintiff] and the other defendants in Georgia, while forcing [plaintiff] to proceed against [foreign defendant], if at all, in France.  Thus, efficient resolution of this case suggests that jurisdiction be asserted over [foreign defendant] in the United States.").  This burden is further heightened because much of the evidence and witnesses regarding the defective nature of Taishan's drywall and resulting damages are located in Florida.  *See Morris v. SSE, Inc*., 843 F.2d 489, 495 (11th Cir. 1988).

### iii.  Florida Has Significant Interests in Exercising Jurisdiction

It is beyond dispute that a forum state has a demonstrable interest in exercising jurisdiction over one who causes tortious injury within its borders.  *See, e.g., Keeton v. Hustler Magazine, Inc*., 465 U.S. 770, 776 (1984); *ITL Int'l, Inc. v. Constenla, S.A.*, No. 1:10CV467 LG-RHW, 2010 WL 4537931, at *7 (S.D. Miss. Nov. 2, 2010) *aff'd*, 669 F.3d 493 (5th Cir. 2012);

*Faith Shipping*, 2010 WL 2360668, at *11 ("[T]he interest of Louisiana in providing the possibility of redress for citizens who are injured by the acts of nonresident defendants is undeniably significant, and it cannot be doubted that [plaintiff's] interest in gaining relief is considerable.").

### iv.   The Judicial System's Interest In Efficient Resolution of the Controversies Is Best Served by the Exercise of Personal Jurisdiction

The interests of the judicial system are served by having this MDL Court resolve all similar Chinese drywall-related claims. As this Court has previously explained in this litigation:

> Because the Court is operating in this capacity, it is arguably more beneficial and convenient for MCC to litigate the claims involving it within the MDL, the gravitas of the federal Chinese drywall claims. . . . The MDL Court has demonstrated the ability to eliminate duplicative and inconsistent rulings by grouping and prioritizing related claims and motions to set for hearing or trial, and coordinating with other state and federal courts to resolve common or related issues. . .. because the Court is sitting as an MDL court, the interest of the judicial system would be that this single Court resolve all similar Chinese drywall-related claims.

*In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 767 F. Supp. 2d 649, 665 (E.D. La. 2011).

### v.   The Shared Interest of The States Are Served By This MDL Court

Finally, as this Court has articulated, "the shared interest of the states, altogether, would be for the efficient and consistent resolution of similar Chinese drywall-related claims before the MDL Court." *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 767 F. Supp. 2d 649, 665 (E.D. La. 2011).

In sum, the circumstances here fit squarely within the Fifth Circuit's reasoning *Bean Dredging Corp. v. Dredge Tech. Corp.*, 744 F.2d 1081, 1085 (5th Cir. 1984):

> [I]t is both fair and reasonable to require [the defendant] to defend this suit in [the forum state]. Because the product was used in Louisiana, because the defects surfaced in Louisiana, because the economic injury has befallen a resident of

42

Louisiana, and because the court has not dismissed the remaining litigation in Louisiana, that state has an interest in providing a forum for this suit.[46]

## III.   TTP'S FLORIDA CONTACTS SHOULD BE ATTRIBUTED TO TG FOR PURPOSES OF PERSONAL JURISDICTION

For the reasons described above, this Court has an independent basis to exercise personal jurisdiction over both TTP and TG.   This Court may exercise personal jurisdiction for the additional and supplementary reason that TTP and TG are alter egos.

### A.   The Fifth Circuit's *Hargrave* Test Governs Alter Ego Determination

Taishan's alter ego analysis wrongly proceeds from the assumption that the appropriate test is one that applies to veil-piercing for purposes of liability.   At this juncture, the Court need only determine whether to attribute TTP's contacts with Florida to TG for jurisdictional purposes.   Attribution of minimum contacts to an alter ego for purposes of personal jurisdiction is a question of federal law governed by Fifth Circuit precedent, not Florida law.   *See supra* at 21-22; *see also Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160-63 (5th Cir. 1983) (applying due process standards in analyzing whether the subsidiary's contacts may be attributed to its parent, and addressing state corporate law only upon review of the question of whether the parent/third-party defendant may be held liable for its subsidiary's actions.); *Oyuela v. Seacor Marine (Nigeria), Inc.*, 290 F. Supp. 2d 713, 723 (E.D. La. 2003) (same).

