UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE MANUFACTURED | * | MDL No. 2047 |
| DRYWALL PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | JOSEPH C. WILKINSON, JR. |
| | * | |

* * * * * * * * * * * * * ** * * * * * ** * * * * * ** * * *

**THIS DOCUMENT RELATES TO:** *Germano, et al. v. Taishan Gypsum Co. Ltd., et al.*,
**Case No. 09-6687**


**MEMORANDUM OF TAISHAN GYPSUM CO. LTD.
IN REPLY TO PLAINTIFFS' OPPOSITION TO THE
RENEWED MOTION TO VACATE THE DEFAULT
JUDGMENT AND DISMISS THE COMPLAINT**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

SUMMARY OF ARGUMENT ..................................................................................1

ARGUMENT ........................................................................................................3

I.     THE DEFAULT JUDGEMENT SHOULD BE VACATED BECAUSE
THE COURT LACKS PERSONAL JURISDICTION OVER TG. ...................................3

     A.     Plaintiffs Have Failed To Satisfy Virginia's Long-Arm Statute. ...........................6

     B.     Plaintiffs Have Failed To Satisfy The Requirements Of Due
Process. ......................................................................................................8

          1.     Plaintiffs Have Not Established That TG Had Minimum
Contacts With Virginia. ...................................................................9

               a.     Plaintiffs Have Failed To Prove That TG
Purposefully Availed Itself Of The Virginia Market. ....................18

               b.     TG's Alleged Awareness That Drywall Might Be
Re-Sold In Virginia Is Not Sufficient To Show That
It Purposefully Availed Itself Of The Privilege Of
Conducting Activities Within The State Of Virginia.
...............................................................................................29

               c.     TTP's Contacts With The U.S. Should Not Be
Attributed To TG. .....................................................................31

               d.     Even If TTP's Contacts Were Attributed To TG,
TTP Did Not Have Minimum Contacts With
Virginia. ..................................................................................46

               e.     No Upstream Entities' Activities Should Be
Attributed To TG. .....................................................................46

          2.     Plaintiffs Have Not Established That Their Causes Of
Action Arose Out Of Or Resulted From TG's Contacts
With Virginia. ...............................................................................47

          3.     The Exercise Of Jurisdiction Over TG Would Offend
Traditional Notions Of Fair Play And Substantial Justice.........................48

II.     THE DEFAULT JUDGMENT MUST BE SET ASIDE BECAUSE
PLAINTIFFS FAILED TO SERVE THE PLEADINGS UPON WHICH
IT WAS BASED...............................................................................................50

III.    THE DEFAULT JUDGMENT SHOULD BE SET ASIDE ON THE
        GROUNDS OF EXCUSABLE NEGLECT. ....................................................................50

IV.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE
        VIRGINIA CONSUMER PROTECTION ACT. ............................................................51

CONCLUSION....................................................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ajax Realty v. J. F. Zook, Inc.*,
  493 F.2d 818 (4th Cir. 1972) ...................................................................................................8

*ALS Scan Inc. v. Digital Serv. Consultants, Inc.*
  293 F.3d 707 (4th Cir. 2002) .................................................................................................24

*Asahi Metal Indus. Co. Ltd. v. Superior Court*,
  480 U.S. 102 (1987) (opinion of O'Connor, J.)....................................................30, 47, 48

*Azzure Denim, LLC v. E.J. Lawrence Corp.*,
  69 Va. Cir. 485 (Cir. Ct. City of Norfolk 2006).................................................................6, 7

*Bay Tobacco, LLC v. Bell Quality Prods., LLC*,
  261 F. Supp. 2d 489 (E.D. Va. 2003) ..........................................................................6, 7, 12

*Bean Dredging v. Rogers-Olympic Corp.*,
  744 F.2d 1081 (5th Cir. 1984) ...............................................................................................29

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)........................................................................................................3, 18, 19

*C.F. Trust, Inc. v. First Flight Ltd. P'ship*,
  359 F. Supp. 2d 497 (E.D. Va. 2005) ...............................................................................14, 45

*Charia v. Cigarette Racing Team, Inc.*,
  583 F.2d 184 (5th Cir. 1978) ...........................................................................................12, 13

*Cheatle v. Rudd's Swimming Pool Supply Co.*,
  360 S.E.2d 828 (Va. 1987).....................................................................................................45

*Cooper v. McDermott Int'l, Inc.*,
  62 F.3d 395 (5th Cir. 1995) ......................................................................................................4

*Frizzel v. Danieli Corp., et al.*,
  No. CL09-5120 (Va. Cir. Ct. City of Norfolk Dec. 22, 2010)..............................................6, 7

*Gibson v. Credit Suisse AG*,
  No. CV 10-1-EJL-REB, 2010 WL 1904773 (D. Idaho May 11, 2010)...................................32

*Growden v. Ed Bowlin & Assocs., Inc.*,
  733 F.2d 1149 (5th Cir. 1984) ...............................................................................................13

*Hydrokinetics, Inc. v. Alaska Mech., Inc.*,
  700 F.2d 1026 (5th Cir. 1983) ........................................................................14

*In re Chinese-Manufactured Drywall Prod. Liability Litig.*,
  767 F. Supp. 2d 649. (E.D. La. 2011) ............................................................3, 4

*In re Ford Motor Co.*,
  591 F.3d 406 (5th Cir. 2009) ...........................................................................3

*Int'l BanCorp LLC v. Societe Des Baines*,
  192 F. Supp. 2d 467 (E.D. Va. 2002) .............................................................44

*Irving v. Owens-Corning Fiberglass Corp.*,
  864 F.2d 383 (5th Cir. 1989) .........................................................................15

*J. McIntyre Mach., Ltd. v. Nicastro*,
  131 S. Ct. 2780 (2011) ........................................................................ passim

*Jackson v. FIE Corp.*,
  302 F.3d 515 (5th Cir. 2002) .........................................................................47

*James v. Claiborne*,
  No. 07-1570, 2009 WL 994951 (W.D. La. Apr. 13, 2009) ..................................49

*Jones v. Bank of Am., Corp.*,
  No. 4:09cv162, 2010 WL 6605789 (E.D. Va. Aug. 24, 2010) .............................44

*Labriola v. Se. Milk, Inc.*,
  No. 08-CV-893(JCC), 2008 WL 4682772 (E.D. Va. Oct. 21, 2008) ...................7, 8

*Lesnick v. Hollingsworth & Vose Co.*,
  35 F.3d 939 (4th Cir. 1994) ...........................................................................12

*LTA, Inc. v. Breeck*,
  No. 1:11 CV213 WJG-RHW, 2011 WL 3841374 (S.D. Miss. Aug. 26, 2011) ......13

*Luv 'N Care Ltd. v. Insta-Mix*,
  438 F.3d 465 (5th Cir. 2006) ..............................................................13, 14, 16

*Marks v. United States*,
  430 U.S. 188 (1977).......................................................................................9

*McFadin v. Gerber*,
  587 F.3d 753 (5th Cir. 2009) .............................................................14, 18, 19, 24

*Minebea Co., Ltd. v. Papst*,
  444 F. Supp. 2d 68 (D. D.C. 2006) .................................................................32

*Mink v. AAAA Dev. LLC*,
    190 F.3d 333 (5th Cir. 1999) ................................................................................24

*Moncrief Oil Int'l Inc. v. OAO Gazprom*,
    481 F.3d 309 (5th Cir. 2007) ................................................................................14

*Morrow v. Vaughan-Bassett Furniture Co.*,
    4 S.E.2d 399 (Va. 1939) ........................................................................................45

*Nan Ya Plastics Corp. U.S.A. v. DeSantis*,
    377 S.E.2d 388 (Va. 1985) ......................................................................................7

*NetKnowledge Techs., LLC v. Baron Capital V, Inc.*,
    No. Civ. A. 3:02-CV-2406-M, 2003 WL 23201333 (N.D. Tex. July 24, 2003) ......................4

*NTE Aviation, Ltd. v. LIAT (1974) Ltd.*,
    561 F. Supp. 2d 687 (E.D. Tex. 2007) ..................................................................14

*Nuovo Pignone, SpA v. Storman Asia, M/V*,
    310 F.3d 374 (5th Cir. 2002) ................................................................................16

*Oswald v. Scripto*,
    616 F.2d 191 (5th Cir. 1970) ................................................................................29

*Oticon v. Sebotek Hearing Sys., LLC*,
    No. 08-5489, 2011 WL 3702423 (D. N.J. Aug. 22, 2011) ....................................10

*Paz v. Brush Engineered Materials Inc.*,
    445 F.3d 809 (5th Cir. 2006) ................................................................................16

*Ruston Gas Turbines, Inc. v. Donaldson Co. Inc.*,
    9 F.3d 415 (5th Cir. 1993) ............................................................................14, 15

*Singletary v. B.R.X., Inc.*,
    828 F.2d 1135 (5th Cir. 1987) ..............................................................................13

*Smith v. Railworks Corp.*,
    No. 10-CV-3980, 2012 WL 752048 (S.D.N.Y. Mar. 6, 2012) ................................4

*Southern Copper, Inc. v. Specialloy, Inc.*,
    245 F.3d 791 (5th Cir. 2000) ..........................................................................15, 24

*Stuart v. Spademan*,
    772 F.2d 1185 (5th Cir. 1985) ..............................................................................14

*Walk Haydel & Assocs., Inc. v. Coastal Paver Prod. Co.*,
    517 F.3d 235 (5th Cir. 2008) ..................................................................................6

*World-Wide Volkswagen v. Woodson,*
   444 U.S. 286, 297 (1980) ................................................................................................11, 30

**FEDERAL STATUTES**

Fed. R. Civ. P. 54(c) and 5(a)(2) ..............................................................................................49

Rule 60(b)(4) ............................................................................................................................47

**OTHER AUTHORITIES**

9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2444 (3d
   ed. 2008) ...............................................................................................................................31

Va. Code. § 8.01-328.1(A)(1) through (10) ..............................................................................6

## SUMMARY OF ARGUMENT

In their opposition, Plaintiffs[1] do not contend that TG[2] had sufficient contacts with the forum State, Virginia, to be subject to <u>general</u> personal jurisdiction thereof.  They attempt only to establish a basis for <u>specific</u> personal jurisdiction over TG under the Virginia long-arm statute. Plaintiffs acknowledge that to establish specific jurisdiction they must show that TG had the "minimum contacts" that Due Process requires – that TG purposefully availed itself of the benefits and protections of the State of Virginia, rather than the United States generally. However, Plaintiffs have failed to meet this burden by a preponderance of the admissible non-hearsay evidence.  The relevant facts are uncontroverted:

- TG manufactures drywall exclusively in China.

- TG sold drywall to only one U.S. company, Venture Supply.

- Phillip Perry, Venture Supply's authorized agent in China, contacted TG on behalf of Venture Supply and inquired about purchasing drywall in China from TG.

- Perry asked to visit TG's factory; TG did not invite him.

- Venture Supply and TG negotiated the terms of sale in China.

- The parties entered into two purchase agreements in China, providing for arbitration before a Chinese forum.

- Pursuant to those agreements, Venture Supply made two purchases of 1/2" thick drywall, FOB at a Chinese port.

---

[1] The Plaintiffs' Steering Committee's Response in Opposition to Taishan Gypsum Co. Ltd.'s Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint (R. Doc. No. 14202) ("Germano PSC Opp. Br."); Plaintiffs' Steering Committee's Global Statement of Facts ("PSC Global SOF") (R. Doc. 14215-2); and Plaintiffs' Steering Committee's Global Memorandum of Law ("PSC Global MOL").  Defendant State of Louisiana also submitted an opposition to this motion on May 18, 2012 (R. Doc. No. 14366).  This memorandum responds to the State of Louisiana's arguments as well.

[2] Defined terms in this memorandum have the same meaning as in TG's opening brief (R. Doc. No. 13490-1).

1

- After Venture Supply's agent inspected the drywall at TG's factory, TG delivered the drywall to the Chinese port selected by Venture Supply, and transferred possession of the drywall to Venture Supply's shipping agent.

- Once TG delivered the drywall to the port in China, the sale was complete.

- Any further shipping, marketing, sales or distribution of the drywall was outside the scope of the FOB purchase agreements.

- Venture Supply advised TG that Venture Supply planned to make a single shipment to Virginia and a second to New Jersey.

- Venture Supply subsequently re-sold some of the drywall to Banner Supply, Inc. in Florida, sold some to other commercial customers, and disposed of a significant portion of the drywall in a landfill.

- TG was not aware of where Venture Supply would resell the drywall it purchased from TG.

- TG was not involved in any marketing or re-sales of Venture Supply's drywall in Virginia.

- TG never sold any drywall to any U.S. companies besides the two sales to Venture Supply in China.

Plaintiffs do not offer any admissible non-hearsay evidence to refute any of these facts. Plaintiffs have also failed to present any admissible evidence that TG targeted potential customers from any particular State. [3] The evidence shows at most that TG was willing to sell drywall in China to companies from the U.S. (and elsewhere) that approached TG in China, and accommodate potential customer requests for price quotes and shipping information.

