1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  CHINESE MANUFACTURED        *    Docket 09-MD-2047
             DRYWALL PRODUCTS            *
6            LIABILITY LITIGATION        *    August 30, 2011
                                         *
7    This Document Relates to All Cases  *    10:00 a.m.
     * * * * * * * * * * * * * * * * * * *

8

9

10                DISCOVERY DISPUTE HEARING BEFORE THE
                       HONORABLE ELDON E. FALLON
11                   UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14   For the PSC:                Herman Herman Katz & Cotlar
                                 BY:  LEONARD A DAVIS, ESQ.
15                               820 O'Keefe Avenue
                                 New Orleans, Louisiana 70113
16

17

18                               Levin, Fishbein, Sedran & Berman
                                 BY:  ARNOLD LEVIN, ESQ.
19                               510 Walnut Street
                                 Suite 500
20                               Philadelphia, Pennsylvania 19106

21

22                               Seeger Weiss, LLP
23                               BY:  CHRISTOPHER SEEGER, ESQ.
                                 3301 Bonita Beach Road
24                               Bonita Springs, Florida  34134

25

```
 1    APPEARANCES CONTINUED:

 2    For Banner:                 Weinberg, Wheeler, Hudgins,
                                    Gunn & Dial
 3                                BY:  NICHOLAS PANAYOTOPOULOS, ESQ.
                                  3344 Peachtree Road
 4                                Suite 2400
                                  Atlanta, Georgia  30326
 5

 6

 7    For Venture Supply, Inc     Sinnott, Muckols & Logan, P.C.
      and Porter-Blaine:          BY:  KENNETH F. HARDT, ESQ.
 8                                13811 Village Mill Drive
                                  Midlothian, Virginia  23114
 9

10

11    For Taishan Gypsum          Hogan Lovells, LLP
      and Taishan Plasterboard:   BY:  FRANK T. SPANO, ESQ.
12                                BY:  ERIC STATMAN, ESQ.
                                  875 Third Avenue
13                                New York, New York 10022

14

15
                                  Stanley, Reuter, Ross, Thornton
16                                  & Alford, LLC
                                  BY:  THOMAS P. OWEN, JR., ESQ.
17                                909 Poydras Street
                                  Suite 2500
18                                New Orleans, Louisiana  70112

19

20
      Official Court Reporter:    Jodi Simcox, RMR, FCRR
21                                500 Poydras Street
                                  Room HB-406
22                                New Orleans, Louisiana 70130
                                  (504) 589-7780
23

24    Proceedings recorded by mechanical stenography, transcript

25    produced by computer.
```

1                          <u>PROCEEDINGS</u>

2                        **(August 30, 2011)**

3                             * * * * *

4          **THE DEPUTY CLERK:**  All rise.

5          **THE COURT:**  Be seated, please.

6               Good morning, ladies and gentlemen.

7          **MR. LEVIN:**  Good morning, Your Honor.  Arnold Levin.

8   Len Davis will speak for the PSC.

9          **MR. SEEGER:**  Actually, Your Honor, it's Chris Seeger.

10  I've got a piece of this too.

11         **MR. LEVIN:**  And Chris Seeger has a piece of it, sir.

12         **MR. DAVIS:**  Good morning, Your Honor.  Leonard Davis.

13  I'm here on behalf of the Plaintiff's Steering Committee.  With

14  us on the phone is Arnold Levin; and speaking for the PSC will

15  be Chris Seeger and Patrick Montoya, and myself locally,

16  obviously.

17         **THE COURT:**  From the defendants?

18         **MR. STATMAN:**  Eric Statman from Hogan Lovells, and I

19  have Frank Spano on the phone.  He'll be speaking for Taishan

20  Gypsum as well.

21         **THE COURT:**  Frank, are you there?

22         **MR. SPANO:**  Good morning, Your Honor.  Yes.  I'd

23  like, if you have not been introduced already, to introduce my

24  colleague, Eric Statman.

25               For everyone's information, Eric co-manages the

 1  Taishan Gypsum litigation with me.  He has participated in all
 2  of the meet and confers with the PSC.  He has been the
 3  principal writer of most of our briefs.  So he's well
 4  acquainted with the facts and law; and with Tom Owen's help, my
 5  plan is for him to conduct most of this conference, since I
 6  think it would be more productive having those folks in front
 7  of you and everyone else.
 8             I do, whenever the Court wants to hear from me,
 9  do have some introductory overview-type remarks that I'd like
10  to offer.
11             **THE COURT:**  Okay.  Well, I'll invite you to come in,
12  but if I don't and you need to come in at that time, just break
13  in and we'll hear from you.
14             To put this matter in some context or
15  background, I should say that on June 15th, 2009, the Court was
16  designated as a transferee court for federal cases involving
17  Chinese-manufactured drywall, creating the Multi-District
18  Litigation known as 2047.
19             Since the inception of MDL-2047, numerous cases
20  have been consolidated with the court from various
21  jurisdictions throughout the country.  A number of the cases
22  involve claims against Taishan Gypsum Company, which is called
23  "TG" for our purposes, and other Taishan entities for their
24  alleged role as manufacturers of a certain amount of the
25  Chinese Drywall.

1              The Taishan entities were successfully served

2    through the Hague Convention in certain cases; other cases,

3    service has not been executed; and, also, there are some state

4    court cases filed against the Taishan entities.

5              We proceeded with one trial involving the

6    Taishan entities, *Germano versus Taishan Gypsum*.  Taishan

7    initially failed to make an appearance.  They were properly

8    served.  A default judgment was rendered; and, in due course, a

9    final default was entered awarding damages to the plaintiffs

10   against the Taishan entities.

11             On June the 10th, 2010, the Taishan entities

12   filed a notice of appeal for the default judgment.  This notice

13   was timely filed with the Fifth Circuit.  On September the

14   10th, 2010, the Taishan entities filed a motion to vacate the

15   default judgment and dismiss the action and to seek remand from

16   the Court of Appeal.

17             On October the 1st of 2010, the United States

18   Court of Appeal for the Fifth Circuit issued an order granting

19   an unopposed motion to stay further proceedings until the court

20   has an opportunity to provide an indicative ruling on the

21   motion to vacate.

22             This Court then issued an order, pursuant to

23   62.1, to allow it to proceed with Taishan's motion prior to the

24   determination of the Court of Appeal by the Circuit.  In

25   furtherance of the order, the Court directed the parties to

1    begin written discovery and deposition discovery limited to the

2    issue of personal jurisdiction raised by the Taishan entities.

3           Depositions were set and proceeded in Hong Kong

4    a couple of months back.  I read the transcript of the

5    depositions and I felt that not much, if anything, was

6    accomplished by the depositions other than to give the Court

7    some idea as to the issues involved, and to introduce the Court

8    to the various comments made by the interpreters, who

9    participated vigorously in this particular case.

10          I felt that the depositions needed to be

11   retaken, because I treat these motions as very serious motions.

12   The Taishan entities have a serious motion here.  I'm trying to

13   develop, or have the parties develop, some evidence so that I

14   can look at the evidence and base my decisions on the evidence

15   as opposed to dealing with it without evidence, because then

16   certain prima facie rules come into play.

17          In a case of this sort, I really think it would

18   be more helpful to the litigation and to the litigants to allow

19   the Court to hear some evidence and make a reasoned and

20   thorough opinion, one way or the other, on it.

21          So the depositions are scheduled in Hong Kong

22   for January the 9th, 2012.  I asked the parties to meet and try

23   to deal with some discovery issues, as well as have some

24   agreement on the nature and scope of the depositions, the

25   people to be deposed, who is going to ask questions, and

1   various logistics involved.

2           In the course of their meetings and because of

3   the industry and good faith and professionalism of the parties,

4   they have been able to resolve many issues; but notwithstanding

5   their conscientious efforts, they have been unable to agree on

6   a small number of discovery issues.  So today I have before me

7   some motions on these discovery issues.

8           The motions that I have are:  The motion to

9   compel discovery filed by the plaintiffs in the case; the

10  personal jurisdiction over a foreign defendant, we're dealing

11  with, in this particular matter, some affiliated companies.

12  That seems to be a particular issue that needs to be focused

13  on.

14          Let me hear from the parties as to how you want

15  to handle the motions.

16          **MR. DAVIS:**  Yes, Your Honor.  This is Leonard Davis.

17          Just so that the Court is aware, Your Honor

18  directed what I have called, and we have called in these

19  discussions, "the questioners" to get together.

20          The questioners are comprised of the various

21  parties who submitted motions and/or joinders in connection

22  with the PSC's motion to compel production of documents, and

23  further jurisdictional depositions of the Taishan defendants,

24  and for sanctions, which is record doc. 8685.

25          Just so our record is clear:  I just want to

 1    point out that the questioners are comprised of others than the

 2    PSC.  Record doc. 8695, 8755, 8765, 8758, and 8792.  Those were

 3    the prior motions that were filed as piggybacks, so to say, to

 4    the PSC's motion.  Also, Venture-Supply and Porter Blaine filed

 5    a motion back when we originally filed ours.

