UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE MANUFACTURED     *   MDL No. 2047
DRYWALL PRODUCTS LIABILITY     *
LITIGATION     *   SECTION L
    *
    *   JUDGE ELDON E. FALLON
    *
    *   MAGISTRATE JUDGE
    *   JOSEPH C. WILKINSON, JR.
    *

* * * * * * * * * * * * * * ** * * * * ** * * * * * ** * *

**THIS DOCUMENT RELATES TO:** *The Mitchell Co., Inc. v. Knauf Gips KG, et al.,* **Case No. 09-4115**

**MEMORANDUM OF TAISHAN GYPSUM CO. LTD.
IN REPLY TO PLAINTIFF'S OPPOSITION TO THE
RENEWED MOTION TO VACATE THE DEFAULT
JUDGMENT AND DISMISS THIS ACTION**

## TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ..............................................................................1

ARGUMENT ...................................................................................................3

I.    THE DEFAULT SHOULD BE VACATED BECAUSE THE COURT
      LACKS PERSONAL JURISDICTION OVER TG. ..........................................3

      A.    Plaintiff Failed To Present Evidence That TG Is Subject To
            Jurisdiction Under The Florida Long-Arm Statute. ..............................6

            1.    Plaintiff Has Not Established Jurisdiction Under Fla. Stat. §
                  48.193(1)(a). ...................................................................6

            2.    Plaintiff Has Not Established Jurisdiction Under Fla. Stat.
                  § 48.193(1)(b). .................................................................7

            3.    Plaintiff Has Not Established Jurisdiction Under Fla. Stat. §
                  48.193(1)(f). ....................................................................8

      B.    Plaintiff Has Failed To Satisfy The Requirements Of Due Process. .......8

II.   TG AND TTP MUST BE TREATED AS SEPARATE ENTITIES. ...................9

      A.    TG And TTP Must Be Treated Separately Under Chinese Law. ...........10

      B.    The Homebuilder's Agency Argument Fails Under Florida Law. ........22

      C.    No Upstream Entities' Activities Should Be Attributed To TG. ...........26

III.  PLAINTIFF IS UNABLE TO SATISFY FLORIDA'S LONG-ARM
      STATUTE TO EXERCISE PERSONAL JURISDICTION OVER TTP.........26

      A.    TTP Has Not Conducted Business In Florida. .....................................27

      B.    TTP Has Not Committed A "Tortious Act" In Florida. ........................31

      C.    TTP's Alleged Conduct Did Not Cause Plaintiff To Sustain An
            "Injury To Person Or Property" In Florida. .......................................31

      D.    TTP Has Not Engaged In Substantial Activity In Florida As
            Required For General Jurisdiction Under The Long-Arm Statute.........32

IV.   DUE PROCESS WOULD NOT PERMIT THE COURT TO EXERCISE
      PERSONAL JURISDICTION OVER TTP.................................................32

     A.     Plaintiff Has Not Established That TTP Had Minimum Contacts With Florida. .................................................................................................33

          1.     Plaintiff Has Failed To Prove That TTP Purposefully Availed Itself Of The Florida Market. .......................................................40

          2.     Plaintiff Cannot Prove That TTP Purposefully Availed Itself Of The Florida Market Based On TTP's Alleged Awareness Of Sales In Florida. ..............................................46

          3.     Plaintiff Has Not Established That Its Causes Of Action Arose Out Of Or Resulted From TTP's Contacts With Florida. ....................................................................................47

          4.     The Exercise Of Jurisdiction Over TTP Would Offend Traditional Notions Of Fair Play And Substantial Justice. .......................48

V.     THE PRELIMINARY DEFAULT MUST BE SET ASIDE BECAUSE PLAINTIFF FAILED TO SERVE THE PLEADING UPON WHICH IT WAS BASED. ......................................................................................................50

VI.     THE DEFAULT JUDGMENT SHOULD BE SET ASIDE ON THE GROUNDS OF EXCUSABLE NEGLECT. ....................................................51

CONCLUSION ...........................................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ALS Scan Inc. v. Digital Serv. Consultants, Inc.,*
293 F.3d 707 (4th Cir. 2002) ................................................44

*Am. Int'l Gr., Inc. v. Cornerstone Bus., Inc.,*
872 So.2d 333 (Fla. 2d DCA 2004) ..................................18

*Asahi Metal Indus. Co. v. Superior Court of Cal.,*
480 U.S. 102 (1987).................................................40, 47, 48, 49

*Blair v. City of Worcester,*
522 F.3d 105 (1st Cir. 2008)...............................................50

*Bloomberg v. Steve Weiss Co.,*
922 So.2d 361 (Fla. 3d DCA 2006) ...................................7

*Burger King v. Rudzewicz,*
471 U.S. 462 (1985).................................................3, 40, 49

*City Nat'l Bank of Detroit v. Basic Food Indus., Inc.,*
520 F.2d 336 (5th Cir. 1975) ..............................................24

*Conax Fla. Corp. v. Astrium, Ltd.,*
499 F. Supp. 2d 1287 (M.D. Fla. 2007)..............................27

*Cooper v. McDermott Int'l, Inc.,*
62 F.3d 395 (5th Cir. 1995) ................................................4

*Dania Jai-Alai Palace v. Sykes,*
450 So. 2d 1114 (Fla. 1984) ..............................................10

*Empire Indus., Inc. v. Kaplan,*
695 So.2d 919 (Fla. 4th DCA 1997).....................................30

*Execut-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.,*
752 So.2d 582 (Fla. 2000).................................................7

*G&G Closed Cir. Events, LLC v. Castro & Cedillos, Inc.,*
No. 11-3274, 2012 WL 748577 (D. Md. Mar. 6, 2012) ............50

*Gibson v. Credit Suisse AG,*
CV 10-1-EJL-REB, 2010 WL 1904773 (D. Idaho May 11, 2010)..........10

iii

*Goodyear Dunlop Operations, S.A. v. Brown,*
   131 S. Ct. 2846 (2011) ........................................................................................................9

*Hobbs v. Don Mealey Chevrolet, Inc.,*
   642 So.2d 1149 (Fla. 5th DCA 1994) ..............................................................................10

*Homeway Furniture Co.of Mount Airy, Inc. v. Horne,*
   822 So.2d 533 (Fla. 2d DCA 2002) ..................................................................................30

*In re Chinese-Manufactured Drywall Prod. Liability Litig.,*
   767 F. Supp. 2d 649 (E.D. La. 2011) ............................................................................3, 4

*In re Ford Motor Co.,*
   591 F.3d 406 (5th Cir. 2009) ...............................................................................................3

*In re WellNx Mktg. & Sales Practices Litig.,*
   No. 07-MD-1861, 2010 WL 3652457 (D. Mass. Sept. 15, 2010) .............................................4

*Int'l Shoe Co. v. Washington,*
   326 U.S. 310 (1945) .......................................................................................................8, 9

*Irving v. Owens-Corning Fiberglass Corp.,*
   864 F.2d 383 (5th Cir. 1989) .............................................................................................37

*J. McIntyre Mach., Ltd. v. Nicastro,*
   131 S. Ct. 2780 (2011) .............................................................................................. passim

*Jackson v. FIE Corp.,*
   302 F.3d 515 (5th Cir. 2002) ........................................................................................47, 48

*James v. Claiborne,*
   2009 WL 994 951 (W.D. La. Apr. 13, 2009) .......................................................................50

*Jasper v. Zara,*
   595 So.2d 1075 (Fla. 2d DCA 1992) .................................................................................30

*Kernel Records Oy v. Mosley,*
   No. 09-21597-Civ. 2010 WL 2812565 (S.D. Fla. July 5, 2010) ....................................23, 32

*Luv 'N Care, Ltd. v. Insta-Mix, Inc.,*
   438 F.3d 465 (5th Cir. 2006) ........................................................................................36, 38

*Marks v. United States,*
   430 U.S. 188 (1977) ...........................................................................................................33

*McFadin, v. Gerber,*
   587 F.3d 753 (5th Cir. 2009) ................................................................................36, 40, 45

*McHugh v. Kenyon*,
   547 So.2d 318 (Fla. 4th DCA 1989) .......................................................................28

*Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*,
   288 F.3d 1264 (11th Cir. 2002) ............................................................................23

*Milligan Elec. Co., Inc. v. Hudson Constr. Co.*,
   886 F. Supp. 845 (N.D. Fla. 1995)..........................................................................8

*Minebea Co., v. Papst*,
   444 F. Supp. 2d 68 (D. D.C. 2006) ........................................................................10

*Mink v. AAAA Dev. LLC*,
   190 F.3d 333 (5th Cir. 1999) ................................................................................44

*NetKnowledge Techs., LLC v. Baron Capital V, Inc.*,
   No. Civ. A. 3:02-CV-2406-M, 2003 WL 23201333 (N.D. Tex. July 24, 2003) ......................4

*Nuovo Pignone, SpA v. Storman Asia, MV*,
   310 F.3d 374 (5th Cir. 2002) ..........................................................................37, 38

*Oticon v. Sebotek Hearing Sys., LLC*,
   No. 08-5489, 2011 WL 3702423 (D. N.J. Aug. 22, 2011) ......................................34

*Paz v. Brush Engineered Materials Inc.*,
   445 F.3d 809 (5th Cir. 2006) ................................................................................37

*Posner v. Essex Ins. Co., Ltd.*,
   178 F.3d 1209 (11th Cir. 1999) ..............................................................................7

*Reflection Mfg., LLC v. I.S.A. Corp.*,
   No. 10-cv-1951, 2011 WL 972570 (M.D. Fla. Mar. 18, 2011) ..............................28

*Robert D. Harley Co. v. Global Force (H.K.) Ltd.*,
   No. 05-CV-21177, 2007 WL 196854 (S.D. Fla. Jan. 23, 2007)..............................30

*Ruston Gas Turbines, Inc. v. Donaldson Co.*,
   9 F.3d 415 (5th Cir. 1993) ............................................................................36, 37

*S. Copper, Inc. v. Specialloy, Inc.*,
   245 F.3d 791 (5th Cir. 2000) ........................................................................37, 45

*Shaffer v. Heitner*,
   433 U.S. 186 (1977).............................................................................................35

*Smith v. Railworks Corp.*,
   No. 10-CV-3980, 2012 WL 752048 (S.D.N.Y. Mar. 6, 2012) ..................................4

*State v. Am. Tobacco Co.*,
  707 So.2d 851, 854 (Fla. 4th DCA 1998) ................................................................23

*Sun Bank, N.A. v. E.F. Hutton & Co.*,
  926 F.2d 1030 (11th Cir. 1991) ...............................................................................8

*Vantage View, Inc. v. Bali East Dev. Corp.*,
  421 So.2d 728 (Fla. 4th DCA 1982) ........................................................................24

*Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*
  517 F.3d 235 (5th Cir. 2008) ..................................................................................6

*Westwind Limousine, Inc. v. Shorter*,
  932 So.2d 571 (Fla. 5th DCA 2006) ........................................................................44

*Wien Air Alaska v. Brandt*,
  195 F.3d 208 (5th Cir. 1999) ..................................................................................36

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980) ................................................................................35, 46, 47

**STATUTES**

Fla. Stat. § 48.193(1) ................................................................................ passim

**RULES**

Fed. R. Civ. P. 4 ................................................................................................50

Fed. R. Civ. P. 5(a)(2) .......................................................................................50

Fed. R. Civ. P. 55(c) and 12(b)(2) .........................................................................1

Fed. R. Civ. P. 60(b)(4) ......................................................................................48

**OTHER AUTHORITIES**

Wright & Miller: § 2444 Proof of Foreign Law, 9A Fed. Prac. & Proc. Civ. § 2444 (3d
  ed. 2012) ........................................................................................10, 16

## SUMMARY OF ARGUMENT

Plaintiff[1] in its opposition[2] failed to meet its burden of proving, by a preponderance of admissible evidence, that TG[3] is subject to personal jurisdiction in Florida.  Both the Florida long-arm statute and Due Process require evidence that the defendant's activities in Florida or directed to Florida caused Plaintiff's injury.  Plaintiff has presented no such evidence.  The relevant facts are uncontroverted:

- TG manufactures drywall exclusively in China.

- TG sold drywall to only one U.S. company, Venture Supply.

- TG and Venture Supply entered into two purchase agreements in China, providing for arbitration before a Chinese forum.

- Pursuant to those agreements, Venture Supply made two purchases of 1/2" thick drywall, FOB a Chinese port.

- After Venture Supply's agent inspected the drywall at TG's factory, TG delivered the drywall to the Chinese port selected by Venture Supply, and transferred possession of the drywall to Venture Supply's shipping agent.

---

[1] The term "Plaintiff" as used herein refers to plaintiff The Mitchell Company, Inc.

[2] This memorandum responds to the Plaintiff's Memorandum of Law in Opposition to Taishan Gypsum Co. Ltd.'s Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint ("Mitchell Opp. Br.") (R. Doc. Nos. 14372), which explicitly incorporates the PSC's Global Statement of Facts ("PSC Global SOF") (R. Doc. No. 14215-2) and the PSC's Global Memorandum of Law ("PSC Global MOL") (R. Doc. No. 14215).  (*See* Mitchell Opp. Br. at 4, 14.)   In addition, this memorandum responds to the PSC's Response in Opposition to Taishan Gypsum Co. Ltd.'s Renewed Motion to Rules 55(c) and 12(b)(2) to Vacate the Default and to Dismiss and Amicus Brief On Florida Law Relating To Jurisdictional Issues Raised By Taishan (R. Doc. No. 14216) ("Mitchell PSC Opp. Br."), certain Florida Homebuilders' *Amicus Curiae* Response to Taishan Gypsum Co. Ltd.'s Motion Pursuant to Rules 55(c) and 12(b)(2) to Vacate the Default and Dismiss the Action ("Homebuilders Opp. Br.") (R. Doc. No. 14390); the Banner Entities' Amicus Memorandum in Response to Mitchell ("Banner Opp. Br.") (R. Doc. Nos. 1434-2); and the State of Louisiana's Opposition Memorandum of Law (R. Doc. No. 14366).

