UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | * * * * * * * * * | MDL No. 2047 SECTION L JUDGE ELDON E. FALLON MAGISTRATE JUDGE JOSEPH C. WILKINSON, JR. |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**THIS DOCUMENT RELATES TO: ALL CASES**

**REPLY DECLARATION OF ZHU YAN**

This is a declaration being made in accordance with and pursuant to 28 U.S.C. § 1746.

ZHU YAN, being duly sworn, deposes and says:

1. I am the same Zhu Yan who swore to a declaration on March 30, 2012[1] in the context of the motions, filed April 2012, of TG and TTP,[2] defendants in the above-captioned action ("Defendants"). I make this reply declaration in the context of these motions and, specifically, to further explain various provisions of Chinese corporate law and to respond to assertions made in the declarations, filed May 8, 2012, of the expert witnesses for the Plaintiffs' Steering Committee, Bing Cheng ("Cheng Decl."), Professor James V. Feinerman ("Feinerman Decl."), and Professor Liu Junhai ("Liu Decl.") (collectively, the "PSC Experts").[3]

2. As I did in my initial declaration, I would like to make clear that although my previous declaration and this declaration are filed in support of the Defendants' motions, I

---
[1] "Zhu Decl." (R. Doc. Nos. 13566-2, 13590-3, 13591-3)
[2] All terms and abbreviations used in my initial declaration in this action have the same meanings when used in this declaration.
[3] R. Doc. Nos. 14203-2, 14203-3 and 14203-1, respectively.

consider my role and duty as offering my independent explanation to the Court on an impartial basis. I am not acting as an advocate for any party.

**Points of Agreement**

### General Observations

3.  The PSC Experts and I agree on basic aspects of Chinese corporate law. We agree, for example, that Chinese corporate law reflects and supports the philosophy that "[t]he principle of limited liability for the shareholders (the principle of no-liability for the shareholders) is the key to the long-term success of the system of corporation." Liu Decl. ¶ 44.

4.  Therefore, in China, the limited liability of shareholders is diligently respected and, as my colleague, Professor Liu, has written, "[c]ourts and arbitration organizations should be extremely careful when deciding whether or not to disregard the legal personality of a company. If the issue at hand lies in the gray areas of legal practice – especially when the legal personality of a company can either be disregarded or not – then the legal personality should decidedly not be disregarded." Liu Junhai, *Protection of Shareholder's Rights in Stock Corporation*, 576 (Law Press China 2d ed., 2004).[4] Likewise, the Legislative Affairs Committee of the Standing Committee of the National People's Congress, a body that coordinated drafting the Company Law, (the "Legislative Committee"), has emphasized that limited liability is the "cornerstone of the corporate system," and therefore courts should "err on the side of caution" when straying from this overriding rule. Legislative Committee, *Interpretation of the Company Law of the People's Republic of China*, Law Press China, 17, 45 (2005).[5]

---

[4] A true and correct copy of excerpts of this publication is attached hereto as Exhibit A, along with an English translation of the same.

[5] A true and correct copy of excerpts of this publication is attached hereto as Exhibit B, along with an English translation of the same.

5.      The PSC Experts and I also acknowledge that limited liability may not be used to intentionally destroy the rights of company creditors. Therefore, as Professor Liu notes, the separation between shareholder and company may be disregarded when "the shareholder[], in order to escape from his legal or promised duty, abuses his treatment of limit[ed] liability." Liu Decl. ¶ 47.

### General Provisions of Company Law

6.      Article 3 of the Company Law codifies the general rule of shareholder limited liability and explicitly provides that company shareholders are liable to the company only "to the extent of the shares they subscribed for."[6]

7.      Article 20[7] provides an exception to this general rule and articulates when corporate separateness may be disregarded. Paragraph 1 mandates that shareholders "shall not abuse their shareholders' rights to injury the interests of the corporation or other shareholders, or abuse the corporation's independent status of the limited liability of shareholders to injure the interests of the creditors of the corporation."[8]  Paragraph 3 articulates the repercussions for violating Paragraph 1: "Where shareholders of a corporation abuse the corporate independent status or the limited liability of shareholders for the purpose of escaping the debts, and seriously injures the interests of the creditors of the corporation, such shareholders shall be jointly and severally liable for the debts of the corporation."[9]

8.      The PSC Experts and I agree that, in order to disregard corporate separateness under Article 20, it is the creditors' burden to establish that the requirements in Paragraph 1 have

---

[6] A true and correct copy of Article 3 is attached, along with an English version of the same, as Exhibit C. True and correct copies and translations of the other Company Law Articles cited herein were previously submitted. (*See* Zhu Decl. Ex C.)

