UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE MANUFACTURED          *   MDL No. 2047
DRYWALL PRODUCTS LIABILITY           *
LITIGATION                           *   SECTION L
                                     *
                                     *   JUDGE ELDON E. FALLON
                                     *
                                     *   MAGISTRATE JUDGE
                                     *   JOSEPH C. WILKINSON, JR.
                                     *

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**THIS DOCUMENT RELATES TO:** *Gross v. Knauf Gips KG et al.*, **Case No. 09-6690**

**MEMORANDUM OF DEFENDANTS TAISHAN GYPSUM CO. LTD.
AND TAIAN TAISHAN PLASTERBOARD CO., LTD.
IN REPLY TO OPPOSITION TO THEIR MOTION PURSUANT
TO RULE 12(B)(2) TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ..................................................................................................1

ARGUMENT ........................................................................................................................3

I.   THE DUE PROCESS CLAUSE PRECLUDES THIS COURT'S EXERCISE
     OF JURISDICTION OVER EITHER TG OR TTP. ............................................................3

    A.   Plaintiffs Have Not Established That TG Or TTP Had Minimum
          Contacts With Louisiana.............................................................................................6

        1.   Plaintiffs Have Failed To Prove That TG Or TTP Purposefully
               Availed Itself Of The Louisiana Market......................................................14

        2.   TG Or TTP's Alleged Awareness That Drywall Might Be Re-
               Sold In Louisiana Is Not Sufficient To Show That Either
               Purposefully Availed Itself Of The Privilege Of Conducting
               Activities Within The State Of Louisiana. ...................................................24

        3.   TG's Or TTP's Willingness To Sell Drywall To U.S.
               Customers Is Not Sufficient To Show That Either
               Purposefully Availed Itself Of The Privilege Of Conducting
               Activities Within The State Of Louisiana. ...................................................27

    B.   Plaintiffs Have Failed To Prove That Their Causes Of Action Arose
          Out Of Or Resulted From TG's Or TTP's Contacts With Louisiana. ......................28

    C.   The Exercise Of Jurisdiction Over TG Or TTP Would Offend
          Traditional Notions Of Fair Play And Substantial Justice.......................................30

II.  THE ACTIVITIES OF OTHER ENTITIES CANNOT BE ATTRIBUTED
     TO TG..........................................................................................................................31

    A.   TTP's Separate Corporate Personhood Must Be Respected Under
          Chinese Law. ...........................................................................................................32

    B.   TTP's Separate Corporate Personhood Would Also Be Respected
          Under Louisiana Law. ..............................................................................................44

    C.   No Upstream Entities' Activities Should Be Attributed To TG Or
          TTP. ..........................................................................................................................45

CONCLUSION....................................................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps">CASES</span>

*Adams v. Unione Mediterranea Di Sicurta*,
   No. 94-1954, 2001 WL 823733 (E.D. La. July 19, 2001) .......................................................3

*ALS Scan Inc. v. Digital Serv. Consultants, Inc.*,
   293 F.3d 707 (4th Cir. 2002) ................................................................................................22

*Asahi Metal Indus. Co. Ltd. v. Superior Court,*
   480 U.S. 102 (1987) (opinion of O'Connor, J.)..........................................................25, 30, 31

*Bateman v. Johns-Manville Sales Corp.*,
   781 F.2d 1132 (5th Cir. 1986) ...............................................................................................30

*Bean Dredging v. Dredge Tech. Corp.*,
   744 F.2d 1081 (5th Cir. 1984) ...............................................................................................27

*Burger King Corp. v. Rudzewicz,*
   471 U.S. 462 (1985).....................................................................................................3, 15, 16

*Charia v. Cigarette Racing Team, Inc.*,
   583 F.2d 184 (5th Cir. 1978) ...................................................................................................9

*Cimino v. Raymark Indus., Inc.*,
   151 F.3d 297 (5th Cir.1998) ...................................................................................................30

*Cooper v. McDermott Int'l, Inc.,*
   62 F.3d 395 (5th Cir. 1995) ..................................................................................................3, 4

*Dahmes v. Champagne Elevators, Inc.*,
   2003-0807 (La. App. 4 Cir. 3/3/04); 869 So. 2d 904 (La. App. 4th 2004).............................28

*Fricke v. Owens-Corning Fiberglass Corp.*,
   647 So.2d 1260 (La. App. 4th Cir. 1994) ................................................................................9

*Gibson v. Credit Suisse AG,*
   No. CV 10-1-EJL-REB, 2010 WL 1904773 (D. Idaho May 11, 2010)...................................32

*Gould v. Hous. Auth. of New Orleans*,
   595 So. 2d 1238 (La. Ct. App. 1992).....................................................................................30

*Hunt v. Schult Homes Corp.*,
   657 So.2d 124 (La. App. 3d Cir. 1995) ...................................................................................9

*In re Auto. Refinishing Paint Antitrust Litig.*,
   358 F.3d 288 (3d Cir. 2004)......................................................................................................3

*In re Heartland and Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
  MDL No. 2046, 2011 WL 1232352 (S.D. Tex. Mar. 31, 2011) .................................................. 3

*Irving v. Owens-Corning Fiberglass Corp.*,
  864 F.2d 383 (5th Cir. 1989) .................................................................................... 11

*J. McIntyre Machinery, Ltd. v. Nicastro*,
  131 S. Ct. 2780 (2011) .................................................................................... passim

*Jefferson v. Lead Indus. Ass'n, Inc.*,
  106 F.3d 1245 (5th Cir. 1997) .................................................................................... 30

*Luv 'N Care, Ltd. v. Insta-Mix, Inc.*,
  438 F.3d 474 (5th Cir. 2006) .................................................................................... 10, 12

*Marks v. United States*,
  430 U.S. 188 (1977) .................................................................................... 6

*McFadin v. Gerber*,
  587 F.3d 753 (5th Cir. 2009) .................................................................................... 10, 15, 16, 22

*Minebea Co., Ltd. v. Papst*,
  444 F. Supp. 2d 68 (D. D.C. 2006) .................................................................................... 32

*Mink v. AAAA Dev. LLC*,
  190 F.3d 333 (5th Cir. 1999) .................................................................................... 22

*Moses v. Universal Ogden Servs.*,
  16 F. Supp. 2d 680 (E.D. La. 1998) .................................................................................... 12

*NetKnowledge Techs., LLC v. Baron Capital V, Inc.*,
  No. Civ. A. 3:02-CV-2406-M, 2003 WL 23201333 (N.D. Tex. July 24, 2003) ...................... 4

*Nuovo Pignone, SpA v. Storman Asia, M/V*,
  310 F.3d 374 (5th Cir. 2002) .................................................................................... 11, 12

*Oswald v. Scripto, Inc.*,
  616 F.2d 191 (5th Cir. 1970) .................................................................................... 27, 28

*Oticon v. Sebotek Hearing Sys., LLC*,
  No. 08-5489, 2011 WL 3702423 (D.N.J. Aug. 22, 2011) ...................................................... 7

*Paz v. Brush Engineered Materials, Inc.*,
  445 F.3d 809 (5th Cir. 2006) .................................................................................... 11

*Ruston Gas Turbines, Inc. v. Donaldson Co.*,
  9 F.3d 415 (5th Cir. 1993) .................................................................................... 10, 11

*Seiferth v. Helicopteros Atuneros, Inc.*,
    472 F.3d 266 (5th Cir. 2006) .........................................................................28, 29

*Smith v. Cotton Fleet Serv., Inc.*,
    500 So. 2d 759 (La. 1987) ......................................................................................44

*Southern Copper, Inc. v. Specialloy, Inc.*,
    245 F.3d 791 (5th Cir. 2000) ...........................................................................11, 22

*Thompson v. Johns-Manville Sales Corp.*,
    714 F.2d 581 (5th Cir. 1983) .................................................................................30

*Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*,
    517 F.3d 235 (5th Cir. 2008) ...................................................................................5

*World-Wide Volkswagen v. Woodson*,
    444 U.S. 286, 297 (1980) ...................................................................................8, 25

## STATUTES

28 U.S.C. § 1631 ..........................................................................................................3

## OTHER AUTHORITIES

9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2444 (3d
    ed. 2008) ................................................................................................................32

Fed. R. Civ. P. 12(b)(2)...............................................................................................1

Fed. R. Civ. P. 12(b)(6)..............................................................................................30

Fed. R. Civ. P. 56.......................................................................................................30

## SUMMARY OF ARGUMENT

In their opposition, Plaintiffs[1] do not contend that TG or TTP[2] had sufficient contacts with the forum State, Louisiana, to be subject to general personal jurisdiction thereof. Plaintiffs are attempting only to establish a basis for specific personal jurisdiction over the Taishan Defendants. Plaintiffs further acknowledge that to establish specific jurisdiction they must show that each Defendant had the "minimum contacts" that Due Process requires – that it purposefully availed itself of the benefits and protections of the State of Louisiana, rather than the United States generally. However, Plaintiffs have failed to meet this burden by a preponderance of the admissible non-hearsay evidence. The relevant facts are uncontroverted:

- TG manufactures drywall exclusively in China.

- TG sold drywall to only one U.S. company, Venture Supply based in Virginia.

- Venture Supply solicited TG in China.

- Venture Supply made two isolated purchases from TG in China, FOB at a Chinese port.

- Venture Supply shipped some of the drywall purchased from TG to Virginia and the rest to New Jersey.

- There is no evidence that any of the drywall that Venture Supply purchased from TG was re-sold in Louisiana.

- TG never participated in any marketing or sales of its drywall in Louisiana.

---

[1] The Plaintiffs' Steering Committee's ("PSC") Response in Opposition to Taishan's Motions Pursuant to Fed. R. Civ. P. 12(b)(2) to Dismiss the Complaints (R. Doc. No. 14204) ("Gross/Wiltz PSC Opp. Br."); PSC's Global Statement of Facts ("PSC Global SOF") (R. Doc. 14215-2); and PSC's Global Memorandum of Law ("PSC Global MOL"). This memorandum also responds to the briefs in opposition submitted by Defendants State of Louisiana (R. Doc. No. 14366) ("SOL Opp. Br."), Banner Supply Company, Banner Supply Company Pompano, LLC, Banner Supply Company Fort Meyers, LLC, Banner Supply Company Tampa, LLC, Banner Supply Port St. Lucie LLC, and Banner Supply International, LLC (R. Doc. No. 1439-2) ("Banner Opp. Br.") and Interior Exterior Building Supply, L.P. (R. Doc. No.14356-1) ("INEX Opp. Br.").

[2] Defined terms in this memorandum have the same meaning as in the Taishan Defendants' opening brief (R. Doc. No. 13590-1) ("Opening Br.").

- TTP sold drywall in China to just two companies that indicated they planned to ship to Louisiana, APIC and GD Distributors.

- APIC purchased drywall from TTP FOB, New Orleans and GD Distributors purchased it CIF, New Orleans.

- GD Distributors requested a CIF sale term in order to include the cost of shipping and insurance in the purchase price for the drywall.

- At GD Distributors' request, TTP made the shipping arrangements on behalf of GD Distributors.

- Both APIC and GD Distributors selected the destination for the drywall they purchased from TTP, they directed the shipping arrangements, and then shipped the drywall they purchased to Louisiana.

- TTP was not aware of where the drywall APIC and GD Distributors purchased would be re-sold.

Plaintiffs do not offer any admissible non-hearsay evidence to refute these facts. Notwithstanding the morass of largely irrelevant "facts" offered by Plaintiffs, the admissible non-hearsay evidence fails to establish that either TG or TTP targeted potential customers from Louisiana or otherwise engaged in purposeful activity directed to the State.[3]  The evidence shows at most that the Taishan Defendants were willing to sell drywall in China to companies from the U.S. (and elsewhere) that approached them in China, and accommodate requests from potential customer for price quotes and shipping information.

