Case 2:09-md-02047-EEF-MBN Document 14576-39 Filed 06/08/12 Page 1 of 6

In re Chinese Manufactured Drywall Products Liability Litigation, 706 F.Supp.2d 655...

706 F.Supp.2d 655
United States District Court,
E.D. Louisiana.

In re CHINESE MANUFACTURED DRYWALL
PRODUCTS LIABILITY LITIGATION.
This Document Relates to Germano, et al.
v.
Taishan Gypsum Co. Ltd., et al. case no. 09–6687.

MDL No. 2047.  |  April 8, 2010.

**Synopsis**

**Background:** Homeowners brought class action against manufacturer of Chinese drywall, among others, alleging negligence, negligence per se, breach of express and implied warranties, and violation of various consumer protection acts, among other claims, after defective drywall was installed in their homes. Preliminary default judgment was entered against manufacturer, and additional homeowners were permitted to intervene.

**Holdings:** The District Court, Eldon E. Fallon, J., held that:
[1] proper measure of damages for loss to real property was cost of repair plus amount of depreciation;
[2] homeowners could recover damages for losses associated with alternative living costs and foreclosure costs; and
[3] homeowners were entitled to recover damages for loss of use and enjoyment of their homes.

Ordered accordingly.

West Headnotes (7)

[1]  **Damages**
 Buildings or other improvements

Under Virginia law, proper measure of damages for injury to real property in homeowners' class action alleging negligence against manufacturer of defective Chinese drywall was cost of repair, including removing and replacing all drywall, flooring, and electrical wires after drywall emitted sulfuric gasses that corroded metal in homeowners' electrical devices, plus amount their properties depreciated due to damage caused by drywall.

2 Cases that cite this headnote

[2]  **Damages**
 Mode of estimating damages in general

**Damages**
 Mode of estimating damages in general

In general, the measure of damages under Virginia law in a negligence action is the amount necessary to compensate the injured party for the damage proximately caused by the tortious conduct.

[3]  **Damages**
 Injuries to Real Property

With respect to injury to real property, Virginia law allows damages to be measured by diminished value, the cost of repair, or a combination of both.

[4]  **Damages**
 Injuries to personal property

Under Virginia law, where personal property has been either destroyed or damaged, the general rule for determining the amount of damages is the fair market value of the property before and immediately after the property was damaged, plus necessary reasonable expenses incurred by the owner in connection with the injury.

[5]  **Damages**
 Injuries to personal property

Under Virginia law, where personal property has been damaged and can be restored by repairs, if the repairs would be less than the diminution in value because of the injury, the amount recoverable in damages is the cost of repairs and the diminution in market value of the injured property, if any, after the repairs are made.

[6]  **Damages**
 Injuries to personal property

Case 2:09-md-02047-EEF-MBN Document 14576-39 Filed 06/08/12 Page 2 of 6

In re Chinese Manufactured Drywall Products Liability Litigation, 706 F.Supp.2d 655...

second shipment of drywall was reduced to 53,912 sheets on 586 pallets, which was shipped onboard the M/V Atlantic Fortune from the Chinese Port of Loading, Lianyungang. *Id.* This shipment was offloaded in Camden, New Jersey. *Id.*

All of Taishan's drywall sold to Venture Supply bore the following legend on end binding label tape: "4#x12#x1/2# Gypsum Board Distributed by Venture Supply, Inc." and on the back of the board: "Venture Supply, Inc. MFG. Shandong Taihe Dongxin, Co., Ltd., China." P3.0629–1000 (Affidavit of Russ M. Herman ¶ 6), Deposition of Samuel G. Porter (12/16/09, 12/17/09) at 321–322.

The Porter–Blaine Corporation, a company related to Venture Supply, Inc., purchased Taishan drywall from Venture Supply, Inc. *See* 2/19/10 Trial Transcript at p. 17 (12–14). Venture Supply, Inc. shipped Taishan drywall to each of the seven intervening plaintiffs' (hereinafter "Plaintiff" or "Plaintiff-intervenor") homes and the drywall was thereupon installed by the Porter–Blaine Corporation in the homes. *See* Trial Transcript at 2/19 Vol. I p. 17(9–14), p. 13(16–20), p. 16(22)-17(2), p. 20(17–24) (Herman Opening).

