706 F.Supp.2d 655
United States District Court,
E.D. Louisiana.

In re CHINESE MANUFACTURED DRYWALL
PRODUCTS LIABILITY LITIGATION.
This Document Relates to Germano, et al.
v.
Taishan Gypsum Co. Ltd., et al. case no. 09–6687.

MDL No. 2047.   |   April 8, 2010.

**Synopsis**

**Background:** Homeowners brought class action against manufacturer of Chinese drywall, among others, alleging negligence, negligence per se, breach of express and implied warranties, and violation of various consumer protection acts, among other claims, after defective drywall was installed in their homes. Preliminary default judgment was entered against manufacturer, and additional homeowners were permitted to intervene.

**Holdings:** The District Court, Eldon E. Fallon, J., held that:
[1] proper measure of damages for loss to real property was cost of repair plus amount of depreciation;
[2] homeowners could recover damages for losses associated with alternative living costs and foreclosure costs; and
[3] homeowners were entitled to recover damages for loss of use and enjoyment of their homes.

Ordered accordingly.

West Headnotes (7)

[1]    **Damages**
        Buildings or other improvements
        Under Virginia law, proper measure of damages for injury to real property in homeowners' class action alleging negligence against manufacturer of defective Chinese drywall was cost of repair, including removing and replacing all drywall, flooring, and electrical wires after drywall emitted sulfuric gasses that corroded metal in homeowners' electrical devices, plus amount their properties depreciated due to damage caused by drywall.

        2 Cases that cite this headnote

[2]    **Damages**
        Mode of estimating damages in general
       **Damages**
        Mode of estimating damages in general
        In general, the measure of damages under Virginia law in a negligence action is the amount necessary to compensate the injured party for the damage proximately caused by the tortious conduct.

[3]    **Damages**
        Injuries to Real Property
        With respect to injury to real property, Virginia law allows damages to be measured by diminished value, the cost of repair, or a combination of both.

[4]    **Damages**
        Injuries to personal property
        Under Virginia law, where personal property has been either destroyed or damaged, the general rule for determining the amount of damages is the fair market value of the property before and immediately after the property was damaged, plus necessary reasonable expenses incurred by the owner in connection with the injury.

[5]    **Damages**
        Injuries to personal property
        Under Virginia law, where personal property has been damaged and can be restored by repairs, if the repairs would be less than the diminution in value because of the injury, the amount recoverable in damages is the cost of repairs and the diminution in market value of the injured property, if any, after the repairs are made.

[6]    **Damages**
        Injuries to personal property

Case 2:09-md-02047-EEF-MBN   Document 14576-41   Filed 06/08/12   Page 2 of 7

In re Chinese Manufactured Drywall Products Liability Litigation, 706 F.Supp.2d 655...

and Disposal of Gypsum Board Waste,* Construction Dimension, February 1992 at 5). Synthetic gypsum is chemically identical to mineral gypsum, but the amount and types of trace materials and unreacted sorbents found in the source material can vary among power plants and among mines from which it originates. P2.0006–0003 (Cozen O'Connor, *Chinese Drywall Litigation: Subrogation Whitepaper* (2009)). Synthetic gypsum is generally obtained in the final stage of industrial processes, where sulfuric acid is neutralized by a calcium salt; for example it is produced as a byproduct of coal combustion power plants. *Id.;* P2.0240.0014 (ASTM International report).

