Case 2:09-md-02047-EFF-MBN   Document 14576-64   Filed 06/08/12   Page 1 of 13

In re Chinese Manufactured Drywall Products Liability Litigation, 706 F.Supp.2d 655...

706 F.Supp.2d 655
United States District Court,
E.D. Louisiana.

In re CHINESE MANUFACTURED DRYWALL
PRODUCTS LIABILITY LITIGATION.
This Document Relates to Germano, et al.
v.
Taishan Gypsum Co. Ltd., et al. case no. 09–6687.

MDL No. 2047.   |   April 8, 2010.

**Synopsis**

**Background:** Homeowners brought class action against manufacturer of Chinese drywall, among others, alleging negligence, negligence per se, breach of express and implied warranties, and violation of various consumer protection acts, among other claims, after defective drywall was installed in their homes. Preliminary default judgment was entered against manufacturer, and additional homeowners were permitted to intervene.

**Holdings:** The District Court, Eldon E. Fallon, J., held that:
[1] proper measure of damages for loss to real property was cost of repair plus amount of depreciation;
[2] homeowners could recover damages for losses associated with alternative living costs and foreclosure costs; and
[3] homeowners were entitled to recover damages for loss of use and enjoyment of their homes.

Ordered accordingly.

West Headnotes (7)

[1]   **Damages**
      Buildings or other improvements

      Under Virginia law, proper measure of damages for injury to real property in homeowners' class action alleging negligence against manufacturer of defective Chinese drywall was cost of repair, including removing and replacing all drywall, flooring, and electrical wires after drywall emitted sulfuric gasses that corroded metal in homeowners' electrical devices, plus amount their properties depreciated due to damage caused by drywall.

2 Cases that cite this headnote

[2]   **Damages**
      Mode of estimating damages in general
      **Damages**
      Mode of estimating damages in general

      In general, the measure of damages under Virginia law in a negligence action is the amount necessary to compensate the injured party for the damage proximately caused by the tortious conduct.

[3]   **Damages**
      Injuries to Real Property

      With respect to injury to real property, Virginia law allows damages to be measured by diminished value, the cost of repair, or a combination of both.

[4]   **Damages**
      Injuries to personal property

      Under Virginia law, where personal property has been either destroyed or damaged, the general rule for determining the amount of damages is the fair market value of the property before and immediately after the property was damaged, plus necessary reasonable expenses incurred by the owner in connection with the injury.

[5]   **Damages**
      Injuries to personal property

      Under Virginia law, where personal property has been damaged and can be restored by repairs, if the repairs would be less than the diminution in value because of the injury, the amount recoverable in damages is the cost of repairs and the diminution in market value of the injured property, if any, after the repairs are made.

[6]   **Damages**
      Injuries to personal property

Case 2:09-md-02047-EFF-MBN   Document 14576-64   Filed 06/08/12   Page 2 of 13

In re Chinese Manufactured Drywall Products Liability Litigation, 706 F.Supp.2d 655...

and Disposal of Gypsum Board Waste, Construction Dimension, February 1992 at 5). Synthetic gypsum is chemically identical to mineral gypsum, but the amount and types of trace materials and unreacted sorbents found in the source material can vary among power plants and among mines from which it originates. P2.0006–0003 (Cozen O'Connor, *Chinese Drywall Litigation: Subrogation Whitepaper* (2009)). Synthetic gypsum is generally obtained in the final stage of industrial processes, where sulfuric acid is neutralized by a calcium salt; for example it is produced as a byproduct of coal combustion power plants. *Id.;* P2.0240.0014 (ASTM International report).

To make drywall from gypsum, first gypsum is crushed or ground up and heated to about 350 degrees Fahrenheit to remove approximately seventy-five percent (75%) of its water content in a process called calcining, thereafter becoming a fine white powder. P2.0006–0003 (Cozen O'Connor, *Chinese Drywall Litigation: Subrogation Whitepaper* (2009)); P2.0051–0001 *(Treatment and Disposal of Gypsum Board Waste,* Construction Dimensions, February 1992 at 5). Second, the calcined gypsum is mixed with water, foam, and other additives to form a slurry which is **\*661** fed between continuous sheets of paper on a continuous belt line. *Id.* Third, as the board moves down the belt line, the calcined gypsum recrystalizes or rehydrates, reverting to its original gypsum state, and the paper sheets become firmly bonded to the rehydrated core. *Id.* Finally, the board is cut to length and conveyed through dryers to remove free moisture. *Id.*

Historically, gypsum was used as far back as 3700 B.C. by the Egyptians as a base to preserve the wall murals in the pyramids. P2.0051–0001(*Treatment and Disposal of Gypsum Board Waste,* Construction Dimension, February 1992 at 6); P2.0240–0022 to –0023 (ASTM International, Oct. 2009 at 9–10). The Roman Empire used gypsum for interior purposes, such as the interior walls of Pompeii. *Id.* There is little information of the use of gypsum plaster during the Middle Ages. *Id.* The modern science of gypsum began with the discoveries by Antoine Lavoisier outlined in his two papers on gypsum presented to the French Academy of Sciences in 1765 and 1766. P2.0240–0022 to –0023 (ASTM International, Oct. 2009 at 11). In the United States, the use of gypsum board started in the early 1950s and was driven by the following issues, (1) avoiding the drying time of plaster which allowed earlier occupancy of buildings, and (2) the lack of skilled plasterers in many locations. P2.0240–0026(ASTM International, Oct. 2009, pg. 13). Gypsum is fire resistant, thus making it a preferable material for drywall.

