# EXHIBIT  B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

---

IN RE CHINESE-MANUFACTURED DRYWALL     MDL No. 2047

PRODUCTS LIABILITY LITIGATION

SECTION: L

THIS DOCUMENT RELATES TO:

JUDGE FALLON

THE MITCHELL COMPANY, INC. v.      MAG. JUDGE WILKINSON

KNAUF GIPS, KG; et al.; Case No. 09-cv-4115

---

## DECLARATION OF ROBERT SCHARF

STATE OF N.Y.

COUNTY OF Nassau


I, Robert Scharf, after having been first duly sworn, state and affirm as follows:


1.     My name is Robert Scharf, and I am over the age of nineteen (19) years and

make this declaration upon my personal knowledge.

2.      Attached as Exhibit A hereto is the deposition which I gave in the case of

*Langham v. Devon International; et al.*

3.      My testimony in the *Langham* case was under oath, and my testimony was

truthful to the best of my ability.   The facts set forth in the deposition are true and correct based

upon my personal knowledge and recollection.

Robert Scharf

Robert Scharf                                                    March 24, 2011

---

**Page 1**

```
              IN THE CIRCUIT COURT OF
              BALDWIN COUNTY, ALABAMA
              No. CV-2009-900948
                   -  -  -
CHAD EVERTT LANGHAM, et al.:
                              :
         v.                   :
                              :
ACE HOME CENTER, et al.   :
                   -  -  -
              MARCH 24, 2011
                   -  -  -
         Videotape deposition of
ROBERT SCHARF, taken pursuant to notice,
was held at THE RADISSON VALLEY FORGE,
1160 First Avenue, King of Prussia,
Pennsylvania, commencing at 9:24 a.m., on
the above date, before LISA CAPALDO, a
Certified Professional Reporter and
Notary Public in and for the Commonwealth
of Pennsylvania.
```

---

**Page 2**

```
APPEARANCES:

DANIELL, UPTON,
PERRY & MORRIS, P.C.
BY:  JONATHON R. LAW, ESQUIRE
P.O. Box 1800
Daphne, AL  36526
(251)625-0046
Jrlaw@dupm.com
Representing the Plaintiffs


CARR ALLISON
BY:  CAROLINE T. PRYOR, ESQUIRE
6251 Monroe Street, Suite 200
Daphne, AL  36526
(215)626-9340
Cpryor@carrallison.com
Representing the Defendant
Ace Hardware Corporation

VERNIS & BOWLING
BY:  RYAN T. NORTHRUP, ESQUIRE
204 S. Royal Street
Mobile, AL  36602
(251)432-0337
Rnorthrup@law-alabama.com
Representing the Defendant
Bass Homes


SCOTT, SULLIVAN, STREETMAN & FOX
BY:  JAMES E. ROBERTSON, ESQUIRE
P.O. Box 1034
Mobile, AL  36633
(251)433-1346
Jrobertson@scottsullivanlaw.com
Representing the Defendant
Ace Home Center
```

---

**Page 3**

```
APPEARANCES CONT:

HUDSON & WATTS
BY:  WESLEY PIPES, ESQUIRE
P.O. Box 989
Mobile, AL  36601
(251)432-7200
Wesley@alabamatrial.com
Representing the Defendant
Pensacola Stevedore Company


WOODLEY WILLIAMS LAW FIRM
BY:  DONALD COLEMAN BROWN, Esquire
One Lakeshore Drive, Suite 1750
Lake Charles, LA  70629
(337)433-6328
Dcbrown@woodleywilliams.com
Representing the Defendant
Devon International Trading and
John Bennett


LUSK, CALDWELL & DEAN
BY:  LESLIE ANN CALDWELL, ESQUIRE
2101 Highland Avenue, Suite 410
Birmingham, AL  35205
(205)933-7090
Lac@lusklaw.com
Representing the Defendant
Devon International, Inc.

CARR ALISON
BY:  CRAIG W. GOOLSBY, ESQUIRE
6251 Monroe Street, Suite 200
Daphne, AL  36526
(251)626-9340
Cgoolsby@carrallison.com
Representing the Defendant
Craig Sinclair Buildings, Inc.
```

---

**Page 4**

```
APPEARANCES CONT.



JONES, WALKER, WAECHTER,
POITEVENT, CARRERE & DENEGRE
BY:  JAMES REBARCHAK, ESQUIRE
254 State Street
Mobile, AL  36603
(251)439-7544
Jrebarchak@joneswalker.com
Representing the Defendant
Fireman's Fund Ins. Co.



McDOWELL, KNIGHT, ROEDDER & SLEDGE
BY:  WILLIAM G. CHASON, ESQUIRE
11 N. Water Street, 13th Floor
Battle House Tower
P.O. Box 350
Mobile, AL  36601
(251)432-5300
Wchason@mcdowellknight.com
Representing the Defendant
Southern Heritage Builders and
David Reynolds and Classic
Home Builders





ALSO PRESENT:  Kevin G. Sugg, Esquire
```

Robert Scharf                                        March 24, 2011

5

1           - - -
2        I N D E X
3           - - -
4
5
  Testimony of:  ROBERT SCHARF
6
7
  By Mr. Law      14, 449
8
  By Mr. Pipes    297, 475
9
  By Mr. Robertson   332
10
  By Mr. Rebarchak   375
11
  By Mr. Chason      477
12
13
           - - -
14
      E X H I B I T S
15
           - - -
16
17  NO.     DESCRIPTION       PAGE
18
     (Exhibits 1 through 79 were marked
19  by counsel and attached to the
    transcript.)
20
     (There are no Exhibit Numbers 13
21  through 24.)
22
23
24

6

1           - - -
2    DEPOSITION SUPPORT INDEX
3           - - -
4
5   Direction to Witness Not to Answer
6   Page Line    Page Line    Page Line
7   None
8
9
10  Request for Production of Documents
11  Page Line    Page Line    Page Line
12  None
13
14
15  Stipulations
16  Page Line    Page Line    Page Line
17  None
18
19
20  Question Marked
21  Page Line    Page Line    Page Line
22  None
23
24

7

1           - - -
2        PROCEEDING
3           - - -
4        MS. CALDWELL:  This is
5   Leslie Caldwell on behalf of
6   Devon.  And before we got started,
7   we wanted to put on the record
8   that the plaintiffs just filed a
9   Seventh Amended Complaint in the
10  Mayo case and a Second Amended
11  Complaints in the Tedder (ph) and
12  the Kays White (ph) case on
13  Tuesday evening which was about a
14  day and a half ago.
15       We had moved to strike those
16  amendments on the basis they are
17  untimely and prejudicial to Devon
18  in part because it prejudices
19  Devon's ability to prepare and
20  conduct essential discovery in the
21  defense of its case.
22       We stand ready and are
23  putting up Devon's corporate
24  representatives, but we do so

8

1   without waiver of any objections
2   to this or any other deposition.
3   And we specifically reserve all
4   objections concerning any new
5   claims the plaintiffs are
6   attempting to assert as to Devon
7   as set forth in their amendment.
8   So that is referenced, and we
9   reserve all objections to
10  plaintiffs seeking any discovery
11  to these untimely amendments for
12  the depositions of Devon's
13  corporate representatives.
14       MR. BROWN:  I would like to
15  just add to that that we also
16  reserve any all rights and
17  objections we have to the
18  plaintiff or any other party using
19  any information obtained during
20  these depositions in support of
21  the new claims that had been
22  filed.
23       MR. LAW:  You all finished?
24  This is Jonathon Law on behalf of

Robert Scharf                                        March 24, 2011

9

1    the plaintiffs.  And I'll simply
2    add that we can obviously take
3    this issue up with the court.  But
4    the rules of civil procedure
5    clearly permit amendments to
6    pleadings through trial to conform
7    to discovery conducted prior to
8    and evidence presented at trial.
9    And the plaintiffs pursuant to
10   Rule 15 filed an Amendment 42 days
11   prior to trial and simply to
12   conform to discovery conducted to
13   date.  And I'd like to note
14   that the plaintiffs have been
15   attempting to take these
16   depositions since October, and the
17   amended pleadings would have been
18   filed sooner had discovery been
19   conducted sooner pursuant to the
20   plaintiff's request.
21       MS. CALDWELL:  And we just
22   obviously and respectively
23   disagree both with your
24   interpretation of the rule and the

10

1    timeliness of your pleadings as
2    well as the fact that you've
3    amended these pleadings prior to
4    any depositions that you've taken
5    of Devon.  So to the extent you
6    are saying that you couldn't amend
7    your pleadings prior to deposing
8    Devon that's inconsistent with
9    what you've done.
10       MR. LAW:  Well, the amended
11   pleading was filed primarily to
12   reflect discovery conducted to
13   date which would include the
14   Fireman's Fund deposition which
15   was just recently completed and
16   the deposition of Mike Pate and
17   Pensacola Stevedore which was
18   completed this Monday the 21st.
19       And just so the record is
20   clear is Devon also objecting to
21   the amended pleading that deleted
22   claims against Devon?
23       MS. CALDWELL:  No, but we do
24   object insofar as the seventh

11

1    amended complaint and Mayo's 62
2    add any kind of agency claim that
3    they are trying to boot strap any
4    claims against Devon that they
5    have already dismissed which I
6    think is what -- what seeks to be
7    done through the seventh amendment
8    in Mayo.
9        MR. ROBERTSON:  Well, and
10   for the record Ace Home Center
11   Incorporated has filed motions to
12   dismiss and objected so.  We don't
13   want to be left out of the party.
14       MR. LAW:  Let's get on with
15   it.
16       MR. BROWN:  I assume again
17   an objection by one is good for
18   objection by all.  We don't have
19   to file suit --
20       MR. LAW:  Works for me.  I'd
21   also just like to remind everybody
22   we do have the usual stipulations
23   and please save all objections as
24   to the form.

12

1        MR. BROWN:  Except as to the
2    form?
3        MR. LAW:  All objections
4    should be to the form pursuant to
5    the usual stipulations.
6        THE VIDEOTAPE TECHNICIAN:
7    We are now on the record.  This is
8    tape number one to the videotape
9    deposition of Robert Scharf in the
10   matter of Langham, et cetera
11   versus Ace Home Center, et cetera,
12   being heard before the Circuit
13   Court of Baldwin County, Alabama,
14   Case Number CV-2009-900948.
15       This deposition is being
16   held at 1168 First Avenue in King
17   of Prussia, Pennsylvania on March
18   24th, 2011.  The time on video is
19   currently 9:30.  My name is Robert
20   Blum.  I'm the videographer.  The
21   court reporter today is Lisa
22   Capaldo.
23       The court reporter has
24   previously sworn in the witness.

Robert Scharf                                                    March 24, 2011

| | 13 |
|---|---|
| 1 | Counsel, would you now please |
| 2 | identify yourselves and your |
| 3 | affiliations for the record. |
| 4 | MR. LAW:  Jonathon Law on |
| 5 | behalf of the plaintiff |
| 6 | homeowners. |
| 7 | MR. PIPES:  Wesley Pipes on |
| 8 | behalf of Pensacola Stevedore |
| 9 | Company, Inc. and Pate Stevedore |
| 10 | Company, Inc. |
| 11 | MR. ROBERTSON:  Jim |
| 12 | Robertson for Ace Home Center. |
| 13 | MR. REBARCHAK:  Jim |
| 14 | Rebarchak for Fireman's Fund |
| 15 | Insurance Company. |
| 16 | MR. BROWN:  Don Brown for |
| 17 | Devon International Trading. |
| 18 | MS. CALDWELL:  And Leslie |
| 19 | Caldwell on the phone also for |
| 20 | Devon International Trading. |
| 21 | MS. PRYOR:  Caroline Pryor |
| 22 | for Ace Hardware Corporation. |
| 23 | MR. NORTHRUP:  Ryan Northrup |
| 24 | for Bass Homes. |

| | 15 |
|---|---|
| 1 | please? |
| 2 | A.   33 Sharon Drive, Ledo Beach, |
| 3 | New York. |
| 4 | Q.   How long have you lived |
| 5 | there in Ledo Beach, New York? |
| 6 | A.   Thirty-five years. |
| 7 | Q.   What's your date of birth, |
| 8 | please? |
| 9 | A.   2/20/48. |
| 10 | Q.   I'm going to mark as exhibit |
| 11 | number one the 30(B)(6) notice of |
| 12 | deposition for Devon International |
| 13 | Industries formally known as Devon |
| 14 | International Trading.  And have you had |
| 15 | a chance to look at some of the topics on |
| 16 | that Exhibit-1 there?  It's on the |
| 17 | following page. |
| 18 | A.   I don't think I've seen |
| 19 | this. |
| 20 | Q.   I spoke with counsel for |
| 21 | Devon, your previous employer prior to |
| 22 | this deposition, and it's my |
| 23 | understanding that you may have some |
| 24 | knowledge of a few of these topics that |

| | 14 |
|---|---|
| 1 | BY MR. LAW: |
| 2 | Q.   Tell us your name, please, |
| 3 | sir. |
| 4 | A.   Robert Scharf. |
| 5 | Q.   Mr. Scharf, I'm Jonathon |
| 6 | Law.  We met before the deposition.  I'm |
| 7 | going to ask you a few questions today. |
| 8 | If you don't understand any of my |
| 9 | questions, tell me that and I'll try to |
| 10 | clarify it for you. |
| 11 | A.   Okay. |
| 12 | Q.   If I ask a bad question, |
| 13 | it's my job to fix it.  So if you tell |
| 14 | me, I'll repeat or clarify the question |
| 15 | for you. |
| 16 | A.   Okay. |
| 17 | Q.   If you answer the question, |
| 18 | we'll assume you understood it.  Is that |
| 19 | fair enough? |
| 20 | A.   That's fair enough. |
| 21 | Q.   If you need to slow me down, |
| 22 | just tell me. |
| 23 | A.   You'll be all right. |
| 24 | Q.   What's your current address, |

| | 16 |
|---|---|
| 1 | you are being tendered to talk about |
| 2 | today and I'm just going to ask you about |
| 3 | a -- |
| 4 | MR. BROWN:  I think it's in |
| 5 | a different form than the one-- |
| 6 | THE WITNESS:  I went |
| 7 | through -- |
| 8 | MR. BROWN:  That's just a |
| 9 | different form. |
| 10 | THE WITNESS:  7,550,000 |
| 11 | E-mails so, but I don't think I've |
| 12 | seen this document. |
| 13 | BY MR. LAW: |
| 14 | Q.   You are pointing to a box? |
| 15 | A.   Yeah, full of documents. |
| 16 | Those were E-mails that I looked at, but |
| 17 | I don't remember seeing anything like |
| 18 | this.  You're going to talk about all |
| 19 | four of these? |
| 20 | Q.   No, sir.  I'm going to ask |
| 21 | you about a couple of them that I've been |
| 22 | told by Devon's counsel that you had |
| 23 | knowledge of and were tendered for and |
| 24 | that would be topic number three that you |

Robert Scharf                                                March 24, 2011

17

1   had some communications with some of the
2   individuals referenced in paragraph
3   number three.
4       A.   Yes.
5       Q.   And I understand maybe not
6   all of them, and we'll get to the ones
7   that you can speak on in a minute.  But
8   you're also being tendered to discuss
9   topic number four, the manufacture,
10  importation, and distribution of Chinese
11  drywall.  Is that correct?
12      MR. BROWN:  Well, he's being
13      tendered on that.  To the extent
14      that he talks about being a
15      manufacturer, he's being tendered
16      to discuss the sale of the drywall
17      by Devon.
18      THE WITNESS:  I know the
19      manufacture, importation,
20      distribution of a particular
21      factory in China not all -- not
22      Chinese drywall.  So I don't know.
23      It says Chinese drywall.  That's a
24      pretty big topic.

18

1   BY MR. LAW:
2       Q.   Fair enough.  And then item
3   number six, it's my understanding you are
4   being tendered to talk about some of
5   those?
6       A.   Yeah, I can talk --
7       Q.   Items or issues?
8       A.   That's correct.
9       MR. REBARCHAK:  For the
10      record, just a housekeeping
11      matter, is he being put up today
12      as the 30(B)(6) representative of
13      Devon on these issues?
14      MR. BROWN:  Yes.
15      MR. REBARCHAK:  Well, how
16      are we going to tell when he gives
17      an opinion that whether he's
18      speaking on behalf of Devon or is
19      he speaking on behalf of himself
20      since we're having two separate
21      depositions in this case.
22      MR. LAW:  Well, if he needs
23      to clarify, I'll ask that the
24      witness clarify.  For example, I

19

1   am taking your deposition in your
2   individual capacity as Robert
3   Scharf.  And I'm going to ask you
4   some background questions and
5   things that may not pertain to
6   your previous employment with
7   Devon.
8       If you need to, when we talk
9   about these three topics we just
10  mentioned, if you need to
11  differentiate between something
12  you, Mr. Scharf, know or something
13  you're testifying on behalf of
14  Devon about just tell me.
15      THE WITNESS:  Okay.
16  BY MR. LAW:
17      Q.   Where are you currently
18  employed, sir?
19      A.   Signature Solar Industries.
20      Q.   What do you do at Signature
21  Solar Industries?
22      A.   I'm a partner.  It's an LLC.
23      Q.   What kind of business does
24  that do?

20

1       A.   We source solar panels in
2   China.  It's a start-up company that just
3   started.
4       Q.   How long has this company
5   been in business?
6       A.   Well, we've been a company
7   about a year.  We haven't brought
8   anything in yet from China.
9       Q.   What did you do prior to
10  starting Signature Solar Industries?
11      A.   I was importing some windows
12  from China.
13      Q.   Was that in your employment
14  with Devon?
15      A.   No, after Devon.
16      Q.   What was the name of the
17  company that you worked for that imported
18  the windows?
19      A.   Baming -- Beneficial Baming
20  Industries.
21      Q.   Is that a company that you
22  owned?
23      A.   No.
24      Q.   How long did you work for

Robert Scharf                                March 24, 2011

21

1  them?
2       A.   Well, about a year I guess.
3       Q.   What did you do prior to
4  that?
5       A.   I was with Devon.
6       Q.   Have you ever given a
7  deposition before?
8       A.   I think one other time.
9       Q.   And that was in this
10  arbitration proceeding with North
11  Pacific?
12       A.   That's correct.
13       Q.   What did you do to prepare
14  for this deposition today?
15       A.   Well, I looked at those
16  E-mails that were in that box.  And then
17  I spoke briefly yesterday with Mr. Brown.
18  And that's how I prepared.
19       Q.   And that would be Don Brown,
20  counsel for Devon?
21       A.   That's correct.
22       Q.   You are going to know the
23  answer to some of the questions I ask
24  before I ask it, but if you'll let me

22

1  finish it, she can type what we're both
2  saying instead of typing us talking at
3  the same time.
4       A.   Did I do that already?
5       Q.   It's all right.  Everybody
6  does it.  Did you review your deposition
7  that you gave in the North Pacific
8  arbitration?
9       A.   Just recently you mean?
10       Q.   Yes, sir.
11       A.   Briefly, I didn't read the
12  whole deposition.  I saw two or three
13  pages on it.
14       Q.   What pages did you look at?
15       A.   I don't know.
16       Q.   And I'm not asking a
17  specific number, but what was the topics
18  that was being discussed on the pages you
19  looked at?
20       MR. BROWN:  Are you talking
21  about discussed with me?
22       MR. LAW:  On the deposition.
23       THE WITNESS:  I don't
24  recall, but it was in the

23

1  deposition there.  So whatever I
2  said there I said.
3       MR. LAW:  Let's go off the
4  record for a second.
5       THE VIDEOTAPE TECHNICIAN:
6  Going off the record.  Time on
7  video is 9:38.
8       - - -
9       (Whereupon, a brief recess
10  was taken.)
11       - - -
12       THE VIDEOTAPE TECHNICIAN:
13  We're now back on the record.  The
14  time on video is 9:39.
15  BY MR. LAW:
16       Q.   Now, what were the topics
17  that were discussed on the pages
18  you read in your deposition?
19       A.   I don't remember.
20       Q.   Then you said you looked at
21  some E-mails in a box that's got a bunch
22  of binders in it.
23       A.   Yeah, I did, at lot of
24  E-mails.  I looked at a lot of records.

24

1       Q.   Besides the E-mails what
2  else did you look at?
3       A.   Whatever was in those boxes.
4  Most of it was E-mails.  Maybe some --
5  most of them were E-mails.
6       MR. LAW:  Is that Devon's
7  production?
8       MR. BROWN:  Yeah.
9  BY MR. LAW:
10       Q.   And those were E-mails
11  between yourself and some North Pacific
12  individuals?
13       A.   Yeah.  Yes.
14       Q.   And some E-mails between
15  yourself and Ruth Wu and some other Devon
16  employees?
17       A.   That's correct.
18       Q.   And besides briefly looking
19  at your previous deposition and going
20  through Devon's production in this case,
21  did you do anything else to prepare for
22  today?
23       A.   I did not.
24       Q.   And you are not currently

Robert Scharf                                    March 24, 2011

25

1  employed by Devon, are you?
2      A.   I am not.
3      Q.   Did you meet with any Devon
4  employees or representatives to talk
5  about this case?
6      A.   No, I did not.
7      Q.   Did you meet with any Devon
8  attorneys besides Mr. Don Brown?
9      A.   No, I did not.
10     Q.   Are you currently doing any
11 business with Devon?
12     A.   No.
13     Q.   Are you seeking to do any
14 business with Devon?
15     A.   No.
16     Q.   Take me through your
17 employment background, please, and let's
18 just go back to about when you got out of
19 high school and move forward.
20     A.   I caddied for a while at a
21 golf course -- no, I went -- my first was
22 Reynolds Aluminum, Reynolds Metals
23 Company in their building products, and
24 from there I went to All Sight which is

26

1  the division in U.S. Steel or building
2  products division.  I was there about
3  seven years I think.
4      Then I went to a small
5  company Allied Building Products that we
6  grew into a pretty large size.  And I
7  left Allied, and I started a company
8  Royal Building Products which we sold and
9  marketed products that were manufactured
10 in Toronto by the Royal Plastics Group.
11     I also had a company that I
12 owned called Denny Building Products
13 where we manufactured aluminum trim coil.
14 We actually we had trim coil made for us
15 in 300 different colors.  Then shortly
16 after that I got involved with Devon.
17     Q.   Allied Building Products,
18 is that the Allied based in Monroe,
19 Louisiana?
20     A.   No.
21     Q.   Different company?
22     A.   Yes.
23     Q.   And when did you first start
24 working for Devon?

27

1      A.   Probably end of '74 or maybe
2  beginning of 1975.
3      Q.   With Devon?
4      A.   Yeah, I think so.  Is that
5  right?  No, I'm sorry.  No.  No.  2004,
6  I'm sorry.  I'm looking, what did I say?
7      Q.   And there's several
8  different Devon entities in this Devon
9  family of companies.  Which one did you
10 first go to work for in '04?
11     A.   Devon International Trading.
12     Q.   How was it that you came to
13 be employed by Devon International
14 Trading?
15     A.   I met John Bennett, and they
16 were sourcing material from China.  And
17 one of my -- my last company before I
18 sold it we used to source products and
19 private label products made in the United
20 States to distributors in the United
21 States.  So there was an opportunity
22 there to bring material in from China and
23 sell it.
24     Q.   The company that you sourced

28

1  materials for that were made in the
2  United States, was that the Denny
3  Aluminum Company?
4      A.   Yes, Denny Building
5  products, yes, Denny company.
6      Q.   Did they manufacture
7  aluminum coils?
8      A.   No.  Denny started as a
9  manufacturer of aluminum foil that went
10 behind aluminum siding.  So that went
11 away.  And then we had -- we leased a
12 paint line, time on a paint line and we
13 made trim coil to match siding colors.
14 That's what Denny did.
15     Q.   And that trim coil --
16     A.   Aluminum trim coil.
17     Q.   Aluminum trim coil, was it
18 manufactured in the U.S.?
19     A.   It was.
20     Q.   Did the Denny building
21 company own the plant that manufactured
22 the aluminum trim coil?
23     A.   They did not.
24     Q.   Did the Denny building

Robert Scharf                                    March 24, 2011

29

1  company provide specifications to a plant
2  and they manufactured the coil to those
3  specifications?
4      A.   No, they specified how they
5  could make it and then we went out and
6  sold it.
7      Q.   And who's the they that
8  specified how it would be made?
9      A.   First American Coil.
10     Q.   And was that the facility
11 that manufactured the coil?
12     A.   That's correct.  They didn't
13 manufacture.  They painted the coil is
14 what it is.  You're fabricating.  The
15 coil is made I don't know where.  They
16 buy big bulks of coil and they re-route
17 them, cut them and they paint them.
18     Q.   Then they put the Denny
19 building products label on it and sell it
20 to you?
21     A.   No, I sold it.  They didn't
22 sell it.
23     Q.   Was that sold under the name
24 Denny Building Products?

30

1      A.   It was.
2      Q.   Did Denny Building Products
3  source any materials from China to your
4  knowledge?
5      A.   No.  No.
6      Q.   Prior to going to work for
7  Devon International Trading in 2004, had
8  you sourced any materials from China?
9      A.   No.
10     Q.   Had you sourced any type of
11 products from China prior to 2004?
12     A.   I had not.
13     Q.   What was your first position
14 with Devon International Trading?
15     A.   I was in sales.
16     Q.   What type of materials did
17 you sell when you first went to work for
18 them?
19     A.   Mostly building materials.
20     Q.   Do you remember the specific
21 materials?
22     A.   Well, we sold nails.  We
23 sold plywood.  I think that's about what
24 we sold.

31

1      Q.   And those were nails and
2  plywood that were manufactured in China?
3      A.   That's correct.
4      Q.   Eventually you made your way
5  up to president with Devon International
6  Trading?
7      A.   Well, there weren't too many
8  people in between.
9      Q.   When did you become
10 president?
11     A.   Maybe five, six months after
12 I started.
13     Q.   What were your duties as the
14 president of Devon International Trading?
15     A.   We just handled mostly
16 sales, trying to drive the sales.
17     Q.   That would be sales of
18 materials manufactured in China?
19     A.   Everything -- I believe
20 almost everything was manufactured in
21 China.
22     Q.   Who did you report to when
23 you became president?
24     A.   John Bennett.

32

1      Q.   He was the owner of the
2  company, wasn't he?
3      A.   Yes.
4      Q.   John Bennett, he owns all of
5  the Devon companies in the Devon family?
6      A.   I don't know.  I don't know
7  who owns what stock in what.  I have no
8  idea.
9      Q.   Did John Bennett report to
10 anybody on behalf of Devon International
11 Trading?
12     A.   I don't know.
13     Q.   Who worked underneath you?
14     A.   We had four or five
15 salespeople, and we had four or five
16 logistics people.
17     Q.   Then Ruth Wu was the vice
18 president of Devon International Trading,
19 right?
20     A.   That's correct.
21     Q.   So that time Ruth Wu would
22 have reported to you?
23     A.   Yes, she reported to me.
24     Q.   The four to five

Robert Scharf                                          March 24, 2011

33

1   salespeople, did they work here in the
2   U.S.?
3       A.   They worked in King of
4   Prussia.
5       Q.   You had some -- you said
6   four to five logistics people.  Some of
7   those worked in China, didn't they?
8       A.   No, nobody worked in China.
9   Nobody reported to me worked in China.
10      Q.   Do you recall the name of
11  these four to five logistics people?
12      A.   Well, Ruth was one.  There
13  was Shin Gin.  There was Shanna.  I don't
14  know her last name.  There was Amy who
15  came later, I think, Amy Lee.  And then
16  there's another woman from -- Taiwanese
17  woman and I can't remember her name.
18      Q.   Now, Devon employed some
19  project managers that worked in the
20  Shanghai office in China.  Is that right?
21      A.   Well, I don't know what you
22  mean by project manager.  They had an
23  office in Shanghai, and there were people
24  there.  I never used the term project

34

1   manager.
2       Q.   Did you read Ruth Wu's
3   deposition that she gave in this case?
4       A.   I did.  I did.
5       Q.   With respect to the duties
6   of the employees of Devon that worked out
7   of the Shanghai office, would you kind of
8   defer to her on that?
9       A.   Yeah, I had very little
10  contact.
11      Q.   Allied Building Products,
12  were they a wholesaler of building
13  products?
14      A.   Yes.
15      Q.   They didn't source or
16  manufacture any products, did they?
17      A.   No.
18      Q.   What about Royal Building
19  Products, were they a wholesaler?
20      A.   I don't think I know who
21  they are.
22      Q.   I thought you said you
23  worked for a company called World
24  Building Products?

35

1       A.   All Siding, Reynolds Metal,
2   All Side which is a U.S. Steel building
3   products division.  Then Royal Building
4   Products and Denny Building Products.
5       Q.   I just misunderstood you.  I
6   apologize.  Royal Building Products, were
7   they a wholesaler?
8       A.   No.
9       Q.   What type of business was
10  that?
11      A.   Well, wait.  Royal Building
12  Products sold and marketed products
13  manufactured by Royal Plastics in
14  Toronto, Canada, and we sold to building
15  distributors.
16      Q.   Did Royal manufacture the
17  products in Toronto?
18      A.   Royal Plastics manufactured
19  the products not Royal Building Products.
20      Q.   Was Royal Plastics a
21  division of Royal Building Products?
22      A.   No.
23      Q.   So Royal Building Products
24  imported the materials from Toronto --

36

1       A.   No, we just acted as a sales
2   and marketing company.  We sold it.  They
3   billed it out of Toronto.  They
4   manufactured it in Toronto.
5       Q.   Then you all just sold it to
6   people in the U.S.?
7       A.   That's correct.
8       Q.   So Royal Plastics would have
9   shipped that stuff into the U.S.?
10      A.   Yes.
11      Q.   How long did you work for
12  Devon International Trading?
13      A.   Maybe close to three years.
14      Q.   At some point in time the
15  name changed to Devon International
16  Industries, Inc., didn't it?
17      A.   Just as I was leaving.
18      Q.   Were you ever actually
19  employed by Devon International
20  Industries?
21      A.   I don't believe so.
22      Q.   Why did you leave the
23  employment of Devon International
24  Trading?

Robert Scharf                                    March 24, 2011

---

37

1      A.   Because of the drywall.
2      Q.   What we're here talking
3 about today?
4      A.   That's correct.
5      Q.   Can you be a little more
6 specific?
7      A.   No, I can't.  Sorry.
8      Q.   Did you leave on good terms?
9      A.   Yes, I did.
10      Q.   Have you done any business
11 with Devon since?
12      A.   I have not.
13      Q.   The drywall we're going to
14 talk about today that came into the U.S.
15 in 2006, was that your first involvement
16 with the sourcing or distributing of
17 drywall?
18      A.   Yes, it was.
19      Q.   And we've talked about some
20 aluminum products and nails and wood.
21 What other type of products had you
22 distributed before?
23      A.   With Devon?
24      Q.   In your business, I mean in

---

38

1 your employment?
2      A.   With Devon?
3      Q.   I'm just saying in general.
4      A.   In my career?
5      Q.   Yes, sir.
6      A.   Mostly aluminum siding,
7 vinyl siding, aluminum trim coil and some
8 roofing.
9      Q.   And then nails and wood when
10 you went to work for Devon?
11      A.   Well, we always sold nails
12 and wood when I was in the wholesaling,
13 not when I was manufacturing.  When I --
14 when I handled the products for Royal
15 Plastics it was just vinyl siding.
16      Q.   Give me your educational
17 background, please, sir.
18      A.   I went to Newark College of
19 Engineering in Newark, New Jersey.
20      Q.   Did you obtain a degree from
21 there?
22      A.   I did not.
23      Q.   About how many years did you
24 go there?

---

39

1      A.   About five.
2      Q.   And that was -- were you
3 seeking an engineering degree?
4      A.   I thought so.
5      Q.   But you didn't obtain --
6      A.   I did not.
7      Q.   Did you get any type of
8 associates or undergraduate degree?
9      A.   No.
10      Q.   Have you had any special
11 training in the sourcing or selling of
12 building products?
13      A.   Sourcing of building
14 products?
15      Q.   Sure.
16      A.   No.
17      Q.   Most of your training been
18 on-the-job?
19      A.   No.  No.  I worked for
20 Reynolds Metals and I worked for All
21 Siding which is a division of U.S. Steel.
22 Their training is where I learned how to
23 sell building products.
24      Q.   What type of training did

---

40

1 you have there?
2      A.   I don't understand that
3 question.
4      Q.   Sure.  What type of training
5 did you have that taught you about
6 selling building products?
7      A.   You have to learn the
8 product and you have to learn how to go
9 out and sell.  I think those were -- I
10 can't go through -- what type of
11 training, they had sales training.
12      Q.   You learned how to market
13 products and sell them to customers?
14      A.   Well, I can market, but we
15 were selling.  We weren't marketing then.
16      Q.   Were you hired to start the
17 building products division for Devon?
18      A.   I don't think so.
19      Q.   At some point in time did
20 you come up with a division called Devon
21 Building Products?
22      A.   Did I come up with a
23 division?
24      Q.   Yes, sir.

Robert Scharf                                    March 24, 2011

41

1      A.   I don't believe so.
2      Q.   And you've seen the name
3  Devon Building Products before, haven't
4  you?
5      A.   I have.
6      Q.   Who came up with that
7  division or --
8      A.   I don't know.
9      Q.   Devon Building Products, was
10 that just kind of a trade name under
11 which Devon International Trading
12 marketed some building products?
13     MR. BROWN:  Object to the
14 form.  You have to answer.
15     THE WITNESS:  I don't know.
16 BY MR. LAW:
17     Q.   Did you ever work for a
18 company called Devon Building Products?
19     A.   No.
20     Q.   Whose idea was it to import
21 drywall from China?
22     A.   NorPac was the one that made
23 the inquiry about drywall.
24     Q.   Who at NorPac made the

42

1  inquiry, the initial inquiry?
2      A.   I would think that would be
3  Jay Buckley.
4      Q.   Was NorPac having a hard
5  time finding domestic drywall for its
6  customers at that time?
7      A.   I don't know.
8      Q.   Tell me about the initial
9  inquiry from Mr. Buckley.
10     A.   He wanted to know if we
11 could get drywall made in China.
12     Q.   Do you know if North Pacific
13 or when Mr. Buckley came to you had
14 previously ordered any drywall from
15 China?
16     A.   Did I know that when he
17 first came to me?
18     Q.   Yes, sir.
19     A.   I did not know it.
20     Q.   You know that now?
21     A.   I'm aware of it now, yes.
22     Q.   Do you know why North
23 Pacific wanted to purchase drywall
24 imported from China as opposed to obtain

43

1  it from its domestic customers?
2      A.   It was less expensive.
3      Q.   The drywall manufactured in
4  China cost less to make than it did in
5  the U.S, didn't it?
6      A.   It cost less to buy for
7  sure.
8      Q.   And in turn North Pacific
9  could buy from Devon for a cheaper price
10 and sell it to its customers and have a
11 greater profit?
12     A.   I don't know what they did
13 with it.  All I know is what I paid for
14 it and what I could sell it to them for.
15     Q.   Did you do -- look into any
16 market prices for drywall that could be
17 purchased in the U.S. prior going to
18 China?
19     A.   I did.
20     Q.   Tell me what did you do to
21 find out about the market price of
22 drywall in U.S. versus China?
23     A.   I went across the street to
24 Home Depot and saw what they were selling

44

1  it for.
2      Q.   How much were they selling
3  it for?
4      A.   At that point it was about
5  $11.00 to $20.00 depending on the size,
6  and the year before it was maybe $7.00 a
7  board.  So now I realized that we
8  probably could buy it in China.
9      Q.   You said 11 to 20 depending
10 on size.  How much was the four by 12 by
11 half inch going for at that time?
12     A.   I think over there it was
13 like $21.00 a sheet.  But there's not a
14 big market in residential products in
15 home centers for four by 12 product,
16 board.
17     Q.   The four by 12 by half inch
18 it's used primarily in residential
19 construction, isn't it?
20     A.   No, not to my knowledge.
21 Four by eight is used in residential.
22 And I think five eighths is the most
23 common thickness for residential and you
24 can use half inch.  Four by 12 boards are

Robert Scharf                                                  March 24, 2011

45

1  usually used on commercial projects.
2       Q.   The half-inch drywall, it's
3  not for commercial applications, is it?
4       A.   No, they can use it for
5  commercial.  Sometimes they can double
6  it.  I don't know for sure.  And some
7  areas will put half and some people put
8  half inch in their house.  My guess is
9  your house has five eighths drywall.
10      Q.   Let's see, the drywall was
11  shipped on May 12th of 2006.  Is that
12  about right?
13      A.   Whatever you say.  You know.
14      Q.   We'll get to some documents
15  in a minute.  What year was it that you
16  went to Home Depot and saw that the four
17  by 12 was selling for $21.00 a sheet?
18      A.   Probably five or six months
19  before it was shipped, four months
20  before.  February of that year I think
21  around that, maybe January.
22      Q.   January to February of 2006?
23      A.   Yeah.
24      Q.   Did you do anything else to

46

1  try to find out the market price of four
2  by 12?
3       A.   No.
4       Q.   For the drywall?  And how
5  much could you get the drywall made for
6  in China around that time?
7       A.   We'd have to check.
8  Somewhere it's in here.  But I'm going to
9  say around 2.50 a board maybe we were
10  paying for.
11      Q.   How much was North Pacific
12  going to pay to Devon per board?
13      A.   I don't know.  We hadn't
14  discussed it at that time.  We were going
15  to act as a broker for them.
16      Q.   When did you learn that
17  North Pacific had tried to obtain some
18  drywall from China before they went to
19  Devon?
20      A.   I don't know if they did it
21  before they went to Devon, but they
22  ordered some drywall from the same
23  factory before we ordered the drywall
24  from that factory.

47

1       Q.   This would be what I've seen
2  in some documents refer to as a Phoenix
3  load?
4       A.   Yes, I would say so.
5       Q.   Were you present when the
6  Phoenix load, when that drywall was
7  manufactured?
8       A.   Not knowingly.
9       Q.   What do you mean by not
10  knowingly?
11      A.   Well, if I was at the
12  factory and they were making it, I didn't
13  know they were making it for Phoenix.
14      Q.   Okay.  And I know you were
15  present when some drywall was being
16  manufactured in China, weren't you?
17      A.   I saw some drywall being
18  manufactured in China.
19      Q.   But you don't know if any of
20  that was the drywall that ended up in the
21  Phoenix load that North Pacific ordered?
22      A.   What I saw being made?
23      Q.   Yes, sir.
24      A.   I don't think so.  I think

48

1  that was way after the fact the Phoenix
2  stuff shipped.
3       Q.   And at some point in time
4  you went to China and the drywall that
5  was part of the Phoenix load it was
6  already trucked to the port to be shipped
7  out, wasn't it?
8       A.   No, wait.  Would you repeat
9  that?
10      Q.   Sure.  The Phoenix load of
11  drywall was about 200,000 sheets, wasn't
12  it?
13      A.   I was told it was 200,000
14  sheets.
15      Q.   When you went to China at
16  some point in time on your initial visit,
17  didn't you see the Phoenix load --
18      A.   Well, they only been to that
19  factory the day before I was there for
20  the first time.  Phoenix was there with
21  somebody from NorPac the day before we
22  were there -- I was there with Julian,
23  first time I was there.
24      Q.   Have you seen any test

Robert Scharf                                        March 24, 2011

49

1  reports that pertain to the testing of
2  any drywall that made up this Phoenix
3  load?
4      A.   I saw some test reports.  I
5  don't know whose -- can we clarify
6  something about this?
7      Q.   Sure.
8      A.   When a factory gets ASTM
9  approval, what they are saying is when
10  they stamp it everything they make, that
11  they have that stamp on is made to ASTM
12  standards and has met that approval,
13  everything.  Then somebody at customs or
14  somebody, an inspector on-the-job or if
15  somebody challenges that then they have
16  to -- then there's a problem.
17          It's not that they get ASTM
18  approval on every order on every load
19  that they make.  The factory sends --
20  supplies their samples to the testing
21  agency.  They get the approval, and then
22  it's up to the factory to manufacture to
23  the standards that was the ASTM standard,
24  that they said, 3364, whatever it was.

50

1  That's how that works.  Nobody checks
2  every panel or every run that the factory
3  makes.  The factory has been certified
4  that they make their product to adhere to
5  ASTM standards.
6      Q.   How many since this load of
7  drywall we're here to talk about today,
8  how many times have you been involved in
9  the purchase of drywall or sourcing of
10  drywall?
11     A.   That's the only time.
12     Q.   And how many factories did
13  you look at in China before it's
14  determined which factory would
15  manufacture the drywall for North
16  Pacific?
17     A.   I saw three and perhaps
18  four, but three I can remember for
19  certain.
20     Q.   And do you know if any of
21  those three factories had this ASTM
22  approval you just mentioned?
23     A.   I would doubt it.
24     Q.   Why would you doubt it?

51

1      A.   Because they were really not
2  very nice factories.
3      Q.   What was not nice about
4  them?
5      A.   Well, they had a lot of
6  filler.  The product wasn't good.  They
7  were -- they were more like I would call
8  a rinky dink type of operation as opposed
9  to the factory that we bought the drywall
10  from.
11     Q.   What is filler?
12     A.   I don't know what they used
13  for filler, but it's not gypsum.  And I
14  think that's where the weight issues come
15  in with Chinese drywall is that when they
16  use a lot of filler it's heavier.  To me
17  it looked like they had yards -- these
18  other factories had yards of cinders, but
19  I don't know for sure.  I don't know what
20  that is.
21     Q.   And gypsum drywall is
22  supposed to be made up of gypsum that
23  comes out of a mine?
24     A.   I really don't know.  I

52

1  don't know that much about drywall.
2      Q.   But when you say filler,
3  that's a material other than gypsum?
4      A.   I would think so.
5      Q.   And how did you know these
6  three factories that you visited used all
7  these fillers?
8      A.   You could see it.
9      Q.   You see it laying around?
10     A.   You see it on the line.  You
11  could see like stones on the line and
12  they were covering them up.
13     Q.   What are cinders?
14     A.   Well, I'm thinking like from
15  furnaces and stuff, whatever they dig
16  out, that's the only thing, like a cinder
17  track or something that they have.  It
18  just looked like heavy gravel, but it
19  wasn't gravely.  I didn't go in and
20  inspect it.  They just had piles of it in
21  the yards there.
22     Q.   Like fly ash?
23     A.   I don't know, but those
24  factories when you pulled up there was a

Robert Scharf                                              March 24, 2011

53

1  terrible odor coming out.
2      Q.   What type of odor?
3      A.   I don't know, but it was
4  bad.
5      Q.   Was it kind of like a
6  burning firecracker type --
7      A.   You get that same odor in a
8  lot of the public restrooms in China.  So
9  I'm not sure what that is.  It's not a
10  manure odor or something like that.  It's
11  some type of chemical odor.
12      Q.   Back to these cinders, was
13  it like fly ash --
14      A.   I don't know what fly ash
15  is.
16      Q.   You know what ash --
17      A.   I don't.  Well, I know what
18  ashes are.  I don't know what they use or
19  what they clean their furnaces with or
20  how they do it.  I don't know.
21      Q.   Did the cinder kind of look
22  like ashes?
23      A.   No, it looked like little
24  pebbles that were like burnt.  That's

54

1  what it looked like to me.  That's not at
2  our factory that we bought from.
3      Q.   I'm going to get to that.
4      A.   That's strictly at these
5  other factories that I visited.
6      Q.   I'm going to get to that.
7  These other factories that you visited,
8  did you ask for any of their ASTM
9  approval or any documents indicating
10  approval?
11      A.   No.
12      Q.   How do you know which
13  factories have the ASTM approval that you
14  mentioned?
15      A.   How do I know?  I don't
16  know.
17      Q.   Because you described to me
18  once a factory has ASTM approval --
19      A.   That's in any product, any
20  building product.  We brought in windows
21  that were ASTM -- had the ASTM approvals
22  on them.  They got the windows approved.
23      Q.   Do you know if those windows
24  were ever tested?

55

1      A.   Yes.
2      Q.   Those are the windows --
3      A.   Well, there's a lot of
4  different windows.  No.  Yes, the windows
5  were tested.  The ones you are talking
6  about were tested.
7      Q.   They were tested in the U.S.
8  once they got here?
9      A.   They were tested in the U.S.
10      Q.   Do you know if they passed?
11      A.   They passed.
12      Q.   And there's different test
13  standards for windows, the AMMA test
14  standards.  You're familiar with those?
15      A.   A little bit, but they count
16  it as their own testing and they were
17  approved with Dade County which is very
18  stringent testing.
19      Q.   The three factories that you
20  just described that had the fillers and
21  smelled bad, you didn't ask them for any
22  ASTM --
23      A.   I didn't ask for anything.
24  I just got out.  After we walked in we

56

1  walked out.
2      Q.   You talked about those
3  three.  Did you look at some other
4  factories?
5      A.   Not drywall factories, no.
6      Q.   The three you just
7  described, were they all in the Shandong
8  providence?
9      A.   They were.
10      Q.   Do you know if the gypsum
11  used to manufacture the drywall that
12  Devon brought to the U.S. came out of the
13  same mine that these other three
14  factories got their gypsum --
15      A.   I have no idea.
16      Q.   So the three you described,
17  when you were present you saw all the
18  filler on the conveyor belts --
19      A.   It wasn't drywall that I
20  would buy.
21      Q.   How many times were you
22  present when the drywall that Devon
23  imported was being manufactured?
24      A.   I don't know that I was ever

Robert Scharf                                    March 24, 2011

57

1  present when that was being manufactured.
2      Q.   Ultimately, you found a
3  factory that could manufacture the
4  drywall for North Pacific?
5      A.   That's correct.
6      Q.   Tell me about that factory.
7      A.   That factory was -- we
8  pulled up.  It looked like a hospital
9  that was -- that factory was like five
10  football fields wide by seven football
11  fields long and you could perform surgery
12  on the floor in there today.  So it was
13  not anything like we had seen before.
14           And we went through.  We sat
15  down, and we negotiated a deal.  They had
16  just sold 200,000 pieces the day before
17  to this Phoenix company.  And then
18  somebody from NorPac was with them.
19      Q.   Do you know who the guy from
20  NorPac who --
21      A.   No, I don't know.  I'm
22  sorry.  Repeat your question.
23      Q.   The gentleman from NorPac
24  that was with them --

58

1      A.   No, I don't know who that
2  was.
3      Q.   The drywall after it was
4  manufactured at the factory, was it
5  stored at that same factory or was it
6  stored somewhere else?
7      A.   I don't know.  I assume it
8  was -- am I allowed to assume?  I assume
9  it was stored in that factory.  It was
10  shipped from that factory.
11      Q.   Now, we've seen some
12  photographs of a whole bunch of
13  drywall --
14      A.   I have.
15      Q.   Was that drywall in those
16  photographs in the same location where
17  the drywall was manufactured?
18      A.   I believe so.  Well, I don't
19  know which photograph -- I don't know
20  whether you saw it in Pensacola or you
21  saw it at the port or you saw it at the
22  factory.  I don't know what photographs.
23      Q.   We'll get to those.  What I
24  want to know is how often were you

59

1  present when the drywall is actually
2  being made that Devon brought into the
3  U.S.?
4      A.   I don't know that I was ever
5  present with the drywall that Devon was
6  being made was brought into the U.S.
7      Q.   Did you ever go visit a
8  gypsum mine where the gypsum came out of?
9      A.   No.
10      Q.   Do you know how close it was
11  in proximity to the factory?
12      A.   I was told it was in the
13  backyard.
14      Q.   Did you see it?
15      A.   No.
16      Q.   These other three factories
17  that you described, did you see a gypsum
18  mine near those three factories?
19      A.   No, I would doubt that they
20  were miners, but I don't know.
21      Q.   How far apart were the three
22  you looked at versus the one where the
23  gypsum -- where the drywall was
24  manufactured for North Pacific?

60

1      A.   Maybe an hour car ride, each
2  one was an hour apart.
3      Q.   The trip you described where
4  you saw the three factories, was that
5  your first trip to China?
6      A.   To China, no.
7      Q.   Was it your first trip to
8  look for drywall?
9      A.   Yes.
10      Q.   Did any of Devon's employees
11  in the Shanghai office, had they -- did
12  they accompany you on this trip to look
13  at these three factories?
14      A.   Yes.
15      Q.   Who would have been with
16  you?
17      A.   Julian Chu.
18      Q.   Anybody else?
19      A.   No.
20      Q.   Had Mr. Chu already been to
21  those factories?
22      A.   No.
23      Q.   Do you know if he obtained
24  any specifications or test reports from

Robert Scharf                                      March 24, 2011

61

1   those factories?
2       A.   No, he had not.
3       Q.   He knew where they were,
4   didn't he?
5       A.   I don't think so.
6       Q.   Did anybody do any research
7   or try to find out where the factories
8   were that you were going to look at?
9       A.   Where they were?
10      Q.   Like how to -- you had to
11  know how to get to them, didn't he?
12      A.   Yeah.  When you say research
13  on where they were, it didn't matter to
14  me where they were located.
15      Q.   And that was a poor
16  question.  Who found out where the
17  factories were located that you went to
18  inspect?
19      A.   I think Julian did or
20  somebody in their office did.
21      Q.   Did he tell you what type of
22  investigation he did to try to find these
23  factories?
24      A.   I imagine he went online to

62

1   look.
2       Q.   Did a little Internet
3   research?
4       A.   I would think so.
5       Q.   And do you know if Ruth Wu
6   or anybody from Devon in the U.S --
7       A.   I would think Ruth did, too.
8       Q.   When you went to the factory
9   that you said you described as clean and
10  looked like a hospital, did you ask for
11  any ASTM approval standards from them?
12      A.   Not at that time, no.
13      Q.   Did you ask for any test
14  reports from them?
15      A.   Not at that time.
16      Q.   Did you later ask for any
17  test reports or ASTM approval standards
18  from the factory?
19      A.   I asked them -- when I went
20  back a second time, when we placed the
21  order, I asked them they have to have
22  ASTM approval and they already had it
23  they told me.  I said, okay.  They
24  certified they had ASTM approvals.

63

1   That's all I needed.  That's what I
2   needed for NorPac.  That's what they
3   wanted.  And they had been there.  They
4   seen the plant.  They got samples from
5   the plant.
6       Q.   So somebody from the plant
7   told you that they had the ASTM approval.
8   Is that a yes?
9       A.   Yes.
10      Q.   You mentioned some certified
11  ASTM standards.  Did they have any type
12  of document they gave you that showed
13  they had a certification?
14      A.   They didn't give it to me,
15  but I believe they furnished it for
16  NorPac.
17      Q.   Do you know when they
18  furnished this document?
19      A.   I don't know.
20      Q.   Did they furnish it later on
21  down the road --
22      A.   No, I don't know when they
23  got it.  I just know that they got it at
24  some point because they didn't ask me for

64

1   it any more.
2       Q.   You never saw any type of
3   ASTM certification document, did you?
4       A.   Certification document?  No,
5   I didn't see that, no.
6       Q.   And you never seen any test
7   reports that would indicate that the
8   drywall that Devon purchased from this
9   factory met ASTM 1396, have you?
10      A.   I saw test reports, the ASTM
11  test reports, and first ones I saw I
12  think they were in Chinese.
13      Q.   Do you know how many test
14  reports you saw?
15      A.   Two.
16      Q.   Do you know what size
17  drywall they were for?
18      A.   One was different, I know
19  that.  I don't know about the -- one was
20  North Pac had tested and one I think
21  Phoenix had tested.
22      Q.   Who gave you these test
23  reports?
24      A.   Well, NorPac gave us one.  I

Robert Scharf                                                    March 24, 2011

65

1  don't know where we got the other one
2  from.
3        Q.   Was the one NorPac gave you
4  in Chinese?
5        A.   No, theirs is from a testing
6  lab in Houston.
7        Q.   Have you seen that test
8  report in any of these documents?
9        A.   No, I have not.
10       Q.   And you went through the
11 document produced --
12       A.   But it was there with the
13 depositions we did in Atlanta.
14       Q.   That would be the
15 depositions that you gave in the NorPac
16 case?
17       A.   Yeah, that document was
18 there somewhere.
19       Q.   And did that test report
20 pertain to some drywall that came out of
21 this Phoenix load we've talked about?
22       A.   Well, I'm not -- no.  No.
23 All right.  You keep saying out of a
24 load.  Nothing comes out of a load to be

66

1  tested.  The factory gets certified or
2  they test how they make their product.
3  So I believe that it was the factory sent
4  samples to NorPac, and they were probably
5  full sheets.  And then I don't know
6  whether they sent them because I
7  requested them or because the Phoenix
8  people requested them, but NorPac got the
9  samples and they were sent to Houston to
10 a testing lab in Houston and they had it
11 tested.
12       And the NorPac controller
13 told me that it -- such great material.
14 It blew away every ASTM standard but one
15 and that was equal to.  And it exceeded
16 every ASTM standard.  That's what their
17 test reads.  And that's what the
18 controller of NorPac told me.
19       Q.   Do you remember that
20 gentleman's name?
21       A.   Well, there's two.  There's
22 either Johnson or Jackson.
23       Q.   Frank Johnson?
24       A.   Yeah, it was Frank Johnson

67

1  and George Jackson.  I think George was
2  the one that was the controller.
3        Q.   Do you know if these sheets
4  they tested, if they were three full size
5  sheets?
6        A.   Do I know for a fact?  No,
7  but I would think that that's what they
8  would be.
9        Q.   And we're going to get into
10 some documents in a minute where North
11 Pacific requested some samples on the
12 drywall.  You recall that, don't you?
13       A.   Uh-huh.  That was Jay
14 Buckley that was requesting.  Apparently,
15 this other fellow in the office who dealt
16 with Phoenix, Jay was going to get a
17 commission on that.  So they were like
18 competitors with each other at that
19 point.  So Jay was asking for samples.
20 Then all of a sudden he didn't need them
21 anymore because the samples showed up.
22 So that's what happened.
23       Q.   Did you or anybody at Devon
24 ever ship any samples to North Pacific?

68

1        A.   We shipped them some small
2  pieces for sale samples.
3        Q.   They weren't full-sized
4  sheets, were they?
5        A.   No.  They couldn't be tested
6  those pieces.  We wouldn't test those
7  pieces.
8        Q.   Did you or anybody at Devon
9  ever ship three full size sheets to the
10 U.S. for testing?
11       A.   No, I did not.
12       Q.   Anybody at Devon?
13       A.   No.  Well, I don't believe
14 so.
15       Q.   We'll mark as Exhibit-2 the
16 notice of your individual deposition
17 today.  Wherever that is.  We'll get to
18 it.  Exhibit-3 is going to be an E-mail
19 from Mr. Buckley to you.  You've seen
20 this E-mail before getting ready for
21 deposition, haven't you?
22       MR. ROBERTSON:  Can you
23 identify it?
24       MR. LAW:  Again, I'm not

Robert Scharf                                      March 24, 2011

69

1   going to refer to every Bate stamp
2   on every document on camera, but
3   it's Devon 7199.
4   BY MR. LAW:
5       Q.   For your information they go
6   in reverse order --
7       A.   I'm reading the bottom.  I
8   didn't realize -- I haven't seen this,
9   no.
10      Q.   Well, take your time and
11  read it and tell me when you are done.
12      A.   Okay.
13      Q.   I'm going to start on the
14  second page of the first E-mail from you
15  to Jay Buckley at the bottom there.  And
16  you carbon copy Mr. Bennett on it.  And
17  you noted in there that John Bennett will
18  visit early next week.  If product is
19  good, we'll get their other dime.
20          Did Dr. Bennett go to China
21  to look at some factories with you?
22      A.   No, he didn't go with me.
23      Q.   Do you know if he went to
24  look at some factories?

70

1       A.   No, he didn't go look at
2   factories.  He was in China when this
3   came up, and he was -- I believe he was
4   going to go look at a factory, and it was
5   during Chinese New Year so everything
6   shut down.  So I'm not sure that he ever
7   got to the factory.
8       Q.   You noted they will make
9   according to our spec.  Whose spec were
10  you referring to there?
11      A.   North Pacific.
12      Q.   So North Pacific provided
13  some specifications to Devon, and Devon
14  took those to the factories to try to
15  find a factory that could manufacture it
16  to the specifications?
17      A.   No.  Well, I don't know what
18  you mean by specifications.  We didn't
19  specify percentages of gypsum or -- the
20  only specifications they would have would
21  be the thickness and the size of the
22  board and they were concerned about the
23  weight of the product.  So that was the
24  weight being within 50 or 60 pounds,

71

1   whatever the weight was.  That's the only
2   -- that's what they were concerned with
3   from us.
4       Q.   So that's what you are
5   referring to there when you said they
6   will make according to our spec?
7       A.   Yes.
8       Q.   So you took those specs to
9   try to find a factory that could make it
10  according to those specs?
11      A.   Yeah, but I'm not
12  comfortable with the word specs because
13  all it is is a size, half inch four by 12
14  board.  That's the specs.
15      Q.   And I'm just going with the
16  language you use?
17      A.   Yeah, I know, but I'm just
18  saying that's what the specs are.
19      Q.   All right.  So these specs
20  you describe, the weight and the size --
21      A.   The size.
22      Q.   You took those, looked for a
23  factory that could make it to those
24  specs?

72

1       A.   To that size, okay.
2       Q.   All right.  There's an
3   E-mail above in response to Mr. Buckley
4   to you in the middle of the page.  And he
5   lays out some items he's requesting.  He
6   says he needs a letter stating material
7   safety data sheet MSDS.  In your
8   experience, you've reviewed MSDS sheets
9   before, haven't you?
10      A.   Most likely.
11      Q.   What is an MSDS sheet?
12      A.   I really -- I don't know.  I
13  sell it, you know, whatever the
14  manufacturer specs were.  I think we ever
15  furnished anything for him.
16      Q.   That was my next question.
17  Did you ever give Mr. Buckley or anybody
18  at NorPac an MSDS sheet from this
19  factory?
20      A.   No.  Whatever they wanted
21  from me, they wound up getting it on
22  their own.  You'll see when you go
23  through these at some point his requests
24  for all this stuff just stops.  It's

Robert Scharf                                    March 24, 2011

73

1   because they got it from Phoenix.  At the
2   time they didn't want me to know too much
3   about what was going on with Phoenix.
4       Q.   Have you seen an MSDS from
5   the Phoenix load that you are referring
6   to?
7       A.   I don't believe so.
8       Q.   So you are just assuming
9   that they got an MSDS sheet --
10      A.   No, I don't know what they
11  got.  Whatever they got -- whatever they
12  got they stopped asking me for whatever,
13  and I never heard from them again about
14  anything about reports or anything.
15      Q.   So you or anybody at Devon,
16  you all didn't go to a factory and ask
17  for an MSDS sheet?
18      A.   No, I never.
19      Q.   Were you going to try to get
20  one when Mr. Buckley kept asking you for
21  one?
22      A.   Well, I wasn't sure what I
23  was going to do.
24      Q.   But eventually he quit

74

1   asking and so you just didn't get one?
2       A.   He got it.  He got whatever
3   he needed.  He got the samples and he got
4   everything he needed.  So we didn't have
5   to furnish him with anything else.
6       Q.   And he asked for a letter
7   regrind ASTM standards.  You're going to
8   give me the same explanation that you
9   think he got it?
10      A.   He didn't get it from me.
11      Q.   That Devon never provide any
12  type of letter specifying ASTM?
13      A.   That's correct.  Well, I
14  don't know -- no, we never provided a
15  letter or not.
16      Q.   Did Devon ever provide any
17  test reports?
18      A.   Never provided any test
19  reports.
20      Q.   You got to let me finish my
21  question.  I just want to make sure that
22  we got a full and complete record.
23      A.   Okay.
24      Q.   And I'm going to try and

75

1   never cut you off.  If I do, you can --
2       A.   Well, I thought you stopped.
3   That was a long pause.
4       Q.   Devon never provided any
5   ASTM test reports indicating that the
6   material met the ASTM standards.  Is that
7   correct?
8       A.   That's correct.
9       Q.   What is the 178 MSF?  What
10  does that mean?
11      A.   Thousand square feet.
12      Q.   $178 dollars?
13      A.   Thousand square feet.
14      Q.   And Mr. Buckley asked for
15  five containers.  He really meant five
16  boats as he indicated in his E-mail.  Was
17  North Pacific planning on buying several
18  more boats --
19      A.   They were planning on buying
20  one a month for a year.
21      Q.   I saw a reference to 18
22  boats in one year.  Is that right?
23      A.   I remember one a month for a
24  year.

76

1       Q.   And those would be full size
2   break bulk --
3       A.   They would be equivalent to
4   what we shipped before depending on the
5   size of the ship.
6       Q.   In this E-mail, Exhibit-3,
7   Ruth references the spec sheet from the
8   factory and the weight of the board.  And
9   Mr. Buckley thought that was too heavy,
10  didn't he?
11      A.   I don't know.  Where are we
12  at now?
13      Q.   I'm on Ruth Wu's E-mail on
14  the bottom, and it actually starts on
15  page two.  She references a spec sheet
16  from the factory, and her response to Mr.
17  Buckley on page one says this is really
18  heavy.
19      A.   I'm not sure what she meant
20  by this.
21      Q.   And you don't know what
22  factory any spec sheets came from, do
23  you?
24      A.   Spec sheet from the factory?

Robert Scharf                                    March 24, 2011

77

1  No, I don't believe there is a spec sheet
2  from the factory.  Maybe she saw
3  something in Chinese that I never saw.
4  So you'd have to ask her.
5       Q.   As of January 20th you
6  hadn't been to China yet to look at these
7  factories, had you?
8       A.   January 20th, no, I had not.
9       Q.   There's another E-mail from
10 Mr. Buckley in the top third, and he
11 mentioned again trying to get the weight
12 down and said the contractors raise a lot
13 of hell about the extra weight.  And he
14 goes on to say it can't be over 55 to 60.
15           Was that your understanding
16 that North Pacific wanted a board that
17 didn't weigh anymore than 55 to 60
18 pounds?  And that was one of these spec
19 issues we talked about, wasn't it?
20      A.   He had heard that the
21 Chinese drywall could be 90 pounds a
22 board, all different weight.  So I think
23 that maybe is equivalent to what the
24 weight is in the U.S. for drywall.

78

1       Q.   And was that one of the
2  specs that we've talked about that North
3  Pacific wanted a board manufactured that
4  didn't weigh any more than 50 to 60
5  pounds?
6       A.   I think so.
7       Q.   That's what Mr. Buckley was
8  telling you in Exhibit-3, wasn't it?
9       A.   Yeah.
10      Q.   And you mentioned the weight
11 may have something to do with the fire
12 rating.  Where did you get that
13 information from?
14      A.   What fire rating?
15      Q.   I'm referring to Exhibit-3,
16 your E-mail to Mr. Buckley at the top.
17 You said --
18      A.   I don't think we needed half
19 inch fire rated.  We will know this
20 should be -- oh, well, fire rated maybe
21 weighs more.
22      Q.   Where did you get that
23 information?
24      A.   I would assume it weighs

79

1  more.  It has to have a fire rating.  It
2  has to hold the flame for two hours or
3  four hours where standard drywall
4  doesn't.  So it has to be denser or the
5  paper has to be -- something has to be
6  different on it.
7       Q.   In any event, you found a
8  factory that could make the board to
9  North Pacific specifications that didn't
10 weigh more than 60 pounds?
11      A.   I don't know whether he's
12 talking about fire rated here or he's
13 talking about what he bought.
14      Q.   I'm just asking you --
15      A.   The factory that we had,
16 they approved, NorPac approved their
17 pounds.
18      Q.   And the specs that you
19 talked about that you had the weight and
20 size to find a factory that could make it
21 to the weight and size, eventually Devon
22 found a factory that could make this
23 drywall to the specific weight and size
24 that North Pacific wanted.  Is that

80

1  correct?
2       A.   Well, the factory that we
3  went to is the one that could make it.
4           MR. BROWN:  John, before you
5       go to the next exhibit.  I'm
6       sorry.  Can we take a little
7       break?
8           MR. LAW:  Sure.
9           THE VIDEOTAPE TECHNICIAN:
10      Going off the record.  Time on
11      video is 10:25.
12                - - -
13          (Whereupon, a brief recess
14      was taken.)
15                - - -
16          THE VIDEOTAPE TECHNICIAN:
17      We're now back on the record.  The
18      time on video is 10:46.
19 BY MR. LAW:
20      Q.   Mr. Scharf, you recall
21 giving the deposition that we discussed
22 earlier in the North Pacific matter,
23 don't you?
24      A.   I do.

Robert Scharf                                    March 24, 2011

81

1    Q.   And that was back on October
2  16th of 2007.  That was much closer in
3  time to the date the drywall came in the
4  U.S. than today, wasn't it?
5    A.   That's correct.
6    Q.   Your mind is probably a
7  little more fresh with respect to the
8  facts back than that it is today, wasn't
9  it?
10   A.   I don't know.  Should be.
11   Q.   And you were under oath when
12  you gave that deposition, weren't you?
13   A.   I believe so.
14   Q.   Everything you said in that
15  deposition was true and accurate to the
16  best of your knowledge, wasn't it?
17   A.   It was.
18   Q.   I'm going to show you a copy
19  of that, and I've got a question about on
20  page 11 if you'd take a look at it,
21  please.
22   A.   Yes.
23   Q.   And you started on page ten.
24  You were describing what Devon

82

1  International did, and you mentioned that
2  they did a little plywood and some
3  motorcycles and plastics at the bottom of
4  page ten there.
5    A.   Yes.
6    Q.   And then over on page 11 you
7  were asked about sourcing.  And I'm on
8  line six on page 11, and you said, no,
9  everything was in China, but they didn't
10  buy anything at that point on spec.
11  Everything was for somebody's purchase
12  order.
13        And the question to you is
14  what did you mean by they didn't buy
15  anything at that point on spec?
16   A.   Nothing came in and was
17  warehoused and resold in less than
18  container loads.  Everything they sourced
19  they would have a customer for like the
20  drywall.  They gave us an order for an
21  entire boat.  We weren't out selling
22  drywall in the United States to anybody.
23   Q.   The drywall was made on
24  spec, wasn't it?  Meaning --

83

1    A.   No.  No.
2    Q.   -- from specs that we talked
3  about?
4    A.   No.  No.  That's not what I
5  mean by spec.
6    Q.   What did you mean by spec --
7    A.   Spec load was that it came
8  in.  You put it in a warehouse someplace
9  and you resold it.  You didn't have a
10  customer for it.  You were speculating on
11  the sale of it.  That's what that meant.
12   Q.   So you didn't mean by
13  specifications there?
14   A.   No.
15   Q.   I'm going to mark as exhibit
16  number four another series of E-mails.
17  Again, they start on the second page
18  which I'm not too interested in.  What
19  I'm going to ask you about is an E-mail
20  from Mr. Buckley on the bottom to you and
21  he's referencing some documents that are
22  needed down there and there's a list.  Do
23  you see that?
24   A.   I see it, yes.

84

1    Q.   And Mr. Buckley here back in
2  January of 2006, he was giving you a list
3  of items that North Pacific needed to
4  provide to some of its big customers of
5  drywall.  Is that correct?
6    A.   That's correct.
7    Q.   Do you recall who any of
8  those big customers were?
9    A.   No, I don't know any of
10  them.
11   Q.   And he mentioned in here the
12  weight again, and then he also mentioned
13  a certificate of formaldehyde omission,
14  item number four.  Do you see that?
15   A.   Yes.
16   Q.   Did you ever obtain a
17  certificate of formaldehyde omission to
18  provide to North Pacific?
19   A.   No.
20   Q.   He's requested a
21  specification sheet, and I think we
22  talked about that.  And you never
23  provided a specification sheet?
24   A.   I didn't we -- I didn't

Robert Scharf                                    March 24, 2011

85

1  provide it.
2       Q.   He asks about voids in the
3  board.  What does that mean?  What are
4  voids in the board?
5       A.   There's no product, holes,
6  missing.
7       Q.   Did you ever see when you
8  went to some of these other factories any
9  boards that had voids in it?
10      A.   I didn't notice.  I didn't,
11  you know, look that carefully, but I know
12  that they are famous for having for
13  having too much in one spot and not
14  enough in another spot and have voids.  A
15  lot of their products they do that with.
16      Q.   You say they being the
17  products made in China?
18      A.   Yes, correct.
19      Q.   So they actually would have
20  the paper on each side but wouldn't have
21  any gypsum --
22      A.   They'd be missing, voids.
23      Q.   That would be a
24  manufacturing defect, wouldn't it?

86

1       A.   I don't know what it was.
2  It may not be a defect.  They may try to
3  do it.  I don't know.
4       Q.   It's not supposed to be made
5  that way, is it?
6       A.   Not for us.
7       Q.   And then he asks in number
8  eight a copy of a stamp on each sheet
9  equal to or exceeds ASTM.  Do you see
10  that?
11      A.   Yes.  I believe the drywall
12  had it all -- it was on every piece of
13  drywall.
14      Q.   And you knew back in January
15  of '06 that those were documents that
16  North Pacific needed to provide to its
17  customers to rely upon?
18      A.   I don't know -- I know what
19  Jay wanted.  I'm not sure.
20      Q.   Well, he wanted those
21  documents we just talked about to provide
22  to his customers that would be customers
23  of North Pacific.  Is that right?
24      A.   You have to ask Jay.  I know

87

1  what he asked me for, but I'm not sure
2  what he -- I don't know what he wanted
3  them for.
4       Q.   What was North Pacific going
5  to do with all this drywall?
6       A.   They sold it.
7       Q.   And they were selling it to
8  their customers?
9       A.   And I believe they pre-sold
10  it also.
11      Q.   And they pre-sold it to
12  wholesalers?
13      A.   I don't know who they sold
14  it to.
15      Q.   And to your knowledge did
16  they sell directly to builders or did
17  they sell to other customers like BMW?
18      A.   No, I'm not sure -- I really
19  don't know who they sold to.
20      Q.   You and Mr. Buckley never
21  talked about who the North Pacific
22  customers were?
23      A.   The last thing he would tell
24  me was who his customers were.

88

1       Q.   Why wouldn't he want you to
2  know his customers was --
3       A.   So that he wouldn't want me
4  to go after his customers.
5       Q.   He wouldn't want you or
6  Devon --
7       A.   To try and -- that's
8  correct.
9       Q.   If you went directly to
10  North Pacific's customers, you could have
11  sold it to them cheaper than North
12  Pacific was selling it to them, couldn't
13  you?
14      A.   I don't know.
15           MS. CALDWELL:  Object to the
16  form.
17  BY MR. LAW:
18      Q.   Well, North Pacific would
19  have to buy --
20      A.   Well, I wouldn't go to North
21  Pacific customers.
22      Q.   I'm just trying to find out
23  why North Pacific wouldn't want you to
24  know who their customers were.

Robert Scharf                                          March 24, 2011

89

1      A.    No distributor of products
2  would want any of their manufacturers to
3  know in any product that I'm aware of who
4  their customers are as a rule.
5      Q.    Why would the distributors
6  not want the --
7      A.    Because some manufacturers
8  sell direct and some don't.
9      Q.    Some manufacturers sell
10  direct to the customers --
11      A.    That's correct.
12      Q.    Some of the manufacturers
13  sell directly to the customers and cut
14  out the middle man, that would be the
15  wholesaler?
16      A.    Some factories sell products
17  direct and some factories don't sell them
18  direct.  I don't know who they are
19  cutting out.
20      Q.    North Pacific, they were a
21  wholesaler, weren't they?
22      A.    I'm not sure what they were.
23  They sold a lot of salvage material.  I'm
24  not sure what they were.  I'm really not.

90

1      Q.    You had sold products
2  besides drywall on behalf of Devon to
3  North Pacific before, haven't you?
4      A.    I have.
5      Q.    What type of products did
6  you sell to them?
7      A.    They bought windows.  They
8  bought motorcycles, dirt bikes.  They may
9  have bought some nails.  I'm not sure.
10      Q.    Do you know if any of those
11  windows were sold in any Home Depots or
12  Lowe's?
13      A.    No.
14      Q.    They weren't or you don't
15  know?
16      A.    I don't know.
17      Q.    I'll show you exhibit number
18  five is an E-mail from Jay Buckley to
19  you, and it starts at the bottom of
20  Exhibit-5.  He's asking for a warranty
21  from Devon there, isn't he?
22      A.    Not from Devon.  The
23  warranty, if there's a warranty it comes
24  from the manufacturer.

91

1      Q.    It says here would you be
2  willing to furnish something in writing
3  as to your warranty policy?
4      A.    The only thing he would --
5  the only thing I would warranty is if we
6  damaged material in shipping we would
7  replace it.  I have no warranty.
8      Q.    And this document is an
9  E-mail from Mr. Buckley to you, isn't it?
10      A.    From Jay, yes.
11      Q.    That was one of your E-mail
12  addresses there, Robert S. or Robert
13  Scharf at aol.com?
14      A.    Yes.
15      Q.    And in this E-mail Mr.
16  Buckley asks for your warranty policy.
17  Is that correct?
18      A.    Yes.
19      Q.    And at this time you were
20  working for Devon International, weren't
21  you?
22      A.    Yes.
23      Q.    And Mr. Buckley requests a
24  copy of your warranty to give to Allied

92

1  stores in Monroe, Louisiana.  Is that
2  correct?
3      A.    Yes.
4      Q.    Now, this Allied stores that
5  is different than the Allied Building
6  Products you talked about?
7      A.    It is.
8      Q.    Allied Stores in Monroe,
9  Louisiana, have you ever sold anything to
10  them before?
11      A.    I don't believe so.
12      Q.    At least according to this
13  communication with Jay Buckley Allied
14  stores was one of North Pacific's
15  customers, wasn't it?
16      A.    I don't know that it was a
17  customer.  It was somebody they were
18  trying to sell or somebody they
19  contacted.
20      Q.    And they were trying to sell
21  drywall to them, weren't they?
22      A.    I don't know.
23      Q.    Wasn't that what this
24  indicates that Mr. Buckley wanted a copy

Robert Scharf                                              March 24, 2011

93

1  of your warranty to give to Allied
2  stores?
3      A.   Well, he's not talking about
4  our warranty for drywall.  He could be
5  talking about windows or motorcycles.
6      Q.   What does it say in the
7  subject line of the E-mail?
8      A.   It says drywall warranty.
9  So maybe he does want drywall warranty.
10 Well, I don't have the drywall warranty.
11 We don't have the -- the factory -- I
12 don't think there is such thing as a
13 drywall warranty.
14     Q.   You never seen one, have
15 you?
16     A.   I have not.
17     Q.   And my question to you is at
18 least in this E-mail Mr. Buckley was
19 asking for a copy of the drywall warranty
20 to give to Allied building stores in
21 Monroe, Louisiana.  Is that correct?
22     A.   No, he wants something in
23 writing as to your warranty policy.  So
24 I'm not sure what he wanted.  He didn't

94

1  get it because we don't have it, but I'm
2  not sure why he wanted something in
3  writing as to our warranty policy.
4      Q.   Well, doesn't he tell you in
5  the E-mail it's to give to --
6      A.   Yeah, but he says to your
7  warranty policy.  He's not asking for a
8  warranty.  So I'm not sure what that
9  means.
10     Q.   Well, if you look at the
11 E-mail, North Pacific needed it to give
12 to Allied stores and other volume
13 customers?
14     A.   I understand that.
15     Q.   He goes on to state I'm
16 getting a copy of what a domestic
17 manufacturers do --
18     A.   That's correct.
19     Q.   Did he ever give you a copy
20 of the warranty that domestic
21 manufacturers provided?
22     A.   I don't think so.
23     Q.   Did you ever look for one?
24     A.   No.  I may have.

95

1      Q.   Do you recall where you
2  looked for it?
3      A.   I went to Home Depot.
4      Q.   Did you go to Home Depot and
5  look for a copy of their warranty?
6      A.   If I wanted a warranty,
7  that's what I would do.  I would go into
8  that -- too fast for stuff.
9      Q.   I got you.  So you would
10 have gone to Home Depot --
11     A.   That's what I would have.  I
12 would have looked over there.  To my
13 knowledge I don't think there is a
14 warranty, a written warranty on drywall.
15 Certainly isn't for anyone in China that
16 I've seen.
17     Q.   There's an E-mail in the
18 middle from you, and you said to Jay
19 Buckley and what's it regarding?
20     A.   In the middle?
21     Q.   Yes, sir, right there.
22     A.   That's the top one.  Are you
23 talking about this one?
24     Q.   Right here, sir, there's an

96

1  E-mail from you, Mr. Scharf.  Is that
2  your E-mail address,
3  Bscharf@devonIT.come?
4      A.   Yes.
5      Q.   And you sent that on
6  February 15th of '06?
7      A.   Yes.  So it's the top one
8  here is what we're talking.  But that's
9  what the E-mail says, right?
10     Q.   There's an E-mail at the
11 very top here.
12     A.   Yes.
13     Q.   From Jay Buckley in response
14 to your E-mail --
15     A.   Are you talking about the
16 one it says yes, yes.
17     Q.   Yes, sir.
18     A.   Okay.
19     Q.   What was that with regard
20 to?
21     A.   I'd be willing to furnish
22 something in writing to my warranty
23 policy.  We didn't have a warranty
24 policy.  But my thinking with Jay was

Robert Scharf                                    March 24, 2011

97

1 that they were concerned about if there
2 was breakage damage in shipping or
3 anything when it came across we would be
4 responsible for that for any breakage.
5 We wouldn't make him pay for it.
6       Q.    And you told him yes in
7 response to his request for a copy of the
8 warranty --
9       A.    I told him yes, yes.
10      Q.    And then he even responded
11 in the very top there and asked you to
12 find a warranty to duplicate?
13      A.    That's correct.
14      Q.    And he goes on to state you
15 know where U.S. manufacturers have sent
16 inspectors to a site and paid them.  Do
17 you see that?
18      A.    I do.
19      Q.    Did Devon ever send an
20 inspector to the plant in China and pay
21 them?
22      A.    No.
23      Q.    And there wasn't any type of
24 third-party inspection control on --

98

1       A.    No.
2       Q.    Devon didn't obtain any
3 inspectors or third-party inspectors to
4 oversee the quality control during the
5 manufacturing process.  Is that correct?
6       A.    That's correct.
7       Q.    Have you ever sold anything
8 to Allied in Monroe, Louisiana?
9       A.    No.
10      Q.    Now, North Pacific was going
11 to pay about $8.50 a board.  Is that
12 right?
13      A.    I think so.
14      Q.    And then obviously North
15 Pacific would have to sell it to their
16 customers for more than 8.50, wouldn't
17 they, to make a profit?
18      A.    I would think so.
19      Q.    That's something you learned
20 in these sales training classes, isn't
21 it?
22      A.    Yeah, I didn't go to law
23 school.  I learned them in the sales
24 training classes.

99

1       Q.    And so with respect to
2 Allied building stores you would expect
3 North Pacific to sell it to them for more
4 than $8.50, wouldn't you?
5           MR. ROBERTSON:  Object to
6       the form.
7           THE WITNESS:  I don't know
8       what they sold it to them for.
9 BY MR. LAW:
10      Q.    Wouldn't you expect them to
11 sell it to them for more than 8.50 so
12 they could make a profit?
13          MR. ROBERTSON:  Object to
14      the form.
15          THE WITNESS:  I would expect
16      that, but I don't know that they
17      did that.
18 BY MR. LAW:
19      Q.    Was it your understanding
20 from these E-mails that Allied and the
21 volume customers of North Pacific, they
22 wouldn't buy this stuff without some sort
23 of written warranty from Devon?
24      A.    No, that was not my

100

1 understanding.
2       Q.    Do you recall getting some
3 more E-mails from North Pacific
4 requesting written warranties from Devon?
5 I'll show you Exhibit-6 which was sent
6 right around February 16th of 2006.
7           Mr. Buckley again on
8 Exhibit-6 is asking you again for a copy
9 of a warranty to show North Pacific's
10 customers.  Is that correct?
11      A.    That's correct.
12      Q.    You all have any
13 communications or phone calls around that
14 time about the warranty that he
15 requested?
16      A.    I don't know.
17      Q.    Do you recall Mr. Buckley
18 asking you several times for some written
19 specifications on the drywall that Devon
20 intended to sell to them?
21      A.    You have to show me what you
22 mean by specifications.
23      Q.    I'm going to show you what
24 we'll mark as exhibit number six.  You'll

Robert Scharf                                    March 24, 2011

101

1  see on the very first E-mail on the
2  second page Mr. Buckley asks you about
3  any news on the drywall plant
4  availability.  Do you see that?
5      A.    Yes.
6      Q.    And it says you got some
7  drywall coming out your ass, is that
8  right, in response?
9      A.    Yes.
10      Q.    You found a factory that
11  could make a lot of drywall, didn't you?
12      A.    Oh, this one made a lot of
13  drywall, yeah.
14      Q.    Is that what you meant by
15  you got drywall coming out your ass?
16      A.    That's what I meant.
17      Q.    And then in response Mr.
18  Buckley asks you when the vessel will be
19  ready to ship, and you responded on the
20  first page three weeks or sooner, didn't
21  you?
22      A.    Yes, I did.
23      Q.    And that was around February
24  of '06?

102

1      A.    Uh-huh.
2      Q.    Is that a yes?
3      A.    Yes, February 14th it says.
4      Q.    At that point you already
5  been to China and inspected some
6  factories, hadn't you?
7      A.    I'm not sure.  It -- it must
8  have been right around that time.  I know
9  I was there on February 20th.  So did I
10  say I was at factories?
11      Q.    I'm not sure.
12      A.    If I ordered his boat today,
13  then I was there.
14      Q.    And does it say you ordered
15  his boat that day?
16      A.    That's what it says on the
17  other one.
18      Q.    And then you told him three
19  weeks or sooner.  And in response to Mr.
20  Buckley on the first page it said but it
21  better meet specs.  Do you see that?
22      A.    Yes.
23      Q.    Mr. Buckley was relying on
24  Devon to provide drywall that met the

103

1  specs, weren't they?
2      A.    I don't know whether he's
3  talking about the flooring here now or
4  the drywall.
5      Q.    Well, and that's why I was
6  going in reverse order.  You said three
7  weeks or sooner is when the boat would
8  ship.  Is that right?
9      A.    Three weeks or sooner that's
10  when the boat, yeah.
11      Q.    And you ordered them a boat
12  of drywall?
13      A.    I did.  That's what it said.
14      Q.    You didn't order them a boat
15  of flooring at that time, did you?
16      A.    No, it was drywall.  And I
17  answered, what specs?  It's a board.
18      Q.    And you are referring to the
19  drywall, aren't you?
20      A.    Right.  I asked him what
21  specs.  I don't know what specs he meant.
22      Q.    What did you mean by it's a
23  board?
24      A.    Drywall, it's a board.  I

104

1  don't know what specs he wants.  It's
2  four by eight by half inch.  That's the
3  spec.
4      Q.    So at least at this time
5  when you ordered it you hadn't provided
6  him with any spec or submittal date from
7  the manufacturer, had you?
8      A.    I don't know.  I really
9  don't know.  We have to go back and see
10  -- I think they got everything from
11  Phoenix is what I think.
12      Q.    I'm going to show you
13  Exhibit-8.  And the reason I'm going
14  through all these E-mails is I know it's
15  been a number of years, and these E-mails
16  were generated around the time the events
17  refer to, weren't they?  For example,
18  when you send an E-mail and say I'm going
19  to visit six factories on this exhibit,
20  you say I'm on a flight in the morning.
21  You sent that E-mail around that time,
22  didn't you?
23      A.    I was in China February
24  21st.

Robert Scharf                                    March 24, 2011

105

1    Q.   So these E-mails were
2  generated around the time the events
3  refer to in them, weren't they?
4    A.   Well, this one was.
5    Q.   You told him you are going
6  to visit six factories.  You mentioned
7  four earlier.  You told me about the
8  three --
9    A.   We didn't go to anymore.
10 After I saw the other ones I said we've
11 seen enough.  We went back -- I knew the
12 first factory was the right factory.
13   Q.   So the first factory you
14 went to is the one you described that was
15 clean, looked like a hospital?
16   A.   Yeah.
17   Q.   And then after that when you
18 went and saw three more --
19   A.   I think I -- I think I saw
20 the Taishan one first and then we went
21 and saw a couple of the other ones.  We
22 may have gone back.  I'm not sure.  But
23 my guess is I -- no, I think I saw that
24 one second.  I think I saw one of the

106

1  other ones, smaller ones first.
2    Q.   The smaller ones being the
3  three that had the filler and smelled
4  bad?
5    A.   That's correct.  And then
6  the other ones we just never went to
7  anymore.  I'd seen enough.
8    Q.   Did you tell Jay or anybody
9  at North Pacific about the three
10 factories that had all the filler and
11 smelled bad?
12   A.   I'm not sure.  Are there
13 E-mails to that effect?  I don't know.
14   Q.   Did you do anything besides
15 look at the factory?  I mean did you
16 watch them actually make the drywall
17 before you told Jay we had a good
18 factory?
19   A.   Did I watch them make the
20 drywall?
21   Q.   Yes, sir.
22   A.   No, I don't think I saw any
23 being run that day.
24   Q.   I'm going to show you

107

1  exhibit number nine if you turn to page
2  two.  There's an E-mail from you, and
3  then actually you'll see you sent the
4  E-mail on page -- from your E-mail
5  address on February 22nd of '06.  And it
6  carries over to the second page.
7    A.   Go ahead.
8    Q.   You told him in your E-mail
9  the quality is excellent.
10   A.   Yes.
11   Q.   You are referring to the
12 drywall at the factory that looked like a
13 hospital, right?
14   A.   That's correct.
15   Q.   What did you do to determine
16 that the quality of the drywall itself
17 was excellent?
18   A.   We saw the finished
19 products.
20   Q.   Where was that --
21   A.   That was at the factory.
22   Q.   And did you see them
23 actually making that finished product?
24   A.   I don't think I saw that day

108

1  that being made, but the factory -- they
2  make good product there I thought, and it
3  looked really good as opposed to the
4  other stuff that we had seen.
5    Q.   And when you said the
6  quality was excellent, that's what you're
7  referring to --
8    A.   Wait.  It was four foot by
9  eight, 12 foot.  It was a half inch
10 thick.  It looked smooth.  It didn't have
11 bows in it or it didn't have elephants
12 they call it in it and there was the
13 right weight, whatever the weight was
14 supposed to be.
15   Q.   With respect to that ASTM
16 standards and the formaldehyde omissions,
17 you didn't do anything to find out if
18 this board met the formaldehyde omissions
19 and ASTM standards, did you?
20   A.   Well, I don't know.  My
21 guess is if -- ASTM won't allow
22 formaldehyde.  So if you are ASTM
23 approved.  But they specifically told me
24 there's no formaldehyde in the drywall.

Robert Scharf                                    March 24, 2011

109

1  Q.   The Chinese people did at
2  the plant?
3  A.   Correct.
4  Q.   And that's the plant where
5  you all bought the 500,000 odd sheets?
6  A.   That's correct.
7  Q.   The E-mail you said we have
8  ASTM approved standards.  Were you just
9  relying on something the guy at the plant
10  told you?
11  A.   Yeah, he said we have -- it
12  was already ASTM approved.
13  Q.   And he didn't give you the
14  document that said -- showed that he was
15  ASTM approved?
16  A.   I don't think he did.
17  Q.   And on the date you sent
18  this E-mail at least as of February 22nd
19  of '06, North Pacific hadn't tested any
20  of this stuff, had they?
21  A.   Well, I don't know.  I think
22  they've already received some at that
23  point.
24  Q.   From the Phoenix load?

110

1  A.   I believe so.
2  Q.   You said you contracted for
3  50 boats this year.  You are referring to
4  the big tankers like the Sanko Rally?
5  A.   That's correct.
6  Q.   And that wasn't an actual
7  written contract, was it?
8  A.   It was a commitment for 50
9  boats.  If this went smooth, we would
10  give you 50 boats.
11  Q.   And the plant that told you
12  that they had the ASTM approval standards
13  and no formaldehyde omissions, is that
14  the same one that you told were about 50
15  boats from?
16  A.   That's correct.
17  Q.   So besides actually just
18  looking at the board there, the finished
19  product that you didn't see them make,
20  you didn't do anything else to determine
21  the quality standards?
22  A.   Me?
23  Q.   Yes, sir.
24  A.   No.

111

1  Q.   You assumed that the plant
2  that you were going to buy the 50 boats
3  from had done some sort of testing,
4  didn't you?
5  A.   They had ASTM approval.
6  They -- they put on every board that they
7  met or exceeded the ASTM standards, and
8  the number that they met or exceeded.  I
9  don't know what else I could do.
10  Q.   The ASTM test that's an
11  actual United States standard, isn't it?
12  A.   I'm not sure.
13  Q.   Have you ever had any
14  problems, divorce yourself from drywall
15  for a minute, have you ever had any
16  problems or defect issues with any other
17  products imported from China?
18  A.   No, not problem, problems.
19  No.
20  Q.   Ever had any issues with any
21  products --
22  A.   Well, we had some dirt bikes
23  with some handles had to be replaced and
24  they sent us new handles and stuff like

112

1  that, but we never had any problems.
2  Q.   What was wrong with the
3  handles?
4  A.   I don't know, but they
5  re-sent new handles.  I don't know what
6  was wrong with them.
7  Q.   And you've sourced products
8  from a manufacturing facility in Toronto
9  before.  We talked about that earlier
10  when you worked for Allied.  Is that
11  right?
12  A.   No.  No.  No.  I had a
13  company walled Royal Building Products
14  which was a company that was formed to
15  sell and market products made by Royal
16  Plastics.
17  Q.   Did you ever visit any of
18  those manufacturing facilities in
19  Toronto?
20  A.   Oh, yeah.
21  Q.   Did you have any defect
22  issues with any of those products
23  manufactured up in Toronto?
24  A.   No.

Robert Scharf                                    March 24, 2011

113

1            MS. CALDWELL:  Object to the
2       form.
3   BY MR. LAW:
4       Q.    How were their quality
5   control standards?
6       A.    Royal Plastics?
7       Q.    Yes, sir.
8       A.    Probably the finest in the
9   world.
10      Q.    How were the quality control
11  standards at least of the three plants
12  you looked at that had all the filler and
13  smelled bad?
14      A.    I don't think they had any
15  quality control.
16      Q.    What about with respect to
17  the plant where the drywall is
18  manufactured for North Pacific?
19      A.    They had ovens.  They
20  checked stuff.  They had a little room,
21  you know, a QC room there.  They showed
22  us that, and they showed us whatever they
23  did on the plant tour.
24      Q.    So they actually gave you a

114

1   tour of the plant?
2       A.    They did.
3       Q.    And they showed you a little
4   room where they had QC, that would be
5   quality control?
6       A.    They did.
7       Q.    Were there some people in
8   there doing something when you were
9   there?
10      A.    They were.
11      Q.    Now, when the actual drywall
12  is manufactured for Devon that was
13  brought to the U.S., you weren't present
14  when they were doing any of this quality
15  control, were you?
16          MR. BROWN:  Object to the
17      form.
18          THE WITNESS:  Just repeat
19      the question again.
20  BY MR. LAW:
21      Q.    Sure.  You weren't present
22  when any of the actual drywall was
23  manufactured for Devon was brought to the
24  U.S., were you?

115

1       A.    I don't believe so.
2       Q.    Exhibit number ten at the
3   bottom as of February 27th of '06 Mr.
4   Buckley was still asking for some
5   samples, and he said this is what's
6   holding up our orders.  Do you see that?
7       A.    These samples sent overnight
8   to me -- yes.
9       Q.    The orders he was referring
10  to was orders from North Pacific's
11  customers, weren't they?
12      A.    No, I don't know -- I'm not
13  sure if he meant that or he meant more
14  orders to me.
15      Q.    Orders from North Pacific to
16  Devon?
17      A.    Yeah, I'm not sure.
18      Q.    And those would be orders
19  for the manufacture of drywall in China?
20      A.    I would think so.
21      Q.    And Mr. Buckley wanted some
22  samples overnighted.  And tell me what
23  size samples were ultimately sent?
24      A.    If it's a sample, it would

116

1   be six inches by eight inches or
2   something like that.
3       Q.    And you told him up here
4   you'd check with the factory in the
5   morning.
6       A.    Maybe he wanted bigger
7   samples, I don't know.
8       Q.    Did you send any samples
9   from any factories besides the factory
10  where the drywall was manufactured?
11      A.    Not to my knowledge.
12      Q.    Sounds like you decided --
13  you selected a factory pretty quickly
14  when you went on your first trip to
15  China, didn't you?
16          MR. BROWN:  Object to the
17      form.
18          THE WITNESS:  I don't think
19      it was pretty quickly.
20  BY MR. LAW:
21      Q.    Did you go and obtain
22  samples from different factories and
23  send --
24      A.    No, I didn't have.  There

Robert Scharf                                        March 24, 2011

117

1  was no reason -- you couldn't buy it from
2  the other factories that I went to.
3  Nobody could buy it from there and send
4  it to the United States.
5      Q.  Why is that?
6      A.  The stuff was horrible.
7      Q.  And you mentioned the filler
8  that you saw--
9      A.  There's filler.  There were
10  voids in the lines that I saw being run.
11  I don't know what they used for liner
12  board.  It just wasn't salable for us.
13      Q.  I'll show you exhibit number
14  11, and it's a series of E-mails around
15  March 1st of '06.  At that point in time
16  you had already placed the order, hadn't
17  you?
18      A.  I'm -- it says if you let me
19  order it without you seeing any sample,
20  it can leave 20 days from today or maybe
21  sooner.
22      Q.  That was my first question.
23  Did he let you order it before they saw
24  the samples?

118

1      A.  That's March 1st so I'm not
2  sure.  You have to check the date on the
3  purchase order.  When he gave me the
4  purchase order, that's when we ordered
5  it.
6      Q.  That was dated February of
7  2006.
8      A.  Yeah, I ordered when I was
9  there in my other E-mails.  That was the
10  week of the 20th of February, whenever
11  that was.
12      Q.  So as of March 1st, 2006 it
13  already had been ordered?
14      A.  I believe so.
15      Q.  In Mr. Buckley's E-mail when
16  you told him if he let you go ahead and
17  order it without sending the samples, he
18  responded and asked if it was zero
19  percent formaldehyde and he told you he
20  needed specifications and asked for ASTM
21  standards.
22      As of March 1st, '06 North
23  Pacific still did not have the
24  formaldehyde omissions, the

119

1  specifications and ASTM standards.  Is
2  that correct?
3      A.  That's what he says here.
4      Q.  And he asked again for a
5  letter on the warranty, didn't he?
6      A.  Right.
7      Q.  At that point in time there
8  still hadn't been any type of warranty
9  provided, has there?
10      A.  There was no warranty.
11      Q.  You responded on March 1st
12  of '06, didn't you?
13      A.  -- they must be the Chinese
14  specs.
15      Q.  There were some specs that
16  were in Chinese, weren't they?
17      A.  Yes.
18      Q.  Who in New York would have
19  translated those?
20      A.  Either Shin or Ruth.
21      Q.  That would be Ruth Wu?
22      A.  Yes.
23      Q.  You reference the weight.
24  You got that off the specifications,

120

1  didn't you?
2      A.  Yes.
3      Q.  Do you know where you got
4  these specifications from?
5      A.  From the drywall factory.
6      Q.  And you actually got it from
7  the factory where the drywall was
8  manufactured?
9      A.  That's correct.
10      Q.  You told him it's really
11  good stuff?
12      A.  Yes.
13      Q.  We've talked about why you
14  thought it was good stuff.  Anything you
15  need to add there?
16      A.  I thought it was good stuff.
17      Q.  You mentioned two factories
18  that could meet specs.  You said I saw
19  six.  Does that kind of refresh your --
20      A.  I don't remember.  We may
21  have seen some other people at the Canton
22  Fairs.  I didn't go to six factories.
23      Q.  But there were two that
24  could meet the specs as you noted in this

Robert Scharf                                         March 24, 2011

121

1  E-mail?
2      A.   That's correct.
3      Q.   Do you know where the other
4  factory was located?
5      A.   No, I think down in Gwangju
6  (ph), south.
7      Q.   Do you know if any of the
8  drywall that was manufactured for Devon
9  and shipped to the U.S. came from that
10  second factory?
11      A.   No, we never dealt with
12  anybody else.
13      MS. CALDWELL:  Object to the
14  form.
15  BY MR. LAW:
16      Q.   You on behalf of Devon
17  picked out the factory that would be used
18  to manufacture the drywall, didn't you?
19      A.   I was in the decision
20  process, yes.
21      Q.   Did you have to get them to
22  make some changes to the drywall to make
23  sure that it would weigh around 60
24  pounds?

122

1      A.   No, sir.
2      Q.   Because earlier on we saw an
3  E-mail earlier where Ruth Wu told North
4  Pacific the weight and Mr. Buckley
5  responded and said it's too heavy.
6      A.   Yeah, I saw that weight.  I
7  believe she had it in kilograms.  Then
8  she had it in something -- some other
9  metrics I guess.  They gave me what their
10  weight was, and their weight was within
11  the guidelines that NorPac wanted.  We
12  did nothing to have them alter any part
13  of their product.
14      Q.   Have you ever pulled
15  specifications or submittal sheets on a
16  product before?
17      A.   No.
18      Q.   You never looked on the
19  Internet to get some submittal sheets
20  to --
21      A.   No.  No, I'm not that
22  Internet savvy.
23      Q.   I know that may be a bad
24  question.  But have you ever requested

123

1  from a manufacturer some submittals or
2  specs to provide to a customer and I'm
3  going to show you Exhibit-12?  It's a
4  submittal on the sheet rock brand gypsum
5  panels.  On page two it tells you the
6  test data and the specifications.
7      And my question is have you
8  ever --
9      A.   I don't think I have.  I
10  don't think I've ever seen something like
11  this before.
12      Q.   With respect to any other
13  type of building product have you ever
14  obtained submittals to provide to a
15  customer?
16      A.   To other products?
17      Q.   Sure.
18      A.   Yeah, spec sheets on other.
19  Yeah, absolutely.
20      Q.   What products would you have
21  obtained spec sheets to provide to a
22  customer on?
23      A.   Vinyl siding, windows,
24  mostly windows I would think.

124

1      Q.   What was the purpose of
2  getting those spec sheets and providing
3  them to a customer?
4      A.   They wanted to see what the
5  specifications were on a product.  A
6  window has moving parts.  Siding has
7  different finishes on it, different
8  alloys in the metal.  Then vinyl has
9  different --
10      Q.   Wind ratings?
11      A.   Vinyl has different
12  stabilizers in it and things like that.
13  So they would want that.
14      Q.   Then you would provide them
15  the spec sheets that would tell them what
16  the window ratings and these other items
17  were you just mentioned?
18      A.   I would provide whatever was
19  provideable.
20      Q.   And you get those from the
21  manufacturer?
22      A.   Most times I would say yes.
23      Q.   And then you provide them to
24  the customers, and you'd expect customers

Robert Scharf                                             March 24, 2011

125

1   to rely on those if they bought the
2   product, wouldn't you?
3        A.   I don't know what they would
4   rely on.  Seriously, I have no clue.  I
5   think from my experience the guy with the
6   best price wins.
7        Q.   Regardless of the quality of
8   the product?
9        A.   I don't know.  I don't know
10  what product you are talking about.  It
11  all depends.
12       Q.   Well, with respect to vinyl
13  siding, some is manufactured to a 90-mile
14  an hour wind load and some to 140.  Are
15  you aware of that?
16       A.   That's not accurate, but
17  that's okay.  That's a marketing thing.
18       Q.   What do you mean by it's a
19  marketing thing?
20       A.   If somebody says they have a
21  140-mile an hour lock on their siding or
22  somebody says they have a 90 mile, that
23  may or may not be so.  I don't know.
24       Q.   Well, you'd expect a

126

1   manufacturer if they said they had a
2   90-mile an hour wind rating to test that
3   product and have data that could support
4   that --
5        A.   I would think that they
6   would do that.
7        Q.   In your experience in
8   selling windows, there'd be an AMMA test
9   report and a little sticker on the
10  window?
11       A.   The windows have -- would be
12  a stricter standard than siding, yes.
13       Q.   And they have a little AMMA
14  sticker that tells you if it meets the
15  window load?
16       A.   That's correct.
17       Q.   And there's AMMA test
18  reports that substantiates that?
19       A.   That's correct.  Windows
20  have moving parts.  They have master
21  frames.  They have sashes and they have
22  glass.  So there's a lot of different
23  components that go into a window.
24       Q.   We saw an E-mail earlier

127

1   where Mr. Buckley requested an MSDS
2   sheet, and if I understand you correctly
3   one was never provided by Devon?
4        A.   None was ever provided by
5   me.
6        Q.   Have you ever seen one?
7        A.   Seen what?
8        Q.   An MSDS sheet on the
9   drywall?
10       A.   If I did, it was in Chinese.
11       Q.   You can't translate --
12       A.   No, I can't translate
13  Chinese.
14       Q.   Do you know if Mr. Buckley
15  could?
16       A.   Mr. Buckley couldn't
17  translate Chinese.
18       Q.   So you never read an MSDS
19  sheet on the drywall that was
20  manufactured for Devon to bring to the
21  U.S.?
22       A.   Nothing was manufactured for
23  Devon.  We bought the product that they
24  manufactured.

128

1        Q.   I'm going to show you
2   exhibit number 25.  It's an MSDS sheet on
3   drywall manufactured in the U.S., and I'm
4   going to ask you if you saw any similar
5   type MSDS on the drywall manufactured
6   that was sold or at least imported for
7   North Pacific.
8        A.   I did not.
9        Q.   And did you ever ask the
10  manufacturer for one?
11       A.   Did I?  No.
12       Q.   Never asked anybody at the
13  plant for one, did you?
14       A.   I didn't, no.
15       Q.   Do you know if anybody else
16  did?
17       A.   I don't know.  They didn't
18  speak English there very well.  It's hard
19  for me to ask for a lot.
20       Q.   Did somebody accompany --
21       A.   Julian Chu, yeah.
22       Q.   On this tour?
23       A.   I'm sorry.  Julian Chu.
24       Q.   Did he translate for you?

Robert Scharf                                                    March 24, 2011

129

1     A.   He did.
2     Q.   Did any of the drywall have
3  North Pacific's name on it?
4     A.   Oh, I don't know.
5     Q.   Did you ever see any drywall
6  that had North Pacific's name on it?
7     A.   North Pacific's name, I
8  don't believe so.
9     Q.   We'll mark as Exhibit-26 a
10 photograph.  You've seen that logo that's
11 depicted there in red, haven't you?
12    A.   I've seen it on here, yes.
13    Q.   And what's it say?
14    A.   Devon Building Products.
15    Q.   And that was stamped on all
16 the packaging for the drywall, wasn't it?
17        MS. CALDWELL:  Object to the
18    form.
19        THE WITNESS:  It was on the
20    boards that were used to wrap the
21    drywall with.
22 BY MR. LAW:
23    Q.   Tell me how the drywall was
24 packaged together.

130

1     A.   They had -- I don't remember
2  how many pieces in a unit, but the units
3  weighed 6,000 pounds.  So they are three
4  tons, and they are four by -- four by
5  eight, four by 12 sheets.  They put them
6  on a skid, on a wood skid.  They put I
7  don't know maybe six or seven bands
8  around it.
9        They put heavy boards,
10 heavier drywall boards around all sides.
11 They then strapped it and banded it.
12 Well, first they put plastic over
13 everything, visqueen over everything,
14 over the drywall.  Then this is just a
15 packaging cover so that it won't rub up
16 against each other.  The ends won't get
17 broken or bent or anything like that.
18    Q.   I'm going to show you
19 Exhibit-27.  Does that show you some of
20 these packages of drywall and how they
21 were packaged together?
22    A.   Yes.
23    Q.   Did you ever see -- did
24 Devon request that anybody else's name be

131

1  placed on any of these sheets of drywall
2  or the packaging?
3     A.   No.  I don't think we
4  requested our own name being placed on it
5  to tell you the truth.
6     Q.   Did you review the purchase
7  order?
8     A.   I've seen the purchase
9  order.
10    Q.   You reviewed the purchase
11 order placed by North Pacific, didn't
12 you?
13    A.   I'm sorry?
14    Q.   You reviewed the purchase
15 order placed by North Pacific?
16    A.   You talking about reviewed
17 it now recently or when we got it?
18    Q.   When the purchase order was
19 placed?
20    A.   Yes.
21    Q.   I'm going to show you
22 Exhibit-28.  Is that the purchase order?
23    A.   I believe this is the
24 purchase order.

132

1     Q.   And this purchase order
2  would have been used in China to have the
3  drywall manufactured?
4     A.   This purchase order?
5     Q.   Yes, sir.
6     A.   No, I believe we would then
7  give a purchase order.
8     Q.   And I saw in your previous
9  testimony in your deposition in front of
10 you you mentioned that you had obtained
11 purchase orders from North Pacific so you
12 could go to the factories to have the
13 drywall manufactured.  Is that kind of
14 how it worked?  You went with purchase
15 order in hand?
16    A.   No.  I don't physically show
17 them my purchase order.  Once I have a
18 purchase order, then I can go out and buy
19 -- this is $4 million worth of product.
20    Q.   The $4 million was paid up
21 front, wasn't it?
22    A.   No, it wasn't paid at all.
23    Q.   Well, and that was a poor
24 question.  The money that Devon paid to

Robert Scharf                                    March 24, 2011

133

1  the factory for the manufacture of the
2  drywall, it was paid up front, wasn't it?
3      A.   Normally you pay 30 percent
4  when you give an order, and then you pay
5  the balance when it's on the water.
6  That's normally what happens.
7      Q.   So before it arrived in the
8  U.S. it was paid for?
9      A.   It was paid for, yes.
10     Q.   The purchase order exhibit
11 whatever it is references grade A
12 drywall.  What is grade A?
13     A.   I don't know.
14     Q.   Is there a grade B?
15     A.   No, there is no --
16     Q.   Did you ever discuss --
17     A.   No.  No.
18     Q.   And this purchase order
19 states must have stamp that the product
20 meets or exceeds North American ASTM
21 standards?
22     A.   That's correct.
23     Q.   And it was a requirement of
24 the purchase order with Devon that the

134

1  gypsum board had a stamp on it indicating
2  that it complied with ASTM standards?
3      A.   That's correct.
4      Q.   Is Exhibit-29 a photograph
5  of that stamp?
6      A.   That's it.
7      Q.   And it said meet or exceeds
8  ASTM 1396?
9      A.   That's correct.
10     Q.   And that was required by the
11 purchase order, wasn't it?
12     A.   Yeah.  I think it's required
13 by customs also.
14     Q.   Did you have any document or
15 anything from customs that says that?
16     A.   Says what?
17     Q.   That the requirement of the
18 stamp?
19     A.   I don't know, but I know
20 that customs is the one who will check
21 stuff like this, and they'll hold up your
22 load if it doesn't have the right
23 approval so I'm not sure.
24     Q.   And that stamp would have

135

1  been put on the board at the time it was
2  made, wouldn't it?
3      A.   Yes.  This is done with
4  what's called an in-line printer.  So as
5  they print -- as they run the drywall, as
6  the board goes through, there's an
7  in-line printer there that would print
8  that out.
9      Q.   And we know you placed the
10 order around February 21st of '06.  How
11 long did it take to make all this?
12     A.   Oh, that's a good question.
13 I think they made it in less than a
14 month.  There may be some documentation
15 there of the exact time.
16     Q.   Do you know if production
17 started right around the time the order
18 was placed?
19     A.   Yes.
20     Q.   At the time the stamp was
21 placed on this board, Devon did not have
22 any test reports indicating that it met
23 ASTM 1396, correct?
24     MS. CALDWELL:  Object to the

136

1  form.  Asked and answered many
2  times.
3      MR. LAW:  I don't think so.
4      THE WITNESS:  The only forms
5  that I remember seeing were the
6  ones that were in Chinese.
7  BY MR. LAW:
8      Q.   So the time the drywall --
9  the stamp was placed on the drywall all
10 you had seen was the Chinese report?
11     A.   I was told that they had met
12 ASTM approval.  They had ASTM approval.
13 I was told that by the factory.  And then
14 they gave us whatever they had that was
15 it was in Chinese Julian would have read
16 it to me.  He would say, Bob, this is 60
17 pounds or this is whatever.  So that's
18 what would have happened.
19     Q.   And what you are referring
20 to they gave you was a spec sheet that
21 was in Chinese?
22     A.   Yeah, they are in here
23 someplace.  I know I reviewed them the
24 other day.

Robert Scharf                                    March 24, 2011

137

1  Q.   We can take the total price
2  of 4,120,000 and change and divide it by
3  the number of boards and that would tell
4  us the price per board that Devon sold it
5  to North Pacific for or intended to sell
6  it to them for?
7      A.   Right.
8      Q.   Thirty is an E-mail from Mr.
9  Buckley to you, and he mentions a
10 shipment of drywall the Phoenix load and
11 it says Phoenix is walking from.  Do you
12 know why Phoenix was walking away from
13 its load at the dock?
14     A.   Yeah, they couldn't pay for
15 it.
16     Q.   They couldn't pay for the
17 shipping, could they?
18     A.   They could not pay for the
19 shipping.
20     Q.   Do you actually know if that
21 load ever made it to the U.S.?
22     A.   Well, I know a year or so
23 later I was there and I looked at it, and
24 it was still in the port in good

138

1  condition in the port.
2      Q.   And I saw that in your last
3  deposition.  At least as of October of
4  2007 it was still sitting there, wasn't
5  it?
6      A.   Yeah, it was.
7      Q.   And the load of drywall that
8  Devon was bringing in the U.S. for North
9  Pacific, it shipped well before October
10 of 2007, didn't it?
11     A.   Yes.  This was half the
12 load.  They shipped 100,000 boards to New
13 Orleans.
14     Q.   Do you know when that
15 shipment went out?
16     A.   No, but it was there before
17 ours.
18     Q.   There in New Orleans?
19     A.   Yeah, and then they didn't
20 take that either.
21     Q.   Did the factory in China,
22 did they also make four by eight size
23 sheets?
24     A.   I would think so.  I would

139

1  think that's a more common size.
2      Q.   And did you ever see them
3  making four by eight?
4      A.   Did I see them making them,
5  no.  Did I see some in the factory,
6  perhaps I did.  They also use metrics.
7  You are saying four-foot by eight-foot or
8  something that would equivalent to that
9  in a metric size, I'm sure they made
10 that.
11     Q.   Devon didn't have any four
12 by eight foot sheets manufactured there,
13 did they?
14     A.   We did not.
15     Q.   The only sheets that Devon
16 had manufactured at the facility are four
17 by 12?
18         MR. BROWN:  Object to the
19 form.
20         THE WITNESS:  The only -- we
21 didn't have anything -- what we
22 ordered was four by 12 that came
23 from that factory.  We didn't
24 manufacture.  Devon didn't

140

1  manufacture it.
2  BY MR. LAW:
3      Q.   I know you didn't get down
4  on the assembly line and put the things
5  together, but was that drywall
6  manufactured by anybody else besides
7  Devon?
8         MR. BROWN:  Object to the
9  form.
10        THE WITNESS:  I don't know.
11 I'm sure they had other customers
12 besides Devon.
13 BY MR. LAW:
14     Q.   And I'm referring to the
15 drywall order via Exhibit-28.
16     A.   Yes.
17     Q.   Devon went to that factory
18 and had all that drywall manufactured?
19        MR. BROWN:  Object to form.
20        THE WITNESS:  We bought all
21 this drywall.
22        MS. CALDWELL:  Object to
23 form.
24        THE WITNESS:  We didn't have

Robert Scharf                                          March 24, 2011

141

1    it manufactured.  We gave the
2    factory an order for this amount
3    of drywall.  They manufactured or
4    they had -- I don't know what they
5    had, but I'm pretty sure they made
6    it when we ordered it.  They
7    didn't have it sitting around
8    either.  This was a big order for
9    them.
10   BY MR. LAW:
11       Q.   And that's my question.
12   They made it pursuant to this order for
13   North Pacific.  Is that correct?
14       A.   I believe so.
15       Q.   And they wouldn't make it
16   until you had a purchase order in hand,
17   would they?
18       A.   I don't think they would
19   make that amount.
20       Q.   All that drywall was made
21   for Devon pursuant to this purchase
22   order?
23            MR. BROWN:  Object to the
24       form.

142

1            THE WITNESS:  It was made
2        for North Pacific, yes.
3    BY MR. LAW:
4        Q.   Did North Pacific pay to
5    have any of the drywall trucked from the
6    factory to the port?
7        A.   No.
8        Q.   Who paid for that?
9        A.   Devon paid for that or maybe
10   Pactrans -- Sinotrains might have paid
11   for that.
12       Q.   We'll look at your
13   deposition from day two.  But in your
14   previous deposition you indicated that
15   you had to line up a whole bunch --
16       A.   They lined up a lot of
17   trucks.  We sent l,000 trucks on a 12
18   hour trip from the port -- from the
19   factory to the port.
20       Q.   And do you recall paying all
21   the cash to the Chinese gentleman that
22   had a little box --
23       A.   He had a box in one of the
24   car, on one end, and the guy had a box on

143

1    the other end.  They got half of it when
2    they left Qingdao and when they left
3    Taishan and the other half when they got
4    to Qingdao.
5        Q.   And all that cash came from
6    Devon, didn't it?
7        A.   I don't know where the cash
8    came from.  I don't know.  We didn't deal
9    in cash.  So I don't know who got the
10   cash.  But we paid the bill at some
11   point.
12       Q.   That's my point.  So Devon
13   paid the bill to have all the drywall
14   trucked from the manufacturing facility
15   to the docks?
16       A.   Yeah, but I'm not certain if
17   Devon paid -- who they paid.  They might
18   have paid Pactrans which was our broker.
19       Q.   And then Pactrans might have
20   paid the trucker guys?
21       A.   That's correct.
22       Q.   And then Devon paid the
23   shipping line to ship all the drywall
24   into the U.S. via the Sanko Rally?

144

1        A.   Or Sinotrains, I don't know
2    which one paid.  They were our broker on
3    this.
4        Q.   You've told us today that
5    you assumed that North Pacific had tested
6    this drywall and my question is we
7    know --
8        A.   Oh, they tested it.
9        Q.   The Phoenix load?
10       A.   I don't know whose load.
11   They tested samples.  They tested samples
12   from the factory.  It wasn't the Phoenix
13   load.  It wasn't their load.  The factory
14   sent them samples and they tested them.
15   And that's who tested them from.
16       Q.   You are holding up
17   Exhibit-25.  That doesn't pertain to this
18   drywall, does it?
19       A.   No, but that's the testing
20   they used -- that's the testing factory
21   they used.  When he said he called in a
22   favor, in one of the E-mails he said I
23   called in a favor and had it tested and
24   really don't want you to send it to

Robert Scharf                                           March 24, 2011

145

1  anybody else.
2       Q.   Right?
3       A.   That's where they tested it.
4       Q.   And you are referring to an
5  E-mail --
6       A.   From Jay Buckley to me or to
7  Ruth I think requesting we wanted them --
8  because they had a copy of the ASTM
9  report or whatever and all the specs and
10 the test reports and we asked -- Ruth
11 apparently asked him for a copy of it,
12 and he said, you know, we called in a
13 favor to have it done.
14      Q.   But you don't know which
15 production run or which plant that
16 drywall came from?
17      A.   No, I don't know.
18      Q.   And you don't know what size
19 drywall they had tested, do you?
20      A.   No.
21      Q.   Had Devon been provided a
22 copy of that report, it would have been
23 maintained in some sort of file at Devon
24 International, wouldn't it?

146

1       A.   Most likely.
2       Q.   In the normal course of
3  business, did you or Ruth or somebody at
4  Devon maintain a file on transactions of
5  this nature?
6       A.   I didn't maintain a file.
7       Q.   Somebody did?
8       A.   I would assume so, but I
9  don't know that for a fact.
10      Q.   And I want to make sure
11 we're clear.  You've gone through all the
12 records produced by Devon?
13      A.   Yes.
14      Q.   And you hadn't seen any test
15 reports from North Pacific, have you?
16      A.   I've seen a test report from
17 North Pacific, yes, and I saw it when we
18 went down to do this deposition and I
19 don't know what happened to it.
20      Q.   In the arbitration hearing?
21      A.   We had a different attorney
22 went down there, and that's when I seen a
23 test report from this factory in China.
24      Q.   That would have been in

147

1  October of 2007?
2       A.   There was a report that --
3  there was a report that NorPac had
4  gotten.  He furnished it with me.  He
5  faxed it to me and you can read --
6  there's E-mails that say that we did it.
7  I'll send it to you and that it was done
8  in Texas in a testing lab.
9       Q.   But you recall seeing that
10 report when you gave your deposition --
11      A.   When I was preparing for
12 this deposition, our attorney had that
13 report.  I remember seeing it.
14      Q.   Preparing for this
15 deposition we're doing today?
16      A.   No, this one.  I'm sorry.
17 The deposition for NorPac in Atlanta.
18      Q.   And that was given on
19 October of 2007?
20      A.   2007.
21      Q.   Which attorney had that
22 report?
23      A.   Paul Crowley.
24           MR. LAW:  Don, did you all

148

1  give me a copy of that report?
2           MR. BROWN:  If we have it.
3  BY MR. LAW:
4       Q.   Was that the first time you
5  recall seeing that report was when you
6  were reviewing it to get ready for a
7  deposition in 2007?
8       A.   No, I think I seen it
9  before.
10      Q.   I've seen some faxes in
11 closing reports and we will look at them.
12 I've got them with me today, but they are
13 all for a different size drywall?
14      A.   But I saw one also that had
15 the different size -- different thickness
16 and probably four by eight.  I don't -- I
17 believe that the factory gets the ASTM
18 approval.  And then it's up to them to
19 certify that they are making it to that
20 standard.  And it should be any size, any
21 thickness in any size that they make
22 once they certify it's ASTM.  Perhaps in
23 China they have other standards that we
24 don't have so they can make it

Robert Scharf                                      March 24, 2011

149

1  differently, but anything that they put
2  that stamp on is supposed to be what
3  they've been -- had approved by ASTM.
4  That's what it's supposed to be. So it
5  shouldn't matter whether it was a half
6  inch, five eighths, it should still meet
7  the ASTM standards.
8      Q.   You are assuming all of
9  this. And this is your first run with
10  drywall?
11     A.   Well, it's not my first
12  rodeo. I mean, you know, I've been
13  around things before. I know how my
14  factories used to be tested, and I know
15  where the windows come from China. We
16  put a test number on every window, but we
17  don't test every window in China and
18  shoot two by fours at 90-miles an hour at
19  them. And if it gets tested -- if it
20  gets by -- customs checks it or the --
21  some building inspector test it it has to
22  meet that standard that they certify on
23  the window.
24     Q.   Customs doesn't test this

150

1  drywall?
2      A.   I don't know -- they might.
3  Well, they'll check to see -- they'll
4  check to see the ASTM number and they'll
5  check to see that they have ASTM
6  approval.
7      Q.   And you'd expect customs to
8  rely on that stamp on the board, wouldn't
9  you?
10     A.   No, I would expect customs
11  to go and take the manufacturer that they
12  have and see that they have ASTM approval
13  before they let it in the country. We've
14  had stuff held up at customs, other
15  things.
16     Q.   You mentioned factories that
17  you've dealt with, and you're referring
18  to factories in Toronto and the U.S.?
19     A.   That's correct.
20     Q.   Is this the first time --
21     A.   That's correct. I wasn't
22  even referring to drywall factories, no.
23     Q.   And this is the first time
24  that you ever imported drywall from

151

1  China, this load in 2006?
2      A.   That is.
3      Q.   So any knowledge you had
4  about what factories do with respect to
5  ASTM standards that's knowledge from
6  dealing with the U.S. factories?
7      A.   And from the window factory
8  in China.
9      Q.   When did Devon import
10  windows from China?
11     A.   I'm going to say they
12  started around 2005. They may have done
13  some before. I don't think so, but I
14  think I was the first one.
15     Q.   Those window were sold down
16  in Miami Dade, weren't they?
17     A.   No, not the ones I dealt
18  with. The ones I dealt with were
19  replacement windows, vinyl replacement
20  windows, and they were sold different
21  places in the United States.
22     Q.   And you didn't see any ASTM
23  reports on those windows or AMMA tests,
24  did you?

152

1      A.   Of course.
2      Q.   You saw them?
3      A.   Well, we were approved by
4  AMMA. We had to have glass strength
5  tests, and we had to certify that the
6  vinyl is lead free.
7      Q.   And you actually saw a
8  report certifying the vinyl was lead
9  free?
10     A.   That I did see.
11     Q.   Did you see the AMMA test
12  reports?
13     A.   I don't know that AMMA is
14  used on a vinyl window or not.
15     Q.   You saw some sort of test
16  report when you were there?
17     A.   I saw them on the Miami Dade
18  windows.
19     Q.   There wouldn't be an MSDS
20  sheet on those, would there?
21     A.   I don't believe so.
22     Q.   But you did see?
23     A.   With those windows are made
24  by -- they'll spec -- the builder -- the

Robert Scharf                                          March 24, 2011

153

1  architect will spec the window.  Then you
2  have to go build the window to that spec.
3  And then that has to be approved.
4       Q.   And after it's built to that
5  spec, the test is performed and they
6  shoot a two-by-four and spray a bunch of
7  water on it?
8       A.   A lot of water on it.
9       Q.   You've seen all those tests,
10 haven't you?
11      A.   I have the reports on the
12 tests.  I have not seen it, but I know
13 that the testing lab in China when we
14 finally got the window approved there and
15 I laughed I said, were they shooting
16 marshmallows at the window or something.
17 My window blew through the U.S. Dade
18 County.  They had a lot of respect for
19 that testing agency in China.  And I
20 think it's the same one that tested the
21 drywall.
22      Q.   But you actually saw a
23 report on the windows?
24      A.   I did.

154

1       Q.   You didn't just rely on what
2  some guy at the Chinese factory said that
3  it met the standards?
4       A.   Well, it was in English.
5       Q.   And you actually read it?
6       A.   And I know windows and I
7  know -- I know the window business.
8       Q.   Tell me if you need a break
9  at any time.
10      A.   I'm good.
11      Q.   Have you seen the invoices
12 placed for the Phoenix loads?
13      A.   The invoices for the
14 Phoenix?  No, I don't believe so.  Unless
15 it was a document that -- I have to see
16 it.
17      Q.   Let me show you Exhibit-33.
18 Have you ever seen that before?
19      A.   I don't think -- if I've
20 seen it, I haven't noticed what this was.
21      Q.   And I'm not representing to
22 you that Devon produced this.  This was
23 produced actually by North Pacific.  And
24 I was just wondering if -- this is a

155

1  different manufacturer or a plant than
2  the plant where the drywall was
3  manufactured for Devon, isn't it?
4       A.   Well, I don't know.
5            MR. BROWN:  Object to the
6       form.
7            THE WITNESS:  My knowledge
8       was that they bought 200,000
9       pieces of drywall through Phoenix
10      that the NorPac guy was --
11      representative was at the factory,
12      somebody who worked for NorPac and
13      they ordered 200,000 pieces the
14      day before I was there the first
15      time.  And then I wasn't about to
16      order it -- I was afraid to order
17      it the first time.
18 BY MR. LAW:
19      Q.   You assumed that that
20 200,000 pieces came from the same
21 factory?
22      A.   I believe it came from the
23 same factory.
24      Q.   Any other reasons you want

156

1  to add as to why you believed that
2  besides what we've talked about?
3       A.   Well, Buckley told me.
4       Q.   Jay Buckley, he wasn't
5  involved in the Phoenix load, was he?
6       A.   No.  No, and the people in
7  China told me they had just received an
8  order for 200,000 pieces.
9       Q.   Do you know if all -- I
10 already asked you that.
11      A.   That's all right.  You can
12 ask me again.
13      Q.   Well, I was going to ask you
14 if you knew if all of the gypsum used at
15 the three plants we talked about and the
16 plant --
17      A.   I don't know.  I was told
18 that Taishan Gypsum -- Taishan Gypsum
19 owned the gypsum mine.  That's what I was
20 told.
21      Q.   They told you it was out
22 back?
23      A.   They told me it was in the
24 back yard.

Robert Scharf                                          March 24, 2011

157

1       Q.   You never saw that mine?
2       A.   I never saw that.  They are
3   not on a 60 by 100 lot.  The backyard
4   could be like far, but that's what they
5   told me.
6       Q.   Have you ever heard of a
7   company called Knauf, K-N-A-U-F?
8       A.   I have now.
9       Q.   When did you first hear
10  about Knauf?
11      A.   We may have -- Julian may
12  have brought them up to me at one point.
13  They were a German manufacturer, and they
14  are near Beijing.  They have a factory
15  and they supposedly make good quality
16  stuff.
17      Q.   What did Julian tell you
18  about Knauf?
19      A.   That they have a factory
20  near Beijing and that their quality is
21  good and they can ship out of Beijing.
22      Q.   Beijing it's near Shandong,
23  isn't it?
24      A.   Well, Beijing is -- Shandong

158

1   is a providence that runs from the sea
2   port in Qingdao.  It goes pretty far deep
3   into west into China.  And I think it's
4   maybe an hour from Beijing.  I'm not
5   sure, though.
6       Q.   Did you visit any factories
7   where drywall is manufactured for Knauf?
8       A.   No, I don't believe I did.
9       Q.   Do you know if the gypsum
10  used --
11      A.   Julian might have.  I'm
12  sorry.
13      Q.   Did he tell you he had
14  visited one of the factories?
15      A.   He may have.
16      Q.   Julian, does he live in
17  China?
18      A.   He does.
19      Q.   Still lives there?
20      A.   He does.  He's Chinese.
21      Q.   And does he still work for
22  Devon, do you know?
23      A.   I don't know.
24      Q.   Do you know if the gypsum

159

1   used by the plant to manufacture drywall
2   for Knauf came out of the same mine as
3   the gypsum used to manufacture the
4   drywall for Devon?
5       A.   No, I don't know.
6       Q.   You and Julian never talked
7   about that?
8       A.   Well, I don't think Julian
9   would know.  We just assumed that all the
10  gypsum that was used by Taishan came from
11  their mine in Taishan, China.
12          MR. LAW:  We're running out
13      of time on this tape here.  Let's
14      take a quick break.
15          THE VIDEOTAPE TECHNICIAN:
16      Going off the record.  This is the
17      end of tape number one, the
18      deposition of Robert Scharf.  Time
19      on video is 11:48.
20              - - -
21          (Whereupon, a brief recess
22      was taken.)
23              - - -
24          THE VIDEOTAPE TECHNICIAN:

160

1       We are now back on the record.
2       This is the beginning of tape
3       number two in the deposition of
4       Robert Scharf.  Time on video is
5       currently 13:02.
6   BY MR. LAW:
7       Q.   Mr. Scharf, I'm going to
8   show you Exhibit-11 and see if I can get
9   you to clarify something for me, please.
10      A.   Okay.
11      Q.   Middle E-mail right here?
12      A.   On the top page?  Yes.  Go
13  ahead.  It says first vessel.  Is that
14  the one?
15      Q.   Yes, sir.  In this E-mail
16  you noted that you saw six factories only
17  two could meet specs and we talked about
18  all that.  The question I have for you is
19  after you talk about the factories you
20  saw you said I think we can buy one of
21  the smaller ones.  Were you talking about
22  Devon perhaps buying a smaller factory?
23      A.   No.  No.  Buy a factory
24  itself you mean?

Robert Scharf                                            March 24, 2011

161

1    Q.   What were you talking about
2  buying a smaller one?
3    A.   I meant buying product from
4  one of the smaller ones.
5    Q.   Buy some drywall --
6    A.   -- checking today where they
7  are.  I believe they never sent the
8  samples so we never did anything with
9  them.
10   Q.   So at this point in time you
11 were talking about getting some samples
12 from some of the smaller factories to
13 send to North Pacific?
14   A.   That's correct.
15   Q.   That's around March of '06,
16 and at that point in time the drywall is
17 already being manufactured, wasn't it?
18   A.   Yes, but they were talking
19 about a lot of boats.
20   Q.   So you all are looking for
21 some other factories to possibly --
22   A.   If we needed -- if we need
23 it faster than what -- they wanted it
24 faster than the other factory could

162

1  produce it.  At the time we thought we
2  might need some more factories.
3    Q.   So you're going to look some
4  of the smaller ones and send samples for
5  North Pacific to see if maybe they wanted
6  to go ahead and get some drywall from
7  smaller factories?
8    A.   That's right.
9    Q.   And you said you'd check and
10 see where the samples were.  Did you
11 order a ship from the factory?
12   A.   I asked the factory to ship
13 them when I was there, yes.
14   Q.   North Pacific wanted the
15 stuff pretty fast, didn't they?
16   A.   They did.
17   Q.   You later learned that the
18 Phoenix load didn't show up on time, and
19 North Pacific had promised some loads to
20 customers, hadn't they?
21   A.   Yeah, I'm not -- only half
22 the load ever shipped to my knowledge
23 from the Phoenix load, and it went to New
24 Orleans.  And they didn't take it, and

163

1  I'm not sure why they didn't take it,
2  NorPac, but they didn't accept it in New
3  Orleans.
4    Q.   Do you know where that half
5  that load ended up going in New Orleans
6  that North Pacific didn't accept?
7    A.   No, I don't, but you'll
8  probably find it.
9    Q.   So the other half of the
10 load is what was sitting on the dock that
11 never shipped, right?
12   A.   That's correct.  It was at
13 the port, yeah, in Qingdao, China, yes.
14   Q.   For all you know it's still
15 sitting there today?
16   A.   Well, it was a year or so
17 after we shipped it was still there.  I
18 know that.
19   Q.   You don't know if it ever
20 made it to the U.S.?
21   A.   I don't know.
22   Q.   Now, was it your
23 understanding from communicating with Mr.
24 Buckley that North Pacific had promised

164

1  some of -- the whole load, the Phoenix
2  load to its customers and when half of it
3  didn't show up they needed drywall pretty
4  fast?
5    A.   No, I don't know that it
6  made a difference.  I don't know whether
7  it made a difference, what I did with
8  them or what they did with Phoenix.  They
9  had -- to my knowledge they had these
10 loads pre-sold, and they wanted to get
11 them out and they wanted to get paid.
12 That's what they wanted.
13   Q.   They had them pre-sold to
14 North Pacific customers?
15   A.   North Pacific had them
16 pre-sold, and they wanted to get it off
17 the boat and they wanted to get it out to
18 their customers.
19   Q.   Exhibit-31 -- and before we
20 get into that, was there a shortage of
21 domestic drywall around this time in '06?
22   A.   There was.
23   Q.   That's kind of what prompted
24 you to go to China and get a better price

Robert Scharf                                           March 24, 2011

165

1  on drywall, wasn't it?
2       A.   It did.
3       Q.   Basically you saw an
4  opportunity in a tough market to bring
5  some Chinese drywall in to make a profit,
6  didn't you?
7       A.   They saw it and I went and
8  did it, yes.
9       Q.   Do you know why North
10 Pacific didn't go over there themselves
11 and go straight to the factory?
12      A.   They didn't want to deal
13 with China directly.  I know that.  I'm
14 not sure why.  I think they didn't want
15 to have to pay for it before they got it.
16      Q.   I'm going to show you
17 Exhibit-31, and for the record I skipped
18 it earlier.  We're going to go back to
19 31.  You got two copies there.
20      A.   I think you just gave me
21 this now.
22      Q.   Let your attorney take a
23 quick look at it if you will.
24      A.   He's not my attorney.

166

1       Q.   That's right.  Let Devon's
2  attorney look at it.
3       A.   Thank you.
4       Q.   And again, the sequence it
5  starts on page number two and the first
6  E-mail from Mr. Buckley to you.
7            In the first E-mail Mr.
8  Buckley is asking you what the sheets
9  look like and if each sheet has the stamp
10 stamped on it.  Is that right?
11      A.   That's correct.
12      Q.   Did you ever look at any
13 U.S. drywall to see if each U.S. sheet
14 had an ASTM stamp on it?
15      A.   Not really.  I've never been
16 in the drywall business.  It's not
17 something --
18      Q.   I understand.  And when Mr.
19 Buckley would ask you these questions
20 such as is the stamp on every board,
21 would you go back to the factory and try
22 to find out?
23      A.   That's exactly what I did.
24      Q.   So this is your first rodeo

167

1  here?
2       A.   That's correct.
3       Q.   All right.  So he asked you
4  if it's on each board, and you said in
5  response, I don't think so.  I don't
6  think it's required for half inch.  But
7  you then went back to the factory, didn't
8  you, to find out if it was on each board?
9       A.   Well, they would put it on
10 each board.
11      Q.   And Mr. Buckley told you in
12 response that the ones he had seen said
13 meets ASTM requirements on the paper
14 edges.  Now, that would be U.S.
15 drywall --
16      A.   Well, I don't believe any
17 Chinese drywall puts anything on the
18 edges.
19      Q.   And that's talking about the
20 little tape around the --
21      A.   That they pull off.  That
22 would have the manufacturer on it and it
23 would have the standards.
24      Q.   Now, the little tape around

168

1  the Chinese drywall didn't have anything
2  on it, did it?
3       A.   I don't believe it did.
4       Q.   And you in response told him
5  in the middle of the page on your E-mail
6  I will request it be stamped?
7       A.   Right.
8       Q.   And you actually went back
9  to the factory and told them stamp it on
10 every board, didn't you?
11      A.   Actually, print it is really
12 better than the word stamped.
13      Q.   I agree.  So you went back
14 to the factory and asked if they have the
15 meets or exceeds printed on every board?
16      A.   Yeah, I probably said
17 stamped, but it should have said printed.
18      Q.   Just make clear --
19      A.   It's a print.  I showed you
20 how they do that.  It's just an in-line
21 printer.
22      Q.   Did you ever watch them
23 print that on the boards out of the
24 in-line printer?

Robert Scharf                                    March 24, 2011

                                                                      169

1      A.   I've seen the in-line
2  printers work in a lot of products.  My
3  guess is I saw it over there, but I'm not
4  sure.
5      Q.   But after Mr. Buckley told
6  you to have it printed on the board, you
7  went back to the factory and told them to
8  print --
9      A.   We have to have it on each
10 board and they said it's not a problem.
11     Q.   And then also Mr. Buckley
12 noted that would help North Pacific sell
13 it, didn't he?
14     A.   Yeah, that's what he said.
15     Q.   He actually wanted it not to
16 just say meets ASTM but to actually add
17 the words or exceeds?
18     A.   Yes, but I think that's
19 pretty much a standard terminology on
20 products with ASTM.  I think most of them
21 say meets or exceeds ASTM standards.
22     Q.   Is that why you had asked
23 the factory to put the or exceeds on the
24 boards?

                                                                      170

1      A.   No, I don't think I asked
2  them to put it -- or maybe I did if
3  that's what Jay wanted, but I think they
4  already had the in-line printer and they
5  had the printing set up for it.
6      Q.   And Jay sent you some
7  pictures of some U.S. stamps as an
8  example.  I'm going to show you
9  Exhibit-34.  Is that Mr. Buckley
10 E-mailing you some pictures of the stamp
11 so you could take it to the factory and
12 tell them what to put on it?
13     A.   I don't see the stamp.
14     Q.   Well, the pictures are
15 attached.  You'll see attachments.  I
16 don't have the actual pictures.  They
17 weren't produced, but the E-mail refers
18 to attachments, and you'll see it's got
19 the little attachment.
20     A.   Yeah, so I don't know.
21     Q.   Was it your understanding or
22 at least does the E-mail indicate that
23 Mr. Buckley E-mailed you some pictures of
24 some examples that you could take to the

                                                                      171

1  factory and show it to them?
2      A.   Yes.
3      Q.   That point in time marks the
4  order had already been placed, doesn't
5  it?
6      A.   March 23rd.  When did it
7  ship?  Do you know?
8      Q.   I think you told me the
9  order was placed around February 21st of
10 '06, and I believe the records indicate
11 it shipped on May 12th?
12     A.   Oh, May.  It probably wasn't
13 made yet then.
14     Q.   Didn't you tell me earlier
15 that it had been made when we saw the
16 E-mail around February 21st of 2000 --
17     A.   I think that's when we
18 ordered it.  I ordered it the week of
19 February 20th in China.
20     Q.   And then you came home and
21 went back to China when they started
22 making it?
23     A.   No.  I went there, saw the
24 factory, came home, went back three weeks

                                                                      172

1  later, ordered it, came back and I think
2  I went back when they were shipping it.
3  Then I went to the port.
4      Q.   So you communicated during
5  this time with Mr. Chu who was in China?
6      A.   That's correct.
7      Q.   And then Mr. Chu would go to
8  the factory and communicate with them?
9      A.   I believe so.
10     Q.   I'm going to show you
11 exhibit number 35.  Then what I'm going
12 to ask you about is this E-mail down here
13 from Jay Buckley to you Mr. Scharf, and
14 he said pictures of the stamp they are
15 putting on it will work just fine.  So
16 you all had some pictures sent to Mr.
17 Buckley for him to look at and see if the
18 stamp is what he wanted on the board?
19     A.   Yeah, we have that picture
20 in here.
21     Q.   And I was going to ask about
22 that.  That's photograph 29 that depicts
23 the stamp?
24     A.   Yeah.

Robert Scharf                                                    March 24, 2011

173

1    Q.   And that's what Devon had
2  them print on the board?
3    A.   That's what NorPac wanted
4  printed on the board.
5    Q.   And North Pacific told Devon
6  and Devon told the factory --
7    A.   Yes, if we have to go
8  through that step I guess that's the way
9  it happened.
10   Q.   All right.  We've been round
11 and round on warranties, and I'm going to
12 show you Exhibit-36 and this time George
13 Jackson -- who is Mr. George Jackson?
14   A.   I think he was the
15 controller at North Pacific.
16   Q.   And he tells you in the
17 subject line items we really need?
18   A.   Yes.
19   Q.   And they're again asking
20 you, and this is in April of '06.  At
21 this point the drywall was being made,
22 wasn't it?
23   A.   Most likely.
24   Q.   It took some time to ship it

174

1  from the factory to the dock, didn't it?
2    A.   Very quickly, that took
3  days, but, yeah, normally it would have
4  taken more time.  See, the beginning of
5  May the whole country shuts down for
6  their May holiday.  So we had to get it
7  there either before that or we would have
8  to wait two weeks with drywall to ship it after that.
9    Q.   And North Pacific wanted
10 this on this stuff on the water?
11   A.   Well, that was a shipping
12 issue now with the port and everything.
13   Q.   So at least as of April of
14 '06, 2006 they were making drywall?
15   A.   I believe that's right.
16   Q.   And here Mr. Jackson on
17 behalf of North Pacific is again asking
18 for a warranty letter, and this time he
19 wants an officer of the company to sign
20 that letter.
21   A.   Yes.
22   Q.   Is that correct?
23   A.   That's correct.
24   Q.   You were an officer of the

175

1  company, weren't you, as the president?
2    A.   The officer would have been
3  John Bennett that would have signed that.
4    Q.   So they wanted the head
5  honcho to sign the letter?
6    A.   That's correct.
7    Q.   And he even gave you some
8  suggested language?
9    A.   He did.
10   Q.   And he noted Devon
11 International Trading Inc. supplied
12 imported drywall to North Pacific Group
13 Inc. all quality claims in the U.S. will
14 be inspected by an independent inspector
15 and our company will honor and pay
16 whatever the inspector determines to be
17 the cost of the problem.  Do you see
18 that?
19   A.   Yes.
20   Q.   Now, was Devon willing to
21 supply such a warranty?
22   A.   No.
23   Q.   These quality claims that
24 they are asking for a warranty on that

176

1  didn't have anything to do whether a
2  piece of board was broken during
3  shipment, did it?
4    A.   I'm not sure what it had to
5  do with.  I don't know what quality
6  problems they had.  Well -- in the past
7  you wouldn't think there was any real
8  quality problems with drywall other than
9  it was damaged and they had to tape it
10 and compound it.
11   Q.   Well, there were some
12 quality issues with the drywall made at
13 the three plants that had voids in it --
14   A.   Well, to me they were
15 quality issues, yes.
16   Q.   And you could foresee that
17 if drywall was shipped into the U.S. from
18 one of those factories --
19   A.   There could be problems,
20 yes.  That's correct.
21   Q.   You could foresee on behalf
22 of Devon that if drywall was brought into
23 the U.S. from one of those three
24 factories with voids and pillars that

Robert Scharf                                          March 24, 2011

177

1  could be some quality issues?
2        MR. BROWN:  Object to the
3  form.
4        THE WITNESS:  I would agree.
5  First time today I agree with you.
6  That would be a quality issue.
7  BY MR. LAW:
8        Q.   And when you were in
9  China -- well, let's see, you became the
10  president of Devon in 2004, didn't you?
11        A.   Probably right around that
12  time, the end of 2004.
13        Q.   And the only person that you
14  reported to at that time would have been
15  the owner of the company, Dr. Bennett?
16        A.   That's correct.
17        Q.   So you were in charge of
18  this operation basically, weren't you?
19        A.   In which operation?
20        Q.   The operation of finding the
21  factory to make the drywall --
22        A.   The drywall was mine, yes.
23        Q.   And getting it on the boat
24  and getting it here and getting it sold?

178

1        A.   That's correct.
2        Q.   They also asked for some
3  financial information on Devon
4  International, even asked for a personal
5  guarantee from Dr. Bennett?
6        A.   That's correct.
7        Q.   Was that ever provided?
8        A.   No.
9        Q.   You all didn't talk about
10  why they requested such financial
11  information?
12        A.   They owed us the money.
13        Q.   I've marked a purchase order
14  as an exhibit that we looked at earlier,
15  and that was a purchase order supplied by
16  North Pacific, wasn't it?
17        A.   Yes.
18        Q.   And according to North
19  Pacific's terms and conditions which I'm
20  going to mark as Exhibit-37 all the
21  purchase orders are subject to these
22  terms and conditions according to the
23  document at least?
24        A.   This wasn't attached to the

179

1  purchase order, though, I don't think.
2        Q.   If you see it, you'll see
3  that the terms and conditions are
4  available on their website.  And you
5  actually looked at this in your
6  deposition back in '07?
7        A.   I probably did, yeah.  I
8  know I've seen this, but --
9        Q.   Did you ever go when the
10  purchase order was accepted by Devon --
11  it was accepted, wasn't it?
12        A.   Yes, it was.
13        Q.   And it was used to go to
14  China and have some drywall manufactured,
15  wasn't it?
16        A.   Yes, it was.
17        Q.   Did you ever go look at the
18  terms and conditions of the purchase
19  order on their website?
20        A.   No.
21        Q.   Did you ever ask them about
22  the terms and conditions?
23        A.   No.  Can I see -- what
24  number was the -- I don't think this was

180

1  on their purchase order.  So then I
2  wouldn't know about terms and conditions
3  of their purchase order.
4        Q.   Well, that's why I'm asking
5  you about it.  Did anybody from North
6  Pacific ever mention it to you or tell
7  you to read the terms and conditions?
8        A.   Not to my knowledge.  I
9  don't remember that.  Well, I'm not going
10  to add.
11        Q.   You can add.
12        A.   I've never -- I've received
13  a lot of purchase orders in my life.
14  I've never seen one with terms and
15  conditions that are not attached to a
16  purchase order ever.
17        Q.   Is that why North Pacific
18  was asking for a separate written
19  warranty document from Devon?
20        A.   No, I don't know why they
21  wanted that.  But we can't furnish it.
22        Q.   You'll agree from January of
23  2006 all the way through April when this
24  stuff was being made they were still

Robert Scharf                                          March 24, 2011

181

1   asking for a written warranty from Devon,
2   weren't they?
3       A.   It looks like that, yes.
4       Q.   Did you just kind of ignore
5   them?
6       A.   No.  There was no warranty.
7   So when they first wanted it, I would say
8   let me go look and see what we have, see
9   what we can do and there is no warranty.
10      Q.   The foil we talked about
11  earlier that came from Toronto that you
12  sold in the U.S., do you recall talking
13  about that?
14      A.   No.  Foil?  No.  No.
15  Aluminum foil was the Denny Building
16  Products, the original Denny company made
17  in Philadelphia as a matter of fact.
18  That was aluminum foil.
19      Q.   And then you sold that in
20  the U.S.  Aluminum trim coil?
21      A.   Coil that was made in
22  Atlanta.
23      Q.   I apologize.  I messed that
24  up.  The aluminum trim coil --

182

1       A.   Was manufactured in Roswell,
2   Georgia.
3       Q.   And then you sold the
4   aluminum trim coil in the U.S., didn't
5   you?
6       A.   That's correct.
7       Q.   If you had a warranty issue
8   from one of your customers with respect
9   to the trim coil, would you go back to
10  the manufacturer in George?
11      A.   There was no warranty with
12  trim coil.
13      Q.   No warrant on the product.
14  What about this -- I thought earlier you
15  told me there was an aluminum product or
16  some product manufactured in Toronto by
17  Royal Plastics?
18      A.   No, that was a vinyl siding
19  manufactured by Royal Plastics.
20      Q.   And then you sold it in the
21  U.S.?
22      A.   That's correct.
23      Q.   If you had an warranty issue
24  with the vinyl siding, would you send it

183

1   back upstream to the manufacturer?
2       A.   No, I would have taken care
3   of it.
4       Q.   Because you were a
5   distributor of that product?
6       A.   No.  I owned a company
7   called Royal Building Products.  I had a
8   partner who was a partner of mine in that
9   who owned Royal Plastics.
10      Q.   And that's where it was
11  manufactured?
12      A.   That's where it was
13  manufactured.  So we weren't the
14  manufacturer, but we had a private label
15  on the products that Royal Plastics made
16  in the United States and it was called
17  Royal Building Materials, Royal Building
18  Products.  And we had different trade
19  names for the different types of sidings.
20      Q.   And you marketed that stuff
21  under those trade names?
22      A.   We marketed under the group
23  name Royal Building Products and the
24  trade names -- and Royal Building

184

1   Products supplied the guarantee on that.
2       Q.   And you put your logo or
3   your name Royal Building Products on the
4   packaging?
5       A.   Yes.  Well, no.  Well, it
6   would have said RoyTech or it would have
7   said Royal Crest.  It would have said the
8   brand name of them in the box.
9       Q.   And if you had a warranty
10  claim with respect to the manufacturing
11  defect of that product, would you replace
12  it and then go back to your manufacturer
13  buddy in Toronto --
14      A.   That's exactly -- he would
15  then, yes.  That's exactly what would
16  happen.
17      Q.   And then he'd make it right
18  with your company?
19      A.   He'd make it right -- which
20  is also half his company.
21      Q.   It sounds like that's what
22  North Pacific wanted to do was if there
23  was a warranty claim they could file it
24  with Devon and then let Devon deal with

Robert Scharf                                    March 24, 2011

185

1  the company in China?
2           MR. BROWN:  Object to the
3  form.
4           THE WITNESS:  I'm not sure
5  what they wanted to do.  George
6  Jackson is a unique individual.
7  I'll just leave it like that.  I'm
8  not sure what his reasoning was.
9  BY MR. LAW:
10     Q.    After Mr. Jackson sent that
11  Mr. Buckley -- they are wearing you
12  out here.
13     A.    They are wearing Buckley out
14  is what they're doing.
15     Q.    Mr. Buckley came back on
16  Exhibit-38 in another E-mail and asked
17  again to check on the warranty that North
18  Pacific was requesting.  Is that right?
19  I'm at the bottom of the exhibit.
20     A.    No.  I had a meeting in
21  Pensacola with George Jackson who had
22  told me -- he's the one that had the ASTM
23  report.  He's the one that said it blows
24  away all standards in the U.S., and after

186

1  that he didn't bother me anymore for
2  anything.
3      Q.    That was the Phoenix load,
4  right?
5      A.    No.  That was drywall that
6  was made in that factory that he had an
7  ASTM report from in English that he had
8  this guy in Texas, this testing lab in
9  Texas test it for him.  He told me that
10  this stuff is terrific.  It blows away
11  every ASTM standard but one and that was
12  equal to that one.  And that was George
13  Jackson that told me that.  Then after
14  that I -- we never -- we didn't have it
15  to furnish.
16     Q.    And I want to make sure I
17  got your earlier testimony right because
18  it sounds a little different.
19           MR. BROWN:  Object to the
20  form and the comments of counsel.
21  BY MR. LAW:
22     Q.    The test that George Jackson
23  had done in Houston, do you know if they
24  tested three full sized sheets?

187

1      A.    Do I know for a fact?  I
2  believe they had full sheets tested.
3      Q.    Do you know where those
4  three full sheets came from?
5      A.    They would have come from
6  the factory in Taishan.
7      Q.    Would they have come off the
8  load, half the Phoenix load that came
9  into New Orleans?
10     A.    No.  I don't know.  It
11  probably just came off the line.
12     Q.    So you think that from the
13  factory that they shipped to the U.S.
14  just three full size sheets?
15     A.    Yeah, I believe that the
16  factory gets the approval.
17     Q.    I understand.
18     A.    And then whatever they make
19  if they are saying that they made that
20  product to that standard that they have
21  to certify it and they have to be
22  accurate.  That's how I believe it's
23  done.  So the actual panels what load
24  they came off of I don't think there's

188

1  any way to tell.
2      Q.    And then I thought that's
3  what you had said earlier.  It was your
4  understanding that the factory has got
5  some sort of ASTM approval?
6      A.    Right.
7      Q.    And that was based upon what
8  the Chinese guy told you at the plant --
9      A.    That's correct.
10     Q.    That it's ASTM approved?
11     A.    That's correct.
12     Q.    I just wanted to mark
13  Exhibit-39 because I know it's been a
14  while and ask you if that date seems
15  correct that the load shipped on May 12th
16  of 2006 and I'm at the bottom.  It notes
17  that it was loaded in three days.  And I
18  guess a better question is did the load
19  ship after the loading was completed on
20  the 12th?
21     A.    I believe so.
22     Q.    And I saw in your deposition
23  previously you noted that you spent the
24  night on the boat?

Robert Scharf                                    March 24, 2011

189

1      A.    I did.
2      Q.    And the loading was
3  completed on the 12th.  So did it ship on
4  either the wee hours of the 12th or the
5  13th?
6      A.    My last night was there was
7  on the Thursday night.  So it was either
8  the 11th or the 10th.  I had business in
9  Shanghai.  I left that Friday morning,
10 and I went back to Shanghai.  And Julian
11 stayed at the ship and the loading, for
12 the last day of the loading.  And he's
13 the one, somewhere there will be an
14 E-mail that will say ship is loaded and
15 it's whatever time it is and it's ready
16 to leave.  I think it left immediately
17 after it was loaded, but I was in
18 Shanghai when they finished the loading.
19     Q.    So it would have left the
20 best of your knowledge around Friday the
21 12th of May of '06?
22     A.    Yeah, or that Saturday the
23 following morning.
24     Q.    I'm going to show you

190

1  Exhibit-40.  In the bottom you'll see an
2  E-mail from Ruth to Jay Buckley and then
3  Buckley responded to both you and Ruth?
4      A.    Right.
5      Q.    And Ruth asked Jay on May
6  4th of '06 for the contact information
7  for a lab in Houston to test drywall.
8          Do you see that?
9      A.    I do.
10     Q.    And do you know why as the
11 ship was being loaded that Ruth asked Jay
12 Buckley where they can test drywall?
13     A.    Yeah, because we wanted to
14 have test reports to show other people.
15 We were trying to sell a lot of drywall.
16 I told the factory we could buy 50 boats
17 this year.
18     Q.    So Devon wanted to test some
19 drywall so they can market it to
20 customers --
21     A.    No, I didn't want to test
22 anything.  I wanted to have this factory
23 send it back -- have a testing lab test
24 it and then have a report that would say

191

1  Taishan factory here's their report in
2  English.
3      Q.    So you as president of Devon
4  wanted to have an actual report in
5  Devon's hands from the lab?
6      A.    Well, I know Ruth wanted it.
7      Q.    Did you all talk about that,
8  you and Ruth why she wanted it?
9      A.    No, not -- maybe back then
10 we did, but we didn't talk about it now.
11 I'm not sure why she wanted it.
12     Q.    And at this point the boat
13 is about to ship in six days, isn't it?
14     A.    Yeah.
15     Q.    It's May 4th --
16     A.    You know, this had nothing
17 to do with that load.
18     Q.    That's what I'm getting at.
19 At least on May 4th of '06 that load had
20 already been made, hadn't it?
21     A.    And they had their test
22 reports already, Northern Pacific.
23     Q.    I understand.  We've been
24 through that.

192

1      A.    Yeah, well, Jay said, well,
2  I can't give it to you because they did
3  me a favor.
4      Q.    But all the drywall that was
5  sitting there -- we'll get to look at
6  some pictures in a minute -- none of the
7  sheets out of that set of drywall, that
8  production run, those were not tested by
9  North Pacific.  Is that correct?
10     A.    I don't know.  I don't know
11 for a fact.  If you go by how it should
12 be done, I would assume that it was done
13 from boards that were made prior to any
14 of that being made.  But I don't know
15 that for a fact.
16     Q.    Just to be clear, to your
17 knowledge three full size sheets were not
18 shipped out of the factory out of this
19 production run to be tested?
20     A.    To my knowledge that's
21 correct, to my knowledge.
22     Q.    So the drywall is already
23 made as of May 4th of '06 and it's got
24 this little stamp or printing on it that

Robert Scharf                                        March 24, 2011

193

1    we've talked about, right?
2        A.   That's correct.
3        Q.   And now Ruth is asking -- I
4    guess the Vice President of Devon
5    International for the contact information
6    for the lab to test drywall that Devon
7    may market to other customers?
8        A.   Well, that's not what she is
9    asking for.  I just assume that.  She
10   wants -- she wants to know where the lab
11   is in Houston.
12       Q.   So the record is clear
13   that's not to test the load going to
14   North Pacific?
15       A.   No, it's not.
16       Q.   And was the purpose of
17   getting a report to market drywall to
18   other customers?
19       A.   I would assume that's what
20   this is.
21       Q.   And you'll see that North
22   Pacific, they didn't use a regular
23   testing agency.  Do you see that?
24       A.   Go ahead.

194

1        Q.   I'm just going to ask.  Do
2    you know what type of testing agency they
3    used?
4        A.   I know exactly what they
5    used.  They used USGA tested it for them.
6    You have their test reports from USGA.
7    That's who tested it for NorPac.
8        Q.   You are talking about the
9    U.S. gypsum report that I marked?
10       A.   That's correct.  That's who
11   tested it for them.
12       Q.   And what Devon wanted was a
13   report from that laboratory in English
14   with the American --
15       A.   And there's one floating
16   around someplace.
17       Q.   From the North Pacific test?
18       A.   I believe so, yeah.
19       Q.   I really would like to see
20   it.
21       A.   I would, too, but I didn't
22   see it in here and I didn't see it in
23   here, but it was in those documents with
24   Crowley.

195

1        Q.   And you are referring to the
2    documents that you looked at at your
3    October deposition?
4        A.   What I did before the
5    deposition, we went through piles of
6    stuff.  In there and I had seen that
7    before.  It wasn't the first time I had
8    seen that.
9        Q.   And Mr. Crowley had this
10   test report?
11       A.   He did.
12       Q.   This lab in Houston, they
13   are not a U.S. manufacturer of drywall,
14   are they?
15       A.   United States Gypsum is.
16       Q.   U.S. Gypsum is, right, but
17   the third-party testing facilities --
18       A.   I don't know who tested it.
19   In here we have their test reports
20   somewhere.
21       Q.   U.S. Gypsum published a test
22   report, but they didn't test their own
23   product.  You've sold a lot of building
24   materials.  A manufacturer doesn't test

196

1    their own product, do they?
2        A.   Not normally they don't.
3        Q.   They get a third party --
4        A.   But USG had this tested for
5    them because NorPac was a customer of
6    theirs I guess.
7        Q.   What I showed you was an
8    MSDS published Exhibit-25?
9        A.   That's exactly what you
10   showed me.  Well, I was told it was USG
11   who had the panels tested in Houston.
12   That's what I was told.
13       Q.   Devon was never supplied any
14   contact information for any testing lab
15   in Houston.  Is that correct?
16       A.   We were supplied -- we had a
17   copy of the testing report.  There were
18   two reports.  One you saw that had the
19   wrong size or a different size and then
20   this other report.
21       Q.   And you haven't seen that
22   report since October of '07?
23       A.   Probably the day before
24   this, probably the last time I saw it.

Robert Scharf                                          March 24, 2011

197

1    Q.   And you are referring to
2  your deposition?
3    A.   I'm sorry, my deposition,
4  yeah.
5    Q.   And you hadn't seen it since
6  then, have you?
7    A.   I have not seen it since
8  then, but it was there.  There was a
9  document.  I can tell you that for sure.
10  And that's because it was different from
11  the other one that's there that had the
12  different size.
13    Q.   Do you know if it was for
14  four by 12 by half inch?
15    A.   Four by 12 by half inch and
16  then -- see, everybody in the world but
17  us uses the metric system.  So they go by
18  I think it was 12.7 millimeters or
19  something.  So there's conversions
20  situations that you have to deal with.
21    Q.   Is there any type of
22  document retention policy that you know
23  of at Devon?
24    A.   I don't believe so.

198

1    Q.   And you know what I mean by
2  that, don't you, like a period of time
3  within which they maintain records?
4    A.   I don't know.
5    Q.   Exhibit-41 is a document
6  produced by Devon, and the top page is a
7  fax cover to Bob from Salina.  And she
8  references some inspection reports that
9  are in Chinese that are attached, and if
10  you'll flip the page you'll see some
11  reports in Chinese.  Who is Salina?
12    A.   Salina I think she works in
13  the Shanghai office.
14    Q.   She's one of the Devon
15  employees that lives in China?
16    A.   That's correct.
17    Q.   And it looks like she was
18  faxing to you some test reports from the
19  factory?
20    A.   Yes, she did.
21    Q.   You saw earlier we saw an
22  E-mail where you referenced some
23  inspection reports that you had in your
24  hand and you were going to get translated

199

1  when you got to New York.  Do you know if
2  this is what you were referring to?
3    A.   I don't think so.  This came
4  by fax?
5    Q.   That's what Ruth identified
6  the fax number.
7    A.   I believe that -- well, I
8  shouldn't even say.  I think that's a
9  testing lab in China, but I'm not sure
10  what -- I've seen that stamp before on
11  other things.
12    Q.   Is that your handwriting on
13  the end that says does not match our size
14  on the last page?
15    A.   No, it's not.
16    Q.   15.9 millimeters that would
17  be larger than the 12.7 half inch,
18  wouldn't it?
19    A.   I would think so, but I'm
20  not -- I wouldn't even know what that
21  meant other than the numbers for the
22  size.
23    Q.   And on March 29th of '06
24  when the drywall had already -- or the

200

1  order had already been placed --
2    A.   I'm sorry.
3    Q.   The question is why was
4  Salina in China sending you reports on
5  the wrong size drywall in March of '06?
6    A.   Well, she may have been
7  asked for whatever inspection reports we
8  had and this is what she sent.  She
9  didn't know the size of the drywall.
10    Q.   Do you know if that came
11  from the same factory?
12    A.   No, I wouldn't but if
13  somebody could read Chinese they would
14  know it.  I don't know where this came
15  from.
16    Q.   The report that you say you
17  saw around October of '07, is that the
18  first time you saw it?
19    A.   No, I've seen it before.  I
20  knew it -- I knew there were two reports.
21  And what happens is they all have -- when
22  they translate the names of the factories
23  they translate strange.  The nail factory
24  we bought a product from when they

Robert Scharf                                      March 24, 2011

201

1  translate the name it was called the
2  Cherrywood Hardware Company or something
3  like that. I didn't even know that was a
4  nail company.
5           So when they translate them
6  I know I've seen a report that had
7  like -- it may have been for fire rated
8  the other report. It was a four by eight
9  board and it was like three quarter or
10 five eighths or something like that. And
11 the name didn't say Tyon (ph). It said
12 something else on it. Then I saw the
13 other one that we got from Jay. That's
14 where it came from. It came from Jay
15 Buckley the other report.
16      Q.   So it was in a grouping with
17 another report that pertained to fire
18 rated?
19      A.   No. No. The one -- the one
20 that had -- I'm going to call it the
21 Phoenix one just because I don't know
22 what else to call it at this moment.
23 That's the one that had a different size
24 on it. And I don't know what was on the

202

1  Phoenix. We can go back and look. I
2  don't know what was on the Phoenix load.
3  There maybe four by eight boards.
4           I believe that report came
5  from Phoenix. They had it or however
6  they tested it or whoever tested it for
7  them. That's what I believe. Then I saw
8  the one that Jay had done in Houston.
9  There was a document that -- and once
10 they got that document, John said
11 everything was fine, you know, and it
12 exceeds all the standards and we're fine
13 with it and I don't think anybody asked
14 me for anything else anymore except more
15 drywall.
16      Q.   I know you saw it in October
17 of '07, and you told me you saw it before
18 then. When did you first see that test
19 report?
20      A.   Probably around the time
21 that we were doing the deal, trying to
22 get it done with Buckley. Somebody sent
23 it to me.
24      Q.   And we've seen all these

203

1  requests back and forth where Mr. Buckley
2  was requesting from you the ASTM specs
3  and standards. It would have been after
4  all that, wouldn't it?
5      A.   I don't know. But maybe if
6  I go through all those we can find it. I
7  don't know. I looked pretty good for
8  that. I didn't find it. Maybe Crowley
9  has it. I know I saw it. That I do
10 know.
11      Q.   You say all those, all those
12 documents produced by Devon you went
13 through these and didn't see any?
14      A.   I didn't notice it. I did
15 not notice them when I went through
16 there. It's a lot of documents there.
17      Q.   The Phoenix group, this
18 Phoenix load, was Phoenix a company in
19 China?
20      A.   Yes -- well, they sold
21 product to NorPac. They were Chinese
22 people. They sold product to NorPac that
23 they sourced in China. I'm not sure
24 whether the company was in China or it

204

1  was in the U.S. company. I don't know.
2      Q.   So the Phoenix, this Phoenix
3  company went to a factory in China and
4  had drywall manufactured for North
5  Pacific?
6      A.   No, actually the North
7  Pacific guy went with the person from
8  Phoenix to the factory.
9      Q.   That manufactured drywall
10 for North Pacific?
11      A.   Yes.
12      Q.   Do you know why the North
13 Pacific guy didn't do the same thing
14 instead of coming through Devon?
15      A.   Yeah, because he was like a
16 competitor with Jay Buckley. He used to
17 buy flooring from Phoenix. They bought
18 their flooring from Phoenix, and he was
19 their flooring person. And when he heard
20 that NorPac was interested in buying
21 drywall in China, he called his Phoenix
22 people and said, listen, my company is
23 going to buy some drywall in China can
24 you find me a Chinese factory. Then he

Robert Scharf                                             March 24, 2011

205

1  went there, and he was -- they were at
2  that factory I told you the day before I
3  went to the factory for the first time.
4  And that day they went in and they
5  ordered 200,000 pieces that day.
6      Q.   The day that you were there?
7      A.   The day before I was there.
8      Q.   So Jay Buckley was competing
9  with this other gentleman from North
10 Pacific to get the drywall here first?
11     A.   Well, I don't know about
12 first.  He knew that -- he was going to
13 buy drywall, and he knew he was doing
14 business with a Chinese group.  So he
15 said to them find it and I can get you
16 the order.
17     Q.   I saw in your deposition
18 from October of '07 that you mentioned
19 that you explored the possibility of
20 trying to bring some drywall into the
21 U.S. to sell in Hawaii?
22     A.   I had a customer that told
23 me that they wanted -- Chinese drywall,
24 you get Chinese drywall and they want it

206

1  in Hawaii, but that you had to buy a boat
2  at a time to make it feasible.  And they
3  are the ones that told me, you know, you
4  got to make sure it had a certain
5  flatness and a certain this and a certain
6  that.
7          I looked into it briefly and
8  we couldn't do it.  The price wasn't
9  right.  It was too low.  They were hoping
10 that maybe you could bring it into Hawaii
11 because the freight would be less than
12 bringing it here.  They had a warehouse
13 in Hawaii, and they could -- they were
14 using a lot of drywall in Hawaii.  They
15 thought maybe they get the Chinese
16 drywall in and then make it work, but the
17 price just didn't work at that point.
18     Q.   That was before --
19     A.   Way before.
20     Q.   Before January of '06?
21     A.   Yeah, way before.
22     Q.   About how far before?
23     A.   I'm going to say -- six
24 months to a year before.

207

1      Q.   What changed from within
2  that six months to a year that made it
3  more --
4      A.   Well, the shortage of
5  drywall in the United States.  So the
6  price got driven up.  So when Jay Buckley
7  asked me can he get drywall, I said,
8  well, let me see now because now maybe
9  you could make it work.
10     Q.   So with respect to the
11 Hawaii idea that you explored, there
12 wasn't really any profit in it for Devon
13 at that point in time?
14     A.   No.  Well, the customer
15 wouldn't buy it.  There was just no way
16 -- it was costing more to ship it and buy
17 it and sell it into Hawaii than they were
18 paying for it now.
19     Q.   And they were paying for
20 domestic product?
21     A.   Yeah.  I'm not sure.
22     Q.   We talked about when you saw
23 the price in Home Depot up at $21.00, is
24 that about when you realized that there

208

1  was some profit in bringing in the
2  drywall from China?
3      A.   Well, when I got the inquiry
4  from NorPac about drywall, the first
5  thing I did was started checking around
6  in it.  And it was like, well, there's a
7  shortage of drywall.  Maybe Jay even told
8  me that and that China may be an option.
9      Q.   And the shortage of the
10 domestic drove the price of the domestic
11 product up, didn't it?
12     A.   That's correct.
13     Q.   The simple supply and
14 demand, isn't it?
15     A.   Yep.
16     Q.   And you went to China and
17 found a factory that could make a whole
18 bunch of drywall and ship 18 boats in a
19 year?
20     A.   They ship more -- I gave
21 them a commitment for 50 boats.
22     Q.   And that was to the same
23 factory?
24     A.   I'm sorry.

Robert Scharf                                    March 24, 2011

209

1    Q.   I want you to finish up.
2    A.   When I said earlier this
3  factory was five or six football fields
4  wide and eight football fields long, we
5  don't build buildings like that in this
6  country.  You're talking about a building
7  is 800 yards long.  It's unfathomable
8  when you see that.
9       They can turn out product
10  quickly and good product.  I had windows
11  made in China.  They make two, 3,000
12  windows per shift.  A factory here would
13  take four, five weeks to make that.
14    Q.   You are not saying as you
15  sit here today this is good product, are
16  you?
17       MR. BROWN:  Object to the
18  form.
19       THE WITNESS:  Am I saying
20  that?
21  BY MR. LAW:
22    Q.   Yes, sir.
23    A.   Yeah, I find it hard to
24  believe that this product has any smell

210

1  to it, any odor to it.  I saw 5,000
2  bundles in Pensacola for months in the
3  warehouse there.  You could eat in that
4  warehouse.
5       You had nothing -- it was a
6  good looking product.  It seemed to
7  perform well.  We had these tests that
8  they showed us that showed that they met
9  all our standards.  I had a hard time
10  believing that this particular drywall
11  from this particular factory that there's
12  a problem with.
13    Q.   You hadn't been in any of my
14  client's homes, have you?
15    A.   Pardon me?
16    Q.   You haven't been in any of
17  my client's homes, have you?
18    A.   No, and I'm not saying that
19  anybody is wrong.  You asked me what I
20  thought.
21    Q.   And I'm asking you as you
22  sit here today, have you read any of the
23  reports or testing data from the consumer
24  product safety commission with respect to

211

1  this product?
2       MR. BROWN:  Object to the
3  form.
4       THE WITNESS:  I have not.
5  BY MR. LAW:
6    Q.   Have you seen some reports
7  on TV as to --
8    A.   I've read some stuff in the
9  papers and what's happened to homes and
10  everything.  And I didn't believe when I
11  first saw this that this would affect
12  this product.
13    Q.   Do you know anybody that has
14  this drywall product in their homes?
15    A.   I don't think so.
16    Q.   Have you ever been in a
17  house that has this drywall product in
18  it?
19    A.   Not to my knowledge.
20    Q.   What's the temperature like
21  over there in the Shangdon providence
22  when this stuff was made?
23    A.   It's -- let see if I can get
24  this right.  I would say that Beijing --

212

1  no.  No.  Quanjo (ph) which is a sea
2  port.  Quanjo they are like North
3  Carolina type weather.  They don't have
4  real severe winters.  Now, Beijing has
5  severe winters.  And where this factory
6  is in Taishan, well, you know I have
7  never worn a jacket when I was there.
8  I've been there in the spring I guess.
9  So I'm not sure what the climate is.  But
10  it's not like south China.  It's not like
11  Quanjo where it's hot and humid all the
12  time.  It's not a subtropical climate.
13    Q.   Back to what you were
14  saying.  They could crank out windows and
15  drywall a heck of a lot faster these
16  factories in China than they can in the
17  U.S., couldn't they?
18    A.   Absolutely.  They also
19  employed 3,000 people, and we employ 30
20  people in a factory.  There's a big
21  difference.
22    Q.   Have you ever seen windows
23  manufactured in the U.S. facility?
24    A.   I have.

Robert Scharf                                    March 24, 2011

213

1  Q.   Have you seen the
2  third-party quality control from the
3  AMMA?
4  A.   I have not.
5  Q.   And you hadn't seen any
6  drywall manufactured in the U.S., have
7  you?
8  A.   No.
9  Q.   I'll switch gears on you
10  now.
11  A.   Go ahead.
12  MR. ROBERTSON:  Before we
13  switch gears, can we take a quick
14  break.
15  THE VIDEOTAPE TECHNICIAN:
16  Going off the record.  Time on
17  video is 13:47.
18  - - -
19  (Whereupon, a brief recess
20  was taken.)
21  - - -
22  THE VIDEOTAPE TECHNICIAN:
23  We're now back on the record.  The
24  time on video is 14:05.

214

1  BY MR. LAW:
2  Q.   Mr. Scharf, if you look at
3  page 77 I put in front of you from your
4  previous deposition.  And response to a
5  question from North Pacific's attorney,
6  they asked you on line three if the
7  samples were sufficient for testing and
8  your response on line five, you said, no,
9  they never told me about testing.  I
10  didn't know they were testing this.
11  Do you see that?
12  A.   Yes.
13  Q.   Is that a correct statement?
14  A.   I would think so.
15  Q.   It wasn't until after the
16  shipment was sent to the U.S. that you
17  were even aware that North Pacific had
18  tested it?
19  A.   No.  No.  They wanted
20  samples to show customers.  That's why I
21  said they are probably the size of this
22  page.  You wouldn't use that size sample
23  for testing.
24  Q.   What I'm asking is you told

215

1  North Pacific's attorney here that you
2  didn't even know they were testing this?
3  A.   No, I didn't know that they
4  wanted those samples to be tested.
5  Q.   You said they never told me
6  about testing.
7  A.   Not testing those samples
8  that I sending.
9  Q.   Well, you can't test the
10  little samples?
11  A.   I don't think so.
12  Q.   My question is it appears
13  here -- and tell me if I'm wrong -- that
14  you were telling North Pacific's attorney
15  that you didn't even know they were
16  testing the drywall.
17  MR. BROWN:  He's answered
18  this several times.  Objection.
19  BY MR. LAW:
20  Q.   Am I wrong?
21  A.   Well, I don't know that you
22  are wrong, but I don't think you're
23  right.  I think this is referring to --
24  when we sent them some samples like this

216

1  size, the size of this page, we sent them
2  samples they wanted to show to people.
3  Now, if their attorney asked me that
4  these were being tested, nobody told me
5  they wanted those samples for testing.
6  I asked the factory to send
7  North Pacific samples the first time I
8  was at the factory, full boards to send
9  to them.  That's what I asked them.  When
10  they -- when I -- there's an E-mail there
11  if it predates this -- it has to pre-date
12  this, when Jay Buckley told me that they
13  had it tested.  And then George Johnson
14  told me that the testing was good and the
15  results were so great.  So I know they
16  had it tested, but if they asked me for a
17  dozen pieces this size or three or
18  whatever they asked for for samples, I
19  wouldn't think that they were going to be
20  testing those samples.
21  Q.   And I just want to confirm
22  on the record Mr. Suggs asked you on a
23  break if all test reports to your
24  knowledge had been produced --

Robert Scharf                                          March 24, 2011

217

1       MR. BROWN:  Mr. Suggs is not
2   here for his deposition.
3       MR. LAW:  I know, but I want
4   to confirm on the record.
5       MR. BROWN:  Through Mr.
6   Suggs?
7       MR. LAW:  Well, I'll confirm
8   through you then if I need to.  I
9   just want to confirm that all
10  documents from North Pacific and
11  in the possession of Mr. Crowley
12  had been produced in this case.
13      MR. BROWN:  All the testing
14  reports we have have been produced
15  -- yes, we have produced all of
16  the testing reports to you.
17      MR. LAW:  And that would
18  include any reports in the
19  possession of Mr. Crowley?
20      MR. BROWN:  As far as we
21  know, yes.
22      MR. LAW:  That's all I need
23  to know.
24      MS. CALDWELL:  Can I clarify

218

1   something?  This is Leslie
2   Caldwell on the phone.  Paul
3   Crowley's file has not been
4   produced, but the test results
5   have been produced I think
6   multiple times throughout Devon's
7   production.  I just want to be
8   clear about that.
9       MR. LAW:  I've seen a lot of
10  test reports, but there's no test
11  report in that production that
12  I've seen and the deponent has
13  indicated that he didn't see them
14  from this Houston laboratory.
15  Have you seen them, Leslie?
16      MS. CALDWELL:  I'm just
17  referring to the test results that
18  we have produced at Devon 408
19  through --
20      MR. BROWN:  429.
21      MS. CALDWELL:  429, Devon
22  147 through 146 and Devon 5917.
23      MR. LAW:  5917 through --
24      MS. CALDWELL:  I'm sorry.

219

1       MR. LAW:  Just one page,
2   5917?
3       MS. CALDWELL:  Yes.
4       MR. LAW:  Thank you, Leslie.
5       MS. CALDWELL:  Sure.
6   BY MR. LAW:
7       Q.   Mr. Scharf, we took a
8   deposition of Mike Pate here recently,
9   and Mr. Pate testified that you told him
10  that the paper on this drywall was
11  recycled?
12      A.   No.  I don't know that I
13  would use the term recycled.  The drywall
14  factory had a plant next door that made
15  liner board which he would call paper.
16  And they manufactured their own liner
17  board.  And that's also another very
18  large factory.  And in that they buy
19  paper from the United States.  And I was
20  standing there, and it looked like a tent
21  city, like huge tents covered over,
22  canvas.
23          And I pulled out one of the
24  flyers.  There was a flyer in it.  And it

220

1   was from a drug store in Brooklyn, New
2   York looking to sell Bayer Asprin II for
3   89 cents.  So I had shown Mike that
4   picture of me standing there holding this
5   flyer, and it was -- it was never even
6   distributed.  It was still -- and it went
7   back to China.
8           So I don't know how you make
9   paper.  And I don't know, but I know that
10  China buys -- they'll buy any scrap paper
11  that we can send over there, they'll buy.
12  And there's different numbers and
13  different degrees of quality on the paper
14  that they buy.  So that's what I know
15  about the paper.
16      Q.   So was the liner board made
17  from recycled paper?
18      A.   No, the liner board -- they
19  have a factory that makes liner board.
20  How they make it I don't know, but I know
21  that they buy paper from the United
22  States that comes back and there's a
23  number like scrap paper 11.  I don't know
24  what the process -- I never seen the

221

1    process after that. But whatever that --
2    and I don't know that recycled is the
3    right word or not the right word. I
4    don't know.
5        Q.   So you don't actually know
6    whether the paper was made from recycled
7    paper?
8        A.   I do not know that.
9        Q.   I told you before our break
10   I was going to switch gears on you. We
11   know that en route the Sanko Rally got in
12   some rough seas and some drywall was
13   damaged. Is that right?
14       A.   That's correct.
15       Q.   And when the boat arrived,
16   there were several surveyors surveying
17   the off loading of the cargo. Is that
18   correct?
19       A.   Yes.
20       Q.   And you were present during
21   the unloading process, weren't you?
22       A.   I was there some of it, yes.
23       Q.   Were you there most of the
24   time it was unloaded?

222

1        A.   I think it took like 36 days
2    to unload it, and I was there maybe two
3    days a week. I was there almost -- at
4    least every week for a day or two, maybe
5    a third day, but I don't remember staying
6    for three days.
7        Q.   Were you there at the end
8    when it was finally off loaded?
9        A.   Yeah, I believe so.
10       Q.   And you were in Pensacola
11   for a while Devon was trying to
12   sell this drywall that North Pacific
13   didn't take, weren't you?
14       A.   I was.
15       Q.   All right. Some of the
16   drywall on the boat was damaged and some
17   of it was actually good product that
18   North Pacific purchased. Is that right?
19           MR. ROBERTSON:  Object to
20       the form.
21           THE WITNESS:  North Pacific
22       had purchased all of it. Then
23       they didn't pay us for it. So we
24       had 3,100 bundles or 3,200 bundles

223

1    out of 7,500 bundles that were
2    salable as non-damaged goods or
3    non-salvaged goods. That's what
4    we had. And then Northern Pacific
5    took a few trucks and then they
6    didn't take anymore.
7    BY MR. LAW:
8        Q.   Okay. So the remaining
9    trucks out of the 3,200 bundles that were
10   non-salvage sellable goods, did Devon
11   begin selling that to other customers of
12   Devon?
13       A.   Other customers that became
14   customers of Devon. That's correct.
15       Q.   And some of those customers
16   were Mazer?
17       A.   That's correct.
18       Q.   And a company called Gulf
19   Coast Shelter or Shelter Products?
20       A.   Yes.
21       Q.   And there were a few others,
22   weren't there?
23       A.   Not very many -- those are
24   the two that bought most of what I sold.

224

1        Q.   From the date the boat was
2    unloaded which was some time around mid
3    to late July '06. Is that right?
4        A.   I have to look, but go
5    ahead. You know better than I do right
6    now when it was.
7        Q.   Tell me this. From the time
8    the boat was unloaded, how long did it
9    take to sell out of the 3,200 bundles the
10   portion that North Pacific did not
11   accept?
12       A.   A long time. We have to
13   look at some documentation on that. Two
14   months, three months. I'm not sure.
15       Q.   You were selling it into
16   2007, weren't you?
17       A.   Yes, I was.
18       Q.   And were you present off and
19   on in Pensacola during that time period?
20       A.   I was.
21       Q.   There is a surveyor. I put
22   a report in front of you there from
23   Sabine Surveyors and it was authored by a
24   gentleman named Ken Atkinson. Do you

Robert Scharf                                    March 24, 2011

225

1  remember Mr. Atkinson?
2      A.   I remember there were
3  several surveyors.  So I met them all.  I
4  couldn't pick them out of a line up right
5  now.  The name is familiar to me.
6          MR. ROBERTSON:  What exhibit
7      number is that?
8          MR. BROWN:  39.
9  BY MR. LAW:
10     Q.   The insurance company, the
11 insurer of the cargo was Fireman's Fund
12 Insurance Company.  Is that correct?
13     A.   I believe so.
14     Q.   And Fireman's Fund Insurance
15 Company, they had a surveyor on site
16 during the unloading process, didn't
17 they?
18     A.   They controlled it.
19     Q.   That's going to be my next
20 question.  So Fireman's Fund had a
21 surveyor on site during the unloading,
22 didn't they?
23     A.   They did.
24     Q.   And Fireman's Fund

226

1  controlled or at least gave the orders to
2  segregate the cargo into what was
3  sellable -- good drywall and what was the
4  salvage or non-sellable drywall.  Is that
5  right?
6          MR. REBARCHAK:  Object to
7      the form of the question.
8          THE WITNESS:  What I was led
9      to believe was it was their cargo,
10     and I couldn't touch it.  And they
11     were going to get it off loaded
12     and they were going to separate it
13     and then they would tell me what I
14     could sell.  That was their cargo.
15 BY MR. LAW:
16     Q.   And the they you are
17 referring to is Fireman's Fund Insurance
18 Company?
19     A.   That's correct.
20     Q.   Did you relay that to Mr.
21 Buckley or somebody at North Pacific that
22 you were waiting on the insurance company
23 to tell you what you could do with it?
24     A.   I would think so.

227

1      Q.   I'm going to show you
2  Exhibit-43.  North Pacific still wanted
3  some of the drywall, didn't they?
4      A.   They did.  No, this is early
5  on, June 27th.
6      Q.   You all knew some of the
7  drywall would be damaged before it got to
8  port, didn't you?
9      A.   Yes, we did.
10     Q.   And the ship sailed through
11 a tropical storm, didn't it?
12     A.   I don't know whether they
13 went around it or through it or over it
14 or whether it was the ship's fault.  I've
15 been through this with other stuff.  I
16 don't know what they sailed through.
17     Q.   They got into some rough
18 weather and rolled?
19     A.   I was told the ship rolled.
20 At the time I didn't even know what that
21 meant.
22     Q.   Well, Mr. Buckley asked you
23 if there was a chance that the insurance
24 company will release any of this before a

228

1  final settlement is done.  Then he asks
2  could they start paying for the stuff
3  they pick up like that.
4          Did you go back to the
5  insurance company and ask that question?
6          MR. REBARCHAK:  Object to
7      the form.
8          THE WITNESS:  Well, I would
9      have gone back to our attorney and
10     said can we -- the answer was we
11     didn't own the load.  We couldn't
12     do anything with the load until
13     after it was released by the
14     insurance company.  I was told
15     they weren't going to release it.
16     Nobody was going to touch it until
17     they had it all off loaded, all
18     segregated into two different
19     warehouses and what was considered
20     salable and what was considered
21     non-salable.
22 BY MR. LAW:
23     Q.   And the attorney that you
24 communicated through that communicated

Robert Scharf                                                    March 24, 2011

229

1  with the insurance company, is that Mr.
2  Hawk?
3      A.   That's Mr. Hawk.  That's
4  correct.
5      Q.   Okay.  Well, if you look
6  back at this survey report I put in front
7  of you.  Ultimately, Fireman's Fund's
8  surveyor prepared a report, and you'll
9  see on page -- it's got a stamp at the
10  bottom 1381.  And that's what happened,
11  wasn't it, the drywall was segregated
12  into what was sellable and was what
13  non-sellable?
14      A.   Well, I don't know whether
15  they called it sell.  They called it
16  damaged or non-damaged.
17      Q.   And it looks like the
18  surveyor determined that about 3,600
19  packages were damaged and 3,373 were
20  declared salvageable.  Is that correct?
21      A.   That's correct.
22      Q.   And did you agree with the
23  segregation of the cargo as to what was
24  damaged and what was salvageable?

230

1          MR. BROWN:  Object to the
2      form.
3          THE WITNESS:  I don't think
4      I was asked.
5  BY MR. LAW:
6      Q.   You were present as it was
7  off loading, weren't you?
8      A.   But I was an observer.
9  Nobody said to me, do you want to sell
10  this or you don't want to sell this.
11  Nobody said -- they just kind of said
12  like stay out of the way.  We'll let you
13  know.  I said, can I take it now?  I said
14  -- the stuff going in this building can
15  we sell it?  No, you can't sell it.
16      Q.   And that order or directive
17  was coming from the insurance company?
18      A.   That's correct.
19          MR. REBARCHAK:  Object to
20      the form of the question.
21  BY MR. LAW:
22      Q.   All right.  The packages
23  that we talked about, the good product
24  that you called it you said was 3,200

231

1  bundles and North Pacific took some of it
2  and then you sold the rest to Mazer?
3      A.   That's correct.
4          MR. ROBERTSON:  Object to
5      the form.
6  BY MR. LAW:
7      Q.   And would that be more like
8  3,373 bundles?
9      A.   That's what it says here.
10      Q.   The 3,622 packages declared
11  by the insurance company as damaged.  Do
12  you see that?
13          MR. REBARCHAK:  Object to
14      the form.
15  BY MR. LAW:
16      Q.   Do you know what happened to
17  that?
18      A.   I do.
19      Q.   What happened to it?
20      A.   Pate bought it.
21      Q.   That would be Mike Pate or
22  Pate or Pensacola Stevedore?
23      A.   Yes, he did.
24          MR. BROWN:  Object to the

232

1      form.
2          THE WITNESS:  There's more
3      to that.
4          MR. BROWN:  If you need to
5      complete your answer.
6  BY MR. LAW:
7      Q.   You can complete your
8  answer.  Just for the record, I always
9  want you to complete your answer.  So if
10  you feel like I cut you off tell me.
11      A.   Well, you've done that a lot
12  but that's okay.  I appreciate that.
13      Q.   I want you to always
14  complete --
15      A.   I tried to get to your
16  question.  I don't want to keep adding to
17  things you haven't asked.  But I was
18  trying to -- once the insurance company
19  released the 3,100 or 3,300 bundles that
20  we had to sell that wasn't going to be
21  paid on their insurance claim it was hard
22  to sell.  So I was trying to sell it.
23  And I was driving to -- on a Monday
24  morning to King of Prussia from Long

Robert Scharf                                      March 24, 2011

233

1  Island, I get a phone call seven o'clock
2  in the morning from a fellow in Atlanta I
3  was trying to sell drywall to, the Friday
4  before, and he was screaming at me and
5  calling me every name he could think of.
6  And he had been a Marine in Vietnam so he
7  knew a lot of stuff that I wasn't
8  familiar with.
9          And he said that there's a
10  salvage company selling that drywall in
11  Pensacola online for like $3.00 a board
12  or $2.00 a board, and I'm trying to sell
13  it to him on Friday for eight or $9.00 a
14  board.  He wants to know what's wrong
15  with me.  So the insurance company gave
16  it to some salvage people before we even
17  had a chance to even finish selling the
18  drywall, an outfit in Houston that was a
19  salvage company in Houston.
20      Q.   This salvage company, did
21  they sell this drywall before Devon was
22  able to sell what was declared good?
23      A.   They tried, yes.
24      Q.   And the drywall to the

234

1  salvage company had sold or was selling
2  came out of this damaged stack?
3      A.   That's correct.
4          MR. ROBERTSON:  Object to
5      the form.
6  BY MR. LAW:
7      Q.   Did Devon hire this salvage
8  company to sell the damaged drywall?
9      A.   No.  I didn't even know who
10  they were.
11      Q.   Did you ever have any
12  communications with anybody from the
13  salvage company?
14      A.   After that I think I did.
15      Q.   Who did you talk to?
16      A.   I'm not sure.
17      Q.   Do you recall what you all
18  talked about?
19      A.   Well, at one point I
20  probably talked about us buying it, the
21  salvage.
22      Q.   I'll get to that in a
23  second.  I marked as Exhibit-44 a little
24  packet of materials from Galen Hawk, and

235

1  he was the gentleman that handled the
2  insurance claim on behalf of Devon?
3      A.   He did.
4      Q.   If you look on the statement
5  of claim here of Devon on page two --
6      A.   Yes.
7      Q.   Mr. Hawk noted the insured
8  and Fireman's Fund have agreed that 55
9  percent of the delivered drywall was
10  damaged and otherwise not sellable at
11  retail.  Do you see that?
12      A.   I do.
13      Q.   Do you agree with that
14  assessment of the 55 percent?
15          MR. ROBERTSON:  Object to
16      the form.
17          MR. REBARCHAK:  Object to
18      the form.
19          THE WITNESS:  I guess that's
20      accurate.
21  BY MR. LAW:
22      Q.   And the insured referred to
23  in this by Mr. Hawk, that would have been
24  Devon, wouldn't it?

236

1      A.   I would think so, yes.
2      Q.   Exhibit-45 is an E-mail at
3  to the bottom from Mr. Hawk to Mr. Stuart
4  Shilaber.  Do you know who that was?
5      A.   Do I know?
6      Q.   Yes, sir.
7      A.   No, I don't think so.
8      Q.   If you'll turn the page,
9  there's an E-mail to Galen in the middle
10  of the page here.  And you'll see he asks
11  Mr. Hawk -- Mr. Shilaber asked Mr.
12  what's to be done with the damaged cargo,
13  and he notes that Fireman's Fund has a
14  salvage company standing by to assist in
15  selling for the best price possible.  And
16  he notes if cargo was to be rejected by
17  Devon.
18          Do you see that?
19      A.   Yes.
20      Q.   Did Mr. Shilaber or Mr. Hawk
21  or anybody ever ask you if Devon was
22  going to reject the damaged portion of
23  the drywall?
24          MR. ROBERTSON:  Object to

Robert Scharf                                    March 24, 2011

237

1      the form.
2           MR. REBARCHAK:  Object to
3      the form, and the hearsay comments
4      in the exhibit.
5           THE WITNESS:  Ask me that
6      one more time.
7      BY MR. LAW:
8      Q.   It appears as though Devon's
9      attorney is being asked if Devon is going
10     to reject the cargo.  Is that correct?
11     A.   Reject the cargo that was
12     non-damaged?
13     Q.   That was damaged.
14          MR. ROBERTSON:  Object to
15     the form.
16          MR. REBARCHAK:  Object to
17     the form.
18          THE WITNESS:  I'm not sure I
19     understand the question.
20     BY MR. LAW:
21     Q.   Did you ever communicate
22     with Mr. Hawk or anybody at Devon
23     regarding whether or not Devon wanted to
24     reject the damaged cargo or try to sell

238

1      it?
2           MR. ROBERTSON:  Object to
3      the form.
4           THE WITNESS:  No, we could
5      never -- we talked about buying it
6      as salvage.  And then that's the
7      only thing we talked about.
8      BY MR. LAW:
9      Q.   You and Mr. Hawk talked
10     about Devon perhaps buying the damaged
11     cargo as salvage?
12          MR. ROBERTSON:  Object to
13     the form.
14          MR. REBARCHAK:  Object to
15     the form.
16          THE WITNESS:  He would have
17     asked me if we buy this at salvage
18     what can you sell it for.
19     BY MR. LAW:
20     Q.   And that would be the
21     damaged portion --
22     A.   The 3,700 -- that's correct.
23          MR. ROBERTSON:  Object to
24     the form.

239

1      BY MR. LAW:
2      Q.   Now, Devon paid cash for
3      this drywall we talked about.  30 percent
4      before it left, and the rest when it got
5      here.  Is that right?
6      A.   Yes.
7      Q.   But it sounds to me like the
8      55 percent of the cargo that was damaged
9      was no longer owned by Devon.  Is that
10     right?
11          MR. ROBERTSON:  Object to
12     the form.
13          MR. REBARCHAK:  Object to
14     the form.
15          THE WITNESS:  We never owned
16     any of the cargo.  When that ship
17     came in, the insurance company,
18     they took the cargo.  I couldn't
19     do anything with it.  If it was my
20     cargo, I would have sold it when
21     it came off the ship.
22     BY MR. LAW:
23     Q.   Well, the 45 percent --
24     A.   I would have sold anything

240

1      that I could have.  I wasn't allowed to
2      touch it.  It went in two separate
3      warehouses, and their surveyor, the
4      Fireman's Fund surveyor took control over
5      everything and that was it.  There was no
6      talking to them.  This is damaged.  This
7      is not.  And that was it.
8           If it was my cargo, I would
9      have sold it as -- I would have sold what
10     was declared good coming off the boat.
11     You can look.  NorPac would have had
12     trucks there waiting for it to load as it
13     came off from the cranes to put it down.
14     Q.   At some point in time did
15     Fireman's Fund release the good cargo so
16     you could begin shipping it out to North
17     Pacific?
18          MR. ROBERTSON:  Object to
19     the form of the question.
20          THE WITNESS:  They did.
21     BY MR. LAW:
22     Q.   Do you know how long after
23     it was unloaded and segregated that that
24     occurred?

Robert Scharf                                    March 24, 2011

241

1      A.   I'd say a long time.
2  Whatever the date was, it seemed forever
3  but it was -- we unloaded.  It took 36
4  days to unload, something to that effect
5  and then maybe another week or ten days
6  before we got a release that we could
7  take that I would think.
8      Q.   During this 36-day period
9  was Fireman's Fund surveyor on site?
10     A.   I believe he was on site
11 every day.  I think that's who made
12 the determination what was good and what
13 was bad.
14     Q.   And what was determined
15 good, you began shipping out when the
16 insurance company released it to North
17 Pacific and then these are other
18 customers?
19          MR. ROBERTSON:  Object to
20     the form.
21          MR. REBARCHAK:  Object to
22     the form.
23          THE WITNESS:  That's
24     correct.

242

1  BY MR. LAW:
2      Q.   Now, tell me -- so you've
3  told me that what was declared damaged
4  and not sellable at retail was purchased
5  by Mr. Pate?
6          MR. ROBERTSON:  Object to
7     the form.
8          MR. PIPES:  Same objection.
9          THE WITNESS:  I believe Mr.
10     Pate bought the salvage that was
11     the 3,600 bundles.  I believe
12     that's who bought it.
13 BY MR. LAW:
14     Q.   At one point in time it was
15 contemplated that Devon may buy that
16 salvage.
17     A.   No, it was asked whether we
18 should buy it or not.  There were a
19 couple options, but that's -- yes, at one
20 point we discussed that.
21     Q.   Who discussed that?
22     A.   I think I discussed it with
23 Galen Hawk.
24     Q.   What were the other options?

243

1  You said a couple options.
2      A.   One was that Mike Pate -- we
3  would buy it with Mike Pate.
4      Q.   Did that occur?
5      A.   No.
6      Q.   Any other options?
7      A.   I don't believe so.
8      Q.   So did Devon end up buying
9  the salvage back from SalvageSale?
10          MR. ROBERTSON:  Object to
11     the form.
12          THE WITNESS:  No.
13 BY MR. LAW:
14     Q.   So did Devon reject that
15 damaged cargo?
16          MR. ROBERTSON:  Object to
17     the form.
18          THE WITNESS:  Well, we never
19     had a choice to do anything with
20     it.  The insurance company said
21     this is damaged and that was the
22     end of that.  If we bought it, we
23     could have resold it, but we
24     didn't buy it.  And I talked to

244

1      Mike about buying it together and
2      that didn't happen.  So, you know,
3      as far as I knew it wasn't my
4      cargo anymore.
5  BY MR. LAW:
6      Q.   How did you get that
7  impression?
8      A.   From Mr. Hawk.  Actually
9  probably from the surveyor more than
10 anybody.
11     Q.   That would be the surveyor
12 at Fireman's Fund?
13     A.   Yeah, that's correct.
14     Q.   And did you ask that
15 surveyor if you could start selling --
16     A.   Absolutely.  I'm sorry.
17     Q.   And what did he tell you?
18     A.   No, couldn't touch anything.
19     Q.   Exhibit-46 is a document
20 entitled salvage authorization.  Is that
21 your signature on this document?
22     A.   It is.
23     Q.   Did you read it before you
24 signed it?

Robert Scharf                                           March 24, 2011

245

1     A.   I'm not sure.  I read it
2   yesterday, but I'm not sure I read this
3   before I signed it.
4     Q.   What was it your
5   understanding that Devon was releasing
6   pursuant to this authorization?
7     A.   I'm not certain.  You have
8   to ask Galen Hawk.
9     Q.   So you don't know what Devon
10  was releasing here?
11    A.   I don't.  Galen told me to
12  -- asked me to sign this.  So it has
13  something to do with the settlement I'm
14  sure.
15    Q.   Do you know whether Devon
16  was ever paid for the proceeds from the
17  salvage or whether any of the proceeds
18  from the salvage were deducted from any
19  payments from Fireman's Fund?
20        MR. ROBERTSON:  Object to
21    the form.
22  BY MR. LAW:
23    Q.   Are those questions for
24  Galen Hawk?

246

1     A.   Galen Hawk would know that.
2     Q.   You know Mr. Frank Johnson,
3   don't you?
4     A.   I do.
5     Q.   Who is Mr. Frank Johnson?
6     A.   I think he was the general
7   manager at NorPac in the Mississippi,
8   Waynesborough, is that where they are?
9     Q.   I'm going to show you some
10  excerpt from Mr. Johnson's testimony in
11  that arbitration hearing we've discussed.
12  And page 36 in the very bottom paragraph
13  Mr. Johnson was talking about the drywall
14  purchased from Devon.  And he said, I
15  mean this is not like going into Home
16  Depot or Lowe's, you know, looking just a
17  package of drywall.  This stuff was beat
18  up all over the place.
19        MR. BROWN:  I object to the
20    form, hearsay and having him
21    comment on someone else's
22    testimony.
23  BY MR. LAW:
24    Q.   I'm just going to ask you if

247

1   you agree with Mr. Johnson --
2     A.   Absolutely not.  You have
3   pictures of the drywall.
4     Q.   So you disagree with Mr.
5   Johnson's testimony?
6     A.   Mr. Johnson was trying to
7   save $4 million that he owed us.
8     Q.   We have enough exhibits, but
9   if you'll take a look at this document
10  that was produced by Devon Bates stamp
11  7043.  Mr. Buckley is asking you,
12  anything on Home Depot.
13        Did North Pacific or Devon
14  try to sell some of this drywall to Home
15  Depot?
16    A.   We had an opportunity to
17  sell it to Home Depot through a buying
18  group out of Atlanta.
19    Q.   And do you know the name of
20  that buying group?
21    A.   It was Pacific Rim.
22    Q.   And how did you know that
23  Pacific Rim was going to sell it to Home
24  Depot?

248

1     A.   They told me.
2     Q.   And they told you that were
3   interested in buying some to sell to Home
4   Depot?
5     A.   That's correct.  I think
6   they had come down and looked at the
7   goods that were in the warehouse there.
8     Q.   Did that ever occur?
9     A.   They didn't buy any.
10    Q.   Pacific Rim didn't?
11    A.   Pacific Rim did not.
12    Q.   Do you know why?
13    A.   I don't think they could
14  make the deal with Home Depot.  That's my
15  guess.
16    Q.   Did they ever ask for any
17  test reports or MSDS sheets on the
18  drywall?
19    A.   Not that I remember.
20    Q.   When Devon began selling
21  this stuff to Mazer and Gulf Coast
22  Shelter, did you or anybody at Devon tell
23  them that Devon had not tested the
24  drywall?

Robert Scharf                                                      March 24, 2011

249

1      A.   That Devon had not tested
2   the drywall?
3      Q.   That's correct.
4      A.   No.
5      Q.   Did any of those, either of
6   those company ever ask for any MSDS
7   sheets or test reports?
8      A.   No.
9      Q.   Did Devon tell either of
10  those companies that Devon didn't have
11  any MSDS sheets or test reports on the
12  drywall?
13     A.   No.
14          MR. ROBERTSON:  What did he
15  say?
16          THE WITNESS:  I said, no.
17  I'm sorry.
18  BY MR. LAW:
19     Q.   Did Devon take any steps to
20  test the drywall when they began
21  marketing it to other customers besides
22  North Pacific?
23     A.   No, we had --
24          MS. CALDWELL:  Object to the

250

1          form.  Asked and answered.
2          THE WITNESS:  It had the
3      ASTM stamp on it, printing on it,
4      on every piece that they had.  And
5      that was fine as long as it had
6      that on it.
7   BY MR. LAW:
8      Q.   Let me show you Exhibit-47.
9   It's a document from North Pacific.  And
10  you'll see there's a note there.  It says
11  stock turned down and returned wet.
12     A.   Yes.
13     Q.   Did North Pacific return
14  some of the drywall that they had
15  purchased from Devon?
16     A.   They did.
17     Q.   They returned several loads,
18  didn't they, they being North Pacific?
19     A.   Well, I think this was the
20  only one that we actually -- was actually
21  accepted at the port.
22     Q.   What do you mean by accepted
23  at the port?
24     A.   They wouldn't let them back

251

1   in the port.
2      Q.   Why wouldn't they let them
3   back in?
4      A.   Well, because the port
5   doesn't store people's goods.  This was
6   -- their trucker damaged this.  They took
7   it out on a weekend in a Pensacola
8   rainstorm, and they didn't cover it.  And
9   the drywall got wet.  This stuff came
10  across an ocean on 30 days, and it didn't
11  have a drop of water on it anywhere.  And
12  NorPac's trucker comes in -- I think it
13  was on a weekend and takes some trucks
14  out of there.  And he took it out without
15  covers on it in a pretty heavy rainstorm
16  and then tried to bring it back.  And I
17  think he delivered a load back.  And then
18  at some point Pate stopped it.  He said,
19  we can't take this, where can we put it.
20     Q.   There's a customer in
21  Thomasville that returned some drywall
22  and noted that there was some cracking
23  and breaking of the stock.  I'm referring
24  to the middle E-mail from Mr. George

252

1   Jackson.
2          Do you recall that?
3      A.   I do.
4      Q.   And Mr. Jackson said Bob
5   Scharf at Devon said -- and I'm referring
6   to the middle E-mail there's -- there's
7   an agreement with Bob Scharf that Devon
8   would cover all claims for quality, and
9   this is a definite quality claim.
10         Do you see that?
11     A.   That's correct.
12     Q.   Was that an agreement
13  between Devon --
14     A.   That's on any damaged
15  material.  That's if any of these goods
16  that we shipped were broken or damaged we
17  would take it back or we would give them
18  the money back.  We wouldn't charge them
19  for it.
20     Q.   And there's a note, it says
21  some cracking and breaking.  Did Devon
22  accept a return of this drywall?
23     A.   If you look, this was a
24  phony claim.  There was no cracking.

Robert Scharf                                      March 24, 2011

253

1   There was no breaking.  We took that
2   back, and we opened them up and then -- I
3   think we even gave it -- I think Mike
4   gave it to some people, here, take this.
5   There was no cracks, and there was
6   nothing wrong with it.  They were trying
7   to return it, and they said that it was
8   cracked.  I think that everybody saw the
9   Internet.
10      Q.   The cost to manufacture the
11  goods was about you said about 2.50 a
12  board?
13          MR. ROBERTSON:  Object to
14      the form.
15          THE WITNESS:  We have to
16      look, but I used 2.50 as a rule of
17      thumb.
18  BY MR. LAW:
19      Q.   And 30 percent of that
20  was paid -- no, that was all paid --
21      A.   We paid the factory.  I'm
22  sorry.  Go ahead.
23      Q.   When was all of that paid to
24  the factory?

254

1       A.   We gave them a deposit of 30
2   percent with the order and the balance --
3   when you have a bill of lading and it's
4   on the water.
5       Q.   And then the cost to ship
6   the goods --
7       A.   Was one million seven or a
8   million 800,000.
9       Q.   When was that paid?
10      A.   Before the ship landed.  We
11  paid that -- after we knew the ship
12  rolled and before it came into Pensacola.
13  We had to pay the freight line knowing
14  that they damaged this cargo.  We had to
15  pay them.
16      Q.   Were you aware of any
17  arbitration proceedings that took place
18  in Beijing, China between Devon and
19  Pactrans?
20      A.   No, it was in Shanghai,
21  China.
22      Q.   Were you aware of an
23  arbitration proceeding in Shanghai
24  between Devon and Pactrans?

255

1       A.   Yes, I was there.
2       Q.   Did you testify in that
3   hearing?
4       A.   I did.
5       Q.   Did you give a deposition in
6   that matter?
7       A.   No.
8       Q.   What was the outcome?
9       A.   I'm not sure.  I'm not sure.
10      Q.   Did Devon have an attorney
11  representing them in Shanghai?
12      A.   That's correct.
13      Q.   Do you recall that
14  gentleman's name?
15      A.   No.  Kevin, you might know.
16  Well, I shouldn't say.  I don't know his
17  name.
18      Q.   He lived in Shanghai,
19  though?
20      A.   No, he's Taiwanese.  He
21  lives in Taiwan.  He has an office in
22  Shanghai.  He was educated in Stanford.
23      Q.   Do you know if Devon is
24  involved currently or has been in any

256

1   arbitration proceedings with Taishan in
2   China?
3       A.   I don't know.
4       Q.   Do you know if there's been
5   any demand for arbitration with Taishan
6   in China?
7       A.   I don't know.
8       Q.   Have you reviewed any
9   arbitration provisions between Taishan
10  and Devon?
11      A.   Have I reviewed them?
12      Q.   Yes, sir.
13      A.   No, sir.
14      Q.   Do you know of any?
15      A.   I do not.
16      Q.   The money we talked about
17  that was paid to manufacture the drywall
18  and ship it here --
19      A.   That's correct.
20      Q.   -- did Devon International
21  Trading or Devon International Industries
22  have that kind of cash flow?
23      A.   I'm not sure.
24          MR. BROWN:  Object to the

Robert Scharf                                    March 24, 2011

257

1    form.
2    BY MR. LAW:
3        Q.   You were the vice president
4    of Devon International Trading in 2006,
5    weren't you?
6        A.   Me?
7        Q.   Yes, sir.
8        A.   No, I don't think I was ever
9    vice president.
10       Q.   I'm sorry.  That was a poor
11   question.  You were the president in
12   April of 2006?
13       A.   Yes, I was.  But that would
14   have all gone through the controller's
15   office.
16       Q.   Do you know whether Devon
17   Health Services, Inc. borrowed $5,000 to
18   pay for the manufacture of the drywall?
19       A.   I don't know.
20           MR. BROWN:  Object to the
21   form.
22   BY MR. LAW:
23       Q.   Who would be able to answer
24   that question?

258

1        A.   I would think -- I'm not
2    sure.  I guess the controller.
3        Q.   That would be George Clark?
4        A.   I think that's his name.
5        Q.   49 is a drywall cash flow
6    model sent to you by Mr. Clark.  Do you
7    know what that is?
8        A.   This was based on us getting
9    12 trucks in 12 months.
10       Q.   Does that tell you what the
11   profit would have been if you got 12
12   trucks in 12 months?
13       A.   I don't think so.
14       Q.   What does it tell us?
15       A.   It tells us how much -- it
16   says a month end balance is summarized
17   below -- this shows us the cash flow
18   schedule.
19       Q.   Did he tell you how the
20   drywall would be paid for?
21       A.   No.
22       Q.   Mr. Clark prepared this?
23       A.   I believe so.
24       Q.   I'll ask him.  I'm going to

259

1    show you a photograph that's marked as
2    Exhibit-30 to Ruth Wu's deposition.  Are
3    those some Chinese guys making drywall?
4        A.   It looks like it, yes, sir.
5        Q.   Do you know those
6    gentlemen's names?
7        A.   No.
8        Q.   Does it look like the
9    factory where the drywall was
10   manufactured?
11       A.   I don't know.  I can't tell
12   from this picture.
13       Q.   I'm going to show you
14   Exhibit-50 and ask you if you know what
15   that is.
16       A.   Well, this looks like the
17   liner board.
18       Q.   That's the liner board we
19   discussed earlier?
20       A.   It's somebody's liner board.
21       Q.   What is the -- is the liner
22   board the exterior --
23       A.   It's what you call paper.
24       Q.   And it's on the outside with

260

1    the gypsum in the middle?
2        A.   That's correct.
3        Q.   What's Exhibit-51?
4        A.   This looks like an extruder
5    from a vinyl extrusion plant that we were
6    looking to buy.  That's why I left when
7    the loading of the ship was to go to
8    Shanghai to check out this factory.
9    That's what this looks like.  You've got
10   another picture.
11       Q.   And Devon was looking to
12   purchase a vinyl extrusion factory in
13   Shanghai.  Is that right?
14       A.   That's correct.
15       Q.   Would that have been
16   purchased by Devon International Trading?
17       A.   No, sir.
18       Q.   Who was looking to purchase
19   it, which Devon company?
20       A.   Well, they were part of the
21   purchase, Devon.  It was a private group
22   that was put together.
23       Q.   Who else was involved in
24   that group?

Robert Scharf                                          March 24, 2011

261

1     A.   Well, I was.  And I think a
2  fellow in Chicago.
3     Q.   And would that factory be
4  used to manufacture vinyl?
5     A.   Vinyl extrusions.
6     Q.   I'm going to show you 52.
7  It's an E-mail to Kitty Pon.  She was
8  with Pactrans?
9     A.   She owned Pactrans.
10     Q.   You told her that you were
11  very lucky, made contract to purchase?
12     A.   That's correct.
13     Q.   K-high or K-Gi (ph) vinyl
14  extrusion factory in Shanghai?
15     A.   That's correct.
16     Q.   Was the factory actually
17  purchased?
18     A.   We signed three different
19  contracts to purchase it, and they
20  changed their mind all three times.
21     Q.   So you never ultimately --
22     A.   We never purchased the
23  company.
24     Q.   Was the idea to purchase

262

1  that factory to manufacture vinyl
2  extrusions to send to the U.S. in
3  container ships?
4     A.   No, it was to -- well, some
5  of it would go that way, yes.
6     Q.   Who is the gentleman in
7  Exhibit-53 on the assembly line with some
8  paper in his hand?
9     A.   That's John Bennett.
10     Q.   Do you know how many times
11  John Bennett went to the factory?
12     A.   Once.
13     Q.   Is that Mr. Chu in
14  Exhibit-54?
15     A.   I don't know.  I don't know
16  who that is.  Julian, no, that's not him.
17  This is one of the people that was in the
18  factory -- that worked in the factory.
19     Q.   Do you know that gentleman's
20  name?
21     A.   I do not.
22     Q.   If you need a break, let me
23  know.
24     A.   I'm good.  You can go.

263

1     Q.   What number you got there,
2  53?
3     A.   54.
4     Q.   I'll show you Exhibit-55.
5  You got a copy there for your attorney on
6  the back.
7     A.   I'm sorry.  What did you
8  say?
9     Q.   If you'll give that one to
10  your attorney to look at it.  Now, around
11  this time September of '06, looking at
12  these E-mails, it sounds like Devon was
13  trying to sell some of the good drywall
14  to some customers.  Is that right?
15     A.   That's correct.
16     Q.   At the bottom you noted an
17  E-mail to John Bennett.  You said they
18  are breaking down the damaged drywall and
19  sorting out what is usable and what needs
20  to go to landfill and what can be used?
21     A.   That's correct.
22     Q.   Was that breaking out what
23  was the good drywall, segregating it
24  versus the damaged drywall that we talked

264

1  about?
2        MR. ROBERTSON:  Object to
3     the form.
4        MR. REBARCHAK:  Same
5     objection.
6        THE WITNESS:  I'm not sure.
7  BY MR. LAW:
8     Q.   Previously John Bennett
9  asked you what is your meaning of sorting
10  the drywall.  And that's I guess what I'm
11  asking you to do.
12     A.   I'm not sure what I meant.
13  I don't know if this was still the
14  surveyors that were sorting it out.
15     Q.   But were they sorting out of
16  the good stack some drywall that needed
17  to go to the dumpster or were they
18  sorting out of the overall boat what was
19  good and bad?
20     A.   As it came out --
21        MR. ROBERTSON:  Object to
22     the form.
23        THE WITNESS:  As it came out
24  off the ship, some went right onto

265

1      a dumpster and was gone and then
2      some got put down on the ground.
3      And they decided this goes into
4      the non-saleable, the damaged and
5      the non-damaged. Because of the
6      date on this, September, I'm -- I
7      would assume that's what that
8      means.
9  BY MR. LAW:
10     Q.    I'm going to ask you a
11 question about the top E-mail that you
12 sent to John Bennett. You noted here,
13 you said, I don't think it's a good idea.
14 Pate is on the port board. You said, I
15 just left a guy who wants 200 trucks at 7
16 PC. Is that $7.00 a piece?
17     A.    $7.00 a piece.
18     Q.    You say, I think I can blend
19 in our product with damaged product and
20 make it work and they won't know the
21 difference.
22     A.    Right.
23     Q.    Are you talking about taking
24 some of the damaged product and mixing it

266

1  with the good and selling to this guy for
2  $7.00?
3      A.    I believe so.
4      Q.    Was it the plan of Devon
5  that you could do that and this purchaser
6  wouldn't know the difference?
7      A.    No, not anybody would.
8  There were -- I think 68 boards to a
9  unit. When they brought it out and said
10 this is damaged, some of those boards
11 were perfectly good inside. And there's
12 no way to tell. Some of them were the
13 whole boards were crushed, but a lot of
14 them were good boards.
15          I believe that the plan for
16 Mike was to take those and break down the
17 units that were good and bad, and then
18 the bad ones would either go to the dumps
19 or he had a different use for it I think.
20 And then the good ones would be
21 re-packaged and sold to salvage.
22     Q.    And you understood that was
23 the plan from talking with Mr. Mike Pate?
24     A.    I understand that's what

267

1  Mike planned on doing. It wasn't what we
2  were going to do. We wound up doing
3  nothing with it, with the damaged.
4      Q.    Do you know if Mr. Pate did
5  what you just described?
6      A.    Do I know that for a fact?
7  I don't.
8      Q.    Do you know if some -- you
9  were present when Mr. Pate was selling
10 some of the damaged to customers and
11 Devon was selling the good?
12     A.    Well, it happens. Yes, it
13 happened when I was there.
14     Q.    It was going on at the same
15 time --
16     A.    Well, it wasn't supposed to
17 happen but it happened.
18     Q.    What do you mean it
19 happened?
20     A.    Well, I had somebody come
21 down and look at something, and by
22 mistake Mike showed him his stuff and
23 sold him his stuff or tried to sell him
24 his stuff and I lost the order.

268

1      Q.    And his stuff would have --
2      A.    Whatever he bought from the
3  salvage.
4           MR. ROBERTSON: Object to
5      the form.
6  BY MR. LAW:
7      Q.    Let me finish my question.
8  That what was the 55 was segregated as
9  damaged that Mike Pate was selling?
10          MR. ROBERTSON: Object to
11     the form.
12          THE WITNESS: I'm not sure
13     how much Mike bought of that. I
14     just know I didn't have any of it
15     at the time. I'm not sure how
16     much Mike bought with it. We had
17     talked with Mike about buying it
18     and then doing that, breaking down
19     the units, figuring out what could
20     be sold, what could be used, what
21     couldn't be used. And then we
22     never did it with Mike. And I
23     believe Mike bought it from the
24     insurance company or bought it

Robert Scharf                                    March 24, 2011

269

1    from salvage.  I don't know who
2    they bought it from.  He bought
3    the salvage.  That's what I
4    believe.
5    BY MR. LAW:
6        Q.    To your knowledge did Mr.
7    Pate pay Devon for that salvage?
8        A.    Not to my knowledge, no.
9        Q.    And when you refer to in
10   this E-mail blending our product, what
11   was our product --
12       A.    That would be the 3,100
13   panels once it got released.
14       Q.    The stuff that's segregated
15   as good?
16       A.    Yeah.
17       Q.    You were talking about
18   blending that with the damaged product?
19       A.    Yeah, because the stuff that
20   was segregated as good also had product
21   in it that was not salable.
22       Q.    You say not salable --
23       A.    It was salvage.  It should
24   have been -- I don't know what they use

270

1    for a formula, but if you open it up and
2    there's 68 boards in there and there may
3    be five or six that were broken.  If I
4    sold it to you, you wanted credit for
5    those five or six boards.
6        Q.    Do you think Home Depot
7    would have bought bundles like that?
8        MR. ROBERTSON:  Object to
9    the form.
10       THE WITNESS:  Well, I don't
11   know.
12   BY MR. LAW:
13       Q.    You tried to sell some to
14   them at least through this group in
15   Georgia?
16       A.    They originally wanted to
17   buy that whole boat when it landed.
18       Q.    That was this group in
19   Georgia we talked about?
20       A.    That's correct.
21       Q.    I'm going to show you
22   Exhibit-56 is an E-mail to John Bennett.
23   And I want to ask you what you are
24   referring to here.  You said spoke to

271

1    Maceda (ph).  He said they have patent,
2    however he thinks it can be knocked off.
3    He will be back at work next week.  It
4    says IKK find out more.
5        A.    Bob Maceda was a president
6    of a window manufacturing company in
7    Cleveland, Ohio.
8        Q.    What was John Bennett's
9    response to that E-mail?
10       A.    I don't know.
11       Q.    Did he say okay right there?
12       A.    I'm sorry.  Yes, he said
13   okay.
14       Q.    So what patent was Devon
15   trying to rip off?
16       MR. BROWN:  Object to the
17   form.
18       THE WITNESS:  They weren't
19   trying to rip off anything.  I'm
20   not even sure that -- Maceda's
21   company had a patent on a window,
22   but he thinks that he was able to
23   make it and give it to somebody
24   else.  That's what that was.

272

1    BY MR. LAW:
2        Q.    Rip off is a poor choice of
3    words.
4        A.    Knocked off.  It was one of
5    his windows that he was making.  Stanton
6    I think was the company that he run,
7    Stanton in Cleveland, Ohio.
8        Q.    And he was referring to
9    somebody had a patent on a window that
10   Mr. Maceda was making?
11       A.    Yeah, he had a patent on a
12   window, Mr. Maceda.  And maybe he came to
13   us to see if we could make it in China
14   for him, and then he could put it in his
15   factory here.  And it would be cheaper
16   for him to have us make it -- have it
17   made in China and then brought back in
18   and -- it would be cheaper for him to buy
19   a manufactured window.  He had a big
20   factory in Cleveland.
21       Q.    And it would have been
22   cheaper to manufacture that window in
23   China and sell it --
24       A.    And brought it into his

273

1  factory in Cleveland and sell it out of
2  there.  And you ordered a window, a
3  custom window in the United States, like
4  I said, it took six to eight weeks to
5  make.  And they'll make them in China in
6  a day, a whole container of windows.
7      Q.    And when you say cheaper,
8  you mean it would be cheaper to
9  manufacture in China as opposed to
10  manufacture in the U.S.?
11      A.    Yes.  I think there's a
12  rumor to that effect on all stuff made in
13  China.
14      Q.    Did you all ever do that?
15      A.    Do what?
16      Q.    Knock off --
17      A.    No, we never did.  It was
18  just an inquiry.
19      Q.    Have you ever reviewed Devon
20  Building Products' website?
21      A.    I probably -- well, I
22  probably seen it.
23      Q.    Did you look at it getting
24  ready for deposition today?

274

1      A.    I did not.
2      Q.    I'm going to show --
3      A.    They still have a website --
4      Q.    Apparently so.  I'm going to
5  show you Exhibit-57.  I marked as
6  Exhibit-5 to Ruth Wu's deposition the
7  website from '06.  You can look at it as
8  well if you want to.
9      A.    Okay, go ahead.
10      Q.    The logo in the right-hand
11  corner says Devon Building Products?
12      A.    It was stamped on the
13  packaging of the drywall, yes.
14      Q.    To your knowledge that was
15  on every bundle or every package, wasn't
16  it?
17      A.    I don't think it was on
18  every one, but it was on a lot of them.
19      Q.    Now, Devon Building
20  Products, it wasn't an actual company,
21  was it?
22      A.    It was not.
23      Q.    Was that just a trade name
24  that Devon International Trading marketed

275

1  its building products under?
2      MR. BROWN:  Object to the
3  form.
4      THE WITNESS:  I guess.  If
5  you look here, it says Devon
6  International Industries, Devon
7  Building Products, Devon
8  Motorcycles, Devon Office
9  Furniture, Devon Super Store.  I
10  think they just marketed
11  everything that way with their
12  name in front of it with what
13  their products were.
14  BY MR. LAW:
15      Q.    And this website, what was
16  the purpose of these websites?  Was it to
17  advertise and market Devon's
18  capabilities?
19      A.    For me it wasn't.  I used my
20  own contacts.  I had no use for these
21  websites at the time.
22      Q.    Do you know whose idea was
23  it to generate these websites?
24      A.    I do not.

276

1      Q.    Was Devon Building Products
2  or at least was Devon International
3  Trading marketing products as Devon
4  Building Products in 2002?
5      A.    They brought in plywood from
6  I believe China.  So I believe they do.
7      Q.    Was that in 2002?
8      A.    You'd have to ask them.
9      Q.    And the plywood, have you
10  ever heard about any issues with
11  formaldehyde in plywood?
12      A.    Well, it's supposed to be
13  formaldehyde free.  It's been that way
14  for a long time.
15      Q.    And you've dealt with
16  plywood?
17      A.    Somewhat, yeah.
18      Q.    And prior to working for
19  Devon --
20      A.    More than I did drywall.
21      Q.    And when you marketed
22  plywood, were you aware it was supposed
23  to be formaldehyde free?
24      A.    Well, again that had an APA

Robert Scharf                                          March 24, 2011

277

1    approval on it and America Plywood
2    Association.  So once that was stamped,
3    then that had all the approvals on it.
4    Nobody would buy it if it didn't have an
5    APA stamp on it in the United States.
6        Q.    Kind of like North Pacific
7    didn't want to buy this drywall --
8        A.    That may have been --
9        Q.    Is that similar to how North
10   Pacific wouldn't buy the drywall if it
11   didn't have the ASTM stamp on it?
12       A.    Well, I'm not sure.  I don't
13   know how much Northern Pacific knew about
14   drywall.  I know that -- when you are
15   talking lumber it has grade stamps and
16   plywood has an APA stamp on it.  You
17   won't go in a building site in the United
18   States if it doesn't have APA on it.
19   Somebody will stop it along the way for
20   sure.  It can go on like, you know,
21   residential jobs if you want it or
22   something to that effect.
23       Q.    Before working for Devon,
24   did you ever sell any APA approved

278

1    plywood that was manufactured in China?
2        A.    No.
3        Q.    Have you ever sold any APA
4    approved plywood manufactured in China?
5        A.    No.
6        Q.    This website references some
7    quality assurance at our manufacturing
8    facilities.  It says ensures your
9    confidence in our products.  Who on
10   behalf of Devon would have been
11   responsible for the quality assurance at
12   the manufacturing facilities?
13       A.    I guess the Shanghai office
14   would have.
15       Q.    That would be Mr. Chu and
16   the people you've identified in Shanghai?
17       A.    I believe so.
18       Q.    It goes on to list items
19   Devon Building Products manufactures, and
20   it lists quality plywood.  During the
21   time you worked for Devon International,
22   did Devon manufacture any plywood?
23       A.    We never manufactured
24   anything.  We maybe had some private

279

1    label products, but we never manufactured
2    anything.
3        Q.    Did you have any private
4    label plywood?
5        A.    I don't think we had the
6    plywood with a private label on it.
7        Q.    There's some fasteners
8    here --
9        A.    That we had a private label
10   on.
11       Q.    And it had the name Devon
12   Building Products on it?
13       A.    It had the name Devon.  I'm
14   not sure.  I'd have to look and see if it
15   said building products or not.
16       Q.    Was the name Devon on the
17   packaging?
18       A.    On the box, yes.
19       Q.    And those fasteners were
20   manufactured in China, weren't they?
21       A.    They were.
22       Q.    Did Devon own the company
23   where they were manufactured?
24       A.    They did not.

280

1        Q.    Was that owned by somebody
2    in China?
3        A.    It was.
4        Q.    What about fire treated
5    lumber, did Devon manufacture that?
6        A.    We did not.
7        Q.    What about windows?
8        A.    We didn't manufacture.  We
9    didn't manufacture anything.
10       Q.    Did you private label any
11   fire treated lumber?
12       A.    No.
13       Q.    What about windows?
14       A.    We didn't private label the
15   windows.
16       Q.    Patio doors?
17       A.    They were hurricane doors
18   that came out of Florida, that we sold in
19   Florida.
20       Q.    Were they private labeled?
21       A.    No.
22       Q.    What do you mean by private
23   label?
24       A.    Private label is you would

Robert Scharf                                    March 24, 2011

281

1  take your name and say that this glass is
2  Devon Building Products. So you would --
3  you would try and promote your name and
4  build a product with your name so it was
5  a private label from a factory.
6          And if you did deal with
7  factories in the United States, you got
8  all the pass throughs on insurance. You
9  were named as additionally insured. And
10  you didn't hide who the factory was, but
11  you didn't go out and say, hey, this
12  factory, it's really this factory, you
13  know, it's a private label. I have a
14  private label program. That's what you
15  would tell people.
16      Q.   Would you agree with me that
17  most products or at least building
18  products have some manufacturer's name on
19  them?
20          MR. BROWN: Object to the
21      form.
22          THE WITNESS: Or some
23      marketing company's name on it.
24      It has some identifier on it.

282

1  BY MR. LAW:
2      Q.   What was the identifier on
3  the drywall?
4          MR. BROWN: Object to the
5      form.
6          THE WITNESS: There was
7      none. It just said ASTM meets or
8      exceeds ASTM standards.
9  BY MR. LAW:
10      Q.   What new products -- and I'm
11  referring to Exhibit-56 -- says we
12  constantly strive to develop new products
13  and improve existing ones. What new
14  products were developed while you worked
15  for Devon International?
16      A.   Just drywall. We didn't
17  develop it. We didn't develop any -- I
18  don't know who wrote this.
19      Q.   Now, when Devon was selling
20  out -- out of the or at least off the
21  dock in Pensacola the good drywall,
22  during that time period Mr. Pate or
23  Pensacola Stevedore was selling the
24  damaged drywall to some customers. Is

283

1  that right?
2      A.   Who is Pensacola Stevedore?
3      Q.   Pate Stevedore, Mike Pate?
4      A.   What were they doing?
5      Q.   Were they selling their
6  damaged drywall during the same time
7  frame --
8      A.   There was an overlap there.
9          MR. ROBERTSON: Object to
10      the form.
11  BY MR. LAW:
12      Q.   And some of that damaged
13  drywall as it was unloaded, was some of
14  the banding and packaging, did some of it
15  rip off and break?
16      A.   It did.
17          MR. ROBERTSON: Object to
18      the form.
19  BY MR. LAW:
20      Q.   And you saw -- you said it
21  was in two warehouses. You had one with
22  the good drywall and one with the
23  damaged. Is that right?
24      A.   That's correct.

284

1          MR. ROBERTSON: Object to
2      the form.
3  BY MR. LAW:
4      Q.   And were there some pallets
5  or bundles of drywall in the warehouse
6  with the damaged stuff that wasn't
7  wrapped or banded together?
8          MR. PIPES: Object to the
9      form.
10          MR. ROBERTSON: Object to
11      the form.
12          THE WITNESS: I don't think
13      there was any that was totally
14      unwrapped or unbanded. There may
15      have been some broken bands on
16      some of it.
17  BY MR. LAW:
18      Q.   Did you see Mike Pate or
19  anybody from Pensacola Stevedore or Pate
20  Stevedore go through and having to
21  re-package any of the damaged drywall
22  that shipped out to customers?
23          MR. ROBERTSON: Object to
24      the form.

Robert Scharf                                                    March 24, 2011

285

1          THE WITNESS:  No, I didn't
2     see it.
3  BY MR. LAW:
4     Q.    Were you ever there in that
5  warehouse or were you primarily in with
6  the good trying to sell it?
7     A.    I was in both warehouses,
8  but I wasn't -- I was primarily in his
9  office with the air conditioning in
10  there.  But I didn't spend a lot of time
11  in the warehouses themselves, but I was
12  in there.  Every day you go in the
13  warehouses and see what's going on.
14     Q.    If you turn to page 171 of
15  your deposition for me, please.
16     A.    Yes.
17     Q.    On page 171 in the middle
18  you said they told me they had 400 to 450
19  trucks, and I was trying to get a count
20  of how many trucks we had left that was
21  labeled, you know, sellable merchandise.
22     A.    Right.
23     Q.    You are referring to the
24  good stuff that you were trying to sell?

286

1     A.    When they knew that there
2  was going to be damage, they told me they
3  had orders for 400 to 450 trucks, could
4  we supply them with 400 to 450 trucks.
5     Q.    You are referring to North
6  Pacific there?
7     A.    That's correct.
8     Q.    On page 191, if you could
9  look at it, please, for me.  I'm going to
10  actually refer to 188 to 189 at the top.
11  You said at the very end of 188, you said
12  there's approximately half a load that
13  was sellable and half the load wasn't
14  sellable.  Is that correct?
15     A.    Yes.
16     Q.    And the half that wasn't
17  sellable is the half that Mike Pate --
18     A.    The half that went to
19  salvage.
20     Q.    Then on page 191 in the
21  middle, line 14.  There's a question from
22  the attorney, he said so you are talking
23  about selling the stuff, the bundles that
24  the insurer has declared to be

287

1  unmarketable in essence.  And your
2  response was, right, it became salvage is
3  what it became.
4          MR. ROBERTSON:  Object to
5     the form.
6  BY MR. LAW:
7     Q.    Do you see that?
8     A.    I see that.
9     Q.    Make sure we're clear.  And
10  I know it was contemplated that Devon may
11  buy some of the salvage.
12     A.    That's correct.
13     Q.    But Devon didn't buy any
14  salvage.  Is that right?
15     A.    We brought no salvage.
16     Q.    The stuff that the insurer
17  declared to be unmarketable that's the
18  stuff that was sold to Pate or Pensacola
19  Stevedore?
20          MR. REBARCHAK:  Object to
21     the form.
22          THE WITNESS:  I'm not sure
23     who they sold it to.
24  BY MR. LAW:

288

1     Q.    My question is that was the
2  portion the insurer declared to be
3  unmarketable --
4     A.    Became salvage and somebody
5  bought it --
6          MR. ROBERTSON:  Before he
7     answers, excuse me, I object to
8     the form of the question.
9          MR. REBARCHAK:  Objection.
10  BY MR. LAW:
11     Q.    That's the portion that was
12  to sold to Mike Pate or Pensacola
13  Stevedore?
14          MR. ROBERTSON:  Same
15     objection.
16          MR. REBARCHAK:  Same
17     objection.
18          THE WITNESS:  He bought
19     nothing from me.  So if he bought
20     drywall, he brought whatever was
21     labeled -- that the insurance
22     company sold him as salvage or --
23     if that answers it.
24  BY MR. LAW:

Robert Scharf                                    March 24, 2011

289

1    Q.   Very last page of your
2  deposition, page 225.
3    A.   225?
4    Q.   Yes, sir, at the very end.
5  And at the top of 225 you noted or at
6  least you testified, you said, I don't
7  think the wholesale ever went under seven
8  or $8.00 a board.
9        Do you see that?
10   A.   Yes.
11   Q.   Is that the best of your
12 recollection that the wholesale during
13 this time period never went below seven
14 or $8.00 a board?
15   A.   That's correct.
16   Q.   Tell me what you mean by a
17 wholesale?
18   A.   What a distributor would
19 pay, not being a retail lumber yard.  A
20 wholesaler would be somebody that sells
21 usually to contractors.
22   Q.   And you got pretty familiar
23 with the drywall market during this time
24 frame, didn't you?

290

1    A.   I didn't because I wasn't
2  involved in drywall every day.  Like I
3  wasn't that tuned in to what the market
4  was price wise.  I was only concerned
5  about getting drywall out of China, and
6  then this happened and then we didn't do
7  it.
8        I really never knew --
9  understood or knew the drywall market
10 other than they said there was a
11 shortage.  You can get it in China.  We
12 could sell it and make some money with
13 it.  That's all I really knew about it.
14 Then the shortage -- then the shortage
15 all of a sudden wasn't a shortage
16 anymore.  And guess what, they stopped
17 the Chinese from bringing it in pretty
18 good, though.
19   Q.   So at least during the time
20 period that you were trying to get rid of
21 the drywall down at the port of
22 Pensacola, during that time period you
23 were familiar with the prices, weren't
24 you?

291

1    A.   Somewhat.  I had to be
2  price -- that's why -- I think most of
3  the drywall I was trying to sell I was
4  getting seven, $8.00 a board for.
5    Q.   And that was the portion
6  that was declared good?
7    A.   That's correct.
8        MR. ROBERTSON:  Object to
9  the form.
10 BY MR. LAW:
11   Q.   And when you say wholesale,
12 would North Pacific, for example, be like
13 a wholesaler?
14   A.   No, they are more like a
15 broker.  They are traders is what they
16 are.  That's really what they are.  They
17 are traders.
18   Q.   The Allied building store in
19 Monroe, Louisiana, they'd be a
20 wholesaler, wouldn't they?
21   A.   I assume -- the other Allied
22 I'm talking about is wholesalers.  I
23 would assume they are a wholesaler.
24       MR. REBARCHAK:  Object to

292

1  the form.
2  BY MR. LAW:
3    Q.   And we saw an E-mail earlier
4  where Allied building store in Monroe was
5  one of North Pacific's client, right?
6    A.   That's correct.
7        MR. ROBERTSON:  Object to
8  the form.
9  BY MR. LAW:
10   Q.   And you are referring to an
11 industry that North Pacifica as the
12 broker and Allied building stores would
13 be the wholesaler?
14       MR. BROWN:  Object to the
15 form.
16       MR. ROBERTSON:  Object to
17 the form.  Calls for speculation.
18       THE WITNESS:  I would call
19 them the trader.  Did you say
20 broker?  Is that the word you
21 used?
22 BY MR. LAW:
23   Q.   Yes.
24   A.   I would call them a broker.

Robert Scharf                                    March 24, 2011

293

1    Q.   Or a trader.  My question is
2  in this scenarios that's contemplated
3  with North Pacific, North Pacific was the
4  broker or trader and Allied building
5  stores, their customer would have been a
6  wholesaler?
7          MR. BROWN:  Object to the
8  form.
9          MR. ROBERTSON:  Object to
10  the form.  He doesn't know.
11  BY MR. LAW:
12    Q.   You've been selling building
13  materials for how long?
14    A.   I know the difference
15  between a distributor and a contractor
16  and a broker.  I do.  Believe me I know.
17  I studied that in my sales training
18  program.
19    Q.   And in addition to studying
20  your sales training program, you've been
21  selling building materials --
22    A.   For a long time.
23    Q.   Hang a number of years on it
24  for me, please.

294

1    A.   Forty years.
2    Q.   You've been dealing with
3  brokers, distributors and wholesalers
4  during that time period?
5    A.   Pretty much.
6    Q.   Then under this scenario you
7  said the wholesaler wouldn't sell it to
8  the contractor.  So that would be the
9  retailer like an Ace Home Center?
10          MR. BROWN:  Object to the
11  form.
12          MR. ROBERTSON:  Object to
13  the form.
14          THE WITNESS:  I'm not sure
15  what the Ace Home Center is.  I
16  was familiar with Ace Hardware.  I
17  don't know what the Ace Home
18  Center is to tell you the truth.
19  BY MR. LAW:
20    Q.   The Home Depot, they are a
21  retailer, aren't they?
22    A.   Yes, they are.  And they
23  have put a lot of distributors out of
24  business.  They are --

295

1    Q.   You consider Lowe's in your
2  industry as a retailer?
3    A.   They are a retail operation.
4    Q.   And Ace Hardware
5  Corporation?
6    A.   Ace Hardware would be the
7  retailer.
8          MR. LAW:  Before I pass the
9  witness, I want to get a couple of
10  things on the record.  First, if
11  there is another test report that
12  hasn't been produced that is
13  produced at a later date, I would
14  certainly reserve the right to
15  reconvene this deposition.  Hope
16  that doesn't occur.  I don't want
17  to reconvene the deposition, but
18  I do want to reserve on the record
19  the right to reconvene in the
20  event there is another test report
21  produced in the future.
22          With that said, I'm going to
23  pass the witness.  I may have some
24  more questions, but I'm going to

296

1  let some of these gentlemen ask
2  some questions.
3          THE WITNESS:  I think it was
4  nice meeting you, but I'm not sure
5  yet.
6          THE VIDEOTAPE TECHNICIAN:
7  We're now going off the record.
8  This is the end of tape number two
9  in the deposition of Robert
10  Scharf.  The time on video is
11  15:08.
12          -  -  -
13          (Whereupon, a brief recess
14  was taken.)
15          -  -  -
16          THE VIDEOTAPE TECHNICIAN:
17  This is the beginning of tape
18  number three of the deposition of
19  Robert Scharf.  Time on video is
20  15:24.
21          MR. PIPES:  Mr. Scharf, my
22  name is Wesley Pipes.  I represent
23  Pensacola Stevedore Company, Inc.
24  and Pate Stevedore Company, Inc.

Robert Scharf                                    March 24, 2011

297

1    I have a few questions, but before
2    I do that I'm going to go ahead
3    and clear something up.
4    Apparently, Jonathon skipped
5    Exhibit Numbers 13 through 24 in
6    his haste, and I wanted to put
7    that on the record.
8    BY MR. PIPES:
9        Q.    Mr. Scharf, I won't be that
10   long, and I'm going to try not to cover
11   the same ground.
12       A.    Okay.
13       Q.    Let me ask you this:  You
14   don't know who bought the salvaged
15   drywall, do you?  I mean you know it -- I
16   think you said it was Pate?
17       A.    I believe that, but I don't
18   know that for a fact.
19       Q.    If I told you that his
20   company actually bought it, would you
21   disagree with me?
22       A.    I don't think so.
23       Q.    Have you ever heard of
24   Pensacola Stevedore Company, Inc.?

298

1        A.    I have.
2        Q.    Have you ever heard of Pate
3    Stevedore Company, Inc.?
4        A.    I have.
5        Q.    And if I told you that
6    Pensacola Stevedore Company, Inc. doing
7    business as Pate Stevedore Company, Inc.
8    actually purchased the drywall, would you
9    have any reason to disagree with me?
10       MR. BROWN:  Object to the
11   form.
12       THE WITNESS:  No, I don't
13   have any reason.
14   BY MR. PIPES:
15       Q.    When did you first meet Mike
16   Pate?
17       A.    Before the ship sailed from
18   China.
19       Q.    Would that have been in
20   connection with trying to line up a
21   Stevedore to unload the ship?
22       A.    That's correct.
23       Q.    And did you find Mr. Pate or
24   did Ruth Wu find Mr. Pate?

299

1        A.    I think Kitty Pon found Mr.
2    Pate.
3        Q.    And Kitty Pon is with
4    Pactrans?
5        A.    She owns Pactrans, yes.
6        Q.    Did you have conversations
7    with Mr. Pate to line up stevedoring
8    services for the boat?
9        A.    No, not until after -- no, I
10   did not.
11       Q.    So your first conversations
12   with him would have been after the boat
13   came in?
14       A.    No, I went down there before
15   the boat to meet him to see if he could
16   do this and just get comfortable with the
17   fact that he could do it.  And it was
18   Kitty Pon I think who is the one who
19   found him and sent us down there.  And
20   then we went.  And then I don't know
21   where Ruth came in on that.
22       Q.    And Mr. Pate's company
23   eventually did perform the stevedoring
24   services?

300

1        A.    That's correct.
2        Q.    And Pactrans, I'll just
3    bring this up now.  What is -- what
4    happened between Devon and Pactrans?  My
5    feeling is there was some sort of
6    animosity or something happened there.
7    If you could enlighten me?
8        A.    This is after the fact.
9    This was not --
10       Q.    Well, at any time really.
11       A.    Yeah, we had some problems
12   with them.
13       Q.    With Pactrans?
14       A.    Yes.
15       Q.    There was some E-mails
16   referencing someone coming to Pensacola,
17   and I don't think -- someone from
18   Pactrans and him not being authorized to
19   go on the docks or go on the ship.  Do
20   you remember that?  Why would someone
21   from Pactrans have wanted to go there?
22       A.    I don't know.
23       Q.    Was he allowed to go on the
24   dock?

Robert Scharf                                    March 24, 2011

301

1     A.   There wasn't any reason why
2  he should have been there.
3     Q.   Do you know if he came?
4     A.   He was there.
5     Q.   Was there ever -- well,
6  there was, there was an arbitration
7  between Pactrans and Devon?
8     A.   There was.
9     Q.   Do you know the outcome of
10 that arbitration?
11    A.   No.
12    Q.   So you don't know who won or
13 lost?
14    A.   I'm not sure, but I gave
15 testimony.
16    Q.   How long ago was that?
17    A.   It was in -- it was over a
18 year ago.  It was in September, August
19 two summers ago, so August 2009.
20    Q.   And you gave testimony in
21 China?
22    A.   I did.
23    Q.   Were you still employed with
24 Devon at that time?

302

1     A.   I was not.
2     Q.   This was your first and only
3  experience with drywall in China.  Is
4  that correct?
5     A.   That's correct.
6     Q.   And I take it you go to
7  China often with your business?
8     A.   More than most, yeah, I
9  go -- yes.
10    Q.   And when did you first start
11 going to China?
12    A.   2004.
13    Q.   So you had roughly two years
14 of experience going to China before the
15 drywall project?
16    A.   Yes, I would say so.
17    Q.   Mr. Law asked you about some
18 customers.  Do you recall Devon selling
19 to a company called Mazer?
20    A.   Yes.
21    Q.   And a company called Gulf
22 Coast Shelter?
23    A.   Yes.
24    Q.   Were you aware that those

303

1  companies were located in Alabama?
2     A.   Mazer's in Alabama.  I'm not
3  sure -- they are from Settle.  They are a
4  Seattle Company.
5     Q.   Gulf Coast Shelter is?
6     A.   Yeah.  They have an office
7  somewhere.  I don't know if it's
8  Mississippi or Alabama, but I know it's
9  somewhere there.  I was even there once.
10    Q.   Did you ever visit any
11 potential clients for Devon in Alabama?
12    A.   No.
13    Q.   Who was basically in charge
14 of trying to sell the sheet rock after
15 NorPac backed out of the deal?
16    A.   I was.
17    Q.   Was there a guy named Nick
18 Egan involved?
19    A.   That was after I left.
20    Q.   So it would have been you,
21 and then when you left it was Nick Egan?
22    A.   I believe so.
23    Q.   But while you were there,
24 Nick Egan was not working with you to do

304

1  that?
2     A.   No.  He worked for me, but
3  he wasn't down there.
4     Q.   So Mazer was an Alabama
5  company or operation?
6     A.   Yes, they are in Birmingham
7  I believe.
8     Q.   And you guys sold a lot of
9  drywall to them?
10    A.   We did.
11    Q.   Did you handle the
12 invoicing?
13    A.   I did not.
14    Q.   Let me show you what was
15 marked as Exhibit-50 to Ruth Wu's
16 deposition, and I'm going to just keep it
17 sequential here.  It will be 57 to yours.
18 I'll ask you if you would, please, look
19 at that.  That's the only copy I have.
20 I'll pass it to you next time.
21    A.   Okay.
22    Q.   And I'll just -- those are
23 materials that appear to be related to
24 Devon's sales to Mazer for drywall from

Robert Scharf                                        March 24, 2011

305

1   the Sanko Rally.  I'll just ask you if
2   you can confirm that.
3        A.   Yep.  Yes.
4        Q.   When you were down in
5   Pensacola in the summer of 2006, did you
6   know -- and then in the fall of 2006 when
7   you were trying to sell the rock, did you
8   know that some of the rock that you, that
9   Devon was selling was going to customers
10  in Alabama?
11       A.   No.
12       Q.   You did not know that?
13       A.   To customers in Alabama?
14       Q.   Yeah, well, to anyone, a
15  wholesaler?
16       A.   I know that Mazer bought it.
17            MS. CALDWELL:  Object to the
18       form.
19  BY MR. PIPES:
20       Q.   And you knew that Mazer was
21  in Birmingham?
22       A.   I did know that.
23       Q.   At one time wasn't this boat
24  supposed to come into the port of Mobile?

306

1        A.   Well, when you say supposed
2   to come in.  There was talk originally
3   about going into Mobile, but we had a
4   more favorable situation in Pensacola.
5        Q.   So at one time it was
6   contemplated that it would come into
7   Mobile?
8        A.   We looked at Savanna.  We
9   looked at a lot of different points.
10       Q.   And who was driving that
11  decision?
12       A.   The decision was financial.
13       Q.   Based on the cost to bring
14  it into each particular port?
15       A.   That's correct.
16       Q.   But at one time it was at
17  least contemplated it might be brought
18  into the port of Mobile?
19       A.   That's correct.
20       Q.   You mentioned something
21  about elephants on -- I wrote this down.
22  This was earlier this morning.  What were
23  you referring to?
24       A.   I can't tell you the

307

1   Ringling Brothers, right?  The people
2   that were in Hawaii that wanted the board
3   had said that you have to be careful that
4   -- one of the knocks on China drywall it
5   wasn't flat enough.  It wasn't straight
6   enough, and they would have elephants
7   buried in it.  So it would be bumpy or
8   lumpy or not smooth enough.
9        Q.   So it was just a reference
10  to the quality --
11       A.   When the -- I think it's
12  when the Hawaiian drywall was brought up.
13       Q.   The photographs that we
14  looked at earlier -- and I can't remember
15  what exhibit numbers they were, but I
16  think they are in this stack.
17            Do you remember being
18  present when these were taken?
19       A.   Well, I don't know that all
20  those photographs were taken at the same
21  time.  I was certainly present when there
22  were photographs taken.
23       Q.   51 is not related to the
24  drywall --

308

1        A.   This looks like a vinyl
2   extruder that was in that KG plant.
3        Q.   53 is in the drywall plant?
4        A.   This is in the drywall
5   plant, yes.
6        Q.   And 54 is in the drywall
7   plant?
8        A.   Yes.
9        Q.   And would those have been
10  taken roughly around the same time?
11       A.   That's a good question.  I
12  don't know.  I have to see another
13  picture with John in it and see what
14  clothes I had on.  Then you would know.
15  Otherwise, he was there once, and I've
16  been there several times.
17       Q.   Who would have taken those
18  pictures?
19       A.   I would think -- Salina was
20  there, too.  Either Salina or Julian
21  would have probably taken these pictures.
22       Q.   Both of whom worked in --
23       A.   I don't think that KG people
24  would take it.

Robert Scharf                                    March 24, 2011

309

1     Q.   Back in July, June, July of
2  2006 when the ship was being unloaded,
3  eventually I think you said that there
4  was some discussion about Devon and Mike
5  jointly buying or somehow acquiring the
6  salvaged rock?
7     A.   That's correct.
8     Q.   Did that -- that never came
9  to pass?
10    A.   No.
11    Q.   In fact there was never any
12 type of joint venture between anyone at
13 Devon and anyone, you know, Mike Pate or
14 Pensacola as far as selling the rock, was
15 there?
16    A.   That's correct.  There was
17 no one involved.
18    Q.   Now, in the course of you
19 being in Pensacola and being present at
20 times when the ship was being unloaded,
21 did you and Mike have conversations
22 about, you know, the fact that the rock
23 was made in China?  Is that something
24 that you all would have discussed?

310

1     A.   I would think there would be
2  some discussion about it.
3     Q.   Do you remember telling him
4  about say the factory where it was made?
5     A.   If I told him -- I've told
6  people about the factory so I would say
7  that's reasonable.
8     Q.   And the reason I say that is
9  in his deposition he said that he
10 remembered you telling him that the
11 factory was so clean you could eat off
12 the floor?
13    A.   I told him he could be
14 operated in there today.  If you look at
15 the pictures, you could even see that
16 from those pictures.  It's an amazingly
17 clean factory for that size.
18    Q.   And I think also when you
19 were answering some of Mr. Law's
20 questions, you remarked upon the
21 cleanliness of the warehouses at the port
22 of Pensacola.  Is that correct?
23    A.   That's correct.
24    Q.   They weren't in any kind of

311

1  disarray, were they?
2     A.   Not at all.
3     Q.   Did you have any problems
4  with the way any of the product was
5  stored at the port of Pensacola?
6     A.   Absolutely not.
7     Q.   Do you remember Mike, Mike
8  Pate having discussions with you about
9  Pensacola Stevedore's bills or the
10 stevedore bills in general?
11    A.   Yes.
12    Q.   Were there ever any -- did
13 he ever ask you, hey, when are we going
14 to get paid or anything to that affect?
15    A.   He did.
16    Q.   Were you in charge of that
17 or was someone else at Devon in charge of
18 paying him?
19    A.   I wasn't in charge of that.
20    Q.   Did you have the authority
21 to pay him or cut a check?
22    A.   No.
23    Q.   Who would have that
24 authority?

312

1     A.   Well, I would think John
2  Bennett.
3     Q.   And he's the head of the
4  company?
5     A.   That's correct.
6     Q.   And he's the head of all the
7  Devon companies?
8     A.   I believe so.
9     Q.   When he would talk to you
10 about that, would you -- what would you
11 tell him?
12    A.   We paid Mike everything that
13 had been agreed to for the stevedoring
14 for the original load.  The problem was
15 the additional stevedoring.
16    Q.   The damage?
17    A.   Well, no, the unloading.
18 Instead of taking six days, it took 30
19 days.  And he had to -- it was a lot more
20 additional stevedoring.  So he was
21 keeping records of how much time was
22 involved, and then he was presenting us
23 with a bill.  That's the bill that didn't
24 get paid in a prompt fashion for Mike.

Robert Scharf                                    March 24, 2011

313

1      Q.   Well, let me back up and
2  ask:  The original stevedoring is --
3  would that be the stevedoring that would
4  have, you know, that would have been
5  necessary if there had been no damage?
6      A.   Right.  I don't recall the
7  amount, but it's 150,000, $160,000,
8  something to that effect.  Then I think
9  there was an additional $150,000 in
10 stevedoring I think.
11     Q.   And there were some
12 additional fees because it took a lot
13 longer because of the breakage?
14     A.   That's correct.
15     Q.   And he had to hire a lot of
16 extra people?
17     A.   A lot longer, yes.
18     Q.   And so he was telling you,
19 hey, I got to get paid, you know, was it
20 -- how would he tell you?
21     A.   He said, Bob, I need some
22 money.
23     Q.   And then what would you do?
24     A.   I see if we can get him some

314

1  money, and we didn't have any money to
2  give him.
3      Q.   So you talked to Dr. Bennett
4  and say Mike wants to get paid, what do
5  we do?
6      A.   We don't have any money to
7  give him.
8      Q.   Do you know if it ever got
9  to the point where the relationship broke
10 down between, you know, Pensacola
11 Stevedore and Devon to where he stopped
12 loading trucks?
13     A.   Not when I was there.  What
14 happened after I left I'm not sure.
15     Q.   When did you leave?
16     A.   I think I left that
17 following March or April.
18     Q.   Let me show you what I'm
19 going to mark as Exhibit-58.  The first
20 thing I'm going to ask you is were you
21 still there when this letter was sent?
22 And I apologize, this is the only copy I
23 have.  I'm going to show it to the
24 lawyers first.

315

1              What's the date of that
2  letter?
3      A.   This is April 9th, 2007.
4      Q.   Do you know if you were
5  still at Devon on that date?
6      A.   It was close.
7      Q.   So could have be, maybe not?
8      A.   Exactly.
9      Q.   Do you remember receiving
10 that letter?
11     A.   No, I don't remember
12 receiving this letter.
13     Q.   Did you and Dr. Bennett --
14 do you remember talking with Dr. Bennett
15 in the spring of 2007 about the issue of
16 Pate Stevedore or Pensacola Stevedore's
17 bills?
18     A.   I do.
19     Q.   Do you -- let me move on.
20 Let me show you what I'm going to mark as
21 Exhibit-59.  And take all the time to
22 look at it.  My question is have you ever
23 seen that before?
24     A.   I think I only saw this in

316

1  these documents that I had.  I never saw
2  it before the other day.
3      Q.   And my question is you
4  didn't see that back in 2007?
5      A.   I don't believe so.
6      Q.   And you didn't -- did you
7  participate in negotiating that --
8      A.   I did not.
9      Q.   -- with Pensacola Stevedore?
10     A.   I did not.
11     Q.   Do you know -- do you know
12 if you were gone when that was executed,
13 if you left Devon already?
14     A.   I think so.
15     Q.   If you had been at Devon, is
16 that something you would have been
17 involved in?
18     A.   I maybe would have signed
19 off on it.
20     Q.   Because what they're
21 discussing in there is basically
22 Pensacola Stevedore selling to Devon
23 almost all of the remaining salvage
24 drywall for $68,850?

Robert Scharf                                          March 24, 2011

317

1        A.    I have no knowledge there.
2        Q.    And you were in charge of
3   selling the drywall so it would have --
4        A.    Well, if I was there, I
5   would have been involved in that.
6        Q.    As far as how Pensacola
7   Stevedore went about selling the drywall
8   that it purchased at salvage, you had no
9   involvement in that, did you?
10       A.    In what Mike sold?
11       Q.    Right.
12       A.    No, I had no involvement.
13       Q.    Or how he did it?
14       A.    No.
15       Q.    Earlier you were asked
16   multiple questions about the Sabine
17   survey, the survey that was performed --
18   I don't know if I'm saying that
19   correctly.
20       A.    I don't know either.
21       Q.    And there are references to
22   sellable drywall and drywall not
23   sellable.  And you are talking about
24   sellable as well.  When you were saying

318

1   it was not sellable, did you mean it was
2   not sellable by Devon because Devon did
3   not own it?
4        A.    Well, I wasn't allowed to
5   sell it.  I wasn't allowed to sell
6   anything.
7        Q.    And my point in saying that
8   is you, Robert Scharf, Bob Scharf and
9   Devon were not making the determination
10   that this stack of drywall that had been
11   put over in the salvage pile was not
12   actually sellable?
13       A.    I made no decisions on any
14   of it.
15       Q.    That's what I wanted to get
16   at.  You are not offering an opinion that
17   no drywall out of this pile could be sold
18   to the general public?
19       A.    No, I have no opinion in
20   that at all.
21       Q.    You had mentioned that at
22   some point there were some loads that had
23   been trucked out of the port of Pensacola
24   that were returned by various customers,

319

1   and I believe they were NorPac customers?
2        A.    That's correct.
3        Q.    And some of them I think you
4   said were false claims?
5        A.    That's correct.
6        Q.    And I think you said at one
7   point Pate put a stop to them, returning
8   them?
9        A.    He stopped them from coming
10   in the port.
11       Q.    What did you mean by that?
12   He just said I'm not going to put them
13   back in my warehouse?
14       A.    Here is what I believe.
15   It's not Pate's warehouse.  It's the
16   port's warehouse.  I mean we owed them
17   some money, too.  But they took back a
18   couple of these trucks that came in early
19   in the morning and they took them back.
20   And I think Mike called me and said, Bob,
21   there's trucks back here.  We can't take
22   these back.
23       Q.    So what happened from that
24   point forward?

320

1        A.    We didn't take any trucks
2   back into the port.  I'm not certain
3   whether NorPac paid for it or not.
4        Q.    If NorPac or one of NorPac's
5   customers said we don't like this load of
6   rock they bought from Devon and it
7   wasn't returned to the port, what would
8   happen?  Would it just be destroyed and
9   they get their money back?
10       A.    Well, if it was damaged,
11   broken and they couldn't use it, we
12   wouldn't charge NorPac.  My guess is
13   NorPac just didn't pay for this.  They
14   owed us $4,200,000 they didn't pay for.
15   So I don't think a few trucks made much
16   difference to NorPac.
17       Q.    Do you know if you ever
18   refunded any money to any purchaser?  In
19   other words, money changed hands and then
20   it was given back?
21       A.    I don't believe so.
22       Q.    Who would know that within
23   Devon?
24       A.    I would guess George Clark

Robert Scharf                                    March 24, 2011

321

1  would know or he could find out.
2      Q.   What's George's position?
3      A.   He's a controller at Devon.
4      Q.   You had mentioned that at
5  one point Devon owed the port of
6  Pensacola some money.  Do you remember
7  how much they were owed?
8      A.   No, it was the storage that
9  was -- the port charges after -- they
10  gave us 90 days free or 60 days free
11  storage which is one of the reasons why
12  we used the port.  So we went over that,
13  and then there was a bill that was
14  presented.  They got paid, but they
15  hadn't been paid at that time.  They were
16  also very nice.  They said, okay, we
17  talked to them and told them when we get
18  the money we'll pay you.
19      Q.   Do you know if anyone ever
20  told Mike Pate that, hey, you'll get paid
21  when the insurance settlement is
22  finalized?
23      A.   I believe he was told that.
24      Q.   Who would have told him

322

1  that?
2      A.   Well, I might have told him
3  that, you know, if he asked me if that's
4  what I was told.  Galen Hawk would have
5  told him that.
6      Q.   You were asked a lot of
7  questions about testing, and I don't want
8  to get into all that again.  But I do --
9  I did have one question.  And that is,
10  when -- when the boat came in and when
11  NorPac, you presented your invoice to
12  NorPac?
13      A.   That's correct.
14      Q.   And then get a letter in
15  return saying, no, we're not going to pay
16  you, we're not going to buy it?
17      A.   That's correct.
18      Q.   At that point somebody at
19  Devon and you all realized that, hey,
20  we're going to have to sell, you know,
21  half this boat ourselves.  Is that a fair
22  statement?
23      A.   No.  We didn't know that
24  right away because when it first came in

323

1  NorPac wanted the drywall right away,
2  right away but we didn't own it.  I
3  couldn't sell it.  The insurance company,
4  they had full control over it.
5      Q.   It was tied up.
6          MR. REBARCHAK:  Object to
7      the form of the question.
8  BY MR. PIPES:
9      Q.   But then it was released at
10  some point?
11      A.   Yes.
12      Q.   And you ended up with
13  roughly half the boat?
14      A.   That's fair.
15      Q.   200,000 around sheets?
16      A.   Right.
17      Q.   And around that time you
18  realized that, okay, Devon, we're going
19  to have to sell this stuff?
20      A.   That's correct.
21      Q.   At that point was there any
22  thought that we better make sure this
23  stuff was actually tested and met the
24  standards that have been stamped on it?

324

1      A.   No.
2      Q.   Did anyone ever inform Mike
3  Pate or anyone at Pensacola Stevedore
4  that, hey, we don't have the ASTM testing
5  that's stamped on the sheets?
6      A.   No.
7          MS. CALDWELL:  Object to the
8      form.
9  BY MR. PIPES:
10      Q.   Who would have negotiated
11  the contract with Pactrans between Devon
12  and Pactrans?
13      A.   Ruth Wu.
14      Q.   Do you know if the port of
15  Pensacola was ever told at any point,
16  hey, we'll pay you our warpage, but you
17  got to, you know, we have a sale lined
18  up, we need to make this sale and then
19  your money will come in?  Do you remember
20  anything like that?
21      A.   No.  I met with the port
22  over payment.  I remember that.  And they
23  were told maybe -- they were told
24  whenever we have the money we'll pay you.

Robert Scharf                                              March 24, 2011

325

1  That's what they were told.
2      Q.   I'm going to show you what
3  I'm going to mark as Exhibit-60.  It's
4  highlighted.  We'll substitute an
5  unhighlighted copy.
6          Is that an E-mail from Dr.
7  Bennett to yourself?
8      A.   Yes.
9      Q.   And is he basically telling
10  you just start selling to anybody you can
11  find?
12      A.   No, he's telling me to start
13  selling to anybody that's NorPac's
14  customer.
15          MR. REBARCHAK:  What's the
16  date of that letter?
17          THE WITNESS:  August 12th,
18  2006.
19  BY MR. PIPES:
20      Q.   Is that because NorPac left
21  you high and dry?
22      A.   I would assume that's what
23  that was, yes.
24      Q.   Did you know who their

326

1  customers were?
2      A.   No, I really didn't.  I
3  wouldn't do that.  I don't know their
4  customers.
5      Q.   Do you know if you were able
6  to sell to any other customers?
7      A.   No.  You'll find E-mails
8  somewhere where they ask me not to sell
9  to their customers.  They were still
10  trying to sell it.  They thought they
11  could still make a little money, and then
12  they would buy it from us.  At one point
13  I said, listen, guys, you are going to
14  buy it you got to buy it.  We got a lot
15  of stuff to sell here.
16      Q.   Do you know if this E-mail
17  which is dated August 12th predated those
18  E-mails you just referred to or came
19  after?
20      A.   I'm not sure.
21      Q.   Bear with me.  I think I'm
22  done.  I just want to make sure I don't
23  have any documents I want to ask you
24  about.

327

1          Do you know if Devon ever
2  imported into the port of Mobile while
3  you worked there?
4      A.   Port of Mobile?
5      Q.   Yes.
6      A.   I don't know.
7      Q.   And at the time that you
8  were doing this drywall, you are also
9  doing nails and all kinds of other stuff?
10      A.   That's correct.
11      Q.   And that's coming in on
12  containers mostly?
13      A.   Everything we do was on
14  containers.
15      Q.   How many times have you been
16  to China with Dr. Bennett?
17      A.   With Dr. Bennett together at
18  the same time?
19      Q.   Yes, sir.
20      A.   Maybe four times.
21      Q.   One of them you told us
22  about that was in relation to this
23  drywall?
24      A.   That's correct.

328

1      Q.   Where you went to the
2  factory when the run had finished I
3  guess?
4      A.   Yeah.  Yes.
5      Q.   And it was going to be
6  trucked to the port?
7      A.   That's correct.
8      Q.   What were the other -- what
9  did you all do on the other times?
10      A.   I went with him twice.  We
11  went to the Canton Fair which is a huge
12  trade show that they have twice a year in
13  Guinjo, China.  Then -- we've been to
14  Shanghai a few times at the same time.
15  Most time we would go our separate ways
16  in China.
17      Q.   What would you do at the
18  fair?  What was the purpose of going to
19  that?
20      A.   Well, everybody that
21  manufactures anything I think in the
22  world ever has displays at that fair.  So
23  we would then look to find new places to
24  source material from.

Robert Scharf                                    March 24, 2011

329

1    Q.   Like a new factory?
2    A.   Like a new factory.
3    Q.   New relationships in China?
4    A.   That's correct.
5    Q.   For various products?
6    A.   Yes.
7    Q.   Were you primarily concerned
8  with building products?
9    A.   Not so much for the fair.
10  We sold food -- plastic food containers
11  to somebody in Chicago, and we sold
12  motorcycles and brought TVs in at times,
13  barbecue grills.  There were things that
14  we would buy.
15    Q.   Devon never bought the
16  extrusion factory?
17    A.   No, we never bought the
18  extrusion factory.
19    Q.   What are extrusions?
20    A.   They are lineals.  They are
21  the frames for the windows on the vinyl
22  window.  That's the best way to tell you.
23  It's the vinyl frame on a window.  It's
24  really a lineal is what it is.  It's an

330

1  extruded vinyl.
2    Q.   So you all were looking to
3  own your own factory there to make that
4  component of windows?
5    A.   Yes.
6    Q.   Is that so that you could
7  then have, you know, easier access to
8  parts --
9    A.   No.  I have a background
10  somewhat in vinyl extruder.  This was a
11  factory that they had set up in Pudong
12  which is a commercial end of Shanghai
13  that was a 300,000 square foot building
14  and had 30 German extruders in there that
15  they had run for about two years.  And
16  then the vinyl windows in China went
17  away.  They stopped buying vinyl windows.
18    Q.   What do you mean --
19    A.   The market dried up for
20  them.
21    Q.   In the U.S.?
22    A.   No, in China.  So they had
23  this factory sitting there that had $30
24  dollars worth of extruders.  They had a

331

1  four-story department building next door
2  for the people to stay there.  It was a
3  beautiful set up.  And we made a deal to
4  buy it for $3 million.  And we made three
5  deals with them and all three times
6  they --
7    Q.   It fell through?
8    A.   They backed out.  It was a
9  Government owned building.
10    Q.   Who were you going to sell
11  those extrusions to?
12    A.   That's a good question.
13    Q.   Was there a plan?
14    A.   Well, probably would have
15  sold the extrusions to window
16  manufacturers in the United States.
17    Q.   So they would have been
18  exported from China to the United States?
19    A.   That's correct.
20    Q.   And then installed in the
21  component windows?
22    A.   Then what you would call a
23  window manufacturer who I would call a
24  fabricator would then cut those up and

332

1  make a window out of it.
2    Q.   And that would have been a
3  direct Devon product?
4    A.   No, it would not have been.
5    Q.   Not the window itself but
6  the extrusion?
7    A.   No.  Devon was part of a
8  group that we were going to buy that
9  factory.
10    MR. PIPES:  Mr. Scharf, I
11  think that's all I have.
12    THE WITNESS:  Thank you.
13    THE VIDEOTAPE TECHNICIAN:
14  Going off the record.  The time on
15  video is 15:59.
16    - - -
17    (Whereupon, a brief recess
18  was taken.)
19    - - -
20    THE VIDEOTAPE TECHNICIAN:
21  We're now back on the record.
22  Time on video is 16:21.
23  BY MR. ROBERTSON:
24    Q.   Mr. Scharf, my name is Jim

333

1 Robertson, and I represent Ace Home
2 Center in this case. First, I'm going to
3 show you what's been marked Exhibit-61
4 and -62 which are cross notices of your
5 deposition, Exhibit-61 and Exhibit 2 is
6 the cross notice of the corporate
7 representative.
8          MR. BROWN:  Are these the
9       same as --
10         MR. ROBERTSON:  Yes.
11         MR. BROWN:  Same paragraph.
12         MR. ROBERTSON:  They track
13      what Jonathon did for the
14      corporate representative for Devon
15      International.
16 BY MR. ROBERTSON:
17   Q.   As to the corporate
18 representative of Devon International on
19 Exhibit-62, can you tell me what areas of
20 that notice you would be responding to?
21         MR. BROWN:  I can tell you
22      this to make it simple.  I can
23      tell you which paragraphs he's
24      been tendered for.

334

1          MR. ROBERTSON:  Yes, that's
2       fair.
3          MR. BROWN:  He's been
4       tendered for paragraphs three,
5       partially three, what knowledge he
6       has, four, six and to what extent
7       he knows anything paragraph nine.
8          MR. ROBERTSON:  Thank you.
9 BY MR. ROBERTSON:
10   Q.   Mr. Scharf, you said earlier
11 that you never told Mazer or Gulf Coast
12 Shelter, two of the companies that Devon
13 sold this Chinese drywall to that Devon
14 had never tested the drywall.
15         Do you remember saying that
16 earlier?
17   A.   I remember what I said.  I'm
18 just trying to understand.  I told them
19 that Devon never tested the drywall?
20   Q.   No, you said that you never
21 told Mazer or Gulf Coast Shelter that
22 Devon had not tested the drywall that it
23 sold?
24   A.   I never told them that I

335

1 tested the drywall that I sold.
2   Q.   You never told them you
3 tested it?
4   A.   I never told them I tested
5 it.
6   Q.   Because in fact Devon never
7 did test it?
8   A.   Never tested it.
9   Q.   The same would hold true
10 with the drywall that ended up with
11 Pensacola Stevedore and that Ace Home
12 Center bought from Pensacola Stevedore.
13 You never told Ace Home Center that you
14 had failed to test the drywall, did you?
15         MR. BROWN:  Object to the
16      form.
17         THE WITNESS:  I don't think
18      I've ever met Ace Wholesale.
19 BY MR. ROBERTSON:
20   Q.   Ace Home Center.
21   A.   Ace Home Center.
22   Q.   Well, you said earlier that
23 as far as you could see that on every
24 sheet of the drywall the ASTM standard

336

1 was printed on those pieces?
2   A.   That's correct.
3   Q.   And that as long as the ASTM
4 stamp was on it that that was something
5 that the people buying the drywall from
6 Devon were looking for?
7   A.   I would think that once they
8 saw that they wouldn't ask any other
9 questions.
10   Q.   Now, you don't know yourself
11 whether the drywall involved in this case
12 did in fact meet the ASTM standard, do
13 you?
14   A.   I know that the factory was
15 certified to make it.
16   Q.   Right.  You testified
17 earlier that at some point in the past
18 the factory had been certified by
19 somebody?
20   A.   Okay.
21   Q.   Right?
22   A.   Yes.
23   Q.   You never saw the
24 certification yourself, right?

Robert Scharf                                        March 24, 2011

337

1       A.   Well, I think I did.
2       Q.   You saw a certification from
3  ASTM that they had inspected the plant
4  and --
5       A.   No, I did not see that.
6       Q.   Okay.  That's just based on
7  what some Chinese official told you,
8  correct?
9            MR. BROWN:  Object to the
10  form.
11           THE WITNESS:  Well, they
12     told me that they were ASTM
13     approved.  Then they put their
14     approval notification on every
15     sheet.
16  BY MR. ROBERTSON:
17      Q.   But you don't know if they
18  tested the drywall that was put in that
19  ship that came to America, do you?
20      A.   No, I don't know.
21      Q.   And you did say that no
22  water ever affected any of the drywall
23  from the time it was produced in China
24  through the time that it was put in the

338

1  warehouses in Pensacola?
2       A.   That's correct.
3       Q.   And in fact when Mr. Law was
4  asking you about that survey by Sabine
5  surveyors, Exhibit-42, do you remember
6  him asking you these questions about
7  looking over the drywall after it came
8  into port in Pensacola?
9       A.   Yes.
10      Q.   Isn't it a fact that those
11  surveyors they found no water damage to
12  any of the drywall?
13      A.   No, there was no water
14  damage, yeah, zero.
15      Q.   All right.  Now, you don't
16  know whether or not the large four foot
17  by 12 foot sheets of drywall which were
18  the sheets that were manufactured in
19  China whether any of those sheets ever
20  made it to NorPac, do you?
21      A.   Give me that again.
22      Q.   The only thing that you
23  think NorPac received from Devon or from
24  the factory in China were the six or

339

1  eight-inch samples of drywall that you
2  said were air shipped over there?
3       A.   No, those samples I gave to
4  them.  We kept them.  I believe the
5  factory sent them full sheets.
6       Q.   But you don't know that, do
7  you?
8       A.   No.
9       Q.   Just asking what you know.
10      A.   Okay.
11      Q.   The samples you gave them
12  you said were for NorPac to use with its
13  customers?
14      A.   As a sales sample.
15      Q.   As a sales sample.  I'm
16  going to show you what was previously
17  marked as Exhibit-41.  And that is the
18  fax that has a stamp of received March
19  29, 2006 from Salina to you.  You're the
20  Bob on the front page where it says to
21  Bob?
22      A.   Okay.
23      Q.   Is that right?
24      A.   I would assume I'm the Bob.

340

1       Q.   Totally four pages were
2  faxed to you.  Those are inspection
3  report documents only in Chinese?
4       A.   Right.
5       Q.   And Salina was in China?
6       A.   That's correct.
7       Q.   And do you know why she was
8  faxing you these reports?
9       A.   I don't know.
10      Q.   And if you look on the
11  reports, if you'll go to the first page
12  of the report, the one you are on.  And
13  you have to turn it up side down.  It's
14  Bates stamped Devon 144.  Do you see
15  that?  Do you see the Devon stamp 144?
16      A.   Devon 00144?
17      Q.   Yes.  Now turn it back
18  because it's upside down.  Turn it right
19  -- under that stamp do you see where it's
20  the fax number, there's a date of April
21  20th of 2002?
22      A.   I see February something
23  2005.  We're looking at the same thing?
24      Q.   Turn it upside down.  Do you

Robert Scharf                                          March 24, 2011

341

1 see another fax?
2     A.   April 20th, 2002.
3     Q.   Turn to the next page on
4 that exhibit.  Do you see another stamp
5 with April 20, 2002?
6     A.   I do.
7     Q.   And if you turn to the third
8 page of this inspection report that's
9 also got a fax date of April 20, 2002?
10     A.   I do.
11     Q.   So would it appear that this
12 inspection report dated back almost four
13 years from the time that she was faxing
14 it to you?
15         MR. BROWN:  Object to the
16 form.  He didn't make the report.
17 BY MR. ROBERTSON:
18     Q.   But when you got the fax in
19 2006, these pages that are attached, the
20 three pages attached that Salina sent you
21 that was the form in which you received
22 them, correct?
23     A.   Well, here, this says
24 February 29th, 2005.  And that's on this

342

1 document.  So I don't think they could
2 have faxed this in 2002 if this document
3 says 2005.
4     Q.   Do you know whether that in
5 fact is the case?
6     A.   Well, this document says
7 2005.
8     Q.   Well, let's go with 2005.
9 That's more than a year earlier from the
10 time of the fax in 2006 to you, correct?
11     A.   That's correct.
12     Q.   So you knew that this
13 inspection report did not involve the
14 drywall that's involved in this case?
15         MR. BROWN:  Object to the
16 form.
17         THE WITNESS:  I didn't know
18 that.
19 BY MR. ROBERTSON:
20     Q.   You knew it wasn't this
21 drywall because the inspection report is
22 dated 2005.
23     A.   I just saw that now that it
24 was dated 2005.  So I didn't know that,

343

1 and I don't know what this is.  We should
2 have had this translated is what we
3 should have done.
4     Q.   You don't know what this
5 report says, do you?
6     A.   No, I don't have a clue what
7 this is.
8     Q.   When you got it, did you ask
9 anybody back in 2006 to please get it
10 translated to find out what in fact these
11 pages were?
12     A.   This may be translated
13 somewhere.
14     Q.   I'm just asking --
15     A.   I don't remember.  I'm
16 sorry.
17     Q.   When you were dealing with
18 Mr. Buckley at North Pacific, I'm going
19 to -- I know it's in here somewhere, but
20 I can't put my fingers on it.  There was
21 a purchase order dated 2/8/06 for
22 $4,120,933.82.  This was the purchase
23 order for the drywall that Devon was
24 going to provide to North Pacific,

344

1 correct?
2     A.   I have to see it.
3     Q.   I'm going to mark it
4 Exhibit-63.
5     A.   Unless there's an addendum
6 to the purchase order this is the one.
7     Q.   That purchase order there
8 was an order that Devon entered into with
9 the Taishan Gypsum Board Company in March
10 of 2006 that's previously been marked as
11 an exhibit, but that was for the
12 $1,450,000, the price that Devon was
13 going to pay to have it manufactured?
14         MR. BROWN:  Object to the
15 form.
16 BY MR. ROBERTSON:
17     Q.   When you negotiated with the
18 Chinese to manufacture, the price that
19 Devon was paying was about --
20     A.   This includes the freight.
21     Q.   I understand.  I know there
22 are other costs.  I was going to get to
23 that.  $1,450,000 that Devon was going to
24 pay the Chinese to make it, right?

Robert Scharf                                    March 24, 2011

345

1    A.   I have to look.
2    Q.   I'll show you the sales
3  confirmation that's previously been
4  marked as an exhibit.
5    A.   So $500,000 bundles would be
6  a little less than a million five, a
7  million four something.
8    Q.   And that's what is showing
9  on the sales confirmation dated March
10 30th, 2006, right?
11   A.   Yes.
12   Q.   Do you know why there was a
13 delay between the date of North Pacific's
14 purchase order in early February of 2006
15 and the sales confirmation between Devon
16 and the manufacturer at the end of March
17 2006?
18   A.   No, I don't know why.
19   Q.   They've previously been
20 talked about at length about all these
21 questions about testing that were coming
22 from NorPac in February and March of
23 2006.
24   Do you remember that line of

346

1  questioning?
2    A.   Yes, I do.
3    Q.   Do you think the delay in
4  North Pacific's purchase order in early
5  February and Devon actually committing to
6  a purchase or a manufacture of the
7  drawall at the end of March 2006 was
8  to --
9    MR. BROWN:  Object to the
10   form.
11 BY MR. ROBERTSON:
12   Q.   -- was to answer the
13 questions NorPac had about the testing?
14   A.   No, sir.  Once NorPac gave
15 us that purchase order there were no more
16 questions.
17   Q.   Well, do you know why Ruth
18 Wu as late as May 4th of 2006 was asking
19 Jay Buckley about a testing laboratory
20 for drywall?
21   A.   Yeah, my guess is she wanted
22 to get a test report done on somebody's
23 drywall, but it had nothing to do with
24 NorPac.

347

1    Q.   She didn't want to get this
2  drywall tested?
3    A.   No.  We don't test anything,
4  okay.  And this drywall as far as we knew
5  the plant certified that they had ASTM
6  approval, whatever the number was on it
7  and that I knew if that's what they
8  certify it, customs or somebody is going
9  to check on it.  It won't get in this
10 country if it's bad.
11   Q.   And you knew that people or
12 companies that would be buying this
13 drywall would also be relying on that
14 ASTM stamp on the drywall?
15   A.   Well, I only know what
16 NorPac -- that's the only customer I
17 knew --
18   Q.   Well, you testified earlier
19 that you thought that Mazer or Gulf Coast
20 Shelter that they would be looking at
21 that stamp on the drywall?
22   A.   I would think they would be
23 fine with that stamp.  They wouldn't ask
24 anymore questions.

348

1    Q.   Once they saw the stamp?
2    A.   Once they knew the stamp was
3  on the board.
4    Q.   You mentioned earlier that
5  if you had bought the drywall that had
6  been segregated by Fireman's Fund that
7  Devon was making its insurance claim on,
8  that if you had bought it you could have
9  resold it?
10   A.   No.  What I was saying was
11 if I owned the cargo when it came into
12 Pensacola, the material that was deemed
13 not damaged, I would have sold it the day
14 it came off the boat.
15   Q.   As to the cargo that was
16 deemed damaged, not all the sheets in
17 those bundles were damaged, were they?
18   A.   I don't know.  I don't know.
19 I didn't open the bundles.
20   Q.   If you had -- you said
21 earlier some of the boards within the
22 bundles could be perfectly good while
23 other boards would be damaged?
24   A.   That's correct.

Robert Scharf                                             March 24, 2011

349

1    Q.   And do you know that when
2   Mr. Pate was looking at the cargo that
3   had been deemed damaged that whether or
4   not he planned to take the damaged
5   bundles and find purchasers that would
6   purchase the good sheets in those
7   bundles?
8          MR. PIPES:  Object to the
9   form.
10         THE WITNESS:  I believe that
11   was his plan.
12   BY MR. ROBERTSON:
13    Q.   To your knowledge he didn't
14   intend to sell broken or damaged drywall
15   to anybody, did he?
16         MR. PIPES:  Object to the
17   form.
18         THE WITNESS:  To my
19   knowledge?  He wasn't trying to
20   fool anybody.  I know that.
21   BY MR. ROBERTSON:
22    Q.   Now, did you mention earlier
23   that Home Depot in Georgia wanted to buy
24   the whole ship load when it landed?

350

1    A.   Yeah.
2          MR. LAW:  Object to the
3   form.  It mischaracterizes his
4   testimony.
5   BY MR. ROBERTSON:
6    Q.   Was that your understanding?
7    A.   They made inquiry about
8   buying it while it was still on the
9   water.
10    Q.   Home Depot did?
11    A.   One of their buying groups
12   of people.
13    Q.   And those buying groups use
14   Home Depot --
15    A.   To sell to Home Depot.
16    Q.   They sell to Home Depot?
17    A.   That's correct.
18    Q.   Do you remember the names of
19   any of those people?
20    A.   It was Pacific Rim, and it
21   was Gotti or Gadi (ph) and I don't know
22   the --
23    Q.   And did you tell them that
24   the ship had been involved in some storms

351

1   on the water?
2    A.   Oh, yeah.
3    Q.   And they -- did you tell
4   them that you expected some of the cargo
5   would be damaged?
6    A.   I don't know if I told that
7   to them.  They had made an inquiry about
8   buying it while it was on the water
9   before I knew it rolled.
10    Q.   Did you talk to them after
11   it rolled?
12    A.   They came and looked at it
13   at the port.
14    Q.   And were you there when they
15   looked at it?
16    A.   I don't think I was there.
17    Q.   Well, do you know --
18    A.   But I might have been there.
19    Q.   Did you have more
20   discussions with them after that?
21    A.   Yeah, I did.
22    Q.   And were they --
23    A.   They would have taken it
24   that day.

352

1    Q.   The whole ship load?
2    A.   They would have taken
3   everything that was deemed not damaged.
4    Q.   Do you know if they wanted
5   any of the cargo that some might have
6   been damaged and some of the sheets were
7   still good?
8    A.   They never expressed that to
9   me.
10    Q.   Now, the good cargo, Devon
11   did not have an insurance claim paid?
12    A.   I don't know.
13    Q.   Now, you were terminated
14   from the company, weren't you?
15    A.   No, I left.
16    Q.   Well, were you asked to
17   leave?
18    A.   No.
19    Q.   Now, the profit margin you
20   had expected to make on this first
21   shipment with North Pacific was about
22   $300,000.  Is that right?
23    A.   I think that's about right.
24    Q.   You factored in the cost of

353

1  transportation, everything else, right?
2      A.   That's right.
3      Q.   Do you know if Devon had to
4  pay anything to the stevedores in
5  Pensacola after the ship came into port
6  or whether those claims or those expenses
7  were paid by the insurance company?
8      A.   I believe we paid Pate the
9  initial contract we had with him for the
10 stevedoring.
11     Q.   Do you know if it was ever
12 reimbursed by Fireman's Fund?
13     A.   I don't know.
14     Q.   Do you know -- when you say
15 you were in the quality control room at
16 the plant in China, do you know what they
17 were doing?
18     A.   No.
19     Q.   Do you know for a fact that
20 this drywall all came from that factory?
21     A.   I know for a fact it all
22 shipped from that factory.
23     Q.   And how do you know that?
24     A.   And I'm pretty sure I know

354

1  for a fact that it came from there.  We
2  had somebody on the ground there when it
3  was being loaded.
4      Q.   That was Julian?
5      A.   No, we had somebody else
6  there.
7      Q.   Who was that?
8      A.   I don't know his name.
9      Q.   Was that somebody Julian
10 found?
11     A.   Somebody that we would hire
12 to make sure the counts were right and
13 everything.
14     Q.   But he wasn't an employee of
15 Devon, was he?
16     A.   No.  Well, no, not an
17 employee of Devon.
18     Q.   You said earlier that
19 there's no such thing as a drywall
20 warranty.  Was that your testimony?
21     A.   That I know of, yes.
22     Q.   Why would there not be a
23 warranty on that product on drywall as
24 opposed to other building products?

355

1      A.   I said there was no warranty
2  before on aluminum trim coil either.  A
3  lot of products, if they get altered,
4  there's no guarantee on them anymore.
5      Q.   Well, and what alteration
6  took place on the drywall?
7      A.   I don't know about the
8  drywall, but I've never seen a warranty
9  on the drywall.
10     Q.   Well, but you don't know of
11 any alteration to the drywall either, do
12 you?
13     A.   No.  Well, if they cut it or
14 I don't know.
15     Q.   But as far as the drywall
16 that you saw in Pensacola, did you see
17 any of it that had been cut?
18     A.   No.
19     Q.   Any of it that appeared to
20 have been re-manufactured?
21     A.   When you say
22 re-manufactured, I'm not sure -- I'm not
23 sure what they use for re-grind in the
24 process when they make drywall.  I'm not

356

1  sure how that's done.  When you say
2  re-manufactured, I'm not sure what you
3  mean.
4      Q.   When you were at the plant
5  in China, did they tell you that this was
6  all original drywall that was being
7  created as opposed to drywall that was
8  second hand or used?
9      A.   I don't know that -- if you
10 know, tell me.  I don't know if there's
11 such a thing.
12     Q.   I'm not aware of it either.
13 As far as you know the drywall you saw in
14 Pensacola when you got there, did that
15 appear to be new drywall?
16     A.   It appeared to me whatever
17 those ASTM standards were that they were
18 able to put on there, and I don't know if
19 you are allowed to put re-grind in it or
20 not.
21     Q.   But this drywall had not as
22 far as you know been used in a house and
23 then taken out?
24     A.   No, it had not been used in

Robert Scharf                                           March 24, 2011

357

1  a house.
2      Q.    In the order contract -- and
3  I know there's an exhibit in here
4  somewhere, but I'm going to re-mark this
5  as Exhibit-64.
6      A.    That is in there, yes.
7      Q.    Exhibit-64, this is that
8  order contract.  It's in English.
9  There's a translation and behind it is
10 the Chinese.  You've seen that before,
11 haven't you?
12     A.    I have.
13     Q.    Mr. Scharf?
14     A.    I have.
15     Q.    Do you know where the ASTM
16 language that is included in the order
17 for the drywall came from?
18     A.    I do not.
19     Q.    Look up in paragraph number
20 one.  Do you see the ASTM standard
21 listed?
22     A.    I do.
23     Q.    And what does it say about
24 the ASTM standard?

358

1      A.    That the production
2  standards to enforce strictly, every
3  piece of drywall board is imprinted made
4  in China, meet or exceeds ASTM C139604
5  standard.  Also, the packaging has
6  shipping marked to include logo provided
7  by U.S. Devon company and the related
8  pieces of information.
9      Q.    Thank you.  That ASTM
10 standard, where did that information come
11 from?  Did you come up with that number?
12     A.    No, not me.
13     Q.    You don't even know what
14 that number means, do you?
15     A.    No, I'm not an expert on
16 drywall.  I might be in this room right
17 now, but I'm not an expert on drywall.
18     Q.    Who told you to include that
19 number in the contract --
20     A.    That's from the factory.
21     Q.    Excuse me.
22     A.    I've been doing that all
23 day.  I apologize.
24     Q.    The ASTM number that is

359

1  included in Exhibit-64, the contract
2  between Devon and the manufacturer --
3      A.    Yes.
4      Q.    -- that information about
5  the number, that was provided by the
6  factory to Devon?
7      A.    It was provided by whomever
8  wrote this.
9      Q.    Whoever wrote the contract?
10     A.    This is in Chinese, but this
11 is in here.
12     Q.    It's got that same ASTM
13 number, correct?
14     A.    That's correct.  So whomever
15 this is that's who did it.  We simply had
16 this translated -- had this translated.
17     Q.    Did you ever when you saw
18 that contract, did you ever make any
19 inquiry to find out what that standard
20 meant, that ASTM standard?
21     A.    No.
22     Q.    Why not?
23     A.    It didn't interest me what
24 it meant.  The factory -- I don't own the

360

1  factory.  The factory -- I don't warranty
2  any of their product.  The factory is
3  saying that this is manufactured by them,
4  this is the standard that they met that
5  they've had it tested.  That's what I
6  need to have.
7      Q.    And as you testified
8  earlier, you understood that buyers of
9  the drywall would be relying on that
10 stamp on the sheets?
11     A.    Right.
12         MS. CALDWELL:  Object to the
13     form.  It misstates prior
14     testimony.
15         THE WITNESS:  They have to
16     enforce this strictly each piece.
17     So the factory is saying that they
18     have to make sure that they
19     strictly enforce the standards for
20     the ASTM.  That's what they are
21     certifying that they are doing.  I
22     don't know what else to do.  I
23     can't tell -- I can't certify it.
24 BY MR. ROBERTSON:

Robert Scharf                                    March 24, 2011

361

1    Q.   But you don't know of any
2  testing that was done on this load of
3  drywall, do you?
4    A.   No.  Here's what I believe.
5    Q.   I'm just asking what you
6  know.
7    A.   Well, but I don't think
8  that's the way it works.  The factory
9  gets certified.  They get the approval.
10  And then they are telling us that every
11  piece is made strictly to that enforcing
12  on those standards.  That's what they are
13  telling us there.
14    Q.   But you don't know whether
15  it was tested or not, do you?
16    A.   No.  My guess is that they
17  don't test it on every piece.  They make
18  it to the standard, and then however good
19  that standard -- that test is good for
20  two years, five years, ten years, I don't
21  know.
22    Q.   So you as the buyer, or you,
23  Devon as the buyer, it made no difference
24  to you whether this load of drywall

362

1  that's involved in this case was tested
2  or not?
3        MR. BROWN:  Object to the
4    form.
5        MS. CALDWELL:  Object to the
6    form.
7        THE WITNESS:  Every load --
8    every piece they are certifying is
9    made to the strict standards of
10    this.  They certify that.  I have
11    no other way of knowing that.
12  BY MR. ROBERTSON:
13    Q.   But, Mr. Scharf, my question
14  was did it make any difference to you
15  whether this load of drywall was
16  independently tested?
17        MR. BROWN:  Object to the
18    form.
19        THE WITNESS:  You know what,
20    I'm not trying to be
21    confrontational.  I don't
22    understand -- and I understand
23    English.  I don't understand what
24    we're missing on this.

363

1  BY MR. ROBERTSON:
2    Q.   I'm just asking if it made
3  any difference to you --
4    A.   I don't understand why would
5  it make any difference to me.
6    Q.   Whether it would make any
7  difference to you whether this load of
8  drywall involved in this case was subject
9  to independent testing prior to sale?
10        MR. BROWN:  Object to the
11    form.
12        THE WITNESS:  No.  The only
13    thing that matters to me is that
14    the factory has the approval, and
15    the factory is stating to me we
16    manufactured it to this standard
17    and we strictly enforced the code.
18    That's the only thing that matters
19    to me at that point.
20  BY MR. ROBERTSON:
21    Q.   So whether or not this load
22  of drywall was tested before sale didn't
23  matter to you?
24        MR. BROWN:  Object to the

364

1    form.  He's answered you in as
2    many different ways as he can.
3        MR. ROBERTSON:  He hasn't
4    answered that question.
5        MR. BROWN:  He can't answer
6    it then.
7        THE WITNESS:  I'm telling
8    you what it means.
9  BY MR. ROBERTSON:
10    Q.   But my question is whether
11  or not it made any difference to you
12  whether this load of drywall was tested?
13        MR. BROWN:  Object to the
14    form.  We've been through this.
15        THE WITNESS:  See, I'm
16    missing -- I'm misconnecting here.
17  BY MR. ROBERTSON:
18    Q.   You've told me that you
19  relied on the certification in general
20  that at some point this factory was
21  certified?
22    A.   That's correct.
23    Q.   My question is --
24    A.   I don't know what

Robert Scharf                                    March 24, 2011

365

1  standards -- how they allowed to put
2  their stamp on it, how often they have to
3  test it. I don't know the answer to your
4  question.
5       Q.   And so did it matter whether
6  this load of drywall was tested?
7            MR. BROWN:  Object to the
8       form.
9            THE WITNESS:  I don't know.
10           MR. BROWN:  Move on to
11      something else.  We've been
12      through this.
13  BY MR. ROBERTSON:
14      Q.   I think that's -- you've
15  told me that as long as they were
16  certified it made no difference to you?
17           MR. BROWN:  Object to the
18      form.  That's not what he said.
19           MS. CALDWELL:  Object to the
20      form.
21           THE WITNESS:  Am I supposed
22  to answer?
23           MR. BROWN:  Just move on.
24           MR. ROBERTSON:  Well, is he

367

1  the standards.
2            MR. BROWN:  Wait a minute.
3  Can we go off video?
4            THE VIDEOTAPE TECHNICIAN:
5  Going off the record.  Time on
6  video is 16 --
7            MR. LAW:  I don't know why
8  we're going off.
9            THE VIDEOTAPE TECHNICIAN:
10  Do you want to stay on or off?
11           MR. BROWN:  Well, if they
12  want to stay on it, we can stay on
13  it.  Don't badger the witness.
14  He's doing the best he can do to
15  answer your question.  I think,
16  and I may be wrong, but perhaps
17  you don't understand what he's
18  trying to explain to you.
19           MR. ROBERTSON:  I understood
20  what he said.
21           MR. BROWN:  But I don't want
22  you to keep badgering this
23  witness.  He has done the best he
24  can do and answered your questions

366

1  going to answer.
2            THE WITNESS:  I answered the
3  question.  The question is here's
4  what I care about.  It says here
5  very, very -- and you gave this to
6  me.  It says that the standard is
7  that they are producing this to
8  the standards to enforce strictly
9  every piece of drywall board is
10  imprinted and every piece is also
11  packaged has shipping marked to
12  include the logo provided by
13  Devon -- they are certifying that
14  we have ASTM approval and that
15  every piece of this is produced to
16  their standards and it's enforced
17  strictly.  That's every piece of
18  every board that comes out of that
19  factory.
20           So I'm going to assume that,
21  yes, they tested every board that
22  came out of the factory.  Why
23  would I assume that they don't?
24  It says that they strictly enforce

368

1  the best he can answer them.
2  Let's just move to something else.
3            MR. ROBERTSON:  Well, I
4  believe what he said was once he
5  heard they had certification at
6  some point that was good enough
7  for him, and whether they tested a
8  particular load of drywall made no
9  difference as long as they had
10  that general certification.
11           MR. BROWN:  That's not what
12  he is saying.
13  BY MR. ROBERTSON:
14      Q.   Let me ask you this, Mr.
15  Scharf, you remember when Jay Buckley
16  continued time and time again to ask you
17  for samples of the drywall to test in
18  February and March 2006?
19      A.   He asked for samples, yes, I
20  remember.
21      Q.   And you do not know whether
22  or not he got those samples to test, do
23  you?
24      A.   He got samples to test, yes.

Robert Scharf                                    March 24, 2011

369

1       Q.   You know that?
2       A.   Yeah, he gave me the test
3   report from this Houston company.
4       Q.   The only test reports that
5   we've seen that have been produced are
6   not related to this drywall.  Did you
7   know that?
8       MR. BROWN:  Object to the
9   form.
10      THE WITNESS:  To which
11   drywall?
12   BY MR. ROBERTSON:
13      Q.   To the drywall involved in
14   this case --
15      A.   That came out of this
16   factory?
17      Q.   No, sir, that came out of
18   this load, these 485,000 sheets?
19      A.   First of all, I don't know
20   why that's a load.  I don't know what a
21   run is.  I don't know how many runs to a
22   load and you don't know.
23      Q.   Would it be fair to say that
24   if whatever test was done was done on

370

1   drywall that was made before this
2   contract of drywall was created --
3       A.   Yeah, it would be more fair to
4   fair to say.  That's what it was.
5       Q.   Excuse me.  I didn't finish
6   my question.  That if they were testing a
7   sample and that sample was manufactured
8   before this load of drywall then the test
9   did not test one of the sheets in this
10   load of drywall?
11      A.   I don't know how they tested
12   it.  I don't know.
13      Q.   Do you understand my
14   question?
15      A.   I understand your question.
16      Q.   Well, then would that be a
17   fair statement that if the tests that
18   were performed on samples were performed
19   on samples created before this load of
20   drywall was manufactured, those tests
21   were not on any of the sheets in this
22   shipment?
23      A.   Let me ask you a question.
24   How could they be on the sheets?

371

1       Q.   That's my point.
2       A.   That wasn't your question to
3   me.  You asked me what I cared about.
4   That's not even close to what you asked
5   me.
6       Q.   Then it would be fair to say
7   that if the samples --
8       A.   It would be stupid to say
9   that the samples after was made.  You
10   have to have it tested before.  There's
11   no other way to do it.
12      Q.   So as far as you know there
13   were no samples tested from the load that
14   was put on the ship --
15      A.   I don't know what was tested
16   from.  I have no idea.
17      Q.   Were there any reasons given
18   by Dr. Bennett for your departure from
19   the company?
20      A.   Reasons for me?
21      Q.   Yes, sir.
22      A.   Not that I know of.
23      Q.   Why did you leave?
24      A.   We just lost a lot of money.

372

1   I wasn't making any money so I left.
2       Q.   Well, did he ask you to
3   leave?
4       A.   No.
5       Q.   And as far as you testifying
6   here today, are you being paid to
7   testify?
8       A.   I am not.
9       Q.   Do you remember Mr. Buckley
10   in March of 2006 asking about the letter
11   on the warranty, asking when he would get
12   a letter on the warranty?  You remember
13   the questions Mr. Law asked you about
14   that?
15      A.   Yes.
16      Q.   Did you ever provide such a
17   letter to North Pacific?
18      A.   No.
19      Q.   Do you remember when you
20   told Mr. Buckley in March of 2006 that if
21   you let me order it without you seeing a
22   sample it can leave 20 days from today,
23   maybe sooner?
24      A.   If it's in an E-mail I

Robert Scharf                                    March 24, 2011

373

1   wrote, that's what I wrote.
2        Q.   Do you remember at the end
3   of March, on March 30th of 2006 when Jay
4   Buckley at NorPac wrote you and said that
5   it is not Frank that is wanting to test
6   more, just send the samples we talked
7   about and not worry about the rest.  Who
8   was Frank?
9        A.   I don't know.
10       Q.   Was that Frank of North
11  Pacific?
12       A.   I don't know.  I don't see
13  it.  I don't know.
14       Q.   It's Bates-stamped Devon
15  number 5133.  And it's dated March 30th
16  of 2006.
17       A.   It says he sent the samples.
18  I don't know who Frank is.
19       Q.   Did you talk to Ruth Wu
20  before she gave her deposition in this
21  case?
22       A.   I did not.
23       Q.   She was asked where you got
24  your information that the drywall was,

374

1   quote, really good stuff and had no
2   formaldehyde.  You talked to Mr. Law
3   about that earlier today.  Do you
4   remember that?
5        A.   I remember talking to him
6   about it.
7        Q.   And that information
8   concerning the lack of formaldehyde, that
9   came from the Chinese, correct?
10       A.   I don't know where it came
11  from.
12       Q.   Do you remember who told you
13  about that?
14       A.   I do not.
15       Q.   Is it fair to say that Devon
16  did not do any testing on the
17  formaldehyde independently?
18       A.   I've testified maybe 300
19  times today.  Devon tested nothing.
20  Devon warranted nothing.  We didn't
21  warranty anything.  We didn't test
22  anything.  We didn't own a factory.  And
23  you sat here all day with everybody else
24  and heard it.  So you want me to just

375

1   keep saying, I'll just keep saying it,
2   no.
3        MR. ROBERTSON:  I might be
4   just about finished.  Why don't
5   you -- I'll go ahead and pass the
6   witness.
7        THE VIDEOTAPE TECHNICIAN:
8   Going off the record.  Time on
9   video is 17:00.
10       - - -
11       (Whereupon, a brief recess
12  was taken.)
13       - - -
14       THE VIDEOTAPE TECHNICIAN:
15  Time on video is 17:07.
16  BY MR. REBARCHAK:
17       Q.   Mr. Scharf, my name is Jim
18  Rebarchak.  I represent Fireman's Fund.
19  If I ask you any questions you don't
20  understand, just ask me to repeat them.
21  I'll more than happy to repeat them for
22  you.
23       A.   Okay.
24       Q.   If I ask you a question and

376

1   you answer it, I'll just assume you
2   understood the question.
3        A.   How many times do I have to
4   answer it, though?  Just once, right?
5        Q.   Just once if you answer
6   correctly.  That's all I care about.
7   Now, you know you are under oath still?
8        A.   I don't think I've told
9   anything that I haven't been under oath
10  for.
11       Q.   Now, you've been put up by
12  Devon as a 30(B)(6) representative on
13  various issues, and one of them was
14  number three in your notice of
15  deposition.  I think you can see it over
16  there.
17       A.   I'm not sure where it is
18  now.
19       Q.   Well, one of the things --
20  now, did you have an agreement with Devon
21  to testify in depositions and answer
22  questions about the Chinese drywall
23  afterwards?
24       A.   I did not.

Robert Scharf                                          March 24, 2011

377

1   Q.   So you are coming down here
2   on your own ticket, your own dime, out of
3   the kindness of your heart?
4   A.   Yeah, basically I am.
5   Q.   Four years after you've
6   worked for the company?
7   A.   That's correct.
8   Q.   Are they paying your
9   expenses or anything?
10   A.   They didn't pay anything
11   today.
12   Q.   Do you make an arrangement
13   they are going to pay your expenses?
14   A.   They said they would, but I
15   don't know what that means.
16   Q.   Do you charge them an hourly
17   rate to come down here?
18   A.   No, I do not.
19   Q.   Are you planning to come
20   down to Mobile for the company for the
21   trial?
22   A.   I don't know.
23   Q.   Have you been asked to do?
24   A.   I was asked.  I'm

378

1   responsible for this.  I got them into
2   this.  I'm the reason there's a drywall
3   that came into this country.
4   Q.   Now, you had mentioned some
5   -- you're up here for a notice of
6   deposition and number three says
7   communications with representatives from
8   Fireman's Fund Insurance Company.
9   Can you tell me
10   conversations you had with individuals
11   that worked for Fireman's Fund Insurance
12   Company?
13   A.   I'm not sure.
14   Q.   As we sit here today, can
15   you tell me of anybody, any conversations
16   with anyone that you had from Fireman's
17   Fund Insurance Company?
18   A.   That I had with Fireman's
19   Fund?
20   Q.   Correct.
21   A.   I don't believe so.  I think
22   Galen had all the conversations unless
23   you are talking about your surveyor.
24   Q.   We'll get to him in a

379

1   second.  Galen Hawk, he did all the work
2   or had the communications with the
3   insurance company?
4   A.   Are you talking about on the
5   claim?
6   Q.   Yes.
7   A.   Yeah, Galen did everything
8   on the claim.
9   Q.   And Galen would know if the
10   insurance company -- he had all
11   conversations with their adjusters.  You
12   didn't have any, correct?
13   A.   With their adjusters, no.
14   If you just let me see the names, I'll
15   see if I recognize the names.  I don't
16   have it here.  I don't know what number
17   it is.
18   Q.   I'll read them out to you,
19   and we'll just go through them one at a
20   time.  Any conversations with Colleen
21   Fitzgerald?
22   A.   No, that doesn't sound
23   familiar.
24   Q.   Now, you said that Ken

380

1   Atkinson worked for Fireman's Fund
2   Insurance Company?
3   A.   Who is Ken Atkinson?
4   Q.   Ken Atkinson, I think you
5   mentioned that he was a surveyor.
6   A.   That's the surveyor.  That
7   was the Fireman's Fund surveyor?
8   Q.   How do you know he was a
9   Fireman's Fund --
10   A.   He would have told me he
11   represented the insurance company.
12   Q.   Did he also represent you?
13   A.   I don't know.  Somebody
14   represented us.  I don't know who it was.
15   Mike Pate got somebody for us.
16   Q.   Mike Pate hired a surveyor
17   for you?
18   A.   And for him that we shared
19   the expense.
20   Q.   Why would you hire a
21   surveyor?
22   A.   I don't know.
23   Q.   You paid for it?
24   A.   Yeah, Mike said when the

Robert Scharf                                    March 24, 2011

381

1  ship rolled the seas.  He said, Bob,
2  we're going to need a surveyor.  I'll
3  share the cost with you on the surveyor.
4  And when this ship lands, there's going
5  to be all the good guys will be taken
6  already.  So I want to hire this guy.  I
7  think he was an old guy, a captain I
8  think that was the guy.  I said, I'll
9  share the cost with you.  I said, fine.
10  I had no idea why we needed a surveyor.
11      Q.   Mr. Pate acted on your
12  behalf and hired a surveyor?
13      A.   That's correct.
14      Q.   And what was the surveyor
15  supposed to do?
16      A.   I don't know.  I don't know.
17  Pate's the expert in stevedoring.
18      Q.   Can you tell me all the
19  conversations you told with Ken Atkinson
20  the surveyor that you say was working for
21  Fireman's Fund?
22      A.   Can I tell you all?  No, I
23  can't tell you all of them.
24      Q.   Can you tell me any of them?

382

1      A.   No.
2      Q.   When you mentioned that
3  Fireman's Fund said that you couldn't
4  sell or it was their cargo --
5      A.   That's correct.
6      Q.   Who told you that?
7      A.   Galen Hawk.
8      Q.   Galen Hawk did.  So anything
9  that you are saying today is based on --
10  is hearsay because it's what Galen Hawk
11  told you.  Is that correct?
12          MR. BROWN:  Object to the
13      form.
14          MR. LAW:  Object to the
15      form.
16          THE WITNESS:  I believe so,
17      unless I had a conversation with
18      somebody that I don't recall who
19      they were or what they were.
20  BY MR. REBARCHAK:
21      Q.   Galen Hawk is the one that
22  mentioned to you that the insurance
23  company said that you couldn't sell any
24  of the product?

383

1      A.   That's correct.
2      Q.   Did you have any
3  conversations with anybody from
4  SalvageSale?
5      A.   Once, I believe.
6      Q.   And who did you talk to?
7      A.   Is there somebody named Chad
8  there?
9      Q.   Yeah.
10      A.   That's who we would have
11  talked to.
12      Q.   And why were you talking to
13  him?
14      A.   Because they put on the
15  Internet that they were selling this
16  drywall in Pensacola.  I didn't even know
17  about it.  I didn't know anything about
18  it.
19      Q.   Were you in charge of
20  selling the salvage?
21      A.   No, I didn't sell anything
22  with the salvage.  I didn't know there
23  was any salvage at the time.  It hadn't
24  been released.  All I knew is I was

384

1  trying to sell the panels that were good,
2  labeled good.  And I get a phone call
3  from somebody saying this is all over the
4  Internet, somebody in Houston, some
5  salvage company is selling this drywall
6  for $2.00 a board or $3.00 a board or
7  whatever it was.
8      Q.   And when did you start
9  selling -- wanting to sell the drywall?
10      A.   As soon as we were told we
11  could sell it.  I don't know the date.
12      Q.   And who told you when you
13  could start selling it?
14      A.   It was Galen.
15      Q.   In your conversation with
16  somebody from SalvageSale was a guy named
17  Chad Ferrell or a guy named Chad to the
18  best of your recollection?
19      A.   Yeah.
20      Q.   And the conversation you had
21  with him was -- what was that?
22      A.   Why were they selling it?
23  Where did they come from?  Who are they?
24      Q.   And what did he tell you?

Robert Scharf                                    March 24, 2011

385

1      A.   That he was hired by the
2  insurance company.
3      Q.   Now, I'm going to go over
4  one of these exhibits that I can't
5  remember who it was, but I'm going to
6  identify it.  I'm going to show you
7  what's marked as Defendant-65 and with it
8  66.
9          Tell me -- if you look at
10 them and tell me if you recognize them at
11 all.
12         MR. BROWN:  Do you have
13 copies?
14         MR. REBARCHAK:  I don't have
15 copies of a lot of them, but it's
16 your records.
17         THE WITNESS:  Yes.
18 BY MR. REBARCHAK:
19     Q.   Do you recognize these?
20     A.   I don't recognize this, but
21 I've seen this.
22     Q.   On exhibit number --
23     A.   65.
24     Q.   65, what does it say up here

386

1  at the top in the bold print, if you
2  could read it for me, please?
3      A.   Are you talking about this
4  right here?
5      Q.   Yes, sir.
6      A.   It says attached please find
7  original contract signed by Bob Scharf.
8  If you require any additional
9  information, please contact Galen Hawk.
10     Q.   And the next exhibit
11 following that that's a facsimile sent
12 back to Dana Kakowski (ph) at
13 SalvageSale.  Is your signed copy number
14 66 a SalvageSale authorization?  Is that
15 correct?
16     A.   That's correct.
17     Q.   Have you ever sold anything
18 at salvage?
19     A.   Me?
20     Q.   Yeah.
21     A.   No.
22     Q.   Never in your life?
23     A.   I don't think so.
24     Q.   And what does the first

387

1  paragraph on this say?  Can you read it
2  for me, please?
3      A.   It is understood and agreed
4  that Devon International Trading has
5  released the damaged goods described
6  herein for salvage and authorizes the
7  sale of such through SalvageSale Inc.
8      Q.   And your attorney Galen Hawk
9  sent that to you to sign, correct?
10     A.   Absolutely.
11     Q.   And you signed it and that's
12 your signature at the bottom?
13     A.   That's correct.
14     Q.   And what were you releasing?
15     A.   It says we release the
16 damaged goods described herein for
17 salvage and authorize the sale of such
18 through SalvageSale, Inc.
19     Q.   On July 24th, 2006 you
20 authorized SalvageSale to sell the
21 salvaged material, correct?
22     A.   This was after they had it
23 on the Internet.
24     Q.   This was after --

388

1      A.   Absolutely.  Absolutely.
2      Q.   And do you have any record
3  of when it was on the Internet?
4      A.   No, I don't, but I'm sure
5  they do.
6      Q.   So you are saying that
7  SalvageSale put it on the Internet
8  before --
9      A.   I knew nothing about that.
10 I never even heard the name.
11     Q.   And would Galen Hawk be the
12 better one to understand that?
13     A.   Absolutely.
14     Q.   Now, the ship came in on
15 June 15th, 2006, correct?
16     A.   I'm not sure.  I'll take
17 your word for it.  If you say it came in
18 on --
19     Q.   I'm not trying to trick you.
20     A.   I know that.  I'm not --
21     Q.   And you had worked out with
22 Pate before that, Pate stevedoring
23 Company or Pensacola, whatever it is --
24 just for the record Pate entities?

Robert Scharf                                              March 24, 2011

389

1      A.    That's fine.
2      Q.    To unload it for you,
3  correct?
4      A.    That's correct.
5      Q.    And then you heard that
6  there was some damage to it or --
7      A.    I heard that the ship had
8  rolled.
9      Q.    The ship had rolled.  Did
10  you call Mr. Pate at that time?
11      A.    He called me and told me the
12  ship rolled.
13      Q.    Then what did you guys do
14  after that?
15      A.    I went to Pensacola.  And he
16  had the photographs.  He said, you know,
17  this could still be good, the way it was
18  loading.  He had the loading photographs
19  and everything.  He said, this could be
20  good or it could be damaged.
21      Q.    Was the ship at the dock at
22  the time?
23      A.    No, it was in the water.
24      Q.    In the water?

390

1      A.    Yeah.
2      Q.    And did you work out a deal
3  at that time for him to unload the
4  damaged?
5      A.    No.  He had a deal to unload
6  the ship from us.  That's what he had.
7  And what he told me was we're going to
8  need a surveyor, and the best guy to have
9  is captain somebody or something.  And I
10  need a surveyor always he said.  So we
11  can share the cost and share the
12  surveyor.  I'll share it with you.  I
13  said, fine.
14      Q.    Did he explain to you why he
15  needed one?
16      A.    If he did, I don't know why.
17      Q.    Do you have an idea?
18      A.    I don't know why.
19      Q.    Do you know what surveyors
20  do?
21      A.    Not really.  I know what
22  they did in China.  The first time I ever
23  got involved with a surveyor when we
24  loaded the ship, and he just verified

391

1  that it was loaded to the loading plan
2  and that he thought it was loaded fine.
3  That's what we had a surveyor for.
4      Q.    You had mentioned that when
5  the ship came in that you couldn't sell
6  any of the product?
7      A.    I was told I couldn't sell
8  any of it.  That's correct.
9      Q.    When the ship came in, did
10  Mr. Pate right at that time his company
11  start unloading the vessel?
12      A.    I believe so.
13      Q.    Did you have some delay in
14  him unloading the vessel because of some
15  discussion about fees?
16      A.    Not fees with me.
17      Q.    Do you remember your
18  deposition in this case when you talked
19  about that?
20      A.    In which case?
21      Q.    In your arbitration case?
22      A.    I have to see it.  I have a
23  copy here if you tell me where we're
24  going.

392

1      Q.    On page 152, if you would.
2      A.    Go ahead.
3      Q.    Line 12.  Can you read that
4  for me?
5      A.    It says Pate was just saying
6  let me get it unloaded.  He was going to
7  unload it in three or four days.  He said
8  let me get it unloaded, and then you can
9  come back and take it.
10      Q.    And when did Mr. Pate finish
11  unloading that ship?
12      A.    I think it was in 36 days or
13  so after it came into port.
14      Q.    So Mr. Pate said you
15  couldn't even take it until he finished
16  unloading it, correct?
17      A.    I don't know what he meant
18  by that.
19          MR. PIPES:  Object to the
20      form of the question.  I object to
21      reading the deposition given four
22      years ago out of context.
23  BY MR. REBARCHAK:
24      Q.    Why did Mr. Pate start right

Robert Scharf                                        March 24, 2011

393

1   off the day the ship came in?  You
2   already made arrangements for him to
3   unload the ship, didn't you?
4       A.   Why what?
5       Q.   Why did not Mr. Pate unload
6   the ship the day it came in?
7       A.   Because there was damage in
8   it.
9       Q.   So you had to work out a fee
10  for him --
11      A.   No, it wasn't his fee.  He
12  was working -- we didn't own the cargo.
13  So it wasn't my cargo.  He had to make
14  sure that he was unloading cargo that he
15  could unload.
16      Q.   You didn't own the cargo.
17  Who owned it?
18      A.   It was Fireman's Fund.
19      Q.   Did you give title to them?
20      A.   I don't know what we did.  I
21  was told that we cannot touch the cargo.
22  It has to all be unloaded and that
23  Fireman's Fund controls it.  That's what
24  I was told.

394

1       Q.   Galen Hawk told you that?
2       A.   Probably Galen, yeah.  I
3   would have sold it as it came off the
4   ship.
5       Q.   Who were you going to sell
6   it to?
7       A.   We had it sold to NorPac.
8       Q.   Did you have a conversation
9   with Jay Buckley at NorPac that you were
10  going to wait until June 27th?
11      A.   I don't know.  Show me what
12  it says, and I'll tell you if it's mine
13  or not.
14      Q.   Let me show you what's
15  marked as Defendant's Exhibit Number 67.
16  My question was -- you are telling me
17  that you are going to sell it immediately
18  when it came in?
19      A.   Well --
20      Q.   And now you're saying --
21  does that exhibit, Exhibit Number 67
22  refresh your recollection that you
23  weren't -- that you talked with Mr.
24  Buckley and you weren't even going to

395

1   think about it until June 27th?
2       A.   No.  It says here that Mike
3   would be finished unloading June 26th or
4   27th, and NorPac was going to pick it up
5   on the 27th.  That's what this says.
6       Q.   And when did he finish
7   unloading it?
8       A.   I don't know.
9       Q.   In July sometime?
10      A.   It was a long time.
11      Q.   Were you there -- I think
12  you mentioned you were there three times,
13  three days when they were unloading the
14  ship?
15      A.   I don't know.  You have to
16  check what I said in the record.  I don't
17  know.
18      Q.   Do you recall as we sit here
19  today how long you were there, how many
20  days you were there?
21      A.   I was there a lot of days.
22      Q.   During the period of time
23  from let's say June 15th when the ship
24  arrived to I think --

396

1       A.   I think I said I was there
2   two or three days a week while the ship
3   was unloading.
4       Q.   Now, who was in charge of
5   taking all of the material off the ship?
6       A.   I don't know if it was the
7   Fireman's Fund's surveyor or whether it
8   was Pate.  Pate was the stevedore.
9       Q.   Who was paying somebody to
10  take the stuff off the ship?
11      A.   Who was paying somebody?
12      Q.   Yeah.
13      A.   We were paying them.  We
14  didn't supervise it.
15      Q.   You didn't supervise it?
16      A.   No.
17      Q.   Well, did Mr. Pate make the
18  determination of what packets were good
19  and what packets were bad?
20      A.   No, your surveyor made the
21  determination.
22      Q.   Did you read Mr. Pate's
23  deposition?
24      A.   No, I did not.  It was taken

Robert Scharf                                    March 24, 2011

397

1  this week I was told.
2      Q.   I just asked you.  I'm not
3  trying to be --
4      A.   No.
5      Q.   Mr. Pate testified that he
6  went through each one of the panels, I
7  mean the packages, and that he marked
8  ones that were damaged and ones that were
9  good.
10     A.   Maybe he did.
11     Q.   Did you pay Mr. Pate for
12  anything else than just the regular I
13  guess stevedoring fees?
14     A.   I don't know.
15     Q.   Did you pay him to mark the
16  good ones and the bad ones?
17     A.   No, I didn't even know he
18  did that.  Did you pay him to do that?
19  It was the Fireman's Fund's surveyor who
20  was there directing that.
21     Q.   Were there any other
22  surveyors there?
23     A.   There was the one that Mike
24  hired with us.  I don't know, captain

398

1  somebody.  And then there was another
2  surveyor from New Orleans.  I don't know
3  who he represented.
4      Q.   And you don't know what the
5  guy that you hired was doing, right?
6      A.   I don't know.
7      Q.   Did you pay his bill?
8      A.   I didn't see his bill.
9      Q.   Was your arrangement with
10  Mr. Pate that you'd pay half of it?
11     A.   I don't know.  We were going
12  to share the cost, yes.
13     Q.   Does that mean share it in
14  50/50?
15     A.   I would think that's what it
16  meant, yes.
17     Q.   Do you know of any other
18  companies that had surveyors down there?
19     A.   There were a lot of
20  surveyors.  I don't know whose company --
21  who had what surveyor, I don't know.
22     Q.   Were there any other claims
23  on that cargo?
24     A.   What do you mean by claims?

399

1      Q.   Any disputes about, you
2  know, how much was damaged?  Didn't you
3  make a claim against the captain of the
4  ship?
5      Q.   Did who make the claim?
6      Q.   Did Devon make any claims
7  besides the claim with Fireman's Fund
8  Insurance Company for damage to the
9  cargo?
10     A.   I don't know.
11     Q.   Who would know that?
12     A.   Galen Hawk would know that.
13     Q.   I'm going to show you what's
14  marked as Defendant's Exhibit Number 68.
15  It's two pages.  And I'm going to ask you
16  if you recognize this.  Excuse me a
17  second.  It's Devon 06585.  I'm sorry.
18          When you've had an
19  opportunity to look at it, read it over
20  and just let me know and I'll ask you
21  some questions about it.
22     A.   Okay.
23     Q.   Does that refresh your
24  memory at all?

400

1      A.   It really doesn't, but go
2  ahead.
3      Q.   Does it say --
4      A.   It says I was delayed in
5  New York.  I don't know if I was even
6  there.  So I don't know.
7      Q.   Does it say there's many
8  surveyors down there?
9      A.   Well, it says there's
10  Toppers and there's one, two, three,
11  four, five, six surveyors.
12     Q.   Six surveyors, do you know
13  what they were doing down there?
14     A.   No, I told you that already.
15     Q.   I'm sorry.  And did you read
16  in there where Mr. Pate and his laborers
17  were determining what was good and what
18  was bad?
19     A.   I did read that.
20     Q.   Now, you were down there two
21  to three days a week for this whole time
22  and you're telling me and the ladies and
23  gentleman of the jury that you don't
24  remember that he was doing that?

Robert Scharf                                    March 24, 2011

401

1        A.   What jury?  Who's the jury?
2        Q.   Well, you're going to be in
3   front of the jury if you don't show up
4   for trial because this is your videotape
5   deposition.
6        A.   I don't know what you just
7   asked me.
8        Q.   My question to you is you
9   were down there two to three days a week,
10  all when it's unloading.  You are paying
11  Mr. Pate to unload the ship, but you
12  don't know that he's separating the good
13  and the bad?
14       A.   No, that's right.
15       Q.   And based on the
16  determination of what's good and bad is
17  how you are going to file your insurance
18  claim.  Isn't that true?
19       A.   I would assume so.  I don't
20  know.  I don't know how we filed -- I
21  didn't know if the whole load would be no
22  good.  I had no idea.
23       Q.   Well, doesn't it say --
24       A.   Who determined what was good

402

1   and what was bad?
2        Q.   What's it say in there?
3        A.   It said Pate would separate
4   them and put down this.  Then somebody
5   had to okay what Pate said was good or
6   bad.  Pate didn't okay that.  I think
7   that was your surveyor that okayed that.
8        Q.   But you don't know that as a
9   fact?
10       A.   I do not know that as a
11  fact.
12       Q.   Tell us what you know for a
13  fact not just what you are --
14       A.   Then I don't know any of
15  that for a fact.
16       Q.   Now, in this it says that
17  Mr. Scharf said all bundles set aside by
18  stevedores as bad.
19       A.   Go ahead.
20       Q.   Who's the only stevedore
21  there?
22       A.   He is, but that doesn't mean
23  that they are bad.
24       Q.   Were unacceptable and

403

1   totally rejected by him.
2        A.   By who?
3        Q.   By you?
4            MR. PIPES:  Object to the
5   form of the question.
6            THE WITNESS:  What am I?
7   BY MR. REBARCHAK:
8        Q.   Bob Scharf.
9        A.   Pate put it aside and said
10  they're bad.  So I told him, okay,
11  they're bad.  I'm not the one that
12  rejected it, though.  I had nothing to do
13  with this.  And I wasn't there when every
14  panel was taken off and every load was
15  taken off the boat.
16       Q.   Is this a true statement?
17  Mr. Scharf said all bundles set aside by
18  stevedore is bad, were unacceptable and
19  totally rejected by him.
20       A.   Maybe they were, but I'm not
21  the person to reject them.
22       Q.   Isn't it your cargo?
23       A.   No, it's not my cargo.
24       Q.   You signed the title to all

404

1   the cargo over to Fireman's Fund
2   Insurance Company?
3        A.   I never got release of --
4   the cargo was never released to us.  It
5   wasn't our cargo.  I thought it was your
6   cargo.
7        Q.   Who paid for it?
8        A.   Who paid for what?
9        Q.   The cargo.
10       A.   We paid for it, yeah.
11       Q.   So why would it --
12       A.   Because it was an insurance
13  claim from before the boat landed.  You
14  had a surveyor there.  I thought the
15  cargo -- I was told I can't sell it.  I
16  can't do anything with it until Fireman's
17  Fund releases it.  That's what I was
18  told.
19       Q.   Have you seen any documents
20  whatsoever where Devon released the cargo
21  to Fireman's Fund Insurance Company?
22            MR. LAW:  Object to the
23  form.
24            MR. BROWN:  Object to the

Robert Scharf                                    March 24, 2011

405

1    form.
2    BY MR. REBARCHAK:
3        Q.    Have you seen any
4    documents --
5        A.    I don't know.  If you have a
6    document, I don't recall.
7        Q.    Did you sign any document as
8    president of Devon that released the
9    cargo to anybody but SalvageSale to sell?
10       A.    I don't believe so.
11       Q.    If you could release it to
12   SalvageSale, then you must have had title
13   to it?
14           MR. BROWN:  I object to the
15       form.
16           THE WITNESS:  You have to
17       ask Galen Hawk why he had it
18       released.  I don't know why.
19   BY MR. REBARCHAK:
20       Q.    Did you sign it as
21   president?
22       A.    I did on my attorney's
23   advice, and he was dealing with the
24   insurance company not me.

406

1        Q.    Now, weren't you guys trying
2    to make money off the salvage cargo?
3           MR. BROWN:  Object to the
4       form.
5           THE WITNESS:  Off the
6       salvage cargo?  I was trying to
7       make money -- I would have loved
8       to make money off the salvage but
9       we never did.
10   BY MR. REBARCHAK:
11       Q.    Well, you already had all
12   the -- was it your understanding that
13   NorPac was going to buy all the undamaged
14   or unsalvaged?
15       A.    Yes, there was.
16       Q.    And that was your belief all
17   the way up to July 20th?
18       A.    To whenever they told us
19   they weren't going to take it.
20       Q.    And all during that period
21   of time did you have conversations with
22   Mr. Buckley about making some money off
23   the salvage cargo?
24       A.    I may have.

407

1        Q.    How were you going to make
2    money off the salvage cargo?
3        A.    Well, if we would have
4    bought it in that SalvageSale, then we
5    would have sold it as salvage.  It didn't
6    happen that way.  We didn't do that.
7        Q.    So the insurance company
8    would have paid you money for the salvage
9    material that you rejected, correct?
10          MR. BROWN:  Object to the
11      form.
12          THE WITNESS:  I don't know.
13   BY MR. REBARCHAK:
14       Q.    Then your plan was that you
15   were going to buy it from the salvage
16   company and sell it and make money?
17       A.    That wasn't my plan.
18       Q.    Well, tell me what your plan
19   was?
20       A.    My plan was just to sell
21   3,190 piles and get out of there.  That
22   was my plan.  And if it wasn't held up
23   for how many -- it doesn't matter.
24       Q.    Now, Mr. Barkley contacted

408

1    you at the end of July about trying to
2    say how you can some money off the
3    salvage?
4        A.    Who is Mr. Barkley?
5        Q.    I'm sorry, Mr. Buckley.
6        A.    He probably wanted to try
7    and sell the salvage.
8        Q.    What were your conversations
9    with him about that?
10       A.    I don't know.  If show me
11   the E-mail, I'll tell you -- I don't know
12   what it was.
13       Q.    This is on page 190 of your
14   deposition in the arbitration case.
15          MR. BROWN:  Is this the
16      arbitration or the NorPac case?
17          MR. REBARCHAK:  Brown and
18      Gallo were the attorneys.
19   BY MR. REBARCHAK:
20       Q.    Page 190?
21       A.    Okay.
22       Q.    Line 24.  Can you read that
23   for me, please?
24       A.    It says this is an E-mail

409

1  exchange, a brief one that you had with
2  Jay Buckley on July 31st.
3       Q.   Your answer.
4       A.   Yep, he had expressed an
5  interest if they could sell the damaged
6  also or they may have a better market to
7  sell the damaged than they do the good
8  stuff.
9       Q.   And why was he talking to
10 you about selling the salvage?
11      A.   I don't know why.  You have
12 to ask Jay.
13      Q.   Now, it's your testimony
14 that you say you didn't own the salvage,
15 the drywall at that time?
16      A.   My understanding we didn't
17 own the drywall anymore.
18      Q.   Would you please read page
19 191, starting on line 14?  Can you read
20 out loud for me, please?
21      A.   So you are talking about
22 also selling the stuff, the bundles that
23 the insurer has declared to be
24 unmarketable in essence.

410

1       Q.   Your answer?
2       A.   Right, it became salvage is
3  what it became.
4       Q.   Now what?  What's your
5  answer?
6       A.   I still hadn't sold
7  anything.  We still owned it all.  It was
8  still all my load.  The insurance company
9  hadn't made any settlement.  They had to
10 come in and say, okay, this is bad, this
11 is good.
12      Q.   So when you say we still own
13 it all, it's all my load, that was not
14 true?
15      A.   I guess it wasn't true.
16      Q.   So you weren't telling the
17 truth back then?
18      MR. BROWN:  Object to the
19 form.
20      THE WITNESS:  I wasn't
21 telling the truth.  I always tell
22 the truth.  I believe that we
23 couldn't sell the load because the
24 insurance company owned the load.

411

1  They had control of the load.  It
2  was your load.  It wasn't my load
3  anymore.
4       Apparently, he wanted to buy
5  the salvage.  They sell a lot of
6  salvage, NorPac.  He wanted to buy
7  the salvage.  Well, I think what I
8  was telling him was that we still
9  had the whole load.  Nothing had
10 been touched yet.  If I could have
11 sold it, I would have sold it to
12 him.  Why didn't I sell it to him
13 on that day?
14 BY MR. REBARCHAK:
15      Q.   Did you tell him that we
16 still own it and it's still on my load?
17      A.   That's -- I said that right
18 there, yes.
19      Q.   But on July 24th you told
20 the salvage company that they had
21 authorization to sell it?
22      A.   I only did whatever -- Galen
23 Hawk was negotiating with the insurance
24 company.  He said, Bob, sign this.  So I

412

1  signed it.
2       Q.   And then a week later Jay is
3  calling you to see about making some
4  money off the load and you are telling
5  him, yeah, it's all my load.  I own it
6  all.  They haven't paid me a dime yet on
7  it.
8       MR. BROWN:  Object to the
9  form.
10 BY MR. REBARCHAK:
11      Q.   Correct?
12      A.   I didn't say they hadn't
13 paid me a dime on it.
14      Q.   You said we still own it.
15 It is still all my load.
16      A.   Right.  The insurance
17 company hadn't made any settlement or
18 anything yet.  That's not they haven't
19 paid a dime.  That's not even close to
20 saying it that way.
21      Q.   So do you know when the
22 insurance company finally closed out your
23 file?
24      A.   I do not.

Robert Scharf                                    March 24, 2011

413

1   Q.   And Galen Hawk would know
2   that?
3   A.   He would.
4   Q.   Now, Mr. Barkley contacted
5   you about --
6   A.   It's Buckley.
7   Q.   Buckley, I'm sorry.  Mr.
8   Buckley contacted you about making some
9   money off the salvage, correct?
10   A.   That's what it says here,
11   yeah.
12   Q.   Did Mr. Pate call you and
13   contact you about making some money off
14   the salvage?
15   MR. PIPES:  Object to the
16   form of the question.
17   THE WITNESS:  Yes, he did.
18   BY MR. REBARCHAK:
19   Q.   Can you tell me what he
20   said, what your conversation was about
21   that?
22   A.   About him buying from the
23   salvage, buy the salvage and then we
24   would sell it and we would share in the

414

1   profits from what it cost -- he could
2   keep it at the port.  We couldn't keep it
3   at the port.  He could make the deal with
4   the port to warehouse it.  He could
5   re-package it if it had to be
6   re-packaged.  He had all the people down
7   there, but he didn't have -- he thought
8   the ability to sell it.  So we talked
9   about that, but we didn't do that.
10   Q.   And how -- you were going to
11   split the profits or how was it going to
12   work?
13   A.   I don't know.  It was a
14   conversation that was had and then we
15   didn't follow up on it.  We didn't do it.
16   Q.   Didn't he send you an E-mail
17   on that?
18   A.   He may have.
19   Q.   And followed up with a
20   letter?
21   A.   He may have, but we didn't
22   do it.
23   Q.   Did you recommend that to
24   SalvageSale that Mr. Pate buy the

415

1   salvage?
2   MR. BROWN:  Object to the
3   form.
4   THE WITNESS:  I don't know.
5   BY MR. REBARCHAK:
6   Q.   Did you tell Mr. Pate to
7   contact SalvageSale to buy it?
8   A.   I don't know that I did.  I
9   don't think I did.
10   Q.   I'm going to show you what's
11   marked as Defendant's 69.  And I would --
12   I'll replace them with ones that are not
13   highlighted.
14   I'm show you what's marked
15   as Defendant's 69.  Do you recognize
16   that?
17   A.   Okay.
18   Q.   What is that?
19   A.   It's a letter that Mike Pate
20   sent saying that he would like to buy the
21   salvage.
22   Q.   Is that an E-mail?
23   A.   No, it's a letter.
24   Q.   It's a letter?  Is it by

416

1   E-mail?
2   A.   I don't think so.
3   Q.   Does it have an E-mail
4   notice at the top?
5   A.   I don't see it.  No, it's an
6   address.
7   Q.   From Pate Stevedoring
8   Company sent Thursday, August 3rd, 2006
9   to Bob Scharf, subject sheet rock.  And
10   it's got Pate Stevedoring E-mail address
11   on it.  That wouldn't be an E-mail
12   addressed to you?
13   A.   It doesn't have my E-mail
14   address.  I don't think it came to me.
15   Q.   Did you have
16   conversations --
17   A.   You think that's an E-mail?
18   Q.   Yeah.
19   A.   I don't see where it was
20   E-mailed.
21   Q.   Did you receive that from
22   Mr. Pate?
23   A.   I saw this yesterday or
24   something, but I don't remember.

Robert Scharf                                          March 24, 2011

417

1      Q.   Tell me your conversations
2  you had with Mr. Pate regarding him
3  purchasing the sheet rock?
4      A.   It's pretty spelled out
5  here.  He wanted to purchase the sheet
6  rock.  He would dispose of the product
7  that's not salvageable, and we can handle
8  this operation in return for an equal
9  share of all the proceeds, and we would
10 go out and sell it.
11     Q.   Did you understand that a
12 lot of the drywall that was marked
13 damaged that you rejected also had good
14 pieces in the 67 pieces in it?
15        MR. BROWN:  Object to the
16     form.
17        THE WITNESS:  Just repeat
18     that again.
19 BY MR. REBARCHAK:
20     Q.   I thought the testimony was
21 that in some of the salvaged drywall that
22 some of the outside pieces may be
23 damaged, but there's 67 pieces inside
24 that some of those might not be damaged?

418

1      A.   Just in the same as some of
2  the good product had damaged pieces in
3  it.  The converse was true, too.  Yes, I
4  would believe that.
5      Q.   Because didn't you tell me
6  also that Mr. Pate was selling some of
7  his salvage material to one of your
8  customers and he was selling his salvage
9  materials as good?
10     A.   No, not as good.  No.  I had
11 a customer come down to the port to look
12 at buying a lot of drywall, and Mike
13 showed him what he had and it was half
14 the price.  He told me.  I think he told
15 him it was salvage.  So I got upset
16 because, Mike, I got a company coming
17 down here and I wasn't there and you
18 showed him what you owned.
19     Q.   Were any of those -- well,
20 were some of the boards in the salvage
21 group perfectly fine?
22     A.   Well, I never opened the
23 loads, but I would assume that they were.
24        MR. LAW:  Object to the form

419

1  and move to strike.  Calls for
2  speculation.
3  BY MR. REBARCHAK:
4      Q.   Now, after -- is it your
5  understanding -- well, were you aware
6  that Mr. Pate wanted to buy the salvaged
7  sheet rock prior to August 3rd, 2006?
8        MR. PIPES:  Object to the
9     form of the question.
10        THE WITNESS:  I would
11     believe we had a conversation
12     about this before the letter went
13     out.
14 BY MR. REBARCHAK:
15     Q.   Would he probably be one of
16 the persons in the best position to know
17 what sheet rock was damaged and what
18 sheet rock wasn't damaged based on the
19 fact that he was taking it off the ship?
20        MR. BROWN:  Object to the
21     form.
22        MR. PIPES:  Object to the
23     form of the question.
24        THE WITNESS:  I don't know.

420

1  They were bundles -- they all
2  looked the same coming off.  I'm
3  not sure who was in the best
4  position to do that.  I didn't
5  believe that Mike's the final say.
6  BY MR. REBARCHAK:
7      Q.   We had gone through this
8  Defendant's Exhibit Number 68, and it
9  mentions that Mr. Frans Coppers, a
10 surveyor represented Skuld on behalf of
11 Time Charter, Sinochart, P&I Club.
12        Do you know anything about
13 that?
14     A.   Let me just see -- let me
15 just see the spelling.
16     Q.   All those people there?  Why
17 don't you read for me, just go down the
18 list of surveyors.
19     A.   Well, it says Coppers was a
20 surveyor from Skuld on behalf of Time
21 Charter, Sinochart.
22     Q.   Now, who are they?
23     A.   Now we're going back, right?
24 We thought we were getting the boat from

Robert Scharf                                    March 24, 2011

421

1  Sinotrains.  And Sinotrains charted a
2  boat from Sank Vanko --
3          MR. LAW:  Pactrans.
4          THE WITNESS:  No.  No,
5  Pactrans was our broker.  Pactrans
6  let's get this -- Sanko Rally was
7  a Japanese ship that Sinotrains
8  charted to do this load.  Until
9  they came -- they showed up I
10  thought we had a Chinese ship.
11  Then this Japanese ship shows up
12  at the port.
13          I think that's who Sinochart
14  is -- Sinochart I think was
15  Sinotrains?  That's a Chinese
16  shipping line.  So I think
17  Sinochart was the people the ship
18  was originally contracted with.
19  And then they -- I don't know.
20  You don't use the word subbed out.
21  They then charted it out to this
22  Sanko Vanko.  So Coppers, would be
23  -- the Time Charter would be Sanko
24  Chart which would Sinotrains which

422

1          is a Chinese government owned
2  shipping line.  Sabine
3  Surveyors --
4  BY MR. REBARCHAK:
5      Q.   Can you tell me why they
6  were there?
7      A.   No.  I told you before I
8  can't tell you why anybody was there.
9      Q.   Would you say that they
10  would have an interest in the cargo if
11  they were there?
12          MR. BROWN:  Object to the
13  form.
14          THE WITNESS:  Here's what I
15  can tell you.  And maybe I'm
16  foolish with this.  I know what I
17  know, and I'm pretty good at what
18  I know.  I don't know about this
19  stuff.  I don't know to this day
20  what those surveyors are supposed
21  to do.  And I thought they were
22  coming out with tripods and things
23  and they were going to measure the
24  parking lot.  I really don't know

423

1          what they were going to do.
2          And I know when Pate said we
3  need a surveyor, we'll get the
4  best guy there, I'll share the
5  expense, okay, that's costing me
6  half of whatever it would have
7  cost me.  That's what I know.  I
8  don't know why -- I remember when
9  -- all these guys in the room.  I
10  didn't know who they were.
11          MR. REBARCHAK:  Why don't we
12  take a little break because the
13  tape is about out.
14          THE VIDEOTAPE TECHNICIAN:
15  Going off the record.  This is the
16  end of tape number three, the
17  deposition of Robert Scharf.  Time
18  on video is 17:49.
19          - - -
20          (Whereupon, a brief recess
21  was taken.)
22          - - -
23          MR. BROWN:  It's a little
24  after 6:00 here.  Mr. Scharf has

424

1          been testifying at this deposition
2  since a little bit after nine,
3  some time after 9:00 this morning.
4  That's nine, almost nine hours
5  he's been doing this.  It's
6  obvious to me he's tired.
7          We've made him available.
8  We've made him available here
9  today.  He's down here from
10  New York on his own dime for this
11  deposition.  We're going to go
12  another hour and then we're going
13  to terminate the deposition.
14  We'll put him up again, and we can
15  depose him a second time.  But I
16  have concerns for the interest of
17  the client and a witness that's
18  getting tired and going through a
19  deposition any longer than what
20  we've done already.  But we're
21  going to do another hour, and then
22  I'm going to terminate the
23  deposition.
24          He can't be here tomorrow.

Robert Scharf                                    March 24, 2011

425

1   We've made him available, told you
2   when he'd be available.  And I
3   appreciate you moving it from one
4   day to the next.  This is how long
5   we had.  He cannot be here
6   tomorrow.
7       MR. LAW:  The only response
8   I'd like to make is Rule 30 is
9   clear the deposition goes day to
10  day, and I understand you want to
11  terminate the deposition and you
12  have the right to.  But the rules
13  require it to continue the
14  following day.  And now that he's
15  tendered as a 30(B)(6)
16  representative, which I've been
17  trying to take the deposition of
18  for quite some time, I'd like to
19  complete the deposition and not
20  come back to Philadelphia.  And
21  there hasn't been any --
22      MS. CALDWELL:  Jonathon,
23  this is Leslie Caldwell on the
24  phone.

426

1       MR. LAW:  Can I finish,
2   Leslie?
3       MS. CALDWELL:  Okay.  I
4   didn't know you weren't finished.
5       MR. LAW:  There hasn't been
6   any objection to my 30(B)(6)
7   notice, and I've just found out
8   this morning that Mr. Scharf would
9   be tendered on some topics.  And
10  like I said under Rule 30 I want
11  to complete the deposition on this
12  trip to Philadelphia or reserve
13  the right to reconvene in Mobile,
14  Alabama at my office.
15      MR. PIPES:  Can we agree
16  that we all reserve so we don't
17  have to say what our particular
18  positions and objections are and
19  they are all preserved for a later
20  date?  So we don't waste the next
21  15 minutes objecting.
22      MS. CALDWELL:  Let me just
23  say, too, for the record.  We have
24  all made accommodations for

427

1   everyone.  Mr. Pate was not
2   deposed on consecutive days.  We
3   arranged and reconvened for the
4   convenience of all the parties.
5   You've deposed Ace Home Center's
6   corporate rep twice not on
7   consecutive days, once for class
8   cert and again recently.
9       It is not unreasonable nor
10  do the rules required that Mr.
11  Scharf sit for some kind of a
12  deposition marathon.  I believe
13  everybody would agree nine and a
14  half hours is more than enough
15  time to be deposed in a day.  Don
16  says and we agree to make Mr.
17  Scharf available again.  It just
18  can't be tomorrow.  And that's an
19  accommodation that's been made for
20  every other party in this case.
21      MR. LAW:  I would just say
22  Mr. Pate is 100 miles from the
23  courthouse and much easier to
24  depose than traveling to

428

1   Philadelphia.
2       MS. CALDWELL:  I'm not going
3   to disagree with that, Jonathon,
4   but we, you know, made Mr. Scharf
5   available.  We didn't make
6   everybody go to New York.  We
7   brought him to Philadelphia as an
8   accommodation to everyone sitting
9   in that room.
10      You got another hour, and
11  then we're calling this off.
12      MR. PIPES:  Let's use that
13  hour.
14      THE VIDEOTAPE TECHNICIAN:
15  We're now back on the record.
16  This is the beginning of tape
17  number four in the deposition of
18  Robert Scharf.  Time on video is
19  18:07.
20  BY MR. REBARCHAK:
21      Q.  Mr. Scharf, before we broke
22  -- took our break from the deposition, we
23  were talking about the surveyors and the
24  companies that they represented in

Robert Scharf                                    March 24, 2011

429

1    Defendant's Exhibit Number 68.  I think
2    we had gone through the first one and you
3    tried to explain to us --
4         A.   Who Sinochart was.
5         Q.   Who Sinochart was?
6         A.   Sinochart's the company
7    that's owned by Sinotrains which is the
8    Chinese freight line.
9         Q.   Were there claims in this
10   case regarding damages against the
11   captain of the ship or other individuals
12   besides Fireman's Fund for damages in
13   this case?
14        A.   No.  I think the only thing
15   we had with the ship was the demurrage
16   charges which were substantial.  And our
17   position was they damaged the cargo, and
18   we got to pay them $26,000 a day for
19   every day it took longer to unload the
20   ship.
21        Q.   Do you think maybe that's
22   why they sent a surveyor to check out
23   what the damage was?
24        A.   But I'm not sure what a

430

1    surveyor does so that's why --
2         Q.   That's fine.  How about the
3    next person?
4         A.   Atkinson, Sabine --
5    represented cargo receiver.
6         Q.   Who's that?
7         A.   It says Devon underwriter
8    Fireman's Fund.
9         Q.   So it says he was represent
10   you all in that as a receiver?
11        MR. BROWN:  Object to the
12        form.
13        THE WITNESS:  Well, I read
14        it says he was representing the
15        underwriter which is you guys.
16   BY MR. REBARCHAK:
17        Q.   What does it say first?
18        A.   First it says a
19   representative cargo receiver Devon
20   underwriter Fireman's Fund.  So that
21   would mean he's representing both of us?
22   Is that what that would mean?
23        Q.   If you don't know, you don't
24   know?

431

1         A.   I don't know.  I'm asking
2    you.  You are not allowed to tell me what
3    you know?
4         Q.   Who else is there?
5         A.   Let's see, Larry Tolbert,
6    surveyor rep, vessel's agent, Mentz
7    Maritime.  Parties invited but not
8    present.  Robert Scarf, delayed in
9    New York.  Michael Barry, surveyor,
10   representative Pate Stevedore instructed
11   by Pate not to join, not to attend joint
12   inspection.  Patrick Weber, surveyor,
13   owners, P&I Club.  I don't know who that
14   is.  I don't know who P&I Club is.  And
15   Tom Barken, surveyor, representative
16   freight forward of Pactrans.  So it looks
17   like we didn't share the stevedore with
18   Pate, the surveyor with Pate.  Look like
19   we shared them with you.
20        Q.   I'm showing you what's
21   marked as Defendant's Exhibit Number 71.
22   Can you tell me what that is?
23        A.   Can you ask me which -- who
24   Mentz represented there?

432

1         Q.   Mentz represented by Larry
2    Tolbert, surveyor, representing vessel's
3    agent, Mentz Maritime, the vessel's
4    agent.
5         A.   Who is the vessel's agent?
6         MR. BROWN:  If you don't
7         know, don't guess at anything.
8         THE WITNESS:  Here's the
9         question, it said we are bugging
10        them because they are instructing
11        us via E-mail that cargo is not
12        released but had produced no
13        official document nor explanation
14        as to why.  Billy Mentz is
15        supposed to be sending us further
16        information in about ten minutes.
17        I will forward it as soon as I get
18        it.  This is from Mike Pate to me.
19        And it says I just landed,
20        the door on the plane won't open.
21        What is the status of the hold on
22        the freight?  And then he told me
23        that was the status on the hold
24        that it hasn't been released yet.

Robert Scharf                                          March 24, 2011

433

BY MR. REBARCHAK:
1
2      Q.   Released by whom?
3      A.   Well, from my understanding
4  it would be from the insurance company,
5  but that's why I said -- who is Mentz
6  that would be able to release the load or
7  not release the load.
8      Q.   And that would be something
9  Galen Hawk would know?
10     A.   I guess.  This is saying
11  that the load is not released and that
12  Mentz is the person, the reason it's not
13  being released.
14     Q.   You don't know for sure why
15  the cargo was not released.  Would that
16  be a fair statement?
17         MR. BROWN:  Object to the
18  form.
19         THE WITNESS:  Do I know why
20  it wasn't released?  Do I know for
21  sure?
22  BY MR. REBARCHAK:
23     Q.   Right.
24     A.   At this point I can take a

434

1  pretty good guess.
2      Q.   Don't guess.
3      A.   Then I don't know for sure.
4      Q.   If you don't know, just say
5  you -- Mr. Hawk handled that?
6      A.   He did handle this.  I don't
7  know.
8      Q.   I'm showing you what's
9  marked as Defendant's Exhibit Number 72.
10  These are all just E-mails to him.
11     A.   Okay.  This is I want to
12  barge -- I was trying to inquire how much
13  -- if I could barge sheet rock to
14  Chicago.
15     Q.   So it was your understanding
16  that you could -- you were trying to make
17  a deal --
18     A.   No, it was my understanding
19  that when I could sell this, I had a
20  possibility I could sell it in Chicago
21  and somebody told me you could barge it
22  to Chicago.
23     Q.   Do you know when Mr. Hawk
24  told you that it was released that you

435

1  could go ahead and officially start
2  selling it?
3      A.   I don't know, but I'll tell
4  you it was probably the exact date we
5  started selling it is the day he told me
6  we could release it.
7      Q.   I'm showing you what's
8  marked as Defendant's Exhibit Number 73
9  which is Devon 6635.  Tell me if you
10  recognize that.
11     A.   Well, there's no attachment
12  on this.
13     Q.   What does it say?
14     A.   Attached is invoice draft.
15     Q.   Why would Mr. Pate be
16  sending you a draft of an invoice?
17         MR. BROWN:  Object to the
18  form.
19         MR. PIPES:  Object to the
20  form.
21         THE WITNESS:  I don't know.
22  BY MR. REBARCHAK:
23     Q.   Do most of your vendors send
24  you drafts of their invoices for your

436

1  review?
2      A.   No, they do not.  But most
3  of them have it pre-set before anything
4  is done.  He did a lot of work off our
5  contract.  He was charging us by the
6  hour.  So my guess is in case there was
7  any negotiations with this he was sending
8  me a draft, but that's the only thing
9  that I could see.  He did a lot of work
10  on good faith.
11     Q.   I'm showing you what's
12  marked as Defendant's Exhibit Number 74.
13  Can you tell me what that is?
14     A.   This is from Mike.  It says,
15  Mike Pate, it says according to figures
16  there are 3,300 bundles that believed to
17  be good, 3,600 bundles believed to be bad
18  and the balance of 138 going to the
19  dumpster.  These figures are before any
20  joint survey inspection of the warehouse.
21     Q.   So is he doing the
22  determination of what's good and bad?
23     A.   No.  What he's saying is
24  he's got them set up and he's waiting to

Robert Scharf                                    March 24, 2011

437

1  have the joint survey inspection.
2      Q.    And why is he reporting to
3  you?
4      A.    I don't know.  Other than I
5  guess I want to get this stuff out as
6  fast as I can.  So he's telling me what's
7  going on.
8      Q.    Is it your understanding you
9  couldn't get it out until they unload
10 everything, determined what was good and
11 what was bad?
12     A.    Yes, but it was my
13 understanding that happened because
14 Fireman's Fund wanted it that way.  That
15 was my understanding.
16     Q.    Did you also know that you
17 were filing an insurance claim on the
18 things that were bad?
19     A.    Well, I knew we were filing
20 an insurance claim, yeah.
21     Q.    But wouldn't you have to
22 determine what's good or bad before --
23     A.    Well, I would think the
24 insurance company would determine that.

438

1  Somebody had to determine it.
2      Q.    Do you think they have to
3  wait until it's unloaded so they can
4  determine what's good or bad?
5      A.    That's what they did, yeah.
6  But you said -- if it was up to me, I
7  would take off whatever was good and get
8  it out on the truck and get it sold.
9      Q.    I'm showing you what's
10 marked as Defendant's Exhibit Number 75.
11 This is Devon's 1277.  Let me put a mark
12 on that.
13         Can you tell me what that
14 is?
15     A.    It's a letter from Mr. Pate
16 to me.  Please find our invoice covering
17 discharge of sheet rock from the Sanko
18 Rally, port -- port Everglades Florida,
19 port of Pensacola, Florida along
20 with applicable supports.  We have not
21 yet received the invoice from MH Barry
22 and Associates for this survey work
23 regarding damages on this vessel.  We
24 will forward report to you for portion of

439

1  your invoice.  I guess we are partners on
2  this.  Again, I don't know.  In the
3  meantime, Barry Associates is
4  overnighting you pictures as requested.
5  And this would be Mike's invoice that I
6  believe would be -- I believe this is
7  just for the additional stevedoring.
8  This is for the extra.  I don't believe
9  this is for -- I think -- discharge
10 bundles sheet rock from hatches to -- I
11 don't know.  There's certainly no dispute
12 on him for what we contracted for and
13 then there was the extra amount.
14     Q.    What was the date of that?
15     A.    This is 7/17, July 17th,
16 2006.
17     Q.    So he's already done his
18 report to you about -- in your survey
19 about what was damaged and what was not
20 damaged?
21         MR. BROWN:  Object to the
22 form.
23         THE WITNESS:  You know, I
24 don't see where -- this just says

440

1  what he unloaded.
2  BY MR. REBARCHAK:
3      Q.    What's on the front page?
4      A.    Covering discharge of sheet
5  rock.  We have not received the invoice
6  from Barry Associates for their survey
7  work regarding damages on the vessel.  We
8  will forward report --
9      Q.    What's the handwriting on
10 the bottom?  Is that your handwriting?
11     A.    No, it's not mine.
12     Q.    Do you know what handwriting
13 it is?
14     A.    I do not.
15     Q.    What does it indicate at the
16 bottom, the handwriting on that?
17         MR. BROWN:  Object to the
18 form.
19         THE WITNESS:  7/12 finish --
20 discharging finished 7/12th to
21 7/14 to Sanko.  16 bundles went to
22 a dumpster.  And somebody got
23 notes on whatever they asked us,
24 how much of the ship was already

Robert Scharf                                    March 24, 2011

441

1       -- looks like this wasn't
2    completely unloaded yet. I don't
3    see here where -- it says here
4    extra labor required to keep
5    warehouse clean of debris $24,000.
6    Materials supplied -- I don't see
7    where this makes any reference to
8    what's damaged or not damaged.
9    And it shows -- here's an invoice
10   for $422,000. He stamped paid on
11   it and paid on this one.
12       MR. REBARCHAK: Thank you.
13       MR. PIPES: Let me object
14   and move to strike to the extent
15   any of that was nonresponsive to
16   the question that was asked.
17       THE WITNESS: I'm sorry.
18   BY MR. REBARCHAK:
19       Q.   I'm showing you what's
20   marked as Defendant's Exhibit Number 76,
21   and I'm looking at the bottom part. If
22   you can tell me what that is?
23       A.   It says use Pate's numbers
24   that we have. Also put in claim for the

442

1    difference from what was loaded in China
2    and unloaded in Pensacola. The daily
3    logs that were signed by Pate are the
4    official unloading documents and nothing
5    else exists. The cargo was released for
6    shipment on the Wednesday of the week.
7       Q.   So you are using Pate's
8    determination of what's good and bad to
9    file your claim with the insurance
10   company?
11       A.   No, I'm using Pate's numbers
12   on how many bundles were there.
13       MR. BROWN: Object to the
14   form.
15       THE WITNESS: No, there was
16   a discrepancy in what was loaded
17   in China and what was unloaded in
18   Pensacola. And obviously the
19   discrepancy was the stuff that
20   went to the dumpster. So if we
21   loaded, you know, 8,000 boards and
22   they only unloaded 7,700 boards,
23   then it looks like 300 boards went
24   into the dumpster.

443

1    BY MR. REBARCHAK:
2       Q.   I'm showing you what's
3    marked as Defendant's 79.
4       A.   You want the highlighted
5    part?
6       Q.   Right.
7       A.   It says I'm running out of
8    time. I just need help. I've tried to
9    protect you. I started getting storage
10   fees, and I'm in big trouble.
11       Q.   Can you explain what that
12   means?
13       A.   This was Jay Buckley wanted
14   to continue to try and sell this to his
15   customers.
16       Q.   Sell what to his customers?
17       A.   To sell the non-damaged
18   drywall. That's what that was. And I
19   was trying to give him time to do it, but
20   now we were on a clock so I had to get
21   this stuff sold. So that's what that
22   was.
23       Q.   And what happened after the
24   11th if you didn't have it sold?

444

1       A.   Nothing happened. I just
2    didn't get it sold.
3       Q.   Did you start having to pick
4    up storage fees?
5       A.   Well, there was a date on
6    there where we had X amount of days in
7    Pensacola free storage, 60 days or 90
8    days. I don't recall. And then after
9    that then we would have to start -- then
10   they started charges us more storage
11   fees, which they did at some point
12   because we negotiated with them.
13       Q.   I'm going back one because I
14   skipped 77. So I'm going to show you
15   what's marked as 77. I asked you earlier
16   whether or not you had contacted Chad at
17   SalvageSale regarding Mike Pate buying
18   the salvaged drywall.
19       A.   Has Mike made contact with
20   Chad for salvage sales. This is me
21   talking to Mike trying to get to Chad.
22       Q.   Can you explain to me why
23   you're trying to get Mike to call Chad at
24   SalvageSale?

445

1      A.    This is Mike Mazer.  Also
2  Mike at Mazer Supply said should be
3  picking up ten trucks of drywall.  I had
4  to bill them.  They are not a NorPac
5  customer.  I will call later.
6          No, only if Mike -- they had
7  a salvage company.  They started the
8  salvage company.  So he maybe was trying
9  to buy some salvage.  That's the only
10  reason I would put him in contact with
11  him.
12          MR. PIPES:  Mike Mazer or
13      Mike Pate?
14          THE WITNESS:  Mike Mazer.
15  BY MR. REBARCHAK:
16      Q.    You're sure it's Mike Mazer?
17      A.    Well, it says here Mazer
18  Supply should be picking up ten trucks of
19  drywall.  I have billed them.  They are
20  not NorPac customer.  Has Mike made
21  contact?  I'm not sure if it's Mike
22  Mazer, no.  It could be Mike Pate.  I
23  don't know.
24      Q.    Do you know when Mike Pate

446

1  eventually bought the salvage?
2      A.    No, I don't.  But I know I
3  still had good material to sell.
4      Q.    After Mr. Pate bought the
5  salvage, did you try to work with him and
6  strike a deal that you had talked about
7  previously before like in August in a
8  couple of those letters?
9          MR. PIPES:  Object to the
10      form.
11          THE WITNESS:  I don't
12      believe I did, no.
13  BY MR. REBARCHAK:
14      Q.    Did you try to?
15      A.    I don't believe I did, no.
16      Q.    Did you try to market some
17  of the damaged drywall for Pate?
18          MS. CALDWELL:  Object to the
19      form.  This has been asked and
20      answered many, many times.  We got
21      30 minutes left.
22          THE WITNESS:  I don't think
23      I did.
24          MS. CALDWELL:  Yes, it has

447

1  been.
2  BY MR. REBARCHAK:
3      Q.    Let me show you what's been
4  marked as defendant's exhibit 78.  Let's
5  just show you this, the bottom part of it
6  if you could.  That maybe will refresh
7  your memory.
8      A.    Still wants to buy damaged
9  drywall --
10          MR. BROWN:  Don't read out
11      loud.
12          THE WITNESS:  Well, we
13      thought we could still make a deal
14      with Pate at this time.
15  BY MR. REBARCHAK:
16      Q.    And that was after he
17  purchased the salvage?
18      A.    Well, it says here Pate
19  wired money today for salvage.  And it
20  said we'll work on a contract with him to
21  partner damaged drywall.  We still him
22  owe $155,000.  I told him when we get
23  insurance settlement we will pay him.
24      Q.    Did anything come of that

448

1  partnership?
2      A.    No, nothing came of it.
3      Q.    You don't know what happened
4  to the money that Pate paid to buy the
5  salvage or do you?
6      A.    What happened to the money?
7      Q.    Yes.
8      A.    I don't know what you mean
9  by what happened to the money.
10      Q.    Well, he paid the money for
11  the salvage.  He bought it, correct?
12      A.    Yes, he did.
13      Q.    Do you know whether that
14  money came to Devon or do you know what
15  happened to the money?
16          MS. CALDWELL:  Object to the
17      form.  Asked and answered.
18          THE WITNESS:  Well, I don't
19      know for a fact, but I would think
20      that the salvage people got it I
21      would think.  See, I don't know
22      how that works.
23  BY MR. REBARCHAK:
24      Q.    Galen Hawk would be the one

449

1  to answer those questions?
2      A.  Yes, he would be the one to
3  answer the question.  Absolutely.
4          MR. REBARCHAK:  I appreciate
5  it.  I'll pass the witness.
6          THE VIDEOTAPE TECHNICIAN:
7  Going off the record.  Time on
8  video is 18:28.
9              - - -
10         (Whereupon, a brief recess
11     was taken.)
12             - - -
13         THE VIDEOTAPE TECHNICIAN:
14     We're now back on the record.
15     Time on video is 18:28.
16 BY MR. LAW:
17     Q.  Mr. Scharf, have you spoken
18  to anybody from the Consumer Product
19  Safety Commission?
20     A.  I have not.
21     Q.  Any request for information
22  or documents that you've received from
23  the CPSC?
24     A.  I don't think so, no.

450

1      Q.  You got Jay Buckley's cell
2  phone number or phone number?
3      A.  No, I don't anymore.  Jay
4  moved to Atlanta someplace.  Jay's been
5  very sick.  I don't know if he's still
6  alive.
7      Q.  He's in Atlanta, Georgia?
8      A.  I think that's where he
9  moved to.
10     Q.  Do you have any contact
11  information for him?
12     A.  I don't.  He used to live
13  wherever NorPac was in Waynesborough,
14  Mississippi.  Then he got very ill, and
15  he moved to somewhere in Atlanta.  I
16  don't have anything for him anymore.
17     Q.  Is Jay his real first name?
18     A.  J-A-Y is all I know.
19     Q.  And you've agreed to come to
20  trial at Devon's request, haven't you?
21     A.  I have.  That was before
22  today.
23     Q.  You're still planning on
24  coming?

451

1      A.  I'll come, yes.
2      Q.  You were asked earlier by
3  Mr. Rebarchak if you were coming to trial
4  and you started to tell him that you
5  brought the drywall in and you got him
6  into this?
7      A.  That's correct.  I'm
8  responsible for this.
9      Q.  And is it your intention to
10 come to trial and testify to try to get
11 them out of this?
12         MR. BROWN:  Object to the
13     form.
14         MS. CALDWELL:  Object to the
15     form.  Asked and answered many,
16     many times.  It is a delay and
17     just harassing the witness.
18         THE WITNESS:  I don't want
19     to get anybody out of anything.  I
20     just want whatever is right and
21     fair to happen here.  Whatever is
22     fair, that's all.
23 BY MR. LAW:
24     Q.  The test reports -- and I'm

452

1  going to ask you a few questions about
2  the ones that were produced.  I'm going
3  to go Devon's Counsel Leslie Caldwell
4  identified by Bates stamp all test
5  reports produced, and I'm going to ask
6  you about some of those.
7          Were any of the test reports
8  in Spanish?
9      A.  In Spanish?
10     Q.  Yes, sir.
11     A.  Not that I recall.
12     Q.  And I'm referring to the
13 test reports that you said you thought
14 you saw around October of '07?
15     A.  I think that was in English.
16 The one that I think that NorPac
17 furnished?
18     Q.  From Houston?
19     A.  I believe that was in
20 English.
21     Q.  And the drywall was not
22 manufactured at a plant called Crescent
23 City, was it?
24     A.  I've never heard of a plant

453

1   named Crescent City.
2       Q.   So the test report that
3   identifies the plant as Crescent City,
4   China, that wouldn't pertain to this
5   drywall, would it?
6           MS. CALDWELL:  Object to the
7       form.
8           THE WITNESS:  I don't know.
9       Crescent City is not the name in
10      Chinese, I can tell you that.  I
11      don't know -- I don't know.
12  BY MR. LAW:
13      Q.   Have you ever heard this
14  plant called or referred to as Crescent
15  City?
16      A.   I have not heard that.
17      Q.   The drywall we're here about
18  today that was imported by Devon, it's
19  not five eighths inch fire rated, is it?
20      A.   It is not.
21      Q.   And it doesn't have any UL
22  listing on it, does it?
23      A.   No, if it's not fire rated,
24  I don't think it would have a UL listing.

454

1       Q.   A UL listing would pertain
2   to the fire retardant standards, wouldn't
3   it?
4       A.   I believe so.
5       Q.   And the test report you saw
6   or think you saw from Houston, it didn't
7   have any UL fire resistant standard on
8   it, did it?
9       A.   It did not.
10      Q.   You've been asked about the
11  drywall getting wet.  This drywall was
12  not moisture resistant, was it?
13      A.   Oh, that's a good question.
14  Not like for bathrooms, it wasn't made
15  for that.  I don't know -- when you say
16  moisture resistant, I don't know how
17  resistant drywall would be.  But it's not
18  what you would call a waterproof drywall.
19      Q.   It wasn't green board, was
20  it?
21      A.   It was not green board.
22      Q.   And it wasn't made for
23  exterior applications, was it?
24      A.   It was not made for exterior

455

1   applications.
2       Q.   And the drywall you said
3   that you believe North Pacific tested was
4   tested in Houston, Texas?
5       A.   I believe so.
6       Q.   It wasn't tested in
7   Las Vegas, Nevada, was it?
8       A.   Well, I don't know.  I think
9   it was in Houston.  I was told Houston.
10      Q.   Did the report that you
11  think you saw, did it say Houston, Texas?
12      A.   I believe so.
13      Q.   You got drywall in your
14  house?
15      A.   Yes.
16      Q.   And when Devon imported the
17  drywall from China, you knew what drywall
18  was used for, didn't you?
19      A.   I did.
20      Q.   And you knew it would be
21  used to construct residential homes for
22  people like my clients, didn't you?
23          MR. BROWN:  Object to the
24      form.

456

1           THE WITNESS:  Well, if you
2       had to ask me about the drywall we
3       brought in, I would think that it
4       wasn't for residential homes.  It
5       could be used there, but I think I
6       testified -- four by 12 sheets by
7       half inch is in most areas more of
8       a commercial size.  Five eighths
9       would be residential size, and
10      four by eight boards -- what I
11      know that most of these sheet
12      rockers use.
13  BY MR. LAW:
14      Q.   But you knew it would be
15  used to construct buildings?
16      A.   Oh, yeah.  Yes, for walls.
17      Q.   Buildings that people would
18  go into?
19      A.   Somebody would go into it
20  for sure.
21      Q.   You talked about elephants
22  on a board.  Was that just a term about
23  elephants in the board or was there
24  actually a Chinese board that had

Robert Scharf                                    March 24, 2011

457

1  elephants printed on it?
2       A.   No, that was just a term
3  meaning that there were humps in the
4  board.
5       Q.   So you haven't seen --
6       A.   Bumps in the board.  I never
7  saw that.
8       Q.   You hadn't seen any boards
9  that had elephants trunk or tail on the
10 board?
11      A.   I have not see it.
12      Q.   Did you ever talk to Henry
13 or Wayne Vick?
14      A.   Henry or Wayne Vick?
15      Q.   They are I'll represent to
16 you they are officers or corporate
17 representatives of Ace Home Center in
18 Robertsdale, Alabama?
19      A.   I don't think so.
20      Q.   You don't recall telling
21 anybody at any retailer in Robertsdale,
22 Alabama or in Alabama about this
23 elephants on the board issue?
24      A.   No.  There were no

458

1  elephants.  No, the answer is no.
2       Q.   You don't recall talking to
3  any retailers in Alabama about the issue
4  with elephants in the board or whatever
5  the elephant issue is?
6       A.   No, our board tested very
7  flat.
8       Q.   This was Julian Chu's first
9  time with buying drywall, wasn't it?
10      A.   Yeah, I believe it was.
11      Q.   You think it was his first
12 time to go to drywall manufacturing
13 facilities?
14      A.   I believe it was.
15      Q.   From the time you were the
16 president at Devon Building Products --
17 and that was about three years?
18      A.   I think less, but two and a
19 half years or something.
20      Q.   During the time you were
21 president of Devon International Trading,
22 Inc., did Devon International Trading
23 have any written quality control
24 standards with respect to products

459

1  imported from China?
2       A.   We did not.
3       Q.   Did any of the Devon family
4  of companies -- and there were some other
5  companies that imported products from
6  China, wasn't there?
7       A.   There were.
8       Q.   Like Devon Furniture I think
9  was one?
10      A.   I was still there, but that
11 came after, yes.
12      Q.   To your knowledge did any of
13 the other Devon companies have any
14 written quality control standards with
15 respect to products imported from China?
16      A.   I don't know.
17      Q.   Devon International
18 Industries, did they have any written
19 quality control standards with respect to
20 products imported from China?
21      A.   I think I was just leaving
22 as Devon International Industries was
23 coming about.
24      Q.   So you wouldn't know?

460

1       A.   I don't know.
2       Q.   And were there any verbal
3  quality control standards with respect to
4  products imported from China to ensure
5  that they were safe for use?
6       A.   No.
7       Q.   There weren't any written
8  standards to ensure they were safe for
9  use?
10      A.   You are talking building
11 products now?
12      Q.   Building products.
13      A.   Yeah, I would say no.
14      Q.   Where is John Bennett right
15 now?
16      A.   I think he's in China.
17      Q.   Do you know what he's doing
18 over there?
19      A.   I don't have a clue.
20      Q.   Devon -- there's an office
21 or a building across the street with the
22 name Devon on it?
23      A.   That's their headquarters.
24      Q.   How long has their

Robert Scharf                                    March 24, 2011

461

1   headquarters been there?
2       A.   Can I defer to --
3       Q.   Was it there when you were
4   president?
5       A.   Yes.
6       Q.   And are all the Devon
7   companies housed in that headquarters
8   across the street?
9       A.   I don't know.
10      Q.   Devon International Trading
11  in the headquarters across the street?
12      A.   Yes, it was.
13      Q.   Devon Health?
14      A.   Devon Health, yes, I believe
15  it was.
16      Q.   Devon Office Furniture?
17      A.   I don't know if they were
18  across the street or not.
19      Q.   Was U.S. Customs present
20  when the drywall was being manufactured
21  in China?
22      A.   U.S. Customs?
23      Q.   Yes, sir.
24      A.   Oh, I don't know.

462

1       Q.   You didn't see any customs
2   officers --
3       A.   No, I didn't see anybody
4   there.
5       Q.   You wouldn't expect U.S.
6   customs to be present during the
7   manufacturing process, would you?
8       A.   No, I wouldn't.
9            MS. CALDWELL:  Object to the
10  form.
11  BY MR. LAW:
12      Q.   Do you know if U.S. Customs
13  ever visited the plant in China?
14      A.   U.S. Customs?
15      Q.   Yes, sir.
16      A.   I don't know.
17      Q.   You wouldn't expect them to,
18  would you?
19           MR. BROWN:  Object to the
20  form.
21           THE WITNESS:  I wouldn't
22  expect them to, no.
23  BY MR. LAW:
24      Q.   Do you have any

463

1   communications with U.S. Customs when the
2   drywall is imported to the U.S.?
3       A.   Did I have any?  No, sir.
4       Q.   Ever have any communications
5   with them regarding the drywall?
6       A.   About drywall, no.
7       Q.   Have you heard on the news
8   about the issues with high lead content
9   in children's toys imported from China?
10           MS. CALDWELL:  Object to the
11  form.  What does that have to do
12  with anything, Jonathon?
13           MR. LAW:  I think it's
14  highly discoverable, and you can
15  object to the form.
16           MS. CALDWELL:  Well, you're
17  wasting your time.  Object to the
18  form.
19  BY MR. LAW:
20      Q.   Your objection is dually
21  noted.
22           Had you heard of those
23  issues prior to the drywall being
24  imported?

464

1       A.   Yes, sir.
2       Q.   Had you heard about any of
3   the issues with tainted milk formula
4   imported from China?
5       A.   Yes.
6       Q.   And had you heard about that
7   prior to the drywall being imported?
8       A.   No.
9       Q.   Any other issues with
10  respect to defects with products imported
11  from China that you heard about prior to
12  the drywall being imported?
13      A.   Can we talk about the lead
14  for a minute?
15      Q.   Sure.
16      A.   Because I've been involved
17  with manufacturing extruding vinyl and --
18  North America to my knowledge is the only
19  country -- the only place in the world
20  where you can't use lead for stabilizers.
21  Europe uses lead.  China uses lead.
22           So when the Chinese get a
23  thing lead-free, they don't even know
24  what that means.  We use titanium as a

Robert Scharf                                                    March 24, 2011

465

1    stabilizer for vinyl instead of lead.  It
2    costs more money, but they don't use it
3    there for anything.  So we knew that when
4    they are going to formulate -- we had to
5    make sure that they certified lead free.
6    So I don't know how Mattel could ever not
7    know it had to be lead-free.
8            But lead is used in most of
9    the world for stabilizers for most of
10   these products, and it's just not used in
11   North America.  But I knew about lead,
12   but I didn't know about the milk.
13       Q.    It's not used for children's
14   toys, is it?
15       A.    What?
16       Q.    Lead?  You said it's used as
17   a stabilizer --
18       A.    I think they use it --
19   plastic toys and stuff is where they use
20   a stabilizer in it.  I think that's where
21   the lead comes into effect.
22       Q.    Have you ever reviewed the
23   consumer product safety commission's
24   recall list before?

466

1    A.    I have not.
2    Q.    Do you know why Pacific Rim
3    did not buy the drywall that we have
4    talked about?
5    A.    I don't know.
6    Q.    Did they ever ask you for
7    any test reports or MSDS sheets?
8    A.    They did not.
9    Q.    You mentioned that somebody
10   -- and I think you said it was not Julian
11   Chu, but somebody in China was at the
12   plant on the ground when the drywall was
13   being loaded?
14   A.    Yes.
15   Q.    Was anybody there when it
16   was actually being manufactured?
17   A.    We had somebody there.
18   Q.    Do you know who was there?
19   A.    No.
20   Q.    Was it an employee of Devon?
21   A.    No, usually you would hire
22   somebody locally and the main reason is
23   to make sure that you get the count that
24   they say they are going to give you.

467

1    Q.    So they were --
2    A.    But we had no experts in
3    manufacturing.
4    Q.    So this individual would
5    have been charged with the duty of
6    counting the boards?
7    A.    That I recollect.
8    Q.    You said -- you mentioned
9    re-grind?
10   A.    Yes.
11   Q.    What is re-grind?
12   A.    Well, what related to vinyl
13   because it's easier for you -- easier to
14   explain it, not understand.  When you
15   extrude anything vinyl and it's off spec,
16   they grind it up and they can re-melt it
17   and use it again.  So you can only use a
18   certain percentage of re-grind depending
19   on the product that you -- it's not a
20   monolithic product.  It's not all virgin
21   material.
22           So whatever was brought up,
23   I'm not sure with drywall who uses -- I
24   think it was recycle -- I don't know if

468

1    they use re-grind or not.  So re-grind is
2    used in a lot of products is acceptable,
3    but you lose strength so you have to be
4    careful how much re-grind you would use.
5    Q.    Do you know if any was used
6    in the drywall?
7    A.    No, I'm not even sure if
8    re-grind is used in drywall.  Somebody
9    asked about what happens when the pieces
10   are broken or chopped -- I don't know
11   that they can just re-grind it up and
12   then they can put it back.  I don't know
13   that.
14   Q.    You never reviewed ASTM
15   1396, have you?
16   A.    I have not.
17   Q.    ASTM 1063?
18   A.    I have not.
19   Q.    1264?
20   A.    I have not.
21   Q.    ASTM 36?
22   A.    No, sir.
23   Q.    Have you ever reviewed any
24   ASTM standards that pertain to drywall?

Robert Scharf                                      March 24, 2011

469

1      A.   I did not.
2           MS. CALDWELL:  Object to the
3      form.  Asked and answered many
4      times.
5           THE WITNESS:  I hope I've
6      given the same answer every time.
7    BY MR. LAW:
8      Q.   You've mentioned that you
9    thought that this plant or at least
10   somebody at the plant told you that it
11   was certified.
12          Who certifies the drywall
13   plants in China?
14     A.   I'm not sure.  It actually
15   somewhere it said Chinese ASTM standards,
16   and it had the numbers and everything.
17   I'm not sure who does that.  The factory
18   certified to us that they had the
19   certification.
20     Q.   To your knowledge was there
21   any third-party quality control at the
22   plant in China?
23          MR. BROWN:  Object to the
24     form.

470

1           THE WITNESS:  I don't know.
2    BY MR. LAW:
3      Q.   And when I say that meaning
4    somebody was not employed --
5      A.   I don't know who -- who the
6    people were in the quality control, in
7    their quality control room.  They could
8    all be Government employees.  I have no
9    idea.
10     Q.   Do you know if there was any
11   third-party in-plant inspection and
12   labeling service?
13     A.   I do not know.
14     Q.   So to your knowledge was the
15   quality control up to this plant that you
16   had contracted with to bring in about 50
17   boats?
18          MR. BROWN:  Object to the
19     form.
20   BY MR. LAW:
21     Q.   You mentioned earlier that
22   Devon has lawyers in Taiwan with offices
23   in Shanghai?
24     A.   No.  We used a lawyer in

471

1    Taiwan who also has an office in
2    Shanghai.
3      Q.   And that lawyer represented
4    Devon in an arbitration that took place
5    in China with Pactrans?
6      A.   That's correct.
7      Q.   And you were present for
8    that arbitration?
9      A.   I was present.
10     Q.   Have you reviewed Exhibit
11   64, paragraph 11?  That's a translated
12   copy.
13     A.   That's why I'm laughing how
14   it's translated because it says to
15   resolve disagreements if disagreements
16   arise both parties should friendly
17   negotiate first.  If not resolved, it
18   will go to the court in -- Shanghai.
19     Q.   And to your knowledge is
20   Devon involved in any type of dispute
21   resolution with Taishan in China right
22   now?
23     A.   Not that I -- I don't know.
24     Q.   Has anybody asked you to

472

1    participate in any type of proceedings
2    with Taishan in China?
3      A.   No, they have not.
4      Q.   Anybody told you if they
5    intend to move forward with --
6      A.   They have not.  This is the
7    first I heard of anything.
8      Q.   Did you or anybody from
9    Devon ever give any specifications to
10   SalvageSale?
11     A.   No.  Well, once again, I
12   would say -- I don't know if they asked
13   what the board was.  The only
14   specification I would know would be half
15   inch four by 12.  I don't know if that's
16   what you meant by specification.
17     Q.   Did they ever ask for any
18   specifications --
19     A.   Not to my knowledge.  Not
20   from my memory.
21     Q.   And SalvageSale never asked
22   you for any tests reports, did they?
23     A.   No.
24     Q.   Did Fireman's Fund Insurance

Robert Scharf                                    March 24, 2011

473

1  Company ever ask you for any
2  specifications?
3      A.   Never asked me.
4      MR. REBARCHAK:  Object to
5  the form the question.
6  BY MR. LAW:
7      Q.   Do you know if they ever
8  asked anybody?
9      A.   No, I don't know.
10     Q.   Have they ever asked you for
11 any test reports, Fireman's Fund?
12     A.   No, not me.
13     Q.   To your knowledge did
14 Fireman's Fund pay for the unloading of
15 the damaged drywall?
16     A.   I don't know.  At one point
17 that was in dispute.  I don't know how
18 that was --
19     Q.   Do you know if they paid for
20 any of the disposal costs associated with
21 some of the damaged drywall?
22     A.   I don't know.  That was all
23 on one invoice.
24     Q.   Did you ever review Mr. Jay

474

1  Buckley's deposition?
2      A.   No.
3      Q.   Mr. Buckley referred to at
4  one point a sale pitch that you had to
5  give to North Pacific.  And I'm just
6  going to ask you if you recall giving
7  such a sales pitch to North Pacific?
8      A.   I don't think I ever went
9  down and did it.
10     Q.   And he said it would be a
11 phone conference to a gentleman named
12 Frank George and David Porter.  Do you
13 know them?
14     A.   I know Frank and George.  I
15 don't think I know David Porter.  I've
16 heard the name before.
17     Q.   Mr. Buckley said that you
18 were going to have to convince them, the
19 North Pacific people that you were
20 actually in the drywall business.  Do you
21 recall having to do that?
22     A.   Well, I wouldn't do it.
23 We weren't actually in the drywall
24 business.

475

1      Q.   You don't recall having
2  given any type of sales pitch --
3      A.   No.  He had talked one time
4  about going down and pitching all his
5  traders so they would go out and try to
6  sell more, but I was never in their
7  offices.
8      Q.   He said this is via phone
9  conference?
10     A.   I don't remember doing that.
11     MR. LAW:  Sir, I thank you
12 for your time.
13 BY MR. PIPES:
14     Q.   I'm going to be real loud so
15 we don't have to waste time.  You have no
16 knowledge of how Pensacola Stevedore
17 marketed and sold the salvaged drywall,
18 do you?
19     A.   I do not.
20     Q.   And you have no knowledge of
21 the method or manner in which he sold it,
22 how many lots, how many bundles, anything
23 like that?
24     A.   I have no idea.

476

1      Q.   Now, Pate, Mike Pate never
2  told you that he could unload that boat
3  with damaged drywall in three to four
4  days, did he?
5      A.   No, not with the damaged
6  drywall, no.
7      Q.   He never represented
8  anything like that to you, did he?
9      A.   No.
10     Q.   And in fact --
11     A.   I think he had five or six
12 days to unload it on the original
13 contract.
14     Q.   In an undamaged state?
15     A.   That's correct.
16     Q.   And in fact after the holds
17 were taken back and some idea of the
18 damage was discovered, you knew fairly
19 well that it was going to take a while to
20 get the stuff unloaded after they
21 started?
22     A.   Yes, I knew.
23     Q.   And his crews didn't
24 lollygag --

Robert Scharf                                      March 24, 2011

477

1        A.   No, sir.  He had good crews.
2            MR. PIPES:  That's all I
3    have.
4    BY MR. CHASON:
5        Q.   I've got some questions.
6            MR. BROWN:  Who is it?
7    BY MR. CHASON:
8        Q.   Mr. Scharf, can you hear me?
9        A.   I hear you fine.
10       Q.    This is Will Chason.  I
11   represent two of the builders in these
12   lawsuits.  One is Classic Home and the
13   other is Southern Heritage.  And I know
14   this is a little bit difficult doing it
15   on the phone, but I was trying to save a
16   trip up there to Philadelphia or whenever
17   you all are.
18           Do you have the Devon
19   production at the deposition, do you have
20   the documents produced by Devon there?
21           MR. BROWN:  No.  No.
22   BY MR. CHASON:
23       Q.   Well, I was looking through
24   the Devon records and I noticed that

478

1    there is a service contract dated April
2    10th, 2006.  And it's at Devon's
3    production at 236 to 241, and it has to
4    do with the contract with the shipping
5    company in which you signed that
6    document.
7            Do you know what I'm talking
8    about?
9        A.   Which document did I sign?
10       Q.   It's a service contract with
11   the shipping company.  It's from April
12   10th, 2006?
13       A.    With the shipping company or
14   the ship's broker, the broker?  Who's the
15   company?
16       Q.   I don't have it in front of
17   me.
18           MR. BROWN:  Will, we can't
19   do this without, you know, without
20   him seeing what you are talking
21   about.  That's the problem with
22   doing it by telephone.
23   BY MR. CHASON:
24       Q.   If you look at that document

479

1    it says that the point of destination for
2    the drywall is either going to be
3    Pensacola or Mobile.  And my question is
4    to you is when was it decided that the
5    drywall would be shipped to Pensacola as
6    opposed to Mobile?
7        A.   I don't know.  We testified.
8    It's somewhere in this report today,
9    though.
10       Q.   Who made the decision that
11   the drywall was going to be shipped to
12   Pensacola?
13       A.   I don't know.
14       Q.   Were you part of that
15   discussion?
16       A.   Yes.
17       Q.   What was that decision based
18   on?
19       A.   We had a better situation --
20   a better dealing going into Pensacola.
21       Q.   A better deal with the
22   stevedore company?
23       A.   A better deal with the
24   stevedore company, a better deal with the

480

1    port.
2        Q.   Was that decision made
3    before or after the Sanko Rally left
4    China?
5        A.   Before it left China.
6        Q.   So when the Sanko Rally left
7    China, it was destined to Pensacola,
8    Florida?
9        A.   That's correct.
10       Q.   Now, did Devon receive
11   different bids and quotes from stevedore
12   companies in Mobile, Alabama?
13       A.   Sinotrains did.  Sinotrains
14   gave us all the pricing.
15       Q.   What was the name --
16       A.   Pactrans gave us all the
17   pricing.
18       Q.   And they are located in
19   Mobile?
20       A.   They are located in Chicago.
21       Q.   So this was the broker that
22   dealt with the stevedore company?
23       A.   This was our freight broker.
24       Q.   And so the freight broker

Robert Scharf                                    March 24, 2011

481

1  dealt with the stevedore company?
2      A.   The freight broker would
3  arrange all the freight.  They dealt with
4  everybody and they gave us the cost, yes.
5      Q.   So the freight company dealt
6  with the stevedore company?
7      A.   No, they were a freight
8  broker.
9      Q.   All right.  Mr. Scharf, was
10  the drywall that was put on the Sanko
11  Rally, was it organic drywall or
12  synthetic drywall?
13      A.   What is synthetic drywall?
14  I don't know.
15      Q.   Do you know the difference
16  between synthetic drywall and organic
17  drywall?
18      A.   I do not.
19      Q.   Mr. Scharf, can you give me
20  the time period in which you went to
21  China to buy the drywall and the time
22  period you left China?
23          MS. CALDWELL:  Object to the
24      form.  Asked and answered.

482

1          THE WITNESS:  I would
2      usually go to China for 11 or 12
3      days, and I made three or four
4      trips to China regarding the
5      factory.
6  BY MR. CHASON:
7      Q.   In 2006 how much time did
8  you spend in China before the Sanko Rally
9  left the port to go to Pensacola,
10  Florida?
11      A.   How much time did I spend in
12  China?
13      Q.   Uh-huh.
14      A.   I don't know.  I'd have to
15  check my passport.  I don't know how many
16  times I was in China.
17      Q.   You don't have any idea of
18  how much time you spent in China before
19  the Sanko Rally left the port?
20      A.   Well --
21          MS. CALDWELL:  Object to the
22      form.  Asked and answered.
23          THE WITNESS:  I don't
24      understand the question then

483

1  because I go to China several
2  times.  You are saying before the
3  Sanko Rally.  I don't know how
4  many times I went before it left.
5      Are you talking about a year
6  before?  I don't understand the
7  question.
8  BY MR. CHASON:
9      Q.   You went to China to buy
10  drywall, correct?
11      A.   Yes.
12      Q.   All right.  And when did you
13  leave to go to China to buy this drywall?
14          MS. CALDWELL:  Object to the
15      form.
16          THE WITNESS:  I don't know.
17      I have documents they had showed
18      me some dates before.  I was there
19      a few times, but I think I bought
20      it -- we agreed to buy it on the
21      week of February 20th.
22  BY MR. CHASON:
23      Q.   February 20th of 2006?
24      A.   Yes.

484

1      Q.   And so you were there before
2  that date?
3      A.   Yes.
4      Q.   How many times?
5      A.   I just told you.  I don't
6  know how many times I've been in China.
7      Q.   Are you going to come to
8  trial?
9          MS. CALDWELL:  Object to the
10      form.  He has answered this many
11      times, Will.  This is now -- we
12      got six more minutes.  You all are
13      just trying to delay this
14      deposition and keep it going.  Six
15      minutes left.  He's already --
16      it's already been asked and
17      answered many times.
18  BY MR. CHASON:
19      Q.   Sir, do you plan on coming
20  to trial?
21      A.   I don't know.  Did you plan
22  on coming to Philadelphia to sit here and
23  do this?  I don't live in Philadelphia
24  either.  This was 150-mile trip for me.

Robert Scharf                                      March 24, 2011

---

**485**

1       MR. ROBERTSON:  Let somebody
2  else -- does anybody else have a
3  question?
4       MR. BROWN:  Jim Patterson?
5       MR. LAW:  Caroline, did you
6  have something?
7       MS. PRYOR:  I'm good.
8  Thanks.
9       MR. NORTHRUP:  Nothing for
10  Bass Homes.
11       MR. LAW:  I think Don's got
12  a few.
13       MR. BROWN:  Are you through,
14  Will?  Is everyone else finished?
15  BY MR. CHASON:
16       Q.   How about coming to New York
17  to see this guy?
18       A.   Which guy?
19       MR. BROWN:  Object.  That's
20  not necessary.
21       THE WITNESS:  Are you
22  serious?
23       MR. BROWN:  Don't answer
24  him.

---

**486**

1       MR. ROBERTSON:  I think it's
2  Mr. Brown's turn.
3       MR. LAW:  When you say
4  finished, I don't know what you're
5  about to launch off into.  I may
6  have some follow-up after you.
7       MR. BROWN:  I've got about
8  five minutes of questions.  I'm
9  going to take a little ten-minute
10  break and talk to my client here
11  about what's happened here today
12  and about some things.  And then
13  we'll be back.  I have about five
14  minutes and we'll be through.
15       MR. LAW:  Unless I have some
16  follow-up after.
17       MR. BROWN:  Unless you have
18  some follow-up.
19       THE VIDEOTAPE TECHNICIAN:
20  Going off the record.  Time on
21  video is 18:56.
22       - - -
23       (Whereupon, a brief recess
24  was taken.)

---

**487**

1       - - -
2       THE VIDEOTAPE TECHNICIAN:
3  We're now back on the record.
4  Time on video is 19:04.  This
5  concludes the videotape deposition
6  of Robert Scharf.  Time on video
7  is 19:04.
8       (Witness excused.)

---

**488**

1       C E R T I F I C A T E
2
3       I hereby certify that
4  the witness was duly sworn by me and that
5  the deposition is a true record of the
6  testimony given by the witness.
7
8
9
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
       LISA CAPALDO
10       Dated:  March 28, 2011
11
12  (The foregoing certification of this
13  transcript does not apply to any
14  reproduction of the same by any means,
15  unless under the direct control and/or
16  supervision of the certifying shorthand
17  reporter.)
18
19
20
21
22
23
24


Robert Scharf                                      March 24, 2011

489

1          LAWYER'S NOTES
2    PAGE  LINE
3    ____ ____ _____
4    ____ ____ _____
5    ____ ____ _____
6    ____ ____ _____
7    ____ ____ _____
8    ____ ____ _____
9    ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____