07/21/2006 10:13 FAX 601 735 2602       NORTH PACIFIC GROUP                    ☒001

 **North Pacific**

July 21, 2006

Ms. Ruth Wu
Devon International Trading

Via facsimile : 610 930-4035


Dear Ms. Wu:

We are returning your invoice unpaid along with a copy of an email transmitted to Bob Scharf. This material was supposed to have shipped back in March. All along we have been telling Bob that the market may drop and the material needs to be shipped. Once the vessel finally arrived we again asked to ship as fast as possible but we were held up an additional month due to the damage and slow off loading as well as legal and insurance holds on the material. Finally we were given the go ahead to begin shipping but by this time, some four months after the intended shipment date, our customers cancelled their orders to us due to the late shipping. North Pacific Group had no alternative but to cancel the purchase due to late shipment.

We have communicated with Bob repeatedly during this process concerning the timeliness of shipment. We have told Bob that North Pacific will assist Devon in marketing the material, however the market has dropped and the sales value will be less than our original orders contained. We have salvaged a small number of orders and we will honor our original purchase price for these loads only. Any future shipments will be at an agreed upon price at the time of shipment. If you would like us to continue to market the material we will do all we can to help you with disposing of the material.

Sincerely,

*Frank Johnston*

Frank Johnston
Division Manager
North Pacific Group
Southern

DEVON 00951

BOB SCHARF - 516-599-8228
G. JACKSON - 601-735-2602
RUTH WU - 610-930-4035

| | EX SANKO RALLY DATE | PICK UP NO. | CUSTOMER PO | NUMBER OF BDLS | TOTAL BDLS TO DATE | | DEVON INTERNATIONAL PATE STEVEDORE COMPANY MV SANKO RALLY DISCHARGE SHEETROCK PORT OF PENSACOLA 6/15-7/12/06 |
|---|---|---|---|---|---|---|---|
| 27 | 7/27/06 | 432693 | GEORGE 7 | 7 | 181 | | BLACK BEAR/SAN ANTONIO, FL/PHILLIP WILLIAMS + SON 5/108 |
| 28 | 7/27/06 | 391187 | 4361828 | 7 | 188 | | STOCK BLDG/METAIRIE, LA/ADD TRUCKING 78/2738 |
| 29 | 7/27/06 | 437501 | 707424 | 7 | 195 | | EMERALD COAST BLDG /P'COLA, FL/EMERALD COAST 37/37 |
| 30 | 7/27/06 | 437502 | 707425 | 7 | 202 | | EMERALD COAST BLDG /P'COLA, FL/EMERALD COAST 24/24 |
| 31 | 7/27/06 | 466006 | 70832 | 7 | 209 | | NORPAC/GYPSUM PRODUCTS INC/SHELTON TRK  OP258/3999 |
| 32 | 7/27/06 | 437506 | 707429 | 9 | 218 | | EMERALD COAST BLDG /P'COLA, FL/EMERALD COAST 37/37 |
| 33 | 7/27/06 | 437507 | 707430 | 9 | 227 | | EMERALD COAST BLDG /P'COLA, FL/EMERALD COAST 24/24 |
| | | | | 80 | | | **SUBMITTED TO DEVON/NORPAC 7/27/06** |
| 34 | 7/28/06 | 437508 | 707431 | 9 | 236 | | EMERALD COAST BLDG /P'COLA, FL/EMERALD COAST 24/24 |
| | | | | 9 | | | **SUBMITTED TO DEVON/NORPAC 7/28/06** |
| 35 | 7/31/06 | 437596 | ROWLAND 1 | 7 | 243 | | LIVE OAKS, FL/CONSOLIDATED LUMBER TRANS 520/0202 |
| 36 | 7/31/06 | 391847 | APO36308 | 7 | 250 | | ORGILL/ANDALUSIA, FL/HUGGIND TRANS 408916/1133 |
| | | | | 14 | | | **SUBMITTED TO DEVON/NORPAC 7/31/06** |
| 37 | 8/1/06 | 391842 | APO36455 | 7 | 257 | | ORGILL/NAVARRE, FL/RAPID TRANS 777/T777 |
| 38 | 8/1/06 | 437509 | 707432 | 9 | 266 | | EMERALD COAST BLDG /P'COLA, FL/EMERALD COAST 37/37T |
| 39 | 8/1/06 | 391843 | APO36456 | 7 | 273 | | ORGILL/NAVARRE, FL/RAPID TRANS 777/T777 |
| 40 | 8/1/06 | 437510 | 707433 | 8 | 281 | | EMERALD COAST BLDG /P'COLA, FL/EMERALD COAST 37/37 |
| | | | | 31 | | | **SUBMITTED TO DEVON/NORPAC 8/1/06** |
| 41 | 8/3/06 | 458938 | 70555 | 7 | 288 | | NORPAC/WALKER BROS/CARNEY TRK 7/34 |
| 42 | 8/3/06 | 391855 | APO36579 | 7 | 295 | | ORGILL/PHILADELPHIA, MS/P.HUGHES TRK 1019/1005 |
| 43 | 8/3/06 | 437598 | ROWLAND 3 | 7 | 302 | | ENAP/LIVE OAK, FL/2 BROTHERS TRK 1/111669 |
| | | | | 21 | | | **SUBMITTED TO DEVON/NORPAC 8/3/06** |
| 44 | 8/4/06 | 391849 | APO 36535 | 7 | 309 | | ORGILL/TUPELO, MS/NEW LINE TRANS 8231/8797 |
| | | | | 7 | | | **SUBMITTED TO DEVON/NORPAC 8/4/06** |
| 45 | 8/7/06 | 432784 | 707476 | 9 | 318 | | EMERALD COAST/PCOLA, FL/EMERALD COAST TRK 37/37 |
| 46 | 8/7/06 | 432785 | 707477 | 9 | 327 | | EMERALD COAST/PCOLA, FL/EMERALD COAST TRK 37/37 |
| 47 | 8/7/06 | 437511 | 707475 | 9 | 336 | | EMERALD COAST/PCOLA, FL/EMERALD COAST TRK 37/37 |
| | | | | 27 | | | **SUBMITTED TO DEVON/NORPAC 8/7/06** |
| 48 | 8/8/06 | 432788 | 707480 | 9 | 345 | | EMERALD COAST/PCOLA, FL/EMERALD COAST TRK 37/37 |
| 49 | 8/8/06 | 432786 | 707478 | 9 | 354 | | EMERALD COAST/PCOLA, FL/EMERALD COAST TRK 37/37 |

2

8/28/20061:56 PM

Aug 28 06 01:20p     Devon - 00572     Resalle     850-438-5214     p.3

P. 1

850-438-5214

Devon-00573

Rosalie

Aug 28 06 01:20p

3

BOB SCHARF - 516-599-8228
G. JACKSON - 601-735-2602
RUTH WU - 610-930-4035

| | EX SANKO RALLY DATE | PICK UP NO. | CUSTOMER PO | NUMBER OF BDLS | TOTAL BDLS TO DATE | | DEVON INTERNATIONAL PATE STEVEDORE COMPANY MV SANKO RALLY DISCHARGE SHEETROCK PORT OF PENSACOLA 6/15-7/12/06 |
|---|---|---|---|---|---|---|---|
| 50 | 8/8/06 | 432787 | 707479 | 9 | 363 | | EMERALD COAST/PCOLA, FL/EMERALD COAST TRK 24/24 |
| | | | | 27 | | | SUBMITTED TO DEVON/NORPAC 8/8/06 |
| 51 | 8/9/06 | 437597 | rowland 2 | 7 | 370 | | ENAP/LIVE OAK, FL/J A RAY TRUCKING 6739/07649 |
| | | | | 7 | | | SUBMITTED TO DEVON/NORPAC 8/9/06 |
| | 8/10/06 | 394845 AND 391846 | | -9 | 361 | | RETURNED FOR RECEIPT ONLY PER NORPAC - SEE PICTUR |
| 52 | 8/15/06 | 437599 | ROWLAND 4 | 7 | 368 | | ENAP/JACKSONVILLE/CONS LBR 30956/DA-48-0100 |
| | | | | 7 | | | SUBMITTED TO DEVON/NORPAC 8/15/06 |
| 53 | 8/21/06 | 432789 | 707481 | 9 | 377 | | EMERALD COAST/PCOLA, FL/EMERALD COAST TRK 37/37 |
| 54 | 8/21/06 | 432790 | 707482 | 9 | 386 | | EMERALD COAST/PCOLA, FL/EMERALD COAST TRK 37/37F |
| | | | | 18 | | | SUBMITTED TO DEVON/NORPAC 8/21/06 |
| 55 | 8/22/06 | 432792 | 707484 | 9 | 395 | | EMERALD COAST/PCOLA, FL/EMERALD COAST TRK 37/37F |
| | | | | 9 | | | SUBMITTED TO DEVON/NORPAC 8/22/06 |
| 56 | 8/23/06 | 432791 | 707483 | 9 | | | EMERALD COAST/PCOLA, FL/EMERALD COAST TRK 37/37F |
| | | | | 9 | | | SUBMITTED TO DEVON/NORPAC 8/28/06 |

8/28/2006 1:57 PM

STRAIGHT BILL OF LADING~ SHORT FORM   ORIGINAL   NOT NEGOTIABLE   Shipper's No. 433791

Carrier's Name: Emerald Coast   TRK-37   Carrier's No.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading,

at Port of Pensacola (Date) 8-23-06 FROM 720A S Barracks St

the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as shown below, which said company (the word company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own railroad, water line, highway route or said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in the Uniform Freight Classification in effect on the date hereof, if this is a rail or rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment. Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Consigned TO Emerald Coast Building Material

On Collect on Delivery Shipments, the letters "COD" must appear before consignee's name or as otherwise provided in Item 430, Sec. 1.   (Mail or street address for purpose of notification only.)

Destination 3040 Palafox St   Street Pensacola   City

County _____ FL State _____ Zip

Route _____   Delivery Address ★
(▲ To be filled in only when shipper desires and governing tariffs provide for delivery thereof.)

Delivering Carrier _____ Car or Vehicle Initials and No. _____

Collect on Delivery $ _____ And Remit to _____

Street _____ City _____ State

Subject to Section 7 of conditions of this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:
The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

_____ (Signature of consignor)

C. O. D. Charges to be
Paid by
☐ Shipper   ☐ Consignee

If charges are to be prepaid, write or stamp here, "To be Prepaid."

| No packages | ITM. | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 1 | Blk | ½"x4'x12 Gypram Board | 59,127 | 11 | |
| | | @ 612 PSD | | | |
| | | PO # 707483 | | | |
| | | Time: 9:10 AM | | | |
| | | Must be Tarped | | | |

Received $ _____ to apply in prepayment of the charges on the property described hereon.

_____ Agent or Cashier

Per _____
(The Signature here acknowledges only the amount prepaid.)

Charges Advanced:
$ _____

†If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is carrier's or shipper's weight.
NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.

The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

_____ per _____

Date Steve Borg Co.
for North Pacific Group   Shipper, Per _____   Agent

† The fibre containers used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Rule 41 of the Uniform Freight Classification and Rule 5 of the National Motor Freight Classification.
† Shipper's imprint in lieu of stamp; not a part of bill of lading approved by the Interstate Commerce Commission.

Per _____

Permanent post-office address of shipper,

1

STRAIGHT BILL OF LADING— SHORT FORM          ORIGINAL – NOT NEGOTIABLE          Shipper's No. 432792

Carrier's Name: Emerald Coast TRK 37          Carrier's No.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading,

at Port of Pensacola (Date) 8-22-06          FROM 720 A S. Barracks St

Consigned TO Emerald Coast Building Materials

Destination 3040 Palafox St          Pensacola

County _____ Street _____ State _____ City _____ Zip

Delivery
Address ★

Route _____

Delivering Carrier _____ Car or Vehicle Initials and No. _____

Collect on Delivery $ _____ And Remit to _____

Street _____ City _____ State _____

| No. Packages | H.M. | Kind of Package, Description of Articles, Special Marks, and Exceptions | *Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 984 | | 1/2" x 4 x 12 Gypsum Board | 59,127 | lbs | |
| | | @ 612 pcs | | | |
| | | PO # 707484 | | | |
| | | Time 11:00 AM | | | |
| | | Must be tarped | | | |

**C. O. D.** Charges to be Paid by ☐ Shipper ☐ Consignee

*If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is carrier's or shipper's weight.
NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.

The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding _____ per _____

Date Stevedore & Co.
for North Pacific Group          Shipper, Per _____          Agent

Permanent post-office
address of shipper _____

Devon - 00575

850-438-5214          p. 4

Aug 22 06 03:26p          Rosalie

BOB SCHARF - 516-599-8228
G. JACKSON - 601-735-2602
RUTH WU - 610-930-4035

| | EX SANKO RALLY DATE | PICK UP NO. | CUSTOMER PO | NUMBER OF BDLS | TOTAL BDLS TO DATE | | DEVON INTERNATIONAL PATE STEVEDORE COMPANY MV SANKO RALLY DISCHARGE SHEETROCK PORT OF PENSACOLA 6/15-7/12/06 |
|---|---|---|---|---|---|---|---|
| 1 | 7/18/06 | 391852 | APO 36541 | 7 | 7 | | ORGILL/COTTONDALE TRUCK 303/316 |
| 2 | 7/18/06 | 391926 | APO 36548 | 7 | 14 | | ORGILL/COTTONDALE TRUCK 309/311T |
| 3 | 7/19/06 | 359382 | VERBAL | 7 | 21 | | NORPAC/WALKER BROS/CARNEY TRK 16/26 |
| 4 | 7/20/06 | 393598 | JB02738 | 7 | 28 | | NORPAC/ACE-GAUTHIER/SHELTON OP210/2399 |
| 5 | 7/20/06 | 391177 | 436650 | 7 | 35 | | STOCK BLDG, METAIRIE/ADD TRUCKING  1337/153T |
| 6 | 7/20/06 | 391848 | APO 36533 | 0 | 35 | RETURNED 7/25 | ORGILL/ANNISTON, AL/WBS 445347/111688 |
| 7 | 7/20/06 | 391846 | APO 36417 | 7 | 42 | | ORGILL/THOMASVILLE AL/WHISTL.DIX 1/99404 |
| 12 | 7/21/06 | 391845 | APO 36416 | 7 | 49 | | ORGILL/THOMASVILLE AL/COMPASS TPORT 7/3 |
| 8 | 7/20/06 | 391844 | APO 36419 | 7 | 49 | | ORGILL/PINE LA/FORREST PROD. 410/725 |
| 9 | 7/21/06 | 391830 | APO 36482 | 7 | 56 | | ORGILL/LUMBER CITY GA/BETHEL FARMS 144/163 |
| 10 | 7/21/06 | 432690 | GEORGE 4 | 7 | 63 | | BLACK BEAR/CLEARWATER FL/C&S 69/713 |
| 11 | 7/21/06 | 432692 | GEORGE 6 | 7 | 70 | | BLACK BEAR/CLEARWATER FL/CHOPCO 409/RH533 |
| 12 | 7/21/06 | 391845 | APO 36416 | 7 | 77 | | ORGILL/THOMASVILLE AL/COMPASS TPORT 7/3 |
| | | | | 84 | | | SUBMITTED TO DEVON 7/21/06 |
| 13 | 7/21/06 | 391851 | APO36540 | 0 | 77 | RETURNED 7/24 | ORGILL/HATTIESBURG, MS/YADA 002/728 |
| 14 | 7/24/06 | 391853 | APO36546 | 7 | 84 | | ORGILL/TRUSSVILLE, AL/RJ&JTRUCKING 109/T11 |
| 15 | 7/24/06 | 432699 | GEORGE 12 | 7 | 91 | | BLACK BEAR/CLEARWATER, FL/ZERIMAR ZAID 717/7177 |
| 16 | 7/24/06 | 458935 | 70552 | 7 | 98 | | NORPAC/WALKER BROS/CARNEY TRK 1/23 |
| | | | | 21 | | | SUBMITTED TO DEVON/NORPAC 7/25/06 |
| 17 | 7/25/06 | 432691 | GEORGE 5 | 7 | 105 | | BLACK BEAR/SAN ANTONIO, TX/WINDCHESTER EXPRESS 5/1 |
| 18 | 7/25/06 | 432697 | GEORGE 10 | 7 | 112 | | BLACK BEAR/CLEARWATER, FL/GYPSUM EXPRESS 06318/7197 |
| 19 | 7/25/06 | 464868 | 205929 | 7 | 119 | | DISPATCH-70696/FORT PAINE, AL/SUNRISE EXPRESS 066/4839 |
| 20 | 7/25/06 | 391850 | APO36538 | 7 | 126 | | ORGILL/GADSDEN, AL/ WBS 445347/111688 |
| 21 | 7/25/06 | 432694 | GEORGE8 | 7 | 133 | | BLACK BEAR/CLEARWATER, FL/AUGUSTINE TRUCKING 794/4201 |
| 22 | 7/25/06 | 458936 | 70553 | 7 | 140 | | NORPAC/WALKER BROS/CARNEY TRK 11/22 |
| 23 | 7/25/06 | 458937 | 70554 | 7 | 147 | | NORPAC/WALKER BROS/CARNEY TRK 5/29 |
| | | | | 49 | | | SUBMITTED TO DEVON/NORPAC 7/25/06 |
| 24 | 7/27/06 | 437505 | 707428 | 9 | 156 | | EMERALD COAST BLDG /P'COLA, FL/EMERALD COAST 24/24 |
| 25 | 7/27/06 | 437504 | 707427 | 9 | 165 | | EMERALD COAST BLDG /P'COLA, FL/EMERALD COAST 37/37 |
| 26 | 7/27/06 | 437503 | 707426 | 9 | 174 | | EMERALD COAST BLDG /P'COLA, FL/EMERALD COAST 24/24 |

P.2
Devon - 00571
850-438-5214
Rosalie
Aug 28 06 01:20p
8/28/20061:56 PM

STRAIGHT BILL OF LADING– SHORT FORM        ORIGINAL = NOT NEGOTIABLE        Shipper's No. 432790

Carrier's Name: Emerald Coast 27/37F

Carrier's No. _____

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading.

at Port of Pensacola (Date) 8-21-06    FROM 720A S. Barracks St

the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as shown below, which said company (the word company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own railroad, water line, highway route or routes, or within the territory of its highway operations, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in the Uniform Freight Classification in effect on the date hereof, if this is a rail or rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment. Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Consigned TO Emerald Coast Building Materials

On Collect on Delivery Shipments, the letters "COD" must appear before consignee's name or as otherwise provided in Item 430, Sec. I.

Destination 8010 Pelofof St            Pens.

Route _____

Delivery Address ★ (★ to be filled in only when shipper desires and governing tariffs provide for delivery thereat.)

Delivering Carrier _____    Car or Vehicle Initials and No. _____

Collect on Delivery $ _____    And Remit to _____

| No. Packages | H.M. | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 98 | | ½" x 4' x 12 Gypsum Board | 59,127 | 12 | |
| | | @ 612 Pcs | | | |
| | | PO # 702482 | | | |
| | | Time: 340 PM | | | |
| | | must be tarped | | | |

*If the shipper moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is carrier's or shipper's weight.
NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.

The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

Pate Steele Qote
for North Pacific Group, Shipper, Per _____

Permanent post-office
Address of shipper, _____

Per X David Roberts Agent

Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:
The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

_____ (Signature of consignor.)

C. O. D. Charges to be
Paid by
☐ Shipper  ☐ Consignee

If charges are to be prepaid, write or stamp here, "To be Prepaid."

Received $ _____ to apply in prepayment of the charges on the property described hereon.

_____ Agent or Cashier

Per _____
(The signature here acknowledges only the amount prepaid.)

Charges Advanced $ _____

† The fibre containers used for this shipment conform to the specifications set forth in the box makers' certificate thereon, and all other requirements of Rule 41 of the Uniform Freight Classification and Rule 5 of the National Motor Freight Classification.
‡ Shipper's imprint in lieu of stamp; not a part of bill of lading approved by the Interstate Commerce Commission.

Aug 21 06 03:41p     Rosalie              850-438-5214          p.4

STRAIGHT BILL OF LADING– SHORT FORM

ORIGINAL · NOT NEGOTIABLE ·

Shipper's No. 432789

Carrier's Name: Emerald Coast    37/37

Carrier's No.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of lading

at Port of Pensacola    (Date) 8·21·06    FROM 720 AS Barracks St

Consigned TO Emerald Coast Building Materials

Destination 3040 Palafox St    Street    Pensacola    City

County    FL    State    Zip

Route

Delivery Address ★

Delivering Carrier    Car or Vehicle Initials and No.

Collect on Delivery $    And Remit to

C. O. D. Charges to be
Paid by
☐ Shipper    ☐ Consignee

| No. Packages | H.M. | Kind of Package, Description of Articles, Special Marks, and Exceptions | *Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 9 Bdl | | ½" x 4' x 12' Gypsum Board | 59,127 | 153 | |
| | | @ 612 Pcs | | | |
| | | PO # 707481 | | | |
| | | | | | |
| | | Time: 11:10 AM, | | | |
| | | must be tarped | | | |

Pat @ Stevedore Co.
for North Pacific Group    Shipper, Per

Permanent post-office
address of shipper,

1

STRAIGHT BILL OF LADING– SHORT FORM

ORIGINAL – NOT NEGOTIABLE

Carrier's Name Emerald Coast 24/24

Shipper's No. 432787

Carrier's No.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading,

at Pat Pensacola _____ (Date) 08-08-06 FROM 720 A S. Barracks St

Consigned TO Emerald Coast Builder Materials

Destination 5070 Palafox St Street Pensacola FL City

Route _____ County _____ Delivery Address ★ _____ State _____ Zip

Delivering Carrier _____ Car or Vehicle Initials and No. _____

Collect on Delivery $ _____ And Remit to _____

| No. Packages | H.M. | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subject to Correction) | Class or Rate | Class Column |
|---|---|---|---|---|---|
| 9 Bdl | | ½" x 4' x 12' Gypsum Board | 59/28 | | |
| | | ⓝ 612 Pcs | | | |
| | | Pᵒ 707479 | | | |
| | | | | | |
| | | Time 8:25 AM | | | |
| | | Must be Tarped | | | |

NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.

The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

Pate Stevedore Co
N North Pacific Group Shipper, Per Sharon Davis

per _____

Agent Vincent Grillo

C.O.D. Charges to be
Paid by ☐ Shipper   ☐ Consignee

Aug 17 06 02:14p    Rosalie                850-438-5214            p.3

STRAIGHT BILL OF LADING– SHORT FORM

ORIGINAL – NOT NEGOTIABLE

Carrier's Name: _Emerald Coast 37/37_

Shipper's No. _43278_

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading

Carrier's No.

at _East Pensacola_ (Date) _8-08-06_ FROM _720 A S. Barracks St_

the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as shown below, which said company the word company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own railroad, water line, highway route or route, or within the territory of its highway operations, otherwise to deliver to another carrier on the route to said destination, it is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in the Uniform Freight Classification in effect on the date hereof, if this is a rail or rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment. Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Consigned TO _Emerald Coast Building Materials_

(Mail or street address of consignee—for purposes of notification only.)

On Collect on Delivery Shipments, the letters "COD" must appear before consignee's name or as otherwise provided in Item 430, Sec. 1.

Destination _Pens._ _____ Street _____ City

_____ County _____ State _Fl_ ____ Zip

Route _____

Delivery Address ★

(a To be filled in only when shipper desires and governing tariffs provide for delivery thereof.)

Delivering Carrier _____ Car or Vehicle Initials and No. _____

Collect on Delivery $ _____ And Remit to _____

Street _____ City _____ State

Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:
The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

_____
(Signature of consignor.)

C.O.D. Charges to be
Paid by
☐ Shipper    ☐ Consignee

If charges are to be prepaid, write or stamp here, "To be Prepaid."

| No. Packages | H.M. | Kind of Package, Description of Articles, Special Marks, and Exceptions | *Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 96 | | 8'½'x4'x12' Gypsum Board | 59,127 | 16 | |
| | | @ 6/2 Per | | | |
| | | PO! 707478 | | | |
| | | | | | |
| | | Time: 7.58 AM | | | |
| | | Must be Tarped | | | |

Received $ _____ to apply in prepayment of the charges on the property described hereon.

Agent or Cashier

Per _____
(The signature here acknowledges only the amount prepaid.)

Charges Advanced:

$ _____

†The fibre containers used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Rule 41 of the Uniform Freight Classification and Rule 5 of the National Motor Freight Classification.

*Shipper's imprint in lieu of stamp; not a part of Bill of Lading approved by the Interstate Commerce Commission.

*If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is carrier's or shipper's weight.
NOTE – Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.
The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

Rate Steve dore Co
or North Pacific Group   Shipper, Per _Sharon Davis_         Per _____   per _____        Per _Danny Roberts_         Agent

permanent post-office
address of shipper.

Devon - 00582

Aug 17 06 02:14p    Rosalie                        850-438-5214              p.2

**STRAIGHT BILL OF LADING– SHORT FORM**

ORIGINAL – NOT NEGOTIABLE

Shipper's No. 43278 8

Carrier's Name: Emerald Coast 37/37T

Carrier's No.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of lading.

at Pt of Pensacola (Date) 8-08-06  FROM 720 S. Pensacola St

the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as shown below, which said company (the word company here understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own railroad, water line, highway route of said route to destination, and as in each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in the Uniform Freight Classification in effect on the date hereof, if this is a rail or rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment. Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Consigned To Emerald Coast Building Materials

Destination 8048 Palafox St                          Pensacola          City
                    County        FL State

Route _____        Delivery        State _____ Zip _____
                                Address ★

(＋To be filled in only when shipper desires and governing tariffs provide for delivery thereof.)

Delivering Carrier _____ Car or Vehicle Initials and No. _____

Collect on Delivery $ _____ And Remit to _____

| No. Packages | H.M. | Kind of Package, Description of Articles, Special Marks, and Exceptions | *Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 9R | | 5/8" x 4 x 12" Gypsum Board | 59,127 lb | | |
| | | @ 612 Pcs | | | |
| | | PO# 707480 | | | |
| | | | | | |
| | | Time 1025 Am | | | |
| | | Must be Taped | | | |

Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignee shall sign the following statement:
The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

_____ (Signature of consignor)

**C. O. D.** Charges to be Paid by:
☐ Shipper   ☐ Consignee

If charges are to be prepaid, write or stamp here, "To be Prepaid."

Received $ _____ to apply in prepayment of the charges on the property described hereon.

_____ Agent or Cashier

Per _____
(The signature here acknowledges only the amount prepaid.)

Charges Advanced: $ _____

*The fibre containers used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Rule 41 of the National Motor Freight Classification.
*Shipper's imprint in lieu of stamp; not a part of bill of lading approved by the Interstate Commerce Commission.

*If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is carrier's or shipper's weight.
NOTE — Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.
The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

Pate Stevedore Co                          per _____
of Worth Pacific Group _____ Shipper, Per _____

_____        _____ Agent
Permanent post-office
address of shipper.

Devon - 00583

Devon - 00584

STRAIGHT BILL OF LADING– SHORT FORM

ORIGINAL – NOT NEGOTIABLE

Shipper's No. 437511

Carrier's Name: Emerald Coast   37/37/T

Carrier's No.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading.

at Coast Pensacola   (Date) 8-07-06 FROM 720A S. Barracko St Pensacola

The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as others below, which said company (the word company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own railroad water line, highway route or routes, or within the territory of its highway operations, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in the Uniform Freight Classification in effect on the date hereof, if this is a rail or rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment. Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Consigned TO Emerald Coast Building Materials

Destination 8040 Alakea St ___ Pensacola

County ___ City

Route ___ State ___ Zip

Delivering Carrier ___ Car or Vehicle Initials and No. ___

Collect on Delivery $ ___ And Remit to ___

Street ___ City ___ State

(Mail or street address for purposes of notification only)

On Collect on Delivery Shipments, the letters "COD" must appear before consignee's name or as otherwise provided in Para 430, Sec 1

Delivery Address (to be filled in only when shipper desires and governing tariffs provide for delivery thereat.)

| No. Packages | H.M. | Kind of Package, Description of Articles, Special Marks, and Exceptions | *Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 9 Bdls | | ½ x 4 x 12" Gypsum Board | 59,127 | lbs | |
| | | @ 6127.00 | | | |
| | | Customer PO: 707475 | | | |
| | | Time 1:30 | | | |
| | | Must be tarped | | | |

*If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is carrier's or shipper's weight.
NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.

The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

Re: Steve Gore or North Pacific Group Shipper, Per J Donald ___ per ___

Permanent post-office address of shipper. ___ Agent

Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse to the consignee, the consignor shall sign the following statement.
The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

(Signature of consignor)

C. O. D. Charges to be Paid by ___
☐ Shipper   ☐ Consignee

If charges are to be prepaid, write or stamp here, "To be Prepaid."

Received $ ___ to apply in prepayment of the charges on the property described hereon.

Agent or Cashier

Per ___
(The signature here acknowledges only the amount prepaid.)

Charges Advanced: ___

*The fibre containers used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Rule 41 of the Uniform Freight Classification and Rule 5 of the National Motor Freight Classification.

*Shipper's imprint in place of stamp; not a part of bill of lading, approved by the Interstate Commerce Commission.

850-438-5214        p.6
Aug 07 06 04:09p        Rosalie

STRAIGHT BILL OF LADING– SHORT FORM

ORIGINAL – NOT NEGOTIABLE

Carrier's Name: Emerald Coast    37/37        Shipper's No. 432785

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this bill of lading.

Carrier's No.

at Port of Pensacola        (Date) 8-07-06    FROM 20 A S. Barracks St Pensacola

Consigned TO Emerald Coast Building Materials

Destination 3040 Palafox St        Pensacola

| No. Packages | H.M. | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 9 Bdl | | ½' x 4' x 12' Gypsum Board | 59,124 lbs | | |
| | | @ 612 pcs | | | |
| | | PO! 707477 | | | |
| | | Time: 10:55 AM | | | |
| | | Must be tarped | | | |

Pete Steigaare Co
for North Pacific Group    Shipper, Per Shawn Davis

Per David Roberts        Agent

P.5

850-438-5214

Rosalie

Aug 07 06 04:09p

Devon - 00585

STRAIGHT BILL OF LADING– SHORT FORM

ORIGINAL – NOT NEGOTIABLE

Shipper's No. _____

Carrier's Name: Emerald Coast 37 /37T

Carrier's No. 432784

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading,

at Prad08 Pensacola (Date) 8-7-06 FROM _____

Consigned To Emerald Coast

Destination 806 Palafox St          Street          Pensacola          City

Route _____ County _____ State _____ Zip _____

Delivering Carrier _____ Car or Vehicle Initials and No. _____

Collect on Delivery $ _____ And Remit to _____

Street _____ City _____ State _____

| No. Packages | H.M. | Kind of Package, Description of Articles, Special Marks, and Exceptions | *Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 96 | | 1/2" x 4' x 12' Gypsum Board | 59127 | 1.25 | |
| | | @ 6129c | | | |
| | | @ 707476 | | | |
| | | Time 0900 | | | |
| | | might be tarped | | | |

C. O. D. Charges to be Paid by
☐ Shipper   ☐ Consignee

_____ Shipper, Per _____          per _____ Agent

for David Roberts

Devon - 00586

P.4

850-438-5214   Rosalie

Aug 07 06 04:08p

STRAIGHT BILL OF LADING– SHORT FORM     ORIGINAL – NOT NEGOTIABLE     Shipper's No. 391849

Carrier's Name: Port of Pensacola  New Line Trans-8231/8797     Carrier's No.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading,

at Port of Pensacola (Date) 8-4-06 FROM 720 A S. Barrack's St. Pens. Fl

the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as shown below, which said company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own railroad, water line, highway route or route, or within the territory of its highway operations, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in the Uniform Freight Classification in effect on the date hereof, if this be a rail or rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment. Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back hereof, set forth in the classification or tariff which governs the transportation of this shipment, and for such terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Consigned TO Orgill Inc.

Destination _____ Street Type 10 ____ City ____

County _____ State M S Zip ____

Route _____ / Delivery Address ★

Delivering Carrier _____ Car or Vehicle Initials and No. ____

Collect on Delivery $ _____ And Remit to ____

| No. Packages | H.M. | Kind of Packages, Description of Articles, Special Marks, and Exceptions | *Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 7 | Bnd. | ½" x 4' x 12' Gypsum Drywall | 45,988 | lbs | |
| | | @ 476 pcs. | | | |
| | | Customer P.O.: APO 36535 | | | |
| | | Time: 9:10 AM | | | |
| | | Load must be tarped | | | |

*If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is carrier's or shipper's weight.
NOTE — Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.
The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding _____ per _____

Pat Steve Gore for North Pacific Group   Shipper, Per Sharon Davis

Permanent post-office address of shipper _____  Per X Charles Thomas   Agent

STRAIGHT BILL OF LADING– SHORT FORM

ORIGINAL – NOT NEGOTIABLE

Shipper's No. _437598_

Carrier's Name: _2 Brothers trucking – 1/111669_

Carrier's No. _____

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading,

at _Port of Pensacola_ (Date) _8-3-06_ FROM _720 A S. Barracks St. Pens. Fl_

the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as shown below, which said company (the word company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own railroad, water line, highway route or routes, or within the territory of its highway operations, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in the Uniform Freight Classification in effect on the date hereof, if this is a rail or rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment. Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Consigned TO _____ (Mail or street address for purposes of notification only)

On Collect on Delivery Shipments, the letters "COD" must appear before consignee's name or as otherwise provided in item 430, Sec. 1.

Destination _____ Street _Live Oak_ _____ City

County _____ State _____ Zip

Route _____ Delivery Address ★

(to be filled in only when shipper desires and governing tariffs provide for delivery thereon.)

Delivering Carrier _____ Car or Vehicle Initials and No. _____

Collect on Delivery $ _____ And Remit to _____

Street _____ City _____ State

Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:

The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

_____ (Signature of consignor)

C. O. D. Charges to be Paid by
☐ Shipper   ☐ Consignee

If charges are to be prepaid, write or stamp here, "To be Prepaid."

Received $ _____ to apply in prepayment of the charges on the property described hereon.

_____ Agent or Cashier

Per _____
(The signature here acknowledges only the amount prepaid.)

Charges Advanced:

| No. Packages | H.M. | Kind of Package, Description of Articles, Special Marks, and Exceptions | *Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 7 Bnd | | 1/2" x 4' x 12' Gypsum Drywall | 45,988 | lbs. | |
| | | @ 476 pcs | | | |
| | | Customer P.O. Rowland 3 | | | |
| | | Time: 3:00 PM | | | |
| | | Load must be tarped | | | |

*If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is carrier's or shipper's weight. NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.

The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding _____ per _____

Rate step code _Pate stepcode_
for North Pacific Group Shipper, Per _Shawn David_

permanent post-office address of shipper.

_____ Agent

Per _E.J.M._

1 The fibre containers used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Rule 41 of the Uniform Freight Classifications and Rule 5 of the National Motor Freight Classification.

1 Shipper's imprint in lieu of stamp: not a part of bill of lading approved by the Interstate Commerce Commission.

Devon - 00588

STRAIGHT BILL OF LADING— SHORT FORM

ORIGINAL – NOT NEGOTIABLE

Shipper's No. 391855

Carrier's Name: P. Hughes -1019/1005

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of lading,

Carrier's No.

at Port of Pensacola (Date) 8-3-06 FROM 720 A S. Barracks St. Pens, Fl.

the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned and destined as shown below, which said company (the word company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own railroad, water line, highway route or route, or within the territory of its highway operations, otherwise to deliver to another carrier on the route to said destination, it is mutually agreed, as to each carrier of all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in the Uniform Freight Classification in effect on the date hereof, if this is a rail or rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment. Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Consigned TO Orgill Inc.

On Collect on Delivery Shipments, the letters "COD" must appear before consignee's name or as otherwise provided in Item 430, Sec. 1. (Mail or street address for purposes of notification only.)

Destination _____ Street _____ Philadelphia City

County _____ State MS Zip

Route _____ Delivery Address ★

Delivering Carrier _____ (To be filled in only when shipper desires and governing tariffs provide for delivery thereof.)

Car or Vehicle Initials and No. _____

Collect on Delivery $ _____ And Remit to _____

Street _____ City _____ State

Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:

The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

_____ (Signature of Consignor.)

C. O. D. Charges to be
Paid by {
☐ Shipper   ☐ Consignee

If charges are to be prepaid, write or stamp here, "To be Prepaid."

Received $ _____ to apply in prepayment of the charges on the property described hereon.

Agent or Cashier

Per _____
(The signature here acknowledges only the amount prepaid.)

Charges Advanced:
$ _____

| No. Packages | ITM. | Kind of Package, Description of Articles, Special Marks, and Exceptions | *Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 7 bnd | | 1/2" X 4' x 12' Gypsum Drywall | 45,988 lbs | | |
| | | @ 476 pcs. | | | |
| | | Customer P.O. APO36579 | | | |
| | | Time: 2:45 PM | | | |
| | | Load must be tarped | | | |

*If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is carrier's or shipper's weight.
NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.

The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

Pate stevedores for North Pacific Group Shipper, Per Bauer Waurs

Permanent post-office address of shipper.

Per _____ Agent

† The fibre containers used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Rule 41 of the Uniform Freight Classification and Rule 5 of the National Motor Freight Classification.

† Shipper's imprint in lieu of stamp; not a part of bill of lading approved by the Interstate Commerce Commission.

Devon - 00589

NORTH PACIFIC TRAFFIC                                           40 004

 **North Pacific**

SOUTHERN
P. O. Box 391
Waynesboro, MS 39367
www.northpacific.com

| DISPATCH/BILL OF LADING | |
|---|---|
| Delivery #: | RON |
| Pickup #: | NP 458938 |
| Carrier Billing #: | 00070555 |
| Date: | 07/24/06 |
| Page: | 1 of 1 |
| Rate Amount Per: | $2.25/Mile |
| Total Miles: | 312 |
| Other Charges: | $25.00 |
| Total Dispatch Charge: | $727.00 |

**DISPATCHED BY:** Jimmy Trigg
Phone #:(866)216-0718
Fax #: (601)671-3258
**CARRIER:**
Camey Trucking    7/34
Robbie Camey

Melvin, AL 36913-
Phone #:  (251)771-6585        Fax #:(251)771-3120

Load Note:   Fully Fully Tarped
Customer P.O. #:
Ready Date: 07/27/06

Stop #: 1
Transport #/Type:  DON LAW
Delivery Date: 07/28/06

Reference #:
Flatbed

**ORIGIN:**
North Pacific Group Inc

Pate Stevedore Co Inc
Port of Pensacola
Pensacola, FL 32501-
Phone #:  (850)438-3648        Fax #:(850)438-5214

**DESTINATION:**
Walker BROS

79 School House Rd

Baileyton, AL 35019-
Phone #:  (256)796-2211        Fax #:

| QUANTITY | UOM | ITEM / DESCRIPTION | COMMENTS |
|---|---|---|---|
| | | PLEASE ATTACH SIGNED AND DATED DISPATCH/BILL OF LADING AND PROOF OF DELIVERY TO YOUR FREIGHT BILL. THESE ITEMS ARE REQUIRED FOR PAYMENT PROCESSING. UNDOCUMENTED FREIGHT BILLS WILL BE RETURNED TO YOU. | |
| 476 | PC | BGWGYAAA120504  1/2 4x12 Gypsum Drywall A Grade | |

45,988 lbs

*Sharay Davis*
*Pate Stevedore*
8-3-06  1:20 PM

Faxed  7/24/06

**DRY WALL
NEED EDGE PROTECTORS
FULLY TARP**

**CANNOT** Load In Rain

**CANNOT UNLOAD IN RAIN**

CARRIER SIGNATURE  *Camey Hodi*                    8-3-06
                                                    DATE

THE PERSON SIGNING THIS DISPATCH SHALL BE DEEMED TO BE AN AGENT OF THE CARRIER OF RECORD AND THE CARRIER OF RECORD ACCEPTS RESPONSIBILITY FOR ANY LOSS OR DAMAGE TO CARGO. CARRIER MAY USE THEIR OWN FORM BILL OF LADING, BUT SUCH FORM WILL SERVE ONLY AS A RECEIPT FOR THE GOODS AND MAY NOT ALTER ANY OF THE TERMS AND CONDITIONS OF THIS CONTRACT OF CARRIAGE. CARRIER OF RECORD AND ALL SUBSEQUENT CARRIERS PROVIDING TRANSPORTATION SERVICES UNDER THIS DISPATCH ACKNOWLEDGES THAT PAYMENT BY NORTH PACIFIC GROUP TO CARRIER OF RECORD CONSTITUTES FULL AND FINAL PAYMENT TO CARRIER, AND ALL OTHER SUBCONTRACTORS OR VENDORS OF SERVICES ON THIS LOAD. CARRIER WAIVES ANY AND ALL LIENS RELATING TO THIS LOAD OR ANY PRIOR LOAD. FREIGHT TERMS: All freight is prepaid unless otherwise noted on this form, if freight collect, carrier will not make delivery of this shipment without payment of the freight and all other lawful charges, and waives recourse against North Pacific Group, for such changes.

P.5                850-438-5214                    Rosalie    Aug 03 06 03:14p

STRAIGHT BILL OF LADING– SHORT FORM

ORIGINAL - NOT NEGOTIABLE

Shipper's No. 437510

Carrier's Name: Emerald Coast - 37/37

Carrier's No.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading

at Port of Pensacola (Date) 8-1-06 FROM 920 A. S. Barracks St. Pensa

the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as shown below, which said company (the word company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own railroad, water line, highway route or routes, or within the territory of its highway operations, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in the Uniform Freight Classification in effect on the date hereof, if this is a rail or rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment. Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper for himself and his assigns.

Consigned TO Emerald Coast Building Materials

On Collect on Delivery shipments, the letters "COD" must appear before consignee's name or as otherwise provided in item 430, Sec. 1.

Destination 8040 Palafox St. Street Pensacola City

County _____ State _____ Zip _____

Route _____

Delivery Address ★ (★ To be filled in only when shipper desires and governing tariffs provide for delivery thereat.)

Delivering Carrier _____ Car or Vehicle Initials and No. _____

Collect on Delivery $ _____ And Remit to _____

(Mail or street address of consignee–for purposes of notification only.)

Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:
The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

_____ (Signature of consignor)

C. O. D. Charges to be
Paid by
☐ Shipper    ☐ Consignee

If charges are to be prepaid, write or stamp here, "To be Prepaid."

| No. Packages | H.M. | Kind of Package, Description of Articles, Special Marks, and Exceptions | *Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 8 Bnd | | 1/2" x 4' x 12' Gypsum Drywall | 45,988 lbs | | |
| 8 | | @ 476 544 | 59,127 lbs | | |
| | | Customer P.O. 707433 | 52,557 lbs | | |
| | | Time: 10:05 AM | | | |
| | | Load must be tarped | | | |

Received $ _____ to apply in prepayment of the charges on the property described hereon.

_____ Agent or Cashier

Per _____
(The signature here acknowledges only the amount prepaid.)

Charges Advanced:
$ _____

†The fibre containers used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Rule 41 of the Uniform Freight Classification and Rule 5 of the National Motor Freight Classification.
†Shipper's imprint in lieu of stamp; not a part of bill of lading approved by the Interstate Commerce Commission.

*If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is carrier's or shipper's weight.
NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.
The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding _____ per _____

Pate Stevedore Co.
for North Pacific Group Shipper, Per Sharon Davis

Per D. Davis Williams Agent

Permanent post-office address of shipper. _____

1

Devon - 00591

STRAIGHT BILL OF LADING-- SHORT FORM       ORIGINAL -- NOT NEGOTIABLE       Shipper's No. 391843

Carrier's Name: Rapid Transport 777/ T777       Carrier's No.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading,

at Port of Pensacola (Date) _____ FROM 720A S. Barracks St. Pens, Fl

the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as shown below, which said company (the word company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own railroad or its own water line, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in the Uniform Freight Classification in effect on the date hereof, if this is a rail or rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment. Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Consigned TO Orgill Inc       (Mail or street address for purposes of notification only)

On Collect on Delivery Shipments, the letters "COD" must appear below consignee's name or as otherwise provided in Item 430, Sec. 1.

Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:
The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

Destination _____ Street Navarre _____ City
_____ County _____ State Fl Zip

Route _____ Delivery Address ★ _____

(Signature of consignee)

(★To be filed in only when shipper desires and governing tariffs provide for delivery thereof.)

Delivering Carrier _____ Car or Vehicle Initials and No. _____

C.O.D. Charges to be Paid by ☐ Shipper ☐ Consignee

Collect on Delivery $ _____ And Remit to _____

If charges are to be prepaid, write or stamp here, "To be Prepaid."

| No. Packages | H.M. | Kind of Package, Description of Articles, Special Marks, and Exceptions | *Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 7 | Bnd. | 1/2"x4'x12' Gypsum Drywall | 45,988 lbs. | 1 |  |
|  |  | @ 476 pc. |  |  |  |
|  |  | Customer P.O.: APO 36456 |  |  |  |
|  |  |  |  |  |  |
|  |  | Time 11:00 AM |  |  |  |
|  |  | Load must be tarped |  |  |  |

Received $ _____ to apply in prepayment of the charges on the property described hereon.

Agent or Cashier

Per _____
(The signature here acknowledges only the amount prepaid.)

Charges Advanced _____

*If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is carrier's or shipper's weight.
NOTE——Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.
The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

1 The fibre containers used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Rule 41 of the Uniform Freight Classification and Rule 5 of the National Motor Freight Classification.
1 Shipper's imprint in lieu of stamp; not a part of bill of lading approved by the Interstate Commerce Commission.

Date Steve Gore for North Pacific Group    Shipper, Per Shavan Davis    per _____

Agent

Permanent post-office address of shipper.    By _____ 8/1/06    Agent

1

Devon - 00592

STRAIGHT BILL OF LADING– SHORT FORM       ORIGINAL – NOT NEGOTIABLE

Shipper's No. 437509

Carrier's Name: Emerald Coast - 37/37T

Carrier's No.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading,

at Port of Pensacola (Date) 8-01-06 FROM 720 A.S. Barracks St Pens Fl.

the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as shown below, which said company (the word company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own railroad, water line, highway route or routes, or within the territory of its highway operations, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in the Uniform Freight Classification in effect on the date hereof, if this is a rail or a rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment. Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Consign TO Emerald Coast Building Materials

On Collect on Delivery Shipments, the letters "COD" must appear before consignee's name or as otherwise provided in item 430, Sec. 1.
(Mail or street address for purposes of notification only)

Destination 8040 Palafox St Street        Pensacola City

_____ County _____ State _____ Fl. Zip

Route

Delivery
Address ★
(+ To be filled in only when shipper desires and governing tariffs provide for delivery thereat.)

Delivering Carrier _____ Car or Vehicle Initials and No. _____

Collect on Delivery $ _____ And Remit to _____

Street        City        State

Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:
The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

(Signature of consignee)

C.O.D. Charges to be
– Paid by
☐ Shipper   ☐ Consignee

If charges are to be prepaid, write or stamp here, "To be Prepaid."

Received $ _____ to apply
in prepayment of the charges on the property described hereon.

Agent or Cashier

Per _____
(The signature here acknowledges only the amount prepaid.)

Charges Advanced:
$

| No. Packages | H.M. | Kind of Package, Description of Articles, Special Marks, and Exceptions | *Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 9-7 bnd | | 1/2"x4'x12' Gypsum Drywall | 45,988 lbs | | |
| | | @ 476 pc. 612 | 59,127 lbs | | |
| | | Customer P.O. 707432 | | | |
| | | Time 0810 | | | |
| | | Load must be tarped | | | |

*If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is carrier's or shipper's weight.
NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.
The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

_____ per _____

Rate Stevedore _____
for North Pacific Group        Shipper, Per _____

Permanent post-office
address of shipper.

Per _____ Agent

The fibre containers used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Rule 41 of the Uniform Freight Classification and Rule 5 of the National Motor Freight Classification."
† Shipper's imprint in lieu of stamp; not a part of bill of lading approved by the Interstate Commerce Commission.

1

Devon - 00593

STRAIGHT BILL OF LADING— SHORT FORM          ORIGINAL – NOT NEGOTIABLE          Shipper's No. 391842

Carrier's Name: Rapid Transit 777/T777          Carrier's No.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of lading,

at Port of Pensacola (Date) 8-01-06 FROM 720 A S. Barracd st. Pens. Fl.

the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned and destined as shown below, which said company (the word company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own railroad, water line, highway route or route, or within the territory of its highway operations, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading, set forth (1) in the Uniform Freight Classification in effect on the date hereof, if this is a rail or rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment. Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Consigned TO Orgill Inc.          (Mail or street address for purposes of notification only.)

On Collect on Delivery Shipments, the letters "COD" must appear before consignee's name or as otherwise provided in Item 430, Sec. 1.

Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:
The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

Destination ____ Street Navarre ____ City

____ County ____ State Fl ____ Zip

Route ____ Delivery Address ★

(to be filled in only when shipper desires and governing tariffs provide for delivery thereat.)

Delivering Carrier ____ Car or Vehicle Initials and No. ____

_____ (Signature of Consignor)

C. O. D. Charges to be
Paid by
☐ Shipper   ☐ Consignee

Collect on Delivery $ ____ And Remit to ____

Street ____ City ____ State

If charges are to be prepaid, write or stamp here, "To be Prepaid."

| No. Packages | H.M. | Kind of Package, Description of Articles, Special Marks, and Exceptions | *Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 7 | | Bundles ½" x 4' x 12' Gypsum Drywall | 45,988 lbs. | | |
| | | @ 476 pc. | | | |
| | | Customer PO: APO 36455 | | | |
| | | Time: 0740 | | | |
| | | Load must be tarped | | | |

Received $ ____ to apply in prepayment of the charges on the property described hereon.

Agent or Cashier

Per ____
(The signature here acknowledges only the amount prepaid.)

Charges Advanced:

*The fibre containers used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Rule 41 of the Uniform Freight Classification and Rule 5 of the National Motor Freight Classification.
†Shipper's imprint in lieu of stamp; not a part of bill of lading approved by the Interstate Commerce Commission.

*If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is carrier's or shipper's weight.
NOTE — Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.
The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding ____ per ____

Nate Stevedore W ____
for North Pacific Group

Shipper, Per ____

Permanent post-office address of shipper ____

Per ____ 8/1/06 ____ Agent

1

Devon - 00594

TRAIGHT BILL OF LADING— SHORT FORM          ORIGINAL - NOT NEGOTIABLE          Shipper's No. 391847

Carrier's Name: HUGGINS TRANSPORTATION    TRK 408916  TRL 1133          Carrier's No.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading,

at Port of Pensacola (Date) 7-31-06    FROM 720A S. Barracks St. Pens. Fl.

Consigned TO Orgill Inc. (Carolina Mill Work)

Destination _____ County _____ Street Andalusia State AL City _____ Zip

Route _____

Delivery Address ★

Delivering Carrier _____ Car or Vehicle Initials and No. _____

Collect on Delivery $ _____ And Remit to _____

Street _____ City _____ State

C. O. D. Charges to be Paid by ☐ Shipper  ☐ Consignee

If charges are to be prepaid, write or stamp here, "To be Prepaid."

| No. Packages | H.M. | Kind of Package, Description of Articles, Special Marks, and Exceptions | *Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 7 Bnd | | 1/2" x 4' x 12' Gypsum Drywall | 45,988 | lbs. | |
| | | @ 476 pcs. | | | |
| | | Customer P.O: APO 36308 | | | |
| | | Time: 11:30 | | | |
| | | Load must be tarped | | | |

Received $ _____ to apply in prepayment of the charges on the property described hereon.

Agent or Cashier

Per _____
(The signature here acknowledges only the amount prepaid.)

Charges Advanced $

*If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is carrier's or shipper's weight.
NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.

The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding _____ per _____

Pate Stevedore for North Pacific Group Shipper, Per _____

_____ Agent

Permanent post-office address of shipper.

so See Soul.

1

Devon - 00595

```
                                            1
        IN THE CIRCUIT COURT OF
        BALDWIN COUNTY, ALABAMA
        No. CV-2009-900948
            -   -   -
CHAD EVERTT LANGHAM, et al.:
                        :
        v.              :
                        :
ACE HOME CENTER, et al.  :
            -   -   -
        FEBRUARY 25, 2011
            -   -   -
        Videotape deposition of RUTH
WU, taken pursuant to notice, was held at
THE RADISSON VALLEY FORGE, 1160 First
Avenue, King of Prussia, Pennsylvania,
commencing at 9:34 a.m., on the above
date, before LISA CAPALDO, a Certified
Professional Reporter and Notary Public
in and for the Commonwealth of
Pennsylvania.
```

```
                                            2
 1  APPEARANCES:
 2
 3      DANIELL, UPTON,
        PERRY & MORRIS, P.C.
 4      BY:  JONATHON R. LAW, ESQUIRE
        P.O. Box 1800
 5      Daphne, AL  36526
        (251)625-0046
 6      Jrlaw@dupm.com
        Representing the Plaintiffs
 7
 8
        CARR ALLISON
 9      BY:  CAROLINE T. PRYOR, ESQUIRE
        6251 Monroe Street, Suite 200
10      Daphne, AL  36526
        Representing the Defendant
11      Ace Hardware Corporation
12
13      VERNIS & BOWLING
        BY:  JAMES T. PATTERSON, ESQUIRE
14      204 S. Royal Street
        Mobile, AL  36602
15      Representing the Defendant
        Bass Homes
16
17
        SCOTT, SULLIVAN, STREETMAN & FOX
18      BY:  JAMES E. ROBERTSON, ESQUIRE
        P.O. Box 1034
19      Mobile, AL  36633
        Representing the Defendant
20      Ace Home Center
21
22
23
24
```

```
                                            3
 1  APPEARANCES CONT:
 2
 3      HUDSON & WATTS
        BY:  WESLEY PIPES, ESQUIRE
 4      P.O. Box 989
        Mobile, AL  36601
 5      Representing the Defendant
        Pensacola Stevedore Company
 6
 7
        WOODLEY WILLIAMS LAW FIRM
 8      BY:  Donald Coleman Brown, Esquire
        One Lakeshore Drive, Suite 1750
 9      Lake Charles, LA  70629
        Representing the Defendant
10      Devon International Trading and
        John Bennett
11
12
        LUSK, CALDWELL & DEAN
13      BY:  LESLIE ANN CALDWELL, ESQUIRE
        2101 Highland Avenue, Suite 410
14      Birmingham, AL  35205
        Representing the Defendant
15      Devon International, Inc.
16
17      CARR ALISON
        BY:  CRAIG W. GOOLSBY, ESQUIRE
18      6251 Monroe Street, Suite 200
        Daphne, AL  36526
19      Representing the Defendant
        Craig Sinclair Buildings, Inc.
20
21
22      JONES, WALKER, WAECHTER,
        POITEVENT, CARRERE & DENEGRE
        BY:  GARY J. RUSSO, ESQUIRE
23      600 Jefferson Street, Suite 1600
        Lafayette, LA  70501
24      Representing the Defendant
        Fireman's Fund Ins. Co.
```

```
                                            4
 1  APPEARANCES CONT.
 2
 3
        McDOWELL, KNIGHT, ROEDDER & SLEDGE
 4      BY:  M. TAE PHILLIPS, ESQUIRE
        P.O. Box 350
 5      Mobile, AL  36601
        Representing the Defendant
 6      Southern Heritage Builders and
        David Reynolds and Classic
 7      Home Builders
 8
 9
        ALSO PRESENT:  Kevin G. Sugg, Esquire
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                      February 25, 2011

---

5

1
2              - - -
3          I N D E X
4              - - -
5
    Testimony of:  RUTH WU
6
7
    By Mr. Law        9, 284
8
    By Mr. Pipes      213, 310
9
    By Mr. Russo      232, 311
10
    By Mr. Robertson  265
11
12
13          - - -
        E X H I B I T S
14
            - - -
15
16  NO.     DESCRIPTION        PAGE
17
    (Exhibits 1 through 64 were marked
18  by counsel and attached to the
    transcript.)
19
    (There is no Exhibit-27.)
20
21
22
23
24

---

6

1          - - -
2      DEPOSITION SUPPORT INDEX
3          - - -
4
5   Direction to Witness Not to Answer
6   Page Line    Page Line    Page Line
7   None
8
9
10  Request for Production of Documents
11  Page Line    Page Line    Page Line
12  None
13
14
15  Stipulations
16  Page Line    Page Line    Page Line
17  None
18
19
20  Question Marked
21  Page Line    Page Line    Page Line
22  None
23
24

---

7

1              - - -
2          PROCEEDING
3              - - -
4       THE VIDEOTAPE TECHNICIAN:
5   We're now on the record.  The
6   following is a videotape
7   deposition.  This is tape number
8   one to the deposition of Ruth Wu
9   in the matter of Langham, et al.
10  versus Ace Home Center, et al.
11  being held before the Circuit
12  Court of Baldwin County, Alabama,
13  Consolidated Case No.
14  CV-2009-900948.
15      This deposition is being
16  held at 1168 First Avenue in King
17  of Prussia, Pennsylvania on
18  February 25th, 2011.  Currently,
19  the time on video is 9:34.  My
20  name is Robert Blum.  I'm the
21  videographer.  The court reporter
22  is Lisa Capaldo.
23      Counsel, will you now please
24  identify yourselves and the

---

8

1   affiliations and then the witness
2   will be sworn?
3       MR. LAW:  Jonathon Law on
4   behalf of the plaintiff
5   homeowners.
6       MR. PIPES:  Wesley Pipes,
7   Pensacola Stevedore and Pate
8   Stevedore.
9       MR. RUSSO:  Gary Russo,
10  Firemen's Fund Insurance Company.
11      MR. BROWN:  Don Brown, Devon
12  International Trading.  Also
13  appearing in the deposition is
14  Kevin Sugg in-house counsel for
15  Devon but not participating in the
16  deposition.
17      MS. CALDWELL:  And Leslie
18  Caldwell for Devon as well.
19      THE WITNESS:  Ruth Wu.
20      THE VIDEOTAPE TECHNICIAN:
21  Counsel on the phone, would you
22  please make your identification
23  for the record?
24      MS. PRYOR:  Caroline Pryor,

---



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                    February 25, 2011

9

1       Ace Hardware Corporation.
2           MR. GOOLSBY:  Craig Goolsby
3   for Craig Sinclair Builders.
4           MR. PATTERSON:  Jim
5   Patterson for Bass Homes
6   Incorporated.
7           MR. PHILLIPS:  Tae Phillips
8   for Classic Home Builders and
9   Southern Home Builders.
10          MR. ROBERTSON:  Jim
11  Robertson for Ace Home Center
12  Incorporated.
13          - - -
14  R U T H   W U, Sworn.
15          - - -
16          EXAMINATION
17          - - -
18  BY MR. LAW:
19      Q.   Tell us your name, please.
20      A.   My name is Ruth Wu.
21      Q.   Miss Wu, I'm Jonathon Law.
22  I represent some plaintiff homeowners.
23  I'm going to ask you some questions
24  today.

10

1           Have you ever given a
2   deposition before?
3       A.   Yes.
4       Q.   How many times?
5       A.   This is the third time.
6       Q.   So you are somewhat familiar
7   with the process, aren't you?
8       A.   A little bit.
9       Q.   Now, do I understand is
10  English your second language?
11      A.   Correct.
12      Q.   You seem to speak it quite
13  well, don't you?
14      A.   I'm all right.
15      Q.   You can read and write the
16  English language, can't you?
17      A.   Yes.
18      Q.   If I ask you a question
19  today that you don't understand, if you
20  point that out I'll try to clarify my
21  question for you.
22      A.   Sure.
23      Q.   If you answer my question,
24  we'll assume you understood it.  Is that

11

1   fair enough?
2       A.   Yes.
3       Q.   If you need me to slow down
4   at any time, feel free to just ask me to
5   slow down.  I can talk fast sometimes.
6       A.   Okay.
7       Q.   You said you've given --
8   this will be your third deposition?
9       A.   Correct.
10      Q.   You gave one at an
11  arbitration hearing involving North
12  Pacific, didn't you?
13      A.   Yes.
14      Q.   When was the second time you
15  gave a deposition?
16      A.   That was probably two years
17  ago.  That was for a window, a window
18  deposition.
19      Q.   Was that a window
20  manufactured by a Devon entity?
21      A.   We sourced the windows for
22  the client, a hurricane windows.
23      Q.   Was it sold down in Miami
24  Dade County?

12

1       A.   Yes, correct.
2       Q.   And then today would be your
3   third deposition.  Is that right?
4       A.   Right.
5       Q.   I've marked as exhibit
6   number one the notice of deposition of
7   Devon International Industries Inc.,
8   formally known as Devon International
9   Trading Inc.  If you can take a look at
10  that, please?
11          On page two there's some
12  topics of inquiry.  Have you reviewed
13  this notice before?
14      A.   Yes, I seen this.
15      Q.   And it's my understanding in
16  talking with your counsel which is here
17  today that you are being tendered as the
18  representative of Devon International
19  Industries Incorporated regarding item
20  number four.  Is that correct?
21      A.   Correct.
22      Q.   Item number four being the
23  manufacture, importation and distribution
24  of Chinese drywall?


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

13

1    A.   Right.
2    Q.   As I ask you questions
3    today, some are going to be general
4    background questions.  If any of my
5    questions you are unable to answer on
6    behalf of Devon, please tell me that.
7    And if you can point out the individual
8    that would be better able to answer that
9    question, I'd anticipate it.
10   A.   Okay.
11       MS. CALDWELL:  And Jonathon,
12   we've reached agreement the
13   deposition you are about to take
14   is of Ms. Wu as the corporate rep
15   for item number four, correct?
16       MR. LAW:  That's correct.
17   As we discussed, I will have some
18   background questions I'd like to
19   ask her and some things that may
20   not fall within item number four
21   but of which she should have
22   knowledge.
23       MS. CALDWELL:  But to the
24   extent they go outside of number

14

1    four, we will adjourn her
2    deposition as the corporate rep
3    and put her up individually if
4    that occurs.
5        MR. LAW:  Sure.  Fair
6    enough.
7    BY MR. LAW:
8    Q.   Where are you currently
9    employed?
10   A.   I work for Devon Medical
11   Products now.
12   Q.   How long have you worked for
13   Devon Medical Products?
14   A.   For three years.
15   Q.   What's your current address,
16   please?
17   A.   Home address?
18   Q.   Yes, ma'am.
19   A.   11216 Valley Forge Circle,
20   King of Prussia, Pennsylvania 19406.
21   Q.   And your date of birth,
22   please?
23   A.   March 7th, '75.
24   Q.   How long have you lived in

15

1    King of Prussia, Pennsylvania?
2    A.   Seven years probably.
3    Q.   Where were you born?
4    A.   I was born in Taiwan.
5    Q.   Walk me through your
6    educational background, please.
7    A.   Sure.  I had my
8    undergraduate in Taiwan.  My major was
9    finance and money and banking, similar to
10   finance.  Then I worked for four years in
11   Taiwan.  Then I came to Philadelphia.  I
12   went to Drexel University and had my
13   M.B.A. degree there.  Then after I
14   graduation I started to work for Devon.
15   Q.   What year did you come to
16   the U.S. to attend Drexel?
17   A.   2001.
18   Q.   Is that the first time
19   you've been to the United States?
20   A.   First time was year 2000
21   came here for two reason.
22   Q.   And what degree did you
23   obtain from Drexel?
24   A.   That was M.B.A. in finance.

16

1    Q.   When did you graduate from
2    Drexel?
3    A.   2003.
4    Q.   Walk me through your
5    employment background, please.
6    A.   Well, when I first started
7    at Devon, I was an intern at Devon IT.
8    Then I transferred to Devon International
9    Trading.  Then around three years ago I
10   started at Devon Medical Products.
11   Q.   Did you start working for
12   Devon IT immediately upon graduation from
13   Drexel?
14   A.   Yes.
15   Q.   Would that have been in
16   2003?
17   A.   Right.
18   Q.   What did you do for Devon
19   IT?
20   A.   I was a marketing intern.  I
21   was there for only three months.  Then I
22   saw Devon International Trading they
23   doing sourcing business between U.S. and
24   China.  I thought I had a better



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

17

1 opportunity there.
2 Q.  Why would you have a better
3 opportunity at Devon International
4 Trading as opposed to Devon IT?
5 A.  Because I can use my
6 language skills because I speak Chinese.
7 Q.  Can you read and write the
8 Chinese language?
9 A.  Yes.
10 Q.  You would be able to
11 translate documents that are written in
12 Chinese to English?
13 A.  Correct.
14 Q.  What year did you begin your
15 employment with Devon International
16 Trading?
17 A.  Same, 2003.
18 Q.  What was your position in
19 2003?
20 A.  I was a project manager.
21 Q.  What were your duties as a
22 project manager?
23 A.  To coordinate between client
24 and our Shanghai office.  So if client

18

1 give us a need, what product they are
2 looking for, then I give the information,
3 I pass the information to our Shanghai
4 office for them to go out and source the
5 product.
6 Q.  How long did you hold the
7 title of project manager?
8 A.  For about one year.
9 Q.  What was the next title you
10 had with Devon International Trading?
11 A.  Then I became the vice
12 president of operations.
13 Q.  What were your duties as
14 vice president of operations?
15 A.  I run the operations.  I
16 have -- I can supervise other project
17 managers.
18 Q.  In 2006 did you hold the
19 title of vice president of operations?
20 A.  Yes.
21 Q.  When did you first obtain
22 that title?
23 A.  You mean from Devon Medical
24 Products or?

19

1 Q.  I want to know when you
2 first obtained the title of vice
3 president of operations for Devon
4 International Trading?
5 A.  That was 2003.  I'm sorry,
6 2003 was project manager.  So one year
7 later it should be 2004.
8 Q.  Who did you report to in
9 2004 at Devon?
10 A.  We have several presidents
11 before Bob Scharf.  There was -- it was
12 Mike Vitten (ph) and there was a Susan
13 McCormick.  She was the COO.  And then
14 there was Ken Macoy (ph) for two weeks.
15 And then there was a Bob Scharf.
16 Q.  When did Mr. Bob Scharf
17 start working for Devon International
18 Trading?
19 A.  I think it was in 2005.
20 Q.  What was his title then?
21 A.  President.
22 Q.  In 2005 did you report to
23 Mr. Bob Scharf?
24 A.  Yes.

20

1 Q.  How long did he hold the
2 title of president?
3 A.  I'm not sure exact time when
4 he started, but he left in February 2007.
5 Q.  So Mr. Scharf was the
6 president of Devon International Trading
7 from 2005 through 2007?
8 A.  Yes.
9 Q.  During that time period you
10 reported to Mr. Scharf?
11 A.  Correct.
12 Q.  Who did he report to at
13 Devon?
14 A.  I would say Dr. John
15 Bennett.
16 MS. CALDWELL:  Don't guess.
17 If you know.
18 THE WITNESS:  Okay.
19 BY MR. LAW:
20 Q.  Well, do you know?
21 A.  He's the president.  He
22 has -- he has some certain right to do
23 things, but the owner of the company is
24 Dr. John Bennett.



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                    February 25, 2011

21

1      Q.   And in 2006 he was the owner
2  of Devon International Trading, wasn't
3  he?
4          MS. CALDWELL:  Object to the
5      form.
6          THE WITNESS:  I'm sorry.
7  BY MR. LAW:
8      Q.   In 2006 Dr. John Bennett was
9  the owner of Devon International Trading?
10     A.   Yes.
11     Q.   When you became vice
12 president of operations in 2004, who
13 worked underneath you?
14     A.   Well, a lot -- we have a lot
15 of Chinese employees.  They already left
16 the company.  So I can't really recall
17 the names.  Sorry.  We have around five,
18 six people at the time.
19     Q.   I'll narrow it down.  In
20 2006 to 2007 how many employees reported
21 to you at Devon International Trading?
22     A.   I don't have the exact
23 number, but I'm thinking that five or six
24 people.

22

1      Q.   And were some of them at the
2  Shanghai office in China?
3      A.   No, Shanghai is a -- is a
4  separate division.
5      Q.   What division is that?
6      A.   They are more like our back
7  office to support U.S. office operation.
8      Q.   So the five to six employees
9  that reported to you from 2006 to 2007,
10 can you give me their names, please?
11     A.   I only know that Amy Lee is
12 still here.  The other people already
13 left.  There might be Xin Jin, X-I-N
14 J-I-N.  That's her name.  And I can't
15 recall the other names.  I'm sorry.
16     Q.   We're going to get to some
17 documents that might reference them
18 later.  What did these employees that
19 reported to you, what were their general
20 duties and responsibilities?
21     A.   Well, our daily operation --
22 the business model for Devon
23 International Trading is we source
24 products for our customers.  So we have

23

1  salespeople going out to talk to
2  customers, and customers may have
3  different products for us to source.  So
4  they will give us specification, what
5  they like, what they want, the quantity.
6  It can be any product.
7          And then we have to narrow
8  down and coordinate with the customer,
9  make to -- and pass that information to
10 the -- to our Shanghai office, to other
11 colleagues.  Then they may come back with
12 questions.  So it's an effort to
13 coordinate between Shanghai office,
14 factory.  First for them to talk to the
15 factories and with our clients.
16     Q.   Is that what you did for
17 Devon International Trading in 2006 to
18 2007 what you just described?
19     A.   Yes.
20     Q.   So you kind of acted as a
21 liaison coordinating with customers of
22 Devon obtaining specifications and
23 quality standards and then coordinating
24 with the Shanghai office that would

24

1  coordinate with the factory.  Is that
2  correct?
3          MS. CALDWELL:  Object to the
4      form.
5          THE WITNESS:  The quality
6      standards are provided by the
7      customers.
8  BY MR. LAW:
9      Q.   Was it one of your jobs to
10 obtain those quality standards and then
11 convey them to the Shanghai office?
12     A.   That's fair to say, yes.
13     Q.   And then would the Shanghai
14 office coordinate with the factories in
15 China to manufacture the products?
16     A.   Yes.
17     Q.   For example, North Pacific
18 was a customer of Devon's in 2006, wasn't
19 it?
20     A.   Yes.
21     Q.   Did Devon import some
22 plywood from North Pacific in 2006?
23     A.   Yes.  2006 -- 2005, between
24 2005 and 2006, yes, we had plywood for



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

25

1  North Pacific.
2      Q.   And did you coordinate with
3  North Pacific to obtain specifications
4  and quality standards from North Pacific
5  for the plywood?
6      A.   They would provide the
7  specifications, yes.
8      Q.   And then would you provide
9  those specifications to Devon's personnel
10 in China?
11     A.   Yes.
12     Q.   And that would be in the
13 Shanghai office?
14     A.   Yes.
15     Q.   And then would the Shanghai
16 office coordinate with the factory in
17 China to manufacture the plywood to those
18 specifications?
19     A.   Yes.
20         MS. CALDWELL:  Object to
21     form.
22 BY MR. LAW:
23     Q.   Is that the normal business
24 model of Devon International Trading in

26

1  2005 to 2006?
2         MS. CALDWELL:  Same
3     objection.
4         THE WITNESS:  Yes, just pass
5     information from customer to the
6     factory.
7  BY MR. LAW:
8      Q.   The drywall we're going to
9  talk about today was brought into the
10 U.S. in May of 2006.  Is that correct?
11     A.   2006, yes.
12     Q.   And around that time period
13 was that the same business model that we
14 just discussed regarding the coordination
15 of specifications and quality standards
16 with the Shanghai office, then
17 coordination from the Shanghai office to
18 the factories in China?
19     A.   Same procedure.
20     Q.   In 2006 can you please
21 provide me the names of the Devon
22 employees that worked out of the Shanghai
23 office?
24     A.   At that time there was

27

1  Salina who she is the officer manager.
2  Julian Chu, he's the project manager.
3  There was Linda Qu, Q-U her last name.
4  And the others are just office staff.
5      Q.   These individuals that you
6  just named, would you coordinate with
7  them regarding the specifications and
8  quality standards of Devon's customers?
9         MS. CALDWELL:  Object to
10     the form.
11         THE WITNESS:  Yeah, I talk
12     to Julian on dry walls.
13 BY MR. LAW:
14     Q.   North Pacific provided Devon
15 with some specifications and quality
16 standards that North Pacific wanted the
17 drywall manufactured to.  Is that
18 correct?
19     A.   Yes.
20     Q.   Did you convey those
21 specifications and quality standards to
22 Julian Chu?
23     A.   I give the information to
24 Julian Chu.

28

1      Q.   What would Miss -- is it
2  C-H-U?
3      A.   Yes.
4      Q.   What would Miss Chu do with
5  that information?
6      A.   He gave the information to
7  the factory.
8      Q.   What's the purpose of
9  obtaining the specifications and quality
10 standards from Devon's customers?
11     A.   We have to because the
12 customers knows what they want.  They
13 always know the products better than us.
14 See, we source many different products.
15 We don't have the expert to be for every
16 product.  So even like you see my
17 background is in finance, Salina was --
18 she went to military school.  Julian was
19 a medical doctor.  We don't have any
20 professionals to exam the product.  So we
21 rely a lot on customer's professionalism
22 because we believe that customers know
23 their product the best.  And we will get
24 the sample produced by the factory for



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

29

1    client to approve.
2          Q.    The specifications and
3    quality standards are provided to Devon
4    so that Devon can give them to the
5    factory and the factory can make the
6    product to those specifications and
7    standards.  Is that right?
8          A.    Yes.
9          Q.    With regard to the drywall,
10   was a North Pacific individual or
11   representative present there in the
12   manufacturing process of the drywall?
13         A.    They didn't go not that I'm
14   aware of.
15         Q.    Clients of Devon such as
16   North Pacific, do they rely on Devon to
17   ensure that the products manufactured in
18   China meet the specifications and quality
19   standards provided?
20         MS. CALDWELL:  Object to the
21   form.
22         THE WITNESS:  Well, I don't
23   know what they rely on, but we
24   rely on the customer to approve

30

1    the samples we provide and that we
2    make the same product as the
3    sample.  So we expect the customer
4    to approve the product.  We don't
5    approve the products on customer's
6    behalf.
7    BY MR. LAW:
8          Q.    Is it the responsibility of
9    Devon to get proper samples to the
10   customers so that the samples can be
11   tested?
12         A.    Well, we give the samples to
13   the customer and customer can do whatever
14   they like.
15         Q.    The customers rely on Devon
16   to provide them with the proper samples
17   so that tests can be run to make sure
18   that the samples meet their specs and
19   quality standards?
20         MS. CALDWELL:  Object to the
21   form.
22         THE WITNESS:  Yes.
23   BY MR. LAW:
24         Q.    Is Devon International

31

1    Trading still doing business?
2          A.    Not that I'm aware of.
3          Q.    What do you do for Devon
4    Medical Products?
5          A.    Devon Medical Products is
6    different.  We will get products from
7    China.  We private label the product, put
8    Devon Medical brand on it and sell in the
9    United States.  And we also have a team
10   of engineers in China to develop our own
11   product.  So we send an American engineer
12   to China to supervise the team.  And we
13   get our own FDA approval and sell the
14   products in United States.
15         Q.    So the medical products are
16   designed and manufactured in China and
17   then imported to the U.S.?
18         A.    Yes.
19         Q.    What do you do for Devon
20   Health?
21         A.    I don't --
22         MS. CALDWELL:  Object to the
23   form.
24         THE WITNESS:  I don't work

32

1    for Devon Health.
2    BY MR. LAW:
3          Q.    Devon Medical Products?
4          A.    I'm the chief operating
5    officer for Devon Medical Products.
6          Q.    What are your duties as the
7    chief operating officer?
8          A.    I supervise the quality
9    department, engineering department,
10   logistic department and the finance, some
11   finance paperwork.
12         Q.    Is Devon Medical a member of
13   the Devon International Group?
14         A.    Devon International Group is
15   fictitious name.  It's a concept.  So
16   it's not really a company or a real
17   group.
18         Q.    I marked as exhibit number
19   two a document obtained off the Internet
20   regarding Devon International Group.  And
21   if you would read that, please, after
22   your attorney looks at it?  What I'm
23   going to ask you to do is read it and
24   tell me if it describes the concept of


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

33

1  Devon International Group.
2      A.   You want me to read the
3  whole paragraph?
4      Q.   Have you reviewed the Devon
5  website before?
6      A.   I've seen this before.
7      Q.   If you would read that and
8  tell me if it describes the concept of
9  the Devon International Group, please?
10         MS. CALDWELL:  We would
11  object to your question as to the
12  form, but also she's not
13  testifying on behalf of Devon
14  International Group.
15         MR. LAW:  That's fine.  This
16  is some of the background
17  questions I told you I would have.
18         THE WITNESS:  The concept is
19  all right, but our marketing did
20  this.  It hasn't been updated for
21  a while.
22  BY MR. LAW:
23      Q.   Okay.  Was this the same
24  concept back in 2006 of Devon

34

1  International Group?
2         MS. CALDWELL:  Same
3  objection.  Object to form.
4         THE WITNESS:  I don't know
5  if there was a Devon International
6  Group at the time.
7  BY MR. LAW:
8      Q.   Who designs these websites
9  for Devon?
10      A.   We have a marketing
11  department.
12      Q.   Can you tell me the names of
13  the individuals in the marketing
14  department, please?
15      A.   The department head is
16  Darren Bejuniak, and under him there are
17  company product managers and designers,
18  graphic designers.
19      Q.   Do you know any of their
20  names?
21      A.   They change frequently.  Now
22  there's a Chris Dubacheck (ph) and Tina
23  -- I don't know her last name in the
24  graphic designers.

35

1      Q.   And these graphic designers
2  and individuals you named, they are
3  employed by Devon?
4      A.   They are -- they belong to
5  Devon Professional Services Group, I
6  believe.
7      Q.   And they would be the ones
8  that would design these web pages?
9      A.   Yes.
10      Q.   Now, in 2006 you worked for
11  Devon International.  Is that right?
12         MS. CALDWELL:  Object to the
13  form.
14         THE WITNESS:  2006 I work
15  for Devon International Trading.
16  BY MR. LAW:
17      Q.   Exhibit number three is
18  another document off the website.  This
19  one is from Devon International.  And
20  tell me if you need a break at any time.
21  We can stop anytime you need to.
22      A.   I believe this is another
23  company, Devon International Inc.
24      Q.   Devon International Inc.?

36

1      A.   Yes.
2      Q.   At some point in time Devon
3  International Inc. became Devon
4  International Trading, didn't it?
5      A.   No, different company.
6      Q.   What's Devon International
7  Inc. do?
8      A.   It focus on the packaging
9  material, mainly bottles, glass bottles.
10      Q.   Does Devon International
11  Inc. manufacture glass bottles in China
12  and import them to the U.S.?
13         MS. CALDWELL:  Object to the
14  form.
15         THE WITNESS:  We don't have
16  the factory.  We don't own a
17  factory.  Customer give us the
18  drawings, specifications, and we
19  give it to the glass factory and
20  make a bottles.
21  BY MR. LAW:
22      Q.   The specifications provided
23  by the customer to Devon are then
24  provided to the Shanghai office.  Is that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                    February 25, 2011

37

1  correct?
2      A.   Yes.
3      Q.   Is it the Shanghai office
4  that goes out and finds the factory to
5  manufacture the bottles or the products
6  to those specifications?
7      A.   Yes.
8      Q.   And in paragraph number one
9  it says Devon International is an
10 American company based in King of
11 Prussia, Pennsylvania that specializes in
12 developing relationships and sourcing and
13 manufacturing products in China.
14         What products does Devon
15 International manufacture in China?
16     MS. CALDWELL:  Same
17         objection as before.  She's not
18         offered as a corporate rep for
19         Devon International.
20         THE WITNESS:  We --
21         manufacturing, we don't own any
22         factory in China.  So -- but for
23         advertisement purpose we say
24         manufacturing, but we don't own

38

1         any factories there.
2  BY MR. LAW:
3      Q.   Who owns the factory where
4  the glass bottles are manufactured?
5      A.   Who owns the factory?
6      Q.   Yes, ma'am.
7      A.   A Chinese owner.  I haven't
8  seen the person.
9      Q.   The specifications that are
10 provided to Devon and then provided to
11 the Shanghai office are provided to the
12 factory to ensure that the product is
13 made to those specifications.  Is that
14 correct?
15     A.   Yes.
16     Q.   And is that what you are
17 referring to here by sourcing and
18 manufacturing products in China?
19         MS. CALDWELL:  Object to the
20         form.  She's not testifying on
21         behalf of Devon International.  So
22         when you say you, that's the basis
23         for my objection.
24         THE WITNESS:  Well, I think

39

1      I explained that we source and we
2  say manufacturing, but we don't --
3  we don't really manufacturing --
4  we don't really manufacture on our
5  own.
6  BY MR. LAW:
7      Q.   Who currently works for
8  Devon International?
9      A.   Well, currently we only
10 probably put two people, the two head
11 accounts under Devon International.  I'm
12 thinking Jeff Lu and Amy Lee probably
13 only two of them, but the company is not
14 very -- is not very active.
15     Q.   Who does Miss Amy Lee and
16 Jeff Lu report to?
17     A.   No one.  It's just two
18 people.  We put two people under Devon
19 International.
20     Q.   But don't they have a
21 supervisor?
22     A.   The company is not much
23 active right now.
24     Q.   The company used to be

40

1  active, didn't it?
2      A.   We had some bottle business.
3  We thought it could take off but it
4  didn't.
5      Q.   When you had the bottle
6  business, who did Amy Lee and Jeff Lu
7  report to?
8      A.   At that time they would talk
9  to me, but they talked to either me or
10 Dr. Bennett.
11     Q.   And the second paragraph
12 says since 2005 Devon International has
13 established expertise in a variety of
14 manufacturing sectors.  Which
15 manufacturing sectors did Devon
16 International have expertise in?
17     MS. CALDWELL:  Object to the
18         form.
19         THE WITNESS:  Well, it's an
20         advertisement way to express, but
21         for this website we wanted to
22         solicit some business for bottles
23         and maybe paper bags and the
24         package for containers, that kind



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                February 25, 2011

41

1  of product.
2  BY MR. LAW:
3      Q.   In 2005 Miss Amy Lee and
4  Jeff Lu would have reported to you?
5      A.   Yeah, they would talk to me,
6  yes.
7      Q.   And then you would have
8  reported to --
9      A.   Wait a minute.  It says
10  2005.  I don't know why they put 2005.
11      Q.   Why is that?
12      A.   Because Devon International
13  didn't start until 2007 or 2008.
14      Q.   You said this is an
15  advertisement?
16      A.   Yes.
17          MS. CALDWELL:  Object to the
18      form.
19          THE WITNESS:  Marketing put
20      this up.
21  BY MR. LAW:
22      Q.   To advertise to customers
23  that Devon could perform these services?
24      A.   Yes.

42

1          MS. CALDWELL:  If you know,
2      Ruth.
3          THE WITNESS:  Well, I don't
4      know.  I didn't take a deep look
5      into this until now.
6  BY MR. LAW:
7      Q.   Well, you are the vice
8  president of operations for or were the
9  vice president of operations for Devon
10  International Trading.  Is that correct?
11      A.   Yeah, at the time for 2006,
12  yes.
13      Q.   And what's the purpose of
14  these advertisements that Devon puts out
15  on the Internet?
16          MS. CALDWELL:  Same
17      objection.
18          THE WITNESS:  Well, they --
19      the purpose for any sort of
20      advertisement is to get business I
21      guess.
22  BY MR. LAW:
23      Q.   Sure.  And to advertise the
24  services that Devon can provide?

43

1          MS. CALDWELL:  Object to the
2      form.
3          THE WITNESS:  Yeah.
4  BY MR. LAW:
5      Q.   Devon International Trading
6  Inc. became Devon International
7  Industries Incorporated.  Is that
8  correct?
9      A.   That's my understanding.
10      Q.   The name changed?
11      A.   Yeah.
12      Q.   Do you know when that name
13  change occurred?
14      A.   I'm not sure the exact time.
15      Q.   Just give me a year?
16      A.   Say 2007 or 2006.  Either
17  2006 or 2007.
18      Q.   At that point in time were
19  you the vice president of Devon
20  International Trading Incorporated?
21      A.   Yes.
22      Q.   And when Devon International
23  Trading Incorporated became Devon
24  International Industries Incorporated,

44

1  did you maintain your position as vice
2  president of operations?
3      A.   Yes.
4      Q.   And during that change Mr.
5  Bob Scharf was still the president,
6  wasn't he?
7      A.   Yes.
8      Q.   Exhibit number four which
9  your counsel is looking at is another
10  document off the website of Devon.  Who
11  worked for Devon Building Products?
12      A.   No one.  It's a fictitious
13  name.
14      Q.   Have you reviewed this web
15  page before?
16      A.   No.  I'm surprised that it's
17  still there.
18      Q.   Why is that?
19      A.   Because we haven't used
20  Devon Building Products for a long time.
21      Q.   Devon Building Products was
22  a name used by one of the Devon entities
23  to market building products, wasn't it?
24      A.   It was Devon International



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                    February 25, 2011

45

1  trading.
2      Q.   So Devon International
3  Trading Incorporated used the name Devon
4  Building Products to market and sell its
5  building products?
6      A.   Sometimes.  I don't know.
7  It was Bob Scharf's idea that he came up
8  this name, but I don't -- I don't use it
9  much.
10     Q.   When did Mr. Scharf come up
11 with the name Devon Building Products?
12     A.   I'm not sure.
13     Q.   What was the purpose of
14 coming up with the name Devon Building
15 Products?
16     A.   I don't know.  You have to
17 ask him.
18     Q.   Looking at exhibit number
19 four it says Devon Building Products is a
20 leading supplier of building materials
21 that have been used in the construction
22 of homes and businesses across America
23 since its inception in 2002.
24     Is that when Devon Building

46

1  Products or Devon began using the name
2  Devon Building Products was in 2002?
3      MS. CALDWELL:  Object to the
4  form.
5      THE WITNESS:  No, marketing
6  put it that way, but, no, it
7  wasn't started from 2002.
8  BY MR. LAW:
9      Q.   When did Devon start using
10 the name Devon Building Products?
11     A.   Probably use it in 2005 a
12 little bit for the coil nails.
13     Q.   For the nails?
14     A.   Coil nails.
15     Q.   Coil nails.  Who was the
16 customer of Devon for the coil nails?
17     A.   Who are the customers?
18     Q.   Yes, ma'am.
19     A.   I don't know the names.  We
20 sell to Florida to Al Perna.  Some here
21 to John Perna.  And the rest are just
22 some roofers.
23     Q.   What other products did
24 Devon market under the name Devon

47

1  Building Products?
2      MS. CALDWELL:  Object to the
3  form.  When you say Devon, who are
4  you referring to, which Devon?
5      THE WITNESS:  Devon, we
6  would put this more on the
7  packaging, the shipping protecter
8  of the drywalls.  I seen that,
9  make some binders.  Other than
10 that I haven't seen this logo for
11 a while.
12 BY MR. LAW:
13     Q.   These web pages were
14 designed for marketing and advertising
15 purposes, weren't they?
16     A.   Yes.
17     Q.   And did Devon market and
18 advertise these coil nails in 2005 under
19 the trade name Devon Building Products?
20     MS. CALDWELL:  Object to the
21 form.
22     THE WITNESS:  I'm not sure
23 what we put on the box.  Sometimes
24 it's -- sometimes it's base on

48

1  customer wants to put their name.
2  Sometimes just blank.  We even
3  came up with the other names like
4  something called Eagles Nails,
5  something like that.
6  BY MR. LAW:
7      Q.   Mr. Scharf was the president
8  in '05 when these coil nails were
9  marketed under the name Devon Building
10 Products?
11     A.   Yeah, I wasn't sure how much
12 we use Devon Building Products.
13     Q.   There's some items listed on
14 Exhibit-4.  It says quality assurance at
15 our manufacturing facilities ensures your
16 confidence in our products.  And then it
17 lists Devon Building Products quality
18 plywood, fasteners, fire treated lumber,
19 windows, patio doors and drywall.  Do you
20 see that?
21     A.   Uh-huh.
22     Q.   You're going to have to say
23 yes for the court reporter.
24     A.   Yes, I'm sorry.



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                           February 25, 2011

49

1      Q.   Devon International
2   manufactured and imported some windows
3   from Miami Dade County.  Is that right?
4           MS. CALDWELL:  Object to the
5   form.
6           THE WITNESS:  The hurricane
7       windows for Miami was based on
8       Miami specifications.  Because for
9       hurricane windows they have
10      specific designs that we have
11      to -- we have to be compliant.
12  BY MR. LAW:
13      Q.   Were those windows marketed
14  under the trade name Devon Building
15  Products?
16      A.   I don't think so.
17      Q.   What company -- which of
18  these Devon companies manufactured the
19  windows?
20          MS. CALDWELL:  Object to the
21      form.  Misstates previous
22      testimony.  She's already
23      testified they don't manufacture.
24          MR. LAW:  Usual

50

1       stipulations.
2           MS. CALDWELL:  I know, but
3       you keep asking it.
4           MR. LAW:  I'm reading what
5       the document says.
6           MS. CALDWELL:  That she's
7       explained.
8           THE WITNESS:  Well, Devon
9       International Trading took the
10      order from Miami Wall.
11  BY MR. LAW:
12      Q.   So Devon International
13  Trading took the order from Miami Wall
14  for the manufacture of windows?
15      A.   Yeah, but we don't own the
16  window factory.  We went to a window
17  factory.
18      Q.   In China?
19      A.   In China.
20      Q.   And that's where the windows
21  were manufactured?
22      A.   Yes.
23      Q.   And then Devon took those
24  windows and put them on a ship and

51

1   imported them to the U.S.?
2       A.   Yes.
3       Q.   Those windows were
4   manufactured to specific specifications
5   of Devon's customer, weren't they?
6       A.   They are.
7       Q.   Did Devon ever test any of
8   those windows?
9       A.   No, we didn't.
10      Q.   Did the customer test them?
11      A.   Had to -- then the customer
12  tested the windows.
13      Q.   Are those the windows that
14  were involved in the litigation in which
15  you gave a deposition?
16      A.   Yes.  There was a
17  deposition, but the deposition was
18  because we did the windows but the
19  customer didn't pay.  They didn't want to
20  pay for it.  So the customer lost the
21  suit and had to pay us and also various
22  other franchise for the windows.
23      Q.   Did the customer give a
24  reason for not paying?

52

1       A.   I don't know why they didn't
2   pay.
3       Q.   The coil nails we talked
4   about, did Devon International Trading
5   take the order from the customer for the
6   manufacture and importation of the coil
7   nails?
8       A.   Yeah, took -- yeah, we took
9   order from customer and place order to
10  the factory.
11      Q.   And those nails were made to
12  specific specifications of the customers?
13      A.   Yes.  Also the customers
14  when they take the coil nails they would
15  put in the nail gun and test the nails.
16      Q.   Looking at Exhibit-4, that's
17  what's referred to here as fasteners.
18  Would that be a coil nail?
19      A.   Yes, fasteners means the
20  nails.
21      Q.   We've talked about windows.
22  Let's talk about plywood.  Did Devon
23  International have a customer that placed
24  an order for plywood?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                    February 25, 2011

53

1    A.   Yes.
2    Q.   And did Devon International
3  obtain a factory in China to manufacture
4  that plywood to specific specifications?
5    A.   Yes.
6    Q.   Then Devon would put it on a
7  boat and import it to the U.S.?
8    A.   Yes.
9    Q.   All right.  Lumber on
10 Exhibit-4, did Devon take an order or
11 Devon International Trading take an order
12 from a customer for the manufacture and
13 importation of lumber?
14   A.   We didn't do fire treated
15 lumber.
16   Q.   Did you do any lumber that
17 was not fire treated?
18   A.   No.
19   Q.   Patio doors, did Devon
20 International Trading take an order for
21 the manufacture and importation of patio
22 doors for a customer?
23   A.   I think that's in the order
24 it was windows and doors.

54

1    Q.   Were those aluminum doors
2  and windows?
3    A.   I'm not sure.  I didn't look
4  at the material.
5    Q.   And the drywall referenced
6  on Exhibit-4, Devon took an order for
7  North Pacific for the manufacture and
8  importation of drywall.  Is that correct?
9    A.   We took order from North
10 Pacific, yeah.
11   Q.   The quality assurance
12 referred to on Exhibit-4 at the
13 manufacturing facilities, who in China
14 would have been responsible for
15 overseeing the quality assurance at the
16 manufacturing facilities?
17   A.   We -- the only thing we do
18 is we send Julian out to the facilities,
19 but he doesn't know the products.  So he
20 sees the factory, just to see their
21 location, see the people.  But this is
22 more for advertisement that we said -- I
23 don't know why we say that there, but I
24 think it's more for advertisement

55

1  purpose.
2    Q.   Advertising and marketing
3  that Devon has quality assurance at its
4  manufacturing facilities?
5    A.   Well, like we don't even --
6  we don't own the manufacturing
7  facilities.
8    Q.   You said Julian.  Is that
9  Julian Chu?
10   A.   Chu.
11   Q.   And Julian Chu works out of
12 the Shanghai office?
13   A.   Yes.
14   Q.   Did Mr. Chu work out of the
15 Shanghai office in 2006 when the drywall
16 was imported to the U.S.?
17   A.   Yes.
18   Q.   Who else worked out of the
19 Shanghai office during that time period?
20   A.   Salina Liu, L-I-U and Linda
21 Qu, Q-U.
22   Q.   Salina Liu and what was the
23 other one?
24   A.   Linda Qu, Q-U.

56

1    Q.   Would those be the three
2  individuals that you would coordinate
3  with and provide the specifications and
4  quality standards to in China?
5    A.   For drywall it was only
6  Julian.
7    Q.   Mr. Bob Scharf he went to
8  China to the factories where the drywall
9  is manufactured, didn't he?
10   A.   He did.
11   Q.   Dr. John Bennett also went
12 to China where the drywall is
13 manufactured, didn't he?
14   A.   Yes, he did, too.
15   Q.   And Mr. Chu would have been
16 living in Shanghai during the
17 manufacturing process?
18   A.   Yes, and he travels to the
19 -- between the factory and Shanghai
20 office.
21   Q.   Now, the drywall is
22 manufactured in the Shandon (ph)
23 Providence?
24   A.   Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

57

1    Q.   How far is that from Mr.
2  Chu's Shanghai office?
3    A.   Let's say if Shandon is in
4  Long Island or New York, then Shanghai is
5  like in South Carolina.
6    Q.   I'm from South Alabama so
7  that's -- so it's several hours apart.
8    A.   I don't know how much travel
9  it takes because I've never been to
10  Shandon.
11    Q.   During the manufacturing
12  process of the drywall, did Mr. Julian
13  Chu go to the factory to make sure the
14  drywall was being made in accordance with
15  North Pacific standards?
16    MS. CALDWELL:  Object to the
17    form.
18    THE WITNESS:  I don't know
19    at what point North Pacific
20    provide the quality standards.  He
21    was there to see the progress, how
22    many sheets they made.  And then
23    we send a sample to North Pacific
24    for Jay Buckley to approve.

58

1  BY MR. LAW:
2    Q.   Do you know what size those
3  samples were?
4    A.   They are four by 12.
5    Q.   Devon never sent a full size
6  sample of the drywall to North Pacific
7  prior to manufacturing it, did they?
8    A.   We didn't need to.
9    Q.   So that's a no?
10    A.   No, we didn't.  We didn't
11  send a full sheet.
12    Q.   So three full size sheets
13  were never provided to North Pacific for
14  testing.  Is that correct?
15    A.   Not that I was aware of.  We
16  sent a small piece, but the same thing
17  that you don't need a whole sheet to test
18  the product.
19    Q.   Have you ever witnessed an
20  ASTM test performed on drywall?
21    A.   No.
22    Q.   Exhibit number five is
23  essentially the same document as exhibit
24  number four but it's from 2006.

59

1    MS. CALDWELL:  We just
2    object.  We don't know that it's
3    from 2006.
4  BY MR. LAW:
5    Q.   If you look right under
6  where it says Devon International Group
7  and tell me what the copy write date is
8  please on exhibit number five?
9    A.   It says 2006, but I don't
10  know how you can print out in 2011 for
11  2006.
12    Q.   Have you ever used an
13  Internet archive cite?
14    A.   Oh, no.
15    Q.   Did you review this website
16  when it was created?
17    A.   I don't know when they put
18  that up because I still didn't go to
19  Devon International Group website.  I
20  don't know when they put that up.
21    Q.   The individuals we discussed
22  earlier that do the marketing and the IT
23  department you discussed, would those
24  have been the same individuals that would

60

1  have created exhibit number five?
2    A.   Yeah, I think Darren was
3  there at the time, Darren Bejuniak.
4    Q.   And one of his
5  responsibilities would be designing these
6  web pages for marketing purposes for
7  Devon?
8    A.   Yes.
9    Q.   Does Dr. Bennett to your
10  knowledge he's the president of --
11    A.   He's the owner.
12    Q.   He's the owner of the Devon,
13  various Devon companies?
14    A.   Right.
15    Q.   He'd be the owner of Devon
16  International Trading Incorporated?
17    A.   He was, yes.
18    Q.   He's the owner of Devon
19  International Industries Incorporated?
20    A.   Yes.
21    Q.   Is there a difference
22  between Devon Health Services Inc. and
23  Devon Medical Products that you currently
24  work for?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                                    February 25, 2011

61

1       A.    Different.
2       Q.    Because they are two
3    different companies?
4       A.    Very different, yes.
5       Q.    Is Dr. Bennett the owner of
6    Devon Health Services Incorporated?
7       A.    Yes.
8       Q.    He's also the owner of Devon
9    Medical?
10      A.    Yes.
11      Q.    What does Devon Office
12   Furniture do?
13      A.    Well, they sell office
14   cubicles to my knowledge.  I'm not
15   involved in Devon Office Furniture.
16      Q.    Do you know if Devon Office
17   Furniture designs and manufactures office
18   furniture as exhibit number six says?
19      MS. CALDWELL:  Object to the
20   form.
21      THE WITNESS:  Well, I am not
22   involved in Devon Office Furniture
23   so I don't know.
24   BY MR. LAW:

62

1       Q.    Who would be the president
2    of Devon Office Furniture?
3       A.    I don't know.  Right now
4    could be Al Perna.
5       Q.    Al Perino (ph)?
6       A.    Al Perna.
7       Q.    Have you ever acted as a
8    liaison between a customer and the
9    Shanghai office for the manufacture and
10   importation of office furniture?
11      A.    I only had very, very little
12   involvement in the beginning, but I don't
13   know much about their operation.
14      Q.    You say in the beginning,
15   what year would that have been?
16      A.    I don't know what year they
17   started, 2009, 2009 probably.
18      Q.    How many employees work out
19   of the -- currently work out of the King
20   of Prussia office?
21      A.    How many employees in total?
22      Q.    Yes, ma'am.
23      A.    I don't have the exact
24   number, roughly 100.

63

1       Q.    In 2006 approximately how
2    many employees worked for these Devon
3    companies?
4       A.    I don't know.
5       Q.    Would have been roughly the
6    same number?
7       A.    Maybe more at the time.
8       Q.    More than 100?
9       A.    More than 100.
10      Q.    When did Devon International
11   Industries Incorporated, when did they
12   stop doing business?
13      A.    I don't know.  After the
14   drywall, the company didn't have much --
15   many activities.  So I don't know the
16   exact time.  They just faded off.
17      Q.    Would that have been around
18   2007, 2008?
19      A.    2007.
20      Q.    These other employees that
21   reported to you that we discussed
22   earlier, do any of those still work for
23   any of the Devon companies?
24      A.    Only Amy Lee here.

64

1       Q.    And does she work out of the
2    King of Prussia office?
3       A.    Yes.
4       Q.    Does she speak Chinese?
5       A.    Yes.
6       Q.    Anybody else that worked for
7    the Devon companies that speaks Chinese
8    besides yourself and Miss Lee?
9       A.    We have other new employees,
10   but they don't have any knowledge.  They
11   are fairly new in the past two years.
12      Q.    And what company do they
13   work for?
14      A.    Devon Medical Products.
15      Q.    That would be for the design
16   -- that's the company that designs and
17   manufactures medical products in China?
18      A.    Yeah, we design and we do
19   take ownership for the products.
20      MR. LAW:  I want to take a
21   quick break.
22      THE VIDEOTAPE TECHNICIAN:
23   Going off the record.  The time on
24   video is 10:34.



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

65

1            - - -
2        (Whereupon, a brief recess
3    was taken.)
4            - - -
5        THE VIDEOTAPE TECHNICIAN:
6    We're now back on the record.  The
7    time on video is 10:49.
8    BY MR. LAW:
9        Q.   Miss Wu, we talked about
10   Julian Chu.  Is Mr. Chu, was he a project
11   manager for Devon?
12       A.   Yes.
13       Q.   What does a project manager
14   do?
15       A.   Because he's based in
16   Shanghai, so he receive the information
17   we pass from the customer and then he
18   will start to contact various factories
19   and then see which factories can take
20   this order for us.
21       Q.   Is that what he did with
22   respect to the drywall?
23       A.   Yes.  So he coordinates with
24   the factory and we coordinate with the

66

1    client.
2        Q.   Let me show you exhibit
3    number seven.  There's a series of
4    E-mails between you and Mr. Scharf and
5    Jay Buckley.
6        A.   What is your question?
7        Q.   Yes, ma'am.  I was waiting
8    until you were done.
9            Was Mr. Buckley employed by
10   North Pacific?
11       A.   Yes.
12       Q.   What was his role with
13   respect to the drywall?
14       A.   He's the main contact that
15   I've seen on E-mail, but I don't know his
16   job function.
17       Q.   Did you coordinate with Mr.
18   Buckley via E-mail regarding the drywall
19   that Devon was importing for North
20   Pacific?
21       A.   Yeah, I send him some
22   E-mails.
23       Q.   And Mr. Scharf, he would
24   carbon copy you on some E-mails to Mr.

67

1    Buckley, wouldn't he?
2        A.   Yes, Bob Scharf is our main
3    contact with Jay Buckley.
4        Q.   Was that the normal business
5    practice of Devon for Mr. Scharf to copy
6    you on some E-mails between him and his
7    customer Mr. Buckley?
8        A.   Whenever he feels
9    comfortable to copy me on the E-mail.
10       Q.   When you'd receive these
11   E-mails, you would read them, wouldn't
12   you?
13       MS. CALDWELL:  Object to the
14   form.
15       THE WITNESS:  I'm supposed
16   to read the E-mail.
17   BY MR. LAW:
18       Q.   And that's part of one of
19   your duties at Devon, isn't it?
20       A.   I would read the E-mail,
21   yeah.
22       Q.   If you look at the first
23   E-mail on the page that would be the
24   bottom one dated January 19th, 2006.  It

68

1    refers to Dr. Bennett visiting China.  It
2    says if product is good we will get the
3    other dom (sp).  They will make according
4    to our spec.  Do you see that?
5        A.   Where?
6        Q.   On the very bottom E-mail?
7        A.   I don't see that.
8        Q.   I apologize.  I gave you the
9    second page of mine.  Let me try to do it
10   this way.  I think I gave you the wrong
11   one.  Bear with me for a moment, please.
12           Yeah, that's correct.  The
13   very bottom E-mail here from Mr. Bob
14   Scharf to Jay Buckley and copied to you
15   on January 19th.
16       A.   I don't know what he meant.
17       Q.   Did Devon obtain
18   specifications from North Pacific to
19   provide to the Shanghai office for the
20   manufacture of the drywall?
21       MS. CALDWELL:  Object to the
22   form.
23       THE WITNESS:  The
24   specifications were provided by



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                        February 25, 2011

69

```
 1      Nor Pac, yeah.
 2  BY MR. LAW:
 3      Q.   Did Dr. Bennett and Mr.
 4  Scharf go to China for the purpose of
 5  finding a factory that could make the
 6  drywall to these specifications?
 7      A.   Not by Dr. Bennett or Bob
 8  Scharf.  Julian went to find the factory.
 9      Q.   When did Dr. Bennett go to
10  China?
11      A.   Before the boat shipped, I
12  don't know the exact time frame.
13      Q.   Did Bob Scharf go to China
14  to inspect some factories prior to
15  placing an order for the production of
16  the drywall?
17      MS. CALDWELL:  Object to the
18  form.
19      THE WITNESS:  Well, for Dr.
20  Bennett and Bob Scharf they went
21  -- when they went to the
22  factories, they pretty much to see
23  the environment and see who they
24  do business with and see those are
```

70

```
 1      the pallets of our drywalls, but
 2      they didn't do due diligence, that
 3      kind of work.
 4  BY MR. LAW:
 5      Q.   Is that what Mr. Julian Chu
 6  would have done?
 7      A.   Julian, he coordinates the
 8  orders, but many -- as soon as the
 9  customer says the samples are good then
10  that's approval.  That's an okay from the
11  customer.
12      Q.   Would Mr. Julian Chu do the
13  due diligence on behalf of Devon?
14      A.   No.  The explanation for due
15  diligence that for vendor survey or
16  questionnaire, no.  He didn't do that.
17  He -- what he did is to see if the
18  factory at the time to see if the factory
19  has the capacity to make a boat load of
20  drywall.  That's what he did.
21      Q.   In this E-mail on the bottom
22  of the page it says they will make
23  according to our spec.  Is that the
24  specifications we've been talking about?
```

71

```
 1      MS. CALDWELL:  Objection to
 2      the form.  She's already answered
 3      the question you asked earlier
 4      about the E-mail.
 5      THE WITNESS:  I think -- it
 6      reads to me that Bob Scharf is
 7      saying -- he say our spec he means
 8      Jay Buckley's specs.  That's how I
 9      read it, but you have to ask Bob.
10  BY MR. LAW:
11      Q.   And I'll ask Bob, but how
12  does Devon know which factories can make
13  the drywall to the specifications of its
14  customers?
15      A.   We don't know.  So we
16  provide the samples for the customer to
17  confirm.
18      Q.   And that's the -- what size
19  sample was provided?
20      A.   Wasn't sure the size.  I
21  don't remember.
22      Q.   If you look at the middle
23  E-mail that was copied to you from Mr.
24  Buckley to Bob Scharf.  In the middle of
```

72

```
 1  the E-mail it requests a material safety
 2  data sheet.  Do you know what an MSDS
 3  sheet is, don't you?
 4      A.   Yes.
 5      Q.   And in part of -- is it one
 6  of your duties at Devon to obtain
 7  documents such as MSDS sheets from these
 8  factories in China and provide it to the
 9  customers at Devon?
10      A.   If there is an MSDS we will
11  provide.
12      Q.   And North Pacific requested
13  an MSDS sheet, didn't they?
14      A.   Yeah.  I think factory
15  provided some sort of sheet, but I never
16  look into the details because I cannot
17  understand those language.  So I have to
18  give it to Jay Buckley.
19      Q.   Was this sheet in Chinese?
20      A.   It was Chinese and English.
21      Q.   Mr. Buckley, he didn't speak
22  or read or write Chinese, did he?
23      A.   No, but I remember there was
24  some sheet in both Chinese and English
```



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

73

1   that was sent to Jay Buckley.  I wasn't
2   sure whether that was the MSDS sheet he
3   refers here.
4       Q.   But you didn't review the
5   MSDS sheet?
6       A.   No.
7       Q.   Did anybody at Devon review
8   that sheet?
9       A.   I don't think so.  We cannot
10  understand what it means on the sheet.
11      Q.   Mr. Buckley also requested a
12  letter specifying ASTM standards.  Did
13  you ever obtain such a letter?
14      A.   We did not have that letter,
15  not that I'm aware of.
16      Q.   Devon never obtained the
17  letter specifying the ASTM standards of
18  the drywall, correct?
19      A.   No.
20      Q.   Is that a correct statement?
21      A.   I don't know if there was a
22  letter saying ASTM standards.
23      Q.   You never saw one?
24      A.   No, I didn't see any to

74

1   clarify.
2       Q.   Mr. Buckley also requested
3   samples of the product and we talked
4   about that.  How many samples were
5   provided?
6       A.   I don't remember.  I know I
7   must have sent or somebody must have sent
8   samples.  We would never produce without
9   customer's approval.
10      Q.   The E-mail above, the one we
11  just discussed is from Mr. Buckley back
12  to you and Bob Scharf.  And he says that
13  he wanted five -- he meant to say five
14  boats.  Did North Pacific want to
15  purchase five boats similar in size to
16  the Sanko Rally full of drywall?
17      A.   I heard they planned to buy
18  a lot.  There were even discussion of 18
19  boats, but it never happened.  They can
20  say whatever number they think it could
21  happen.
22      Q.   And when you say boat,
23  that's a cargo ship like the Sanko Rally?
24      A.   Yes, they called bregg (sp)

75

1   bulk.
2       Q.   Why did it never happen?
3       A.   Because the first one didn't
4   go so well.
5       Q.   To your knowledge did Mr.
6   Scharf or Mr. Chu find a factory that
7   could make the drywall to the
8   specifications that North Pacific
9   requested?
10      A.   Did they find a factory?
11  Well, at the time we -- what we did is to
12  find the factory that has the capacity to
13  make the big volume in the short period
14  of time.  As far as the specs all we can
15  do is send samples for Nor Pac to
16  approve.
17      Q.   You never went to China
18  during the process of manufacturing or
19  importing drywall, did you?
20      A.   I didn't.
21      Q.   Did anybody else from Devon
22  besides Dr. Bennett and Mr. Scharf?
23      A.   No.
24      Q.   Let me show you exhibit

76

1   number eight.  There's an E-mail towards
2   the top third of the page from Mr.
3   Buckley that references the spec sheet
4   from the factory.
5       MR. ROBERTSON:  Jonathon,
6   what date is that?
7   BY MR. LAW:
8       Q.   January 22nd, 2006.  The
9   E-mail I'm going to ask you about is the
10  one dated January 20th, 2006 from you to
11  Mr. Buckley.  You reference the spec
12  sheet from the factory and a weight and
13  size of the drywall.  Is that correct?
14      A.   Yeah.  That's what it says
15  here.
16      Q.   Who at the factory did you
17  obtain the spec sheet from?
18      A.   Well, it was January 20th.
19  So I wasn't sure if that's the one that
20  made the drywall for this order, but at
21  that time we were confirming the -- how
22  many sheets per bundle so the truck can
23  handle.  There's more for logistic
24  question.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

77

1    Q.   But you obtained a spec
2  sheet from the factory to determine this
3  information, didn't you?
4    A.   That's what I said here.
5    Q.   Did you obtain spec sheets
6  from several different factories?
7    A.   We looked for like six
8  factories in the beginning.  So I wasn't
9  sure -- I'm not sure which factory I
10  refer here.
11    Q.   And who is we?  Did somebody
12  else assist you in looking for these six
13  factories?
14    A.   Who is waiting for the
15  decision or?
16    Q.   You said we looked for six
17  factories.  Did somebody assist you in
18  looking for these six factories?
19    A.   I'm sorry.  Can you say that
20  again?
21    Q.   Did somebody else at Devon
22  in addition to yourself look for the six
23  factories?
24    A.   Julian, yes.

78

1    Q.   So Julian Chu would have
2  been assisting in China in locating the
3  six factories that could make it to the
4  specifications?
5    A.   Yeah, I search online.  I
6  saw some information of the factories
7  that they put online and then have Julian
8  to go talk to these factories.
9    Q.   And you obtain spec sheets
10  from some of these factories?
11    A.   Yeah, they provide samples
12  and some provide spec sheets, but I don't
13  remember that much of that process.
14    Q.   Did you maintain a record?
15  Did you keep these spec sheets?
16    A.   No.  No, I didn't.
17    Q.   What type of information
18  would they provide?
19    A.   I don't remember.  In this
20  case we were talking about the weight.
21    Q.   Weight was an issue with
22  North Pacific, wasn't it?
23    A.   Yeah, we were talking about
24  if too heavy per bundle then the truck

79

1  won't be able to handle it.
2    Q.   Were you and Mr. Chu looking
3  for a factory that could make the
4  drywall, manufacture it to a specific
5  weight?
6    A.   No.  It just factory provide
7  what they have, and I needed Jay Buckley
8  to say that's fine or not.
9    Q.   If you look at exhibit
10  number nine, the bottom E-mail from Mr.
11  Buckley back to you.  He says this is
12  really heavy.  We have to see how our
13  customers respond.  And he goes on to
14  describe troubles they could have if the
15  drywall is too heavy.
16         What did you and Mr. Chu do
17  to try to find a factory that could make
18  drywall that wasn't as heavy as the one
19  that you provided the spec sheet on
20  previously?
21         MS. CALDWELL:  Object to the
22    form.
23         THE WITNESS:  I didn't think
24    we make any change.  He only say

80

1         that so we need a smaller bundle
2         instead of putting too many sheets
3         per bundle.
4  BY MR. LAW:
5    Q.   So you make the bundle --
6  put less sheets in the bundle to make the
7  actual bundle itself weigh less?
8         MS. CALDWELL:  Object to
9    form.
10         THE WITNESS:  That's what it
11    says here.
12  BY MR. LAW:
13    Q.   And is that something that
14  Mr. Chu would have been doing on the
15  ground in China for Devon is finding --
16  coordinating with the factory to make
17  sure they put less sheets in a bundle?
18    A.   He can count.  He can count
19  how many sheets per bundle, yeah.
20    Q.   My question is was he the
21  individual on behalf of Devon on the
22  ground of the factory in China that would
23  have coordinated making sure that there
24  weren't too many sheets in the bundle?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

81

1      A.   Yes.
2      Q.   And that would have been one
3 of Mr. Chu's duties on behalf of Devon in
4 China?
5      A.   It wasn't too difficult.  We
6 put in -- we put in the purchase order
7 saying four by 12 by a half-inch, 68
8 sheets per bundle.  So factory just make
9 it that way.
10      Q.   And Mr. Chu would relay that
11 information to the factory in China?
12      A.   Yes.
13      Q.   Does Mr. Chu speak English?
14      A.   Yes.
15      Q.   If you look at exhibit
16 number nine for me, the next E-mail on
17 January 22nd, 2006 from Mr. Scharf.  In
18 the middle of the E-mail he says we
19 should have all spec issues put to bed.
20 And my question is what spec issues was
21 North Pacific and Devon trying to clear
22 up?
23      A.   I don't know.  It doesn't
24 spell out here what kind of issues.

82

1      Q.   The E-mail above it Mr.
2 Buckley again is concerned with the
3 weight and says the contractors raise a
4 lot of hell about the extra weight if it
5 gets over 55 to 60 pounds.  That's per
6 sheet, isn't it?
7      A.   I don't know.
8      Q.   Well, a bundle weighs more
9 than 55 to 60 pounds, doesn't it?
10      A.   Yeah.
11      Q.   And was it your
12 understanding that Mr. Buckley wanted the
13 actual sheets to weigh less than 60
14 pounds?
15      MS. CALDWELL:  Object to
16 form.
17      THE WITNESS:  I don't
18 remember, but -- I don't remember
19 that -- the process, but I know
20 that at the end he agreed with 68
21 sheets per bundle that he agreed
22 to.
23 BY MR. LAW:
24      Q.   Maybe I need to ask Mr.

83

1 Scharf about the actual weight of the
2 individual sheets.
3      A.   I mean do we need to ask --
4 are you going to ask Bob Scharf about it?
5      Q.   Did Mr. Scharf coordinate
6 with Mr. Buckley more often than you did?
7      A.   Yes.
8      Q.   Did you know -- strike that.
9      Was North Pacific a customer
10 of one of the Devon companies before Mr.
11 Bob Scharf became president?
12      A.   No, I don't think so.
13      Q.   That would be a customer
14 that Mr. Bob Scharf brought to North
15 Pacific?
16      A.   Yes.
17      Q.   I'm going to show you
18 exhibit number ten.
19      MS. CALDWELL:  Jonathon, can
20 you just hand them to me.
21 BY MR. LAW:
22      Q.   And I'm going to ask you
23 about the bottom two E-mails, if you'd
24 like to read those to yourself.

84

1      A.   Yeah.
2      Q.   Mr. Buckley was asking Devon
3 if the drywall was zero percent
4 formaldehyde.  Was that some information
5 that you obtained from some of these spec
6 sheets that you reviewed?
7      MS. CALDWELL:  Object to the
8 form.
9 BY MR. LAW:
10      Q.   I'm referring to the bottom
11 E-mail where Mr. Buckley says --
12      A.   This paragraph?
13      Q.   Yes.  Is it zero percent
14 formaldehyde?  Need to see specification
15 sheets so we will know what the specs
16 are.
17      MS. CALDWELL:  Object to the
18 form.
19      THE WITNESS:  Well, I don't
20 know the answer for these
21 questions.
22 BY MR. LAW:
23      Q.   Well, my question to you is
24 you reviewed these spec sheets that were



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

85

1 obtained from the factory and provided by
2 Mr. Chu.
3       A.   I didn't review it, the spec
4 sheet.  I didn't review the details of
5 the sheet.
6       Q.   We talked about an MSDS
7 sheet and a specification sheet.  And I
8 understand that you didn't review the
9 MSDS, but you did receive some
10 specifications from the factories from
11 Mr. Chu.  Is that correct?
12      A.   I don't know if that's from
13 the same factory.  I wrote on the other
14 E-mail that was January, but this is the
15 March.  I don't know.  I don't know if
16 it's the same spec sheet.  I don't even
17 know if the spec sheet is the same as the
18 MSDS sheet.  It could be the same sheet.
19      Q.   Well, in this E-mail of
20 March Mr. Buckley is still asking for
21 specifications and a letter on a
22 warranty, isn't he?
23          MS. CALDWELL:  Object to
24      form.

86

1          THE WITNESS:  That's what he
2      says here.
3 BY MR. LAW:
4      Q.   And did you ever review any
5 specification sheets that mentioned the
6 percentage of formaldehyde content?
7      A.   I didn't.
8      Q.   Did you and Mr. Scharf ever
9 talk about any specifications that would
10 reference the formaldehyde content of any
11 drywall?
12      A.   No, this is the first time I
13 see this word.  I don't know what this
14 formaldehyde means.
15      Q.   Mr. Buckley is still as of
16 March 1st asking for ASTM standards on
17 the drywall, isn't he?
18          MS. CALDWELL:  Object to
19      form.
20          THE WITNESS:  That's what
21      Jay Buckley says here.
22 BY MR. LAW:
23      Q.   And the next E-mail above it
24 which was copied to Mr. Chu it's from Bob

87

1 Scharf references the weight of the
2 boards and Mr. Scharf says there is no
3 formaldehyde.  It says this is really
4 good stuff.
5          Do you know where he would
6 have gotten that information?
7      A.   I don't know.  You have to
8 ask Bob.
9      Q.   If a specification sheet was
10 provided to Devon in Chinese, would you
11 have been the employee in the United
12 States that would have translated it for
13 Mr. Scharf?
14      A.   Not for the spec sheets or
15 the MSDS sheet because it's technical,
16 and we don't really have that kind of
17 knowledge to translate that.
18      Q.   You don't know where Mr.
19 Scharf got his information that the
20 drywall is really good stuff and had no
21 formaldehyde?
22          MS. CALDWELL:  Object to the
23      form.  Asked and answered.
24          THE WITNESS:  I don't know

88

1      where he got the information.
2 BY MR. LAW:
3      Q.   But you're not -- you don't
4 have any expertise to review the
5 specifications and MSDS sheets and
6 determine if the drywall was good drywall
7 that had no formaldehyde.  Is that
8 correct?
9      A.   I don't.  Neither is Julian.
10      Q.   Mr. Julian Chu doesn't have
11 the expertise to review MSDS and spec
12 sheets to determine if the drywall is
13 good drywall with no formaldehyde?
14      A.   We can't -- we don't have
15 that kind of knowledge, but we pass that
16 information.  That's why we have to pass
17 the information, whatever we receive from
18 the factory to customer to confirm.
19      Q.   Well, at least as of March
20 1st when these E-mails were sent the
21 customer didn't have that information.
22 Is that correct?
23          MS. CALDWELL:  Same
24      objection.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

89

1     THE WITNESS:  Seems that's
2  what he says here.
3  BY MR. LAW:
4     Q.   But Mr. Scharf in an E-mail
5  is giving that information on March 1st,
6  2006?
7     A.   Even if Bob Scharf said that
8  customer can -- has to have approval.
9  Can't just say by approved based on the
10  E-mails there is no formaldehyde.
11     Q.   I'm going to show you
12  exhibit number 12.
13     MR. PIPES:  John, do you
14  mind handing me the exhibits that
15  she's done with?
16  BY MR. LAW:
17     Q.   Very bottom E-mail is from
18  you to Mr. Buckley.  Were you providing
19  Mr. Buckley the size and weight and board
20  count per bundle?
21     A.   Yes.  He wanted four by 12
22  half-inch and then we find this is the
23  number we finalize and that he approved
24  the weight would be all right.

90

1     Q.   Where did you get the
2  information that you put in this E-mail?
3     A.   Well, based on the
4  information provided by the factory, and
5  then there was another -- I think there
6  was another E-mail doing exercising on
7  different -- whether we want to mix four
8  by eight with four by 12 and then it turn
9  out Jay Buckley wanted four by 12.
10     Q.   I think that's the top
11  E-mail where it says regarding four by
12  eight and four by 12, and you said I got
13  the finalized info from the factory last
14  night.
15     Who at the factory did you
16  obtain that information from?
17     A.   This would be the Tyshon
18  (ph) at the time we already -- we should
19  already finalize with the factory.
20     Q.   And this information would
21  have come to you through Julian Chu?
22     A.   Yes.
23     Q.   Had the order been placed on
24  March 21st, 2006 when this information

91

1  was obtained?
2     A.   I don't know, but there's a
3  purchase order -- there's a date.  So you
4  can find out.
5     Q.   Was the -- did the
6  manufacturing process begin shortly after
7  the purchase order was placed by North
8  Pacific?
9     A.   I think so.
10     Q.   And North Pacific wanted to
11  get the drywall to the U.S. pretty
12  quickly, didn't they?
13     A.   Yes.
14     Q.   They had a sense of urgency,
15  didn't they?
16     MS. CALDWELL:  Object to the
17  form.
18     THE WITNESS:  I didn't know
19  their urgency until when the
20  boat -- until the boat arrived and
21  they say it's too late.
22  BY MR. LAW:
23     Q.   That would be when the Sanko
24  Rally arrived in China to be loaded?

92

1     A.   Arrived Pensacola and they
2  say it's late.  They wanted to cancel it.
3  That was -- I didn't know the urgency
4  until then.
5     Q.   North Pacific was requesting
6  the samples and ASTM test reports before
7  they would place the purchase order with
8  Devon.  Is that correct?
9     A.   That's what it says in the
10  E-mail, but I thought Jay Buckley did
11  some testing on his own.
12     Q.   To your knowledge Devon
13  never tested any of the drywall.  Is that
14  correct?
15     A.   We didn't.
16     Q.   Have you ever seen an ASTM
17  test report that pertained to the drywall
18  that was imported on the Sanko Rally?
19     A.   I didn't see an ASTM testing
20  report.  I know we didn't do it.  The
21  factory didn't do it.  I remember there
22  was two sheets that said some ASTM
23  testing data.  I don't know where those
24  two sheets came from.



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

93

1    Q.   And you don't know what
2  drywall those two sheets pertain to, do
3  you?
4    A.   I don't know.
5    Q.   And you don't know if it
6  pertained to the drywall that's imported
7  on the Sanko Rally, do you?
8    A.   I don't know where those two
9  sheets are from.  So I don't know if
10  that's related.
11    Q.   The drywall North Pacific
12  tested, you don't know if that's the same
13  drywall that was imported on the Sanko
14  Rally, do you?
15    A.   Well -- well -- in one of
16  the E-mail I was asking for where to send
17  the samples to.  So I might have done --
18  I might have send samples to him as being
19  five years old.
20    Q.   I understand.  But those
21  samples would have been the size that you
22  discussed earlier.  Was it four by 12?
23    A.   Not four by 12.  We wouldn't
24  be able to send that by air.  If we send

94

1  samples, it has to be by air.
2    Q.   It wasn't a full-size sheet
3  in any event?
4    A.   It wouldn't be full size.
5    Q.   You don't know what drywall
6  North Pacific tested, do you?
7    A.   I don't know what, but they
8  must have tested our samples.  I assume
9  they did.
10    Q.   But you don't know?
11    A.   I don't know.
12    Q.   Did Mr. Buckley or anybody
13  from North Pacific ever tell you that
14  they performed an ASTM test on the
15  samples provided by Devon?
16    A.   Even if he did, he didn't
17  tell me.
18    Q.   So nobody from North Pacific
19  ever told you that they performed a test
20  on the samples provided by Devon?
21    A.   Not that I'm aware of, but
22  he gave us the okay.
23    Q.   Let me show you exhibit
24  number is 11, and if you would tell me if

95

1  that's the proper purchase order?
2    MR. LAW:  Did I skip an
3  exhibit?
4    MS. CALDWELL:  Well, you
5  gave her 12.
6    MR. LAW:  I must have
7  skipped 11.
8    MS. CALDWELL:  Well, no,
9  here's 11.
10  BY MR. LAW:
11    Q.   If you look at number 11 for
12  me, please.
13    A.   Okay.
14    Q.   Is that the proper purchase
15  order for the drywall that was imported
16  on the Sanko Rally?
17    A.   This is -- this was the
18  purchase order.
19    Q.   And would the manufacturing
20  process have started shortly after this
21  purchase order was placed?
22    A.   It was -- it started March,
23  sometime in March or -- yeah.  March,
24  from March through April.

96

1    Q.   That's when the drywall was
2  manufactured?
3    A.   Right.
4    Q.   Was March through April?
5    A.   That's my understanding.
6    Q.   Where did you obtain that
7  information?
8    A.   Where did I get that
9  information?
10    Q.   Yes, ma'am?
11    A.   Because from the E-mail that
12  I can tell that the boat didn't ship
13  until May.  So it had to be manufactured
14  between March and April.
15    Q.   At the time this purchase
16  order was placed with Devon, the drywall
17  had not been tested, the ASTM test had
18  not been performed.  Is that correct?
19    MS. CALDWELL:  Object to the
20  form.
21    THE WITNESS:  I don't know.
22  BY MR. LAW:
23    Q.   Were there any other
24  purchase orders?


an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                    February 25, 2011

97

1     A.   Any other purchase?
2     Q.   Devon for the drywall that's
3  imported on the Sanko Rally?
4     A.   Were there other order,
5  purchase order?
6     Q.   I'm not asking for another
7  boat.  I'm talking about for the drywall
8  that came in on the Sanko Rally.  Is this
9  the only purchase order?
10     A.   I think so.  There may be
11  some revision but same purchase order
12  number.  So it's the same order.
13     Q.   It references grade, Gypsum
14  drywall A grade.  What is A grade?
15     A.   A grade means -- well, my
16  memory is a little bit faded now, but I
17  saw in my previous deposition A grade
18  means it's not -- it's not broken.
19     Q.   Did you review your previous
20  deposition to prepare for today?
21     A.   I see that.
22     Q.   So the A grade would be
23  drywall that was imported that was not
24  broken?

98

1     A.   Yes.
2     Q.   The purchase order from
3  North Pacific required that the drywall
4  have a stamp on it indicating that it
5  meets or exceeds North American ASTM
6  standards.  Is that true?
7     MS. CALDWELL:  Object to the
8     form.
9     THE WITNESS:  I think that's
10     what it says.  We can tell from
11     the pictures.
12  BY MR. LAW:
13     Q.   The pictures of the actual
14  drywall itself?
15     A.   Was it on the drywall or on
16  the wrapper?  I don't think we put
17  anything on the drywall.  It was on the
18  wrapper.
19     Q.   The purchase order between
20  Devon and North Pacific required that the
21  drywall sold to North Pacific comply with
22  the North American ASTM standards.  Is
23  that correct?
24     A.   That's what it says here.

99

1     Q.   Was that your understanding
2  that Devon was to supply North Pacific
3  with the drywall that complied with the
4  ASTM standards?
5     A.   Yes, but that's for Nor Pac
6  to verify.
7     Q.   Did anybody from North
8  Pacific ever visit, go to China when the
9  drywall was loaded on the ship and
10  brought to the U.S.?
11     A.   Not that I'm aware of.
12     Q.   To your knowledge Mr.
13  Buckley never went to China.  Is that
14  correct?
15     A.   Not during the process, no.
16     Q.   During the manufacturing
17  process he wasn't present, was he?
18     A.   He wasn't there.
19     Q.   North Pacific didn't intend
20  to test every one of the 485,000 sheets
21  of drywall, did they?
22     MS. CALDWELL:  Object to the
23     form.
24     THE WITNESS:  It's not

100

1     practical.
2  BY MR. LAW:
3     Q.   It would be impossible to
4  test 485,000 sheets, wouldn't it?  And
5  North Pacific was relying on Devon to
6  provide them with drywall pursuant to
7  this purchase order that complied with
8  the ASTM standards.  Is that correct?
9     MS. CALDWELL:  Object to the
10     form.
11     THE WITNESS:  Well, it's not
12     practical or possible to test
13     every sheet.  So it's the
14     standard -- the practice that we
15     would send samples out of the same
16     factory to the customer.  So --
17     and they approve that and that's
18     the same product that we -- the
19     factory were going to produce.
20  BY MR. LAW:
21     Q.   You would expect Devon to
22  provide North Pacific with drywall that
23  came out of the same production line as
24  the drywall that was tested by North



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                    February 25, 2011

101

1  Pacific?
2          MS. CALDWELL:  Object to the
3      form.
4          THE WITNESS:  Well, I think
5      that's a reasonably assumption.
6  BY MR. LAW:
7      Q.   And you don't know whether
8  the drywall that was actually tested by
9  North Pacific came off the same
10  production line as the drywall that was
11  provided by Devon to North Pacific?
12      A.   I don't know if it was from
13  the same production line.
14      Q.   You don't even know if it
15  was from the same factory, do you?
16      A.   Yes.
17      Q.   You do know it was from the
18  same factory?
19      A.   Yes.
20      Q.   How do you know that?
21      A.   Well, we don't want to cheat
22  customer.  We would just -- we want to
23  make sure that the product arrives to the
24  United States the customer won't have the

102

1  issue that say this wasn't what they
2  ordered.
3      Q.   The drywall that North
4  Pacific tested, you never reviewed those
5  test reports, did you?
6      A.   I didn't see that.
7      Q.   And you don't know if the
8  drywall that North Pacific tested was
9  from the same factory as the drywall that
10  Devon provided to North Pacific, do you?
11      A.   Why would they test other
12  samples?  So I assume they tested the
13  samples we provided from the factory.
14      Q.   Those weren't full size
15  samples, were they, full size sheets?
16          MS. CALDWELL:  Objection to
17      the form.  Asked and answered.
18          THE WITNESS:  They are not.
19  BY MR. LAW:
20      Q.   And my question is you don't
21  have any independent knowledge, you do
22  not know if the drywall that North
23  Pacific tested came from the same factory
24  as the drywall that Devon provided to

103

1  North Pacific pursuant to this contract?
2          MS. CALDWELL:  Object to
3      form.  Asked and answered.
4          THE WITNESS:  No, I assume
5      it's from the same factory, yes.
6  BY MR. LAW:
7      Q.   And that's my question.  You
8  are assuming that.  You do not know that
9  the drywall --
10      A.   Well, I didn't go to China
11  to pick out the samples by myself, but my
12  understanding is it was from the same
13  factory.
14      Q.   And where did you get that
15  understanding?
16      A.   Julian send it to me.
17      Q.   Julian sent the sample to
18  you?
19      A.   Right.
20      Q.   And you sent the sample to
21  North Pacific?
22      A.   Right.
23      Q.   But you don't know if North
24  Pacific tested that sample that you

104

1  provided, do you?
2          MS. CALDWELL:  Object to the
3      form.  Asked and answered many
4      times.
5          THE WITNESS:  They had to.
6      I mean whether Nor Pac wants to
7      test the samples or not, they
8      approved the samples at the end so
9      we ship the product.
10  BY MR. LAW:
11      Q.   Did Mr. Buckley ever request
12  from you or from Mr. Chu or Mr. Scharf a
13  full size sheet so that these tests could
14  be performed?
15      A.   No one would take that kind
16  of air shipment for four by 12 sheet of
17  drywall.
18      Q.   Did you try to do such a
19  shipment?
20      A.   It's impossible.  To use
21  samples, small piece of sample is common
22  just like when you buy granite you don't
23  need the full size of granite to your
24  house.  You just take a small piece.



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                    February 25, 2011

105

1     Q.   But with your knowledge of
2  importing products from China was it not
3  possible to ship or send three full size
4  sheets to North Pacific to be tested?
5     A.   It wasn't requested by Nor
6  Pac.
7     Q.   If North Pacific tested
8  three full size sheets, it's safe to
9  assume that they came from another
10 shipment?
11    A.   There were not -- there were
12 two other small shipments to -- two in --
13 loads, but I don't know when they
14 arrived.  I don't remember when they
15 arrive.  They weren't available for Nor
16 Pac at the time to test full size, but
17 they didn't request that either.
18    Q.   But they did request via
19 Exhibit-11 that Devon provide them with
20 drywall that meets the North American
21 ASTM standards?
22    A.   It says you have to stamp
23 under the product says meets or exceeds
24 ASTM standards.

106

1     Q.   What did Devon do to ensure
2  that the product that they were importing
3  with the stamp meets or exceeds ASTM
4  standards did in fact meet those
5  standards?
6     A.   We don't have any testing
7  knowledge or capability so we rely on Nor
8  Pac to do that.
9     Q.   So Devon independently
10 didn't do anything to ensure that the
11 drywall that was imported met the ASTM
12 standards?
13    A.   We cannot know.
14    Q.   Devon did not do anything --
15    A.   We didn't do any testing I'm
16 sure.
17    Q.   The price is 177 MSF.  What
18 does the MSF stand for?
19    A.   That's a good question.  I
20 was trying to think -- I didn't Google
21 yesterday.  It meant something like cubic
22 foot, cubic foot, but it doesn't make
23 sense if it's like metric square, feet.
24 It doesn't make sense out of that

107

1  abbreviation, but it's a standard convert
2  -- it's a conversion rate.
3        MS. CALDWELL:  Jonathon,
4     just so I know, this is an
5     Exhibit-9 to what deposition?
6        MR. LAW:  Exhibit-13, and
7     I've marked as Exhibit-13.  Your
8     deposition was Exhibit-9 to Mr.
9     Bob Scharf's deposition that he
10    gave in litigation involving North
11    Pacific.
12 BY MR. LAW:
13    Q.   Exhibit-13 is the North
14 Pacific purchase order general terms and
15 conditions.  Was this part of the exhibit
16 number 11 that I provided you part of the
17 purchase order with North Pacific?
18    A.   It wasn't provided.  We only
19 received this part.
20    Q.   You only received exhibit
21 number 11?
22    A.   Right.
23    Q.   You haven't reviewed
24 Exhibit-13 before?

108

1     A.   Not at all.
2     Q.   Do you know if Mr. Bob
3  Scharf was provided Exhibit-13?
4     A.   Was he to provide us?
5     Q.   Was it provided to Mr. Bob
6  Scharf, do you know?
7     A.   No, he didn't have this
8  either.  Not to my knowledge.  I never
9  seen this before.
10    Q.   We've talked about some
11 products that Devon has contracted with
12 customers to manufacture and import, and
13 we talked about some coil nails earlier.
14 Did Devon issue a warranty on those coil
15 nails to its customers?
16       MS. CALDWELL:  Object to the
17    form.
18       THE WITNESS:  I don't think
19    we did.
20 BY MR. LAW:
21    Q.   What about the window that
22 was manufactured for a customer from
23 Miami Dade, did Devon provide a warranty
24 on that window?



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                    February 25, 2011

109

1          MS. CALDWELL:  Object to the
2     form.
3          THE WITNESS:  I don't know.
4     I have to look at the agreement.
5  BY MR. LAW:
6     Q.   Did you and Mr. Scharf ever
7  discuss any warranties to be provided to
8  North Pacific?
9     A.   No, we didn't discuss about
10 warranty.
11         MS. CALDWELL:  Jonathon, I
12    don't know how these were
13    attached, but they are not
14    sequential, the Bates number.
15         MR. LAW:  That's fine.  It's
16    still an exhibit to Mr. Scharf's
17    deposition.
18 BY MR. LAW:
19    Q.   I'm showing you exhibit
20 number 14.  It appears to be a test
21 report that was faxed at some point in
22 time to Mr. Jay Buckley.  If you look at
23 the report itself on the second page.
24         Have you seen this report

110

1  before?
2     A.   Yes.
3     Q.   When did you see this
4  report?
5     A.   I'm not sure exact when.
6  That should be around March.
7     Q.   March of 2006?
8     A.   Yes.
9     Q.   Was it provided to you by
10 Mr. Chu?
11    A.   I am not sure, but I seen
12 this before.
13    Q.   Why did you review this
14 report in March of 2006?
15    A.   Well, it got this from
16 factory, but this was -- I guess I pass
17 this to Jay Buckley, but this is done in
18 Chinese facility done by the factory.
19    Q.   This is a test report on
20 some drywall, and the testing was
21 performed in China at a Chinese facility,
22 wasn't it?
23    A.   Right.
24    Q.   And you'll see at the top

111

1  right it pertains to drywall that as a
2  size of 8.5 millimeters?
3     A.   Yes.
4     Q.   That's not the right size of
5  the drywall that Devon imported for North
6  Pacific, is it?
7          MS. CALDWELL:  Object to the
8     form.
9          THE WITNESS:  I have to
10    convert half-inch to 8.5
11    millimeters.  I'm not sure.
12 BY MR. LAW:
13    Q.   Does 12.7 ring a bell?  12.7
14 millimeters would convert to a half-inch?
15    A.   Okay.  We can do a simple
16 calculation.
17    Q.   What do you need to do such
18 a calculation?
19    A.   I mean half-inch to a
20 millimeter, but that might make sense.
21 Is that a second page?
22    Q.   If you look at the purchase
23 order Exhibit-11, please, it references
24 the size of the drywall as 12.7

112

1  millimeters, the actual thickness.
2     A.   Yep.
3     Q.   That would be a half an
4  inch, wouldn't it?
5     A.   Yes.
6     Q.   And the test report that you
7  provided to Mr. Buckley, exhibit number
8  14 or page two of Exhibit-14 is for an
9  8.5 millimeter sheet, isn't it?
10         MS. CALDWELL:  Object to the
11    form.
12         THE WITNESS:  That's what it
13    says here.
14 BY MR. LAW:
15    Q.   That test report doesn't
16 pertain to the drywall that Devon
17 imported for North Pacific, does it?
18         MS. CALDWELL:  Objection.
19         THE WITNESS:  I don't know
20    because it says -- now I read it
21    it says the company -- the company
22    is not Tyshon (ph).
23 BY MR. LAW:
24    Q.   Let me ask you this:  Does



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Ruth Wu                                    February 25, 2011

                                                          113

1   that test report pertain to the drywall
2   that Devon imported for North Pacific?
3        A.   I don't know.  I don't know
4   if this is for that drywall.
5        Q.   The drywall on the test
6   report which is page two to Exhibit-14 is
7   for drywall that has a thickness of 8.5
8   millimeters.  Is that correct?
9        A.   That's what it says here,
10  yes.
11       Q.   The drywall that Devon
12  imported for North Pacific was 12.7
13  millimeters?
14       A.   Yes.
15       Q.   So this test report doesn't
16  pertain to the drywall that Devon
17  imported for North Pacific?
18            MS. CALDWELL:  Object to the
19       form.  Asked and answered.
20            THE WITNESS:  Well, the
21       second page seems -- I don't know.
22       The first page there's a different
23       company and different thickness,
24       but the second page is 12.7 and

                                                          114

1        it's Tyshon.
2   BY MR. LAW:
3        Q.   Where did this test report,
4   the second page, have you reviewed it
5   before?
6        A.   I seen this, but I didn't
7   look into details.
8        Q.   When did you see this test
9   report, and for the record it's Bates
10  stamp NP1073?
11       A.   This one?  I'm not sure if I
12  seen this one 1073.  I seen the ones with
13  this stamp on it, the oval stamp on it.
14  I've seen this page, this page, but I'm
15  not sure for this one, 1073, just because
16  I didn't look into details.
17       Q.   But you've seen the page
18  that's stamped NPI074 on the bottom?
19       A.   I think I saw it before.
20       Q.   When did you see that page?
21       A.   Around same time, March I
22  guess.
23       Q.   And if you look at item
24  number three it tells you the thickness

                                                          115

1   of the drywall that was tested on this
2   document.  And can you tell me what the
3   thickness of it was?
4        A.   This one says 8.5 plus/minus
5   .55.
6        Q.   It would be 8.5 millimeters
7   plus or minus .5?
8        A.   That's what it says here,
9   yes.
10       Q.   And that's not the size of
11  the drywall that Devon imported from
12  North Pacific, is it?
13       A.   It's not, but I don't know
14  -- I don't know the purpose why we send
15  this to Jay Buckley, but it's for him to
16  examine the test report not for me to
17  review the details.
18       Q.   I'm going to show you
19  exhibit number 15 is an E-mail from Mr.
20  Buckley.  Mr. Buckley noted that the
21  reports that were faxed to him were for
22  8.5 millimeter except for one.
23            Did Mr. Buckley request that
24  you get him another test report?

                                                          116

1        A.   I don't know.  I wasn't
2   copied on this E-mail.
3        Q.   The reports that were faxed
4   to Jay Buckley that we looked at earlier,
5   did you fax those to Jay Buckley?
6        A.   I'm not sure.  Maybe Bob
7   Scharf did.  If I fax, it would have a
8   cover letter.
9        Q.   I'm going to show you
10  Exhibit-16.  Exhibit-16 at the bottom is
11  an E-mail from you to Jay Buckley, and
12  you ask him for the contact information
13  for the lab in Houston that can test
14  drywalls.  Is that correct?
15       A.   I ask him where -- yeah, I
16  asked him where I can send the samples I
17  guess.
18       Q.   On May 4th of 2006 you were
19  asking Mr. Buckley where Devon could send
20  drywall to be tested?
21       A.   I thought that was based on
22  his request to he wants me to -- he has a
23  lab to test the samples, and I'm just
24  only asking him where to send to.



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

117

```
1      Q.   It appears to me that you
2   are asking Mr. Buckley the contact
3   information for a lab in Houston where
4   Devon can test some drywall.  Is that
5   right?
6          MS. CALDWELL:  Object to the
7      form.  It mischaracterizes her
8      testimony.
9   BY MR. LAW:
10     Q.   At the top Mr. Buckley tells
11  you that he didn't use a regular testing
12  agency.  He called in a favor with a U.S.
13  manufacturer.  They tested it for us.
14  Don't think they would do it again.
15  Sorry.
16         You weren't sending drywall
17  to a lab to be tested for North Pacific,
18  were you?
19     A.   Well, we don't test our own
20  products because we don't have the
21  knowledge for the test reports.  And we
22  won't pay for the testing fees.  Customer
23  needs to pay for the testing fees and
24  review the report.  So in this E-mail I
```

118

```
1   think I was asking Jay Buckley where he
2   wants me to sent the samples for him to
3   test where is the designated lab.
4      Q.   Mr. Buckley tells you in
5   response that he's already tested some
6   drywall, and he doesn't provide you with
7   any information.  Is that correct?
8      A.   So what?  It reads to me
9   that he already tested.
10     Q.   Why was Devon wanting to
11  send drywall to be tested at a lab in
12  Houston if Mr. Buckley already tested
13  some drywall?
14         MS. CALDWELL:  Object to the
15     form.  It mischaracterizes her
16     testimony.
17         THE WITNESS:  I don't know.
18     I don't know.  I just simply ask
19     him where he wants me to send the
20     samples to.
21  BY MR. LAW:
22     Q.   And he tells you that he's
23  already called in a favor with the U.S.
24  manufacturer.  They tested it for us and
```

119

```
1   won't do it again.  Sorry.
2      Q.   Did you try to find some
3   other lab to test some drywall after he
4   told you this?
5      A.   No, I would not do that.
6      Q.   Why were you asking him for
7   the contact information for a lab where
8   he had already tested drywall for North
9   Pacific?
10         MS. CALDWELL:  Object to the
11     form.  Asked and answered.
12         THE WITNESS:  Well, I
13     thought I just said that I thought
14     I was asking him which lab or the
15     lab information that he wants me
16     to send the drywalls to.
17  BY MR. LAW:
18     Q.   But he had already tested
19  the drywall.
20         MS. CALDWELL:  Object to the
21     form.  You're arguing.
22         MR. LAW:  Makes no sense
23     whatsoever.
24         THE VIDEOTAPE TECHNICIAN:
```

120

```
1      Counsel, we need to go off the
2      record.  This is the end of tape
3      number one of the deposition of
4      Ruth Wu.  Time on video is 11:47.
5             - - -
6          (Whereupon, a brief recess
7      was taken.)
8             - - -
9          THE VIDEOTAPE TECHNICIAN:
10     We're now back on the record.
11     This is the beginning of tape
12     number two of the deposition of
13     Ruth Wu.  The time on video is
14     11:55.
15  BY MR. LAW:
16     Q.   Miss Wu, the Sanko Rally
17  sailed on May 15th, 2006.  Is that right?
18     A.   That sounds about right.
19     Q.   Do you know when the drywall
20  was loaded on the boat?
21     A.   It took five days in China
22  to load on the boat.
23     Q.   It took five days to load it
24  onto the boat before the boat set sail?
```



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

121

1      A.   Yes.
2      Q.   On May 4th of 2006 if you
3  look at Exhibit-16, why were you asking
4  your customer North Pacific for the
5  contact information for a lab that could
6  test drywall?
7           MS. CALDWELL:  Object to
8      form.  Asked and answered.
9           THE WITNESS:  I don't
10     remember why I ask him, but he
11     said -- I don't know why I ask
12     him.  I ask if he already tested.
13     I don't.  I wouldn't do that
14     spontaneously by myself.  It could
15     be requested by Jay Buckley.
16 BY MR. LAW:
17     Q.   The drywall that he tells
18 you he tested with a U.S. manufacturer
19 for a favor, did you see that test
20 report?
21     A.   I didn't.
22     Q.   You don't know what drywall
23 he tested, do you?
24     A.   I don't know.  I didn't see

122

1  the test report.
2      Q.   You don't know what factory
3  the drywall he tested came from, do you?
4           MS. CALDWELL:  Object to the
5      form.  Asked and answered.
6           THE WITNESS:  Well, Nor Pac
7      can do whatever they want to do
8      with the samples I provided.  So I
9      wouldn't get involved in how they
10     handle their testing.
11 BY MR. LAW:
12     Q.   Well, let me ask you this
13 way:  Did you ever see any test reports
14 provided by North Pacific indicating the
15 drywall had been tested at the direction
16 of North Pacific?
17     A.   I didn't see the test
18 report.
19     Q.   So as of May 4th of 2006 you
20 don't know whether the drywall on the
21 Sanko Rally had been tested, do you?
22           MS. CALDWELL:  Object to the
23     form.  Asked and answered.
24           MR. LAW:  I haven't asked

123

1  her that.
2           MS. CALDWELL:  You are going
3      about the same way.  She's told
4      you exactly her understanding of
5      what occurred.
6  BY MR. LAW:
7      Q.   Let me repeat my question.
8  As of May 4th, 2006 you don't know
9  whether the drywall imported by Devon on
10 the Sanko Rally had been tested, do you?
11          MS. CALDWELL:  Object to the
12     form.
13          THE WITNESS:  Well, I send
14     the samples.  They can either test
15     it or not test it or use other
16     samples tested.  I would not have
17     knowledge of how they handled the
18     testing.
19 BY MR. LAW:
20     Q.   Did Mr. Scharf ever tell you
21 that North Pacific required three full
22 size sheets to test?
23     A.   I didn't know that.
24     Q.   You never had that

124

1  conversation with Mr. Scharf?
2      A.   No.
3      Q.   And you never had that
4  conversation with Mr. Buckley?
5      A.   No.
6      Q.   Exhibit-17 is a document
7  produced by Devon in this case.  If you
8  look at page two, it's pretty much all in
9  Chinese, and I have no idea what it says.
10 And I was going to ask you if you know
11 what this is.
12     A.   It says testing report for
13 -- it says here fire treated -- not fire
14 treated.  I don't know.  It says it's
15 durable for fire.  I don't know what that
16 means.  Gypsum board from Shandon Tyshon
17 Company and 2005, June 20th.
18     Q.   The company that you just
19 mentioned, was that the factory where
20 this drywall was manufactured for North
21 Pacific?
22     A.   Yes.
23     Q.   Does it appear to you that
24 exhibit number 17 is a test report



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

125

1  pertaining to some drywall manufactured
2  at that factory?
3        A.    Yes.
4        Q.    Would you turn to page two
5  for me, please?  Is that part of the test
6  report?
7        A.    Yes.
8        Q.    Does it tell you what size
9  drywall was tested?
10       A.    It doesn't say the size.  It
11  says the difference -- the differences of
12  the length, width and thickness, the
13  weight, some basic information.
14       Q.    If you look at page three,
15  please, and tell me if it tells you the
16  size in the top right-hand corner?
17       A.    Yes.
18       Q.    What size was this drywall
19  that was tested?
20       A.    15.9.
21       Q.    And there's some handwritten
22  language that says not match our size.
23  Is that your handwriting?
24       A.    No, it's not my handwriting.

126

1        Q.    Do you know whose it is?
2        A.    No.
3        Q.    In any event, the 15.9
4  that's not the drywall that was imported
5  on the Sanko Rally, is it?
6        A.    Based on the time frame of
7  the drywall tested in this test report
8  cannot be the same drywall on the Sanko
9  Rally.
10       Q.    It's a different size also,
11  isn't it?
12       A.    Well, size can be different,
13  but the component could be the same.
14       Q.    The thickness of the drywall
15  tested on Exhibit-17 is different than
16  the thickness of the drywall imported on
17  the Sanko Rally?
18       A.    Yes.
19       Q.    Whose fax numbers is that at
20  the top of these documents?  It says
21  Devon Inc.?
22       A.    That's from Shanghai 8621 --
23  that 21 is from Shanghai.
24       Q.    Was this a document faxed

127

1  from Shanghai to Devon in the United
2  States?
3        A.    Looks like it.
4        Q.    Would Mr. Chu have been the
5  one that provided this document to Devon?
6        A.    That's reasonable, yeah.
7        Q.    And did he provide it to you
8  for review?
9        A.    I wasn't sure who was the
10  first recipient.  I've seen this report
11  before, but it's not for my knowledge to
12  review the contents of the report.
13       Q.    When did you first receive
14  this report?
15       A.    If it was faxed on -- he
16  says June 7th, 2000 -- no, it can't be.
17  I think that date was mixed up.
18       Q.    The date is probably wrong?
19       A.    The fax number -- they
20  probably didn't fix the date on the fax
21  machine.
22       Q.    Would this have been around
23  the time that Devon was looking for
24  factories to manufacture drywall for

128

1  North Pacific?
2        A.    Yes, when we were doing
3  drywall I saw this report.
4        Q.    Why did you obtain a copy of
5  this report from Mr. Chu in China?
6        A.    Why did I obtain it?  He
7  sent it to me.  I didn't request a report
8  from him.
9        Q.    Was this to be provided to
10  Mr. Buckley or to North Pacific?
11       A.    Maybe we send it to him, but
12  I'm not sure.
13       Q.    Do you know who Fred Pond
14  is?
15       A.    Fred Pond?
16       Q.    Yes, ma'am.  Pond, P-O-N-D?
17       A.    No, I never heard --
18  P-O-N-D.  Not Kitty Pon, no.
19       Q.    I've marked exhibit number
20  18 an E-mail on the bottom from Mr.
21  Buckley to Mr. Scharf and to you
22  requesting some items.  And item number
23  four is a certificate of formaldehyde
24  omission.  And item number six is -- I'm



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                    February 25, 2011

129

1  sorry.  Number five is a specification
2  sheet.  It also asks for samples in item
3  number seven and the stamp on each sheet
4  it says equal to or exceeds ASTM.
5      You reviewed this E-mail
6  when you got it from Mr. Buckley, didn't
7  you?
8      A.   I was CC on it, yes.
9      Q.   Would it have been part of
10 your duties to obtain from Mr. Chu in
11 China these items that Mr. Buckley has
12 requested?
13     A.   We would try to accommodate,
14 but this is an E-mail that wasn't --
15 whatever on the purchase order that we
16 would try to accommodate.
17     Q.   Did you try to accommodate
18 Mr. Buckley and obtain the certificate of
19 formaldehyde omissions and the
20 specification sheet and the samples of
21 the product?
22     A.   No, I didn't know the term
23 formaldehyde until today.
24     Q.   So you didn't take any steps

130

1  to obtain any certificates of
2  formaldehyde omissions?
3      A.   I didn't.
4      Q.   We've talked about the
5  specification sheets.  Did you send some
6  pictures of some stamps on the boards to
7  Mr. Buckley telling him what each sheet
8  would say?
9      A.   I'm not sure if I did, but I
10 saw some pictures -- some pictures,
11 whatever we have in the database, but I'm
12 not sure if I send those specific
13 pictures to him.
14     Q.   Did you have any
15 communications with Mr. Buckley, E-mails
16 or phone conferences where he requested
17 that the word exceeds be added on each
18 sheet to read meets or exceeds ASTM 1396?
19     A.   I didn't talk to Jay Buckley
20 on this subject.
21     Q.   Did you talk to somebody
22 else on this subject?
23     A.   Bob Scharf mentioned that.
24 He said somewhere needs to say meets or

131

1  exceeds ASTM standards.
2      Q.   Mr. Scharf told you that was
3  a request of North Pacific?
4      A.   He didn't say that
5  specifically.  He'd say it needs to say
6  meets or exceeds ASTM standards.
7      Q.   Did you relay that
8  information back to China to Mr. Chu?
9      A.   I don't think I put that
10 specific purchase order.  Maybe I did.
11 If I didn't put down purchase order, then
12 later on Bob Scharf went to China and he
13 could have told the factory about the
14 stamp.
15     Q.   So it would have either been
16 relayed by you to the factory in a
17 purchase order or Mr. Scharf may have
18 told the factory directly?
19     A.   Right.
20     Q.   Is exhibit number 19 a
21 purchase order?
22         MS. CALDWELL:  Object to the
23 form.  Is it the purchase order?
24 BY MR. LAW:

132

1      Q.   You said it would have been
2  on the purchase order or Mr. Scharf would
3  have relayed it.  And what I'm asking --
4  and I should have been more clear -- is
5  this the purchase order for the purchase
6  of the drywall?
7      A.   This was a confirmation from
8  Shanghai Union (ph) import/export
9  company.
10     Q.   Is there a separate document
11 that would constitute a purchase order
12 placed by Devon?
13     A.   I think there was.
14     Q.   Did you review some
15 documents to get ready for your
16 deposition today?
17     A.   I saw some E-mails and
18 pictures, yes.
19     Q.   What pictures did you look
20 at?
21     A.   I look at some pictures that
22 shows like Bob Scharf looking at the
23 piles of drywall.
24     Q.   You looked at some pictures



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                      February 25, 2011

133

1  of Mr. Scharf and Dr. Bennett in China at
2  the manufacturing plant?
3       A.   When they saw -- I wasn't
4  sure it was at the factory or the port,
5  but it was pallets of drywalls.
6       Q.   And you did that getting
7  ready for your deposition today?
8          MS. CALDWELL:  Object to the
9          form.
10         THE WITNESS:  Not really
11         part of preparation because I've
12         seen those pictures before.  So
13         there's nothing new that I haven't
14         seen.
15 BY MR. LAW:
16      Q.   You saw them back around the
17 time they were taken, didn't you?
18      A.   I saw them before, yes.
19      Q.   And then you looked at them
20 again here recently?
21      A.    Not really to look at them
22 to prepare for this deposition.  Just --
23 I don't know.  Just I saw some of the
24 pictures.

134

1       Q.   And that was here recently
2  in the last couple of days?
3       A.   Yes.
4       Q.   And you looked at some
5  E-mails to get ready for your deposition.
6  Did you also read your previous
7  depositions, the two that you've given
8  before?
9       A.   Yes, I did.
10      Q.   Did you see a purchase order
11 in some documents when you were getting
12 ready for your deposition?
13      A.   I seen this.  I didn't see a
14 purchase order from me, myself.  There
15 was one, but it was also general
16 information that -- something like this,
17 this part.
18      Q.   And who would it have been
19 from?
20      A.   From Devon U.S. office,
21 Devon Trading.
22      Q.   Do you know who prepared
23 that purchase order?
24      A.   Should be me.

135

1       Q.   So what is -- Exhibit-19 is
2  a confirmation of the purchase order.  Is
3  that correct?
4       A.   Yes.
5       Q.   There's a unit price on
6  there.  It list the sheets and then has a
7  unit price.  It says U.S. D299.  Is that
8  $2.99?
9       A.   That's the cost.
10      Q.   Is that what it cost Devon
11 to manufacture the 485,044 sheets?
12         MS. CALDWELL:  Object to the
13         form.  Devon didn't manufacture.
14         THE WITNESS:  That's what we
15         paid the factory.
16 BY MR. LAW:
17      Q.   That's what it cost to have
18 the drywall produced was $2.99 per sheet?
19      A.   That's the cost of goods
20 plus other storage, ocean freight,
21 overhead expenses.
22      Q.   And I'm going to get to
23 that.  My question for purposes of
24 Exhibit-19 is the cost to produce the

136

1  actual drywall per board was $2.99?
2       A.   Correct.
3       Q.   Exhibit number 20 is an
4  E-mail.  That's an E-mail from Mr.
5  Buckley to you and Bob Scharf.  Mr.
6  Buckley is requesting a warranty letter.
7  He was requesting some sort of warranty
8  from Devon.  Is that correct?
9          MS. CALDWELL:  Object to the
10         form.
11         THE WITNESS:  I don't think
12         we ever provided any warranty
13         letter to Nor Pac.
14 BY MR. LAW:
15      Q.   One was requested by Nor
16 Pac, wasn't it?
17      A.   That's what it says here,
18 yes.
19      Q.   And Nor Pac is North
20 Pacific.  Is that right?
21      A.   Yes.
22      Q.   And Mr. Buckley requested a
23 written warranty from Devon regarding a
24 quality of the drywall.  Is that correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

137

1          MS. CALDWELL:  Object to the
2     form.
3          THE WITNESS:  I think he
4     meant the drywall need to be
5     intact not breaking because we
6     were concerned about the breakage.
7   BY MR. LAW:
8     Q.    You don't recall any
9   requests from Mr. Buckley for a warranty
10  regarding the quality of the drywall that
11  Devon was providing to North Pacific?
12    A.    No, not that I'm aware of.
13    Q.    Who is George Jackson?
14    A.    He's also from North
15  Pacific.
16    Q.    Did you have any
17  communications with Mr. Jackson regarding
18  any requested warranty from Devon?
19    A.    No, not from me.
20    Q.    Do you know if Mr. Scharf
21  did?
22    A.    I don't know.
23    Q.    Did you and Mr. Scharf ever
24  discuss the request or any request of

138

1   North Pacific for any type of warranty
2   regarding quality issues?
3     A.    I know we didn't issue any
4   warranty letter because impossible to
5   make sure that the drywalls won't break.
6     Q.    But did you and Mr. Scharf
7   have any communications regarding any
8   request by North Pacific for a warranty
9   regarding the quality of the drywall?
10    A.    We didn't really discuss
11  about that.
12          MR. LAW:  Let's go off the
13    record for a minute.
14          THE VIDEOTAPE TECHNICIAN:
15    Going off the record.  Time on
16    video is 12:14.
17             -  -  -
18    (Whereupon, a brief recess
19    was taken.)
20             -  -  -
21          THE VIDEOTAPE TECHNICIAN:
22    We're now back on the record.  The
23    time on video is 13:20.
24  BY MR. LAW:

139

1     Q.    Miss Wu, does Devon have the
2   contact information for Jay Buckley?
3     A.    You mean a phone number?
4     Q.    Current phone number and
5   address?
6     A.    Current?
7     Q.    Yes, ma'am.
8     A.    I only have the old
9   information.  I don't know where he is or
10  what he's doing now.
11    Q.    Do you have his old contact
12  information?
13    A.    Old contact at North
14  Pacific.
15    Q.    Do you have a phone number
16  for him?
17    A.    The old phone number I
18  probably can find from the address book.
19    Q.    If could you just give
20  whatever contact information you have to
21  your attorneys I'd appreciate it.
22    A.    Okay.
23    Q.    Did you on behalf of Devon
24  obtain the shipping insurance to insure

140

1   the cargo on the Sanko Rally?
2     A.    In the beginning, yes.
3     Q.    But you didn't handle the
4   actual insurance claim regarding the
5   damaged cargo?
6     A.    No, I wasn't involved in the
7   claim.
8     Q.    Who on behalf of Devon would
9   have handled the insurance claim
10  regarding the damaged cargo?
11    A.    To my knowledge at that time
12  it was Galen Hawk our attorney.
13    Q.    Who did Mr. Hawk report to
14  at Devon?
15    A.    I don't know.  He's
16  attorney, I don't know who he reports to.
17    Q.    Did you gather information
18  for Mr. Hawk to provide to the insurance
19  company?
20    A.    I think I did.  I fax him
21  information.
22    Q.    Exhibit-21 is a letter from
23  you to Kevin -- I'm sorry -- to Chuck
24  Patterson regarding drywall insurance.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                February 25, 2011

141

1     A.    Yes.
2     Q.    And then at this point in
3  time April 26th of 2006 you are looking
4  for somebody, a company to insure the
5  cargo. Is that right?
6     A.    Yes.
7     Q.    If you look at item number
8  three regarding moisture protection?
9     A.    Yes.
10     Q.    You referenced in your
11  letter in that last sentence on paragraph
12  three from factory's record it never had
13  a problem with moisture before. Do you
14  see that?
15     A.    From factory's record it
16  never had problem with moisture before
17  that. That's what it says.
18     Q.    What factory record are you
19  referring to?
20     A.    April 26th, I would mean
21  Tyshon.
22     Q.    And the drywall at this
23  point in time is being manufactured,
24  isn't it?

142

1     A.    Yes.
2     Q.    Do you know how long it took
3  to manufacture the 400,000, approximately
4  400,000 sheets?
5     A.    Between two to four weeks.
6     Q.    Did you speak with somebody
7  at the factory or did you obtain some
8  sort of written record that informed you
9  that moisture was not a problem?
10     A.    Well, I didn't speak to
11  anyone at the factory. I wasn't sure my
12  source for this information.
13     Q.    Why were you trying to get
14  insurance against moisture, for moisture
15  protection? I'm referring to item number
16  three. It says for moisture protection.
17     A.    We just didn't want the
18  drywall to get damped.
19     Q.    You didn't want the drywall
20  -- you wanted insurance in case the
21  drywall got wet?
22     A.    Right, on the water.
23     Q.    Is it bad for drywall to get
24  wet?

143

1     MS. CALDWELL: Object to the
2  form.
3     THE WITNESS: Like number
4  four, we don't want it to get wet
5  or get broken during shipping so
6  it's more logistic concern.
7  BY MR. LAW:
8     Q.    Some got broken during
9  shipping, didn't it?
10     A.    It can break at any point.
11     Q.    Do you know whether any of
12  the drywall in the Sanko Rally got wet
13  during shipment?
14     A.    Not that I'm aware of. I
15  know it got broken, but I didn't hear any
16  wet damage.
17     Q.    Do you know if any of it got
18  wet during the unloading process?
19     A.    I didn't hear anything.
20     Q.    Mr. Scharf, he was in
21  Pensacola during part of the unloading
22  process, wasn't he?
23     A.    Yes.
24     Q.    Did you ever go to

144

1  Pensacola?
2     A.    No.
3     Q.    Did Dr. Bennett?
4     A.    He didn't either.
5     Q.    Anybody else from Devon?
6     A.    Besides Bob there was
7  another salesperson Nick Egan, E-G-A-N.
8     Q.    And who did Mr. Egan work
9  for at that time?
10     A.    He reported to Bob Scharf.
11     Q.    Did he work for one of these
12  Devon companies?
13     A.    Devon International Trading,
14  he was a salesperson.
15     Q.    He was a salesperson for
16  Devon International Trading?
17     A.    Yes.
18     Q.    Is Mr. Egan still employed
19  by Devon company?
20     A.    No, he left.
21     Q.    When did he leave?
22     A.    About two years ago.
23     Q.    Do you know where he works
24  now?



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

145

1     A.   I'm not sure.  He's from
2  New Jersey.  He went to Boston and then I
3  don't know where he is now.
4     Q.   Why did he leave Devon?
5     A.   Because his sales number is
6  not good.  So he kind of -- Dr. Bennett
7  wasn't happy with his sales performance.
8     Q.   So he was fired?
9     A.   Yes.
10     Q.   Do you have any current
11  contact information for Mr. Egan?
12     A.   I don't have his current
13  information.  The old contact was the
14  company sales -- after he left the
15  company I don't have his contact
16  information.
17     Q.   Does Devon maintain a file
18  like a personnel file on its employees?
19     A.   I think human resources has.
20     Q.   So human resources, would
21  they have his address, his last known
22  address in the file?
23     A.   Maybe they have.  I don't
24  know.

146

1     Q.   Who is in charge of human
2  resources?
3     A.   That would be Felicia Mova.
4     Q.   I'll show you exhibit number
5  22.  What is exhibit number 22?
6     A.   It's a service contract
7  between Pactrans and the Devon
8  International Trading.
9     Q.   Is this for the purpose of
10  shipping the drywall across the seas to
11  the U.S?
12     A.   Yes, correct.
13     Q.   Who at Devon negotiated this
14  contract?
15     A.   Bob and I.
16     Q.   It's dated March 30th, 2006
17  and the original port listed under item
18  number one -- is it Qingdao (ph) to
19  Mobile, Alabama.
20     A.   That's what it says here.
21     Q.   This shipment was initially
22  intended to come into the port of Mobile,
23  Alabama, wasn't it?
24     A.   There was a discussion that

147

1  Nor Pac wanted the shipment to come to
2  south.  So we were looking for different
3  ports and then finally decided that it
4  would be Pensacola.
5     Q.   When was it -- who made the
6  decision to ship it into Pensacola versus
7  Mobile?
8     A.   I wasn't sure whose
9  decision, but it was more like a joint
10  decision because we chose Pensacola over
11  Mobile only because Mobile is a busy port
12  and Pensacola had the capacity to
13  accommodate the unloading at the time.
14     Q.   Did you know when the
15  decision was made to unload the cargo in
16  Pensacola, Florida versus Mobile,
17  Alabama?
18     A.   I wasn't sure the exact time
19  frame, but at some point that sales
20  confirmation says Pensacola.  The one we
21  just saw that says Pensacola.
22     Q.   The purchase order we looked
23  at earlier?
24     A.   The sales confirmation, yes.

148

1     Q.   And it's dated before -- I
2  believe it's Exhibit-11.  It was dated
3  February of 2006, isn't it?
4     A.   Not this -- yes, this one
5  always says Pensacola, but I don't know
6  -- there were some revisions.  I don't
7  know if they changed the port or not.  So
8  by February -- February 8th we haven't
9  decided whether it should go to
10  Pensacola.  So this could be the later
11  revision.
12     MR. BROWN:  What exhibit are
13  you looking at?
14     MR. LAW:  Exhibit-11.
15  BY MR. LAW:
16     Q.   So there's a later revision
17  of Exhibit-11?
18     A.   I don't think they changed
19  the date, and it is the same purchase
20  order number.  I just don't think that we
21  already decided to go to Pensacola that
22  early, in early February 8th because we
23  talked about different ports.
24     Q.   So you are saying Exhibit-11



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                              February 25, 2011

149

1   may not have been prepared in February of
2   2006.  This may be a later revision.  The
3   date wasn't changed?
4        A.   Right.
5        Q.   How can we date Exhibit-11?
6        A.   February 8th is fine, but
7   they have later -- later they add the
8   destination port.
9        Q.   The material terms of
10  Exhibit-11 that being the quantity and
11  the price, did it ever change?
12       A.   Even the quantity changed
13  once.
14       Q.   That's Exhibit-11 contains
15  the final quantity and price?
16       A.   Yes.
17       Q.   The requirements in
18  Exhibit-11, the drywall meet or exceed
19  the North American standards.  Is that
20  correct, did that change?
21       A.   That part I wasn't sure if
22  it was on the first one, but I know that
23  the quantity changed after we finalized
24  the quantity.  That part I didn't notice.

150

1        Q.   And I asked a bad question.
2   The final purchase order is in fact
3   Exhibit-11, isn't it?
4        A.   Yes.
5        MS. CALDWELL:  Since you
6   asked a bad question I won't
7        object.
8   BY MR. LAW:
9        Q.   Just make sure we're clear
10  on the record.  Exhibit 11, the date may
11  be wrong, but the other information in
12  Exhibit-11 does constitute the final
13  purchase order?
14       A.   It does, yes.
15       Q.   Was the decision made to
16  sail into Pensacola before or after the
17  ship left the harbor in China?
18       A.   I think before.
19       Q.   Exhibit-23 is a handwritten
20  note.  Is that your handwriting?
21       A.   Yes.
22       Q.   And it's dated March 28th,
23  it says Bob J. Buckley, we need to
24  increase the price from eight to 8.48.

151

1   Is that from $8.00, eight U.S. dollars to
2   $8.48?
3        A.   Yes.
4        Q.   Why was the price increased
5   per sheet?
6        A.   Well, I guess -- I'm not
7   sure, but my guess is that was because we
8   pays more on the shipping and we
9   couldn't -- we couldn't sustain by $8.00.
10       Q.   So the shipping costs more
11  than originally anticipated so the price
12  went up from $8.00 and $8.48 per sheet?
13       A.   Yes.
14       Q.   Does exhibit 11 reference
15  the $8.00 or the $8.48 price per sheet?
16       A.   I have to divide this four
17  million back to 485,000 sheet and you
18  come up with number.  I don't know if
19  that's eight or 8.48.
20       Q.   Your lawyer is going to do
21  it for us.  I'll tell you what, when we
22  take a break we'll get a calculator and
23  check it.
24       Salina Lu, she works at the

152

1   King of Prussia office?
2        A.   No, Shanghai.
3        Q.   What was her involvement in
4   any of the manufacture and importation of
5   the drywall?
6        A.   For drywall I couldn't
7   recall her involvement.
8        Q.   Exhibit-24 is a letter from
9   you to Kitty Pon.  Who is Kitty Pon?
10       A.   She's the freight for order,
11  she booked the -- she charge the boat for
12  us.
13       Q.   She worked for Pactrans?
14       A.   Yes.
15       Q.   Via this letter Exhibit-24
16  Devon intended to cancel the contract
17  with Pactrans because the Sanko Rally was
18  incompetent to carry the cargo.  Is that
19  correct?
20       A.   We had concern on the
21  shipping.
22       Q.   And this letter is dated
23  April 29th, 2006.  This concern arose
24  before the drywall was loaded on the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                    February 25, 2011

153

1   Sanko Rally, didn't it?
2       A.   Yeah, that was before.
3       Q.   What concerns did you have
4   that prompted this letter?
5       A.   We were worried about the
6   breakage.
7       Q.   Why were you worried about
8   the breakage?
9       A.   I don't know because I
10  wasn't there to see -- even if I see the
11  boat I don't know how to determine that.
12  But -- it says we were concerned about if
13  we need to put all the drywalls on we had
14  to stack more than six levels.
15      Q.   Was the boat too small or
16  was it not the proper vessel?
17      A.   I don't think the boat was
18  too small.  It was the shape.  It wasn't
19  a box shape.
20      Q.   Did you come to that
21  conclusion yourself or did somebody bring
22  that to your attention?
23      A.   That was -- well, I heard
24  about the discussion about box vessel.

154

1       Q.   Where did you hear about
2   that discussion?
3       A.   It was when we were talking
4   about around that time frame so we talk
5   about what kind of boat we are going to
6   get.
7       Q.   Who is the we that you would
8   talk about what kind of boat you were
9   going to get?
10      A.   Well, Kitty Pon provided the
11  vessel information to us.
12      Q.   So you were talking with
13  Kitty Pon and you got concerns about the
14  Sanko Rally not being the proper vessel
15  to transport the cargo?
16      A.   Right.  I had that concern,
17  and then Kitty Pon and her team tried to
18  convince us that they thought this would
19  be a good vessel and they provided
20  loading plan to us.
21      Q.   So on April 29th of '06 at
22  least Devon intended to cancel the Sanko
23  Rally but ultimately ended up using the
24  Sanko Rally to import the drywall?

155

1       A.   Right, because Pactrans
2   thinks the boat is good.
3       Q.   Did you convey to North
4   Pacific that another vessel may be
5   required to import the drywall?
6       A.   No, we didn't.
7       Q.   Do you know if Mr. Scharf
8   did?
9       A.   I don't know if he did.
10      Q.   Was there a concern that
11  North Pacific needed to receive the
12  drywall sooner than another vessel could
13  be provided to ship it?
14      A.   We didn't know if there was
15  another vessel available, but our
16  shipper, our freight order told us this
17  is the boat that's available at the time.
18      Q.   North Pacific wanted to get
19  the drywall quickly, didn't they?
20      A.   They did, yes.
21      Q.   You didn't have any
22  communications with Jay Buckley or
23  anybody at North Pacific regarding the
24  fact there may be a delay in getting

156

1   another vessel to import the drywall?
2       A.   Well, like I said earlier I
3   didn't know -- I know they wanted
4   drywall, but I didn't know they wanted it
5   so badly that they would even cancel the
6   order when the boat arrived at the
7   Pensacola port.  I didn't know until then
8   that they say, well, it's too late.  They
9   don't want the drywalls anymore.
10      Q.   Did they tell you it was too
11  late that they didn't want the drywall
12  due to the time it took to get it here or
13  because part of it was damaged?
14      A.   No, they took the good ones.
15  So I believe it was the timing, by the
16  time they already ordered from somebody
17  else also coming from different port.
18  That's my impression, but I could be
19  wrong.
20      Q.   And the time that the
21  drywall and the Sanko Rally was in
22  transit to the United States, North
23  Pacific had placed another order with
24  another company for the import of



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

157

1  drywall, hadn't they?
2      A.   That's what I heard that
3  they also order from other companies and
4  they have other source of drywalls.
5      Q.   Do you know what other
6  companies they ordered Chinese
7  manufactured drywall from?
8      A.   I don't know.
9      Q.   Have you ever heard of a
10  company called Knauf?
11     A.   I didn't hear.  I didn't
12  know this name.
13     Q.   Today have you heard of a
14  company called Knauf?
15     A.   I only heard that name two
16  days ago from my attorneys, but before
17  that I never heard of the name.
18     Q.   So prior to two days ago you
19  never heard of a company called Knauf?
20  It's spelled K-N-A-U-F?
21     A.   Not at all.
22     Q.   Do you know the names of any
23  other distributors or importers that
24  might have manufactured drywall in the

158

1  same facility where Devon obtained the
2  drywall?
3      A.   I heard there are other
4  companies buy the same drywalls from the
5  same factory, but I don't know who.
6      Q.   And how do you know that
7  there were other companies that also or
8  that manufactured drywall at the same
9  factory in China?
10         MS. CALDWELL:  Object to the
11     form.
12  BY MR. LAW:
13     Q.   I'll rephrase it.  You said
14  you heard of other companies that had
15  manufactured drywall in the same facility
16  in China.  And my question is where did
17  you get that information?
18         MS. CALDWELL:  Same
19     objection.
20         THE WITNESS:  Where I get
21     that impression?  I don't know.  I
22     don't know was it from the article
23     or that I only heard that at the
24     time there was the construction

159

1  boom in the South and they needed
2  a lot of drywalls.  So people
3  different companies buying from
4  some source from China.
5  BY MR. LAW:
6      Q.   And you don't know whether
7  one of those companies was a company
8  called Knauf?
9      A.   I don't know.  I really
10  don't know this name.
11     Q.   You said maybe from the
12  articles.  Did you read an article about
13  this construction boom?
14     A.   There was a construction
15  boom in the South in Miami, and then the
16  price of drywall dropped so much because
17  it was a shortage and then it suddenly
18  become over flooded with all the drywalls
19  so the price dropped and the whole
20  construction business is down.
21     Q.   Do you know when the price
22  dropped?
23     A.   When?  Probably around 2007,
24  I guess.

160

1      Q.   Drywall -- the price of
2  drywall is still pretty high in the
3  summer and fall of 2006, wasn't it?
4          MS. CALDWELL:  Object to the
5      form.
6          THE WITNESS:  I cannot make
7      sure.
8  BY MR. LAW:
9      Q.   If you look at Exhibit-25
10  for me, please.
11         MS. CALDWELL:  Jonathon, can
12     you tell us where this came from?
13         MR. LAW:  Sure.  This is
14     another document out of the North
15     Pacific production.
16  BY MR. LAW:
17     Q.   And it's a two-page
18  document.  Page two refers to a survey
19  fee?
20     A.   Yes.
21     Q.   And on page one is an E-mail
22  from you to Dr. Bennett asking him to
23  approve a survey fee in China for the
24  drywall bulk shipment.  Why was Devon



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                    February 25, 2011

161

1  hiring a company to survey the drywall in
2  China?
3       A.    That's for insurance purpose
4  that we want to make sure that we have a
5  surveyor to see the loading and we also
6  have a surveyor to see the unloading.
7       Q.    And were you involved in
8  obtaining the surveyor to see the loading
9  of the vessel?
10      A.    I didn't see any loading or
11  unloading.
12      Q.    Were you involved in
13  selecting the surveyor that was obtained?
14      A.    In China we used a company
15  called Intertech(ph).  Julian found that
16  surveyor.
17      Q.    And then she forwarded the
18  information to you and you requested
19  approval from Dr. Bennett to hire that
20  surveyor?
21      A.    Yes.
22      Q.    And a surveyor was also
23  obtained to survey the unloading of the
24  vessel in Pensacola.  Is that correct?

162

1       A.    Yes.
2       Q.    Did Devon retain the
3  surveyor or did its insurance company
4  Fireman's Fund Insurance Company retain
5  the surveyor?
6       A.    I didn't know any surveyor.
7  I think it was Fireman's Fund make a
8  recommendation, and then Mike Pate say he
9  would split the cost with Devon.
10      Q.    Was this M.H. Barry?  Was
11  that the surveyor that Mike Pate split
12  the cost with Devon to survey the
13  unloading?
14      A.    Yes.
15      Q.    There's another survey
16  company that surveyed the cargo in
17  Pensacola named Sabine Surveyors.  Have
18  you heard of them?
19      A.    No.
20      Q.    Have you ever heard of a
21  gentleman named Ken Atkinson?
22      A.    No.
23      Q.    Devon didn't retain a
24  company called Sabine Surveyors.  Is that

163

1  correct?
2       A.    I don't remember.  I don't
3  think we did.
4       Q.    Exhibit-24 is an E-mail from
5  you to Paul Crowley and Mike Dougherty.
6       A.    Yes.
7       Q.    Dated October 21st, 2007.
8       A.    Yes.
9       Q.    Who is Paul Crowley?
10      A.    He's our attorney.
11      Q.    He's in-house counsel for
12  Devon?
13      A.    Is he in-house or outside?
14  I think his office is outside.
15           MS. CALDWELL:  Jonathon,
16  where did this document come from?
17           MR. LAW:  This was also an
18  exhibit in Mr. Scharf's deposition
19  in the North Pacific arbitration.
20           MS. CALDWELL:  To the extent
21  we don't know if there were any
22  agreements and privileges
23  asserting it, I don't know what
24  occurred in that other litigation.

164

1  But this is obviously
2  correspondence between Miss Wu and
3  an attorney for Devon.  So I just
4  don't know the circumstances under
5  which it was produced in the other
6  litigation, if there's any kind of
7  privilege asserted.
8           MR. LAW:  We'll clear it up.
9  Let's go off the record for a
10  minute.
11           THE VIDEOTAPE TECHNICIAN:
12  Going off the record.  The time on
13  video is 13:46.
14           -  -  -
15           (Whereupon, a brief recess
16  was taken.)
17           -  -  -
18           THE VIDEOTAPE TECHNICIAN:
19  We're now back on the record.
20  Time on video is 13:47.
21           MS. CALDWELL:  Plaintiff's
22  counsel has showed you a document
23  marked plaintiff's Exhibit-26, and
24  we just discussed, we are not



an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                              February 25, 2011

165
 1          waiving any attorney-client
 2      privilege that may be asserted in
 3      connection with this document.
 4              MR. LAW:  Fair enough.
 5      BY MR. LAW:
 6          Q.   If you look at Exhibit-26,
 7      please, that's an E-mail generated by
 8      you, isn't it?
 9          A.   Yes.
10          Q.   And you noted that you
11      reviewed Mr. Bob Scharf's expense report.
12      Do you maintain expense reports for
13      employees of Devon?
14          A.   I do review expense report,
15      but in this case for Bob Scharf I had to
16      take -- I had to take the information
17      from accounting.
18          Q.   You've referenced some
19      visits Mr. Scharf made to China.  It
20      looks like there's four of them or four
21      different trips to China on Exhibit-26.
22      Is that correct?
23          A.   Yes.
24          Q.   Can you tell me how many

166
 1      total days Mr. Scharf was in China from
 2      February 19th through May 14th?
 3          A.   How many days?
 4          Q.   Yes, ma'am.  I counted 31,
 5      but I was going to let you tell me.
 6          A.   Every time he goes there
 7      it's about seven to ten days.  Yeah,
 8      about seven to ten days, so 30 days is
 9      fair.
10          Q.   And this was in 2006, wasn't
11      it?
12          A.   Yes.
13          Q.   And from -- see, you told me
14      from April through May of 2006 is when
15      the drywall is manufactured?
16          A.   March and April it was
17      manufacturing and May is loading.
18          Q.   So he was there in March and
19      April while the drywall is being
20      manufactured and then went back in April
21      and May when the drywall is being loaded?
22              MS. CALDWELL:  Object to the
23      form.
24              THE WITNESS:  He was there

167
 1      in May for the loading.
 2      BY MR. LAW:
 3          Q.   And he was there in March
 4      and April when the drywall was being
 5      manufactured, wasn't he?
 6          A.   Yes.
 7          Q.   Do you know what -- does Mr.
 8      Scharf did he keep like a log of what he
 9      was doing when he was in China on these
10      trips?
11          A.   No, he doesn't.
12          Q.   Do you know what he was
13      doing when he was in China in March and
14      April?
15          A.   At that time we thought this
16      is a big business so he was excited.  He
17      was there, but I don't know what exactly
18      he does.
19          Q.   He would visit the factory
20      when he was there, wouldn't he?
21          A.   Yes, of course.
22          Q.   And do you know how many
23      times Dr. Bennett went to China in March
24      and April when the drywall was being

168
 1      manufactured?
 2          A.   I'm not sure how many times,
 3      but I know he was there at least once.  I
 4      saw the pictures once.
 5          Q.   And Dr. Bennett, he also
 6      visited the factory where the drywall was
 7      manufactured during his trip to China,
 8      didn't he?
 9          A.   Yes, he did.
10          Q.   We'll mark as exhibit number
11      28 a photograph produced by Devon.  Is
12      that Dr. Bennett at the factory in China?
13          A.   Yes.
14          Q.   That would be him standing
15      there holding those little papers under
16      his arm?
17          A.   Yes.
18          Q.   Mr. Scharf, he was in China
19      with Dr. Bennett during that visit that's
20      depicted in Exhibit-28, wasn't he?
21          A.   Yes.
22          Q.   We'll mark this as
23      Exhibit-29, another photograph.  Is that
24      Bob Scharf?  You can kind of barely see



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

169

1  him in the corner there behind that
2  gentleman in the brown coat?
3      A.   Yes, that's Bob Scharf.
4      Q.   Who's the gentleman in the
5  brown coat?
6      A.   I don't know.
7      Q.   And that's Dr. Bennett in
8  the middle of the photograph standing by
9  the drywall, isn't it?
10     A.   Yes.
11     Q.   Exhibit-30 is a photograph
12 of two gentlemen making drywall.  Is that
13 what they are doing there in photograph
14 30?
15     A.   Yes.
16     Q.   Do you know their names?
17     A.   No, I don't know them.
18     Q.   This is -- these three
19 photographs I've just marked that's the
20 facility where the drywall is
21 manufactured, isn't it?
22     A.   Yes, at the factory.
23     Q.   Are there any other
24 factories or was it all manufactured in

170

1  one single factory?
2      A.   To my knowledge this is the
3  only factory that makes the drywall for
4  the Sanko Rally.
5      Q.   Exhibit-31 is a gentleman in
6  a black coat standing in front of some
7  drywall.  Is that Dr. Scharf?  I'm sorry,
8  Dr. Bennett?
9      A.   This is Dr. Bennett.
10     Q.   And who's the woman standing
11 to his right?
12     A.   I don't know if this was
13 Salina.  Salina may accompany him to the
14 factory.
15     Q.   Exhibit-32 is a photograph
16 of a stamp on a sheet of drywall.  You've
17 seen that photograph before, haven't you?
18     A.   Yes.
19     Q.   And the purchase order we
20 looked at earlier, Exhibit-11, North
21 Pacific required that Devon print that
22 stamp on every sheet of drywall?
23         MS. CALDWELL:  Object to the
24     form.

171

1  BY MR. LAW:
2      Q.   Is that correct?
3          MS. CALDWELL:  Misstates
4      previous testimony.
5          THE WITNESS:  This was our
6      drywall, yeah.
7  BY MR. LAW:
8      Q.   If you look at Exhibit-11
9  for me, please.  North Pacific required
10 each sheet of drywall have stamped on it
11 that it meets or exceeds the North
12 American standards.  Is that correct?
13     A.   Yes.
14     Q.   Exhibit-33 is a photograph
15 of a whole bunch of drywall and if you
16 could look at it.  Whose logo is that
17 stamped on the drywall in Exhibit-33?
18         MS. CALDWELL:  Object to the
19     form.  It mischaracterizes the
20     photograph.
21 BY MR. LAW:
22     Q.   Do you see something stamped
23 on the drywall in Photograph 33?
24     A.   Yeah, it looks like it's the

172

1  Devon Building Product on the wrapper.
2      Q.   Have you seen any other
3  logos or names on any of the sheets of
4  drywall that were imported on the Sanko
5  Rally?
6      A.   Not on the sheets.
7      Q.   Exhibit-34 is a better close
8  up.  Is that a better photograph of the
9  logo stamp on the drywall as depicted in
10 Exhibit-34?
11         MS. CALDWELL:  Object to the
12     form.
13         THE WITNESS:  It says Devon
14     Building Products.
15 BY MR. LAW:
16     Q.   Is this Mr. Scharf in
17 Exhibit-35 pointing at a logo stamped on
18 the drywall that says Devon?
19     A.   Yeah, that's Bob Scharf.
20     Q.   Who made the arrangements to
21 truck or ship the drywall from the
22 factory to the Sanko Rally?
23     A.   We arranged the trucking.
24 Devon arranged the trucking.

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

173

1    Q.   Did you handle that or did
2  Mr. Scharf handle it?
3    A.   Julian.
4    Q.   Julian Chu?
5    A.   Yes.
6    Q.   Mr. Scharf was present when
7  the drywall was shipped from the
8  production facility to the Sanko Rally,
9  wasn't he?
10   A.   I'm sorry.  Say that again.
11   Q.   Mr. Scharf was present when
12 the drywall was shipped on these trucks
13 from the factory to the Sanko Rally?
14   A.   Yes.
15   Q.   Was Dr. Bennett present when
16 the drywall was shipped by Devon from the
17 manufacturing facility to the dock?
18   A.   No, there was only one
19 present and that was Bob Scharf.
20   Q.   Exhibit-36 is another
21 photograph.  Is that Dr. Bennett getting
22 in the truck in Exhibit-36?
23   A.   Yes.
24   Q.   Did he drive any of the

174

1  drywall from the factory to the boat?
2    A.   No, he didn't.  They were
3  excited at the time.  Bob Scharf and Dr.
4  Bennett, they were excited.  They wanted
5  to go to China to see the big piles of
6  drywalls and they thought that it looks
7  magnificent.
8         MS. CALDWELL:  Are you done
9    with these, John?
10 BY MR. LAW:
11   Q.   Yes, ma'am.  Exhibit-37 is a
12 letter from you to somebody.  If you take
13 a moment and look at it for me.
14   A.   Yeah.  This was a letter
15 for freight broker to clear the customs
16 in the United States.
17   Q.   You noted in the letter
18 drywalls are building products made of
19 plaster from gypsum mine covered by paper
20 on the face and the back.
21        Have you ever seen drywall
22 manufactured before?
23   A.   No.
24   Q.   Where did you get this

175

1  information from?
2    A.   I just try my best to
3  describe the product, what it is to the
4  customs so that we can be ruled under the
5  correct category and apply for the
6  correct duty rate.
7    Q.   To describe what drywall is
8  as you did in Exhibit-37, did you do any
9  research about drywall?
10   A.   Maybe I look up on Internet
11 for like to describe what it is.
12   Q.   And that's where you got
13 this information that it's a plaster from
14 a gypsum mine?
15   A.   I think I made copy from
16 Internet and try to explain what it is.
17 I don't know if it is the -- it is the
18 right way, right explanation of a
19 product.
20   Q.   You were just making a
21 general statement to customs as to what
22 gypsum is to see if it fell within one of
23 the categories so it would be exempt from
24 being taxed by the customs?

176

1    A.   Yes.
2    Q.   You don't know for a fact
3  whether or not the actual drywall on the
4  Sanko Rally was made of plaster and came
5  from a gypsum mine?
6    A.   My understanding of how a
7  gypsum board is made -- I don't know.
8    Q.   You weren't present during
9  the manufacturing process?
10   A.   I wasn't.
11   Q.   And you don't know whether
12 this -- the drywall on the Sanko Rally
13 came from some sort of recycled product
14 or whether it came out of a mine, do you?
15   A.   From recycled?  I don't
16 know.  I thought -- I was describing the
17 product for tax rate.  It wasn't -- that
18 wasn't for scientific analysis of what it
19 is.  It's just a general description.
20   Q.   I understand.  And I'm just
21 trying to make sure it's clear that you
22 don't know whether the actual drywall in
23 the Sanko Rally came from a gypsum mine
24 or whether it was made from some other



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                    February 25, 2011

177

1  type of recycled product, do you?
2      A.   I would not know.
3      Q.   Who provided you the
4  information for the actual ruling you
5  cite HTS number 6809.11?
6      A.   I found out the duty rate.
7      Q.   From these tariff schedules
8  of the United States?
9      A.   Yes.
10     Q.   I'll make those exhibit
11  number 38.  Is that your handwriting in
12  the bottom where you write gypsum board
13  and you cite the number?
14     A.   Yes.  Yes, that was my
15  handwriting.  Do you have a question?
16     Q.   I think you answered it.  My
17  question was is that the document that
18  you used to come up with the numbers to
19  classify the gypsum product for customs
20  purposes?
21     A.   Yes.
22     Q.   Exhibit-39 is a survey
23  report prepared by Sabine Surveyors, and
24  you told me earlier that this was a

178

1  surveyor retained by Fireman's Fund
2  Insurance Company.  Is that correct.
3      MR. RUSSO:  Objection.
4  BY MR. LAW:
5      Q.   What I'm going to ask you
6  about is on the third to the last page
7  where the cargo is segregated into
8  damaged and undamaged.
9      A.   I never seen this.  I
10  thought our surveyor was the M.H., the
11  other company.
12     Q.   Right.  The M.H. Barry was
13  the surveyor that Devon and Pate,
14  Pensacola Stevedore or Mike Pate shared
15  the cost to survey the unloading of the
16  vessel.
17     A.   Yes, I never seen this.
18     MR. RUSSO:  Objection.
19  BY MR. LAW:
20     Q.   Exhibit-40 is an E-mail from
21  George Clark to Mr. Scharf and Dr.
22  Bennett and you dated September 1st of
23  2006.  Who is Mr. George Clark?
24     A.   He's the head of accounting

179

1  department.
2      Q.   And who does he work for?
3      A.   The accounting department
4  works for various companies.
5      Q.   So he also was the head --
6  is he the accountant for or at least at
7  this time for Devon International
8  Trading?
9      A.   Yes.
10     Q.   When I'm saying this time,
11  I'm referring to Exhibit-40.  Back in
12  September he would have been the head of
13  accounting for Devon International
14  Trading?
15     A.   Yes.
16     Q.   And he notes this thumbnail
17  sketch and references the total bundles
18  of drywall.  Then he references declared
19  to be unusable 3,760 bundles.  Do you see
20  that?
21     A.   Yes.
22     Q.   Then the bundles available
23  for sale is 3,373.
24     A.   Yes.

180

1      Q.   Then it notes that the
2  bundle counts have been taken from
3  current records of Ruth Wu.  Where did
4  you get this segregation of the damaged
5  -- I'm sorry -- of the unsalable versus
6  the bundles available for sale?
7      A.   There was a letter from Mike
8  Pate saying he finished the unloading and
9  how many bundles are good and how many
10  are bad, how many went to the dumpsters
11  directly.
12     Q.   Did you ever talk to anybody
13  from Fireman's Fund Insurance Company
14  regarding the segregating the unusable
15  bundles into one section of the warehouse
16  and the usable ones into another?
17     A.   I didn't.  I didn't talk to
18  Fireman's Fund.
19     Q.   You never talked to anybody
20  from Fireman's Fund?
21     A.   Not at all.
22     Q.   Would Mr. Galen Hawk have
23  likely been the gentleman that would have
24  coordinated with Fireman's Fund on the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                          February 25, 2011

181

1    insurance claim?
2        A.   He would be the person.
3        Q.   But you got this record from
4    Mike Pate?
5        A.   Yes.
6        Q.   Do you know where he got it
7    from?
8        A.   I don't know.  I thought he
9    did the job so he knows the number.
10       Q.   In any event, the unsalable
11   bundles of drywall, who took possession
12   of those?
13       A.   I don't know.  I only know
14   that we only have the title for the good
15   ones and we don't have the title for the
16   bad ones.
17       Q.   The 3,700 -- the 3,373
18   bundles that were available for sale,
19   were those the good ones that Devon kept
20   title to?
21       A.   Yes.
22       Q.   And of those 3,300 bundles
23   you sold some of them on the Internet,
24   didn't you?

182

1        A.   Yes.
2        Q.   Did you sell them on eBay?
3        A.   Yes, we did, very few.
4        Q.   What did you do -- you sold
5    them to customers besides North Pacific,
6    didn't you?
7        A.   Yes.
8        Q.   The ones that were sold on
9    the Internet --
10       A.   By you you meant Devon,
11   right?
12       Q.   Yes, ma'am.
13           MR. ROBERTSON:  Jonathon?
14           MR. LAW:  Yes, Jim.
15           MR. ROBERTSON:  Can we go
16       off the record for just a moment,
17       please, off the video for a
18       moment?
19           MR. LAW:  Let me finish my
20       line of questioning here.
21           MR. ROBERTSON:  I had an
22       objection that I just wanted to
23       make, and I didn't want to mess up
24       your video.

183

1            MR. LAW:  All right.
2            THE VIDEOTAPE TECHNICIAN:
3        Going off the record.  Time on
4        video is 14:08.
5            MR. ROBERTSON:  If I could
6        have a standing objection to the
7        characterization of drywall as
8        either good or bad or usable or
9        unusable.  If I could have a
10       standing objection to the form of
11       those questions and have that
12       agreement with you, then I won't
13       make any further objection on that
14       line of questioning.
15           MR. LAW:  That's fine, Jim.
16           MR. PIPES:  And we agree
17       that an objection by one is an
18       objection by all.
19           THE VIDEOTAPE TECHNICIAN:
20       We're now back on the record.
21       Time on video is 14:09.
22   BY MR. LAW:
23       Q.   The 3,300 bundles of drywall
24   available for sale, some of that was sold

184

1    to North Pacific, wasn't it?
2        A.   Yes.
3        Q.   Can you just give me an
4    approximate number of bundles that was
5    sold to North Pacific?
6        A.   I don't have the -- I cannot
7    remember numbers, but I think it was --
8    the numbers is in the documents we
9    produced.
10       Q.   North Pacific, they knew
11   what they were getting, didn't they,
12   because you had provided them with
13   samples before the drywall came into the
14   U.S.?
15       A.   Yes.
16       Q.   Some of these other 3,300
17   bundles that were available for sale,
18   some of that was sold to a company called
19   Mazer Supply?
20       A.   Yes.
21       Q.   And some was sold to Gulf
22   Coast Shelter?
23       A.   Yes.
24       Q.   I know there were other



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                February 25, 2011

185

1 people. I'm just asking about the few of
2 them. Then some of it was sold on the
3 Internet as well?
4      A.   Yes.
5      Q.   About how many bundles were
6 sold on the Internet?
7      A.   I don't know exact. It was
8 only very few. I would say under ten
9 truckload.
10      Q.   Truckloads, there's 476
11 sheets on a truck?
12      A.   Sounds about right.
13      Q.   About seven bundles?
14      A.   Yes.
15      Q.   And you all sold about ten
16 of those truckloads on the Internet?
17      A.   Yes.
18      Q.   Were all ten, approximately
19 ten truckloads sold through eBay?
20      A.   Less than ten truckloads.
21      Q.   Less than ten were sold
22 through eBay?
23      A.   Yes.
24      Q.   EBay didn't take title to

186

1 that drywall, did they?
2      A.   No, eBay didn't.
3      Q.   You just used eBay to market
4 it and exchange information to potential
5 purchasers?
6      A.   We posted it on eBay say for
7 the buyer, interested buyers can go to
8 the port to look at the drywall and pick
9 up from there.
10      Q.   But eBay is an Internet
11 website, isn't it?
12      A.   Yes.
13      Q.   And you used eBay to pass
14 information to kind of advertise that the
15 drywall was for sale to potential
16 customers?
17      A.   Yes.
18      Q.   At no time did eBay take
19 title to any of the drywall?
20      A.   No.
21      Q.   You didn't actually --
22 strike that.
23      What did Devon do from a
24 quality control standpoint to test the

187

1 drywall before it sold it to Mazer and
2 Gulf Coast Shelter and some of these
3 other purchasers that wasn't provided
4 advanced samples?
5      A.   Well, we didn't do any
6 testing. But like I said, they have to
7 come to the port, look at the product.
8 If they like, they pick up from the port.
9 We didn't make any deliveries.
10      Q.   Did you allow any of these
11 purchasers to take three full size sheets
12 with them so they could test it to see if
13 it did in fact conform with ASTM
14 standards that Devon printed on the
15 board?
16      MS. CALDWELL:  Object to the
17      form.
18      THE WITNESS:  I wasn't in
19      Pensacola so I didn't know how the
20      sales was made.
21 BY MR. LAW:
22      Q.   She didn't like my question
23 so I'm going to ask it another way. To
24 your knowledge did Devon permit any of

188

1 these purchasers to remove three full
2 size sheets of drywall to test it to
3 ensure that the AST -- that it met the
4 ASTM standard printed on the board?
5      A.   To my knowledge I didn't
6 hear anyone requested that.
7      Q.   So to your knowledge that
8 was not done?
9      A.   Right, because they didn't
10 request that they wanted to test.
11      Q.   Did Devon tell any of these
12 purchasers that they didn't have any test
13 reports that could substantiate or
14 indicate that the drywall did in fact
15 conform to the ASTM standards printed on
16 the board?
17      A.   We didn't tell them what we
18 don't have because it wasn't requested.
19      Q.   Did it ever occurred to you
20 that some of these purchasers may be
21 relying on the fact that the board says
22 it meets or exceeds the ASTM 1396?
23      MS. CALDWELL:  Object to the
24      form.



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                              February 25, 2011

189

1        THE WITNESS:  I cannot guess
2   what they think.
3   BY MR. LAW:
4        Q.    The 3,760 bundles that were
5   declared unusable, at some point in time
6   Devon had an opportunity to purchase
7   those back from the insurance company,
8   didn't they?
9        A.    No, I didn't know that.
10       Q.    That would be a question for
11  Mr. Hawk or Mr. Scharf?
12       A.    Yeah, I never heard about
13  that.
14       Q.    Devon kept title to the 37
15  -- I'm sorry, the 3,373 bundles?
16       A.    Correct.
17       Q.    Did Devon release title to
18  the 3,760 bundles to somebody else?
19       A.    When the customer -- my
20  belief is that when the customer takes --
21  picks up the product from the port they
22  -- the title is transferred to the
23  customer.
24       Q.    Do you know who it was

190

1   transferred to the customer from who?
2        A.    So if -- so say Mazer come
3   to pick up the drywall from the port, so
4   from the time they pick up they have the
5   title, the goods.  That's my
6   interpretation.
7        Q.    But they didn't take that
8   title from Devon?
9        A.    It's very technical.
10       Q.    I think I'm getting
11  outside -- I'm going to show you
12  Exhibit-41 and we'll move on.  Exhibit-41
13  is from Dr. Bennett to you and Mr. Clark
14  and a Peter Sinaca (ph).  Who is Peter
15  Sinaca?
16       A.    I'm not -- I know him --
17  what he represents -- I think he's from a
18  credit insurance guy or for credit or
19  finance type of person.  I wasn't sure
20  why he is copied or he's sent on this
21  E-mail.
22       Q.    Dr. Bennett noted that Nor
23  Pac is taking the undamaged portion of
24  the load and that would have been the

191

1   3,300 sheets that we talked about?
2        A.    That's what he says in this
3   E-mail, but he -- that's what he thinks,
4   but --
5        Q.    That didn't in fact happen,
6   did it?
7        A.    I don't think it happened.
8   Nor Pac didn't take -- on them is a
9   portion of this load.  He thought that
10  Nor Pac would take all.
11       Q.    All undamaged drywall?
12       A.    Right.
13       Q.    And that would be the 3,373
14  sheets?
15       A.    Right.
16       Q.    Did Nor Pac in fact end up
17  taking all 3,373 sheets for approximately
18  $2 million?
19       A.    You mean bundles.
20       Q.    Thank you.  Did Nor Pac
21  actually end up purchasing the 3,300
22  bundles for $2 million?
23       A.    They only took a portion of
24  it not the whole.

192

1        Q.    Did Devon end up selling the
2   remainder that North Pacific did not
3   purchase?
4        A.    So we sold to Mazer, Gulf
5   Shelter.
6        Q.    And some other --
7        A.    And some small orders.
8        Q.    And my question is was it
9   all ultimately sold, all of the 3,300
10  bundles?
11       A.    I believe it was all sold.
12  It took a while.
13       Q.    Dr. Bennett noted that he'd
14  like to meet with you -- I'm not saying
15  you.  I'm quoting from the letter.  In
16  the next two weeks before I return to
17  China.
18            Did you meet with Dr.
19  Bennett around this time before he
20  returned to China?
21       A.    I meet with him all the
22  time.  So in here he meant to me with --
23  I would say he meant to me with George
24  Clark and Peter Sinaca.



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                    February 25, 2011

193

1     Q.   Do you know what he went
2  back to China for around July of 2006?
3     A.   I don't know if he did.
4     Q.   Tell me if you need a break.
5  Exhibit-42.
6         MS. CALDWELL:  42.
7  BY MR. LAW:
8     Q.   Exhibit-42 appears to be a
9  fax from you to George Johnson at North
10 Pacific.  Were you invoicing Mr. Johnson
11 at North Pacific for 229,000 sheets
12 approximately of drywall?
13    A.   Yes.
14    Q.   If you look at page two
15 there's the actual invoice and it lists
16 the quantity and then there's a price
17 listed.  Do you see that?
18    A.   Yes.
19    Q.   Was the price $8.50 per
20 sheet?
21    A.   That's what it says.
22    Q.   Was that the average price
23 that Devon was selling the undamaged, the
24 salable drywall for around this time

194

1  period?  That was July of 2006?
2     A.   At that time we only had one
3  buyer that was North Pacific.
4     Q.   And was that the price they
5  were paying for the drywall they were
6  purchasing in July of '06, $8.50 a sheet?
7     A.   Yeah, at that time they pay
8  for $8.50 per sheet.
9     Q.   Was that the market price at
10 least wholesale market price for drywall
11 back in July of 2006?
12    A.   I don't know the wholesale
13 price at the time.
14    Q.   Who established that price
15 of 8.50 per sheet?
16    A.   I guess that was Bob Scharf.
17    Q.   You weren't involved in
18 negotiating that price for North Pacific?
19    A.   No.
20    Q.   What was the average price
21 that Devon was -- strike that.
22         North Pacific returned some
23 of the drywall to Devon because it was
24 damaged, didn't they?

195

1         MS. CALDWELL:  Object to the
2  form.
3         THE WITNESS:  That was in
4  the E-mail.
5  BY MR. LAW:
6     Q.   Exhibit-43 is a letter from
7  Mr. Jackson to you on August of 2006.
8     A.   Yeah, they accepted most of
9  the goods except for the small -- I
10 notice a small deduction, and he wrote
11 back because those were broken.
12    Q.   Did Devon take those sheets
13 back or did North Pacific retain the
14 broken sheets?
15    A.   I think they kept those
16 sheets.
17    Q.   They didn't pay for them,
18 did they?
19    A.   They didn't pay, but they
20 kept those.
21    Q.   And did Devon permit North
22 Pacific to deduct the -- from the
23 purchase price the amount of money for
24 the drywall that was damaged?

196

1     A.   We didn't permit.  We didn't
2  want to accept.  They just short pay.
3     Q.   What did Devon do about
4  that?
5     A.   Can't do anything.
6     Q.   This happened several times,
7  didn't it?
8     A.   I don't know how many.  It
9  was small, small amount.
10    Q.   But this happened on more
11 than one occasion where North Pacific
12 would deduct money for drywall that was
13 damaged in their shipment?
14    A.   I thought it was only once.
15         MS. CALDWELL:  Object to the
16 form.
17 BY MR. LAW:
18    Q.   At the top George Jackson
19 refers to an agreement with Bob Scharf
20 that Devon would cover all claims for
21 quality and this is definitely a quality
22 claim.  Were you aware of such an
23 agreement?
24    A.   I don't believe there was an



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

197

1  agreement specifically discussed --
2  discussing about quality or warranty.
3      Q.   So you disagree with what
4  Mr. George Jackson says here that there
5  was an agreement with Devon that Devon
6  would cover all claims for quality?
7          MS. CALDWELL:  Object to the
8      form.
9          THE WITNESS:  There wasn't
10     any written agreement, and he can
11     say whatever he wants to say.
12 BY MR. LAW:
13     Q.   So you disagree with him?
14     A.   Yes.
15     Q.   I'm showing you Exhibit-44.
16 What is this?
17     A.   The daily pickup log
18 maintained by Mike Pate.
19         MR. PIPES:  Object to the
20     form.
21 BY MR. LAW:
22     Q.   At the top there's some
23 handwriting there.  It says Bob slash
24 Ruth I have pictures to E-mail of return

198

1  truck.  Which E-mail do you want me to
2  use?  Do you know whose handwriting that
3  is?
4      A.   I don't know.
5      Q.   And you'll see there's on
6  line six and line 13 it looks like some
7  drywall was returned.  Is that correct?
8      A.   Yes, that's what it says.
9      Q.   Did you get some pictures
10 E-mailed to you showing why this drywall
11 is returned?
12     A.   I didn't receive any
13 pictures.
14     Q.   Do you have any reason to
15 disagree with what's on this document
16 that drywall is returned on items number
17 six and number 13?
18     A.   No, it is what it says here,
19 but I didn't receive the E-mail and I
20 didn't see -- I didn't see the damage of
21 the drywall.
22         MR. LAW:  Go off the record.
23         THE VIDEOTAPE TECHNICIAN:
24     Going off the record.  The time on

199

1  video is 14:24.
2          - - -
3      (Whereupon, a brief recess
4      was taken.)
5          - - -
6          THE VIDEOTAPE TECHNICIAN:
7      We're now back on the record.  The
8      time on video is 14:25.
9  BY MR. LAW:
10     Q.   I understand you didn't get
11 any pictures E-mailed to you, but this
12 drywall listed in item number six and
13 number 13, those bundles, it looks like
14 35 and 77, those were returned, weren't
15 they?
16     A.   It says returned, but I
17 don't know if it was returned to the
18 location at Pate Stevedore Company.
19     Q.   Do you know why Mike Pate
20 would send you this document or did he
21 send this document to you?
22     A.   He had his -- his staff to
23 fax this pickup log to us every day.
24     Q.   Why was this pickup log

200

1  faxed to you every day?
2      A.   So we know how many bundles
3  were picked up out of the 3,373.
4      Q.   And when you got these
5  pickup logs, sometimes they would
6  indicate that some bundles had been
7  returned such as Exhibit-44, didn't they?
8      A.   Yeah, in that case they just
9  whoever -- are these from North Pacific?
10 They just not pay.
11     Q.   It says Orgill (ph).  Did
12 Devon sell some drywall to Orgill?
13     A.   No, not directly.  I don't
14 think that was Mazer or -- this is July
15 so it must be North Pacific's customer.
16     Q.   So some of the drywall that
17 Devon sold to North Pacific that North
18 Pacific sold to its customers was
19 returned back to Devon?
20     A.   It says returned here, but I
21 don't think any drywall were picked up
22 and returned back to the location because
23 the trucking is very expensive and it's
24 just keep the drywall and not pay for it.



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                February 25, 2011

201

1       MR. LAW:  We're going to
2   take a five-minute break.
3       THE VIDEOTAPE TECHNICIAN:
4   Going off the record.  This is the
5   end of tape number two in the
6   deposition of Ruth Wu.  Time on
7   video is 14:27.
8           - - -
9       (Whereupon, a brief recess
10   was taken.)
11          - - -
12      THE VIDEOTAPE TECHNICIAN:
13   We're now back on the record.
14   This is the beginning of tape
15   number three in the deposition of
16   Ruth Wu.  Time on video is 14:40.
17  BY MR. LAW:
18      Q.   I'm going to show you
19   Exhibit-45.  Exhibit-45 is -- well, tell
20   me what Exhibit-45 is, please.
21      A.   I don't know when they use
22   this.  It looks to me like the form in
23   addition to this they used for the pickup
24   from the port.

202

1       Q.   Did anybody to your
2   knowledge sell drywall off the Sanko
3   Rally to North Pacific besides Devon?
4       A.   No, not that I'm aware of.
5       Q.   There's a reference on here
6   to gypsum drywall A grade.  Does that
7   indicate that this is a bundle or a
8   shipment of drywall that was not damaged
9   or broken?
10      A.   Yeah, that's from the 3,373
11   bundles.
12      Q.   That means it came out of
13   the 3,373, the A grade reference?
14      A.   Yes.
15      Q.   And that would have been
16   drywall that Devon sold as opposed to --
17      A.   This is not Devon sold to
18   North Pacific, but this is their internal
19   documents.
20      Q.   It indicates that some of
21   the drywall was returned.  It says stock
22   turned down.  Then returned wet.
23      A.   Handwriting on it?
24      Q.   Yes, ma'am.

203

1       A.   I didn't see this part
2   before.
3       Q.   To your knowledge did North
4   Pacific return any drywall because it was
5   wet?
6       A.   Not that I'm aware of.
7       MS. CALDWELL:  Same
8   objection.  Jonathon, this looks
9   like an -- a letter from Miss Wu
10   to Devon's in-house counsel or
11   counsel for Devon Paul Crowley.
12   We didn't produce it, so we are
13   not waiving any privilege that may
14   be attached.
15      MR. LAW:  Duly noted.
16  BY MR. LAW:
17      Q.   If you look at Exhibit-46,
18   please, there's a list of sales.  You got
19   Mazer, Gulf, Nor Pac, Sharkey, Maga,
20   Internet.  There's a few others.  Are
21   these vendors that Devon sold drywall to?
22      A.   Do I have to answer this?
23      MS. CALDWELL:  We have not
24   waived any privilege.

204

1       THE WITNESS:  Yeah, that
2   looks like a summary of the
3   drywall we sold.
4   BY MR. LAW:
5       Q.   Did you keep track of the
6   amounts of drywall sold by Devon and who
7   it went to?
8       A.   I didn't keep a record, and
9   that was why that at the time I had to
10   get the numbers from accounting and give
11   it to Paul Crowley.
12      Q.   Somebody in accounting in
13   the normal course of business at Devon
14   would keep records of the amount of money
15   the drywall is sold for?
16      A.   We didn't keep a record
17   until Paul Crowley asked.  He requested.
18   So we provided this number, yes.
19      Q.   Who would have kept track of
20   the sales, the drywall sales and how much
21   the drywall was sold for at Devon?
22      A.   Accounting.
23      Q.   To your knowledge was this
24   -- does Exhibit-46 reference all of the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

205

1    drywall sales for the drywall that Devon
2    sold?
3        A.   Yes.
4        Q.   And it came out to
5    approximately $1,091,412?
6        A.   Yeah, that's the -- that was
7    the sales.
8        Q.   Do you know how much money
9    the insurance company paid, Fireman's
10   Fund Insurance Company paid Devon?
11       A.   I'm not sure.
12       MS. CALDWELL:  Jonathon, you
13       are not going to ask her anything
14       about the insurance claim, are
15       you?  Because she's not being
16       offered for that purpose.
17       MR. LAW:  I've asked her a
18       few things and records where her
19       name appears.  It's my
20       understanding you all are going to
21       tender a witness in that regard.
22       Is that correct?
23       MR. BROWN:  That's correct.
24   BY MR. LAW:

206

1        Q.   Exhibit-47 is a fax
2    transmittal, and then there's nine plus
3    one pages that says to Bob Scharf.  And
4    you noted on here I hope these help.  And
5    it looks like a bunch of information on
6    gypsum recycling companies.  Is that
7    correct?
8        A.   This was when he was down in
9    Pensacola he asked me to look for some
10   information.
11       Q.   Did Devon contemplate
12   selling some of the broken and damaged
13   drywall to a recycling company?
14       A.   I don't know what his plan
15   was.
16       MS. CALDWELL:  Object to the
17       form.
18       THE WITNESS:  He asked me to
19       search for information, but I
20       don't think we ever sold to any
21       waste or scrapping, recycling
22       business.
23   BY MR. LAW:
24       Q.   Do you know that for a fact

207

1    or is there somebody else I should ask
2    that question?
3        A.   I don't think we ever sold
4    to any this kind of organization or
5    company.
6        Q.   Did Mr. Scharf tell you why
7    he was requesting information on gypsum
8    recycling companies?
9        A.   I don't know why.
10       Q.   Exhibit-48 is another
11   purchase order for drywall.  This
12   purchase order is dated April 2006, and
13   it looks like at least this purchase
14   order contemplated a shipment of drywall
15   going into Savanna, Georgia?
16       A.   It is a second order.
17       Q.   Did Devon actually ship a
18   boat of 485,044 sheets of drywall to
19   Savanna, Georgia?
20       A.   No, this one we didn't ship.
21       Q.   Was this order canceled?
22       A.   It was canceled.  I don't
23   know when, but we didn't ship this order.
24       Q.   Did North Pacific cancel the

208

1    order?
2        A.   I don't know whether they
3    canceled it or I'm not sure.
4        Q.   Do you know why the order
5    never shipped?
6        A.   I know this one was never
7    shipped.
8        Q.   Do you know why?
9        A.   I guess everyone was so busy
10   --
11       MS. CALDWELL:  Don't guess.
12       Do you know?
13       THE WITNESS:  We just want
14       to ship the first order and then
15       figure the second.
16   BY MR. LAW:
17       Q.   Was an order ever placed
18   with the factory in China for the
19   manufacture of the drywall that was
20   contemplated by Exhibit-40?
21       A.   No, it wasn't.
22       Q.   Had an order been placed
23   with the same factory have been used?
24       MS. CALDWELL:  Object to the



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

209

1          form.  Calls for speculation.
2          THE WITNESS:  If they ever
3     place this order to that factory,
4     I would not know.
5     BY MR. LAW:
6          Q.   Did you talk with Mr. Chu
7     about using the same factory to place a
8     second order for drywall?
9          A.   For this order?
10         Q.   Yes, ma'am.
11         A.   If I did I don't remember.
12         Q.   Would you look at Exhibit-11
13    for me, please?  Did you prepare any
14    agreements or contracts to sell drywall
15    to some of these other companies we've
16    talked about like Mazer and Sharkey?
17         A.   No, I didn't.
18         Q.   Did you ever prepare any
19    purchase orders or invoices?
20         A.   Invoices.
21         Q.   Do you know if anybody else
22    at Devon prepared any agreements for any
23    of these other entities such as Mazer to
24    purchase drywall from Devon?

210

1          A.   Not that I'm aware of.
2          Q.   Exhibit-11, did you
3     prepare -- you reviewed that when North
4     Pacific prepared it, didn't you?
5          A.   Yes.
6          Q.   And it was sent to your
7     attention?
8          A.   I receive it in an E-mail
9     either from North Pacific directly or
10    from Bob Scharf.
11         Q.   Do you know of any written
12    contracts or agreements between North
13    Pacific and Devon besides Exhibit-11 that
14    would pertain to the purchase of drywall?
15         A.   I don't think there was any.
16         Q.   Have you seen any documents
17    that would indicate that Devon was
18    disclaiming all warranties for the
19    drywall that it intended to sell to North
20    Pacific?
21         A.   There wasn't any written
22    agreement about any warranty.
23         Q.   So you haven't seen any
24    written document that Devon was

211

1     disclaiming warranties in the products
2     that it intended to sell to North
3     Pacific?
4          A.   I didn't see any.
5          Q.   Do you live in a house?
6          A.   Condo.
7          Q.   You have drywall in your
8     condo, don't you?
9          A.   Yes.
10         Q.   It's not the drywall that
11    came in on the Sanko Rally, is it?
12         A.   No.
13         Q.   When the order was placed by
14    North Pacific with Devon for the
15    manufacture and importation of drywall,
16    you knew what drywall was used for,
17    didn't you?
18         A.   For houses, yes.
19         Q.   Used in the construction of
20    residential homes like yours?
21         A.   Yes.
22         Q.   When Devon imported the
23    drywall and sold it to these various
24    vendors, you were aware that that drywall

212

1     was going to end up in residential homes
2     such as my client's houses, weren't you?
3          MS. CALDWELL:  Object to the
4     form.
5          THE WITNESS:  The drywalls,
6     the purpose of the product is
7     intended for residential use or
8     commercial use.
9     BY MR. LAW:
10         Q.   And you were aware that
11    Devon intended to sell the drywall that
12    it obtained -- strike that.
13         You were aware that North
14    Pacific intended to sell the drywall that
15    it obtained from Devon to various other
16    vendors and distributors ultimately to be
17    installed in people's houses, didn't you?
18         A.   Yeah, I can see that.
19         MR. LAW:  I'm probably going
20    to have more questions, but I'm
21    going to pass the witness.
22         MS. CALDWELL:  Can we go off
23    the record?
24         THE VIDEOTAPE TECHNICIAN:



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                    February 25, 2011

213

1    Going off the record.  Time on
2    video is 14:53.
3            - - -
4        (Whereupon, a brief recess
5    was taken.)
6            - - -
7        THE VIDEOTAPE TECHNICIAN:
8    We're now back on the record.  The
9    time on video is 14:55.
10   BY MR. PIPES:
11       Q.   Miss Wu, my name is Wesley
12   Pipes.  I represent Pensacola Stevedore
13   Company Inc. and Pate Stevedore Company
14   Inc.  I'm just going to ask you some more
15   questions.
16       First of all, are you
17   familiar with Mike Pate?
18       A.   I talked to him on the phone
19   several times.
20       Q.   Did you ever meet him in
21   person?
22       A.   No.
23       Q.   What is your understanding
24   of Mr. Pate's occupation?

214

1        A.   I know that he has Pate
2    Stevedore Company, and he handles
3    unloading, charging from the goods from
4    the boat to the port.
5        Q.   From the port of Pensacola?
6        A.   Yes.
7        Q.   So you understand he's a
8    stevedore?
9        A.   Yes.
10       MS. CALDWELL:  Object to the
11   form.
12   BY MR. PIPES:
13       Q.   Did you ever meet him in
14   person?
15       A.   No, never.
16       Q.   Did you ever travel to the
17   port of Pensacola?
18       A.   I've never been to
19   Pensacola.
20       Q.   Are you the records
21   custodian for Devon International
22   Industries?
23       A.   What is custodian?
24       Q.   Well, let me tell you why

215

1    I'm asking.  You filed an affidavit in
2    support of Devon's motion to dismiss the
3    current or several of the current actions
4    for lack of jurisdiction.
5        Do you remember preparing
6    that affidavit?
7        A.   I sign -- I look at it and I
8    signed.
9        Q.   And I apologize.  I don't
10   have a copy in front of me, and I
11   apologize for that.  But one of the
12   things that was said in the affidavit is
13   that you are the records custodian for
14   Devon International Industries.
15       A.   To keep the files.
16       Q.   And Devon International
17   Industries was formally known as Devon
18   International Trading Company.  Is that
19   correct?
20       A.   Devon International
21   Industries?
22       Q.   Yes.
23       A.   Yes.
24       Q.   Now, is it okay if I just

216

1    refer to both of those as Devon?
2        A.   Yeah, it would be easier for
3    everyone.
4        Q.   Devon sold a lot of the
5    product that it kept after the load was
6    unloaded at the port of Pensacola to
7    North Pacific.  Is that correct?
8        A.   I'm sorry.  The question
9    again?
10       Q.   After the ship came in --
11       A.   Yes.
12       Q.   -- there was damage to the
13   load.  Is that correct?
14       A.   Yes.
15       Q.   Devon kept some of the load.
16   It kept the undamaged portion of the
17   load.  Is that correct?
18       MS. CALDWELL:  Object to the
19   form.
20       THE WITNESS:  It kept --
21   well --
22           - - -
23       (Whereupon, a brief recess
24   was taken.)



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                February 25, 2011

217

1          - - -
2    BY MR. PIPES:
3        Q.   The ship came in.  It's your
4    understanding that the drywall suffered
5    damage in transit from China.  Is that
6    correct?
7        A.   Yes.
8        Q.   The drywall was divided into
9    damaged and undamaged.  Is that correct?
10       A.   Yes.
11         - - -
12         (Whereupon, a brief recess
13       was taken.)
14         - - -
15         THE VIDEOTAPE TECHNICIAN:
16       We are now back on the record.
17       The time on video is 15:35.
18   BY MR. PIPES:
19       Q.   Miss Wu, you are aware that
20   some of the sheet rock was damaged in
21   shipment from China.  Is that correct?
22       A.   Yes.
23       Q.   And after it arrived in the
24   port of Pensacola the sheet rock was

218

1    divided into good sheet rock and for lack
2    of a better term bad sheet rock.  Is that
3    correct?
4        A.   Yes.
5        Q.   And Devon kept title to the
6    good sheet rock?
7        A.   Correct.
8        Q.   And then Devon sold that
9    sheet rock to various customers.  Is that
10   correct?
11       A.   Yes.
12       Q.   And for example, North
13   Pacific was one of those customers?
14       A.   Yes.
15       Q.   And then Gulf Coast Shelter?
16       A.   Yes, that's another one.
17       Q.   And Mazer Discount Home
18   Center?
19       A.   Correct.
20       Q.   And Maga, M-A-G-A, Material
21   Supply, are you familiar with that?
22       A.   I can see from this one
23   that's a very small number.
24       Q.   And you are looking at

219

1    Exhibit-46.  Is that correct?
2        A.   Yes.
3        Q.   Were you familiar with those
4    sales to Gulf Coast Shelter and to Mazer
5    and Maga?
6        A.   All I did after the shipment
7    arrived was to invoice them.
8        Q.   You invoiced those
9    companies?
10       A.   Yes, based on the pickup
11   log.
12       Q.   Let me show you what I'm
13   going to mark as Exhibit-49.  What is
14   Exhibit-49?
15       A.   It's from our accounting
16   system.  It's receivable invoices.
17       Q.   If you would, please, after
18   you have a chance to look at it, please
19   tell me what Exhibit-49 is?
20       A.   It's an invoice report from
21   our accounting system.
22         MR. ROBERTSON:  Have you all
23       been going forward with the
24       deposition while we've been off

220

1    the line?
2          MR. PIPES:  We have.  I
3        showed her an exhibit and asked
4        her what it was.
5          MR. RUSSO:  Just started.
6          MR. PIPES:  Just now.
7    BY MR. PIPES:
8        Q.   If you would, please,
9    describe what Exhibit-49 is.
10       A.   This is an account
11   receivable invoice history report
12   generated by our -- from our accounting
13   system.
14       Q.   And does that deal solely
15   with Gulf Coast Shelter?
16       A.   For this part only for Gulf
17   Coast Shelter.
18       Q.   And do you know where Gulf
19   Coast Shelter is located?
20       A.   Not on top of my head.
21       Q.   Do you know if they are
22   located in Alabama?
23       A.   I don't know.
24       Q.   What was the total sales if


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

221

1  you flip to the last page?
2      A.   530,740.
3      Q.   To Gulf Coast Shelter?
4      A.   Yes, that's what it says.
5      Q.   Thank you.  I'm going to
6  show you what I'm going to mark as
7  Exhibit-50.  After you have a chance to
8  look at it, please let me know what
9  Exhibit-50 is.
10     A.   It's an invoice from Devon
11 International Trading to Mazer.
12     Q.   Where is Mazer located?
13     A.   It says Birmingham, Alabama.
14     Q.   And how much -- what were
15 the total sales to Mazer?
16     A.   This one here on this
17 invoice is 42,840.
18     Q.   Were there other invoices to
19 Mazer?
20     A.   Well, attached to this
21 document it looks like in total there was
22 294,426.
23     Q.   To Mazer?
24     A.   To Mazer.

222

1      Q.   Will you agree with me that
2  Devon sold this sheet rock to customers
3  in Alabama?
4          MS. CALDWELL:  Object to the
5      form.
6          THE WITNESS:  Well, in that
7      invoice it says to Mazer.  We bill
8      to Alabama.  They have different
9      locations.
10 BY MR. PIPES:
11     Q.   Mazer has different
12 locations?
13     A.   I don't know.  A lot of them
14 have different locations.  So I bill -- I
15 send the invoice to Alabama.  I don't
16 know where they sell the drywalls to.
17     Q.   Do you know where it was
18 delivered?
19     A.   Because all the customers
20 came to the port to pick up from
21 Pensacola, I have no knowledge where they
22 sell their drywalls to.
23     Q.   What about Gulf Coast
24 Shelter?

223

1      A.   Gulf Coast Shelter the same
2  thing that I send invoice to them and
3  they came to Pensacola to pick up, but I
4  don't know where they sell to.
5      Q.   Will you agree with me that
6  some of this -- some of the good sheet
7  rock that was kept by Devon was sold to
8  people ultimately in Alabama?
9      A.   Could be, but I don't know
10 because they came to pick up and I
11 invoice to their headquarters.
12     Q.   Who would be in a better
13 position at Devon to know that other than
14 yourself?
15     A.   I don't think anybody would
16 know because we didn't track down where
17 those drywall after they leave the port.
18 So I was told to invoice those
19 headquarters, but we don't know where and
20 who they sell to.
21     Q.   Okay.  Do you have any
22 knowledge of the insurance claim filed by
23 Devon with regard to the damaged sheet
24 rock?

224

1      A.   No, I wasn't involved in the
2  insurance claim.
3      Q.   Do you know who was involved
4  in the insurance claim?
5      A.   It was Galen Hawk.
6      Q.   Anybody else?
7      A.   Not that I'm aware of.
8      Q.   Are you aware that Galen
9  Hawk is an attorney?
10     A.   Yes.
11     Q.   Do you know of anyone who
12 worked directly for Devon?  In other
13 words, was it a Devon employee who would
14 know about the insurance claim?
15     A.   I don't think anyone was
16 directly involved.  I don't know.  I
17 don't know who was involved.
18     Q.   Who was supposed to pay the
19 Stevedores for their services in relation
20 to unloading the ship?
21     A.   To pay Stevedore, Devon,
22 Devon International Trading paid Pate
23 Stevedore.
24     Q.   Let me show you what we're



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                    February 25, 2011

225

1  going to mark as Exhibit-51.  Is that an
2  E-mail from you to John Bennett and
3  Robert Scharf?
4       A.   Yes.
5       Q.   Who is Kevin Sugg?
6       A.   He's right there.
7       Q.   He's here with us.  In-house
8  counsel?
9       A.   Yes.
10      Q.   And you're telling John
11 Bennett, Robert Scharf and Kevin Sugg
12 about a conversation you had with Mike
13 Pate in this E-mail?
14      A.   Yes.
15      Q.   And if you look down at the
16 bottom almost to the end there's a
17 statement he says his family has been
18 doing this for 90 years.  Do you see
19 that?
20      A.   Yes.
21      Q.   Do you see the sentence that
22 says he doesn't believe in Kitty Pon.  I
23 told him that he has to believe in us
24 because we are the company who will pay

226

1  the bill?
2       A.   Yes.
3       Q.   Did I read that correctly?
4       A.   Yes.
5       Q.   And you did tell him that
6  Devon would pay his bill?
7       A.   Yes.
8       Q.   Are you aware that after the
9  ship was unloaded he didn't receive all
10 of his payments?
11      MS. CALDWELL:  Object to the
12 form.  Who are you talking about?
13 BY MR. PIPES:
14      Q.   Let me rephrase.  Are you
15 aware that after July 2006 after the
16 ship, after the Sanko Rally had been
17 unloaded, there was still outstanding
18 Stevedoring bills?
19      A.   I only knew that we made
20 several payments.  I wasn't aware of the
21 -- if we still owe Pate Stevedore
22 anything.  I thought we paid all.
23      Q.   Let me show you what I'm
24 going to mark as 52.  That's a letter

227

1  written in January 2007?
2       A.   April.
3       Q.   I'm sorry.  April 2007 to
4  Bob Scharf, have you seen that letter?
5       A.   I may have seen it.
6       Q.   Will you agree with me that
7  Mr. Pate is saying that his company is
8  owed approximately 131,000?
9       A.   That's what it says here,
10 but did we pay any more after that I
11 don't know.
12      Q.   You are not aware of whether
13 payment was made after that?
14      A.   I don't know.
15      Q.   Let me show you what I'm
16 going to mark as Exhibit-53.  Are those a
17 series of E-mails from you to Dr.
18 Bennett?
19      A.   Okay.  What was the
20 question?
21      Q.   If you look at the top of
22 the page -- well, I apologize.  That's my
23 only copy.
24           Is this an E-mail from you

228

1  to Dr. Bennett saying that Mr. Pate wants
2  his company to be paid?
3       A.   Yes.
4       Q.   And he's saying he's owed --
5  he wants almost $150,000.  Do I read that
6  correctly?
7       A.   Yes.
8       Q.   And what is the date of that
9  E-mail?
10      A.   April 10th.
11      Q.   And so that's the day after
12 the letter we just read at Exhibit-52.
13 Is that correct?
14      A.   Yes.
15      Q.   Have you ever seen a release
16 and bill of sale between Devon and Pate
17 Stevedore Company or Pensacola Stevedore
18 Company?
19      A.   No.
20      Q.   Do you know anything about
21 that?
22      A.   I don't know.
23      Q.   Let me show you what I'm
24 going to mark as Exhibit-54.  My first


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                    February 25, 2011

229

1    question is have you ever seen that
2    document?
3        A.    I never seen this.
4        Q.    So you weren't in any way
5    involved in negotiating the release or
6    the bill of sale that's mentioned in that
7    document?
8        A.    I never seen this before.
9        Q.    Do you have -- do you have
10   any knowledge of who would have
11   negotiated that document on behalf of
12   Devon?
13       A.    This is April 23rd.  I don't
14   know who was in charge in this
15   negotiation.
16       Q.    That's something we would
17   have to ask somebody else?
18       A.    Yes.
19       Q.    I'm going to show you what
20   I'm going to mark as Exhibit-55.  Have
21   you ever seen that document before?
22       A.    No.
23       Q.    Did you see any of the
24   invoices that came to Devon from the

230

1    Stevedore?
2        A.    I have other invoice for
3    services, but I don't understand this.
4        Q.    So you don't have any
5    knowledge of that?
6        A.    No.
7        Q.    Do you know if that $68,000
8    was ever paid that's mentioned in that
9    invoice?
10       A.    I don't know.  It doesn't
11   make sense to me.  I cannot understand
12   why.
13       Q.    When you say it doesn't make
14   sense to you, is that just because you
15   don't know anything about it or is there
16   another reason?
17       A.    I don't know why we needed
18   to buy drywalls from Pate because we
19   already -- we were struggling selling the
20   drywall.
21       Q.    Let me show you Exhibit-56,
22   and my only question is have you seen
23   that document before?
24       A.    January 25th of 2008?  I

231

1    never seen this.
2        Q.    Were you aware that there
3    was a lawsuit between Pate Stevedore
4    Company and Devon?
5        A.    I don't know.
6        Q.    You never heard of that?
7        A.    Yeah, I didn't know about
8    it.
9        Q.    If there is a lawsuit
10   against Devon, who within the company and
11   I'm talking about this particular company
12   Devon International Industries --
13       A.    That would be our in-house
14   counsel would know about it.
15       Q.    But you don't have any
16   knowledge of that?
17       A.    I didn't know about this.
18   This was pretty late in 2008.
19       MR. PIPES:  That's all I
20   have.  Let's go off.
21       THE VIDEOTAPE TECHNICIAN:
22   Going off the record.  The time on
23   video is 15:53.
24       - - -

232

1            (Whereupon, a brief recess
2        was taken.)
3        - - -
4        THE VIDEOTAPE TECHNICIAN:
5        We're now back on the record.
6        Time on video is 15:54.
7    BY MR. RUSSO:
8        Q.    Hi, Miss Wu.  I'm Gary
9    Russo.  I represent Fireman's Fund.  We
10   met a little while ago in the hall.  Do
11   you mind if I call you Ruth?
12       A.    That's fine.
13       Q.    I'll try to slow down.  I
14   have a tendency to go too quickly.  If I
15   do, ask me to slow down.  But if I ask
16   you a question and you answer it, I'll
17   assume you understood.  Is that fair?
18       A.    Yes.
19       Q.    You mentioned your in-house
20   counsel.  In 2006 did you have an
21   in-house counsel?  Did Devon have an
22   in-house counsel?
23       A.    Yes.
24       Q.    Who was it?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

233

1      A.   It was Kevin Sugg.
2      Q.   Has Mr. Sugg been the
3  in-house counsel from 2006 to current?
4      A.   Yes.
5      Q.   You earlier testified that
6  Pate and Devon shared the cost of a
7  surveyor.  Why was that?
8      A.   At that time my impression
9  was when the boat was arriving Pensacola
10  we already heard the boat went through
11  some 50-foot high sea.  We are not sure
12  what we are going to get when it arrived
13  to port.
14          And then I heard when it
15  arrived there is damage.  So we found
16  that surveyor recommended by Fireman's
17  Fund because we didn't know who to go to.
18  Then I got a phone call from Mike Pate.
19  He said he's willing to split the cost.
20  He wants to make sure he's covered also
21  for his job.
22      Q.   Why would he need to be
23  covered?  Did you understand why he was
24  agreeing to split the cost of the

234

1  surveyor?
2      A.   Yeah.  He was saying that,
3  okay, he's doing his job to unload the
4  drywall.  He doesn't want anybody to
5  think that it's because of -- because of
6  him causing the damage.
7      Q.   So the surveyor was going to
8  work for both Devon and Pate to do two
9  things as I understand it, confirm what
10  was damaged in the voyage and make sure
11  that nothing was damaged as it was off
12  loaded?
13      A.   Correct.
14      Q.   So that Devon and Pate from
15  the moment the boat hit Pensacola used
16  whatever efforts they could to make sure
17  that the drywall was not further damaged?
18      A.   Correct.
19      Q.   And as far as you know it
20  was not.  From the vessel to wherever
21  Pate stored it in Pensacola, there was no
22  further damage to the drywall?
23      A.   Not that I'm aware of.
24      Q.   You testified a lot about

235

1  when Mr. Law was questioning you about
2  the sending to the manufacturer the
3  specifications from your customer and in
4  this case it was Nor Pac.  I think you
5  might have mentioned it a couple of
6  times, but it's my understanding that the
7  manufacturer of all of this drywall,
8  every single sheet of it was a company
9  called Tyshon?
10      A.   Yes.
11          MR. LAW:  Object to the
12  form.
13  BY MR. RUSSO:
14      Q.   Do they still exist?
15      A.   I think they do.  I don't
16  know.  I haven't checked.
17      Q.   And you know from your own
18  personal knowledge that the company that
19  manufactured the drywall every sheet of
20  drywall that was brought in by Devon was
21  a company called Tyshon?
22          MR. LAW:  Object to the
23  form.
24          THE WITNESS:  That's my

236

1      understanding.
2  BY MR. RUSSO:
3      Q.   The photographs that Mr. Law
4  showed you of the drywall in China, you
5  remember Mr. Scharf was there and Dr.
6  Bennett was there.  Were those
7  photographs taken in a facility that is
8  owned by Tyshon?
9      A.   That's what I believe.
10      Q.   You mentioned earlier
11  Fireman's Fund, and I just want to clear
12  up.  Fireman's Fund had issued an
13  insurance policy that covered the cargo
14  as it left China until it arrived and was
15  stored in a warehouse somewhere in
16  Pensacola.  Is that correct?
17      A.   Correct.
18      Q.   Devon had no other
19  relationship with Fireman's Fund other
20  than as its insurer of that cargo, right?
21      A.   Correct.
22      Q.   You did not handle the
23  insurance claim, and you said that the
24  lawyer Mr. Hawk, Galen Hawk did.  Surely,



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

237

1    Mr. Scharf would have had authority to
2    act with Mr. Hawk on behalf of Devon with
3    respect to the insurance claim?
4            MS. CALDWELL:  Object to the
5        form.
6            THE WITNESS:  I would not
7        know the interaction between Bob
8        Scharf and --
9    BY MR. RUSS:
10       Q.   I appreciate that.  I know
11   you weren't involved.  But Mr. Scharf
12   would have had authority to act on behalf
13   of Devon?
14           MS. CALDWELL:  Object.
15           THE WITNESS:  That I don't
16       know.  All I know is Galen Hawk
17       was the person taking care of the
18       claim.
19   BY MR. RUSSO:
20       Q.   Right.  But you saw a lot of
21   E-mail with Mr. Scharf.  He was the
22   president.  Was he the president of the
23   company?
24       A.   Yeah, he was.

238

1        Q.   Why would he not have had
2    authority on behalf of Devon to act with
3    respect to the insurance claim?
4        A.   Because he was a sales-type
5    of person.  So he's acting as salesperson
6    for the company, more that function
7    instead of handling claims.
8        Q.   So as far as -- do you know
9    who within the Devon organization would
10   have been the person handling claims?
11   Did you have a person in Devon called the
12   claims handler?
13       A.   I thought Galen was
14   considered as a Devon.
15       Q.   But he's the outside lawyer.
16   Do you remember earlier you said inside,
17   outside?  You understand that that like
18   your lawyer who is here, Mr. Sugg, he's
19   internal, he's an inside lawyer for
20   Devon, right?
21       A.   Well, Kevin is inside.  I
22   wasn't -- I'm not sure about Galen.
23       Q.   You don't know whether he
24   was or not?

239

1        A.   Right, he has an office in
2    Devon, but he comes very rarely.  So I
3    don't know if he's outside or inside.
4        Q.   Okay.  I wanted to ask you a
5    couple of things about the Devon office.
6    It's here in King of Prussia?
7        A.   Yes.
8        Q.   Fairly close to this
9    facility we're in today?
10       A.   Yes.
11       Q.   Is it a warehouse or an
12   office building?
13       A.   Office building.
14       Q.   How many offices are in the
15   office building, Devon offices?
16       A.   For Devon, all Devon
17   companies?  You mean all the officers all
18   together?
19       Q.   Yes.  How many offices are
20   occupied in that office building?  Is it
21   a complete floor, two floors, half a
22   floor?
23       A.   For two floors we probably
24   have 20.

240

1        Q.   But you said you had 100?
2        A.   You mean officers?
3        Q.   I'm talking about employees
4    that work there.
5        A.   Employees we have about 100.
6        Q.   And do they all have offices
7    at that office facility here in King of
8    Prussia?
9        A.   All the employees are here.
10       Q.   And that's what I'm asking
11   you.  Are there 100 offices here in this
12   building?
13       A.   No -- you said offices,
14   right?
15       Q.   Yeah.  I'm confusing you,
16   and I apologize.  I'm not talking about
17   officers.  I'm talking about offices,
18   like a place where somebody would have a
19   desk and a telephone.  How many of those
20   do you have here in King of Prussia?
21       A.   Offices, I never count.  I
22   would say -- how many offices you mean
23   companies or the actual office with one
24   person sitting?



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                      February 25, 2011

241

1      Q.   Is it multiple floors in the
2  building?
3          MR. BROWN:  Are you asking
4      her how many rooms it has for
5      office space?
6  BY MR. RUSSO:
7      Q.   How many offices does Devon
8  occupy in King of Prussia in the building
9  where you are located?  I'm not looking
10  for an exact count.  Is it multiple
11  floors?
12     A.   We have only two floors.
13     Q.   Okay.  And those two floors
14  are full of Devon employees working out
15  of that King of Prussia office?
16     A.   With all different
17  companies.
18     Q.   How many Devon companies are
19  there?
20     A.   How many?
21     Q.   Ballpark.
22     A.   Ten, I don't know.
23     Q.   And in 2006 were there more
24  or about the same?

242

1      A.   About the same.
2      Q.   With respect to the
3  insurance claim that was made for this
4  drywall that we've been talking about, do
5  you recall when that claim was finally
6  resolved with Fireman's Fund?
7      A.   I don't know the exact time
8  frame.
9      Q.   But it was in 2007?
10     A.   Okay.  I don't know.
11     Q.   You don't know?
12     A.   I don't know.
13     Q.   Do you know what year?
14     A.   I'm not sure.
15     Q.   If in 2006 the shipment
16  arrived, was the claim resolved during
17  that year or was it the next year?
18     A.   To be honest I'm not sure.
19     Q.   Have you ever seen any of
20  the paperwork from Fireman's Fund to Mr.
21  Hawk?  I'm going to show you a March
22  22nd, 2007 letter.
23          After you look at it, let me
24  know.

243

1      A.   I never seen it.
2      Q.   But you see that the letter
3  does refer to the insurance claim, and
4  it's directed to Mr. Hawk, correct?
5      A.   Yes.
6      Q.   And it's dated when?
7      A.   March 22nd, 2007.
8      Q.   You wouldn't quarrel with
9  that date if I told you that the
10  insurance claim was still in negotiation
11  or not completely settled in March of
12  2007?
13     A.   What does it say?
14     Q.   Does it appear like the
15  claim is still open in 2007?
16     A.   It looks like that.
17     Q.   Do you know whether or not
18  the claim was ultimately settled and
19  resolved?
20     A.   We received a payment from
21  Fireman's Fund.
22     Q.   And do you know whether or
23  not Devon was ultimately satisfied with
24  the resolution of its insurance claim?

244

1          MS. CALDWELL:  Object.
2      We're not offering her for that.
3          MR. RUSSO:  I understand.
4      And I'm -- I understand she hasn't
5      been produced as the corporate
6      representative with respect to the
7      insurance issues, but she's a
8      witness.  She had some
9      involvement.  So I'm just trying
10     to find out what she knows if
11     anything.
12  BY MR. RUSSO:
13     Q.   If you could find -- it's
14  buried in here -- Exhibit-24.  Do you
15  recall that letter?
16     A.   Yes.
17     Q.   This is the letter that you
18  sent to Kitty Pon on April 29th of 2006.
19  And I'm going to read one part of the
20  letter right in the middle.  You are
21  talking about the vessel Sanko Rally.
22  And you said it is incompetent for our
23  cargo quantity and is foreseen to cause
24  breakage during shipping.

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Ruth Wu                                          February 25, 2011

245

1          Do you see that?
2      A.   Yes.
3      Q.   So you had that concern in
4  April of 2006.  In fact, it was a
5  sufficient enough concern that you wrote
6  a letter to Kitty Pon about it, correct?
7      A.   Correct.
8      Q.   But ultimately the Sanko
9  Rally carried the cargo from China to
10  Pensacola, and I don't see anything in
11  the correspondence -- maybe I missed it
12  -- where that issue was resolved in
13  writing that someone wrote back to you
14  and said, oh, don't worry about it.  We
15  got that fixed.  Tell me what happened
16  because the Sanko Rally ultimately
17  brought the cargo, correct?
18      A.   We were concerned at the
19  time, but then Pactrans told us this is
20  the right vessel and then provided
21  loading plan.  And when we were doing the
22  loading Pactrans were there seeing the
23  loading.  So that's why we still went
24  ahead.

246

1      Q.   So you made the decision at
2  some point after April 29th even though
3  you expressed this concern that you would
4  still -- you were going to send the cargo
5  on that vessel, the Sanko Rally?
6      A.   Yes.
7      Q.   Do you recall ever
8  disclosing that to Fireman's Fund at any
9  point during the handling of the claim?
10      A.   I don't know.
11      Q.   You didn't handle that?
12      A.   Right.
13      Q.   In fact, I'm going to show
14  you an E-mail from Jay Buckley to Bob
15  Scharf.  We'll mark that as Exhibit-58.
16          Have you ever seen that
17  before?
18      A.   I wasn't copied on this
19  E-mail.
20      Q.   Does it appear to you that,
21  though, the subject matter is the
22  possibility that you may actually get a
23  different vessel to transport the cargo?
24      A.   This was before the

247

1  Exhibit-24?
2      Q.   Yes.
3      A.   So we had the concern at the
4  time.
5      Q.   Right.  So at some point
6  you're saying between the date in
7  Exhibit-24 and the vessel leaving you
8  were satisfied it was okay?
9      A.   Right.
10      Q.   Now, you made arrangements
11  with Pate Stevedore to handle the
12  Stevedoring on this vessel actually even
13  before the vessel arrived in Pensacola,
14  correct?
15      A.   Yes.
16      Q.   And Pate Stevedore worked
17  with Devon from the moment the vessel
18  arrived until the goods were off loaded,
19  stored in a warehouse and then Pate
20  actually even loaded out the cargo that
21  was sold when it left Pensacola?
22      A.   Correct.
23      Q.   They were involved with
24  Devon from before their vessel arrived at

248

1  the dock until the drywall left
2  Pensacola?
3      A.   Correct.
4      MR. LAW:  Object to the
5  form.
6  BY MR. RUSSO:
7      Q.   And did Pate Stevedore
8  assist Devon to your knowledge in making
9  the insurance claim with Fireman's Fund?
10      A.   Not that I'm aware of.
11      Q.   But then you weren't
12  involved in that?
13      A.   Right.
14      Q.   I'm going to show you two
15  documents that came out of the Devon
16  production and then actually an E-mail
17  from you.  I'll attach these as one
18  exhibit, Exhibit-59?
19      MS. CALDWELL:  But the top
20  one is from Pate.
21      MR. RUSSO:  I just grabbed
22  that one to identify the other
23  two.
24      MS. CALDWELL:  So you want


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

249

1    to make it a composite exhibit.
2         MR. RUSSO:  I'm going to
3    make it a composite exhibit.  For
4    the record it's an E-mail from
5    Ruth Wu to Pate Stevedore dated
6    May 11th, 2008.  I'm not saying
7    that they were attached, but they
8    are two documents.  I'll pull it
9    out of the Devon production.  And
10   let me just ask you to take a look
11   at those, please.
12        MR. PIPES:  If they weren't
13   attached, I would object to them
14   being put together as one exhibit.
15        MR. RUSSO:  I understand.
16   I'm not suggesting anything by it.
17   It just makes it a little easier.
18        THE WITNESS:  Okay.
19   BY MR. RUSSO:
20        Q.   First, the E-mail, can you
21   tell me that's you to Pate.  What's going
22   on in that E-mail?
23        A.   Seems I just made contact
24   with him and ask him to call me.

250

1         Q.   So that Exhibit-59 may have
2    been your initial, at least your initial
3    contact with Pate?
4         A.   Yes.
5         Q.   Now, the two other
6    attachments to that exhibit.  One is port
7    of Pensacola, and it lists some names of
8    Stevedores.  Is one of the Stevedores
9    that Devon was retaining listed in the
10   port of Pensacola Stevedore sheet?
11        A.   Pate Stevedore Company.
12        Q.   And did you do some
13   independent research?  Did you find that
14   sheet or did somebody give it to you?  Do
15   you recall?
16        A.   I look online.
17        Q.   So you actually found that
18   document that's entitled Port of
19   Pensacola online somewhere?
20        A.   Yes.
21        Q.   And the first name on the
22   top on port of -- that's Port of
23   Pensacola sheet is Pate Stevedoring
24   Company?

251

1         A.   Yes.
2         Q.   And that's who you sent the
3    E-mail to?
4         A.   Yes.
5         Q.   The next one, the next sheet
6    down is a Google search it looks like.
7    Did you do that as well?
8         A.   I'm not sure if this was
9    from me, but it has the same phone
10   number.
11        Q.   So on Goggle, whoever did
12   that search, and I found this in your
13   document production, when they searched
14   for Stevedores I assume it pulled up Pate
15   Stevedoring Company?
16        A.   This -- I didn't notice this
17   one.  It has the same phone number, same
18   address.  So I went to Pate Stevedore,
19   yes.
20        Q.   So from the Google record
21   you could compare and see it was the same
22   phone number as the company listed on the
23   Port of Pensacola sheet that you found
24   online?

252

1         A.   Yes.
2         Q.   I'm going to show you what
3    I'm going to mark as Exhibit-60.  Have
4    you seen that before?
5         A.   I'm not sure.  I'm not sure
6    the purpose of this.  So Pate was saying
7    that he acted on our behalf, on Devon's
8    behalf confirming that a damage is caused
9    by the vessel.
10        Q.   Did you know that Pate was
11   forwarding communications to third
12   parties indicating that they were
13   actually operating on behalf of Devon
14   with respect to the damage to the cargo?
15        MR. LAW:  Object to the
16   form.
17        THE WITNESS:  I don't know
18   if this was actually sent out to
19   anyone.
20   BY MR. RUSSO:
21        Q.   You don't know if it was
22   sent out, but let's assume it was.  It's
23   signed, right, by Mr. Pate?
24        A.   That's what it says.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

253

1      Q.   And it says on behalf of the
2   consignee.  Who's the consignee?
3      A.   The consignee is Devon
4   International Trading.
5      Q.   I take it, Ruth, that you do
6   not know what invoices of Pate's were
7   paid or not paid?
8      A.   I didn't reconcile the
9   payments with Mike Pate.
10      Q.   So you wouldn't know if, for
11   example, there had been a representation
12   that all of Pate's bills had been paid in
13   the submission to the insurance company
14   when in fact they hadn't been then?  You
15   wouldn't know that?
16      A.   I don't know.
17      Q.   As of July 13th of 2006, had
18   North Pacific canceled its purchase
19   order?
20      A.   They tried to.
21      Q.   But they had already
22   informed someone at Devon that they were
23   going to cancel, it was their intent?
24      A.   Yes.

254

1      Q.   I'm not going to attach it
2   if you don't recognize it or know what it
3   is for the record.  It's a Devon document
4   6635.  Have you ever seen that before?
5      A.   I don't know what it is.  It
6   doesn't say much.
7      Q.   It doesn't.  Any idea why
8   Pate would be sending to Mr. Scharf a
9   draft invoice?
10      A.   I don't know why.
11      Q.   Can you think of any reason
12   why somebody would send a draft invoice
13   for approval?
14      A.   I don't know.  Why doesn't
15   he just send an invoice?
16      Q.   Again, I'm assuming you are
17   not going to know what this is, but if
18   you do I'm not going to attach it.
19         MR. BROWN:  If she doesn't
20   you mean.
21         MR. RUSSO:  Does not.
22         MS. CALDWELL:  Gary, this
23   appears to come from Mr. Hawk.  So
24   we're going to make the same

255

1   objection that we made with
2   Jonathon.  We're going to reserve
3   any contingents of attorney client
4   privilege.
5         MR. RUSSO:  Okay.  Although
6   you see he's sending it to a third
7   party.  I'm happy with you making
8   that reservation, but I just
9   wanted to point out that he sent
10   this to somebody.
11   BY MR. RUSSO:
12      Q.   Let me show you -- this is
13   a -- if you've seen this before or are
14   you familiar with it, I'll ask you about
15   it.  If not I won't.
16      A.   No.
17      Q.   No idea?  Just for the
18   record it's a salvage authorization sent
19   by Mr. Hawk to Dan Bucowski (ph) with
20   Salvage Sale.
21         MS. CALDWELL:  While she's
22   reviewing that, just so for the
23   record purposes, some of these
24   things are highlighted.  We don't

256

1   need --
2         MR. RUSSO:  I'll substitute.
3   If they are mine, I'll substitute.
4         MS. CALDWELL:  And I think,
5   Wesley, for yours, too, we just
6   don't want the highlighted portion
7   in.
8         MR. RUSSO:  But that's the
9   part I like.
10         MR. LAW:  I didn't highlight
11   any.  I don't think.
12   BY MR. RUSSO:
13      Q.   For the record, this is
14   exhibit-61.  You've identified Jay
15   Buckley often who is with North Pacific
16   and one of the parties that I understood
17   you had actually had what you thought was
18   a sale for the drywall, too, correct?
19      A.   Yes.
20      Q.   And Bob Scharf you've
21   identified already as the president of
22   Devon.  I'm only really interested in the
23   bottom E-mail from Mr. Scharf to Mr.
24   Buckley, and I'm going to read this to



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

257

1  you. We need to sell everything this
2  week. I also think we can sell the
3  damaged and make some money.
4        Do you know what he's
5  referring to?
6        A.   I don't know. It was in
7  July.
8        Q.   Correct, July 31st.
9        A.   Right. It looks like he
10 meant those damaged drywall.
11       Q.   Do you ever recall there
12 being discussions within Devon that there
13 might be a way to sell the damaged
14 drywall, that portion of the drywall that
15 had been damaged and make money?
16       A.   Well, my understanding has
17 been that we don't own any title of those
18 damage drywall. So I didn't know
19 anything that documents you show me today
20 that there was any salvage agreement or
21 anything like that.
22       Q.   And you said you don't own
23 title, but I understand you really don't
24 know one way or another about the issue

258

1  of title, right? That's not something
2  that you feel qualified to speak to or is
3  it?
4        A.   Well, maybe title is too
5  serious word, but I mean -- all I knew
6  was we can only sell the good stuff. We
7  cannot sell the broken.
8        Q.   And from where did you get
9  that information?
10       A.   That's the impression from
11 Bob Scharf.
12       Q.   So whatever you learned
13 about that you learned from Mr. Scharf?
14       A.   Yes.
15       Q.   In terms of how your policy
16 worked and how you would get paid for the
17 damage, what your duties and obligations
18 were under the insurance policy, that's
19 not something you would know about?
20       A.   I didn't read the policy.
21 The reason why I think that way is
22 because I didn't handle any invoice for
23 the broken -- the bad stuff. I only
24 invoiced the good bundles.

259

1        Q.   I was going to ask you that.
2  I didn't see any invoices anywhere in any
3  documents you produced that showed sales
4  of damaged drywall to anybody from Devon?
5        A.   That's correct.
6        MS. CALDWELL:  Do you want
7  to take a break?
8        THE WITNESS:  I'm okay. You
9  are almost --
10       MR. RUSSO:  I'm getting
11 there. I got another little stack
12 here and I had some back there in
13 a little folder.
14       THE WITNESS:  And another
15 truckload of documents.
16 BY MR. RUSSO:
17       Q.   Although I know again you
18 didn't handle it, do you know what
19 ultimately happened to the damaged
20 drywall?
21       A.   I don't know.
22       Q.   Do you know that ultimately
23 Pate took possession of the damaged
24 drywall and tried to sell it?

260

1        MR. PIPES:  Object to the
2  form.
3        MR. ROBERTSON:  Gary, can I
4  have a standing objection to the
5  form of those questions?
6        MR. RUSSO:  All of my
7  questions for the rest of the day?
8        MR. ROBERTSON:  Well, just
9  to form of the questions as you
10 refer to damaged drywall.
11       MR. RUSSO:  I'm sorry. I'll
12 fix that.
13 BY MR. RUSSO:
14       Q.   When I refer to the damaged,
15 I'm actually using the terms I saw in
16 those sheets, but maybe we'll call it the
17 drywall --
18       MR. RUSSO:  Jim, you got an
19 idea for the term? Salvaged
20 drywall?
21       MR. ROBERTSON:  No, I would
22 say the drywall that Devon didn't
23 sell.
24       MR. RUSSO:  Okay.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

261

1   BY MR. RUSSO:
2       Q.   We'll mark as Exhibit-62 an
3   E-mail from Pate Stevedoring dated August
4   3rd, 2006 to Bob Scharf subject sheet
5   rock proposal?
6       A.   Well, I haven't seen this
7   E-mail before, but I did hear from Bob
8   Scharf saying that we don't own those --
9   we cannot touch those salvage from the
10  3,700 bundles.  We can only look at the
11  3,300 bundles.
12      Q.   Right.  I understand.  You
13  told me that that Mr. Scharf had
14  suggested that to you earlier.  But it
15  does appear that Mr. Pate is
16  communicating with Mr. Scharf about
17  taking those -- that drywall, correct?
18      A.   It looks like the
19  confirmation from Pate.
20      Q.   And I'm going to mark as
21  Exhibit-63 an actual letter from Mr. Pate
22  to Mr. Scharf.  Does it appear that now
23  in the letter he's confirming what was
24  said in the E-mail earlier?

262

1           MR. PIPES:  Object to the
2   form.
3           THE WITNESS:  Yes, that's
4   the same information, yes.
5   BY MR. RUSSO:
6       Q.   And that series, those two,
7   that E-mail and that letter were about
8   three or four days after Exhibit-61 where
9   Mr. Scharf told Mr. Buckley I think we
10  can sell damaged and make some money.
11      A.   I don't think we ever sold
12  to Mike Pate and make money out of it
13  from Mike Pate.
14      Q.   It might not have happened,
15  but it looks like that was the plan,
16  right?
17          MR. PIPES:  Object to the
18  form.
19          THE WITNESS:  It seems
20  subjective to me.
21          MR. BROWN:  If you don't
22  know, you don't know.
23          THE WITNESS:  That's not
24  what I think he means.

263

1   BY MR. RUSSO:
2       Q.   While he's reviewing that,
3   are you familiar with the company called
4   Salvage Sale?  Does that mean anything to
5   you?
6       A.   No.
7       Q.   Exhibit-64 is a series of
8   E-mails between Mr. Bennett who is the
9   owner of the Devon companies?
10      A.   Yes.
11      Q.   And Mr. Scharf who is the
12  president of Devon International Trading,
13  correct?
14      A.   Correct.
15      Q.   You can actually read the
16  entire E-mail.  It addresses two issues I
17  think we've already talked about but I
18  want to discuss with you.
19          In Exhibit-64 let me start
20  on the bottom first.  It's an E-mail from
21  Mr. Scharf dated August the 14th to Mr.
22  Bennett and I'm going to read it.  Pate
23  wired money today for salvage.
24          Do you know what that's

264

1   referring to?
2       A.   I don't know.
3       Q.   Do you know how Mr. Scharf
4   would have known that Mr. Pate on the
5   very day he did it had wired money to
6   Salvage?
7       A.   I don't know anything about
8   this E-mail.
9       Q.   What about this?  Will work
10  on a contract with him to partner damaged
11  drywall.  We still owe him 150,000 USD.
12  I told him when we get insurance
13  settlement we will pay him.
14          Do you know anything about
15  this?
16      A.   I don't know anything about
17  it.
18      Q.   But it does appear that Mr.
19  Scharf is involved in the insurance
20  claim, correct?
21      A.   I don't know.  You have to
22  ask Bob.  I wasn't copied on the E-mail.
23          MS. CALDWELL:  Objection.
24          MR. RUSSO:  I'm going to


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                          February 25, 2011

265

1     skip these because I don't think
2     you know anything about them.
3          THE VIDEOTAPE TECHNICIAN:
4     Going off the record.  Time on
5     video is 16:34.
6               - - -
7          (Whereupon, a brief recess
8     was taken.)
9               - - -
10         THE VIDEOTAPE TECHNICIAN:
11    We're now back on the record.
12    Time on video is 16:42.
13    BY MR. ROBERTSON
14    Q.   My name is Jim Robertson,
15    and I represent Ace Home Center
16    Incorporated in Robertsdale, Alabama.
17         Can you hear me?
18    A.   Yes.
19    Q.   Have you ever had any
20    dealings on behalf of Devon with Ace Home
21    Center?
22    A.   Between Devon and Ace Home
23    Center?
24    Q.   Yes, ma'am.

266

1     A.   No.
2     Q.   Do you know either Henry
3     Vick or Wayne Vick?
4     A.   I don't know any of them.
5     Q.   Okay.  So it would be fair
6     to say until I mention that name Ace Home
7     Center you've never even heard it?
8     A.   Never heard of them.
9     Q.   Okay.  Can you tell me
10    whether anyone at Devon ever told Ace
11    Home Center that the drywall that was on
12    the MV Sanko brought into Pensacola was
13    not independently tested?
14    A.   Not that I'm aware of.
15    Q.   And before the drywall on
16    that load on the MV Sanko was put on the
17    ship, to your knowledge Devon did not do
18    any independent testing itself, did it?
19    A.   Devon did not.
20    Q.   And you don't know of any
21    evidence that any of the drywall on the
22    MV Sanko ever got wet from the time it
23    left the factory until the time it was
24    put into the warehouse in Pensacola?

267

1     A.   I didn't hear any wet
2     damage.
3     Q.   In May of 2006 when you
4     contacted Jay Buckley at North Pacific
5     you asked him for contact information for
6     a lab in Houston to test drywall, right?
7     A.   I asked him where he wants
8     me to send the drywalls to.
9     Q.   Okay.  And I looked at this
10    E-mail that was dated May 4th, 2006, and
11    Mr. Buckley says in response to your
12    request about the lab in Houston, we
13    didn't use a regular testing agency.  We
14    called in a favor with a U.S.
15    manufacturer.  They tested it for us.
16    Don't think they would do it again.
17    Sorry.
18         Do you remember that E-mail?
19         MS. CALDWELL:  What exhibit,
20    Jim, so we can show her?
21         MR. ROBERTSON:  It's Devon
22    page 1957.
23         MR. BROWN:  Do you have an
24    exhibit number, Jim?

268

1          MR. LAW:  It was a pretty
2     early one I used.  May '04 E-mail.
3     Is that it?
4          MS. CALDWELL:  Yeah.
5     Exhibit-16.
6          THE WITNESS:  Yes, I have
7     Exhibit-16.
8          MS. CALDWELL:  She's got it
9     in front of her, Jim.
10    BY MR. ROBERTSON:
11    Q.   So other than Mr. Buckley
12    telling you in that E-mail he doesn't
13    think that the U.S. manufacturer would
14    test again and said sorry, did he suggest
15    anywhere else that the drywall could be
16    tested independently?
17         MS. CALDWELL:  Object to the
18    form.
19         THE WITNESS:  I don't know
20    if there was other E-mails other
21    than this.
22    BY MR. ROBERTSON:
23    Q.   And I believe you told Mr.
24    Law earlier that as of the date of that



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                          February 25, 2011

269

1  E-mail, May 4th, 2006, you did not know
2  if the drywall that was loaded on the
3  Sanko was tested or not?
4       MS. CALDWELL:  Object to the
5  form.
6       THE WITNESS:  It wasn't
7  tested by Devon.
8  BY MR. ROBERTSON:
9       Q.   Well, you don't know if that
10 drywall was ever tested, do you?
11      A.   I only knew that I send
12 samples to Jay Buckley.  I don't know
13 what he did to the samples.
14      Q.   Do you remember -- and I
15 don't think this was an exhibit -- but it
16 was Mr. Law was talking about back in
17 early March there were still negotiations
18 going on between Jay Buckley and Mr.
19 Scharf about signing a contract for the
20 drywall, right?
21      A.   In March?  Did you say in
22 March 2006?
23      Q.   Right.  Well, the only
24 contract that I saw that Devon -- Mr.

270

1  Scharf or Devon agreed to for the
2  manufacture of this drywall in China that
3  went on the MV Sanko was dated March
4  30th, 2006?
5       MS. CALDWELL:  Object to the
6  form.
7       THE WITNESS:  Which one is
8  that?
9  BY MR. ROBERTSON:
10      Q.   Well, it's a three-page fax
11 that Julian Chu sent to you and the date
12 on the sales confirmation is March 30,
13 2006.
14      A.   The sales confirmation, that
15 was between Devon, Shanghai and the
16 Shanghai import export company.
17      Q.   The sales confirmation for
18 $1,450,281.56.  That's how much Devon was
19 going to pay to have the drywall
20 manufactured.  Is that right?
21      A.   Yes.
22      Q.   And there was originally on
23 the contract shipped to Mobile, Alabama
24 and that was scratched out and somebody

271

1  wrote in Pensacola, Florida and had an
2  arrow pointing to that.  Do you know who
3  wrote Pensacola, Florida on that sales
4  confirmation?
5       MS. CALDWELL:  Object to the
6  form.  Tell us what document you
7  are looking at because I don't
8  know that we have it.
9       MR. ROBERTSON:  It's Devon
10 Bates stamp 5913.
11      MS. CALDWELL:  I don't know
12 that's been introduced here.
13      MR. ROBERTSON:  Well, I know
14 that Mr. Law asked her about the
15 facts or I thought he did the
16 facts from Julian in China to her
17 because it says to Ruth three
18 pages Julian and this is one of
19 the three pages.
20      If you'd like while Mr. Law
21 is looking, can I ask her another
22 question to speed this along?
23 BY MR. ROBERTSON:
24      Q.   Ms. Wu, there was originally

272

1  a projection by George Clark at Devon
2  Health and you were copied on an E-mail
3  to John Bennett, Ruth Wu and Bob Scharf
4  about the drywall model for payment dates
5  and he included various options that
6  showed the contract amount for selling
7  the drywall to Nor Pac for 4,120,000 and
8  some odd dollars.  And then there were
9  various models for gross profit to Devon.
10      Do you remember those --
11 that discussion or E-mail with George
12 Clark about how much money Devon could
13 expect to make off of this transaction?
14      MS. CALDWELL:  Object to the
15 form.
16      THE WITNESS:  There was
17 something like that.  It's better
18 if we can find out that document.
19      MR. BROWN:  Well, we're not
20 going to do him a favor by looking
21 through and trying to figure out
22 what he's talking about.
23      MR. ROBERTSON:  That's --
24 it's Devon 149 through Devon 154.



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

273

1          MR. BROWN:  We don't have
2     the documents.  We don't have
3     them.
4          MR. ROBERTSON:  Well, that's
5     why I should be there and not
6     here.
7     BY MR. ROBERTSON:
8          Q.   Miss Wu, do you know whether
9     or not Devon lost money after everything
10    was said and done between the money Devon
11    got from sales of drywall and the money
12    Devon got from Fireman's Fund Insurance
13    Company and the money Devon got from
14    anyone else?
15         MS. CALDWELL:  Object to the
16    form.  Jim, we are not offering
17    her -- that was a specific request
18    on the 30(b)6 and we are not
19    tendering her for that subject
20    matter.
21         MR. ROBERTSON:  I'm just
22    asking if she knows.
23         THE WITNESS:  Well, my
24    impression is we lost money

274

1     overall.
2     BY MR. ROBERTSON:
3          Q.   Do you know one way or the
4     other?
5          A.   What does that mean?
6          MR. BROWN:  Did you make
7     money?
8     BY MR. ROBERTSON:
9          Q.   Do you know whether you did
10    or not?
11         A.   We lost money.
12         Q.   How do you know that?
13         A.   Because we paid a lot of
14    expense, overhead, storage and legal
15    fees.
16         Q.   Well, you just told me -- is
17    there someone else in the company that
18    actually knows more about that than you
19    do?
20         A.   That would be for accounting
21    to respond.
22         Q.   Would that be George Clark?
23         A.   He would know.
24         Q.   Now, he actually works for

275

1     Devon Health, doesn't he?
2          MS. CALDWELL:  Object to the
3     form.  She's already testified
4     about his position earlier on.
5          THE WITNESS:  He's the head
6     of accounting department that
7     works for various companies.
8     BY MR. ROBERTSON:
9          Q.   But his E-mail address is
10    from Devon Health, isn't it?
11         A.   That's his E-mail address.
12         Q.   He doesn't have an E-mail
13    address with Devon International, does
14    he?
15         A.   He doesn't.
16         Q.   I think you told us earlier
17    that the insurance claim we'd have to
18    talk to other people, right?
19         A.   Yeah, I wasn't involved in
20    the claim.
21         Q.   Did anyone ever complain to
22    you that there was a problem with any of
23    the drywall that Devon brought to America
24    on the shipment on the MV Sanko

276

1     concerning the sulfur content of the
2     drywall?
3          A.   I didn't receive any
4     complaints myself.
5          Q.   Were the only complaints,
6     Miss Wu, that you knew about were that
7     some of the drywall on the MV Sanko had
8     been broken during the transit?
9          A.   Correct.
10         Q.   Other than the shifting of
11    the cargo, were there any other problems
12    that you knew about related to the
13    drywall?
14         A.   I didn't know any complaint.
15         Q.   And of the -- you referred
16    earlier to good drywall and bad drywall.
17    Did you understand that all of the
18    drywall that Devon did not sell to third
19    parties but that was purchased by
20    Pensacola Stevedore, Pate Stevedore that
21    some of that drywall would be sold by
22    Pensacola or paid to third parties?
23         A.   I didn't know that those --
24    those drywalls could be resale.



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                            February 25, 2011

277

1    Q.   Did you know that Pensacola
2  Stevedore or Pate Stevedore had actually
3  purchased some of that drywall that Devon
4  chose not to resell?
5    A.   I don't know.  I didn't know
6  about that.
7    Q.   And you never saw the
8  drywall that Pate Stevedore or Pensacola
9  Stevedore took possession of and sold,
10 did you?
11   A.   I never seen that.
12   Q.   So have you ever -- strike
13 that.
14        Did anyone tell you what the
15 condition of the drywall that Pate
16 Stevedore or Pensacola Stevedore took
17 possession of, what the condition was?
18   A.   I didn't know the condition.
19   Q.   Do you know anybody at Devon
20 who would?
21   A.   Besides Bob Scharf, Nick
22 Egan was in Pensacola so he might have
23 seen that.
24   Q.   Bear with me.  I may be

278

1  done.
2        Miss Wu, are you aware of
3  any contract that Devon signed to
4  manufacture this drywall with a Chinese
5  company before the March 30, 2006 sales
6  confirmation that I mentioned earlier?
7        MS. CALDWELL:  Object to the
8        form.
9        THE WITNESS:  Besides this
10       sales confirmation of Exhibit-19?
11 BY MR. ROBERTSON:
12   Q.   That's the one dated March
13 30, 2006?
14   A.   Yes.
15   Q.   Right.  Do you know of
16 anyone before that date that Devon agreed
17 to the manufacture of drywall in China?
18       MS. CALDWELL:  Object to the
19       form.
20       THE WITNESS:  I wasn't sure
21       your question whether you're
22       looking for a contract between Nor
23       Pac and Devon or Devon to the
24       manufacturer.

279

1  BY MR. ROBERTSON:
2    Q.   No, ma'am.  I'm asking for
3  any contract that you're aware of before
4  March 30, 2006 that Devon had to have a
5  company manufacture the drywall for
6  purchase by Devon in China?
7    A.   There might be other
8  documents because this is a sales
9  confirmation.
10   Q.   Before March 30, 2006?
11   A.   I'm sorry.  What happened?
12   Q.   The reason I ask that is it
13 appeared in reviewing these documents
14 that that was the first time that Devon
15 had actually gotten involved with a
16 drywall manufacturer or purchase in China
17 for shipment to America?
18       MS. CALDWELL:  Object to the
19       form.
20       THE WITNESS:  Well, this was
21       the first time we did drywall.
22 BY MR. ROBERTSON:
23   Q.   First time you did drywall.
24 And did you have an opportunity to find

280

1  that document where the ship to Mobile,
2  Alabama was scratched out on the sales
3  confirmation and Pensacola, Florida was
4  substituted?
5    A.   Yes.
6    Q.   Do you know whose
7  handwriting that is?
8    A.   That was mine.
9    Q.   And do you know when if
10 Julian Chu faxed that sales confirmation
11 to you it was faxed sometime after March
12 30th, 2006, wasn't it?
13   A.   It looks that way.  He faxed
14 it to me.
15   Q.   And do you remember when
16 Julian actually faxed it to you?
17   A.   I don't remember.
18   Q.   But sometime after March 30,
19 2006?
20   A.   Yes.
21   Q.   Do you know when it was that
22 you would have written on that sales
23 confirmation Pensacola, Florida instead
24 of Mobile, Alabama?


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                    February 25, 2011

281

1        A.   I'm not sure.
2        Q.   And do you know who told you
3   to change it from Mobile, Alabama to
4   Pensacola, Florida?
5        A.   It must be when I'm sure the
6   port will be Pensacola instead of Mobile.
7        Q.   But you don't remember when
8   you learned that it would be Pensacola
9   instead of Mobile?
10        A.   I don't remember exactly
11   when.
12        Q.   It was sometime after March
13   30th, 2006, correct?
14           MS. CALDWELL:  Object to the
15        form.
16           THE WITNESS:  I'm not sure.
17   BY MR. ROBERTSON:
18        Q.   Well, when you got the fax
19   from Julian Chu that showed the sales
20   confirmation dated March 30, 2006, at
21   that time the sales confirmation said
22   shipped to Mobile, Alabama, correct?
23           MS. CALDWELL:  If you know.
24           THE WITNESS:  No.  I really

282

1        cannot tell whether it was before
2        or after.
3   BY MR. ROBERTSON:
4        Q.   Well, you told me earlier
5   that that's your handwriting that changes
6   it to Pensacola, Florida, right?
7        A.   Yes, but he could have send
8   it to me earlier.  I did a handwriting --
9   I wrote Pensacola and then he have the
10   sales sign and fax it back to me.  So I
11   really cannot tell whether I did that
12   after or before.
13        Q.   So you're saying he could
14   have sent you the sales confirmation
15   between Devon and Tyshon even though it's
16   dated March 30, 2006 before March 30,
17   2006?
18        A.   Yes, he could send me a
19   draft.
20        Q.   And the draft would already
21   have the date of the sales confirmation
22   on it?
23        A.   He could date later, but he
24   show me the draft for me to confirm.  And

283

1   then I send it back to him and then he
2   fax it back to me again.
3        Q.   But you don't know one way
4   or the other when you changed the
5   shipment point from Mobile to Pensacola,
6   do you?
7        A.   I don't know for sure, but I
8   don't think I would receive it first and
9   then make change on the sales
10   confirmation later.  It just doesn't
11   sound right.
12        Q.   Were you privy to the
13   E-mails back and forth between Mr.
14   Buckley and Mr. Scharf about switching
15   the drywall to Mobile?
16        A.   I'm sorry.  Can you say that
17   again?
18        Q.   Were you knowledgeable about
19   the E-mails between Mr. Scharf and Mr.
20   Buckley about shipping the drywall to
21   Mobile because it looks like you were not
22   copied on some of those E-mails?
23        A.   If I were not copied, then I
24   would not know.

284

1        Q.   We'd have to ask Mr. Scharf
2   about that, right?
3        A.   Yes.
4           MR. ROBERTSON:  That's all I
5        have, Miss Wu.  Thank you.
6           MR. LAW:  Anyone else?
7   BY MR. LAW:
8        Q.   Miss Wu, I've got just a few
9   more.  Do you want to take a break or
10   keep going?
11           To your knowledge did Devon
12   receive any money from the sale of any
13   drywall by Pensacola Stevedore Company?
14           MS. CALDWELL:  Object to the
15        form.  You mean Pate Stevedore
16        Company?
17           THE WITNESS:  Not from
18        Pensacola Stevedore.
19   BY MR. LAW:
20        Q.   To your knowledge did Devon
21   receive any money from the sale of any
22   drywall by Pate Stevedore Company?
23        A.   Not that -- I don't know
24   anything.



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                    February 25, 2011

285

1    Q.   To your knowledge did Devon
2  receive any money from the sale of any
3  drywall by Mike Pate?
4    A.   I don't know if there was
5  any.
6    Q.   I'm going to show you
7  Exhibit-43 we looked at earlier.  And if
8  you'll look at the bottom E-mail from you
9  to Mr. Jackson.  It looks like nine
10 bundles was sold for $10.47 per sheet.
11 Is that right?  I'm at the end of the
12 sentence there.  It says in parentheses
13 10.47 per sheet, 612 sheets.
14    A.   What was the question?
15    Q.   Sure.  At least with this
16 shipment referenced in Exhibit-43 in your
17 E-mail to Mr. Jackson Devon was selling
18 612 sheets to North Pacific for 10.47 per
19 sheet.
20    A.   No, it was a credit,
21 authorized a credit.  It didn't say that
22 I sold to him for $10.00 per sheet.  It
23 was an authorized credit that Nor Pac
24 deducted by themselves.

286

1    Q.   Nor Pac credited themselves
2  $10.47 per sheet?
3    A.   Correct.
4    Q.   Does that tell you that at
5  least for that shipment the drywall sold
6  by Devon to North Pacific was for $10.47
7  a sheet?
8    A.   No, I don't know why they
9  take $2.00 per sheet.  They probably
10 wanted to compensate their trucking fees.
11    Q.   So they tacked on a little
12 extra on top of the 8.50 per sheet?
13    A.   Yes.
14    Q.   So the drywall on
15 August 18th of 2006 was still trading at
16 about $8.50 per sheet between Devon and
17 North Pacific?
18    A.   Correct.
19    Q.   Did Devon ever sell any
20 drywall for $1.00 per sheet to anybody?
21    A.   Not down to $1.00 for the
22 good ones from 3,300 bundles, not that
23 low.
24    Q.   So the good drywall was

287

1  selling at least in August of 2006 around
2  $8.50 a sheet?
3    A.   In 2006 and then the price
4  dropped later, but I forgot how low but
5  it would never go down to $1.00 per
6  sheet.
7    Q.   That's out of the good
8  stock, right?
9    A.   Yes.
10    MR. ROBERTSON:  Object to
11 the form.
12 BY MR. LAW:
13    Q.   Now, we talked earlier about
14 around the time of the drywall market
15 went down and I guess the building went
16 down, was it your understanding that the
17 drywall was in such a big demand down in
18 the Southeast due to rebuilding after
19 hurricanes?
20    A.   I wasn't sure exactly when
21 hurricane was.  Was it in 2005?
22    Q.   Well, there's Hurricane Ivan
23 in 2004 along the Alabama gulf coast and
24 Hurricane Katrina in 2005.  Both storms

288

1  devastated the Gulf Coast.
2    But my question is was it
3  your understanding that there was a
4  shortage of drywall due to rebuilding
5  after those hurricanes?
6    A.   Well, also the Miami market
7  was very big.  So I don't -- it wasn't my
8  part to do the market research.
9    Q.   For purposes of shipping we
10 know at one point in time the Sanko Rally
11 was to sail into the port of Mobile,
12 Alabama.  Did you speak with anybody at
13 the port authority in Mobile to try to
14 determine shipping costs?
15    MS. CALDWELL:  Object to the
16 form.  I think that misstates the
17 testimony.
18    MR. LAW:  I'm not stating
19 any testimony.
20    MS. CALDWELL:  You said that
21 it was intended.  I don't know
22 that's what's come out that it was
23 ever intended to go to Mobile.
24 BY MR. LAW:


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                February 25, 2011

289

1    Q.    Did you ever speak to
2  anybody at the port authority in Mobile
3  to try to determine shipping costs into
4  Mobile's port?
5    A.    Shipping?  Ocean freight?
6    Q.    That's correct.
7    A.    No, the port doesn't handle
8  that.
9    Q.    Do you know where Mobile,
10  Alabama is located on a map?
11    A.    Very close to Pensacola I
12  guess.
13    Q.    And you're aware that Mobile
14  and Pensacola ports are very close
15  together, aren't you?
16    A.    Yes, I do know.
17    Q.    Were you aware that Mr.
18  Scharf visited both Mobile and Pensacola
19  at various times after the Sanko Rally
20  came into port?
21    A.    I would not know where he
22  goes.
23    Q.    The drywall that was sold to
24  Mazer and Gulf Coast Shelter, you sent

290

1  invoices to Mazer and Gulf Coast Shelter
2  in the State of Alabama, didn't you?
3    A.    That's what it says in the
4  invoice.
5    Q.    And you knew that the
6  drywall that was leaving the port of
7  Pensacola on trucks to ship out was being
8  shipped out for both Mazer and Gulf Coast
9  Shelter?
10    MS. CALDWELL:  Object to the
11  form.  Asked and answered.
12    THE WITNESS:  They send
13  trucks to the port, Pensacola port
14  to pick up.  So from that point we
15  would not where they take the
16  trucks to.
17  BY MR. LAW:
18    Q.    Mazer and Gulf Coast Shelter
19  sent trucks to the port to pick up
20  drywall?
21    A.    Correct.
22    Q.    Would you agree with me that
23  it was at least foreseeable that some of
24  this drywall would end up in the State of

291

1  Alabama?
2    MS. CALDWELL:  Object to the
3  form.  Asked and answered.
4    MR. LAW:  I don't think
5  anybody asked that question.
6    MS. CALDWELL:  She
7  absolutely did, and she just said
8  it just then.  She didn't know
9  where it was going to go.
10    MR. LAW:  That's not my
11  question.
12    MS. CALDWELL:  You asked if
13  it was foreseeable that it would
14  end up in Alabama.
15    MR. LAW:  I've got your
16  objection to the form.
17  BY MR. LAW:
18    Q.    Mobile's port, Pensacola's
19  port very close together.  You've
20  acknowledged that.  And my question is
21  was it at least foreseeable that some of
22  this drywall that you are invoicing Mazer
23  and Gulf Coast Shelter and Alabama for
24  would end up in the State of Alabama?

292

1    MS. CALDWELL:  Object to the
2  form.
3    THE WITNESS:  It's possible,
4  but it's not for me to -- I didn't
5  need to know where they want to go
6  to.
7  BY MR. LAW:
8    Q.    You've -- have you dealt
9  with any U.S. manufacturing facilities
10  before?
11    A.    In what kind of products?
12    Q.    For any product.
13    A.    U.S. manufacturing?  No,
14  only for medical products.
15    Q.    So you dealt with some U.S.
16  manufacturing facilities for medical
17  products?
18    A.    Yes.
19    Q.    And I understand that Devon
20  manufactures some medical devices in
21  China.  Is that correct?
22    A.    Yes, but that's Devon
23  Medical Products.
24    Q.    I understand.  Have you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                February 25, 2011

293

1  dealt with manufacturing facilities in
2  China besides Devon's for the manufacture
3  of medical products before?
4        A.   For other factories in
5  China?
6        Q.   That's correct.
7        A.   I have some involvement,
8  yes.
9        Q.   From a quality control
10 standpoint, would you agree that the
11 quality control standards in the U.S.
12 manufacturing facilities are more
13 stringent than the quality controls
14 standards than in Chinese manufacturing
15 facilities?
16       MS. CALDWELL:  Object to the
17    form.
18       THE WITNESS:  That's
19    people's perception.  Well, that's
20    people's perception, but it could
21    be done differently.  So it really
22    depend on every factory and how
23    they handle their quality system.
24 BY MR. LAW:

294

1        Q.   For the medical devices, I'm
2  not talking about the ones that Devon
3  manufactures at its own facilities, but
4  the medical devices that you've dealt
5  with manufacturing facilities in China
6  versus manufacturing facilities in the
7  U.S., from a quality control standpoint
8  were the U.S. facilities more stringent
9  than the Chinese manufacturing plants?
10       MS. CALDWELL:  Object to the
11    form.
12       THE WITNESS:  Well, although
13    it's not really related, I would
14    like to answer, yeah.  That's
15    people's perception, but it's
16    different now.  A lot of Chinese
17    factories have ISO 13485 for
18    medical products and U.S. only
19    need to be compliant to FDA
20    quality standard which is
21    self-compliant and ISO is not a
22    self-compliant system.  It needs
23    an outside third party to come in
24    to give you -- to audit the

295

1        factory and give certificate.
2  BY MR. LAW:
3        Q.   Would that be an outside
4  third party within China?
5        A.   Yes.
6        Q.   And I don't really know what
7  all you just said means, but with respect
8  to drywall have you dealt with any
9  domestic drywall manufacturers?
10       A.   I didn't.
11       Q.   You never have?
12       A.   I never.
13       Q.   Does Devon have a list, a
14 written checklist of quality control
15 standards to follow as it pertains to
16 products imported from China?
17       A.   For -- the practice is
18 between Devon International Trading and
19 Devon Medical Products are very
20 different.  With Devon International
21 Trading is strictly sourcing based on
22 customer's needs and then we go to China
23 find a factory and we produce samples for
24 client to approve and then we ship the

296

1  products.  For that kind of business we
2  don't -- we don't get involved in the
3  testing and the quality.  We want the
4  customer to confirm the quality.  But for
5  medical products, if we are registered as
6  the distributor or the manufacturer of
7  the device with FDA, we have the duty to
8  report to FDA for our work.
9        Q.   So for the medical devices
10 Devon does have some written quality
11 control checklists?
12       A.   Yes.
13       Q.   But at least for building
14 products, drywall, Devon did not have any
15 written quality control standards?
16       A.   We did not.  Like I said
17 earlier, the window clients needs to
18 shoot to the windows to test for
19 hurricane and for nails they put in the
20 nail gun and test if they jam the nail
21 guns.
22       Q.   Did Devon have any -- we've
23 talked about written -- but any unwritten
24 quality control standards to ensure that



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                    February 25, 2011

297

1   the building products such as drywall
2   that Devon imported were safe for use?
3       A.   It's really broad to say
4   what is safe to use mean.  We need a
5   definition for that.
6       Q.   Does Devon have any
7   unwritten quality control standards as it
8   pertains to building products such as
9   drywall to ensure that it meets certain
10  standards in the U.S.?
11      A.   We didn't have any quality
12  policies for building products.
13      Q.   Mr. Pipes asked you earlier
14  about an affidavit you gave wherein you
15  stated that you were the records
16  custodian for Devon?
17      A.   For the files.
18      Q.   Have you received any
19  requests from the consumer product safety
20  commission to compile any records on
21  behalf of Devon to show them that
22  indicate any sales of Chinese drywall?
23      A.   I didn't receive that
24  report.

298

1       Q.   Did you receive any requests
2   or has anybody at Devon requested that
3   you compile some records to provide to
4   the consumer product safety commission?
5       A.   Did I receive the request or
6   did I keep the record?
7       Q.   Well, first, did you receive
8   a request?
9       A.   I didn't receive a request.
10      Q.   Did somebody at Devon
11  receive a request from the consumer
12  product safety commission?
13      A.   If there was somebody
14  receive it I don't know.  Maybe our legal
15  department receive it.
16      Q.   Did somebody ask that you
17  compile some records to be provided to
18  the consumer product safety commission?
19      A.   Nobody ask me.
20      Q.   Have you ever compiled any
21  records to be provided to the consumer
22  product safety commission?
23      A.   I didn't.
24      Q.   Did somebody at Devon?

299

1       MS. CALDWELL:  Object to the
2   form.  She said she doesn't even
3   know if there was a request made.
4   BY MR. LAW:
5       Q.   To your knowledge has
6   anybody at Devon received any complaints
7   about any defective nature of the drywall
8   that was imported by Devon?
9       A.   I didn't know until this
10  case.  I was informed by the attorney.
11      MS. CALDWELL:  Okay.
12  BY MR. LAW:
13      Q.   Do you know anybody that
14  works at this plant that you identified,
15  this Tyshon plant in China?
16      A.   Do I know anybody?
17      Q.   That's correct.
18      A.   No, I don't.
19      Q.   Do you know if Tyshon is a
20  company owned by the Chinese government?
21      A.   I didn't know.
22      Q.   Anybody from Tyshon ever
23  come to your office in King of Prussia?
24      A.   Not at all.

300

1       Q.   The medical products
2   manufactured by Devon Medical Products --
3   is it Devon Medical that you work for
4   now?
5       A.   Yes.
6       Q.   And Devon Medical actually
7   owns a manufacturing plant in China to
8   manufacture its products?
9       A.   We don't own a manufacturing
10  plant, but we developed our own products
11  by our own engineers.  We provided the
12  drawings and specs to the factory.
13      Q.   So Devon provided some specs
14  to the factory that manufactures the
15  medical devices?
16      MS. CALDWELL:  Object to the
17  form.
18      THE WITNESS:  We designed
19  the products.
20      MS. CALDWELL:  Devon Medical
21  Group.
22  BY MR. LAW:
23      Q.   I understand that.  And
24  Devon Medical Group provides specs to a


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                    February 25, 2011

301

1    factory in China that Devon doesn't own
2    to manufacture its devices.  Is that
3    correct?
4        A.   Say that again.
5        Q.   Devon Medical provides some
6    specifications to a factory in China that
7    Devon Medical doesn't own to manufacture
8    its devices?
9        A.   No, we own the products.
10       Q.   Who owns the manufacturing
11   facility?
12       A.   For the medical products?
13       Q.   Correct.
14       A.   We have different factories.
15       Q.   There's different factories
16   in China that manufacture different
17   components that go into the medical
18   devices?
19       A.   The factories are like
20   assembling plants.
21       Q.   Right.  But those aren't
22   owned by Devon, are they?
23       A.   They are not owned by Devon.
24       Q.   Who owns those factories?

302

1        A.   Different factories, we have
2    several near Shanghai, some in Shingin
3    (ph).
4        Q.   The one is Shanghai, is it
5    owned by --
6        A.   We don't own any factory.
7        Q.   Did the Devon project
8    managers in Shanghai, do they coordinate
9    with the factories that manufacture these
10   medical products?
11       A.   After the Devon
12   International Trading went out of
13   business, it's not operating like myself
14   I switched -- I transfer to Devon Medical
15   Products.  So the Shanghai office also
16   focus on the medical products now.
17       Q.   So these individuals that
18   we've talked about today, they are
19   project managers.  Is that their title in
20   Shanghai?
21       A.   Yes.
22       Q.   And those project managers
23   also act as kind of liaisons with the
24   factories that make the components that

303

1    go into the Devon devices?
2        MS. CALDWELL:  Object to the
3        form.
4        THE WITNESS:  They are now
5        working on medical products, yes.
6    BY MR. LAW:
7        Q.   But do they coordinate with
8    the factories that Devon doesn't own to
9    make these components that go into the
10   medical devices?
11       A.   They do, but for medical
12   devices it's different.
13       Q.   You recall giving a
14   deposition in the arbitration hearing
15   with North Pacific and it was back in
16   2007, don't you?
17       A.   Yes.
18       Q.   And you were under oath when
19   you gave that testimony, weren't you?
20       A.   Yes.
21       Q.   In your deposition, page 15
22   on line 21 you were asked by the attorney
23   if you were the one that decided on which
24   factory Devon would contract with to make

304

1    this drywall and you said no.  We're on
2    line 24 on page 15.  I've highlighted it
3    for you.  Do you see that?
4        A.   Yes.
5        Q.   And then you were asked was
6    that Mr. Scharf, and you said for this
7    project he went China office went to the
8    factory first and then they identified
9    different factories and made a
10   recommendation which factory we should go
11   to.  And then Bob Scharf went there and
12   visited the factory and said, yes, this
13   factory is good.  So you could say yes he
14   made the final decision.
15       Is that testimony true and
16   accurate?
17       A.   Yes.
18       Q.   So Mr. Scharf took the
19   specifications provided by North Pacific,
20   and he went and visited some factories
21   until he found one that was good and made
22   the decision that that was the factory
23   that could make the drywall?
24       A.   He take the specifications



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                          February 25, 2011

305

1   to any factory that he visited, but I
2   don't know how he selection criteria.
3   But at the time that we decided to go to
4   this factory, to use this factory because
5   they were the only factory big enough to
6   take -- to have capacity for this volume.
7       Q.   And Mr. Scharf with the
8   specifications from North Pacific visited
9   several different factories, didn't he?
10      A.   I think he visit more than
11  this one.
12      Q.   And ultimately as the
13  president of Devon International
14  Industries or Devon International Trading
15  Mr. Scharf decided which factory to use
16  to manufacture the drywall?
17      A.   Yes.
18      Q.   North Pacific didn't pick
19  the factory, did they?
20      A.   No.  We provided samples
21  from different factories to North
22  Pacific, too.
23      Q.   With regard to the Devon
24  Medical devices that Devon Medical

306

1   Products manufactures at these Chinese
2   facilities, do the project managers at
3   the Shanghai office, do they take the
4   specifications to different plants and
5   find one that can manufacture the
6   components for the device?
7       A.   That's what they are
8   supposed to do.
9           THE VIDEOTAPE TECHNICIAN:
10          I've got one minute, counsel.
11          We're now going off the record.
12          This is the end of tape number
13          three of the deposition of Ruth
14          Wu.  Time on video is currently
15          17:24.
16              - - -
17          (Whereupon, a brief recess
18  was taken.)
19              - - -
20          THE VIDEOTAPE TECHNICIAN:
21          We're now back on the record.
22          This is the beginning of tape
23          number four in the deposition of
24          Ruth Wu.  Time on video is 17:29.

307

1   BY MR. LAW:
2       Q.   Miss Wu, these medical
3   devices that Devon Medical manufactures,
4   do they come in a package?
5       A.   It's finished goods,
6   finished goods.
7       Q.   Comes in a package?
8       A.   Yes.
9       Q.   Devon has its name on that
10  package?
11      A.   Yes.
12      Q.   And you agree with me that
13  Devon manufactures its medical devices?
14      A.   Yes.
15      Q.   And it manufactures them in
16  China?
17      A.   Yes.  We are registered with
18  FDA.
19      Q.   Does Dr. Bennett own all of
20  the Devon family of companies?
21      A.   I think so, yes.
22      Q.   And they are all based in
23  the King of Prussia office?
24      A.   Yes.

308

1       Q.   Does Dr. Bennett report to
2   anybody?
3       A.   No.
4       Q.   Everybody reports to him?
5       A.   Yes.
6       Q.   Last few questions.  We saw
7   a document earlier that indicated that
8   Devon made the drywall for $2.99 per
9   sheet.  Do you know what I'm referring
10  to?
11          MS. CALDWELL:  Object to
12          form.  I don't.  I don't think
13          there's any document that says
14          that.
15  BY MR. LAW:
16      Q.   There's a confirmation.  Do
17  you remember the confirmation?
18      A.   I'm not sure which one.  The
19  cost of goods?
20      Q.   Yes, ma'am.  According to
21  Exhibit-19 the cost to Devon for the
22  drywall to be manufactured was $2.99.
23      A.   That was the cost of goods.
24      Q.   What is cost of goods mean



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                          February 25, 2011

309

1   to you?
2       A.   It means sales, deduct the
3   cost of goods in return and then that's
4   the gross profit.
5       Q.   And it's your testimony that
6   Devon had the burden of testing the
7   drywall?
8           MS. CALDWELL:  Object to the
9       form.
10  BY MR. LAW:
11      Q.   I'm sorry.  Was your
12  testimony that North Pacific had the
13  burden of testing this drywall?
14      A.   Yes.
15      Q.   And according to the
16  purchase order, I think it's Exhibit-11,
17  Devon was going to sell the drywall to
18  North Pacific for $8.50 a sheet?
19      A.   Yes.
20      Q.   Why didn't North Pacific
21  just buy the drywall themselves for 2.99
22  as opposed to paying Devon 8.50 a sheet?
23          MS. CALDWELL:  Object to the
24      form.

310

1           THE WITNESS:  Why?  I would
2       not know why North Pacific think
3       that way.
4           MR. LAW:  We'll ask them.
5       Miss Wu, I thank you for your
6       time.
7   BY MR. PIPES:
8       Q.   Miss Wu, I have a couple
9   real quick follow-ups.  Did Dr. Bennett
10  ever go to Pensacola to your knowledge?
11      A.   No, he didn't.
12      Q.   Other than Nick Egan and Bob
13  Scharf, did anybody else at Devon
14  actively try to sell the drywall?
15      A.   Only Bob Scharf.  Nick Egan
16  joined later, and then I post it on eBay.
17  That was all.
18      Q.   Just you three?
19      A.   Yes.
20      Q.   Mr. Russo asked you some
21  questions about some E-mails and letters
22  that were marked Exhibit-61 through 64.
23  I'm just going to hand these back to you.
24          You weren't copied on any of

311

1   those E-mails or letters, were you?
2       A.   No, I wasn't.
3       Q.   Would you agree with me that
4   you have no knowledge of whether or not
5   the proposal made in Exhibit-63 ever came
6   to pass?
7       A.   I didn't -- I don't know.
8       Q.   Would you agree that Dr.
9   Bennett and Mr. Scharf are the people
10  most qualified to answer those questions?
11      A.   Yes.
12      Q.   And to discuss the meaning
13  of Exhibit-61 through 64?
14      A.   Yes.
15          MR. PIPES:  That's all I
16      have.
17  BY MR. RUSSO:
18      Q.   Ruth, I have one or two real
19  quickly to follow up.  Although you don't
20  know whether or not that agreement was
21  protected as discussed in 61 through 64,
22  it does appear on August 14th that an
23  agreement was at least being discussed
24  and contemplated between Pate and Devon?

312

1       A.   That's whatever it says is
2   on the paper.
3       Q.   That's what it says that an
4   agreement was being contemplated between
5   Devon and Pate on August 14th of 2006?
6           MR. LAW:  Object, and calls
7       for speculation.
8           MR. RUSSO:  Is that what it
9       says?
10          MR. BROWN:  It speaks for
11      itself.
12          MR. RUSSO:  That's fine.
13          MR. BROWN:  Thank you.
14      You're done.
15          MR. ROBERTSON:  I'll take a
16      copy.
17          MR. PATTERSON:  This is Jim
18      Patterson for Bass Homes.  I'd
19      like copies of the video and
20      transcript.
21          THE VIDEOTAPE TECHNICIAN:
22      We're now going off the record.
23      This is the end of tape number
24      four.  It concludes the videotape



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                                February 25, 2011

313

1    deposition of Ruth Wu.  Time on
2    video is 17:35.
3         MS. PRYOR:  I would like a
4    copy of the deposition with a
5    travel and an ASCII, please.
6         MR. PHILLIPS:  The same as
7    Ms. Pryor.
8         (Witness excused.)
9         (Deposition concluded at
10   approximately 5:35 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

315

1         LAWYER'S NOTES
2    PAGE  LINE
3    ____ ____ _____
4    ____ ____ _____
5    ____ ____ _____
6    ____ ____ _____
7    ____ ____ _____
8    ____ ____ _____
9    ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____

314

1              C E R T I F I C A T E
2
3              I hereby certify that
4    the witness was duly sworn by me and that
5    the deposition is a true record of the
6    testimony given by the witness.
7
8
9    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
     LISA CAPALDO
10   Dated:  March 10, 2011
11
12   (The foregoing certification of this
13   transcript does not apply to any
14   reproduction of the same by any means,
15   unless under the direct control and/or
16   supervision of the certifying shorthand
17   reporter.)
18
19
20
21
22
23
24



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

**A**

a.m
1:15
abbreviation
107:1
able
13:8 17:10
79:1 93:24
absolutely
291:7
accept
196:2
accepted
195:8
accommodate
129:13,16,17
147:13
accompany
170:13
accordance
57:14
account
220:10
accountant
179:6
accounting
165:17 178:24
179:3,13
204:10,12,22
219:15,21
220:12 274:20
275:6
accounts
39:11
accurate
304:16
ACE
1:7 2:11,20
7:10 9:1,11
265:15,20,22
266:6,10

acknowledged
291:20
act
237:2,12
238:2 302:23
acted
23:20 62:7
252:7
acting
238:5
actions
215:3
active
39:14,23 40:1
actively
310:14
activities
63:15
actual
80:7 82:13
83:1 98:13
112:1 136:1
140:4 176:3,
22 177:4
193:15 240:23
261:21
add
149:7
added
130:17
addition
77:22 201:23
address
14:15,17
139:5,18
145:21,22
251:18 275:9,
11,13
addresses
263:16
adjourn
14:1

advanced
187:4
advertise
41:22 42:23
47:18 186:14
advertisement
37:23 40:20
41:15 42:20
54:22,24
advertisements
42:14
advertising
47:14 55:2
affidavit
215:1,6,12
297:14
affiliations
8:1
agency
117:12 267:13
ago
11:17 16:9
144:22
157:16,18
232:10
agree
183:16 222:1
223:5 227:6
290:22 293:10
307:12 311:3,
8
agreed
82:20,21
270:1 278:16
agreeing
233:24
agreement
13:12 109:4
183:12
196:19,23
197:1,5,10

210:22 257:20
311:20,23
312:4
agreements
163:22
209:14,22
210:12
ahead
245:24
air
93:24 94:1
104:16
al
1:5,7 2:5,10,
14,19 3:4,14,
18 4:5 7:9,10
46:20 62:4,5,
6
ALABAMA
1:2 7:12 57:6
146:19,23
147:17 220:22
221:13 222:3,
8,15 223:8
265:16 270:23
280:2,21
281:3,22
287:23 288:12
289:10 290:2
291:1,14,23,
24
ALISON
3:17
ALLISON
2:8
allow
187:10
along
271:22 287:23
already
21:15 22:12
49:22 71:2
90:18,19

118:5,9,12,
23 119:8,18
121:12 148:21
156:16 230:19
233:10 253:21
256:21 263:17
275:3 282:20
ALSO
4:9 8:12 31:9
33:12 51:21
52:13 56:11
61:8 73:11
74:2 126:10
129:2 134:6,
15 137:14
156:17 157:3
158:7 161:5,
22 163:17
168:5 179:5
233:20 257:2
288:6 302:15,
23
Although
255:5 259:17
294:12 311:19
aluminum
54:1
always
28:13 148:5
America
45:22 275:23
279:17
American
31:11 37:10
98:5,22
105:20 149:19
171:12
amount
195:23 196:9
204:14 272:6
amounts
204:6
Amy



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

22:11 39:12,
15 40:6 41:3
63:24

**analysis**
176:18

**and/or**
314:15

**ANN**
3:13

**another**
35:18,22 44:9
90:5,6 97:6
105:9 115:24
144:7 155:4,
12,15 156:1,
23,24 160:14
162:15 168:23
173:20 180:16
187:23 207:10
218:16 230:16
257:24
259:11,14
271:21

**Answer**
6:5 10:23
13:5,8 84:20
203:22 232:16
294:14 311:10

**answered**
71:2 87:23
102:17 103:3
104:3 113:19
119:11 121:8
122:5,23
177:16 290:11
291:3

**anticipate**
13:9

**anticipated**
151:11

**Anybody**
64:6 73:7
75:21 94:12

99:7 144:5
155:23
180:12,19
202:1 209:21
223:15 224:6
234:4 259:4
277:19 286:20
288:12 289:2
291:5 298:2
299:6,13,16,
22 308:2
310:13

**anymore**
156:9

**anytime**
35:21

**anywhere**
259:2 268:15

**apart**
57:7

**apologize**
68:8 215:9,11
227:22 240:16

**appear**
124:23 243:14
246:20
261:15,22
264:18 311:22

**APPEARANCES**
2:1 3:1 4:1

**appeared**
279:13

**appearing**
8:13

**appears**
109:20 117:1
193:8 205:19
254:23

**apply**
175:5 314:13

**appreciate**
139:21 237:10

**approval**
31:13 70:10
74:9 89:8
161:19 254:13

**approve**
29:1,24 30:4,
5 57:24 75:16
100:17 160:23
295:24

**approved**
89:9,23 104:8

**approximate**
184:4

**approximately**
63:1 142:3
185:18 191:17
193:12 205:5
227:8 313:10

**April**
95:24 96:4,14
141:3,20
152:23 154:21
166:14,16,19,
20 167:4,14,
24 207:12
227:2,3
228:10 229:13
244:18 245:4
246:2

**arbitration**
11:11 163:19
303:14

**archive**
59:13

**arguing**
119:21

**arm**
168:16

**arose**
152:23

**around**
16:9 21:17

26:12 63:17
110:6 114:21
127:22 133:16
154:4 159:23
192:19 193:2,
24 287:1,14

**arranged**
172:23,24

**arrangements**
172:20 247:10

**arrive**
105:15

**arrived**
91:20,24 92:1
105:14 156:6
217:23 219:7
233:12,15
236:14 242:16
247:13,18,24

**arrives**
101:23

**arriving**
233:9

**arrow**
271:2

**article**
158:22 159:12

**articles**
159:12

**ASCII**
313:5

**asked**
71:3 87:23
102:17 103:3
104:3 113:19
116:16 119:11
121:8 122:5,
23,24 150:1,6
204:17 205:17
206:9,18
220:3 267:5,7
271:14 290:11
291:3,5,12

297:13 303:22
304:5 310:20

**asking**
50:3 84:2
85:20 86:16
93:16 97:6
116:19,24
117:2 118:1
119:6,14
121:3 132:3
160:22 185:1
215:1 240:10
241:3 273:22
279:2

**asks**
129:2

**assembling**
301:20

**asserted**
164:7 165:2

**asserting**
163:23

**assist**
77:12,17
248:8

**assisting**
78:2

**assume**
10:24 94:8
102:12 103:4
105:9 232:17
251:14 252:22

**assuming**
103:8 254:16

**assumption**
101:5

**assurance**
48:14 54:11,
15 55:3

**AST**
188:3

**ASTM**


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

58:20 73:12,
17,22 86:16
92:6,16,19,22
94:14 96:17
98:5,22 99:4
100:8 105:21,
24 106:3,11
129:4 130:18
131:1,6
187:13 188:4,
15,22

**Atkinson**
162:21

**attach**
248:17 254:1,
18

**attached**
5:18 109:13
203:14 221:20
249:7,13

**attachments**
250:6

**attend**
15:16

**attention**
153:22 210:7

**attorney**
32:22 140:12,
16 163:10
164:3 224:9
255:3 299:10
303:22

**a t t o r n e y -
c l i e n t**
165:1

**attorneys**
139:21 157:16

**audit**
294:24

**August**
195:7 261:3
263:21 286:15

287:1 311:22
312:5

**authority**
237:1,12
238:2 288:13
289:2

**authorization**
255:18

**authorized**
285:21,23

**available**
105:15
155:15,17
179:22 180:6
181:18 183:24
184:17

**Avenue**
1:14 3:13
7:16

**average**
193:22 194:20

**aware**
29:14 31:2
58:15 73:15
94:21 99:11
137:12 143:14
196:22 202:4
203:6 210:1
211:24
212:10,13
217:19 224:7,
8 226:8,15,20
227:12 231:2
234:23 248:10
266:14 278:2
279:3 289:13,
17

_____ B _____

**B**
5:13

**back**
22:6 23:11
33:24 65:6

74:11 79:11
120:10 131:8
133:16 138:22
151:17 164:19
166:20 174:20
179:11 183:20
189:7 193:2
194:11
195:11,13
199:7 200:19,
22 201:13
213:8 217:16
232:5 245:13
259:12 265:11
269:16 282:10
283:1,2,13
303:15 306:21
310:23

**background**
13:4,18 15:6
16:5 28:17
33:16

**bad**
142:23 150:1,
6 180:10
181:16 183:8
218:2 258:23
276:16

**badly**
156:5

**bags**
40:23

**BALDWIN**
1:2 7:12

**Ballpark**
241:21

**banking**
15:9

**barely**
168:24

**Barry**
162:10 178:12

**base**

47:24

**based**
37:10 49:7
65:15 89:9
90:3 116:21
126:6 219:10
295:21 307:22

**basic**
125:13

**basis**
38:22

**Bass**
2:15 9:5
312:18

**Bates**
109:14 114:9
271:10

**Bear**
68:11 277:24

**bed**
81:19

**began**
46:1

**beginning**
62:12,14 77:8
120:11 140:2
201:14 306:22

**behalf**
8:4 13:6 30:6
33:13 38:21
70:13 80:21
81:3 139:23
140:8 229:11
237:2,12
238:2 252:7,
8,13 253:1
265:20 297:21

**being**
7:11,15
12:17,22
57:14 93:18
141:23 149:10
154:14

166:19,21
167:4,24
175:24 205:15
249:14 257:12
290:7 311:23
312:4

**Bejuniak**
34:16 60:3

**belief**
189:20

**believe**
28:22 35:6,22
148:2 156:15
192:11 196:24
225:22,23
236:9 268:23

**bell**
111:13

**belong**
35:4

**Bennett**
3:10 20:15,24
21:8 40:10
56:11 60:9
61:5 68:1
69:3,7,9,20
75:22 133:1
144:3 145:6
160:22 161:19
167:23 168:5,
12,19 169:7
170:8,9
173:15,21
174:4 178:22
190:13,22
192:13,19
225:2,11
227:18 228:1
236:6 263:8,
22 272:3
307:19 308:1
310:9 311:9

**besides**
64:8 75:22



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

144:6 182:5
202:3 210:13
277:21 278:9
293:2
**best**
28:23 175:2
**better**
13:8 16:24
17:2 28:13
172:7,8 218:2
223:12 272:17
**between**
16:23 17:23
23:13 24:23
56:19 60:22
62:8 66:4
67:6 96:14
98:19 142:5
146:7 164:2
210:12 228:16
231:3 237:7
247:6 263:8
265:22 269:18
270:15 273:10
278:22 282:15
283:13,19
286:16 295:18
311:24 312:4
**big**
75:13 167:16
174:5 287:17
288:7 305:5
**bill**
222:7,14
226:1,6
228:16 229:6
**bills**
226:18 253:12
**binders**
47:9
**Birmingham**
3:14 221:13
**birth**

14:21
**bit**
10:8 46:12
97:16
**black**
170:6
**blank**
48:2
**Blum**
7:20
**board**
89:19 124:16
136:1 176:7
177:12 187:15
188:4,16,21
**boards**
87:2 130:6
**boat**
53:7 69:11
70:19 74:22
91:20 96:12
97:7 120:20,
22,24 152:11
153:11,15,17
154:5,8
155:2,17
156:6 174:1
207:18 214:4
233:9,10
234:15
**boats**
74:14,15,19
**Bob**
19:11,15,16,
23 44:5 45:7
56:7 67:2
68:13 69:7,
13,20 71:6,9,
11,24 74:12
83:4,11,14
86:24 87:8
89:7 107:9
108:2,5 116:6

130:23 131:12
132:22 136:5
144:6,10
146:15 150:23
165:11,15
168:24 169:3
172:19 173:19
174:3 194:16
196:19 197:23
206:3 210:10
227:4 237:7
246:14 256:20
258:11 261:4,
7 264:22
272:3 277:21
304:11
310:12,15
**book**
139:18
**booked**
152:11
**boom**
159:1,13,15
**born**
15:3,4
**Boston**
145:2
**both**
72:24 216:1
234:8 287:24
289:18 290:8
**bottle**
40:2,5
**bottles**
36:9,11,20
37:5 38:4
40:22
**bottom**
67:24 68:6,13
70:21 79:10
83:23 84:10
89:17 114:18
116:10 128:20

177:12 225:16
256:23 263:20
285:8
**BOWLING**
2:13
**Box**
2:4,18 3:4
4:4 47:23
153:19,24
**brand**
31:8
**break**
35:20 64:21
138:5 143:10
151:22 193:4
201:2 259:7
284:9
**breakage**
137:6 153:6,8
244:24
**breaking**
137:5
**bregg**
74:24
**brief**
65:2 120:6
138:18 164:15
199:3 201:9
213:4 216:23
217:12 232:1
265:7 306:17
**bring**
153:21
**broad**
297:3
**broken**
97:18,24
143:5,8,15
195:11,14
202:9 206:12
258:7,23
276:8

**broker**
174:15
**brought**
26:9 83:14
99:10 235:20
245:17 266:12
275:23
**Brown**
3:8 8:11
148:12 169:2,
5 205:23
241:3 254:19
262:21 267:23
272:19 273:1
274:6 312:10,
13
**Buckley**
57:24 66:5,9,
18 67:1,3,7
68:14 71:24
72:18,21
73:1,11 74:2,
11 76:3,11
79:7,11 82:2,
12 83:6 84:2,
11 85:20
86:15,21
89:18,19 90:9
92:10 94:12
99:13 104:11
109:22 110:17
112:7 115:15,
20,23 116:4,
5,11,19
117:2,10
118:1,4,12
121:15 124:4
128:10,21
129:6,11,18
130:7,15,19
136:5,6,22
137:9 139:2
150:23 155:22
246:14



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

256:15,24
262:9 267:4,
11 268:11
269:12,18
283:14,20

**Buckley's**
71:8

**Bucowski**
255:19

**Builders**
4:6,7 9:3,8,9

**Building**
44:11,20,21,
23 45:4,5,11,
14,19,20,24
46:2,10 47:1,
19 48:9,12,17
49:14 172:1,
14 174:18
239:12,13,15,
20 240:12
241:2,8
287:15 296:13
297:1,8,12

**Buildings**
3:19

**bulk**
75:1 160:24

**bunch**
171:15 206:5

**bundle**
76:22 78:24
80:1,3,5,6,7,
17,19,24 81:8
82:8,21 89:20
180:2 202:7

**bundles**
179:17,19,22
180:6,9,15
181:11,18,22
183:23 184:4,
17 185:5,13
189:4,15,18

191:19,22
192:10 199:13
200:2,6
202:11 258:24
261:10,11
285:10 286:22

**burden**
309:6,13

**buried**
244:14

**business**
16:23 22:22
25:23 26:13
31:1 40:2,6,
22 42:20
63:12 67:4
69:24 159:20
167:16 204:13
206:22 296:1
302:13

**businesses**
45:22

**busy**
147:11 208:9

**buy**
74:17 104:22
158:4 230:18
309:21

**buyer**
186:7 194:3

**buyers**
186:7

**buying**
159:3

―――― C ――――

**C**
314:1

**calculation**
111:16,18

**calculator**
151:22

**CALDWELL**

3:12,13 8:17,
18 13:11,23
20:16 21:4
24:3 25:20
26:2 27:9
29:20 30:20
31:22 33:10
34:2 35:12
36:13 37:16
38:19 40:17
41:17 42:1,16
43:1 46:3
47:2,20 49:4,
20 50:2,6
57:16 59:1
61:19 67:13
68:21 69:17
71:1 79:21
80:8 82:15
83:19 84:7,17
85:23 86:18
87:22 88:23
91:16 95:4,8
96:19 98:7
99:22 100:9
101:2 102:16
103:2 104:2
107:3 108:16
109:1,11
111:7 112:10,
18 113:18
117:6 118:14
119:10,20
121:7 122:4,
22 123:2,11
131:22 133:8
135:12 136:9
137:1 143:1
150:5 158:10,
18 160:4,11
163:15,20
164:21 166:22
170:23 171:3,
18 172:11
174:8 187:16
188:23 193:6

195:1 196:15
197:7 203:7,
23 205:12
206:16
208:11,24
212:3,22
214:10 216:18
222:4 226:11
237:4,14
244:1 248:19,
24 254:22
255:21 256:4
259:6 264:23
267:19 268:4,
8,17 269:4
270:5 271:5,
11 272:14
273:15 275:2
278:7,18
279:18
281:14,23
284:14
288:15,20
290:10 291:2,
6,12 292:1
293:16 294:10
299:1,11
300:16,20
303:2 308:11
309:8,23

**call**
232:11 233:18
249:24 260:16

**called**
48:4 74:24
117:12 118:23
157:10,14,19
159:8 161:15
162:24 184:18
235:9,21
238:11 263:3
267:14

**Calls**
209:1 312:6

**came**
15:11,21 45:7
48:3 92:24
97:8 100:23
101:9 102:23
105:9 122:3
160:12 176:4,
13,14,23
184:13 202:12
205:4 211:11
216:10 217:3
222:20 223:3,
10 229:24
248:15 289:20
311:5

**cancel**
92:2 152:16
154:22 156:5
207:24 253:23

**canceled**
207:21,22
208:3 253:18

**cannot**
72:16 73:9
106:13 126:8
160:6 184:6
189:1 230:11
258:7 261:9
282:1,11

**capability**
106:7

**capacity**
70:19 75:12
147:12 305:6

**CAPALDO**
1:16 7:22
314:9

**carbon**
66:24

**care**
237:17

**cargo**
74:23 140:1,



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

5,10 141:5
147:15 152:18
154:15 162:16
178:7 236:13,
20 244:23
245:9,17
246:4,23
247:20 252:14
276:11

Carolina
57:5

CAROLINE
2:9 8:24

CARR
2:8 3:17

CARRERE
3:22

carried
245:9

carry
152:18

Case
7:13 78:20
124:7 142:20
165:15 200:8
235:4 299:10

categories
175:23

category
175:5

cause
244:23

caused
252:8

causing
234:6

CC
129:8

CENTER
1:7 2:20 7:10
9:11 218:18
265:15,21,23

266:7,11

certain
20:22 297:9

certificate
128:23 129:18
295:1

certificates
130:1

certification
314:12

Certified
1:16

certify
314:3

certifying
314:16

CHAD
1:5

chance
219:18 221:7

change
34:21 43:13
44:4 79:24
149:11,20
281:3 283:9

changed
43:10 148:7,
18 149:3,12,
23 283:4

changes
282:5

characterizat
ion
183:7

charge
146:1 152:11
229:14

charging
214:3

Charles
3:9

cheat
101:21

check
151:23

checked
235:16

checklist
295:14

checklists
296:11

chief
32:4,7

China
16:24 22:2
24:15 25:10,
17 26:18
29:18 31:7,
10,12,16
36:11 37:13,
15,22 38:18
50:18,19 53:3
54:13 56:4,8,
12 64:17 68:1
69:4,10,13
72:8 75:17
78:2 80:15,22
81:4,11 91:24
99:8,13
103:10 105:2
110:21 120:21
128:5 129:11
131:8,12
133:1 150:17
158:9,16
159:4 160:23
161:2,14
165:19,21
166:1 167:9,
13,23 168:7,
12,18 174:5
192:17,20
193:2 208:18
217:5,21
236:4,14

245:9 270:2
271:16 278:17
279:6,16
292:21 293:2,
5 294:5
295:4,16,22
299:15 300:7
301:1,6,16
304:7 307:16

Chinese
12:24 17:6,8,
12 21:15 38:7
64:4,7 72:19,
20,22,24
87:10 110:18,
21 124:9
157:6 278:4
293:14 294:9,
16 297:22
299:20 306:1

chose
147:10 277:4

Chris
34:22

Chu
27:2,22,24
28:4 55:9,10,
11,14 56:15
57:13 65:10
70:5,12 75:6
78:1 79:2,16
80:14 81:10,
13 85:2,11
86:24 88:10
90:21 104:12
110:10 127:4
128:5 129:10
131:8 173:4
209:6 270:11
280:10 281:19

C-H-U
28:2

Chuck
140:23

Chu's
57:2 81:3

Circle
14:19

CIRCUIT
1:1 7:11

circumstance
s
164:4

cite
59:13 177:5,
13

claim
140:4,7,9
181:1 196:22
205:14 223:22
224:2,4,14
236:23 237:3,
18 238:3
242:3,5,16
243:3,10,15,
18,24 246:9
248:9 264:20
275:17,20

claims
196:20 197:6
238:7,10,12

clarify
10:20 74:1

Clark
178:21,23
190:13 192:24
272:1,12
274:22

Classic
4:6 9:8

classify
177:19

clear
81:21 132:4
150:9 164:8
174:15 176:21



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

236:11
**client**
11:22 17:23,
24 29:1 66:1
255:3 295:24
**clients**
23:15 29:15
296:17
**client's**
212:2
**close**
172:7 239:8
289:11,14
291:19
**Coast**
184:22 187:2
218:15 219:4
220:15,17,19
221:3 222:23
223:1 287:23
288:1 289:24
290:1,8,18
291:23
**coat**
169:2,5 170:6
**coil**
46:12,14,15,
16 47:18 48:8
52:3,6,14,18
108:13,14
**Coleman**
3:8
**colleagues**
23:11
**come**
15:15 23:11
45:10 90:21
146:22 147:1
151:18 153:20
163:16 177:18
187:7 190:2
254:23 288:22
294:23 299:23

307:4
**comes**
239:2 307:7
**comfortable**
67:9
**coming**
45:14 156:17
**commencing**
1:15
**commercial**
212:8
**commission**
297:20 298:4,
12,18,22
**common**
104:21
**Commonwealth**
1:18
**communicating**
261:16
**communications**
130:15 137:17
138:7 155:22
252:11
**companies**
49:18 60:13
61:3 63:3,23
64:7 83:10
144:12 157:3,
6 158:4,7,14
159:3,7 179:4
206:6 207:8
209:15 219:9
239:17 240:23
241:17,18
263:9 275:7
307:20
**Company**
3:5 8:10
20:23 21:16
32:16 34:17

35:23 36:5
37:10 39:13,
22,24 49:17
63:14 64:12,
16 112:21
113:23
124:17,18
132:9 140:19
141:4 144:19
145:14,15
156:24
157:10,14,19
159:7 161:1,
14 162:3,4,
16,24 178:2,
11 180:13
184:18 189:7
199:18 205:9,
10 206:13
207:5 213:13
214:2 215:18
225:24 227:7
228:2,17,18
231:4,10,11
235:8,18,21
237:23 238:6
250:11,24
251:15,22
253:13 263:3
270:16 273:13
274:17 278:5
279:5 284:13,
16,22 299:20
**compare**
251:21
**compensate**
286:10
**compile**
297:20 298:3,
17
**compiled**
298:20
**complain**
275:21

**complaint**
276:14
**complaints**
276:4,5 299:6
**complete**
239:21
**completely**
243:11
**compliant**
49:11 294:19
**complied**
99:3 100:7
**comply**
98:21
**component**
126:13
**components**
301:17 302:24
303:9 306:6
**composite**
249:1,3
**concept**
32:15,24
33:8,18,24
**concern**
143:6 152:20,
23 154:16
155:10 245:3,
5 246:3 247:3
**concerned**
82:2 137:6
153:12 245:18
**concerning**
276:1
**concerns**
153:3 154:13
**concluded**
313:9
**concludes**
312:24
**conclusion**

153:21
**condition**
277:15,17,18
**conditions**
107:15
**Condo**
211:6,8
**conferences**
130:16
**confidence**
48:16
**confirm**
71:17 88:18
234:9 282:24
296:4
**confirmation**
132:7 135:2
147:20,24
261:19
270:12,14,17
271:4 278:6,
10 279:9
280:3,10,23
281:20,21
282:14,21
283:10
308:16,17
**confirming**
76:21 252:8
261:23
**conform**
187:13 188:15
**confusing**
240:15
**connection**
165:3
**considered**
238:14
**consignee**
253:2,3
**Consolidated**
7:13



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

constitute
132:11 150:12

construction
45:21 158:24
159:13,14,20
211:19

consumer
297:19 298:4,
11,18,21

CONT
3:1 4:1

contact
65:18 66:14
67:3 116:12
117:2 119:7
121:5 139:2,
11,13,20
145:11,13,15
249:23 250:3
267:5

contacted
267:4

containers
40:24

contains
149:14

contemplate
206:11

contemplated
207:14 208:20
311:24 312:4

content
86:6,10 276:1

contents
127:12

contingents
255:3

contract
103:1 146:6,
14 152:16
264:10
269:19,24

270:23 272:6
278:3,22
279:3 303:24

contracted
108:11

contractors
82:3

contracts
209:14 210:12

control
186:24 293:9,
11 294:7
295:14
296:11,15,24
297:7 314:15

controls
293:13

conversation
124:1,4
225:12

conversion
107:2

convert
107:1 111:10,
14

convey
24:11 27:20
155:3

convince
154:18

COO
19:13

coordinate
17:23 23:8,13
24:1,14 25:2,
16 27:6 56:2
65:24 66:17
83:5 302:8
303:7

coordinated
80:23 180:24

coordinates

65:23 70:7

coordinating
23:21,23
80:16

coordination
26:14,17

copied
68:14 71:23
86:24 116:2
190:20 246:18
264:22 272:2
283:22,23
310:24

copies
312:19

copy
59:7 66:24
67:5,9 128:4
175:15 215:10
227:23 312:16
313:4

corner
125:16 169:1

corporate
13:14 14:2
37:18 244:5

Corporation
2:11 9:1

Correct
10:11 11:9
12:1,20,21
13:15,16
17:13 20:11
24:2 26:10
27:18 37:1
38:14 42:10
43:8 54:8
58:14 68:12
73:18,20
76:13 85:11
88:8,22 92:8,
14 96:18
98:23 99:14

100:8 113:8
116:14 118:7
135:3 136:2,
8,24 146:12
149:20 152:19
161:24 163:1
165:22 171:2,
12 175:5,6
178:2 189:16
198:7 205:22,
23 206:7
215:19 216:7,
13,17 217:6,
9,21 218:3,7,
10,19 219:1
228:13
234:13,18
236:16,17,21
243:4 245:6,
7,17 247:14,
22 248:3
256:18 257:8
259:5 261:17
263:13,14
264:20 276:9
281:13,22
286:3,18
289:6 290:21
292:21 293:6
299:17 301:3,
13

correctly
226:3 228:6

correspondence
164:2 245:11

cost
135:9,10,17,
19,24 162:9,
12 178:15
233:6,19,24
308:19,21,
23,24 309:3

costs

151:10 288:14
289:3

couldn't
151:9 152:6

counsel
5:18 7:23
8:14,21 12:16
44:9 120:1
163:11 164:22
203:10,11
225:8 231:14
232:20,21,22
233:3 306:10

count
80:18 89:20
240:21 241:10

counted
166:4

counts
180:2

COUNTY
1:2 7:12
11:24 49:3

couple
134:2 235:5
239:5 310:8

course
167:21 204:13

COURT
1:1 7:12,21
48:23

cover
116:8 196:20
197:6

covered
174:19
233:20,23
236:13

CRAIG
3:17,19 9:2,3

created
59:16 60:1



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

credit
190:18
285:20,21,23
credited
286:1
criteria
305:2
Crowley
163:5,9
203:11
204:11,17
cubic
106:21,22
cubicles
61:14
current
14:15 139:4,6
145:10,12
180:3 215:3
233:3
Currently
7:18 14:8
39:7,9 60:23
62:19 306:14
custodian
214:21,23
215:13 297:16
customer
23:8 24:18
26:5 29:24
30:3,13
36:17,23
46:16 48:1
51:5,10,11,
19,20,23
52:5,9,23
53:12,22 62:8
65:17 67:7
70:9,11 71:16
83:9,13
88:18,21 89:8
100:16
101:22,24

108:22 117:22
121:4 189:19,
20,23 190:1
200:15 235:3
296:4
customers
22:24 23:2,21
24:7 27:8
28:10,12,22
30:10,15
41:22 46:17
52:12,13
71:14 72:9
79:13 108:12,
15 182:5
186:16 200:18
218:9,13
222:2,19
customer's
28:21 30:5
74:9 295:22
customs
174:15 175:4,
21,24 177:19
C V - 2 0 0 9 -
9 0 0 9 4 8
1:3 7:14

D

D
5:2
D299
135:7
Dade
11:24 49:3
108:23
daily
22:21 197:17
damage
143:16 198:20
216:12 217:5
233:15 234:6,
22 252:8,14

257:18 258:17
267:2
damaged
140:5,10
156:13 178:8
180:4 194:24
195:24 196:13
202:8 206:12
217:9,20
223:23
234:10,11,17
257:3,10,13,
15 259:4,19,
23 260:10,14
262:10 264:10
damped
142:18
Dan
255:19
DANIELL
2:3
Daphne
2:5,10 3:18
Darren
34:16 60:2,3
data
72:2 92:23
database
130:11
date
1:16 14:21
59:7 76:6
91:3 127:17,
18,20 148:19
149:3,5
150:10 228:8
243:9 247:6
268:24 270:11
278:16
282:21,23
dated
67:24 76:10
146:16 148:1,

2 150:22
152:22 163:7
178:22 207:12
243:6 249:5
261:3 263:21
267:10 270:3
278:12 281:20
282:16 314:10
dates
272:4
David
4:6
day
199:23 200:1
228:11 260:7
264:5
days
120:21,23
134:2 157:16,
18 166:1,3,7,
8 262:8
deal
220:14
dealings
265:20
dealt
292:8,15
293:1 294:4
295:8
DEAN
3:12
decided
147:3 148:9,
21 303:23
305:3,15
decision
77:15 147:6,
9,10,15
150:15 246:1
304:14,22
declared
179:18 189:5

deduct
195:22 196:12
309:2
deducted
285:24
deduction
195:10
deep
42:4
defective
299:7
Defendant
2:10,15,19
3:5,9,14,19,
24 4:5
definitely
196:21
definition
297:5
degree
15:13,22
delay
155:24
delivered
222:18
deliveries
187:9
demand
287:17
DENEGRE
3:22
department
32:9,10
34:11,14,15
59:23 179:1,3
275:6 298:15
depend
293:22
depicted
168:20 172:9
deposition



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

1:11 6:2 7:7, 8,15 8:13,16 10:2 11:8,15, 18 12:3,6 13:13 14:2 51:15,17 97:17,20 107:5,8,9 109:17 120:3, 12 132:16 133:7,22 134:5,12 163:18 201:6, 15 219:24 303:14,21 306:13,23 313:1,4,9 314:5

**depositions**
134:7

**describe**
79:14 175:3, 7,11 220:9

**described**
23:18

**describes**
32:24 33:8

**describing**
176:16

DESCRIPTION
5:16 176:19

**design**
35:8 64:15,18

**designated**
118:3

**designed**
31:16 47:14 300:18

**designers**
34:17,18,24 35:1

**designing**
60:5

**designs**
34:8 49:10 61:17 64:16

**desk**
240:19

**destination**
149:8

**details**
72:16 85:4 114:7,16 115:17

**determine**
77:2 88:6,12 153:11 288:14 289:3

**devastated**
288:1

**develop**
31:10

**developed**
300:10

**developing**
37:12

**device**
296:7 306:6

**devices**
292:20 294:1, 4 296:9 300:15 301:2, 8,18 303:1, 10,12 305:24 307:3,13

**Devon**
3:10,15 8:11, 15,18 11:20 12:7,8,18 13:6 14:10,13 15:14 16:7,8, 10,12,18,22 17:3,4,15 18:10,23 19:3,9,17

20:6,13 21:2, 9,21 22:22 23:17,22 24:21 25:24 26:21 27:14 29:3,4,15,16 30:9,15,24 31:3,5,8,19 32:1,3,5,12, 13,14,20 33:1,4,9,13, 24 34:5,9 35:3,5,11,15, 19,23,24 36:2,3,6,10, 23 37:9,14,19 38:10,21 39:8,11,18 40:12,15 41:12,23 42:9,14,24 43:5,6,19,22, 23 44:10,11, 20,21,22,24 45:2,3,11,14, 19,24 46:1,2, 9,10,16,24 47:3,4,5,17, 19 48:9,12,17 49:1,14,18 50:8,12,23 51:7 52:4,22 53:2,6,10,11, 19 54:6 55:3 58:5 59:6,19 60:7,12,13, 15,18,22,23 61:6,8,11,15, 16,22 62:2 63:2,10,23 64:7,14 65:11 66:19 67:5,19 68:17 70:13 71:12 72:6,9 73:7,16 75:21 77:21 80:15,

21 81:3,21 83:10 84:2 87:10 92:8,12 94:15,20 96:16 97:2 98:20 99:2 100:5,21 101:11 102:10,24 105:19 106:1, 9,14 108:11, 14,23 111:5 112:16 113:2, 11,16 115:11 116:19 117:4 118:10 123:9 124:7 126:21 127:1,5,23 132:12 134:20,21 135:10,13 136:8,23 137:11,18 139:1,23 140:8,14 144:5,12,13, 16,19 145:4, 17 146:7,13 152:16 154:22 158:1 160:24 162:2,9,12, 23 163:12 164:3 165:13 168:11 170:21 172:1,13,18, 24 173:16 178:13 179:7, 13 181:19 182:10 186:23 187:14,24 188:11 189:6, 14,17 190:8 192:1 193:23 194:21,23 195:12,21 196:3,20

197:5 200:12, 17,19 202:3, 16,17 203:11, 21 204:6,13, 21 205:1,10 206:11 207:17 209:22,24 210:13,17,24 211:14,22 212:11,15 214:21 215:14,16, 17,20 216:1, 4,15 218:5,8 221:10 222:2 223:7,13,23 224:12,13, 21,22 226:6 228:16 229:12,24 231:4,10,12 232:21 233:6 234:8,14 235:20 236:18 237:2,13 238:2,9,11, 14,20 239:2, 5,15,16 241:7,14,18 243:23 247:17,24 248:8,15 249:9 250:9 252:13 253:3, 22 254:3 256:22 257:12 259:4 260:22 263:9,12 265:20,22 266:10,17,19 267:21 269:7, 24 270:1,15, 18 271:9 272:1,9,12, 24 273:9,10, 12,13 275:1,



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

10,13,23
276:18 277:3,
19 278:3,16,
23 279:4,6,14
282:15
284:11,20
285:1,17
286:6,16,19
292:19,22
294:2 295:13,
18,19,20
296:10,14,22
297:2,6,16,21
298:2,10,24
299:6,8
300:2,3,6,13,
20,24 301:1,
5,7,22,23
302:7,11,14
303:1,8,24
305:13,14,23,
24 307:3,9,
13,20 308:8,
21 309:6,17,
22 310:13
311:24 312:5

**Devon's**
24:18 25:9
27:8 28:10
51:5 203:10
215:2 252:7
293:2

**didn't**
11:12 29:13
36:4 40:1,4
41:13 42:4
51:9,19 52:1
53:14 54:3
56:9,13 58:8,
10 59:18
63:14 70:2,16
72:13,21
73:4,24 75:3,
20 77:3 78:16
79:23 85:3,4,

8 86:7 88:21
91:12,15,18
92:3,15,19,
20,21 94:16
96:12 99:19
102:6 103:10
105:17
106:10,15,20
108:7 109:9
114:6,16
117:11
121:21,24
122:17 123:23
127:20 128:7
129:6,22,24
130:3,19
131:4,11
133:17 134:13
135:13 138:3,
10 140:3
142:10,17,19
143:9,15,19
144:4 149:24
153:1 155:6,
14,19,21
156:3,4,7,11
157:11 161:10
162:6,23
168:8 174:2
180:17 181:24
182:6,23
184:11 185:24
186:2,21
187:5,9,19,22
188:5,9,12,17
189:8,9 190:7
191:5,8
194:24
195:17,19
196:1,7
198:12,19,20
199:10 200:7
203:1,12
204:8,16
207:20,23
209:17 210:4

211:4,17
212:17 223:16
226:9 231:7,
17 233:17
246:11 251:16
253:8 256:10
257:18
258:20,22
259:2,18
260:22 267:1,
13 276:3,14,
23 277:5,18
285:21 290:2
291:8 292:4
295:10
297:11,23
298:9,23
299:9,21
305:9,18
309:20 310:11
311:7

**difference**
60:21 125:11

**differences**
125:11

**different**
23:3 28:14
31:6 36:5
61:1,3,4 77:6
90:7 113:22,
23 126:10,12,
15 147:2
148:23 156:17
159:3 165:21
222:8,11,14
241:16 246:23
294:16 295:20
301:14,15,16
302:1 303:12
304:9 305:9,
21 306:4

**differently**
293:21

**difficult**

81:5
**diligence**
70:2,13,15
**direct**
314:15
**directed**
243:4
**Direction**
6:5 122:15
**directly**
131:18 180:11
200:13 210:9
224:12,16
**disagree**
197:3,13
198:15
**disclaiming**
210:18 211:1
**disclosing**
246:8
**Discount**
218:17
**discuss**
109:7,9
137:24 138:10
263:18 311:12
**discussed**
13:17 26:14
59:21,23
63:21 74:11
93:22 164:24
197:1 311:21,
23
**discussing**
197:2
**discussion**
74:18 146:24
153:24 154:2
272:11
**discussions**
257:12
**dismiss**

215:2
**distribution**
12:23
**distributor**
296:6
**distributors**
157:23 212:16
**divide**
151:16
**divided**
217:8 218:1
**division**
22:4,5
**dock**
173:17 248:1
**doctor**
28:19
**document**
32:19 35:18
44:10 50:5
58:23 115:2
124:6 126:24
127:5 132:10
160:14,18
163:16 164:22
165:3 177:17
198:15
199:20,21
210:24 221:21
229:2,7,11,
21 230:23
250:18 251:13
254:3 271:6
272:18 280:1
308:7,13
**Documents**
6:10 17:11
22:17 72:7
126:20 132:15
134:11 184:8
202:19 210:16
248:15 249:8
257:19 259:3,



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu

February 25, 2011

327

15 273:2
279:8,13
**doesn't**
54:19 81:23
82:9 88:10
106:22,24
112:15 113:15
118:6 125:10
167:11 225:22
230:10,13
234:4 254:6,
7,14,19
268:12 275:1,
12,15 283:10
289:7 299:2
301:1,7 303:8
**doing**
16:23 31:1
63:12 80:14
90:6 128:2
139:10 167:9,
13 169:13
225:18 234:3
245:21
**dollars**
151:1 272:8
**dom**
68:3
**domestic**
295:9
**Don**
8:11
**Donald**
3:8
**doors**
48:19 53:19,
22,24 54:1
**Dougherty**
163:5
**down**
11:3,5,23
21:19 23:8
131:11 159:20

202:22 206:8
223:16 225:15
232:13,15
251:6 286:21
287:5,15,16,
17
**Dr**
20:14,24 21:8
40:10 56:11
60:9 61:5
68:1 69:3,7,
9,19 75:22
133:1 144:3
145:6 160:22
161:19 167:23
168:5,12,19
169:7 170:7,
8,9 173:15,21
174:3 178:21
190:13,22
192:13,18
227:17 228:1
236:5 307:19
308:1 310:9
311:8
**draft**
254:9,12
282:19,20,24
**drawings**
36:18 300:12
**Drexel**
15:12,16,23
16:2,13
**Drive**
3:8 173:24
**dropped**
159:16,19,22
287:4
**dry**
27:12
**drywall**
12:24 26:8
27:17 29:9,12

48:19 54:5,8
55:15 56:5,8,
12,21 57:12,
14 58:6,20
63:14 65:22
66:13,18
68:20 69:6,16
70:20 71:13
73:18 74:16
75:7,19
76:13,20
79:4,15,18
84:3 86:11,17
87:20 88:6,
12,13 91:11
92:13,17
93:2,6,11,13
94:5 95:15
96:1,16 97:2,
7,14,23 98:3,
14,15,17,21
99:3,9,21
100:6,22,24
101:8,10
102:3,8,9,22,
24 103:9
104:17 105:20
106:11 110:20
111:1,5,24
112:16 113:1,
4,5,7,11,16
115:1,11
116:20 117:4,
16 118:6,11,
13 119:3,8,19
120:19 121:6,
17,22 122:3,
15,20 123:9
124:20 125:1,
9,18 126:4,7,
8,14,16
127:24 128:3
132:6,23
135:18 136:1,
24 137:4,10
138:9 140:24

141:22
142:18,19,
21,23 143:12
146:10 149:18
152:5,6,24
154:24 155:5,
12,19 156:1,
4,11,21
157:1,7,24
158:2,8,15
159:16 160:1,
2,24 161:1
166:15,19,21
167:4,24
168:6 169:9,
12,20 170:3,
7,16,22
171:6,10,15,
17,23 172:4,
9,18,21
173:7,12,16
174:1,21
175:7,9
176:3,12,22
179:18 181:11
183:7,23
184:13 186:1,
8,15,19 187:1
188:2,14
190:3 191:11
193:12,24
194:5,10,23
195:24 196:12
198:7,10,16,
21 199:12
200:12,16,
21,24 202:2,
6,8,16,21
203:4,21
204:3,6,15,
20,21 205:1
206:13
207:11,14,18
208:19 209:8,
14,24 210:14,
19 211:7,10,

15,16,23 24
212:11,14
217:4,8
223:17 230:20
234:4,17,22
235:7,19,20
236:4 242:4
248:1 256:18
257:10,14,18
259:4,20,24
260:10,17,
20,22 261:17
264:11
266:11,15,21
267:6 268:15
269:2,10,20
270:2,19
272:4,7
273:11 275:23
276:2,7,13,
16,18,21
277:3,8,15
278:4,17
279:5,16,21,
23 283:15,20
284:13,22
285:3 286:5,
14,20,24
287:14,17
288:4 289:23
290:6,20,24
291:22 295:8,
9 296:14
297:1,9,22
299:7 304:1,
23 305:16
308:8,22
309:7,13,17,
21 310:14
**drywalls**
47:8 70:1
116:14 119:16
133:5 138:5
153:13 156:9
157:4 158:4



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

| | | | | |
|---|---|---|---|---|
| 159:2,18 174:6,18 212:5 222:16, 22 230:18 267:8 276:24 | 17 171:10 **Eagles** 48:4 **earlier** 59:22 63:22 71:3 93:22 108:13 116:4 | 19 **either** 40:9 43:16 105:17 108:8 123:14 131:15 144:4 183:8 210:9 266:2 | 198:10 199:11 **E-mails** 66:4,22,24 67:6,11 83:23 88:20 89:10 130:15 132:17 134:5 227:17 | 10:10,16 17:12 72:20, 24 81:13 **enough** 11:1 14:6 165:4 245:5 305:5 |

**Dubacheck**
34:22

**due**
70:2,13,14
156:12 287:18
288:4

**Duly**
203:15 314:4

**dumpsters**
180:10

**durable**
124:15

**During**
20:9 44:4
55:19 56:16
57:11 75:18
99:15,16
143:5,8,13,
18,21 168:7,
19 176:8
242:16 244:24
246:9 276:8

**duties**
17:21 18:13
22:20 32:6
67:19 72:6
81:3 129:10
258:17

**duty**
175:6 177:6
296:7

━━━━ E ━━━━

**E**
2:18 5:2,13
314:1

**each**
129:3 130:7,

147:23 156:2
170:20 177:24
233:5 236:10
238:16
261:14,24
268:24 275:4,
16 276:16
278:6 282:4,8
285:7 287:13
296:17 297:13
308:7

**early**
148:22 268:2
269:17

**easier**
216:2 249:17

**eBay**
182:2 185:19,
22,24 186:2,
3,6,10,13,18
310:16

**educational**
15:6

**effort**
23:12

**efforts**
234:16

**Egan**
144:7,8,18
145:11 277:22
310:12,15

**E-G-A-N**
144:7

**eight**
76:1 90:8,12
150:24 151:1,

**E-mail**
66:15,18
67:9,16,20,23
68:6,13 70:21
71:4,23 72:1
74:10 76:1,9
79:10 81:16,
18 82:1 84:11
85:14,19
86:23 89:4,17
90:2,6,11
92:10 93:16
96:11 115:19
116:2,11
117:24 128:20
129:5,14
136:4 160:21
163:4 165:7
178:20 190:21
191:3 195:4
197:24 198:1,
19 210:8
225:2,13
227:24 228:9
237:21
246:14,19
248:16 249:4,
20,22 251:3
256:23 261:3,
7,24 262:7
263:16,20
264:8,22
267:10,18
268:2,12
269:1 272:2,
11 275:9,11,
12 285:8,17

**E-mailed**

263:8 268:20
283:13,19,22
310:21 311:1

**employed**
14:9 35:3
66:9 144:18

**employee**
87:11 224:13

**employees**
21:15,20
22:8,18 26:22
62:18,21
63:2,20 64:9
145:18 165:13
240:3,5,9
241:14

**employment**
16:5 17:15

**end**
82:20 104:8
120:2 191:16,
21 192:1
201:5 212:1
225:16 285:11
290:24
291:14,24
306:12 312:23

**ended**
154:23

**engineer**
31:11

**engineering**
32:9

**engineers**
31:10 300:11

**English**

134:5 227:17
263:8 268:20
283:13,19,22
310:21 311:1

**employed**

**ensure**
29:17 38:12
106:1,10
188:3 296:24
297:9

**ensures**
48:15

**entire**
263:16

**entities**
44:22 209:23

**entitled**
250:18

**entity**
11:20

**environment**
69:23

**equal**
129:4

**ESQUIRE**
2:4,9,13,18
3:3,8,13,17,
22 4:4,9

**essentially**
58:23

**established**
40:13 194:14

**et**
1:5,7 7:9,10

**event**
94:3 126:3
181:10

**EVERTT**
1:5



Toll Free: 800.345.4940
Facsimile: 215.988.1843

ESQUIRE
an Alexander Gallo Company

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

**Everybody**
308:4

**evidence**
266:21

**exact**
20:3 21:22
43:14 62:23
63:16 69:12
110:5 147:18
185:7 241:10
242:7

**exactly**
123:4 167:17
281:10 287:20

**exam**
28:20

**EXAMINATION**
9:16

**examine**
115:16

**example**
24:17 218:12
253:11

**exceed**
149:18

**exceeds**
98:5 105:23
106:3 129:4
130:17,18
131:1,6
171:11 188:22

**exchange**
186:4

**excited**
167:16 174:3,
4

**excused**
313:8

**exempt**
175:23

**exercising**
90:6

**exhibit**
12:5 32:18
35:17 44:8
45:18 58:22,
23 59:8 60:1
61:18 66:2
75:24 79:9
81:15 83:18
89:12 94:23
95:3 107:15,
20 109:16,19
112:7 115:19
124:24 128:19
131:20 136:3
146:4,5
148:12 150:10
151:14 163:18
168:10 177:10
220:3 248:18
249:1,3,14
250:6 267:19,
24 269:15

**Exhibit-11**
105:19 111:23
148:2,14,17,
24 149:5,10,
14,18 150:3,
12 170:20
171:8 209:12
210:2,13
309:16

**Exhibit-13**
107:6,7,13,24
108:3

**Exhibit-14**
112:8 113:6

**Exhibit-16**
116:10 121:3
268:5,7

**Exhibit-17**
124:6 126:15

**Exhibit-19**
135:1,24
278:10 308:21

**Exhibit-21**
140:22

**Exhibit-23**
150:19

**Exhibit-24**
152:8,15
163:4 244:14
247:1,7

**Exhibit-25**
160:9

**Exhibit-26**
164:23 165:6,
21

**Exhibit-27**
5:19

**Exhibit-28**
168:20

**Exhibit-29**
168:23

**Exhibit-30**
169:11

**Exhibit-31**
170:5

**Exhibit-32**
170:15

**Exhibit-33**
171:14,17

**Exhibit-34**
172:7,10

**Exhibit-35**
172:17

**Exhibit-36**
173:20,22

**Exhibit-37**
174:11 175:8

**Exhibit-39**
177:22

**Exhibit-4**
48:14 52:16
53:10 54:6,12

**Exhibit-40**
178:20 179:11
208:20

**Exhibit-41**
190:12

**Exhibit-42**
193:5,8

**Exhibit-43**
195:6 285:7,
16

**Exhibit-44**
197:15 200:7

**Exhibit-45**
201:19,20

**Exhibit-46**
203:17 204:24
219:1

**Exhibit-47**
206:1

**Exhibit-48**
207:10

**Exhibit-49**
219:13,14,19
220:9

**Exhibit-50**
221:7,9

**Exhibit-51**
225:1

**Exhibit-52**
228:12

**Exhibit-53**
227:16

**Exhibit-54**
228:24

**Exhibit-55**
229:20

**Exhibit-56**
230:21

**Exhibit-58**
246:15

**Exhibit-59**
248:18 250:1

**Exhibit-60**
252:3

**exhibit-61**
256:14 262:8
310:22 311:13

**Exhibit-62**
261:2

**Exhibit-63**
261:21 311:5

**Exhibit-64**
263:7,19

**Exhibit-9**
107:5,8

**Exhibits**
5:17 89:14

**exist**
235:14

**expect**
30:3 100:21
272:13

**expense**
165:11,12,14
274:14

**expenses**
135:21

**expensive**
200:23

**expert**
28:15

**expertise**
40:13,16
88:4,11

**explain**
175:16

**explained**
39:1 50:7

**explanation**
70:14 175:18



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

export
270:16

express
40:20

expressed
246:3

extent
13:24 163:20

extra
82:4 286:12

**F**

F
314:1

face
174:20

facilities
48:15 54:13,
16,18 55:4,7
292:9,16
293:1,12,15
294:3,5,6,8
306:2

facility
110:18,21
158:1,15
169:20 173:8,
17 236:7
239:9 240:7
301:11

fact
106:4 150:2
155:24 176:2
187:13
188:14,21
191:5,16
206:24 245:4
246:13 253:14

factories
23:15 24:14
26:18 38:1
56:8 65:18,19
69:14,22

71:12 72:8
77:6,8,13,17,
18,23 78:3,6,
8,10 85:10
127:24 169:24
293:4 294:17
301:14,15,19,
24 302:1,9,24
303:8 304:9,
20 305:9,21

factory
23:14 24:1
25:16 26:6
28:7,24 29:5
36:16,17,19
37:4,22 38:3,
5,12 50:16,17
52:10 53:3
54:20 56:19
57:13 65:24
69:5,8 70:18
72:14 75:6,
10,12 76:4,
12,16 77:2,9
79:3,6,17
80:16,22
81:8,11 85:1,
13 88:18
90:4,13,15,19
92:21 100:16,
19 101:15,18
102:9,13,23
103:5,13
110:16,18
122:2 124:19
125:2 131:13,
16,18 133:4
135:15 141:18
142:7,11
158:5,9
167:19 168:6,
12 169:22
170:1,3,14
172:22 173:13
174:1 208:18,

23 209:3,7
266:23 293:22
295:1,23
300:12,14
301:1,6 302:6
303:24 304:8,
10,12,13,22
305:1,4,5,15,
19

factory's
141:12,15

facts
271:15,16

faded
63:16 97:16

fair
11:1 14:5
24:12 165:4
166:9 232:17
266:5

fairly
64:11 239:8

fall
13:20 160:3

familiar
10:6 213:17
218:21 219:3
255:14 263:3

family
225:17 307:20

far
57:1 75:14
234:19 238:8

fast
11:5

fasteners
48:18 52:17,
19

favor
117:12 118:23
121:19 267:14
272:20

fax
116:5,7
126:19
127:19,20
140:20 193:9
199:23 206:1
270:10 281:18
282:10 283:2

faxed
109:21 115:21
116:3 126:24
127:15 200:1
280:10,11,
13,16

FDA
31:13 294:19
296:7,8
307:18

FEBRUARY
1:9 7:18 20:4
148:3,8,22
149:1,6 166:2

fee
160:19,23

feel
11:4 258:2

feels
67:8

fees
117:22,23
274:15 286:10

feet
106:23

Felicia
146:3

fell
175:22

fictitious
32:15 44:12

figure
208:15 272:21

file
145:17,18,22

filed
215:1 223:22

files
215:15 297:17

final
149:15 150:2,
12 304:14

finalize
89:23 90:19

finalized
90:13 149:23

finally
147:3 242:5

finance
15:9,10,24
28:17 32:10,
11 190:19

find
69:8 75:6,10,
12 79:17
89:22 91:4
119:2 139:18
250:13 272:18
279:24 295:23
306:5

finding
69:5 80:15

finds
37:4

fine
33:15 79:8
109:15 149:6
183:15 232:12
312:12

finish
182:19

finished
180:8 307:5,6

fire
48:18 53:14,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

17 124:13,15
**fired**
145:8
**Fireman's**
3:24 162:4,7
178:1 180:13,
18,20,24
205:9 232:9
233:16
236:11,12,19
242:6,20
243:21 246:8
248:9 273:12
**Firemen's**
8:10
**FIRM**
3:7
**First**
1:13 7:16
15:18,20 16:6
18:21 19:2
23:14 67:22
75:3 86:12
113:22
127:10,13
149:22 208:14
213:16 228:24
249:20 250:21
263:20
279:14,21,23
283:8 298:7
304:8
**five**
21:17,23 22:8
58:22 59:8
60:1 74:13,15
93:19 120:21,
23 129:1
**five-minute**
201:2
**fix**
127:20 260:12
**fixed**

245:15
**flip**
221:1
**flooded**
159:18
**floor**
239:21,22
**floors**
239:21,23
241:1,11,12,
13
**Florida**
46:20 147:16
271:1,3
280:3,23
281:4 282:6
**focus**
36:8 302:16
**folder**
259:13
**follow**
295:15 311:19
**following**
7:6
**follow-ups**
310:9
**foot**
106:22
**foregoing**
314:12
**foreseeable**
290:23
291:13,21
**foreseen**
244:23
**FORGE**
1:13 14:19
**forgot**
287:4
**form**
21:5 24:4

25:21 27:10
29:21 30:21
31:23 33:12
34:3 35:13
36:14 38:20
40:18 41:18
43:2 46:4
47:3,21 49:5,
21 57:17
61:20 67:14
68:22 69:18
71:2 79:22
80:9 82:16
84:8,18 85:24
86:19 87:23
91:17 96:20
98:8 99:23
100:10 101:3
102:17 103:3
104:3 108:17
109:2 111:8
112:11 113:19
117:7 118:15
119:11,21
121:8 122:5,
23 123:12
131:23 133:9
135:13 136:10
137:2 143:2
158:11 160:5
166:23 170:24
171:19 172:12
183:10 187:17
188:24 195:2
196:16 197:8,
20 201:22
206:17 209:1
212:4 214:11
216:19 222:5
226:12
235:12,23
237:5 248:5
252:16 260:2,
5,9 262:2,18
268:18 269:5
270:6 271:6

272:15 273:16
275:3 278:8,
19 279:19
281:15 284:15
287:11 288:16
290:11 291:3,
16 292:2
293:17 294:11
299:2 300:17
303:3 308:12
309:9,24
**formaldehyde**
84:4,14 86:6,
10,14 87:3,21
88:7,13 89:10
128:23
129:19,23
130:2
**formally**
12:8 215:17
**forth**
283:13
**forward**
219:23
**forwarded**
161:17
**forwarding**
252:11
**found**
161:15 177:6
233:15 250:17
251:12,23
304:21
**four**
12:20,22
13:15,20 14:1
15:10 44:8
45:19 58:4,24
81:7 89:21
90:7,8,9,11,
12 93:22,23
104:16 128:23
142:5 143:4

151:16 165:20
262:8 306:23
312:24
**FOX**
2:17
**frame**
69:12 126:6
147:19 154:4
242:8
**franchise**
51:22
**Fred**
128:13,15
**free**
11:4
**freight**
135:20 152:10
155:16 174:15
289:5
**frequently**
34:21
**front**
170:6 215:10
268:9
**full**
58:5,11,12
74:16 94:4
102:14,15
104:13,23
105:3,8,16
123:21 187:11
188:1 241:14
**full-size**
94:2
**function**
66:16 238:6
**Fund**
3:24 8:10
162:4,7 178:1
180:13,18,
20,24 205:10
232:9 233:17



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

236:11,12,19
242:6,20
243:21 246:8
248:9 273:12
**Furniture**
61:12,15,17,
18,22 62:2,10
**further**
183:13
234:17,22

--- G ---

**G**
4:9
**Galen**
140:12 180:22
224:5,8
236:24 237:16
238:13,22
**GARY**
3:22 8:9
232:8 254:22
260:3
**gather**
140:17
**gave**
11:10,15 28:6
51:15 68:8,10
94:22 95:5
107:10 297:14
303:19
**general**
13:3 22:19
107:14 134:15
175:21 176:19
**generated**
165:7 220:12
**gentleman**
162:21 169:2,
4 170:5
180:23
**gentlemen**
169:12

**George**
137:13
178:21,23
192:23 193:9
196:18 197:4
272:1,11
274:22
**Georgia**
207:15,19
**getting**
133:6 134:11
155:24 173:21
184:11 190:10
259:10
**give**
18:1,2 22:10
23:4 27:23
29:4 30:12
36:17,19
43:15 51:23
72:18 139:19
184:3 204:10
250:14 294:24
295:1
**given**
10:1 11:7
134:7 314:6
**giving**
89:5 303:13
**glass**
36:9,11,19
38:4
**go**
13:24 18:4
29:13 57:13
59:18 69:4,9,
13 75:4 78:8
99:8 103:10
120:1 138:12
143:24 148:9,
21 164:9
174:5 182:15
186:7 198:22

212:22 231:20
232:14 233:17
287:5 288:23
291:9 292:5
295:22 301:17
303:1,9
304:10 305:3
310:10
**goes**
37:4 79:13
166:6 289:22
**Goggle**
251:11
**going**
9:23 13:3
22:16 23:1
26:8 32:23
48:22 64:23
76:9 83:4,17,
22 89:11
100:19 115:18
116:9 123:2
124:10 135:22
138:15 151:20
154:5,9
164:12 166:5
178:5 183:3
187:23 190:11
198:24 201:1,
4,18 205:13,
20 207:15
212:1,19,21
213:1,14
219:13,23
221:5,6 225:1
226:24 227:16
228:24
229:19,20
231:22 233:12
234:7 242:21
244:19 246:4,
13 248:14
249:2,21
252:2,3
253:23 254:1,

17,18,24
255:2 256:24
259:1 261:20
263:22 264:24
265:4 269:18
270:19 272:20
284:10 285:6
291:9 306:11
309:17 310:23
312:22
**good**
68:2 70:9
87:4,20 88:6,
13 106:19
145:6 154:19
155:2 156:14
180:9 181:14,
19 183:8
218:1,6 223:6
258:6,24
276:16
286:22,24
287:7 304:13,
21
**goods**
135:19 190:5
195:9 214:3
247:18 307:5,
6 308:19,23,
24 309:3
**Google**
106:20 251:6,
20
**GOOLSBY**
3:17 9:2
**gotten**
87:6 279:15
**government**
299:20
**grabbed**
248:21
**grade**
97:13,14,15,

17,22 202:6,
13
**graduate**
16:1
**graduation**
15:14 16:12
**granite**
104:22,23
**graphic**
34:18,24 35:1
**gross**
272:9 309:4
**ground**
80:15,22
**Group**
32:13,14,17,
20 33:1,9,14
34:1,6 35:5
59:6,19
300:21,24
**guess**
20:16 42:21
110:16 114:22
116:17 151:6,
7 159:24
189:1 194:16
208:9,11
287:15 289:12
**Gulf**
184:21 187:2
192:4 203:19
218:15 219:4
220:15,16,18
221:3 222:23
223:1 287:23
288:1 289:24
290:1,8,18
291:23
**gun**
52:15 296:20
**guns**
296:21



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

guy
190:18

Gypsum
97:13 124:16
174:19
175:14,22
176:5,7,23
177:12,19
202:6 206:6
207:7

H

H
5:13 9:14

hadn't
157:1 253:14

half
112:3 239:21

half-inch
81:7 89:22
111:10,14,19

hall
232:10

hand
83:20 310:23

handing
89:14

handle
76:23 79:1
122:10 140:3
173:1,2
236:22 246:11
247:11 258:22
259:18 289:7
293:23

handled
123:17 140:9

handler
238:12

handles
214:2

handling

238:7,10
246:9

handwriting
125:23,24
150:20
177:11,15
197:23 198:2
202:23 280:7
282:5,8

handwritten
125:21 150:19

happen
74:21 75:2
191:5

happened
74:19 191:7
196:6,10
245:15 259:19
262:14 279:11

happy
145:7 255:7

harbor
150:17

Hardware
2:11 9:1

hasn't
33:20 244:4

haven't
38:7 44:19
47:10 107:23
122:24 133:13
148:8 170:17
210:23 235:16
261:6

Hawk
140:12,13,18
180:22 189:11
224:5,9
236:24 237:2,
16 242:21
243:4 254:23
255:19

head

34:15 39:10
178:24 179:5,
12 220:20
275:5

headquarters
223:11,19

Health
31:20 32:1
60:22 61:6
272:2 275:1,
10

hear
143:15,19
154:1 157:11
188:6 261:7
265:17 267:1

heard
74:17 128:17
153:23 157:2,
9,13,15,17,19
158:3,14,23
162:18,20
189:12 231:6
233:10,14
266:7,8

hearing
11:11 303:14

heavy
78:24 79:12,
15,18

held
1:12 7:11,16

hell
82:4

help
206:4

Henry
266:2

her
13:19 14:1,3
22:14 27:3
34:23 95:5
117:7 118:15

123:1,4
152:3,7
154:17
205:13,17,18
220:3,4 241:4
244:2 267:20
268:9 271:14,
16,21 273:17,
19

hereby
314:3

Heritage
4:6

Hi
232:8

high
160:2 233:11

Highland
3:13

highlight
256:10

highlighted
255:24 256:6
304:2

hire
161:19

hiring
161:1

history
220:11

hit
234:15

hold
18:6,18 20:1

holding
168:15

HOME
1:7 2:20 4:7
7:10 9:8,9,11
14:17 218:17
265:15,20,22
266:6,11

homeowners
8:5 9:22

Homes
2:15 9:5
45:22 211:20
212:1 312:18

honest
242:18

hope
206:4

hours
57:7

house
104:24 211:5

houses
211:18 212:2,
17

Houston
116:13 117:3
118:12 267:6,
12

HTS
177:5

HUDSON
3:3

human
145:19,20
146:1

hurricane
11:22 49:6,9
287:21,22,24
296:19

hurricanes
287:19 288:5

I

idea
45:7 124:9
254:7 255:17
260:19

identificati
on



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

8:22
**identified**
256:14,21
299:14 304:8
**identify**
7:24 248:22
**immediately**
16:12
**import**
24:21 36:12
53:7 108:12
154:24 155:5
156:1,24
270:16
**import/export**
132:8
**importation**
12:23 52:6
53:13,21 54:8
62:10 152:4
211:15
**imported**
31:17 49:2
51:1 55:16
92:18 93:6,13
95:15 97:3,23
106:11 111:5
112:17 113:2,
12,17 115:11
123:9 126:4,
16 172:4
211:22 295:16
297:2 299:8
**importers**
157:23
**importing**
66:19 75:19
105:2 106:2
**impossible**
100:3 104:20
138:4
**impression**
156:18 158:21

233:8 258:10
273:24
**inception**
45:23
**inch**
112:4
**included**
272:5
**incompetent**
152:18 244:22
**Incorporated**
9:6,12 12:19
43:7,20,23,24
45:3 60:16,19
61:6 63:11
265:16
**increase**
150:24
**increased**
151:4
**independent**
102:21 250:13
266:18
**independently**
106:9 266:13
268:16
**INDEX**
6:2
**indicate**
188:14 200:6
202:7 210:17
297:22
**indicated**
308:7
**indicates**
202:20
**indicating**
98:4 122:14
252:12
**individual**
13:7 29:10
80:21 83:2

**individually**
14:3
**individuals**
27:5 34:13
35:2 56:2
59:21,24
302:17
**Industries**
12:7,19 43:7,
24 60:19
63:11 214:22
215:14,17,21
231:12 305:14
**info**
90:13
**information**
18:2,3 23:9
26:5 27:23
28:5,6 65:16
77:3 78:6,17
81:11 84:4
87:6,19 88:1,
16,17,21 89:5
90:2,4,16,20,
24 96:7,9
116:12 117:3
118:7 119:7,
15 121:5
125:13 131:8
134:16 139:2,
9,12,20
140:17,21
142:12
145:11,13,16
150:11 154:11
158:17 161:18
165:16 175:1,
13 177:4
186:4,14
206:5,10,19
207:7 258:9
262:4 267:5
**informed**
142:8 253:22

299:10
**in-house**
8:14 163:11,
13 203:10
225:7 231:13
232:19,21,22
233:3
**initial**
250:2
**initially**
146:21
**inquiry**
12:12
**Ins**
3:24
**inside**
238:16,19,21
239:3
**inspect**
69:14
**installed**
212:17
**instead**
80:2 238:7
280:23 281:6,
9
**Insurance**
8:10 139:24
140:4,9,18,
24 142:14,20
161:3 162:3,4
178:2 180:13
181:1 189:7
190:18 205:9,
10,14 223:22
224:2,4,14
236:13,23
237:3 238:3
242:3 243:3,
10,24 244:7
248:9 253:13
258:18
264:12,19

273:12 275:17
**insure**
139:24 141:4
**insurer**
236:20
**intact**
137:5
**intend**
99:19
**intended**
146:22 152:16
154:22 210:19
211:2 212:7,
11,14 288:21,
23
**intent**
253:23
**interaction**
237:7
**interested**
186:7 256:22
**intern**
16:7,20
**internal**
202:18 238:19
**Internationa
l**
3:10,15 8:12
12:7,8,18
16:8,22 17:3,
15 18:10
19:4,17 20:6
21:2,9,21
22:23 23:17
25:24 30:24
32:13,14,20
33:1,9,14
34:1,5 35:11,
15,19,23,24
36:3,4,6,10
37:9,15,19
38:21 39:8,



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

11,19 40:12,
16 41:12
42:10 43:5,6,
20,22,24
44:24 45:2
49:1 50:9,12
52:4,23 53:2,
11,20 59:6,19
60:16,19
63:10 144:13,
16 146:8
179:7,13
214:21
215:14,16,18,
20 221:11
224:22 231:12
253:4 263:12
275:13
295:18,20
302:12
305:13,14

**Internet**
32:19 42:15
59:13 175:10,
16 181:23
182:9 185:3,
6,16 186:10
203:20

**interpretation**
190:6

**Intertechph**
161:15

**introduced**
271:12

**invoice**
193:15 219:7,
20 220:11
221:10,17
222:7,15
223:2,11,18
230:2,9
254:9,12,15
258:22 290:4

**invoiced**
219:8 258:24

**invoices**
209:19,20
219:16 221:18
229:24 253:6
259:2 290:1

**invoicing**
193:10 291:22

**involved**
51:14 61:15,
22 122:9
140:6 161:7,
12 194:17
224:1,3,16,17
229:5 237:11
247:23 248:12
264:19 275:19
279:15 296:2

**involvement**
62:12 152:3,7
244:9 293:7

**involving**
11:11 107:10

**Island**
57:4

**ISO**
294:17,21

**issue**
78:21 102:1
108:14 138:3
245:12 257:24

**issued**
236:12

**issues**
81:19,20,24
138:2 244:7
263:16

**item**
12:19,22
13:15,20
114:23

128:22,24
129:2 141:7
142:15 146:17
199:12

**items**
48:13 128:22
129:11 198:16

**Ivan**
287:22

---
                    **J**
---

**J**
3:22 150:23

**Jackson**
137:13,17
195:7 196:18
197:4 285:9,
17

**jam**
296:20

**JAMES**
2:13,18

**January**
67:24 68:15
76:8,10,18
81:17 85:14
227:1 230:24

**Jay**
57:24 66:5
67:3 68:14
71:8 72:18
73:1 79:7
86:21 90:9
92:10 109:22
110:17 115:15
116:4,5,11
118:1 121:15
130:19 139:2
155:22 246:14
256:14 267:4
269:12,18

**Jeff**
39:12,16 40:6
41:4

**Jefferson**
3:23

**Jersey**
145:2

**Jim**
9:4,10 182:14
183:15 260:18
265:14
267:20,24
268:9 273:16
312:17

**Jin**
22:13

**J-I-N**
22:14

**job**
66:16 181:9
233:21 234:3

**jobs**
24:9

**John**
3:10 20:14,24
21:8 46:21
56:11 89:13
174:9 225:2,
10 272:3

**Johnson**
193:9,10

**joined**
310:16

**joint**
147:9

**JONATHON**
2:4 8:3 9:21
13:11 76:5
83:19 107:3
109:11 160:11
163:15 182:13
203:8 205:12
255:2

**JONES**
3:21

**Jrlaw@dupm.c
om**
2:6

**Julian**
27:2,12,22,
24 28:18
54:18 55:8,9,
11 56:6 57:12
65:10 69:8
70:5,7,12
77:24 78:1,7
88:9,10 90:21
103:16,17
161:15 173:3,
4 270:11
271:16,18
280:10,16
281:19

**July**
193:2 194:1,
6,11 200:14
226:15 253:17
257:7,8

**June**
124:17 127:16

**jurisdiction**
215:4

**just**
11:4 23:18
26:4,14 27:4,
6 39:17 43:15
46:21 48:2
54:20 59:1
63:16 74:11
79:6 81:8
83:20 89:9
101:22
104:22,24
107:4 114:15
116:23 118:18
119:13 124:18
133:22,23
139:19 142:17
147:21 148:20



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu

February 25, 2011

336

150:9 164:3,
24 169:19
175:2,20
176:19,20
182:16,22
184:3 185:1
186:3 196:2
200:8,10,24
208:13 213:14
215:24 220:5,
6 228:12
230:14 236:11
244:9 248:21
249:10,17,23
254:15 255:8,
17,22 256:5
260:8 273:21
274:16 283:10
284:8 291:7,8
295:7 309:21
310:18,23

---

**K**

**Katrina**
287:24

**keep**
50:3 78:15
167:8 200:24
204:5,8,14,16
215:15 284:10
298:6

**Ken**
19:14 162:21

**kept**
181:19 189:14
195:15,20
204:19 216:5,
15,16,20
218:5 223:7

**Kevin**
4:9 8:14
140:23 225:5,
11 233:1
238:21

**kind**
23:20 40:24
70:3 81:24
87:16 88:15
104:15 145:6
154:5,8 164:6
168:24 186:14
207:4 292:11
296:1 302:23

**King**
1:14 7:16
14:20 15:1
37:10 62:19
64:2 152:1
239:6 240:7,
20 241:8,15
299:23 307:23

**Kitty**
128:18 152:9
154:10,13,17
225:22 244:18
245:6

**Knauf**
157:10,14,19
159:8

**K-N-A-U-F**
157:20

**knew**
184:10 211:16
226:19 258:5
269:11 276:6,
12 290:5

**KNIGHT**
4:3

**know**
19:1 20:17,20
22:11 28:13,
22 29:23
34:4,19,23
41:10 42:1,4
43:12 45:6,16
46:19 50:2
52:1 54:19,23

57:8,18 58:2
59:2,10,17,20
61:16,23
62:3,13,16
63:4,13,15
66:15 68:16
69:12 71:12,
15 72:2 73:21
74:6 81:23
82:7,19 83:8
84:15,20
85:12,15,17
86:13 87:5,7,
18,24 91:2,18
92:3,20,23
93:1,4,5,8,9,
12 94:5,7,10,
11 96:21
101:7,12,14,
17,20 102:7,
22 103:8,23
105:13 106:13
107:4 108:2,6
109:3,12
112:19 113:3,
21 115:13,14
116:1 118:17,
18 120:19
121:11,13,22,
24 122:2,20
123:8,23
124:10,14,15
126:1 128:13
129:22 133:23
134:22
137:20,22
138:3 139:9
140:15,16
142:2 143:11,
15,17 144:23
145:3,24
147:14 148:5,
7 149:22
151:18 153:9,
11 155:7,9,14
156:3,4,7

157:5,8,12,
22 158:5,6,
21,22 159:6,
9,10,21 162:6
163:21,23
164:4 167:7,
12,17,22
168:3 169:6,
16,17 170:12
175:17 176:2,
7,11,16,22
177:2 181:6,
8,13 184:24
185:7 187:19
189:9,24
190:16 193:1,
3 194:12
196:8 198:2,4
199:17,19
200:2 201:21
205:8 206:14,
24 207:9,23
208:2,4,6,8,
12 209:4,21
210:11 214:1
220:18,21,23
221:8 222:13,
16,17 223:4,
9,13,16,19
224:3,11,14,
16,17 227:11,
14 228:20,22
229:14 230:7,
10,15,17
231:5,7,14,
17 233:17
234:19
235:16,17
237:7,10,16
238:8,23
239:3 241:22
242:7,10,11,
12,13,24
243:17,22
246:10
252:10,17,21

253:6,10,15,
16 254:2,5,
10,14,17
257:4,6,18,
24 258:19
259:17,18,
21,22 262:22
263:24 264:2,
3,7,14,16,21
265:2 266:2,
4,20 268:19
269:1,9,12
271:2,8,11,
13 273:8
274:3,9,12,
23 276:14,23
277:1,5,18,
19 278:15
280:6,9,21
281:2,23
283:3,7,24
284:23 285:4
286:8 288:10,
21 289:9,16,
21 291:8
292:5 295:6
298:14 299:3,
9,13,16,19,
21 305:2
308:9 310:2
311:7,20

**knowledge**
13:22 60:10
61:14 64:10
75:5 87:17
88:15 92:12
99:12 102:21
105:1 106:7
108:8 117:21
123:17 127:11
140:11 170:2
187:24 188:5,
7 202:2 203:3
204:23 222:21
223:22 229:10



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

230:5 231:16
235:18 248:8
266:17
284:11,20
285:1 299:5
310:10 311:4

**knowledgeable**
283:18

**known**
12:8 145:21
215:17 264:4

**knows**
28:12 181:9
244:10 273:22
274:18

---

L

**LA**
3:9,23

**lab**
116:13,23
117:3,17
118:3,11
119:3,7,14,15
121:5 267:6,
12

**label**
31:7

**lack**
215:4 218:1

**Lafayette**
3:23

**Lake**
3:9

**Lakeshore**
3:8

**LANGHAM**
1:5 7:9

**language**
10:10,16
17:6,8 72:17
125:22

**last**

27:3 34:23
90:13 134:2
141:11 145:21
178:6 221:1
308:6

**late**
91:21 92:2
156:8,11
231:18

**later**
19:7 22:18
131:12
148:10,16
149:2,7
282:23 283:10
287:4 310:16

**LAW**
2:4 3:7 5:7
8:3 9:18,21
13:16 14:5,7
20:19 21:7
24:8 25:22
26:7 27:13
30:7,23 32:2
33:15,22 34:7
35:16 36:21
38:2 39:6
41:2,21 42:6,
22 43:4 46:8
47:12 48:6
49:12,24
50:4,11 58:1
59:4 61:24
64:20 65:8
67:17 69:2
70:4 71:10
76:7 80:4,12
82:23 83:21
84:9,22 86:3,
22 88:2 89:3,
16 91:22
95:2,6,10
96:22 98:12
100:2,20
101:6 102:19

103:6 104:10
107:6,12
108:20 109:5,
15,18 111:12
112:14,23
114:2 117:9
118:21
119:17,22
120:15 121:16
122:11,24
123:6,19
131:24 133:15
135:16 136:14
137:7 138:12,
24 143:7
148:14,15
150:8 158:12
159:5 160:8,
13,16 163:17
164:8 165:4,5
167:2 171:1,
7,21 172:15
174:10 178:4,
19 182:14,19
183:1,15,22
187:21 189:3
193:7 195:5
196:17
197:12,21
198:22 199:9
201:1,17
203:15,16
204:4 205:17,
24 206:23
208:16 209:5
212:9,19
235:1,11,22
236:3 248:4
252:15 256:10
268:1,24
269:16
271:14,20
284:6,7,19
287:12
288:18,24
290:17 291:4,

10,15,17
292:7 293:24
295:2 299:4,
12 300:22
303:6 307:1
308:15 309:10
310:4 312:6

**lawsuit**
231:3,9

**lawyer**
151:20 236:24
238:15,18,19

**LAWYER'S**
315:1

**leading**
45:20

**learned**
258:12,13
281:8

**least**
88:19 154:22
168:3 179:6
194:10 207:13
250:2 285:15
286:5 287:1
290:23 291:21
296:13 311:23

**leave**
144:21 145:4
223:17

**leaving**
247:7 290:6

**Lee**
22:11 39:12,
15 40:6 41:3
63:24 64:8

**left**
20:4 21:15
22:13 144:20
145:14 150:17
236:14 247:21
248:1 266:23

**legal**

274:14 298:14

**length**
125:12

**LESLIE**
3:13 8:17

**less**
80:6,7,17
82:13 185:20,
21

**Let's**
52:22 57:3
138:12 164:9
231:20 252:22

**letter**
73:12,13,14,
17,22 85:21
116:8 136:6,
13 138:4
140:22 141:11
152:8,15,22
153:4 174:12,
14,17 180:7
192:15 195:6
203:9 226:24
227:4 228:12
242:22 243:2
244:15,17,20
245:6 261:21,
23 262:7

**letters**
310:21 311:1

**levels**
153:14

**liaison**
23:21 62:8

**liaisons**
302:23

**likely**
180:23

**Linda**
27:3 55:20,24

**Line**



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

6:6,11,16,21
100:23
101:10,13
182:20 183:14
198:6 220:1
303:22 304:2
315:2
**LISA**
1:16 7:22
314:9
**list**
135:6 203:18
295:13
**listed**
48:13 146:17
193:17 199:12
250:9 251:22
**lists**
48:17 193:15
250:7
**litigation**
51:14 107:10
163:24 164:6
**little**
10:8 46:12
62:11 97:16
168:15 232:10
249:17
259:11,13
286:11
**Liu**
55:20,22
**L-I-U**
55:20
**live**
211:5
**lived**
14:24
**living**
56:16
**load**
70:19 120:22,

23 190:24
191:9 216:5,
13,15,17
266:16
**loaded**
91:24 99:9
120:20 152:24
166:21 234:12
247:18,20
269:2
**loading**
154:20 161:5,
8,10 166:17
167:1 245:21,
22,23
**loads**
105:13
**located**
220:19,22
221:12 241:9
289:10
**locating**
78:2
**location**
54:21 199:18
200:22
**locations**
222:9,12,14
**log**
167:8 197:17
199:23,24
219:11
**logistic**
32:10 76:23
143:6
**logo**
47:10 171:16
172:9,17
**logos**
172:3
**logs**
200:5

**long**
14:12,24 18:6
20:1 44:20
57:4 142:2
**look**
12:9 42:4
54:3 59:5
67:22 71:22
72:16 77:22
79:9 81:15
95:11 109:4,
22 111:22
114:7,16,23
121:3 124:8
125:14
132:19,21
133:21 141:7
160:9 165:6
171:8,16
174:13 175:10
186:8 187:7
193:14 203:17
206:9 209:12
215:7 219:18
221:8 225:15
227:21 242:23
249:10 250:16
261:10 285:8
**looked**
77:7,16 116:4
132:24 133:19
134:4 147:22
170:20 267:9
285:7
**looking**
18:2 44:9
45:18 52:16
77:12,18 79:2
127:23 132:22
141:3 147:2
148:13 218:24
241:9 271:7,
21 272:20
278:22

**looks**
32:22 127:3
165:20 171:24
174:6 198:6
199:13 201:22
203:8 204:2
206:5 207:13
221:21 243:16
251:6 257:9
261:18 262:15
280:13 283:21
285:9
**lost**
51:20 273:9,
24 274:11
**lot**
21:14 28:21
74:18 82:4
159:2 216:4
222:13 234:24
237:20 274:13
294:16
**low**
286:23 287:4
**Lu**
39:12,16 40:6
41:4 151:24
**lumber**
48:18 53:9,
13,15,16
**LUSK**
3:12

**M**

**M**
4:4
**M.B.A**
15:13,24
**M.H**
162:10
178:10,12
**ma'am**
14:18 38:6

46:18 62:22
66:7 96:10
128:16 139:7
166:4 174:11
182:12 202:24
209:10 265:24
279:2 308:20
**machine**
127:21
**Macoy**
19:14
**Maga**
203:19 218:20
219:5
**M-A-G-A**
218:20
**magnificent**
174:7
**main**
66:14 67:2
**mainly**
36:9
**maintain**
44:1 78:14
145:17 165:12
**maintained**
197:18
**major**
15:8
**making**
80:23 169:12
175:20 248:8
255:7
**manager**
17:20,22 18:7
19:6 27:1,2
65:11,13
**managers**
18:17 34:17
302:8,19,22
306:2
**manufacture**



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

12:23 24:15 25:17 36:11 37:5,15 39:4 49:23 50:14 52:6 53:3,12, 21 54:7 62:9 68:20 79:4 108:12 127:24 135:11,13 142:3 152:4 208:19 211:15 270:2 278:4, 17 279:5 293:2 300:8 301:2,7,16 302:9 305:16 306:5

**manufactured**
11:20 27:17 29:17 31:16 38:4 49:2,18 50:21 51:4 56:9,13,22 96:2,13 108:22 124:20 125:1 141:23 157:7,24 158:8,15 166:15,20 167:5 168:1,7 169:21,24 174:22 235:19 270:20 300:2 308:22

**manufacturer**
117:13 118:24 121:18 235:2, 7 267:15 268:13 278:24 279:16 296:6

**manufacturers**
295:9

**manufactures**
61:17 64:17

292:20 294:3 300:14 306:1 307:3,13,15

**manufacturing**
29:12 37:13, 21,24 38:18 39:2,3 40:14, 15 48:15 54:13,16 55:4,6 56:17 57:11 58:7 75:18 91:6 95:19 99:16 133:2 166:17 173:17 176:9 292:9,13,16 293:1,12,14 294:5,6,9 300:7,9 301:10

**map**
289:10

**March**
14:23 85:15, 20 86:16 88:19 89:5 90:24 95:22, 23,24 96:4,14 110:6,7,14 114:21 146:16 150:22 166:16,18 167:3,13,23 242:21 243:7, 11 269:17,21, 22 270:3,12 278:5,12 279:4,10 280:11,18 281:12,20 282:16 314:10

**mark**
168:10,22 219:13 221:6

225:1 226:24 227:16 228:24 229:20 246:15 252:3 261:2, 20

**marked**
5:17 6:20 12:5 32:18 107:7 128:19 164:23 169:19 310:22

**market**
44:23 45:4 46:24 47:17 186:3 194:9, 10 287:14 288:6,8

**marketed**
48:9 49:13

**marketing**
16:20 33:19 34:10,13 41:19 46:5 47:14 55:2 59:22 60:6

**match**
125:22

**material**
36:9 54:4 72:1 149:9 218:20

**materials**
45:20

**matter**
7:9 246:21 273:20

**Mazer**
184:19 187:1 190:2 192:4 200:14 203:19 209:16,23 218:17 219:4 221:11,12,15,

19,23,24 222:7,11 289:24 290:1, 8,18 291:22

**McCormick**
19:13

**McDOWELL**
4:3

**mean**
18:23 83:3 104:6 111:19 139:3 141:20 191:19 239:17 240:2,22 254:20 258:5 263:4 274:5 284:15 297:4 308:24

**meaning**
311:12

**means**
52:19 71:7 73:10 86:14 97:15,18 124:16 202:12 262:24 295:7 309:2 314:14

**meant**
68:16 74:13 106:21 137:4 182:10 192:22,23 257:10

**Medical**
14:10,13 16:10 18:23 28:19 31:4,5, 8,15 32:3,5, 12 60:23 61:9 64:14,17 292:14,16, 20,23 293:3 294:1,4,18 295:19 296:5,

9 300:1,2,3, 6,15,20,24 301:5,7,12, 17 302:10,14, 16 303:5,10, 11 305:24 307:2,3,13

**meet**
29:18 30:18 106:4 149:18 192:14,18,21 213:20 214:13

**meets**
98:5 105:20, 23 106:3 130:18,24 131:6 171:11 188:22 297:9

**member**
32:12

**memory**
97:16

**mention**
266:6

**mentioned**
86:5 124:19 130:23 229:6 230:8 232:19 235:5 236:10 278:6

**mess**
182:23

**met**
106:11 188:3 232:10

**metric**
106:23

**Miami**
11:23 49:3,7, 8 50:10,13 108:23 159:15 288:6

**middle**



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

71:22,24
81:18 169:8
244:20

**Mike**
19:12 162:8,
11 163:5
178:14 180:7
181:4 197:18
199:19 213:17
225:12 233:18
253:9 262:12,
13 285:3

**military**
28:18

**millimeter**
111:20 112:9
115:22

**millimeters**
111:2,11,14
112:1 113:8,
13 115:6

**million**
151:17
191:18,22

**mind**
89:14 232:11

**mine**
68:9 174:19
175:14 176:5,
14,23 256:3
280:8

**minus**
115:7

**minute**
41:9 138:13
164:10 306:10

**mischaracteri
zes**
117:7 118:15
171:19

**Miss**
9:21 28:1,4

39:15 41:3
64:8 65:9
120:16 139:1
164:2 203:9
213:11 217:19
232:8 273:8
276:6 278:2
284:5,8 307:2
310:5,8

**missed**
245:11

**Misstates**
49:21 171:3
288:16

**mix**
90:7

**mixed**
127:17

**Mobile**
2:14,19 3:4
4:5 146:19,22
147:7,11,16
270:23 280:1,
24 281:3,6,9,
22 283:5,15,
21 288:11,13,
23 289:2,9,
13,18

**Mobile's**
289:4 291:18

**model**
22:22 25:24
26:13 272:4

**models**
272:9

**moisture**
141:8,13,16
142:9,14,16

**moment**
68:11 174:13
182:16,18
234:15 247:17

**money**

15:9 195:23
196:12 204:14
205:8 257:3,
15 262:10,12
263:23 264:5
272:12 273:9,
10,11,13,24
274:7,11
284:12,21
285:2

**Monroe**
2:9 3:18

**months**
16:21

**MORRIS**
2:3

**most**
195:8 311:10

**motion**
215:2

**Mova**
146:3

**move**
190:12

**MSDS**
72:2,7,10,13
73:2,5 85:6,
9,18 87:15
88:5,11

**MSF**
106:17,18

**multiple**
241:1,10

**must**
74:7 94:8
95:6 200:15
281:5

**MV**
266:12,16,22
270:3 275:24
276:7

**myself**

103:11 121:14
134:14 276:4
302:13

─────── N ───────

**N**
5:2

**nail**
52:15,18
296:20

**nails**
46:12,13,14,
15,16 47:18
48:4,8 52:3,
7,11,14,15,
20 108:13,15
296:19

**name**
7:20 9:19,20
22:14 27:3
32:15 34:23
43:10,12
44:13,22
45:3,8,11,14
46:1,10,24
47:19 48:1,9
49:14 157:12,
15,17 159:10
205:19 213:11
250:21 265:14
266:6 307:9

**named**
27:6 35:2
162:17,21

**names**
21:17 22:10,
15 26:21
34:12,20
46:19 48:3
157:22 169:16
172:3 250:7

**narrow**
21:19 23:7

**nature**

299:7

**near**
302:2

**need**
11:3 18:1
35:20,21
58:8,17 80:1
82:24 83:3
84:14 104:23
111:17 120:1
137:4 150:23
153:13 193:4
233:22 256:1
257:1 292:5
294:19 297:4

**needed**
79:7 155:11
159:1 230:17

**needs**
117:23 130:24
131:5 294:22
295:22 296:17

**negotiated**
146:13 229:11

**negotiating**
194:18 229:5

**negotiation**
229:15 243:10

**negotiations**
269:17

**Neither**
88:9

**never**
57:9 58:5,13
72:15 73:16,
23 74:8,19
75:2,17 92:13
99:13 102:4
108:8 123:24
124:3 128:17
141:12,16
157:17,19
178:9,17



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

| | | | | |
|---|---|---|---|---|
| 180:19 189:12 208:5,6 214:15,18 229:3,8 231:1,6 240:21 243:1 266:7,8 277:7,11 287:5 295:11, 12 | 102:3,8,10,22 103:1,21,23 105:4,7,20 107:10,13,17 109:8 111:5 112:17 113:2, 12,17 115:12 117:17 119:8 121:4 122:14, 16 123:21 | 174:17 190:22 192:13 203:15 206:4 | 148:20 151:18 168:10 177:5, 11,13 181:9 184:4 198:16, 17 199:12,13 201:5,15 204:18 218:23 251:10,17,22 267:24 | 22 123:11 131:22 133:8 135:12 136:9 137:1 143:1 150:7 158:10 160:4 166:22 170:23 171:18 172:11 187:16 188:23 195:1 |

**New**
57:4 64:9,11
133:13 145:2

**Nick**
144:7 277:21
310:12,15

**night**
90:14

**nine**
79:10 81:16
206:2 285:9

**nobody**
94:18 298:19

**normal**
25:23 67:4
204:13

**North**
11:11 24:17,
22 25:1,3,4
27:14,16
29:10,16
54:7,9 57:15,
19,23 58:6,13
66:10,19
68:18 72:12
74:14 75:8
78:22 81:21
83:9,14 91:7,
10 92:5 93:11
94:6,13,18
98:3,5,20,21,
22 99:2,7,19
100:5,22,24
101:9,11

124:20 128:1,
10 131:3
136:19
137:11,14
138:1,8
139:13 149:19
155:3,11,18,
23 156:22
160:14 163:19
170:20 171:9,
11 182:5
184:1,5,10
192:2 193:9,
11 194:3,18,
22 195:13,21
196:11 200:9,
15,17 202:3,
18 203:3
207:24 210:3,
9,12,19
211:2,14
212:13 216:7
218:12 253:18
256:15 267:4
285:18 286:6,
17 303:15
304:19 305:8,
18,21 309:12,
18,20 310:2

**Notary**
1:17

**note**
150:20

**noted**
115:20 165:10

**notes**
179:16 180:1
315:1

**nothing**
133:13 234:11

**notice**
1:12 12:6,13
149:24 195:10
251:16

**NP1073**
114:10

**NP1074**
114:18

**number**
7:7 12:6,20,
22 13:15,20,
24 21:23
32:18 35:17
37:8 44:8
45:18 58:22,
24 59:8 60:1
61:18 62:24
63:6 66:3
74:20 76:1
79:10 81:16
83:18 89:12,
23 94:24
95:11 97:12
107:16,21
109:14,20
112:7 114:24
115:19 120:3,
12 124:24
127:19
128:19,22,24
129:1,3
131:20 136:3
139:3,4,15,17
141:7 142:15
143:3 145:5
146:4,5,18

306:12,23
312:23

**numbers**
126:19 177:18
184:7,8
204:10

---

O

---

**oath**
303:18

**Object**
21:4 24:3
25:20 27:9
29:20 30:20
31:22 33:11
34:3 35:12
36:13 38:19
40:17 41:17
43:1 46:3
47:2,20 49:4,
20 57:16 59:2
61:19 67:13
68:21 69:17
79:21 80:8
82:15 84:7,17
85:23 86:18
87:22 91:16
96:19 98:7
99:22 100:9
101:2 103:2
104:2 108:16
109:1 111:7
112:10 113:18
117:6 118:14
119:10,20
121:7 122:4,

196:15 197:7,
19 206:16
208:24 212:3
214:10 216:18
222:4 226:11
235:11,22
237:4,14
244:1 248:4
249:13 252:15
260:1 262:1,
17 268:17
269:4 270:5
271:5 272:14
273:15 275:2
278:7,18
279:18 281:14
284:14 287:10
288:15 290:10
291:2 292:1
293:16 294:10
299:1 300:16
303:2 308:11
309:8,23
312:6

**objection**
26:3 34:3
37:17 38:23
42:17 71:1
88:24 102:16
112:18 158:19
178:3,18
182:22 183:6,
10,13,17,18
203:8 255:1
260:4 264:23
291:16



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

obligations
258:17
obtain
15:23 18:21
24:10 25:3
53:3 68:17
72:6 73:13
76:17 77:5
78:9 90:16
96:6 128:4,6
129:10,18
130:1 139:24
142:7
obtained
19:2 32:19
73:16 77:1
84:5 85:1
91:1 158:1
161:13,23
212:12,15
obtaining
23:22 28:9
161:8
obviously
164:1
occasion
196:11
occupation
213:24
occupied
239:20
occupy
241:8
occurred
43:13 123:5
163:24 188:19
occurs
14:4
ocean
135:20 289:5
October
163:7

odd
272:8
offered
37:18 205:16
offering
244:2 273:16
office
17:24 18:4
22:2,7 23:10,
13,24 24:11,
14 25:13,16
26:16,17,23
27:4 36:24
37:3 38:11
55:12,15,19
56:20 57:2
61:11,13,15,
16,17,22
62:2,9,10,20
64:2 68:19
134:20 152:1
163:14 239:1,
5,12,13,15,20
240:7,23
241:5,15
299:23 302:15
304:7 306:3
307:23
officer
27:1 32:5,7
officers
239:17 240:2,
17
offices
239:14,15,19
240:6,11,13,
17,21,22
241:7
Oh
59:14 245:14
Okay
11:6 13:10
20:18 33:23

70:10 94:22
95:13 111:15
139:22 215:24
223:21 227:19
234:3 239:4
241:13 242:10
247:8 249:18
255:5 259:8
260:24 266:5,
9 267:9
299:11
old
93:19 139:8,
11,13,17
145:13
omission
128:24
omissions
129:19 130:2
once
149:13 168:3,
4 196:14
ones
35:7 114:12
156:14 180:16
181:15,16,19
182:8 286:22
294:2
online
78:5,7
250:16,19
251:24
open
243:15
operating
32:4,7 252:13
302:13
operation
22:7,21 62:13
operations
18:12,14,15,
19 19:3 21:12
42:8,9 44:2

opportunity
17:1,3 189:6
279:24
opposed
17:4 202:16
309:22
options
272:5
order
50:10,13
52:5,9,24
53:10,11,20,
23 54:6,9
65:20 69:15
76:20 81:6
90:23 91:3,7
92:7 95:1,15,
18,21 96:16
97:4,5,9,11,
12 98:2,19
100:7 107:14,
17 111:23
129:15
131:10,11,
17,21,23
132:2,5,11
134:10,14,23
135:2 147:22
148:20 150:2,
13 152:10
155:16 156:6,
23 157:3
170:19
207:11,12,
14,16,21,23
208:1,4,14,
17,22 209:3,
8,9 211:13
253:19 309:16
ordered
102:2 156:16
157:6
orders
70:8 96:24

192:7 209:19
organization
207:4 238:9
Orgill
200:11,12
original
146:17
originally
151:11 270:22
271:24
outside
13:24 163:13,
14 190:11
238:15,17
239:3 294:23
295:3
outstanding
226:17
oval
114:13
over
82:5 147:10
159:18
overall
274:1
overhead
135:21 274:14
overseeing
54:15
owe
226:21 264:11
owed
227:8 228:4
owned
236:8 299:20
301:22,23
302:5
owner
20:23 21:1,9
38:7 60:11,
12,15,18
61:5,8 263:9



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

ownership
64:19

owns
38:3,5 300:7
301:10,24

**P**

P.C
2:3

p.m
313:10

P.O
2:4,18 3:4
4:4

Pac
69:1 75:15
99:5 104:6
105:6,16
106:8 122:6
136:13,16,19
147:1 190:23
191:8,10,16,
20 203:19
235:4 272:7
278:23 285:23
286:1

Pacific
11:12 24:17,
22 25:1,3,4
27:14,16
29:10,16
54:7,10
57:15,19,23
58:6,13
66:10,20
68:18 72:12
74:14 75:8
78:22 81:21
83:9,15 91:8,
10 92:5 93:11
94:6,13,18
98:3,20,21
99:2,8,19
100:5,22

101:1,9,11
102:4,8,10,23
103:1,21,24
105:4,7
107:11,14,17
109:8 111:6
112:17 113:2,
12,17 115:12
117:17 119:9
121:4 122:14,
16 123:21
124:21 128:1,
10 131:3
136:20
137:11,15
138:1,8
139:14 155:4,
11,18,23
156:23 160:15
163:19 170:21
171:9 182:5
184:1,5,10
192:2 193:10,
11 194:3,18,
22 195:13,22
196:11 200:9,
17,18 202:3,
18 203:4
207:24 210:4,
9,13,20
211:3,14
212:14 216:7
218:13 253:18
256:15 267:4
285:18 286:6,
17 303:15
304:19 305:8,
18,22 309:12,
18,20 310:2

Pacific's
200:15

package
40:24 307:4,
7,10

packaging

36:8 47:7

Pactrans
146:7 152:13,
17 155:1
245:19,22

PAGE
5:16 6:6,11,
16,21 12:11
44:15 67:23
68:9 70:22
76:2 109:23
111:21 112:8
113:6,21,22,
24 114:4,14,
17,20 124:8
125:4,14
160:18,21
178:6 193:14
221:1 227:22
267:22 303:21
304:2 315:2

pages
35:8 47:13
60:6 206:3
271:18,19

paid
135:15 205:9,
10 224:22
226:22 228:2
230:8 253:7,
12 258:16
274:13 276:22

pallets
70:1 133:5

paper
40:23 174:19
312:2

papers
168:15

paperwork
32:11 242:20

paragraph
33:3 37:8

40:11 84:12
141:11

parentheses
285:12

part
67:18 72:5
107:15,16,19
125:5 129:9
133:11 134:17
143:21
149:21,24
156:13 203:1
220:16 244:19
256:9 288:8

participatin
g
8:15

particular
231:11

parties
252:12 256:16
276:19,22

partner
264:10

party
255:7 294:23
295:4

pass
18:3 23:9
26:4 65:17
88:15,16
110:16 186:13
212:21 311:6

Pate
8:7 162:8,11
178:13,14
180:8 181:4
197:18
199:18,19
213:13,17
214:1 224:22
225:13 226:21
227:7 228:1,

16 230:18
231:3 233:6,
18 234:8,14,
21 247:11,16,
19 248:7,20
249:5,21
250:3,11,23
251:14,18
252:6,10,23
253:9 254:8
259:23 261:3,
15,19,21
262:12,13
263:22 264:4
276:20 277:2,
8,15 284:15,
22 285:3
311:24 312:5

Pate's
213:24 253:6,
12

patio
48:19 53:19,
21

PATTERSON
2:13 9:4,5
140:24
312:17,18

Paul
163:5,9
203:11
204:11,17

pay
51:19,20,21
52:2 117:22,
23 194:7
195:17,19
196:2 200:10,
24 224:18,21
225:24 226:6
227:10 264:13
270:19

paying
51:24 194:5



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

309:22

**payment**
227:13 243:20
272:4

**payments**
226:10,20
253:9

**pays**
151:8

**Pennsylvania**
1:14,19 7:17
14:20 15:1
37:11

**Pensacola**
3:5 8:7 92:1
143:21 144:1
147:4,6,10,
12,16,20,21
148:5,10,21
150:16 156:7
161:24 162:17
178:14 187:19
206:9 213:12
214:5,17,19
216:6 217:24
222:21 223:3
228:17 233:9
234:15,21
236:16 245:10
247:13,21
248:2 250:7,
10,19,23
251:23
266:12,24
271:1,3
276:20,22
277:1,8,16,22
280:3,23
281:4,6,8
282:6,9 283:5
284:13,18
289:11,14,18
290:7,13
310:10

**Pensacola's**
291:18

**people**
21:18,24
22:12 39:10,
18 54:21
159:2 185:1
223:8 275:18
311:9

**people's**
212:17
293:19,20
294:15

**percent**
84:3,13

**percentage**
86:6

**perception**
293:19,20
294:15

**perform**
41:23

**performance**
145:7

**performed**
58:20 94:14,
19 96:18
104:14 110:21

**Perino**
62:5

**period**
20:9 26:12
55:19 75:13
194:1

**permit**
187:24 195:21
196:1

**Perna**
46:20,21
62:4,6

**PERRY**
2:3

**person**
38:8 181:2
190:19 213:21
214:14 237:17
238:5,10,11
240:24

**personal**
235:18

**personnel**
25:9 145:18

**pertain**
93:2 112:16
113:1,16
210:14

**pertained**
92:17 93:6

**pertaining**
125:1

**pertains**
111:1 295:15
297:8

**Peter**
190:14 192:24

**ph**
19:12,14
34:22 56:22
62:5 90:18
112:22 132:8
146:18 190:14
200:11 255:19
302:3

**Philadelphia**
15:11

**PHILLIPS**
4:4 9:7 313:6

**phone**
8:21 130:16
139:3,4,15,17
213:18 233:18
251:9,17,22

**photograph**
168:11,23

169:8,11,13
170:15,17
171:14,20,23
172:8 173:21

**photographs**
169:19 236:3,
7

**pick**
103:11 186:8
187:8 190:3,4
222:20 223:3,
10 290:14,19
305:18

**picked**
200:3,21

**picks**
189:21

**pickup**
197:17
199:23,24
200:5 201:23
219:10

**pictures**
98:11,13
130:6,10,13
132:18,19,
21,24 133:12,
24 168:4
197:24 198:9,
13 199:11

**piece**
58:16 104:21,
24

**piles**
132:23 174:5

**PIPES**
3:3 5:8 8:6
89:13 183:16
197:19
213:10,12
214:12 217:2,
18 220:2,6,7
222:10 226:13

**231:19 249:12**
260:1 262:1,
17 297:13
310:7 311:15

**place**
52:9 92:7
209:3,7
240:18

**placed**
52:23 90:23
91:7 95:21
96:16 132:12
156:23
208:17,22
211:13

**placing**
69:15

**plaintiff**
8:4 9:22

**Plaintiffs**
2:6

**Plaintiff's**
164:21,23

**plan**
154:20 206:14
245:21 262:15

**planned**
74:17

**plant**
133:2 299:14,
15 300:7,10

**plants**
294:9 301:20
306:4

**plaster**
174:19 175:13
176:4

**please**
7:23 8:22
9:19 12:10
13:6 14:16,22
15:6 16:5



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

22:10 26:20
32:21 33:9
34:14 59:8
68:11 95:12
111:23 125:5,
15 160:10
165:7 171:9
182:17 201:20
203:18 209:13
219:17,18
220:8 221:8
249:11 313:5
**plus**
115:7 135:20
206:2
**plus/minus**
115:4
**plywood**
24:22,24
25:5,17 48:18
52:22,24 53:4
**point**
10:20 13:7
36:2 43:18
57:19 109:21
141:2,23
143:10 147:19
189:5 246:2,9
247:5 255:9
283:5 288:10
290:14
**pointing**
172:17 271:2
**POITEVENT**
3:22
**policies**
297:12
**policy**
236:13
258:15,18,20
**Pon**
128:18 152:9
154:10,13,17

225:22 244:18
245:6
**Pond**
128:13,15,16
**P-O-N-D**
128:16,18
**port**
133:4 146:17,
22 147:11
148:7 149:8
156:7,17
186:8 187:7,8
189:21 190:3
201:24 214:4,
5,17 216:6
217:24 222:20
223:17 233:13
250:6,10,18,
22 251:23
281:6 288:11,
13 289:2,4,7,
20 290:6,13,
19 291:18,19
**portion**
190:23 191:9,
23 216:16
256:6 257:14
**ports**
147:3 148:23
289:14
**position**
17:18 44:1
223:13 275:4
**possession**
181:11 259:23
277:9,17
**possibility**
246:22
**possible**
100:12 105:3
292:3
**post**
310:16

**posted**
186:6
**potential**
186:4,15
**pounds**
82:5,9,14
**practical**
100:1,12
**practice**
67:5 100:14
295:17
**preparation**
133:11
**prepare**
97:20 133:22
209:13,18
210:3
**prepared**
134:22 149:1
177:23 209:22
210:4
**preparing**
215:5
**PRESENT**
4:9 29:11
99:17 173:6,
11,15,19
176:8
**president**
18:12,14,19
19:3,21 20:2,
6,21 21:12
42:8,9 43:19
44:2,5 48:7
60:10 62:1
83:11 237:22
256:21 263:12
305:13
**presidents**
19:10
**pretty**
69:22 91:11

124:8 160:2
231:18 268:1
**previous**
49:21 97:17,
19 134:6
171:4
**previously**
79:20
**price**
106:17 135:5,
7 149:11,15
150:24 151:4,
11,15 159:16,
19,21 160:1
193:16,19,22
194:4,9,10,
13,14,18,20
195:23 287:3
**print**
59:10 170:21
**printed**
187:14 188:4,
15
**prior**
58:7 69:14
157:18
**private**
31:7
**privilege**
164:7 165:2
203:13,24
255:4
**privileges**
163:22
**privy**
283:12
**probably**
11:16 15:2
39:10,12
46:11 62:17
127:18,20
139:18 159:23
212:19 239:23

286:9
**problem**
141:13,16
142:9 275:22
**problems**
276:11
**procedure**
26:19
**PROCEEDING**
7:2
**process**
10:7 29:12
56:17 57:12
75:18 78:13
82:19 91:6
95:20 99:15,
17 143:18,22
176:9
**produce**
74:8 100:19
135:24 203:12
295:23
**produced**
28:24 124:7
135:18 164:5
168:11 184:9
244:5 259:3
**product**
18:1,5 23:6
28:16,20,23
29:6 30:2,4
31:7,11 34:17
38:12 41:1
58:18 68:2
74:3 100:18
101:23 104:9
105:23 106:2
129:21 172:1
175:3,19
176:13,17
177:1,19
187:7 189:21
212:6 216:5



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

292:12 297:19
298:4,12,18,
22

**Production**
6:10 69:15
100:23
101:10,13
160:15 173:8
248:16 249:9
251:13

**Products**
14:11,13
16:10 18:24
22:24 23:3
24:15 28:13,
14 29:17 30:5
31:4,5,6,14,
15 32:3,5
37:5,13,14
38:18 44:11,
20,21,23
45:4,5,11,15,
19 46:1,2,10,
23 47:1,19
48:10,12,16,
17 49:15
54:19 60:23
64:14,17,19
105:2 108:11
117:20 172:14
174:18 211:1
292:11,14,17,
23 293:3
294:18
295:16,19
296:1,5,14
297:1,8,12
300:1,2,8,10,
19 301:9,12
302:10,15,16
303:5 306:1

**Professional**
1:17 35:5

**professionali**

**sm**
28:21

**professionals**
28:20

**profit**
272:9 309:4

**progress**
57:21

**project**
17:20,22
18:7,16 19:6
27:2 65:10,13
302:7,19,22
304:7 306:2

**projection**
272:1

**prompted**
153:4

**proper**
30:9,16 95:1,
14 153:16
154:14

**proposal**
261:5 311:5

**protected**
311:21

**protecter**
47:7

**protection**
141:8 142:15,
16

**provide**
25:6,8 26:21
30:1,16 42:24
56:3 57:20
68:19 71:16
72:8,11
78:11,12,18
79:6 100:6,22
105:19 108:4,
23 118:6
127:7 140:18

298:3

**provided**
24:6 27:14
29:3,19
36:22,24
38:10,11
58:13 68:24
71:19 72:15
74:5 79:19
85:1 87:10
90:4 94:15,20
101:11
102:10,13,24
104:1 107:16,
18 108:3,5
109:7 110:9
112:7 122:8,
14 127:5
128:9 136:12
154:10,19
155:13 177:3
184:12 187:3
204:18 245:20
298:17,21
300:11,13
304:19 305:20

**Providence**
56:23

**provides**
300:24 301:5

**providing**
89:18 137:11

**Prussia**
1:14 7:17
14:20 15:1
37:11 62:20
64:2 152:1
239:6 240:8,
20 241:8,15
299:23 307:23

**PRYOR**
2:9 8:24
313:3,7

**Public**

1:17

**pull**
249:8

**pulled**
251:14

**purchase**
74:15 81:6
91:3,7 92:7
95:1,14,18,
21 96:15,24
97:1,5,9,11
98:2,19 100:7
107:14,17
111:22 129:15
131:10,11,
17,21,23
132:2,5,11
134:10,14,23
135:2 147:22
148:19 150:2,
13 170:19
189:6 192:3
195:23
207:11,12,13
209:19,24
210:14 253:18
279:6,16
309:16

**purchased**
276:19 277:3

**purchasers**
186:5 187:3,
11 188:1,12,
20

**purchasing**
191:21 194:6

**purpose**
28:8 37:23
42:13,19
45:13 55:1
69:4 115:14
146:9 161:3
205:16 212:6
252:6

**purposes**
47:15 60:6
135:23 177:20
255:23 288:9

**pursuant**
1:12 100:6
103:1

**put**
14:3 31:7
39:10,18
41:10,19 46:6
47:6,23 48:1
50:24 52:15
53:6 59:17,20
78:7 80:6,17
81:6,19 90:2
98:16 131:9,
11 153:13
249:14
266:16,24
296:19

**puts**
42:14

**putting**
80:2

— Q —

**Qingdao**
146:18

**Qu**
27:3 55:21,24

**Q-U**
27:3 55:21,24

**qualified**
258:2 311:10

**quality**
23:23 24:5,10
25:4 26:15
27:8,15,21
28:9 29:3,18
30:19 32:8
48:14,17
54:11,15 55:3



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

56:4 57:20
136:24 137:10
138:2,9
186:24 196:21
197:2,6
293:9,11,13,
23 294:7,20
295:14 296:3,
4,10,15,24
297:7,11

**quantity**
23:5 149:10,
12,15,23,24
193:16 244:23

**quarrel**
243:8

**Question**
6:20 10:18,
21,23 13:9
33:11 66:6
71:3 76:24
80:20 81:20
84:23 102:20
103:7 106:19
123:7 135:23
150:1,6
158:16
177:15,17
187:22 189:10
192:8 207:2
216:8 227:20
229:1 230:22
232:16 271:22
278:21 285:14
288:2 291:5,
11,20

**questioning**
182:20 183:14
235:1

**questionnaire**
70:16

**questions**
9:23 13:2,4,
5,18 23:12

33:17 84:21
183:11 212:20
213:15 260:5,
7,9 308:6
310:21 311:10

**quick**
64:21 310:9

**quickly**
91:12 155:19
232:14 311:19

**quite**
10:12

**quoting**
192:15

———————
          R
———————

**R**
2:4 9:14
314:1

**RADISSON**
1:13

**raise**
82:3

**Rally**
74:16,23
91:24 92:18
93:7,14 95:16
97:3,8 120:16
122:21 123:10
126:5,9,17
140:1 143:12
152:17 153:1
154:14,23,24
156:21 170:4
172:5,22
173:8,13
176:4,12,23
202:3 211:11
226:16 244:21
245:9,16
246:5 288:10
289:19

**rarely**
239:2

**rate**
107:2 175:6
176:17 177:6

**reached**
13:12

**read**
10:15 17:7
32:21,23
33:2,7 67:11,
16,20 71:9
72:22 83:24
112:20 130:18
134:6 159:12
226:3 228:5,
12 244:19
256:24 258:20
263:15,22

**reading**
50:4

**reads**
71:6 118:8

**ready**
132:15 133:7
134:5,12

**real**
32:16 310:9
311:18

**really**
21:16 32:16
39:3,4 79:12
87:3,16,20
133:10,21
138:10 159:9
256:22 257:23
281:24 282:11
293:21 294:13
295:6 297:3

**reason**
15:21 51:24
198:14 230:16
254:11 258:21
279:12

**reasonable**

127:6

**reasonably**
101:5

**rebuilding**
287:18 288:4

**recall**
21:16 22:15
137:8 152:7
242:5 244:15
246:7 250:15
257:11 303:13

**receivable**
219:16 220:11

**receive**
65:16 67:10
85:9 88:17
127:13 155:11
198:12,19
210:8 226:9
276:3 283:8
284:12,21
285:2 297:23
298:1,5,7,9,
11,14,15

**received**
107:19,20
243:20 297:18
299:6

**recess**
65:2 120:6
138:18 164:15
199:3 201:9
213:4 216:23
217:12 232:1
265:7 306:17

**recipient**
127:10

**recognize**
254:2

**recommendation**
162:8 304:10

**recommended**
233:16

**reconcile**
253:8

**record**
7:5 8:23
64:23 65:6
78:14 114:9
120:2,10
138:13,15,22
141:12,15,18
142:8 150:10
164:9,12,19
181:3 182:16
183:3,20
198:22,24
199:7 201:4,
13 204:8,16
212:23 213:1,
8 217:16
231:22 232:5
249:4 251:20
254:3 255:18,
23 256:13
265:4,11
298:6 306:11,
21 312:22
314:5

**records**
180:3 204:14
205:18 214:20
215:13
297:15,20
298:3,17,21

**recycled**
176:13,15
177:1

**recycling**
206:6,13,21
207:8

**refer**
77:10 216:1
243:3 260:10,
14



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                February 25, 2011

348

reference
22:17 76:11
86:10 151:14
202:5,13
204:24

referenced
54:5 141:10
165:18 285:16

references
76:3 87:1
97:13 111:23
179:17,18

referred
52:17 54:12
276:15

referring
38:17 47:4
84:10 141:19
142:15 179:11
257:5 264:1
308:9

refers
68:1 73:3
160:18 196:19

regard
29:9 205:21
223:23 305:23

regarding
12:19 26:14
27:7 32:20
66:18 90:11
136:23
137:10,17
138:2,7,9
140:4,10,24
141:8 155:23
180:14

registered
296:5 307:17

regular
117:11 267:13

related
93:10 276:12

294:13

relation
224:19

relationship
236:19

relationships
37:12

relay
81:10 131:7

relayed
131:16 132:3

release
189:17 228:15
229:5

rely
28:21 29:16,
23,24 30:15
106:7

relying
100:5 188:21

remainder
192:2

remember
71:21 72:23
74:6 78:13,19
82:18 92:21
105:14 121:10
163:2 184:7
209:11 215:5
236:5 238:16
267:18 269:14
272:10
280:15,17
281:7,10
308:17

remove
188:1

rep
13:14 14:2
37:18

repeat
123:7

rephrase
158:13 226:14

report
19:8,22 20:12
39:16 40:7
92:17,20
109:21,23,24
110:4,14,19
112:6,15
113:1,6,15
114:3,9
115:16,24
117:24 121:20
122:1,18
124:12,24
125:6 126:7
127:10,12,14
128:3,5,7
140:13
165:11,14
177:23 219:20
220:11 296:8
297:24 308:1

reported
20:10 21:20
22:9,19 41:4,
8 63:21
144:10

Reporter
1:17 7:21
48:23 314:17

reports
92:6 102:5
115:21 116:3
117:21 122:13
140:16 165:12
188:13 308:4

represent
9:22 213:12
232:9 265:15

representatio
n
253:11

representati
ve
12:18 29:11
244:6

Representing
2:6,10,15,19
3:5,9,14,19,
24 4:5

represents
190:17

reproduction
314:14

Request
6:10 104:11
105:17,18
115:23 116:22
128:7 131:3
137:24 138:8
188:10 267:12
273:17 298:5,
8,9,11 299:3

requested
72:12 73:11
74:2 75:9
105:5 121:15
129:12 130:16
136:15,22
137:18 161:18
188:6,18
204:17 298:2

requesting
92:5 128:22
136:6,7 207:7

requests
72:1 137:9
297:19 298:1

required
98:3,20
123:21 155:5
170:21 171:9

requirements
149:17

resale
276:24

research
175:9 250:13
288:8

resell
277:4

reservation
255:8

reserve
255:2

residential
211:20 212:1,
7

resolution
243:24

resolved
242:6,16
243:19 245:12

resources
145:19,20
146:2

respect
65:22 66:13
237:3 238:3
242:2 244:6
252:14 295:7

respond
79:13 274:21

response
118:5 267:11

responsibili
ties
22:20 60:5

responsibili
ty
30:8

responsible
54:14

rest
46:21 260:7



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

retain
162:2,4,23
195:13
retained
178:1
retaining
250:9
return
192:16 197:24
203:4 309:3
returned
192:20 194:22
198:7,11,16
199:14,16,17
200:7,19,20,
22 202:21,22
review
59:15 73:4,7
85:3,4,8 86:4
88:4,11 97:19
110:13 115:17
117:24 127:8,
12 132:14
165:14
reviewed
12:12 33:4
44:14 84:6,24
102:4 107:23
114:4 129:5
165:11 210:3
reviewing
255:22 263:2
279:13
revision
97:11 148:11,
16 149:2
revisions
148:6
Reynolds
4:6
right
10:14 12:3,4

13:1 16:17
20:22 29:7
33:19 35:11
39:23 49:3
53:9 59:5
60:14 62:3
89:24 96:3
103:19,22
107:22 110:23
111:1,4 117:5
120:17,18
131:19 136:20
141:5 142:22
149:4 154:16
155:1 170:11
175:18 178:12
182:11 183:1
185:12 188:9
191:12,15
225:6 236:20
237:20 238:20
239:1 240:14
244:20 245:20
246:12 247:5,
9 248:13
252:23 257:9
258:1 261:12
262:16 267:6
269:20,23
270:20 275:18
278:15 282:6
283:11 284:2
285:11 287:8
301:21
right-hand
125:16
ring
111:13
Robert
7:20 225:3,11
Robertsdale
265:16
ROBERTSON
2:18 5:10

9:10,11 76:5
182:13,15,21
183:5 219:22
260:3,8,21
265:13,14
267:21
268:10,22
269:8 270:9
271:9,13,23
272:23 273:4,
7,21 274:2,8
275:8 278:11
279:1,22
281:17 282:3
284:4 287:10
312:15
rock
217:20,24
218:1,2,6,9
222:2 223:7,
24 261:5
ROEDDER
4:3
role
66:12
roofers
46:22
rooms
241:4
roughly
62:24 63:5
Royal
2:14
ruled
175:4
ruling
177:4
run
18:15 30:17
RUSS
237:9
RUSSO

3:22 5:9 8:9
178:3,18
220:5 232:7,9
235:13 236:2
237:19 241:6
244:3,12
248:6,21
249:2,15,19
252:20 254:21
255:5,11
256:2,8,12
259:10,16
260:6,11,13,
18,24 261:1
262:5 263:1
264:24 310:20
311:17 312:8,
12
RUTH
1:11 5:5 7:8
8:19 9:20
42:2 120:4,13
180:3 197:24
201:6,16
232:11 249:5
253:5 271:17
272:3 306:13,
24 311:18
313:1

───── S ─────

S
2:14 5:13
Sabine
162:17,24
177:23
safe
105:8 297:2,4
safety
72:1 297:19
298:4,12,18,
22
sail
120:24 150:16

288:11
sailed
120:17
salable
193:24
sale
179:23 180:6
181:18 183:24
184:17 186:15
228:16 229:6
255:20 256:18
263:4 284:12,
21 285:2
sales
145:5,7,14
147:19,24
187:20 203:18
204:20 205:1,
7 219:4
220:24 221:15
259:3 270:12,
14,17 271:3
273:11 278:5,
10 279:8
280:2,10,22
281:19,21
282:10,14,21
283:9 297:22
309:2
salespeople
23:1
salesperson
144:7,14,15
238:5
sales-type
238:4
Salina
27:1 28:17
55:20,22
151:24 170:13
salvage
255:18,20
257:20 261:9



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

263:4,23
264:6

**Salvaged**
260:19

**sample**
28:24 30:3
57:23 58:6
71:19 103:17,
20,24 104:21

**samples**
30:1,9,10,12,
16,18 58:3
70:9 71:16
74:3,4,8
75:15 78:11
92:6 93:17,
18,21 94:1,8,
15,20 100:15
102:12,13,15
103:11 104:7,
8,21 116:16,
23 118:2,20
122:8 123:14,
16 129:2,20
184:13 187:4
269:12,13
295:23 305:20

**Sanko**
74:16,23
91:23 92:18
93:7,13 95:16
97:3,8 120:16
122:21 123:10
126:5,8,17
140:1 143:12
152:17 153:1
154:14,22,24
156:21 170:4
172:4,22
173:8,13
176:4,12,23
202:2 211:11
226:16 244:21
245:8,16

246:5 266:12,
16,22 269:3
270:3 275:24
276:7 288:10
289:19

**satisfied**
243:23 247:8

**Savanna**
207:15,19

**saw**
16:22 73:23
78:6 97:17
114:19 128:3
130:10 132:17
133:3,16,18,
23 147:21
168:4 237:20
260:15 269:24
277:7 308:6

**saying**
71:7 73:22
81:7 148:24
179:10 180:8
192:14 227:7
228:1,4 234:2
247:6 249:6
252:6 261:8
282:13

**says**
37:9 40:12
41:9 45:19
48:14 50:5
59:6,9 61:18
68:2 70:9,22
74:12 76:14
79:11 80:11
81:18 82:3
84:11 86:2,21
87:2,3 89:2
90:11 92:9
98:10,24
105:22,23
112:13,20,21
113:9 115:4,8

124:9,12,13,
14 125:11,22
126:20 127:16
129:4 135:7
136:17 141:17
142:16 146:20
147:20,21
148:5 150:23
153:12
172:13,18
188:21 191:2
193:21 197:4,
23 198:8,18
199:16
200:11,20
202:21 206:3
221:4,13
222:7 225:17,
22 227:9
252:24 253:1
267:11 271:17
285:12 290:3
308:13 312:1,
3,9

**Scharf**
19:11,15,16,
23 20:5,10
44:5 45:10
48:7 56:7
66:4,23 67:2,
5 68:14 69:4,
8,13,20 71:6,
24 74:12
75:6,22 81:17
83:1,4,5,11,
14 86:8 87:1,
2,13,19 89:4,
7 104:12
108:3,6 109:6
116:7 123:20
124:1 128:21
130:23 131:2,
12,17 132:2,
22 133:1
136:5 137:20,

23 138:6
143:20 144:10
155:7 165:15,
19 166:1
167:8 168:18,
24 169:3
170:7 172:16,
19 173:2,6,
11,19 174:3
178:21 189:11
194:16 196:19
206:3 207:6
210:10 225:3,
11 227:4
236:5 237:1,
8,11,21
246:15 254:8
256:20,23
258:11,13
261:4,8,13,
16,22 262:9
263:11,21
264:3,19
269:19 270:1
272:3 277:21
283:14,19
284:1 289:18
304:6,11,18
305:7,15
310:13,15
311:9

**Scharf's**
45:7 107:9
109:16 163:18
165:11

**schedules**
177:7

**school**
28:18

**scientific**
176:18

**SCOTT**
2:17

**scrapping**

206:21

**scratched**
270:24 280:2

**sea**
233:11

**search**
78:5 206:19
251:6,12

**searched**
251:13

**seas**
146:10

**second**
10:10 11:14
40:11 68:9
109:23 111:21
113:21,24
114:4 207:16
208:15 209:8

**section**
180:15

**sectors**
40:14,15

**See**
28:14,16
48:20 54:20,
21 57:21
65:19 68:4,7
69:22,23,24
70:17,18
73:24 79:12
84:14 86:13
92:19 97:21
102:6 110:3,
24 114:8,20
121:19,24
122:13,17
134:10,13
141:14 153:10
161:5,6,8,10
166:13 168:24
171:22 174:5
175:22 179:19


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

187:12 193:17
198:5,20
203:1 211:4
212:18 218:22
225:18,21
229:23 243:2
245:1,10
251:21 255:6
259:2 304:3

**seeing**
245:22

**seen**
12:14 33:6
38:8 47:8,10
66:15 92:16
108:9 109:24
110:11 114:6,
12,14,17
127:10
133:12,14
134:13 170:17
172:2 174:21
178:9,17
210:16,23
227:4,5
228:15 229:1,
3,8,21 230:22
231:1 242:19
243:1 246:16
252:4 254:4
255:13 261:6
277:11,23

**sees**
54:20

**segregated**
178:7

**segregating**
180:14

**segregation**
180:4

**selecting**
161:13

**selection**

305:2

**s e l f -
compliant**
294:21,22

**sell**
31:8,13 45:4
46:20 61:13
182:2 200:12
202:2 209:14
210:19 211:2
212:11,14
222:16,22
223:4,20
257:1,2,13
258:6,7
259:24 260:23
262:10 276:18
286:19 309:17
310:14

**selling**
192:1 193:23
206:12 230:19
272:6 285:17
287:1

**send**
31:11 54:18
57:23 58:11
66:21 75:15
93:16,18,24
100:15 103:16
105:3 115:14
116:16,19,24
118:11,19
119:16 123:13
128:7,11
130:5,12
199:20,21
222:15 223:2
246:4 254:12,
15 267:8
269:11 282:7,
18 283:1
290:12

**sending**

117:16 235:2
254:8 255:6

**sense**
91:14 106:23,
24 111:20
119:22
230:11,14

**sent**
58:5,16 73:1
74:7 88:20
103:17,20
118:2 190:20
210:6 244:18
251:2 252:18,
22 255:9,18
270:11 282:14
289:24 290:19

**sentence**
141:11 225:21
285:12

**separate**
22:4 132:10

**September**
178:22 179:12

**sequential**
109:14

**series**
66:3 227:17
262:6 263:7

**serious**
258:5

**service**
146:6

**Services**
35:5 41:23
42:24 60:22
61:6 224:19
230:3

**set**
120:24

**settled**
243:11,18

**settlement**
264:13

**Seven**
15:2 66:3
129:3 166:7,8
185:13

**Shandon**
56:22 57:3,10
124:16

**Shanghai**
17:24 18:3
22:2,3 23:10,
13,24 24:11,
13 25:13,15
26:16,17,22
36:24 37:3
38:11 55:12,
15,19 56:16,
19 57:2,4
62:9 65:16
68:19 126:22,
23 127:1
132:8 152:2
270:15,16
302:2,4,8,
15,20 306:3

**shape**
153:18,19

**shared**
178:14 233:6

**Sharkey**
203:19 209:16

**sheet**
58:11,17
72:2,3,13,
15,19,24
73:2,5,8,10
76:3,12,17
77:2 79:19
82:6 85:4,5,
7,16,17,18
87:9,15 94:2
100:13

104:13,16
112:9 129:2,
3,20 130:7,18
135:18 151:5,
12,15,17
170:16,22
171:10 193:20
194:6,8,15
217:20,24
218:1,2,6,9
222:2 223:6,
23 235:8,19
250:10,14,23
251:5,23
261:4 285:10,
13,19,22
286:2,7,9,
12,16,20
287:2,6 308:9
309:18,22

**sheets**
57:22 58:12
72:7 76:22
77:5 78:9,12,
15 80:2,6,17,
19,24 81:8
82:13,21 83:2
84:6,15,24
86:5 87:14
88:5,12
92:22,24
93:2,9 99:20
100:4 102:15
105:4,8
123:22 130:5
135:6,11
142:4 172:3,6
185:11 187:11
188:2 191:1,
14,17 193:11
195:12,14,16
207:18 260:16
285:13,18

**Shelter**
184:22 187:2



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

192:5 218:15
219:4 220:15,
17,19 221:3
222:24 223:1
289:24 290:1,
9,18 291:23

**shifting**
276:10

**Shingin**
302:2

**ship**
50:24 74:23
96:12 99:9
104:9 105:3
147:6 150:17
155:13 172:21
207:17,20,23
208:14 216:10
217:3 224:20
226:9,16
266:17 280:1
290:7 295:24

**shipment**
104:16,19
105:10 143:13
146:21 147:1
160:24 196:13
202:8 207:14
217:21 219:6
242:15 275:24
279:17 283:5
285:16 286:5

**shipments**
105:12

**shipped**
69:11 173:7,
12,16 208:5,7
270:23 281:22
290:8

**shipper**
155:16

**shipping**
47:7 139:24

143:5,9
146:10 151:8,
10 152:21
244:24 283:20
288:9,14
289:3,5

**shoot**
296:18

**short**
75:13 196:2

**shortage**
159:17 288:4

**shorthand**
314:16

**shortly**
91:6 95:20

**show**
66:2 75:24
83:17 89:11
94:23 115:18
116:9 146:4
190:11 201:18
219:12 221:6
224:24 226:23
227:15 228:23
229:19 230:21
242:21 246:13
248:14 252:2
255:12 257:19
267:20 282:24
285:6 297:21

**showed**
164:22 220:3
236:4 259:3
272:6 281:19

**showing**
109:19 197:15
198:10

**shows**
132:22

**sign**
215:7 282:10

**signed**

215:8 252:23
278:3

**signing**
269:19

**similar**
15:9 74:15

**simple**
111:15

**simply**
118:18

**Sinaca**
190:14,15
192:24

**Sinclair**
3:19 9:3

**single**
170:1 235:8

**sitting**
240:24

**six**
21:18,23 22:8
61:18 77:7,
12,16,18,22
78:3 128:24
153:14 198:6,
17 199:12

**size**
58:2,5,12
71:18,20
74:15 76:13
89:19 93:21
94:4 102:14,
15 104:13,23
105:3,8,16
111:2,4,24
115:10 123:22
125:8,10,16,
18,22 126:10,
12 187:11
188:2

**sketch**
179:17

**skills**
17:6

**skip**
95:2 265:1

**skipped**
95:7

**slash**
197:23

**SLEDGE**
4:3

**slow**
11:3,5
232:13,15

**small**
58:16 104:21,
24 105:12
153:15,18
192:7 195:9,
10 196:9
218:23

**smaller**
80:1

**sold**
11:23 98:21
181:23 182:4,
8 183:24
184:5,18,21
185:2,6,15,
19,21 187:1
192:4,9,11
200:17,18
202:16,17
203:21 204:3,
6,15,21 205:2
206:20 207:3
211:23 216:4
218:8 222:2
223:7 247:21
262:11 276:21
277:9 285:10,
22 286:5
289:23

**solely**

220:14

**solicit**
40:22

**somebody**
74:7 77:11,
17,21 130:21
141:4 142:6
153:21 156:16
174:12 189:18
204:12 207:1
229:17 240:18
250:14 254:12
255:10 270:24
298:10,13,
16,24

**somewhat**
10:6

**somewhere**
130:24 236:15
250:19

**soon**
70:8

**sooner**
155:12

**sorry**
19:5 21:6,17
22:15 48:24
77:19 117:15
119:1 129:1
140:23 170:7
173:10 180:5
189:15 216:8
227:3 260:11
267:17 268:14
279:11 283:16
309:11

**sort**
42:19 72:15
136:7 142:8
176:13

**sound**
283:11

**sounds**



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

120:18 185:12

**source**
18:4 22:23
23:3 28:14
39:1 142:12
157:4 159:4

**sourced**
11:21

**sourcing**
16:23 37:12
38:17 295:21

**South**
57:5,6 147:2
159:1,15

**Southeast**
287:18

**Southern**
4:6 9:9

**sp**
68:3 74:24

**space**
241:5

**speak**
10:12 17:6
64:4 72:21
81:13 142:6,
10 258:2
288:12 289:1

**speaks**
64:7 312:10

**spec**
68:4 70:23
71:7 76:3,11,
17 77:1,5
78:9,12,15
79:19 81:19,
20 84:5,24
85:3,16,17
87:14 88:11

**specializes**
37:11

**specific**

49:10 51:4
52:12 53:4
79:4 130:12
131:10 273:17

**specifically**
131:5 197:1

**specification**
23:4 84:14
85:7 86:5
87:9 129:1,20
130:5

**specification
s**
23:22 25:3,7,
9,18 26:15
27:7,15,21
28:9 29:2,6,
18 36:18,22
37:6 38:9,13
49:8 51:4
52:12 53:4
56:3 68:18,24
69:6 70:24
71:13 75:8
78:4 85:10,21
86:9 88:5
235:3 301:6
304:19,24
305:8 306:4

**specifying**
73:12,17

**specs**
30:18 71:8
75:14 84:15
300:12,13,24

**speculation**
209:1 312:7

**speed**
271:22

**spell**
81:24

**spelled**
157:20

**split**
162:9,11
233:19,24

**spontaneously**
121:14

**square**
106:23

**stack**
153:14 259:11

**staff**
27:4 199:22

**stamp**
98:4 105:22
106:3 114:10,
13 129:3
131:14
170:16,22
172:9 271:10

**stamped**
114:18
171:10,17,22
172:17

**stamps**
130:6

**stand**
106:18

**standard**
100:14 107:1
188:4 294:20

**standards**
23:23 24:6,10
25:4 26:15
27:8,16,21
28:10 29:3,7,
19 30:19 56:4
57:15,20
73:12,17,22
86:16 98:6,22
99:4 100:8
105:21,24
106:4,5,12
131:1,6
149:19 171:12

187:14 188:15
293:11,14
295:15
296:15,24
297:7,10

**standing**
168:14 169:8
170:6,10
183:6,10
260:4

**standpoint**
186:24 293:10
294:7

**start**
16:11 19:17
41:13 46:9
65:18 263:19

**started**
15:14 16:6,10
20:4 46:7
62:17 95:20,
22 220:5

**State**
290:2,24
291:24

**stated**
297:15

**statement**
73:20 175:21
225:17

**States**
15:19 31:9,14
87:12 101:24
127:2 156:22
174:16 177:8

**stating**
288:18

**steps**
129:24

**Stevedore**
3:5 8:7,8
178:14 199:18
213:12,13

214:2,8
224:21,23
226:21 228:17
230:1 231:3
247:11,16
248:7 249:5
250:10,11
251:18 276:20
277:2,8,9,16
284:13,15,
18,22

**Stevedores**
224:19 250:8
251:14

**Stevedoring**
226:18 247:12
250:23 251:15
261:3

**Stipulations**
6:15 50:1

**stock**
202:21 287:8

**stop**
35:21 63:12

**storage**
135:20 274:14

**stored**
234:21 236:15
247:19

**storms**
287:24

**Street**
2:9,14 3:18,
23

**STREETMAN**
2:17

**strictly**
295:21

**strike**
83:8 186:22
194:21 212:12
277:12



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

stringent
293:13 294:8

struggling
230:19

stuff
87:4,20
258:6,23

subject
130:20,22
246:21 261:4
273:19

subjective
262:20

submission
253:13

substantiate
188:13

substitute
256:2,3

substituted
280:4

suddenly
159:17

suffered
217:4

sufficient
245:5

Sugg
4:9 8:14
225:5,11
233:1,2
238:18

suggest
268:14

suggested
261:14

suggesting
249:16

suit
51:21

Suite

2:9 3:8,13,
18,23

sulfur
276:1

SULLIVAN
2:17

summary
204:2

summer
160:3

supervise
18:16 31:12
32:8

supervision
314:16

supervisor
39:21

supplier
45:20

supply
99:2 184:19
218:21

SUPPORT
6:2 22:7
215:2

supposed
67:15 224:18
306:8

Sure
10:22 14:5
15:7 20:3
30:17 42:23
43:14 45:12
47:22 48:11
54:3 57:13
71:20 73:2
76:19 77:9
80:17,23
101:23 106:16
110:5,11
111:11
114:11,15

116:6 127:9
128:12 130:9,
12 133:4
138:5 142:11
145:1 147:8,
18 149:21
150:9 151:7
160:7,13
161:4 168:2
176:21 190:19
205:11 208:3
233:11,20
234:10,16
238:22
242:14,18
251:8 252:5
278:20 281:1,
5,16 283:7
285:15 287:20
308:18

Surely
236:24

surprised
44:16

survey
70:15 160:18,
23 161:1,23
162:12,15
177:22 178:15

surveyed
162:16

surveyor
161:5,6,8,13,
16,20,22
162:3,5,6,11
178:1,10,13
233:7,16
234:1,7

Surveyors
162:17,24
177:23

Susan
19:12

sustain
151:9

switched
302:14

switching
283:14

sworn
8:2 9:14
314:4

system
219:16,21
220:13 293:23
294:22

─────────
T
─────────

T
2:9,13 5:13
9:14 314:1

tacked
286:11

TAE
4:4 9:7

Taiwan
15:4,8,11

take
12:9 13:13
40:3 42:4
52:5,14
53:10,11,20
64:19,20
65:19 104:15,
24 129:24
151:22 165:16
174:12 185:24
186:18 187:11
190:7 191:8,
10 195:12
201:2 249:10
253:5 259:7
284:9 286:9
290:15 304:24
305:6 306:3
312:15

taken
1:12 65:3
120:7 133:17
138:19 164:16
180:2 199:4
201:10 213:5
216:24 217:13
232:2 236:7
265:8 306:18

takes
57:9 189:20

taking
190:23 191:17
237:17 261:17

talk
11:5 23:1,14
26:9 27:11
40:8 41:5
52:22 78:8
86:9 130:19,
21 154:4,8
180:12,17
209:6 275:18

talked
40:9 52:3,21
65:9 74:3
85:6 108:10,
13 130:4
148:23 180:19
191:1 209:16
213:18 263:17
287:13 296:23
302:18

talking
12:16 70:24
78:20,23 97:7
154:3,12
226:12 231:11
240:3,16,17
242:4 244:21
269:16 272:22
294:2

tape
7:7 120:2,11



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

201:5,14
306:12,22
312:23
**tariff**
177:7
**tax**
176:17
**taxed**
175:24
**team**
31:9,12
154:17
**technical**
87:15 190:9
**TECHNICIAN**
7:4 8:20
64:22 65:5
119:24 120:9
138:14,21
164:11,18
183:2,19
198:23 199:6
201:3,12
212:24 213:7
217:15 231:21
232:4 265:3,
10 306:9,20
312:21
**telephone**
240:19
**Tell**
9:19 13:6
32:24 33:8
34:12 35:20
59:7 94:13,
17,24 96:12
98:10 115:2
123:20 125:8,
15 151:21
156:10 160:12
165:24 166:5
188:11,17
193:4 201:19

207:6 214:24
219:19 226:5
245:15 249:21
266:9 271:6
277:14 282:1,
11 286:4
**telling**
130:7 225:10
268:12
**tells**
114:24 117:10
118:4,22
121:17 125:15
**ten**
83:18 166:7,8
185:8,15,18,
19,20,21
241:22
**tendency**
232:14
**tender**
205:21
**tendered**
12:17
**tendering**
273:19
**term**
129:22 218:2
260:19
**terms**
107:14 149:9
258:15 260:15
**test**
51:7,10 52:15
58:17,20
92:6,17
94:14,19
96:17 99:20
100:4,12
102:5,11
104:7 105:16
109:20 110:19
112:6,15

113:1,5,15
114:3,8
115:16,24
116:13,23
117:4,19,21
118:3 119:3
121:6,19
122:1,13,17
123:14,15,22
124:24 125:5
126:7 186:24
187:12 188:2,
10,12 267:6
268:14
296:18,20
**tested**
30:11 51:12
92:13 93:12
94:6,8 96:17
100:24 101:8
102:4,8,12,23
103:24 105:4,
7 115:1
116:20
117:13,17
118:5,9,11,
12,24 119:8,
18 121:12,18,
23 122:3,15,
21 123:10,16
125:9,19
126:7,15
266:13 267:15
268:16 269:3,
7,10
**testified**
49:23 233:5
234:24 275:3
**testifying**
33:13 38:20
**Testimony**
5:5 49:22
117:8 118:16
171:4 288:17,

19 303:19
304:15 309:5,
12 314:6
**testing**
58:14 92:11,
19,23 106:6,
15 110:20
117:11,22,23
122:10 123:18
124:12 187:6
266:18 267:13
296:3 309:6,
13
**tests**
30:17 104:13
**Thank**
191:20 221:5
284:5 310:5
312:13
**themselves**
285:24 286:1
309:21
**thickness**
112:1 113:7,
23 114:24
115:3 125:12
126:14,16
**thing**
54:17 58:16
223:2
**things**
13:19 20:23
205:18 215:12
234:9 239:5
255:24
**think**
19:19 38:24
49:16 53:23
54:24 60:2
68:10 71:5
72:14 73:9
74:20 79:23
83:12 90:5,10

91:9 97:10
98:9,16 101:4
106:20 108:18
114:19 117:14
118:1 127:17
131:9 132:13
136:11 137:3
140:20 145:19
148:18,20
150:18 153:17
162:7 163:3,
14 175:15
177:16 184:7
189:2 190:10,
17 191:7
195:15
200:14,21
206:20 207:3
210:15 223:15
224:15 234:5
235:4,15
254:11 256:4,
11 257:2
258:21 262:9,
11,24 263:17
265:1 267:16
268:13 269:15
275:16 283:8
288:16 291:4
305:10 307:21
308:12 309:16
310:2
**thinking**
21:23 39:12
**thinks**
155:2 191:3
**third**
10:5 11:8
12:3 76:2
178:6 252:11
255:6 276:18,
22 294:23
295:4
**thought**



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu

February 25, 2011

356

16:24 40:3
92:10 116:21
119:13 154:18
167:15 174:6
176:16 178:10
181:8 191:9
196:14 226:22
238:13 256:17
271:15

**three**
14:14 16:9,21
35:17 56:1
58:12 105:3,8
114:24 123:21
125:14 141:8,
12 142:16
169:18 187:11
188:1 201:15
262:8 271:17,
19 306:13
310:18

**three-page**
270:10

**thumbnail**
179:16

**time**
7:19 10:5
11:4,14
15:18,20
20:3,9 21:18
26:12,24 34:6
35:20 36:2
40:8 42:11
43:14,18
44:20 55:19
60:3 63:7,16
64:23 65:7
69:12 70:18
75:11,14
76:21 86:12
90:18 96:15
105:16 109:22
114:21 120:4,
13 126:6

127:23 133:17
138:15,23
140:11 141:3,
23 144:9
147:13,18
154:4 155:17
156:12,16,20
158:24
164:12,20
166:6 167:15
174:3 179:7,
10 183:3,21
186:18 189:5
190:4 192:19,
22 193:24
194:2,7,13
198:24 199:8
201:6,16
204:9 213:1,9
217:17 231:22
232:6 233:8
242:7 245:19
247:4 265:4,
12 266:22,23
279:14,21,23
281:21 287:14
288:10 305:3
306:14,24
310:6 313:1

**times**
10:4 104:4
167:23 168:2
196:6 213:19
235:6 289:19

**timing**
156:15

**Tina**
34:22

**title**
18:7,9,19,22
19:2,20 20:2
181:14,15,20
185:24 186:19
189:14,17,22

190:5,8 218:5
257:17,23
258:1,4
302:19

**today**
9:24 10:19
12:2,17 13:3
26:9 97:20
129:23 132:16
133:7 157:13
239:9 257:19
263:23 302:18

**together**
239:18 249:14
289:15 291:19

**told**
33:17 94:19
119:4 123:3
131:2,13,18
155:16 166:13
177:24 223:18
225:23 243:9
245:19 261:13
262:9 264:12
266:10 268:23
274:16 275:16
281:2 282:4

**top**
76:2 90:10
110:24 117:10
125:16 126:20
196:18 197:22
220:20 227:21
248:19 250:22
286:12

**topics**
12:12

**total**
62:21 166:1
179:17 220:24
221:15,21

**touch**
261:9

**towards**
76:1

**track**
204:5,19
223:16

**trade**
47:19 49:14

**Trading**
3:10 8:12
12:9 16:9,22
17:4,16 18:10
19:4,18 20:6
21:2,9,21
22:23 23:17
25:24 31:1
35:15 36:4
42:10 43:5,
20,23 45:1,3
50:9,13 52:4
53:11,20
60:16 134:21
144:13,16
146:8 179:8,
14 215:18
221:11 224:22
253:4 263:12
286:15
295:18,21
302:12 305:14

**transaction**
272:13

**transcript**
5:18 312:20
314:13

**transfer**
302:14

**transferred**
16:8 189:22
190:1

**transit**
156:22 217:5
276:8

**translate**

17:11 87:17

**translated**
87:12

**transmittal**
206:2

**transport**
154:15 246:23

**travel**
57:8 214:16
313:5

**travels**
56:18

**treated**
48:18 53:14,
17 124:13,14

**tried**
154:17 253:20
259:24

**trip**
168:7

**trips**
165:21 167:10

**troubles**
79:14

**truck**
76:22 78:24
172:21 173:22
185:11 198:1

**trucking**
172:23,24
200:23 286:10

**truckload**
185:9 259:15

**Truckloads**
185:10,16,
19,20

**trucks**
173:12 290:7,
13,16,19

**true**
98:6 304:15



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

314:5

try
10:20 68:9
79:17 104:18
119:2 129:13,
16,17 175:2,
16 232:13
288:13 289:3
310:14

trying
81:21 106:20
142:13 176:21
244:9 272:21

turn
90:8 125:4

turned
202:22

two
11:16 12:11
15:21 19:14
32:19 39:10,
13,17,18 61:2
64:11 83:23
92:22,24
93:2,8 105:12
112:8 113:6
120:12 124:8
125:4 134:7
142:5 144:22
157:15,18
160:18 169:12
192:16 193:14
201:5 234:8
239:21,23
241:12,13
248:14,23
249:8 250:5
262:6 263:16
311:18

two-page
160:17

type
78:17 138:1
177:1 190:19

Tyshon
90:17 112:22
114:1 124:16
141:21 235:9,
21 236:8
282:15
299:15,19,22

U

U
9:14
U.S
15:16 16:23
22:7 26:10
31:17 36:12
51:1 53:7
55:16 91:11
99:10 117:12
118:23 121:18
134:20 135:7
146:11 151:1
184:14 267:14
268:13 292:9,
13,15 293:11
294:7,8,18
297:10

Uh-huh
48:21

ultimately
154:23 192:9
212:16 223:8
243:18,23
245:8,16
259:19,22
305:12

unable
13:5

undamaged
178:8 190:23
191:11 193:23
216:16 217:9

under
34:16 39:11,
18 46:24

47:18 48:9
49:14 59:5
105:23 146:17
164:4 168:15
175:4 185:8
258:18 303:18
314:15

undergraduate
15:8

underneath
21:13

understand
10:9,19 72:17
73:10 85:8
93:20 176:20
199:10 214:7
230:3,11
233:23 234:9
238:17 244:3,
4 249:15
257:23 261:12
276:17
292:19,24
300:23

understanding
12:15 43:9
82:12 96:5
99:1 103:12,
15 123:4
176:6 205:20
213:23 217:4
235:6 236:1
257:16 287:16
288:3

understood
10:24 232:17
256:16

Union
132:8

unit
135:5,7

United
15:19 31:9,14

87:11 101:24
127:1 156:22
174:16 177:8

University
15:12

unless
314:15

unload
147:15 234:3

unloaded
216:6 226:9,
17

unloading
143:18,21
147:13 161:6,
11,23 162:13
178:15 180:8
214:3 224:20

unsalable
180:5 181:10

unusable
179:19 180:14
183:9 189:5

unwritten
296:23 297:7

updated
33:20

UPTON
2:3

urgency
91:14,19 92:3

usable
180:16 183:8

USD
264:11

use
17:5 45:8
46:11 48:12
104:20 117:11
123:15 198:2
201:21 212:7,
8 267:13

297:2,4
305:4,15

Usual
49:24

V

v
1:6
VALLEY
1:13 14:19
variety
40:13
various
51:21 60:13
65:18 179:4
211:23 212:15
218:9 272:5,9
275:7 289:19
vendor
70:15
vendors
203:21 211:24
212:16
verify
99:6
VERNIS
2:13
versus
7:10 147:6,16
180:5 294:6
vessel
153:16,24
154:11,14,19
155:4,12,15
156:1 161:9,
24 178:16
234:20 244:21
245:20 246:5,
23 247:7,12,
13,17,24
252:9
via
66:18 105:18



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu                                February 25, 2011
                                                      358

152:15

**vice**
18:11,14,19
19:2 21:11
42:7,9 43:19
44:1

**Vick**
266:3

**video**
7:19 64:24
65:7 120:4,13
138:16,23
164:13,20
182:17,24
183:4,21
199:1,8
201:7,16
213:2,9
217:17 231:23
232:6 265:5,
12 306:14,24
312:19 313:2

**videographer**
7:21

**Videotape**
1:11 7:4,6
8:20 64:22
65:5 119:24
120:9 138:14,
21 164:11,18
183:2,19
198:23 199:6
201:3,12
212:24 213:7
217:15 231:21
232:4 265:3,
10 306:9,20
312:21,24

**visit**
99:8 167:19
168:19 305:10

**visited**
168:6 289:18
304:12,20

305:1,8

**visiting**
68:1

**visits**
165:19

**Vitten**
19:12

**volume**
75:13 305:6

**voyage**
234:10

---
**W**
---

**W**
3:17 9:14

**WAECHTER**
3:21

**Wait**
41:9

**waiting**
66:7 77:14

**waived**
203:24

**waiving**
165:1 203:13

**Walk**
15:5 16:4

**WALKER**
3:21

**Wall**
50:10,13

**walls**
27:12

**want**
19:1 23:5
28:12 33:2
51:19 64:20
74:14 90:7
101:21,22
122:7 142:17,
19 143:4
156:9,11

161:4 182:23
196:2 198:1
208:13 234:4
236:11 248:24
256:6 259:6
263:18 284:9
292:5 296:3

**wanted**
27:16 40:21
74:13 82:12
89:21 90:9
91:10 92:2
142:20 147:1
155:18 156:3,
4 174:4
182:22 188:10
239:4 255:9
286:10

**wanting**
118:10

**wants**
48:1 104:6
116:22 118:2,
19 119:15
197:11 228:1,
5 233:20
267:7

**warehouse**
180:15 236:15
239:11 247:19
266:24

**warranties**
109:7 210:18
211:1

**warranty**
85:22 108:14,
23 109:10
136:6,7,12,23
137:9,18
138:1,4,8
197:2 210:22

**wasn't**
21:2 24:18
44:6,23 46:7

48:11 71:20
73:1 76:19
77:8 78:22
79:18 81:5
94:2 99:17,18
102:1 105:5
107:18 110:22
116:1 127:9
129:14 133:3
136:16 140:6
142:11 143:22
145:7 146:23
147:8,18
149:3,21
153:10,18
160:3 166:10
167:5 168:20
173:9 176:10,
17,18 184:1
187:3,18
188:18 190:19
197:9 208:21
210:21 224:1
226:20 238:22
246:18 264:22
269:6 275:19
278:20 280:12
287:20 288:7
311:2

**waste**
206:21

**water**
142:22

**WATTS**
3:3

**way**
40:20 46:6
68:10 81:9
122:13 123:3
175:18 187:23
229:4 257:13,
24 258:21
274:3 280:13
283:3 310:3

**Wayne**
266:3

**web**
35:8 44:14
47:13 60:6

**website**
33:5 35:18
40:21 44:10
59:15,19
186:11

**websites**
34:8

**week**
257:2

**weeks**
19:14 142:5
192:16

**weigh**
80:7 82:13

**weighs**
82:8

**weight**
76:12 78:20,
21 79:5 82:3,
4 83:1 87:1
89:19,24
125:13

**we'll**
10:24 151:22
164:8 168:10,
22 190:12
246:15 260:16
261:2 310:4

**went**
15:12 28:18
50:16 56:7,11
69:8,20,21
75:17 99:13
131:12 145:2
151:12 166:20
167:23 180:10
193:1 204:7
233:10 245:23



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

251:18 270:3
287:15 302:12
304:7,11,20

**We're**
7:5 22:16
26:8 65:6
120:10 138:22
150:9 164:19
183:20 199:7
201:1,13
213:8 224:24
232:5 239:9
244:2 254:24
255:2 265:11
272:19 304:1
306:11,21
312:22

**weren't**
47:15 51:5
80:24 102:14
105:15 117:16
176:8 194:17
199:14 212:2
229:4 237:11
248:11 249:12
303:19 310:24

**WESLEY**
3:3 8:6
213:11 256:5

**wet**
142:21,24
143:4,12,16,
18 202:22
203:5 266:22
267:1

**we've**
13:12 52:21
70:24 108:10
130:4 209:15
219:24 242:4
263:17 296:22
302:18

**whatever**
30:13 74:20

88:17 122:7
129:15 130:11
139:20 197:11
234:16 258:12
312:1

**whatsoever**
119:23

**Whenever**
67:8

**wherein**
297:14

**Whereupon**
65:2 120:6
138:18 164:15
199:3 201:9
213:4 216:23
217:12 232:1
265:7 306:17

**wherever**
234:20

**whether**
73:2 90:7
101:7 104:6
122:20 123:9
143:11 148:9
159:6 176:3,
11,14,22,24
208:2 227:12
238:23
243:17,22
266:10 273:8
274:9 278:21
282:1,11
311:4,20

**whoever**
200:9 251:11

**whole**
33:3 58:17
159:19 171:15
191:24

**wholesale**
194:10,12

**width**

125:12

**WILLIAMS**
3:7

**willing**
233:19

**window**
11:17,19
50:16 108:21,
24 296:17

**windows**
11:21,22
48:19 49:2,7,
9,13,19
50:14,20,24
51:3,8,12,13,
18,22 52:21
53:24 54:2
296:18

**wired**
263:23 264:5

**within**
13:20 175:22
231:10 238:9
257:12 295:4

**Witness**
6:5 8:1,19
20:18 21:6
24:5 26:4
27:11 29:22
30:22 31:24
33:18 34:4
35:14 36:15
37:20 38:24
40:19 41:19
42:3,18 43:3
46:5 47:5,22
49:6 50:8
57:18 61:21
67:15 68:23
69:19 71:5
79:23 80:10
82:17 84:19
86:1,20 87:24
89:1 91:18

96:21 98:9
99:24 100:11
101:4 102:18
103:4 104:5
108:18 109:3
111:9 112:12,
19 113:20
118:17 119:12
121:9 122:6
123:13 133:10
135:14 136:11
137:3 143:3
158:20 160:6
166:24 171:5
172:13 187:18
189:1 195:3
197:9 204:1
205:21 206:18
208:13 209:2
212:5,21
216:20 222:6
235:24 237:6,
15 244:8
249:18 252:17
259:8,14
262:3,19,23
268:6,19
269:6 270:7
272:16 273:23
275:5 278:9,
20 279:20
281:16,24
284:17 290:12
292:3 293:18
294:12 300:18
303:4 310:1
313:8 314:4,6

**witnessed**
58:19

**woman**
170:10

**WOODLEY**
3:7

**word**

86:13 130:17
258:5

**words**
224:13

**work**
14:10 15:14
31:24 35:14
55:14 60:24
62:18,19
63:22 64:1,13
70:3 144:8,11
179:2 234:8
240:4 264:9
296:8 300:3

**worked**
14:12 15:10
21:13 26:22
35:10 44:11
55:18 63:2
64:6 152:13
224:12 247:16
258:16

**working**
16:11 19:17
241:14 303:5

**works**
39:7 55:11
144:23 151:24
179:4 274:24
275:7 299:14

**worried**
153:5,7

**worry**
245:14

**wouldn't**
67:1,11 93:23
94:4 100:4
112:4 121:13
122:9 167:20
243:8 253:10,
15

**wrapper**
98:16,18



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

172:1

**write**
10:15 17:7
59:7 72:22
177:12

**writing**
245:13

**written**
17:11 136:23
142:8 197:10
210:11,21,24
227:1 280:22
295:14
296:10,15,23

**wrong**
68:10 127:18
150:11 156:19

**wrote**
85:13 195:10
245:5,13
271:1,3 282:9

**WU**
1:12 5:5 7:8
8:19 9:20,21
13:14 65:9
120:4,13,16
139:1 164:2
180:3 201:6,
16 203:9
213:11 217:19
232:8 249:5
271:24 272:3
273:8 276:6
278:2 284:5,8
306:14,24
307:2 310:5,8
313:1

---
                X
---
**X**
5:2,13

**Xin**
22:13

**X-I-N**

22:13

---
                Y
---

**Yeah**
27:11 41:5
42:11 43:3,11
48:11 50:15
52:8 54:10
60:2 64:18
66:21 67:21
68:12 69:1
72:14 76:14
78:5,11,23
80:19 82:10
84:1 95:23
116:15 127:6
153:2 166:7
171:6,24
172:19 174:14
189:12 194:7
195:8 200:8
202:10 204:1
205:6 212:18
216:2 231:7
234:2 237:24
240:15 268:4
275:19 294:14

**year**
15:15,20
17:14 18:8
19:6 43:15
62:15,16
242:13,17

**years**
11:16 14:14
15:2,10 16:9
64:11 93:19
144:22 225:18

**Yep**
112:2

**yesterday**
106:21

**York**
57:4

**yourself**
64:8 77:22
83:24 153:21
223:14

**yourselves**
7:24

---
                Z
---

**zero**
84:3,13

---
                .
---

**.5**
115:7

**.55**
115:5

---
                '
---

**'04**
268:2

**'05**
48:8

**'06**
154:21 194:6

---
                1
---

**1**
5:17

**1.00**
286:20,21
287:5

**10**
314:10

**10.00**
285:22

**10.47**
285:10,13,18
286:2,6

**100**
62:24 63:8,9
240:1,5,11

**1034**
2:18 64:24

**1049**
65:7

**1073**
114:12,15

**1091412**
205:5

**10th**
228:10

**11**
94:24 95:7,9,
11 107:16,21
150:10 151:14

**11216**
14:19

**1147**
120:4

**1155**
120:14

**1160**
1:13

**1168**
7:16

**11th**
249:6

**12**
58:4 81:7
89:12,21
90:8,9,12
93:22,23 95:5
104:16

**12.7**
111:13,24
113:12,24

**1214**
138:16

**13**
198:6,17
199:13

**131000**
227:8

**1320**

**138:23**

**1346**
164:13

**1347**
164:20

**13485**
294:17

**1396**
130:18 188:22

**13th**
253:17

**14**
109:20 112:8

**1408**
183:4

**1409**
183:21

**1424**
199:1

**1425**
199:8

**1427**
201:7

**1440**
201:16

**1450281.56**
270:18

**1453**
213:2

**1455**
213:9

**149**
272:24

**14th**
166:2 263:21
311:22 312:5

**15**
115:19 303:21
304:2

**15.9**



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

125:20 126:3
**150000**
228:5 264:11
**1535**
217:17
**154**
272:24
**1553**
231:23
**1554**
232:6
**15th**
120:17
**1600**
3:23
**1634**
265:5
**1642**
265:12
**17**
124:24
**1724**
306:15
**1729**
306:24
**1735**
313:2
**1750**
3:8
**177**
106:17
**18**
74:18 128:20
**1800**
2:4
**18th**
286:15
**19**
131:20
**19406**

14:20
**1957**
267:22
**19th**
67:24 68:15
166:2
**1st**
86:16 88:20
89:5 178:22

————— 2

**2**
191:18,22
**2.00**
286:9
**2.99**
135:8,18
136:1 308:8,
22 309:21
**20**
136:3 239:24
**200**
2:9 3:18
**2000**
15:20 127:16
**2001**
15:17
**2002**
45:23 46:2,7
**2003**
16:3,16
17:17,19
19:5,6
**2004**
19:7,9 21:12
287:23
**2005**
19:19,22 20:7
24:23,24 26:1
40:12 41:3,10
46:11 47:18
124:17

287:21,24
**2006**
18:18 21:1,8,
20 22:9 23:17
24:18,22,23,
24 26:1,10,
11,20 33:24
35:10,14
42:11 43:16,
17 55:15
58:24 59:3,9,
11 63:1 67:24
76:8,10 81:17
89:6 90:24
110:7,14
116:18 120:17
121:2 122:19
123:8 141:3
146:16 148:3
149:2 152:23
160:3 166:10,
14 178:23
193:2 194:1,
11 195:7
207:12 226:15
232:20 233:3
241:23 242:15
244:18 245:4
253:17 261:4
267:3,10
269:1,22
270:4,13
278:5,13
279:4,10
280:12,19
281:13,20
282:16,17
286:15 287:1,
3 312:5
**2007**
20:4,7 21:20
22:9 23:18
41:13 43:16,
17 63:18,19
159:23 163:7

227:1,3
242:9,22
243:7,12,15
303:16
**2008**
41:13 63:18
230:24 231:18
249:6
**2009**
62:17
**2011**
1:9 7:18
59:10 314:10
**204**
2:14
**20th**
76:10,18
124:17
**21**
126:23 303:22
**2101**
3:13
**213**
5:8
**21st**
90:24 163:7
**22**
146:5
**229000**
193:11
**22nd**
76:8 81:17
242:22 243:7
**232**
5:9
**23rd**
229:13
**24**
304:2
**25**
1:9

**251625-0046**
2:5
**25th**
7:18 230:24
**265**
5:10
**26th**
141:3,20
**28**
168:11
**284**
5:7
**28th**
150:22
**294426**
221:22
**29th**
152:23 154:21
244:18 246:2

————— 3

**30**
166:8 169:14
270:12 278:5,
13 279:4,10
280:18 281:17
282:16
**30b6**
273:18
**30th**
146:16 270:4
280:12 281:13
**31**
166:4
**310**
5:8
**311**
5:9
**31st**
257:8
**33**
171:23



Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

Ruth Wu

February 25, 2011

362

**3300**
181:22 183:23
184:16 191:1,
21 192:9
261:11 286:22

**3373**
179:23 181:17
189:15
191:13,17
200:3 202:10,
13

**35**
199:14

**350**
4:4

**35205**
3:14

**36526**
2:5,10 3:18

**36601**
3:4 4:5

**36602**
2:14

**36633**
2:19

**37**
189:14

**3700**
181:17 261:10

**3760**
179:19 189:4,
18

**38**
177:11

**3rd**
261:4

——— 4 ———

**400000**
142:3,4

**410**
3:13

**4120000**
272:7

**42**
193:6

**42840**
221:17

**476**
185:10

**485000**
99:20 100:4
151:17

**485044**
135:11 207:18

**4th**
116:18 121:2
122:19 123:8
267:10 269:1

——— 5 ———

**50-foot**
233:11

**52**
226:24

**530740**
221:2

**535**
313:10

**55**
82:5,9

**5913**
271:10

——— 6 ———

**60**
82:5,9,13

**600**
3:23

**61**
311:21

**612**
285:13,18

**6251**

2:9 3:18

**64**
5:17 310:22
311:13,21

**6635**
254:4

**68**
81:7 82:20

**68000**
230:7

**6809.11**
177:5

——— 7 ———

**70501**
3:23

**70629**
3:9

——— ' ———

**'75**
14:23

——— 7 ———

**77**
199:14

**7th**
14:23 127:16

——— 8 ———

**8.00**
151:1,9,12,15

**8.48**
150:24 151:2,
12,15,19

**8.5**
111:2,10
112:9 113:7
115:4,6,22

**8.50**
193:19 194:6,
8,15 286:12,
16 287:2
309:18,22

**8621**
126:22

**8th**
148:8,22
149:6

——— 9 ———

**9**
5:7

**90**
225:18

**934**
1:15 7:19

**989**
3:4



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

STRAIGHT BILL OF LADING– SHORT FORM     ORIGINAL – NOT NEGOTIABLE     Shipper's No. 437596

Carrier's Name: Consolidated Lumber transport - 520/0202     Carrier's No.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of lading

at Port of Pensacola (Date) 7-31-06 FROM 720 A S. Barracks St, Pens, Fl

the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as shown below, which said company (the word company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own railroad water line, highway route or routes, or within the territory of its highway operations, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in the Uniform Freight Classification in effect on the date hereof, if this is a rail or rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment. Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Consigned TO
On Collect on Delivery Shipments, the letters "COD" must appear before consignee's name or as otherwise provided in Item 430. Sec. 1.                                            (Mail or street address for purposes of notification only.)

Destination _____ Street _____ Live Oaks _____ City

_____ County _____ State _____ Zip

Route _____ Delivery Address *

(*To be filled in only when shipper desires and governing tariffs provide for delivery thereof.)

Delivering Carrier _____ Car or Vehicle Initials and No. _____

Collect on Delivery $ _____ And Remit to _____

| No. Packages | H.M. | Kind of Package, Description of Articles, Special Marks, and Exceptions | *Weight (Subject to Correction) | Class or Rate | Check Column |
|---|---|---|---|---|---|
| 7 Bnd | | 1/2" x 4' x 12' Gypsum Drywall | 45,988 lbs | lbs | |
| | | @ 476 pcs. | | | |
| | | Customer P.O. Rowland 1 | | | |
| | | Time - 1.25 PM | | | |
| | | Load must be tarped | | | |

*If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is carrier's or shipper's weight.
NOTE— Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.
The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding _____ per _____.

Date Stevedore
for North Pacific Group Shipper, Per Sharon Davis

Permanent post-office address of shipper,

C.O.D. Charges to be
Paid by
☐ Shipper  ☐ Consignee

If charges are to be prepaid, write or stamp here: "To be Prepaid."

Received $ _____ to apply in prepayment of the charges on the property described hereon.

_____ Agent or Cashier

Per _____
(The signature here acknowledges only the amount prepaid.)

Charges Advanced: $ _____

If the fibre containers used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Rule 41 of the Uniform Freight Classification and Rule 5 of the National Motor Freight Classification."
"(Shipper's imprint in lieu of stamp; not a part of bill of lading approved by the Interstate Commerce Commission.

Per X _____ Agent

Devon - 00596