1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  CHINESE MANUFACTURED      *   Docket 09-MD-2047
                DRYWALL PRODUCTS          *
6               LIABILITY LITIGATION      *   June 13, 2012
                                          *
7   * * * * * * * * * * * * * * * * * *   New Orleans, Louisiana

8

9

10                 STATUS CONFERENCE BEFORE THE
                    HONORABLE ELDON E. FALLON
11                 UNITED STATES DISTRICT JUDGE

12

    Appearances::
13

14  For the Plaintiffs:          Russ M. Herman, Esq.
                                  Leonard A. Davis, Esq.
15                                Anthony Irpino, Esq.
                                  Arnold Levin, Esq.
16                                Frederick S. Longer, Esq.
                                  Gerald E. Meunier, Esq.
17                                Christopher A. Seeger, Esq.

18

19  For the Defendants:          Kevin F. Risley, Esq.
                                  Sidney J. Angelle, Esq.
                                  Jacqueline M. Brettner, Esq.
20                                Judy L. Burnthorn, Esq.
                                  Gregory O. Currier, Esq.
21                                Megan E. Donohue, Esq.
                                  Carlina C. Eiselen, Esq.
22                                Steven Glickstein, Esq.
                                  Lambert J. Hassinger Jr., Esq.
23                                Melissa M. Lessell, Esq.
                                  Brian S. Martin, Esq.
24                                Philip D. Nizialek, Esq.
                                  A. Hugh Scott, Esq.

25

1   Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
2                                   500 Poydras Street, Room B-406
                                    New Orleans, Louisiana 70130
3                                   (504) 589-7778

4

5

6   Proceedings recorded by mechanical stenography using
    computer-aided transcription software.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## PROCEEDINGS

### (June 13, 2012)

(The following proceedings were held in chambers.)

**THE COURT:**  Let me make some comments just to put this matter in perspective.  As we all know, North River Insurance Company is a named defendant in two omnibus class actions that were filed in this MDL known as the *Silva* and the *Amato* cases.  The claims against North River arise from its role as an excess insurer for Interior Exterior Building Supply, which is a co-defendant and supplier of Chinese drywall during the years that Chinese drywall was problematic in this area and in other areas of the country.

Interior Exterior and its primary insurers entered into a class action settlement agreement sometime either this year or maybe last year.  North River did not participate in the agreement.  The InEx settlement agreement provided among other things for some $8 million to be put up for the plaintiffs as well as an assignment to pursue North River for funds under its excess policy.

The parties, North River and the plaintiffs, have in good faith tried to resolve the matter.  On May 31, 2012, they were particularly focused on trying to look at ways that they could resolve it.  After five or six hours of protracted mediation, it appeared that the parties had reached an impasse.

```
1              I felt that it was the fair thing to do for both
2     sides to bring this matter to a head.  I, accordingly, set a
3     date of November 26, 2012, for a trial.  I suggested that the
4     parties try to meet before today to focus on and think about
5     what they needed by way of discovery, to discuss their needs,
6     and to see whether or not they could give me some input as to
7     appropriate scheduling for the discovery.  The basic reason
8     today is to get their input from that.
9              I might say that it's a little bit complicated
10    at this point because on June 8, North River filed a motion to
11    lift the stay against other defendants.  I would be interested
12    in input as to what part that plays in it.  I don't intend to
13    make any observations or opinions as to that motion because
14    it's just been filed and the parties haven't had a chance to
15    respond to it.  I want to give everybody an opportunity to
16    respond and also to have oral argument if there's a need.  So I
17    really am focused today on getting any input that you all may
18    have as to what your discovery needs are and how we can go
19    about satisfying it.
20            MR. HERMAN:  May it please the Court.  Russ Herman
21    for plaintiffs.  With me are Arnold Levin, Chris Seeger,
22    Gerry Meunier, Anthony Irpino, Leonard Davis, and Fred Longer.
23    Essentially, we are the trial team.  We have met since
24    yesterday and this morning.
25              I have for Your Honor, in accord with
```

1    Your Honor's request, a memorandum as to what discovery we
2    believe we need against Interior Exterior but primarily against
3    North River.  I'm sorry.  I may have handed you two documents
4    of the same.
5              Much of the discovery against North River is
6    based upon our independent research as well as, in primary
7    part, based upon Ms. Reese's deposition, which was concluded
8    yesterday.  I have for Mr. Nizialek also, who I believe is the
9    coverage counsel for Interior Exterior, a copy.
10             In addition to that, Your Honor, in order to
11    assist the Court, we discussed a way perhaps that Your Honor
12    might consider trying the case against North River because of
13    its complexity and its impact in terms of a global settlement.
14    So the second memoranda before Your Honor suggests that there
15    be a phase one seller redhibition liability of InEx.  The
16    parties would be trial plaintiffs selected from representative
17    periods of time, and the trial defendants would be
18    Interior Exterior and North River.
19             The issue in phase one would be whether
20    Interior Exterior was a seller of Chinese drywall to plaintiffs
21    with active or constructive knowledge of defect pursuant to
22    Louisiana Civil Code Article 2545.  We believe that threshold
23    issue has to be met.
24             If there's a verdict in favor of at least one
25    plaintiff in phase one, we would immediately go to phase two,

1    which is the total amount of damages owed to buyers of Chinese

2    drywall sold by InEx as a seller with knowledge.  Parties would

3    be trial plaintiffs, the trial defendants would be

4    Interior Exterior and North River, and the issues would be the

5    total amount of damages owed to buyers of Chinese drywall sold

6    by Interior Exterior as a seller with knowledge.

7                    Phase three, liability of North River as a bad

8    faith insurer -- assuming that the damages in phase two exceed

9    the underlying coverage, the only issue that would be left is

10   to determine what the liability of North River is, and at that

11   point as to whether North River is a bad faith insurer under

12   Louisiana law, which would call for substantial penalties and

13   attorneys' fees.

14                    In phase three, the parties would be trial

15   plaintiffs, the same as in phase two, and the trial defendant

16   would be North River.  The issue would be the amount owed by

17   North River as a bad faith insurer of Interior Exterior or, in

18   the event they're found to be in good faith, the amount that

19   they owe.

20                    We believe, Your Honor, that these are phases

21   that can be tried by one jury expeditiously, that discovery can

22   move on parallel tracks, and that Your Honor can move to a

23   fairness hearing as scheduled but take the matter under

24   advisement until these three phases take place.

25                    Basically, Your Honor, this is the consideration

1    that our trial team and others working with us have given to
2    both the issues of discovery and a suggestion that Your Honor
3    might want to file or may not want to file.

4            I've given copies to opposing counsel, both
5    counsel for North River, counsel for its insured
6    Interior Exterior Supply, Ltd., and to Mr. Phil Nizialek, who
7    is Interior Exterior's coverage attorney.

8            **THE COURT:**  Any response?

