# EXHIBIT "B"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL | ) | MDL NO. 2047 |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | SECTION: L |
| | ) | |
| | ) | JUDGE FALLON |
| | ) | MAG. JUDGE WILKINSON |
| _____ | ) | |

THIS DOCUMENT RELATES TO ALL CASES

### PLAINTIFFS' STEERING COMMITTEE'S REQUESTS FOR ADMISSIONS TO NORTH RIVER INSURANCE COMPANY

TO:     **North River Insurance Company**
           Through its counsel:
           **Sidney Angelle, Esq.**
           **Eric B. Berger, Esq.**
           *LOBMAN CARNAHAN BATT ANGELLE & NADER*
           400 Poydras Street
           Suite 2300
           New Orleans, LA 70130
           **AND**
           **Kevin F. Risely, Esq.**
           **Brian Martin, Esq.**
           *THOMPSON COE*
           One Riverway
           Suite 1600
           Houston, TX 77056

           **PLEASE TAKE NOTICE** that, pursuant to Pursuant to Rules 36 of the Federal Rules of

Civil Procedure, plaintiffs hereby request that defendant North River Insurance Company respond

to each of the following requests for admissions within 30 days from the service of this document,

or at such other time as ordered by the Court.

## DEFINITIONS & INSTRUCTIONS

1.      Whenever used herein, the following terms shall have the following meanings:

(a) "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

(b) "Computer" means all devices utilizing microchips to facilitate processing, analysis, or storage of data, including microcomputers (also known as personal computers), laptop computers, portable computers, notebook computers, palmtop computers (also known as personal digital assistants or PDA's), minicomputers and mainframe computers.

(c) "Concerning" means relating to, referring to, describing, evidencing, embodying, or constituting.

(d) "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data compilations. Documents shall include all drafts, including drafts with "track changes,"and shall be deemed to be separate documents within the meaning of this term.

(e) "Plaintiffs" means each of the individuals who are designated and/or identified as plaintiffs for the November 26, 2012 trial of this matter.

(f) "Trial Plaintiffs" means each of the individuals who are designated and/or identified as plaintiffs for the November 26, 2012 trial of this matter.

(g) "CPSC" means the Federal Consumer Product Safety Commission, any committee, subcommittee or advisory committee thereto, and any person, employee or agent acting as a representative thereof.

(h) "EPA" means the Environmental Protection Agency, any committee, subcommittee or advisory committee thereto, and any person, employee or agent acting as a representative thereof.

(i) "CDC" means Centers for Disease Control and Prevention's (CDC's) Division of Environmental Hazards and Health Effects within the National Center for Environmental Health (NCEH), any committee, subcommittee or advisory committee thereto, and any person, employee or agent acting as a representative thereof.

(j) "ATSDR" means Agency for Toxic Substances and Disease Registry, any committee, subcommittee or advisory committee thereto, and any person, employee or agent acting as a representative thereof.

(k) "Identify" with respect to persons, means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present

or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

(l) "Identify" with respect to documents, means to give, to extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

(m) "Including" or "includes" means including, without limitation.

(n) "Defendant," "you," or "your" means each of the individual named Defendants to whom this set of discovery is directed, and any of its domestic or international predecessors in interest, successors in interest, subsidiaries, divisions, subdivisions, affiliates, officers, directors, employees, representatives, independent contractors, consultants, or agents, whether present or former, including but not limited to their attorneys and accountants.

(o) "Chinese drywall" relates to drywall, plasterboard, or wallboard manufactured in China.

(p) "Quality Assurance Methods" means the testing or other protocols used to ensure the ultimate quality and consistency of drywall, plasterboard, or wallboard, including, but not limited to, the stages of production at which tests were performed, if any; testing of raw materials used for production if any; specific types of testing performed, if any; and, periodic chemical composition tests on the final product, if any.

(q) "Process Control" means the on-line or real-time measurements and corrective actions, processes and protocols used to ensure the proper operation of a manufacturing process for its drywall, including, but not limited to, the amounts, quantities and qualities of raw materials employed, the types of monitoring devices utilized, if any; the frequency with which measurement devices were calibrated, if ever; and, the frequency of which production and measurement equipment was inspected for wear, corrosion, or other damage, if ever.

