**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

---------------------------------------------------------- x

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION

THIS DOCUMENT RELATES TO
ALL CASES AND:

*Payton, et al. v. Knauf Gips KG, et al.*
Case No. 2:09-cv-07628 (E.D. La.)

*Gross, et al. v. Knauf Gips KG, et al.*
Case No. 2:09-cv-06690 (E.D. La.)

*Rogers, et al. v. Knauf Gips KG, et al.*
Case No. 2:10-cv-00362 (E.D. La.)

*Abreu, et al. v. Gebrueder Knauf*
*Verwaltungsgesellschaft KG, et al.*
Case No. 2:11-cv-00252 (E.D. La.)

*Block, et al. v. Gebrueder Knauf*
*Verwaltungsgesellschaft, KG, et al.*
Case No. 11-cv-1363 (E.D. La.)

*Arndt, et al. v. Gebrueder Knauf*
*Verwaltungsgesellschaft, KG, et al.*
Case No. 11-cv-2349 (E.D. La.)

*Cassidy, et al. v. Gebrueder Knauf*
*Verwaltungsgesellschaft, KG, et al.*
Case No. 11-cv-3023 (E.D. La.)

*Vickers, et al. v. Knauf Gips KG, et al.*
Case No. 2:09-cv-04117 (E.D. La.)

---------------------------------------------------------- x

MDL NO. 2047

SECTION:  L

JUDGE FALLON

MAG. JUDGE WILKINSON

**MEMORANDUM OF LAW IN SUPPORT OF**
**FINAL APPROVAL OF THE KNAUF SETTLEMENT**

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................1

II.   BACKGROUND ................................................................................................3

    A.    Factual History .......................................................................................3

        1.    Export and Distribution of Chinese-Manufactured Drywall....................3

        2.    Role of Remaining Knauf Defendants ....................................................5

            a)    Knauf Wuhu and Knauf Dongguan ....................................................5

            b)    Knauf Indonesia ...............................................................................6

            c)    Knauf Brasil......................................................................................7

            d)    Knauf Gips.........................................................................................7

            e)    Knauf Insulation ................................................................................8

            f)    Knauf U.K. ........................................................................................10

            g)    Knauf AMF ......................................................................................11

            h)    Knauf International and GKV ............................................................11

        3.    Odor Related Complaints .....................................................................12

        4.    Nature of Defect ..................................................................................16

        5.    Corrosion-Related Complaints .............................................................18

        6.    Lack of Health Implications ................................................................23

    B.    Overview of the Chinese Drywall Litigation .........................................25

    C.    Terms of Knauf Settlement .....................................................................29

        1.    Overview .............................................................................................29

        2.    The Settlement Class............................................................................30

        3.    Settlement Benefits .............................................................................31

            a)    Remediation Fund Benefits ..............................................................31

            b)    Other Loss Fund Benefits .................................................................38

            c)    Attorneys' Fees ................................................................................40

III.  ARGUMENT ....................................................................................................40

    A.    Public Policy Favors Settlement of Class Action Lawsuits .........................41

    B.    The Knauf Settlement Is Fair, Reasonable and Adequate..........................42

        1.    Absence of Fraud or Collusion .............................................................44

        2.    Complexity, Expense and Likely Duration of the Litigation .................45

3.   Stage of the Proceedings and the Amount of Discovery Completed.....................47

4.   Probability of Plaintiffs' Success on the Merits / Range of Possible Recovery....................................................................................................49

   a)   KPT ..........................................................................................................49

      (1)   Probability of Plaintiffs' Success on the Merits....................................49

      (2)   Range of Possible Recovery..................................................................51

   b)   Other Knauf Defendants...........................................................................54

      (1)   No Viable Veil-Piercing Argument .......................................................55

         (a)   Under well-settled principles of governing law, a shareholder or affiliate is not liable for the debts of a corporation......................................................................................55

         (b)   Chinese law governs whether Plaintiffs can pierce KPT's corporate veil ...................................................................56

         (c)   To pierce KPT's veil under Chinese law, Plaintiffs must show abuse of KPT's corporate form ......................................57

         (d)   Under each state's law, Plaintiffs would also have to establish that another Knauf entity abused KPT's corporate form..................................................................58

         (e)   Plaintiffs would be unable to satisfy their burden of establishing that another Knauf entity used KPT's corporate form fraudulently or for an improper purpose...............................61

      (2)   No Viable Agency Argument .................................................................66

         (a)   KPT did not have actual authority to act on behalf of Knauf Gips ..........................................................................................66

         (b)   Knauf Gips did not imply to Plaintiffs that KPT is authorized to act for Knauf Gips .................................................67

         (c)   Knauf Insulation could not be liable as KPT's sales agent ...........69

      (3)   Jurisdictional Defenses ........................................................................71

      (4)   German Collection Defenses.................................................................74

   c)   Allocation of Fault ...................................................................................79

   d)   Conclusion ...............................................................................................81

5.   Opinions of the Class Counsel, Class Representatives, and Absent Class Members.........................................................................................................82

IV.   CONCLUSION ............................................................................................................83

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### <u>CASES</u>

*Adm's of Tulane Educ. Fund v. Biomeasure, Inc.*,
  687 F. Supp. 2d 620 (E.D. La. 2009), *aff'd*,
  *Adm's of Tulane Educ. Fund v. Ipsen, S.A.*,
  450 Fed. App'x 326 (5th Cir. 2011) ....................................................................... 66, 67, 68

*Advertects, Inc. v. Sawyer Indus., Inc.*,
  84 So. 2d 21 (Fla. 1955) ................................................................................................. 65

*Altier v. Worley Catastrophe Response, LLC*,
  No. 11-241, 2012 WL 161824 (E.D. La. Jan. 18, 2012) ................................ 42, 43, 44, 45, 82

*Ames v. Ford Motor Co.*,
  299 F. Supp. 2d 678 (S.D. Tex. 2003) .............................................................................. 70

*Anderson v. Abbott*,
  321 U.S. 349 (1944) ....................................................................................................... 55

*Ankum v. White Consol. Indus.*,
  No. 91-2990, 1992 WL 185705 (E.D. La. July 30, 1992) .................................................... 70

*Bearry v. Beech Aircraft Corp.*,
  818 F.2d 370 (5th Cir. 1987) ........................................................................................... 73

*Bloodsworth v. Smith & Nephew*,
  No. 2:05CV622-D, 2005 WL 3470337 (M.D. Ala. Dec. 19, 2005) ...................................... 70

*Buchanan v. Ameristar Casino Vicksburg, Inc.*,
  957 So. 2d 969 (Miss. 2007) ............................................................................................ 55

*Butcher v. Superior Offshore Int'l, LLC*,
  754 F. Supp. 2d 829 (E.D. La. 2010) .......................................................................... 66, 71

*Canon Latin Am., Inc. v. Lantech (C.R.) S.A.*,
  2011 WL 240684 (S.D. Fla. Jan. 24, 2011) ....................................................................... 63

*Cintron v. Osmose Wood Preserving, Inc.*,
  681 So. 2d 859 (Fla. Dist. Ct. App. 1996) ......................................................................... 50

*Consol. Dev. Corp. v. Sherritt, Inc.*,
  216 F.3d 1286 (11th Cir. 2000) .................................................................................. 73, 74

*Cotton v. Hinton*,
  559 F.2d 1326 (5th Cir. 1977) .............................................................................. 41, 42, 43, 47

Page(s)

*Cross Country Home Servs., Inc. v. Home Serv. USA Corp.*,
No. 08-61456, 2010 WL 55439 (S.D. Fl. Jan. 6, 2010) ....................................................... 74

*D. H. Overmyer Co., Inc. v. Loflin*,
440 F.2d 1213 (5th Cir. 1971) ............................................................................................ 41

*Dalton v. R & W Marine, Inc.*,
897 F.2d 1359 (5th Cir. 1990) ............................................................................................ 64

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ............................................................................................................ 39

*Dickson Marine Inc. v. Panalpina, Inc.*,
179 F.3d 331 (5th Cir. 1999) ....................................................................................... 73, 74

*Enic, PLC v. F.F. S. & Co., Inc.*,
870 So. 2d 888 (Fla. Dist. Ct. App. 2004).............................................................. 66, 67, 71

*Ex parte Wild Wild West Social Club, Inc.*,
806 So. 2d 1235 (Ala. 2001)............................................................................................... 49

*Fina Oil and Chem. Co. v. Amoco Prod. Co.*,
673 So. 2d 668 (La. Ct. App. 1996)..................................................................................... 59

*First Health, Inc. v. Blanton*,
585 So. 2d 1331 (Ala. 1991)......................................................................................... 55, 58

*First State Bank of Childress v. Fields*,
551 S.W.2d 476 (Tex. Civ. App. 1977) ............................................................................... 69

*Gibraltar Sav. v. LDBrinkman Corp.*,
860 F.2d 1275 (5th Cir. 1988) ............................................................................................ 64

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
131 S. Ct. 2846 (2011) ................................................................................................. 72, 73

*Gucci Am., Inc. v. Huoqing*,
No. C-09-05969, 2011 WL 31191 (N.D. Cal. Jan. 3, 2011) ............................................... 53

*Hanson v. Denckla*,
357 U.S. 235 (1958)............................................................................................................ 72

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984)............................................................................................................ 73

*Home Ins. Co. v. A. J. Warehouse*,
210 So. 2d 544 (La. Ct. App. 1968)..................................................................................... 70

Page(s)

*Hyundai Motor Co. v. Rodriguez*,
    995 S.W.2d 661 (Tex. 1999) ........................................................... 50

*In re Chevron U.S.A., Inc.*,
    109 F.3d 1016 (5th Cir. 1997) ....................................................... 28

*In re Corrugated Container Antitrust Litig.*,
    643 F.2d 195 (5th Cir. 1981) ........................................... 2, 41, 42, 47

*In re Giant Interactive Group, Inc. Sec. Litig.*,
    279 F.R.D. 151 (S.D.N.Y. 2011) ................................................... 53

*In re Katrina Canal Breaches Litig.*,
    628 F.3d 185 (5th Cir. 2010) ......................................................... 43

*In re Shell Oil Refinery*,
    155 F.R.D. 552 (E.D. La. 1993) .................................................... 47

*In re SMTC Mfg. of Texas*,
    421 B.R. 251 (Bankr. W.D. Tex. 2008) .......................................... 64

*In re Vioxx Prox. Liab. Litig.*,
    478 F. Supp. 2d 897 (E.D. La. 2007) ............................................. 56

*Industrias Magromer Cueros y Pieles S.A. v. Louisiana Bayou Furs Inc.*,
    293 F.3d 912 (5th Cir. 2002) ......................................................... 59

*Int'l Ins. Co. v. Johns*,
    874 F.2d 1447 (11th Cir. 1989) ..................................................... 57

*Jackson v. Tanfoglio Giuseppe, S.R.L.*,
    615 F.3d 579 (5th Cir. 2010) ............................................... 60, 63, 73

*John Deere Const. Equip. v. England*,
    883 So. 2d 173 (Ala. 2003) .................................................... 66, 68

*Johnston v. Multidata Sys. Int'l Corp.*,
    523 F.3d 602 (5th Cir. 2008) ......................................................... 73

*Jolly v. Ins. Co. of N. Am.*,
    331 So. 2d 368 (Fla. Dist. Ct. App. 1976)....................................... 49

*Lake City Stevedores, Inc. v. E.-W. Shipping Agencies, Inc.*,
    474 F.2d 1060 (5th Cir. 1973) ....................................................... 69

*Miller v. Republic Nat'l Life Ins. Co.*,
    559 F.2d 426 (5th Cir. 1977) ......................................................... 41

Page(s)

*Mobil Oil Corp. v. Bransford*,
    648 So. 2d 119 (Fla. 1995) ............................................................................... 68

*Molinos Valle Del Cibao, C. Por A. v. Lama*,
    633 F.3d 1330 (11th Cir. 2011) ...................................................................... 63

*Morales v. Bayou Concessions Salvage, Inc.*,
    No. 03 Civ. 657, 2004 WL 2381525 (E.D. La. Oct. 22, 2004) ........................... 60

*Newby v. Enron Corp.*,
    394 F.3d 296 (5th Cir. 2004) .......................................................49, 53, 71, 82

*Nolan v. Boeing Co.*,
    736 F. Supp. 120 (E.D. La. 1990) .................................................................... 66

*Parker v. Anderson*,
    667 F.2d 1204 (5th Cir. 1982) ........................................................................ 41

*Patin v. Thoroughbred Power Boats*,
    294 F.3d 640 (5th Cir. 2002) .......................................................................... 56

*Qualley v. Int'l Air Serv. Co., Ltd.*,
    595 So. 2d 194 (Fla. Dist. Ct. App. 1992).......................................................... 67

*Reaves v. Wiggs*,
    192 So. 2d 401 (Miss. 1966)............................................................................ 49

*Reed v. Gen. Motors Corp.*,
    703 F.2d 170 (5th Cir. 1983) .................................................................... 42, 43

*Reynolds Am., Inc. v. Gero*,
    56 So. 3d 117 (Fla. Dist. Ct. App. 2011) .......................................................... 67

*Riggins v. Dixie Shoring Co., Inc.*,
    590 So. 2d 1164 (La. 1991) ................................................................ 55, 59, 60

*Robert's Fish Farm v. Spencer*,
    153 So. 2d 718 (Fla. 1963) ............................................................................. 55

*Rosson v. McFarland*,
    962 So. 2d 1279 (Miss. 2007)......................................................................... 60

*Scrushy v. Tucker*,
    70 So. 3d 289 (Ala. 2011) .............................................................................. 57

*Seminole Boatyard, Inc. v. Christoph*,
    715 So. 2d 987 (Fla. Dist. Ct. App. 1998)........................................................ 59

Page(s)

*Sentinel Indus. Contracting Corp. v. Kimmins Indus. Serv. Corp.*,
   743 So. 2d 954 (Miss. 1999) ............................................................................... 57

*Simmons v. Clark Equip. Credit Corp.*,
   554 So. 2d 398 (Ala. 1989) ................................................................................ 59

*SmithKline Beecham Corp. v. Doe*,
   903 S.W.2d 347 (Tex. 1995) .............................................................................. 49

*Sol Melia, S.A. v. Fontana*,
   67 So. 3d 1226 (Fla. Dist. Ct. App. 2011) ........................................................ 63

*Southern v. Pfizer, Inc.*,
   471 F. Supp. 2d 1207 (N.D. Ala. 2006) ............................................................ 70

*Speer v. Taira Lynn Marine, Ltd., Inc.*,
   116 F. Supp. 2d 826 (S.D. Tex. 2000) ............................................................... 69

*SSP Partners v. Gladstrong Invs. (USA) Corp.*,
   275 S.W.3d 444 (Tex. 2009) ........................................................................ 55, 61

*Sylvas v. Heckel*,
   162 So. 2d 774 (La. Ct. App. 1964) .................................................................. 69

*TAGC Mgmt., LLC v. Lehman*,
   842 F. Supp. 2d 575 (S.D.N.Y. 2012) ............................................................... 53

*Taylor v. Gen. Motors Corp.*,
   707 So. 2d 198 (Ala. 1997) ................................................................................ 50

*Technical Chem. Co. v. Jacobs*,
   480 S.W.2d 602 (Tex. 1972) .............................................................................. 50

*Thibaut v. Ourso*,
   605 F. Supp. 1 (M.D. La. 1981) ........................................................................ 41

*Town of Haynesville, Inc. v. Entergy Corp.*,
   956 So. 2d 192 (La. Ct. App. 2007) .................................................................. 60

*Turner v. Murphy Oil USA*,
   472 F. Supp. 2d 830 (E.D. La. 2007) ........................................................ passim

*Tyler v. Walt*,
   167 So. 182 (La. 1936) ...................................................................................... 69

*United States v. Bestfoods*,
   524 U.S. 51 (1998) ............................................................................................. 55

Page(s)

*Validsa, Inc. v. PDVSA Servs., Inc.*,
    424 F. App'x 862 (11th Cir. 2011) ................................................................................. 69

*W. J. Perryman & Co. v. Penn Mut. Fire Ins. Co.*,
    324 F.2d 791 (5th Cir. 1963) ....................................................................................... 41

*WH Smith PLC v. Benages & Assocs., Inc.*,
    51 So. 3d 577 (Fla. Dist. Ct. App. 2010) ..................................................................... 59

*Whetstone Candy Co., Inc. v. Kraft Foods, Inc.*,
    351 F.3d 1067 (11th Cir. 2003) ................................................................................... 66

*Whitney v. Wyman*,
    101 U.S. 392 (1879) ..................................................................................................... 69

## FEDERAL STATUTES

28 U.S.C. § 1407 .................................................................................................................. 25

F.R.C.P. 23(e)(2) ................................................................................................................. 42

## STATE STATUTES

Fla. Stat. Ann. § 768.81 ...................................................................................................... 80

La. Civ. Code Ann. Art. 2323-24 ........................................................................................ 80

La. Rev. Stat. Ann. § 9:2800.54(A) ..................................................................................... 50

Miss. Code Ann. § 11-1-63(a) .............................................................................................. 50

Miss. Code Ann. § 11-7-15 .................................................................................................. 80

Miss. Code Ann. § 85-5-7 .................................................................................................... 80

Tex. Bus. Org. § 1.102 ......................................................................................................... 57

Tex. Bus. Org. § 1.104 ......................................................................................................... 57

Tex. Bus. Org. § 21.223 ....................................................................................................... 61

Tex. Civ. Prac. & Rem. § 33 ............................................................................................... 80

Page(s)

## TREATISES AND RESTATEMENTS

WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE
CORPS. § 8326 (rev. ed. 2006) ................................................................ 56

Restatement (Second) of Conflict of Laws  § 307 (1971) ........................ 56

Restatement (Second) of Torts § 402A (1965).......................................... 54

Restatement (Third) of Agency § 7.01 (2006) ........................................ 70

Restatement (Third) of Torts:  Prod. Liab. § 1 (1998) .............................. 54

## LEGAL ARTICLES

Donald C. Clarke, *The Enforcement of United States Court Judgments in China*,
GEO. WASH. U. L. SCHOOL PUBLIC L. & LEGAL THEORY,
Working Paper No. 236 (2004)....................................................... 51, 52, 53

Xinran Deng, *Enforcement of Foreign Judgements in China*, HG ORG GLOBAL LEGAL
RESOURCES (March 29, 2011)................................................................. 52

Hon. Eldon E. Fallon, Jeremy T. Grabill & Robert Pitard Wynne, *Bellwether Trials in
Multidistrict Litigation*, 82 Tul. L. Rev. 2323 (2008)........................................ 28

Andre R. Fiebig, *The Recognition and Enforcement of Punitive Damage Awards in
Germany: Recent Developments*, 22 GA. J. INT'L & COMP. L. 635 (1992) ............... 75, 76, 78

Andrea Pinna, *Recognition and Res Judicata of US Class Action Judgments in European
Legal Systems*, 1 ERASMUS L. REV. 31 (2008).............................................. 78, 79

Ramon E. Reyes, Jr., *The Enforcement of Foreign Court Judgments in the People's
Republic of China: What the American Lawyer Needs to Know*,
23 BROOK. J. INT'L L. 241 (1997) .......................................................... 53

Fang Shen, *Are You Prepared For This Legal Maze? How to Serve Legal Documents,
Obtain Evidence, and Enforce Judgments in China*,72 UMKC L. Rev. 215 (2003)........ 51, 52

Ariel Ye, *Enforcement of Foreign Arbitral Awards and Foreign Judgments in China*,
74 DEF. COUNSEL J. 248 (2007) .......................................................... 51, 52, 53

Arthur Anyuan Yuan, *Enforcing and Collecting Money Judgments in China from a U.S.
Judgment Creditor's Perspective*, 36 GEO. WASH. INT'L L. REV. 757 (2004) ........... 51, 52, 53

The Knauf Defendants[1] submit this Memorandum of Law in Support of Final Approval of the Knauf Settlement.[2]  The Knauf Settlement is contingent on certain future events.[3]  This memorandum assumes that those contingencies are resolved satisfactorily.

## I.  **INTRODUCTION**

On December 20, 2011, the Knauf Defendants entered into a landmark settlement of claims brought on behalf of a class of homeowners related to allegedly defective drywall manufactured by KPT and exported to the United States.  The Knauf Settlement will help thousands of American homeowners affected by problems arising from KPT drywall.  Under the Settlement, Class Members can elect either to have their properties fully remediated (including removal of all KPT drywall and replacement of damaged items, such as electrical systems, HVAC systems and appliances) at the Knauf Defendants' expense or to receive a discounted cash equivalent.  Class Members also will receive compensation for economic losses allegedly caused by KPT drywall.  In addition, the Knauf Defendants will pay Class Members' attorneys'

---

[1]    The Knauf Defendants are Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"); Knauf Plasterboard (Wuhu) Co., Ltd. ("Knauf Wuhu"); Guangdong Knauf New Building Material Products Co., Ltd. ("Knauf Dongguan"), Knauf Gips KG ("Knauf Gips"); Gebr. Knauf Verwaltungsgesellschaft KG ("GKV"); Knauf International GmbH ("Knauf International"); Knauf Insulation GmbH ("Knauf Insulation"); Knauf UK GmbH ("Knauf U.K."); Knauf AMF GmbH & Co. KG ("Knauf AMF"); Knauf do Brasil Ltda. ("Knauf Brasil"); and PT Knauf Gypsum Indonesia ("Knauf Indonesia").

[2]    *See* Amended Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047 ("Knauf Settlement") (Rec. Doc. No. 15742-2).

[3]    In particular, the Knauf Defendants can terminate the Knauf Settlement at their sole and exclusive discretion if (i) there are opt-outs remaining 14 days prior to the Fairness Hearing (Knauf Settlement § 8.3.2); (ii) Banner, InEx and/or L&W terminate their respective class settlements or declare bankruptcy (*id.* § 4.8.5); (iii) the Knauf Defendants fail to agree with Banner and/or InEx on a solution that extinguishes the potential claims of Banner and InEx or their insurers against the Knauf Defendants (*id.* § 4.8.6); or (iv) the Global Settlement is not effectuated (*id.* § 2.1).

fees and costs so that all the benefits provided to Class Members will go towards their intended purposes. This innovative Settlement will resolve the claims of thousands of property owners, fully restore their properties to the conditions that they would have been in absent KPT drywall and permit them to avoid the expense, uncertainty and delay associated with litigation. It should receive final approval.

As the Fifth Circuit has held, a proposed settlement must ultimately "stand or fall on the adequacy of its terms."[4]  The terms of the Knauf Settlement are not only adequate but, as Plaintiffs have acknowledged, represent an "excellent result" for the Plaintiffs.[5]

The substantial benefits of the Knauf Settlement must be weighed against the considerable risk, delay and expense of pursuing litigation. Of all the Knauf Defendants named in this litigation, KPT alone was responsible for the manufacture and sale of the defective drywall at issue, and there is no dispute that KPT bears at least partial liability for the damages that were proximately caused by its defective product. Ordinarily, this is where the legal analysis would begin and end, if not for the fact that KPT is a Chinese business entity. Given China's longstanding refusal to honor the judgments of U.S. courts, enforcement of a judgment against KPT in China is exceedingly unlikely. Aware of this, Plaintiffs have cast their nets wide, naming as additional defendants a number of Knauf affiliates scattered across four different continents which neither manufactured nor sold KPT's defective drywall.  As will be

---

[4]     *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981).

