## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | : : : : : : | **MDL NO. 2047** **SECTION:  L** **JUDGE FALLON** **MAG. WILKINSON** |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO:**
*Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687
*The Mitchell Co., Inc. v. Knauf Gips KG*, Case No. 09-4115
*Gross v. Knauf Gips KG*, Case No. 09-6690
*Wiltz v. Beijing New Building Materials Public Ltd., Co.*, Case No. 10-361

### ORDER & REASONS

Before the Court are the following four motions: (1) Taishan Gypsum Co. Ltd's ("TG") Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint in *Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687 (R. Doc. 13490); (2) TG's Renewed Motion Pursuant to Rules 55(c) and 12(b)(2) to Vacate the Entry of Default and Dismiss This Action in *The Mitchell Co., Inc. v. Knauf Gips KG*, Case No. 09-4115 (R. Doc. 13566); (3) TG and Taian Taishan Plasterboard Co. Ltd.'s ("TTP")(collectively "Taishan" or "Taishan Entities") Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Gross v. Knauf Gips KG*, Case No. 09-6690 (R. Doc. 13590); and (4) TG and TTP's Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Wiltz v. Beijing New Building Materials Public Ltd., Co.*, Case No. 10-361 (R. Doc. 13591).  Extensive discovery was conducted in preparation for the motions, followed by lengthy briefing and an evidentiary hearing with oral arguments.  The Court has now reviewed the parties' arguments, the relevant evidence, and the applicable law, and it is ready to rule.

## TABLE OF CONTENTS

I.  **BACKGROUND**...........................................................................5
    A.  **The MDL Litigation**.................................................5
    B.  **The Knauf Entities**.................................................6
    C.  **The Taishan Entities**...............................................8
II. **TG'S RENEWED MOTION TO VACATE THE DEFAULT JUDGMENT &**
    **DISMISS THE COMPLAINT IN** *GERMANO*...............................13
    A.  **Present Motion & Summary of the Parties' Positions**..........14
        1.  *TG's Motion*...................................................14
        2.  *The PSC's Responses in Opposition*.............................15
            a.  Response to the Motion ...................................15
            b.  Global Memorandum.........................................15
        3.  *TG's Reply*....................................................16
    B.  **Motion to Dismiss for Lack of Personal Jurisdiction**.........17
        1.  *Standard of Review*...........................................17
        2.  *Applicable Law*...............................................18
        3.  *Personal Jurisdiction Over a Foreign Defendant*...............20
        4.  *Virginia's Long-Arm Statute*..................................20
            a.  Subsection (A)(2)-Contracting to Supply Services.........22
            b.  Subsections (A)(4) & (A)(5)-Tortious Injury & Breach of
                Warranty..................................................25
        5.  *Due Process Clause*...........................................27
        6.  *Minimum Contacts*.............................................27
            a.  Specific Personal Jurisdiction...........................28
            b.  Supreme Court Jurisprudence on Specific Personal Jurisdiction..29
            c.  Effect of *J. McIntyre* on the Specific Personal Jurisdiction
                Analysis..................................................35
            d.  Fifth Circuit's Interpretation of Specific Personal Jurisdiction.....39
        7.  *TG's Minimum Contacts in* Germano.............................40
            a.  TG's Lack of Physical Contacts in Virginia...............41
            b.  TG's Nationwide Contacts..................................41
            c.  TG's Virginia Contacts...................................43
            d.  TG has Sufficient Minimum Contacts with Virginia for Specific
                Personal Jurisdiction ....................................50
        8.  *Cause of Action Arises From Forum Minimum Contacts*..........55
        9.  *Fair Play & Substantial Justice*.............................58
            a.  Burden on TG..............................................58
            b.  Virginia's Interest ......................................60
            c.  Plaintiffs' Interest......................................60
            d.  Judicial System's Interest................................61
            e.  States' Shared Interest...................................61
            f.  The Exercise of Personal Jurisdiction Over TG is Fair &
                Reasonable................................................62

        *10.*    *Imputation of Contacts Between TG & TTP*.................................63

   **C.**    **The Court's Ruling on Vacating the Default Judgment**.................64

        *1.*     *Applicable Law*.............................................................64

        *2.*     *Personal Jurisdiction*...................................................66

        *3.*     *Excusable Neglect*........................................................66

        *4.*     *Other Reason That Justifies Relief*................................68

            a.    Failure to Serve...............................................69

            b.    Failure to State a Claim Under the VCPA..............69

**III.**    **TG'S RENEWED MOTION TO VACATE THE ENTRY OF DEFAULT &**

      **DISMISS THE ACTION IN *MITCHELL***..............................................70

   **A.**    **Present Motion & Summary of the Parties' Positions**.................70

        *1.*     *TG's Motion*...............................................................70

        *2.*     *The PSC's Response*....................................................70

        *3.*     *Mitchell's Response*....................................................71

        *4.*     *Certain Florida Homebuilders'* Amicus Curiae *Response*......71

        *5.*     *The Banner Entities' Response*.....................................72

        *6.*     *TG's Reply*.................................................................73

   **B.**    **The Court's Ruling on TG's Motion to Dismiss for Lack of Personal**

      **Jurisdiction**....................................................................73

        *1.*     *Standard of Review*......................................................73

        *2.*     *Applicable Law*............................................................73

        *3.*     *Personal Jurisdiction Over a Foreign Defendant*..............73

        *4.*     *Imputing TTP's Forum Contacts to TG for Purposes of Personal*

            *Jurisdiction*.................................................................74

            a.    Piercing the Corporate Veil................................74

            b.    Applicable Law................................................75

            c.    Facts Regarding the Relationship Between TG & TTP..............78

            d.    Agency and/or Alter Ego Exists Between TG & TTP..................84

        *5.*     *Florida's Long-Arm Statute*...........................................87

            a.    Subsection (a)-Business in the State......................88

               i.     Applicable Law..................................88

               ii.    The Parties' Arguments.......................89

               iii.   Facts Regarding Taishan's Florida-Related Business.......89

               iv.   Taishan's Florida-Related Business Satisfies Subsection (a)

                   of the Florida Long-Arm Statute..............100

            b.    Subsection (b)-Tortious Activity in the State............103

            c.    Subsection (f)-Causing Injury in the State.................105

        *6.*     *Due Process Requirements for Specific Personal Jurisdiction*.............107

        *7.*     *Taishan's Minimum Contacts With Florida*.........................108

        *8.*     *Cause of Action Arises From Forum Minimum Contacts*.....................113

        *9.*     *Fair Play & Substantial Justice*.....................................116

   **C.**    **The Court's Ruling on Vacating the Preliminary Default**.................116

        *1.*     *Applicable Law*............................................................117

        *2.*     *Personal Jurisdiction*...................................................117

   3. *Excusable Neglect*................................................................117
   4. *Other Reason That Justifies Relief-Failure to Serve*...............118
  **D.** **Adverse Inference Against Taishan**....................................119
**IV.** **TG & TTP'S MOTION TO DISMISS THE COMPLAINT IN *GROSS***................121
  **A.** **Present Motion & Summary of the Parties' Positions**...................121
   1. *Taishan's Motion*.......................................................121
   2. *PSC's Response*.........................................................122
   3. *Interior Exterior's Response*..........................................122
   4. *Taishan's Reply*........................................................122
  **B.** **The Court's Ruling on TG's Motion to Dismiss for Lack of Personal Jurisdiction**................................................................123
   1. *Standard of Review*.....................................................123
   2. *Applicable Law*.........................................................123
   3. *Personal Jurisdiction Over a Foreign Defendant*....................124
   4. *Imputing TTP's Forum Contacts to TG*...............................124
    a. Piercing the Corporate Veil....................................124
    b. Applicable Law..................................................124
    c. TTP's Minimum Contacts are Imputable to TG.....................126
   5. *Louisiana Long-Arm Statute*..........................................128
   6. *Due Process Requirements for Specific Personal Jurisdiction*.......130
   7. *Minimum Contacts*......................................................131
    a. Taishan's Minimum Contacts....................................131
     i. Taishan Lacks Physical Contacts With Louisiana..........131
     ii. Taishan's Nationwide Contacts..........................132
     iii. Taishan's Louisiana-Related Contacts.................132
    b. Taishan has Sufficient Minimum Contacts With Louisiana to Satisfy Due Process.............................................135
   8. *Cause of Action Arises From or Relates to Minimum Contacts*.......139
   9. *Fair Play & Substantial Justice*.....................................141
**V.** **TG & TTP'S MOTION TO DISMISS THE COMPLAINT IN *WILTZ***.................141
**VI.** **CONCLUSION**............................................................142

## II.      BACKGROUND

### A.      MDL Litigation

The present litigation arises from alleged property damage and personal injuries

sustained as a result of the presence of Chinese-manufactured drywall in homes and other

buildings in a number of states.  During approximately 2005 to 2008, hundreds-of-millions of

square feet of gypsum wallboard manufactured in China ("Chinese drywall") were exported to

the United States, primarily along the East Coast and Gulf South, as a result of an exceptionally

high demand for building supplies in the aftermaths of Hurricanes Rita and Katrina, as well as a

general new-housing boom.  The Chinese drywall was then installed in newly-constructed and

reconstructed properties.  After installation of this drywall, owners and occupants of the

properties began noticing unusual odors, blackening of silver and copper items and components,

and the failure of appliances, including microwaves, refrigerators, and air-conditioning units.

Some also experienced health problems, such as skin and eye irritation, respiratory issues, nose

bleeds, and headaches.  As a result, these property owners began filing suit in both state and

federal courts against those involved with Chinese drywall, including the installers,

homebuilders, suppliers, importers, exporters, and manufacturers, as well as their insurers and

sureties.

On June 15, 2009, this Court was designated as the transferee court for all federal cases

involving Chinese-manufactured drywall, creating Multi-District Litigation 2047 (the "MDL").

*See* (R. Doc. 1).  Since the inception of MDL 2047, over three years ago, hundreds of lawsuits

involving thousands of plaintiffs and defendants, have been filed and the cases consolidated

before this Court.  The Court has worked to oversee and manage this complex litigation,

including: presiding over numerous regularly-scheduled hearings and monthly status conferences, which are attended by hundreds of counsel; vetting and appointing counsel to steering committees (plaintiff, defendant, homebuilder, installer, insurer), mediators, special masters, and a *pro se* curator; communicating and coordinating with state and federal judges who preside over related Chinese drywall litigation; issuing 26 pretrial orders which govern procedure in the MDL, as well as countless orders and minute entries; maintaining a public MDL website; presiding over ten bellwether trials and proceedings, as well as issuing detailed findings of fact and conclusions of law; facilitating numerous settlement negotiations and mediations; monitoring the pilot remediation program; and managing the 15,000-plus record documents filed into the litigation.  *See* Case No. 09-md-2047.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities, and (2) the Taishan Entities.  The litigation has focused upon these two entities and their downstream associates, and has proceeded on separate tracks for the claims against each group as described as follows.

### B.    Knauf Entities

The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), manufactured and sold its Chinese drywall in the United States.  The Knauf Entities are named defendants in numerous cases consolidated with the MDL litigation and litigation in state courts. The Knauf Entities first entered their appearance in the MDL litigation on July 2, 2009.  *See* (R. Doc. 18).  On November 2, 2009, in Pretrial Order No. 17, KPT agreed to a limited waiver of service.  *See* (R. Doc. 401).  On March 15-19, 2010, the Court presided over a bellwether trial in

*Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall.  *See* (R. Doc. 2713).  For purposes of the trial, KTP stipulated that its Chinese drywall "emits certain reduced sulfur gases and the drywall emits an odor."  *Id.*  The Court found in favor of the plaintiff family in *Hernandez*, issued a detailed Findings of Fact and Conclusions of Law, *see id.*, and entered a Judgment in the amount of $164,049.64.  *See* (R. Doc. 3012).

Thereafter, on October 14, 2010, the Knauf Entities entered into a pilot remediation program with the Plaintiffs' Steering Committee ("PSC") in the MDL.  This program was largely based upon the remediation protocol formulated by the Court in *Hernandez*.  The Knauf pilot remediation program is ongoing and is in the process of remediating 2,000 homes containing KPT Chinese drywall.  At the Court's urging, the parties began working together to monetize this program and make it available to a broader class of plaintiffs.

On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which is designed to resolve all Knauf-related, Chinese drywall claims.  *See* (R. Doc. 12061-5).  This Agreement is the most significant step thus far towards global resolution of all Chinese drywall claims.

In addition to the Knauf Settlement Agreement, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation.  These additional class action settlement agreements involve the following defendants and in most cases, their insurers:  Interior Exterior Building Supply, LP ("Interior Exterior"); the Banner Entities; L&W Supply Corp. and USG Corp.; and a group of numerous homebuilders, installers, suppliers.  *See*

-7-

(R. Docs. 10033-3, 12258-3, 13375-2, 14404-2).  The Court has granted preliminary approval to all of the foregoing settlement agreements which are the subject of the final fairness hearing set for November 2012.

>   **C.    Taishan Entities**

The second group of manufacturer defendants in the litigation and the defendants who are challenging personal jurisdiction in the present motions, are the Chinese-based Taishan Entities, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP")(collectively "Taishan" or "Taishan Entities").  As discussed below, the course of the litigation involving the Taishan Entities has not followed the same trajectory or enjoyed the same measure of success as that involving the Knauf Entities.

As an alleged manufacturer of Chinese drywall which has been installed in plaintiffs' properties, Taishan is a named defendant in numerous cases in both the MDL litigation and litigation filed in state courts.  The Court's inquiry for purposes of the present motions pertains to four cases in the MDL in which Taishan has been served, entered an appearance, and in two of these cases, subjected to default judgment proceedings.  These four cases are: *Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687; *The Mitchell Co., Inc. v. Knauf Gips KG*, Case No. 09-4115; *Gross v. Knauf Gips KG*, Case No. 09-6690; and *Wiltz v. Beijing New Building Materials Public Ltd., Co.*, Case No. 10-361.  The Court will briefly discuss each of these cases as they pertain to Taishan before detailing the overall course of the MDL litigation involving claims against Taishan.

*Germano* has served as the main vehicle for the MDL litigation involving Taishan, particularly TG, all of which will be discussed in greater detail below.  *Germano* was filed

originally in the U.S. District Court for the Eastern District of Virginia as a Virginia class action against TG by the owners of homes located in Virginia which allegedly contain TG-manufactured Chinese drywall.  *See* (R. Docs. 1-1, 1-2)(Case No. 09-6678).  On August 3, 2009, TG was served.  *See* (R. Doc. 1-7)(Case No. 09-6687).  *Germano* was then transferred to the U.S. District Court for the Eastern District of Louisiana and consolidated with the MDL litigation on October 13, 2009.  (R. Doc. 1)(Case No. 09-6678).  Thereafter, the class was expanded to a nationwide class.  *See* (R. Doc. 470)(Case No. 09-md-2047).

*Mitchell* was originally filed in the U.S. District Court for the Northern District of Florida as a class action on behalf of homebuilders in the states of Louisiana, Georgia, Texas and Florida who used drywall manufactured by TG for the construction, repair, or remodeling of properties, and who, as a result, incurred expenses associated with repair or replacement of this drywall and/or other property damaged by the drywall, and/or incurred liability for property damages. *See* (R. Doc. 1-1)(Case No. 09-4115).   On May 8, 2009, service was executed on TG.  *See* (R. Doc. 52)(Case No. 09-md-2047).  Shortly thereafter, *Mitchell* was transferred to the Eastern District of Louisiana and consolidated with the MDL litigation.  *See* (R. Doc. 1)(Case No. 09-4115).

*Gross* and *Wiltz* were both filed in the Eastern District of Louisiana and consolidated with the MDL litigation as nationwide class actions by property owners whose homes contain Taishan-manufactured Chinese drywall.  *See* (R. Doc. 1)(Case No. 09-6690); (R. Docs. 1, 1-1)(Case No. 10-361).  Taishan was served or entered an appearance in both cases.  *See* (R. Docs. 2140, 2141, 2553); (R. Docs. 7408, 7409).  The cases are distinguishable by the fact that *Gross* involves claims against "indeterminate defendants" who have allegedly concealed their identity

and are allegedly responsible for the Chinese drywall in plaintiff class members' properties. *See* (R. Doc. 1)(Case No. 09-6690). *Wiltz*, on the other hand, is a more typical class action filed on behalf of property owners against Taishan as a result of the damage caused by the presence of Taishan's drywall in their properties. *See* (R. Docs. 1, 1-1)(Case No. 10-361).

The first issues in the MDL litigation involving Taishan arose when TG failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, although TG had been properly served in each case. *See* (R. Doc. 52); (R. Doc. 1-7)(Case No. 09-6687). As a result, the Court entered preliminary defaults against TG in both of these cases. *See* (R. Docs. 277, 487).

After affording TG more than a reasonable amount of time to answer or enter an appearance, the Court moved forward with an evidentiary hearing in furtherance of the Preliminary Default in *Germano* on the claims of 14 intervening plaintiffs (the "Intervening-Plaintiffs"). *See* (R. Doc. 502, 1223, 1258, 2380). Following this hearing, which occurred on February 19 and 20, 2010, the Court issued detailed Findings of Fact & Conclusions of Law. *See* (R. Doc. 2380). On May 11, 2010, the Court issued a Default Judgment against TG in *Germano*, in favor of the Intervening-Plaintiffs, in the amount of $2,609,129.99. (R. Doc. 3031). On the last day to timely do so, June 10, 2010, TG filed a Notice of Appeal of the Default Judgment in *Germano*. (R. Doc. 3670). On this same day, TG also entered its appearance in *Germano* and *Mitchell*. *See* (R. Doc. 3668).

After TG entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction, as well as on procedural grounds. *See* (R. Docs. 5436, 5583). However, because

-10-

of the pending appeal, this Court was without jurisdiction to address any motions filed by TG. *See* (R. Doc. 5504). Accordingly, TG sought and was granted by the Fifth Circuit, a stay of its appeal to allow this Court to provide an indicative ruling on TG's motions to vacate the preliminary default and default judgments. *See* (R. Doc. 5649). In response, this Court issued an order pursuant to Federal Rule of Civil Procedure 62.1 to allow it to consider TG's motions. *See* (R. Doc. 6101). In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve TG's motions to vacate. Sometime after the initial discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan been served, including *Gross* and *Wiltz.*

Formal personal jurisdiction discovery of Taishan began in October 2010, *see e.g.* (R. Docs. 5839, 5840), and continued over the year-and-a-half leading up to the filing of the present motions. Discovery has included the production of both written and electronic documents, as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery has not been without trials and tribulations, requiring close supervision by the Court. The Court has presided over regularly-scheduled status conferences to keep the parties on track, and conducted hearings and issued rulings to resolve numerous discovery-related disputes. *See e.g.* (R. Docs. 7136, 7511).

The first Taishan depositions were held in Hong Kong on April 4-8, 2011. *See* (R. Docs. 8296, 8297). Thirteen attorneys traveled to Hong Kong and deposed the following three Taishan witnesses: (1) Jia Tongchun, General Manager, Director of Board of Directors, and five-percent owner of TG; (2) Peng Wenglong (a.k.a. Frank Clem), Manager of Foreign Trade Department of TG in 2005, salesperson at TTP from 2006-07, and current Manager of Foreign Trade

Department at TG; and (3) Zhang Jianchun, Secretary of TG and TTP.  *See id.*

Upon return to the United States, several motions were filed seeking to schedule a second round of Taishan depositions as a result of problems during the depositions and seeking discovery sanctions against Taishan.  *See* (R. Docs. 8685, 8695, 8755, 8758, 8768, 8792, 8805). Taishan opposed these motions.  *See* (R. Docs. 8841, 8842).  The Court, after reviewing the transcripts from the depositions, concluded that the "depositions were ineffective because of disagreement between interpreters, counsel, and witnesses, translation difficulties, speaking objections, colloquy among counsel and interpreters, and in general ensuing chaos."  *See* (R. Doc. 9107).  Accordingly, the Court ordered the parties to move forward with further written discovery and to schedule a second-round of Taishan depositions, but this time with knowledgeable and prepared witnesses, a single translator, and Court supervision.  *See id.*  The parties complied with the Court's orders and met regularly with the Court to resolve their further discovery disputes.  *See* (R. Docs. 9524, 10092, 9649, 9944, 10007, 10216, 10269, 10799, 11175, 10804, 11138, 11192, 11326).

The Court scheduled the second round of Taishan depositions for the week of January 9, 2012, in Hong Kong.  *See* (R. Docs. 10804, 11138, 11192).  The Court appointed a Federal Rule of Evidence 706 expert to operate as the sole interpreter at the depositions.  *See* (R. Doc. 11533). Counsel for the interested parties and Judge Fallon traveled to Hong Kong for these depositions. The following witnesses were deposed or re-deposed: (1) Peng Wenlong (a.k.a. Frank Clem); (2) Jia Tongchun; (3) Che Gang (a.k.a. Bill Cher), Manager of International Trading for Taishan, salesperson at TG from 2001-06 and 2009-12, and salesperson at TTP from 2006-07; (4) Peng Shiliang, General Manager and Chairman of Board of Directors of TTP from 2006-09, employee

of TTP, and Plant Manager of TG from 2009-12; and (5) Fu Tinghuan, Supervisor at TG, Deputy General Manager at TG, and Director of TTP.  Because the Court was present at the depositions, objections were ruled upon immediately and the majority of problems which plagued the first round of depositions were absent.  Also, the Court was able to observe the comments, intonation, and body language of the deponents.  Upon return from Hong Kong, the parties informed the Court that minimal further discovery was necessary before briefing could be submitted on Taishan's personal jurisdiction challenges.

In April 2012, TG and TTP filed the present motions.  Responses in opposition were filed by the PSC, Interior Exterior, the Banner Entities, and Certain Florida Homebuilders, (R. Docs. 14202, 14204, 14209, 14216, 14356, 14372, 14390, 14392, 14391-4), with other parties joining in these motions, including the State of Louisiana (collectively the "Respondents").  Prior to the hearing, evidentiary objections were raised by Taishan, which the Respondents addressed.[1]  On June 29, 2012, over three years since the creation of MDL 2047, and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions.  The Court coordinated its hearing with Judge Joseph Farina of the 11th Judicial Circuit Court of Florida, who had a similar motion involving Taishan's challenge to personal jurisdiction.

The Court will now address and rule-upon the motions filed by Taishan in *Germano*, *Mitchell*, *Gross*, and *Wiltz*.

## II.   TG'S RENEWED MOTION TO VACATE THE DEFAULT JUDGMENT & DISMISS THE COMPLAINT IN *GERMANO*

---

[1]Although the Court did not entertain a formal hearing on the evidentiary objections, the evidence relied upon by the Court in the present Order & Reasons reflects its rulings.

The first Motion addressed by the Court is TG's Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint in *Germano*.  (R. Doc. 13490).

## A.     Present Motion & Summary of the Parties' Positions

### 1.     *TG's Motion*

 TG raises four arguments in support of its Motion.  First, TG argues that the Default Judgment should be vacated and the claims against it dismissed because the Court lacks personal jurisdiction over it in *Germano*.  As a threshold matter, TG argues that Virginia and Fourth Circuit law governs the question of personal jurisdiction.  Next, TG argues that plaintiffs are unable to satisfy Virginia's long arm statute, as is required for personal jurisdiction, because TG did not transact business in Virginia and it does not regularly do or solicit business in Virginia. Finally, TG argues that plaintiffs are unable to satisfy the due process requirements of personal jurisdiction because: (1) plaintiffs cannot establish that TG had minimum contacts with Virginia; (2) plaintiffs cannot establish that their causes of action arose out of or resulted from TG's contacts with Virginia; and (3) the exercise of personal jurisdiction over TG would be unreasonable and offend traditional notions of fair play and substantial justice.

Second, TG argues that the Default Judgment should be set aside because plaintiffs failed to serve the pleadings upon which the Default Judgment was based, specifically the motion for intervention and the Second Amended Complaint.

Third, TG argues that the Default Judgment should be set aside on the grounds of excusable neglect.  In support, TG alleges: its default was not willful; vacating the judgment will not prejudice the plaintiffs; it has a meritorious defense; it will incur significant financial losses if the default stands; and it acted expeditiously to vacate the default.

-14-

Fourth, TG argues that the Complaint fails to state a claim under the Virginia Consumer Protection Act ("VCPA").

> ## 2. The PSC's Responses in Opposition

The PSC filed both a specific Response in opposition to TG's Motion (R. Doc. 14202) and a Global Memorandum of law in opposition to all four of Taishan's motions.  (R. Doc. 14209).  The Court will now summarize each.

> ### a. Response to the Motion

The PSC first addresses TG's personal jurisdiction arguments.  As a threshold matter, the PSC argues that the Court must apply Virginia's long-arm statute and the Due Process Clause, as informed by the law of the Fifth Circuit, in determining whether there exists personal jurisdiction over TG.  It then argues that TG, based upon its Virginia contacts, is subject to personal jurisdiction under Virginia's long-arm statute and the Due Process Clause.

Second, the PSC argues that the Court previously and correctly ruled that jurisdiction over TG was accomplished by proper service of the First Amended Complaint.

Third, the PSC argues that TG is not entitled to have the Default Judgment vacated on the basis that plaintiffs allegedly failed to state a claim under the VCPA, since the claims against TG which support the Default Judgment include a number of non-VCPA allegations.

Fourth, the PSC argues that TG has not shown excusable neglect in its failure to timely respond to the Default Judgment.

> ### b. Global Memorandum

The PSC's Global Memorandum addresses the issue at the center of all four of Taishan's motions, personal jurisdiction.  Therein, the PSC first argues that the Court may exercise

personal jurisdiction over TG because it purposefully sold its drywall products to customers in the United States with the expectation that these products would be delivered to Virginia, Florida, Louisiana, and other states.  According to the PSC, these activities constitute sufficient "minimum contacts" in the personal jurisdiction context.  The PSC contends that the Supreme Court's recent decision in *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011), does not change this conclusion.  Finally, the PSC argues the exercise of personal jurisdiction over TG comports with the due process requirements of fair play and substantial justice.

The second section in the PSC's Global Memorandum argues for the imputation of TTP's forum contacts to TG for purposes of personal jurisdiction on the basis that, pursuant to Chinese law, the corporate personalities of TG and TTP are commingled.  In support of this argument, the PSC presents the opinions of three Chinese legal experts.

Third, the PSC argues that its right to pursue the entities upstream to Taishan, namely China National Building Materials Group Corp. ("CNBM") and Beijing New Building Material Group Co. Ltd. ("BNBM"), should be preserved since the PSC was precluded from taking any discovery from these entities.

### 3.    *TG's Reply*

TG filed a Reply in further support of its Motion.  (R. Doc. 14572).  TG expands upon the arguments in its original briefing.  It argues that plaintiffs fail to demonstrate by preponderance of the evidence that this Court possesses specific personal jurisdiction over it pursuant to the Virginia long-arm statute or due process.  TG interprets *J. McIntyre* as supporting its position that its contacts with Virginia are insufficient for personal jurisdiction.  It also argues, citing to its own Chinese law expert, that TTP's contacts cannot be imputed to TG for

purposes of personal jurisdiction.  TG accuses plaintiffs of relying upon inadmissible hearsay evidence.

**B.     The Court's Ruling on TG's Motion to Dismiss for Lack of Personal Jurisdiction**

As noted, TG seeks dismissal of the claims against it in *Germano* on the basis of lack of personal jurisdiction.  *See* (R. Doc. 13490).

*1.     Standard of Review*

Federal Rule of Civil Procedure 12(b)(2) provides a right to dismissal of claims against a defendant when personal jurisdiction is lacking.  "When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident.  The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."  *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985)(citing *Thompson v. Chrysler Motors Corp*., 755 F.2d 1162, 1165 (5th Cir. 1985)).

When a court hears a Rule 12(b)(2) motion without an evidentiary hearing, the plaintiff need only present a *prima facie* case of personal jurisdiction.  *See Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, (5th Cir. 2008).   When there is an evidentiary hearing, however, the plaintiff is held to the higher standard of preponderance of the evidence.  *See id.* (citing *Brown v. Slenker*, 220 F.3d 411, 419 (5th Cir. 2000).  The Fifth Circuit "has never explicitly laid out the criteria necessary to constitute a 'full evidentiary hearing,'"  *Kwik-Kopy Corp. v. Byers*, 37 Fed. App'x 90, at *4 (5th Cir. May 9, 2002), but has concluded for purposes of an evidentiary hearing, "both parties must be allowed to submit affidavits and to employ all forms of discovery, subject to the district court's discretion and as long as the discovery pertains

-17-

to the personal-jurisdiction issue." *Walk Haydel & Assocs., Inc.*, 517 F.3d at 242.  The

distinguishing factor between a mere hearing and an "evidentiary hearing" is the presentation of

evidence "beyond the written materials."  *See Kwik-Kopy Corp.*, 37 Fed. App'x at *4(quoting

*Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280 (9th Cir. 1977)).  The Court finds that

the hearing on the present Motion falls into the evidentiary hearing category, because the Court

is relying on evidence representing the full extent of personal jurisdiction discovery and

depositions.  This conclusion requires plaintiffs to establish personal jurisdiction by a

preponderance of the evidence.

2.    <em>Applicable Law</em>

As noted, *Germano* was originally filed in the U.S. District Court for the Eastern District

of Virginia, within the Fourth Circuit, and then transferred to the MDL Court seated in the

Eastern District of Louisiana, within the Fifth Circuit, for consolidated and coordinated pretrial

proceedings.  *See* Case No. 09-6687.   The parties agree that for purposes of determining

personal jurisdiction in *Germano*, the applicable substantive law is the law of Virginia, but they

disagree as to whether Fourth Circuit or Fifth Circuit law applies as federal law.  Thus, before

beginning any personal jurisdiction analysis, the Court must determine the applicable law.

The Court concludes that as the MDL transferee court, it is obliged to apply, consistent

with the parties' own positions, the substantive state law of the transferor court, Virginia law,

and the federal law of its own circuit, the Fifth Circuit.  This conclusion is overwhelmingly

supported by both the jurisprudence and legal scholarship.  *See In re Gen. Am. Life Ins. Co. Sales

Practices Litig.*, 391 F.3d 907, 911 (8th Cir. 2004); *Murphy v. F.D.I.C.*, 208 F.3d 959, 965 (11th

Cir. 2000); *Bradley v. United States*, 161 F.3d 777, 782 n.4 (4th Cir. 1998); *Newton v.

-18-

*Thomason*, 22 F.3d 1455, 1460 (9th Cir. 1994); *Menowitz v. Brown*, 991 F.2d 36, 40-41 (2d Cir. 1993); *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1175-76 (C.A.D.C. 1987); *In re Vioxx Prods. Liab. Litig.*, —F.Supp.2d—, 2012 WL 956496, at *2 (E.D. La. Mar. 20, 2012); *In re BP S'holder Derivative Litig.*, 2001 WL 4345209, at * (S.D. Tex. Sept. 15, 2011)(citing *In re Parmalat Sec. Litig.*, 659 F.Supp.2d 504, 517 (S.D.N.Y. 2009)); *Various Plaintiffs v. Various Defendants*, — F.Supp.2d —, 2012 WL 1106730, at *2 (E.D. Pa. Apr. 3, 2012); *Briggs v. Air & Liquid Sys. Corp.*, 2012 WL 975875, at *1 n.1 (E.D. Pa. Feb. 13, 2012); *Floyd v. Air & Liquid Sys. Corp.*, 2012 WL 975639, at *1 n.1 (E.D. Pa. Feb. 8, 2012); *Aikins v. Gen. Elec. Corp.*, 2011 WL 6415117, at *1 n.1 (E.D. Pa. Dec. 9, 2011); *In Re Hydroxycut Mktg. & Sales Practices Litig.*, 810 F.Supp.2d 1100, 1106 (S.D. Cal. 2010); *In re DirecTV Early Cancellation Litig.*, 738 F.Supp.2d 1062, 1074 (C.D. Cal. 2010); *In re Zicam Cold Remedy Mktg., Sales Practices, & Prods. Liab. Litig.*, 797 F.Supp.2d 940, 941 (D.Ariz. 2011); *Hinds Cty., Miss. v. Wachovia Bank, N.A.*, 708 F.Supp.2d 348, 366 n.11 (S.D.N.Y. 2010); *In re Zyprexa Prods. Liab. Litig.*, 671 F.Supp.2d 397, 430 (E.D.N.Y. 2009); *In re Conagra Peanut Butter Prods. Liab. Litg*., 2009 WL 799422, at *1 (N.D. Ga. 2009); 15 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Joan E. Steinman, Catherine T. Struvel, and Vikram David Amar, Federal Practice and Procedure § 3866 (3d ed. 2009); Daniel A. Richards, An Analysis of the Judicial Panel on Multidistrict Litigation's Selection of Transferee District and Judge, 78 Fordham L. Rev. 311, 316 (2009).  This conclusion is also consistent with the Court's dicta earlier in the litigation.  *See In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 767 F.Supp.2d 649, 656 n.2 (E.D. La. 2011).  Accordingly, the Court now addresses Fifth Circuit federal law and Virginia state law on personal jurisdiction.

