```
 1                  UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF LOUISIANA

 3

 4     * * * * * * * * * * * * * * *
                                   *
 5     IN RE:  CHINESE MANUFACTURED *        Docket 09-MD-2047
               DRYWALL PRODUCTS     *
 6             LIABILITY LITIGATION *        Section L
                                   *
 7     * * * * * * * * * * * * * * *  *        New Orleans, Louisiana
                                   *
 8     Relates to:  ALL CASES        *        August 23, 2012
                                   *
 9     * * * * * * * * * * * * * * *

10                    TELEPHONE HEARING BEFORE THE
11                     HONORABLE ELDON E. FALLON
                     UNITED STATES DISTRICT JUDGE
12

13     Appearances:

14
       For the Plaintiffs:           Herman Herman & Katz, LLC
15                                    BY:  RUSS M. HERMAN, ESQ.
                                          LEONARD A. DAVIS, ESQ.
16                                    820 O'Keefe Avenue
                                     New Orleans, Louisiana 70113
17

18     For the Plaintiffs:           Lambert and Nelson
                                     BY:  HUGH P. LAMBERT, ESQ.
19                                         CAYCE C. PETERSON, ESQ.
                                     701 Magazine Street
20                                    New Orleans, Louisiana 70130

21
       For the Plaintiffs:           Lumpkin & Reeves
22                                    BY:  JAMES R. REEVES, ESQ.
                                     160 Main Street
23                                    Biloxi, MS 39530

24

25
```

```
1    For Interior Exterior:        Galloway Johnson Tompkins
                                     Burr & Smith
2                                  BY:  RICHARD DUPLANTIER JR., ESQ.
                                       CARLINA C. EISELEN, ESQ.
3                                  701 Poydras Street, 40th Floor
                                   New Orleans, Louisiana 70139
4

5    For The North River           Thompson Coe Cousins & Irons, LLP
     Insurance Company:            BY:  KEVIN RISLEY, ESQ.
6                                       BRIAN S. MARTIN, ESQ.
                                   One Riverway, Suite 1600
7                                  Houston, Texas 77056

8
     Official Court Reporter:      Toni Doyle Tusa, CCR, FCRR
9                                  500 Poydras Street, HB-406
                                   New Orleans, Louisiana 70130
10                                 (504) 589-7778
                                   Toni_Tusa@laed.uscourts.gov
11

12

13   Proceedings recorded by mechanical stenography using
     computer-aided transcription software.
14

15

16

17

18

19

20

21

22

23

24

25
```

**PROCEEDINGS**

**(August 23, 2012)**

(The following proceedings were held in chambers by telephone.)

THE COURT:  Hello.  Good morning everyone.  This is Judge Fallon.  Who is on the line first for the plaintiffs?

MR. DAVIS:  Good morning, Your Honor.  This is Leonard Davis.

MR. LAMBERT:  Skip Lambert.

MR. PETERSON:  Cayce Peterson.

MR. REEVES:  Jim Reeves, Your Honor.

MR. DAVIS:  I know Russ is joining.

THE COURT:  Anyone else for the plaintiffs?

For the defendants.

MR. DUPLANTIER:  Judge, it's Rick Duplantier and Carlina Eiselen on behalf of Interior Exterior.

MR. RISLEY:  Your Honor, Kevin Risley and Brian Martin on behalf of North River.

THE COURT:  Any other defendants?  Is that it on the phone?

Let me make some general comments.  This is a hearing today on several motions.  The North River Insurance Company is a defendant in at least two omnibus class action complaints in this MDL.  The claims against North River actually arise from its role as an excess insurer of Interior

Exterior Building Supply and Interior Exterior Enterprises, LLC, who are co-defendants and suppliers of the Chinese drywall during the period in question when Chinese drywall was sold, distributed, and installed into homes in the various areas of the Gulf Coast and East Coast.

In the spring of 2011, Interior Exterior and its primary insurers, Arch and Liberty Mutual, entered into a class action settlement agreement.  The Interior Exterior class settlement agreement provides certain class members access to compensation from a fund, which it consists of the full policy limits of Arch and Liberty as well as an assignment to pursue North River for its excess funds in connection with their excess policies.

North River did not participate in the Interior Exterior settlement agreement.  North River declared that the reason it didn't participate is because it felt it had defenses.  The defenses that they cite are that Interior Exterior is not liable for the damage caused by the Chinese drywall under the laws applicable to that issue and, second, that Interior Exterior's primary insurance policies have not been and they don't expect them to be exhausted, leaving its own excess policies not even triggered or not yet triggered or maybe never will be triggered.

Following the Interior Exterior settlement agreement, the Knauf defendants -- they manufactured a

| | |
|---|---|
| 10:03 | 1 | substantial portion of the drywall, actually a majority of the |
| 10:03 | 2 | drywall with which Interior Exterior was involved -- entered |
| 10:03 | 3 | into a settlement with the plaintiffs' steering committee.  The |
| 10:03 | 4 | finalization of the Knauf settlement agreement is conditioned, |
| 10:04 | 5 | however, upon the participation and contribution of home |
| 10:04 | 6 | builders, installers, suppliers, and those entities' insurers, |
| 10:04 | 7 | including the North River insurance areas. |
| 10:04 | 8 | North River stands by its defenses and has |
| 10:04 | 9 | chosen not to participate in the global settlement with Knauf, |
| 10:04 | 10 | so it seemed to me that I at that point had no alternative.  I |
| 10:04 | 11 | had stayed everything against North River and everybody else. |
| 10:04 | 12 | In view of North River's position, which they feel is a |
| 10:04 | 13 | legitimate position, the two areas of no liability on Interior |
| 10:04 | 14 | Exterior and no exhaustion of the primary insurers, I felt that |
| 10:04 | 15 | that was something that the Court had to address.  We had to |
| 10:05 | 16 | bring those two issues into focus so as to at least resolve or |
| 10:05 | 17 | attempt to resolve or inform the parties on those two issues. |
| 10:05 | 18 | So I lifted the stay on litigation against North River to the |
| 10:05 | 19 | plaintiffs through the PSC to propound discovery on North River |
| 10:05 | 20 | as well as schedule mediation. |
| 10:05 | 21 | There was a mediation in this Court.  After |
| 10:05 | 22 | about five hours of serious mediation/discussions, it became |
| 10:05 | 23 | apparent that notwithstanding good faith on both sides that a |
| 10:05 | 24 | resolution could not and would not be reached.  So I went to |
| 10:05 | 25 | Plan B, and that was to set a trial date against North River |

