UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA


IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION

MDL NO.:    2047
SECTION:    L
JUDGE FALLON
MAGISTRATE WILKINSON

THIS DOCUMENT RELATES TO:
ALL CASES
_____/

## CLAIMANTS', DON MARLINGA'S AND JANICE MARLINGA'S, SEPARATE MEMORANDUM OF LAW IN SUPPORT OF CORRECTED MOTION FOR RELIEF FROM STAY

**I.     INTRODUCTION**

Claimants, DON MARLINGA and JANICE MARLINGA (the "Marlingas" or "Claimants"), by and through their undersigned counsel, hereby file this separate memorandum of law in support of their Corrected Motion for Relief from Stay, in which Claimants seek relief from the Stay imposed by the Court in its Order & Reasons Preliminarily Approving the Settlement Agreement Regarding the Claims Involving Builders, Installers, Suppliers, and Participating Insurers, Conditionally Certifying a Settlement Class, Approving the Form Notice to Class Members, and Staying Claims against Builders, Installers, Suppliers and Participating Insurers (Dk # 14562), and its Order (1) Setting Consolidated Fairness Hearing, (2) Establishing Coordinated Opt Out, Objection and Briefing Deadlines, and (3) Entering Litigation Stay in Favor of Settling Parties (Dk # 14566) (collectively, the "Court's Stay Orders").

*In Re: Chinese-Manufactured Drywall Products Liability Litigation*
MDL No. 2047
Claimants', Don Marlinga's and Janice Marlinga's, Separate Memorandum of
Law in Support of Corrected Motion for Relief from Stay

## II.   <u>BACKGROUND</u>

Claimants are listed as Plaintiffs in Plaintiffs' Omnibus Class Action Complaint (III) (the "Wiltz Omnibus Complaint"), as having a claim against "Pro Wall," the manufacturer of at least some of the drywall installed in Claimants' home.  "Pro Wall" may be another name for or may be otherwise associated with Beijing New Building Materials Public Ltd. Co., Taishan Gypsum Co., Ltd., or one or more of their related companies (collectively, "Taishan").  Claimants have no other claims pending in this Multi-District Litigation ("MDL").

Prior to the filing of the Wiltz Omnibus Complaint in 2010, Claimants had brought an action, *Don and Janice Marlinga v. A.R.B.C. Corporation*, Case No. 09-10655-CA, in the Circuit Court of the 20th Judicial Circuit in and for Collier County, Florida, on December 7, 2009, against A.R.B.C. Corporation ("A.R.B.C."), the builder of Claimants' home, based upon damages suffered as a result of the allegedly defective Chinese drywall installed in their home.  (Exhibit 1)  In or about June of 2010, A.R.B.C. brought Stock Building Supply, LLC, and Stock Building Supply of Florida, LLC (collectively, "Stock"), into the state court action through a third-party complaint, and, thereafter, Claimants added Stock as a defendant by amending their complaint.  (Exhibit 2)  Stock has also brought fourth party complaints against drywall suppliers Guardian Building Products Distribution, Inc., Manchester Holdings, Inc., and Manchester Furniture Group, Inc., in that case.

The state court case is ready to be set for trial.  However, due to the pendency of Stock's Motion to Stay Action filed in that action, premised upon this Court's Stay Orders

*In Re: Chinese-Manufactured Drywall Products Liability Litigation*
*MDL No. 2047*
*Claimants', Don Marlinga's and Janice Marlinga's, Separate Memorandum of*
*Law in Support of Corrected Motion for Relief from Stay*

entered in the MDL, a case management conference had to be postponed.  (Exhibit 3)

Claimants have asserted no claims against A.R.B.C., Stock or any other builder, supplier or distributor in the MDL.  Claimants have asserted no claims against a drywall manufacturer in the state court action.

Claimants have been defined as "Class Members" and A.R.B.C. and Stock as "Participating Defendants" in the proposed Settlement Agreement in MDL No. 2047 Regarding Claims Involving Builders, Installers, Suppliers and Participating Insurers (the "Global Settlement").  "Pro Wall" or Taishan is not a "Participating Defendant."  Accordingly, the only claim that the Marlingas have asserted in the MDL is not covered by the proposed Global Settlement.  Guardian and Manchester are also not "Participating Defendants."

Claimants have properly and timely opted-out of the proposed Global Settlement. (Dk # 15822).  However, Stock has not agreed to the release of Claimants from the effect of the stay.

Notwithstanding that Claimants are not parties to the proposed settlement for which the stay was imposed and they have no claims common to both cases, the Court's Stay Orders purport to prevent them from proceeding with their state court case.

In the second of the Court's Stay Orders, the Court provided:

> 8.  The stay and injunction set forth in paragraph 6 is without prejudice to any party's contention as to whether the Court has jurisdiction, or if it has jurisdiction whether it is proper, to enter a non-consensual stay or injunction of state court cases involving class members who validly opt out of a particular class action settlement.  All parties' positions as to that issue are

*In Re: Chinese-Manufactured Drywall Products Liability Litigation*
MDL No. 2047
Claimants', Don Marlinga's and Janice Marlinga's, Separate Memorandum of
Law in Support of Corrected Motion for Relief from Stay

expressly preserved. If and when the issue is presented, the Court will
determine the issue de novo based on the submissions of the parties.

(Dk # 14566, p. 5).

## III. __ARGUMENT__

Claimants believe that this Court lacks jurisdiction or did not properly exercise its

jurisdiction in entering a non-consensual stay or injunction of the Claimants' state court

case. In particular, Claimants assert that the Court's Stay Orders violate the Tenth

Amendment of the United States Constitution, the Anti-Injunction Act, 28 U.S.C. § 2283,

and the concept of "federalism" to the extent these orders purport to restrain Claimants

from proceeding with their state court claims, and, therefore, Claimants should be granted

relief from the effect of the stay.

The Tenth Amendment of the United States Constitution provides: "The powers not

delegated to the United States by the Constitution, nor prohibited by it to the States, are

reserved to the States respectively, or to the people." Ingrained in the United States

Constitution is the concept of "federalism." This concept means:

> a system in which there is sensitivity to the legitimate interests of both State and
> National Governments, and in which the National Government, anxious though it
> may be to vindicate and protect federal rights and federal interests, always
> endeavors to do so in ways that will not unduly interfere with the legitimate activities
> of the States.

*Younger v. Harris*, 401 U.S. 37, 44, 91 S. Ct. 746, 750 (1971). Because of this required

sensitivity, the United States Supreme Court has found it necessary "to repeat time and

*In Re: Chinese-Manufactured Drywall Products Liability Litigation*
MDL No. 2047
Claimants', Don Marlinga's and Janice Marlinga's, Separate Memorandum of
Law in Support of Corrected Motion for Relief from Stay

time again that the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." *Younger*, 401 U.S. at 45, 91 S. Ct. at 751.

To ensure the concept of federalism would be properly recognized, Congress passed the "Anti-Injunction Act," 28 U.S.C. § 2283, which provides: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."  This act serves as a check on the authority of the federal courts to issue stays or injunctions under the "All Writs Act," 28 U.S.C.A. § 1651, and prohibits such action unless the requirements of one of the three narrow exceptions contained therein are met. *Estate of Brennan v. Church of Scientology Flag Serv. Org., Inc.*, 645 F.3d 1267, 1273 (11th Cir. 2011).

Here, the first and third exceptions have no applicability.  There is no Act of Congress that authorizes a stay in these circumstances and no judgment exists that needs to be protected or effectuated.  Thus, a stay or injunction can only be justified if it is deemed "*necessary*" to aid the jurisdiction of the United States District Court for the Eastern District of Louisiana.

In light of the federalism concerns underlying the Anti-Injunction Act, courts construe the exception for "necessary in aid of its jurisdiction" narrowly, with any doubts as to the propriety of an injunction against state court proceedings being resolved in favor of

*In Re: Chinese-Manufactured Drywall Products Liability Litigation*
MDL No. 2047
Claimants', Don Marlinga's and Janice Marlinga's, Separate Memorandum of
Law in Support of Corrected Motion for Relief from Stay

permitting the state courts to proceed. *Id.* It is not enough that the injunction "relate" to the federal court's jurisdiction. *Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 295, 90 S. Ct. 1739, 1747 (1970). Ordinarily, a federal court may issue an injunction "in aid of its jurisdiction" in only two circumstances, neither of which applies here: (1) the district court has exclusive jurisdiction over the action because it has been removed from state court; or, (2) the state court entertains an *in rem* action involving a *res* over which the district court has been exercising jurisdiction in an *in rem* action. *Estate of Brennan*, 645 F.3d at 1273 (quoting *In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1250-51 (11ᵗʰ Cir. 2006)). A very limited exception has been carved out for complex multi-state litigation where an injunction or stay is necessary to prevent an interference with the federal court's jurisdiction. In these cases, the complex multi-state litigation is considered to be the "*res*." *Id.* at 1251. However, while it may be said that "the exercise by the state court of jurisdiction over the same *res* necessarily impairs, and may defeat, the federal court's control," *Kline v. Burke Constr. Co.*, 260 U.S. 226, 229, 43 S. Ct. 79, 81 (1922), the converse is also true. Where the jurisdiction of the state court has first attached, the federal court is precluded from exercising its jurisdiction over the same *res* to defeat or impair the state court's jurisdiction. *Id.; In re Bayshore Ford Trucks Sales*, 471 F.3d at 1251.

The "complex multi-state litigation" exception has been applied only in cases where some definite harm could be identified. Common among these cases is that the state court

*In Re: Chinese-Manufactured Drywall Products Liability Litigation*
MDL No. 2047
Claimants', Don Marlinga's and Janice Marlinga's, Separate Memorandum of
Law in Support of Corrected Motion for Relief from Stay

action sought to be enjoined is commenced *after* the federal court has taken control over the "res" and, in most cases, after the federal court has already entered a judgment or is about to enter a judgment that is or will be binding upon the plaintiffs in the state court action. *See*, *e.g.*, *Battle v. Liberty Nat'l Life Ins. Co.*, 877 F.2d 877 (11th Cir. 1989) (affirming court order enjoining plaintiffs in three state court class action proceedings from pursuing claims that were substantially similar to those claims settled by final judgment in federal antitrust class action lawsuit); *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1332 (5th Cir. 1981) (multidistrict court's order enjoining certain plaintiffs in class action from pursuing lawsuit pending in a state court in which same persons were also plaintiffs and from pursuing any claims relating to class action in any court other than federal district court, which was issued shortly before entry of judgment based upon approved settlements, did not violate Anti-Injunction Act or Tenth Amendment of United States Constitution).  In this regard, a distinction is drawn between attempts to stay a *pending* state court action and one that seeks to prevent a state court action from being *instituted*. *E.g.*, *Broussard v. Meineke Discount Muffler*, 903 F.Supp. 16 (W.D.N.C. 1995).  In *Broussard*, the court held that it was not authorized to stay a state court action by members of a class certified in federal court because the state court action was pending in an *in personam* action in state court, even though it was duplicative of the federal class action. This holding is consistent with the well-established rule that "where federal and state courts have concurrent jurisdiction over actions involving identical issues and both are *in*

*In Re: Chinese-Manufactured Drywall Products Liability Litigation*
MDL No. 2047
Claimants', Don Marlinga's and Janice Marlinga's, Separate Memorandum of
Law in Support of Corrected Motion for Relief from Stay

*personam*, the actions may proceed simultaneously and neither court may enjoin the other proceeding." *Id.* at 18 (quoting *St. Paul Fire & Marine Ins. Co. v. Lack*, 443 F.2d 404, 407 (4th Cir. 1971)).  Here, the Court is purporting to stay a *pending in personam* state court action.  It has no power to do so.

Furthermore, in this case, unlike in all or nearly all the reported cases addressing the "complex multi-state litigation" exception, *the claims in the state case action are not the same as those in the federal action*.  This Court has no jurisdiction over the Marlingas' claims against A.R.B.C. and Stock because they have not been asserted in the MDL. Moreover, nothing the state court can or might do will have any effect whatsoever over this Court's jurisdiction or judgments. The Court's apparent goal of seeking to promote a global settlement by imposing a stay is simply insufficient to justify such an unwarranted and unwelcome interference with the jurisdiction of the state courts.  It certainly does not rise to the level of "necessity."  *See In re Bayshore Ford Trucks Sales*, 471 F.3d at 1250; *see also Chen v. Lester*, 364 Fed. Appx. 531 (11th Cir. 2010) (district court did not abuse its discretion by denying plaintiff's requests to stay state court proceedings, absent any justification for doing so).  Meanwhile, the stay is causing and will continue to cause Claimants real damages as they continue to incur the cost of home ownership, by paying property taxes, insurance premiums, association fees, maintenance expenses, and other carrying costs, while being unable to reside in their home.

*In Re: Chinese-Manufactured Drywall Products Liability Litigation*
MDL No. 2047
Claimants', Don Marlinga's and Janice Marlinga's, Separate Memorandum of
Law in Support of Corrected Motion for Relief from Stay

By its June 4, 2012 orders, the Court has attempted to pull the Marlingas' state court claims into the MDL by entertaining a global settlement proposal that has defined the "res" to include, essentially, every Chinese drywall claim brought in every court throughout the country. However, this Court does not possess the authority to control all these pending state court claims, and its orders violate the Tenth Amendment, the Anti-Injunction Act, and the concept of federalism that govern in these circumstances to the extent those orders purport to do so. *See*, *e.g.*, *In re Bayshore Ford Trucks Sales* (injunction by federal district court following denial of class certification in franchisees' contract action against franchisor, imposing stay against further proceedings in related state-court class action brought by putative member of non-certified class, could not be justified under "necessary in aid of [district court's] jurisdiction" exception to Anti-Injunction Act); *Sounds of Serv. Radio, Inc. v. Islamorada, Village of Islands*, 344 F.Supp.2d 1376 (S.D. Fla. 2004) (plaintiff's claim in federal court for preliminary injunction enjoining defendants from proceeding further in defendants' case against plaintiff, which was currently pending in state court, was barred by federal anti-injunction statute).

## IV.  **CONCLUSION**

For the reasons set forth about, Claimants respectfully request that this Court enter an Order granting their Motion for Relief from Stay, relieving them from the stay imposed pursuant to the Court's Stay Orders, and providing for such other relief as the Court deems appropriate.

*In Re: Chinese-Manufactured Drywall Products Liability Litigation*
MDL No. 2047
Claimants', Don Marlinga's and Janice Marlinga's,
Corrected Motion for Relief from Stay

Dated October 11, 2012                Respectfully submitted,

                                      By:    *s/ Thomas A. Conrad*
                                             THOMAS A. CONRAD, ESQ.
                                             Florida Bar No. 440957
                                             E-Mail: taconrad@sbwlawfirm.com
                                             Shapiro, Blasi, Wasserman & Gora, P.A.
                                             7777 Glades Rd., Suite 400
                                             Boca Raton, FL 33434
                                             Tel:   (561) 477-7800
                                             Fax:   (561) 477-7722
                                             *Attorneys for Claimants Don and Janice Marlinga*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 11, 2012, this document was served upon all parties by electronically uploading same to Lexis File & Serve in accordance with Pretrial Order No. 6 and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047.

                          *s/ Thomas A. Conrad*
                          THOMAS A. CONRAD, ESQ.
                          Florida Bar No. 440957
                          taconrad@sbwlawfirm.com

IN THE CIRCUIT COURT OF THE 20th JUDICIAL CIRCUIT IN AND FOR COLLIER COUNTY, FLORIDA

**GENERAL JURISDICTION DIVISION**

**CASE NO:**   *09.10655.CA*

DON and JANICE MARLINGA,

     Plaintiffs,

v.

