# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

IN RE:  CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION

MDL NO. 2047
SECTION: L
JUDGE FALLON
MAG. JUDGE WILKINSON

THIS DOCUMENT RELATES TO:
ALL CASES AND

*Silva, et al. v. Interior Exterior Building
Supply, LP, et al.*
Case No. 09-08030 (E.D. La.)

*Silva, et al. v. Arch Insurance Company, et al.*
Case No. 09-08034 (E.D. La.)

*Payton, et al. v. Knauf Gips, KG, et al.*
Case No. 2:09-cv-07628 (E.D. La.)

*Wiltz, et al. v. Beijing New Building Materials
Public Limited Co., et al.*
Case No. 2:10-cv-00361 (E.D. La.)

*Gross, et al. v. Knauf Gips, KG, et al.*
Case No. 2:09-cv-06690 (E.D. La.)

*Rogers, et al. v. Knauf Gips, KG, et al.*
Case No. 2:10-cv-00362 (E.D. La.)

*Amato, et al. v. Liberty Mutual Ins. Co., et al.*
Case No. 2:10-cv-00932 (E.D. La.)

*Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a
Shandong Taihe Dongxin Co., Ltd., et al.*
Case No. 2:11-cv-00080 (E.D. La.)

*Abreu, et al. v. Gebrueder Knauf
Verwaltungsgesellschaft, KG, et al.*
Case No. 2:11-cv-00252 (E.D. La.)

**RESPONSE OF THE PSC, INEX AND THE KNAUF DEFENDANTS TO NORTH RIVER'S OPPOSITION TO THE MOTION TO EXPEDITE CONSIDERATION OF THE SECOND AMENDMENT TO THE INEX AND KNAUF CLASS SETTLEMENTS**

**A.**    **Scheduling**

North River's brief contains much rhetoric but little substance.

The only issue before the Court is whether to expedite the Court's consideration of the proposed Second Amendment to the InEx and Knauf settlement agreements negotiated by the PSC, InEx, Arch, Liberty and Knauf.  As to that issue, before North River filed its brief, InEx's counsel Phil Nizialek wrote to North River's counsel as follows:

> Rick [Duplantier] forwarded to me a copy of your email of yesterday to the Court regarding the referenced and the related Motion to Expedite Hearing.  I called you to discuss this, but haven't heard back from you.  We are amenable to discuss a timetable for a hearing on the Joint Motion.  Please give me a call to discuss, or provide me with North River's suggested timetable for our consideration.[1]

North River thus far has declined the invitation to meet and confer.  But that is no party's fault but its own.  The signatories to the Second Amendment remain willing to discuss a schedule with North River's counsel.  If North River wants to have such a discussion, they need only return Mr. Nizialek's call.  Failing that, the Court will have to set a schedule.

**B.**    **The Merits**

Although North River's brief concerns only a scheduling matter, the brief contains so many misstatements of fact that they must be addressed now so that the misimpressions North River attempts to create do not become embedded in anyone's consciousness.

North River's brief proceeds from the following reasoning:  (1) there was no risk that the Knauf Defendants would terminate their settlement with respect to InEx-supplied homes;  (2) therefore there was no risk to InEx in letting the termination deadline pass without reaching an

---

[1] Email from Philip Nizialek to Kevin Risley, dated October 18, 2012 (attached as Exhibit 1).

1

accommodation with the PSC and the Knauf Defendants; (3) instead the PSC, InEx and the Knauf Defendants conspired to deprive North River of its rights; (4) therefore the Louisiana case law permitting an insured to settle without the consent of the insurer when time is of the essence and the insurer has unjustifiably delayed does not apply.  As demonstrated below, North River is wrong on all counts.

1.      **Incorrect Premise No. 1:  The Knauf Defendants have acted as if they would proceed with the settlement without a North River contribution.**

The Knauf Defendants consistently have stated – from the time they first entered into their settlement agreement with the PSC – that they would terminate their settlement with respect to InEx-supplied homes without a satisfactory North River contribution to the InEx settlement.  They have backed up those words with action.  Here are the documented facts as opposed to generalities contained in North River's brief:

- In the Knauf Settlement, the InEx Class Settlement was defined explicitly to include "any supplemental recovery against InEx's excess insurer, The North River Insurance Company."[2]  In addition, any amounts attributable to KPT Chinese Drywall that are "received or to be received" under the InEx Class Settlement, including amounts received from North River, must be "deposited into the Remediation Fund" to partially offset the Knauf Defendants' costs.[3]  Furthermore, the Knauf Settlement is conditioned on a resolution of claims between "InEx or its insurers" and, absent such a resolution, "the Knauf Defendants can terminate the Settlement either in its entirety, or as to all Participating Class Members who are

---

[2] Knauf Settlement § 1.21.

