


# PLAINTIFFS VS. INEX
# Chinese Drywall MDL Case
# Expert Report

Prepared by:

James A. Tompkins, Ph.D.
President

October 5, 2012

Tompkins International
6870 Perry Creek Rd, Raleigh, NC 27616
www.tompkinsinc.com

EXHIBIT
A

# TABLE OF CONTENTS

1.0 INTRODUCTION ........ 1

2.0 LIST OF MATERIALS REVIEWED AND PROJECT RELATED ACTIVITIES ........ 1

3.0 UNDERSTANDING OF THE CASE ........ 2

4.0 SUMMARY OF OPINIONS ........ 4

5.0 OPINIONS ........ 4

6.0 THAT THE DEFECTIVE DRYWALL EVENT WAS AN UNPRECENDENTED PHENOMENON THAT INEX COULD NOT HAVE PREVENTED OR TESTED FOR ........ 5

7.0 THAT INEX TOOK REASONABLE AND PRUDENT PRECAUTIONS TO ENSURE THEY WERE BUYING ASTM CERTFIED DRYWALL ........ 5

8.0 THAT INEX COULD NOT HAVE KNOWN ABOUT NOR TESTED FOR EXCESS SULFUR IN THE DRYWALL ........ 5

9.0 THAT TESTING AT EVERY STEP IN THE SUPPLY CHAIN IS NOT AN INTERNATIONAL STANDARD ........ 6

10.0 THAT KNAUF KNEW OF THE DEFECTIVE DRYWALL AND TOOK NO STEPS TO ENSURE THAT THOSE WHO BOUGHT IT FROM THEM KNEW ABOUT IT ........ 6

11.0 THAT KNAUF SINGLED OUT ONE CUSTOMER FOR RESTITUTION AND ENAGED IN DAMAGE CONTROL ........ 7

12.0 THAT INEX WAS A VICTIM OF MALFEASANCE AND NEGLECT ON THE PART OF KNAUF AND TAISHAN ........ 7

13.0 OPNIONS IN REBUTTAL TO PLAINTIFFS EXPERT ROSEMARY COATES ........ 7

14.0 IN CONCLUSION ........ 10

APPENDIX A – JIM TOMPKINS RESUME ........ 11

## 1.0 INTRODUCTION

I, James A. Tompkins, Ph.D., am the President of Tompkins International, Inc., headquartered in Raleigh, North Carolina. I founded Tompkins Associates, Inc. in 1975. Tompkins International, Inc. is internationally known as an authority on warehousing, material handling, facilities planning, logistics, supply chain, distribution and Logistics Service Providers. I have a B.S., M.S., and Ph.D. in Industrial Engineering with a material handling/supply chain/flow focus, all of which I received from Purdue University. I have over 40 years of material handling, distribution and supply chain consulting experience, and I have participated in over 500 supply chain projects I have attached my current resume and a listing of my publications.[1]

Galloway, Johnson, Tompkins, Burr and Smith, counsel for INEX, retained me based on my experience in the global supply chain, to include China. My rate for retention is $500 per hour. I have been requested to review documents made available to me by the parties to this litigation as well as analyze other available information. I have also been requested to answer the following question:

- Did INEX act as a reasonable and prudent distributor in obtaining and importing drywall from China that ultimately was proven to contain a latent defect that caused off-gassing, smells and corrosion to copper and silver in homes where the drywall was installed in the United States?

As a designated expert on the above matter, I have performed foundational work by reviewing the court documents and their exhibits.

## 2.0 LIST OF MATERIALS REVIEWED AND PROJECT RELATED ACTIVITIES

The materials I have reviewed that have allowed me to prepare this report include the following:*

1. Report of Rosemary Coates
2. 42 Rules by Rosemary Coates
3. Corporate Testimony of Clay and James Geary
4. Personal Testimony of Clay and James Geary
5. Testimony of Isabel Knauf
6. Testimony of Dr. Hans Hummel
7. Testimony of David Gregory
8. Testimony of Mark Norris
9. Testimony of Rebecca Galleon
10. Testimony of Aprille Casey
11. Testimony of Brandyn Smith
12. Appropriate ASTM standards
13. INEX purchase and shipping documentation
14. USG test results of Knauf's drywall purchased from INEX

[1] James A. Tompkins Resume (see Appendix).





