# EXHIBIT A

1

2          (REAL-TIME) UNEDITED TRANSCRIPTION DISCLAIMER

3

4    The following transcript of proceedings, or any portion
     thereof, is UNEDITED and UNCERTIFIED by the certified
5    court reporter, at the request of counsel for the
     plaintiff.
6
     The purchaser/user agrees not to disclose this
7    (real-time) unedited transcription in any form (written
     or electronic) to anyone who has no connection to this
8    case.  This is an unofficial transcription which should
     NOT be relied upon for purposes of verbatim citation of
9    testimony.

10   This transcription has not been checked, proofread or
     corrected.  It is a draft transcript, NOT a certified
11   transcript.  As such, it may contain computer-generated
     mistranslations of stenotype code or electronic
12   transmission errors, resulting in inaccurate or
     nonsensical word combinations, or untranslated
13   stenotype symbols which cannot be deciphered by
     non-stenotypists.  Corrections will be made in the
14   preparation of the certified transcription, resulting
     in differences in content, page and line numbers,
15   punctuation, and formatting.

16   This (real-time) unedited transcript contains no
     appearance page, certificate page, index, or
17   certification.

18

19

20

21

22

23

24

25

                  ROUGH DRAFT TRANSCRIPT ONLY

```
 1              THE VIDEOGRAPHER:  We're now on the
 2    record.  My name is Doug Overstreet, I'm the
 3    videographer.  Today's date is October 31st, 2012, it's
 4    5:07 p.m., beginning of tape one, this video deposition
 5    is being held in Corpus Christi, Texas, in the matter
 6    of Chinese manufacture drywall products liability
 7    litigation the U.S. District Court Eastern District of
 8    Louisiana.  The deponent is Mr. Saul Soto.  Would
 9    counsel please identify themselves for the record.
10              MR. LONGER:  Fred Longer on behalf of the
11    class counsel.
12              MR. GAUGHAN:  Matthew on behalf of class
13    counsel.
14              MR. HUSEMAN:  And Van Huseman on behalf of
15    the deponent.
16              MR. DODSON:  Paul Dodson for the deponent.
17              THE VIDEOGRAPHER:  Would the court
18    reporter please swear in the witness.
19                        SAUL SOTO,
20    having been first duly sworn, testified as follows:
21                       EXAMINATION
22    BY MR. LONGER:
23      Q.    Mr. Soto, my name is Fred Longer.  We met
24    before the deposition began in the hallway outside.
25    But I'll introduce myself again.  I am going to be
```

1  asking you a series of questions today.

2      A.    Okay.

3      Q.    And they are related to the objection that has

4  been filed on your behalf in the multi district

5  litigation taking place in the Eastern District of

6  Louisiana involving the Chinese drywall matter.

7      A.    Okay.

8      Q.    If I don't ask a question that you understand,

9  just let me know.  Is that okay?

10      A.    That will work.  Thank you, sir.

11      Q.    We are being recorded here, as you can see all

12  around you.  I would appreciate it, sir, you're soft

13  spoken, but I would appreciate that you keep your voice

14  up because I actually have hearing loss and I like to

15  be able to hear people and in order to do that, I need

16  to have them speak loudly.

17      A.    I understand.

18      Q.    Thank you.

19      A.    My wife tells me that.

20      Q.    For the record, sir, would you please state

21  your full name?

22      A.    My name is Saul Soto.

23      Q.    And what is your residence address?

24      A.    My residence address is 429 Claride, Corpus

25  Christi, Texas, zip code 78418.

1    Q.    And what is your date of birth?

2    A.    Date of birth is March 30th, 1982.

3    Q.    And what is your social security number?

4    A.    My social security is 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.

5    Q.    Now, my appreciation is that you have a

6  business that you operate called SHS Construction; is

7  that correct?

