1    Q.   Who makes sheetrock?

2    A.   There are many people that make sheetrock.

3    Q.   Well, the brand name sheetrock?

4    A.   I don't know, to be honest with you.

5    Q.   Do you know if it's a Chinese board sheetrock?

6    A.   I don't know.

7    Q.   Are you aware that it's manufactured by United

8  States gypsum USG?

9    A.   I don't know.

10   Q.   All right.  At some point -- and I don't know

11  when, we can do it even now or later -- we'll mark

12  these boxes as exhibits.  Let me ask your counsel,

13  though.  I want to do this -- let me just ask you real

14  fast.  Or I can go off the record.  These documents

15  based on my quick look at this stuff are

16  undifferentiated, it's just his entire records for the

17  year and --

18          MR. HUSEMAN:  The records he has

19  possession of.  And we're not making representation

20  that there could not be other records but these are the

21  ones in his possession.  And rather than try to discern

22  which ones were relevant to your gypsum board and not,

23  we produced them all so there's not any issue about

24  that.

25          MR. LONGER:  Will you later tell us which

1   ones are relevant or is it supposed to be a fishing

2   expedition for us to figure it out?

3           MR. HUSEMAN:  Well, what you asked for is

4   contained in there and the extent of the subpoena is

5   not absolutely clear to us on some documents because

6   you have documents that involved more than one thing

7   and which could arguably, for example, involve

8   sheetrock or gypsum board.  And so sort of an abundance

9   of precaution these were all produced to us.  If you

10  want us to go through them for us and give you sort of

11  a learned opinion on that, we'll do that.

12          MR. LONGER:  Well, I'm going to mark them

13  as exhibits, banker box 1, Exhibit No. 2.

14          MR. HUSEMAN:  Sure.

15          MR. LONGER:  Banker box 2 Exhibit No. 3

16  and banker box 3 Exhibit No. 4.  And but I absolutely

17  believe that we shouldn't have to figure out what is

18  relevant, if you're fully capable of doing it.

19          MR. HUSEMAN:  Well, obviously that's

20  something I'm willing to inflict on Mr. Bandas since he

21  is in the substance of the case than we are which I

22  explained to you before the deposition, but I don't

23  think he'd have any problem trying to do that for you.

24          MR. LONGER:  All right.

25          (Exhibit Nos. 2, 3, 4 were marked.)

1              MR. LONGER:  I thank Ms. Bertolini for

2    teaching me how to count.

3         Q.   All right.  So let's continue now.  The next

4    section of the document is 3 -- section 3, attorneys

5    fees, expenses and payments to you.  Mr. Soto in your

6    words can you tell us what you understand your

7    situation is in terms of how you're going to get paid

8    in this contract?

9         A.   Pretty much if the court approves something,

10   that's how I get paid.

11        Q.   All right.  Did you -- do you recall being

12   told that you could get an incentive award up to

13   $5,000?

14             MR. HUSEMAN:  And that of course goes into

15   the substance of your discussion with Mr. Bandas and

16   you're not to discuss that, please.

17        Q.   Well, apart there the discussion with

18   Mr. Bandas, the document says that you were going to be

19   entitled to an incentive award of not to exceed $5,000;

20   is that correct?

21        A.   That is what it says here.

22        Q.   All right.  By the way, I don't want to go

23   into the nitty-gritty of it, but you did discuss this

24   document with Mr. Bandas, did you not?

25             MR. HUSEMAN:  We're not going into any of

1    that.

2        Q.    It's a yes or no.  Did you discuss this

3    document?

4                MR. HUSEMAN:   No, you're not to discuss

5    that.  You produced the document to him, the document

6    speaks for itself but your discussions with Mr. Bandas

7    regarding your relations with him are not to be

8    discussed otherwise.

9        Q.    All right.  Next section 3.3 says that in the

10   alternative to an incentive award, if your objection is

11   settled without the necessity for court approval,

12   attorneys agree to request as part of the settlement a

13   separate payment to you to compensate you for your

14   time, effort and/or benefit you confer on the class

15   through your service as an objector.  Do you see that?

16       A.    I do see that.

17       Q.    The amount of the payment is contingent on the

18   outcome of the settlement negotiations but will not

19   exceed $5,000.  Do you see that?

