1      Q.    And you don't have any specific recollection,

2   do you, of having purchased any drywall that was made

3   in China from Home Depot, correct?

4      A.    I don't have a specific time, no.

5      Q.    I just want to be sure I understood your

6   answer.  You said I don't have a specific time, no.

7   You don't have any recollection of having bought

8   Chinese manufactured drywall at Home Depot, do you?

9      A.    I mean, I don't know where I bought it from

10  but I remember seeing that in the back.

11     Q.    Okay.  But they are -- if you bought it from

12  some defendant or some supplier?

13     A.    Okay.

14     Q.    Other than Home Depot, they're not a

15  participating defendant in this settlement, are they?

16     A.    Are they not?

17     Q.    Apparently not.  But I take it that you

18  wouldn't know because you haven't looked at the

19  settlement agreement to be sure; is that correct?

20     A.    I can't remember, to be honest with you.

21     Q.    And the last paragraph of your declaration,

22  which says "many of these sheets of drywall included

23  the letters China or made in China.  I have looked at

24  the pictures of examples of Chinese drywall posted at

25  the settlement website and I can affirm that many of

1  the sheets of drywall that I have purchased, installed

2  and used during the class period have been marked in

3  similar, if not identical, ways indicating that they

4  were manufactured in China."

5          That's information that you've already covered

6  with me; is that correct?

7      A.   I have covered that I have seen the Chinese

8  stamped on the back.

9      Q.   Right.  You just spoke about that?

10     A.   Correct.

11     Q.   But you Don know where you got that board

12  from?

13     A.   I don't know where.

14     Q.   And you can't attribute that to Home Depot at

15  all, correct?

16     A.   I can't say for sure, no.

17     Q.   You can't say at all, can you?

18     A.   I don't remember.

19     Q.   If Home Depot says that they didn't get it,

20  you have no reason to dispute that they didn't get

21  Chinese drywall, correct?

22     A.   I mean, I can't change anything that they

23  said, that's correct.

24     Q.   Well, you have -- do you have any evidence to

25  suggest otherwise?

1    A.    I don't.

2    Q.    Okay.  The body of this objection, Exhibit No.

3  5, says that you -- on page 2, that you object to the

4  class definition.  Do you see that, top of page 3?

5    A.    3 or 2? ?  You said 2.  I'm sorry.

6    Q.    I'm on page 3.  It says as an initiate matter,

7  objections made to the class definition?

8    A.    I see that.

9    Q.    So what is your objection to the class

10  definition, sir?

11    A.    It's written right here, sir.

12    Q.    All right.  Is this I want to ask, is this the

13  first time you read this?

14    A.    No.

15    Q.    So it says it's vague and ambiguous.  Can you

16  tell me what you recollect the class definition to be?

17    A.    I can't remember at this moment.

18    Q.    Is it fair to say that -- strike that.

19         It says "more over the class is defined in

20  terms of merit based criteria."  Do you see that?

21    A.    Uh-huh.

22    Q.    Do you know what merit-based criteria are?

23    A.    It's a criteria depending on your merits,

24  different things.

25    Q.    Okay.  I don't understand your answer.  Is

1   that the best -- and I don't mean to be flip here?

2      A.   No, that's fine.

3      Q.   Is that the best you can say?  Because you're

4   using the same word to define the term?

5      A.   That's the best I can say, sir.  I'm sorry.

6      Q.   That's fine?

7      A.   These are all lawyer words, you know, so

8   that's -- that's why I hired a lawyer to, you know...

9      Q.   So it fair to say then that Mr. Bandas wrote

10  these words, not you?

11      A.   It's fair to say that, you know, he's the

12  lawyer and he can -- what needs to be drafted

13  correctly, depending on what.

14      Q.   And you are the client, though, correct?

15      A.   Yes, sir.

16      Q.   Do you believe that you control Mr. Bandas'

17  and he is your representative?

18      A.   He is my representative.

19      Q.   Do you believe you control his actions?

20      A.   Actions in what way?

21      Q.   What he files in court, for example?

22      A.   Well, of course.

23      Q.   Okay.  But you didn't read this before it was

24  filed, correct?

