1  fulfill this intention?

2      A.   I will possibly go see Mr. Covarrubias.

3      Q.   Mr. --

4      A.   Dr. Covarrubias, I'm sorry, because he used to

5  be -- years ago he used to be the person that I would

6  go to.

7      Q.   Now, have you ever seen -- I'm going to

8  butcher his name -- Dr. Covarrubias?

9      A.   C-O-V-A-R-R-U-B-I-A-S.

10     Q.   Covarrubias?

11     A.   Yes, sir, you got it.

12     Q.   Thank you.  So Dr. Covarrubias, have you

13 expressed any concerns about breathing in dust or

14 anything?

15     A.   No, I haven't.

16     Q.   When was the last time you saw a doctor?

17     A.   For myself?

18     Q.   Yes, sir.

19     A.   Okay.  Probably about two or three years ago.

20     Q.   And what was the nature of that visit?

21     A.   I was having a lot of congestion that wouldn't

22 go away.

23     Q.   Like a cold?

24     A.   No.  It wasn't a cold.  It was just cold air

25 would hit me and I would start coughing like I almost

1      wanted to kind of throw up.  And so I went to see the

2      doctor for that.  Because the congestion would never go

3      away.

4          Q.    You know, you're from Corpus Christi, it

5      doesn't get cold here too often.  But the --

6                  MR. HUSEMAN:  Well, actually, Counsel, it

7      was down to 80 last week.

8                  THE WITNESS:  Yeah.  Yeah.  No, it was

9      actually 60.

10                  MR. LONGER:  So this is years ago so we

11      have had climate warming.

12          Q.    Now, back when you saw Dr. Covarrubias?

13          A.    I didn't see him for that.

14          Q.    You saw a physician?

15          A.    Yes, sir.

16          Q.    It was a physician?

17          A.    It was a physician.

18          Q.    And do you recollect that name?

19          A.    It was actually a woman's name.  It wasn't

20      here in Corpus.  It was in Reynosa on the other side of

21      the border.

22          Q.    Do you recollect her name?

23          A.    Her name?  No, I don't sir.  I'm sorry.

24          Q.    And did you obtain a diagnosis at that visit?

25          A.    I don't remember a diagnosis like what she

1   said exactly, but I do remember she gave me some pills

2   to get rid of the congestion.  That's what I do

3   remember.

4       Q.   Do you remember what the pill was?

5       A.   No, sir.

6       Q.   Was it an antibiotic?  Was it --

7       A.   I don't remember.

8       Q.   Anti bacterial drug or --

9       A.   It was probably a combination of a few things

10  but I don't remember.

11      Q.   Was it a cough syrup?

12      A.   No, it wasn't a cough syrup.  It was a pill,

13  it was a couple of pills exactly but I don't remember

14  exactly what the name was.  I know obviously one was

15  for congestion but that's all I remember.

16      Q.   And where did you fill the prescription?

17      A.   Where did I fill the prescription?

18      Q.   Was it a Walgreen's?  Was it rite aid.  I

19  don't know what you have down here.  CVS?

20      A.   I don't remember.  I don't remember exactly

21  where.

22      Q.   But back then, you didn't even know about

23  Chinese drywall, so you didn't explain to her that you

24  had any association between that and your work?

25      A.   I didn't know about it, correct.

1    Q.    Can you ever explain to her that you thought

2    that there was an association between that congestion

3    and your work?

4    A.    No, sir, I didn't know about it.

5    Q.    Well, you knew you were working so did you

6    explain to the doctor that I have this congestion, do

7    you think it may be caused by my exposures to anything

8    in my line of business?

9    A.    Honestly, I feel that I take those matters a

10   little more seriously now that I'm a little bit older

11   than what I was a few years ago.  So at that point I

12   did not say that to her.

13   Q.    I hope that you're right on that, that we're

14   all older and wiser.

15   A.    Well, I mean, I'm speaking for myself.  I'm

16   sorry.

17   Q.    Okay.  Now, I want to quickly go through your

18   document request which I don't believe that I've marked

19   as an exhibit yet, so I'm going to do that real quick.

