# EXHIBIT B

1

2          (REAL-TIME) UNEDITED TRANSCRIPTION DISCLAIMER

3

4     The following transcript of proceedings, or any portion
      thereof, is UNEDITED and UNCERTIFIED by the certified
5     court reporter, at the request of counsel for the
      plaintiff.
6
      The purchaser/user agrees not to disclose this
7     (real-time) unedited transcription in any form (written
      or electronic) to anyone who has no connection to this
8     case.  This is an unofficial transcription which should
      NOT be relied upon for purposes of verbatim citation of
9     testimony.

10    This transcription has not been checked, proofread or
      corrected.  It is a draft transcript, NOT a certified
11    transcript.  As such, it may contain computer-generated
      mistranslations of stenotype code or electronic
12    transmission errors, resulting in inaccurate or
      nonsensical word combinations, or untranslated
13    stenotype symbols which cannot be deciphered by
      non-stenotypists.  Corrections will be made in the
14    preparation of the certified transcription, resulting
      in differences in content, page and line numbers,
15    punctuation, and formatting.

16    This (real-time) unedited transcript contains no
      appearance page, certificate page, index, or
17    certification.

18

19

20

21

22

23

24

25

```
 1                (Exhibit No. 11 to 25 were marked.)
 2                THE VIDEOGRAPHER:  We are now the record.
 3   My name is hang, I am a videographer for Golkow
 4   Technologies, today's date is November 1st, 2012.  And
 5   the time is 2:17 p.m. the video deposition is being
 6   held in Corpus Christi, Texas in re Chinese drywall
 7   products liability litigation for the United States
 8   District Court Eastern District of Louisiana.  The
 9   deponent today is Ronnie Garcia, will counsel please
10   identify themselves for the record.
11                MR. GAUGHAN:  Matthew Gaughan for class
12   counsel.
13                MR. LONGER:  Fred Longer on behalf of
14   class counsel.
15                MR. HUSEMAN:  Van Huseman on behalf of
16   Mr. Garcia.
17                MR. DODSON:  And Paul Dodson for
18   Mr. Garcia.
19                THE VIDEOGRAPHER:  Would the court
20   reporter please swear in the witness.
21                     RONNIE GARCIA,
22   having been first duly sworn, testified as follows:
23                MR. GAUGHAN:  Before I start asking the
24   witness questions, I wanted to confirm that we were
25   available this morning, ready, willing and able to take
```

1    the deposition of Ms. Jan Petrus and it's my

2    understanding that she's not going to show up for

3    deposition and also we're also available to depose

4    Mr. Vitela and also he's not going to be produced,

5    correct.

6                    MR. HUSEMAN:  As far as I know.  I don't

7    represent them, so -- but that's what the rumor on the

8    street is.

9                           EXAMINATION

10   BY MR. GAUGHAN:

11       Q.    And I guess -- good morning, Mr. Garcia.

12       A.    Yes, sir.

13       Q.    I guess as an initial matter, we've marked a

14   series of boxes over here as Exhibits 11 through 25 and

15   I guess these are -- these are records that you

16   obtained last night; is that correct?

17       A.    I was able to obtain them.

18       Q.    Okay.  And these pertain to your business; is

19   that correct?

20       A.    Yes, sir.

21       Q.    And what's the name of your business?

22       A.    Bay Area contracting & construction.

23       Q.    And were you able to review all of these

24   documents?

25       A.    No, sir.

1     Q.    Okay.  Did you identify any records in there

2   that you've sorted out as specifically involving

3   Chinese drywall?

4     A.    I haven't had time to look at that.

5     Q.    Okay.  Were you able to identify some

6   documents that involved drywall?

7     A.    Yes, sir.

8     Q.    Okay.  And are those the documents we see over

9   there, the edge of the table?

10    A.    There were some other documents I was able to

11  pick out while I was looking through them.

12    Q.    And having had a chance to pick out some of

13  those documents, did you see anything on there that

14  specifically reference that the drywall in those

15  records was in fact Chinese?

16    A.    I didn't look at them, just -- I was just

17  looking for drywall.

18    Q.    Okay.  So you can't say one way or the other

19  whether any of those records actually involved the

20  purchase of Chinese drywall?

21    A.    Well, they don't say specifically Chinese

22  drywall.

