1    know, to make sure you're not -- you're not -- your

2    company don't come up on the lawsuit or anything like

3    that.

4         Q.    Now, did your golf buddy Mr. Chapa tell you at

5    any point that Mr. Bandas had a history of objecting to

6    class settlements before you met with him?

7         A.    No, sir.

8         Q.    And did he tell you at any point that, you

9    know, Mr. Bandas some courts had considered him a

10   serial objector to class settlements?

11        A.    No, sir.

12        Q.    Now, I just want to briefly ask you, in

13   addition to yourself there's a couple of other

14   individuals who also objected to this settlement I a

15   long with yourself.   Jan Petrus, do you know

16   Ms. Petrus?

17        A.    No.

18        Q.    How about Ernest Vitela, do you know him?

19        A.    I think I've heard of him.

20        Q.    Have you ever met him?

21        A.    No, sir.

22        Q.    How about E & E construction, are you familiar

23   with that company?

24        A.    No, sir.

25        Q.    Mr. Soto, Saul Soto, do you know Mr. Soto?

1     A.    I've met him briefly.

2     Q.    When did you meet him?

3     A.    About a day ago.

4     Q.    Not yesterday, the day before yesterday?

5     A.    Yeah, the day before yesterday, yeah.

6     Q.    Okay.  When did you -- what was the context of

7  this meeting?

8     A.    What's that?

9     Q.    What was the context of you meeting him?

10     A.    I just met him in an out.

11     Q.    Grabbing a cup of coffee somewhere, you bumped

12  into him at dunking doughnuts?

13     A.    No, he came up and here I was up here.

14     Q.    So when you were meeting with your counsel?

15     A.    Yes, sir.

16     Q.    Okay.  By the way, when you originally

17  retained Mr. Bandas, he was your only counsel at that

18  point?

19     A.    Who's that?

20     Q.    Mr. Bandas?

21     A.    Bandas.

22     Q.    When did you come to learn that you were going

23  to be represented by other attorneys at this

24  deposition?

25     A.    When I talked to Mr. Van Huseman.

ROUGH DRAFT TRANSCRIPT ONLY

1     Q.    Okay.  And when was that, just a couple of

2  days ago?

3     A.    I would think four or five days ago.

4     Q.    Okay.  And I guess you mentioned that you

5  retained Mr. Bandas and he's not here today, is he?

6     A.    No, sir.

7     Q.    How do you feel about that?

8     A.    I've got a good counsel here.

9     Q.

10                 MR. HUSEMAN:  Thank you.

11     Q.    Do you think that the individual you retained

12  specifically to represent you on your appeal -- or on

13  your objection should be present today defending your

14  deposition?

15     A.    I'm not a lawyer.  I don't know.  I don't know

16  how it works, you know.  I'm just -- I'm just a

17  contractor.

18     Q.    Okay.  And you mentioned that Mr. Chapa works

19  for the Batman law firm?

20     A.    Yes, sir.

21     Q.    And you never retained them as counsel, did

22  you?

23     A.    No, not really.  I've talked to -- for advice

24  I talked to Batman.

25     Q.    Advice in connection with your objection?

1      A.    No, sir.

2      Q.    What sort of advice?

3            MR. HUSEMAN:  Well, hold on.  If it's

4  legal advice you're talking about -- I don't know what

5  you're talking about.  If it's legal advice, you're not

6  to disclose that with him.

7            THE WITNESS:  It's not.

8      Q.    He just testified he didn't retain him?

9            MR. HUSEMAN:  If it's what golf ball,

10  that's okay.

11     A.    In construction you've got to put a lien on

12  somebody for them to pay you, you know, you talk to an

13  attorney can you get a lien out there in place for a

14  company to pay you.

15     Q.    And so how long have you known Batman?

16     A.    I guess about five years.

17     Q.    Did you ever play golf with Batman?

18     A.    Yes, sir.

19     Q.    How is he?  Is he good?

20     A.    Sucks.

21     Q.    So?

22            MR. LONGER:  He spends too much time in

23  the office.

24            THE WITNESS:  What's that?

25            MR. LONGER:  Spends too much time in the

1    office.

