1    attention in any way?

2        A.    No, sir.

3        Q.    And you yourself, you didn't object to this

4    settlement involving Lowe's, did you?

5        A.    Is this about Lowe's?

6        Q.    This is not about Lowe's, no, sir.  So apart

7    from this objection, you didn't -- you're not aware of

8    doing any other objection to another drywall

9    settlement, are you?

10       A.    No, sir.

11       Q.    Okay.  And are you aware that under -- under

12   the terms of the Lowe's settlement, which has been

13   finally approved by a court in Muscogee county Georgia,

14   that your claims against Lowe's are barred, are you

15   aware of that fact?

16       A.    No, sir.

17       Q.    And can you tell me whether any of these

18   entities that you've identified in paragraph 4 are what

19   we referred to earlier as participating defendants?

20       A.    I don't know.

21       Q.    If I told you that Home Depot is the only

22   entity here that's actually a participating defendants

23   in the settlement, would that refresh your memory one

24   way or the other?

25       A.    No, sir.

1       Q.   And I'll represent to you that Home Depot --

2   excuse me -- Home Depot is in fact a participating

3   defendant in this settlement, okay?

4       And we've had some discussions with counsel

5   for Home Depot and one thing that they represented to

6   us is that they never purchased any drywall from a

7   Chinese company and they never, to their knowledge,

8   distributed any Chinese drywall.  Do you have any

9   reason to disagree with those assertions by Home Depot?

10      A.   I don't know.  No, I don't have no --

11      Q.   And as you sit here today, you have no memory

12  of standing in a Home Depot store and actually

13  purchasing drywall, do you?

14      A.   No memory in purchasing drywall?

15      Q.   Do you remember actually sitting in a Home

16  Depot and buying Chinese drywall?

17      A.   I don't -- I mean, I bought drywall.

18      Q.   But you can't --

19      A.   But I don't know, you know, from where,

20  from -- you're saying if I sat in a Home Depot and

21  purchased Chinese drywall.

22      Q.   I'm saying you testified earlier that you

23  recall seeing made in China and other markings on --

24      A.   But not -- I didn't say where I got it.  I

25  don't know where.

1    Q.    And I'm asking you, do you remember, have a

2   specific memory of actually standing in a Home Depot

3   store and seeing those markings?

4    A.    No, I don't think -- I don't recall.

5    Q.    So you really have no idea whether you bought

6   Chinese drywall from Home Depot, do you?

7    A.    I don't -- like you said, you know, you're

8   saying that they didn't purchase Chinese drywall.

9    Q.    And are you aware of the fact that no

10  homeowner in the State of Texas has initiated a lawsuit

11  against Home Depot for the purchase of defective

12  Chinese drywall?

13   A.    Like I said, I'm not aware of it, but like I

14  said, I heard that there was a complaint about it.

15  That we went and did some remediation on it and that's

16  how I heard about it too, what the customers were

17  paying about that.  But it went in one ear and out the

18  other until this came up.

19   Q.    And that wasn't about Home Depot, was it?

20   A.    No, not that I recall?

21   Q.    So you have no basis to refute Home Depot

22  counsel representation that Home Depot never

23  distributed or sold Chinese drywall?

24   A.    I mean, I'm not an attorney.  So what are you

25  trying to say?  Can you explain that a little bit

1    better.

2        Q.    Sure.  What I'm trying to ask you is you have

3    no personal knowledge that would in any way call into

4    question Home Depot's counsel's representation that

5    Home Depot never sold Chinese drywall?

6        A.    I don't know.  I can't tell you.

7        Q.    You can't -- you have nothing to -- nothing

8    there?

9        A.    No.

10       Q.    Okay.

11       A.    I don't know if they did or not.  Like I said,

12   I just purchased drywall.

13       Q.    Okay.  And do you also own a company called

14   course in general contractors, LLC?

15       A.    No.

16       Q.    And I didn't bring it with me today, but we

17   did do some research and it appears actually that you

18   own the company, it's got the same property address as

19   your home address?

