1    Q.    And have you underlined anything else in any
2  of the other exhibits today?
3              THE WITNESS:  I hope not.  Nobody said
4  anything.
5    Q.    I'm sorry, I should have.  I don't know that I
6  gave you instructions at the beginning, but --
7    A.    No, that's it.
8    Q.    That's it.  Okay.
9              MR. HUSEMAN:  It ain't that big of a deal,
10  Ronnie, don't worry about it.
11              MR. GAUGHAN:  I'm not going to cry about
12  it.
13    Q.    Could you turn back to Exhibit No. 5.  We were
14  looking at that earlier?
15    A.    26?
16    Q.    No, number 5, it's the objection.
17  Specifically I'd like you to turn back to that
18  affidavit we looked at earlier.
19    A.    Affidavit.  Affidavit.  What page is that?
20    Q.    Well, you want to go past page 4, which is the
21  end of the actual objection and then you'll see -- or
22  actually page 6 after that, you'll see Exhibit A.  Flip
23  through that.  And Exhibit B, go through that and the
24  next Exhibit is C.  I couldn't give you a page number
25  because there's no consecutive page numbers there?

1     A.    Well, I did sign this one.

2     Q.    And I want you to look at that, I guess

3  paragraph that begins with?

4     A.    I wrote on this one, too.  What.

5     Q.    Can I just see that for a second?  I want to

6  make sure you're in the right page here.  And just so

7  the record reflects, you underlined something else on

8  this exhibit as well?

9     A.    Yes.

10     Q.    That's Exhibit 5.  All right.  Here you go,

11  Mr. Bandas.  This is Exhibit C?

12     A.    You called me Bandas.

13     Q.    I'm sorry.  I think it's maybe a little slip

14  there.

15         This is Exhibit C to your objection.  We

16  looked at this earlier.  This is your affidavit.  And

17  if you look at the second full paragraph under where,

18  you know, you I guess set forth that you're stating the

19  below items under penalty of perjury, you see "I am the

20  owner of Bay Area contracting & construction, Inc."?

21     A.    Uh-huh.

22     Q.    And then it lists the address as 3902 south

23  port avenue in Corpus Christi, Texas, 78415.  And I

24  guess my question for you:  Is that the address you

25  currently reside in?

```
 1       A.    Right now?

 2       Q.    Yeah.

 3       A.    On the construction?

 4       Q.    Is that where --

 5       A.    The construction part of it.

 6       Q.    Is that where you reside?

 7       A.    Reside to live or do business?

 8       Q.    Is that where you're living?

 9       A.    No.

10       Q.    And what do you mean by do business?

11       A.    Doing business.  Right now at that address or

12  what is this.

13       Q.    Yeah.  What -- I guess what's going on at that

14  address?  Let's back up?

15       A.    Right now I've got the building up for sale.

16       Q.    Okay.  And you don't currently live there or

17  maintain a business out of that location; is that

18  correct --

19       A.    Not at this time.

20       Q.    And I guess my question for you is:  We

21  attempted service on you at this address and obviously

22  there was no one there to receive the subpoena.  So I

23  guess why did you include this address in your

24  affidavit if it was no longer being used?

25       A.    Because that's what they asked me at that
```

1     time.

2          Q.   Okay.  So you're just saying that's the

3     address of your company?

4          A.   Uh-huh.

5          Q.   Are you planning --

6          A.   Right now I got a P.O. Box for the company.

7          Q.   Are you planning to change the address of your

8     company officially?

9          A.   Yes, sir.

10         Q.   With the secretary of state corporations

11    division of Texas?

12         A.   (Witness moves his head up and down.)

13         Q.   Okay.  And just to that last question, so you

14    are planning to change the corporation's address with

15    the secretary of state for the State of Texas?

16         A.   I will.

17         Q.   Okay.  What's the current address for your

18    company?  You said it's a Po box?

19         A.   P.O. Box.

20         Q.   What address is it so we have it?

21         A.   It's P.O. Box 897, Corpus Christi, Texas,

22    78403.

