```
 1      A.    Yes, sir.
 2      Q.    When was the phone call?
 3      A.    I don't recall.  I don't know if it's two days
 4  before that.
 5      Q.    Okay.  So a couple of days before the 27th?
 6      A.    Yes, sir.
 7      Q.    Who called who?
 8      A.    What's that in.
 9      Q.    Did he call you or did you call?
10      A.    I got his number and I called him and then he
11  called me.  We were playing phone call.
12      Q.    So you initiated the contact?
13      A.    Yes, sir.
14      Q.    So you talked to him on that first occasion.
15  And then did you go meet him or was there another phone
16  call before that.
17      A.    It was another phone call and we set up a time
18  and date.
19      Q.    Is that the same date?  Are we talking about
20  the next day?
21      A.    I want to say -- because I think it was on a
22  weekend and we talked on Sunday and then I think I came
23  in on a Monday and talked to him or something like
24  that.
25      Q.    Okay.
```

```
1    A.    But you know, I can't be definite.
2    Q.    And by the time you went in and signed the
3  retainer agreement on the 28th, was it your
4  understanding at that point that you were going to
5  pursue an objection to the settlement?
6    A.    Yeah, we explained about what we were doing.
7         MR. HUSEMAN:  Let's not talk about what
8  you and Chris talked about.
9         THE WITNESS:  No, that's it.
10   Q.    I don't want to know what you talked about.  I
11 just want to know your understanding when you were
12 going in to sign the retainer agreement is you were
13 going to do an objection, correct?
14   A.    Correct.
15   Q.    Okay.  And so the two meetings that were in
16 person were on the 27th and 28th?
17   A.    I'd have to see a calendar, but...
18   Q.    Do you have it on your phone or something?
19 Does that help?
20   A.    Yeah, let me look it up real quick.  Because I
21 think -- I'm thinking the 28th is like on a -- what was
22 it?  September, right?
23   Q.    Yeah.
24   A.    September.  See, September -- oh, no, it was
25 October.  See, because it was -- September was on a
```

```
 1   Friday, so like I said, I think I talked to him -- I
 2   went and seen him on Thursday and then we organized
 3   that and met again on Sunday -- on the 28th.
 4       Q.   And I guess were how long were both meetings
 5   starting with the Thursday meeting?
 6       A.   I would want to say like maybe 30 minutes to
 7   an hour.
 8       Q.   Okay.  And then when you met on the 28th was
 9   that similar duration?
10       A.   Yes, sir.
11       Q.   Longer or shorter?
12       A.   Give or take.
13       Q.   And I gather from today's testimony that you
14   don't really know much about the terms of the
15   settlement itself; is that fair to say?
16       A.   Yes, sir.
17       Q.   Okay.  And would you agree that your objection
18   is really at the behest of Mr. Bandas?
19       A.   I don't really -- I can't really tell you.
20       Q.   You don't know?
21       A.   No, sir.
22       Q.   So is your intention to object?  You yourself
23   came up with the idea?  It was your idea to object?
24       A.   Oh, he -- we just talked about it.  He did all
25   the objections and everything.  Is that fair to say.
```

```
 1      Q.   I guess I'm asking you?
 2      A.   We talked with that.
 3           MR. HUSEMAN:  Let's not talk about what we
 4  talk about with our lawyer.  I keep coming back to that
 5  and we keep having to come back to that.
 6           MR. GAUGHAN:  Some clients are different
 7  than others, right?
 8      Q.   I guess what I'm really trying to figure out
 9  is you didn't at any point go in there and say, hey, I
10  want to object to this settlement, I came up with this
11  idea to object, I want to object?
12      A.   Yeah, it was my idea.
13           MR. HUSEMAN:  See, that's going into
14  things he talked to Chris Bandas about and I'm going to
15  ask him not to testify to those things.
16      Q.   Before you met or talked with Mr. Bandas, did
17  you have an intention to object to the settlement
18  agreement?
19      A.   Before I met -- before I went to go talk to
20  him?
21      Q.   Before you talked to him on the phone or met
22  with him in person?
23      A.   Well, we talked.
24      Q.   Again, I don't want you to talk about what you
25  talked about, but --
```

```
 1      A.    Well, you know, it was just, you know, have I
 2   ever seen this product.  I've seen it.
 3      Q.    So you had no intention of objecting at that
 4   point this time before you actually met with him or
 5   talked to him on the phone?  Do you not understand my
 6   question?
 7      A.    I didn't have that -- what was that again?
 8      Q.    Okay.  Before you spoke with Mr. Bandas on the
 9   phone or met with him in person, you had no intention
10   of objecting to this settlement, did you?
11      A.    No, I didn't.
12      Q.    Can you tell me anything about the settlement?
13      A.    No, sir.
14      Q.    And I guess I'll ask this.  Did you have an
15   understanding that at any time that you had an option
16   of opting out of the settlement as opposed to objecting
17   to it?
18      A.    No, sir.
19      Q.    Do you know what opting out is?
20      A.    Getting out of it.
21      Q.    Okay.  So you wouldn't be bound -- if you
22   opted out you wouldn't be bound by the settlement?
