# Exhibit 1

# Index of Objections

| Objector(s) | Objection | Page No. and FN |
|---|---|---|
| Bolden, Thomas A. and Smith, Monica | "We would submit to the Court that it would be appropriate to include pre-remediation repair expenses (such as HVAC, Appliances etc) in the Other Loss Fund (Section 4.7.4.) so that they could submit copies of their receipts and be properly compensated for the losses they have incurred as a result of the drywall." (¶5) "Section 4.7 allows property owners and tenants to receive its pro rata share of the other loss fund as determined by certain procedures. This section allows for the recovery of pre-remediation alternative living expenses, however it excludes personal property damage. It is our belief that the personal property damage was meant to cover the losses of peoples coffee pots, televisions, computers and other small appliances, which individually would not amount to a significant sum of money. In this case, someone's air conditioning unit is a necessity in order to occupy the home, especially in the southern summer months." (¶6) "An air condition unit and its components should be treated in much the same way alternative living expenses since if the unit was not fixed, the Panneton's would have had to find another place to live. However, given their duty to mitigate their damages, they chose, what they believed to be the more inexpensive solution and repair their air conditioning unit instead." (¶7) "Claimants would submit to the Court that it would be simple to include a section on the Other Loss claim form to include losses such as the one stated above and that claimants should not be punished and not made whole because they chose to repair their unit instead of relocating." (¶8) | pp.7-10 & n.25 |
| | "Second, Claimants object in that the warranty period should be longer than one year. The one year starts to run as of substantial completion to the home, however, punch list items have taken longer to finish and by the time they are complete, the warranty period has already been in affect for several months. Claimaints as that either the warranty period be extended or that warranty provision does not start to run until the punchlist items for the house are complete." (¶9) | pp.7-10 & n.30 |
| | "Third, claimants object to the arbitrary decision to pay additional move-out costs when a home is larger than 3500 sq.ft. Section 4.3.1.1 of Settlement Agreement dictates that a home under 3500 sq.ft. is paid a sum of $8.50 per 'under air' square footage while a home greater than 3500 sq.ft. is paid $10.00 per 'under air' square footage. Claimant suggest to this court that all participants in this settlement should be paid $10.00 per 'under air' square foot." (¶10) | pp.7-10 & n.25 |

| Objector(s) | Objection | Page No. and FN |
|---|---|---|
| Friedlander, Gregory | "Comes now Gregory Friedlander, pro se, and files this limited objection based on fairness alleging there are interpretations, not changes, required in fairness which should be made to the settlement which cause no harm, no additional work, no additional cost and no significant modification of other provisions in the agreement. ... The interpretation or change is to allow the self remediation payment to go (1) First to removal of the Sheetrock and affected materials and (2) then the balance under a contractor's estimate to a bank to pay off the debt on the properties in question or to the owner." (¶¶1, 1(1)) | pp. 7-10 & n.33 |
| Kinler, Gerard | "The Kinler's concern in that by just taking into acount the 'under air' square footage of their home will not properly compensate them for all the moving expenses they experienced in moving the family back to Prairieville, Louisiana.  In addition to having moving expenses, Mr. Kinler, a school teacher, had to secure a new job as he could not live in Louisiana and teach in Florida.  As a result of the cuts in their household income, the Kinlers eventually lost their dream home to foreclosure.  In addition to losing their home, as a result of having to move back to Louisiana, Mr. Kinler lost his retirement that he had been accumulating since 2005 because he did not have enough time in the Florida School System to be vested."<br>"The Kinlers would ask this Court to allow claimants with extraordinary moving expenses or other expenses related to drywall, to apply the Other Loss Claim seciton of the settlement for additional compensation under section 4.7 of the settlement." (¶¶ 6-7) | pp.7-10 & n.25 |
|  | "In addition, the Kinlers object to having to decide to stay in or opt out with-out fully being informed of what they would receive for their lost equity in their home.  The home was purchased for $350,000, however prior to the foreclosure, the Kinlers upgraded many aspects of their home including landscaping, private drives, and crown molding, etc.  What time frame is going to be considered for the value of the home to determine equity?  As more and more Florida homes were found to have drywall, including entire subdivisions like the Kinlers, the home values plummeted." (¶ 8) | pp.10-11 & n.39 |

