# EXHIBIT  24

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DIVISION OF LOUISIANA
 2
 3   IN RE:  CHINESE-MANUFACTURED    MDL NO. 2047
     DRYWALL PRODUCTS LIABILITY
 4   LITIGATION                      SECTION: L
 5
     THIS DOCUMENT APPLIES TO:
 6   ALL CASES AND
 7   Payton, et al., v. Knauf Gips, KG, et al.
     Case No. 2:09-cv-07628 (E.D. La.)
 8
     Gross, et al., v. Knauf Gips, KG, et al.
 9   Case No. 2:09-cv-06690 (E.D. La.)
10   Rogers, et al., v. Knauf Gips, KG, et al.
     Case No. 2:10-cv-0362 (E.D. La.)
11
     Amato, et al., v. Liberty Mutual Ins. Co.
12   Case No. 2:10-cv-00932 (E.D. La.)
13   Abreu, et al., v. Gebrueder Knauf
     Verwaltungsgesellshaft, KG, et al.
14   Case No. 2:11-cv-00252 (E.D. La.)
15   Block, et al., v. Gebrueder Knauf
     Verwaltungsgesellshaft, KG, et al.
16   Case No. 2:11-cv-1363 (E.D. La.)
17   Arndt, et al., v. Gebrueder Knauf
     Verwaltungsgesellshaft, KG, et al.
18   Case No. 2:11-cv-2349 (E.D. La.)
19   Cassidy, et al., v. Gebrueder Knauf
     Verwaltungsgesellshaft, KG, et al.
20   Case No. 2:11-cv-3023 (E.D. La.)
21   Vickers, et al., v. Knauf Gips, KG, et al.
     Case No. 2:09-cv-04117 (E.D. La.)
22
23                DEPOSITION OF WAYNE KAPLAN
                 DATE TAKEN:  OCTOBER 29, 2012
24
25
```

Confidential - Subject to Further Confidentiality Review

```
 1
 2              CONFIDENTIAL - SUBJECT TO FURTHER
                     CONFIDENTIALITY REVIEW
 3
 4               DEPOSITION OF WAYNE KAPLAN
 5
 6    DATE TAKEN:     OCTOBER 29, 2012
 7    TIME:          9:36 A.M. - 11:03 A.M.
 8    PLACE:         ROBERTS & DURKEE
                     121 ALHAMBRA PLAZA, SUITE 1603
 9                   CORAL GABLES, FLORIDA 33134
10
11        Examination of the witness taken before:
                     Susan D. Wasilewski
12            Registered Professional Reporter
                  Certified Realtime Reporter
13                 Certified CART Provider
14
15
16
17
18
19
20
21
22
23          GOLKOW TECHNOLOGIES, INC.
24     877.370.3377 ph | 917.591.5672 fax
25               deps@golkow.com
```

Confidential - Subject to Further Confidentiality Review

```
 1                    APPEARANCES
 2
    Counsel for Plaintiffs in MDL:
 3
        FREDERICK S. LONGER, ESQUIRE
 4      Levin, Fishbein, Sedran & Berman
        510 Walnut Street, Suite 500
 5      Philadelphia, Pennsylvania 19106-3697
        (215) 592-1500
 6      flonger@lfsblaw.com
 7
 8  Counsel for Certain Banner Supply Entities:
 9      SHUBHRA R. MASHELKAR, ESQUIRE
        Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC
10      3344 Peachtree Road, Suite 2400
        Atlanta, Georgia 30326
11      (404) 591-9663
        smashelkar@wwhgd.com
12
13
    Counsel for Wayne Kaplan:
14
        C. DAVID DURKEE, ESQUIRE
15      Roberts & Durkee, P.A.
        121 Alhambra Plaza, Suite 1603
16      Coral Gables, Florida 33134
        (305) 442-1700
17      durkee@rdlawnet.com
18
        PAUL D. STEVENS, ESQUIRE
19      Milstein Adelman, LLP
        2800 Donald Douglas Loop North
20      Santa Monica, California 90405
        (310) 396-9600
21      pstevens@milsteinadelman.com
22
23
24
25
```

Confidential - Subject to Further Confidentiality Review

```
 1                 APPEARANCES BY TELEPHONE

 2

    Counsel for Various Installers and Builders:

 3

        VALERIE B. GREENBERG, ESQUIRE

 4      Akerman Senterfitt, LLP

        One Southeast Third Avenue, 25th Floor

 5      Miami, Florida 33131

        (305) 374-5600

 6      Valerie.greenberg@akerman.com

 7

 8  Counsel for Various Home Builders:

 9      MARK A. SALKY, ESQUIRE

        Greenberg Traurig, LLP

10      333 Southeast 2nd Avenue, Suite 4400

        Miami, Florida 33131

11      (305) 579-0500

        Salkym@gtlaw.com

12

13

    Counsel for Various Home Builders:

14

        BRIAN A. EVES, ESQUIRE

15      Mintzer, Sarowitz, Zeris, Ledva & Meyers, LLP

        1000 Northwest 57th Court, Suite 300

16      Miami, Florida 33126

        (305) 774-9966

17      BEves@defensecounsel.com

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                    I N D E X

 2   WITNESS                                         PAGE

 3   CALLED BY CLASS COUNSEL IN THE MDL:

 4     WAYNE KAPLAN

 5        DIRECT EXAMINATION BY MR. LONGER...............  6

 6

 7

 8

 9

10

11                  E X H I B I T S

12                                                   PAGE

13   No. 1   Objections to Proposed Settlement of

                Class Action Against Builders,

14              Installers, Suppliers and Participating

                Insurers                                25

15

     No. 2   Wayne Kaplan's Responses to Class

16              Counsel's Interrogatories               47

17   No. 3   Wayne Kaplan's Responses to Class

                Counsel's Requests for Production of

18              Documents                               47

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1              THEREUPON, the following proceedings were had

 2   and taken at 9:36 a.m.:

 3              THE COURT REPORTER:  Do you solemnly swear or

 4       affirm the testimony you're about to give will be

 5       the truth, the whole truth, and nothing but the

 6       truth?

 7              THE WITNESS:  I do.

 8              THE COURT REPORTER:  Thank you.

 9              WAYNE KAPLAN, called as a witness by Class

10   Counsel in the MDL, having been first duly sworn,

11   testified as follows:

12                      DIRECT EXAMINATION

13   BY MR. LONGER:

14       Q.   Good morning, Mr. Kaplan.  I apologize for the

15   delay this morning but we're going to move ahead

16   quickly, I hope, and just ask you some questions and get

17   you out of here.

18              So to begin with, I will be asking you

19   questions.  My name is Fred Longer, we met beforehand.

20   As I ask questions, I'm perfectly capable of asking

21   unintelligible questions.  If you don't understand the

22   question for whatever reason, please let me know.  I'm

23   happy to try to rephrase it so that you do understand

24   it.  Is that okay?

25       A.   Yes, thank you.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   I'm sure you met with your counsel to go over
 2  what a deposition is.  I'm just here to ask you some
 3  questions about an objection you filed in the
 4  multidistrict litigation taking place in the Eastern
 5  District of Louisiana, and along those lines, I have a
 6  number of thoughts and issues that I need to clarify
 7  with you.  Okay?
 8      A.   That's fine.
 9      Q.   The only other thing I would tell you, and
10  you're doing it already very well, is that because this
11  is a transcribed record, you must verbalize your answer.
12      A.   Yes, sir.
13      Q.   Okay.  Have you ever been deposed before?
14      A.   I have.
15      Q.   And you understand the process then?
16      A.   I do.
17      Q.   Very well.  Now, why don't we begin.  Why don't
18  you just give us your full name for the record?
19      A.   Wayne Kaplan.
20      Q.   And what is your address?
21      A.   My residential address?
22      Q.   Yes.
23      A.   17866 Lake Azure Way, Boca Raton, Florida.
24      Q.   And just so that I'm clear, is the Boca Raton
25  address at Lake Azure Way, is that a property that is
```

1  affected with what you contend to be Chinese drywall?

2      A.   It is.

3      Q.   And you currently reside in that home?

4      A.   I do.

5      Q.   What is your vocation, sir?

6      A.   I'm a lawyer.

7      Q.   And congratulations, you really know what a

8  deposition is.

9      A.   I've been to a few.

10     Q.   Okay.  As I appreciate the property that we're

11 now -- is the Lake Azure Way property the only property

12 that you have with Chinese drywall?

13     A.   Yes.

14     Q.   So I'm going to refer to it as your home, if

15 that's okay with you.

16     A.   It's more than okay because it is my home.

17     Q.   Okay.  So you have retained counsel for claims

18 about your home, correct?

19     A.   I have.

20     Q.   And who have you retained as your counsel for

21 claims involving the Chinese drywall in your home?

22     A.   Primarily, Mr. Durkee.

23     Q.   And you prefaced your answer by primarily, so

24 let me ask you, you have other counsel?

25     A.   Whoever he is working with is also my counsel.

Confidential - Subject to Further Confidentiality Review

```
1        Q.   Okay.  Did you sign a retainer agreement with

2   Mr. Durkee?

3        A.   I don't recall but I don't think so.

4        Q.   Did you sign a retainer agreement with anyone

5   he is working with?

6        A.   For certain I had not.

7        Q.   Do you know what the terms of your retention

8   with Mr. Durkee is?

9        A.   Generally.

10        Q.   Can you please tell me what you understand

11   those terms of your contract with Mr. Durkee to be?

12        A.   Privileged, I think that would be privileged,

13   unless my counsel tells me otherwise.

14        Q.   I haven't heard an objection but I don't

15   believe that it is.

16             MR. STEVENS:  Privileged?  I think we can go

17        into the basic terms.

