# EXHIBIT  22

1

2                (REAL-TIME) UNEDITED TRANSCRIPTION DISCLAIMER

3

4    The following transcript of proceedings, or any portion
     thereof, is UNEDITED and UNCERTIFIED by the certified
5    court reporter, at the request of counsel for the
     plaintiff.
6
     The purchaser/user agrees not to disclose this
7    (real-time) unedited transcription in any form (written
     or electronic) to anyone who has no connection to this
8    case.  This is an unofficial transcription which should
     NOT be relied upon for purposes of verbatim citation of
9    testimony.

10   This transcription has not been checked, proofread or
     corrected.  It is a draft transcript, NOT a certified
11   transcript.  As such, it may contain computer-generated
     mistranslations of stenotype code or electronic
12   transmission errors, resulting in inaccurate or
     nonsensical word combinations, or untranslated
13   stenotype symbols which cannot be deciphered by
     non-stenotypists.  Corrections will be made in the
14   preparation of the certified transcription, resulting
     in differences in content, page and line numbers,
15   punctuation, and formatting.

16   This (real-time) unedited transcript contains no
     appearance page, certificate page, index, or
17   certification.

18

19

20

21

22

23

24

25

1          THE VIDEOGRAPHER:  We're now on the

2   record.  My name is Doug Overstreet, I'm the

3   videographer.  Today's date is October 31st, 2012, it's

4   5:07 p.m., beginning of tape one, this video deposition

5   is being held in Corpus Christi, Texas, in the matter

6   of Chinese manufacture drywall products liability

7   litigation the U.S. District Court Eastern District of

8   Louisiana.  The deponent is Mr. Saul Soto.  Would

9   counsel please identify themselves for the record.

10          MR. LONGER:  Fred Longer on behalf of the

11   class counsel.

12          MR. GAUGHAN:  Matthew on behalf of class

13   counsel.

14          MR. HUSEMAN:  And Van Huseman on behalf of

15   the deponent.

16          MR. DODSON:  Paul Dodson for the deponent.

17          THE VIDEOGRAPHER:  Would the court

18   reporter please swear in the witness.

19               SAUL SOTO,

20   having been first duly sworn, testified as follows:

21               EXAMINATION

22   BY MR. LONGER:

23     Q.    Mr. Soto, my name is Fred Longer.  We met

24   before the deposition began in the hallway outside.

25   But I'll introduce myself again.  I am going to be

1    asking you a series of questions today.

2        A.    Okay.

3        Q.    And they are related to the objection that has

4    been filed on your behalf in the multi district

5    litigation taking place in the Eastern District of

6    Louisiana involving the Chinese drywall matter.

7        A.    Okay.

8        Q.    If I don't ask a question that you understand,

9    just let me know.  Is that okay?

10        A.    That will work.  Thank you, sir.

11        Q.    We are being recorded here, as you can see all

12    around you.  I would appreciate it, sir, you're soft

13    spoken, but I would appreciate that you keep your voice

14    up because I actually have hearing loss and I like to

15    be able to hear people and in order to do that, I need

16    to have them speak loudly.

17        A.    I understand.

18        Q.    Thank you.

19        A.    My wife tells me that.

20        Q.    For the record, sir, would you please state

21    your full name?

22        A.    My name is Saul Soto.

23        Q.    And what is your residence address?

24        A.    My residence address is 429 Claride, Corpus

25    Christi, Texas, zip code 78418.

1     Q.    And what is your date of birth?

2     A.    Date of birth is March 30th, 1982.

3     Q.    And what is your social security number?

4     A.    My social security is 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.

5     Q.    Now, my appreciation is that you have a

6  business that you operate called SHS Construction; is

7  that correct?

8     A.    That is correct, sir.

9     Q.    What is the full name of that company?

10    A.    That is the name.  It's really just my

11 initials.  It's SHS, which is Saul, and then my mom's

12 maiden name, Hernandez, Soto.

13    Q.    Now, my appreciation is that business is just

14 a name, you're not incorporated; is that correct?

15    A.    We are not incorporated, we're a sole

16 proprietorship.

17    Q.    What is the tax identification number, if any,

18 for SHS Construction Company?

19    A.    I pretty much since it's sole proprietary use

20 my social security mainly.  At one occupant I used

21 another one when I had employees and that one is

22 actually in that box, in those boxes, that tax ID

23 number.

24    Q.    We'll talk about those boxes in a moment but

25 for what period of time did you have employees that

1    we're talking about?

2        A.    Back in around 2009.

3        Q.    And what was the tax ID number that you used

4    in that time frame?

5        A.    I would have to look in there, sir.  I'm

6    sorry.  I do not have that in front of me.

7        Q.    Okay.  Was it somebody else's social security

8    number?

9        A.    No, it was just a tax ID for tax purposes.

10       Q.    All right.  Now, is it fair to say then that

11   any questions that I direct to you are also directed to

12   SHS construction?

13       A.    That would be correct.

14       Q.    All right.  Sir, you have Counsel with you

15   today, Mr. Huseman and Mr. Dodson; is that correct?

16       A.    Yes, that's correct.

17       Q.    Who are these gentlemen?

18       A.    They are the lawyers who are helping me with

19   this at this moment.

20       Q.    All right.  And when did you first meet either

21   of these gentlemen?

22       A.    I met them, I believe it was last week.  I'd

23   have to look at my schedule.  I believe it was last

24   week.

25       Q.    Okay.  And were they -- were they retained,

1    which may be the wrong word.  Were they engaged to

2    assist you in preparation for today's deposition?

3         A.    Yes, they helped me with today's preparation.

4         Q.    Okay.  And you met them last week to prepare

5    for the deposition; is that correct?

6         A.    I met them, yes.

7         Q.    All right.  And you have a calendar with you?

8         A.    I can look on my phone if you will allow me

9    to.

10         Q.    Yes.

11         A.    And I can give you -- is that what you would

12    need the date?

13         Q.    Yes, sir.

14         A.    I have it here October 24th, which is last

15    Wednesday at 10 a.m.

16         Q.    All right.  And did you arrive at this office

17    at 10 a.m.?

18         A.    I arrived at this office, actually like around

19    9:45 or 9:30 in the morning.

20         Q.    I understand you're prompt.  I saw you were

21    prompt this afternoon.  So you met beginning at around

22    let's just say 9:45, 10 o'clock and how many hours did

23    you meet with counsel?

24         A.    We were together -- let's see here.  For a

25    couple of hours, a few hours, something like that.  I

1   don't remember the exact time.  I'm trying to put it

2   together in my head.

3        Q.   So was it before lunch?

4        A.   Can I look at my phone again real quick?

5        Q.   Certainly.

6        A.   Let me look at a text message just to kind of

7   help me figure out more or less when I left, something

8   like that.

9        Q.   Whatever will refresh your recollection,

10   that's fine with me.

11        A.   It looks like around 1:00 or 2:00 or somewhere

12   around that time.  I can't say exactly what time I left

13   but it was around that time.

14        Q.   Okay.  So approximately three or four hours?

15        A.   Uh-huh.

16        Q.   Is that a yes?

17        A.   That is -- that's correct.

18        Q.   Who was present the meeting?

19        A.   That day was Mr. Huseman, Mr. Dodson, Eric,

20   and I think Ronnie was there, too, right?

21             MR. HUSEMAN:  Uh-huh.

22        A.   Ronnie, yeah.

23        Q.   All right.  Just so that I'm clear, Ronnie is

24   Ronnie Garcia?

25        A.   Ronnie Garcia, that is correct.

```
 1      Q.    And Eric, I don't know that name.  Who is
 2  Eric?
 3      A.    Eric works for --
 4            MR. HUSEMAN:  He's the fellow that you met
 5  a while ago that made the comment about wearing a tie.
 6            MR. LONGER:  He looks sharp.
 7            MR. HUSEMAN:  I'll take implication on
 8  that.
 9      Q.    And what is Eric's last name?
10            MR. HUSEMAN:  Stewart.
11            MR. LONGER:  S-T-E-W-A-R-T?
12            MR. HUSEMAN:  Yes, sir.
13      Q.    Is that the only time that you met with -- in
14  connection with preparation for today's deposition?
15      A.    No.  We also met on Monday.
16      Q.    And who is the "we"?
17      A.    The same people.
18      Q.    For how long did you meet on Monday?
19      A.    From around 1:30 or 2:00 until about 5:00.
20  Yeah, around 5 o'clock p.m.
21      Q.    All right.  On either occasion, did you take
22  any notes?
23      A.    Yes, I did.
24      Q.    And do you have them with you?
25      A.    I do.
```

1     Q.    All right.  Going to ask that I be presented

2  with them and I'll mark them as an exhibit.

3              MR. HUSEMAN:  At this point I'm going to

4  instruct him not to produce those to you.  I assert

5  attorney/client privilege.

6     Q.    Would those notes be useful to you -- let me

7  ask you this question.

8              When I walked into the hallway when I met you

9  this afternoon before the deposition, were you

10  reviewing those notes?

11    A.    I was reviewing everything that I had.

12    Q.    Including your notes?

13    A.    Yes, that is correct.

14    Q.    Were those notes useful to you in terms of

15  refreshing your recollection as to how to proceed

16  through the course of this deposition?

17    A.    They help me stay focused and to be able to...

18    Q.    Is that a yes with an explanation?

19    A.    Yes, that's correct.

20              MR. LONGER:  I'm going to ask that those

21  notes be produced.

22              MR. HUSEMAN:  And those are protected by

23  attorney/client privilege so do not divulge those.

24              THE WITNESS:  Okay.

25    Q.    Have you had any communications with any other

1  counsel in connection with preparation for today's

2  deposition?

3      A.   Mr. Chris Bandas.

4      Q.   And what have you done with Mr. Bandas in the

5  way of preparing for today's deposition?

6              MR. HUSEMAN:  And if you would be kind let

7  me interrupt you.  You can tell him when you met with

8  him.

9              THE WITNESS:  That's correct.

10             MR. HUSEMAN:  But not the substance of any

11 communication with your attorneys, please.

12             THE WITNESS:  I appreciate that.  Thank

13 you.

14     A.   We met -- we met a couple of times back on

15 September 28th, I believe, and then again -- is it okay

16 if I look at my schedule on my phone?

17     Q.   Sure.

18     A.   And October 17th.  Yeah, we have communicated,

19 I believe one or two times on the phone this month.

20     Q.   All right.  And would anything in that

21 Blackberry relate those communications?

22     A.   I mean, we talk on the phone.  I believe there

23 might have been like a text message just confirming a

24 time, I believe.

25             MR. HUSEMAN:  Yeah, make sure Mr. Soto you

1    stay away from the substance of any communications.

2              THE WITNESS:  Okay.

3              MR. HUSEMAN:  The subject matter or the

4    contempt, either one.

5              THE WITNESS:  Okay.

6         Q.    All right.  Now, the meeting on September 28,

7    is that the first time that you met Mr. Bandas?

8         A.    That is the first time we met face-to-face.

9         Q.    Okay.  And how did you meet Mr. Bandas

10   otherwise prior to that?

11        A.    Through a friend of mine.

12        Q.    And your friend's name is?

13        A.    His name is Christopher Batman.

14        Q.    Can you spell that, please?

15        A.    C-H-R-I-S-T-O-P-H-E-R.

16        Q.    And the last name?

17        A.    Batman, B-A-T-M-A-N.

18        Q.    And who is Mr. Batman to you?

19        A.    He's just a friend who also is a customer of

20   mine.

21        Q.    And what sort of customer is he?

22        A.    We have done work for him on his home, some

23   remodeling, things of that nature.

24        Q.    And what relationship, if any, does Mr. Batman

25   have to Mr. Bandas, to your knowledge?

1    A.    I believe they work in the same office.  I

2  don't know exactly what they do together, to be honest

3  with you.

4    Q.    What is Mr. Batman's vocation?

5    A.    He is a lawyer.

6    Q.    And he is an attorney for the Bandas law firm?

7    A.    I'm actually not sure.  I believe he operates

8  out of there, but he has his own law firm, which is the

9  Batman law firm.

10    Q.    Got it.  Now, you mentioned that you had met

11  Mr. Bandas prior to September 28th in connection with

12  Mr. Batman.  Was that by telephone?

13    A.    I had talked to him on telephone before that.

14    Q.    All right.  And what date was that?

15

16

17    A.    It was probably a few days before that.

18    Q.    So late September 2012?

19    A.    That is correct.

20    Q.    All right.  And when you spoke to Mr. Batman,

21  what -- what was it that he was relating to you that

22  you should speak to Mr. Bandas?

23    A.    Obviously since we know each other and we

24  worked together before, he knew that we -- you know, we

25  installed sheetrock and we did things of that nature.

1    And we had also installed sheetrock in a couple of jobs

2    at his house, so he let me know about this case.

3        Q.    Is that the first time you had ever heard

4    about the Chinese drywall case?

5        A.    That is correct.

6        Q.    And was Mr. Batman interested in -- did he

7    express any interest in you participating as an

8    objector to the settlement at that time?

9        A.    All he said is, you know, knowing that I had

10   installed it before, that, you know, it was something

11   that I should probably look into.

12       Q.    What is it that you should look into?  I

13   missed that?

14       A.    As far as the installation of the sheetrock

15   that we had done before.

16       Q.    Yeah, but what was it that he said you should

17   look into and the nature of the litigation?

18       A.    As far as being a class member.

19       Q.    And what was it that you were going to look

20   into?

21       A.    Well, seeing --

22       Q.    As far as being a class member?

23       A.    Well, seeing as I knew that I had installed

24   sheetrock before, then I knew that I needed to look

25   into it because I might have been involved in putting

1    in defective sheetrock in people's houses.

2         Q.    Did he direct you to Mr. Bandas specifically?

3         A.    Yes, he referred me.

4         Q.    Is there anything else about that conversation

5    that you can recollect with Mr. Batman?

6         A.    That's pretty much everything, sir, that I can

7    remember.

8         Q.    Do you know if Mr. Batman and Mr. Bandas share

9    cases together?

10        A.    I don't know.

11        Q.    And -- and the -- what's the next step that

12   you took in the way of following up on your

13   conversation with Mr. Batman?

14        A.    He gave me the number to Mr. Bandas and I

15   called it.

16        Q.    All right.  And that was the call that we

17   agreed was some time in late September 2012?

18        A.    That is correct.

19        Q.    And what was the nature of your conversation

20   with Mr. Bandas?

21             MR. HUSEMAN:  Once again Mr. Sew Soto you

22   do not talk about what was discussed.

23             MR. LONGER:  Let me just.

24             MR. HUSEMAN:  Let me give him

25   instructions, please.  Any content of your

1    communication with Mr. Bandas should not be discussed.

2               THE WITNESS:  Okay.

3        Q.    When you called Mr. Bandas, was it your --

4    what was your intention?

5        A.    Well, to be honest with you, the first thing

6    that came to mind and that got me worried was man, if I

7    installed this sheetrock in some people's houses, how

8    can I be held liable against it or is that, you know,

9    going to affect me?

