# EXHIBIT  23

1

2          **(REAL-TIME) UNEDITED TRANSCRIPTION DISCLAIMER**

3

4     The following transcript of proceedings, or any portion
      thereof, is UNEDITED and UNCERTIFIED by the certified
5     court reporter, at the request of counsel for the
      plaintiff.

6
      The purchaser/user agrees not to disclose this
7     (real-time) unedited transcription in any form (written
      or electronic) to anyone who has no connection to this
8     case.  This is an unofficial transcription which should
      NOT be relied upon for purposes of verbatim citation of
9     testimony.

10    This transcription has not been checked, proofread or
      corrected.  It is a draft transcript, NOT a certified
11    transcript.  As such, it may contain computer-generated
      mistranslations of stenotype code or electronic
12    transmission errors, resulting in inaccurate or
      nonsensical word combinations, or untranslated
13    stenotype symbols which cannot be deciphered by
      non-stenotypists.  Corrections will be made in the
14    preparation of the certified transcription, resulting
      in differences in content, page and line numbers,
15    punctuation, and formatting.

16    This (real-time) unedited transcript contains no
      appearance page, certificate page, index, or
17    certification.

18

19

20

21

22

23

24

25

1              (Exhibit No. 11 to 25 were marked.)

2              THE VIDEOGRAPHER:  We are now the record.

3    My name is hang, I am a videographer for Golkow

4    Technologies, today's date is November 1st, 2012.  And

5    the time is 2:17 p.m. the video deposition is being

6    held in Corpus Christi, Texas in re Chinese drywall

7    products liability litigation for the United States

8    District Court Eastern District of Louisiana.  The

9    deponent today is Ronnie Garcia, will counsel please

10   identify themselves for the record.

11             MR. GAUGHAN:  Matthew Gaughan for class

12   counsel.

13             MR. LONGER:  Fred Longer on behalf of

14   class counsel.

15             MR. HUSEMAN:  Van Huseman on behalf of

16   Mr. Garcia.

17             MR. DODSON:  And Paul Dodson for

18   Mr. Garcia.

19             THE VIDEOGRAPHER:  Would the court

20   reporter please swear in the witness.

21                       RONNIE GARCIA,

22   having been first duly sworn, testified as follows:

23             MR. GAUGHAN:  Before I start asking the

24   witness questions, I wanted to confirm that we were

25   available this morning, ready, willing and able to take

1   the deposition of Ms. Jan Petrus and it's my

2   understanding that she's not going to show up for

3   deposition and also we're also available to depose

4   Mr. Vitela and also he's not going to be produced,

5   correct.

6               MR. HUSEMAN:  As far as I know.  I don't

7   represent them, so -- but that's what the rumor on the

8   street is.

9                    EXAMINATION

10   BY MR. GAUGHAN:

11     Q.    And I guess -- good morning, Mr. Garcia.

12     A.    Yes, sir.

13     Q.    I guess as an initial matter, we've marked a

14   series of boxes over here as Exhibits 11 through 25 and

15   I guess these are -- these are records that you

16   obtained last night; is that correct?

17     A.    I was able to obtain them.

18     Q.    Okay.  And these pertain to your business; is

19   that correct?

20     A.    Yes, sir.

21     Q.    And what's the name of your business?

22     A.    Bay Area contracting & construction.

23     Q.    And were you able to review all of these

24   documents?

25     A.    No, sir.

1      Q.     Okay.  Did you identify any records in there

2  that you've sorted out as specifically involving

3  Chinese drywall?

4      A.     I haven't had time to look at that.

5      Q.     Okay.  Were you able to identify some

6  documents that involved drywall?

7      A.     Yes, sir.

8      Q.     Okay.  And are those the documents we see over

9  there, the edge of the table?

10     A.     There were some other documents I was able to

11  pick out while I was looking through them.

12     Q.     And having had a chance to pick out some of

13  those documents, did you see anything on there that

14  specifically reference that the drywall in those

15  records was in fact Chinese?

16     A.     I didn't look at them, just -- I was just

17  looking for drywall.

18     Q.     Okay.  So you can't say one way or the other

19  whether any of those records actually involved the

20  purchase of Chinese drywall?

21     A.     Well, they don't say specifically Chinese

22  drywall.

23     Q.     So you don't know; is that correct?

24     A.     Well, that's what it says right there off the

25  invoices.

1      Q.    All right.  So you really have no way of

2  knowing one way or the other if those records in fact

3  involve purchases of Chinese drywall, correct?

4      A.    I'm not too sure.

5      Q.    Could you please state your name and address

6  for the record?

7      A.    My name is Ronnie Garcia, my address is at

8  3938 Surfside boulevard.

9      Q.    And what's your --

10      A.    Corpus Christi, Texas 78402.

11      Q.    Okay.  And what's your social security number?

12      A.    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.

13      Q.    And just as kind of an introductory matter,

14  we've noticed both your deposition individually as well

15  as a deposition of Bay Area contracting & construction,

16  Inc.  Are you aware of that fact?

17      A.    Sir?

18      Q.    Are you aware that we've noticed your

19  deposition individually as well as noticing the

20  deposition of Bay Area contracting & construction,

21  Inc.?

22      A.    I'm not -- I mean, I don't understand.

23              MR. HUSEMAN:  He will be speaking for both

24  of them.

25              MR. GAUGHAN:  That's what I want to

1    establish.

2                    THE WITNESS:  Okay.

3        Q.    So you're prepared today to answer questions

4    both for yourself personally and for Bay Area?

5        A.    Yes, sir.

6        Q.    Okay.  Thank you.  What's your -- what's your

7    specific position at Bay Area contracting &

8    construction?

9        A.    I was the president.

10       Q.    Okay.  Are there any other officers or

11   directors of that company?

12       A.    No, sir.

13       Q.    And does that company have any employees?

14       A.    Yeah, it had employees.

15       Q.    How many employees?

16       A.    Eight.  Sometimes it depends on the projects.

17       Q.    And I guess going back to 2008 to present,

18   would you say that that company had approximately eight

19   employees during that --

20       A.    Yes, sir.

21       Q.    Was it always the same employees?

22       A.    Yes, sir.

23       Q.    And who are those individuals?

24       A.    My brothers rocky Garcia, Domingo Garcia,

25   Danny Mendieta, my secretary, her name is Estella

1    Terraza and myself and I can't remember who else, Joe

2    Perez.

3        Q.    And are these the same individuals that have

4    been with Bay Area contracting & construction, Inc.

5    from 2008 to present?

6        A.    Well, yes, sir.

7        Q.    Okay.  And you kind of gestured.  Is that --

8    there's been some --

9        A.    There's some that -- that have been laid off

10   because of the job market.

11       Q.    Okay.  But there are no other individuals that

12   you didn't identify?

13       A.    No.

14       Q.    During that time period?  Thank you.

15             Have you ever been a party to a lawsuit

16   before?

17       A.    No, sir.

18       Q.    Okay.  Was your company sued by an Ashley

19   combs for a car accident?

20       A.    Yes, sir.

21       Q.    Okay.  Were you ever a party to any other

22   actions beyond that one?

23       A.    Well, they were trying to sue me, but it

24   was -- the vehicle that they hit was -- it was actually

25   my -- one part of the company, it was my brother's

1   truck.

2        Q.    Okay.  But is that the only lawsuit that you

3   or your company has been involved in?

4        A.    Yes, sir.

5        Q.    No breach of contract claims, anything like

6   that?

7        A.    No, sir.

8        Q.    Can you tell me a little bit more about that

9   accident?

10       A.    What's that?

11       Q.    The lawsuit with Ms. Combs, can you tell me a

12   little bit more about that action?

13       A.    I don't know what that pertains to, but -- I

14   don't know.  I just know that she had Thomas J. Henry

15   and they were just trying to sue the company and I was

16   telling them it's not a company vehicle, and this was

17   it.

18       Q.    Did you -- were you deposed in that lawsuit?

19       A.    I ended up settling.  I just told them you

20   know what, here's X amount of dollars, that's it.

21       Q.    Well, you're appearing here today at a

22   deposition.  I guess my question is:  In that

23   particular lawsuit, did you also appear for a

24   deposition?

25       A.    I don't know.  I guess it would be a

1  deposition.  I don't know.  I don't know if it's

2  called.  I mean, we had attorneys -- I had my attorney

3  there and he was going back and forth.  It wasn't a

4  deposition, I don't think.

5      Q.   Were they asking you questions like I'm asking

6  you questions right now with a court reporter present?

7      A.   I can't remember.  I think so.  Yeah, I think

8  you're right.

9      Q.   Okay.  So you might have been deposed, you're

10  not sure?

11      A.   I don't know what you're trying to get on that

12  part.

13      Q.   Well, do you understand --

14      A.   That's -- you're saying something about

15  lawsuit.

16      Q.   Yeah.  Well, I guess what I'm trying to ask

17  you, Mr. Garcia, is right now what's going on is I'm

18  taking your deposition?

19      A.   Uh-huh.

20      Q.   And we have a stenographer here who is taking

21  down what I'm asking you as well as, you know, your

22  answers.  Now, what I'm trying to figure out is in

23  connection with the lawsuit by Ms. Combs, was there a

24  similar process where a lawyer was asking you questions

25  and a stenographer was taking -- creating a record?

1    A.    I don't remember.

2    Q.    Okay.  So you testified that you ultimately

3  settled that lawsuit?

4    A.    Yes, sir.

5    Q.    How much money did you settle it for?

6    A.    I think like 2 grand.

7    Q.    2 grand.  And did Ms. Combs allege any sort of

8  personal injuries?

9    A.    That's -- I guess that's what it was about.

10   Q.    Okay.  And are you a party to any lawsuits

11 that specifically involve Chinese drywall?

12   A.    No, sir.

13   Q.    Okay.  So you're not a plaintiff or a

14 defendant in any litigation involving Chinese drywall?

15   A.    No, sir.

16   Q.    Can you tell me the address of each of the

17 properties where you installed Chinese drywall?

18   A.    I cannot.

19   Q.    Can you tell me the address of any property

20 where you installed Chinese drywall?

21   A.    No, sir.

22   Q.    Can you tell -- give me an approximate number

23 of homes where you installed Chinese drywall?

24   A.    I don't remember.  I mean, I don't know

25 what -- I just know I installed drywall.

1     Q.    Okay.  You said that you know that you

2     installed drywall.  How do you know that you installed

3     Chinese drywall?

4     A.    I've seen it.  That's you will I can say.  I

5     know I seen it.  It can be in Dallas, it could have

6     been in Galveston, it could have been in Houston.  I

7     mean, I've seen all kinds of drywall.

8     Q.    Now, where specifically did you see this

9     Chinese drywall?

10    A.    What's that?

11    Q.    Where do you actually recall seeing the

12    Chinese drywall?

13    A.    You know, like I said, it could be Houston,

14    Dallas or Fort Worth.

15    Q.    At a job site?

16    A.    At a project we did.

17    Q.    Okay.  Do you have any recollection of

18    actually seeing Chinese drywall in a -- anywhere else?

19    A.    Just letterings like USG.  We used tempo made

20    from Mexico, we used different types of drywall.  We

21    tried to use for the value the prices.

22    Q.    Okay.  But I guess what I'm trying to figure

23    out is you testified that you actually remember seeing

24    Chinese drywall at some point at a job site?

25    A.    I said I've seen the name Chinese drywall at

1    one time or another.  I don't know.  I can't -- I can't

2    remember that accident like you're telling me if I had

3    somebody, you know, taking my deposition or what.  I

4    can't remember that far back.

5         Q.    Okay.  What I'm trying to ask you, again, is

6    where -- was it at a job site?  Do you recall seeing it

7    at a store?  Where do you remember seeing it?

8         A.    At one of the projects.

9         Q.    Okay.  So you have no memory as you sit here

10   actually seeing Chinese drywall at a store, for

11   instance?  No memory?

12        A.    I just know I've seen it on a project.

13        Q.    Okay.  And then you just mentioned a couple of

14   brands of drywall.  One of them was USG?

15        A.    Uh-huh.

16        Q.    Now, is it your belief that USG makes Chinese

17   drywall?

18        A.    No.

19        Q.    Okay.  And then was the other company tempo?

20        A.    I think it's temple.  It's a Mexican drywall

21   made from Mexico.

22        Q.    And is it your belief that that company also

23   makes Chinese drywall or sells it?

24        A.    I don't know.

25        Q.    Okay.

1       A.    I'm not a -- I just -- I just purchase and

2   install it.

3       Q.    Okay.  So is it fair to say with respect to

4   temple drywall it's injury understanding that drywall

5   is it's made in China and not -- excuse me, made in

6   Mexico and not in China?

7       A.    Now, what was that again?

8       Q.    I'll ask again.  Specifically with respect to

9   temple drywall, is it your -- it's your understanding,

10  correct, that that drywall is actually from Mexico and

11  not from China?

12      A.    Well, temple.

13      Q.    Yeah?

14      A.    I think that's what -- I think that's what I

15  recall them telling us.

16      Q.    Now, have you actually gone back and spoken to

17  any of your customers to let them know that you think

18  you may have installed Chinese drywall in their homes?

19      A.    No, sir.

20      Q.    Do you intend to do so?

21      A.    Not unless it arises.

22      Q.    Okay.  So what do you mean by if it arises?

23      A.    I mean, I had a customer, you know, a while

24  back tell me about some drywall that's coming, you

25  know, screws are coming -- corroding and you know, they

1  had a water leak and stuff like that.  And we went back

2  and repaired it.  But I never thought of anything

3  happening because of the drywall.

4      Q.    Now, you just mentioned a customer that you

5  went to their house and there was some issue with the

6  screws?

7      A.    Yeah, the drywalls and screws.

8      Q.    Was that recently?

9      A.    No, it's been years.

10     Q.    Okay.  And could you tell us who that

11 homeowner is?

12     A.    I can't recall.

13     Q.    When you were at that homeowner's property,

14 did you observe anything that you thought was Chinese

15 drywall?

16     A.    I can't recall.

17     Q.    Did you save any of that drywall that you

18 removed from that property?

19     A.    It's been too much -- it's been a couple of

20 years.

21     Q.    Have you saved any drywall that you think is

22 Chinese drywall from any job whatsoever?

23     A.    No, sir.

24     Q.    So you don't have any samples of what you

25 believe to be Chinese drywall?

1     A.     Not at this time.

2     Q.     Okay.  And let me next ask you, should some of

3  your customers come forward that contend that you

4  installed Chinese drywall in their properties, how do

5  you -- do you have any intention to remedy that

6  situation?

7     A.     Well, I'd have to, you know, go in and repair

8  it as much as I can.

9     Q.     You would do that, though?

10    A.     Yes, sir.

11    Q.     Okay.  Now, when is it you first remember

12  hearing problems -- or scratch that.

13           When is it that you first remember hearing

14  that there were problems with drywall that had been

15  imported from China?

16    A.     I don't recall.  I mean, I just remember a

17  customer saying something about their house having it

18  at one time.  Because we used to do insurance work

19  remediation on it and just, you know, overhearing stuff

20  like that.

21    Q.     So you said you heard about it from a

22  customer?

23    A.     Uh-huh.

24    Q.     Was this one of your former customers?

25    A.     I don't recall.  It's just -- you know, it's

1    been so long ago you hear -- you hear and it stays in

2    your head somehow and we go in there and just do the

3    work, you know.  We just tell them put a claim in, you

4    know, what else can -- you know.

5        Q.    So you're not telling me that this is someone

6    that came to you and said, hey, you installed this bad

7    drywall in my house, I need you to replace it?

8        A.    Well, like I said -- like I said, we used to

9    do insurance remediation so I don't think it was --

10   might not have been one of my homes, it could -- it

11   could have been, but I can't remember.  I can't recall.

12       Q.    And I'll just represent to you that one of the

13   things you did in connection with your objection that

14   you filed with our settlement is that you represented

15   that none of your former customers had complained to

16   you that you had installed defective drive wall in

17   their house?

18       A.    That's what I'm saying.  That's exactly what

19   I'm saying.

20       Q.    I just want to make sure I understood

21   correctly.  This individual or individuals that you're

22   saying told you that there was Chinese drywall in your

23   house, you're not telling me that these individuals

24   were --

25       A.    My customers.

1    Q.    Any of your existing customers?

2    A.    Well, not the homes I built, no.  It's like I

3  said, it might have been an insurance claim that

4  somebody put in and they call me out to go take care of

5  it.

6    Q.    Is that -- is that a large part of your

7  business, doing insurance claims?

8    A.    No, not really.

9    Q.    And I guess you mentioned insurance claims.

10  Are these individuals that put in claims because they

11  had Chinese drywall in their house?

12    A.    It was just one of those, you know, like I get

13  calls I have once in a while and I get the -- you know,

14  if I do it, I do it.  If I don't, I don't.

15    Q.    And what can you tell me about when these

16  conversations occurred, if anything?

17    A.    I can't.

18    Q.    So this could have been four years ago, it

19  could have been one year ago?

20    A.    It was a little bit more, probably four years,

21  maybe five years.

22    Q.    Okay.  As you sit here today, you can't -- I'm

23  sorry.  You can't identify these particular customers

24  that you did work with Chinese drywall, can you?

25    A.    No, sir.

1    Q.    Did you do any sort of demolition work at

2  these properties?

3    A.    We did a lot of demolition work.

4    Q.    And do you remember seeing Chinese drywall

5  when you did this demolition work?

6    A.    I could have.  Like I said, my memory is not

7  as good as it used to be.

8    Q.    So you testified that the first time you

9  remember hearing about homeowner's having problems with

10  Chinese drywall was from customers, correct?

11    A.    Well, from -- I guess it would be a customer

12  or someone who did some repairs to the house.

13    Q.    You don't recall seeing anything in the news

14  media or anything like that?

15    A.    No, sir.

16    Q.    How about from other contractors that you were

17  friendly with?

