Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT

 2            EASTERN DISTRICT OF LOUISIANA

 3

 4   IN RE:  CHINESE-MANUFACTURED   :  MDL NO. 2047

     DRYWALL PRODUCTS LIABILITY     :

 5   LITIGATION                     :  SECTION:  L

                                    :

 6   -------------------------------  :  JUDGE FALLON

     This Document Relates to:      :

 7   ALL CASES                      :  MAG. JUDGE

                                    :  WILKINSON

 8

 9

10        CONFIDENTIAL - SUBJECT TO FURTHER

11            CONFIDENTIALITY REVIEW

12

13        TUESDAY, SEPTEMBER 18, 2012

14        NOVEMBER 2012 TRIAL PLAINTIFFS

15

                    -  -  -

16

17        Videotaped deposition of NEW ORLEANS AREA

     HABITAT FOR HUMANITY, INC., through the testimony of

18   JIM PATE, held at the Law Offices of Herman, Herman

     & Katz, L.L.C., 820 O'Keefe Avenue, New Orleans,

19   Louisiana, commencing at 9:06 a.m., on the above

     date, before Leslie B. Doyle, Certified Court

20   Reporter (LA), Registered Diplomate Reporter,

     Certified LiveNote Reporter.

21

22                  -  -  -

23        GOLKOW TECHNOLOGIES, INC.

24     877.370.3377 ph | 917.591.5672 fax

25          deps@golkow.com
```

EXHIBIT

1

Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S :
 2
 3    APPEARING ON BEHALF OF THE PLAINTIFFS' STEERING
 4    COMMITTEE:
 5         SCOTT ALAN GEORGE, ESQUIRE
              Email:  Sgeorge@seegerweiss.com
 6            Phone:  (215) 553-7982
           SEEGER WEISS, LLP
 7         1515 Market Street, Suite 1380
           Philadelphia, Pennsylvania  19102
 8
 9         LEONARD A. DAVIS, ESQUIRE
              Email:  Ldavis@hhkc.com
10            Phone:  (504) 581-4892
           HERMAN, HERMAN & KATZ, LLC
11         820 O'Keefe Avenue
           New Orleans, Louisiana  70113
12
13         HUGH P. LAMBERT, ESQUIRE
              Email:  Law@lambertandnelson.com
14            Phone:  (504) 581-1750
           LAMBERT & NELSON, PLC
15         701 Magazine Street
           New Orleans, Louisiana  70130
16
17         DAWN M. BARRIOS, ESQUIRE
              Email:  Barrios@bkc-law.com
18         ZACHARY L. WOOL, ESQUIRE
              Email:  Zwool@bkc-law.com
19            Phone:  (504) 524-3300
           BARRIOS, KINGSDORF & CASTEIX, LLP
20         One Shell Square
           701 Poydras Street, Suite 3650
21         New Orleans, Louisiana  70139-3650
22
23
24
25
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (CONTINUED):

 2

 3    APPEARING ON BEHALF OF INTERIOR/EXTERIOR BUILDING

 4    SUPPLY, L.L.C.:

 5         RICHARD G. DUPLANTIER, JR., ESQUIRE
              Email:  Rduplantier@gjtbs.com

 6         BENJAMIN R. GRAU, ESQUIRE
              Email:  Bgrau@gjtbs.com

 7         Phone:  (504) 525-6802

           GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, PLC

 8         701 Poydras Street, 40th Floor
           New Orleans, Louisiana  70139

 9

10    APPEARING ON BEHALF OF NORTH RIVER INSURANCE

11    COMPANY:

12         KEVIN F. RISLEY, ESQUIRE
              Email:  Krisley@thompsoncoe.com

13         BRIAN S. MARTIN, ESQUIRE
              Email:  Bmartin@thompsoncoe.com

14         Phone:  (713) 403-8210

           THOMPSON, COE, COUSINS & IRONS, L.L.P.

15         One Riverway, Suite 1600
           Houston, Texas  77056

16

17    APPEARING ON BEHALF OF LANDMARK AMERICAN INSURANCE

18    COMPANY:

19         MELISSA M. LESSELL, ESQUIRE
              Email:  Mlessell@dkslaw.com

20         Phone:  (504) 593-0689

           DEUTSCH, KERRIGAN & STILES, LLP

21         755 Magazine Street
           New Orleans, Louisiana  70130

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (CONTINUED):

 2

 3    APPEARING ON BEHALF OF NATIONAL SURETY CORPORATION

 4    AND FIREMAN'S FUND INSURANCE COMPANY:

 5        MEGAN E. DONOHUE, ESQUIRE

              Email:  Mdonohue@joneswalker.com

 6        Phone:  (337) 593-7600

          JONES, WALKER, WAECHTER, POITEVENT, CARRERE &

 7          DENEGRE, L.L.P.

          600 Jefferson Street, Suite 1600

 8        Lafayette, Louisiana  70501

 9

10    ALSO PRESENT:

11        JIM GEARY

12        CLAY GEARY

13        JEREMY EPSTEIN

14

15    VIDEOGRAPHER:

16        HANK COBB

          Golkow Technologies, Inc.

17

18                        - - -

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                INDEX OF EXAMINATIONS

 2    EXAMINATION

 3      BY MR. DUPLANTIER..........................9

 4      BY MR. RISLEY............................161

 5    ACKNOWLEDGMENT OF DEPONENT...................176

 6    ERRATA......................................177

 7    LAWYER'S NOTES..............................178

 8    CERTIFICATE.................................179

 9                      * * *

10

11                INDEX OF EXHIBITS

12    NOAHH 1......................................16

13      RE-NOTICE OF 30(B)(6) DEPOSITION OF

14      NEW ORLEANS AREA HABITAT FOR HUMANITY, INC.

15    NOAHH 2......................................40

16      8/11/10 LETTER TO MARGARET SUNKEL FROM

17      CHUBB (NOAHH-0000036 - NOAHH-0000044)

18    NOAHH 3......................................42

19      2/14/11 LETTER TO MARGARET SUNKEL FROM

20      CHUBB (NOAHH-0000057 - NOAHH-0000067)

21    NOAHH 4......................................43

22      4/20/11 LETTER TO JIM PATE FROM ACE USA

23      (NOAHH-0000068 - NOAHH-0000069)

24

25
```

 1    EXHIBITS (CONTINUED):

 2

 3    NOAHH 5.....................................43

 4       4/20/11 LETTER TO JIM PATE FROM ACE USA

 5       (NOAHH-0000068 - NOAHH-0000069)

 6    NOAHH 6.....................................49

 7       E-MAIL CHAIN (NOAHH-0002410)

 8    NOAHH 7.....................................56

 9       UNDATED LETTER TO AMANDA CURRY FROM FLY

10       SYSTEM (NOAHH-0002410)

11    NOAHH 8.....................................69

12       E-MAIL CHAIN (NOAHH-0002862)

13    NOAHH 9.....................................73

14       "DRYWALL TIMELINE"

15       (NOAHH-0003435 - NOAHH-0003437)

16    NOAHH 10....................................99

17       8/20/09 LETTER TO WHOM IT MAY CONCERN

18       ON NATIONAL GYPSUM LETTERHEAD

19       (NOAHH-0000001)

20    NOAHH 11...................................103

21       11/09 INTERIOR/EXTERIOR INVOICE

22    NOAHH 12...................................111

23       E-MAIL CHAIN

24       (NOAHH-0015468 - NOAHH-0015469)

25

Confidential - Subject to Further Confidentiality Review

1    EXHIBITS (CONTINUED):

2

3    NOAHH 13....................................113

4       E-MAIL CHAIN (NOAHH-0002282)

5    NOAHH 14....................................123

6       SPREADSHEET

7       (NOAHH-0007679 - NOAHH-0007686)

8    NOAHH 15....................................127

9       9/13/12 MEMORANDUM TO NOAHH BOARD OF

10      DIRECTORS FROM JIM PATE

11      (NOAHH-0014571 - NOAHH-0014573)

12   NOAHH 16....................................133

13      E-MAIL FROM JIM PATE

14      (NOAHH-0007723 - NOAHH-0007724)

15   NOAHH 17....................................136

16      E-MAIL CHAIN (NOAHH-0002742)

17   NOAHH 18....................................136

18      E-MAIL CHAIN (NOAHH-0002761)

19   NOAHH 19....................................138

20      E-MAIL CHAIN

21      (NOAHH-0002541 - NOAHH-0002542)

22   NOAHH 20....................................139

23      E-MAIL CHAIN

24      (NOAHH-0015461 - NOAHH-0015462)

25

Confidential - Subject to Further Confidentiality Review

1    EXHIBITS (CONTINUED):

2

3    NOAHH 21...................................142

4       E-MAIL FROM JIM PATE (NOAHH-0007722)

5    NOAHH 22...................................146

6       E-MAIL CHAIN (NOAHH-0002403)

7    NOAHH 23...................................147

8       3/20/09 LETTER FROM NOAHH (NOAHH-0002314)

9    NOAHH 24...................................150

10      E-MAIL CHAIN

11      (NOAHH-0002756 - NOAHH-0002758)

12   NOAHH 25...................................152

13      E-MAIL FROM BILLY MARCHAL (NOAHH-0007705)

14   NOAHH 26...................................153

15      7/11/11 LETTER FROM NOAHH (NOAHH-0000011)

16   NOAHH 27...................................158

17      UNDATED LETTER FROM THE U.S. CONSUMER

18      PRODUCT SAFETY COMMISSION TO ALEIS TUSA

19      (NOAHH-0015503 - NOAHH-0015507)

20   NOAHH 28...................................163

21      E-MAIL CHAIN

22      (NOAHH-0008477 - NOAHH-0008480)

23                    * * *

24

25

Confidential - Subject to Further Confidentiality Review

```
 1                    PROCEEDINGS
 2              THE VIDEOGRAPHER:  We are now on the
 3         record.  My name is Henry Cobb.  I'm the
 4         videographer for Golkow Technologies.
 5         Today's date is September 18th, 2012.  The
 6         time now is 9:06 a.m.
 7              This video deposition is being held in
 8         New Orleans, Louisiana, in the matter of
 9         Chinese Drywall for the United States
10         District Court, Eastern District of
11         Louisiana.  The deponent today is Jim
12         Pate, representing New Orleans Area
13         Habitat for Humanity, Incorporated.
14              Counsel will be noted on the
15         stenographic record.  The court reporter
16         today is Leslie Doyle, and will now swear
17         in the witness.
18                      * * *
19                   JIM PATE,
20    having been first duly sworn, was examined and
21              testified as follows:
22                      * * *
23                   EXAMINATION
24    BY MR. DUPLANTIER:
25         Q.   Good morning, Mr. Pate.  My name is
```

Confidential - Subject to Further Confidentiality Review

1    Richard Duplantier, and I'm counsel for

2    Interior/Exterior Building Supply in the

3    multi-district litigation in which New Orleans Area

4    Habitat for Humanity is now a party.

5              Can you give us your name and your current

6    business address for the record?

7         A.   My name is Jim Pate.  My business address

8    is 7100 St. Charles Avenue, New Orleans, Louisiana,

9    70118.

10        Q.   You are familiar with this deposition

11   process; is that correct?

12        A.   (Nods head.)

13        Q.   You're an attorney; is that correct?

14             MR. GEORGE:  Objection; compound.

15   BY MR. DUPLANTIER:

16        Q.   You can answer it.

17        A.   I practice law, but I haven't practiced

18   law in about 20, 30 years.

19        Q.   You are aware that you've been identified

20   as the representative on behalf of New Orleans Area

21   Habitat for Humanity?

22        A.   That's correct.

23        Q.   Okay.  Is there a shorter acronym that we

24   can use to identify that group, or do I need to say

25   that every time?

```
 1        A.    No.  New Orleans Habitat will be adequate.

 2        Q.    New Orleans Habitat.  Okay.

 3              Did you have an opportunity to review any

 4   documents in preparation for your testimony today?

 5        A.    The documents that we've turned over, yes.

 6        Q.    You've reviewed all of the documents that

 7   you've turned over?

 8        A.    Probably not all of them, no.

 9        Q.    Okay.  Can -- is there any specific

10   documents that you can recall preparing -- reviewing

11   to prepare for your testimony today?

12              MR. GEORGE:  Objection.  I would

13          suggest that's privileged.  If any,

14          refresh his memory.  I think you can ask

15          about those, but, otherwise, it's work

16          product.

17   BY MR. DUPLANTIER:

18        Q.    You can answer the question.

19        A.    I don't recall any in particular.  I

20   reviewed some and others I didn't.  It was mostly

21   checking them out before we gave them to our lawyer.

22   So it was sporadic.  There's a tremendous amount of

23   documentation we've delivered.  I didn't review all

24   of it.

25        Q.    Was there any document in particular that
```

Confidential - Subject to Further Confidentiality Review

1    refreshed your recollection that you can recall this

2    morning?

3        A.    Probably the only one was the timeline

4    that we prepared in-office.

5        Q.    And who prepared that timeline?

6        A.    It was done by Aleis Tusa, who is my

7    director of communications.

8        Q.    What is your current

9    title?

10       A.    I am the executive director.

11       Q.    And how long have you been the executive

12   director of New Orleans Habitat?

13       A.    Over 12 years.

14       Q.    And in that position, what is your -- what

15   are your responsibilities for New Orleans Habitat?

16       A.    I manage all of the operations of it, the

17   various departments.  I hire and fire all the

18   employees except those that are hired and fired by

19   my department heads.

20       Q.    How many employees does New Orleans

21   Habitat currently have?

22       A.    It currently has about 34.

23       Q.    In 2007, shortly after Katrina, how many

24   employees did Habitat have?

25       A.    Post-Katrina, we had four out of 11

Confidential - Subject to Further Confidentiality Review

```
 1    pre-Katrina employees come on board.  By 2007, early

 2    2007, we were probably at about 30.  We ultimately

 3    got to about 60.

 4         Q.   Can you just briefly explain to me how New

 5    Orleans Habitat is structured from a corporate

 6    standpoint?

 7         A.   New Orleans Habitat is a 501(c)(3) corp

 8    incorporated in the State of Louisiana.  We have a

 9    local board of directors.

10         Q.   How is New Orleans Habitat funded?

11         A.   We raise all of our own funds, largely

12    donations from individuals, foundations,

13    corporations.  A minuscule amount is volunteer fees.

14         Q.   Can you just, so that I understand who I'm

15    speaking with, give me a little description of your

16    background and what you did before you became the

17    executive director of Habitat?

18         A.   Uh-huh.  Yes.  I -- I'm a graduate of the

19    University of Tennessee College of Law.  I practiced

20    law for about eight, nine years.  Left there and

21    went to Union -- what was then Union Planter's Bank

22    in the pension, profit sharing trust department.

23    From there, I left and went to Union Central

24    Insurance as their pension, profit sharing

25    specialist.  Ultimately started working with a group
```

Confidential - Subject to Further Confidentiality Review

1    that included some agents and some individuals, but

2    largely in the area of sports contracts; Scottie

3    Pippen and Reggie White, that type of stuff.  And

4    then subsequently became the executive director of

5    the Dallas Area Habitat for Humanity.

6         Q.   What year was that that you became first

7    involved as an employee of Habitat?

8         A.   1992.

9         Q.   And had you been involved as a board

10   member or something before that time?

11        A.   For eight years prior to that, I was

12   involved either as a board member of the Memphis,

13   Tennessee, Habitat for Humanity, which is where I'm

14   from, as a board member, also what we call a core

15   volunteer, somebody who goes out regularly and works

16   on houses.

17        Q.   And how did you end up becoming the

18   executive director in Dallas?

19        A.   The construction manager of the Memphis

20   affiliate moved to Dallas to become the executive

21   director in 1990, and that affiliate was fairly new

22   and did not have a core of volunteers, so he called

23   me and a couple of other people from Memphis to come

24   in and help them do what we call a blitzville.

25   That's building a house essentially in a week, very

Confidential - Subject to Further Confidentiality Review

1    high intensity, very energetic.  So I would go in

2    and help him.  And we did a five-house blitz in '92.

3    And his board president and he asked me to come in

4    as the deputy director, which a couple of months

5    later, after thinking about it, I decided to do.

6         Q.    And how long did you stay in that

7    position?

8         A.    At deputy, I was roughly nine or ten

9    months, and then the executive director went to run

10   the Phoenix affiliate, and I became the ED.

11        Q.    And then you -- how did you come to New

12   Orleans?

13        A.    A guy named Joe Gatlin, who was the

14   regional director of Habitat International, changed

15   their structure.  Louisiana is part of his region,

16   and they had had a rapid turnover in executive

17   directors, and he recommended that I meet with them

18   and talk with them, so I came and met with them and

19   talked with them and came on board.

20        Q.    And so you moved to New Orleans to become

21   the executive director of New Orleans Habitat?

22        A.    That's correct.

23        Q.    Is that correct?

24        A.    That's correct.

25        Q.    Let me finish asking my questions before

Confidential - Subject to Further Confidentiality Review

1    you start answering, because, otherwise, the record

2    is going to get confused, as I'm sure you

3    understand.

4         A.    Uh-huh.

5    '    Q.    I'm going to provide to you a copy of

6    Exhibit 1 which we will attach to the deposition,

7    which is the notice of the deposition of New Orleans

8    Area Habitat.

9              MR. GEORGE:   Thank you.

10             (Deposition Exhibit 1 was marked for

11                   identification.)

12   BY MR. DUPLANTIER:

13        Q.    Have you had an opportunity to review this

14   document?

15        A.    Yes, I have.

16        Q.    You reviewed it with your counsel, I would

17   assume; is that correct?

18        A.    That's correct.

19        Q.    Did you review it with anyone else within

20   Habitat?

21        A.    No.

22        Q.    Have you reviewed it with, for example,

23   Ms. Tusa?

24        A.    No.

25        Q.    Is she still employed?

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Uh-huh.

 2        Q.    Is that a yes?

 3        A.    Yes.

 4        Q.    Let me ask you about question 2.  How

 5   does --

 6              MR. GEORGE:  Give him a second.  He's

 7              trying to find it.

 8              It's the sixth numbered page.  It

 9              looks like this (indicating).

10   BY MR. DUPLANTIER:

11        Q.    How is Habitat structured internationally,

12   and how do the affiliates interrelate?

13        A.    Habitat for Humanity International -- I'll

14   call it Habitat International -- is its own

15   corporation.  It basically originally focused on the

16   international affiliates, and those are, you know,

17   like Habitat Nigeria, Habitat Korea, things like

18   that.  Habitat itself was founded essentially as a

19   grass root's organization with a little affiliate

20   starting various towns when they had a group of

21   people inspired to start doing the Habitat type

22   work.

23              We were -- we are all independent

24   501(c)(3)s in our respective states of residence.

25   We all have our own governance, and, basically, it's
```

Confidential - Subject to Further Confidentiality Review

1    a very loose affiliation with Habitat International,

2    largely focused on making sure that we're consistent

3    in our mission, which is to provide decent,

4    affordable housing for low-income families.  And how

5    we accomplish that in our respective areas is pretty

6    much ours as long as the outcome is that we sell the

7    house at cost, which is defined by the local

8    affiliate, and that we provide permanent financing

9    and charge zero interest.

10          More recently, since about -- oh, about

11   2004 or 5, we've gotten a lot more structured in

12   terms of branding.  And by that, I mean consistent

13   logos with all the affiliates, same kind of color

14   scheme, designs and so forth.  But, basically,

15   that's it.  Otherwise, Habitat International offers

16   opportunities for learning best practices, doing

17   training.  All of that's voluntary.  None of it's

18   mandatory.

19   Q.   Let me ask you a few questions.  Does

20   Habitat International provide funding for start up

21   of a new group in any state or city?

22   A.   They -- I can't answer that.  I don't know

23   of any where that's -- where they've started start

24   up.

25   Q.   Do they provide funding of any type to the

Confidential - Subject to Further Confidentiality Review

```
 1    affiliates?

 2         A.    They fund in a couple of situations.  One

 3    is a competitive grant.  For example, a national

 4    organization will make a large donation to them for

 5    the purpose of funding some Habitat houses.  A good

 6    example of that is Home Depot, which through their

 7    foundation -- this is a number of years ago -- gave

 8    a large grant to Habitat International with the

 9    proviso that they would indicate where they wanted

10    those grant funds spent.  The affiliate could accept

11    the funding and build the house or not.  Not every

12    affiliate was offered the opportunity to

13    participate, because Home Depot only wanted it where

14    they had a new or relatively new store.  So you

15    applied.  If your town was -- if your affiliate was

16    on the list of where they wanted to be, you could

17    apply for it and they would fund, for example, a

18    house.

19              As a general, broad rule, they do not fund

20    affiliates at all.  On the contrary, the affiliates

21    tithe upstream to Habitat International funding to

22    be used overseas.

23         Q.    Do they provide you resources?

24         A.    We have intranet and communications set

25    up, newsletters.  We have a -- Habitat International
```

Confidential - Subject to Further Confidentiality Review

```
 1    has a website where they maintain sort of a library
 2    of best practices and occasional legal documents, an
 3    example being the -- what is it -- the
 4    anti-terrorism thing that everybody has to file
 5    nowadays.  They had a template that affiliates could
 6    go pull off, have your own attorney review, execute.
 7    That's largely what they do.  We have -- they have
 8    essentially an annual meeting for affiliate board
 9    presidents, board members, affiliate staff who --
10    and you can go to that meeting.  Again, totally
11    voluntary.
12         Q.   Do they provide you education?  For
13    example, do they provide you education on
14    construction techniques?
15         A.   Only on the website.
16         Q.   Only on the website?
17         A.   Yeah.
18         Q.   How about guidelines for purchasing
19    products to be used in construction?
20         A.   No.
21         Q.   Do they provide you any information in
22    that regard?
23         A.   No.
24         Q.   That is all -- as far as you can recall,
25    that is all done internally; the decision-making
```

1    with regard to purchases, for example, is all done

2    by the New Orleans Habitat?

3        A.    That's correct.

4        Q.    Why would Habitat International get

5    involved in the -- ever get involved in the bulk

6    purchase of, for example, drywall?

7        A.    Their only involvement at that level would

8    be to fund the affiliate, and that's only occurred,

9    to my knowledge, with disasters.  So with the local

10   affiliates that we have an opportunity to get a

11   bunch of shingles so we can get these tornado houses

12   reshingled and we need 100,000 to buy the shingles,

13   Habitat usually is raising funds -- Habitat

14   International is typically raising funds for any

15   given disaster relief, you know.  Hurricane Katrina,

16   Hurricane Andrew, they did the same thing.

17   Tornadoes, the stuff in Joplin, Missouri, Habitat

18   International raised some.  When they raise funds

19   specifically for disaster relief because they have a

20   broader communication network and e-mail network,

21   they direct those funds back to the affiliate.

22       Q.    Do you have to pay those funds back to

23   Habitat International?

24       A.    Generally speaking, no.  Sometimes they'll

25   do a zero interest loan.