---

[46]   If the Court find that Taishan's Florida contacts suffice to subject it to the jurisdiction of Florida courts in *Mitchell* or any other Florida-filed action, then the Court may exercise jurisdiction for all claims under the doctrine of pendent personal jurisdiction, which supplies a basis for personal jurisdiction over claims for which the Court would otherwise lack an independent basis for personal jurisdiction.   *See, e.g., Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 783 (N.D. Tex. 2008) (holding that "once a district court has personal jurisdiction over a defendant for one claim, it may 'piggyback' onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same facts as the claim over which it has proper personal jurisdiction.") (citations omitted); *see also, Conwill v. Greenberg Traurig, L.L.P.*, No. 09-4365, 2009 WL 5178310, at *9 (E.D. La. Dec. 22, 2009) (exercising pendent personal jurisdiction).

43

In the Fifth Circuit, "the alter ego test for attribution of contacts, *i.e.*, personal jurisdiction, is less stringent than that for liability."  *Stuart v. Spademan,* 772 F.2d 1185, 1198 n.12 (5th Cir. 1985) (citation omitted); *see also Reul v. Sahara Hotel*, 372 F. Supp. 995, 997 (S.D. Tex. 1974) ("[T]he legal test of liability is different from and should be more stringent than a legal test relating to the amenability of process and forum.  For that reason the many, many cases which treat the liability question are of limited value.").  In particular, the Fifth Circuit has articulated a non-exhaustive list of factors that courts should consider in determining whether two corporations should be "[fuse[d] . . . for jurisdictional purposes:" (1) the amount of stock owned by the parent of the subsidiary; (2) whether the entities have separate headquarters, directors, and officers; (3) whether corporate formalities are observed; (4) whether the entities maintain separate accounting systems; and (5) whether the parent exercises complete control over the subsidiary's general policies or daily activities.  *Hargrave*, 710 F.2d at 1160; *see also DP Solutions, Inc. v. Rollins, Inc.,* 34 Fed. App'x 150, at *5 (5th Cir. 2002) (reiterating factors).

Here, the evidence is more than sufficient to establish that TG is TTP's alter ego.  *See* Global SOF 52-70 (setting forth facts supporting argument that TTP functioned as TG's alter ego); PSC's Response in Opp. (*Gross* and *Wiltz*) at 10-11. (showing that TTP is TG's alter ego under Fifth Circuit's *Hargrave* test).  Consequently, TTP's contacts with Florida should be attributed to TG for purposes of whether this Court may assert personal jurisdiction over TG in *Mitchell* and any other Florida-filed action transferred hereto.

**B.** **Should the Court Reach the Substantive Issue of TTP and TG's Status as Independent Corporations, Chinese Law Applies and Would Disregard TTP's Separate Corporate Personhood**

   **1.** **Florida Choice of Law Rules Govern Whether to Disregard TTP's Separate Corporate Personhood**

Banner agrees with Taishan and the PSC that a MDL court sitting in diversity must apply the choice of law rules of the transferor court, and that this court should therefore apply Florida's choice of law provisions to the question of whether to disregard TTP's separate corporate personhood.   Mov. Br. 45; Global Br. 4, n.20.   Because Florida lacks a statutory directive on choice of law, Florida courts look to the Restatement (Second) Conflict of Laws to determine which law to apply.   *In re World Vision Entm't, Inc.*, 275 B.R. 641, 661 (Bankr. M.D. Fla. 2002) (citing *Digiola v Koch & Sons., Div. of Wickes Mfg. Co.*, 944 F.2d 809, 812 (11th Cir. 1991). Under the Restatement (Second) Conflict of Laws, a conflict of law exists "when two or more states have a legitimate interest in a particular set of facts in litigation and the laws of those states differ . . . ."   *Chapman v. DePuy Orthopedics, Inc.*, 760 F. Supp. 2d 1310, 1313 (M.D. Fla. 2011).   Each of these requirements is met here.