Significantly, Plaintiffs have failed to offer any admissible evidence whatsoever that their causes of action arose from TG's contacts with Virginia, as Due Process also requires. None of

---

[3] Plaintiffs cite numerous documents and testimony, but much of it is irrelevant or otherwise inadmissible and none of it demonstrates that TG targeted Virginia customers. TG will address the inadmissibility of certain evidence Plaintiffs have submitted in the Evidentiary Objections accompanying this memorandum.

the Plaintiffs have offered any evidence that the drywall Venture Supply shipped from China to the U.S. was installed in any of their homes.

Plaintiffs also have failed to rebut TG's showing that the exercise of personal jurisdiction would offend "traditional notions of fair play and substantial justice," because each of the *Burger King* factors weighs against the Court's assertion of jurisdiction over TG.

The Judgment also is invalid because Plaintiffs failed to serve TG with any pleading or motion containing the claims upon which the Judgment was based.

Finally, TG has demonstrated that the Judgment should also be vacated on the grounds of excusable neglect.

## ARGUMENT

## I.   THE DEFAULT JUDGEMENT SHOULD BE VACATED BECAUSE THE COURT LACKS PERSONAL JURISDICTION OVER TG.

<u>Governing Law</u>

The Court should apply the Fourth Circuit law to the question of whether the Eastern District of Virginia had personal jurisdiction over TG.  Binding precedent in the Fifth Circuit requires an MDL transferee court to apply the law that would govern the transferor court in its determination of personal jurisdiction.  *See In re Ford Motor Co.*, 591 F.3d 406 (5th Cir. 2009) (granting writ of mandamus directing transfer court to not follow the decisions of MDL transferee court on the issue of *forum non conveniens* because those decisions conflicted with precedent in circuit of transferor court).  Plaintiffs ignore *In re Ford* and improperly rely upon precedents from outside of the Fifth Circuit that reach a different choice of law conclusion.[4]  As this Court explained in *In re Chinese-Manufactured Drywall Prod. Liability Litig.*, 767 F. Supp.

---

[4] Germano PSC Opp. Br. at 8-9; PSC Global MOL at 4, n.20.

2d 649, 657 n.2. (E.D. La. 2011):  "If the cases were transferred by the MDL panel to this Court for consolidation the Court would be obligated under the same Fifth Circuit law to look to the law of the foreign forum to determine personal jurisdiction." (citing *In re WellNx Mktg. & Sales Practices Litig.,* No. 07-MD-1861, 2010 WL 3652457, at *1-2 (D. Mass. Sept. 15, 2010)).[5] Furthermore, the Due Process requirement that the defendant reasonably anticipate litigation in the forum State also favors applying Fourth Circuit law to the question of whether the Eastern District of Virginia had personal jurisdiction over TG.  *See Smith v. Railworks Corp.*, No. 10-CV-3980, 2012 WL 752048, at *6 (S.D.N.Y. Mar. 6, 2012).  TG certainly could not reasonably anticipate  being haled into a Court in Virginia under Fifth Circuit jurisdictional standards.

Burden Of Proof

Since TG has contradicted the jurisdictional allegations in the Complaint through various declarations, documents and deposition testimony, Plaintiffs must meet their burden of proof based on admissible non-hearsay evidence.  *Cooper v. McDermott Int'l, Inc.,* 62 F.3d 395 (5th Cir. 1995) (unpublished).  *See also NetKnowledge Techs., LLC v. Baron Capital V, Inc.*, No. Civ. A. 3:02-CV-2406-M, 2003 WL 23201333, at *3 (N.D. Tex. July 24, 2003) (granting defendant's motion to dismiss for lack of personal jurisdiction after evidentiary hearing due to "insufficient reliable, non-hearsay evidence" of minimum contacts).

Plaintiffs have argued that they need only make a *prima facie* showing of a basis for the exercise of personal jurisdiction over TG because this Court is not conducting any evidentiary hearing.[6]  However, the Court has made it quite clear that it desired to proceed with an

---

[5] Plaintiffs misleadingly cite this Court's prior statement in the same opinion indicating that in cases involving federal questions (other than personal jurisdiction) a transferee court should follow the law of its own circuit.  *Id.*

[6] PSC Global MOL at 5, n.21.  The parties attended a conference with the Court on May 16, 2012.  At that conference, Plaintiffs agreed that they must prove personal jurisdiction by the preponderance of the evidence

evidentiary hearing.  *See, e.g.,* August 30, 2011 Transcript of oral argument on the PSC's

"Motion To Compel Production of Documents and Further Jurisdictional Depositions of the

Taishan Defendants" at 6:12-20[7]:

> The Taishan entities have a serious motion here. I'm trying to
> develop, or have the parties develop, some evidence so that I can
> look at the evidence and base my decisions on the evidence as
> opposed to dealing with it without evidence, because then certain
> prima facie rules come into play.  In a case of this sort, I really
> think it would be more helpful to the litigation and to the litigants
> to allow the Court to hear some evidence and make a reasoned and
> thorough opinion, one way or the other, on it.

and September 9, 2011 Order & Reasons (R. Doc. No. 10269) granting the PSC's motion:

> This Court is extending every opportunity to Taishan to present
> evidence to support its position, but if no evidence is forthcoming
> or if appropriate discovery is thwarted so that a fair hearing
> becomes impossible, this fact-finder will be compelled to construe
> all disputed facts in the plaintiff's favor.

September 9, 2011 Order at 14.

      In response, counsel for TG and TTP promptly informed the Court and the parties that

they welcomed the opportunity to participate in an evidentiary hearing and the Court and the

parties have proceeded accordingly.[8]  At the depositions in Hong Kong earlier this year, the

Court again indicated that it was hearing testimony, assessing the credibility of witnesses and

---

standard that accompanies an evidentiary hearing.  However, Plaintiffs have not formally withdrawn their "*prima facie* showing" argument.  Accordingly, in an abundance of caution, we will briefly address it here.

[7] A copy of relevant excerpts from the August 30, 2011 transcript is attached to the Reply Declaration of Frank T. Spano, dated June 8, 2012 ("Spano Reply Decl.") as Exhibit 23.

[8] *See* Spano Reply Decl., Exhibit 24 (letter dated October 28, 2011 from J. Cyr to Judge Fallon).  On January 6, 2012, the Court entered an Order Regarding Authenticity and Admissibility of Certain Documents Identified by Parties for Use at Depositions in Hong Kong the Week of January 9, 2012 (R. Doc. 12126), and an Order Regarding Use of Depositions in MDL and State Court Proceedings (R. Doc. 12127), both clearly in anticipation of the evidentiary hearing to be held on the issue of personal jurisdiction.  Moreover, in its Minute Entry for the November 10, 2011 status conference held in relation to the status of discovery and depositions of the Taishan entities (R. Doc. 11192), the Court noted that the parties were working on a "stipulation regarding evidentiary issues pertaining to exhibits to be used at the depositions, for example business records and hearsay," undoubtedly with an eye towards admissibility of documents as part of the evidentiary hearing.

acting as a fact finder.[9]  Furthermore, at the very beginning of the Hong Kong depositions, counsel for TG and TTP also stated without any objection that TG and TTP welcomed the Court's rulings on objections at the depositions because they wanted the depositions to be admissible evidence as part of the record in the hearing before the Court.[10]  Since the Court has been conducting an evidentiary hearing, Plaintiffs must meet the preponderance of the admissible evidence standard.  *See Walk Haydel & Assocs., Inc. v. Coastal Paver Prod. Co*., 517 F.3d 235, 241-42 (5th Cir. 2008).

A.    **Plaintiffs Have Failed To Satisfy Virginia's Long-Arm Statute.**

Contrary to Plaintiffs' argument, to determine whether TG is subject to personal jurisdiction in the Eastern District of Virginia, the Court must follow a two-step process, considering first the requirements of the Virginia long-arm statute.  Although the statute has been held to extend to the limits of Due Process, it restricts jurisdiction to causes of action arising from acts enumerated in the statute.  *See Bay Tobacco, LLC v. Bell Quality Prods., LLC*, 261 F. Supp. 2d 489, 492 (E.D. Va. 2003); *see also* Letter Opinion of Judge Karen J. Burrell, *Frizzel v. Danieli Corp., et al.,* No. CL09-5120 (Va. Cir. Ct. City of Norfolk Dec. 22, 2010) at 4 (court's "first inquiry" is whether long-arm statute reaches non-resident defendant's conduct) (citing *Peninsula Cruise, Inc. v. New River Yacht Sales, Inc.*, 512 S.E.2d 560, 562 (Va. 1999)).[11]

---

[9] *See* Affidavit of Russ M. Herman, dated May 7, 2012 (R. Doc. No. 14215-3) ("Herman Aff.")  Ex. 6 ("Che Tr.") at 98:7-21; Herman Aff. Ex. 110 ("Shiliang Tr.") at 44:8-21.

[10] *See* Declaration of Frank T. Spano, dated April 2, 2012 (R. Doc. No. 13490-2) ("Spano Decl.") Ex. 2 ("Jia Tr.") 531:24-534:15.

[11] *Azzure Denim, LLC v. E.J. Lawrence Corp.*, 69 Va. Cir. 485 (Cir. Ct. City of Norfolk 2006), cited by Plaintiffs, is not to the contrary.  There The Court stated that "[t]he trial court must conduct a fact specific inquiry into the jurisdictional issue so as to determine first whether the defendant's activities fall within one of the enumerated categories of Va. Code.  § 8.01-328.1(A)(1) through (10).  If so, the Court then must determine whether such activities constitute sufficient 'minimum contacts' with Virginia. . . ."

<u>TG Did Not Transact Business In Virginia</u>.

Contrary to Plaintiffs' assertion, Venture Supply's signing of a purchase agreement in Virginia did not constitute the transaction of business in Virginia by TG within the meaning of Section 8.01-328.1(A)(1) of the long-arm statute. *See Labriola v. Se. Milk, Inc.*, No. 08-CV-893(JCC), 2008 WL 4682772, at *5 (E.D. Va. Oct. 21, 2008) (signing of guaranty contract in Virginia insufficient basis for jurisdiction under statute).[12] Nor did TG's FOB sale of drywall to Venture Supply in China constitute transacting business in Virginia. *See Bay Tobacco*, 261 F. Supp. 2d at 493 (FOB sales outside Virginia did not constitute transacting business in the State, even when the products were subsequently shipped to Virginia). *Bay Tobacco* has been followed in the Virginia state courts. *See, e.g., Frizzel* at 5-6 (company that repeatedly sold products FOB outside the State but delivered them to common carrier at purchaser's request did not transact business in State).[13]

<u>TG Did Not Contract To Supply Things In Virginia</u>.

TG's FOB sale to Venture Supply in China also was not "contracting to supply . . . things in this Commonwealth" within the meaning of section 8.01 328.1(A)(2) of the long-arm statute. *See Frizzel* at 6-7 (defendant that sold FOB outside of the State did not supply it in Virginia even

---

[12]Plaintiffs mistakenly rely upon *Nan Ya Plastics Corp. U.S.A. v. DeSantis*, 377 S.E.2d 388 (Va. 1985), a lawsuit that arose from a contract with a Virginia resident plaintiff that was solicited, negotiated and consummated in Virginia. The foreign defendant recruited plaintiff for employment by contacting him in Virginia, flying him to Texas for his job interview, and sending him an offer letter and acceptance of counter-offer letter in Virginia. In this case, essentially the reverse occurred. Venture Supply solicited TG in China, Perry negotiated the purchase agreements with TG in China, and it was fully performed there. Venture Supply's signing of one of the agreements in Virginia was a mere formality that did not change the locus of the contract from China to Virginia.

[13]*See also* Memorandum of Law In Support of Taishan Gypsum Co. Ltd.'s Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint (R. Doc. No. 1349-01) ("Opening Br.") at 12-41.

*Azzure Denim, LLC* relied upon Plaintiffs, is clearly inapposite. That case involved New York defendants who purchased clothing "FOB New York" from the Virginia plaintiff, but also re-sold millions of dollars' worth of clothing to retail outlets in Virginia at prices that allegedly breached their agreement with the plaintiff. Obviously, this case is not at all similar to *Azzure Denim* because TG did not purchase anything from Virginia, ship products to Virginia or breach a contract there.

though the purchaser directed the defendant to ship it to Virginia); *Labriola*, 2008 WL 4682772 at *5 ("[M]erely entering into a contract with a resident party will not subject a nonresident defendant to personal jurisdiction . . . unless some substantial part of contractual formation or performance occurs in Virginia") (quoting *John G. Kolbe, Inc. v. Chromodern Chair Co.,* 180 S.E.2d 664 (Va. 1971)).

           <u>TG Did Not Regularly Do Or Solicit Business In Virginia</u>.

           Plaintiffs also have failed to show that TG "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth" within the meaning of sections 8.01-328.1(A)(4) or (5) of the Virginia long-arm statute.  Venture Supply paid for the drywall and completed its transaction in China before it re-sold any of the drywall in Virginia.  Even if Venture Supply's purchase was considered revenue TG derived from goods used in Virginia, it represented too small a percentage of TG's total sales to establish personal jurisdiction.  *Ajax Realty v. J. F. Zook, Inc.*, 493 F.2d 818, 822 (4th Cir. 1972).  TG's sales to Venture Supply in China simply do not reflect the purposeful activity in Virginia necessary to satisfy the long-arm statute.