 6            Just so that our record is clear:  This argument

 7    is being made on behalf of what we call the questioners against

 8    what we call the Taishan entities.

 9            Chris Seeger and Patrick Montoya will primarily

10    be addressing this argument.  As you will recall, Your Honor,

11    this was discussed at the status conference, and we understood

12    that this was going to be primarily by telephone and that local

13    counsel were going to appear.

14            **THE COURT:**  Yes.

15            **MR. SEEGER:**  So I'll let Chris Seeger take it from

16    here and Patrick Montoya as needed.

17            **THE COURT:**  Okay.

18            **MR. SEEGER:**  Your Honor, thank you for the time.

19            **THE COURT:**  Yes.

20            **MR. SEEGER:**  I would have been -- I did think it was

21    a telephonic conference or I would be there in person.  So I

22    apologize that I'm not present.

23            **THE COURT:**  Yes.  No, that's fine.

24            **MR. SEEGER:**  Your Honor, I've been thinking of ways

25    to try to simplify the motion.  As you can see, it's pretty

1  voluminous, and we've given you a lot of exhibits and things to
2  look through that we think prove the points that support the
3  granting of the motion to compel.
4          The way I'm thinking of this motion is it's sort
5  of three basic topic areas.  The upstream/downstream
6  relationships between the entities.  From there, we've asked
7  for the production of documents.
8          The second topic would be, you know, the
9  searches that we believe -- the inadequate searches that we
10 believe that were done of the computers of the individuals
11 within these entities.
12         Then the third item is the request for documents
13 supporting the assertion by Taishan that one of the reasons
14 they created this other entity, this TTP entity, was for tax
15 purposes.
16         If you don't mind, I'll sort of go in that
17 order.  I'll do this in a general way, and I'd like to reserve
18 a little rebuttal time, because I'm not going to take up a lot
19 of your time sort of in general overview, Your Honor.  I know
20 you know the issues.
21         THE COURT:  Right.  The third area that I saw that
22 needed to be at least focused on is the sale and marketing
23 information.  There was some question about that.  There was
24 also a fourth one regarding the VAT material.
25         MR. SEEGER:  Yes.  That's the tax issue, Your Honor,

```
 1    that I was going to address last.
 2              THE COURT:  All right.
 3              MR. SEEGER:  The sales and marketing point, I kind
 4    of -- I have that sort of -- the way I was going to group
 5    that -- because I think it's easier to think of it that way --
 6    is in connection with the computer searches and the documents
 7    we've asked for there.
 8              THE COURT:  Okay.
 9              MR. SEEGER:  So if I could just take the Court's time
10    and maybe spend just a minute or two on the upstream/downstream
11    relationships and then I'll move on from there.
12              THE COURT:  All right.
13              MR. SEEGER:  I'll do it that way.  Is that okay, Your
14    Honor?
15              THE COURT:  Yes, that's fine.
16              MR. DAVIS:  Just, if I may interject, so that those
17    on the phone know, my appreciation is is that the Court has
18    before it the two binders:  The one that Taishan submitted, as
19    well as the one that the PSC submitted.  So if there's a
20    reference to exhibits, the Court can follow along with that.
21              THE COURT:  Right.  Yes, I have them.
22              MR. SEEGER:  To simplify this, Judge, these
23    upstream/downstream relationships are really critical.  We've
24    asked for documents, like annual reports, government filings of
25    BNBM, board minutes of Taishan or BNBM, and other types of
```

 1   documents like that.

 2                  The reason we've asked for them is because we

 3   don't have to prove -- we don't think the law supports the

 4   argument made by the defendant that we need to prove alter ego

 5   or "piercing of a veil" theory.

 6                  Under certain legal tests, we can impute the

 7   contacts of the parent companies to the subsidiaries.  So these

 8   are highly relevant documents which will, at the end of the

 9   day, I think, produce very fruitful information for the Court

10   with regard to jurisdiction.

11                  One thing I have to point out, just by way of

12   background, is that most of the exhibits that you have there,

13   Your Honor, that we've attached that relate to BNBM, CNBM, TG,

14   and TTP, the plaintiffs have gotten those through their own

15   investigations.

16                  Most of those investigations, Your Honor, are

17   just, like, on the Internet and things of that nature.  Very

18   little of which you have there, and I think it's clear from the

19   motion, have even been produced by the defendant.  So these

20   documents clearly exist; they haven't been produced; and

21   they're holding onto them.

22                  Now, just in terms of the relationships, what we

23   show you in the motion is that CNBM, which is a Chinese --

24   which is, basically, China, owns BNBM, which owns 65 percent of

25   Taishan Gypsum.  We know that BNBM, through the depositions and

1    the documents that we have, have guaranteed loans for Taishan.

2    We know that there are board members and directors and managers

3    of Taishan that also hold positions on BNBM and CNBM.

4              For example, Mr. Jia, who I deposed when we were

5    in Hong Kong is the chairman of Taishan.  He sits on the board

6    of BNBM.  Cao Jianglin is a supervisor at TG; and he has been a

7    chairman, supervisor and president at BNBM.

8              We believe -- and I could go on and on and on,

9    and this is laid out in the motion -- but we believe that these

10   are highly incestuous relationships among these entities.  We

11   have the right to inquire there.

12             If we get these documents, these upstream and

13   downstream documents, which will demonstrate, if they exist,

14   which will bring me to point 2, which will demonstrate these

15   relationships.  This is going to be highly informative.

16   Because, again, under certain legal tests, which are not as

17   strict as piercing of the veil or alter ego, we can impute the

18   conduct and the U.S. contacts of the parents to the

19   subsidiaries.

20        **THE COURT:**  Doesn't Taishan take the position,

21   though, that they don't have these documents; and that if you

22   want them, you should get them from BNBM?  What's your answer

23   to that?

24        **MR. SEEGER:**  Well, the answer to that is that they

25   haven't even -- we don't believe they've even searched for

1   them, if they -- I'm talking about now in the files of TG.

2               But the test there isn't -- again, there's not

3   an alter ego.  The test is:  "Does TG have access to the

4   documents that demonstrate these relationships?  Could they go

5   to BNBM and ask them for the documents?  Could they ask them to

6   produce them?"  And we have no evidence that that's even been

7   done.

8               But what we do know is we do know that people

9   that hold board positions on TG also hold those positions with

10  BNBM.  We believe, if you look at the depositions -- and they

11  weren't great -- from the last time we were there when we

12  questioned Mr. Jia on this, you know, he gave us very

13  unsatisfactory answers like, he doesn't have documents.  He's a

14  board member of BNBM, but he says he doesn't have board

15  documents; or documents are put in front of him to review and

16  they're taken away from him at the end of the day.

17              So we've got, you know -- again, so, I don't

18  think the question is the way that the defendants have framed

19  it, like we need to prove, you know, anything more than -- they

20  have the ability to go to BNBM and CNBM and ask for the

21  documents, and they haven't done that.

22          **THE COURT:**  Is BN- --

23          **MR. SEEGER:**  And as I said -- I'm sorry.

24          **THE COURT:**  Isn't BNBM a part of the litigation, not

25  in every case, but haven't they been sued in some cases?

1      **MR. SEEGER:**  I believe the answer to that is yes.

2           Lenny, that's correct; right?

3      **MR. DAVIS:**  The answer to that is yes, and I believe

4  that they have not --

5      **MR. LEVIN:**  Your Honor, this is Levin.  They've been

6  sued in the *Gross* complaint and other complaints.

7      **THE COURT:**  Yes.  Right.  So the question is --

8      **MR. DAVIS:**  But they have not --

9      **THE COURT:**  The question is:  Why don't you get it

10  from them with the 30(b)(6)?

11      **MR. LEVIN:**  Because they default- -- and this is

12  Levin again, Your Honor -- they defaulted.

13      **THE COURT:**  All right.  Okay.

14      **MR. SEEGER:**  So to get -- in a general way, moving on

15  to the next point, which goes to what Your Honor was talking

16  about, the marketing documents.

17           The way I see it is this is part and parcel of

18  the computer searches that were done.  We're being told by the

19  defendants something that is completely implausible.  This is

20  a -- really, for all intents and purposes, this is a

21  multi-national company.

22           Their marketing materials boast that they ship

23  drywall throughout the world, you know, thousands and thousands

24  of tons of drywall made up to U.S. standards, which are, you

25  know, half-inch drywall, and that's not used in Europe or

1   anywhere else; and boasting that they comply with ASTM

2   standards, which are standards used in the United States.

3                    So now we're starting to get a production of

4   documents, and what we see is that they've searched the

5   computers of seven employees, from Mr. Jia below him, who were

6   involved in the manufacture and sale of drywall.

7                    We're seeking discovery of all of the employees

8   that have relevant information.  And we know, as I said before,

9   there are several other -- at least three other people who hold

10  leadership roles in BNBM and CNBM, as well as TG.  Those

11  computers weren't searched.