[3] Defined terms in this memorandum have the same meaning as in TG's opening brief (R. Doc. No. 13490-1) ("Opening Br.").

Plaintiff does not offer any admissible non-hearsay evidence to refute any of these facts. Plaintiff has also failed to present any admissible evidence that TG targeted potential customers from Florida or any other State. [4]   The evidence shows at most that TG was willing to sell drywall in China to companies from the U.S. (and elsewhere) that approached TG in China, and accommodate potential customer requests for price quotes and shipping information.

Significantly, Plaintiff has also failed to offer any admissible evidence that its causes of action arose from any TG contacts with Florida as Due Process requires.  Plaintiff offers no evidence that any of the drywall that TG sold to Venture Supply in China was used by Plaintiff to construct homes in Florida.

Aware of TG's lack of contacts with Florida, Plaintiff seeks to impute the activities of TTP to TG.  Plaintiff uses the term "Taishan" to mean both TG and TTP, even though one of the issues before this Court is whether the juridical independence of TG and TTP can be ignored. Notwithstanding this confusing rhetorical device, there is no basis for treating TG and TTP as one entity.

Even if TTP's acts were attributed to TG, Plaintiff has not offered evidence of any conduct by TTP that fits within the Florida long-arm statute and satisfies the overarching requirements of Due Process for personal jurisdiction.  The uncontroverted evidence is that TTP sold drywall in China to only three customers who came from Florida and solicited TTP in China. TTP did not ship any drywall to Florida and TTP had no role in marketing or re-selling drywall in Florida.

---

[4] Plaintiff cites numerous documents and testimony, but much of it is irrelevant or otherwise inadmissible, and none of it demonstrates that TG targeted Florida customers.  TG will address the inadmissibility of certain evidence Plaintiff has submitted in the Evidentiary Objections accompanying this memorandum.

Plaintiff also has failed to rebut TG's showing that the exercise of personal jurisdiction would offend "traditional notions of fair play and substantial justice," because each of the *Burger King* factors weighs against the Court's assertion of jurisdiction over TG.

The preliminary default also is invalid because Plaintiff failed to serve TG with any pleading or motion containing the claims upon which the default was based.

Finally, TG has demonstrated that the default should also be vacated on the grounds of excusable neglect.

## ARGUMENT

## I.    THE DEFAULT SHOULD BE VACATED BECAUSE THE COURT LACKS PERSONAL JURISDICTION OVER TG.

Governing Law

Binding precedent in the Fifth Circuit requires this MDL transferee court to apply the law that would have governed the transferor court in its determination of personal jurisdiction, *i.e.* Eleventh Circuit law.  In *In re Ford Motor Co.*, 591 F.3d 406 (5th Cir. 2009) the Fifth Circuit granted a writ of mandamus directing the original transferor court to not follow the decisions of an MDL transferee court on the issue of *forum non conveniens* because those decisions conflicted with the Fifth Circuit precedent binding in the transferor court. Clearly, application of the doctrine of *forum non conveniens* was a matter of federal law as are the requirements of Due Process for personal jurisdiction.  Plaintiff ignores *In re Ford* and cites to inapposite cases from outside of the Fifth Circuit.[5]  Indeed, while Plaintiff cites to this Court's decision in *In re Chinese-Manufactured Drywall Prod. Liability Litig.*, 767 F. Supp. 2d 649, 657 n.2. (E.D. La. 2011), it cites the statement that in cases involving <u>federal question</u> jurisdiction, a transferee

---

[5] *See* PSC Global MOL at 4, n.20.

court should follow the law of its own circuit.  Plaintiff ignores the following, more directly on point sentence from the same opinion:  "If the cases were transferred by the MDL panel to this Court for consolidation the Court would be obligated under the same Fifth Circuit law to look to the law of the foreign forum to determine personal jurisdiction." *Id.* (citing *In re WellNx Mktg. & Sales Practices Litig.,* No. 07-MD-1861, 2010 WL 3652457, at *1-2 (D. Mass. Sept. 15, 2010)).

Furthermore, the Due Process requirement that the defendant reasonably anticipate litigation in the forum State also favors applying Eleventh Circuit law to the question of whether the Northern District of Florida had personal jurisdiction over TG.  *See Smith v. Railworks Corp.,* No. 10-CV-3980, 2012 WL 752048, at *6 (S.D.N.Y. Mar. 6, 2012).  TG certainly could not reasonably anticipate being haled into a court in Florida under Fifth Circuit jurisdictional standards.  *Id.*

Burden Of Proof

Since TG has contradicted the jurisdictional allegations in the Complaint through various declarations, documents and deposition testimony, Plaintiff must meet its burden of proof based on admissible non-hearsay evidence.  *See Cooper v. McDermott Int'l, Inc.,* 62 F.3d 395, at *5 (5th Cir. 1995) (unpublished).  *See also NetKnowledge Techs., LLC v. Baron Capital V, Inc.*, No. Civ. A. 3:02-CV-2406-M, 2003 WL 23201333 at *3 (N.D. Tex. July 24, 2003) (granting motion to dismiss for lack of personal jurisdiction after evidentiary hearing due to "insufficient reliable non-hearsay evidence" of minimum contacts).

Plaintiff has argued that it need only make a *prima facie* showing of a basis for the exercise of personal jurisdiction over TG because this Court is not conducting any evidentiary

hearing.[6]  However, the Court has made it quite clear that it desired to proceed with an evidentiary hearing.  *See, e.g.* August 30, 2011 Transcript of oral argument on the PSC's "Motion To Compel Production of Documents and Further Jurisdictional Depositions of the Taishan Defendants" at 6:12-20[7]:

> The Taishan entities have a serious motion here.  I'm trying to develop, or have the parties develop, some evidence so that I can look at the evidence and base my decisions on the evidence as opposed to dealing with it without evidence, because then certain prima facie rules come into play.  In a case of this sort, I really think it would be more helpful to the litigation and to the litigants to allow the Court to hear some evidence and make a reasoned and thorough opinion, on way or the other, on it.

and September 9, 2011 Order & Reasons (R. Doc. No. 10269) granting the PSC's motion:

> This Court is extending every opportunity to Taishan to present evidence to support its position, but if no evidence is forthcoming or if appropriate discovery is thwarted so that a fair hearing becomes impossible, this fact-finder will be compelled to construe all disputed facts in the plaintiff's favor.

September 9, 2011 Order at p. 14.

In response, counsel for TG and TTP promptly informed the Court and the parties that they welcomed the opportunity to participate in an evidentiary hearing and the Court and the parties have proceeded accordingly.[8]  At the depositions in Hong Kong earlier this year, the

---

[6]PSC Global MOL at 5, n.21.  The parties attended a conference with the Court on May 16, 2012.  At that conference, the plaintiffs agreed that they must prove personal jurisdiction by the preponderance of the evidence standard that accompanies an evidentiary hearing.  However, the plaintiffs have not formally withdrawn their "*prima facie* showing" argument.  Accordingly, in an abundance of caution, we will briefly address it here.

[7]A copy of relevant excerpts from the August 30, 2011 transcript is attached to the Reply Declaration of Frank T. Spano, dated June 8, 2012 ("Spano Reply Decl.") as Exhibit 43.

[8]*See* Spano Reply Decl. Ex. 44 (Letter dated October 28, 2011 from J. Cyr to Judge Fallon).  On January 6, 2012, the Court entered an Order Regarding Authenticity and Admissibility of Certain Documents Identified by Parties for Use at Depositions in Hong Kong the Week of January 9, 2012 (R. Doc. 12126), and an Order Regarding Use of Depositions in MDL and State Court Proceedings (R. Doc. 12127), both clearly in anticipation of the evidentiary hearing to be held on the issue of personal jurisdiction.  Moreover, in its Minute Entry for the November 10, 2011 status conference held in relation to the status of discovery and depositions of the Taishan entities (R. Doc. 11192),

Court again indicated that it was hearing testimony, assessing the credibility of witnesses and acting as a fact finder.[9]  Furthermore, at the very beginning of the Hong Kong depositions, counsel for TG and TTP also stated without any objection that TG and TTP welcomed the Court's rulings on objections at the depositions because TG and TTP wanted the depositions to be admissible evidence as part of the record in the hearing before the Court.[10]  Since the Court has been conducting an evidentiary hearing, Plaintiff must meet the preponderance of the admissible evidence standard.  *See Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241-42 (5th Cir. 2008).

> ### A.   Plaintiff Failed To Present Evidence That TG Is Subject To Jurisdiction Under The Florida Long-Arm Statute.
>
> #### 1.   Plaintiff Has Not Established Jurisdiction Under Fla. Stat. § 48.193(1)(a).

Plaintiff asserts that TG "systematically conducted a general course of business activity in the state" such that TG was "carrying on a business" in Florida within the meaning of § 48.193(1)(a) of the long-arm statute.[11]  The evidence compels a contrary conclusion.  TG has never had an office, bank account, or any property in Florida.  TG never had any officers, directors or employees who worked in or visited Florida.  TG's only U.S. customer was Venture Supply, and its two isolated sales to this Virginia company were made in China.  TG did not ship any drywall to Florida, or to anywhere else in the U.S., and had no role in marketing or re-selling

---

the Court noted that the parties were working on a "stipulation regarding evidentiary issues pertaining to exhibits to be used at the depositions, for example business records and hearsay," undoubtedly with an eye towards admissibility of documents as part of the evidentiary hearing.

[9] *See* Herman Aff. Ex. 6 ("Che Tr.") at 98:7-21; Herman Aff. Ex. 110 ("Shiliang Tr.") at 44:8-21.

[10] *See* Spano Decl. Ex. 2 ("Jia Tr.") 531:24-534:15.

[11] Mitchell Opp. Br. at 10.  Plaintiff in its opposition does not contend that TG had sufficient contacts with the forum State to be subject to general personal jurisdiction under the Florida long-arm statute.  Plaintiff attempts only to establish a statutory basis for specific personal jurisdiction over TG.

drywall in Florida.  These activities did not constitute carrying on a business in Florida (*see* Mitchell Opening Br. at 27-28) and Plaintiff cites no authority indicating otherwise.

### 2.   Plaintiff Has Not Established Jurisdiction Under Fla. Stat. § 48.193(1)(b).

Plaintiff has put forth no evidence, much less a preponderance of admissible evidence, that TG committed a tortious act in Florida for purpose of personal jurisdiction under section 48.193(1)(b) of Florida's long-arm statute.  Under Florida law, a sale of a product outside the State is not a tortious act within the State for purposes of § 48.193(b), even if the product is allegedly defective and caused injury in Florida.  *Bloomberg v. Steve Weiss Co.,* 922 So.2d 361 (Fla. 3d DCA 2006) (although out-of-state sale may have had ultimate consequences in the State, allegedly causing injuries from ingesting product, the sale itself did not directly cause damage within the State).  Plaintiff's allegation of an economic injury as an ultimate consequence of TG's sales of drywall abroad is similarly insufficient to establish a tortious act in the State.[12]

Plaintiff's claim is outside the scope of § 48.193(b) for the additional reason that its alleged economic injury occurred in Alabama, not Florida.  *See Posner v. Essex Ins. Co., Ltd.,* 178 F.3d 1209, 1220 (11th Cir. 1999) ("[E]ven the broader construction of subsection (1)(b) adopted by this court does not permit the exercise of personal jurisdiction pursuant to an allegation of injury to the business interest of a Florida plaintiff where that interest is located entirely outside of Florida.")[13]

---

[12]Plaintiff cannot distinguish *Bloomberg* on the ground that the defendant there merely sold the product but did not manufacture it.  Mitchell Opp. Br. at 12.  In *Bloomberg* as in this case, the alleged tortious act was the sale of the product into the stream of commerce.  If TG had made no sales, Plaintiff would have no claim.  But *Bloomberg* establishes that a foreign sale alone is not tortious activity in the State.  In addition, *Execut-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.,* 752 So.2d 582, 585 (Fla. 2000), cited in Homebuilders Opp. Br. at 58, involved a situation where – unlike the present case – a substantial aspect of the alleged tort, price fixing, directly occurred in Florida.

[13]*See also* Mitchell Opening Br. at 28.

**3.      Plaintiff Has Not Established Jurisdiction Under Fla. Stat. §
48.193(1)(f).**

Plaintiff's claim for economic injury in Alabama fails to qualify as an "injury to persons

or property" in Florida for purposes of personal jurisdiction under long-arm statute.  *See Sun*

*Bank, N.A. v. E.F. Hutton & Co.,* 926 F.2d 1030, 1033 (11th Cir. 1991) ("[A] purely economic

injury… is insufficient to confer jurisdiction over a defendant under [Fla. Stat.] § 48.193(1)(f).").

Even if Plaintiff could satisfy the requirement of an injury, Plaintiff has offered no admissible

evidence that TG was engaged in solicitation or service activities in the State (as required by

§ 48.193(1)(f)(1)) or that Plaintiff's injury was caused by products TG sold that were used and

consumed in the State (as required by § 48.193(1)(f)(2)).