[7] In an effort to avoid disputes related to translations, I will use those of Professor Liu when quoting directly to Company Law Articles.

[8] Liu Decl. ¶ 49.

[9] *Id.*

3

not been followed and that the elements of Paragraph 3 are present.[10] In such case, the creditor must affirmatively bring forth evidence of abuse of the corporate form (by, for example, undercapitalization and commingling of legal personalities between shareholder and company), that the abuse was done for the purpose of escaping debts, and that the abuse seriously injured the interests of the corporations' creditors.

**Specific Provisions of Company Law**

9.  While Articles 3 and 20 apply generally to all shareholders, Company Law also contains provisions that are specific to a sole shareholder of a single person company.

10. Some of these specific provisions facilitate the sole shareholder's operation of the company. Article 61, for example, provides that the Sole Shareholder shall formulate the company's articles of association. Article 62 provides that the sole shareholder need not create a board of directors, and instead may enjoy the wide range of functions and powers enumerated in Article 38.[11]

11. Some of these specific provisions are designed to control the risk of a sole shareholder's abuse of the corporate form. Article 59 sets the minimum registered capital of a single person company at RMB 100,000, (which is higher than the minimum registered capital for multiple-shareholder companies), requires that the registered capital be contributed in a lump

---

[10] *See, e.g.,* Cheng Decl. ¶ 25; Liu Decl. ¶ 59.
[11] These functions and powers include: (1) determining the company's business orientation and investment plans; (2) electing and replacing directors and supervisory board directors other than those who are workers' representatives, and determining matters relating to the remuneration of directors and supervisory board directors; (3) deliberating on, and approving reports produced by the board of directors; (4) deliberating on, and approving reports produced by the supervisory board or the supervisors, as the case may be; (5) deliberating on, and approving annual financial budget proposals and final accounting plans in relation to the company; (6) deliberating on, and approving profit distribution plans in relation to the company and plans to make up losses suffered by the company; (7) adopting resolutions relating to increases to, or reductions in, the company's registered capital; (8) adopting resolutions relating to the issue of bonds by the company; (9) adopting resolutions relating to mergers, divisions, changes in corporate form, or the dissolution or liquidation of the company; (10) amending the company's articles of association; and (11) such other powers as are prescribed in the company's articles of association. Art. 38, CCL.

4

sum instead of by installment, and prohibits a shareholder from establishing more than one single-person company, which itself is prohibited from investing in and establishing any further single-person company. Article 60 requires that the sole shareholder note its one-shareholder ownership on its business license. Article 63 requires the single-person company to issue an annual financial statement that must be audited by a qualified accounting firm.

12. Article 64 also serves to protect single-person company's creditors. As explained by the Legislative Committee of China, Article 64 was drafted to address the risk that the shareholder of a single person company would "use the company's independent legal personality and their own limited liability status to abuse their rights and evade debt obligations through means such as commingling the property of the company with their own property. This greatly reduces the property that the company may use to fulfill its debts and seriously prejudices the interests of the company's creditors." *Interpretation of Company Law*, at 98.

13. Article 64 therefore provides that a creditor may be able to hold the sole shareholder liable for the company's debts if the shareholder is unable to show that his own property is separate from that of the company. Thus, factors that are relevant to Article 64 (and which would weigh against disregarding corporate separateness if shown) include whether the sole shareholder and company maintained separate facilities, offices, supplies, bank accounts and financial departments.

14. The PSC Experts and I agree that Article 64 supplements, and does not replace, other Company Law Articles. Accordingly, Article 64 does not change the general rule articulated in Article 3 that the initial presumption under Company Law is that all shareholders have limited liability and are liable to the company to the extent of their agreed capital contributions. Nor does a creditor's reliance on Article 64 preclude his reliance on Article 20.

**Points of Disagreement**

15.     Despite our agreement on some issues, I strongly disagree with the PSC Experts' ultimate thesis that the sole shareholder may not have limited liability unless he establishes all aspects of corporate separateness – regardless of whether there has been any initial showing of shareholder abuse, intention to evade debt, or creditor injury. As explained below, the reasoning provided for this thesis is specious, and the conclusion itself contravenes the letter and spirit of Company Law.