Significantly, Plaintiffs have failed to offer any admissible evidence whatsoever that their causes of action arose from contacts TG or TTP had with Louisiana, as Due Process requires. None of the Plaintiffs have offered any evidence that TG or TTP drywall was installed in any of their homes.

---

[3]Plaintiffs cite numerous documents and testimony, but much of it is irrelevant or otherwise inadmissible and none of it demonstrates the Taishan Defendants targeted Louisiana customers.  The Taishan Defendants will address the inadmissibility of certain evidence in the Evidentiary Objections accompanying this memorandum.

Plaintiffs also have failed to rebut the Taishan Defendants' showing that the exercise of personal jurisdiction would offend "traditional notions of fair play and substantial justice," because each of the *Burger King* factors weighs against the Court's assertion of jurisdiction over TG or TTP.

## ARGUMENT

### I. THE DUE PROCESS CLAUSE PRECLUDES THIS COURT'S EXERCISE OF JURISDICTION OVER EITHER TG OR TTP.

Governing Law

Plaintiffs concede that in this directly-filed MDL action, the Court must determine personal jurisdiction based exclusively upon the Taishan Defendants' contacts with this forum State, Louisiana.[4]

Burden Of Proof

Since the Taishan Defendants have contradicted the jurisdictional allegations in the Complaint through various declarations, documents and deposition testimony, Plaintiffs must meet their burden of proof based on admissible non-hearsay evidence. *See Cooper v. McDermott Int'l, Inc.,* 62 F.3d 395 (5th Cir. 1995) (unpublished). In *Cooper*, the Fifth Circuit held that the

---

[4]Gross/Wiltz PSC Opp. at 7. Apparently recognizing that the Taishan Defendants lacked minimum contacts with Louisiana, Banner asks the Court to transfer the action to a district court in Florida pursuant to 28 U.S.C. § 1631. Banner Opp. Br. at 9, n. 25. There is no basis under the statute for such a transfer. *See Adams v. Unione Mediterranea Di Sicurta*, No. 94-1954, 2001 WL 823733 (E.D. La. July 19, 2001) (28 U.S.C. § 1631 is limited to transfers where *subject matter* jurisdiction is lacking, and does not apply to transfers to cure deficiencies related to personal jurisdiction). In any event, Plaintiffs/Banner have not established that TG or TTP's actions were within the scope of the Florida long-arm statute and that each company had the minimum contacts with Florida that Due Process would require for a district court in Florida to be able to exercise personal jurisdiction. Banner alternatively urges the Court not to transfer the case to Florida but to consider the Taishan Defendants contacts with Florida nonetheless. This is also incorrect because the Court must determine whether this forum has jurisdiction over each plaintiff's claim, not whether a plaintiff could have sued in a different state and then filed a tag-along motion to transfer the case to the MDL. *See In re Heartland and Payment Sys., Inc. Customer Data Sec. Breach Litig.,* MDL No. 2046, 2011 WL 1232352 (S.D. Tex. Mar. 31, 2011). Banner cites *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 297 (3d Cir. 2004), but that case involved an action under the Clayton Act, a federal statute that courts have construed to permit an aggregation of a defendant's contacts for jurisdictional purposes. The instant case is a diversity action, not an exception to the normal Due Process requirement that the defendant have purposefully availed itself of a particular State forum. Accordingly, there is no basis for the Court to consider the Taishan Defendants' contacts with Florida for purposes of the motion.

proponent of personal jurisdiction was required to submit admissible evidence, even in the absence of an evidentiary hearing and when it was subject only to the *prima facie* standard. *Id. See also NetKnowledge Techs., LLC v. Baron Capital V, Inc.*, No. Civ. A. 3:02-CV-2406-M, 2003 WL 23201333, at *3 (N.D. Tex. July 24, 2003) (granting defendant's motion to dismiss for lack of personal jurisdiction after evidentiary hearing due to "insufficient reliable, non-hearsay evidence" of minimum contacts).

Plaintiffs have argued that they need only make a *prima facie* showing of a basis for the exercise of personal jurisdiction because this Court is not conducting any evidentiary hearing.[5] However, the Court made it quite clear that it desired to proceed with an evidentiary hearing. *See, e.g.*, August 30, 2011 Transcript of oral argument on the PSC's "Motion To Compel Production of Documents and Further Jurisdictional Depositions of the Taishan Defendants" at 6:12-20[6]:

> The Taishan entities have a serious motion here. I'm trying to develop, or have the parties develop, some evidence so that I can look at the evidence and base my decisions on the evidence as opposed to dealing with it without evidence, because then certain prima facie rules come into play. In a case of this sort, I really think it would be more helpful to the litigation and to the litigants to allow the Court to hear some evidence and make a reasoned and thorough opinion, one way or the other, on it.

and September 9, 2011 Order & Reasons (R. Doc. No. 10269) granting the PSC's motion:

> This Court is extending every opportunity to Taishan to present evidence to support its position, but if no evidence is forthcoming

---

[5] PSC Global MOL at 5, n.21. The parties attended a conference with the Court on May 16, 2012. At that conference, Plaintiffs agreed that they must prove personal jurisdiction by the preponderance of the evidence standard that accompanies an evidentiary hearing. However, Plaintiffs have not formally withdrawn their "*prima facie* showing" argument. Accordingly, in an abundance of caution, we will briefly address it here.

[6] A copy of the August 30, 2011 transcript is attached to the Reply Declaration of Frank T. Spano, dated June 8, 2012 ("Spano Reply Decl.") as Exhibit 20.

> or if appropriate discovery is thwarted so that a fair hearing
> becomes impossible, this fact-finder will be compelled to construe
> all disputed facts in the plaintiff's favor.

September 9, 2011 Order at 14.

In response, counsel for TG and TTP promptly informed the Court and the parties that they welcomed the opportunity to participate in an evidentiary hearing and the parties have proceeded accordingly.[7]  At the depositions in Hong Kong earlier this year, the Court again indicated that it was hearing testimony, assessing the credibility of witnesses and acting as a fact finder.[8]  Furthermore, at the very beginning of the Hong Kong depositions, counsel for TG and TTP stated without any objection that TG and TTP welcomed the Court's rulings on objections at the depositions because TG and TTP wanted the depositions to be admissible evidence as part of the record in the hearing before the Court.[9]  Since the Court is conducting an evidentiary hearing, Plaintiffs must meet the preponderance of the admissible evidence standard.  *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241-42 (5th Cir. 2008).

---

[7] *See* Spano Reply Decl. Exhibit 21 (Letter dated October 28, 2011 from J. Cyr to Judge Fallon).  On January 6, 2012, the Court entered an Order Regarding Authenticity and Admissibility of Certain Documents Identified by Parties for Use at Depositions in Hong Kong the Week of January 9, 2012 (R. Doc. 12126), and an Order Regarding Use of Depositions in MDL and State Court Proceedings (R. Doc. 12127), both clearly in anticipation of the evidentiary hearing to be held on the issue of personal jurisdiction.  Moreover, in its Minute Entry for the November 10, 2011 status conference held in relation to the status of discovery and depositions of the Taishan entities (R. Doc. 11192), the Court noted that the parties were working on a "stipulation regarding evidentiary issues pertaining to exhibits to be used at the depositions, for example business records and hearsay," undoubtedly with an eye towards admissibility of documents as part of the evidentiary hearing.

[8] *See* Herman Aff. Ex. 6 ("Che Tr.") at 98:7-21; Herman Aff. Ex. 110 ("Shiliang Tr.") at 44:8-21.

[9] *See* Spano Decl. Ex. 2 ("Jia Tr.") 531:24-534:15.

### A.   Plaintiffs Have Not Established That TG Or TTP Had Minimum Contacts With Louisiana.

Plaintiffs have failed to establish by a preponderance of the admissible non-hearsay evidence that the Court's exercise of personal jurisdiction over TG or TTP would satisfy Due Process.

Plaintiffs Misinterpret The Majority Ruling In *Nicastro*.

*Marks v. United States*, 430 U.S. 188, 193-194 (1977) held that when "no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds". 430 U.S. at 193 (internal quotation and citation omitted).  *Marks* itself found a governing standard for obscenity in the case it was examining even though no more than three Justices joined in any of the opinions *Id.* at 194.  Just as in *Marks*, in *J. McIntyre Machinery, Ltd. v. Nicastro* a majority of the Justices concurring in the judgment of the Supreme Court embraced a clear rationale for the Court's ruling.  Both Justice Kennedy's opinion for the plurality and Justice Breyer's concurring opinion agreed that (1) Due Process requires that a defendant in a stream of commerce case purposefully avail itself of a particular State forum; (2) a defendant cannot be subject to personal jurisdiction merely because it could foresee or expect sales of its product in the forum State; and (3) a foreign manufacturer's marketing efforts directed generally to potential U.S. customers, rather than toward a specific State, do not constitute purposeful availment of a particular State.  131 S. Ct. 2780 (2011).  This was the holding of the Supreme Court in *Nicastro*.[10]

---

[10] *See* Opening Br. at 24-28.

Contrary to Plaintiffs' assertion, the *Nicastro* ruling did not depend on a complete absence of contacts between the foreign defendant and the forum State.[11]  Rather, the decision by the majority of the Supreme Court assumed that the foreign manufacturer knew or should have known that its products might be sold in the forum State –  precisely what Plaintiffs allege here with respect to TG and TTP.  Nevertheless, taking these facts precisely as the New Jersey court found them, the majority of the Supreme Court Justices found purposeful availment was not shown.  *See* concurring opinion at 2792; *see also* 131 S. Ct. at 2791 ("At no time did [the] petitioner engage in any activities in [the forum State] that reveal an intent to invoke or benefit from the protection of its laws.") (plurality opinion).

<u>The *Nicastro* Majority Rejected The Foreseeability Standard Argued By Plaintiffs.</u>

The foreseeability of sales in the forum State was the touchstone of the New Jersey Supreme Court's holding that was reversed by the U.S. Supreme Court.  *See Nicastro*, 131 S. Ct. at 2793 ("I am not persuaded by the absolute approach adopted by the New Jersey Supreme Court . . . that . . .  a producer is subject to jurisdiction for a products-liability action so long as it 'knows or reasonably should know that its products are distributed through a nation-wide distribution system that *might* lead to those products being sold in any of the fifty states'") (concurring opinion) (emphasis in original); *see also Oticon v. Sebotek Hearing Sys., LLC*, No. 08-5489, 2011 WL 3702423, at *8-9 (D.N.J. Aug. 22, 2011) (Justice Breyer "would not adopt as strict a rule as that enunciated by the plurality, but he too voiced his disagreement with the notion that mere foreseeability is the cornerstone of the stream of commerce jurisprudence.").[12]  Justice

---

[11]PSC Global MOL at 16.

[12]*See also* Opening Br. at 24-28.

Breyer found that employing "foreseeability" as a substitute for purposeful conduct was particularly unfair in the case of a foreign defendant. 131 S. Ct. at 2793-94.

The *Nicastro* majority's rejection of foreseeability as a substitute for purposeful conduct directed at the forum State was consistent with existing Supreme Court precedents, as Justice Breyer noted. *See id.* at 2793 ("For one thing, to adopt this view would abandon the heretofore accepted inquiry of whether, focusing upon the relationship between 'the defendant, the *forum* and the litigation,' it is fair in light of the defendant's contacts *with that forum*, to subject the defendant to suit there.") (citing *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)) (emphasis in original). Justice Breyer also relied on *World-Wide Volkswagen v. Woodson,* in which the court held that the purposeful availment requirement was not satisfied merely because a defendant sold a product outside the State when it was foreseeable the product might cause injury in the State. 444 U.S. 286, 297 (1980) ("[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State.")