The drywall product from China was never tested pursuant to the United States ASTM standard. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 13), P1.1802–0046 to 0061, P1.1802–0023; Deposition of Samuel G. Porter (12/16/09) at p. 84–85. Venture relied on a representation that Chinese testing was equivalent to the U.S. testing standards. *Id.* However, the Chinese tests were accomplished by a government agency of the Republic of China and not by an independent testing laboratory. *Id.* Certificates of Quality were likewise issued by a government agency. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 14), P1.1802–0045, P1.1802–0043. But the Certificate of Quality Management System Certification issued predates the production of the drywall shipped to the United States by at least two (2) years. *Id.*

On March 19, 2005, BNBM became the largest shareholder of Taihe Dongxin by purchasing sixty-five percent (65%) of the equity of Taishan Dongxin. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 16), P3.0629–0150, P3.0629–0177. The state-owned Assets Supervision and Administration Commission of the State Counsel (SASAC) of the People's Republic of China controls the "plasterboard" manufacturing, exportation and certification industry. P3.0629–1000 (Affidavit of Russ M. Herman ¶¶ 18 –20), P3.0629–0113, P3.0629–0136, 0137. The SASAC supervises and manages the State-owned assets of the enterprises engaged in drywall production, including Taishan. *Id.* The degree of control SASAC (Government of China) exerts and influences is extensive. *Id.* For example, SASAC assumes the responsibility as the investor on behalf of the state; it supervises and manages the state-owned assets and enterprises; controls the value preservation and increment of the state-owned assets; guides and pushes forward the reform and restructuring of SOEs; appoints and removes top executives of SOEs; is responsible for organizing SOEs to turn gains over to the state; is responsible for urging SOEs to carry out laws and regulations for safety production; directs and supervises the management work of local state-owned assets; and undertakes other tasks assigned by the State Council. *Id.* Furthermore, SASAC oversees and **\*663** controls 150 large central state-owned enterprises (SOEs), including China National Building Material Group Corporation (AS CNBM Group). P3.0629–1000 (Affidavit of Russ M. Herman ¶ 18), P3.0629–0113 to 0116. SASAC has a presence in the United States through CNBM USA Corporation, located at 17800 Castleton Street, City of Industry, California 91748. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 21), P3.0629–0122. SASAC owns 100% of the CNBM Group. *Id.* CNBM Group, in turn, owns 56.4% of the China National Building Material Company, Limited (CNBM Co., Ltd); 75% of BNBM; 100% of CNBM Import and Export Co. and 100% of CNBM Academy. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 19), P3.0629–0117 to 0120, P3.0629–0123 to 0125. CNBM Co., Ltd. Owns 52.40% of Beijing New Building Material Co., Ltd. (BNBM). *Id.* CNBM Group, in turn, owns 56.4% of the China National Building Material. *Id.* CNBM USA was established in 2006 the same year that Taihe (Taishan) sold Chinese-manufactured drywall to Venture Supply Inc. *Id.* CNBM (USA) Corporation has the announced mission to provide all kinds of building materials and services in the national market. *Id.*

CNBM's Gypsum Board business production on December 31, 2008 from its wholly owned subsidiary, Taishan Gypsum Co., was $262.3 million yuan. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 22), P3.0629–0125, P3.0629–0331, 0332. Taihe's (Taishan) revenue for 2006 was 773,000,000 yuan. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 23), P3.0629–0130. A yuan is worth approximately 6.8 dollars. *Id.* Taishan manufactures more than 60 types of products including standard plasterboard. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 24), P3.0629–0153. In addition to the shipments in 2006 to Venture Supply, Taishan Plasterboard Co., Ltd. shipped 76 shipments of plasterboard to the U.S. between March 2006 and August 2007 to four U.S. ports. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 25), P3.0629–0175.

Case 2:09-md-02047-EEF-MBN Document 14576-39 Filed 06/08/12 Page 3 of 6

In re Chinese Manufactured Drywall Products Liability Litigation, 706 F.Supp.2d 655...

**C. GENERAL SCIENTIFIC FINDINGS ON CHINESE DRYWALL WHICH DISTINGUISH IT FROM TYPICAL, BENIGN DRYWALL**

Chinese drywall is different from typical, benign drywall for the following reasons:

1. Chinese drywall has a significantly higher average concentration of strontium and significantly more detectable levels of elemental sulfur. P2.0135–0003.