To make drywall from gypsum, first gypsum is crushed or ground up and heated to about 350 degrees Fahrenheit to remove approximately seventy-five percent (75%) of its water content in a process called calcining, thereafter becoming a fine white powder. P2.0006–0003 (Cozen O'Connor, *Chinese Drywall Litigation: Subrogation Whitepaper* (2009)); P2.0051–0001 *(Treatment and Disposal of Gypsum Board Waste,* Construction Dimensions, February 1992 at 5). Second, the calcined gypsum is mixed with water, foam, and other additives to form a slurry which is **\*661** fed between continuous sheets of paper on a continuous belt line. *Id.* Third, as the board moves down the belt line, the calcined gypsum recrystalizes or rehydrates, reverting to its original gypsum state, and the paper sheets become firmly bonded to the rehydrated core. *Id.* Finally, the board is cut to length and conveyed through dryers to remove free moisture. *Id.*

Historically, gypsum was used as far back as 3700 B.C. by the Egyptians as a base to preserve the wall murals in the pyramids. P2.0051–0001(*Treatment and Disposal of Gypsum Board Waste,* Construction Dimension, February 1992 at 6); P2.0240–0022 to –0023 (ASTM International, Oct. 2009 at 9–10). The Roman Empire used gypsum for interior purposes, such as the interior walls of Pompeii. *Id.* There is little information of the use of gypsum plaster during the Middle Ages. *Id.* The modern science of gypsum began with the discoveries by Antoine Lavoisier outlined in his two papers on gypsum presented to the French Academy of Sciences in 1765 and 1766. P2.0240–0022 to –0023 (ASTM International, Oct. 2009 at 11). In the United States, the use of gypsum board started in the early 1950s and was driven by the following issues, (1) avoiding the drying time of plaster which allowed earlier occupancy of buildings, and (2) the lack of skilled plasterers in many locations. P2.0240–0026(ASTM International, Oct. 2009, pg. 13). Gypsum is fire resistant, thus making it a preferable material for drywall.

P2.0051–0001 *(Treatment and Disposal of Gypsum Board Waste,* Construction Dimensions, February 1992 at 6).

**B. HOW & WHEN THE CHINESE DRYWALL WAS INSTALLED IN THE PLAINTIFF INTERVENOR HOMES**

The Chinese drywall in the present cases was manufactured by Shandong Taihe Dongxin Co., Ltd. which on September 10, 2007, changed its name to Taishan Gypsum Co., Ltd. P3.0629–1000 (Affidavit of Russ M. Herman In Support of the Plaintiffs' Steering Committee's Evidentiary Presentation Regarding Taishan Gypsum Co., Ltd. ¶ 15); Trial Transcript at 2/19 Vol. I p. 9–18, P3.0629–0150; P3.0629–0177 (Herman Opening). Hereafter, Shandong Taihe Dongxin Co., Ltd. and Taishan Gypsum Co., Ltd. shall be referred to as "Taishan."

On November 9, 2005, Venture Supply, Inc., a company in Norfolk, Virginia, provided an original letter of credit in the amount of $429,600.00 to the order of Shandong Taihe Dongxin Co. for 120,000 sheets of drywall to meet all USA ASTM ratings and fire rating standards. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 5), P1.1802–0063 to 0068. On November 14, 2005, Frank Clem, manager of Venture Supply, was advised that the manufacturer was not clear on U.S. ASTM ratings and Venture Supply was requested to remove U.S. ASTM requirements from the letter of credit and rely solely upon Chinese ratings. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 7). Venture Supply then contracted with Taishan to purchase drywall. P3.0629–1000 (Affidavit of Russ M. Herman ¶¶ 7–8), P1.1802–0070. Although it originally contracted to meet United States' ASTM standards, Taishan insisted that the drywall it sold to Venture Supply, Inc. would not be required to meet these standards. *Id.* Accordingly, on November 15, 2005, Venture Supply directed its bank to remove the U.S. ASTM requirement from the letter of credit to Taishan. *Id.* Pursuant to contract, on December 25, 2005, Taishan had 2,000 pallets of drywall shipped aboard the M/V Glykofillousa from the Chinese Port of Loading, Lianyungang. P3.0629–1000 (Affidavit of Russ M. Herman ¶¶ 10–11), P1.1802–0091, P1.1802–0003. The shipment **\*662** arrived in the United States in February, 2006. *Id.*