P2.0051–0001 *(Treatment and Disposal of Gypsum Board Waste,* Construction Dimensions, February 1992 at 6).

**B. HOW & WHEN THE CHINESE DRYWALL WAS INSTALLED IN THE PLAINTIFF INTERVENOR HOMES**

The Chinese drywall in the present cases was manufactured by Shandong Taihe Dongxin Co., Ltd. which on September 10, 2007, changed its name to Taishan Gypsum Co., Ltd. P3.0629–1000 (Affidavit of Russ M. Herman In Support of the Plaintiffs' Steering Committee's Evidentiary Presentation Regarding Taishan Gypsum Co., Ltd. ¶ 15); Trial Transcript at 2/19 Vol. I p. 9–18, P3.0629–0150; P3.0629–0177 (Herman Opening). Hereafter, Shandong Taihe Dongxin Co., Ltd. and Taishan Gypsum Co., Ltd. shall be referred to as "Taishan."

On November 9, 2005, Venture Supply, Inc., a company in Norfolk, Virginia, provided an original letter of credit in the amount of $429,600.00 to the order of Shandong Taihe Dongxin Co. for 120,000 sheets of drywall to meet all USA ASTM ratings and fire rating standards. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 5), P1.1802–0063 to 0068. On November 14, 2005, Frank Clem, manager of Venture Supply, was advised that the manufacturer was not clear on U.S. ASTM ratings and Venture Supply was requested to remove U.S. ASTM requirements from the letter of credit and rely solely upon Chinese ratings. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 7). Venture Supply then contracted with Taishan to purchase drywall. P3.0629–1000 (Affidavit of Russ M. Herman ¶¶ 7–8), P1.1802–0070. Although it originally contracted to meet United States' ASTM standards, Taishan insisted that the drywall it sold to Venture Supply, Inc. would not be required to meet these standards. *Id.* Accordingly, on November 15, 2005, Venture Supply directed its bank to remove the U.S. ASTM requirement from the letter of credit to Taishan. *Id.* Pursuant to contract, on December 25, 2005, Taishan had 2,000 pallets of drywall shipped aboard the M/V Glykofillousa from the Chinese Port of Loading, Lianyungang. P3.0629–1000 (Affidavit of Russ M. Herman ¶¶ 10–11), P1.1802–0091, P1.1802–0003. The shipment **\*662** arrived in the United States in February, 2006. *Id.*

On December 16, 2005, a second contract was signed between Venture Supply and Shandong Taihe Dongxin Co. for 100,000 sheets on 2,000 pallets to be shipped to Norfolk, Virginia. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 12), P1.1802–0089, P1.1802–0003, P1.1802–0007. However, the

# In Re:

*Chinese Drywall Products Liability Litigation MDL*

*Samuel G. Porter*
*December 16, 2009*

*GOLKOW TECHNOLOGIES, INC.*
*Excellence In Court Reporting For Over 20 Years*
*877.370.3377*
*deps@golkow.com*

Original File sp121609.txt
Min-U-Script® with Word Index

HERMAN AFFIDAVIT
EXHIBIT
72

Page 53

1  A. Venture did.
2  Q. And when Venture paid Donald
3  Woods for his services, was that by check?
4  A. Yes.
5  Q. And how much did you pay Donald
6  Woods for this?
7  A. I don't recall the exact
8  amount.
9  Q. You were the big boss in this,
10 so to speak. You gave directions, correct?
11 A. Yes, sir.
12 Q. And that was throughout these
13 transactions, correct; that is, with Taishan,
14 correct?
15 A. Uh...
16 Q. Donald Woods and Tobin acted at
17 your direction and for Venture, correct?
18 A. Yes.
19 Q. Okay. Now, there was a request
20 by Frank Peng, who was the plant manager of
21 the plant where Taishan was manufacturing
22 drywall which you bought?
23 A. Yes, sir.
24 Q. There was a controversy with

Page 54

1  Frank Peng when he asked that Venture remove
2  from its line of credit or letter of credit
3  the designation that the Taishan drywall was
4  to be delivered after ASTM tests, correct?
5  A. Yes.
6  Q. How many tests?
7     MR. HARDT: Object to the form.
8  A. How many tests?
9     BY MR. HERMAN:
10 Q. How many tests did you
11 understand originally were going to be
12 performed on the Taishan drywall according to
13 American standard tests?
14 A. That was -- there was one, but
15 from what I understand, what the problem
16 Frank and them had was, American standard
17 testing, they have their Chinese testing,
18 which is a CCC or some other type of test
19 that's similar to it.
20 Q. Did Mr. Frank Peng of Taishan
21 say that he really didn't understand the
22 American standards for testing drywall? He
23 did say that --
24 A. Yes.