9            **MR. RISLEY:**  Yes, Your Honor.  Kevin Risley on behalf
10   of North River.  We did speak on Friday afternoon with
11   representatives of the PSC as well as most if not all of the
12   parties here.  At that time we were told what the plaintiffs
13   envisioned was a *Germano* style trial, six properties or so, a
14   one phase trial.

15           Well, first off, yesterday evening after 5:00,
16   we received word that the PSC has filed a motion to intervene
17   to bring I believe it's 15 separate properties from *Silva* into
18   *Amato* or vice versa.  They are proposing 15 different
19   properties now, including several where they say it's Habitat
20   for Humanity, but Habitat has not filed a profile form on those
21   properties; individual owners have.  There are some who are
22   non-Louisiana plaintiffs who have no direct action claim
23   against North River at this point in time.

24           I'm a little hesitant to go into too much detail
25   until we know who the parties are on the plaintiffs' side.  I

1   will say that looking at this initially, I see a lot of flaws

2   in it, including the very practical one that the Court

3   anticipated a two-week trial setting.  There's no way to try 15

4   properties in three phases in two weeks.

5              Having said that in general, we obviously need

6   to do investigations and expert tours of all the properties

7   that are involved.  We think a number much smaller than 16 is

8   appropriate for trial.  There's been no expert discovery done

9   and no experts designated, for that matter, yet.

10             One big factor that was not there the last time

11   at the *Germano* trial, the cost of remediation was largely done

12   by expert testimony.  We now have a track record of a pilot

13   program where we know what it actually costs to repair these

14   houses.  We will need to do discovery on that.  So with the

15   schedule the Court said, which I think is fairly ambitious but

16   can be done, we envision it will take all that time.

17             Now, the motion we had filed includes a request

18   that both the primary insurers who have not exhausted at this

19   time be involved, but more importantly that Knauf be involved.

20   This is the Knauf product that's at issue.  There may be one or

21   two of those properties that Habitat doesn't own that claimed

22   to have some mixed board in it, but by and large these are

23   Knauf houses.

24             If we want to get this wrapped up and determine

25   the ultimate liability, we need to have Knauf involved in that.

1  We need to know what is InEx's liability, what of that passes

2  through.  I think Knauf has responded.  I know you don't want

3  to get into too much of it today, but these are the issues that

4  are kind of driving us right now.  They admit all but one of

5  the Knauf entities has been served and that's KPT.  We think

6  they have appeared and we will brief that.

7           We think what makes more sense is a trial on a

8  limited number of houses that includes all phases of the

9  potential North River liability.  I'm not wild about the

10  plaintiffs handpicking the plaintiffs they get to choose.  We

11  have been stayed.  I'm not sure I'm in a position to offer any

12  alternatives.  But if we are going to do this in a way that

13  makes sense, let's do it so it's a soup-to-nuts trial for when

14  it's over, we know what the situation is, not what it might be.

15           **MR. HERMAN:**  Your Honor, I would like to pass out a

16  copy of the intervention.  Mr. Meunier will address the

17  intervention.

18           **MR. MEUNIER:**  Just briefly, Judge, not to anticipate

19  argument on it because I know counsel will have an opportunity

20  to file an opposition brief, perhaps we will argue this at a

21  later time, but just to address the issue of whether KPT/Knauf

22  is a needed party.

23           What this motion seeks to have the Court address

24  is the solidary liability and redhibition for a manufacturer or

25  seller and a downstream seller such as InEx.  We think the law

1   is clearly in favor of solidary liability here, although it
2   appears North River will seek to invoke comparative fault
3   allocation by percentage, and we think that's not supported by
4   the case law or the policy.
5            So if the Court were to address this motion and
6   rule on this, it would certainly resolve the matter raised
7   about having Knauf at the trial because we don't think its
8   necessary or appropriate to have Knauf as part of this trial.
9        **THE COURT:**  We do need to focus on that, as to
10  whether or not there's comparative or whether it's solidary.
11       **MR. RISLEY:**  In addition to the redhibition claims,
12  they have at least pled negligence claims.  So unless they are
13  willing to dismiss those claims, they intend to go forward, we
14  are certainly entitled to have that issue resolved by the jury.
15  Rather than have to do it twice, once where Knauf is not at
16  trial and once where they are, then we try to enforce our
17  rights against them, it makes a lot more sense and it's a lot
18  easier for the Court to try it once instead of twice.
19       **THE COURT:**  What happens if there's a stipulation
20  that the drywall is defective?
21       **MR. RISLEY:**  Is there a stipulation, then, that we
22  have to pass through all of our liability to Knauf?  Unless
23  that's in there, we need to have them at trial to resolve that
24  issue.  I really do think from our perspective, without knowing
25  where the liability ends up, the trial doesn't do a lot of good

1    from our perspective.

2         **MR. ANGELLE:**  Sidney Angelle on behalf of

3    North River.  The stipulation would also have to cover the

4    notion that Knauf would not require further proof down the road

5    but that they would be bound by the findings of fact in that

6    first trial.  There could be ways to fashion it, but it would

7    take some real draftsmanship to do it.  They would have to be

8    amenable to such stipulations.

9         **THE COURT:**  One thing that we need to focus on, and I

10   don't need to focus on it now, but I do think that we need to

11   decide case numbers.  I think if we are going to get something

12   out of it, we need to see some representative kind of cases.

13              Now, they may all have to be from Louisiana for

14   me to try the cases.  Insofar as who picks them, that's

15   something else that we can deal with.  If we do six, then three

16   and three; if we do twelve, six and six might be a way of doing

17   it.  I don't know what the right number is.  I don't know how

18   it interfaces with excess insurer numbers.  I don't think you

19   can try one case and then deal with excess unless you pick some

20   mansion and deal with it.

21        **MR. HERMAN:**  Your Honor, I might add just as a

22   background that we approximate 1,200 Interior Exterior

23   North River plaintiffs.  Many of those are from Louisiana.  One

24   of the issues for Your Honor to consider at some point is those

25   folks who have gone through the remediation program, to what

1    extent those remediations cost, as a barometer of the usual and

2    customary costs per square feet of these homes, or whether we

3    need Louisiana plaintiffs who have not yet had their homes

4    remediated.  So at some point that issue has to be met as well.

5            MR. SEEGER:  Chris Seeger.  The problem is that the

6    remediation program is a product of negotiation and tremendous

7    purchasing party by the parties there.  The plaintiffs in this

8    case who are going to be going against North River don't have

9    that ability.  I guess I'm questioning the relevance of what

10    the cost program would be to North River when we get a verdict

11    and the home owner has to go out into the marketplace and hire

12    a contractor.  I think we are back where the Hernandezes were.

13            MR. RISLEY:  I'm sure it's an evidentiary matter that

14    we will have to take up at trial.