(r) "Manufacturing Methods" mean the protocol or specifications for manufacturing drywall.

(s) "Test" or "Tests" means all tests, inspections, checks, studies, evaluations, measurements, and analyses of drywall and the materials and compounds which make up the same, into or of the composition, chemical or physical properties, performance, life expectancy, and formulation thereof.

(t) "Person" means any natural person or any business, legal, or governmental entity or association.

(u) "You", "your" or "your company" means North River Insurance Company, as applicable, including relevant predecessors, successors, subsidiaries, departments, divisions and/or affiliates, and including, without limitation, any organization or entity which it manages or controls, together with all present and former directors, officers, employees, agents, representatives or any persons

acting or purporting to act on its behalf.

(v) "INEX" means INTERIOR/EXTERIOR BUILDING SUPPLY, LP. and any of its affiliates or subsidiaries.

2.      The following rules of construction apply to all discovery requests:

(a) The terms "all" and "each" shall be construed as all and each;

(b) The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope;

(c) The use of the singular form of any word includes the plural and vice versa; and

(d) Requests that are stated in the present tense include the past tense and those in the past tense include the present tense.

3.      Unless otherwise noted, these requests require responses for the time period from January 1, 2001 through the date of these interrogatories (the "relevant time period").

4.      Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these interrogatories are continuing in nature so that if, after answering, you acquire additional responsive knowledge or information, plaintiffs direct that you serve supplemental answers after acquiring such additional knowledge or information.

5.      If at any time after answering these interrogatories you determine that an answer you provided was false, you must immediately notify plaintiffs' counsel and provide amended answers as soon as reasonably possible.

6.      If you refuse to respond to any of these interrogatories based on a claim of privilege pursuant to Federal Rule of Civil Procedure 26(b)(5), you must provide a statement of the claim of privilege and all facts relied upon in support of that claim, including the parties involved, any dates involved, the relevant subject matter of the privileged material, any documents or ESI supporting the privileged information, including the dates, authors, recipients, title and subject matter, and present location of any documents or ESI involved. In the case of attorney work product privilege, you must also identify the litigation for which the work product was prepared.

7.      If you answer any Request for Admission by reference to business records pursuant to Federal Rule of Civil Procedure 33(d), identify such records by Bates number and the name of your employee certifying the documents or ESI as business records for purposes of answering the Request.

## REQUESTS FOR ADMISSIONS

**Request for Admission No. 1:**

Please admit or deny that drywall is a widely used construction material that is also known as gypsum board, wallboard, plasterboard, sheetrock, and gyproc.

**Request for Admission No. 2:**

Please admit or deny that a drywall panel is composed of a layer of hardened gypsum plaster sandwiched between two layers of paper liner.

**Request for Admission No. 3:**

Please admit or deny that gypsum is a hydrated calcium sulfate, composed of two molecules of water ($H_2O$) and one of calcium sulfate ($CaSO_4$).

**Request for Admission No. 4:**

Please admit or deny that the gypsum used to make drywall can be created both naturally and synthetically.

**Request for Admission No. 5:**

Please admit or deny that naturally occurring gypsum is a deposit largely the result of the evaporation of water in ancient inland seas which contains large amounts of dissolved gypsum.

**Request for Admission No. 6:**

Please admit or deny that synthetic gypsum is chemically identical to mineral gypsum, but the amount and types of trace materials and unreacted sorbents found in the source material can vary among power plants and among mines from which it originates.

**Request for Admission No. 7:**

Please admit or deny that, when making gypsum into drywall, gypsum is crushed or ground up and heated to about 350 degrees Fahrenheit to remove approximately seventy-five percent (75%) of its water content in a process called calcining, thereafter becoming a fine white powder.

**Request for Admission No. 8:**

Please admit or deny that, when making drywall from gypsum, the calcined gypsum (or fine white powder) is then mixed with water, foam, and other additives to form a slurry which is fed between continuous sheets of paper on a continuous belt line.