[5]     *See* Memorandum of Law in Support of the Joint Motion of Proposed Settlement Class Counsel, the PSC, and the Knauf Defendants for an Order:  (1) Preliminarily Approving the Knauf Settlement; (2) Conditionally Certifying a Settlement Class; (3) Issuing Class Notice; (4) Scheduling a Fairness Hearing; and (5) Staying Claims Against the Knauf Defendants, at 21 (Rec. Doc. No. 12061-4).

demonstrated below, Plaintiffs face huge obstacles to prevailing against and/or collecting from these additional Knauf affiliates.

Despite the fact that the Plaintiffs are unlikely to recover in court, the Knauf Defendants recognize that drywall supplied by KPT has caused damage to homes and hardship to homeowners.  Consequently, the Knauf Defendants have elected – for settlement purposes only – not to rely upon their corporate separateness and collection defenses and instead have agreed to provide the generous benefits under the Settlement.  These corporate separateness and collection defenses will not be waived in litigation.  As a result, the Settlement represents a surpassingly favorable outcome for the Plaintiffs.  The Court should approve the Knauf Settlement – and the related settlements involving Banner, InEx, L&W, other supply chain defendants and their insurers – because they offer a fair recovery for the Plaintiffs, avoid a difficult and almost certainly futile collection struggle, and bring to final resolution what has already become a protracted and costly litigation.

## II.   BACKGROUND

### A.   Factual History

#### 1.   Export and Distribution of Chinese-Manufactured Drywall

In 2005, the United States was experiencing a building boom, resulting in an increased demand for building supplies.  Following Hurricanes Katrina and Rita in 2005, the demand in the Southeastern part of the United States only increased.  As demand outstripped supply, American building supply distributors sought alternative suppliers beyond the nation's borders.  The shortage – and the international search for new supplies – included drywall.

In response to this unmet demand in the United States, hundreds of millions of square feet of drywall, produced by multiple Chinese manufacturers, was exported from China to the

United States starting in late 2005.[6]  This drywall was sold to distributors and suppliers, resold to builders and installers, and ultimately installed in thousands of properties located primarily in the southeastern United States.

Of the Chinese-manufactured drywall exported to the United States between 2005 and 2006, approximately 60 million square feet was manufactured by KPT, a Chinese corporation with its principal place of business in the city of Tianjin, China.[7]  KPT drywall was installed primarily in the states of Florida, Louisiana, Alabama, Mississippi and Texas.[8]  This KPT-manufactured drywall reached the United States in multiple shipments between December 2005 and August 2006.[9]  KPT sold the majority of the KPT drywall – approximately 32 million square feet – to Rothchilt International Limited ("Rothchilt").[10]  Rothchilt resold this drywall to La

---

[6]     The Gypsum Association has reported that 320 million square feet of drywall was imported from China into the United States between 2005 and 2007.  *See* Gypsum Assoc'n, *Comments on Imported Chinese Drywall Issue* (May 7, 2009),  *available at* http://www.pabcogypsum.com/TechData/Gypsum_Association_Comments_on_Chinese_ Wallboard_Issue.pdf, attached as Ex. 1.  Notably, not all of this drywall was reactive in the way that much of the KPT drywall was revealed to be.

[7]     *See* Knauf Plasterboard (Tianjin) Co., Ltd.'s Second Amended Supplemental Response to the Plaintiffs' First Request for Production of Documents Concerning Jurisdictional Issues, attached as Ex. 2; Declaration of Mark Norris ("Norris Decl."), *Camposano v. Knauf Gips KG*, No. 10-45796 CA (42) (Fla. Cir. Ct. 2010), attached as Ex. 3, at ¶ 3 ("KPT is a Chinese limited company organized under the laws of China.  Its principal place of business is North Yinhe Bridge, East Jingjin Road, RC-300400, Tianjin, China.").

[8]     The vast majority of properties affected by KPT-manufactured drywall are located in the states of Florida, Louisiana, Alabama, Mississippi or Texas.

[9]     *See* Knauf Plasterboard (Tianjin) Co., Ltd.'s Second Amended Supplemental Response to the Plaintiffs' First Request for Production of Documents Concerning Jurisdictional Issues (Ex. 2).

[10]    *See id.*; *see also* Norris Decl. (Ex. 3) at ¶ 5 ("KPT sold plasterboard imported to the ports of Miami and Tampa to Rothchilt International Limited . . . a Taiwanese company.").

Suprema Enterprise, Inc. ("La Suprema"),[11] which in turn resold the overwhelming majority of the drywall to various Banner Supply Company affiliates (collectively, "Banner").[12]  KPT sold an additional approximately 20 million square feet of the KPT-manufactured drywall directly to Interior Exterior Building Supply, L.P. ("InEx"), and approximately five million square feet of the KPT-manufactured drywall to L&W Supply Company ("L&W").[13]  Banner, InEx and L&W are all American building supply distribution companies.

### 2.    Role of Remaining Knauf Defendants

As indicated above, KPT was solely and exclusively responsible for the manufacture and sale of the drywall at issue in this litigation.  Nevertheless, Plaintiffs have named as additional defendants a number of Knauf affiliates whose connection to the manufacture and sale of KPT drywall ranges from the tangential to the non-existent.

### a)    Knauf Wuhu and Knauf Dongguan

Knauf Wuhu and Knauf Dongguan are two Knauf affiliates in China that also exported drywall to the United States in 2005 and 2006.  Both are Chinese corporations;  their principal places of business are Wuhu, China and Guangdong, China, respectively.  There is no evidence

---

[11]     *See* Deposition of Salomon H. Abadi dated Oct. 19, 2009 ("Abadi Dep."), attached as Ex. 4, at 20:10-21:4 (La Suprema purchased KPT drywall through Rothchilt); Norris Decl. (Ex. 3) at ¶ 6 ("I have learned that Rothchilt resold the drywall to La Suprema Enterprise Inc.").

[12]     *See* Abadi Dep. (Ex. 4) at 104:22-105:18 ("99.999 percent" of the KPT drywall purchased by La Suprema was resold to the Banner entities, while a "little bit was dispatched to 84 Lumber in Fort Myers.").  "Banner" includes Banner Supply Co.; Banner Supply Co. - Pompano, LLC; Banner Supply Co. - Port St. Lucie, LLC; Banner Supply Co. - Fort Myers, LLC; and Banner Supply Co. - Tampa, LLC.

[13]     *See* Knauf Plasterboard (Tianjin) Co., Ltd.'s Second Amended Supplemental Response to the Plaintiffs' First Request for Production of Documents Concerning Jurisdictional Issues (Ex. 2).

that the drywall manufactured by Knauf Wuhu or Knauf Dongguan was in any way defective.[14] For this reason, Plaintiffs with claims involving Knauf Wuhu or Knauf Dongguan drywall are not covered by the Knauf Settlement; they have the option to dismiss or litigate their claims.

### b)   Knauf Indonesia

Knauf Indonesia is an Indonesian corporation which produces and sells drywall primarily for the local Indonesian market.  Knauf Indonesia's manufacturing operation is separate from that of any other Knauf affiliate, including KPT.  Rothchilt purchased drywall from Knauf Indonesia for export to the United States in or about 2006.[15]  There is no evidence that Knauf Indonesia's drywall was in any way defective.[16]  For this reason, Plaintiffs with claims involving Knauf Indonesia drywall are not covered by the Knauf Settlement; they have the option to dismiss or litigate their claims.

---

[14]   *See* Affidavit of Matthew J. Perricone, Ph.D. dated Aug. 29, 2012 ("Perricone Aff.") attached as Ex. 5, at ¶ 13 ("[N]either the Knauf Wuhu- or Knauf Dongguan-manufactured boards caused copper tarnishing"); *see also* Deposition of David N. Gregory dated Sept. 14, 2011 ("Gregory Dep. II"), attached as Ex. 6, at 688:3-13 (the problem was believed to be confined to KPT because "at that time, [KPT] was the only plant which was taking natural gypsum from that particular place.").

[15]   *See* Abadi Dep. (Ex. 4) at 91:9-19 (in 2006, La Suprema purchased drywall manufactured by Knauf Indonesia through Rothchilt), 117:17-118:21 (La Suprema purchased 193 containers of drywall from Knauf Indonesia); Gregory Dep. II (Ex. 6) at 501:3-10 ("[W]hen I was still based in Indonesia, we did an order to the U.S., a small order that was prepared.  And we didn't even dispatch it in its entirety, because the customer couldn't take it because the demand was slowing down."); Deposition of Ann Zhong dated Aug. 12, 2011 ("Zhong Dep. II"), attached as Ex. 7, at 282:10-16 (Knauf Indonesia also exported drywall to the U.S.).

[16]   *See* Deposition of Isabel Corinna Knauf dated Dec. 8, 2010 ("I. Knauf Dep. II"), attached as Ex. 8, at 761:20-24 (no knowledge of any defect in drywall manufactured by Knauf Indonesia); Deposition of Michael Anthony Robson dated Nov. 17, 2010 ("Robson Dep."), attached as Ex. 9, at 498:10-13 (no knowledge of any "disputes involving sulfur and Knauf Gypsum Indonesia").

### c)     Knauf Brasil

Knauf Brasil is a Brazilian corporation which produces and sells drywall primarily in the local Brazilian market.  Knauf Brasil supplied drywall to La Suprema for export to the United States prior to La Suprema's first purchase of KPT-manufactured drywall.[17]   Knauf Brasil's manufacturing operation is separate from that of any other Knauf affiliate, including KPT.  There is no evidence that the drywall manufactured by Knauf Brasil was defective.[18]  For this reason, Plaintiffs with claims involving Knauf Brasil drywall are not covered by the Knauf Settlement; they have the option to dismiss or litigate their claims.

### d)     Knauf Gips

Knauf Gips is a form of limited partnership organized under the laws of Germany with its principal place of business in Iphofen, Germany.  Knauf Gips' central business is the manufacture of building and construction supplies, including drywall, primarily for the German market.[19]  Knauf Gips' manufacturing operation is separate from that of any other Knauf affiliate, including KPT.  In its long history, Knauf Gips has made only two isolated sales of

---

[17]     *See* Abadi Dep. (Ex. 4) at 94:8-95:13 (Abadi purchased "50 containers" from Knauf Brasil "way before" his "business dealings with China."), 239:1-240:18 (Abadi imported drywall from Knauf Brasil for a "short period."); Seifart Trial Tr., vol. VI, afternoon session, (June 9, 2010), attached as Ex. 10, at 739:18-740:3 (Scott Giering, testifying that Banner received drywall manufactured by Knauf Brasil before it received drywall manufactured by Knauf entities in China); Seifart Trial Tr., vol. XIV, afternoon session (June 15, 2010), attached as Ex. 11, at 1980:13-23 (testimony of Jack Landers, indicating that La Suprema provided Banner with "Knauf" wallboard from Brazil).

[18]     *See* Abadi Dep. (Ex. 4) at 240:19-22 (not only did La Suprema not receive any complaints about Knauf Brasil's drywall, but La Suprema was so satisfied with the quality of the drywall that it "wanted more").

[19]     *See* Declaration of Martin Stuermer ("Stuermer Decl."), *Synalovski v. Knauf Plasterboard (Tianjin) Co., Ltd.*, No. 10-41716 (Fla. Cir. Ct. 2010), attached as Ex. 12, at ¶3; Deposition of Martin Stuermer dated Oct. 15, 2010 ("Stuermer Dep. III"), attached as Ex. 13, at 718:4-18 (the "main business" of Knauf Gips is "serving the German market").

drywall to the United States – to an Illinois company through the ports of Cape Canaveral, Florida and Charleston, South Carolina.[20]   But these sales were entirely unrelated to Chinese drywall, and there is no evidence that drywall manufactured by Knauf Gips was defective. Knauf Gips is wholly owned by members of the Knauf family and is not a shareholder in KPT or in any of the other Knauf Defendants.[21]   There are departments within Knauf Gips – including the legal department and the research and development department – which provide services to other Knauf affiliates, including KPT.[22]

   **e)**  **Knauf Insulation**

   Knauf Insulation is a manufacturer and seller of insulation, *not* drywall.  It is a German corporation with its principal place of business in Shelbyville, Indiana.   Although Knauf Insulation has never manufactured or sold drywall, Knauf Insulation was approached by one of its U.S. insulation customers, InEx, in late 2005 for information regarding the availability of drywall manufactured by other Knauf entities overseas.[23]   InEx also sought drywall from various

---

[20] *See* Stuermer Decl. (Ex. 12) at ¶ 5; Deposition of Martin Stuermer dated Aug. 18, 2010 ("Stuermer Dep. I"), attached as Ex. 14, at 142:9-143:10.

[21] *See* Deposition of Manfred Norbert Grundke dated Dec. 15, 2010 ("Grundke Dep."), attached as Ex. 15, at 135:17-24 (Knauf Gips is owned by the "family").

[22] *See* Stuermer Dep. I (Ex. 14) at 95:8-15 (describing the "service department of the Knauf Gips KG" which "provide[s] services to other companies"); Stuermer Dep. III (Ex. 13) at 668:13-23 (services offered by Knauf Gips include legal services and research and development services); I. Knauf Dep. II (Ex. 8) at 478:20-479:3 ("[T]here are departments in Knauf Gips KG that render services to the group . . . that are billed to those companies."); Grundke Dep. (Ex. 15) at 34:14-35:4 (Knauf Gips offers "[r]esearch and development, technical competence centers, legal service, and other supporting activities for which experts are required" by other Knauf affiliates).

[23] *See* Robson Dep. (Ex. 9) at 365:20-366:19 (Knauf Insulation's employees "don't sell drywall"); Deposition of Jeffrey R. Brisley dated Sept. 27, 2010 ("Brisley Dep."), attached as Ex. 16, at 489:1-495:20, 513:2-12 (Knauf Insulation did not approach InEx for the purpose of selling drywall but only "responded to [InEx's] inquiry."); *see also* (continued...)

other international suppliers in 2005 and 2006, including Beijing New Building Materials Public

Ltd. Co. ("BNBM") and Taian Taishan Plasterboard Co., Ltd. in China.[24]  As a courtesy to its

long-time customer and to promote InEx's continued goodwill, Knauf Insulation made inquiries

within the Knauf Group on behalf of InEx, ultimately referring InEx to the Knauf entities in

China as possible sources of drywall.[25]

---

KI0000073, attached as Ex. 17 (Sept. 23, 2005 email from Kurt Heider of Knauf Insulation, relaying InEx's inquiry regarding the availability of "Knauf Gypsum board").

[24]    *See* Deposition of Clayton C. Geary and James F. Geary, Sr. dated Feb. 5, 2010 ("Geary Dep."), attached as Ex. 18, at 60:23-64:4 (InEx received four shipments of Taian Taishan drywall in 2006 which was distributed to U.S. customers through 2007), 114:22-117:4 (InEx was referred to BNBM by a freight company and negotiated and executed a contract for BNBM drywall but ultimately "never got any BNBM product" due to shipping difficulties), 157:3-15; *see also* MDL Distributor Profile for InEx, attached as Ex. 19, at 4 (indicating purchase of 33,000 pieces of drywall manufactured by "Taian Taishaan Plasterboard Co." in 2006); INT/EXT00764-65, attached as Ex. 20, and INT/EXT00771-72, attached as Ex. 21 (unexecuted drywall contracts dated Nov. 4, 2005, identifying InEx as the buyer and including BNBM among the sellers); INT/EXT01208-11, attached as Ex. 22, at INT/EXT01209 (Addendum to Application and Agreement for Documentary Credit for Account of Interior/Exterior Building Supply, L.P. in Favor of HLP/GAC International, Inc., dated Nov. 15, 2005, identifying drywall manufacturer as "Taihe, Shandong Plant II, a Division of Beijing New Building Materials Company Ltd."); INT/EXT00884-86, attached as Ex. 23, at INT/EXT00885 (Apr. 6, 2006 email from Clay Geary of InEx, requesting that Weida Freight "pursue further the possibility of Interior/Exterior purchasing gypsum board from BNBM."); INT/EXT00814-17, attached as Ex. 24 (Application and Agreement for Documentary Credit, dated May 12, 2006, submitted by InEx in favor of BNBM).

[25]    *See* Deposition of Robert F. Claxton dated Sept. 28, 2010 ("Claxton Dep."), attached as Ex. 25, at 87:16-88:23 ("Jeff Brisley was assisting as a courtesy to our customers, because we are not a producer or seller of drywall."); Brisley Dep. (Ex. 16) at 290:5-291:6, 501:4-9 (Knauf Insulation made inquiries to Knauf U.K. on behalf of InEx), 495:23-496:23 ("[W]e responded to inquiries, but we didn't campaign for the sale of Knauf drywall."), 510:3-514:19; *see also* KI0000088, attached as Ex. 26 (Dec. 9, 2006 email from Clay Geary, expressing InEx's appreciation for Knauf Insulation's assistance in connecting InEx with alternate sources of drywall "during a time of hard allocation").

After Knauf Insulation referred InEx to KPT, InEx negotiated with KPT for the purchase of drywall, and the resulting sales contracts were executed between InEx and KPT.[26]   These contracts expressly identify KPT as the seller, state that InEx takes delivery of the shipments at the port of Tianjin, China, and stipulate that any dispute involving the contracts must be arbitrated in Tianjin, P.R.C.[27]   InEx paid KPT directly for these shipments, and Knauf Insulation did not receive any remuneration in connection with KPT's sales of drywall.[28]

### f)   Knauf U.K.

Knauf U.K. is a German corporation, which manufactures drywall and building systems in the United Kingdom, with factories in Sittingbourne and Immingham.  Knauf U.K. played no role in the manufacture of drywall by KPT.  Knauf U.K.'s limited connection to the present litigation stems from the fact that an executive at Knauf U.K. alerted L&W Supply to the possibility of obtaining drywall through KPT in late 2005 and subsequently helped to facilitate communications between L&W and KPT.[29]   The resulting sale of KPT-manufactured drywall was negotiated and executed between L&W and KPT, and the sales contract expressly identified

---

[26]   *See*, *e.g.*, INT/EXT000525, attached as Ex. 27 (Contract No. EX-USD-20051019, dated Oct. 21, 2005).

[27]   *See id.*

[28]   *See*, *e.g.*, Robson Dep. (Ex. 9) at 512:5-10 (Knauf Insulation obtained no "financial advantage" from its referral of InEx to KPT); Brisley Dep. (Ex. 16) at 479:3-21 (no expectation of remuneration for referring InEx to Knauf entities that manufactured drywall), 525:2-526:4 (no discussion of financial benefits for referring InEx to Knauf entities that manufactured drywall).

[29]   *See*, *e.g.*, Robson Dep. (Ex. 9) at 107:4-108:12 (Knauf U.K. was asked to help coordinate communications between "potential manufacturing plants and the USA."); Deposition of Mark Norris dated Nov. 12, 2010 ("Norris Dep. II"), attached as Ex. 28, at 583:1-20 (Knauf U.K. had interactions with L&W but was not involved in the export of KPT-manufactured drywall to the U.S.).

KPT as the seller of the drywall,[30]   Payment for the KPT drywall was made directly to KPT's bank account in Tianjin, and Knauf U.K. did not receive any remuneration from the sale of KPT drywall.[31]

### g)   Knauf AMF

Knauf AMF, a German corporation, is a global manufacturer of suspended ceiling systems, with its head office in Grafenau, Germany and sales offices worldwide.  Knauf AMF does not manufacture drywall and has no discernible connection to the Chinese Drywall litigation.[32]

### h)   Knauf International and GKV

Knauf International and GKV are holding companies.[33]   Neither company manufactures or sells drywall, and neither company has employees.[34]   Knauf International, a German

---

[30]   *See* L&W-MDL_000143, attached as Ex. 29 (Contract for Order No. TJ-USA-0601).

[31]   *See* L&W-MDL_026361, attached as Ex. 30 (wire transfer payment request form); L&W-MDL_026365, attached as Ex. 31 (wire transfer payment request form); L&W-MDL_021483, attached as Ex. 32 (wire transaction detail); L&W-MDL_021492, attached as Ex. 33 (wire transaction detail); L&W-MDL_002340, attached as Ex. 34 (internal L&W email); L&W-MDL_026367-68, attached as Ex. 35 (internal L&W email).

[32]   *See* Stuermer Dep. I (Ex. 14) at 124:10-11 ("AMF, they are not producing plasterboards.").

[33]   *Id*. at 83:2-5 ("Knauf International is only a holding company which holds activities or investments in other companies of the Knauf Group."), 143:14-18, 166:1-3 ("Knauf Verwaltungsgesellschaft is only a holding company with no employees."), 206:24-207:5; Deposition of Hans Peter Ingenillem, dated July 25, 2010 ("Ingenillem Dep. I"), attached as Ex. 36, at 71:10-13, 235:10-13; Grundke Dep. (Ex. 15) at 30:9-31:3, 117:10-13.

[34]   Stuermer Dep. I (Ex. 14) at 83:6-7 ("[T]here's no one working for Knauf International."), 166:1-3 ("Knauf Verwaltungsgesellschaft is only a holding company with no employees."), 173:16-17; Deposition of Martin Stuermer, dated Aug. 19, 2010 ("Stuermer Dep. II"), attached as Ex. 37, at 397:5-8 (GKV is "only a holding company which holds investments.   They do not sell plasterboards."), 546:3-15 (Knauf (continued...)

corporation, is a holding company for the majority of the Knauf affiliates worldwide, including KPT, Knauf Wuhu and Knauf Dongguan.[35]   Knauf International is itself a wholly owned subsidiary of GKV, a German limited partnership.[36]   GKV, in turn, is wholly owned by members of the Knauf family.[37]

### 3.     Odor Related Complaints

KPT was first alerted to the possibility of an odor issue in connection with its drywall in late October 2006, approximately one month after its last order of drywall had shipped to the United States.[38]   KPT was advised by La Suprema that some of the drywall distributed to Banner in Florida was "smelling bad."[39]   Initial communications from La Suprema to KPT in late October indicated that only a handful of homes were at issue, with WCI Communities being the

---

International has no employees and "no administration" and pays no salaries); Grundke Dep. (Ex. 15) at 34:8-10 (GKV "does not have [its] own employees or any own business.").

[35]     Stuermer Dep. I (Ex. 14) at 46:18-24 (KPT, Knauf Wuhu and Knauf Dongguan are subsidiaries of Knauf International); Ingenillem Dep. I (Ex. 36) at 235:10-13 ("Knauf International is a major holding company held by GKV, and Knauf International has most of the international Knauf companies."), 327:9-21 (Knauf International holds "[a] lot of companies in all the countries where Knauf is, almost all."), 328:10-21; I. Knauf Dep. II (Ex. 8) at 418:10-14, 421:17-422:8 (Knauf International owns KPT, Knauf Wuhu and Knauf Dongguan).

[36]     Stuermer Dep. I (Ex. 14) at 44:23-45:1 ("Knauf International GmbH is a 100 percent subsidiary of the Gebrueder Knauf Verwaltungsgesellschaft KG."); Stuermer Dep. III (Ex. 13) at 772:20-23; I. Knauf Dep. II (Ex. 8) at 418:14-17.

[37]     Grundke Dep. (Ex. 15) at 117:10-17 (GKV's shareholders are Knauf family members).

[38]     See KPT0023640, attached as Ex. 38 (Nov. 13, 2006 email from Mark Norris, confirming that KPT was first advised of an odor problem on Oct. 27, 2006).