3.      *Personal Jurisdiction Over a Foreign Defendant*

It is axiomatic under Fifth Circuit law that a federal district court sitting in diversity may exercise personal jurisdiction over a foreign defendant if: (1) the long-arm statute of the forum state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction is consistent with the Due Process Clause of the United States Constitution.  *Clemens v. McNamee*, 615 F.3d 374, 377 (5th Cir. 2010)(citing *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999)); *Seiferth v. Helicopteros Atuneros, Inc.,* 472 F.3d 266, 270 (5th Cir. 2006)(citing *Mink v. AAA Dev. LLC*, 190 F.3d 333, 335 (5th Cir. 1999)); *Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 812 (5th Cir. 2006)(quoting *Allred v. Moore & Peterson*, 117 F.3d 278 (5th Cir. 1997)); *Ouazzani-Chahdi v. Greensboro News & Record, Inc.*, 200 F. App'x 289, 291 (5th Cir. 2006)(citing *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002)); *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 418 (5th Cir. 1993).  The Court now addresses each of these requirements in turn.

4.      *Virginia's Long-Arm Statute*

In *Germano*, the Court is obliged to apply Virginia's long-arm statute under the first prong of the personal jurisdiction inquiry.  The Virginia long-arm statute provides in relevant part,

> A. A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:
>
> 1. Transacting any business in this Commonwealth;
>
> 2. Contracting to supply services or things in this Commonwealth;
>
> 3. Causing tortious injury by an act or omission in this Commonwealth;
>
> 4. Causing tortious injury in this Commonwealth by an act or omission outside

this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth;

5. Causing injury in this Commonwealth to any person by breach of warranty expressly or impliedly made in the sale of goods outside this Commonwealth when he might reasonably have expected such person to use, consume, or be affected by the goods in this Commonwealth, provided that he also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth....  Va. Code Ann. § 8.01-328.1.

The Virginia Supreme Court has stated that "[t]he purpose of our 'long arm statute' is to assert jurisdiction, to the extent permissible under the Due Process Clause of the Constitution of the United States, over nonresidents who engage in some purposeful activity in Virginia."  *Danville Plywood Corp. v. Plain & Fancy Kitchens, Inc.*, 218 Va. 533, 534 (1977)(citing *Carmichael v. Snyder*, 209 Va. 451, 456 (1968)); *Caldwell v. Seaboard S.R., Inc*., 238 Va. 140, 153 (1989); *John G. Kolbe, Inc. v. Chromodem Chair Co., Inc*., 211 Va. 736, 740 (1971).  Virginia's long-arm statute is a "single-act statute requiring only one transaction in Virginia to confer jurisdiction on our courts."  *Nan Ya Plastics Corp. U.S.A. v. DeSantis*, 237 Va. 255, 260 (Va. 1989); *Danville Plywood Corp.*, 218 Va. at 534-35; *I.T. Sales, Inc. v. Dry*, 222 Va. 6, 9 (1981).  "'[T]he statutory inquiry [of the Virginia long arm statute] necessarily merges with the constitutional [due process] inquiry, and the two inquiries essentially become one.'" *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002)(quoting *Stover v. O'Connell Assocs., Inc*., 84 F.3d 132, 135-36 (4th Cir. 1996)).  Once the Virginia long-arm statute is satisfied, the question simply becomes "whether the defendant has sufficient 'minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945));

*Processing Research, Inc. v. Larson*, 686 F.Supp. 119, 121 (E.D. Va. 1988).  The Court's first

task in its personal jurisdiction analysis, thus, is to determine whether TG's activities fall into

one of the enumerated categories of the Virginia long-arm statute.

TG argues that plaintiffs are unable to satisfy Virginia's long-arm statute because: (1) it

did not transact business in Virginia, (2) it did not contract to supply things in Virginia, and (3) it

does not regularly do or solicit business in Virginia.  *See* (R. Docs. 13490, 14572).  Plaintiffs

counter, arguing that TG is subject to personal jurisdiction under the Virginia long-arm statute

because TG entered into multiple contracts with Venture Supply, a Virginia company, for the

purchase and sale of thousands of sheets of defective Chinese drywall, earning TG hundreds of

thousands of dollars.  (R. Doc. 14202).  According to plaintiffs, these facts satisfy subsections

(A)(2), (4), and (5) of the Virginia long-arm statute; thus, the Court now addresses these

subsections of the statute.

<u>a.</u>      <u>Subsection (A)(2)-Contracting to Supply Services</u>

Pursuant to subsection (A)(2) of the Virginia long-arm statute, "[a] court may exercise

personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action

arising from the person's....[c]ontracting to supply services or things in this Commonwealth."

Va. Code Ann. § 8.01-328.1(A)(2).  In order for subsection (A)(2) to apply, the court must

conclude that either the defendant made a contract in the forum or contracted to perform

obligations in the forum.  *Richard v. Ivy Grp. Int'l, Inc.*, 2011 WL 1814929, at *6 (E.D. Va. May

11, 2011)(citing *Promotions, Ltd. v. Brooklyn Bridge Centennial Comm.*, 763 F.2d 173, 175 (4th

Cir. 1985)).  In determining whether the consummation of a contract provides personal

jurisdiction under subsection (A)(2), courts are to consider: (1) where the contract was

negotiated and executed, (2) who initiated the contact, (3) the extent of the communications, both telephonic and written, and (4) where the obligations of the parties under the contract were to be performed. *Decision Insights, Inc. v. Quillen*, 2005 WL 2757930, at *5 (E.D. Va. Oct. 21, 2005)(quoting *Affinity Memory & Micro, Inc. v. K&O Enters.*, 20 F.Supp.2d 948, 952 (E.D. Va. 1998)). The Court will now examine the evidence pertaining to the factors of subsection (A)(2).

TG entered into two contracts for the sale of its drywall with Venture Supply, Inc., a Norfolk, Virginia company. *See* (Russ M. Herman Aff. Exs. 1, 80, 81, May 7, 2012); (Frank Spano Decl. Ex. 8, Apr. 2, 2012); (R. Doc. 14215-2, p.30, 33-34); (R. Docs. 13490, pp. 7-10; 14572). Contractual negotiations occurred over the telephone, through email, and in-person in China. *See* (Spano Decl. Ex. 1 (Jia Tongchun Dec. ¶¶ 26, 27, Aug. 15, 2010); Ex. 3 (Peng Wenlong Dep. 366:10-370:8, 519:6-17, Apr. 7, 2011); Ex. 5 (Gang Che Dep. 60:8-22, Jan. 11, 2012); Ex. 9); (Herman Aff. Exs. 44; 70; 71; 72 (Samuel Porter Dep. 28:2-6, 130:1-6, 345:1-15, 346:17-347:8, Dec. 16, 2009); 73, 74; 75; 76; 78). The communications between TG and Venture were regular and relatively extensive during the time period the parties were engaged in a business relationship. *See id.* The first contract was executed via fax in Virginia[2] and the second was executed in person, in China. *See* (Herman Aff. Exs. 80, 81); (Decl. Spano Ex. 6 (Dep. Tinghuan Fu Ex. 3, Jan. 10, 2010)); (R. Docs. 14202, pp. 10-11; 14215-2, p. 34; 14572, p.). Phillip Perry of Tobin Trading, Inc., on behalf on Venture, initiated contact with TG in November 2005. *See* (Spano Decl. Ex. 1 (Tongchun Dec. ¶ 26); Ex. 3 (P. Wenglong Dep. 519:6-

---

[2]Taishan does not dispute the plaintiffs' allegation that the first contract between Venture and TG was executed via fax in Virginia. Although the Court finds no specific evidence to support this allegation, because it is not contested and because the contract provides that "fax copies are regarded as valid," *see* (Herman Aff. Ex. 80), the Court takes this allegation as true.

17)); (Herman Aff. Ex. 72 (Porter Dep. 28:2-6)).  The obligations under the contracts were to be performed by TG in China where it manufactured the drywall and shipped it F.O.B. to Venture at a Chinese port.  *See* (Herman Aff. Exs. 80, 81).

This evidence renders a decision under subsection (A)(2) difficult.  Because the contract negotiations and communications involving the Venture-TG contracts occurred in both China and Virginia and one contract was executed in Virginia and the other in China, these facts do not favor or oppose Virginia as the forum.  The remaining two factors- who initiated the contact and the obligations under the contract-however, are China-based, leaving the Court to conclude that the facts do not sufficiently support the application of subsection (A)(2) to TG in *Germano* by a preponderance of the evidence.

This conclusion is bolstered by a case cited by TG, *Frizzel v. Danieli Corp*., No. CL09-5120 (Va. Cir. Ct., Dec. 22, 2010), in which the court held that subsection (A)(2) of the Virginia long-arm statute did not apply to a manufacturer, even though it assisted in shipping its products to the forum state and may have known that the products were going to the forum state, because it sold its products F.O.B. outside of the forum.  Similarly, in *Processing Research, Inc. v. Larson*, 686 F.Supp. 119, 122 (E.D. Va. 1988), the Eastern District of Virginia held that a contract entered into outside of Virginia to supply an aircraft outside of Virginia did not satisfy subsection (A)(2) simply because the aircraft was purchased by a Virginia plaintiff, the tort involving the aircraft occurred in Virginia, and the nonresident defendant profited off the sale.  This case further suggests subsection (A)(2) is inapplicable.  Thus, the Court must consider the remaining provisions of the Virginia long-arm statute to determine whether personal jurisdiction exists over TG in *Germano*.

-24-

> b.      Subsections (A)(4) & (A)(5)-Tortious Injury & Breach of
>         Warranty

Subsections (A)(4) and (A)(5) of the Virginia long-arm statute prove more favorable for

the plaintiffs.  Under subsection (A)(4) of the Virginia long-arm statute, a court may exercise

personal jurisdiction over a defendant who causes tortious injury in the State by an act or

omission outside the State if the defendant "regularly does or solicits business, or engages in any

other persistent course of conduct, or derives substantial revenue from goods used or consumed

or services rendered in this Commonwealth."  Va. Code Ann. § 8.01-328.1(A)(4).  Under

subsection (A)(5), a court may exercise personal jurisdiction over a defendant who causes injury

in the State by breach of warranty, express or implied, made in the sale of goods outside of the

State, if he might reasonably have expected the injured person to "use, consume, or be affected

by the goods in [the State], provided that [the defendant] also regularly does or solicits business,

or engages in any other persistent course of conduct, or derives substantial revenue from goods

used or consumed or services rendered in [the State]."  Va. Code Ann. § 8.01-328.1(A)(5).

It does not appear that TG disputes that the plaintiffs allege its drywall caused "tortious

injury" or breached warranties in Virginia.  *See* (R. Docs. 13490, p. 14; 14572, p. 8).  However,

TG does dispute that it "regularly does or solicits business or engages in any other persistent

course of conduct, or derives substantial revenue from goods used or consumed or services

rendered in [Virginia]," a requirement for both subsections (A)(4) and (A)(5) of the Virginia

long arm statute.  *See id.*  Plaintiffs rely on the latter part of this requirement-"derives substantial

revenue from goods used or consumed or services rendered"-in support of their argument.  *See*

(R. Doc. 14202, p. 11).  They note and TG admits that it obtained $724,800.00 in revenue from

the two Venture Supply contracts.  *See id.*; (R. Doc. 13490, p. 15 n.18).  The difference of

opinion lies in whether this amount constitutes "substantial revenue."  *See id.*

The jurisprudence demonstrates  "a trend toward liberal construction of 'substantial revenue' provisions."  *Ajax Realty Corp. v. J.F. Zook, Inc*., 493 F.2d 818, 822 (4th Cir. 1972). "Although percentage of total sales may be a factor to be considered, it cannot be dispositive, for a small percentage of the sales of a [corporate] giant may indeed prove substantial in an absolute sense.  On the other hand, it is difficult to identify an absolute amount which ipso facto must be deemed 'substantial.'"  *Id*.  In the limited jurisprudence on the issue, it has been held that revenues of $37,000 and $25,000 constituted "substantial" revenues for purposes of the Virginia long-arm statute, but that $13,955 was not substantial.  *See id.*; *compare Gordonsville Indus., Inc. v. Am. Artos Corp.*, 549 F.Supp. 200, 203 (W.D. Va. 1982).  Upon review of this jurisprudence and giving due consideration to the fact that these cases are decades old, the Court finds that TG incurred substantial revenues for purposes of subsections (A)(4) and (A)(5). Certainly $724,800 is substantial revenue when compared to $37,000 and $25,000, and although it may only represent a small percentage of TG's total sales revenue, *see* (R. Doc. 13490, p. 15 n.18), percentage is not a dispositive factor and the trend is to broadly construe the substantial revenue requirement.  Further, TG or its affiliates have derived over 8.5 million dollars from its drywall sales in the United States, and its drywall has been found in thousands of homes in the United States.  *See* (Herman Aff. Ex. 1 Amend.).

Because the Court finds that personal jurisdiction exists over TG pursuant to the Virginia long-arm statute, specifically subsections (A)(4) and (A)(5), it is next necessary to address the second requirement for personal jurisdiction, whether the exercise of personal jurisdiction comports with the Due Process Clause.

5.      *Due Process Clause*

"The Due Process Clause 'operates to limit the power of a State to assert in personam jurisdiction over a nonresident defendant.'" *Ouazzani-Chahdi,* 200 Fed. App'x at 291 (quoting *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 413-14 (1984)); *Asahi Metal Indus. Co., Ltd. v. Superior Court of Ca.*, 480 U.S. 102, 109 (1986);  *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)(citing *Kulko v. Ca. Superior Court*., 436 U.S. 84, 91 (1978)).  A court's exercise of personal jurisdiction over a foreign defendant is consistent with due process only when: (1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice.  *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945); *Paz*, 445 F.3d at 813 (quoting *Panda Brandywine Corp. v. Potomac Elec. Power Corp.*, 253 F.3d 865, 867 (5th Cir. 2011)); *Clemens v. McNamee*, 615 F.3d 374, 377 (5th Cir. 2010)(citing *Revell v. Lidov*, 317 F.3d 467, 470 (5th Cir. 2002)); *Ouazzani-Chahdi,* 200 Fed. App'x at 291 (quoting *Revell*, 317 F.3d at 470); *Ruston Gas Turbines, Inc*., 9 F.3d at 418 (citing *Int'l Shoe Co.*, 326 U.S. at 316)).  The limits of the Due Process Clause "have been substantially relaxed over the years....largely attributable to a fundamental transformation in the American economy." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292-93 (1980)(internal citations omitted).  The Court will now address the due process requirements in turn, beginning with minimum contacts.

6.      *Minimum Contacts*

"The 'constitutional touchstone' of the inquiry to determine if personal jurisdiction can be exercised is whether the defendant 'purposefully established minimum contacts in the forum

state.'" *Seifarth*, 472 F.3d at 271 (quoting *Asahi Metal Ind. Co. v. Super. Ct.*, 480 U.S. 102, 108-09 (1987)); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)(citing *Int'l Shoe*, 326 U.S. at 316).  There exist two types of minimum contacts: those that give rise to specific personal jurisdiction and those which give rise to general jurisdiction.  *Clemens v. McNamee*, 615 F.3d 374, 377 (5th Cir. 2010)(citing *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994)); *Seifarth*, 472 F.3d at 271; *Revell v. Lidov*, 317 F.3d 467, 470 (5th Cir. 2002); *Ruston Gas Turbines, Inc.*, 9 F.3d at 418.  Only specific personal jurisdiction is alleged by plaintiffs.  *See* (R. Doc. 14209, p. 7).  Specific jurisdiction exists when "'the defendant has "purposefully directed" his activities at residents of the forum...and the litigation results from alleged injuries that arise out of or relate to those activities.'"  *Clemens v. McNamee*, 615 F.3d 374, 377 (5th Cir. 2010)(quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *Seifarth*, 472 F.3d at 271 (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002)).  The Court now addresses the applicable law for specific personal jurisdiction.

a.      Specific Personal Jurisdiction

For specific personal jurisdiction to attach, "[t]he non-resident's purposefully directed activities in the forum must be such that he could reasonably anticipate being haled into court in the forum state." *Id.*(quoting *Burger King,* 471 U.S. at 474).  Specific personal jurisdiction requires a sufficient nexus between the non-resident's contacts with the forum and the cause of action.  *Id.* at 378-79 (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)).  A defendant who purposefully avails himself of the privilege of conducting activities in the forum state invokes the benefits and protections of the forum's laws.  *Id.* at 379 (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  "The 'purposeful availment' requirement

ensures that a defendant will not be hauled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Id.* (citing *Burger King*, 471 U.S. at 472). The activities of a defendant are not measured by quantity, but rather quality as "[a] single act by the defendant directed at the forum state...can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Ruston Gas Turbines, Inc.*, 9 F.3d at 419. In order for the Court to make a proper decision on specific personal jurisdiction over TG in *Germano*, it will place the matter in perspective by reviewing the relevant Supreme Court and Fifth Circuit jurisprudence.

<u>b.</u>      <u>Supreme Court Jurisprudence on Specific Personal Jurisdiction</u>

The Court begins its review of the Supreme Court's jurisprudence on specific personal jurisdiction with the decision in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980). *World-Wide Volkswagen* was a products liability case filed in Oklahoma and involved personal injuries sustained by plaintiffs while operating their vehicle, which was purchased in New York and while being driven to Arizona, was involved in an accident in Oklahoma. *See id.* at 288. Two of the defendants, the New York vehicle distributor and the New York vehicle dealer, objected to personal jurisdiction in the Oklahoma court. *See id.* at 288-89. The Supreme Court agreed with these defendants and held that personal jurisdiction was lacking, because the defendants: (1) carried on no activity whatsoever in Oklahoma, (2) they closed no sales in Oklahoma, (3) they performed no services there, (4) they availed themselves of none of the privileges or benefits of Oklahoma law, (5) they did not solicit business in Oklahoma either through salespersons or advertising reasonably calculated to reach the State, and (6) they did not regularly sell cars at wholesale or retail to Oklahoma customers or residents or serve or seek to serve the Oklahoma market. *See id.* at 295. The Court noted in support of its holding, "[i]n

short, respondents seek to base [personal] jurisdiction on one, isolated occurrence and whatever inferences can be drawn therefrom: the fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma." *Id.* During its analysis, the Court distinguished the facts before it from a situation in which "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id*. at 298. This statement spawned what is now referred to as the "stream-of-commerce" doctrine, which has been applied and explained in subsequent cases.

The Supreme Court next addressed specific personal jurisdiction in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985). *Burger King* involved a suit by a Florida fast-food restaurant franchisor against a Michigan-based franchisee alleging breach of franchise obligations and trademark infringement in a Florida district court. *See id.* at 464-68. With regard to specific personal jurisdiction the Court remarked,

> [W]here the defendant 'deliberately' has engaged in significant activities within a State, or has created 'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well. *Id*. at 475-76 (internal citations omitted).

The Court further noted that personal jurisdiction "may not be avoided merely because the defendant did not physically enter the forum State....[since] it is an escapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines," and concluded "[s]o long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion

that an absence of physical contacts can defeat personal jurisdiction there." *Id*. at 476.  With

regard to contract-related contacts with the forum, the Court stated,

> If the question is whether an individual's contract with an out-of-state party *alone* can
> automatically establish sufficient minimum contacts in the other party's home forum, we
> believe the answer is clearly that it cannot....It is these factors-prior negotiations and
> contemplated future consequences, along with the terms of the contract and the parties'
> actual course of dealing-that must be evaluated in determining whether the defendant
> purposefully established minimum contacts within the forum.  *Id*.  at 478-79 (emphasis in
> original).

The Court ultimately concluded that specific personal jurisdiction existed over the

nonresident defendant, even though he lacked any physical ties with the forum.  The Court based

its decision on the following facts: (1) the franchise dispute grew directly out of a contract which

had a *"substantial* connection" with the forum; (2) the defendant reached out and negotiated with

the forum plaintiff for a long-term franchise and benefits which would derive from the forum

plaintiff; (3) defendant entered into a 20-year contractual relationship with the forum plaintiff

that envisioned continuing contacts with the plaintiff; (4) the defendant's alleged breaches caused

foreseeable injuries to the forum plaintiff in the forum; (5) defendant knew he was affiliating

himself with the plaintiff in the forum based on the contractual documents; (6) the plaintiff's

forum office made the key negotiating decisions; and (7) the contract contained a forum choice-

of-law provision.  *See id.* at 479-82.

The next instructive case is *Asahi Metal Industry Co., Ltd. v. Superior Court of*

*California*, 480 U.S. 102 (1987).  In *Asahi*, the Court was split on the issue of whether the

foreign defendant had sufficient minimum contacts with the forum to satisfy specific personal

jurisdiction, but it agreed that due process was violated by the exercise of personal jurisdiction

over the defendant on fairness and reasonableness grounds.  *See id.  Asahi* involved products

liability claims brought by plaintiffs injured in the forum state, California, while riding a

motorcycle containing tire tubes manufactured by a Taiwanese defendant.  *See id.*  The

Taiwanese defendant filed a cross-claim against the Japanese manufacturer of tire valves which

were used in the Taiwanese defendant's tire tubes, *see id.* at 105-06, and the Japanese

manufacturer contested personal jurisdiction in the forum.  *See id.* at 106.

Justice O'Connor wrote for a plurality of the Court finding that minimum contacts with

the forum were lacking.  Justice O'Connor characterized the stream-of-commerce doctrine as

follows,

> The placement of a product into the stream of commerce, without more, is not an act of
> the defendant purposefully directed toward the forum State.  Additional conduct of the
> defendant may indicate an intent or purpose to serve the market in the forum State, for
> example, designing the product for the market in the forum State, advertising in the
> forum State, establishing channels for providing regular advice to customers in the forum
> State, or marketing the product through a distributor who has agreed to serve as the sales
> agent in the forum State.  But a defendant's awareness that the stream of commerce may
> or will sweep the product into the forum State does not convert the mere act of placing
> the product into the stream into an act purposefully directed toward the forum State.  *Id*.
> at 112.

This characterization is sometimes referred to as the "stream-of-commerce-plus" test.  Under this

reasoning, Justice O'Connor concluded that the Japanese manufacturer's "awareness that some of

[its] valves sold to [the Taiwanese tube manufacturer] would be incorporated into tire tubes sold

in California" did not constitute sufficient minimum contacts with the forum, since the Japanese

manufacturer: (1) did no business in the forum, (2) had no office, agents, employees, or property

in the forum, (3) did not advertise or solicit business in the forum, (4) did not create, control, or

employ the distribution system that brought its valves to the forum; and (5) did not design its

product in anticipation of sales in the forum.  *Id*. at 112-13.

Justice Brennan's concurring opinion disagreed with both the plurality's interpretation of

the stream-of-commerce theory and its conclusion that the Japanese defendant did not

purposefully avail itself of the forum state.  *See id.* at 116.  Justice Brennan reasoned,

> Under [the plurality's] view, a plaintiff would be required to show 'additional conduct'
> directed toward the forum before finding the exercise of jurisdiction over the defendant
> to be consistent with the Due Process Clause.  I see no need for such a showing, however.
> The stream of commerce refers not to unpredictable currents or eddies, but to the regular
> and anticipated flow of products from manufacture to distribution to retail sale.  As long
> as a participant in this process is aware that the final product is being marketed in the
> forum State, the possibility of a lawsuit there cannot come as a surprise.  Nor will the
> litigation present a burden for which there is no corresponding benefit.  A defendant who
> has placed goods in the stream of commerce benefits economically from the retail sale of
> the final products in the forum State, and indirectly benefits from the State's laws that
> regulate and facilitate commercial activity.  These benefits accrue regardless of whether
> that participant directly conducts business in the forum State, or engages in additional
> conduct directed toward that State.  Accordingly, most courts and commentators have
> found that jurisdiction premised on the placement of a product into the stream of
> commerce is consistent with the Due Process Clause, and have not required a showing of
> additional conduct.  *Id*. at 116-17 (internal citations omitted).

Justice Brennan criticized the plurality's "marked retreat from the analysis in *World-Wide*

*Volkswagen*."  *Id.* at 118.  He concluded by affirming the lower court's finding of minimum

contacts on the basis that "'although [the Japanese manufacturer] did not design or control the

system of distribution that carried its valve assemblies into [the forum], the [manufacturer] was

aware of the distribution system's operation, and it knew that it would benefit economically from

the sale in [the forum] of products incorporating its components.'"  *Id.* at 121.

The Supreme Court's most recent pronouncement on specific personal jurisdiction was in

*J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S.Ct. 2780 (2011), a products-liability case

involving personal injuries caused by the foreign defendant's machinery in the forum.  Despite

the intent to clarify the "decades-old questions left open in *Asahi*" of the proper test under the

stream-of-commerce doctrine, *see id.* at 2785,  *J. McIntyre* failed to produce a majority opinion

from the Court.  *See id.*

The plurality opinion, announced by Justice Kennedy, held that minimum contacts were lacking between the foreign manufacturer of the machine and the forum where the plaintiff was injured by the manufacturer's machine.  The plurality relied upon the following facts in reaching its decision: (1) the distributor of defendant's machines agreed to sell the machines in the United States generally; (2) the manufacturer's officials attended trade shows in the United States, but not in the forum state; (3) up to four of the manufacturer's machines ended up in the forum; (4) the manufacturer had no office in the forum; (5) the manufacturer did not own property or pay taxes in the forum; (6) the manufacturer did not advertise in the forum; and (7) the manufacturer did not send any employees to the forum.  *Id*. at 2790.  The plurality criticized the "stream of commerce" doctrine as espoused by Justice Brennan's concurrence in *Asahi* and in *World-Wide Volkswagen*, reasoning "as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State....This Court's precedents make clear that it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment."  *Id*. at 2788-89.

Justice Breyer wrote the concurring opinion in *J. McIntyre*[3], finding that based upon existing Supreme Court precedent and the facts involving the defendant's forum activities, the plaintiff failed to meet his burden of demonstrating personal jurisdiction over the foreign defendant.  *See id.* at 2791.  Justice Breyer distinguished his decision from both, in his characterization, the plurality's embrace of a narrow view of personal jurisdiction over a foreign defendant and the lower court's substantially broader view.  *See id.* at 2793.

Justice Ginsburg authored the dissenting opinion in *J. McIntyre*, concluding that the

---

[3]The Court will explore Justice Breyer's concurrence in greater detail in the following section.  *See infra* Section II.B.6.c.

foreign defendant had sufficient minimum contacts with the forum state to exercise specific

personal jurisdiction. *See* 131 S.Ct. at 2794-2804. In support of this conclusion, Justice

Ginsburg noted the following: (1) the defendant's regular attendance and exhibitions at business

conventions in the United States, and (2) the defendant's engagement of a U.S. distributor to sell

its machines throughout the country. *See id.* at 2797. According to the dissent, these contacts

evidenced purposeful steps and targeting to reach customers for the defendant's products in the

United States. Justice Ginsburg concluded that the machine did not randomly or fortuitously

reach the forum, but was there as a result of defendant's deliberate connections with the United

States through a local distributor. *See id.*

> c.    Effect of *J. McIntyre* on Specific Personal Jurisdiction
>        Analysis

The parties rely upon *J. McIntyre* in support of their respective positions, but their

interpretations of the case and its effects on specific personal jurisdiction are diametrically

opposed. TG argues that a majority of the Court in *J. McIntyre* rejected the stream-of-commerce

doctrine, because both the plurality and concurrence rejected the proposition that a defendant

who introduces his products into the stream of commerce is subject to personal jurisdiction

merely because the defendant could foresee or expect that its product would be sold in the forum

state. *See* (R. Docs. 13490, pp. 24-29, 14572, pp. 9-17). TG further argues that its position on

*McIntyre* is supported by a "growing number of courts," and that the Fourth and Fifth Circuits

have likewise rejected the stream-of-commerce doctrine. Accordingly, TG asks the Court to

disregard any jurisprudence which applies the stream-of-commerce doctrine.

In response, Plaintiffs argue: (1) *J. McIntyre's* plurality opinion is not binding and

therefore cannot be held to change Fifth Circuit jurisprudence; (2) the jurisdictional minimum

contacts that the plurality and the concurrence held were lacking in *J. McIntyre* are present in *Germano*; (3) a majority of the Supreme Court in *J. McInyre* applied the stream-of-commerce doctrine; and (4) the concurrence left open the question of whether a foreign defendant could be subject to suit in a state where it marketed its products via the internet.  *See* (R. Doc. 14209, pp. 15-20).

As noted, the Supreme Court in *J. McIntyre* failed to reach a majority opinion, leaving three separate decisions: (1) the plurality opinion by Justice Kennedy, (2) the concurrence by Justice Breyer, and (3) the dissent by Justice Ginsburg.  *See* 131 S.Ct. 2780.  "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds....'" *Marks v. United States*, 430 U.S. 188, 993 (1977)(quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)).  Under this accepted jurisprudential rule, Justice Breyer's concurrence, based on the narrowest grounds, constitutes the holding of the Court in *J. McIntyre*.  *See id.*  This has been recognized by a plethora of courts.  *See e.g. Frito-Lay N. Am., Inc. v. Medallion Foods, Inc.*, —F.Supp.2d—, 2012 WL 1108427, at *5 (E.D. Tex. Mar. 20, 2012)("[T]he plurality opinion in *McIntyre*, written by Justice Kennedy, is not the precedential holding of the Supreme Court....Justice Breyer's concurrence is the controlling opinion..."); *Eskridge v. Pac. Cycle, Inc*., 2010 WL 1036826, at *4 (S.D.W.Va. Mar. 27, 2012)("Because [J. McIntyre] did not produce a majority opinion adopting either Justice O'Connor's or Justice Brennan's reliance on current Supreme Court precedent, post-*Asahi* Fourth Circuit case law remains binding."); *Huddleston v. Fresenius Med. Care N. Am.*, 2012 WL 996959, at *5 (S.D. Ohio Mar. 22, 2012)("However, because no opinion in

*J.McIntyre* commanded five votes, Justice Breyer's concurrence controls."); *Graham*, 2012 WL 893748, at *3 ("This [plurality] opinion, however, did not command a majority of the justices and is not binding on this Court....Justice Breyer's concurrence [] is binding."); *Askue v. Aurora Corp. of Am.*, 2012 WL 843939, at *7 (N.D. Ga. Mar. 12, 2012)(finding Justice Breyer's concurrence constitutes the holding of the Supreme Court in *J. McIntyre*); *Sieg v. Sears Roebuck & Co.*, —F.Supp.2d—, 2012 WL 610961, at *5 (M.D. Pa. Feb. 24, 2012)(relying on Supreme Court precedent for personal jurisdiction analysis because the *J. McIntyre* Court was unable to reach a majority); *UTC Fire & Sec. Ams. Corp., Inc. v. NSC Power, Inc.*, —F.Supp.2d—, 2012 WL 423349, at *8 (S.D.N.Y. Feb. 10, 2012)("However, because no opinion in *J. McIntyre* commanded five votes, Justice Breyer's concurrence controls."); *Lindsey v. Cargotect USA, Inc.*, 2011 WL 4587583, at *7 (W.D.Ky. Sept. 30, 2011)(adhering to existing precedent on purposeful availment in the wake of *J.McIntyre* because there was no majority consensus on a single test); *Dram Techs., LLC v. Am. II Grp., Inc*., 2011 WL 4591902, at *2 (E.D. Tex. Sept. 30, 2011)("Under the rule from *Marks*, the concurring opinion by Justice Breyer, which concurs in the Judgment on much narrower grounds, is the binding holding from the Supreme Court."); *Bluestone Innovations Tx., LLC v. Formosa Epitaxy, Inc.*, 822 F.Supp.2d 657, 662 (E.D. Tex. 2011)(characterizing Justice Breyer's concurrence as the controlling opinion in *J. McIntyre*). Thus, the Court applies Justice Breyer's concurrence as controlling law.