10:05  1   focused primarily on those issues.  The trial date was set for
10:06  2   November 26, 2012.  The trial would focus on the liability of
10:06  3   Interior Exterior as the insured of North River and whether or
10:06  4   not Interior Exterior was a good faith or bad faith seller,
10:06  5   leaving the issue of damages to be resolved at a later date.
10:06  6            On July 10, the Court met with counsel and
10:06  7   directed each side to select six cases as a discovery pool so
10:06  8   that they could focus on those cases as opposed to trying to
10:06  9   focus on a thousand or so cases that are involved in the mix.
10:06  10  I gave each side an opportunity to pick six.  That would form
10:06  11  the discovery pool, and then they would discover those cases
10:07  12  and from those cases pick the cases that would be
10:07  13  bell-weathered.
10:07  14           We are here today because the PSC has filed
10:07  15  motions regarding this discovery.  There are actually three
10:07  16  motions involved.  The way that I have grouped them, the PSC's
10:07  17  first supplemental and amended request for admissions is one,
10:07  18  the second was the set for production of documents and there's
10:07  19  a number of subcategories for that, and then third the request
10:07  20  for a third round of depositions.
10:07  21           I'll hear from the movants at this time.  It
10:07  22  would help me if you would talk to me first about the
10:07  23  admissions.
10:07  24           **MR. DAVIS:**  Good morning, Your Honor.  This is
10:07  25  Leonard Davis and I will be arguing on behalf of the PSC.

| | | |
|---|---|---|
| 10:07 | 1 | Just by way of background just so that it's |
| 10:07 | 2 | framed, Your Honor, we filed this motion to compel on |
| 10:08 | 3 | August 15, 2012.  Much earlier than that, on June 28 we served |
| 10:08 | 4 | a request for production of documents on North River as well as |
| 10:08 | 5 | a request for admissions.  North River did provide objections |
| 10:08 | 6 | to the request for production of documents.  Those various |
| 10:08 | 7 | pleadings are attached to our memorandum respectively as A, B, |
| 10:08 | 8 | and C, and I presume the Court has seen that -- |
| 10:08 | 9 | THE COURT:  Right. |
| 10:08 | 10 | MR. DAVIS:  -- as well as the request for admissions. |
| 10:08 | 11 | Objections were provided.  That was provided on August 2 and |
| 10:08 | 12 | that's attached as Exhibit D. |
| 10:08 | 13 | I can certainly address each one in order, but I |
| 10:08 | 14 | do have some general, overall comments that apply to all |
| 10:08 | 15 | three -- |
| 10:08 | 16 | THE COURT:  All right. |
| 10:08 | 17 | MR. DAVIS:  -- with respect to this motion.  I |
| 10:08 | 18 | thought it would be appropriate to deal with that up front.  So |
| 10:08 | 19 | I'll do that and then, as Your Honor wants, I will address each |
| 10:09 | 20 | one of those three in any order that the Court desires. |
| 10:09 | 21 | THE COURT:  Sure.  Okay. |
| 10:09 | 22 | MR. DAVIS:  First of all, North River asked for a |
| 10:09 | 23 | seat at the table, and I think Your Honor's prefatory comments |
| 10:09 | 24 | acknowledge that.  They ask to be present at the trial and, |
| 10:09 | 25 | quite frankly, we are obligating North River with respect to |

that.

This issue arises out of a direct action, so we have North River here as a result of the direct action statute. North River is, in fact, a real party in interest. As Your Honor has aptly noted, North River stands behind InEx as its excess or its insurance carrier.

What we found out through the discovery that we have taken thus far -- and the Court is well aware of the issues that we have had with discovery, having to bring motions to compel, having to take two depositions of a corporate rep to, in essence, get one deposition after being in the federal courthouse for Your Honor to preside over it. After North River provided a profile form years ago, now we find out that they have provided a supplemental profile form and they're really a shell entity is what we found out.

We need to make sure that we have the proper party and know who we are dealing with, who is North River, and we don't have that information despite what North River has said with the, I think, four or five pages that were printed out from their Web site that they claim shows whatever they are.

So we have got minimal discovery with respect to North River at this point, and we have had to claw and tooth for every single little bit that we have gotten thus far. We don't even have basic information. We have the one deposition

10:11  1   of Agnes Reiss, who was put up as the corporate designee, but
10:11  2   Agnes Reiss really didn't have responses to quite a lot of
10:11  3   information and she deferred to others and clearly indicated
10:11  4   that a number of documents existed but hadn't been produced.
10:11  5        This Court asked us and suggested that we work
10:11  6   on a parallel track as to Interior Exterior and North River.
10:11  7   Now, the PSC is spending thousands, thousands, millions of
10:11  8   dollars on a trial, potentially.  We are spending time on this
10:11  9   InEx trial.  I look at this and I look at the response that was
10:11  10  filed by North River and I shake my head, quite frankly,
10:11  11  because I don't understand where North River is spending time.
10:11  12       We are repeating what was done previously in
10:12  13  trials to find out if InEx is a good faith or bad faith seller.
10:12  14  We know the damages here.  InEx is spending time and money.
10:12  15  Quite frankly, North River is not doing anything but sitting
10:12  16  back, and you may recall in one of these other hearings I
10:12  17  suggested they weren't even in the stadium.  They are just a
10:12  18  spectator at best at this point.
10:12  19       So the issue that we need to find out is what is
10:12  20  North River's liability for bad faith, and this Court has heard
10:12  21  this before and we have talked about the effective exhaustion
10:12  22  of the primary policies.  I don't think I need to go back into
10:12  23  that.  North River claims it has no exposure and they have
10:12  24  continued to say that.  But once the exposure to InEx is
10:12  25  determined, the real issue is, in fact, North River's exposure

10:12
10:12
10:13
10:13
10:13
10:13
10:13
10:13
10:13
10:13
10:13
10:13
10:13
10:13
10:14
10:14
10:14
10:14
10:14
10:14
10:14
10:14
10:14
10:14
10:14

1   and we should be able to explore that now.  We know the

2   damages.  InEx has taken plaintiff depositions as we go forward

3   and, quite frankly, the most important thing here is

4   North River's exposure and that needs to be determined.

5              Now, I'm going to go back in history a little

6   bit here and I'm going to reference your April 19 proceeding

7   that took place.  At that time the bad faith issues were

8   brought to the attention of the Court, specifically on page 14

9   of your transcript.  Russ spoke about bad faith and our

10  inability to plead bad faith until discovery occurred.  At

11  page 33 of that transcript, Your Honor acknowledged that we,

12  the PSC, are entitled to the basic discovery and in fact

13  suggested that we move forward with discovery.