A.R.B.C. Corporation, a Florida corporation

             Defendant.                    /

**CIVIL ACTION**

## COMPLAINT

Plaintiffs, DON MARLINGA and JANICE MARLINGA, husband and wife, by and through their undersigned counsel, sue Defendant, A.R.B.C. Corporation, a Florida corporation, and allege as follows:

## JURISDICTION AND VENUE

1.    This is an action for damages in excess of $15,000.00, exclusive of interest, costs, and attorneys' fees.

2.    Venue in this action is proper because, among other things, the Subject Property is located in Collier County, Florida and at least one of the causes of action accrued in Collier County, Florida.

3.    All conditions precedent to the maintenance of the causes of action set forth herein, including compliance with Chapter 558, Florida Statutes, have occurred, been satisfied, been waived or excused.

1

**EXHIBIT "1"**

4.     Plaintiffs have retained the law firm of Shapiro, Blasi & Wasserman, P.A. to represent them in this cause and have agreed and become obligated to pay it a reasonable fee for its services.

## PLAINTIFFS

5.     At all times material hereto, Plaintiffs DON MARLINGA and JANICE MARLINGA (collectively the "MARLINGAS") are residents of Michigan, and are over the age of twenty-one and are otherwise sui juris.

6.     In June 2007, Plaintiffs DON MARLINGA and JANICE MARLINGA purchased from A.R.B.C. Corporation the home located at 11697 Bald Eagle Way, Naples, Florida 34119 (hereinafter the "Home").

## DEFENDANTS

7.     Defendant, A.R.B.C Corporation ("A.R.B.C."), is a builder of luxury homes, and is incorporated in Florida and does business throughout the state of Florida.

8.     Defendant purchased or otherwise procured drywall manufactured in China ("Chinese drywall") for use in Plaintiffs' Home.   Defendant further installed or caused the installation of Chinese drywall in the Plaintiff's Home.

9.     The drywall in Plaintiffs' Home is emitting various sulfide gases and/or other chemicals through "off-gassing" that creates noxious, "rotten egg-like" odors, and has caused significant damage and corrosion to the Home's structure and mechanical systems such as air-conditioner and refrigerator coils, copper tubing, faucets, metal surfaces, electrical wiring, and computer wiring, as well as personal and other property ("Other Property").

SHAPIRO BLASI WASSERMAN & GORA, P.A.  7777 Glades Road, Suite 400, Boca Raton, Florida  33434
Tel: (561) 477-7800; Fax: (561) 477-7722

**EXHIBIT "1"**

10.    Defendant's acts or omissions, directly or indirectly through its agents, employees, or affiliates have injured Plaintiffs as more fully alleged herein.

11.    Specifically, as a result of defective drywall and the corrosive effects of the sulfide gases and other chemicals being released from these products, Plaintiffs have incurred or will incur significant damages including, but not limited to: repair/replacement of Plaintiffs' Home, other Property, and any materials contaminated or corroded by the drywall as a result of "off-gassing;" incidental and consequential damages; and diminution of value of Plaintiffs' Home.

12.    As a further result of defective drywall and the corrosive effects of the sulfide gases and other chemicals being released from these products, Plaintiffs' have been exposed to the defective drywall and the corrosive and harmful effects of the sulfide gases and other chemicals being released from these hazardous substances.

13.    As a further result of defective drywall and the corrosive effects of the sulfide gases and other chemicals being released from these products, Plaintiffs have suffered or will suffer damages for injuries from medical ailments, including but not limited to respiratory problems, sinus problems, eye irritations and nosebleeds, in addition to the creation of noxious odors, which smell like "rotten eggs."

14.    Because neither the long term effects of Chinese drywall, nor the triggers of the adverse chemical processes within the Chinese drywall are yet fully understood, the mere existence of Chinese manufactured drywall in the Plaintiffs' Home causes automatic and substantial diminution of value to a home.

3

**EXHIBIT "1"**

## COUNT I

### NEGLIGENCE

15.     Plaintiffs incorporate and restate paragraphs 1-14 as if fully set forth herein.

16.     Defendant owed a duty to Plaintiffs to exercise reasonable care in the selecting, purchasing, inspecting, and/or installing of the defective drywall in the homes marketed and sold to Plaintiffs and to prevent the drywall from containing defects as set forth herein.

17.     Defendant also owed a duty to Plaintiffs to adequately warn of its failure to do the same; to instruct Plaintiffs of the defects associated with drywall; not to misrepresent that the drywall was safe for its intended purpose when, in fact, it was not; and not to conceal information from Plaintiffs regarding reports of adverse effects associated with drywall.

18.     Defendant was negligent and breached its duty to exercise reasonable care in the selection, purchase, inspection, and/or installation of drywall.  Defendant further breached its duty to adequately warn of their failure to do the same.

19.     Defendant further breached its duty by:  failing to adequately warn and instruct the Plaintiff of the defects associated with drywall; misrepresenting that drywall was safe for its intended purpose when, in fact, it was not; concealing information from Plaintiffs regarding reports of adverse effects associated with drywall; and improperly concealing and/or misrepresenting information from the Plaintiffs concerning the severity of risks and dangers of the defective Chinese drywall and/or the manufacturing Defect.

4

**EXHIBIT "1"**

20.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: diminution of value of Plaintiffs' Home; replacement/repair of Plaintiffs' Home; the removal and replacement of any drywall contained in Plaintiffs' Home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

21.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property and other related expenses.

22.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT II

## STRICT LIABILITY

23.     Plaintiffs incorporate and restate paragraphs 1-14 as if fully set forth herein.

5

**EXHIBIT "1"**

24.    Defendant were responsible for the selection, purchase, inspection, and installation of the drywall at issue.

25.    By the time the drywall left the Defendant's hands, the risks associated with the product far outweighed its benefits and Defendant knew, or should have known, the product was unsafe, defective, and could cause serious physical and economic harm to Plaintiffs and their Home.

26.    Because the drywall created an unreasonable risk to Plaintiffs' Home and person, Defendants are strictly liable for economic and physical injuries to Plaintiffs.

27.    No prudent buyer of a home with the defective drywall product could be expected to determine on his or her own that the product was dangerous and defective.

28.    Defendant not only selected, purchased, inspected, and installed poorly designed and defective drywall, but also failed to give Plaintiffs adequate warning regarding the risks associated with defective drywall product.

29.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: diminution of value of Plaintiffs' Home; replacement/repair of Plaintiffs' Home; the removal and replacement of all of the drywall contained in Plaintiffs' Home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, other metal surfaces

6

**EXHIBIT "1"**

and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

30.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property and other related expenses.

31.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT III

### BREACH OF EXPRESS WARRANTY

32.     Plaintiffs incorporate and restate paragraphs 1-14 as if fully set forth herein.

33.     Defendant expressly warranted that the drywall installed in Plaintiffs' Home was safe, efficacious, well tested and of high quality.

34.     By installing a defective, unsafe, and poorly manufactured drywall product, Defendant breached their express warranty.

35.     Defendant knew or should have known that their warranties were specious.

36.     Plaintiffs relied on these express warranties to Plaintiffs' detriment.

7

37.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: diminution of value of Plaintiffs' Home; replacement/repair of Plaintiffs' Home; the removal and replacement of all of the drywall contained in Plaintiffs' Home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

38.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property and other related expenses.

39.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT IV

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

40.    Plaintiffs incorporate and restate paragraphs 1-14 as if fully set forth herein.

SHAPIRO BLASI WASSERMAN & GORA, P.A.   7777 Glades Road, Suite 400, Boca Raton, Florida  33434
Tel: (561) 477-7800; Fax: (561) 477-7722

**EXHIBIT "1"**

41.    At all times material hereto, Plaintiffs and Defendant were in privity of contract.

42.    At the time Defendant selected, purchased, inspected, and installed the defective drywall, Defendant knew, or it was reasonably foreseeable, that the drywall would be used in the Plaintiffs' Home as a building material, and impliedly warranted the product to be fit for that use.

43.    The Chinese drywall product was placed into the stream of commerce by Defendant in a defective condition and the defective drywall was expected to, and did, reach users, handlers, and persons coming into contact with said product without substantial change in the condition in which it was sold.

44.    The drywall was defective because it was not fit for the uses intended, to wit: the installation of the drywall in Plaintiffs' Home for use as a building material, because it contained defects as set forth herein.

45.    Defendant thus breached the implied warranty of merchantability because the drywall was not fit to be installed in Plaintiffs' Home as a building material due to the defects set forth herein.

46.    Defendant had reasonable and adequate notice of the Plaintiffs' claims for breach of implied warranty of merchantability and failed to cure same.

47.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: diminution of value of Plaintiffs' Home; replacement/repair of Plaintiffs' Home; the removal and replacement of all of the drywall contained in Plaintiffs' Home; the replacement of Other Property (air-conditioner and

9

**EXHIBIT "1"**

refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

48.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property and other related expenses.

49.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT V

### BREACH OF IMPLIED WARRANTY OF FITNESS
### FOR A PARTICULAR PURPOSE

50.    Plaintiffs incorporate and restate paragraphs 1-14 as if fully set forth herein.

51.    At all times material hereto, Plaintiffs and Defendant were in privity of contract.

52.    The Chinese drywall product was placed into the stream of commerce by Defendant in a defective condition and was expected to, and did,

10

**EXHIBIT "1"**

reach users, handlers, and persons coming into contact with said product without substantial change in the condition in which it was sold.

53.    The drywall was defective because it was not fit for the specific purpose of being installed in the Plaintiffs' Home as a building material, for which Plaintiffs bought the product in reliance on the judgment of Defendant.

54.    Defendant breached the implied warranty of fitness for a particular purpose because the drywall was not fit to be installed in Plaintiffs' Home as a building material due to the defects set forth herein.

55.    Defendant had reasonable and adequate notice of the Plaintiffs' claims for breach of implied warranty of merchantability and failed to cure same.

56.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: diminution of value of Plaintiffs' Home; replacement/repair of Plaintiffs' Home; the removal and replacement of all of the drywall contained in Plaintiffs' Home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

57.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property and other related expenses.

SHAPIRO BLASI WASSERMAN & GORA, P.A.   7777 Glades Road, Suite 400, Boca Raton, Florida  33434
Tel: (561) 477-7800; Fax: (561) 477-7722

**EXHIBIT "1"**

58.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT VI

## NEGLIGENT MISREPRESENTATION

59.    Plaintiffs incorporate and restate paragraphs 1-14 as if fully set forth herein.

60.    Defendant negligently misrepresented material facts regarding the characteristics of the drywall and omitted other material facts that should have been disclosed to Plaintiffs.

61.    In disseminating information regarding the drywall, Defendant negligently caused statements to be made, which they knew or should have known were inaccurate and untrue.

62.    In disseminating information regarding the drywall, Defendant intended for Plaintiffs to rely on their misrepresentations and Plaintiffs justifiably relied on their misrepresentations.

63.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: diminution of value of Plaintiffs'. Home; replacement/repair of Plaintiffs' Home; the removal and replacement of all of the drywall contained in Plaintiffs' Home; the replacement of Other Property (air-conditioner and

12

**EXHIBIT "1"**

refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

64.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property and other related expenses.

65.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT VII

### EQUITABLE RELIEF, INJUNCTIVE RELIEF AND MEDICAL MONITORING

66.     Plaintiffs incorporate and restate paragraphs 1-14 as if fully set forth herein.

67.     Because no adequate remedy exists for the conduct of Defendant, equitable and injunctive relief is appropriate.

68.     Plaintiffs will suffer irreparable injury if the Court does not order injunctive relief and medical monitoring.

SHAPIRO·BLASI WASSERMAN & GORA, P.A.  7777 Glades Road, Suite 400, Boca Raton, Florida 33434
Tel: (561) 477-7800; Fax: (561) 477-7722

**EXHIBIT "1"**

69.    Plaintiffs demand that Defendant: (A) recall, repurchase and/or repair Plaintiffs' Home and (B) initiate and pay for a medical monitoring program under Florida law.

70.    Medical monitoring is a necessary component of the relief the Court should order because some of the sulfur compounds being emitted from the defective drywall are very hazardous.   For example, Hydrogen Sulfide ("H2S"), one of the compounds found in the drywall is a broad-spectrum poison – meaning it can attack more than one system of the body simultaneously.   H2S most commonly affects the central nervous system.   Through a complex reaction the H2S prevents oxygen from reaching cells in the body, essentially preventing them from "breathing."

71.    As a direct consequence of the wrongful and/or tortious acts and/or omissions of Defendant's conduct, Plaintiffs have been exposed to H2S, and other toxins, in quantities sufficient to harm Plaintiffs.   The long term effects of exposure to the toxins emanating from the defective drywall are unknown.   Thus, there is a need for medical monitoring.

72.    Until it has been conclusively established that all defective drywall has been removed and that air quality is safe, Defendant should bear the expense of air and environmental monitoring in Plaintiffs' Home.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury as to all issues so triable as a matter of right.

14

**EXHIBIT "1"**

Don and Janice Marlinga v. A.R.B.C. Corporation
Complaint

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests that this Honorable Court grant the following relief:

    a.  An order requiring that Defendant pay compensation to Plaintiffs to the full extent permitted by the law;

    b.  An order requiring medical monitoring;

    c.  Costs and expenses in this litigation, including, but not limited to, expert fees, filing fees, and reasonable attorneys' fees; and

    d.  Such other relief as the Court may deem just and appropriate.

Dated: December 7, 2009

Respectfully submitted,

Allison Grant, Esq.
Shapiro, Blasi, Wasserman & Gora, P.A.
7777 Glades Road, Suite 400
Boca Raton, Florida  33434
Tel: (561) 477-7800
Fax: (561) 477-7722
Email: agrant@sbwlawfirm.com

15

## EXHIBIT "1"

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT IN AND FOR COLLIER COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 09-10655-CA

DON and JANICE MARLINGA,

        Plaintiffs,

v.

A.R.B.C. Corporation, a Florida corporation, et al.

        Defendants.

_____/

## FOURTH AMENDED COMPLAINT

    Plaintiffs, DON MARLINGA and JANICE MARLINGA, husband and wife, by and through their undersigned counsel, sue Defendants, A.R.B.C. CORPORATION ("A.R.B.C."), a Florida corporation, STOCK BUILDING SUPPLY, LLC, a North Carolina limited liability company ("STOCK- NC"), and STOCK BUILDING SUPPLY OF FLORIDA, LLC, a Florida limited liability company ("STOCK-FL"), and allege as follows:

## JURISDICTION AND VENUE

    1.    This is an action for damages in excess of $15,000.00, exclusive of interest, costs, and attorneys' fees.

    2.    Venue in this action is proper because, among other things, the subject Home is located in Collier County, Florida, and at least one of the causes of action accrued in Collier County, Florida.

    3.    All conditions precedent to the maintenance of the causes of action set forth herein, including compliance with Chapter 558, Florida Statutes, have occurred, been

1

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

satisfied, been waived or excused.

4.      Plaintiffs have retained the law firm of Shapiro, Blasi, Wasserman & Gora, P.A. to represent them in this cause and have agreed and become obligated to pay it a reasonable fee for its services.

## PLAINTIFFS

5.      At all times material hereto, Plaintiffs, DON MARLINGA and JANICE MARLINGA (collectively, "Plaintiffs"), are residents of Michigan, and are over the age of twenty-one and are otherwise sui juris.