[3] *Id.* § 4.8.1.

members of or were eligible to participate in … the InEx Class Settlement (if the failure to agree is with InEx or its insurers)."[4]

- On April 9, 2012, in opposition to North River's motion to lift the stay and pursue litigation against the Knauf Defendants, the Knauf Defendants stated:

  North River's memorandum (at page 4) proceeds from an incorrect premise that North River's contribution to a global resolution is not necessary because the Knauf Defendants already have committed to remediating all InEx-supplied properties containing KPT Chinese Drywall…. In fact, the structure of the proposed global settlement makes North River's participation an integral prerequisite to a complete resolution of claims. InEx, and therefore North River, will not obtain global peace without North River's participation.

  * * *

  North River's position that it may stand on the sidelines and watch other parties settle the litigation with no contribution from North River is unfounded because there will be no global settlement of claims against InEx without a contribution from North River.[5]

- At a status conference on June 13, 2012, the Knauf Defendants' counsel Mr. Glickstein explicitly stated that the Knauf Defendants would terminate the settlement absent a contribution from North River:

  I will state the position as we have told the Court and told the plaintiffs and told you [Kevin Risley]. We have been very candid that Knauf's willingness to go forward with the settlement is contingent upon all parties in the distribution chain making a fair contribution. The company is willing to overwrite the majority of the costs but not the totality of the costs. They have legitimate collection defenses which they have asserted and which under the settlement they would waive.

  I know you guys are acting as if you disbelieve our client, but our client is dead serious that the InEx portion of the settlement, at least, will not go forward if there's not a fair resolution of the North River piece. The

---

[4] *Id.* § 4.8.6.

[5] Knauf Defendants' Opposition to the Motion of The North River Insurance Company to Lift Stays as to the Knauf Entities and Interior/Exterior Building Supply Company at 4-5 [Rec. Doc. 13597].

settlement gives Knauf the right to proceed with the settlement in Florida, where the lion's share of its liability is, and not to go forward with respect to InEx supplied homes if there isn't a satisfactory resolution of this.[6]

- Beginning on August 24, 2012, the Knauf Defendants included the following footnote in bi-weekly reports provided to the Court concerning progress in the Pilot Program:

  As the Court is aware, to date InEx's excess insurer, North River, has declined to participate in the potential global resolution of Chinese Drywall litigation. The Knauf Entities have advised the Court that, in light of their right to terminate the InEx portion of the settlement absent a satisfactory settlement with North River, they are not enrolling new applicants for InEx supplied homes into the Pilot Program. While not reflected in this report, the numbers in future reports may be adjusted downward to reflect this decision.[7]

- In their brief in support of final approval of the Knauf settlement, the Knauf Defendants explicitly stated that "[t]he Knauf Settlement is contingent on certain future events" that have not occurred and explicitly stated that one contingency triggering termination would be if "the Knauf Defendants fail to agree with Banner and/or InEx on a solution that extinguishes the potential claims of Banner and InEx or their insurers against the Knauf Defendants."[8]

These were just the on the record statements. There were many more off the record.

---

[6] Transcript of Status Conference before the Honorable Eldon E. Fallon on June 13, 2012 at 30-31 (excerpt attached as Exhibit 2).

[7] Bi-Weekly Pilot Program Status Report, dated August 24, 2012 (attached as Exhibit 3). That footnote was repeated in subsequent reports submitted to the Court on September 7 and 21, 2012 and October 5, 2012.

[8] Memorandum of Law in Support of Final Approval of the Knauf Settlement at 1 n.3 [Rec. Doc. 15751-2.] North River's statement (at page 3 n.3) that the Knauf Defendants' brief did not list this contingency is therefore incorrect.