*Reviewed testimony includes all exhibits presented in each deposition.

I base my findings and opinions that follow in this report on my work and examinations to date. I reserve the right to add, alter, or delete portions of my report upon discovery of additional information.

## 3.0 UNDERSTANDING OF THE CASE

In 2005 and 2006 there was an already existing state of high demand for drywall in the United States. Initially, this high demand was fueled by the roaring property market in the US where new home construction was peaking; and the demand for drywall peaked along with it. Demand was driven higher after Hurricane Katrina hit the Gulf Coast in August 2005. Many homes and businesses were damaged or destroyed and needed repair or rebuild. At this time the majority of drywall in the US was made and sold by US based manufacturers. After Katrina, demand far exceeded supply in the US. A rationing system by domestic suppliers was put in place and not all distributors and end users of drywall could get enough to meet their needs.

In this context many building materials companies were approached by or sought out foreign drywall manufacturers, including some from China, who could produce and ship enough product to meet their and their customers' demand in the US.

In 2005 INEX was contacted by a representative of Knauf Insulation, a current vendor, asking if INEX was interested in obtaining Knauf drywall from Knauf China. After conducting proper due diligence, INEX chose to engage Knauf, a well know multinational building materials manufacturer based in Germany. The company had done business with Knauf in the past. When Knauf could no longer meet INEX's demand, INEX approached Metro-Resources, a broker for Chinese made products. After several and various conversations and exchanges between the two companies it was agreed upon that with help from Metro-Resources, INEX would buy drywall from a manufacturer in China called Taishan.

INEX, had previously imported drywall from overseas, including Indonesia, Thailand and Mexico, without incident or problems. While there were isolated complaints about this board, these are the same type of complaints about domestic board and not unique to this imported board.

INEX has a long history and excellent reputation in the building material supply business. The company, wanting to continue to provide excellent products and services to its customers and its tradition of selling only the best products took steps to ensure that the drywall products they were buying from China met all industry standard certifications.

These steps included: A) Ensuring that the product was ASTM 36 certified; B) Ensuring they were buying from reputable, large, experienced drywall manufacturers; C) Buying from a company they had dealt with before; and D) Further ensuring certification by making sure that the letter of credit included an assurance INEX would not be required to purchase drywall that was not ASTM certified, or pay the manufacturer for drywall that was not ASTM certified.





In the Summer of 2006 the first shipments of drywall from Knauf and Taishan arrived in the US and INEX took possession. They then began selling the products to their customers. As expected demand was high and they sold out their allotment of imported product.

In late October 2006 the first reports of "smelly drywall" started to come in to Knauf through their customer "Banner Supply." Knauf sent Dr. Hans Hummel to investigate some homes in Florida. Hummel also took samples to be tested. The test showed that there was a high sulfur content in the drywall resulting from the shale in the gypsum. Further testing revealed that the sulfur was present in the Shale/Gypsum at the Luneng mine in China and that was determined to be the source of the problem and the resulting bad smell.

In fairly short order Knauf came to an agreement with Banner supply that they would replace the faulty drywall for them, under the condition that they sign a confidentiality agreement. The agreement was executed by the two companies. At this point Knauf knew it had 1.5 million square feet of faulty drywall in the US.

Knauf egregiously chose not to share that information with anyone. Had they done so, installation of the faulty drywall could have ceased. Where it had been installed, (at this point in hundreds of homes, maybe thousands) repairs and reparations could have been made. None of which was done.

As a result of Knauf and Taishan covering up the problems with the sulfurous drywall from the Luneng mine in China, thousands of homeowners and a great number of buyers, sellers, installers, building supply companies and importers were served with lawsuits. These lawsuits sought to assign blame and liability on any and all that had a part to play in the making, selling, distributing and use of the drywall in the supply chain.

After careful review of the case materials, it is apparent that the responsibility for the introduction into the United States of Chinese drywall that can release sulfur gas lays solely and exclusively with Knauf and Taishan. Had Knauf and Taishan informed their customers in a timely fashion that their Chinese drywall could, would and did release sulfur gas, a small local problem could have been prevented from becoming a massive and regional problem.