8    A.    That is correct, sir.

9    Q.    What is the full name of that company?

10    A.    That is the name.  It's really just my

11  initials.  It's SHS, which is Saul, and then my mom's

12  maiden name, Hernandez, Soto.

13    Q.    Now, my appreciation is that business is just

14  a name, you're not incorporated; is that correct?

15    A.    We are not incorporated, we're a sole

16  proprietorship.

17    Q.    What is the tax identification number, if any,

18  for SHS Construction Company?

19    A.    I pretty much since it's sole proprietary use

20  my social security mainly.  At one occupant I used

21  another one when I had employees and that one is

22  actually in that box, in those boxes, that tax ID

23  number.

24    Q.    We'll talk about those boxes in a moment but

25  for what period of time did you have employees that

ROUGH DRAFT TRANSCRIPT ONLY

1    we're talking about?

2        A.    Back in around 2009.

3        Q.    And what was the tax ID number that you used

4    in that time frame?

5        A.    I would have to look in there, sir.  I'm

6    sorry.  I do not have that in front of me.

7        Q.    Okay.  Was it somebody else's social security

8    number?

9        A.    No, it was just a tax ID for tax purposes.

10       Q.    All right.  Now, is it fair to say then that

11   any questions that I direct to you are also directed to

12   SHS construction?

13       A.    That would be correct.

14       Q.    All right.  Sir, you have Counsel with you

15   today, Mr. Huseman and Mr. Dodson; is that correct?

16       A.    Yes, that's correct.

17       Q.    Who are these gentlemen?

18       A.    They are the lawyers who are helping me with

19   this at this moment.

20       Q.    All right.  And when did you first meet either

21   of these gentlemen?

22       A.    I met them, I believe it was last week.  I'd

23   have to look at my schedule.  I believe it was last

24   week.

25       Q.    Okay.  And were they -- were they retained,

1    which may be the wrong word.  Were they engaged to

2    assist you in preparation for today's deposition?

3         A.    Yes, they helped me with today's preparation.

4         Q.    Okay.  And you met them last week to prepare

5    for the deposition; is that correct?

6         A.    I met them, yes.

7         Q.    All right.  And you have a calendar with you?

8         A.    I can look on my phone if you will allow me

9    to.

10        Q.    Yes.

11        A.    And I can give you -- is that what you would

12   need the date?

13        Q.    Yes, sir.

14        A.    I have it here October 24th, which is last

15   Wednesday at 10 a.m.

16        Q.    All right.  And did you arrive at this office

17   at 10 a.m.?

18        A.    I arrived at this office, actually like around

19   9:45 or 9:30 in the morning.

20        Q.    I understand you're prompt.  I saw you were

21   prompt this afternoon.  So you met beginning at around

22   let's just say 9:45, 10 o'clock and how many hours did

23   you meet with counsel?

24        A.    We were together -- let's see here.  For a

25   couple of hours, a few hours, something like that.  I

1   don't remember the exact time.  I'm trying to put it
2   together in my head.
3       Q.   So was it before lunch?
4       A.   Can I look at my phone again real quick?
5       Q.   Certainly.
6       A.   Let me look at a text message just to kind of
7   help me figure out more or less when I left, something
8   like that.
9       Q.   Whatever will refresh your recollection,
10  that's fine with me.
11      A.   It looks like around 1:00 or 2:00 or somewhere
12  around that time.  I can't say exactly what time I left
13  but it was around that time.
14      Q.   Okay.  So approximately three or four hours?
15      A.   Uh-huh.
16      Q.   Is that a yes?
17      A.   That is -- that's correct.
18      Q.   Who was present the meeting?
19      A.   That day was Mr. Huseman, Mr. Dodson, Eric,
20  and I think Ronnie was there, too, right?
21           MR. HUSEMAN:  Uh-huh.
22      A.   Ronnie, yeah.
23      Q.   All right.  Just so that I'm clear, Ronnie is
24  Ronnie Garcia?
25      A.   Ronnie Garcia, that is correct.