20       A.    I do see that.

21       Q.    It says if the settling parties agree to make

22   such a payment will receive the amount of that payment

23   in addition to the benefits set forth in paragraph 3.1,

24   which is what you would have gotten from the settlement

25   anyway, correct?

1      A.    That's what it says here.

2      Q.    And if the settling parties do not agree to

3  make a separate payment to you, you will receive only

4  the benefit set forth in paragraph 3.1, is that

5  correct?  Is that what it says?

6      A.    That's exactly what it says.

7      Q.    What's your understanding of that?

8      A.    What it says here.

9      Q.    Do you have -- did you have an understanding

10  on September 28th that your counsel may try to

11  separately negotiate a settlement of your objection?

12              MR. HUSEMAN:  Any discussions you had with

13  Mr. Bandas, you're not to discuss with counsel.

14              THE WITNESS:  Correct.

15              MR. LONGER:  I'm not asking for

16  discussions, I'm asking for his understanding at the

17  conclusion of that meeting or what his understanding of

18  section 3.3 is.

19              MR. HUSEMAN:  To clarify, you're asking

20  what his take away was from his discussions with

21  Mr. Bandas?

22              MR. LONGER:  Yes.

23              MR. HUSEMAN:  Okay.  My instruction to you

24  is not to discuss that with him.

25      Q.    Sir, did you have an understanding of

```
 1    Mr. Bandas' business prior to meeting with him?
 2         A.    No.
 3         Q.    In the course of your association with
 4    Mr. Bandas, have you come to understand that he has
 5    objected to many settlements, class-action settlements
 6    thereon the country?
 7         A.    I don't know anything about that.
 8         Q.    Are you aware of motions that have been filed
 9    in the federal court seeking to sanction you and
10    Mr. Bandas for filing motions frivolous motions in
11    front of the court?
12         A.    I don't know anything about that, sir.
13         Q.    You don't know that there's a motion for
14    sanctions against you personally?
15         A.    I do not.
16         Q.    Would it be of interest to you that you might
17    be personally liable for a sanction that Judge Fallon
18    in the federal court myself impose on you because you
19    filed frivolous papers in front of the federal court?
20         A.    When you say frivolous, is that your opinion?
21         Q.    I believe it's on its face obviously
22    frivolous.
23              MR. HUSEMAN:  So what's your question to
24    him?
25         A.    Yeah.  What is the question, I am.
```

1      Q.    Aisle read it again because your counsel filed

2  frivolous papers on your behalf?

3      A.    That I might be?  So it hasn't been done,

4  correct?

5      Q.    It's before the judge.  Do you think it's

6  something that your counsel should bring to your

7  attention?

8                  MR. HUSEMAN:  Okay.  Don't answer that

9  question.  If you're going to continue basically

10  harassing him as you are, we're going to call -- stop

11  that line of questioning.  You're welcome to ask him

12  other questions, but in terms of trying to drive a

13  wedge between him and his lawyer or to interfere with

14  the attorney/client privilege, he may have Mr. Bandas,

15  we're not going to go any further down that road

16  without Fallon saying that's appropriate.

17                  MR. LONGER:  Well, I believe in the

18  conference that we had with Judge Fallon this

19  afternoon, he instructed us that we could address

20  standing, his underlying objection and his relationship

21  with his counsel.

22                  MR. HUSEMAN:  And --

23                  MR. LONGER:  And I believe that his

24  knowledge of what his counsel is doing in federal court

25  and what his counsel has done elsewhere is related to

1   his relationship with his counsel.

2            MR. HUSEMAN:  And your attempts -- just

3   make sure we're clear about what I'm saying to you.

4   Your attempts to say would it be of interest to you or

5   would you like to know or those type of things are

6   basically calculated at least in my view sitting here,

7   as a way of trying to interfere with Mr. Soto's

8   relationship with Mr. Bandas and if that's what the

9   judge has in mind, then perhaps you-all need to make a

10  more explicit ruling on it.  You had a chance to

11  discuss the relationship with him, you've had a

12  contract and in terms of your trying to make Mr. Soto

13  feel bad or to put Mr. Bandas in a bad light with his

14  client, that part I'm not going to go along with.