25      A.   That I can't remember reading this.  I know I

 1   read it.

 2       Q.    You read it in preparation of your deposition,

 3   correct?

 4       A.    No.

 5       Q.    You've not read it in preparation for today?

 6       A.    That is not what I said.

 7       Q.    I'm asking you the question?

 8       A.    Okay.  I'm sorry.  I have read it before my

 9   preparation.

10       Q.    I see.  All right.  The next objection, which

11   is on the next paragraph, is that the proponents of the

12   settlement have not carried their burden of proof on

13   the fairness adequacy and reasonableness of this

14   settlement.

15            Now, earlier you testified that you didn't

16   like the attorneys fee.  I recollect that?

17       A.    Okay.

18       Q.    Is there anything else that you think is

19   unfair, inadequate or unreasonable about the

20   settlement?

21       A.    I feel it's unfair that it's not totally

22   specific as far as what the class is going to get.

23       Q.    Okay.  Do you think that that's unusual, that

24   in a class-action people don't know precisely what

25   they're going to get?

1     A.    I don't know, sir.

2     Q.    Next page.  You object that the class cannot

3 be maintained as a class-action under the requirements

4 of rule 23 of the federal rules of civil procedure?

5     A.    That I wrote.  No, I'm just kidding.  I'm just

6 kidding.  I'm sorry.

7     Q.    It's getting late in the day and I appreciate

8 your humor.  But?

9     A.    Okay.  I'm sorry.

10    Q.    That's something that Mr. Bandas wrote for

11 you, right?

12    A.    That is correct.

13    Q.    All right.  Are you familiar with rule 23 of

14 the federal rules of civil procedure?

15    A.    No.

16    Q.    Do you have any idea why the class cannot be

17 maintained as a class-action under rule 23?

18    A.    I don't know.

19    Q.    Next you say that objections made to the

20 request for attorneys fee under both a percentage of

21 recovery basis and a load star analysis, do you see

22 that?

23    A.    Yes, sir, I see that.

24    Q.    Can you tell us what a percentage of recovery

25 basis is for attorneys fees?

1     A.     I can't.

2     Q.     Can you tell us what a load star analysis is?

3     A.     No, sir.

4     Q.     Do you know what a mega fund case is?

5     A.     No, sir.

6     Q.     Is it your position that counsel should only

7  be entitled to 10 percent of any recovery on a

8  contingent basis in a common fund case?

9     A.     Yes, I feel 10 percent is reasonable.

10    Q.     Okay.  Have you ever been involved in any

11 lawsuit personally?

12    A.     No, sir, I haven't.

13    Q.     Any members of your family?

14    A.     Not that I can remember.

15    Q.     Any friends or relatives?

16    A.     Some friends that work for a lawyer, so...

17    Q.     Do you know what the going rate is for

18 contingency fee in Corpus Christi Texas is today?

19    A.     Contingency fee?  I don't know what exactly --

20 like for a specific case or for specific something.

21    Q.     Let's say for personal injury?

22    A.     Okay.

23    Q.     Car accident?

24    A.     I don't know.

25    Q.     Okay.  You mentioned that in preparation for

1    your deposition you met with counsel and Mr. Garcia was

2    present.  Do you recollect that?

3        A.    He was present.

4        Q.    Do you know Mr. Garcia?

5        A.    No, I don't know him personally.

6        Q.    When did you first meet Mr. Garcia?

7        A.    The first time we came here, which I think you

8    wrote down.  I don't remember the date.  That's when.

9    I'm sorry.

10        Q.    And do you have an understanding of how

11    Mr. Garcia came to be a plaintiff or objector in this

12    litigation based upon your meetings with him?

13        A.    I think a friend of his or something like

14    that.

15        Q.    Is that Mr. Batman?

16        A.    I don't think so.  I think -- okay.  I think

17    it was Bert, Bert, Bert.