20   And I hope that we can run through these faster.  This

21   is Exhibit No. 9.  I'm going to hand that to you.

22         MR. LONGER:  There's a page missing.

23   A.    Mister -- I hate to ask.

24   Q.    You need a break?

25   A.    Just a quick break.  I need the talk to my

1   wife because I'm sure we've been here from quite a

2   while and she hasn't heard from me.

3              MR. LONGER:  It's 8 o'clock, let's take a

4   break.

5              THE VIDEOGRAPHER:  Off the record at 8:01,

6   end of tape two.

7              (A recess was taken.)

8              THE VIDEOGRAPHER:  On the record at 8:07,

9   beginning of tape three.

10      Q.    Mr. Soto, we have just taken a short break.

11      A.    Thank you for that.

12      Q.    And I want to have you for your patience.  Let

13   me direction you to Exhibit No. 9, which I had produced

14   to you just before the break?

15      A.    Correct.

16      Q.    It is objector Saul Soto and SHS Construction

17   responses an objections to request for production

18   propounded by class counsel.  Do you have that document

19   in front of you?

20      A.    Correct.

21      Q.    All right.  Now, these were documents -- I'm

22   sorry.  This document was produced to me and filed in

23   the federal court in the Eastern District of Louisiana

24   by Mr. Bandas on your behalf.  Do you know that?

25      A.    Yes, sir.

1       Q.    All right.  So are there any communications

2  between you and anyone else in the Chinese drywall

3  litigation to your knowledge?

4       A.    No, sir.

5               MR. HUSEMAN:  You mean other parties?

6               MR. LONGER:  Other litigants, other

7  parties.

8               MR. HUSEMAN:  He obviously talked to his

9  lawyers, you know.

10              MR. LONGER:  Well, I said litigants,

11  didn't I?

12              MR. HUSEMAN:  Okay.

13              MR. LONGER:  So maybe Mr. Bandas will

14  become a litigant, I don't know.

15              MR. HUSEMAN:  If your fondest wishes are

16  realized.

17              MR. LONGER:  But we shall see.

18       Q.    Now, document request No. 4?

19       A.    Okay.

20       Q.    It references -- it asks for documents

21  reflecting damages to your property that you alleged

22  are caused by Chinese drywall.  You say that after your

23  search that any documents responsive to this request

24  will be produced.  Now, you've produced to us three

25  boxes here, Exhibits 2, 3, and 4.  Is there anything

1    else that you have in your possession, control or

2    custody that you intend to produce to me that is

3    responsive to this request?

4        A.    That is what I could find.

5        Q.    That is the universe right there; is that

6    correct?

7        A.    That's as much as I can find pretty much.

8        Q.    All right.  As to document request No. 5,

9    we're asking there for documents that you intend to

10   submit for other lost claims as that term is identified

11   in the Chinese drywall litigation.  Do you see that?

12       A.    Uh-huh.

13       Q.    All right.  Do you know what the other loss

14   fund is designed to cover?

15       A.    No, sir, I do not.

16       Q.    Do you have any understanding of why you

17   responded the way you did or was it something that you

18   just allowed counsel to do for you?

19       A.    That's why I got a lawyer to help me with

20   this.

21       Q.    Thank you.  No. 6, all invoices of your

22   purchase of Chinese drywall.  The universe is right in

23   front of us; is that correct?

24       A.    That's pretty much what I could find, yes.

25       Q.    All right.  Do you own any companies?

1      A.      Any companies like all together?

2      Q.      Well, this question, interrogatory No. 7, it

3   says for each company you own, all documents reflecting

4   your ownership or articles of incorporation.  You run

5   SHS Construction, which is doing business -- I'm sorry,

6   it's Saul Soto doing business as?

7      A.      Correct, doing business as.

8      Q.      SHS construction?

9      A.      That is correct.

10     Q.      Do you own any incorporated companies?

11     A.      One, which we never did anything with which

12  we're closing down this year.

13     Q.      Okay.  And what is that company?

14     A.      Buena Vista lawn and landscaping it's an LLC.

15     Q.      And I -- I feel come to ask compelled to ask.

16  Is that a business that ever engaged in practices that

17  involved Chinese drywall?