23    Q.    So you don't know; is that correct?

24    A.    Well, that's what it says right there off the

25  invoices.

1      Q.    All right.  So you really have no way of

2   knowing one way or the other if those records in fact

3   involve purchases of Chinese drywall, correct?

4      A.    I'm not too sure.

5      Q.    Could you please state your name and address

6   for the record?

7      A.    My name is Ronnie Garcia, my address is at

8   3938 Surfside boulevard.

9      Q.    And what's your --

10      A.    Corpus Christi, Texas 78402.

11      Q.    Okay.  And what's your social security number?

12      A.    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.

13      Q.    And just as kind of an introductory matter,

14   we've noticed both your deposition individually as well

15   as a deposition of Bay Area contracting & construction,

16   Inc.  Are you aware of that fact?

17      A.    Sir?

18      Q.    Are you aware that we've noticed your

19   deposition individually as well as noticing the

20   deposition of Bay Area contracting & construction,

21   Inc.?

22      A.    I'm not -- I mean, I don't understand.

23           MR. HUSEMAN:  He will be speaking for both

24   of them.

25           MR. GAUGHAN:  That's what I want to

```
 1   establish.
 2               THE WITNESS:  Okay.
 3       Q.   So you're prepared today to answer questions
 4   both for yourself personally and for Bay Area?
 5       A.   Yes, sir.
 6       Q.   Okay.  Thank you.  What's your -- what's your
 7   specific position at Bay Area contracting &
 8   construction?
 9       A.   I was the president.
10       Q.   Okay.  Are there any other officers or
11   directors of that company?
12       A.   No, sir.
13       Q.   And does that company have any employees?
14       A.   Yeah, it had employees.
15       Q.   How many employees?
16       A.   Eight.  Sometimes it depends on the projects.
17       Q.   And I guess going back to 2008 to present,
18   would you say that that company had approximately eight
19   employees during that --
20       A.   Yes, sir.
21       Q.   Was it always the same employees?
22       A.   Yes, sir.
23       Q.   And who are those individuals?
24       A.   My brothers rocky Garcia, Domingo Garcia,
25   Danny Mendieta, my secretary, her name is Estella
```

1    Terraza and myself and I can't remember who else, Joe
2    Perez.
3        Q.    And are these the same individuals that have
4    been with Bay Area contracting & construction, Inc.
5    from 2008 to present?
6        A.    Well, yes, sir.
7        Q.    Okay.  And you kind of gestured.  Is that --
8    there's been some --
9        A.    There's some that -- that have been laid off
10   because of the job market.
11       Q.    Okay.  But there are no other individuals that
12   you didn't identify?
13       A.    No.
14       Q.    During that time period?  Thank you.
15             Have you ever been a party to a lawsuit
16   before?
17       A.    No, sir.
18       Q.    Okay.  Was your company sued by an Ashley
19   combs for a car accident?
20       A.    Yes, sir.
21       Q.    Okay.  Were you ever a party to any other
22   actions beyond that one?
23       A.    Well, they were trying to sue me, but it
24   was -- the vehicle that they hit was -- it was actually
25   my -- one part of the company, it was my brother's

1   truck.

2       Q.      Okay.  But is that the only lawsuit that you

3   or your company has been involved in?

4       A.      Yes, sir.

5       Q.      No breach of contract claims, anything like

6   that?

7       A.      No, sir.

8       Q.      Can you tell me a little bit more about that

9   accident?

10      A.      What's that?

11      Q.      The lawsuit with Ms. Combs, can you tell me a

12  little bit more about that action?

13      A.      I don't know what that pertains to, but -- I

14  don't know.  I just know that she had Thomas J. Henry

15  and they were just trying to sue the company and I was

16  telling them it's not a company vehicle, and this was

17  it.

18      Q.      Did you -- were you deposed in that lawsuit?

19      A.      I ended up settling.  I just told them you

20  know what, here's X amount of dollars, that's it.

21      Q.      Well, you're appearing here today at a

22  deposition.  I guess my question is:  In that

23  particular lawsuit, did you also appear for a

24  deposition?