2              THE WITNESS:  He enjoys the whole course,

3    he's all over the course.  He gets his money worth but

4    he goes out there and has fun.

5        Q.    Have you ever paid him for any of this legal

6    advice?

7        A.    No, sir.  No.  No, I don't think.  No, sir.

8        Q.    Is it fair to say you're buddies with Batman?

9        A.    Not really.

10        Q.    You just play golf with him every so often?

11        A.    We haven't played that often, but I wouldn't

12    want to play with him too often.

13        Q.    How many times a year -- how many times a year

14    do you play golf with Batman?

15        A.    Maybe once a year, at the most.

16        Q.    Okay.  And you testified --

17        A.    Maybe once a year.

18        Q.    You testified that he gave you some legal

19    advice?

20        A.    Yes.

21        Q.    And I guess I'm trying to figure out why he's

22    giving you free legal advice.  Can you tell?  Because

23    of your friendship with Mr. Chapa?

24        A.    Yeah, with Bert.

25        Q.    And you've never -- you've never actually

1    retained Mr. Chapa to represent you in any litigation

2    or anything like that?

3        A.    He's not an attorney.

4        Q.    Did I say Chapa?  You've never actually

5    retained Mr. Batman as counsel?

6        A.    Not really, no, I don't remember.  I mean, I

7    was going to retain him once, but he's not a family

8    lawyer.

9        Q.    Have you ever referred to any cases to Batman?

10       A.    No, sir.

11       Q.    How about any cases to Mr. Bandas, have you

12   ever referred any cases to Mr. Bandas?

13       A.    No, sir.

14       Q.    Did you know Mr. Bandas prior to Chapa

15   bringing you to meet Mr. Bandas?

16       A.    I've met him once I think it was at bat map's

17   party or something.

18       Q.    Just once?

19       A.    I think so.

20       Q.    How long ago was this?

21       A.    I think last year.

22       Q.    2011?

23       A.    I think so.

24       Q.    And you didn't talk about Chinese drywall or

25   anything like that at that point?

1      A.   We didn't know what -- I mean, he knew I

2  was -- he knew -- I knew he was a lawyer and he didn't

3  know what I was.  I was just association just walking

4  around, you know.

5      Q.   Okay.  Did Chapa ever mention that he had a

6  connection with Mr. Bandas?

7      A.   No, sir.

8      Q.   Do you understand that his office is located

9  in the same building as Mr. Bandas' office?

10      A.   Yes, sir.

11      Q.   Do you know if Mr. Chapa is going to make any

12  money for referring you to Mr. Bandas?

13      A.   I do not know.

14      Q.   You're golf buddies never mentioned anything

15  about that?

16      A.   No, sir.

17      Q.   He never picks up a round of beer or anything

18  like that?

19      A.   He's always buying the beer.

20      Q.   Okay.  Maybe I'll start hanging out with him.

21      A.   Yeah.

22      Q.   Okay.  So you testified that you don't recall

23  seeing any sort of advertisements with respect to this

24  Chinese drywall settlement; is that correct?

25      A.   On TV?

1    Q.    Yeah.

2    A.    No.

3    Q.    How about in paper publication format?

4    A.    No, sir.

5    Q.    Now, did Bert ever show you anything in

6  connection with the settlement that you're now

7  objecting to?

8    A.    No, sir.

9    Q.    He didn't show you a copy of the settlement,

10  anything like that?

11    A.    No, sir.

12    Q.    Did he tell you about the website,

13  ChineseDrywallSettlement.com, anything like that?

14    A.    No, sir.

15    Q.    How about did he provide you a copy of the

16  notice of that settlement?

17    A.    No, sir.  Can I take a break and get some

18  water or something?

19    Q.    Yes.  And by the way, if -- any time you need

20  to take a break, just let me know.

21              THE VIDEOGRAPHER:  Off the record at 2:58.

22              (A recess was taken.)

23              THE VIDEOGRAPHER:  We're back on the

24  record at 3:06.