20       A.    What's it called?

21       Q.    Course in general contractors C-O-R?

22       A.    Corsand?

23       Q.    Yeah.

24       A.    It's not really existing.

25       Q.    What do you mean by that?

1    A.    We opened it and we shut it down.

2    Q.    Did it do any business?

3    A.    Yes, sir.

4    Q.    It did?

5    A.    Yes, sir.

6    Q.    During the time period 2006 through present,

7    did it do any business?

8    A.    2006, we built a couple of houses.

9    Q.    And did you install drywall in those houses?

10    A.    Yes, sir.

11    Q.    And so is it possible that some of the Chinese

12    drywall, some or all the Chinese drywall that you saw

13    was actually purchased by Corsand and installed by

14    Corsand and not by your Bay Area consulting and

15    contractors construction?

16    A.    I can't -- you know, I don't really -- I can't

17    tell you there.  I mean, because I also did a joint

18    venture with another company called -- it was called

19    Ram cia.

20    Q.    What do you mean joint venture?

21    A.    I did a couple of houses with them, too.

22    Q.    Well, when you say you did a couple of houses

23    with them, were you also -- was your company working on

24    that or you assisting?

25    A.    I was sort of like a partner with that

1    company.  But we only did a couple of houses and it

2    dissolved and that was it.

3        Q.    And this was another entity that was set up?

4        A.    Well, it wasn't an LLC or nothing.

5        Q.    What was it?

6        A.    Just proprietorship.

7        Q.    Okay.  So when you did that work, you were

8    doing it yourself, not as -- not as Bay Area consulting

9    and construction?

10       A.    Yes, sir.

11       Q.    You were doing it individually as yourself?

12       A.    Yes, sir.

13       Q.    Okay.  And it's also possible that Chinese

14   drywall that you recall seeing with the markings made

15   in China, etcetera, was actually on one of those job

16   sites and not on one of the job sites where Bay Area

17   consulting and contract -- or construction was

18   performing the job; is that correct?

19       A.    I can't tell you if it was or was not.

20       Q.    And to your knowledge, neither of these

21   entities that we just mentioned, Corsand and what was

22   the other one?

23       A.    Ramcia.

24       Q.    Filed objections to this settlement, did they?

25       A.    No, sir.

ROUGH DRAFT TRANSCRIPT ONLY

1     Q.    So to the extent the work you did where you

2  saw the Chinese drywall involved one of these entities,

3  no objection has been filed?

4     A.    Not at this time.

5     Q.    And what's your understanding of whether it's

6  too late or whether there's still time to file an

7  objection?

8     A.    I -- you know, I can't believe you came up

9  with that one.

10     Q.    Well, coincidentally, your retainer agreement

11  and the date of your objection were actually the last

12  day to opt out of this -- or to opt out and object to

13  the settlement.  Did you know that?

14     A.    No, sir.

15     Q.    It was just a coincidence?

16     A.    What's that?

17     Q.    This was just a coincidence that the final day

18  for objecting -- or the day before, I should say, you

19  met Chris Bandas and the next day you filed an

20  objection?

21     A.    I guess it was.

22     Q.    Just coincidence.

23     A.    Corsand, I already forgot about that one.

24     Q.    Don't worry, I found out about it.

25     A.    I thought we dissolved that.

1          MR. GAUGHAN:  I'll mark this as 25 -- 26,

2    I'm sorry.

3          THE WITNESS:  Can I get some more water?

4          MR. GAUGHAN:  Yes, we can go off the

5    record.

6               (A recess was taken.)

7          THE VIDEOGRAPHER:  We're back on the

8    record at 3:58, this is the beginning of tape number 2.

9     Q.   Mr. Garcia, I'm showing you what's been marked

10   as Exhibit 26.  I think it's right there?