23               (Exhibit No. 28 was marked.)

24         Q.   And if we needed to, say, serve you with a

25    subpoena at a future date for whatever reason, where

1    would be the best place to actually accomplish that?

2        A.    In my condo.

3        Q.    And what's the address there?

4        A.    3938 Surfside boulevard, unit 2125, Corpus

5    Christi, Texas 78403.  Let me check real quick.

6        Q.    Okay.

7        A.    It's 402.

8        Q.    That's the -- what is that unit number the

9    402?

10       A.    No.  The zip code.

11       Q.    Okay.  So it's 84 -- 78402?

12       A.    Yes.

13       Q.    Okay.  Thank you.  And I take it you would

14   accept service of a subpoena on behalf of Bay Area?

15       A.    Yes.

16       Q.    As well?  Thank you.  The next exhibit that

17   I'm showing you is Exhibit 28.  And this is a copy of

18   your class-action objector power of attorney and

19   contingent fee agreement.  And have you seen this

20   document before?

21       A.    Yes, sir.

22       Q.    When did you first see this document?

23       A.    When I signed the other document.

24       Q.    If you look to the third page, does that

25   refresh your memory of when you saw this document?

 1      A.      On the 28th.

 2      Q.      28th of September, 2012?

 3      A.      Yes, sir.

 4      Q.      Okay.  And I guess earlier we were talking

 5  about the scope of Mr. Bandas' representation of you

 6  and your company, I guess.  But as I look at this

 7  document, it's made between Ronnie Garcia and Bandas

 8  law firm, PC.  Do you see that?

 9      A.      Yes, sir.

10      Q.      So is there any separate agreement where

11  Mr. Bandas undertook to represent Bay Area -- was it

12  consulting?

13      A.      Contracting and construction.

14      Q.      Contracting and construction.  Is there a

15  separate document like this that you signed on behalf

16  of --

17      A.      This is the only thing I've got.

18      Q.      And they if we look at section 1, it talks

19  about the scope and method of representation.  Do you

20  see that?

21      A.      Yes.

22      Q.      And under section 1.1 it talks about attorneys

23  legal services.  Do you see that?

24      A.      Yes.

25      Q.      And can you just review that section real

1   quick and let me know when you're done, just look up,

2   please.

3        A.    Yes, sir.

4        Q.    And would you agree that essentially the scope

5   of the representation here is for Mr. Bandas to prepare

6   and file on your behalf an objection to a proposed

7   class-action settlement in the case styled MDL 2047?

8        A.    That's what it says here.

9        Q.    And then in that next bit, we also see the

10  tail end of that next sentence and to represent you in

11  an appeal therefrom the objection, do you see that?

12       A.    Yes, sir.

13       Q.    So I was asking you before what your

14  understanding of the scope of the representation was.

15  Would you agree that based on this paragraph,

16  Mr. Bandas is only representing you with respect to

17  your objection and any appeal that might -- may follow

18  from that objection?

19       A.    Well, I just know he's counsel.  A lot of

20  these words that, you know, I haven't really read it,

21  so --

22       Q.    You never read this before?

23       A.    No, sir.  I looked at it but I mean, I can

24  read.

25       Q.    Well, let me ask you this question.  Is it

1    your understanding that Mr. Bandas is representing you

2    so far as you may pursue damages for any fear of future

3    illness you might have, any loss to your business

4    reputation?

5        A.    I think that's what it's saying here.

6        Q.    I agree this is him saying he's only

7    representing you with respect to your objection and any

8    appeal that follows.  You think that there's something

9    in this document that means he's -- the representation

10   is more broad than that?

11       A.    I don't know.

12       Q.    Okay.  So is it your understanding that he's

13   representing you for any future claims you might bring

14   as well?

15       A.    I hope.  I don't know.  I don't really know.

16   I don't know what to tell you on that part.  What kind

17   of future claims?

18       Q.    Well, have you filed a lawsuit?  You haven't

19   filed a lawsuit, have you, against anyone?