23      A.    What's that?
24      Q.    So you're saying you're getting out of the
25   settlement if you opt out and I'm just trying to
```

1  clarify.  By that, do you mean that you wouldn't be
2  bound by the settlement?
3     A.   Repeat it again.
4     Q.   All right.  Did it ever --
5     A.   You said something about opting out.
6     Q.   Opting out, yeah.  That's some of the jargon
7  if you read the notice.  There was a couple of options
8  you would have.  One is you can do nothing and if you
9  do nothing, that means you would be bound by the
10 settlement and you would participate in any benefits
11 that might be available to you under the settlement.
12 Option number 2 you opt out which means you would not
13 receive any benefits from the settlement but you also
14 would not be bound by it, meaning you could pursue
15 claims against Home Depot or any other participating
16 defendant and option 3 is what you did, which is
17 objecting to the settlement so you're in effect bound
18 by the settlement but you're raising issues that you
19 think are flawed with the settlement.  Did you
20 understand that you had those options?
21        MR. HUSEMAN:  Well, just a minute.
22 Basically I object to that as a back door attempt to
23 try to invade attorney/client privilege again because
24 you're asking him after discussion with Chris what he
25 understood, which is the same as asking him what Chris

```
 1  told him so don't answer that one.
 2              MR. GAUGHAN:  I completely disagree with
 3  that characterization.
 4              MR. HUSEMAN:  All right.
 5       Q.   I just want to know what he understood?
 6              MR. HUSEMAN:  What he understood what his
 7  lawyer is the same as asking what his lawyer told him
 8  essentially so that's not why we're going to talk about
 9  it.
10              MR. GAUGHAN:  So I can't ask him.
11              MR. HUSEMAN:  You can ask him but I don't
12  want you to ask what his told him.
13       Q.   I don't want you to tell me what Chris told
14  you?
15       A.   You have to talk to my attorney about that
16  part.
17       Q.   I want to understand if you understood you had
18  those three options?
19       A.   Like I said, I would have to get with my
20  attorney to see which way to go.
21       Q.   Okay.  But I take it you didn't understand
22  before today that you had those three options?
23              MR. HUSEMAN:  Well, you're basically
24  trying to find out what Chris told him by that.
25              MR. LONGER:  Privileged objection we don't
```

```
 1  have to have a speaking objection.  You've made your
 2  objection.
 3              MR. HUSEMAN:  Okay.  The objection is --
 4              MR. LONGER:  Answer the question.  Or told
 5  him don't answer.
 6              MR. HUSEMAN:  Are both of you-all doing
 7  this?
 8              MR. GAUGHAN:  I happen agree with what
 9  he's saying.  Are you telling him not to answer?  I
10  just want to know if he understood he had those 3
11  options.
12      A.    I looked them over.
13      Q.    You looked over those 3 options?
14      A.    When I was reviewing it, I did.
15      Q.    Reviewing what?
16      A.    It's in here, in here.
17      Q.    In where?
18      A.    One of these exhibits about the opting out.  I
19  remember seeing it.  Is it -- ain't it in here.
20      Q.    I don't know.
21      A.    That's what I'm saying, you know it more than
22  I did and I know I read something about it when I was
23  reviewing it a little bit.  Yeah, it's got to be in
24  here.  But I think I did see it.  Let me see.  Not that
25  one.  This guy wrote on his, too.
```

```
 1      Q.    All right.  I guess I'm going to ask you a
 2   different question.
 3      A.    It's in here, right?  Because I know I thought
 4   I saw it.
 5      Q.    It may be in one of the other documents you
 6   have.  I didn't give you the notice, the class notice.
 7   Let me ask you this.
 8            Before September 28, 2012, did you review the
 9   notice of the class settlement, anything like that?
10      A.    If I reviewed the class settlement?
11      Q.    No, not the settlement.  There's a notice
12   that's actually something that would be mailed out to
13   known class members and was also available in that
14   website we talked about earlier, which is the
15   ChineseDrywallSettlement.com?
16      A.    No, I didn't.
17      Q.    So you didn't review that notice?
18      A.    No, I didn't.
19      Q.    Okay.  So you didn't understand at that time
20   that you had a right to either opt out, object or
21   participate in the settlement?
22      A.    No, sir.
23      Q.    And because you didn't object or opt out of
24   the settlement, did you understand that you're
25   currently bound by the settlement as approved by the
```

```
 1  court if it is approved?
 2      A.   I'm bound to what?
 3      Q.   If the settlement is approved by the court and
 4  affirmed on appeal you'll be bound by the settlement,
 5  do you understand that?
 6      A.   No, sir.
 7      Q.   Because you didn't object -- or you didn't opt
 8  out.  I'm sorry?
 9      A.   No, sir.
10      Q.   Okay.
11              (Exhibit No. 30 was marked.)
12      Q.   And these are just for the record these are
13  the articles of incorporation of Bay Area contracting &
14  construction, Inc. and I'm just marking these as
15  being -- they were produced today during your -- before
16  your deposition.  Do you recognize these?