| Objector(s) | Objection | Page No. and FN |
|---|---|---|
| Panneton, Ovila C. and Ruth | "Claimant has incurred an estimated $5488.00 (Exhibit A) just in repairs to his air conditioning unit in his home.  If this expense is taken from his Lump Sum Payment, claimant may not be fully compensated for his expenses related to alternative living expenses and moving costs.  The lump sum payment would also go toward compensating Mr. and Mrs. Panneton for their destroyed electronics.  Mr. and Mrs. Panneton have replaced their condenser coils seven times as well as replace the outside compressor and air handlers." (¶5)<br>"We would submit to the Court that it would be appropriate to include these types of expenses in the Other Loss Fund (Section 4.7.4) so that they could submit copies of their receipts and be properly compensated for the losses they have incurred as a result of the drywall." (¶6)<br>"Section 4.7 allows property owners and tenants to receive its pro rata share of the other loss fund as determined by certain procedures.  This section allows for the recovery of pre-remediation alternative living expenses, however it excludes personal property damage.  It is our belief that the personal property damage was meant to cover the losses of peoples coffee pots, televisions, computers and other small appliances, which individually would not amount to a significant sum of money.  In this case, someone's air conditioning unit is a necessity in order to occupy the home, especially in the southern summer months." (¶7)<br>"An air condition unit and its components should be treated in much the same way alternative living expenses since if the unit is not fixed, the Panneton's would have had to find another place to live.  However, given their duty to mitigate their damages, they chose, what they believed to be the more inexpensive solution and repair their air conditioning unit instead." (¶8)<br>"Claimants would submit to the Court that it would be simple to include a section on the Other Loss claim form to include losses such as the one state above and that claimants such as the Pannetons should not be punished and not made whole because they chose to repair their unit instead of relocating." (¶10) | pp.7-10 & n.25 |

4

| Objector(s) | Objection | Page No. and FN |
|---|---|---|
| Perry Homes, LLC | "Perry Homes has direct claims against the Knauf Defendants and Other Releasees in the Knauf Settlement, and is also the assignee of all claims, except personal injury claims, of thirteen homeowners whose homes have been determined to contain Knauf Tianjin ('KPT') drywall board." (¶ 4)<br>"Perry Homes objects to Section 12.2.2 of the Knauf Settlement." (¶ 8)<br>"Concurrent with the service of this notice of intention to object, Perry Homes timely and properly served its notice of opt-out of the Knauf Settlement to the extent that any of Perry Homes' claims qualify Perry Homes as a Class Member.  It is Perry Homes' interpretation of Section 12.2.2 that because each of the thirteen homeowners assigned all of their claims, except personal injury claims, to Perry Homes, any homeowner that would qualify as a 'Class member' is not a 'Participating Class Member' with respect to those assigned claims.  Thus, Section 12.2.2 would not bar Perry Homes, as assignee, from asserting a claim for contribution, indemnification or subrogation against the Knauf Defendants and Other Releasees.  Furthermore, Section 12.2.2 would not bar Perry Homes from asserting an independent claim for contribution, indemnification or subrogation against the Knauf Defendants and Other Releasees." (¶ 9)<br>"If Perry Homes' interpretation of Section 12.2.2 is correct with respect to the thirteen homeowners, Perry Homes will withdraw its objection to the Knauf Settlement." (¶ 10) | pp.11-12 & nn.45, 46 |
| | "Perry Homes would also object to Section 12.2.2 to the extent that any homeowner listed on Exhibit 'B,' and that is not duplicative of the thirteen homeowners on Exhibit 'A,' fails to opt out of the Knauf Settlement and then subsequently seeks remediation from Perry Homes, Perry Homes would object to Section 12.2.2 as Perry Homes' right to seek contribution, indemnification and subrogation from the Knauf Defendants for those homes is covered by Perry Homes' agreement with Knauf." (¶ 10) | pp.11-12 & nn.45, 46 |
| Sekellick, Therese | "There were three tests performed in our building in 2009 and 2011 I was told the result for my condo were 'inconclusive.  Then after Jan 10 the remediation committee did a new inspection and decided I do not have it.  Two out of three tests were inconclusive.  But now I am told I will not be compensated for anything since I don't have CDW.  How can I be assured that if my A/C broke it is not because of the CDW." (¶1) | pp.7-10 & n.28 |