18             MR. LONGER:  A retainer agreement is not

19        privileged, so I don't see why the terms should be.

20        A.   I don't have a retainer agreement, to my

21   knowledge.

22        Q.   Right.  I heard that.  So what do you

23   understand the terms of your contract with your counsel

24   to be?

25        A.   David and I are both working on the case.  I am
```

Confidential - Subject to Further Confidentiality Review

1   cocounsel in the case.  I am the original lawyer who

2   filed the action and we have not decided on an hourly or

3   a percentage.  We have a working relationship on this

4   that we're going to work out the terms.

5       Q.   Okay.  Now, my appreciation is that you

6   retained Mr. Durkee in March of 2011; is that correct?

7       A.   Approximately, yes.

8       Q.   Okay.  Tell me how that came about.  You

9   approached Mr. Durkee?  Tell me how that happened.

10      A.   We were both litigating cases in Palm Beach

11  County.  Mr. Durkee became the plaintiff liaison counsel

12  for Palm Beach County.  I had observed him representing

13  his various clients.  I approached him and said I'm

14  litigating my own case, he and I had been talking, I

15  need someone to try the case because I didn't think it

16  was in my interest to try the case.  He agreed to do so.

17  He wanted to be involved in the case from the point that

18  he would get involved not just for trying the case, and

19  I agreed to that.

20      Q.   Very well.  Would you agree with me that

21  Mr. Durkee owes a duty of loyalty to you as your

22  counsel?

23      A.   Yes.

24      Q.   And I take it that -- well, let me ask it

25  differently.

Confidential - Subject to Further Confidentiality Review

1          Would you also agree that in order to fulfill

2    that promise of loyalty or fidelity, that he must not

3    actively represent clients who have interests adverse to

4    yours?

5          MR. STEVENS:  Calls for speculation.

6     A.   It depends.  Sometimes you can have

7    representation of clients that have adverse interests if

8    there is full disclosure and consent, so I don't think I

9    can answer that question.

10    Q.   All right.  When you retained Mr. Durkee, did

11   you discuss his multiple representations of other

12   clients that might be adverse to your interests?

13    A.   What I discussed with Mr. Durkee, forgive me,

14   respectfully, I'm not going to reveal to you.

15    Q.   All right.  That's fine.  Can you tell me

16   whether you waived any conflict with Mr. Durkee about

17   his multiple representations with his other clients?

18    A.   Again, I believe that would be privileged.

19   What I've done with Mr. Durkee would be privileged and

20   I'm not going to answer that unless I'm directed to do

21   so by my counsel.

22          MR. LONGER:  I haven't heard you object.  I've

23       heard your client object.

24    A.   It is my privilege, as you know.

25    Q.   I fully understand that.  What I was going to

Confidential - Subject to Further Confidentiality Review

1    say is something which I probably should keep my mouth

2    shut.

3        A.    And what I say is with respect, because I think

4    you can tell from the tone of my voice that is

5    respectful to you.

6        Q.    I understand your concerns.  You're not the

7    lawyer here, although you are a lawyer, Mr. Kaplan, I

8    appreciate your concerns, but your counsel have not

9    raised the objection, so I'm going to ask you to answer

10   the question until I hear an objection.

11            MR. STEVENS:  I will object to that, and I do

12       believe that the client, when it comes to

13       attorney-client, can refuse as well and can assert

14       the privilege as well, so to that extent, there

15       is -- it's not inappropriate for Mr. Kaplan to

16       raise.

17       A.    Let me also point out that I actually am

18   counsel of record in the state court action for myself

19   as well.

20       Q.    Very well.  Thank you for informing me of that.

21            So let's take it a different way.  You're

22   counsel in this case, you say you saw Mr. Durkee present

23   himself in court and you decided -- and obviously you

24   saw him representing other clients, correct?

25       A.    That is correct.

Confidential - Subject to Further Confidentiality Review

1       Q.   So you're aware that he has other clients, yes?

2       A.   I am.

3       Q.   And when you were thinking to retain him, you

4    were aware then that there was a possibility that there

5    may be other interests of his clients which could be

6    adverse to yours, correct?

7       A.   I don't know if that's correct.  I don't know

8    if it actually came to my thought process.  I knew he

9    was representing other persons who suffered the effects

10   of Chinese drywall.

11      Q.   Okay.  Now, in connection with the global

12   settlement which -- I'm calling it the global

13   settlement.  Let me ask you.  Are you familiar with the

14   global settlement?

15      A.   I've read it, if we're talking about the same

16   one, with the builders and the subcontractors.

17      Q.   Builders, installers, suppliers, insurers.

18      A.   I have read that, yes.

19      Q.   Okay.

20           MR. STEVENS:  Let me just interject to be

21      clear, that that is the only settlement agreement

22      that you're referring to, is the global settlement,

23      Fred?

24           MR. LONGER:  Yes.

25      Q.   There are five interrelated settlements in the

1    multidistrict litigation taking place before Judge

2    Fallon.  Are you aware of that?

3        A.   I am.

4        Q.   All right.  I mean, I could rattle them off.

5    You have the Knauf settlement, you're familiar with

6    that?

7        A.   I am familiar with that but I've not read it.

8    I know there is a settlement.

9        Q.   Very well.  There is the settlement with Banner

10   Supply.

11       A.   I am aware of that.

12       Q.   There is a settlement with L & W.  Are you

13   familiar with that?

14       A.   I am not.  I know there was five but I did not

15   know that was one of the five.

16       Q.   There is the settlement with INEX,

17   Interior-Exterior Supply Company.

18       A.   I also am not aware of that.

19       Q.   There is the insurance settlement which

20   involves builders, suppliers, installers and insurers,

21   which we refer to and the settlement itself refers to

22   itself as the global settlement, and that's one that

23   you've read and are completely familiar with?

24       A.   Your word is completely familiar.  My word is I

25   read it.

Confidential - Subject to Further Confidentiality Review

1    Q.   Fine.  Fair enough.  And it is that settlement,

2    the global settlement that you have filed an objection

3    to; is that correct?

4    A.   Yes, sir.

5    Q.   All right.  Now, are you aware that Mr. Durkee

6    has clients that are involved in the global settlement,

7    some are participating in it -- actually, let me ask you

8    that way.

9         Are you aware that Mr. Durkee has clients that

10   are participating in the global settlement?

11   A.   Yes.

12   Q.   Are you aware that Mr. Durkee has clients that

13   he has opted out of the global settlement?

14        MR. STEVENS:  Objection; misstates facts.

15        Mr. Durkee -- the clients have opted out exercising

16        their rights under the settlement agreement.

17        Counsel is carrying that out, so I just want to

18        clarify how we are interpreting --

19        MR. LONGER:  I'll restate the question.  That's

20        fair enough.

21   Q.   Are you aware that Mr. Durkee represents

22   clients who have opted out of the global settlement?

23   A.   I think I am.

24   Q.   Are you aware that Mr. Durkee represents you

25   and you have objected to that settlement?

```
 1      A.    I am certainly aware of that, yes, sir.

 2      Q.    Completely aware?

 3      A.    That one I could use the word completely.

 4      Q.    Very well.  So are you aware that the

 5   settlements have language and it has been expressed in

 6   court that opt-outs from these settlements could

 7   jeopardize their going forward?

 8      A.    I am.

 9      Q.    And have you discussed with -- well, no.

10   Strike that.

11            Are you aware that Mr. Durkee is representing

12   clients that are trying to opt out of the settlement

13   and, therefore, could cause the settlement to fail?

14      A.    Yes.

15      Q.    Now, you have objected to the settlement but

16   not opted out of the global settlement, correct?

17      A.    Correct.

18      Q.    So you have your concerns about the settlement

19   but if your objections are not sustained, you will

20   participate in that settlement, correct?

21      A.    Whatever the judge tells me I have to do, I

22   will do.

23      Q.    All right.  And you're aware that your

24   interests then or the interests of Mr. Durkee's other

25   clients who are trying to tank that settlement are
```

Confidential - Subject to Further Confidentiality Review

```
 1   adverse to yours, correct?

 2        MR. STEVENS:  Objection.  Other clients who are

 3        opting out are not attempting to tank anything.  The

 4        settlement agreement provides for such under the --

 5        MR. LONGER:  That's a speaking objection.  I

 6        understand and you can object at that point, but I

 7        don't need to hear any further.

 8        MR. STEVENS:  So let me restate then.  They

 9        aren't attempting to tank, they are simply opting

10        out.

11        MR. SALKY:  Is that an objection to form?  This

12        is Mark Salky.

13        MR. STEVENS:  Yes.

14        MR. SALKY:  Then let's just say objection to

15        form and avoid the speaking objections, please.

16        MR. STEVENS:  I'll object how I see fit,

17        Counsel.  Thank you.

18   BY MR. LONGER:

19        Q.   Mr. Kaplan, I take it you're aware that the

20   interests of Mr. Durkee's other clients who are opting

21   out of the settlement are adverse to yours because they

22   are seeking or they know that by opting out, they are

23   jeopardizing the settlement from going forward?

24        MR. STEVENS:  Objection; calls for a legal

25        conclusion, misstates facts.
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   And I don't know that to be -- I don't know

 2   that to be true or not to be true and I don't know what

 3   his other clients think.  All I know is he has clients

 4   that have opted out, for whatever reasons they chose to

 5   opt out.  You'd have to ask them as to why.

 6        Q.   Well, have you spoken to your counsel about why

 7   they are opting out?

 8        A.   Whatever I have spoken to my counsel about

 9   would be privileged.

10        Q.   So you're aware from conversations with your

11   counsel that his clients have opted out and they are

12   adverse to your interests?

13        A.   Whatever I've discussed with my counsel is

14   privileged.