10       Q.    Okay.  Did Mr. Batman show you the settlement

11   agreement?

12       A.    No.

13       Q.    Did Mr. Batman direct you to the website or

14   any location where you could obtain the settlement

15   agreement?

16       A.    No, he didn't.

17       Q.    So he suggested to you at the time that you

18   could be held liable for something in the -- during

19   your conversation?

20       A.    He did not suggest that, no, sir.

21       Q.    Well, how is it that you became concerned and

22   were asking yourself how is that going to affect me?

23       A.    Well, as a Ben business owner, I mean, I work

24   off of referrals and that's the first thing that came

25   to mind.

1    Q.    Has anyone expressed to you a concern about

2    Chinese drywall being in their home?

3    A.    Nobody has called me on that.

4    Q.    Now, you called Mr. Bandas on September 20 --

5    I'm sorry, in late September?

6    A.    Yes.

7    Q.    And how long did you talk to Mr. Bandas?

8    A.    A couple of hours.

9    Q.    And in the course of that conversation, were

10   you seeking to retain counsel?  Strike that.

11         Going into the conversation, were you seeking

12   to retain counsel?

13   A.    I knew that I needed to talk to a lawyer,

14   that's what I did know.

15   Q.    All right.  And at the end of the

16   conversation, what was your understanding about what

17   you were going to do about speaking to a lawyer?

18   A.    Well, my understanding was that I was part of

19   this class and after seeing pictures, which confirmed

20   to me that I did install sheetrock of that nature that

21   were made in China, you know, the pictures that I seen

22   showed -- helped me understand that, it kind of was

23   true.

24   Q.    Well, this is on the told phone.  Where did

25   you see pictures of Chinese drywall?

1        A.      You were talking about telephone?

2        Q.      The late September 2012 telephone call.  I

3    thought that's what we were talking about?

4        A.      Oh, okay.  I'm sorry.  I apologize.  Well, you

5    know, one thing is talking to somebody on the phone and

6    the other is meeting face-to-face to be able to

7    understand things a little bit more.  So that's the

8    next thing that we did is meet face-to-face.

9        Q.      All right.  So you spoke for a couple of

10   hours.  And my question to you was:  Well, let me just

11   break it down?

12       A.      You know what, can I -- I didn't know that you

13   were talking about speaking on the phone.

14       Q.      All right.

15       A.      I apologize for that.  But what I can say,

16   though, that I did speak on the phone for not two

17   hours.  I was thinking we were talking about the

18   conversation that we had -- well, the time --

19       Q.      The face-to-face meeting?

20       A.      The face-to-face meeting.  I'm sorry, sir.

21   That is what -- after speaking on the phone, we spoke

22   on the phone maybe about maybe about ten or 15 minutes.

23   That was when we set something up to meet face-to-face.

24   And then when we met face-to-face, we spoke for about a

25   couple of hours.

```
 1        Q.    Okay.

 2        A.    I apologize for that.

 3        Q.    So what was the nature of the telephone call

 4   with Mr. Bandas for those ten or 15 minutes?

 5              MR. HUSEMAN:  Do not discuss the content

 6   of your discussions with your lawyer.

 7        Q.    Well, did he offer you any legal advice?

 8              MR. HUSEMAN:  Well, once again, he is your

 9   lawyer and what you discussed with him is privileged,

10   so don't respond to that.

11              MR. LONGER:  The only thing that's

12   privileged is if he offered legal advice.

13        Q.    Did he offer you legal advice?

14        A.    He mentioned to me face-to-face.

15        Q.    That you should meet face-to-face?

16        A.    That is correct.

17              MR. HUSEMAN:  That was his advice to you.

18        A.    That was his advice to me.

19        Q.    Did he mention to you that he worked with

20   Mr. Batman?

21              MR. HUSEMAN:  Once again, do not discuss

22   the content of your discussion with Mr. Bandas.

23        Q.    Did you talk about the terms of retention

24   during that telephone call?

25        A.    No.
```

1      Q.    All right.  So you arranged for a meeting on

2   September 28 and how did that play out?  You went over

3   to the Bandas law firm?

4      A.    We met at Mr. Bandas' home.

5      Q.    At his home?

6      A.    Yes.

7      Q.    Okay.  Is that near your neighborhood?

8      A.    That is on the way to a job site that I was

9   going to go to that day.

10     Q.    I see.  And what time did you arrive at his

11  home on September 28th?

12     A.    If I remember correctly, it was around 9:30,

13  around that time.

14     Q.    All right.  And if you met for two hours, you

15  left around 11:30?

16     A.    Something like that, yes, sir.

17     Q.    And during the course of that meeting, did you

18  review any documents?

19             MR. HUSEMAN:  Once again, what you did

20  with counsel in terms of communication, you're not to

21  reveal.

22     Q.    Well, my understanding is that you saw

23  pictures.  Is that true?

24             MR. HUSEMAN:  Well, once again, what you

25  and Mr. Bandas discussed or did is not to be discussed

1  here.

2      Q.    Did you sign any documents?

3      A.

4            MR. HUSEMAN:  If you signed a contract you

5  can tell him that.  That's okay.

6      A.    Yes.  Yes, sir.

7      Q.    So you talked about retention at that point in

8  time?

9      A.    Retaining counsel.

10     Q.    All right.

11           MR. HUSEMAN:  Anything beyond where you

12  are right now, the fact that you signed up with him and

13  talked with him do not go there.  Do not talk about

14  anything you discussed, what you reviewed, what he told

15  you or what you told him.

16           THE WITNESS:  Okay.

17           MR. HUSEMAN:  All right.

18     Q.    Just about to go into marking this document as

19  an exhibit but before I do that, Mr. Soto, you have in

20  front of you whatever it is you brought in that

21  envelope.  Can you identify for the record, please,

22  what you've brought with you?

23     A.    This is an objection.  This is the request for

24  objections and this is the subpoena that you-all issued

25  to me.

1    Q.    Okay.  And your notes are in the envelope; is

2  that right?

3    A.    Yes, sir.

4    Q.    All right.  And how many pages are your notes?

5    A.    One page, front and back.

6    Q.    All right.  And would you just take it out of

7  the envelope, please, and show it to the camera so that

8  we can identify it and I would like to mark it?

9              MR. HUSEMAN:  No, we're not going to do

10  that.

11              MR. LONGER:  I would like to mark that.

12              MR. HUSEMAN:  Showing it to the camera has

13  the same effect as showing it to you and we're not

14  doing that, so if you would like to have it marked and

15  looking at this I'll tell you counsel what this is.

16  Are notes concerning how we prepared him for

17  deposition.

18              MR. LONGER:  That's fine.

19              MR. HUSEMAN:  That's our advice to him and

20  we are not going to voluntarily give that to you.

21  Unless the judge for some reason orders us.

22              MR. LONGER:  What I'm thinking is that we

23  mark that as an exhibit and that it not be -- that the

24  court reporters will hold on to it and that we may or

25  may not get it, depending on how the court rules.

1          MR. HUSEMAN:  Okay.  I don't have a

2    problem with that.

3          MR. LONGER:  And you can have your court

4    reporter hold on to it, that will be fine.

5          MR. HUSEMAN:  That will be fine.  And

6    Ginny, if you will make a copy of it when we come to a

7    break.  And guard it with your life.

8          SPEAKER:  Do you want to seal it.

9          MR. LONGER:  Yes.  So that will be Exhibit

10   No. A and then I will have numbered documents going

11   forward.

12         MR. HUSEMAN:  Okay.

13         (Exhibit No. 1 was marked.)

14    Q.    Okay.  Exhibit No. 1 --

15    A.    Sir, I'm sorry.  Would it be okay if I went to

16   the restroom?

17    Q.    Yeah, let's take a break.

18         THE VIDEOGRAPHER:  Off the record at 5:40.

19         (A recess was taken.)

20         THE VIDEOGRAPHER:  We're on the record at

21   5:47.

22    Q.    Mr. Soto, over the break, I had the document

23   that was provided to me by Mr. Huseman marked as

24   Exhibit No. 1.  It's in front of you?

25    A.    Okay.

1      Q.    This document is entitled class-action

2 objector power of attorney and contingent fee

3 agreement; is that correct?

4      A.    That is correct.

5      Q.    So the purpose of -- this is your retainer

6 agreement with -- well, actually, let's go to page 3 of

7 the document.  Is that your signature?

8      A.    It is my signature, correct.

9      Q.    And it's also signed by Mr. Bandas,

10 Christopher A. Bandas; is that correct?

11      A.    On the back part of it?

12      Q.    Page 3, yes.

13      A.    Page 3, yes, sir.

14      Q.    Okay.  And this is the document that you

15 signed at Mr. Bandas' home on September 28th; is that

16 correct?

17      A.    That is correct.

18      Q.    Did you sign any other documents on that day?

19      A.    Not that I can remember, sir.

20      Q.    This retainer agreement -- well, it's a power

21 of attorney and contingent fee agreement.  And it

22 purports to be for a class-action objector, correct?

23      A.    That's what it looks like, sir, yes, sir.

24      Q.    Did Mr. -- I take it from this document that

25 Mr. Bandas has -- or you have not retained Mr. Bandas

1    to pursue any claims that you may actually have based

2    upon your fear of injury; is that correct?

3        A.    That is correct.

4        Q.    You have no expectation that Mr. Bandas will

5    help you in any way if in fact you are personally

6    injured to pursue that claim; is that right?

7        A.    That is correct.

8        Q.    And the same goes for any business claims, you

9    have no expectation that Mr. Bandas is going to help

10   you out as a lawyer for any business losses?

11       A.    That is correct.

12       Q.    You have no expectations that Mr. Bandas is

13   going to help you out for any concerns that you may

14   have about lawsuits of anyone that you've installed

15   drywall into their homes who may sue you; is that

16   correct?

17       A.    That is correct.

18       Q.    The only thing that you have retained him for

19   on a contingent basis, correct?  You retain him on a

20   contingent basis, correct?

21       A.    Yes.

22       Q.    Is to object to a settlement?

23       A.    That is correct.

24       Q.    And he talks there that you may get -- or I'm

25   sorry, the document -- by the way, I just want to be

1    sure now.  If you go to paragraph 2.1 of the document,

2    it says you represent you're a member of the class as

3    defined in the materials published at

4    https://ChineseDrywallClass.com.  Do you see that?

5         A.    Yes, sir.

6         Q.    Now, have you ever visited the website of

7    https://Chinesedrywallclass.com prior to signing this

8    document?

9         A.    Yes.

10        Q.    You did?

11        A.    Prior to signing, yes.

12        Q.    All right.  And when was that?

13        A.    That same day.

14        Q.    Was that before you went to Mr. Bandas' house.

15        A.    No.

16        Q.    Sir, so while you were at Mr. Bandas' house,

17   you visited a website, Chinesedrywall.com?

18        A.    Yes, sir.

19        Q.    Did you read the documents on

20   ChineseDrywallClass.com?

21        A.    Not all the documents, sir.

22        Q.    What documents did you read?

23        A.    Just kind of scanned through it and looked at

24   the -- more of the pictures.

25        Q.    Pictures of what?

1    A.    Of drywall.

2    Q.    So you can't tell us what -- apart from

3  photographs, what any of the definitions or documents

4  said on that visit of ChineseDrywallClass.com; is that

5  correct?

6    A.    Yeah, I can't remember any of that stuff.

7    Q.    Did you have a sense that the settlement

8  afforded benefits to persons who were class members?

9    A.    I did have a sense of it, yes.

10    Q.    And what benefits were provided to class

11  members that you discovered on September 28, 2012?

12    A.    Well, it just said to submit and that's all I

13  can remember.

14    Q.    Do you remember that it offered persons in the

15  class that they could take from a fund of $80 million?

16    A.    I'm sorry, say that again.

17    Q.    Do you remember the size of the fund that was

18  being?

19    A.    Oh, yes, sir.

20    Q.    -- being provided?

21    A.    Yes, sir, I remember that.

22    Q.    And was it $80 million or was it 82.7 million?

23    A.    I don't remember that, but I know it was

24  around $80 million.  I don't remember the exact number.

25    Q.    And did you realize that you could, if you in

1  fact were a class member, you could take from the fund?

2      A.    I did realize that.

3      Q.    And did you look to see which participating

4  defendants were involved in the litigation that you --

5      A.    I did not, sir.

6      Q.    -- were associated with?

7      A.    I did not, sir.

8      Q.    Did you -- so as of September 28, 2012, you

9  did not know who the participating defendants were in

10  the litigation that you were related to that you might

11  have a claim against; is that correct?

12      A.    I'll be honest, I'm kind of confused.  Is

13  there a way you can maybe rephrase that a little bit

14  for me?

15      Q.    Sure.  On the website,

16  ChineseDrywallClass.com, the settlement agreement was

17  there?

18      A.    Okay.

19      Q.    It had exhibits to it?

20      A.    Uh-huh.

21      Q.    That identified the participating defendants

22  and the participating.  Are you aware of that?

23      A.    I don't remember.  I can't say for sure.

24      Q.    Are you aware of it today?

25      A.    That there's participating defendants?

1    Defendant is -- can you explain the defendant exactly,

2    what that means?

3        Q.    Yeah.   Like south Florida drywall?

4        A.    Okay.   There's several of them.   I think I

5    remember that now.

6        Q.    Okay.   And is that a vague recollection that

7    you saw that?   Or do you just remember the photos?

8        A.    As far as seeing --

9        Q.    What you saw when you visited?

10       A.    Correct.

11       Q.    The website?

12       A.    What I remember seeing is the pictures of made

13   in China on the backs of sheetrocks.

14       Q.    Excuse me just one second.

15             Okay.   Now, the Exhibit 1 talks about

16   attorneys fees, expenses and payments to you.   Do you

17   see that?

18       A.    Yes.

19       Q.    All right.   And actually -- I'm sorry.   This

20   is my bad.   Let's talk about section 2.2.

21       A.    Yes.

22       Q.    Actually, I'm going to have to go back to 2.1.

23   I'm a lawyer.   Excuse me.

24       A.    Okay.

25       Q.    All right.   What did you understand the

1   definition of the member of a class to be on September

2   28th, 2012, based upon your review of Chinese drywall

3   class.com?

4       A.   Well, my understanding is you're part of that

5   class if you installed it, you worked around it, you

6   know, and you remember seeing those markings on the

7   back.

8       Q.   All right.  And it says that you can

9   demonstrate that you're entitled -- now I'm going to

10  section 2.2?

11      A.   Okay.

12      Q.   You can demonstrate you're entitled to receive

13  settlement benefits as a member through documentation

14  or by affidavit.  And you've brought with -- well,

15  that's what it says, correct?

16      A.   Correct.  That is correct.

17      Q.   And you've brought with you today three banker

18  boxes full of documents that do what?  They purport to

19  show that you are entitled to receive benefits?

20      A.   They show my purchases and me reselling

21  sheetrock.

22      Q.   Okay.  Now, sheetrock, as I understand it, is

23  a trade name, so sort of like Kleenex is for tissue

24  paper.  Is that your understanding?