18    A.    I don't recall.

19    Q.    So as you sit here today, you can't tell me

20  when you first remember hearing, you know, that there

21  are problems with Chinese drywall?

22    A.    No, sir.  Just like I said, it was just like a

23  conversation, a long time ago.

24    Q.    And that was --

25    A.    And I never thought of anything about that.

1    Like I said, I try to do my work the best I can and

2    keep on going.

3        Q.   But you think that was more than four years

4    ago; is that correct?

5        A.   Yes, sir.

6        Q.   Now, if you remember hearing about these sort

7    of problems more than four years ago with Chinese

8    drywall, did you take any sort of action yourself to

9    make sure you weren't using Chinese drywall at that

10   point?

11       A.   You know, like I say, we try to use USGA

12   product, but, you know, we try to go with, you know,

13   with the best value to get to -- to meet the

14   market's -- what our profitability market.

15       Q.   So you just install the cheapest drywall?

16       A.   We try to, that give us the best price.

17       Q.   Even after hearing complaints about defective

18   drywall you continued to use it is?

19       A.   I didn't look into it.  Like I said, I just

20   try to pick up drywall and let's go.  You know, we got

21   deadlines to meet and we got to meet them, you know.

22       Q.   Just turn a blind eye to it?

23       A.   Well, like I said, I don't know.  I didn't

24   know what -- I didn't know it was this bad or if it's,

25   you know...

1    Q.    But you still installed Chinese drywall in

2    people's homes after you had heard others complain

3    about it?

4    A.    Could have.  If it's still in the market, like

5    I said, you know, you put it out there if it's still in

6    the market.

7    Q.    Okay.  But you don't remember actually

8    installing any drywall during that time period, do you,

9    from -- from when you first heard that there were

10   problems with drywall to, you know, four years ago till

11   now?

12   A.    Now, what are you saying again?

13   Q.    What I'm trying to say is you don't have any

14   specific recollection as you sit here today that you --

15   that you actually installed Chinese drywall in

16   someone's house after you -- four years ago when

17   someone first mentioned there were problems with it?

18   A.    Well, like I said, you know, if it was out

19   there, like you said, we try to put the cheapest

20   drywall out there.  And if it was part of it, it

21   goes -- you know, it's -- that's what we try to do it.

22   We order it and you know, let's get it into where we

23   need to get into the project and get it up and taped

24   and floated and painted.

25   Q.    So you used the cheapest drywall but you don't

 1   know, you have no idea whether it was Chinese, Mexican,
 2   American, you don't know?
 3       A.    No, sir.
 4       Q.    Okay.  Thank you.  Do you know what brand of
 5   Chinese drywall that you may have installed, any sense
 6   of that?
 7       A.    It's been too long.
 8       Q.    Now, specifically with respect to the
 9   settlement that you're objecting to, do you remember
10   seeing any sort of advertisements, anything like that
11   about the settlement?
12       A.    No, sir.
13       Q.    How is it that you came to know about the
14   settlement?
15       A.    What's that?
16       Q.    How did you come to learn about the
17   settlement?
18       A.    Another perpendicular, another friend of mine
19   telling me about it.
20       Q.    Who is the friend?
21       A.    Bert Chapa.
22       Q.    Bert.  What was his last name?
23       A.    Chapa.
24       Q.    How do you spell that?
25       A.    C-H-A-P-A.

1    Q.    Okay.  Now, who is Mr. Chapa?

2    A.    He's a golf buddy of mine.

3    Q.    Okay.  And what is does Mr. Chapa could for a

4  living?

5    A.    He's a legal assistant.

6    Q.    Where does he work?

7    A.    Here in Corpus.

8    Q.    Do you know the name of the law firm?

9    A.    It's Batman law office.

10    Q.    That's Mr. Batman?

11    A.    Yes, sir.

12    Q.    So Mr. Chapa, what does he do specifically at

13  Batman's office?

14    A.    He works for Batman.

15    Q.    Is he a paralegal?  Is he an investigator?  Do

16  you know what his --

17    A.    I think he's an investigator.

18    Q.    Okay.  And you testified that you played golf

19  with Mr. Chapa?

20    A.    I would, golf buddies.

21    Q.    How long have you guys been golf buddies?

22    A.    Ten, 12 years.

23    Q.    And had Mr. Chapa, during that time period,

24  ever asked you about -- or brought to your attention

25  other litigations like this one?

1  A. No, sir.

2  Q. Okay. And backing up to -- when would you

3 tell me that Mr. Chapa, is that two P's or one P? I'm

4 sorry.

5  A. Just one.

6  Q. Mr. Chapa first told you about the settlement,

7 when was that?

8  A. I guess about two months ago.

9  Q. So at some point in September, late August

10 some time around then?

11  A. What are we, October? We're already in

12 November.

13  Q. November 1, yeah.

14  A. Yeah, probably late September or beginning

15 of -- something like that. September. Yeah,

16 September.

17  Q. Late September?

18  A. I think it might have been beginning of

19 September because I was up in Dallas and Fort Worth.

20  Q. Okay. What did Mr. Chapa tell you about the

21 settlement at that time?

22  A. He didn't tell me nothing about the

23 settlement.

24  Q. I thought you had just testified that you

25 first learned of the settlement from Mr. Chapa?

1    A.    Well, not the settlement, but the -- about

2    the -- about what's going on with the Chinese drywall.

3    Q.    What did he tell you what was going on with

4    Chinese drywall?

5    A.    Well, he said if I ever worked with it, you

6    know.  Since he nosy work with a lot of drywall.

7    Q.    Okay.  So you told him yes, you might have

8    worked with him, I'm assuming?

9    A.    Yes.

10    Q.    And then what else did he tell you?

11    A.    Well, he told me exactly what you're saying,

12    where did you see it.  I said I don't know.  It could

13    have been in a project in Houston, Galveston or Dallas,

14    the same thing or in Corpus, I said, but I know I've

15    seen it, but I don't really -- you don't real you pay

16    attention to stuff like that.  Like I said, you just

17    slap that thing in the wall, you see an emblem, you

18    know, like you see a lot of them.  You know, we just

19    did a project -- we're doing a project in Portland and

20    you know, we see it, it's got an emblem that says USG

21    ultra light.  And you know, I put it up and let's go,

22    you know.

23    Q.    Okay.  So Mr. Chapa asked you if you had ever

24    seen Chinese drywall at any work sites; is that

25    correct?

```
 1        A.    Yes, sir.

 2        Q.    And you told him yes, is that --

 3        A.    Well, I told him I vaguely remember it.

 4        Q.    You didn't -- you didn't specifically remember

 5  it but you might have seen it, is that what you told

 6  him?

 7        A.    Yes, I told him I vaguely remember.

 8        Q.    And what did he tell you next?

 9        A.    He said there's, you know -- he introduced me

10  to Chris and he told me if I wanted to pursue this.

11        Q.    And when did he introduce you to Chris?

12        A.    In September.

13        Q.    And when you say Chris, you're talking about

14  Chris Bandas; is that correct?

15        A.    Chris Bandas, yes.

16        Q.    Now, at the time he introduced you to Chris,

17  was that the same day when you retained Mr. Bandas?  Or

18  is it a different time?

19        A.    It wasn't the same day.

20        Q.    Okay.  So where did you meet him?

21        A.    Who's that?

22        Q.    Mr. Bandas?

23        A.    At his office.

24        Q.    Okay.  So at some point in September you went

25  into Mr. Bandas' office, correct?
```

1      A.    Yes, sir.

2      Q.    And what was your intention at that time?

3      A.    We just talked about what we were talking

4  about now, about Chinese drywall.

5      Q.    Did you go into his office with the intention

6  of retaining a lawyer to represent you with potential

7  claims that you might have against distributors and

8  other parties that you purchased drywall from?

9      A.    Yes, sir.

10     Q.    Okay.  And did you ultimately retain

11  Mr. Bandas?

12     A.    I told him, you know, we talked about it, I

13  told him.

14            MR. HUSEMAN:  Just a minute.  Ronnie, I

15  don't want you talking about any communications you had

16  with Chris.  That's attorney/client privilege and we

17  assert that.  So you can talk to Matthew about things,

18  which are not involved in communications between you

19  and your lawyer.  Yeah, we've given them copies of the

20  contracts which will speak for themselves as the

21  relationship there.

22     Q.    And I guess my last question was ultimately

23  did you retain Mr. Bandas?

24     A.    Yes, sir.

25     Q.    And what's your understanding of the scope of

1  his representation of you?

2      A.    It's, you know, that's how come I retained

3  him, to make sure that he does what we need to do on

4  this matter.

5      Q.    And when you say this matter, are you

6  referring to this objection that you're currently have

7  filed to --

8      A.    Yes, sir.

9      Q.    You don't -- you don't understand that he's

10  representing you with respect to claims that you may

11  assert against other parties that you think sold

12  drywall, defective drywall to you, do you?

13      A.    Well, like you said, I've used it and then you

14  were saying that if I, you know, did it on purpose.

15  You know, I don't feel like I did it on purpose.  I did

16  it because it was the best value out there at the time.

17      Q.    I guess what I'm trying to ask you is do you

18  understand that Mr. Bandas' represent <Suffix>ation of

19  you is limited to this objection that you have filed to

20  this class-action settlement or do you understand that

21  his representation is broader in scope than that?

22      A.    I don't -- I don't understand what you are

23  applying.

24      Q.    Well, I guess we'll come back to this a little

25  later.  I wanted to follow-up on something first

1    hopefully I can clarify what I am trying to ask you.

2         But Mr. Chapa, you mentioned you had been

3    playing golf with him at some point he brought to your

4    attention that there were issues with Chinese drywall;

5    is that correct?

6    A.   No, he asked me if I had seen it or installed

7    it and I said probably, I installed all kinds of

8    drywall.

9    Q.   How is it that you went from playing golf to

10   looking to retain an attorney?

11   A.   What's that?

12   Q.   How did you go from playing golf with

13   Mr. Chapa to hey, I'm going to retain an attorney?  How

14   did that come about?

15   A.   I don't remember.  We just talked about it.

16   Q.   Did Mr. Chapa bring to your attention at any

17   point that there was a settlement involving installers

18   and builders and distributors and insurance carriers at

19   some point?

20   A.   He just said, you know, there was something

21   about what's going on with Chinese drywall.

22   Q.   But how did you get from there to going to

23   meet Mr. Bandas?

24   A.   He said, you know, you might need to look --

25   you know, talk to Chris about it.

1    Q.    Talk to Chris about what?

2    A.    About the Chinese drywall.

3    Q.    I guess just to tell him about Chinese

4  drywall?  What was he telling you that you needed to

5  talk to him about?

6    A.    That there was maybe a settlement on it or

7  there was legal action on it or something.

8    Q.    Was it your understanding when you were going

9  in to see Mr. Bandas that you were going to discuss the

10 prospect of you objecting to the settlement?

11   A.    No, sir.

12   Q.    When did that come to your attention, after

13 meeting Mr. Bandas?

14   A.    I don't recall.

15   Q.    Now, before you went in to meet with

16 Mr. Bandas, did your golf buddy Mr. Chapa mention to

17 you that there was a prospect that you might make some

18 money if you pursued an objection to the class

19 settlement?

20   A.    No, sir.

21   Q.    And what did your golf buddy Mr. Chapa tell

22 you that you might expect out of this meeting with

23 Mr. Bandas?

24   A.    He didn't really say anything about it.  He

25 just said talk to Chris about it and see what -- you

1    know, to make sure you're not -- you're not -- your

2    company don't come up on the lawsuit or anything like

3    that.

4         Q.    Now, did your golf buddy Mr. Chapa tell you at

5    any point that Mr. Bandas had a history of objecting to

6    class settlements before you met with him?

7         A.    No, sir.

8         Q.    And did he tell you at any point that, you

9    know, Mr. Bandas some courts had considered him a

10   serial objector to class settlements?

11        A.    No, sir.

12        Q.    Now, I just want to briefly ask you, in

13   addition to yourself there's a couple of other

14   individuals who also objected to this settlement I a

15   long with yourself.  Jan Petrus, do you know

16   Ms. Petrus?

17        A.    No.

18        Q.    How about Ernest Vitela, do you know him?

19        A.    I think I've heard of him.

20        Q.    Have you ever met him?

21        A.    No, sir.

22        Q.    How about E & E construction, are you familiar

23   with that company?

24        A.    No, sir.

25        Q.    Mr. Soto, Saul Soto, do you know Mr. Soto?

```
 1      A.    I've met him briefly.
 2      Q.    When did you meet him?
 3      A.    About a day ago.
 4      Q.    Not yesterday, the day before yesterday?
 5      A.    Yeah, the day before yesterday, yeah.
 6      Q.    Okay.  When did you -- what was the context of
 7  this meeting?
 8      A.    What's that?
 9      Q.    What was the context of you meeting him?
10      A.    I just met him in an out.
11      Q.    Grabbing a cup of coffee somewhere, you bumped
12  into him at dunking doughnuts?
13      A.    No, he came up and here I was up here.
14      Q.    So when you were meeting with your counsel?
15      A.    Yes, sir.
16      Q.    Okay.  By the way, when you originally
17  retained Mr. Bandas, he was your only counsel at that
18  point?
19      A.    Who's that?
20      Q.    Mr. Bandas?
21      A.    Bandas.
22      Q.    When did you come to learn that you were going
23  to be represented by other attorneys at this
24  deposition?
25      A.    When I talked to Mr. Van Huseman.
```

1        Q.    Okay.  And when was that, just a couple of

2   days ago?

3        A.    I would think four or five days ago.

4        Q.    Okay.  And I guess you mentioned that you

5   retained Mr. Bandas and he's not here today, is he?

6        A.    No, sir.

7        Q.    How do you feel about that?

8        A.    I've got a good counsel here.

9        Q.

10             MR. HUSEMAN:  Thank you.

11        Q.    Do you think that the individual you retained

12   specifically to represent you on your appeal -- or on

13   your objection should be present today defending your

14   deposition?

15        A.    I'm not a lawyer.  I don't know.  I don't know

16   how it works, you know.  I'm just -- I'm just a

17   contractor.

18        Q.    Okay.  And you mentioned that Mr. Chapa works

19   for the Batman law firm?

20        A.    Yes, sir.

21        Q.    And you never retained them as counsel, did

22   you?

23        A.    No, not really.  I've talked to -- for advice

24   I talked to Batman.

25        Q.    Advice in connection with your objection?

1    A.    No, sir.

2    Q.    What sort of advice?

3              MR. HUSEMAN:  Well, hold on.  If it's

4    legal advice you're talking about -- I don't know what

5    you're talking about.  If it's legal advice, you're not

6    to disclose that with him.

7              THE WITNESS:  It's not.

8    Q.    He just testified he didn't retain him?

9              MR. HUSEMAN:  If it's what golf ball,

10   that's okay.

11   A.    In construction you've got to put a lien on

12   somebody for them to pay you, you know, you talk to an

13   attorney can you get a lien out there in place for a

14   company to pay you.

15   Q.    And so how long have you known Batman?

16   A.    I guess about five years.

17   Q.    Did you ever play golf with Batman?

18   A.    Yes, sir.

19   Q.    How is he?  Is he good?

20   A.    Sucks.

21   Q.    So?

22             MR. LONGER:  He spends too much time in

23   the office.

24             THE WITNESS:  What's that?

25             MR. LONGER:  Spends too much time in the

```
 1   office.
 2                THE WITNESS:  He enjoys the whole course,
 3   he's all over the course.  He gets his money worth but
 4   he goes out there and has fun.
 5       Q.    Have you ever paid him for any of this legal
 6   advice?
 7       A.    No, sir.  No.  No, I don't think.  No, sir.
 8       Q.    Is it fair to say you're buddies with Batman?
 9       A.    Not really.
10       Q.    You just play golf with him every so often?
11       A.    We haven't played that often, but I wouldn't
12   want to play with him too often.
13       Q.    How many times a year -- how many times a year
14   do you play golf with Batman?
15       A.    Maybe once a year, at the most.
16       Q.    Okay.  And you testified --
17       A.    Maybe once a year.
18       Q.    You testified that he gave you some legal
19   advice?
20       A.    Yes.
21       Q.    And I guess I'm trying to figure out why he's
22   giving you free legal advice.  Can you tell?  Because
23   of your friendship with Mr. Chapa?
24       A.    Yeah, with Bert.
25       Q.    And you've never -- you've never actually
```

1    retained Mr. Chapa to represent you in any litigation

2    or anything like that?

3        A.    He's not an attorney.

4        Q.    Did I say Chapa?  You've never actually

5    retained Mr. Batman as counsel?

6        A.    Not really, no, I don't remember.  I mean, I

7    was going to retain him once, but he's not a family

8    lawyer.

9        Q.    Have you ever referred to any cases to Batman?

10       A.    No, sir.

11       Q.    How about any cases to Mr. Bandas, have you

12   ever referred any cases to Mr. Bandas?

13       A.    No, sir.

14       Q.    Did you know Mr. Bandas prior to Chapa

15   bringing you to meet Mr. Bandas?

16       A.    I've met him once I think it was at bat map's

17   party or something.

18       Q.    Just once?

19       A.    I think so.

20       Q.    How long ago was this?

21       A.    I think last year.

22       Q.    2011?

23       A.    I think so.

24       Q.    And you didn't talk about Chinese drywall or

25   anything like that at that point?

1    A.    We didn't know what -- I mean, he knew I

2  was -- he knew -- I knew he was a lawyer and he didn't

3  know what I was.  I was just association just walking

4  around, you know.

5    Q.    Okay.  Did Chapa ever mention that he had a

6  connection with Mr. Bandas?

7    A.    No, sir.

8    Q.    Do you understand that his office is located

9  in the same building as Mr. Bandas' office?

10    A.    Yes, sir.

11    Q.    Do you know if Mr. Chapa is going to make any

12  money for referring you to Mr. Bandas?

13    A.    I do not know.

14    Q.    You're golf buddies never mentioned anything

15  about that?