```
 1       Q.   Well, I would assume that post-Katrina,
 2   Habitat International supported the New Orleans
 3   Habitat operation?
 4       A.   That's correct.  Nineteen affected
 5   affiliates; that's correct.
 6       Q.   And what kind of resources did they
 7   provide -- strike that.
 8            I would assume if someone made a disaster
 9   contribution to Habitat International --
10       A.   Uh-huh.
11       Q.   -- with regard to Hurricane Katrina, it
12   was then redirected through them down to New Orleans
13   Habitat; is that correct?
14       A.   Well, to one of the 19 affiliates.
15       Q.   To one of the 19 affiliates?
16       A.   Or maybe all of them.  They may have
17   given, you know, what we call unrestricted funding
18   where people -- you could make a donation to Habitat
19   International and say, I want it to go to New
20   Orleans Habitat, and that would go to New Orleans
21   Habitat.  Or you could say, I want to help Katrina
22   victims, and then they would decide how to spread it
23   out among the affiliates based on their needs,
24   requests, so forth.
25       Q.   But I can write a check to Habitat
```

Confidential - Subject to Further Confidentiality Review

```
 1    International, its own 501(c)(3); is that correct?

 2         A.   Right.

 3         Q.   And if I write a check to Habitat

 4    International, some of that money was then given to

 5    one of the 19 affiliates, including New Orleans

 6    Habitat, for Katrina relief; is that correct?

 7         A.   If the check said for Katrina relief.

 8         Q.   Suppose the check didn't say it was for

 9    Katrina relief.  How --

10         A.   Then -- I'm sorry.

11         Q.   How did they handle those types of

12    undedicated donations at that time?

13              MR. GEORGE:  Objection.

14         A.   Well, I don't really know how they handle

15    them, but they -- typically, if it's an undesignated

16    donation, they use it as they need.

17    BY MR. DUPLANTIER:

18         Q.   Okay.  How much money did you receive

19    through Habitat International for Katrina relief --

20    did New Orleans Habitat --

21              MR. GEORGE:  You know, Rick, this is

22              really getting outside of the subject

23              matter here and under the guidance that

24              Judge Fallon gave us on your motion to

25              compel.  This is irrelevant.  It's a
```

Confidential - Subject to Further Confidentiality Review

```
 1              fishing expedition that you're engaged in.

 2              I'm not going to stop you; you have your

 3              time; you can use it as you see fit, but

 4              you're simply wandering off into the

 5              wilderness here.

 6                  MR. DUPLANTIER:  I'll get -- once I

 7              get through the wilderness and I go to

 8              chop down the tree, I'll connect the dots,

 9              I promise.  I really will.

10  BY MR. DUPLANTIER:

11      Q.   So if you can answer the question.

12      A.   Would you repeat the question?

13      Q.   How much -- what amount of funds did

14  Habitat International direct for Katrina recovery to

15  the local area New Orleans Habitat?

16      A.   I think we received about 19 million.

17      Q.   And none of those funds were paid back,

18  for lack of a better word, to Habitat International;

19  is that correct?

20      A.   That's correct.

21      Q.   All right.  The million dollars that

22  Habitat spent -- that New Orleans Area Habitat spent

23  to buy drywall in 2007, where did those funds come

24  from?

25      A.   They probably came out of the money that
```

```
 1    Habitat International sent us.  But we also raised
 2    about $20 million directly and independent of
 3    Habitat International.
 4         Q.   Do you have any recollection about
 5    the series of transactions that took place in
 6    2007 when New Orleans Habitat bought the
 7    drywall -- the bulk drywall?
 8              MR. GEORGE:  Objection.
 9              MR. DUPLANTIER:  Can you tell me what
10         your objection is?
11              MR. GEORGE:  I think the term "bulk
12         drywall" is ambiguous.
13              MR. DUPLANTIER:  Okay.  Let me -- I'll
14         be -- I'll rephrase the question.
15    BY MR. DUPLANTIER:
16         Q.   Do you have any recollection about the
17    process undertaken by the New Orleans Area Habitat
18    when it bought 100,000 sheets of Fly System's
19    Taishan drywall?
20              MR. GEORGE:  Objection.
21              MR. DUPLANTIER:  What's your
22         objection?
23              MR. GEORGE:  No foundation for the
24         question.
25              MR. DUPLANTIER:  Okay.  Let's try this
```

Confidential - Subject to Further Confidentiality Review

```
1              again.  I'm happy to rephrase it all day

2              long.

3    BY MR. DUPLANTIER:

4         Q.    Are you aware that New Orleans Habitat

5    purchased 100,000 sheets of Chinese drywall

6    manufactured by Taishan and bought from a company

7    called Fly Systems?

8         A.    Yes, I am.

9         Q.    And New Orleans Area Habitat spent

10   approximately $1 million on that purchase; is that

11   correct?

12        A.    That's correct.

13        Q.    Do you recall the series of discussions

14   that took place at the time that that purchase was

15   made?

16        A.    I think I recall some of them, but not

17   specifically.  By the time we bought it in

18   March 2007, you know, we were building -- we had

19   gone from 12 to 13 houses a year to, I don't know,

20   by that time probably 50 a year.  Employees had gone

21   from, like, 11 to probably at that time about 35.

22   So I had a lot on my plate.

23        Q.    Understood.

24              Do you recall whether anyone from New

25   Orleans Area Habitat sought the guidance of Habitat
```

Confidential - Subject to Further Confidentiality Review

1    International about that purchase?

2        A.    To my knowledge, no.  It was all -- we

3    were contacted directly, pursued it in-house.

4        Q.    Who contacted you?

5        A.    The Fly Systems broker.  I don't recall

6    the name.

7        Q.    Was it someone that you had dealt with

8    previously?

9        A.    No.

10       Q.    Do you know why they contacted you?

11       A.    They had this drywall sitting in a

12   warehouse, Dupuy warehouse at the port of New

13   Orleans, and they wanted to not have to continue

14   paying storage for it or so they said.

15       Q.    Do you remember who they contacted?

16       A.    I do not recall exactly who it was at that

17   time.  Could have been our construction manager.  It

18   could have been someone in the office.  My staff

19   member who dealt with it primarily was a guy named

20   Bob Marye, and he was on my development team as a

21   major donor person and faith communities.  His focus

22   was on faith communities and major donors.

23       Q.    Let's talk about the structure in 2007.  I

24   want to talk about 2007 and maybe going forward.

25   But in 2007, how was New Orleans Habitat structured?

Confidential - Subject to Further Confidentiality Review

```
1        A.    In 2007?

2        Q.    Correct.

3        A.    We have essentially been structured the

4   same way.  Just as things have increased or

5   decreased, we may have dropped off specific

6   subtitles.

7        Q.    Okay.

8        A.    But in broad terms, New Orleans Habitat is

9   structured with the executive director, who reports

10  to the board.  I have two direct -- at that time

11  direct reports.  One was operations and one was

12  finances.  And then under them, the org chart

13  basically called for a ReStore director.  Well, in

14  2007, depending on when it was, we may not have had

15  the ReStore.  But construction manager, director of

16  finance, director of development.

17            And things like director of development is

18  a good example.  I did not have one person who was

19  the director of development.  I had two people.  One

20  was the director of development for major donors and

21  faith communities.  The other was director of

22  development for all other purposes.

23            Let's see.  Finance.  Volunteer, director

24  of the volunteer department, who was in charge of

25  recruiting the volunteers, managing their
```

Confidential - Subject to Further Confidentiality Review

1    deployment, construction side, had a lot of input on

2    where the volunteers worked.  Let's see what else.

3    I think that's about all at that time.

4         Q.    The construction manager reported to the

5    director of operations; is that correct?

6         A.    To the director of operations and to me.

7         Q.    All right.  So the director of operations

8    was a direct report to you?

9         A.    Yes.

10        Q.    The construction manager was also a direct

11   report to you?

12        A.    For practical purposes, but org chart

13   purposes, not necessarily.

14        Q.    Okay.

15        A.    We're a fairly intimate organization, and

16   as a, you know, nonprofit with a lot of diverse

17   activities and all, we don't necessarily have real

18   sharply delineated lines of --

19        Q.    Right.

20        A.    -- communication.

21        Q.    Who was the director of operations in

22   2007?

23        A.    That would have been Elizabeth Lisle.

24        Q.    And who was the construction manager in

25   2007?

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Right.  I believe it was Mike Lopinto at
 2   that time.
 3        Q.    And what was Bob Marye's job title?
 4        A.    He was direct -- development director for
 5   major gifts and faith communities or major donors
 6   and faith communities.
 7        Q.    Did he have any involvement or
 8   responsibilities for overseeing construction of
 9   operations?
10        A.    No.
11        Q.    I would assume that those responsibilities
12   for oversight of construction would have been Mike
13   Lopinto?
14        A.    At that time.
15        Q.    From a finance perspective, who was
16   responsible for purchases for building a house, for
17   example, the materials that were necessary?
18        A.    In 2007?
19        Q.    Correct.
20        A.    That was -- I'm going to split the answer
21   into two parts.  I had an accounting department,
22   finance department that would handle the purchase
23   orders, the invoices, the checks and so forth.  The
24   actual decision on either materials or
25   subcontractors was made by the director of
```

Confidential - Subject to Further Confidentiality Review

1   construction in conjunction with the house leader.

2          The house leaders were -- at that time, we

3   called them house leaders, and there was only one

4   level.  And the house leader was a staff member who

5   was responsible for typically four to six houses at

6   any given time, and, basically, since they're

7   building the houses, if we needed the shingles

8   delivered, they would call and say, I need the

9   shingles delivered.  They would chose who to call or

10   they would be told who to call, either way,

11   depending on whether we had multiple vendors or subs

12   available or just one.

13          Most of the subcontractors and suppliers

14   were vetted by the management team, a lot of input

15   from the construction director, and that was

16   basically on delivery capacity and availability of

17   products through that vendor, reliability, cost.

18   You know, you could have a plumber who says he'll

19   plumb our houses for less, but if he never shows up

20   to do the finish out, then we got a problem with it.

21      Q.   Who vetted suppliers, for example?  Who

22   was responsible for that?

23      A.   There was not a particular single person

24   who did it at that time.  It was sort of a troika of

25   the construction director, director of operations,

Confidential - Subject to Further Confidentiality Review

1    with input from me, and from time to time

2    decision-making from me or decision-making from one

3    of them.

4        Q.   So the construction manager in 2007 would

5    have been involved in the process of selecting

6    vendors and subcontractors?

7        A.   That's correct.

8        Q.   And Elizabeth Lisle would have also been

9    involved in the process, as well; is that correct?

10       A.   Usually, yeah.

11       Q.   What about from a quality control

12   perspective?  Were there policies and procedures in

13   place at New Orleans Habitat with regard to quality

14   control of the products that were being used?

15       A.   Not of the products, of the -- you know,

16   the construction of the house had to meet code and

17   had to meet our standards.

18       Q.   But there wasn't a specific quality

19   control process with regard to evaluation of

20   products?

21       A.   No.

22       Q.   Who was responsible for quality control

23   with regard to the homes?  The building, the actual

24   building?

25       A.   The compliance with code and with our

Confidential - Subject to Further Confidentiality Review

1    designs?

2        Q.    Yes.

3        A.    The house leader, ultimately the

4    construction director.

5        Q.    Does Habitat New Orleans use a general

6    contractor, or do they consider themselves to be the

7    general contractor on a project?

8        A.    We are the general contractor.  We're

9    licensed as that.

10       Q.    You hold a license as a general

11   contractor?

12       A.    That's correct.

13       Q.    And you perform that function when you

14   build a house as the general contractor; is that

15   correct?

16       A.    Clarify what you mean.

17       Q.    New Orleans Habitat acts as the general

18   contractor when it builds a home; is that correct?

19       A.    That's correct.

20       Q.    You do sub out many of the

21   responsibilities for construction to subs, but

22   that's done through a formal process; is that

23   correct?

24       A.    We sub out what we call the trades,

25   electrical, plumbing, HVAC, those things that are

1   required to be done by a licensed electrician,

2   plumber.  We do not have those positions on staff.

3   Then we -- are you referring to 2007?

4       Q.   Yes.

5       A.   We typically subbed out a couple of other

6   things that we're not required to do by code, but we

7   found it to be easier and more efficient.  That

8   would be the foundation work and the flat work, in

9   other words, concrete and concrete block work.  And

10  then we would start with volunteers at the floor

11  system.  Later in the process, we always subbed out

12  the drywall work and the floor coverings.  Sometimes

13  we would sub out setting the cabinets.  Typically,

14  we did not.

15      Q.   At what point in time -- what year,

16  approximately, did you start subbing out the

17  drywall?

18      A.   We've always done it.

19      Q.   So you've always subbed out the drywall?

20      A.   Yeah.

21      Q.   So in 2007 and 2009, you were subbing out

22  the drywall; is that correct?

23      A.   That's correct.

24      Q.   I would assume that New Orleans Area

25  Habitat, because it's an independent 501(c)(3), has

```
 1    its own independent insurance; is that correct?

 2         A.    That is correct.

 3         Q.    Is there a broker that you use here in New

 4    Orleans?

 5         A.    It depends on the type of insurance.  We

 6    have -- we -- because we're carrying the mortgage

 7    note at zero interest for our families, at the

 8    beginning, we select the homeowners insurance,

 9    carrier and agent.  The homeowner has the right to

10    subsequently change agents, but since we're

11    collecting the escrow and paying it out, very, very,

12    very rarely has anyone switched off of them.

13              And then, on the flip side, for our --

14    I'll call it corporate.

15         Q.    Right.  And that's what I was referring to

16    there.

17         A.    That would be inclusive of our volunteer

18    insurance, our vehicle insurance, our builders risk

19    insurance, that category of stuff, general

20    liability.  That's the -- most of that, if not all

21    of it -- and I'm not 100 percent sure, but most, if

22    not all of that, is handled through the --

23    currently, the Lockton Agency -- I think I've got

24    that right, L-O-C-K-T-O-N -- and they're a Chubb

25    agent.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And how long have you been working with
 2    that group?
 3                  MR. GEORGE:  I object to this line of
 4                questioning, as well.  Like earlier, I
 5                mean, this is really far afield.  Again,
 6                you have seven hours today.  You can do
 7                what you want with it, but, you know,
 8                what's that issue in this case?  You said
 9                core-wise on the three homes.  Now you're
10                asking about insurance policies.
11                  MR. DUPLANTIER:  Right.  It's No. 3.
12                  MR. GEORGE:  Right.  It's not
13                relevant, and to the 403, it's way afield.
14    BY MR. DUPLANTIER:
15        Q.   You can answer the question.
16        A.   I'm not -- what's the question?  I thought
17    I had answered it.
18        Q.   How long have you been dealing with the
19    Lockton Agency?
20        A.   Lockton, I think about five, maybe seven
21    years now.
22        Q.   So since 2007?
23        A.   I think that's right.
24        Q.   Do you have any specific recollection as
25    to when New Orleans Habitat first discovered a
```

Confidential - Subject to Further Confidentiality Review

1    problem with imported drywall?

2          A.    Well, when we first learned it, for sure,

3    that we had a problem, was with Ricardo Crespo and I

4    forget the other homeowner's name.  I'm referencing

5    that with regards to Habitat homes.

6          Q.    Do you remember what period of time that

7    was?

8          A.    That would have been in either May or June

9    of 2009 -- or 2010.  I'm sorry.

10         Q.    When you say that, when you had a problem

11   with drywall, are you talking about the drywall that

12   you had purchased in 2007, or are you talking about

13   any problems with drywall?

14         A.    Well, we had used INEX drywall up until we

15   made the purchase, --

16         Q.    Correct.

17         A.    -- which was in March of 2007, I think.

18   The -- we were doing the Musicians' Village project.

19   The perimeter streets were complete, but the

20   interior streets we had to build, so we started on

21   the perimeter, and most of those houses were

22   INEX-provided drywall, because we started building

23   in about April 2006.  So the house I alluded to,

24   Ricardo Crespo, was one of the INEX houses, and we

25   had absolutely no idea that there was any issue with

1    that.  We had focused all of our testing protocol on

2    the Fly System drywall.  INEX had -- we had inquired

3    of INEX, and they had said, we've never used Chinese

4    drywall, so we didn't think that there was an issue

5    there.

6         Q.   Let me make sure I can -- I ask the

7    question a different way.  When did Habitat, New

8    Orleans Area Habitat first realize a need to at

9    least investigate the problem?

10        A.   Oh, okay.  I don't remember if it was --

11   exactly which news source, but it was a story

12   written by Aaron Keesler.  I think that's Sarasota

13   Times Herald.  We don't subscribe to that.  We're

14   not familiar with that, but it was picked up either

15   by AP or somebody, and we learned in January of 2009

16   that there was, first, such a thing as Chinese

17   drywall versus, you know, domestic drywall, and that

18   there was a problem with it and apparently had been

19   one developing.  And that would have been in two --

20   I want to say January 2009, late January, maybe

21   February.

22        Q.   At that point in time, did you report any

23   potential claims to your insurance company?

24        A.   Not at that time, I don't think.

25        Q.   I'm going to show you a series of letters.

Confidential - Subject to Further Confidentiality Review

```
 1                    MR. DAVIS:  While you're looking, is

 2            anybody in a black SUV?  They're parked in

 3            a bad spot.

 4                    MR. DUPLANTIER:  I am.

 5                    MR. GRAU:  Might be Rick's.

 6                    MR. DUPLANTIER:  Yeah.

 7                    MR. DAVIS:  It needs to be moved.

 8                    MR. DUPLANTIER:  Okay.

 9                    MR. LAMBERT:  Let's take a break.

10                    MR. DUPLANTIER:  Take a break.

11                    THE VIDEOGRAPHER:  The time now is

12            9:47 a.m.  We are now off the record.

13   (Off the record.)

14                    THE VIDEOGRAPHER:  The time now is

15            9:48 a.m.  We are now off the record.

16            This is the end of tape 1.

17   (Recess.)

18                    THE VIDEOGRAPHER:  The time now is

19            9:55 a.m.  We are now back on the record.

20            This is the beginning of tape 2.

21   BY MR. DUPLANTIER:

22      Q.   Mr. Pate, I presented to you three

23   letters.  The first one is dated August 11th, 2010,

24   from the Chubb Insurance Group to Margaret Sunkel,

25   and we've identified that as Exhibit 3 [sic].  Who
```

Confidential - Subject to Further Confidentiality Review

```
 1    is Ms. Sunkel?
 2            (Deposition Exhibit 2 was marked for
 3                    identification.)
 4       A.    She was -- at that time was our attorney.
 5       Q.    Was she hired by Habitat New Orleans or
 6    someone else?
 7       A.    We hired her, and I'm not -- I honestly
 8    don't know if we were paying her or Chubb was.
 9       Q.    This letter indicates that you had sent a
10    letter to the Federal Insurance Company on July 26,
11    2009.  Do you have any recollection about what claim
12    you were reporting to them at that time?
13       A.    The date's wrong.  I didn't send that
14    letter in 2009, I think.
15       Q.    Okay.  When -- you sent the letter in
16    2010?
17       A.    Yes.
18       Q.    All right.  And do you remember what claim
19    you were reporting to them?
20       A.    By July, we were alerting -- that would
21    have been Ricardo Crespo and the first three or four
22    houses that we found.  We had started our own
23    inspection protocol for visual corrosion and all.
24    And, frankly, when Ricardo came in and we told him,
25    you have INEX, there's not a problem, and he said,
```

Confidential - Subject to Further Confidentiality Review

```
 1    well, it says Made in China in my water heater

 2    closet.  And then he had a cross, silver cross, and

 3    he said, I've basically had this all my life, and

 4    I've never had problems with it tarnishing, and it

 5    was a grayish black.  So that prompted us to go

 6    start looking at the INEX homes, and we found

 7    several that showed visual signs of corrosion and

 8    all.  That's when we gave them the notice.

 9         Q.   Did you look at any of your own homes

10    at that time?

11         A.   No, not --

12              MR. GEORGE:   Objection.

13    BY MR. DUPLANTIER:

14         Q.   And when I say, "your own homes," I mean

15    homes where you would use the drywall that you would

16    purchase in 2007.

17         A.   You're talking the Fly System homes?

18         Q.   The Fly Systems.

19         A.   Not at that time, we didn't.

20         Q.   When you purchased the Fly Systems

21    drywall, were you aware that it was made in China?

22         A.   It was on the -- one of the bills of

23    lading or one of the documents referencing the sale,

24    but I don't believe any of us particularly paid --

25    or any of us.  I don't think I paid attention to --
```

1    it was the name Taishan -- I don't -- that it was,

2    quote, Chinese drywall.

3        Q.    There is a second letter which we'll

4    identify as Exhibit 4 [sic], which is dated

5    February 14th of 2011.

6            (Deposition Exhibit 3 was marked for

7                        identification.)

8            And, again, that's a response from Ace,

9    and it appears that they corrected the date, that,

10   in fact, your letter was dated July 26th of 2010.

11   And that was about the time period -- July 26, 2010,

12   is about the time period when you believe you first

13   became aware or New Orleans Habitat first became

14   aware that some of the drywall purchased from INEX

15   had been made in China; is that correct?

16       A.    That's correct.

17       Q.    Were you aware in July of 2010, that some

18   of the drywall that you purchased from

19   Interior/Exterior, from INEX, was the same

20   manufacturer as this Fly Systems drywall?

21       A.    No.  At the time, all we saw was Knauf.

22       Q.    So when you went to the Crespo home, all

23   you saw was Knauf?

24       A.    Yeah.  I think that's correct.

25       Q.    But when you inspected some of the other

Confidential - Subject to Further Confidentiality Review

1    INEX-supplied home, I'm assuming that you discovered

2    that it was Taishan drywall; is that correct?

3        A.   That was after we started the remediation,

4    yeah.

5        Q.   It was after the remediation.  And then

6    the third letter, which we'll identify as 5, is from

7    Ace USA.

8            (Deposition Exhibit 5 was marked for

9                    identification.)

10           Do you remember what type of coverage you

11   had with Ace USA?

12       A.   I think Ace is excess carrier.

13       Q.   Okay.  Do you know -- strike that.

14           Have either Chubb or Ace, have they

15   provided Habitat New Orleans with legal counsel?

16       A.   I don't really know the answer to that.  I

17   should, but I don't.  Chubb supplied one for a

18   couple of claims, individual claims, probably in

19   fall of -- I don't really remember the time frame,

20   but I just -- I don't -- guess I just don't really

21   know the answer.  I think that -- I think they have

22   paid for a lot of the legal fees.

23       Q.   What about the remediation?  Have they

24   assisted in funding the remediation?

25       A.   No.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Have any of your insurance companies

 2   assisted in funding the remediations?

 3        A.    Nope.  We've done that all out of funds

 4   that we've raised.

 5        Q.    Has Habitat International assisted in the

 6   funding of the remediation?

 7        A.    They made a $1 million zero interest loan.

 8              COURT REPORTER:  I'm sorry.  Say that

 9         again.

10              THE WITNESS:  $1 million zero interest

11         loan.

12        A.    The total remediation costs to date have

13   been about 11.8 million.

14   BY MR. DUPLANTIER:

15        Q.    Do you know what the total costs have been

16   for the INEX homes?

17        A.    I can't tell you off the top of my head.

18   We -- we expend about -- about 52 to 54,000 per

19   house, and that includes the move-out/move-in

20   funding for the family, their alternative housing.