*First*, both the State of Florida and the People's Republic of China have legitimate interests in the question of whether to disregard TTP's separate corporate personhood.   In determining which state's doctrine on disregarding separate corporate personhood to apply, Florida's interest in adjudicating claims that have caused considerable damage to Florida homes and severely tarnished the reputation of Florida businesses*, see supra* 41-42, must be weighed against China's fundamental interest in determining when and if to disregard TTP's separate corporate personhood.   *See Kalb, Voorhis v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) (noting state of incorporation's interest in determining when and if to strip from shareholders the insulation of limited liability).

*Second*, the laws of Florida and China differ as to when it is appropriate to disregard a corporation's separate personhood.  In particular, while Florida law requires "that the corporation was organized or employed to mislead creditors or to work a fraud upon them," *Hobbs v. Don Mealey Chevrolet*, 642 So. 2d 1149, 1156 (Fla. Dist. Ct. App. 1994), as described in greater detail below, the Company Law of China[47] requires no such showing.  In particular, Article 64 of the Company Law adopts a *presumption* that companies – like TTP – that are owned by a single shareholder have abused the corporate form, requiring the single shareholder – TG in this instance – to prove that its property, broadly construed, was kept independent from TTP. Florida law contains no equivalent provision.

These fundamental differences between Florida and Chinese law require the Court to determine which state's law to apply.  And as both the PSC and Taishan have acknowledged, Florida courts would apply the law of the state of incorporation – here, China's Company Law – to the question of whether to disregard TTP and TG's separate corporate personalities.  *See* Mov. Br. 46; Global Br. 26; *In re Hillsborough Holdings Corp.*, 123 B.R. 1004, 1014 (Bankr. M.D. Fla. 1990) (citing *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 91-93 (1987) ("the law of the state of incorporation governs whether a corporation's form should be disregarded" because the state of incorporation has a substantial interest in "promoting stable relationships among parties involved in the corporations it charters" and in "preventing the corporate form from becoming a shield for unfair business dealing").[48]

---

[47]   Company Law (*Gongsi Fa*) (adopted by the Fifth Session of the Standing Committee of the Eighth National People's Congress, 19 December 1993), effective 1 July 1994, revised at the 18th Meeting of the Standing Committee of the Tenth National People's Congress, 27 October 2005, effective as of January 1, 2006.

[48]   Under the RESTATEMENT, "[t]he local law of the state of incorporation will be applied to determine [issues involving the rights and liabilities of a corporation], except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to

**2.    Claimants Have Made Adequate Showing That Chinese Law Would Disregard TTP and TG's Separate Corporate Personhood**

China's Company Law recognizes that a corporation generally has an independent personality separate from its shareholders. [49]    This separate personality serves to limit shareholders' liability for debts incurred by the corporation.[50]  However, as the Company Law makes clear, limited liability is not absolute under Chinese law.[51]  As explained in the PSC's global brief, Taishan's Chinese law expert improperly applied Article 20(3) of China's Company Law, which governs veil-piercing generally and requires "abuse [of] the corporate independent status or the limited liability of shareholders."   A separate provision, Article 64, governs companies such as TTP that are owned by a sole shareholder, and does not require a showing of abuse.  *See* Global Br. 27-29.  As explained in the Declaration of Bing Cheng dated May 3, 2012:

> Article 20(3) requires plaintiffs to bear the burden of proof when attempting to establish that the shareholder shall be held jointly and severally liable for the debts of the shareholder's company.  Article 64, however, adopts a presumption of abuse of the independent status of a one-person limited liability company; thus reversing the burden of proof and requiring the shareholder to prove that it should not assume joint and several liability for the debts of a one-person limited liability company by establishing that the property of the one-person limited liability company is separate from shareholder's own property.[52]

TG has not met its burden of proving that its property was independent from TTP's, and thus veil-piercing under Chinese law is proper here.[53]  Under Chinese law, the term "property"

---

the occurrence and the parties, in which event the local law of the other state will be applied." *Restatement (Second) of Conflict of Laws* § 302 (1971).

[49]    *See* Declaration of Bing Cheng dated 5/3/2012 ¶ 15.