       **B.**       **<u>Plaintiffs Have Failed To Satisfy The Requirements Of Due Process</u>.**

           Even if the Virginia long-arm statute encompassed TG's FOB sales to Venture Supply in China, Plaintiffs have failed to meet their burden of proving by a preponderance of the admissible non-hearsay evidence that the Court's exercise of personal jurisdiction would satisfy Due Process.

1.      **Plaintiffs Have Not Established That TG Had Minimum Contacts With Virginia.**

Plaintiffs Misinterpret The Majority Ruling in *Nicastro*.

*Marks v. United States*, 430 U.S. 188 (1977) held that when "no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. at 193 (internal quotation and citation omitted). *Marks* itself found a governing standard for obscenity in the case it was examining even though no more than three Justices joined in any of the opinions. *Id.* at 194. In *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011), a majority of the Justices concurring in the judgment of the Supreme Court embraced a clear rationale for the Court's ruling. Both Justice Kennedy's opinion for the plurality and Justice Breyer's concurring opinion agreed that (1) Due Process requires that a defendant in a stream of commerce case purposefully avail itself of a particular State forum; (2) a defendant cannot be subject to personal jurisdiction merely because it could foresee or expect its product would be re-sold in the forum State; and (3) a foreign manufacturer's marketing efforts directed generally to potential U.S. customers, rather than toward a specific State, do not constitute purposeful availment of a particular State. This was the holding of the Supreme Court in *Nicastro*.[14]

Contrary to Plaintiffs' assertion, the *Nicastro* ruling did not depend on a complete absence of contacts between the defendant and the State.[15] Rather, the decision by the majority of the Supreme Court assumed that the foreign manufacturer in *Nicastro* knew or should have

---

[14] *See* Opening Br. at 24-28.

[15] PSC Global MOL at 16.

9

known that its products might be sold in the forum State – precisely what Plaintiffs allege here with respect to TG.   Nevertheless, taking these facts precisely as the New Jersey court found them, the majority of the Supreme Court Justices found that purposeful availment was not shown. *See* concurring opinion at 131 S. Ct. at 2792; *see also* plurality opinion at 2791 ("[a]t no time did the petitioner engage in any activities in [the forum State] that reveal an intent to invoke or benefit from the protection of its laws").

   The *Nicastro* Majority Rejected The Foreseeability Standard Argued By Plaintiffs.

   The foreseeability of sales in the forum State was the touchstone of the New Jersey Supreme Court's holding that was reversed by the U.S. Supreme Court.  *See Nicastro*, 131 S. Ct. at 2793 ("I am not persuaded by the absolute approach adopted by the New Jersey Supreme Court . . . that . . .  a producer is subject to jurisdiction for a products-liability action so long as it 'knows or reasonably should know that its products are distributed through a nation-wide distribution system that *might* lead to those products being sold in any of the fifty states'") (Breyer, J., concurring opinion) (emphasis in original); *see also* Opening Br. at 24-28; *see also* *Oticon v. Sebotek Hearing Sys., LLC*, No. 08-5489, 2011 WL 3702423, at *8-9 (D. N.J. Aug. 22, 2011) (Justice Breyer "would not adopt as strict a rule as that enunciated by the plurality, but he too voiced his disagreement with the notion that mere foreseeability is the cornerstone of the stream of commerce jurisprudence.").  Justice Breyer found that employing "foreseeability" as a substitute for purposeful conduct was particularly unfair in the case of a foreign defendant.  131 S. Ct. at 2793-94.

   The *Nicastro* majority's rejection of foreseeability as a substitute for purposeful conduct directed at the forum State was consistent with existing Supreme Court precedents, as Justice Breyer noted.  *See* 131 S. Ct. at 2793 ("For one thing, to adopt this view would abandon the

10

heretofore accepted inquiry of whether, focusing upon the relationship between 'the defendant, the *forum* and the litigation,' it is fair in light of the defendant's contacts *with that forum*, to subject the defendant to suit there.") (citing *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)) (emphasis in original).  Justice Breyer **also** relied on *World-Wide Volkswagen v. Woodson*, in which the Court held that the purposeful availment requirement was not satisfied merely because a defendant sold a product outside the State when it was foreseeable the product might cause injury in the State.  444 U.S. 286, 297 (1980) ("[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State.").

The *Nicastro* Majority Rejected The "National Market" Approach Argued By Plaintiffs.

In *Nicastro,* the foreign manufacturer had made substantial efforts over many years to market its products to the U.S. through its U.S. distributor.  Nevertheless, a majority of the U.S. Supreme Court, concluded that this did not show purposeful availment of the forum State.  131 S. Ct. at 2790 ("In this case, petitioner directed marketing and sales efforts at the United States . . . Here the question concerns the authority of a New Jersey state court to exercise jurisdiction, so it is petitioner's purposeful contacts with New Jersey, not with the United States, that alone are relevant.") (Kennedy, J., plurality opinion); *id.* at 2791 ("[T]he British Manufacturer permitted, indeed *wanted*, its American distributor to sell its machines to anyone in America willing to buy them. . . .  In my view, these facts do not provide contacts between the British firm and the State of New Jersey constitutionally sufficient to support New Jersey's assertion of jurisdiction in this case.") (Breyer, J., concurring opinion) (emphasis added).

Rather than finding personal jurisdiction based upon national marketing, both the plurality and concurring opinions in *Nicastro* required plaintiff to come forth with evidence of specific efforts by the foreign manufacturer to sell in the forum State.  *See Nicastro*, 131 S. Ct. at

11

2792 ("Mr. Nicastro, who here bears the burden of proving jurisdiction, has shown no specific effort by the British Manufacturer to sell in New Jersey.") (concurring opinion).

Controlling Law In The Fourth Circuit Is Consistent With *Nicastro*.

Consistent with *Nicastro*, controlling law in the Fourth Circuit holds that a defendant must do more than merely place the product in the stream of commerce to purposefully avail itself of a State, even if the defendant was aware that the stream may or will sweep the product into the State. *See, e.g., Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 945 (4th Cir. 1994); *Bay Tobacco*, 261 F. Supp. 2d at 494-95 (FOB sale outside Virginia followed by shipment to Virginia at purchaser's request did not show purposeful contacts by seller with Virginia). Plaintiffs cannot distinguish *Bay Tobacco* by arguing it was only a breach of contract case.[16] *Bay Tobacco* involved both tort and contract claims, and the Court's Due Process analysis considered the facts underlying all of the claims. *See id.* Due Process requirements apply regardless of the plaintiff's theory of recovery.[17]

The Fifth Circuit Also Has Required Purposeful Efforts To Serve The Forum State.

Although not controlling, cases in the Fifth Circuit also have consistently held that sales of products made outside the forum State unaccompanied by purposeful efforts to serve the market in the State do not establish purposeful availment. *See, e.g., Charia v. Cigarette Racing Team, Inc.*, 583 F.2d 184 (5th Cir. 1978). In *Charia*, the plaintiff was a Louisiana resident who had purchased a boat from a Florida-based boatbuilder. *Id.* The manufacturer sold the boat FOB Florida. The cost of shipping was added to the purchase price, and the manufacturer arranged to ship the boat from Florida to Louisiana. The Fifth Circuit found that because the defendant sold

---

[16] Germano PSC Opp. Br. at 13, n.38.

[17] *See* Opening Br. at 34-38.

12

the boat FOB Florida, it could not be argued under a "stream of commerce rationale" that it was indirectly shipping its product into Louisiana and could have reasonably foreseen that the sale would have effects in Louisiana.  Cigarette's sale of four boats to Louisiana residents over a five-year period were "isolated and sporadic" sales that "did not involve purposeful conduct within Louisiana so as to avail itself of the benefits and protections of Louisiana's laws."  *Id.* at 189. *See also, Benjamin v. W. Boat Bldg. Corp.*, 472 F.2d 723 (5th Cir. 1973).  (Louisiana resident who initiated purchase of boat from Washington State boatbuilder and accepted delivery in Washington did not satisfy burden of proving minimum contacts of boatbuilder in Louisiana, notwithstanding communications regarding contract to plaintiff in Louisiana); *Singletary v. B.R.X., Inc.*, 828 F.2d 1135, 1136 (5th Cir. 1987) (finding that "contact was weakened even further by the fact that the sale was initiated by the buyer, and was shipped F.O.B. California, the seller's place of business"); *Growden v. Ed Bowlin & Assocs., Inc.*, 733 F.2d 1149 (5th Cir. 1984) (denying jurisdiction, based on *Charia*, over out-of-state used aircraft seller that sold to Louisiana resident but delivered aircraft outside state, notwithstanding seller's knowledge aircraft would be based in Louisiana and require repairs there).

*Charia* and *Benjamin* continue to be controlling in the Fifth Circuit.  *See, Luv 'N Care Ltd. v. Insta-Mix*, 438 F.3d 465, 471-72 (5th Cir. 2006) (acknowledging *Charia's* holding but stating "a F.O.B. term does not prevent a court from exercising personal jurisdiction over a non-resident defendant *where other factors*, such as the quantity and regularity of shipments, suggest that jurisdiction is proper") (emphasis added);[18] *LTA, Inc. v. Breeck*, No. 1:11CV213WJG-RHW, 2011 WL 3841374 (S.D. Miss. Aug. 26, 2011) (Indiana boat manufacturer that delivered boats to

---

[18] The Supreme Court's decision in *Nicastro* has cast into doubt the continued validity of the Fifth Circuit's holding in *Luv N' Care*, insofar as it was based on the now discredited view that mere foreseeability of the product making its way into the forum State is sufficient to establish purposeful availment.  438 F.3d at 470.

Mississippi not subject to personal jurisdiction with respect to claims of Plaintiff who had seen defendant's national advertisement); *NTE Aviation, Ltd. v. LIAT (1974) Ltd.*, 561 F. Supp. 2d 687, 690-91 (E.D. Tex. 2007) (foreign defendant who leased jet engine from Texas lessor not subject to personal jurisdiction in Texas notwithstanding that the parties had exchanged telephone calls, payments, and correspondence in Texas).[19]

      <u>Plaintiffs Cannot Rely On Fifth Circuit Cases That Are Inconsistent With *Nicastro*</u>.

      Plaintiffs cannot rely upon *Ruston Gas Turbines, Inc. v. Donaldson Co. Inc.*, 9 F.3d 415 (5th Cir. 1993) or other cases that have found purposeful availment based on a defendant's "mere foreseeability or awareness" that its products would be sold in the State. *First*, as discussed above, Fifth Circuit law is not controlling. *Second*, since *Ruston* was decided, its interpretation of the requirements of Due Process in stream of commerce cases has been called into question; indeed, in *Luv 'N Care, Ltd.*, Judge DeMoss, the author of the *Ruston* opinion, specially concurring, questioned its constitutionality and advocated that the Fifth Circuit adopt Justice O'Connor's "stream of commerce plus" approach instead. 438 F.3d at 474-475. In addition, subsequent to *Ruston*, the Fifth Circuit has held that "foreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts toward the forum." *McFadin v. Gerber,* 587 F.3d 753, 762 (5th Cir. 2009) (quoting *Wien Air Alaska v. Brandt*, 195 F.3d 208, 212 (5th Cir. 1999)). Ultimately, as discussed above, a majority of the Justices of the Supreme

---

[19] Along the same lines, the Fifth Circuit has held in various factual contexts that contracting with a resident of the forum State is insufficient to subject the nonresident defendant to personal jurisdiction when the defendant does not initiate the contact and is not required to perform the contract in the forum State. *See, e.g., Hydrokinetics, Inc. v. Alaska Mech., Inc.,* 700 F.2d 1026 (5th Cir. 1983); *Moncrief Oil Int'l Inc. v. OAO Gazprom,* 481 F.3d 309 (5th Cir. 2007); and *Stuart v. Spademan,* 772 F.2d 1185, 1194 (5th Cir. 1985) ("The random use of interstate commerce to negotiate and close a particular contract, the isolated shipment of goods to the forum at the instigation of the resident plaintiffs, . . . do not constitute the minimum contacts necessary to constitutionally exercise jurisdiction over [defendant]."). These cases illustrate further that Venture Supply's activities in Virginia connected with its purchases from TG, such as Venture Supply's communications with TG or Venture Supply's arranging of a Letter of Credit with a Chinese bank do not show that TG purposefully availed itself of Virginia.

Court in *Nicastro* overruled *Ruston* insofar as it held that mere foreseeability or awareness that the product might be sold in the forum State would be sufficient to establish that a defendant purposefully availed itself of the State.

Moreover, TG's conduct fails to meet even the looser requirements for purposeful availment of the pre-*Nicastro* Fifth Circuit cases erroneously relied upon by Plaintiffs. *See, e.g., Ruston*, 9 F.3d at 419-421 (out-of-state component parts manufacturer for gas turbines reasonably anticipated suit in Texas where it *knew* its products were going to be delivered to a specific user in Texas, manufacturer had made 211 direct shipments to Texas, and manufacturer's employees visited Texas on several occasions to assist customers). Clearly, the factors that the Fifth Circuit considered in deciding in *Ruston*, including that sales of the non-resident defendant's products in the forum State were foreseeable are not present here. TG did not have knowledge of a specific customer to whom its products would be re-sold in the forum State; TG made no direct shipments to customers in the State; and TG never sent employees to the State, let alone on numerous occasions over a period of years. *See Southern Copper, Inc. v. Specialloy, Inc.,* 245 F.3d 791 (5th Cir. 2000) (non-resident's FOB sale outside forum State with resident taking possession outside State insufficient to show purposeful availment; distinguishing *Ruston* because of the number and quality of additional contacts in that case beyond the FOB sale) (unpublished opinion).