12                   The other part of this which is implausible is

13  to say there is no central server.  There's no one place they

14  can go to, whether it's a backup tape, or a hard drive, or a

15  central repository of information that this company stored

16  during this time frame.

17                   They say that each and every one of these

18  individuals used their own private PC.  I just think in today's

19  world, when you're doing business at the level of billions of

20  dollars, that's implausible.

21                   Now, I'm not -- I don't want it to sound like

22  I'm saying that Mr. Spano and his crew are telling us something

23  other than what they know.  It's got to be the case that

24  they're being told this by their client.  It's implausible

25  though, nonetheless.

1          With regard to marketing, just to give you --

2   well, I mean, I kind of laid it out, but we've attached

3   documents -- and Lenny has them there and he can point them

4   out -- where these representations are made.

5          The other thing is, the employees of TG who are

6   doing most of the selling and marketing and dealing with U.S.

7   customers were never -- really never did this under the --

8   like, their business cards, for example, don't even reflect

9   that they were employees of any entity other than TG.  They

10  don't say that they were -- you know, Frank Clem is a name that

11  you've probably heard, Your Honor.  His business cards don't

12  say, "Frank Clem working for TTP."  They say he works for

13  Taishan Gypsum, or the predecessor name of Taishan Gypsum.

14         So it's just, again, with regard to these -- you

15  know, to only search seven computers, to produce the documents

16  on these seven, when we know there are at least three other

17  employees.  And then to take the position that because the

18  company moved -- and I think they say they moved their

19  headquarters sometime around February or March of 2009 -- that

20  the information that was available from 2005 to 2008 is no

21  longer available is unsatisfactory without further

22  investigation.

23         Maybe this is just a topic area that we're going

24  to have to really dig into when we're in Hong Kong; but on its

25  surface, something sounds wrong.

1          I mean, we know that before they moved their

2   headquarters, you know, that they knew there were problems with

3   the drywall.  They did a settlement with a company called

4   Guardian Building where they were -- where Guardian was

5   returning tons of their drywall.  Now, most of the allegations

6   it seems, when you read the settlement papers, deals with just

7   defective problems with the drywall, like it was brittle and

8   things like that.

9          But there are a number of things that tend to

10  show that they knew before they moved their offices that there

11  were issues.  In January of 2009, the *Florida Business Journal*

12  contacted TG about problems in Florida.  And we list these in

13  the motion, Your Honor.

14         So that's sort of the second area that I would

15  group together.  The productions being inadequate, and that

16  they didn't go through all the computers and all the

17  individuals that had the information.  The excuses as to where

18  this stuff is are inadequate, and it all relates to -- and if

19  you look at the marketing materials, we know this stuff has to

20  exist.

21         The third area, which I'll just briefly

22  outline -- and then we can allow -- I don't know if Lenny wants

23  to add to what I've done or Patrick, and then we can let the

24  defendants speak and then we'd like to respond to it -- is this

25  whole issue of the VAT tax, this VAT exemption, which was

1    supposedly the purpose for why they set up this separate entity
2    of TTP.
3                      They are saying we shouldn't get any
4    information, it's none of our business what they do for tax
5    purposes.  But at the end of the day, we believe, and we
6    believe we will easily establish, that TTP was part and parcel
7    of TG:  The same employees; they shared everything; that they
8    were just set up for the purpose of shipping drywall, but there
9    was no real corporate formality honored between these two
10   companies.
11                     So their argument of, "No, no, no.  We set this
12   up for tax purposes and we've adhered to all the corporate
13   formalities," we think really is relevant in the context of
14   that.  We would like to see those documents to see if, for
15   example, did they ever take these tax exemptions that they say
16   was the whole purpose of setting up the company; did they file
17   the requisite documents to establish this?
18                     So I've kind of taken several areas and grouped
19   them into the three, but I think most of what we're asking for
20   really, just to over-simplify, really fall into the
21   upstream/downstream area and the relationships between those
22   entities, the people that share these positions with -- you
23   know, the incestuous relationships between them, the marketing
24   materials, and the computer searches that were done and were
25   inadequately done, and then this tax issue.

1           THE COURT:  All right.  Anything --

2           MR. SEEGER:  Lenny, did you want to add anything?

3           THE COURT:  Anything from the plaintiffs to

4    supplement what was said?

5           MR. PANAYOTOPOULOS:  Your Honor, Nick Panayotopoulos

6    on behalf of certain Banner entities that are also part of the

7    questioners.

8                Lenny, unless somebody else from the PSC has

9    something else to say, I'd like to add a few things.

10          MR. DAVIS:  I'll defer to Nick then.

11          THE COURT:  Okay.  Go ahead, Nick.

12          MR. PANAYOTOPOULOS:  Your Honor, on the VAT issue,

13   from our understanding of the VAT from our research on Chinese

14   law -- and it's pretty basic across the world in countries that

15   charge VAT -- you can get a refund for VAT if you declare that

16   it's for export purposes and it's not being used inside of the

17   country.

18                So the whole purpose of the VAT refunds and the

19   VAT, what we're looking for is:  Where -- what are you telling

20   the Chinese government or other authorities the purpose of the

21   production of this drywall is and other materials?  Are you

22   telling them, as we suspect, that it's for export to Louisiana,

23   that it's for export to Florida, that it's for export to

24   Virginia?  We don't know because these documents have been

25   withheld from production with the sole argument against the

 1   production is that it's not -- it's not related and it's not

 2   relevant.

 3                    Well, of course, these documents that relate to

 4   the purpose of where -- that relate to where these -- the

 5   intent of these companies, that it was to export to the United

 6   States in these particular states, they're obviously relevant,

 7   and even more so to the applicable of standards likely to lead

 8   to admissible evidence.

 9                    On the question -- back on the other question

10   about control.  We've got admissions from public statements

11   from BNBM's parent -- and they're quoted on page 17 of the

12   questioners' supplemental memorandum -- where we've got BNBM

13   claiming, bragging and admitting that it actively -- it

14   participates actively in the daily operations and management of

15   TG.  It's the defendant's own admissions that we're relying on.

16   And we know that the sworn statements that were made in those

17   depositions in China are just not true.

18                    So we've got sufficient evidence to pierce and

19   go forward, and we know that they do have control over each

20   other's documents and that the parent companies actively

21   control those entities on their day-to-day operations.

22                    That's all I have to say, Your Honor.

23              THE COURT:  Okay.

24              MR. HARDT:  Your Honor, this is Ken Hardt on behalf

25   of Venture Supply and Porter-Blaine in the *Germano* action.

1      **THE COURT:**  Okay.

2      **MR. HARDT:**  We filed a separate supplemental

3  memorandum on this issue, and I hope Your Honor received it.

4      **THE COURT:**  Yes, we did.

5      **MR. HARDT:**  We focused primarily as far as the

6  documents go on the ESI that Mr. Seeger mentioned.  But I just

7  wanted to suggest something as far as that goes, because the

8  response, or what we're being told, as far as the ability to do

9  a computer search just kind of makes you scratch your head and

10  say, "Really?  This is a multi-national corporation.  They all

11  had individual personal computers and they were all just thrown

12  away in March of 2009 with no backup of any information?"

13      The reason why it's important, at least from a

14  jurisdictional standpoint, in the Virginia actions -- and I

15  will mention that we do have Taishan in default in two state

16  court Virginia actions, and they have filed responsive

17  pleadings -- well, now filed motions to set aside those

18  defaults raising the personal jurisdictional issue.  So we have

19  a direct interest in this.

20      But you have the fellow that my client was

21  dealing with, is Frank Clem or Mr. Peng, who at the time that

22  we were dealing with him was very young.  He was 24.  He was

23  making decisions as to the content of the sale, the price of

24  the sale, the terms of the sale, at least as far as negotiating

25  with our broker, and he was talking about whether or not ASTM

1    standards had to be in the contract and all this type of stuff.

2                    We've been produced e-mails from Mr. Peng to my

3    client or my client's agent, Mr. Perry, but there's no internal

4    e-mails at all, no internal documents at all that support this

5    24-year-old who's making these decisions on the first --

6    according to Taishan, the first sale of drywall to the United

7    States from any superiors.

8                    And along those lines, of the seven computers

9    they searched, they didn't even search Mr. Peng's

10   supervisor's -- his direct supervisor's.

11                   So we share the same concern as the PSC on the

12   scope of the computer, the ESI search, and that's the point

13   that I'd like to make and what we made in our memo.

14           THE COURT:  Okay.

15           MR. DAVIS:  Your Honor, I just have two comments.

16           THE COURT:  Yes.

17           MR. DAVIS:  One is to elaborate.  Specifically, there

18   was a discussion by me --

19           THE COURT:  Try to speak in the mic so that they hear

20   you.

21           MR. DAVIS:  I'm sorry.

22                   There was specifically a discussion by Nick

23   Panayotopoulos about page 17.  That reference relates to a note

24   wherein BNBM is guaranteeing a financial obligation to a bank,

25   specifically about Taishan.  And that note specifically

1   addresses and requires that the guarantor, BNBM, actively be

2   aware of the operations of Taishan in the occurrence and

3   conditions of the business.  That's on page 18 is where that's

4   referenced.