**B.      Plaintiff Has Failed To Satisfy The Requirements Of Due Process.**

Plaintiff's failure to establish a basis for personal jurisdiction over TG under the Florida

long-arm statute makes a jurisdictional inquiry under the United States Constitution unnecessary

because Florida's long-arm statute confers less jurisdiction upon Florida courts than allowed by

the United States Constitution.  *Milligan Elec. Co., Inc. v. Hudson Constr. Co.*, 886 F. Supp. 845,

848 (N.D. Fla. 1995).  But, even if the requirements of the Florida long-arm statute had been met,

Plaintiff failed to establish that personal jurisdiction is proper under the Due Process Clause of

the Fourteenth Amendment of the United States Constitution.

All parties agree that to satisfy the constitutional Due Process requirement, a defendant

must have sufficient "minimum contacts" with the forum state such that "the maintenance of the

suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v.*

*Washington*, 326 U.S. 310, 316 (1945) (citation and internal quotation marks omitted).  Plaintiff,

however, has offered no evidence sufficient to establish TG had minimum contacts with Florida.

Plaintiff presented no evidence that TG sold to Florida buyers, knew of its products being

shipped to or re-sold in Florida, or directed its marketing to Florida.  In short, there is no evidence that TG had any presence at all in Florida.  Plaintiff also has failed to show that its claims arose from TG's contacts with Florida:  there is no evidence that Plaintiff's alleged economic loss resulted from any drywall that TG sold in China.  On this record, it is an understatement to say the exercise of jurisdiction over the Chinese corporation in this action would run afoul of the very notions of fair play and substantial justice that the Due Process clause serves to protect. [14]

## II.   TG AND TTP MUST BE TREATED AS SEPARATE ENTITIES.

Plaintiff asserts "Taishan" is subject to this court's jurisdiction based on its own actions and not based on any alter ego theory.[15]   However, Plaintiff's jurisdictional argument relies solely on the actions of TTP; Plaintiff has not put forth any evidence of TG's own actions that supports personal jurisdiction over it.  Because Plaintiff has the burden of proving jurisdiction, this is reason enough for dismissal of Plaintiff's case.

Apparently, recognizing that there is no connection between TG and Florida sufficient for personal jurisdiction there, the PSC has attempted to attribute the acts of TG's wholly-owned subsidiary, TTP, to TG.  However, the PSC has failed to meet its burden of proving by a preponderance of admissible evidence that there is any basis to disregard TG's separate corporate personhood; and in any case, Plaintiff/PSC/Homebuilders have also failed to establish that TTP would be subject to personal jurisdiction in Florida.

---

[14] The Homebuilders assert that general jurisdiction over TG would be permissible under the Due Process clause. However, general jurisdiction is permissible only where defendant's contacts with Florida "are so 'continuous and systematic' as to render them essentially at home in the forum State."  *Goodyear Dunlop Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011) (citing *Int'l Shoe*, 326 U.S. at 317).  As discussed above, TG does not have any contacts with the state of Florida, much less contacts this pervasive.

[15] Mitchell Opp. Br. at 1.

A.    **TG And TTP Must Be Treated Separately Under Chinese Law.**

In its opening brief, TG established that Chinese corporate law (*Gongsi Fa*, or "Company Law") applies to the question of whether TG and TTP should be treated independently.[16]  The PSC concedes this point and submitted the opinion of three Chinese attorneys who assert that certain facts that the PSC selected for them and told them to consider as true provide a basis for disregarding the separate legal personhood of TG and TTP.[17]  These opinions are far outside the realm of what a legal expert may present to the Court.  *See, e.g.*, Wright & Miller: § 2444 Proof of Foreign Law, 9A Fed. Prac. & Proc. Civ. § 2444 (3d ed. 2012) ("The purpose of an expert witness in foreign law is to aid the court in determining the content of the applicable foreign law, not to apply the law to the facts of the case.").[18]  Even more crucial is that, as shown below, this conclusion is based on a highly flawed interpretation of Chinese law that contravenes both its letter and spirit.  Understood correctly, Company Law provides no basis for attributing TTP's acts to TG and instead requires that TG's liability be limited to acts that it conducted itself.

---

[16] *See* TG's Memorandum in Support of its Renewed Motion Pursuant to Rules 55(C) and 12(B)(2) to Vacate the Entry of Default and Dismiss This Action ("Mitchell Opening Br.") (R. Doc. No. 13566-1) at 46.

[17] Not surprisingly, neither Plaintiff, the PSC nor any other party has argued that Florida law would require the Court to disregard the separate personhood of TG and TTP.  Under Florida law, in order to ignore corporate personhood and impute the contacts of independent entities to one another for jurisdictional purposes, a plaintiff must prove both:  (1) that the subsidiary is a mere instrumentality or alter ego of the parent and, as under Chinese law (2) that the subsidiary was formed for an improper purpose.  *Hobbs v. Don Mealey Chevrolet, Inc.*, 642 So.2d 1149, 1156 (Fla. 5th DCA 1994) ("[t]he corporate veil will not be penetrated . . . unless it is shown that the corporation was organized or employed to mislead creditors or to work a fraud upon them."), citing *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 114, 1120-21 (Fla. 1984) (alteration in original).

[18] *See also Minebea Co., v. Papst*, 444 F. Supp. 2d 68, 182 (D. D.C. 2006) (purpose of expert testimony is to aid the court in determining the content of the applicable foreign law – not to apply it to the facts of the case and make ultimate legal conclusions); *Gibson v. Credit Suisse AG*, CV 10-1-EJL-REB, 2010 WL 1904773, at *2 n.4 (D. Idaho May 11, 2010) (expert affidavit on foreign Bahamian law is permissible, "but only to the extent of discussing Bahamian standards, not legal conclusions").

<u>Chinese Law Overview</u>

In China, the principle of limited liability for shareholders is recognized as the "key to the long-term success of the system of corporation."[19]  Thus, the concept of limited liability is the starting point and foundation of Company Law.[20]  The general rule of shareholder limited liability is firmly articulated in Article 3, which provides that company shareholders are liable to the company only "to the extent of the shares they subscribed for."[21]  However, two Articles which were adopted in a 2005 revision to Company Law, provide special exceptions to Article 3.[22]  Article 20, which applies generally to all corporations, provides that a corporation's corporate separateness may be disregarded if a creditor proves that the shareholders seriously injured the creditor by abusing the corporate separateness for the purpose of evading debt.[23]  Article 64, which applies only to corporations with one shareholder, provides that corporate separateness may be disregarded if a sole shareholder is unable to show that his own property is separate from that of the company.[24]  If the sole shareholder makes this initial showing, it will retain its corporate separateness unless the creditor proves that Article 20 applies.[25]

Chinese courts are cautious in applying these new provisions out of concern they be used to undermine the "cornerstone" of Chinese corporate law, *i.e.* limited liability.[26]  For example,

---

[19] Liu Decl. ¶ 44.

[20] Zhu Reply Decl. ¶ 3.

[21] *Id.* ¶ 6 and Ex. C.

[22] *Id.* ¶¶ 7, 13.

[23] *Id.* ¶ 7.

[24] *Id.* ¶ 13.

[25] *Id.* ¶¶ 14, 24.

[26] *Id.* ¶ 4.

the Legislative Affairs Committee of the Standing Committee of the National People's Congress, a body that coordinated drafting the Company Law, has emphasized that courts should "err on the side of caution" when straying from the general rule of limited liability.[27]   Indeed, the PSC's own legal expert, Professor Liu Junhain, has explicitly intoned that "[c]ourts and arbitration organizations should be extremely careful when deciding whether or not to disregard the legal personality of a company.  If the issue at hand lies in the gray areas of legal practice – especially when the legal personality of a company can either be disregarded or not – then the legal personality should decidedly not be disregarded."[28]   Accordingly, Chinese courts will rarely, if ever, disregard corporate separateness under either Article unless it is clear that the corporate form has been intentionally and maliciously abused by a shareholder in order to evade company debts and such abuse caused serious harm to company creditors.[29]   Although PSC asserts otherwise, this limitation is recognized by leading Chinese scholars and legislative bodies,[30] and, in fact, Professor Liu himself has often commented that malice should be present if a company's corporate separateness is disregarded.[31]

The PSC Misinterprets And Misapplies Company Law.

According to PSC, Article 64 is the equivalent of Article 20, except that the sole shareholder has the burden of proof.[32]   As stated by one of its experts:

---

[27] Zhu Reply Decl. ¶ 4.

[28] *Id.* ¶ 4 (quoting Professor Liu).

[29] *Id.* ¶¶ 16-20.

[30] *Id.* ¶¶ 16-18.

[31] *Id.* ¶ 18.

[32] PSC Global MOL at 30.

> Article 20(3) requires plaintiffs to bear the burden of proof when attempting to establish that the shareholder shall be held jointly and severally liable for the debts of the shareholder's company. Article 64, however, adopts a presumption of abuse of the independent status of a one-person limited liability company; thus reversing the burden of proof and requiring the shareholder to prove that it should not assume joint and several liability . . .[33]

According to the PSC, an analysis under Article 64 is the same as one under Article 20 and, to have limited liability, the shareholder must establish there has been absolutely no abuse of the corporate form.[34]  The PSC does not address the fact that Article 64 does not even mention the term abuse.  Yet the PSC asserts that the term "property" in Article 64 is so broad as to include such things as control, business relationships, operations, governance and leadership. Based on this logic, a shareholder can only establish that its "property," as used in Article 64, is separate by proving a lack of any abuse of corporate form and by proving it adhered to "the principle of honesty, integrity or public policy."[35]  Using this reading of Article 64, the PSC then argues that TG's independence from TTP may be disregarded – regardless of whether there has been any initial showing of shareholder abuse, intention to evade debt, or creditor injury – because TG has not proved all aspects of its corporate separateness.[36]

The PSC's argument is based on a gross misinterpretation of Chinese law.  First, before Article 64 becomes relevant, activating any burden articulated therein, there must be a showing

---

[33]Cheng Decl. ¶ 19.

[34]PSC Global MOL at 27.

[35]*Id.* at 28.

[36]PSC Global MOL at 29-30.

that Article 20's rule of limited liability no longer applies, *i.e.*, there must be some showing of abuse by the shareholder to the creditor's detriment.[37]

Second, the PSC's assertion that Article 64 is the equivalent of Article 20 (but for the bearer of the burden of proof) disregards the very different language in the two Articles.[38]  Both Articles address when a shareholder may be subject to joint and several liability.  However, Article 64 applies "where the sole shareholder of a one-person limited liability company 'is unable to prove that the corporate <u>property</u> are [sic] independent from the single shareholder's own.'"[39]  Article 20 is much broader and applies "[w]here shareholders of a corporation <u>abuse</u> the corporate independent status . . . for the purpose of escaping debts, and seriously injure[] the interests of the creditors of the corporation."[40]  On its face, Article 64 deals with the narrow issue of independence of shareholder property, whereas Article 20, on its face, deals with the broader issues of abuse and independence of personhood.

Third, the PSC's interpretation of Article 64 is at odds with its own acknowledgement that Article 64 supplements, not replaces, Article 20.  *See* Global MOL, at 30.  If Article 64 placed a burden on the sole shareholder to establish every element relevant to an analysis under Article 20, however, Article 20 would have no relevance in the case of the sole shareholder:  if the shareholder did not satisfy his burden under Article 64, the corporate veil would be pierced and Article 20 would be irrelevant.[41]  Thus, Plaintiff's interpretation of Article 64 necessarily

---

[37]Zhu Reply Decl. ¶ 27.

[38]Zhu Reply Decl. ¶¶ 32-33.

[39]*Id.* ¶ 33.

[40]*Id.*

[41]*Id.* ¶ 34.

reads Article 20 out of Company Law as applied to sole shareholders.[42]  This cannot be the intent of the rule.[43]

Fourth, the PSC is wrong that "property" in Article 64 should be construed as meaning conduct such as governance, control and relationships.[44]  Nothing in the Company Law, Chinese legal commentary, or the Chinese language, supports a definition so broad.[45]  The idea that corporate separateness can be disregarded because the shareholder's and company's control, leadership and governance overlap is particularly absurd given that certain Company Law specifically authorizes the shareholder of a single person to have a high level of control over the company.[46]  Instead, the reasonable definition of "property" is something owned, *i.e.* possessions of either the shareholder or the corporation such as the company's headquarters, offices, separate financial accounts and supplies.[47]  This definition is consistent with the term's plain meaning in Chinese, with Chinese legal commentary, and with other Company Law provisions.[48]

<u>Thus, properly understood, Article 64 is satisfied through an initial showing of independent property (sufficient contribution of company assets independent from the</u>

---

[42]*Id.*

[43]*Id.*

[44]Zhu Reply Decl. ¶¶ 28-30.

[45]*Id.* ¶ 28.

[46]*Id.* ¶¶ 10, 11, 31.

[47]*Id.* ¶ 29.

[48]*Id.* ¶¶ 28-30.

shareholder, independent headquarters, separate offices, separate employees, etc.) and if this showing is made, the creditor must satisfy its burden of establishing that Article 20 applies.[49]

### TG Has Established That Its Property Is Separate From That Of TTP.

TG has established that its property is separate from that of TTP.  The PSC concedes that TG's financial reports were separate from TTP's[50] and the PSC has not disproved any of the evidence TG presented in its moving brief that TG and TTP had their own separate production facilities, factories, warehouses, supplies, equipment, computers and bank accounts.[51]  In fact, the PSC's sole assertion related to property is that some former TG sales employees kept their phone numbers when they began working for TTP and that this indicates that TG and TTP shared offices.[52]  Not only is this statement nonsensical (phone numbers have not been tied to a physical location for years), but it does not rebut the other evidence showing TG and TTP kept separate offices[53] and it certainly does not outweigh all of the other evidence TG has presented evidencing that its property is separate from TTP.[54]  (*Id.* at 10-12.)  All of the PSC's other Article 64 arguments relate to other elements of corporate separateness, such as operation,

---

[49] *Id.* ¶ 14, 36.