**The Intent Component in Deciding Whether to Disregard Corporate Separateness**

16.     As an initial matter, I address the PSC Experts' contention that I stated to this Court that malice and an intent to abuse the corporate form are explicit requirements of Articles 20 and Article 64.[12] That is not true. I do not opine that any Chinese laws concerned explicitly provide that maliciousness and intentionality are required in order to disregard the independent status of a company. What I stated previously is that "in practice" Chinese courts will rarely, if ever, disregard corporate identity unless the corporate form has been intentionally and maliciously abused by a shareholder in order to evade company debts and such abuse caused serious harm to company creditors.[13] This statement is neither novel nor unsupported. In fact, leading scholars in this field explicitly hold the same opinion as mine.[14]

17.     The Legislative Committee has clearly warned that "the application of a system to disregard corporate personality must be limited to certain specific cases in judicial practice, and the scope of applicability must not be arbitrarily expanded," and therefore courts should apply

---

[12] *See Cheng* Decl. ¶ 27-31; Feinerman Decl. ¶ 26-28; Liu Decl. ¶ 68.
[13] Zhu Decl. 48.
[14] *See, e.g.,* Zhu Ciyun, Piercing the Corporation Veil; from Legal Rules to Practices (*Gonsi Renge Fouren: Cong Fatiao Yueru Shijian*), in 2 QINGHYA L. REV. 111-125 (2007) (a true and correct copy of excerpts of which is attached hereto as Exhibit E, along with a certified English translation).

the system only where "the shareholder in question has subjective malice to evade debt obligations and has committed the specific act." *Interpretation of Company Law*, at 43.

18.     Professor Liu himself has commented that "malicious" abuse is present prior to disregarding corporate separateness under Chinese law. In 2012, for example, he was cited as saying that, under Company Law "[i]f a shareholder *maliciously* abuses the company's legal person status, thereby resulting in the company losing its independence, the corporate veil may then be lifted."[15]

19.     Malicious intent is also implied by the statutory terms "abuse" and "evade," which indicate that some level of corruption.

20.     As explained above, the PSC Experts' assertion that there is no basis under Chinese law for requiring creditors to prove an intentional and malicious element in order to disregard corporate separateness[16] is wrong and, in my opinion, disingenuously made.

### The Relationship Between Articles 3, 20 and 64

21.     The PSC Experts assert that, under Article 64, a sole shareholder is automatically liable for any company debt unless he can first show the independence of his property from that of the company.[17]

---

[15] *See* Li, Yuan, *What happened to Zijin Mining's 2499 Legal Entanglements?*, Legal Weekly, http://www.legalweekly.cn/content.jsp?id=170515&lm=%E5%85%AC%E5%8F%B8%E4%B8%8E%E6%-B3%95, Jan. 10, 2012, a true and correct copy of which is attached hereto as Exhibit D, along with an English translation of the relevant section).

[16] Cheng Decl. ¶ 27; Feinerman Decl. ¶ 26; Liu Decl. ¶ 68.

[17] *See* Cheng Decl. ¶ 23; Liu Decl. ¶¶ 57-58. In her declaration, Ms. Cheng cites extensively to Chinese court decisions. These decisions are not binding. According to Chinese Constitution and Law of Legislation, only laws, regulations and other legislative rules have the binding force for the adjudication of courts. It is clearly reflected that the Supreme People's Court has just established the institution of Case Guidance. It means that only the cases promulgated by the Supreme People's Court can enjoy the reference (or consulting /*cankao*, rather than binding) force for other courts in the same scope. *See* Notice of the Supreme People's Court on Issuing the Provisions on Case Guidance issued on November 26, 2010 & Article 7. None of the cases cited by Ms. Cheng are even the *stare decisis* issued by the Supreme People's Court.

22.     The term "property" in Article 64 is then defined by the PSC Experts so broadly as to include things such as corporate control, business relationships, operations, governance and leadership.[18]

23.     According to the PSC Experts, property integrity may not be established by "[m]ere documentation such as separate articles of association . . . or other similar paper records," but instead requires something much more: proof of *every aspect of corporate separateness*.[19]

24.     The PSC Experts then opine that even if the shareholder satisfies his alleged burden under Article 64, the plaintiff creditor may then attempt to disregard corporate separateness under Article 20.[20]

25.     The PSC Experts' conclude that in order to enjoy limited liability, a sole shareholder must establish – without any initial showing of abuse by the shareholder or any injury to a creditor or any justification for disregarding Article 3 – every single aspect of corporate separateness.