<u>The *Nicastro* Majority Rejected The "National Market" Approach Argued By Plaintiffs</u>.

In *Nicastro,* the foreign manufacturer had made substantial efforts over many years to market its products to the U.S. through its U.S. distributor. Nevertheless, a majority of the U.S. Supreme Court concluded that this did not show purposeful availment of the forum State. 131 S. Ct. at 2790 ("In this case, petitioner directed marketing and sales efforts at the United States . . . Here the question concerns the authority of a New Jersey state court to exercise jurisdiction, so it is petitioner's purposeful contacts with New Jersey, not with the United States, that alone are relevant.") (Kennedy, J., plurality opinion); *id.* at 2791 ("[T]he British Manufacturer permitted, indeed *wanted*, its American distributor to sell its machines to anyone in America willing to buy them.. . . In my view, these facts do not provide contacts between the British firm and the State

of New Jersey constitutionally sufficient to support New Jersey's assertion of jurisdiction in this case.")  (Breyer, J., concurring) (emphasis added).

Rather than finding personal jurisdiction based upon national marketing, both the plurality and concurring opinions in *Nicastro* required plaintiff to come forth with evidence of specific efforts by the foreign manufacturer to sell in the forum State.  *See Nicastro*, 131 S. Ct. at 2792 ("Mr. Nicastro, who here bears the burden of proving jurisdiction, has shown no specific effort by the British Manufacturer to sell in New Jersey.") (concurring opinion).

<u>Controlling Law In The Fifth Circuit Is Consistent With *Nicastro*</u>.

TG and TTP's activities in China fall squarely within cases in the Fifth Circuit that held that sales of products outside the forum State unaccompanied by purposeful efforts to serve the market in the State do not establish purposeful availment.  *See, e.g.*, *Charia v. Cigarette Racing Team, Inc.*, 583 F.2d 184 (5th Cir. 1978) (FOB sales outside of forum State do not constitute purposeful availment of the State even when the seller arranged for shipment of the product into forum).  *Charia* remains the law of the Fifth Circuit, and is dispositive here.  Plaintiffs also cannot distinguish *Hunt*,[13] *Fricke*[14] and other Louisiana state court rulings requiring conduct directed to the forum State to establish specific jurisdiction, and finding that the mere fact that the defendant's product found its way to a Louisiana user cannot satisfy minimum contacts requirements.[15]

---

[13] *Hunt v. Schult Homes Corp.*, 657 So.2d 124 (La. App. 3d Cir. 1995).

[14] *Fricke v. Owens-Corning Fiberglass Corp.*, 647 So.2d 1260 (La. App. 4th Cir. 1994).

[15] *See* Opening Br. at 42-49.

Plaintiffs Cannot Rely On Cases In The Fifth Circuit Cases That Are Inconsistent With
*Nicastro*.

Since *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415 (5th Cir. 1993) was
decided, its interpretation of the requirements of Due Process in stream of commerce cases has
been called into question; indeed, in *Luv 'N Care, Ltd. v. Insta-Mix, Inc.*, Judge DeMoss, the
author of the *Ruston* opinion, specially concurring, questioned its constitutionality and advocated
that the Fifth Circuit adopt Justice O'Connor's "stream of commerce plus" approach instead.
438 F.3d 474 (5th Cir. 2006).  In addition, subsequent to *Ruston*, the Fifth Circuit has held that
"foreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of
specific acts toward the forum."  *McFadin v. Gerber,* 587 F.3d 753, 762 (5th Cir. 2009) (quoting
*Wien Air Alaska v. Brandt*, 195 F.3d 208, 212 (5th Cir. 1999)).  Ultimately, as discussed above, a
majority of the Justices of the Supreme Court in *Nicastro* overruled *Ruston* insofar as it held that
mere foreseeability or awareness that the product might be sold in the forum State would be
sufficient to establish that a defendant purposefully availed itself of the State.

TG and TTP's conduct fails to meet even the looser requirements for purposeful
availment of the pre-*Nicastro* Fifth Circuit cases erroneously relied upon by Plaintiffs.  *See, e.g.*,
*Ruston*, 9 F.3d at 419-421 (out-of-state component parts manufacturer for gas turbines
reasonably anticipated suit in Texas where it *knew* its products were going to be delivered to a
specific user in Texas, manufacturer had made 211 direct shipments to Texas, and
manufacturer's employees visited Texas on several occasions to assist customers).  The factors
that the Fifth Circuit considered in deciding in *Ruston*, including that sales of the non-resident
defendant's products in the forum State were foreseeable, are not present here.  The Taishan
Defendants did not have actual knowledge of any specific customer to whom either company's
products would be re-sold in the forum State, made no direct shipments to customers in the State,

10

and never sent employees to the State, let alone on numerous occasions over a period of years. *See Southern Copper, Inc. v. Specialloy, Inc.*, 245 F.3d 791 (5th Cir. 2000) (non-resident's FOB sale outside forum State with resident taking possession outside State insufficient to show purposeful availment; distinguishing *Ruston* because of the number and quality of additional contacts in that case beyond the FOB sale) (unpublished opinion).

In *Irving v. Owens-Corning Fiberglass Corp.*, 864 F.2d 383, 387 (5th Cir. 1989), a Yugoslavian asbestos supplier that supplied all of the asbestos used by the plaintiff's Texas employer over a 15-year period, directly shipped asbestos to Texas approximately 30 times, and partially paid the cost of testing of its products in Texas, was found to have reason to foresee that its product would be sold in the State. By contrast, TG did not have any customers from Louisiana. In addition, TTP had short-lived relationships with only two U.S. customers, each of which purchased drywall in China and shipped to Louisiana, and TTP did not ship drywall to Louisiana or utilize testing facilities or other services in Louisiana.

In *Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809 (5th Cir. 2006), also relied upon by Plaintiffs, the Fifth Circuit found that the non-resident manufacturer knew that the beryllium-containing products it sold to Boeing would be used exclusively at Boeing's space shuttle construction facility in the forum State. 445 F.3d at 813. Unlike the defendant in *Paz,* the Taishan Defendants had no knowledge of any use of their products in the forum State, exclusive or otherwise. Plaintiffs' reliance on *Nuovo Pignone, SpA v. Storman Asia, M/V*, 310 F.3d 374 (5th Cir. 2002) is also misplaced because in that case the very subject of the lawsuit was breach of a contract to ship a product to the forum State. Thus, the Fifth Circuit concluded "[w]e have established that [the foreign defendant] directed its activities toward Louisiana by

agreeing to transport the reactor to the Port of New Orleans." *Id.* at 382. Here, by contrast, neither TG nor TTP contracted to ship products to Louisiana or engage in any activities there.

Likewise, even in *Luv 'N Care*, a case that "stretches the stream of commerce theory beyond its past limits,"[16] the non-resident defendant sold 82,000 pieces of the infringing product to a national distributor and was aware of 65 shipments that went from its factory directly into the forum State. None of TG's drywall was shipped to Louisiana. TTP's isolated sales to APIC and GD Distributors bear no resemblance to the "regularity and quantity of shipments" to the forum State in *Luv 'N Care* that led the Fifth Circuit to conclude that "jurisdiction in the forum state was unforeseeable." 438 F.3d at 472 n.11.

Plaintiffs' reliance on *Moses v. Universal Ogden Servs.*, 16 F. Supp. 2d 680, 681-682 (E.D. La. 1998), is similarly misplaced. In *Moses*, a manufacturer of the back of a chair that caused injury in Louisiana had sold 117,000 chair backs on numerous occasions over 18 years to a manufacturer that assembled and sold the chairs in Louisiana. This Court found that "the nature and continuity of [the chair back manufacturer's] relationship with [the manufacturer who sold the chairs in Louisiana] supplies due process components of personal jurisdiction." By contrast, TG did not supply drywall to anyone from Louisiana, and TTP's isolated sales to APIC and GD Distributors in China were fortuitous events of a passing nature. Even under the law in Fifth Circuit cited by Plaintiffs, TG and TTP did not purposefully avail themselves of the privilege of conducting activities in Louisiana.

<u>*Nicastro* Requires Dismissal Of This Case</u>.

Justice Breyer's adherence to Supreme Court precedents and the limited facts found by the New Jersey Supreme Court led him to conclude, like the plurality, that Plaintiff had not

---

[16] 438 F.3d at 475 (DeMoss, J. concurring).

established that the foreign manufacturer had purposefully availed itself of the forum State. *See, e.g.*, 131 S. Ct. at 2792 ("And he has not otherwise shown that the British Manufacturer purposefully availed itself of the privilege of conducting activities within New Jersey, or that it delivered its goods in the stream of commerce with the expectation that they will be purchased by New Jersey users.") (concurring opinion) (internal quotation marks and citation omitted). The *Nicastro* majority's ruling – as well as its analysis and reasoning – indicates that this Court should find a lack of personal jurisdiction over TG and TTP. As summarized below, the Taishan Defendants' connection to the forum State was much more attenuated than that of the foreign manufacturer that was not subject to personal jurisdiction in *Nicastro*:

COMPARISON OF FORUM STATE
CONTACTS BETWEEN THE TAISHAN DEFENDANTS AND McINTYRE

| Activity | McIntyre | TG | TTP |
|---|---|---|---|
| Office in State | No | No | No |
| Paid taxes in State | No | No | No |
| Advertised in State | No | No | No |
| **Employees travelled to the U.S. to seek customers** | **Yes** | **No** | **No** |
| **Manufacturer's representatives attended industry conventions in the U.S.** | **Yes** | **No** | **No** |
| **Manufacturer's representatives assisted installation of products in the U.S.** | **Yes** | **No** | **No** |
| **U.S. Distributor** | **Yes** | **No** | **No**[17] |

---

[17]Based on representations by Florida-based Oriental Trading Company ("Oriental Trading") that it planned to distribute TTP's drywall in the U.S., in October 2006, TTP entered into the SAA with Oriental Trading. Notwithstanding the title of the SAA, Oriental Trading did not have the right to act as TTP's sales agent in the U.S. The SAA merely provided Oriental Trading with the right to purchase drywall under the brand name "DUN" in the "territory of the U.S.A." (SAA ¶¶ 1-2.) The undisputed facts are that Oriental Trading never sold or distributed TTP's drywall to anyone in Louisiana or anywhere else. Herman Aff. Ex. 9 ("Gonima Tr. A") 62:2-15, 82:18-83:19; Mitchell Opening Brief (Rec. Doc. No. 13566-1) at 21.

13

| Distributor sales in State | Yes | No | No |
|---|---|---|---|
| Manufacturer shipments to State | No | No | No |
| Marketing in State | No | No | No |
| Advertised on passive website | Yes | Yes | Yes |

### 1.   Plaintiffs Have Failed To Prove That TG Or TTP Purposefully Availed Itself Of The Louisiana Market.

The Supreme Court in *Nicastro* made clear that personal jurisdiction must be based on "the defendant's actions, not his expectations."  131 S. Ct. at 2789.  The Taishan Defendants' *actions* relevant to personal jurisdiction consisted of nothing more than FOB or CIF sales in China.  Those actions are insufficient to show that either company purposefully availed itself of the State of Louisiana.

Plaintiffs attempt to confuse the jurisdictional issue referring to the term "Taishan" as meaning both TG and TTP, when one of the issues before this Court is whether the juridical independence of TG and TTP can be ignored.  Nevertheless, Plaintiffs concede TG never sold drywall to anyone in Louisiana and that there is no evidence that any of the drywall TG sold Venture Supply was re-sold in Louisiana.   Plaintiffs cannot seriously contend that TG purposefully availed itself of Louisiana.