2. Chinese drywall releases reduced sulfur gases. P1.2025–0003, 0004, (Streit Supplemental Report), Trial Transcript at 2/19 Vol. II p. 57(23)-p. 58(18) (Scully Testimony) (The Court has accepted Dr. Scully as an expert in the fields of corrosion, metallurgy, and materials science. Trial Transcript at 2/19 Vol. I, p. 46 (19–24) (Scully Testimony)). The three main gases that are released from CDW are hydrogen sulfide ($H_2S$), carbonyl sulfide (COS), and carbon disulfide ($CS_2$). Trial Transcript at 2/19 Vol. II p. 57(23)-58(18) (Scully Testimony), Trial Deposition of Lori Streit (2/16/10) at p. 68(21)-p. 69(3). The CDW also releases elemental sulfur. P1.2025–0003, 0004 (Streit Supplemental Report). The Plaintiffs' experts have detected reduced sulfur gas emissions by conducting laboratory tests on samples of Chinese drywall. Trial Deposition of Lori Streit (2/16/10) at p. 24(16)-p. 25(1). These emissions are also confirmed by strong odors. Trial Deposition of Lori Streit (2/16/10) at p. 55(10–14), Trial Transcript at 2/22 Vol. I p. 101(7–14) (Rutila Testimony). The fact that ***664** Chinese drywall emits sulfur gases has also been reported by the U.S. Consumer Products Safety Commission, the Florida Department of Health, and other investigatory agencies and firms. Trial Deposition of Lori Streit (2/16/10) at p. 68(21)-p. 69(3), p. 80(1–17).

3. The sulfur gases released by Chinese drywall are irritating to the human body. Trial Deposition of Lori Streit (2/16/10) at p. 55(15–21), Trial Transcript at 2/22 Vol. I p. 101(17–19) (Rutila Testimony). Exposed individuals reported irritation of the eyes, respiratory system, and skin, among other things. *Id.*

4. The sulfur gases released by Chinese drywall cause offending odors in homes, making them hard if not impossible to live in. Trial Transcript at 2/19 Vol. I p. 53(23)-pg. 54(7)(Morgan testimony), Trial Transcript at 2/22 Vol. I p. 8(4–17)(Michaux Testimony), Trial Deposition of Lori Streit (2/16/10) at p. 55(10–1)

5. The sulfur gases released by Chinese drywall are corrosive to metals, particularly copper and silver. Trial Deposition of Lori Streit (2/16/10) at p. 80(8–17), p. 90(23)-p. 91(7), Trial Transcript at 2/19 Vol. II p. 56 (19)-p. 57(12), p. 59(3–12) (Scully Testimony)). "Corrosion" is defined by the ASTM as the chemical or electrochemical reaction between a material, usually a metal, and its environment that produces a deterioration of the materials and its properties. P1.1852–0002 (ASTM Terminology), Trial Transcript at 2/19 Vol. II p. 51(20)-p. 52(5) (Scully Testimony). Copper and silver metal components in the Plaintiffs' houses are extremely vulnerable to corrosion from exposure to the sulfur gases. P2.0076–0001, 0002 (Graedel 1983 (copper)), Trial Transcript at 2/19 Vol. II p. 56(19–24) (Scully Testimony), P2.0202–0001, 0002 (Chudnovsky 2008 (silver)), Trial Transcript at 2/19 Vol. II p. 157(13–18) (Galler Testimony). The sulfur gases, in reacting with metals, form sulfide deposits on the surfaces of the metals. Trial Deposition of Lori Streit (2/16/10) at p. 80(8–17). For example, a reaction of sulfur gases with copper pipes will form copper sulfide on the metals. Trial Deposition of Lori Streit (2/16/10) at p. 72(18–24). The reaction of sulfur gases with metals can be said to be "consuming" the useful, pure metals by replacing those metals with sulfides. Trial Transcript at 2/19 Vol. II p. 141 (15–16) (Galler Testimony) (The Court has accepted Mr. Galler as an expert in the fields of electrical engineering, power electronics, electrical machinery, and failure analysis. Trial Transcript at 2/19 Vol. I, p. 128 (3–7) (Galler Testimony)).