On December 16, 2005, a second contract was signed between Venture Supply and Shandong Taihe Dongxin Co. for 100,000 sheets on 2,000 pallets to be shipped to Norfolk, Virginia. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 12), P1.1802–0089, P1.1802–0003, P1.1802–0007. However, the

Case 2:09-md-02047-EEF-MBN   Document 14576-41   Filed 06/08/12   Page 3 of 7

In re Chinese Manufactured Drywall Products Liability Litigation, 706 F.Supp.2d 655...

second shipment of drywall was reduced to 53,912 sheets on 586 pallets, which was shipped onboard the M/V Atlantic Fortune from the Chinese Port of Loading, Lianyungang. *Id.* This shipment was offloaded in Camden, New Jersey. *Id.*

All of Taishan's drywall sold to Venture Supply bore the following legend on end binding label tape: "4#x12#x1/2# Gypsum Board Distributed by Venture Supply, Inc." and on the back of the board: "Venture Supply, Inc. MFG. Shandong Taihe Dongxin, Co., Ltd., China." P3.0629–1000 (Affidavit of Russ M. Herman ¶ 6), Deposition of Samuel G. Porter (12/16/09, 12/17/09) at 321–322.

The Porter–Blaine Corporation, a company related to Venture Supply, Inc., purchased Taishan drywall from Venture Supply, Inc. *See* 2/19/10 Trial Transcript at p. 17 (12–14). Venture Supply, Inc. shipped Taishan drywall to each of the seven intervening plaintiffs' (hereinafter "Plaintiff" or "Plaintiff-intervenor") homes and the drywall was thereupon installed by the Porter–Blaine Corporation in the homes. *See* Trial Transcript at 2/19 Vol. I p. 17(9–14), p. 13(16–20), p. 16(22)-17(2), p. 20(17–24) (Herman Opening).

The drywall product from China was never tested pursuant to the United States ASTM standard. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 13), P1.1802–0046 to 0061, P1.1802–0023; Deposition of Samuel G. Porter (12/16/09) at p. 84–85. Venture relied on a representation that Chinese testing was equivalent to the U.S. testing standards. *Id.* However, the Chinese tests were accomplished by a government agency of the Republic of China and not by an independent testing laboratory. *Id.* Certificates of Quality were likewise issued by a government agency. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 14), P1.1802–0045, P1.1802–0043. But the Certificate of Quality Management System Certification issued predates the production of the drywall shipped to the United States by at least two (2) years. *Id.*

On March 19, 2005, BNBM became the largest shareholder of Taihe Dongxin by purchasing sixty-five percent (65%) of the equity of Taishan Dongxin. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 16), P3.0629–0150, P3.0629–0177. The state-owned Assets Supervision and Administration Commission of the State Counsel (SASAC) of the People's Republic of China controls the "plasterboard" manufacturing, exportation and certification industry. P3.0629–1000 (Affidavit of Russ M. Herman ¶¶ 18 –20), P3.0629–0113, P3.0629–0136, 0137. The SASAC supervises and manages the State-owned assets of the enterprises engaged in drywall production, including Taishan. *Id.* The degree of control SASAC (Government of China) exerts and influences is extensive. *Id.* For example, SASAC assumes the responsibility as the investor on behalf of the state; it supervises and manages the state-owned assets and enterprises; controls the value preservation and increment of the state-owned assets; guides and pushes forward the reform and restructuring of SOEs; appoints and removes top executives of SOEs; is responsible for organizing SOEs to turn gains over to the state; is responsible for urging SOEs to carry out laws and regulations for safety production; directs and supervises the management work of local state-owned assets; and undertakes other tasks assigned by the State Council. *Id.* Furthermore, SASAC oversees and **\*663** controls 150 large central state-owned enterprises (SOEs), including China National Building Material Group Corporation (AS CNBM Group). P3.0629–1000 (Affidavit of Russ M. Herman ¶ 18), P3.0629–0113 to 0116. SASAC has a presence in the United States through CNBM USA Corporation, located at 17800 Castleton Street, City of Industry, California 91748. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 21), P3.0629–0122. SASAC owns 100% of the CNBM Group. *Id.* CNBM Group, in turn, owns 56.4% of the China National Building Material Company, Limited (CNBM Co., Ltd); 75% of BNBM; 100% of CNBM Import and Export Co. and 100% of CNBM Academy. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 19), P3.0629–0117 to 0120, P3.0629–0123 to 0125. CNBM Co., Ltd. Owns 52.40% of Beijing New Building Material Co., Ltd. (BNBM). *Id.* CNBM Group, in turn, owns 56.4% of the China National Building Material. *Id.* CNBM USA was established in 2006 the same year that Taihe (Taishan) sold Chinese-manufactured drywall to Venture Supply Inc. *Id.* CNBM (USA) Corporation has the announced mission to provide all kinds of building materials and services in the national market. *Id.*