Page 55

1  Q. -- didn't he?
2  A. In the e-mail, yes.
3  Q. Yeah.
4     MR. HARDT: I think it's Frank
5  Clem. Are you sure it's Frank Peng?
6     MR. HERMAN: Well, the e-mails
7  say "Frank Peng."
8     MR. HARDT: I thought it was
9  Clem.
10    MR. HERMAN: And in many
11 translations, it comes out "Frank
12 Clem." They are --
13    MR. HARDT: Just for
14 clarification, I think Mr. Peng was
15 the translator.
16    MR. HERMAN: Well, may be.
17    MR. HARDT: Okay.
18    MR. HERMAN: May be. But the
19 e-mails all say "Frank Peng."
20    MR. HARDT: Right. And I --
21 but just for your clarification, I
22 think Mr. Peng was the translator.
23    BY MR. HERMAN:
24 Q. Now, eventually, you -- what

Page 56

1  you did is you told Don Woods and Phillip
2  Perry, "Look, get that drywall here. I'm
3  going to agree to take out the American
4  standard testing out of the letter of
5  credit" --
6     MR. HARDT: Object to the form.
7  You can answer.
8     BY MR. HERMAN:
9  Q. -- correct?
10 A. Yes, because apparently that
11 had nothing to do with the financial
12 transactions with the bank.
13 Q. All right. Now, where did you
14 send the Taishan drywall to be tested?
15 A. I didn't send it anywhere.
16 Q. So when the Taishan Shandong
17 drywall that you purchased was delivered to
18 Venture, it had not been tested by you,
19 correct?
20 A. That's correct.
21 Q. And it had not been tested by
22 any American standard test at that point?
23    MR. HARDT: Object to the form.
24 You can answer.

Page 57

BY MR. HERMAN:
Q. Is that correct?
A. I had test results that I had received. I don't know if Frank had did the testing or if one of his other customers had done the testing.
Q. In other words, you received testing from Taishan Shandong that Taishan Shandong had done on drywall in China, correct?
A. Yes, sir.
Q. But you received no drywall in which American standard testing had been done, correct?
   MR. HARDT: Object to the form. That's not what he testified to.
BY MR. HERMAN:
Q. Am I correct?
A. I don't -- could you rephrase the question?
Q. Sure.
   Do you know of any American company that tested drywall in China in accord with American standard testing?

Page 58

A. I do not, but I received documentation that the tests were done.
Q. From China?
A. Yes, sir.
Q. Nothing in the United States?
A. No.
Q. And Porter-Blaine did not do any testing on that drywall, correct?
A. That's correct.
Q. So the drywall that Venture got from Taishan Shandong and sold to Porter-Blaine, which was then either sold by Porter-Blaine to be installed in homes or properties in Virginia or in which Porter-Blaine itself installed for homes in Virginia, was not tested in the United States of America; is that correct?
   MR. HARDT: Object to the form. You can answer.
A. Not that I'm aware of.
BY MR. HERMAN:
Q. All right. Now --
A. I've never had American -- or domestic board tested, either, from Venture

Page 59

Supply.
Q. Okay. Now, when you received -- were aware at the time that you received the Taishan Shandong drywall from China, that other Chinese products had been found either defective or harmful to American consumers?
A. I really hadn't paid attention to it, no.
Q. Okay. Now, you got certain tests from China, correct?
A. Yes, sir.
Q. They were not completely translated, were they?
A. They were -- no, but I had taken them to Old Dominion University in the linguistics department and had them translated by somebody there.
Q. They were not translated completely, were they?
A. No.
Q. So the testing that the Chinese at Shandong Taishan sent you test results of were not completely translated into English,

Page 60

were they?
   MR. HARDT: Object to the form.
BY MR. HERMAN:
Q. Am I correct?
A. That's correct.
   MR. HERMAN: Would you show me, please, the Frank file?
BY MR. HERMAN:
Q. You had directed that the drywall which you purchased from Taishan Shandong be labeled with the name "Venture Supply, Inc.," correct?
A. On the end tabs, yes.
Q. On the end tabs; and also a phone number, correct?
A. Yes, sir.
Q. And at one point, the phone number was incorrect, had to be changed because it was stamped incorrectly?
A. I don't recall that, but it's very possible.
Q. All right. Now, the end tape would be if you laid a sheet of sheetrock flat -- the end tape would be around the

**Jessica Richardelli**

From: Bender, Kenneth (RBC Centura) [Kenneth Bender@rbc.com]
Sent: Wednesday, November 09, 2005 1:12 PM
To: Jessica Richardelli
Cc: Kaldre, Monika (RBC Centura); Towler, Vernon (RBC Centura Bank)
Subject: letter of credit application

Please deliver to Sam Porter; thanks.

Sam, here is the letter of credit application and agreement for your review. If this reflects what you want us to put in the letter of credit, then please have it signed by an authorized signatory of your company and fax it to us at 704 686 1498, attn Monika Kaldre, with a copy to Vernon Towler at 757-892-2045. Put the original in the mail to us; our address is at the top of the application.

We hope to get this out (issued to the Chinese bank via SWIFT) within a few hours of receipt of your fax.