15            THE COURT:  I think those are legitimate points.

16            MR. RISLEY:  I think Mr. Herman makes a good point

17    because there's some thought -- to the extent homes have been

18    remediated and paid for by Knauf or some other third party, I'm

19    not sure what claim there is remaining against North River if

20    their house has been fixed.  So that's another issue that I

21    think will come up.  It may be helpful to have some of those in

22    the trial group if you are trying to do an evaluation analysis.

23    It may not be helpful if you are trying to establish the amount

24    of the claims.

25            THE COURT:  As you all see it, what are we trying to

1   establish at this trial?

2            **MR. HERMAN:**  At the trial itself?  Ultimately,

3   North River's liability for damages in excess of the underlying

4   insurance.

5            **THE COURT:**  How do we do that on a bellwether view?

6   They have excess in each case or do they have excess once a

7   certain total amount is achieved?

8            **MR. HERMAN:**  It's our view once a certain total

9   amount is achieved.

10            **MR. RISLEY:**  Our view is a little bit different.

11            **MR. LEVIN:**  They can stipulate to a class,

12   Your Honor, or even stipulate in the event of a liability

13   verdict that at that point, rather than to forego individual

14   trials thereafter, they stipulate to a class at that time.

15   Then you don't have the class argument.  You don't have notice

16   to the class.  You have the exemplar plaintiffs, and you have a

17   stipulated class if the plaintiffs prevail.

18            **MR. RISLEY:**  I wasn't prepared to do any of that

19   today.

20            **THE COURT:**  I understand.  I'm not asking you all to

21   stipulate to anything today.  I just want to think out loud

22   with you.

23            **MR. RISLEY:**  No.  Well, to go to the Court's previous

24   point, it is our contention, as we have said in our objections

25   to the proposed settlement, they have asked in that that the

1    Court declare that the primaries are exhausted.  It's our view

2    that some of that settlement money is not going to pay covered

3    claims, it's going to pay houses that don't have bad boarding

4    even, but that's one issue to deal with.

5                    The other, though, I think is if we can get a

6    determination, with InEx as a defendant, as to what these

7    juries think it costs to fix houses, that will give us a more

8    informed ability to go forward and continue talking with the

9    plaintiffs once we have that determined.  I don't think we need

10   to go straight to a class-wide action.  That may give us a

11   better basis for resolving this once we have that range of

12   actual costs determined.

13           **THE COURT:**  You see, the thing that we have to focus

14   on, too, eventually is the Seventh Amendment situation.  When

15   you separate liability from damages, if there is a clean

16   separation, you can do it with several juries or two juries.

17   If there is no clean separation and you're getting something

18   that's a flow-over, either comparative or other issues, then

19   you have a problem if you have more than one jury to deal with

20   it.

21           **MR. RISLEY:**  Absolutely.

22           **THE COURT:**  So we really do have to eventually focus

23   on that type situation too.  Is there any way of trying X

24   number of cases and then extrapolating that to the numbers to

25   determine what the amount is?

1          **MR. HERMAN:**  Well, in effect, we could have a

2     *Hernandez* type trial with a number of claimants representing

3     different time periods and different types of construction.

4     That may form a basis for some calculus as to what the overall

5     exposure is as determined by a jury.

6          **MR. RISLEY:**  I think the Fifth Circuit historically

7     has been very adverse to that approach.  It was a very popular

8     idea in asbestos and some other mass torts.  I believe the

9     Fifth Circuit's real issue there was there's too much variation

10    between individual plaintiffs to use that as a class-wide

11    extrapolation basis.

12         **THE COURT:**  Well, it's certainly true for personal

13    injury cases.  Personal injury cases, that's a whole different

14    deal.  It's a little more doable with property.

15         **MR. RISLEY:**  Potentially it's more doable, but we

16    have not had a chance to know enough about the class to know.

17    We know there are some that have not remediated their cases,

18    some that have; some that have moved out, some that haven't.

19    It's not like a car where you can just look at a value of a car

20    because of the other damages that are being asserted.

21         **THE COURT:**  That is not as problematic as the type of

22    house.  If you have one type of house like these with the

23    Levittowns, then you try two of them and then you just multiply

24    that by 2,000 of them because that's the same house.  We don't

25    have that here.  There may well be some way of categorizing

1  them and then taking some from each category and multiplying
2  it.
3          **MR. HERMAN:**  Your Honor, we don't think we have a
4  *Gasoline* type case here.  The plaintiff negotiation committee
5  in *Knauf* for two years researched the issues of how you
6  determine types of residences and values.  What came out of
7  that and what is reflected in the global settlement in *Knauf* is
8  a square-footage type of formula, which we feel is supported
9  both in the literature and by experts.
10         **THE COURT:**  Well, it's proved by the pilot program.
11 We did it theoretically and then you all put it in practice,
12 both sides.  It's proved to be something that is not only
13 workable but is accurate.
14         **MR. RISLEY:**  I think that raises a couple of points,
15 though.  First, I understand the Court's comment a minute ago
16 it may be possible to categorize it.  I don't think we are at
17 that point yet.  Whether we can or cannot is something we don't
18 know yet.
19             The other part is that the settlement that's
20 pending before the Court will have all the *Knauf* plaintiffs
21 that want to have their houses fully remediated with the same
22 format as the pilot remediation program.  So we have a
23 situation here where the plaintiffs that are going to come
24 after us if they want to can have Knauf pay to get their house
25 fixed.

1            Again, that may be getting into some evidentiary

2    issue of why should we pay a higher level if they can get it

3    fixed for that price.  But we do know that unless these

4    plaintiffs opt out of the settlement, if they have 81 percent

5    of Knauf board, Knauf will fix their house for them.

6            **THE COURT:**  I have a motion before me that we need to

7    tee up and get some input on because that's going to be

8    significant, too, insofar as the nature and extent of the

9    trial, and then we have the motion that was just presented

10   which is going to impact it.

11           The thing that we really need to focus on a

12   little bit more, and I don't think that we can do it

13   necessarily here -- in the other cases, I was interested in

14   trying to find out primarily the nature and extent of damages

15   in those particular cases.  We tried six of them or whatever

16   and we got some input from those cases and were able to design

17   some kind of protocol that was consistent with the evidence in

18   the case.

19           This issue with regard to excess insurance is a

20   little bit more problematic in the sense that you have to

21   figure out a way, by bellwether or sampling in some fashion, to

22   deal with a manageable number of cases and then extrapolate

23   that manageable number of cases to determine whether the

24   amounts awarded in those cases, when extrapolated to the whole

25   census, exceeds the primary, and whether that was ascertained

1   by the excess insurer so that they have a potential for

2   punitives or that type of damage.  So it's a difficult

3   assignment because that's where the issue is.

4           The big issue here is not necessarily proving

5   that the drywall was defective.  I don't know whether anybody

6   contests that from the standpoint of sulfur content and risk or

7   potential risk to the two predominant metals, the silver and

8   the copper, or whether they contest seriously odor associated

9   with exposure to that drywall which makes it uncomfortable to

10  live in a house with the windows down in this climate.  So I

11  don't know whether that's a big issue at this point.  The big

12  issue is what's the cost and whether the total of those

13  properties exceed or are likely to exceed the primary coverage.