**Request for Admission No. 9:**

Please admit or deny that, when making drywall from gypsum, as the board moves down the belt line, the calcined gypsum recrystalizes or rehydrates, reverting to its original gypsum state, and the paper sheets become firmly bonded to the rehydrated core.

**Request for Admission No. 10:**

Please admit or deny that, when making drywall from gypsum, the board is cut to length and conveyed through dryers to remove free moisture

**Request for Admission No. 11:**

Please admit or deny that in the United States, the use of gypsum board started in the early 1950s.

**Request for Admission No. 12:**

Please admit or deny that gypsum is fire resistant, thus making it a preferable material for drywall.

**Request for Admission No. 13:**

Please admit or deny that Chinese drywall is different from typical, benign drywall because Chinese drywall has a significantly higher average concentration of strontium.

**Request for Admission No. 14:**

Please admit or deny that Chinese drywall is different from typical, benign drywall because Chinese drywall has a significantly more detectable levels of elemental sulfur.

**Request for Admission No. 15:**

Please admit or deny that Chinese drywall is different from typical, benign drywall because Chinese drywall releases reduced sulfur gases.

**Request for Admission No. 16:**

Please admit or deny that the fact that Chinese drywall emits sulfur gases has been reported by the U.S. Consumer Products Safety Commission, the Florida Department of Health, and other investigative agencies and firms.

**Request for Admission No. 17:**

Please admit or deny that Chinese drywall is different from typical, benign drywall because the sulfur gases released by Chinese drywall are corrosive to metals.

**Request for Admission No. 18:**

Please admit or deny that the sulfur gases released by Chinese drywall are particularly corrosive to copper and silver.

**Request for Admission No. 19:**

Please admit or deny that the sulfur gases released by Chinese drywall can be irritating to the human body.

**Request for Admission No. 20:**

Please admit or deny that the sulfur gases released by Chinese drywall can cause noticeable odors in homes.

**Request for Admission No. 21:**

Please admit or deny that copper and silver are prevalent as metal components in most homes and buildings.

**Request for Admission No. 22:**

Please admit or deny that copper is used in electrical wiring and coils for HVAC systems, refrigerators, plumbing systems, and other devices in homes and buildings.

**Request for Admission No. 23:**

Please admit or deny that silver is used in the contact points for light switches, fire/smoke alarms, computers, and virtually all electrical components.

**Request for Admission No. 24:**

Please admit or deny that copper and silver metal components in houses are vulnerable to corrosion from exposure to the sulfur gases emitted by Chinese drywall.

**Request for Admission No. 25:**

Please admit or deny that the corrosion on metals caused by the sulfur gases emitted by Chinese drywall can cause premature failure of electrical & mechanical devices.

**Request for Admission No. 26:**

Please admit or deny that mechanical, electrical and electronic failures have been shown to have occurred prematurely due to industrial corrosive environments in homes with Chinese drywall.

**Request for Admission No. 27:**

Please admit or deny that evaluation of comparable HVAC systems, appliances, and electronics in homes without Chinese Drywall have shown premature failures of HVAC systems, appliances, and electronics, and the wires did not have corrosion product thicknesses that would predict premature failures.

**Request for Admission No. 28:**

Please admit or deny that the corrosion on metals caused by the sulfur gases emitted by Chinese drywall can pose a fire risk.

**Request for Admission No. 29:**

Please admit or deny that the corrosion on metals caused by the sulfur gases emitted by Chinese drywall can increase resistance in the circuiting of appliances and electronics.

**Request for Admission No. 30:**

Please admit or deny that increased resistance in the circuitry of appliances and electronics increases heat in the appliances and electronics.

**Request for Admission No. 31:**

Please admit or deny that increased resistance in the circuitry of appliances and electronics can cause excessive heating of the connection when energized.

**Request for Admission No. 32:**

Please admit or deny that complete failure of an electrical switch in a home can lead to fires or other life safety problems, depending on the intended function of the switch.

**Request for Admission No. 33:**

Please admit or deny that according to the Battelle Classification scheme, the recognized standard for measuring corrosivity of environments, there are four Classifications ranging from benign to severe.

**Request for Admission No. 34:**

Please admit or deny that the Battelle Classifications are characterized as I (benign), II (mild), III (moderately severe), and IV (severe industrial).