[39]     See KPT012285, attached as Ex. 39 (Oct. 27, 2006 email from Cecilia Wang, relaying report from La Suprema that "Knauf boards is smelling bad").

principal homebuilder affected.[40]   La Suprema later speculated that as many as thousands of homes could be involved,[41] but a representative from KPT who travelled from China to Florida to address the reported odor problem was informed in mid-November that there had been only a handful of actual complaints.[42]   At the end of that month, WCI Communities advised KPT in writing that only 50 of its homes were at issue.[43]   At this time, KPT had received no odor-related complaints regarding any of the drywall – over two million square feet altogether – that had been shipped months before to InEx[44] and to L&W.[45]   Indeed, L&W was alerted to the alleged odor problems associated with the drywall distributed by Banner but concluded that its own supply of KPT-manufactured drywall had been unaffected.[46]   L&W did not receive its first odor-related

---

[40]   *See* KPT0023888, attached as Ex. 40 (Oct. 31, 2006 email from Rothchilt to Cecilia Wang, forwarding address of affected home and indicating that there were "4 to 5 houses with the same problem."); KPT0051335-36, attached as Ex. 41 (Oct. 28, 2006 email from Rothchilt to Cecilia Wang, forwarding a message from "Salomon's buyer," who indicated that "WCI is the main builder" and that "G. L. Homes is also having a problem.").

[41]   *See* KPT0024284, attached as Ex. 42 (Nov. 07, 2006 email from Cecilia Wang to Mark Norris, explaining that Salomon Abadi of La Suprema had called, suggesting that "it will be a big problem not only in Miami but all over the USA market, maybe cover thousand of houses.").

[42]   *See* Deposition of Mark P. Norris dated Nov. 11, 2010 ("Norris Dep. I"), attached as Ex. 43, at 303:23-304:5 (KPT was aware of six complaints in mid-November 2006); Norris Dep. II (Ex. 28) at 642:2-643:3 (KPT's director of sales was apprised of only two complaints when he visited Florida in November 2006).

[43]   *See* KPT0023650-51, attached as Ex. 44 (Nov. 30, 2006 letter from Keith Hurand of WCI Communities, Inc., making reference to the "fifty homes at issue").

[44]   *See* Norris Dep. II (Ex. 28) at 756:4-759:9 (In 2006 and 2007, Norris had no reason to believe that InEx had received defective drywall from KPT.).

[45]   *See* L&W-MDL_022713-18, attached as Ex. 45, at L&W-MDL_022713 (internal L&W email).

[46]   *See id.*; *see also* L&W-MDL_024462-66, attached as Ex. 46 (internal L&W email).

complaint in connection with Chinese-manufactured drywall until several months later, in August 2007, and L&W believed that complaint to be "isolated."[47]  InEx has claimed that it was not aware of any problems with its Chinese-manufactured drywall until much later, in early 2009.[48]  Significantly, however, invoices generated by InEx in early 2006 expressly stipulate that certain customer orders were *not* to be filled with drywall manufactured by Knauf affiliates, establishing that InEx should have been aware of customer misgivings regarding the Chinese-manufactured drywall from an early date.[49]  InEx did not notify KPT of any complaints prior to 2009.[50]

Given the large volume of KPT-manufactured drywall exported to the United States, the small number of complaints received, and the localized nature of those complaints, KPT concluded that the odor issue must have been confined to an isolated batch.[51]  KPT advised

---

[47]    *See* KI0000048-51, attached as Ex. 47, at KI0000048 (Aug. 15, 2007 email from Tim Mahaffey, indicating that a complaint from Lennar Homes was "the only complaint we have had so far, and I believe it is isolated").

[48]    *See* Geary Dep. (Ex. 18) at 271:18-272:11 (InEx received its first indication of a possible problem with KPT-manufactured drywall "very close to Mardi Gras" of 2009), 314:8-315:1 ("The first notice that we had was we got an e-mail that's – I think it was January 12th from someone saying – a Wall Street Journal article, I believe it was, was January 12 of '09."), 368:6-369:6 (prior to 2009, no one at InEx had reported anything unusual about the KPT-manufactured drywall), 389:19-22 (no reports of odor when KPT-manufactured drywall was off-loaded and warehoused).

[49]    *See id.* at 316:11-325:21.  In addition, an InEx executive specifically requested domestic USG drywall for his own home refurbishment in 2006.  *See id.* at 328:17-332:5.

[50]    *See id.* at 368:17-370:4 (InEx first advised KPT of potential problems with KPT drywall no earlier than 2009 through a conference call with counsel.); Norris Dep. II (Ex. 28) at 756:4-18 (Asked when InEx first told KPT that it had received "bad drywall," Norris replied "I don't think I've ever been told.").

[51]    *See, e.g.*, Norris Dep. I (Ex. 43) at 303:23-304:5 ("[A]t the time, we thought it was an isolated batch problem.  We thought it was isolated to only the houses that had been complained...."); *see also* Deposition of Hans-Ulrich Hummel dated June 29, 2011 (continued...)

Rothchilt on November 13, 2006 to "stop all further sales" of the suspect drywall, a message that was communicated to Banner no later than the next day.[52]  KPT also agreed to replace all of the KPT-manufactured drywall in the possession of Banner and, in addition, commissioned an independent environmental consulting firm, the Center for Toxicology and Environmental Health, LLC ("CTEH"), to investigate the source of the odor and to conduct air quality and safety testing of affected homes.  In late November, CTEH concluded that the KPT drywall was emitting "sulfur-containing compounds" but that the measured concentrations of these compounds in affected homes were "not at levels that should be considered a public health concern."[53]  KPT promptly circulated these findings to affected homebuilders and distributors.[54]

---

("Hummel Dep."), attached as Ex. 48, at 1115:5-1115:22 (Hummel believed the problem to be "very limited," affecting "[m]aybe a handful or maybe 10 or 20" homes.).

[52]  *See* BANNER-MDL00007341, attached as Ex. 49 (Nov. 13, 2006 letter from Mark Norris to Rothchilt, asking Rothchilt to "stop all further sales of our plasterboards which were delivered under the above reference [sic] contract."); BANNER-MDL00007340-41, attached as Ex. 50 (Nov. 14, 2006 email to Donald Coblentz of Banner , forwarding the Nov. 13, 2006 "stop sale" letter."); *see also* Norris Dep. I (Ex. 43) at 301:1-302:23 (KPT sent the "stop sale" letter to Rothchilt, despite uncertainty about the source of the odor, because it was the "responsible thing to do."); Norris Dep. II (Ex. 28) at 423:22-425:8 (KPT intended that the information in the "stop sale" letter be communicated to downstream customers); Seifart Trial Tr., vol. XII, afternoon session, (June 14, 2010), attached as Ex. 51, at 1737:24-1741:9 (Despite receipt of the "stop sale" letter, Banner did not advise its customers to stop using KPT-manufactured drywall).

[53]  *See* CTEH, Summary of Air Sampling Results (Nov. 29, 2006) [hereinafter Air Sampling Results], attached as Ex. 52, at 3.

[54]  *See*, *e.g.*, KPT0074162-67, attached as Ex. 53 (Nov. 30, 2006 email forwarding CTEH findings to Banner); KPT0074168-73, attached as Ex. 54 (Nov. 30, 2006 email forwarding CTEH findings to WCI Communities); KPT0074174-79, attached as Ex. 55 (Nov. 30, 2006 email forwarding CTEH findings to GL Homes).

### 4.    Nature of Defect

The ultimate cause of the odor associated with KPT's defective drywall appears to have been the presence of unusual shale impurities in the raw gypsum supplied to KPT by a local Chinese mine.[55]  The fact that the gypsum supplied to KPT contained a small proportion of shale impurities was unremarkable, though:  shale impurities are routinely present in gypsum deposits[56] and in fact are not normally screened out of commercial gypsum supplies.[57]  In the drywall industry, such shale impurities are non-problematic so long as an acceptable level of pure gypsum is maintained, for whatever shale impurities may be present in raw gypsum are typically broken down in the course of the drywall manufacturing process and incorporated into the finished plasterboard product as a harmless, non-reactive filler.[58]

---

[55]    *See* Am. Indus. Hygiene Ass'n, *White Paper on Corrosive Drywall* (Oct. 10, 2010), *available at* http://www.aiha.org/news-pubs/govtaffairs/Documents/W-Corrosive%20Drywall-10-10-10.pdf, attached as Ex. 56, at 5 (Chinese Drywall "seems to have originated from a Chinese mine where high-sulfur gypsum was mixed with oil shale."); Deposition of Michael G. Ward dated Nov. 18, 2011 ("Ward Dep."), attached as Ex. 57, at 135:3-7 (the "evidence from China" indicates that shale can contain materials that produce sulphurous odors).

[56]    *See* Expert Report of Michael G. Ward dated Nov. 2011("Ward Expert Report"), attached as Ex. 58, at WARD-SYN-002702 ("Shale is not uncommon in gypsum deposits, being a compacted mud in a multiple layered form.").

[57]    *See id.* ("If shale is present in commercial gypsum deposits it would not normally be removed, simply regarded as an inert impurity.").

[58]    *See id.* at WARD-SYN-002691 ("The presence of shale is not a problem to the board maker, as shale is simply a compacted mud or clay, its laminar structure means it is easily broken down in the milling process and effectively an inert filler."); *see also* Deposition of Martin Halbach dated June 9, 2011 ("Halbach Dep."), attached as Ex. 59, at 614:22-619:21 (when Halbach inspected the KPT plant in November 2006, he noted an odor in connection with the raw gypsum supply but found that the odor was completely extinguished during the early stages of the manufacturing process and did not affect the finished plasterboard).

The shale impurities affecting KPT's gypsum supply ultimately (and surprisingly) proved uncharacteristically problematic because they contained reactive sulfur compounds which not only survived the drywall manufacturing process but continued to be reactive in the finished plasterboard, gradually releasing gaseous sulfur compounds into the home environment.  Such an outcome was not merely extraordinary and unexpected – KPT had never received odor-related complaints before – but unprecedented in the drywall manufacturing industry.  Indeed, the evidentiary record contains repeated testimony, from individuals with long experience in the drywall industry, indicating that the defect at the heart of this litigation could not have been anticipated or predicted by KPT or any other drywall manufacturer.[59]  Far from emitting gases into the environment, gypsum is well-known for its ability to *absorb* gases from the environment.[60]  Because off-gassing of sulfur compounds from drywall in the home was a

---

[59]     *See*, *e.g.*, Ward Expert Report (Ex. 58) at WARD-SYN-002702 ("With respect to the specific case where the presence of organic matter has apparently resulted in sulphurous emissions from the finished product I am personally unaware of any other occasion where this has occurred and do not believe it could have been predicted or anticipated."); Ward Dep. (Ex. 57) at 131:3-10, 296:7-20, 297:14-298:6, 301:19-302:15, 307:4-309:8 (During the time that Ward chaired the working group on indoor air quality for the trade association Eurogypsum, the subject of problem emissions, "sulphurous or otherwise," was never raised in connection with gypsum wallboard.), 309:9-310:2 (no awareness of any instance of "sulphurous vapors emitting from drywall used in construction" prior to "2006 and the experience with the Chinese Drywall in the Southeastern United States"); Norris Dep. II (Ex. 28) at 779:14-780:19 (Prior to October 2006, Norris had never received an odor complaint and had never heard of anyone in the industry experiencing an odor-related problem.); Deposition of David N. Gregory dated Sept. 13, 2011 ("Gregory Dep. I"), attached as Ex. 60, at 268:11-269:9 (The defect was a "freak occurrence" without precedent in Gregory's twenty years in the industry.); Gregory Dep. II at (Ex. 6) 692:5-10 ("[T]his was such an unusual phenomenon or occurrence . . . that even to this date, it has not happened anywhere else other than this batch of boards that went to the U.S.").

[60]     *See* Ward Expert Report (Ex. 58) at WARD-SYN-002703 ("[G]ypsum boards are an excellent medium for providing an improvement in indoor air quality, as they are . . . porous and capable of having scavengers for specific air pollutants incorporated in their core.").

phenomenon that had never been previously encountered, quality control screening for sulfur or sulfides – whether in raw material or finished plasterboard – was an unheard of practice in the drywall industry at the time that the defective drywall was manufactured by KPT.[61]

Even today, off-gassing from reactive Chinese-manufactured drywall ("Chinese Drywall") remains to some extent a mystery.   As reported by the CPSC's testing firm, "emissions from Chinese drywall represent a complex, dynamic, unstable mixture of low-level contaminants" which "may not be present in ambient air for a long enough period of time to permit accurate characterization."[62]   The sulfur compounds within the defective Chinese-manufactured drywall that release the odor-causing gases have not been definitively identified, and the chemical mechanisms underlying the off-gassing process remain unclear.[63]

### 5.   Corrosion-Related Complaints

After the initial handful of odor-related complaints, KPT concluded that it had successfully isolated all or nearly all of the problem drywall and that the defect amounted to

---

[61]   Ward Dep. Ex. 19 (Ward Expert Opinion), attached as Ex. 61 ("I have never come across or heard of any gypsum wallboard manufacturing process that includes specific testing for the presence of Sulphur, other than in the form of Sulphate, in either the raw materials or finished product."); *see also* I. Knauf Dep. II (Ex. 8) at 814:2-815:4 (no screening for sulfur compounds in 2005-2006 because problems related to sulfur content were "something that we had never encountered").   KPT has since instituted a quality control check for odor emissions.  *See id*. at 815:1-9; Hummel Dep. (Ex. 48) at 1089:11-1090:15.

[62]   Envtl. Health & Eng'g, Final Report on an Indoor Environmental Quality Assessment of Residences Containing Chinese Drywall (Jan. 28, 2010), *available at* http://www.cpsc.gov/library/foia/foia10/os/51homeFinal.pdf [hereinafter Envtl. Quality Assessment], attached without appendices as Ex. 62, at 3.

[63]   *See* Nat'l Ass'n of Home Builders, *Imported Problematic Drywall:   Identification Strategies and Remediation Guidelines* (March 2011), attached as Ex. 63, at 16 ("Although various theories have been proposed, the chemistry of problematic drywall has yet to be resolved.").

nothing more than an unpleasant, self-evident smell.[64]  KPT had no reason to suspect a more widespread problem and was wholly dependent on distributors and others in the supply chain in the United States to alert it to any further issues.  It was not until mid-2008 that the problem resurfaced in earnest with the first corrosion-related complaints.  The first claims of corrosion in association with Chinese-manufactured drywall came to KPT via L&W, based on reports from one of L&W's customers, Lennar Homes, a major homebuilder in the Florida area.[65]

As noted above, the emission of sulfur-bearing gases from drywall was unprecedented. That the trace levels of sulfur-bearing gases emitted by KPT's drywall would or could cause corrosion of plumbing, wiring and electronics in the home was even further beyond the reach of reasonable expectation.  Drywall emissions had never before been known to cause corrosion of any sort in the home environment.[66]

In fact, the link between defective Chinese-manufactured drywall and corrosion in the home remains to some extent unexplained.  Despite multiple studies conducted by various federal, state and private entities, the CPSC's testing firm has concluded that there is "no consensus regarding the cause . . . of the adverse environmental conditions found in homes

---

[64]    Norris Dep. I (Ex. 43) at 303:23-304:5 ("[A]t the time, we thought it was an isolated batch problem.  We thought it was isolated to only the houses that had been complained. . . .  We thought we'd put a fence around it."); Norris Dep. II (Ex. 28) at 699:16-700:2 ("As I've said several times the last couple of days, we genuinely, I genuinely thought that it was an isolated batch that we managed to capture."); Deposition of Isabel Corinna Knauf dated Dec. 7, 2010 ("I. Knauf Dep. I"), attached as Ex. 64, at 329:15-17 ("We thought that it was a very limited problem and that the problem was solved.").

[65]    *See* L&W-MDL_027561-65, attached as Ex. 65 (demand letter from counsel); *see also* L&W-MDL_024353-60, attached as Ex. 66.

[66]    *See* Ward Expert Opinion (Ex. 61) ("I have never ever come across or heard of gypsum wallboard causing corrosion or any other damage to construction materials under any circumstances.").

containing Chinese drywall."[67]  Even the identity of the gases responsible for that corrosion is in dispute.  According to Plaintiffs' expert, the corrosion associated with Chinese Drywall is primarily attributable to the emission of three reduced sulfur gases – hydrogen sulfide, carbonyl sulfide and carbon disulfide.[68]  However, carbonyl sulfide has been detected at similar concentrations in homes with and without defective Chinese-manufactured drywall,[69] and the CPSC's study concluded that carbon disulfide concentrations, while higher (though not significantly higher) in affected homes, were not significantly correlated to corrosion.[70]  In fact, the concentrations of carbonyl sulfide and carbon disulfide found in affected homes are "within the range . . . present in human breath."[71]

Hydrogen sulfide appears more likely to be the key to the corrosion issue, for hydrogen sulfide has been detected at statistically significantly higher concentrations in homes containing defective Chinese-manufactured drywall than in control homes.[72]  Moreover, hydrogen sulfide

---

[67]   Envtl. Quality Assessment, *supra* note 62 (Ex. 62) at 3.

[68]   *See* Deposition of Lori A. Streit dated Feb. 12, 2010, attached as Ex. 67, at 55:2-56:1 (identifying hydrogen sulfide, carbonyl sulfide, and carbon disulfide as the three primary corrosive agents); Germano Default Hearing Tr., vol. I, afternoon session (Feb. 19, 2010), attached as Ex. 68, at 56:25-58:24 (testimony of expert witness John R. Scully, suggesting that hydrogen sulfide, carbonyl sulfide, carbon disulfide *and* elemental sulfur could be contributing to corrosion in affected homes).

[69]   Expert Report of Phillip T. Goad dated Dec. 30, 2009 ("Goad Expert Report"), attached as Ex. 69, at 4 ("Carbonyl sulfide was consistently detected in both Subject and Control houses, at similar concentrations.").

[70]   Envtl. Quality Assessment, *supra* note 62 (Ex. 62) at 102.

[71]   *See* Goad Expert Report (Ex. 69) at 4.

[72]   *See id.* at 3 ("Of the chemicals detected, only hydrogen sulfide appears to have an average level that is while only slightly higher, statistically significant, in houses with Chinese drywall compared to control houses."); *see also* Envtl. Quality Assessment, *supra* note 62 (Ex. 62) at 113, 114 (concluding that "both indoor formaldehyde and
(continued...)

concentrations in affected homes were "found to be positively and significantly associated with silver and copper corrosion rates."[73]   However, hydrogen sulfide has been detected in some *outdoor* air samples at concentrations higher than inside affected homes, suggesting a possible external source of hydrogen sulfide contamination.[74]   Moreover, the investigation commissioned by the CPSC detected hydrogen sulfide in affected homes at concentrations well below the levels associated with corrosion-related problems under prevailing ISA standards.[75]   In fact, the rates of copper corrosion observed in affected homes were "1 to 2 orders of magnitude greater than predicted based on hydrogen sulfide alone," a fact which led Environmental Health & Engineering to conclude, in its report for the CPSC, that corrosion associated with defective Chinese-manufactured drywall "may not be solely attributable" to hydrogen sulfide or to any of

---

hydrogen sulfide concentrations were associated with silver and copper corrosion" and suggesting that "hydrogen sulfide is a primary corrosive agent in this study because both silver and copper are highly sensitive to $H_2S$"); Hernandez Trial Tr. vol. III, morning session (Mar. 17, 2010), attached as Ex. 70, at 547:10-548:1 (testimony of Richard J. Lee, explaining that the "driving force" behind the corrosion observed in the Hernandez home was the "production of hydrogen sulfide gas").

[73]   Envtl. Quality Assessment, *supra* note 62 (Ex. 62) at 102.

[74]   *See* Goad Expert Report (Ex. 69) at 3 ("[I]n the CTEH, CPSC and FDOH studies the highest hydrogen sulfide concentrations were in outdoor air samples."); CTEH, Knauf Tianjin Plasterboard Evaluation (January 29, 2009) [hereinafter Plasterboard Evaluation], attached without appendices as Ex. 71, at 11 (elevated concentrations of hydrogen sulfide in the outdoor air indicated "other sources of hydrogen sulfide in the area").

[75]   *See* Envtl. Quality Assessment, *supra* note 62 (Ex. 62) at 80, 89, 91 (indicating that the maximum detected concentration of hydrogen sulfide in affected homes was 2.23 ppb); Int'l Soc'y of Automation, ISA-S71.04-1985, Environmental Conditions for Process Measurement and Control Systems:  Airborne Contaminants at 13-14 (1985), attached as Ex. 72 (an environment where "corrosion is not a factor in determining equipment reliability" is characterized by hydrogen sulfide concentrations of under 3ppb).

the other reduced sulfur gases analyzed in its study.[76]  An additional, as-yet unidentified factor appears to be at work.

Given the uncertainties still surrounding the corrosion issue – after years of intense sampling, testing, inquiry and study – it is unsurprising that early analyses of Chinese Drywall off-gassing did not contain any suggestion of a potential corrosion risk.  In fact, data developed in 2006 and 2007 indicated that hydrogen sulfide – now believed to be a primary contributing factor in Chinese Drywall-related corrosion – was *not* present at elevated concentrations in homes containing KPT-manufactured drywall.   Indeed, CTEH concluded in 2006 that concentrations of hydrogen sulfide in affected homes were consistent with the concentrations found outdoors or in unaffected homes.[77]  Accordingly, neither KPT nor any of the other Knauf Defendants were aware, or had any reason to be aware, that the off-gassing of KPT drywall posed any risk of corrosion until 2008, when the first actual reports of drywall-related corrosion began to surface.[78]

---

[76]     Envtl. Quality Assessment, *supra* note 62 (Ex. 62) at 115.

[77]     CTEH, Air Sampling Results, *supra* note 53 (Ex. 52) at 2 ("These data indicate that the homes built with the Knauf Tianjin product did not have elevated levels of hydrogen sulfide."); *see also* CTEH, Knauf Tianjin Plasterboard Evaluation, *supra* note 74 (Ex. 71) at 11 ("These data indicate that the homes built with the Knauf Tianjin product did not have elevated levels of hydrogen sulfide compared to outdoors or to homes built with alternative products.").

[78]     *See* Norris Dep. II (Ex. 28) at 393:4-395:2, 641:8-16 (Norris first heard of corrosion problems linked to KPT drywall in 2008); I. Knauf Dep. I (Ex. 64) at 341:12-13 ("The tarnishing issue did not arise until approximately 2008."); Gregory Dep. I (Ex. 60) at 104:17-21 ("[W]e didn't see any issue with corrosion until the end of 2008."); Hummel Dep. (Ex. 48) at 983:23-984:5 (Hummel became aware of a corrosion problem in "2008/2009"); Halbach Dep. (Ex. 59) at 451:10-24 (Halbach learned of the corrosion problems in 2008); Deposition of Hans Peter Ingenillem dated July 26, 2011 ("Ingenillem Dep. II"), attached as Ex. 73, at 594:9-20 (Ingenillem became aware of the corrosion issue in 2008).

6.      **Lack of Health Implications**

Since CTEH delivered its initial findings in November 2006, there has been broad agreement on one central fact:  off-gassing from Chinese drywall does not implicate human health and safety in any manner.  From the inception of the litigation, various arms of federal and state health and safety watch dogs have issued report after report assessing potential health effects associated with the drywall.  None of these have found a risk of personal injury to occupants of homes containing reactive Chinese drywall generally nor have they found any scientific or medical evidence of documented harm to an individual.[79]  There is simply no data to suggest a health risk to be found anywhere in the medical literature.  Indeed, environmental studies of Chinese drywall exposure reviewed by the CDC "failed to document environmental exposures at levels" that could even "plausibly result in adverse health effects."[80]  Far from suggesting a health risk, the CDC found that the "best scientific evidence available" did not even support "undertaking a long-term health study."[81]  The following sources in addition to the CDC support the absence of a health risk associated with Chinese Drywall:

---

[79]     At least one court has acknowledged this lack of data suggesting a human health risk. *See* Order Approving Class Settlement, *Harrell v. S. Kendall Constr. Corp.*, No. 2009-08401 CA 42 (Fla. Cir. Ct. Mar. 4, 2011), attached as Ex. 74, at 4 (noting absence of "current scientifically or medically documented proof that defective drywall caused actionable or bodily injuries").