In writing the concurrence, Justice Breyer emphasized on no less than four occasions that he was relying entirely upon Supreme Court *precedent* regarding specific personal jurisdiction and the stream-of-commerce doctrine. *See id.* at 2791 ("In my view, the outcome of this case is determined by our precedents."); 2792 ("[T]his case requires no more than adhering to our

precedents."); 2793 ("[T]his is an unsuitable vehicle for making broad pronouncements that refashion basic jurisdictional rules."); 2794 ("I again reiterate that I would adhere strictly to our precedents.").  The precedent relied upon by Justice Breyer includes the Supreme Court's decisions in *World-Wide Volkswagen* and *Asahi*.  *See id.* at 2792.  Notably, Justice Breyer quoted the portion of *World-Wide Volkswagen* which created the stream-of-commerce doctrine. *See id.*

Justice Breyer applied this precedent to the three facts relied upon by the lower court: (1) a U.S. distributor, on a single occasion, sold one of the defendant's machine to a forum customer, (2) the defendant permitted and wanted its distributor to sell its machines to anyone, anywhere in the U.S., and (3) representatives of the defendant attended trade shows in the United States, but not the forum.  Justice Breyer concluded "[n]one of our precedents finds that a single isolated sale, even if accompanied by the kind of sales effort here, is sufficient [for personal jurisdiction]."  *Id.* at 2791-92.  Justice Breyer then reasoned,

> Here, the relevant facts found by the [lower court] show no 'regular flow' or 'regular course' of sales in [the forum]; and there is no 'something more,' such as special state-related design, advertising, advice, marketing, or anything else. [Plaintiff], who here bears the burden of proving jurisdiction, has shown no specific effort by the [defendant] to sell in [the forum]. [Plaintiff] has introduced no list of potential New Jersey customers who might, for example, have regularly attended trade shows.  And [plaintiff] has not otherwise shown that the [defendant] 'purposefully availed itself of the privilege of conducting activities' within [the forum], or that it delivered its goods in the stream of commerce 'with the expectation that they will be purchased by [forum] users.  *Id.* at 2792 (quoting *World-Wide Volkswagen*, 444 U.S. at 297-98)).

Justice Breyer concluded by declaring, "I would not work such a change to the law in the way either the plurality or the [lower court] suggests."  He characterized the plurality opinion as espousing a "seemingly strict no-jurisdiction rule" and the lower court's opinion as an "absolute approach," under which "a producer is subject to jurisdiction so long as it 'knows or reasonably

-38-

should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states." *Id*. at 2793 (emphasis in original). Justice Breyer's concurrence provides a clear directive to the Court to apply existing Supreme Court precedent on specific personal jurisdiction and the stream-of-commerce doctrine. Because the Court looks to Fifth Circuit law when applying federal law in the present matter, it now addresses the Fifth Circuit's interpretation of the foregoing Supreme Court precedent.

d.  Fifth Circuit's Interpretation of Specific Personal<br>Jurisdiction

The Fifth Circuit has not addressed specific personal jurisdiction over foreign defendants and the stream-of-commerce doctrine since the issuance of *J. McIntyre*. *See Graham v. Hamilton*, 2012 WL 893748, at *3 n.2 (W.D. La. Mar. 15, 2012); *Powell v. Profile Design, LLC*, —F.Supp.2d—, 2012 WL 149518, at *8 (S.D. Tex. Jan. 18, 2012); *Ainsworth v. Cargotec USA, Inc*., 2011 WL 6291812, at *4 (S.D. Miss. Dec. 15, 2011). However, the Circuit has previously stated "'[a]bsent rejection by a majority on the Supreme Court, we have continued to apply the stream of commerce analysis found in our pre-*Asahi* cases.'" *Id.* (quoting *Ham v. La Cienega Music Co.*, 4 F.3d 413, 416 & n.11 (5th Cir. 1993)). As discussed above, a majority of the *J. McIntyre* Court did not reject the stream-of-commerce doctrine; only the plurality rejected the doctrine with the concurrence and dissent both applying the doctrine, albeit with different interpretations and applications. Justice Breyer's concurrence, the governing decision, expressly requires the application of existing Supreme Court precedent on specific personal jurisdiction, leaving unaltered the pre-*J. McIntyre* jurisprudence relied upon by the Fifth Circuit. Thus, the Court applies the Fifth Circuit's law as informed by Supreme Court precedent on specific personal jurisdiction and the stream-of-commerce doctrine.

-39-

The Fifth Circuit has unequivocally declared its adherence to Justice Brennan's concurrence in *Asahi* and the stream-of-commerce doctrine originated in *World-Wide Volkswagen*. *See Choice Healthcare, Inc. v. Kaiser Found. Health Plan of Colo.*, 615 F.3d 364, 373 (5th Cir. 2010)(citing *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 420 (5th Cir. 1993)("In the years after *Asahi*, the Fifth Circuit has continued to follow the original 'stream-of-commerce' theory established in the majority opinion of *World-Wide Volkswagen*, and has rejected the 'stream-of-commerce-plus' theory advocated by the *Asahi* plurality.")). Thus, the Court must reject the "stream-of-commerce-plus" approach to specific personal jurisdiction in favor of the less stringent "stream-of-commerce" approach. This latter, applicable approach was recently described by the Fifth Circuit as follows:

> Where a nonresident's contact with the forum state 'stems from a product, sold or manufactured by the foreign defendant, which has caused harm in the forum state, the court has specific jurisdiction if it finds that the defendant delivered the product into the stream of commerce with the expectation that it would be purchased or used by consumers in the forum state.' Under this 'relatively expansive' theory, only 'mere foreseeability' that a defendant might be haled into court because it purposely availed itself of the benefits of the forum state is required. A defendant need not have 'purposely directed' its activities to the forum. *Jackson v. Tanfoglio Guiseppe, S.R.L.*, 615 F.3d 579, 585 (5th Cir. 2010).

The Court will apply the foregoing jurisprudence to the evidence in *Germano*.

*7.*    *TG's Minimum Contacts in* Germano

The Court considers the following personal jurisdiction-related evidence in *Germano*.

a.    <u>TG's Lack of Physical Presence in Virginia</u>

It is undisputed that TG lacks any physical presence in Virginia: (1) TG manufactures drywall exclusively in China; (2) TG does not sell drywall in Virginia; (3) TG has never manufactured products in Virginia; (4) TG has never performed services in Virginia; (5) TG

-40-

does not have offices and does not own or lease real or personal property in Virginia; (6) TG does not maintain any bank account in Virginia; (7) TG has never appointed an agent to accept service of process in Virginia; (8) TG has never paid taxes or incurred tax liability in Virginia; (9) TG is not registered to do business in Virginia; (10) TG has never been incorporated in Virginia; (11) TG has never maintained any corporate books or records in Virginia; (12) TG does not have a mailing address or telephone number in Virginia; (13) TG does not have officers, directors, employees or agents in Virginia, and none maintain a residence or place of business in Virginia; and (14) None of TG's officers, directors, employees, or agents have visited Virginia for business purposes.  (Spano Decl. Ex. 1 (Tongchun Decl.)).

b.     TG's Nationwide Contacts

TG has a number of contacts with the United States generally.  TG or its affiliated companies manufactured and sold approximately 1,825,202 sheets of drywall which were shipped to and used in the United States from 2005 to 2009.  *See* (Herman Aff. Ex. 1).  Several of these sales were directly with U.S. companies.  *See e.g.* (Herman Aff. Exs. 10, 20, 80, 81, 86, 100, 103, 123, 157).  Additionally, certain drywall shipments to the United States were arranged by TG or its affiliates.  *See e.g.* (Herman Aff. Ex. 64, 127).

TG holds itself out as a Chinese manufacturer of new building materials, particularly drywall, that exports its products world-wide, including the United States.  (Spano Decl. Ex. 2 (Tongchun Dep., Pl.s' Ex. 20); Ex. 3 (P. Wenglong Dep. Ex. 20)); (Herman Aff. Exs. 5, 10, 16, 22, 73).  In TG's marketing and informational brochure, it includes an illustration of its world-wide marketing web, including an arrow pointing from China to the United States.  (Spano Decl. Ex. 2 (Tongchun Dep., Pl.s' Ex. 20)).

-41-

TG has operated a website since approximately 2003. (Spano Decl. Ex. 3 (P. Wenglong Dep. 541:16-542:12)); (Herman Aff. Exs.5, 22). Some portions of the website are written in English. *See id.* The website does not allow for online purchase of TG's drywall or other products; nor does it provide access to online communications with TG. *See id.* at 542:21-543:5. TG maintains the website to inform people about TG and to encourage the purchase of its products. (Spano Decl. Ex 2 (Tongchun Dep. 929:1-9)). Specifically, when asked about the intent behind the TG website, TG's representative responded , "[t]he reason for setting up the website is to have more people know Taishan Gypsum," and when asked if the website was created so customers would buy TG's product, TG's representative responded, "I don't exclude that intention." *See id.* The TG website, like its brochure, states that TG is one of the largest drywall manufacturers in the world and that it exports its product world-wide, including to the United States. (Herman Aff. Ex. 22).

Additionally, TG published and advertised its products on a third-party website, Alibaba.com. (Herman Aff. Ex. 23 (Carlos Rios Dep. 16:16-24, 32:2-10, Dec. 8, 2011); Ex. 24 (Yongzhi (Charley) Yang Dep. 79:4-81:10, Feb. 21, 2012); Ex. 143 (John Gunn Dep. 88:2-19, July 22, 2011)). Alibaba.com is an Asian website comparable to Ebay or Craigslist in the United States, which allows for the sale of products via the internet on a global basis. (Herman Aff. Ex. 23 (Rios Dep. 32:4-10)). Some customers in the United States have purchased drywall from TG utilizing the Alibaba.com website. (Herman Aff. Ex. 24 (Yang Dep. 80:2-6); Ex. 25 (Darrin Steber Dep. 16:4-21, Dec. 30, 2011)).

TG's employees used Americanized names and communicated in English with U.S. customers. *See e.g.* (Herman Aff. Exs. 10, 27, 28, 44, 59, 64, 70, 71, 73, 74, 75, 76). For

example, two sales employees of Taishan, Peng Wenglong and Che Gang, used the names Frank Clem and Bill Cher, respectively, when dealing with U.S. customers. *See id.* TG employed salespersons and workers specifically for the U.S. market. *See* (Herman Aff. Ex. 10).

TG shipped to U.S. customers and potential customers samples of its drywall, usually at the request and cost of the customer. *See* (Spano Decl. Ex. 3 (P. Wenglong Dep. 268:1-270:2); Ex. 5 (Che Dep. 285:12-286:2, 288:13-289:3); Ex. 143 (Gunn Dep. 69:17-19, 70:24-71:11)); (Herman Aff. Exs. 34, 49, 52, 53, 54, 55, 57, 73).

Taishan encouraged, welcomed, and accommodated representatives of U.S. companies to visit its drywall offices and factories in China. *See* (Herman Exs. 57, 58, 59).

TG manufactured its drywall specifically for U.S. customers by: representing its drywall satisfied American Society for Testing and Materials ("ASTM") standards; measuring the drywall in U.S. measurements; placing on the drywall, labels written in English and information and colors as requested by U.S. customers; and employing packing and shipment of the drywall for the United States. *See* (Herman Aff. Exs. 10, 13, 16, 35, 42, 43, 73, 100, 103, 123, 143 (Gunn Dep. 58:3-60:16, 83:16-20, 84:1-13, 214:19-24)). For example, Taishan altered one of its logos so that it was printed on drywall sold to a U.S. customer in the colors of the U.S. flag-red, white and blue. *See id.* at 42, 43.

<u>c.</u>    TG's Virginia Contacts

In addition, TG has the following Virginia-specific contacts, most involving its business relationship with Venture Supply, Inc., a Virginia company.

In November 2005, Phillip Perry of Tobin Trading, Inc., a Virginia-based entity, contacted TG to inquire about TG's drywall and represented he was an agent of Venture Supply, Inc., a

Virginia company.  (Spano Decl. Ex. 1 (Tongchun Decl. ¶ 26); Ex. 3 (Peng Dep. 519:6-17));

(Herman Aff. Ex. 72 (Porter Dep. 28:2-6)).  This contact initiated the business relationship

between Venture and TG, which spanned two years.

During the course of the business relationship between Venture and TG, Venture's main

contact at TG was Peng Wenglong.  *See* (Spano Decl. Ex. 5 (Che Dep. 60:8-22)).  Mr. Wenglong

used the Americanized name of "Frank Clem" and communicated in English when dealing with

Venture.  *See* (Herman Aff. Exs. 44, 70, 71, 73, 74, 75, 76).  Mr. Perry communicated on behalf of

Venture with TG both over the telephone and in person regarding the purchase of TG's drywall.

(Spano Decl. Ex. 3 (Peng Dep. 366:10-370:8)).  Additionally, Samuel Porter, Venture's owner,

communicated with TG.  *See* (Herman Aff. Ex. 72 (Samuel Porter Dep. Dec. 17, 2009 345:1-15)).

Shortly after his initial communications with TG, Mr. Perry, on behalf of Venture,

traveled to China and met with representatives of TG.  (Spano Decl. Ex. 1 (Tongchun Decl. ¶ 27);

Ex. 3 (Peng Dep. 366:10-17)).  During his visit with TG in China, Mr. Perry negotiated a contract

with TG for the sale of TG drywall.  (Spano Decl. Ex. 1 (Tongchun Decl. ¶ 27)).

On November 7, 2005, after Mr. Perry's trip to China, he reported to Venture that samples

of TG's product would be sent from Hong Kong, and TG had told him "that a lot of American

companies have made enquires, but I was the first to show enough interest to make the trip.  If we

continue this size purchases or increase the volume, they will make us the USA representative."

(Herman Aff. Ex. 73).

On November 9, 2005, Venture provided a letter of credit to TG in the amount of

$429,600.00 for the purchase of 120,000 sheets of drywall manufactured to Venture's

specifications and in compliance with all applicable U.S. ASTM and fire rating standards.

(Herman Aff. Ex. 79).  Venture received documentation from TG showing that the TG drywall satisfied ASTM standards.  *See* (Herman Ex. 72 (Porter Dep. 57:21-58:3, 59:10-12)).  Specifically, Venture "received documentation [from TG] that the ASTM tests were done [in China]."  *See id.*

On November 17, 2005, the first contract between TG and Venture was executed in Virginia.[4]  (Spano Decl. Ex. 3 (P. Wenglong Dep. 370:10-16, 531:6-20); Ex. 8; Ex. 12).  The contract provided that TG would manufacture and sell to Venture, 100,000 sheets of TG drywall at the price of $358,000.000.  (Herman Aff. Ex. 80).  Delivery was specified to occur at a Chinese port, with Venture responsible for the arrangement and payment for transportation to Virginia from the Chinese port.  *See id.*  All disputes under the contract were to be settled by negotiation, and if not, then submitted to the Foreign Trade Arbitration Commission of the China Council for the Promotion of International Trade.  *See id.*  The contract noted Venture's address in Virginia. *See* (Spano Decl. Ex. 12).

Following the execution of the first contract, Venture and TG engaged in extensive discussions regarding their current and future business relationship.  For example, after Venture inquired about becoming TG's exclusive drywall distributor in the United States, *see* (Herman Aff. Ex. 74), Peng Wenglong a.k.a. Frank Clem wrote on behalf of TG to Mr. Perry, "First, it is our hope to cooperate with you to enlarge the market at your end.  We have adjusted largely the producing line for you.  And we will let this line only for you if you like."  (Spano Decl. Ex. 9); (Herman Aff. Ex. 70).  This email also stated the pricing for the TG drywall and that Mr. Clem was working to persuade the TG sales manager and factory to negotiate on the price.  *See id.*

---

[4]*See supra* n.2.

Then again, on December 2, 2005, Mr. Clem wrote to Venture,

> It is our hope to cooperate with you especially in the field of gypsum board.  We know that you are one of the powerful companies to deal with the gypsum products in your country.  And we would like to introduce ourself as one of the biggest gypsum board producing factor with the annual production of more than 200 million square meters.  We are confident that there is a bright future for our cooperation by joint efforts.  (Herman Aff. Ex. 71).

In mid-December 2005, TG and Venture again discussed the concept of Venture becoming the exclusive distributor of TG drywall in the United States, and future sales were contemplated.  *See* (Herman Aff. Ex. 75).  Additionally, around this same time, TG reached out to Venture to assist a third company in importing TG's drywall to the United States.  *See* (Herman Aff. Ex. 76).  On December 15, 2005, Mr. Perry and TG communicated again via email, during which the following information was revealed: TG anticipated and hoped for a long-term business relationship with Venture; TG agreed to give Venture priority treatment for sales of its drywall; TG would produce the drywall pursuant to Venture's specifications; TG would send samples of its drywall to Venture in the United States for testing purposes; and TG  planned to send an employee to the United States.  *See* (Herman Aff. Ex. 78).  Throughout their business relationship, TG and Venture discussed designating Venture as the exclusive distributor of TG's drywall in the United States, but these discussions never developed into a formal agreement.  *See* (Herman Aff. Ex. 72 (Porter Dep. 130:1-6, 346:17-347:8)).

On December 16, 2005, Mr. Perry, returned to China to inspect the TG drywall purchased in the first contract between TG and Venture.  (Spano Decl. Ex. 1 (Tongchun Dec. ¶ 29)).  While Mr. Perry was in China, he entered into a second contract, on behalf of Venture, with TG for the purchase of additional TG drywall.  (Spano Decl. Ex. 1 (Tongchun Dec. ¶ 30); Ex. 3 (Peng Dep. 370:10-16, 531:6-20); Ex. 8; Ex. 13).  The second contract, similar to the first, provided for the

purchase of 100,000 sheets of TG drywall by Venture, at a price of $366,800.00, with delivery to a Chinese port.  *See id.*  The contract placed responsibility on Venture for shipping the drywall from the Chinese port to Virginia.  *See* (Herman Aff. Ex. 81).  All disputes under the contract were to be settled by negotiation, and if not, then submitted to the Foreign Trade Arbitration Commission of the China Council for the Promotion of International Trade.  *See id.*  This contract also noted Venture's address in Virginia.  *See* (Spano Decl. Ex. 13).  On or about March 11, 2006, Mr. Perry again visited TG in China to inspect the drywall involved in the second contract. (Spano Decl. Ex. 1 (Tongchun Dec. ¶ 31)).

Pursuant to its contracts with Venture, TG "manufactured drywall to U.S. dimensions on a made-to-order OEM [original equipment manager] basis."  (Spano Decl. Ex. 8).  This "drywall was imprinted with the following marks: VENTURE SUPPLY INC. MFG: SHANDONG TAIHE, CHINA.  *Id.*  The TG-Venture drywall also had sealing tape on its edges with the marking "Venture Supply."  *Id.*; (Herman Aff. Ex. 44, Ex. 72 (Dep. Porter 60:9-62:14)).

As noted, both contracts between TG and Venture provided that Venture was responsible for transporting the TG drywall from China to Virginia.  (Spano Decl. Ex. 1 (Tongchun Decl. ¶¶ 28, 30, 34); Ex. 3 (P. Wenglong Dep 518:3-10); Ex. 12; Ex. 13).  However, TG assisted with this shipping.  On November 17, 2005, Mr. Perry sent an email to TG inquiring about the earliest date for shipment of the drywall to Virginia, the names of shipping companies, and other shipping-related assistance.  *See* (Spano Decl. Ex. 16)).  TG provided Mr. Perry with contact information for shipping agents and passed on information concerning available ships, freight rates, as well as other details.  (Spano Decl. Ex 3 (P. Wenlong Dep. 357:12-358:14, 372:13-374:8); Ex. 16).  Venture used this information and the contacts provided by TG to arrange for shipment of the TG

-47-

drywall to Virginia.  *See id.*; (Spano Decl. Ex. 3 (Peng Dep. 371:13-24)).

Pursuant to the two contracts for the purchase of drywall between TG and Venture, TG delivered two shipments to the Lianyungang port in China for shipment to Venture in Virginia. (Spano Decl. Ex. 1 (Tongchun Decl. ¶ 33); Ex. 3 (Peng Dep. 370:17-24, 526:11-24)).  The Taian Shandong Province Special Invoices for Export list "FOB" as the term of delivery for this drywall.  (Spano Decl. Ex. 1 (Tongchun Dec. ¶ 34)).  The packing lists/invoices for the two shipments also indicated the shipments were "FOB any port in China."  (Spano Decl. Exs. 14, 15).

Venture retained a shipping agent recommended by TG to deliver the TG drywall from the Lianyungang port in China to Virginia for the first shipment and to New Jersey for the second shipment.  *See* (Spano Decl. Exs. 17, 18); (Herman Aff. Ex. 72 (Dep. Porter 33:234:1, 278:7-16)). The shipment to New Jersey was transported via railcar to Virginia.  *See* (Herman Aff. Ex. 72 (Porter Dep. 278:7-16)).  TG obtained the invoices from the shipping agent.  (Spano Decl. Ex. 3 (Peng Dep. 362:10-364:5)).  Both the commercial and packing invoices noted Venture's address in Virginia and that the drywall was to be shipped to Virginia.  *See* (Spano Decl. Exs. 14, 15). Venture received the bargained-for 100,000 sheets of drywall for the first contract, but only received a partial shipment of 59,000 out of 100,000 sheets of drywall for the second contract. *See* (Herman Aff. Ex. 72 (Porter Dep. 28:11-21, 103:15-19)).

The TG drywall contained in these shipments ultimately ended up in the homes of the *Germano* Intervening-Plaintiffs and other Virginia properties.  *See* (R. Doc. 2380, pp. 9-10); (Herman Ex. 72 (Porter Dep. 74:16-80:18)).  Venture sold a substantial amount of the TG drywall to Porter-Blaine Corp., a Virginia company, which then sold the drywall to subcontractors who

worked with Porter-Blaine in construction of homes in Virginia.  *See generally* (Herman Aff. Ex. 72 (Porter Dep. 38:21-41:13)).  Based upon Venture's own records and the unique drywall labeling requested by Venture and applied by TG, Venture is able to identify properties in Virginia which contain Venture-purchased TG drywall.  *See* (Herman Aff. Ex. 72 (Porter Dep. 312:3-12, 321:17-322:4)).

TG alleges that it had no knowledge or information concerning whether the drywall it sold and delivered to Venture in China would be distributed or used in Virginia.  (Spano Decl. Ex. 1 (Tongchun Decl. ¶ 33); Ex. 2 (Jia Tongchun Dep. 543:1-14, Apr. 4, 2011)).  However, the evidence refutes this position.  TG was told by Mr. Perry that the drywall TG sold to Venture would be shipped to and used in Virginia.  (Spano Decl. Ex. 3 (Peng Dep. 332:5-333:4, 371:13-17)).  Also, Mr. Perry emailed TG specifically requesting information for shipment of the TG drywall to Virginia.  (Spano Decl. Ex. 16).  A report issued by TG itself provides, "Mr. Phillip Perry replied that our plasterboard after arriving at the destination (Norfolk, Virginia) was well received by the market and had already been used in the projects, without having any negative feedback."  (Spano Decl. Ex. 3 (Peng Dep. Ex. 14)).  Additionally, TG sought out the shipment location for its drywall, provided this information on tax forms required by the Chinese government, and kept records of this information.  (Spano Decl. Ex. 3 (Wenglong Dep. 323:20-325:22)).

Although the evidence before the Court shows Venture as the only Virginia company which conducted business with TG in the United States, other U.S. companies which purchased TG's drywall sold or used this drywall in Virginia.  For example, Guardian Building Products Distribution, Inc. purchased drywall from TG; then Guardian sold this TG drywall to Builders

First Source, which in turn sold this drywall in Virginia.  *See* (Herman Aff. Ex. 143 (Gunn Dep.

25:14-26:15, 79:22-80:2)).

d.    <u>TG has Sufficient Minimum Contacts With Virginia for Specific</u>
<u>Personal Jurisdiction</u>

Based upon the foregoing evidence and the applicable law on personal jurisdiction, the

Court finds that TG possesses sufficient minimum contacts with Virginia to support the exercise

of specific personal jurisdiction over TG in *Germano*.  While TG has no physical contacts with

the forum, it did possess contacts which demonstrate it purposefully directed its activities at the

forum such that it reasonably could anticipate being haled into court there.  *See Burger King*, 471

U.S. at 476.  TG's contacts with Virginia are beyond mere random, fortuitous, or attenuated

contacts.  *Compare World-Wide Volkswagen*, 444 U.S. at 295.  TG placed its drywall into the

stream of commerce with the knowledge that its drywall would end up in and be used in Virginia.

*See Ruston*, 9 F.3d at 419.  TG had more than reasonable knowledge that its products *might* end

up in Virginia; it knew its products *would* end up in Virginia.  *See J. McIntyre*, 131 S.Ct. at 2793.

In comparing the facts in *Germano* with those in *J. McIntyre*, TG has more substantial

contacts with Virginia than the defendant in *J. McIntyre* did with its forum.  The relevant contacts

in *J. McIntyre* were limited to: (1) a U.S. distributor on one occasion sold one of the defendant's

machines to a forum customer; (2) the defendant permitted and wanted its distributor to sell its

machines to anyone, anywhere in the U.S.; and (3) representatives of the defendant attended trade

shows in the U.S., but not in the forum.  *See* 131 S.Ct. at 2791-92 (Breyer, J., concurring).  TG's

substantial Virginia-related contacts are analyzed as follows.

Over the course of two years, TG actively and deliberately negotiated with and entered

into two contracts for the sale of approximately 150,000 sheets of its drywall with a Virginia

-50-

company.  TG benefitted from these sales financially, profiting almost three-fourths-of-a-million

dollars.  "A defendant who has placed goods in the stream of commerce benefits economically

from the retail sale of the final products in the forum State, and indirectly benefits from the

State's laws that regulate and facilitate commercial activity."  *Asahi*, 480 U.S. at 116-17

(Brennan, J. concurring).  Indeed, the Fifth Circuit has found personal jurisdiction on the basis of

a foreign defendant's sale of products bound for the forum.  *See Luv N' Care, Ltd. v. Insta-Mix,*

*Inc.*, 438 F.3d 465, 471 (5th Cir. 2006); *see also Ruston Gas Turbines, Inc. v. Donaldson Co.,*

*Inc.,* 9 F.3d 415, 420-21 (5th Cir. 1993); *Irving v. Owens-Corning Fiberglas Corp.*, 864 F.2d 383,

386 (5th Cir. 1989).

TG engaged in email, phone, and in-person communications with Venture in support and

furtherance of their business relationship.  While these communications were first initiated by

Venture and the in-person communications occurred in China, *see Growden v. Ed Bowlin &*

*Assocs., Inc.,*, 733 F.2d 1149, 1151-53 (5th Cir. 1984); *S. Copper, Inc. v. Specialloy, Inc.*, 245

F.3d 791, at *3 (5th Cir. Dec. 2, 2000), based upon review of all communications, the Court finds

that TG was as involved as Venture in their business relationship and negotiations.  *See Burger*

*King*, 471 U.S. at 478-79 (considering prior negotiations and actual course of dealing in personal

jurisdiction analysis).  For example: TG offered to lower the prices of the drywall for Venture and

to give Venture priority in purchasing drywall; it sought to increase its business with Venture and

make Venture the exclusive distributor of its drywall in the United States; and it sought Venture's

assistance in providing a third-party with shipping information for its drywall.  TG's

representative communicated in English and used an Americanized version of his name.  TG

planned to send one of its employees to the United States.

As noted, TG and Venture both sought to expand future drywall sales in the United States through Venture. Although this plan never came to fruition, the Supreme Court has recognized that contemplated future consequences and negotiations for long-term, forum-related business are factors which favor personal jurisdiction in the forum. *See Burger King*, 471 U.S. at 479-82.

TG sent samples of its drywall to Virginia to facilitate the sale of TG's drywall to Venture. TG accommodated Venture's representative at its factory and offices in China. The Supreme Court has recognized that special state-related marketing or advertising is a factor to be considered in favor of exercising personal jurisdiction in that state. *See J. McIntyre*, 131 S. Ct. at 2792 (Breyer, J. concurring); *Asahi*, 480 U.S. at 112 (O'Connor, J. plurality).

TG manufactured drywall for Venture based upon Venture's specifications and U.S. standards. TG marked the drywall's face and endtapes with Venture's name. "[D]esigning the product for the market in the forum state" is an example of "[a]dditional conduct of the defendant [that] may indicate an intent or purpose to serve the market in the forum state." *Asahi*, 480 U.S. at 112 (O'Connor, J., plurality); *accord J. McIntyre*, 131 S.Ct at 2791-92 (Breyer, J. concurring)(finding special state-related design of a product supportive of personal jurisdiction).

Although TG did not ship the drywall to Virginia, it assisted Venture with shipping the drywall from China to Virginia by providing information on shipping companies, dates, prices and other logistics. TG attempts to insulate itself from personal jurisdiction on the basis that it used F.O.B. shipping terms, but the Fifth Circuit has held that "a F.O.B. term does not prevent a court from exercising personal jurisdiction over a non-resident where other factors...suggest that jurisdiction is proper," *Luv N'Care*, 438 F.3d at 471-72; these "other factors" are present here. Taishan's argument also fails because it relies on cases which pre-date the Supreme Court's

decision in *World-Wide Volkswagen*, the case which forms the basis of the Fifth Circuit's current

minimum contacts test.  The sole post-*World-Wide Volkswagen* case relied upon by Taishan

regarding the effect of an F.O.B. shipment term on minimum contacts, *Southern Copper*, 245 F.3d

791, is unpublished and predates the Fifth Circuit's published decision in *Luv N' Care*, 438 F.3d

465, cited above and which reaches a different conclusion from *Southern Copper* on F.O.B.

shipments.  *See also Irving*, 864 F.2d at 386 (finding personal jurisdiction where defendant

conveyed products to third party for shipment to the forum); *Ruston*, 9 F.3d at 420-21 (finding

personal jurisdiction where defendant delivered products to third party for shipment to the forum).