14              We had raised at that time the *Sosebee* case and

15  other items that addressed discovery of excess insurance

16  matters, and we talked about that again at page 17 and that was

17  well set out in our brief, but the bad faith issue was in fact

18  discussed and that's critical here.

19              Then I'm going to move forward to the June 13

20  conference that was before Your Honor.  At page 23, Your Honor

21  acknowledged that both sides agree that discovery is needed.

22  There was no question about that.  The Court says, "I can't see

23  any harm in dual tracks."  The Court suggested dual tracks.

24  Then at page 41, I believe -- 43.  I'm sorry.  The Court -- 41.

25  I'm sorry.  The Court says that both sides are to proceed and

| | |
|---|---|
| 10:14 | 1 |
| 10:15 | 2 |
| 10:15 | 3 |

it would be helpful to keep this thing on two tracks.  So I
think that's where we are at this point.  We are on two tracks.
We need to proceed.

            Now, Your Honor, I can address the order in
which you want me to address with respect to the admissions,
the production of documents, and the depositions.  I can try to
go through each one of those in that order if you want or I can
address them in any order that Your Honor wants me to proceed.

            THE COURT:  Well, specifically the admissions, let's
deal with those.  The PSC's first supplemental and amended
request for admissions, as I understand it, they make an
admission.  What they have done is take the Court's order and
convert those to admissions and there's some 80-some-odd
admissions, 81 requests.  I understand that North River takes
the position first that they are not due yet and also then says
that they are voluminous and it presents problems.

            MR. DAVIS:  Your Honor, what we did there was on
June 28 we filed our initial request for admissions.  We
received North River's objections on August 2.  What we did on
July 31, prior to receipt of North River's objections, we
attempted to clean up any confusion with respect to a
definition and filed a supplemental and amended request for
admissions.  The only thing that that did was clean up a
definition of *Chinese drywall*.  The admissions are exactly the
same.  All it did was change the definition so that everybody

10:16   1   could understand when we talked about Chinese drywall, it meant
10:16   2   reactive or problem drywall.
10:16   3               Now, what we got -- and this is Exhibit D to our
10:17   4   memo.  What we got was, what is it, two pages of objections
10:17   5   without any single response that the Federal Rules require.
10:17   6   North River spoke about maybe being able to reach stipulations
10:17   7   and the like but never responded to the request for admissions
10:17   8   and gave reasons that it's not under the -- Rule 36, it's
10:17   9   limited to matters within there.  The Court has directed the
10:17   10  parties to focus on discovery and the like but didn't go
10:17   11  through each one.
10:17   12              Now, Your Honor did instruct us to sit with
10:17   13  North River as a trial conference and see if we could reach
10:17   14  some stipulations.  We, in fact, did that.  We sat with
10:17   15  North River.  We heard what they suggested.  We responded to
10:18   16  them in a meet-and-confer in my office.  We went over their
10:18   17  comments.
10:18   18              At this date we do not have an agreement on any
10:18   19  stipulations and the request for admissions ought to be
10:18   20  responded to.  We wrote North River about that and told them we
10:18   21  don't have agreements.  So our position is we ought to have
10:18   22  answers to the stipulations.  When we get that -- I'm sorry,
10:18   23  answers to the request for admissions.  When we get that, we
10:18   24  are happy to continue discussions about stipulations.
10:18   25              We have time to deal with that, but at this

10:18  1  point there are requests for admissions that are outstanding.
10:18  2  We are allowed to proceed with requests for admissions under
10:18  3  the Federal Rules and the Federal Rules require that a party
10:18  4  respond to a request for admissions.  We are entitled to
10:18  5  responses.
10:18  6          THE COURT:  Let me hear from North River.
10:19  7          MR. RISLEY:  Thank you, Your Honor.  This is Kevin
10:19  8  Risley.  Can you hear me all right?
10:19  9          THE COURT:  Yes, I can hear you, Kevin.
10:19  10         MR. RISLEY:  I'm going to take a step back and take a
10:19  11 slightly bigger look for a second.  I think what the Court
10:19  12 decides today will affect whether we go to trial in November or
10:19  13 not.  We have started to get ready for trial on discovering 12
10:19  14 properties.  We agree discovery is necessary on that.  At this
10:19  15 point we have completed the inspections of the homes and we had
10:19  16 a representative at each of those inspections.  Tomorrow we
10:19  17 begin the plaintiffs' depositions.  We have people lined up to
10:19  18 cover all those.  We are participating in those proceedings.
10:19  19 The question is what discovery is needed to get ready for
10:19  20 trial.
10:19  21         Now, you heard Mr. Davis sit there and use a lot
10:19  22 of analogies about in the building, outside of the stadium.  We
10:19  23 are in this case.  We are in the proceedings.  We are doing
10:19  24 everything needed to be done to get ready for trial.  What the
10:20  25 PSC has decided to do, however, is to try to interfere with

that by conducting a lot of unnecessary discovery on issues
that have absolutely nothing to do with the November trial.

We anticipate there are about 50 depositions of
both fact plaintiffs, fact witnesses, and experts that have to
be taken before the November trial.  We have got all we can do
if we focus on what's necessary.  We are hearing now that the
PSC still wants to pursue the bad faith claim against
North River.  Well, we have talked about the fact there are no
pleadings for that.  The Court was aware of that and said,
"I'll let you have the deposition to see if you can come up
with anything."  They still haven't.  They have not given you a
single fact or a single reason why they think there is bad
faith in this case.

Now, we have talked about this before.  The
settlement has not been consummated yet.  The primary coverage
has not paid dollar one.  The primary coverage is completely
inexhausted at this point in time.  If, in fact, North River
and InEx prevail at the November trial and InEx's liability is
limited to the replacement cost of the drywall, it will never
get above -- InEx's liability will never get above the primary
coverage.  So the whole idea of what they call bad faith, which
really sounds more like a collectability concern, is premature
and may never come to pass.