6.      In June 2007, Plaintiffs purchased from A.R.B.C. the home located at 11697 Bald Eagle Way, Naples, Florida 34119 (hereinafter the "Home"). In or about August 2009, it was discovered that defective Chinese-manufactured drywall had been installed in the Home.

## DEFENDANTS

7.      A.R.B.C. is a builder of luxury homes and is incorporated in Florida and does business throughout the state of Florida, including Collier County.

8.      STOCK-NC is a North Carolina limited liability company with its principal place of business in Raleigh, North Carolina.

9.      STOCK-FL is a Florida limited liability company with its principal place of business in Fort Myers, Lee County, Florida. (Collectively, STOCK-NC and STOCK-FL will be referred herein as "STOCK.")

10.     STOCK is in the business of selling, distributing and supplying drywall and

2

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

other building materials.

11.     A.R.B.C. purchased or otherwise procured drywall manufactured in China ("Chinese drywall") through STOCK for use in the Home.  A.R.B.C. further installed or caused the installation of the Chinese drywall in the Home.

12.     The drywall in the Home constitutes an unduly hazardous condition posing a serious or unreasonable risk of harm or injury to persons and property.  It is emitting various sulfide gases and/or other chemicals through "off-gassing" that creates noxious, "rotten egg-like" odors, and has caused significant damage and corrosion to the Home's structure and to the mechanical systems or other elements in the Home, such as the air-conditioning, electrical components and wiring, refrigerator coils, copper tubing, faucets, and metal surfaces. Additionally, this off-gassing process has damaged other property that Plaintiffs owned or purchased independent or outside of their contract with A.R.B.C.  This property includes the hardwood floor in the den, electrical hanging and other lighting fixtures, an alarm system, a speaker sound system, the central vacuum system, electrical wall plates and dimmer switches and plugs, an entertainment center, pool control system, kitchen faucet, mirrors, and washer and dryer (collectively, the "Other Property").

13.     Defendants' acts or omissions, directly or indirectly through their agents, employees, or affiliates have injured Plaintiffs as more fully alleged herein.

14.     Specifically, as a result of defective drywall and the corrosive effects of the sulfide gases and other chemicals being released from these products, Plaintiffs have incurred or will incur significant damages including, but not limited to:  repair/replacement

3

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

of the Home, the Other Property, and any materials contaminated or corroded by the drywall as a result of "off-gassing," incidental and consequential damages, and diminution of value of the Home.

15.    As a further result of defective drywall and the corrosive effects of the sulfide gases and other chemicals being released from these products, Plaintiffs have been exposed to the defective drywall and the corrosive and harmful effects of the sulfide gases and other chemicals being released from these hazardous substances.

16    As a further result of defective drywall and the corrosive effects of the sulfide gases and other chemicals being released from these products, Plaintiffs have suffered or will suffer damages for injuries from medical ailments, including but not limited to respiratory problems, sinus problems, eye irritations and nosebleeds, in addition to experiencing noxious odors which smell like "rotten eggs."

17.    Because neither the long-term effects of Chinese drywall, nor the triggers of the adverse chemical processes within the Chinese drywall are yet fully understood, the mere existence of Chinese manufactured drywall in the Home causes automatic and substantial diminution of value to the Home.

## COUNT I

### NEGLIGENCE
### (A.R.B.C.)

18.    Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

19.    A.R.B.C. owed a duty to Plaintiffs to exercise reasonable care in the selecting,

4

**EXHIBIT "2"**

purchasing, inspecting, and/or installing of the drywall in the Home marketed and sold to Plaintiffs and to prevent the drywall from containing defects as set forth herein.

20.     A.R.B.C. also owed a duty to Plaintiffs to adequately warn of its failure to do the same; to instruct Plaintiffs of the defects associated with drywall; not to misrepresent that the drywall was safe for its intended purpose when, in fact, it was not; and not to conceal information from Plaintiffs regarding reports of adverse effects associated with drywall.

21.     A.R.B.C. was negligent and breached its duty to exercise reasonable care in the selection, purchase, inspection, and/or installation of drywall.   A.R.B.C. further breached its duty to adequately warn of their failure to do the same.

22.     A.R.B.C. further breached its duty by:  failing to adequately warn and instruct the Plaintiffs of the defects associated with drywall; misrepresenting that drywall was safe for its intended purpose when, in fact, it was not; concealing information from Plaintiffs regarding reports of adverse effects associated with drywall; and improperly concealing and/or misrepresenting information from the Plaintiffs concerning the severity of risks and dangers of the defective Chinese drywall.

23.     As a direct and proximate cause of A.R.B.C.'s acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for diminution of value of the Home; replacement/repair of the Home; the removal and replacement of any drywall contained in the Home; the replacement and/or repair of mechanical systems or other elements in the Home; the replacement and/or repair of the

5

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

Other Property; and the repair and/or replacement of any other materials contaminated or corroded by the drywall.

24.     As a direct and proximate cause of A.R.B.C.'s acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property, carrying expenses such as property taxes, insurance, homeowner's association fees, utilities, air conditioning maintenance, lawn maintenance, pest control, pool service, and other related expenses, and the loss of income from the intended sale of a second Florida home, which was pulled off the market as a result of Plaintiffs' inability to move into the subject Home.

25.     As a direct and proximate cause of A.R.B.C.'s acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT II

### STRICT LIABILITY
### (A.R.B.C.)

26.     Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

27.     A.R.B.C. was responsible for the selection, purchase, inspection, and installation of the drywall at issue.

28.     At all material times, A.R.B.C. was in the business of distributing, supplying,

6

**EXHIBIT "2"**

and/or selling drywall of the type contained in the Home.

29.     At all material times, the drywall contained in the Home was placed into the stream of commerce, distributed, supplied and/or sold by A.R.B.C.

30.     A.R.B.C. expected the drywall to reach Plaintiffs' Home without substantial change affecting its condition and the defective drywall did in fact reach Plaintiffs' Home without substantial change affecting that condition.

31.     By the time the drywall left A.R.B.C.'s hands, the risks associated with the product far outweighed its benefits and A.R.B.C. knew, or should have known, that the product was unsafe, defective, and could cause serious physical and economic harm to Plaintiffs and their Home.

32.     Because the drywall created an unreasonable risk to the Home and to persons, A.R.B.C. is strictly liable for Plaintiffs' economic damages and physical injuries.

33.     No prudent buyer of a home with the defective drywall product could be expected to determine on his or her own that the product was dangerous and defective.

34.     A.R.B.C. not only selected, purchased, inspected, and installed poorly designed and defective drywall, but also failed to give Plaintiffs adequate warning regarding the risks associated with the defective drywall product.

35.     As a direct and proximate cause of A.R.B.C.'s acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for diminution of value of the Home; replacement/repair of the Home; the removal and replacement of any drywall contained in the Home; the replacement and/or repair of

7

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

mechanical systems or other elements in the Home; the replacement and/or repair of the Other Property; and the repair and/or replacement of any other materials contaminated or corroded by the drywall.

36.     As a direct and proximate cause of A.R.B.C.'s acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property, carrying expenses such as property taxes, insurance, homeowner's association fees, utilities, air conditioning maintenance, lawn maintenance, pest control, pool service, and other related expenses, and the loss of income from the intended sale of a second Florida home, which was pulled off the market as a result of Plaintiffs' inability to move into the subject Home.

37.     As a direct and proximate cause of A.R.B.C.'s acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT III

### BREACH OF EXPRESS WARRANTY
### (A.R.B.C.)

38.     Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

39.     Plaintiffs purchased a "Gold Standard Home" from A.R.B.C.  According to "The Arthur Rutenberg Gold Standard Home Agreement" executed by the parties, a copy

8

**EXHIBIT "2"**

of which is attached hereto as Exhibit "A", A.R.B.C. expressly warranted that Plaintiff's Home would have no more than five "minor items" needing additional work at the time of closing and have "no defects 15 days after closing."

40.    In the "Arthur Rutenberg Homes Building Agreement" executed by the parties, a copy of which is attached hereto as Exhibit "B," A.R.B.C. further warranted in writing that Plaintiff's Home would have "craftsmanship equal to or better than that used in the model home at 7873 Classics Drive, Naples, FL 34113" and that the original material and workmanship would be free of defects.

41.    The Home was constructed with a major defect, to wit: defective drywall manufactured in China, which existed at the time of the closing and 15 days thereafter, and was not equal to or better than the craftsmanship used in the model home, wherein no corrosive effects from the defective drywall were evident and, apparently, no defective Chinese-manufactured drywall was installed.

42.    By installing a defective, unsafe, and poorly manufactured drywall product, A.R.B.C. breached its express warranties.

43.    A.R.B.C. knew or should have known that their warranties were specious.

44.    Plaintiffs relied on these express warranties to Plaintiffs' detriment.

45.    As a direct and proximate cause of A.R.B.C.'s breaches of express warranties, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for diminution of value of the Home; replacement/repair of the Home; the removal and replacement of any drywall contained in the Home; the replacement and/or

9

**EXHIBIT "2"**

Case 2:09-md-02047-EEF-MBN Document 15922-1 Filed 10/11/12 Page 35 of 87

repair of mechanical systems or other elements in the Home; the replacement and/or repair of the Other Property; and the repair and/or replacement of any other materials contaminated or corroded by the drywall.

46.    As a direct and proximate cause of A.R.B.C.'s breaches of express warranties, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property, carrying expenses such as property taxes, insurance, homeowner's association fees, utilities, air conditioning maintenance, lawn maintenance, pest control, pool service, and other related expenses, and the loss of income from the intended sale of a second Florida home, which was pulled off the market as a result of Plaintiffs' inability to move into the subject Home.

47.    As a direct and proximate cause of A.R.B.C.'s breaches of express warranties, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT IV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (A.R.B.C.)

48.    Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

49.    At all times material hereto, Plaintiffs and A.R.B.C. were in privity of contract.

50.    A.R.B.C. has failed and refused to honor any of its express guaranties or

10

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

warranties or to correct the defects alleged herein pursuant to the terms of its contract.

51.     Any disclaimers or limitation of warranties claimed  by A.R.B.C. are inapplicable, ineffective, inconspicuous, unenforceable, unconscionable, and/or in violation of Florida law and public policy.

52.     At the time A.R.B.C. selected, purchased, inspected, and installed the defective drywall, A.R.B.C. knew, or it was reasonably foreseeable, that the drywall would be used in the Home as a building material, and it impliedly warranted the product to be fit for that use.

53.     The Chinese drywall product was placed into the stream of commerce by A.R.B.C. in a defective condition and the defective drywall was expected to, and did, reach users, handlers, and persons coming into contact with said product without substantial change in the condition in which it was sold.

54.     The drywall was defective because it was not fit for the uses intended, to wit: the installation of the drywall in the Home for use as a building material.

55.     A.R.B.C. thus breached the implied warranty of merchantability because the drywall was not fit to be installed in the Home as a building material due to the defects set forth herein.

56.     A.R.B.C. had reasonable and adequate notice of the Plaintiffs' claims for breach of implied warranty of merchantability and failed to cure same.

57.     As a direct and proximate cause of A.R.B.C.'s breaches of implied warranty, Plaintiffs have incurred economic damages and are entitled to recover monetary damages

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

for diminution of value of the Home; replacement/repair of the Home; the removal and replacement of any drywall contained in the Home; the replacement and/or repair of mechanical systems or other elements in the Home; the replacement and/or repair of the Other Property; and the repair and/or replacement of any other materials contaminated or corroded by the drywall.

58.    As a direct and proximate cause of A.R.B.C.'s breaches of implied warranty, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property, carrying expenses such as property taxes, insurance, homeowner's association fees, utilities, air conditioning maintenance, lawn maintenance, pest control, pool service, and other related expenses, and the loss of income from the intended sale of a second Florida home, which was pulled off the market as a result of Plaintiffs' inability to move into the subject Home.

59.    As a direct and proximate cause of A.R.B.C.'s breaches of implied warranty, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT V

### BREACH OF IMPLIED WARRANTY OF FITNESS
### FOR A PARTICULAR PURPOSE
### (A.R.B.C.)

60. .   Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

12

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

61.   At all times material hereto, Plaintiffs and A.R.B.C. were in privity of contract.

62.   A.R.B.C. failed and refused to honor any of its express guaranties or warranties or to correct the defects alleged herein pursuant to the terms of its contract.

63.   Any disclaimers or limitation of warranties claimed   by A.R.B.C. are inapplicable, ineffective, inconspicuous, unenforceable, unconscionable, and/or in violation of Florida law and public policy.

64.   The Chinese drywall product was placed into the stream of commerce by A.R.B.C. in a defective condition and was expected to, and did, reach users, handlers, and persons coming into contact with said product without substantial change in the condition in which it was sold.

65.   The drywall was defective because it was not fit for the specific purpose of being installed in the Home as a building material, for which Plaintiffs bought the product in reliance on the judgment of A.R.B.C.

66.   A.R.B.C. breached the implied warranty of fitness for a particular purpose because the drywall was not fit to be installed in the Home as a building material due to the defects set forth herein.

67.   A.R.B.C. had reasonable and adequate notice of the Plaintiffs' claims for breach of implied warranty of fitness for a particular purpose and failed to cure same.

68.   As a direct and proximate cause of A.R.B.C.'s breaches of implied warranty, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for diminution of value of the Home; replacement/repair of the Home; the removal and

13

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

replacement of any drywall contained in the Home; the replacement and/or repair of mechanical systems or other elements in the Home; the replacement and/or repair of the Other Property; and the repair and/or replacement of any other materials contaminated or corroded by the drywall.

69.     As a direct and proximate cause of A.R.B.C.'s breaches of implied warranty, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property, carrying expenses such as property taxes, insurance, homeowner's association fees, utilities, air conditioning maintenance, lawn maintenance, pest control, pool service, and other related expenses, and the loss of income from the intended sale of a second Florida home, which was pulled off the market as a result of Plaintiffs' inability to move into the subject Home.

70.     As a direct and proximate cause of A.R.B.C.'s breaches of implied warranty, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT VI

### BREACH OF IMPLIED WARRANTY OF HABITABILITY APPLICABLE TO NEW HOMES
### (A.R.B.C.)

71.     Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

72.     In Florida, there is an implied warranty of habitability and fitness in all sales

14

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

of new homes that the home will be "reasonably fit for the ordinary and general purpose intended – as living quarters."

73.     At all times material hereto, Plaintiffs and A.R.B.C. were in privity of contract.

74.     A.R.B.C. failed and refused to honor any of its express guaranties or warranties or to correct the defects alleged herein pursuant to the terms of its contract.

75.     Any disclaimers or limitation of warranties claimed  by A.R.B.C. are inapplicable, ineffective, inconspicuous, unenforceable, unconscionable, and/or in violation of Florida law and public policy.

76.     As built and sold by A.R.B.C., the Home was not reasonable fit for the ordinary and general purpose intended, *i.e.*, as living quarters, because the Chinese drywall installed in the Home emits sulfur-based compounds that are hazardous to the health of the occupants and corrosive to the mechanical systems and other components in the Home as well as to the Other Property.

77.     A.R.B.C. had reasonable and adequate notice of Plaintiffs' claims for breach of implied warranty and failed to cure same.