- On March 29, 2012, after North River filed a motion to lift the stay of litigation against the Knauf Defendants, their counsel Mr. Glickstein sent an email to North River's counsel stating:

  > Having read page 4 of your brief to lift the stay against Knauf, and having heard a similar statement at a prior status conference, I believe you are under a misconception about whether Knauf has agreed to fund a settlement of plaintiff's claims against INEX involving KPT drywall without North River's participation.  I'd like to walk you through the settlement agreement and show you why you are mistaken.[9]

- The Knauf Defendants' counsel, Mr. Miller, explicitly stated at the May 31, 2012 mediation with North River – in the presence of North River's counsel and client – that the Knauf Defendants would terminate their settlement with respect to InEx-supplied homes if there was not a satisfactory North River contribution.[10]

- The Knauf Defendants' counsel orally advised the PSC's lead counsel Russ Herman and Arnold Levin on many occasions that they would terminate their settlement with respect to InEx-supplied homes without an adequate contribution from North River. The Knauf Defendants' executives repeated that warning directly to Messrs. Herman and Levin on more than one occasion, including at the May 31, 2012 mediation.

- During an untranscribed Court conference on August 2, 2012 at which North River's counsel was present, PSC member Daniel Becnel stated that he had been told that the Knauf Defendants had stopped enrolling InEx-supplied homes in the Pilot Program. The Knauf Defendants' counsel, Mr. Glickstein confirmed that the Knauf Defendants

---

[9] Email from Steve Glickstein to Kevin Risley, dated March 29, 2012 (attached as Exhibit 4).

[10] Under Federal Rule of Evidence 408, although statements made in settlement negotiations are inadmissible to prove liability, they are admissible to negate the claim of undue delay which North River has asserted.

had done so because North River had refused to make a contribution to the InEx Settlement.[11]

- Shortly, thereafter, Mr. Glickstein had a phone call with Messrs. Nizialek and Duplantier on August 7, 2012 to explain that the decision to stop enrolling InEx-supplied homes in the Pilot Program was caused by the failure to reach agreement with North River and that the Knauf Defendants would in fact terminate their settlement with respect to InEx-supplied homes if no agreement was reached by the November 6, 2012 deadline. This statement was repeated orally to InEx's counsel on many other occasions.

- In response to a request by PSC member Daniel Becnel to put the Knauf Defendants' position in writing, the Knauf Defendants sent Mr. Becnel an email explaining that North River's non-participation caused the Knauf Defendants to stop enrolling InEx-supplied homes in the Pilot Program and would result in the Knauf Defendants terminating the settlement with respect to those homes:

    The Knauf Class Settlement Agreement is contingent on Knauf reaching a satisfactory resolution with InEx and its insurers, including its excess carrier North River. In other words, if InEx and/or its insurers do not make a satisfactory contribution to offset Knauf's costs under the Class Settlement Agreement, Knauf has the right to terminate the settlement with respect to homes supplied by InEx.

    Unfortunately, North River is not willing to settle on reasonable terms. North River has provided as one reason for its refusal to settle on reasonable terms that it believes that Knauf will continue to remediate homes supplied by InEx without a settlement contribution from them. North River

---

[11] The moving parties' brief in support of approval inadvertently stated that the suspension of the Pilot Program for InEx-supplied homes was communicated to InEx in September 2012. In fact, as the record demonstrates conclusively, the communication was in August 2012.

is mistaken in this assumption; Knauf is not willing to continue to remediate InEx supplied homes without a settlement with North River.[12]

These were not just words.  The Knauf Defendants did, in fact, stop enrolling InEx-supplied homes in the Pilot Program – a decision that caused great consternation to homeowners, their counsel, the PSC and InEx.

Given these facts, the notion that the Knauf Defendants have acted as if they would proceed without a North River contribution is unsupportable.  All of the evidence is to the contrary.

## 2.   Incorrect Premise No. 2:  Time was not of the essence because InEx had no exposure if the Knauf Defendants terminated their agreement.

North River asserts that the InEx and Knauf settlements have completely separate existences, so that if the Knauf Defendants pulled out, InEx still would have the benefit of releases from all plaintiffs who received KPT Chinese Drywall from InEx.  According to North River, InEx should have let the termination happen because there would be no consequences to InEx in allowing the Knauf settlement to evaporate.

In fact, InEx's very existence would be threatened by the course of action North River has proposed.  A brief history of how and when the various settlements were put together, and how they became connected to each other, will demonstrate why.