Further, claims that INEX did not take enough or the proper steps to ensure that what they were buying and selling was certified and acceptable drywall are spurious and false. INEX took proper and expected steps and that in the end, no industry standard testing for importers of drywall or any other ordinary or extraordinary measures taken by INEX could have exposed the sulfur problem. Only a timely and truthful explanation of the problem from the manufacturers to INEX could have amended the problem which was not INEX's making. As it turned, out no such information was forthcoming and INEX was an innocent victim of negligence by two large multinational drywall manufacturers. INEX vetted their suppliers, ensured the product was properly certified. Further, INEX in no way could have anticipated, prevented or ameliorated the problems with the drywall which were caused by a high sulfur content in the raw materials bought and used by the aforementioned manufacturers.





## 4.0 SUMMARY OF OPINIONS

INEX acted reasonably in importing drywall and should not be responsible for any monetary, physical or health related damages resulting from the sale and installation of defective drywall that they purchased from Knauf and Taishan in 2005. They were victims of a conspiracy of silence once the problems with the drywall became known to the manufacturers. Prior to this being known there was no way INEX could have foreseen, prevented or taken any industry standard actions to have prevented the damage the drywall caused. INEX took reasonable precautions and performed satisfactory due diligence in choosing suppliers to buy from and import drywall to the United States.

They ensured that the drywall they were buying was from reputable companies with long histories of producing superior products. They followed industry standards for ensuring that the drywall they were buying was of the highest quality and met ASTM standards. No amount of additional or non-industry standard testing could have foreseen the sulfur problem in the drywall.

Nothing that was in the public domain or media at the time could have forewarned them not to buy and sell drywall produced in China. In 2005 approximately 60% of all goods sold in Wal-Mart for example were made in China. The atmosphere of the time was that Chinese made goods for sale in the US were the standard, not the exception.

ASTM C36 testing and certification did not account for high sulfur content in gypsum. INEX bought and sold the product in good faith. When the suppliers did learn that there was a problem with the drywall they chose not to inform INEX of the issues and conspired to keep it a secret. This conspiracy led to the drywall being installed in thousands of homes where a bad sulfur smell resulted and eventually corrosion of copper and silver occurred.

Had the manufacturers informed INEX of the issues in a timely manner, INEX may have prevented any further distribution of the product and could have possibly rectified any already occurring damages done to person, property and pocketbook of their customers.

Additionally it is my opinion that the expert for the plaintiffs, Rosemary Coates, has little in the way of background, experience or credibility in respect to the case and subject matter at hand. It is my opinion that her report is flawed, generic and incorrect.

## 5.0 OPINIONS

That INEX ensured that they were conducting business with and buying drywall from suppliers with worldwide reputations for quality products, services and integrity.

Prior to purchasing drywall from overseas INEX conducted due diligence in order to engage with a reputable supplier(s) with a history of producing certified products of excellent quality. Based on this research and a long-standing relationship with the globally well known building materials company Knauf, INEX made the decision to purchase drywall from Knauf. Knauf was the worldwide leader in drywall manufacturing. Their reputation for excellence was well known. INEX also had an existing relationship with Knauf which served to further confirm that Knauf





was a company they could trust and conduct business with. Ninety percent of the overseas drywall INEX purchased was from Knauf. The remaining ten percent was purchased from Taishan, a company based in China. INEX ensured that they would be conducting business with and buying from a reputable company. Taishan was at the time the largest producer of drywall in China. Taishan was awarded the prestigious distinction of being a "Famous China Brand". This is an official honor bestowed by the Chinese government to only a very few companies. It means they are a "national champion" company - a company whose methods, practices and reputation put them in the top 5% of all companies. My employees have visited the Taishan manufacturing facilities in China and inspected the campus, buildings, equipment and QC operations. They also interviewed key managers and sales people. My employees made it clear to me that this was and is a world class company and facility.

## 6.0 THAT THE DEFECTIVE DRYWALL EVENT WAS AN UNPRECENDENTED PHENOMENON THAT INEX COULD NOT HAVE PREVENTED OR TESTED FOR

Prior to this event there had been no recorded cases of imported drywall in the United States causing bad smells due to off-gassing and corrosion of copper and silver due to the same. Therefore, INEX could not have foreseen much less take reasonable action to prevent, importing and selling drywall of this nature.