1     Q.    And Eric, I don't know that name.  Who is

2     Eric?

3     A.    Eric works for --

4           MR. HUSEMAN:  He's the fellow that you met

5     a while ago that made the comment about wearing a tie.

6           MR. LONGER:  He looks sharp.

7           MR. HUSEMAN:  I'll take implication on

8     that.

9     Q.    And what is Eric's last name?

10          MR. HUSEMAN:  Stewart.

11          MR. LONGER:  S-T-E-W-A-R-T?

12          MR. HUSEMAN:  Yes, sir.

13    Q.    Is that the only time that you met with -- in

14    connection with preparation for today's deposition?

15    A.    No.  We also met on Monday.

16    Q.    And who is the "we"?

17    A.    The same people.

18    Q.    For how long did you meet on Monday?

19    A.    From around 1:30 or 2:00 until about 5:00.

20    Yeah, around 5 o'clock p.m.

21    Q.    All right.  On either occasion, did you take

22    any notes?

23    A.    Yes, I did.

24    Q.    And do you have them with you?

25    A.    I do.

1    Q.   All right.  Going to ask that I be presented

2    with them and I'll mark them as an exhibit.

3              MR. HUSEMAN:  At this point I'm going to

4    instruct him not to produce those to you.  I assert

5    attorney/client privilege.

6    Q.   Would those notes be useful to you -- let me

7    ask you this question.

8              When I walked into the hallway when I met you

9    this afternoon before the deposition, were you

10   reviewing those notes?

11   A.   I was reviewing everything that I had.

12   Q.   Including your notes?

13   A.   Yes, that is correct.

14   Q.   Were those notes useful to you in terms of

15   refreshing your recollection as to how to proceed

16   through the course of this deposition?

17   A.   They help me stay focused and to be able to...

18   Q.   Is that a yes with an explanation?

19   A.   Yes, that's correct.

20             MR. LONGER:  I'm going to ask that those

21   notes be produced.

22             MR. HUSEMAN:  And those are protected by

23   attorney/client privilege so do not divulge those.

24             THE WITNESS:  Okay.

25   Q.   Have you had any communications with any other

1  counsel in connection with preparation for today's

2  deposition?

3      A.   Mr. Chris Bandas.

4      Q.   And what have you done with Mr. Bandas in the

5  way of preparing for today's deposition?

6              MR. HUSEMAN:  And if you would be kind let

7  me interrupt you.  You can tell him when you met with

8  him.

9              THE WITNESS:  That's correct.

10              MR. HUSEMAN:  But not the substance of any

11  communication with your attorneys, please.

12              THE WITNESS:  I appreciate that.  Thank

13  you.

14      A.   We met -- we met a couple of times back on

15  September 28th, I believe, and then again -- is it okay

16  if I look at my schedule on my phone?

17      Q.   Sure.

18      A.   And October 17th.  Yeah, we have communicated,

19  I believe one or two times on the phone this month.

20      Q.   All right.  And would anything in that

21  Blackberry relate those communications?

22      A.   I mean, we talk on the phone.  I believe there

23  might have been like a text message just confirming a

24  time, I believe.

25              MR. HUSEMAN:  Yeah, make sure Mr. Soto you

1    stay away from the substance of any communications.

2              THE WITNESS:  Okay.

3              MR. HUSEMAN:  The subject matter or the

4    contempt, either one.

5              THE WITNESS:  Okay.

6      Q.   All right.  Now, the meeting on September 28,

7    is that the first time that you met Mr. Bandas?

8      A.   That is the first time we met face-to-face.

9      Q.   Okay.  And how did you meet Mr. Bandas

10   otherwise prior to that?

11     A.   Through a friend of mine.

12     Q.   And your friend's name is?

13     A.   His name is Christopher Batman.

14     Q.   Can you spell that, please?

15     A.   C-H-R-I-S-T-O-P-H-E-R.

16     Q.   And the last name?

17     A.   Batman, B-A-T-M-A-N.

18     Q.   And who is Mr. Batman to you?

19     A.   He's just a friend who also is a customer of

20   mine.