15     Q.   Are you aware that courts around the country

16  have found Mr. Bandas to be a professional objector?

17            MR. HUSEMAN:  Okay.  This is the same line

18  of questioning.  I'm telling Mr. Soto not to answer

19  that pending the judge ruling on that.

20            MR. DODSON:  So we need to go ahead and

21  set a hearing on that.

22            MR. LONGER:  If you like.

23            MR. DODSON:  As I understand from the

24  rules if we're not going to go into it then we also

25  need to go ahead and file a motion so I can get that

1    cooking.

2              MR. HUSEMAN:  We will do that in a while

3    and the other part is you can go ahead and ask him

4    questions that are not within dispute.  He's here for

5    your purposes.

6              MR. LONGER:  All right.  I'll move on.

7         Q.   Okay.  There is a section in here also with

8    section 5.2, Mr. Soto, dealing with association of

9    co-counsel?

10        A.   In section 2.

11        Q.   The last page of the document, page 3.

12        A.   Okay.  Association.  Okay.

13        Q.   And this talks about how Mr. Bandas can

14   associate with other co-counsel.  Is your understanding

15   that your counsel here today are governed by section

16   5.2?

17        A.   That is true.

18        Q.   Okay.  So you don't have a separate contract

19   with the gentlemen in this room?  Or do you?

20        A.   No, not an actual contract.  There's one, I

21   think you might have it, that shows that they would be

22   helping us, I think, with this.

23        Q.   I'm not sure of what you're referencing.  Can

24   you tell me?

25              MR. HUSEMAN:  Do we have that document

```
 1   that they signed off on, disclosure document?
 2               MR. DODSON:  Probably.
 3               MR. HUSEMAN:  See if you can get that for
 4   him.
 5               THE WITNESS:  That's the one --
 6               MR. HUSEMAN:  To short-circuit the
 7   inquiry, we're not sharing any of the fee with
 8   Mr. Bandas.
 9               MR. LONGER:  Okay.
10               MR. HUSEMAN:  We're not in plaintiff
11   lawyer mode.
12               MR. LONGER:  He's paying you directly.
13               MR. HUSEMAN:  That's right he's paying us
14   by the hour to do this.
15      Q.   Okay.  All right.  Should we go ahead while
16   we're waiting?
17               MR. HUSEMAN:  It's your pleasure, whatever
18   you like.  No need to burn daylight.
19               MR. LONGER:  That's my thinking.  I
20   thought he was going to pop in and pop out.
21               MR. HUSEMAN:  That was my thinking, too.
22      Q.   Let me go back to page 2, paragraph number 4.
23   Now, you've read this before you signed the document,
24   right?
25      A.   I did read it.
```

1    Q.    And you understood then that if the objection

2    that you filed was successful or any appeal therefrom

3    any resulting in the disapproval or the rejection of

4    the proposed settlement which caused you to lose right

5    under the proposed -- I'm sorry, I misread that.   It

6    says --

7    A.    I'm sorry.   Which one are we looking at?

8    Q.    Section 4 on page 2?

9              THE WITNESS:   The whole thing?   4.4 or

10   4.5?   Just that one?   Okay.

11   Q.    You understood and it was explained to you,

12   according to this and you understand that if

13   successful, the objection or any appeal therefrom may

14   result from the disapproval or rejection of the

15   proposed settlement.   Did you understand that?

16   A.    Yes.

17   Q.    So in other words, you could -- your objection

18   may tank this entire settlement and you understood

19   that?

20   A.    I understand that if nothing happens, I don't

21   get anything.

22   Q.    Did you understand that if your objection is

23   successful, you may destroy the settlement from going

24   forward?

25   A.    May destroy?   Can you elaborate a little bit

1  more on that?

2      Q.    Sure.   I want to ask a question that you

3  understand.

4          Did you understand that if your objection was

5  successful, you could cause every class member not to

6  receive the benefits of the settlement?   In other

7  words, all the homeowners that are out there that could

8  get money from this settlement would be precluded from

9  doing so because your single objection could terminate

10  the settlement?

11      A.    I don't know, sir.

12      Q.    You didn't know that?

13      A.    I don't know.

14      Q.    Well, this says that it was explained to you

15  and you understand that.   You didn't understand that;

16  is that right?