18        Q.    Okay.  Do you have any sense of who Bert was?

19    Just a --

20        A.    Yeah.  That's what I was trying to remember.

21    Bert works with Mr. Batman.

22        Q.    Is Bert an attorney also?

23        A.    I don't think so.  I remember he said he

24    played golf with Bert, something like that.

25        Q.    Just out of curiosity, are you familiar with

1    Mr. Garcia 's company, the Bay Area contracting

2    construction, Inc.?

3       A.    I'm not familiar with Mr. Garcia's company.

4       Q.    In the course of your business as SHS

5    construction, you've never observed them as I'm going

6    to say a competitor of yours?

7       A.    No.  I'm sorry.  If I eat.  I just needed a

8    little something.  I'm sorry.

9       Q.    Sure.  It looks good on video.

10      A.    I didn't mean to do that.  I'm sorry.  I

11    believe he does more commercial stuff and we don't do

12    as much commercial stuff as he did.  That's probably

13    why we never --

14      Q.    You do residential?

15      A.    Residential and some commercial work but not

16    as much as he does.

17      Q.    And how do you know that from having met with

18    him just recently?

19      A.    Yes.

20      Q.    Do you know Ernest Vitella?

21      A.    I do not.

22      Q.    Have you ever met Mr. Vitella?

23      A.    No, sir.

24      Q.    Are you familiar with E & E construction?

25      A.    No, sir.

ROUGH DRAFT TRANSCRIPT ONLY

1      Q.     Have you, prior to meeting with Mr. Bandas on

2   September 28, did you go to the court's website?

3      A.     No, sir.

4      Q.     Did you do any -- do you have a computer?

5      A.     Yes, I do.

6      Q.     And does that computer have Internet access?

7      A.     Yes, sir.

8      Q.     Have you done any personal investigation of

9   the proceedings that are taking place in the federal

10   court in New Orleans?

11      A.     A little bit.  Not a lot.  Some on you-all's

12   own website, on your own website.

13      Q.     At Levin Fishbein?

14      A.     At Herman & Herman & Katz or something.  I

15   don't know if that's yours.

16      Q.     No, don't apologize.  They have better

17   pictures.

18      A.     Yeah.

19      Q.     So what did you -- what did you find out in

20   the course of your personal investigation?

21      A.     I'm more of a picture person.  I remember just

22   looking at those pictures again and seeing the

23   markings.

24      Q.     So is it fair to say that you did no personal

25   investigation of the proceedings prior to your

1    objection?  And when I say proceedings, I mean the

2    judicial proceedings taking place in front of Judge

3    Fallon?

4        A.    No, because I did look at the website before

5    that.  Not as far as the court one, but the other one.

6        Q.    The Herman, Herman website?

7        A.    No, that was at a different time.

8        Q.    The Chinese drywall class?

9        A.    Yes.

10       Q.    Okay.  And I'm not sure.  When did you do that

11   personal investigation?

12       A.    Okay.  Let me make sure here.  The personal

13   one -- if we're talking about personal like my own

14   computer.

15       Q.    Yes.

16       A.    It would be after some time of our meeting

17   with Mr. Bandas.

18       Q.    Okay.  So after you met with your counsel and

19   authorized him to object on your behalf is when you

20   began to look into what it was that you were objecting

21   to; is that fair to say?

22       A.    I did more research after.

23       Q.    Okay.

24       A.    In addition to what I did.

25       Q.    All right.  I'm going to provide you with

1    what's been marked as Exhibit No. 8, which are the

2    answers to interrogatories that have been provided to

3    us.  Take a look at that, if you would.

4         A.    Okay.

5         Q.    Are you familiar with that document?

6         A.    Yes.

7         Q.    These were answers to interrogatories that

8    were provided to us.  They were actually filed in the

9    court.  I want to ask you to explain your answer to

10   interrogatory No. 5.  And I guess just so it's clear,

11   interrogatory No. 5 asks for any Chinese drywall you

12   purchased, state whether you ever explained, inquired,

13   made written and/or verbal notice that the Chinese

14   drywall was defective.  And then it asks you to explain

15   your answer basically.