18     A.      No, sir.

19     Q.      Or any drywall for that matter?

20     A.      That I can tell you, no, no, sir.

21     Q.      Okay.  All right.  Document request No. 8.

22  Have you produced all invoices, purchase orders, sales

23  slips or other paper reflecting the resale of Chinese

24  drywall?

25     A.      In the resale as far as my understanding is

1   the contracts that I use to do my business.   And

2   they're in there as well.

3       Q.    Okay.   And are they -- if we were to look at a

4   contract?

5       A.    Okay.

6       Q.    Would it be separately identified the resale

7   of drywall?

8       A.    As far as what invoice would go with the

9   paperwork is that what you're saying?

10      Q.    How would -- how would we know --

11      A.    Okay.

12      Q.    That you were reselling drywall in any

13  document in there?   What would it say in what would I

14  look for?

15      A.    Honestly the only way that that would be in --

16  we have gotten a better with that -- is on the invoices

17  now, which that hasn't always within the policy but now

18  we will put the job that it goes to.   And we'll write

19  it on there.   Years ago we didn't used to do that.   The

20  only way of knowing is the invoices that go to that

21  month pretty much.

22      Q.    When you say now, when did that practice

23  begin?

24      A.    Well, my assistant has been with me for two

25  years, so she helps do all that stuff.

ROUGH DRAFT TRANSCRIPT ONLY

1    Q.    So since 2010?  Or --

2    A.    Somewhere around there, yes, sir.

3    Q.    Since you had an assistant?

4    A.    Yeah, she's she helps me with that.

5    Q.    All right.  If I were to ask you to stand up

6    and walk over to boxes, would you be able to find an

7    example of where the drywall is separately identified?

8    Or would it take you for of because you'd have to look

9    at every single piece of paper?

10    A.    If I looked at 2011 or something, probably.

11    Q.    I'm just asking, do you think that you could

12    get up and put your hands on such a document right away

13    or are you as lost in the woods as I would be?

14    A.    You would probably be lost in the woods.  I

15    would know in the sense that because that's the work

16    that I did.  But I would take a little witness of time.

17    Q.    All right.  I'm not going to ask you to do

18    that now.  Thank you.

19          All right.  Request No. 9, all expert reports

20    and analysis of the settlement at issue.  Do you have

21    anything there?

22    A.    No, sir.

23    Q.    All right.  No. 10, is it correct that you do

24    not have any documents responsive to that request which

25    asks you for what you intend to admit at the fairness

1   hearing?

2       A.   That is correct.

3       Q.   Do you intend to appear at the fairness

4   hearing?

5       A.   I don't know.

6       Q.   You don't know?

7       A.   No, I don't know.

8       Q.   Are you willing to appear at the fairness

9   hearing?

10      A.   If I need to be there, yes.

11      Q.   If the court orders you to appear?

12      A.   Oh, of course.

13      Q.   You will appear?

14      A.   Without a doubt, yes, sir.

15      Q.   Is that expense something that Mr. Bandas will

16  advance for you?  Or is that an expense that you will

17  have to incur?

18      A.   I don't know.

19      Q.   What is your contract say about any expenses

20  in this litigation?  I see the title expenses and

21  payments to you, but I'm looking for what your

22  understanding is as to expenses and I don't see any

23  discussion of expenses.  There it is.  4.4, you will

24  not be responsible the pay attorneys fees or expenses

25  of any kind.  So is it your understanding that

1    Mr. Bandas is going to pay for you to go to New Orleans

2    if you have to?

3        A.    If that's what it says here and if that's the

4    way it needs to work, I guess so.

5        Q.    Well, you better hope so, right?

6        A.    I hope so.  We will see.

7        Q.    All right.  Maybe there will be satellite

8    litigation.  You never know.  All right.  Request No.

9    11 addresses affidavits you intend to submit and you

10   say that you don't have any?

11       A.    I don't have any, no, sir.

12       Q.    Any documents, correct?

13       A.    That is correct.

14       Q.    All right.  I'm going to take a break now and

15   go off the record.