25      A.      I don't know.  I guess it would be a

1  deposition. I don't know. I don't know if it's
2  called. I mean, we had attorneys -- I had my attorney
3  there and he was going back and forth. It wasn't a
4  deposition, I don't think.
5      Q.    Were they asking you questions like I'm asking
6  you questions right now with a court reporter present?
7      A.    I can't remember. I think so. Yeah, I think
8  you're right.
9      Q.    Okay. So you might have been deposed, you're
10 not sure?
11     A.    I don't know what you're trying to get on that
12 part.
13     Q.    Well, do you understand --
14     A.    That's -- you're saying something about
15 lawsuit.
16     Q.    Yeah. Well, I guess what I'm trying to ask
17 you, Mr. Garcia, is right now what's going on is I'm
18 taking your deposition?
19     A.    Uh-huh.
20     Q.    And we have a stenographer here who is taking
21 down what I'm asking you as well as, you know, your
22 answers. Now, what I'm trying to figure out is in
23 connection with the lawsuit by Ms. Combs, was there a
24 similar process where a lawyer was asking you questions
25 and a stenographer was taking -- creating a record?

1    A.    I don't remember.

2    Q.    Okay.  So you testified that you ultimately

3  settled that lawsuit?

4    A.    Yes, sir.

5    Q.    How much money did you settle it for?

6    A.    I think like 2 grand.

7    Q.    2 grand.  And did Ms. Combs allege any sort of

8  personal injuries?

9    A.    That's -- I guess that's what it was about.

10    Q.    Okay.  And are you a party to any lawsuits

11  that specifically involve Chinese drywall?

12    A.    No, sir.

13    Q.    Okay.  So you're not a plaintiff or a

14  defendant in any litigation involving Chinese drywall?

15    A.    No, sir.

16    Q.    Can you tell me the address of each of the

17  properties where you installed Chinese drywall?

18    A.    I cannot.

19    Q.    Can you tell me the address of any property

20  where you installed Chinese drywall?

21    A.    No, sir.

22    Q.    Can you tell -- give me an approximate number

23  of homes where you installed Chinese drywall?

24    A.    I don't remember.  I mean, I don't know

25  what -- I just know I installed drywall.

1    Q.    Okay.  You said that you know that you

2  installed drywall.  How do you know that you installed

3  Chinese drywall?

4    A.    I've seen it.  That's you will I can say.  I

5  know I seen it.  It can be in Dallas, it could have

6  been in Galveston, it could have been in Houston.  I

7  mean, I've seen all kinds of drywall.

8    Q.    Now, where specifically did you see this

9  Chinese drywall?

10    A.    What's that?

11    Q.    Where do you actually recall seeing the

12  Chinese drywall?

13    A.    You know, like I said, it could be Houston,

14  Dallas or Fort Worth.

15    Q.    At a job site?

16    A.    At a project we did.

17    Q.    Okay.  Do you have any recollection of

18  actually seeing Chinese drywall in a -- anywhere else?

19    A.    Just letterings like USG.  We used tempo made

20  from Mexico, we used different types of drywall.  We

21  tried to use for the value the prices.

22    Q.    Okay.  But I guess what I'm trying to figure

23  out is you testified that you actually remember seeing

24  Chinese drywall at some point at a job site?

25    A.    I said I've seen the name Chinese drywall at

1   one time or another.  I don't know.  I can't -- I can't

2   remember that accident like you're telling me if I had

3   somebody, you know, taking my deposition or what.  I

4   can't remember that far back.

5       Q.   Okay.  What I'm trying to ask you, again, is

6   where -- was it at a job site?  Do you recall seeing it

7   at a store?  Where do you remember seeing it?

8       A.   At one of the projects.

9       Q.   Okay.  So you have no memory as you sit here

10  actually seeing Chinese drywall at a store, for

11  instance?  No memory?

12      A.   I just know I've seen it on a project.

13      Q.   Okay.  And then you just mentioned a couple of

14  brands of drywall.  One of them was USG?

15      A.   Uh-huh.

16      Q.   Now, is it your belief that USG makes Chinese

17  drywall?

18      A.   No.

19      Q.   Okay.  And then was the other company tempo?

20      A.   I think it's temple.  It's a Mexican drywall

21  made from Mexico.

22      Q.   And is it your belief that that company also

23  makes Chinese drywall or sells it?

24      A.   I don't know.

25      Q.   Okay.

1    A.    I'm not a -- I just -- I just purchase and

2  install it.