25    Q.    Mr. Garcia, I want to follow-up on some of the

1    things we were talking about earlier.  Specifically you

2    mentioned that you're not a party to any Chinese

3    drywall litigation as a defendant or as a plaintiff; is

4    that correct?

5         A.    I think so.  Yes, you are correct.

6         Q.    I am correct?

7         A.    Well, unless you're talking about this right

8    here with Bandas.

9         Q.    Well, you didn't actually file a lawsuit, to

10   your knowledge, did you?

11        A.    No, sir.

12        Q.    Just an objection, correct?

13        A.    Just an objection.

14        Q.    And you haven't been sued by anyone?

15        A.    No, sir.

16        Q.    As someone that installed Chinese drywall in

17   their home, correct?

18        A.    Correct.

19        Q.    So I guess my question for you is if you

20   haven't been sued, why -- why are you retaining

21   counsel?  Why did you approach Mr. Bandas?

22        A.    In case I do get sued.

23        Q.    So when you met with Mr. Chapa and he advised

24   you that there were some problems with Chinese drywall,

25   is it your testimony that at that point in time you

1    wanted to meet with a lawyer in the event someone

2    actually sues you for Chinese drywall?

3         A.    I got counsel just to make sure I'm okay, I'm

4    covered.

5         Q.    Is that customary practice for you, that you

6    go and meet with lawyers because you think you might be

7    sued?

8         A.    No, sir.

9         Q.    And you didn't do that when there was the auto

10   accident with Ms. Combs, did you?

11        A.    What's that?

12        Q.    Did you do that after the auto accident with

13   Ms. Combs?  Did you consult with a lawyer?

14        A.    Yes, sir.

15        Q.    Before you got sued?

16        A.    No.

17        Q.    Okay.  Well, why in this particular instance

18   did you think you should consult with a lawyer before

19   you actually got sued?

20        A.    There was just, you know -- I talked to Bandas

21   about it and he said there was something --

22               MR. HUSEMAN:  Nothing he says.  Nothing

23   you say to him, okay?

24        Q.    I guess what I'm trying to figure out is not

25   what you talked to Mr. Bandas about, but, you know, why

1    it is that had you actually felt that you should meet

2    with an attorney when you hadn't even been sued yet.

3    Why is that?

4        A.    Why is that?

5        Q.    Yeah.  Why is that?

6        A.    Oh, because I installed, you know, I think I

7    installed some bad -- the Chinese drywall.

8        Q.    You think you did, but you don't know anyway,

9    correct?

10       A.    I know I've seen it.  I know I put it -- I

11   don't remember -- recall where.  Like I said, I don't

12   recall that -- that lawsuit that that lady filed

13   against me.

14       Q.    So is it your testimony today that when you

15   talked to your -- Mr. Chapa and it first came up that

16   maybe you should meet with a lawyer that you were

17   thinking you might be sued at that point?

18       A.    Well, also, they were saying there was some

19   health reasons or some other stuff that might come up.

20       Q.    Did they mention anything about the settlement

21   that you're currently objecting to?

22       A.    Not really.

23       Q.

24            MR. LONGER:  What was the answer?

25       A.    I said not really, I don't know what the

ROUGH DRAFT TRANSCRIPT ONLY

1    settlement is.

2         Q.    Not really or no?

3         A.    No.

4         Q.    So your testimony today that you didn't hear

5    about the settlement until after you met with

6    Mr. Bandas?

7         A.    I still don't know really what the settlement

8    is.  I don't know enough about it yet.

9         Q.    Okay.  I guess we'll explore that a little bit

10   then.  I guess if we could show the witness what's been

11   marked yesterday as Exhibit 5.

12        A.    Exhibit 5.

13        Q.    That's from yesterday's deposition.  If you

14   could just take a moment and look at it and just let me

15   know if you've seen this document before.

16        A.    This document?

17        Q.    Yes.

18        A.    Yes.

19        Q.    When did you see this document?

20        A.    When I went over to Bandas' house -- Bandas'

21   office.

22        Q.    Okay.  So I guess we should back up a minute.

23   This document is dated September 28, 2012.  If you look

24   to page number 4 of this document, do you see it's

25   dated September 28, 2012?