11    A.   This one.

12    Q.   Yes.  Have you seen this document before?

13    A.   Yes.

14    Q.   When did you see this document?

15    A.   I'd say probably about three or four days ago.

16    Q.   Okay.  Now, did you see this document, if you

17   look at the top of this document, it says over the

18   right-hand side before the page number, it says "filed

19   10/18/12."  Do you see that?

20    A.   Yes, sir.

21    Q.   I take it you didn't see this document before

22   10/18/12; is that correct?

23    A.   Before?

24    Q.   Yeah.

25    A.   No.

ROUGH DRAFT TRANSCRIPT ONLY

1      Q.    You just saw it for the first time a couple of

2   days ago?

3      A.    I didn't notice those numbers up this.

4      Q.    Did you know that your counsel was filing this

5   document before 10/18/12?

6      A.    No, sir.

7      Q.    Okay.  Now, did your counsel ever seek

8   information to respond to these interrogatories from

9   you?

10      A.    Before then?

11      Q.    Yeah.

12      A.    Before 10/18/12?

13      Q.    Yes.

14      A.    No, sir.

15      Q.    And I'm going to also mark as Exhibit 27 --

16   did I just give you -- let me see that copy real quick.

17      A.    This is 27.

18      Q.    Yeah.  Sometimes I like to give out the

19   version I wrote on, so making sure I do not.  No, this

20   is clean.  There you go, sir.  So, sir, can you look at

21   Exhibit 27 there as well right in front of you.  And

22   I'm going to ask you the same question.  When was the

23   first time you saw this document?

24      A.    10/19/12.

25      Q.    You saw it on 10/18/12?

1      A.    No.

2      Q.    The same time frame, you saw it a couple of

3  days ago as well?

4      A.    Yes, sir.

5      Q.    And this -- I'll represent to you?

6      A.    That's in October.

7      Q.    Yeah.  This is in October, sir.  I'll

8  represent to you that these are responses to requests

9  for documents that was directed to you and Bay Area

10  contracting and construction.

11     A.    September, October.  Now, what with a that

12  again?  Can you repeat that?

13     Q.    I'm representing to you that this document in

14  front of you, Exhibit 27 is your responses, response of

15  yourself and Bay Area contracting & construction to

16  requests for production of documents that were by class

17  counsel.  Now, I guess my question for you is --

18     A.    Okay.  Go ahead.

19     Q.    Did your counsel ever request that you provide

20  any sort of documents in your possession before

21  10/18/12?

22     A.    Can you go ahead and repeat that?  I was

23  thinking of something else real quick.

24     Q.    Did anyone request that you provide

25  documentation in connection with this request for

1   production of documents before 10/18/12?

2           MR. HUSEMAN:  Ronnie, understand you are

3   not to say anything you discussed with your lawyer or

4   any communications.

5       A.   No, I had to have seen this on 10/18, right?

6       Q.   10/18 actually it's dated?

7       A.   Yeah.

8       Q.   Well, you don't remember if -- seeing this

9   document before 10/18/12, do you?

10      A.   I don't remember.

11      Q.   Okay.  Did there come a time when you were

12  asked to provide documents that supported your

13  objection in this litigation?

14      A.   Yes, sir.

15      Q.   When was that?

16          MR. HUSEMAN:  Judgment.  If you're talking

17  about dealings with your lawyer, you're not to talk

18  about those with him, okay.

19      A.

20          THE WITNESS:  Okay.

21          MR. HUSEMAN:  You can tell him if you've

22  looked for documents previously to try to determine

23  whether you sold any Chinese drywall or involved with

24  it you can tell him you have gone to look for it but I

25  don't want any communication with any lawyer you've

1    discussed.

2            THE WITNESS:  Because I don't really

3    understand what he's trying to say.  Something about

4    looking for documents.  I've looked for documents.

5        Q.    When?

6        A.    A week ago, a couple days ago.  You know, been

7    looking.

8        Q.    But more recently, not two weeks ago or three

9    weeks ago.  Is that correct?

10       A.    No, he just said, you know, make sure I have

11   documents.