20       A.    (Witness moves his head side to side.)  No,

21   sir.

22       Q.    Do you plan to do that?

23       A.    No, sir.

24       Q.    You don't plan to?

25       A.    I don't think I need to.

 1      Q.    So I take it your fear of future -- any sort
 2   of future personal injury?
 3      A.    On what we're talking about right now, Chinese
 4   drywall.
 5      Q.    Yes.  You don't think that rises to the level
 6   where you need legal representation to file a lawsuit?
 7      A.    Well, hopefully Bandas will be there to keep
 8   going with this.
 9      Q.    But is it your understanding that he's
10   actually going to represent you if you wanted to file a
11   lawsuit to recover those damages?
12      A.    I don't understand what you're saying, try to
13   say again.
14      Q.    Well, I mean, you hired Mr. Bandas, so I'm
15   trying to figure out -- you hired him, I'm assuming to
16   pursue an objection, right?
17      A.    You're saying future lawsuits, future lawsuits
18   against?
19      Q.    Well, you haven't filed a lawsuit?
20      A.    I know but you're saying am I going to be
21   filing a future lawsuit against somebody.
22      Q.    Yeah, that's what I'm --
23      A.    I don't know who's that somebody yet.
24      Q.    Well, we went through your response to
25   interrogatories where it was talking about your -- you

1  had some sort of fear of future injuries.

2      A.    Oh, okay.

3      Q.    I guess do you intend to file a lawsuit

4  against Home Depot or any other entity in connection

5  with that fear of future injury?

6      A.    I don't know what the correct answer would be

7  on that.  I don't know at this time.

8      Q.    Okay.  So would it be fair to say that you

9  don't currently intend to file a lawsuit?

10     A.    Yes, sir.

11     Q.    If you turn to section 3.2 and just read

12 through that for me real quick, and that's at the

13 bottom, starting at the bottom of page 1 of this

14 agreement?

15     A.    Okay.

16     Q.    Now, this section is talking about a possible

17 incentive award to you of $5,000, correct?

18     A.    That's what it's saying.

19     Q.    Now, I want to go back to the time when you

20 first talked to Bert Chapa.  Was this something that

21 Mr. Chapa told you about that you might get a possible

22 incentive award?

23     A.    No.

24     Q.    If you pursued an objection with Mr. Bandas?

25     A.    He didn't say that.

1    Q.    Is this something that you thought you might

2  get when you first filed this objection, that you

3  might, hey, if I pursue this Oxy might get $5,000?

4    A.    No, sir.

5    Q.    When did you first become aware of this

6  provision?

7    A.    Right now.  I didn't read -- I didn't read

8  through -- I didn't read through this.

9    Q.    What are you hoping to get out of this

10  objection?

11    A.    What's this?

12    Q.    What did you hoping to get out of this

13  objection that you're pursuing?

14    A.    I hope it's a fair settlement with all the

15  people in this case.

16    Q.    Are you expecting to get any sort of money out

17  of it yourself?

18    A.    No, sir.

19    Q.    You have no idea what you'd actually -- you

20  yourself would actually want other than to see

21  attorneys make less money?

22    A.    That's true.

23    Q.    So there's nothing other than the attorney fee

24  provision that you actually have an objection to in

25  this settlement; is that right?

1      A.    On this settlement?

2      Q.    Yeah.  You're objecting to a settlement,

3   right?

4      A.    Yes, sir.  It's an attorneys fees.

5      Q.    You're not hoping to get anything other than

6   to see attorneys make less money?

7      A.    What's that?

8      Q.    I'm trying to figure out why you're objecting

9   to the settlement.  What are you trying to get out of

10   this?  You don't expect to receive any --

11      A.    Well, I just want to make sure I'm not caught

12   in the middle if somebody else comes up and says, you

13   know, you used Chinese drywall in my business up here

14   in Houston or Dallas.  At least I'll be waived at that

15   part of it.

16      Q.    So you're just really from what I gather from

17   what you just said, you want to get some sort of

18   release?