17      A.   Yes, sir.
18      Q.   And these are in fact the articles of
19  incorporation?
20      A.   Yes, sir.
21      Q.   For Bay Area contracting?
22      A.   Yes, sir.
23      Q.   Okay.  You can put that aside.
24              (Exhibit No. 31 was marked.)
25      Q.   And these also were produced in advance of
```

 1  today's deposition and these look like documents from
 2  the department of treasury Internal Revenue Service
 3  pertaining to Bay Area contracting and construction,
 4  Inc. and we see the taxpayer ID as 74-2967377.  And
 5  based on these documents, it appears that Bay Area
 6  contracting & construction, I can was set up as an S
 7  corporation, that your appreciation?
 8      A.   Yes, sir.
 9      Q.   And this looks like it calls for the
10  submission of some paperwork.  Did you submit that
11  paperwork?
12      A.   For what?  What was that for?
13      Q.   If you read the first.
14           Graph in if the letter the "in order to make
15  an election of an S corporation, and I'm asking you,
16  you completed and returned that form, to your
17  knowledge?
18      A.   I didn't.  My CPA did.
19      Q.   Okay.  You can put that aside.
20           (Exhibit No. 32 was marked.)
21      Q.   I'm going to also mark this as 32.  This was
22  produced today as well.  And this more or less looks
23  like a certificate of good standing dated October 30,
24  2003 from the Texas comptroller of public accounts.  Is
25  that what this in fact is, to your knowledge?

```
 1      A.    Yes, sir.
 2      Q.    Okay.  You can put that aside.
 3      A.    I didn't know I brought all this stuff.
 4            MR. GAUGHAN:  I'm going to go off the
 5   record, I think.
 6            THE VIDEOGRAPHER:  Going off the record at
 7   5:39.
 8            (A recess was taken.)
 9            THE VIDEOGRAPHER:  We're back on the
10   record at 5:49.
11      Q.    Mr. Garcia, I don't have --
12            MR. HUSEMAN:  If we had other really good
13   videographer.
14            MR. GAUGHAN:  Mr. Garcia, this concludes
15   our deposition.  I have though further questions
16   subject to a motion we will be filing obviously seeking
17   to pursue some additional areas of inquiry that your
18   counsel objected to today.  So it's possible we will be
19   back here to continue this deposition.  But at this
20   time, I have no further questions for you.  So thank
21   you for your time.
22                      EXAMINATION
23   BY Mr. Huseman:
24      Q.    I want to break tradition and ask you a
25   question or two on our behalf and I want to direct your
```

1  attention back to the series of questions that was
2  asked by opposing counsel concerning the details of the
3  objection and the legal basis for -- remember
4  discussions of Lone Star and mega fund and those types
5  of things?
6      A.   Yes, sir.
7      Q.   And the various definitions of the class and
8  such as that. Did you make personally any decisions as
9  to what would be the nature of the objection or what
10 objections to make or which ones were legally viable?
11         MR. GAUGHAN:  Objection, form.
12     Q.   Go ahead and answer it.
13     A.   No, sir, I let my legal counsel do that.
14     Q.   All right. And I'm asking you these questions
15 because the judge and his briefing clerks will probably
16 read some of this and I don't want things to be taken
17 out of context to say that you don't mean these things.
18         In terms of making decisions, what objections
19 are legally viable, supported by the facts, and are
20 appropriate, is that a decision that you personally
21 made or is that one that you delegated to your retained
22 lawyers?
23         MR. GAUGHAN:  Objection to form. You can
24 answer.
25     A.   I let my legal attorney set all the

```
 1  objections.
 2      Q.   And I thank you for struggling through those,
 3  trying to read those and trying to figure out what they
 4  meant, but did you understand what all the objections
 5  meant and what the implications were?
 6           MR. GAUGHAN:  Object, form.
 7      A.   No, sir.
 8      Q.   Okay.  All right.  Thank you very much,
 9  Mr. Garcia:
10           MR. LONGER:  Before we actually go off the
11  record, what we talked about with your cocounsel --
12  your partner, I'm sorry is we will have these documents
13  that are in Exhibit.
14           MR. GAUGHAN:  11 through 25.
15           MR. LONGER:  11 through 25, they were
16  marked for identification, I would ask you to -- we had
17  talked about having an outside vendor reproduce these
18  documents.
19           MR. HUSEMAN:  We can do that.
20           MR. LONGER:  Because it seems to me it's
21  so voluminous that it makes the most sense.
22           MR. HUSEMAN:  I think it does I'm in
23  agreement with you.
24           MR. LONGER:  And then we would also ask
25  that you identify and cull down from that what is
```

1  relevant and what is not.
2              MR. HUSEMAN:  As I told you yesterday with
3  regard to Mr. Soto, I have now conferred with Chris
4  Bandas, called him and told him that I had a job for
5  him, and he said he would do it, so I think you're -- I
6  think both of your wishes are granted on this one.
7              MR. LONGER:  Very good.  All right.  Well,
8  thank you.  Thank you for your time.
9              THE VIDEOGRAPHER:  Off the record at 5:52.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25