| Objector(s) | Objection | Page No. and FN |
|---|---|---|
| | "I bought my condo as an investment to be rented. (I have an exchange 1031 drawn out for the settlement). I bought it for $347,000 now it is assessed for $67,000. I rented it the first year from May 2008 to May 2009. Then we found out about the CDW and was unable also afraid to rent it. (After finding out about the CDW, the previous renter, called to say he will seek legal advice since his son was visiting on weekend). I have a lot of lost rent that will not be compensated by the resolution." (¶2) | pp.7-10 & n.28 |
| | "The Banner settlement assign the defendants benefits to the Knauf Defendants and the proceed will be deposited into the Remediation Fund. Since I am not getting any of the Remediation Fund. Why is it that I still have to pay legal fees for Banner. I was told by the association in our building that I still have to pay my share of the legal fees even if I opt out." (¶3) | pp.13-14 & n.52 |
| Willis, John and Lori | "Any cap on Knauf's responsibility to the 'Other Loss Fund' pursuant to Section 4.6.4." (¶ 1(a)) | pp.7-10 & n.27 |
| | "The contribution of any funds derived from the Banner Class Settlement into the Remediation Fund to offset responsibility of Knauf and, thus, diverting funds from the 'Other Loss Fund' before every Approved Claim is fully paid." (¶ 1(b)) | pp.7-10 & n.26 |
| | "Section 4.2.3 and Section 4.6.3 providing for contribution of any funds derived from the Insurer Class Settlement and settlements with Excluded Releasees into the Remediation Fund to offset any responsibility of Knauf and, thus, diverting funds from the 'Other Loss Fund before every Approved Claim is fully paid." (¶ 1(c)) | pp.7-10 & n.26 |
| | "Section 4.25 permits a refund of dollars from the Remediation Fund, rather than contributing those funds to the 'Other Loss Fund' without regard to whether or not there has been a pro rata reduction in claims pursuant to Section 4.7.4.5. As a result, 'Other Loss Fund' plaintiffs could have their valid Approved Claim reduced in pro rate fashion because there are insufficient funds in the 'Other Loss Fund', while Knauf could be receiving millions of dollars in refund from Insurer Class Settlement, Banner Class Settlement, and/or other Excluded Releasees. This is particularly unfair where the only recovery for some claimants may be from those specific funds." (¶ 2) | pp.7-10 & n.27 |
| | "Section 4.2.5 permits refund of Remediation Funds to Knauf defendants after ALL 'Participating Owner Class Members' have been compensated. However, there is NO definition of 'Participating Owner Class Members.' Persistently throughout the agreement there are conflicts between such definitions. ... Without a definition of 'Participating Owner Class Members,' the refund provision is vague and unenforceable." (¶ 3) | p.13 & n.50 |

| Objector(s) | Objection | Page No. and FN |
|---|---|---|
| | "Section 4.7.4.4.1 mandates that the 'Special Master reduce any Approved Claim by any amount that was or could have been reimbursed of the Other Loss under the Class Member's insurance policy.' As written, there are a number of infirmities.<br>(a) Since Insurer Class Settlement permits for 'Other Loss' claims, application of this provision would nullify the resulting award since every dollar is potentially coming from the Class Member's insurance policy.<br>(b) There is no disclosure as to what insurance policy amount has been implicated by claimant in this settlement to evaluate a class member's exposure or risk of reduction.<br>(c) The reduction predicated on what 'could have been' reimbursed in unenforceable and vague. Who determines whether or not the claim 'could have been reimbursed' and under what standard? A trial court determination? A court of appeals? The argument of Knauf counsel, or some other counsel? What is the amount that 'could have been reimbursed'? The policy limits? An amount discounted for difficulties surrounding the litigation? Applying what state's law is to determine the amount which 'could have been reimbursed'?" (¶ 4) | pp.7-10 & n.32 |
| | "Imposition of arbitrary threshold percentage (Section 1.28 and stated therein elsewhere) to qualify for Knauf settlement funds pursuant to Section 4.7.1.4." (¶ 5) | pp.12-13 & n.48 |
| | "Lack of any validated information or meaningful representation by the parties providing guidance or estimate as to the range or expected recovery for claims pursuant to Section 4.7.1.4." (¶ 6) | pp.10-11 & n.39 |
| | "Requirement for an expert report pursuant to Section 4.7.1.4.2(k): (i) there is no known expert specialty identified which could qualify; (ii) the expenses of such are not reimbursable." (¶ 7) | pp.7-10 & n.29 |
| | "Section 4.7.1.4 appears to prohibit Plaintiffs from seeking 'Pre-remediation Alternative Living Expenses' pursuant to 4.7.1.1. The ability to seek 'Lump Sum' as part of the 'Lost Equity' calculation does not end the analysis where other homeowners who receive 'Lump Sum' are permitted to seek Section 4.7.1.4 recovery. Due t the persistent health and respiratory issues involving their minor son, Brannon, Plaintiffs moved out of their home approximately 45 days after learning of the existence of reactive drywall. Their home was sold as part of the effort to mitigate losses 15 months later. During that time, they sustained significant damages. If Plaintiffs had remediated, they would have qualified for damages under Section 4.7.1.1. The disparate treatment of homeowners who sustained the same damages for the same reasons is unfair." (¶ 8) | pp.7-10 & n.29 |