15             MR. STEVENS:  Second the objection.

16        Q.   Based on the communications that you've had

17   with your counsel, do you have an understanding that he

18   has represented clients that have opted out of the

19   global settlement and their interests are adverse to

20   yours?

21        A.   Anything that would be based upon the

22   conversations with my counsel would be privileged, and

23   I'm not --

24             MR. STEVENS:  Second the objection and add

25        asked and answered.
```

Confidential - Subject to Further Confidentiality Review

1      Q.   Apart from any communications that you've had

2    with your counsel, do you have an understanding that the

3    clients that Mr. Durkee represents that have opted out

4    of the global settlement have adverse interests to you?

5      A.   I have an understanding that certain clients

6    represented by Mr. Durkee have opted out of the

7    settlement agreement.  Whether they have an adverse

8    interest to me or not is not something that I am

9    interested in or know about.

10     Q.   As cocounsel in your litigation, do you have a

11   litigation strategy to stay in the settlement, the

12   global settlement, and only object knowing that there

13   are opt-outs represented by your cocounsel?

14     A.   Any strategy would be work product privileged

15   and I would object to responding to any strategy I have

16   as a lawyer or as a client.

17          MR. STEVENS:  Second the objection.

18     Q.   Have you become aware of the number of the

19   opt-outs that Mr. Durkee represents?

20     A.   I am not aware of that.

21     Q.   Do you know the composition of the opt-outs

22   that Mr. Durkee represents, and by that I mean whether

23   or not those homeowners own KPT board or non-KPT board?

24     A.   I do not.

25     Q.   Are you aware of a motion being filed under

Confidential - Subject to Further Confidentiality Review

```
 1    seal to disqualify counsel who have a conflict between

 2    clients that are in the settlement and those that are

 3    outside of the settlement?

 4         MR. STEVENS:  Objection; misstates facts, and I

 5      would ask you to rephrase that question, that it

 6      asserts that such a conflict exists as opposed to

 7      that a conflict does exist.  That hasn't been

 8      established yet.

 9         Q.   Are you aware of a motion being filed under

10    seal about disqualification of counsel?

11         A.   I'm aware of a motion to disqualify Mr. Durkee.

12    I am not aware that it was under seal or not.

13         Q.   Have you read that motion?

14         A.   I actually may have been aware that it was

15    under seal but I don't recall whether I -- I don't

16    recall that.

17         Q.   That's fine.  Have you read that motion?

18         A.   I have not.

19         Q.   Have you had conversations with Mr. Durkee

20    about that motion?

21         A.   Whatever conversations I've had with

22    Mr. Durkee, it's privileged.

23         Q.   I understand that.  I'm just asking if you've

24    had such conversations, not the content of them.

25         A.   That would -- answering that question would be
```

Confidential - Subject to Further Confidentiality Review

1    revealing the contents of the conversation.  I refuse to

2    answer that on the basis of privilege.

3            MR. STEVENS:  Second the objection.

4        Q.   I don't know that I agree with that, so let me

5    explore that a little bit.

6        A.   That sometimes happens.

7        Q.   How did you become aware of the motion?

8        A.   I think that would be privileged.

9        Q.   Okay.  Did you physically receive the motion?

10       A.   No.

11       Q.   So I take it you were told about the motion; is

12   that fair enough?

13       A.   It's not fair enough.  It's privileged.  I'm

14   not going to answer those questions no matter how many

15   times you ask me in different ways.

16       Q.   All right.

17       A.   With respect, sir.

18       Q.   And your only -- the only way that you could

19   tell me what your understanding of the motion is would

20   be subject to a privilege objection; is that correct?

21       A.   I didn't say that.  You said that.

22       Q.   I'm not trying to put words in your mouth.  So

23   what is your understanding of the motion then?

24       A.   That there is a motion to disqualify

25   Mr. Durkee.

Confidential - Subject to Further Confidentiality Review

1       Q.   And do you know that it is based upon case law

2  that states -- well, primarily on the In Re Corn

3  Derivatives litigation case dealing with counsel who

4  represent adverse interests, including persons that are

5  trying to stay in the settlement and those that are

6  trying to opt out of the settlement?

7       A.   I am not aware of that.

8       Q.   If I were to represent to you that the Corn

9  Derivatives case is authority for the proposition that

10  there is a disqualifying conflict between your counsel

11  and you because he represents clients that are in the

12  settlement and you are -- as well as clients that are

13  attempting to opt out of the settlement, that you are

14  in -- that your counsel -- I'm sorry.  I told you I

15  could ask a good question.  I'm about to do that.

16          If I were to represent to you that the Corn

17  Derivatives case is authority for the proposition that

18  there is a disqualifying conflict between counsel who

19  represents clients in the settlement and clients that

20  are seeking to opt out of the settlement, would that

21  present to you or would you agree with me that your

22  counsel has a disqualifying conflict?

23      A.   No.

24          THE WITNESS:  Sorry.

25      Q.   And is that -- well, why is that?

Confidential - Subject to Further Confidentiality Review

```
 1      A.   Because I don't think he does.

 2           MR. STEVENS:  I'm going to object.  This is an

 3      incomplete hypothetical, improper hypothetical,

 4      calls for a legal conclusion, based on facts not in

 5      evidence.

 6           THE WITNESS:  I apologize.

 7      Q.   It's like Love Story.  You never have to say

 8  you're sorry.

 9      A.   Tell my wife that.

10           THE WITNESS:  You don't have to put that on the

11      record.

12      Q.   All right.  The global settlement, I want to be

13  sure, you've received the notice in the mail of the

14  global settlement?

15      A.   I don't recall.

16      Q.   Have you been provided or have had access to

17  the notice that went out for the global settlement?

18      A.   I don't recall.

19      Q.   Are you aware of a website that is available on

20  the Internet that has all of the settlement documents?

21      A.   Yes.

22      Q.   And have you read the settlement documents?

23      A.   I've read the global settlement.

24      Q.   Right.  Did you read the notice that was an

25  exhibit to the settlement?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.   I don't recall.

 2      Q.   Did you ever see a notice on television?

 3      A.   No.

 4      Q.   Did you ever see a publicated -- publicated, is

 5   that a word? -- a published notice in any newspaper or

 6   magazine?

 7      A.   The only place I would have seen any notice is

 8   if it was provided to me in the mail or from some other

 9   source.  I did not see it from any media outlet, and I

10   think I probably did see it but I don't want to testify

11   under oath that I did because I just don't recall it

12   specifically, but I think that I did.

13      Q.   Okay.

14      A.   But please understand I'm not saying I did

15   because I'm not 100 percent certain.

16      Q.   I understand.

17      A.   I think I did.

18      Q.   With that clarification, you think that you've

19   read the notice, and I guess the question is do you

20   think that you read a notice that you received in the

21   mail?

22      A.   Well, if I received it, I absolutely read it.

23   If I received it in the mail, I would have read it.  I

24   suspect that I probably received it in some fashion but

25   I don't want to say with 100 percent certainty because I
```

```
 1   don't recall if I did or I didn't.  It makes sense to me

 2   that I did.  I received a lot of things relating to

 3   Chinese drywall.  I don't recall it specifically, so I

 4   apologize.

 5        Q.   Did you take issue with any of the information

 6   in the notice?

 7        A.   Well, since I don't recall 100 percent if I've

 8   read it, I can't answer that question, since I can't

 9   recall what was in the notice specifically.

10        Q.   Thank you.  So I'm going to ask the court

11   reporter to mark as your first exhibit the objections

12   you filed in the litigation.

13             (Kaplan Exhibit No. 1 was marked for

14   identification.)

15             THE WITNESS:  Thank you.

16        Q.   So, Mr. Kaplan, you have Exhibit 1 before you?

17        A.   I have a document marked as Exhibit 1, yes.

18        Q.   Do you need a moment to look at it or are you

19   familiar with that document?

20        A.   I'm generally familiar with this, yes.

21        Q.   All right.  This is a document entitled

22   Objections to Proposed Settlement of Class Action

23   Against Builders, Installers, Suppliers, and

24   Participating Insurers.  Is that correct?

25        A.   That's what it says.
```

Confidential - Subject to Further Confidentiality Review

1       Q.   And it starts out:  Comes now Wayne Kaplan,

2  objector.  Correct?

3       A.   It does.

4       Q.   And this is your objection to the global

5  settlement, correct?

6       A.   It is.

7       Q.   And based upon the legend at the top, it was

8  filed on September 28, 2012; is that correct?

9       A.   I see a stamp in the right -- top right-hand

10  corner that's dated September 28th, 2012, at 1:31 p.m.

11      Q.   Okay.  Now, what was the process, if you can

12  describe it, that led to this document?

13      A.   I don't understand what you mean by process.

14      Q.   Sure.  So did you -- you've read the global

15  settlement, you are aware that you had choices to make

16  in terms of requesting exclusion, which is opting out,

17  objecting, or participating in the settlement; is that

18  correct?

19      A.   I was aware that there were choices to make,

20  including objecting, and I chose to object.

21      Q.   Okay.  And you spoke to your counsel about your

22  choice to object; is that correct?

23      A.   Whatever I spoke to my counsel about is

24  privileged and I refuse to answer on that basis.

25      Q.   Okay.  This objection, did you authorize your

Confidential - Subject to Further Confidentiality Review

```
 1    counsel to file it?

 2        A.   Yes.

 3        Q.   And that was -- did you understand what he was

 4    going to object to or was that something that you were

 5    just leaving up to him?

 6        A.   No.  I understood what -- I understand what the

 7    objection is and I did not leave everything up to my

 8    counsel.

 9        Q.   Okay.  So which of the provisions of this

10    objection are yours and which are his?

11        A.   All of them are mine.

12        Q.   All right.  So let's begin with II, Notice of

13    Intention to Appear and Request to Speak at the Hearing.

14    Are you intending to appear in person at the fairness

15    hearing?