25      A.   Yes, sir.

1    Q.    Who makes sheetrock?

2    A.    There are many people that make sheetrock.

3    Q.    Well, the brand name sheetrock?

4    A.    I don't know, to be honest with you.

5    Q.    Do you know if it's a Chinese board sheetrock?

6    A.    I don't know.

7    Q.    Are you aware that it's manufactured by United

8    States gypsum USG?

9    A.    I don't know.

10   Q.    All right.  At some point -- and I don't know

11   when, we can do it even now or later -- we'll mark

12   these boxes as exhibits.  Let me ask your counsel,

13   though.  I want to do this -- let me just ask you real

14   fast.  Or I can go off the record.  These documents

15   based on my quick look at this stuff are

16   undifferentiated, it's just his entire records for the

17   year and --

18              MR. HUSEMAN:  The records he has

19   possession of.  And we're not making representation

20   that there could not be other records but these are the

21   ones in his possession.  And rather than try to discern

22   which ones were relevant to your gypsum board and not,

23   we produced them all so there's not any issue about

24   that.

25              MR. LONGER:  Will you later tell us which

1    ones are relevant or is it supposed to be a fishing

2    expedition for us to figure it out?

3              MR. HUSEMAN:  Well, what you asked for is

4    contained in there and the extent of the subpoena is

5    not absolutely clear to us on some documents because

6    you have documents that involved more than one thing

7    and which could arguably, for example, involve

8    sheetrock or gypsum board.  And so sort of an abundance

9    of precaution these were all produced to us.  If you

10   want us to go through them for us and give you sort of

11   a learned opinion on that, we'll do that.

12             MR. LONGER:  Well, I'm going to mark them

13   as exhibits, banker box 1, Exhibit No. 2.

14             MR. HUSEMAN:  Sure.

15             MR. LONGER:  Banker box 2 Exhibit No. 3

16   and banker box 3 Exhibit No. 4.  And but I absolutely

17   believe that we shouldn't have to figure out what is

18   relevant, if you're fully capable of doing it.

19             MR. HUSEMAN:  Well, obviously that's

20   something I'm willing to inflict on Mr. Bandas since he

21   is in the substance of the case than we are which I

22   explained to you before the deposition, but I don't

23   think he'd have any problem trying to do that for you.

24             MR. LONGER:  All right.

25             (Exhibit Nos. 2, 3, 4 were marked.)

1          MR. LONGER:  I thank Ms. Bertolini for

2  teaching me how to count.

3     Q.   All right.  So let's continue now.  The next

4  section of the document is 3 -- section 3, attorneys

5  fees, expenses and payments to you.  Mr. Soto in your

6  words can you tell us what you understand your

7  situation is in terms of how you're going to get paid

8  in this contract?

9     A.   Pretty much if the court approves something,

10  that's how I get paid.

11     Q.   All right.  Did you -- do you recall being

12  told that you could get an incentive award up to

13  $5,000?

14          MR. HUSEMAN:  And that of course goes into

15  the substance of your discussion with Mr. Bandas and

16  you're not to discuss that, please.

17     Q.   Well, apart there the discussion with

18  Mr. Bandas, the document says that you were going to be

19  entitled to an incentive award of not to exceed $5,000;

20  is that correct?

21     A.   That is what it says here.

22     Q.   All right.  By the way, I don't want to go

23  into the nitty-gritty of it, but you did discuss this

24  document with Mr. Bandas, did you not?

25          MR. HUSEMAN:  We're not going into any of

1    that.

2         Q.    It's a yes or no.  Did you discuss this

3    document?

4              MR. HUSEMAN:  No, you're not to discuss

5    that.  You produced the document to him, the document

6    speaks for itself but your discussions with Mr. Bandas

7    regarding your relations with him are not to be

8    discussed otherwise.

9         Q.    All right.  Next section 3.3 says that in the

10   alternative to an incentive award, if your objection is

11   settled without the necessity for court approval,

12   attorneys agree to request as part of the settlement a

13   separate payment to you to compensate you for your

14   time, effort and/or benefit you confer on the class

15   through your service as an objector.  Do you see that?

16        A.    I do see that.

17        Q.    The amount of the payment is contingent on the

18   outcome of the settlement negotiations but will not

19   exceed $5,000.  Do you see that?

20        A.    I do see that.

21        Q.    It says if the settling parties agree to make

22   such a payment will receive the amount of that payment

23   in addition to the benefits set forth in paragraph 3.1,

24   which is what you would have gotten from the settlement

25   anyway, correct?

1    A.    That's what it says here.

2    Q.    And if the settling parties do not agree to

3    make a separate payment to you, you will receive only

4    the benefit set forth in paragraph 3.1, is that

5    correct?  Is that what it says?

6    A.    That's exactly what it says.

7    Q.    What's your understanding of that?

8    A.    What it says here.

9    Q.    Do you have -- did you have an understanding

10   on September 28th that your counsel may try to

11   separately negotiate a settlement of your objection?

12             MR. HUSEMAN:  Any discussions you had with

13   Mr. Bandas, you're not to discuss with counsel.

14             THE WITNESS:  Correct.

15             MR. LONGER:  I'm not asking for

16   discussions, I'm asking for his understanding at the

17   conclusion of that meeting or what his understanding of

18   section 3.3 is.

19             MR. HUSEMAN:  To clarify, you're asking

20   what his take away was from his discussions with

21   Mr. Bandas?

22             MR. LONGER:  Yes.

23             MR. HUSEMAN:  Okay.  My instruction to you

24   is not to discuss that with him.

25   Q.    Sir, did you have an understanding of

1  Mr. Bandas' business prior to meeting with him?

2       A.    No.

3       Q.    In the course of your association with

4  Mr. Bandas, have you come to understand that he has

5  objected to many settlements, class-action settlements

6  thereon the country?

7       A.    I don't know anything about that.

8       Q.    Are you aware of motions that have been filed

9  in the federal court seeking to sanction you and

10  Mr. Bandas for filing motions frivolous motions in

11  front of the court?

12       A.    I don't know anything about that, sir.

13       Q.    You don't know that there's a motion for

14  sanctions against you personally?

15       A.    I do not.

16       Q.    Would it be of interest to you that you might

17  be personally liable for a sanction that Judge Fallon

18  in the federal court myself impose on you because you

19  filed frivolous papers in front of the federal court?

20       A.    When you say frivolous, is that your opinion?

21       Q.    I believe it's on its face obviously

22  frivolous.

23            MR. HUSEMAN:  So what's your question to

24  him?

25       A.    Yeah.  What is the question, I am.

1    Q.    Aisle read it again because your counsel filed

2  frivolous papers on your behalf?

3    A.    That I might be?  So it hasn't been done,

4  correct?

5    Q.    It's before the judge.  Do you think it's

6  something that your counsel should bring to your

7  attention?

8            MR. HUSEMAN:  Okay.  Don't answer that

9  question.  If you're going to continue basically

10  harassing him as you are, we're going to call -- stop

11  that line of questioning.  You're welcome to ask him

12  other questions, but in terms of trying to drive a

13  wedge between him and his lawyer or to interfere with

14  the attorney/client privilege, he may have Mr. Bandas,

15  we're not going to go any further down that road

16  without Fallon saying that's appropriate.

17            MR. LONGER:  Well, I believe in the

18  conference that we had with Judge Fallon this

19  afternoon, he instructed us that we could address

20  standing, his underlying objection and his relationship

21  with his counsel.

22            MR. HUSEMAN:  And --

23            MR. LONGER:  And I believe that his

24  knowledge of what his counsel is doing in federal court

25  and what his counsel has done elsewhere is related to

1  his relationship with his counsel.

2          MR. HUSEMAN:  And your attempts -- just

3  make sure we're clear about what I'm saying to you.

4  Your attempts to say would it be of interest to you or

5  would you like to know or those type of things are

6  basically calculated at least in my view sitting here,

7  as a way of trying to interfere with Mr. Soto's

8  relationship with Mr. Bandas and if that's what the

9  judge has in mind, then perhaps you-all need to make a

10  more explicit ruling on it.  You had a chance to

11  discuss the relationship with him, you've had a

12  contract and in terms of your trying to make Mr. Soto

13  feel bad or to put Mr. Bandas in a bad light with his

14  client, that part I'm not going to go along with.

15     Q.    Are you aware that courts around the country

16  have found Mr. Bandas to be a professional objector?

17          MR. HUSEMAN:  Okay.  This is the same line

18  of questioning.  I'm telling Mr. Soto not to answer

19  that pending the judge ruling on that.

20          MR. DODSON:  So we need to go ahead and

21  set a hearing on that.

22          MR. LONGER:  If you like.

23          MR. DODSON:  As I understand from the

24  rules if we're not going to go into it then we also

25  need to go ahead and file a motion so I can get that

1    cooking.

2                    MR. HUSEMAN:  We will do that in a while

3    and the other part is you can go ahead and ask him

4    questions that are not within dispute.  He's here for

5    your purposes.

6                    MR. LONGER:  All right.  I'll move on.

7        Q.   Okay.  There is a section in here also with

8    section 5.2, Mr. Soto, dealing with association of

9    co-counsel?

10       A.   In section 2.

11       Q.   The last page of the document, page 3.

12       A.   Okay.  Association.  Okay.

13       Q.   And this talks about how Mr. Bandas can

14   associate with other co-counsel.  Is your understanding

15   that your counsel here today are governed by section

16   5.2?

17       A.   That is true.

18       Q.   Okay.  So you don't have a separate contract

19   with the gentlemen in this room?  Or do you?

20       A.   No, not an actual contract.  There's one, I

21   think you might have it, that shows that they would be

22   helping us, I think, with this.

23       Q.   I'm not sure of what you're referencing.  Can

24   you tell me?

25                    MR. HUSEMAN:  Do we have that document

1   that they signed off on, disclosure document?

2               MR. DODSON:  Probably.

3               MR. HUSEMAN:  See if you can get that for

4   him.

5               THE WITNESS:  That's the one --

6               MR. HUSEMAN:  To short-circuit the

7   inquiry, we're not sharing any of the fee with

8   Mr. Bandas.

9               MR. LONGER:  Okay.

10              MR. HUSEMAN:  We're not in plaintiff

11  lawyer mode.

12              MR. LONGER:  He's paying you directly.

13              MR. HUSEMAN:  That's right he's paying us

14  by the hour to do this.

15     Q.   Okay.  All right.  Should we go ahead while

16  we're waiting?

17              MR. HUSEMAN:  It's your pleasure, whatever

18  you like.  No need to burn daylight.

19              MR. LONGER:  That's my thinking.  I

20  thought he was going to pop in and pop out.

21              MR. HUSEMAN:  That was my thinking, too.

22     Q.   Let me go back to page 2, paragraph number 4.

23  Now, you've read this before you signed the document,

24  right?

25     A.   I did read it.

1    Q.    And you understood then that if the objection

2    that you filed was successful or any appeal therefrom

3    any resulting in the disapproval or the rejection of

4    the proposed settlement which caused you to lose right

5    under the proposed -- I'm sorry, I misread that.  It

6    says --

7    A.    I'm sorry.  Which one are we looking at?

8    Q.    Section 4 on page 2?

9    THE WITNESS:  The whole thing?  4.4 or

10    4.5?  Just that one?  Okay.

11    Q.    You understood and it was explained to you,

12    according to this and you understand that if

13    successful, the objection or any appeal therefrom may

14    result from the disapproval or rejection of the

15    proposed settlement.  Did you understand that?

16    A.    Yes.

17    Q.    So in other words, you could -- your objection

18    may tank this entire settlement and you understood

19    that?

20    A.    I understand that if nothing happens, I don't

21    get anything.

22    Q.    Did you understand that if your objection is

23    successful, you may destroy the settlement from going

24    forward?

25    A.    May destroy?  Can you elaborate a little bit

1    more on that?

2         Q.    Sure.  I want to ask a question that you

3    understand.

4              Did you understand that if your objection was

5    successful, you could cause every class member not to

6    receive the benefits of the settlement?  In other

7    words, all the homeowners that are out there that could

8    get money from this settlement would be precluded from

9    doing so because your single objection could terminate

10   the settlement?

11        A.    I don't know, sir.

12        Q.    You didn't know that?

13        A.    I don't know.

14        Q.    Well, this says that it was explained to you

15   and you understand that.  You didn't understand that;

16   is that right?

17        A.    I read this before I signed it and I signed it

18   based on what I read.

19        Q.    All right.  And it says that if you are

20   successful, it may result in the disapproval or

21   rejection of the proposed settlement which may cause

22   you to lose your right of settlement benefits under the

23   proposed settlement to which you object, correct?

24        A.    Yes, I could lose my right, yes.

25        Q.    But you had -- you did understand that it

1    wouldn't be just you, it had to have been the entire

2    settlement would have been terminated or disapproved,

3    right?

4        A.    That I don't know.

5        Q.    Are you aware that that's the effect of your

6    objection today as we sit here now?

7        A.    I didn't know that.

8        Q.    Is it your intent to deprive other people from

9    getting money from builders, installers, suppliers,

10   insurers because of your single interest in objecting?

11       A.    What I know is that I feel that it's unfair,

12   one, that the lawyers are getting paid an obscene

13   amount of money and which I feel that that should go to

14   the class.  That is what I do know.

15       Q.    Do you have any concern about the other class

16   members getting benefits?

17       A.    Well, I feel if the lawyers get paid less,

18   they would probably get paid more.

19       Q.    And this concern -- is that the only concern

20   that you have about the settlement, by the way, is the

21   attorneys fees being obscene was I think your word?

22       A.    That's one of them and I also feel it's unfair

23   as far as everything, the settlement, if you will.

24       Q.    The settlement is unfair, is that what you're

25   saying?

1    A.    I feel there should be more that should go to

2    the class.

3    Q.    That in other words, that we didn't get enough

4    money from the defendants?

5    A.    No.  That most of the money is going to the

6    lawyers versus going to the class.

7    Q.    Are you aware that Judge Fallon is going to

8    make the determination of how much money goes to the

9    lawyers and not -- and I guess by using your logic, to

10   the class?

11   A.    I believe so.

12   Q.    Do you know that we have asked the court up to

13   32 percent, but the court ultimately decides what the

14   amount is?

15   A.    That is true.

16   Q.    And that being true, you think that that's

17   wrong?

18   A.    I feel what's wrong is that you-all would even

19   ask for 32 percent.

20   Q.    Do you think Judge Fallon would let an unfair

21   amount of money go to lawyers?

22   A.    I don't know.

23   Q.    Don't you think a federal judge has the

24   obligation to ensure that only a reasonable fee is

25   awarded?

1     A.     I would hope so.

2     Q.     And do you have faith that Judge Fallon will

3  award a reasonable fee and no more?

4     A.     I don't know.

5     Q.     Now, it also says that attorneys have also

6  explained and you understand that if there are

7  negotiations to settle your objection, attorneys may

8  negotiate the amount of any payment to you as well as

9  the amount of attorneys fee concurrently in order to

10  arrive at a total settlement amount.  Do you see that

11  sentence in section 4?