16    A.    No, sir.

17    Q.    He never picks up a round of beer or anything

18  like that?

19    A.    He's always buying the beer.

20    Q.    Okay.  Maybe I'll start hanging out with him.

21    A.    Yeah.

22    Q.    Okay.  So you testified that you don't recall

23  seeing any sort of advertisements with respect to this

24  Chinese drywall settlement; is that correct?

25    A.    On TV?

1      Q.    Yeah.

2      A.    No.

3      Q.    How about in paper publication format?

4      A.    No, sir.

5      Q.    Now, did Bert ever show you anything in

6   connection with the settlement that you're now

7   objecting to?

8      A.    No, sir.

9      Q.    He didn't show you a copy of the settlement,

10  anything like that?

11     A.    No, sir.

12     Q.    Did he tell you about the website,

13  ChineseDrywallSettlement.com, anything like that?

14     A.    No, sir.

15     Q.    How about did he provide you a copy of the

16  notice of that settlement?

17     A.    No, sir.  Can I take a break and get some

18  water or something?

19     Q.    Yes.  And by the way, if -- any time you need

20  to take a break, just let me know.

21              THE VIDEOGRAPHER:  Off the record at 2:58.

22              (A recess was taken.)

23              THE VIDEOGRAPHER:  We're back on the

24  record at 3:06.

25     Q.    Mr. Garcia, I want to follow-up on some of the

1    things we were talking about earlier.  Specifically you

2    mentioned that you're not a party to any Chinese

3    drywall litigation as a defendant or as a plaintiff; is

4    that correct?

5         A.   I think so.  Yes, you are correct.

6         Q.   I am correct?

7         A.   Well, unless you're talking about this right

8    here with Bandas.

9         Q.   Well, you didn't actually file a lawsuit, to

10   your knowledge, did you?

11        A.   No, sir.

12        Q.   Just an objection, correct?

13        A.   Just an objection.

14        Q.   And you haven't been sued by anyone?

15        A.   No, sir.

16        Q.   As someone that installed Chinese drywall in

17   their home, correct?

18        A.   Correct.

19        Q.   So I guess my question for you is if you

20   haven't been sued, why -- why are you retaining

21   counsel?  Why did you approach Mr. Bandas?

22        A.   In case I do get sued.

23        Q.   So when you met with Mr. Chapa and he advised

24   you that there were some problems with Chinese drywall,

25   is it your testimony that at that point in time you

1    wanted to meet with a lawyer in the event someone

2    actually sues you for Chinese drywall?

3         A.   I got counsel just to make sure I'm okay, I'm

4    covered.

5         Q.   Is that customary practice for you, that you

6    go and meet with lawyers because you think you might be

7    sued?

8         A.   No, sir.

9         Q.   And you didn't do that when there was the auto

10   accident with Ms. Combs, did you?

11        A.   What's that?

12        Q.   Did you do that after the auto accident with

13   Ms. Combs?  Did you consult with a lawyer?

14        A.   Yes, sir.

15        Q.   Before you got sued?

16        A.   No.

17        Q.   Okay.  Well, why in this particular instance

18   did you think you should consult with a lawyer before

19   you actually got sued?

20        A.   There was just, you know -- I talked to Bandas

21   about it and he said there was something --

22             MR. HUSEMAN:  Nothing he says.  Nothing

23   you say to him, okay?

24        Q.   I guess what I'm trying to figure out is not

25   what you talked to Mr. Bandas about, but, you know, why

1    it is that had you actually felt that you should meet

2    with an attorney when you hadn't even been sued yet.

3    Why is that?

4         A.    Why is that?

5         Q.    Yeah.  Why is that?

6         A.    Oh, because I installed, you know, I think I

7    installed some bad -- the Chinese drywall.

8         Q.    You think you did, but you don't know anyway,

9    correct?

10        A.    I know I've seen it.  I know I put it -- I

11   don't remember -- recall where.  Like I said, I don't

12   recall that -- that lawsuit that that lady filed

13   against me.

14        Q.    So is it your testimony today that when you

15   talked to your -- Mr. Chapa and it first came up that

16   maybe you should meet with a lawyer that you were

17   thinking you might be sued at that point?

18        A.    Well, also, they were saying there was some

19   health reasons or some other stuff that might come up.

20        Q.    Did they mention anything about the settlement

21   that you're currently objecting to?

22        A.    Not really.

23        Q.

24              MR. LONGER:  What was the answer?

25        A.    I said not really, I don't know what the

1    settlement is.

2        Q.    Not really or no?

3        A.    No.

4        Q.    So your testimony today that you didn't hear

5    about the settlement until after you met with

6    Mr. Bandas?

7        A.    I still don't know really what the settlement

8    is.  I don't know enough about it yet.

9        Q.    Okay.  I guess we'll explore that a little bit

10   then.  I guess if we could show the witness what's been

11   marked yesterday as Exhibit 5.

12       A.    Exhibit 5.

13       Q.    That's from yesterday's deposition.  If you

14   could just take a moment and look at it and just let me

15   know if you've seen this document before.

16       A.    This document?

17       Q.    Yes.

18       A.    Yes.

19       Q.    When did you see this document?

20       A.    When I went over to Bandas' house -- Bandas'

21   office.

22       Q.    Okay.  So I guess we should back up a minute.

23   This document is dated September 28, 2012.  If you look

24   to page number 4 of this document, do you see it's

25   dated September 28, 2012?

1      A.    On 4?

2      Q.    Yeah.  At the bottom there on the bottom

3   left-hand side?

4      A.    Yes, sir.

5      Q.    Okay.  Now, was -- as you look at this today,

6   does this refresh your memory that it was September 28,

7   2012 when you went to Mr. Bandas' office?

8      A.    Yes.

9      Q.    Okay.  And you didn't meet with him prior to

10  this date?

11     A.    Prior?  Meaning before?

12     Q.    Yeah.

13     A.    I met with him before.

14     Q.    Other than the party that we talked about

15  earlier where you met him?

16     A.    Yes, sir.

17     Q.    Okay.  So in connection with this objection,

18  this was the first time you met with Mr. Bandas was

19  September 28, 2012?

20     A.    No.  I think it was the day before, then I met

21  with him afterwards.

22     Q.    Did you meet with him both days?

23     A.    Both days.

24     Q.    September 27 and 28?

25     A.    Yes, sir.

1     Q.    Okay.  Did you ever go to Mr. Bandas' house?

2     A.    No, sir.

3     Q.    Okay.  So when was the first time you actually

4  saw this document?  Was it on the 27th then?

5     A.    Well, this one says the 28th so it's got to be

6  28.

7     Q.    I guess that's the date it was filed, but --

8  okay.  And are you aware this document is objection was

9  actually filed with the court?

10    A.    That's what it says here.

11    Q.    And is this a document that you reviewed

12  during your preparation for today's deposition?

13    A.    I reviewed it sort of.  I don't understand

14  most of it.

15    Q.    Okay.  What is your understanding of the

16  nature of your objection to the settlement in this

17  case?

18    A.    The objection?

19    Q.    Yeah.

20    A.    Whatever it says here.  It was saying

21  something about the 32 percent award fees.

22    Q.    And is that why you're objecting to the

23  settlement because there as a 32 percent award of fees?

24    A.    And plus I think that's what it is.

25    Q.    Have you actually ever read the settlement?

1       A.    No, sir, just read through here.  I don't know

2   the actual facts about it.

3       Q.    I'm sorry.

4             MR. LONGER:  He doesn't know the actual

5   facts about it.

6       A.    I just know about Chinese drywall.

7       Q.    Well, how did you come to learn that there

8   was, you know, what you're calling a 32 percent fee

9   provision if you had never actually read the

10  settlement?

11      A.    My attorney is the one --

12            MR. HUSEMAN:  Okay.  Let's not go into

13  that.

14      A.    Would do this.

15      Q.    Now, have you ever visited the settlement

16  website, the ChineseDrywallSettlement.com?

17      A.    No, sir.  Is it on here?

18      Q.    On your objection?

19      A.    Yes.

20      Q.    No, it's not on your objection.  So you've

21  never visited that website?

22      A.    No, sir.

23      Q.    Are you familiar with any of what we're

24  calling the participating defendants in this

25  settlement?

1        A.     No, sir.

2        Q.     Do you know whether you have purchased drywall

3    from any of these participating defendants?

4        A.     Can you go through them and let me know which

5    ones they are?

6        Q.     Well, I'm asking you the question.  I guess do

7    you know one way or the other whether you purchased

8    drywall from any of these participating defendants?

9        A.     Depends where they're at.  Whether -- I mean,

10   I know I've installed some.  I must have bought some

11   somewhere.  I don't know if it's building specialties

12   or L & W or McCoy's or I don't know which one it was.

13       Q.     So you don't know?

14       A.     What's that?

15       Q.     You don't know?

16       A.     I don't think I would know if Chinese -- you

17   know, unless it was printed out on my invoices.

18       Q.     So you're objecting to a settlement and you

19   don't know whether you purchased drywall from any of

20   the participating defendants; is that fair to say?

21       A.     I just know I've seen it.  I installed it at

22   one point or another.

23       Q.     Okay.  And if we can just take a look at this

24   objection you have here, I'm looking at page number 2

25   of the objection.  And in the second paragraph there,

1    it mentions that you're not attending the fairness

2    hearing.  Can you -- can you tell me why you don't

3    intend to attend the fairness hearing?

4        A.    Because counsel said I probably didn't need to

5    attend it.

6        Q.    And are you aware that your counsel is not

7    planning on attending the fairness hearing either?

8        A.    I don't know.  I don't know what Bandas is

9    going to do or if he's not going to show up.

10       Q.    Would you expect your counsel to attend the

11   fairness hearing where you've raised an objection to,

12   you know, the terms of a settlement?

13       A.    If you're asking me, I think I would.

14       Q.    Does that cause concern for you that your

15   lawyer is not intending to attend this fairness

16   hearing?

17       A.    I'm not a lawyer.  I don't know what -- how --

18   what goes on in none of this.  That's why I -- you

19   know, I'm not an attorney.

20       Q.    You think he should attend, though?

21       A.    I would think, if he's got some type of

22   interest with it, he would -- he would be attending.

23       Q.    Okay.  And if we look at the final paragraph

24   of this second page, it looks like one of the things

25   you're objecting to is the procedures or requirements

1    for objecting.  What specifically about those

2    procedures and requirements are you objecting to?

3         A.    Which part of it is?  Where is it at again?

4         Q.    If you look at paragraph 4 on this page?

5         A.    Oh, on page 4.

6         Q.    Page 2.

7         A.    Okay.  Now, what was the question again?

8         Q.    What specific -- why are you objecting to the

9    procedures and requirements for objecting?  What's your

10   understanding of those procedures and requirements?

11        A.    I can't understand what he's trying to say

12   here.

13        Q.    So you're objecting to the procedures and

14   requirements but you don't know what they are; is that

15   fair to say?

16        A.    Well, my counsel is the one who put it

17   together for me.

18        Q.    And if you turn to the next page, page number

19   3, that top paragraph, you're also objecting to the

20   class definition.  What's your understanding of what

21   the class definition is in this case?

22        A.    I don't know.  I don't actually know what the

23   definition of this case is.  I just know it was Chinese

24   drywall.

25        Q.    Okay.

1    A.    Other than that, that's the only thing I know.

2    Q.    So there's nothing that you can point to here

3    today that you think is flawed with the class

4    definition?

5    A.    I don't under it.  Can you explain it to me.

6    Q.    I'm just asking:  Is there anything that

7    you -- as you sit here today, you've objected to the

8    class definition.  Is there something you can tell me

9    about the class definition that you find to be flawed?

10   A.    Well, the way that he wrote it up here is,

11   it's over my head on this.

12   Q.    So you don't know, I guess, is that fair to

13   say?

14   A.    I don't know.

15   Q.    Do you need to take that?

16   A.    No.  It's my son.  I'll call him later.

17   Q.    Okay.  If we go down one -- if we go down six

18   lines in the same paragraph, there's a sentence

19   beginning "moreover, the class is defined in terms of

20   merit-based criteria."  And what is your understanding

21   of what that term means, merit-based criteria?

22   A.    Merit-based criteria.  I don't understand that

23   one either.

24   Q.    Okay.  And if we go down three more lines, I

25   guess two more lines, you see that sentence beginning

1    "objection is also made to the class definition in

2    allowing class members to be class members creates a

3    conflict of interest"?

4        A.    Now, which one is that again?

5        Q.    The -- I guess if we go eight lines down from

6    the top of the first paragraph, you see a sentence that

7    says "objection is also made to the class definition in

8    that allowing defendants to be class members creates a

9    conflict of interest and objection is made on this

10    basis." Do you see that?

11        A.    Yes.

12        Q.    Okay.  What's your understanding of the

13    conflict of interest?

14        A.    Conflict of interest.  Well, then the conflict

15    of interest is if Chinese drywall was -- is used in a

16    certain place.

17        Q.    There's a conflict of interest because drywall

18    is used in a certain place?

19        A.    It could have been used in a certain project,

20    homes or commercial or Naval base.

21        Q.    And that's the conflict of interest that you

22    were concerned about when you filed this objection?

23        A.    Or it could be -- it would be a conflict of

24    interest to me if, you no, they come back after me.

25        Q.    And in the next paragraph -- and I'm not going

1    to read the whole sentence but you object to the

2    fairness, adequacy and reasonableness of the

3    settlement.  Can you describe to me what your objection

4    is there?

5        A.    The only thing that I object on was the 32

6    percent that's going to be awarded to attorneys fees.

7        Q.    That's what this whole paragraph to you --

8        A.    That's all I can come up with the on that.

9        Q.    Just the award of attorneys fees?

10       A.    I don't know what the total amount is.

11       Q.    I guess if you can turn to page 4.  And I

12   think this gets into what your understanding of the

13   objection is the second paragraph there, the middle

14   paragraph?

15       A.    Yes.

16       Q.    Okay.  If you read that first sentence, can

17   you tell me what your understanding of what the term

18   percentage of recovery basis is?

19       A.    I don't even know what that is.

20       Q.    Okay.  So do you know what percentage of

21   recovery basis is?

22       A.    Not really.

23       Q.    How about load star, you just mentioned you

24   didn't know what that was?

25       A.    I don't know what load star is.

1    Q.   So yes, you don't know what that is?

2    A.   No, sir.

3    Q.   And then we also talk about if you go down

4    that third line there's reference to a mega fund case?

5    A.   Where is that at?

6    Q.   The third line of that paragraph talks about

7    mega fund case.

8    A.   Yeah, okay.

9    Q.   Do you know what -- what's a mega fund case,

10   can you tell me?  Is that a no?

11   A.   No, sir.

12   Q.   If we move down two lines from there, it says

13   that attorneys fee should not exceed 10 percent of the

14   common fund.  Do you see that?

15   A.   Common fund.  Common fund.  Yes.

16   Q.   So is it your position that attorneys fees

17   should not exceed 10 percent of the fund?

18   A.   Yes, sir.

19   Q.   And have you actually -- you haven't actually

20   reviewed the settlement, have you?

21   A.   No, sir.

22   Q.   So if I told you that attorneys fees, common

23   benefit fees were actually capped at 15 percent, would

24   that make a difference to you in terms of filing this

25   objection?

1     A.     At this time I don't know.  I would have to

2  check with counsel on that.

3     Q.     What's your opinion?

4     A.     What's that?

5     Q.     What's your opinion?  Do you think 15 percent

6  common benefit fees is reasonable?

7     A.     Depends on the amount, the total amount.

8     Q.     Total amount of what?

9     A.     Of the funds.

10    Q.     And would you agree with me there's not much

11 of a difference between ten and 15 percent?

12    A.     Well, there is a big difference, depends on

13 what you're talking about.

14    Q.     But certainly you allege that it was a 32

15 percent common benefit fee before, correct?

16    A.     That's what it says here.

17    Q.     Okay.  So you would agree at least that 15

18 percent is much closer to ten percent than?

19    A.     Yeah, it would be half the cost, yeah.

20    Q.     And what's your understanding of how much --

21 what the value of -- total value of the settlement is?

22    A.     Total value depends on what is the total

23 value.

24    Q.     I'm asking you.  What's your understanding of

25 how much the settlement is for?

1    A.    Like I said, I don't know.

2    Q.    So it could be $5 mill, you don't know?

3    A.    It could be $5 million.

4    Q.    If I told you it was $82 million, would that

5    ring a bell for you?

6    A.    I'm trying to figure out if it's $80 million

7    at 32 percent, that's a lot.  So you know, you figure,

8    you know, 2 percent of 80 -- what was it 80 something

9    million.

10    Q.    $82 million?

11    A.    2 percent would be good, too or 5 percent.

12    Q.    So you're objecting to basically the attorneys

13    fees and that's it, correct, of this settlement?

14    A.    I would think so.

15    Q.    Okay.  If what you just told me is in fact

16    correct, then the rest of this objection here that's

17    been filed by counsel that talks about class

18    definition, etcetera, that does not -- that doesn't

19    reflect what you yourself, your actual objection to

20    this settlement is, is that correct?

21    A.    Now, what was the class definition again?

22    Q.    I didn't tell you the class definition.  You

23    don't know the class definition from what I appreciate

24    from your earlier testimony.  So what I'm trying to

25    gather is from what you're telling me, your only

1  objection to this settlement is the fees; is that

2  right?

3       A.   That's what I was talking about.

4       Q.   So far as your counsel has raised other

5  issues, procedures, policies, class definition, those

6  sort of things, that's not why you're here today?

7  That's not why you're objecting to the settlement, is

8  that fair to say?

9       A.   The reason I'm here is just to -- you know, I

10 installed this product and they're saying they're going

11 to award somebody 32 percent.