21   We had rounded up a couple of hundred apartments

22   that we had kind of on hold for families.  We did

23   not start off with that because we didn't think that

24   was going to be an issue, but we ended up there

25   fairly short order.  But we paid for their
```

Confidential - Subject to Further Confidentiality Review

1    move-in/move-out, POD storage for their house and,

2    obviously, the hard cost of remediation.  And that

3    included the preservation of evidence under Judge

4    Fallon's ruling.

5              So the hard cost of the remediation

6    monitoring was probably about, depending on the

7    house -- we have bigger, smaller, different

8    structured houses -- hard cost of the remediation

9    was generally about 35,000.  The other costs up to

10   54 were the various ancillary costs to help the

11   family.

12             One thing that makes that remediation hard

13   cost different is that, when we build a house and

14   present it to the family, it's got -- for example,

15   all of the walls are all off-white.  Family moves

16   in, lives in the house.  They decide to paint the

17   daughter's back bedroom a pastel color.  When we did

18   the remediation, we matched that.  If they had

19   swapped out one of our light fixtures with something

20   fancier, we matched that.  So there was a little

21   variation, some variation on it.

22        Q.   Sure.

23             How many total homes have you remediated?

24        A.   215.

25        Q.   Of those 215, how many of those homes were

Confidential - Subject to Further Confidentiality Review

```
 1    INEX-supplied reactive drywall?

 2         A.    I think there were 11 that were INEX.

 3         Q.    So 11 of the homes were INEX-supplied, and

 4    approximately 204 of the homes were drywall that had

 5    been supplied by Habitat of New Orleans; is that

 6    correct?

 7         A.    Fly Systems drywall.

 8         Q.    Right.  But you purchased it directly from

 9    Fly Systems; is that correct?

10         A.    That's correct.

11         Q.    Have you sued Fly Systems?

12         A.    Yes.

13         Q.    Where?

14         A.    I don't -- my lawyers handled it.

15               MR. GEORGE:  That was not a topic.

16         A.    I think -- I think they're brought into

17    the multi-district.

18    BY MR. DUPLANTIER:

19         Q.    Well, has Habitat filed any individual

20    suits against Fly Systems?

21               MR. GEORGE:  Objection.  It's beyond

22          the scope of the deposition today.

23    BY MR. DUPLANTIER:

24         Q.    You can answer the question.

25         A.    I don't know the answer to that.
```

Confidential - Subject to Further Confidentiality Review

1        Q.    All right.  I'm going to go back a little

2    bit for you.  There was a significant document

3    production that was made by Habitat, Mr. Pate, as

4    I'm sure you're aware.  Many, many, many of the

5    e-mails are e-mails that were forwarded to Aleis --

6    is it Aleis Tusa --

7        A.    Aleis Tusa.

8        Q.    -- on December 9th -- on December 7th of

9    2009 or December 9 of 2009.  Is there a reason

10   during that period in time why everyone was

11   forwarding their drywall e-mails to Aleis?

12       A.    The only thing I can recall is -- that

13   particular date doesn't ring a bell with me, but --

14   December 2009?

15       Q.    Yeah.

16       A.    We had -- and I don't recall particularly

17   the time frame, but we had someone who had gotten

18   some of the Fly Systems drywall from the ReStore and

19   had filed -- or had contacted us and said it was bad

20   drywall.  Their particular house had a mixture --

21   according to them, a mixture of Lowe's, Home Depot

22   and our ReStore drywall, and we handed it over to

23   the insurance company.  I don't recall exactly when

24   that time frame was.

25       Q.    You will agree with me that Habitat of New

Confidential - Subject to Further Confidentiality Review

```
 1   Orleans, including yourself -- strike that.

 2              You will agree with me that Habitat of New

 3   Orleans, through you on many occasions, continued to

 4   believe until late -- strike that.

 5              You will agree with me, Mr. Pate, that

 6   Habitat of New Orleans, through statements that you

 7   made, at least until June of 2010, continued to

 8   believe that your Fly Systems Taishan drywall was

 9   nonreactive; is that correct?

10              MR. GEORGE:  Objection to form.

11      A.   We believed that our drywall was not --

12   the Fly System drywall was nonreactive.

13   BY MR. DUPLANTIER:

14      Q.   And you had determined prior to that point

15   in time that the Fly Systems drywall was, in fact,

16   Taishan drywall; isn't that correct?

17              MR. GEORGE:  Objection to form.

18      A.   That is correct.

19              MR. DUPLANTIER:  What was the

20          objection?

21              MR. GEORGE:  Hhm?

22              MR. DUPLANTIER:  What was the

23          objection?

24              MR. GEORGE:  It's leading and lack of

25          foundation.
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. DUPLANTIER:

 2        Q.   All right.  I'm going to take a step back

 3    for a bit.  I'm going to give you Exhibit 6, which

 4    is an e-mail chain.

 5        (Deposition Exhibit 6 was marked for

 6                     identification.)

 7             MR. GEORGE:  Do you have a copy I can

 8        see?

 9             MR. GRAU:  You gave me two.

10             MR. DUPLANTIER:  Oh, I gave you two.

11             MR. GEORGE:  Thank you.

12        A.   (Reviewing document.)  Okay.

13    BY MR. DUPLANTIER:

14        Q.   Who is Amanda Curylo?

15        A.   She was on staff, and I believe that she

16    was either AmeriCorps or Vista.

17        Q.   What was her job?

18        A.   She would have been on the -- as I recall,

19    she was on the construction side.  I -- what is

20    that?

21        Q.   January 4th of 2007.

22        A.   Yeah.

23        Q.   And Elizabeth Lisle was the director of

24    operations?

25        A.   That's correct.
```

Confidential - Subject to Further Confidentiality Review

1       Q.    And Elizabeth would have been the person

2    responsible for coordinating the bulk purchase of

3    the Fly Systems drywall; is that correct?

4       A.    I wouldn't couch it that way.

5       Q.    Who was?

6       A.    I think it was collective decision of me.

7    What I had asked Elizabeth -- actually, I'm not sure

8    I asked her to or whether she took it upon herself.

9    But she's talking about moving it around, whether we

10   move it out of Dupuy to some other facility or

11   whether we leave it in Dupuy, how much it would

12   cost, so forth.  All of that was part of the dynamic

13   to figure out if it made sense for us to do the

14   purchase.

15      Q.    Who made the decision?

16      A.    Ultimately, I made the decision to go

17   forward on it.

18      Q.    And why did you do it?

19      A.    Why did I make the decision?

20      Q.    Correct.

21      A.    A lot of factors.  The chief one at that

22   time was that we felt like, if we had it, it would

23   be a reliable source.  We were having problems with

24   having drywall delivered.  You know, might not even

25   be available.  We'd call someone and they'd say, I

```
 1    don't have any.  Or I would need it Friday afternoon
 2    or Saturday morning, and they'd say, I can't get it
 3    to you till next week.
 4              And to kind of put that in context, we
 5    build our homes in partnership with our volunteers,
 6    and they fluctuate day-to-day, the number we have
 7    there, so we're not sure when they were going to
 8    finish, for example, the frame-out on the house.  So
 9    we don't have a hard and fast schedule that says,
10    for example, on the 32nd day of construction, the
11    drywall is delivered.  So we would have to basically
12    ask to have it delivered at the house on fairly
13    short notice, and that wasn't reliable.  That was a
14    major, major factor, was availability and
15    reliability of delivery of drywall.
16         Q.    Did Habitat International get involved in
17    the process to decide -- of deciding whether you
18    should purchase that drywall?
19         A.    Not in any direct sense.  They had a guy
20    named Ken Meinert who was part of what they called
21    Operation Helping Hands, and that was their Gulf
22    Coast initiative.  Most of it -- for us, it was
23    mostly just cash.  For some of the smaller
24    affiliates, they couldn't deal with the crisis, so
25    Habitat International actually provided volunteer
```

Confidential - Subject to Further Confidentiality Review

```
 1    teams, not necessarily Habitat International

 2    employees, but volunteer teams or sometimes

 3    employees.

 4              Ken Meinert was part of the Operation

 5    Helping Hands on the international side.  We

 6    interfaced with him; if we decided to do that, can

 7    we get funding from International.  It's money that

 8    was coming to us.  They had already allocated for

 9    New Orleans Habitat, but they asked us to keep them

10    posted on it as we were drawing money down so they

11    could keep their donors informed.

12              So I'm sure at some point we asked Ken

13    about, if we made a purchase like this, would the

14    fund -- how long would it take to get the funding if

15    we had to close it.  I say that in contraposition to

16    making a decision.  He had nothing to do with the

17    decision.  It was just like, you know, telling your

18    bank, we may need to set up a line of credit and

19    draw down on it at a certain time; is it going to be

20    available?

21         Q.   Well, they paid for it, right?

22              MR. GEORGE:   Objection.

23    BY MR. DUPLANTIER:

24         Q.   "They," being Operation Helping Hands,

25    provided the direct funds for the purchase of that
```

Confidential - Subject to Further Confidentiality Review

1    Fly Systems drywall; isn't that true?

2                  MR. GEORGE:   Objection.

3    BY MR. DUPLANTIER:

4        Q.   You can answer it.

5        A.   I believe the check was our check.

6        Q.   Did they reimburse you for that expense?

7        A.   It may have been a reimburse.   They may

8    have sent it ahead of time.   But, understand, they

9    were sending ultimately $19 million in bits and

10   pieces over, I guess, a couple of years.

11       Q.   Did you do any cost/benefit analysis over

12   the price that you were paying at that time to

13   drywall suppliers versus the price that you were

14   paying for the hundred -- you purchased 100,000

15   sheets, and you were given 20,000 sheets, correct?

16       A.   Uh-huh.

17       Q.   And you paid approximately a million

18   dollars; is that correct?

19       A.   Uh-huh.

20       Q.   So it was a million dollars for 120,000

21   sheets; is that correct?

22       A.   Well, or a million for 100,000 with 20

23   donated.   But, yeah, a million for 120, and the --

24   we did a cost/benefit analysis in a -- to a certain

25   extent, but it wasn't -- price wasn't the issue to

Confidential - Subject to Further Confidentiality Review

 1    us so much; it was availability.

 2         Q.    Because it wasn't just the price that you

 3    were paying for the drywall; you were going to have

 4    to pay for storage; is that correct?

 5         A.    Right.

 6         Q.    You were going to have to pay for it to be

 7    moved every time it was moved; is that correct?

 8         A.    That's correct; pallet fee.

 9         Q.    And you paid a five-dollar --

10    approximately about a five-dollar per pallet fee for

11    moving them from the warehouse; is that right?

12         A.    That's correct.

13         Q.    Do you know ultimately what the total --

14         A.    Let me -- let me back off, correct one

15    thing.

16         Q.    Sure.

17         A.    The pallet fee moves it to the dock.

18         Q.    Right.

19         A.    So we either had to pay to have it

20    delivered or we had to use one of our vehicles to

21    deliver it.

22         Q.    And sometimes you were having to pay for

23    these deliveries, as well; is that right?

24         A.    It wasn't very frequent.  We usually

25    had -- at that time, if I recall correctly, we had

Confidential - Subject to Further Confidentiality Review

1    about three 16-foot trailers which would hold a

2    pallet.  So we just -- our house leader or

3    construction staff or one of our AmeriCorps would

4    drive the trailer over there, they'd put the pallet

5    on it, they'd drive it back to the job site.

6         Q.    As we sit here today, for the drywall that

7    you purchased in 2007, can you tell me what, on a

8    per-sheet basis, it ended up costing Habitat of New

9    Orleans?

10        A.    I couldn't give you that number.  I can

11   tell you that the cost per sheet, while less than

12   what we were paying, for example, INEX --

13        Q.    Correct.

14        A.    -- was a little less when you factor in

15   these other things, I'm not sure that it was

16   necessarily any less, because INEX -- it was not

17   only the cost of the drywall but delivery, and in

18   their case, one of the reasons we used them is that

19   they would actually -- we call it loading.  They'd

20   move the drywall into the house.  We had other

21   suppliers who, you know, put the pallet on the

22   ground out front, and volunteers had to carry it in

23   and stack it up, or the subcontractor.

24        Q.    Right.

25        A.    Probably more often than not, it was the

Confidential - Subject to Further Confidentiality Review

```
 1    subcontractor.

 2        Q.    With INEX, you didn't have that problem,

 3    correct?

 4        A.    Delivery?

 5        Q.    Yeah.

 6        A.    That's correct.

 7        Q.    I have --

 8              MR. DUPLANTIER:  And I don't have

 9              copies of this.  I'm sorry.  We copied --

10              we made copies of exhibits as best we

11              could.

12    BY MR. DUPLANTIER:

13        Q.    I'm going to give you what we'll identify

14    as Exhibit 7.

15          (Deposition Exhibit 7 was marked for

16                    identification.)

17              MS. LESSELL:  Rick, just so the record

18              is clear, can you identify by Bates number

19              if there is one?

20              MR. DUPLANTIER:  Sure.

21              Let me see this at the bottom.

22              It's Bates numbers NOAHH-9004.

23    BY MR. DUPLANTIER:

24        Q.    And I'm going to ask you to read this.  I

25    need to run to the restroom.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    MR. DUPLANTIER:  Just let him read it
 2          and don't do the whole let's go off the
 3          record.
 4                    MR. GEORGE:  Can I ask a question?
 5                    MR. DUPLANTIER:  Sure.
 6                    MR. DAVIS:  Can we get some copies?
 7                    MR. DUPLANTIER:  I think he's pulling
 8          out the copies real quick.
 9                    MR. GRAU:  Sorry.
10                    THE VIDEOGRAPHER:  Go off the record?
11                    MR. LAMBERT:  Yeah.
12                    THE VIDEOGRAPHER:  The time now is
13          10:19 a.m.  We are now off the record.
14    (Recess.)
15                    THE VIDEOGRAPHER:  The time now is
16          10:22.  We're now back on the record.
17          This is a continuation of tape 2.
18    BY MR. DUPLANTIER:
19        Q.    Who is Amanda Curry?
20        A.    I think I've already answered that.  She's
21    with AmeriCorps Vista, I believe.
22        Q.    Who first raised the issue about buying
23    the drywall; is that right?
24        A.    No, she did not raise it.
25        Q.    Who did?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   I think it was Mike Lopinto.  Don't hold
 2   me to that.  I don't -- I don't recall who Fly
 3   Systems originally contacted.
 4             MR. GEORGE:  This was discussed
 5             earlier.  Objection; asked and answered.
 6   BY MR. DUPLANTIER:
 7        Q.   Do you remember seeing this letter back in
 8   2007, when the issue first was being discussed?
 9        A.   Yes.  All of it came -- I think, to my
10   knowledge, all of it came across my desk.
11        Q.   Has this been marked as 7?
12        A.   It's marked 7 on here.
13             MR. GRAU:  Yeah.
14   BY MR. DUPLANTIER:
15        Q.   This letter clearly indicates the
16   manufacturer of the drywall; is that correct?
17        A.   Yeah.
18             MR. GEORGE:  Objection to form.  The
19             document speaks for itself.
20   BY MR. DUPLANTIER:
21        Q.   Did you, before making the decision, go
22   and inspect the drywall at the warehouse?
23             MR. GEORGE:  Objection.  You mean him,
24             Jim Pate, personally, --
25             MR. DUPLANTIER:  Yeah.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. GEORGE:  -- or Habitat?

 2              MR. DUPLANTIER:  No, him.  He said he

 3        made the -- you made the decision.

 4      A.    No, I personally did not go to the

 5   warehouse and look at it.

 6   BY MR. DUPLANTIER:

 7      Q.    Do you know who did?

 8      A.    Amanda and -- I don't recall who else saw

 9   it.  A couple of my staff went over and looked at

10   it.

11      Q.    Which ones?

12      A.    I don't recall.

13      Q.    What were their job responsibilities?

14      A.    Well, one -- they would have either been

15   in operation side with Elizabeth or her designee.

16   Bob Marye may have gone over and looked at it.  I

17   don't know.

18      Q.    Have you talked to Bob about this?

19      A.    No.  Bob left years ago.

20      Q.    All right.  Have you talked with Bob at

21   all about the Chinese drywall problem?

22      A.    No.  Well, let me back up.  At the time

23   that it arose?

24      Q.    Since he left Habitat.  Let me say --

25      A.    No, not since he left.
```

```
 1        Q.    Did Bob go and inspect the drywall?

 2        A.    I don't recall who did.

 3        Q.    What were they looking for when

 4   they inspected it?

 5        A.    To see if it was there, how much space it

 6   was taking.  I mean, that's all I recall getting

 7   reported -- having reported to me.

 8        Q.    Did they look at the markings on the

 9   drywall?

10        A.    It said Crescent City on it.

11        Q.    Did it also indicate that it was made in

12   China?

13        A.    It probably had the Taishan name on it.

14        Q.    Did that indicate to you that it was made

15   in China?

16        A.    Not particularly.  I mean, it makes sense

17   now, but at the time, you know...

18        Q.    Would it have made a difference to you if

19   you knew at the time it was made in China?

20        A.    Probably not.  I had never heard of any

21   kind of issue with drywall anywhere, period.

22        Q.    All right.

23        A.    I mean, drywall is -- in theory, is

24   crushed -- I mean pressed gypsum, and some of it

25   has, as I understand, fly ash in it, although I'm
```

Confidential - Subject to Further Confidentiality Review

1    not sure I knew that at the time.  It's -- what I'm

2    trying to say is, it's something you mine out of the

3    ground and press into sheets.

4         Q.    You have been the executive director

5    of New Orleans Area Habitat for 12 years;

6    is that right?

7         A.    That's -- that's correct.

8         Q.    You're in the business of building houses,

9    right?

10              MR. GEORGE:   Objection.

11        A.    No.  Our mission includes building houses,

12   but an important part of it is the dynamic of how we

13   do it.  Because we believe that decent and

14   affordable housing is a matter of conscience, and

15   the way that you make it a matter of conscience is

16   by involving the volunteers in the process, and the

17   partner families do their sweat equity working on

18   other Habitat houses and ultimately their own, so

19   that the volunteers who are drawn from all

20   socioeconomic and demographic areas and are what we

21   call partner families, they're ultimate homeowners,

22   get to know each other, realize that people who are

23   lower income are just like them with the same dreams

24   and aspirations.  So the -- historically, two

25   critical distinctions about what Habitat does is the

Confidential - Subject to Further Confidentiality Review

1    use of volunteers and the sweat equity component of

2    the families.

3              The end result is a house, and the house

4    is built to code, and we like to think we build a

5    very fine house structurally and all.  But, yeah, to

6    that extent, building houses is part of what we do.

7    BY MR. DUPLANTIER:

8        Q.   You've never had a problem with any type

9    of drywall you've ever used before, have you?

10       A.   No.

11       Q.   And, in fact, at the time that you built

12   these houses in 2007 with INEX drywall, you didn't

13   have any problems with the drywall, did you?

14       A.   No.  But -- no, we did not.  No.

15       Q.   No one had any complaints about the

16   drywall at the time you used it in 2007, that you're

17   aware of?

18       A.   That's correct.  You need to be aware

19   that -- and I've mentioned this earlier -- that we

20   sub out all our drywall.

21       Q.   I understand.

22       A.   All right.

23       Q.   In 2007, who were you subbing your drywall

24   out to?

25       A.   I don't recall.  We haven't had one

Confidential - Subject to Further Confidentiality Review

1    long-term ongoing drywall installer that's kind of

2    a -- people get in and out of it.

3         Q.   Have you -- has anyone on behalf of

4    Habitat of New Orleans gone back and talked with the

5    drywall installers from 2006 and 2007 about the

6    homes that were built at that time period?

7         A.   No.

8         Q.   Are you aware of any that -- the drywall

9    installers having any problems with the drywall that

10   you purchased from INEX?

11        A.   No.  And we -- no, do not.

12        Q.   So going back to this purchase of this

13   $100,000 -- 100,000 pieces of Taishan drywall, once

14   you purchased that, did you continue to obtain

15   drywall from any other source?

16        A.   I don't believe so.  There's one

17   exception.  We initiated a program during the

18   post-Katrina period that we called -- what was it

19   called -- Home in a Box.  And, basically, what we

20   did is, we had a lot of acquaintances, corporate

21   faith community in other parts of the country who

22   wanted to help and the communities wanted to help,

23   and I came up with the concept of having them frame

24   the house according to our plans, just the

25   components, the wall components and all, in a public

Confidential - Subject to Further Confidentiality Review

1    place, a church parking lot, shopping center,

2    parking lot, whatever, and parallel with that,

3    solicit donations of everything else to go in the

4    house that was reasonable.  For instance, the

5    heating, air conditioning, plumbing fixtures,

6    electrical, everything, all according to our

7    specifications.  So if somebody wanted to do a House

8    in a Box, they got a set of plans and they got that,

9    and we had some conversation with them.

10         They would do this in most -- I think all,

11   if not all, the vast majority of the Home in a Box

12   houses, they bought the drywall locally and put it

13   in the 18-wheeler they sent to us.  So we'd get a

14   whole house in that we would assemble on our

15   foundation and forces.

16         Q.   Have you found any of those homes with

17   reactive drywall?

18         A.   No.

19         Q.   So other than the Home in a Box -- how

20   many of those did you build?

21         A.   Probably about 10 or 12.

22         Q.   So other than that drywall, you -- Habitat

23   of New Orleans started exclusively using the drywall

24   from the warehouse that they bought; is that

25   correct?

```
 1        A.    I believe that's correct.

 2        Q.    And, in fact, you started giving some of

 3   that drywall to nonprofits at one point in time; is

 4   that correct?

 5        A.    That's correct.

 6        Q.    During that period of time that you were

 7   using the drywall, were there any complaints about

 8   that particular drywall, at the time you were using

 9   it and installing it in 2007?

10        A.    Not the drywall.

11        Q.    Were there complaints about something

12   else?

13        A.    Transport, moving it.  In our case, I

14   mean, that wasn't our warehouse and those weren't

15   our forklift operators, --

16        Q.    Right.

17        A.    -- pallet folks, and our trailers were

18   just run-of-the-mill, 16-foot flatbed trailers.

19   They're not trucks or vehicles specifically designed

20   to carry drywall and so forth.