[50]    *Id.*

[51]    *Id.* ¶ 17.

[52]    *Id.* ¶ 19.

[53]    *Id.* ¶ 19.

under Article 64 encompasses far more than ordinary corporate assets and is interpreted "broadly enough to cover [all] reasonable arms length pecuniary relationships," especially those involving the business operations of the single shareholder and the one-person limited liability company. Global Br. 29. Chinese courts consider a broad range of factors in applying a totality of the circumstances test to determine whether the property of the one-person limited liability company was maintained independently from that of the single shareholder.[54]

Here, claimants have alleged more than sufficient evidence to establish that TTP and TG's property was maintained independently. *See* Global Br. 31-33.

Moreover, even if TTP were able to prove the independence of its property under Article 64, claimants have nonetheless established a case for disregarding TTP and TG's corporate personality under Article 20(3). Contrary to what Taishan argues, Mov. Br. 50, Chinese law does not require claimants to prove that a subsidiary was formed for an improper purpose. Article 20(3) itself contains no such provision. Nor has the Supreme People's Court issued any guidance clarifying that Article 20(3) includes an intent element.[55] Indeed, a Chinese legal practitioner's review of Chinese case law yielded not a single case where a Chinese court required claimants to prove an intent element in addition to establishing abuse of the corporate form.[56] Here, claimants have alleged sufficient evidence to establish that TTP and TG abused the separate corporate personality of TTP. *See* Global Br. 34. Applying Article 20(3) of the Chinese Company Law, the Court should disregard the separate corporate personalities of TTP and TG.

---

[54]   *Id.*

[55]   *See Id.* ¶¶ 27-31 (describing lawmaking process in China, the significance of guidance from the Supreme People's Court, and noting that the Supreme People's Court has issued no such guidance that Article 20(3) should be interpreted to include an intent element)

[56]   *Id.* at 31.

**3.    Alternatively, Claimants Have Made Adequate Showing That Florida Law Would Disregard TTP and TG's Corporate Personality on an Agency Theory**

Alternatively, if Florida law were applied, TTP and TG's separate corporate personalities should be disregarded under an agency theory.  Under Florida law, the elements of an agency are: "(1) acknowledgement by the principal that the agent will act for it, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Am. Tobacco*, 707 So. 2d at 854.  "The issue of control is critical to the determination of agency." *Id.*  Here, the facts clearly support that TG exercised the degree of operational control over TTP necessary to establish an agency relationship.  *See* Global SOF 52-70; *see also* PSC's *Mitchell* Opp. 8-10, 12-15 (setting forth facts supporting agency relationship between TG and TTP under Florida law).

**C.    The Exercise of Personal Jurisdiction on an Agency or Alter Ego Basis Comports with Constitutional Due Process**

The exercise of personal jurisdiction on the basis of agency or alter ego comports with constitutional due process.  *Patin v. Thoroughbred Power Boats, Inc.,* 294 F.3d 640, 653 (5th Cir. 2002) ("[I]t is compatible with due process . . . to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court.").

**IV.    AN ADVERSE INFERENCE IS MERITED**

As explained *supra* at 4-5, Taishan's contemporaneous emails produced in this litigation reveal that it exported to the U.S. many more millions of square feet of drywall than accounted for in its Manufacturer Profile Forms.  Taishan has produced no sales, shipping or tax documents related to these millions of square feet of unaccounted drywall exported to the U.S., despite the

fact that it is required under Chinese law to maintain or produce such documentation for a period of 10 years.[57] Ex. 3 to Affidavit of Nicholas P. Panayotopoulos In Support of the Banner Entities' Memorandum of Law In Response to Taishan's Motion to Dismiss in *Gross* and *Wiltz*, and Amicus Memorandum of Law in Response to Taishan's Motion to Dismiss in *Mitchell* (Declaration of Bing Cheng dated 5/18/2012), ¶¶ 7-9. Taishan failed to maintain these statutorily-required records and similarly failed to disclose information regarding the sales in its profile forms, in spite of court orders threatening sanctions if Taishan did not submit complete disclosures in its profile forms, *see* Pre-Trial Order 25 (Deadline for Submission of Profile Forms), filed November 4, 2011 (ECF No. 11151), and court orders compelling the production of documents, *see, e.g.*, Order & Reasons, pp. 27, 29, filed September 9, 2011 (ECF No. 10269). Taishan's failure warrants an inference that the documents were harmful to them and beneficial to claimants. *See Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692, 696 (6th Cir. 1994) (holding that employer's failure to maintain employment records as required by statute warranted shifting of burden of proof); *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1330-31 (5th Cir. 1985) (same); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1419 (10th Cir. 1987) ("We believe that because Gates violated [29 C.F.R.] § 1602.14 by destroying the personnel records, Hicks is entitled to the benefit of a presumption that the destroyed documents would have bolstered her case.").