In *Irving v. Owens-Corning Fiberglass Corp.,* 864 F.2d 383, 387 (5th Cir. 1989), a Yugoslavian asbestos supplier that supplied <u>all</u> of the asbestos used by the plaintiff's Texas employer over a 15-year period, directly shipped asbestos to Texas approximately 30 times, and partially paid the cost of testing of its products in Texas, was found to have reason to foresee that its product would be sold in the State. By contrast, TG's relationship with Venture Supply was

15

short-lived; TG did not ship drywall to Virginia; and TG did not utilize testing facilities or other services in Virginia.

Similarly, in *Paz v. Brush Engineered Materials Inc.*, 445 F.3d 809 (5th Cir. 2006), also relied upon by Plaintiffs, the Fifth Circuit found that the non-resident manufacturer <u>knew</u> that the beryllium-containing products it sold to Boeing would be used <u>exclusively</u> at Boeing's space shuttle construction facility in the forum State.  445 F.3d at 813.  Unlike the defendant in *Paz,* TG had no knowledge of any use of its products in the forum State, exclusive or otherwise.  Plaintiffs' reliance on *Nuovo Pignone, SpA v. Storman Asia, M/V*, 310 F.3d 374 (5th Cir. 2002) is also misplaced because in that case the very subject of the lawsuit was breach of a contract to ship a product to the forum State.  Thus, the Fifth Circuit concluded "[w]e have established that [the foreign defendant] directed its activities toward Louisiana by agreeing to transport the reactor to the Port of New Orleans."  *Id.* at 387.  Here, by contrast, TG did not agree to ship products to Virginia or engage in any activities there.

Likewise, even in *Luv 'N Care*, a case that "stretches the stream of commerce theory beyond its past limits,"[20] the non-resident defendant sold 82,000 pieces of the infringing product to a national distributor and was aware of 65 shipments that went from its factory directly into the forum State.  TG's isolated sales to Venture Supply in China followed by Venture Supply's single shipment to Virginia bore no resemblance to the "regularity and quantity of shipments" to the forum State in *Luv 'N Care* that led the Fifth Circuit to conclude that "jurisdiction in the forum state was [ ]foreseeable."  438 F.3d at 472, n.11.  Even under the inapplicable Fifth Circuit law cited by Plaintiffs, TG did not purposefully avail itself of the privilege of conducting activities in Virginia.

---

[20] 438 F.3d at 475 (DeMoss, J., concurring opinion).

_Nicastro_ Requires Dismissal Of This Case.

Justice Breyer's adherence to the High Court's precedents and the facts found by the New Jersey Supreme Court led him to conclude, like the plurality, that Plaintiff had not established that the foreign manufacturer had purposefully availed itself of the forum State.  _See, e.g.,_ 131 S. Ct. at 2792 ("And he has not otherwise shown that the British manufacturer purposefully availed itself of the privilege of conducting activities within New Jersey, or that it delivered its goods in the stream of commerce with the expectation that they will be purchased by New Jersey users.") (concurring opinion) (internal quotation marks and citation omitted).  Based on the _Nicastro_ majority's ruling – as well as its analysis and reasoning – this Court should find a lack of personal jurisdiction over TG.  As summarized below, TG's connection to the forum State was even more attenuated than that of the foreign manufacturer in _Nicastro_.[21]

COMPARISON OF FORUM STATE
CONTACTS BETWEEN TG AND McINTYRE

| Activity | McIntyre | TG |
|---|---|---|
| Office in State | No | No |
| Paid taxes in State | No | No |
| Advertised in State | No | No |
| **Employees travelled to the U.S. to seek customers** | **Yes** | **No** |
| **Manufacturer's representatives attended industry conventions in the U.S.** | **Yes** | **No** |
| **Manufacturer's representatives assisted installation of products in the U.S.** | **Yes** | **No** |
| **U.S. Distributor** | **Yes** | **No** |

---

[21] _See also_ Opening Br. at 29-32.

17

| Distributor sales in State | Yes | No |
|---|---|---|
| Manufacturer shipments to State | No | No |
| Marketing in State | No | No |
| Advertised on passive website | Yes | Yes |

### a.   Plaintiffs Have Failed To Prove That TG Purposefully Availed Itself Of The Virginia Market.

The Supreme Court in *Nicastro* made clear that personal jurisdiction must be based on "the defendant's actions, not his expectations."  131 S. Ct. at 2789.  TG's *actions* relevant to personal jurisdiction consisted of nothing more than two FOB sales to Venture Supply in China. These actions are insufficient to show that TG purposefully availed itself of the State of Virginia.[22]

Merely Contracting With A Virginia Company Is Insufficient.

The fact that Venture Supply happened to be from Virginia was fortuitous, and not the result of any purposeful efforts by TG directed to Virginia.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) (the mere fact that a contract is with a forum State resident cannot without more establish minimum contacts with the State); *see also McFadin v. Gerber*, 587 F.3d 753, 760 (5th Cir. 2009) ("Jurisdiction must not be based on the fortuity of one party residing in the forum state.").

---

[22] Plaintiffs attempt to confuse the jurisdictional issue referring to the term "Taishan" as meaning both TG and TTP, when one of the issues before this Court is whether the juridical independence of TG and TTP can be ignored.  *See* Section I.B.(1)(c), *infra*.

Plaintiffs argue that "purposeful negotiation with a business entity in the forum State may subject a defendant to personal jurisdiction within the State."[23]  In fact, *Burger King* required much more than negotiating a contract with a forum State resident to establish minimum contacts.  The non-resident franchisee purchased a long-term franchise that contemplated a 20-year relationship, and signed an agreement with a Florida choice of law clause.  Furthermore, the parties' course of dealing involved substantial, continuing contacts with Florida, including communicating with Burger King's corporate headquarters to resolve disputes, attending training seminars in Florida, and sending monthly rent, franchise fees and royalty payments to Florida.  In view of all of that purposeful activity by the franchisees connected to Florida, personal jurisdiction was appropriate.  471 U.S. at 482.  TG by contrast, entered into contracts providing for arbitration in China; the contracts chose a Chinese forum, and did <u>not</u> choose Virginia law.  Perry conducted most of the negotiations on behalf of Venture Supply in China.[24]  There were, in fact, few communications between TG and Venture Supply other than their contacts in China.[25]  Moreover, unlike the franchisees in *Burger King*, TG did not have to render any performance in the forum State and never set foot there.  China was the locus of the contracts.  *See McFadin*, 587 F.3d at 760.

Plaintiffs also assert that TG "initiated its agreement with Venture Supply by having Venture Supply's President, Samuel G. Porter, execute its first contract with Taishan in

---

[23]PSC Global MOL at 9 (citing *Burger King*, 471 U.S. at 472).

[24]Spano Decl. Ex. 3 ("Peng Tr.") 366:10-368:1.

[25]Peng Tr. 369:5-370:8 ("I remember under the guidance of Mr. Phillip, I talked to his colleagues or leaders in the United States a few times over the phone very few times . . . [in] English . . . . Simple and limited exchanges.").

Virginia."[26]   In fact, Venture Supply's agent initiated contact with TG in China.[27]   After reaching out to TG in China, Perry proceeded to negotiate the purchase agreements with TG in China.  Moreover, TG did not "have" Porter do anything in Virginia.  TG did not care where Venture Supply signed its purchase agreements, as illustrated by the fact that Perry signed the second agreement in China.  The fact that Venture Supply decided to sign one of the agreements in Virginia is not probative of any purposeful conduct directed by TG to Virginia.[28]

<u>TG Did Not Target The Market In The U.S. Or Virginia</u>.

The admissible non-hearsay evidence does not support Plaintiffs' "targeting" allegation. TG's marketing efforts were primarily focused on the vast domestic market in China.[29]   TG advertised in domestic Chinese publications and attended industry trade fairs in China.  TG paid little attention to the U.S. market for drywall.  TG did not advertise in any U.S. publications or attend any trade fairs in the U.S.[30]   Also, TG did not conduct market research or otherwise study the market for drywall in the U.S.  In fact, TG had not included sales to U.S. companies in its business plans, as TG believed the cost of transportation was too high for U.S. companies to economically import its drywall.[31]   TG did not pay any attention at all to the market for drywall in any particular State.

---

[26] PSC Germano Opp. Br. at 12.

[27] *See, e.g.*, Herman Aff. Ex. 75 ("[W]e sought you out in part because our research shows you could produce the boards at an acceptable price for the competitive market here.").

[28] *See* Opening Br. at 20-21.

[29] Herman Aff. Ex. 2 ("Fu Tr.") 79:11-80:1, 81:10-14.

[30] Peng Tr. 273:13-274:13, 528:1-3.

[31] Jia Tr. 855:16-857:3 ("The product gypsum board is a heavy product.  To export such a product for a long period of time is an action that's [u]nimaginable.  The shipping cost is very expensive . . . . Common sense tells us that . . . it is impossible for us to have any plan to occupy American market.")

TG did not send unsolicited marketing materials or samples of drywall to any potential U.S. customer.  The uncontroverted testimony of TG's witnesses was that it would only send samples if a potential customer specifically requested them, the samples were available in the factory, and the potential customer arranged to have it shipped through DHL or some other carrier at its cost.[32]  Contrary to Plaintiffs' assertion, TG did not use the U.S. Postal Service to send samples from China to the U.S.

Contrary to Plaintiffs' argument that TG designed drywall "to meet Venture Supply's needs for marketing in Virginia,"[33] TG did not design its drywall for the Virginia market.  TG simply manufactured drywall in the sizes the customer wanted, and marked it as the customer specified.  As an OEM manufacturer, TG had always done this for customers wherever they came from.[34]  The 1/2" thick drywall Venture Supply ordered could have been distributed and used anywhere in the U.S. and, indeed, was not even unique to the U.S.  It was used in other countries and TG had made it in that size for customers outside of the U.S.[35]  Moreover, there is no evidence that either the product or the process was customized for the U.S. or Virginia markets.  TG simply cut the length and height of the drywall to the requested dimensions.[36]

---

[32] *See, e.g.,* Che Tr. at 284:17-291:18.

[33] Germano PSC Opp. Br. at 13.

[34] *See, e.g.,* Peng Tr. 266:6-267:23; Che Tr. 40:9-18; 222:19-223:2; 358:22-359:23.  PSC Global MOL at 26 ("the acts of each corporation should be attributed to the other for the purposes of determining this Court's jurisdiction over Taishan"), 35; *see also* Germano PSC Opp. Br. at 1 (incorporating the PSC Global MOL), 12 ("Taishan advertised and targeted its products for sale in the United States . . . made it possible for American customers to place orders through intermediaries such as Oriental Trading Co. . . . .")

[35] Peng Tr. 134:1-7; Jia Tr. 688:24-689:20.

[36] TG did not supply drywall to Venture Supply that was certified as meeting the ASTM standard.  Accordingly, Plaintiffs' arguments regarding that standard have nothing to do with this case.

None of the numerous e-mails between TG and potential customers cited by Plaintiffs evidence purposeful conduct by TG directed toward targeting the U.S. market or Virginia in particular.  TG's responses to inquiries from potential customers almost always quoted drywall prices FOB at a Chinese port in the first instance.  Only when the potential customer specifically asked for information about the cost to ship to a destination outside of China did TG obtain this information from third parties and pass it on to the potential customer who had requested it. Likewise, other passive conduct by TG in China, such as welcoming Perry or other potential customers who requested a plant tour, or assisting Venture Supply with its shipping arrangements, does not prove that TG targeted the market in the U.S. generally or Virginia in particular.

Plaintiffs argue further that "Taishan marketed its products to the United States both from its own website, as well as on the Alibaba website."[37]  In fact, neither website reflects any effort by TG to target the market in the U.S. or Virginia.  TG created the English version of its website primarily for domestic consumption.  It existed for years before TG had any communications from potential U.S. customers such as Venture Supply.[38]  Passing references to exports to the U.S. as part of a list of other countries to which products had been exported hardly qualifies as "targeting" the U.S. market and it certainly does not constitute evidence that either TG or TTP targeted Virginia.

Plaintiffs argue that "Taishan made it possible for American customers to place orders through intermediaries such as Oriental Trading Co., through whom Defendant would consign and ship products to the builders and installers who ultimately purchased and used the

[37] Germano PSC Opp. Br. at 12.

[38] Peng Tr. 541:16-542:13.