5           **THE COURT:**  Of what, A, B, C?

6           **MR. DAVIS:**  I'm sorry.  It is on the PSC's renewed

7   motion.  It's the memorandum -- the supplemental memorandum

8   that we filed --

9           **THE COURT:**  Yes, I got it.  I have it.

10          **MR. DAVIS:**  -- that's in the binder before you.

11          **THE COURT:**  Yes.

12          **MR. DAVIS:**  I just want to point that out.  That's

13  what he was talking about with respect to that issue.

14          Then Your Honor asked a question in this

15  argument about control, and you said that Taishan says they

16  don't have the documents in their possession.  That's a legal

17  argument that we address on page 9 of our memorandum.  There

18  are specific cases that are cited at the top of that page.

19  Federal courts construe possession, custody or control very

20  broadly.

21          That paragraph of the brief specifically

22  addresses Your Honor's question.  The question here is:  Do

23  they have the ability to get the documents?  When you've got

24  board members -- and this is a practical approach -- when

25  you've got board members that govern what happens in a company

1    and they sit also on the upstream entities -- and the chart on

2    the upstream entities is on page 15 -- when they sit and they

3    make high-level decisions, it's a practical question:  Can they

4    get the information?

5                     We have no way to get the information from

6    anyone -- anyone -- other than the two entities:  TG, TTP, who

7    are before Your Honor.  We can't go to BNBM; we tried; they got

8    a default judgment taken against them.  Who do we go to?  We

9    have exhausted all our efforts.

10                    It's the people who are before Your Honor,

11   Taishan, or alternatively -- and that's the subject of another

12   argument -- whether T. Rowe Price, JP Morgan, Morgan Stanley,

13   who Your Honor's aware of, who are public investors and own

14   shares of stock, albeit a small amount, 8 shares, because we

15   know that the People's Republic of China on down, BNBM, CNBM,

16   really control what happens here.  They are who's in control of

17   Taishan, and we know that from our own investigation.

18                    That's the purpose of the chart, Your Honor, on

19   page 15.  It reflects the ownership interest as we appreciate

20   it.  But, again, we don't have that information because Taishan

21   refuses to produce the basics.

22            **THE COURT:**  Okay.  Anyone else from the plaintiff?

23                    Eric, do you want to speak on behalf of the

24   defendants or do you want Frank to do it?

25            **MR. STATMAN:**  I think Frank is probably going to.

1            **MR. SPANO:**  Your Honor, Frank Spano.

2                  I think what I'd like to do is address the

3    comments on the completeness of our document searches and

4    production, and then turn over the substance of the other

5    arguments to my colleagues.

6            **THE COURT:**  Okay.  Go ahead, Frank.

7            **MR. SPANO:**  We need to bear in mind the exercise

8    we're undertaking here, Your Honor, which is to develop the

9    facts necessary for the Court to make its decision regarding

10   whether Taishan Gypsum is subject to personal jurisdiction.

11                 And that question is determined by whether

12   Taishan Gypsum's conduct directed towards a particular state

13   amounted to purposeful availment of the benefits of doing

14   business in a particular state.

15                 This is what the Supreme Court clarified in the

16   *Nicastro* case, and this is what has been the focus of our

17   discovery efforts here.  To be specific, we have searched, and

18   searched again, and produced every document we can find that is

19   a communication with anyone in the U.S., that relates to anyone

20   in the U.S., or has anything at all to do with Taishan Gypsum

21   or TTP sales of drywall to anyone in the U.S.

22                 Our production included all of the underlying

23   transaction documents in the client's files, all of the

24   contracts, all of the invoices, all of the shipping documents,

25   including any VAT-related documentation for any transaction we

 1    had involving drywall sold in U.S. dimensions.

 2                    And I would also add this included numerous

 3    documents that are probably not even relevant to personal

 4    jurisdiction since most of the sales concerned sales of drywall

 5    to Chinese trading companies in China.

 6                    I have been intimately involved in the document

 7    searches and collection, and it was a major undertaking for us

 8    and for our clients.  Hogan Lovells made four trips to China.

 9    Using both American and Chinese attorneys, we interviewed

10    witnesses and we collected documents.

11                    As we discussed a little bit previously back in

12    June, we conducted these searches with the client's assistance;

13    but on our own, we looked in all the places in the company

14    where we had a reason to believe, in our professional and

15    ethical responsibility, there might be relevant documents.  We

16    searched the e-mails of every salesman who ever told or tried

17    to sell drywall made to U.S. dimensions to anyone.

18                    With respect to computers, we learned that

19    Taishan Gypsum did not function like a modern American company.

20    It's a fact that there is no company server.  It's also a fact

21    that the e-mails we were able to collect came from personal

22    e-mail accounts, online Internet e-mail accounts, that we were

23    able to log onto computers using the employee's personal

24    passwords, conduct searches using search terms, and collect

25    whatever we could find that was relevant to the jurisdictional

1    issues.

2                 The federal rules and common sense simply don't

3    require us to search the files of every employee in the

4    company.  The discovery rules and common sense apply to

5    concepts of proportionality and reasonableness.  We didn't

6    search every person's e-mail who had personal e-mail because we

7    were satisfied that the other people hadn't used their personal

8    e-mails for company business; and we verified that by

9    interviewing them, by interviewing other people in the company,

10   and by looking at the e-mails we did collect and seeing that

11   other people's names didn't come up.

12                As for -- Mr. Hardt mentioned that we didn't

13   collect e-mail from Mr. Peng's superior, but Mr. Peng's

14   superior had absolutely no role in the manufacturing or sale of

15   drywall to U.S. dimensions.  Again, this is confirmed by the

16   fact that his name does not appear on any document related to

17   any sale or any of the e-mails of any of the salesmen.

18                There is virtually no chance of finding other

19   jurisdictionally relevant, non-duplicative documents in the

20   files of people who we know had nothing to do with the

21   manufacturing or sale of the drywall to U.S. dimensions, and

22   never interacted with BNBM or any other upstream entities.

23                It would simply be a waste of time to undertake

24   useless searches.  And I think it's fair to say, the law is

25   especially reluctant to impose this type of unnecessary burden

1    on a foreign defendant, who has not even been determined to be
2    subject to the Court's jurisdiction.

3              We've participated and our client has
4    participated in good faith in jurisdictional discovery; and
5    we've devoted extensive time and resources to the process, and
6    so has our client.

7              Taishan Gypsum recognizes that the Court needs a
8    full record; and it also appreciates that the Court has
9    determined it needs further testimony concerning its contacts
10   with the U.S., and Taishan Gypsum is prepared to provide that
11   testimony in Hong Kong as ordered.  But as Eric will elaborate
12   when we discuss the particular issues that have been raised,
13   there has to be some limit on jurisdictional discovery.

14             We simply cannot endlessly go off on all sorts
15   of tangents that really don't concern Taishan Gypsum or TTP's
16   jurisdictional contacts with any U.S. state.  At bottom, we're
17   talking about speculation and fishing expeditions that are
18   simply highly unlikely to yield any additional relevant
19   documents, and highly likely to provide additional information
20   to inform the Court's decision.

21             So I appreciate your indulging me to hear this,
22   but this is my overview of the problem:  The problem is one of
23   scope.

24             **THE COURT:**  Okay.  That you, Frank.
25             Let me hear Eric.

 1           **MR. STATMAN:**  With Your Honor's permission, I'd like
 2    to first address the issue --
 3           **THE COURT:**  Maybe you ought to come to the podium so
 4    everybody can hear you.
 5                Give us your name for the record, Eric.
 6           **MR. STATMAN:**  Eric Statman.  I'm with Hogan Lovells
 7    representing Taishan Gypsum and TTP.
 8                With Your Honor's permission, I'd first like to
 9    address this issue of documents that are relating to BNBM and
10    BNBM's upstream entities and affiliates.
11                First of all, I'd like to clarify that if you
12    look at the plaintiff's -- the PSC's document request, it's
13    clear that all the documents that are in this category are
14    documents that are held by BNBM and upstream.  They're not held
15    by Taishan; they're not created by Taishan; and they're not
16    maintained by TG or TTP.
17                The next issue that needs to be addressed is
18    what -- plaintiffs seem to be conflating two separate concepts
19    into one, and those are:  Have they shown in a reasonably
20    particular way that they're entitled to discovery regarding the
21    upstream relationship; and have they shown the requisite
22    control to make that showing.
23                And the other issue is:  Have they shown control
24    from the point of view, can TG obtain the documents if it's
25    first determined that the PSC has shown an entitlement to the

1  documents?

2            I think that they've completely fallen down on

3  showing an entitlement to the documents.  Because given all of

4  their charts and given all of their bluster, all that they've

5  shown is that BNBM is a major shareholder of Taishan Gypsum.

6  It owns 43 percent directly -- 42 percent directly and

7  23 percent through another entity.