[50] In its analysis of Article 64, the PSC focuses on what TTP can establish, for example: "Taishan makes no assertion that TTP's board of directors . . . ever met at all" and "the only financial records from TTP that were produced were very short, annual summaries."  *See, e.g.*, PSC Global MOL at 31-32.  However, what TTP can or cannot establish is irrelevant to an Article 64 analysis: Article 64 provides that the shareholder, not the company, show that its property is independent.  Notably, Plaintiff concedes that TG's financial reports were separate from TTP's and that it held regular board meetings.  *Id.*

[51] Opening Br. 11.

[52] PSC Global SOF at 68.

[53] Opening Br. at 11.

[54] Notably, even if there was minimal use of one entity's property by the other, such use would not necessarily constitute a basis to disregard corporate separateness. Company Law is not so severe as to absolutely prohibit any sharing or use of assets between shareholder and company – whether use of one entity's property by another constitutes abuse may be a question of type and degree of use.  *See* Zhu Reply Decl. ¶ 51.

control and governance.[55]   But, as explained above, such factors are only relevant to an inquiry

under Article 20, not Article 64, and are the PSC's burden to establish.

> The PSC Cannot Satisfy Its Burden Of Proving That Disregarding TG's Corporate
> Independence Is Authorized Under Article 20.

The PSC failed to establish that TG's independent personhood should be disregarded

under Article 20.   Article 20 requires proof of three elements: (1) the shareholder abused its

corporate form; (2) this abuse was conducted in order to evade the payment of its debts; and (3)

the abuse caused severe injury to the creditor.[56]   The PSC disregards the second and third

elements, and its support for the first is grossly insufficient.

> Trademarks

The PSC states that evidence related to TTP's alleged use of TG's Taishan and DUN

trademarks is "the strongest evidence that [it] has to show that TG and TTP were the same".[57]

The PSC does not dispute that TTP's use of the Taishan trademark was pursuant to a valid

license.[58]   Rather, the PSC quibbles with the license's terms and asserts, arguing that because the

license did not require TTP to pay a monetary fee to TG and because the authorization for use

was not narrowly limited, the license establishes that TG abused its corporate form.[59]   However,

there is no suggestion that the license was unfair to TG, TTP or any third party.   And while TTP

may not have paid TG a monetary fee pursuant to the license, TG was compensated by other

means, such as benefiting from increased brand exposure.   Under Chinese law, a subsidiary's use

---

[55] *See* PSC Global Opp. Br. at 32-33.

[56] Zhu Reply Decl. ¶ 7.

[57] PSC Global Opp. Br at 33.

[58] *See* Opening Br. at 10.

[59] PSC Global MOL at 33.

of its parent's marks does not constitute abuse of the corporate form. Indeed, it is barely, if at all, material in an analysis on whether to disregard corporate separateness.[60]

The PSC has established nothing untoward in TTP's licensed use of TG's trademarks.[61] That this is the PSC's "strongest evidence" on this point speaks volumes.

<u>TG And TTP Operated Separately And TG Exercised An Acceptable Level Of Control Over TTP.</u>

TG established in its moving brief that it did not exert improper control over TTP.[62] While TG was involved in certain high-level aspects of TTP's governance, the record shows that TTP's own general manger exercised authority over TTP's daily operations, not TG, and TTP had its own bank accounts, financial department and quality control departments.[63] Nevertheless, the PSC argues that the operation of TG and TTP was not separate by alleging that (1) there is insufficient evidence that TTP's Board of Directors met regularly or made high-level decisions; and (2) "TTP's leadership simply came from TG."[64] Neither allegation evidences that TG abused its corporate form. The PSC offers no explanation as to how an alleged failure to keep regular meetings or TG's high-level decision-making constitutes TG's abuse of the corporate form under Chinese Law, <u>especially</u> when Company Law explicitly provides that a single

---

[60] *See* Zhu Reply Decl. ¶ 50; *accord*, *Am. Int'l Gr., Inc. v. Cornerstone Bus., Inc*., 872 So.2d 333, 336 (Fla. 2d DCA 2004) (subsidiary's use of parent's logo or trademark does not alone create agency or authorize penetration of corporate veil).

[61] As for TTP's allegedly unauthorized use of the DUN mark, this occurred out of a misunderstanding by TTP's sales employee. Jia Tr. 805:1-4. It is not unusual for subsidiaries to have permission to use a parent's trademarks. When Oriental Trading asked TTP to put the DUN mark on certain drywall, Bill Che acquiesced without confirming that TTP was permitted to do so. Jia Tr. 805:7-12. TG management was not aware of this agreement. *Id.* In short, this was a simple mistake on the part of the salesman. It does not indicate an intention to evade debt nor does it indicate that TTP and TG were the same entity.

[62] *See* Opening Br. at 8-12, 47-55.

[63] *See Id.* at 10, 54.

[64] PSC Global MOL at 31-32.

shareholder company need not even have a board of directors and authorizes a sole shareholder to have powers above those permissible for other types of shareholders.[65]

### TG And TTP Did Not Settle One Another's Disputes.

Plaintiff incorrectly argues that "TTP resolved disputes with TG's customers and accepted sales that had begun under TG."[66]  This is yet another mischaracterization of the facts, not supported by admissible evidence.  There are two disputes to which the PSC refers, one with Guardian, and another with Oriental Trading.  Neither indicates abuse of the corporate form.  In the Guardian dispute, Guardian threatened suit against both TG and TTP.  The PSC relies upon the testimony of a Guardian witness that a settlement meeting was attended by a person who described himself as the "General Manager" and was described by the Guardian witness as being 6'2" or 6'3" and 240 lbs, whom the witness believed to be Mr. Jia.  Yet, as the Court knows from attending the depositions in Hong Kong in 2012, the description given does not fit Jia, but does fit Peng Shiliang, who in fact was TTP's General Manager.  Furthermore, whether TG was or was not involved in settlement discussions, the PSC does not dispute that TTP ultimately was the settling party.[67]

The second dispute relates to Oriental Trading's effort to retrieve a deposit of $100,000 it placed with TTP.  A TTP employee began facilitating Oriental Trading's efforts in 2007.  In 2008, after TTP had transferred all of its assets to TG, presumably even including this deposit, the deposit was refunded.  There is <u>no</u> <u>evidence</u> that this employee was acting on behalf of TG in

---

[65] Zhu Reply Decl. ¶ 10 and n. 11 (citing  Art. 38, CCL.).

[66] PSC Global MOL at 34.

[67] PSC Global SOF at 59.

connection with the return of the deposit to Oriental Trading or that TG expended any of its own assets in refunding the deposit.[68]

### The PSC Provides No Other Reasons To Disregard TG's Corporate Separateness.

The PSC's remaining assertions regarding abuse of corporate form are either immaterial, unsupported or contradicted by the record.  The PSC alleges that TTP was not adequately capitalized, but concedes that TG registered 22 million yuan of capital investments in TTP – far more than what is required under Company Law[69]– and the PSC makes no allegation that TTP was required to seek further funds or loans from TG or from any other source to operate its business.  The PSC makes the ridiculous argument that TG abused its corporate form when it raised TTP's rent.[70]  The fact that TG and TTP's financial statements do not itemize specific cash payments made between TG and TTP for equipment sales and repurchases, does not mean that the transactions were not legitimate arms-length transactions.  In fact, in 2006, TTP reported cash payments for fixed assets of 34,380,888.25 yuan.  TTP also reported over 32 million yuan in liabilities, including over 3 million yuan in accounts payable in 2006.[71]

The PSC's other assertions made in support of its Article 20 argument are also easily dismissed.  The PSC argues that "TTP was the foreign sales desk of TG during the time it needed to issue VAT invoices,"[72] but this is just another way of saying that TTP fulfilled its corporate

---

[68] *See also* Zhu Reply Decl. ¶ 54 (noting that even if the PSC's assertions and characterizations of these disputes were true, which they are not, such dispute resolution would not be dispositive of corporate abuse under Chinese law).

[69] *Id.* ¶ 11 (noting that, under Article 59 of Company law, the minimum registered capital of a single-person company is RMB 100,000).

[70] PSC Global MOL at 33.

[71] Herman Aff. Ex. 176 (Jia Tr. Def's 45A).

[72] PSC Global MOL at 33.

function, in accordance with the purpose for which it was created.  The fact that a few salesmen familiar with international sales for export transferred from TG to TTP on a voluntary basis is consistent with, and does not undermine, TTP's corporate separateness.  And aside from superficialities such as retaining TG's corporate address on their e-mail signatures, the transferred employees' selling efforts were exclusively on behalf of TTP.

The PSC's assertion that TTP used TG's marketing materials simply reflects that TG, like most parent companies, described all of the products and services offered by the companies within its corporate family.  This too was not an abuse of the corporate form.[73]  The PSC cannot establish that the two entities comingled funds – the PSC concedes that both TG and TTP prepared separate financial statements and the PSC puts forth no evidence proving that the content of the statements are inaccurate.[74]  And while the PSC makes much of the fact that certain TG employees left TG to work at TTP, the PSC cannot establish that the entities actually shared any employees.[75]  The PSC's effort to attach significance to its allegation that TG and TTP used the same accounting firm also fails.[76]  Chinese corporate law contains no prohibition

---

[73] The PSC argues that "from the customer's perspective, there was no TTP"; however, this assertion is not supported by admissible evidence. *See* PSC Global MOL at 34. Moreover, the claim is untrue.  Every single sales invoice to a U.S. customer following the formation of TTP was in the name of TTP, not TG, and the customers paid TTP for the drywall they purchased, not TG.  They knew precisely who they were buying from.

*See also* Zhu Reply Decl. ¶ 53 (describing how and why a parent and subsidiary sharing marketing materials does not constitute corporate abuse).

[74] *See also* Opening Br. at 11 (providing evidence that TTP had its own bank accounts and financial department and that TG never loaned TTP money).

[75] PSC Global SOF at 52.  *See also* Opening Br. at 11 (providing evidence that TTP hired 260 employees, none of which were shared with TG).

[76] *See* PSC Global SOF at 70.

against related entities using the same accountant, nor is use of a common accountant improper or indicative of abuse of the corporate form or otherwise.[77]

> The PSC Has Not Shown Malicious Intention.

Even if the PSC could satisfy its burden of proof and establish that TG evaded the payment of its debts by abusing its independent status and, as a result, seriously damaged a creditor's interest, a Chinese court would not disregard TG's separate corporate existence because the PSC has made no showing that TG created TTP to intentionally and maliciously harm its creditors. As set forth above and in its moving brief, the evidence established that TG formed TTP for a valid business purpose – not out of a malicious intent to evade its creditors.[78] TTP ceased operating at the end of 2008, before it had any creditors who based their claims on allegedly defective drywall. Therefore, in China, TG and TTP would be recognized as the distinct entities that they are.

**B.    The Homebuilder's Agency Argument Fails Under Florida Law.**

Seeking a second bite at the apple, the Homebuilders have filed an amicus brief arguing that TTP's alleged actions may be attributed to TG under an agency theory of jurisdiction under Florida law. TG established in its opening brief why Chinese corporate law should apply to the question of whether TG and TTP should be treated as separate entities.[79] The PSC concedes the

---

[77] Zhu Reply Decl. ¶ 45.

[78] *See* Opening Br. at 12.

[79] As explained in TG's moving brief, China has a purposely enacted a comprehensive corporate legal code that has enabled it to transition from a communist planned economy to a more modern market economy. Application of Chinese law to Chinese companies achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interest in the corporation. Moreover, as a matter of international comity, Chinese law should be respected and should determine when the integrity and separate corporate personhoods of Chinese companies should be recognized and when they should be ignored. Opening Br. at 47.

point and Plaintiff ignores it.[80]  The Homebuilders fail to offer any persuasive argument to the

contrary[81] but, even if Florida agency law were applied here, TG's independence would still be

respected.

Under Florida law, to establish agency for the purpose of exercising personal jurisdiction

over the principal, Plaintiff must prove "(1) acknowledgment by the principal that the agent will

act for it; (2) the agent's acceptance of the undertaking; and (3) control by the principal over the

action of the agent."  *State v. Am. Tobacco Co.*, 707 So.2d 851, 854 (Fla. 4th DCA 1998).  Even

if TTP was not a Chinese company, but was instead a Florida subsidiary of TG, its activities

would not be sufficient to subject TG to personal jurisdiction on an agency theory absent

evidence establishing the three elements of agency, set forth above.  *See Meier ex rel. Meier v.*

*Sun Int'l Hotels, Ltd.,* 288 F.3d 1264, 1274 (11th Cir. 2002) ("Where the 'subsidiary's presence

in the state is primarily for the purpose of carrying on its own business and the subsidiary has

preserved some semblance of independence from the parent, jurisdiction over the parent may not

be acquired on the basis of the local activities of the subsidiary.'").