26.     The PSC Experts' conclusion is without any valid justification and essentially eviscerates the limited liability that Company Law was designed to provide all shareholders, including those of one-person companies.

27.     First, the PSC Experts have disregarded Article 3 and its relationship with Article 64. The starting point of any analysis regarding when to disregard corporate separateness is Article 3, which sets a presumption that limited liability exists. Therefore, before Article 64 becomes relevant and any burden articulated therein is activated, some initial showing must be

---

[18] *See, e.g.,* Liu Decl. ¶¶ 62-64.
[19] Feinerman Decl. ¶¶ 19-22; *see also* Cheng Decl. ¶¶ 21-22; Liu Decl. ¶¶ 62-64 (same).
[20] *See, e.g.,* Feinerman Decl. ¶ 24; Liu Decl. ¶ 67.

8

made as to why Article 3's rule of limited liability no longer applies – there must be some showing of abuse by the shareholder to the creditor's detriment.

28.     Second, the PSC Experts' definition of "property" as including corporate control, operations, governance and leadership is completely unsupported and grossly overbroad. Nothing in the Company Law, other Chinese legal authority – or even in the Chinese language – supports a definition of property that includes things such as control, relationships or leadership.

29.     The proper definition of "property" is possessions, assets, or that which is owned by the shareholder. This definition is in accord with the word's plain meaning and with the legal commentary on Article 64.

30.     The Legislative Committee's commentary writes that Article 64's purpose is to prevent the shareholder from "greatly reduc[ing] the property that the company may use to fulfill its debts and seriously prejudic[ing] the interests of the company's creditors." *Interpretation of Company Law*, at 98. This commentary comports with the more narrow definition of property.

31.     The idea that corporate separateness can be disregarded because the shareholder's and company's control, leadership and governance overlap is particularly absurd given that certain Company Law specifically authorizes the shareholder of a single person to have a high level of control over the company. *See supra* ¶¶ 10-11.

32.     Third, the PSC Expert's opinion that in order to establish separation of property under Article 64, the shareholder must establish the same elements of corporate separateness relevant in an Article 20 analysis[21] is wrong. This opinion defies the language of both provisions, is inconsistent with other Company Law provisions, and contravenes the policy that Company Law is meant to support.

---

[21] *See, e.g.*, Cheng Decl. ¶ 24; Feinerman Decl. ¶ 25 ("[t]he factors Chinese courts consider when evaluating a veil-piercing claim under Article 20(3) are the same kinds of factors that are relevant to a determination under Article 64").

9

33. The suggestion that both Articles require an analysis of the same factors is disproved by the Articles' fundamentally different language. Both Articles address when a shareholder may be subject to joint and several liability. However, Article 64 applies where the sole shareholder of a one-person limited liability company "is unable to prove that the corporate **property** are [sic] independent from the single shareholder's own."[22] Article 20 is much broader and applies "[w]here shareholders of a corporation **abuse** the corporate independent status . . . for the purpose of escaping debts, and seriously injure[] the interests of the creditors of the corporation."[23] On its face, Article 64 deals with the narrow issue of independence of shareholder property whereas Article 20, on its face, deals with the broader issues of abuse and independence of personhood. Had the drafters intended the two Articles to require the same things, the same language would have been employed.

34. Similarly, the PSC Expert's interpretation of Article 64 is at odds with their acknowledgement that Article 64 supplements, not replaces, Article 20. If Article 64 places a burden on the shareholder to establish every element relevant to an analysis under Article 20, Article 20 would have no relevance in the case of the sole shareholder: If the shareholder did not satisfy his alleged burden of establishing all aspects of corporate separateness under Article 64, corporate separateness will be disregarded and Article 20 is irrelevant; if he does establish all aspects of corporate separateness, there is nothing left to prove under Article 20 and again Article 20 is rendered irrelevant. The PSC Experts' interpretation of Article 64 reads Article 20 out of Company Law, at least with regard to the sole shareholder. This cannot be the intent of the rule.

---

[22] Liu Decl. ¶ 58 (emphasis added).
[23] *Id.* ¶ 49.