TTP made a single sale to APIC, FOB at a Chinese port. [18]  APIC's representative in China advised TTP that New Orleans was the purchaser's intended destination.[19]  There is no evidence TTP had any information from APIC indicating it planned to re-sell the drywall in

---

[18]Plaintiffs double count two draft commercial invoices related to the APIC sale, even though they have the same invoice number.  Herman Aff. Ex. 1.  The later invoice for 5760 sheets reflects the actual amount TTP delivered to APIC's shipping agent at the Chinese port.  *See* Herman Aff. Exs. 111 and 112.

[19]*See* Opening Br. at 15.

Louisiana.  Plaintiffs also concede that GD Distributors made a single purchase from TTP, CIF, New Orleans.  The CIF term meant that GD Distributors paid the cost of shipping and insurance in advance by including it in the purchase price for the drywall rather than paying it "collect" at the destination.[20]  Besides APIC and GD Distributors, TTP made no other sales to U.S. customers that shipped to Louisiana.[21]  GD Distributors selected New Orleans as the destination and directed TTP to make the shipping arrangements on its behalf.  There is also no evidence TTP had any information from GD Distributors indicating it planned to re-sell the drywall in Louisiana.

<u>Merely Contracting With A Louisiana Company Is Insufficient</u>.

The fact that Triax Trading (APIC's designated recipient for the drywall) and GD Distributors happened to be from Louisiana was fortuitous, and not the result of any purposeful efforts by TTP directed to Louisiana.  *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478 (1985) (the mere fact that a contract is with a forum State resident cannot without more establish minimum contacts with the State); *see also McFadin v. Gerber*, 587 F.3d 753, 760 (5th Cir. 2009) ("Jurisdiction must not be based on the fortuity of one party residing in the forum state."). *Burger King* required much more than negotiating a contract with a forum State resident to establish minimum contacts.  The non-resident franchisee purchased a long-term franchise that contemplated a 20-year relationship, and signed an agreement with a Florida choice of law

---

[20]*Id.* at 15-16.

[21]INEX alleges it purchased 33,000 sheets of TTP's drywall from Metro Resources Corp., a Canadian company ("Metro Resources").  INEX Opp. Br. at 2-3.  However, TTP never sold drywall to Metro Resources and INEX does not offer any evidence such sales occurred.  Metro Resources allegedly obtained a copy of a report from an unidentified source showing that TTP's drywall met the ASTM C1936 standard.  INEX Opp. Br. at 2-3 n.8 and Exhibit B.  The evidence is that TTP freely furnished copies of this report to any potential customer who requested it, including companies in China.  Peng Tr. at 411:10-412:1.  The report proffered by INEX is irrelevant and inadmissible to demonstrate that TTP purposefully directed any conduct to Louisiana.  *See* Evidentiary Objections Obj. No. 64-65.

clause.  Furthermore, the parties' course of dealing involved substantial, continuing contacts with Florida, including communicating with Burger King's corporate headquarters to resolve disputes, attending training seminars in Florida, and sending monthly rent, franchise fees and royalty payments to Florida.  In view of the entirety of the purposeful activity of the franchisees connected to Florida, personal jurisdiction was appropriate.  471 U.S. at 482.  In contrast to the Burger King franchisees' substantial connection to the forum State, TTP dealt with APIC and GD Distributors through their intermediaries in China, and did not have any telephone or e-mail communications with them in Louisiana.  Moreover, TTP did not have to render any performance in the forum State and never set foot there.  China was the locus of the contracts.  *See McFadin*, 587 F.3d at 760.

TTP's FOB sale to APIC in China cannot conceivably be considered a sale in Louisiana.  TTP's CIF sale to GD Distributors in China should be viewed the same way, since it only included the cost of shipment in the purchase price as an accommodation to the customer.  Moreover, even if TTP's CIF sale to GD Distributors was considered a sale in Louisiana, it would not establish that TTP purposefully availed itself of Louisiana.  *See Nicastro*, 131 S. Ct. at 2792 ("And the Court, in separate opinions, has strongly suggested that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce fully aware (and hoping) that such a sale will take place.")  (Breyer, J., concurring).[22]

---

[22] Plaintiffs allege that GD Distributors received "banking directions" in English at its Louisiana address.  Gross/Wiltz PSC Opp. at 16.  However, there is no evidence those communications were from TTP.  In all likelihood such communications were from the Chinese bank GD Distributors was corresponding with in connection with making payment for the drywall in China in advance of TTP delivering it to the port in China.

<u>Neither TG Nor TTP Targeted The Market In The U.S. Or Louisiana</u>.

The admissible non-hearsay evidence does not support Plaintiffs' "targeting" allegation. TG's marketing efforts were primarily focused on the vast domestic market in China.   TG advertised in domestic Chinese publications and attended industry trade fairs in China.   The Taishan Defendants paid little attention to the U.S. market for drywall.  They did not advertise in any U.S. publications or attend any trade fairs in the U.S.[23]  Also, the Taishan Defendants did not conduct market research or otherwise study the market for drywall in the U.S.  The Taishan Defendants did not pay any attention at all to the market for drywall in any particular State.[24]  In fact, TG did not include sales to U.S. companies in its business plans because TG believed the cost of transportation was too high for U.S. companies to economically import its drywall.[25]

Plaintiffs falsely assert that it was "standard company practice" to "mail" drywall samples to customers in the U.S.[26]  There is no evidence TG or TTP ever sent unsolicited marketing materials or samples of drywall to any potential U.S. customer.  They only provided samples of drywall to prospective customers who requested them.[27]  Sometimes the potential customers came to the factory and took samples away with them, as occurred in the case of GD

---

[23]Peng Tr. 273:13-274:13, 528:1-3.

[24]Yongzhi (Charley) Yang of Stone Pride International Corp. testified that he did not understand the TTP "export department" to be dedicated to selling necessarily to the U.S., but to anywhere outside of China.  Herman Aff. Ex. 24 ("Yang Tr.") at 85:17-86:3.

[25]Jia Tr. 855:16-857:3 ("The product gypsum board is a heavy product.  To export such a product for a long period of time is an action that's [u]nimaginable.  The shipping cost is very expensive . . . . Common sense tells us that . . . it is impossible for us to have any plan to occupy American market.")

[26]Gross/Wiltz PSC Op. at 18-19.

[27]Peng Tr. 268:1-270:2 ("we did not think about sending samples to the United States for promotion . . . some of the customers, they want to have the samples to be shipped to the United States.  They require that.  And the customers, they agree that the cost for the shipment would be paid by they themselves . . . and they themselves come to our company to talk about the business, and they said it would be very inconvenient for them to bring it to the United States, and they want us to ship it for them.  And the customer would agree that they pay for the fee of the shipment, then we would ship it for them.").

Distributors.  On other occasions, the potential customer requested that TG or TTP send samples using international courier services such as DHL.  In those instances, the Taishan Defendants required the requesting person to pre-pay the shipping and the Taishan Defendants merely dropped the samples off with the courier in China.[28]  Plaintiffs' assertion that "Taishan availed itself of the United States postal service" is also not supported by any evidence.[29]

TG's use of its website, or B2B sites such as Alibaba, does not evidence any effort by TG or TTP to target the market in the U.S. or in Louisiana.  TG created the English version of its website primarily for domestic consumption.   It existed for years before TG had any communications from potential U.S. customers.[30]  Passing references to exports to the U.S. as part of a list of other countries to which TG or TTP had exported products hardly qualifies as targeting the U.S. market, and it certainly does not constitute evidence that either TG or TTP targeted Louisiana.

When TTP made its isolated sales in China to APIC and GD Distributors, those sales did not result from it targeting the market in the U.S. or Louisiana.  TTP did not design or "customize" its drywall for those markets.  The 1/2" thick drywall that APIC and GD Distributors ordered could have been distributed and used anywhere in the U.S. and, indeed, was not even unique to the U.S.  It was used in other countries and TG had previously manufactured drywall that size for customers outside of the U.S.[31]  TTP simply manufactured its drywall in the sizes the customers wanted, and marked the drywall exactly as the customers directed.  As an

---

[28]*See e.g.*, Che Tr. at 284:17-291:18.

[29]Herman Aff. ¶ 41.

[30]Peng Tr. 541:16-542:13.

[31]Peng Tr. 134:1-7; Jia Tr. 688:24-689:20.

OEM manufacturer, TTP (and TG too) had always done this for customers, wherever they came from.[32]

Likewise, neither TG nor TTP "customized" their manufacturing or modified the design of their drywall to meet ASTM standards.[33]  ASTM stands for American Society for Testing and Materials.  It is an international standard, not an American standard.[34]  The ASTM issues procedures for testing and certification of materials of every sort that are used worldwide. ASTM C139604 is the ASTM standard applicable to drywall.  In late 2005, Venture Supply asked that TG supply drywall meeting the ASTM standard but TG refused because it was unfamiliar with the standard.[35]  After a number of other potential customers asked for drywall meeting the ASTM standard, TTP arranged to have a sample of its drywall tested by a lab in China, which certified that the drywall it produced met the ASTM standards.[36]

TTP's drywall was certified as meeting the ASTM standard by the Quality Supervision and Inspection Center of the China National Building Materials Industry.[37]  TTP did not obtain ASTM certification as part of an effort to market drywall to the U.S or to any particular State.

---

[32]*See, e.g.*, Peng Tr. 266:6-267:23; Che Tr. 40:9-18; 222:19-223:2; 358:22-359:23.  Similarly, the fact that Oriental Trading directed TTP to place the "DUN" logo on the drywall it purchased, and selected the colors, reflects TTP's passive acquiescence to a customer's orders, not purposeful conduct directed to any State.

[33]Herman Aff. ¶ 38.

[34]Jia Tr. 718:17-719:21 ("As far as I know, Canada, Australia and many other countries also require to produce gypsum board in accordance with American standard.  Many countries who are small and have difficulties in producing their own standard therefore, they are required to use standard of other countries.  The ASTM American Standard not only serve the people of the United States but serve also the people worldwide.  This is a general common sense in the gypsum board industry . . . .").

[35]Porter Tr. 53:19-54:24.

[36]Jia Tr. 728:12-729:16.

[37]*See, e.g.*, Herman Aff. Exs. 37, 40.

TTP's drywall was not certified by any U.S. lab as meeting the ASTM standard, and TTP never contacted any labs in the U.S. concerning ASTM testing of their drywall.[38]

Plaintiffs allege further that "Taishan" sold drywall to Devon International, a U.S. company with offices in China, and that the drywall Devon International purchased was shipped to Pensacola, Florida.   Plaintiffs allege that Robert Scharf of Devon International visited "Taishan's" factory.   These assertions seriously mischaracterize the facts, and are not supported by admissible evidence.   Plaintiffs rely on hearsay testimony from a case in Alabama to which neither TG nor TTP was a party.[39]   The Taishan Defendants are not even mentioned in the deposition testimony that Plaintiffs rely upon.   In fact, neither company sold drywall to Devon International.   TTP sold drywall to a Chinese trading company, Shanghai Yuyuan Market Import & Export Co. Ltd. ("Shanghai Yuyuan"), in China.[40]   Shanghai Yuyuan instructed TTP to put "Devon" on the packaging of the drywall.[41]   Shanghai Yuyuan picked up the drywall at TTP's factory.[42]   TTP did not sell the drywall to Devon International or ship it to the U.S.   TTP had no further involvement with the drywall once it was picked up from the factory.   There remains no evidence that TG or TTP sold drywall to Devon International or that any of that company's drywall was re-sold in Louisiana.

Plaintiffs allege that "Taishan" sold 85 million square feet of drywall to U.S. customers. To arrive at this figure, Plaintiffs allegedly added up all of the drywall reflected on both TG's

---

[38]Jia Tr. 728:9-12.

[39]Herman Aff. ¶¶ 89-91.

[40]*See* Herman Aff. Ex. 19, which contains TTP's Manufacturer's Profile Form, Exhibit A at Entry Nos. 12-14.