6. The corrosion on metals caused by the sulfur gases emitted by Chinese drywall causes premature failure of electrical & mechanical devices. P1.2001–0019, 0020, 0021 (CTL/Krantz Original Report, HVAC Coil Failure due to Corrosion), P3.0625–0001, 0002 ([FRE 1006](#) Summary of HVAC Coil Failure Data), P1.2053–0001 (Virginia Corrosion Thicknesses Exceed Failure Standard), Trial Transcript at 2/19 Vol. II p. 55(24)-p. 156(17) (Galler Testimony), Trial Transcript at 2/19 Vol. II p. 100(17)-p. 101(16), p. 152(22)-p. 153(1) (Scully Testimony), Trial Transcript at 2/22 Vol. I p. 90(3–23) (Barnett Testimony proffer) (The PSC tenders Dr. Barnett, and the Court accepts him as, an ***665** expert in Engineering and Fire Safety. Trial Deposition of Jonathan Barnett (2/12/10) at p. 11(14)-18(22),

Case 2:09-md-02047-EEF-MBN Document 14576-39 Filed 06/08/12 Page 4 of 6

In re Chinese Manufactured Drywall Products Liability Litigation, 706 F.Supp.2d 655...

P1.2015–0019—P1.2015–0024 (Barnett Report, C.V.). The Plaintiff-intervenors have reported many premature failures of major appliances and consumer electronics in their homes during their first three years of use of these homes. P1.2018–0014, 0015, 0046 (SGH/Rutila Supplemental Report), Trial Transcript at 2/22 Vol. II p. 11(23)-p. 12(13)(Rutila Testimony). Laboratory analysis of these copper and silver components from the Virginia homes identified the corrosion as the cause of an HVAC coil failure and severe corrosion deposits at the operative connections in the appliances and in consumer electronics. P1.2018–0015, 0046 (SGH/Rutila Supplemental Report), P1.2001–0019, 0020, 0021 (CTL/Krantz Original Report), P1.2020–0002, 0003, 0004, (Original Galler Report), Trial Transcript at 2/19 Vol. II p. 48(23)-p. 149(6)(Galler Testimony), Trial Transcript at 2/19 Vol. II p. 52(18)-p. 53(4), p. 65(6–16), p. 111(18–23) (Scully Testimony). Mechanical, electrical, and electronic failures have been shown to have occurred prematurely due to the severe industrial corrosive environments in these Chinese Drywall homes. P1.2001–0019, 0020, 0021 (CTL/Krantz Original Report, HVAC Coil Failure due to Corrosion), P3.0625–0001, 0002 ([FRE 1006](#) Summary of HVAC Coil Failure Data), P1.2053–0001 (Virginia Corrosion Thicknesses Exceed Failure Standard), Trial Transcript at 2/19 Vol. II p. 55(24)-p. 156(17) (Galler Testimony), Trial Transcript at 2/19 Vol. II p. 100(17)-p. 101(16), p. 152(22)-p. 153(1) (Scully Testimony), Trial Transcript at 2/22 Vol. I p. 90(3–23) (Barnett Testimony proffer) (The PSC tenders Dr. Barnett, and the Court accepts him as, an expert in Engineering and Fire Safety. Trial Deposition of Jonathan Barnett (2/12/10) at p. 11(14)-18(22), P1.2015–0019—P1.2015–0024 (Barnett Report, C.V.). Evaluation of comparable HVAC systems, appliances, and electronics in *control* homes (e.g., similar homes without Chinese Drywall) do not show premature failures of HVAC systems, appliances, and electronics, and the wires do not have corrosion product thicknesses that would predict premature failures. P1.2022–0005, 0006, 0007, 0008 (Scully Supplemental Report), Trial Transcript at 2/19 Vol. II p. 1(23)-p. 112(2) (Scully Testimony), Trial Transcript at 2/22 Vol. II p. 12(18)-p. 13(22), p. 23(6–14) (Rutila Testimony), P1.1892–0001, 0002, 0003, P1.2057–0001, 0002, P1.2057–0001, 0002 (comparisons between corroded electronics from CDW homes and electronics from control homes), Trial Transcript at 2/19 Vol. II p. 144(2–19), p. 149(7–16) (Galler Testimony).

7. The corrosion on metals caused by the sulfur gases emitted by Chinese drywall poses a fire risk. Trial Transcript at 2/19 Vol. II p. 130 (3–14) (Galler Testimony). The corrosion increases resistance in the circuitry of appliances and electronics. *See* P1.2020–0004 (Galler Report); *see also* P2.0202–0001 (Chudnovsky, Corrosion of Electrical Conductors), Trial Transcript at 2/19 Vol. II p. 130 (3–14) (Galler Testimony). Increased resistance increases heat in appliances and electronics. P1.2020–0002 (Galler Report), Trial Transcript at 2/19 Vol. II p. 130 (3–14) (Galler Testimony). This increased **\*666** resistance can cause excessive heating of the connection when energized. *See* Trial Transcript at 2/19 Vol. II p. 129(25)-p. 130 (2) (Galler Testimony); *see also* P2.0202–0001 (Chudnovsky 2008). Complete failure of a switch can lead to fires or other life safety problems, depending on the intended function of the switch. Trial Transcript at 2/19 Vol. II p. 130 (3–14) (Galler Testimony).