CNBM's Gypsum Board business production on December 31, 2008 from its wholly owned subsidiary, Taishan Gypsum Co., was $262.3 million yuan. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 22), P3.0629–0125, P3.0629–0331, 0332. Taihe's (Taishan) revenue for 2006 was 773,000,000 yuan. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 23), P3.0629–0130. A yuan is worth approximately 6.8 dollars. *Id.* Taishan manufactures more than 60 types of products including standard plasterboard. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 24), P3.0629–0153. In addition to the shipments in 2006 to Venture Supply, Taishan Plasterboard Co., Ltd. shipped 76 shipments of plasterboard to the U.S. between March 2006 and August 2007 to four U.S. ports. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 25), P3.0629–0175.



TAISHAN 2006 STRUCTURE – Post March 16 Global Offering

August 4, 2011 Mtg.

1. State Owned Asset Supervision and Administration Commission of the State Counsel [Doc. Ref. Taishan & BNBM Structure/Government Control 00113 & 00136-00137; CNBM Global Offering P. 29]
2. [Doc. Ref. CNBM Global Offering P. 27 & P. 97]
3. Beijing New Building Material (Group) Company Limited [Doc. Ref. CNBM Global Offering P. 18 & P. 97]
4. China National Building Material Import and Export Company[Doc. Ref. CNBM Global Offering P. 20 & P. 97]
5. [Doc. Ref. CNBM Global Offering P. 19 & P. 97]
6. China Cinda Asset Management Corporation [Doc. Ref. CNBM Global Offering P. 20 & P. 97]
7. [Doc. Ref. CNBM Global Offering P. 97]
8. [Doc. Ref. CNBM Global Offering P. 20 & P. 97]
9. [Doc. Ref. CNBM Global Offering P. 18 & P. 97]
10. [Doc. Ref. CNBM Global Offering P. 31 & P. 97]
11. [Doc. Ref. Zhang Deposition, Dated April 6, 2011 P. 141:24 – 142:21; Jai Deposition, Dated April 5, 2011 P. 480:24 –481:24; Peng Deposition, Dated April 7, 2011 P. 135:3-5 & Declaration of Jia Tongchun dated August 15, 2010, Paragraph 39]
12. [Doc. Ref. China National Building Company Limited Announcement re: Connected Transaction Acquisition of the Entire Equity Interest in Taian Donglian Investment Trading Company Limited Connected Transaction Provision of Financial Assistance to Taian State Owned Assets Management Company]

**IMPORTANT**

*If you are in any doubt about this prospectus, you should obtain independent professional advice.*



# China National Building Material Company Limited*
# 中國建材股份有限公司

*(a joint stock limited company incorporated in the People's Republic of China with limited liability)*