Regards,
Bender

<<LC application Venture Supply3.doc>>

---

This e-mail may be privileged and/or confidential, and the sender does not waive any
Any distribution, use or copying of this e-mail or the information it contains by ot
If you received this e-mail in error, please advise me (by return e-mail or otherwis

11/9/2005

HERMAN AFFIDAVIT
**EXHIBIT**
**79**

EXHIBIT
PSC > VPB
39

V001811

| | |
|---|---|
| **RBC Centura**<br>International Department<br>200 Providence Road, 3rd Floor<br>Charlotte NC 28207 | **Application and Agreement**<br>**For Commercial Documentary Credit**<br><br>**Date: November 09, 2005** |

Please issue an irrevocable documentary credit in accordance with this application and forward same to your correspondent for delivery to the beneficiary as indicated below (by check "x"). In issuing the Credit you are expressly authorized to make such changes from the terms herein below set forth as you in your safe discretion may deem advisable provided that no such changes shall vary the principal terms hereof.

Transmit by:   X☐ Cable     ☐ Courier

| **Advising Bank:**<br>AGRICULTURAL BANK OF CHINA, TAIAN BRANCH<br>NO.96 YINGXUAN STREET TAIAN SHANDONG, P.R.CHINA 271000<br>SWIFT BIC: ABOCCNBJ150; ACCOUNT: 1408010016050<br>TEL: 0086-538-8228899, EXT 2056/2058 | **Applicant** (name and address)<br>Ventura Supply Inc.<br>1140 Azalea Garden Road<br>Norfolk. VA 23502-5612 |
|---|---|

| **Beneficiary** (name and address) | **Amount** |
|---|---|
| Shandong Taihe Dongxin Co., Ltd<br>South Suburb of Taian,<br>Shandong Province<br>People's Republic of China | In Words: four hundred twenty-nine thousand six hundred US dollars<br>In Figures: $429,600.00<br>X☐ Maximum   ☐ Approximately   ☐ Variance (+/- 10%) |

**Expiration Date:** January 08, 2006    In the country of the beneficiary unless otherwise indicated.

Available by drafts at sight drawn on you or at your option, any of your correspondents.
(indicate tenor – Sight, 30 days, 60 days, etc.)
(For time drafts only)  Discount charges, if any, for the account of the ☐ applicant   ☐ beneficiary.

**Drafts must be accompanied by the following documents in triplicate unless otherwise stipulated (as checked):**

X☐ Signed Commercial Invoice
☐ Negotiable ☐ Marine ☐ Air Insurance Policy or Certificate, in duplicate, for 110% of CIF value (unless otherwise specified) covering All Risks and War Risks and other risks (please specify)_____.
X☐ Insurance to be effected by ourselves. We agree to keep insurance coverage in force until this transaction is completed.
X☐ Full set of clean on board ☐ port to port Ocean Bills of Lading X☐ multimodal transport document issued to the order of X☐RBC Centura ☐ The applicant ☐ Shipper, blank endorsed ☐ _____
☐ Clean Air Waybill consigned to ☐ The applicant ☐_____
☐ Marked Freight X☐ Collect ☐ Prepaid and notify the applicant and ☐ Rogers & Brown Customs Brokers, 6160 Kempsville Circle, Suite 314A, Norfolk, VA 23502, TEL (757) 455-8522, FAX (757) 455-8531, attn Maryann
X☐ Packing List showing each pallet containing 3 hacks of 34 drywall boards each, plastic wrapped, steel banded
X☐ Other documents, if any: Inspection Certificate from Tobin Trading Inc. stating that they have inspected the goods (120,000 sheets of 3660 x 1220 x 12.7 mm Gypsum board (T/E)) in seller's factory and that they meet buyer's specifications, meet all applicable USA ASTM rating and Fire rating standards, and that pallets are constructed of drywall material or other material not subject to insect infestation (no wood), and that packing meets buyer's requirements, as per packing list.

**Covering shipment of:** 120,000 sheets of 3660 x 1220 x 12.7 mm Gypsum board (T/E) at USD3.58 / sheet

☐ C.I.F.   ☐ CFR   ☐ C & I   X☐ F.O.B. Qingdao. China
(name of city, port, or airport)

Shipment from: Qingdao China           Partial shipments: X☐ Permitted ☐Prohibited
Shipment to: Norfolk, VA USA           Transshipments:    ☐ Permitted X☐Prohibited
Latest shipment date: December 09, 2005
X☐ Documents must be presented or negotiated no later than 21 days after date of shipment, but no later than the expiration date.
X☐ All banking charges outside the issuing bank for beneficiary's account.
☐ All banking charges for account of the ☐ applicant ☐ beneficiary.
☐ This Documentary Credit is transferable by the advising bank.
**Special Instructions:**

Unless otherwise expressly stated herein, this documentary credit is subject to the Uniform Customs and Practice for Documentary Credits, current revision in force as of date of this application.

V001812

## TERMS AND CONDITIONS OF APPLICATION AND AGREEMENT FOR COMMERCIAL DOCUMENTARY CREDIT

In consideration of your issuing, at our request, your Documentary Credit (herein called "the Credit") substantially in accordance with the Application appearing on page one hereof, the undersigned agree as follows:

1. We certify that each draft or acceptance under or purporting to be under the Credit will grow out of transactions pursuant to definite bona fide contracts for the shipment of goods within a specified reasonable time.