14  Isn't that what we are dealing with?

15          **MR. RISLEY:**  I think you're right on the property

16  side of it.

17          **MR. SCOTT:**  Your Honor, Hugh Scott for Liberty

18  Mutual.  You all have been talking about the primaries and I'm

19  one of them.

20          **THE COURT:**  Sure.

21          **MR. SCOTT:**  I just observed that the issue, really,

22  of whether we are talking, let me put it this way, whose skin

23  is in the game, the primary skin in the game and the excess

24  skin in the game -- you can look at this way, Your Honor.  If

25  the damages, soup to nuts, for a house that is 250,000 bucks --

1  which as Your Honor knows is rock-bottom low compared to

2  *Hernandez* and *Germano* and so forth, but assume it's 250,000

3  bucks.  You need 32 houses to get out of primary.  You get

4  $8 million of limits.  You divide $250,000 into $8 million.  I

5  have $4 million.  This gentleman has $4 million.  So if these

6  gentlemen can prove up 32 houses, we are in excess.  If they

7  swing and miss 32 times, as I'm hearing it, they have about

8  1,162 more times to swing at the ball.

9          **MR. HERMAN:**  I don't want to mislead, though.  We

10  believe that's the total number.  Some of them, of course, are

11  Taishan, but there are more claimants who claim 100 percent

12  Knauf that would well satisfy the formula that you just set

13  out.

14          **THE COURT:**  Are you on any excess for Taishan?

15          **MR. RISLEY:**  Yes.  Well, we are on excess for InEx to

16  the extent there's Taishan liability, but it is a much smaller

17  number.

18          **THE COURT:**  How many of those?

19          **MR. RISLEY:**  Less than 100.  It may be less than 50

20  as far as we have been able to determine.  49 is the number we

21  have been able to come up with.  Now, I think there are some

22  out there that may be unknown, so it's potentially a little

23  higher than that, but it's a much smaller number than the

24  overall Knauf houses.

25          **THE COURT:**  One thing this intervention has put at

1   issue is that if it's a question of proportionate
2   responsibility, I can understand bringing in all of the
3   potential proportionately liable individuals.  But if you're in
4   for a penny, you're in for a pound, if it's not proportionate
5   but in solido, then it really doesn't matter from the
6   standpoint of whether there's two people or three people on
7   this issue.
8           MR. RISLEY:  It matters greatly to us because the
9   liability doesn't stop with us.  Under the same statute that
10  creates the in solido obligation, it creates a right to go
11  against the ultimate responsible party.  We don't want all the
12  distributors and the installers and builders and stuff, but we
13  do want the party that made the bad product and who is the
14  source of our potential liability to be involved in the
15  litigation to get that ultimately decided.
16          THE COURT:  How about putting Taishan in instead of
17  Knauf and try the Taishan cases?
18          MR. RISLEY:  Well, the Court is about to decide
19  Taishan's jurisdictional issue.  We have had no substantive
20  discovery against Taishan.  Those depositions were pretty well
21  limited, as the Court knows from sitting in that windowless
22  room for a week.
23          THE COURT:  Right.
24          MR. RISLEY:  I doubt the ability to get Taishan fully
25  discovered and ready for trial by December.

1               One other issue I wanted to mention.  We have

2    talked only in terms of property damage.  There are still

3    personal injury claims on file.  I'm not sure there's any real

4    intent to go forward with them.  If they do, that obviously is

5    a completely different and ultimately more complex situation.

6               **MR. HERMAN:**  We would only put forth property claims.

7               **THE COURT:**  We have been mentioning or talking about

8    your client.  Do you want to weigh in on anything?

9               **MR. GLICKSTEIN:**  Sure.  I'm not in the case.  I'm

10   talking as an amicus.

11               **THE COURT:**  Yes.

12               **MR. GLICKSTEIN:**  Steven Glickstein for Knauf

13   defendants.  As I hear the various parties talking and also

14   knowing what divides the issues, it seems to me the most

15   important issue to resolve is phase one of the trial because

16   North River is taking the position that they will win the trial

17   and have zero percent liability.  If that's the result of the

18   trial, that counsels the parties in one direction.  If it's not

19   the result of the trial, it counsels the parties in a different

20   direction.

21               The second issue is a legal issue that the

22   parties have identified, which Your Honor has said in for a

23   penny, in for a pound, or is it a completely proportional

24   responsibility.  The PSC and North River have different views

25   of that, but that's a legal issue that Your Honor could resolve

1  without a trial.  Once Your Honor resolves it, that will help
2  dictate the format of the trial.
3          I personally don't see, whether you use the Moss
4  estimates or any estimates, any reasonable way that the trials
5  could come out where North River's total excess limits, the
6  assigned limits of $72 million, is exhausted even if you use
7  the Moss numbers.
8          Frankly, as the parties go and discuss and
9  figure out which -- yes, in an individual case, you might be
10  able to dispute a number, and it should be plus 10 percent or
11  minus 20 percent.  I don't really see where the parties can in
12  good faith dispute that if InEx is liable and in for a penny
13  and in for a pound that it's not going to go over $72 million.
14  I just don't think that's disputable.
15          **MR. HERMAN:**  Your Honor, we have been discussing
16  these issues for virtually a day and a half now, and it is why
17  we suggested that there be a phase one trial to determine
18  exactly what Interior Exterior's liability is.  Counsel
19  opposite has argued that at this point in time they believe
20  Interior Exterior was a good faith seller, that they can win on
21  that point, and that there's no liability here.  So it seems to
22  me that has to be a principal issue.
23          Secondly, in terms of discovery, while
24  Your Honor is receiving briefs and motions on the various
25  issues that have come up before you today, we still should

proceed with discovery.  It's our view that we need discovery against North River and we need discovery against Interior Exterior, and we see no reason why we shouldn't proceed with that discovery.  We have discovery teams who are versed in the case who are at this juncture ready to file requests for production, subpoenas, and notices of deposition.

Initially, our view was that this conference was essentially a discovery conference.  I would ask if the parties opposite -- and I'm using that term because we have various parties defendant in interest here -- whether they have a list of deponents and what type of discovery they want so that we can consider it and go ahead and get these issues calendared.

THE COURT:  I think you all both agree on that aspect of the case.  We do need discovery.  I don't see any harm in doing dual tracks.  I really would like your view.  You feel it should be open and you should be able to discover everything from the significant people, but I need a little bit more specifics as to who do you need.

MR. ANGELLE:  One of the issues, Judge, is that we still don't know who the plaintiffs are going to be, and obviously that's a chunk of discovery there.

THE COURT:  Well, there's no question about that. You need the plaintiffs that you're going to be discovering, but you need probably somebody else other than the plaintiffs.