**Request for Admission No. 35:**

Please admit or deny that the International Standards Association (ISA) has developed a parallel corrosivity classification scheme.

**Request for Admission No. 36:**

Please admit or deny that the corrosivity classification schemes established by standard-setting organizations such as International Standards Organization (ISO) mirror the Battelle and the ISA standards.

**Request for Admission No. 37:**

Please admit or deny that the Battelle Classification Scheme for Corrosive Environments establishes qualitative and quantitative criteria to be used to classify environments.

**Request for Admission No. 38:**

Please admit or deny that the qualitative criteria for Battelle Corrosivity Classifications schemes are as follows:

a.   No significant corrosion observed, well-controlled environment;
b.   Pore corrosion mechanism begins, operating reliability affected, unprotected copper contains oxide and chloride;
c.   Moderately severe environment, associated with industrial operation, pore corrosion and creep, corrosion product on unprotected copper rich in sulfide and oxide; and
d.   Severe industrial environment, corrosion mechanism dominated by creep corrosion product on copper primarily a sulfide.

**Request for Admission No. 39:**

Please admit or deny that the Battelle Corrosivity Classifications, as well as ISA and the other corrosivity standards also have quantitative criteria for the levels of corrosive environments.

**Request for Admission No. 40:**

Please admit or deny that the quantitative criteria are based on corrosion product thickness measurements, measured in angstroms, units used to measure electromagnetic radiation equal to one ten-billionth of a meter, or microns, linear measurements equivalent to one-millionth of a meter.

**Request for Admission No. 41:**

Please admit or deny that the Battelle quantitative thickness criteria are as follows:

a.     <300 angstroms for 30 days (<.03 microns)
b.     300-1000 angstroms for first year (.03 - .1 microns)
c.     1000-4000 angstroms for first year (.1 - .4 microns)
d.     >4000 angstroms for first year (>.4 microns)

**Request for Admission No. 42:**

Please admit or deny that application of Battelle, ISA, and other corrosive environment criteria to real world components is demonstrated in the peer-reviewed literature.

**Request for Admission No. 43:**

Please admit or deny that the application Battelle, ISA, and other corrosive environment criteria to real world components is demonstrated in industry standards for corrosive environment criteria to real world components is demonstrated industry standards for corrosivity such as the International Society of Corrosion Engineer (NACE) Standard Recommended Practice Preparation, Installation, Analysis, and Interpretation of Corrosion Coupons in Oilfield Operations.

**Request for Admission No. 44:**

Please admit or deny that the application Battelle, ISA, and other corrosive environment criteria to real world components is also demonstrated by the Chinese Drywall Investigation performed by Sandia National Laboratories as documented in the CPSC/Sandia "Interim Report on the Status of Electrical Components Installed in Homes with Chinese Drywall."

**Request for Admission No. 45:**

Please admit or deny that based on the Battelle corrosivity criteria, corrosion scientists have established a failure threshold to predict electrical and electronic failures based on measuring corrosion product thicknesses on real world components or copper reactivity coupons standardized to a given period of time that the copper is exposed to the corrosive environment, and this standard failure threshold is 1000 angstroms (.1 micron) for the first year of exposure, or 300 angstroms (.3 micron) for 30 days of exposure.

**Request for Admission No. 46:**

Please admit or deny that handheld XRF is unreliable for the purpose of identifying Chinese drywall on a board-by-board basis.

**Request for Admission No. 47:**

Please admit or deny that observation of corrosion on a wire is not a reliable tool to be used for the purpose of selective identification and removal of Chinese drywall because

1.  CPSC and FDOH have determined that corrosion observation is a screening tool, not a tool for Chinese drywall board by board identification;
2.  No governmental or peer-reviewed endorsement exists for board by board identification;
3.  It is an incorrect assumption that effects of corrosive Chinese drywall are only very localized-these gases actually disburse throughout the house;
4.  There are no available receptacles next to many boards in house, e.g., "scarce" in ceilings;
5.  It is impractical to determine where one drywall board stops and next one starts; and
6.  There is no guarantee that all Chinese drywall contamination can be removed or certify the same to code officials.