[80]     Div. of Envtl. Hazards & Health Effects, Nat'l Ctr. for Envtl. Health, Centers for Disease Control and Prevention, *Summary of State Health Department Reviews of Deaths Reported to and Investigated by the Consumer Product Safety Commission Related to Exposure to Imported Drywall* (Jan. 3, 2011), *available at* http://www.cpsc.gov/info/drywall/cdcdrywall01032011.pdf , attached as Ex. 75, at 3.

[81]     *See* Press Release, U.S. Consumer Prod. Safety Comm'n & U.S. Dep't of Housing and Urban Dev., *CPSC Completes Final Studies to Help Affected Homeowners Remediate Problem Drywall* (Sept. 15, 2011), *available at* http://www.cpsc.gov/cpscpub/prerel/prhtml11/11327.html, attached as Ex. 76.

- Div. of Envtl. Hazards & Health Effects, Nat'l Ctr. for Envtl. Health, Centers for Disease Control and Prevention, *Summary of State Health Department Reviews of Deaths Reported to and Investigated by the Consumer Product Safety Commission Related to Exposure to Imported Drywall* (Jan. 3, 2011), *available at* http://www.cpsc.gov/info/drywall/cdcdrywall01032011.pdf (Ex. 75), at 2 (Studies conducted by the CPSC and other government agencies concludedthat "none of the sulfur compounds found in indoor air were at concentrations historically associated with human health effects.").

- Nat'l Ctr. for Envtl. Health & Agency for Toxic Substance & Disease Registry, *Imported Drywall and Your Home*, *available at* http://www.cdc.gov/nceh/drywall/docs/ImportedDrywallandYourHome.pdf (last visited Aug. 31, 2012), attached as Ex. 77 ("Compounds found in the CPSC's evaluations of the drywall were not at levels historically linked to human health effects.").

- U.S. Consumer Prod. Safety Comm'n, Draft Indoor Air Study (2009), *available at* http://www.cpsc.gov/info/drywall/TabC.pdf, attached without appendices as Ex. 78, at 19 (Reduced sulfur compounds were generally found at concentrations "below levels set by EPA, ATSDR and others as health guidelines . . . .").

- Am. Indus. Hygiene Ass'n, *White Paper on Corrosive Drywall* (Oct. 10, 2010), *available at* http://www.aiha.org/news-pubs/govtaffairs/Documents/W-Corrosive%20Drywall-10-10-10.pdf (Ex. 56), at 7 (indicating that a "CDC toxicological evaluation suggested that air contaminant concentrations associated with emissions from CDW are below levels demonstrated to present a health hazard").

- Fla. Dep't of Health, Div. of Disease Control and Health Protection (May 15, 2009), Frequently Asked Questions, *available at* http://www.doh.state.fl.us/environment/community/indoor-air/drywallFAQ.html, attached as Ex. 79 (The Florida Department of Health "has not identified data suggesting an imminent or chronic health hazard at this time.").

- Va. Dep't of Health, Div. of Envtl. Epidemiology, Frequently asked Questions about Drywall Imported from China (Nov. 8, 2010), *available at* http://www.vdh.virginia.gov/epidemiology/DEE/PublicHealthToxicology/docume nts/pdf/chinese%20drywall%20FAQ%20final.pdf, attached as Ex. 80, at 1 ("Current data does not suggest any immediate or chronic health problems associated with Chinese drywall.").

- CTEH, Knauf Tianjin Plasterboard Evaluation (January 29, 2009) (Ex. 71), at 13 ("[T]he measured concentrations [of sulfur-containing compounds] in homes containing the Knauf Tianjin product are not at levels considered a public health concern.").

- Envtl. Health & Eng'g, *Final Report on an Indoor Environmental Quality Assessment of Residences Containing Chinese Drywall* (Jan. 28, 2010), *available at* http://www.cpsc.gov/library/foia/foia10/os/51homeFinal.pdf (Ex. 62), at 116 ("Most of the two-week average concentrations of hydrogen sulfide measured in complaint homes included in this study were below [ATSDR and EPA] health-based benchmarks," and the "levels of carbon disulfide in complaint and non-complaint homes were well below the ATSDR and EPA health-based benchmarks.").

- Nat'l Ass'n of Home Builders, *Imported Problematic Drywall: Identification Strategies and Remediation Guidelines* (March 2011), *available at* http://www.nahb.org/fileUpload_details.aspx?contentID=153298 (Ex. 63), 31 ("No studies in the medical literature were found relating adverse health effects at low concentrations to the types of corrosive species identified during testing performed by federal and state agencies in the homes containing problematic drywall.").[82]

## B.   Overview of the Chinese Drywall Litigation

On June 15, 2009, the Judicial Panel on Multidistrict Litigation transferred all federal actions alleging damages from Chinese Drywall to this Court for coordinated and consolidated pretrial proceedings in MDL 2047 pursuant to 28 U.S.C. § 1407.[83]

Since the creation of the MDL, this Court has worked diligently to manage the nationwide litigation of Chinese Drywall claims. The Court's efforts have included the coordination and oversight of pretrial discovery and motion practice for thousands of individual cases as well as the Omni Complaint class in the MDL.[84] In coordination with numerous state

---

[82]   *See also* Envtl. Health & Eng'g, *Problem Drywall Assessment and Indoor Environmental Quality Evaluation 144 Groesbeek Street and 4 Darden Street Fort Bragg, North Carolina* (February 7, 2011), *available at* http://www.cpsc.gov/info/drywall/ehefeb2011.pdf, attached as Ex. 81, at 7, 73 (Chinese drywall not present in homes subject to CPSC investigation involving highly publicized deaths of infants in Fort Bragg, North Carolina).

[83]   *See* Transfer Order, *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 626 F. Supp. 2d 1346 (J.P.M.L. 2009) (Rec. Doc. No. 1).

[84]   *See, e.g., Payton v. Knauf Gips KG*, No. 2:09-cv-07628 (E.D. La.) (Omnibus I, I(A), I(B), I(C)); *Wiltz v. Beijing New Bldg. Materials Public Ltd. Co.*, No. 2:10-cv-00361 (E.D. La.)
(continued...)

court judges also overseeing Chinese Drywall-related litigation, this Court has endeavored to achieve consistency and finality in the resolution of this litigation.[85]

In order to accomplish its goals, the Court appointed a Plaintiffs' Liaison Counsel ("PLC"), a Defendants' Liaison Counsel ("DLC"), and a Homebuilders and Installers Liaison Counsel to coordinate service and filings, establish a document depository, and receive and distribute pleadings, orders and motions.[86]   The Court also created a Plaintiffs' Steering Committee and a Defendants' Steering Committee to coordinate and conduct pretrial discovery, prepare and respond to pleadings and motions, attend court status conferences and hearings,

---

(Omnibus II, II(A), II(B), II(C)); *Gross v. Knauf Gips KG*, No. 2:09-cv-06690 (E.D. La.) (Omnibus III, III(A)); *Rogers v. Knauf Gips KG*, No. 2:10-cv-00362 (E.D. La.) (Omnibus IV, IV(A), IV(B), IV(C)); *Amato v. Liberty Mut. Ins. Co.*, No. 2:10-cv-00932 (E.D. La.) (Omnibus V); *Hernandez v. AAA Ins.*, No. 2:10-cv-03070 (E.D. La.) (Omnibus VI); *Abel v. Taishan Gypsum Co., Ltd.*, No. 2:11-cv-00080 (E.D. La) (Omnibus VII); *Abreu v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 2:11-cv-00252 (E.D. La.) (Omnibus VIII); *Haya v. Taishan Gypsum Co., Ltd.*, No. 2:11-cv-01077 (E.D. La.) (Omnibus IX); *Block v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 11-cv-1363 (E.D. La.) (Omnibus X); *Benoit v. Lafarge S.A.*, Case No. 11-cv-1893 (E.D. La.) (Omnibus XI); *Arndt v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 11-cv-2349 (E.D. La.) (Omnibus XII); *Cassidy v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 11-cv-3023 (E.D. La.) (Omnibus XIV).

[85]   The Court has consulted with the Honorable Joseph Farina of the 11th Judicial Circuit Court of Florida (Dade County) and the Honorable Charles Greene of the 17th Judicial Circuit Court of Florida (Broward County).  *See, e.g.*, Transcript of Status Conference at 2:17-3:17 (Oct. 14, 2010) (Rec. Doc. No. 12444) (comments of J. Fallon praising "the help of state court judges" and noting his reliance on "their wisdom, on their suggestions in trying to gather all of the cases and move them forward").

[86]   *See* Pretrial Order No. 3 (Rec. Doc. No. 21) (appointing Plaintiffs' Liaison Counsel, Russ Herman); *see* Pretrial Order No. 4 (Rec. Doc. No. 22) (appointing Defendants' Liaison Counsel, Kerry J. Miller); Pretrial Order No. 18 (Rec. Doc. No. 414) (appointing Homebuilders and Installers Liaison Counsel, Phillip A. Wittmann).

negotiate and enter into stipulations, and pursue all settlement options.[87]   In March 2010, the Court appointed State and Federal Coordination Committees "to assist the Court, the litigants and the judicial system to facilitate coordination between this MDL and the various state court cases."[88]   The Court also created an Insurer Steering Committee and appointed Lead Counsel for the Insurer Steering Committee.[89]

The Court has employed "Omni" complaints to assist the parties in gathering all interested and affected entities together in a coordinated manner.[90]   Intervention Omni complaints have been filed on behalf of thousands of Plaintiffs suing more than a thousand Defendants, including the Knauf Defendants and other manufacturers of Chinese Drywall,[91] as well as numerous importers, builders, suppliers and installers of Chinese Drywall, their insurers and other defendants.

---

[87]   *See* Pretrial Order No. 7 (Rec. Doc. No. 143) (creating the DSC ); Pretrial Order No. 8 (Rec. Doc. No. 144-2) (creating the PSC and appointing lead counsel of the PSC, Arnold Levin).

[88]   *See* Pretrial Order No. 19 (Rec. Doc. No. 1871) (appointing a Plaintiffs' State/Federal Coordination Committee and a Defendants' State/Federal Committee).

[89]   *See* Pretrial Order No. 20 (Rec. Doc. No. 2369) (appointing Insurer Steering Committee and Lead Counsel for the Insurer Steering Committee, Judy Y. Barrasso).

[90]   *See* Transcript of Status Conference at 4-5 (June 24, 2010) (Rec. Doc. No. 12443) (recognizing that omnibus complaints serve as a vehicle to "effectively and efficiently" serve hundreds of defendants and evaluate the "whole census").

[91]   The other Chinese Drywall manufacturer defendants include Taishan Gypsum Co., Ltd. ("Taishan"), BNBM, China National Building Material Co., Ltd. ("CNBM"), and related entities.

In the spring of 2010, the Court resolved ten bellwether cases involving properties in Virginia and Louisiana.[92]  In connection with these bellwether cases, and after considering the testimony of experts concerning the effects of Chinese Drywall, this Court made numerous findings of fact regarding the scope of remediation of Plaintiffs' homes.[93]  In June 2010, an additional Chinese Drywall claim was tried in Miami-Dade County circuit court.[94]  The jury returned its verdict on June 18, 2010, finding KPT 35% liable, and various distributors collectively 65% liable, for damages sustained by Florida homeowners Armin G. Seifart and Lisa M. Gore Seifart.[95]  The Seifart trial and the various bellwether trials have collectively served as a useful tool for all litigants involved in the Chinese Drywall litigation and have provided an indispensable background for settlement negotiations.[96]

---

[92]    *See Hernandez v. Knauf Gips KG*, No. 2:09-cv-06050 (E.D. La. May 11, 2010) (Rec. Doc. No. 3012) (one case); *Germano v. Taishan Gypsum Co., Ltd.*, No. 2:09-cv-06687 (E.D. La. May 11, 2010) (Rec. Doc. No. 3013) (seven cases).  Two additional bellwether cases, *Campbell v. Knauf Plasterboard (Tianjin) Co. Ltd.*, No. 2:09-cv-7628 (E.D. La.) and *Clement v. Knauf Plasterboard (Tianjin) Co. Ltd.*, No. 2:09-cv-7628 (E.D. La.), were settled on the eve of trial on June 18, 2010.  *See* Minute Entry (June 18, 2010) (Rec. Doc. No. 3830).

[93]    *See In re Chinese Manufactured Drywall Prods. Liab. Litig.* (*Germano*), 706 F.Supp.2d 655 (E.D.La. 2010) (Findings of Fact and Conclusions of Law); *In re Chinese Manufactured Drywall Prods. Liab. Litig.* (*Hernandez*), No. MDL 2047, 2010 WL 1710434 (E.D.La. Apr. 27, 2010) (Findings of Fact and Conclusions of Law).

[94]    *See* Final Judgment Against Banner Supply Co., *Seifart v. Banner Supply Co.*, No. 09-38887 CA (42) (Fla. Cir. Ct., Jan. 10, 2011), attached as Ex. 82.

[95]    *See id.*

[96]    *See* Hon. Eldon E. Fallon, Jeremy T. Grabill & Robert Pitard Wynne, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2367 (2008) (concluding that the "use of bellwether trials proves on balance an effective tool in resolving complex multidistrict litigation"); *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997) ("The notion that the trial of some members of a large group of claimants may provide a basis for enhancing prospects of settlement or for resolving common issues or claims is a sound one that has achieved general acceptance by both bench and bar. . . .  The reasons for (continued...)

In the many months since the resolution of the bellwether cases and the conclusion of the Seifart trial, there has been widespread jurisdictional and merits discovery of the Knauf Defendants, including the production of over half a million pages of documents and the taking of over two dozen days of deposition testimony in Hong Kong, Germany, the United Kingdom and the United States.

This extensive history of litigation-related activity forms the backdrop for the proposed settlement agreement currently before the Court.  Negotiations between the settling parties were informed by an extraordinarily well-developed record, and the final terms of the Knauf Settlement reflect the lessons learned over the course of many months of diligent inquiry, analysis and litigation.

### C.      Terms of Knauf Settlement

#### 1.      Overview

The Knauf Settlement is the result of months of arms-length negotiations between the PSC and the Knauf Defendants.   Together with four inter-related settlements, the Knauf Settlement offers a comprehensive resolution of claims asserted by owners and tenants whose homes or businesses contain KPT Chinese Drywall and who filed lawsuits prior to December 9, 2011 with the Knauf Defendants and with numerous other entities in the supply chain.[97]   In

---

acceptance by bench and bar are apparent.  If a representative group of claimants are tried to verdict, the results of such trials can be beneficial for litigants who desire to settle such claims by providing information on the value of the cases as reflected by the jury verdicts.  Common issues or even general liability may also be resolved in a bellwether context in appropriate cases.").

[97]     KPT Chinese Drywall includes "any and all drywall products manufactured, sold, marketed, distributed, and/or supplied by KPT and which are alleged to be defective." Knauf Settlement § 1.26.  KPT Chinese Drywall does "not include drywall products, manufactured, sold, marketed, distributed, and/or supplied by any Knauf Defendant other than KPT."  *Id.*   "Lower-Case KPT Chinese Drywall" means "KPT Chinese Drywall
(continued...)

addition to the Knauf Settlement, the PSC also has entered into proposed class settlements with InEx ("InEx Settlement"), Banner ("Banner Settlement"), L&W ("L&W Settlement") and 670 builders, installers, suppliers and insurers ("Global Settlement") to resolve those parties' liability, including liability arising from the distribution, sale and/or installation of KPT Chinese Drywall. All of the settlements are inter-related.  The termination or non-approval of any of the other settlements permits the Knauf Defendants to terminate the Knauf Settlement.  Additionally, participants in the Knauf Settlement must also participate in the other settlements if they are eligible.

Pursuant to the Knauf Settlement, the Knauf Defendants have agreed to create two settlement funds – the Remediation Fund and the Other Loss Fund – from which benefits will be paid to remediate Class Members' properties that contain KPT Chinese Drywall and to compensate Class Members for losses caused by KPT Chinese Drywall.

## 2.  The Settlement Class

By order dated January 10, 2012, this Court preliminarily approved the Knauf Settlement and conditionally certified the following class:  "All persons or entities who, as of December 9, 2011, filed a lawsuit in the Litigation as a named plaintiff (*i.e.*, not an absent class member) asserting claims arising from, or otherwise related to, KPT Chinese Drywall, whether or not the Knauf Defendants are named parties to the lawsuit."[98]  The Class is subdivided into three

---

bearing the lower-case 'TianJin, China' markings."  *Id.* § 1.26.1.  Because the Knauf Defendants deny that Lower-Case KPT Chinese Drywall is reactive, Class Members whose claims arise from Lower-Case KPT Chinese Drywall must submit contrary evidence to obtain settlement benefits.  *Id.* § 4.9.

[98]   *See* Order Preliminarily Approving Knauf Settlement, Conditionally Certifying a Knauf Settlement Class, Issuing Class Notice, Scheduling a Settlement Fairness Hearing, and Staying Claims as to the Knauf Defendants (Rec. Doc. No. 12138).  The Litigation includes all cases pending before this Court and in state courts.  Knauf Settlement §§ (continued...)

subclasses – a Residential Owner Subclass, a Commercial Owner Subclass and a Tenant Subclass.  As a result, the Class includes all plaintiffs in this Court or state court who own, rent or live in properties with KPT Chinese Drywall.

### 3.    Settlement Benefits

As more fully described below, the Knauf Settlement offers Participating Class Members substantial relief, including (i) complete remediation of properties with KPT Chinese Drywall and compensation for personal property damage and for expenses associated with the need to vacate the property during remediation or, for Class Members who choose not to remediate their properties, a discounted cash option; (ii) compensation for economic loss and/or bodily injury allegedly caused by KPT Chinese Drywall; and (iii) payment of attorneys' fees separately and in addition to the other benefits provided.  In return, Participating Class Members will release their claims against the Knauf Defendants and against others in the supply chain that are participating in related settlements.[99]

### a)    Remediation Fund Benefits

The Remediation Fund is uncapped and will be available to remediate properties at no cost to Class Members.[100]  KPT Property Owners[101] will be given three options:  (i) remediation

---

[99]   1.34, 1.57.  The Class also includes any person or entity who has settled claims with the Knauf Defendants under the Settlement Agreement for the Demonstration Remediation of Homes with KPT Drywall ("Pilot Program") or whose property has been remediated under a Major Builder Settlement Agreement or a settlement with a Builder or Supplier only for the purposes of obtaining benefits from the Other Loss Fund.  *Id.* § 1.1.2.

[99]   Knauf Settlement § 5.2.

[100]   *Id.* § 4.2.

[101]   A "KPT Property" is an Affected Property in which the KPT Drywall Percentage exceeds 90%.  *Id.* § 1.28.  The "KPT Drywall Percentage" is the amount of KPT Chinese Drywall in the Affected Property divided by the total amount of KPT Chinese Drywall and Non-
(continued...)

by Knauf ("Program Contractor Remediation Option") (§ 4.3.1); (ii) remediation by a contractor chosen by the Class Member and paid for by Knauf ("Self-Remediation Option") (§ 4.3.2); or (iii) a cash payment in lieu of remediation at a discount from the estimated cost of remediation ("Cash-Out Option") (§ 4.3.3).  Mixed Property Owners may select either the Self-Remediation or Cash-Out Options.[102]

Under the Program Contractor Remediation Option, the Remediation Fund will pay Moss & Associates, LLC ("Moss") to remediate the KPT Property pursuant to the Remediation Protocol.[103]  Moss is a reputable contractor that has substantial experience remediating properties with KPT Chinese Drywall through its involvement in the Pilot Program.  The Remediation Protocol is intended to accomplish the removal on a cost-effective basis of all drywall and contamination, including, but not limited to, corrosion, tarnishing and pitting, and restoration of the property with the same construction quality and finishes as existed prior to the remediation (including remediating any damage to the quality and finishes that was caused by the drywall). Among other things, the remediation work includes:

- removing and replacing all drywall;

- removing and replacing all electrical wiring;

- removing and replacing all fire safety equipment;

- replacing all copper gas lines and fittings and all other gas lines found to be contaminated;

---

KPT Chinese Drywall, rounded to the next highest 10% increment.  *Id.* §1.27.  A "Mixed Property" is an Affected Property in which the KPT Drywall Percentage is 90% or less. *Id.* § 1.36.

[102]     *Id.* § 4.3.4.

[103]     *Id.* § 4.3.1.

- removing, storing and reinstalling all fixtures that would interfere with the removal of the drywall;

- repairing of HVAC systems;

- removing and replacing porous insulation and repairing or replacing non-porous insulation;

- removing and replacing carpet, carpet padding, laminate flooring and laminate padding;

- removing and replacing affected plumbing components; and

- removing and replacing kitchen refrigerators and freezers, wine coolers, ice machines, microwaves, cooktop ovens, and other appliances where necessary.[104]

The scope of remediation under the Remediation Protocol is consistent with that ordered by this Court after the bellwether trial in *Hernandez v. Knauf Gips KG.*[105] and that recommended in guidelines issued by the Consumer Product Safety Commission.[106]   In other words, Class Members will obtain full remediation of KPT Properties equal to the remediation recovery to which they would be entitled even assuming success in litigation and success in enforcing a judgment, which, as explained below, is far from certain.

In addition to funding the remediation of Affected Properties, the Remediation Fund will pay Residential Owners who select the Program Contractor Remediation Option a Lump Sum Payment of $8.50 per square foot for KPT Properties that are less than or equal to 3,500 square

---

[104]    *Id.* at Ex. F (Remediation Protocol § I).

[105]    *See In re Chinese Manufactured Drywall Prods. Liab. Litig.* (*Hernandez*), No. MDL 2047, 2010 WL 1710434 (E.D.La. Apr. 27, 2010) (Findings of Fact and Conclusions of Law).

[106]    *See* U.S. Consumer Prod. Safety Comm'n & U.S. Dep't of Housing and Urban Dev., *Remediation Guidance for Homes with Corrosion from Problem Drywall as of September 15, 2011* (2011), *available at* http://www.cpsc.gov/info/drywall/remediation091511.pdf (last visited August 24, 2012), attached as Ex. 83.

feet or $10 per square foot for KPT Properties that are greater than 3,500 square feet.[107]  The Lump Sum Payment reimburses Participating Class Members for personal property damage, alternative living expenses during remediation, maintenance of the KPT Property during remediation, and moving and storage expenses incurred as a result of the remediation.[108]  The Remediation Fund also will make a Delay Period Payment to Class Members who select the Program Contractor Remediation Option if the remediation takes longer than three months.[109]

Under the Self-Remediation Option, the Remediation Fund will pay the KPT Property Owner's chosen contractor an amount equal to an estimate of what it would cost Moss to remediate the KPT Property.  A Class Member selecting this option must submit a binding contract with a licensed contractor providing for the scope of work equivalent to that set forth in the Remediation Protocol, ensuring that such Class Members will obtain full remediation.  Class Members choosing this option also will be entitled to the Lump Sum Payment, but not the Delay Period Payment, because the homeowner and not the Knauf Defendants will control the amount of time it takes to complete construction.  For Mixed Property Owners selecting this option, the payment to the chosen contractor and the Lump Sum Payment will be multiplied by the KPT

---

[107]     Knauf Settlement § 4.3.1.1.

[108]     As described below, commercial Owners can seek recovery of economic losses caused by the need to vacate the Property during remediation from the Other Loss Fund.