Despite TG's claims to the contrary, the evidence demonstrates that it possessed

knowledge and information that the drywall it sold to Venture would be shipped to Virginia and

used in Virginia.  Its contracts with Venture and invoices for the Venture-purchased drywall, as

well as its own records and tax documents, noted Venture was a Virginia company with a

Virginia address and that the Venture-purchased drywall would be shipped to Virginia.  TG was

told by Venture that the drywall was used in Virginia properties.  TG provided Virginia-related

shipping information to Venture.  TG's own internal report recognized the use of its drywall in

Virginia.  "As long as a [defendant] is aware that the final product is being marketed in the forum

State, the possibility of a lawsuit there cannot come as a surprise."  *Asahi*, 480 U.S. at 116-17

(Brennan, J. concurring).  TG possessed more than mere awareness or expectation that its drywall

would be delivered, sold, and installed in Virginia.  *See Asahi*, 480 U.S. at 121 (Brennan, J.

concurring); *J. McIntyre*, 131 S.Ct. at 2788-89 (Kennedy, J. plurality); *see also Paz v. Brush

Engineered Materials, Inc.,* 445 F.3d 809, 813-14 (5th Cir. 2006)(finding personal jurisdiction

over foreign distributor because it knew its products sold outside of the forum would be used in

the forum); *Luv N' Care*, 438 F.3d at 471 (finding personal jurisdiction in part on the basis that foreign defendant knew, based upon sales invoices, that its product would reach the forum); *Ruston Gas*, 9 F.3d at 420-21 (finding personal jurisdiction part because foreign defendant knew its products, after delivering them to a third-party shipper, would be delivered to a specific user in the forum); *Bean Dredging Corp. v. Rogers-Olympic Corp.*, 744 F.2d 1081 (5th Cir. 1984)(finding personal jurisdiction over foreign component part manufacturer solely on the basis that the manufacturer produced thousands of products which were sold nationwide)*; Austin v. N. Am. Forest Prods.*, 656 F.2d 1149, 1090 (5th Cir. 1981)(finding subject to personal jurisdiction in large part because defendant knew its product would be shipped to and installed in the forum); *Oswalt v. Tokai-Seiki KK,* 616 F.2d 191, 199-200 (5th Cir. 1980)(finding personal jurisdiction over foreign manufacturer who delivered its products to a distributor with the understanding its product would be sold in a nationwide market).

TG's Venture-purchased drywall did in fact end up in Virginia and was used in Virginia properties.  TG asserts that it did not know the ultimate buyer or user of its drywall in Virginia. The Fifth Circuit, however, has concluded that such lack of knowledge does not insulate a foreign defendant from personal jurisdiction in the forum.  *See Irving*, 864 F.2d at 386 ("Personal jurisdiction does not require certain knowledge of the user's identity.").

Even applying the *Asahi* and *J. McIntyre* pluralities' requirement that personal jurisdiction may attach under the stream of commerce doctrine only when there is "something else" connecting the defendant to the forum, that "something else" is present here.  TG conformed its drywall to meet U.S. standards, placed the name of a Virginia company on its drywall, and facilitated in shipping this drywall to Virginia for use in Virginia.

-54-

Because the Court finds TG's forum contacts with Virginia satisfy the minimum contacts necessary for specific personal jurisdiction, the Court must address the second prong of the minimum contacts test.

> 8.      *Cause of Action Arises From Forum Minimum Contacts*

The second prong of the specific personal jurisdiction, minimum contacts test is the requirement that "the litigation results from alleged injuries that arise out of or relate to [defendant's] activities [in the forum].'"  *Clemens v. McNamee*, 615 F.3d 374, 377 (5th Cir. 2010)(quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *Seifarth*, 472 F.3d at 271 (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002)).

TG argues that this requirement cannot be satisfied unless plaintiffs prove that the drywall they allege caused their damages is traceable to the drywall that TG sold to Venture, and that the mere presence of TG's drywall in plaintiffs' homes is insufficient to confer personal jurisdiction. Plaintiffs respond that they have demonstrated that their claims arise from and relate to TG's manufacture and sale of defective Chinese drywall, and they are not required for purposes of personal jurisdiction to directly trace the drywall in their homes to the drywall sold by TG to Venture.

The Second Amended Complaint in *Germano* alleges that TG "designed, manufactured, exported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall at issue in this case."  (R. Doc. 470).  The *Germano* plaintiffs bring tort claims against TG for their personal injuries and property damage caused by TG's "defective" and "unfit" drywall.  *See id.* The class definition in *Germano* provides in relevant part: "All owners and landlords of real properties located in the United States containing defective Chinese drywall manufactured, sold,

-55-

distributed, supplied, marketed, inspected, imported or delivered by [TG]."  *See id.*  TG's minimum contacts with Virginia, discussed extensively above, include its design, manufacture, marketing, and sale of its drywall for Venture, a Virginia company, which TG knew would be delivered to Virginia and was used in Virginia properties.  The presence of TG's drywall in Virginia properties is the alleged cause of the *Germano* plaintiffs' injuries.  Accordingly, the Court finds that the claims against TG in *Germano* "relate to" and "arise from" TG's minimum contacts with Virginia.

The Court does not read the "arise from" or "relate to" requirements as narrowly as TG suggests; nor does it find any jurisprudence supporting this narrow interpretation.  The Supreme Court has not yet addressed "what sort of tie between a cause of action and a defendant's contacts with a forum" is required for specific personal jurisdiction.  *See Helicopteros*, 466 U.S. at 416 n.10.  The plain language of this requirement alone indicates a broader interpretation of the nexus between minimum contacts and the allegations against the foreign defendant.  The method suggested by TG is more akin to a Rule 12(b)(6) challenge for failure to state a claim, while here the Court is only at the juncture of determining personal jurisdiction.

Even if the Court were to apply the tracing requirement urged by TG, the Court finds the evidence does trace the drywall TG sold to Venture to drywall in plaintiffs' Virginia homes.  The Court previously determined from the evidence presented that the drywall in the *Germano* Plaintiff-Intervenors' homes is TG-brand drywall.[5]  *See* (R. Doc. 2380, pp. 9-10).  The Venture-

---

[5]The Court may take judicial notice of the record in prior, related proceedings.  *See* Fed. R. Evid. 201(b)("The court may judicially notice a fact that is not subject to reasonable dispute because it...can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see also Enriquez-Gutierrez v. Holder*, 612 F.3d 400, 410-11 (5th Cir. 2010).  Taishan cites in opposition to the Court's use of judicial notice, *Jackson v. FIE Corp.*, 302 F.3d 515 (5th Cir. 2002).  The Court finds *Jackson* does not present a bar to the use

purchased TG drywall contains specific markings which have been identified in Virginia-
contaminated homes pursuant to the Court-ordered Threshold Inspection Program ("TIP") of
Pretrial Order 13 and the photo-catalog required by Pretrial Order 10.  *See* (R. Docs. 171, 181).
Both TG and the plaintiffs were required to and did submit profile forms which indicate for TG,
the type of drywall sold to Venture, and for the plaintiffs, the type of TG drywall in their homes.
*See e.g.* (Spano Dec. Ex. 8).  Venture itself has identified the drywall it purchased from TG in
contaminated Virginia properties.  Notably, at the evidentiary hearing on the Motion, TG
admitted that its drywall sold to Venture is located in two of the Plaintiff-Intervenors'
contaminated homes.  *See* Tr. Hr'g (June 29, 2012).

Finally, the Court recognizes the argument raised by Taishan at the hearing that because
the *Germano* class is a nationwide class, any non-Virginia plaintiffs' claims against TG would not
"arise from" or "relate to" TG's minimum contacts in Virginia.  The Court finds that the solution
suggested by the PSC in response to this argument-severing and transferring non-Virginia cases-
would resolve TG's dispute.  *See id.*  Though at this time, all of the Plaintiff-Intervenors are
Virginia homeowners.

### 9.        *Fair Play & Substantial Justice*

Under the final prong of the due process inquiry, "[e]ven if minimum contacts exist, the
exercise of personal jurisdiction over a non-resident defendant will fail to satisfy due process
requirements if the assertion of personal jurisdiction offends 'traditional notions of fair play and
substantial justice.'" *Ruston Gas Turbines, Inc.*, 9 F.3d at 421 (quoting *Int'l Shoe*, 326 U.S. at

---

of judicial notice here as *Jackson* merely requires that the Court provide Taishan the opportunity
to raise personal jurisdiction as a defense and challenge its identity as the manufacturer of the
drywall in *Germano*.  As evidenced by this very Order & Reasons, the Court has provided
Taishan the opportunity to do both.

316)).  Once a plaintiff has established minimum contacts, the burden shifts to the defendant to show the assertion of personal jurisdiction in the forum would be unfair or unreasonable. *Seiferth,* 472 F.3d at 271 (citing *Nuovo Pignone,* 310 F.3d at 382); *Wien Air Alaska v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)(citing *Akro Corp. v. Luker*, 45 F.3d 1541, 1547 (Fed. Cir. 1995)).  "It is rare to say the assertion is unfair after minimum contacts have been shown."  *Id.* (citing *Akro Corp.*, 45 F.3d at 1549)).  A court is to consider the following factors in making the fairness determination: (1) the defendant's burden, (2) the forum state's interest, (3) the plaintiff's interest in convenient and effective relief, (4) the judicial system's interest in efficient resolution of controversies, and (5) the state's shared interest in furthering fundamental social policies.  *Paz*, 445 F.3d at 814; *Ruston Gas Turbines, Inc*., 9 F.3d at 421.

TG argues that the exercise of jurisdiction over it would be unreasonable and would offend traditional notions of fair play and substantial justice.  (R. Doc. 13490).  It cites *Asahi* in support of its argument.  The plaintiffs disagree, arguing that due process is not violated by the exercise of personal jurisdiction over TG.  The Court will address the parties' arguments for each of the due process factors as follows.

a.     Burden on TG

The first factor is the burden on the defendant.  TG argues this factor is "particularly compelling" since it is a foreign defendant who, if subjected to U.S. law, would face logistical and bureaucratic difficulties in terms of transportation, translation, governmental approval, deep-seated cultural differences, all of which are prohibitively expensive.  In response, plaintiffs argue the case law provides that when minimum contacts have been established, serious burdens on a foreign defendant may be justified.

The Court agrees that TG will face burdens if it is subjected to personal jurisdiction in this forum.  As evidenced by the already difficult, time-consuming, and expensive discovery process, further litigation will burden TG, as well as the Court and other litigants.  This factor is undeniably the strongest in opposition to personal jurisdiction.  The Supreme Court has stated in this context "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."  *Asahi*, 480 U.S. at 114.

This factor, however, needs to be balanced against the benefit received or sought by TG. Clearly, TG considered its Virginia-related dealings as an opportunity for a new market.  TG boasted about being a world-wide supplier of drywall and cited its business in the United States as an example.  To reap these benefits and now claim hardship is a bit disingenuous. Additionally, the Supreme Court recognizes, "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome."  *World-Wide Volkswagen*, 444 U.S. at 294.  Further, the larger and more sophisticated the defendant, the less burdensome it is to defend in a foreign country.  *See e.g. Bean Dredging Corp. v. Dredge Tech. Corp.*, 744 F.2d 1081, 1085 (5th Cir. 1984)("Given the magnitude of [defendant's] operations, the court is compelled to hold that it is not unreasonably inconvenient for [defendant] to defend the suit in [the forum].").  As evidence of its ability to defend, the Court notes that Taishan has had the ability and resources to procure excellent counsel who have aggressively and ably advanced its position.

<u>b.</u>      <u>Virginia's Interest</u>

The second factor is the interest of the forum state.  TG argues that because it did

not engage in any activities in Virginia, personal jurisdiction is not favored by Virginia, especially since Virginia has an interest in its citizens pursuing defendants who acted in the State and are subject to personal jurisdiction there.  The Court finds that Virginia has a great interest in its citizens being able to litigate against TG for the alleged damages caused to their properties, especially after years of suffering in homes contaminated with Chinese drywall and considering the great efforts and expenses incurred to bring TG to the United States in an effort to hold TG accountable for these damages.

<u>c.</u>      <u>Plaintiffs' Interest</u>

The third factor is the plaintiffs' interest.  TG argues that the plaintiffs' interests can be best served by allowing them to proceed against the domestic defendants alleged to have supplied, distributed, or installed the drywall in their homes.  In response, plaintiffs argue they have a strong interest in obtaining efficient relief against TG for the damages caused by TG's own defective product to their homes and properties.  The Court agrees with the plaintiffs and notes that, even if the Court possesses personal jurisdiction over the domestic defendants in the stream of commerce with TG, many of these defendants were innocent sellers, distributors, and installers, and some have little-to-no assets and/or insurance coverage.  Further, it would be immensely burdensome for the plaintiffs to litigate their claims against TG in China.  Thus, the plaintiffs' interest is strong.

<u>d.</u>      <u>Judicial System's Interest</u>

The fourth factor is the judicial system's interest.  TG argues that this factor does not favor the exercise of personal jurisdiction because of the aforementioned difficulties with intercontinental, multi-lingual, and cross-cultural adjudication.  Plaintiffs respond that the judicial

system has strong interest in this Court's adjudication of the related, consolidated claims against TG. The Court agrees that the judicial system has a great interest in the exercise of personal jurisdiction over TG. The MDL Panel authorized this Court to conduct proceedings in all Chinese drywall-related cases, but the Court's progress has been stymied by, at first, TG's failure to appear in the litigation, and later by the massive discovery required to resolve the present personal jurisdiction challenge. The judicial system has an interest in this Court effectively and efficiently resolving the Chinese drywall-related claims, and it can best satisfy this interest by having TG, a major manufacturer defendant, before the Court while the litigation remains consolidated.

e. <u>States' Shared Interest</u>

The fifth factor is the shared interest of the several states. TG argues that neither China nor international comity would favor the exercise of personal jurisdiction over it given its lack of contacts with the forum and the Chinese arbitration clause in the contracts with Venture. In considering the interests of the several states, the Court should "consider the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction." *Asahi*, 480 U.S. at 115. The Court recognizes that the adjudication of a foreign entity's rights in the United States may not be favored by principals of international comity, but it also cannot be argued that international comity is opposed to holding manufacturers of an allegedly defective product liable for the damage caused by their product. In a "flat world" in which we now live, markets are world-wide and it is in everyone's interest to discourage the manufacture and distribution of defective products. Additionally, at oral argument TG admitted that its contract with Venture providing for arbitration in China would not govern the claims of plaintiff property

owners.  *See* Tr. Hr'g (June 29, 2012).

> f.      The Exercise of Personal Jurisdiction Over TG is Fair &
> Reasonable

When considered all together, even in light of the great burden placed on TG to litigate in this forum, the Court finds that the exercise of personal jurisdiction over TG in this forum does not offend traditional notions of fair play and substantial justice.  At least four out of five of the factors favor the exercise of personal jurisdiction over TG.  As the Supreme Court has stated "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant."  *Asahi*, 480 U.S. at 114.

Taishan invokes *Asahi* in support of its argument that the exercise of personal jurisdiction over it is unfair and unreasonable.  However, *Asahi* is distinguishable.  In *Asahi*, the Court concluded that the exercise of personal jurisdiction over a foreign defendant was unreasonable and unfair because of the burden placed on the foreign defendant to litigate in the United States, the argument raised by Taishan, but also on the basis that the only remaining claims against the foreign defendant were by another foreign defendant, diminishing the forum's interest in these entirely foreign claims.  *See* 480 U.S. at 114.  Here, the claims against Taishan are made by forum plaintiffs who were injured by Taishan's products in the forum, maximizing the interest of the forum state, the forum plaintiffs, the shared states, and the judicial system.

Now that the Court has determined there exists specific personal jurisdiction over TG in *Germano*, it next will consider whether this personal jurisdiction may be bolstered by imputing TTP's forum contacts to TG.

10.     *Imputation of Contacts*[6]

Although it is not clear plaintiffs intend to do so in *Germano*, to the extent that plaintiffs

seek to impute the forum contacts of TTP to TG for purposes of personal jurisdiction in *Germano*,

TG opposes any such imputation.  TG argues that TTP's contacts with the United States do not

assist plaintiffs in their personal jurisdiction claim, and there exist insufficient grounds to impute

TTP's activities to TG for the purpose of asserting personal jurisdiction over TG.  Plaintiffs

counter that the evidence pertaining to the relationship between TG and TTP provides sufficient

basis to attribute TTP's forum contacts to TG for purposes of personal jurisdiction.  Both parties

agree that Chinese law applies to the analysis of whether TTP's contacts may be imputed to TG

for purposes of personal jurisdiction, but they disagree on the interpretation and application of

Chinese law and have presented competing expert opinions on this law.

The Court finds no reason to address the parties' arguments on imputing the contacts of

TTP to TG for purposes of personal jurisdiction in *Germano,* because the present evidence

demonstrates that TTP had no contacts with Virginia during the relevant time period, leaving no

forum contacts to impute to TG.  TTP was not created until after the sales of drywall from TG to

Venture were completed.  *See* (Spano Decl. Exs. 12, 13), *compare* (Spano Decl. Ex. 1 (Tongchun

Decl. ¶ 38); Ex. 2 (Tongchun Dep. 474:13-16, Def.'s Exs. 33A, 34A)); *see also Jackson*, 615 F.3d

_____

[6]The PSC, as well as other parties who have filed responses in opposition to the present motions, seeks to preserve its right to argue that the contacts of entities upstream to TG and TTP may be imputed to TG and TTP on the basis that the PSC was precluded from taking any discovery from two of these entities, CNBM and BNBM.  *See* (R. Doc. 14209).  TG objects, alleging the PSC previously represented that it did not intend to assert personal jurisdiction on this basis and that personal jurisdiction discovery was complete.  *See* (R. Doc. 14572).  The Court permits the PSC and others to preserve their right to argue for personal jurisdiction over CNBM and BNBM, but limits this right to personal jurisdiction over these entities only, not for purposes of imputing personal jurisdiction to TG and TTP since the personal jurisdiction of these entities is intended to be fully resolved by the present discovery and motions.

at 589 (finding subsidiary of non-resident defendant could not be subject to personal jurisdiction on the basis that the subsidiary did not manufacture any of the relevant products during the applicable time period); *PBM Prods. v. Mead Johnson Nutrition, Co.*, 2009 WL 3175665, at *3 (E.D. Va. Sept. 29, 2009)(requiring subsidiary to have forum contacts for imputation of contacts to parent for purposes of personal jurisdiction).  This conclusion is inconsequential to the Court's ultimate determination on personal jurisdiction over TG, however, because the Court finds that TG, on its own, satisfies the requirements for specific personal jurisdiction in *Germano*.  Because the Court finds personal jurisdiction over TG in *Germano*, the Court will now address the second form of relief requested by TG in its Motion, an order from the Court vacating the Default Judgment against it in *Germano*.

### C.     The Court's Ruling on Vacating the Default Judgment

The Court entered a Default Judgment in *Germano* against TG pursuant to Federal Rule of Civil Procedure 55 for TG's failure to appear or otherwise defend the action.  (R. Doc. 3013). TG's Motion seeks to have this Default Judgment vacated.  The Court will now discuss the applicable law on vacating a default judgment pursuant to Federal Rules of Civil Procedure 55(c) and 60(b), followed by TG's arguments under this law.

#### 1.     *Applicable Law*

Rule 55(c) provides that "[t]he court may set aside an entry of a default for good cause, and it may set aside a default judgment under Rule 60(b)."  Fed. R. Civ. P. 55(c).  Although default judgments are disfavored as a matter of policy, this policy "is counterbalanced by considerations of social goals, justice and expediency, a weighing process that lies largely within the domain of the trial judge's discretion."  *Rogers v. Hartford Life & Accident Ins. Co.*, 167 F.3d

933, 936 (5th Cir. 1999)(quoting *Pelican Prod. Corp. v. Marino*, 893 F.2d 1143, 1146 (10th Cir.

1990)); *Recreational Props., Inc. v. Sw. Mortg. Serv. Corp.*, 804 F.2d 311, 313-14 (5th Cir. 1986).

There are seven general factors for a court to consider in addressing a Rule 60(b) motion: (1) final

judgments should not lightly be disturbed; (2) a Rule 60(b) motion is not to be used as a substitute

for appeal; (3) Rule 60(b) should be liberally construed in order to do substantial justice; (4)

whether the motion was made within a reasonable time; (5) whether-if the judgment was a

default-the interest in deciding cases on the merits outweighs, in the particular case, the interest in

the finality of the judgment; (6) whether there are any intervening equities that would make it

inequitable to grant relief; and (7) any other factors relevant to the justice of the judgment under

attack.  *In re Marinez*, 589 F.3d 772, 777 (5th Cir. 2009)(citing *Edward H. Bohlin Co., Inc. v. The*

*Banning Co., Inc.*, 6 F.3d 350, 353 (5th Cir. 1992)).  In addition, Rule 60(b) provides the

following statutory bases for vacating a default judgment:

> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6) any other reason that justifies relief.

TG seeks to vacate the Default Judgment on the grounds found in subsections (1), (4), and (6).

*See* (R. Doc. 13490, p.10).  The Court will now address the parties' arguments under these

subsections.

2.     *Personal Jurisdiction*

Invoking subsection (4) of Rule 60(b), TG seeks to have the Default Judgment vacated for

lack of personal jurisdiction.  "Rule 60(b)(4) authorizes a court to vacate a judgment as 'void'

when personal jurisdiction is lacking.  Under such circumstances, [the Fifth Circuit] has

determined that 'the district court has no discretion, the judgment is either void or it is not.'"

*Magness v. Russian Fed'n*, 247 F.3d 609, n. 19 619 (5th Cir. 2001)(citing *Recreational Props.,

Inc. v. Sw. Mortg. Serv. Corp.*, 804 F.2d 311, 313-14 (5th Cir. 1986)); *Fowler Rodriguez Valdes-

Faule, LLP v. Medford*, 2011 WL 6258493, at *1 (E.D. La. Dec. 15, 2011); *see e.g. Jackson v.

Tanfoglio Guiseppe, S.R.L.*, 615 F.3d 579 (5th Cir. 2010).  "If the judgment is void, the district

court must set it aside."  *Jackson v. FIE Corp*., 302 F.3d 515, 524 (5th Cir. 2002).  Because the

Court has already concluded that there is personal jurisdiction over TG in *Germano*, this

argument is quickly dismissed.

3.     *Excusable Neglect*

Additionally, TG seeks to vacate the Default Judgment pursuant to subsection (1) of Rule

60(b) on the basis of excusable neglect.  (R. Docs. 13490, 14572).  TG admits it was served with

the Complaint in *Germano*, but claims it did not respond because it did not understand the

significance of it and it was ignorant of the U.S. legal system.  According to TG, once it learned

of and understood the Default Judgment against it, it expeditiously took measures to appear and

participate in the litigation.  TG argues that vacating the Default Judgment will not prejudice the

plaintiffs, it has a meritorious defense, and it will incur significant financial losses if the Default

stands.

In response, plaintiffs argue that the Default Judgment should not be vacated because TG was on notice of the claims against it in *Germano* when it was served with the First Amended Complaint, but it failed to timely enter an appearance.  Plaintiffs note that the First Amended Complaint was translated into TG's native language, Chinese, and it contains several references to Venture, whom TG contracted with in English.  Plaintiffs also argue that TG does not have a meritorious defense.

"In assessing a motion to vacate a default judgment, [the Fifth Circuit has] interpreted Rule 60(b)(1) as incorporating the Rule 55 'good-cause' standard applicable to entries of default." *In re OCA, Inc.*, 551 F.3d 359, 369 (5th Cir. 2008).  The following factors are to be considered for good cause under subsection (1): whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented.  *Id.* (quoting *Jenkens & Gilchrist v. Groia & Co.*, 542 F.3d 114, 119 (5th Cir. 2008)).  Additionally, courts may consider: whether the public interest was implicated, whether there was significant financial loss to the defendant, and whether the defendant acted expeditiously to correct the default.  *Id.*  A court need not consider all of these factors, but instead these factors are to be used to identify circumstances which warrant a finding of "good cause."  *Id.*

The Court finds that vacating the Default Judgment on the basis of TG's excusable neglect is not warranted.  While the Court does not conclude whether the failure to respond on TG's behalf was "wilful," it does note that TG was served with the First Amended Complaint in its native language, and it was aware that it had previously sold its drywall to Venture, the Virginia company also named in the Complaint, all rendering questionable TG's alleged naivete.  Additionally, the plaintiffs invested substantial amounts of money, time, and effort in serving TG

and preparing for and presenting the Default Judgment hearing, yet the Intervening-Plaintiffs who were awarded damages under the Default Judgment are still suffering property damage from the presence of TG's drywall in their homes.  Whether or not TG's defense is meritorious is speculative, especially since the Court finds personal jurisdiction exists over TG and it has voluminous evidence before it indicating that TG manufactured and sold a defective product, placed this product into the stream of commerce, and profited from its sales.  The public has an interest in seeing that persons harmed by defective, foreign products be accorded relief for their damages.  The Court recognizes that TG will suffer financial losses if ordered to pay under the Default Judgment, but at the same time TG incurred a financial gain by its business transactions with Venture.  Finally, whether TG acted expeditiously upon receiving service of the Complaint is also questionable, since TG did not act when it was first served, but only after service of the Default Judgment against it, and then it appeared the last day permissible to appeal the Default Judgment.

### 4.    *Other Reason That Justifies Relief*

Rule 60(b)(6), the final basis set forth by TG for vacating the Default Judgment, provides a "catch-all" provision for vacating a default judgment.  Indeed, "[r]elief under subsection (6) is not available if the type of relief sought is covered by the other subsections in Rule 60(b), and is available only if extraordinary circumstances exist."  *United States v. $670,706.55*, 367 Fed. App'x 532, 535 (5th Cir. Feb. 24, 2010)(citing *Hess v. Cockrell*, 281 F.3d 212, 216 (5th Cir. 2002)).  The Court categorizes TG's final two argument under this provision.  These arguments are: (1) plaintiffs' failure to serve TG with required pleadings, and (2) plaintiffs' failure to state a claim under the VCPA.

a.     Failure to Serve

TG argues that the Default Judgment must be set aside because plaintiffs failed to serve it with the pleadings upon which the Default Judgment was based.  (R. Doc. 13590).  Specifically, TG notes that it was never served with the motion for intervention, the Intervention Complaint, or the Second Amended Complaint.  In response, plaintiffs argue that the Court previously and correctly ruled that jurisdiction over TG was accomplished by proper service of the First Amended Complaint.  (R. Doc. 14202).  Indeed, the Court has already addressed and denied the argument raised by TG.  *See* (R. Doc. 4872).  The Court incorporates its previous Order & Reasons herein, denying TG's same argument for purposes of the present Motion.

b.     Failure to State a Claim under the VCPA

TG also argues that the Complaint fails to state a claim under the VCPA, and as a result, the Default Judgment cannot be based on this claim.  (R. Doc. 14572).  Plaintiffs respond that the Default Judgment was based upon more claims than those under the VCPA so even without the VCPA claims, the Default Judgment stands.  (R. Doc. 14204).  TG is correct that the *Germano* Complaint fails to state a claim under the VCPA.  *See* (R. Doc. 4872). The Court issued an Order & Reasons reaching this conclusion and it incorporates and adopts this ruling herein.  *See id.* Even without the VCPA claims, however, several viable claims remain against TG in *Germano* which support the damages awarded in the Default Judgment.  Thus, the Court finds no basis to vacate the Default Judgment against TG in *Germano*.

## III.   TG'S RENEWED MOTION TO VACATE THE ENTRY OF DEFAULT & DISMISS THE ACTION IN *MITCHELL*

The second motion addressed by the Court is TG's Renewed Motion Pursuant to Rules 55(C) and 12(B)(2) to Vacate the Entry of Default and Dismiss the Action in *Mitchell*.  (R. Doc.

-69-

13566).

### A.     Present Motion & Summary of Parties' Arguments

####     *1.     TG's Motion*

TG filed the present Motion seeking to vacate the Preliminary Default and dismiss the claims against it in the *Mitchell* case.  (R. Doc. 13566).  TG first argues that the Preliminary Default should be vacated and the claims against it dismissed because the Court lacks personal jurisdiction.  TG argues that Florida and Eleventh Circuit law are applicable to the personal jurisdiction analysis, and thereunder, plaintiffs fails to overcome their burden of demonstrating TG has sufficient Florida contacts to satisfy the Florida long arm statute and due process.  TG next argues that TTP's Florida-related contacts cannot be attributed to it for personal jurisdiction purposes.  With regard to TTP individually, TG also argues that plaintiffs are unable to satisfy the Florida long arm statute requirements for exercise of personal jurisdiction and due process would be violated if the Court exercised personal jurisdiction over TTP.

 In addition to lack of personal jurisdiction, TG argues that the Preliminary Default should be set aside because plaintiffs failed to serve it with the pleadings upon which the Default was based and on the basis of excusable neglect.

####     *2.     The PSC's Response*

The PSC filed a Response in opposition to TG's Motion.  (R. Doc. 14216).  The PSC first argues that TG and TTP are both subject to personal jurisdiction under the Florida long-arm statute and due process, and it urges the Court to treat TG and TTP as the same entity for purposes of personal jurisdiction.  Second, the PSC argues that the Preliminary Default should stand, because TG acknowledges it was properly served with the original Complaint.

Additionally, the PSC has filed a Global Memorandum, which the Court has already summarized, that responds to all of TG and TTP's motions, addressing the common issue in all motions, personal jurisdiction.  *See supra* Section II.A.2.b.

### 3.  *Mitchell's Response*

Mitchell, the named plaintiff, filed a Response in opposition to TG's Motion.  (R. Doc. 14372).  It first argues that this Court may properly exercise personal jurisdiction over TG pursuant to the Florida long-arm statute, and this exercise of personal jurisdiction comports with the Due Process Clause.  Second, Mitchell argues that the Preliminary Default is properly based upon the initially served Complaint.  Third, Mitchell argues that TG's neglect in failing to timely appear in this Court is not excusable.

### 4.  *Certain Florida Homebuilders'* Amicus Curiae *Response*

Certain Florida Homebuilders[7] filed an *Amicus Curiae* Response in opposition to TG's Motion.  (R. Doc. 14390).  The Homebuilders first argue that TTP acted as TG's agent in the sale of drywall, permitting imputation of TTP's forum activities to TG for purposes of evaluating personal jurisdiction.  According to the Homebuilders, Florida law applies to determine the question of agency.

Second, the Homebuilders argue that the Court may assert personal jurisdiction under the Florida long-arm statute over both TG and TTP, because they were carrying on business in Florida, committed tortious acts in Florida, and their drywall caused injury to Florida customers

---

[7]Certain Florida Homebuilders include: Lennar Corporation; Lennar Homes, LLC; U.S. Home Corporation; Meritage Homes of Florida, Inc.; G.L. Building Corporation; Boynton Beach Associates XVI, LLP; G.L. Homes of Davie Associates II, Ltd.; and G.L. Homes of Davie IV Corporation.

while they sought to serve the Florida market with their products.

Third, the Homebuilders argue that the Court may assert specific personal jurisdiction over Taishan consistent with the Due Process Clause, because Taishan has purposefully availed itself of the benefits and protections of Florida law, and the Amended Complaint's allegations arise out of Taishan's intent to serve the Florida market.

Fourth, the Homebuilders allege they have not been permitted to obtain discovery from Taishan's upstream entities, CNBM and BNBM, and seek to reserve this right.

5.      *The Banner Entities' Response*

The Banner Entities[8] also filed a Response in opposition to TG's Motion.  (R. Doc. 14392).  Banner first argues that TG and TTP's contacts with Florida satisfy the three separate personal jurisdiction requirements under the State's long-arm statute.  Second, Banner argues that TTP and TG's contacts with Florida satisfy the requirements for exercising personal jurisdiction under the Due Process Clause.  Third, Banner argues that TTP's Florida contacts should be attributed to TG for purposes of personal jurisdiction.  Fourth, Banner argues that an adverse inference against Taishan is warranted because of Taishan's failure to maintain required documents and disclose accurate information regarding its drywall sales.

6.      *TG's Reply*

TG filed a Reply in further support of its Motion, largely reiterating and expanding upon the arguments in its original brief.  (R. Doc. 14573).

**B.      The Court's Ruling on TG's Motion to Dismiss for Lack of Personal**

---

[8]The Banner Entities are: Banner Supply, Co.; Banner Supply Co. Fort Myers, LLC; Banner Supply Co. Pompano, LLC; Banner Supply, Co. Port St. Lucie, LLC; Banner Supply Co. Tampa, LLC; and Banner Supply International, LLC.