They now say, well, North River is a shell
corporation.  They don't tell us why that is the case.  It's

10:21  1    true North River has no full-time compensated employees, but
10:21  2    that's not an uncommon situation for an insurance company.  It
10:21  3    is very typical for these holding companies to have several
10:21  4    companies, each adequately capitalized and financed but with
10:21  5    one common crew that does the work for everyone and the cost is
10:21  6    allocated among the various companies.
10:22  7            Now, specifically with regard to North River,
10:22  8    there is evidence in front of the Court and was put in front of
10:22  9    the Court by the PSC in a motion to compel that North River is
10:22  10   authorized to do business in all 50 states and the District of
10:22  11   Columbia.  Every state, including Louisiana, requires the
10:22  12   respective insurance commissions to do an annual audit of the
10:22  13   financial condition of every admitted insurer at the end of
10:22  14   every year.
10:22  15           The insurance commissioner of Louisiana is fine
10:22  16   with the financial condition of North River, including the
10:22  17   ratings from A.M. Best and Standard & Poor's, which rate
10:22  18   North River either strong or excellent and put them at an asset
10:22  19   size of over a billion and a quarter dollars.  So for us to
10:22  20   take the time now to do discovery on North River's financial
10:22  21   condition is a waste of time and would distract from what we
10:22  22   would want to do.
10:22  23           Now, going specifically to the request for
10:22  24   admissions, I don't think Mr. Davis answered your question
10:22  25   about how they were formulated, but we were told they took the

Court's prior opinion and chopped it up.  In fact, there's even a couple places where they leave parenthetical comments of the Court in there and didn't even edit the questions the correct way.

However, it was the PSC from day one that have been saying we have to have stipulations to simplify this trial.  We sent them proposed stipulations in July.  We met with them on August 10 and discussed them.  They agreed with some in principle, didn't with others; said, "We will revise them and get back to you in a week or so."  We still have not seen them.  What Mr. Davis tells you now is, "Well, we aren't even going to talk about stipulations until North River is ordered to answer these 81 requests for admission."

Now, I don't want to take the Court through all of them, but in our response we filed on Tuesday, we pointed out some of those are very technical issues that, number one, are far beyond the knowledge of an insurance company, but number two are things the jury in this case will never be asked to find.

What we propose in stipulations would, in fact, take the defect issue out of the case because it would concede that at least some of the drywall in these houses has the tendency to release sulfur and create gas.  The PSC wants to add some that they can affect metal.  We are willing to consider those.

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
| 10:24 | 1  | So the question is where should we be spending                           |
| 10:24 | 2  | our time right now, on stipulations [*sic*] that, quite frankly,          |
| 10:24 | 3  | most of which we will be unable to answer, or upon the                   |
| 10:24 | 4  | stipulations the PSC has been demanding that it wants to                 |
| 10:24 | 5  | simplify the trial?  We think everybody, including the Court,            |
| 10:24 | 6  | would be better off if we can reach these stipulations.  We              |
| 10:24 | 7  | think that if we want to go to trial in November, the                    |
| 10:24 | 8  | appropriate thing to do is work on the stipulations, not make            |
| 10:24 | 9  | us spend time trying to figure out the science that will never           |
| 10:24 | 10 | be relevant to the trial in this case.                                   |
| 10:25 | 11 | I guess if the Court doesn't have any questions,                         |
| 10:25 | 12 | that's what I have to say on the admissions.                             |
| 10:25 | 13 | **THE COURT:**  From the standpoint of the parties, can                   |
| 10:25 | 14 | everybody stipulate that the drywall is defective?                       |
| 10:25 | 15 | **MR. RISLEY:**  Your Honor, what we have suggested is --                 |
| 10:25 | 16 | because not all of the Chinese drywall is defective, even not            |
| 10:25 | 17 | all Knauf board.  Subject to confirmation from the inspection            |
| 10:25 | 18 | that just occurred, we are willing to admit that Taishan and             |
| 10:25 | 19 | KPT board in the house releases sulfur and can cause damage to           |
| 10:25 | 20 | the metals.  I don't know what else they want us to stipulate            |
| 10:25 | 21 | to.                                                                       |
| 10:25 | 22 | **MR. DAVIS:**  Your Honor, that is part of the issue, is                 |
| 10:25 | 23 | when we have tried to reach stipulations, we can't get the               |
| 10:25 | 24 | stipulations so that we can avoid a number of issues, and its            |
| 10:25 | 25 | for that reason why the requests for admissions are hanging out          |

there.  When we see the responses to the requests for
admissions, then we can address the stipulations.  We can
hopefully gather some stipulations.

        MR. RISLEY:  Your Honor, why don't they respond to
the stipulations we sent them in July and see if we can agree
with them or not?

        THE COURT:  There's some things that I agree with
both of you all on.  With regard to these trials, we have to
focus on the trials.  We really need to focus on the trials,
and the focus of the trials has to be the drywall or the ones
that I mentioned to you all that I limited the trials to the
two issues that we are dealing with primarily.

        The question that I was trying to focus
everybody on is to try to get some resolution on the issues
that North River is urging, namely the liability of Interior
Exterior and whether Interior Exterior was a good faith or bad
faith seller.  That's important because that determines whether
or not their damages are restricted or not restricted, or at
least it potentially focuses on that.  But those are the issues
that I see necessary to try.