78.     As a direct and proximate cause of A.R.B.C.'s breaches of implied warranty, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for diminution of value of the Home; replacement/repair of the Home; the removal and replacement of any drywall contained in the Home; the replacement and/or repair of mechanical systems or other elements in the Home; the replacement and/or repair of the Other Property; and the repair and/or replacement of any other materials contaminated or

15

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

corroded by the drywall.

79.     As a direct and proximate cause of A.R.B.C.'s breaches of implied warranty, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property, carrying expenses such as property taxes, insurance, homeowner's association fees, utilities, air conditioning maintenance, lawn maintenance, pest control, pool service, and other related expenses, and the loss of income from the intended sale of a second Florida home, which was pulled off the market as a result of Plaintiffs' inability to move into the subject Home.

80.     As a direct and proximate cause of A.R.B.C.'s breaches of implied warranty, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT VII

### NEGLIGENT MISREPRESENTATION
### (A.R.B.C.)

81.     Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

82.     A.R.B.C. negligently misrepresented material facts regarding the characteristics of the drywall and omitted other material facts that should have been disclosed to Plaintiffs.

83.     In disseminating information regarding the drywall, A.R.B.C. negligently

16

## EXHIBIT "2"

caused statements to be made, which it knew or should have known were inaccurate and untrue.

84.    In disseminating information regarding the drywall, A.R.B.C. intended for Plaintiffs to rely on its misrepresentations and Plaintiffs justifiably relied on these misrepresentations by purchasing the Home and waiting for A.R.B.C. to correct the defective Chinese drywall condition.

85.    As a direct and proximate cause of A.R.B.C.'s misrepresentations, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for diminution of value of the Home; replacement/repair of the Home; the removal and replacement of any drywall contained in the Home; the replacement and/or repair of mechanical systems or other elements in the Home; the replacement and/or repair of the Other Property; and the repair and/or replacement of any other materials contaminated or corroded by the drywall.

86.    As a direct and proximate cause of A.R.B.C.'s misrepresentations, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property, carrying expenses such as property taxes, insurance, homeowner's association fees, utilities, air conditioning maintenance, lawn maintenance, pest control, pool service, and other related expenses, and the loss of income from the intended sale of a second Florida home, which was pulled off the market as a result of Plaintiffs' inability to move into the subject Home.

87.    As a direct and proximate cause of A.R.B.C.'s misrepresentations, Plaintiffs

17

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT VIII

### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (A.R.B.C.)

88.     Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

89.     This is an action for relief under section 501.201, et seq., Florida Statutes, the Florida Deceptive and Unfair Trade Practices Act.

90.     Plaintiffs are "consumers" as that term is defined in section 501.203(7), Florida Statutes.

91.     A.R.B.C. is engaged in "trade or commerce" as that phrase is defined in section 501.203(8), Florida Statutes.

92.     Section 501.204(1), Florida Statutes, provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

93.     A.R.B.C. misrepresented or failed to disclose material facts regarding the condition of Plaintiffs' Home; to wit, that inferior and defective Chinese drywall had been installed.

94.     Prior to the installation of the defective drywall in the Home, A.R.B.C. knew

18

**EXHIBIT "2"**

that drywall suppliers were obtaining foreign drywall and offering it for use in the construction of new homes.

95.    However, by that time, A.R.B.C. had determined that foreign drywall was inferior, defective and possibly harmful and should not be installed in the homes and should not be used in the construction of new homes. A.R.B.C. has admitted that it discussed this issue with STOCK, but, nonetheless, accepted Chinese drywall and installed it in the Home because of the shortage of domestic drywall available in Florida. The drywall was clearly marked "Made in China."

96.    Notwithstanding A.R.B.C.'s awareness of the risks associated with foreign drywall, A.R.B.C. permitted Chinese drywall to be installed in Plaintiffs' Home.

97.    Prior to the closing on Plaintiffs' Home, A.R.B.C. was aware that inferior and defective Chinese drywall had been installed in the Home but concealed this fact from Plaintiffs.

98.    A.R.B.C.'s acts and omissions constitute unfair and deceptive practices in the conduct of A.R.B.C.'s trade or commerce pursuant to section 501.204, Florida Statutes.

99.    As a direct and proximate cause of A.R.B.C.'s unfair and deceptive acts, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for diminution of value of the Home; replacement/repair of the Home; the removal and replacement of any drywall contained in the Home; the replacement and/or repair of mechanical systems or other elements in the Home; the replacement and/or repair of the Other Property; and the repair and/or replacement of any other materials contaminated or

19

**EXHIBIT "2"**

corroded by the drywall.

100.   As a direct and proximate cause of A.R.B.C.'s unfair and deceptive acts, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property, carrying expenses such as property taxes, insurance, homeowner's association fees, utilities, air conditioning maintenance, lawn maintenance, pest control, pool service, and other related expenses, and the loss of income from the intended sale of a second Florida home, which was pulled off the market as a result of Plaintiffs' inability to move into the subject Home.

101.   As a direct and proximate cause of A.R.B.C.'s unfair and deceptive acts, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

102.   Plaintiffs are entitled to recover their attorneys' fees pursuant to section 501.2105, Florida Statutes, upon prevailing in this matter.

## COUNT IX

### BUILDING CODE VIOLATIONS PURSUANT TO SECTION 553.84, FLORIDA STATUTES
### (A.R.B.C.)

103.   Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

104.   The 2004 Florida Building Code, Building, with 2005 Amendments, and the 2004 Florida Building Code, Residential, with 2005 Amendments (hereinafter collectively

20

**EXHIBIT "2"**

referred to as the "Building Code") both apply to residences.

105.    The purpose of the Building Code is to "establish the minimum requirements to safeguard the public health, safety and general welfare ... and safety to life and property from fire and other hazards attributed to the built environment ... ." Section 101.3, Intent, 2004 Florida Building Code, Building with 2005 Amendments.

106.    Section R702.3.1 of the Building Code requires that all gypsum board material (also referred to as drywall) shall conform to various ASTM standards including ASTM C 1396.

107.    The ASTM standard C 1396, in turn, requires that the sampling, packaging and marking of gypsum board material, among other things, comply with ASTM Specification C 1264. *See* Section 14.1, ASTM C 1396.

108.    Specification C 1264 requires:

Unless otherwise specified in the purchase agreement, each gypsum panel product or package shall have legibly marked thereon the following: the thickness, the name of the producer or supplier, the brand name, if any, and the ASTM specification for the product.

109.    Plaintiffs are informed and believe that A.R.B.C. did not "otherwise specif[y] in the purchase agreement," such that the drywall utilized in the Home was required to have legibly marked on each gypsum panel product the information required by ASTM C 1264. Plaintiffs are further informed and believe that all of the required information was not marked on each gypsum product or package and, in addition, contained the markings "Made in China," which is in violation of C 1264. If any of the Code-required markings are

21

**EXHIBIT "2"**

not present on the drywall board, that drywall does not meet the Building Code requirement

for gypsum board.

110.   Accordingly, the Chinese drywall utilized by A.R.B.C. in the Home was not

approved for use by the Building Code.   Because of the improper markings on the Chinese

drywall, A.R.B.C. should have sought approval and input from the requisite building official.

The Building Code provides a procedure in that regard.

111.   Section 104.11 of the Building Code requires that a builder, such as A.R.B.C.,

who intends to use material not otherwise approved for use by the Building Code, must

have that alternative material *approved for use* by the building official:

> **104.11 Alternative materials, design and methods of construction and
> equipment.**  The provisions of this code are not intended to prevent the
> installation of any material...not specifically prescribed by this code, *provided
> that any such alternative has been approved.*  An alternative material, design
> or method of construction shall be approved where the building official finds
> that the proposed design is satisfactory and complies with the intent of the
> provisions of this code, and the material, method or work offered is, for the
> purpose intended, at least the equivalent of that prescribed in this code in
> quality, strength, effectiveness, fire resistance, durability and safety... .  The
> building official shall require that sufficient evidence or proof be submitted to
> substantiate any claim made regarding the alternative.

112.   Plaintiffs are informed and believe that A.R.B.C. did not seek approval to

utilize the Chinese drywall and show compliance with R702.3.1 as required by Section

104.11. As set forth above, if a builder intends to use a gypsum board that is not properly

marked pursuant to the code, they are obligated to approach the building code official and

seek approval through the alternative materials provision of the code.

22

**EXHIBIT "2"**

113.    Section 553.84, Florida Statutes, provides:

Notwithstanding any other remedies available, any person or party, in an individual capacity or on behalf of a class of person or parties, damaged as a result of a violation of this part or the Florida Building Code, has a cause of action in any court of competent jurisdiction against the person or party who committed the violation; however, if the person or party obtains the required building permits and any local government or public agency with authority to enforce the Florida Building Code approves the plans, if the construction project passes all required inspections under the code, and if there is no personal injury or damage to property other than the property that is the subject of the permits, plans, and inspections, this section does not apply unless the person or party knew or should have known that the violation existed.

114.    As the builder, it was A.R.B.C.'s obligation to ensure that the materials it used in the building of the Home conformed to the standards set forth in the Building Code.

115.    A.R.B.C. violated the applicable building codes in construction of the Home in numerous respects and knew or should have known the obvious violations as set forth and described herein.

116.    Plaintiffs contend and allege that Chinese drywall was not permitted by the Building Code insofar as it is materially hazardous to the public safety, health and general welfare and to the safety of life and property.

117.    A.R.B.C. violated the requirements of the applicable building codes because it never alerted the building code official that it intended to use Chinese drywall instead of ASTM compliant gypsum board, nor did it seek to obtain approval from the building code official for the use of the alternative material.

118.    A.R.B.C. also violated the requirements of the applicable building codes because some of the Chinese drywall it used in the construction of the Home is not

23

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

identified by the manufacturer's name, the thickness, the brand name and the ASTM specification.

119.    Pursuant to Florida Statutes, Section 553.84, Plaintiffs hereby assert a cause of action against Defendants for these violations of the Building Code.

120.    A.R.B.C. knew or should have known that the Chinese drywall did not conform to the Building Code requirements for gypsum board because a visual inspection of the Chinese drywall would have revealed that it did not have some or all of the requisite markings required by the Building Code.  A.R.B.C. is in the best position to notice that the sheets of Chinese drywall it used did not contain the markings required by the Building Code.

121.    The material composition of the Chinese drywall in the Home renders it inferior to American-made drywall and unfit for ordinary use in residential construction.

122.    Unlike American-made drywall, the Chinese drywall in the Home emits several sulfur compounds, including, but not limited to, carbon disulfide, carbonyl sulfur, and hydrogen sulfide.  The Chinese drywall in the Home is also suspected to contain several other impurities.  The sulfur based compounds create a sulfur odor which renders the drywall unfit for the ordinary purpose for which it was intended.

123.    The Chinese drywall emits these sulfur based compounds because it suffers from either a defective manufacturing and/or mining process.

124.    As a direct and proximate cause of these code violations, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for diminution

24

**EXHIBIT "2"**

of value of the Home; replacement/repair of the Home; the removal and replacement of any drywall contained in the Home; the replacement and/or repair of mechanical systems or other elements in the Home; the replacement and/or repair of the Other Property; and the repair and/or replacement of any other materials contaminated or corroded by the drywall.

125.   As a direct and proximate cause of these code violations, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property, carrying expenses such as property taxes, insurance, homeowner's association fees, utilities, air conditioning maintenance, lawn maintenance, pest control, pool service, and other related expenses, and the loss of income from the intended sale of a second Florida home, which was pulled off the market as a result of Plaintiffs' inability to move into the subject Home.

126.   As a direct and proximate cause of these code violations, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT X

### EQUITABLE RELIEF, INJUNCTIVE RELIEF AND MEDICAL/ENVIRONMENTAL MONITORING
### (A.R.B.C.)

127.   Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

128.   Because no adequate remedy exists for the conduct of A.R.B.C., equitable and injunctive relief is appropriate.  An award of damages will not protect Plaintiffs from

## EXHIBIT "2"

possible harm, the extent of which is not and cannot be known without the monitoring requested herein.

129.    Plaintiffs will suffer irreparable injury if the Court does not order injunctive relief and medical/environmental monitoring.

130.    Plaintiffs' Home has been analyzed and it contains hazardous compounds emitted from the Chinese drywall that is greater than normal background levels.

131.    As a proximate result of the exposure, Plaintiffs have a significantly increased risk of contracting a serious latent disease.

132.    The risk of harm to Plaintiffs was caused the negligent and other wrongful or actionable acts of A.R.B.C., as described herein.

133.    Monitoring procedures exist that makes the detection of the presence of the hazardous compounds and the early detection of adverse health affects possible.  These procedures would not normally be employed or recommended in the absence of the exposure described herein.

134.    Plaintiffs demand that A.R.B.C.: (A) recall, repurchase and/or repair the Home and (B) initiate and pay for a medical/environmental monitoring program under Florida law.

135.    Medical/environmental monitoring is a necessary component of the relief the Court should order because some of the sulfur compounds being emitted from the defective drywall are very hazardous.  For example, Hydrogen Sulfide ("H2S"), one of the compounds found in the drywall is a broad-spectrum poison – meaning it can attack more than one system of the body simultaneously.  H2S most commonly affects the central

26

**EXHIBIT "2"**

nervous system.  Through a complex reaction, the H2S prevents oxygen from reaching cells in the body, essentially preventing them from "breathing."

136.    As a direct consequence of the wrongful and/or tortious acts and/or omissions of A.R.B.C.'s conduct, Plaintiffs have been exposed to H2S, and other toxins, in quantities sufficient to harm Plaintiffs. The long-term effects of exposure to the toxins emanating from the defective drywall are unknown.  Thus, there is a need for medical/environmental monitoring.

137.    Until it has been conclusively established that all defective drywall and other adversely affected elements of the Home have been removed and that air quality is safe, A.R.B.C. should bear the expense of environmental monitoring in the Home.  Without environmental monitoring being performed, Plaintiffs will be unable to determine whether occupancy in the Home will be safe.

## COUNT XI

### NEGLIGENCE
### (STOCK)

138.    Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

139.    STOCK distributed, supplied and/or sold to A.R.B.C. the drywall that was installed in the Home.

140.    STOCK knew that its drywall would be installed in residences, including Plaintiffs' Home.

141.    STOCK also knew or should have known that the drywall was defective,

27

**EXHIBIT "2"**

unreasonably dangerous and/or not reasonably safe for its intended use and that A.R.B.C. had advised STOCK it did not want Chinese drywall for its homes.

142.   As such, STOCK owed Plaintiffs a duty to, among other things, exercise reasonable care to (a) investigate, inspect, and/or test the drywall to ensure it was free from defects that could cause property damage, bodily injury, and damage the health and safety of A.R.B.C.'s customers or the ultimate consumers; and (b) market, distribute, supply and/or sell drywall materials that were free from defects and in compliance with applicable laws, codes, regulations, and standards applicable to its industry.

143.   STOCK breached its duty of care to Plaintiffs by, among other things, (a) failing to exercise reasonable care in investigating, inspecting and/or testing  the drywall it distributed, sold and/or supplied for installation into homes to ensure that it was not defective and complied with all applicable building and industry standards, (b) failing to exercise reasonable care in overseeing, managing, controlling, inspecting, investigating and/or auditing the manufacturer, importer, wholesaler or distributor of the drywall STOCK sold and/or supplied, (c) acquiring, procuring, marketing, distributing, wholesaling, supplying, and/or selling drywall which contained defects that caused Plaintiffs' damages, and (d) failing to supply drywall that complied with all applicable building and industry standards.

144.   The aforesaid breaches in STOCK's duty of care were the direct and proximate cause of Plaintiffs' injuries, losses, and damages.