We of course acknowledge that the InEx agreement was concluded before the final Knauf agreement.  But that simply reflected the fact that the PSC negotiated agreements with different defendants in stages; it always was contemplated that the PSC would attempt to reach agreements with all defendants in the supply chain so that all of the settlements could be considered together as a consolidated whole.  Indeed, the PSC already had negotiated the Pilot Program agreement with the Knauf Defendants at the time it concluded the InEx agreement, and at the time the InEx settlement

---

[12] Email from Steve Glickstein to Daniel Becnel, dated August 8, 2012 (attached as Exhibit 5).

was concluded, the PSC was engaged in negotiations with the Knauf Defendants to reach a final agreement.

The Knauf Defendants, as is known, insisted upon linking the settlements.  In particular, the Knauf Defendants negotiated provisions in their settlement that (1) a portion of any North River recovery would be assigned to the Remediation Fund to offset the Knauf Defendants costs,[13] and (2) the Knauf Defendants could terminate if there was no satisfactory resolution with InEx and its insurers.[14]  Moreover, Section 4.8.2.1 of the Knauf Settlement explicitly provided that:

> A Participating Class Member who has opted out of the InEx, Banner and/or L&W Settlements must successfully apply to the Court to opt back in to those Settlements to be eligible to obtain benefits under this Settlement.  If the Participating Class Member remains an opt out from the InEx, Banner and/or L&W Class Settlements, then the Participating Class Member shall be deemed an opt out from this Settlement.[15]

Class members were of course notified that the settlements were interconnected so that if they wanted the very large benefits of the Knauf settlement, they would have to participate in the InEx settlement, if eligible.  The Court-approved class notice stated:  "To obtain benefits from the Knauf Settlement, Class Members who were supplied KPT Chinese Drywall through InEx must also participate in the InEx settlement and assign their benefits under the InEx settlement to the Knauf Defendants to the extent that they relate to KPT Chinese Drywall."[16]  The connectivity among the various settlements is further demonstrated by the fact that the InEx settlement deadlines for opt outs and objections, and the date for the InEx Fairness Hearing, were repeatedly extended to accommodate first the Knauf settlement and later the Global settlement.[17]  In the end, the Court

---

[13] Knauf Settlement § 4.8.2.

[14] *Id.* § 4.8.6.

[15] *Id.* § 4.8.2.1.

[16] Rec. Doc. 12061-28 (emphasis in original).

[17] *See*, *e.g.*, Rec. Doc. 10185, 11299, 12768, 14197.

issued a scheduling order advising Class Members that they should exercise their opt out rights by considering the "inter-related" Knauf and InEx Settlements together, and that the Court would consider the fairness of the two Settlements together.[18]

In light of the multiple notices to InEx Class Members that they should consider the two settlements together – and the fact that they could not opt out of the InEx Settlement if they wanted the benefit of the Knauf Settlement – it is clear that if the Knauf Defendants withdrew from their Settlement, notice of that termination would have to be given to InEx Class Members and a new opportunity to opt out would have to be provided. Without the backstop of the Knauf Settlement there likely would be a huge number of opt outs from the InEx Settlement, threatening InEx with potentially ruinous liability that North River has not agreed to insure and would in any event exceed coverage limits.

North River's position seems to be that – with a November 6, 2012 termination deadline looming – InEx should have gambled that the Knauf Defendants were bluffing when they said they would terminate their settlement, notwithstanding that the Knauf Defendants already had stopped enrolling InEx-supplied homes in the Pilot Program. Alternatively, North River's position suggests that InEx should have let the termination happen and absorb the opt out risk.

Either way, North River's position is absurd. Perhaps a large insurance company like North River can afford to take the risk that everything would just work out. But these are not gambles that a small company like InEx can take – especially when its excess insurer, North River, refuses to acknowledge that it would defend InEx from the resulting avalanche of claims or cover the resulting liability up to policy limits, let alone cover any exposure above policy limits. In essence, North

---

[18] Rec. Doc. 14566.

River was telling InEx to play Russian roulette.  The only problem is that if the bullet fired, it would kill InEx, not North River.

If North River wanted InEx to gamble, it should have confirmed to InEx that it would defend and indemnify InEx against the potential adverse consequences of a wrong decision.  Instead North River reserved all its coverage defenses, leaving InEx to fend for itself in violation of its duties to InEx under the policies and Louisiana law.  Under these circumstances, time was certainly of the essence – no rational business in InEx's position could let the November 6, 2012 termination deadline pass and gamble on what would happen next.