## 7.0 THAT INEX TOOK REASONABLE AND PRUDENT PRECAUTIONS TO ENSURE THEY WERE BUYING ASTM CERTFIED DRYWALL

Throughout 2005, when considering, and then executing on the purchase of drywall from overseas, INEX understood the importance of buying drywall that was ASTM C-36 certified. Various countries have unique standards for the type of drywall products that can be used in construction. In the US it is ASTM C-36. With that understanding, INEX took reasonable precautions and received concrete assurance from the suppliers that what they were buying was ASTM certified. This was clearly laid out in paperwork provided to INEX by the suppliers and the Letter of Credit. While a LOC is not a purchase order it does govern the rules by which a deal between seller and buyer is to be completed and only in meeting these rules will payment from buyer to seller be released. It was therefore inherent and implicit that with the release of funds the parties and the bank agreed that the ASTM C-36 certification was guaranteed. Further INEX ensured that the proper warranties and insurance were in place for the shipment.

## 8.0 THAT INEX COULD NOT HAVE KNOWN ABOUT NOR TESTED FOR EXCESS SULFUR IN THE DRYWALL

INEX took reasonable steps and conducted proper due diligence to ensure that their imported drywall met ASTM C-36 standard. With that said, ASTM C-36 certification did not include tests for or account for the sulfur content of drywall. In fact, there was no available reference in the media or industry literature of previous issues with drywall being produced or used anywhere in the world that had adverse affects related to high sulfur content. In other words, this was an unprecedented event that no one from INEX could have foreseen or prepared for. There was no





industry standard or requirement for testing for sulfur in drywall. In fact, these products were tested by USG.

## 9.0 THAT TESTING AT EVERY STEP IN THE SUPPLY CHAIN IS NOT AN INTERNATIONAL STANDARD

It is standard for manufacturers of a given product to be given specifications for that product and to conduct a quality control regime that ensures the product meets the given specifications and standards. It is also standard operating procedure for manufacturers, when making a product on a regular basis to have their facilities and products meet national and international standards for safety and quality.

When selling to domestic or overseas buyers the manufacturer is required to inform the buyer whether or not their facilities and/or products meet or exceed local and/or international standards and specifications and those of the particular market the buyer company originates from and where the product will be deployed. In this case the supplier gave INEX verbal, written and contractual assurances that the proper standards and specifications were met.

It is not standard practice in the manufacturing and import export world to have a product tested at every stop on a given supply chain. For example, if a company in the US buys a leather jacket from the U.K., the U.K. company will use internal and perhaps external testing bodies to be sure that the product the jacket is indeed lambskin and not pigskin as the buyer contracted to by lambskin jackets and then prove to the buyer that the products meet certification. In some cases a buyer may order additional testing but this by no means always done.

Once this has been attested to by the factory and ascertained by the importing wholesaler, the wholesaler does not need to test every jacket upon arrival in the US to be sure it is lambskin. Nor do the retailers who buy it from the wholesaler or the individual stores who get the product from the parent retailer. This is not industry standard and if it was international and domestic trade would come to a standstill due to time and cost involved.

## 10.0 THAT KNAUF KNEW OF THE DEFECTIVE DRYWALL AND TOOK NO STEPS TO ENSURE THAT THOSE WHO BOUGHT IT FROM THEM KNEW ABOUT IT

The testimony of the Knauf shareholders, officer managers and employees clearly shows that the company and its officers and employees knew of the defects in the drywall within weeks of its arrival in the US. Word of the problems started to come into Knauf as early as September 2006. At first Knauf thought it to be an isolated problem. But, after deploying their chief scientist to investigate and then test the materials they had full knowledge that all of the drywall they sold to the US was defective and that potentially thousands of homes and many more thousands of people would be affected. There was a concerted effort by Knauf to cover up and contain the problem when Knauf should have: 1) immediately informed its customers of the problem; 2) given them guidance on how to handle the issue; 3) recalled the product; 4) made restitution to those who bought drywall for them; and 5) forewarned all affected parties including importers, buyers, big box retail stores, other retailers, home developers, contractors, installers and





homeowners of the defective product. Instead they stayed silent. INEX could have not done any of this as they were not in a position to do so, but the manufacturers were.