21     Q.   And what sort of customer is he?

22     A.   We have done work for him on his home, some

23   remodeling, things of that nature.

24     Q.   And what relationship, if any, does Mr. Batman

25   have to Mr. Bandas, to your knowledge?

1    A.    I believe they work in the same office.  I

2  don't know exactly what they do together, to be honest

3  with you.

4    Q.    What is Mr. Batman's vocation?

5    A.    He is a lawyer.

6    Q.    And he is an attorney for the Bandas law firm?

7    A.    I'm actually not sure.  I believe he operates

8  out of there, but he has his own law firm, which is the

9  Batman law firm.

10    Q.    Got it.  Now, you mentioned that you had met

11  Mr. Bandas prior to September 28th in connection with

12  Mr. Batman.  Was that by telephone?

13    A.    I had talked to him on telephone before that.

14    Q.    All right.  And what date was that?

15

16

17    A.    It was probably a few days before that.

18    Q.    So late September 2012?

19    A.    That is correct.

20    Q.    All right.  And when you spoke to Mr. Batman,

21  what -- what was it that he was relating to you that

22  you should speak to Mr. Bandas?

23    A.    Obviously since we know each other and we

24  worked together before, he knew that we -- you know, we

25  installed sheetrock and we did things of that nature.

1    And we had also installed sheetrock in a couple of jobs

2    at his house, so he let me know about this case.

3        Q.    Is that the first time you had ever heard

4    about the Chinese drywall case?

5        A.    That is correct.

6        Q.    And was Mr. Batman interested in -- did he

7    express any interest in you participating as an

8    objector to the settlement at that time?

9        A.    All he said is, you know, knowing that I had

10   installed it before, that, you know, it was something

11   that I should probably look into.

12       Q.    What is it that you should look into?  I

13   missed that?

14       A.    As far as the installation of the sheetrock

15   that we had done before.

16       Q.    Yeah, but what was it that he said you should

17   look into and the nature of the litigation?

18       A.    As far as being a class member.

19       Q.    And what was it that you were going to look

20   into?

21       A.    Well, seeing --

22       Q.    As far as being a class member?

23       A.    Well, seeing as I knew that I had installed

24   sheetrock before, then I knew that I needed to look

25   into it because I might have been involved in putting

1    in defective sheetrock in people's houses.

2       Q.    Did he direct you to Mr. Bandas specifically?

3       A.    Yes, he referred me.

4       Q.    Is there anything else about that conversation

5    that you can recollect with Mr. Batman?

6       A.    That's pretty much everything, sir, that I can

7    remember.

8       Q.    Do you know if Mr. Batman and Mr. Bandas share

9    cases together?

10      A.    I don't know.

11      Q.    And -- and the -- what's the next step that

12   you took in the way of following up on your

13   conversation with Mr. Batman?

14      A.    He gave me the number to Mr. Bandas and I

15   called it.

16      Q.    All right.  And that was the call that we

17   agreed was some time in late September 2012?

18      A.    That is correct.

19      Q.    And what was the nature of your conversation

20   with Mr. Bandas?

21             MR. HUSEMAN:  Once again Mr. Sew Soto you

22   do not talk about what was discussed.

23             MR. LONGER:  Let me just.

24             MR. HUSEMAN:  Let me give him

25   instructions, please.  Any content of your

1    communication with Mr. Bandas should not be discussed.

2    THE WITNESS:  Okay.

3    Q.    When you called Mr. Bandas, was it your --

4    what was your intention?

5    A.    Well, to be honest with you, the first thing

6    that came to mind and that got me worried was man, if I

7    installed this sheetrock in some people's houses, how

8    can I be held liable against it or is that, you know,

9    going to affect me?