17      A.    I read this before I signed it and I signed it

18  based on what I read.

19      Q.    All right.   And it says that if you are

20  successful, it may result in the disapproval or

21  rejection of the proposed settlement which may cause

22  you to lose your right of settlement benefits under the

23  proposed settlement to which you object, correct?

24      A.    Yes, I could lose my right, yes.

25      Q.    But you had -- you did understand that it

1    wouldn't be just you, it had to have been the entire

2    settlement would have been terminated or disapproved,

3    right?

4        A.    That I don't know.

5        Q.    Are you aware that that's the effect of your

6    objection today as we sit here now?

7        A.    I didn't know that.

8        Q.    Is it your intent to deprive other people from

9    getting money from builders, installers, suppliers,

10   insurers because of your single interest in objecting?

11       A.    What I know is that I feel that it's unfair,

12   one, that the lawyers are getting paid an obscene

13   amount of money and which I feel that that should go to

14   the class.  That is what I do know.

15       Q.    Do you have any concern about the other class

16   members getting benefits?

17       A.    Well, I feel if the lawyers get paid less,

18   they would probably get paid more.

19       Q.    And this concern -- is that the only concern

20   that you have about the settlement, by the way, is the

21   attorneys fees being obscene was I think your word?

22       A.    That's one of them and I also feel it's unfair

23   as far as everything, the settlement, if you will.

24       Q.    The settlement is unfair, is that what you're

25   saying?

1    A.    I feel there should be more that should go to

2    the class.

3    Q.    That in other words, that we didn't get enough

4    money from the defendants?

5    A.    No.  That most of the money is going to the

6    lawyers versus going to the class.

7    Q.    Are you aware that Judge Fallon is going to

8    make the determination of how much money goes to the

9    lawyers and not -- and I guess by using your logic, to

10   the class?

11   A.    I believe so.

12   Q.    Do you know that we have asked the court up to

13   32 percent, but the court ultimately decides what the

14   amount is?

15   A.    That is true.

16   Q.    And that being true, you think that that's

17   wrong?

18   A.    I feel what's wrong is that you-all would even

19   ask for 32 percent.

20   Q.    Do you think Judge Fallon would let an unfair

21   amount of money go to lawyers?

22   A.    I don't know.

23   Q.    Don't you think a federal judge has the

24   obligation to ensure that only a reasonable fee is

25   awarded?

1       A.    I would hope so.

2       Q.    And do you have faith that Judge Fallon will

3   award a reasonable fee and no more?

4       A.    I don't know.

5       Q.    Now, it also says that attorneys have also

6   explained and you understand that if there are

7   negotiations to settle your objection, attorneys may

8   negotiate the amount of any payment to you as well as

9   the amount of attorneys fee concurrently in order to

10  arrive at a total settlement amount.  Do you see that

11  sentence in section 4?

12      A.    "Attorneys have also explained and you

13  understand that if there are negotiations to settle

14  your objection, attorneys may negotiate the amount of

15  any payment to you as well as the amount of attorneys

16  fee concurrently in order to arrive at a total

17  settlement amount."

18      Q.    Is that a correct statement?

19      A.    Yes, that is a correct statement.

20      Q.    Just out of curiosity, how much time did

21  Mr. Bandas go over explaining this section to you?

22            MR. HUSEMAN:   Okay.   That goes to the

23  substance of what you-all discussed.

24            MR. LONGER:   I'm just asking how many

25  minutes.

1          MR. HUSEMAN:  I'm asking -- you asked how

2    long you talked about A and B is the same as asking for

3    the discussions of A and B.

4          MR. LONGER:  Let me just say the document

5    speaks for itself.

6          MR. HUSEMAN:  That's exactly right.

7          MR. LONGER:  So I'm asking how much time

8    did his attorneys spend explaining.

9          MR. HUSEMAN:  Anything beyond what the

10   document says, I don't want him discussing, Fred.

11         MR. LONGER:  So that's going to be part of

12   your --

13         MR. HUSEMAN:  Yes.

14         MR. LONGER:  -- motion for protective

15   order?

16         MR. HUSEMAN:  Yes.  How much time he

17   spent, how Mr. Bandas explain it is all privileged.