16         So if you could, in your response, you say "I

17   have recollection of a conversation with a

18   subcontractor maybe two or three years ago about how

19   Lowe's sold inferior Chinese drywall.  I have not

20   communicated with any manufacturer, sellers or

21   distributor of Chinese drywall about Chinese drywall."

22         Did you already describe to us that

23   conversation with that subcontractor about Lowe's?

24         A.    Yes, that is what I mentioned.

25         Q.    We've covered that already?

1    A.    Yes, sir.

2    Q.    And you're aware that Lowe's is not a

3    defendant in this settlement, correct?

4    A.    Correct.  But my --

5    Q.    And so there's no -- and --

6    A.    Can I say something maybe?

7    Q.    It's your deposition.

8    A.    The reason I brought that up as far as

9    remembering that he had told me something about Lowe's,

10   the Chinese is that from then on, that stayed in my

11   mind as far as the China thing.  That's what stayed in

12   my mind.  And then I remember like if I would see made

13   in China, I was like, oh, okay.  But I mean, I didn't

14   know that this would happen to me.

15   Q.    Have you read any newspaper articles,

16   Internet, websites, anything prior to very recently

17   with your meeting with Mr. Batman about Chinese drywall

18   being defective?

19   A.    No, sir.

20   Q.    Interrogatory No. 6, it actually asks who

21   installed drywall in your home in Ingleside, Texas and

22   the manufacturer of that drywall but you don't live if

23   Ingleside?

24   A.    Correct.

25   Q.    So you were kind enough to point that out to

1  us.  And then you went on to explain that you in fact

2  live at Claride, 429 Claride and that you bought your

3  home in 2003 or 2004 and you say that you remodeled

4  that home?

5      A.    Correct.

6      Q.    And when you remodeled it, you used about 50

7  plus sheets of drywall?

8      A.    That is correct.

9      Q.    Do you remember what the manufacturer of that

10 drywall was?

11     A.    No, I do not, sir.

12     Q.    You say you think you bought that drywall at

13 Home Depot?

14     A.    That is correct.

15     Q.    So is it you're not sure?

16     A.    Yes, sir.

17     Q.    It could be anywhere?

18     A.    I'm not sure.

19     Q.    Do you have any receipts in Exhibits No. 2, 3

20 or 4?  I'm sorry, I said sheets didn't I.  Do you have

21 any documents in any of the boxes here, Exhibits 3, 2,

22 3 and 4 that would indicate the purchase of the drywall

23 in your home?

24     A.    I can't say for sure, to be honest with you.

25     Q.    Do you know whether Chinese drywall was being

1   imported into the United States in 2003 and 2004?

2       A.   I don't know.

3       Q.   You recollect that Home Depot will -- has

4   stated to me that they never purchased Chinese drywall?

5       A.   I recollect that.

6       Q.   So would you agree with me that it's more than

7   likely that you bought at Home Depot, if you bought at

8   Home Depot, domestic board?

9       A.   I mean, I don't know exactly which one I put

10  in there.  I mean, you're asking domestic board as far

11  as the name brand?  I'm sorry, are you asking is that

12  the name brand again?  Is the or is it --

13      Q.   No, domestic board being drywall made in the

14  United States?

15      A.   I don't know.

16      Q.   All right.  Are you at all familiar with the

17  problems that Chinese drywall causes?

18      A.   Yes.

19      Q.   What is it that you understand Chinese drywall

20  does?

21      A.   It has a foul smell, it causes corrosion.

22  It's inferior.  Let me see.  I'm trying to remember

23  here.  There's a discoloration on it.  Those are what I

24  can remember right now, sir.

25      Q.   Okay.  Is there a foul smell in your home?

1      A.     No, sir.

2      Q.     You mentioned that Chinese drywall causes

3   corrosion?

4      A.     Correct.

5      Q.     What kind of corrosion?

6      A.     On pipes, if I remember correctly.

7      Q.     Have you evaluated your home to see whether

8   there's been any corrosion in your home?