16                THE VIDEOGRAPHER:  Off the record at 8:17.

17                (Off the record.)

18                THE VIDEOGRAPHER:  We're on the record at

19   8:23.

20       Q.    Mr. Soto, on October 18, your attorney sent to

21   my office an e-mail containing invoices from Home Depot

22   and from Lowe's?

23       A.    Okay.

24       Q.    I'm going to show you the documents that were

25   produced.  And we can actually mark that as Exhibit No.

1    10.   And I'm going to ask you if you're familiar with

2    producing that set of?

3         A.    Yes, sir.

4         Q.    Invoices?

5         A.    Yes, sir, this is the -- this is correct.

6         Q.    How did you -- how did you produce those only

7    those documents to your counsel?

8         A.    Only these?  Well, at that point he well, we

9    had to get some things together that said sheetrock on

10   them, so this is what I could find at that time.

11        Q.    Okay.  And now are those documents that

12   comprise Exhibit No. 10 in these boxes?

13        A.    They are in there somewhere, yes, sir.

14        Q.    So we're going to re -- we're going to find

15   them again or you're going to find them again?

16        A.    Well, actually.

17             MR. HUSEMAN:  Hopefully.

18        A.    I believe they're kind of out kind of if you

19   would go through a file they would be kind of all

20   together, but as far as exactly where they're at, I

21   don't know.

22        Q.    Okay.  All right.  Now, you had a choice in

23   this settlement to object as you did?

24        A.    Okay.

25        Q.    Are you at all aware of the alternatives to

1    that choice?

2        A.    Alternatives as this what is the.

3        Q.    Well, the settlement agreement provides that

4    you could opt out of the class or request exclusion

5    from the class?

6        A.    Yes, sir.  Yes.

7        Q.    It suggests that you could object to the

8    settlement?

9        A.    Uh-huh.

10       Q.    Or it says that you can basically do nothing

11   and participate in the class?

12       A.    Yes, I'm aware of that, yes, sir.

13       Q.    All right.  And you chose to object, I guess

14   the question is:  What was your consideration, if any,

15   about opting out of the settlement?

16             MR. HUSEMAN:  Once again, just out of an

17   abundance of caution, Mr. Soto.

18       Q.    Don't tell us what Mr. Ban sass said to you?

19             MR. HUSEMAN:  Well said.

20       A.    Okay.  You're asking what my thinking or say

21   that again.  I'm sorry.

22       Q.    You are the client?

23       A.    Correct.  Yes, sir.

24       Q.    You have an attorney?

25       A.    Correct.

1    Q.    You are responsible for your own choices?

2    A.    Correct.

3    Q.    Correct?

4    A.    Correct.

5    Q.    Mr. Bandas doesn't control your choices, does

6    he?

7    A.    That is true.

8    Q.    Okay.  So as the master of your domain, why

9    did you choose not to opt out?

10    A.    Well, I didn't opt out because I was opposed

11    to this case as an objector.  Sorry.  That was the

12    option that I chose.

13    Q.    Okay.  And what was the thought process that

14    you went through that got you to that point?

15    A.    Honestly, that the class should get a little

16    bit more.

17    Q.    And that was based upon discussions that you

18    only came about with counsel, is that fair to say?

19          MR. HUSEMAN:  Don't answer that question.

20    Q.    Let me say it differently.  You don't have

21    that opinion or that thought until after you talked to

22    counsel; is that correct?

23    A.    That came to mind after we talked.

24    Q.    I have no further questions.  Thank you very

25    much for your time, Mr. Soto witness with the thank

1    you, sir?

2              MR. LONGER:  Do any of you gentlemen

3    intend to ask the witness a question?

4              MR. HUSEMAN:  I must have left the wrong

5    impression with you.

6              MR. DODSON:  Is there anything we want to

7    try to resolve this evening?  There's been --

8              MR. LONGER:  We can be on the record until

9    these gentlemen tell me we can be off the record.  We

10   have an issue.  And it's my understanding from our

11   discussions that despite the court hearing today,

12   Ms. Petrus will not be presented tomorrow and

13   Mr. Vitela will not be presented.

14             MR. DODSON:  More exactly because of the

15   court hearing today they won't be presented.