3    Q.    Okay.  So is it fair to say with respect to

4  temple drywall it's injury understanding that drywall

5  is it's made in China and not -- excuse me, made in

6  Mexico and not in China?

7    A.    Now, what was that again?

8    Q.    I'll ask again.  Specifically with respect to

9  temple drywall, is it your -- it's your understanding,

10 correct, that that drywall is actually from Mexico and

11 not from China?

12   A.    Well, temple.

13   Q.    Yeah?

14   A.    I think that's what -- I think that's what I

15 recall them telling us.

16   Q.    Now, have you actually gone back and spoken to

17 any of your customers to let them know that you think

18 you may have installed Chinese drywall in their homes?

19   A.    No, sir.

20   Q.    Do you intend to do so?

21   A.    Not unless it arises.

22   Q.    Okay.  So what do you mean by if it arises?

23   A.    I mean, I had a customer, you know, a while

24 back tell me about some drywall that's coming, you

25 know, screws are coming -- corroding and you know, they

1     had a water leak and stuff like that.  And we went back

2     and repaired it.  But I never thought of anything

3     happening because of the drywall.

4        Q.    Now, you just mentioned a customer that you

5     went to their house and there was some issue with the

6     screws?

7        A.    Yeah, the drywalls and screws.

8        Q.    Was that recently?

9        A.    No, it's been years.

10        Q.    Okay.  And could you tell us who that

11     homeowner is?

12        A.    I can't recall.

13        Q.    When you were at that homeowner's property,

14     did you observe anything that you thought was Chinese

15     drywall?

16        A.    I can't recall.

17        Q.    Did you save any of that drywall that you

18     removed from that property?

19        A.    It's been too much -- it's been a couple of

20     years.

21        Q.    Have you saved any drywall that you think is

22     Chinese drywall from any job whatsoever?

23        A.    No, sir.

24        Q.    So you don't have any samples of what you

25     believe to be Chinese drywall?

1    A.    Not at this time.

2    Q.    Okay.  And let me next ask you, should some of

3  your customers come forward that contend that you

4  installed Chinese drywall in their properties, how do

5  you -- do you have any intention to remedy that

6  situation?

7    A.    Well, I'd have to, you know, go in and repair

8  it as much as I can.

9    Q.    You would do that, though?

10    A.    Yes, sir.

11    Q.    Okay.  Now, when is it you first remember

12  hearing problems -- or scratch that.

13         When is it that you first remember hearing

14  that there were problems with drywall that had been

15  imported from China?

16    A.    I don't recall.  I mean, I just remember a

17  customer saying something about their house having it

18  at one time.  Because we used to do insurance work

19  remediation on it and just, you know, overhearing stuff

20  like that.

21    Q.    So you said you heard about it from a

22  customer?

23    A.    Uh-huh.

24    Q.    Was this one of your former customers?

25    A.    I don't recall.  It's just -- you know, it's

1   been so long ago you hear -- you hear and it stays in

2   your head somehow and we go in there and just do the

3   work, you know. We just tell them put a claim in, you

4   know, what else can -- you know.

5       Q.   So you're not telling me that this is someone

6   that came to you and said, hey, you installed this bad

7   drywall in my house, I need you to replace it?

8       A.   Well, like I said -- like I said, we used to

9   do insurance remediation so I don't think it was --

10  might not have been one of my homes, it could -- it

11  could have been, but I can't remember. I can't recall.

12      Q.   And I'll just represent to you that one of the

13  things you did in connection with your objection that

14  you filed with our settlement is that you represented

15  that none of your former customers had complained to

16  you that you had installed defective drive wall in

17  their house?

18      A.   That's what I'm saying. That's exactly what

19  I'm saying.

20      Q.   I just want to make sure I understood

21  correctly. This individual or individuals that you're

22  saying told you that there was Chinese drywall in your

23  house, you're not telling me that these individuals

24  were --

25      A.   My customers.

1     Q.    Any of your existing customers?

2     A.    Well, not the homes I built, no.  It's like I

3  said, it might have been an insurance claim that

4  somebody put in and they call me out to go take care of

5  it.

6     Q.    Is that -- is that a large part of your

7  business, doing insurance claims?

8     A.    No, not really.

9     Q.    And I guess you mentioned insurance claims.

10  Are these individuals that put in claims because they

11  had Chinese drywall in their house?

12     A.    It was just one of those, you know, like I get

13  calls I have once in a while and I get the -- you know,

14  if I do it, I do it.  If I don't, I don't.