 1       A.    On 4?

 2       Q.    Yeah.  At the bottom there on the bottom

 3   left-hand side?

 4       A.    Yes, sir.

 5       Q.    Okay.  Now, was -- as you look at this today,

 6   does this refresh your memory that it was September 28,

 7   2012 when you went to Mr. Bandas' office?

 8       A.    Yes.

 9       Q.    Okay.  And you didn't meet with him prior to

10   this date?

11       A.    Prior?  Meaning before?

12       Q.    Yeah.

13       A.    I met with him before.

14       Q.    Other than the party that we talked about

15   earlier where you met him?

16       A.    Yes, sir.

17       Q.    Okay.  So in connection with this objection,

18   this was the first time you met with Mr. Bandas was

19   September 28, 2012?

20       A.    No.  I think it was the day before, then I met

21   with him afterwards.

22       Q.    Did you meet with him both days?

23       A.    Both days.

24       Q.    September 27 and 28?

25       A.    Yes, sir.

1      Q.   Okay.  Did you ever go to Mr. Bandas' house?

2      A.   No, sir.

3      Q.   Okay.  So when was the first time you actually

4  saw this document?  Was it on the 27th then?

5      A.   Well, this one says the 28th so it's got to be

6  28.

7      Q.   I guess that's the date it was filed, but --

8  okay.  And are you aware this document is objection was

9  actually filed with the court?

10      A.   That's what it says here.

11      Q.   And is this a document that you reviewed

12  during your preparation for today's deposition?

13      A.   I reviewed it sort of.  I don't understand

14  most of it.

15      Q.   Okay.  What is your understanding of the

16  nature of your objection to the settlement in this

17  case?

18      A.   The objection?

19      Q.   Yeah.

20      A.   Whatever it says here.  It was saying

21  something about the 32 percent award fees.

22      Q.   And is that why you're objecting to the

23  settlement because there as a 32 percent award of fees?

24      A.   And plus I think that's what it is.

25      Q.   Have you actually ever read the settlement?

1        A.    No, sir, just read through here.  I don't know

2   the actual facts about it.

3        Q.    I'm sorry.

4              MR. LONGER:  He doesn't know the actual

5   facts about it.

6        A.    I just know about Chinese drywall.

7        Q.    Well, how did you come to learn that there

8   was, you know, what you're calling a 32 percent fee

9   provision if you had never actually read the

10  settlement?

11       A.    My attorney is the one --

12             MR. HUSEMAN:  Okay.  Let's not go into

13  that.

14       A.    Would do this.

15       Q.    Now, have you ever visited the settlement

16  website, the ChineseDrywallSettlement.com?

17       A.    No, sir.  Is it on here?

18       Q.    On your objection?

19       A.    Yes.

20       Q.    No, it's not on your objection.  So you've

21  never visited that website?

22       A.    No, sir.

23       Q.    Are you familiar with any of what we're

24  calling the participating defendants in this

25  settlement?

1       A.     No, sir.

2       Q.     Do you know whether you have purchased drywall

3   from any of these participating defendants?

4       A.     Can you go through them and let me know which

5   ones they are?

6       Q.     Well, I'm asking you the question.  I guess do

7   you know one way or the other whether you purchased

8   drywall from any of these participating defendants?

9       A.     Depends where they're at.  Whether -- I mean,

10  I know I've installed some.  I must have bought some

11  somewhere.  I don't know if it's building specialties

12  or L & W or McCoy's or I don't know which one it was.

13      Q.     So you don't know?

14      A.     What's that?

15      Q.     You don't know?

16      A.     I don't think I would know if Chinese -- you

17  know, unless it was printed out on my invoices.

18      Q.     So you're objecting to a settlement and you

19  don't know whether you purchased drywall from any of

20  the participating defendants; is that fair to say?

21      A.     I just know I've seen it.  I installed it at

22  one point or another.

23      Q.     Okay.  And if we can just take a look at this

24  objection you have here, I'm looking at page number 2

25  of the objection.  And in the second paragraph there,

1    it mentions that you're not attending the fairness

2    hearing.  Can you -- can you tell me why you don't

3    intend to attend the fairness hearing?