12       Q.    But that was within the last two weeks or so?

13       A.    Yes, sir.

14       Q.    Not before 10/18/12?

15       A.    I can't recall.

16       Q.    Okay.  And you can go back to Exhibit 26.

17       A.    26.

18       Q.    And I want you to look at interrogatory No. 1.

19   "State the date you retained your counsel."  It's on

20   page 2 on the bottom there.

21       A.    Oh, on No. 1, objector objectives.

22       Q.    No.  I'm sorry, at the bottom of page 2?

23       A.    State the date you retained counsel.

24       Q.    And then if you flip the page, I'm not going

25   to read that first paragraph, but the second sentence

1    says "I retained the Bandas law firm, PC on September

2    28, 2012."  Is that consistent with your memory?

3         A.    That's when we signed an agreement.

4         Q.    So that's a yes?

5         A.    Yes, sir.

6         Q.    And if you go to page 4 of this document and

7    look at interrogatory No. 6?

8         A.    Number 4, No. 6.

9         Q.    And it actually says "identify --

10        A.    The person who installed the drywall.

11        Q.    Yeah, in Ingleside Texas and the manufacturer

12   of the drywall and then do you see your response to

13   that interrogatory?

14        A.    I do not own a home in Ingleside.

15        Q.    Yes, I see that.  But you do own a home in

16   Corpus Christi, correct, according to this?

17        A.    Yes.

18        Q.    And that's accurate?

19        A.    (Witness moves his head up and down.)

20        Q.    And you're saying you remodeled your house

21   three years ago, about three years ago.

22              So you remodeled your house three years ago;

23   is that correct, sir?

24        A.    Yes, sir.

25              MR. LONGER:  Which hone home.

1      Q.      Which home is that?

2      A.      I got one in Sinton and I got a condo in -- I

3   had a house here in Corpus.

4      Q.      So this involves the house in Corpus?

5      A.      A condo and -- the house I ended up selling my

6   house?  Corpus to move back into my condo because I

7   didn't have nobody -- it was just there and so I

8   decided to budget down myself and I sold my house.

9      Q.      All right.  So you have a condo that you're

10  currently living at?

11     A.      Uh-huh.

12     Q.      What's the address of that property?

13     A.      3839 Surfside boulevard.

14     Q.      And then you mentioned a home that you own in

15  Corpus Christi what's the address?

16     A.      It's Indiana.

17     Q.      Is that the house that's at issue in this

18  interrogatory here?

19     A.      Well, it's actually probably all three of them

20  because I -- at the same time I built a home in Sinton.

21     Q.      Okay.  What's the address of the property --

22  did you just say the address of the property?

23     A.      Yes, 525 Indiana.

24     Q.      When and what's the third property?  What's

25  the address of that?

1      A.      1816 avenue C.

2      Q.      And so you remodeled all 3 of these houses is

3  that what you're saying?

4      A.      Yes, sir.

5      Q.      Around 3 years ago?

6      A.      Well, actually the one in Sinton is a new

7  home.

8      Q.      When did you build that house?

9      A.      In 2007.  I think '07.

10      Q.      Okay.  '07.  And then when did you remodel the

11  house for each of the properties in Corpus Christi?

12      A.      2008.

13      Q.      And I guess let me ask you, do you have any

14  understanding of some of the symptoms that one would

15  expect to encounter in a home that has Chinese drywall

16  installed in it, defective Chinese drywall, I should

17  say?

18      A.      No, sir.

19      Q.      You never heard that people experienced rotten

20  egg odors, anything like that?

21      A.      Somebody told me about it.

22      Q.      Have you yourself or any of -- anyone that's

23  been in your house -- any of these three properties

24  ever told you that they noticed anything like a rotten

25  egg odor or a foul odor?

1    A.    Not at this time.

2    Q.    Now, has it -- has anyone ever told you that

3  another symptom of Chinese drywall is it causes

4  corrosion to wiring and metal surfaces?

5    A.    No.   That's the only time I -- you know, was

6  going back to when I redid that remediation for that

7  lady.