19      A.    Yes.

20      Q.    You're not hoping to get any sort of benefit

21   under the settlement?

22      A.    No, sir.

23      Q.    Could I ask you to turn to paragraph 4.  And

24   actually, it looks like there's 4.4 and 4.5 and under

25   that we see 4.  It must have been some sort of mix up

1    of the numbering here but do you see where it says

2    conflict of interests?

3         A.    Conflict of interests, okay.  Attorneys are --

4         Q.    Please read through that and let me know when

5    you're finished.

6         A.    Okay.

7         Q.    Do you understand this provision at all?  Let

8    me just start there.

9         A.    Yes and no.

10        Q.    Okay.  I'm just going to have you focus on a

11   little bit of that first sentence there.  And I'll try

12   to break it down so it will be a little bit

13   understandable.  But it says that attorneys have

14   explained that if successful the objection or any

15   appeal therefrom may result in the disapproval or

16   rejection of the proposed settlement."  Do you see

17   that?

18        A.    Yes, sir.

19        Q.    Okay.  At the time you filed this -- I'm

20   sorry.  At the time your counsel filed this objection,

21   did you understand that by filing this objection you

22   may wipe out the settlement entirely for other -- other

23   people that are eligible for the settlement?

24        A.    At the time I signed this?

25        Q.    Yes.

1    A.   I didn't know.

2    Q.   Do you think that your objection in this case,

3  the objection that you're filing or your counsel has

4  filed for you, is justified in delaying compensation to

5  thousands of homeowners who have been affected by

6  Chinese drywall?

7    A.   It's delaying it.

8    Q.   It could delay it.  It could completely do

9  away with the settlement?

10    A.   I didn't know that.

11    Q.   How do you feel about that?

12    A.   A little discouraged, but.

13    Q.   Do you want to go forward with the

14  understanding that you could prevent homeowners from

15  getting any benefit under this settlement agreement?

16    A.   I'd have to talk to my attorney.

17    Q.   But as you sit here today, you don't know

18  without talking to your tone or?

19    A.   He's got this -- he's got my interest on it

20  but I'd to see what he's -- on behalf of what he's --

21  you know, since he's counsel.

22    Q.   If I told you --

23    A.   Or these guys are my counsel now.

24    Q.   If I told you I represent families who live in

25  these homes and can't actually stay in these homes

1    because the environment is so toxic that they have had

2    to rent apartments and their homes are foreclosed upon

3    because they couldn't pay the mortgage and, you know,

4    your objection is potentially going to tank any sort of

5    recovery by those people, how does that make you feel?

6         A.    I thought you said Chinese drywall wasn't

7    toxic?

8         Q.    Well, it's irritating.

9         A.    That's what you said earlier.

10        Q.    It's irritating.  I told you earlier --

11        A.    Did you say that earlier.

12        Q.    I said there's no long-term proven health

13   consequence?

14        A.    But you just said right now it's toxic.

15        Q.    Well, if I told you -- have you ever been this

16   a house with Chinese drywall where you've actually

17   experienced it?

18        A.    I don't -- you know, like I said, I didn't

19   know.  I mean, I didn't know it was toxic like you're

20   saying.  It is.

21        Q.    Well --

22        A.    How toxic is it?

23        Q.    It releases gasses that are extremely

24   irritating.  Now, has it been proven that that's going

25   to cause any long-term health effect?  It has not been

```
 1    proven.  Okay.  But is it pleasant to live somewhere
 2    where your eyes are watering all the time or your
 3    throat is sore?
 4        A.    I'm having that problem.
 5        Q.    Would you like to live there?
 6        A.    I'm having that problem.
 7        Q.    Constantly?
 8        A.    My eyes are watering right now.
 9        Q.    For four years?
10            MR. LONGER:  From there blistering
11    examination.
12            THE WITNESS:  Is it that bad?
13            MR. HUSEMAN:  Be nice, Fred.
14        Q.    That's what I'm trying to figure out.  Is you
15    think that you holding up this settlement for these
16    people, you think that's justified based on your very
17    weak demonstration that you actually had any sort of --
18    you installed any Chinese drywall?
19        A.    What do you want me to say about that again?
20    I mean, it's -- you're saying it's weak?
21        Q.    I mean --
22            MR. LONGER:  Go to another question.
23        Q.    I'll ask another question.  So I guess it's
24    okay with you that you're potentially holding up the
25    settlement or even your objection could completely tank
```

1    the settlement?  That's okay with you?