7

| Objector(s) | Objection | Page No. and FN |
|---|---|---|
| | "Lack of any validated information or meaningful representation by the parties providing guidance or estimate as to the range or expected recovery for claims made against the Insurer Class Settlement, and the unfairness of the allocation." (¶ 9) | pp.10-11 & n.39 |
| | "Section 1.19 (Individual Participating Class Member Costs) and Section 14.1 conflict in defining recovery of allowable expenses and violates the constitutional right to contract. Section 1.19 defines 'Individual Participating Class Member Costs' as 'those costs reasonably incurred by a Participating Class Member in connection with the prosecution of a claim relating to an Affected Property.' Such reasonable costs should include those incurred by counsel including inspection, photocopies, facsimile, postage/overnight mail, travel/mileage, filing fees, etc. However, Section 14.1 limits recovery of these incurred expenses in connection with the prosecution of the claim to only 'reasonable inspection costs.' There is no basis to restrict such recovery or to interfere with Bar approved contracts providing for recovery of additional costs." (¶ 10) | N/A |
| | "Any cap on Knauf's responsibility to the 'Other Loss Fund' pursuant to Section 4.6.4." (¶ 11(a)) | pp.7-10 & n.27 |
| | "The contribution of any funds derived from the Banner Class Settlement into the Remediation Fund to offset responsibility of Knauf and, thus, diverting funds from the 'Other Loss Fund'." (¶ 11(b)) | pp.7-10 & n.26 |
| | "The contribution of any funds derived from the Insurer Class Settlement into the Remediation Fund pursuant to Section 4.6.3 to offset any responsibility of Knauf and, thus, diverting funds from the 'Other Loss Fund.'" (¶ 11(c)) | pp.7-10 & n.26 |
| | "Lack of any validated information or representation by the parties providing guidance as to the range of expected recovery for claims pursuant to Section 4.7.2." (¶ 11(d)) | pp.10-11 & n.39 |
| | "Sections 4.7.2.3.1. and 4.7.2.7. prohibit any fee or cost recovery for the Plaintiff, even if they prevail on their claim. Instead, because Knauf has the right to contest the claim (see Section 4.7.2.6), Knauf's disparate economic power unfairly places an undue burden on Plaintiffs without the possibility for recovery of valid costs of collection of records, putting forward an expert, and the process of submitting the claim. However, all other Plaintiffs are permitted to recover attorneys fees and costs in some manner. Therefore, this settlement inappropriately and arbitrarily discriminates against bodily injury plaintiffs." (¶ 11(e)) | pp.7-10 & n.29 |

| Objector(s) | Objection | Page No. and FN |
|---|---|---|
| | "Sections 4.7.2.3(a) and 4.7.2.3(b) require a certification that ALL pharmacies and medical providers since January 2005 sign a certification that all records are produced. First, there is no explanation as to what certification is expected or how Plaintiffs could even force such a 'certification'. Second, there is no 'best effort' requirement; instead, this provision as written suggests the failure to obtain a single certification could act as a bar to recovery. Third, there is a conflict in the language between pharmacies and healthcare providers where the certification for pharmacies is that the 'production is complete' and for healthcare providers 'all such records in the custody, possession or control of the healthcare provider have been produced'. There is no explanation or logical reason for the different treatment." (¶ 11(f)) | pp.7-10 & n.31 |
| | "Requirement for any expert report pursuant to Section 4.7.2.5: (i) there is no known expert specialty identified which could qualify; (ii) the costs of such are not reimbursable." (¶ 11(g)) | pp.7-10 & n.31 |
| | "Section 4.7.2.2. requirement for a 'contemporaneous diagnosis by the treating physician that the alleged injury was caused by KPT Chinese Drywall', imposing two impossible threshold standards: (i) 'contemporaneous', meaning at the time of the first complaint or, alternatively, the term is irreparably vague; (ii) requiring a 'treating physician' to diagnosis the injury was caused not just by reactive drywall in general, but specifically by 'KPT drywall' and associating with 'KPT drywall' 'contemporaneous' with the initial diagnosis." (¶ 11(h)) | pp.7-10 & n.31 |
| | "Lack of any validated information or meaningful representation by the parties providing guidance or estimate as to the range or expected recovery for claims made against the Insurer Class Settlement, and the unfairness of the allocation." (¶ 11(i)) | pp.10-11 & n.39 |