16        A.   I've not made that decision.  I'll make that in

17    consultation with my counsel.

18        Q.   Are you prepared to come to New Orleans to

19    appear at the fairness hearing?

20        A.   If, after consultation with my counsel, they

21    believe it is in my best interest, I will do so.

22        Q.   I'd like to go to the next page, III, subpart

23    A, The Class Notice Contains Materially Deficient

24    Disclosures.  Do you see that, sir, on page two?

25        A.   I see the middle of page two where it says, A,
```

```
1   The Class Notice Contains Materially Deficient

2   Disclosures.

3       Q.   And as I recollect your testimony, you said

4   that you don't recall if you read the notice 100 percent

5   and I can't recall what was in the notice specifically,

6   and yet here you have an objection to a notice.

7   Correct?

8       A.   Yes.  That would tell me that I read it.

9       Q.   And what do you object to about the notice?

10      A.   I can't make a determination as to whether the

11  settlement is in my best interest or not.

12      Q.   And what information do you contend is lacking

13  that would allow you to make a conclusion as to whether

14  or not the settlement was in your best interest or not?

15      A.   How much money each one of the defendants has

16  contributed, how much each one of their insurers is

17  contributing, specifically those defendants that are my

18  defendants.  It would go a long way to helping me to

19  make a determination whether there are any proceeds that

20  the individual defendants are contributing themselves

21  rather than just their insurance carriers, what their

22  financial condition is, so I can make a determination if

23  they have fairly paid into the settlement or not.

24           And by way of example, if I could, if someone

25  has 100 million dollars in the bank or they have $100 in
```

Confidential - Subject to Further Confidentiality Review

1   the bank, that would make a big difference as to how

2   much I would think it would be in my interest to go

3   forward with the settlement or not to go forward with

4   the settlement.

5       Q.   And you contend that all of that information

6   should have been published in a notice to the class?

7           MR. STEVENS:  Misstates testimony.

8       Q.   Let me rephrase the question.  Do you contend

9   that all of the information that you've just described

10  should be in a published notice to the class?

11      A.   I think it should at least be in the settlement

12  allocation agreement.  As to the legality of what goes

13  in a class notice, I don't do that kind of work and I'm

14  not sure what's deficient in terms of that regard, but

15  it should be disclosed before I agree to a settlement so

16  that I and every other plaintiff can make a decision

17  whether it's in their best interest or not.  This

18  settlement, it is impossible for me to determine if it's

19  in my best interest or not.

20      Q.   Are you aware that this notice was approved by

21  Judge Fallon?

22      A.   I assume it was but I don't know that for a

23  fact, but I assume that it was.

24      Q.   Are you aware that there was an order

25  preliminarily approving the settlement and the notice

Confidential - Subject to Further Confidentiality Review

1    issued by Judge Fallon?

2        A.   I am aware of orders by Judge Fallon.  What

3    they specifically say I couldn't tell you without

4    looking at them.

5        Q.   Are you also aware that this settlement was

6    based upon a court-supervised mediation overseen by

7    Judge Fallon?

8            MR. STEVENS:  I'm going to object;

9        argumentative and irrelevant, and the terms of the

10       settlement you referenced provide for what

11       Mr. Kaplan has done, which was also ordered by the

12       court, and for clarification, that is the right to

13       object to any term or condition of the settlement.

14           MR. LONGER:  Well, that's -- I understand your

15       objection.

16       Q.   Did you know that this was a court-supervised

17   settlement?

18       A.   I know the court was involved to some degree.

19       Q.   Were you aware that there was a mediation that

20   resulted in this settlement?

21           MR. STEVENS:  Same objections.

22       A.   I'm not sure.

23       Q.   You also say that you don't know what your

24   recovery will be in Section 3A.  Are you aware of that?

25           MR. STEVENS:  Can you clarify that question?

```
 1              MR. LONGER:  Sure.

 2         Q.   Page 3 states:  The failure to provide this

 3    necessary information precludes Class Members from

 4    forming any understanding of what the settlement means

 5    in terms of their recovery.

 6         A.   Am I aware that that says that in the

 7    objection?  Yes, and I agree with it.

 8         Q.   Okay.  And are you aware of other settlements,

 9    class action settlements, that provide general terms of

10    the settlement but did not allow anyone to make any

11    individual analysis of their specific recoveries?

12         A.   The only other settlement I've reviewed is the

13    Banner settlement.

14         Q.   Mr. Kaplan, I didn't ask you this at the

15    beginning of the deposition but I'm going to come back

16    to it now.  You mentioned that you're an attorney.

17         A.   I am.

18         Q.   I don't know the nature of your practice.  Can

19    you just tell me what that is?

20         A.   I do commercial litigation.

21         Q.   And in the course of your career, have you

22    participated in any class actions?

23         A.   When you say participate, as a lawyer?

24         Q.   Yes, sir.

25         A.   Not significantly.  Maybe one, maybe one.  I'm
```

Confidential - Subject to Further Confidentiality Review

 1    going back a long way but I'm not 100 percent certain,

 2    it was so long ago.  I can't remember if it was a class

 3    action or not, this particular case I'm thinking of.  I

 4    think it was.

 5        Q.    Okay.  So, generally speaking then, you may

 6    have had one experience with a class action; is that

 7    fair?

 8        A.    Yes, and I was probably a two-year lawyer when

 9    I was participating, if I was participating.

10        Q.    So I take it that the wealth of your experience

11    as an attorney is basically in what I consider binary

12    litigation?

13        A.    Well, whatever you consider it, you consider

14    it.  I don't do class action litigation, if that's what

15    you're asking me.

16        Q.    That's exactly what I'm asking you.

17        A.    I do not.

18        Q.    And so you're not familiar with class actions

19    that do not specify in their notices what the individual

20    recoveries will be?

21        A.    I'm not familiar with class action in general.

22        Q.    Would you be surprised that many class actions

23    cannot and do not provide in the notice information

24    sufficient for individual class members to specify what

25    their recovery would be?

```
 1            MR. STEVENS:  I'm going to object; calls for

 2       speculation, improper hypothetical, facts not in

 3       evidence.

 4       Q.   You can answer the question.

 5       A.   As a lawyer for 30 years, very little would

 6  surprise me.

 7       Q.   All right.  The next section of this objection

 8  of yours deals with the -- well, it's subpart B, The

 9  Settlement Fails To Account For Necessary Subclasses.

10            Can you tell us what that objection is in

11  regards to?

12       A.   Give me a moment just to review it, please.

13            MR. STEVENS:  I'm going to object in that I

14       think the way the question is phrased, the document

15       speaks for itself, actually.

16            MR. LONGER:  Okay.

17       Q.   What is your understanding of what the document

18  says?

19       A.   With regards to this section?

20       Q.   In that section, yes.

21       A.   Well, my understanding is that you cannot make

22  a determination as to what builders are contributing,

23  what installers are contributing, what my specific

24  builder is contributing, what my specific installer is

25  contributing, and without knowing that, again, that's
```

Confidential - Subject to Further Confidentiality Review

1   part of the overall thing that we've already discussed,

2   I cannot make a fair determination whether it's in my

3   interest or not.  I'm going to be releasing certain

4   people by virtue of a settlement if I agree to it.  I

5   don't want to release people if it's not in my interest

6   to do that, and I can't make that determination.

7       Q.   And are you aware that the individual

8   contributions were determined during a court-supervised

9   mediation?

10      A.   You've asked me if I was aware that this was a

11  mediation.  I told you I was not sure whether I was

12  aware if it was a mediation, so I can't answer that

13  question.

14      Q.   Okay.  And are you aware that the individual

15  contributions were confidential under the terms of that

16  mediation?

17      A.   I'm not aware of that.  Nevertheless, I have a

18  right to object and I object if I am not made aware of

19  information that will allow me to determine if the

20  settlement is in my best interest or not, and that

21  settlement that I read cannot -- does not allow me, and

22  I would guess almost all plaintiffs, to make that

23  determination.  It may be in my interest, it may not, it

24  may be in somebody else's interest, it may not, but we

25  can't make that determination.

Confidential - Subject to Further Confidentiality Review

1    Q.   In the course of your litigation in Palm Beach

2    County --

3    A.   Yes.  You mean my particular case, is that what

4    you're referring to?

5    Q.   Yes.  I'm sorry if that wasn't clear, yes, your

6    case in Palm Beach County, Kaplan versus Albanese -- I

7    actually don't know how to say the name of the

8    defendant.

9    A.   Albanese-Popkin.

10   Q.   That case in particular, have you obtained any

11   discovery about the insurance of Albanese-Popkin?

12   A.   I believe that we did.

13   Q.   Are you aware there is a pollution exclusion in

14   their insurance policies?

15   A.   I think I am.

16   Q.   Are you aware that one of the carriers has

17   denied coverage?

18   A.   I know there was a dec action between them, so

19   I assume that to be the case, and I assume that I knew

20   that.  I can't tell you with 100 percent certainty.

21   Q.   Do you believe, based upon what you've just

22   told us about your knowledge of Albanese-Popkin's

23   insurance, that the coverage with Albanese is going to

24   be quite limited?

25   A.   I have no idea.  I have no idea what they've

Confidential - Subject to Further Confidentiality Review

1   arranged.  That's what I'd like to know.

2       Q.   Based upon your understanding and your

3   experiences and your knowledge of -- general knowledge,

4   would you agree that the amount of insurance that is

5   going to be available to the developer in your

6   litigation is quite limited?

7       A.   I cannot agree or disagree without adequate

8   additional information.

9       Q.   All right.  And have you obtained -- in your

10  case in Palm Beach County you've also sued Ocean Coast

11  Drywall of South Florida, Incorporated, correct?

12      A.   I did.

13      Q.   And are you -- have you obtained the insurance

14  policies of Ocean Coast Drywall in the course of that

15  litigation?

16      A.   I'm not sure.  I think we probably did but I'm

17  not 100 percent certain.

18      Q.   And are you aware that the policies for Ocean

19  Coast Drywall also contain pollution exclusions?

20      A.   If I received it, I would probably be aware.

21  If I didn't receive, I would not be aware.  I have no

22  recollection one way or the other sitting here.

23      Q.   If you accept my representation that they exist

24  in those policies for Ocean Coast Drywall, what is your

25  expectation of any recovery from Ocean Coast Drywall's

Confidential - Subject to Further Confidentiality Review

1   insurance?

2        A.   I have no idea without additional information.

3        Q.   Are you familiar with case law in Florida

4   dealing with pollution exclusion provisions of insurance

5   policies?

6        A.   Define what you mean by familiar.

7        Q.   Do you have any understanding at all about the

8   courts in Florida upholding pollution exclusion

9   provisions in third-party insurance policies?

10       A.   I'm sure there is some case law that upholds it

11  but if you're asking me specifically about a case, I

12  couldn't tell you.

13       Q.   Have you made any evaluation in your litigation

14  about the chances of obtaining insurance coverage -- I'm

15  sorry.  I misspoke.

16            Have you made any evaluation in your litigation

17  about the chances of Ocean Coast Drywall obtaining any

18  insurance coverage?

19       A.   Whatever I've made in that regard would be work

20  product privileged.

21       Q.   And can you tell me whether or not you've made

22  an evaluation?

23       A.   That would still be privileged.

24       Q.   All right.  Why do you need to know

25  specifically what your builder or installer contributed

Confidential - Subject to Further Confidentiality Review