12     A.     "Attorneys have also explained and you

13  understand that if there are negotiations to settle

14  your objection, attorneys may negotiate the amount of

15  any payment to you as well as the amount of attorneys

16  fee concurrently in order to arrive at a total

17  settlement amount."

18     Q.     Is that a correct statement?

19     A.     Yes, that is a correct statement.

20     Q.     Just out of curiosity, how much time did

21  Mr. Bandas go over explaining this section to you?

22          MR. HUSEMAN:  Okay.  That goes to the

23  substance of what you-all discussed.

24          MR. LONGER:  I'm just asking how many

25  minutes.

1        MR. HUSEMAN:  I'm asking -- you asked how

2   long you talked about A and B is the same as asking for

3   the discussions of A and B.

4        MR. LONGER:  Let me just say the document

5   speaks for itself.

6        MR. HUSEMAN:  That's exactly right.

7        MR. LONGER:  So I'm asking how much time

8   did his attorneys spend explaining.

9        MR. HUSEMAN:  Anything beyond what the

10  document says, I don't want him discussing, Fred.

11       MR. LONGER:  So that's going to be part of

12  your --

13       MR. HUSEMAN:  Yes.

14       MR. LONGER:  -- motion for protective

15  order?

16       MR. HUSEMAN:  Yes.  How much time he

17  spent, how Mr. Bandas explain it is all privileged.

18  We've given you the document that sets for the

19  relationship.  He's confirmed his relationship and

20  that's pretty much where it's going to end for now.

21       MR. LONGER:  All right.  All right.  And

22  Mr. Dodson has returned to the room here with a

23  document that we were anxiously awaiting for.  And we

24  do not have the document; is that correct?

25       MR. DODSON:  I don't have a signed copy

1    that I can find.  Checking around for it.

2              MR. LONGER:  Just so I'm clear, the name

3    of the document -- or the description of the document

4    is what this we're waiting for?

5              MR. DODSON:  Disclosures to Mr. Soto about

6    our being involved in the case.

7              MR. LONGER:  Understood.  Thank you.  When

8    and if that arrives we will have that marked as Exhibit

9    No. -- why don't we wait until it arrives because

10   otherwise it may get confused in the math.

11             MR. HUSEMAN:  It's in box 3.  No, I don't

12   know.  I have never seen a signed copy.  I know that we

13   got his signature was obtained, I think by probably by

14   Chris.

15             THE WITNESS:  Uh-huh.

16             MR. HUSEMAN:  And I haven't seen a signed

17   copy.  I thought we had one, but apparently don't.

18        Q.   Okay.  So Mr. Soto, have you ever seen the --

19   I'm sorry.  Yeah, I'll ask the question.

20             Prior to its filing, did you see the objection

21   that Mr. Bandas filed on your behalf?

22        A.   Prior to it being signed, I did see it.

23        Q.   All right.  Now, I just want to be clear.  The

24   document that's in front of you, the objection, you saw

25   that before it was filed?

1      A.    I don't remember.  I'm trying to.

2      Q.    Okay.  Now, you met with Mr. Bandas, you said,

3  up until 11:30 on the 20th of September.  And at that

4  point, did he show you what he was going to -- he

5  didn't show you what he was going to file?

6      A.    Say that again.  I'm sorry.

7      Q.    All right.  Let me --

8      A.    I'm sorry.  I'm sorry.

9      Q.    Can I see the document in front of you?

10     A.    This one?

11     Q.    Yeah.

12     A.    Yeah.

13     Q.    Right.  So I'm -- I have my own copy.  You can

14  hold on to this.

15     A.    Okay.

16     Q.    I'm going to have that document which is of

17  record, but I'm going to have it marked anyways as

18  Exhibit No. 5 to your deposition.

19            (Exhibit No. 5 was marked.)

20            MR. HUSEMAN:  I've already got one but I

21  always take more paper.  Is this the same?  That is the

22  same thing?

23            MR. GAUGHAN:  It's the same document.

24            MR. LONGER:  It's 15859 apart from his we

25  go double sided photo copying, it should be the same.

1          MR. HUSEMAN:  I'm looking at the

2    thickness, his is considerably thinner.

3          MR. LONGER:  His is double sided.

4          MR. HUSEMAN:  Duplexed.

5    Q.    All right.  When you -- well, I'm sorry.  Is

6    there a question pending?  All right.  Let me ask a

7    question since it may have gotten lost in the

8    confusion, Mr. Soto and I apologize for that.  I've now

9    give than you Exhibit No. 5, which is basically

10   identical to the document that you have in front of

11   you.  It's entitled class-action agreement and award of

12   expenses January Petrus, Saul Soto, SHS construction,

13   Ronnie Garcia, Bay Area contacting, and construction,

14   Inc. and Ernest vie tela, E & E construction Co?

15   A.    Okay.  Okay.  I'm sorry, yes.

16   Q.    All right.  So that is the same document you

17   have in your hands, right?

18   A.    That is correct.

19   Q.    All right.  How did -- when did you obtain the

20   document that you have in your hands?

21   A.    I'm going to be honest, I really don't

22   remember.

23   Q.    Did it come in the mail to you?

24   A.    No.

25   Q.    Was it given to you by your counsel during one

```
 1    of your meetings?
 2         A.    I remember getting a copy of it at his office.
 3    That's what I remember.
 4         Q.    At whose office, Mr. Bandas?
 5         A.    That is correct.
 6         Q.    All right.  And when was that?  When did you
 7    go to his office and obtain this document?
 8         A.    I don't remember, sir.  I honestly don't.
 9         Q.    All right.  But it was after September 28th;
10    is that correct?
11         A.    I believe so.
12         Q.    All right.  Now, Exhibit B to Exhibit 5, as
13    confusing as that may be?
14         A.    I'm already getting all confused.
15         Q.    It's your declaration, sir?
16         A.    I understand.
17         Q.    So I'd ask you to turn to that document.
18         A.    Okay.  To my declaration?
19         Q.    Right.
20         A.    Okay.  Okay.
21         Q.    Is this declaration bear your signature?
22         A.    It does.
23         Q.    And you signed this when you were at
24    Mr. Bandas' house?
25         A.    I'm trying to remember.  I can't remember if
```

1    it was at his house or not.  I can't say for sure, sir.

2    I'm sorry.

3        Q.    All right.  Did you meet with Mr. Bandas at

4    any other time on September 28 other than the meeting

5    that you described earlier being at his house?

6        A.    I remember I had to go by the office to sign

7    something, but I can't remember when.  I'm sorry.

8        Q.    All right.  You say that -- and the document

9    that you're a member of the class in that paragraph,

10   the third paragraph?

11       A.    Uh-huh.

12       Q.    It says "I am not within any of the exclusions

13   in the class definition."  What exclusions did you

14   review and what do you understand that to be?

15       A.    Like I'm not excluded from the class.

16       Q.    Okay.  All right.  The next paragraph says

17   that you or SHS, and I'm paraphrasing here?

18       A.    Correct.

19       Q.    Purchased, installed and used 1,000 to 1500

20   sheets of drywall over the last five to ten years.  Do

21   you see that?

22       A.    I do see that.

23       Q.    What -- do you know the brand that you usually

24   buy when you buy drywall?

25       A.    I mean, I obviously remember sheetrock, but I

1    mean, I buy it different places so I mean I just go to

2    get the sheetrock that's there available at different

3    places.  I don't look at the brand so much.

4        Q.    Does brand mean anything to you when you're

5    using sheetrock?

6        A.    Well, it means now more.  It means more now

7    knowing that, you know, we have installed it before

8    without -- I would have thought that, you no know,

9    there wouldn't be inferior sheetrock at these places.

10        Q.    Do you know that there is -- that there was

11    inferior sheetrock at these places?

12        A.    Now I know.

13        Q.    How do you know?

14        A.    By knowing that it was available at the

15    stores.

16        Q.    How do you know that?

17        A.    By -- this is one thing I remember.  I do

18    remember this.  Years ago to talking to one of my

19    subcontractors, he asked me specifically, he says where

20    do you get your sheetrock from?  I said well, different

21    places but mostly from Lowe's, he says well, you know,

22    I don't really like to use that one.  I'm like why?  He

23    said, well, he says, that stuff is from China.  And I

24    said from China?  He's like yeah.  I said okay.  At

25    that point I didn't really think anything of it.

1  That's what I do remember.

2      Q.   Was that true what you just told this

3  gentleman that you mostly get your sheetrock from

4  Lowe's?

5      A.   Mostly, that is true.

6      Q.   All right.  We have to change the tape.  So

7  we'll take a break?

8           THE WITNESS:  Okay.

9           THE VIDEOGRAPHER:  Off the record at 6:40,

10  end of tape one.

11           (A recess was taken.)

12           THE VIDEOGRAPHER:  We're on the record at

13  6:51, beginning of tape two.

14      Q.   When we took a break, Mr. Bandas you had said

15  that you mostly get your sheetrock from Lowe's.  Do you

16  recollect that testimony?

17      A.   Mr. Soto.

18      Q.   I'm sorry.  Mr. Soto.  Thank you for

19  listening.

20      A.   That's okay.  Mostly through Lowe's but

21  mostly -- yeah.

22      Q.   And is that true throughout time that you

23  mostly got your sheetrock at Lowe's?

24      A.   As far as percentage wise, yes, getting more

25  from Lowe's than other ones.

1    Q.    And what is that percentage, if you could

2    guesstimate?

3    A.    I'll give you a broad percentage.  About a 60

4    percent, 65 percent, somewhere around there.

5    Q.    All right.  Is it your understanding that

6    you're objecting to Lowe's, the drywall in this -- in

7    your objection, Exhibit No. 5?

8    A.    As far as Lowe's?

9    Q.    Yes.

10   A.    No, it was -- for my understanding, it was in

11   different other places as well.

12   Q.    Right.  But my question to you is:  Was it

13   your understanding that your objection pertained to

14   Lowe's among other participating defendants?

15   A.    Among other, yes.

16   Q.    All right.  And so it was your understanding

17   that Lowe's was a participating defendant?

18   A.    I believe so, yes.

19   Q.    Okay.  And were you aware that Lowe's has a

20   settlement that has been judicially approved by a

21   court?

22   A.    I can't say that I do know for sure, no, sir.

23   Q.    Are you aware that any claims that you may

24   have related to your drywall purchase from Lowe's are

25   barred by a settlement from a Georgia state court?

1      A.    I don't know anything about that, sir.

2      Q.    All right.  Are you aware that Mr. Bandas had

3  his office manager object to that settlement?

4      A.    I don't know anything about that, sir.

5      Q.    Do you know Mr. Bandas' office manager?

6      A.    Not personally I don't know.

7      Q.    Have you met -- her name is Jan Petrus.  Do

8  you know Ms. Petrus?

9      A.    I don't know her.

10      Q.    Her name appears on Exhibit No. 5, along with

11  yours and others?

12      A.    Okay.

13      Q.    Never met her?

14      A.    No.  No, sir.

15      Q.    So -- okay.  Your counsel has just given me a

16  document which is called an attorney disclosure to

17  client and client consent.  I'm going to have that

18  marked as Exhibit No. 6.

19            MR. LONGER:  Is it a one page document.

20            MR. DODSON:  That's what we dot.

21      Q.    Your down represented to me that there is an

22  endorsed copy to this client consent signed by you.  Do

23  you recollect signing this document or something that

24  looks like this document?

25      A.    Yes, something similar, yes, sir.

1          MR. HUSEMAN:  You might want to explain

2    what that is that he has.

3          MR. DODSON:  If they've got any questions.

4          MR. HUSEMAN:  Okay.

5      Q.    All right.  I believe we have an agreement

6    with counsel that we will include -- or I'm sorry --

7    obtain the signed version of Exhibit No. 6?

8      A.    Okay.

9      Q.    And we will include that in the deposition.

10   And I'll ask that it be marked as Exhibit No. 7 when

11   it's produced?

12         MR. DODSON:  Yeah.  If you want, we can

13   try to get it tonight, but if it works for you, we can

14   get it in the morning.

15         MR. LONGER:  Well, is the -- it works for

16   me if you'll tell me that the only thing on the second

17   page is the signature lines or if there's more to it,

18   then it doesn't really work then I ask that you get it

19   tonight.

20         MR. DODSON:  That's all that I know of.

21         MR. LONGER:  That page 2 is a signature

22   line.

23         MR. DODSON:  Sign.

24         MR. HUSEMAN:  This is something that we

25   told Chris that we wanted him sign.  It didn't have a

1    signature sheet for him to put in final form.  He says

2    it's been done.  But that it will look obviously

3    somewhat different if there is signature lines on other

4    stuff.  But that's what we told him we wanted in the

5    disclosure.

6              MR. LONGER:  And do you know what the

7    hourly rate is per hour.

8              MR. HUSEMAN:  Yeah.

9              MR. LONGER:  $400.

10             MR. HUSEMAN:  Uh-huh.

11   Q.    Is that obscene?  It's getting there, huh?

12   A.    Yeah.

13             MR. HUSEMAN:  If not I'll go back and try

14   again.

15   Q.    Okay.  I'm going back to your Exhibit No. 5,

16   which is the objection that was filed on your behalf

17   and we're still looking at your declaration.  So the

18   paragraph dealing with the drywall that you purchased,

19   you say over the years I have purchased drywall from

20   Lowe's and you mentioned that you got the bulk of your

21   drywall from them --

22   A.    Uh-huh.

23   Q.    -- correct?  It also says that you got it from

24   Home Depot, McCoy's and a variety of other building

25   supply companies.  Do you see that?

1    A.    That is correct, yes, I see that.

2    Q.    Do you know if McCoy's is a participating

3  defendant in the settlement that you are objecting to?

4    A.    I don't know, sir.

5    Q.    Was it important for you to know who your --

6  who your objections were lodged against or not?

7    A.    I knew it was a lot of people.  I knew it was

8  a lot of companies.

9    Q.    Okay.  Well, I will represent to you that

10  McCoy's is not a defendant that's participating in the

11  settlement that you're objecting to.

12    A.    Okay.

13    Q.    I will represent to you that Home Depot is a

14  participating defendant in the settlement?

15    A.    Okay.

16    Q.    Were you aware of that prior to me telling you

17  that?

18    A.    That I was, yes.

19    Q.    And how did you become aware of that?

20    A.    I remember that -- I think it was the website.

21    Q.    And what kind of drywall did you buy from Home

22  Depot, if you remember a brand?

23    A.    Oh, I don't know a brand.  If it's asking

24  about brand, I don't remember.

25    Q.    Do you recollect buying -- do you recollect

1   buying any domestic board from Home Depot?

2       A.    I don't recollect.  I don't know.  I can't say

3   for sure.

4       Q.    Do you know what I mean by domestic?

5       A.    Made here.

6       Q.    When I say domestic board, I mean drywall made

7   in the United States?

8       A.    Okay.

9       Q.    So let me restate the question?

10      A.    Thank you.

11      Q.    Do you remember buying domestic drywall at

12  Home Depot?

13      A.    I don't remember, sir, to be honest with you.

14      Q.    Do you remember buying any Chinese drywall at

15  Home Depot?

16      A.    I remember seeing Chinese stamped on the back,

17  that's what I do remember.