12      Q.   So you're here because the 32 percent, in your

13 opinion, an not because of --

14      A.   Well --

15      Q.   Class definition for instance?

16      A.   Like I said, I don't know what the class

17 definition but I want to know -- see what the other

18 customers or the other clients are going to get other

19 than --

20      Q.   I think you're agreeing with me.

21      A.   Okay.

22      Q.   Are you?  Is that a yes?  Do you agree with

23 me?

24      A.   What's that?  About?

25      Q.   You're objecting to fees, you're not here

1    because of the class definition?

2        A.    Well, like I said, I'm here to make sure

3    everything is legally, you know, in the -- the clients

4    are going to get their fair share, you know.

5        Q.    And by that, you mean you're concerned about

6    this -- what you consider to be a 32 percent fee

7    provision, correct?

8        A.    Yes.  Yes, sir.

9        Q.    Okay.  Do you know what class counselor common

10   benefit counsel is?

11       A.    Where is that at?

12       Q.    I'm just asking, have you ever heard the term

13   common benefit counsel?

14       A.    No, I'm not an attorney.  What was that again,

15   common what.

16       Q.    Common benefit counsel.  It's not in this

17   document, that I know of.

18             So you don't know what that term means?

19       A.    No.

20       Q.    So I take it you don't appreciate the

21   difference between common benefit counsel and

22   individually retained counsel?

23       A.    It says -- it's unclear common benefit fees.

24   I don't know.

25       Q.    You don't know?

1      A.    No.

2      Q.    And also is it your understanding that Judge

3  Fallon, who is presiding over this MDL litigation must

4  approve any sort of fees that are ultimately paid to

5  common benefit counsel?

6      A.    I don't know who the judge is.

7      Q.    If I represent to you that Judge Fallon is

8  overseeing MDL 27 and would ultimately approve any sort

9  of fees that went to common benefit counsel, would that

10  change your basis of your objection in any way?

11      A.    It could.

12      Q.    Okay.  So in other words, the settlement has

13  not been approved by the court yet, so 15 percent, 32

14  percent, whatever you think it is, the fee amount, is

15  not etched in stone.  The court must approve it.  So

16  does that change your basis for objecting at all?  In

17  other words, is oversight by a federal judge who will

18  ultimately decide how much in fees should be awarded to

19  common benefit counsel?

20      A.    Okay.

21      Q.    I mean, don't you think that's adequate

22  safeguards when we're dealing with the difference

23  between 10 percent, which you think is adequate, as

24  opposed to 15 percent, which is in the settlement

25  agreement?

1       A.    Is that in the settlement agreement?  I don't

2    know.

3       Q.    I'll represent to you it is, that common

4    benefit fees are capped at 15 percent.

5       A.    Okay.

6       Q.    So if the settlement agreement caps fees,

7    common benefit fees at 15 percent and you think they

8    should be 10 percent, don't you think that having Judge

9    Fallon in place to approve the fees adequately

10    safeguards your concerns about the amount of attorneys

11    fees in this case?

12       A.    It could be.

13       Q.    And do you have any sense or knowledge about

14    the actual efforts that it took class counsel to

15    negotiate the settlement?

16       A.    No, sir.

17       Q.    Time and effort, you have no sense of that.

18    And if I told you this litigation has been going on

19    since 2009, would that change your opinion about how

20    much compensation class counsel might be entitled to?

21       A.    2009, huh?

22       Q.    What's that?

23       A.    You said 2009?

24       Q.    Yes.

25       A.    Okay.

1    Q.    Would that change your opinion at all about 10

2  percent versus 15 percent?

3    A.    I'd have to get with counsel on that and see

4  what they say.

5    Q.    So you have no opinion yourself?

6    A.    No, sir.

7    Q.    As you sit here today?  And do you have any

8  sense of how expensive it is to litigate this case?

9    A.    No, sir.

10   Q.    Are you familiar with the Haag service

11  requirements?

12   A.    No.

13   Q.    And if I told you it sometimes cost us over

14  $100,000 to prepare and serve a complaint in China,

15  would that shock you?

16   A.    No, sir.

17   Q.    You think that's a small chunk of change,

18  $100,000 to file and serve a complaint?

19   A.    That's a lot.  That's a lot of change.

20   Q.    So you'd agree you have no real sense of, you

21  know, the cost or the scope of this litigation,

22  correct?

23   A.    No, sir.

24   Q.    And actually, I'm going to have you turn a few

25  pages to what's actually Exhibit C to this -- to this

1    objection, which is actually your affidavit.

2        A.    What exhibit is that?

3        Q.    It's Exhibit C to this objection?

4        A.    Okay.

5        Q.    And is that your signature down there in the

6    bottom?

7        A.    Yes, sir.

8        Q.    And this is also dated September 28, 2012,

9    correct?

10       A.    Yes, sir.

11       Q.    If you look at the third page of this

12   document, which starts I am a member of this class, do

13   you see that paragraph?

14       A.    Yes, sir.

15       Q.    If you look at this final sentence, it says

16   you're not within the exclusions in the class

17   definition.  What is your appreciation of what those

18   exclusions are?

19       A.

20            MR. HUSEMAN:  Incidentally, Mr. Garcia I

21   don't want you repeating anything Mr. Bandas told you

22   in your discussions with him in your answer so exclude

23   that from any answer, please.

24       Q.    Can you identify any of the exclusions for me?

25       A.    No, sir.

1    Q.    Not one?

2    A.    I don't know what the exclusions are right

3  now.

4    Q.    And if you look to that next paragraph, it

5  says either I personally or through Bay Area

6  contracting construction, Inc., (a company I own)

7  purchased, installed, and used thousands and thousands

8  of sheets of drywall over the last 15 plus years.  Over

9  the years, I purchased drywall from Lowe's, Home Depot,

10  builder's square, (now out of business), McCoy's, and a

11  variety of other building supply companies."  Do you

12  see that?

13    A.    Yes, sir.

14    Q.    Can you give me any sense of where you

15  actually purchased the bulk of your drywall?

16    A.    The bulk?

17    Q.    Yes.

18    A.    That would probably be like best and McCoy's.

19    Q.    Okay.  And I guess what percentage of drywall

20  would you say you purchased from those was that three

21  entities you just identified?  Could you give me a

22  ballpark number there?

23    A.    At least 50 percent.

24    Q.    From those three?

25    A.    (Witness moves his head up and down.)

1    Q.    And then you've identified a couple of others

2    here, including Lowe's and Home Depot.  What percentage

3    of drywall would you buy from Lowe's and Home Depot?

4    A.    The other percentage.

5    Q.    Would you say that's probably half between

6    Lowe's and half between?  Or is there some other way

7    you would break it down?

8    A.    Well, I mean, it's -- like I said, it could

9    be -- I don't know.  It varies.  Like when we do

10   projects out of -- out of Corpus we pick them up in

11   Home Depot or Lowe's or, you know, building specialties

12   out in that area.  What ever is in the area that we're

13   working at.

14   Q.    Let's throw a number out there.  So you said

15   you estimated that you bought between 50 percent of

16   your dry -- about 50 percent of your drywall either at

17   Lowe's or Home Depot.  Would you say that you bought --

18   A.    Maybe 20 or 10 and 10.

19   Q.    Somewhere around that neighborhood.  Okay.

20   Now, are you aware that your counsel has represented I

21   think one of his -- either his secretary or one of his

22   officer workers in pursuing an objection to a

23   settlement that involved Lowe's home centers?

24   A.    No.

25   Q.    Okay.  That's never been brought to your

1   attention in any way?

2       A.   No, sir.

3       Q.   And you yourself, you didn't object to this

4   settlement involving Lowe's, did you?

5       A.   Is this about Lowe's?

6       Q.   This is not about Lowe's, no, sir.  So apart

7   from this objection, you didn't -- you're not aware of

8   doing any other objection to another drywall

9   settlement, are you?

10      A.   No, sir.

11      Q.   Okay.  And are you aware that under -- under

12  the terms of the Lowe's settlement, which has been

13  finally approved by a court in Muscogee county Georgia,

14  that your claims against Lowe's are barred, are you

15  aware of that fact?

16      A.   No, sir.

17      Q.   And can you tell me whether any of these

18  entities that you've identified in paragraph 4 are what

19  we referred to earlier as participating defendants?

20      A.   I don't know.

21      Q.   If I told you that Home Depot is the only

22  entity here that's actually a participating defendants

23  in the settlement, would that refresh your memory one

24  way or the other?

25      A.   No, sir.

1    Q.    And I'll represent to you that Home Depot --

2  excuse me -- Home Depot is in fact a participating

3  defendant in this settlement, okay?

4         And we've had some discussions with counsel

5  for Home Depot and one thing that they represented to

6  us is that they never purchased any drywall from a

7  Chinese company and they never, to their knowledge,

8  distributed any Chinese drywall.  Do you have any

9  reason to disagree with those assertions by Home Depot?

10   A.    I don't know.  No, I don't have no --

11   Q.    And as you sit here today, you have no memory

12  of standing in a Home Depot store and actually

13  purchasing drywall, do you?

14   A.    No memory in purchasing drywall?

15   Q.    Do you remember actually sitting in a Home

16  Depot and buying Chinese drywall?

17   A.    I don't -- I mean, I bought drywall.

18   Q.    But you can't --

19   A.    But I don't know, you know, from where,

20  from -- you're saying if I sat in a Home Depot and

21  purchased Chinese drywall.

22   Q.    I'm saying you testified earlier that you

23  recall seeing made in China and other markings on --

24   A.    But not -- I didn't say where I got it.  I

25  don't know where.

1        Q.    And I'm asking you, do you remember, have a

2  specific memory of actually standing in a Home Depot

3  store and seeing those markings?

4        A.    No, I don't think -- I don't recall.

5        Q.    So you really have no idea whether you bought

6  Chinese drywall from Home Depot, do you?

7        A.    I don't -- like you said, you know, you're

8  saying that they didn't purchase Chinese drywall.

9        Q.    And are you aware of the fact that no

10  homeowner in the State of Texas has initiated a lawsuit

11  against Home Depot for the purchase of defective

12  Chinese drywall?

13        A.    Like I said, I'm not aware of it, but like I

14  said, I heard that there was a complaint about it.

15  That we went and did some remediation on it and that's

16  how I heard about it too, what the customers were

17  paying about that.  But it went in one ear and out the

18  other until this came up.

19        Q.    And that wasn't about Home Depot, was it?

20        A.    No, not that I recall?

21        Q.    So you have no basis to refute Home Depot

22  counsel representation that Home Depot never

23  distributed or sold Chinese drywall?

24        A.    I mean, I'm not an attorney.  So what are you

25  trying to say?  Can you explain that a little bit

1    better.

2         Q.    Sure.  What I'm trying to ask you is you have

3    no personal knowledge that would in any way call into

4    question Home Depot's counsel's representation that

5    Home Depot never sold Chinese drywall?

6         A.    I don't know.  I can't tell you.

7         Q.    You can't -- you have nothing to -- nothing

8    there?

9         A.    No.

10        Q.    Okay.

11        A.    I don't know if they did or not.  Like I said,

12   I just purchased drywall.

13        Q.    Okay.  And do you also own a company called

14   course in general contractors, LLC?

15        A.    No.

16        Q.    And I didn't bring it with me today, but we

17   did do some research and it appears actually that you

18   own the company, it's got the same property address as

19   your home address?

20        A.    What's it called?

21        Q.    Course in general contractors C-O-R?

22        A.    Corsand?

23        Q.    Yeah.

24        A.    It's not really existing.

25        Q.    What do you mean by that?

1    A.    We opened it and we shut it down.

2    Q.    Did it do any business?

3    A.    Yes, sir.

4    Q.    It did?

5    A.    Yes, sir.

6    Q.    During the time period 2006 through present,

7  did it do any business?

8    A.    2006, we built a couple of houses.

9    Q.    And did you install drywall in those houses?

10    A.    Yes, sir.

11    Q.    And so is it possible that some of the Chinese

12  drywall, some or all the Chinese drywall that you saw

13  was actually purchased by Corsand and installed by

14  Corsand and not by your Bay Area consulting and

15  contractors construction?

16    A.    I can't -- you know, I don't really -- I can't

17  tell you there.  I mean, because I also did a joint

18  venture with another company called -- it was called

19  Ram cia.

20    Q.    What do you mean joint venture?

21    A.    I did a couple of houses with them, too.

22    Q.    Well, when you say you did a couple of houses

23  with them, were you also -- was your company working on

24  that or you assisting?

25    A.    I was sort of like a partner with that

1     company.  But we only did a couple of houses and it

2     dissolved and that was it.

3          Q.    And this was another entity that was set up?

4          A.    Well, it wasn't an LLC or nothing.

5          Q.    What was it?

6          A.    Just proprietorship.

7          Q.    Okay.  So when you did that work, you were

8     doing it yourself, not as -- not as Bay Area consulting

9     and construction?

10         A.    Yes, sir.

11         Q.    You were doing it individually as yourself?

12         A.    Yes, sir.

13         Q.    Okay.  And it's also possible that Chinese

14    drywall that you recall seeing with the markings made

15    in China, etcetera, was actually on one of those job

16    sites and not on one of the job sites where Bay Area

17    consulting and contract -- or construction was

18    performing the job; is that correct?

19         A.    I can't tell you if it was or was not.

20         Q.    And to your knowledge, neither of these

21    entities that we just mentioned, Corsand and what was

22    the other one?

23         A.    Ramcia.

24         Q.    Filed objections to this settlement, did they?

25         A.    No, sir.

1      Q.    So to the extent the work you did where you

2  saw the Chinese drywall involved one of these entities,

3  no objection has been filed?

4      A.    Not at this time.

5      Q.    And what's your understanding of whether it's

6  too late or whether there's still time to file an

7  objection?

8      A.    I -- you know, I can't believe you came up

9  with that one.

10      Q.    Well, coincidentally, your retainer agreement

11  and the date of your objection were actually the last

12  day to opt out of this -- or to opt out and object to

13  the settlement.  Did you know that?

14      A.    No, sir.

15      Q.    It was just a coincidence?

16      A.    What's that?

17      Q.    This was just a coincidence that the final day

18  for objecting -- or the day before, I should say, you

19  met Chris Bandas and the next day you filed an

20  objection?

21      A.    I guess it was.

22      Q.    Just coincidence.

23      A.    Corsand, I already forgot about that one.

24      Q.    Don't worry, I found out about it.

25      A.    I thought we dissolved that.

1          MR. GAUGHAN:  I'll mark this as 25 -- 26,

2     I'm sorry.

3          THE WITNESS:  Can I get some more water?

4          MR. GAUGHAN:  Yes, we can go off the

5     record.

6          (A recess was taken.)

7          THE VIDEOGRAPHER:  We're back on the

8     record at 3:58, this is the beginning of tape number 2.

9     Q.    Mr. Garcia, I'm showing you what's been marked

10    as Exhibit 26.  I think it's right there?

11    A.    This one.

12    Q.    Yes.  Have you seen this document before?

13    A.    Yes.

14    Q.    When did you see this document?

15    A.    I'd say probably about three or four days ago.

16    Q.    Okay.  Now, did you see this document, if you

17    look at the top of this document, it says over the

18    right-hand side before the page number, it says "filed

19    10/18/12."  Do you see that?

20    A.    Yes, sir.

21    Q.    I take it you didn't see this document before

22    10/18/12; is that correct?

23    A.    Before?

24    Q.    Yeah.

25    A.    No.

1    Q.    You just saw it for the first time a couple of

2    days ago?

3    A.    I didn't notice those numbers up this.

4    Q.    Did you know that your counsel was filing this

5    document before 10/18/12?

6    A.    No, sir.

7    Q.    Okay.  Now, did your counsel ever seek

8    information to respond to these interrogatories from

9    you?

10   A.    Before then?

11   Q.    Yeah.

12   A.    Before 10/18/12?

13   Q.    Yes.

14   A.    No, sir.

15   Q.    And I'm going to also mark as Exhibit 27 --

16   did I just give you -- let me see that copy real quick.

17   A.    This is 27.

18   Q.    Yeah.  Sometimes I like to give out the

19   version I wrote on, so making sure I do not.  No, this

20   is clean.  There you go, sir.  So, sir, can you look at

21   Exhibit 27 there as well right in front of you.  And

22   I'm going to ask you the same question.  When was the

23   first time you saw this document?

24   A.    10/19/12.

25   Q.    You saw it on 10/18/12?

1      A.    No.

2      Q.    The same time frame, you saw it a couple of

3  days ago as well?

4      A.    Yes, sir.

5      Q.    And this -- I'll represent to you?

6      A.    That's in October.

7      Q.    Yeah.  This is in October, sir.  I'll

8  represent to you that these are responses to requests

9  for documents that was directed to you and Bay Area

10  contracting and construction.

11      A.    September, October.  Now, what with a that

12  again?  Can you repeat that?

13      Q.    I'm representing to you that this document in

14  front of you, Exhibit 27 is your responses, response of

15  yourself and Bay Area contracting & construction to

16  requests for production of documents that were by class

17  counsel.  Now, I guess my question for you is --

18      A.    Okay.  Go ahead.

19      Q.    Did your counsel ever request that you provide

20  any sort of documents in your possession before

21  10/18/12?

22      A.    Can you go ahead and repeat that?  I was

23  thinking of something else real quick.

24      Q.    Did anyone request that you provide

25  documentation in connection with this request for

1    production of documents before 10/18/12?

2                  MR. HUSEMAN:  Ronnie, understand you are

3    not to say anything you discussed with your lawyer or

4    any communications.

5         A.    No, I had to have seen this on 10/18, right?

6         Q.    10/18 actually it's dated?

7         A.    Yeah.

8         Q.    Well, you don't remember if -- seeing this

9    document before 10/18/12, do you?

10        A.    I don't remember.

11        Q.    Okay.  Did there come a time when you were

12   asked to provide documents that supported your

13   objection in this litigation?

14        A.    Yes, sir.

15        Q.    When was that?

16                  MR. HUSEMAN:  Judgment.  If you're talking

17   about dealings with your lawyer, you're not to talk

18   about those with him, okay.