21             So sometimes, you know, we'd have -- the

22   most common thing was, you've got the square of

23   drywall, is the -- one of the corners getting bumped

24   by a forklift or another pallet.  So instead of

25   having a pure 4-by-12 sheet or 4-by-8 sheet, there'd
```

Confidential - Subject to Further Confidentiality Review

```
 1    be a chunk out of the corner of several.  That's --
 2    that was not common, but that was an occasional
 3    complaint, so we talked with Dupuy about being
 4    careful with our drywall.
 5         Q.   Were there any complaints about an odor
 6    with regard to the drywall?
 7         A.   None whatsoever.
 8         Q.   Let me ask you this:  At what point did
 9    you open the ReStore?
10         A.   The ReStore was open before Katrina.
11         Q.   Okay.
12         A.   I had -- and I want to say we entered into
13    the lease -- we leased the property, the warehouse,
14    ReStore building, probably 2003, maybe -- I think it
15    was probably late 2002 or 2003.
16         Q.   At some point, not only did you start
17    giving away the drywall, you started selling it; is
18    that correct?
19         A.   A very small amount, hopefully to defray
20    the cost of storage and handling.
21         Q.   How many pieces did you sell out of the
22    ReStore?
23         A.   I don't know exactly.  It was about
24    $20,000 worth, and we sold it either at our cost or,
25    in some cases, less than what we paid for it.
```

1      Q.   Do you know if the ReStore sold any other

2   brand of drywall?

3      A.   No.

4      Q.   Has the ReStore or has Habitat New Orleans

5   tracked down the sale -- the owners who bought that

6   drywall from the ReStore and put them on notice that

7   they may have defective drywall?

8      A.   No.

9      Q.   Why not?

10     A.   Because we didn't have records of all of

11  them.  Sometimes Joe the contractor would buy it and

12  go put it in Ms. Smith's house, for example, so...

13     Q.   Well, have you put Joe the contractor on

14  notice that he may have bought bad drywall from

15  Habitat of New Orleans?

16     A.   No.

17     Q.   Have you put anybody on notice who bought

18  drywall?  Have you attempted to locate where that

19  drywall went?

20     A.   I -- I'm not sure of the answer to that,

21  but we -- we have not reached out to the people who

22  purchased it.

23     Q.   Who runs the Habitat ReStore now?

24     A.   Now?

25     Q.   Yeah.

```
 1        A.    Earl -- and I'm drawing a blank on Earl's

 2   last name, on my staff.  He's been running it -- I

 3   think we hired him a number of months ago.

 4        Q.    How about before Earl?

 5        A.    We've had several people who have run it.

 6   The person who ran it to start with when we opened

 7   it was Courtney Lemoine, who's moved back to New

 8   York City and gotten her master's degree.  And then

 9   it was run by Laurie -- and, again, I don't recall

10   Laurie's last name -- for about a year.  And then

11   we've had several other people run it.  You know,

12   some people do well at it and some don't.

13        Q.    Well, I just want to make sure I

14   understand --

15        A.    Right.

16        Q.    -- correctly.

17              You sold approximately $23,000 worth of

18   drywall from the ReStore; is that correct?

19              MR. GEORGE:  Objection to form.

20   BY MR. DUPLANTIER:

21        Q.    Let's -- let me clear up any objection, so

22   let's take a look.

23              MR. GEORGE:  And asked and answered.

24   BY MR. DUPLANTIER:

25        Q.    I'm going to mark this e-mail dated
```

Confidential - Subject to Further Confidentiality Review

```
 1    November 11th, 2009, as Exhibit 8.

 2              (Deposition Exhibit 8 was marked for

 3                       identification.)

 4                   MS. DONOHUE:  The Bates number?

 5                   MR. DUPLANTIER:  It is Bates 2862.

 6                   MR. GEORGE:  Thank you, Rick.

 7         A.   (Reviewing document.)  Okay.

 8    BY MR. DUPLANTIER:

 9         Q.   Who is Frank Cannon?

10         A.   Frank was in the finance department.

11         Q.   He reported to you?

12         A.   Reported to Lisa.

13         Q.   Who reported to you?

14         A.   Correct.

15         Q.   And he's reporting revenue from drywall

16    sales for the Habitat ReStore of -- as of November

17    11th, 2009, as $23,066.  Do you recall that?

18         A.   That's what it says, yes.

19         Q.   Yeah.  Okay.

20         A.   That's consistent with what I recall it

21    being.

22         Q.   At this point in time, in November 11th of

23    2009, why was he being asked to track drywall sales?

24         A.   Because -- he wasn't being asked to track

25    them.  We had stopped selling it out of the ReStore
```

Confidential - Subject to Further Confidentiality Review

```
 1   by then.

 2        Q.    When did you stop selling it?

 3        A.    Probably October.

 4        Q.    But you were continuing to sell it in --

 5        A.    2009.

 6        Q.    -- in October of 2009, right?

 7        A.    Yeah, probably.

 8        Q.    And who made the decision to stop selling

 9   it?

10        A.    Me.

11        Q.    And why did you make that decision?

12        A.    I just felt like -- I think -- am I

13   recalling the year correctly?  2009 is when...

14        Q.    If you can't recall, it's okay.

15        A.    I don't recall.  Yeah, that's right.

16   2009.  I can't recall why.  No one said to.

17        Q.    The Consumer Product Safety Commission

18   hadn't told you --

19        A.    Not at that time.

20        Q.    -- that there was a problem at that time?

21        A.    That's correct.

22        Q.    So you just voluntarily, just out of the

23   kindness of your heart, stopped selling it?

24              MR. GEORGE:  Oh, come on, Rick.

25              MR. DAVIS:  Objection.  Just make the
```

```
 1              objection.

 2                   MR. GEORGE:  Objection.

 3                   MR. DAVIS:  Just make the objection.

 4              Let's move on.

 5   BY MR. DUPLANTIER:

 6        Q.    I'm trying to understand why you decided

 7   to stop selling the drywall from the ReStore that

 8   you were obviously -- it was an income stream, and

 9   I'm trying to understand why you stopped selling it.

10                   MR. GEORGE:  Objection to form.

11                   You can answer the question again if

12              you want.

13                   THE WITNESS:  I'm sorry.  What?

14                   MR. GEORGE:  You can answer his

15              question.

16        A.    We decided in that fall of 2009, because

17   everything was breaking loose.  I think the Keesler

18   story came out, whatever it was, February of 2009.

19   He came and interviewed me in February -- I think

20   I've got the year correct here, but in any event,

21   over the course of several months, we were actively

22   involved with the EPA consumer safety folks.  The

23   combined federal/state group would ask questions of

24   us.  We supplied documentation, including to the

25   State Attorney General, concerning all of this.
```

Confidential - Subject to Further Confidentiality Review

```
 1              And, ultimately, what I decided was that
 2    it was all way too fuzzy, and, you know, while we
 3    had not found anything, there was just too much
 4    background noise on it, that there might be issues
 5    and problems.  And since we can't test every sheet
 6    of it, I decided that we would stop using it, we'd
 7    stop giving it through our donated drywall program
 8    and stop selling it at the ReStore.  All of that was
 9    in October of that year.
10    BY MR. DUPLANTIER:
11        Q.   After this point in time, when you made
12    the decision to stop selling the drywall and up to
13    now, have you made any effort to track where that
14    drywall went?
15              MR. GEORGE:  Objection to form.  The
16              sold drywall?
17              MR. DUPLANTIER:  Yes.
18              MR. GEORGE:  Asked and answered.
19        A.   The sold drywall?
20    BY MR. DUPLANTIER:
21        Q.   Correct.
22        A.   No.
23        Q.   Do you know how many Habitat ReStore
24    customers have contacted Habitat to complain about
25    problems with corrosive drywall?
```

Confidential - Subject to Further Confidentiality Review

```
1        A.    Maybe two.

2        Q.    Have you remediated those homes?

3        A.    No.

4        Q.    Have you compensated those

5    homeowners?

6        A.    No.  Well, let me rephrase that.  There

7    was one person who complained and filed suit.  As I

8    said, I sent my team over to look.  We didn't see

9    corrosion as we understood it, and her general

10   contractor, who was a friend of hers, said that the

11   house had Home Depot, Lowe's and ReStore drywall in

12   it, that he kind of mixed it up.  So we didn't know

13   what rock was where, but she's claiming that she had

14   bought from us.  We turned it over to the insurance

15   company.  They did settle with her.  We just

16   basically relied on their call on that.

17       Q.    What's her name?  Do you know?

18             MR. GEORGE:  Objection.  Who?

19   BY MR. DUPLANTIER:

20       Q.    The homeowner, the "she" you referred to.

21       A.    I think it was Simon.

22       Q.    I'm going to give you what we'll attach as

23   Exhibit 9 in globo.  It is Habitat Bates numbers

24   3435, 3436 and 3437.

25             (Deposition Exhibit 9 was marked for
```

Confidential - Subject to Further Confidentiality Review

```
 1                      identification.)
 2              MR. GEORGE:  Thank you.
 3   BY MR. DUPLANTIER:
 4       Q.   You -- I think you referred to these
 5   documents earlier.
 6       A.   Are there three of them or what?
 7       Q.   It appears to be three different
 8   documents.
 9       A.   But you've handed me one.
10       Q.   No.  There are three -- I'm sorry.
11   There's three --
12       A.   Three pages.
13       Q.   It's one document that's three pages.
14   It's three different timelines, I believe.  I'm not
15   really sure, and that's why I'm going to ask.
16   (Off the record.)
17   BY MR. DUPLANTIER:
18       Q.   This may be one timeline, as well, and
19   that's what I'm going to try and find out.
20       A.   (Reviewing document.)
21       Q.   Do you recall this timeline?
22       A.   Yes, uh-huh.
23       Q.   Was there more than one timeline prepared?
24       A.   It was prepared piecemeal.
25       Q.   Okay.
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    And I had to pull from different sources

 2    and files, so sometimes the dates got garbled.

 3        Q.    Who prepared this?

 4        A.    Aleis Tusa.

 5        Q.    Why?

 6        A.    I asked her to keep a timeline.

 7        Q.    Did you have input into the timeline?

 8        A.    No.

 9        Q.    Do you know if anybody else did?

10        A.    Well, some of the early stuff, like the

11    Fly Systems letter on the sale and all, she had to

12    go pull that out, and that was in one of Bob Marye's

13    files.

14        Q.    Okay.

15        A.    But in terms of actually pulling together

16    the dates and times and all, you know, Aleis did

17    that.  She went and tracked down the documents and

18    so forth.

19        Q.    Does she still work with you?

20        A.    Yes.

21        Q.    Did you provide her any of the information

22    that went into this timeline?

23              MR. GEORGE:  Objection.

24        A.    I don't -- I don't believe so, but I can't

25    say completely that that's the case.
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. DUPLANTIER:

 2         Q.    Do you believe that it's accurate?

 3         A.    The timeline?

 4         Q.    Yes.

 5         A.    I think it's probably pretty close to

 6    accurate.  But, again, I -- you know, I honestly

 7    haven't studied it all that hard.

 8         Q.    Well, let's talk about some of the factors

 9    here.  This particular timeline -- strike that.

10                What did you do with this timeline?  What

11    was it used for?

12         A.    At the -- at the time, she -- I just felt

13    like we needed a record of what was going on

14    without -- that we could quick reference.

15         Q.    Okay.

16         A.    Aleis is, as I have mentioned earlier,

17    director of communications.

18         Q.    Correct.

19         A.    So part of the rationale for this was that

20    we had Keesler and Joaquin Sapien from ProPublica

21    coming in interviewing.  Obviously, it had made

22    local news and -- we were not the initiator of the

23    local news coverage of Chinese drywall, corrosive

24    drywall issues, but, occasionally, we were contacted

25    by local reporters and all, so this was helpful in
```

Confidential - Subject to Further Confidentiality Review

1    preparing for an interview or whatever.  That was

2    part of it.

3        Q.   At some point in time, you asked one of

4    the Habitat employees to monitor the multi-district

5    litigation proceedings; isn't that true?

6              MR. GEORGE:  Objection.

7        A.   I asked a staff person --

8    BY MR. DUPLANTIER:

9        Q.   Yes.

10       A.   -- to monitor it?

11       Q.   Yes.

12             MR. GEORGE:  Rick, I object to that as

13             beyond the scope of this deposition.

14   BY MR. DUPLANTIER:

15       Q.   Okay.  You can still answer it.

16       A.   I -- I don't -- I don't think I assigned

17   somebody, you follow this litigation.  I have staff

18   meetings every Tuesday, so I can't say that I didn't

19   say, call Margi and find out what's going on here or

20   something.  I don't know.

21       Q.   Well, do you know if, in fact, someone on

22   staff was monitoring what was going on in the MDL

23   proceedings?

24             MR. DAVIS:  I'm going to --

25             MR. GEORGE:  Same objection.

```
 1                    MR. DAVIS:  I'm going to also make an
 2              added objection insofar as it may call for
 3              some privileged information insofar as
 4              litigation was already in the works, and
 5              Counsel may have been involved in matters.
 6                    MR. DUPLANTIER:  Okay.
 7    BY MR. DUPLANTIER:
 8         Q.   I don't want to know anything that
 9    you discussed with your lawyers.  I don't want to
10    know anything that your lawyers told you to do.
11    What I'm interested in is, who at Habitat instructed
12    a staff member who reported to Aleis Tusa to monitor
13    the MDL proceedings?
14                    MR. GEORGE:  Objection.
15                    MR. DAVIS:  Again, I just want to be
16              clear.  You're not asking if any direction
17              came from a lawyer?
18                    MR. DUPLANTIER:  No, no.
19                    MR. DAVIS:  It's purely within
20              Habitat?
21                    MR. DUPLANTIER:  Correct, correct.
22                    MR. DAVIS:  Just note my objection.
23    BY MR. DUPLANTIER:
24         Q.   If a lawyer told you to do it, tell me
25    that, and I'll stop asking questions.
```

1        A.   I would answer that by saying I am unaware

2    of any staff member being directed internally to

3    monitor multi-district.

4              MR. GEORGE:  I think we have a tape

5              issue.  Do you want to go off record for a

6              second to --

7              MR. DUPLANTIER:  No, no.  Not yet.

8              Let's go to the end.

9              THE VIDEOGRAPHER:  We have about seven

10             minutes.

11   BY MR. DUPLANTIER:

12        Q.   Let's go back to the timeline.  It appears

13   from this timeline that, as far as significant

14   events, in the mind of Aleis Tusa and Habitat of New

15   Orleans, nothing very significant occurred between

16   the time that you purchased it in February of 2009?

17             MR. GEORGE:  Objection to form.

18   BY MR. DUPLANTIER:

19        Q.   Is that correct?

20        A.   Repeat the question.

21             MR. DUPLANTIER:  You want to read it

22             back to him?

23             COURT REPORTER:  "Let's go back to the

24             timeline.  It appears from this timeline

25             that, as far as significant events, in the

Confidential - Subject to Further Confidentiality Review

```
 1              mind of Aleis Tusa and Habitat of New

 2              Orleans, nothing very significant occurred

 3              between the time that you purchased it in

 4              February of 2009?"

 5                   MR. GEORGE:  Objection to form.  The

 6              mind of Aleis Tusa.

 7                   MR. DUPLANTIER:  Okay.  I'll rephrase

 8              it.

 9   BY MR. DUPLANTIER:

10        Q.   It appears from this timeline that, from

11   March of 2007 until February of 2009, Habitat did

12   not consider there to be any significant events; is

13   that correct?

14                   MR. GEORGE:  Objection to form.

15   BY MR. DUPLANTIER:

16        Q.   You can answer it.

17                   MR. GEORGE:  There's no foundation for

18              that.

19                   MR. DUPLANTIER:  The timeline is the

20              foundation.

21                   MR. GEORGE:  It speaks for itself.

22        A.   Between March -- between when the news

23   story --

24   BY MR. DUPLANTIER:

25        Q.   When you bought it.
```

Confidential - Subject to Further Confidentiality Review

1        A.    And the news story came, Keesler story?

2        Q.    Correct.

3        A.    No, we were unaware of any issue.

4        Q.    Are you aware when the first lawsuits

5    began to be filed in Louisiana with regard to

6    Chinese drywall?

7        A.    No.

8        Q.    Your first notice, or Habitat of New

9    Orleans' first general notice, that there might be a

10   problem was when the media reports came out; is that

11   correct?

12       A.    Right.

13       Q.    Was someone assigned to monitoring the

14   media reports about drywall?

15             MR. GEORGE:  Objection.

16       A.    We have Google popup, so if we're

17   mentioned, it comes up.  We didn't have -- I didn't

18   have an employee who was monitoring the media for

19   drywall.  Aleis -- I don't think she did a popup,

20   but I think she -- when a story came to her

21   attention, she'd bring it to my attention.

22             There's a guy named Donald Bonin who's in

23   the communication department of Habitat

24   International, and he does have Google popup, or

25   whatever it's called -- I don't know what it's

Confidential - Subject to Further Confidentiality Review

1    called, but -- and anytime Habitat for Humanity is

2    mentioned anywhere, he gets it, I mean down to the

3    minuscule -- that's his job at Habitat.  So he would

4    periodically forward some article or story if it

5    referenced us.  But other than that kind of

6    monitoring, no.

7                    MR. DUPLANTIER:  Do you want to go

8          off?  Let's go off, take a break.

9                    THE VIDEOGRAPHER:  The time now is

10         10:54 a.m.  We're now off the record.

11         This is the end of tape 2.

12   (Recess.)

13                    THE VIDEOGRAPHER:  The time now is

14         11:06 a.m.  We're now back on the record.

15         This is the beginning of tape 3.

16   BY MR. DUPLANTIER:

17        Q.    Let's go back to this timeline that's

18   Exhibit 9.  So New Orleans Habitat purchased the

19   drywall in March of 2007, began using it in various

20   methods, using it themselves in homes that they were

21   constructing, selling it at the ReStore, and then

22   also through a donation program to charitable

23   organizations.  Did you track the drywall donations

24   at all?

25        A.    Most of them, we know who received it.  We

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    So there was no tracking of the drywall

 2   sales by the Habitat New Orleans ReStore; is that

 3   true?

 4        A.    It depended on what time it was in the

 5   course of things and who was managing the ReStore.

 6   The -- as a general rule, where we came out on this

 7   was that whoever bought it had to go pick it up at

 8   Dupuy.  So we'd give them a little handwritten

 9   receipt that says they've purchased, but it -- like

10   I was saying earlier, it may be the contractor's

11   name.  There wasn't, you know, Joe Schmuck, 1347

12   thus and such street purchased this.

13        Q.    All right.  How many sheets -- of the

14   120,000 sheets that were purchased and donated to

15   Habitat of New Orleans, how many were used or sold

16   or donated?  How many do you have left?

17              MR. GEORGE:  Objection.

18        A.    I can't recall how many we have left.

19   It's over -- over 60.  I don't know how many are

20   left.

21   BY MR. DUPLANTIER:

22        Q.    Somewhere over 60 what?

23        A.    Sheets.

24        Q.    Sheets.

25        A.    60,000.  I'm sorry.
```

Confidential - Subject to Further Confidentiality Review

```
1        Q.    60,000 sheets?

2        A.    Yeah.  The majority -- I want to say the

3    vast majority of it is still there.

4        Q.    It's all still in the Dupuy warehouse?

5        A.    Unfortunately.

6        Q.    So you used approximately -- either used,

7    sold or donated approximately 60,000 sheets?

8        A.    I don't recall the precise number, but I

9    would say in that -- we used probably closer to 70.

10       Q.    So approximately 70,000 sheets of the Fly

11   Systems drywall was used -- either used, donated or

12   sold by Habitat of New Orleans; is that correct?

13       A.    I can't answer that, you know, to the

14   precision you're seeking.  I don't recall how many.

15   I know that if we did 215 -- or, actually, more than

16   that.  But if we did 215 houses with it, it's up in

17   that range.  I don't think any of the donated

18   partners got more than, you know, 20 houses or so.

19   So I just can't answer that.

20       Q.    From the period of March of 2007, when you

21   bought the Fly Systems Taishan drywall, and until

22   March of 2009, when you ran the first tests on that

23   drywall, did you make a distinction when you were

24   building a house between the donated drywall or the

25   Fly Systems drywall and domestic drywall when you
```

Confidential - Subject to Further Confidentiality Review

```
 1    were building a house?

 2                    MR. GEORGE:   Objection.

 3    BY MR. DUPLANTIER:

 4         Q.    Do you understand the question?

 5         A.    No.

 6         Q.    All right.  Did you have other sources --

 7    from March of 2007 to March of 2009, did you have

 8    other sources of drywall?

 9         A.    Only the House in a Box.

10         Q.    Only -- so all other drywall that you had

11    during that period of time came from the Fly Systems

12    Taishan drywall; is that correct?

13         A.    To the best of my knowledge, yes.

14         Q.    From March of 2007 until this first media

15    report in February of 2009, did Habitat of New

16    Orleans have any concerns about the Fly Systems

17    Taishan drywall?

18         A.    No.

19         Q.    Were there any complaints up until this

20    point in time, up to February of 2009, about the

21    dry -- the Fly Systems Taishan drywall?

22         A.    As a drywall product?

23         Q.    Yes.

24         A.    No.

25         Q.    You first received some media information
```

Confidential - Subject to Further Confidentiality Review

1    about problems with Chinese drywall and you began an

2    investigation; is that correct?

3        A.    Yes.

4        Q.    Who initiated that investigation?

5        A.    I would say I initiated.  The person who

6    was doing it was Bob Marye.  Bob is the one who

7    brought the story to my attention.

8        Q.    Right.

9        A.    And he said, there's this thing going on.

10   And I said, do we -- can you check and see if

11   that's -- if we have what appears to be Chinese

12   drywall?  He went -- located the -- you know, the

13   Fly Systems stuff, that letter you showed me

14   earlier.

15       Q.    Correct.

16       A.    And he came in and read it to me.  And I

17   said, okay, let's find a testing laboratory and test

18   what we've got.  I put any use sales or donation on

19   a hiatus till we got the test results back.

20       Q.    You hired a testing company to come in and

21   perform some tests on the drywall?

22       A.    We went to -- I believe it's AESI, their

23   local engineering firm that specializes, and at that

24   point, according to the stories, all we had heard

25   was off-gassing of whatever, and they specialize in

Confidential - Subject to Further Confidentiality Review

```
 1    had originally thought that -- like, the Catholic

 2    Charities arm, folks like that, that they -- we

 3    would get a name and address where they were using

 4    it and a certification that the person was low

 5    income, elderly or physically challenged.

 6         Q.    Right.

 7         A.    But for the larger nonprofits that are in

 8    affordable housing, they deal with the same market

 9    we do, more or less, and we felt like that was

10    unnecessary, so we -- no, we didn't track where

11    they -- they used it.

12         Q.    And have you put any of those nonprofits

13    on notice that they may have bad drywall?

14         A.    Yeah, absolutely.  They've gotten letters.

15    Every time we've, you know, sent something out to

16    the homeowner, something went out to the donors.

17    Let me rephrase that.  I'm not sure every time we

18    sent something out to the homeowners en masse, but I

19    think every time.  I want to say there have been

20    maybe four letters that have gone to the

21    participants in the donated drywall.

22         Q.    Have you remediated any of those homes?

23         A.    No, we have not.

24         Q.    Have you settled with any of those

25    organizations or those property owners?
```

Confidential - Subject to Further Confidentiality Review

1      A.    No.

2      Q.    Does the ReStore have a process for

3  tracking sales in general, like a point-of-sale

4  system at the ReStore?

5            MR. GEORGE:   Objection.

6      A.    Are you talking about the sale, just as,

7  you know, a concrete block for 80 cents or Joe

8  Schmuck?

9  BY MR. DUPLANTIER:

10     Q.    An invoicing system; an invoicing system.

11  Do they have an invoicing system?

12     A.    We have no -- it's all donated materials,

13  so we have no cost of goods coming in, so --

14     Q.    Right.

15     A.    -- we don't -- we don't keep a ongoing

16  invoice -- I mean or invoice system.  We have a dual

17  tape on the cash register.  I'm not sure we had that

18  in 2007.  But to get at what I think you're asking,

19  I don't think we had that system.

20     Q.    Well, let me make sure that we're on the

21  same page.