Under these circumstances, this Court should either (1) deem that Taishan is subject to personal jurisdiction in this Court, *see Ins. Corp. of Ireland, Inc. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982); Fed. R. Civ. P. 37(b)(2)(A)(i), or (2) draw an adverse inference that the missing or incomplete discovery supports the Court's exercise of personal jurisdiction.

---

[57] TG and TTP maintained such records through at least the start of this litigation as evidenced by their production for the disclosed sales.

*See Hamilton v. Accu-Tek*, 32 F. Supp. 2d 47, 68 (E.D.N.Y. 1998) ("Since the necessary information is in the exclusive control of defendants, where they have failed to provide the information, this Court finds that plaintiffs have satisfied their burden [to establish personal jurisdiction], and the case should proceed."); *see also City of New York v. A-1 Jewelry & Pawn, Inc.*, 501 F. Supp. 2d 369, 389 (E.D.N.Y. 2007) ("Jarrett's strategy to conceal Patriot's records after this lawsuit was commenced creates an adverse inference supporting the decision that the facts demonstrate that this court has personal jurisdiction over Patriot."); *In re Vitamins Antitrust Litig.*, 120 F. Supp. 2d 58, 68 (D.D.C. 2000) ("[T]he Court may draw an adverse inference from [the] refusal to answer plaintiffs' questions about his jurisdictional contacts when resolving his Motion to Dismiss.").

## V.    CONCLUSION

For the foregoing reasons, Banner respectfully requests that this Court deny Taishan's motions to dismiss these actions for lack of personal jurisdiction, for a finding that the Taishan entities are subject to personal jurisdiction in Florida, and for such other further relief as this Court deems proper.

Respectfully submitted this 18th day of May, 2012.

**WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC**

  */s/ Nicholas Panayotopoulos*
**NICHOLAS P. PANAYOTOPOULOS, ESQ.**
Georgia Bar Number: 560679
3344 Peachtree Road, Suite 2400
Atlanta, GA 30326
Telephone:  (404) 876-2700
npanayo@wwhgd.com

*Counsel for Banner Supply Company; Banner Supply Company Pompano, LLC; Banner Supply Company Fort Myers, LLC; Banner Supply Company Tampa, LLC; and Banner Supply International, LLC*

**PETERSON & ESPINO, P.A.**

  */s/ Michael Peterson*
**MICHAEL P. PETERSON, ESQ.**
10631 SW 88th Street, Suite 220
Miami, FL 33176
Telephone:  (305) 270-3773
Facsimile:  (305) 275-7410
mpeterson@petersonespino.com

*Counsel for Banner Supply Company Port St. Lucie, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing The Banner Entities' Memorandum Of Law In Response To Taishan's Motions To Dismiss In *Gross* And *Wiltz*, And Amicus Memorandum Of Law In Response To Taishan's Renewed Motion To Vacate The Entry Of Default And Dismiss In *Mitchell* Banner Entities' Motion For Leave To File Brief As Amici Curiae has been served on Plaintiffs' Liaison Counsel Russ Herman and Defendants' Liaison Counsel Kerry Miller by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pretrial Order No. 6, and that the foregoing was filed with the Clerk of Court for the United States District Court for the Eastern District of Louisiana by using the CM/ECF System which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 18th day of May, 2012.

  */s/ Nicholas P. Panayotopoulos*
**NICHOLAS P. PANAYOTOPOULOS, ESQUIRE**