22

products."[39]   In fact, there is no evidence that TG had any "intermediaries" in the U.S., let alone any company authorized to accept orders on its behalf.   TG never consigned its products to anyone and no American customers placed orders for TG's drywall through any intermediaries.[40]

Plaintiffs allege that "Taishan" sold 85 million square feet of drywall to U.S. customers. To arrive at this figure, Plaintiffs allegedly added up all of the drywall reflected on both TG's and TTP's manufacturer's profile forms.[41]   This is misleading because TTP's sales should be considered separate from TG's two sales to Venture Supply.   Moreover, even as to TTP, Plaintiffs' claim is misleading because the vast majority of the drywall TTP sold, approximately 77,685,000 square feet, was sold to Chinese trading companies in China and was not exported to the U.S. by TTP.   Peng W. further explained that his or other salesmen's e-mails regarding exports were intended to give a general sense of TG and TTP's capabilities in response to inquiries from potential customers, but did not represent actual sales data.[42]

Plaintiffs focus wrongly on the number of sheets of drywall that allegedly wound up in the U.S. rather than TG's isolated sales to Venture Supply that led to only one single shipment to the forum State.   There was no "regular . . . flow of sales" or "'regular course' of sales" from TG

---

[39]Germano PSC Opp. Br. at 12.

[40]Oriental Trading signed a Sole Agency Agreement ("SAA") with <u>TTP</u>, not TG.  Notwithstanding the title of the SAA, Oriental Trading did not have the right to act as TTP's sales agent in the U.S.  The SAA merely provided Oriental Trading with the right to purchase drywall under the brand name "DUN" in the "territory of the U.S.A." (SAA ¶¶ 1-2).  The undisputed facts are that Oriental Trading never sold or distributed TTP's drywall to anyone. Herman Aff. Ex. 9 ("Gonima Tr. A") 62:2-15, 82:18-83:19; Mitchell Opening Brief (R. Doc. No. 13566-1) at 21.

[41]PSC Global MOL at 1; Herman Aff. Ex. 1.

[42]Peng Tr. 264:14-265:6.  Peng W. continued to use TG's corporate signature on e-mail responses to potential U.S. customers after he transferred to TTP but this was an oversight and does not indicate he was acting on behalf of TG or that TG was trying to make those sales.  Peng Tr. 161:5-162:10.

23

to Virginia sufficient to establish purposeful availment of the State.  *Nicastro*, 131 S. Ct. at 2792 (alteration in original) (alteration in original).[43]

Plaintiffs refer to *dicta* in Justice Breyer's concurring opinion in *Nicastro* suggesting that "target[ing] the world by selling products from its Web site" or "consign[ing] the products through an intermediary (say, Amazon.com) who then receives and fulfills the orders," *id.* at 2793, could be an element of showing purposeful availment in some cases.  The evidence shows that TG's marketing efforts were nothing like the scenario Justice Breyer envisioned.  TG's website was not interactive.  Thus, customers could not purchase products or communicate with TG through its website.  It is well settled that merely maintaining a passive website is insufficient to establish purposeful conduct directed to a particular State for purposes of personal jurisdiction.  *See ALS Scan Inc. v. Digital Serv. Consultants, Inc.* 293 F.3d 707, 714 (4th Cir. 2002) ("[A] person who simply places information on the Internet does not subject himself to jurisdiction in each State into which the electronic signal is transmitted and received. Such passive Internet activity does not generally include directing electronic activity into the State with the manifested intent of engaging business or other interactions in the State . . . ."); *see also Mink v. AAAA Dev. LLC,* 190 F.3d 333, 336-37 (5th Cir. 1999) (website that posted information about defendant's products and services, and provided users with a printable mail-in order form, was not to be classified "as anything more than passive advertisement which is not grounds for the exercise of personal jurisdiction."); *McFadin*, 587 F.3d at 763 ("Here the website was passive, providing no means for orders, offering only [the defendant's] contact information.  We

---

[43] Plaintiffs note that TG purchased waste paper from the U.S. and then processed it in China in connection with manufacturing of drywall.  Herman Aff. ¶ 63.  Plaintiffs do not, however, assert that these purchases of waste paper reflect the purposeful availment of any particular State.  Plaintiffs incorrectly assert that TG sold a paper machine to a company in Ohio.  Germano PSC Opp. Br. at 11.  In fact, TG purchased certain parts from an Ohio company, as the invoice reflects.  Herman Aff. Ex. 164.

have found similar web pages to be insufficient to meet minimum contacts."); *Southern Copper, Inc. v. Specialloy, Inc.*, 245 F.3d 791, at *3 (5th Cir. 2000) (no personal jurisdiction based on website where no evidence demonstrated that defendant entered into contracts with customers over its website). Indeed, McIntyre advertised its products in English on its UK website. 131 S. Ct. at 2795. Therefore, Justice Breyer's reference to "contemporary commercial circumstances" that were not present in *Nicastro* could not have meant something as mundane as a company advertising on a passive website. *Id.* at 2794.[44]

TG Did Not Ship Drywall To Virginia.

There is no evidence that TG shipped any drywall that a customer purchased to Virginia. Plaintiffs allege that "Taishan aided and directed shipments of its products to Virginia,"[45] but there is no dispute that after TG delivered the drywall to Venture Supply FOB at a Chinese port it was no longer "its" drywall. The evidence is also overwhelming that Venture Supply, rather than TG, shipped the drywall from China to Virginia, and that Venture Supply made its own shipping arrangements.[46] It was Perry, not TG, who signed the freight contract with the China shipping company and arranged customs through the American company Rogers & Brown's counterpart in China.[47] After communicating with the China shipping company, Perry forwarded to Venture Supply "information . . . about the vessel we will be sending the board

---

[44] TG posted company and product information on B2B websites such as Alibaba and EC Plaza, but those websites were also passive and no sales were or could be made on those websites. The B2B sites merely forwarded occasional inquiries from potential customers to TG. Those B2B postings were also not comparable to a company that "markets its products through pop-up advertisements it knows will be viewed in a forum." *Id.* There is no evidence that any TG advertisements "popped up" on any website viewed by any potential customer in the U.S. or Virginia, or that any information regarding TG's products was accessible on the internet unless someone made an affirmative effort to seek it out.

[45] Germano PSC Opp. Br. at 14.

[46] *See* Opening Br. at 8-9.

[47] Herman Aff. Ex. 70.

on."[48]   Moreover, according to the Letter of Credit Application Venture Supply posted with the Agricultural Bank of China, <u>the insurance for the shipment was to be arranged by Venture Supply and the freight was to be paid "collect" by Venture Supply.</u>[49]   TG's role was limited to passing on information from the shipping agent Venture Supply selected.[50]

Plaintiffs argue further that TG "separately invoiced and sold plywood pallets . . . of its customized drywall to Venture Supply."[51]   The evidence shows Venture Supply solicited a purchase of plywood pallets from TG incidental to Venture Supply's purchase of drywall in China.[52]   Venture Supply ordered plywood pallets from TG in China, so that TG could use them for packaging its second order of drywall in the manner Venture Supply requested.[53]   TG delivered the drywall on plywood pallets to the Chinese port selected by Venture Supply. Venture Supply then shipped the drywall loaded on the plywood pallets to New Jersey.[54]

TG's FOB sale to Venture Supply in China cannot conceivably be considered a sale in Virginia.   Moreover, even if Venture Supply's single shipment of drywall to Virginia is taken into account, it does not establish that TG purposefully availed itself of the benefits and protections of the State of Virginia.   *See Nicastro*, 131 S. Ct. at 2792 ("And the Court, in

---

[48] Herman Aff. Ex. 77.

[49] Herman Aff. Ex. 79.

[50] *See* Spano Decl. Ex. 18.

[51] Germano PSC Opp. Br. at 11-13.

[52] Herman Aff. Ex. 72 ("Porter Tr.") 67:6-9; Peng Tr. 519:19-520:12.

[53] Porter Tr. 230:18-22; Peng Tr. 521:2-522:11.

[54] Plaintiffs contradict themselves.   In their brief, they argue that TG separately contracted for, invoiced and sold plywood pallets of drywall to Venture Supply on two separate occasions.   Germano PSC Opp. Br. at 11.   However, in their Global SOF, Plaintiffs argue that "Taishan," incident to assisting customers with shipping arrangements, "included wooden pallets and hanging belts for the shipping . . . ."   PSC Global SOF at 24.

separate opinions, has strongly suggested that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce fully aware (and hoping) that such a sale would take place.")  (Breyer, J., concurring)

<u>TG Did Not Use Venture Supply As A Distributor</u>.

Plaintiffs allege that "Taishan also contracted with Venture Supply Company in Virginia to sell Taishan's products in Virginia and nationwide."[55]  The two Venture Supply purchase agreements provided for the purchase and delivery of drywall in China, and nothing more. Venture Supply initiated communications with TG expressing its desire to become TG's U.S. distributor.[56]   TG never appointed Venture Supply to serve as a distributor and Venture Supply never distributed any drywall in Virginia or anywhere else in the U.S. on TG's behalf.  Moreover, TG's refusal to sell drywall to another potential customer certainly does not prove that Venture Supply was TG's distributor.[57]  Venture Supply's communications regarding a hoped-for U.S. distributorship that never came to pass do not evidence any purposeful conduct by TG directed toward Virginia.

<u>TG Did Not Sell Drywall To Any Other U.S. Company</u>.

Plaintiffs allege further that "Taishan" sold drywall to Devon International, a U.S. company with offices in China, and that the drywall Devon International purchased was shipped to Pensacola, Florida.   Plaintiffs allege that Robert Scharf of Devon International visited "Taishan's" factory.  These assertions seriously mischaracterize the facts, and are not supported

---

[55]PSC Global MOL at 2.

[56]*See, e.g.,* Herman Aff. Ex. 74 ("[T]hey have asked me to approach you with the idea of becoming the exclusive distributor of the Shandong Taihe Dongxin Co., Ltd. in the U.S.A.").

[57]Herman Aff. Ex. 76.

by admissible evidence.  Plaintiffs rely on hearsay testimony from a case in Alabama in which neither TG nor TTP was a party.[58]  The Taishan Defendants are not even mentioned in the deposition testimony that Plaintiffs rely upon.  In fact, neither company sold drywall to Devon International.  TTP sold drywall to a Chinese trading company, Shanghai Yuyuan Market Import & Export Co. Ltd. ("Shanghai Yuyuan"), in China.[59]  Shanghai Yuyuan instructed TTP to put "Devon" on the packaging of the drywall.  Shanghai Yuyuan picked up the drywall at TTP's factory.  TTP did not sell the drywall to Devon International or ship it to the U.S.  TTP had no further involvement with the drywall once it was picked up from the factory.  There remains no evidence that TG sold drywall to any U.S. customer besides Venture Supply.[60]

Plaintiffs argue that "Taishan's intention to sell more drywall in the United States" is a sufficient reason to deny TG's motion.[61]  This contention is factually inaccurate and legally insufficient and inconsistent with their concession that Due Process requires purposeful availment of a particular forum State through conduct directed at that State.[62]  The evidence relied upon by Plaintiffs shows at most a willingness on the part of TG or TTP to sell drywall in China to U.S. companies that came to China.  Furthermore, even if Plaintiffs had shown TG

---

[58]Herman Aff. ¶¶ 89-91.

[59]*See* Spano Reply Decl. Ex. 25, which is a copy of the Purchase Agreement between TTP and Shanghai Yuyuan for drywall marked with the "Devon" logo.  *See also* Herman Aff. Ex. 19 ("TTP's MPF") Entry Nos. 12-14.

[60]Perry claimed he met other U.S. customers of TG when he toured the factory, but his statements are inadmissible hearsay, and not supported by any other testimony or documents.  *See, e.g.*, Herman Aff. Ex.116, which is an email from Perry to Porter, dated 11/28/05 to Perry (claiming to have met "another American from Texas at the factory. He said that he was from the HGC company.").

Although the distributor profile forms filed by Florida-based Banner Supply Inc. and certain of its affiliates (collectively "Banner") state that "it appears" Banner received drywall manufactured by TG, there is no evidence that TG sold any drywall to Banner.  Rather, Venture Supply allegedly sold some of the drywall it purchased from TG to Banner.  Porter Tr. 139:22-140:2.

[61]PSC Global MOL at 4.

[62]PSC Global MOL at 7-8.

intended to sell more drywall to U.S. customers, under *Nicastro* it would be inadequate to establish that TG purposefully availed itself of Virginia. Such facts "may reveal an intent to serve the U.S. market, but they do not show that [a foreign defendant] purposefully availed itself of the [forum State] market." 131 S. Ct. at 2790.[63]

> **b. TG's Alleged Awareness That Drywall Might Be Re-Sold In Virginia Is Not Sufficient To Show That It Purposefully Availed Itself Of The Privilege Of Conducting Activities Within The State Of Virginia.**

Plaintiffs allege that "Taishan was actually aware, beyond a theoretical foreseeability, that its products would enter Virginia, Florida and Louisiana."[64] That assertion is legally insufficient and factually inaccurate.

As shown above, a majority of the Supreme Court in *Nicastro* rejected arguments that a defendant who introduced its products into the stream of commerce could be subject to personal jurisdiction merely because it "knew or reasonably should have known" its product <u>might</u> be re-sold in the forum State. Plaintiffs' argument fails for the same reason that the New Jersey Supreme Court's holding in *Nicastro* was incorrect.