8            As a major shareholder, it exercises the rights

9  any major shareholder would exercise anywhere in the world:  It

10  appoints members to the board of TG; it has oversight

11  capabilities through its members of the board on TG.  Like any

12  major shareholder, it issues guarantees to its, let's call it

13  "subsidiary" for this purpose, but to TG; and in exchange for

14  that guarantee, TG paid a fee.

15            So there is a formality that the two companies

16  went through.  These two companies keep separate offices; they

17  have separate employees; they have separate factories; they do

18  everything separately.

19            Now, it's -- the first case that the plaintiffs

20  cite in their own brief on the issue of whether or not they can

21  obtain documents from upstream -- about upstream entities and

22  about the upstream entities' way of doing business is a case

23  called *Walker versus Newgent*, which is a Fifth Circuit case of

24  Great Providence, 1978.  And in that case the court denied --

25  found that there wasn't an alter ego relationship.  The court

said:  "A subsidiary corporation will not be regarded as the
alter ego of its parent because of stock ownership, a
duplication of some or all of the directors, or an exercise of
control that stock ownership gives."

But after taking depositions for five days,
after having thousands and thousands of pages of documents
produced, all the PSC has come up with is that BNBM is a stock
owner of TG, and it exercises the level of control that any
stock owner would own.

I don't think that there are many corporations
that would own 65 percent of another corporation and just not
pay any heed to its goings on, but that doesn't mean that
they're alter egos; and that doesn't mean that they've made the
requisite showing on that basis to get to the point where we
can even argue about whether TG itself has sufficient
possession, custody and control of documents created by BNBM to
obtain those documents from BNBM.

Now, Mr. Seeger made a reference to some
unspecified other theories that somehow entitle them -- that
have less of a requisite showing for alter ego.  I don't know
what those theories are.  I assume that he's referring to the
agency theory that they've bruited about, and to another theory
that's never been applied in this context.

But even "agency," under Fifth Circuit law,
under *Hargrave*, and under all cases following *Hargrave* -- and

 1    their brief, by the way, doesn't cite *Hargrave*, which is

 2    probably the leading case on this issue -- those cases say you

 3    analyze the issue in the same way that you do alter ego.  You

 4    look to see at the level of control.  It has to be much more

 5    than a normal parent/subsidiary relationship.

 6             The two entities have to be "fused," is the word

 7    that *Hargrave* uses.  Going back to the *Cannon* case from the

 8    Supreme Court in the 1920s, the two entities have to be fused.

 9    The Fifth Circuit almost never finds that level of control

10    based on far more evidence than what the evidence that's been

11    brought to bear here.

12             The only evidence that they've pointed to is a

13    statement from CNBM that because BNBM purchased 65 percent of

14    Taishan directly and indirectly, that it will participate more

15    actively in the daily operation and management of TG.  Of

16    course.  Are they going to purchase 65 percent and then just

17    stay in Beijing and not find out what's going on with their

18    investment?

19             They also say that the guarantee requires BNBM

20    to be involved in the -- and know what's going on at TG.  Of

21    course.  Would you give a guarantee to a company and have no

22    idea what their operations are about?  You have members of --

23    employees of your company on the board of directors, which is

24    perfectly normal.  We could just say, "Don't listen to what's

25    happening at TG.  Just go down to the meetings and don't listen

1   to anything and don't tell us what's going on."

2                    The plaintiffs have, essentially, given us no

3   evidence beyond that of a normal shareholder relationship that

4   BNBM has with TG.

5                    Now, turning to the issue of control, if we ever

6   have to get there --

7        **THE COURT:**  With regard to entitlement, do you see

8   any difference between the discovery aspect and the substantive

9   aspect?

10       **MR. STATMAN:**  Absolutely, Your Honor.  I'm aware that

11   the threshold for obtaining discovery is far less.  The

12   threshold for obtaining discovery is making a particularized

13   description of the elements of the alter ego relationship, but

14   that's absolutely lacking here.

15                    My point is that they've only shown the normal

16   shareholder relationship between BNBM and TG, and they've shown

17   nothing else.  They asked Mr. Jia questions about it.  He said

18   there was nothing more than that kind of relationship.  He did

19   use the term "joint venture," which he explained meant

20   cooperation.

21                    But there's nothing more than just that

22   relationship.  They have to show something more.  The cases

23   that we're talking about show that there are employees being

24   shared, that they're selling the same product, that they're

25   acting as one.  They have nothing that rises even close to that

 1   level.  All they have is stock ownership and a graph -- or a

 2   chart, which is obtainable on the Internet, which we don't deny

 3   the existence of, which anybody could obtain by doing a search.

 4   And that's all they have as far as showing a relationship.

 5               To suggest beyond -- that beyond BNBM and

 6   Taishan Gypsum they have an alter ego relationship, but then

 7   that the relationship should go even further up to CNBM and up

 8   to SASAC and up to the very halls of the People's Republic of

 9   China is absurd.  The relationship should be cut at its base,

10   which is BNBM and TG.  There is no alter ego.  There's been no

11   showing whatsoever, not a scintilla, beyond ownership of BNBM

12   and TG.

13               So I'm loathe to even go to the issue of whether

14   or not Taishan Gypsum has sufficient possession, custody and

15   control of documents that were created by BNBM, and that are

16   maintained by BNBM, but I will for the Court, if the Court

17   wishes me to do so.

18               **THE COURT:**  Yes.

19               **MR. STATMAN:**  The first point that I think needs to

20   be made is that the plaintiffs haven't cited to any Fifth

21   Circuit authority that I can find in their brief.  They've

22   cited to a number of cases from outside the Fifth Circuit.  The

23   *Camden* and *Cooper* cases I think would be the most relevant

24   cases of the cases that they've cited to.

25               Those cases talk about control in a situation

 1   where two entities or more are selling the same product, are

 2   sharing documents involved in their typical daily operations,

 3   where they're participating together to sell.

 4           But even more importantly, I think, a fairly

 5   recent case from the Southern District of Texas from 2010 said

 6   that *Cooper* and *Camden* are not the law in the Fifth Circuit;

 7   that instead, the *Weema* case -- the *Weema against Royal Dutch*

 8   *Shell* case is the war -- is the law.  And in the *Weema* case,

 9   the Fifth Circuit said that:  "We reject the concept that

10   access to documents constitutes control."

11           They didn't go further.  But this Fifth Circuit

12   case, whose name I will supply at the end of the argument, if

13   the Court is okay with that --

14           **THE COURT:**  Yes.

15           **MR. STATMAN:**  -- this Fifth Circuit -- this Southern

16   District case from Texas says under *Weema*, you -- just because

17   two companies are affiliates, just because they share officers

18   and directors, does not mean that they have the ability to

19   control the production of documents from one another.  There

20   has to be something more than that, and that is not shown by

21   the plaintiffs.

22           In addition to that, the idea that Taishan

23   Gypsum has control over BNBM documents because Mr. Jia is the

24   director of BNBM is false.  The *Gerling* case out of the Third

25   Circuit, which is the highest court ever to address this issue,

 1    said in that situation the company does not have control over

 2    the documents.  Mr. Jia may have control over the documents.

 3    He's the director.  It's not Taishan Gypsum that's the

 4    director, Mr. Jia is the director.

 5                    Let's ask ourselves:  What kind of documents are

 6    they asking Mr. Jia to obtain?  It's true that he's probably --

 7    he's given documents at the -- when he's at a board meeting.

 8    Is he given documents that go into the strategy that BNBM might

 9    have had when acquiring Taishan Gypsum?  Is he given documents

10    that go back three, four years into the past that talk about

11    BNBM sales strategy?  Is he even entitled to ask for those

12    documents?

13                    Would an American director be entitled to just

14    ask for those documents, or would he have to sue to get them if

15    he thought there was some reason to get them because there was

16    some misconduct?  I think answer is the latter.

17                    Just because TG -- let's say that TG is a joint

18    venture of BNBM for the sake of argument.  Could a joint

19    venture partner go to its partner and say, "Give us all the

20    documents that went into your strategy to acquire this joint

21    venture"?  I don't think so.

22                    But that's what they're saying that the kind of

23    control that these companies have because Mr. Jia is a

24    director, and because there is a -- he described it, BNBM and

25    TG, loosely as a joint venture.  A layman was describing BNBM

 1    and TG as a joint venture, which he explained later it meant

 2    cooperation or corporation.  I'm not sure which the right

 3    translation is on that.

 4              Then the plaintiffs go into an area that is not

 5    addressed in their brief, that TG knew about problems with

 6    drywall in 2009.  I'm, quite frankly, at a loss to understand

 7    how any of that has anything to do with sales of drywall

 8    between 2006 and 2008, and how any -- whatever problems they

 9    may have been alerted to by a newspaper in Florida would have

10    in relationship to TG's purposeful availment of contacts with a

11    particular state in the United States.

12              So I think that that's just a non-issue that's

13    just been thrown out there as a trial balloon.

14              Getting to VAT tax.  We've supplied every VAT

15    document that accompanied every sale that we made.  The

16    application for VAT status or relief from VAT status would have

17    absolutely shed no light whatsoever on whether or not TG or TTP

18    was seeking to purposefully avail itself of doing business in

19    the United States.