In this case, the Homebuilders fail to establish the elements of agency.  The

Homebuilders offer no evidence whatsoever that TG acknowledged TTP would act for it in

connection with any sales activities related to the U.S. or Florida or that TTP accepted any such

undertaking.  With respect to the element of control, as set forth above, the evidence clearly

established that TG did not exert improper control over TTP, and TTP maintained operational

---

[80] *See* PSC Global MOL at 26-27.  *See also* Banner Opp. Br. at 45.

[81] The Homebuilders cite to an unpublished Florida district court decision, *Kernel Records Oy v. Mosley*, No. 09-21597-Civ. 2010 WL 2812565 (S.D. Fla. July 5, 2010). an "unusual case" that warranted an exception to the general rule of applying the law of the state of incorporation to a question of personal jurisdiction over a foreign corporation on an alter ego theory, based on the activities of its sole shareholder in Florida.  *See Id.* at *2, 6.  *Mosley*, however, did not apply Florida law to an agency theory of personal jurisdiction over a foreign company and its foreign subsidiary and therefore lends no support to the Homebuilders' argument.  *Id.* at *6-7.

independence.  The evidence is, therefore, clearly insufficient to assert jurisdiction over TG on an agency theory.  *See Am. Tobacco*, 707 S.2d at 855.  ("As to the control element of the agency relationship, the amount of control the parent exercises must be very significant . . . 'to the extent the subsidiary manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation.'") (quoting *Vantage View, Inc. v. Bali East Dev. Corp.*, 421 So.2d 728 (Fla. 4th DCA 1982), *modified on other grounds by Dania Jai-Alai Palace v. Sykes*, 450 So. 2d 1114 (Fla. 1984)).  The evidence shows that TTP's sales of drywall in China to three customers from Florida were made exclusively for its own account, and not on behalf of TG.  In addition, the fact that TTP was able, under Chinese law, to issue VAT invoices to domestic Chinese customers (VAT invoices were not issued to foreign customers) further demonstrates that TTP was formed for a legitimate purpose independent of any sales to U.S. customers, and does not lend support to the Homebuilders' argument that TTP acted as TG's agent.

The Homebuilders fare no better on a theory of apparent authority.  Apparent authority requires evidence that "the principal allows or causes others to believe that an agent possesses actual authority."  *City Nat'l Bank of Detroit v. Basic Food Indus., Inc.*, 520 F.2d 336, 337 (5th Cir. 1975).  The Homebuilders fail to offer any such evidence.  The Homebuilders misrepresent that Guardian's purchase of drywall from Tai'an Taigao Trading ("Taigao Trading") in China was a purchase from "a separate Taishan affiliate."[82]  There is no evidence Taigao Trading was anything other than a Chinese trading company customer of TTP.  Moreover, the Homebuilders' assertion that TG negotiated the settlement that both TG and TTP entered into with Guardian (because Guardian threatened to sue both companies) is, as discussed above, not supported by

---

[82] Homebuilders' Opp. Br. at 50.

24

admissible evidence.  In any event, TG's involvement in the settlement negotiations would not establish that <u>TTP</u> acted as agent for TG.  TTP signed the settlement agreement and paid the settlement amount for the simple reason that it had sold the drywall at issue to Taigao Trading. Likewise, TTP entered into the SAA with Oriental Trading exclusively on its own behalf, not on behalf of TG.  The fact that TTP agreed to Oriental Trading's request to affix the DUN trademark to the TTP drywall it sold to Oriental Trading only reflected a TTP salesmen's misunderstanding of the scope of TTP's trademark license from TG, not that TTP sold drywall as TG's agent.[83]  Finally, the fact that TTP salesmen continued to use TG's corporate signature or telephone number on certain e-mail responses to inquiries from potential U.S. customers also does not indicate TTP was acting as an agent of TG.  The evidence shows this was a mere oversight, and no customer ever purchased drywall from TTP believing it was acting as an agent for TG.[84]  To the contrary, any sales of drywall to U.S. customers in 2006-2007 after TTP was formed were made exclusively by TTP.  The invoices and shipping documents for those transactions were all exclusively in the name of TTP.  Moreover, the customers paid TTP's invoices directly to TTP.  There is no evidence that TTP was TG's agent, actually or apparently, in connection with any sales to U.S. or Florida customers.

---

[83] *See* Jia Tr. 805:1-12.

[84] *See* Peng Tr. 154:16-156:2 ("Q: Why did you put Taihe Group under your name?  A: No, because when I was writing the e-mail, I did not try intentionally to write it like this . . . ."  Q: Is that something that just is automatically put under your name by the e-mail system you use?  A: During certain time period, it would be written like this . . . We did not pay attention to it . . . We did not intentionally write it like this . . . ."); Peng 253:15-24 ("Q: Mr. Peng, what company name did you write under your name in the Chinese version of this e-mail? A: Under my name, it was written as Taihe Dongxin Company Limited.  That is being set up by the program.  This is not what I wrote down.");  Peng Tr. 254:18-257:9 ("It is the number when I first work for TG . . . In the year 2006, after I joined TTP, because in the new office of TTP they did not have a new telephone number, they did not have a line.  At that time, we tried to apply for a local telephone services from a supplier . . . At that point, they help to adjust the telephone to my office or transfer . . . Therefore, when I worked for TTP, the telephone number was still (00 86) 5388 812017.").

C.     **No Upstream Entities' Activities Should Be Attributed To TG.**

Plaintiff has represented that it did not intend to assert a theory of personal jurisdiction involving imputing the contacts of any Upstream Entity to TG or TTP.[85]   Nevertheless, Plaintiff boldly tries to "preserve" the issue even though the PSC and others conducted jurisdictional discovery for more than 18 months, including discovery from the Taishan Defendants concerning their relationship with the Upstream Entities.   Plaintiff does not identify <u>any</u> facts suggesting that further discovery would provide a basis for attributing an Upstream Entity's activities in Florida to TG.   Furthermore, prior to agreeing to a briefing schedule for the Taishan Defendants' jurisdictional motions, the PSC represented to the Court that it had completed discovery concerning personal jurisdiction.[86]   For all these reasons, the Court should deny Plaintiff's request to re-open jurisdictional discovery with respect to any Upstream Entity.[87]

III.   **PLAINTIFF IS UNABLE TO SATISFY FLORIDA'S LONG-ARM STATUTE TO EXERCISE PERSONAL JURISDICTION OVER TTP.**

Even if TTP's activities could be attributed to TG for jurisdictional purposes, Plaintiff does not offer evidence of conduct by TTP that would satisfy the requirements of the Florida long-arm statute and Due Process.

---

[85]*See* Herman Aff. Exs. 148, 149, which are copies of email correspondence between the PSC and TG's local counsel.

[86]*See* Transcript of Monthly Status Conference, Feb. 23, 2012 at 12:23-13:4 (Spano Reply Decl., Ex. 45) ("The parties are completing their discovery on the jurisdictional aspect of the case.  I think the plaintiffs had maybe one or two witnesses on the west coast that they're going to be deposing.  I've given them the schedule for briefing, and I would intend to have oral argument on that motion in June, middle of June.").

[87]Plaintiff also asserts that is has been unable to obtain discovery concerning the "Luneng mine."  PSC Global SOF 88-90.  Plaintiff admits that TG did not own this mine, and Plaintiff does not assert that any Upstream Entity had any involvement with the mine.  Accordingly, further discovery concerning mines would also not be relevant to the question of personal jurisdiction over TG.  *See* Evidentiary Objections, Obj. No. 40.

A.  **TTP Has Not Conducted Business In Florida.**

"In order to establish that a defendant is "carrying on a business" for the purposes of personal jurisdiction under § 48.193(a) of the Florida long-arm statute, the activities of the defendant must be considered collectively and must show a general course of business activity in the state for pecuniary benefit." *Conax Fla. Corp. v. Astrium, Ltd.*, 499 F. Supp. 2d 1287, 1294 (M.D. Fla. 2007). The evidence concerning TTP does not meet that standard. The sales TTP made to Wood Nation, B America, and Oriental Trading in China were its only sales to customers who came from Florida, and those sales were completed in China.[88] TTP did not perform any part of those sales in Florida and conducted no other business activity in the State. Two of the three customers purchased drywall FOB China; the other sale was also made in China but with a CIF term, which is identical to FOB China except that the cost of shipping and insurance was included in the purchase price of the drywall.[89] Although the three purchasers informed TTP that they planned to ship the drywall form China to Florida,[90] TTP had no involvement with the drywall after it delivered the drywall to the port in China that each purchaser selected.

The Homebuilders also refer to drywall purchases in China that were made by Beijing New Building Materials Import & Export Co., Ltd. ("BBMIEC"), a Chinese company, to show that "Taishan" conducted business in Florida. The evidence relied on for this point is

---

[88] Plaintiff also raises the issue of TTP's failed SAA with Oriental Trading that predates the ultimate sales to Oriental Trading. Notwithstanding its title, nothing in the agreement permitted Oriental Trading the right to act as TTP's sales agent in the U.S. and no purchases were made pursuant to this agreement. Mitchell Opening Br. at 19.

[89] *See* Opening Br. at 21-22.

[90] The Homebuilders make much of the fact that TTP, at Wood Nation's direction, stamped the customer's Florida telephone number on the drywall sold (Homebuilders Opp. Br. at 32-33), but this was just a matter of an OEM acquiescing to the purchaser's wishes; it does not prove TTP transacted any business in Florida or directed its conduct toward doing so.

inadmissible,[91] but even if considered would not prove that either TG or TTP conducted business in Florida.  TG had its own contracts with BBMIEC,[92] but TTP actually sold and delivered the drywall at issue to BBMIEC in China, as the VAT invoices issued by TTP reflect.[93]  Although Plaintiff argues "Taishan" was aware that BBMIEC would ship the drywall to Florida, this assertion is not supported by admissible evidence.[94]  In any event, a foreign manufacturer's sales outside the State, which did not arise or result from solicitation or negotiation of contracts in the State, do constitute conducting business in the State merely because the product wound up in the State.[95]  *See, e.g. Reflection Mfg., LLC v. I.S.A. Corp.*, No. 10-cv-1951, 2011 WL 972570, at 6-7 (M.D. Fla. Mar. 18, 2011) (no jurisdiction under section (1)(a) of Florida long-arm statute where defendant did not initiate business relationship with Florida plaintiff, had only passive website, communicated with plaintiff in Florida but contract did not provide for delivery of products in Florida and where defendant delivered goods to Florida plaintiff in Alabama, which goods ultimately ended up in Florida).

<u>TTP Did Not Sell Drywall To Devon International</u>.

Plaintiff alleges that a representative from Devon International, a U.S. company with offices in China, visited "the Taishan factory," was informed that Taishan had ASTM approval

---

[91] The evidence was neither authenticated by admissible testimony nor part of the parties' admissibility stipulation.

[92] *See* Affidavit of Hilarie Bass in Support of Certain Florida Homebuilders' Amicus Curiae Response . . ." dated May 18, 2012 (R. Doc. No. 14390-1) ("Bass Decl.") Ex. 14A.

[93] *See* Spano Reply Decl. Ex. 46, which are TTP's VAT invoices to BBMIEC from the relevant time period.

[94] The Homebuilders offer a single handwritten notation at the bottom of a sales contract referencing a bill of lading number and speciously conclude that TG or TTP must have known the drywall was destined for Miami. (Homebuilders' Opp. Br. At 43, Ex. 14A.)  The Homebuilders then argue that TG sold drywall to BBMIEC in China, which then sold the drywall to Rothchilt International Ltd., in China, which then sold and shipped the drywall to La Suprema in Miami, which then sold the drywall to Banner in Florida. (Homebuilders' Opp. Br. At 43-45.)

[95] The Homebuilders' reliance on *McHugh v. Kenyon*, 547 So.2d 318, 319 (Fla. 4th DCA 1989) is inappropriate because the decision makes no reference to Fla. Stat. § 48.193(1)(a).

for the drywall manufactured there, and selected it to manufacture certain drywall it planned to sell to a secondary buyer.[96]  According to Plaintiff, "Taishan" later sold drywall to Devon International, that drywall was later shipped to Pensacola, Florida, and, after passing through the hands of other various buyers and sellers, was ultimately sold to Mitchell.[97]  As a matter of law, Plaintiff's account cannot be considered because nearly all of it is based on inadmissible hearsay — a deposition in an Alabama state court action in which neither TG nor TTP were parties (and, in fact, are not even mentioned in the transcript).

Regardless of whether or not a Devon International employee toured TG or TTP's factories in China, there is no evidence either company sold drywall to Devon International. Plaintiff's allegation is based on a purchase order that shows only that TTP contracted with a Chinese trading company, Shanghai Yuyuan Market Import & Export Co. Ltd. ("Shanghai Yuyuan"), which instructed TTP to put the word "Devon" on the drywall's packaging and mark the drywall indicating it met general ASTM standards.[98]  Devon International was not a party to the transaction between Shanghai Yuyuan and TTP in China.  Shanghai Yuyuan picked up the drywall at TTP's factory in China.  Plaintiff submits no evidence that TTP had any involvement with that drywall after that point.  This transaction does not evidence that TTP conducted any business in Florida.

---

[96] Mitchell PSC Opp. Br. at 3; Homebuilders' Opp. Br. at 27;

[97] Mitchell PSC Opp. Br. at 2-5; PSC Global SOF at 40-44; Mitchell Opp. Br. at 5-8.

[98] See Spano Reply Decl. Ex. 47, which is a copy of the Purchase Agreement between TTP and Shanghai Yuyuan for drywall marked with the "Devon" logo.  See also Herman Aff. Ex. 19 ("TTP's MPF") Entry Nos. 12-14.