10

35. Furthermore, if Article 64 required proof that no aspect of abuse of corporate form exists, it would be difficult to justify the need for the other Company Law Articles specific to single-person companies that mitigate risk to creditors.[24]

36. Instead, the only factors relevant to the inquiry of Article 64 are those that narrowly go to show whether property – the assets of the shareholder, not his conduct – are separate from those of the company. If a sole shareholder can make an initial showing of independent property (sufficient contribution company assets independent from the shareholder, independent headquarters, separate offices, separate financial accounts, separate supplies, and bank accounts, etc.), Article 64 has been satisfied.

### The PSC Experts' Opinion Based On Assumed Facts Is Contrary To Chinese Law

37. Two of the PSC Experts, Ms. Cheng and Professor Liu together state that they have considered facts provided to them by the plaintiffs, assume them to be true, and indicate that they are examples of certain kinds of corporate abuse.[25] They also make conclusions as to whether the corporate separateness of TG and TTP should be disregarded based on these factual assertions.[26]

38. I have examined the factual assertions in Ms. Cheng's and Professor Liu's declarations and have considered if, under Chinese law, they constitute certain kinds of corporate abuse. I note, however, and the PSC Experts concede,[27] that a proper analysis regarding when to disregard corporate separateness depends on all facts of the case taken as a whole – not a handful of facts selected by a partial creditor, like the ones on which the PSC Experts rely.

---

[24] *See also supra* ¶¶ 10-11.
[25] *See* Cheng Decl. ¶ 32; Liu Decl. ¶ 69. Professor Feinerman simply states that Ms. Cheng and Professor Liu's opinion are supported by the factual assertions contained in their declarations. (Feinerman Decl. ¶ 29.)
[26] *See* Cheng Decl. ¶ 34-35; Liu Decl. ¶ 73.
[27] *See, e.g.*, Cheng Decl. ¶ 26 ("Chinese courts consider the unique facts of each case *in toto*").

11

39. The PSC Experts' opinion based on these limited assumed facts is contrary to Chinese law because (1) under Chinese law, the determination of whether the separate legal personhood of a corporation should be ignored must be based on all the facts considered together and (2) many of the facts relied upon by the PSC Experts do not support disregarding the corporate form under Chinese law.

40. One of the factual assertions that Ms. Cheng and Professor Liu rely upon is that:

TG contributed an initial registered capital investment of RMB 15,000,000 to TTP. On June 22, 2006, TG increased its registered capital investment in TTP by RMB 7,000,000 bringing TG's total registered capital investment in TTP to RMB 22,000,000.[28]

41. Contrary to the PSC Experts' opinion, to me, this assertion indicates that TTP was adequately capitalized (there is no allegation that TTP was required to seek further funds or loans from TG or from any other source in order to operate its business) and therefore would weigh against disregarding TG's and TTP's corporate separateness.

42. Ms. Cheng and Professor Liu conclude that TTP failed to observe corporate formalities based on the following assertions:

- TTP and TG produced separate annual reports; however, TG and TTP have not presented additional evidence that TTP otherwise maintained separate financial records. TTP failed to produce records showing monthly or quarterly audited financial statements. Aside from annual financial statements, TTP produced no evidence showing that it maintained separate accounting records from TG.

- There is no record of TTP holding regular meetings of its Board of Directors although there are records that TG regularly held meetings of its own Board of Directors.

- TTP and TG both used Tai'an Zhongcheng CPA for accounting services. TTP used Tai'an Zhongcheng CPA to perform the capital verification during its formation mandated by Chinese law. TG used the same accountant to value shares TG sold to its parent, Beijing New Building Materials, Ltd.[29]

---

[28] See Cheng. Decl. ¶ 32, at 12; Liu Decl. ¶ 69, at 28-29.
[29] See Cheng Decl. ¶ 32, at 13; Liu Decl. ¶ 69, at 29.

43. First, assuming that each of these allegations are true (and I am informed at least some are contested by TG and TTP), it is my opinion that, simply as an evidentiary matter, these three assertions are completely insufficient to prove that TTP failed to observe corporate formalities.

44. Second, what TTP can or cannot establish is irrelevant to the analysis under Article 64, as Article 64 provides that the <u>shareholder</u>, not the company, show that <u>its</u> property is independent. In the first two assertions, the PSC Experts concede that TG's financial reports were separate from TTP's and that TG held regular Board of Directors' meetings.