[41]*See* Spano Reply Decl., Ex. 22, which is a copy of the Purchase Contract between TTP and Shanghai Yuyuan.

[42]*Id.* ¶ 5.

and TTP's manufacturer's profile forms.[43]  This is misleading because TTP's sales should be considered separate from TG's sales.  Moreover, even as to TTP, Plaintiffs' claim is misleading because the vast majority of the drywall TTP sold, approximately 77,685,000 square feet, was sold to Chinese trading companies in China and was not exported to the U.S. by TTP.  Peng W. further explained that salesmen's e-mails regarding exports were intended to give a general sense of TG and TTP's capabilities in response to inquiries from potential customers but did not represent actual sales data.[44]

Plaintiffs focus wrongly on the number of sheets of drywall that allegedly wound up in the U.S. rather than TTP's two isolated sales to companies that shipped to the forum State.  There was no "regular flow" or "regular course of sales" by Defendants to Louisiana sufficient to establish purposeful availment of the State.  *Nicastro,* 131 S. Ct. at 2792.[45]

Plaintiffs mistakenly refer to *dicta* in Justice Breyer's concurring opinion in *Nicastro* suggesting that "target[ing] the world by selling products from its Web site" or "consign[ing] the products through an intermediary (say, Amazon.com) who then receives and fulfills the orders", *id.* at 2793, could be an element of showing purposeful availment in some cases.  The evidence shows that TG and TTP's marketing efforts were nothing like the scenario Justice Breyer envisioned.  Neither company ever sold products from TG's website, which Plaintiffs concede was not interactive.  Customers could not purchase products or communicate with TG or TTP

---

[43]PSC Global MOL at 1; Herman Aff. Ex. 1.

[44]Peng Tr. 264:14-265:6.  Plaintiffs point out that Peng W. continued to use TG's corporate signature on e-mail responses to potential U.S. customers after he transferred to TTP. Peng W. explained that this was an oversight and does not indicate he was acting on behalf of TG or that TG was trying to make those sales.  Peng Tr. 161:5-162:10.

[45]Plaintiffs note that TG purchased waste paper from the U.S. and then processed it in China in connection with manufacturing of drywall.  Herman Aff. ¶ 63.  Plaintiffs do not, however, assert that these purchases of waste paper reflect the purposeful availment of any particular State.  Plaintiffs incorrectly assert that TG sold a paper machine to a company in Ohio.  Herman Aff. Ex. 164.  In fact, TG purchased certain parts from an Ohio company, as the invoice reflects.

through the TG website.   It is well settled that merely maintaining a passive website is insufficient to establish purposeful conduct directed to a particular State for purposes of personal jurisdiction.   *See Mink v. AAAA Dev. LLC,* 190 F.3d 333, 336-37 (5th Cir. 1999) (Court found website that posted information about defendant's products and services, and provided users with a printable mail-in order form, was not to be classified "as anything more than passive advertisement which is not grounds for the exercise of personal jurisdiction."); *McFadin*, 587 F.3d at 763 ("Here the website was passive, providing no means for orders, offering only [the defendant's] contact information.   We have found similar web pages to be insufficient to meet minimum contacts."); *Southern Copper, Inc. v. Specialloy, Inc.*, 245 F.3d 791, at *3 (5th Cir. 2000) (no personal jurisdiction based on website where no evidence demonstrated that defendant entered into contracts with customers over its website); *see also ALS Scan Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002) ("[A] person who simply places information on the Internet does not subject himself to jurisdiction in each State into which the electronic signal is transmitted and received.   Such passive Internet activity does not generally include directing electronic activity into the State with the manifested intent of engaging business or other interactions in the State . . . .").   Indeed, McIntyre advertised its products in English on its UK website.   131 S. Ct. at 2795.   Therefore, Justice Breyer's reference to "contemporary commercial circumstances" that were not present in *Nicastro* could not have meant something as mundane as a company advertising on a passive website.   131 S. Ct. at 2794.[46]

---

[46]TG also posted company and product information on B2B websites such as Alibaba and EC Plaza, but those websites were also passive and no sales were or could be made on those websites.   The B2B sites merely forwarded occasional inquiries from potential customers to TG.   Those B2B postings were also not comparable to a company that "markets its products through pop-up advertisements it knows will be viewed in a forum."   *Id.*   There is no evidence that any TG advertisements "popped up" on any website viewed by any potential customer in the U.S. or Louisiana in particular, or that any information regarding TG's or TTP's products was accessible on the internet unless someone made an affirmative effort to seek it out.   There is also no evidence that TG or TTP had any "intermediaries" in the U.S., let alone any company authorized to accept orders on their behalf.   They also never consigned their products to anyone.

<u>The Taishan Defendants Did Not Ship Drywall To Louisiana</u>.

There is no evidence TTP shipped any drywall that a customer purchased to Louisiana. Gonima's "impression" that TTP was "willing" to ship "anywhere in the United States" is inadmissible hearsay, and in any case not probative of any actual conduct by TTP.[47]  Gonima had no personal knowledge of any TG or TTP shipments to Louisiana.[48]

Similarly, the testimony of John Gunn of South Carolina-based Guardian, a company that never purchased drywall directly from TG or TTP, is inadmissible to prove anything regarding TG or TTP's sales or marketing related to Louisiana.[49]  Gunn testified without personal knowledge and based upon multiple levels of hearsay.  He stated that someone named Leon told him that Yang of TTP told him that TTP shipped to the U.S. but Gunn was not sure the translation of their Chinese conversation had been accurate.[50]  Gunn certainly did not expect TTP to ship drywall to the U.S., as Guardian arranged its own shipping for the drywall it purchased from Taian Taigao Trading that had been supplied by TTP.[51]  Similarly unreliable and inadmissible is the testimony of Sam Porter of Venture Supply with respect to an e-mail from Perry describing Perry's alleged conversation with a shipping agent about a shipment of containers of drywall to an unidentified customer in New Orleans.[52]

---

[47]*See* Gonima Tr. A at 70:13-71:7; 73:19-75:25.

[48]Gonima had actual knowledge only of Oriental Trading's FOB China purchases that it shipped to Florida and did not resell to anyone.  Gonima Tr. A 62:2-15, 82:18-83:19.

[49]Gross/Wiltz PSC Opp. at 17.

[50]Herman Aff. Ex. 143 ("Gunn Tr.") at 211:12-213:2.

[51]Gunn Tr. 213:9-214:11.

[52]Herman Aff. Ex. 72 ("Porter Tr.") at 97:10-100:2.

Yongzhi (Charley) Yang of California-based Stone Pride also had no actual knowledge of any TG or TTP sales or shipments to Louisiana. His multi-level hearsay testimony concerning what someone else told him TTP said about "exports" to Louisiana is unreliable and inadmissible, particularly since TTP regarded its FOB sales in China as "exports."[53]

Plaintiffs' assertion that TG or TTP was "willing" to ship drywall to Louisiana is contradicted further by the evidence. TG and TTP quoted drywall sales FOB Qingdao in the first instance, unless the potential customer specifically requested prices including the cost of shipping to various destinations. Only then would they obtain shipping cost information from a carrier or shipping agent and pass it on to the potential customer who had made the request.[54] Not only did the Taishan Defendants never ship drywall to purchasers in Louisiana, they never even suggested it.[55]

> ### 2.    TG Or TTP's Alleged Awareness That Drywall Might Be Re-Sold In Louisiana Is Not Sufficient To Show That Either Purposefully Availed Itself Of The Privilege Of Conducting Activities Within The State Of Louisiana.

*Nicastro* rejected arguments that a defendant who introduced its products into the stream of commerce could be subject to personal jurisdiction merely because it "knew or reasonably should have known" its product <u>might</u> be re-sold in the forum State. Plaintiffs' argument based on TG or TTP's alleged awareness of sales in Louisiana fails for the same reason that the New Jersey Supreme Court's holding in *Nicastro* was incorrect.

---

[53] Herman Aff. Ex. 24 ("Yang Tr.") at 18:11-20:7.

[54] *See e.g.* Herman Aff. Ex. 51 (also Che Tr. Ex. 18), which is a 7/10/06 e-mail from TP Construction: ("Would you please find out the freight from Qindao to New Orleans for me? . . . [W]ould you please mail me some samples.")

[55] Some of Plaintiffs' assertions are downright frivolous. For example, they allege that Peng W. "would advise customers about shipping to New Orleans," (Gross/Wiltz PSC Opp. at 19) when he actually testified that "[s]ome of the customers, it would be possible that they did mention about probably they wanted to ship to the city of New Orleans. . . ." Peng W. Tr. at 333:10-334:10. In other words, the customers advised TTP they might be shipping to New Orleans, just the opposite of what Plaintiffs assert.

Contrary to Plaintiffs' arguments,[56] the Supreme Court's suggestion in *World-Wide Volkswagen* that purposeful availment may be satisfied when "a corporation that delivers its products into the stream of commerce with the expectation that they <u>will</u> be purchased by consumers in the forum State" (emphasis added) would require more than mere knowledge the product <u>might</u> be used in the State. Although such an "expectation" that a product <u>will</u> be purchased by consumers in the forum State might be shown by evidence that sales of a defendant's products in the State were not an isolated occurrence but resulted from its purposeful efforts to serve the market in the State, 444 U.S. at 297-98,[57] here there is no evidence that the Taishan Defendants expected their drywall to be re-sold in Louisiana. There was no regular flow of TG or TTP's drywall into Louisiana. APIC and GD Distributors each made a single shipment from China to Louisiana. To the extent APIC or GD Distributions re-sold any of TTP's drywall in Louisiana, those re-sales did not result from any purposeful efforts by TTP to serve the market in the State.

> <u>The Louisiana Long-Arm Statute Does Not Provide A Basis For Personal Jurisdiction In Circumstances Where Due Process Does Not</u>.

Plaintiffs argue TG or TTP could have "foreseen, realized, expected or anticipated that the product may eventually be found in the state by reason of its nature and the manufacturer's marketing practices," within the meaning of section 13-3201(A)(8) of the Louisiana long-arm

---

[56]PSC Global MOL at 8.

[57]To the extent the "fractured panel" in *Asahi* upheld the *World-Wide Volkswagen* "principle" as Plaintiffs assert, PSC Global MOL at 10, both the O'Connor and Brennan concurring opinions would also require more than mere foreseeability, or even knowledge, of isolated sales of the product in the forum State. *See* Opening Br. at 22-23; *see Asahi Metal Indus. Co. Ltd. v. Superior Court,* 480 U.S. 102, 109-111 (1987) (opinion of O'Connor, J.) (expectation for minimum contacts requires "something more" than merely placing a product into the stream of commerce even if the defendant was "awar[e]" that the stream of commerce "may or will sweep the product into the forum State"); *Id.* at 117, 119 (Brennan, J. concurring in part and concurring in judgment) (expectation sufficient for minimum contacts may be found where a sale in forum State is part of "the regular and anticipated flow" of commerce into the State, but not where the sale is only an "edd[y]," *e.g.,* an isolated occurrence).

statute.  The "marketing practices" relied upon by Plaintiffs and INEX consisted of sending samples of drywall to potential customers who requested them and responding to requests to provide shipping cost information to various destinations.[58]  This conduct would not fall within the long-arm statute and in any event, as shown above, would fail to satisfy the overarching Due Process requirement that Plaintiffs show purposeful conduct by TG or TTP directed to Louisiana. Due Process requires more than a few isolated sales outside of the State that eventually find their way into the State not due to purposeful efforts of the manufacturer to serve the market in the State.  Plaintiffs cannot look to Louisiana's long-arm statute to afford jurisdiction under circumstances that Due Process would not permit.

Plaintiffs Have Not Shown TG Or TTP Were Aware Of Sales In Louisiana.