Knauf Plasterboard Tianjin (hereinafter "Knauf" or "KPT") and Plaintiffs Steering Committee (hereinafter "PSC") experts agree that all of the problematic Chinese drywall products share similar chemical and physical properties. P1.2025–0003, 0004, (Streit Supplemental Report), Deposition of Matthew Perricone Ph.D. (1/21/10) Ex. 2 (Perricone Original Report) at p.i (¶ 4.7), Deposition of Sandy Sharp (2/5/10) at p. 148(15)-p. 150(11), Trial Deposition of Lori Streit (2/16/10) at p. 24(6)-p. 25(1), p. 26(11–12), p. 27(21)-p. 28(7) (finding commonalities among Chinese drywall products).

### D. PLAINTIFF–INTERVENOR HOMES HAVE BEEN EXPOSED TO A CORROSIVE ENVIRONMENT PRODUCED BY CHINESE DRYWALL

The level of corrosive sulfur gases emitted by Chinese drywall in the Plaintiff-intervenors' homes exceed the safe level established by recognized standards, peer reviewed literature, and expert opinions and this corrosive environment has had a significant impact on the expose property.

#### 1. CPSC Standards

The seven Plaintiff intervenors' homes meet the CPSC "Interim Guidance—Identification of Homes with Corrosion from Problem Drywall (January 28, 2010)." P1.1844–0001 (CPSC Guidance Problem Drywall), Trial Transcript at 2/22

Case 2:09-md-02047-EEF-MBN Document 14576-39 Filed 06/08/12 Page 5 of 6

In re Chinese Manufactured Drywall Products Liability Litigation, 706 F.Supp.2d 655...

Vol. II p. 6(25)-p. 7(5) (Rutila Testimony). P1.1844–0001 (CPSC Guidance Problem Drywall), Trial Transcript at 2/22 Vol. II p. 11(1–19) (Rutila Testimony). The CPSC Guidance sets forth "Corroborating Evidence" for the presence of CDW in such homes. *Id.* The CPSC Guidance requires that 4 out of 6 types of corroborating evidence be met to establish a "Problem Drywall" home. *Id.* The six types of evidence are: (a) corrosive conditions demonstrated by copper sulfide on copper coupons or confirmation of sulfur in blackening of grounding wires and/or air conditioning coils; (b) confirmed markings of Chinese origin on the drywall; (c) strontium levels (excluding the exterior paper) exceeding 1200 ppm; (d) laboratory elevated sulfur readings above 10 ppm; (e) elevated levels of $H_2S$, COS, $CS_2$; and (f) corrosion of copper to form copper sulfide when copper is placed in test chambers with drywall samples from the home. *Id.* The seven Plaintiff intervenors' homes meet the corroborating evidence criteria set forth in the CPSC Guidance. P1.2025–0003, 0004. (Streit Supplemental Report, off gassing studies), Deposition of Lori Streit (2/16/10) at 2/22 Vol. I p. 39(24)-p. 40(4), p. 42 (8–14), p. 51(13–25), p. 59 (14)-p. 60 (6) (Streit Testimony), P1.1824 (FRE 1006 Summary of Screening Data for Virginia Homes, (copper strips in mason jars and laboratory verification of copper sulfide on HVAC and wire), P1.2001–0019, 0026, 0036, P1.2002–0007 (CTL/Krantz Original and Supplemental Reports, laboratory confirmation copper sulfide on wires and HVAC), P1.2021–0008, 0010, 0011, P1.2022–0020, 0021, 0022 (Scully Original and Supplemental Reports, laboratory confirmation of copper sulfide on wires and HVAC), Trial Transcript at 2/19 Vol. II p. 111(13–22) (Scully Testimony, copper sulfide on wires and HVAC) (The PSC tenders Brad Krantz, and the Court accepts him, as an expert in corrosion science. P1.2001–0001 (Original CTL/Krantz Report, C.V.)), Trial ***667** Transcript at 2/22 Vol. II p. 5(13–17) (Rutila Testimony).