## GLOBAL OFFERING

| | |
|---|---|
| Number of H Shares offered pursuant to the Global Offering : | 654,214,000 (subject to adjustment and the Over-allotment Option) |
| Number of Public Offer Shares : | 65,422,000 (subject to adjustment) |
| Number of International Placing Shares : | 588,792,000 (including 59,474,000 Sale H Shares) (subject to adjustment and the Over-allotment Option) |
| Maximum offer price : | HK$2.75 per H Share payable in full on application in Hong Kong dollars, subject to refund, plus 1% brokerage, SFC transaction levy of 0.005% and Stock Exchange trading fee of 0.005% |
| Nominal value : | RMB 1.00 each |
| Stock code : | 3323 |

**Sole Global Coordinator, Bookrunner, Sponsor and Lead Manager**

**Morgan Stanley**

The Stock Exchange of Hong Kong Limited and Hong Kong Securities Clearing Company Limited take no responsibility for the contents of this prospectus, make no representation as to its accuracy or completeness and expressly disclaim any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this prospectus.

A copy of this prospectus, having attached thereto the documents specified in the paragraph entitled "Documents Delivered to the Registrar of Companies" in Appendix IX to this prospectus, has been registered by the Registrar of Companies in Hong Kong as required by Section 342C of the Companies Ordinance (Chapter 32 of the Laws of Hong Kong). The Securities and Futures Commission and the Registrar of Companies in Hong Kong take no responsibility for the contents of this prospectus or any other document referred to above.

The Offer Price is expected to be fixed by agreement between the Global Coordinator, on behalf of the Underwriters, the Selling Shareholders and the Company on the Price Determination Date. The Price Determination Date is expected to be on or around Thursday, March 16, 2006 and, in any event, not later than Tuesday, March 21, 2006. The Offer Price will be not more than HK$2.75 and is currently expected to be not less than HK$2.30 unless otherwise announced. Investors applying for Public Offer Shares must pay, on application, the maximum offer price of HK$2.75 for each H Share together with a brokerage of 1%, SFC transaction levy of 0.005% and Stock Exchange trading fee of 0.005%.

The Global Coordinator, on behalf of the Underwriters, may, with the consent of the Company (on behalf of itself and the Selling Shareholders), reduce the indicative Offer Price range (which is HK$2.30 to HK$2.75 per H Share) and/or the number of Offer Shares below that stated in this prospectus at any time on or prior to the morning of the last day for lodging applications under the Hong Kong Public Offering. In such a case, notices of the reduction in the indicative offer price range and/or the number of Offer Shares will be published in the South China Morning Post and the Hong Kong Economic Times not later than the morning of the day which is the last day for lodging applications under the Hong Kong Public Offering. If applications for Public Offer Shares have been submitted prior to the day which is the last day for lodging applications under the Hong Kong Public Offering, then even if the offer price range and/or the number of Offer Shares is so reduced such applications cannot be subsequently withdrawn. If, for any reason, the Offer Price is not agreed between the Company (on behalf of itself and the Selling Shareholders) and the Global Coordinator, on behalf of the Underwriters, the Global Offering (including the Hong Kong Public Offering) will not proceed.

The Company is incorporated, and its businesses are located, in the PRC. Potential investors should be aware of the differences in the legal, economic, and financial systems between the mainland of the PRC and Hong Kong and that there are different risk factors relating to making an investment in PRC-incorporated companies. Potential investors should also be aware that the regulatory framework in the PRC is different from the regulatory framework in Hong Kong and should take into consideration the different market nature of the Shares of the Company. Such differences and risk factors are set out in the sections entitled "Risk Factors" and "Appendix VI — Summary of Principal PRC Legal and Regulatory Provisions" and "Appendix VII — Summary of Articles of Association." Investors should also be aware that the companies and securities regulatory framework in the PRC to which the Group is subject has only recently been introduced.