2. As to drafts or acceptances under or purporting to be under the Credit, which are payable in the United States Currency, we agree (a) in the case of each sight draft, to reimburse you at your issuing office, on demand, in United States legal tender, the amount paid on such draft, or, if so demanded by you, to pay to you at said office, in advance in such legal tender the amount required to pay such draft, and (b) in the case of each acceptance, to pay to you. at said office, in United States legal tender, the amount thereof, on demand but in any event not later than one business day prior to maturity. or, in case the acceptance is not payable at your office, then on demand, but in any event in time to reach the place of payment in the usual course of the mails not later than one business day prior to maturity

3. As to drafts or acceptances under or purporting to be under the Credit, which are payable in currency other than United States currency, we agree (a) in the case of each sight draft, to reimburse you, at your issuing office, on demand, the equivalent of the amount paid, in United States legal tender at the rate of exchange then current for cable transfers to the place of payment in the currency in which such draft is drawn; and (b) in the case of each acceptance, to furnish you, at said office, on demand, but in any event in time to reach the place of payment in the usual course of the mails not later than one business day prior to maturity, with first class bankers' demand bills of exchange to be approved by you for the amount of the acceptance, payable in the currency of the acceptance and bearing our endorsement, or, if you so request, to pay to you, at said office. on demand, the equivalent of the acceptance in United States legal tender at the rate of exchange then current for cable transfers to the place of payment in the currency in which the acceptance is payable. A demand made on one of us shall fix the exchange rate as to all of us If for any reason whatsoever there shall be at the time of your demand for reimbursement or payment no rate of exchange current for effective cable transfers to the place of payment in the currency in which any such draft is drawn on any such acceptance is payable, we agree to pay you. on demand, in United States legal tender an amount which in your sole judgment shall be sufficient to meet our obligations hereunder, which amount may be applied by you at any time as a payment on account of such obligations, or at your option, held as security therefor: it being understood, however, that we shall remain liable for any deficiency which may result if such amount in United States legal tender shall prove to be insufficient to effect full payment or reimbursement to you at the time when a rate of exchange for such cable transfers shall be again current.

4. We also agree to pay you, on demand, your commission and all charges and expenses (including all charges for legal services) paid or incurred by you in connection with the Credit, plus correspondents' charges, if any, and interest where chargeable.

5. That. if the foregoing application requests the inclusion in the Credit of any provision for Clean Advances to the beneficiary, you may place in the Credit such a provision in that respect as you may deem appropriate, under which any bank entitled to negotiate drafts under the Credit, acting in its discretion in each instance and upon the request and receipt in writing from the beneficiary, may make any one or more Clean Advances at any time on or prior to the date by which drafts are to be negotiated under the Credit The aggregate of such advances shall in no event be more than the amount specified in the Application for Clean Advances, and in no event shall any such advance exceed the amount remaining available under the Credit at the time of the advance. While it is expected by us that each such advance will be repaid to the bank that made the advance by the beneficiary from the proceeds of any drafts drawn under the Credit, should any such advances not be thus repaid, we will on demand pay you the amounts thereof as if such advances were evidenced by drafts drawn under the Credit, together with interest on each such amount for the period that the same shall have been outstanding as such rate as you may find at the time of demand to be payable. It is understood that neither you nor any bank which may make such advances shall be obligated to inquire into the use that may be made thereof by the beneficiary and that you and each such bank shall be without liability for any wrongful use that may be made by the beneficiary of any funds so advanced.

6. We hereby recognize and admit your unqualified right to the possession and disposal of all property shipped or warehoused under or pursuant to or in connection with the Credit or in any way relative thereto or to the drafts drawn thereunder, whether or not released to any of us on trust or bailee receipt or otherwise. and also in and to all shipping documents, warehouse receipts. policies or certificates of insurance and other documents accompanying or relative to drafts drawn under the Credit, and in and to the proceeds of each and all of the foregoing, until such time as all the obligations and liabilities of us or any of us to you at any time existing under or with reference to the Credit or this agreement, or any other credit or any other obligation or liability to you, whether now existing or hereafter created or arising, have been fully paid and discharged, all as security for such obligations and liabilities; and that all or any of such property and documents, and the proceeds of any thereof. coming into the possession of you or any of your correspondents, may be held and disposed of by you as herein provided: and the receipt by you. or any of your correspondents, at any time of this security, of whatever nature, including cash, shall not be deemed a waiver of any of your rights or powers herein recognized.

7. Unless otherwise instructed by you, we agree from time to time to give you trust receipts in any form acceptable to you for any property or documents released by you to any of us and to sign and deliver to you such Statements of Trust Receipt Financing, such Security Agreements and/or such Financing Statements as you may from time to time request in any form acceptable to you. We will pay any relative filing fees In the event you receive some, but not all, of the documents against which availments may be made and, at our request. you deliver such documents to us. against trust receipt or otherwise, prior to the presentation of the relative draft, we agree to pay you on demand the amount of any claim made against you by reason thereof and authorize you to pay or accept (as the case may be) such draft when it is presented, regardless of whether or not such draft or any documents which may accompany it complies with the terms of the Credit.