MR. RISLEY:  We need all the plaintiffs, even the

1   ones who have been deposed before.  It's been two years since

2   their depositions.  I think those would be short, but we need

3   to know did they have to move out the house, are they claiming

4   other damages, that kind of thing.  We need all the experts.

5                   We will need nonparty discovery from some of

6   InEx's customers.  As the Court is aware from some prior

7   pleadings, the PSC's position is InEx should have known this

8   material was bad because people said, "We don't want Knauf

9   board."  I want to know why they didn't want Knauf board.  Was

10  it because they thought it smelled bad or because they

11  preferred American products?

12                  They copied hundreds of invoices.  It's not as

13  many customers.  There are several nonparty customers that will

14  have to be taken.  We will want people who have been involved

15  in the remediation program, understand what they have done to

16  remediate those houses and what it has cost to do so.

17          **THE COURT:**  Well, I think the first step, though, is

18  going to be in devising a method of picking plaintiffs.

19          **MR. RISLEY:**  Can I make one other point?

20          **THE COURT:**  Yes.

21          **MR. RISLEY:**  We did, since the last time we met with

22  the Court, send discovery to the plaintiffs that was served on

23  April 19.  We have no response to any of that yet.

24          **MR. SEEGER:**  Who did you send that to?  Nobody can

25  find it.  I didn't get it.  Fred didn't get it.  Lenny didn't

1  get it.

2          **MR. RISLEY:**  It was served through the Court's Web

3  site.

4          **MR. DAVIS:**  We have spoken about that a couple times

5  and we never received it.

6          **MR. RISLEY:**  Suzanne sent you the material on Friday,

7  I thought.

8          **MR. DAVIS:**  No.

9          **MR. RISLEY:**  Okay.  Well, there's a problem there.

10  It's served through the Court's Web site and we have receipts.

11          **MR. DAVIS:**  I know there's an order that's out there

12  on service, and service on liaison counsel and the like.  We

13  get thousands of things through Lexis, I have to tell you.

14          **MR. RISLEY:**  I understand.

15          **MR. DAVIS:**  So that's why that order, I think,

16  originally was put in place, so we wouldn't miss those things.

17  I have to tell you, I've asked for it a couple times.  I know

18  Fred asked for it.  Neither of us have those e-mails.  Please

19  just get it to us.

20          **THE COURT:**  Talk to me first about numbers, though,

21  from the standpoint of plaintiffs.  Do we need 32 or do we need

22  less than 32?  Can we deal with something like six, three each,

23  or can we deal with 12, six each?  What's some input?  Or do

24  you all need to think about it a little bit more?  I don't have

25  any problem with each side picking the same number of people or

1 | the same number of houses and that will be the plaintiffs, that
2 | will be the census that we deal with.
3 |        **MR. SEEGER:**  My only concern, Judge, is that we come
4 | out of this with meaningful information for the parties.
5 |        **THE COURT:**  That's right.
6 |        **MR. SEEGER:**  If we do four and they come out of it
7 | saying that's only four and this gentleman says 32, I don't
8 | know.  We can do 32.  We can do 50.
9 |        **THE COURT:**  We could do 12 three times or something
10 | and that's a possibility.
11 |        **MR. LONGER:**  It's Fred Longer for the record.  In our
12 | motion in intervention -- everyone is speaking here in terms of
13 | properties, but in terms of the intervention, we are really
14 | only talking about four Louisiana plaintiffs.  Habitat for
15 | Humanity has properties, but it's really the one plaintiff.
16 | Then we have the Puigs, the Byrnes, the Beckendorfs.  It's
17 | really just four.
18 |        **THE COURT:**  How many properties are involved in
19 | those?
20 |        **MR. LONGER:**  Well, they are single property owners.
21 |        **THE COURT:**  See, that's the problem, though, that was
22 | raised if you just try four.
23 |        **MR. LONGER:**  Except for Habitat.
24 |        **MR. RISLEY:**  The issue with Habitat is they have only
25 | filed a profile form on one of the pieces of property

1   identified in the motion to intervene; individual owners have

2   filed on the other properties.  So there's an issue as to

3   whether Habitat has more than one property at issue right now.

4            To get back to your earlier question, I think if

5   you're going to stick to a two-week trial setting sometime this

6   year, it's going to be hard to do more than six or possibly

7   eight.  We are willing to go forward on that basis, but you

8   cannot do 12 or 15 properties in a two-week trial.

9        **MR. LEVIN:**  If you are really interested in finding

10  out what the case is all about and you try with the

11  intervention plaintiffs that we intervened and you have a

12  special interrogatory where you go into the number of

13  properties that there are that are InEx properties, you could

14  resolve in that special interrogatory whether the $8 million is

15  exhausted.

16           If you don't want to resolve that, then you're

17  sitting here and saying we should try four properties and then

18  four properties and then four properties, and not only abuse

19  the plaintiffs and the plaintiffs class but abuse the Court,

20  and that's what you seem to be wanting to do.

21       **MR. RISLEY:**  No.  I don't think the Fifth Circuit

22  would let you do the kind of thing you are talking about, to

23  use an extrapolation method.  They have rejected it every time.

24           Now, as the Court pointed out, maybe when we

25  know more, there might be a way to do it.  I'm skeptical about

1    it.  I don't think I'm going to sit here today and say, in
2    spite of no track record and no authority to do, we can do one
3    trial to be extrapolated out 300 or 400 times.

4                    I do think that if we try six, eight houses and
5    we know what the values are -- and by the way, if InEx is a
6    good faith seller and they are limited under redhibition
7    damages to the cost of the board, you would never get above
8    $8 million.  That's one possible result here, is that InEx's
9    total liability is under the primary limits.

10                   But if it's not and they are not a good faith
11   seller and we find out that it's going to cost $200,000 a house
12   or $80,000, whatever it is, that gives us different information
13   than we have right now.  That serves some value.

14            **THE COURT:**  All right.  I'll need to go back to my
15   drawing board and decide how many cases we are going to try and
16   then we will deal with it.  I didn't get as much input from you
17   all, frankly, as I was hoping.  I thought some of this would be
18   worked out in your discussions, but we are coming at it from
19   different avenues.  I'm going to have to come up with something
20   and deal with it that way.  Meanwhile, I've got two motions
21   before me, your motion and the intervention, so that's both of
22   those we ought to deal with.

23            **MS. BURNTHORN:**  Judge, may I ask a question?  As you
24   know, Judy Burnthorn, and I represent Landmark American
25   Insurance Company, an excess of North River.  Also, National

Surety is here, which is also a company excess of North River.