**Request for Admission No. 48:**

Please admit or deny that large Florida homebuilders with extensive experience in Chinese drywall remediation have determined that the removal of all drywall in affected homes is efficient and cost effective, and that attempted selective identification and removal of Chinese drywall is neither efficient not cost-effective.

**Request for Admission No. 49:**

Please admit or deny that removal of all drywall from a Chinese drywall home has been demonstrated repeatedly to be an efficient method of repair.

**Request for Admission No. 50:**

Please admit or deny that for complete drywall removal, the removal process does not call for highly-skilled workers and removes drywall from a home rapidly and efficiently.

**Request for Admission No. 51:**

Please admit or deny that for attempted selective drywall removal, assuming that boards could be accurately identified (which the Court rejects), Chinese drywall would have to be "surgically excised" from a mixed Chinese drywall/non-Chinese drywall home, followed by the installation of new board in place of the Chinese drywall only.

**Request for Admission No. 52:**

Please admit or deny that selective drywall removal requires the use of skilled workers.

**Request for Admission No. 53:**

Please admit or deny that selective drywall removal is not an efficient method of repair.

**Request for Admission No. 54:**

Please admit or deny that selective removal of drywall, with the corresponding need to patch the borders between old and new board, is time-consuming and requires a highly-skilled drywall installer to attempt to conceal the patch.

**Request for Admission No. 55:**

Please admit or deny that once installed, the finishing process for drywall includes taping and multiple layers of drywall finish followed by sanding and painting, which renders the demarcation between drywall segments almost impossible and certainly impractical to detect.

**Request for Admission No. 56:**

Please admit or deny that corrosive gases emitted from Chinese drywall cause significant damage to copper high and low voltage wires as a result of the buildup of thick films or corrosion product.

**Request for Admission No. 57:**

Please admit or deny that failure analysis, where the concern is the "weakest link" because the goal is to prevent failures and protect against life safety issues connected to failures (i.e. corrosion increases resistance which increase heat and generates a fire risk) it is customary to focus on the most vulnerable components.

**Request for Admission No. 58:**

Please admit or deny that in cases of corroding copper tubing, the maximum corrosion thickness and maximum pit depth are important considerations in failure analysis.

**Request for Admission No. 59:**

Please admit or deny that reactive sulfur gases permeate the sheathing of cooper ground wiring and corrode such wires from the inside out.

**Request for Admission No. 60:**

Please admit or deny that it is not feasible to clean the wires of corrosion product to render them free of risk of future failure.

**Request for Admission No. 61:**

Please admit or deny that in order to remove corrosion product from copper wiring to render the wiring free of the frisk of future failure, one would have to remove the wire, remove the insulation on the wire, clean the wire, and reinstall the wire insulation, such process is not only time-consuming but requires special equipment and expertise.

**Request for Admission No. 62:**

Please admit or deny that building codes are drafted for life safety purposes and generally set a minimum level of safety.

**Request for Admission No. 63:**

Please admit or deny that corrosion on active residential wiring is a violation of the national safety code as well as the safety and building codes of the various states.

**Request for Admission No. 64:**

Please admit or deny that it is practical to remove the wiring all drywall is out of the home because of the ease of access to the cavities where the wiring is located.

**Request for Admission No. 65:**

Please admit or deny that the replacement of electrical wires, requires access to wall and ceilings cavities currently covered by drywall.

**Request for Admission No. 66:**

Please admit or deny that it is both economical and practical in remediating homes with Chinese drywall to remove all the wiring while the drywall is gone, rather than removing only some of the wiring at this time and then risk later having to tear down the drywall again in the case that additional wiring exposed to sulfur gases is harmed or fails.

**Request for Admission No. 67:**

Please admit or deny that the low-voltage wiring supporting life and safety devices such as fire alarms and smoke detectors should be removed and replaced because of the low cost of replacement when compared with the high risk of injury or death if these devices are not functioning properly.

**Request for Admission No. 68:**

Please admit or deny that the corrosive gases emitted by Chinese drywall which are

responsible for corroding copper in wiring, also can damage a home's plumbing and mechanical copper components.