[109]     Knauf Settlement. § 4.3.1.2.  The Delay Period Payment is capped at a single one-time payment of $1.50 per square foot for Class Members who own KPT Properties exceeding 3,500 square feet.  *Id.* § 4.3.1.2.2.  Class Members who own KPT Properties less than or equal to 3,500 square feet are entitled to a payment of $1.50 per square foot for each additional month of remediation exceeding three months.  *Id.* § 4.3.1.2.1.

Drywall Percentage to reflect the extent to which the claimed damage is attributable to KPT Chinese Drywall.[110]

Under the Cash-Out Option, a Class Member can elect not to remediate the KPT Property. In that event, the Remediation Fund will pay the KPT Property Owner an amount equal to an estimate of what it would cost Moss to remediate the KPT Property less $7.50 per square foot.[111] The discount accounts for additional risk to the Knauf Defendants in light of the fact that the Class Member is not remediating the property, which could expose the Knauf Defendants to lawsuits from subsequent purchasers or others who might allege damages arising from the KPT Chinese Drywall.[112]

In addition, for Residential Owners who select the Cash-Out Option, the Remediation Fund will pay a reduced Lump Sum Payment of $3.50 per square foot because the KPT Property Owner will not incur alternative living expenses or any other expenses associated with the need to vacate the KPT Property during remediation. The Remediation Fund will not pay Class Members who select the Cash-Out Option a Delay Period Payment because those Class Members' properties will not be remediated.[113] For Mixed Property Owners who select the

---

[110]    *Id.* § 4.3.4.1. The "KPT Drywall Percentage" is the amount of KPT Chinese Drywall in the Affected Property divided by the total amount of KPT Chinese Drywall and Non-KPT Chinese Drywall, rounded to the next highest 10% increment. *Id.* §1.26.

[111]    *Id.* § 4.3.3.

[112]    To select this option, a Class Member must obtain a release from his/her bank if the property is encumbered by a mortgage or other lien, record the existence of reactive Chinese Drywall in local property records, if permitted, and covenant to inform subsequent purchasers of the presence of KPT Chinese Drywall and to indemnify the Knauf Defendants against claims from subsequent purchasers. *Id.*

[113]    *Id.* § 4.3.3.

Cash-Out Option, the payments will be multiplied by the KPT Drywall Percentage to reflect the extent to which the claimed damage is attributable to KPT Chinese Drywall.[114]

With respect to Foreclosed Properties, the Knauf Settlement provides the Mortgagee with the option to select from among the Program Contractor Remediation, Self-Remediation and Cash-Out Options if it provides a release to the Knauf Defendants and the Other Releasees.  The Owner prior to foreclosure will be entitled to the Lump Sum Payment, but not the Delay Period Payment.[115]

The Knauf Settlement also provides benefits to Class Members who own units in multiple unit properties and/or Multiple Unit Property Governing Bodies, such as condominium associations.[116]  The options available to such Class Members depend on whether it is feasible to treat each individual unit in the multiple unit property as an individual property and whether the units in the multiple unit properties are KPT Properties or whether some are Mixed Properties.[117]

Some Class Members remediated their Properties at their own expense prior to the submission of the proposed Knauf Settlement.  Such Class Members also are entitled to benefits under the Knauf Settlement in the form of an alternative dispute resolution process through

---

[114]   *Id.* § 4.3.4.2.  A Mixed Property Owner selecting the Cash-Out Option (unlike a KPT Property Owner) will not be required to obtain a release from his/her bank if the property is encumbered by a mortgage or other lien.  *Id.*

[115]   *Id.* § 4.3.5.

[116]   Multiple Unit Property Governing Bodies are Class Members to the extent any unit of the Multiple Unit Property is the subject of a lawsuit.  *Id.* § 1.1.2.

[117]   *Id.* § 4.3.6.

which they can seek reimbursement of their reasonable costs.  If the mediation does not resolve the claim of such a Participating Class Member, the Court will resolve the claim.[118]

The Knauf Defendants will make an initial deposit of $200 million into the Remediation Fund and will replenish the Remediation Fund in increments of $50 million each time the balance of the Fund is reduced to $25 million.[119]  In addition, Participating Class Members will assign their recoveries from the InEx, Banner and L&W Settlements to the extent attributable to KPT Chinese Drywall to the Knauf Defendants and the Knauf Defendants will deposit those amounts in the Remediation Fund for the purpose of providing remediation benefits to those Class Members.[120]  Furthermore, 50% of funds allocated to Participating Class Members on account of KPT Chinese Drywall from the Global Settlement will be deposited into the Remediation Fund for the purpose of providing remediation benefits to those Class Members.[121] Participating Class Members' assignments of their recoveries from these other Settlements to the Remediation Fund reflect the contribution of other parties in the supply chain to the repair of Participating Class Members' properties to resolve their potential liability to those Participating Class Members and also the fact that Participating Class Members' Remediation Claims are being fully compensated without any reduction for attorneys' fees and costs.  Any funds

---

[118]     *Id.* § 4.3.7.

[119]     *Id.* § 4.2.2.

[120]     *Id.* § 4.8.2.

[121]     *Id.* § 4.2.3.  Because of the integral relationship between the Knauf Settlement and the InEx, Banner, L&W and Global Settlements, Participating Class Members in the Knauf Settlement must also participate in those Settlements to the extent that they are eligible. *Id.* § 4.8.2.1.  In addition, cross-termination provisions permit the Knauf Defendants to terminate the Knauf Settlement if any of those parties terminate their Settlements or if the Knauf Defendants fail to reach an agreement with Banner and/or InEx to resolve their claims against the Knauf Defendants.  *Id.* §§ 4.8.5, 4.8.6.

remaining in the Remediation Fund after satisfaction of all Class Members' Remediation Claims and payment of all administrative expenses will revert to the Knauf Defendants.

### b)      Other Loss Fund Benefits

In addition to the remediation benefits described above, Participating Class Members can seek reimbursement for economic losses caused by KPT Chinese Drywall from the Other Loss Fund.  In particular, the Other Loss Fund will reimburse:

- Residential Owners for alternative living expenses arising from the need to vacate the Affected Property prior to remediation due to property damage caused by KPT Chinese Drywall;[122]

- Commercial Owners for economic loss for a period not to exceed three months arising from the inability to use or rent Affected Property during remediation or from the inability to sell Affected Property due to property damage caused by KPT Chinese Drywall;[123]

- Owners of Foreclosed Properties, in an amount to be determined by the Special Master for Lost Equity;[124]

- Residential Owners or Commercial Owners who sold Affected Properties in an attempt to mitigate their losses, in an amount to be determined by the Special Master for Lost Equity;[125] and

- Tenants, in an amount to be determined by the Special Master to compensate for moving expenses (if the Tenant is displaced during remediation) and personal property damage caused by KPT Chinese Drywall.[126]

Some plaintiffs have asserted claims to recover for bodily injuries allegedly caused by KPT Chinese Drywall notwithstanding the lack of support for such claims.  For those Class

---

[122]     *Id.* § 4.7.1.1.

[123]     *Id.* § 4.7.1.2.

[124]     *Id.* § 4.7.1.3.

[125]     *Id.* § 4.7.1.4.

[126]     *Id.* § 4.7.1.5.

Members, the Knauf Settlement establishes a mechanism by which they can raise those disputed claims, including by making expert submissions subject to challenge under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny, and final resolution by the Court.[127]

The Other Loss Fund will not pay claims for stigma, injury to reputation, loss of enjoyment of home, psychological or emotional injury, medical monitoring, injury to reputation, credit rating loss, legal and accounting expenses, or loss of investment opportunity.[128]

The Knauf Defendants will contribute $30 million to the Other Loss Fund, which contribution is capped.[129]  In addition, 50% of funds allocated to class members on account of KPT Chinese Drywall from the Global Settlement will be deposited into the Other Loss Fund.[130]

The Special Master will evaluate all claims, including any claims that satisfy the criteria for bodily injury claims and withstand any *Daubert* challenge, to the Other Loss Fund and determine eligibility and amount of any benefits paid to each Class Member from the Other Loss Fund.[131]  If the total of all allowed claims is more than the amount in the Other Loss Fund, the amount of the claims will be reduced on a pro rata basis.  If the total of all allowed claims is less than the amount in the Other Loss Fund, any remaining funds will be used to offset any deficiency in legal fees and costs and any post-final approval administrative legal fees and costs.

---

[127]    *Id.* § 4.7.1.6.

[128]    *Id.* § 4.7.3.

[129]    *Id.* § 4.6.2.

[130]    *Id.* § 4.6.3.

[131]    *Id.* § 4.7.4.4.

If any funds remain after satisfaction of legal fees and costs, the remainder will be subject to a *cy pres* distribution for charitable purposes, subject to Court approval.[132]

### c)      Attorneys' Fees

In addition to the benefits provided to class members by the Remediation and Other Loss Funds, the Knauf Defendants will pay separately up to $160 million in attorneys' fees and costs, if approved by the Court, to compensate the PSC, common benefit counsel, Settlement Class Counsel and individually retained Plaintiffs' counsel for all preparation and litigation work performed (i) on behalf of any Participating Class Member or the Class or in connection with (ii) the Knauf Settlement; (iii) the Pilot Program; (iv) the Major Builder Settlement Agreements; (v) any agreement governing homes remediated prior to December 20, 2011; and (vi) any other previous settlement between the Knauf Defendants and any other party relating to claims arising from KPT Chinese Drywall unless attorneys' fees and costs already have been separately addressed under such settlement.[133]   As a result, individual Participating Class Members will not be responsible for payment of attorneys' fees or costs out of their recovery of benefits under the Knauf Settlement, which is an additional significant benefit for Class Members.

## III.    <u>ARGUMENT</u>

Given that Plaintiffs could never collect a judgment in China against KPT – the only Knauf Defendant with responsibility for the defective product – and given the overwhelming challenges Plaintiffs would face in litigation against the remaining Knauf Defendants, the Knauf Settlement is a highly favorable outcome for the Plaintiffs.  For the reasons set forth below, the Knauf Defendants respectfully request that the Court grant final approval.

---

[132]     *Id.* § 4.7.4.5.

[133]     *Id.* §§ 14.1, 14.2, 14.3, 14.4.

## A.  Public Policy Favors Settlement of Class Action Lawsuits

The Fifth Circuit has long upheld the "strong judicial policy favoring the resolution of disputes through settlement."[134]   In fact, in the Fifth Circuit, settlement agreements "will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits."[135]

As this Court has explained, the strong public interest favoring settlement is "especially apparent in the class action context where claims are complex and may involve a large number of parties, which otherwise could lead to years of protracted litigation and sky-rocketing expenses."[136]   Given the formidable cost, scope and complexity of class action litigation, settlement of class action claims will often "contribute greatly to the efficient utilization of . . . scarce judicial resources."[137]   Accordingly, the Fifth Circuit recognizes a particular and "overriding public interest in favor of settlement" of class action claims.[138]

---

[134]  *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982); *see also Thibaut v. Ourso*, 605 F. Supp. 1, 3 (M.D. La. 1981) (settlement has "always been a favored means of resolving disputes"); *W. J. Perryman & Co. v. Penn Mut. Fire Ins. Co.*, 324 F.2d 791, 793 (5th Cir. 1963) ("The law favors and encourages compromises.").

[135]  *D. H. Overmyer Co., Inc. v. Loflin*, 440 F.2d 1213, 1215 (5th Cir. 1971); *see also Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir. 1977).

[136]  *Turner v. Murphy Oil USA*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007) (Fallon, J.); *see also In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217 (5th Cir. 1981) ("[T]he prospect of a long, complex and expensive trial militates in favor of settlement."); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("[C]lass action suits have a well deserved reputation as being most complex.").

[137]  *Cotton*, 559 F.2d at 1331.

[138]  *Id.*

### B.     The Knauf Settlement Is Fair, Reasonable and Adequate

Under the Federal Rules of Civil Procedure, approval of a proposed class action settlement must be based on a finding that the settlement is "fair, reasonable, and adequate."[139] In evaluating a settlement, a court must balance the terms of the negotiated settlement against the rewards – if any – that the class would likely have achieved had their claims progressed to trial.[140]   Although the court may "analyze the law and facts to some extent to examine the probability of plaintiffs' success on the merits,"[141] the court's objective should not be to try the case or to "resolve contested issues of fact or law."[142]   Rather, the court must confine its inquiry to a consideration of the relative merits of the proposed settlement "as compared to the alternative of litigation."[143]

The court's analysis also should be guided by the principle that "compromise is the essence of a settlement."[144]   The court "should not make a proponent of a proposed settlement

---

[139]   F.R.C.P. 23(e)(2); *see also Cotton*, 559 F.2d at 1330 (The "cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable and is not the product of collusion between the parties.").

[140]   *Cotton*, 559 F.2d at 1330; *see also Turner*, 472 F. Supp.2d at 843 ("When evaluating a proposed settlement, the Court must compare its terms with the rewards the class would likely receive following a trial and judgment in its favor."); *In re Corrugated Container*, 643 F.2d at 212 ("[T]he district court's most important function in reviewing compromises of class actions is its consideration of the settlement terms.").

[141]   *Altier v. Worley Catastrophe Response, LLC*, Civil Action Nos. 11-241, 11-242, 2012 WL 161824, at *17 (E.D. La. Jan. 18, 2012).

[142]   *Turner*, 472 F. Supp.2d at 843; *see also Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983); *Altier*, 2012 WL 161824, at *17 ("When examining the fairness of a proposed settlement, the court should not engage in a trial on the merits because the very purpose of the compromise is to avoid the delay and expense of trial.").

[143]   *Turner*, 472 F. Supp.2d at 843.

[144]   *Cotton*, 559 F.2d at 1330.

'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.'"[145]   As the Fifth Circuit has observed, it is the nature of compromise that neither side should receive "all which it desired."[146]

In the Fifth Circuit, evaluation of the fairness, reasonableness and adequacy of a proposed class action settlement is informed by the "six focal facets" set forth in *Reed v. Gen. Motors Corp.*, 703 F.2d 170 (5th Cir. 1983):

> (1) the existence of fraud or collusion behind the settlement;
> (2) the complexity, expense, and likely duration of the litigation;
> (3) the stage of the proceedings and the amount of discovery completed;
> (4) the probability of plaintiffs' success on the merits;
> (5) the range of possible recovery; and
> (6) the opinions of the class counsel, class representatives, and absent class members."[147]

Fifth Circuit courts are "entitled to rely upon the judgment of experienced counsel for the parties" that a proposed settlement agreement is fair, reasonable and adequate.[148]   Indeed, a court assessing the terms of a proposed settlement agreement "should be hesitant to substitute its own judgment for that of counsel."[149]   Accordingly, and consistent with the strong judicial policy

---

[145]   *Id.* (quoting *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D.N.Y. 1972)).

[146]   *Id.* at 1334 (5th Cir. 1977).

[147]   *Reed*, 703 F.2d at 172;  *see also Turner*, 472 F. Supp. 2d at 843 (citing the *Reed* factors); *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 194-95 (5th Cir. 2010) (citing the *Reed* factors).

[148]   *Cotton*, 559 F.2d at 1330.

[149]   *Id.*

favoring settlement agreements, a "presumption is made in favor of the settlement's fairness, absent contrary evidence."[150]

### 1.      Absence of Fraud or Collusion

The first of the *Reed* factors – the existence of fraud or collusion – may be the most critical consideration in the analysis of a proposed settlement agreement.  This is because, in the absence of fraud or collusion, a court may presume that the proposed settlement is fair and reasonable.[151]   Indeed, where, as here, the proposed agreement "resulted from arms-length negotiations between experienced counsel and was not tainted by fraud or collusion," a "strong presumption exists in favor of settlement."[152]

The Knauf Settlement before the Court is the end result of extensive, hard-fought, arm's-length negotiations between the parties, all of whom were represented by capable and experienced counsel.  Not only did negotiations occur in the "full context of the adversarial process,"[153] but one claim has been taken to verdict,[154] and ten additional bellwether cases have been resolved.[155]   Moreover, the parties have engaged in wide-ranging discovery, including voluminous document productions and upwards of one hundred fact and expert witness

---

[150]     *Turner*, 472 F. Supp. 2d at 843.

[151]     *Altier*, 2012 WL 161824, at *15 ("The court may presume that a proposed settlement is fair and reasonable when it is the result of arm's-length negotiations.").

[152]     *Turner*, 472 F. Supp. 2d at 844.

[153]     *Id.* at 846.

[154]     *See* Final Judgment Against Banner Supply Co., *Seifart v. Banner Supply Co.*, No. 09-38887 CA (42) (Fla. Cir. Ct. Jan. 10, 2011) (Ex. 82).

[155]     *See supra* note 92 and accompanying text.

depositions conducted in Europe, Asia and the United States, as well as extensive motion practice, clearly demonstrating the contentious nature of the litigation.

In short, there is nothing in the history of the settlement negotiations or in the terms of the final agreement to disturb the "presumption that no fraud or collusion occurred between counsel."[156]   Because the Knauf Settlement is the product of good faith negotiations between vigorous and experienced advocates, the Court is entitled to presume that the agreed-upon terms are fair, reasonable and adequate.[157]

### 2.   Complexity, Expense and Likely Duration of the Litigation

The complexity, expense and likely duration of the Chinese Drywall litigation weighs heavily in favor of settlement approval.  The Chinese Drywall litigation already has proven to be an extraordinarily complex, costly and time-consuming undertaking.[158]   Since the formation of this MDL more than two and a half years ago, thousands of claimants have participated in the PSC's omnibus class action complaints.  The Court has held regular monthly status conferences attended by hundreds of counsel and has entered over two dozen separate Pretrial Orders, as well as scores of other orders and minute entries.  To date, more than 15,000 entries have been recorded on the docket in this MDL.  Moreover, myriad claims and defenses have been asserted by the parties which will "require a high degree of scientific and technical skill and knowledge,

---

[156]     *Altier*, 2012 WL 161824, at *15.

[157]     *Id.*; *Turner*, 472 F. Supp. 2d at 844.

[158]     *See Altier*, 2012 WL 161824, at *17 ("[T]his litigation, including the settlement effort, has been complex, expensive and time-consuming for the named plaintiffs, counsel, the parties and the court . . . .  These factors weigh in favor of approving the settlement.").

making discovery particularly expensive in light of the tests and experts required to successfully litigate the case."[159]

The complexity of the Chinese Drywall litigation is further compounded by the variety and multiplicity of the MDL claimants; they are from many different states and include parties as diverse as residential and commercial tenants, homeowners, owners of vacation properties, owners of commercial properties, and condominium associations. The international nature of the litigation also has contributed substantially to the expense and complexity of the litigation. Because the various Knauf Defendants are based in numerous countries worldwide, scattered across four different continents, the discovery effort to date has required extensive international coordination and travel, and even routine legal issues – including service of process and assertion of jurisdiction – have presented unusual litigation challenges.

As costly and time-consuming as the Chinese Drywall litigation has already proven to be, substantial work remains. Considerable additional expert discovery would be required in advance of any trial, including individual expert reports and inspections of every affected property. Trial would be followed inevitably by post-trial motions and appeals, and even this would not be the end of the litigation, for any final judgment obtained against the foreign-based Knauf Defendants would only be the beginning of a struggle to enforce that judgment in foreign jurisdictions, a process which could entail an additional, independent round of trials and appeals in foreign courts.

In light of the foregoing, full resolution of the pending legal issues in the Chinese Drywall litigation could require many years to achieve, and the costs of such a protracted litigation could easily reduce to insignificance whatever total award might be granted to the

---

[159]     *Turner*, 472 F. Supp. 2d at 846.

Class.  The inevitable appeals process "would add additional time and considerable expense and delay to the receipt of any relief afforded,"[160] and even if a final judgment were to be awarded in favor of the Class, securing recognition and enforcement of that judgment in foreign jurisdictions would likely represent its own time-consuming struggle.  Approval of the Knauf Settlement will prevent such unnecessary prolongation of an already costly litigation process and will afford prompt, comprehensive, long-anticipated relief to the Plaintiffs.

### 3.      Stage of the Proceedings and the Amount of Discovery Completed

The argument for settlement approval is particularly compelling where, as here, "all or nearly all discovery" is complete,[161] although Fifth Circuit courts can and have approved settlement agreements negotiated during the earliest stages of litigation, on the basis of little or no formal discovery.[162]  As the below summary indicates, discovery to date in the Chinese Drywall litigation has been extraordinarily thorough, far-reaching and complex:

- The various parties in the Chinese Drywall litigation have exchanged extensive written discovery requests and have produced tens of thousands of documents.  The Knauf Defendants alone have produced over one hundred thousand documents, comprising over half a million pages of documentary evidence.  Distributors Banner , InEx and L&W have produced over ten thousand documents between them.

- Over one hundred depositions have been conducted to date in Asia, Europe and throughout the United States.  Deponents have included class representatives, corporate officers and employees, and experts retained by the various parties.

---

[160]    *Id.* at 846; *see also In re Shell Oil Refinery*, 155 F.R.D. 552, 563 (E.D. La. 1993) (approving class action settlement and noting "[e]ven if the plaintiffs prevailed at trial and were awarded damages in excess of the amount of the settlement, lengthy appeals and expenses could be anticipated.").

[161]    *Turner*, 472 F. Supp. 2d at 847.

[162]    *See In re Corrugated Container*, 643 F.2d at 211; *see also Cotton*, 559 F.2d at 1332 (affirming approval of settlement even though "very little formal discovery was conducted and . . . there is no voluminous record in this case").

- Over two dozen days of deposition testimony have been taken from 15 officers and employees of the Knauf Defendants alone.[163]

- The parties have engaged numerous technical and scientific experts.  Several of these experts have been deposed, sometimes repeatedly.

In addition, the underlying claims have been extensively litigated.  In 2010, this Court resolved ten bellwether cases involving properties in Virginia and Louisiana,[164] while an additional Chinese Drywall claim was tried to verdict in Miami-Dade County Circuit Court.[165]

The parties to the Knauf Settlement came to the negotiating table with well-informed expectations regarding the risks and rewards of continued litigation.  The expansive discovery record, the extensive prior history of motion practice, and the lessons gleaned from multiple bellwether cases all served to educate the negotiating parties regarding the relative strengths and weaknesses of their respective legal positions.  As a result, the final compromise reached by the parties – and their conclusion that "settlement was preferable to looming litigation"[166] – reflects not only a thorough understanding of the factual and legal issues but a realistic appreciation by all parties of the full range of possible litigation outcomes.

---

[163]   Jeffrey R. Brisley (Sept. 27, 2010); Robert F. Claxton (Sept. 28, 2010); Oliver Froehlich (Sept. 20-21, 2010); Zhang Fudong (Aug. 10, 2011); David Gregory (Sept. 13-14, 2011); Manfred N. Grundke (Dec. 15, 2010); Martin Halbach (June 8-9, 2011 and July 27, 2011); Hans-Ulrich Hummel (Oct. 19-20, 2010 and June 29, 2011); Hans Peter Ingenillem (July 25-26, 2011); Baldwin Knauf (July 21-22, 2011); Isabel Knauf (Dec. 7-8, 2010); Mark Norris (Nov. 11-12, 2010 and Aug. 10, 2011); Michael A. Robson (Nov. 17, 2010); Martin Stuermer (Aug. 18-19, 2010 and Oct. 15, 2010), Ann Zhong (Aug. 11-12, 2011 and Sept. 12, 2011).

[164]   *See supra* note 92 and accompanying text.

[165]   *See* Final Judgment Against Banner Supply Co., *Seifart v. Banner Supply Co.*, No. 09-38887 CA (42) (Fla. Cir. Ct., Jan. 10, 2011) (Ex. 82).

[166]   *Turner*, 472 F. Supp.2d at 847-48.