**Jurisdiction**

In its first request for relief, TG seeks dismissal of the claims against it and TTP in *Mitchell* on the basis of lack of personal jurisdiction.

      *1.*     *Standard of Review*

The standard of review the Court considers for a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction is discussed above and incorporated and adopted herein.  *See supra* Section II.B.1.  In short, Rule 12(b)(2) permits dismissal of claims against a defendant when personal jurisdiction is lacking.  *See id.*  The initial burden is on the *Mitchell* plaintiffs to demonstrate personal jurisdiction over the foreign defendant by a preponderance of the evidence.  *See id.*

      *2.*     *Applicable Law*

*Mitchell* was originally filed in the Northern District of Florida, within the Eleventh Circuit, and then transferred to the MDL Court seated in the Eastern District of Louisiana, within the Fifth Circuit, for consolidated and coordinated pretrial proceedings.  *See* Case No. 09-4115.  As a result, the Court will apply Florida state law as the substantive law and Fifth Circuit law as federal, procedural law.  *See supra* Section II.B.2.

      *3.*     *Personal Jurisdiction Over a Foreign Defendant*

As noted, a federal district court sitting in diversity may exercise personal jurisdiction over a foreign defendant if: (1) the long-arm statute of the forum state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction is consistent with the Due Process Clause of the United States Constitution.  *See supra* Section II.B.3.

      *4.*     *Imputing TTP's Forum Contacts to TG for Purposes of Personal Jurisdiction*

Before the Court considers whether there exists personal jurisdiction over TG individually in *Mitchell*, it will determine whether, as argued in the response briefs, TG and TTP may be treated as a single entity under this inquiry by virtue of imputing TTP's forum contacts to TG. TG opposes any such imputation. TG argues that TTP's contacts with the United States do not assist plaintiffs in their personal jurisdiction claim, and there exist insufficient grounds to disregard TG and TTP's separate corporate personhood, as is required to attribute TTP's contacts to TG. Respondents counter that the corporate personalities of TG and TTP have been commingled, and thus, TTP's separate personhood can be disregarded and its forum contacts attributed to TG for purpose of personal jurisdiction.

a.    Piercing the Corporate Veil

TG and most Respondents agree that Chinese law on piercing the corporate veil applies to the analysis of whether TTP's contacts may be imputed to TG for purposes of personal jurisdiction, but they disagree on the interpretation and application of this law and have presented competing expert opinions on this law. However, the Court finds it need not at this juncture of the litigation determine whether TTP's corporate veil can be pierced to determine whether TG is liable for TTP's forum-related actions. Piercing the corporate veil is not necessary for imputing contacts of one affiliated corporation to another for purposes of *personal jurisdiction*, but rather is the test conducted for imposing *liability* as between related corporations. *See Hudson Drydocks, Inc. v. Wyatt Yachts, Inc.,* 760 F.2d 1144, 1148 (11th Cir. 1985); *Tara Prods., Inc. v. Hollywood Gadgets, Inc.*, 2010 WL 1531489, at *12 (S.D. Fla. Apr. 16, 2010); *Def. Control USA, Inc. v. Atlantis Consultants Ltd. Corp.,* 4 So. 3d 694, 697-98 (Fla. App. 3 Dist. 2009); *Davis v. Vinnell Corp.*, 2007 WL 2462010, at *3 (N.D. Fla. Aug. 27, 2007). The Court will address the parties'

-74-

arguments regarding piercing the corporate veil when and if such a determination becomes appropriate.  For now, it will address the applicable law for imputing forum contacts between companies for purposes of personal jurisdiction and apply this law to the facts of the present case.

b.      Applicable Law

Notably, in the recent Supreme Court cases addressing personal jurisdiction over foreign defendants the Court either declined to address the imputation of minimum contacts between affiliated corporate entities, *see Goodyear Dunlop*, 131 S.Ct. 2846, 2857, or the issue was not before the Court.  *See J. McIntyre*, 131 S.Ct. 2780.  However, the Supreme Court in *Cannon Manufacturing. Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925), recognized the possibility of imputing the forum contacts of a subsidiary to a parent for personal jurisdiction purposes, but declined to do so where these affiliates maintained separate and distinct corporate entities.  Numerous courts have since read *Cannon* as permitting, in certain circumstances, based on the relationship of affiliated corporations, imputation of one corporation's forum contacts to another for personal jurisdiction purposes.  *See e.g. Bauman v. DaimlerChrysler Corp.,* 644 F.3d 909 (9th Cir. 2011); *Estate of Thomas v. Estate of Rakestraw*, 545 F.3d 357, 362 (6th Cir. 2008); *Steinbuch v. Cutler*, 518 F.3d 580, 589 (8th Cir. 2008); *Stubbs v. Wyndham Nassau Resort*, 447 F.3d 1357, 1361 (11th Cir. 2006); *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1278 (10th Cir. 2005); *Fruedensprung v. Offshore Technical Servs., Inc.,* 379 F.3d 327, 346 (5th Cir. 2004).  Generally, the jurisprudence considers a number of factors to determine if the level of "control" or "importance" between the corporate entities is sufficient for the imputation of forum contacts.  *See e.g. id.*

Because *Mitchell* is before the Court pursuant to jurisdiction under the Class Action

Fairness Act ("CAFA")[9], the Court is obliged to apply the state law of the forum to determine

whether a subsidiary's forum contacts may be imputed to a parent company for purposes of

personal jurisdiction.  *See Admin. of Tulane Educ. Fund v. Ipsen, S.A.*, 450 Fed.App'x 326, 330

n.5 (5th Cir. 2011).  The forum in *Mitchell* is Florida; thus, the Court will apply Florida law on

this issue.

Under Florida law, the general rule is that, "a parent and subsidiary are separate and

distinct corporate entities, and the presence of one in a forum state may not necessarily be

attributed to the other."  *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 446 F.3d

1357, 1361 (11th Cir. 2006); *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1272 (11th Cir.

2002)(citing *Consol. Dev. Corp. v. Sheritt, Inc.*, 216 F.3d 1286, 1293 (11th Cir. 2000)).

However, a plaintiff may establish personal jurisdiction in the forum over a non-resident parent

corporation by virtue of its subsidiary's activities in the forum when "the parent exercises

sufficient control over the subsidiary to render the subsidiary an agent or alter ego of the parent."

*Schwartzberg v. Knobloch*, —So. 3d—, 2012 WL 1698746, at *7 (Fla. App. 2 Dist. 2012); *Meier,*

288 F.3d at 1272 (quoting Charles Alan Wright and Arthur R. Miller, Federal Practice and

Procedure § 1069.4 (3d ed. 2002)).

""[O]wnership of a resident subsidiary corporation by an out-of-state parent corporation,

without more, will not sustain the assertion of personal jurisdiction over the foreign parent."

*Brownsberger v. Gexa Energy, LP*, 2011 WL 197464, at *3 (S.D. Fla. Jan. 20, 2011).  "Generally,

proof of control by the parent over the internal business operations and affairs of the subsidiary is

---

[9]CAFA is based upon federal diversity jurisdiction.  *See Audler v. CBC Innovis, Inc*., 519
F.3d 239, 248 (5th Cir. 2008)(citing *Braud v. Transp. Serv. Co.*, 445 F.3d 801, 803 (5th Cir.
2006)).

required to fuse the two for jurisdictional purposes, and the degree of control exercised by the

parent must be greater than that normally associated with ownership and directorship." *Id.*

> Thus, a parent's ownership of all of its subsidiary's stock is an insufficient reason, standing alone, to disregard distinct corporate entities: Actual domination, rather the opportunity to exercise control must be shown, with the day-to-day control of the subsidiary by the parent so complete as to render the subsidiary, in fact, an 'agent' or 'mere department' of the parent for jurisdictional purposes." *Id.* (internal citations omitted).

Put another way, "[t]he relevant inquiry is whether the level of control is so extensive that the

subsidiary 'functions solely to achieve the purpose of the dominant corporation.'" *Estate of Miller*

*v. Toyota Motor Corp.*, 2008 WL 4525058, at *5 (M.D. Fla. Oct. 6, 2008).  "[I]f a subsidiary is a

mere instrumentality, the parent corporation will be subject to personal jurisdiction." *Knights*

*Armament Co. v. Optical Sys. Tech., Inc.*, 2008 WL 2157108, at *6 (M.D. Fla. May 21, 2008).

"Another factor to consider is whether the nonresident corporation would perform the equivalent

services if its subsidiary did not exist." *PBM Air, Inc. v. Dr. Ing. Hc. F. Porsche A.G.*, 751

F.Supp.2d 1264, 1276 (M.D. Fla. 2010); *Estate of Miller v. Toyota Motor Corp.*, 2008 WL

4525058, at *5 (M.D. Fla. Oct. 6, 2008)(citing *Wiwa v. Royal Dutch Petrol. Co.*, 226 F.3d 88, 95

(2d Cir. 2000).

With this law in mind, the Court now reviews the evidence to determine whether TTP was

acting as an alter ego or agent of TG while conducting its Florida-related business.

### c.     Facts Regarding the Relationship Between TG & TTP

TG is a Chinese corporation with its principal place of business in Tai'an City, Shandong

Province, People's Republic of China.  (Spano Decl. Ex. 1 (Jia Tongchun Decl. ¶ 4, Aug. 15,

2010)).  TG was previously known as Shangdong Taihe Taishan Plasterboard Main Factory

(Group) and later as Shangdong Taihe Dongxin Co., Ltd., but in 2007 it changed its name to TG.

*Id.* at ¶ 3.  TG began manufacturing drywall in 1992, exclusively in China, and is now one of the largest drywall manufacturers in that country.  *Id.* at ¶¶ 6, 7, 8.

At some time around or before 2005, the Chinese government began to incentivize manufacturers to utilize recycled materials by providing an exemption from value added tax ("VAT") on the sale of products manufactured with recycled materials.  *See* (R. Doc. 13566).  In 2005, TG, by its use of recycled materials in manufacturing drywall, qualified for this VAT exemption.  *Id.*; (Spano Decl. Ex. 4 (Dep. Zhang 141:15-18)).  However, certain of TG's customers who sold their products outside of China, for economic reasons, desired to pay VAT on the purchase of TG's products.  (Spano Decl. Ex. 2 (Dep. Tongchun 481:8-21, 645:10-12); Ex. 4 (Dep. Zhang 141:15-17, 142:5-6); Ex. 6 (Dep. Fu 109:18-19)).  In 2006, the Chinese tax bureau informed TG that it could not enjoy the benefits of the VAT exemption if it continued to issue VAT invoices to its customers.  *See* (Spano Decl. Ex. 2 (Dep. Tongchun 481:4-7, 645:14-22); Ex. 4 (Dep. Zhang 141:24-142:6)).  As a result, TG formed TTP as a company to sell its products to customers who desired to pay VAT.  *See* (Spano Decl. Ex. 2 (Dep. Tongchun 481:16-24, 644:3-8); Ex. 4 (Dep. Zhang 141:24-142:21); Ex 6 (Fu Dep. 109:16-22)).  TG did not form TTP specifically for the purpose of selling drywall to U.S. importers, *see* (Spano Decl. Ex. 2 (Dep. Tongchun 480:19-23)), but after TTP was formed, TTP conducted all of the export sales that were previously done by TG.  *See* (Spano Decl. Ex. 6 (Fu Dep. 108:4-7)).

TTP was incorporated in February 2006 to produce and sell products, including drywall, as a wholly-owned subsidiary of TG.  (Spano Decl. Ex. 1 (Tongchun Decl. ¶ 39); Ex. 2 (Tongchun Dep. 474:13-116, Def.'s Exs. 33A, 34A).  That is, TG owns 100-percent of TTP.  (Spano Decl. Ex. 2 (Dep. Tongchun 646:17-21, Def.'s Exs. 33A, 34A)).  TG created Articles of

Incorporation for TTP.  (Spano Decl. Ex. 2 (Dep. Tongchun Def.'s Ex. 34A)).  TTP prepared

financial reports for the years 2006, 2007, and 2008.  *See* (Spano Decl. Ex. 2 (Dep. Tongchun

Exs. 45A, 46A, 47A)).  TTP held board of director meetings "irregularly," but at least once a

year.  *See* (Herman Aff. Ex. 110 (S. Peng Dep. 33:21-34:3)).  Approximately once a month, TTP

would submit written reports to TG.  *See* (Spano Decl. Ex. 2 (Tongchun Dep. 131:6-132:9)).

Additionally, TTP would verbally communicate with TG.  *See id.* at 132:9-16.  These

communications generally involved TTP's production and volume of sales.  *See id.* at 132:14-19,

443:18-445:5.

Peng Shiliang, Fu Tinghuan, and Wang Fengqin, all from TG, were appointed to the board

of directors of TTP.  (Spano Decl. Ex. 2 (Tongchun Dep. Def.'s Ex. 35A), Ex. 6 (Fu Dep. 111:8-

10)).  Peng Shiliang was assigned to be the general manager of TTP.  *Id.* at 646:17-647:6, 653:8-

13.  Peng Shiliang is an employee of both TG and TTP, having offices at both companies.  *See*

(Herman Aff. Ex. 110 (S. Peng Dep. 74:12-76:22)).  Fu Tinghuan was not compensated by TTP

for his role as a member of the board of directors of TTP.  (Spano Decl. Ex. 6 (Fu Dep. 115:4-

17)).  Fu Tinghuan also served as the Deputy General Manager and Director of Sales for TG.  *See*

(Spano Decl. Ex. 6 (Fu Dep. 29:11-30:5, 34:2-12)).  Since 2010, Jianchun Zhang has served as

the Secretary of the Board of Directors of both TG and TTP.  *See* (Spano Decl. Ex. 4 (Zhang Dep.

20:1-23, 22:21-23:2)).

TTP was registered with the Chinese business licensing department.  *See* (Spano Decl. Ex.

2 (Tongchun Dep., Def.'s Ex. 33A)).  To fulfill the requirements for this registration: TTP

received a capital contribution from TG, TTP purchased equipment from TG, TTP rented a

manufacturing site from TG, and TTP bought offices from TG.  *See id.* at 648:22-649:18, Def.'s

Exs. 37A, 40A, 42A, 43A.  In February 2006, TG made an initial capital contribution to TTP in the amount of 15 million RMB.  *See id.* at Def's Ex. 37A.  TG made a second capital contribution of seven million RMB in June 2006.  *See id.* at Def.'s Ex. 38A.  On February 10, 2006, TG entered into a lease agreement with TTP for property to be used as TTP's manufacturing site; the price for this lease was 80,000 RMB.  *See id.* at 174:7-9, Def.'s Ex. 40A.  On February 20, 2006, TG and TTP entered into a written agreement whereby TG sold manufacturing equipment to TTP for RMB 35,727,650.75.  *See id.* at 174:2-4, 474:23-475:5, 662:12-20, Def.'s Ex. 42A; (Herman Aff. EX. 175).  TTP's financial records do not reflect the exact amount for the purchase.  *See* (Herman Aff. Ex. 176).  TTP maintained its office, factory, equipment, and warehouse separate from those of TG.  *See id.* at 170:14-171:9, 647:21-23, 648:9-11; (Spano Decl. Ex. 4 (Zhang Dep. 111:3-6, 126:21-127:7)).  When TTP was no longer active, it sold-back and/or leased-back its plant, offices, and equipment to TG.  *See* (Spano Decl. Ex. 2 (Tongchun Dep. Ex. 44A); Ex. 4 (Zhang Dep. 155:6-9); Ex. 6 (Fu. Dep. 111:11-19)).  However, the financial records of the companies do not reflect the exact amount of these transactions.

On February 20, 2006, TG authorized TTP to "use the 'Taishan brand' and other trademarks registered by [TG] for a period of use tentatively set at five years."  *See id.* (Spano Ex. 2 (Tongchun Dep. 175:10-21, 474:13-16, Def.'s Ex. 41A); Ex. 6 (Fu Dep. 110:204)).  TTP sold this TG-brand drywall.  *See generally id.*  However, TTP did not pay compensation for this authorization.  *See* (Spano Decl. Ex. 2 (Tongchun Dep. 676:14-677:2)).

TTP and TG did not directly share employees.  (Spano Decl. Ex. 2 (Tongchun Dep. 171:10-12, 877:23-878:5).  However, TTP employed several employees who previously worked for TG, including, but not limited to: Gang Che, Peng Wenglong, Yang Jiapo, and Peng Shiliang.

(Spano Decl. Ex. 3 (S. Peng Dep. 384:13-17); Ex. 5 (Che Dep. 20:2-25:14, 148:11-14)); (Herman

Aff. Ex. 110 (S. Peng Dep. 29:10-19)).  Gang Che, Peng Wenglong, and Yang Jiapo were on the

sales staff at TG before going to TTP to conduct its sales.  *See* (Herman Aff. Ex. 110 (S. Peng

Dep. 55:18-23)); (Spano Decl. Ex. 6 (Fu Dep. 39:4-40:3)).  Peng Shiliang was the director of

production at TG before going to TTP.  *See id.* at 30:10-11.  While TTP was in active business,

employees of TTP were paid by TTP.  (Spano Decl. Ex. 2 (Tongchun Dep. 196:1-8), Ex. 4

(Zhang Dep. 42:4-6)).  When TTP ceased production, the former TG employees at TTP returned

to TG.  *See* (Spano Decl. Ex. 5 Che Dep. 20:2-9), Ex. 6 (Fu Dep. 110:13-20)).  In hiring

employees at TTP, there was no interview or notification process; TG merely informed its

employees that they could "volunteer" to work at TTP, which the TG employees apparently did.

*See* (Spano Ex. 6 (Fu Dep. 110:13-20, 116:15-24)).

     While the former employees of TG were working at TTP, they used TG telephone and fax

numbers, email addresses, and business cards in dealing with customers.  *See* (Spano Decl. Ex. 2

(Tongchun Dep. Pl.s' Ex. 20, p.16)); *compare* (Spano Decl. Ex. 2 (Tongchun Dep. 788:21-789:5);

Ex. 3 (W. Peng Dep. 509:8-22, Ex. 4); (Herman Aff. Ex. 4 (Peng W. Dep. 87:7-88:4); Ex. 28; Ex.

100, Ex. 143 (Gunn Dep. 49:6-51:14); Ex. 156; Ex. 159).  TTP employees directed their

customers and potential customers to TG's website for information about the company and its

products.  *See* (Herman Aff. Ex. 4 (W. Peng Dep. 285:5-12)).

     In dealing with customers and potential customers, TG and TTP held themselves out as

operating as a single business entity.  *See* (Spano Decl. Ex. 3 (Peng W. Dep. 484:17-485:9);

(Herman Aff. Ex. 9 (Gonima Dep. 27:3-14)).  TG and TTP's business relationships with two U.S.

companies in particular demonstrate this.

The first company is Guardian Building Supplies, a South Carolina company.  Guardian
entered into communications with a Chinese company it knew simply as "Taihe" through this
company's representative Yang Jiapo a.k.a. Apollo Yang.  *See* (Herman Aff. Ex. 143 (Gunn Dep.
49:2-52:13, 67:3-11, 74:24-75:1, 86:17-23, 185:6-11, 208:15-19, 209:10-12)).  Mr. Yang's
business card, which he provided to Guardian, indicated that he worked for TG.  *See id.* at 50:1-
51:19, 86:17-23, 208:22-209:1; (Herman Ex. 156).  Apollo Yang initially worked for TG, then
TTP, and returned back to TG after the cessation of TTP.  *See* (Herman Ex. 143 (Gunn Dep.
30:19-31:1, 49:2-51:20, 67:3-11, 208:15-23); Ex. 156)).  When a representative of Guardian
traveled to China to purchase drywall, he met with individuals who represented themselves as
"Taihe" or TG employees.  *See* (Herman Ex. 143 (Gunn Dep. 30:19-31:1, 49:2-51:20, 67:3-11,
208:15-23); Ex. 156)).  In April 2006, Guardian entered into a sales agreement with an entity it
believed was  "Taihe" or TG's predecessor for the purchase of TG drywall.  *See* (Herman Aff. Ex.
143 (Gunn Dep. 74:24-76:15, 86:17-23, 112:11-14, 166:2-16, 209:10-12); Ex. 157).  Although
the contract was for the purchase of "Taihe" or TG drywall, the seller listed on the contract was
Taian Taigao Trading Corporation ("TTT").  *See* (Herman Aff. Ex. 143 (Gunn Dep. 74:24-76:15,
112:11-17); Ex. 157).  When Guardian began to receive complaints from its customers regarding
defects in the drywall that Guardian purchased from TG, Guardian contacted TG and sent
representatives to meet with TG in China.  *See* (Herman Aff. Ex. 143 (Gunn Dep. 122:8-15,
138:24-139:12, 141:8-145:14, 166:2-167)).  It was not until the trip to China that Guardian
became aware that "Taihe" or TG was involved with TTT, which Guardian believed "was a front
set up [by Taihe] to distance [Guardian]."  *See id.* at 139:6-140:25, 166:20-167:24.  Guardian
dealt with TG, including a man it believed to be the general manager of TG, and TTT during

-82-

these discussions.  *See id.* at 145:129-14, 237:4-238:10; (Herman Ex. 161).  In October 2008, Guardian finally resolved its dispute with TG by entering into a settlement agreement with TTP, not TG or TTT.  *See id.* at 173:24-177:15; (Herman Ex. 158).

The second company is Oriental Trading Company, LLC ("OTC"), a Florida company. While representatives of OTC were in China, TTP employees held themselves out as working for Taishan or Taihe or TG, all part of a single building materials business group.  *See* (Herman Aff. Ex. 9 (Gonima Dep. 26:10-27:15, 96:11-25)).  On October 20, 2006, TTP entered into a Sole Agency Agreement with OTC whereby TTP agreed to sell to OTC drywall manufactured by TTP "under the brand name of 'DUN'" and certified that OTC was "its exclusive agent for the DUN brand in the United States of America." (Herman Aff. Exs. 20, 26).  DUN was a brand that TG was exclusively authorized to produce.  *See id.;* (Spano Decl. Ex. 2 (Tongchun Dep. 800:22-805:4); Ex. 5 (Che Dep. 40:19-41:1)).  TG never authorized TTP to produce or sell DUN brand drywall.  *See id.*  Nonetheless, TTP sold approximately 60,000 sheets of DUN brand drywall to OTC pursuant to its agreement with OTC.  *See* (Herman Aff. Ex. 9 (Gonima Dep. 77:25-78:9), Ex. 27).  As part of the Sole Agency Agreement, OTC paid a $100,000.00 deposit to TTP.  *See* (Herman Aff. Ex. 60 (Gonima Dep. 51:17-20, 53:20, 54:12, 66:5-67:6)).  When the business relationship ended between OTC and TTP, it was TG, not TTP, which OTC dealt with in seeking return of the deposit.  *See* (Herman Aff. Ex. 6 (Che Dep. 79:4-82:6); Ex. 9).

TTP's last sale to a U.S. company was in July 2007.  *See* (Herman Aff. Ex. 19).  TTP ceased production of drywall in 2008 "for the consideration of economic interests." (Spano Decl. Ex. 4 (Zhang Dep. 151:16-19)).  The demand for TTP's drywall from non-VAT customers was not sufficient to warrant further production.  *See id.* at 152:4-154:20.  The decision to stop TTP's

production of drywall was made jointly by the board of directors of each TG and TTP.  *Id*. at 155:1-5.

TTP legally remains incorporated, with two employees and some assets, including factories and equipment, and some business accounts.  *See* (Spano Decl. Ex. 4 (Zhang Dep. 57:5-23)).  Shiliang Peng is one of these remaining employees.  *See* (Herman Aff. Ex. 110 (S. Peng Dep. 74:12-76:22)).  TTP, however, no longer operates or produces any products, including drywall.  *See id.* at 57:9-10, 21-23.  TTP currently has no income from its operations.  (Spano Dec. Ex. 4 (Zhang Dep. 66:1-3).  TG, or one of its subsidiaries, pays the salaries of TTP's remaining two employees.  *Id*. at 66:4-8; (Herman Aff. Ex. 110 (S. Peng Dep. 75:8-24)).  Additionally, TG has handled TTP's business affairs since TTP stopped production.  *See* (Herman Aff. Ex. 9 (Ivan Gonima Dep. Dec. 13, 2011 143:5-160:17), Ex. 143 (John Gunn Dep. July 22, 2011)).

### d.      Agency & Alter Ego Exists Between TG & TTP

Applying the foregoing law to the facts deduced by the Court, the Court finds that TTP was operating as an alter ego or agent of TG in conducting its business.  While the Court recognizes that TTP was created with separate articles of incorporation, registered with the Chinese business licensing department, and submitted financial reports separate from TG, the facts demonstrate TTP's alter ego or agent status.

TG created TTP specifically to manufacture TG's products, particularly drywall, and sell this drywall to TG's existing customers.  *See Stubbs,* 447 F.3d at 1363 (noting that subsidiary which conducted business solely for parent constituted agent or alter ego of that parent); *PFM Air*, 751 F.Supp.2d at 1276 (finding alter ego or agency relationship where subsidiary existed to

provide support to parent in the forum country); *Enic*, 870 So. 2d at 891 (finding agency

relationship established where subsidiary functions solely to achieve the purposes of the parent).

TTP essentially became the export sales wing of TG.  *See id.*  If TTP did not exist, then TG would

perform the equivalent services, a fact in favor of an agency or alter ego relationship.  *See PFM*

*Air,* 751 F.Supp.2d at 1276.

TG authorized TTP to use a TG trademark in producing drywall, but it did not charge and

TTP did not pay for this right.  *See id.; compare Knights Armament,* 2008 WL 2157108, at *6

(finding no agency relationship between a subsidiary and parent where subsidiary applied for its

own trademark); *Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F.Supp.2d 1335, (S.D. Fla.

2002)(finding no agency or alter ego relationship in part because subsidiary distributed its own

products through its own sales organization).  In addition, TTP sold the exclusive right to

purchase a brand of drywall owned by TG which TG did not authorize TTP to sell.  *See id.*

TG and TTP held themselves out to customers and potential customers as a single entity.

*See Am. Tobacco*, 707 So. 2d at 855 (noting that subsidiary and parent's interchangeable

involvement in business affairs with plaintiff favored alter ego or agency relationship); *compare*

*Enic*, 870 So. 2d at 892 (finding no agency or alter ego relationship where subsidiary did not hold

itself out as parent in business negotiations).  TTP employees used TG's fax and telephone

numbers, email addresses, business cards, and website when dealing with customers.  *See id.; see*

*also Stubbs,* 447 F.3d at 1362 (finding alter ego or agency relationship in part because related

entities used the same address in advertisements and checks); *Knights Armament*, 2008 WL

2157108, at *6 (finding shared website a factor in favor of agency relationship).  The names of

the companies were used interchangeably on business contracts and agreements.  *See Am.*

*Tobacco*, 707 So. 2d at 855; *compare Enic*, 870 So. 2d at 892 (finding no agency or alter ego relationship where subsidiary did not hold itself out as parent in business negotiations). TG and TTP settled one another's debts and disputes with customers. *See id.*

TG employees "volunteered" to work for TTP, particularly the members of TG's foreign sale staff, and these employees returned to TG after TTP stopped production of drywall. There was no interview or notification process for these employees when they joined TTP.

TG wholly-owned TTP. *But see Schwartzberg*, 2012 WL 1698746, at *7 (noting indirect ownership of affiliated entity does not support finding of alter ego or agency). TG and TTP shared board members. *See Enic*, 870 So. 2d at 891 (noting common board members as suggestive of agency or alter ego relationship). Not all of TTP's board members received compensation from TTP. TTP only held irregular board meetings. TTP reported to TG on its business affairs. *See Enic*, 870 So. 2d at 891 (finding a subsidiary's reporting to parent a factor in favor of agency or alter ego).

TG rented or sold to TTP a factory, offices, and equipment for the manufacturing and sale of TG brand drywall. When TTP stopped production of drywall, it turned these properties back over to TG. These rental and sales transactions were not accurately reflected in the financial records of either company. *See Am. Tobacco*, 707 So. 2d at 855 (considering whether financial reports of affiliated companies reflect ownership of manufacturing plants in alter ego and agency analysis).

When TTP stopped production and sales of drywall, TG or its subsidiary paid the salaries of the remaining TTP employees and handled TTP's remaining business affairs. *See Am. Tobacco,* 707 So. 2d at 855 (noting a company's paying the salaries of employees of an affiliated

company is a factor in favor of alter ego or agency); *compare Gen. Cigar Holdings*, 205

F.Supp.2d at 1344 (finding no agency or alter ego relationship in part because subsidary paid its

own employees).

Based upon the foregoing, the forum contacts of TTP are imputed to TG and considered in

determining personal jurisdiction over these entities.

### 5.    *Florida's Long-Arm Statute*

Because Florida serves as the forum for *Mitchell*, in determining whether there exists

personal jurisdiction over Taishan, the Court must first inquire whether the Florida long-arm

statute brings Taishan within the personal jurisdiction of the State.  *See supra* Section II.B.2-3.

The Florida long-arm statute provides in relevant part:

(1) Any person, whether or not a citizen or resident of this state, who personally or
through an agent[10] does any of the acts enumerated in this subsection thereby submits
himself or herself and, if he or she is a natural person, his or her personal representative to
the jurisdiction of the courts of this state for any cause of action arising from the doing or
any of the following acts:

(a) Operating, conducting, engaging in, or carrying on a business or business
venture in this state or having an office or agency in this state.

(b) Committing a tortious act within this state.

-       -       -       -       -       -       -       -

(f) Causing injury to persons or property within this state arising out of an act or
omission by the defendant outside this state, if, at the time of the injury, either:

1. The defendant was engaged in solicitation or service activities within
this state; or

---

[10]Because the Court has already determined that TTP was operating as an agent or alter
ego of TG in its Florida-related activities, *see supra* Section III.B.4, the Court need not re-
address this issue for purposes of the Florida long arm statute analysis.

2. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.  Fla. Stat. Ann. § 48.193.

"'Courts are required to strictly construe the long-arm statute.'" *Caiazzo v. Am. Royal Arts Corp.*, 73 So. 3d 245, 256 (Fla. 4 Dist. App. Ct. 2011)(quoting *Seabra v. Int'l Specialty Imps., Inc*., 869 So. 2d 732, 733 (Fla. 4 Dist. App. Ct. 2004)).   "As used in [subsection (1) of] the long arm statute, 'the term 'arising from' is broad; it does not mean 'proximately caused by,' but only requires a direct affiliation, nexus, or substantial connection to exist between the basis for the cause of action and the business activity.'" *Golant v. German Shepherd Dog Club of Am., Inc.*, 26 So. 3d 60, 62 (Fla. 4 Dist. Ct. App. 2010)(quoting *Citicorp Ins. Brokers (Marine), Ltd. v. Charman*, 635 So. 2d 79, 82 (Fla. 1 Dist. Ct. App. 1994)).  The Court will now discuss these three provisions under the Florida Long-Arm Statute which are at issue: subsections (a), (b), and (f).

   a.   <u>Subsection (a)-Business in the State</u>

     i.  Applicable Law

As noted, the Florida long-arm statute confers personal jurisdiction over an entity which is or was "(a) [o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state."  Fla. Stat. Ann. § 48.193(1)(a).   "To invoke long arm jurisdiction under section 48.193(1)(a), the activities of the corporation 'must be considered collectively and show a general course of business activity in the State for pecuniary benefit.'" *Golant*, 26 So. 3d at 63 (quoting *Dinsmore v. Martin Blumenthal Assocs., Inc*., 314 So. 2d 561, 564 (Fla. 1975)).  "It is not necessarily the number of transactions, but rather the nature and extent of the transaction(s) that determines whether a person is 'carrying on a business or business venture' within the state."  *Joseph v. Chanin*, 869 So. 2d 738, at 740 (Fla. 4 Dist. Ct.