        If the jury comes back and finds for the
plaintiff in both of those issues, that's one thing.  If the
jury comes back and finds for the defendant in both of those
issues, that's significant too.  I wanted to give each side an
opportunity to see what a jury would do in these particular

10:27 1  cases on those two issues, namely the liability of Interior
10:27 2  Exterior and whether Interior Exterior was a good or bad faith
10:27 3  seller, whether they knew or should have known or could have
10:27 4  known or may have known or whether they actually knew.  That's
10:28 5  the focus on the case.
10:28 6        From the plaintiffs' standpoint, I think there
10:28 7  are just too many requests for admissions.  83 requests for
10:28 8  admissions, that in itself is problematic.  So what happens in
10:28 9  that type situation is defendant just says, "I deny all of
10:28 10 them."  So if you can stipulate that the drywall is defective,
10:28 11 the drywall emanates odors that contaminate the property -- I
10:28 12 don't think anybody could or should or would buy drywall that
10:28 13 does that.
10:28 14        MR. RISLEY:  Your Honor, this is Kevin Risley for
10:28 15 North River.  We generally agree with what the Court just said,
10:28 16 although we still disagree upon whether it's a "knew or should
10:28 17 have known" test --
10:28 18        THE COURT:  I understand that.
10:28 19        MR. MILLER:  -- but I want to make clear we are not
10:29 20 going to contest that KPT or Taishan drywall emits sulfur odors
10:29 21 that creates an unpleasant smell and corrodes metals.  Those
10:29 22 are not in the requests for admissions that were served on us.
10:29 23 Those seem to me to be the real key facts that the PSC needs.
10:29 24 It's not even in their requests for admission.
10:29 25        MR. DAVIS:  Your Honor, what we know is that just

10:29  1    this week InEx has spent approximately a full day in these
10:29  2    homes with their inspectors inspecting this.  If they were
10:29  3    going to give us stipulations to those effects, we wouldn't be
10:29  4    spending time doing that, and it's for this reason these
10:29  5    requests for admissions are important.
10:29  6          MR. RISLEY:  Your Honor, this is Kevin Risley.  I
10:29  7    went to several of those inspections and other people from my
10:29  8    office, and Sid Angelle's office did too.  The reason for the
10:29  9    inspection is to confirm that there is either KPT or Taishan
10:29 10    drywall in the house.  Those are facts we don't know.  We made
10:29 11    that clear to the PSC when we met with them on August 10.  We
10:30 12    will make those stipulations as long as we confirm there is
10:30 13    that drywall in the house.
10:30 14          THE COURT:  It seems to me that we are arguing over
10:30 15    something that we need not argue about.  If the parties enter
10:30 16    into a stipulation that the drywall emits odors, that it's a
10:30 17    bad smell and contaminates metals, why do we have to prove that
10:30 18    the drywall smells bad and contaminates metals?  I think that
10:30 19    an expert saying that a drywall that smells bad and
10:30 20    contaminates metals is defective -- does anybody intentionally
10:30 21    manufacture drywall that smells bad and contaminates metals?  I
10:30 22    don't know who would buy that.  How would they advertise it,
10:30 23    "Buy our drywall.  It smells bad and contaminates metals"?
10:30 24          So it just seems to me that if that's the
10:30 25    agreement between the parties, it really removes the defective

10:31   1   condition other than maybe a witness saying any drywall that
10:31   2   contaminates metals and smells bad is inherently defective, if
10:31   3   you need that.  What do you gain from another 84 objections?
10:31   4   What's the purpose of it?
10:31   5           MR. HERMAN:  Your Honor, this is Russ Herman.  I just
10:31   6   have one comment regarding the stipulations offered were in the
10:31   7   nature of general causation and not specific.  Trial testimony,
10:31   8   even with a general causation stipulation, in whatever number
10:31   9   of cases Your Honor decides we are going to try, we still have
10:31  10   to have the expert testimony on specific causation and also the
10:31  11   explanation why the drywall is defective vis-à-vis specific
10:32  12   problems.  So I don't think a general stipulation really covers
10:32  13   the trial aspects.
10:32  14           Given Your Honor's comment regarding that there
10:32  15   are too many requests for admissions, we will withdraw them and
10:32  16   we will just move on.
10:32  17           THE COURT:  Okay.
10:32  18           MR. RISLEY:  Your Honor, Kevin Risley for
10:32  19   North River.  I think we can take care of that.  We made
10:32  20   them -- I'm not sure what you call them -- general causation,
10:32  21   but the stipulations we proposed were that the KPT or the
10:32  22   Taishan drywall can emit sulfur gases and cause metal
10:32  23   corrosion.  If we can determine through the inspections that
10:32  24   there is KPT and Taishan board in the house, we will stipulate
10:32  25   to that, which should take care of specific causation.

10:33    1          **MR. HERMAN:**  Well, there's always a problem with

10:33    2    "can" cause.  That's all I'm going to say about that.  That's

10:33    3    why that stipulation really was not acceptable.

10:33    4          **THE COURT:**  Take a look at the stipulation, if you

10:33    5    can put, rather than "can," "did" and in this particular house

10:33    6    it did cause it.  If that's a potential problem, then a

10:33    7    stipulation it can cause it followed up by an expert that says

10:33    8    that this did cause it and no expert on the other side that

10:33    9    said it did not, then that can handle that.

10:33   10          It just seems to me this ought to be able to be

10:33   11    handled by a stipulation that deals with it or gets as close as

10:33   12    you can.  And then if you have to supplement with a witness and

10:33   13    undisputed testimony of a witness, that to me, I think,

10:34   14    resolves the issue of causation.  In any event, it looks like

10:34   15    the admissions issue is mooted now.

10:34   16          What about the stipulations?  Can you all get

10:34   17    together?  I would like to have some kind of time frame on

10:34   18    that.  Where are we on the time frame from the plaintiffs?  Can

10:34   19    you do that in 10 days?

10:34   20          **MR. HERMAN:**  Certainly, Your Honor.

10:34   21          **THE COURT:**  Let's do it in 10 days.  Lenny, get back

10:34   22    to me on that when you all have and give me a copy of the

10:34   23    stipulations.