145.   STOCK knew or reasonably should have know that its acts and omissions in marketing, distributing, supplying and/or selling defective drywall would cause Plaintiffs

**EXHIBIT "2"**

substantial damages. If STOCK had exercised that degree of care that a prudent or reasonably cautious distributor and/or supplier acting under the same circumstances would have exerted, it would or could have foreseen that the drywall was defective and that damages would ensure as a result of marketing, distributing, supplying and/or selling defective drywall.

146.   As a direct and proximate cause of STOCK's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for diminution of value of the Home; replacement/repair of the Home; the removal and replacement of any drywall contained in the Home; the replacement and/or repair of mechanical systems or other elements in the Home; the replacement and/or repair of the Other Property; and the repair and/or replacement of any other materials contaminated or corroded by the drywall.

147.   As a direct and proximate cause of STOCK's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property, carrying expenses such as property taxes, insurance, homeowner's association fees, utilities, air conditioning maintenance, lawn maintenance, pest control, pool service, and other related expenses, and the loss of income from the intended sale of a second Florida home, which was pulled off the market as a result of Plaintiffs' inability to move into the subject Home.

148.   As a direct and proximate cause of STOCK's acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse

29

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT XII

### NEGLIGENT FAILURE TO WARN
### (STOCK)

149.    Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

150.    Plaintiffs suffered damages from the unduly hazardous condition of the drywall in the Home posing serious or unreasonable risk of harm or injury to persons and/or property, including but not limited to, the Other Property in the Home.

151.    STOCK distributed, supplied, and/or sold to A.R.B.C. the drywall that was installed in the Home.

152.    STOCK knew that its drywall would be installed in residences, including Plaintiffs' Home.

153.    As such, STOCK owed Plaintiffs a duty to, among other things, exercise reasonable care to (a) disclose any defects in the drywall materials it distributed, sold and/or supplied or disclose any adverse affects associated with the drywall, (b) warn about any dangers inherent in the drywall, and/or (c) warn about any problems or dangers in using the drywall for residential construction.

154.    STOCK knew or should have know that the drywall was or was likely to be defective, unreasonably dangerous and/or not reasonably safe for its intended use, and, in fact, A.R.B.C. has advised STOCK that it did not want Chinese drywall for its homes.

30

**EXHIBIT "2"**

155.   STOCK knew or should have know that unless it warned of the risk of using the drywall it distributed, sold, and/or supplied, Plaintiffs would suffer harm.  However, STOCK failed to provide an adequate warning of such danger.

156.   Plaintiffs did not know, had no reason to believe, and were never informed that the drywall had an odor or emitted noxious gases, or could pose serious or unreasonable risk of harm or injury to persons and/or property.  Without a warning, Plaintiffs had no way of anticipating that the drywall could harm persons and/or property including the Other Property.

157.   STOCK breached its duty of care by (a) failing to disclose any defects in the drywall materials it distributed, supplied and/or sold which it knew or reasonably should have known about, (b) failing to warn about any dangers inherent in the drywall, and/or (c) failing to warn about any problems or dangers in using the drywall for residential construction.

158.   The aforesaid breaches in STOCK's duty of care were the direct and proximate cause of Plaintiffs' injuries, losses and damages.

159.   STOCK knew or reasonably should have known that its acts and omissions in failing to disclose and/or warn of drywall defects would cause substantial damages.  If STOCK had exercised that degree of care that a prudent or reasonably cautious distributor and/or supplier acting under the same circumstances would have exerted, it would or could have foreseen that damages to Plaintiffs would ensue as a result of failing to disclose and/or warn of drywall defects.

160.   As a direct and proximate cause of STOCK's acts and omissions, Plaintiffs

31

**EXHIBIT "2"**

have incurred economic damages and are entitled to recover monetary damages for diminution of value of the Home; replacement/repair of the Home; the removal and replacement of any drywall contained in the Home; the replacement and/or repair of mechanical systems or other elements in the Home; the replacement and/or repair of the Other Property; and the repair and/or replacement of any other materials contaminated or corroded by the drywall.

161.    As a direct and proximate cause of STOCK's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property, carrying expenses such as property taxes, insurance, homeowner's association fees, utilities, air conditioning maintenance, lawn maintenance, pest control, pool service, and other related expenses, and the loss of income from the intended sale of a second Florida home, which was pulled off the market as a result of Plaintiffs' inability to move into the subject Home.

162.    As a direct and proximate cause of STOCK's acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT XIII

### BREACH OF THE POST-SALE DUTY TO WARN
### (STOCK)

163.    Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

32

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

164.    Plaintiffs suffered damages from the unduly hazardous condition of the drywall in the Home posing serious or unreasonable risk of harm or injury to persons and/or property, including, but not limited to, the Other Property, in the Home.

165.    STOCK distributed, sold and/or supplied to A.R.B.C. the drywall that was installed in the Home.

166.    STOCK knew that its drywall would be installed in residences, including Plaintiffs' Home.

167.    After the time such drywall left STOCK's control and/or was sold to A.R.B.C., and before it was installed in the Home or Plaintiffs had placed Other Property in the Home, STOCK knew or reasonably should have known that the drywall was unduly hazardous and/or posed a substantial risk of harm to persons and property.

168.    STOCK, as the distributor, supplier and/or seller of the drywall, had a duty to exercise reasonable care to learn of post-sale problems with its drywall product and/or issue a post-sale warning of potential dangers and/or risk of harm associated with the use of its drywall product in residential construction.  STOCK breached that duty by failing to properly investigate and/or learn of any post-sale problems with its drywall product and/or issue a post-sale warning of such risks.

169.    The potential dangers and/or risk of harm associated with the use of the drywall in residential construction were sufficiently great to justify the burden of providing a warning.

170.    Customers, such as A.R.B.C., or ultimate consumers, such as Plaintiffs, to

33

**EXHIBIT "2"**

whom a warning might have been provided, could have been identified by STOCK.

171.   A warning could have been effectively communicated to STOCK's customers, such as A.R.B.C., or to the ultimate consumers, such as Plaintiffs, and acted on by them.

172.   At all material times, STOCK stood in a better position than A.R.B.C. and Plaintiffs to know of such drywall's applications, performance, risks and dangers and could have reasonably assumed that A.R.B.C. and Plaintiffs were less aware of the potential dangers and/or risks of harm associated with the use of STOCK's drywall product in residential construction.

173.   A reasonable distributor, seller and/or supplier in STOCK's position would have provided a post-sale warning.

174.   As a direct and proximate cause of STOCK's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for diminution of value of the Home; replacement/repair of the Home; the removal and replacement of any drywall contained in the Home; the replacement and/or repair of mechanical systems or other elements in the Home; the replacement and/or repair of the Other Property; and the repair and/or replacement of any other materials contaminated or corroded by the drywall.

175.   As a direct and proximate cause of STOCK's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property, carrying expenses such as property taxes, insurance, homeowner's association fees, utilities, air conditioning maintenance, lawn

34

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

maintenance, pest control, pool service, and other related expenses, and the loss of income from the intended sale of a second Florida home, which was pulled off the market as a result of Plaintiffs' inability to move into the subject Home.

176. As a direct and proximate cause of STOCK's acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

<u>COUNT XIV</u>

**STRICT PRODUCT LIABILITY
(STOCK)**

177. Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

178. At all material times, STOCK was in the business of distributing, supplying, and/or selling drywall of the type contained in the Home.

179. At all material times, the drywall contained in the Home was placed into the stream of commerce, distributed, supplied and/or sold by STOCK to A.R.B.C.

180. At the time said drywall was placed into the stream of commerce, distributed, supplied and/or sold by STOCK, STOCK intended that the drywall reach its consumers and/or ultimate users of the drywall, such as A.R.B.C. and/or Plaintiffs.

181. STOCK expected the drywall to reach A.R.B.C. and Plaintiffs' Home without substantial change affecting its condition, and the defective drywall did in fact reach A.R.B.C. and Plaintiffs' Home without substantial change affecting that condition.

35

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

182. Plaintiffs suffered damages from the unduly hazardous condition of the drywall in the Home posing serious or unreasonable risk of harm or injury to persons and/or property, including, but not limited to, the Other Property, in the Home.

183. The defective drywall distributed, placed into the stream of commerce, supplied and/or sold by STOCK directly and proximately caused Plaintiffs substantial damages.

184. As a direct and proximate cause of STOCK's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for diminution of value of the Home; replacement/repair of the Home; the removal and replacement of any drywall contained in the Home; the replacement and/or repair of mechanical systems or other elements in the Home; the replacement and/or repair of the Other Property; and the repair and/or replacement of any other materials contaminated or corroded by the drywall.

185. As a direct and proximate cause of STOCK's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property, carrying expenses such as property taxes, insurance, homeowner's association fees, utilities, air conditioning maintenance, lawn maintenance, pest control, pool service, and other related expenses, and the loss of income from the intended sale of a second Florida home, which was pulled off the market as a result of Plaintiffs' inability to move into the subject Home.

186. As a direct and proximate cause of STOCK's acts and omissions, Plaintiffs

36

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT XV

### STRICT PRODUCTS LIABILITY FAILURE TO WARN
### (STOCK)

187.    Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

188.    At all material times, STOCK was in the business of distributing, supplying, and/or selling drywall of the type contained in the Home.

189.    At all material times, the drywall contained in the Home was placed into the stream of commerce, distributed, and/or sold by STOCK to A.R.B.C.

190.    At the time said drywall was placed into the stream of commerce, distributed, supplied and/or sold by STOCK, STOCK intended that the drywall reach its consumers and/or ultimate users of the drywall, such as A.R.B.C. and/or Plaintiffs.

191.    STOCK expected the drywall to reach A.R.B.C. and Plaintiffs' Home without substantial change affecting its condition, and the drywall did in fact reach A.R.B.C. and Plaintiffs' Home without substantial change affecting that condition.

192.    Plaintiffs suffered from the unduly hazardous condition of the drywall in the Home posing serious or unreasonable risk of harm or injury to persons and/or property, including, but not limited to, the Other Property, in the Home.

193.    The use of such defective drywall in residential construction involved a danger

37

**EXHIBIT "2"**

of which STOCK was required to provide a warning.  However, STOCK failed to provide an adequate warning of such danger.

194.    Plaintiffs did not know, had no reason to believe, and were never informed that the drywall had an odor or emitted noxious gases, and could pose serious or unreasonable risk of harm or injury to persons and/or property.

195.    To the extent the drywall in Plaintiffs' Home was defective, unreasonably dangerous and/or not reasonably safe for its intended use, it was because STOCK failed to warn of the risk of harm or injury to persons and/or property, including, but not limited to, the Other Property, in the Home.  Without a warning, Plaintiffs had no way of anticipating that the drywall could harm their persons or property and had every reason to expect that the product could be safely used in the Home in the ordinary manner.

196.    STOCK's failure to adequately warn of the drywall's unreasonably dangerous propensities or the risks associated with the use of the drywall directly and proximately caused Plaintiffs substantial damages.

197.    As a direct and proximate cause of STOCK's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for diminution of value of the Home; replacement/repair of the Home; the removal and replacement of any drywall contained in the Home; the replacement and/or repair of mechanical systems or other elements in the Home; the replacement and/or repair of the Other Property; and the repair and/or replacement of any other materials contaminated or corroded by the drywall.

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

198.    As a direct and proximate cause of STOCK's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property, carrying expenses such as property taxes, insurance, homeowner's association fees, utilities, air conditioning maintenance, lawn maintenance, pest control, pool service, and other related expenses, and the loss of income from the intended sale of a second Florida home, which was pulled off the market as a result of Plaintiffs' inability to move into the subject Home.

199.    As a direct and proximate cause of STOCK's acts and omissions, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

<u>COUNT XVI</u>

**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR
PRACTICES ACT
(STOCK)**

200.    Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

201.    This is an action for violation of §§501.201, et seq., Fla. Stat., the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA" or the "Act").

202.    The purpose of FDUTPA is "[t]o protect the consuming public and legitimate business enterprise from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202(2).

39

**EXHIBIT "2"**

203.    At all material times, A.R.B.C. and Plaintiffs were persons and consumers of drywall as defined under FDUTPA.

204.    At all material times, STOCK engaged in trade or commerce by selling, advertising, soliciting, offering, distributing and/or supplying drywall to consumers.

205.    STOCK advertised, solicited, offered, distributed, supplied and/or sold the drywall that was installed in Plaintiffs' Home.

206.    At the time STOCK advertised, solicited, offered, distributed, supplied and/or sold the drywall, STOCK represented that the drywall was fit for the ordinary purpose for which it was intended, *i.e.*, safe and fit for use in the construction of residential homes, and free from defects.

207.    Plaintiffs suffered damages from the unduly hazardous condition of the drywall in the Home posing serious or unreasonable risk of harm or injury to the person and/or property, including, but not limited to, the Other Property.

208.    At the time STOCK sold, advertised, solicited, offered, distributed and/or supplied the drywall that was installed in the Home, STOCK knew or should have known that the drywall was in fact unfit and/or unreasonably dangerous.

209.    STOCK sold or supplied the subject drywall to A.R.B.C. after being advised by A.R.B.C. that A.R.B.C. considered Chinese drywall to be inferior and did not want it installed in its homes, and STOCK knew about the unfit and/or unreasonably dangerous nature of the drywall before it was installed in the Home or Plaintiffs had placed Other Property in the Home.

**EXHIBIT "2"**

210.    Plaintiffs' claims arise from STOCK's unfair and deceptive conduct in selling, advertising, soliciting, offering, distributing and/or supplying defective drywall, and/or failing to disclose that the drywall was defective, unreasonably dangerous and/or not reasonably safe for its intended use in residential construction.

211.    STOCK's unfair and deceptive conduct in advertising, soliciting, offering, distributing and/or supplying defective drywall, and or failing to disclose that the drywall was defective, unreasonably dangerous and/or not reasonably safe for its intended use in residential construction constitutes unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices within the meaning of FDUTPA.

212.    STOCK's unfair and deceptive conduct in advertising, soliciting, offering, distributing and/or supplying defective drywall and/or failing to disclose that the drywall was unfit, was likely to deceive and/or mislead a consumer, such as Plaintiffs, acting reasonably in the same circumstances, to the consumer's detriment.  A reasonable consumer would presume that the drywall was reasonably fit for the ordinary purpose for which drywall is used in residential construction, *i.e.*, safe and fit for use in the construction of residential homes.  A reasonable consumer would also presume that the distributor or supplier of such drywall product would disclose and/or issue a warning to consumers after it became aware that the drywall was not reasonably fit for the ordinary purpose for which drywall is used.

213.    STOCK's unfair and deceptive conduct in advertising, soliciting, offering, distributing and/or supplying defective drywall and/or failing to disclose that the drywall was defective, unreasonably dangerous and/or not reasonably safe for its intended use offends

41

**EXHIBIT "2"**

public policy and is immoral, unethical, and is substantially injurious to consumers, such as Plaintiffs.

214.    To the extent the drywall in the Home was defective, unreasonably dangerous and/or not reasonably safe for its intended use, Plaintiffs did not get what they bargained for and are entitled to their actual damages, plus attorneys' fees and court costs. STOCK's violations of FDUTPA directly and proximately caused substantial damages.

215.    As a direct and proximate cause of STOCK's deceptive and unfair trade practices, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for diminution of value of the Home; replacement/repair of the Home; the removal and replacement of any drywall contained in the Home; the replacement and/or repair of mechanical systems or other elements in the Home; the replacement and/or repair of the Other Property; and the repair and/or replacement of any other materials contaminated or corroded by the drywall.