### 3.    Incorrect Premise No. 3:  The timing of the Second Amendment was designed to prejudice North River.

While conspiracy theories make for good television drama, imagined conspiracies rarely are supported by facts.  The notion that the PSC, InEx, Arch, Liberty and the Knauf Defendants concocted a scheme to present the Second Amendment at the last minute, in order to maximize prejudice to North River, ranks with the best of TV fiction.

North River asks why the Second Amendment was not negotiated a year ago when the Knauf settlement was initially presented to the Court in January 2012 – given that the Knauf Defendants made clear at that time that they would not go through with their settlement without a satisfactory resolution of North River's contribution.  There are two very good answers to that question.

First, all parties very much preferred reaching an agreement with North River to concluding an agreement over North River's objection.  The first half of 2012 was thus devoted to a futile attempt to reach a voluntary agreement with North River.  Toward that end,  the parties sought and obtained an order from the Court compelling a mediation with client representatives present.[19]  That mediation was held on May 31, 2012.  The Knauf Defendants flew two executives in from Germany

---

[19] [Rec. Doc. 14259.]

to attend that mediation with their counsel, which was also attended by the PSC, executives and counsel for InEx, counsel for Arch and Liberty, and a representative of and counsel for North River. At the mediation, the Knauf Defendants made clear that they would terminate their settlement with respect to InEx-supplied homes if there was no satisfactory solution by the termination deadline. Unfortunately, the mediation failed. The reason why the Second Amendment was not conceived in the first half of 2012 is that the parties proceeded exactly as North River suggests they should have proceeded – by exploring whether a voluntary agreement could be reached with North River.

The reason why the Second Amendment was not presented immediately after the mediation is that it took a significant amount of time both to conceive of the possible solution and to negotiate it. At the conclusion of the failed mediation on May 31, 2012, the Knauf Defendants again communicated orally to the PSC and InEx that some alternative solution would have to be found if they wanted to avoid termination. It was not immediately clear, however, that any solution was possible without North River's participation. In addition, there was not an immediately apparent solution for dealing with the prospect that InEx might win a liability trial – which was the principal reason North River expressed at the mediation for not making a significant contribution to a settlement.

The job of a good lawyer, however, is not just to identify problems but to find solutions. That is especially so when the consequences of a Knauf termination were terrible not only for InEx, but also for InEx class members who could not remediate their homes if the Knauf Defendants terminated their settlement. And so experienced mass tort counsel put their heads together to see if a solution could be designed that would resolve the issue despite North River's refusal to participate.

Legal research was conducted as to whether an insurance carrier could enforce the "no settlement" provisions of its insurance contract when the consequence of the insurer's refusal to

settle presented grave and immediate risks to the insured.  That research, described in the next section, revealed that Louisiana law does not force an insured to commit economic suicide when its carrier unjustifiably refuses to settle, especially when the insurer refuses to provide assurance that it will protect the insured from the consequences of not settling.  Instead, the law allows the insured to settle and bind its insurer in those circumstances.  Likewise, over a period of time a concept developed for protecting North River's principal position that it should pay zero if it won the InEx bellwether trial.  What the parties came up with was a high-low agreement which provided that North River had to pay nothing to Knauf class members if it won the InEx bellwether trial, and that it would pay 50% or 100% of available policy limits if InEx was found liable in the bellwether trial, with the percentage determined by the trial results and on a legal ruling by the Court as to whether InEx was solidarily or severally liable on the redhibition claim.

Once the general concepts of a potential agreement were discussed, the parties had to enter into a complex five-way negotiation among the PSC, InEx, Arch, Liberty and the Knauf Defendants to work out the actual agreement.  As with any negotiation, things did not proceed in a linear fashion; the negotiations were difficult and no party got all of what it wanted.  InEx had to accept a high-low settlement which did not relieve it of the burdens, distractions and potential reputational risk of the upcoming trial.  The PSC likewise had to forego settling for a single liquidated amount, and instead accelerated its efforts to take on the burdens and expense of a trial against InEx to determine InEx's liability, as well as North River's liability, and the risk that non-KPT homeowners would get no money beyond the Arch and Liberty contributions.  The Knauf Defendants likewise took the risk that an InEx victory at trial would yield no additional contribution to the Remediation Fund to offset their costs; they gave up their right to terminate if that occurred.  In addition, knowing that North River would challenge the validity of the agreement, the Defendants had to take the risk

that a court would not enforce it, although they fervently believe it is enforceable. The Knauf Defendants and the PSC also had to agree on how any supplemental recovery from North River might be divided between the Remediation Fund and the Other Loss Fund. The notion that all of this could come together in a minute ignores the complexity of the issues that had to be resolved by five parties with independent interests. The agreement took 3 ½ months to negotiate from the conclusion of the failed mediation on the last day of May until mid-September 2012. It was presented to North River as soon as it was concluded.