## 11.0 THAT KNAUF SINGLED OUT ONE CUSTOMER FOR RESTITUTION AND ENAGED IN DAMAGE CONTROL

Knauf came to an agreement with their customer Banner Supply in which they replaced the defective drywall that Banner bought from them and other sundry remedies. Knauf had Banner sign a settlement agreement which included a confidentiality clause which precluded Banner from talking about the issue with anyone in the media, in the industry or with any others. This shows that Knauf: 1) knew how big the problem was; 2) took actions to rectify it with a single customer; and 3) then engaged in a conspiracy of silence that kept all other injured parties in the dark about the defective drywall, including INEX.

## 12.0 THAT INEX WAS A VICTIM OF MALFEASANCE AND NEGLECT ON THE PART OF KNAUF AND TAISHAN

Knauf and Taishan produced and sold products to INEX that were not what they claimed to be, whether the manufacturers had prior knowledge to that or not. This originated at the mine and resulted in a downstream supply chain domino effect where anyone who took possession of Knauf or Taishan drywall had assurances by the suppliers that the product was defect free, and that they were in possession of the highest quality, certified products that would behave as advertised. In the case of the Taishan board, INEX took the added step of engaging a trusted and reputable broker, METRO-RESEOURCES, who further assured and guaranteed to INEX that the Taishan drywall was certified and of the highest quality. And worse, when the problems were discovered by Knauf and Taishan, they kept the information from INEX, victimizing them and all other entities downstream on the supply chain.

## 13.0 OPNIONS IN REBUTTAL TO PLAINTIFFS EXPERT ROSEMARY COATES

INEX did act in a reasonable manner and consistent with companies who imported goods from China to the US at the time. They ascertained verbally and in writing that the drywall they were buying was ASTM C-36 certified; and that the companies they were buying from were established and reputable and had no history of defective products in the US. Additionally they had imported building materials from overseas before and followed accepted standards and had no previous problems with products or customers.

It is reckless and wrong to suggest that by way of news accounts of defective products from China being discovered in the US is a pretext for either not importing goods from China or for having to go above and beyond industry accepted norms for a wholesaler importing goods from China. Further, Ms. Coates provides no proof that there was an unusual amount of media stories regarding Chinese products during 2005 and 2006, or relative to other countries of origin. Ms. Coates is being hypocritical in feeding into spurious anti-China hype and fears while she herself purports to be an expert in sourcing from China and has apparently led many companies to do just that.





Further, her "expertise" should lead her to the conclusion that no amount of testing, inspections or consultants could have detected the high levels of sulfur in the gypsum from the Lenung mine. INEX was indeed attuned to quality problem that could arise from buying products from overseas, or domestically for that matter, which is why they conducted due diligence to buy from established suppliers with good track records and why they sought and received assurances that the drywall was ASTM C certified.

Further to Ms. Coates' claim that INEX reading the papers could have prevented them from importing defective drywall, defective products at this time were detected and dealt with from dozens of countries who exported to the US, not just China. It is also well known that domestically made products suffered from quality issues. Some of these cases of domestic and foreign defective products were in the media and some were not. None of them could have led INEX to a conclusion about Chinese drywall.

I am of the opinion that if Ms. Coates holds such a low opinion of Chinese made goods as she outlined amply in her report then perhaps she was liable for neglect as well as she has seemingly made a career out of helping companies source and buy products in China.

Ms. Coates makes reference to "Elephant Board" that INEX imported from Thailand in 1999. She cites "a few customers" who complained. She does not establish what, if anything was wrong with this product. Additionally, her statement that INEX had experience with imported drywall and knew it was different is vague, empty rhetoric that has no basis in this case, or to the reality of the import export world or building supplies.

Differing physical properties are common across a broad spectrum of building material products. The initial physical differences are not indicative of defects. For example, some roof shingles can be heavier than others. This is indicative of the type of material used, but not of a defect in one or the other. More specifically to this case, it is thought by many in the industry that heavier than normal drywall is preferred by some. It is a more substantive product that lasts longer and provides better soundproofing. Some contractors may not like it because it is heavier and therefore harder to hang. Consumers may prefer it for the qualities just described. This difference in physical characteristics is not indicative of or cause for concern about potential defects.

During the time which INEX was selling China sourced drywall to its clients there were no known defects in the product. If, and I am not saying it was, company policy to send out a particular product when there was no request by a customer for a particular brand there is no intended or actual harm to the customer. Furthermore, this point is not relevant to the case as there were no known defects of product at the time.