10   Q.    Okay.  Did Mr. Batman show you the settlement

11   agreement?

12   A.    No.

13   Q.    Did Mr. Batman direct you to the website or

14   any location where you could obtain the settlement

15   agreement?

16   A.    No, he didn't.

17   Q.    So he suggested to you at the time that you

18   could be held liable for something in the -- during

19   your conversation?

20   A.    He did not suggest that, no, sir.

21   Q.    Well, how is it that you became concerned and

22   were asking yourself how is that going to affect me?

23   A.    Well, as a Ben business owner, I mean, I work

24   off of referrals and that's the first thing that came

25   to mind.

1      Q.    Has anyone expressed to you a concern about

2  Chinese drywall being in their home?

3      A.    Nobody has called me on that.

4      Q.    Now, you called Mr. Bandas on September 20 --

5  I'm sorry, in late September?

6      A.    Yes.

7      Q.    And how long did you talk to Mr. Bandas?

8      A.    A couple of hours.

9      Q.    And in the course of that conversation, were

10  you seeking to retain counsel?  Strike that.

11          Going into the conversation, were you seeking

12  to retain counsel?

13     A.    I knew that I needed to talk to a lawyer,

14  that's what I did know.

15     Q.    All right.  And at the end of the

16  conversation, what was your understanding about what

17  you were going to do about speaking to a lawyer?

18     A.    Well, my understanding was that I was part of

19  this class and after seeing pictures, which confirmed

20  to me that I did install sheetrock of that nature that

21  were made in China, you know, the pictures that I seen

22  showed -- helped me understand that, it kind of was

23  true.

24     Q.    Well, this is on the told phone.  Where did

25  you see pictures of Chinese drywall?

1     A.     You were talking about telephone?

2     Q.     The late September 2012 telephone call.  I

3  thought that's what we were talking about?

4     A.     Oh, okay.  I'm sorry.  I apologize.  Well, you

5  know, one thing is talking to somebody on the phone and

6  the other is meeting face-to-face to be able to

7  understand things a little bit more.  So that's the

8  next thing that we did is meet face-to-face.

9     Q.     All right.  So you spoke for a couple of

10  hours.  And my question to you was:  Well, let me just

11  break it down?

12     A.     You know what, can I -- I didn't know that you

13  were talking about speaking on the phone.

14     Q.     All right.

15     A.     I apologize for that.  But what I can say,

16  though, that I did speak on the phone for not two

17  hours.  I was thinking we were talking about the

18  conversation that we had -- well, the time --

19     Q.     The face-to-face meeting?

20     A.     The face-to-face meeting.  I'm sorry, sir.

21  That is what -- after speaking on the phone, we spoke

22  on the phone maybe about maybe about ten or 15 minutes.

23  That was when we set something up to meet face-to-face.

24  And then when we met face-to-face, we spoke for about a

25  couple of hours.

```
 1      Q.     Okay.

 2      A.     I apologize for that.

 3      Q.     So what was the nature of the telephone call

 4   with Mr. Bandas for those ten or 15 minutes?

 5             MR. HUSEMAN:  Do not discuss the content

 6   of your discussions with your lawyer.

 7      Q.     Well, did he offer you any legal advice?

 8             MR. HUSEMAN:  Well, once again, he is your

 9   lawyer and what you discussed with him is privileged,

10   so don't respond to that.

11             MR. LONGER:  The only thing that's

12   privileged is if he offered legal advice.

13      Q.     Did he offer you legal advice?

14      A.     He mentioned to me face-to-face.

15      Q.     That you should meet face-to-face?

16      A.     That is correct.

17             MR. HUSEMAN:  That was his advice to you.

18      A.     That was his advice to me.

19      Q.     Did he mention to you that he worked with

20   Mr. Batman?

21             MR. HUSEMAN:  Once again, do not discuss

22   the content of your discussion with Mr. Bandas.

23      Q.     Did you talk about the terms of retention

24   during that telephone call?

25      A.     No.
```

1    Q.    All right.  So you arranged for a meeting on

2  September 28 and how did that play out?  You went over

3  to the Bandas law firm?