18   We've given you the document that sets for the

19   relationship.  He's confirmed his relationship and

20   that's pretty much where it's going to end for now.

21         MR. LONGER:  All right.  All right.  And

22   Mr. Dodson has returned to the room here with a

23   document that we were anxiously awaiting for.  And we

24   do not have the document; is that correct?

25         MR. DODSON:  I don't have a signed copy

1    that I can find.  Checking around for it.

2                MR. LONGER:  Just so I'm clear, the name

3    of the document -- or the description of the document

4    is what this we're waiting for?

5                MR. DODSON:  Disclosures to Mr. Soto about

6    our being involved in the case.

7                MR. LONGER:  Understood.  Thank you.  When

8    and if that arrives we will have that marked as Exhibit

9    No. -- why don't we wait until it arrives because

10   otherwise it may get confused in the math.

11               MR. HUSEMAN:  It's in box 3.  No, I don't

12   know.  I have never seen a signed copy.  I know that we

13   got his signature was obtained, I think by probably by

14   Chris.

15               THE WITNESS:  Uh-huh.

16               MR. HUSEMAN:  And I haven't seen a signed

17   copy.  I thought we had one, but apparently don't.

18       Q.    Okay.  So Mr. Soto, have you ever seen the --

19   I'm sorry.  Yeah, I'll ask the question.

20            Prior to its filing, did you see the objection

21   that Mr. Bandas filed on your behalf?

22       A.    Prior to it being signed, I did see it.

23       Q.    All right.  Now, I just want to be clear.  The

24   document that's in front of you, the objection, you saw

25   that before it was filed?

1       A.     I don't remember.  I'm trying to.

2       Q.     Okay.  Now, you met with Mr. Bandas, you said,

3   up until 11:30 on the 20th of September.  And at that

4   point, did he show you what he was going to -- he

5   didn't show you what he was going to file?

6       A.     Say that again.  I'm sorry.

7       Q.     All right.  Let me --

8       A.     I'm sorry.  I'm sorry.

9       Q.     Can I see the document in front of you?

10      A.     This one?

11      Q.     Yeah.

12      A.     Yeah.

13      Q.     Right.  So I'm -- I have my own copy.  You can

14   hold on to this.

15      A.     Okay.

16      Q.     I'm going to have that document which is of

17   record, but I'm going to have it marked anyways as

18   Exhibit No. 5 to your deposition.

19              (Exhibit No. 5 was marked.)

20              MR. HUSEMAN:  I've already got one but I

21   always take more paper.  Is this the same?  That is the

22   same thing?

23              MR. GAUGHAN:  It's the same document.

24              MR. LONGER:  It's 15859 apart from his we

25   go double sided photo copying, it should be the same.

1          MR. HUSEMAN:  I'm looking at the

2    thickness, his is considerably thinner.

3          MR. LONGER:  His is double sided.

4          MR. HUSEMAN:  Duplexed.

5    Q.    All right.  When you -- well, I'm sorry.  Is

6    there a question pending?  All right.  Let me ask a

7    question since it may have gotten lost in the

8    confusion, Mr. Soto and I apologize for that.  I've now

9    give than you Exhibit No. 5, which is basically

10   identical to the document that you have in front of

11   you.  It's entitled class-action agreement and award of

12   expenses January Petrus, Saul Soto, SHS construction,

13   Ronnie Garcia, Bay Area contacting, and construction,

14   Inc. and Ernest vie tela, E & E construction Co?

15   A.    Okay.  Okay.  I'm sorry, yes.

16   Q.    All right.  So that is the same document you

17   have in your hands, right?

18   A.    That is correct.

19   Q.    All right.  How did -- when did you obtain the

20   document that you have in your hands?

21   A.    I'm going to be honest, I really don't

22   remember.

23   Q.    Did it come in the mail to you?

24   A.    No.

25   Q.    Was it given to you by your counsel during one

1    of your meetings?

2        A.   I remember getting a copy of it at his office.

3    That's what I remember.

4        Q.   At whose office, Mr. Bandas?

5        A.   That is correct.

6        Q.   All right.  And when was that?  When did you

7    go to his office and obtain this document?

8        A.   I don't remember, sir.  I honestly don't.

9        Q.   All right.  But it was after September 28th;

10   is that correct?