9      A.     Not that I can tell.

10     Q.     You mentioned discoloration?

11     A.     Correct.

12     Q.     Is there any discoloration in any of the

13  drywall that you've bought at Home Depot that's been

14  installed in your home?

15     A.     Not that I've seen.

16     Q.     Say you say if you sell your home you will

17  have to disclose that -- I'm sorry, I'm skipping ahead.

18  It says that you're worried and concerned that there

19  could be Chinese drywall in your home, correct?

20     A.     Yes, sir.

21     Q.     Can you describe your worry and concern?

22     A.     Well, if it is Chinese drywall, you know, and

23  the only way to find that out is by taking it off.  But

24  if it is, I mean, if I later want to sell my house, I'd

25  have to let them know it is Chinese drywall.

1    Q.    There's a lot of if's in that answer.  The it

2  was Chinese drywall, you would expect there to be a

3  foul smell in your house, correct?

4    A.    I don't remember if all of the Chinese drywall

5  had that smell.

6    Q.    If it was Chinese drywall, you would expect

7  there to be corrosion in your hope, correct?

8    A.    Possibly, yes.

9    Q.    If there was Chinese drywall in your home you

10  would expect to be discoloration, correct?

11    A.    Correct.

12    Q.    And you've already told me that none of those

13  three things are present in your home, correct?

14    A.    That is what I remember, yes, sir.

15    Q.    So if there was Chinese drywall in your home,

16  you'd have to have pretty good Chinese drywall, right?

17    A.    I guess.

18    Q.    Are you aware that not all Chinese drywall is

19  containing sulfur or off-gassing sulfur, reduced sulfur

20  gasses, really bad question.  Let me ask that again.

21    A.    Yeah, please.

22    Q.    Are you aware that not all Chinese drywall gas

23  emits reduced sulfur gasses?

24    A.    I think that's what I remember.  That's what I

25  was saying, that I don't think all of it has that

1    smell.

2        Q.    Right.  Well, not only it doesn't have that

3    smell, but not all Chinese drywall is reactive?

4        A.    Okay.

5        Q.    Are you aware of that?

6        A.    No, sir.

7        Q.    So you may have nonreactive board in your

8    home?

9        A.    I don't know.

10       Q.    Well, it sounds like you do, doesn't it?

11       A.    Well, I mean, if -- if those were the only

12   three factors that determine it, well, then if that's

13   what we went off of, well, then maybe not.

14       Q.    Do you intend to sell your home any time soon?

15       A.    Not right now, sir.

16       Q.    Do you have any intention to take out the

17   board that you bought at Home Depot and replace it with

18   domestic board or other board?

19       A.    I mean, even if I had, wanted to, I mean, it's

20   not a possibility.

21       Q.    But you don't have any intention to do that?

22       A.    Not right now, sir.

23       Q.    And the fact of the matter is that you were

24   never concerned that there was Chinese drywall in your

25   home until after you spoke to Mr. Bandas or Mr. Batman;

1    is that correct?

2        A.    It became a concern after that, yes, sir.

3        Q.    So after you talked to lawyers, that's when

4    your concern manifested?

5        A.    Correct.

6        Q.    All right.  You work with -- what is the

7    nature of SHS construction?  What do you do?

8        A.    We do a lot of remodeling.  Take down old

9    stuff and put new stuff up.

10       Q.    Soup to nuts in terms of you do demolition,

11   you do --

12       A.    Yes, sir, demolition.

13       Q.    Framing?

14       A.    Yes.

15       Q.    And then finishing?

16       A.    All the way through.

17       Q.    All the way through.  So do you subcontract

18   out the installation of drywall or you do that

19   yourselves as well?

20       A.    It depends on the job.  Some of it we do, some

21   of it we do, I do it personally.

22       Q.    Now, you said in 2009, I believe, you had

23   employees?

24       A.    Uh-huh.

25       Q.    Since, say, I guess 2010?

1    A.    Uh-huh.

2    Q.    Or some time in 2009 you no longer have

3  employees; is that right?

4    A.    We -- what we do is we sub -- pretty much

5  people want to get paid more so they don't mind being

6  subs.