16             MR. LONGER:  And we are going to get a

17   signed document, Exhibit No. 7 for the attorney

18   disclosure to client and client consent.

19             MR. HUSEMAN:  We've already asked Chris to

20   sends us the signed version.  We will get that and you

21   will get it forth with.

22             MR. LONGER:  So much for tonight is that

23   what you're saying?

24             MR. DODSON:  Well, I had hoped that --

25             MR. LONGER:  We can do it tomorrow.

1          MR. DODSON:  That it was okay with you for

2    tomorrow is what I was understanding earlier.

3          MR. LONGER:  It was.

4          MR. DODSON:  All right.

5          MR. LONGER:  And what else do you hope to

6    clear up?

7          MR. DODSON:  There was an issue where we

8    were going -- there was -- about some questions, I

9    don't remember specifically that had to do with your

10   going into items with him about Chris', Mr. Bandas'

11   work on other cases.

12         MR. LONGER:  You're going to file a motion

13   for protective order.

14         MR. DODSON:  All right.

15         MR. LONGER:  Is that correct?

16         MR. DODSON:  If I need to.

17         MR. HUSEMAN:  If you want us to, we can do

18   it.

19         MR. LONGER:  I have a whole series of

20   questions on Mr. Bandas.  But based upon your

21   representation that if I asked those questions, you

22   will object and instruct him not to answer.

23         MR. HUSEMAN:  That's right.  And the

24   question was -- that was on the floor was whether or

25   not you were serious about pursuing that such that we

1   need to actually file that motion and the you are, then

2   we will.

3                   MR. LONGER:  Well, I took you at your

4   word.

5                   MR. DODSON:  Your timing have any sort of

6   constraints about whether we need to get that done

7   tomorrow.

8                   MR. LONGER:  November 7 is when we intend

9   to have a hearing with Judge Fallon, it should be

10   tee'ed up before then so we can respond.

11                   MR. DODSON:  Do we need to do anything

12   that would your travel easier?

13                   MR. LONGER:  Give it to me tomorrow.  I'll

14   look at it on the plane on Friday.

15                   MR. DODSON:  We're not going to try to get

16   it resolved by phone calls before you leave Corpus is

17   what I'm hearing?

18                   MR. LONGER:  Well, if Mr. Soto will make

19   himself available, we could try to have a discussion

20   with Judge Fallon, in fact, tomorrow if you want to

21   work at it that way.

22                   MR. DODSON:  I'm trying to make your life

23   easy.

24                   MR. LONGER:  Well, all right.  Well, I'm

25   here.  And Mr. Soto, is your schedule such that you can

1   be available on sort of short notice either Thursday

2   or -- tomorrow being Thursday or Friday?

3                    MR. HUSEMAN:  What this is about is that

4   if they're right, we're wrong about what they get to

5   ask you, we don't want them to have to make another

6   trip down here and depose you.

7                    THE WITNESS:  No, I understand.

8                    MR. HUSEMAN:  And I really don't like

9   depositions on telephones, so I would rather do it

10  while they're here so we're trying to see if you could

11  do that if we had to squeeze in a little bit more depo.

12                   THE WITNESS:  Can I ask how long that

13  would be?

14                   MR. DODSON:  When can you not?

15                   MR. LONGER:  I think the deposition being

16  constrained as it was, it would last no more than a

17  half hour.

18                   THE WITNESS:  Okay.  If that is true, I

19  can make myself available, let me see.  Tomorrow is

20  Thursday, right?

21                   MR. HUSEMAN:  Yeah.  He's going to be

22  busy.

23                   THE WITNESS:  I know you're leaving Friday

24  or -- right?

25                   MR. LONGER:  Yes.

```
 1              MR. HUSEMAN:  Friday morning, would that
 2  work?
 3              MR. LONGER:  Friday morning would work.
 4              THE WITNESS:  Yeah.  If that's 30 minutes,
 5  that would be okay.
 6              MR. LONGER:  Are we adjourned.
 7              THE VIDEOGRAPHER:  We're off the record at
 8  8:33, end of deposition, end of tape three.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```