15     Q.    And what can you tell me about when these

16  conversations occurred, if anything?

17     A.    I can't.

18     Q.    So this could have been four years ago, it

19  could have been one year ago?

20     A.    It was a little bit more, probably four years,

21  maybe five years.

22     Q.    Okay.  As you sit here today, you can't -- I'm

23  sorry.  You can't identify these particular customers

24  that you did work with Chinese drywall, can you?

25     A.    No, sir.

1      Q.    Did you do any sort of demolition work at

2   these properties?

3      A.    We did a lot of demolition work.

4      Q.    And do you remember seeing Chinese drywall

5   when you did this demolition work?

6      A.    I could have.  Like I said, my memory is not

7   as good as it used to be.

8      Q.    So you testified that the first time you

9   remember hearing about homeowner's having problems with

10  Chinese drywall was from customers, correct?

11     A.    Well, from -- I guess it would be a customer

12  or someone who did some repairs to the house.

13     Q.    You don't recall seeing anything in the news

14  media or anything like that?

15     A.    No, sir.

16     Q.    How about from other contractors that you were

17  friendly with?

18     A.    I don't recall.

19     Q.    So as you sit here today, you can't tell me

20  when you first remember hearing, you know, that there

21  are problems with Chinese drywall?

22     A.    No, sir.  Just like I said, it was just like a

23  conversation, a long time ago.

24     Q.    And that was --

25     A.    And I never thought of anything about that.

1    Like I said, I try to do my work the best I can and

2    keep on going.

3        Q.    But you think that was more than four years

4    ago; is that correct?

5        A.    Yes, sir.

6        Q.    Now, if you remember hearing about these sort

7    of problems more than four years ago with Chinese

8    drywall, did you take any sort of action yourself to

9    make sure you weren't using Chinese drywall at that

10   point?

11       A.    You know, like I say, we try to use USGA

12   product, but, you know, we try to go with, you know,

13   with the best value to get to -- to meet the

14   market's -- what our profitability market.

15       Q.    So you just install the cheapest drywall?

16       A.    We try to, that give us the best price.

17       Q.    Even after hearing complaints about defective

18   drywall you continued to use it is?

19       A.    I didn't look into it.  Like I said, I just

20   try to pick up drywall and let's go.  You know, we got

21   deadlines to meet and we got to meet them, you know.

22       Q.    Just turn a blind eye to it?

23       A.    Well, like I said, I don't know.  I didn't

24   know what -- I didn't know it was this bad or if it's,

25   you know...

1      Q.    But you still installed Chinese drywall in
2    people's homes after you had heard others complain
3    about it?
4      A.    Could have.  If it's still in the market, like
5    I said, you know, you put it out there if it's still in
6    the market.
7      Q.    Okay.  But you don't remember actually
8    installing any drywall during that time period, do you,
9    from -- from when you first heard that there were
10   problems with drywall to, you know, four years ago till
11   now?
12     A.    Now, what are you saying again?
13     Q.    What I'm trying to say is you don't have any
14   specific recollection as you sit here today that you --
15   that you actually installed Chinese drywall in
16   someone's house after you -- four years ago when
17   someone first mentioned there were problems with it?
18     A.    Well, like I said, you know, if it was out
19   there, like you said, we try to put the cheapest
20   drywall out there.  And if it was part of it, it
21   goes -- you know, it's -- that's what we try to do it.
22   We order it and you know, let's get it into where we
23   need to get into the project and get it up and taped
24   and floated and painted.
25     Q.    So you used the cheapest drywall but you don't