4        A.    Because counsel said I probably didn't need to

5    attend it.

6        Q.    And are you aware that your counsel is not

7    planning on attending the fairness hearing either?

8        A.    I don't know.  I don't know what Bandas is

9    going to do or if he's not going to show up.

10       Q.    Would you expect your counsel to attend the

11   fairness hearing where you've raised an objection to,

12   you know, the terms of a settlement?

13       A.    If you're asking me, I think I would.

14       Q.    Does that cause concern for you that your

15   lawyer is not intending to attend this fairness

16   hearing?

17       A.    I'm not a lawyer.  I don't know what -- how --

18   what goes on in none of this.  That's why I -- you

19   know, I'm not an attorney.

20       Q.    You think he should attend, though?

21       A.    I would think, if he's got some type of

22   interest with it, he would -- he would be attending.

23       Q.    Okay.  And if we look at the final paragraph

24   of this second page, it looks like one of the things

25   you're objecting to is the procedures or requirements

1   for objecting.  What specifically about those

2   procedures and requirements are you objecting to?

3       A.   Which part of it is?  Where is it at again?

4       Q.   If you look at paragraph 4 on this page?

5       A.   Oh, on page 4.

6       Q.   Page 2.

7       A.   Okay.  Now, what was the question again?

8       Q.   What specific -- why are you objecting to the

9   procedures and requirements for objecting?  What's your

10  understanding of those procedures and requirements?

11      A.   I can't understand what he's trying to say

12  here.

13      Q.   So you're objecting to the procedures and

14  requirements but you don't know what they are; is that

15  fair to say?

16      A.   Well, my counsel is the one who put it

17  together for me.

18      Q.   And if you turn to the next page, page number

19  3, that top paragraph, you're also objecting to the

20  class definition.  What's your understanding of what

21  the class definition is in this case?

22      A.   I don't know.  I don't actually know what the

23  definition of this case is.  I just know it was Chinese

24  drywall.

25      Q.   Okay.

1    A.    Other than that, that's the only thing I know.

2    Q.    So there's nothing that you can point to here

3    today that you think is flawed with the class

4    definition?

5    A.    I don't under it.  Can you explain it to me.

6    Q.    I'm just asking:  Is there anything that

7    you -- as you sit here today, you've objected to the

8    class definition.  Is there something you can tell me

9    about the class definition that you find to be flawed?

10    A.    Well, the way that he wrote it up here is,

11    it's over my head on this.

12    Q.    So you don't know, I guess, is that fair to

13    say?

14    A.    I don't know.

15    Q.    Do you need to take that?

16    A.    No.  It's my son.  I'll call him later.

17    Q.    Okay.  If we go down one -- if we go down six

18    lines in the same paragraph, there's a sentence

19    beginning "moreover, the class is defined in terms of

20    merit-based criteria."  And what is your understanding

21    of what that term means, merit-based criteria?

22    A.    Merit-based criteria.  I don't understand that

23    one either.

24    Q.    Okay.  And if we go down three more lines, I

25    guess two more lines, you see that sentence beginning

1    "objection is also made to the class definition in

2    allowing class members to be class members creates a

3    conflict of interest"?

4         A.   Now, which one is that again?

5         Q.   The -- I guess if we go eight lines down from

6    the top of the first paragraph, you see a sentence that

7    says "objection is also made to the class definition in

8    that allowing defendants to be class members creates a

9    conflict of interest and objection is made on this

10   basis."  Do you see that?

11        A.   Yes.

12        Q.   Okay.  What's your understanding of the

13   conflict of interest?

14        A.   Conflict of interest.  Well, then the conflict

15   of interest is if Chinese drywall was -- is used in a

16   certain place.

17        Q.   There's a conflict of interest because drywall

18   is used in a certain place?

19        A.   It could have been used in a certain project,

20   homes or commercial or Naval base.

21        Q.   And that's the conflict of interest that you

22   were concerned about when you filed this objection?

23        A.   Or it could be -- it would be a conflict of

24   interest to me if, you no, they come back after me.