8    Q.    Let me ask you this.   These three properties

9  that we just talked about, have you experienced any of

10  those sort of problems where there was corrosion or to

11  any metal surfaces or wiring, anything like that?

12    A.    Not at this time.

13    Q.    You haven't had to replace any AC coils or

14  anything like that, HVAC units?

15    A.    Not at this time.

16    Q.    How about --

17    A.    I think it's because of the -- the AC coils in

18  the attic.   Most of the time the ones that are inside

19  the closet areas are the ones that has the problems, I

20  think.

21    Q.    Which property are we talking about?

22    A.    I don't have none of that right now.

23    Q.    So you haven't had any of that in these

24  properties?

25    A.    No.

1    Q.    How about have you heard that sometimes people

2    with Chinese drywall experience irritation of the eyes,

3    throat, that sort of thing, have you ever heard

4    anything like that?

5    A.    I'm having that right now in my condo so I

6    don't know.  I don't know if that's the problem.

7    Q.    Just right now that's not something that

8    you've experienced regularly since you've had the

9    condo, is it?

10    A.    (Witness moves his head side to side.)

11    Q.    How about for any of the other properties,

12    have you experienced that sort of problem?

13    A.    No, sir.

14    Q.

15                MR. LONGER:  What was his answer to the

16    question?  He didn't answer.

17    Q.    Maybe I was looking at your head nodding side

18    to side here, but I had asked just right now you said

19    you had some irritation of your sinuses, was it?

20    A.    Sinuses and eyes.

21    Q.    And I'm asking that's not something you've

22    experienced regularly since you did these -- you built

23    the one property and you remediated the two other

24    properties?

25    A.    I don't -- I just -- I don't -- it comes and

ROUGH DRAFT TRANSCRIPT ONLY

1    goes, I don't know.

2        Q.    So that's not something you experience

3    regularly.

4        A.    Not regularly.

5        Q.    And to your knowledge, it has nothing to do

6    with Chinese drywall?  It could be anything; is that

7    fair to say?

8        A.    That's fair to say.

9        Q.    So is it fair to say that there's really

10   nothing -- there's nothing you can point to that leads

11   you to believe that there's Chinese drywall in any of

12   these three properties you just mentioned?

13       A.    I wouldn't know.

14       Q.    Okay.  You don't recall installing Chinese

15   drywall in any of these properties?

16       A.

17              MR. LONGER:  Is that a yes or no.

18       A.    I don't know.

19       Q.    You don't know?

20       A.    No, sir.

21       Q.    I guess no is the answer; is that right?

22       A.    Yes, sir.

23              MR. HUSEMAN:  His answer was he didn't

24   know, it wasn't no.

25              MR. GAUGHAN:  That's why I'm asking to

1  clarify.

2     Q.   Is that a no?

3     A.   Well, I don't know if I did or not.  I don't

4  know.  It's been too long ago.

5     Q.   So just earlier you said you don't know

6  whether you installed Chinese drywall in any of these

7  three properties?

8     A.   I don't recall.  I mean, maybe I could.  Maybe

9  I couldn't.  We use materials from other projects to

10 finish these, you know, like to renovate my condo,

11 renovate this, instead of being sitting in the

12 warehouse, you utilize it somehow.

13    Q.   So that's a maybe, you don't actually

14 remember?

15    A.   I don't remember.

16    Q.   Okay.  So why is it that you're concerned that

17 there might be Chinese drywall in any of these three

18 properties?

19    A.   Well, that's because my parents lived in that

20 one house in Sinton and I live in the --

21    Q.   I guess what specifically leads you to think

22 there's actually Chinese drywall there?

23    A.   There could be.

24    Q.   But you have no idea?

25    A.   I don't have no idea.

1      Q.     And in all likelihood there is no Chinese

2   drywall in any of these properties?

3      A.     We don't know unless we go in there and open

4   it all up.