2        A.    No, it's not.

3        Q.    Okay.  And could you -- what do you mean by

4    that?

5        A.    Well, it's not -- it's not okay with me, but

6    like I said, I'd have to -- that's why I got legal

7    counsel and we got Bandas.  We needed review to see

8    what -- you know, what -- I'm not holding it up.  You

9    know, hopefully they can work something out and we

10   proceed.

11       Q.    What if it actually results in the settlement

12   being either tanked or -- I'm using the term tanked but

13   if it gets disapproved by the court?

14       A.    Tanked is like nobody gets paid on anything is

15   this I don't understand what the word is.

16       Q.    Basically I know you haven't read the

17   settlement, but the participating defendants have a

18   right to walk away from this agreement based on

19   objections, based on opt-outs and that sort of thing.

20   So if a whole bunch of the participating defendants

21   decide hey, we're pulling out, we don't want to

22   participate in this agreement, then there would be no

23   money available for homeowners.  So I'm just asking:

24   You know, that's okay with you?

25       A.    It's -- like I said, it's not -- it's not okay

1    with me, but I'd have to check with counsel.

2         Q.    Okay.  And I think we just read the first

3    paragraph or the first sentence of this paragraph that

4    attorneys have explained and you understand that if

5    successful, the objection or any appeal therefrom may

6    result in the disapproval or rejection of the proposed

7    settlement, correct?  Do you remember looking at that

8    earlier?

9         A.    Yes, sir.

10        Q.    Okay.  Did you understand that at the time you

11   signed this agreement?

12        A.    Like I said, I didn't -- I hadn't really

13   reviewed it.

14        Q.    So you didn't understand it?

15        A.    No.

16        Q.    Okay.  And is it fair to say sitting here

17   today this is the first time that you understood this

18   was a potential outcome?

19        A.    Pretty much.

20        Q.    Okay.  And I want to direct you down to the

21   third full sentence of this paragraph it says"

22   attorneys have also explain and you understand that if

23   there are negotiations to settle your objection,

24   attorneys may negotiate the amount of any payment to

25   you as well as the amount of attorneys' fees

1    concurrently in order to a arrive at a total settlement

2    amount.  "Do you see that paragraph?

3         A.   Yes, sir.

4         Q.   How do you feel about the prospect of your

5    attorneys trying to simultaneously negotiate a

6    resolution of your objection and trying to negotiate

7    their own fees?

8         A.   I mean, I don't know what to say there.  I'm

9    not an attorney.  I don't know what -- I don't know

10   what he's doing.

11        Q.   Do you think that's appropriate?  You don't

12   know?

13        A.   I don't know.

14        Q.   And I guess what do you think inappropriate

15   fee for your counsel would be in this case?  Is there a

16   dollar amount or a percentage, anything like that?

17        A.   I don't -- I don't know.

18        Q.   And as far as you know, your counsel has

19   produced no benefit to the class that's in this

20   settlement agreement; is that correct?

21        A.   I don't -- that sounds -- like I said, I don't

22   really know about that.  I don't know what they do.  I

23   don't know what Bandas does as an attorney.

24        Q.   Do you know whether your counsel participated

25   in negotiation of this settlement at all?

1      A.     No, sir.

2      Q.     And other than representing you in this

3  objection, are you aware of any other conduct by the

4  attorney Mr. Bandas in terms of the Chinese drywall

5  litigation generally?

6      A.     No, sir.

7            MR. GAUGHAN:  We're going to go off the

8  record for a minute.