```
 1    to the settlement when the funds are available and you

 2    can just identify the amount of money available for the

 3    entire class?

 4        A.   Because if my builder, for example, as I tried

 5    to explain it, and I probably did it poorly if you don't

 6    understand my position, if they have 100 million dollars

 7    in the bank, for example, and they have contributed one

 8    dollar, then this would not be a very good deal for me,

 9    if I let somebody off the hook through a release.  If

10    they had $100 in the bank and they contributed $1,000,

11    it might be a good deal for me.  I can't make that

12    determination until I know the factors that are

13    involved.

14        Q.   Well, you've been involved in your own private

15    litigation.  Have you made that -- have you discovered

16    that information?

17        A.   Discovered what information?

18        Q.   The assets that are available to your builder

19    and installer?

20        A.   Under Florida law I wouldn't be allowed to do

21    that at this stage in the litigation even if I wanted

22    to.

23        Q.   So the answer is no?

24        A.   The answer is no because I'm not allowed to

25    under law.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   All right.

 2      A.   But I would encourage you to allow them to give

 3   us that information.  I would love to have it if you

 4   were to volunteer it.

 5      Q.   Well, as I understand it, I don't have it

 6   either, so there you go.

 7      A.   Okay.

 8      Q.   As I say, it's part of a mediation process, and

 9   the PSC was observing.

10      A.   That doesn't mean I don't have the right to

11   object and I strenuously object.

12           MR. STEVENS:  I am going to object.  If we have

13      a question, we have a question.

14           MR. LONGER:  Sure.

15      Q.   I know that your counsel has said that the

16   document speaks for itself, but if you could, tell me in

17   your own words --

18      A.   Yes, sir.

19      Q.   -- what Subpart C of your objection deals with,

20   which begins on page 5 of Exhibit 1, I would appreciate

21   hearing it.

22      A.   Sure.  Would you give me a moment, please, to

23   read it?

24      Q.   Certainly.

25      A.   Thank you.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. DURKEE:  You guys go ahead.

 2              (Discussion off the record.)

 3   BY MR. LONGER:

 4       Q.  Yes, sir.

 5       A.  My understanding of this is in conjunction with

 6   what we already talked about.  I can't make a

 7   determination as to whether it's in my best interest to

 8   go forward with the settlement or not without knowing

 9   the participation of the defendants and insurance and

10   the contributions that they make, so that is a large

11   portion of this subsection here as well.

12       Q.  So that is quite --

13       A.  Let me finish my answer.

14       Q.  I didn't mean to interrupt.  Excuse me.

15       A.  And it is also my understanding that these

16   settlement agreements, these various settlement

17   agreements are intertwined in a sense that dismantling

18   one would dismantle them all, and I think it unfairly

19   creates an atmosphere to inhibit people who want to

20   object from objecting because those, for example, in the

21   Knauf settlement, that may want to go forward with the

22   settlement because they think it's in their interest

23   might be in conflict with those -- might be is my

24   operative word -- with those of us who want to object

25   for whatever reasons we want to object to the global
```

Confidential - Subject to Further Confidentiality Review

 1    settlement.

 2        Q.   So here you are objecting, so it's not

 3    inhibiting your ability to object.

 4        A.   Well, I may not be the typical person in that

 5    regard, but I think there is a cloud that is created by

 6    the interwoven settlements being dependent on each

 7    other, meaning that if one fails, they all fail.  I

 8    think that creates a situation where those in the global

 9    settlement who want to object should not have to be

10    concerned about other people in other settlements.

11        Q.   Okay.  And I'm just curious, because you

12    said -- you did say object and I --

13        A.   Oh, I'm sorry.  I'm just going to -- oh, the

14    door is closed.  I'm sorry.  You've got me very involved

15    here.

16        Q.   Okay.  I wonder.  You had used the word

17    objection and I'm wondering if you also meant opting

18    out, to request exclusion, and that's your concern?

19        A.   I am concerned about that as well.

20        Q.   I see.  So in that connection, I believe you

21    have opted out of the Banner settlement; is that

22    correct?

23        A.   I have.

24        Q.   So you didn't feel inhibited to opt out of the

25    Banner settlement and object in this settlement; is that

Confidential - Subject to Further Confidentiality Review

1    fair?

2        A.   Me personally?

3        Q.   Yes.

4        A.   Obviously not.  Here we are.

5        Q.   So the objection that you're making here

6    doesn't apply to you but you're saying it applies to

7    others?

8            MR. STEVENS:  Objection; misstates.

9        A.   I think if you ask the court reporter to read

10   back my response, you will find that your conclusion is

11   inaccurate.

12       Q.   Well, you didn't feel inhibited, correct?

13       A.   I felt a responsibility that I shouldn't

14   otherwise feel and I made the decision that I made.

15   There may be others that felt differently, but that is

16   not all of C as well.  C also talks about some of the

17   other things that I discussed in my answer as well.

18       Q.   Well, as to your lack of knowledge about the

19   contributions of the participating defendants, we've

20   already covered that in your prior answers, correct?

21       A.   Well, we spoke about it.  I don't know what we

22   covered or not because I don't know what in your head

23   you want to be covered, but I've covered it.

24       Q.   Fair enough.

25       A.   To the extent of the best I can in answering

Confidential - Subject to Further Confidentiality Review

```
 1   your questions.

 2        Q.   All right.  The next subpart of your

 3   objection -- the last subpart of your objection is

 4   subpart D which begins on page 6.

 5        A.   Yes.

 6        Q.   Do you see that?

 7        A.   I do.

 8        Q.   And you say:  This Settlement Is Unfair,

 9   Unreasonable, And Inadequate Because There Is

10   Insufficient Evidence To Support Class Counsel's

11   Requested Attorneys' Fees.  That's the subheading of

12   that section, correct?

13        A.   That's what it reads.

14        Q.   Okay.  What evidence are you aware of to

15   support class counsel's requested attorneys' fees and

16   what part of that evidence do you consider to be

17   insufficient?

18        A.   I'm not aware of any adequate evidence at all

19   that would allow counsel to receive up to 32 percent in

20   attorney fees, which I recall from the agreement, which

21   I think -- I don't mean this disrespectfully, I'm an

22   attorney and I earn my living that way, but I think it's

23   an obscene amount of money, and before I would want to

24   agree as a participant to a settlement that allows that

25   amount of money to be paid in attorneys' fees, I would
```

Confidential - Subject to Further Confidentiality Review

1    want to know that it's been earned.

2        Q.   Are you aware that as to the KPT fee, your

3    counsel will recover under the settlement?

4        A.   I am not aware.

5             MR. STEVENS:  Calls for speculation.

6        A.   I'm not aware of that.

7        Q.   Have you asked to look at your counsel's hourly

8    records that they intend to submit for their fee request

9    in this settlement?

10       A.   No.

11       Q.   Have you asked your counsel or have you asked

12   the court or sought to see the records of counsel's fees

13   that are reported monthly to Judge Fallon's

14   court-appointed auditor, Mr. Garrett?

15       A.   As to what I asked my counsel, that portion of

16   your question would be privileged.  I refuse to answer

17   that.

18            If you would, repeat the question without that,

19   I will answer the rest of it, please.

20       Q.   Fair enough.  Have you seen -- are you aware

21   that the --

22            MR. STEVENS:  I'm going to object.  This is

23       irrelevant.  This has nothing to do with the basis

24       of his objection as to class counsel's fees.

25            MR. LONGER:  He says there is inadequate

Confidential - Subject to Further Confidentiality Review