18      Q.    And why is that in your memory when you don't

19  remember domestic board just out of curiosity?

20      A.    To be honest with you, it had to do with

21  triggers as far as, you know, one thing that my -- that

22  subcontractor had told me about.  And since then, I

23  just kind of saw oh, Chinese, that's it.

24      Q.    And you're saying you have a distinct memory?

25      A.    As far as talking to that person.

1       Q.     Oh, do you have a --

2       A.     The conversation.

3       Q.     Do you have a distinct memory of seeing a

4    marking on Chinese drywall -- I'm sorry, on drywall

5    that you bought at Home Depot that said made in China?

6       A.     I don't know if I bought it at Home Depot but

7    I remember seeing made in China.

8       Q.     I see.  So it could have been anywhere?

9       A.     It could have been.  I can't say for sure.

10      Q.     Not necessarily Home Depot?

11      A.     Correct.

12      Q.     All right.  I have been represented to by

13   counsel for Home Depot that Home Depot is not aware of

14   any customer that purchased Chinese drywall from Home

15   Depot.  Do you have any reason to dispute that?

16      A.     I don't know for sure.  I mean.

17      Q.     I also have been represented that Home Depot

18   is not aware of any customer who alleges that they

19   purchased Chinese drywall from a Home Depot store in

20   Texas.  Do you have any reason to dispute that

21   statement?

22      A.     I don't know for sure.

23      Q.     I have also been represented that Home Depot

24   is not aware of any claims asserted against it by

25   customers in Texas about Chinese drywall.  Do you have

1    any reason to dispute that statement?

2         A.    I don't know.

3         Q.    You say I don't know.  Do you have any reason

4    to dispute that statement?  It's more yes or no?

5         A.    Where does that statement come from?  I

6    don't --

7         Q.    Counsel for Lowe's -- or for Home Depot.

8         A.    Oh, okay.  If that's what they're saying, I

9    can't change what they're saying.

10        Q.    Do you have any reason to dispute that Home

11   Depot is not aware of any invoices, records or other

12   documents which identify a specific instance of the

13   purchase of Chinese drywall from Home Depot?

14        A.    Is that what they're saying?

15        Q.    Yes.

16        A.    I can't change what they're saying.

17        Q.    All right.  And are you aware that Home Depot

18   says that they only purchase drywall from domestic

19   drywall manufacturers?

20        A.    Okay.

21        Q.    That's okay with you?

22        A.    I mean --

23        Q.    You don't dispute it?

24        A.    I mean, that's what they're saying.  I can't

25   change what they're saying.

1      Q.    And you don't have any specific recollection,

2   do you, of having purchased any drywall that was made

3   in China from Home Depot, correct?

4      A.    I don't have a specific time, no.

5      Q.    I just want to be sure I understood your

6   answer.  You said I don't have a specific time, no.

7   You don't have any recollection of having bought

8   Chinese manufactured drywall at Home Depot, do you?

9      A.    I mean, I don't know where I bought it from

10  but I remember seeing that in the back.

11     Q.    Okay.  But they are -- if you bought it from

12  some defendant or some supplier?

13     A.    Okay.

14     Q.    Other than Home Depot, they're not a

15  participating defendant in this settlement, are they?

16     A.    Are they not?

17     Q.    Apparently not.  But I take it that you

18  wouldn't know because you haven't looked at the

19  settlement agreement to be sure; is that correct?

20     A.    I can't remember, to be honest with you.

21     Q.    And the last paragraph of your declaration,

22  which says "many of these sheets of drywall included

23  the letters China or made in China.  I have looked at

24  the pictures of examples of Chinese drywall posted at

25  the settlement website and I can affirm that many of

1    the sheets of drywall that I have purchased, installed

2    and used during the class period have been marked in

3    similar, if not identical, ways indicating that they

4    were manufactured in China."

5            That's information that you've already covered

6    with me; is that correct?

7        A.    I have covered that I have seen the Chinese

8    stamped on the back.

9        Q.    Right.  You just spoke about that?

10       A.    Correct.

11       Q.    But you Don know where you got that board

12   from?

13       A.    I don't know where.

14       Q.    And you can't attribute that to Home Depot at

15   all, correct?

16       A.    I can't say for sure, no.

17       Q.    You can't say at all, can you?

18       A.    I don't remember.

19       Q.    If Home Depot says that they didn't get it,

20   you have no reason to dispute that they didn't get

21   Chinese drywall, correct?

22       A.    I mean, I can't change anything that they

23   said, that's correct.

24       Q.    Well, you have -- do you have any evidence to

25   suggest otherwise?

1      A.     I don't.

2      Q.     Okay.  The body of this objection, Exhibit No.

3  5, says that you -- on page 2, that you object to the

4  class definition.  Do you see that, top of page 3?

5      A.     3 or 2? ?  You said 2.  I'm sorry.

6      Q.     I'm on page 3.  It says as an initiate matter,

7  objections made to the class definition?

8      A.     I see that.

9      Q.     So what is your objection to the class

10  definition, sir?

11      A.     It's written right here, sir.

12      Q.     All right.  Is this I want to ask, is this the

13  first time you read this?

14      A.     No.

15      Q.     So it says it's vague and ambiguous.  Can you

16  tell me what you recollect the class definition to be?

17      A.     I can't remember at this moment.

18      Q.     Is it fair to say that -- strike that.

19             It says "more over the class is defined in

20  terms of merit based criteria."  Do you see that?

21      A.     Uh-huh.

22      Q.     Do you know what merit-based criteria are?

23      A.     It's a criteria depending on your merits,

24  different things.

25      Q.     Okay.  I don't understand your answer.  Is

1   that the best -- and I don't mean to be flip here?

2       A.   No, that's fine.

3       Q.   Is that the best you can say?  Because you're

4   using the same word to define the term?

5       A.   That's the best I can say, sir.  I'm sorry.

6       Q.   That's fine?

7       A.   These are all lawyer words, you know, so

8   that's -- that's why I hired a lawyer to, you know...

9       Q.   So it fair to say then that Mr. Bandas wrote

10  these words, not you?

11      A.   It's fair to say that, you know, he's the

12  lawyer and he can -- what needs to be drafted

13  correctly, depending on what.

14      Q.   And you are the client, though, correct?

15      A.   Yes, sir.

16      Q.   Do you believe that you control Mr. Bandas'

17  and he is your representative?

18      A.   He is my representative.

19      Q.   Do you believe you control his actions?

20      A.   Actions in what way?

21      Q.   What he files in court, for example?

22      A.   Well, of course.

23      Q.   Okay.  But you didn't read this before it was

24  filed, correct?

25      A.   That I can't remember reading this.  I know I

1    read it.

2        Q.    You read it in preparation of your deposition,

3    correct?

4        A.    No.

5        Q.    You've not read it in preparation for today?

6        A.    That is not what I said.

7        Q.    I'm asking you the question?

8        A.    Okay.  I'm sorry.  I have read it before my

9    preparation.

10       Q.    I see.  All right.  The next objection, which

11   is on the next paragraph, is that the proponents of the

12   settlement have not carried their burden of proof on

13   the fairness adequacy and reasonableness of this

14   settlement.

15            Now, earlier you testified that you didn't

16   like the attorneys fee.  I recollect that?

17       A.    Okay.

18       Q.    Is there anything else that you think is

19   unfair, inadequate or unreasonable about the

20   settlement?

21       A.    I feel it's unfair that it's not totally

22   specific as far as what the class is going to get.

23       Q.    Okay.  Do you think that that's unusual, that

24   in a class-action people don't know precisely what

25   they're going to get?

1        A.    I don't know, sir.

2        Q.    Next page.  You object that the class cannot

3  be maintained as a class-action under the requirements

4  of rule 23 of the federal rules of civil procedure?

5        A.    That I wrote.  No, I'm just kidding.  I'm just

6  kidding.  I'm sorry.

7        Q.    It's getting late in the day and I appreciate

8  your humor.  But?

9        A.    Okay.  I'm sorry.

10        Q.    That's something that Mr. Bandas wrote for

11  you, right?

12        A.    That is correct.

13        Q.    All right.  Are you familiar with rule 23 of

14  the federal rules of civil procedure?

15        A.    No.

16        Q.    Do you have any idea why the class cannot be

17  maintained as a class-action under rule 23?

18        A.    I don't know.

19        Q.    Next you say that objections made to the

20  request for attorneys fee under both a percentage of

21  recovery basis and a load star analysis, do you see

22  that?

23        A.    Yes, sir, I see that.

24        Q.    Can you tell us what a percentage of recovery

25  basis is for attorneys fees?

```
 1        A.    I can't.

 2        Q.    Can you tell us what a load star analysis is?

 3        A.    No, sir.

 4        Q.    Do you know what a mega fund case is?

 5        A.    No, sir.

 6        Q.    Is it your position that counsel should only

 7  be entitled to 10 percent of any recovery on a

 8  contingent basis in a common fund case?

 9        A.    Yes, I feel 10 percent is reasonable.

10        Q.    Okay.  Have you ever been involved in any

11  lawsuit personally?

12        A.    No, sir, I haven't.

13        Q.    Any members of your family?

14        A.    Not that I can remember.

15        Q.    Any friends or relatives?

16        A.    Some friends that work for a lawyer, so...

17        Q.    Do you know what the going rate is for

18  contingency fee in Corpus Christi Texas is today?

19        A.    Contingency fee?  I don't know what exactly --

20  like for a specific case or for specific something.

21        Q.    Let's say for personal injury?

22        A.    Okay.

23        Q.    Car accident?

24        A.    I don't know.

25        Q.    Okay.  You mentioned that in preparation for
```

1  your deposition you met with counsel and Mr. Garcia was

2  present.  Do you recollect that?

3       A.    He was present.

4       Q.    Do you know Mr. Garcia?

5       A.    No, I don't know him personally.

6       Q.    When did you first meet Mr. Garcia?

7       A.    The first time we came here, which I think you

8  wrote down.  I don't remember the date.  That's when.

9  I'm sorry.

10      Q.    And do you have an understanding of how

11  Mr. Garcia came to be a plaintiff or objector in this

12  litigation based upon your meetings with him?

13      A.    I think a friend of his or something like

14  that.

15      Q.    Is that Mr. Batman?

16      A.    I don't think so.  I think -- okay.  I think

17  it was Bert, Bert, Bert.

18      Q.    Okay.  Do you have any sense of who Bert was?

19  Just a --

20      A.    Yeah.  That's what I was trying to remember.

21  Bert works with Mr. Batman.

22      Q.    Is Bert an attorney also?

23      A.    I don't think so.  I remember he said he

24  played golf with Bert, something like that.

25      Q.    Just out of curiosity, are you familiar with

1  Mr. Garcia 's company, the Bay Area contracting

2  construction, Inc.?

3      A.    I'm not familiar with Mr. Garcia's company.

4      Q.    In the course of your business as SHS

5  construction, you've never observed them as I'm going

6  to say a competitor of yours?

7      A.    No.  I'm sorry.  If I eat.  I just needed a

8  little something.  I'm sorry.

9      Q.    Sure.  It looks good on video.

10      A.    I didn't mean to do that.  I'm sorry.  I

11  believe he does more commercial stuff and we don't do

12  as much commercial stuff as he did.  That's probably

13  why we never --

14      Q.    You do residential?

15      A.    Residential and some commercial work but not

16  as much as he does.

17      Q.    And how do you know that from having met with

18  him just recently?

19      A.    Yes.

20      Q.    Do you know Ernest Vitella?

21      A.    I do not.

22      Q.    Have you ever met Mr. Vitella?

23      A.    No, sir.

24      Q.    Are you familiar with E & E construction?

25      A.    No, sir.

1    Q.    Have you, prior to meeting with Mr. Bandas on

2    September 28, did you go to the court's website?

3    A.    No, sir.

4    Q.    Did you do any -- do you have a computer?

5    A.    Yes, I do.

6    Q.    And does that computer have Internet access?

7    A.    Yes, sir.

8    Q.    Have you done any personal investigation of

9    the proceedings that are taking place in the federal

10   court in New Orleans?

11   A.    A little bit.  Not a lot.  Some on you-all's

12   own website, on your own website.

13   Q.    At Levin Fishbein?

14   A.    At Herman & Herman & Katz or something.  I

15   don't know if that's yours.

16   Q.    No, don't apologize.  They have better

17   pictures.

18   A.    Yeah.

19   Q.    So what did you -- what did you find out in

20   the course of your personal investigation?

21   A.    I'm more of a picture person.  I remember just

22   looking at those pictures again and seeing the

23   markings.

24   Q.    So is it fair to say that you did no personal

25   investigation of the proceedings prior to your

1    objection?  And when I say proceedings, I mean the

2    judicial proceedings taking place in front of Judge

3    Fallon?

4         A.    No, because I did look at the website before

5    that.  Not as far as the court one, but the other one.

6         Q.    The Herman, Herman website?

7         A.    No, that was at a different time.

8         Q.    The Chinese drywall class?

9         A.    Yes.

10         Q.    Okay.  And I'm not sure.  When did you do that

11    personal investigation?

12         A.    Okay.  Let me make sure here.  The personal

13    one -- if we're talking about personal like my own

14    computer.

15         Q.    Yes.

16         A.    It would be after some time of our meeting

17    with Mr. Bandas.

18         Q.    Okay.  So after you met with your counsel and

19    authorized him to object on your behalf is when you

20    began to look into what it was that you were objecting

21    to; is that fair to say?

22         A.    I did more research after.

23         Q.    Okay.

24         A.    In addition to what I did.

25         Q.    All right.  I'm going to provide you with

1    what's been marked as Exhibit No. 8, which are the

2    answers to interrogatories that have been provided to

3    us.  Take a look at that, if you would.

4         A.    Okay.

5         Q.    Are you familiar with that document?

6         A.    Yes.

7         Q.    These were answers to interrogatories that

8    were provided to us.  They were actually filed in the

9    court.  I want to ask you to explain your answer to

10   interrogatory No. 5.  And I guess just so it's clear,

11   interrogatory No. 5 asks for any Chinese drywall you

12   purchased, state whether you ever explained, inquired,

13   made written and/or verbal notice that the Chinese

14   drywall was defective.  And then it asks you to explain

15   your answer basically.

16         So if you could, in your response, you say "I

17   have recollection of a conversation with a

18   subcontractor maybe two or three years ago about how

19   Lowe's sold inferior Chinese drywall.  I have not

20   communicated with any manufacturer, sellers or

21   distributor of Chinese drywall about Chinese drywall."

22         Did you already describe to us that

23   conversation with that subcontractor about Lowe's?

24         A.    Yes, that is what I mentioned.

25         Q.    We've covered that already?

1      A.    Yes, sir.

2      Q.    And you're aware that Lowe's is not a

3   defendant in this settlement, correct?