19        A.

20                  THE WITNESS:  Okay.

21                  MR. HUSEMAN:  You can tell him if you've

22   looked for documents previously to try to determine

23   whether you sold any Chinese drywall or involved with

24   it you can tell him you have gone to look for it but I

25   don't want any communication with any lawyer you've

1    discussed.

2                THE WITNESS:  Because I don't really

3    understand what he's trying to say.  Something about

4    looking for documents.  I've looked for documents.

5        Q.    When?

6        A.    A week ago, a couple days ago.  You know, been

7    looking.

8        Q.    But more recently, not two weeks ago or three

9    weeks ago.  Is that correct?

10       A.    No, he just said, you know, make sure I have

11   documents.

12       Q.    But that was within the last two weeks or so?

13       A.    Yes, sir.

14       Q.    Not before 10/18/12?

15       A.    I can't recall.

16       Q.    Okay.  And you can go back to Exhibit 26.

17       A.    26.

18       Q.    And I want you to look at interrogatory No. 1.

19   "State the date you retained your counsel."  It's on

20   page 2 on the bottom there.

21       A.    Oh, on No. 1, objector objectives.

22       Q.    No.  I'm sorry, at the bottom of page 2?

23       A.    State the date you retained counsel.

24       Q.    And then if you flip the page, I'm not going

25   to read that first paragraph, but the second sentence

1    says "I retained the Bandas law firm, PC on September

2    28, 2012."  Is that consistent with your memory?

3         A.    That's when we signed an agreement.

4         Q.    So that's a yes?

5         A.    Yes, sir.

6         Q.    And if you go to page 4 of this document and

7    look at interrogatory No. 6?

8         A.    Number 4, No. 6.

9         Q.    And it actually says "identify --

10        A.    The person who installed the drywall.

11        Q.    Yeah, in Ingleside Texas and the manufacturer

12   of the drywall and then do you see your response to

13   that interrogatory?

14        A.    I do not own a home in Ingleside.

15        Q.    Yes, I see that.  But you do own a home in

16   Corpus Christi, correct, according to this?

17        A.    Yes.

18        Q.    And that's accurate?

19        A.    (Witness moves his head up and down.)

20        Q.    And you're saying you remodeled your house

21   three years ago, about three years ago.

22             So you remodeled your house three years ago;

23   is that correct, sir?

24        A.    Yes, sir.

25             MR. LONGER:  Which hone home.

1      Q.    Which home is that?

2      A.    I got one in Sinton and I got a condo in -- I

3   had a house here in Corpus.

4      Q.    So this involves the house in Corpus?

5      A.    A condo and -- the house I ended up selling my

6   house?  Corpus to move back into my condo because I

7   didn't have nobody -- it was just there and so I

8   decided to budget down myself and I sold my house.

9      Q.    All right.  So you have a condo that you're

10   currently living at?

11      A.    Uh-huh.

12      Q.    What's the address of that property?

13      A.    3839 Surfside boulevard.

14      Q.    And then you mentioned a home that you own in

15   Corpus Christi what's the address?

16      A.    It's Indiana.

17      Q.    Is that the house that's at issue in this

18   interrogatory here?

19      A.    Well, it's actually probably all three of them

20   because I -- at the same time I built a home in Sinton.

21      Q.    Okay.  What's the address of the property --

22   did you just say the address of the property?

23      A.    Yes, 525 Indiana.

24      Q.    When and what's the third property?  What's

25   the address of that?

1    A.    1816 avenue C.

2    Q.    And so you remodeled all 3 of these houses is

3  that what you're saying?

4    A.    Yes, sir.

5    Q.    Around 3 years ago?

6    A.    Well, actually the one in Sinton is a new

7  home.

8    Q.    When did you build that house?

9    A.    In 2007.  I think '07.

10    Q.    Okay.  '07.  And then when did you remodel the

11  house for each of the properties in Corpus Christi?

12    A.    2008.

13    Q.    And I guess let me ask you, do you have any

14  understanding of some of the symptoms that one would

15  expect to encounter in a home that has Chinese drywall

16  installed in it, defective Chinese drywall, I should

17  say?

18    A.    No, sir.

19    Q.    You never heard that people experienced rotten

20  egg odors, anything like that?

21    A.    Somebody told me about it.

22    Q.    Have you yourself or any of -- anyone that's

23  been in your house -- any of these three properties

24  ever told you that they noticed anything like a rotten

25  egg odor or a foul odor?

1       A.      Not at this time.

2       Q.      Now, has it -- has anyone ever told you that

3   another symptom of Chinese drywall is it causes

4   corrosion to wiring and metal surfaces?

5       A.      No.   That's the only time I -- you know, was

6   going back to when I redid that remediation for that

7   lady.

8       Q.      Let me ask you this.   These three properties

9   that we just talked about, have you experienced any of

10  those sort of problems where there was corrosion or to

11  any metal surfaces or wiring, anything like that?

12      A.      Not at this time.

13      Q.      You haven't had to replace any AC coils or

14  anything like that, HVAC units?

15      A.      Not at this time.

16      Q.      How about --

17      A.      I think it's because of the -- the AC coils in

18  the attic.   Most of the time the ones that are inside

19  the closet areas are the ones that has the problems, I

20  think.

21      Q.      Which property are we talking about?

22      A.      I don't have none of that right now.

23      Q.      So you haven't had any of that in these

24  properties?

25      A.      No.

1    Q.    How about have you heard that sometimes people

2    with Chinese drywall experience irritation of the eyes,

3    throat, that sort of thing, have you ever heard

4    anything like that?

5    A.    I'm having that right now in my condo so I

6    don't know.  I don't know if that's the problem.

7    Q.    Just right now that's not something that

8    you've experienced regularly since you've had the

9    condo, is it?

10    A.    (Witness moves his head side to side.)

11    Q.    How about for any of the other properties,

12    have you experienced that sort of problem?

13    A.    No, sir.

14    Q.

15          MR. LONGER:  What was his answer to the

16    question?  He didn't answer.

17    Q.    Maybe I was looking at your head nodding side

18    to side here, but I had asked just right now you said

19    you had some irritation of your sinuses, was it?

20    A.    Sinuses and eyes.

21    Q.    And I'm asking that's not something you've

22    experienced regularly since you did these -- you built

23    the one property and you remediated the two other

24    properties?

25    A.    I don't -- I just -- I don't -- it comes and

1    goes, I don't know.

2        Q.    So that's not something you experience

3    regularly.

4        A.    Not regularly.

5        Q.    And to your knowledge, it has nothing to do

6    with Chinese drywall?  It could be anything; is that

7    fair to say?

8        A.    That's fair to say.

9        Q.    So is it fair to say that there's really

10   nothing -- there's nothing you can point to that leads

11   you to believe that there's Chinese drywall in any of

12   these three properties you just mentioned?

13       A.    I wouldn't know.

14       Q.    Okay.  You don't recall installing Chinese

15   drywall in any of these properties?

16       A.

17             MR. LONGER:  Is that a yes or no.

18       A.    I don't know.

19       Q.    You don't know?

20       A.    No, sir.

21       Q.    I guess no is the answer; is that right?

22       A.    Yes, sir.

23             MR. HUSEMAN:  His answer was he didn't

24   know, it wasn't no.

25             MR. GAUGHAN:  That's why I'm asking to

1    clarify.

2        Q.    Is that a no?

3        A.    Well, I don't know if I did or not.  I don't

4    know.  It's been too long ago.

5        Q.    So just earlier you said you don't know

6    whether you installed Chinese drywall in any of these

7    three properties?

8        A.    I don't recall.  I mean, maybe I could.  Maybe

9    I couldn't.  We use materials from other projects to

10   finish these, you know, like to renovate my condo,

11   renovate this, instead of being sitting in the

12   warehouse, you utilize it somehow.

13       Q.    So that's a maybe, you don't actually

14   remember?

15       A.    I don't remember.

16       Q.    Okay.  So why is it that you're concerned that

17   there might be Chinese drywall in any of these three

18   properties?

19       A.    Well, that's because my parents lived in that

20   one house in Sinton and I live in the --

21       Q.    I guess what specifically leads you to think

22   there's actually Chinese drywall there?

23       A.    There could be.

24       Q.    But you have no idea?

25       A.    I don't have no idea.

1     Q.    And in all likelihood there is no Chinese

2   drywall in any of these properties?

3     A.    We don't know unless we go in there and open

4   it all up.

5     Q.    Are you going to go in there an open it up?

6     A.    I'm not.

7     Q.    Why not?

8     A.    What's that?

9     Q.    Why not?

10     A.    Too much work.

11     Q.    Yeah, but if there's potentially corrosive

12   Chinese drywall, don't you think you would want to see

13   if it's in there?

14     A.    Well, I would think if it's like asbestos and

15   you start messing with it, then you have more problems.

16   You just wait until -- see what happens.

17     Q.    And --

18     A.    If it starts coming off the wall, we'll know.

19     Q.    And this drywall has been in the wall for

20   about four years?

21     A.    Yes, sir.

22     Q.    And you haven't had any problems?

23     A.    Well, the shifting grounds and everything else

24   that we have in Texas, you know, it does move, but...

25     Q.    But no problems that you think or can point to

1  that would be associated with Chinese drywall, correct?

2      A.   I'm not an expert.  I don't know.  I can't

3  tell you that.

4      Q.   I understand you're not an expert, but you

5  sitting here right now --

6      A.   It's like I was telling him earlier today,

7  yesterday, I started renovating my bathroom a little

8  bit in my condo and you know, I was looking at drywall

9  but you know, I didn't want to -- I didn't want to open

10  it up to find out if it had Chinese drywall.

11      Q.   You actually looked at it or you didn't?

12      A.   I was looking at it but you know, I was

13  renovating the floor of my condo's bathroom.

14      Q.   You could -- could you see in there or not?

15      A.   No, I'd have to open it up but I looked at it.

16  It looks like, you know --

17      Q.   Could you see anything, any markings on that

18  drywall?

19      A.   Yeah, you could see some type of discoloration

20  but I'm not going to -- I'm just going to repaint it.

21      Q.   Is it green board?

22      A.   It's not green board.

23      Q.   What color was it?

24      A.   It's white, just regular board.

25      Q.   White?

1     A.     Yeah.

2     Q.     Did you see any labelling on it?

3     A.     You couldn't, it's painted over it.

4     Q.     Okay.  So I guess what specifically makes you

5  think that the value of your property or any of these

6  three properties has been diminished in any way?  Can

7  you point to anything?

8     A.     Not if we have to -- you know, if I have to

9  disclose if it's, you know -- if it's Chinese drywall.

10    Q.     But you just testified that you didn't -- you

11 don't know?

12    A.     We don't know.

13    Q.     So why would you have to disclose what you

14 don't know?

15    A.     That's true.

16    Q.     And why is it that you fear for your own

17 health and the health of your family as set forth in

18 this interrogatory response?

19    A.     Maybe the negative impact of it.

20    Q.     I'm sorry, what it says here in this

21 interrogatory response is that you fear for your own

22 health and the health of your family and I'm

23 paraphrasing it.

24    A.     Yeah.

25    Q.     But why?  I mean, I'm guess trying to figure

1    out why.  From what you're telling me you haven't had

2    any problems and no one in your family has either.

3         A.    You know, well, my parents are old, so you

4    never know.

5         Q.    And how much fear are you really dealing with?

6    I mean, have you had to go see any sort of healthcare

7    providers to treat you for this fear?

8         A.    For me?

9         Q.    Yeah.

10        A.    Personally?

11        Q.    Yeah.

12        A.    I have, but not -- not -- just for my eye

13   irritation and for my health.

14        Q.    Well, did you ever get screened by any

15   physician to determine whether you've suffered any sort

16   of adverse health consequences?

17        A.    No, sir.

18        Q.    For being exposed to Chinese drywall?

19        A.    Well, I don't know.

20        Q.    Okay.  Is that's a no, you have not?

21        A.    I haven't gotten screened.

22        Q.    And have you seen a psychiatrist or a

23   psychologist to help you cope with this fear that you

24   or your family might develop an illness associated with

25   Chinese drywall exposure?

1    A.    Can you repeat that again?

2    Q.    Have you or anyone in your family, I should

3   say, seen either a psychiatrist or a psychologist?

4    A.    No.

5    Q.    Or other healthcare provider?

6    A.    No.

7    Q.    To deal with this, cope with this fear that

8   you might develop an injury in the future from your

9   exposure to Chinese drywall?

10    A.    No, sir.

11    Q.    No.  When did you first start having this fear

12   that you might develop health problems or someone in

13   your family might develop health problems by virtue of

14   being exposed to Chinese drywall?

15    A.    What was that again?  When did I start having

16   these fears?

17    Q.    Yeah.  When did you start becoming afraid that

18   either you yourself or someone in your family might

19   develop an illness from being exposed to Chinese

20   drywall?

21    A.    Just finding out that, you know, I might have

22   this in my homes, probably you know, two or three weeks

23   ago.

24    Q.    Two or three weeks ago?

25    A.    Yes, sir.

1    Q.    So around the time that you were first having

2  conversations with Mr. Chapa about Chinese drywall?

3    A.    Uh-huh.

4    Q.    And before that time, you never were afraid

5  that either yourself or someone in your family might

6  develop some sort of illness from being exposed to

7  Chinese drywall; is that fair?

8    A.    Yes, sir.

9    Q.    Okay.  And what did Mr. Chapa tell you that

10 made you suddenly --

11   A.    It wasn't actually Mr. Chapa, it was

12 Mr. Bandas.

13   Q.    Okay.

14        MR. HUSEMAN:  Once again, I repeat myself,

15 don't talk about what Chris Bandas told you or any of

16 your lawyers told you or what you told them, okay?

17   Q.    Mr. Garcia, a little while ago you testified

18 that you saw an eye doctor to deal with some eye

19 irritation you were experiencing.  Who was that doctor?

20   A.    Dr. Perez.

21   Q.    And what did they tell you about the nature of

22 your condition with your eye?  Or is it both eyes?  I'm

23 sorry.  Or is it one?

24   A.    Both eyes.  Just, you know, they're just

25 irritation from what's in the air and I don't know

1  what's -- just dryness pretty much.

2      Q.    Did that -- did that doctor tell you that your

3  condition with your eyes had anything to do with

4  possible exposure to Chinese drywall?

5      A.    No.  They couldn't tell.  They can't tell

6  that.

7      Q.    And have you --

8      A.    I don't even know if, you know...

9      Q.    Have you seen any other healthcare provider

10  that's told you any --

11     A.    No, sir.

12     Q.    -- physical condition that you're experiencing

13  is in any way related to your exposure to Chinese

14  drywall?

15     A.    No, sir.

16     Q.    And you mentioned some congestion recently?

17     A.    Sinus.

18     Q.    Sinus problems.  Has any doctor told you that

19  the problem you're experiencing with your sinuses is

20  any way related to your exposure to Chinese drywall?

21     A.    They don't know anything about Chinese

22  drywall.

23     Q.    And are you aware that not all drywall that

24  comes from China is reactive or off gasses?

25     A.    I'm not aware about that.  If they're still

1    selling Chinese drywall.

2        Q.    You're asking me?

3        A.    Yes.

4        Q.    I'm the one asking the questions, I guess.

5              So I'm just asking?

6                    MR. LONGER:  Who's the they?  They're

7    selling Chinese drywall in China.

8                    THE WITNESS:  But not in Texas.

9                    MR. LONGER:  They are.

10                    MR. HUSEMAN:  Is it one of the settling

11   parties.

12                    MR. LONGER:  I didn't mean to interrupt.

13   Excuse me.

14       Q.    So for all you know, this recent sinus

15   problems that you've been experiencing could be an

16   allergy or some other non-Chinese drywall related?

17       A.    I don't know all the facts of Chinese drywall

18   if it does or does not so like I said --

19       Q.    You have no idea one way or the other?

20       A.    No.

21       Q.    Whether sinus problems you're having have

22   anything to do with Chinese drywall, correct?

23       A.    Yes.

24       Q.    And what is your level of knowledge about the

25   adverse health consequences that have been associated

1    with Chinese drywall?  I take it from your prior answer

2    you don't have any, is that fair to say?

3         A.    I don't know.

4         Q.    You never reviewed any sort of medical

5    literature that brought to your attention that there

6    were potential adverse health consequences associated

7    with exposure to drywall?

8         A.    Is there some literature out there?

9         Q.    I'm asking you?

10        A.    I haven't had time.

11        Q.    Are you aware that a federal agency, the CPSC

12   conducted a study and concluded that there were no

13   adverse health consequences that are associated with

14   Chinese drywall?

15        A.    I have not recalled anything like that,

16   haven't reviewed it.

17        Q.    And I'm looking on page 5 in response to the

18   same interrogatory and just to kind of paraphrase a bit

19   there in that second full paragraph, there's really

20   just two sentences, you indicated that you had some

21   damage to personal property.  And saw blades and router

22   bits that corroded quickly?

23        A.    Some routers and blades and we took some of

24   those things back to Home Depot and were able to

25   reimburse us on stuff like that that went out quicker

1    than what they usually do.

2         Q.    So you didn't suffer any out-of-pocket loss

3    because they were replaced by Home Depot?

4         A.    They there was adjust a small fee.

5         Q.    What's a small fee?

6         A.    What's that?

7         Q.    What small fee is that?

8         A.    For the shipping part of it.

9         Q.    How much would that be?

10        A.    I don't recall.

11        Q.    If you could quantify, you know, the totality

12   of those fees that you paid in connection with saw

13   blades and router bits corroding and having to be

14   replaced?

15        A.    The routers alone --

16        Q.    How much would that be?

17        A.    I don't recall.

18        Q.    Less than $20?

19        A.    Probably about 100 bucks, something like that.

20        Q.    At maximum say 100 bucks, no more than that?

21        A.    No, sir.

22        Q.    Okay.  Do you have any sort of receipts or

23   anything like that that go along with -- that support

24   your claim that you incurred out-of-pocket expenses for

25   these?