22     A.    Uh-huh.

23     Q.    Did the ReStore have a way of tracking

24  today I sold this customer 100 sheets of drywall?

25     A.    No.

Confidential - Subject to Further Confidentiality Review

1    that.  I don't know how we found them.  I think

2    literally Yellow Pages or whatever.  Contacted them

3    and they did the testing protocol.

4         Q.   Did anyone from Habitat do any

5    investigation into the nature of the problem with

6    the drywall beyond reading what was in the media

7    stories?

8              MR. GEORGE:  Objection to form.

9              You can answer.

10             THE WITNESS:  Yeah.

11        A.   I think at that time, I prob -- I -- I

12   don't know if anybody else did or not, but I think I

13   probably may have done a little Googling at that

14   point to see if there were other stories.  But,

15   basically, no, we didn't -- there wasn't anything

16   but what was in the media, basically, or at that

17   time, I didn't know of anything other than what's in

18   the media.

19   BY MR. DUPLANTIER:

20        Q.   Did you do any legal searches for lawsuits

21   that might be pending?

22        A.   No.

23        Q.   At what point in time did you become aware

24   that there was a multi-district litigation pending

25   in New Orleans?

Confidential - Subject to Further Confidentiality Review

```
 1              MR. GEORGE:  Objection to form.  It's

 2          beyond the scope of the deposition.

 3              You can answer.

 4    BY MR. DUPLANTIER:

 5       Q.   You can answer.

 6       A.   I couldn't tell you when that -- you know,

 7    when we found out there was a multi-district.  I'm

 8    sure I saw that it was consolidated, the cases were

 9    consolidated here, in the Times Picayune, but...

10       Q.   What -- you had the tests run, and they

11    came back.  What were the results?

12       A.   No detectable amount.

13       Q.   Do you know what kind of tests they ran?

14       A.   It was for about 20 different

15    sulfur-gassing compounds.

16       Q.   Do you know if they tested the actual

17    product, or did they do air testing?

18       A.   They did air testing at that time.

19       Q.   When was the first time that you actually

20    tested the product?

21       A.   That is testing the product, according to

22    our experts.

23       Q.   So you felt that that testing was

24    sufficient in March of 2009?

25              MR. GEORGE:  Objection to form.
```

```
 1        A.   We did -- we relied completely on those
 2   experts.  They're supposed to be experts in the
 3   field.  The lab they used was supposed to be one of
 4   the best in the country.  We did what they told us.
 5   BY MR. DUPLANTIER:
 6        Q.   You relied on them; they came back and
 7   told you there's no problem with the drywall?
 8             MR. GEORGE:  Objection; misstates
 9             testimony.
10   BY MR. DUPLANTIER:
11        Q.   Well, what did they tell you?
12        A.   They -- well, they came and did the tests.
13        Q.   Correct.
14        A.   And then they informed us of the results,
15   and it was non-detectable, which means they didn't
16   pick up any of the sulfide gases.
17        Q.   And then you started using that drywall
18   again; is that correct?
19        A.   That's correct.
20        Q.   And, in fact, you continued to use that
21   drywall until the end -- till late 2009; isn't that
22   correct?
23             MR. GEORGE:  Objection.
24        A.   That's right.
25             MR. DUPLANTIER:  What's your
```

Confidential - Subject to Further Confidentiality Review

```
 1              objection?

 2                   MR. GEORGE:  It lacks foundation.

 3   BY MR. DUPLANTIER:

 4       Q.   Habitat of New Orleans continued to use

 5   the Fly Systems Taishan drywall until late 2009;

 6   isn't that correct?

 7       A.   We used it till essentially October of

 8   2009.

 9       Q.   So you were aware of the media reports

10   about Chinese drywall; you, at that point in October

11   of 2009, had been already contacted by the Consumer

12   Product Safety Commission; isn't that correct?

13       A.   That's correct.

14       Q.   In fact, why don't we take a look at the

15   timeline.  It appears that you were first contacted

16   by the Consumer Product Safety Commission on

17   April 23rd of 2009.

18       A.   Yeah.  That's what -- that's what the

19   timeline says.

20       Q.   All right.

21                   MR. GEORGE:  Can you tell me which

22              topic this is relevant to, Rick?

23                   MR. DUPLANTIER:  Let's see.  6 --

24                   MR. GEORGE:  Purchase of drywall?

25                   MR. DUPLANTIER:  -- 7, 8, 9.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. GEORGE:  Storage of drywall?

 2              MR. DUPLANTIER:  9.

 3              MR. GEORGE:  I don't see it.

 4              MR. DUPLANTIER:  9.

 5              MR. GEORGE:  Oh, I see 9.  I don't see

 6         the relevance, CPSC communications.

 7              MR. DUPLANTIER:  It's just for

 8         reference to the time period as to when

 9         they were selling and using the drywall.

10         It wasn't really relevance to what or --

11              MR. GEORGE:  He answered the question

12         already, when it was, when he stopped

13         selling it, when he was selling it.

14              MR. DUPLANTIER:  Right.

15              MR. GEORGE:  So what does the CPSC

16         have to do with it?

17              MR. DUPLANTIER:  What?

18              MR. GEORGE:  What does the CPSC have

19         to do with it?

20              MR. DUPLANTIER:  It just -- it helps

21         refresh his recollection about the timing

22         of --

23              MR. GEORGE:  He already answered the

24         question.  There's no recollection

25         problems.
```

Confidential - Subject to Further Confidentiality Review

1           MR. DUPLANTIER:  I just want to make

2       sure the record was clear.  That's all.

3           MR. GEORGE:  Are you satisfied now?

4           MR. DUPLANTIER:  Oh, yeah.

5           MR. GEORGE:  Okay.

6   BY MR. DUPLANTIER:

7       Q.   At some point in time after the tests came

8   back, you began to report to the people who were

9   using your drywall that, while we had -- while New

10  Orleans Habitat had Chinese drywall, we had ours

11  testing [sic] and ours was fine; is that correct?

12          MR. GEORGE:  Objection.

13  BY MR. DUPLANTIER:

14      Q.   You can answer.

15      A.   Let me make sure I'm responding to your

16  question.

17      Q.   Absolutely.

18      A.   When we had testing done and the test

19  results came back, did we share them with the

20  participants in the donated drywall program and with

21  our families?

22      Q.   Yes.

23      A.   The answer to that is yes.

24      Q.   At any point in time, did anyone ever

25  reach out to you and advise Habitat of New Orleans

Confidential - Subject to Further Confidentiality Review

1   that maybe the testing was inadequate?

2        A.    Keesler -- I don't recall when it was, but

3   it was, I want to say, in the -- probably the summer

4   of 2009, one of the times he crashed the office, you

5   know, just showed up, and said that there were

6   reports that the air bag testing was inadequate.

7   But I'm not sure -- frankly, I'm not sure when we

8   found out about the three-chamber or the combustion

9   testing.  The occasional conversations we had with

10  Consumer Product or whoever, they didn't know what

11  they were -- how -- what the testing protocol was or

12  what they were testing for.

13       Q.    All right.  Did you go back and speak with

14  the testing company and say, we need to reassess the

15  way these tests are being done on our drywall, ever?

16       A.    Ultimately.

17       Q.    When was that?

18       A.    Fall of -- summer or fall of '09.  By

19  then, the local AESI people had given Columbia

20  permission -- Columbia Laboratories on the West

21  Coast permission to talk with us directly, so we had

22  several conversations with Michael Tuday of the

23  Columbia Analytical.

24            Did you ask -- were you referencing '09 or

25  '10?

Confidential - Subject to Further Confidentiality Review

1        Q.    I asked you when you contacted the lab and

2    discussed with them the need for a different kind of

3    testing.

4        A.    Like I said, late 2009.

5        Q.    The timeline also indicates that you -- or

6    someone contacted Interior/Exterior in June of 2009.

7    Do you know who contacted INEX?

8        A.    It would have been John Mezzenga.

9        Q.    What's his -- how do you pronounce his

10   last name?

11       A.    Mezzenga.  The spelling, I think, is

12   M-A-Z-U-E-N-G-A [sic].

13       Q.    And who was he at the time in June of

14   2009?

15       A.    By then, we had a purchasing department.

16   He was head of purchasing.

17       Q.    Okay.  And who asked him to contact INEX?

18       A.    Probably me.

19       Q.    Do you recall that conversation?

20       A.    Not particularly.

21       Q.    Was there a reason why you decided to have

22   him contact INEX?

23       A.    By that time?

24       Q.    Yes.

25       A.    Yeah, all the media and everything.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And do you know what he asked INEX?

 2          A.    He asked -- I don't know.  I know what he

 3    reported to me.

 4          Q.    Okay.  What did he report to you?

 5          A.    That the INEX representative said they

 6    only used domestic drywall.

 7          Q.    Do you know if he -- what period of time

 8    he referenced when he asked INEX when they were

 9    using -- when they were only selling domestic --

10          A.    Ever.

11          Q.    Ever?

12          A.    (Nods head.)

13          Q.    Okay.  Have you spoken to Mr. Mezzenga

14    since this?  Does he still work for you?

15          A.    No.

16          Q.    Have you spoken to him about it since June

17    of 2009?

18          A.    Are you talking about, like, in the

19    hallway or something?

20          Q.    No, no, about this.  I'm sorry.

21          A.    The litigation?

22          Q.    No, about that inquiry that he made of

23    INEX.  Have you -- other than the first conversation

24    that you had where he called and he told you -- what

25    did he tell you they said?
```

Confidential - Subject to Further Confidentiality Review

1    A.    He said the sales representative said that

2    they've never used Chinese drywall; it's all

3    domestic.  I don't recall whether it was U.S. Gypsum

4    or National Gypsum, but he came back and said, we've

5    always been a National Gypsum shop, and that's all

6    we deal with.

7    Q.    Okay.

8    A.    And if you're asking was there a follow on

9    to that, --

10   Q.    Yes.

11   A.    Yeah, after we started getting results or

12   started having even more stuff, I want to say in

13   early 2010, I said, I want it in writing.

14   Q.    Well, let's go back to 2009, then.  There

15   was no written communication in June of 2009, was

16   there?

17            MR. GEORGE:  Objection.

18   A.    Between us and INEX?

19   BY MR. DUPLANTIER:

20   Q.    Yeah, between -- yeah.

21   A.    None that I am aware of.

22   Q.    Was there any internal communication about

23   that conversation in June of 2009?

24   A.    Other than probably John, Elizabeth and I

25   saying, here's the result -- I mean, here's what

1    INEX told me.  That's probably it.  We didn't have

2    any deeper discussions about it.

3         Q.   Do you know who at INEX Mr. Mezzenga spoke

4    with?

5         A.   No.

6         Q.   I'm going to show you, which we'll mark as

7    10, the National -- the letter -- a letter from

8    National Gypsum.

9         (Deposition Exhibit 10 was marked for

10                    identification.)

11              MR. GEORGE:  Thank you.

12   BY MR. DUPLANTIER:

13        Q.   Do you know who received this letter?

14        A.   It was faxed to our office, and I think it

15   went to John.

16        Q.   You think it went to John, or it did go to

17   John?

18        A.   I can't recall if John was with us --

19   still with us at that point.

20        Q.   Who took over for John if it wasn't -- if

21   it wouldn't have been John?

22        A.   Basically, it would have been Mitch

23   Danese, and he wasn't here then.  January 2010?  It

24   was probably John.  I think John was there, but I

25   couldn't tell you.

Confidential - Subject to Further Confidentiality Review

```
1        Q.    Did you ask someone to get this letter?

2        A.    Yeah.  I said, I want it in writing; go

3   back to INEX, I want it in writing.

4        Q.    Did you ask anyone on your staff or

5   anybody affiliated with New Orleans Habitat to

6   investigate, other than calling INEX and asking for

7   a letter?

8        A.    For the INEX --

9        Q.    Strike that.  Strike that.

10             MR. GEORGE:  Objection.

11   BY MR. DUPLANTIER:

12        Q.    Strike that.

13             Were you aware that INEX was a party to

14   the multi-district litigation by this point in time?

15        A.    No.

16        Q.    You weren't aware of that?

17        A.    No.

18        Q.    Do you know who they called at INEX to get

19   a copy of this letter?

20        A.    No.  I'm -- no.

21        Q.    Do you know whether or not they asked, are

22   you selling this -- what type of drywall are you

23   selling now?

24             MR. GEORGE:  Asked and answered.

25   BY MR. DUPLANTIER:
```

Confidential - Subject to Further Confidentiality Review

1        Q.    You can answer it.

2        A.    I don't know that -- I wasn't privy to

3    that conversation.

4        Q.    You don't know what was said?

5        A.    No.  I know what I said was, find out if

6    they ever sold Chinese drywall; I want -- they've

7    already told us no; now I want it in writing.

8        Q.    Did you take this letter to mean

9    that INEX was representing that they've never

10   sold Chinese drywall?

11       A.    That's how I took it.

12       Q.    But that's not what the letter says, does

13   it?

14             MR. GEORGE:  Objection.

15       A.    The letter is from National Gypsum, not

16   from INEX.

17   BY MR. DUPLANTIER:

18       Q.    Right.

19       A.    The letter in context -- the verbal

20   statements were, we've never sold Chinese drywall.

21       Q.    Are you aware as we sit here today that

22   three months prior to this, at a minimum, INEX had

23   acknowledged that they had sold Chinese drywall?

24       A.    No.

25       Q.    Are you -- were you aware as we sit here

Confidential - Subject to Further Confidentiality Review

1    today that Habitat of New Orleans was actually

2    buying drywall at this time or shortly before this

3    time to Habitat of New -- strike that.

4              MR. GEORGE:  Objection.

5    BY MR. DUPLANTIER:

6         Q.   Are you aware that shortly before this

7    letter, INEX had been selling drywall to Habitat?

8         A.   I think for a period, they did, yeah.

9         Q.   In 2009; isn't that correct?

10        A.   After we quit using the -- our own stuff.

11   So, yeah, fall of 2009.

12        Q.   And, in fact, you used INEX-supplied

13   drywall on some of the remediation projects; isn't

14   that correct?

15        A.   I don't know the answer to that, because

16   we subcontracted all of the remediation.

17        Q.   But you will admit that, during

18   this relevant period of time, Habitat of New

19   Orleans was actively buying drywall from

20   Interior/Exterior in November of 2009?

21             MR. GEORGE:  Objection.

22             You can answer.

23        A.   It was done through my purchasing office.

24   I would not be surprised if we were.

25   BY MR. DUPLANTIER:

Confidential - Subject to Further Confidentiality Review

1        Q.    Okay.  I'll attach as Exhibit 11 to the

2    deposition an invoice that's dated 11/19.

3            (Deposition Exhibit 11 was marked for

4                        identification.)

5            Yeah, let me give you the one that's been

6    marked.

7                    MR. DUPLANTIER:  You can have that

8            one.

9                    MR. GEORGE:  So this has not been ever

10           Bates stamped in this litigation?

11                   MR. DUPLANTIER:  I guess not.

12                   MR. GEORGE:  Where did you get it

13           from?

14                   MR. DUPLANTIER:  I got it from

15           Interior/Exterior.

16                   MR. GEORGE:  They didn't produce it?

17                   MR. DUPLANTIER:  No.

18                   MR. GEORGE:  Okay.

19                   MR. DUPLANTIER:  It hasn't been the

20           subject of discovery.

21   BY MR. DUPLANTIER:

22       Q.    John Mezzenga, is that the representative

23   that --

24       A.    Yes.

25       Q.    This is being shipped to John; is that

Confidential - Subject to Further Confidentiality Review

```
 1    correct?

 2         A.    Yeah.   Actually, the shipping location

 3    would have been to the job site.

 4         Q.    Right.   But the billing was to New Orleans

 5    Area Habitat for Humanity; isn't that correct?

 6         A.    Uh-huh.   Uh-huh.   Looks like November '09.

 7         Q.    And this is a house that was being built

 8    at approximately the time period of November 2009;

 9    is that correct?

10         A.    That's correct.

11         Q.    Isn't it true that at this -- by this

12    period of time in late 2009, Habitat, like many

13    other companies, were getting letters assuring that

14    the drywall that they were buying at that time was,

15    in fact, domestic drywall from -- not just from

16    National Gypsum, but from other suppliers?

17               MR. GEORGE:   Objection.

18         A.    I have no idea.

19    BY MR. DUPLANTIER:

20         Q.    Okay.   Were you aware or have you become

21    aware that INEX had stopped selling Taishan drywall

22    in 2007?

23         A.    I do not know that.

24         Q.    No one's ever explained that to you?

25         A.    No.
```

Confidential - Subject to Further Confidentiality Review

1      Q.    And you don't know who at INEX, John or

2    someone else, would have contacted to get this

3    letter faxed over, do you?

4      A.    No, I do not.

5      Q.    Is John still around?

6      A.    No.

7      Q.    Where is he?

8      A.    He went off to graduate school, and that's

9    when we hired -- he left to go back to graduate

10   school.

11     Q.    Where; do you know?

12     A.    Don't know.

13     Q.    Okay.

14   (Off the record.)

15   BY MR. DUPLANTIER:

16     Q.    There are three properties in particular

17   that have been identified as plaintiffs for this

18   particular November 26 trial.

19     A.    Uh-huh.

20     Q.    It's the Casey LeBlanc property at 1909

21   Alvar Street, Rochelle Morgan at 1925 Alvar Street,

22   and Richard Crespo at 1921 Alvar Street.  These are

23   three of the 11 homes that INEX supplied Chinese

24   drywall to Habitat for Humanity.  Is that your

25   recollect -- your understanding?

Confidential - Subject to Further Confidentiality Review

1       A.    That's my understanding.

2       Q.    At the time that these three homes were

3    built, who was the construction manager for these

4    properties?

5       A.    Those were built very, very early on, so

6    it was probably Ken Francois.

7       Q.    Do you have any recollection of who the

8    drywall installer would have been at the time that

9    these homes were built?

10      A.    No.

11      Q.    Habitat for Humanity -- Habitat New

12   Orleans was the general contractor; is that correct?

13      A.    That's correct.

14      Q.    At the time that these homes were built,

15   were there any complaints with regard to the drywall

16   that was sold by INEX?

17      A.    Are you talking about did we --

18      Q.    Yes.  Did Habitat, as the general

19   contractor, raise any complaints about the drywall

20   that had been supplied by INEX?

21      A.    No.

22      Q.    Did Habitat ever give any direction to

23   Interior/Exterior that we don't want any imported

24   drywall --

25      A.    No.

Confidential - Subject to Further Confidentiality Review

1          Q.    -- used in our homes?

2          A.    No.

3          Q.    Did you ever give direction to

4     Interior/Exterior --

5          A.    Let me -- let me step back and correct

6     that.  I'm sure we said something when we started

7     using them again in November 2009.

8          Q.    Right.  I'm talking about the time that

9     these houses were built --

10         A.    No.

11         Q.    -- in 2007.

12         A.    No.  That was an alien concept to me.

13         Q.    There was no concern about using

14    Chinese-supplied drywall at that point in time?

15         A.    There was no concern about that.

16         Q.    Do you know if anybody looked at the

17    drywall when it was delivered to the properties?

18                MR. GEORGE:  Objection.

19    BY MR. DUPLANTIER:

20         Q.    Inspected it?

21         A.    No, not inspect.  I mean, my staff didn't.

22         Q.    Were you -- are you aware that the drywall

23    was clearly marked that it was a product of China?

24         A.    No, I -- I am aware now.  I wasn't then.

25         Q.    Were there any complaints that you're

Confidential - Subject to Further Confidentiality Review

```
 1    aware of from the installer of the drywall when he

 2    built these three properties?

 3         A.   No.

 4         Q.   Are you aware of any complaints by any

 5    installer with regard to any of the drywall that was

 6    supplied by Interior/Exterior in 2007?

 7         A.   Not to me, no.

 8         Q.   Did you test the drywall from Fly Systems

 9    when you bought it?

10         A.   No.

11         Q.   Do you know what drywall was used in the

12    remediation of these three homes?

13              MR. GEORGE:  Objection.  It's beyond

14              the scope of the deposition.

15         A.   As I said, we --

16              MR. GEORGE:  No.  Actually, I withdraw

17              that objection.  My apologies, Rick.

18              MR. DUPLANTIER:  Okay.

19         A.   As I said, we subcontracted all of that,

20    so, no, I don't know whether -- all of the

21    remediation general contractors ordered their stuff.

22    BY MR. DUPLANTIER:

23         Q.   Did you -- do you know how much their cost

24    was for the remediation of each of these properties?

25         A.   I think we covered that earlier.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. GEORGE:  Again, that's --
 2   BY MR. DUPLANTIER:
 3       Q.   General cost.  I'm talking about
 4   specifically.  Did you come here with a specific
 5   number with regard to each one of these three
 6   houses?
 7       A.   No, but they're --
 8              MR. GEORGE:  That's beyond the scope
 9              of -- that's beyond the scope of this
10              deposition.  Remediation costs?  He
11              answered you earlier, too, generally.  I
12              let you have that one.
13              MR. DUPLANTIER:  Thank you.
14       A.   They were all in the range of 32 to
15   34,000, but that's only the hard cost.  That does
16   not include the ancillary cost to us.
17   BY MR. DUPLANTIER:
18       Q.   It's my understanding that, even into
19   late -- strike that.
20              It's my understanding that, even into the
21   first quarter of 2010, that you, personally, were
22   insisting that there was nothing wrong with the
23   Taishan drywall that Habitat had been using; is that
24   correct?
25       A.   I would say "insisting" is not an accurate
```

```
 1    representation.  Did I state that we felt like the

 2    drywall was noncorrosive?  That part's correct.

 3         Q.   I'm going to come back --

 4              MR. DUPLANTIER:  I don't need to

 5              attach this stuff to the deposition, do I?

 6              These are the remediation files.  I'm not

 7              going to really use it with him unless

 8              something comes up.  But it's just the

 9              file -- the files that you guys --

10              MR. GEORGE:  You haven't referred to

11              it, you haven't marked them, so I'm happy

12              to spare the copying costs.

13              MR. DUPLANTIER:  Yes.

14              MR. DAVIS:  Is this blocking the

15              camera?

16              THE VIDEOGRAPHER:  No.  I'll let you

17              know if something is blocking the camera.

18              THE WITNESS:  Can I get another

19              bottled water?

20              MR. DAVIS:  Sure.

21    (Off the record.)

22    BY MR. DUPLANTIER:

23         Q.   Okay.  I'm going to --

24              MR. DUPLANTIER:  Again, I don't have

25              copies of this one.  I may have them.
```

Confidential - Subject to Further Confidentiality Review

```
 1              When we take a break, I can give you

 2         copies, but, Chris, I'll have to -- I

 3         mean, Scott, I'll have to give you this

 4         one first to look at.

 5              MR. GEORGE:  Thank you.

 6              MR. DUPLANTIER:  This is 12.  This is

 7         an e-mail from Jim Pate to Bob Marye dated

 8         3/19/2009.