---

[63] The Fifth Circuit cases following a "national market" approach to personal jurisdiction cited by Plaintiffs' have been overruled by *Nicastro*. For example, *Bean Dredging v. Rogers-Olympic Corp.*, 744 F.2d 1081, 1085 (5th Cir. 1984), found a basis for personal jurisdiction in Louisiana over a non-resident component manufacturer merely because it introduced thousands of steel casting into the stream of commerce and made no attempt to limit the states where its products would end up being sold and used. The Court did not require any specific efforts directed toward the forum State as *Nicastro* clearly mandates. *Bean Dredging* in turn relied upon *Oswald v. Scripto*, 616 F.2d 191, 199-200 (5th Cir. 1970), one of the cases which found jurisdiction based on a defendant's having had "every reason to believe its product would be sold to a nation-wide market," again without any evidence of purposeful conduct directed specifically toward the forum State. *Oswald* was relied upon by the <u>dissent</u> in *Nicastro*, 131 S. Ct. at 2805. Plaintiffs are advocating this Court follow the same "national market" approach to personal jurisdiction that was adopted by the New Jersey Supreme Court, urged by the <u>dissent</u> in *Nicastro*, and rejected by a majority of the Supreme Court. 131 S. Ct. at 2801.

[64] PSC Global MOL at 21.

Contrary to the Plaintiffs' arguments,[65] the Supreme Court's suggestion in *World Wide Volkswagen* that purposeful availment may be satisfied when "a corporation that delivers its products into the stream of commerce with the expectation that they <u>will</u> be purchased by consumers in the forum State" (emphasis added) would require more than mere knowledge the product <u>might</u> be used in the State.  Although such an "expectation" that a product <u>will</u> be purchased by consumers in the forum State might be shown by evidence that sales of a defendant's products in the State were not an isolated occurrence but resulted from its purposeful efforts to serve the market in the State, 444 U.S. at 297-98, here there is no evidence that TG expected its drywall to be re-sold in Virginia.  There was no regular flow of TG's drywall into Virginia that resulted from TG's efforts to serve the market in Virginia.  Venture Supply made only one isolated shipment of drywall it purchased from TG in China to Virginia.  To the extent that Venture Supply re-sold any of that drywall in Virginia, those re-sales did not result from any purposeful efforts by TG to serve the market in the State.[66]

To the extent that "awareness" or "foreseeability" of sales in the forum State are relevant to showing whether a defendant purposefully availed itself of a forum State, Plaintiffs have not established either with respect to TG.  The fact that Venture Supply informed TG that at one point it planned to make a single shipment to a port in Virginia does not show TG was aware of

---

[65]PSC Global MOL at 8.

[66]To the extent the "fractured panel" in *Asahi* upheld the *World-Wide Volkswagen* "principle" as Plaintiffs assert, (PSC Global MOL at 10), both the O'Connor and Brennan concurring opinions would require more than mere foreseeability, or even knowledge, of isolated sales of the product in the forum State.  *See* Opening Br. at 22-23; *see also Asahi Metal Indus. Co. Ltd. v. Superior Court*, 480 U.S. 102, 109-111 (1987) (opinion of O'Connor, J.) (expectation for minimum contacts requires "something more" than merely placing a product into the stream of commerce even if the defendant was "awar[e]" that the stream of commerce "may or will sweep the product into the forum State"); *Id.* at 117, 119 (Brennan, J. concurring in part and concurring in judgment) (expectation sufficient for minimum contacts may be found where a sale in forum State is part of "the regular and anticipated flow" of commerce into the State, but not where the sale is only an "edd[y]," *e.g.,* an isolated occurrence)

or foresaw subsequent sales in Virginia.  Plaintiffs also cannot rely upon invoices, packing slips or other documents that reflect nothing more than possible shipment destinations.[67]

### c.   TTP's Contacts With The U.S. Should Not Be Attributed To TG.

In opposition to TG's motion, Plaintiffs do not directly argue that TTP's alleged contacts with the U.S. should be attributed to TG.[68]  However, by incorporating the PSC's Global Memorandum of Law and Facts, Plaintiffs conceivably could be asserting that TTP sold drywall that its purchasers distributed to the U.S. and that these alleged indirect contacts with the U.S. should be attributed to TG because the Court should "pierce the corporate veil between TG and TTP."[69]  As explained above, any contacts with the U.S. as a whole are actually irrelevant to the question whether a court in Virginia has jurisdiction over TG.  Moreover, as explained below, Plaintiffs have failed to prove by a preponderance of the admissible non-hearsay evidence that there are sufficient grounds to disregard TG and TTP's separate corporate personhood and attribute TTP's activities to TG for the purpose of asserting personal jurisdiction over TG.[70]

TTP's Separate Corporate Personhood Must Be Respected Under Chinese Law.

Plaintiffs concede that Chinese corporate law (*Gongsi Fa*, or "Company Law") applies to the question of whether TG and TTP should be treated independently.[71]  Plaintiffs have

---

[67] The fact that TG heard months or years after the sale that the drywall had been received in Virginia is not relevant to showing whether it acted purposefully toward Virginia at the time of the sale. *See* Herman Aff. Ex. 69.

[68] *See* PSC Germano Opp. Br.

[69] *See, e.g.,* PSC Global MOL at 1 (asserting that "Taishan" targeted the United States generally, and Virginia, Florida and Louisiana, in particular for sales of its Chinese drywall, knowing that the drywall would be used to build homes).  *See also* PSC Global MOL at 35.

[70] TG submits in further support of this motion the accompanying Declaration of Zhu Yan, dated March 30, 2012 ("Zhu Decl.") and Professor Zhu's Reply Declaration, dated June 4, 2012 ("Zhu Reply Decl.")

[71] PSC Global MOL at 27.

submitted the opinions of three Chinese attorneys who assert that certain facts that Plaintiffs selected for them and told them to consider as true provide a basis for disregarding the separate legal personhood of TG and TTP. These opinions are far outside the realm of what a legal expert may present to the Court. *See, e.g.,* 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2444 (3d ed. 2008) ("The purpose of an expert witness in foreign law is to aid the court in determining the content of the applicable foreign law, not to apply the law to the facts of the case.").[72] Even more crucial is that, as shown below, this conclusion is based on a highly flawed interpretation of Chinese law that contravenes both its letter and spirit. Understood correctly, Company Law provides no basis for attributing TTP's acts to TG and instead requires that TG's liability be limited to acts that it conducted itself.

Chinese Law Overview

In China, the principle of limited liability for shareholders is recognized as the "key to the long-term success of the system of corporation."[73] Thus, the concept of limited liability is the starting point and foundation of Company Law.[74] The general rule of shareholder limited liability is firmly articulated in Article 3, which "provides that company shareholders are liable to the company only to the extent of the shares they subscribed for."[75] However, two Articles which were adopted in a 2005 revisions to Company Law, provide special exceptions to Article

---

[72]*See also Minebea Co., Ltd. v. Papst*, 444 F. Supp. 2d 68, 182 (D. D.C. 2006) (purpose of expert testimony is to aid the court in determining the content of the applicable foreign law – not to apply it to the facts of the case and make ultimate legal conclusions); *Gibson v. Credit Suisse AG*, No. CV 10-1-EJL-REB, 2010 WL 1904773, at *2 n.4 (D. Idaho May 11, 2010) (expert affidavit on foreign Bahamian law is permissible, "but only to the extent of discussing Bahamian standards, not legal conclusions").

[73]Liu Decl. ¶ 44.

[74]Zhu Reply Decl. ¶ 3.

[75]Zhu Reply Decl. ¶ 6 and Ex. C.

3.[76]   Article 20, which applies generally to all corporations, provides that a corporation's separateness may be disregarded if a creditor proves that the shareholders seriously injured the creditor by abusing the corporate separateness for the purpose of evading debt.[77]   Article 64, which applies only to corporations with one shareholder, provides that corporate separateness may be disregarded if a sole shareholder is unable to show that his own property is separate from that of the company.[78]   If the sole shareholder makes this initial showing, it will retain its corporate separateness unless the creditor proves that Article 20 applies.[79]

Chinese courts are cautious in applying these new provisions out of concern they be used to undermine the "cornerstone" of Chinese corporate law, *i.e.* limited liability.[80]   For example, the Legislative Affairs Committee of the Standing Committee of the National Peoples' Congress, a body that coordinated drafting the Company Law, has emphasized that courts should "err on the side of caution" when straying from the general rule of limited liability.[81]   Indeed, Plaintiffs' own legal expert, Professor Liu Junhain, has explicitly intoned that "[c]ourts and arbitration organizations should be extremely careful when deciding whether or not to disregard the legal personality of a company.   If the issue at hand lies in the gray areas of legal practice – especially when the legal personality of a company can either be disregarded or not – then the legal

---

[76]*Id.* ¶¶ 7, 13.

[77]*Id.* ¶ 7.

[78]*Id.* ¶ 13.

[79]*Id.* ¶¶ 14, 24.

[80]*Id.* ¶ 4.

[81]*Id.*

personality should decidedly not be disregarded."[82]  Accordingly, Chinese courts will rarely, if ever, disregard corporate separateness under either Article unless it is clear that the corporate form has been intentionally and maliciously abused by a shareholder to evade company debts and such abuse caused serious harm to company creditors.[83]  Although Plaintiffs assert otherwise, this limitation is recognized by leading Chinese scholars and legislative bodies[84] and, in fact, Professor Liu himself has often commented that malice should be present if a company's corporate separateness is disregarded.[85]

<u>Plaintiffs Misinterpret And Misapply Company Law</u>.

According to Plaintiffs, Article 64 is the equivalent of Article 20, except that the sole shareholder has the burden of proof.[86] As stated by one of their experts:

> Article 20(3) requires plaintiffs to bear the burden of proof when attempting to establish that the shareholder shall be held jointly and severally liable for the debts of the shareholder's company. Article 64, however, adopts a presumption of abuse of the independent status of a one-person limited liability company; thus reversing the burden of proof and requiring the shareholder to prove that it should not assume joint and several liability . . . .[87]

According to Plaintiffs, an analysis under Article 64 is the same as one under Article 20 and, to have limited liability, the shareholder must establish there has been absolutely no abuse

---

[82]Zhu Reply Decl. ¶ 4 (quoting Professor Liu).

[83]*Id.* ¶¶ 16-20.

[84] *See Id.* Decl. ¶¶ 16-18

[85]*Id.* ¶ 18.

[86]PSC Global MOL at 30.

[87]Cheng Decl. ¶ 19.

of the corporate form.[88]   While Plaintiffs do not directly address the fact that Article 64 does not even mention the term "abuse," Plaintiffs do assert that the term "property" in Article 64 is so broad as to include such things as control, business relationships, operations, governance and leadership.   Based on this logic, a shareholder can only establish that its "property," as used in Article 64, is separate by proving a lack of any abuse of corporate form and by proving it adhered to "the principle of honesty, integrity or public policy."[89]   Using this reading of Article 64, Plaintiffs then argue that TG's independence from TTP may be disregarded – regardless of whether there has been any initial showing of shareholder abuse, intention to evade debt, or creditor injury – because TG has not proved all aspects of its corporate separateness.[90]

Plaintiffs' argument is based on a gross misinterpretation of Chinese law.   First, before Article 64 becomes relevant, activating any burden articulated therein, there must be a showing that Article 20's rule of limited liability no longer applies, *i.e.*, there must be some showing of abuse by the shareholder to the creditor's detriment.[91]

Second, Plaintiffs' assertion that Article 64 is the equivalent of Article 20 (but for the bearer of the burden of proof) disregards the very different language in the two Articles.[92]   Both Articles address when a shareholder may be subject to joint and several liability.   However, Article 64 applies "where the sole shareholder of a one-person limited liability company 'is unable to prove that the corporate <u>property</u> are [sic] independent from the single shareholder's

---

[88] PSC Global MOL at 27.

[89] *Id.*

[90] *Id.* at 29-30.

[91] Zhu Reply Decl. ¶ 27.

[92] *Id.* ¶¶ 32-33.

own.'"[93]   Article 20 is much broader and applies "[w]here shareholders of a corporation abuse the corporate independent status . . . for the purpose of escaping debts, and seriously injure[ ] the interests of the creditors of the corporation."[94]   On its face, Article 64 deals with the narrow issue of independence of shareholder property, whereas Article 20, on its face, deals with the broader issues of abuse and independence of personhood.

Third, Plaintiffs' interpretation of Article 64 is at odds with its own acknowledgement that Article 64 supplements, not replaces, Article 20.[95]   If Article 64 placed a burden on the sole shareholder to establish every element relevant to an analysis under Article 20, however, Article 20 would have no relevance in the case of the sole shareholder:  if the shareholder did not satisfy his burden under Article 64, the corporate veil would be pierced and Article 20 would be irrelevant.[96]   Thus, Plaintiffs' interpretation of Article 64 necessarily reads Article 20 out of Company Law as applied to sole shareholders.[97]   This cannot be the intent of the rule.[98]

Fourth, Plaintiffs are wrong that "property" in Article 64 should be construed as meaning conduct such as governance, control and relationships.[99]   Nothing in the Company Law, Chinese legal commentary, or the Chinese language, supports a definition so broad.[100]   The idea that corporate separateness can be disregarded because the shareholder's and company's control,

---

[93] *Id.* ¶ 7.

[94] *Id.* ¶ 33.

[95] *See* PSC Global MOL at 30.

[96] Zhu Reply Decl. ¶ 34.

[97] *Id.*

[98] *Id.*

[99] *Id.* ¶¶ 28-30.