20              The subject of the VAT was discussed at the

21    deposition of Mr. Zhang.  And he said that TG had gained an

22    exemption from VAT, but they needed to be able to sell VAT to

23    certain people who were then going to be exporting to other

24    countries, and that is the reason that TTP was formed.  It was

25    a complete and total explanation of why TTP was formed.

1              The application to the Chinese government, if

2    there is any, we don't even know what there is and what there

3    might be, is not going to shed any light upon whether TG or TTP

4    was availing itself of sales in the New York market.

5              With all respect to the counsel for certain

6    Banner entities and his understanding of the VAT, it's my

7    understanding that TG or TTP would not be applying for an

8    exemption for VAT for an export sale, but the exporter would be

9    applying for an exemption for sale.

10             So all those sales that TTP made to Chinese

11   companies -- Chinese export companies in China, TTP gets paid

12   the VAT.  It's the exporter that would seek to get the

13   exemption from the VAT.

14             Now, Frank has, I think, has addressed ESI.  The

15   only thing I want to add to that is that it seems that we've

16   moved so far in the last five or six years in this country that

17   we can't imagine that people actually do internal business by

18   talking to one another; that they used e-mail for communicating

19   with the outside world, and they did internal business by

20   picking up the telephone or walking it to somebody's office.

21             You have to remember, TG is not a factory -- or

22   is not located in Manhattan.  It's not located in New Orleans.

23   It's located in Provincial China.  These people didn't even

24   have computers, we understand, until early 2000.  Is it so

25   strange?  Can we not remember back in our own lives when we

1    walked down the hall and talked to somebody about business,

2    when decisions were done in that way?

3                    To say that it's impossible and implausible and

4    it can't be, it just ignores the reality of life, that it can

5    be, and that's what we've been told.  It also tends to impugn

6    the honesty of this firm, which I think considering that not a

7    single question was asked of any of the witnesses by the PSC or

8    by anybody else about TG's document retention, about their ESI,

9    they never inquired, to now say that our searches for ESI were

10   insufficient, that it can't be, that someone's lying, is just

11   irresponsible.

12                   Now, I'd like to get a copy of -- the word

13   "irresponsible" was not the word that I meant to use, Your

14   Honor.  That came out inadvertently.  I would say "inaccurate."

15            THE COURT:  Okay.

16            MR. STATMAN:  The Southern District case that I was

17   referring to -- and I apologize for not having it at my

18   fingertips, but --

19            THE COURT:  That's all right.

20            MR. STATMAN:  -- I had some drywall problems

21   yesterday due to a downgraded hurricane -- it is called

22   *WesternGeco versus ION Geophysical*, and it's only reported on

23   Westlaw.  If you want the cite, I'll be glad to give you the

24   cite.

25            THE COURT:  Yes.

1          **MR. STATMAN:**  It's 2010 Westlaw 2266524, and that's

2     out of the Southern District of Texas in 2010.

3               **MR. DAVIS:**  226524?

4               **MR. STATMAN:**  2266524.

5               **THE COURT:**  What's the name of it, Eric?

6               **MR. STATMAN:**  I don't know how it's pronounced, but

7     it's *WesternGeco, G-E-C-O, against ION Geophysical.*

8                    I have nothing further.

9                    Frank, do you have anything that you'd like to

10    insert?

11              **THE COURT:**  I understand your argument.

12                   What's your evaluation of how we deal with what

13    has been done?  Has anybody made any affidavits or anything?

14    I'm not talking about attorneys, I'm talking about the people

15    who you communicated with.  Did they make any affidavits as to

16    what they did to search for it and couldn't find it?

17                   I didn't get the impression that any attorney

18    felt that your firm, or you, or any of your colleagues

19    misrepresented anything.  I had the feeling that they felt that

20    some information that was given to you was perhaps not

21    accurate.

22              **MR. SEEGER:**  That's correct, Your Honor.

23              **MR. PANAYOTOPOULOS:**  That is correct, Your Honor.

24    Absolutely.

25              **MR. DAVIS:**  That is correct.  And I want to make this

 1   record very clear -- very clear -- I do have a number of items

 2   to respond, but I do want to step in at this point, and I just

 3   said something to counsel:  We are not suggesting that Hogan

 4   Lovells has acted improperly.  We want our record to be very

 5   clear.

 6               We also understand that business in China is

 7   different than business in the United States.

 8               MR. STATMAN:  On the issue of affidavits, I don't

 9   believe we've submitted any affidavits from the client side on

10   ESI and preservation of documents, but we certainly have -- and

11   Frank participated in this more than I did -- but we certainly

12   have notes from interviews that we took.

13               I'm sure that if we put an affidavit in, it

14   would say nothing different than what we've said in our papers.

15               MR. SPANO:  That's certainly true.

16               THE COURT:  Let me hear a response.  Lenny, you --

17               MR. DAVIS:  I don't have Chris here.  If I may, Your

18   Honor -- Chris, I'm prepared to move forward with a response,

19   unless you'd like to go forward and I can tail on you.

20               MR. SEEGER:  I just had a couple of brief points, if

21   the judge has the tolerance for me just to make them --

22               THE COURT:  Yes, go ahead.

23               MR. SEEGER:  -- and then Lenny -- Your Honor, could I

24   take two minutes?

25               THE COURT:  Yes, go ahead, Chris.

1          **MR. SEEGER:**  I just want to be really clear:  On the

2     e-mail issue, what we've gotten, and we've gotten this through

3     depositions, is Mr. Jia, for example, I believe testified --

4     and, you know, Frank, if it was two or three -- he had a few

5     assistants.

6               We don't have anything from the defendant

7     showing that searches were done of his assistants' files or a

8     production was made.  I have a hard time, but when Mr. Jia

9     testifies that those assistants do his e-mails for him -- I

10    mean, this is a man who didn't even know his e-mail address.

11    And when we asked him what it was, he didn't remember it.

12    That's like not knowing your house address.

13              Then he said, "My assistants do this for me."

14    Okay.  So then you got to go to the -- we have to know they

15    went to the assistants.

16              And, Your Honor, I think where you're going on

17    this affidavit issue -- and I don't mean to try to get a step

18    ahead of you on it -- it's just that, you know, if at the end

19    of day everything has really been done, then produce the

20    affidavits, say the searches have been done in compliance with

21    Rule 34.  And if we find out that this defendant, not the

22    lawyers, that this defendant has misspoken or was untrue, we're

23    going to take that up with the Court.

24              But we've got to nail this down somehow.

25              **MR. SPANO:**  Your Honor, this is Frank Spano.

1          I just have to respond to Chris' comment.  This
2     issue with Mr. Jia's assistants was addressed three months ago
3     with the PSC.  We explained that we verified that the
4     assistants only sent and received e-mails from Mr. Jia's
5     computer, and we searched his computer.  So it's a non-issue.
6          It wasn't even part of the motion.  And it's
7     just -- it's just a wasteful distraction to even raise it
8     again.
9          **MR. SEEGER:**  Well, I wasn't done making my point,
10    Frank.
11         **MR. SPANO:**  And I also, just -- I don't understand
12    why our client, because its Chinese, should be treated
13    differently than any other party responding to a document
14    request.  There's no foundation whatsoever that the document
15    collection was incomplete.  They didn't make any record at the
16    depositions.
17         And I'm not aware of any precedent under Rule 34
18    that in the normal course of business, without any basis, a
19    party responding to discovery has to produce affidavits
20    detailing its search when there's no evidence of
21    incompleteness, spoliation, or any other discovery misconduct.
22         So I'm very troubled by the fact that there
23    seems to be an inference that, because the client is Taishan
24    Gypsum and it's in the drywall business, they lack credibility.
25    I have a real problem with that.

1          **MR. SEEGER:**  I have to admit if I were standing there
2   live, Mr. Spano probably wouldn't have bounced up and
3   interrupted me in the middle of what I was saying.  I really
4   only have a minute or two left.

5               Our requests have nothing to do with where this
6   defendant was located.  It's just in some of the arguments for
7   not producing or that searches have been done are just
8   implausible.

9               I mean, on the point that people do business by
10  telephone, not in the United States, and they're doing business
11  with people in the United States, we know there are e-mails
12  from the United States distributors who are purchasing it, and
13  we know there are e-mails from the marketing people.  Are these
14  marketing people operating on an island without supervision
15  from Mr. Jia or any of the other managers?  Hard to believe.

16              It has nothing to do with who the defendant is
17  or what country they're from.  It has to do with a basic
18  understanding of international business in shipping and sales.
19  And just from years of all of us practicing law on both
20  plaintiffs' and defendant's side, seeing productions and not
21  seeing very basic things in this production that we would see
22  in any production by a defendant.

23              So I would reject any implication that we're
24  picking on a company just because they're Chinese.  It has
25  nothing to do with it.  We just want to get these documents to

 1   make our motion.