<u>TTP Did Not Target Or Solicit The Florida Market</u>.

The PSC also alleges that jurisdiction is proper under Fla. Stat. § 48.193(1)(a) because of the "extensive efforts of Taishan to target and market its products to customers in Florida."[99] However, Plaintiff presented no admissible evidence that TG or TTP directed marketing efforts to Florida.  Apart from the TTP sales in China described above – all of which were initiated by the buyer in China – the only support Plaintiff provides is that "Taishan . . . responded to inquiries from [three companies], expressing a willingness to ship product to Florida" and may or may not have responded to request for samples.[100]  In Florida, much more is needed to find jurisdiction under § 48.193(1)(a).[101]  *See, e.g.*, *Homeway Furniture Co.of Mount Airy, Inc. v. Horne*, 822 So.2d 533, 536 (Fla. 2d DCA 2002) (no jurisdiction over foreign furniture store where they had no store, facilities or offices in Florida, and there was no evidence indicating a regular course of business in Florida notwithstanding that defendants furniture was shipped to Florida buyer via a third-party common carrier); *Jasper v. Zara,* 595 So.2d 1075 (Fla. 2d DCA 1992) (long-arm statute did not permit exercise of jurisdiction over foreign defendant financial planners who never maintained office, agent, address, or telephone listing in Florida

---

[99] Mitchell PSC Opp. Br. at 11.  *See also* Mitchell Opp. Br. at 11 (alleging that "Taishan" targeted Florida").

[100] PSC Global SOF at 19, 44.

[101] *Robert D. Harley Co. v. Global Force (H.K.) Ltd.*, No. 05-CV-21177, 2007 WL 196854, at *5 (S.D. Fla. Jan. 23, 2007), cited by the Homebuilders (Homebuilders' Opp. Br. at 57) is distinguishable.  In that action, the defendant, a foreign manufacturer, entered into an exclusive distribution contract with a Florida company, which provided it would be governed by Florida law and contemplated at least a three-year relationship.  At the time of entering into the contract, the foreign manufacturer knew that some of the existing clients of the distributor were located in Florida.  Further, throughout the three-year relationship, the foreign manufacturer shipped $5-6 million worth of goods directly to the customer in Florida.  Finally, the foreign defendant's employees attended at least one meeting in Florida.  None of those circumstances are present here.

The Homebuilders' reliance on *Empire Indus., Inc. v. Kaplan*, 695 So.2d 919, 920-21 (Fla. 4th DCA 1997) is equally unavailing as the "letter agreement" at issue expressly contemplated development and marketing of a toy product *in Florida*, the defendants also travelled to Florida multiple times to negotiate the contract, sent artwork to Florida for approval and assisted the marketing company plaintiff in constructing prototypes in Florida.  Again, none of those factors are present here.

notwithstanding their communications with Florida client after Florida client solicited their assistance).

Nor did TTP solicit business in Florida within the meaning of § 48.193(1). To try to demonstrate otherwise, Plaintiff alleges TTP sent samples of drywall to Carn Construction in Florida.[102]   But the evidence shows Carn Construction approached TTP through an intermediary in China to ask for the samples.[103]   Similarly, Wood Nation's contract with TTP entered into in China and providing for delivery of drywall "FOB China", and communications by Wood Nation to TTP regarding the markings it wanted on that drywall cannot be considered activities in the state by TTP within the scope of the long-arm statute.[104]

**B.      TTP Has Not Committed A "Tortious Act" In Florida.**

Plaintiff's allegation of economic injury, whether in Alabama or Florida, does not change the locus of TTP's activity from China to Florida for purposes of establishing "tortious acts" by TTP in Florida within the meaning of § 48.193(1)(b) of the statute.[105]   *See* section I(A)(2) *supra* at p. 7, addressing the same issue with respect to TG.

**C.      TTP's Alleged Conduct Did Not Cause Plaintiff To Sustain An "Injury To Person Or Property" In Florida.**

Plaintiff concedes that its alleged damages are limited to economic injury in Alabama.[106]   Whether or not Plaintiff's claims are barred by the economic loss rule is beside the point.  *Aetna*

---

[102]PSC Global SOF at 19.  *See also* Mitchell PSC Opp. Br. at 17)

[103]Herman Aff. Exs. 53, 54.

[104]Herman Aff. Exs. 18, 100.

[105]*See* Opening Br. at 58.  The PSC's assertion that TTP acted negligently or failed to provide warnings in Florida, (PSC Mitchell Opp. at 15), is just another way of alleging the drywall TTP sold in China was defective.  Surely jurisdiction cannot be premised on TTP's <u>lack</u> of activity in Florida.

[106]*See* Mitchell Opp. Br. 13-14.

establishes that claims of economic injury do not satisfy the "injury to person or property" requirements of § 48.193(1)(f) of the Florida long-arm statute. *See* Mitchell Opening Br. at 28-29. Moreover, the long-arm statute does not apply to injuries like Mitchell's alleged economic loss that occurred outside of the State.[107] Mitchell also cannot look to the alleged injuries sustained by Florida homeowners as a substitute for Mitchell's lack of an injury in Florida. The long-arm statute clearly requires Mitchell to assert its own causes of action "arising from" acts of TTP that were within the scope of the statute. Mitchell cannot satisfy the long-arm statute based upon the claims of others. In addition, Mitchell also fails to place TTP within the scope § 48.193(1)(f) because it has not shown that TTP's alleged conduct which gave rise to Mitchell's claim "was directed at Florida residents, corporations, or property and the harm was felt exclusively or primarily in Florida." *Kernel Records Oy*, 2010 WL 2812565, at *5.

### D. TTP Has Not Engaged In Substantial Activity In Florida As Required For General Jurisdiction Under The Long-Arm Statute.

Plaintiff does not dispute that TTP's isolated sales in China to companies that advised TTP they intended to ship drywall to Florida were insufficient to subject it to general personal jurisdiction pursuant to § 48.193(2) of the Florida long-arm statute.[108]

## IV. DUE PROCESS WOULD NOT PERMIT THE COURT TO EXERCISE PERSONAL JURISDICTION OVER TTP.

Even if TTP's acts were attributed to TG, Plaintiff has failed to satisfy the requirements of Due Process for the Court to exercise personal jurisdiction over TTP.

---

[107] *See* Opening Br. at 58-59.

[108] *See* Mitchell Opening Br. at 59-62.

### A.   Plaintiff Has Not Established That TTP Had Minimum Contacts With Florida.

Plaintiff Misinterprets The Majority Ruling in *Nicastro*.

*Marks v. United States*, 430 U.S. 188 (1977) held that when "no single rationale explaining the result enjoys the assent of five Justices, the holding of the court may be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds." 430 U.S. at 193 (citation and internal quotation omitted).  *Marks* itself found a governing standard for obscenity in the case it was examining even though no more than three Justices joined in any of the opinions. 430 U.S. at 194.  In *J. McIntyre Mach., Ltd. v. Nicastro,* 131 S. Ct. 2780 (2011), a majority of the Justices concurring in the judgment of the Supreme Court embraced a clear rationale for the Court's ruling.  Both Justice Kennedy's opinion for the plurality and Justice Breyer's concurring opinion agreed that (1) Due Process requires that a defendant in a stream of commerce case purposefully avail itself of a particular State forum; (2) a defendant cannot be subject to personal jurisdiction merely because it could foresee or expect its product would be re-sold in the forum State; and (3) a foreign manufacturer's marketing efforts directed generally to potential U.S. customers, rather than toward a specific State, do not constitute purposeful availment of a particular State.  This was the holding of the Supreme Court in *Nicastro*.[109]

Contrary to Plaintiff's assertion, the *Nicastro* ruling did not depend on a complete absence of contacts between the foreign defendant and the forum State.[110]  Rather, the decision by the majority of the Supreme Court assumed that the foreign manufacturer knew or should

---

[109]*See* Opening Br. at 24-28.

[110]PSC Global MOL at 16.

have known that its products might be sold in the forum State – precisely what Plaintiff alleges here with respect to TG and TTP. Nevertheless, taking these facts precisely as the New Jersey court found them, the majority of the Supreme Court Justices found purposeful availment was not shown. *See* concurring opinion at 2792; *see also* 131 S. Ct. at 2791 ("At no time did the petitioner engage in any activities in [the forum State] that reveal an intent to invoke or benefit from the protections of its laws.") (plurality opinion).

The *Nicastro* Majority Rejected The Foreseeability Standard Argued By Plaintiff.

The foreseeability of sales in the forum State was the touchstone of the New Jersey Supreme Court's holding that was reversed by the U.S. Supreme Court. *See Nicastro*, 131 S. Ct. at 2793 ("I am not persuaded by the absolute approach adopted by the New Jersey Supreme Court . . . that . . . a producer is subject to jurisdiction for a products-liability action so long as it 'knows or reasonably should know that its products are distributed through a nation-wide distribution system that *might* lead to those products being sold in any of the fifty states'") (Breyer, J., concurring opinion) (emphasis in original) (citation omitted). S*ee also Oticon v. Sebotek Hearing Sys., LLC*, No. 08-5489, 2011 WL 3702423, at *8-9 (D. N.J. Aug. 22, 2011) (Justice Breyer "would not adopt as strict a rule as that enunciated by the plurality, but he too voiced his disagreement with the notion that mere foreseeability is the cornerstone of the stream of commerce jurisprudence.").[111]   Justice Breyer found that employing "foreseeability" as a substitute for purposeful conduct was particularly unfair in the case of a foreign defendant. 131 S. Ct. at 2793-94.

The *Nicastro* majority's rejection of foreseeability as a substitute for purposeful conduct directed at the forum State was consistent with existing Supreme Court precedents, as Justice

---

[111]*See also* Opening Br. at 24-28.

Breyer noted.  *See* 131 S. Ct. at 2793 ("For one thing, to adopt this view would abandon the heretofore accepted inquiry of whether, focusing upon the relationship between 'the defendant, the *forum* and the litigation,' it is fair in light of the defendant's contacts *with that forum*, to subject the defendant to suit there.")  (citing *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)) (emphasis in original).  Justice Breyer also relied on *World-Wide Volkswagen,* in which the Court held that the purposeful availment requirement was not satisfied merely because a defendant sold a product outside the State when it was foreseeable the product might cause injury in the State.  *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 287 (1980) ("[T]he foreseeability that is critical to Due Process is not the mere likelihood that a product will find its way into the forum State.").

The *Nicastro* Majority Rejected The "National Market" Approach Argued By Plaintiff.

In *Nicastro,* the foreign manufacturer had made substantial efforts over many years to market its products to the U.S. through its U.S. distributor.  Nevertheless, a majority of the U.S. Supreme Court concluded that this did not show purposeful availment of the forum State.  131 S. Ct. at 2790 ("In this case, petitioner directed marketing and sales efforts at the United States . . . Here the question concerns the authority of a New Jersey state court to exercise jurisdiction, so it is petitioner's purposeful contacts with New Jersey, not with the United States, that alone are relevant.") (Kennedy, J., plurality opinion); *id.* at 2791 ("[T]he British manufacturer permitted, indeed *wanted*, its American distributor to sell its machines to anyone in America willing to buy them. . . . In my view, these facts do not provide contacts between the British firm and the State of New Jersey constitutionally sufficient to support New Jersey's assertion of jurisdiction in this case.") (Breyer, J., concurring opinion) (emphasis added).

Rather than finding personal jurisdiction based upon national marketing, both the plurality and concurring opinions in *Nicastro* required plaintiff to come forth with evidence of specific efforts by the foreign manufacturer to sell to the forum State.  *See Nicastro*, 131 S. Ct. at 2792 ("Mr. Nicastro, who here bears the burden of proving jurisdiction, has shown no specific effort by the British manufacturer to sell in New Jersey.") (concurring opinion).

Plaintiff Cannot Rely On Fifth Circuit Cases That Are Inconsistent With *Nicastro*.

Plaintiff cannot rely upon *Ruston Gas Turbines, Inc. v. Donaldson Co.,* 9 F.3d 415 (5th Cir. 1993) or other cases that have found purposeful availment based on a defendant's "mere foreseeability or awareness" that its products would be sold in the State.  *First*, as discussed above, Fifth Circuit law is not controlling.  *Second*, since *Ruston* was decided, its interpretation of the requirements of Due Process in stream of commerce cases has been called into question; indeed, in *Luv 'N Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465 (5th Cir. 2006), Judge DeMoss, the author of the *Ruston* opinion, specially concurring, questioned its constitutionality and advocated that the Fifth Circuit adopt Justice O'Connor's "stream of commerce plus" approach instead. 438 F.3d at 474-75.  In addition, subsequent to *Ruston*, the Fifth Circuit has held that "foreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts toward the forum."  *McFadin*, *v. Gerber,* 587 F.3d 753, 762 (5th Cir. 2009) (quoting *Wien Air Alaska v. Brandt*, 195 F.3d 208, 212 (5th Cir. 1999)).  Ultimately, as discussed above, majority of the Justices of the Supreme Court in *Nicastro* overruled *Ruston* insofar as it held that mere foreseeability or awareness that the product might be sold in the forum State would be sufficient to establish that a defendant purposefully availed itself of the State.