45. I disagree that TTP's and TG's use of the same accountant constitutes a failure to observe corporate formalities. Chinese corporate law contains no prohibition against related entities using the same accountant or any other third party service provider. Nor is use of a common accountant improper or indicative of abuse of the corporate form or otherwise. Ms. Cheng's citation to case law[30] to suggest otherwise is completely unavailing. As stated above, this decision would not be binding authority on a Chinese court. But more importantly, in case cited, the court did not list sharing the same accountants and auditors as a factor in the judgment. And, in fact, the court held that corporate separateness *should not* be disregarded. Thus, the third assertion is irrelevant to whether corporate formalities were or were not observed.

46. Ms. Cheng and Professor Liu conclude that TG and TTP commingled assets, failed to engage in arm's length business transactions, and abused the corporate form based on assertions related to two lease agreements, two sales contracts and one instance of TTP's use, with TG's authorization, of a TG trademark.[31]

---

[30] *See* Cheng Decl. ¶ 22, at 9, n. 16 (citing *China Galaxy Investment Co., Ltd. v. Hefei Feifan Investment Consulting Co., Ltd*, (2011), Anhui Higher People's Court).
[31] Cheng ¶ 32, at 13-14; Liu Decl. ¶ 69, at 29-30.

47.     First, the information asserted in Ms. Cheng and Professor Liu's declarations is insufficient to provide a basis for a broad conclusion as to whether TG and TTP commingled assets and abused the corporate form.

48.     Second, I disagree with the PSC Experts' assertion that the fact that TG raised the rent on a manufacturing site to reflect market conditions is a fact tending to show that TTP and TG did not observe corporate formalities. My view of this fact is the opposite—if TG and TTP did not observe formalities or act at arm's length, there would have been no reason to have raised the rent, and instead TTP could have paid below market rates.

49.     Third, the transactions described by the PSC Experts were conducted pursuant to valid agreements that contained sound terms and the PSC Experts make no indication otherwise. This indicates that property of TTP and TG were treated as separate – not the opposite: the two entities did not indiscriminately use one another's properties, but did so by contract as separate business entities. Accordingly, this would weigh against disregarding corporate separateness, not the opposite.

50.     Fourth, the company's use of the shareholder's trademark, without more, does not constitute the commingling of corporate assets, nor does it constitute abuse of the corporate form. Indeed, it is barely, if at all, material in an analysis on whether to disregard corporate separateness.

51.     Fifth, even if there was minimal use of one entity's property by the other, such would not necessarily constitute a basis to disregard corporate separateness – Company Law is not so severe as to absolutely prohibit any sharing or use of assets between shareholder and company – whether use of one entity's property by another constitutes abuse may be a question of type and degree of use.

52. Ms. Cheng and Professor Liu also conclude that TTP and TG shared employees and management.[32] This is a factual, and not legal, conclusion, and, therefore, not something on which I will opine. I will mention, however, that overlap of employees and management between shareholder and company is permissible under Chinese law.

53. Ms. Cheng and Professor Liu also state that TTP's use of TG's marketing materials support disregarding TTP's and TG's corporate separateness.[33] I disagree. First, if a parent company's marketing materials describe all products and services offered by the companies within its corporate family, a subsidiary's use of those materials would not constitute corporate abuse. Second, if TG was compensated by TTP for such use, TTP's utilization of the materials would actually support corporate separateness under Chinese law.

54. Defendants informed me that Ms. Cheng's and Professor Liu's assertions about TG and TTP settling each other's debts and about TTP employees holding themselves out as TG employees, are in dispute. Still, none of these assertions are dispositive of corporate abuse. Also, because these assertions do not relate to whether TG's property is separate from TTP's, they would not relate to Article 64, and therefore it would be the plaintiff's burden to establish that such assertions are true.

55. In conclusion, for the reasons set forth above, it is my opinion that the PSC Experts' declarations do not accurately state Chinese law on the issue of when to disregard a company's independent legal personality, and that their conclusions as to whether to disregard Defendants' corporate separateness is flawed, particularly regarding the subjective requirement of maliciousness and intention.

---

[32] Cheng Decl. ¶ 32, at 15; Liu Decl. ¶ 69, at 31.
[33] Cheng Decl. ¶ 32, at 15; Liu Decl. ¶ 69, at 31-32.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4 day of June, 2012

By: _____Zhu Yan_____
Zhu Yan