To the extent that "awareness" or "foreseeability" of sales in the forum State is relevant to showing whether a defendant purposefully availed itself of the State, Plaintiffs have not established either with respect to TG or TTP.  The fact that TTP was informed by two of its purchasers that they planned to ship drywall to a port in Louisiana does not show TTP was aware of or foresaw subsequent sales in Louisiana that may have occurred.  Likewise, Plaintiffs cannot rely upon invoices, packing slips or other documents that reflect nothing more than possible shipment destinations that prospective purchasers were considering.[59]

---

[58]INEX Opp. Br. at 5 and n. 10.

[59]See Gross/Wiltz PSC Opp. Br. At 15-16.  Likewise to the extent there is evidence that the drywall arrived at the purchasers' intended destination, it also does not reflect any purposeful conduct by the Taishan Defendants directed to the forum State.

**3.      TG's Or TTP's Willingness To Sell Drywall To U.S. Customers Is Not Sufficient To Show That Either Purposefully Availed Itself Of The Privilege Of Conducting Activities Within The State Of Louisiana.**

Plaintiffs argue that "Taishan's intention to sell more drywall in United States" is a sufficient reason to deny the Taishan defendants' motions.[60] This contention is factually inaccurate, legally insufficient and inconsistent with their concession that Due Process requires purposeful availment of a particular forum State through conduct directed at that State.[61] The evidence relied upon by Plaintiffs shows — at most — a willingness by TG or TTP to sell drywall in China to U.S. companies that approached them.  Even if Plaintiffs had shown the Taishan Defendants intended to sell more drywall in China to U.S. customers, under *Nicastro* that would still be inadequate to establish that TG purposefully availed itself of Louisiana.  Such facts "may reveal an intent to serve the U.S. market, but they do not show that [a foreign defendant] purposefully availed itself of the [forum State] market." 131 S. Ct. at 2790.

The Fifth Circuit cases following a "national market" approach to personal jurisdiction cited by Plaintiffs' have been overruled by *Nicastro*.  For example, *Bean Dredging v. Dredge Tech. Corp.*, 744 F.2d 1081, 1085 (5th Cir. 1984), found a basis for personal jurisdiction in Louisiana over a non-resident component manufacturer merely because it introduced thousands of steel casting into the stream of commerce and made no attempt to limit the states where its products would end up being sold and used.  The Court did not require any specific efforts directed toward the forum State as *Nicastro* clearly mandates.  *Bean Dredging* in turn relied upon *Oswald v. Scripto, Inc.*, 616 F.2d 191, 199-200 (5th Cir. 1970), one of the cases which found jurisdiction based on a defendant's having had "every reason to believe its product would be sold

---

[60]PSC Global MOL at 4.

[61]*See* PSC Global MOL at 7-8.

to a nation-wide market," again without any evidence of purposeful conduct directed specifically toward the forum State.  *Oswald* was relied upon by the <u>dissent</u> in *Nicastro*, *Id.* at 2805. Plaintiffs are advocating this Court follow the same "national market" approach to personal jurisdiction that was adopted by the New Jersey Supreme Court, urged by the <u>dissent</u> in *Nicastro*, and rejected by a majority of the Supreme Court. 131 S. Ct. at 2801.

For similar reasons, *Dahmes v. Champagne Elevators, Inc.*, 869 So.2d 904 (La. App. 4th 2004) does not support Plaintiffs' argument, as in that case a Louisiana court held it could exercise personal jurisdiction based on the mere fact that a non-resident "manufactured a significant component part of a nationally marketed elevator."  Due Process clearly requires more than merely supplying products to a national market.

### B.   Plaintiffs Have Failed To Prove That Their Causes Of Action Arose Out Of Or Resulted From TG's Or TTP's Contacts With Louisiana.

In this case, each individual Plaintiff has a separate claim and consequently a separate burden of proving, by a preponderance of the admissible non-hearsay evidence, that his or her causes of action arose out of or resulted from TG's or TTP's contacts with Louisiana.  *See Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 275 (5th Cir. 2006) ("[I]f a plaintiff's claims relate to different forum contacts of the defendant, specific jurisdiction must be established for each claim.").  None of the Plaintiffs in this case have met their individual burdens.  Each Plaintiff has not offered any evidence that he or she was injured by TG, TTP or one of the 91 other "indeterminate defendants" named in the Complaint.  There is absolutely no evidence whatsoever that any drywall in any individual Plaintiff's home is traceable to the drywall Venture Supply purchased from TG, or to the drywall APIC or GD Distributors purchased from TTP.

Plaintiffs assert that their claims "exist because of Taishan's forum-related contacts," and cite paragraphs of the Complaint that allege "Defendants" supplied drywall that was defective and "caused" them damages.[62]  However, in the context of this evidentiary hearing Plaintiffs may not rely on unsupported conclusory allegations contained in the Complaint or elsewhere. Plaintiffs cite *Seiferth*,[63] but it undermines their argument.  In *Seiferth*, Plaintiff's decedent was killed on the very same helicopter platform the defendant had transported into the forum State. Here, each Plaintiff offers no evidence that he or she was injured by the very same TG or TTP drywall through which that defendant is alleged to have purposefully availed itself of Louisiana. Moreover, in *Seiferth*, the Fifth Circuit found it did not have personal jurisdiction over a claim – similar to Plaintiffs' claims here – that merely related to the defendant's contacts with the forum but did not arise out of or result from them.  *See* 472 F.3d at 275 (claim for defective design of helicopter platform did not arise from purposeful acts of transporting it into forum State and inspecting it there).

Plaintiffs also devote much effort to arguing that they have a viable market share theory that obviates the need for them to identify the manufacturer of the drywall in their homes. Plaintiffs have failed to demonstrate an adequate basis for a market share liability theory – they have offered no evidence that drywall is fungible and their allegations are actually to the contrary — even if that theory was recognized under Louisiana law.  Regardless, each of the Plaintiffs cannot hide behind "a market share" theory to satisfy his or her separate burden under the U.S. Constitution to show that his or her claim arose from the Taishan Defendants' contacts with the

---

[62]Gross/Wiltz PSC Opp. at 23.

[63]Gross/Wiltz PSC Opp. at 22.

forum State.  Consequently, for this reason alone the Court should dismiss each Plaintiff's claim for lack of specific personal jurisdiction.[64]

### C.  The Exercise Of Jurisdiction Over TG Or TTP Would Offend Traditional Notions Of Fair Play And Substantial Justice.

Plaintiffs concede that litigating their claims in this Court would impose an enormous burden on TG and TTP.  This factor is particularly compelling in this case, where TG and TTP specifically sought protection under the legal rules regarding international commerce by entering into contracts for sales that were completed in China.  As the Supreme Court held in *Asahi*, "even apart from the question of the placement of goods in the stream of commerce . . . [t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."  480 U.S. at 114.[65]

The Taishan Defendants have shown that the other factors for consideration – the interests of the forum State, the interests of Plaintiffs and the judicial system's interest in efficient resolution of controversies – tilt against asserting jurisdiction over either TG or TTP.  The interests of Plaintiffs and Louisiana's interest in providing its residents with a forum to adjudicate their drywall-related claims in a timely and efficient manner would be served by this

---

[64]Even if the Court found a sufficient connection between Plaintiffs' claims and TG or TTP's contacts with Louisiana to satisfy Due Process, Plaintiffs' claims would be subject to dismissal for legal insufficiency.  The Fifth Circuit has ruled no fewer than four times that Louisiana does not recognize claims based on market share liability.  *See Cimino v. Raymark Indus., Inc*., 151 F.3d 297, 314 (5th Cir.1998); *Jefferson v. Lead Indus. Ass'n, Inc*., 106 F.3d 1245, 1247-48 (5th Cir. 1997); *Bateman v. Johns-Manville Sales Corp*., 781 F.2d 1132, 1133 (5th Cir. 1986); and *Thompson v. Johns-Manville Sales Corp*., 714 F.2d 581, 583 (5th Cir. 1983).  None of the cases cited by Plaintiffs demonstrate that Louisiana has moved towards adopting market share liability.  To the contrary, the two Louisiana cases the Plaintiffs cite both rejected such a theory.  *George v. Hous. Auth. of New Orleans*, 906 So.2d 1282, 1286-87 (La. App. 4 Cir. 2005), 1286-87, writ denied, 2005-2211 (La. 2/17/06); 924 So. 2d 1016; *Gould v. Hous. Auth. of New Orleans*, 595 So. 2d 1238, 1241 (La. Ct. App. 1992).  The Taishan Defendants reserve their right to seek dismissal of Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(6), Fed. R. Civ. P. 56 or other appropriate grounds.

[65]All of the Justices concurred in this portion of Justice O'Connor's opinion.

Court adjudicating the numerous drywall-related claims Plaintiffs have made against domestic parties that, unlike the Taishan Defendants, actually supplied, distributed or installed drywall in Louisiana. That would be a much more efficient way for Plaintiffs to obtain relief without the unfairness and complexity of dragging TG or TTP into this litigation from China.

Plaintiffs also do not address, and thus concede, the fifth factor, the shared interest of the "several states." In cases involving a foreign defendant, this factor "calls for a court to consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction" by the Court. *Asahi,* 480 U.S. at 115 (emphasis in original). TG has demonstrated that considerations of international comity between the U.S. and China do not favor the exercise of jurisdiction over TG or TTP under these circumstances.[66]

For all of the foregoing reasons, the exercise of personal jurisdiction in this case would not be reasonable, even if the Court found TG or TTP had minimum contacts with Louisiana. *See Asahi*, 480 U.S. at 121-22. ("[T]his case fits within the rule that 'minimum requirements inherent in the concept of fair play and substantial justice may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities.'") (Stevens, J. concurring in part and concurring in the judgment) (quoting *Burger King,* 471 U.S. at 477-78, internal quotation omitted).

## II.     THE ACTIVITIES OF OTHER ENTITIES CANNOT BE ATTRIBUTED TO TG.

Plaintiffs have failed to prove by a preponderance of the admissible non-hearsay evidence that there are sufficient grounds to disregard TG and TTP's separate corporate personhood and attribute TTP's activities to TG for the purpose of asserting personal jurisdiction over TG.

---

[66]*See* Opening Br. at 42-44.

A.   **TTP's Separate Corporate Personhood Must Be Respected Under Chinese Law.**

In its opening brief, TG established that Chinese corporate law (*Gongsi Fa*, or "Company Law") applies to the question of whether TG and TTP should be treated independently.[67] Plaintiffs concede this point and submitted the opinion of three Chinese attorneys who assert that certain facts that Plaintiffs selected for them and told them to consider as true provide a basis for disregarding the separate legal personhood of TG and TTP.   These opinions are far outside the realm of what a legal expert may present to the Court. *See, e.g*., 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2444 (3d ed. 2008) ("The purpose of an expert witness in foreign law is to aid the court in determining the content of the applicable foreign law, not to apply the law to the facts of the case.").[68]  Even more crucial is that, as shown below, this conclusion is based on a highly flawed interpretation of Chinese law that contravenes both its letter and spirit.   Understood correctly, Company Law provides no basis for attributing TTP's acts to TG and instead requires that TG's liability be limited to acts that it conducted itself.

Chinese Law Overview

In China, the principle of limited liability for shareholders is recognized as the "key to the long-term success of the system of corporation."[69]   Thus, the concept of limited liability is the starting point and foundation of Company Law.[70]   The general rule of shareholder limited

---

[67] Opening Br. at 58-59.

[68] *See also Minebea Co., Ltd. v. Papst*, 444 F. Supp. 2d 68, 182 (D. D.C. 2006) (purpose of expert testimony is to aid the court in determining the content of the applicable foreign law – not to apply it to the facts of the case and make ultimate legal conclusions); *Gibson v. Credit Suisse AG*, No. CV 10-1-EJL-REB, 2010 WL 1904773, at *2 n.4 (D. Idaho May 11, 2010) (expert affidavit on foreign Bahamian law is permissible, "but only to the extent of discussing Bahamian standards, not legal conclusions").