**2. Florida Division of Health Standards**

The Florida Case Definition for "Confirmatory Evidence of Drywall Associated Corrosion" includes three items. P1.1841–0001–0004 (FLA Case Definition), Trial Transcript at 2/22 Vol. II p. 5(7)-p. 8(25) (Rutila Testimony). If any one of the three is positive, that is considered confirmatory evidence. *Id.* The three types of confirmatory evidence are: (1) laboratory testing for elemental sulfur indicating that the gypsum source in the drywall contributes to the reduced sulfur gases emitted from the corrosive drywall; (2) laboratory analysis (i.e., headspace) for reduced sulfur gas emissions capable of causing copper corrosion in the house; and (3) qualitative analysis of suspect drywall for its ability to cause corrosion/blackening of copper under controlled conditions indicating drywall samples from the house emit gasses capable of corroding copper. *Id.* The Taishan drywall in the seven Virginia Plaintiff intervenors' homes meets at least one of the types of the confirmatory evidence criteria for the Florida Case Definition. P1.2025–0003, 0004 (Streit Supplemental Report laboratory results for elevated sulfur, $H_2S$, COS, and $CS_2$), Deposition of Lori Streit (2/16/10) at 2/22 Vol. I p. 39(24)-p. 40 (5) (Streit Testimony); *see also* P1.2023–0011 (Streit Original Report), P1.1824–0001 (FRE 1006 Summary of Screening Data for Virginia Homes, "aging" tests showing blackening of copper strips in mason jars (chamber test)).

**3. Battelle & International Standards Association Classifications Indicate the Corrosion Found in Plaintiff-intervenor Homes is Severe**

The Plaintiff intervenors' homes demonstrate levels of corrosion found in the most severe industrial corrosive environment. Trial Transcript at 2/19 Vol. II p. 112(9–15) (Scully Testimony). P2.0195–0026, 0065, 0066 (Abbott, 1993, MTI # 38), Trial Transcript at 2/19 Vol. II p. 92 (11–18), p. 83 (8–14) (Scully Testimony); *see also* P2.0228–0012 (p. 360) (Sinclair text), P2.0245–0003 (Abbott 1988). According to the Battelle Classification scheme, the recognized standard for measuring corrosivity of environments, there are four Classifications ranging from benign to severe industrial. *Id.* The Classifications are characterized as I (benign), II (mild), III (moderately severe), and IV (severe industrial). *Id.* The International Standards Association (ISA) has developed a parallel corrosivity classification scheme. P1.0176–0003, 0014, Trial Transcript at 2/19 Vol. II p. 91(12–15) (Scully Testimony). Additionally, the corrosivity classification schemes established by standard-setting organizations such as International Standards Organization (ISO) mirror the Battelle and the ISA standards. P1.1836–0001, (ISO 11844 Corrosivity Standard), P1.0091 (IEC 654–4 Corrosivity Standard), Trial Transcript at 2/19 Vol. II p. 112 (6–15) (Scully Testimony).

The Battelle Classification Scheme for Corrosive Environments establishes qualitative and quantitative criteria to be used to classify environments. P2.0195–0017, 0026, 0065, 0066 (Abbott 1993, MTI # 38), P2.0228–0012 (Sinclair text), Trial Transcript at 2/19 Vol. II p. 91(6–15) (Scully Testimony). These criteria are discussed in turn.

Case 2:09-md-02047-EEF-MBN   Document 14576-39   Filed 06/08/12   Page 6 of 6

In re Chinese Manufactured Drywall Products Liability Litigation, 706 F.Supp.2d 655...