The obligations of the Hong Kong Underwriters under the Hong Kong Underwriting Agreement to subscribe for, and to procure applicants for the subscription for, the Public Offer Shares, are subject to termination by the Global Coordinator (on behalf of the Hong Kong Underwriters) if certain grounds arise at any time prior to 8:00 a.m. on the day that trading in the Offer Shares commences on the Stock Exchange. Such grounds are set out in the section entitled "Underwriting — Underwriting Arrangements and Expenses — Hong Kong Public Offering — Hong Kong Underwriting Agreement — Grounds for termination" in this prospectus. It is important that you refer to that section for further details.

The Offer Shares have not been and will not be registered under the U.S. Securities Act or any state securities laws of the United States. The Offer Shares are being offered only (1) to qualified institutional buyers in the United States in reliance on Rule 144A under the U.S. Securities Act or (2) outside the United States in reliance on Regulation S under the U.S. Securities Act.

\* *For identification only*

March 13, 2006

HERMAN AFFIDAVIT
EXHIBIT
131

Q000438

The map below indicates the locations of our primary production plants and the annual capacities (as at September 30, 2005):



| ■ Cement | Annual Capacity |
|---|---|
| Luhong (Shandong) | 3.87 million tonnes |
| Huaihai (Jiangsu) | 3.43 million tonnes |
| Ziyan (Hebei) | 1.41 million tonnes |
| Nanyang (Henan) | 1.21 million tonnes |
| Zaozhuang Luhong (Shandong) | 1.01 million tonnes |

| △ Gypsum Board | Annual Capacity |
|---|---|
| Tai'an (Shandong) | 101 million sq.m. |
| Zhuozhou (Hebei) | 50 million sq.m. |
| Beijing (Beijing) | 45 million sq.m. |
| Jiangyin (Jiangsu) | 30 million sq.m. |
| Weifang (Shandong) | 30 million sq.m. |
| Zaozhuang (Shandong) | 30 million sq.m. |
| Qinhuangdao (Hebei) | 20 million sq.m. |
| Jingmen (Hubei) | 20 million sq.m. |
| Pizhou (Jiangsu) | 19 million sq.m. |
| Lucheng (Shanxi) | 9 million sq.m. |
| Xuzhou (Jiangsu) | 6 million sq.m. |

| ● Glass Fiber | Annual Capacity |
|---|---|
| Tongxiang (Zhejiang) | 131,500 tonnes |
| Jiujiang (Jiangxi) | 44,500 tonnes |
| Chengdu (Sichuan) | 34,000 tonnes |

Immediately after the Global Offering, the Company will be 63.49%-owned (assuming that the Over-allotment Option is not exercised), directly and indirectly, by Parent. Parent is a SASAC-managed company in the PRC, which manages a wide range of operations in the building materials industry, including building materials manufacturing, machinery and equipment fabrication, production line design, engineering, equipment procurement and construction, product research and development, logistics, wholesale and retail distributions and international trading. Parent assumed ownership of and management responsibility for a majority of the state-owned enterprises and research institutes under the management of the former State Administration of Building Materials Industry, the State Council agency then in charge of China's building materials industry. See "*History, Reorganization and Group Structure*."

*Cement.* We are a major cement producer in the PRC. We operate five clinker and cement plants with nine production lines in Shandong, Jiangsu, Henan and Hebei provinces. We operated three production lines with an aggregate annual capacity of 3.3 million tonnes throughout 2004 and operated a newly constructed production line with an annual capacity of 1.2 million tonnes from October to December 2004, producing approximately 3.7 million tonnes of cement in the aggregate in the same year. We acquired three additional cement production lines in early 2005 with an aggregate annual capacity of 2.4 million tonnes and we commenced production on two other newly constructed production lines in July 2005 with an aggregate annual capacity of 4.0 million tonnes. As a result, our aggregate annual cement production capacity reached nearly 11.0 million tonnes as at September 30, 2005. Assuming our production lines currently under construction will be completed and ready to commence production on schedule, we expect that our aggregate annual cement production capacity will increase to approximately 13.4 million tonnes by the end of 2006 and

Q000541