8. Except so far as otherwise expressly stated in the Credit. we agree (a) that you and any of your correspondents may receive and accept, as a "Bill of Lading" relative to the Credit, any document issued or purporting to be issued by or on behalf of any carrier which acknowledges receipt of property for transportation, whatever the specific provisions of such documents. and any such bill of lading issued by or on behalf of an ocean carrier may be accepted by you as in "Ocean Bill of Lading" whether or not the entire transportation is by water, and the date of every bill of lading shall be deemed the date of shipment of the property mentioned therein. and (b) that you and any of your correspondents may receive and accept as sufficient and controlling the description of the property contained in the invoice and also receive and accept bills of lading, insurance. and other documents. however variant in description from that contained in the invoice: and (c) that you and any of your correspondents may

receive and accept bills of lading containing stamped, written, or typewritten provisions thereon, whether or not signed or initialed, and you and any of your correspondents may assume conclusively that the same were placed with proper authority on the bill of lading at the time of its signing and issuance by the carrier or any agent thereof; and (d) that if the Credit states that except so far as expressly stated it is subject to the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce, Paris, France, which are in effect on the issue date (herein called the "Uniform Customs") the Credit shall be so subject in all respects, and (e) that, if the Credit does not state that except so far as otherwise expressly stated it is subject to the Uniform Customs, you and any of your correspondents may, without limiting the type of document acceptable according to any other provisions of this agreement, accept documents, of any character which comply with the Uniform Customs or which comply with the laws or regulations in force and customs and usages of the place of negotiation; and (f) that you and any of your correspondents may receive and accept as documents of insurance under the Credit either insurance policies or insurance certificates which need not be for an amount of insurance greater than the amount paid by you under or relative to the Credit; and (g) that you and any of your correspondents may receive, accept and pay as complying with the terms of the Credit, any drafts or other documents, otherwise in order, which may be signed by, or issued to, the administrator or executor of, or the trustee in bankruptcy of, or the receiver for any of the property of, the party in whose name the Credit provides that any drafts or other documents shall be drawn or issued.

9. Except as otherwise expressly stated in the Credit, we agree (a) that part shipment may be made under the Credit and that you may honor the relative drafts without inquiry regardless of any apparent disproportion between the quantity shipped and the amount of the relative draft and the total amount of the Credit and the total quantity to be shipped under the Credit; and (b) that if the Credit specified shipments in installments within stated periods and the shipper fails to ship in any designated period, shipments of subsequent installments may nevertheless be made in their respective designated periods and you may honor the relative drafts.

10. We agree that in the event of any extension of the maturity or time for presentation of drafts, acceptances or documents, or any other modifications of the terms of the Credit, at the request of any of us, with or without notification to the others, or in the event of any increase in the amount of the Credit at our request, this agreement shall be binding upon us with regard to the Credit so increased or otherwise modified to drafts, documents and property covered thereby, and to any action taken by you or any of your correspondents in accordance with such extension, increase, or other modification.

11. We hereby expressly authorize you and any of your correspondents to accept and pay at your option any drafts drawn under or purporting to be drawn under the Credit notwithstanding any discrepancies or irregularities between the drafts and documents presented and those required by the terms of the Credit; provided that as to discrepancies and irregularities not otherwise covered by the provisions of this agreement, you or your correspondent so accepting or paying must be furnished with an indemnity satisfactory to you which, running in our favor as well as yours covers the discrepancies or irregularities but is limited to the actual damage directly attributable to such discrepancies or irregularities.

12. We assume all risks of the acts or omissions of the users of the Credit. We agree that should the beneficiary under the Credit, upon receipt of advice by cable, or otherwise, of the issuance of the Credit, but prior to its actual receipt, negotiate drafts by virtue of such advice, such negotiation shall be considered a proper one and shall be included under the terms and subject to all conditions hereof, and we assume all the risks of the misuse of the Credit whatsoever. Neither you nor your correspondents shall be responsible: for the existence, character, description, quality, quantity, weight, condition, packing, value, or delivery of the property purporting to be represented by documents; for any difference in character, description, quality, quantity, weight, condition, packing, or value of the property from that expressed in documents; for the form, validity, sufficiency, genuineness or legal effect of documents, even if such documents should in fact prove to be in any or all respects invalid, insufficient, fraudulent, or forged; for the time, place, manner, or order in which shipment is made; for partial or incomplete shipment, or failure or omission to ship any or all of the property referred to in the Credit; for the character, adequacy, validity, or genuineness of any insurance, for the solvency or responsibility of any insurer, or for any other risk connected with insurance; for any deviation from instructions, delay, default or fraud by the shipper or anyone else in connection with the property or the shipping thereof; for the solvency, responsibility or relationship to the property of any party issuing any documents in connection with the property; for delay in arrival or failure to arrive of either the property of any of the documents relating thereto; for delay in giving or failure to give notice of arrival or any other notice; for any breach of contract between the shippers or vendors and ourselves or any of us, for the validity or sufficiency of any instrument assigning or purporting to assign the Credit or the rights or benefits thereunder or proceeds thereof in whole or in part, which may prove to be invalid or ineffective for any reason, for failure of any draft to bear any reference or adequate reference to the Credit, or failure of documents to accompany any draft at negotiation, or failure of documents to accompany any draft at payment if sent by duplicate mail, or failure of any person to note the amount of any draft on the reverse of the Credit or to surrender or take up the Credit or to send forward documents apart from drafts as required by the terms of the Credit, each of which provisions, if contained in the Credit itself, it is agreed may be waived by you, or for errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, wireless or otherwise, whether or not they be in cipher, nor shall you be responsible for any error, neglect, or default of any of your correspondents for errors in translation or for errors in interpretation of technical terms or for any consequences arising from causes beyond your control; and none of the above shall affect, impair, or present the vesting of any of your rights or powers hereunder. You shall have the right to transmit the terms of the Credit without translating them. We shall protect you and any other drawee in paying any draft dated on or before the expiration of any time limit expressed in the Credit regardless of when drawn and when or whether negotiated. If the Credit provides that payment is to be made by your correspondent, neither you nor such correspondent shall be responsible for the failure of any of the documents specified in the Credit to come into your hands or for any delay in connection therewith, and our obligation to reimburse you for payments made or obligations incurred shall not be affected by such failure or delay in the receipt by you of any such documents. In furtherance and extension and not in limitation of the specific provisions hereinbefore set forth, we agree that any action taken by you or any correspondent of yours, under or in connection with the Credit or the relative drafts, documents, or property, if taken in good faith, shall be binding on us, and shall not put you or your correspondent under any resulting liability to us; and we make like agreement as to any inaction or omission unless in breach of good faith.