The question I had, and just a clarification from Russ' procedure being proposed, is:  As you know, at the preliminary approval stage of the InEx settlement, it was put on the record that Landmark was being released in the settlement, as was National Surety.  When Russ said his procedure that's being proposed --

You said a fairness hearing to be followed by the trials as you described, but you said held "under advisement."  Is that just because, I mean, there would not be an intentional holding under advisement of the decision on the fairness hearing, it's just a matter of timing, or did you mean that there could be no decision on the fairness hearing, that's for the Court to decide --

**MR. HERMAN:**  Yes.

**THE COURT:**  That's right.

**MS. BURNTHORN:**  You weren't implying that it would have to be held under submission?  You said to be held "under advisement."

**MR. HERMAN:**  I think it's up to the Court as to whether that happens or not.

**MS. BURNTHORN:**  Okay.

**MR. HERMAN:**  It really depends on what happens in terms of the fairness hearing.  There are a lot of --

**MS. LESSELL:**  What do you mean?  What depends on what

1  happens?

2          **MR. HERMAN:**  Well, there's a lot of muscle in the

3  global settlement, but there are some tendons and sinews that

4  bind those muscles.  If, in the fairness process, Knauf

5  determines that for one legitimate reason or another there's no

6  settlement, then there's no reason for a trial.  On the other

7  hand, if we go through a trial, then any reservations that

8  Knauf has to withdraw from the settlement are resolved.

9          **MR. RISLEY:**  Is that Knauf's position?

10          **MR. HERMAN:**  I don't know what Knauf's position is.

11          **MR. GLICKSTEIN:**  I will state the position as we have

12  told the Court and told the plaintiffs and told you.  We have

13  been very candid that Knauf's willingness to go forward with

14  the settlement is contingent upon all parties in the

15  distribution chain making a fair contribution.  The company is

16  willing to overwrite the majority of the costs but not the

17  totality of the costs.  They have legitimate collection

18  defenses which they have asserted and which under the

19  settlement they would waive.

20          I know you guys are acting as if you disbelieve

21  our client, but our client is dead serious that the InEx

22  portion of the settlement, at least, will not go forward if

23  there's not a fair resolution of the North River piece.  The

24  settlement gives Knauf the right to proceed with the settlement

25  in Florida, where the lion's share of its liability is, and not

1  to go forward with respect to InEx supplied homes if there

2  isn't a satisfactory resolution of this.

3       **MR. LEVIN:**  He has made that statement to us.

4       **MR. RISLEY:**  He has.

5       **MR. LEVIN:**  We believe him.  We don't like it.

6       **MR. RISLEY:**  I just wanted to make sure we heard it

7  from him.

8       **MR. GLICKSTEIN:**  In answer to your question and I

9  think further answer to the question Judge Fallon asked, to me

10  the biggest obstacle to lawyers fairly evaluating North River's

11  position in the case is North River's position that if it were

12  to go to trial, it will end up with zero percent responsibility

13  because InEx will have zero percent responsibility, and that's

14  a factual question for a jury to resolve; or that even if it

15  has some responsibility, it will be a very small piece of

16  responsibility, and under the law if you are determined to be,

17  hypothetically, 10 or 15 percent responsible, you only have to

18  pay 15 percent of the damages instead of 100 percent.  That's a

19  legal question for Judge Fallon to resolve.

20       In addition, there's the point that you make

21  that the issue of assuming you have 100 percent responsibility,

22  can you come against the Knauf defendant for the difference;

23  and if so, what are going to be the collection issues for your

24  company in attempting to obtain satisfaction.

25       Those are the types of issues that I think,

1  except for the first one, that lawyers can fairly evaluate.  We

2  know the range.  We know the range of damages.  I think the

3  trial is likely not going to tell us a lot of new information

4  with respect to what it takes to remediate a home.  I think you

5  know enough and we know enough so that lawyers can evaluate the

6  strength or weakness of the collection defenses both in China

7  and in Germany and to handicap that.

8          I think the biggest piece of missing information

9  is the piece that you have identified, which is will you win

10  the trial or not.  If you want to have the trial, I think you

11  need to have the trial.  The company's position is certainly

12  that if you try the case, you better be pretty confident in

13  winning it; because if you don't, there's likely not going to

14  be an InEx settlement on the Knauf side.

15          THE COURT:  You could carve InEx out of it and then

16  the issue is before you.

17          MR. RISLEY:  I'm not sure you have stated all our

18  positions correctly, but I appreciate you setting out your

19  views.  Thank you.

20          MR. GLICKSTEIN:  I'm always good at exaggerating the

21  other side's views.

22          THE COURT:  Well, I think that pinpoints some issues.

23  I think he is right on many of them.  I think that the one area

24  that lawyers can't really weigh in on, other than in an

25  advocacy way, is the liability of InEx.  The amount of damages

1    is something that at least can be computed with the information
2    that you all have, meaning all of you, from the pilot program
3    as well as the negotiations that have gone on.
4              You have a pretty good fix on how much it's
5    going to cost per square foot to remediate the houses.  Numbers
6    are what they are; you just add them up.  The one area that you
7    can't do that with is the liability of InEx.  That is something
8    that is in the eye of the beholder and, therefore, the jury
9    would give you some input on that.
10             I do agree that the jury is not going to give
11   you a lot of input on the cost of remediation.  I think you
12   know that.  It's almost a waste of time to do it again.  We did
13   it six times.  It costs a million dollars each time to do it.
14   It just doesn't make sense to spend that kind of money to find
15   out how much it costs to remediate the homes.  Not only do you
16   know what the juries in the past have given, but you also know
17   how much it actually has cost for thousands of homes now to be
18   remediated.  So that's something that I think we have to deal
19   with.
20             He raises an issue, though, from the standpoint
21   of the percentage of liability.  He says that if he is in it
22   for 10 percent, 15 percent, 20 percent, whatever it is, he may
23   be responsible to the plaintiffs for 100 percent, but he may be
24   able to come after you or other people for the overage that he
25   is responsible for, whether it's 10 percent or 5 percent or

1    100, assuming it's not 100 percent.  So his position is if you

2    are going to have to do that, do it one time as opposed to two.

3    That's what I'm hearing, anyway.

4            **MR. RISLEY:**  I think that's correct, Judge.

5            **MR. MEUNIER:**  Judge, if Knauf has settled out, he

6    loses his right of contribution, and he is limited to a

7    reduction by the percentage of fault which he doesn't have.  So

8    I think the in solido liability motion resolves that question.

9    I'm assuming Knauf has settled.

10           **MR. RISLEY:**  I know we are not going to argue summary

11   judgment today, but under the redhibition statute --

12           **THE COURT:**  That's where he is coming from.

13           **MR. GLICKSTEIN:**  There are a lot of legal issues to

14   be resolved.

15           **THE COURT:**  I think a lot of it is.  Those are legal

16   issues, not necessarily factual issues.

17           **MR. HASSINGER:**  Judge, Joe Hassinger.  I represent

18   InEx.  Touching on discovery again, I see the list of all the

19   InEx people that the plaintiffs propose to redepose.  We do

20   have a problem with making them sit through depositions again,

21   in particular the Gearys, the principals of the company, plus

22   anybody who has already been deposed in the case.