**Request for Admission No. 69:**

Please admit or deny that this corrosion of copper plumbing components can cause pitting which leave corrosion product in the wall of the pipe.

**Request for Admission No. 70:**

Please admit or deny that from a scientific standpoint, under normal operating conditions, humidity and microscopic moisture on these pipes (or other copper surfaces such as coils or wire) will create the conditions for the deepening of these pits by the reactivation of the corrosion inside the pit, regardless of whether or not the defective drywall is removed.

**Request for Admission No. 71:**

Please admit or deny that heating, ventilating, and air-conditioning ("HVAC") units contain both copper and silver components, all of which are corroded by the sulfur gases emitted by Chinese drywall.

**Request for Admission No. 72:**

Please admit or deny that the Plaintiffs' homes contain Chinese drywall.

**Request for Admission No. 73:**

Please admit or deny that the Chinese drywall in Plaintiffs' homes was supplied by INEX.

**Request for Admission No. 74:**

Please admit or deny that the Chinese drywall in Plaintiffs' homes emits certain reduced sulfur gases.

**Request for Admission No. 75:**

Please admit or deny that the Chinese drywall in Plaintiffs' homes emits an odor.

**Request for Admission No. 76:**

Please admit or deny that the Chinese drywall in Plaintiffs' homes is not fit for its ordinary and/or intended purpose.

**Request for Admission No. 77:**

Please admit or deny that the Chinese drywall in Plaintiffs' homes is so useless and/or inconvenient that it must be presumed that Plaintiffs would not have purchased the drywall had they known about the emissions of reduced sulfur gases at the time of the sale.

**Request for Admission No. 78:**

Please admit or deny that the Chinese drywall in Plaintiffs' homes is so useless and/or inconvenient that it must be presumed that Plaintiffs would not have purchased the drywall had they known about the emissions of odors at the time of the sale.

**Request for Admission No. 79:**

Please admit or deny that the reduced sulfur gases from the Chinese drywall in Plaintiffs' homes were hidden from Plaintiffs at the time of delivery.

**Request for Admission No. 80:**

Please admit or deny that the reduced sulfur gases from the Chinese drywall in Plaintiffs' homes were unknown to Plaintiffs at the time of delivery.

**Request for Admission No. 81:**

Please admit or deny that the Plaintiffs have given sufficient notice of the defective Chinese drywall to INEX.

Respectfully submitted,

Dated: June 28, 2012

/s/ Leonard A. Davis
Russ M. Herman, Esquire
Leonard A. Davis, Esquire
HERMAN, HERMAN & KATZ, L.L.C.
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*

Arnold Levin, Esquire
Fred S. Longer, Esquire
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel*
*MDL 2047*

### PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm. LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Robert Josefsberg
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
rjosefsberg@podhurst.com

Ervin A. Gonzalez
Colson, Hicks, Eidson, Colson
  Matthews, Martinez, Gonzales,
  Kalbac & Kane
255 Aragon Avenue, 2nd Floor
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
 Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
Lambert and Nelson
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Bruce William Steckler
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
 & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker
Parker, Waichman, Alonso LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

James Robert Reeves
Lumpkin & Reeves
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Daniel K. Bryson
Whitfield, Bryson & Mason, LLP
900 W. Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5035
dan@wbmllp.com

Richard J. Serpe, Esquire
Law Offices of Richard J. Serpe
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
rserpe@serpefirm.com

Christopher Seeger
Seeger Weiss, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

**OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE**

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W
Suite  650
Washington, DC 20006
Phone: (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com

Andrew A. Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 (mailing address)
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Anthony Irpino
Irpino Law Firm
2216 Magazine Street
New Orleans, LA 70130
Phone: (504) 525-1500
Fax: (504) 525-1501
airpino@irpinolaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing discovery has been served on Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail <u>or</u> by hand delivery and e-mail <u>and</u> upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, on this 28th day of June, 2012.

/s/ Leonard A. Davis
Leonard A. Davis
Herman, Herman & Katz, L.L.C.
820 O'Keefe Ave.
New Orleans, LA  70113
PH:  (504) 581-4892
Fax:  (504) 561-6024
ldavis@hhklawfirm.com