### 4. Probability of Plaintiffs' Success on the Merits / Range of Possible Recovery

The PSC has acknowledged that Plaintiffs would face serious obstacles to establishing both liability and damages should the present action proceed to trial.[167]  These obstacles include strong jurisdictional and merits defenses as well as substantial limitations on the scope of allowable recovery.  Moreover, even if a verdict were rendered against KPT – or against any of the other foreign-based Knauf Defendants – Plaintiffs would face "almost insurmountable problems collecting any judgment."[168]

### a) KPT

#### (1) Probability of Plaintiffs' Success on the Merits

There is no dispute that KPT manufactured some portion of the defective Chinese Drywall exported to the United States.  As explained above, KPT was unaware of and could not have foreseen the defect, a consideration which relieves KPT of liability under any negligence-based theory.[169]

---

[167]  *See* Memorandum of Law in Support of the Joint Motion of Proposed Settlement Class Counsel, the PSC, and the Knauf Defendants for an Order:  (1) Preliminarily Approving the Knauf Settlement; (2) Conditionally Certifying a Settlement Class; (3) Issuing Class Notice; (4) Scheduling a Fairness Hearing; and (5) Staying Claims Against the Knauf Defendants, at 20 (Rec. Doc. No. 12061-4) ("Settlement Class Counsel and the PSC . . . recognize that Plaintiffs would face serious obstacles to establishing both liability and damages should the cases proceed to trial.").

[168]  *See Newby v. Enron Corp.*, 394 F.3d 296, 302 (5th Cir. 2004).

[169]  *Jolly v. Ins. Co. of N. Am.*, 331 So. 2d 368, 371 (Fla. Dist. Ct. App. 1976) (defendant may be held liable under a theory of negligence only if "prudent human foresight" would have anticipated the alleged harm as a "likely result" of the defendant's conduct); *Reaves v. Wiggs*, 192 So. 2d 401, 403 (Miss. 1966) (no duty to "guard against events which are not reasonably to be anticipated"); *Ex parte Wild Wild West Social Club, Inc.*, 806 So. 2d 1235, 1240 (Ala. 2001) ("The question of the existence of a duty to use care is grounded in the concept of foreseeability."); *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, (continued...)

Even on a no-fault or strict liability theory, Plaintiffs' success against KPT on the merits is not assured. In order to prevail on any strict liability claim against KPT, Plaintiffs would be required to demonstrate not only that their homes contained KPT drywall and that this particular drywall was defective, but also that the presence of this defective drywall in their homes caused the damages alleged.[170] This is not necessarily a trivial showing, for the causal mechanisms underlying the corrosion observed in Plaintiffs' properties *remain unknown*.[171] Indeed, defective Chinese-manufactured drywall does not appear to be the sole source of sulfur-bearing gases

---

360 (Tex. 1995) ("Of the factors relevant to determining whether a duty exists, the foreseeability of the risk is the foremost and dominant consideration.").

[170] In most of the relevant jurisdictions, proximate causation is the standard. *See* La. Rev. Stat. Ann. § 9:2800.54(A) ("The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity."); Miss. Code Ann. § 11-1-63(a) (Product liability plaintiffs must prove that the "defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought"); *Taylor v. Gen. Motors Corp.*, 707 So. 2d 198, 202 (Ala. 1997) (Under the AEMLD, a products liability plaintiff must "prove that the defect proximately caused his injuries."); *Cintron v. Osmose Wood Preserving, Inc.*, 681 So. 2d 859, 861 (Fla. Dist. Ct. App. 1996) (A strict liability claimant must prove the "existence of a proximate causal connection between the condition of the product and the plaintiff's injury."); . Texas applies a "producing cause" standard, which does not incorporate a foreseeability requirement, in manufacturing and design defect claims. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 667 (Tex. 1999) ("[F]or strict liability a product defect must be shown to have been only a producing cause" or "but for" cause of injury, rather than a "proximate cause."); *Technical Chem. Co. v. Jacobs*, 480 S.W.2d 602, 604 (Tex. 1972) ("Proof of causation is a necessary element of a strict liability case.").

[171] Envtl. Quality Assessment, *supra* note 62 (Ex. 62) at 3 (finding "no consensus regarding the cause . . . of the adverse environmental conditions found in homes containing Chinese drywall").

detected in affected homes[172], nor do the sulfur-bearing gases detected in affected homes appear to be the sole cause of the corrosion observed in those homes.[173]

**(2)     Range of Possible Recovery**

Even if Plaintiffs were successful in obtaining a judgment against KPT, Plaintiffs would need a Chinese court to enforce that judgment and then would need to actually collect on that judgment – both all but impossible missions.

Enforcement of foreign judgments of any sort in China is "notoriously difficult."[174] Indeed, "recognition and enforcement in China of foreign court judgments from *any* country – not just the United States – is extremely rare and occurs only in special circumstances."[175]  The difficulties of enforcing U.S. judgments are particularly acute, for "Chinese law requires that

---

[172]     *See* CTEH, Plasterboard Evaluation, *supra* note 74 (January 29, 2009) (Ex. 71), at 11 (elevated concentrations of hydrogen sulfide in the outdoor air indicated "other sources of hydrogen sulfide in the area").

[173]     *See* Envtl. Quality Assessment, *supra* note 62 (Ex. 62) at 115 ("[T]he copper corrosion observed in homes may not be solely attributable to the concentration of reduced sulfur gases observed in this study.").

[174]     *See* Arthur Anyuan Yuan, *Enforcing and Collecting Money Judgments in China from a U.S. Judgment Creditor's Perspective*, 36 GEO. WASH. INT'L L. REV. 757, 758 (2004); *see also* Ariel Ye, *Enforcement of Foreign Arbitral Awards and Foreign Judgments in China*, 74 DEF. COUNSEL J. 248, 251 (2007) ("Generally speaking, enforcing a foreign court judgment in China is very difficult . . . ."); Fang Shen, *Are You Prepared For This Legal Maze?  How to Serve Legal Documents, Obtain Evidence, and Enforce Judgments in China*, 72 UMKC L. Rev. 215, 234 (2003) (Enforcement of U.S. judgments in China "can be fraught with much difficulty and uncertainty.").

[175]     Donald C. Clarke, *The Enforcement of United States Court Judgments in China* 3, GEO. WASH. U. L. SCHOOL PUBLIC L. & LEGAL THEORY, Working Paper No. 236 (2004) (emphasis in original) (finding only three instances in the "post-Mao era" – all of them involving uncontested divorce decrees – in which a foreign judgment was recognized in China); *see also* Ye, *supra* note 174, at 251 (finding only one foreign court judgment – a judgment of an Italian court – that had been recognized and enforced by the Chinese courts).

there exist a treaty or reciprocity between the foreign state and China in order for a foreign judgment to be enforced."[176]   Indeed, under Article 268 of China's Civil Procedure Law, a Chinese court may undertake review of a foreign judgment only in "accordance with the provisions of an international treaty ... or in accordance with the principles of mutual benefit [reciprocity]."[177]   Because there exists no treaty between the United States and China that would obligate China to enforce U.S. judgments, "recognition and enforcement of a US judgment in China is impossible" on such grounds.[178]   Moreover, enforcement of a U.S. judgment on general principals of reciprocity, though theoretically possible under Chinese law, is considered extraordinarily unlikely.[179]   Indeed, researchers studying the issue in recent years have failed to locate even a single case in the modern history of Chinese jurisprudence in which a U.S. judgment has been enforced on any grounds at all.[180]   As one commentator succinctly concluded,

---

[176]   *See* Clarke, *supra* note 175, at 2 (citing Articles 267 and 268 of China's Civil Procedure Law).

[177]   *See id.* (quoting Article 268 of the Civil Procedure Law) (second alteration in original).

[178]   *See* Xinran Deng, *Enforcement of Foreign Judgements in China*, HG.ORG GLOBAL LEGAL RESOURCES (March 29, 2011)  ("China has not entered into an agreement regarding the recognition and enforcement of foreign judgments with the US, and therefore recognition and enforcement of a US judgment in China is impossible."); *see also* Clarke, *supra* note 175, at 2; Shen, *supra* note 174, at 233 (noting the absence of any treaty or convention mandating reciprocal recognition and enforcement of judgments between the U.S. and China).

[179]   *See* Clarke, *supra* note 175, at 2; *see also* Yuan, *supra* note 174, at 780-81 ("The lack of uniformity in U.S. recognition practices" may cause Chinese courts to "refuse recognition of a U.S. judgment.").

[180]   *See* Clarke, *supra* note 175, at 3; *see also* Ye, *supra* note 174, at 251.

"[T]here is to date no evidence suggesting that a Chinese court would enforce the judgment of a United States court, and considerable evidence suggesting it would not."[181]

In the highly unlikely event a Chinese court were to honor a U.S. judgment against KPT, collection on that judgment would pose its own challenges and uncertainties.  The Chinese legal system offers so "little help in facilitating the collection effort"[182] that "[d]espite the powers granted to the People's Courts to execute judgments, it is often difficult for the courts to get domestic judgments enforced, let alone foreign court judgments."[183]

There is, in short, overwhelming reason to believe that a verdict against KPT would be an empty victory due to the unwillingness of Chinese courts to enforce U.S. judgments and the impossibility of a party collecting on a judgment.  As the Fifth Circuit noted in *Newby v. Enron Corp.*, settlement is a manifestly superior option to litigation where, as here, the "unwillingness of foreign sovereigns to enforce U.S. judgments" may make collecting on any judgment an "exercise in legal futility."[184]

---

[181]   Clarke, *supra* note 175, at 5; *see also* Ye, *supra* note 174, at 251; *In re Giant Interactive Group, Inc. Sec. Litig.*, 279 F.R.D. 151, 164 (S.D.N.Y. 2011) (noting the "challenge of enforcing a judgment in China."); *TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575 (S.D.N.Y. 2012) (granting order of attachment in part because "plaintiffs' anticipation of difficulty in enforcing a judgment against [China-based] defendants appears to be reasonable"); *Gucci Am., Inc. v. Huoqing*, No. C-09-05969, 2011 WL 31191, at *16 (N.D. Cal. Jan. 3, 2011) (finding plaintiffs entitled to a "significant award of statutory damages" under the Lanham Act, in part based on the possibility that any judgment against the Chinese defendant, "regardless of the amount of damages imposed may not have a deterring effect because enforcing the judgment may prove difficult.").

[182]   Yuan, *supra* note 174, at 759.

[183]   Ramon E. Reyes, Jr., *The Enforcement of Foreign Court Judgments in the People's Republic of China:  What the American Lawyer Needs to Know*, 23 BROOK. J. INT'L L. 241, 265 (1997).

[184]   *Newby*, 394 F.3d at 302, 306 (finding settlement desirable where "(1) the court's personal jurisdiction over [the Foreign Member Firms] was in doubt, (2) their ultimate expected
(continued...)

### b)      Other Knauf Defendants

KPT aside, the Remaining Knauf Defendants[185] vigorously contest liability on any theory.   None of the Remaining Knauf Defendants manufactured or sold KPT drywall. Consequently, they cannot be held liable under strict liability or warranty principles; their liability, if any, must be based on negligence.[186]   Because these Knauf Defendants did not manufacture or sell KPT drywall and had no dealings with Plaintiffs, Plaintiffs would have difficulty establishing that any of them owed a duty to Plaintiffs.

As a result, Plaintiffs have alleged theories of *derivative*, rather than direct, liability against these other Knauf Defendants.  First, Plaintiffs allege that they can pierce the corporate veil of KPT to impose liability on its affiliates for KPT's tortious conduct.  Second, Plaintiffs contend that KPT acted as an agent of Knauf Gips and therefore, Knauf Gips is liable for the tortious conduct of KPT.   Third, Plaintiffs contend that, for sales outside Florida, Knauf Insulation acted as the sales agent of KPT when Knauf Insulation introduced InEx to KPT and that Knauf Insulation is liable in that role.   As explained below, Plaintiffs would face overwhelming obstacles in establishing any of their derivative liability theories.

---

liability was minimal or non-existent, and (3) even if the court entered judgment against them, collecting the judgments appeared to be an exercise in legal futility.").

[185]   The Remaining Knauf Defendants are Knauf Wuhu, Knauf Dongguan, Knauf Gips, Gebr. Knauf Verwaltungsgesellschaft KG; Knauf International GmbH; Knauf Insulation; Knauf UK; Knauf AMF GmbH & Co. KG; Knauf do Brasil Ltda. and PT Knauf Gypsum Indonesia.

[186]   Restatement (Third) of Torts: Prod. Liab. § 1 (1998) (providing strict liability for "[o]ne who sells or distributes a defective product"); *Id.* § 20 (defining "One Who Sells Or Otherwise Distributes"); Restatement (Second) of Torts § 402A (1965) (providing strict liability for "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer").

(1)     **No Viable Veil-Piercing Argument**

(a)     **Under well-settled principles of governing law, a shareholder or affiliate is not liable for the debts of a corporation**

"It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."[187]   As the United States Supreme Court has explained:

> Normally, the corporation is an insulator from liability on claims of creditors.  The fact that incorporation was desired in order to obtain limited liability does not defeat that purpose.  Limited liability is the rule not the exception . . . .[188]

Chinese law recognizes the same principles.   Under Article 3(ii) of the 2006 PRC Company Law, limited liability of the shareholders of a Chinese corporation is the rule, not the

---

[187]   *United States v. Bestfoods*, 524 U.S. 51, 61 (1998); *see SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2009) ("Creation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace."); *Buchanan v. Ameristar Casino Vicksburg, Inc.*, 957 So. 2d 969, 977 (Miss. 2007) ("'[T]he cardinal rule of corporate law is that a corporation possesses a legal existence separate and apart from that of its officers and shareholders.'") (citations omitted; alteration in original); *Riggins v. Dixie Shoring Co., Inc.*, 590 So. 2d 1164, 1167 (La. 1991) ("The general rule that corporations are distinct legal entities, separate from the individuals who comprise them, and that the shareholders are not liable for the debts of the corporation, is statutory in origin and well supported by the jurisprudence."); *First Health, Inc. v. Blanton*, 585 So. 2d 1331, 1334 (Ala. 1991) ("The concept that a corporation is a legal entity existing separately from its shareholders is well settled in Alabama."); *Robert's Fish Farm v. Spencer*, 153 So. 2d 718, 721 (Fla. 1963) ("The corporate entity is an accepted, well used and highly regarded form of organization in the economic life of our state and nation . . . .  'Their purpose is generally to limit liability and serve a business convenience.'") (citation omitted).

[188]   *Anderson v. Abbott*, 321 U.S. 349, 361-62 (1944).

exception.[189]   Consistent with China's recognition of these principles, Article 5 of KPT's Articles of Association expressly provides:

> The organization of the Company is a limited liability company.  It is liable for its debts with all its assets.  Knauf [International] shall not be liable to the debts of the Company . . . .[190]

As demonstrated below, Plaintiffs would be unable to establish the extraordinary circumstances necessary to pierce KPT's corporate veil under Chinese law, or under the laws of Alabama, Florida, Louisiana, Mississippi or Texas.

> **(b)     Chinese law governs whether Plaintiffs can pierce KPT's corporate veil**

An MDL court sitting in diversity "must apply the law of the transferor state, that is, the law in which the action was filed, including the transferor forum's choice-of-law rules."[191] Consistent with the Restatement (Second) of Conflict of Laws,[192] each state's choice-of-law principles dictate that Chinese veil-piercing law applies because it is the state of incorporation of the company whose veil Plaintiffs seek to pierce.[193]

---

[189]     *See* Affidavit of Nicholas Calcina Howson ("Howson Aff."), attached as Ex. 84, at ¶ 8.

[190]     KPT0074303-20, attached as Ex. 85, at KPT0074306.

[191]     *In re Vioxx Prox. Liab. Litig.*, 478 F. Supp. 2d 897, 903 (E.D. La. 2007) (Fallon, J.).

[192]     Restatement (Second) of Conflict of Laws § 307 (1971) ("The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts."); *see also* 17 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corps. § 8326 (rev. ed. 2006) ("[L]iability of a shareholder for corporate debts and the extent and character of that liability are to be determined by the law of the incorporating state . . . .").

[193]     *See, e.g., Patin v. Thoroughbred Power Boats*, 294 F.3d 640, 647 (5th Cir. 2002) ("In light of these authorities, we agree with the district court's determination that the Louisiana State Supreme Court would most likely conclude that the law of the state of incorporation governs the determination when to pierce a corporate veil." (citations (continued...)

KPT is incorporated under the laws of China.  Accordingly, Chinese law governs whether Plaintiffs can pierce KPT's corporate veil.

> ### (c)    To pierce KPT's veil under Chinese law, Plaintiffs must show abuse of KPT's corporate form

As set forth above, under Chinese law, shareholders generally are not liable for the debts of a corporation.[194]   Much like in the United States, there is, however, an exception to this general rule of corporate separateness in cases of abuse of the corporate form:[195]

> The shareholder(s) of a company shall observe laws, administrative regulations and the company's articles of association, exercise the powers of a shareholder according to law, and shall not abuse its/their powers to damage the rights and interests of the company or other shareholders; *and shall not abuse* (lanyong) *the independent legal person status of the company or the limited liability of shareholders to damage the rights and interests of company creditors*.[196]

---

omitted)); *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989) ("[W]e believe that a Florida court would apply the choice of law rules of the *Restatement (Second) of Conflicts of Laws*," which "provides that the law of the state of incorporation governs the liabilities of the officers or directors to the corporation."); *Scrushy v. Tucker*, 70 So. 3d 289, 298 (Ala. 2011) ("In Alabama, the law of the state of incorporation governs the internal corporate relationship." (internal quotation marks and citations omitted)); Tex. Bus. Org. § 1.102 (the law of the foreign state of incorporation governs "internal affairs of the entity."); *Id.* § 1.104 (the "law of the jurisdiction that governs an entity as determined under Sections 1.101-1.103 applies to the liability of an owner . . . of the entity in the capacity as an owner . . . for an obligation, including a debt or other liability, of the entity for which the owner . . . is not otherwise liable by contract."). Mississippi does not appear to have analyzed choice of law issues in the veil-piercing context but, like the other states, Mississippi follows the Restatement (Second) of Conflict of Laws.  *See Sentinel Indus. Contracting Corp. v. Kimmins Indus. Serv. Corp.*, 743 So. 2d 954, 960 (Miss. 1999).

194    Howson Aff. ¶ (Ex. 84) at 8.

195    *Id.*

196    *Id.* at 9 (emphasis added) (citing Paragraph 3 of Article 20 of the 2006 PRC Company Law).

Even prior to the codification of veil-piercing principles in the 2006 PRC Company Law, Chinese courts applied those principles.[197]   For example, one case identifies "looting of [subsidiary] assets," commingling of assets and shared premises as significant factors to be considered in evaluating veil-piercing claims[198] and another held that piercing was permitted where the shareholders had either depleted the assets of the company or not fully capitalized it.[199] Chinese courts have never found control of the corporation by its shareholder alone a sufficient basis to pierce the corporate veil.[200]

> **(d)**   **Under each state's law, Plaintiffs would also have to establish that another Knauf entity abused KPT's corporate form**

Even if, contrary to controlling Fifth Circuit precedent, a court applied American veil piercing law, the result would be the same.  Like Chinese law, each of the five states where KPT drywall was sold requires plaintiffs seeking to pierce the corporate veil to establish abuse of the corporate form to the detriment of creditors.  Courts applying those states' laws consistently have refused to pierce the corporate veil where plaintiffs are unable to prove a misuse of the corporate form that defrauded a creditor:

- **Alabama:**  "[t]he dominant party must have complete control and domination"; ii) "[t]*he control must have been misused by the dominant party*"; and iii) "[t]he misuse of this control must proximately cause the harm or unjust loss complained of."[201]  To satisfy this standard, plaintiffs must demonstrate that a corporation's

---

[197]   *Id.* at ¶¶ 11-13.

[198]   *Id.* at ¶ 11.

[199]   *Id.* at ¶ 13.

[200]   *Id.* at ¶ 15.

[201]   *Blanton*, 585 So. 2d at 1334-35 (emphasis added) (reversing judgment for plaintiff and directing judgment for defendant as a matter of law where plaintiff failed to establish that sole shareholder had misused control of corporation).

separate corporate existence permitted a shareholder to perpetrate a "*fraud* on [the plaintiffs]."[202]

- **Florida:**  "(1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) *the corporate form must have been used fraudulently or for an improper purpose*; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant."[203]

- **Louisiana:**  "if the plaintiffs do not *allege shareholder fraud, they bear a heavy burden of proving that the sharehold*ers disregarded the corporate entity to such an extent that it ceased to become distinguishable from themselves."[204]   In the absence of fraud, Louisiana courts consider, but are clear that establishing only some of these factors in the absence of fraud is insufficient to pierce:[205]  "1) commingling of corporate and shareholder funds; 2) failure to follow statutory formalities for incorporating and transacting corporate affairs; 3) undercapitalization; 4) failure to provide separate bank

---

[202]   *Simmons v. Clark Equip. Credit Corp.*, 554 So. 2d 398, 401 (Ala. 1989) (emphasis added).

[203]   *Seminole Boatyard, Inc. v. Christoph*, 715 So. 2d 987, 990 (Fla. Dist. Ct. App. 1998) (emphasis added) (recognizing that Florida courts have "imposed a strict standard upon those wishing to pierce a corporate veil").   Applying this standard, Florida courts consistently have refused *to pierce the corporate veil – as a matter of law – in the absence of a show*ing of shareholder abuse.  *See, e.g., WH Smith PLC v. Benages & Assocs., Inc.*, 51 So. 3d 577, 583 (Fla. Dist. Ct. App. 2010) (reversing denial of parent company's motion to dismiss because allegation that parent company instructed subsidiaries to breach agreement with subsidiary's judgment creditor, "without more, does not constitute the type of 'improper conduct' necessary to pierce the corporate veil").

[204]   *Riggins*, 590 So. 2d at 1168 (emphasis added) (reversing judgment for plaintiffs as a matter of law where "[t]here [was] no evidence that [the defendant] used the corporate form to perpetrate a fraud"); *see Industrias Magromer Cueros y Pieles S.A. v. Louisiana Bayou Furs Inc.*, 293 F.3d 912, 920 (5th Cir. 2002) (shareholder's "actions, as a matter of law, do not warrant piercing the corporate veil" even though shareholder "misrepresented material facts" because "he did not do so 'with the intention either to obtain an unjust advantage over [plaintiff] or to cause a loss or inconvenience to [plaintiff]'").