App. 2004)(citing *Silver v. Levinson*, 648 So. 2d 240 (Fla. 4 Dist. Ct. App. 1994)).

ii.       The Parties' Arguments

TG argues that subsection (a) is not satisfied here because: (1) it has never had an office, bank account, or any property in Florida; (2) it has no officers, directors, or employees in the State, nor have they visited the State; and (3) it has never sold drywall to any companies located in the State.  Respondents counter that subsection (a) is satisfied because: (1) Taishan systematically conducted a general course of business activity in Florida for pecuniary benefit, as evidenced by its sale of hundreds-of-thousands of sheets of drywall in numerous transactions with Florida buyers from May 2006 to July 2007; (2) it knew that its products would end up in the State; (3) it shipped its products to Florida on a number of occasions; and (4) it solicited business in the State.  They argue that the injury-causing product need not be the one sold in the course of business, only that it be manufactured by the defendant.

iii.       Facts Regarding Taishan's Florida-Related Business[11]

In order to determine whether subsection (a) of the Florida Long Arm Statute applies to Taishan, the Court must examine the evidence of Taishan's Florida-related business activities.  A detailed summary of this evidence follows.

From 2006 to 2007, Taishan sold almost 200,000 sheets of its drywall, through several transactions, to Florida customers or customers doing business in Florida.  *See* (Herman Aff. Exs. 1, 38, 39, 88, 89, 90, 100, 167, 170).  Taishan made almost $800,000.00 from these sales.  *See id.*; (Herman Ex. 165 (Sharf Dep. 132:14-133:9)).  Although Taishan has no physical contacts with

---

[11]As discussed in conjunction with TG's *Germano* Motion, Taishan also had extensive contacts and business activities with the United States generally.  *See supra* Section II.B.7.b. The Court adopts and incorporates these factual findings herein.

Florida, as discussed at length below, it had extensive contacts with the State incident to its negotiation and execution of these sales.

**Oriental Trading Company, LLC.**  On October 20, 2006, TTP entered into a "Sole Agency Agreement" with Oriental Trading Company, LLC ("OTC"), a Miami, Florida, limited liability corporation, *see* (Herman Aff. Ex. 26), whereby TTP granted to OTC the sole right to purchase TTP's drywall of a specific size and under the brand name of "DUN" within the United States.  *See* (Herman Aff. Exs. 20, 64); (Spano Decl. Ex. 5 (Che Dep. 36:23-40:18, 45:23-46:2)).  OTC agreed to purchase not less than 20,000 sheets of TTP drywall between November 2006 to February 2007, and not less than 1,000,000 sheets in the following 12 months.  *See id.*  The agreement was notarized under Florida law.  *See id.*  Incident to this agreement, OTC paid a $100,000 deposit to TTP.  *See* (Herman Aff. Ex. 60 (Gonima Dep. 51:17-20, 53:20, 54:12, 66:5-67:6)).  From December 2006 to July 2007, OTC purchased drywall from TTP on ten occasions, totaling approximately 57,800 sheets of drywall at a cost of $208,711.20, and each purchase was shipped to Florida.  *See* (Herman Aff. Exs. 1, 19).

Ivan Gonima served as OTC's registered agent and manager during OTC's business relationship with Taishan.  *See* (Herman Aff. Ex. 9 (Gonima Dep. 13:10-13), Ex. 26)).  In 2006 and 2007, Che Gang on behalf of Taishan and Ivan Gonima on behalf of OTC exchanged hundreds of instant messages and emails in English regarding this business relationship.  *See e.g.* (Herman Aff. Exs. 21, 27, 28, 29, 36, 43, 46, 49, 57, 61, 62, 64, 65).  Che Gang used the Americanized name "Bill Cher" in communicating with OTC.  *See id.*

Taishan knew through communications and business records with OTC that the Taishan drywall purchased by OTC would be shipped to Florida.  *See* (Herman Aff. Ex. 9 (Gonima Dep.

33:11-18); Ex. 25, pp. 25-26; Ex. 64).  For example, the Pro Forma Invoice of December 30, 2006, for a shipment of 20,100 sheets of TTP drywall, specifically provided that delivery would be to Miami, Florida.  *See* (Herman Aff. Ex. 84).  Again on April 12, 2007, Mr. Gomina emailed Bill Cher, informing him that half of a drywall order would be shipped to Miami, the other half to Orlando, and Mr. Cher provided Mr. Gonima with information on shipping to Miami.  *See* (Herman Aff. Ex. 64); (Spano Decl. Ex. 5 (Che Dep. 66:7-9, 209:18-23)).  TTP issued export invoices for approximately 44,490 pieces of drywall which were sold to OTC and shipped to Miami.  *See* (Herman Aff. Ex. 85, Ex. 110 (S. Peng Dep. 95:9-96:15)).

Several communications between Mr. Gonima and Bill Cher involved a plan for future marketing and expanding the sale of Taishan drywall in the United States.  *Id*. at Ex. 64.  Taishan offered to assist OTC with marketing and selling its drywall in the United States.  *See* (Herman Aff. Ex. 60 (Gomina Dep. 55:9-15)).

In working with Taishan, OTC requested that the Taishan drywall it purchased meet "American Codes & Standards."  *Id*. at 36.  In response, Taishan customized its manufacturing to meet American Society for Testing and Materials ("ASTM") standards and provided ASTM certificates to OTC.  *Id*. at Ex. 9 (Gomina Dep. 141:23-25).  Taishan also manufactured its drywall for American customers in inches rather than metric measurements.  *Id.* at 43:10-16. Specific to OTC, Taishan agreed to alter the typical Taishan DUN brand logo to appear in "BLUE RED and WHITE because those are the colors of the American Flag."  (Herman Aff. Ex. 9 (Gonima Dep. 129:4-133:1); Ex. 27, pp. 5-7; Ex. 43).  Taishan also agreed at OTC's request, to manufacture its drywall with specific designs, colors, labels, barcodes, and endtapes, all in an effort to better target the U.S. market.  *See* (Herman Aff. Ex. 9 (Gomina Dep. 51:1-3, 113:22-

115:18); Ex. 27; Ex. 43; Ex. 46).

As was its practice, *see* (Spano Decl. Ex. 3 (Peng W. Dep. 268-271), Ex. 5 (Che Dep.

288:9-290:11, 312:6-313:6)); (Herman Aff. Ex. 50), Taishan shipped samples of its drywall to

OTC in Florida.  *See* (Herman Aff. 9 (Gomina Dep. 109:23-110:2); Ex. 27, pp. 30-31; Ex. 49).

Bill Cher welcomed Mr. Gomina's visit to China on behalf of OTC.  *See* (Herman Aff. Ex.

27, pp. 34-35; Ex. 57).  Mr. Cher asked for Mr. Gomina's trip itinerary in advance and provided

airport and hotel recommendations.  *See* (Herman Aff. Ex. 27).  During the trip, Bill Cher picked

up Mr. Gomina from his hotel and provided a tour of the Taishan factory and offices; thereafter,

they had lunch at the Taishan cafeteria, and Mr. Gonima was given promotional materials.  *See*

(Herman Aff. Ex. 9 (Gonima Dep. 32:3-8, 40:19-42:13, 44:9-21)).

Taishan arranged for shipment of the drywall purchased by OTC from China to Florida.

*See* (Herman Aff. Ex. 9 (Gomina Dep. 35:5-9, 46:24-47:1, 138:5-15); Ex. 62).  Although all of

OTC's drywall purchases with Taishan were F.O.B. China, Taishan actually handled and paid for

the shipping of the drywall to Florida.  *See* (Herman Aff. Ex. 60 (Gomina Dep. II 45:4-9, 58:1-

59:16)).  OTC would place an order with Taishan through Bill Cher, instruct Mr. Cher as to the

area where the drywall needed to be shipped, and Mr. Cher took care of it.  *See* (Herman Aff. Ex.

9 (Gomina Dep. 35:10-21)).  Often, Mr. Cher would make suggestions as to which Florida port

would be best for shipment.  *See* (Herman Aff. Ex. 9 (Gomina Dep. I 81:12-82:6); Ex. 60

(Gomina Dep. II 59:17-60:21)).  All of OTC's drywall shipments went to Florida.  *See id.* at

35:22-36:7; (Herman Aff. Ex. 60 (Gomina Dep. II 60:22-25)).  Taishan ensured that its OTC

drywall shipments to Florida satisfied the Florida Department of Transportation's regulations.

*See* (Herman Aff. Ex. 64).

Ultimately because the market demand dropped and OTC was unable to find any buyers for the drywall it purchased from Taishan, OTC donated its Taishan drywall. *See* (Herman Aff. Ex. 60 (Gomina Dep. 55:22-57:10)).

When OTC sought the return of its $100,000 deposit from Taishan, Taishan did not return any of the deposited funds. *See id.* at 56:10-13. Instead, TTP urged OTC to purchase more of its drywall or its other products, such as screws, paper tape, and frames, and use the deposit money as payment for these items. *See id.* at 62:3-63:11. OTC was not interested in purchasing other products from China and used a third-party to have the deposit transferred to the third-party's bank account in China. *See id.* at 63:18-65:5. However, OTC has not yet received this money and the issue remains pending in the Chinese court system. *See id.* at 65:5-66:2.

Taishan sought a "long term relationship" with OTC, including the future sale of metal studs, framing, tracking, toilets, and sinks. *See* (Herman Aff. Ex. 27). In December 2007, Mr. Cher and OTC communicated about a new business relationship whereby Taishan would provide Chinese products, particularly electronics, to OTC in the United States. *See* (Herman Aff. Ex. 21).

**B. America Corporation, Onyx Gbh Corporation and R &R Building Materials.**

TTP also engaged in the sale of its drywall with B. America Corporation, a Florida company. In B. America's dealings with TTP, Onyx Gbh Corporation, also a Florida company, served as B. America's purchase agent and negotiated on behalf of B. America. *See* (Herman Aff. Ex. 97 (Rafael Sardi Dep. 9:3-6, 16:7-20, 21:23-22:11, Feb. 9, 2012). On September 2, 2006, TTP and B. America entered into a contract for the sale of 1,320 sheets of TTP drywall. *See id.* at 21:4-9, 25:9-10; (Herman Aff. Ex. 86). The drywall was to be produced to meet ASTM standards. *See*

*id.*  Further, the contract provided "DELIVERY TERM: CFR MIAMI."  *Id.*  B. America wired

half of the contract price to TTP.  *See* (Herman Aff. Ex. 87, Ex. 97 (Sardi Dep. 25:5-6).

However, on November 23, 2006, the contract was cancelled by the parties due to the fact that

"both parties can not bear the dropped price in the American market."  (Herman Aff. Ex. 87, Ex.

97 (Sardi Dep. 9-10)).

Thereafter, seeking a refund for the money paid by B. America to TTP for the cancelled

contract, a representative from Onyx communicated via email with TTP.  *See* (Herman Aff. Ex.

97 (Sardi Dep. 21:10-17, 25:11-16).  When it became apparent that TTP would not refund the

money to B. America, B. America decided to purchase drywall from TTP, using as payment, the

money it had previously wired to TTP for the earlier, terminated contract.  *See id.* at 21:18-22,

25:16-20, 55:22-56:19.  B. America identified another Florida company, R&R Building

Materials, to purchase this drywall from B. America.  *See id.* at 21:18-22.  The representative

from Onyx then communicated further, in English, with Che Gang, a.k.a. Bill Cher, of Taishan

regarding a contract for and the price of TTP's drywall.  *See* (Herman Aff. Ex. 87).

On April 7, 2007, TTP prepared an invoice and packing list showing B. America as the

buyer of 660 sheets of drywall for $5,656.20, to be shipped from China "CIF Miami Port."  *See*

(Herman Aff. Ex. 87, 88, 89, 90).  "CIF" stands for "cost, insurance and freight."  *See* (Herman

Aff. Ex. 97 (Sardi Dep. 71:20-72:4)).

Also, in April 2007, a representative from Onyx and a representative of B. America

emailed with Bill Cher, during which Mr. Cher wrote "[w]e will arrange the shipping to Miami

Port at an early time....the destination port is Miami."  *See* (Herman Aff. Ex. 63).  TTP then made

the shipping arrangements for the drywall to be shipped to B. America in Miami, Florida.  *See*

-94-

(Herman Aff. Ex. 97 (Sardi Dep. 63:6-64:15)).

On May 7, 2007, TTP took out a Cargo Transportation Insurance Policy on the drywall purchased by B. America.  *See* (Herman Aff. Ex. 87).  This Insurance Policy provides that Miami, Florida is the destination for the drywall.  *See id.*

Shipping and customs documents involving the TTP drywall purchased by B. America show the drywall was shipped from China on May 1, 2007, and reached Miami, Florida on June 11, 2007.  *See* (Herman Aff. Exs. 63, 87).  After the drywall reached Florida, Onyx shipped and sold the drywall to R&R in Miami.  *See* (Herman Aff. Exs. 94; 97 (Sardi Dep. 66:6-9, 77:2-7)).

In 2008, Bill Cher, on behalf of Taishan, emailed a representative of B. America and expressed enthusiasm towards working further together.  *See* (Herman Aff. Ex. 99).

**Wood Nation, Inc**.  Wood Nation, Inc., a Tampa, Florida company engaged in the business of buying and selling drywall, also purchased drywall from TTP.  *See* (Herman Aff. Ex. 38; Ex. 39 (Richard Hannam Dep. 95:17-98:11, Feb. 13, 2012).  Richard Hannam was the president of Wood Nation at this time.  *See id.*  Wood Nation communicated with TTP through David Wei of BNBM USA.  *See* (Herman Aff. Ex. 101 (Richard Hannam Dep. II 48:14-19, Feb. 14, 2011)).  Taishan told Mr. Hannam that it was exporting its products to the United States.  *See id.* at 49:25-50:8.  During the course of Wood Nation's relationship with Taishan, Mr. Hannam was under the impression that Wood Nation and Taishan would be engaged in future sales of drywall.  *See id.* at 51:19-23, 79:6-12.

On or about June 7, 2006, Mr. Hannam traveled to China and visited a plant where TTP was manufacturing drywall.  *Id.*  David Wei emailed Peng Wenglong a.k.a. Frank Clem and Yang Jiapo a.k.a. Apollo Yang information on Mr. Hamman's flight schedule and requested Taishan

provide travel and four or five star hotel accommodations for Mr. Hamman.  *See* (Herman Aff. Ex. 58).  During the trip, Mr. Hannam met with Apollo Yang, as well as other Taishan employees. *See* (Herman Aff. Ex. 101 (Hannam Dep. 50:18-51:2)).

On June 10, 2006, Mr. Hannam, on behalf of Wood Nation, entered into a contract with TTP for the purchase of 330,000 sheets of TTP drywall produced to ASTM standards.  *See* (Herman Aff. Ex. 38; Ex. 39 (Hannam Dep. 95:17-98:11); Ex. 100).  The contract provided Wood Nation's address as in Tampa, Florida, and it provided Tampa, Florida as the port of discharge. *See* (Herman Aff. Ex. 100).  TTP provided Mr. Hannam with test reports stating the TTP drywall met ASTM standards.  *See* (Herman Aff. Ex. 37; Ex. 38; Ex. 39 (Richard Hannam Dep. 95:17-98:11); Ex. 100).   Wood Nation provided these reports to its customer, Suncoast Building Materials, Inc.  (Herman Aff. Ex. 38).

Wood Nation requested that the drywall it purchased from TTP: contain custom endtape with certain colors; state the drywall met ASTM standards; designate on the back of the boards that the drywall is manufactured by TTP per ASTM standards; state the contact information as Tampa, Florida, with a local phone number; and to contain writing only in English.  *See* (Herman Aff. Ex. 47; Ex. 48).  TTP agreed to stamp the drywall boards with the contact phone number and location of Tampa, Florida.  *See* (Herman Aff. Ex. 19; Ex. 201 (W. Peng Dep. 514:10-515:6)).

Suncoast ultimately agreed to buy from Wood Nation only 40 containers of TTP's drywall, manufactured to ASTM standards and shipped to the Port of Tampa, Florida in two shipments, one in July 2006 and a second in August 2006.  *Id.*; (Herman Aff. Ex. 101 (Hannam Dep. 82:19-83:5)).  Accordingly, on July 4, 2006, Wood Nation entered into a revised contract with TTP for the purchase of only 40 containers, or 26,4000 sheets, of drywall.  *Id.*  Delivery

under this contract was F.O.B. China, and Wood Nation arranged for the shipment from China to Florida. *See* (Herman Aff. Ex. 39 (Hannam Dep. 79:1-80:20)). Suncoast picked up the drywall shipment at the Port of Tampa. *Id.*

**Devon International Trading.** In 2006, Devon International Trading, a Pennsylvania company, was approached by North Pacific Group about arranging for the purchase of drywall manufactured in China. *See* (Herman Ex. 165 (Robert Sharf Dep. 41:20-42:43:7, Mar. 24, 2011)); (R. Doc. 14844). Robert Sharf, president of Devon, traveled to China and toured potential factories to produce this drywall, one of which was Taishan's factory. *See id.* at 50:12-19. TG sent samples of its drywall to Devon. *See id.* at 338:22-339:5.

On February 8, 2006, North Pacific and Devon executed a purchase order for the purchase of 485,044 sheets of drywall from China, to be manufactured at standards which exceed ASTM standards, and to be delivered to the port in Pensacola, Florida. *See* (Herman Aff. Ex. 166). Accordingly, Devon issued an Order Request on March 15, 2006, to TG to purchase the drywall requested by North Pacific. *See* (Herman Aff. Ex. 167, p. 15). On March 30, 2006, a Sales Confirmation was issued reflecting that the trading company Shanghai Yu Yuan Import & Export Company would be the seller of the TG drywall to Devon. *See id.* at pp. 2, 16-17. These agreements provided that the Devon logo would be imprinted on the TG drywall. *See id.* at pp. 4, 16-17. The Devon logo, as provided for in the agreements, was stamped on the TG drywall purchased by Devon. *See id.* at p.4; (Herman Aff. Ex. 165 (Sharf Dep. 129:9-21, 274:10-18); Ex. 168).

Devon inquired as to whether the TG drywall satisfied ASTM standards, and TG responded that its drywall did satisfy ASTM standards and provided test reports to Devon. *See*

(Herman Aff. Ex. 165 (Sharf Dep. 62:16-64:21)). Every piece of drywall that Devon purchased

from TG was stamped with the guarantee that the drywall met or exceeded ASTM standards. *See*

*id.* at 86:7-13, 111:5-9, 133:23-134:9, 168:13-169:10.

Devon purchased and imported 484,044 sheets of drywall purchased from TG, which were

delivered in Pensacola, Florida on or about June 16, 2006. *See* (Herman Aff. Ex. 167; Ex. 168).

In the course of transit, however, 255,680 sheets were damaged and rendered unusable, leaving

229,364 sheets available for sale. *See id.* Because of the damage to the drywall, North Pacific

only purchased a portion of its original order. *See* (Herman Aff. Ex. 169). Devon then sold the

remaining drywall to distributers and wholesalers, with some sold to individuals via Ebay. *See*

(Herman Aff. Ex. 167, Ex. 168). These buyers included Mazer, Gulf Coast Shelter, and Shelter

Products. *See* (Herman Aff. Ex. 165 (Sharf Dep. 223:8-24)).

Another customer that Devon sold the drywall to was Emerald Coast Building Supply.

*See* (Herman Aff. Ex. 170); (R. Doc. 14372-4 (Kristen Law Sagafi Decl. Ex. 5, May 17, 2012));

(R. Doc. 14844). Between April and July 2006, Rightway Drywall, Inc. purchased at least 840

boards of drywall from Emerald Coast. *See* (R. Docs. 14372-9, 14372-10 (Mike Jenkins Dec. Ex.

A, Apr. 30, 2012)); (R. Doc. 14844). Mitchell then purchased drywall from Rightway, containing

the same imprint as the Devon Taishan drywall, for the purpose of building homes in Pensacola,

Florida. *See id;* (R. Doc. 14372-1 (Chuck Stefan Dec. Apr. 30, 2012); R. Doc. 14372-2).

**Carn Construction Corp.** Carn Construction Corporation, of Weston, Florida, also

communicated with Taishan regarding the purchase and shipment of Taishan drywall. Carn

became familiar with Taishan through the website Alibaba.com, an Asian-based website for the

sale and purchase of products online. *See* (Herman Aff. Ex. 23 (Carlos Rios Dep. 17:17-24,

31:23-32:10, Dec. 8, 2012)).  On this site Taishan described itself as a drywall exporter.  *See id.*
Carn communicated with Taishan in English via telephone and email.  *See id.* at 20:3-21:15.
During these conversations, Taishan held itself out to Carn as an exporter of its products
worldwide, including the United States and Florida.  *See id.* at 30:25-31:19.  Taishan provided
Carn with information on pricing for shipment, storage and transportation of its drywall.  *Id*. at
28:3-29:3.  At the request of Carn's agent, Taishan sent samples of its drywall to Carn in Florida.
(Herman Aff. Ex. 23 (Rios Dep. 25:13-22); Ex. 53; Ex.54).  Carn requested and Taishan
confirmed that the drywall met U.S. standards.  *See id*. at 53:4-14.  Taishan told Carn that it had
the option to have its drywall marked with a brand for marketing purposes.  *See id.* at 39:1-14.

      **Miscellaneous.**  There is also evidence demonstrating that Taishan sold drywall to Beijing
Building Materials Import and Export Co., Ltd., which sold this drywall to Rothchilt
International, Ltd., which shipped the drywall to La Suprema Enterprises, Inc. and La Suprema
Trading, Inc., which finally sold the Taishan drywall to Banner in Florida where Banner delivered
it to homes throughout the State.  *See* (R. Doc. 14390, Exs. 15-23).  Moreover, Taishan responded
to inquiries from Tanader Tang from Bluefire International and Wenny Yin from SCT Co., Ltd.,
expressing a willingness to ship product to Florida.  *See* (Herman Aff. Ex. 105, Ex. 106).  Venture
learned from shipping agents that TG sent at least one container shipment to Miami which was
originally supposed to go to Venture.  *See* (Herman Aff. Ex. 72 (Porter Dep. 97:11-99:20)).
Guardian Building Products Distribution Inc. purchased drywall from Taishan which was shipped
to Florida and sold to Stock Building Supplies, which sold the drywall to builders and contractors
in Florida.  *See* (Herman Aff. Ex. 143 (Gunn Dep. 24:2-25:3, 78:12-79:25, 183:2-5)).

               iv.    Taishan's Florida-Related Business Satisfies Subsection (a)
                      of the Florida Long-Arm Statute

The Court finds, based upon the foregoing evidence, that subsection (a) of the Florida long arm statute is satisfied by Taishan's Florida-related business and its targeting of customers in the Florida market for the sale of its drywall.  As mentioned, Taishan sold almost 200,000 sheets of its drywall in several transactions to Florida customers or customers doing business in Florida from 2006 to 2007.  *See* (Herman Aff. Exs. 1, 38, 39, 88, 89, 90, 100, 167, 170).  Taishan made almost $800,000.00 from these sales.  *See id.*; (Herman Ex. 165 (Sharf Dep. 132:14-133:9)).

Although Taishan was never physically present in Florida, it had extensive contacts within the State incident to its negotiation and execution of these sales.  The evidence demonstrates that over the course of at least two years: (1) Taishan negotiated and contracted with a number of Florida companies and companies doing business in Florida for the sale of its drywall; (2) as a result of these sales, Taishan's drywall was shipped to Florida; (3) in some instances, Taishan took care of or assisted with the shipping to Florida; (4) Taishan granted a Florida business the sole right to purchase a specific brand of its drywall in the United States; (5) Taishan engaged in extensive communications with its Florida customers or customers who were sending or selling its drywall to Florida; (6) these communications were conducted in English with Taishan employees who used Americanized versions of their names; (7) Taishan knew or reasonably should have known, based upon its communications with customers and sales-related documents, that its drywall was shipped to and ended-up in Florida; (8) Taishan specially manufactured its drywall to meet U.S. standards and measurements, and stamped it with information, logos, colors, and designs to appeal to the U.S. market, including imprinting the drywall with Florida-specific information; (9) Taishan shipped samples of its product to Florida; (10) Taishan welcomed and accommodated at its factory and offices in China, representatives of Florida and Florida-related

companies; (11) on at least one occasion, Taishan took out cargo insurance on drywall it had sold

to a Florida customer and destined for Florida; (12) Taishan tested its drywall to determine if it

met U.S. standards and provided these reports to its Florida-related customers; (13) Taishan held

itself out to customers as doing business in Florida; and (14) Taishan's drywall ended up in

Florida and installed in Florida properties.  Based upon the applicable jurisprudence, the

foregoing contacts with the State satisfy subsection (a) of the Florida long-arm statute.  *See*

*Robert D. Harley Co. v. Global Force (H.K.) Ltd.,* 2007 WL 196854, at *4 (S.D. Fla. Jan. 23,

2007)(finding personal jurisdiction under subsection (a) of the Florida long-arm statute where

defendant executed agreement which contemplated business with a Florida subsidiary, this

business resulted in $5-6 million per year for three years, defendant shipped its goods directly to

Florida, and it attended a meeting in Florida.); *Sierra v. A Betterway Rent-A-Car, Inc*., 863 So. 2d

358, 360 (Fla. 3 Dist. Ct. App. 2003)(finding personal jurisdiction over defendant who knew its

products were used in Florida, did not discourage or prohibit the use of its products in Florida,

advertised globally, and three accidents involving its products occurred in Florida.); *Gilins v.*

*Trotwood Corp*., 682 So. 2d 693, 693-94 (Fla. 5 Dist. Ct. App. 1996)(finding personal jurisdiction

over foreign defendant in Florida who although was not authorized to do business or solicited

business in the state and had no office, agent, or property in the State, specially-manufactured a

machine outside of the state which it knew was destined to be used in Florida .); *McHugh v.*

*Kenyon*, 547 So. 2d 318, 319 (Fla. 4 Dist. Ct. App. 1989)(finding personal jurisdiction over

defendant who conducted no business in Florida, had no salesperson or distributors in the State,

and no other ties to Florida, on the basis that the defendant produced hundreds of thousands of

product units which were distributed over five-years in the United States, with 6,000 marketed in

Florida.); *compare Promex, LLC v. Perez Distrib. Fresno, Inc.,* 2010 WL 3452341, at *3-4 (S.D. Fla. Sept. 1, 2010)(finding no personal jurisdiction over defendant who sold products to two Florida customers, because no evidence that defendant sold its products on more occasions or of a series of acts involving these transactions, the latter of which may have conferred jurisdiction).

TG cites in support of its Motion, *Travel Opportunities of Fort Lauderdale, Inc. v. Walter Karl List Management, Inc.*, 726 So. 2d 313, 314 (Fla. 4 Dist. Ct. App. 1998), where the court found long-arm jurisdiction under subsection (a) was lacking because the foreign defendant had no physical presence in the state, did not solicit business in the state, and merely sold 19 lists over a period of two years with a value exceeding $198,000.   The present matter is easily distinguishable, especially since in *Travel Opportunities* the court noted that the defendant did not have a business relationship with the forum over a period of years, and it did not send extensive business correspondence to Florida, *see id.*, both of which Taishan had.  Taishan also cites *Reflections Manufacturing, LLC v. I.S.A. Corp.*, 2011 WL 972570, at *6-7 (M.D. Fla. Mar. 18, 2011), but this case too is distinguishable for the fact that Taishan's business-related contacts are more pervasive than the defendant's contacts in *Reflections* which included: no physical presence; a single, unsolicited transaction with forum resident; business communications; and delivery outside of the forum.  *See id.*  Although the Court need not address the other two subsections alleged as bases for personal jurisdiction under the Florida long-arm statute, it will do so in the interest of thoroughness.

b.      <u>Subsection (b)-Tortious Activity in the State</u>

Pursuant to subsection (b) of the Florida long arm statute, "[a] court has specific jurisdiction over a defendant where [it] 'commits a tortious act within this state.'" *Reiss v. Ocean*

-102-

*World, S.A.*, 11 So. 3d 404, 406 (Fla. 4 Dist. Ct. App. 2009). "In order to commit a tortious act within this state, a defendant's physical presence in Florida is not required," *id.* (citing *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002)), as subsection (b) also applies to "defendants committing tortious acts outside the state that cause injury in Florida." *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1217 (11th Cir. 1999). "While a defendant's physical presence in the state is not required, it is not, however, enough that the actions of a defendant committed outside of Florida ultimately have consequences in Florida. Instead, [defendant's] actions must directly cause injury or damage within the state.*" Blumberg v. Steve Weiss & Co., Inc*. 922 So. 2d 361, 364 (Fla. 3 Dist. Ct. App. 2006)(citing *Korman v. Kent*, 821 So. 2d 408, 411 (Fla. 4 Dist. Ct. App. 2002)). "[T]he plaintiff must demonstrate that the non-resident defendant 'committed a substantial aspect of the alleged tort in Florida....such a showing is properly made by establishing that the activities in Florida 'were essential to the success of the tort.'" *Williams Elec. Co., Inc. v. Honeywell, Inc*., 854 F.2d 389, 394 (11th Cir. 1988)(quoting *Watts v. Haun*, 393 So. 2d 54, 56 (Fla. Dist. Ct. App. 1981)).

TG argues that because it did not sell drywall to any Florida entity, it did not commit tortious activity in Florida. TG, citing *Blumberg v. State Weiss & Co., Inc*., 922 So. 2d 361 (Fla. 3d DCA 2006), claims that Florida courts have held that downstream injury in Florida caused by a product placed into the stream of commerce outside of Florida does not constitute commission of a substantial aspect of the tort for purposes of the long arm statute. TG, also argues, citing *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1220 (11th Cir. 1999), that because the alleged economic injury here occurred in Alabama and not Florida, subsection (b) does not apply.

Respondents counter, arguing subsection (b) is satisfied because the damages to plaintiffs

involving Taishan's defective drywall occurred in Florida, and Taishan's failure to warn, a tortious offense, occurred in Florida.  They factually distinguish the cases relied upon by Taishan.

In *Mitchell*, the Complaint alleges that Taishan manufactured and sold its defective drywall, and this drywall was shipped to Florida where it was installed in properties and caused tortious damage.  *See* (R. Doc. 1)(Case No. 09-4115).  The evidence demonstrates that Taishan sold and marketed this drywall to Florida or Florida-related companies, it shipped or assisted with shipping its drywall to Florida pursuant to these sales, and it knew or it was reasonable for it to know its drywall would be sold and used in Florida.  *See supra* Section III.B.5.a.iii.  Accordingly, under the applicable law, although Taishan did not have a physical presence in Florida, it allegedly committed tortious acts in the State.

*Blumberg*, cited by Taishan, is distinguishable.  Unlike Taishan, the defendant in *Blumberg* was not the manufacturer of the product, but rather a seller of another manufacturer's component product.

The Court also finds *Posner* unpersuasive.  Taishan cites *Posner* as barring personal jurisdiction under subsection (b) because the *Mitchell* plaintiffs suffered only economic injury and suffered this injury outside of Florida.  The claim at issue in *Posner* was breach of fiduciary duty to a Bermuda corporation, which the court characterized as an allegation of damage to the defendant's business interest in Bermuda.  Here, however, the torts at issue allegedly caused damage to properties, which in turn obligated the plaintiffs to repair or replace the damage, causing plaintiffs to incur their own damages.  *See* (R. Doc. 1)(Case No. 09-4115).  The plaintiffs' damages were incurred in Florida, as well as other states.  Even if these damages were purely economic, many of the remediating homebuilder plaintiffs have received assignments from

homeowners to pursue the homeowners' property damage claims against Taishan.  *See* Tr. Hr'g (June 29, 2012).

c.       Subsection (f)-Causing Injury in the State

Pursuant to subsection (f) of Florida's long arm statute, an entity is subject to personal jurisdiction when it is,

> Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at the time of the injury, either: 1. The defendant was engaged in solicitation or service activities within this state; or 2. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.  Fla. Stat. Ann. § 48.193(f).