10:34   24          I move to the second issue.  The second set of

10:34   25    requests for production of documents, what's that?  Lenny, do

|         |    |                                                                              |
|---------|----|------------------------------------------------------------------------------|
| 10:34   | 1  | you want to lead off.                                                         |
| 10:34   | 2  | **MR. DAVIS:**  Sure.  Your Honor, I can go through each                      |
| 10:34   | 3  | one of the 18 item by item and speak to where they were                       |
| 10:35   | 4  | addressed in the deposition, but I think I've provided that.                  |
| 10:35   | 5  | The real crux here, and it really ties into the depositions, is               |
| 10:35   | 6  | that we haven't gotten the information that we needed.  We did                |
| 10:35   | 7  | attempt to take this deposition, which we did take, of the                    |
| 10:35   | 8  | corporate designee, but many times throughout her deposition                 |
| 10:35   | 9  | she spoke about the documents or not having the knowledge about              |
| 10:35   | 10 | that stuff.                                                                    |
| 10:35   | 11 | Now, there's clearly a number of people who we                                |
| 10:35   | 12 | listed for a potential deposition.  I think if we started out                |
| 10:35   | 13 | with the person who really has the knowledge, who's Doug Libby,               |
| 10:35   | 14 | and we had the claims file, we could cut through quite a lot of               |
| 10:35   | 15 | this.  If we started with that, I think the list of deponents                 |
| 10:35   | 16 | would be shorter, and I think the documents would be shorter by              |
| 10:35   | 17 | having the claims file.  I have set forth in the memo why we                  |
| 10:35   | 18 | ought to be getting the claims file.                                          |
| 10:36   | 19 | Now, I can go through each one of these,                                      |
| 10:36   | 20 | starting with Request No. 1, the underwriting files, and we                   |
| 10:36   | 21 | didn't receive that.                                                          |
| 10:36   | 22 | I can go through the agreement between                                        |
| 10:36   | 23 | North River and U.S. Fire.  Just a couple days ago, we finally               |
| 10:36   | 24 | got an e-mail that had the North River agreement, so we did get               |
| 10:36   | 25 | something on No. 2.                                                           |

10:36  1          On Request No. 3, we haven't received anything,
10:36  2  which are the communications between North River and U.S. Fire.
10:36  3          Policies and procedures on No. 4, we haven't
10:36  4  received that.  Again, if Your Honor wants me to go through the
10:36  5  specific testimony, I'm prepared to do that, where Agnes Reiss
10:36  6  deferred to others or said the information is contained in a
10:36  7  file.  That with the excerpts that I provided, I think the
10:36  8  Court has a pretty good flavor of where we are.
10:37  9          THE COURT:  Yes, I do.
10:37  10         What's the defendant's position?
10:37  11         MR. HERMAN:  Your Honor, if I might just add one
10:37  12  thing --
10:37  13         THE COURT:  Sure.
10:37  14         MR. HERMAN:  -- that really concerns me.  Having
10:37  15  taken both of the North River depositions and looking at the
10:37  16  coverage, the underwriting file is extraordinarily important,
10:37  17  as well as the communications, because the coverage provided by
10:37  18  North River is not identical to the underlying coverage, and
10:37  19  North River has asserted certain defenses.  It's very unusual
10:37  20  that an excess insurer doesn't insure the underlying liability
10:37  21  that the primary insurer has undertaken to insure.
10:37  22         I don't know how, again, we go ahead and spend a
10:38  23  million dollars to go prove something that ought to be pretty
10:38  24  much apparent except for the issue of bad faith, and I'm not
10:38  25  going to argue that, and then be faced with a situation where

10:38
10:38
10:38
10:38
10:38
10:38
10:38
10:38
10:38
10:39
10:39
10:39
10:39
10:39
10:39
10:39
10:39
10:39
10:39
10:39
10:39
10:39
10:39
10:39
10:40

1    there is no excess coverage down the line.  North River is a

2    direct action defendant.  They can protest about double

3    tracking, but it seems to me we have got to have and we are at

4    least entitled to the basic information that the original

5    30(b)(6) deposition requested.

6            Secondly, we just got it and I just reviewed

7    what is purported to be an agreement between the two insurers,

8    that is, North River and United.  It's not a duplicate

9    original.  It's not a Xerox of an original.  It seems to have

10   at least one page that's half blank.  So I'm very disturbed

11   about the issues that we raised months ago and then we reraised

12   and we still don't have answers to, and the 30(b)(6) deponent

13   referred to other individuals for those answers.

14           **THE COURT:**  Kevin, what's your position on this?

15           **MR. RISLEY:**  Well, it's going to take a while to

16   answer all the things they said, Judge.  Of course, I think our

17   first point is there's one question of whether the discovery

18   should ever be allowed, but the immediate question is whether

19   we should be doing it right now with the trial staring us in

20   the face.  We think we are going to have our hands full doing

21   the discovery, the depositions, the expert preparation, the

22   motions that will have to be done.

23           We did file a response to the requests as well

24   as summarized in our response we filed with the Court on

25   Tuesday.  I think what's instructive is that Mr. Davis, instead

1  of going into the details, said, "Well, Judge, what we really

2  want is Doug Libby and the claims file."  The reason they want

3  Doug Libby is not because he knows anything about this claim.

4  As I recall Ms. Reese's deposition, he sat in a couple meetings

5  where the case was discussed, but he is not a day-to-day

6  handler.  He is not a decision maker.  He is the president of

7  the company, and that's why they want his deposition.  It has

8  nothing to do with these claims.  It's truly to try to harass.

9  The Court will remember that they tried to order the Court to

10  make Mr. Libby come to mediation and the Court declined to do

11  that.

12       Now, on the documents they want, they talked

13  about two things specifically, the underwriting file and the

14  claims file.  What they keep neglecting to tell the Court is

15  the entire claims file was created after this litigation began.

16  I forget the exact dates, but North River learned of the case

17  one day when it received copies of the petitions from its

18  insured, InEx, and hired counsel the next day to assist it in

19  the litigation.  So everything that's been done in the handling

20  of the claim on this has been in litigation with the assistance

21  of counsel.  There is no nonprivileged portion of the claims

22  file to produce.

23       On the underwriting file, we hear Mr. Herman now

24  say he is concerned because the coverage of the excess policy

25  is not the same as the coverage of the primary policy.  I'm not

10:41   1  sure if it's true or not, but assuming that it is, so what?
10:41   2  North River's obligations to InEx are determined by the
10:41   3  policies that we produced years ago and not by what notes may
10:41   4  or may not be in an underwriting file.  If they want to know
10:41   5  what coverage North River provides, that is determined solely
10:41   6  from the face of the contract between InEx and North River.
10:41   7          On the servicing agreement, I don't understand
10:41   8  Mr. Herman's concerns on that.  If the Court would like, I
10:42   9  would be happy to send a copy to the Court so the Court can
10:42  10  look at it and see.  I did notice that the signatures on there
10:42  11  are typed in instead of handwritten, but we asked the client
10:42  12  for the copy of the agreement and that's what their copy is.
10:42  13  That's the copy they rely upon in doing their business.  So I'm
10:42  14  not sure why the fact that Mr. Herman doesn't like the form of
10:42  15  the agreement makes it somehow devious or underhanded.
10:42  16          I guess my general point on all of this is we
10:42  17  have yet to hear anything as to why this discovery will help us
10:42  18  get ready for a November trial.  So on the documents which go
10:42  19  to communications between InEx and North River during the
10:42  20  litigation or matters that are not relevant to any issue, we
10:42  21  don't see why we should be producing those things at this time.
10:42  22          I will point out to the Court that we indicated
10:42  23  we had no documents responsive to requests 4, 5, 9, and 10.
10:42  24  They still have a motion to compel on that even though there
10:42  25  are no such documents.