216.    As a direct and proximate cause of STOCK's deceptive and unfair trade practices, Plaintiffs have incurred or will incur incidental and consequential damages including, but not limited to, loss of use and enjoyment of real property, carrying expenses such as property taxes, insurance, homeowner's association fees, utilities, air conditioning maintenance, lawn maintenance, pest control, pool service, and other related expenses, and the loss of income from the intended sale of a second Florida home, which was pulled off the market as a result of Plaintiffs' inability to move into the subject Home.

217.    As a direct and proximate cause of STOCK's deceptive and unfair trade

42

**EXHIBIT "2"**

practices, Plaintiffs have suffered economic and non-economic damages resulting from exposure to the adverse health effects of defective drywall, and Plaintiffs have incurred or will incur personal injuries and/or risk of serious and dangerous health consequences from such exposure.

## COUNT XVII

## EQUITABLE RELIEF, INJUNCTIVE RELIEF AND MEDICAL/ENVIRONMENTAL MONITORING
## (STOCK)

218.   Plaintiffs incorporate and restate paragraphs 1-17 as if fully set forth herein.

219.   Because no adequate remedy exists for the conduct of STOCK, equitable and injunctive relief is appropriate.  An award of damages will not protect Plaintiffs from possible harm, the extent of which is not and cannot be known without the monitoring requested herein.

220.   Plaintiffs will suffer irreparable injury if the Court does not order injunctive relief and medical/environmental monitoring.

221.   Plaintiffs' Home has been analyzed and it contains hazardous compounds emitted from the Chinese drywall that is greater than normal background levels.

222.   As a proximate result of the exposure, Plaintiffs have a significantly increased risk of contracting a serious latent disease.

223.   The risk of harm to Plaintiffs was caused the negligent and other wrongful or actionable acts of STOCK, as described herein.

224.   Monitoring procedures exist that makes the detection of the presence of the

43

**EXHIBIT "2"**

hazardous compounds and the early detection of adverse health affects possible. These procedures would not normally be employed or recommended in the absence of the exposure described herein.

225.    Plaintiffs demand that STOCK: (A) recall, repurchase and/or repair the Home and (B) initiate and pay for a medical/environmental monitoring program under Florida law.

226.    Medical/environmental monitoring is a necessary component of the relief the Court should order because some of the sulfur compounds being emitted from the defective drywall are very hazardous. For example, Hydrogen Sulfide ("H2S"), one of the compounds found in the drywall is a broad-spectrum poison – meaning it can attack more than one system of the body simultaneously. H2S most commonly affects the central nervous system. Through a complex reaction, the H2S prevents oxygen from reaching cells in the body, essentially preventing them from "breathing."

227.    As a direct consequence of the wrongful and/or tortious acts and/or omissions of STOCK's conduct, Plaintiffs have been exposed to H2S, and other toxins, in quantities sufficient to harm Plaintiffs. The long-term effects of exposure to the toxins emanating from the defective drywall are unknown. Thus, there is a need for medical/environmental monitoring.

228.    Until it has been conclusively established that all defective drywall and other adversely affected elements of the Home have been removed and that air quality is safe, STOCK should bear the expense of environmental monitoring in the Home. Without environmental monitoring being performed, Plaintiffs will be unable to determine whether

44

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

occupancy in the Home will be safe.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury as to all issues so triable as a matter of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Honorable Court grant the following relief:

a.   An order requiring that Defendants pay damages as compensation to Plaintiffs to the full extent permitted by the law;

b.   An order requiring medical/environmental monitoring;

c.   Costs and expenses in this litigation, including, but not limited to, expert fees, filing fees, and, as to Counts VIII and XVI, reasonable attorneys' fees pursuant to section 501.2105, Florida Statutes; and

d.   Such other relief as the Court may deem just and appropriate.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

45

**EXHIBIT "2"**

*Don and Janice Marlinga v. A.R.B.C. Corporation, et al.*
Case No. 09-10655-CA
Fourth Amended Complaint

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via facsimile and U.S. Mail on March 27, 2012, to:  J. Michael Coleman, Esquire, *Counsel for A.R.B.C. Corporation*, Coleman Hazzard & Taylor, P.A., 2640 Golden Gate Parkway, Suite 304, Naples, FL 34105 (239) 298-5236; Samuel A. Danon, Esquire and Corey Lee, Esquire, *Counsel for Stock Entities*, Hunton & Williams, LLP, 1111 Brickell Avenue, Suite 2500, Miami, FL  33131  (305) 810-2460 and (305) 810-1620; A. Todd Brown, Esquire, *Counsel for Stock Entities*, Hunton & Williams, LLP, Bank of America Plaza, Suite 3500, 101 S. Tryon Street, Charlotte, NC  28280  (704) 378-4890; Wesley R. Parsons, Esquire, *Counsel for Guardian Building*, Clarke Silverglate, P.A., 799 Brickell Plaza, Suite 900, Miami, FL  33131  (305) 377-3001; Richard H. Ford, Esquire and Robert R. Saunders, Esquire, *Counsel for Manchester*, Wicker, Smith, O'Hara, McCoy & Ford, P.A., P. O. Box 2753, Orlando, FL  32802  (407) 649-8118.

SHAPIRO, BLASI, WASSERMAN & GORA, P.A.
*Attorneys for Plaintiffs*
Corporate Centre at Boca Raton
7777 Glades Road, Suite 400
Boca Raton, FL  33434
Telephone:   (561) 477-7800
Facsimile:    (561) 477-7722

By:    _____
       THOMAS A. CONRAD, ESQ.
       FL Bar No. 440957
       E-Mail:  taconrad@sbwlawfirm.com

46

**EXHIBIT "2"**

## THE ARTHUR RUTENBERG® GOLD STANDARD HOME AGREEMENT

A Gold Standard Home has ..e or less minor items needing additional work at the time of closing and no defects 15 days after closing.

Ideally, when you move into your new Arthur Rutenberg® Home, it should be 100% complete. There should be no minor items left undone. Arthur Rutenberg's® independently owned Franchises accomplish this more than two thirds of the time. Further, our policy is not to close with more than five minor items incomplete and if you can allow us the time, we prefer to achieve 100%.

To add yours to our list of Gold Standard Homes, we will need your cooperation. We ask you to read this information carefully and to ask your Sales Consultant to explain any points in further detail. Then we ask you to sign this document, signifying your willingness to participate in this program.

Upon completion of your home, you will be asked to conduct an inspection with the Construction Manager. Together we will prepare a list of any deficiencies to be corrected. Subsequently, you and the Construction Manager will reinspect the home to assure both of us that all corrective work has been satisfactorily completed.

The correction of these items and the reinspection may take several days to complete, and we must both be willing not to close until the work is completed, or at least until there are five or less incomplete items.

After closing, we will be in touch with you at least twice during the first 15 days to see if there is anything else we can do. The Franchisee or Building Company President will make a personal visit 15 days after closing to assure that we have performed.

Of course, our guaranty service personnel will be available to correct any problems that may occur for 12 months after you close on your home.

The simplicity and comprehensiveness of this policy reflects our confidence in the commitment of our employees and subcontractors to service our customers. Working together, your home will be built to Arthur Rutenberg's® Gold Standard.

This 22nd day of March, 2005.

Signed in the presence of:

Builder's Sales Consultant

BY:
NAME/TITLE

Buyers

- 8 -

8R702

## EXHIBIT "A"
## EXHIBIT "2"

MARLINGA, D 00045



Arthur Rutenberg Homes

BUILDING AGREEMENT

This Agreement made and entered into this 28th day of April, 2005, by and between Mr. Don Marlinga and Janice Marlinga , as Buyer, whose mailing address is:7937 Bridge Valley   Clarkston, MI 48348 , Phone(s) Home: 348-4175, Work: , and A.R.B.C. Corporation, 5645 Strand Blvd., Naples, FL 34110 as Builder.

1. Description: Builder will construct, finish and deliver a Residence on land owned by Buyer, the Legal Description of which is: Twin Eagles  Lot  (c)     , and Street Address is_____ situated in Collier County, State of Florida, for the consideration described below.

2. Purchase Price: Buyer will pay Builder, the sum of $  823,300.00  (U.S. Dollars) (the "Contract Price") in the following manner:

| | | |
|---|---|---|
| 1 | $   82,330.00 | (10%) this date as down payment, by check subject to collection. |
| 2 | $  123,495.00 | (15%) when plumbing is roughed in and slab is poured. |
| 3 | $  123,495.00 | (15%) when exterior walls are complete, roof trusses set and dry-in completed. |
| 4 | $  123,495.00 | (15%) windows installed, electrical, air cond. and plumbing roughed; ready for drywall |
| 5 | $  123,495.00 | (15%) when drywall complete, masonry/veneer/stucco/stone/exterior finish complete. |
| 6 | $  164,660.00 | (20%) cabinets and trim installed and ready for paint, roof complete. |
| 7 | $   82,330.00 | (10%) when completely finished and ready for delivery to Buyer. |

Builder agrees to modify the above payment schedule to conform to the schedule of an approved construction lender as required. All draw payments, with the exception of the final, are made directly to the Builder. Time is of the essence in this Agreement. All sums are due upon notice from Builder. Any amounts not paid within 10 days of such notice shall bear interest at the rate of 18% per year until paid. Final payment is due no later than 10 days after Buyer receives notice of completion from Builder.

The Contract Price is guaranteed to Buyer for a start in the month of Feb/Mar 2006. Should start of construction be delayed beyond this time by Buyer, or by reason of ruling or regulation of any governmental authority, or by reason of any other cause not the fault of Builder, then the above price may be increased to the published price for the month of actual start. If any delay in the start month is caused by Builder the price in this Agreement will remain effective.

THE BUYER/OWNER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO 10 PERCENT OF THE CONTRACT PRICE) DEPOSITED IN AN ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED, IN WRITING, BY THE BUYER/OWNER. If Buyer does not waive such right to an escrow account, Buyer acknowledges that the deposit shall be governed by the provisions of Section 501.1375, Florida Statutes and that all accrued interest on the deposit shall belong to Builder and shall not be credited to Buyer or applied against the Contract Price.

Buyer hereby WAIVES Buyer's rights to an escrow account. Initialed _____ Buyer _____ Buyer

Subject to the provisions of this Agreement, Builder agrees to use its best effort to deliver the completed Residence specified herein on or about 300 days from start of construction but it is understood that this is neither a contractual obligation nor a guarantee of any kind. Start of construction is defined as the date on which footings are poured, or in the case of monolithic footings and slab, the day forms are set. Builder cannot and will not be responsible for any damages or inconvenience caused to Buyer for failure to complete the Residence specified herein within the above number of days, regardless of the reason for such delay. Buyer agrees that Builder shall have the right to substitute material or items of comparable quality for such material or items which may be unobtainable by reason of strikes or discontinuance of production for any reason. Builder shall advise Buyer of such substitutions, giving advance notice where possible.

ARHEG.DOC

- 1 -

07/02

EXHIBIT "B"
EXHIBIT "2"

MARLINGA, D 00008

3. **Craftsmanship:** Residence will have craftsmanship equal to or better than that used in the model home at 7873 Classics Drive,       ples, FL 34113.

4. **Exhibits:** The following exhibits are attached hereto and are incorporated herein and more fully describe the Residence covered by this Agreement, Product Manual Floor Plan Sheet, and Specifications (10 pages or more), Specifications and features shown in other model home centers and included in their Base Price may be different from specifications and features included in the Base Price in the itemization of this Agreement. The Contract Price is based specifically on these exhibits. Any specification and/or feature discussed but not included in these exhibits is not included in the Contract Price.

5. **Changes:** Should Buyer at any time before or during the construction of Residence require any additions or changes to plans, Buyer shall have the right to make such changes when practical, and price of same shall be paid in cash at the time of signing the Change Order. A Plan Approval Period, extending from the signing of this Agreement to time when both Approval Plans and Color Worksheet are signed, provides time for these changes. During Plan Approval Period, changes to Residence can be made at customary sales office prices. After Plan Approval Period, an administrative service charge of $_____50.00 may be added to the price of any change. After construction has commenced, changes will be priced to include rework on Residence or rework of materials being prepared by a supplier to Residence.

Should changes in plans or specifications be required by authorities of subdivision where Residence is located, such as developer, Architectural Review Board, Homeowner's Association or by competent municipal or any other governmental authority having jurisdiction over construction practices on Residence, such changes shall be made at Buyer's expense. Builder shall be allowed additional time necessary to complete work for each Change Order, whether at request of Buyer or in compliance with restrictions of subdivision where Residence is located.

6. **Insurance:** Builder will provide Builder's Risk Insurance for the complete value of the Residence during the construction period. Builder will also furnish Worker's Compensation as mandated by the Florida Statutes, and Builder's Public Liability Insurance, in the amount of $1,000,000 combined single limit. Builder will pay utility company bills for electricity and water used during construction. Buyer will provide Flood Insurance for Residences where applicable and/or Windstorm Coverage for Residences built within 1,000 feet of the Gulf, Ocean, Bays, or on a Barrier Island during the construction period. Buyer is advised to furnish Buyer's Public Liability Insurance.

7. **Site Costs:** It is hereby agreed that, when applicable, the following site or location related items are to be charged to Buyer:

- All necessary surveys
- Equipment rental providing utility service not available to Buyer's homesite during construction
- All building fees and permit charges
- Water and sewer impact and connection fees
- Water meter
- Other impact fees
- Extra foundation block, fill dirt and labor under the slab, pool deck, patio, drives or walks over and above that which would be required for the normal two course foundation
- Soil test
- Engineering
- Pilings
- Additional expenses for pumping concrete due to site conditions
- Any fill dirt required at the time of grading the lawn area
- Additional machine grading of the lot over 10,000 square feet
- Removal of excess dirt, vegetation and trees in building area or in lawn area at time of grading
- Underground electric, telephone service
- Additional electric service lines over fifty (50) feet for overhead power
- Extended electrical service through attic or under slab
- Expense caused by rock or other adverse subsoil conditions

1BAREG.DOC                                                             - 2 -                                                                      8/7/02

**EXHIBIT "B"**

**EXHIBIT "2"**

- Additional concrete driveway over <u>1600</u> square feet will be charged at $_____6.55 per square foot
- Additional concrete for 'c sidewalk will be charged at $_____3.5' r square foot.
- Additional public water and sewer lines over a distance of forty (40, 'o t
- Septic tank, water well, water pump and related electrical plumbing connections

Those charges listed above which are applicable are shown in the attached itemization or may be charged to Buyer by written and signed change order at a later date.

8. Home Insulation: Builder shall provide insulation in Residence as follows:

| | | | |
|---|---|---|---|
| Vaulted living area ceilings | Type <u>Batt</u> | Thickness __9"__ | R-Value <u>30</u> |
| Other living area ceilings | Type <u>Blown</u> | Thickness __12"__ | R-Value <u>30</u> |
| Exterior block walls | Type <u>Rigid Board</u> | Thickness __3/4"__ | R-Value <u>5</u> |
| Exterior frame walls | Type <u>Batt</u> | Thickness __6"__ | R-Value <u>26</u> |
| Living area garage walls | Type <u>Batt</u> | Thickness 3 1/2" | R-Value <u>11</u> |
| Interior ceiling knee walls | Type <u>Batt</u> | Thickness 6 1/2" | R-Value <u>26</u> |

(The higher the R-Value, the greater the insulating power.)