North River is correct that the parties did not immediately file the Second Amendment in Court once it was fully negotiated on September 14, 2012. Rather, InEx presented the Second Amendment to North River for its consideration and consent first. When North River refused its consent, counsel for InEx, and later counsel for the Knauf Defendants, attempted to engage North River in discussions that might lead to a resolution with North River, in which case the filing of the Second Amendment would have been unnecessary. When there was no resolution by mid-October, the parties had no choice but to file.

### 4.  Incorrect Premise No. 4:  Louisiana law does not permit InEx to settle without North River's permission in these circumstances.

As set forth in our memorandum in support of the joint motion, under Louisiana law, courts have refused to enforce "consent-to-settle' or "no action" clauses in insurance policies where, as here, an insurer wrongfully denies coverage or unjustifiably delays settlement, forcing the insured to enter into a reasonable settlement on its own.[20]  North River contends that *Babst* is at variance with Louisiana law and an unwarranted extension of the Louisiana Supreme Court's decision in *Hooley*, which should be limited to its facts.

---

[20] Joint Mem. at 11-13 (citing, among other cases, *Thomas W. Hooley & Sons v. Zurich Gen. Acc. & Liability Ins. Co.*, 235 La. 289 103 So.2d 449 (1958) and *Emile M. Babst Co. v. Nichols Constr. Corp.*, 488 So.2d 699, 703 (La.App. 1 Cir. 1986)).

But North River does not cite a single case or other authority in support of its contention. To the contrary, even the cases that North River cites acknowledge that an exception to the general rule that "consent-to-settle" clauses are enforceable arises under Louisiana law where, as here, "the insurer 'denies coverage or unjustifiably delays settlement.'"[21]

Moreover, in *Hooley*, the Louisiana Supreme Court explicitly made clear that a "consent-to-"settle" clause might be unenforceable not only "following a denial of liability by the insurer," but also based on the insurer's "inaction thereto."[22] The holding in *Babst* is consistent with that principle. Indeed, *Babst* is not the only case that has applied the principle – that an insurer's unjustified delay in settling prohibits the insurer from relying on a "consent-to-settle" clause – in circumstances analogous to those present here. Thus, the court in *Federal Insurance Co. v. New Hampshire Ins. Co.*,[23] held that an excess insurer that paid a settlement within the primary insurers' policy limits could maintain a claim for reimbursement against the primary insurers which allegedly "'unjustifiably delayed' completion of the settlement agreement … when 'time was of the essence' because [the insured] was at an imminent risk of losing money" in an upcoming trial.

Here, *Babst* is directly on point. InEx's very existence was threatened by North River's unjustifiable delay in consenting to settlement. Absent the Second Amendment, the Knauf Defendants would terminate their settlement, which likely would cause the InEx settlement to collapse and expose InEx to potentially crippling liability that would exceed its insurance coverage. Louisiana law does not compel InEx to jump from an airplane without a parachute. Rather, under these circumstances, InEx can enter into the Second Amendment notwithstanding the "consent-to-

---

[21] *New England Ins. Co. v. Barnett*, 465 Fed. Appx. 302, 307 (5th Cir. 2012); *see Danrik Constr. Inc. v. American Casualty Co. of Reading Pa.*, 314 Fed. Appx. 720, 723 (5th Cir. 2009) (same).

[22] *Hooley*, 235 La. at 300, 103 So.2d at 453.

[23] 2010 WL 28568, at *6 (M.D. La. Jan. 4, 2010).

settle" clause in its insurance policy with North River under Louisiana law.  As North River has not cited any case to the contrary, its position should be disregarded.

### 5.     Incorrect Premise No. 5:  The Second Amendment requires a new publication notice.

North River devotes a couple of sentences (at pages 2, 8) to arguing that the InEx class must be provided with a separate notice informing them of the Second Amendment.  North River misstates both the facts and the law.