Importing from China, or anywhere for that matter does require finding and vetting suppliers, negotiating contracts, arranging for shipping and being attuned to products specifications and requirements - all of which INEX was aware of and engaged in line with industry standards.

There is no evidence that INEX did not seek out advice on needed information about importing drywall from China. In fact the opposite is true, they eliminated several potential suppliers from consideration based on items they read and advice they sought out. Again, without citation Ms.





Coates continued to reference to items printed in abundance about defective Chinese goods is at best hearsay and at worst a purposeful distortion of the facts.

Companies must resort to 3rd party testing of products when the manufacturer has no internal testing regime and if they are not pre-certified on a particular requirement. Both Knauf and Taishan claimed and provided documentation that their facilities and products met the ASTM standards for drywall use in the US and thus INEX had no reasonable pretext for conducting further testing. Had they employed a 3rd party testing concern, nothing they would have tested for would have shown the sulfur content, only relevant ASTM standards.

90% of the drywall INEX bought was from Knauf, which met all ASTM standards including shipping and product marks. INEX requested the same standards from Taishan and was assured this would be the case. There may have been negligence on the broker's part if not all boards were marked properly. SGS was only under consideration to be engaged to monitor the loading process in China, not for quality control as this would have been unnecessary with an ASTM certified supplier and product line. Had they employed SGS, nothing they would have tested for would have shown the sulfur content, only relevant ASTM standards.

There is no basis for comparison between US domestic drywall manufacturers who are part of the US Gypsum Association and overseas manufacturers who are not. In fact, Germany and China have their own associations and industry standard groups that the suppliers in question belonged to in 2005 that INEX could rely on.

No amount of shipping inspection would have revealed a sulfur defect.

Letters of Credit specify all of the manufacturing, quality, sundry and other agreed upon terms that both parties must meet for full consummation of the transaction. In this case it was specified that all products from Knauf and Taishan be ASTM certified for the purchase to be valid. The products were ASTM certified; and again, nothing they would have tested for under ASTM would have shown the sulfur content, only relevant ASTM standards were met.

The weight of the product shown in the shipping documents is not relevant because: 1) the weight deviations have nothing to do with ASTM standards; 2) weight variations can occur because not all mined gypsum weighs the same; 3) in many cases heavier drywall means better drywall; and 4) the weight is not relevant to defect the elevated sulfur content that had no effect on the product.

The CPSC web site regarding defective drywall was set up AFTER INEX bought and sold products from Knauf and Taishan and AFTER problems were discovered and AFTER litigation began. This web site did not exist at the time of purchase and installation of the Chinese drywall. Regarding the ASTM and ISO published standards Ms Coates cites, they are certainly helpful guides, but: A) Are not required reading when buying drywall; and B) Are not relevant to the case because none of the bodies and standards mentioned had advice or a testing regime in place for the actual problem, which was elevated sulfur content.





INEX took reasonable steps to ensure they were buying quality and certified products from quality and certified manufacturers regardless of past or non-existent past relationships. Nothing in the vetting process could have prevented INEX from buying and then selling certified drywall with a higher than normal sulfur content.

Products of different origin and from different suppliers across all product categories have material differences as well as variations in performance. These differences are accounted for by customers and where they want to can specify specific brands with specific properties. It is not the duty or responsibility of warehouse personnel to investigate or set forth opinions on the variations between brands. Their job is to ensure that products that are ordered by customers leave the warehouse in good order and are properly loaded and delivered.

## 14.0 IN CONCLUSION

Based upon my experience and my investigation into INEX importing drywall from China: My answer to the question: "Did INEX act as a reasonable and prudent distributor by importing drywall from China that ultimately was proven to contain a latent defect that caused off-gassing, smells and corrosion to copper and silver in homes where the drywall was installed in the United States?" Is clearly: YES, INEX DID NOT KNOW OF THE LATENT DEFECT IN THE DRYWAL AND, FURTHER, SHOULD NOT HAVE KNOWN OF LATENT DEFECT ACTING AS A REASONABLE IMPORTER OF THE DRYWALL. They should not and could not have known of the sulfur defect. They took all reasonable and standard precautions to ensure that they were buying quality, certified product and additionally there were no standards, testing regimes, or preventative measures that INEX could have taken to anticipate the sulfur defect. INEX was victimized by the manufacturers first with the product and then a conspiracy and cover-up following the discovery of the defect.