4    A.    We met at Mr. Bandas' home.

5    Q.    At his home?

6    A.    Yes.

7    Q.    Okay.  Is that near your neighborhood?

8    A.    That is on the way to a job site that I was

9  going to go to that day.

10    Q.    I see.  And what time did you arrive at his

11  home on September 28th?

12    A.    If I remember correctly, it was around 9:30,

13  around that time.

14    Q.    All right.  And if you met for two hours, you

15  left around 11:30?

16    A.    Something like that, yes, sir.

17    Q.    And during the course of that meeting, did you

18  review any documents?

19         MR. HUSEMAN:  Once again, what you did

20  with counsel in terms of communication, you're not to

21  reveal.

22    Q.    Well, my understanding is that you saw

23  pictures.  Is that true?

24         MR. HUSEMAN:  Well, once again, what you

25  and Mr. Bandas discussed or did is not to be discussed

1    here.

2        Q.    Did you sign any documents?

3        A.

4            MR. HUSEMAN:  If you signed a contract you

5    can tell him that.  That's okay.

6        A.    Yes.  Yes, sir.

7        Q.    So you talked about retention at that point in

8    time?

9        A.    Retaining counsel.

10        Q.    All right.

11            MR. HUSEMAN:  Anything beyond where you

12    are right now, the fact that you signed up with him and

13    talked with him do not go there.  Do not talk about

14    anything you discussed, what you reviewed, what he told

15    you or what you told him.

16            THE WITNESS:  Okay.

17            MR. HUSEMAN:  All right.

18        Q.    Just about to go into marking this document as

19    an exhibit but before I do that, Mr. Soto, you have in

20    front of you whatever it is you brought in that

21    envelope.  Can you identify for the record, please,

22    what you've brought with you?

23        A.    This is an objection.  This is the request for

24    objections and this is the subpoena that you-all issued

25    to me.

1      Q.    Okay.  And your notes are in the envelope; is

2   that right?

3      A.    Yes, sir.

4      Q.    All right.  And how many pages are your notes?

5      A.    One page, front and back.

6      Q.    All right.  And would you just take it out of

7   the envelope, please, and show it to the camera so that

8   we can identify it and I would like to mark it?

9             MR. HUSEMAN:  No, we're not going to do

10   that.

11             MR. LONGER:  I would like to mark that.

12             MR. HUSEMAN:  Showing it to the camera has

13   the same effect as showing it to you and we're not

14   doing that, so if you would like to have it marked and

15   looking at this I'll tell you counsel what this is.

16   Are notes concerning how we prepared him for

17   deposition.

18             MR. LONGER:  That's fine.

19             MR. HUSEMAN:  That's our advice to him and

20   we are not going to voluntarily give that to you.

21   Unless the judge for some reason orders us.

22             MR. LONGER:  What I'm thinking is that we

23   mark that as an exhibit and that it not be -- that the

24   court reporters will hold on to it and that we may or

25   may not get it, depending on how the court rules.

1          MR. HUSEMAN:  Okay.  I don't have a

2    problem with that.

3          MR. LONGER:  And you can have your court

4    reporter hold on to it, that will be fine.

5          MR. HUSEMAN:  That will be fine.  And

6    Ginny, if you will make a copy of it when we come to a

7    break.  And guard it with your life.

8          SPEAKER:  Do you want to seal it.

9          MR. LONGER:  Yes.  So that will be Exhibit

10   No. A and then I will have numbered documents going

11   forward.

12          MR. HUSEMAN:  Okay.

13          (Exhibit No. 1 was marked.)

14   Q.    Okay.  Exhibit No. 1 --

15   A.    Sir, I'm sorry.  Would it be okay if I went to

16   the restroom?