11       A.   I believe so.

12       Q.   All right.  Now, Exhibit B to Exhibit 5, as

13   confusing as that may be?

14       A.   I'm already getting all confused.

15       Q.   It's your declaration, sir?

16       A.   I understand.

17       Q.   So I'd ask you to turn to that document.

18       A.   Okay.  To my declaration?

19       Q.   Right.

20       A.   Okay.  Okay.

21       Q.   Is this declaration bear your signature?

22       A.   It does.

23       Q.   And you signed this when you were at

24   Mr. Bandas' house?

25       A.   I'm trying to remember.  I can't remember if

1   it was at his house or not.  I can't say for sure, sir.

2   I'm sorry.

3       Q.    All right.  Did you meet with Mr. Bandas at

4   any other time on September 28 other than the meeting

5   that you described earlier being at his house?

6       A.    I remember I had to go by the office to sign

7   something, but I can't remember when.  I'm sorry.

8       Q.    All right.  You say that -- and the document

9   that you're a member of the class in that paragraph,

10  the third paragraph?

11      A.    Uh-huh.

12      Q.    It says "I am not within any of the exclusions

13  in the class definition."  What exclusions did you

14  review and what do you understand that to be?

15      A.    Like I'm not excluded from the class.

16      Q.    Okay.  All right.  The next paragraph says

17  that you or SHS, and I'm paraphrasing here?

18      A.    Correct.

19      Q.    Purchased, installed and used 1,000 to 1500

20  sheets of drywall over the last five to ten years.  Do

21  you see that?

22      A.    I do see that.

23      Q.    What -- do you know the brand that you usually

24  buy when you buy drywall?

25      A.    I mean, I obviously remember sheetrock, but I

1    mean, I buy it different places so I mean I just go to

2    get the sheetrock that's there available at different

3    places.  I don't look at the brand so much.

4        Q.    Does brand mean anything to you when you're

5    using sheetrock?

6        A.    Well, it means now more.  It means more now

7    knowing that, you know, we have installed it before

8    without -- I would have thought that, you no know,

9    there wouldn't be inferior sheetrock at these places.

10       Q.    Do you know that there is -- that there was

11   inferior sheetrock at these places?

12       A.    Now I know.

13       Q.    How do you know?

14       A.    By knowing that it was available at the

15   stores.

16       Q.    How do you know that?

17       A.    By -- this is one thing I remember.  I do

18   remember this.  Years ago to talking to one of my

19   subcontractors, he asked me specifically, he says where

20   do you get your sheetrock from?  I said well, different

21   places but mostly from Lowe's, he says well, you know,

22   I don't really like to use that one.  I'm like why?  He

23   said, well, he says, that stuff is from China.  And I

24   said from China?  He's like yeah.  I said okay.  At

25   that point I didn't really think anything of it.

1    That's what I do remember.

2        Q.   Was that true what you just told this

3    gentleman that you mostly get your sheetrock from

4    Lowe's?

5        A.   Mostly, that is true.

6        Q.   All right.  We have to change the tape.  So

7    we'll take a break?

8                    THE WITNESS:  Okay.

9                    THE VIDEOGRAPHER:  Off the record at 6:40,

10   end of tape one.

11                    (A recess was taken.)

12                    THE VIDEOGRAPHER:  We're on the record at

13   6:51, beginning of tape two.

14       Q.   When we took a break, Mr. Bandas you had said

15   that you mostly get your sheetrock from Lowe's.  Do you

16   recollect that testimony?

17       A.   Mr. Soto.

18       Q.   I'm sorry.  Mr. Soto.  Thank you for

19   listening.

20       A.   That's okay.  Mostly through Lowe's but

21   mostly -- yeah.

22       Q.   And is that true throughout time that you

23   mostly got your sheetrock at Lowe's?

24       A.   As far as percentage wise, yes, getting more

25   from Lowe's than other ones.

ROUGH DRAFT TRANSCRIPT ONLY

1     Q.    And what is that percentage, if you could

2  guesstimate?

3     A.    I'll give you a broad percentage.  About a 60

4  percent, 65 percent, somewhere around there.