7    Q.    Okay.  I'm sure that works out well for

8  somebody?

9    A.    Yeah.  Yeah.

10    Q.    And so you don't have any employees that --

11  strike that.

12        So when you subcontract out the work for let's

13  say installation of drywall, somebody else is doing

14  that, right?

15    A.    Not all the time, sir.

16    Q.    Okay.  So tell me how that splits out.

17    A.    Well, depending on the job, of course, of how

18  big it is, how small it is, I'm really kind of more a

19  hands-on, so people are paying me to make sure things

20  are getting done.  So I'll be there most of the time

21  helping them to put it up.  Sometimes I won't be there,

22  aisle have to run to other appointments to do other

23  estimates.

24    Q.    All right.  So you runaround from different

25  sites to be sure that your crews are doing what they're

1    supposed to be doing or your subcontractors?

2        A.   Subcontractors, yes, sir.

3        Q.   Okay.  And in the course of that, you breathe

4    in whatever is there at the site, right?

5        A.   Uh-huh.

6        Q.   Up until meeting with Mr. Batman, did you ever

7    have concerns that what you were breathing in could be

8    causing you injury?

9        A.   I always had a fear that at a certain point

10   like, for example, in what we're at right now, that a

11   product or something that we use would be -- would be a

12   bad product, you know.  And that it would affect me.

13   That I've always had without a doubt.  And now that

14   this is happening, you know, I've seen all of these

15   things, that has escalated more.  That's how I felt.

16       Q.   Are you the type of person that, say, for

17   example, you're using a paint, making this up?

18       A.   Okay.

19       Q.   And the paint contained a lot of benzene?

20       A.   Okay.

21       Q.   Benzene is a known carcinogen?

22       A.   Uh-huh.

23       Q.   And you were exposed to the benzene in that

24   paint.  Are you the type of person that would hire a

25   lawyer an say I want to see sue the manufacturer of

1    that paint for putting in defective benzene?

2        A.    Am I that type of person?

3        Q.    Yeah.  I mean, like do you respect lawyers

4    enough that if you were injured, you would hire a

5    lawyer to represent you for your injury?

6        A.    Oh, yes.  Yes, sir, I can see that, yes.

7        Q.    Okay.  But in this case, you did not hire a

8    lawyer to represent you for any of your concerns about

9    illness, disease or medical problems, isn't that true?

10   You testified to that earlier.

11       A.    Yes, sir.

12       Q.    I take it that your concerns about illness,

13   disease and medical problems are not very significant,

14   Mr. Soto; is that correct?

15       A.    I mean, I'm not dying right now, that's for

16   sure.

17       Q.    Well, they don't rise to the level that you

18   think that you need to take any legal action; isn't

19   that correct, sir?

20       A.    Yes.

21       Q.    Now, you also talk about some de Walt drills?

22       A.    Uh-huh.

23       Q.    Do you know if any of the drill receipts are

24   in Exhibits 2, 3 or 4?

25       A.    They probably are, yes, sir.

 1      Q.    All right.  And what -- when did you buy these

 2   drills?

 3      A.    It was a few years back.  Probably around

 4   2009, somewhere around that time, sir.  I can't say

 5   exactly what day or time.

 6      Q.    All right.  And you say that -- is it -- well,

 7   actually, you say "during the time period that I recall

 8   working with Chinese drywall" do you see that the

 9   second sentence?

10      A.    Uh-huh.

11      Q.    Of that paragraph?

12      A.    Uh-huh.

13      Q.    That's -- is that referencing the 2009 period

14   that you just now testified to?

15      A.    I think it's 2009.  I'm referencing that time

16   frame.

17      Q.    And once again, sir, you don't know when

18   Chinese drywall was imported into the United States,

19   correct?

20      A.    Correct.  Yes, sir.

21      Q.    What -- in 2009, how would you describe your

22   business?  Was it on -- was it coming out of the

23   recession?  Going into the recession?  Were you busy?