 1    know, you have no idea whether it was Chinese, Mexican,
 2    American, you don't know?
 3        A.    No, sir.
 4        Q.    Okay.  Thank you.  Do you know what brand of
 5    Chinese drywall that you may have installed, any sense
 6    of that?
 7        A.    It's been too long.
 8        Q.    Now, specifically with respect to the
 9    settlement that you're objecting to, do you remember
10    seeing any sort of advertisements, anything like that
11    about the settlement?
12        A.    No, sir.
13        Q.    How is it that you came to know about the
14    settlement?
15        A.    What's that?
16        Q.    How did you come to learn about the
17    settlement?
18        A.    Another perpendicular, another friend of mine
19    telling me about it.
20        Q.    Who is the friend?
21        A.    Bert Chapa.
22        Q.    Bert.  What was his last name?
23        A.    Chapa.
24        Q.    How do you spell that?
25        A.    C-H-A-P-A.

```
 1        Q.    Okay.  Now, who is Mr. Chapa?

 2        A.    He's a golf buddy of mine.

 3        Q.    Okay.  And what is does Mr. Chapa could for a

 4   living?

 5        A.    He's a legal assistant.

 6        Q.    Where does he work?

 7        A.    Here in Corpus.

 8        Q.    Do you know the name of the law firm?

 9        A.    It's Batman law office.

10        Q.    That's Mr. Batman?

11        A.    Yes, sir.

12        Q.    So Mr. Chapa, what does he do specifically at

13   Batman's office?

14        A.    He works for Batman.

15        Q.    Is he a paralegal?  Is he an investigator?  Do

16   you know what his --

17        A.    I think he's an investigator.

18        Q.    Okay.  And you testified that you played golf

19   with Mr. Chapa?

20        A.    I would, golf buddies.

21        Q.    How long have you guys been golf buddies?

22        A.    Ten, 12 years.

23        Q.    And had Mr. Chapa, during that time period,

24   ever asked you about -- or brought to your attention

25   other litigations like this one?
```

1      A.     No, sir.

2      Q.     Okay.  And backing up to -- when would you

3   tell me that Mr. Chapa, is that two P's or one P?  I'm

4   sorry.

5      A.     Just one.

6      Q.     Mr. Chapa first told you about the settlement,

7   when was that?

8      A.     I guess about two months ago.

9      Q.     So at some point in September, late August

10  some time around then?

11     A.     What are we, October?  We're already in

12  November.

13     Q.     November 1, yeah.

14     A.     Yeah, probably late September or beginning

15  of -- something like that.  September.  Yeah,

16  September.

17     Q.     Late September?

18     A.     I think it might have been beginning of

19  September because I was up in Dallas and Fort Worth.

20     Q.     Okay.  What did Mr. Chapa tell you about the

21  settlement at that time?

22     A.     He didn't tell me nothing about the

23  settlement.

24     Q.     I thought you had just testified that you

25  first learned of the settlement from Mr. Chapa?

1      A.     Well, not the settlement, but the -- about

2    the -- about what's going on with the Chinese drywall.

3      Q.     What did he tell you what was going on with

4    Chinese drywall?

5      A.     Well, he said if I ever worked with it, you

6    know.  Since he nosy work with a lot of drywall.

7      Q.     Okay.  So you told him yes, you might have

8    worked with him, I'm assuming?

9      A.     Yes.

10     Q.     And then what else did he tell you?

11     A.     Well, he told me exactly what you're saying,

12   where did you see it.  I said I don't know.  It could

13   have been in a project in Houston, Galveston or Dallas,

14   the same thing or in Corpus, I said, but I know I've

15   seen it, but I don't really -- you don't real you pay

16   attention to stuff like that.  Like I said, you just

17   slap that thing in the wall, you see an emblem, you

18   know, like you see a lot of them.  You know, we just

19   did a project -- we're doing a project in Portland and

20   you know, we see it, it's got an emblem that says USG

21   ultra light.  And you know, I put it up and let's go,

22   you know.

23     Q.     Okay.  So Mr. Chapa asked you if you had ever

24   seen Chinese drywall at any work sites; is that

25   correct?

 1      A.    Yes, sir.

 2      Q.    And you told him yes, is that --

 3      A.    Well, I told him I vaguely remember it.

 4      Q.    You didn't -- you didn't specifically remember

 5 it but you might have seen it, is that what you told

 6 him?

 7      A.    Yes, I told him I vaguely remember.

 8      Q.    And what did he tell you next?

 9      A.    He said there's, you know -- he introduced me

10 to Chris and he told me if I wanted to pursue this.

11      Q.    And when did he introduce you to Chris?

12      A.    In September.

13      Q.    And when you say Chris, you're talking about

14 Chris Bandas; is that correct?

15      A.    Chris Bandas, yes.

16      Q.    Now, at the time he introduced you to Chris,

17 was that the same day when you retained Mr. Bandas?  Or

18 is it a different time?

19      A.    It wasn't the same day.

20      Q.    Okay.  So where did you meet him?

21      A.    Who's that?

22      Q.    Mr. Bandas?

23      A.    At his office.

24      Q.    Okay.  So at some point in September you went

25 into Mr. Bandas' office, correct?