25        Q.   And in the next paragraph -- and I'm not going

1  to read the whole sentence but you object to the

2  fairness, adequacy and reasonableness of the

3  settlement.  Can you describe to me what your objection

4  is there?

5      A.   The only thing that I object on was the 32

6  percent that's going to be awarded to attorneys fees.

7      Q.   That's what this whole paragraph to you --

8      A.   That's all I can come up with the on that.

9      Q.   Just the award of attorneys fees?

10      A.   I don't know what the total amount is.

11      Q.   I guess if you can turn to page 4.  And I

12  think this gets into what your understanding of the

13  objection is the second paragraph there, the middle

14  paragraph?

15      A.   Yes.

16      Q.   Okay.  If you read that first sentence, can

17  you tell me what your understanding of what the term

18  percentage of recovery basis is?

19      A.   I don't even know what that is.

20      Q.   Okay.  So do you know what percentage of

21  recovery basis is?

22      A.   Not really.

23      Q.   How about load star, you just mentioned you

24  didn't know what that was?

25      A.   I don't know what load star is.

1      Q.     So yes, you don't know what that is?

2      A.     No, sir.

3      Q.     And then we also talk about if you go down

4  that third line there's reference to a mega fund case?

5      A.     Where is that at?

6      Q.     The third line of that paragraph talks about

7  mega fund case.

8      A.     Yeah, okay.

9      Q.     Do you know what -- what's a mega fund case,

10  can you tell me?  Is that a no?

11      A.     No, sir.

12      Q.     If we move down two lines from there, it says

13  that attorneys fee should not exceed 10 percent of the

14  common fund.  Do you see that?

15      A.     Common fund.  Common fund.  Yes.

16      Q.     So is it your position that attorneys fees

17  should not exceed 10 percent of the fund?

18      A.     Yes, sir.

19      Q.     And have you actually -- you haven't actually

20  reviewed the settlement, have you?

21      A.     No, sir.

22      Q.     So if I told you that attorneys fees, common

23  benefit fees were actually capped at 15 percent, would

24  that make a difference to you in terms of filing this

25  objection?

```
 1        A.    At this time I don't know.  I would have to
 2   check with counsel on that.
 3        Q.    What's your opinion?
 4        A.    What's that?
 5        Q.    What's your opinion?  Do you think 15 percent
 6   common benefit fees is reasonable?
 7        A.    Depends on the amount, the total amount.
 8        Q.    Total amount of what?
 9        A.    Of the funds.
10        Q.    And would you agree with me there's not much
11   of a difference between ten and 15 percent?
12        A.    Well, there is a big difference, depends on
13   what you're talking about.
14        Q.    But certainly you allege that it was a 32
15   percent common benefit fee before, correct?
16        A.    That's what it says here.
17        Q.    Okay.  So you would agree at least that 15
18   percent is much closer to ten percent than?
19        A.    Yeah, it would be half the cost, yeah.
20        Q.    And what's your understanding of how much --
21   what the value of -- total value of the settlement is?
22        A.    Total value depends on what is the total
23   value.
24        Q.    I'm asking you.  What's your understanding of
25   how much the settlement is for?
```

1      A.    Like I said, I don't know.

2      Q.    So it could be $5 mill, you don't know?

3      A.    It could be $5 million.

4      Q.    If I told you it was $82 million, would that

5   ring a bell for you?

6      A.    I'm trying to figure out if it's $80 million

7   at 32 percent, that's a lot.  So you know, you figure,

8   you know, 2 percent of 80 -- what was it 80 something

9   million.

10      Q.    $82 million?

11      A.    2 percent would be good, too or 5 percent.

12      Q.    So you're objecting to basically the attorneys

13   fees and that's it, correct, of this settlement?

14      A.    I would think so.

15      Q.    Okay.  If what you just told me is in fact

16   correct, then the rest of this objection here that's

17   been filed by counsel that talks about class

18   definition, etcetera, that does not -- that doesn't

19   reflect what you yourself, your actual objection to

20   this settlement is, is that correct?