5      Q.     Are you going to go in there an open it up?

6      A.     I'm not.

7      Q.     Why not?

8      A.     What's that?

9      Q.     Why not?

10      A.     Too much work.

11      Q.     Yeah, but if there's potentially corrosive

12   Chinese drywall, don't you think you would want to see

13   if it's in there?

14      A.     Well, I would think if it's like asbestos and

15   you start messing with it, then you have more problems.

16   You just wait until -- see what happens.

17      Q.     And --

18      A.     If it starts coming off the wall, we'll know.

19      Q.     And this drywall has been in the wall for

20   about four years?

21      A.     Yes, sir.

22      Q.     And you haven't had any problems?

23      A.     Well, the shifting grounds and everything else

24   that we have in Texas, you know, it does move, but...

25      Q.     But no problems that you think or can point to

1   that would be associated with Chinese drywall, correct?

2       A.    I'm not an expert.  I don't know.  I can't

3   tell you that.

4       Q.    I understand you're not an expert, but you

5   sitting here right now --

6       A.    It's like I was telling him earlier today,

7   yesterday, I started renovating my bathroom a little

8   bit in my condo and you know, I was looking at drywall

9   but you know, I didn't want to -- I didn't want to open

10  it up to find out if it had Chinese drywall.

11      Q.    You actually looked at it or you didn't?

12      A.    I was looking at it but you know, I was

13  renovating the floor of my condo's bathroom.

14      Q.    You could -- could you see in there or not?

15      A.    No, I'd have to open it up but I looked at it.

16  It looks like, you know --

17      Q.    Could you see anything, any markings on that

18  drywall?

19      A.    Yeah, you could see some type of discoloration

20  but I'm not going to -- I'm just going to repaint it.

21      Q.    Is it green board?

22      A.    It's not green board.

23      Q.    What color was it?

24      A.    It's white, just regular board.

25      Q.    White?

1    A.    Yeah.

2    Q.    Did you see any labelling on it?

3    A.    You couldn't, it's painted over it.

4    Q.    Okay.  So I guess what specifically makes you

5    think that the value of your property or any of these

6    three properties has been diminished in any way?  Can

7    you point to anything?

8    A.    Not if we have to -- you know, if I have to

9    disclose if it's, you know -- if it's Chinese drywall.

10   Q.    But you just testified that you didn't -- you

11   don't know?

12   A.    We don't know.

13   Q.    So why would you have to disclose what you

14   don't know?

15   A.    That's true.

16   Q.    And why is it that you fear for your own

17   health and the health of your family as set forth in

18   this interrogatory response?

19   A.    Maybe the negative impact of it.

20   Q.    I'm sorry, what it says here in this

21   interrogatory response is that you fear for your own

22   health and the health of your family and I'm

23   paraphrasing it.

24   A.    Yeah.

25   Q.    But why?  I mean, I'm guess trying to figure

1    out why.  From what you're telling me you haven't had

2    any problems and no one in your family has either.

3        A.    You know, well, my parents are old, so you

4    never know.

5        Q.    And how much fear are you really dealing with?

6    I mean, have you had to go see any sort of healthcare

7    providers to treat you for this fear?

8        A.    For me?

9        Q.    Yeah.

10       A.    Personally?

11       Q.    Yeah.

12       A.    I have, but not -- not -- just for my eye

13   irritation and for my health.

14       Q.    Well, did you ever get screened by any

15   physician to determine whether you've suffered any sort

16   of adverse health consequences?

17       A.    No, sir.

18       Q.    For being exposed to Chinese drywall?

19       A.    Well, I don't know.

20       Q.    Okay.  Is that's a no, you have not?

21       A.    I haven't gotten screened.

22       Q.    And have you seen a psychiatrist or a

23   psychologist to help you cope with this fear that you

24   or your family might develop an illness associated with

25   Chinese drywall exposure?

1      A.    Can you repeat that again?

2      Q.    Have you or anyone in your family, I should

3  say, seen either a psychiatrist or a psychologist?