9            THE VIDEOGRAPHER:  Off the record at 4:56.

10           (Off the record.)

11           THE VIDEOGRAPHER:  We're back on the

12  record at 5:08.  This begins tape 3.

13     Q.     Mr. Garcia you just testified that you don't

14  know what Bandas does as an attorney.  Do you recall

15  that testimony?

16     A.     Yes, sir.

17     Q.     I guess I can tell you what he does, but are

18  you aware in Walmart stores in order of denying his

19  objection to a settlement fees, the court observed that

20  Bandas objection filed on behalf of Ms. Clawson is a

21  generic boilerplate objection prepared and filed by

22  attorneys working for their own personal benefit an not

23  for the benefit of this class or for the lawyers'

24  clients.  The record before the court demonstrates that

25  Bandas is a professional objector who is improperly

1   attempting to high-jack the settlement of this case

2   from deserving class members and dedicated, hard

3   working counsel, solely to coerce ill gotten,

4   inappropriate and unspecified legal fees."  How do you

5   feel about having an individual like that representing

6   you?

7       A.   I didn't know that.

8       Q.   And how do you feel about having an individual

9   like that representing you on this objection?  Does it

10  make you think twice about --

11           MR. DODSON:  All right.  At this time

12  we're terminating this line of inquiry as being outside

13  the scope of examination as we understand the judge

14  allowed.  And do not answer.

15           MR. GAUGHAN:  Okay.  And we obviously

16  disagree on that, but...

17           MR. LONGER:  It may become a point of

18  motions practice with the court.

19      Q.   And I guess I presented to you earlier was

20  it -- I think it's Exhibit 27, which is answers to

21  interrogatories.  And we looked a little bit at the

22  interrogatories earlier which were Exhibit 26 and we

23  went through a few of those.  But I want to ask you:

24  Did you -- do you have a recollection of going through

25  this request for documents and looking for documents

1    that were responsive to this request for documents?

2        A.    Are you saying looking for documents, for --

3        Q.    Yeah.  Was there a point in time when you were

4    given a copy of plaintiff's request for production of

5    documents to yourself and your company and you were

6    looking for those documents?

7        A.    Yes.  I just -- I got tied up doing what I was

8    doing an didn't have time to look for them.

9        Q.    When was this?

10       A.    What's that?  When they -- when you-all

11   requested that or when --

12       Q.    Can you give me a point in time?

13       A.    What's that?  Some time last week.

14       Q.    Last week, not -- not before October 18, 2012

15   when your counsel filed these answers to our request

16   for production of documents?

17       A.    I didn't.

18                 (Exhibit No. 29 was marked.)

19       Q.    I'm going to show you what's been marked as

20   Exhibit 29.  Have you seen this document before?

21       A.    Yes, sir.

22       Q.    When did you -- when did you see this

23   document?

24       A.    I think it was on the 28th of September.  What

25   are we, October?

1    Q.    Well, this is actually, I think we looked

2  earlier at your retainer agreement with Mr. Bandas.

3  This is a different document.  And it looks like -- I

4  don't see a day in there but it looks like it's from

5  October 2012 at some point.  Do you see at the bottom

6  right above your signature?

7    A.    This one doesn't have a date, but it's October

8  12.

9    Q.    October --

10    A.    October 2012.

11    Q.    At some point in October, correct?

12    A.    Yes, sir.

13    Q.    Okay.  Do you remember receiving this

14  document?

15    A.    I signed it.

16    Q.    Do you remember when you signed it?

17    A.    In October some time.

18    Q.    Okay.  Well, let me ask you this question.  In

19  preparing for today's deposition, who did you -- who

20  did you meet with, if anyone?

21    A.    To prepare for it?

22    Q.    Yeah.

23    A.    Mr. Van Huseman.

24    Q.    And when exactly was that?

25    A.    When was that?

1    Q.    Yeah.

2    A.    About a week ago.

3    Q.    Okay.  And had you signed this agreement

4 before you met with Mr. Van Huseman?