```
1        evidence to support the fee.
2             MR. STEVENS:  Whether he's asked his counsel or
3        not is irrelevant to that.
4             MR. LONGER:  I'm not asking that question.
5        He's asked me to restate it.  I'm about to restate
6        it.
7             MR. STEVENS:  Proceed.
8   BY MR. LONGER:
9        Q.   Are you aware that members of the PSC are
10  required to report their time records and expenses to
11  the court on a monthly basis?
12       A.   I'm not sure.  I may have known that at one
13  time but I can't recall it specifically sitting here, so
14  I may have known that at one time but I can't tell you
15  if I have ever known it or not.
16       Q.   As an officer of the court I will represent to
17  you that there is a pretrial order in this litigation
18  that requires me to report my time on a monthly basis.
19  Have you looked at my time or sought to look at my time
20  that has been submitted to the court on a monthly basis?
21       A.   No.
22       Q.   So is it fair to say that you don't know if my
23  time records or the time records of other members of the
24  PSC are sufficient or not to support class counsel's
25  requested attorneys' fees?
```

1      A.   Here's what I would say in regard to that:  32

2   percent of 83 million dollars is a lot of money, and it

3   is true that I've not reviewed your specific hourly

4   billing, it is true I don't know the number of hours and

5   who submitted them and what the rates are, and all the

6   things you typically do when you analyze whether you

7   think an hourly billing is sufficient, but based on my

8   30 years experience, I think 32 percent of an 83 million

9   dollar settlement would be outrageous under any

10  circumstances in this case.  That's my opinion based on

11  30 years of experience.

12          MR. STEVENS:  I'm going to assert a late

13      objection, that your question actually misstates

14      facts in that class counsel has not yet made a fee

15      request for class counsel, so to term this as though

16      they have as opposed to making an overall fee

17      request, I think that misstates.

18          MR. LONGER:  Maybe I misstated but the question

19      will stand.

20      Q.   So --

21      A.   I'm sorry.  I'm stealing exhibits.

22      Q.   Mr. Kaplan, I don't want to belabor this point

23  too much, but are you familiar with the case law

24  involving megafund fee requests?

25      A.   No.

Confidential - Subject to Further Confidentiality Review

```
1        Q.   Are you familiar with -- well, I take it from

2    your answer that you could not tell us whether an 83

3    million dollar settlement is a megafund or not?

4        A.   Probably not, but I would guess that 83 million

5    seems kind of mega to me, but I don't know that.

6        Q.   I heard you say billion.

7        A.   No, million, million.  I didn't say billion, I

8    said million.  You misheard me.

9        Q.   Okay.  I have just a few questions about your

10   answers to interrogatories.  While I'm at it, I'll go

11   over your requests for production of documents as well.

12            So I'm going to ask the court reporter to mark

13   as Exhibit 2 Wayne Kaplan's Responses to Class Counsel's

14   Interrogatories and I will also ask the court reporter

15   to mark as Exhibit Number 3 Wayne Kaplan's Responses to

16   Class Counsel's Requests for Production of Documents.

17            (Kaplan Exhibit No. 2 was marked for

18   identification.)

19            (Kaplan Exhibit No. 3 was marked for

20   identification.)

21            MR. STEVENS:  Fred, I'm sorry, which is 2?

22            MR. LONGER:  The interrogatories are 2.

23   BY MR. LONGER:

24       Q.   Mr. Kaplan, I'm handing you Exhibit Number 2.

25   These are your responses to class counsel's
```

Confidential - Subject to Further Confidentiality Review

1    interrogatories.  Would you take a moment and have a

2    look at that?

3         A.   Yes.

4         Q.   Is that your signature on the last page on

5    the -- what I'll call an affidavit?

6         A.   It's my signature -- it's a copy of my

7    signature by the word affiant.

8         Q.   Fair enough.  Can you describe the process by

9    which the answers to our interrogatories were stated in

10   this document, if you can?

11        A.   Well, I think it would be work product

12   privileged as to my understanding of what you probably

13   mean by the word process, so if you want to reask your

14   question, perhaps I can answer it, but as stated, I

15   can't.

16        Q.   All right.  I'm not trying to make too much of

17   this.  I just want to know did you give information to

18   your counsel that he then wrote down on this, did he

19   provide information and then you endorsed it?  That just

20   generic information, how did this process come about?

21        A.   Generically, I left the objections to my

22   counsel.  I did review everything before it was signed.

23   As to the answers, they are mine.  I think that pretty

24   much is the best way I can answer your question.

25        Q.   Okay.  As to Request Number 2, which is

Confidential - Subject to Further Confidentiality Review

```
 1    actually Interrogatory Number 2 but it says request --

 2        A.   Yes.

 3        Q.   -- identify the total number of persons your

 4    counsel represents in connection with Chinese drywall

 5    litigation, did you seek to obtain this information from

 6    your counsel?

 7        A.   No.

 8        Q.   As to Request Number 3, identify the number of

 9    clients your counsel is representing in connection with

10    the Chinese drywall litigation that have objected to the

11    settlement, opted out of the settlement, and/or have

12    chosen to accept the benefits of the settlement, did you

13    seek to obtain the information for this interrogatory

14    from your counsel?

15            MR. STEVENS:  I'm going to object; irrelevant.

16        A.   What I sought from my counsel is privileged.

17    You can ask it another way and I might be able to give

18    you an answer.

19        Q.   Well, I thought I asked it the same way I asked

20    the other one.

21        A.   Well, if you did and I didn't object, I'd like

22    to belatedly.

23        Q.   I was going to go back and try to do the same

24    thing.

25        A.   For the record, I'm not waiving any privilege.
```

Confidential - Subject to Further Confidentiality Review

```
 1    If I inadvertently waived privilege on the previous

 2    question, it was not my intent to do so and I'm not

 3    waiving privilege under any circumstances for any

 4    question.

 5         Q.   Well, what efforts did you make to complete

 6    your answer here?

 7              MR. STEVENS:  Objection.  Here meaning?

 8         Q.   I'm sorry.  As to Request Number 3 you say:

 9    Without waiving any of the foregoing objections,

10    Objector responds as follows:  Objector has no personal

11    knowledge of facts responsive to this interrogatory.  I,

12    of course, know that my counsel has filed an objection

13    on my behalf.

14              Do you see that answer?

15         A.   I do.

16         Q.   Did you make any effort to find out the number

17    of clients your counsel is representing in connection

18    with the Chinese drywall litigation that have objected

19    to the settlement, opted out of the settlement, and/or

20    have chosen to accept the benefits of the settlement?

21         A.   No.

22              MR. STEVENS:  Objection; completely irrelevant

23         to this proceeding.