4      A.    Correct.  But my --

5      Q.    And so there's no -- and --

6      A.    Can I say something maybe?

7      Q.    It's your deposition.

8      A.    The reason I brought that up as far as

9   remembering that he had told me something about Lowe's,

10   the Chinese is that from then on, that stayed in my

11   mind as far as the China thing.  That's what stayed in

12   my mind.  And then I remember like if I would see made

13   in China, I was like, oh, okay.  But I mean, I didn't

14   know that this would happen to me.

15      Q.    Have you read any newspaper articles,

16   Internet, websites, anything prior to very recently

17   with your meeting with Mr. Batman about Chinese drywall

18   being defective?

19      A.    No, sir.

20      Q.    Interrogatory No. 6, it actually asks who

21   installed drywall in your home in Ingleside, Texas and

22   the manufacturer of that drywall but you don't live if

23   Ingleside?

24      A.    Correct.

25      Q.    So you were kind enough to point that out to

1    us.  And then you went on to explain that you in fact

2    live at Claride, 429 Claride and that you bought your

3    home in 2003 or 2004 and you say that you remodeled

4    that home?

5         A.    Correct.

6         Q.    And when you remodeled it, you used about 50

7    plus sheets of drywall?

8         A.    That is correct.

9         Q.    Do you remember what the manufacturer of that

10   drywall was?

11        A.    No, I do not, sir.

12        Q.    You say you think you bought that drywall at

13   Home Depot?

14        A.    That is correct.

15        Q.    So is it you're not sure?

16        A.    Yes, sir.

17        Q.    It could be anywhere?

18        A.    I'm not sure.

19        Q.    Do you have any receipts in Exhibits No. 2, 3

20   or 4?  I'm sorry, I said sheets didn't I.  Do you have

21   any documents in any of the boxes here, Exhibits 3, 2,

22   3 and 4 that would indicate the purchase of the drywall

23   in your home?

24        A.    I can't say for sure, to be honest with you.

25        Q.    Do you know whether Chinese drywall was being

1    imported into the United States in 2003 and 2004?

2       A.    I don't know.

3       Q.    You recollect that Home Depot will -- has

4    stated to me that they never purchased Chinese drywall?

5       A.    I recollect that.

6       Q.    So would you agree with me that it's more than

7    likely that you bought at Home Depot, if you bought at

8    Home Depot, domestic board?

9       A.    I mean, I don't know exactly which one I put

10    in there.  I mean, you're asking domestic board as far

11    as the name brand?  I'm sorry, are you asking is that

12    the name brand again?  Is the or is it --

13       Q.    No, domestic board being drywall made in the

14    United States?

15       A.    I don't know.

16       Q.    All right.  Are you at all familiar with the

17    problems that Chinese drywall causes?

18       A.    Yes.

19       Q.    What is it that you understand Chinese drywall

20    does?

21       A.    It has a foul smell, it causes corrosion.

22    It's inferior.  Let me see.  I'm trying to remember

23    here.  There's a discoloration on it.  Those are what I

24    can remember right now, sir.

25       Q.    Okay.  Is there a foul smell in your home?

1      A.    No, sir.

2      Q.    You mentioned that Chinese drywall causes

3  corrosion?

4      A.    Correct.

5      Q.    What kind of corrosion?

6      A.    On pipes, if I remember correctly.

7      Q.    Have you evaluated your home to see whether

8  there's been any corrosion in your home?

9      A.    Not that I can tell.

10      Q.    You mentioned discoloration?

11      A.    Correct.

12      Q.    Is there any discoloration in any of the

13  drywall that you've bought at Home Depot that's been

14  installed in your home?

15      A.    Not that I've seen.

16      Q.    Say you say if you sell your home you will

17  have to disclose that -- I'm sorry, I'm skipping ahead.

18  It says that you're worried and concerned that there

19  could be Chinese drywall in your home, correct?

20      A.    Yes, sir.

21      Q.    Can you describe your worry and concern?

22      A.    Well, if it is Chinese drywall, you know, and

23  the only way to find that out is by taking it off.  But

24  if it is, I mean, if I later want to sell my house, I'd

25  have to let them know it is Chinese drywall.

1    Q.    There's a lot of if's in that answer.  The it

2    was Chinese drywall, you would expect there to be a

3    foul smell in your house, correct?

4    A.    I don't remember if all of the Chinese drywall

5    had that smell.

6    Q.    If it was Chinese drywall, you would expect

7    there to be corrosion in your hope, correct?

8    A.    Possibly, yes.

9    Q.    If there was Chinese drywall in your home you

10   would expect to be discoloration, correct?

11   A.    Correct.

12   Q.    And you've already told me that none of those

13   three things are present in your home, correct?

14   A.    That is what I remember, yes, sir.

15   Q.    So if there was Chinese drywall in your home,

16   you'd have to have pretty good Chinese drywall, right?

17   A.    I guess.

18   Q.    Are you aware that not all Chinese drywall is

19   containing sulfur or off-gassing sulfur, reduced sulfur

20   gasses, really bad question.  Let me ask that again.

21   A.    Yeah, please.

22   Q.    Are you aware that not all Chinese drywall gas

23   emits reduced sulfur gasses?

24   A.    I think that's what I remember.  That's what I

25   was saying, that I don't think all of it has that

1    smell.

2         Q.    Right.  Well, not only it doesn't have that

3    smell, but not all Chinese drywall is reactive?

4         A.    Okay.

5         Q.    Are you aware of that?

6         A.    No, sir.

7         Q.    So you may have nonreactive board in your

8    home?

9         A.    I don't know.

10        Q.    Well, it sounds like you do, doesn't it?

11        A.    Well, I mean, if -- if those were the only

12   three factors that determine it, well, then if that's

13   what we went off of, well, then maybe not.

14        Q.    Do you intend to sell your home any time soon?

15        A.    Not right now, sir.

16        Q.    Do you have any intention to take out the

17   board that you bought at Home Depot and replace it with

18   domestic board or other board?

19        A.    I mean, even if I had, wanted to, I mean, it's

20   not a possibility.

21        Q.    But you don't have any intention to do that?

22        A.    Not right now, sir.

23        Q.    And the fact of the matter is that you were

24   never concerned that there was Chinese drywall in your

25   home until after you spoke to Mr. Bandas or Mr. Batman;

1    is that correct?

2         A.    It became a concern after that, yes, sir.

3         Q.    So after you talked to lawyers, that's when

4    your concern manifested?

5         A.    Correct.

6         Q.    All right.  You work with -- what is the

7    nature of SHS construction?  What do you do?

8         A.    We do a lot of remodeling.  Take down old

9    stuff and put new stuff up.

10        Q.    Soup to nuts in terms of you do demolition,

11   you do --

12        A.    Yes, sir, demolition.

13        Q.    Framing?

14        A.    Yes.

15        Q.    And then finishing?

16        A.    All the way through.

17        Q.    All the way through.  So do you subcontract

18   out the installation of drywall or you do that

19   yourselves as well?

20        A.    It depends on the job.  Some of it we do, some

21   of it we do, I do it personally.

22        Q.    Now, you said in 2009, I believe, you had

23   employees?

24        A.    Uh-huh.

25        Q.    Since, say, I guess 2010?

1    A.    Uh-huh.

2    Q.    Or some time in 2009 you no longer have

3    employees; is that right?

4    A.    We -- what we do is we sub -- pretty much

5    people want to get paid more so they don't mind being

6    subs.

7    Q.    Okay.  I'm sure that works out well for

8    somebody?

9    A.    Yeah.  Yeah.

10    Q.    And so you don't have any employees that --

11    strike that.

12         So when you subcontract out the work for let's

13    say installation of drywall, somebody else is doing

14    that, right?

15    A.    Not all the time, sir.

16    Q.    Okay.  So tell me how that splits out.

17    A.    Well, depending on the job, of course, of how

18    big it is, how small it is, I'm really kind of more a

19    hands-on, so people are paying me to make sure things

20    are getting done.  So I'll be there most of the time

21    helping them to put it up.  Sometimes I won't be there,

22    aisle have to run to other appointments to do other

23    estimates.

24    Q.    All right.  So you runaround from different

25    sites to be sure that your crews are doing what they're

1    supposed to be doing or your subcontractors?

2         A.    Subcontractors, yes, sir.

3         Q.    Okay.  And in the course of that, you breathe

4    in whatever is there at the site, right?

5         A.    Uh-huh.

6         Q.    Up until meeting with Mr. Batman, did you ever

7    have concerns that what you were breathing in could be

8    causing you injury?

9         A.    I always had a fear that at a certain point

10   like, for example, in what we're at right now, that a

11   product or something that we use would be -- would be a

12   bad product, you know.  And that it would affect me.

13   That I've always had without a doubt.  And now that

14   this is happening, you know, I've seen all of these

15   things, that has escalated more.  That's how I felt.

16        Q.    Are you the type of person that, say, for

17   example, you're using a paint, making this up?

18        A.    Okay.

19        Q.    And the paint contained a lot of benzene?

20        A.    Okay.

21        Q.    Benzene is a known carcinogen?

22        A.    Uh-huh.

23        Q.    And you were exposed to the benzene in that

24   paint.  Are you the type of person that would hire a

25   lawyer an say I want to see sue the manufacturer of

1    that paint for putting in defective benzene?

2        A.    Am I that type of person?

3        Q.    Yeah.  I mean, like do you respect lawyers

4    enough that if you were injured, you would hire a

5    lawyer to represent you for your injury?

6        A.    Oh, yes.  Yes, sir, I can see that, yes.

7        Q.    Okay.  But in this case, you did not hire a

8    lawyer to represent you for any of your concerns about

9    illness, disease or medical problems, isn't that true?

10   You testified to that earlier.

11       A.    Yes, sir.

12       Q.    I take it that your concerns about illness,

13   disease and medical problems are not very significant,

14   Mr. Soto; is that correct?

15       A.    I mean, I'm not dying right now, that's for

16   sure.

17       Q.    Well, they don't rise to the level that you

18   think that you need to take any legal action; isn't

19   that correct, sir?

20       A.    Yes.

21       Q.    Now, you also talk about some de Walt drills?

22       A.    Uh-huh.

23       Q.    Do you know if any of the drill receipts are

24   in Exhibits 2, 3 or 4?

25       A.    They probably are, yes, sir.

```
 1      Q.   All right.  And what -- when did you buy these
 2  drills?
 3      A.   It was a few years back.  Probably around
 4  2009, somewhere around that time, sir.  I can't say
 5  exactly what day or time.
 6      Q.   All right.  And you say that -- is it -- well,
 7  actually, you say "during the time period that I recall
 8  working with Chinese drywall" do you see that the
 9  second sentence?
10      A.   Uh-huh.
11      Q.   Of that paragraph?
12      A.   Uh-huh.
13      Q.   That's -- is that referencing the 2009 period
14  that you just now testified to?
15      A.   I think it's 2009.  I'm referencing that time
16  frame.
17      Q.   And once again, sir, you don't know when
18  Chinese drywall was imported into the United States,
19  correct?
20      A.   Correct.  Yes, sir.
21      Q.   What -- in 2009, how would you describe your
22  business?  Was it on -- was it coming out of the
23  recession?  Going into the recession?  Were you busy?
24  Were you not busy?
25      A.   2009.  2009, we were pretty busy.  I remember
```

1    that because I had several employees and I had a lot of

2    drills.

3        Q.    And you had a lot of business?

4        A.    Yeah.

5        Q.    So your lots of employees were using lots of

6    drills doing lots of jobs, right?

7        A.    Correct.

8        Q.    And that's more so than usual; is that what

9    you're telling us?

10       A.    As far as the work itself?  Is that what we're

11   referring to.

12       Q.    The use of the drills is the what I'm

13   referring to.

14       A.    Oh, the use of the drills.  Well, the drills

15   are -- were assigned specify specifically to two people

16   one per -- each person had their own drill so it might

17   not have not been used by a lot of different people,

18   it's used by the same person.

19       Q.    But they were very busy persons using those

20   drills?

21       A.    They were busy using drills, correct.

22       Q.    And they were more busy than usual in the

23   course of your business in that time period that we're

24   talking about?

25       A.    I don't know if more busy than usual, to be

1    honest with you.  We were busy, I know that.  And

2    here's -- I'm sorry, let me say something on that.  The

3    reason I say that is because around that time, it had

4    only been a couple of years since I had started my

5    business.  And as you're growing as a business, you

6    start learning things.  You know, what to do and

7    whatnot to do.  So I mean, we've always kept busy, but

8    if you ask me if we were busy every year, yes, we were

9    busy every year.  If you ask me how much money we made

10   each year, it would be different, you know.

11       Q.    All right.  I just -- I'm just looking at what

12   you're here in writing talking about, which is drills?

13       A.    Correct.

14       Q.    Corroding within a few months and failing

15   prematurely?

16       A.    Correct.

17       Q.    Where did you buy the drills?

18       A.    I mean, it was probably either Lowe's or Home

19   Depot.

20       Q.    Are you aware that they have return policies

21   at Lowe's or Home Depot for products that fail

22   prematurely?

23       A.    Yes, sir.

24       Q.    Have you ever returned something to Lowe's or

25   Home Depot because of --

1     A.    I have, yes, sir.

2     Q.    Did you return the drills to Lowe's or Home

3  Depot?

4     A.    To be honest with you, no.

5     Q.    And did it ever dawn on you that something

6  that you ought to do because they were failing

7  prematurely?

8     A.    It was probably something I should have done.

9     Q.    And you know, you're aware that drills have

10  warranties as well, right?

11     A.    Yes, sir.

12     Q.    And do you think that if you had bought these

13  within the -- when did you buy the drills, in 2009?

14     A.    That's, again, I'm saying that's around the

15  time that I bought it.

16     Q.    But you were also saying drills usually last

17  more than a year and these drills last less than a

18  year, right?

19     A.    Correct.

20     Q.    Do you know whether or not de Walt drills have

21  a year -- a year -- a one-year warranty?

22     A.    Yes, now I do know that.

23     Q.    And they were covered by warranty, these

24  drills?

25     A.    Yes, sir.

1    Q.   But you think that the Chinese drywall that
2    these gentlemen were working with these drills caused
3    them to corrode; is that your testimony?
4    A.   My testimony is that they failed prematurely
5    than they usually do because my drills usually last for
6    about a year.  That is what my testimony says there,
7    right there.
8    Q.   So --
9    A.   And the reason that I know that they were
10   corroded is because I take them apart and I saw the
11   corrosion inside.
12   Q.   All right.  Are you telling us that you are
13   not associating that corrosion with Chinese drywall or
14   are you telling us that those drills corroded because
15   those gentlemen were working with the drills near
16   Chinese drywall?
17   A.   I can't say for sure.  I'm saying that that
18   could be a factor.
19   Q.   But you don't know?
20   A.   Correct, I don't know.
21   Q.   And you don't have any expert to support that
22   theory, right?
23   A.   No, sir.
24   Q.   And you haven't hired Mr. Bandas to hire an
25   expert to support that theory?

1      A.    No, sir.

2      Q.    So it's possible, in fact, it's just your

3  speculation at best that there's an association between

4  those drills corroding and exposure to Chinese drywall?