1      A.    It's been three years ago, four years ago, I
2  don't know.
3      Q.    So it's possible that --
4      A.    For me, I don't know.  I mean, you know, I
5  don't know.
6      Q.    You don't know.  Okay.  Now, did you
7  maintain -- I take it you didn't actually maintain
8  possession of any of these corroded saw blades or
9  router bits?
10      A.    No, sir.
11      Q.    So you have no proof that the corrosion --
12      A.    Those things have been replaced already, you
13  know.
14      Q.    And you have no proof that the corrosion that
15  affected these items had anything to do with Chinese
16  drywall?
17      A.    I can't tell you.
18      Q.    You didn't have an expert or anyone like that
19  look at these items?
20      A.    No, no expert.
21      Q.    And I guess in the next paragraph of this
22  interrogatory response, you're talking about your
23  business reputation being damaged.  Do you see that?
24      A.    Yes.
25      Q.    And I guess how is your business reputation

1  been damaged?  Can you tell me a little bit about that?

2      A.    Well, it's not damaged unless it's out that,

3  you know, we replaced Chinese drywall.

4      Q.    So it hasn't been damaged because you haven't

5  had to replace any Chinese drywall?

6      A.    That's true.

7      Q.    And none of your customers have complained

8  about Chinese drywall on any of the jobs that your

9  company did; is that correct?

10     A.    Not at this time.

11     Q.    Mr. Bandas -- I'm going to have you look again

12 at Exhibit No. 5, if you don't mind.  You're not

13 writing on that, are you?

14     A.    Just underlining.  Sorry.

15     Q.    I ask that you don't do that in the future

16 just because that's part of the record.

17     A.    Oh, okay.

18           MR. DODSON:  Is it something we can make

19 another copy?

20           MR. LONGER:  What kind of marking.

21           MR. GAUGHAN:  He underlined.  Just have

22 the record reflect that you underlined one of the

23 things in one of the exhibits here.

24     A.    And what exhibit was that.

25           THE WITNESS:  It's Exhibit 26.

1    Q.    And have you underlined anything else in any

2    of the other exhibits today?

3              THE WITNESS:  I hope not.  Nobody said

4    anything.

5    Q.    I'm sorry, I should have.  I don't know that I

6    gave you instructions at the beginning, but --

7    A.    No, that's it.

8    Q.    That's it.  Okay.

9              MR. HUSEMAN:  It ain't that big of a deal,

10   Ronnie, don't worry about it.

11             MR. GAUGHAN:  I'm not going to cry about

12   it.

13   Q.    Could you turn back to Exhibit No. 5.  We were

14   looking at that earlier?

15   A.    26?

16   Q.    No, number 5, it's the objection.

17   Specifically I'd like you to turn back to that

18   affidavit we looked at earlier.

19   A.    Affidavit.  Affidavit.  What page is that?

20   Q.    Well, you want to go past page 4, which is the

21   end of the actual objection and then you'll see -- or

22   actually page 6 after that, you'll see Exhibit A.  Flip

23   through that.  And Exhibit B, go through that and the

24   next Exhibit is C.  I couldn't give you a page number

25   because there's no consecutive page numbers there?

1      A.    Well, I did sign this one.

2      Q.    And I want you to look at that, I guess

3   paragraph that begins with?

4      A.    I wrote on this one, too.  What.

5      Q.    Can I just see that for a second?  I want to

6   make sure you're in the right page here.  And just so

7   the record reflects, you underlined something else on

8   this exhibit as well?

9      A.    Yes.

10     Q.    That's Exhibit 5.  All right.  Here you go,

11   Mr. Bandas.  This is Exhibit C?

12     A.    You called me Bandas.

13     Q.    I'm sorry.  I think it's maybe a little slip

14   there.

15          This is Exhibit C to your objection.  We

16   looked at this earlier.  This is your affidavit.  And

17   if you look at the second full paragraph under where,

18   you know, you I guess set forth that you're stating the

19   below items under penalty of perjury, you see "I am the

20   owner of Bay Area contracting & construction, Inc."?

21     A.    Uh-huh.

22     Q.    And then it lists the address as 3902 south

23   port avenue in Corpus Christi, Texas, 78415.  And I

24   guess my question for you:  Is that the address you

25   currently reside in?

1    A.    Right now?

2    Q.    Yeah.

3    A.    On the construction?

4    Q.    Is that where --

5    A.    The construction part of it.

6    Q.    Is that where you reside?

7    A.    Reside to live or do business?

8    Q.    Is that where you're living?

9    A.    No.

10   Q.    And what do you mean by do business?

11   A.    Doing business.  Right now at that address or

12   what is this.

13   Q.    Yeah.  What -- I guess what's going on at that

14   address?  Let's back up?

15   A.    Right now I've got the building up for sale.

16   Q.    Okay.  And you don't currently live there or

17   maintain a business out of that location; is that

18   correct --

19   A.    Not at this time.

20   Q.    And I guess my question for you is:  We

21   attempted service on you at this address and obviously

22   there was no one there to receive the subpoena.  So I

23   guess why did you include this address in your

24   affidavit if it was no longer being used?

25   A.    Because that's what they asked me at that

 1   time.

 2       Q.    Okay.  So you're just saying that's the

 3   address of your company?

 4       A.    Uh-huh.

 5       Q.    Are you planning --

 6       A.    Right now I got a P.O. Box for the company.

 7       Q.    Are you planning to change the address of your

 8   company officially?

 9       A.    Yes, sir.

10       Q.    With the secretary of state corporations

11   division of Texas?

12       A.    (Witness moves his head up and down.)

13       Q.    Okay.  And just to that last question, so you

14   are planning to change the corporation's address with

15   the secretary of state for the State of Texas?

16       A.    I will.

17       Q.    Okay.  What's the current address for your

18   company?  You said it's a Po box?

19       A.    P.O. Box.

20       Q.    What address is it so we have it?

21       A.    It's P.O. Box 897, Corpus Christi, Texas,

22   78403.

23             (Exhibit No. 28 was marked.)

24       Q.    And if we needed to, say, serve you with a

25   subpoena at a future date for whatever reason, where

1    would be the best place to actually accomplish that?

2        A.    In my condo.

3        Q.    And what's the address there?

4        A.    3938 Surfside boulevard, unit 2125, Corpus

5    Christi, Texas 78403.  Let me check real quick.

6        Q.    Okay.

7        A.    It's 402.

8        Q.    That's the -- what is that unit number the

9    402?

10        A.    No.  The zip code.

11        Q.    Okay.  So it's 84 -- 78402?

12        A.    Yes.

13        Q.    Okay.  Thank you.  And I take it you would

14    accept service of a subpoena on behalf of Bay Area?

15        A.    Yes.

16        Q.    As well?  Thank you.  The next exhibit that

17    I'm showing you is Exhibit 28.  And this is a copy of

18    your class-action objector power of attorney and

19    contingent fee agreement.  And have you seen this

20    document before?

21        A.    Yes, sir.

22        Q.    When did you first see this document?

23        A.    When I signed the other document.

24        Q.    If you look to the third page, does that

25    refresh your memory of when you saw this document?

```
 1        A.    On the 28th.
 2        Q.    28th of September, 2012?
 3        A.    Yes, sir.
 4        Q.    Okay.  And I guess earlier we were talking
 5   about the scope of Mr. Bandas' representation of you
 6   and your company, I guess.  But as I look at this
 7   document, it's made between Ronnie Garcia and Bandas
 8   law firm, PC.  Do you see that?
 9        A.    Yes, sir.
10        Q.    So is there any separate agreement where
11   Mr. Bandas undertook to represent Bay Area -- was it
12   consulting?
13        A.    Contracting and construction.
14        Q.    Contracting and construction.  Is there a
15   separate document like this that you signed on behalf
16   of --
17        A.    This is the only thing I've got.
18        Q.    And they if we look at section 1, it talks
19   about the scope and method of representation.  Do you
20   see that?
21        A.    Yes.
22        Q.    And under section 1.1 it talks about attorneys
23   legal services.  Do you see that?
24        A.    Yes.
25        Q.    And can you just review that section real
```

1    quick and let me know when you're done, just look up,

2    please.

3         A.    Yes, sir.

4         Q.    And would you agree that essentially the scope

5    of the representation here is for Mr. Bandas to prepare

6    and file on your behalf an objection to a proposed

7    class-action settlement in the case styled MDL 2047?

8         A.    That's what it says here.

9         Q.    And then in that next bit, we also see the

10   tail end of that next sentence and to represent you in

11   an appeal therefrom the objection, do you see that?

12        A.    Yes, sir.

13        Q.    So I was asking you before what your

14   understanding of the scope of the representation was.

15   Would you agree that based on this paragraph,

16   Mr. Bandas is only representing you with respect to

17   your objection and any appeal that might -- may follow

18   from that objection?

19        A.    Well, I just know he's counsel.  A lot of

20   these words that, you know, I haven't really read it,

21   so --

22        Q.    You never read this before?

23        A.    No, sir.  I looked at it but I mean, I can

24   read.

25        Q.    Well, let me ask you this question.  Is it

1  your understanding that Mr. Bandas is representing you

2  so far as you may pursue damages for any fear of future

3  illness you might have, any loss to your business

4  reputation?

5      A.   I think that's what it's saying here.

6      Q.   I agree this is him saying he's only

7  representing you with respect to your objection and any

8  appeal that follows.  You think that there's something

9  in this document that means he's -- the representation

10  is more broad than that?

11      A.   I don't know.

12      Q.   Okay.  So is it your understanding that he's

13  representing you for any future claims you might bring

14  as well?

15      A.   I hope.  I don't know.  I don't really know.

16  I don't know what to tell you on that part.  What kind

17  of future claims?

18      Q.   Well, have you filed a lawsuit?  You haven't

19  filed a lawsuit, have you, against anyone?

20      A.   (Witness moves his head side to side.)  No,

21  sir.

22      Q.   Do you plan to do that?

23      A.   No, sir.

24      Q.   You don't plan to?

25      A.   I don't think I need to.

1     Q.     So I take it your fear of future -- any sort

2  of future personal injury?

3     A.     On what we're talking about right now, Chinese

4  drywall.

5     Q.     Yes.  You don't think that rises to the level

6  where you need legal representation to file a lawsuit?

7     A.     Well, hopefully Bandas will be there to keep

8  going with this.

9     Q.     But is it your understanding that he's

10  actually going to represent you if you wanted to file a

11  lawsuit to recover those damages?

12     A.     I don't understand what you're saying, try to

13  say again.

14     Q.     Well, I mean, you hired Mr. Bandas, so I'm

15  trying to figure out -- you hired him, I'm assuming to

16  pursue an objection, right?

17     A.     You're saying future lawsuits, future lawsuits

18  against?

19     Q.     Well, you haven't filed a lawsuit?

20     A.     I know but you're saying am I going to be

21  filing a future lawsuit against somebody.

22     Q.     Yeah, that's what I'm --

23     A.     I don't know who's that somebody yet.

24     Q.     Well, we went through your response to

25  interrogatories where it was talking about your -- you

1    had some sort of fear of future injuries.

2        A.    Oh, okay.

3        Q.    I guess do you intend to file a lawsuit

4    against Home Depot or any other entity in connection

5    with that fear of future injury?

6        A.    I don't know what the correct answer would be

7    on that.  I don't know at this time.

8        Q.    Okay.  So would it be fair to say that you

9    don't currently intend to file a lawsuit?

10        A.    Yes, sir.

11        Q.    If you turn to section 3.2 and just read

12    through that for me real quick, and that's at the

13    bottom, starting at the bottom of page 1 of this

14    agreement?

15        A.    Okay.

16        Q.    Now, this section is talking about a possible

17    incentive award to you of $5,000, correct?

18        A.    That's what it's saying.

19        Q.    Now, I want to go back to the time when you

20    first talked to Bert Chapa.  Was this something that

21    Mr. Chapa told you about that you might get a possible

22    incentive award?

23        A.    No.

24        Q.    If you pursued an objection with Mr. Bandas?

25        A.    He didn't say that.

1    Q.    Is this something that you thought you might

2  get when you first filed this objection, that you

3  might, hey, if I pursue this Oxy might get $5,000?

4    A.    No, sir.

5    Q.    When did you first become aware of this

6  provision?

7    A.    Right now.  I didn't read -- I didn't read

8  through -- I didn't read through this.

9    Q.    What are you hoping to get out of this

10 objection?

11   A.    What's this?

12   Q.    What did you hoping to get out of this

13 objection that you're pursuing?

14   A.    I hope it's a fair settlement with all the

15 people in this case.

16   Q.    Are you expecting to get any sort of money out

17 of it yourself?

18   A.    No, sir.

19   Q.    You have no idea what you'd actually -- you

20 yourself would actually want other than to see

21 attorneys make less money?

22   A.    That's true.

23   Q.    So there's nothing other than the attorney fee

24 provision that you actually have an objection to in

25 this settlement; is that right?

```
 1        A.    On this settlement?
 2        Q.    Yeah.  You're objecting to a settlement,
 3   right?
 4        A.    Yes, sir.  It's an attorneys fees.
 5        Q.    You're not hoping to get anything other than
 6   to see attorneys make less money?
 7        A.    What's that?
 8        Q.    I'm trying to figure out why you're objecting
 9   to the settlement.  What are you trying to get out of
10   this?  You don't expect to receive any --
11        A.    Well, I just want to make sure I'm not caught
12   in the middle if somebody else comes up and says, you
13   know, you used Chinese drywall in my business up here
14   in Houston or Dallas.  At least I'll be waived at that
15   part of it.
16        Q.    So you're just really from what I gather from
17   what you just said, you want to get some sort of
18   release?
19        A.    Yes.
20        Q.    You're not hoping to get any sort of benefit
21   under the settlement?
22        A.    No, sir.
23        Q.    Could I ask you to turn to paragraph 4.  And
24   actually, it looks like there's 4.4 and 4.5 and under
25   that we see 4.  It must have been some sort of mix up
```

1   of the numbering here but do you see where it says

2   conflict of interests?

3        A.   Conflict of interests, okay.  Attorneys are --

4        Q.   Please read through that and let me know when

5   you're finished.

6        A.   Okay.

7        Q.   Do you understand this provision at all?  Let

8   me just start there.

9        A.   Yes and no.

10       Q.   Okay.  I'm just going to have you focus on a

11  little bit of that first sentence there.  And I'll try

12  to break it down so it will be a little bit

13  understandable.  But it says that attorneys have

14  explained that if successful the objection or any

15  appeal therefrom may result in the disapproval or

16  rejection of the proposed settlement."  Do you see

17  that?

18       A.   Yes, sir.

19       Q.   Okay.  At the time you filed this -- I'm

20  sorry.  At the time your counsel filed this objection,

21  did you understand that by filing this objection you

22  may wipe out the settlement entirely for other -- other

23  people that are eligible for the settlement?

24       A.   At the time I signed this?

25       Q.   Yes.

1      A.    I didn't know.

2      Q.    Do you think that your objection in this case,

3  the objection that you're filing or your counsel has

4  filed for you, is justified in delaying compensation to

5  thousands of homeowners who have been affected by

6  Chinese drywall?

7      A.    It's delaying it.

8      Q.    It could delay it.  It could completely do

9  away with the settlement?

10     A.    I didn't know that.

11     Q.    How do you feel about that?

12     A.    A little discouraged, but.

13     Q.    Do you want to go forward with the

14  understanding that you could prevent homeowners from

15  getting any benefit under this settlement agreement?

16     A.    I'd have to talk to my attorney.

17     Q.    But as you sit here today, you don't know

18  without talking to your tone or?

19     A.    He's got this -- he's got my interest on it

20  but I'd to see what he's -- on behalf of what he's --

21  you know, since he's counsel.

22     Q.    If I told you --

23     A.    Or these guys are my counsel now.

24     Q.    If I told you I represent families who live in

25  these homes and can't actually stay in these homes

1  because the environment is so toxic that they have had

2  to rent apartments and their homes are foreclosed upon

3  because they couldn't pay the mortgage and, you know,

4  your objection is potentially going to tank any sort of

5  recovery by those people, how does that make you feel?

6     A.    I thought you said Chinese drywall wasn't

7  toxic?

8     Q.    Well, it's irritating.

9     A.    That's what you said earlier.

10    Q.    It's irritating.  I told you earlier --

11    A.    Did you say that earlier.

12    Q.    I said there's no long-term proven health

13  consequence?

14    A.    But you just said right now it's toxic.

15    Q.    Well, if I told you -- have you ever been this

16  a house with Chinese drywall where you've actually

17  experienced it?

18    A.    I don't -- you know, like I said, I didn't

19  know.  I mean, I didn't know it was toxic like you're

20  saying.  It is.

21    Q.    Well --

22    A.    How toxic is it?

23    Q.    It releases gasses that are extremely

24  irritating.  Now, has it been proven that that's going

25  to cause any long-term health effect?  It has not been

1  proven.  Okay.  But is it pleasant to live somewhere

2  where your eyes are watering all the time or your

3  throat is sore?

4      A.    I'm having that problem.

5      Q.    Would you like to live there?

6      A.    I'm having that problem.

7      Q.    Constantly?

8      A.    My eyes are watering right now.

9      Q.    For four years?

10            MR. LONGER:  From there blistering

11  examination.

12            THE WITNESS:  Is it that bad?

13            MR. HUSEMAN:  Be nice, Fred.

14      Q.    That's what I'm trying to figure out.  Is you

15  think that you holding up this settlement for these

16  people, you think that's justified based on your very

17  weak demonstration that you actually had any sort of --

18  you installed any Chinese drywall?

19      A.    What do you want me to say about that again?

20  I mean, it's -- you're saying it's weak?

21      Q.    I mean --

22            MR. LONGER:  Go to another question.

23      Q.    I'll ask another question.  So I guess it's

24  okay with you that you're potentially holding up the

25  settlement or even your objection could completely tank

1   the settlement?  That's okay with you?