 9    (Deposition Exhibit 12 was marked for

10                   identification.)

11              MR. GEORGE:  It's two pages?

12              MR. DUPLANTIER:  Yes.

13              MR. GEORGE:  Can I have one of those

14         clips so we can keep it from getting

15         separated?

16              MR. DUPLANTIER:  I'll help you with a

17         stapler.

18              MS. LESSELL:  Do you have a Bates

19         number?

20              MR. GEORGE:  NOAHH-0015468 is the

21         first page.  It's two pages.

22              MS. LESSELL:  Thank you.

23    A.   (Reviewing document.)  Okay.

24    BY MR. DUPLANTIER:

25         Q.   Do you recall that?
```

Confidential - Subject to Further Confidentiality Review

1      A.   Not in specific detail, but that -- yeah,

2  that would be consistent with my relationship with

3  Bob.

4      Q.   Right.  You -- someone was raising some

5  concerns with Bob about the type of testing that you

6  were doing; isn't that true?

7      A.   No, that's not true.

8      Q.   Okay.  Let me see it for a second,

9  Mr. Pate.  I'm sorry.

10          MR. GEORGE:  Do you want to get a copy

11          right now?

12          MR. DUPLANTIER:  I have copies

13          somewhere.  It's just, you know, things

14          are getting all jumbled up, so...

15  BY MR. DUPLANTIER:

16      Q.   Just put this aside for a minute.

17          I'm going to give you another e-mail from

18  you, which we will --

19      A.   Do you need this back or --

20      Q.   Not for now.  We'll come back to it in a

21  little bit.

22      A.   Okay.

23      Q.   I'm trying to get some of these e-mails

24  out of my pile, honestly -- which we'll mark as 13,

25  and it's Bates No. 2282.

Confidential - Subject to Further Confidentiality Review

1                    (Deposition Exhibit 13 was marked for

2                              identification.)

3                    MR. GEORGE:  Do you have a copy of

4             that, or we only have one of that too?

5                    MR. DUPLANTIER:  No.  Here you go.

6                    MR. GEORGE:  Thank you.

7        A.    (Reviewing document.)  Okay.

8    BY MR. DUPLANTIER:

9        Q.    This is April of 2010, if you recall; is

10   that right?

11       A.    Yeah, that's the date on it.

12       Q.    Who is Debbie Koehler?

13       A.    She is with the Arch Diocese, so that

14   would be Catholic Charities, and their -- their --

15   Operation Helping Hands was their program for

16   post-Katrina relief.

17       Q.    And she's advising you about a confirmed

18   case of Chinese drywall that they had received from

19   Habitat of New Orleans; is that correct?

20       A.    Yes.

21       Q.    All right.  And you responded to her; is

22   that correct?

23       A.    Yes.

24       Q.    And at that point, you reiterated the

25   position of Habitat of New Orleans, that Habitat was

Confidential - Subject to Further Confidentiality Review

```
 1    not convinced that there was a problem with the

 2    drywall that Habitat had been donating; is that

 3    correct?

 4                    MR. GEORGE:  Objection.

 5                    MR. DUPLANTIER:  What's your

 6              objection?

 7                    MR. GEORGE:  The document speaks for

 8              itself.  You're characterizing it.

 9                    MR. DUPLANTIER:  Okay.

10    BY MR. DUPLANTIER:

11         Q.   You can answer the question.

12         A.   Repeat your question.

13         Q.   I'm going to have her read it back to

14    her -- back to you.

15                    COURT REPORTER:  "And at that point,

16              you reiterated the position of Habitat of

17              New Orleans, that Habitat was not

18              convinced that there was a problem with

19              the drywall that Habitat had been

20              donating; is that correct?"

21         A.   It is correct that I made that statement

22    in this e-mail.

23    BY MR. DUPLANTIER:

24         Q.   Was that your belief at the time?

25         A.   Oh, yeah; absolutely.
```

Confidential - Subject to Further Confidentiality Review

1    Q.   At what point in time did you have the

2    moment where you went, oh, no, we've been selling

3    corrosive drywall and using corrosive drywall?

4    A.   It was after Ricardo Crespo and the other

5    homeowner set up the appointment and met.  That was

6    kind of double-barreled.  "A," it was INEX, which we

7    had no reason to believe had ever used -- had ever

8    delivered us any Chinese drywall, and, yet, there it

9    was, Chinese -- you know, made in China.  And,

10   second, there were very poignant signs of corrosion,

11   not simply on the pipes and all.  Although when we

12   got over there, we saw that, but when he held his

13   little cross up.  And at that time, when we first

14   started this, we still had -- we still felt that the

15   Fly System -- I'll call it Fly System -- drywall had

16   been adequately tested and was okay; that Ricardo

17   and these cases are in the Musicians' Village area,

18   so, as I said earlier, the perimeter ones were

19   mostly INEX.  Interior ones, by the time we got

20   around to doing the interior, we were mostly using

21   our stuff out of the warehouse.  So you're talking

22   about next-door neighbors, next-door neighbors.  So

23   we started having other inquiries, and it was after

24   that that we, from visual inspection, felt like

25   there were issues with the Taishan Fly -- the Fly

1    System drywall.

2        Q.   Are you aware as we sit here today,

3    Mr. Pate, that two of these three houses that are

4    the subject of this litigation are -- have Taishan

5    drywall in them and not Knauf?

6        A.   Only by, you know, comments from the

7    attorneys.

8        Q.   Okay.

9        A.   And --

10       Q.   I don't want to know what the lawyers

11   and you have discussed.

12            But at some point in time, did you come --

13   did Habitat of New Orleans come to realize that the

14   Taishan drywall that they were using and donating

15   was the same drywall that INEX had sold to them?

16            MR. GEORGE:  Objection.  Actually,

17            it's misstating earlier testimony.

18            MR. DUPLANTIER:  That's fine.

19   BY MR. DUPLANTIER:

20       Q.   You can answer the question.

21       A.   Repeat your question.

22            MR. DAVIS:  Privilege, also.

23            MR. GEORGE:  Oh, and -- sure -- to the

24            extent, obviously, he's learning a lot

25            from his attorneys, that should be kept in

Confidential - Subject to Further Confidentiality Review

```
 1          mind --

 2               MR. DUPLANTIER:  Yes.

 3               MR. GEORGE:  -- by you and the

 4          witness.

 5               MR. DUPLANTIER:  Yes.

 6   BY MR. DUPLANTIER:

 7      Q.   Did Habitat, other than being -- besides

 8   being told by lawyers, has Habitat ever investigated

 9   and determined that the Taishan drywall that you

10   were using that you bought from Fly Systems is the

11   same Taishan drywall that was used in two of these

12   three homes that are the subject of this lawsuit --

13               MR. GEORGE:  Objection.

14   BY MR. DUPLANTIER:

15      Q.   -- and that was supplied by INEX?

16               MR. GEORGE:  Objection.

17      A.   Did we --

18   BY MR. DUPLANTIER:

19      Q.   Did you know that?

20      A.   No.  That -- no, we did -- I did not know

21   that, absent the discussions with counsel --

22      Q.   Counsel.

23      A.   -- after the fact.

24      Q.   After the fact; after the fact.

25               MR. DUPLANTIER:  I need to take five
```

```
 1                minutes to kind of get things -- what time

 2                is it?

 3                    MR. GRAU:  11:53.

 4                    THE VIDEOGRAPHER:  You have about 15

 5                minutes left on the tape.

 6                    MR. DUPLANTIER:  All right.  Well,

 7                let's keep going, then.

 8                    THE WITNESS:  Am I supposed to hand

 9                this to you?

10                    MR. GEORGE:  I'll take -- I'll keep

11                these.  I'll be the caddie.

12                    THE WITNESS:  I don't mind having them

13                in front of me.

14                    MR. GEORGE:  No, no.  It's fine.

15      BY MR. DUPLANTIER:

16          Q.   Do you have any recollection of who the

17      first homeowner was to complain about Chinese

18      drywall to Habitat of New Orleans?

19                    MR. GEORGE:  Objection.

20          A.   I don't recall, but when the media started

21      coming out in earlier 2010, you know, after the

22      local media picked it up, I'm sure we had a couple

23      of phone calls, contacts on it.  That's just what

24      people do.

25      BY MR. DUPLANTIER:
```

Confidential - Subject to Further Confidentiality Review

1        Q.    Did you -- did anyone from Habitat of New

2    Orleans contact Fly Systems?

3        A.    I think we -- this is as best I recall?

4        Q.    Yes.

5        A.    When we found out issues were coming up,

6    we tried to reach out to them.  Could not locate

7    them.

8        Q.    Who did that?  Who reached out to the --

9        A.    I don't recall.

10       Q.    You don't know who it was?

11       A.    Yeah.

12       Q.    Do you know how they reached out to Fly

13   Systems?

14       A.    I'm sure by telephone.

15       Q.    Were there ever any letters sent or --

16       A.    Not that I know of.

17       Q.    Have you ever filed suit against Fly

18   Systems directly in Florida?

19       A.    No.

20       Q.    Has Habitat of New Orleans reached out to

21   either one of the -- strike that.

22            Has Habitat of New Orleans reached out to

23   the manufacturer, Taishan, who manufactured the

24   drywall?

25       A.    Only through our attorneys.

Confidential - Subject to Further Confidentiality Review

1        Q.    Only -- and only as part of this

2    litigation, I would assume?

3        A.    That's correct.

4        Q.    Did Habitat purchase drywall from -- I

5    want to confine my question to the time period from

6    October of 2005 until March of 2007, when you bought

7    the Fly Systems drywall.  Besides INEX, who else was

8    supplying drywall to Habitat of New Orleans?

9        A.    Give me the start date again.

10       Q.    October of 2005.

11       A.    We probably -- and I'm fairly confident in

12   this -- got some drywall from Home Depot, maybe

13   Lowe's.  At that start-off date you're talking

14   about, if I recall correctly, one or the other of

15   them was the only place in the city that you could

16   get drywall.

17       Q.    Are you aware that there was a shortage of

18   drywall post-Katrina?

19       A.    Oh, yeah.

20       Q.    And where did you turn to to get drywall

21   at that point in time?

22       A.    Pretty much wherever we could find it and

23   get it.

24       Q.    So you went to Home Depot and Lowe's, and

25   we know that you purchased some from INEX.  Anywhere

Confidential - Subject to Further Confidentiality Review

1    else?

2         A.    I can't recall off the top of my head.

3         Q.    Well, by March of 2007, how many -- strike

4    that.

5               For example, let's talk about 2006.  How

6    many homes did Habitat of New Orleans build in 2006

7    in New Orleans, or in this region?

8         A.    I'd have to go -- I'll have to go check.

9    I mean, I can't give you a hard answer to that

10   because it's open-ended.  It's on -- we always are

11   finishing houses and starting new ones.

12              Post-Katrina, as I've mentioned earlier,

13   we went from a small, sort of stable 12-to-14-house

14   affiliate to this massive explosion of building we

15   were doing post-Katrina.  I would say in 2006, may

16   have gotten up to 30 to 40 houses.

17        Q.    All of that drywall did not come from

18   INEX, then, for those homes; is that correct?

19        A.    That's correct.

20        Q.    Where did the other drywall come from?

21        A.    Some of it came -- well, I've already

22   answered that.  I -- it's -- I'm pretty sure some

23   came from either or both of Lowe's and Home Depot.

24   I'm not sure if we had another local supplier that

25   we might have gotten a time or two.  And in 2006, we

Confidential - Subject to Further Confidentiality Review

1    did have a couple, maybe three Homes in a Box, where

2    the drywall came in from Tucson or wherever.

3        Q.    Who was handling purchasing at that time

4    for Habitat of New Orleans?

5             MR. GEORGE:  Objection.

6        A.    At -- I'm sorry.  Give me the time frame

7    again.  2005 to --

8    BY MR. DUPLANTIER:

9        Q.    -- to 2007, early 2007.

10       A.    That would have probably been done by

11   our -- we didn't have a purchasing department at

12   that point, so it probably would have been the

13   construction manager.  For at least part of that

14   time, it was Ken Francois.  And, generally speaking,

15   you know, the house leader, together with Ken, or

16   Ken would call the suppliers and subcontractors.

17             MR. DUPLANTIER:  Okay.  Can we take a

18                break?

19             MR. GEORGE:  Do you want to do the --

20                when is lunch due?

21             MR. EPSTEIN:  It's here.

22             MR. GEORGE:  Do you want to do a lunch

23                break, then?

24             MR. DUPLANTIER:  Yeah, yeah.  That

25                would be great.

Confidential - Subject to Further Confidentiality Review

```
1              THE VIDEOGRAPHER:  The time now is

2         11:58 a.m.  We are now off the record.

3         This is the end of tape 3.

4    (Recess.)

5              THE VIDEOGRAPHER:  The time now is

6         12:37 p.m.  We are now back on the record.

7         This is the beginning of tape 4.

8    BY MR. DUPLANTIER:

9         Q.   Mr. Pate, I appreciate you letting us take

10   a break in the middle of this deposition.

11            I'm going to give you a spreadsheet as

12   part of the production.

13            MR. GEORGE:  Thank you.

14   BY MR. DUPLANTIER:

15       Q.   And we'll mark this as Habitat 14.

16         (Deposition Exhibit 14 was marked for

17                 identification.)

18            Are you familiar with this spreadsheet?

19   It's Habitat Bates No. 7679 through 7686.

20       A.   I'm not familiar with this specific

21   spreadsheet, no.

22       Q.   Does this appear to represent all of the

23   Habitat homes that have been inspected and are

24   suspicious of having Chinese drywall?

25       A.   (Reviewing document.)  I'm sorry.  The
```

Confidential - Subject to Further Confidentiality Review

1    type is so small, I can barely read it.

2        Q.   I understand.

3        A.   It's either all of them or very close to

4    all of them.

5        Q.   Okay.  Who on behalf of Habitat has been

6    doing or participating in these inspections of the

7    properties?

8            MR. DAVIS:  I'm going to object

9                insofar as it may call for anything

10               privileged, so I'm going to advise you and

11               the witness that if it comes -- if the

12               response may involve any lawyer or

13               attorney involvement, please refrain from

14               going into that.

15           MR. GEORGE:  And, also, I would object

16               that the topic is limited to expert

17               inspections.

18   BY MR. DUPLANTIER:

19       Q.   You can answer it.

20       A.   I'm sorry to ask this again.  Could you

21   repeat it again?

22           MR. DUPLANTIER:  Can you read back my

23               question?

24           MR. DAVIS:  I won't repeat the

25               objection.

Confidential - Subject to Further Confidentiality Review

1          MR. DUPLANTIER:  You don't need to.

2          COURT REPORTER:  "Who on behalf of

3          Habitat has been doing or participating in

4          these inspections of the properties?"

5     A.   In the early first few houses, we had

6   Aleis Tusa -- I'm drawing a blank on his last name,

7   but Danny, he was on my construction staff, and

8   Eddie, our electrician, were doing the visuals on

9   INEX houses.  But when we realized there may be more

10  magnitude to it, then my staff doesn't participate

11  in the rest of them.  It was done by W.D. Scott, who

12  is an environmental engineer, and his firm did all

13  of the inspections and so forth.  There were

14  occasions when, for whatever reason, one of our

15  staff people was there, but that was mostly to hold

16  hands with the -- with our homeowner, you know, make

17  the introduction, this is Bill Scott we talked to

18  you about and so forth.

19  BY MR. DUPLANTIER:

20     Q.   Do you know if the drywall that you bought

21  from Fly Systems came marked with Crescent City

22  Gypsum on it?

23          MR. GEORGE:  Objection.  You mean,

24          like, when title changed hands to Habitat?

25          MR. DUPLANTIER:  No.  I'll rephrase

Confidential - Subject to Further Confidentiality Review

```
 1              the question.
 2    BY MR. DUPLANTIER:
 3       Q.   When you bought it from Fly Systems in
 4    March of 2007, was it marked with Crescent City
 5    Gypsum?
 6       A.   As far as I know, we never marked it any
 7    other way.  The markings were face-down.  The boards
 8    stack face-up.
 9       Q.   Right.
10       A.   So I don't really know the answer to that
11    if you're relating it to when we bought it.
12       Q.   Correct.
13       A.   Yeah.
14       Q.   At some point in time, you became aware
15    that it was marked Crescent City Gypsum; is that
16    correct?
17       A.   That's correct.
18       Q.   But you don't know who put that marking on
19    there?
20       A.   No.
21       Q.   While it had Crescent City Gypsum marked
22    on it, it also had Made in China marked on it; is
23    that correct?
24              MR. GEORGE:  Asked and answered.
25       A.   From what I have seen, yeah.
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. DUPLANTIER:

 2         Q.    Have all the homes now been remediated?

 3         A.    All except one.

 4         Q.    Which one has not been remediated?

 5         A.    It's -- I couldn't give you the address,

 6    but a tree fell on it during Isaac, so...

 7         Q.    You couldn't fix it?

 8         A.    Well, yeah.  We literally had vacated the

 9    family, were getting ready to do the work, and a

10    tree fell on it.

11              MR. GEORGE:  And that's beyond the

12              scope of this deposition.

13    BY MR. DUPLANTIER:

14         Q.    Mr. Pate, I'm going to show you a

15    memorandum that was recently produced, and we'll

16    mark this as 15.

17         (Deposition Exhibit 15 was marked for

18                  identification.)

19         One issue that I think we're going to

20    have, maybe I'm wrong, is this memorandum is dated

21    Novem -- September 13th, 2012.  I get the impression

22    that it's likely that this memo had some kind of

23    automatic date that updated whenever you opened it

24    up or printed it?

25         A.    Yeah.
```

Confidential - Subject to Further Confidentiality Review

1          Q.   Do you remember when you wrote this

2     memorandum to the board of directors?

3               MR. GEORGE:  Do you want that last

4          page on there?

5               MR. DUPLANTIER:  I don't, actually.

6               MR. GEORGE:  Do you want us to --

7               MR. DUPLANTIER:  Take the last page

8          off, guys.

9               MR. GEORGE:  Are you using this later?

10              MR. DUPLANTIER:  Let me see.  I don't

11         remember...

12         A.   Just from the internal -- I would guess

13    July or August.

14    BY MR. DUPLANTIER:

15         Q.   Of this year?

16         A.   No.

17         Q.   Of 2011?

18         A.   Well, this is -- no.  This was right

19    after -- it would have been 2010.

20         Q.   Okay.

21              One of the things that you reference in

22    this memorandum is that you have thoroughly reviewed

23    the legal filings, most notably Judge Fallon's

24    multi-district litigation rulings.  It's on the

25    first page towards the bottom.

Confidential - Subject to Further Confidentiality Review

1       A.    Yeah.

2       Q.    Do you remember who did that for Habitat

3  of New Orleans?

4               MR. GEORGE:  Objection, to the extent

5           it involves possible privilege.

6               MR. DUPLANTIER:  Well, that's why I

7           asked him who.

8               MR. GEORGE:  Plus, it's not covered by

9           the deposition notice.  There isn't

10          anything about legal proceedings and so

11          forth.  But, you know, that hasn't stopped

12          you before, so go for it.

13              MR. DUPLANTIER:  Scott, the notice has

14          covered all communications with boards of

15          directors.  He's reporting something to

16          the board of the directors in a

17          memorandum, and I'm asking about the

18          contents of that communication with the

19          board of directors.

20              MR. GEORGE:  You asked him who

21          Habitat has looking on dockets or

22          investigating many things is beyond the

23          scope of this.

24              MR. DUPLANTIER:  It's referenced in

25          the document and the communication to the

Confidential - Subject to Further Confidentiality Review

```
 1              board of directors.  So you're telling me

 2              that if something is in a memo that's

 3              part -- that's been produced as part of a

 4              30(b)(6) notice and because I just

 5              discovered in this document that they've

 6              been doing this, that I can't ask about it

 7              because I didn't ask the specific

 8              question, even though the deposition

 9              notice covered this communication?  Do you

10              understand why that objection is

11              unfounded?  My --

12                   MR. GEORGE:  No, no.  I --

13                   MR. DUPLANTIER:  My deposition

14              notice --

15                   MR. GEORGE:  I don't know why

16              you're -- I object.  It's not a privilege

17              ground.  I'm not instructing him not to

18              answer.  This back and forth, I'm not

19              convinced, under your reasoning --

20                   MR. DUPLANTIER:  You can answer the

21              question.