[100] *Id.* ¶ 28.

leadership and governance overlap is particularly absurd given that certain Company Law specifically authorizes the shareholder of a single person to have a high level of control over the company.[101]   Instead, the reasonable definition of "property" is something owned, *i.e.* possessions of either the shareholder or the corporation such as the company's headquarters, offices, separate financial accounts and supplies.[102]   This definition is consistent with the term's plain meaning in Chinese, with Chinese legal commentary, and with other Company Law provisions.[103]

Thus, properly understood, Article 64 is satisfied through an initial showing of independent property (sufficient contribution of company assets independent from the shareholder, independent headquarters, separate offices, separate employees, etc.) and if this showing is made, the creditor must satisfy its burden of establishing that Article 20 applies.[104]

TG Has Established That Its Property Is Separate From That Of TTP

The evidence shows TG's property is separate from that of TTP.  TG and TTP had their own separate production facilities, factories, warehouses, supplies, equipment, computers and bank accounts.[105]   Plaintiffs do not refute any of these facts.  Furthermore, Plaintiffs concede that TG's financial reports were separate from TTP's.[106]   In fact, Plaintiffs' sole assertion related

---

[101] *See id.* ¶¶ 10-11, 31.

[102] *Id.* ¶ 29.

[103] *Id.* ¶¶ 28-30.

[104] *Id.* ¶¶ 14, 36.

[105] Jia Tr. 170:14-171:9; 175:7-9, 648:9-17, Def's Exs. 40A, 43A; Herman Aff. Ex. 110 ("Shiliang Tr.") at 118:21-119:15; Spano Decl. Ex. 4 ("Zhang Tr.") at 110:13-111:10, 126:21-127:7.

[106] In its analysis of Article 64, Plaintiffs focus on what TTP can establish, for example: "Taishan makes no assertion that TTP's board of directors . . . ever met at all" and "the only financial records from TTP that were produced were very short, annual summaries."  *See, e.g.,* PSC Global MOL at 31-32.  However, what TTP can or

to property is that some former TG sales employees kept their phone numbers when they began working for TTP and that this indicates that TG and TTP shared offices.[107]   Not only is this statement nonsensical (phone numbers have not been tied to a physical location for years), but it does not rebut the other evidence in the record showing TG and TTP kept separate offices[108] and it certainly does not outweigh all of the other evidence that TG's property was separate from TTP.[109]   All of Plaintiffs' other Article 64 arguments relate to other elements of corporate separateness, such as operation, control and governance.[110]   But, as explained above, such factors are only relevant to an inquiry under Article 20, not Article 64, and are Plaintiffs' burden to establish.

<u>Plaintiffs Cannot Satisfy Their Burden Of Proving That Disregarding TG's Corporate Independence Is Authorized Under Article 20</u>.

Plaintiffs have failed to establish that TG's independent personhood should be disregarded under Article 20.   Article 20 requires proof of three elements: (1) the shareholder abused its corporate form; (2) this abuse was conducted to evade the payment of its debts; and (3) the abuse caused severe injury to the creditor.[111]   Plaintiffs disregard the second and third elements, and their support for the first is grossly insufficient.

---

cannot establish is irrelevant to an Article 64 analysis: Article 64 provides that the <u>shareholder</u>, not the company, show that its property is independent.  Notably, Plaintiffs concede that TG's financial reports were separate from TTP's and that it held regular board meetings.  *Id.*

[107]PSC Global SOF at 68.

[108]Shiliang Tr. 118:21-24; Jia Tr. 171:7-9, 647:21-23; Peng Tr. 70:17-20; Zhang Tr. 126:21-127:7, 139:9-140:4.

[109]Notably, even if there was minimal use of one entity's property by the other, such use would not necessarily constitute a basis to disregard corporate separateness. Company Law is not so severe as to absolutely prohibit any sharing or use of assets between shareholder and company – whether use of one entity's property by another constitutes abuse may be a question of type and degree of use.  Zhu Reply Decl. ¶ 51.

[110]*See* PSC Global MOL at 32-33.

[111]Zhu Reply Decl. ¶ 7.

Trademarks

Plaintiffs state that evidence related to TTP's alleged use of TG's Taishan and DUN trademarks is "the strongest evidence that [it] has to show that TG and TTP were the same".[112] Plaintiffs do not dispute that TTP's use of the Taishan trademark was done pursuant to a valid license.[113]  Rather, Plaintiffs quibble with the license's terms and assert that because the license did not require TTP to pay a monetary fee to TG and because the authorization for use was not narrowly limited, the license establishes that TG abused its corporate form.[114]  However, there is no suggestion that the license was unfair to TG, TTP or any third party.  And while TTP may not have paid TG a monetary fee pursuant to the license, TG was compensated by other means, such as benefiting from increased brand exposure.[115]  Under Chinese law, a subsidiary's use of its parent's marks do not constitute abuse of the corporate form. Indeed, it is barely, if at all, material in an analysis on whether to disregard corporate separateness.[116]  Moreover, Plaintiffs have established nothing untoward in TTP's licensed use of TG's trademarks.[117]  That this is Plaintiffs' "strongest evidence" on this point speaks volumes.

---

[112] PSC Global MOL at 33.

[113] Jia Tr. 175:10-20, 445:8-448:15, 661:8-21, Def's Ex. 41A; Zhang Tr. 149:4-9; PSC Global MOL at 33.

[114] PSC Global MOL at 33.

[115] PSC Global MOL at 33.

[116] Zhu Reply Decl. ¶ 50.

[117] As for TTP's allegedly unauthorized use of the DUN mark, this occurred out of a misunderstanding by TTP's sales employee.  Jia Tr. 805:1-4.  It is not unusual for subsidiaries to have permission to use a parent's trademarks. When OTC asked TTP to put the DUN mark on certain drywall, Bill Che acquiesced without confirming that TTP was permitted to do so.  Jia Tr. 805:7-12.  TG management was not aware of this agreement.  *Id.*  In short, this was a simple mistake on the part of the salesman.  It does not indicate an intention to evade debt nor does it indicate that TTP and TG were the same entity.

<u>TG And TTP Operated Separately And TG Exercised An Acceptable Level Of Control Over TTP</u>.

The evidence clearly establishes that TG did not exert improper control over TTP.  TTP maintained operational independence from TG.  Peng Shiliang was responsible for the everyday operations of TTP.[118]  He, not the Board of Directors, had the right to hire and fire employees in his role as general manager.[119]  The department managers of TTP reported to Peng Shiliang,[120] and in his capacity as general manager he did not report to TG's executives.[121]  About once per month, TTP sent a written report to Jia's office.[122]  When necessary, TTP's directors would verbally communicate with Jia.[123]  The reports would provide the specifics of production and the volume of sales, but they did not provide information regarding the identity of customers.[124]  TG and TTP had no cost-sharing agreements.  Instead, "[w]hen TG provide[s] assistance or help to TTP, TTP has to pay a fee to TG."[125]

While TG was involved in some high-level aspects of TTP's governance, the record shows that TTP's own general manger exercised authority over TTP's daily operations, not TG, and TTP had its own bank accounts, financial department and quality control departments.[126]

---

[118] *See* Shiliang Tr. 24:20-25:11.

[119] Fu Tr. 115:18-116:4; Jia Tr. 210:6-17.

[120] *See* Shiliang Tr. 26:1-27:6.

[121] *See* Shiliang Tr. 25:19-24.

[122] *See* Jia Tr. 131:18-132:16.

[123] *Id.*

[124] *See* Jia Tr. 443:18-444:5; *see also* Jia Tr. 133:17-19.

[125] *See* Zhang Tr. 113:11-114:6.

[126] Shiliang Tr. 119:11-15; Zhang Tr. 138:13-139:7.

Nevertheless, Plaintiffs argue that the operation of TG and TTP was not separate by alleging that (1) there is insufficient evidence that TTP's Board of Directors met regularly or made high-level decisions; and (2) "TTP's leadership simply came from TG."[127]   Neither allegation evidences that TG abused its corporate form.  Plaintiffs offer no explanation as to how an alleged failure to hold regular board meetings or TG's high-level decision-making constitutes TG's abuse of the corporate form under Chinese Law, <u>especially</u> when Company Law explicitly provides that a single shareholder company need not even have a board of directors and authorizes a sole shareholder to have powers above those permissible for other types of shareholders.[128]

TG And TTP Did Not Settle One Another's Disputes.

Plaintiffs incorrectly argue that "TTP resolved disputes with TG's customers and accepted sales that had begun under TG."[129]   This is yet another mischaracterization of the facts, not supported by admissible evidence.  There are two disputes to which Plaintiffs refer, one with Guardian, and another with Oriental Trading.  Neither indicate abuse of the corporate form.  In the Guardian dispute, Guardian threatened suit against both TG and TTP.  Plaintiffs rely upon the testimony of a Guardian witness that a settlement meeting was attended by a person who described himself as the "General Manager" and was described by the Guardian witness as being 6'2" or 6'3" and 240 lbs., whom the witness believed to be Mr. Jia.  Yet, as the Court knows from attending the depositions in Hong Kong in 2012, the description given does not fit Jia, but does fit Peng Shiliang, who in fact was TTP's General Manager.  Furthermore, whether TG was

---

[127] PSC Global Opp. Br. 31-32.

[128] Zhu Reply Decl. ¶ 10 and n. 11 (citing Art. 38, (CC)).

[129] PSC Global MOL at 34.

or was not involved in settlement discussions, Plaintiffs do not dispute that TTP ultimately was the settling party.[130]

The second dispute relates to Oriental Trading's effort to retrieve a deposit of $100,000 it placed with TTP.  A TTP employee began facilitating Oriental Trading's efforts to obtain a refund in 2007.  In 2008, after TTP had transferred all of its assets to TG, presumably even including this deposit, the deposit was refunded.  There is <u>no evidence</u> that this employee was acting on behalf of TG in connection with the return of the deposit that Oriental Trading had given to TTP or that TG expended any of its own assets in refunding the deposit.

<u>Plaintiffs Provide No Other Reasons To Disregard TG's Corporate Separateness</u>.

Plaintiffs' remaining assertions regarding abuse of corporate form are either immaterial, unsupported or contradicted by the record.  Plaintiffs allege that TTP was not adequately capitalized, but concede that TG registered 22 million yuan of capital investments in TTP – far more than what is required under Company Law,[131] and Plaintiffs make no allegation that TTP was required to seek further funds or loans from TG or from any other source to operate its business.  Plaintiffs make the ridiculous argument that TG abused its corporate form when it raised TTP's rent.[132]  The fact that TG and TTP's financial statements do not itemize specific cash payments made between TG and TTP for equipment, sales and repurchases does not mean that the transactions were not legitimate arms-length transactions.  In fact, in 2006, TTP reported

---

[130]PSC Global SOF at 59.

[131]*See* Zhu Reply Decl.  ¶ 11 (noting that, under Article 59 of Company law, the minimum registered capital of a single-person company is RMB 100,000).

[132]PSC Global MOL at 33.

cash payments for fixed assets of 34,380,888.25 yuan.  TTP also reported over 32 million yuan in liabilities, including over 3 million yuan in accounts payable in 2006.[133]

Plaintiffs' other assertions made in support of its Article 20 argument are also easily dismissed.  Plaintiffs argue that "TTP was the foreign sales desk of TG during the time it needed to issue VAT invoices,"[134] but this is just another way of saying that TTP fulfilled its corporate function, in accordance with the purpose for which it was created.  The fact that a few salesmen familiar with international sales for export transferred from TG to TTP on a voluntary basis is consistent with, and does not undermine, TTP's corporate separateness.  And aside from superficialities such as retaining TG's corporate address on their e-mail signatures, the transferred employees' selling efforts were exclusively on behalf of TTP.

Plaintiffs' assertion that TTP used TG's marketing materials simply reflects that TG, like most parent companies, described all of the products and services offered by the companies within its corporate family.  This too was not an abuse of the corporate form.[135]  Plaintiffs cannot establish that the two entities comingled funds – Plaintiffs concede that both TG and TTP prepared separate financial statements and Plaintiffs put forth no evidence proving that the content of the statements are inaccurate.[136]  And while Plaintiffs make much of the fact that certain TG employees left TG to work at TTP, Plaintiffs cannot establish that the entities actually

---

[133]Herman Aff. Ex. 176 (Jia Tr. Def's Ex. 45A).

[134]PSC Global MOL at 33.

[135]Plaintiffs argue that "from the customer's perspective, there was no TTP"; however, this assertion is not supported by admissible evidence. *See* PSC Global MOL at 34.  Moreover, the claim is untrue.  Every single sales invoice to a U.S. customer following the formation of TTP was in the name of TTP, not TG, and the customers paid TTP for the drywall they purchased, not TG.  They knew precisely who they were buying from.

[136]*See also* Mitchell Opening Br. at 10 (providing evidence that TTP had its own bank accounts and financial department and that TG never loaned TTP money).

shared any employees.[137]  Plaintiffs' effort to attach significance to their allegation that TG and TTP used the same accounting firm also fails.[138]  Chinese corporate law contains no prohibition against related entities using the same accountant, nor is use of a common accountant improper or indicative of abuse of the corporate form or otherwise. [139]

>   Plaintiffs Have Not Shown Malicious Intention.