 2                 The other thing is, you know, again, on the

 3   point on the U.S. contacts, their own marketing documents that

 4   are attached -- and Lenny has them there as exhibits and

 5   they're attached to the brief, Your Honor -- boasts of sales,

 6   not of a couple hundred boards, but thousands of tons of

 7   drywall in the U.S. to U.S. standards.  That is impossible to

 8   have that done without some kind of -- without more documents

 9   involved showing that.

10                 Just to move on to my last point on the

11   upstream/downstream.  It's just not the law that under Rule 34

12   we have to pierce the veil or prove alter ego.  It's just not

13   the law.  Eric made a point about a case that wasn't in our

14   brief.  Okay, we'll go take a look at that.  But in every other

15   case that we looked at, it is clearly not the law.  So maybe

16   they found an outlier that we missed.  We'll go take a look at

17   it.  Maybe Lenny knows it and can address it.  But I'm not

18   aware of any case that I've looked at in putting this brief

19   together that supports the argument that we have to pierce the

20   veil.

21                 I mean, Rule 34 is a much more liberal, broader

22   standard than that.  And the tests that are involved, I mean,

23   we would -- even if we -- and probably if we had to, we'd

24   probably do very well with them.  Is there a commingling of

25   employees?  I already laid out a list in my opening about

1   Mr. Jia and several others who were both acting for TG and on

2   BNBM.  There's a clear intermingling of employees, officers and

3   directors in this case.

4               Is there common ownership?  We've clearly

5   established that.  So there is -- there should be no -- you

6   know, and Mr. Yang Yanjun -- and if I don't pronounce these

7   names right, I apologize -- he was a director of TG, he was a

8   board member of BNBM, and a deputy general member of CNBM.

9   That's about as much as intermingling as you can possibly get,

10  Your Honor.

11              I'll hand it off to Lenny or any other

12  plaintiffs at this point.

13           **MR. DAVIS:**  Your Honor, I just need to respond to a

14  few of the comments that were made.

15              And I have to tell the Court, really look at

16  this and take a common sense approach.  Where are we right now?

17  We are at discovery, and Your Honor addressed that a few

18  moments ago.  We are at discovery; discovery for jurisdiction.

19  We are not at the ultimate question:  Is there a veil piercing

20  at this point?  Is there alter ego at this point?

21              We are attempting to follow Your Honor's orders

22  to get to a point where we can take a deposition that's

23  meaningful.  So I approached this common sense and I look at

24  what we have done, the questioners, to get to where we are with

25  respect to documents, which is what Your Honor wanted addressed

1  first.

2                    Now, I heard counsel's comments about the

3  *Nicastro* opinion out of the Supreme Court.  I'm not going to

4  belabor that point.  We address that at page 23.  And all I'll

5  say is that, as our brief says, Taishan's argument is

6  misplaced.  I'll leave it at that, and the brief is before the

7  Court.

8                    Taishan talked about all these documents they

9  produced.  We got 16,000 documents -- and, again, I look at

10  this common sense -- half are garbage, and I use that term

11  literally.  I'm not trying to be funny when I say that:  Half

12  are garbage.  They are photographs, pictures of trash.  Okay.

13  Half are garbage.  The other half are not complete documents.

14                    We did not get a search or a production from

15  upper management is what we didn't get.  That reference is at

16  footnote 17, page 19 of the brief about the document

17  production.

18                    Now, why can't we come before the Court and give

19  the Court more basis, which is what I heard in counsel

20  opposite's argument?  Common sense, Your Honor, is how I look

21  at this.  I'm used to litigation where you send a request for

22  production -- and oftentimes we deal with U.S. companies -- you

23  get a response, you go depose the person, you get a response.

24                    Here, it's exactly like we said in the

25  conclusion of the brief:  It's a "hide the pea."  And, again,

 1   my comment is not based at Hogan Lovells.  My comment is based
 2   at the documents that we've received, and the ability to come
 3   before the Court and give the Court a piece of paper that shows
 4   exactly what we contend.
 5                  In fact, throughout our brief and attached to
 6   our brief what Your Honor has are documents, as Chris said
 7   earlier, that we discovered independent of the judicial
 8   process.  That's not how litigation normally works.
 9                  For instance, just the basic annual report that
10   gives information, just the basic amount of guarantees that
11   give information, those types of things are basic in regular
12   litigation.  We had to go do our own searches because we
13   couldn't get the information.
14                  Now, I understand we're dealing with an
15   international-type issue, and we have to go to China to get the
16   information.  But control here is the key, the
17   upstream/downstream.  When those at the top control, then we
18   ought to be able to find out who is pulling the strings, who is
19   in charge.  We don't have that information.
20                  We had to go do our independent searches to get
21   what we could get to even find the percentage of ownership and
22   get the Court a chart that makes sense, which is an attachment,
23   I believe -- I don't remember if it's G or M, but I can get
24   that to you -- but that's in our brief.  It's Exhibit G.
25   That's footnoted based on our research.

1           So we can go get a corporate annual report.  We

2  need somebody who can answer the questions.  That's next step

3  here.  We are in this discovery issue, not getting information

4  like one would typically get in typical litigation, and that's

5  the problems that we are having.  It ties into the control

6  issue that Your Honor focused on early on.

7           If the Court wants added research on that issue,

8  we're happy to give that to the Court.  We can do that.  But I

9  believe that we have submitted what the current state of the

10 law is to the Court with respect to the ability of these

11 directors and these other entities that we can't go get

12 information from because they won't appear before the Court.

13 We have provided to the Court what the law is.  And these folks

14 who ran or run Taishan clearly have the ability to go get the

15 information.

16          Your Honor's comment about an affidavit, I

17 appreciate, because that's a practical approach, and it's

18 common sense.  Look, if they don't have the stuff, tell us you

19 don't have it and, we trust, verify it with an affidavit.  We

20 understand that.  That's all we can get.  We can't do any more.

21 But if we find out at a later date through our own

22 investigation that, in fact, the stuff existed, then we expect

23 that the Court will take the appropriate action at that time,

24 and we're not there yet.  We understand all of that.

25          So I look at this as a practical approach.

 1   Again, I go back to the "hide the pea" case, that's at page 27

 2   of our brief.  We have to go through the process that the

 3   United States requires, that the federal rules set forth:  We

 4   make a request.  We're entitled to get a full, complete

 5   production, and we need to be assured that we get a full and

 6   complete production.

 7                    And I believe that that means that we ought to

 8   get it from the upstream folks, because they're the ones in

 9   charge.

10            **THE COURT:**  Anything else from the plaintiffs?

11            **MR. SPANO:**  Yes, Your Honor, Frank Spano.  I just

12   want to correct a few --

13            **THE COURT:**  Well, wait.  Frank, you're not the

14   plaintiffs.

15            **MR. SPANO:**  I'm sorry.  I didn't hear that.

16            **THE COURT:**  Let me hear from the plaintiffs.  Anybody

17   else?

18            **MR. PANAYOTOPOULOS:**  Your Honor, Nick Panayotopoulos,

19   although not technically a plaintiff in the litigation, but

20   against Taishan.

21                    A few points:  These companies -- these

22   defendants were served with discovery and they only searched

23   certain computers.  They have certain duties, as all American

24   companies do, in terms of discovery, to do a full search for

25   the requested documents.

 1              What they did instead was they limited their

 2     searches to very few people that they picked.  And in addition

 3     to limiting their search in that form, in spite of not having

 4     any such agreement from the PSC or from the rest of us, they

 5     also limited what they searched for.  They were not searching

 6     for what we asked for, which was sales of anything to the

 7     United States, to support our jurisdictional arguments.

 8              So they limited the scope of the search terms,

 9     and they limited the scope of the computers that were actually

10     searched.  So we're not questioning the veracity of the law

11     firm.  We're questioning what they did was sufficient under

12     American law in compliance with discovery.

13              That is directed to the ESI question, Your

14     Honor.  And in no question am I suggesting that the law firm is

15     lying.

16              Next would be whether there's a scintilla of

17     evidence related to ownership.  Again, Your Honor knows all the

18     difficulty that we've had getting even basic information from

19     the witnesses, which is all the questions we were asking.  Most

20     of them were a waste of time because these witnesses wouldn't

21     answer them.

22              In spite of that, we've gone to other sources

23     and we found that BNBM and TG have -- don't have separate

24     annual reports.  They produce an annual report and they talk

25     about, for example, that BNBM and TG had sales of drywall

1    boards of 14.22 million square meters that were exported to the

2    U.S. in 2006 and 2007.

3              We don't have the documents that support those

4    sales.  Where are those documents?  To suggest that those

5    documents never existed is just -- it's not that it's not

6    plausible, it's just impossible.

7              We've got the evidence from their own documents

8    of control from one entity to the other.  There was a direct

9    quote that was dismissed from these companies that say that

10   there's daily control from one company to the next.  That is

11   not what a shareholder does in a true market transaction.  A

12   shareholder does not get involved in the day-to-day operations

13   to manage one company; and that's what, by their own admission,

14   we've got here.

15             We've also gotten to this one now, we've got the

16   shared officers and directors and other items that other

17   counsel noted.