Moreover, TTP's conduct fails to meet even the looser requirements for purposeful availment of the pre-*Nicastro* Fifth Circuit cases erroneously relied upon by Plaintiff.  *See, e.g.,*

36

*Ruston*, 9 F.3d at 419-421 (out-of-state component parts manufacturer for gas turbines reasonably anticipated suit in Texas where it *knew* its products were going to be delivered to a specific user in Texas, manufacturer had made 211 direct shipments to Texas, and manufacturer's employees visited Texas on several occasions to assist customers). Clearly, the factors that the Fifth Circuit considered in deciding in *Ruston*, including that sales of the non-resident defendant's products in the forum State were foreseeable are not present here. TTP did not have actual knowledge of a specific customer to whom its products would be re-sold in the forum State, TTP made no direct shipments to customers in the State, and TTP never sent employees to the State, let alone on numerous occasions over a period of years. *See S. Copper, Inc. v. Specialloy, Inc.,* 245 F.3d 791 (5th Cir. 2000) (non-resident's FOB sale outside forum State with resident taking possession outside State insufficient to show purposeful availment; distinguishing *Ruston* because of the number and quality of additional contacts in that case beyond the FOB sale) (unpublished opinion).

In *Irving v. Owens-Corning Fiberglass Corp.,* 864 F.2d 383, 387 (5th Cir. 1989), a Yugoslavian asbestos supplier that supplied all of the asbestos used by the plaintiff's Texas employer over a 15 year period, directly shipped asbestos to Texas approximately 30 times, and partially paid the cost of testing of its products in Texas, was found to have reason to foresee that its product would be sold in the State. By contrast, TTP's relationship with its three Florida-based customers was short-lived; TTP did not ship drywall to Florida; and TTP did not utilize testing facilities or other services in Florida.

Similarly, in *Paz v. Brush Engineered Materials Inc.*, 445 F.3d 809 (5th Cir. 2006), also relied upon by Plaintiff, the Fifth Circuit found that the non-resident manufacturer knew that the beryllium-containing products it sold to Boeing would be used exclusively at Boeing's space

shuttle construction facility in the forum State.  *Id.* at 813.  Unlike the defendant in *Paz,* TTP had no knowledge of any use of its products in the forum State, exclusive or otherwise.  Plaintiff's reliance on *Nuovo Pignone, SpA v. Storman Asia, MV*, 310 F.3d 374 (5th Cir. 2002) is also misplaced because in that case the very subject of the lawsuit was breach of a contract to ship a product to the forum State.  Thus, the Fifth Circuit concluded "[w]e have established that [the foreign defendant] directed its activities toward Louisiana by agreeing to transport the reactor to the Port of New Orleans".  *Id.* at 387.  Here, by contrast, TTP did not contract to ship products to Florida or engage in any activities there.

Likewise, even in *Luv 'N Care*, a case that "stretches the stream of commerce doctrine beyond its past limits,"[112] the non-resident defendant sold 82,000 pieces of the infringing product to a national distributor and was aware of 65 shipments that went from its factory directly into the forum State.  TTP's isolated sales in China to just three companies that ultimately shipped its drywall to Florida bore no resemblance to the "regularity and quantity of shipments" to the forum State in *Luv 'N Care* that led the Fifth Circuit to conclude that "jurisdiction in the forum state was foreseeable."  438 F.3d at 472, n.11.  Even under the inapplicable Fifth Circuit law cited by Plaintiff, TTP did not purposefully avail itself of the privilege of conducting activities in Florida.

### *Nicastro* Requires Dismissal Of This Case.

Justice Breyer's adherence to the High Court's precedents and the facts found by the New Jersey Supreme Court led him to conclude, like the plurality, that Plaintiff had not established that the foreign manufacturer had purposefully availed itself of the forum State.  *See, e.g.*, 131 S. Ct. at 2792 ("And he has not otherwise shown that the British manufacturer purposefully availed

---

[112] 483 F.3d at 475 (DeMoss, J., concurring opinion).

itself of the privilege of conducting activities within New Jersey, or that it delivered its goods in the stream of commerce with the expectation that they will be purchased by New Jersey users.") (concurring opinion) (internal citation and quotation marks omitted).  Based on the *Nicastro* majority's ruling – as well as its analysis and reasoning – this Court should find a lack of personal jurisdiction over TTP.  As summarized below, TTP's connection to the forum State was even more attenuated than that of the foreign manufacturer in *Nicastro*.[113]

## COMPARISON OF FORUM STATE CONTACTS BETWEEN TTP AND McINTYRE

| Activity | McIntyre | TTP |
|---|---|---|
| Office in State | No | No |
| Paid taxes in State | No | No |
| Advertised in State | No | No |
| **Employees travelled to the U.S. to seek customers** | **Yes** | **No** |
| **Manufacturer's representatives attended industry conventions in the U.S.** | **Yes** | **No** |
| **Manufacturer's representatives assisted installation of products in the U.S.** | **Yes** | **No** |
| **U.S. Distributor** | **Yes** | **No**[114] |
| **Distributor sales in State** | **Yes** | **No** |
| Manufacturer shipments to State | No | No |
| Marketing in State | No | No |
| Advertised on passive website | Yes | Yes |

---

[113] *See also* Opening Br. at 29-32.

[114] Oriental Trading signed the SAA with TTP.  Notwithstanding the title of the SAA, Oriental Trading did not have the right to act as TTP's sales agent in the U.S.  The SAA merely provided Oriental Trading with the right to purchase drywall under the brand name "DUN" in the "territory of the U.S.A."  (SAA ¶¶ 1-2).  The undisputed facts are that Oriental Trading never sold or distributed TTP's drywall to anyone.  Herman Aff. Ex. 9 ("Gonima Tr. A") 62:2-15, 82:18-83:19; Opening Brief at 21.

1. **Plaintiff Has Failed To Prove That TTP Purposefully Availed Itself Of The Florida Market.**

As set forth at length in TG's opening brief, consistent with *Nicastro*, controlling law in the Eleventh Circuit holds that a defendant must do more than merely place the product in the stream of commerce to purposefully avail itself of a State, even if the defendant was aware that the stream may or will sweep the product into the State. The Eleventh Circuit has expressly adopted Justice O'Connor's more stringent purposeful availment, "foreseeability plus" standard from *Asahi (Asahi Metal Indus. Co. v. Superior Court of Cal.,* 480 U.S. 102 (1987)).[115] Plaintiff cannot distinguish any of the cases TG cited in an attempt to argue otherwise. Plaintiff also has failed to offer evidence that TTP engaged in any purposeful activity directed to the forum State as required by the Eleventh Circuit to establish minimum contacts. Since TTP sold drywall in China only and did not perform any portion of its sales contracts in Florida, the fact that Wood Nation, B America and Oriental Trading happened to be from Florida does not prove purposeful conduct by TTP directed to the State. *See Burger King v. Rudzewicz,* 471 U.S. 462, 478 (1985) (the mere fact that a contract is with a forum State resident cannot without more establish minimum contacts with the State); *see also McFadin*, 587 F.3d at 760 ("Jurisdiction must not be based on the fortuity of one party residing in the forum state".)

TTP's FOB sales to Wood Nation and Oriental Trading in China cannot conceivably be considered as sales in Florida. TTP's CIF sale to B America in China should be viewed the same way, since it only included the cost of shipment in the purchase price as an accommodation to the customer. Moreover, even if TTP's sale to B America in China was considered a sale in Florida, it would not establish that TTP purposefully availed itself of Florida. *See Nicastro*, 131

---

[115] Opening Br. at 66-71.

S. Ct. at 2792 ("And the Court, in separate opinions, has strongly suggested that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce fully aware (and hoping) that such a sale would take place.")  (Breyer, J., concurring)

<u>Neither TG Nor TTP Targeted The Market In The U.S. Or Florida.</u>

Banner argues that "Taishan" should be subject to personal jurisdiction in Florida because it targeted the U.S. market for drywall through its marketing efforts.[116]  The admissible non-hearsay evidence does not support such "targeting" allegations with respect to either TG or TTP.  TG's marketing efforts were primarily focused on the vast domestic market in China.[117]  TG advertised in domestic Chinese publications and attended industry trade fairs in China.  TG paid little attention to the U.S. market for drywall.  TG did not advertise in any U.S. publications or attend any trade fairs in the U.S.[118]  Also TG did not conduct market research or otherwise study the market for drywall in the U.S.  In fact, TG had not included sales to U.S. companies in its business plans, as TG believed the cost of transportation was too high for U.S. companies to economically import its drywall.[119]  TG did not pay any attention at all to the market for drywall in any particular State.

None of the numerous e-mails between the Taishan Defendants and potential customers cited by Plaintiff evidence purposeful conduct by either TG or TTP directed toward targeting the U.S. market or Florida in particular.  TG's and TTP's responses to inquiries from potential

---

[116] Banner Opp. Br. at 25-26.

[117] Fu Tr. 79:11-80:1, 81:10-14.

[118] Peng Tr. 273:13-274:13, 528:1-3.

[119] Jia Tr. 855:16-857:3 ("The product gypsum board is a heavy product.  To export such a product for a long period of time is an action that's [u]nimaginable.  The shipping cost is very expensive . . . . Common sense tells us that . . . it is impossible for us to have any plan to occupy American market.").

41

customers almost always quoted drywall prices FOB at a Chinese port in the first instance.  Only when the potential customer specifically asked for information about the cost to ship to a destination outside of China did the Taishan Defendants obtain this information from third parties and pass it on to the potential customer who had requested it.

The uncontroverted evidence is that neither TG nor TTP ever sent unsolicited marketing materials or samples of drywall to any potential U.S. customer.  Taishan Defendants would only send samples if a potential customer specifically requested them, the samples were available in the factory, and the potential customer arranged to have it shipped through DHL or some other carrier at its cost.[120]  Contrary to Plaintiff's assertion, the Taishan Defendants did not use the U.S. Postal Service to send samples from China to the U.S.

The Homebuilders and Banner also argue that TG should be subject to jurisdiction in Florida because TG targeted the U.S. market for drywall by identifying itself in its marketing materials as an exporter to the U.S. and through its use of the Alibaba website.[121]  In fact, the referenced "marketing materials" are merely brochures that contain passing references to exports to a number of countries, one of which is the U.S.  Passing references to exports to the U.S. as part of a list of other countries to which TG or TTP had exported products hardly qualifies as targeting the U.S. market, and it certainly does not constitute evidence that either TG or TTP targeted Florida.  As for the Alibaba site, the website was passive and no sales were or could be made on it — it merely forwarded occasional inquiries from potential customers to TG.

Plaintiff alleges that "Taishan" sold 85 million square feet of drywall to U.S. customers.  To arrive at this figure, Plaintiff allegedly added up all of the drywall reflected on both TG's and

---

[120] *See e.g.* Che Tr. at 284:17-291:18.

[121] *See* Banner Opp. Br. at 25-26; Homebuilders Opp. Br. at 13, 68-69.

TTP's manufacturer's profile forms.[122]   This is misleading because TTP's sales should be considered separate from TG's two sales to Venture Supply.   Moreover, even as to TTP, Plaintiff's claim is misleading because the vast majority of the drywall TTP sold, approximately 77,685,000 square feet, was to Chinese trading companies in China, not to U.S. customers.[123] Peng W. further explained his or other salesmen's e-mails regarding exports were intended to give a general sense of TG and TTP's capabilities in response to inquiries from potential customers, but did not represent actual sales data.[124]

Plaintiff focuses wrongly on the number of sheets of drywall that allegedly wound up in the U.S. rather than the Taishan Defendants' actual conduct.   TG had no customers from Florida. TTP's sales to Wood Nation, B America and Oriental Trading were simple sales to purchasers that were completed in China.   TTP had no control over the drywall after selling it to its customers in China, and did not participate in any efforts by Wood Nation, Oriental Trading or B America to re-sell in Florida any of the drywall they purchased from TTP.   There was no "regular . . . flow" of sales or "'regular course' of sales" from TTP to Florida sufficient to

---

[122]PSC Global MOL at 1;  Herman Aff. Ex. 1.   This chart is inadmissible for a number of reasons, including principally that it consists of argument, not evidence.  *See* Evidentiary Objections, Obj. No. 1.

[123]In TTP's MPF No. 234 concerning Oriental Trading's FOB purchase of drywall in China, the quantity of sheets recorded is 2,000, however the Export Invoice for this transaction indicates that Oriental Trading actually purchased 20,100 sheets.   The amount paid for the drywall listed on the MPF was also missing a digit and should have read $77,385.00, rather than $7,738.00.   The fact that TTP produced the underlying documents reflecting the actual amount sold demonstrates that the error in the MPF was an oversight and belies the Homebuilders' allegation that TTP limited its document production to only those sales reflected in its profile forms or otherwise withheld discovery.  *See* Homebuilders' Opp. at 9-10.

[124]Peng Tr. 264:14-265:6.  Peng W. continued to use TG's corporate signature on e-mail responses to potential U.S. customers after he transferred to TTP but this was an oversight and does not indicate he was acting on behalf of TG or that TG was trying to make those sales.  Peng Tr. 161:5-162:10.  Indeed, none of the e-mail communications cited by Plaintiff led to further sales by TG.  Any sales of drywall to U.S. customers in 2006-2007 after TTP was formed were made exclusively by TTP.  The customers paid TTP's invoices so they undoubtedly knew who they were buying from.

establish purposeful availment of the State.   *Nicastro*, 131 S. Ct. at 2792 (alteration in original).[125]

Plaintiff refers to *dicta* in Justice Breyer's concurring opinion in *Nicastro* suggesting that "target[ing] the world by selling products from its Web site" or "consign[ing] the products to an intermediary (say, Amazon.com) who then receives and fulfills the orders", 131 S. Ct. at 2793, could be an element of showing purposeful availment in some cases. The evidence shows that TG's marketing efforts were nothing like the scenario Justice Breyer envisioned.  TG never sold products from its website.   TG's website was not interactive.   Thus, customers could not purchase products or communicate with TG through its website.   It is well settled that merely maintaining a passive website is insufficient to establish purposeful conduct directed to a particular State for purposes of personal jurisdiction.  *See Westwind Limousine, Inc. v. Shorter*, 932 So.2d 571, 575 n.7 (Fla. 5th DCA 2006) (noting in a specific jurisdiction case, as dicta in a footnote, that posting a passive website by itself does not constitute soliciting business in Florida or transacting business in Florida because it does not demonstrate any effort on the part of the defendant to target Florida or purposefully avail itself of the benefits of Florida's laws).  *Accord ALS Scan Inc. v. Digital Serv. Consultants, Inc.* 293 F.3d 707, 714 (4th Cir. 2002) ("[A] person who simply places information on the Internet does not subject himself to jurisdiction in each State into which the electronic signal is transmitted and received.  Such passive Internet activity does not generally include directing electronic activity into the State with the manifested intent of engaging business or other interactions in the State . . . .");  *Mink v. AAAA Dev. LLC,* 190 F.3d 333, 336-37 (5th Cir. 1999) (Court found website that posted information about defendant's

---

[125] Plaintiff notes that TG purchased waste paper from the U.S. and then processed it in China in connection with manufacturing of drywall.  Herman Aff. ¶ 63.  Plaintiff does not, however, assert that these purchases of waste paper reflect the purposeful availment of any particular State.

products and services, and provided users with a printable mail-in order form not to be classified "as anything more than passive advertisement which is not grounds for the exercise of personal jurisdiction."); *McFadin*, 587 F.3d at 763 ("Here the website was passive, providing no means for orders, offering only [the defendant's] contact information.  We have found similar web pages to be insufficient to meet minimum contacts."); *S. Copper, Inc.*, 245 F.3d at *3 (no personal jurisdiction based on website where no evidence demonstrated that defendant entered into contracts with customers over its website and where website described company and products in general terms and was used merely for advertisement, providing details by which a reader could contact the company for more information.)   Indeed, McIntyre advertised its products in English on its UK website.  131 S. Ct. at 2795. Therefore, Justice Breyer's reference to "contemporary commercial circumstances" that were not present in *Nicastro* could not have meant something as mundane as a company advertising on a passive website.  131 S. Ct. at 2794.[126]

---

[126]TG posted company and product information on B2B websites such as Alibaba and EC Plaza, but those websites were also passive and no sales were or could be made on those websites.  The B2B sites merely forwarded occasional inquiries from potential customers to TG.  Those B2B postings were also not comparable to a company that "markets its products through pop-up advertisements it knows will be viewed in a forum."  *Id.* There is no evidence that any TG advertisements "popped up" on any website viewed by any potential customer in the U.S. or Florida, or that any information regarding TG's products was accessible on the internet unless someone made an affirmative effort to seek it out.

**2.      Plaintiff Cannot Prove That TTP Purposefully Availed Itself Of The Florida Market Based On TTP's Alleged Awareness Of Sales In Florida.**

Plaintiff alleges that "Taishan was actually aware, beyond a theoretical foreseeability, that its products would enter Virginia, Florida and Louisiana."[127] That assertion is legally insufficient and factually inaccurate.

As shown above, a majority of the Supreme Court in *Nicastro* rejected arguments that a defendant that introduced its products into the stream of commerce could be subject to personal jurisdiction merely because it "knew or reasonably should have known" its product might be re-sold in the forum State. Plaintiff's argument fails for the same reason that the New Jersey Supreme Court's holding in *Nicastro* was incorrect.

Contrary to the Plaintiff's arguments,[128] the Supreme Court's suggestion in *World Wide Volkswagen* that purposeful availment may be satisfied when "a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State" (emphasis added) would require more than mere knowledge the product might be used in the State. Although such an "expectation" that a product will be purchased by consumers in the forum State might be shown by evidence that sales of a defendant's products in the State were not an isolated occurrence but resulted from its purposeful efforts to serve the market in the State, 444 U.S. at 297-298, here there is no evidence that TTP expected its drywall to be re-sold in Florida. There also was no regular flow of TTP drywall into Florida that resulted from its efforts to serve the market in Florida. Plaintiff concedes that Oriental Trading did not re-sell any of the drywall it purchased from TTP. To the extent that

---

[127] PSC Global MOL at 21.

[128] PSC Global MOL at 8.

Wood Nation or B America re-sold any of the drywall they purchased from TTP in China to anyone in Florida, those re-sales did not result from any purposeful efforts by TG to serve the market in the State.[129]

To the extent that "awareness" or "foreseeability" of sales in the forum State are relevant to showing whether a defendant purposefully availed itself of a forum State, Plaintiff has not established either with respect to TTP.  The fact that TTP was informed by three purchasers in China that they planned to make shipments to Florida does not show TTP was aware of or foresaw subsequent sales in Florida.  Plaintiff also cannot rely upon invoices, packing slips or other documents that reflect nothing more than other possible shipment destinations.[130]

### 3.   Plaintiff Has Not Established That Its Causes Of Action Arose Out Of Or Resulted From TTP's Contacts With Florida.

Plaintiff had the burden of proving by a preponderance of the admissible non-hearsay evidence that its claims arose out of or resulted from TTP's contacts with Florida.  Plaintiff has failed to meet its burden.

In the context of this evidentiary hearing, Plaintiff may not rely on unsupported conclusory allegations contained in the Complaint, its motion for a preliminary default or elsewhere.  *See Jackson v. FIE Corp.*, 302 F.3d 515, 531 (5th Cir. 2002) (jurisdictional allegations and factual findings that supported default judgment not entitled to preclusive effect

---

[129] To the extent the "fractured panel" in *Asahi* upheld the *World-Wide Volkswagen* "principle" as Plaintiff asserts, (PSC Global MOL at 10), both the O'Connor and Brennan concurring opinions would require more than mere foreseeability, or even knowledge, of isolated sales of the product in the forum State.  *See* Opening Br. at 22-23; *see Asahi*, 480 U.S. at 109-111 (opinion of O'Connor, J.) (expectation for minimum contacts requires "something more" than merely placing a product into the stream of commerce even if the defendant was "awar[e]" that the stream of commerce "may or will sweep the product into the forum State"); *Id.*, at 117, 119 (Brennan, J. concurring in part and concurring in judgment) (expectation sufficient for minimum contacts may be found where a sale in forum State is part of "the regular and anticipated flow" of commerce into the State, but not where the sale is only an "edd[y]," *e.g.* an isolated occurrence).

[130] Likewise, to the extent there is evidence that the drywall arrived at the purchasers' intended destination, it also does not reflect any purposeful conduct by TTP directed to Louisiana.

in context of motion to vacate default based upon lack of personal jurisdiction).  To permit Plaintiff to rely upon facts found by default would amount to a denial of Due Process.  *See Jackson*, 302 F.3d at 529-530 (*res judicata* effect of default judgment must yield to Rule 60(b)(4) and Due Process concern for protecting ability of party to contest personal jurisdiction).

Plaintiff offers no evidence that its causes of action arose out of or resulted from TTP's contacts with Florida that allegedly supply the basis for this Court's exercise of personal jurisdiction.  Plaintiff admittedly does not have any drywall that TTP sold to Wood Nation, B America or Oriental Trading.  To the extent Plaintiff alleges it obtained TTP's drywall from another source, such as Rightway or Inex, Plaintiff's acquisition of that drywall, and thus it claims, are unrelated to TTP's alleged contacts with Florida.  Consequently, for this reason alone the Court should dismiss Plaintiff's claims for lack of specific personal jurisdiction.

**4.   The Exercise Of Jurisdiction Over TTP Would Offend Traditional Notions Of Fair Play And Substantial Justice.**

Plaintiff concedes that litigating its claims in this Court would impose an enormous burden on either TG or TTP.  This factor is particularly compelling in this case, where both companies restricted their activities to China, reasonably expecting protection under the legal rules regarding international commerce.  As the Supreme Court held in *Asahi*, "even apart from the question of the placement of goods in the stream of commerce . . . [t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."  480 U.S. at 114.[131]

---

[131] All of the Justices concurred in this portion of Justice O'Connor's opinion.

The other factors for consideration – the interests of the forum State, the interests of Plaintiff and the judicial system's interest in efficient resolution of controversies – tilt against asserting jurisdiction.  The interests of Plaintiff and Florida's interest in providing its residents with a forum to adjudicate their drywall-related claims in a timely and efficient manner would be served by the Florida courts adjudicating the numerous drywall-related claims Plaintiff has made against domestic parties that actually supplied, distributed or installed drywall in Florida.  That would be a much more efficient way for Plaintiff to obtain relief without the unfairness and complexity of dragging TTP into this litigation from China.

Plaintiff also does not address, and thus concede, the fifth factor, the shared interest of the "several states."  In cases involving a foreign defendant, this factor "calls for a court to consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction" by the Court.  *Asahi,* 480 U.S. at 115 (emphasis in original).  The considerations of international comity between the U.S. and China do not favor the exercise of jurisdiction over TTP under these circumstances.[132]

For all of the foregoing reasons, the exercise of personal jurisdiction in this case would not be reasonable, even if the Court found TTP had minimum contacts with Florida.  *See Asahi*, 480 U.S. at 121-22 ("[T]his case fits within the rule that 'minimum requirements inherent in the concept of fair play and substantial justice may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities.'") (Stevens, J. concurring in part and concurring in the judgment) (quoting *Burger King,* 471 U.S. at 477-78, internal quotation omitted)).  The Taishan Defendants have demonstrated that exercising personal jurisdiction over

---

[132] *See* Opening Br. at 73-77.

either TG or TTP would contravene "traditional notions of fair play and substantial justice" in violation of the Due Process clause of the constitution.

## V.   THE PRELIMINARY DEFAULT MUST BE SET ASIDE BECAUSE PLAINTIFF FAILED TO SERVE THE PLEADING UPON WHICH IT WAS BASED.

Plaintiff argues that it was appropriate to grant a default judgment based on an Amended Complaint that was not served on TG or TTP because claims in the Amended Complaint were identical to the claims in the original Complaint.[133]   A default judgment must not differ in kind from the pleading upon which it is based and any pleading containing new claims must be served on a defaulting party.  *See James v. Claiborne*, 2009 WL 994 951, *5 (W.D. La. Apr. 13, 2009); *G&G Closed Cir. Events, LLC v. Castro & Cedillos, Inc.*, No. 11-3274, 2012 WL 748577, at *1 (D. Md. Mar. 6, 2012) (an amended pleading that contains a new claim for relief, insofar as it is brought by a new plaintiff and alleges different facts than those set forth in the original complaint must be served on a party in default in the manner prescribed by Rule 4).  The purpose of Rule 5(a)(2) is to "ensure[ ] that a party, having been served, is able to make an informed decision not to answer a complaint without fearing additional exposure to liability for claims raised only in subsequent complaints that are never served."  *Blair v. City of Worcester*, 522 F.3d 105, 109 (1st Cir. 2008).  As set forth in TG's moving papers, the Amended Complaint added new plaintiffs to the action by seeking certification of a nationwide class of persons, rather than a discrete class of builders in specific states.[134]   Due to Plaintiff's failure to serve TG, the Court did not obtain personal jurisdiction over TG with respect to the Amended Complaint.   As a result, the preliminary default was not valid.

---

[133] *See* Mitchell Opp. Br. at 19-20.

[134] Opening Br. at 78.

## VI.    THE DEFAULT JUDGMENT SHOULD BE SET ASIDE ON THE GROUNDS OF EXCUSABLE NEGLECT.

It cannot be credibly disputed that TG had a good-faith basis for believing that it was not subject to jurisdiction in Florida, and that it was not necessary to appear in the proceedings.  TG has satisfied the requirement of showing meritorious defenses, including the absence of product defects and causation of each Plaintiff's alleged injuries and Plaintiff has offered no proof that it would be prejudiced by having to prove its case on the merits rather than enjoying the victory by default.

## CONCLUSION

For all of the foregoing reasons, the Court should vacate the default judgment and dismiss the action against TG.

Dated: June 8, 2012

                                        Respectfully submitted,

                                        Thomas P. Owen Jr.
                                        Joe Cyr
                                        Frank T. Spano
                                        Eric Statman
                                        HOGAN LOVELLS US LLP
                                        875 Third Avenue
                                        New York, New York 10022
                                        Telephone: 212-918-3000
                                        Facsimile: 212-918-3100
                                        Joe.cyr@hoganlovells.com
                                        Frank.spano@hoganlovells.com
                                        Eric.statman@hoganlovells.com

                                        Richard C. Stanley (La. Bar No. 8487)
                                        Thomas P. Owen, Jr. (La. Bar No. 28181
                                        STANLEY, REUTER, ROSS, THORNTON &
                                        ALFORD, LLC
                                        909 Poydras Street, Suite 2500
                                        New Orleans, Louisiana 70112
                                        Telephone: 504-523-1580

                                        51

Facsimile: 504-524-0069
rcs@stanleyreuter.com
tpo@stanleyreuter.com


**Attorneys for Defendant
Taishan Gypsum Co. Ltd.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Reply Memorandum of Law In Further Support of Taishan Gypsum Co. Ltd.'s Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint has been served on Plaintiff' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail and upon all parties by electronically uploading the same to Lexis Nexis File & Serve in accordance with the Pretrial Order No. 6, and that the foregoing was also electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 8th day of June, 2012.


<u>/s/ Thomas P. Owen, Jr.</u>