[69] Liu Decl. ¶ 44.

[70] Reply Declaration of Zhu Yan, dated June 4, 2012 ("Zhu Reply Decl.") ¶ 3.

liability is firmly articulated in Article 3, which provides that company shareholders are liable to the company "only to the extent of the shares they subscribed for."[71]   However, two Articles, which were adopted in a 2005 revision to Company Law,[72] provide special exceptions to Article 3.[73]   Article 20, which applies generally to all corporations, provides that a corporation's corporate separateness may be disregarded if a creditor proves that the shareholders seriously injured the creditor by abusing the corporate separateness for the purpose of evading debt.[74] Article 64, which applies only to corporations with one shareholder, provides that corporate separateness may be disregarded if a sole shareholder is unable to show that his own property is separate from that of the company.[75]  If the sole shareholder makes the proper favorable initial showing, it will retain its corporate separateness unless the creditor proves that Article 20 applies.[76]

Chinese courts are cautious in applying these new provisions out of concern they could be used to undermine the "cornerstone" of Chinese corporate law, *i.e.* limited liability.[77]  For example, the Legislative Affairs Committee of the Standing Committee of the National Peoples' Congress, a body that coordinated drafting the Company Law, has emphasized that courts should

---

[71]Zhu Reply Decl. ¶ 6; Ex. C.

[72]Liu Decl. ¶ 48.

[73]Zhu Reply Decl. ¶¶ 7, 13.

[74]*Id.* ¶ 7.

[75]*Id.* ¶ 13.

[76]*Id.* ¶¶ 14, 24.

[77]*Id.* ¶ 4.

"err on the side of caution" when straying from the general rule of limited liability.[78]  Indeed, Plaintiffs' own legal expert, Professor Liu Junhain, has explicitly intoned that "[c]ourts and arbitration organizations should be extremely careful when deciding whether or not to disregard the legal personality of a company.  If the issue at hand lies in the grey areas of legal practice – especially when the legal personality of a company can either be disregarded or not – then the legal personality should decidedly not be disregarded."[79]  Accordingly, Chinese courts will rarely, if ever, disregard corporate separateness under either Article unless it is clear that the corporate form has been intentionally and maliciously abused by a shareholder to evade company debts and such abuse caused serious harm to company creditors.[80]  Although Plaintiffs assert otherwise, this limitation is recognized by leading Chinese scholars and legislative bodies[81] and, in fact, Professor Liu himself has often commented that malice should be present if a company's corporate separateness is disregarded.[82]

<u>Plaintiffs Misinterpret And Misapply Company Law</u>.

According to Plaintiffs, Article 64 is the equivalent of Article 20, except that the sole shareholder has the burden of proof.[83]  As stated by one of their experts:

> Article 20(3) requires plaintiffs to bear the burden of proof when attempting to establish that the shareholder shall be held jointly and severally liable for the debts of the shareholder's company. Article 64, however, adopts a presumption of abuse of the

---

[78]Zhu Reply Decl. ¶ 4.

[79]*Id*. ¶ 4 (quoting Professor Liu).

[80]Zhu Reply Decl. ¶¶ 16-20.

[81]*Id.* ¶¶ 16-18.

[82]*Id.* ¶ 18.

[83]PSC Global MOL 30.

> independent status of a one-person limited liability company; thus
> reversing the burden of proof and requiring the shareholder to
> prove that it should not assume joint and several liability . . .[84]

According to Plaintiffs, an analysis under Article 64 is the same as one under Article 20 and, to have limited liability, the shareholder must establish there has been absolutely no abuse of the corporate form.[85]  While Plaintiffs do not directly address the fact that Article 64 does not even mention the term "abuse," Plaintiffs do assert that the term "property" in Article 64 is so broad as to include such things as control, business relationships, operations, governance and leadership.  Based on this logic, a shareholder can only establish that its "property," as used in Article 64, is separate by proving a lack of any abuse of corporate form and by proving it adhered to "the principle of honesty, integrity or public policy."[86]  Using this reading of Article 64, Plaintiffs then argue that TG's independence from TTP may be disregarded – regardless of whether there has been any initial showing of shareholder abuse, intention to evade debt, or creditor injury – because TG has not proved all aspects of its corporate separateness.[87]

Plaintiffs' argument is based on a gross misinterpretation of Chinese law.  First, before Article 64 becomes relevant, activating any burden articulated therein, there must be a showing that Article 20's rule of limited liability no longer applies, *i.e.*, there must be some showing of abuse by the shareholder to the creditor's detriment.[88]

---

[84]Cheng Decl. ¶ 19.

[85]PSC Global MOL at 27.

[86]*Id.* at 28.

[87]PSC Global MOL at 29-30.

[88]Zhu Reply Decl. ¶ 27.

Second, Plaintiffs' assertion that Article 64 is the equivalent of Article 20 (but for the bearer of the burden of proof) disregards the very different language in the two Articles.[89]  Both Articles address when a shareholder may be subject to joint and several liability.  However, Article 64 applies "where the sole shareholder of a one-person limited liability company 'is unable to prove that the corporate property are [sic] independent from the single shareholder's own.'"[90]  Article 20 is much broader and applies "[w]here shareholders of a corporation abuse the corporate independent status . . . for the purpose of escaping debts, and seriously injure[] the interests of the creditors of the corporation."[91]  On its face, Article 64 deals with the narrow issue of independence of shareholder property, whereas Article 20, on its face, deals with the broader issues of abuse and independence of personhood.

Third, Plaintiffs' interpretation of Article 64 is at odds with its own acknowledgement that Article 64 supplements, not replaces, Article 20.[92]  If Article 64 placed a burden on the sole shareholder to establish every element relevant to an analysis under Article 20, Article 20 would have no relevance in the case of the sole shareholder:  if the shareholder did not satisfy his burden under Article 64, the corporate veil would be pierced and Article 20 would be irrelevant.[93]  Thus, Plaintiffs' interpretation of Article 64 necessarily reads Article 20 out of Company Law as applied to sole shareholders.[94]  This cannot be the intent of the rule.[95]

---

[89] Zhu Reply Decl. ¶¶ 32-33.

[90] *Id.* ¶ 33.

[91] *Id.*

[92] *See* PSC Global MOL at 30.

[93] Zhu Reply Decl. ¶ 34.

[94] *Id.* ¶ 34.

36

Fourth, Plaintiffs are wrong that "property" in Article 64 should be construed as meaning conduct such as governance, control and relationships.[96]  Nothing in the Company Law, Chinese legal commentary, or the Chinese language, supports a definition so broad.[97]  The idea that corporate separateness can be disregarded because the shareholder's and company's control, leadership and governance overlap is particularly absurd given that certain Company Law specifically authorizes the shareholder of a single person to have a high level of control over the company.[98]  Instead, the reasonable definition of "property" is something owned, *i.e.* possessions of either the shareholder or the corporation such as the company's headquarters, offices, separate financial accounts and supplies.[99]  This definition is consistent with the term's plain meaning in Chinese, with Chinese legal commentary, and with other Company Law provisions.[100]

Thus, properly understood, Article 64 is satisfied through an initial showing of independent property (sufficient contribution of company assets independent from the shareholder, independent headquarters, separate offices, separate employees, etc.) and if this showing is made, the creditor must satisfy its burden of establishing that Article 20 applies.[101]

---

[95] Zhu Reply Decl. ¶ 34.

[96] *Id.* ¶ 28-30.

[97] *Id.* ¶ 28.

[98] *See id.* ¶¶ 10-11, 31.

[99] *Id.* ¶ 29.

[100] *Id.* ¶¶ 28-30.

[101] *Id.* ¶¶ 14, 36.

<u>TG Has Established That Its Property Is Separate From That Of TTP</u>.

TG has established that its property is separate from that of TTP.  Plaintiffs concede that TG's financial reports were separate from TTP's[102]  and Plaintiffs have not disproved any of the evidence TG presented in its moving brief that TG and TTP had their own separate production facilities, factories, warehouses, supplies, equipment, computers and bank accounts.[103]  In fact, Plaintiffs' sole assertion related to property is that some former TG sales employees kept their phone numbers when they began working for TTP and that this indicates that TG and TTP shared offices.[104]  Not only is this statement nonsensical (phone numbers have not been tied to a physical location for years), but it does not rebut the evidence showing TG and TTP kept separate offices[105] and it certainly does not outweigh all of the evidence TG has presented evidencing that its property is separate from TTP.[106]  All of Plaintiffs' other Article 64 arguments relate to other elements of corporate separateness, such as operation, control and governance.[107] But, as explained above, such factors are only relevant to an inquiry under Article 20, not Article 64, and are Plaintiffs' burden to establish.

---

[102]In its analysis of Article 64, Plaintiffs focus on what TTP can establish, for example: "Taishan makes no assertion that TTP's board of directors . . . ever met at all" and "the only financial records from TTP that were produced were very short, annual summaries."  *See, e.g.*, PSC Global MOL at 31-32.  However, what TTP can or cannot establish is irrelevant to an Article 64 analysis: Article 64 provides that the <u>shareholder</u>, not the company, show that its property is independent.  Notably, Plaintiffs concede that TG's financial reports were separate from TTP's and that it held regular board meetings.  *Id.*

[103]Opening Br. at 10.

[104]PSC Global SOF at 68.

[105]Opening Br. at 10-11.

[106]*Id.* 10-12.  Notably, even if there was minimal use of one entity's property by the other, such use would not necessarily constitute a basis to disregard corporate separateness. Company Law is not so severe as to absolutely prohibit any sharing or use of assets between shareholder and company — whether use of one entity's property by another constitutes abuse may be a question of type and degree of use.  Zhu Reply Decl. ¶ 51.

[107]*See* PSC Global MOL at 32-33.

<u>Plaintiffs Cannot Satisfy Their Burden Of Proving That Disregarding TG's Corporate
Independence Is Authorized Under Article 20</u>.

Plaintiffs failed to establish that TG's independent personhood should be disregarded under Article 20.  Article 20 requires proof of three elements: (1) the shareholder abused its corporate form; (2) this abuse was conducted to evade the payment of its debts; and (3) the abuse caused severe injury to the creditor.  Plaintiffs disregard the second and third elements, and their support for the first is grossly insufficient.

<u>Trademarks</u>

Plaintiffs state that evidence related to TTP's alleged use of TG's Taishan and DUN trademarks is "the strongest evidence that [it] has to show that TG and TTP were the same"[108] Plaintiffs do not dispute that TTP's use of the Taishan trademark was pursuant to a valid license.[109]  Rather, Plaintiffs quibble with the license's terms and argue that because the license did not require TTP to pay a monetary fee to TG and because the authorization for use was not narrowly limited, the license establishes that TG abused its corporate form.[110]  However, there is no suggestion that the license was unfair to TG, TTP or any third party.  And while TTP may not have paid TG a monetary fee pursuant to the license, TG was compensated by other means, such as benefiting from increased brand exposure.[111]  Under Chinese law, a subsidiary's use of its parent's marks does not constitute abuse of the corporate form.  Indeed, it is barely, if at all, material in an analysis on whether to disregard corporate separateness.[112]  Moreover, Plaintiffs

---

[108]PSC Global MOL at 33.

[109]Opening Br. at 9.

[110]PSC Global MOL at 33.

[111]*Id.*

[112]*See* Zhu Reply Decl. ¶ 50.

have established nothing untoward in TTP's licensed use of TG's trademarks.[113]  That this is Plaintiffs' "strongest evidence" on this point speaks volumes.

> ### TG And TTP Operated Separately And TG Exercised An Acceptable Level Of Control Over TTP.

TG established in its moving brief that it did not exert improper control over TTP.[114] While TG was involved in some high-level aspects of TTP's governance, the record shows that TTP's own general manger exercised authority over TTP's daily operations, not TG, and TTP had its own bank accounts, financial department and quality control departments. [115] Nevertheless, Plaintiffs argue that the operation of TG and TTP was not separate by alleging that (1) there is insufficient evidence that TTP's Board of Directors met regularly or made high-level decisions; and (2) "TTP's leadership simply came from TG."[116]  Neither allegation evidences that TG abused its corporate form.  Plaintiffs offer no explanation as to how an alleged failure to keep regular meetings or TG's high-level decision-making constitutes TG's abuse of the corporate form under Chinese Law, especially when Company Law explicitly provides that a single shareholder company need not even have a board of directors and authorizes a sole shareholder to have powers above those permissible for other types of shareholders.[117]

---

[113]As for TTP's allegedly unauthorized use of the DUN mark, this occurred out of a misunderstanding by TTP's sales employee.  Jia Tr. 805:1-4.  It is not unusual for subsidiaries to have permission to use a parent's trademarks. When OTC asked TTP to put the DUN mark on certain drywall, Bill Che acquiesced without confirming that TTP was permitted to do so.  Jia Tr. 805:7-12.  TG management was not aware of this agreement.  *Id.*  In short, this was a simple mistake on the part of the salesman.  It does not indicate an intention to evade debt nor does it indicate that TTP and TG were the same entity.

[114]Opening Br. 10.

[115]*See* Opening Br. at 65-66.

[116]PSC Global MOL at 31-32.

[117]Zhu Reply Decl. ¶ 10 and n.11 (citing Art. 38, CCL).

TG And TTP Did Not Settle One Another's Disputes.

Plaintiffs incorrectly argue that TTP resolved disputes with TG's customers and accepted sales that had begun under TG.[118]  This is yet another mischaracterization of the facts, not supported by admissible evidence.  There are two disputes to which Plaintiffs refer, one with Guardian, and another with Oriental Trading.  The facts associated with neither supports Plaintiffs' argument.  In the Guardian dispute, Guardian threatened suit against both TG and TTP.  Plaintiffs rely upon the testimony of a Guardian witness that a settlement meeting was attended by a person who described himself as the "General Manager" and was described by the Guardian witness as being 6'2" or 6'3" and 240 lbs., whom the witness believed to be Mr. Jia.  Yet, as the Court knows from attending the depositions in Hong Kong in 2012, the description given does not fit Jia, but does fit Peng Shiliang, who in fact was TTP's General Manager.  Furthermore, whether TG was or was not involved in settlement discussion, Plaintiff does not dispute that TTP ultimately was the settling party.[119]

The second dispute relates to Oriental Trading's effort to retrieve a deposit of $100,000 it placed with TTP.  A TTP employee began facilitating Oriental Trading's efforts to obtain a refund in 2007.  In 2008, after TTP had transferred all of its assets to TG, presumably even including this deposit, the deposit was refunded.  There is no evidence that this employee was acting on behalf of TG in connection with the return of the deposit to Oriental Trading or that TG expended any of its own assets in refunding the deposit.[120]

---

[118]See Gross/Wiltz PSC Opp. Br. at 9; PSC Global SOF at 56-61.

[119]PSC Global MOL at 59.

[120]See Zhu Reply Decl. ¶ 54 (noting that even if the PSC's assertions and characterizations of these disputes were true, which they are not, such dispute resolution would not be dispositive of corporate abuse under Chinese law).

<u>Plaintiffs Provide No Other Reasons To Disregard TG's Corporate Separateness</u>.

Plaintiffs' remaining assertions regarding abuse of corporate form are either immaterial, unsupported or contradicted by the record.  Plaintiffs allege that TTP was not adequately capitalized, but concedes that TG registered 22 million yuan of capital investments in TTP – far more than what is required under Company Law[121] – and Plaintiffs make no allegation that TTP was required to seek further funds or loans from TG or from any other source to operate its business.  Plaintiffs make the ridiculous argument that TG abused its corporate form when it raised TTP's rent.[122]  The fact that TG and TTP's financial statements do not itemize specific cash payments made between TG and TTP for equipment, sales and repurchases, does not mean that the transactions were not legitimate arms-length transactions.  In fact, in 2006, TTP reported cash payments for fixed assets of 34,380,888.25 yuan.  TTP also reported over 32 million yuan in liabilities, including over 3 million yuan in accounts payable in 2006.[123]

Plaintiffs' other assertions made in support of its Article 20 argument are also easily dismissed.  Plaintiffs argue that "TTP was the foreign sales desk of TG during the time it needed to issue VAT invoices,"[124] but this is just another way of saying that TTP fulfilled its corporate function, in accordance with the purpose for which it was created.  The fact that a few salesmen familiar with international sales for export transferred from TG to TTP on a voluntary basis is consistent with, and does not undermine, TTP's corporate separateness.  And aside from

---

[121]*See* Zhu Reply Br. ¶ 11 (noting that under Article 59 of the Company Law, the minimum registered capital of a single-person company is RMB 100,000).

[122]PSC Global MOL at 33.

[123]Herman Aff. Ex. 176 (Jia Tr. Def's Ex. 45A).

[124]PSC Global MOL at 33.

superficialities such as retaining TG's corporate address on their e-mail signatures, the transferred employees' selling efforts were exclusively on behalf of TTP.

Plaintiffs' assertion that TTP used TG's marketing materials simply reflects that TG, like most parent companies, described all of the products and services offered by the companies within its corporate family. This too was not an abuse of the corporate form.[125] Plaintiffs cannot establish that the two entities comingled funds – Plaintiffs concede that both TG and TTP prepared separate financial statements and Plaintiffs put forth no evidence proving that the content of the statements are inaccurate.[126] And while Plaintiffs make much of the fact that certain TG employees left TG to work at TTP, Plaintiffs cannot establish that the entities actually shared any employees.[127] Plaintiffs' effort to attach significance to their allegation that TG and TTP used the same accounting firm also fails.[128] Chinese corporate law contains no prohibition against related entities using the same accountant, nor is use of a common accountant improper or indicative of abuse of the corporate form or otherwise.[129]

<u>Plaintiffs Have Not Shown Malicious Intention</u>.

Even if Plaintiffs could satisfy their burden of proof and establish that TG evaded the payment of its debts by abusing its independent status and, as a result, seriously damaged a

---

[125] Plaintiffs argue that "from the customer's perspective, there was no TTP"; however, this assertion is not supported by admissible evidence. *See* PSC Global MOL at 34. Moreover, the claim is untrue. Every single sales invoice to a U.S. customer following the formation of TTP was in the name of TTP, not TG, and the customers paid TTP for the drywall they purchased, not TG. Customers knew they were buying from TTP.

[126] *See also* Opening Br. at 10 (providing evidence that TTP had its own bank accounts and financial department and that TG never loaned TTP money).

[127] PSC Global SOF at 52. *See also* Opening Br. at 11 (providing evidence that TTP hired 260 employees, none of which were shared with TG).

[128] *See* PSC Global SOF at 70.

[129] Zhu Reply Decl. ¶ 45.

creditor's interest, a Chinese court would not disregard TG's separate corporate existence because Plaintiffs have made no showing that TG created TTP to intentionally and maliciously harm its creditors.  As set forth above, and in its moving brief, the evidence established that TG formed TTP for a valid business purpose – not out of a malicious intent to evade its creditors.[130]  TTP ceased operating at the end of 2008, before it had any creditors who based their claims on allegedly defective drywall.  Therefore, in China, TG and TTP would be recognized as the distinct entities that they are.

**B.**     **TTP's Separate Corporate Personhood Would Also Be Respected Under Louisiana Law.**

Although Plaintiffs concede that Chinese law governs the issue, they alternatively argue that under Louisiana law TTP's contacts should be attributed to TG.[131]  However, under Louisiana law there is a strong presumption of corporate separateness that cannot be rebutted by showing merely the normal incidents of a parent-subsidiary relationship – and that is all that the evidence in this case shows.  *See Smith v. Cotton Fleet Serv., Inc.*, 500 So. 2d 759, 762 (La. 1987).  ("[T]he strong social interest in encouraging capital investment would require that the separate identity be respected absent conduct on the part of the shareholders constituting waiver of the privilege of insulation, such as their own disregard of the corporate form, or the use of the corporate form to perpetrate fraud.").[132]

---

[130]*See* Opening Br. at 10.

[131]Gross/Wiltz PSC Opp. at 8-9.

[132]Plaintiffs have also failed to satisfy the Fifth Circuit's *Dickson* criteria for attributing the contacts from one corporate entity to another.  *See* Opening Br. at 63-66.

**C.      No Upstream Entities' Activities Should Be Attributed To TG Or TTP.**

Plaintiffs have represented that they did not intend to assert a theory of personal jurisdiction involving imputing the contacts of any Upstream Entity to TG or TTP.[133] Nevertheless, Plaintiffs boldly try to "preserve" the issue even though they conducted jurisdictional discovery for more than 18 months, including discovery from the Taishan Defendants concerning their relationship with the Upstream Entities.  Plaintiffs do not identify <u>any</u> facts suggesting that further discovery would provide them with a basis for attributing an Upstream Entity's activities in Louisiana to TG or TTP.  Furthermore, prior to agreeing to a briefing schedule for the Taishan Defendants' jurisdictional motions, Plaintiffs represented to the Court that they had completed discovery concerning personal jurisdiction.[134]  For all these reasons, the Court should deny Plaintiffs' request to re-open jurisdictional discovery with respect to any Upstream Entity.[135]

---

[133]*See* Herman Aff. Exs. 148, 149, which are copies of email correspondence between the PSC and TG's local counsel.

[134]*See* Transcript of Monthly Status Conference, Feb. 23, 2012 at 12:23-13:4 (Spano Reply Decl., Ex. 23) ("The parties are completing their discovery on the jurisdictional aspect of the case.  I think the plaintiffs had maybe one or two witnesses on the west coast that they're going to be deposing.  I've given them the schedule for briefing, and I would intend to have oral argument on that motion in June, middle of June."

[135]Plaintiffs also assert they have been unable to obtain discovery concerning the "Luneng mine."  PSC Global SOF at 88-90.  Plaintiffs admit that TG did not own this mine, and Plaintiffs do not assert that any Upstream Entity had any involvement with the mine.  Accordingly, further discovery concerning mines would also not be relevant to the question of personal jurisdiction over TG.  *See* Evidentiary Objections, Obj. No. 40.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should dismiss the action against TG and TTP.

Respectfully submitted,


<u>Thomas P. Owen Jr.</u>
Joe Cyr
Frank T. Spano
Eric Statman
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
Telephone: 212-918-3000
Facsimile: 212-918-3100
Joe.cyr@hoganlovells.com
Frank.spano@hoganlovells.com
Eric.statman@hoganlovells.com

Richard C. Stanley (La. Bar No. 8487)
Thomas P. Owen, Jr. (La. Bar No. 28181)
STANLEY, REUTER, ROSS, THORNTON &
ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: 504-523-1580
Facsimile: 504-524-0069
rcs@stanleyreuter.com
tpo@stanleyreuter.com


**Attorneys for Taishan Gypsum Co. Ltd.
and Tai'an Taishan Plasterboard Co., Ltd.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Reply Memorandum In Further Support of TG and TTP's Motion Pursuant to Rules 12(b)(2) and 55(c) to Vacate the Default and to Dismiss this Action has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail and upon all parties by electronically uploading the same to Lexis Nexus File & Serve in accordance with the Pretrial Order No. 6, and that the foregoing was also electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 8th day of June, 2012.

<u>/s/ Thomas P. Owen, Jr.</u>