(Dean, Corrosion Text), P1.1843–0001 (ASTM Standard for Corrosion Tests), P2.0205–0009 (Tran 2003). Nevertheless, even with the limitations described above, the use of copper reactivity coupons in CDW homes produces data which also predicts premature electrical and electronic failures. The prediction of failure of electronic and electrical components (standardized to one year) in Florida and Louisiana CDW homes is also confirmed by the Knauf expert, Dr. Sandy Sharp, based on Dr. Sharp's copper reactivity coupon data from MeadWestVaco (MWV) and Dr. Sharp's own published industrial electrical and electronic equipment corrosion failure threshold. P1.2056–0001 ([FRE 1006](link) Florida, Louisiana, and Virginia Coupon Data), Deposition of Sandy Sharp (2/5/10) at 2/22 Vol. II p. 39(17)-p. 40(1), p. 40(7–9), p. 42(5–14) (Sharp Testimony), Trial Transcript at 2/19 Vol. II p. 102(15)-p. 03(10) (Scully Testimony). The CPSC also utilized copper reactivity coupons in the 51 Home Study and this process revealed that the corrosion thickness measurements on these coupons from CDW homes in Virginia, Florida, and Louisiana exceed the 300 angstrom failure threshold for 30 days and also predicted premature failures. P1.0019–0084, 0085, 0086, 0129 (CPSC 51 Home Study), Trial Transcript at 2/19 Vol. II p. 111(3–10) (Scully Testimony). Thus, based on measuring the thickness of the corrosion product on real world components in four different laboratories (Sandia, Scully/U Va, CTL/Krantz, and **\*671** SGH/Rutila), and on copper reactivity coupons in two different laboratories (MWV and CPSC); these six different laboratories predict premature electrical and electronic failures in CDW homes due to the corrosivity of the environment produced by Chinese drywall. P1.2022–0009, 0010 (Supplemental Scully Report), Trial Transcript at 2/19 Vol. II p. 10(10)-p. 112(15), p. 100(23)-p. 101(16), p. 104(3–14) (Scully Testimony).

In summary, by any recognized standard, high levels of corrosive gases are present in the representative homes. This condition is clearly irritating and harmful to residents and destructive to property. It has to be remediated. The challenge for the Court is to determine the scope of this remediation.

**E. SCOPE OF REMEDIATION**

The evidence supports the conclusion that the appropriate remediation for the Plaintiff-intervenor homes includes the removal of all drywall, all electrical wiring, the entire HVAC system, and many other items such as appliances, carpet, cabinetry, trim work and flooring. P1.1888–0003 (Beazer Scope of Remediation), P1.2058–0001 (Wright Scope of Remediation), Trial Transcript at 2/19 Vol. I at 77(4)-84(24) (Phillips Testimony), Trial Transcript at 2/22 Vol. I p. 98(13–21), 99(16–22) (Rutila Testimony), Trial Transcript at 2/22 Vol. II p. 28(10–13) (Rutila Testimony). The scope of this remediation is supported by both the scientific and practical evidence presented. Trial Transcript at 2/22 Vol. II p. 28(10–13) (Rutila Testimony), p. 69 (2–10) (Wright Testimony).

The scientific evidence demonstrated that corrosion has damaged most components that contain copper or silver. P1.2016–0109 (SGH Original Report), Trial Transcript at 2/22 Vol. II p. 28(4–6), (10–13) (Rutila Testimony). The practical evidence demonstrated that selective removal of only CDW is not feasible or cost-effective in this case. Trial Transcript 2/19 Vol. I p. 75 (10–25) (Phillips Testimony). The practical evidence further revealed that attempting to gently remove, store or clean or protect carpet, cabinetry or flooring is not feasible or cost-effective. P1.2050–0003 (Summaries of Cost Estimates), Trial Transcript at 2/19 Vol. I p. 79 (1–13) (carpets), p. 77(18–20) (cabinets), p. 86(2–19) (wood floors) (Phillips Testimony). The practical evidence also indicates that items such as trim work and base boards will likely be ruined or extensively damaged when the drywall is removed. P1.2016–0087 (SGH Original Report), Trial Transcript 2/19 Vol. I p. 87(2–6) (Phillips Testimony), Trial Transcript at 2/22 Vol. II p. 91(13–16) (Wright Testimony). The Court will now discuss the details of and justification for the scope of this remediation.

**1. All Drywall in the Plaintiff-intervenor Homes Needs to be Removed & Replaced**

As indicated above, the Chinese drywall in the Plaintiff-intervenors' homes emits a foul odor, irritates the human body, and emits sulfur gases which corrode copper and silver, metals of which most electronic and mechanical objects are made, thus reducing these objects life span and posing a fire risk and making the homes hard, if not impossible, to live in. Accordingly, all Chinese drywall must be removed from the Plaintiff-intervenors' homes. There seems to be little or no dispute on this issue. There is dispute, however, over the scope of remediation where the home contains both Chinese drywall and non-Chinese drywall. The issue is whether all drywall should be removed or only the problematic drywall in this case. The overwhelming evidence reveals that in such mixed structures it is necessary to remove all the drywall, both Chinese and other, for the following reasons.