You shall not in any way be liable for any failure by you or anyone else to pay or accept any draft or acceptance under the Credit resulting from any censorship, law, control, or restriction rightfully or wrongfully exercised by any de facto or de jure domestic or foreign government or agency or from any other cause beyond your control or the control of your correspondents, agents, or sub-agents of for any loss or damage to us or anyone else resulting from any such failure to pay or accept, all such risks being expressly assumed by us, and we agree to indemnify and hold you harmless from any claim, loss, liability, or expense arising by reason of any such failure to pay or accept. We are responsible to you for all obligations imposed upon you with respect to the Credit or the relative drafts, documents, or property.

13. We agree to procure promptly any necessary import and export or other licenses for the import or export or shipping of the property and to comply with all foreign and domestic governmental regulations in regard to the shipment of the property or the financing thereof, and to furnish such certificates in that respect as you may at any time require, and to keep the property adequately covered by insurance satisfactory to you. in companies satisfactory to you. and to assign the policies or certificates of insurance to you, or to make the loss or adjustment, if an. payable to you. at your option: and to furnish you if demanded with evidence of acceptance by insurers of such assignment.

14. Each of us agrees, at any time and from time to time, on demand, to deliver to you. as a security for any and all of the liabilities of us and any of us hereunder and all other liabilities of us and any of us to you. direct or contingent, joint, several, or independent, now or hereafter existing. due or to become due, whether created directly or acquired by assignment or otherwise, additional property satisfactory to you or to make such payment as you may require. Each of us agrees that the balance of every account of us or any of us with you and each claim of us or any of us against you existing from time to time, shall be subject to a lien and subject to be set off against any and all such liabilities of us or any of us: and you may at any time or from time to time at your option and without notice appropriate and apply toward the payment of any of such liabilities of us or any of us the balance of each such account of us or any of us with you and each such claim of us or any of us against, and we and each of us will continue to be liable for any deficiency. Each of us agrees that all property of every description now or hereafter in your possession or custody or in transit to you for any purpose including safekeeping, collection, or pledge, for the account of us or any of us, or as to which we or any of us may have any interest, right, or power, whether or not such property is in whole or in part released to us or any of us on trust or bailee receipt, are hereby made security and subject to a lien and security interest in your favor for any and all such liabilities of us or any of us. You may at any time and from time to time, without notice, transfer into your own name or that of your nominee any property so held as collateral. Each of us agrees that upon the failure of us or any of us at all times to keep a margin of security with you satisfactory to you, or upon the non-payment or non-fulfillment of any such liabilities of us or any of us when they shall become due or be made due, or upon the death or insolvency of us or any of us, or upon the suspension of business of us or any of us, or upon the issuance of any warrant of attachment against the credits or any of the property of us or any of us. or upon the making by us or any of us of an assignment for the benefit of creditors, or upon the application for the appointment or the appointment of a trustee or receiver for us or any of us or for any of the property of us or any of us. or upon the taking of possession by any public official having regulatory powers over any of us of the property of any of us for the purpose of conserving the assets of any of us, or upon any proceedings being commenced by or against us or any of us under or purporting to be under any bankruptcy, reorganization, arrangement, readjustment of debt, receivership. liquidation, dissolution, winding up, adjustment. compensation or liquidation law or statute of any jurisdiction, then and in any such event, (a) any and all such liabilities of us or any of us shall, at your option. become and be immediately due and payable, without notice, presentation, demand of payment or protest, all such being hereby expressly waived, and notwithstanding any credit or time allowed to any of us, or any instrument evidencing such liabilities or otherwise, and (b) you shall have the right from time to time to sell, re-sell, assign, and deliver all or any part of the property securing any liabilities of us or any of us, arrived or to arrive, at any Brokers' Board of Exchange, or a public or private sale, at your option, without having the property at the place of sale, in such parcel or parcels and at such time or times and at such place or places, and upon such terms and conditions as you may deem proper, and in connection therewith may grant options all without demand, advertisement or notice to us or any of us, all of which are hereby expressly waived, and to apply the net proceeds of such sale or sales to the payment of any and all such liabilities and we and each of us will continue liable to you for any deficiency. with interest. Upon each such sale, you may purchase the whole or any part of the property of us or any of us being sold, free from any right of redemption, which we and each of us hereby expressly waive and release. Demands or calls for collateral on or any notices to us or any of us respectively (a) may be made or given by you by leaving same at the last known address of us or any of us respectively or by mailing, telegraphing, cabling, radioing, telephoning, or otherwise sending same to such address, with the same effect as if delivered to all of us in person, (b) shall be considered made as of the time of such leaving or mailing, telegraphing, cabling, radioing, telephoning, or other sending by public agencies of communication Each of us agrees that with or without notification to any of us, you may exchange, release, surrender, realize upon, release on trust receipt to any of us, or otherwise deal with any property by whomsoever pledged, mortgaged, or subjected to a security interest to secure directly or indirectly any of the obligations hereunder or for which any of the undersigned may be liable.

We will bear and pay all expenses of every kind (including all charges for legal services) of the enforcement of any of your rights herein mentioned, of any claim or demand by you against us or any of us, and of any actual or attempted sale, exchange, enforcement, collection, maintenance, retention, insurance, compromise, settlement, release, delivery on trust receipt or delivery of any such security, and of the receipt of proceeds thereof, and will repay to you any such expenses incurred by you.

15. None of your options, powers, or rights (including those hereunder) shall be waived unless you or your authorized agent shall have signed such waiver in writing. No such waiver. unless expressly as stated therein, shall be effective as to any transaction which occurs subsequent to the date of such waiver. nor as to any continuance of a breach after such waiver. No segregation or specific allocation by you of specified collateral against any liability shall waive or affect any lien of any sort against other securities or property or any of your options, powers. or rights (including those hereunder).

16. The word "property" as used in this agreement includes goods, merchandise, securities, funds. closes in action, and any and all other forms of property, whether real, personal. or mixed and any right or interest therein. Property in your possession shall include property in possession of anyone for you in any manner whatsoever. Your options. powers, and rights specified in this agreement are in addition to those otherwise created. You are hereby expressly given the right and power in furtherance of any right, power. or privilege which you may have hereunder or in connection with the Credit to execute endorsements. assignments, or other instruments of conveyance to transfer in our name. place. and stead covering any property standing in our name or belonging to us of every kind and description which you may hold or which may come into your possession under the Credit or by reason of this agreement.

17 If the undersigned is a banking institution, the undersigned hereby appoints you as its agent to the extent of issuing the Credit in accordance with. and subject to the terms and provisions of the foregoing Application and Agreement for Documentary Letter of Credit.

18. This agreement shall be binding upon us. our heirs, executors, administrators. successors and assigns and shall inure to the benefit of, and to be enforceable by you, your successors. transferees, and assigns. If this agreement should be terminated or revoked by operation of law as to us. or any of us, we will indemnify and save you harmless from any loss which may be suffered or incurred by you in acting hereunder prior to the receipt by you. or your transferees or assigns. of notice in writing of such termination or revocation. If this agreement is signed by two or more parties. it shall be the joint and several agreement of such parties and whenever used herein, the singular number shall include the plural. and the plural the singular. This agreement shall be governed by and construed in accordance with the law of the State of North Carolina.

19. We hereby certify that transactions in the merchandise covered by this application are not prohibited under the Foreign Assets Control or Cuban Assets Control Regulations of the United States Treasury Department, and that any importation covered by this application conforms in every respect with all existing United States Government regulations and executive orders.
20. We agree that if we obtain possession of merchandise covered under this documentary credit prior to Centura Bank's receipt and review of the required documents. all discrepancies on said documents will be automatically waived.
21. We warrant that no shipment in connection with this transaction is or will be in violation of U.S. Treasury Department Foreign Assets Control Regulations.
22. This Documentary Credit is secured by:

_Venture Supply Inc._
(Corporation or Firm)

By: _[signature] President_
(Authorized Signature and Title)

_[signature]_ (SEAL)
(Individual)

V001816

Venture Supply, Inc.
1140 Azalea Garden Road
Norfolk, VA 23502
Phone: 757-855-5433
Fax: 757-857-0283

VENTURE SUPPLY INC.

# FAX

To: Vernon

From: Jessica A. Richardelli

Fax: 892-2045

Date: 11/9/05

Phone:

Pages: 6

Re: Letter of Credit

CC:

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply

V001817

**HP Officejet V Series V40**
**Personal Printer/Fax/Copier/Scanner**

**Log for**
PorterBlaine
7578570662
Nov 09 2005 2:57PM

**Last Transaction**

| Date | Time | Type | Identification | Duration | Pages | Result |
|---|---|---|---|---|---|---|
| Nov 9 | 2:52PM | Fax Sent | 8922045 | 4:35 | 6 | OK |

V001818