23           **THE COURT:**  Have any of those people been deposed?

24           **MR. IRPINO:**  Anthony Irpino.  No, Your Honor.

25   There's not a single name of an individual who has been deposed

1    previously on this list.  It is true that the Gearys were
2    deposed as 30(b)(6) witnesses.
3            **MR. HERMAN:**  Your Honor, if I might, we wouldn't
4    intend to ask the same questions, of course.  One of the issues
5    here is whether -- assume that Interior Exterior has full
6    liability.  Then there's a question of their insolvency and
7    bankruptcy which has to be explored.  When one looks at the
8    direct action statute, those issues really come into play and
9    they also translate into a penalty situation.  We would seek to
10   explore Interior Exterior's financial ability to pay beyond its
11   primary insurance.  Certainly those questions have never been
12   asked or gone into at a prior time.
13           **MR. HASSINGER:**  Joe Hassinger again, Judge.  I'm
14   going to need to think through that.
15           **THE COURT:**  I understand.  I'm not going to bind
16   anybody.  The thing, though, that that raises is that
17   impacts -- and it may well be something that you would want to
18   happen because it impacts on any claim that you or anyone may
19   have for penalties.
20           **MR. HASSINGER:**  It may, Judge, and that's why I say
21   I'm thinking about that and at the same time thinking about two
22   New Orleans natives who have run this company to what it is
23   today and have been put through a hell of a lot --
24           **THE COURT:**  I know.
25           **MR. HASSINGER:**  -- because of a defective product by

1    a manufacturer who is not stepping up to take 100 percent of

2    the liability and responsibility.  So those are the two things

3    I'm weighing.

4         **MR. LEVIN:**  You're getting a "get out of jail free"

5    card through the settlement other than these two natives that

6    have done very well in Louisiana and established a business and

7    a foundation going bankrupt absent the settlement, so you ought

8    to consider the benefits of this settlement and your

9    cooperation at least as to producing witnesses that we need to

10   get to North River and not to you.

11        **THE COURT:**  I think he is in favor of the settlement.

12   I think that he would like it to go through.

13        **MR. HASSINGER:**  Obviously.

14        **MR. LEVIN:**  He has to help us.

15        **THE COURT:**  All right.  Well, the meeting is not as

16   helpful to me as I had hoped that it would be, but I always

17   give you all an opportunity to give me input.  If you do agree

18   on things, then that means something to me, and I usually adopt

19   it or at least take it into consideration in fashioning my own

20   view.  Obviously, we are not even on the same page here, so I'm

21   going to have to then deal with it without any agreement and

22   fashion a discovery plan and a trial plan.

23             With regard to the discovery plan, it would help

24   me if you gave me specifics like the plaintiffs have as to who

25   you want, who you need, and anything that you may think of that

1    would be helpful from your standpoint so that I at least plug
2    that into my thinking.
3            **MR. RISLEY:**  We will do that, Your Honor.
4            **THE COURT:**  It does seem to me that really the key
5    issue that -- the trials are not going to, I don't think, be
6    able to resolve it from the standpoint of mathematics.  Unless
7    we try 32 cases, I'm not going to be able to say, or anybody,
8    that this exceeds it.  The trials, if they have any effect,
9    it's going to be to inform the parties so that they can make
10   some judgment as to the ultimate resolution of the case.
11           Generally, bellwether trials are not very
12   helpful in terms of giving you a market.  Certainly it's true
13   in personal injuries.  You can't say that because this trial,
14   the plaintiff's death case, brought in $200,000 or $2 million
15   that means that every death case is going to bring in
16   $2 million.  It doesn't work that way.  It does give you some
17   input on responsibility and liability.
18           If a jury or 15 juries or four juries find a
19   defendant liable, three out of four find them liable, or one
20   out of four finds them liable, that's at least some input that
21   from that information you know that there is exposure.  Whether
22   it's 25 percent or 100 percent, there's exposure.  So maybe
23   that, along the lines that Steve is talking about, ought to be
24   the focus of the trials.
25           We ought to figure a way of focusing on

1   liability *vel non* and see whether or not that gives the parties

2   help.  If you try the case together in four cases or whatever

3   it is and no liability is found on the part of InEx, I think

4   that's significant.  If liability is found on InEx in all of

5   them, I think that's significant.  I think whatever it is, it's

6   significant, and that gives you something that you can chew on

7   as opposed to damages.

8             I also think that if we figure out a way of

9   getting that sample, of getting that information in a cheap

10  way, that then is not inconsistent with having to do it again

11  on a broader scale.

12            I also have talked to you all about trials.  I

13  haven't talked with you about some summary trials.  I don't

14  know whether you have focused on that, whether we can do

15  summary trials and get the input from the jury on that discrete

16  issue.  So that instead of pitching the whole thing and costing

17  you $2 million and you $1 million or $2 million, maybe we can

18  do it in some efficient way to give you that information on

19  that discrete issue.

20            I generally am not in favor of getting input

21  that is meaningless because then nobody gives any credence to

22  it.  I know in the past we have experimented with things like

23  getting input but it's not binding on the parties.  That is not

24  very valuable, in my experience.  It's generally a waste of

25  time.  That's a way of doing it, too, but I really would like

1    to see whether we can do this efficiently and a discrete issue
2    and see where we are.  If we need to step it out further, we
3    can step it out further.  I think that's the issue in this
4    case, whether or not InEx is liable.  That's the issue.
5              MR. ANGELLE:  Your Honor, I take everything you are
6    saying to heart and agree with it.  I do think that part and
7    parcel of InEx's liability or lack thereof has to do with Knauf
8    being in the case because in terms of getting meaningful
9    information when we have a primary defendant saying their
10   defense -- they are not claiming they are not culpable, they
11   are saying they are not collectible against.  I think the only
12   way to crystallize the issues that Steve had was to have them
13   be a party to at least pursue the notion of can they be brought
14   before the Court, have they already waived jurisdictional
15   defenses and those things, because only with them being in that
16   mix does it permit North River to determine exactly where they
17   are globally as opposed to just one bellwether.
18             THE COURT:  You have mixed too many things there.
19   From the standpoint of liability, that may be one thing.  But
20   from the standpoint of whether they are before the Court or
21   not, that's a whole different issue.  Collectability is a whole
22   different issue.  The fact that they are collectible or not
23   collectible is insignificant until an attempt is made to
24   collect.  You don't even focus on that.  I understand and I
25   hear you all.

1           **MR. ANGELLE:**  It duplicates any trial we do, and

2      that's not exactly economical or judicially economical.

3           **THE COURT:**  Well, it depends on how much you spend in

4      doing it and how much time you take in doing it.  If you do it

5      and it's going to take a month to do it that way and

6      $10 million to do it that way as opposed to not doing it that

7      way and spending a week or two, and half that if not one-third

8      of that, that at least factors into something.

9                The thing about it is that you're looking for

10     information as opposed to ultimate resolution.  Now, the

11     information hopefully leads to ultimate resolution, but I don't

12     know whether we are going to get from a certain number the

13     answer to how much, if any, your company is going to be

14     responsible for.  I don't know whether that can be done.

15               If you try the case against five or six people

16     or four people, whatever the numbers are, and liability is

17     found, that then is significant, particularly if you only need

18     32 properties to get over the primary.  How can anybody feel

19     that if there are 2,000 properties in play here and if you need

20     32 to get involved -- if there's no liability, then it's of no

21     value.  If there is liability, I don't think anybody in this

22     room can argue that the likelihood is that it won't exceed

23     primary.  Okay.  I've thought out loud with you all.

24          **MR. HERMAN:**  Judge, excuse me.  We would like to go

25     ahead and proceed with discovery now.

1          **THE COURT:**  Both sides, I would like to proceed along

2   the discovery lines.  I don't have any problem with it.  I

3   would think that it would be helpful to keep this thing on two

4   tracks.

5          With discovery, my first approach is to allow

6   the lawyers to work out the specifics of discovery.  If you

7   can't, then I will, but I need your input as to who you need.

8   If you get it from him and you can work out some discovery

9   plan, fine, but we need to get moving on it.  I'll give you a

10  week to do it, but we have got to get moving on it.  A week

11  after you give them the material, if you give -- I would hope

12  you would be able to give it to them by Monday.

13         **MR. RISLEY:**  I should be able to.  It shouldn't be a

14  problem.

15         **THE COURT:**  A week after, tell me whether or not you

16  all can agree on it.  If not, then I will arrange the

17  discovery.  I would like to have two tracks.  The same way with

18  the motions.

19         **MR. MEUNIER:**  Your Honor, you talked a lot about one

20  of the threshold questions being the selection of trial

21  plaintiffs.  It just occurred that the selection of trial

22  plaintiffs is dictated by what the issue is in phase one.  If

23  the issue is going to be fault only, whether or not InEx was a

24  bad faith seller, then you may pick trial plans according to a

25  point in time of purchase in order to line up representatively

1    with different states of knowledge on the part of InEx.  On the
2    other hand, if you are picking trial plans from phase one to
3    extrapolate to this magic $8 million number, then it's a lot
4    different.

5            So I'm only mentioning this because obviously we
6    are talking kind of circular.  For a discovery plan, we need to
7    know who the trial plaintiffs are.  If we want to know who the
8    trial plaintiffs are, it depends on what that issue is at the
9    trial.

10           **THE COURT:**  I want to sleep on it a little bit, but I
11   really do think that we ought to get to the crux of the matter.
12   The crux of the matter is really liability in this case.  If we
13   had five houses, then it would be important to find out how
14   much damages there are because that would be something.  If
15   each house is owned by Donald Trump, that's different; but if
16   not, then it's a problem.

17           If we have 1,000 or 2,000 homes, I know what has
18   been paid out per home.  I know the square footage amounts.  I
19   don't know whether we have to go through that to decide the
20   issue of exhaustion of primary.  It seems to me the primary is
21   going to be exhausted.

22           The crux of it is whether or not InEx is liable.
23   Don't you agree on that?  I think Steve is right on.  That's
24   the crux of it.  The rest of it, you may have different views,
25   but you have information that you can base your stuff on.  With

liability, it's advocacy.  It's in the eye of the beholder from your standpoint, so you need some information.

So I think in answer to your question, I really am thinking in terms of the liability aspect of the case.  I would like to do it as efficiently and as cost-effective as we can because it may not be -- if it gives you information and the ultimate thing is resolved, then it would be worth it.  If not, we will have wasted some money because we may have to do it again.

**MR. MEUNIER:**  If the question is what did InEx know and when did they know it, as to each selective plaintiff, you really don't have to get into much about the plaintiff's cost and scope.

**THE COURT:**  Well, that's what I'm saying.  I don't think you need the cost of it.  I think you need to know their liability.  I don't think cost is really an issue in this particular case.  I think it's going to be there, but I do think you need liability.

My thinking, then, just to help you in picking the cases, we need to focus on the liability aspect.  I'm interested in whether we can figure out a plan that each side gets an equal number of cases.

I think your point is well taken; we can't try 20 or 30 cases.  That doesn't make sense either, but I don't think you need that from the liability standpoint.  You may

1   need it from the standpoint of quantum.  You know, we would
2   need it if nothing had been done in this case, but a lot of
3   water is over the dam now from the standpoint of how much it
4   costs.  We have never focused on liability of InEx.  It's the
5   first time.  The rest of it we focused on and maybe beat it to
6   death.

7           MR. LEVIN:  With some stipulations to get around the
8   *Gasoline* case on the Seventh Amendment, if North River is
9   cooperative, I'm sure we could structure something very
10  economical and get some real good information out of a trial.

11          THE COURT:  I think the best we can do as colleagues
12  is try to get some information out of it and take it to our
13  people and look at it.  We are not going to be able, through
14  these trials, to resolve the case because of these trials in
15  the sense of extrapolating or whatever it is, making decisions.
16  I do think you can get enough information from these trials
17  that will allow you to make some reasonable decisions to
18  ultimately resolve it.  If we look at it in a discrete way, it
19  can be doable.  If we try to do everything in these trials,
20  it's not going to be doable.

21              Let me just leave you with this.  I really would
22  like you all to scrutinize the trials.  Let's see if we can
23  come up with six cases, three from each.  If we need more, you
24  all tell me we need more, I'll do the more.  I'm really focused
25  on liability of InEx in those trials.  That will then inform us

```
1   as to the nature and extent of the discovery.  I really don't
2   necessarily need discovery on damages if we are just doing
3   liability.  From the standpoint of liability, InEx's liability,
4   I think it's going to also be -- I don't know whether their
5   actions, then, are going to be able to be decided by that jury
6   if we don't put damages in it.
7              Well, chew on it and let me talk again with the
8   major players on the next Monday.
9         THE LAW CLERK:  The 25th, you have a nonjury.  We
10  could do it on the break.
11        THE COURT:  Sure.
12        MR. DAVIS:  Monday the 25th?
13        THE COURT:  Yes.
14        MR. ANGELLE:  Do we have a time, Judge?
15        THE LAW CLERK:  In the afternoon about 1:30.
16        THE COURT:  I can accommodate you all on the phone if
17  you want to.
18        MR. HERMAN:  Your Honor, may the plaintiff team use
19  your jury room for a short meeting?
20        THE COURT:  Sure.  Okay.  Thanks very much.
21        (Proceedings adjourned.)
22                            *  *  *
23
24
25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**<u>CERTIFICATE</u>**

I, Toni Doyle Tusa, CCR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled matter.


                              s/ Toni Doyle Tusa
                              Toni Doyle Tusa, CCR, FCRR
                              Official Court Reporter