[205]   *See, e.g., Fina Oil and Chem. Co. v. Amoco Prod. Co.*, 673 So. 2d 668 (La. Ct. App. 1996) (affirming summary judgment for defendants where parent corporation was contractually obligated to furnish management services and management personnel to subsidiary, and to pay subsidiary's bills, salaries and expenses, and where subsidiary did not have a bank account until seven months after incorporation, but where there was no evidence of abuse).

accounts and bookkeeping records; and 5) failure to hold regular shareholder and director meetings."[206]

- **Mississippi:**  "a) Some frustration of contractual expectations regarding the party to whom he looked for performance; b) the flagrant disregard of corporate formalities by the defendant corporation and its principals; and c) *a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder.*"[207]

- **Texas:**  "(a) A holder of shares . . . may not be held liable to the corporation or its obligees with respect to:  (2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder . . . is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory . . . .  (b) Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder . . . caused the corporation to be used for the purpose of perpetrating and

---

[206]   *Riggins*, 590 So. 2d at 1168.  It should be noted that some courts in Louisiana have also recognized the "single business enterprise" theory as an alternative basis for piercing a corporate veil.  *See, e.g.*, *Town of Haynesville, Inc. v. Entergy Corp.*, 956 So. 2d 192 (La. Ct. App. 2007) (reversing summary judgment for plaintiff and holding, as a matter of law, that defendants did not constitute a single business enterprise).  This theory was *not* been recognized by the Louisiana Supreme Court and was expressly rejected by this Court.  *See Morales v. Bayou Concessions Salvage, Inc.*, No. 03 Civ. 657, 2004 WL 2381525, *3 (E.D. La. Oct. 22, 2004) (Fallon, J.).  The single business enterprise doctrine involves applying a non-exhaustive eighteen factor test, including such factors such as inadequate capitalization, commingling of assets, and fraud, but "where some factors suggest that one entity is the alter ego of another, the maintenance of corporate formalities tips in favor of finding that the entities are not alter egos."  *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 587 (5th Cir. 2010) (refusing to pierce the veil and affirming dismissal for lack of personal jurisdiction where the defendant "entities appear to have been operated in a way that their brands and products appear identical and their business relationships are deeply intertwined," where the "entities shared office space, phone numbers, and the [individuals] were officers and directors of each of the [defendant] entities," where "employees testified that they could not distinguish between each of the [defendant] companies and viewed them as one company," and where the "entities were indebted to one another through a variety of business transactions").

[207]   *Rosson v. McFarland*, 962 So. 2d 1279, 1288 (Miss. 2007) (emphasis added) (reversing judgment for plaintiff and rendering judgment for defendant on plaintiff's veil-piercing claim because there was "no evidence that [defendant] used [the corporation's] money for her own personal benefit, or that [defendant] was using a shell corporation as a shield from persona liability").

did perpetrate an *actual fraud* on the obligee primarily for the direct personal benefit of the holder . . . ."[208]

> **(e)**   **Plaintiffs would be unable to satisfy their burden of establishing that another Knauf entity used KPT's corporate form fraudulently or for an improper purpose**

There is no evidence in the substantial discovery record that any Knauf entity abused KPT's corporate form to the detriment of KPT's creditors.  Absent such evidence, Plaintiffs would be unable to prevail on their alter ego claims, or even maintain jurisdiction over the Remaining Knauf Defendants.  As set forth above, Chinese law (as well as the law of each of the five States where KPT drywall was sold) requires Plaintiffs to establish that another Knauf entity looted the assets of KPT, commingled funds or otherwise abused KPT's corporate form to the detriment of KPT's creditors.

The facts developed during discovery show that KPT was not organized or otherwise used by any Knauf entity to mislead KPT's creditors or perpetrate a fraud on them.  KPT is an operating company that sells drywall on its own account through its own personnel and receives the proceeds from those sales, which are deposited into its own bank accounts for its own benefit.[209]  KPT maintains its funds in its own bank accounts to which KPT has exclusive access

---

[208]   Tex. Bus. Org. § 21.223 (formerly Tex. Bus. Corp. Act. art. 2.21).  Notably, Texas has expressly rejected the single business enterprise doctrine.  *See SSP Partners*, 275 S.W.3d at 450-56 ("The 'single business enterprise' liability theory on which SSP relies does not entail . . . the abuse required before the law disregards the corporate structure to impose liability."   In Texas, "abuse" such as "fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like . . . is necessary before disregarding the existence of a corporation as a separate entity. Any other rule would seriously compromise what we have called a "bedrock principle of corporate law" – that a legitimate purpose for forming a corporation is to limit individual liability for the corporation's obligations.").

[209]   Grundke Dep. (Ex. 15) at 128:16-19; Robson Dep. (Ex. 9) at 522:19-22; Stuermer Dep. III (Ex. 13) at 724:9-14, 726:24-727:6.

and from which it pays its trade creditors, taxes and other debts.[210]   KPT has no overdue financial liabilities.[211]   Moreover, no Knauf entity can or has withdrawn money from KPT bank accounts or otherwise removed assets from KPT.[212]   Nor has KPT transferred money from its bank accounts solely for the benefit of any other Knauf entity.[213]

In their pleadings, although they never allege abuse, Plaintiffs point to several facts that are typical of affiliated companies, such as some shared services, officers and directors, claiming that these facts demonstrate that the veil should be pierced.  However, the law is clear that none of them support a veil piercing theory.

For instance, Plaintiffs claim that KPT was controlled by Knauf Gips.[214]   But, even assuming contrary to fact, that Plaintiffs could establish that Knauf Gips controlled KPT, that would be insufficient to justify piercing KPT's corporate veil (even if Knauf Gips were a

---

[210]   Robson Dep. (Ex. 9) at 513:12-18, 522:19-22, 524:3-9; Stuermer Dep. III (Ex. 13) at 723:21-726:1, 726:24-727:6; Deposition of Ann Zhong dated Aug. 11, 2011 ("Zhong Dep. I"), attached as Ex. 86, at 101:3-102:13; Zhong Dep. II (Ex. 7) at 447:13-448:7; Deposition of Ann Zhong dated Sept. 12, 2011 ("Zhong Dep. III"), attached as Ex. 87, at 482:18-20, 497:11-499:18, 501:9-504:18, 505:15-506:8, 507:1-508:6, 508:17-513:6, 556:18-558:1.

[211]   Stuermer Dep. III (Ex. 13) at 720:17-722:16.

[212]   Robson Dep. (Ex. 9) at 524:1-9; Stuermer Dep. III (Ex. 13) at 723:21-724:14, 725:14-726:1; Zhong Dep. I (Ex. 86) at 101:3-102:13; Zhong Dep. III (Ex. 87) at 482:18-20, 497:11-499:18, 501:9-504:18, 505:15-506:8, 508:17-513:6, 556:18-558:1.

[213]   Robson Dep. (Ex. 9) at 513:12-18; Zhong Dep. III (Ex. 87) at 482:18-20, 505:15-506:11, 508:23-509:14.

[214]   *See*, *e.g.*, *Payton v. Knauf Gips KG*, No. 2:09-cv-07628 (E.D. La.) (Omnibus I, I(A), I(B), I(C)) at ¶ 2074 ("Upon information and belief, at all times material hereto, Knauf Gips supervised, operated, trained and otherwise exercised control and/or had the right to control the operations of Knauf Tianjin, and its agents, apparent agents, and employees.").

shareholder of KPT, which it is not[215]).  However, control alone is not sufficient to pierce the corporate veil.  Chinese law – consistent with the law of Alabama, Florida, Louisiana, Mississippi and Texas – does not permit veil piercing absent evidence of shareholder "abuse" that "damage[s] the rights and interests of company creditors."[216]

Plaintiffs also rely on the fact that some KPT directors and officers also are directors and/or officers of other Knauf entities.  But that fact does not demonstrate any abuse to the detriment of KPT's creditors.  Nor is that fact surprising or unusual.  Knauf International owns the stock of KPT, which gives International the right to appoint the directors of KPT.[217]  It is well-settled that an overlap of officers or directors is insufficient to pierce the corporate veil.[218]

Nor is the fact that other Knauf entities provide certain contractual services to KPT sufficient to pierce the corporate veil.  The provisions of services to KPT did not and could not

---

[215]   KPT's Articles of Association make clear that Knauf International is "[t]he only shareholder" of KPT.  KPT0074303-20 (Ex. 85) at KPT0074305.  Plaintiffs have never addressed the fact that piercing a defendant's corporate veil only permits a plaintiff to reach the assets of the defendant's shareholders.  *See* Howson Aff. (Ex. 84) at ¶ 13 (discussing a recent decision of a Chinese court that declined to pierce the corporate veil of a Chinese corporation because the defendant "was not in fact a direct shareholder of the legal person debtor"); *see also Molinos Valle Del Cibao, C. Por A. v. Lama*, 633 F.3d 1330, 1351 (11th Cir. 2011) ("[T]he Florida Supreme Court would decide [that Florida law] does not permit a plaintiff to pierce the corporate veil against a non-shareholder director."); *Canon Latin Am., Inc. v. Lantech (C.R.) S.A.*, 2011 WL 240684, at *12 (S.D. Fla. Jan. 24, 2011) (summary judgment in favor of defendant "[b]ecause it is undisputed that Jimenez is not a shareholder in Lantech, as is required to pierce the corporate veil under Florida law").

[216]   Howson Aff. (Ex. 84) at ¶ 9.

[217]   KPT0074303-20 (Ex. 85) at KPT0074308 (Articles of Association).

[218]   *See*, *e.g.*, *Jackson*, 615 F.3d at 587; *Sol Melia, S.A. v. Fontana*, 67 So. 3d 1226, 1228 (Fla. Dist. Ct. App. 2011).

redound to the detriment of KPT's creditors.[219]  There is no evidence that KPT's resources were diverted to provide gratuitous services to other Knauf entities.

In their pleadings, Plaintiffs repeatedly rely on a decision of the European Court of Justice affirming the European Commission's finding that European Knauf entities were held jointly and severally liable for antitrust violations committed by certain Knauf entities in Europe. The European Court of Justice based its decision on a finding that those European Knauf entities constituted a "single economic unit" for purposes of European Union antitrust law.  However, the EU decision has no bearing on veil-piercing issues under Chinese (or U.S.) law for a number of reasons.

- The instant case is governed by Chinese law, not EU law.[220]

- The EU decision does not make any finding that any Knauf entity abused the corporate form of KPT (or any other Knauf entity) to the detriment of KPT's creditors and thus has no bearing on that essential element of Plaintiffs' claims under Chinese (or U.S.) law.[221]

---

[219]  *See Dalton v. R & W Marine, Inc.*, 897 F.2d 1359, 1363 (5th Cir. 1990) (rejecting alter ego theory where the parent "offers benefit plans to its subsidiaries' employees," the parent "owns 100% of its subsidiaries and remains responsible for general policy," and the "subsidiaries funnel their revenues into centralized bank accounts and file a consolidated federal tax return with" the parent); *Gibraltar Savings v. LDBrinkman Corp.*, 860 F.2d 1275, 1291 (5th Cir. 1988) ("That [the parent corporation's] chief financial officer and in-house counsel provided services for the subsidiaries was neither unusual nor improper;" affirming judgment notwithstanding the verdict in favor of parent corporation); *In re SMTC Mfg. of Texas*, 421 B.R. 251, 323 (Bankr. W.D. Tex. 2008) ("To obtain economies of scale, multinational corporations often provide services to their subsidiaries such as obtaining financing and providing information technology, accounting, engineering, marketing, and other services;" judgment for parent corporation on veil-piercing claim).

[220]  *See supra* Section III.B(4)(b)(1)(b).

[221]  *See* Case C-407/08P, *Knauf Gips KG v. Comm'n* [2010] O J C 234, 5 C.M.L.R. 12 ("*Knauf Gips CJEU*"), attached as Ex. 88; Deposition of Philip Marsden dated Nov. 8, 2011 ("Marsden Dep."), attached as Ex. 89, at 171:16-178:3.

- The EU decision involved activity in Europe from March 31, 1992 to November 25, 1998[222] – *before KPT was even acquired by Knauf International in 1999*,[223] and therefore before KPT had an affiliation with any Knauf entity. The EU decision only involves European Knauf entities,[224] and as such, says absolutely nothing about any Knauf entity's relationship to KPT or anything about KPT's operations.

- The EU decision is a function of European Union competition law principles, which differ materially from the corporate law principles at issue in Plaintiffs' veil-piercing claims.[225] Under European competition law, to deter anticompetitive conduct and maximize fines imposed on violators, there is a *presumption* that all affiliated companies are part of a "single economic unit."[226] By contrast, there is no corresponding presumption under Chinese or U.S. veil-piercing law that entities are responsible for the acts of their separately incorporated affiliates; rather, to the contrary, it is presumed that corporate affiliates are not responsible for each other's debts.[227]

- The EU decision itself explicitly recognized that companies can be treated as a "single economic unit" for purposes of European competition law, "*even if in law that economic unit consists . . . of several persons, natural or legal*."[228] In other words, even under European law, the determination that a group of companies constitute a "single business enterprise" for purposes of European competition law has no bearing on whether those companies are separate entities for other purposes.

In sum, this litigation has produced no evidence that would support a showing that any

Knauf entity has abused KPT's corporate form to the detriment of KPT's creditors. Therefore,

---

[222]   *Knauf Gips CJEU* (Ex. 88) at ¶ 3(14).

[223]   Robson Dep. (Ex. 9) at 41:10-22, 199:3-200:5.

[224]   *See Knauf Gips CJEU* (Ex. 88) at ¶ 3(17).

[225]   *See* Marsden Dep. (Ex. 89) at 171:16-178:3.

[226]   *See id*.

[227]   *See supra* Section III.B(4)(b)(1)(a). As the Florida Supreme Court has explained, a contrary rule "would completely destroy the corporate entity as a method of doing business and it would ignore the historical justification for the corporate enterprise system." *Advertects, Inc. v. Sawyer Indus., Inc.*, 84 So. 2d 21, 24 (Fla. 1955).

[228]   *Knauf Gips CJEU* (Ex. 88) at ¶ 64.

plaintiffs would be unable to support their veil piercing claim, or at a minimum would face substantial obstacles in establishing liability against the Remaining Knauf Defendants based on such a theory.

**(2)      No Viable Agency Argument**

Plaintiffs also have alleged that Knauf Gips is liable for KPT's conduct because KPT supposedly acted as Knauf Gips' agent and that Knauf Insulation is liable for having acted as KPT's sales agent in facilitating KPT's sale of drywall to InEx.  As with Plaintiffs' veil-piercing theory, Plaintiffs would be unable to establish liability against Knauf Gips or Knauf Insulation based on an agency theory or, at a minimum, would face substantial hurdles in satisfying their burden.[229]

**(a)      KPT did not have actual authority to act on behalf of Knauf Gips**

Plaintiffs would be unable to establish an actual agency relationship between KPT and Knauf Gips, "which requires: (1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; *and* (3) control by the principal over the actions of the agent."[230]  Indeed, an actual agency theory would fail as a matter of law under

---

[229]   *John Deere Const. Equip. v. England*, 883 So. 2d 173, 179 (Ala. 2003) ( "[w]hen a defendant's liability is to be based on agency, agency may not be presumed; . . . the party asserting agency has the burden of presenting [sufficient] evidence of the alleged agency") (alterations in original); *accord Nolan v. Boeing Co.*, 736 F. Supp. 120 125 (E.D. La. 1990) ("An agency relationship cannot be presumed; it must be clearly established."); *Enic, PLC v. F.F. S. & Co., Inc.*, 870 So. 2d 888, 891 (Fla. Dist. Ct. App. 2004) ("Determination of the existence of an agency is an issue of fact and the burden is on the plaintiff to establish a prima facie case.").

[230]   *Whetstone Candy Co., Inc. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1077 (11th Cir. 2003); *accord Butcher v. Superior Offshore Int'l, LLC*, 754 F. Supp. 2d 829, 835 (E.D. La. 2010); *Adm's of Tulane Educ. Fund v. Biomeasure, Inc.*, 687 F. Supp. 2d 620, 629-30 (E.D. La. 2009) (noting that Louisiana has codified actual agency under Civil Code Article 2985), *aff'd*, *Adm's of Tulane Educ. Fund v. Ipsen, S.A.*, 450 Fed. App'x 326 (5th (continued...)

the first two requirements because there is no express agreement between Knauf Gips and KPT stating that KPT is expressly authorized to act as an agent of Knauf Gips.[231] First, Knauf Gips did not authorize KPT to enter into contracts on behalf of Knauf Gips.  Knauf Gips made no representations whatsoever to KPT that would suggest Knauf Gips' willingness to assume responsibility for KPT's contracts.  Second, KPT did not accept such an arrangement to contract on behalf of Knauf Gips.  KPT's sales contracts state that KPT, and no one else, is the seller of KPT's drywall that was sold in the United States.[232]

> **(b)** **Knauf Gips did not imply to Plaintiffs that KPT is authorized to act for Knauf Gips**

Plaintiffs also would be unable to establish that KPT acted as Knauf Gips' agent under an implied agency theory.  "To establish implied agency in this case, Plaintiffs must show:  (1) that [Knauf Gips] made some overture or inference directly to the Plaintiffs *and* (2) that Plaintiffs reasonably relied on [KPT's] purported authority as a direct consequence of these

---

Cir. 2011); *Reynolds Am., Inc. v. Gero*, 56 So. 3d 117, 119 (Fla. Dist. Ct. App. 2011); *Enic*, 870 So. 2d at 891 (citing *Goldschmidt v. Holman*, 571 So. 2d 422, 424 n.5 (Fla. 1990)).

[231]   *See Adm's of Tulane Educ. Fund*, 687 F. Supp. 2d at 630 (granting parent company's motion to dismiss actual agency claim; "Plaintiffs do not claim (and have not presented any evidence) that [the parent company] expressly appointed [the subsidiary] to negotiate or enter into the [Research Funding Agreement] and Licensing Agreement with plaintiffs. Instead plaintiffs assert that [the subsidiary] acted as an implied agent for [the parent companies]."), *aff'd*, *Ipsen, S.A.*, 450 Fed. App'x 326 ("Though Plaintiffs make a bald assertion that [the subsidiary] was [the parent's] actual agent, they offer no evidence to support an express authorization for [the subsidiary] to act as [the parent's] agent with regard to the RFA or Licensing Agreement."); *see also Qualley v. Int'l Air Serv. Co.*, Ltd., 595 So. 2d 194, 196 (Fla. Dist. Ct. App. 1992) (granting parent company's motion to dismiss actual agency claim; "There is no language in the contractual provision [between the parent company and the subsidiary] which constitutes any undertaking by [the parent company] to assume liability for the obligations of [its subsidiary].").

[232]   *See, e.g.*, INT/EXT000525 (Ex. 27).

representations."[233]  Notably, under this test, reliance cannot be created by the agent, but must instead be "based upon the principal's holding the agent out to a third party as having the authority upon which he acts."[234]

Here, with respect to the first prong of the test, there is no evidence in the discovery record that Plaintiffs had any direct communication with Knauf Gips wherein Knauf Gips implied that KPT was its agent.

With respect to the second prong, even assuming, contrary to fact, that any Plaintiff had communicated with Knauf Gips, the Fifth Circuit has stated that:

> [T]he mere fact that [plaintiff] met with Ipsen employees does not establish an agency relationship when the declaration does not state for what purposes he met with Ipsen employees or that the employees represented to him that Biomeasure was acting on behalf of Ipsen. Because Plaintiffs at no point assert reliance on representations made by Ipsen, their implied agency claim cannot succeed.[235]

Here, having never communicated with Knauf Gips, Plaintiffs clearly could not establish reliance on representations from Knauf Gips that KPT was acting as its agent.

---

[233]   *Ipsen*, 450 Fed. App'x at 333; *accord Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995) (emphasis added) ("Our law is well settled that an apparent agency exists only if each of three elements are present: (a) a representation by the purported principal; (b) a reliance on that representation by a third party; and (c) a change in position by the third party in reliance on the representation.").

[234]   *John Deere Const. Equip.*, 883 So. 2d at 179 (quotation marks and citations omitted) (reversing judgment in favor of plaintiff and holding that there was no apparent agency relationship between manufacturer and its dealer); *see Bransford*, 648 So. 2d at 121 ("It is the first of these elements that is primarily relevant here.  The factual allegations in the complaint below clearly fail to allege even the minimum level of a 'representation' necessary to create an apparent agency relationship.  The plaintiff below alleged no genuine factual representation by Mobil, but merely assumed that such a representation is implicit in the prominent use of Mobil symbols and products throughout the station and in the provision of support activities.  As noted above, such an assumption is not sustainable in today's world.").

[235]   *Ipsen*, 450 Fed. App'x at 333.

Therefore, Plaintiffs would be unable to impose liability on Knauf Gips on the alleged ground that KPT acted as its agent under either an actual or implied agency theory.

### (c)     Knauf Insulation could not be liable as KPT's sales agent

Knauf Insulation is the only Knauf Defendant with assets in the United States.  Seeking to reach those assets, Plaintiffs contend Knauf Insulation is liable to them because it supposedly acted as KPT's sales agent when it referred InEx to KPT for the purchase of KPT Drywall.  As an initial matter such a theory is available only to Class Members whose KPT drywall was supplied by InEx.  This theory would not be available to Class Members from Florida who have Banner-supplied or L&W-supplied KPT Drywall installed in their homes because Knauf Insulation played no role in referring Banner or L&W to KPT.

InEx-supplied Class Members would fare no better, however.  First, even assuming, contrary to fact, that Knauf Insulation acted as KPT's sales agent, Knauf Insulation would not be liable for KPT's defective drywall.  It is well-established that an agent cannot be liable for the debts of its principal where the identity of the principal is disclosed, unless the agent either expressly agrees to be liable or engages in tortious conduct himself.[236]  As the Restatement (Third) of Agency states:

---

[236]     *See Whitney v. Wyman*, 101 U.S. 392, 392, 396 (1879); *Validsa, Inc. v. PDVSA Servs., Inc.*, 424 F. App'x 862, 874 (11th Cir. 2011); *Lake City Stevedores, Inc. v. E.-W. Shipping Agencies, Inc.*, 474 F.2d 1060, 1063 (5th Cir. 1973) (holding that agent is not liable despite significant dealings with third-party); *Speer v. Taira Lynn Marine, Ltd., Inc.*, 116 F. Supp. 2d 826, 829-30 (S.D. Tex. 2000) ("There is no such thing as *respondeat inferior*"; "while the Court appreciates Plaintiff's creative reasoning, this argument utterly lacks support in the law, and if accepted would turn agency law on its head."); *Tyler v. Walt*, 167 So. 182, 187 (La. 1936); *First State Bank of Childress v. Fields*, 551 S.W.2d 476, 478 (Tex. Civ. App. 1977); *Sylvas v. Heckel*, 162 So. 2d 774 (La. Ct. App. 1964) (holding that salesperson cannot be liable for principal's wrongful refusal to return deposit).

> Only an agent's own tortious conduct subjects the agent to liability under this rule. An agent is not subject to liability for torts committed by the agent's principal that do not implicate the agent's own conduct; *there is no principle of* "*respondeat inferior.*" Likewise, an agent is not subject to liability for torts committed by the agent's predecessor or coagent.[237]

Indeed, courts routinely refuse to hold sales agents or brokers liable for product defects.[238]

There is no evidence that KPT's identity was undisclosed. In fact, the contracts between InEx and KPT, which InEx negotiated and signed, clearly state that KPT is the seller and do not reference Knauf Insulation whatsoever.[239] There also is no evidence that Knauf Insulation agreed to be liable for the debts of KPT. Indeed, no party has so alleged.

Nor is there any evidence that Knauf Insulation committed a tortious act. Knauf Insulation did not oversee KPT's manufacturing. Given the mysterious and latent nature of the defect, along with Knauf Insulation's lack of knowledge about manufacturing drywall – since it

---

[237]     § 7.01, cmt. d. (2006) (emphasis added).

[238]     *See Home Ins. Co. v. A. J. Warehouse*, 210 So. 2d 544, 551 (La. Ct. App. 1968) (finding "no possible basis" for a determination of liability against a broker-distributor in connection with the sale of allegedly defective shelving, where the broker-distributor "simply got the parties together" and conveyed the customer's requirements to the manufacturer); *Ankum v. White Consol. Indus.*, No. 91-2990, 1992 WL 185705, at *3 (E.D. La. July 30, 1992) ("[C]ommon sense dictates that a broker that connects two people, even if it negotiates the terms of the contract and advertises the product, is not a seller."); *Southern v. Pfizer, Inc.*, 471 F. Supp. 2d 1207, 1219 (N.D. Ala. 2006) (negligence claim against pharmaceutical sales representatives had "no possibility of survival in Alabama state court" because sales agents were not "sellers"); *Bloodsworth v. Smith & Nephew*, No. 2:05CV622-D, 2005 WL 3470337, at *7 (M.D. Ala. Dec. 19, 2005) (A sales agent is not deemed a "seller" under Alabama law and cannot be held liable on a "claim for negligent manufacture or sale"); *Ames v. Ford Motor Co.*, 299 F. Supp. 2d 678, 680 (S.D. Tex. 2003) (granting summary judgment on grounds that customs broker could not be "deemed a seller for products liability purposes under Texas law).

[239]     *See*, *e.g.*, INT/EXT000525 (Ex. 27).

was in the insulation business, not in the drywall business – Knauf Insulation had no reason to know that KPT's drywall might be defective.

In any event, even if an agent were liable for the debt of its principal (and it is not) Plaintiffs would be unable to make the threshold showing that Knauf Insulation acted as KPT's sales agent.  As discussed above, that would require Plaintiffs to prove "that: (1) the principal indicated the agent was acting for it, (2) the agent acted or agreed to act on the principal's behalf, and (3) the agent was subject to the principal's control."[240]

Plaintiffs would be unable to establish these elements.  There is no evidence that KPT suggested to anyone – Knauf Insulation and InEx included – that Knauf Insulation had authority to act on KPT's behalf.  Nor is there any evidence that Knauf Insulation acted or agreed to act on KPT's behalf, or that KPT exercised any control over Knauf Insulation.  Thus, Knauf Insulation did not act as KPT's sales agent by referring InEx to KPT.

Similarly, Plaintiffs could not establish an implied agency relationship because there is no evidence that KPT represented to InEx that Knauf Insulation was KPT's sales agent, and therefore, InEx could not possibly have relied on such representations.

### (3)  Jurisdictional Defenses

As the Fifth Circuit has held, settlements are particularly favored where, as here, the court's personal jurisdiction over foreign defendants "was in doubt."[241]  KPT, Knauf Wuhu, Knauf Dongguan and Knauf Insulation have not contested jurisdiction.[242]  But all other foreign

---

[240]  *Butcher*, 754 F. Supp. 2d at 835; *accord Enic*, 870 So. 2d at 891.

[241]  *See Newby*, 394 F.3d at 306.

[242]  Knauf Wuhu and Knauf Dongguan have not contested jurisdiction relating to their own sales of drywall in the U.S.  They would contest jurisdiction with respect to KPT's sales of drywall.

Knauf Defendants have contested jurisdiction.  Moreover, the jurisdictional issues related to these foreign Knauf Defendants are different than those recently considered by this Court in connection with Taishan.  Unlike Taishan, the foreign Knauf Defendants that are contesting jurisdiction did not sell the allegedly defective drywall that was installed in Plaintiffs' properties. None has any contacts with Alabama, Florida, Louisiana, Mississippi and/or Texas that would permit courts in those states to exercise jurisdiction over them.

It is well-settled that to establish jurisdiction over a defendant, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."[243]  The defendant's affirmative contacts with the state must be sufficient for a court to exercise either general or specific jurisdiction, depending on whether the cause of action arises out of those contacts:

> A court may assert *general* jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so "continuous and systematic" as to render them essentially at home in the forum State.  *Specific* jurisdiction, on the other hand, depends on an "affiliatio[n] between the forum and the underlying controversy," principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.[244]

As the Fifth Circuit recently explained:

> The "continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum."  To confer general jurisdiction, a defendant must have a business presence *in* the forum state. Injecting a product, even in substantial volume, into a forum's

---

[243]   *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945).

[244]   *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011) (citations omitted) (emphasis added).

"stream of commerce," without more, does not support general jurisdiction.[245]

The key states certainly do not have general jurisdiction over the foreign Knauf Defendants because they have had no meaningful contact – never mind "continuous and systematic" contact – with the key states.  There is no evidence that, in any of the five states, the foreign Knauf Defendants:

- maintain any offices, employees or agents;

- own, use, possess or have any other interest in property;

- sell its products to residents;

- advertise its products to residents or otherwise solicit sales from residents;

- receive mail;

- have a telephone listing; or

- pay taxes.

In short, no state could obtain *general* jurisdiction over the foreign Knauf Defendants because none has a business presence in the states.

Plaintiffs also would be unable to establish *specific* jurisdiction over the foreign Knauf Defendants.  Most notably, none of the foreign Knauf Defendants had any involvement in the

---

[245]   *Jackson*, 615 F.3d at 588 (citations omitted); *see Brown*, 131 S. Ct. at 2857 (unanimously holding that sales *to* the forum state, like the "mere purchases" from and business negotiations and trainings in the forum state in *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984), fail to demonstrate a business presence *in* the state); *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 611-14 (5th Cir. 2008); *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1292 (11th Cir. 2000); *Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999) ("The record shows that [defendant] simply exercised its right to structure its affairs in a manner calculated to shield it from the general jurisdiction of forums"); *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 372-73 (5th Cir. 1987) (holding that purchases of nearly $195 million and sales of $250 million was not sufficient to establish general jurisdiction).

manufacturing, negotiations or sales of KPT drywall in the United States.[246]   And, Plaintiffs' claims in no way arise out of the foreign Knauf Defendants' own products or any of alleged connections to the forum states, as is required to support jurisdiction over the foreign Knauf Defendants directly.   Finally, plaintiffs would not be able to establish personal jurisdiction over any of the foreign Knauf Defendants by attributing KPT's contacts with the relevant jurisdictions to the foreign Knauf Defendants.   To do so, Plaintiffs would have to pierce KPT's corporate veil or establish that KPT acted as the agent for one or more of the foreign Knauf Defendants, which as explained above, Plaintiffs would be unable to do.[247]

Accordingly, even establishing jurisdiction over the foreign Knauf Defendants would pose substantial obstacles to Plaintiffs.

### (4)   German Collection Defenses

Assuming that Plaintiffs were to receive a judgment against any of the German Knauf Defendants, Plaintiffs would be required to enforce that judgment in Germany.[248]   Such an

---

[246]   *See* Norris Dep. I (Ex. 43) at 97:3-98:18; Norris Dep. II (Ex. 28) at 770:14-771:7, 773:1-21, 777:19-778:5.

[247]   *See, e.g.*, *Sherritt*, 216 F.3d at 1293 ("It is well established that as long as a parent and a subsidiary are separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other."); *Dickson Marine*, 179 F.3d at 338 (holding that plaintiff, "the proponent of the agency/alter ego theory," failed to meet its burden of overcoming the "presumption of corporate separateness . . . by clear and convincing evidence"); *Cross Country Home Servs., Inc. v. Home Serv. USA Corp.*, No. 08-61456, 2010 WL 55439 (S.D. Fl. Jan. 6, 2010) (holding that court may only consider parent company's direct contacts with Florida and not its subsidiary's contacts because plaintiff had failed to establish an agency or alter-ego relationship; granting parent company's motion to dismiss for lack of personal jurisdiction).

[248]   This brief focuses on the obstacles to collecting a judgment in Germany – rather than in Indonesia, Brazil and the United Kingdom, where other foreign Knauf Defendants are located – because no plaintiff has made a serious attempt to establish liability of the entities based in Indonesia, Brazil or the United Kingdom.   We do not imply that it would be any easier to collect in those countries.

enforcement action would entail substantial cost and delay for Plaintiffs, not least because German courts will not even entertain enforcement of a United States civil judgment until all appeals have first been exhausted in the United States.[249]   Subsequent enforcement proceedings in Germany could themselves entail three separate stages of litigation, consisting of the "first-instance enforcement proceedings and two subsequent appeals."[250]   In addition, American Plaintiffs seeking enforcement of an American judgment in Germany would be obliged not only to make an advance payment to the German court to effect "service of process on the defendant,"[251] but they would also be obliged, upon the demand of the defendant, to post a bond in an amount at the discretion of the German court.[252]   Because the losing party bears the costs of litigation under German law,[253] an American plaintiff pursuing a German enforcement action would be required to post a substantial bond in an amount no less than the legal fees that it would be anticipated the defendants would incur if the enforcement action were not successful.[254]   Accordingly, even assuming Plaintiffs were able to obtain a judgment against any one of the

---

[249]   Affidavit of Joachim Zekoll dated Aug. 19, 2012 ("Zekoll Aff."), attached as Ex. 90, at ¶¶ 14-15 ("The enforcement of foreign judgments requires their finality."); s*ee also* Andre R. Fiebig, *The Recognition and Enforcement of Punitive Damage Awards in Germany: Recent Developments*, 22 GA. J. INT'L & COMP. L. 635, 637 (1992).

[250]   *See* Zekoll Aff. (Ex. 90) at ¶ 15.

[251]   *Id.* at ¶ 15.

[252]   *See id.* at ¶ 16.

[253]   *Id.* at ¶ 15.

[254]   *Id.* at ¶¶ 15-16.

German Knauf Defendants, Plaintiffs would likely be required to advance substantial sums to undertake the enforcement of that judgment in Germany.[255]

The risks of committing to such an expensive and time-consuming process would be substantial, for Plaintiffs' likelihood of success in enforcing a United States class action judgment in Germany is decidedly uncertain. The uncertainties begin with the issue of jurisdiction, for under the German Code of Civil Procedure, recognition of a foreign judgment is foreclosed unless the German courts are satisfied that the foreign court's jurisdiction was proper *under German law*.[256] In conducting this analysis, German courts must "fully review the jurisdictional findings of the foreign court as well as the factual allegations supporting them *de novo* and apply exclusively German law in doing so."[257] German courts will not recognize assertions of jurisdiction that have no equivalent under German law. Moreover, German courts are obliged to reassess all of the underlying facts relevant to the jurisdictional issue, and the parties are entitled to challenge all such facts anew.[258] Thus, pursuit of an enforcement action in Germany could entail substantial re-litigation of key factual issues. Ultimately, if a German court were to conclude that the American court lacked jurisdiction under German law, then "the American judgment would not be recognized in Germany."[259]

---

[255]   *See id.* at ¶¶ 15-16.

[256]   *Id.* at ¶ 8; *see also* Fiebig, *supra* note 249, at 638 ("[T]he rendering court must have had proper jurisdiction *according to German law*." (emphasis added)).

[257]   Zekoll Aff. (Ex. 90) at ¶ 8.

[258]   *Id.* at 8.

[259]   *Id.* at 8.

To the extent that Plaintiffs rely on alter-ego or agency theories to obtain jurisdiction over the German Knauf Defendants, Plaintiffs must also contend with the real risk that German courts will not countenance the alter ego or agency theories advanced by Plaintiffs.  Recognizing the "fundamental principle that corporations are distinct legal entities," German courts have taken a "strong stance against veil piercing" and will disregard the corporate form only in "extremely exceptional situations" involving a "fundamental infraction of corporate governance law."[260] Agency under German law is likewise subject to strict standards, for German courts require (1) that the "person acting as agent . . . be vested with the power of agency," *e.g.*, by operation of contract or by operation of law, and (2) that the agent was clearly acting "in behalf of the principal," either by the agent's own explicit declaration or because the "circumstances clearly indicate the intent to act in the principal's name."[261]  Plaintiffs would face substantial hurdles, to say the least, in convincing a German court that any one of the German Knauf Defendants authorized KPT to act as its agent, and there is likewise no evidence that KPT indicated that it was acting in the name of any German Knauf Defendant.  Plaintiffs' inability to satisfy "these core requirements of German agency law is fatal for any agency-based claim."[262]  We emphasize again that findings by a U.S. court on veil piercing or agency would not bind a German court in a jurisdictional challenge, and the issue would be litigated anew in Germany.

Any plaintiff seeking enforcement of an American class action judgment in Germany must also confront the "distinct possibility" that recognition of such a judgment will be barred as

---

[260]     *Id.* at ¶¶ 9, 11.

[261]     *Id.* at ¶ 12.

[262]     *Id.* at ¶ 13.

a matter of German public policy and statutory law.[263]   Class actions are unknown in Germany,[264] and although the German courts have never squarely addressed the issue of recognition of foreign class actions,[265] there is substantial reason to believe that German courts would be averse to recognition and enforcement of an American class action judgment.  In fact, the highest court in Germany, the Federal Constitutional Court, blocked the service of a class action complaint on a German company due in part to the Court's conviction that the "potential for abuse inherent in such actions could force defendants into unreasonable settlements."[266] Moreover, certain features of the class action system in the United States may be "fundamentally at odds with core principles of German law."[267]  It has been argued, for example, that the opt-out mechanism underlying United States class actions is incompatible with Germany's constitutional right to be heard, enshrined in Article 103(1) of the German Federal Constitution.[268]  The opt-out mechanism is also in marked tension with the general procedural right of parties in Germany to "exercise control over the scope and content of the proceedings."[269]  In particular, the opt-out

---

[263]   *Id.* at ¶ 6.

[264]   *See* Andrea Pinna, *Recognition and Res Judicata of US Class Action Judgments in European Legal Systems*, 1 ERASMUS L. REV. 31, 46 (2008) (In Germany, "class-action mechanisms are still unknown.").

[265]   Zekoll Aff. (Ex. 90) at ¶ 3.

[266]   *Id.* at ¶ 5 ("At least one other German court has come to the same conclusion."); *see also* Fiebig, *supra* note 249, at 635 (noting that the "German legal community . . . considers the U.S. torts system absurd and excessive . . . largely due to the effect that U.S. damage awards typically exceed those granted by German courts . . . .").

[267]   Zekoll Aff. (Ex. 90) at ¶ 4.

[268]   *Id.* at ¶ 4.

[269]   *Id.* at ¶ 5.

mechanism may violate a fundamental principle of German procedural law, embodied in the German Code of Civil Procedure, which guarantees to each aggrieved party the right to "decide for himself whether, when, and with precisely what sort of demand for relief he will assert his right in court."[270]   Although these concerns address potential unfairness to plaintiffs, the defendant would be able to challenge the class judgment because German public policy "does not aim at the protection of a particular party (plaintiff or defendant), but serves the purpose of safeguarding fundamental (German) legal principles."[271]   Furthermore, it would be unfair to enforce a judgment obtained through a procedure that from the outset would bind only the defendant and not the class members.[272]   Given the misgivings expressed by German courts regarding United States class actions, there is considerable reason to doubt whether an American class action judgment would survive enforcement proceedings before a German court.[273]

### c)      Allocation of Fault

Four of the five key states – Florida, Louisiana, Mississippi and Texas – not only require that a plaintiff's damages be allocated amongst each defendant in proportion to their relative fault, but have also statutorily abolished or significantly limited the application of joint and

---

[270]   *Id.* at ¶ 5 (internal quotation marks and citations omitted); *see also* Pinna, *supra* note 264, at 47 (The "vast majority of German doctrine" holds that the "inclusion of absent class members without their consent violates plaintiffs' fundamental rights.")

[271]   Zekoll Aff. (Ex. 90) at ¶ 5.

[272]   *See id.* at ¶ 6.

[273]   *Id.* at ¶ 5.

several liability.[274]   Similarly, these states reduce a plaintiff's damages by the plaintiff's own comparative fault.[275]

Three of these states – Florida, Louisiana and Mississippi – have abolished joint and several liability except in cases where the defendant has committed an intentional tort.[276]   Those exceptions are not applicable where, as here, the plaintiffs are injured by the unintentional acts of multiple independent tortfeasors.

Additionally, in Texas, a defendant can only be required to pay more than its share of damages where the defendant is found to be more than 50% at fault.[277]   Here, any defendant consistently found to be more than 50% at fault might quickly exhaust its ability to pay its own share of damages, even assuming its assets were accessible to U.S. litigants.

---

[274]   Fla. Stat. Ann. § 768.81(3) ("In a negligence action, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability."); La. Civ. Code Ann. Art. 2324(B) (A "tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person."); Miss. Code Ann. § 85-5-7(2) (Liability shall "not [be] joint and several and a joint tort-feasor shall be liable only for the amount of damages allocated to him in direct proportion to his percentage of fault."); Tex. Civ. Prac. & Rem. § 33.013(a) ("[A] liable defendant is liable to a claimant only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility.").

[275]   *See* Fla. Stat. Ann. § 768.81(2); La. Civ. Code Ann. Art. 2323(A); Miss. Code Ann. § 11-7-15; Tex. Civ. Prac. & Rem. § 33.012(a).

[276]   Fla. Stat. Ann. § 768.81(4) (excluding intentional torts and claims "resulting from pollution" or where "joint and several liability is specifically provided by chapter 403 ['Environmental Control'], chapter 498 ['Land Sales Practices'], chapter 517 ['Securities Transactions'], chapter 542 ['Combinations Restricting Trade or Commerce'], or chapter 895 ['Offenses Concerning Racketeering and Illegal Debts']"); La. Civ. Code Ann. Art. 2324(A) (excluding conspiracies "to commit an intentional or willful act"); Miss. Code Ann. § 85-5-7(3) (excluding claims wherein defendants "consciously and deliberately pursue a common plan or design to commit a tortious act, or actively take part in it").

[277]   Tex. Civ. Prac. & Rem. § 33.013(b)(1); *see also* Tex. Civ. Prac. & Rem. § 33.013(b)(2) (excluding conspiracies to commit specified crimes).

Even in the most straightforward case – where the individual plaintiff has only one type of Chinese Drywall that was purchased through only one chain of distribution – there are likely to be several parties other than Knauf Defendants that substantially share in the plaintiff's damages, including key distributors such as Banner and InEx.  For example, in *Seifart v. Banner Supply Co.*, the jury attributed fault to each of the four parties identified on the verdict form: Banner (55%); KPT (35%); La Suprema (5%); and Rothchilt (5%).[278]  In the "checkerboard" homes with both KPT and Taishan board, fault would need to be allocated between an even greater number of parties.

Moreover, even assuming that every Knauf Defendant were somehow liable, fault would need to be allocated among these different Knauf entities.  KPT – the only Knauf Defendant who manufactured defective Chinese Drywall – would almost certainly be found more at fault than any of the other Knauf Defendants.  Accordingly, if liability were divided between KPT and any of the other Knauf Defendants, the greater portion of the resulting judgment would likely be allocated to KPT and would almost certainly be unrecoverable because China does not honor U.S. judgments.

### d) Conclusion

The legal, factual and jurisdictional obstacles to Plaintiffs' success on the merits– obstacles recognized and acknowledged by the PSC[279] – are considerable.  Even if Plaintiffs

---

[278]   *See* Final Judgment Against Banner Supply Co., *Seifart v. Banner Supply Co.*, No. 09-38887 CA (42) (Fla. Cir. Ct., Jan. 10, 2011) (Ex. 82).

[279]   *See* Memorandum of Law in Support of the Joint Motion of Proposed Settlement Class Counsel, the PSC, and the Knauf Defendants for an Order:  (1) Preliminarily Approving the Knauf Settlement; (2) Conditionally Certifying a Settlement Class; (3) Issuing Class Notice; (4) Scheduling a Fairness Hearing; and (5) Staying Claims Against the Knauf Defendants, at 20 (Rec. Doc. No. 12061-4) ("Settlement Class Counsel and the PSC . . .
(continued...)

were able to prevail on the merits, recovery would present its own "almost insurmountable problems," particularly given the substantial legal obstacles preventing enforcement of U.S. judgments in China.[280]   The Eastern District of Louisiana has observed that this kind of "uncertainty about the outcome" of a litigation "weighs heavily in favor of approving the settlement agreement."[281]   The contrast is particularly clear where, as here, the proposed settlement delivers benefits to Plaintiffs beyond those that could reasonably be expected even if Plaintiffs were to succeed at trial.  Taken together, the generous compensation guaranteed under the Knauf Settlement, the difficulty of prevailing at trial against the Knauf Defendants – particularly those among the Knauf Defendants that had no hand in manufacturing, selling or distributing the defective drywall – and the unlikelihood that Plaintiffs, if successful, would ever be able to collect on any judgment against the sole Knauf Defendant that manufactured and sold the defective product, strongly favor a finding that the Knauf Settlement is "preferable to litigation."[282]

### 5. Opinions of the Class Counsel, Class Representatives, and Absent Class Members

The Knauf Defendants refer to the brief submitted on behalf of the Class in support of the Knauf Settlement for the opinions of class counsel and class representatives regarding the

---

recognize that Plaintiffs would face serious obstacles to establishing both liability and damages should the cases proceed to trial.").

[280]   *See Newby*, 394 F.3d at 302.

[281]   *Altier*, 2012 WL 161824, at *18 ("[U]ncertainty about the outcome weighs heavily in favor of approving the settlement agreement."); *see also Turner*, 472 F. Supp. 2d at 849.

[282]   *Turner*, 472 F. Supp. 2d at 849.

fairness, reasonableness and adequacy of the Knauf Settlement.   Objections to the Knauf Settlement will be addressed after the conclusion of the opt-out/objection period.

## IV.   <u>CONCLUSION</u>

As demonstrated above, the Knauf Settlement is fair, reasonable and adequate.   Class Members will obtain full remediation of their properties in addition to compensation for economic losses caused by KPT drywall.   In addition and significantly, the Knauf Defendants have agreed to pay Class Members' attorneys' fees and costs so that none of the other benefits provided to Class Members under the Knauf Settlement will be diverted for that purpose.

Those settlement benefits far exceed any recovery that Class Members likely would obtain if they litigated their claims.   Plaintiffs almost certainly would be unable to recover from KPT, the manufacturer of the drywall, because China does not enforce judgments obtained in the United States.   Plaintiffs' claims against the other Knauf Defendants entail substantial obstacles to recovery.   Those Knauf Defendants are affiliates of KPT, none of which manufactured, sold or supplied the drywall at issue.   In light of those facts, Plaintiffs would be unlikely to establish liability against, or even personal jurisdiction over, any of those Knauf Defendants.   At a minimum, doing so would be extremely problematic for Plaintiffs.

Even if Plaintiffs could overcome those obstacles, liability likely would be allocated among other responsible parties in the supply chain, thereby limiting the amount of any judgment against any Knauf Defendant to only that percentage of the judgment for which that Knauf Defendant was determined to be at fault.   Thus, to be fully compensated, Plaintiffs likely would have to rely on recovering from other entities in the supply chain, some of which might be judgment proof.   Plaintiffs would face additional significant obstacles in attempting to enforce any resulting judgments against those Knauf Defendants in Germany.   Recovery, if any, would be achieved only at substantial cost and after years of litigation, appeals and enforcement efforts.

In sum, the substantial benefits offered by the Knauf Settlement outweigh the significant risks, uncertainty and cost of litigating. For the foregoing reasons, the Knauf Defendants respectfully request that this Court find that the Knauf Settlement is fair, reasonable and adequate.

Respectfully submitted,

Dated:  September 4, 2012            By:  /s/ Kyle Spaulding
                                                              KERRY J. MILLER (# 24562)
     KYLE A. SPAULDING (# 29000)
     FRILOT L.L.C.
     1100 Poydras Street
     Suite 3700
     New Orleans, LA  70163
     Telephone:  (504) 599-8194
     Facsimile: (504) 599-8145
     Email:  kmiller@frilot.com

- AND -

STEVEN GLICKSTEIN (NY Bar # 1038157)
JAY P. MAYESH (NY Bar # 1081603)
GREGORY J. WALLANCE (NY Bar # 1247337)
ROBERT GRASS (NY BAR # 2501278)
KARIN E. GARVEY (NY BAR # 2997831)
M. TOMAS MURPHY (*of counsel*)
JOSEPH KOHN (*of counsel*)
KAYE SCHOLER LLP
425 Park Avenue
New York, NY  10022
Telephone:  (212) 836-8485
Facsimile:  (212) 836-6485
Email:  sglickstein@kayescholer.com

Counsel for the Knauf Defendants