TG, citing *Sun Bank, N.A. v. E.F. Hutton & Co.*, 926 F.2d 1030, 1033 (11th Cir. 1991), argues that the mere economic injury suffered by Mitchell and other homebuilders does not satisfy subsection (f).  TG also argues that even if plaintiffs demonstrate non-economic injury, subsection (f) is not satisfied, because TG was not engaged in solicitation or service activities in the state, nor were plaintiffs' injuries caused by products that Taishan sold and were used and consumed in the State.

Respondents counter that subsection (f) applies because Taishan caused injury to plaintiffs in Florida by manufacturing and designing defective drywall and failing to warn plaintiffs of the defect, all while: (1) Taishan was engaged in solicitation of drywall-related business in Florida, and (2) Taishan's defective products were used in Florida in the ordinary course of commerce when its drywall was installed in Florida homes.  They further argue that this Court has already determined that the loss to plaintiffs in the MDL constitutes more than mere economic loss.

Taishan also argues that subsection (f) does not apply because it was not engaged in solicitation or service activities and its products were not used in Florida at the time of plaintiffs'

-105-

alleged injuries.  The evidence demonstrates that Taishan caused property damage and possibly personal injuries in Florida as a result of the drywall it designed, manufactured, sold, and, on occasion, shipped to Florida.  *See supra* Section III.B.45.a.iii.  Additionally, at the time of these injuries, Taishan was soliciting customers in the State through business communications and by sending samples of its product to the State.  *See id.*  Also at this time, Taishan's drywall was being used in Florida in the construction and reconstruction of homes and other buildings.  *See id.*  Thus, subsection (f) of the Florida long arm statute is satisfied.  *See N. Star Int'l Seafood Co., Inc. v. Banner Beef & Seafood Co., Inc.*, 677 So. 2d 1003, 1004 (Fla. 3 Dist. Ct. App. 1996)(finding subsection (f) of Florida long-arm statute satisfied by non-resident defendant's single sale of food to the forum where the food caused injury); *Cal-Mar Indus., Inc. v. Wilson Research Corp.*, 442 F.Supp. 796, 799 (D.C. Fla. 1977)(finding personal jurisdiction over defendant who shipped samples of its product to a Florida corporation).  This conclusion applies even to claims of plaintiffs whose Taishan drywall ended up in and caused damage in Florida, but did not reach Florida directly as a result of Taishan's Florida-related activities, for example after being handled by out-of-state defendants in the chain-of-commerce of Taishan and later brought into Florida. *See Davis v. Pyrofax Gas Corp.*, 492 So. 2d 1044, 1046 (Fla. 1986); *Wetzel v. Fisherman's Whaft of Pompano Beach*, 771 So. 2d 1195, 1198 (Fla. 4 Dist. Ct. App. 2000); *Kravitz v. Gebrueder Pletscher Druckgusswaremfabrik*, 442 So. 2d 985, 987 (Fla. 3 Dist. Ct. App. 1983).

Taishan argues that no injury occurred in Florida as a result of its drywall because any alleged injury was merely economic, which is outside the scope of subsection (f).  The Court recognizes that the case cited by Taishan, *Sun Bank*, holds that "[t]he Florida Supreme Court has decided that a purely economic injury of the sort alleged in this case is insufficient to confer

jurisdiction over a defendant under [subsection (f)]."  926 F.2d at 1033.  However, *Sun Bank* is distinguishable because it involved claims of fraudulent misrepresentation, *see id.*, while here, the allegations in the Complaint arise out of property damage.  Although *Mitchell* is brought on behalf of homebuilders who "incurred any expense" associated with Taishan's drywall, and not on behalf of the property owners who actually sustained the damage to their properties, many property owners have assigned their property damage claims to the remediating homebuilder plaintiffs.  *See* Tr. Hr'g (June 29, 2012).

Because the Court finds that the Florida long arm statute has been satisfied by Taishan's Florida-related activities, it must now address the second prong of the personal jurisdiction inquiry, the due process analysis.

### *6.     Due Process Requirements for Specific Personal Jurisdiction*

In conjunction with the specific personal jurisdiction analysis for TG's *Germano* Motion, the Court reviewed the applicable law under due process for subjecting a foreign defendant to specific personal jurisdiction.  *See supra* Section II.B.3, 5.  This law requires that: (1) the defendant has purposefully availed itself of the benefits and protections of the forum state by establishing minimum contacts with the forum state, and (2) the exercise of personal jurisdiction over this defendant does not offend traditional notions of fair play and substantial justice.  *See id.*  The Court then addressed at length the type and extent of minimum contacts with the forum required for specific personal jurisdiction and the stream-of-commerce doctrine.  *See supra* Section II.B.6.  The Court's due process legal findings and conclusions in *Germano* are equally applicable to *Mitchell* and are incorporated herein.  *See id.*  Applying this law, the Court will next address Taishan's minimum contacts in *Mitchell*, whether the cause of action arises from and/or

relates to these minimum contacts, and finally, whether the exercise of personal jurisdiction is fair and reasonable.

### 7.    *Taishan's Minimum Contacts With Florida*

In applying the applicable law on the minimum contacts required for specific personal jurisdiction to the present facts, the Court finds that Taishan has sufficient minimum contacts with Florida to support the exercise of specific personal jurisdiction over Taishan in *Mitchell*. Because the Court has already discussed these facts at length during its analysis under the Florida Long-Arm Statute, *see supra* Section III.B.5.a.iii., the Court adopts these factual findings for purpose of the due process analysis and makes the following observations and conclusions based thereon.

While Taishan has no physical contacts with Florida, it does possess contacts which demonstrate it purposefully directed its activities at the State such that it reasonably could anticipate being haled into court there. *See Burger King*, 471 U.S. at 476. Taishan's contacts with Florida are beyond mere random, fortuitous, or attenuated contacts. *Compare World-Wide Volkswagen*, 444 U.S. at 295. Taishan placed its drywall into the stream-of-commerce with the knowledge that its drywall would end up in and be used in Florida. *See Ruston*, 9 F.3d at 419.

Contrary to Taishan's arguments, the Fifth Circuit does not prescribe to the dictate of the *Asahi* and *J. Intyre* pluralities that personal jurisdiction may attach under the stream of commerce doctrine only when there is "something else" connecting the defendant to the forum. Rather, following the concurrences in these same cases, as is required by the Fifth Circuit, the Court finds Taishan has minimum contacts with Florida because, during its course of production, Taishan demonstrated a regular and anticipated flow of its drywall to Florida, it marketed its drywall to Florida-based customers, and it benefitted economically from doing so. Taishan had more than

reasonable knowledge that its products *might* end up in Florida; it knew its products *would* end up in Florida.  *See J. McIntyre*, 131 S.Ct. at 2793.

In comparing the facts in *Mitchell* with those in *J. McIntyre*, Taishan has more substantial contacts with Florida than the defendant in *J. McIntyre* did with its forum.  As noted, the relevant contacts in *J. McIntyre* were limited to: (1) a U.S. distributor on one occasion sold one of the defendant's machines to a forum customer; (2) the defendant permitted and wanted its distributor to sell its machines to anyone, anywhere in the U.S.; and (3) representatives of the defendant attended trade shows in the U.S., but not in the forum.  *See* 131 S.Ct. at 2791-92.

Over the course of approximately two years, Taishan actively and deliberately negotiated and entered into several contracts for the sale of hundreds of thousands of sheets of its drywall with Florida companies and companies doing business in Florida.  Among these contracts was a "sole agency agreement" with a Florida business, which granted this business the sole right to purchase a specific brand of Taishan drywall.  These contacts evidence "regular and anticipated flow of products from manufacture to distribution to retail sale" as the Supreme Court requires for minimum contacts, *see Asahi,* 480 U.S. at 116-17 (Brennan, J. concurring), as opposed to a single, isolated sale to the forum which is insufficient for specific personal jurisdiction.  *See J. McInyre*, 131 S.Ct. at 2792.   Taishan benefitted from these sales financially, making almost a million dollars from the sales.  "A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final products in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity."  *Id*.  Indeed, the Fifth Circuit has found personal jurisdiction on the basis of a foreign defendant's sale of products bound for the forum.  *See Luv N' Care*, 438 F.3d at 471; *see also Ruston*, 9 F.3d at 420-21; *Irving*,

864 F.2d at 386.

Taishan engaged in extensive email, phone, and in-person communications with Florida customers in support and furtherance of their business relationships.  Taishan's representatives communicated in English and used Americanized versions of their names.  These prior negotiations are relevant to the minimum contacts analysis and favor personal jurisdiction.  *See Burger King*, 471 U.S. at 478-79 (considering parties' course of dealings in minimum contacts analysis).

Taishan welcomed Florida-based customers to its offices and factory in China.  Taishan assisted these customers with travel accommodations, and provided transportation, tours, and provided promotional materials, and lunch.  These facts too favor personal jurisdiction.  *See Asahi*, 480 U.S. at 2792 (considering marketing tactics in minimum contacts analysis); *Burger King*, 471 U.S. at 478-79 (considering parties' course of dealings in minimum contacts analysis).

Taishan sent samples of its drywall to Florida to facilitate the sale of its drywall to Florida-based customers.  The Supreme Court has recognized that special state-related marketing or advertising is a factor to be considered in favor of exercising personal jurisdiction in that state. *See J. McIntyre*, 131 S. Ct. at 2792 (Breyer, J. concurring); *Asahi*, 480 U.S. at 112 (O'Connor, J. plurality).

Taishan made plans with Florida customers to expand its drywall marketing and business in the United States and Florida.  Although these plans did not reach fruition, the Supreme Court had recognized that contemplated future consequences and negotiations for long-term, forum-related business is evidence in favor of personal jurisdiction.  *See Burger King*, 471 U.S. at 479-82.

Taishan designed and manufactured drywall for its Florida-related customers to meet American standards, and it used inches instead of the metric system for measurements of the drywall.  Taishan imprinted on its drywall destined to Florida, custom designs, colors, labels, barcodes, and endtapes.  On one shipment, Taishan agreed to label the drywall with "Tampa" and include a Florida-based phone number.  "[D]esigning the product for the market in the forum state" is an example of "[a]dditional conduct of the defendant [that] may indicated an intent or purpose to serve the market in the forum state."  *Asahi*, 480 U.S. at 112 (O'Connor, J., plurality); *accord J. McIntyre*, 131 S.Ct at 2791-92 (Breyer, J. concurring)(finding special state-related design of a product supportive of personal jurisdiction).

In some instances, Taishan handled and paid for the shipping of its drywall to Florida.  It also made suggestions to customers on shipping to Florida-based ports.  It catered its shipping to satisfy Florida shipping requirements.  Taishan took out shipping insurance on a drywall shipment destined for Florida.

TG attempts to insulate itself from personal jurisdiction on the basis that it used F.O.B. shipping terms, but the Fifth Circuit has held that "a F.O.B. term does not prevent a court from exercising personal jurisdiction over a non-resident where other factors...suggest that jurisdiction is proper," *Luv N'Care*, 438 F.3d at 471-72; these "other factors" are present here.  Taishan's argument also fails, as it did in *Germano*, because it relies on cases which pre-date the Supreme Court's decision in *World-Wide Volkswagen*, the case which forms the basis of the Fifth Circuit's current minimum contacts test.  Also, once again, the only post-*World-Wide Volkswagen* case relied upon by Taishan regarding the effect of an F.O.B. shipment term on minimum contacts, *Southern Copper*, 245 F.3d 791, is unpublished and predates the Fifth Circuit's published

-111-

decision in *Luv N' Care*, 438 F.3d 465, cited above and which reaches a different conclusion from *Southern Copper* on F.O.B. shipments.

Despite Taishan's claims to the contrary, it possessed knowledge and information that the drywall it sold to Florida customers and customers doing business in Florida would be shipped to Florida, sold in Florida, and used in Florida. This knowledge was demonstrated by sales and shipping related documents, as well as communications with these customers. Taishan also held itself out to customers as doing business in Florida. "As long as a [defendant] is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Asahi*, 480 U.S. at 116-17 (Brennan, J. concurring). Taishan possessed more than mere awareness or expectation that its drywall would be delivered, sold, and installed in Florida. *See Asahi*, 480 U.S. at 121 (Brennan, J. concurring); *J. McIntyre*, 131 S.Ct. at 2788-89 (Kennedy, J. plurality); *see also Paz,* 445 F.3d at 813-14 (finding personal jurisdiction over foreign distributor because it knew its products sold outside of the forum would be used in the forum); *Ruston Gas*, 9 F.3d at 420-21 (finding personal jurisdiction part because foreign defendant knew its products, after delivering them to a third-party shipper, would be delivered to a specific user in the forum); *Bean Dredging*, 744 F.2d 1081 (finding personal jurisdiction over foreign component part manufacturer solely on the basis that the manufacturer produced thousands of products which were sold nationwide)*; Oswalt*, 616 F.2d at 199-200 (finding personal jurisdiction over foreign manufacturer who delivered its products to a distributor with the understanding its product would be sold in a nationwide market); *Austin,* 656 F.2d at 1090 (finding defendant subject to personal jurisdiction in large part because the evidence demonstrated that it knew its product would be shipped to and installed in the forum); *Luv N' Care*, 438 F.3d at 471 (finding personal jurisdiction

in part on the basis that foreign defendant knew, based upon sales invoices, that its product would reach the forum).

Finally, Taishan's drywall did in fact end-up in Florida and was used by plaintiffs in Florida properties. Taishan seeks to insulate itself from personal jurisdiction by arguing that it did not know the identity of the final purchasers or users of its drywall. The evidence suggests otherwise. Moreover, the Fifth Circuit has held that the this lack of knowledge is inconsequential to the personal jurisdiction inquiry. *See Irving*, 864 F.2d at 386 ("Personal jurisdiction does not require certain knowledge of the user's identity.").

### 8.    *Cause of Action Arises From Forum Minimum Contacts*

Taishan next argues that personal jurisdiction is lacking because the claims against it in *Mitchell* do not arise from its forum minimum contacts as is required for specific personal jurisdiction. According to Taishan, there is no evidence to connect the drywall used and replaced by the plaintiffs to its own drywall which is alleged to have been sold in Florida. Rather, according to Taishan, plaintiffs allege they purchased drywall from two entities, neither of whom purchased their drywall from Taishan or anyone with Taishan drywall.

The Respondents argue that there exists a clear and demonstrated nexus between Taishan's conduct in manufacturing and selling defective drywall and the plaintiffs' damages, because plaintiffs are seeking to recover for damages they suffered as a result of the defective drywall that Taishan purposely directed to Florida. They further argue that Taishan improperly reads a "tracing" requirement in the analysis, when in fact all that needs to be shown is that the claims relate to or arise from a defendant's forum contacts.

As noted, specific personal jurisdiction exists when 'the defendant has "purposefully

directed" his activities at residents of the forum...and the litigation results from alleged injuries that arise out of or relate to those activities.'" *Clemens v. McNamee*, 615 F.3d 374, 377 (5th Cir. 2010)(quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *Seifarth*, 472 F.3d at 271 (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002)). Taishan's challenge is to the latter portion of this sentence; that is, whether the claims in *Mitchell* against it arise from or relate to its minimum contacts with the forum.

The Complaint in *Mitchell*, in relevant part, contains claims on behalf of a class of homebuilders who constructed homes using Taishan's drywall and then, as a result of using this drywall, incurred expenses in repairing and/or replacing this drywall, as well as incurred liability for property damages caused by the drywall. *See* (R. Doc. 1-1)(Case No. 09-4115). The Complaint further alleges that Taishan designed, manufactured, marketed, warranted, distributed and sold to the plaintiffs this defective drywall. *See id.* Taishan's minimum contacts with Florida, discussed extensively above, include its design, manufacture, marketing, and sale of its drywall to Florida customers and customers doing business in Florida. Thus, the claims against Taishan in *Mitchell* arise from or relate to its forum-related contacts.

Taishan urges the Court to require every plaintiff in *Mitchell* to prove that the drywall it was involved with was drywall sold by Taishan to Florida customers or was shipped to or used in Florida. The Supreme Court has yet to address the exact standard for the "arise from" or "relate to" requirements for specific personal jurisdiction. *See Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 415 n.10 (1984). Consistent with the plain language of "relate to" and "arise out of," the jurisprudence on the issue is absent of the narrow interpretation insisted upon by Taishan. Further, as noted, the Florida Supreme Court does not require for personal

jurisdiction to attach that the actual injury-causing product be directly linked to the defendant's sale of the product in the forum; the defendant's general business in the forum involving the product is sufficient. *See Davis*, 492 So. 2d at 1046. Nonetheless, the drywall at issue in *Mitchell* can be tracked to Taishan and its Florida-related activities. This is supported by the information found in profile forms submitted by the parties, the Court-ordered Threshold Inspection Program ("TIP") which requires inspection and recording of the type of drywall in homes, and the Court's photo-catalog which displays the trademarks of various drywall manufacturers, including Taishan. At the hearing on the present Motion, Lennar, one of the major Florida homebuilders, stated that it has identified at least 400 homes in Florida which it has remediated and which contain Taishan's drywall. *See* Tr. Hr'g (June 29, 2012).

Taishan also takes issue with the fact that *Mitchell* involves non-Florida plaintiffs whose claims do not arise from or relate to its Florida-related activities. However, as alleged in the Complaint, non-Florida plaintiffs did work in Florida involving Taishan's drywall. *See* (R. Doc. 1-1)(Case No. 09-4115). To the extent that plaintiffs have no connection to Florida, the Court finds that the PSC's offer to sever and transfer all non-Florida claims would remedy the issue raised by Taishan.

The Court finds that the plaintiffs' claims against Taishan in *Mitchell* arise from and relate to Taishan's minimum contacts with Florida in manufacturing, marketing, selling, and shipping its drywall to this State.

### 9.    *Fair Play & Substantial Justice*

The Court previously reviewed the applicable law for determining the final requirement for personal jurisdiction: whether the exercise of personal jurisdiction over a foreign defendant

complies with traditional notions of fair play and substantial justice. *See supra* Section II.B.9. In short, this requirement places the burden on the defendant to demonstrate that the exercise of personal jurisdiction over it offends traditional notions of fair play and substantial justice based on the following factors: (1) the defendant's burden, (2) the state's interest, (3) the plaintiff's interest in convenient and effective relief, (4) the judicial system's interest in efficient resolution of controversies, and (5) the state's shared interest. *See id.* For the same reasons stated by the Court in *Germano*, particularly that the last four factors all favor personal jurisdiction, the Court finds that the exercise of personal jurisdiction over Taishan in *Mitchell* does not offend traditional notions of fair play and substantial justice. *See id.*

Now that the Court has determined that it possesses personal jurisdiction over Taishan in *Mitchell*, it will address Taishan's arguments for vacating the Preliminary Default issued against it in *Mitchell*.

### C.    The Court's Ruling on Vacating the Preliminary Default

As noted, the Court entered a Preliminary Default entered against TG in *Mitchell* pursuant to Federal Rule of Civil Procedure 55 for TG's failure to appear or otherwise defend the action. (R. Doc. 277). The Court will address the applicable law for vacating a default and apply this law to the arguments raised by Taishan.

#### 1.    Applicable Law

The applicable law the Court considers for a motion to vacate a default judgment is discussed above in the *Germano* analysis and incorporated herein. *See* Section II.C.1. In essence, it is appropriate to vacate a default judgment where, as argued by Taishan, the failure to appear is due to excusable neglect, the Court lacks personal jurisdiction over the defaulted

defendant, and/or "any other reason that justifies relief."  *See id.*  The Court will focus first on the personal jurisdiction argument because it is also implicated in Taishan's Rule 12(b)(2) argument, then it will address excusable neglect, and finally Taishan's remaining argument of failure to serve.

### 2.    *Personal Jurisdiction*

Because the Court has concluded that it may exercise personal jurisdiction over Taishan in *Mitchell*, Taishan's argument for vacating the Preliminary Default for lack of personal jurisdiction fails.  *See also supra* Section II.C.2.

### 3.    *Excusable Neglect*

Taishan also argues that the Preliminary Default against it in *Mitchell* should be set aside on the grounds of excusable neglect.  The Court previously addressed the applicable law for considering whether a defaulted defendant's failure to timely appear constitutes excusable neglect, which permits a default to be vacated.  *See supra* Section II.C.3.  The Court adopts and incorporates this applicable law herein.   To determine whether a default judgment should be vacated for a defendant's excusable neglect, the following factors are to be considered by the Court: (1) whether the default was wilful, (2) whether vacating the default will prejudice the plaintiff, (3) whether a meritorious defense is presented, (4) whether defendant will suffer significant financial loss, (5) whether the public interest is implicated, and (6) whether defendant acted expeditiously in correcting the default.  *See id.*

Considering the facts under this law, the Court finds that vacating the Default Judgment on the basis of TG's excusable neglect is not warranted.  While the Court does not conclude whether the failure to respond on TG's behalf was "wilful," it does note that TG was served with

the original Complaint in its native language, and it was aware that it had previously sold its

drywall to several Florida-related companies, all suggesting TG was properly put on notice of the

claims against it in *Gross*. Additionally, the plaintiffs invested substantial amounts of money,

time and effort in serving TG. Whether or not TG's defense is meritorious is speculative,

especially since the Court finds personal jurisdiction exists over Taishan in *Mitchell* and it has

voluminous evidence before it indicating that TG and TTP manufactured and sold a defective

product, placed this product into the stream of commerce, and profited from its sales. The public

has an interest in seeing that persons harmed by defective, foreign products be accorded relief for

their damages. The Court recognizes that TG will suffer significant financial losses if ordered to

pay under the Preliminary Default, but at the same time Taishan incurred a financial gain by its

Florida-related sales. Finally, whether TG acted expeditiously is also questionable; it appears that

TG did not act in the MDL, until it was notified of the Default Judgment against it in *Germano*

and it appeared the last day permissible to appeal that Default Judgment.

### 4. *Other Reason That Justifies Relief-Failure to Serve*

Taishan also argues that the Preliminary Default against TG in *Mitchell* should be set

aside for the additional reason that plaintiffs failed to serve the pleadings upon which it was

based. Specifically, Taishan argues that pursuant to Federal Rule of Civil Procedure 5(a)(2),

plaintiffs were required to serve the Amended Complaint on TG in accordance with Federal Rule

of Civil Procedure 4, because the Amended Complaint introduced new claims. Respondents

argue that the Preliminary Default against TG is properly based upon the initially served

Complaint. They deny that the Amended Complaint introduced new claims since it only proposes

alternative class definitions.

Federal Rule of Civil Procedure 5(a)(2) generally does not require service of pleadings and other papers which do not assert additional claims, but it does require that "a pleading that asserts a new claim for relief against such a party must be served on that party pursuant to Rule 4." Here, the parties argue as to whether the Preliminary Default should be vacated or remain in effect based upon the plaintiffs' failure to serve TG with the Amended Complaint. However, neither of the parties address the fact that the Amended Complaint "filed" by plaintiffs was marked deficient by the Court on July 7, 2009, *see* (R. Doc. 42), and to date this deficiency has not been remedied. Thus, the Preliminary Default was based upon the only valid complaint filed in the litigation, the original Complaint filed in the Northern District of Florida on March 6, 2009, prior to the case's consolidation with the MDL litigation. There is no basis to vacate the Preliminary Default for failure to serve the Amended Complaint since it currently has no legal effect.

### D.    Adverse Inference Against Taishan

Banner alleges Taishan's emails reveal that Taishan exported to the United States millions more square feet of drywall than is accounted for in its Manufacturer Profile Forms and other discovery, even though it is required to maintain such records under Chinese law for a period of 10 years. As a result, Banner seeks to have the Court either: (1) deem that Taishan is subject to personal jurisdiction in this Court, or (2) draw an adverse inference that the missing or incomplete discovery supports the Court's exercise of personal jurisdiction. Taishan has not addressed this issue in its briefing.

Under Federal Rule of Civil Procedure 37(b)(2), a court may issue an order "directing that the matters embraced in the [discovery] order or other designated facts be taken as established for

-119-

purposes of the act, as the prevailing party claims." In *Insurance Corporation of Ireland, Inc. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 695-96 (1982), the Supreme Court held that pursuant to this Rule, a district court may, consistent with basic constitutional guarantees, conclude that a party who has violated a discovery order is subject to personal jurisdiction. The Supreme Court cautioned, however, that for this sanction to be proper, it must meet two standards. *See id.* "First, [the] sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Id.* at 707.

Since the requested sanction is "specifically related" to the personal jurisdiction discovery ordered by the Court, the Court will focus its inquiry on whether this sanction is just. With regard to the "just" standard, courts have been hesitant to impose an *Insurance Corp.*-type sanction except in instances of especially egregious conduct. *See id.* at 698-99 (resisting discovery requests for nearly three years and violating several orders compelling discovery); *Compaq Computer Corp. v. Ergonome, Inc.*, 387 F.3d 403, 413 (5th Cir. 2004)(requiring two years to conduct sufficient alter ego discovery mostly due to defendants' obstructive behavior in filing unsuccessful petitions for writs of mandamus, recusal, and bankruptcy petition). While Taishan has posed some challenges to successful personal jurisdiction discovery, particularly in the first round of Rule 30(b)(6) depositions conducted in Hong Kong, in instances where the plaintiffs have raised questions about the legitimacy of Taishan's discovery responses, Taishan has provided affidavits from its corporate representative asserting the discovery was properly and thoroughly conducted and Taishan's counsel has represented the same to the Court. If the Court does learn that Taishan has been less than forthcoming with relevant discovery, severe penalties may be appropriate, including perjury. At this time, however, the Court declines to find a basis

for any presumptions or sanctions under Rule 37.

## IV.     TG & TTP'S MOTION TO DISMISS THE COMPLAINT IN *GROSS*

The third motion addressed by the Court is TG and TTP's Motion Pursuant to Rule 12(B)(2) to Dismiss the Complaint in *Gross*.  (R. Doc. 13590).

### A.     Present Motion[12] & Summary of Parties' Positions

#### 1.     *Taishan's Motion*

Taishan argues that the claims against it in *Gross* must be dismissed because the Court lacks personal jurisdiction over both TG and TTP.  According to Taishan, plaintiffs cannot establish that either TG or TTP had minimum contacts with Louisiana, because any Louisiana-related sales of drywall were isolated and occurred in China.  Taishan further argues that plaintiffs cannot demonstrate their causes of action arose out of or resulted from TG or TTP's contacts with Louisiana, particularly since plaintiffs cannot trace the drywall in their homes to Taishan.  According to Taishan, even if it has minimum contacts with the forum, the exercise of personal jurisdiction would be unreasonable and would offend traditional notions of fair play and substantial justice.  Finally, Taishan argues that, under both Chinese and Louisiana law, the activities of other entities-particularly TTP and upstream entities-cannot be attributed to TG.

#### 2.     *PSC's Response*

The PSC filed a Response in opposition, addressing Taishan's motions to dismiss in both *Gross* and *Wiltz*.  (R. Doc. 14204).  The PSC first argues that TG and TTP may be treated as a

---

[12]The Banner entities filed a joint Response in opposition to Taishan's motions in *Mitchell, Gross* and *Wiltz*.  (R. Doc. 14392).  Because Banner's Response argues for personal jurisdiction over Taishan in a Florida federal forum, and the Court already addressed this issue at length with regard to Taishan's *Mitchell* motion, the Court need not reiterate its Florida-related analysis for purposes of *Gross* and *Wiltz*.

single entity for purposes of the personal jurisdiction analysis, and it concludes that these entities'

contacts with Louisiana are sufficient to satisfy both the Louisiana long-arm statute and the

minimum contacts required by federal due process.  Next, the PSC argues that the plaintiffs'

causes of action exist because of Taishan's forum-related activities, demonstrating their claims

arise out of Taishan's contacts with Louisiana.  The PSC also filed a Global Memorandum of Law

in Opposition to all of Taishan's motions.  (R. Doc. 14209).  The Court summarized this

Response above and adopts and incorporates this summary herein.  *See supra* Section.II.A.2.b.

### 3. *Interior Exterior's Response*

Interior Exterior Building Supply, LP also filed a Response in opposition to TG's motions

to dismiss in *Gross* and *Wiltz*.  (R. Doc. 14356).  Interior Exterior adopts the filings of the PSC.

In addition, Interior Exterior alleges that Taishan produced 33,000 sheets of drywall which were

sold to Interior Exterior, a Louisiana company, through Metro Resources Corporation, a company

with offices in Canada and Michigan.  Finally, Interior Exterior argues that the Louisiana long-

arm statute provides this Court with jurisdiction over Taishan as a result of the foreseeability of

Taishan's drywall ending up in Louisiana and Taishan's marketing and selling its drywall

directed for Louisiana.

### 4. *Taishan's Reply*

Taishan filed a Reply in further support of its Motion to Dismiss.  (R. Doc. 14575).

Taishan largely reiterates and expands upon the arguments in its original briefing.

### B. Court's Ruling on Taishan's Motion to Dismiss for Lack of Personal Jurisdiction

Taishan seeks dismissal of the claims against it in *Gross* pursuant to Rule 12(b)(2) for lack

of personal jurisdiction.

### 1.   Standard of Review

The standard of review under which a Court considers a motion to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction is discussed above and incorporated and adopted herein.  *See supra* Sections II.B.1, III.B.1.  In summary, Rule 12(b)(2) provides a defendant with a right to dismissal of the claims against it when personal jurisdiction is lacking, and in the present Motion, the proper burden of proof is preponderance of the evidence since the Court conducted an evidentiary hearing on Taishan's personal jurisdiction objections.  *See id.*

### 2.   Applicable Law

The Court previously addressed the applicable law for analyzing personal jurisdiction. *See supra* Sections II.B.2, III.B.2.  The Court incorporates and adopts this law for purposes of the *Gross* Motion.  In essence, the Court concluded that the applicable law is the substantive law of the original forum state and the federal law of the Fifth Circuit.  *See id.  Gross* was originally filed in the Eastern District of Louisiana, within the Fifth Circuit, and was automatically consolidated and coordinated with the MDL for pretrial proceedings.  *See* Case No. 09-6687. Thus, the Court must apply the substantive state law of Louisiana and the federal law of its own circuit, the Fifth Circuit.

### 3.   Personal Jurisdiction Over a Foreign Defendant

As noted in conjunction with the *Germano* and *Mitchell* motions, a federal district court sitting in diversity may exercise personal jurisdiction over a foreign defendant if: (1) the long-arm statute of the forum state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction is consistent with the Due Process Clause of the United States Constitution. *See supra* Sections II.B.3, III.B.3.

4.      *Imputing TTP's Forum Contacts to TG*

Before the Court proceeds with its analysis of whether there exists personal jurisdiction

over TG and TTP individually, it will determine whether these two entities may be treated as a

single entity for purposes of personal jurisdiction.  Taishan opposes the attribution of contacts

from affiliated entities, such as TTP, to TG, while plaintiffs argue that such attribution of contacts

is appropriate.

### a.      Piercing the Corporate Veil

For the reasons provided in the analysis of Taishan's Motion in *Mitchell*, *see supra*

Section III.B.4.a., the Court finds that it need not at this time, for purposes of determining

personal jurisdiction over Taishan, apply the law for piercing the corporate veil, which determines

liability between related corporations under corporate law.  Instead, the Court applies the

following law.

### b.      Applicable Law

The Court finds that the imputation of minimum contacts between affiliated business

entities for purpose of personal jurisdiction is permissible in certain limited situations.  The Court

addressed the applicable jurisprudence supporting this conclusion in its analysis of Taishan's

Motion in *Mitchell*.  *See supra* Section III.B.4.b.  The Court incorporates and adopts this legal

summary and analysis for purposes of the present issue.

Because *Gross* is before the Court pursuant to jurisdiction under CAFA, the Court is

obliged to apply the law of the state of the forum to determine whether the forum contacts of a

subsidiary company may be imputed to its parent company for purposes of personal jurisdiction.

*See Admins. of Tulane*, 450 F. App'x at 330 n.5.  As noted, the forum here is Louisiana.

Louisiana law recognizes the possibility of imputing contacts of a subsidiary to a parent for purposes of personal jurisdiction when the subsidiary is actually an alter ego of the parent.  *See e.g. id.; Jackson v. Tanfoglio Guiseppe, S.R.L.,* 615 F.3d 579, 587 (5th Cir. 2010); *Whitener v. Pliva, Inc.,* 2012 WL 1343964, at *5 (E.D. La. Apr. 18, 2012); *Puckett v. Advance Sports, Inc.,* 2009-0507 (La. App. 1 Cir. Oct. 26, 2009); 2009 WL 3430283, at *5; *Davis v. Dempster, Inc.,* 790 So. 2d 43, 48 (La. App. 3 Cir. 2000).  "Under Louisiana law, the factors to be considered to determine whether one entity is an alter ego of another or whether two entities are a 'single business enterprise' are similar."  *Jackson,* 615 F.3d at 587 (citing *Green v. Champion Ins. Co.,* 577 So. 2d 249, 257-58 (La. Ct. App. 1991)).  These factors include, but are not limited to: (1) common ownership, (2) common directors and officers, (3) common employees, (4) common offices (5) unified administrative control, (6) similar or supplementary business functions, (7) one corporation financing the other, (8) inadequate capitalization, (9) one corporation's creation of the other, (10) one corporation paying the salaries, expenses, or losses of the other corporation, (11) one corporation receiving no business other than that given to it by the affiliated corporation, (12) shared property, (13) noncompliance with corporate formalities, (14) services rendered by the employees of one corporation on behalf of another corporation, (15) centralized accounting, (16) undocumented transfer of funds between corporations, (17) unclear allocation of profits and losses between corporations, and (18) excessive fragmentation of a single enterprise into separate corporations.  *See Green,* 577 So. 2d at 257-58; *accord Jackson,* 615 F.3d at 587.  "This list is illustrative and is not intended as an exhausted list of relevant factors.  No one factor is dispositive...."  *Id.* at 258*; accord Jackson,* 615 F.3d at 587.

  Additionally, Louisiana law recognizes that personal jurisdiction may be imputed to a

foreign defendant based upon the forum-related contacts of its agent.  *See* La. Rev. Stat. §

13:3201(A); *Gillespie v. Bynum*, 508 So. 2d 628, 630 (La. App. 2 Cir. 1978).  Under Louisiana

law, agency is termed as "mandate" and defined as "a contract by which a person, the principal,

confers authority on another person, the mandatory, to transact one or more affairs for the

principal."  La. Civ. Code art. 2989.  A mandate relationship can be express or implied.  *See*

*Admin. of Tulane*, 450 F. App'x at 333; *E. Smith Plumbing, Inc. v. Manuel*, 2011-1277, p.7 (La.

App. 3 Cir. 3/28/12); 88 So. 3d 1209, 1215.  "'[A]n agency relationship cannot be presumed, it

must be clearly established.'"  *Id.* (quoting *Roberson Adver. Serv., Inc. v. Winnfield Life Ins., Co.*,

453 So. 2d 662, 665 (La. App. 5 Cir. 1984)).  For an implied agency, "'the principal has the right

to control the conduct of the agent and the agent has the authority to bind the principal.'"

*Commercial Capital Holding Corp. v. Team Ace Joint Venture*, 2000 WL 726880, at *4 (E.D. La.

June 2, 2000)(quoting *Urbeso v. Bryan*, 583 So. 2d 114, 117 (La. App. 4 Cir. 1991)).  Implied

agency "is established 'by the words and conduct of the parties and the circumstances of the

case.'"  *Id.* (quoting *Self v. Walker Oldsmobile Co., Inc.*, 614 So. 2d 1371, 1375 (La. App. 3 Cir.

1993)).

<u>c.</u>      <u>TTP's Minimum Contacts are Imputable to TG</u>

Applying this law to the facts already deduced by the Court involving the relationship

between TTP and TG, *see supra* Section III.B.4.c., the Court finds sufficient basis to impute the

forum contacts of TTP to TG for purposes of personal jurisdiction in *Gross*.  The following facts

are conclusive of an alter ego and/or agency relationship between TG and TTP: (1) TG

specifically formed TTP to sell TG products to a portion of TG's existing customer base; (2) TTP

was a wholly-owned subsidiary of TG; (3) all of TTP's board of directors came from TG; (4) At

least one board of director of TTP was not compensated for his position; (5) certain employees

and board of directors overlapped at TG and TTP; (6) TTP purchased or rented all of its

equipment, factory, and offices from TG, and then sold them back to TG, but the financial records

of the entities do not accurately reflect the sale or rental prices exchanged; (7) several TG

employees "volunteered" to work at TTP and returned to their jobs at TG once TTP stopped

production; (8) the former TG employees continued to use the same telephone and fax numbers,

email addresses, and business cards that they used at TG while they worked for TTP; (9) TTP, in

dealing with customers and potential customers, held itself out as TG or represented that TTP and

TG were the same entity; (10) TG authorized TTP to use its registered trademarks, particularly

the "Taishan" trademark; (11) TTP entered into an agreement with a U.S. customer whereby the

customer was given exclusive rights to a TG brand which TG had not authorized TTP to use or

sell; (12) TG and TTP interchanged in conducting business; (13) TTP only held irregular board

meetings; (14) TG and TTP interchanged in settling debts with customers; and (15) after TTP

stopped production, TG or its subsidiary continued to pay the salaries of TTP's remaining

employees and handled TTP's business affairs.  This conclusion is consistent with the applicable

jurisprudence.  *See Jackson,* 615 F.3d at 587 (finding the following factors weigh in favor of an

alter ego relationship: operating in a way that the entities' brands and products appear identical

and their business relationships are deeply intertwined; shared phone numbers; common officers

and directors; evidence of undocumented transfers of funds between the entities; one entities'

payment of the employee salaries of the other); *Whitener v. Pliva, Inc.,* 2012 WL 1343964, at *6-

7 (E.D. La. Apr. 18, 2012)(finding no alter ego relationship between parent and subsidiary, but

noting as relevant factors in the inquiry: 100% ownership, common board members, conducting a

website which holds out the parent and subsidiary as a single entity, paying the salaries of the

subsidiary, undocumented transfers between the entities); *In re Chinese Manufactured Drywall*

*Prods. Liab. Litig.*, 767 F.Supp.2d 649, 667 (E.D. La. 2011)(finding alter ego based in part on

100% ownership by the parent of the subsidiary, common officers and directors, common phone

number and website, and common employees); *Green*, 577 So. 2d at 258-59 (finding single

business enterprise where controlling shareholder, common employees, employees were

compensated by both companies, employees performed services without regard to which of the

corporations they worked for, the companies only did business given to it by the related

businesses, financial activities were not properly reflected in the books, and funds were

transferred without repayment schedule).  Thus, the Court will consider the contacts of both TTP

and TG in the following personal jurisdiction analysis and the entities will be referred to as

"Taishan" collectively.  This analysis begins with a brief review of the Louisiana long arm statute

requirements, followed by the due process requirements of minimum contacts and fairness.

### 5.   *Louisiana Long-Arm Statute*

Under the first requirement for personal jurisdiction in *Gross*, the Louisiana long-arm

statute must be satisfied.  The Louisiana long-arm statute provides in relevant part:

A. A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from any one of the following activities performed by the nonresident:

(1) Transacting any business in this state.

(2) Contracting to supply services or things in this state.

(3) Causing injury or damage by an offense or quasi offense committed through an act or omission in this state.

(4) Causing injury or damage in this state by an offense or quasi offense

committed through an act or omission outside of this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in this state.

-     -     -     -     -     -     -     -     -     -     -

(8) Manufacturing of a product or component thereof which caused damage or injury in this state, if at the time of placing the product into the stream of commerce, the manufacturer could have foreseen, realized, expected, or anticipated that the product may eventually be found in this state by reason of its nature and the manufacturer's marketing practices.

B. In addition to the provisions of Subsection A, a court of this state may exercise personal jurisdiction over a nonresident on any basis consistent with the constitution of this state and of the Constitution of the United States.  La. Rev. Stat. § 13:3201.

"'[T]he limits of the Louisiana Long-arm Statute and the limits of constitutional due process are now coextensive....under the express wording of the present Long-Arm Statute, the sole inquiry into the jurisdiction over a nonresident is a one-step analysis of the constitutional due process requirements.'" *Alonso v. Line*, 2002-2644 (La. 5/20/03); 846 So. 2d 745. 750 (quoting *Ruckstuhl v. Owens Corning Fiberglas Corp*., 98-1126 (La. 4/13/99); 731 So. 2d 881, 885)).  The specific contacts listed in section A once set out the limits of Louisiana's long-arm jurisdiction, but now section A merely "serve[s] as a 'valuable list of contacts sufficient to give rise to in personam jurisdiction.'" *Id.* (quoting Frank L. Maraist and Harry T. Lemmon, Louisiana Civil Law Treatise, Vol 1, Civil Procedure § 2.3, p. 15 (1991)).  Thus, the Court need not conduct an independent analysis of the Louisiana long arm statute requirements before moving to the due process analysis for specific personal jurisdiction over Taishan in *Gross*.

### 6.     *Due Process Requirements for Specific Personal Jurisdiction*

The Court has already set out at length the applicable law and the Court's interpretation thereof for determining whether the exercise of specific personal jurisdiction comports with the

Due Process Clause.  *See supra* Sections II.B.5-6.  The Court adopts and incorporates this law and analysis for purposes of Taishan's Motion in *Gross*.  In short, due process permits a court to exercise personal jurisdiction over a foreign defendant when that defendant has purposefully availed itself of the benefits and protections of the forum state by establishing minimum contacts with the forum state, and the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.  *See id.*  For purposes of specific personal jurisdiction, which is at issue in the present matter, the defendant's minimum contacts with the forum must demonstrate that the defendant purposefully directed its activities at the forum, and the litigation results from alleged injuries which arise out of or relate to those activities.  *See id.* The Court's analysis in *Gross* is governed and informed by jurisprudence from the Supreme Court and the Fifth Circuit.  *See id.*

Taishan argues that neither TG nor TTP have sufficient contacts with Louisiana to satisfy due process, and neither entity has purposefully availed itself of the Louisiana market simply based upon TTP's isolated sales of drywall in China and its alleged awareness of sales of this same drywall in Louisiana.  Taishan concedes that TTP made two isolated sales in China to two companies-Advanced Products International, Corp. ("APIC") and GD Distributors, LLC ("GD Distributors")-who advised TTP that they intended to ship the drywall to Louisiana.

Plaintiffs respond that Taishan has more than sufficient contacts with Louisiana to satisfy personal jurisdiction, as evidenced by Taishan's manufacture and sale of its drywall to entities, some Louisiana-based, with the knowledge and intent that its drywall would be shipped to and used in Louisiana.

7.      *Minimum Contacts*

-130-

The first inquiry under the due process analysis for specific personal jurisdiction is whether Taishan has sufficient minimum contacts with the forum, Louisiana. The Court finds the following evidence relevant to this inquiry.

a. Taishan's Minimum Contacts

i. Taishan Lacks Physical Contacts With Louisiana

First, the Court addresses the contacts Taishan does not have with Louisiana. Taishan has never manufactured drywall in Louisiana. *See* (Spano Decl. Ex. 1 (Decl. Jia Tongchun)). Taishan has never advertised in Louisiana or performed any services there. *See id.* TG has a website, but the website is entirely passive and TTP does not have its own website. *See* (Spano Decl. Ex. 3 (W. Peng Dep. 283:15-16, 542:1-543:5, Apr. 7, 2011 )). Taishan has never registered to do business nor has had an office, bank account or agent appointed to accept service of process in Louisiana. *See* (Spano Decl. Ex. 1; Ex. 2 (Tongchun Dep. 536:1-4, 12-15, 537:5-8, Apr. 4, 2011)). Taishan has never paid taxes nor had a mailing address or telephone in Louisiana. *See* (Spano Decl. Ex. 1; Ex. 2 (Tongchun Dep. 537:1-4)). Taishan has never owed or leased any real or personal property in Louisiana. *See* (Spano Decl. Ex. 1; Ex. 2 (Tongchun Dep. 535:20-24, 538:15-18)). Taishan has never been registered to do business in Louisiana. *See* (Spano Decl. Ex. 1, Ex. 2 (Tongchun Dep. 536:12-15)). No employee, officer, director, or agent of Taishan ever has maintained a place of business or resided in Louisiana, or visited Louisiana. *See* (Spano Decl. Ex. 1; Ex. 2 (Tongchun Dep. 537:13-17); Ex. 3 (W. Peng Dep. 38:3-5, 275:7-11); Ex. 4 (Jianchun Zhang Dep. 82:6-24, Apr. 6, 2011); Ex. 12). None of Taishan's employees have ever attended a trade show or exhibition in the United States. *See* (Spano Decl. Ex. 3 (W. Peng Dep. 273:13-274:13)).

-131-

ii.     Taishan's Nationwide Contacts

The Court previously addressed Taishan's nationwide contacts in its analysis of minimum contacts in *Germano* and *Mitchell*. *See supra* Sections II.B.7, III.B.5.a.iii.  Rather than repeat these lengthy findings, the Court adopts and incorporates these facts for purposes of the *Gross* Motion.

iii.     Taishan's Louisiana-Related Contacts

Finally, the Court addresses Taishan's Louisiana-related contacts.  During 2006 and 2007, Taishan sold at least 45,756 sheets of drywall, through a number of transactions, which ended up in Louisiana, earning Taishan a profit of $195,915.29.  *See* (Herman Aff. Ex. 1 Amend.).  It had specific communications with customers regarding the manufacture and shipment of its drywall to Louisiana.  *See* (Spano Decl. Ex. 13).  In one particular email, Taishan was informed that "[a]fter Hurricane Katrina, the Great New Orleans area need rebuild, and housing market in USA is very hot in these days."  (Herman Aff. Ex. 108).  Taishan held itself out to its U.S.-based customers as interested in and selling its drywall to Louisiana.  *See* (Herman Aff. Ex. 9 (Gonima Dep. 72:16-18, 73:19-23, 74:2-6, 75:2-8, 79:23-80:4); Ex. 24 (Yongzhi Yang Dep. 81:11-17, Feb. 21, 2012); Ex. 72 (Porter Dep. 34:18-22, 97:11-99:20); Ex. 143 (Gunn Dep. 56:5-8)).  It also provided shipping information and rates to its customers regarding shipment of drywall to New Orleans, Louisiana.  *See* (Herman Aff. Exs. 64; 65).  Venture Supply learned that containers of TG drywall originally destined for it in Virginia were actually shipped and discharged to New Orleans, Louisiana.  *See* (Herman Aff. Ex. 72 (Porter Dep. 97:11-99:20)).

TTP admits it sold its drywall to two companies-Advanced Products International Corp. ("API") and GD Distributors, LLC ("GD Distributors")-who informed TTP that they intended to

ship the drywall they purchased to Louisiana.  *See* (Spano Decl. Ex. 12).  The facts involving

Taishan's business relationship with these companies are addressed in turn.

**GD Distributors, LLC.**  Sometime around 2006, the owner of GD Distributors, LLC, a

Louisiana company, learned about Taishan on the internet, particularly on Alibaba.com.  *See*

(Herman Aff. Ex. 25 (Steber Dep. 15:20-16:24)).  He sent an email to Taishan, and thereafter the

parties emailed back-and-forth in English regarding Taishan's business, factory, the price and size

of its drywall, and shipping the drywall to the United States.  *See id.* at 17:5-20.

At some time during GD Distributor's business relationship with Taishan, the owner of

GD Distributors traveled to China to visit Taishan's factory.  *See id.*  During this trip, Taishan

recommended to the owner a hotel to stay in, sent a driver and interpreter to the hotel to bring him

to tour the Taishan offices and factory, and provided lunch at the factory.  *See id.* at 23:15-25,

24:18-20, 30:2-3.  At the tour, the parties discussed the product, price, and ASTM certification.

*See id.* at 26:8-12.  Taishan provided English interpreters during the tour of its office and factory.

*See id.* 18:7-12.

Taishan provided GD Distributors with test reports which stated that the Taishan drywall

satisfied ASTM standards.  *See id.* at 28:8-21, 54:25-58:19; (Herman Aff. Ex. 40).  Additionally,

Taishan provided a sample of its drywall to GD Distributors.  *See id.* at 34:4-36:6.

On July 11, 2006, GD Distributors entered into an agreement with TTP for the purchase of

1,320 sheets of drywall for the amount of $11,601.22.  *See* (Herman Aff. Ex. 25 (Steber Dep.

45:9-13); Ex. 40; Ex. 109); (Spano Decl. Ex. 15).  The Invoice provided that the delivery term

was "CIF New Orleans."  *See id.*

Taishan set up the shipment of the drywall to the Port of New Orleans.  *See id.* at 21:3-

22:5, 27:5-7.  According to GD Distributors, Taishan "absolutely" knew its drywall was being shipped to New Orleans, Louisiana.  *See id.* at 22:22-25.  The shipping for the drywall to GD Distributors was included in the price of the drywall sale.  *See id.* at 22:9-21.

GD Distributors sold the drywall it purchased from Taishan to another Louisiana company, Helton Construction.  *See id.* at 69:7-18; (Herman Aff. Ex. 40).

**Advanced Products International Corp.**  API, based in California, purchased 5,676 sheets of drywall for $24,123.00 from TTP on July 3, 2006.  *See* (Spano Decl. Ex. 7 (S. Peng Dep. Ex. 4)).  The Invoice for this transaction notes that the sale was done F.O.B. China with a final destination of New Orleans, Louisiana.  *See id.*  Again on July 20, 2006, API purchased 5,760 pieces of drywall for $24,998.40 from TTP.  *See* (Spano Decl. Ex. 7 (S. Peng Dep. Ex. 5)); (Herman Aff. Ex. 110 (S. Peng Dep. 83:18-84:4)).  The Invoice for this transaction indicates the sale as F.O.B. China with the final destination in New Orleans, Louisiana.  *See id.*  TTP did not ship this drywall to Louisiana.  *See* (Spano Decl. Ex. 5 (Che Dep. 370:13-371:4); Ex. 7 (S. Peng Dep. 84:16-85:5)).  API's representative handled the shipping arrangements for the drywall to be shipped from China to Triax Trading & Logistics, LLC in New Orleans, Louisiana.  *See* (Spano Decl. Ex. 5 (Che. Dep. 371:5-11); Ex. 4; Ex. 5; Ex. 6; Ex. 7).

**Interior Exterior Building Supply, LP.**  33,000 sheets of Taishan's drywall were sold to Interior Exterior Building Supply, LP, a Louisiana company, by Metro Resources Corporation, a corporation with offices in Canada and Michigan.  *See* (R. Doc. 14356-1, Ex. A).  Metro provided Interior Exterior with a testing report for this drywall which shows that the drywall was manufactured by TTP on February 9, 2006.  *See* (R. Doc. 14356-2, Ex. B).

**Miscellaneous.**  In July 2006, Taishan shipped samples of its drywall to TP Construction,

Inc. in Jefferson, Louisiana.  *See* (Herman Aff. Ex. 51).  TG shipped 100,000 boards to New

Orleans, Louisiana for an entity identified as "Phoenix."  *See* (Herman Aff. Ex. 165 (Sharf Dep.

237:8-238:20, 162:21-163:3)).

> **b.**    Taishan has Sufficient Minimum Contacts With Louisiana to
> Satisfy Due Process

While there is no evidence of Taishan's physical presence in Louisiana, its other non-

physical contacts with the State demonstrate it purposefully directed its activities at the forum

such that it reasonably could anticipate being haled into court there.  *See Burger King*, 471 U.S. at

476.  Taishan's contacts with Louisiana are beyond mere random, fortuitous, or attenuated

contacts.  *Compare World-Wide Volkswagen*, 444 U.S. at 295.  Taishan placed its drywall into the

stream of commerce with the knowledge that its drywall would end up in Louisiana.  *See Ruston*,

9 F.3d at 419.

Contrary to Taishan's arguments, the Fifth Circuit does not prescribe to the dictate of the

*Asahi* and *J. Intyre* pluralities that personal jurisdiction may attach under the stream of commerce

doctrine only when there is "something else" connecting the defendant to the forum.  Rather,

following the concurrences in these same cases, as is required by the Fifth Circuit, the Court finds

Taishan has minimum contacts with Louisiana because, during its course of production, Taishan

demonstrated a regular and anticipated flow of its drywall to Louisiana, it marketed its drywall to

Louisiana-based customers, and it benefitted economically from doing so.  Taishan had more than

reasonable knowledge that its products *might* end up in Louisiana; it knew its products *would* end

up in Louisiana.  *See J. McIntyre*, 131 S.Ct. at 2793.

In comparing the facts in *Gross* with those in *J. McIntyre*, Taishan has more substantial

contacts with Louisiana than the defendant in *J. McIntyre* did with its forum.  The relevant

contacts in *J. McIntyre* were limited to: (1) a U.S. distributor on one occasion sold one of the

defendant's machines to a forum customer; (2) the defendant permitted and wanted its distributor

to sell its machines to anyone, anywhere in the U.S.; and (3) representatives of the defendant

attended trade shows in the U.S., but not in the forum.  *See* 131 S.Ct. at 2791-92.

Over the course of two years, Taishan manufactured and sold, through a number of

transactions, 45,756 sheets of drywall destined for Louisiana and/or Louisiana customers, earning

$195,915.29.

Taishan manufactured its drywall specifically to match U.S. specifications in size and

quality, and often used English-language markings.  *See J. McIntyre,* 131 S.Ct. at 2792; *Asahi*,

480 U.S. at 113.  Taishan provided samples of its drywall to at least two different Louisiana

businesses.  *See id.*  The owner of a Louisiana company traveled to China to visit Taishan's

drywall factory.  *See id.*  The Supreme Court recognizes that the defendant's designing the

product for sale in the forum and forum-specific marketing both favor personal jurisdiction in the

forum.  *See id.*

Taishan engaged in extensive communications with U.S.-based companies regarding the

manufacture, sale, and shipment of its drywall to Louisiana.  *See Burger King*, 471 U.S. at 478-79

(considering prior negotiations and actual course of dealing in personal jurisdiction analysis).

Taishan knew that its drywall was sold to and would end up in Louisiana.  It held itself out

as interested in and actively marketing and selling its drywall to Louisiana.  It provided to

customers and potential customers information and pricing for shipping its product from China to

Louisiana.  Taishan sold its drywall to at least two companies in the U.S. which informed it that

they would be shipping the drywall to Louisiana.  Taishan itself arranged the shipment of its

drywall to Louisiana. "As long as a [defendant] is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Asahi*, 480 U.S. at 116-17 (Brennan, J. concurring). Taishan possessed more than mere awareness or expectation that its drywall would be delivered, sold, and installed in Louisiana. *See Asahi*, 480 U.S. at 121 (Brennan, J. concurring); *J. McIntyre*, 131 S.Ct. at 2788-89 (Kennedy, J. plurality); *see also Paz*, 445 F.3d at 813-14 (finding personal jurisdiction over foreign distributor because it knew its products sold outside of the forum would be used in the forum); *Ruston Gas*, 9 F.3d at 420-21 (finding personal jurisdiction in part because foreign defendant knew its products, after delivering them to a third-party shipper, would be delivered to a specific user in the forum); *Bean Dredging*, 744 F.2d 1081 (finding personal jurisdiction over foreign component part manufacturer solely on the basis that the manufacturer produced thousands of products which were sold nationwide)*; Oswalt*, 616 F.2d at 199-200 (finding personal jurisdiction over foreign manufacturer who delivered its products to a distributor with the understanding its product would be sold in a nationwide market); *Austin,* 656 F.2d at 1090 (finding personal jurisdiction in large part because defendant knew its product would be shipped to and installed in the forum); *Luv N' Care*, 438 F.3d at 471 (finding personal jurisdiction in part on the basis that foreign defendant knew, based upon sales invoices, that its product would reach the forum).

Taishan attempts to insulate itself from personal jurisdiction by arguing that its sales, even to customers who informed it that its drywall was going to Louisiana, were conducted F.O.B. in China, which transferred title of the drywall in China, thereafter leaving Taishan with no further obligations involving the drywall. Taishan's argument fails for the following reasons. First, several of the cases relied upon by Taishan pre-date the Supreme Court's decision in *World-Wide*

*Volkswagen*, the case which forms the basis of the Fifth Circuit's current minimum contacts test. Second, the sole modern case relied upon by Taishan regarding the effect of an F.O.B. shipment term on minimum contacts, *Southern Copper*, 245 F.3d 791, is unpublished and predates the Fifth Circuit's published decision in *Luv N' Care*, 438 F.3d 465, which reaches a different conclusion from *Southern Copper* on F.O.B. shipments.  Specifically, *Southern Copper* found that a defendant's knowledge that it product would end up in a forum through indirect F.O.B. shipments on its own did not satisfy minimum contacts with the forum, but recognized this fact might be relevant when considered with other forum contacts.  245 F.3d at *4.  *Luv N' Care* later held,

> Jurisdiction, however, 'does not depend on the technicalities of when title passes;' rather, jurisdiction may attach both to manufacturers who supply their own delivery systems and to those that make use of the distribution systems of third parties....we conclude that a F.O.B. term does not prevent a court from exercising personal jurisdiction over a non-resident where other factors...suggest that jurisdiction is proper.  438 F.3d at 471-72l; *accord Irving*, 864 F.2d at 386.

Likewise, the Court finds that the use of an F.O.B. term in Taishan's Louisiana-related contracts does not, on its own, insulate Taishan from personal jurisdiction in *Gross*.

Finally, Taishan's drywall did end up in Louisiana and was used in Louisiana properties. Taishan argues that because it lacked knowledge of the ultimate buyer and location of its drywall, there is no personal jurisdiction over it in *Gross*.  The evidence does not support this position, but in any event, the Fifth Circuit disagrees, concluding that lack of knowledge is inconsequential to personal jurisdiction.  *See Irving*, 864 F.2d at 386 ("Personal jurisdiction does not require certain knowledge of the user's identity.").

Because the Court finds Taishan has minimum contacts with Louisiana, it must now determine whether these contacts arise from or relate to the claims against it in *Gross*.

8.      *Cause of Action Arises From or Relates to Minimum Contacts*

-138-

The second half of the minimum contacts requirement for specific personal jurisdiction is that "the litigation results from alleged injuries that arise out of or relate to" the foreign defendant's minimum contacts with the forum.  *See Clemens v. McNamee*, 615 F.3d 374, 377 (5th Cir. 2010)(quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *Seifarth*, 472 F.3d at 271 (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002)).

Taishan argues that because the *Gross* plaintiffs' alternative liability theory is that they cannot identify it as the manufacturer of the drywall that caused their injuries, plaintiffs cannot show that their cause of action arose out of or related to Taishan's contacts with Louisiana. Taishan also argues that even if the Louisiana plaintiffs can demonstrate a sufficient nexus between Taishan's activities in Louisiana and their damages from drywall, the non-Louisiana plaintiffs cannot demonstrate the same since they do not reside in Louisiana or claim any injury from drywall in Louisiana.

Plaintiffs respond that their Chinese drywall claims arise from Taishan's contacts with the forum, specifically its manufacture and sale of Chinese drywall destined for Louisiana.  With regard to their alternative liability theory, plaintiffs argue that Taishan's challenge is properly raised under a Rule 12(b)(6) challenge, not under Rule 12(b)(2).  However, if the Court does address the alternative liability issue, plaintiffs argue that Louisiana law recognizes the alternative liability theory.

*Gross* was filed as a nationwide class action on behalf of owners of homes containing defective Chinese drywall manufactured, exported, imported, distributed, delivered, supplied, marketed, or sold by numerous defendants.  *See* (R. Doc. 366, Amended Complaint).  TG and TTP are among the defendants named in the Amended Complaint.  *See id.*  The reason for this

-139-

style of pleading is "[d]efendants have marketed their products in a manner designed to conceal their identity." *Id.*

The evidence discussed in the preceding section, *see supra* Section IV.B.7.a.iii, demonstrates that Taishan manufactured, exported, marketed and/or sold its drywall to Louisiana customers or to customers doing business in Louisiana. The profile forms, TIP inspections, and photographic catalog, all Court-ordered and providing information on the type of drywall in homes, also demonstrate the presence of Taishan's drywall in the homes of Louisiana plaintiffs. The Court finds no law which supports Taishan's narrow reading of the "arise from" and "relate to" requirement for specific personal jurisdiction. *See e.g. Helicopteros*, 466 U.S. at 415 n.10. Instead, the Court finds the plain language "arise from" and "relate to" as suggesting a broader interpretation of the required nexus. Because the Court is only dealing with personal jurisdiction at this juncture, it finds that plaintiffs' claims against Taishan arise from or relate to Taishan's manufacture, marketing, and sale of its drywall to Louisiana, the forum state.

Taishan's challenge to the application of the alternative liability theory is, as noted by plaintiffs, to be raised in a Rule 12(b)(6) challenge and not in the personal jurisdiction context.

Finally, Taishan's argument pertaining to non-Louisiana plaintiffs is resolved by the PSC's suggestion to sever and transfer any non-Louisiana plaintiffs from *Gross*.

Because the Court finds the first prong of the due process, personal jurisdiction test is satisfied, it now turns to the second and final prong of this test.

### 9. *Fair Play & Substantial Justice*

The Court previously reviewed the applicable law for determining the final requirement for personal jurisdiction: whether the exercise of personal jurisdiction over a foreign defendant

comports with traditional notions of fair play and substantial justice. *See supra* Section II.B.9. In short, this requirement places the burden on the defendant to demonstrate that the exercise of personal jurisdiction over it offends traditional notions of fair play and substantial justice based on the following factors: (1) the defendant's burden, (2) the state's interest, (3) the plaintiff's interest in convenient and effective relief, (4) the judicial system's interest in efficient resolution of controversies, and (5) the state's shared interest. *See id.* For the same reasons stated by the Court in *Germano* and *Mitchell*, particularly that the last four factors all favor personal jurisdiction, the Court finds that the exercise of personal jurisdiction over Taishan in *Gross* does not offend traditional notions of fair play and substantial justice. *See id.*

For all of the foregoing reasons, the Court concludes that the exercise of specific personal jurisdiction over Taishan in *Gross* is proper.

## V.   TG & TTP'S MOTION TO DISMISS THE COMPLAINT IN *WILTZ*

The fourth and final motion addressed by the Court is TG and TTP's Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Wiltz*. (R. Doc. 13591). This Motion is substantially the same as Taishan's Motion to Dismiss Pursuant to Rule 12(b)(6) in *Gross,* which the Court addresses directly above. *See supra* Section IV. Because of the similarity in these motions, as well as the responses, particularly shown by the fact that the respondents filed joint responses to both the *Gross* and *Wiltz* motions, the Court incorporates and adopts herein its summaries, analyses, findings, and conclusions in *Gross*, and it ultimately concludes that the exercise of specific personal jurisdiction over Taishan in *Wiltz* is proper. *See id.*

## VI.   CONCLUSION

For the foregoing reasons it is ordered that the following motions are DENIED: (1) TG'S

Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint in *Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687 (R. Doc. 13490); (2) TG's Renewed Motion Pursuant to Rules 55(c) and 12(b)(2) to Vacate the Entry of Default and Dismiss This Action in *The Mitchell Co., Inc. v. Knauf Gips KG*, Case No. 09-4115 (R. Doc. 13566); (3) TG and TTP'S Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Gross v. Knauf Gips KG*, Case No. 09-6690 (R. Doc. 13590); and (4) TG and TTP's Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Wiltz v. Beijing New Building Materials Public Ltd., Co.*, Case No. 10-361 (R. Doc. 13591).

New Orleans, Louisiana this 4th day of September 2012.

_____
U.S. District Judge

CC:     United States Court of Appeals for the Fifth Circuit

-142-