|       |    |                                                                                      |
|-------|----|--------------------------------------------------------------------------------------|
| 10:43 | 1  | So I guess the other thing I should mention is |
| 10:43 | 2  | the reservation-of-rights letter, ordinarily that would be |
| 10:43 | 3  | discoverable because it usually comes out before litigation |
| 10:43 | 4  | starts.  In this case it came out after and was prepared with |
| 10:43 | 5  | the assistance of counsel. |
| 10:43 | 6  | So if the PSC had given North River notice of |
| 10:43 | 7  | the claims before litigation, we might be in a different |
| 10:43 | 8  | situation.  But rather than giving any chance to resolve it, |
| 10:43 | 9  | they filed the lawsuit, that's where we find ourselves, and |
| 10:43 | 10 | that's why the claims of privilege have been asserted. |
| 10:43 | 11 | MR. DAVIS:  Your Honor, if I may respond to that. |
| 10:43 | 12 | THE COURT:  Yes.  Go ahead. |
| 10:43 | 13 | MR. DAVIS:  I'm going to specifically cite the Court |
| 10:43 | 14 | to page 7 of our memorandum.  The information contained in that |
| 10:43 | 15 | claims file doesn't qualify for the work product privilege.  It |
| 10:43 | 16 | was assembled in the ordinary course of business.  The work |
| 10:43 | 17 | product doctrine shouldn't protect all of that. |
| 10:43 | 18 | As the court in the *United States v. El Paso* |
| 10:43 | 19 | *Company* case said, the work product only protects materials |
| 10:44 | 20 | assembled and brought into being in anticipation of litigation. |
| 10:44 | 21 | That's not what we have here.  The advisory committee on |
| 10:44 | 22 | Rule 26(b)(3) of the Federal Rules make it clear that materials |
| 10:44 | 23 | assembled in the ordinary course of business are excluded from |
| 10:44 | 24 | the protection of work product doctrine.  I'm citing to the |
| 10:44 | 25 | cases that are in there, that *El Paso Company* case, the |

1  *Douga v. D & B Boat Rentals*, and the other cases that are cited

2  at footnote 8 of our brief.

3  In addition to that, just an example of what we

4  heard about Mr. Libby -- and this is on page 253.  This is when

5  we are talking about reinsurance.  The question was posed:

6  **"QUESTION:**  Who's in charge of reinsurance?

7  **"ANSWER:**  I don't know the specific person in charge

8  right now.

9  **"QUESTION:**  Well, would Mr. Libby know, the

10  president?

11  **"ANSWER:**  I'm sure Mr. Libby would know."

12  So that's an example of just one of many times

13  where the corporate designee referenced that Mr. Libby was the

14  person that would know, and we think by starting with that

15  person we ought to be able to get some answers.

16  **MR. RISLEY:**  Your Honor, back to Mr. Libby again.

17  First off, I'm not sure why we have been talking about

18  reinsurance.  Number one, it has nothing to do with the trial.

19  Number two, as we set out in our response, it's not

20  discoverable.  Several courts have held that.

21  What they want to do is disrupt the president of

22  the company because they think this gives them maximum

23  leverage.  Ms. Reiss did not invoke Mr. Libby's name.  She

24  assumes that as the president of the company, he would probably

25  know that.  Well, that may well be, but why at this point in

10:45   1   the litigation are we spending our time and your time arguing

10:45   2   about the name of the person in charge of reinsurance, which is

10:45   3   not discoverable anyway?

10:45   4           Now, on the claims file, I agree that normally a

10:46   5   claims file has very little privileged information in it.  But

10:46   6   when we receive a letter from our insured's defense counsel

10:46   7   saying, "Here's an update on the litigation," that's

10:46   8   privileged.

10:46   9           So we gave them a privilege log with every

10:46   10  privileged document on there.  If they believe there are

10:46   11  certain documents for which the privilege was improperly

10:46   12  claimed, let them tell us that, and we will look at it and tell

10:46   13  them whether we will produce it or not.  If they think there

10:46   14  are specific documents, they get to identify them to us.

10:46   15          THE COURT:  Let's handle it that way.  In the first

10:46   16  place, 4, 5, 9, and 10, as I understand it, there's no

10:46   17  documents that North River has.  Is that right?

10:46   18          MR. RISLEY:  That's correct, Your Honor.

10:46   19          THE COURT:  So then that's the answer to those.

10:46   20  Those are moot.

10:46   21          With regard to the privilege, I have to drill

10:46   22  down on that.  Lenny, take a look at the privilege log.  If you

10:46   23  have any interest in any of the documents or if you need any

10:47   24  more specificity on the privilege log, get more specificity.

10:47   25  Drill down on the documents that you need.  If you have any

10:47  1   interest in any of them, all of them, then let me know.  What I
10:47  2   will do is order that they be delivered to the registry of the
10:47  3   Court.  I will look them over and make a decision as to whether
10:47  4   or not they are privileged or not privileged.
10:47  5           MR. DAVIS:  Okay.
10:47  6           THE COURT:  What's the underwriting file?  When was
10:47  7   that compiled?  Is that a privileged situation there?
10:47  8           MR. RISLEY:  Well --
10:47  9           MR. HERMAN:  Your Honor, if I can respond, the
10:47  10  underwriting file would be the file as to what were the
10:47  11  considerations regarding the eventual policy that was written
10:47  12  by North River and provided to Interior Exterior.  It is very
10:48  13  unusual that you have an excess policy that doesn't cover the
10:48  14  basic coverage provided by the underlying insurer.
10:48  15          We have no idea, based on the defenses that
10:48  16  North River has filed, as to how there can be this disparity as
10:48  17  between coverage by underlying insurance and no coverage by
10:48  18  excess.  The only way to get at that would be the underwriting
10:48  19  file that was developed prior to the North River policy being
10:48  20  issued.
10:48  21          MR. RISLEY:  Your Honor, I don't understand that
10:48  22  argument at all.  The coverage we provided, it comes from the
10:48  23  four corners of the document itself.  If they want to see what
10:49  24  coverage North River provided, they should read the policy they
10:49  25  have had for several years now.

10:49
10:49
10:49
10:49
10:49
10:49
10:49
10:49
10:49
10:49
10:49
10:49
10:49
10:49
10:49
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50

1    The underwriting file is not a matter of a

2  privilege.  If you look at page 13 of the response we filed

3  yesterday, we cited as Fifth Circuit precedent the *McCullough*

4  case that an underwriting file is irrelevant to the resolution

5  of a coverage dispute and for that reason it shouldn't be

6  discoverable.  It won't lead to anything.  It is not admissible

7  by itself.  The terms come from the policy and not the

8  underwriting.

9    **MR. HERMAN:**  I looked at the facts of that case and

10 they are very different here.  The question is whether or not

11 in the confection of a policy under the law -- in a direct

12 action state where the policy is construed against the insurer

13 in any ambiguous terms, etc., whether in the underwriting of

14 that policy there was something that happened where North River

15 got a premium for some coverage that it is not providing.  I

16 think it's fundamental.  This is not some game where we spend a

17 million dollars to go prove one issue and then we find out

18 later there's no coverage.  I mean, that's silliness.

19    **MR. RISLEY:**  The answer to that is easy.  If there

20 was an ambiguity, it would be a different issue.  No one has

21 alleged an ambiguity here, certainly no one has identified any

22 to us, and the PSC's motion to compel doesn't identify any.

23 This is not an ambiguity case.

24    Number two, I'm tired of hearing about a million

25 dollars.  I think anybody that spends a million dollars to try

10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:51
10:51
10:51
10:51
10:51
10:51
10:51
10:51
10:51
10:51
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52

1  this case is crazy themselves.  This is a simple, well-defined

2  case that if we focus on the issues and stop doing stuff like

3  this, it will not cost anything close to a million dollars.

4          MR. HERMAN:  Well, that's your view.

5          THE COURT:  I understand both sides' position.  The

6  underwriting file may well be relevant, but I don't see any

7  relevance to these particular two issues that we are dealing

8  with now.  It may well be relevant.  I may be visiting this at

9  another time.  But at present with regard to the production of

10  the underwriting file for these cases, I don't see any

11  relevance to it, so I don't find that that's necessary to be

12  produced.

13          There are a number of requests here.  I may have

14  to deal with the additional requests in writing.  There's a

15  third element that I thought I raised.

16          The depositions.  I have it here now.  Give me

17  some information on the third round of depositions.  Where are

18  we there?

19          MR. DAVIS:  Your Honor, those names came out of Agnes

20  Reiss' deposition and we set forth the ones.

21          THE COURT:  What do you seek to get, Lenny, out of

22  those depositions?

23          MR. DAVIS:  Well, I think what we will attempt to

24  find out is more information regarding the policy and the

25  coverage and the defenses, if any, but we had intended to go

10:52  1    into claims, underwriting, and the like.

10:52  2             MR. RISLEY:  Your Honor, Kevin Risley, if I may.

10:52  3                 If you are through, Lenny.

10:52  4             MR. DAVIS:  Yes.

10:52  5             MR. RISLEY:  If we tried to offer evidence from our

10:52  6    employees as to what the policies meant, the PSC would scream

10:52  7    that that's improper parol evidence, and it is.  If they want

10:52  8    to know about the policy and the coverages, look at the policy.

10:52  9    We have asked the PSC repeatedly tell us what any of these 14

10:52  10   depositions have to do with whether InEx is a good faith seller

10:52  11   or not, and we get no answer to it.  If they can't answer that

10:52  12   question, we shouldn't be wasting our time on these

10:53  13   depositions.

10:53  14            THE COURT:  That makes sense to me, Lenny.  It just

10:53  15   does.  I'm not saying that this may never be an issue.  It may

10:53  16   be an issue when InEx sues them for whatever they are going to

10:53  17   sue them for.

10:53  18            MR. DAVIS:  I understand, Your Honor.  We were

10:53  19   intending to dual track.

10:53  20            THE COURT:  If I'm going to expect you all to get

10:53  21   ready for these trials, the issues that I have really focused

10:53  22   you on with these trials is InEx's liability and whether they

10:53  23   are a good faith seller.

10:53  24            MR. DAVIS:  We understand, Your Honor.

10:53  25            THE COURT:  So with that one I will deny the motion

| | |
|---|---|
| 10:53 | 1 |
| 10:53 | 2 |
| 10:53 | 3 |
| 10:53 | 4 |

to compel the depositions.

**MR. DAVIS:**  I assume we can bring that up at a later date?

**THE COURT:**  Yes, because the issues are different. For both of you all, in these cases that's all we are focused on are those two issues, as I see it.  If those two issues come back, whatever way they come back from -- I don't know whether that's the thing that will tip it, but at least to me you have to take that into consideration.

It seems to me that if the plaintiffs win on those two issues, the defendant has got to take that into consideration.  If they don't, they have got to recognize that they are looking at penalties that are going to be tremendous. If not, maybe they don't have to look at it that way.  But it's got to have some information for both sides, I would think.  If we get no resolution points, this will go on indefinitely.

It's the only way that I can focus North River, as I see it.  They're an excess insurance company.  They can be focused on in the overall trials and everything.  From the standpoint of settlement, if their position is "We believe our insured is not liable and that's why we won't pay anything," then we ought to at least see what a jury says about that.

**MR. DAVIS:**  Judge, we hear you.

**THE COURT:**  Okay.  Thank you very much, folks.

(Proceedings adjourned.)

1                          **<u>CERTIFICATE</u>**

2            I, Toni Doyle Tusa, CCR, FCRR, Official Court

3    Reporter for the United States District Court, Eastern District

4    of Louisiana, do hereby certify that the foregoing is a true

5    and correct transcript, to the best of my ability and

6    understanding, from the record of the proceedings in the

7    above-entitled matter.

8

9

10                              *s/ Toni Doyle Tusa*
                               Toni Doyle Tusa, CCR, FCRR
11                             Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25