9. Soil Conditions: Builder does not expressly or impliedly warrant or guaranty soil or subsurface conditions of the subject property. Buyer is responsible for obtaining any and all soils and subsurface tests and assumes the risk of any and all loss or damage to the subject property caused by soil or subsurface conditions, whether or not any such adverse conditions could have been discovered prior to the closing by appropriate testing. Builder does not undertake to and will not test the soil or subsurface conditions unless requested and paid for by Buyer. It is Buyer's sole responsibility to ensure that as of the start of construction, the soil and subsurface conditions are suitable for construction of this Residence.

10. Pool Finish: If improvements purchased herein include a swimming pool with a natural or exposed aggregate finish, Buyer expressly acknowledges that with a natural finish light gray spotting or streaking discoloration called "mottling" may occur and that an exposed aggregate finish may experience discoloration. These are normal conditions and are not defects. The pool finish is not warranted against streaks, stains, mottling, discolorations, spotting caused by foreign impurities in the materials, and checking or shrinkage cracks are normal to all cementitious materials. Buyer is responsible for the proper maintenance and care of the pool, as well as the careful balance of the chemicals in the pool water, to help prevent stains, streaks, or other discolorations of the pool finish.

11. Completion: Once Builder has received full payment, Builder will deliver possession of premises to Buyer and present an "Affidavit of Contractor" pursuant to 713.06, Florida Statutes. Buyer must not take possession of or occupy Residence prior to completion and final payment. If Buyer takes possession prior to completion and or final payment to Builder, such possession constitutes full and complete acceptance of Residence "As Is" and terminates any obligation of Builder. Builder's right to recover full and final payment is not diminished by Buyer's actions.

Buyer or their designated representative, may enter upon Residence at reasonable times, without interrupting work, to observe construction progress at Buyer's own risk. Buyer releases, indemnifies, defends and holds Builder and its agents harmless from any and all liability for damages or injury sustained by Buyer or Buyer's representative while on Residence or sustained to Residence by actions of Buyer, Buyer's representative or by any third party brought on Residence by Buyer.

Buyer shall not perform any work related to this Agreement, either directly or indirectly, except as covered by this Agreement, nor award any other contracts in connection with construction or other work on Buyer's lot.

12. Builder's Guaranty: Builder certifies that the above Residence is guaranteed against defects in the original material and workmanship for ONE YEAR from the "Closing Date". The Closing Date is defined as the earlier of: the date Builder delivers possession of the Residence to Buyer, or ten days after the date Builder delivers a Notice of Completion to Buyer, or the date final payment is made by Buyer to Builder. Builder will at its option repair or replace, at no charge to Buyer, any component of this Residence which shall be found either structurally or functionally defective. This Guaranty does not cover

1SARES.DOC
-3-
8/7/02

**EXHIBIT "B"**

**EXHIBIT "2"**

MARLINGA, D 00046

carpet, lawns and landscaping, mold, mildew, and fungus, and other items which are subject to normal maintenance by the homeowner.

Further, the basic structural components of the above Residence are guaranteed against structural defects in the original material or workmanship for a period of ten years from the Closing Date. The basic structural components include:

- Foundation
- Concrete or Wood Floor Systems

- Exterior Walls and Load Bearing Interior Partitions
- Roof Trusses and Rafters

Minor expansion, contraction, and settling cracks normal to construction, and damage due to soil or other subsurface conditions are not considered to be defects under the terms of this Guaranty. This Guaranty remains with the Residence and is transferable to future owners, and is in exclusion of, and in lieu of, all other guaranties, expressed or implied, written or oral, including but not limited to any implied warranties of fitness or merchantability, save and except all manufacturers guaranties or warranties which shall be enforced according to their own terms.

Builder reserves the right to determine whether the work requested of it is included under this Builder's Service Guaranty. Builder's sole obligation is to perform service work and it is not liable for any money damages or payments in lieu of performance. Builder's obligation extends only to work performed by or for Builder and excludes all additional work performed directly for Buyer.

13. Statutory Disclosures:

Radon Gas: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit. Builder has made no independent inspection of the Property to determine the presence of conditions which may result in radon gas; however, Builder is not aware of any such condition.

Swimming Pool Safety: If this Agreement includes a residential swimming pool, Builder must provide Buyer a document containing the requirements of the Swimming Pool Safety Act (F.S. 515) and a copy of the publication adopted by the Department of Health under F.S. 515.31 that provides information on drowning prevention and the responsibilities of pool ownership.

*Buyer hereby states that Buyer (has)(has not) received a copy of the Swimming Pool Safety Act F.S. 515 and the Swimming Pool Drowning Prevention Brochure.*

Energy Efficiency Rating: If at the time of or prior to Buyer's execution of this Building Agreement, Buyer makes a written request for an energy calculation for the Residence, the energy-efficiency rating for the Residence shall be provided to Buyer, prior to occupancy, at Buyer's expense.

*Buyer hereby states that Buyer (has)(has not) received a copy of the energy-efficiency rating information brochure prepared by the Department of Community Affairs.*

Construction Industry Recovery Fund: Payment may be available from the Construction Industry Recovery Fund if Buyer loses money on a project performed under contract, where the loss results from specified violations of Florida Law by a State Licensed Contractor. For information about the Recovery Fund and filing a claim, Buyer may contact the Florida Construction Industry Licensing Board at the following number and address: Construction Industry Licensing Board, 7950 Arlington Expressway, Room 300, Jacksonville, Florida 32211-7467, Tel.: (904) 727-6530.

Florida's Construction Lien Law: ACCORDING TO FLORIDA'S CONSTRUCTION LIEN LAW (SECTIONS 713.001-713.37, FLORIDA STATUTES), THOSE WHO WORK ON

1BABEG.DOC                                                    - 4 -                                                    8/7/02

**EXHIBIT "B"**

**EXHIBIT "2"**

MARLINGA, D 00011

YOUR PROPERTY OR PROVIDE MATERIALS AND ARE NOT PAID I . FULL HAVE A RIGHT O REINFORCE THEIR CLAIM FOR PAYMENT AGAINST YOUR PROPERTY. THIS CLAIM IS KNOWN AS A CONSTRUCTION LIEN. IF YOUR CONTRACTOR OR A SUBCONTRACTOR FAILS TO PAY SUBCONTRACTORS, SUB-SUBCONTRACTORS, OR MATERIAL SUPPLIERS OR NEGLECTS TO MAKE OTHER LEGALLY REQUIRED PAYMENTS, THE PEOPLE WHO ARE OWED MONEY MAY LOOK TO YOUR PROPERTY FOR PAYMENT, EVEN IF YOU HAVE PAID YOUR CONTRACTOR IN FULL. IF YOU FAIL TO PAY YOUR CONTRACTOR, YOUR CONTRACTOR MAY ALSO HAVE A LIEN ON YOUR PROPERTY. THIS MEANS IF A LIEN IS FILED YOUR PROPERTY COULD BE SOLD AGAINST YOUR WILL TO PAY FOR LABOR, MATERIALS, OR OTHER SERVICES THAT YOUR CONTRACTOR OR A SUBCONTRACTOR MAY HAVE FAILED TO PAY. FLORIDA'S CONSTRUCTION LIEN LAW IS COMPLEX AND IT IS RECOMMENDED THAT WHENEVER A SPECIFIC PROBLEM ARISES, YOU CONSULT AN ATTORNEY.

14. Assignment: Buyer may not assign this Agreement without the written consent of Builder.

15. Resolving Disputes: Buyer and Builder agree to use their best efforts to amicably resolve any dispute that may arise between them. We agree to give each other timely written notice of any disputed issue and to mediate any dispute before proceeding with litigation. Within ten days of becoming aware of a dispute Buyer or Builder shall deliver to the other a written notice describing the dispute and that party's position. Within ten days of receiving the written notice the other party shall deliver a written response to the notice describing their position regarding the dispute. We agree that we will work together for at least twenty days following that written response to the notice, to resolve the dispute. If we cannot resolve that dispute after twenty days, either Buyer or Builder may deliver to the other a written demand for mediation. We will select an impartial mediator to assist us in mediating the dispute and we will share evenly the mediator's fee and room charge, if any, for a place to conduct the mediation. If we cannot agree on a mediator we shall file a Request for Mediation with the American Arbitration Association ("AAA"), sharing the AAA fees for mediation and have the AAA appoint a mediator in accordance with the AAA's Construction Industry Mediation Procedures. If we cannot resolve the dispute at mediation, we agree to resolve the dispute by a lawsuit filed in the county where the project is located. Mediation is a condition precedent to litigation. We waive any right to jurisdiction or venue in any other court. The law in that state

HARED.DOC                                - 9 -                                        8/7/02

**EXHIBIT "B"**

**EXHIBIT "2"**

MARLINGA, D 00012

( )

shall be applied when construing this Building Agreement and shall be applied when resolving any dispute between us. Builder and P·····er agree to have a judge resolve the dispute and we waive any right to a jury trial for any and all dis_____ between us of any kind. We also waiv_____ right to seek any award of punitive or exemplary damages in any and all disputes between us of any kind. We agree that each of us will pay our own expert witnesses, attorneys' fees and costs incurred to investigate, mediate and litigate the dispute, including for trial and appeals, even if a relevant statute would award the fees and costs to the prevailing party. We agree that this lawsuit will only involve Buyer, Builder and any subcontractors, suppliers or engineers whose work or materials are at issue and that we will not join any other party in the lawsuit. This dispute resolution procedure will survive the termination or breach of the Building Agreement.

16. Cancellations: This contract is not cancelable by either party.

(THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK)

- 6 -

b/7/02

**EXHIBIT "B"**
**EXHIBIT "2"**

ACKNOWLEDGMENT OF GUARANTIES AND DISCLAIMERS



I understand that the Builder's Guaranty in Paragraph 12 contains all of the guaranties and warranties provided me relating to the Residence I am purchasing. BUILDER, A.R.B.C. CORPORATION HEREBY DISCLAIMS ANY AND ALL OTHER WARRANTIES OR GUARANTIES, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OR GUARANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. I ACKNOWLEDGE RECEIPT OF THE MOLD AND CHEMICAL DISCLOSURE AND DISCLAIMER AND UNDERSTAND THAT BUILDER DISCLAIMS ANY LIABILITY FOR ANY DAMAGES OF ANY KIND RELATED TO EXPOSURE TO MOLD, FUNGUS, OR CHEMICALS. I further understand that no other representations, either oral or written, or whether contained in any advertisements, pamphlets, brochures or similar sales materials, shall create any additional express or implied warranties or guaranties beyond those contained in the Building Agreement. To the extent any such representations contradict the terms hereof, such representations shall be invalid and the terms of these documents control.

I UNDERSTAND THAT FLORIDA LAW CONTAINS IMPORTANT REQUIREMENTS I MUST FOLLOW BEFORE I MAY FILE A LAWSUIT OR ARBITRATION FOR DEFECTIVE CONSTRUCTION AGAINST A CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL FOR AN ALLEGED CONSTRUCTION DEFECT IN MY HOME. SIXTY (60) DAYS BEFORE I FILE MY LAWSUIT OR ARBITRATION, I MUST DELIVER TO THE CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS I ALLEGE ARE DEFECTIVE AND PROVIDE THE CONTRACTOR AND ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND MAKE AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. I AM NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR OR ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW.



I understand that "Arthur Rutenberg Homes" is a trademark only, and is being used by Builder, A.R.B.C. Corporation, and that neither Arthur Rutenberg, personally, nor Arthur Rutenberg Homes, Inc., has any legal involvement in or responsibility, obligation or liability for the construction of my home, or for performance of this Agreement or any warranties or guaranties whether expressed or implied or contained herein.

I understand that the Builder's Guaranty will be null and void if the terms and conditions of Agreement have been modified or altered.

I have received a copy of the Home Owner Manual.

IN WITNESS WHEREOF, said parties to these presents have hereunto set their hands and seals the day and year above written.

WITNESSES:

_____        _____
                                        BUYER

_____        _____
                                        BUYER

_____        By: _____
                                        NAME/TITLE

_____        A.R.B.C. CORPORATION
                                        BUILDER
                                        License Number: CBC047719

fBAREG DOC                        - 7 -                        8/7/02

**EXHIBIT "B"**
**EXHIBIT "2"**

MARLINGA, D 00044

## THE ARTHUR RUTENBERG® GOLD STANDARD HOME AGREEMENT

A Gold Standard Home has five or less minor items needing additional work at the time of closing and no defects 15 days after closing.

Ideally, when you move into your new Arthur Rutenberg® Home, it should be 100% complete. There should be no minor items left undone. Arthur Rutenberg's® independently owned Franchises accomplish this more than two thirds of the time. Further, our policy is not to close with more than five minor items incomplete and if you can allow us the time, we prefer to achieve 100%.

To add yours to our list of Gold Standard Homes, we will need your cooperation. We ask you to read this information carefully and to ask your Sales Consultant to explain any points in further detail. Then we ask you to sign this document, signifying your willingness to participate in this program.

Upon completion of your home, you will be asked to conduct an inspection with the Construction Manager. Together we will prepare a list of any deficiencies to be corrected. Subsequently, you and the Construction Manager will reinspect the home to assure both of us that all corrective work has been satisfactorily completed.

The correction of these items and the reinspection may take several days to complete, and we must both be willing not to close until the work is completed, or at least until there are five or less incomplete items.

After closing, we will be in touch with you at least twice during the first 15 days to see if there is anything else we can do. The Franchisee or Building Company President will make a personal visit 15 days after closing to assure that we have performed.

Of course, our guaranty service personnel will be available to correct any problems that may occur for 12 months after you close on your home.

The simplicity and comprehensiveness of this policy reflects our confidence in the commitment of our employees and subcontractors to service our customers. Working together, your home will be built to Arthur Rutenberg's® Gold Standard.

This 22nd day of March, 2005.

Signed in the presence of:

Builder's Sales Consultant                                    Buyers

By: _____                    _____
NAME/TITLE                                                    _____

**EXHIBIT "B"**
**EXHIBIT "2"**

MARLINGA, D 00015

## MOLD AND CHEMICAL DISCLOSURE and DISCLAIMER

What Homeowners Should Know about Mold and Chemicals:

Mold. Lately, mold has been in the news. Mold is a type of fungus. It occurs naturally in the environment, and it is necessary for the natural decomposition of plant and other organic material. It spreads by means of microscopic spores borne on the wind, and is found everywhere life can be supported. Residential home construction is not, and cannot be, designed to exclude mold spores. If the growing conditions are right, mold can grow in your home. Most homeowners are familiar with mold growth in the form of bread mold, and mold that may grow on bathroom tile. Mold can also grow in other areas of the home such as air conditioning ducts and wall cavities.

In order to grow, mold requires a food source. This might be supplied by items found in the home, such as fabric, carpet or even wallpaper, or by building materials, such as drywall, wood and insulation, to name a few. Also, mold growth requires a temperate climate. The best growth occurs at temperatures between 40° F and 100° F. Finally, mold growth requires moisture. Moisture is the only mold growth factor that can be controlled in a residential setting. By minimizing moisture, a homeowner can reduce or eliminate mold growth.

Moisture in the home can have many causes. Spills, leaks, overflows, condensation, and high humidity are common sources of home moisture. Good housekeeping and home maintenance practices are essential in the effort to prevent or eliminate mold growth. If moisture is allowed to remain on the growth medium, mold can develop within 24 to 48 hours. All buildings contain some level of molds or fungus. The Center for Disease Control states that a causal link between the presence of toxic mold and serious health conditions has not been proven. While all mold is not necessarily harmful, certain strains of mold have been shown to have adverse health effects in susceptible persons.

What the Homeowner can do. The homeowner can take positive steps to reduce or eliminate the occurrence of mold growth in the home, and thereby minimize any possible adverse effects that may be caused by mold. These steps include the following:

1.     Before bringing items into the home, check for signs of mold. Potted plants (roots and soil), furnishings, or stored clothing and bedding material, as well as many other household goods, could already contain mold growth. Once mold is brought into the home, its spores can spread to other areas of the home.

2.     Regular vacuuming and cleaning will help reduce mold levels. Mild bleach solutions and most tile cleaners are effective in eliminating or preventing mold growth.

3.     Keep the humidity in the home low. Ventilate kitchens and bathrooms by opening the windows, using exhaust fans, or running the air conditioning to remove excess moisture in the air. Promptly clean up and dry spills, condensation and other sources of moisture. Promptly replace any materials that cannot be thoroughly dried, such as drywall or insulation.

4.     Inspect for leaks on a regular basis. Look for discolorations or wet spots. Repair any leaks promptly. Inspect condensation pans (refrigerators and air conditioners) for mold growth. Take notice of musty odors, and any visible signs of mold.

5.     Should mold develop, thoroughly clean the affected area with a mild solution of bleach. First, test to see if the affected material or surface is color safe. Porous materials, such as fabric, upholstery or carpet should be discarded. Should the mold growth be severe, call on the services of a qualified professional.

6.     Electronic air filters that may assist in effective air filtration and dehumidifiers to maintain humidity levels are available at additional cost from numerous vendors.

1BAREG DOC

Rev 8/7/02

**EXHIBIT "B"**
**EXHIBIT "2"**

MARLINGA, D 00016

**Chemicals.** Every home contains products, materials and industrial chemicals that are used in constructing the home which may cause allergic or other bodily reactions in certain individuals. You should consult your physician to determine the chemicals that may adversely affect you or members of your family. The construction products used in building your home contain, among others, some of the following chemicals in measurable amounts:

> WATER or MOISTURE (contains or allows the growth of molds, mildew and fungus)
> FORMALDEHYDE (e.g. in carpeting and pressed wood products)
> ARSENIC (e.g. in treated wood products)
> FIBERGLASS (e.g. in insulation products)
> PETROLEUM AND PETROLEUM PRODUCTS (e.g. in vinyl and plastic products)
> METHYELENE CHORLIDE (e.g. in paint thinners)

If you are not comfortable with the fact that these chemicals or substances will exist in some amount in the home you are purchasing, you should not purchase this home.

**Disclaimer**

Whether or not your home experiences mold growth depends largely on how you maintain your home. Whether you or a family member experience any adverse health effects due to exposure to mold or chemicals depends largely on your personal susceptibility to those conditions. THE BUYER UNDERSTANDS AND AGREES THAT THE BUILDER IS NOT RESPONSIBLE, AND HEREBY DISCLAIMS ANY LIABILITY FOR, ANY DAMAGES, ILLNESS OR ALLERGIC REACTIONS WHICH THE BUYER, OR THE BUYER'S FAMILY MEMBERS MAY EXPERIENCE AS A RESULT OF MOLD, MILDEW, FUNGUS, SPORES OR CHEMICALS, TO INCLUDE, BUT NOT BE LIMITED TO, PROPERTY DAMAGE, PERSONAL INJURY, LOSS OF INCOME, EMOTIONAL DISTRESS, DEATH, LOSS OF USE, LOSS OF VALUE, AND ADVERSE HEALTH EFFECTS, OR ANY OTHER EFFECTS.

This Mold and Chemical Disclosure and Disclaimer is hereby appended to and made a part of the Building Agreement or Home Purchase Agreement. The consideration for this agreement shall be the same consideration as stated in the Building Agreement or Home Purchase Agreement. Should any term or provision of this document be ruled invalid or unenforceable by an arbitrator or a court of competent jurisdiction, the remainder of this document shall nonetheless stand in full force and effect.

I have read and understand and agree to the above.

| | | | |
|---|---|---|---|
| BUYER | 4/28/05 /Date | BUYER | 4/28/05 Date |

iBAREG·DOC

Rev. 8/7/02

MARI INGA D 00017

**EXHIBIT "B"**
**EXHIBIT "2"**

## RESIDENTIAL SWIMMING POOL SAFETY ACT
### FLORIDA STATUTE – CHAPTER 515

515.21 Short title.
515.23 Legislative findings and intent.
515.25 Definitions.
515.27 Residential swimming pool safety feature options; penalties.
515.29 Residential swimming pool barrier requirements.
515.31 Drowning prevention education program; public information publication.
515.33 Information required to be furnished to buyers.
515.35 Rulemaking authority.
515.37 Exemptions.

**515.21 Short title.**—This chapter may be cited as the "Preston de Ibern/McKenzie Merriam Residential Swimming Pool Safety Act."

**515.23 Legislative findings and intent.**—The Legislature finds that drowning is the leading cause of death of young children in this state and is also a significant cause of death for medically frail elderly persons in this state, that constant adult supervision is the key to accomplishing the objective of reducing the number of submersion incidents, and that when lapses in supervision occur a pool safety feature designed to deny, delay, or detect unsupervised entry to the swimming pool, spa, or hot tub will reduce drowning and near-drowning incidents. In addition to the incalculable human cost of these submersion incidents, the health care costs, loss of lifetime productivity, and legal and administrative expenses associated with drownings of young children and medically frail elderly persons in this state each year and the lifetime costs for the care and treatment of young children who have suffered brain disability due to near-drowning incidents each year are enormous. Therefore, it is the intent of the Legislature that all new residential swimming pools, spas, and hot tubs be equipped with at least one pool safety feature as specified in this chapter. It is also the intent of the Legislature that the Department of Health be responsible for producing its own or adopting a nationally recognized publication that provides the public with information on drowning prevention and the responsibilities of pool ownership and also for developing its own or adopting a nationally recognized drowning prevention education program for the public and for persons violating the pool safety requirements of this chapter.

**515.25 Definitions.**—As used in this chapter, the term:
(1) "Approved safety pool cover" means a manually or power-operated safety pool cover that meets all of the performance standards of the American Society for Testing and Materials (ASTM) in compliance with standard F1346-91.
(2) "Barrier" means a fence, dwelling wall, or nondwelling wall, or any combination thereof, which completely surrounds the swimming pool and obstructs access to the swimming pool, especially access from the residence or from the yard outside the barrier.
(3) "Department" means the Department of Health.
(4) "Exit alarm" means a device that makes audible, continuous alarm sounds when any door or window which permits access from the residence to any pool area that is without an intervening enclosure is opened or left ajar.
(5) "Indoor swimming pool" means a swimming pool that is totally contained within a building and surrounded on all four sides by walls of or within the building.
(6) "Medically frail elderly person" means any person who is at least 65 years of age and has a medical problem that affects balance, vision, or judgment, including, but not limited to, a heart condition, diabetes, or Alzheimer's disease or any related disorder.
(7) "Outdoor swimming pool" means any swimming pool that is not an indoor swimming pool.
(8) "Portable spa" means a nonpermanent structure intended for recreational bathing, in which all controls and water-heating and water-circulating equipment are an integral part of the product and which is cord-connected and not permanently electrically wired.
(9) "Public swimming pool" means a swimming pool, as defined in s. 514.011(2), which is operated, with or without charge, for the use of the general public; however, the term does not include a swimming pool located on the grounds of a private residence.
(10) "Residential" means situated on the premises of a detached one-family or two-family dwelling or a one-family townhouse not more than three stories high.

**EXHIBIT "B"**

**EXHIBIT "2"**

MARLINGA, D 00018

RESIDENTIAL SWIMMING POOL SAFETY ACT
FLORIDA STATUTE – CHAPTER 515

(11) "Swimming pool" means any structure, located in a residential area, that is intended for swimming or recreational bathing and contains water over 24 inches deep, including, but not limited to, in-ground, aboveground, and on-ground swimming pools; hot tubs; and nonportable spas.
(12) "Young child" means any person under the age of 6 years.

515.27 Residential swimming pool safety feature options; penalties.--
(1) In order to pass final inspection and receive a certificate of completion, a residential swimming pool must meet at least one of the following requirements relating to pool safety features:
(a) The pool must be isolated from access to a home by an enclosure that meets the pool barrier requirements of s. 515.29;
(b) The pool must be equipped with an approved safety pool cover;
(c) All doors and windows providing direct access from the home to the pool must be equipped with an exit alarm that has a minimum sound pressure rating of 85 dB A at 10 feet; or
(d) All doors providing direct access from the home to the pool must be equipped with a self-closing, self-latching device with a release mechanism placed no lower than 54 inches above the floor.
(2) A person who fails to equip a new residential swimming pool with at least one pool safety feature as required in subsection (1) commits a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083, except that no penalty shall be imposed if the person, within 45 days after arrest or issuance of a summons or a notice to appear, has equipped the pool with at least one safety feature as required in subsection (1) and has attended a drowning prevention education program established by s. 515.31. However, the requirement of attending a drowning prevention education program is waived if such program is not offered within 45 days after issuance of the citation.

515.29 Residential swimming pool barrier requirements.--
(1) A residential swimming pool barrier must have all of the following characteristics:
(a) The barrier must be at least 4 feet high on the outside.
(b) The barrier may not have any gaps, openings, indentations, protrusions, or structural components that could allow a young child to crawl under, squeeze through, or climb over the barrier.
(c) The barrier must be placed around the perimeter of the pool and must be separate from any fence, wall, or other enclosure surrounding the yard unless the fence, wall, or other enclosure or portion thereof is situated on the perimeter of the pool, is being used as part of the barrier, and meets the barrier requirements of this section.
(d) The barrier must be placed sufficiently away from the water's edge to prevent a young child or medically frail elderly person who may have managed to penetrate the barrier from immediately falling into the water.
(2) The structure of an aboveground swimming pool may be used as its barrier or the barrier for such a pool may be mounted on top of its structure; however, such structure or separately mounted barrier must meet all barrier requirements of this section. In addition, any ladder or steps that are the means of access to an aboveground pool must be capable of being secured, locked, or removed to prevent access or must be surrounded by a barrier that meets the requirements of this section.
(3) Gates that provide access to swimming pools must open outward away from the pool and be self-closing and equipped with a self-latching locking device, the release mechanism of which must be located on the pool side of the gate and so placed that it cannot be reached by a young child over the top or through any opening or gap.
(4) A wall of a dwelling may serve as part of the barrier if it does not contain any door or window that opens to provide access to the swimming pool.
(5) A barrier may not be located in a way that allows any permanent structure, equipment, or similar object to be used for climbing the barrier.

515.31 Drowning prevention education program; public information publication.--
(1) The department shall develop a drowning prevention education program, which shall be made available to the public at the state and local levels and which shall be required as set forth in s. 515.27(2) for persons in violation of the pool safety requirements of this chapter. The department may charge a fee, not to exceed $100, for attendance at such a program. The drowning prevention education program shall be funded using fee proceeds, state funds appropriated for such purpose, and grants. The department, in lieu of developing its own program, may adopt a nationally recognized drowning prevention education program to be approved for use in local safety education programs, as provided in rule of the department.

Page 2 of 3

Rev. 11/3/2000

MARLINGA, D. 00019

**EXHIBIT "B"**
**EXHIBIT "2"**

## RESIDENTIAL SWIMMING POOL SAFETY ACT
### FL   DA STATUTE – CHAPTER 515

(2) The department shall also produce, for distribution to the public at no charge, a publication that provides information on drowning prevention and the responsibilities of pool ownership. The department, in lieu of developing its own publication, may adopt a nationally recognized drowning prevention and responsibilities of pool ownership publication, as provided in rule of the department.

515.33 Information required to be furnished to buyers.--A licensed pool contractor, on entering into an agreement with a buyer to build a residential swimming pool, or a licensed home builder or developer, on entering into an agreement with a buyer to build a house that includes a residential swimming pool, must give the buyer a document containing the requirements of this chapter and a copy of the publication produced by the department under s. 515.31 that provides information on drowning prevention and the responsibilities of pool ownership.

515.35 Rulemaking authority.--The department shall adopt rules pursuant to the Administrative Procedure Act establishing the fees required to attend drowning prevention education programs and setting forth the information required under this chapter to be provided by licensed pool contractors and licensed home builders or developers.

515.37 Exemptions.--This chapter does not apply to:
(1) Any system of pumps, irrigation canals, or irrigation flood control or drainage works constructed or operated for the purpose of storing, delivering, distributing, or conveying water.
(2) Stock ponds, storage tanks, livestock operations, livestock watering troughs, or other structures used in normal agricultural practices.
(3) Public swimming pools.
(4) Any political subdivision that has adopted or adopts a residential pool safety ordinance, provided the ordinance is equal to or more stringent than the provisions of this chapter.
(5) Any portable spa with a safety cover that complies with ASTM F1346-91 (Standard Performance Specification for Safety Covers and Labeling Requirements for All Covers for Swimming Pools, Spas and Hot Tubs).
(6) Small, temporary pools without motors, which are commonly referred to or known as "kiddy pools."

www.leg.state.fl.us

MARLINGA, D 00020

## EXHIBIT "B"
## EXHIBIT "2"

IN THE COUNTY/CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT IN
AND FOR COLLIER COUNTY, FLORIDA _CIVIL_ DIVISION

Don Marlinga, et al.

_____

v.                                                    CASE NO. 2009-CA-10655

ARBC Corporation

_____

**ORDER**

THIS CAUSE having come to be heard on Defendant's/Plaintiff's

Motion to/for _Continue Case Management Conference_

and the Court having heard argument of counsel and being otherwise

advised in the premises, it is hereby,

ORDERED AND ADJUDGED that said Motion is granted/denied.

_Case management conference is reset for_
_October 4, 2012 at 9:00 am. Counsel advised_
_in open court as to date and time._

_____

DONE AND ORDERED, in Naples, Collier County, Florida, this

_20_ day of _August_ , 20 _12_ .

HONORABLE
County/Circuit Judge

Copies Furnished to:

**EXHIBIT "3"**

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR
COLLIER COUNTY, FLORIDA - CIVIL ACTION

DON and JANICE MARLINGA,

Plaintiffs,

vs.

A.R.B.C. Corporation, a Florida
Corporation, et al,

Defendants.

CASE NO. 09-10655-CA

## AGREED ORDER TO CONTINUE CASE MANAGEMENT CONFERENCE

This matter came before the Court on Defendants, Stock Building Supply, LLC and

Stock Building Supply of Florida, LLC's (together "Defendants" or "Stock"), Agreed Motion to

Continue the Case Management Conference currently set for October 4, 2012. This Court

having considered the pertinent portions of the record and being otherwise fully advised in the

premises. It is hereby:

**ORDERED and ADJUDGED** that Stock's Agreed Motion to Continue the Case

Management Conference is **GRANTED.** The Case Management Conference is continued until

February 28, 2013 at 9:00 a.m.

**DONE AND ORDERED** in Chambers at Collier County, Florida this _1st_ day of

_October_____, 2012.

_____
CIRCUIT COURT JUDGE

Copies furnished to: All Counsel of Record

J. Michael Coleman
Thomas Conrad
Steve Housen
Wesley Parson
Daniel White
Diane Cottrell

1

**EXHIBIT "3"**