Initially, we point out that the overwhelming majority of InEx class members *do* have notice of the Second Amendment.  Most potential claimants against InEx are represented by counsel in the MDL, and those claimants did receive notice (through their counsel) when the motion to approve the Second Amendment was filed.  The question, therefore, is not whether there should be additional notice, but whether there should be a second *publication* notice and another opportunity to opt out.

The law does not support North River's claim for a second publication notice in these circumstances.  While Rule 23(e) requires the dissemination of notice to the class to advise its members of a settlement or compromise of class claims, the "mechanics of the notice process are left to the discretion of the district court subject only to the broad 'reasonableness' standard imposed by due process."[24]

---

[24] *See Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1059 (5th Cir. 1979) (upholding posting of notice on bulletin board at place of employment in Rule 23(b)(2) action involving only 100 class members); *see also Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950) ("constitutional requirements" of due process are met where class notice "[a]pprises interested parties of the pendency of the action and afford[s] them an opportunity to present their objections" with "due regard for the practicalities and peculiarities of the case."); *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982), *cert. denied*, 464 U.S. 818 (1983) ("[N]o rigid standards govern the contends of notice to class members…."); *Harris v. Graddick*, 615 F. Supp. 239, 244 (M.D. Ala. 1985); *Rivera v. Patino*, 524 F. Supp. 136, 150 (N.D. Cal. 1981) (noting that "the form and timing of any notice to the class members rests in [the court's] discretion").

The district court has the same broad discretion to determine whether to renotice the class regarding changes to an agreement.[25]  In cases where an amendment is insubstantial and/or increases or improves the benefits to the class, courts are reluctant to issue a second class notice – especially when (as here) the costs would be quite substantial.[26]  The PRINCIPLES OF AGGREGATE LITIGATION (Amer. Law Inst. 2010) suggests that a new notice is required only to "class members who may be *substantially adversely* affected by a change" that modifies the terms "in any material way," but not where the new terms result in "benefits not substantially less than those proposed in the original settlement."[27]

The proposed Second Amendment serves only to improve benefits to InEx Class Members, thereby obviating any need for a new publication notice.  The Second Amendment prevents the Knauf Defendants from terminating their settlement based on North River's refusal to participate –

---

[25] *E.g.*, *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 800 F. Supp. 2d 328, 333 (D. Me. 2011) (noting district court's "discretion under Rule 23(e) not to require new notice to the *entire* class, especially … where there are no rights to be preserved, and no likelihood that someone … would want to opt out because" of the proposed amendment).

[26] *See*, *e.g.*, *Harris*, 615 F. Supp. at 244 (refusing to order additional class notice in light of "class counsel's representation that the interests of the plaintiff class are in no way impaired by the amendment" and where the amendment to class settlement was "extremely narrow"); *New Motor Vehicles*, 800 F. Supp. 2d at 334 (declining to order class-wide notice of "immaterial" amendments in light of expensive cost of initial notice that was "large and national in character, relying on national magazines and newspapers, the internet and newswires" and the unlikelihood that amendments would cause additional class members to opt out considering modest adjustment to recoveries and the expiration of statutes of limitations"); *In re Metropolitan Life Ins. Co. Sales Practices Litig.*, 1999 WL 33957871, *13 (W.D. Pa. Dec. 28, 1999) (where modifications to class settlement include enhancements for Class Members, which were described in the Notice to the Class, … additional notice to the Class of these modifications is unnecessary.").

[27] *Id.* § 3.05(e) and (f) cmt. e (emphasis added); *New Motor Vehicles*, 800 F. Supp. 2d at 334 n.8.

an enormous benefit to the class.[28]  In addition, the Second Amendment provides that a portion of the recovery obtained from North River would be assigned to the Other Loss Fund, instead of all the money going to the Remediation Fund to offset the Knauf Defendants' costs – which is another improvement for the InEx class.  North River does not identify any way in which the InEx class has been impaired by the Second Amendment.  Consequently – and especially in light of the fact that virtually all InEx Class Members' counsel have received actual notice through service of the Second Amendment in the MDL – it is not necessary to have another round of publication notice.

Moreover, North River is not a member of the InEx Class and therefore lacks standing to object to the sufficiency of class notice.[29]  Significantly, to date no Class Member with standing has objected to the Second Amendment or requested leave to opt out – a factor which confirms that the proposed change is beneficial to Class Members and does not require an expensive and time-consuming second publication notice.

---

[28] By contrast, if the Knauf Defendants withdrew from their settlement, that would require renotice to InEx Class Members and an opportunity for them to opt out because that would entail a material adverse change to the benefits available to them.  *See* page 9

[29] *See Int'l Un. of Electronic, Elec., Salaried, Machine and Furniture Workers v. Unisys Corp.*, 858 F. Supp. 1243, 1261 (E.D.N.Y. 1994) (where counsel for non-class members requested court to renotice class, court held that counsel "ha[d] no standing to maintain any claims bearing upon the sufficiency of notice to the class members.").

Respectfully submitted,

Dated: October 23, 2012 /s/ Richard G. Duplantier
Richard G. Duplantier
Galloway Johnson Tomkins Burr and Smith
701 Poydras Street, 40th Floor
New Orleans, LA  70139
Phone: (504) 525-6802
Fax: (504) 525-2456
rduplantier@gjtbs.com

*Counsel for Interior/Exterior Building Supply, L.P.*

**PLAINTIFFS' LEAD COUNSEL MDL 2047**

Russ M. Herman, Esquire (Bar No. 6819)
Leonard A. Davis, Esquire (Bar No. 14190)
Stephen J. Herman, Esquire (Bar No. 23129)
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
LDavis@hhkc.com

Arnold Levin (On the Brief)
Fred S. Longer (On the Brief)
Matthew C. Gaughan (On the Brief)
Sandra L. Duggan (On the Brief)
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
Alevin@lfsblaw.com

**PLAINTIFFS' STEERING COMMITTEE**

Dawn M. Barrios
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
BECNEL LAW FIRM, LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Bruce William Steckler
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Ervin A. Gonzalez
COLSON, HICKS, EIDSON, COLSON
MATTHEWS, MARTINEZ, GONZALES,
KALBAC & KANE
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

Robert C. Josefsberg
PODHURST ORSECK, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
rjosefsberg@podhurst.com

Hugh P. Lambert
LAMBERT AND NELSON
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Gerald E. Meunier
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker
PARKER, WAICHMAN, ALONSO, LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Scott Wm. Weinstein
MORGAN & MORGAN
12800 University Drive, Suite 600
Ft. Myers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

Ben W. Gordon, Jr.
LEVIN, PAPANTONIO, THOMAS,
MITCHELL ECHSNER & PROCTOR, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

James Robert Reeves
LUMPKIN & REEVES
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger
SEEGER WEISS, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Daniel K. Bryson
LEWIS & ROBERTS
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
Phone: (919) 981-0191
Fax: (919) 981-0431
dkb@lewis-roberts.com

Richard J. Serpe, Esquire
LAW OFFICES OF RICHARD J. SERPE
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
rserpe@serpefirm.com

**OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE**

Richard S. Lewis
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
rlewis@hausfeldllp.com

Jeremy W. Alters
ALTERS LAW FIRM, P.A.
4141 N.E. 2nd Avenue
Suite 201
Miami, FL 33137
Phone: (305) 571-8550
Fax: (305) 571-8559
jeremy@alterslaw.com

Andrew A. Lemmon
LEMMON LAW FIRM, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

**PROPOSED CLASS COUNSEL**

Arnold Levin
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
Alevin@lfsblaw.com

Russ M. Herman, Esquire (Bar No. 6819)
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Rherman@hhkc.com

**PROPOSED SUBCLASS COUNSEL**

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
 & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com
Proposed Louisiana Subclass Counsel

James Robert Reeves
Lumpkin & Reeves
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630   jrr@lumpkinreeves.com
Proposed Non-Louisiana Subclass Counsel


**KNAUF DEFENDANTS**

KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
FRILOT L.L.C.
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504) 599-8194
Facsimile: (504) 599-8145
Email: kmiller@frilot.com

- AND –

STEVEN GLICKSTEIN (NY Bar No. 1038157)
JAY P. MAYESH (NY Bar No. 1081603)
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
Telephone: (212) 836-8485
Facsimile: (212) 836-6485
Email: sglickstein@kayescholer.com
*Counsel for the Knauf Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 23rd day of October, 2012.

/s/ Richard G. Duplantier
Richard G. Duplantier
Galloway Johnson Tomkins Burr and Smith
701 Poydras Street, 40th Floor
New Orleans, LA  70139
Phone: (504) 525-6802
Fax: (504) 525-2456
rduplantier@gjtbs.com

*Counsel for Interior/Exterior Building Supply, L.P.*