17   Q.    Yeah, let's take a break.

18          THE VIDEOGRAPHER:  Off the record at 5:40.

19          (A recess was taken.)

20          THE VIDEOGRAPHER:  We're on the record at

21   5:47.

22   Q.    Mr. Soto, over the break, I had the document

23   that was provided to me by Mr. Huseman marked as

24   Exhibit No. 1.  It's in front of you?

25   A.    Okay.

1    Q.    This document is entitled class-action

2  objector power of attorney and contingent fee

3  agreement; is that correct?

4    A.    That is correct.

5    Q.    So the purpose of -- this is your retainer

6  agreement with -- well, actually, let's go to page 3 of

7  the document.  Is that your signature?

8    A.    It is my signature, correct.

9    Q.    And it's also signed by Mr. Bandas,

10  Christopher A. Bandas; is that correct?

11    A.    On the back part of it?

12    Q.    Page 3, yes.

13    A.    Page 3, yes, sir.

14    Q.    Okay.  And this is the document that you

15  signed at Mr. Bandas' home on September 28th; is that

16  correct?

17    A.    That is correct.

18    Q.    Did you sign any other documents on that day?

19    A.    Not that I can remember, sir.

20    Q.    This retainer agreement -- well, it's a power

21  of attorney and contingent fee agreement.  And it

22  purports to be for a class-action objector, correct?

23    A.    That's what it looks like, sir, yes, sir.

24    Q.    Did Mr. -- I take it from this document that

25  Mr. Bandas has -- or you have not retained Mr. Bandas

1   to pursue any claims that you may actually have based

2   upon your fear of injury; is that correct?

3       A.    That is correct.

4       Q.    You have no expectation that Mr. Bandas will

5   help you in any way if in fact you are personally

6   injured to pursue that claim; is that right?

7       A.    That is correct.

8       Q.    And the same goes for any business claims, you

9   have no expectation that Mr. Bandas is going to help

10   you out as a lawyer for any business losses?

11       A.    That is correct.

12       Q.    You have no expectations that Mr. Bandas is

13   going to help you out for any concerns that you may

14   have about lawsuits of anyone that you've installed

15   drywall into their homes who may sue you; is that

16   correct?

17       A.    That is correct.

18       Q.    The only thing that you have retained him for

19   on a contingent basis, correct?  You retain him on a

20   contingent basis, correct?

21       A.    Yes.

22       Q.    Is to object to a settlement?

23       A.    That is correct.

24       Q.    And he talks there that you may get -- or I'm

25   sorry, the document -- by the way, I just want to be

1   sure now.  If you go to paragraph 2.1 of the document,

2   it says you represent you're a member of the class as

3   defined in the materials published at

4   https://ChineseDrywallClass.com.  Do you see that?

5       A.   Yes, sir.

6       Q.   Now, have you ever visited the website of

7   https://Chinesedrywallclass.com prior to signing this

8   document?

9       A.   Yes.

10      Q.   You did?

11      A.   Prior to signing, yes.

12      Q.   All right.  And when was that?

13      A.   That same day.

14      Q.   Was that before you went to Mr. Bandas' house.

15      A.   No.

16      Q.   Sir, so while you were at Mr. Bandas' house,

17  you visited a website, Chinesedrywall.com?

18      A.   Yes, sir.

19      Q.   Did you read the documents on

20  ChineseDrywallClass.com?

21      A.   Not all the documents, sir.

22      Q.   What documents did you read?

23      A.   Just kind of scanned through it and looked at

24  the -- more of the pictures.

25      Q.   Pictures of what?

1     A.    Of drywall.

2     Q.    So you can't tell us what -- apart from

3  photographs, what any of the definitions or documents

4  said on that visit of ChineseDrywallClass.com; is that

5  correct?

6     A.    Yeah, I can't remember any of that stuff.

7     Q.    Did you have a sense that the settlement

8  afforded benefits to persons who were class members?

9     A.    I did have a sense of it, yes.

10    Q.    And what benefits were provided to class

11  members that you discovered on September 28, 2012?

12    A.    Well, it just said to submit and that's all I

13  can remember.

14    Q.    Do you remember that it offered persons in the

15  class that they could take from a fund of $80 million?

16    A.    I'm sorry, say that again.

17    Q.    Do you remember the size of the fund that was

18  being?

19    A.    Oh, yes, sir.

20    Q.    -- being provided?

21    A.    Yes, sir, I remember that.

22    Q.    And was it $80 million or was it 82.7 million?

23    A.    I don't remember that, but I know it was

24  around $80 million.  I don't remember the exact number.

25    Q.    And did you realize that you could, if you in

1    fact were a class member, you could take from the fund?

2        A.    I did realize that.

3        Q.    And did you look to see which participating

4    defendants were involved in the litigation that you --

5        A.    I did not, sir.

6        Q.    -- were associated with?

7        A.    I did not, sir.

8        Q.    Did you -- so as of September 28, 2012, you

9    did not know who the participating defendants were in

10   the litigation that you were related to that you might

11   have a claim against; is that correct?

12       A.    I'll be honest, I'm kind of confused.    Is

13   there a way you can maybe rephrase that a little bit

14   for me?

15       Q.    Sure.    On the website,

16   ChineseDrywallClass.com, the settlement agreement was

17   there?

18       A.    Okay.

19       Q.    It had exhibits to it?

20       A.    Uh-huh.

21       Q.    That identified the participating defendants

22   and the participating.    Are you aware of that?

23       A.    I don't remember.    I can't say for sure.

24       Q.    Are you aware of it today?

25       A.    That there's participating defendants?

```
 1    Defendant is -- can you explain the defendant exactly,
 2    what that means?
 3         Q.   Yeah.  Like south Florida drywall?
 4         A.   Okay.  There's several of them.  I think I
 5    remember that now.
 6         Q.   Okay.  And is that a vague recollection that
 7    you saw that?  Or do you just remember the photos?
 8         A.   As far as seeing --
 9         Q.   What you saw when you visited?
10         A.   Correct.
11         Q.   The website?
12         A.   What I remember seeing is the pictures of made
13    in China on the backs of sheetrocks.
14         Q.   Excuse me just one second.
15              Okay.  Now, the Exhibit 1 talks about
16    attorneys fees, expenses and payments to you.  Do you
17    see that?
18         A.   Yes.
19         Q.   All right.  And actually -- I'm sorry.  This
20    is my bad.  Let's talk about section 2.2.
21         A.   Yes.
22         Q.   Actually, I'm going to have to go back to 2.1.
23    I'm a lawyer.  Excuse me.
24         A.   Okay.
25         Q.   All right.  What did you understand the
```

ROUGH DRAFT TRANSCRIPT ONLY

1    definition of the member of a class to be on September

2    28th, 2012, based upon your review of Chinese drywall

3    class.com?

4        A.    Well, my understanding is you're part of that

5    class if you installed it, you worked around it, you

6    know, and you remember seeing those markings on the

7    back.

8        Q.    All right.  And it says that you can

9    demonstrate that you're entitled -- now I'm going to

10   section 2.2?

11       A.    Okay.

12       Q.    You can demonstrate you're entitled to receive

13   settlement benefits as a member through documentation

14   or by affidavit.  And you've brought with -- well,

15   that's what it says, correct?

16       A.    Correct.  That is correct.

17       Q.    And you've brought with you today three banker

18   boxes full of documents that do what?  They purport to

19   show that you are entitled to receive benefits?

20       A.    They show my purchases and me reselling

21   sheetrock.

22       Q.    Okay.  Now, sheetrock, as I understand it, is

23   a trade name, so sort of like Kleenex is for tissue

24   paper.  Is that your understanding?

25       A.    Yes, sir.