5     Q.    All right.  Is it your understanding that

6  you're objecting to Lowe's, the drywall in this -- in

7  your objection, Exhibit No. 5?

8     A.    As far as Lowe's?

9     Q.    Yes.

10     A.    No, it was -- for my understanding, it was in

11  different other places as well.

12     Q.    Right.  But my question to you is:  Was it

13  your understanding that your objection pertained to

14  Lowe's among other participating defendants?

15     A.    Among other, yes.

16     Q.    All right.  And so it was your understanding

17  that Lowe's was a participating defendant?

18     A.    I believe so, yes.

19     Q.    Okay.  And were you aware that Lowe's has a

20  settlement that has been judicially approved by a

21  court?

22     A.    I can't say that I do know for sure, no, sir.

23     Q.    Are you aware that any claims that you may

24  have related to your drywall purchase from Lowe's are

25  barred by a settlement from a Georgia state court?

1    A.    I don't know anything about that, sir.

2    Q.    All right.  Are you aware that Mr. Bandas had

3  his office manager object to that settlement?

4    A.    I don't know anything about that, sir.

5    Q.    Do you know Mr. Bandas' office manager?

6    A.    Not personally I don't know.

7    Q.    Have you met -- her name is Jan Petrus.  Do

8  you know Ms. Petrus?

9    A.    I don't know her.

10   Q.    Her name appears on Exhibit No. 5, along with

11  yours and others?

12   A.    Okay.

13   Q.    Never met her?

14   A.    No.  No, sir.

15   Q.    So -- okay.  Your counsel has just given me a

16  document which is called an attorney disclosure to

17  client and client consent.  I'm going to have that

18  marked as Exhibit No. 6.

19              MR. LONGER:  Is it a one page document.

20              MR. DODSON:  That's what we dot.

21   Q.    Your down represented to me that there is an

22  endorsed copy to this client consent signed by you.  Do

23  you recollect signing this document or something that

24  looks like this document?

25   A.    Yes, something similar, yes, sir.

1          MR. HUSEMAN:  You might want to explain

2    what that is that he has.

3          MR. DODSON:  If they've got any questions.

4          MR. HUSEMAN:  Okay.

5      Q.   All right.  I believe we have an agreement

6    with counsel that we will include -- or I'm sorry --

7    obtain the signed version of Exhibit No. 6?

8      A.   Okay.

9      Q.   And we will include that in the deposition.

10   And I'll ask that it be marked as Exhibit No. 7 when

11   it's produced?

12         MR. DODSON:  Yeah.  If you want, we can

13   try to get it tonight, but if it works for you, we can

14   get it in the morning.

15         MR. LONGER:  Well, is the -- it works for

16   me if you'll tell me that the only thing on the second

17   page is the signature lines or if there's more to it,

18   then it doesn't really work then I ask that you get it

19   tonight.

20         MR. DODSON:  That's all that I know of.

21         MR. LONGER:  That page 2 is a signature

22   line.

23         MR. DODSON:  Sign.

24         MR. HUSEMAN:  This is something that we

25   told Chris that we wanted him sign.  It didn't have a

1    signature sheet for him to put in final form.  He says

2    it's been done.  But that it will look obviously

3    somewhat different if there is signature lines on other

4    stuff.  But that's what we told him we wanted in the

5    disclosure.

6                    MR. LONGER:  And do you know what the

7    hourly rate is per hour.

8                    MR. HUSEMAN:  Yeah.

9                    MR. LONGER:  $400.

10                   MR. HUSEMAN:  Uh-huh.

11        Q.    Is that obscene?  It's getting there, huh?

12        A.    Yeah.

13                   MR. HUSEMAN:  If not I'll go back and try

14   again.

15        Q.    Okay.  I'm going back to your Exhibit No. 5,

16   which is the objection that was filed on your behalf

17   and we're still looking at your declaration.  So the

18   paragraph dealing with the drywall that you purchased,

19   you say over the years I have purchased drywall from

20   Lowe's and you mentioned that you got the bulk of your

21   drywall from them --

22        A.    Uh-huh.

23        Q.    -- correct?  It also says that you got it from

24   Home Depot, McCoy's and a variety of other building

25   supply companies.  Do you see that?

1      A.    That is correct, yes, I see that.

2      Q.    Do you know if McCoy's is a participating

3  defendant in the settlement that you are objecting to?

4      A.    I don't know, sir.

5      Q.    Was it important for you to know who your --

6  who your objections were lodged against or not?

7      A.    I knew it was a lot of people.  I knew it was

8  a lot of companies.

9      Q.    Okay.  Well, I will represent to you that

10  McCoy's is not a defendant that's participating in the

11  settlement that you're objecting to.

12      A.    Okay.

13      Q.    I will represent to you that Home Depot is a

14  participating defendant in the settlement?

15      A.    Okay.

16      Q.    Were you aware of that prior to me telling you

17  that?

18      A.    That I was, yes.

19      Q.    And how did you become aware of that?

20      A.    I remember that -- I think it was the website.

21      Q.    And what kind of drywall did you buy from Home

22  Depot, if you remember a brand?

23      A.    Oh, I don't know a brand.  If it's asking

24  about brand, I don't remember.

25      Q.    Do you recollect buying -- do you recollect

1    buying any domestic board from Home Depot?

2        A.    I don't recollect.  I don't know.  I can't say

3    for sure.

4        Q.    Do you know what I mean by domestic?

5        A.    Made here.

6        Q.    When I say domestic board, I mean drywall made

7    in the United States?

8        A.    Okay.

9        Q.    So let me restate the question?

10       A.    Thank you.

11       Q.    Do you remember buying domestic drywall at

12   Home Depot?

13       A.    I don't remember, sir, to be honest with you.

14       Q.    Do you remember buying any Chinese drywall at

15   Home Depot?

16       A.    I remember seeing Chinese stamped on the back,

17   that's what I do remember.

18       Q.    And why is that in your memory when you don't

19   remember domestic board just out of curiosity?

20       A.    To be honest with you, it had to do with

21   triggers as far as, you know, one thing that my -- that

22   subcontractor had told me about.  And since then, I

23   just kind of saw oh, Chinese, that's it.

24       Q.    And you're saying you have a distinct memory?

25       A.    As far as talking to that person.

1    Q.    Oh, do you have a --

2    A.    The conversation.

3    Q.    Do you have a distinct memory of seeing a

4 marking on Chinese drywall -- I'm sorry, on drywall

5 that you bought at Home Depot that said made in China?

6    A.    I don't know if I bought it at Home Depot but

7 I remember seeing made in China.

8    Q.    I see.  So it could have been anywhere?

9    A.    It could have been.  I can't say for sure.

10    Q.    Not necessarily Home Depot?

11    A.    Correct.

12    Q.    All right.  I have been represented to by

13 counsel for Home Depot that Home Depot is not aware of

14 any customer that purchased Chinese drywall from Home

15 Depot.  Do you have any reason to dispute that?

16    A.    I don't know for sure.  I mean.

17    Q.    I also have been represented that Home Depot

18 is not aware of any customer who alleges that they

19 purchased Chinese drywall from a Home Depot store in

20 Texas.  Do you have any reason to dispute that

21 statement?

22    A.    I don't know for sure.

23    Q.    I have also been represented that Home Depot

24 is not aware of any claims asserted against it by

25 customers in Texas about Chinese drywall.  Do you have

1    any reason to dispute that statement?

2         A.    I don't know.

3         Q.    You say I don't know.  Do you have any reason

4    to dispute that statement?  It's more yes or no?

5         A.    Where does that statement come from?  I

6    don't --

7         Q.    Counsel for Lowe's -- or for Home Depot.

8         A.    Oh, okay.  If that's what they're saying, I

9    can't change what they're saying.

10        Q.    Do you have any reason to dispute that Home

11   Depot is not aware of any invoices, records or other

12   documents which identify a specific instance of the

13   purchase of Chinese drywall from Home Depot?

14        A.    Is that what they're saying?

15        Q.    Yes.

16        A.    I can't change what they're saying.

17        Q.    All right.  And are you aware that Home Depot

18   says that they only purchase drywall from domestic

19   drywall manufacturers?

20        A.    Okay.

21        Q.    That's okay with you?

22        A.    I mean --

23        Q.    You don't dispute it?

24        A.    I mean, that's what they're saying.  I can't

25   change what they're saying.