24   Were you not busy?

25      A.    2009.  2009, we were pretty busy.  I remember

1    that because I had several employees and I had a lot of

2    drills.

3        Q.    And you had a lot of business?

4        A.    Yeah.

5        Q.    So your lots of employees were using lots of

6    drills doing lots of jobs, right?

7        A.    Correct.

8        Q.    And that's more so than usual; is that what

9    you're telling us?

10       A.    As far as the work itself?  Is that what we're

11   referring to.

12       Q.    The use of the drills is the what I'm

13   referring to.

14       A.    Oh, the use of the drills.  Well, the drills

15   are -- were assigned specify specifically to two people

16   one per -- each person had their own drill so it might

17   not have not been used by a lot of different people,

18   it's used by the same person.

19       Q.    But they were very busy persons using those

20   drills?

21       A.    They were busy using drills, correct.

22       Q.    And they were more busy than usual in the

23   course of your business in that time period that we're

24   talking about?

25       A.    I don't know if more busy than usual, to be

1    honest with you.  We were busy, I know that.  And

2    here's -- I'm sorry, let me say something on that.  The

3    reason I say that is because around that time, it had

4    only been a couple of years since I had started my

5    business.  And as you're growing as a business, you

6    start learning things.  You know, what to do and

7    whatnot to do.  So I mean, we've always kept busy, but

8    if you ask me if we were busy every year, yes, we were

9    busy every year.  If you ask me how much money we made

10   each year, it would be different, you know.

11       Q.    All right.  I just -- I'm just looking at what

12   you're here in writing talking about, which is drills?

13       A.    Correct.

14       Q.    Corroding within a few months and failing

15   prematurely?

16       A.    Correct.

17       Q.    Where did you buy the drills?

18       A.    I mean, it was probably either Lowe's or Home

19   Depot.

20       Q.    Are you aware that they have return policies

21   at Lowe's or Home Depot for products that fail

22   prematurely?

23       A.    Yes, sir.

24       Q.    Have you ever returned something to Lowe's or

25   Home Depot because of --

```
 1        A.    I have, yes, sir.

 2        Q.    Did you return the drills to Lowe's or Home

 3   Depot?

 4        A.    To be honest with you, no.

 5        Q.    And did it ever dawn on you that something

 6   that you ought to do because they were failing

 7   prematurely?

 8        A.    It was probably something I should have done.

 9        Q.    And you know, you're aware that drills have

10   warranties as well, right?

11        A.    Yes, sir.

12        Q.    And do you think that if you had bought these

13   within the -- when did you buy the drills, in 2009?

14        A.    That's, again, I'm saying that's around the

15   time that I bought it.

16        Q.    But you were also saying drills usually last

17   more than a year and these drills last less than a

18   year, right?

19        A.    Correct.

20        Q.    Do you know whether or not de Walt drills have

21   a year -- a year -- a one-year warranty?

22        A.    Yes, now I do know that.

23        Q.    And they were covered by warranty, these

24   drills?

25        A.    Yes, sir.
```

1    Q.    But you think that the Chinese drywall that

2    these gentlemen were working with these drills caused

3    them to corrode; is that your testimony?

4    A.    My testimony is that they failed prematurely

5    than they usually do because my drills usually last for

6    about a year.  That is what my testimony says there,

7    right there.

8    Q.    So --

9    A.    And the reason that I know that they were

10   corroded is because I take them apart and I saw the

11   corrosion inside.

12   Q.    All right.  Are you telling us that you are

13   not associating that corrosion with Chinese drywall or

14   are you telling us that those drills corroded because

15   those gentlemen were working with the drills near

16   Chinese drywall?

17   A.    I can't say for sure.  I'm saying that that

18   could be a factor.

19   Q.    But you don't know?

20   A.    Correct, I don't know.

21   Q.    And you don't have any expert to support that

22   theory, right?

23   A.    No, sir.

24   Q.    And you haven't hired Mr. Bandas to hire an

25   expert to support that theory?

1      A.      No, sir.

2      Q.      So it's possible, in fact, it's just your

3   speculation at best that there's an association between

4   those drills corroding and exposure to Chinese drywall?

5      A.      It is a possibility, direct.

6      Q.      It's you guessing?

7      A.      Okay.

8      Q.      Now, you say your business reputation has been

9   damaged?

10     A.      Uh-huh.

11     Q.      Tell me about that.

12     A.      Well, again, going back to I always trying to

13  provide the best for our clients.  Now I know that, you

14  know, we've installed Chinese drywall in some of their

15  homes.  I don't know who or where, but just knowing

16  that has affected the reputation that we have.  Because

17  I would have to inform them about that.

18     Q.      Okay.  Let's break that down.  Now you know?

19     A.      Correct.

20     Q.      That you've installed Chinese drywall in some

21  of your client's homes.  How do you know that?

22     A.      By remembering the pictures that I saw and

23  remembering the markings that I saw.

24     Q.      All right.  And which clients have you gone to

25  the effort of telling them that they have Chinese

1    drywall in their home?

2        A.    I haven't gone to any of them.

3        Q.    Do you have any intention to do that?

4        A.    I don't know what I need to do.

5        Q.    Do you have any intention of telling any of

6    your clients, I installed Chinese drywall in your home?

7        A.    Intention, yes, I do have the intention.

8        Q.    Okay.  And when do you intend to effectuate

9    that intent?

10       A.    I don't know.

11       Q.    Have you consulted with any counsel as to your

12   obligation as to whether or not you need to make that

13   disclosure?

14              MR. HUSEMAN:  Think discussions you had

15   with counsel are not to be discussed, Mr. Soto.

16              MR. LONGER:  He's counsel I'm just asking

17   if he's had a discussion about whether he needs to make

18   the disclosure he hasn't retained Mr. Bandas to give

19   him that.

20              MR. HUSEMAN:  You asked if he's talked to

21   a lawyer about that particular subject and that's what

22   we're objecting as being privileged.

23              MR. LONGER:  That's an invalid objection.

24   Mark that, please.

25       Q.    Do you have any intention to talk to a lawyer

1   about whether or not you have a duty to make that

2   disclosure?

3       A.

4               MR. HUSEMAN:   Without saying whether you

5   have or in fact are not.

6       A.      I do have an intention.

7       Q.      Okay.  And who are you going to talk to?

8       A.      I don't know.

9       Q.      Certainly not Mr. Bandas, right?

10      A.      I didn't say that.

11      Q.      Okay.  Now, none of your clients -- I think

12  you told me earlier have ever told you that they're

13  complaining to you about Chinese drywall in their

14  homes; is that correct?

15      A.      They have not called me personally.

16      Q.      Have you gone to any of the homes that you've

17  installed any drywall in that have the effects of

18  Chinese drywall?

19      A.      The effects, no.

20      Q.      Have you ever noticed foul smell in any of the

21  homes that you've worked in from Chinese drywall?

22      A.      I can't recall which homes those were.

23      Q.      Have you ever noticed any corrosion in any of

24  the homes that is indicative of Chinese drywall?

25      A.      I don't remember what homes they were.

1     Q.    Have you ever noticed any discoloration in any

2  of the homes that you've installed Chinese drywall in?

3     A.    I don't remember the homes.

4     Q.    And you don't know if you've even installed

5  Chinese drywall in those homes, right?

6     A.    I never said that.  What I said is I don't

7  remember the homes.

8     Q.    All right.  Now, tell me, you're concerned and

9  you're telling me that you have emotional distress.

10  How is that going for you?

11     A.    Well, I have worry there that I didn't have

12  before.

13     Q.    And that's as a result of speaking to

14  Mr. Batman, right?

15     A.    That's as a result knowing that I've installed

16  Chinese drywall.

17     Q.    I see.  And have you seen any medical

18  practitioner about your concerns?

19     A.    No, sir.

20     Q.    Do you have any intention to see a medical

21  practitioner about your concern?

22     A.    Yes, sir.

23     Q.    Who is your doctor?

24     A.    I don't have a doctor.

25     Q.    Who will you go to see when you -- when you