1    A.    Yes, sir.

2    Q.    And what was your intention at that time?

3    A.    We just talked about what we were talking

4   about now, about Chinese drywall.

5    Q.    Did you go into his office with the intention

6   of retaining a lawyer to represent you with potential

7   claims that you might have against distributors and

8   other parties that you purchased drywall from?

9    A.    Yes, sir.

10   Q.    Okay.  And did you ultimately retain

11  Mr. Bandas?

12   A.    I told him, you know, we talked about it, I

13  told him.

14        MR. HUSEMAN:  Just a minute.  Ronnie, I

15  don't want you talking about any communications you had

16  with Chris.  That's attorney/client privilege and we

17  assert that.  So you can talk to Matthew about things,

18  which are not involved in communications between you

19  and your lawyer.  Yeah, we've given them copies of the

20  contracts which will speak for themselves as the

21  relationship there.

22   Q.    And I guess my last question was ultimately

23  did you retain Mr. Bandas?

24   A.    Yes, sir.

25   Q.    And what's your understanding of the scope of

1    his representation of you?

2       A.   It's, you know, that's how come I retained

3    him, to make sure that he does what we need to do on

4    this matter.

5       Q.   And when you say this matter, are you

6    referring to this objection that you're currently have

7    filed to --

8       A.   Yes, sir.

9       Q.   You don't -- you don't understand that he's

10   representing you with respect to claims that you may

11   assert against other parties that you think sold

12   drywall, defective drywall to you, do you?

13      A.   Well, like you said, I've used it and then you

14   were saying that if I, you know, did it on purpose.

15   You know, I don't feel like I did it on purpose.  I did

16   it because it was the best value out there at the time.

17      Q.   I guess what I'm trying to ask you is do you

18   understand that Mr. Bandas' represent <Suffix>ation of

19   you is limited to this objection that you have filed to

20   this class-action settlement or do you understand that

21   his representation is broader in scope than that?

22      A.   I don't -- I don't understand what you are

23   applying.

24      Q.   Well, I guess we'll come back to this a little

25   later.  I wanted to follow-up on something first

ROUGH DRAFT TRANSCRIPT ONLY

1    hopefully I can clarify what I am trying to ask you.

2            But Mr. Chapa, you mentioned you had been

3    playing golf with him at some point he brought to your

4    attention that there were issues with Chinese drywall;

5    is that correct?

6        A.    No, he asked me if I had seen it or installed

7    it and I said probably, I installed all kinds of

8    drywall.

9        Q.    How is it that you went from playing golf to

10   looking to retain an attorney?

11       A.    What's that?

12       Q.    How did you go from playing golf with

13   Mr. Chapa to hey, I'm going to retain an attorney?  How

14   did that come about?

15       A.    I don't remember.  We just talked about it.

16       Q.    Did Mr. Chapa bring to your attention at any

17   point that there was a settlement involving installers

18   and builders and distributors and insurance carriers at

19   some point?

20       A.    He just said, you know, there was something

21   about what's going on with Chinese drywall.

22       Q.    But how did you get from there to going to

23   meet Mr. Bandas?

24       A.    He said, you know, you might need to look --

25   you know, talk to Chris about it.

1    Q.    Talk to Chris about what?

2    A.    About the Chinese drywall.

3    Q.    I guess just to tell him about Chinese

4    drywall?  What was he telling you that you needed to

5    talk to him about?

6    A.    That there maybe a settlement on it or

7    there was legal action on it or something.

8    Q.    Was it your understanding when you were going

9    in to see Mr. Bandas that you were going to discuss the

10   prospect of you objecting to the settlement?

11   A.    No, sir.

12   Q.    When did that come to your attention, after

13   meeting Mr. Bandas?

14   A.    I don't recall.

15   Q.    Now, before you went in to meet with

16   Mr. Bandas, did your golf buddy Mr. Chapa mention to

17   you that there was a prospect that you might make some

18   money if you pursued an objection to the class

19   settlement?

20   A.    No, sir.

21   Q.    And what did your golf buddy Mr. Chapa tell

22   you that you might expect out of this meeting with

23   Mr. Bandas?

24   A.    He didn't really say anything about it.  He

25   just said talk to Chris about it and see what -- you