21      A.    Now, what was the class definition again?

22      Q.    I didn't tell you the class definition.  You

23   don't know the class definition from what I appreciate

24   from your earlier testimony.  So what I'm trying to

25   gather is from what you're telling me, your only

1  objection to this settlement is the fees; is that

2  right?

3      A.    That's what I was talking about.

4      Q.    So far as your counsel has raised other

5  issues, procedures, policies, class definition, those

6  sort of things, that's not why you're here today?

7  That's not why you're objecting to the settlement, is

8  that fair to say?

9      A.    The reason I'm here is just to -- you know, I

10 installed this product and they're saying they're going

11 to award somebody 32 percent.

12     Q.    So you're here because the 32 percent, in your

13 opinion, an not because of --

14     A.    Well --

15     Q.    Class definition for instance?

16     A.    Like I said, I don't know what the class

17 definition but I want to know -- see what the other

18 customers or the other clients are going to get other

19 than --

20     Q.    I think you're agreeing with me.

21     A.    Okay.

22     Q.    Are you?  Is that a yes?  Do you agree with

23 me?

24     A.    What's that?  About?

25     Q.    You're objecting to fees, you're not here

1    because of the class definition?

2        A.    Well, like I said, I'm here to make sure

3    everything is legally, you know, in the -- the clients

4    are going to get their fair share, you know.

5        Q.    And by that, you mean you're concerned about

6    this -- what you consider to be a 32 percent fee

7    provision, correct?

8        A.    Yes.  Yes, sir.

9        Q.    Okay.  Do you know what class counselor common

10   benefit counsel is?

11       A.    Where is that at?

12       Q.    I'm just asking, have you ever heard the term

13   common benefit counsel?

14       A.    No, I'm not an attorney.  What was that again,

15   common what.

16       Q.    Common benefit counsel.  It's not in this

17   document, that I know of.

18            So you don't know what that term means?

19       A.    No.

20       Q.    So I take it you don't appreciate the

21   difference between common benefit counsel and

22   individually retained counsel?

23       A.    It says -- it's unclear common benefit fees.

24   I don't know.

25       Q.    You don't know?

1    A.    No.

2    Q.    And also is it your understanding that Judge

3    Fallon, who is presiding over this MDL litigation must

4    approve any sort of fees that are ultimately paid to

5    common benefit counsel?

6    A.    I don't know who the judge is.

7    Q.    If I represent to you that Judge Fallon is

8    overseeing MDL 27 and would ultimately approve any sort

9    of fees that went to common benefit counsel, would that

10   change your basis of your objection in any way?

11   A.    It could.

12   Q.    Okay.  So in other words, the settlement has

13   not been approved by the court yet, so 15 percent, 32

14   percent, whatever you think it is, the fee amount, is

15   not etched in stone.  The court must approve it.  So

16   does that change your basis for objecting at all?  In

17   other words, is oversight by a federal judge who will

18   ultimately decide how much in fees should be awarded to

19   common benefit counsel?

20   A.    Okay.

21   Q.    I mean, don't you think that's adequate

22   safeguards when we're dealing with the difference

23   between 10 percent, which you think is adequate, as

24   opposed to 15 percent, which is in the settlement

25   agreement?

1    A.    Is that in the settlement agreement?  I don't

2  know.

3    Q.    I'll represent to you it is, that common

4  benefit fees are capped at 15 percent.

5    A.    Okay.

6    Q.    So if the settlement agreement caps fees,

7  common benefit fees at 15 percent and you think they

8  should be 10 percent, don't you think that having Judge

9  Fallon in place to approve the fees adequately

10  safeguards your concerns about the amount of attorneys

11  fees in this case?

12    A.    It could be.

13    Q.    And do you have any sense or knowledge about

14  the actual efforts that it took class counsel to

15  negotiate the settlement?

16    A.    No, sir.

17    Q.    Time and effort, you have no sense of that.

18  And if I told you this litigation has been going on

19  since 2009, would that change your opinion about how

20  much compensation class counsel might be entitled to?

21    A.    2009, huh?

22    Q.    What's that?

23    A.    You said 2009?

24    Q.    Yes.

25    A.    Okay.

1     Q.    Would that change your opinion at all about 10

2  percent versus 15 percent?

3     A.    I'd have to get with counsel on that and see

4  what they say.

5     Q.    So you have no opinion yourself?

6     A.    No, sir.

7     Q.    As you sit here today?  And do you have any

8  sense of how expensive it is to litigate this case?

9     A.    No, sir.

10     Q.    Are you familiar with the Haag service

11  requirements?

12     A.    No.

13     Q.    And if I told you it sometimes cost us over

14  $100,000 to prepare and serve a complaint in China,

15  would that shock you?

16     A.    No, sir.

17     Q.    You think that's a small chunk of change,

18  $100,000 to file and serve a complaint?

19     A.    That's a lot.  That's a lot of change.

20     Q.    So you'd agree you have no real sense of, you

21  know, the cost or the scope of this litigation,

22  correct?

23     A.    No, sir.

24     Q.    And actually, I'm going to have you turn a few

25  pages to what's actually Exhibit C to this -- to this

1  objection, which is actually your affidavit.

2      A.    What exhibit is that?

3      Q.    It's Exhibit C to this objection?

4      A.    Okay.

5      Q.    And is that your signature down there in the

6  bottom?

7      A.    Yes, sir.

8      Q.    And this is also dated September 28, 2012,

9  correct?

10      A.    Yes, sir.

11      Q.    If you look at the third page of this

12  document, which starts I am a member of this class, do

13  you see that paragraph?

14      A.    Yes, sir.

15      Q.    If you look at this final sentence, it says

16  you're not within the exclusions in the class

17  definition.  What is your appreciation of what those

18  exclusions are?

19      A.

20          MR. HUSEMAN:  Incidentally, Mr. Garcia I

21  don't want you repeating anything Mr. Bandas told you

22  in your discussions with him in your answer so exclude

23  that from any answer, please.

24      Q.    Can you identify any of the exclusions for me?

25      A.    No, sir.

1    Q.    Not one?

2    A.    I don't know what the exclusions are right

3    now.

4    Q.    And if you look to that next paragraph, it

5    says either I personally or through Bay Area

6    contracting construction, Inc., (a company I own)

7    purchased, installed, and used thousands and thousands

8    of sheets of drywall over the last 15 plus years.  Over

9    the years, I purchased drywall from Lowe's, Home Depot,

10   builder's square, (now out of business), McCoy's, and a

11   variety of other building supply companies."  Do you

12   see that?

13   A.    Yes, sir.

14   Q.    Can you give me any sense of where you

15   actually purchased the bulk of your drywall?

16   A.    The bulk?

17   Q.    Yes.

18   A.    That would probably be like best and McCoy's.

19   Q.    Okay.  And I guess what percentage of drywall

20   would you say you purchased from those was that three

21   entities you just identified?  Could you give me a

22   ballpark number there?

23   A.    At least 50 percent.

24   Q.    From those three?

25   A.    (Witness moves his head up and down.)

1     Q.    And then you've identified a couple of others

2  here, including Lowe's and Home Depot.  What percentage

3  of drywall would you buy from Lowe's and Home Depot?

4     A.    The other percentage.

5     Q.    Would you say that's probably half between

6  Lowe's and half between?  Or is there some other way

7  you would break it down?

8     A.    Well, I mean, it's -- like I said, it could

9  be -- I don't know.  It varies.  Like when we do

10  projects out of -- out of Corpus we pick them up in

11  Home Depot or Lowe's or, you know, building specialties

12  out in that area.  What ever is in the area that we're

13  working at.

14     Q.    Let's throw a number out there.  So you said

15  you estimated that you bought between 50 percent of

16  your dry -- about 50 percent of your drywall either at

17  Lowe's or Home Depot.  Would you say that you bought --

18     A.    Maybe 20 or 10 and 10.

19     Q.    Somewhere around that neighborhood.  Okay.

20  Now, are you aware that your counsel has represented I

21  think one of his -- either his secretary or one of his

22  officer workers in pursuing an objection to a

23  settlement that involved Lowe's home centers?

24     A.    No.

25     Q.    Okay.  That's never been brought to your