4      A.    No.

5      Q.    Or other healthcare provider?

6      A.    No.

7      Q.    To deal with this, cope with this fear that

8  you might develop an injury in the future from your

9  exposure to Chinese drywall?

10      A.    No, sir.

11      Q.    No.  When did you first start having this fear

12  that you might develop health problems or someone in

13  your family might develop health problems by virtue of

14  being exposed to Chinese drywall?

15      A.    What was that again?  When did I start having

16  these fears?

17      Q.    Yeah.  When did you start becoming afraid that

18  either you yourself or someone in your family might

19  develop an illness from being exposed to Chinese

20  drywall?

21      A.    Just finding out that, you know, I might have

22  this in my homes, probably you know, two or three weeks

23  ago.

24      Q.    Two or three weeks ago?

25      A.    Yes, sir.

1  Q. So around the time that you were first having

2 conversations with Mr. Chapa about Chinese drywall?

3  A. Uh-huh.

4  Q. And before that time, you never were afraid

5 that either yourself or someone in your family might

6 develop some sort of illness from being exposed to

7 Chinese drywall; is that fair?

8  A. Yes, sir.

9  Q. Okay.  And what did Mr. Chapa tell you that

10 made you suddenly --

11  A. It wasn't actually Mr. Chapa, it was

12 Mr. Bandas.

13  Q. Okay.

14    MR. HUSEMAN:  Once again, I repeat myself,

15 don't talk about what Chris Bandas told you or any of

16 your lawyers told you or what you told them, okay?

17  Q. Mr. Garcia, a little while ago you testified

18 that you saw an eye doctor to deal with some eye

19 irritation you were experiencing.  Who was that doctor?

20  A. Dr. Perez.

21  Q. And what did they tell you about the nature of

22 your condition with your eye?  Or is it both eyes?  I'm

23 sorry.  Or is it one?

24  A. Both eyes.  Just, you know, they're just

25 irritation from what's in the air and I don't know

1    what's -- just dryness pretty much.

2        Q.    Did that -- did that doctor tell you that your

3    condition with your eyes had anything to do with

4    possible exposure to Chinese drywall?

5        A.    No.    They couldn't tell.    They can't tell

6    that.

7        Q.    And have you --

8        A.    I don't even know if, you know...

9        Q.    Have you seen any other healthcare provider

10   that's told you any --

11       A.    No, sir.

12       Q.    -- physical condition that you're experiencing

13   is in any way related to your exposure to Chinese

14   drywall?

15       A.    No, sir.

16       Q.    And you mentioned some congestion recently?

17       A.    Sinus.

18       Q.    Sinus problems.    Has any doctor told you that

19   the problem you're experiencing with your sinuses is

20   any way related to your exposure to Chinese drywall?

21       A.    They don't know anything about Chinese

22   drywall.

23       Q.    And are you aware that not all drywall that

24   comes from China is reactive or off gasses?

25       A.    I'm not aware about that.    If they're still

88

```
 1   selling Chinese drywall.
 2       Q.    You're asking me?
 3       A.    Yes.
 4       Q.    I'm the one asking the questions, I guess.
 5             So I'm just asking?
 6                   MR. LONGER:  Who's the they?  They're
 7   selling Chinese drywall in China.
 8                   THE WITNESS:  But not in Texas.
 9                   MR. LONGER:  They are.
10                   MR. HUSEMAN:  Is it one of the settling
11   parties.
12                   MR. LONGER:  I didn't mean to interrupt.
13   Excuse me.
14       Q.    So for all you know, this recent sinus
15   problems that you've been experiencing could be an
16   allergy or some other non-Chinese drywall related?
17       A.    I don't know all the facts of Chinese drywall
18   if it does or does not so like I said --
19       Q.    You have no idea one way or the other?
20       A.    No.
21       Q.    Whether sinus problems you're having have
22   anything to do with Chinese drywall, correct?
23       A.    Yes.
24       Q.    And what is your level of knowledge about the
25   adverse health consequences that have been associated
```

1  with Chinese drywall?  I take it from your prior answer

2  you don't have any, is that fair to say?

3      A.    I don't know.

4      Q.    You never reviewed any sort of medical

5  literature that brought to your attention that there

6  were potential adverse health consequences associated

7  with exposure to drywall?

8      A.    Is there some literature out there?

9      Q.    I'm asking you?

10      A.    I haven't had time.

11      Q.    Are you aware that a federal agency, the CPSC

12  conducted a study and concluded that there were no

13  adverse health consequences that are associated with

14  Chinese drywall?

15      A.    I have not recalled anything like that,

16  haven't reviewed it.

17      Q.    And I'm looking on page 5 in response to the

18  same interrogatory and just to kind of paraphrase a bit

19  there in that second full paragraph, there's really

20  just two sentences, you indicated that you had some

21  damage to personal property.  And saw blades and router

22  bits that corroded quickly?

23      A.    Some routers and blades and we took some of

24  those things back to Home Depot and were able to

25  reimburse us on stuff like that that went out quicker

1    than what they usually do.

2         Q.    So you didn't suffer any out-of-pocket loss

3    because they were replaced by Home Depot?

4         A.    They there was adjust a small fee.

5         Q.    What's a small fee?

6         A.    What's that?

7         Q.    What small fee is that?

8         A.    For the shipping part of it.

9         Q.    How much would that be?

10        A.    I don't recall.

11        Q.    If you could quantify, you know, the totality

12   of those fees that you paid in connection with saw

13   blades and router bits corroding and having to be

14   replaced?

15        A.    The routers alone --

16        Q.    How much would that be?

17        A.    I don't recall.

18        Q.    Less than $20?

19        A.    Probably about 100 bucks, something like that.

20        Q.    At maximum say 100 bucks, no more than that?

21        A.    No, sir.

22        Q.    Okay.  Do you have any sort of receipts or

23   anything like that that go along with -- that support

24   your claim that you incurred out-of-pocket expenses for

25   these?

1     A.     It's been three years ago, four years ago, I
2  don't know.
3     Q.     So it's possible that --
4     A.     For me, I don't know.  I mean, you know, I
5  don't know.
6     Q.     You don't know.  Okay.  Now, did you
7  maintain -- I take it you didn't actually maintain
8  possession of any of these corroded saw blades or
9  router bits?
10    A.     No, sir.
11    Q.     So you have no proof that the corrosion --
12    A.     Those things have been replaced already, you
13  know.
14    Q.     And you have no proof that the corrosion that
15  affected these items had anything to do with Chinese
16  drywall?
17    A.     I can't tell you.
18    Q.     You didn't have an expert or anyone like that
19  look at these items?
20    A.     No, no expert.
21    Q.     And I guess in the next paragraph of this
22  interrogatory response, you're talking about your
23  business reputation being damaged.  Do you see that?
24    A.     Yes.
25    Q.     And I guess how is your business reputation

1    been damaged?  Can you tell me a little bit about that?

2        A.    Well, it's not damaged unless it's out that,

3    you know, we replaced Chinese drywall.

4        Q.    So it hasn't been damaged because you haven't

5    had to replace any Chinese drywall?

6        A.    That's true.

7        Q.    And none of your customers have complained

8    about Chinese drywall on any of the jobs that your

9    company did; is that correct?

10       A.    Not at this time.

11       Q.    Mr. Bandas -- I'm going to have you look again

12   at Exhibit No. 5, if you don't mind.  You're not

13   writing on that, are you?

14       A.    Just underlining.  Sorry.

15       Q.    I ask that you don't do that in the future

16   just because that's part of the record.

17       A.    Oh, okay.

18             MR. DODSON:  Is it something we can make

19   another copy?

20             MR. LONGER:  What kind of marking.

21             MR. GAUGHAN:  He underlined.  Just have

22   the record reflect that you underlined one of the

23   things in one of the exhibits here.

24       A.    And what exhibit was that.

25             THE WITNESS:  It's Exhibit 26.