5    A.    Sir?

6    Q.    Had you signed this agreement before you met

7 with Mr. Van Huseman?

8    A.    Yes, sir.

9    Q.    Okay.  So that was about a week ago?

10    A.    (Witness moves his head up and down.)

11    Q.    Did you sign it when you were at that meeting

12 or before?

13    A.    What's that again?

14    Q.    Did you sign this document, Exhibit 29 before

15 or after the meeting, I guess?  We'll start there.

16    A.    That was before the meeting.

17    Q.    Did you bring it with you to the meeting to

18 give to Mr. Huseman?

19    A.    No, I was running a little late and I didn't

20 bring it to him.

21    Q.    Did you give it to Mr. Bandas?

22    A.    Yes, sir.

23    Q.    Did you stop by his office to drop it off or

24 did you mail it to him?

25    A.    Yes, sir.

```
 1        Q.    Which one was it?

 2        A.    I dropped it off.

 3        Q.    Okay.  When you were actual prepping for

 4   today's deposition, was there -- who was present during

 5   that at that meeting?

 6        A.    Mr. Van and Mr. Paul.

 7        Q.    Okay.

 8        A.    And there was somebody else.  Eric.  Eric.

 9        Q.    Was Mr. Soto also present at that meeting?

10        A.    One meeting, yes, sir.

11        Q.    You had more than one meeting?

12        A.    Yes, sir.

13        Q.    So you met last week and when was the other

14   meeting?

15        A.    This week.

16        Q.    Okay.  And so Mr. Soto was present during this

17   more recent meeting?

18        A.    Yes, sir.

19        Q.    Okay.  And did you take any notes during that

20   meeting?

21        A.    Sir in.

22        Q.    Did you take any notes?

23        A.    Not really.

24        Q.    Not really?

25        A.    I scribbled some stuff down.
```

 1      Q.    And do you have those notes somewhere in your

 2  possession?

 3      A.    I don't have them with me.

 4      Q.    What happened to them?

 5      A.    Huh?

 6      Q.    What happened to those notes?

 7      A.    They told me not to bring any notes in.

 8      Q.    Okay.  Well, do you have them at home?

 9      A.    Sir?

10      Q.    Do you have those notes at home?

11      A.    Yes, sir.

12      Q.    Did you review them before today's deposition?

13      A.    Well, actually, just what was here pretty

14  much.

15      Q.    That's your notes?

16      A.    No.  That's just the stuff that I need to know

17  about.

18      Q.    Okay.  So I guess what I'm trying to ask is

19  before you came in today, did you look at those notes

20  at any point?

21      A.    I reviewed them a little bit just to be aware

22  of what you-all are going to be telling me.

23      Q.    Did they refresh your recollection or your

24  memory before you came in today's deposition?

25      A.    Not really.

1        Q.     Why did you look at the notes?

2        A.     What's that?

3        Q.     Why did you look at the notes?

4        A.     Just to try to be calm.  They said try to be

5   calm and just take my time in answering questions.

6   What are you getting at?

7        Q.     I'm just trying to ask if you looked at them

8   before today to refresh your memory?

9        A.     I don't take good notes.  I don't.  He's

10  smiling over there.  I don't know why.

11       Q.     Okay.

12              MR. LONGER:  Would you object to producing

13  those notes to us?

14              MR. DODSON:  Yes.

15       A.     Why do you need notes for?

16              MR. LONGER:  As bad as the notes are,

17  would you object to their production.

18              MR. DODSON:  We do object to them.  This

19  is not proper method for asking for production.

20       Q.     So we just established your counsel would

21  object to the production.  I'll move on now.

22              So is it your understanding that counsel

23  appearing today here are actually representing you?

24       A.     At this time, yes, sir.

25       Q.     And what's your understanding of the scope of

ROUGH DRAFT TRANSCRIPT ONLY

1    that representation?

2    A.   Just like what he just did right now.

3    Q.   So is it -- is this a representation that you

4    believe is in going to be ongoing after we complete

5    this deposition?

6    A.   I can't tell -- I can't say if it is or not.

7    I don't know.

8    Q.   Okay.  Did you review this agreement?

9    A.   This agreement?

10    Q.   Yeah. .  Specifically paragraph 3.

11    A.   3.  Now I have.

12    Q.   And so is it your understanding based on

13    what's in this paragraph that Mr. Van Huseman is

14    present here today to represent you solely in

15    connection with today's deposition?

16    A.   Is that what that says?

17    Q.   Is that -- I'm asking.

18    A.   This says defending any deposition.

19    Q.   Well, you've only been -- this is the only

20    deposition that's been noticed of you so far, correct?

21    A.   Yes, sir.

22    Q.   And unless we notice another deposition and

23    get that deposition, is it your understanding based on

24    this paragraph that that's the end of the

25    representation after today by Mr. Van Huseman?

1     A.    I guess.  I'm not too -- I mean, to me it's

2    just, you know -- I don't know.  It's up to my

3    attorney, I guess, if he wants to -- if we're going to

4    do another deposition or not.

5     Q.    I guess what I'm trying to get is you don't

6    understand or appreciate the scope of the

7    representation?

8     A.    What do you mean appreciate?  I'm glad they're

9    here.  That's the truth.

10                MR. HUSEMAN:  No, I'm the one that says

11    thank you.

12     Q.    So I guess so do you appreciate that they're

13    going to be representing you in pursuing your drywall

14    claims after today, Mr. Van Huseman?

15     A.    Sure.

16     Q.    Okay.  That's your understanding that they

17    represent you going forward?

18     A.    (Witness moves his head up and down.)

19     Q.    Yes?

20     A.    Yes, sir.  It actual says that on-line 4.

21     Q.    What does it say on-line 4?

22     A.    It says van Huseman will represent --

23    undertakes the limits to what is described in four

24    coined paragraphs.

25     Q.    So what does that mean to you?

1      A.    That they'll represent me.

2      Q.    So the limited part that doesn't --

3      A.    I don't see limit part.

4      Q.    The scope of the representation undertake --

5  that Huseman under takes is limited to what is

6  described in the foregoing paragraph?

7      A.    Yeah.

8      Q.    So you read that to mean that they're

9  representing you going forward?

10     A.    I would think going forward.

11     Q.    Okay.

12     A.    Forward going.

13     Q.    And let me ask you a question.  Did you have

14  any sort of concern about potential long-term health

15  consequences, stigma to value of your home or damage to

16  your personal reputation before your conversation with

17  Bert Chapa that we talked about earlier with respect to

18  Chinese drywall?  Let me clarify.

19     A.    Now you're saying three things, right?  You

20  said health, home and what else?

21     Q.    And damage to your personal reputation?

22     A.    Oh, my reputation.  Till I talked to -- I

23  always have -- I always have problems with reputation,

24  but --

25     Q.    I'm not sure what that means, but I meant

1    specifically with respect to Chinese drywall.

2        A.    With Chinese drywall?  Well, if it comes up.

3    I mean, if it's having like you're saying these

4    effects, of course.

5        Q.    But before we talked about this conversation

6    you had with Mr. Chapa and what I'm trying to figure

7    out is did you have these concerns before you met with

8    him about Chinese drywall?

9        A.    I never did really think about it.

10       Q.    Okay.  That's what I'm trying to figure out.

11       A.    Okay.

12       Q.    And we talked about your -- I believe it was

13   two meetings you had with Mr. Van Huseman.  How many

14   total meetings did you have with Mr. Bandas regarding

15   Chinese drywall?  I'll expand that to telephone calls

16   as well.  I'll break it down.  We'll start with

17   meetings, actual physical meetings where you met in

18   person.

19       A.    I think two.  And two phone calls.

20       Q.    So the 27th and 28th which we talked about

21   before where you met him initially and then you went in

22   and signed the objection paperwork, those are the first

23   two meetings?

24       A.    No.  I think it was just phone calls first.

25       Q.    Okay.  So you had a phone call on?