24         A.   The answer is no.  I answered the question.

25         Q.   Just out of interest, I know that you sued
```

Confidential - Subject to Further Confidentiality Review

1    Mr. Albanese personally.

2        A.   I did.

3        Q.   Why?

4        A.   Because he was --

5             MR. STEVENS:  Objection; irrelevant to this

6        proceeding and the questions as to why -- as to his

7        deposition is an objection.

8             MR. LONGER:  Are you instructing him not to

9        answer?

10            MR. STEVENS:  You can answer.

11       A.   Without getting into any intended privileged

12   areas, he was the contractor.

13       Q.   All right.  What, if anything, are you -- let

14   me say it differently.  In your answer to Interrogatory

15   Number 5, you say that you, among other things, wrote to

16   your insurance carrier, Tower Hill Selective Insurance

17   Company.

18       A.   I did.

19       Q.   What, if anything, resulted from your request

20   for -- well, actually, what did you write to them about?

21   Did you request coverage?

22       A.   I think I did.  I don't recall the letter

23   exactly.  I think I either asked them for coverage or I

24   asked them to investigate, or maybe both.

25       Q.   And what was the result of that request or

Confidential - Subject to Further Confidentiality Review

1   requests?

2       A.   They sent an engineer to examine the house to

3   determine whether there was Chinese drywall.  He did, in

4   fact, come to the house, he did an inspection, he did a

5   report, and they denied coverage on an exclusion, and

6   that's in general terms, maybe that's as specific as I

7   can get, but at least that's in general terms what

8   happened as a result.

9       Q.   One follow-up question:  Do you know what

10  exclusion it was that they denied coverage under?

11      A.   I knew it at the time because I looked at it

12  once they did it, but I can't recall now.

13      Q.   Was it a pollution exclusion?

14      A.   I can't recall now.

15      Q.   Was it a material defect?

16      A.   You can ask me 50 different ways, but the

17  answer is going to be same.  I don't recall.

18           MR. STEVENS:  He's saying he didn't recall.

19      Q.   Sometimes something -- I could show you this

20  coffee cup, it might jog your memory, I don't know.

21      A.   I don't think it's going to jog my memory on

22  it.  You can keep trying but I think the answer is going

23  to be no.

24      Q.   I will drink a cup of coffee for you.

25      A.   Okay.  I'd like a cup of coffee.  I had to get

Confidential - Subject to Further Confidentiality Review

1    up early to come here.

2         Q.   If you would, we're done with Exhibit Number 2

3    and we'll go to Exhibit Number 3.

4         A.   Yes, sir.

5         Q.   The last page of the document, this appears to

6    be -- or not appears.  This says it's a declaration of

7    Wayne Kaplan and it's signed by Wayne Kaplan.  Is that

8    your signature, Mr. Kaplan?

9         A.   It's a copy of my signature.

10        Q.   I don't understand that.  You said that before.

11   What do you mean a copy of your signature?

12        A.   This is not the original.

13        Q.   Fair enough.  Thank you.  Someone has this

14   original?

15        A.   I would assume.

16        Q.   Me too.  All right.  And the essence of this

17   declaration, as I perceive it, is that you are making it

18   in support of your membership as part of the global

19   settlement and that you are also saying you are a member

20   of the class as defined in the global settlement; is

21   that correct?

22        A.   Yeah.  I think this document says exactly what

23   it says.

24        Q.   Am I wrong?

25        A.   I can read it if you want, into the record,

Confidential - Subject to Further Confidentiality Review

1    what it says.  Do you really want me to do that?  I

2    will.

3         Q.   No, I want you to agree with me.

4         A.   I know you do.  The document says what it says.

5    Your characterization of it may or may not be accurate.

6         Q.   Thank you.  I hope that I have read it

7    accurately.

8              The report or analysis that the insurance

9    carrier made of your home --

10        A.   Yes, what about it?

11        Q.   Do you have that available to you?

12        A.   Do I have a copy in my possession?

13        Q.   Right.

14        A.   I do.

15        Q.   I didn't --

16        A.   I do.

17        Q.   You do?

18        A.   I do.

19        Q.   Do you intend to rely upon that in any way?

20        A.   I have no idea sitting here today.

21        Q.   All right.  Do you consider it an analysis

22   of -- strike that.

23             Okay.  The affidavit that we have just

24   described, the last page of Exhibit Number 3 --

25        A.   The declaration?

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Yes, sir, the declaration.

 2        A.   Yes, sir.

 3        Q.   Thank you for correctly pointing that out to

 4   me.  Is that a document you intend to rely upon at the

 5   fairness hearing?

 6        A.   That would be up to my attorneys.

 7             Let me -- I'm going to volunteer something even

 8   though lawyers generally shouldn't volunteer something.

 9   There is a small error.  I advised my counsel of this

10   earlier, without waiving any objection, in these

11   documents.  I'm an officer of the court and I just

12   wanted to make sure.  There is one or two invoices

13   that's a repair to the refrigerator that's identified as

14   air conditioner repairs incorrectly.  They are very

15   small items but I want to make sure, since I'm an

16   officer of the court and I realized that error this

17   morning, that I point it out to you and all counsel of

18   record, including the court.  That was an inadvertent

19   inclusion and it's designated as part of the air

20   conditioning invoices, so I think more accurately it

21   should say air conditioning and refrigerator invoices.

22        Q.   Just so I'm clear as to which document it is

23   that you are referencing, I know that these are not

24   Bates numbered or otherwise identified --

25        A.   I'll be able to tell you.
```

```
 1      Q.   If you could, tell me which one or ones.

 2      A.   Yes.  It's one or two.  Dollings, and it says

 3 Dollings on the left side and Intercounty Engineering on

 4 the right.

 5      Q.   So is that like Bette Midler "dahlings" or --

 6      A.   Well, I don't know how she spells it but they

 7 spell it D-o-l-l-i-n-g-'-s.

 8      Q.   Can you show it to me?

 9      A.   There is two of them.

10      Q.   Oh, there it is.

11      A.   The date is April 14, it looks like, '11, and

12 it's another one of April 14, '11.  I guess it's the

13 continuation.

14           MS. MASHELKAR:  The amount of $397.50 and $140?

15           THE WITNESS:  140 looks like 05, although I'm

16      having a little difficulty reading it.  It might

17      just be 140, and $377.50, if I'm reading them

18      correctly.

19           MS. MASHELKAR:  Okay.

20      A.   It's insignificant but I want to be candid with

21 you all so that we don't have any mistakes.

22      Q.   And just so I'm clear, one of the initial clues

23 about your problem with drywall, Chinese drywall in your

24 home, was the coil problems that you were having with

25 your air conditioner?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   And my understanding is that your home was

 3   built by Albanese or developed by Albanese.  They used

 4   Banner Supply to provide the drywall, correct?

 5      A.   That's my understanding.

 6      Q.   And is it Ocean Coast Drywall of South Florida

 7   that installed the drywall?

 8      A.   That is also my understanding.

 9      Q.   And have you had your home tested to understand

10   all of the different brands or brand of drywall that

11   exists in your home?

12      A.   I'm not sure I understand your question.

13   Testing for all the different brands?  I didn't know

14   there was a test for every brand of drywall that exists

15   in the world.  I must be misunderstanding what you're

16   saying.

17      Q.   I'm asking if you have made or attempted to

18   make an analysis of the manufacturers of the drywall in

19   your home.

20      A.   Yes.

21      Q.   And what is -- what have you concluded those

22   results to be?

23      A.   That it --

24           MR. STEVENS:  Vague and ambiguous.

25      A.   Well, there was Chinese drywall from a Chinese
```

```
 1   manufacturer.

 2        Q.   And have you determined which manufacturer it

 3   is?

 4        A.   We have.

 5        Q.   Who is the manufacturer of the Chinese drywall

 6   in your home?

 7        A.   I don't recall sitting here.  It was not Knauf.

 8   I may have it in my answer.  If it's in my interrogatory

 9   answers, then I have it, but I don't recall just sitting

10   here.  Give me a moment and I may be able to tell you.

11        Q.   I'll give you two moments.

12        A.   I may be able to tell you from the documents I

13   have but I don't recall off the top of my head which one

14   it was.

15             I don't think I have that information with me

16   and I just don't recall just sitting here which one it

17   was.

18        Q.   Do you have a document that identifies who the

19   manufacturer is based on the analysis that you've done?

20        A.   I think I have something.  In fact, I'm certain

21   I do.  I don't know whether it's correspondence or

22   something that I wrote down or whatever, but it's in a

23   report of some sort.  When I say report, a writing.

24        Q.   And all you can tell us today is that it's not

25   Knauf?
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. STEVENS:  Argumentative; asked and

 2       answered.

 3       A.   Yes.

 4       Q.   Do you know if it's Taishan board?

 5       A.   I think it is.

 6       Q.   Have you made any analysis of whether your home

 7   is comprised completely of Taishan board, if that's what

 8   it is, or some mixture of that board and maybe domestic

 9   board?

10       A.   I'm not certain but I think there was a mixture

11   because of the size differential that we used in

12   different portions of the house, but I'm not 100 percent

13   certain.  When I say the size, I mean the thickness, the

14   width of the board.

15       Q.   Sure.  So we'll say ceilings are different than

16   walls or --

17       A.   Second floors or flooring may be different, and

18   I recall something about that.

19              MR. LONGER:  Well, Mr. Kaplan, thank you for

20       your time.  I have no further questions.

21              THE WITNESS:  Thank you.  I appreciate it.

22              MR. DURKEE:  Any other counsel want to ask

23       questions?  I'm not sure everyone is entitled to but

24       anyone want to at least proffer their questions,

25       Valerie, Mark?
```

```
 1              MS. GREENBERG:  No.

 2              MR. DURKEE:  Okay.  All right.  Then we're

 3         going to go ahead and hang up the phone and nice

 4         talking to you guys this morning.  We're just going

 5         to hang up on you now.

 6                   (Discussion off the record.)

 7              MR. DURKEE:  We are going to read and I will

 8         take the lead, David Durkee, will take the lead on

 9         being the contact person for Mr. Kaplan.  You can

10         send all the materials and he will properly read and

11         timely read.

12              MR. LONGER:  You will have to do it on an

13         expedited basis, that's my concern.

14                   (Discussion off the record.)

15              THEREUPON, the Deposition of WAYNE KAPLAN,

16    was concluded at 11:03 a.m.

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE OF REPORTER

 2

 3

 4            I, Susan D. Wasilewski, Registered Professional

 5    Reporter, Certified Realtime Reporter, Certified CART

 6    Provider, Certified Manager of Reporting Services, and

 7    Florida Professional Reporter, do hereby certify that I

 8    was authorized to and did stenographically report the

 9    examination of the witness named herein; that a review

10    of the transcript was requested; and that the foregoing

11    transcript is a true record of my stenographic notes.

12            I FURTHER CERTIFY that I am not a relative,

13    employee, or attorney, or counsel for any of the

14    parties, nor am I a relative or employee of any of the

15    parties' attorney or counsel connected with the action,

16    nor am I financially interested in the outcome of this

17    action.

18            DATED THIS 11/01/2012 at Lakeland, Polk County,

19    Florida.

20

21    _____

      SUSAN D. WASILEWSKI, RPR, CRR, CCP, CMRS, FPR

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -  -  -  -

                      E R R A T A

 2                    -  -  -  -  -  -

 3

 4     PAGE  LINE  CHANGE

 5     ____  ____  _____

 6          REASON:  _____

 7     ____  ____  _____

 8          REASON:  _____

 9     ____  ____  _____

10          REASON:  _____

11     ____  ____  _____

12          REASON:  _____

13     ____  ____  _____

14          REASON:  _____

15     ____  ____  _____

16          REASON:  _____

17     ____  ____  _____

18          REASON:  _____

19     ____  ____  _____

20          REASON:  _____

21     ____  ____  _____

22          REASON:  _____

23     ____  ____  _____

24          REASON:  _____

25
```

Confidential - Subject to Further Confidentiality Review

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
 4                I,_____, do
 5     hereby certify that I have read the
 6     foregoing pages, and that the same is
 7     a correct transcription of the answers
 8     given by me to the questions therein
 9     propounded, except for the corrections or
10     changes in form or substance, if any,
11     noted in the attached Errata Sheet.
12
13
14     _____
15      WAYNE KAPLAN                    DATE
16
17
18     Subscribed and sworn
       to before me this
19     _____ day of _____, 20____.
20     My commission expires:_____
21
       _____
22     Notary Public
23
24
25
```

Confidential - Subject to Further Confidentiality Review

```
 1                    LAWYER'S NOTES

 2      PAGE  LINE

 3      ____  ____   _____

 4      ____  ____   _____

 5      ____  ____   _____

 6      ____  ____   _____

 7      ____  ____   _____

 8      ____  ____   _____

 9      ____  ____   _____

10      ____  ____   _____

11      ____  ____   _____

12      ____  ____   _____

13      ____  ____   _____

14      ____  ____   _____

15      ____  ____   _____

16      ____  ____   _____

17      ____  ____   _____

18      ____  ____   _____

19      ____  ____   _____

20      ____  ____   _____

21      ____  ____   _____

22      ____  ____   _____

23      ____  ____   _____

24      ____  ____   _____

25      ____  ____   _____
```

Exhibit 1 to Kaplan 10/29/2012 Deposition

Sep 28 2012
01:31PM

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | ) MDL NO. 2047 |
| | ) |
| | ) SECTION: L |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) |
| ALL CASES | ) JUDGE FALLON |
| | ) MAG. JUDGE WILKINSON |
| | ) |

## OBJECTIONS TO PROPOSED SETTLEMENT OF CLASS ACTION AGAINST BUILDERS, INSTALLERS, SUPPLIERS AND PARTICIPATING INSURERS

COMES NOW Wayne Kaplan ("Objector"), member of the putative class, by and through his undersigned counsel, files these Objections To Proposed Settlement Of Class Action Against Builders, Installers, Suppliers And Participating Insurers.

### I.      PARTY STATUS

Wayne Kaplan is a member of the Settlement Class and received the Notice Of Pendency And Proposed Settlement Of Class Action Against Builders, Installers, Suppliers And Participating Insurers ("Class Notice").

### II.     NOTICE OF INTENTION TO APPEAR AND REQUEST TO SPEAK AT THE HEARING

Objector requests that he be allowed to appear in person or through counsel at the final approval hearing to talk about these objections, and to otherwise participate in the final approval hearing.

KAPLAN

EXHIBIT
10-29-12
SDW

III.   OBJECTIONS TO THE SETTLEMENT

A district court may approve a settlement only if it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(C).  Settlements that take place prior to formal class certification, as is the case here, require a higher standard of fairness:

> The dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a court designated class representative, weigh in favor of a more probing inquiry than may normally be required under Rule 23(e). ... See also Manual for Complex Litigation §30.45 (3rd ed. 1995) ("Approval under Rule 23(e) of settlements involving settlement classes ... requires closer judicial scrutiny than approval of settlements where class certification has been litigated."). *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

Here, the settlement is not fair, reasonable, or adequate, and Objector objects to the settlement for the following reasons.

A.   The Class Notice Contains Materially Deficient Disclosures.

The Class Notice fails to provide sufficient information to allow Class Members to properly evaluate the settlement and their options.  In discussing the requisites of adequate notice in class action suits, the 5th Circuit has stated: "Not only must the substantive claims be adequately described but the notice must contain information reasonably necessary to make a decision to remain a class member and be bound by the final judgment or opt-out of the action." *In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088, 1104-1105 (5th Cir. 1977).

Here, the Class Notice fails to disclose what each of the participating defendants and participating insurers are contributing to the Settlement.  The Settlement Allocation Plan states only as follows: "[t]he Participating Defendant Funds are expected to be funded roughly as follows: (a) Participating Builders Fund – 40% of the Gross Settlement

2

Amount; (b) Participating Suppliers Fund – 40% of the Gross Settlement Amount; and (c) Participating Installers Fund – 20% of the Gross Settlement Amount." Further, Class Notice provides absolutely no indication, even a general range, as to what the individual recovery for Class Members will be.

The failure to provide this necessary information precludes Class Members from forming any understanding of what the Settlement means in terms of their recovery. Without being furnished with this information, Class Members cannot make intelligent decisions as to whether or not they would be better served pursuing their claims against the participating defendant and insurer in state court or other venues. As such, Class Members are left without sufficient information to be able to assess the merits of the Settlement.

**B.      The Settlement Fails To Account For Necessary Subclasses.**

The Manual For Complex Litigation says that if significant differences in interests exist between different groups within the class, the certification must create subclasses, with separate representatives and class counsel for each subclass.    Manual For Complex Litigation 4th §21.23, p. 272.  The Supreme Court addressed this requirement in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), where it mandated separate class representatives and class counsel for subgroups within the class, even in the settlement context:

> The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected.  Although the named parties alleged a range of complaints, each served generally as representative for the whole, not for a separate constituency.  In another asbestos class action, the Second Circuit spoke precisely to this point: "[W]here differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without

3

creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups. The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class. But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups." *Amchem Prods., Inc. v. Windsor*, 521 U.S. at 742.

The Supreme Court reiterated this rule in *Ortiz*:

[I]t is obvious after *Amchem* that a class divided between holders of present and future claims (some of the latter involving no physical injury and attributable to claimants not yet born) requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel. See *Amchem*, 521 U.S., at 627 (class settlements must provide "structural assurance of fair and adequate representation for the diverse groups and individuals affected"); cf. 5 J. Moore, T. Chorvat, D. Feinbert, R. Marmer, & J. Solovy, Moore's Federal Practice §23.25[5][e], p. 23-149 (3d ed. 1998) (an attorney who represents another class against the same defendant may not serve as class counsel). FN31
FN31. ... In *Amchem*, we concentrated on the adequacy of named plaintiffs, but we recognized that the adequacy of representation enquiry is also concerned with the "competency and conflicts of class counsel." Id., at 626, n. 20, 117 S.Ct. 2231 ...; see also 5 Moore's Federal Practice §23.25 [3][a] (adequacy of representation concerns named plaintiff and class counsel).

*Ortiz*, 527 U.S. at 856.

Here, subclasses are necessary because Class Members must receive funds according to the specific contributions made by that Class Member's respective builder, installer, and/or supplier to the Settlement Fund. The Settlement, however, fails to account for subclasses amongst the Class Members, and thus fails to properly allocate the funds. Accordingly, the Settlement does not satisfy the adequacy requirements of Rule 23.

4

C.    **This Settlement Has Been Tied To Other Pending Chinese Drywall Settlements In Such A Way As To Preclude Opt-Outs.**

Due process requires that absent class members be given the opportunity to opt-out of a class action involving money damage claims. [See *Phillips Petroleum Co. v. Shutts*, 105 S.Ct. 2965, 2974, fn. 3 (1985); *Brown v. Ticor Title Ins. Co.* (9th Cir. 1992) 982 F.2d 386, 392 [it violates due process to give res judicata effect to a class action judgment involving money damage claims of class members who had not been afforded opt-out rights]; see also Manual for Complex Litigation, Third, § 30.231 (1995)]. Here, however, the Settlement has been tied to the other proposed Chinese drywall settlements in such a way as to render the "opt-out" provision illusory.

While the Settlement states that there is an opportunity for Class Members to seek exclusion, in practice, this is not true. The Settlement is conditioned on non-Knauf homeowners accepting the Settlement, and releasing downstream defendants. However, Class Members believe that many of these downstream defendants have insurance and assets well in excess of what they are contributing to the Settlement, and as such, Class Members may be better off pursuing these entities in state court.[1] Nevertheless, in order to make an intelligent decision, Class Members must be provided with the exact amount each participating defendant and insurer are contributing to the Settlement.

Class Counsel has made clear that the Settlement will become invalid if too many people opt-out, however has not stated what amount of opt-outs would dismantle the Settlement. Because of the condition that non-Knauf homeowners must accept the Settlement, despite it possibly being in their better financial interests not to do so, Class

---

[1] Indeed in this matter, the amounts each participating defendant and insurer are contributing have not been disclosed leaving the Objector to speculate as to whether or not he would be better off pursuing his case in state court.

5

Counsel has created a Settlement that puts Knauf homeowners at odds with non-Knauf homeowners who choose to request exclusion.

Further, because Class Counsel created this conflict among Class Members, they cannot adequately represent such Class Members. See *Payne v. Travenol Laboratories, Inc.* (5th Cir. 1982) 673 F.2d 798, 810–811 [to provide adequate representation, the class representative must not seek relief that favors some class members at the expense of others].

Because the Settlement does not actually permit Class Members to opt-out, other than perhaps some minimal, tolerable number, the Settlement is in violation of Fed. Rule Civ. P. 23.

**D.    This Settlement Is Unfair, Unreasonable, And Inadequate Because There Is Insufficient Evidence To Support Class Counsel's Requested Attorneys' Fees.**

The amount of the proposed attorneys' fees is an integral element in determining whether the settlement is fair, reasonable, and adequate. "In class actions whose primary objective is to recover money damages, settlements may be negotiated on the basis of a lump sum that covers both class claims and attorney fees. Although there is no bar to such arrangements, the simultaneous negotiation of class relief and attorney fees creates a potential conflict ... The judge can condition approval of the settlement on a separate review of the proposed attorneys' compensation." Manual For Complex Litigation 4th § 21.7, p. 335. Courts have recognized that the class action settlement dynamic itself "creates incentives for collusion – the temptation from the lawyers to agree to a less than optimal settlement 'in exchange for red-carpet treatment on fees.'" *Goldberger v. Integrated Resources, Inc.*, 209 F3d 43, 53 (2nd Cir. 2000).

6

Here, there is inadequate evidence to support the reasonableness of the fee request by Class Counsel, and taking those fees from the already insufficient settlement fund renders the settlement unfair, unreasonable and inadequate.

## IV.    CONCLUSION

Wherefore, Objector prays that the Court deny the proposed settlement, deny certification of the settlement class, deny the requested fees to Class Counsel and grant Objector such other and further relief as to which Objector may be entitled.

Respectfully submitted,

Dated: September 27, 2012

/s/ C. David Durkee, Esq.
ROBERTS & DURKEE, P.A.
Alhambra Towers
Penthouse 1 – Suite 1603
121 Alhambra Plaza
Coral Gables, FL 33134
Phone: (305) 442-1700
Fax: (305) 442-2559
durkee@rdlawnet.com
Counsel for Wayne Kaplan

Mark Milstein, Esq.
Paul D. Stevens, Esq.
Allison R. Willett, Esq.
MILSTEIN ADELMAN, LLP
2800 Donald Douglas Loop North
Santa Monica, CA 90405
Phone: (310) 396-9600
Fax: (310) 396-9635
Counsel for Wayne Kaplan

7