5      A.    It is a possibility, direct.

6      Q.    It's you guessing?

7      A.    Okay.

8      Q.    Now, you say your business reputation has been

9  damaged?

10      A.    Uh-huh.

11      Q.    Tell me about that.

12      A.    Well, again, going back to I always trying to

13  provide the best for our clients.  Now I know that, you

14  know, we've installed Chinese drywall in some of their

15  homes.  I don't know who or where, but just knowing

16  that has affected the reputation that we have.  Because

17  I would have to inform them about that.

18      Q.    Okay.  Let's break that down.  Now you know?

19      A.    Correct.

20      Q.    That you've installed Chinese drywall in some

21  of your client's homes.  How do you know that?

22      A.    By remembering the pictures that I saw and

23  remembering the markings that I saw.

24      Q.    All right.  And which clients have you gone to

25  the effort of telling them that they have Chinese

1   drywall in their home?

2        A.   I haven't gone to any of them.

3        Q.   Do you have any intention to do that?

4        A.   I don't know what I need to do.

5        Q.   Do you have any intention of telling any of

6   your clients, I installed Chinese drywall in your home?

7        A.   Intention, yes, I do have the intention.

8        Q.   Okay.  And when do you intend to effectuate

9   that intent?

10       A.   I don't know.

11       Q.   Have you consulted with any counsel as to your

12  obligation as to whether or not you need to make that

13  disclosure?

14            MR. HUSEMAN:  Think discussions you had

15  with counsel are not to be discussed, Mr. Soto.

16            MR. LONGER:  He's counsel I'm just asking

17  if he's had a discussion about whether he needs to make

18  the disclosure he hasn't retained Mr. Bandas to give

19  him that.

20            MR. HUSEMAN:  You asked if he's talked to

21  a lawyer about that particular subject and that's what

22  we're objecting as being privileged.

23            MR. LONGER:  That's an invalid objection.

24  Mark that, please.

25       Q.   Do you have any intention to talk to a lawyer

1    about whether or not you have a duty to make that

2    disclosure?

3         A.

4              MR. HUSEMAN:  Without saying whether you

5    have or in fact are not.

6         A.    I do have an intention.

7         Q.    Okay.  And who are you going to talk to?

8         A.    I don't know.

9         Q.    Certainly not Mr. Bandas, right?

10        A.    I didn't say that.

11        Q.    Okay.  Now, none of your clients -- I think

12   you told me earlier have ever told you that they're

13   complaining to you about Chinese drywall in their

14   homes; is that correct?

15        A.    They have not called me personally.

16        Q.    Have you gone to any of the homes that you've

17   installed any drywall in that have the effects of

18   Chinese drywall?

19        A.    The effects, no.

20        Q.    Have you ever noticed foul smell in any of the

21   homes that you've worked in from Chinese drywall?

22        A.    I can't recall which homes those were.

23        Q.    Have you ever noticed any corrosion in any of

24   the homes that is indicative of Chinese drywall?

25        A.    I don't remember what homes they were.

1    Q.    Have you ever noticed any discoloration in any

2    of the homes that you've installed Chinese drywall in?

3    A.    I don't remember the homes.

4    Q.    And you don't know if you've even installed

5    Chinese drywall in those homes, right?

6    A.    I never said that.  What I said is I don't

7    remember the homes.

8    Q.    All right.  Now, tell me, you're concerned and

9    you're telling me that you have emotional distress.

10   How is that going for you?

11   A.    Well, I have worry there that I didn't have

12   before.

13   Q.    And that's as a result of speaking to

14   Mr. Batman, right?

15   A.    That's as a result knowing that I've installed

16   Chinese drywall.

17   Q.    I see.  And have you seen any medical

18   practitioner about your concerns?

19   A.    No, sir.

20   Q.    Do you have any intention to see a medical

21   practitioner about your concern?

22   A.    Yes, sir.

23   Q.    Who is your doctor?

24   A.    I don't have a doctor.

25   Q.    Who will you go to see when you -- when you

1  fulfill this intention?

2      A.    I will possibly go see Mr. Covarrubias.

3      Q.    Mr. --

4      A.    Dr. Covarrubias, I'm sorry, because he used to

5  be -- years ago he used to be the person that I would

6  go to.

7      Q.    Now, have you ever seen -- I'm going to

8  butcher his name -- Dr. Covarrubias?

9      A.    C-O-V-A-R-R-U-B-I-A-S.

10     Q.    Covarrubias?

11     A.    Yes, sir, you got it.

12     Q.    Thank you.  So Dr. Covarrubias, have you

13  expressed any concerns about breathing in dust or

14  anything?

15     A.    No, I haven't.

16     Q.    When was the last time you saw a doctor?

17     A.    For myself?

18     Q.    Yes, sir.

19     A.    Okay.  Probably about two or three years ago.

20     Q.    And what was the nature of that visit?

21     A.    I was having a lot of congestion that wouldn't

22  go away.

23     Q.    Like a cold?

24     A.    No.  It wasn't a cold.  It was just cold air

25  would hit me and I would start coughing like I almost

1    wanted to kind of throw up.  And so I went to see the

2    doctor for that.  Because the congestion would never go

3    away.

4        Q.    You know, you're from Corpus Christi, it

5    doesn't get cold here too often.  But the --

6                MR. HUSEMAN:  Well, actually, Counsel, it

7    was down to 80 last week.

8                THE WITNESS:  Yeah.  Yeah.  No, it was

9    actually 60.

10               MR. LONGER:  So this is years ago so we

11   have had climate warming.

12       Q.    Now, back when you saw Dr. Covarrubias?

13       A.    I didn't see him for that.

14       Q.    You saw a physician?

15       A.    Yes, sir.

16       Q.    It was a physician?

17       A.    It was a physician.

18       Q.    And do you recollect that name?

19       A.    It was actually a woman's name.  It wasn't

20   here in Corpus.  It was in Reynosa on the other side of

21   the border.

22       Q.    Do you recollect her name?

23       A.    Her name?  No, I don't sir.  I'm sorry.

24       Q.    And did you obtain a diagnosis at that visit?

25       A.    I don't remember a diagnosis like what she

1   said exactly, but I do remember she gave me some pills

2   to get rid of the congestion.  That's what I do

3   remember.

4        Q.   Do you remember what the pill was?

5        A.   No, sir.

6        Q.   Was it an antibiotic?  Was it --

7        A.   I don't remember.

8        Q.   Anti bacterial drug or --

9        A.   It was probably a combination of a few things

10  but I don't remember.

11       Q.   Was it a cough syrup?

12       A.   No, it wasn't a cough syrup.  It was a pill,

13  it was a couple of pills exactly but I don't remember

14  exactly what the name was.  I know obviously one was

15  for congestion but that's all I remember.

16       Q.   And where did you fill the prescription?

17       A.   Where did I fill the prescription?

18       Q.   Was it a Walgreen's?  Was it rite aid.  I

19  don't know what you have down here.  CVS?

20       A.   I don't remember.  I don't remember exactly

21  where.

22       Q.   But back then, you didn't even know about

23  Chinese drywall, so you didn't explain to her that you

24  had any association between that and your work?

25       A.   I didn't know about it, correct.

Q.   Can you ever explain to her that you thought
that there was an association between that congestion
and your work?

A.   No, sir, I didn't know about it.

Q.   Well, you knew you were working so did you
explain to the doctor that I have this congestion, do
you think it may be caused by my exposures to anything
in my line of business?

A.   Honestly, I feel that I take those matters a
little more seriously now that I'm a little bit older
than what I was a few years ago.  So at that point I
did not say that to her.

Q.   I hope that you're right on that, that we're
all older and wiser.

A.   Well, I mean, I'm speaking for myself.  I'm
sorry.

Q.   Okay.  Now, I want to quickly go through your
document request which I don't believe that I've marked
as an exhibit yet, so I'm going to do that real quick.
And I hope that we can run through these faster.  This
is Exhibit No. 9.  I'm going to hand that to you.

MR. LONGER:  There's a page missing.

A.   Mister -- I hate to ask.

Q.   You need a break?

A.   Just a quick break.  I need the talk to my

1    wife because I'm sure we've been here from quite a

2    while and she hasn't heard from me.

3              MR. LONGER:  It's 8 o'clock, let's take a

4    break.

5              THE VIDEOGRAPHER:  Off the record at 8:01,

6    end of tape two.

7              (A recess was taken.)

8              THE VIDEOGRAPHER:  On the record at 8:07,

9    beginning of tape three.

10    Q.    Mr. Soto, we have just taken a short break.

11    A.    Thank you for that.

12    Q.    And I want to have you for your patience.  Let

13   me direction you to Exhibit No. 9, which I had produced

14   to you just before the break?

15    A.    Correct.

16    Q.    It is objector Saul Soto and SHS Construction

17   responses an objections to request for production

18   propounded by class counsel.  Do you have that document

19   in front of you?

20    A.    Correct.

21    Q.    All right.  Now, these were documents -- I'm

22   sorry.  This document was produced to me and filed in

23   the federal court in the Eastern District of Louisiana

24   by Mr. Bandas on your behalf.  Do you know that?

25    A.    Yes, sir.

1    Q.    All right.  So are there any communications

2  between you and anyone else in the Chinese drywall

3  litigation to your knowledge?

4    A.    No, sir.

5              MR. HUSEMAN:  You mean other parties?

6              MR. LONGER:  Other litigants, other

7  parties.

8              MR. HUSEMAN:  He obviously talked to his

9  lawyers, you know.

10              MR. LONGER:  Well, I said litigants,

11  didn't I?

12              MR. HUSEMAN:  Okay.

13              MR. LONGER:  So maybe Mr. Bandas will

14  become a litigant, I don't know.

15              MR. HUSEMAN:  If your fondest wishes are

16  realized.

17              MR. LONGER:  But we shall see.

18    Q.    Now, document request No. 4?

19    A.    Okay.

20    Q.    It references -- it asks for documents

21  reflecting damages to your property that you alleged

22  are caused by Chinese drywall.  You say that after your

23  search that any documents responsive to this request

24  will be produced.  Now, you've produced to us three

25  boxes here, Exhibits 2, 3, and 4.  Is there anything

1    else that you have in your possession, control or

2    custody that you intend to produce to me that is

3    responsive to this request?

4         A.    That is what I could find.

5         Q.    That is the universe right there; is that

6    correct?

7         A.    That's as much as I can find pretty much.

8         Q.    All right.  As to document request No. 5,

9    we're asking there for documents that you intend to

10   submit for other lost claims as that term is identified

11   in the Chinese drywall litigation.  Do you see that?

12        A.    Uh-huh.

13        Q.    All right.  Do you know what the other loss

14   fund is designed to cover?

15        A.    No, sir, I do not.

16        Q.    Do you have any understanding of why you

17   responded the way you did or was it something that you

18   just allowed counsel to do for you?

19        A.    That's why I got a lawyer to help me with

20   this.

21        Q.    Thank you.  No. 6, all invoices of your

22   purchase of Chinese drywall.  The universe is right in

23   front of us; is that correct?

24        A.    That's pretty much what I could find, yes.

25        Q.    All right.  Do you own any companies?

1     A.    Any companies like all together?

2     Q.    Well, this question, interrogatory No. 7, it

3   says for each company you own, all documents reflecting

4   your ownership or articles of incorporation.  You run

5   SHS Construction, which is doing business -- I'm sorry,

6   it's Saul Soto doing business as?

7     A.    Correct, doing business as.

8     Q.    SHS construction?

9     A.    That is correct.

10    Q.    Do you own any incorporated companies?

11    A.    One, which we never did anything with which

12  we're closing down this year.

13    Q.    Okay.  And what is that company?

14    A.    Buena Vista lawn and landscaping it's an LLC.

15    Q.    And I -- I feel come to ask compelled to ask.

16  Is that a business that ever engaged in practices that

17  involved Chinese drywall?

18    A.    No, sir.

19    Q.    Or any drywall for that matter?

20    A.    That I can tell you, no, no, sir.

21    Q.    Okay.  All right.  Document request No. 8.

22  Have you produced all invoices, purchase orders, sales

23  slips or other paper reflecting the resale of Chinese

24  drywall?

25    A.    In the resale as far as my understanding is

1   the contracts that I use to do my business.  And

2   they're in there as well.

3       Q.   Okay.  And are they -- if we were to look at a

4   contract?

5       A.   Okay.

6       Q.   Would it be separately identified the resale

7   of drywall?

8       A.   As far as what invoice would go with the

9   paperwork is that what you're saying?

10      Q.   How would -- how would we know --

11      A.   Okay.

12      Q.   That you were reselling drywall in any

13  document in there?  What would it say in what would I

14  look for?

15      A.   Honestly the only way that that would be in --

16  we have gotten a better with that -- is on the invoices

17  now, which that hasn't always within the policy but now

18  we will put the job that it goes to.  And we'll write

19  it on there.  Years ago we didn't used to do that.  The

20  only way of knowing is the invoices that go to that

21  month pretty much.

22      Q.   When you say now, when did that practice

23  begin?

24      A.   Well, my assistant has been with me for two

25  years, so she helps do all that stuff.

1    Q.    So since 2010?  Or --

2    A.    Somewhere around there, yes, sir.

3    Q.    Since you had an assistant?

4    A.    Yeah, she's she helps me with that.

5    Q.    All right.  If I were to ask you to stand up

6    and walk over to boxes, would you be able to find an

7    example of where the drywall is separately identified?

8    Or would it take you for of because you'd have to look

9    at every single piece of paper?

10    A.    If I looked at 2011 or something, probably.

11    Q.    I'm just asking, do you think that you could

12    get up and put your hands on such a document right away

13    or are you as lost in the woods as I would be?

14    A.    You would probably be lost in the woods.  I

15    would know in the sense that because that's the work

16    that I did.  But I would take a little witness of time.

17    Q.    All right.  I'm not going to ask you to do

18    that now.  Thank you.

19          All right.  Request No. 9, all expert reports

20    and analysis of the settlement at issue.  Do you have

21    anything there?

22    A.    No, sir.

23    Q.    All right.  No. 10, is it correct that you do

24    not have any documents responsive to that request which

25    asks you for what you intend to admit at the fairness

1    hearing?

2        A.    That is correct.

3        Q.    Do you intend to appear at the fairness

4    hearing?

5        A.    I don't know.

6        Q.    You don't know?

7        A.    No, I don't know.

8        Q.    Are you willing to appear at the fairness

9    hearing?

10       A.    If I need to be there, yes.

11       Q.    If the court orders you to appear?

12       A.    Oh, of course.

13       Q.    You will appear?

14       A.    Without a doubt, yes, sir.

15       Q.    Is that expense something that Mr. Bandas will

16   advance for you?  Or is that an expense that you will

17   have to incur?

18       A.    I don't know.

19       Q.    What is your contract say about any expenses

20   in this litigation?  I see the title expenses and

21   payments to you, but I'm looking for what your

22   understanding is as to expenses and I don't see any

23   discussion of expenses.  There it is.  4.4, you will

24   not be responsible the pay attorneys fees or expenses

25   of any kind.  So is it your understanding that

1    Mr. Bandas is going to pay for you to go to New Orleans

2    if you have to?

3         A.    If that's what it says here and if that's the

4    way it needs to work, I guess so.

5         Q.    Well, you better hope so, right?

6         A.    I hope so.  We will see.

7         Q.    All right.  Maybe there will be satellite

8    litigation.  You never know.  All right.  Request No.

9    11 addresses affidavits you intend to submit and you

10   say that you don't have any?

11        A.    I don't have any, no, sir.

12        Q.    Any documents, correct?

13        A.    That is correct.

14        Q.    All right.  I'm going to take a break now and

15   go off the record.

16              THE VIDEOGRAPHER:  Off the record at 8:17.

17              (Off the record.)

18              THE VIDEOGRAPHER:  We're on the record at

19   8:23.

20        Q.    Mr. Soto, on October 18, your attorney sent to

21   my office an e-mail containing invoices from Home Depot

22   and from Lowe's?

23        A.    Okay.

24        Q.    I'm going to show you the documents that were

25   produced.  And we can actually mark that as Exhibit No.

1   10.   And I'm going to ask you if you're familiar with

2   producing that set of?

3       A.    Yes, sir.

4       Q.    Invoices?

5       A.    Yes, sir, this is the -- this is correct.

6       Q.    How did you -- how did you produce those only

7   those documents to your counsel?

8       A.    Only these?  Well, at that point he well, we

9   had to get some things together that said sheetrock on

10  them, so this is what I could find at that time.

11      Q.    Okay.  And now are those documents that

12  comprise Exhibit No. 10 in these boxes?

13      A.    They are in there somewhere, yes, sir.

14      Q.    So we're going to re -- we're going to find

15  them again or you're going to find them again?

16      A.    Well, actually.

17              MR. HUSEMAN:  Hopefully.

18      A.    I believe they're kind of out kind of if you

19  would go through a file they would be kind of all

20  together, but as far as exactly where they're at, I

21  don't know.

22      Q.    Okay.  All right.  Now, you had a choice in

23  this settlement to object as you did?

24      A.    Okay.

25      Q.    Are you at all aware of the alternatives to

1    that choice?

2        A.    Alternatives as this what is the.

3        Q.    Well, the settlement agreement provides that

4    you could opt out of the class or request exclusion

5    from the class?

6        A.    Yes, sir.  Yes.

7        Q.    It suggests that you could object to the

8    settlement?

9        A.    Uh-huh.

10       Q.    Or it says that you can basically do nothing

11   and participate in the class?

12       A.    Yes, I'm aware of that, yes, sir.

13       Q.    All right.  And you chose to object, I guess

14   the question is:  What was your consideration, if any,

15   about opting out of the settlement?

16            MR. HUSEMAN:  Once again, just out of an

17   abundance of caution, Mr. Soto.

18       Q.    Don't tell us what Mr. Ban sass said to you?

19            MR. HUSEMAN:  Well said.

20       A.    Okay.  You're asking what my thinking or say

21   that again.  I'm sorry.

22       Q.    You are the client?

23       A.    Correct.  Yes, sir.

24       Q.    You have an attorney?

25       A.    Correct.

1      Q.     You are responsible for your own choices?

2      A.     Correct.

3      Q.     Correct?

4      A.     Correct.

5      Q.     Mr. Bandas doesn't control your choices, does

6  he?

7      A.     That is true.

8      Q.     Okay.  So as the master of your domain, why

9  did you choose not to opt out?

10     A.     Well, I didn't opt out because I was opposed

11 to this case as an objector.  Sorry.  That was the

12 option that I chose.

13     Q.     Okay.  And what was the thought process that

14 you went through that got you to that point?

15     A.     Honestly, that the class should get a little

16 bit more.

17     Q.     And that was based upon discussions that you

18 only came about with counsel, is that fair to say?

19            MR. HUSEMAN:  Don't answer that question.

20     Q.     Let me say it differently.  You don't have

21 that opinion or that thought until after you talked to

22 counsel; is that correct?

23     A.     That came to mind after we talked.

24     Q.     I have no further questions.  Thank you very

25 much for your time, Mr. Soto witness with the thank

```
 1   you, sir?
 2                  MR. LONGER:  Do any of you gentlemen
 3   intend to ask the witness a question?
 4                  MR. HUSEMAN:  I must have left the wrong
 5   impression with you.
 6                  MR. DODSON:  Is there anything we want to
 7   try to resolve this evening?  There's been --
 8                  MR. LONGER:  We can be on the record until
 9   these gentlemen tell me we can be off the record.  We
10   have an issue.  And it's my understanding from our
11   discussions that despite the court hearing today,
12   Ms. Petrus will not be presented tomorrow and
13   Mr. Vitela will not be presented.
14                  MR. DODSON:  More exactly because of the
15   court hearing today they won't be presented.
16                  MR. LONGER:  And we are going to get a
17   signed document, Exhibit No. 7 for the attorney
18   disclosure to client and client consent.
19                  MR. HUSEMAN:  We've already asked Chris to
20   sends us the signed version.  We will get that and you
21   will get it forth with.
22                  MR. LONGER:  So much for tonight is that
23   what you're saying?
24                  MR. DODSON:  Well, I had hoped that --
25                  MR. LONGER:  We can do it tomorrow.
```

```
 1              MR. DODSON:  That it was okay with you for

 2   tomorrow is what I was understanding earlier.

 3              MR. LONGER:  It was.

 4              MR. DODSON:  All right.

 5              MR. LONGER:  And what else do you hope to

 6   clear up?

 7              MR. DODSON:  There was an issue where we

 8   were going -- there was -- about some questions, I

 9   don't remember specifically that had to do with your

10   going into items with him about Chris', Mr. Bandas'

11   work on other cases.

12              MR. LONGER:  You're going to file a motion

13   for protective order.

14              MR. DODSON:  All right.

15              MR. LONGER:  Is that correct?

16              MR. DODSON:  If I need to.

17              MR. HUSEMAN:  If you want us to, we can do

18   it.

19              MR. LONGER:  I have a whole series of

20   questions on Mr. Bandas.  But based upon your

21   representation that if I asked those questions, you

22   will object and instruct him not to answer.

23              MR. HUSEMAN:  That's right.  And the

24   question was -- that was on the floor was whether or

25   not you were serious about pursuing that such that we
```

1    need to actually file that motion and the you are, then

2    we will.

3              MR. LONGER:  Well, I took you at your

4    word.

5              MR. DODSON:  Your timing have any sort of

6    constraints about whether we need to get that done

7    tomorrow.

8              MR. LONGER:  November 7 is when we intend

9    to have a hearing with Judge Fallon, it should be

10   tee'ed up before then so we can respond.

11             MR. DODSON:  Do we need to do anything

12   that would your travel easier?

13             MR. LONGER:  Give it to me tomorrow.  I'll

14   look at it on the plane on Friday.

15             MR. DODSON:  We're not going to try to get

16   it resolved by phone calls before you leave Corpus is

17   what I'm hearing?

18             MR. LONGER:  Well, if Mr. Soto will make

19   himself available, we could try to have a discussion

20   with Judge Fallon, in fact, tomorrow if you want to

21   work at it that way.

22             MR. DODSON:  I'm trying to make your life

23   easy.

24             MR. LONGER:  Well, all right.  Well, I'm

25   here.  And Mr. Soto, is your schedule such that you can

1    be available on sort of short notice either Thursday

2    or -- tomorrow being Thursday or Friday?

3                MR. HUSEMAN:  What this is about is that

4    if they're right, we're wrong about what they get to

5    ask you, we don't want them to have to make another

6    trip down here and depose you.

7                THE WITNESS:  No, I understand.

8                MR. HUSEMAN:  And I really don't like

9    depositions on telephones, so I would rather do it

10   while they're here so we're trying to see if you could

11   do that if we had to squeeze in a little bit more depo.

12               THE WITNESS:  Can I ask how long that

13   would be?

14               MR. DODSON:  When can you not?

15               MR. LONGER:  I think the deposition being

16   constrained as it was, it would last no more than a

17   half hour.

18               THE WITNESS:  Okay.  If that is true, I

19   can make myself available, let me see.  Tomorrow is

20   Thursday, right?

21               MR. HUSEMAN:  Yeah.  He's going to be

22   busy.

23               THE WITNESS:  I know you're leaving Friday

24   or -- right?

25               MR. LONGER:  Yes.

1          MR. HUSEMAN:  Friday morning, would that

2   work?

3          MR. LONGER:  Friday morning would work.

4          THE WITNESS:  Yeah.  If that's 30 minutes,

5   that would be okay.

6          MR. LONGER:  Are we adjourned.

7          THE VIDEOGRAPHER:  We're off the record at

8   8:33, end of deposition, end of tape three.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1 to Soto 10/31/2012 Deposition

# CLASS ACTION OBJECTOR
## POWER OF ATTORNEY AND CONTINGENT FEE AGREEMENT

This agreement ("Agreement") is made between SAUL SOTO ("Client(s)" or "you") and BANDAS LAW FIRM, P.C. (hereinafter "Attorneys").

In consideration of the mutual promises contained herein, Client(s) and Attorneys agree as follows:

1. **SCOPE AND METHOD OF REPRESENTATION**

   1.1 **Attorneys' Legal Services.** You agree Attorneys will: Prepare and file on your behalf an objection to a proposed class action settlement in the case styled *MDL 2047; In Re: Chinese-Manufactured Drywall Products Liability Litigation*; In the United States District Court, Eastern District of Louisiana, and represent you in any appeal therefrom (the "Objection").

   1.2 **Method of Representation.** BLF is a Texas law firm located at 500 N. Shoreline, Suite 1020, Corpus Christi, Texas 78471, (361) 698-5200. No lawyer of the BLF is licensed in Louisiana federal court. However, if necessary, Attorneys will seek admission before Louisiana courts *pro hac vice* or as required by the applicable federal rules of practice and/or will seek to associate local counsel in order to properly effectuate this representation. Client authorizes that Attorneys prepare the Objection for filing *pro se* if necessary so as to allow Attorneys meet the Objection filing deadline and sufficient time in which seek admission *pro hac vice* and/or associate Lousiana counsel if the later cannot be accomplished before the Objection filing deadline.

2. **YOUR REPRESENTATIONS AND DUTIES AS AN OBJECTOR**

   2.1 You represent you are a member of the Class as defined in the materials published at https://chinesedrywallclass.com

   2.2 You represent you can demonstrate you are entitled to receive settlement benefits as a member of the Class through documentation or by affidavit.

3. **ATTORNEYS' FEES, EXPENSES AND PAYMENTS TO YOU**

   3.1 **Class Action Settlement:** If a settlement is approved by the Court, you will receive the full amount of any benefits you are entitled to receive under the settlement as a class member. Attorneys shall not be entitled to receive any portion of your share of the benefits under the class settlement.

   3.2 **Incentive Award:** If the outcome of your objection is determined by the Court or is settled and the settlement is presented to the Court for approval, Attorneys may, in their sole discretion, petition the Court for approval of a modest (not to exceed

DEPOSITION
EXHIBIT
1

$5,000) payment to you to compensate you for your time, effort and/or the benefit you confer on the Class through your service as an objector (an "incentive award"). If the Court grants or approves an incentive award, you will receive the amount awarded to you by the Court in addition to the benefits set forth in paragraph 3.1. If Attorneys petition the Court for an incentive award on your behalf and the Court denies the incentive award, you will receive only the benefits set forth in section 3.1.

3.3    **Settlement:** In the alternative to section 3.2 above, if your objection is settled without the necessity for Court approval, Attorneys agree to request as part of the settlement a separate payment to you to compensate you for your time, effort and/or the benefit you confer on the Class through your service as an objector. The amount of the payment is contingent on the outcome of the settlement negotiations, but will not exceed $5,000. If the settling parties agree to make such a payment, you will receive the amount of that payment in addition to the benefits set forth in paragraph 3.1. If the settling parties do not agree to make a separate payment to you, you will receive only the benefits set forth in paragraph 3.1.

4.4    **Attorneys' Fees:** You agree the payment of attorneys' fees will be contingent upon the outcome of the objection. You will not be responsible to pay attorneys' fees or expenses of any kind. You agree Attorneys may receive a fee for their services if they are successful in pursuing an objection to the class settlement or any appeal therefrom. The attorneys' fees will be paid by the defendants or as part of the attorneys' fees awarded to class counsel. You acknowledge you do not have any interest in any such fees. You further acknowledge the attorneys' fees may substantially exceed any payments to you as set forth above.

4.5    You understand and acknowledge you will not receive any special benefits or recovery not afforded to other members of the Class by reason of your service as an objector other than as set forth above. You further acknowledge no other benefits or payments have been promised to you.

4.    **CONFLICTS OF INTEREST**

Attorneys have explained and you understand that, if successful, the objection or any appeal there from may result in the disapproval or rejection of the proposed settlement which may, in turn, cause you to lose your right to receive settlement benefits under the proposed settlement, to which you object. You acknowledge and agree to this risk and waive any conflict of interest arising from the objection or any appeal there from. Attorneys have also explained and you understand that if there are negotiations to settle your objection, Attorneys may negotiate the amount of any payment to you as well as the amount of attorneys' fees concurrently in order to arrive at a total settlement amount. You acknowledge and waive any conflict of interest between Attorneys and you arising out of any such negotiations and grant Attorneys sole discretion to propose the amount of any payment to you during the negotiations. The settlement will not be finally agreed upon, however, until you have approved the terms of the settlement, the amount of the payment to you, and the amount of attorneys' fees.

**5. ADMINISTRATIVE MATTERS**

5.1     **Termination:** Attorneys reserve the right to withdraw from this matter if you fail to honor this Agreement or for any reason permitted or required under the rules of the court or state in which the class action is pending.

5.2     **Association of Co-counsel:** Attorneys may associate other lawyers to assist in representing you if, before any association becomes effective, you agree in writing to the terms of the arrangement including (1) the identity of all lawyers or law firms involved, (2) whether fees will be divided based on the proportion of services performed or by lawyers agreeing to assume joint responsibility for the representation; and (3) the share of the fee each lawyer or law firm will receive, or if the division is based on the proportion of services performed, the basis on which the division will be made.

5.3     **No Guaranty of Results:** Attorneys will use their best efforts in representing you in this matter, but we cannot guarantee the outcome of any given matter. You acknowledge Attorneys have made no promises or guarantees concerning the outcome of this matter, and nothing in this agreement shall be construed as such a promise or guarantee.

5.4     **Entire Agreement:** This Agreement contains the entire agreement between us regarding this matter and the fees, expenses and payments relative thereto. This Agreement shall not be modified except by written agreement signed by both parties.

I certify and acknowledge that I have had the opportunity to read this Agreement, that I have voluntarily entered into this Agreement fully aware of its terms and conditions, and that I have received a copy of this Agreement.

Signed and accepted on this 2B day of September 2012.

Clients: _____

Attorneys: _____
Christopher A. Bandas