2      A.    No, it's not.

3      Q.    Okay.  And could you -- what do you mean by

4   that?

5      A.    Well, it's not -- it's not okay with me, but

6   like I said, I'd have to -- that's why I got legal

7   counsel and we got Bandas.  We needed review to see

8   what -- you know, what -- I'm not holding it up.  You

9   know, hopefully they can work something out and we

10   proceed.

11      Q.    What if it actually results in the settlement

12   being either tanked or -- I'm using the term tanked but

13   if it gets disapproved by the court?

14      A.    Tanked is like nobody gets paid on anything is

15   this I don't understand what the word is.

16      Q.    Basically I know you haven't read the

17   settlement, but the participating defendants have a

18   right to walk away from this agreement based on

19   objections, based on opt-outs and that sort of thing.

20   So if a whole bunch of the participating defendants

21   decide hey, we're pulling out, we don't want to

22   participate in this agreement, then there would be no

23   money available for homeowners.  So I'm just asking:

24   You know, that's okay with you?

25      A.    It's -- like I said, it's not -- it's not okay

1    with me, but I'd have to check with counsel.

2        Q.    Okay.  And I think we just read the first

3    paragraph or the first sentence of this paragraph that

4    attorneys have explained and you understand that if

5    successful, the objection or any appeal therefrom may

6    result in the disapproval or rejection of the proposed

7    settlement, correct?  Do you remember looking at that

8    earlier?

9        A.    Yes, sir.

10       Q.    Okay.  Did you understand that at the time you

11   signed this agreement?

12       A.    Like I said, I didn't -- I hadn't really

13   reviewed it.

14       Q.    So you didn't understand it?

15       A.    No.

16       Q.    Okay.  And is it fair to say sitting here

17   today this is the first time that you understood this

18   was a potential outcome?

19       A.    Pretty much.

20       Q.    Okay.  And I want to direct you down to the

21   third full sentence of this paragraph it says"

22   attorneys have also explain and you understand that if

23   there are negotiations to settle your objection,

24   attorneys may negotiate the amount of any payment to

25   you as well as the amount of attorneys' fees

1    concurrently in order to a arrive at a total settlement

2    amount.  "Do you see that paragraph?

3        A.    Yes, sir.

4        Q.    How do you feel about the prospect of your

5    attorneys trying to simultaneously negotiate a

6    resolution of your objection and trying to negotiate

7    their own fees?

8        A.    I mean, I don't know what to say there.  I'm

9    not an attorney.  I don't know what -- I don't know

10   what he's doing.

11       Q.    Do you think that's appropriate?  You don't

12   know?

13       A.    I don't know.

14       Q.    And I guess what do you think inappropriate

15   fee for your counsel would be in this case?  Is there a

16   dollar amount or a percentage, anything like that?

17       A.    I don't -- I don't know.

18       Q.    And as far as you know, your counsel has

19   produced no benefit to the class that's in this

20   settlement agreement; is that correct?

21       A.    I don't -- that sounds -- like I said, I don't

22   really know about that.  I don't know what they do.  I

23   don't know what Bandas does as an attorney.

24       Q.    Do you know whether your counsel participated

25   in negotiation of this settlement at all?

1      A.    No, sir.

2      Q.    And other than representing you in this

3  objection, are you aware of any other conduct by the

4  attorney Mr. Bandas in terms of the Chinese drywall

5  litigation generally?

6      A.    No, sir.

7            MR. GAUGHAN:  We're going to go off the

8  record for a minute.

9            THE VIDEOGRAPHER:  Off the record at 4:56.

10           (Off the record.)

11           THE VIDEOGRAPHER:  We're back on the

12  record at 5:08.  This begins tape 3.

13     Q.    Mr. Garcia you just testified that you don't

14  know what Bandas does as an attorney.  Do you recall

15  that testimony?

16     A.    Yes, sir.

17     Q.    I guess I can tell you what he does, but are

18  you aware in Walmart stores in order of denying his

19  objection to a settlement fees, the court observed that

20  Bandas objection filed on behalf of Ms. Clawson is a

21  generic boilerplate objection prepared and filed by

22  attorneys working for their own personal benefit an not

23  for the benefit of this class or for the lawyers'

24  clients.  The record before the court demonstrates that

25  Bandas is a professional objector who is improperly

1    attempting to high-jack the settlement of this case

2    from deserving class members and dedicated, hard

3    working counsel, solely to coerce ill gotten,

4    inappropriate and unspecified legal fees."  How do you

5    feel about having an individual like that representing

6    you?

7        A.    I didn't know that.

8        Q.    And how do you feel about having an individual

9    like that representing you on this objection?  Does it

10   make you think twice about --

11              MR. DODSON:  All right.  At this time

12   we're terminating this line of inquiry as being outside

13   the scope of examination as we understand the judge

14   allowed.  And do not answer.

15              MR. GAUGHAN:  Okay.  And we obviously

16   disagree on that, but...

17              MR. LONGER:  It may become a point of

18   motions practice with the court.

19       Q.    And I guess I presented to you earlier was

20   it -- I think it's Exhibit 27, which is answers to

21   interrogatories.  And we looked a little bit at the

22   interrogatories earlier which were Exhibit 26 and we

23   went through a few of those.  But I want to ask you:

24   Did you -- do you have a recollection of going through

25   this request for documents and looking for documents

1    that were responsive to this request for documents?

2        A.    Are you saying looking for documents, for --

3        Q.    Yeah.  Was there a point in time when you were

4    given a copy of plaintiff's request for production of

5    documents to yourself and your company and you were

6    looking for those documents?

7        A.    Yes.  I just -- I got tied up doing what I was

8    doing an didn't have time to look for them.

9        Q.    When was this?

10        A.    What's that?  When they -- when you-all

11    requested that or when --

12        Q.    Can you give me a point in time?

13        A.    What's that?  Some time last week.

14        Q.    Last week, not -- not before October 18, 2012

15    when your counsel filed these answers to our request

16    for production of documents?

17        A.    I didn't.

18              (Exhibit No. 29 was marked.)

19        Q.    I'm going to show you what's been marked as

20    Exhibit 29.  Have you seen this document before?

21        A.    Yes, sir.

22        Q.    When did you -- when did you see this

23    document?

24        A.    I think it was on the 28th of September.  What

25    are we, October?

1     Q.    Well, this is actually, I think we looked

2  earlier at your retainer agreement with Mr. Bandas.

3  This is a different document.  And it looks like -- I

4  don't see a day in there but it looks like it's from

5  October 2012 at some point.  Do you see at the bottom

6  right above your signature?

7     A.    This one doesn't have a date, but it's October

8  12.

9     Q.    October --

10    A.    October 2012.

11    Q.    At some point in October, correct?

12    A.    Yes, sir.

13    Q.    Okay.  Do you remember receiving this

14 document?

15    A.    I signed it.

16    Q.    Do you remember when you signed it?

17    A.    In October some time.

18    Q.    Okay.  Well, let me ask you this question.  In

19 preparing for today's deposition, who did you -- who

20 did you meet with, if anyone?

21    A.    To prepare for it?

22    Q.    Yeah.

23    A.    Mr. Van Huseman.

24    Q.    And when exactly was that?

25    A.    When was that?

1    Q.    Yeah.

2    A.    About a week ago.

3    Q.    Okay.  And had you signed this agreement

4    before you met with Mr. Van Huseman?

5    A.    Sir?

6    Q.    Had you signed this agreement before you met

7    with Mr. Van Huseman?

8    A.    Yes, sir.

9    Q.    Okay.  So that was about a week ago?

10    A.    (Witness moves his head up and down.)

11    Q.    Did you sign it when you were at that meeting

12    or before?

13    A.    What's that again?

14    Q.    Did you sign this document, Exhibit 29 before

15    or after the meeting, I guess?  We'll start there.

16    A.    That was before the meeting.

17    Q.    Did you bring it with you to the meeting to

18    give to Mr. Huseman?

19    A.    No, I was running a little late and I didn't

20    bring it to him.

21    Q.    Did you give it to Mr. Bandas?

22    A.    Yes, sir.

23    Q.    Did you stop by his office to drop it off or

24    did you mail it to him?

25    A.    Yes, sir.

1    Q.    Which one was it?

2    A.    I dropped it off.

3    Q.    Okay.  When you were actual prepping for

4    today's deposition, was there -- who was present during

5    that at that meeting?

6    A.    Mr. Van and Mr. Paul.

7    Q.    Okay.

8    A.    And there was somebody else.  Eric.  Eric.

9    Q.    Was Mr. Soto also present at that meeting?

10   A.    One meeting, yes, sir.

11   Q.    You had more than one meeting?

12   A.    Yes, sir.

13   Q.    So you met last week and when was the other

14   meeting?

15   A.    This week.

16   Q.    Okay.  And so Mr. Soto was present during this

17   more recent meeting?

18   A.    Yes, sir.

19   Q.    Okay.  And did you take any notes during that

20   meeting?

21   A.    Sir in.

22   Q.    Did you take any notes?

23   A.    Not really.

24   Q.    Not really?

25   A.    I scribbled some stuff down.

1    Q.    And do you have those notes somewhere in your

2    possession?

3    A.    I don't have them with me.

4    Q.    What happened to them?

5    A.    Huh?

6    Q.    What happened to those notes?

7    A.    They told me not to bring any notes in.

8    Q.    Okay.  Well, do you have them at home?

9    A.    Sir?

10    Q.    Do you have those notes at home?

11    A.    Yes, sir.

12    Q.    Did you review them before today's deposition?

13    A.    Well, actually, just what was here pretty

14    much.

15    Q.    That's your notes?

16    A.    No.  That's just the stuff that I need to know

17    about.

18    Q.    Okay.  So I guess what I'm trying to ask is

19    before you came in today, did you look at those notes

20    at any point?

21    A.    I reviewed them a little bit just to be aware

22    of what you-all are going to be telling me.

23    Q.    Did they refresh your recollection or your

24    memory before you came in today's deposition?

25    A.    Not really.

1    Q.   Why did you look at the notes?

2    A.   What's that?

3    Q.   Why did you look at the notes?

4    A.   Just to try to be calm.  They said try to be

5    calm and just take my time in answering questions.

6    What are you getting at?

7    Q.   I'm just trying to ask if you looked at them

8    before today to refresh your memory?

9    A.   I don't take good notes.  I don't.  He's

10   smiling over there.  I don't know why.

11   Q.   Okay.

12        MR. LONGER:  Would you object to producing

13   those notes to us?

14        MR. DODSON:  Yes.

15   A.   Why do you need notes for?

16        MR. LONGER:  As bad as the notes are,

17   would you object to their production.

18        MR. DODSON:  We do object to them.  This

19   is not proper method for asking for production.

20   Q.   So we just established your counsel would

21   object to the production.  I'll move on now.

22        So is it your understanding that counsel

23   appearing today here are actually representing you?

24   A.   At this time, yes, sir.

25   Q.   And what's your understanding of the scope of

1    that representation?

2        A.    Just like what he just did right now.

3        Q.    So is it -- is this a representation that you

4    believe is in going to be ongoing after we complete

5    this deposition?

6        A.    I can't tell -- I can't say if it is or not.

7    I don't know.

8        Q.    Okay.  Did you review this agreement?

9        A.    This agreement?

10        Q.    Yeah. .  Specifically paragraph 3.

11        A.    3.  Now I have.

12        Q.    And so is it your understanding based on

13    what's in this paragraph that Mr. Van Huseman is

14    present here today to represent you solely in

15    connection with today's deposition?

16        A.    Is that what that says?

17        Q.    Is that -- I'm asking.

18        A.    This says defending any deposition.

19        Q.    Well, you've only been -- this is the only

20    deposition that's been noticed of you so far, correct?

21        A.    Yes, sir.

22        Q.    And unless we notice another deposition and

23    get that deposition, is it your understanding based on

24    this paragraph that that's the end of the

25    representation after today by Mr. Van Huseman?

1      A.    I guess.  I'm not too -- I mean, to me it's

2   just, you know -- I don't know.  It's up to my

3   attorney, I guess, if he wants to -- if we're going to

4   do another deposition or not.

5      Q.    I guess what I'm trying to get is you don't

6   understand or appreciate the scope of the

7   representation?

8      A.    What do you mean appreciate?  I'm glad they're

9   here.  That's the truth.

10            MR. HUSEMAN:  No, I'm the one that says

11   thank you.

12      Q.    So I guess so do you appreciate that they're

13   going to be representing you in pursuing your drywall

14   claims after today, Mr. Van Huseman?

15      A.    Sure.

16      Q.    Okay.  That's your understanding that they

17   represent you going forward?

18      A.    (Witness moves his head up and down.)

19      Q.    Yes?

20      A.    Yes, sir.  It actual says that on-line 4.

21      Q.    What does it say on-line 4?

22      A.    It says van Huseman will represent --

23   undertakes the limits to what is described in four

24   coined paragraphs.

25      Q.    So what does that mean to you?

1        A.      That they'll represent me.

2        Q.      So the limited part that doesn't --

3        A.      I don't see limit part.

4        Q.      The scope of the representation undertake --

5   that Huseman under takes is limited to what is

6   described in the foregoing paragraph?

7        A.      Yeah.

8        Q.      So you read that to mean that they're

9   representing you going forward?

10        A.      I would think going forward.

11        Q.      Okay.

12        A.      Forward going.

13        Q.      And let me ask you a question.  Did you have

14   any sort of concern about potential long-term health

15   consequences, stigma to value of your home or damage to

16   your personal reputation before your conversation with

17   Bert Chapa that we talked about earlier with respect to

18   Chinese drywall?  Let me clarify.

19        A.      Now you're saying three things, right?  You

20   said health, home and what else?

21        Q.      And damage to your personal reputation?

22        A.      Oh, my reputation.  Till I talked to -- I

23   always have -- I always have problems with reputation,

24   but --

25        Q.      I'm not sure what that means, but I meant

1   specifically with respect to Chinese drywall.

2       A.   With Chinese drywall?  Well, if it comes up.

3   I mean, if it's having like you're saying these

4   effects, of course.

5       Q.   But before we talked about this conversation

6   you had with Mr. Chapa and what I'm trying to figure

7   out is did you have these concerns before you met with

8   him about Chinese drywall?

9       A.   I never did really think about it.

10      Q.   Okay.  That's what I'm trying to figure out.

11      A.   Okay.

12      Q.   And we talked about your -- I believe it was

13  two meetings you had with Mr. Van Huseman.  How many

14  total meetings did you have with Mr. Bandas regarding

15  Chinese drywall?  I'll expand that to telephone calls

16  as well.  I'll break it down.  We'll start with

17  meetings, actual physical meetings where you met in

18  person.

19      A.   I think two.  And two phone calls.

20      Q.   So the 27th and 28th which we talked about

21  before where you met him initially and then you went in

22  and signed the objection paperwork, those are the first

23  two meetings?

24      A.   No.  I think it was just phone calls first.

25      Q.   Okay.  So you had a phone call on?

1    A.    Yes, sir.

2    Q.    When was the phone call? .

3    A.    I don't recall.  I don't know if it's two days

4  before that.

5    Q.    Okay.  So a couple of days before the 27th?

6    A.    Yes, sir.

7    Q.    Who called who?

8    A.    What's that in.

9    Q.    Did he call you or did you call?

10    A.    I got his number and I called him and then he

11  called me.  We were playing phone call.

12    Q.    So you initiated the contact?

13    A.    Yes, sir.

14    Q.    So you talked to him on that first occasion.

15  And then did you go meet him or was there another phone

16  call before that.

17    A.    It was another phone call and we set up a time

18  and date.

19    Q.    Is that the same date?  Are we talking about

20  the next day?

21    A.    I want to say -- because I think it was on a

22  weekend and we talked on Sunday and then I think I came

23  in on a Monday and talked to him or something like

24  that.

25    Q.    Okay.

1       A.    But you know, I can't be definite.

2       Q.    And by the time you went in and signed the

3   retainer agreement on the 28th, was it your

4   understanding at that point that you were going to

5   pursue an objection to the settlement?

6       A.    Yeah, we explained about what we were doing.

7             MR. HUSEMAN:  Let's not talk about what

8   you and Chris talked about.

9             THE WITNESS:  No, that's it.

10      Q.    I don't want to know what you talked about.  I

11  just want to know your understanding when you were

12  going in to sign the retainer agreement is you were

13  going to do an objection, correct?

14      A.    Correct.

15      Q.    Okay.  And so the two meetings that were in

16  person were on the 27th and 28th?

17      A.    I'd have to see a calendar, but...

18      Q.    Do you have it on your phone or something?

19  Does that help?

20      A.    Yeah, let me look it up real quick.  Because I

21  think -- I'm thinking the 28th is like on a -- what was

22  it?  September, right?

23      Q.    Yeah.

24      A.    September.  See, September -- oh, no, it was

25  October.  See, because it was -- September was on a

1    Friday, so like I said, I think I talked to him -- I

2    went and seen him on Thursday and then we organized

3    that and met again on Sunday -- on the 28th.

4         Q.    And I guess were how long were both meetings

5    starting with the Thursday meeting?

6         A.    I would want to say like maybe 30 minutes to

7    an hour.

8         Q.    Okay.  And then when you met on the 28th was

9    that similar duration?

10        A.    Yes, sir.

11        Q.    Longer or shorter?

12        A.    Give or take.

13        Q.    And I gather from today's testimony that you

14   don't really know much about the terms of the

15   settlement itself; is that fair to say?

16        A.    Yes, sir.

17        Q.    Okay.  And would you agree that your objection

18   is really at the behest of Mr. Bandas?

19        A.    I don't really -- I can't really tell you.

20        Q.    You don't know?

21        A.    No, sir.

22        Q.    So is your intention to object?  You yourself

23   came up with the idea?  It was your idea to object?

24        A.    Oh, he -- we just talked about it.  He did all

25   the objections and everything.  Is that fair to say.

1     Q.    I guess I'm asking you?

2     A.    We talked with that.

3           MR. HUSEMAN:  Let's not talk about what we

4     talk about with our lawyer.  I keep coming back to that

5     and we keep having to come back to that.

6           MR. GAUGHAN:  Some clients are different

7     than others, right?

8     Q.    I guess what I'm really trying to figure out

9     is you didn't at any point go in there and say, hey, I

10    want to object to this settlement, I came up with this

11    idea to object, I want to object?

12    A.    Yeah, it was my idea.

13          MR. HUSEMAN:  See, that's going into

14    things he talked to Chris Bandas about and I'm going to

15    ask him not to testify to those things.

16    Q.    Before you met or talked with Mr. Bandas, did

17    you have an intention to object to the settlement

18    agreement?

19    A.    Before I met -- before I went to go talk to

20    him?

21    Q.    Before you talked to him on the phone or met

22    with him in person?

23    A.    Well, we talked.

24    Q.    Again, I don't want you to talk about what you

25    talked about, but --

1      A.    Well, you know, it was just, you know, have I

2    ever seen this product.  I've seen it.

3      Q.    So you had no intention of objecting at that

4    point this time before you actually met with him or

5    talked to him on the phone?  Do you not understand my

6    question?

7      A.    I didn't have that -- what was that again?

8      Q.    Okay.  Before you spoke with Mr. Bandas on the

9    phone or met with him in person, you had no intention

10   of objecting to this settlement, did you?

11     A.    No, I didn't.

12     Q.    Can you tell me anything about the settlement?

13     A.    No, sir.

14     Q.    And I guess I'll ask this.  Did you have an

15   understanding that at any time that you had an option

16   of opting out of the settlement as opposed to objecting

17   to it?

18     A.    No, sir.

19     Q.    Do you know what opting out is?

20     A.    Getting out of it.

21     Q.    Okay.  So you wouldn't be bound -- if you

22   opted out you wouldn't be bound by the settlement?

23     A.    What's that?

24     Q.    So you're saying you're getting out of the

25   settlement if you opt out and I'm just trying to

1    clarify.  By that, do you mean that you wouldn't be

2    bound by the settlement?

3         A.    Repeat it again.

4         Q.    All right.  Did it ever --

5         A.    You said something about opting out.

6         Q.    Opting out, yeah.  That's some of the jargon

7    if you read the notice.  There was a couple of options

8    you would have.  One is you can do nothing and if you

9    do nothing, that means you would be bound by the

10   settlement and you would participate in any benefits

11   that might be available to you under the settlement.

12   Option number 2 you opt out which means you would not

13   receive any benefits from the settlement but you also

14   would not be bound by it, meaning you could pursue

15   claims against Home Depot or any other participating

16   defendant and option 3 is what you did, which is

17   objecting to the settlement so you're in effect bound

18   by the settlement but you're raising issues that you

19   think are flawed with the settlement.  Did you

20   understand that you had those options?

21                MR. HUSEMAN:  Well, just a minute.

22   Basically I object to that as a back door attempt to

23   try to invade attorney/client privilege again because

24   you're asking him after discussion with Chris what he

25   understood, which is the same as asking him what Chris

1    told him so don't answer that one.

2              MR. GAUGHAN:  I completely disagree with

3    that characterization.

4              MR. HUSEMAN:  All right.

5    Q.    I just want to know what he understood?

6              MR. HUSEMAN:  What he understood what his

7    lawyer is the same as asking what his lawyer told him

8    essentially so that's not why we're going to talk about

9    it.

10             MR. GAUGHAN:  So I can't ask him.

11             MR. HUSEMAN:  You can ask him but I don't

12   want you to ask what his told him.

13   Q.    I don't want you to tell me what Chris told

14   you?

15   A.    You have to talk to my attorney about that

16   part.

17   Q.    I want to understand if you understood you had

18   those three options?

19   A.    Like I said, I would have to get with my

20   attorney to see which way to go.

21   Q.    Okay.  But I take it you didn't understand

22   before today that you had those three options?

23             MR. HUSEMAN:  Well, you're basically

24   trying to find out what Chris told him by that.

25             MR. LONGER:  Privileged objection we don't

```
 1    have to have a speaking objection.  You've made your
 2    objection.
 3              MR. HUSEMAN:  Okay.  The objection is --
 4              MR. LONGER:  Answer the question.  Or told
 5    him don't answer.
 6              MR. HUSEMAN:  Are both of you-all doing
 7    this?
 8              MR. GAUGHAN:  I happen agree with what
 9    he's saying.  Are you telling him not to answer?  I
10    just want to know if he understood he had those 3
11    options.
12        A.    I looked them over.
13        Q.    You looked over those 3 options?
14        A.    When I was reviewing it, I did.
15        Q.    Reviewing what?
16        A.    It's in here, in here.
17        Q.    In where?
18        A.    One of these exhibits about the opting out.  I
19    remember seeing it.  Is it -- ain't it in here.
20        Q.    I don't know.
21        A.    That's what I'm saying, you know it more than
22    I did and I know I read something about it when I was
23    reviewing it a little bit.  Yeah, it's got to be in
24    here.  But I think I did see it.  Let me see.  Not that
25    one.  This guy wrote on his, too.
```

1    Q.    All right.  I guess I'm going to ask you a

2    different question.

3    A.    It's in here, right?  Because I know I thought

4    I saw it.

5    Q.    It may be in one of the other documents you

6    have.  I didn't give you the notice, the class notice.

7    Let me ask you this.

8         Before September 28, 2012, did you review the

9    notice of the class settlement, anything like that?

10   A.    If I reviewed the class settlement?

11   Q.    No, not the settlement.  There's a notice

12   that's actually something that would be mailed out to

13   known class members and was also available in that

14   website we talked about earlier, which is the

15   ChineseDrywallSettlement.com?

16   A.    No, I didn't.

17   Q.    So you didn't review that notice?

18   A.    No, I didn't.

19   Q.    Okay.  So you didn't understand at that time

20   that you had a right to either opt out, object or

21   participate in the settlement?

22   A.    No, sir.

23   Q.    And because you didn't object or opt out of

24   the settlement, did you understand that you're

25   currently bound by the settlement as approved by the

1    court if it is approved?

2        A.    I'm bound to what?

3        Q.    If the settlement is approved by the court and

4    affirmed on appeal you'll be bound by the settlement,

5    do you understand that?

6        A.    No, sir.

7        Q.    Because you didn't object -- or you didn't opt

8    out.  I'm sorry?

9        A.    No, sir.

10       Q.    Okay.

11                 (Exhibit No. 30 was marked.)

12       Q.    And these are just for the record these are

13   the articles of incorporation of Bay Area contracting &

14   construction, Inc. and I'm just marking these as

15   being -- they were produced today during your -- before

16   your deposition.  Do you recognize these?

17       A.    Yes, sir.

18       Q.    And these are in fact the articles of

19   incorporation?

20       A.    Yes, sir.

21       Q.    For Bay Area contracting?

22       A.    Yes, sir.

23       Q.    Okay.  You can put that aside.

24                 (Exhibit No. 31 was marked.)

25       Q.    And these also were produced in advance of

1    today's deposition and these look like documents from

2    the department of treasury Internal Revenue Service

3    pertaining to Bay Area contracting and construction,

4    Inc. and we see the taxpayer ID as 74-2967377.  And

5    based on these documents, it appears that Bay Area

6    contracting & construction, I can was set up as an S

7    corporation, that your appreciation?

8         A.    Yes, sir.

9         Q.    And this looks like it calls for the

10   submission of some paperwork.  Did you submit that

11   paperwork?

12        A.    For what?  What was that for?

13        Q.    If you read the first.

14             Graph in if the letter the "in order to make

15   an election of an S corporation, and I'm asking you,

16   you completed and returned that form, to your

17   knowledge?

18        A.    I didn't.  My CPA did.

19        Q.    Okay.  You can put that aside.

20             (Exhibit No. 32 was marked.)

21        Q.    I'm going to also mark this as 32.  This was

22   produced today as well.  And this more or less looks

23   like a certificate of good standing dated October 30,

24   2003 from the Texas comptroller of public accounts.  Is

25   that what this in fact is, to your knowledge?

1    A.    Yes, sir.

2    Q.    Okay.  You can put that aside.

3    A.    I didn't know I brought all this stuff.

4              MR. GAUGHAN:  I'm going to go off the

5    record, I think.

6              THE VIDEOGRAPHER:  Going off the record at

7    5:39.

8              (A recess was taken.)

9              THE VIDEOGRAPHER:  We're back on the

10   record at 5:49.

11   Q.    Mr. Garcia, I don't have --

12             MR. HUSEMAN:  If we had other really good

13   videographer.

14             MR. GAUGHAN:  Mr. Garcia, this concludes

15   our deposition.  I have though further questions

16   subject to a motion we will be filing obviously seeking

17   to pursue some additional areas of inquiry that your

18   counsel objected to today.  So it's possible we will be

19   back here to continue this deposition.  But at this

20   time, I have no further questions for you.  So thank

21   you for your time.

22                     EXAMINATION

23   BY Mr. Huseman:

24   Q.    I want to break tradition and ask you a

25   question or two on our behalf and I want to direct your

1   attention back to the series of questions that was

2   asked by opposing counsel concerning the details of the

3   objection and the legal basis for -- remember

4   discussions of Lone Star and mega fund and those types

5   of things?

6       A.   Yes, sir.

7       Q.   And the various definitions of the class and

8   such as that.  Did you make personally any decisions as

9   to what would be the nature of the objection or what

10  objections to make or which ones were legally viable?

11          MR. GAUGHAN:  Objection, form.

12      Q.   Go ahead and answer it.

13      A.   No, sir, I let my legal counsel do that.

14      Q.   All right.  And I'm asking you these questions

15  because the judge and his briefing clerks will probably

16  read some of this and I don't want things to be taken

17  out of context to say that you don't mean these things.

18          In terms of making decisions, what objections

19  are legally viable, supported by the facts, and are

20  appropriate, is that a decision that you personally

21  made or is that one that you delegated to your retained

22  lawyers?

23          MR. GAUGHAN:  Objection to form.  You can

24  answer.

25      A.   I let my legal attorney set all the

1   objections.

2        Q.    And I thank you for struggling through those,

3   trying to read those and trying to figure out what they

4   meant, but did you understand what all the objections

5   meant and what the implications were?

6             MR. GAUGHAN:  Object, form.

7        A.    No, sir.

8        Q.    Okay.  All right.  Thank you very much,

9   Mr. Garcia:

10            MR. LONGER:  Before we actually go off the

11  record, what we talked about with your cocounsel --

12  your partner, I'm sorry is we will have these documents

13  that are in Exhibit.

14            MR. GAUGHAN:  11 through 25.

15            MR. LONGER:  11 through 25, they were

16  marked for identification, I would ask you to -- we had

17  talked about having an outside vendor reproduce these

18  documents.

19            MR. HUSEMAN:  We can do that.

20            MR. LONGER:  Because it seems to me it's

21  so voluminous that it makes the most sense.

22            MR. HUSEMAN:  I think it does I'm in

23  agreement with you.

24            MR. LONGER:  And then we would also ask

25  that you identify and cull down from that what is

1    relevant and what is not.

2                MR. HUSEMAN:  As I told you yesterday with

3    regard to Mr. Soto, I have now conferred with Chris

4    Bandas, called him and told him that I had a job for

5    him, and he said he would do it, so I think you're -- I

6    think both of your wishes are granted on this one.

7                MR. LONGER:  Very good.  All right.  Well,

8    thank you.  Thank you for your time.

9                THE VIDEOGRAPHER:  Off the record at 5:52.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 28 to Garcia 11/1/2012 Deposition

# CLASS ACTION OBJECTOR
## POWER OF ATTORNEY AND CONTINGENT FEE AGREEMENT

This agreement ("Agreement") is made between RONNIE GARCIA ("Client(s)" or "you") and BANDAS LAW FIRM, P.C. (hereinafter "Attorneys").

In consideration of the mutual promises contained herein, Client(s) and Attorneys agree as follows:

1. **SCOPE AND METHOD OF REPRESENTATION**

   1.1 **Attorneys' Legal Services.** You agree Attorneys will: Prepare and file on your behalf an objection to a proposed class action settlement in the case styled *MDL 2047; In Re: Chinese-Manufactured Drywall Products Liability Litigation*; In the United States District Court, Eastern District of Louisiana, and represent you in any appeal therefrom (the "Objection").

   1.2 **Method of Representation.** BLF is a Texas law firm located at 500 N. Shoreline, Suite 1020, Corpus Christi, Texas 78471, (361) 698-5200. No lawyer of the BLF is licensed in Louisiana federal court. However, if necessary, Attorneys will seek admission before Louisiana courts *pro hac vice* or as required by the applicable federal rules of practice and/or will seek to associate local counsel in order to properly effectuate this representation. Client authorizes that Attorneys prepare the Objection for filing *pro se* if necessary so as to allow Attorneys meet the Objection filing deadline and sufficient time in which seek admission *pro hac vice* and/or associate Lousiana counsel if the later cannot be accomplished before the Objection filing deadline.

2. **YOUR REPRESENTATIONS AND DUTIES AS AN OBJECTOR**

   2.1 You represent you are a member of the Class as defined in the materials published at https://chinesedrywallclass.com

   2.2 You represent you can demonstrate you are entitled to receive settlement benefits as a member of the Class through documentation or by affidavit.

3. **ATTORNEYS' FEES, EXPENSES AND PAYMENTS TO YOU**

   3.1 **Class Action Settlement:** If a settlement is approved by the Court, you will receive the full amount of any benefits you are entitled to receive under the settlement as a class member. Attorneys shall not be entitled to receive any portion of your share of the benefits under the class settlement.

   3.2 **Incentive Award:** If the outcome of your objection is determined by the Court or is settled and the settlement is presented to the Court for approval, Attorneys may, in their sole discretion, petition the Court for approval of a modest (not to exceed

DEPOSITION
EXHIBIT
28

$5,000) payment to you to compensate you for your time, effort and/or the benefit you confer on the Class through your service as an objector (an "incentive award"). If the Court grants or approves an incentive award, you will receive the amount awarded to you by the Court in addition to the benefits set forth in paragraph 3.1. If Attorneys petition the Court for an incentive award on your behalf and the Court denies the incentive award, you will receive only the benefits set forth in section 3.1.

3.3    Settlement:  In the alternative to section 3.2 above, if your objection is settled without the necessity for Court approval, Attorneys agree to request as part of the settlement a separate payment to you to compensate you for your time, effort and/or the benefit you confer on the Class through your service as an objector. The amount of the payment is contingent on the outcome of the settlement negotiations, but will not exceed $5,000. If the settling parties agree to make such a payment, you will receive the amount of that payment in addition to the benefits set forth in paragraph 3.1. If the settling parties do not agree to make a separate payment to you, you will receive only the benefits set forth in paragraph 3.1.

4.4    Attorneys' Fees: You agree the payment of attorneys' fees will be contingent upon the outcome of the objection. You will not be responsible to pay attorneys' fees or expenses of any kind. You agree Attorneys may receive a fee for their services if they are successful in pursuing an objection to the class settlement or any appeal therefrom. The attorneys' fees will be paid by the defendants or as part of the attorneys' fees awarded to class counsel. You acknowledge you do not have any interest in any such fees. You further acknowledge the attorneys' fees may substantially exceed any payments to you as set forth above.

4.5    You understand and acknowledge you will not receive any special benefits or recovery not afforded to other members of the Class by reason of your service as an objector other than as set forth above. You further acknowledge no other benefits or payments have been promised to you.

4.    **CONFLICTS OF INTEREST**

Attorneys have explained and you understand that, if successful, the objection or any appeal there from may result in the disapproval or rejection of the proposed settlement which may, in turn, cause you to lose your right to receive settlement benefits under the proposed settlement, to which you object. You acknowledge and agree to this risk and waive any conflict of interest arising from the objection or any appeal there from. Attorneys have also explained and you understand that if there are negotiations to settle your objection, Attorneys may negotiate the amount of any payment to you as well as the amount of attorneys' fees concurrently in order to arrive at a total settlement amount. You acknowledge and waive any conflict of interest between Attorneys and you arising out of any such negotiations and grant Attorneys sole discretion to propose the amount of any payment to you during the negotiations. The settlement will not be finally agreed upon, however, until you have approved the terms of the settlement, the amount of the payment to you, and the amount of attorneys' fees.



**5.   ADMINISTRATIVE MATTERS**

5.1   ~~Termination: Attorneys reserve the right to withdraw from this matter if you fail~~ to honor this Agreement or for any reason permitted or required under the rules of the court or state in which the class action is pending.

5.2   **Association of Co-counsel:** Attorneys may associate other lawyers to assist in representing you if, before any association becomes effective, you agree in writing to the terms of the arrangement including (1) the identity of all lawyers or law firms involved, (2) whether fees will be divided based on the proportion of services performed or by lawyers agreeing to assume joint responsibility for the representation, and (3) the share of the fee each lawyer or law firm will receive, or if the division is based on the proportion of services performed, the basis on which the division will be made.

5.3   **No Guaranty of Results:** Attorneys will use their best efforts in representing you in this matter, but we cannot guarantee the outcome of any given matter. You acknowledge Attorneys have made no promises or guarantees concerning the outcome of this matter, and nothing in this agreement shall be construed as such a promise or guarantee.

5.4   **Entire Agreement:** This Agreement contains the entire agreement between us regarding this matter and the fees, expenses and payments relative thereto. This Agreement shall not be modified except by written agreement signed by both parties.

I certify and acknowledge that I have had the opportunity to read this Agreement, that I have voluntarily entered into this Agreement fully aware of its terms and conditions, and that I have received a copy of this Agreement.

Signed and accepted on this 28th day of September 2012.

Clients: _____

Attorneys: _____

Christopher A. Bandas