22                   MR. GEORGE:  -- irrelevant topics that

23              were mentioned here, you can just go into

24              for hours and hours and hours.  I'm

25              suggesting that this question is beyond
```

Confidential - Subject to Further Confidentiality Review

```
 1              the scope.  It's on the record.  If you
 2              want to get involved in colloquy with me,
 3              we can do that.  If you want to have him
 4              answer the question, you can do that, too.
 5   BY MR. DUPLANTIER:
 6       Q.   You can answer the question, Mr. Pate.  Go
 7   ahead.
 8       A.   Okay.
 9              THE WITNESS:  Could you read it back?
10              COURT REPORTER:  Sure.
11              "Do you remember who did that for
12              Habitat of New Orleans?"
13              And the question before that:  "One of
14              the things that you reference in this
15              memorandum is that you have thoroughly
16              reviewed the legal findings, most notably
17              Judge Fallon's multi-district litigation
18              rulings.  It's on the first page towards
19              the bottom."
20              THE WITNESS:  That's legal filings.
21       A.   Yeah, it would have been me.
22   BY MR. DUPLANTIER:
23       Q.   You were reviewing the actual legal
24   filings yourself?
25       A.   In conjunction with Margi Sunkel, our
```

Confidential - Subject to Further Confidentiality Review

1    counsel.

2         Q.    Okay.  And so there was nobody on staff

3    that was monitoring the notices being posted on

4    the multi-district website?

5         A.    Nope.

6    (Off the record.)

7    BY MR. DUPLANTIER:

8         Q.    Can you tell me -- you reference in

9    this memorandum --

10        A.    Uh-huh.

11        Q.    -- on the last page, one of your

12   residents, one of your owners demanded that you

13   pay for rehearsal space.  Do you remember who that

14   was?

15             MR. GEORGE:  Same objection as last

16             time.  It's beyond the scope.

17             MR. DUPLANTIER:  That's fine.

18   BY MR. DUPLANTIER:

19        Q.    You can answer it.

20        A.    No.  I don't recall specifically who it

21   was.

22        Q.    Let me give you another one of your

23   e-mails.  Oh, wait.  You know what?  Let me -- I'm

24   going to have to put this at the top, just because I

25   don't want to cover up any of the words.  Let me go

Confidential - Subject to Further Confidentiality Review

1    back to this.  Hang on.  Where is it?

2              Who is Jack Bowers?

3        A.    Jack Bowers is a consultant we use largely

4    on the development side.  He's a -- investment

5    banker is his background.  He's retired.

6        Q.    Andy Lee, who is that?

7        A.    Andy Lee is an attorney with Jones, Walker

8    law firm, past board president.

9        Q.    Okay.  And Dennis Kehoe?

10        A.    He's a professor of history at Tulane and

11   a past board president.

12        Q.    They weren't on the board at the time you

13   wrote this particular memorandum?

14        A.    No.

15        Q.    Why were you copying them?

16        A.    Respect.

17        Q.    Here is 16.  It is Habitat 7723, 7724.

18            (Deposition Exhibit 16 was marked for

19                    identification.)

20        A.    (Reviewing document.)  Okay.

21        Q.    Let me ask you a couple of background

22   questions before I ask about this particular report.

23   How many homes are in the Musicians' Village?

24        A.    72 single-family homes and 10

25   elder-friendly duplex units.

Confidential - Subject to Further Confidentiality Review

1      Q.   Of those 72 homes, INEX supplied drywall

2    to 24 of them; is that correct?

3      A.   I thought it was a little more than that,

4    but I couldn't tell you precisely.

5      Q.   When -- in this memorandum to the board,

6    when you talk about we had obtained a letter from

7    them, from INEX, on National Gypsum letterhead and,

8    verbally, they had assured our staff that they had

9    only used National Gypsum, are you referencing the

10   conversation that you believe John Mezzenga had with

11   Interior/Exterior?

12     A.   Yes.

13     Q.   Do you know if anyone else from Habitat

14   New Orleans had any conversations with a

15   representative of Interior/Exterior besides John?

16          MR. GEORGE:  Objection.

17     A.   Some of our field staff may have talked to

18   them about deliveries or something like that.  But

19   on this topic, --

20   BY MR. DUPLANTIER:

21     Q.   Yes.

22     A.   -- as far as I know, that one John was the

23   only one.

24     Q.   You also say on page 2 of this report,

25   it's the third paragraph from the bottom, so it

Confidential - Subject to Further Confidentiality Review

1    increasingly appears -- you were continuing to

2    assert to your board that the drywall that you had

3    been using from Fly Systems, the Taishan drywall,

4    was good and noncorrosive, and you believed that

5    when you wrote this e-mail; isn't that true?

6              MR. GEORGE:   Objection.

7         A.   This memo is to my executive committee.

8    BY MR. DUPLANTIER:

9         Q.   Okay.

10        A.   And the statement is, so it appears --

11   increasingly appears that our Chinese drywall is

12   probably good and no -- noncorrosive.  That was my

13   belief at the time I wrote that.

14        Q.   Have there been any specific

15   communications between Habitat New Orleans and

16   Habitat International with regard to the remediation

17   because of Chinese drywall?

18        A.   I'm sure we've told them that we were

19   doing the remediation and that we were following

20   Judge Fallon's guidelines on the preservation of

21   evidence and the remediation, elements of

22   remediation.  I don't think we've given them, like,

23   status reports or anything like that.

24        Q.   I'll show you an e-mail, which we'll mark

25   as 17.

Confidential - Subject to Further Confidentiality Review

```
 1              (Deposition Exhibit 17 was marked for

 2                       identification.)

 3              MR. GEORGE:  Thank you.

 4       A.    (Reviewing document.)  Okay.

 5    BY MR. DUPLANTIER:

 6       Q.    Do you remember receiving this e-mail?

 7       A.    Not really.

 8       Q.    Do you remember doing anything in response

 9    to this e-mail?

10       A.    I don't think we did anything in response

11    to it.  We had already started the testing.

12       Q.    Do you know who Lynn Gangemella is?

13       A.    No.

14       Q.    Okay.

15       A.    And neither did Jay, I might add.

16       Q.    So you know the report that's dated --

17    e-mail, I'm sorry -- what we'll mark as 18.  It's

18    dated April 26th, 2009.

19              (Deposition Exhibit 18 was marked for

20                       identification.)

21       A.    (Reviewing document.)

22       Q.    Do you remember this e-mail?

23              MR. GEORGE:  I don't see him receiving

24              it.

25       A.    I started to say, I've never seen this.
```

```
 1    BY MR. DUPLANTIER:

 2         Q.   Do you remember ever discussing this with

 3    Alice?

 4         A.   Aleis?

 5         Q.   Aleis Tusa?

 6         A.   I don't recall doing so.

 7         Q.   I would assume that Habitat didn't do

 8    anything differently with regard to the testing

 9    protocols in response to this e-mail, did you?

10              MR. GEORGE:  Objection to form.

11         A.   I didn't see it, so I don't think we did

12    anything with or about it.

13    BY MR. DUPLANTIER:

14         Q.   Let me ask you this, Mr. Pate:  Have you

15    contacted the testing company and asked them why

16    they only did air testing the first round?  Have you

17    talked with them?

18         A.   AESI?

19         Q.   Yes.

20         A.   No.

21         Q.   Have you sued them?

22         A.   No.

23         Q.   I'll show you an e-mail that's dated

24    1/13/2010.  It's an e-mail chain.  It's marked as 19

25    to the deposition.
```

Confidential - Subject to Further Confidentiality Review

1           (Deposition Exhibit 19 was marked for

2                   identification.)

3       A.   (Reviewing document.)   Okay.

4       Q.   Who -- your -- the beginning, the first

5  e-mail from Elizabeth Lisle to Aleis Tusa --

6       A.   The first in the chain?

7       Q.   Yeah, yeah.

8       A.   It's from Aleis to Elizabeth.

9       Q.   Okay.   She references that -- a statement

10  that, right now Habitat, we, are purchasing our

11  drywall locally.

12           Do you know who you were purchasing

13  drywall from at this time?

14      A.   I don't know specifically who we were

15  purchasing from at that time.   I think...

16      Q.   You don't know?

17      A.   No.

18           COURT REPORTER:   I'm sorry.   You said

19           no?

20           THE WITNESS:   No.

21  BY MR. DUPLANTIER:

22      Q.   I'm going a little backwards here just

23  because I'm trying to get through.   I apologize.

24  But we got a lot of information from you guys in a

25  short period of time, so...

Confidential - Subject to Further Confidentiality Review

```
 1              I'll give you an e-mail dated
 2    September 16th, 2009.
 3          (Deposition Exhibit 20 was marked for
 4                  identification.)
 5              MR. GEORGE:  Thank you.
 6        A.   (Reviewing document.)  Okay.
 7    BY MR. DUPLANTIER:
 8        Q.   You reference to him what you understood
 9    to be the truth on September 16th of 2009, that
10    there was more drywall -- Chinese drywall that had
11    been imported and used with no ill effect than any
12    of the bad drywall.
13              MR. GEORGE:  Objection.
14    BY MR. DUPLANTIER:
15        Q.   Do you recall that?
16        A.   The second sentence in the next to last
17    paragraph?
18        Q.   Correct.
19        A.   That was my understanding at the time.
20        Q.   Is it still your understanding?
21        A.   I have no idea.
22        Q.   Do you know how much Chinese drywall is
23    bad and how much is good?
24        A.   No.
25        Q.   You are aware that some Chinese drywall is
```

Confidential - Subject to Further Confidentiality Review

 1    good?

 2                MR. GEORGE:  Objection.

 3        A.    I don't know the answer to that.  I don't

 4    know the universe of Chinese drywall.

 5    BY MR. DUPLANTIER:

 6        Q.    That's fine.

 7              You know what?  I'm going to go back to

 8    one of these earlier e-mails.  I'm sorry.  I

 9    apologize.  Going to NOAHH 16, you reference in this

10    e-mail that Aleis and Dan of your staff did

11    Mr. Crespo's house.

12                MR. GEORGE:  Are you seeing that, or

13            do you want to find it?

14    BY MR. DUPLANTIER:

15        Q.    Yeah.  It's in the second paragraph

16    towards the bottom.  Thus comes the bad news; when

17    Aleis and Dan of our staff and Eddie Freeman, our

18    electrician, went to Ricardo's house, do you see

19    that?

20        A.    Yeah.

21        Q.    They were stunned to find out by

22    inspection of the back of the drywall in the HVAC

23    closet that it was clearly marked with Product of

24    China.  Do you recall that?

25        A.    Uh-huh.

Confidential - Subject to Further Confidentiality Review

1          Q.     Do you recall that conversation with

2     Aleis?

3          A.     Yeah, I think so.

4          Q.     And Habitat was able to discover by

5     opening Mr. Crespo's HVAC closet that Chinese

6     drywall had been used in his home?

7          A.     It was on the back of the drywall, the

8     front facing the next room.

9          Q.     But you could see it?

10         A.     Yeah.

11         Q.     It was plainly -- it was plainly obvious

12    by opening up the closet, right?

13         A.     Well, I didn't look --

14                MR. GEORGE:  Objection.

15         A.     -- myself.

16    BY MR. DUPLANTIER:

17         Q.     Right.  Aleis did.

18         A.     Yeah.  And they said it was marked.  I

19    don't know if it was front and center or down in the

20    corner or what.

21         Q.     They didn't have to do any destructive

22    testing to make that discovery, did they?

23         A.     That's correct.

24         Q.     I'm going to give you an e-mail.  It's

25    dated -- which we'll mark as 21, which is dated

Confidential - Subject to Further Confidentiality Review

```
1    5/14/2010.

2            (Deposition Exhibit 21 was marked for

3                    identification.)

4    A.    (Reviewing document.)  Okay.

5    Q.    Do you recall, after sending this e-mail,

6    reviewing the letter that was sent by INEX?

7    A.    Which letter are you referring to?

8    Q.    I'm referring to the letter that you're

9    talking about in this e-mail, so whatever letter

10   you're referring to.  I'm not sure.

11            MR. GEORGE:  Objection to form.  Do

12            you want to start again there?  It got a

13            bit --

14            MR. DUPLANTIER:  Sure.

15            MR. GEORGE:  Thanks.

16   BY MR. DUPLANTIER:

17   Q.    Do you know what letter you're referring

18   to in this e-mail?

19   A.    It's the one that was faxed from INEX to

20   us with the National Gypsum letterhead.

21   Q.    And that was faxed to you in January of

22   2010; is that correct?

23   A.    As I recall.

24   Q.    Okay.  Now, after you sent this e-mail,

25   did you go back and look at the letter to see if it
```

Confidential - Subject to Further Confidentiality Review

1    said what you were concerned about it saying?

2         A.    What would that be?

3              MR. GEORGE:  Objection to form.

4    BY MR. DUPLANTIER:

5         Q.    Well, I suspect that they carefully worded

6    it to say, in effect, now.  That's what you're

7    reporting to Aleis and John Mezzenga, that you're

8    worried that the letter that we got from INEX only

9    said that's what we sell now.  Did you go back and

10   look at the letter?

11        A.    I think so.

12        Q.    Did you have a conversation with John

13   about what the intent of the letter was?

14        A.    No.  It speaks for itself.

15        Q.    It speaks for itself, right.

16              And it was at this -- at that point that

17   you decided to inspect all of the INEX homes?

18        A.    At this point?

19              MR. GEORGE:  Objection.

20   BY MR. DUPLANTIER:

21        Q.    Yes.  You can answer.

22        A.    Well, as I say in this e-mail, depending

23   on the answer, meaning the answer from INEX, on how

24   much Chinese drywall they distributed to us, i.e.,

25   from when and to where, depending on the answer, we

Confidential - Subject to Further Confidentiality Review

1    will need to ascertain the houses in which it was

2    used and then at least do a visual inspection.  So

3    this was contributing to the decision to go inspect

4    them all.

5         Q.    Did INEX cooperate with you?

6               MR. GEORGE:   Objection to form.

7               Go ahead.

8         A.    I don't think we had any interface with

9    INEX, other than probably asking how much, and I'm

10   not sure we asked INEX that or just decided to go

11   forward based on what we had in our files.

12   BY MR. DUPLANTIER:

13        Q.    Well, were you able to differentiate

14   between an INEX-supplied home and a Habitat-supplied

15   home?

16        A.    Yeah.

17        Q.    How?

18        A.    We keep a construction in progress file on

19   every house, and in that file is the purchase order

20   and the invoice, and I don't think a copy of the

21   check is kept in there, but we -- we track that.

22        Q.    So you have a copy of the invoice, or is

23   there a spreadsheet where it said this drywall was

24   supplied by INEX?

25        A.    House by house, there's a copy of the

Confidential - Subject to Further Confidentiality Review

1    purchase order, usually a copy of the invoice.

2    Every once in a while, you know, Joe, the house

3    leader, will stick it in his truck and lose it.

4         Q.    Do you know if anybody contacted INEX

5    directly and asked for the information about which

6    houses they supplied?

7              MR. GEORGE:  Objection.

8         A.    I do not know the answer to that.  That

9    was putting my team on alert.

10   BY MR. DUPLANTIER:

11        Q.    If anybody did that, who would have been

12   responsible for doing that?  John Mezzenga?

13        A.    Probably John.  It might have been Aleis.

14   If I recall correctly -- yeah, it says John or Lisa.

15   Lisa Farris was our -- is our head of finance, so

16   she would have had the files that had all of the

17   invoices, purchase orders and so forth.  So I'm

18   basically saying either John or Lisa.  You might

19   want to check.  Whether they did so, I don't know.

20        Q.    This is an e-mail from Aleis Tusa to Aaron

21   Kessler?

22        A.    Keesler.

23        Q.    Keesler?  Is he the reporter?

24        A.    Yeah.

25        Q.    I'll mark this as 22.  This is Habitat

Confidential - Subject to Further Confidentiality Review

```
 1    Bates 2403.

 2            (Deposition Exhibit 22 was marked for

 3                    identification.)

 4              (Brief interruption.)

 5              MS. LESSELL:  I'm sorry, 24 what?

 6              MR. DUPLANTIER:  2403.

 7              MS. LESSELL:  Thank you.

 8              MR. DAVIS:  Do you want to see if

 9         there's still people on the phone?

10              MR. GEORGE:  Is anyone still on the

11         phone for the deposition of Jim Pate?

12              MR. DUPLANTIER:  Yes.

13              MR. GEORGE:  You're moving.

14              UNIDENTIFIED SPEAKER:  Yes.

15              MR. GEORGE:  Okay, that's good.

16              MR. DAVIS:  What's the exhibit?

17              MR. DUPLANTIER:  22.

18      A.   (Reviewing document.)  Okay.

19   BY MR. DUPLANTIER:

20      Q.   This e-mail references some tracking that

21   was done by Aleis.  Do you remember discussing that

22   with her?

23      A.   I don't recall it, but it's entirely

24   possible I did.

25      Q.   Do you know how she was able to track
```

Confidential - Subject to Further Confidentiality Review

1      these properties?

2          A.    I don't know how she arrived at these

3      numbers.

4          Q.    Do you think they're inaccurate?

5          A.    I don't know.  I don't know what the

6      purpose was or what her time frame.  That was right

7      at the time of our very first contact from Keesler.

8          Q.    Right.

9          A.    And as you can tell, he's positioning

10     himself as a -- you know, doing research and asking

11     us to help him.

12         Q.    Sure.  Okay.

13               The next exhibit will be 23, and it's

14     Habitat 2314.

15            (Deposition Exhibit 23 was marked for

16                      identification.)

17         A.    (Reviewing document.)  Okay.

18         Q.    Is this the first notice that went to all

19     of the Habitat homeowners?

20               MR. GEORGE:  Objection to form.

21         A.    I believe it's the first one.

22     BY MR. DUPLANTIER:

23         Q.    Okay.  This document reflects at

24     the time, March 20th of 2009, what the knowledge of

25     Habitat was with regard to the problems with

Confidential - Subject to Further Confidentiality Review

1    drywall, as I understand it.  Is that correct?

2                    MR. GEORGE:  Objection.

3        A.    It reflects our test results at that time,

4    and that's --

5    BY MR. DUPLANTIER:

6        Q.    Right.  I understand.

7        A.    I don't think we had anything else.

8        Q.    Well, I'm actually more interested in the

9    second paragraph.  Well, strike that.

10                   Let me -- let's start with the first

11   paragraph.  This notice is dated March 20th of 2009,

12   and you did not -- up until this point, you had not

13   contacted INEX; in fact, it happened after this

14   letter; is that right?

15                   MR. GEORGE:  Objection to form.

16       A.    I think that's correct.

17   BY MR. DUPLANTIER:

18       Q.    The timeline that you produced is right in

19   front of you if you need to refresh your

20   recollection.

21                   This indicates that you had had some

22   inquiries from individuals about the quality of the

23   sheetrock.

24       A.    Uh-huh.

25       Q.    Even though you had had inquiries about

Confidential - Subject to Further Confidentiality Review

1    the quality of the sheetrock, you had not contacted

2    INEX, is that correct, at this point in time?

3        A.    That's correct.

4        Q.    And at this point in time, you had had no

5    complaints about any problems with any homes related

6    to the drywall, that you're aware of; is that

7    correct?

8        A.    Any -- I don't recall any complaints.

9        Q.    All right.  And, in fact, in the second

10   paragraph, it says that Hab -- New Orleans Area

11   Habitat for Humanity has not received any reports

12   from anyone who has experienced a problem.  And

13   that's as of March 20th, 2009; is that correct?

14               MR. GEORGE:  You want him to say

15          that's what it says in the paper?

16               MR. DUPLANTIER:  Yes, I do.

17       A.    Yeah.  That's what it says in the letter.

18   BY MR. DUPLANTIER:

19       Q.    And was that, in fact -- was this letter

20   an accurate representation of Habitat's information

21   at this time?

22       A.    As I recall.

23       Q.    You had not had any complaints from any of

24   your homeowners about problems with corrosion, had

25   you?

Confidential - Subject to Further Confidentiality Review

1       A.    No.

2       Q.    You had not had any complaints with --

3   from any homeowners with problems with regard to a

4   smell, had you?

5       A.    No.

6       Q.    It was at that point in time that you had

7   the drywall tested by EASI [sic], and this is what

8   you're reporting to your homeowners?

9       A.    We had done the test -- started the

10  testing in late January and February, whatever.

11      Q.    This is twenty -- this will be Habitat 24.

12          (Deposition Exhibit 24 was marked for

13                  identification.)

14          MR. GEORGE:   Thank you.

15      A.    (Reviewing document.)  Okay.

16  BY MR. DUPLANTIER:

17      Q.    Who's Chris?

18      A.    Actually, I don't know.

19      Q.    You don't know Chris Whipple?

20      A.    No.   I mean, the name doesn't ring a bell

21  or anything.

22      Q.    Doesn't ring a bell?

23      A.    Obviously, we communicated.

24      Q.    Well, he's got a Habitat NOLA e-mail

25  address; is that correct?

Confidential - Subject to Further Confidentiality Review

```
1        A.    No.

2        Q.    Chris Whipple?  Oh, no, I'm sorry.  It's

3   to Chris and to Aleis.

4        A.    Yeah.

5        Q.    I'm sorry.  I apologize.  I apologize.

6              MR. DUPLANTIER:  Yeah, I found it.

7              MR. GRAU:  Okay.

8   BY MR. DUPLANTIER:

9        Q.    Mr. Whipple is putting you, Jim Pate, on

10   notice that air tests alone may be insufficient to

11   detect a problem with corrosive drywall.  Do you

12   recall that?  Do you recall this e-mail?

13             MR. GEORGE:  Objection to form.

14        A.    I don't really recall it, but I would note

15   that, at that time, we had already started our own

16   testing protocol.

17   BY MR. DUPLANTIER:

18        Q.    I understand.

19             Do you -- did you go back and look at your

20   testing reports to review them as to determine

21   whether they were tests being done -- strike that.

22             Did you ever go back at this point in time

23   and look at the reports and see that you were only

24   doing -- that Habitat of New Orleans was only doing

25   air testing?
```

Confidential - Subject to Further Confidentiality Review

1           MR. GEORGE:  Objection to form.

2    BY MR. DUPLANTIER:

3       Q.   Air sampling?

4           MR. GEORGE:  Same objection.

5       A.   I don't think I did anything in response

6    to this.

7           THE VIDEOGRAPHER:  You have about ten

8        minutes on the tape.

9           MR. DUPLANTIER:  Okay.

10          What number was that?  24?

11          MR. GEORGE:  25.

12          MR. DUPLANTIER:  This is 25 or that --

13          MR. GEORGE:  That was 24.

14          THE WITNESS:  This is 24.

15   BY MR. DUPLANTIER:

16      Q.   I'll give you an e-mail from Billy Marchal

17   to W.D. Scott, Troiana, Aleis Tusa and Elizabeth

18   Lisle, and ask you to take a look at that.  It's

19   Habitat 7705.

20          (Deposition Exhibit 25 was marked for

21              identification.)

22      A.   (Reviewing document.)  Okay.

23      Q.   Who is Mr. Marchal, and what was his role

24   at this point?

25      A.   We hired Billy -- it's Billy Marchal.

Confidential - Subject to Further Confidentiality Review

1        Q.    Okay.

2        A.    We hired him to be our project manager for

3    the remediation.

4        Q.    Okay.  This is written in July of 2011?

5        A.    Right.

6        Q.    Can you tell me why he was calling the

7    homeowners, specifically giving the INEX homeowners

8    highest priority?

9        A.    The first place that we saw an issue was

10    with INEX homes.  By then, we, I think, probably had

11    decided to test all of them.

12        Q.    Right.

13        A.    And what the letter -- what the memo

14    references is we had talked with Bill Scott, W.D.

15    Scott.  That's the Bill referred to.  He's an

16    environmental engineer, and we had asked him to do

17    all of the inspections.  And so Billy was calling

18    the homeowners to say that Bill Scott would be

19    calling or his staff would be calling them, making

20    appointments to come inspect their homes.

21        Q.    Weren't you remediating homes by this

22    point?

23        A.    No.

24        Q.    July of 2011?

25        A.    No.  We were inspecting.

Confidential - Subject to Further Confidentiality Review

1        Q.    I'm going to give you a letter dated

2    July 11th of 2011.

3           (Deposition Exhibit 26 was marked for

4                    identification.)

5               MR. GEORGE:  Rick, to the extent you

6            have questions about remediation and so

7            forth, we continue to believe it's beyond

8            the scope of the deposition.

9               MR. DUPLANTIER:  Okay.

10              MR. GEORGE:  Thanks for understanding.

11       A.    (Reviewing document.)  Okay.

12   BY MR. DUPLANTIER:

13       Q.    I'm a little confused, then.

14       A.    Well, I need to correct -- you had asked

15   7/22/2011, hadn't we already begun remediating.

16       Q.    Right.

17       A.    And I was thinking July 2010.  By this

18   date, we had begun remediating.

19       Q.    You had hired W.D. Scott back in July of

20   2010?

21       A.    Yeah.  So -- and that -- in response to

22   your question, yes, we had started doing --

23   remediating.

24               THE VIDEOGRAPHER:  You have about five

25            minutes.

Confidential - Subject to Further Confidentiality Review

1             MR. DUPLANTIER:  Okay.

2    BY MR. DUPLANTIER:

3        Q.    So why were INEX homes being given this

4    assessment in July of 2011 on a highest priority?

5        A.    Oh, subject line.  That's the watch list.

6    It's a year later.

7        Q.    Okay.

8        A.    That's houses that we're -- we didn't see

9    definitive signs of corrosion or it didn't have

10   readily visible Chinese drywall.  We put them on a

11   watch list and went back to see them a year later.

12       Q.    Okay.  All right.

13            MR. DUPLANTIER:  We've got to change

14            tapes.  You want to take a break for a

15            couple minutes?

16            THE VIDEOGRAPHER:  The time now is

17            1:33 p.m.  We are now off the record.

18   (Recess.)

19            THE VIDEOGRAPHER:  The time now is

20            1:42 p.m.  We're now back on the record.

21            MR. GEORGE:  Actually, whoa, whoa,

22            whoa.  Slow down.  I got called out for a

23            second.  Sorry.

24            THE VIDEOGRAPHER:  Pause on that.

25   (Recess.)

Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  The time now is

 2          1:44 p.m.  We are now back on the record.

 3          This is the beginning of tape 5.

 4   BY MR. DUPLANTIER:

 5      Q.   Mr. Pate, did New Orleans Habitat ever

 6   send a formal letter to Interior/Exterior about

 7   their findings with regard to the drywall?

 8              MR. GEORGE:  Objection.  Habitat's

 9          findings?

10              MR. DUPLANTIER:  Yes.

11      A.   No.

12   BY MR. DUPLANTIER:

13      Q.   Did you ever send a formal written inquiry

14   into INEX about the type of drywall that may have

15   been sold in 2006 and 2007 to Habitat?

16      A.   No.

17      Q.   Excuse me.  Did you ever provide to

18   Interior/Exterior any complaints from any residents

19   that may have been received?

20      A.   I don't believe so.

21      Q.   We know that Habitat of New Orleans

22   received inquiries from the Attorney General, and

23   you responded to those; is that correct?

24      A.   That's correct.

25      Q.   Do you remember when that took place?
```

Confidential - Subject to Further Confidentiality Review

1        A.    I really don't recall exactly.  It says

2    December 2009 we responded, so I assume it was

3    earlier than that.

4        Q.    Who was responsible for coordinating that

5    response to those governmental agencies?

6              MR. GEORGE:  It's beyond the scope of

7              this deposition, so I object.

8              MR. DUPLANTIER:  That's fine.

9    BY MR. DUPLANTIER:

10       Q.    You can answer it.  You can answer it.

11       A.    Well, I think in terms of the Louisiana

12   Attorney General deal, Aleis probably pulled

13   together the data, and I reviewed all of it.

14       Q.    Besides you and Aleis, who would have been

15   involved in that process?

16       A.    I don't know who would have been.  I don't

17   recall who -- if anybody else was...

18       Q.    Did you ever meet with anybody from the

19   Attorney General's office?

20       A.    No.

21       Q.    Louisiana Attorney General's office?

22             MR. GEORGE:  Same objection.

23             MR. DUPLANTIER:  That's fine.

24       A.    I did not meet.  I had a telephone call

25   with them.

Confidential - Subject to Further Confidentiality Review

1    BY MR. DUPLANTIER:

2         Q.    Do you remember who that was?

3         A.    It was the one that died young.

4         Q.    Bryan McMinn?

5         A.    Yeah.

6         Q.    Anybody else?

7         A.    No.  I don't think so.

8         Q.    Did you ever meet with anybody from the

9    Consumer Product Safety Commission?

10              MR. GEORGE:   Same objection.

11         A.    I didn't, but they came in and took

12   samples.  I think Aleis arranged to get them in the

13   warehouse.

14   BY MR. DUPLANTIER:

15         Q.    But you weren't present for any of that?

16         A.    No.

17         Q.    Anybody besides Aleis present when they

18   took those samples?

19         A.    I don't know.

20         Q.    I'm going to attach as 27 to the

21   deposition --

22              Where's my pen?  Where's my black pen?

23   (Off the record.)

24              (Deposition Exhibit 27 was marked for

25                    identification.)

```
 1    BY MR. DUPLANTIER:

 2        Q.    Sorry about that.  This is Bates numbers

 3    15503 through 15507.  I'll ask if you --

 4              MR. GEORGE:  Do you have a copy?

 5              MR. DUPLANTIER:  No.  That's the only

 6        one I have.

 7              MR. GEORGE:  I just want to see what

 8        we're looking at.  Okay.  I object to this

 9        line of questioning as being beyond the

10        scope of the deposition.

11              MR. DUPLANTIER:  That's fine.

12    BY MR. DUPLANTIER:

13        Q.    You can answer it.

14              MR. DUPLANTIER:  Unless you want to

15        call the judge.  Do you want to call the

16        judge?

17              MR. GEORGE:  I think it --

18              MR. DUPLANTIER:  Your recourse is

19        to stop and call the judge or basically

20        I'm going to --

21              MR. GEORGE:  You get an answer.

22        Whether or not it can be used later on in

23        the way you want to use it is another

24        issue.  I think the judge would appreciate

25        us allowing the questioning to go forward,
```

Confidential - Subject to Further Confidentiality Review

```
 1              and he can decide --

 2                   MR. DUPLANTIER:  Exactly what the

 3              judge would tell you.

 4                   MR. GEORGE:  So thanks for your offer,

 5              but I think it prudent to be a wiser

 6              counsel in this situation.

 7         A.   (Reviewing document.)  Okay.

 8    BY MR. DUPLANTIER:

 9         Q.   Do you recall receiving that letter?

10         A.   (Inaudible.)

11                   COURT REPORTER:  I'm sorry?

12         A.   Yes.

13    BY MR. DUPLANTIER:

14         Q.   And do you recall working with Ms. Tusa on

15    the response to that letter?

16         A.   Yes.

17         Q.   Did you seek any information from anyone

18    outside of Habitat of New Orleans to respond to that

19    letter?

20         A.   I don't recall doing so, and we had

21    already provided them with a lot of this

22    information.  This was kind of a follow-up.

23         Q.   They had come in and done an informal

24    inquiry before this letter; is that correct?

25         A.   They didn't come in our office.  This was
```

Confidential - Subject to Further Confidentiality Review

1   by telephone.

2        Q.   Just by telephone?

3        A.   Yeah.

4        Q.   Had they collected the samples before they

5   sent the letter?

6        A.   I don't know the answer to that.  There's

7   not a date on the letter.  I don't recall.  I think

8   they had.  Yeah, they -- yeah, they had come in and

9   collected their samples.

10       Q.   What is -- do you -- as we sit here

11  today -- and I may have asked you this, Mr. Pate,

12  and I don't remember.  Do you know who you --

13  Habitat of New Orleans is obtaining their drywall

14  from right now?

15       A.   I want to say Campbell Roofing Supply.

16            MR. DUPLANTIER:  Kevin, I'm going to

17            pass the witness to you, if you're ready.

18  (Off the record.)

19                      * * *

20                   EXAMINATION

21  BY MR. RISLEY:

22       Q.   Mr. Pate, good afternoon.  My name is

23  Kevin Risley.  I represent the North River Insurance

24  Company, and I've got a few questions to ask you,

25  but I don't think we'll be very long.  Is that all

Confidential - Subject to Further Confidentiality Review

1    right?

2         A.   Yes, fine.

3         Q.   Mr. Duplantier just asked you about a

4    request for information you received from the U.S.

5    Consumer Product Safety Commission, correct?

6         A.   Correct.

7         Q.   Did you receive or did New Orleans Habitat

8    receive other communications from the CPSC?

9         A.   We had telephone conversations.  I don't

10   recall per se getting a written one or anything

11   before that.

12        Q.   Okay.  What about after that?

13        A.   I -- I can't recall if it was them, EPA or

14   whatever it is, not CDC, but one of the other

15   agencies that took samples, who, like a year and a

16   half later, at our request gave us a copy of their

17   testing, but everything was done by anonymous code.

18        Q.   Okay.  I have seen several newspaper or

19   online articles where you've been quoted in

20   connection with Chinese drywall, and I think one of

21   them you said that not all Chinese drywall is bad.

22   Do you remember that?

23        A.   Uh-huh.

24        Q.   And what did you mean by that?

25        A.   Well, that I didn't know whether it was

Confidential - Subject to Further Confidentiality Review

```
 1    all bad or anything.

 2         Q.    Do you have an understanding now as to

 3    whether all of the drywall manufactured in China and

 4    imported to the U.S. after Hurricane Katrina emitted

 5    sulfur gases?

 6                   MR. GEORGE:  I object.  It's beyond

 7              the scope of the deposition.  Obviously,

 8              the witness can answer.

 9         A.    Repeat that.

10    BY MR. RISLEY:

11         Q.    Do you have an understanding now whether

12    all of the drywall manufactured in China and

13    imported into this area after Hurricane Katrina

14    emits sulfur gas or sulfur gas compounds?

15         A.    I don't have any knowledge of that.

16         Q.    I'm going to hand you what's been marked

17    as Deposition Exhibit 28, which is Bates numbered

18    NOAHH-8477 to 8480, which appears to be an e-mail

19    strand.

20              (Deposition Exhibit 28 was marked for

21                   identification.)

22              Are you familiar with these e-mails?

23                   MR. GEORGE:  Let him review it, all

24              right?  Let him review first.

25                   MR. RISLEY:  Sure.  Take your time to
```

```
 1              look at it if you need to.

 2                   MR. GEORGE:  And there are two

 3              different e-mails here; is that correct,

 4              Kevin?

 5                   THE WITNESS:  It looks like three

 6              or --

 7                   MR. RISLEY:  I believe there are two,

 8              that's correct.

 9                   THE WITNESS:  Two.

10                   MR. GEORGE:  Okay.

11        A.   (Reviewing document.)  Okay.

12   BY MR. RISLEY:

13        Q.   Have you seen these e-mails before?

14        A.   Yeah.

15        Q.   If you look at the last page --

16        A.   Which one?

17        Q.   8480, the last page of the second e-mail.

18                   MR. GEORGE:  The fourth page.

19        A.   Okay.

20   BY MR. RISLEY:

21        Q.   It appears to start with an e-mail from

22   the Reverend Alan Coe to Bob Marye asking whether

23   Habitat sheetrock comes from China.  Do you see

24   that?

25        A.   Yes.
```

Confidential - Subject to Further Confidentiality Review

1       Q.    Did Mr. Marye -- am I pronouncing his name

2    right?

3       A.    Marye (different pronunciation).

4       Q.    Marye?

5       A.    Uh-huh.

6       Q.    Did he bring this e-mail to your

7    attention?

8       A.    I think later on in the thread, yeah.

9       Q.    Okay.

10      A.    I might add that Bob Marye is a ordained

11   minister, and he may have known Alan through his,

12   you know, religious affiliations.

13      Q.    Okay.  Did you have any idea why Reverend

14   Coe was asking about where Habitat sheet -- Habitat

15   sheetrock came from?

16      A.    Not why.

17      Q.    Okay.

18      A.    At this point, it was all over the media.

19      Q.    So people were aware of the issue by that

20   time, correct?

21      A.    Oh, yeah.

22      Q.    Okay.

23      A.    It was on -- on the news and everything

24   else.

25      Q.    And then on the very first page of the

Confidential - Subject to Further Confidentiality Review

1    first e-mail, which is 8477, the top part appears to

2    be an e-mail from you to Mr. Marye, correct?

3        A.    Yes.

4        Q.    And could you read that first paragraph,

5    please, out loud.

6              MR. GEORGE:   Where it starts,

7              "Please"?

8    BY MR. RISLEY:

9        Q.    "Please add to."

10       A.    Yeah.

11       Q.    Yeah.

12       A.    "Please add to the brief first question

13   something to the effect, we would note that Chinese

14   drywall has been imported and used in the United

15   States construction industry for many years without

16   problem or issue."

17       Q.    And what was your basis for saying that?

18       A.    Just what I had heard, that it had come in

19   all over the country, West Coast, New England and

20   everything, and that it went many years -- I'm

21   not -- that was a, you know, undefined term, but

22   that's just kind of what I had heard.

23       Q.    Now, this e-mail was sent to Mr. Marye on

24   March 19th, 2009, correct?

25       A.    That's correct.

Confidential - Subject to Further Confidentiality Review

1        Q.   And by that point, you had been working

2    for Habitat both here and in Dallas for several

3    years, correct?

4        A.   2009?

5        Q.   Yes.

6        A.   That's correct.  A number of years.

7        Q.   And how long have you been the executive

8    director of Habitat here now?

9        A.   Started in 2000, January 2000.

10       Q.   And in that time, how many homes has

11   Habitat New Orleans built?

12       A.   When I got here, the affiliate had built

13   about 34.  Between 2000, 2005, I added about 60, so

14   we had 101 houses before Katrina.  Post-Katrina,

15   we've done -- it's in excess of 370 houses.

16       Q.   And prior to Katrina, had you ever heard

17   any reports of sheetrock from any source emitting

18   sulfur gas and corroding or rusting metals?

19       A.   No, I had not.

20       Q.   At some point, did Habitat for Humanity

21   International set up a task force to investigate

22   Chinese drywall?

23       A.   I don't know the answer to that.

24       Q.   Okay.  Does that mean that you or people

25   on your staff have had no communications with a

Confidential - Subject to Further Confidentiality Review

1    Habitat for Humanity International task force on

2    drywall investigation?

3         A.    On drywall investigation?

4         Q.    Yes.

5         A.    We've had some exchanges where they've

6    alerted us to a news article or something that

7    popped up.  We have sent them, I think, our test

8    results, but that was more because we were saying,

9    this is what we're doing and how we're handling it,

10   but we weren't reporting to them.  We didn't have to

11   send that to them.

12        Q.    When Habitat New Orleans was building

13   houses in this area after Katrina, were there ever

14   any complaints from people installing the drywall

15   that it was brittle?

16        A.    Not from any of our installation

17   subcontractors.

18        Q.    Were there any complaints from any of the

19   installers or the subcontractors that the drywall

20   was heavy?

21        A.    I don't recall that.  I don't recall any

22   complaints about anything, other than occasionally

23   it's dinged up.

24             MR. GEORGE:  I would mark that's

25             outside of the scope of the deposition

1           today.

2    BY MR. RISLEY:

3        Q.   In your experience, is that unusual for

4    drywall to get dinged up as it's moved around and

5    transported back and forth?

6        A.   I think you've got --

7                MR. GEORGE:  Same objection.  Go

8            ahead.

9        A.   I think there's kind of two different

10   categories.  Normally, we have the drywall delivered

11   from our distributor to the house site, so the

12   distributor is in control of, you know, ordering it,

13   storing it, warehousing it, loading it.  They have

14   the proper pallets and equipment and trucks to get

15   it out to the job site.  With the drywall that we

16   had in the Dupuy warehouse, the Fly System drywall,

17   the warehouse people controlled that, and there was

18   other stuff in there in addition to our drywall.

19               So it's their -- their forklift drivers

20   and everything, and those were not as -- I assume as

21   experienced or careful with drywall, so I said

22   sometimes they'd clip a corner and deliver a pallet

23   full where half of the boards had, you know, a

24   couple of inches knocked off in the corner, or

25   they'd slam it down on the trailer harder than it

Confidential - Subject to Further Confidentiality Review

1    should.  And since it's 12-foot board on a 4-foot

2    pallet, you know, you might get some flex and get a

3    couple of boards broken.

4    BY MR. RISLEY:

5        Q.   But when drywall has a couple inches

6    knocked off the end of it, does that make it

7    unsuitable to be used?

8        A.   No.  It's just harder for the --

9             MR. GEORGE:  Objection; beyond the

10           scope.

11           Go ahead.

12       A.   Doesn't make it unusable.  It just makes

13   it longer time for the installer and tape bed and

14   texture, because they have to dress it up, that type

15   of stuff.

16   BY MR. RISLEY:

17       Q.   Is that an indication that there's some

18   defect in the drywall, which means it shouldn't be

19   used for residential construction?

20            MR. GEORGE:  Same objection.  Well

21           beyond the scope.

22   BY MR. RISLEY:

23       Q.   You can go ahead and answer.

24       A.   Not in my opinion.

25            MR. GEORGE:  To the extent you know.

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. RISLEY:

 2         Q.    During the time that Habitat New Orleans

 3    was constructing houses after Hurricane Katrina, was

 4    there ever any complaint by any of the employees of

 5    Habitat, the volunteers, subcontractors or anyone

 6    else about the drywall smelling bad?

 7         A.    No.

 8         Q.    Do you have an opinion as to whether

 9    Interior/Exterior knew at the time it sold drywall

10    to Habitat New Orleans that the drywall could emit

11    sulfur gases?

12              MR. GEORGE:  Same objection.  Can you

13         clarify "knew."

14              MR. RISLEY:  Knew, yes.  That was his

15         question.

16              MR. GEORGE:  Beyond the scope of the

17         deposition.

18              THE WITNESS:  Can you repeat the

19         question?

20              COURT REPORTER:  Yes, sir.

21              "Do you have an opinion as to whether

22         Interior/Exterior knew at the time it sold

23         drywall to Habitat New Orleans that the

24         drywall could emit sulfur gases?"

25         A.    I have no opinion on that.
```

Confidential - Subject to Further Confidentiality Review

1    BY MR. RISLEY:

2        Q.   Do you have an opinion as to whether

3    Interior/Exterior should have known at the time it

4    sold drywall to Habitat New Orleans that it can emit

5    sulfur gas -- emit sulfur gases?

6               MR. GEORGE:   Same objection.

7        A.   I have no opinion on -- particularly on

8    the issue of emitting sulfur gases.   I don't have

9    any opinion on that.

10   BY MR. RISLEY:

11       Q.   Okay.  Do you have an opinion on anything

12   else that you think Habitat -- excuse me -- that

13   Interior/Exterior either knew or should have known

14   about the drywall they sold but didn't tell you?

15              MR. GEORGE:   Same objection.

16              You can answer.

17       A.   I think the pertinent phrase is "should

18   have told me," and I don't know -- I don't

19   particularly have an opinion on that piece of it.  I

20   think my opinion, from what I've seen subsequently,

21   is, you know, that's their business, they deal in

22   building materials and drywall, they've got staff

23   that stores it, handles it and deals with it, so in

24   the event there's anything different about the

25   Chinese drywall, they were in a far better position

Confidential - Subject to Further Confidentiality Review

```
 1    to figure that out than -- than me.

 2    BY MR. RISLEY:

 3         Q.   But you had staff who handled and stored

 4    and used the Taishan drywall for a period of months,

 5    if not years, correct?

 6         A.   No.

 7              MR. GEORGE:   Same objection.

 8    BY MR. RISLEY:

 9         Q.   No?

10         A.   No.

11         Q.   Okay.  You bought -- Habitat New Orleans

12    bought and was donated a substantial amount of

13    Taishan drywall?

14         A.   That's correct.

15         Q.   And in the time that it was used in the

16    houses, your employees, volunteers and

17    subcontractors noticed nothing unusual about the

18    drywall, correct?

19         A.   And no -- nothing was ever brought to my

20    attention that anybody noticed anything.

21         Q.   Fair enough.  Okay.

22         A.   I want to reiterate, as I said earlier, my

23    volunteers and staff basically did not handle it.

24    Sometimes if it was dropped in the front yard,

25    they'd carry it in.  But, generally, you know, we
```

Confidential - Subject to Further Confidentiality Review

```
 1   had subcontractors who did that.
 2        Q.   And between the time that Habitat New
 3   Orleans obtained the Taishan drywall and the time
 4   you learned of the problem sometime in 2009, some of
 5   that drywall remained stored at the Dupuy site,
 6   correct?
 7        A.   That's correct.
 8        Q.   Did anyone involved in either delivering,
 9   storing or removing drywall there notice anything
10   unusual about it?
11        A.   Not that I was told.
12             MR. RISLEY:  Appreciate it.  Those are
13        all the questions I have.
14             THE WITNESS:  Thank you.
15             MR. GEORGE:  Your promises are
16        meaningful.
17             MR. RISLEY:  I try to be.
18             MR. GEORGE:  Before we close this,
19        Rick, any --
20             MR. DUPLANTIER:  I'm fine.
21             MR. GEORGE:  All right.
22             MR. RISLEY:  Mr. Pate, thank you for
23        your time today.  I do appreciate it.
24             MS. DONOHUE:  I have no questions.
25             MS. LESSELL:  No questions.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    MR. DUPLANTIER:  We're done.

 2                    THE VIDEOGRAPHER:  The time is 2:07.

 3          We are now going off the record.  This

 4          concludes today's videotaped deposition of

 5          Mr. Pate.

 6                    (DEPOSITION CONCLUDED.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

1           ACKNOWLEDGMENT OF DEPONENT

2

3           I,_____, do hereby

4    certify that I have read the foregoing pages and

5    that the same is a correct transcription of the

6    answers given by me to the questions therein

7    propounded, except for the corrections or changes in

8    form or substance, if any, noted in the attached

9    Errata Sheet.

10          _____

11          JIM PATE                    DATE

12

13   Subscribed and sworn to before me this

14   _____ day of _____, 20 _____.

15   My commission expires: _____

16

17   Notary Public

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                      ERRATA

 3                    - - - - - -

 4    PAGE   LINE   CHANGE

 5    ____   ____   _____

 6    ____   ____   _____

 7    ____   ____   _____

 8    ____   ____   _____

 9    ____   ____   _____

10    ____   ____   _____

11    ____   ____   _____

12    ____   ____   _____

13    ____   ____   _____

14    ____   ____   _____

15    ____   ____   _____

16    ____   ____   _____

17    ____   ____   _____

18    ____   ____   _____

19    ____   ____   _____

20    ____   ____   _____

21    ____   ____   _____

22    ____   ____   _____

23    ____   ____   _____

24    ____   ____   _____

25    ____   ____   _____
```

Confidential - Subject to Further Confidentiality Review

```
 1                          - - - - - -

 2                       LAWYER'S NOTES

 3                          - - - - - -

 4    PAGE   LINE

 5    ____   ____    _____

 6    ____   ____    _____

 7    ____   ____    _____

 8    ____   ____    _____

 9    ____   ____    _____

10    ____   ____    _____

11    ____   ____    _____

12    ____   ____    _____

13    ____   ____    _____

14    ____   ____    _____

15    ____   ____    _____

16    ____   ____    _____

17    ____   ____    _____

18    ____   ____    _____

19    ____   ____    _____

20    ____   ____    _____

21    ____   ____    _____

22    ____   ____    _____

23    ____   ____    _____

24    ____   ____    _____

25    ____   ____    _____
```

Confidential - Subject to Further Confidentiality Review

```
 1                        CERTIFICATE
 2              I, LESLIE B. DOYLE, Certified Court
 3    Reporter (LA), NCRA Registered Professional Reporter
 4    and Certified LiveNote™ Reporter, do hereby certify
 5    that prior to the commencement of the examination,
 6    JIM PATE was duly sworn by me to testify to the
 7    truth, the whole truth and nothing but the truth.
 8              I DO FURTHER CERTIFY that the foregoing is
 9    a verbatim transcript of the testimony as taken
10    stenographically by and before me at the time, place
11    and on the date hereinbefore set forth, to the best
12    of my ability.
13              I DO FURTHER CERTIFY that I am neither a
14    relative nor employee nor attorney nor counsel of
15    any of the parties to this action, and that I am
16    neither a relative nor employee of such attorney or
17    counsel, and that I am not financially interested in
18    the action.
19              This 24th day of September, 2012.
20
21
22              _____
                LESLIE B. DOYLE, RMR, RDR
23              Certified Court Reporter (LA)
                Certified LiveNote™ Reporter
24
25
```