Even if Plaintiffs could satisfy their burden of proof and establish that TG evaded the payment of its debts by abusing its independent status and, as a result, seriously damaged a creditor's interest, a Chinese court would <u>not</u> disregard TG's separate corporate existence because Plaintiffs have made no showing that TG created TTP to intentionally and maliciously harm its creditors.  The evidence establishes that TG formed TTP for a valid business purpose – not out of a malicious intent to evade its creditors.[140] TTP ceased operating at the end of 2008 "for the consideration of economic interests" because fewer customers required VAT invoices, before it had any creditors who based their claims on allegedly defective drywall.[141]  Therefore, in China, TG and TTP would be recognized as the distinct entities that they are.

>   TTP's Separate Corporate Personhood Would Also Be Respected Under Virginia Law.

---

[137]PSC Global SOF at 52.  *See also* Opening Br. at 11 (providing evidence that TTP hired 260 employees, none of whom were shared with TG).

[138]*See* PSC Global SOF at 70.

[139]Zhu Reply Decl. ¶ 45.

[140]Mitchell Opening Br. at 8 ("The Chinese tax bureau advised TG in 2005 that TG had to establish a totally independent company if it wanted to issue VAT invoices to its customers.  As a result, TG established TTP.").

[141]Zhang Tr. 151:16-19, 155:3-5.

TG agrees with Plaintiffs that Chinese law should govern the question of whether to impute the contacts of TTP to TG for purposes of personal jurisdiction.[142]   However, although the Fourth Circuit apparently has not addressed the issue, the Eastern District of Virginia has held that this type of question should be determined based on Virginia law.  *See Int'l BanCorp LLC v. Societe Des Baines*, 192 F. Supp. 2d 467, 477 n.18 (E.D. Va. 2002).   This ruling is questionable, insofar as it cites no Virginia authority, and is inconsistent with the choice of law rule in Virginia that "the law of the state of incorporation . . . determine[s] whether the corporate veil may be pierced."  *Jones v. Bank of Am., Corp.*, No. 4:09cv162, 2010 WL 6605789, at *10 (E.D. Va. Aug. 24, 2010) (quoting *Guest Servs. Co. v. Delia Ratta*, No. 101281, 1991 WL 835131, at *4 (Va. Cir. Ct. Aug. 14, 1991)); *C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 359 F. Supp. 2d 497, 501 n.6 (E.D. Va. 2005); *Morrow v. Vaughan-Bassett Furniture Co.*, 4 S.E.2d 399 (Va. 1939).

---

[142]PSC Global MOL at 26.

In the event this Court finds that Virginia law should govern the veil piercing issue, Virginia law also requires that the separate corporate personhood of TG and TTP be maintained. Under Virginia law, to pierce the corporate veil, the proponent of piercing must demonstrate that "the corporation was a device or sham used to disguise wrongs, obscure fraud, or conceal crime." *Cheatle v. Rudd's Swimming Pool Supply Co.,* 360 S.E.2d 828, 831 (Va. 1987).  In this case, Plaintiffs have offered no admissible evidence that TG created TTP or used it merely to disguise a wrong, obscure fraud, or conceal crime.

### d.    Even If TTP's Contacts Were Attributed To TG, TTP Did Not Have Minimum Contacts With Virginia.

Even if TTP's activities could be attributed to TG for jurisdictional purposes, Plaintiffs do not offer evidence of any conduct by TTP (either individually or even if considered in combination with TG) that would satisfy the requirements of the Virginia long-arm statute and Due Process.  There is no evidence TTP sold drywall to anyone from Virginia or shipped any drywall to the State.  Nor is there any evidence that any of TTP's customers in China re-sold in Virginia any drywall they purchased from TTP.

### e.    No Upstream Entities' Activities Should Be Attributed To TG.

Plaintiffs have represented that they did not intend to assert a theory of personal jurisdiction involving imputing the contacts of any Upstream Entity to TG or TTP. [143] Nevertheless, Plaintiffs boldly try to "preserve" the issue even though they conducted jurisdictional discovery for more than 18 months, including discovery from the Taishan Defendants concerning their relationship with the Upstream Entities.  Plaintiffs do not identify <u>any</u> facts suggesting that further discovery would provide them with a basis for attributing an

---

[143] *See* Herman Aff. Exs. 148, 149, which are copies of email correspondence between the PSC and TG's local counsel.

Upstream Entity's activities in Virginia to TG.  Furthermore, prior to agreeing to a briefing schedule for the Taishan Defendants' jurisdictional motions, Plaintiffs represented to the Court that they had completed discovery concerning personal jurisdiction.[144]  For all these reasons, the Court should deny Plaintiffs' request to re-open jurisdictional discovery with respect to any Upstream Entity.[145]

## 2. Plaintiffs Have Not Established That Their Causes Of Action Arose Out Of Or Resulted From TG's Contacts With Virginia.

Each of the Plaintiffs has failed to meet his or her burden of proving by a preponderance of the admissible non-hearsay evidence that his or her causes of action arose out of or resulted from TG's contacts with Virginia.  Each of the Plaintiffs has failed to offer any evidence that he or she was injured by TG's products.  There is absolutely no evidence whatsoever that the drywall Plaintiffs claim is in their homes is traceable to drywall Venture Supply purchased from TG in China and then shipped to Virginia.  Indeed, the evidence suggests Venture Supply sold some of that drywall to Banner in Florida and disposed of a substantial portion of the rest of it in a landfill.[146]

In the context of this evidentiary hearing, Plaintiffs may not rely on unsupported conclusory allegations contained in the Complaint or elsewhere.  Plaintiffs also fail to satisfy their burden of proof by referring to findings of fact or evidence introduced at the default hearing

---

[144] *See* Transcript of Monthly Status Conference, Feb. 23, 2012 at 12:23-13:4 ("The parties are completing their discovery on the jurisdictional aspect of the case.  I think the plaintiffs had maybe one or two witnesses on the west coast that they're going to be deposing.  I've given them the schedule for briefing, and I would intend to have oral argument on that motion in June, middle of June.").

[145] Plaintiffs also assert they have been unable to obtain discovery concerning the "Luneng mine."  PSC Global SOF 88-90.  Plaintiffs admit that TG did not own this mine, and Plaintiffs do not assert that any Upstream Entity had any involvement with the mine.  Accordingly, further discovery concerning mines would also not be relevant to the question of personal jurisdiction over TG.  *See* Evidentiary Objections, Obj. No. 40.

[146] A true and correct copy of Venture Supply's Profile Form is annexed to the Spano Reply Decl. as Exhibit 26.

not otherwise admissible in this evidentiary hearing.  *See Jackson v. FIE Corp.*, 302 F.3d 515, 531 (5th Cir. 2002) (jurisdictional allegations and factual findings that supported default judgment not entitled to preclusive effect in context of motion to vacate default based upon lack of personal jurisdiction).  To permit Plaintiffs to rely upon facts found by default would amount to a denial of Due Process.  *See Jackson*, 302 F.3d at 529-530 (*res judicata* effect of default judgment must yield to Rule 60(b)(4) and Due Process concern for protecting ability of party to contest personal jurisdiction).

Consequently, for this reason alone, the Court should dismiss each Plaintiff's claims for lack of specific personal jurisdiction.

### 3.    The Exercise Of Jurisdiction Over TG Would Offend Traditional Notions Of Fair Play And Substantial Justice.

Plaintiffs concede that litigating Plaintiffs' claims in this Court would impose an enormous burden on TG.  This factor is particularly compelling in this case, where TG specifically sought protection under the legal rules regarding international commerce by entering into contracts that provided for "FOB" sales in China subject to arbitration in China.  As the Supreme Court held in *Asahi*, "even apart from the question of the placement of goods in the stream of commerce . . . [t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."  480 U.S. at 114.[147]

TG also has shown that the other factors for consideration – the interests of the forum State, the interests of Plaintiffs and the judicial system's interest in efficient resolution of controversies – tilt against asserting jurisdiction over TG.  The interests of Plaintiffs and

---

[147] All of the Justices concurred in this portion of Justice O'Connor's opinion.

Virginia's interest in providing its residents with a forum to adjudicate their drywall-related claims in a timely and efficient manner would be served by the Virginia courts adjudicating the numerous drywall-related claims Plaintiffs have made against domestic parties that, unlike TG, actually supplied, distributed or installed drywall in Virginia. That would be a much more efficient way for Plaintiffs to obtain relief without the unfairness and complexity of dragging TG into this litigation from China.

Plaintiffs also do not address, and thus concede, the fifth factor, the shared interest of the "several states." In cases involving a foreign defendant, this factor "calls for a court to consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction" by the Court. *Asahi,* 480 U.S. at 115 (emphasis in original). TG has demonstrated considerations of international comity between the U.S. and China do not favor the exercise of jurisdiction over TG under these circumstances.[148]

For all of the foregoing reasons, the exercise of personal jurisdiction in this case would not be reasonable, even if the Court found TG had minimum contacts with Virginia. *See Asahi*, 480 U.S. at 121-22. ("[T]his case fits within the rule that 'minimum requirements inherent in the concept of fair play and substantial justice may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities.'") (Stevens, J. concurring in part and concurring in the judgment) (quoting *Burger King,* 471 U.S. at 477-78, internal quotation omitted).

---

[148] *See* Opening Br. at 42-44.

## II.   THE DEFAULT JUDGMENT MUST BE SET ASIDE BECAUSE PLAINTIFFS FAILED TO SERVE THE PLEADINGS UPON WHICH IT WAS BASED.

Plaintiffs attempt to avoid their violation of the federal rules[149] by arguing that the Plaintiff-Intervenors adopted the Second Amended Complaint but not its national class action allegations.[150]  Plaintiffs cite nothing in the record to support this assertion.  Plaintiffs' fallback position that TG was served with Plaintiffs' initial complaint, is unavailing.  Plaintiff-Intervenors were not named in that complaint and obviously could not have obtained a judgment on that pleading, even if they fell within its proposed class.  *See James v. Claiborne*, No. 07-1570, 2009 WL 994951, at *5 (W.D. La. Apr. 13, 2009) (parties desiring to obtain default were required to join action through amendment of complaint prior to entry of default in favor of named plaintiffs).  Contrary to Plaintiffs' assertion, *James* is not distinguishable on the grounds that it involved an opt-in collective action under the FLSA.  Rather, the Court based its determination on the general requirements Fed. R. Civ. P. 54(c) and 5(a)(2) that a default judgment must not differ in kind from the pleading upon which it is based and any pleading containing new claims must be served on a defaulting party.  *Id.*  Due to Plaintiffs' failure to serve TG, the Court did not obtain personal jurisdiction over TG with respect to the intervenor claims and the Second Amended Complaint.  As a result, the preliminary default and the Judgment was not val*id.*

## III.   THE DEFAULT JUDGMENT SHOULD BE SET ASIDE ON THE GROUNDS OF EXCUSABLE NEGLECT.

It cannot be credibly disputed that TG had a good-faith basis for believing that it was not subject to jurisdiction in Virginia, and that it was not necessary to appear in the proceedings.  TG has satisfied the requirement of showing meritorious defenses, including the absence of product

---

[149] *See* Opening Br. at 45-47.

[150] Germano PSC Opp. Br. at 16 n. 40.

defects and causation of each Plaintiff's alleged injuries[151] and Plaintiffs have offered no proof that they would be prejudiced by having to prove their case on the merits rather than enjoying the victory by default.

## IV. THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE VIRGINIA CONSUMER PROTECTION ACT.

The Judgment did not specify the legal claims upon which it granted relief to the Plaintiff-Intervenors. To the extent it awarded any relief on Virginia Consumer Protection Act Claims, it is invalid and must be set aside.

### CONCLUSION

For all of the foregoing reasons, the Court should vacate the default judgment and dismiss the action against TG.


Dated: June 8, 2012

                                        Respectfully submitted,

                                        Thomas P. Owen Jr.
                                        Joe Cyr
                                        Frank T. Spano
                                        Eric Statman
                                        HOGAN LOVELLS US LLP
                                        875 Third Avenue
                                        New York, New York 10022
                                        Telephone: 212-918-3000
                                        Facsimile: 212-918-3100
                                        Joe.cyr@hoganlovells.com
                                        Frank.spano@hoganlovells.com
                                        Eric.statman@hoganlovells.com

---

[151] Plaintiffs argue that TG "is saddled with the proofs of defect" established at the default hearing. Germano PSC Opp. Br. at 22. However, if a defendant that defaulted could not raise meritorious defenses to facts or issues that were found against it by default, then it would be deprived of any meaningful opportunity to move to vacate its default, in violation of Due Process. Finally, the Court should consider notions of international comity when considering that TG appeared promptly after the default.

51

Richard C. Stanley (La. Bar No. 8487)
Thomas P. Owen, Jr. (La. Bar No. 28181
STANLEY, REUTER, ROSS, THORNTON &
ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: 504-523-1580
Facsimile: 504-524-0069
rcs@stanleyreuter.com
tpo@stanleyreuter.com


**Attorneys for Defendant
Taishan Gypsum Co. Ltd.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Reply Memorandum of Law In Further Support of Taishan Gypsum Co. Ltd.'s Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail and upon all parties by electronically uploading the same to Lexis Nexis File & Serve in accordance with the Pretrial Order No. 6, and that the foregoing was also electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 8th day of June, 2012.

<u>/s/ Thomas P. Owen, Jr.</u>