18             Finally, on the VAT issue, the defendants want

19   us to take their word that the documents that we're requesting

20   are just -- they're not going to be supportive of our position.

21   That's not how discovery works in America.  If they want to be

22   treated like the American companies in this American action,

23   they need to produce the documents that may lead to admissible

24   evidence.

25             We're not required to take their word for it

1    that those documents would not be helpful.  If they're within

2    their custody or control, they should produce them so that this

3    Court and all the litigants can check and verify that what

4    these defendants' position is is true.

5              That's all I have, Your Honor.  We appreciate

6    your time.

7         THE COURT:  Okay.  Anybody else from the plaintiff?

8         MR. HARDT:  Yes, Your Honor.  Ken Hardt on behalf of

9    Venture Supply and Porter-Blaine.

10             Real briefly, I join in other counsels' -- our

11   comments are not, and my comments were not directed at counsel

12   at all.  They were directed solely at the information that was

13   being provided to counsel.

14             Real quickly on the ESI.  The bottom line of

15   that is we have been told that the only search conducted was of

16   seven personal e-mail accounts.  Period.  That's the extent of

17   the ESI search.  I just can't -- you know, with supervisors and

18   whatnot, that just can't be enough.

19             That's all I have to say, Your Honor.  Thank

20   you.

21        THE COURT:  Anyone else from the plaintiffs?

22             All right.  Frank, let me hear your comments.

23        MR. SPANO:  Yes, I need to just take a moment and

24   correct some factual inaccuracies in the last -- in Nick and

25   Lenny's most recent statements.

1           First of all, TG produced its complete corporate

2  files, which shows in detail how BNBM acquired an interest in

3  TG and under what terms.  We have that resolution by

4  resolution, point by point chronologically.  So insofar as

5  Taishan Gypsum has documents regarding its relationships with

6  BNBM, they have all been produced.  There are no other

7  documents in the possession, custody or control of Taishan

8  Gypsum regarding the relationship with BNBM that remain to be

9  produced.

10           Regarding the documents, all of those exhibits

11  attached to the motions to compel that the PSC pointed out they

12  obtained independently, those are documents from BNBM and CNBM.

13  They are publically available because they are

14  publically-traded companies.  There's nothing remarkable about

15  that.  Those are not TG documents.  Taishan Gypsum is not a

16  publically-traded company.  It doesn't issue annual reports.

17  So I just wanted to correct that point.

18           Regarding Nick's final comments, we did search

19  for and produce documents regarding any sales of anything by

20  Taishan Gypsum or any of its subsidiaries to the U.S.

21           Apart from drywall, there was, to my

22  recollection, the sale of some related partition products or

23  maybe some screws to an entity based in New York in conjunction

24  with a drywall sale.  That was produced.  That is all there is.

25           As far as the comment that most of the

 1   production was garbage, this sort of makes me feel I'm damned

 2   if I do and damned if I don't.  We cast a wide net, and even

 3   though probably not relevant for jurisdiction, where there was

 4   any contact with the U.S., including the purchase of raw

 5   materials used in the production of drywall.  We captured all

 6   that from the purchasing department.

 7            And all of the communications regarding the

 8   purchase of paper from the U.S. that was used in the production

 9   of drywall, we produced that for the sake of completeness.

10            **THE COURT:**  Okay.  Eric, do you have anything?  Any

11   comment?

12            **MR. STATMAN:**  Just very, very, briefly.

13            In listening to both Mr. Davis' and Mr. Seeger's

14   comments about the law regarding control, they still to me are

15   conflating the one element of control, which is the element

16   that goes to showing entitlement to documents about upstream

17   relationships, that element of control, and the element of

18   control that goes to the ability to obtain documents.

19            With regard to the former, just so they

20   understand, I think we've had plenty of briefing on the issue.

21   But I just want to quote from a case called *Blessey Marine*

22   where the court wrote:  "Because the courts have long presumed

23   the institutional independence of related corporations, there

24   must be clear evidence of one corporation asserting sufficient

25   control to make the other its agent or alter ego."  Citing the

1   *Dickson Marine* case, which we cite in our brief.

2                   "In other words, there must be a showing of

3   something beyond the mere existence of a corporate relationship

4   to warrant the exercise of jurisdiction over the non-resident

5   defendant."  Quoting *Freudensprung*, again quoting *Dickson*

6   *Marine*, which we cite in our briefs.  It's absent from the

7   PSC's brief.

8                   Finally, the court wrote:  "In fact, the degree

9   of control exercised by the parent must be greater than that

10  normally associated with common ownership and directorship."

11  Quoting *Hargrave*, which we cite in our brief.

12                  These comments were all made in the context of

13  the question:  Should there be discovery into this

14  relationship?

15                  That's all I need to say.

16          **THE COURT:**  All right.  Thank you all.  I'll take

17  into consideration all the comments made, plus the cases that

18  were cited in addition to your briefs.

19                  I'll also have a transcript made of this.  I may

20  refer to that.  I'll mark this as submitted.  You'll be hearing

21  from me shortly.

22                  Thank you very much.  Court will stand in

23  recess.

24          **MR. DAVIS:**  Your Honor, if I may?

25          **THE COURT:**  Yes.

1       **MR. DAVIS:**  Your earlier order directed us to look at

2    documents first.  We've done that now, and I think we brought

3    the issues to Your Honor's attention.

4           I just have some housekeeping issues that I want

5    to deal with, if it's okay, so we can get some direction and

6    not lose time.

7       **THE COURT:**  All right.

8       **MR. DAVIS:**  Your Honor sent out an order that asked

9    the parties to look at the jurisdiction, that was record

10   document 9911 -- I'm sorry, the translators and the like.

11      **THE COURT:**  Right.

12      **MR. DAVIS:**  We have, in fact, reached out to every

13   one of the translators that were there.

14      **THE COURT:**  I got that list and I sent it to

15   everybody.

16      **MR. DAVIS:**  We have done that.  I can give Your Honor

17   a report.  I don't know if you want it right now, but I'm happy

18   to do that.  I'm happy to share it.  I've spoken to opposing

19   counsel and advised them that we e-mailed each of those.  Some

20   of those just haven't responded; some have; one I think is

21   conflicted out, they've done work for one of the PSC firms.

22           But I have some information that we can address.

23      **THE COURT:**  Why don't do you that.  I think it would

24   be helpful if you put it in the form of a letter and sent

25   copies to everybody so that we have that.

1        **MR. DAVIS:**  I'll do that, and I have that prepared
2  and we can talk about that, but that's one component.

3              But I know that Your Honor wants us to also look
4  at the next step which was:  Who should the witnesses be?  I
5  just raise the issue now because until we know what documents
6  we have, it's difficult for us to address which individuals.
7  We have already started to talk about individuals, and I know
8  the Court saw that in the prior letters, and we've had those
9  communications back and forth.  So we are aware of that issue.

10             But when Your Honor is ready for us to address
11  that further, we certainly will.  But in the meantime, my
12  expectation is is that we're going to look at the translators
13  and nail down a location.

14        **THE COURT:**  Yes.  I thought, Frank, you came in on
15  the location and you felt that you had one that would
16  accommodate everybody.  Is that what I'm hearing?

17        **MR. SPANO:**  Actually, after we conferred about it and
18  realized the number of people who are likely to attend, the
19  eight-person conference room that we had available for the
20  entire week probably will not work.  And we have a much larger
21  conference room available, but only for the 9th, the 10th and
22  the 13th.

23             So if the depositions can't be done on those
24  three days, we need to talk about, unfortunately, options other
25  than the Hogan Lovells Hong Kong office.

1      **THE COURT:**  All right.  Get with Frank on that.

2   We'll nail down those three dates, and then let's have a plan B

3   in the event we need them.  If you all can agree, fine; if you

4   can't, then I'll set something up.

5      **MR. DAVIS:**  Okay.  Thank you, Your Honor.  I just

6   wanted to make sure that we had these housekeeping issues

7   addressed.

8      **THE COURT:**  Right.  I think from everybody's

9   standpoint, we ought to know who the witnesses are, who's going

10  to ask questions of those witnesses, and where it's going to

11  be, and the translators.  When we get the translators, I may

12  issue an order just making the translators 706 so that we've

13  got the Court's imprimatur on the translators so that we'll

14  have some consistency there.

15     **MR. DAVIS:**  Thank you, Your Honor.

16     **THE COURT:**  Okay.  All right, folks.  Thanks again.

17     **THE DEPUTY CLERK:**  All rise.

18     (WHEREUPON, the proceedings were concluded.)

19                          *****

20                      **CERTIFICATE**

21      I, Jodi Simcox, RMR, FCRR, Official Court Reporter
    for the United States District Court, Eastern District of
22  Louisiana, do hereby certify that the foregoing is a true and
    correct transcript, to the best of my ability and
23  understanding, from the record of the proceedings in the
    above-entitled and numbered matter.

24

25                    S/ Jodi Simcox, RMR, FCRR
                      Jodi Simcox, RMR, FCRR
                      Official Court Reporter


                JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA