# EXHIBIT  22

Confidential - Subject to Further Confidentiality Review

1              UNITED STATES DISTRICT COURT

               EASTERN DISTRICT OF LOUISIANA

2

    IN RE:                    §   MDL NO. 2047

3   CHINESE-MANUFACTURED      §   SECTION: L

    DRYWALL PRODUCTS          §   JUDGE FALLON

4   LIABILITY LITIGATION      §   MAG. JUDGE WILKINSON

5

    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

6   CONFIDENTIAL - SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

7              ORAL AND VIDEOTAPED DEPOSITION OF

8                         SAUL SOTO

9                  TAKEN ON OCTOBER 31, 2012

10

    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

11

12      ORAL AND VIDEOTAPED DEPOSITION of SAUL SOTO,

13  produced as a witness at the instance of the Class

14  Counsel, and duly sworn, was taken in the above-styled

15  and numbered cause on the 31st day of October, 2012,

16  from 5:07 p.m. to 8:33 p.m., before SYLVIA KERR, CSR,

17  RPR, CRR in and for the State of Texas, reported by

18  machine shorthand, at the offices of Huseman, Dodson &

19  Hummell, 615 North Upper Broadway, Suite 2000, Corpus

20  Christi, Nueces County, Texas, pursuant to the Federal

21  Rules of Civil Procedure.

22

23

24              GOLKOW TECHNOLOGIES, INC.

           877.370.3377 ph | 917.591.5672 fax

25              deps@golkow.com

Confidential - Subject to Further Confidentiality Review

```
 1                A P P E A R A N C E S

 2

     COUNSEL FOR THE PLAINTIFFS':

 3       FREDERICK S. LONGER, ESQUIRE

         MATTHEW C. GAUGHAN, ESQUIRE

 4       Levin, Fishbein, Sedran & Berman

         510 Walnut Street, Suite 500

 5       Philadelphia, Pennsylvania 19106

         (215) 592-1500

 6

 7

 8   COUNSEL FOR THE DEPONENT RONNIE GARCIA:

         VAN HUSEMAN, ESQUIRE

 9       PAUL DODSON, ESQUIRE

         Huseman, Dodson & Hummell, PLLC

10       615 North Upper Broadway, Suite 2000

         Corpus Christi, Texas 78401

11       (361) 883-3563

12

13

14   ALSO PRESENT:

         GINNY McCLUSKEY, Court Reporter

15       DOUG OVERSTREET, Videographer

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
1                         INDEX
2                                                    PAGE
       Appearances..................................    2
3    SAUL SOTO
          Examination by Mr. Longer..................    4
4
5
6                       EXHIBITS
7    NUMBER         DESCRIPTION                        PAGE
8    No. A Handwritten Notes by Mr. Soto.............   24
          (Retained by Ms. McCluskey)
9
     No. 1 Class Action Objector Power of Attorney and
10         Contingent Fee Agreement for Saul Soto.....   24
11   No. 2 Box 1 of Documents......................    34
          (Exhibits 2, 3 and 4 Retained by Mr. Huseman)
12
     No. 3 Box 2 of Documents......................    34
13
     No. 4 Box 3 of Documents......................    34
14
     No. 5 Objection to Class Action Settlement Agreement
15         and Award of Attorneys' Fees and Expenses by
           Objectors Jan Petrus; Saul Soto, SHS
16         Construction; Ronnie Garcia, Bay Area
           Contacting & Construction, Inc. and Ernest
17         Vitela, E and E Construction Co...........    50
18   No. 6 Attorney Disclosure to Client and Client
           Consent..................................    57
19
     No. 7 Attorney Disclosure to Client and Client
20         Consent..................................    58
21   No. 8 Objector Saul Soto's and SHS Construction's
           Answers and Objections to Interrogatories
22         Propounded by Class Counsel...............    75
23   No. 9 Objectors Saul Soto and SHS Construction's
           Responses and Objections to Requests for
24         Production Propounded by Class Counsel.....    99
25   No. 10 Receipts from Lowe's and Home Depot........  107
```

Confidential - Subject to Further Confidentiality Review

```
 1                    THE VIDEOGRAPHER:  We're now on the
 2    record.  My name is Doug Overstreet.  I'm the
 3    videographer.  Today's date is October 31st, 2012.  It's
 4    5:07 p.m., beginning of tape one.  This video deposition
 5    is being held in Corpus Christi, Texas, in the matter of
 6    Chinese-Manufactured Drywall Products Liability
 7    Litigation of the U.S. District Court, Eastern District
 8    of Louisiana.  The deponent is Mr. Saul Soto.  Would
 9    counsel please identify themselves for the record.
10                    MR. LONGER:  Fred Longer on behalf of the
11    class counsel.
12                    MR. GAUGHAN:  Matthew Gaughan also on
13    behalf of class counsel.
14                    MR. HUSEMAN:  Van Huseman on behalf of the
15    deponent.
16                    MR. DODSON:  Paul Dodson for the deponent.
17                    THE VIDEOGRAPHER:  Would the court
18    reporter please swear in the witness.
19                         SAUL SOTO,
20    having been first duly sworn, testified as follows:
21                       EXAMINATION
22    BY MR. LONGER:
23       Q.   Mr. Soto, my name is Fred Longer.  We met
24    before the deposition began in the hallway outside, but
25    I'll introduce myself again.  I am going to be asking
```

Confidential - Subject to Further Confidentiality Review

1    you a series of questions today.

2         A.    Okay.

3         Q.    And they are related to the objection that has

4    been filed on your behalf in the multi-district

5    litigation taking place in the Eastern District of

6    Louisiana involving the Chinese drywall matter.

7         A.    Okay.

8         Q.    If I don't ask a question that you understand,

9    just let me know.  Is that okay?

10        A.    That will work.  Thank you, sir.

11        Q.    We are being recorded here, as you can see all

12   around you.  I would appreciate it, sir -- you're

13   soft-spoken, but I would appreciate that you keep your

14   voice up because I actually have hearing loss, and I

15   like to be able to hear people.  And in order to do

16   that, I need to have them speak loudly.

17        A.    I understand.

18        Q.    Thank you.

19        A.    My wife tells me that.

20        Q.    For the record, sir, would you please state

21   your full name?

22        A.    My name is Saul Soto.

23        Q.    And what is your residence address?

24        A.    My residence address is 429 Claride, Corpus

25   Christi, Texas, zip code 78418.

Confidential - Subject to Further Confidentiality Review

 1      Q.    And what is your date of birth?

 2      A.    Date of birth is March 30th, 1982.

 3      Q.    And what is your Social Security number?

 4      A.    My Social Security is 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.

 5      Q.    Now, my appreciation is that you have a

 6   business that you operate called SHS Construction; is

 7   that correct?

 8      A.    That is correct, sir.

 9      Q.    What is the full name of that company?

10      A.    That is the name.  It's really just my

11   initials.  It's SHS, which is Saul, and then my mom's

12   maiden name, Hernandez, Soto.

13      Q.    Now, my appreciation is that business is just a

14   name, you're not incorporated; is that correct?

15      A.    We are not incorporated, we are a sole

16   proprietorship.

17      Q.    What is the Tax Identification Number, if any,

18   for SHS Construction Company?

19      A.    I pretty much -- since it's a sole proprietor,

20   I use my Social Security mainly.  At one point I used

21   another one when I had employees.  And that one is

22   actually in that box, in those boxes, that Tax ID

23   Number.

24      Q.    We'll talk about those boxes in a moment.

25            But for what period of time did you have

Confidential - Subject to Further Confidentiality Review

```
 1    employees that we're talking about?

 2        A.   Back in around 2009.

 3        Q.   And what was the Tax ID Number that you used in

 4    that time frame?

 5        A.   I would have to look in there, sir.  I'm sorry.

 6    I do not have that right in front of me.

 7        Q.   Okay.  Was it somebody else's Social Security

 8    number?

 9        A.   No.  It was just a Tax ID for tax purposes.

10        Q.   All right.  Now, is it fair to say then that

11    any questions that I direct to you are also directed to

12    SHS Construction?

13        A.   That would be correct.

14        Q.   All right.  Sir, you have Counsel with you

15    today, Mr. Huseman and Mr. Dodson; is that correct?

16        A.   Yes, they are, that's correct.

17        Q.   Who are these gentlemen?

18        A.   They are the lawyers who are helping me with

19    this at this moment.

20        Q.   All right.  And when did you first meet either

21    of these gentlemen?

22        A.   I met them, I believe it was last week.  I'd

23    have to look at my schedule, but I believe it was last

24    week.

25        Q.   Okay.  And were they retained, which may be
```

Confidential - Subject to Further Confidentiality Review

1    the wrong word.  Were they engaged to assist you in

2    preparation for today's deposition?

3         A.   Yes, they helped me with today's preparation.

4         Q.   Okay.  And you met them last week to prepare

5    for the deposition; is that correct?

6         A.   I met them, yes.

7         Q.   And you have a calendar with you?

8         A.   I can look on my phone if you will allow me to.

9         Q.   Yes.

10        A.   And I can give you -- is that what you would

11   need, the date?

12        Q.   Yes, sir.

13        A.   I have it here October 24th, which was last

14   Wednesday, at 10 a.m.

15        Q.   All right.  And did you arrive at this office

16   at 10 a.m.?

17        A.   I arrived at this office, actually, like around

18   9:45 or 9:30 in the morning.

19        Q.   I understand you're prompt.  I saw you were

20   prompt this afternoon.

21             So you met beginning at around, let's just say,

22   9:45, 10 o'clock.  And how many hours did you meet with

23   counsel?

24        A.   We were together -- let's see here.  For a

25   couple of hours, a few hours, something like that.  I

Confidential - Subject to Further Confidentiality Review

1    don't remember the exact time.  I'm trying to put it

2    together in my head.

3         Q.   Did you leave before lunch?

4         A.   Can I look at my phone again real quick?

5         Q.   Certainly.

6         A.   What I'm going to do, I'm going to look at a

7    text message, just to kind of help me figure out more or

8    less when I left, something like that.

9         Q.   Whatever will refresh your recollection, that's

10   fine with me.

11        A.   It looks like around 1:00 or 2:00 or somewhere

12   around that time.  I can't say exactly what time I left,

13   but it was around that time.

14        Q.   Okay.  So approximately three or four hours?

15        A.   Uh-huh.

16        Q.   Is that a yes?

17        A.   That is -- that's correct.

18        Q.   Who was present at the meeting?

19        A.   That day was Mr. Huseman, Mr. Dodson, Eric.

20   And I think Ronnie was there, too, right?

21                  MR. HUSEMAN:  Uh-huh.

22        A.   Ronnie, yeah.

23        Q.   All right.  Just so that I'm clear, Ronnie is

24   Ronnie Garcia?

25        A.   Ronnie Garcia, that is correct.

Confidential - Subject to Further Confidentiality Review

1        Q.   And Eric, I don't know that name.  Who is Eric?

2        A.   Eric works for Mr. --

3             MR. HUSEMAN:  He's the fellow that you met

4    a while ago that made the comment about wearing a tie.

5             MR. LONGER:  Very good.  He looks sharp.

6             MR. HUSEMAN:  I'll take the implication on

7    that.

8             MR. LONGER:  And what is Eric's last name?

9             MR. HUSEMAN:  Stewart.

10            MR. LONGER:  S-t-e-w-a-r-t?

11            MR. HUSEMAN:  Yes, sir.

12       Q.   (By Mr. Longer)  Is that the only time that you

13   met with -- in connection with preparation for today's

14   deposition?

15       A.   No.  We also met on Monday.

16       Q.   And who is the "we"?

17       A.   The same people.

18       Q.   And for how long did you meet on Monday?

19       A.   From around 1:30 or 2:00 till about 5:00.

20   Yeah, around 5 o'clock p.m.

21       Q.   All right.  On either occasion, did you take

22   any notes?

23       A.   Yes, I did.

24       Q.   And do you have them with you?

25       A.   I do.

1      Q.   All right.  I'm going to ask that I be

2   presented with them and I'll mark them as an exhibit.

3             MR. HUSEMAN:  And at this point I'm going

4   to instruct him not to produce those to you and assert

5   attorney/client privilege.

6      Q.   (By Mr. Longer)  Would those notes be useful to

7   you -- let me ask you this question.

8             When I walked into the hallway when I met you

9   this afternoon before the deposition, were you reviewing

10  those notes?

11     A.   I was reviewing everything that I had.

12     Q.   Including your notes?

13     A.   Yes, that is correct.

14     Q.   Were those notes useful to you in terms of

15  refreshing your recollection as to how to proceed

16  through the course of this deposition?

17     A.   They help me stay focused and to be able to...

18     Q.   Is that a yes with an explanation?

19     A.   Yes, that's correct.

20            MR. LONGER:  I'm going to ask that those

21  notes be produced.

22            MR. HUSEMAN:  Yeah, and those are

23  protected by attorney/client privilege, so do not

24  divulge those.

25            THE WITNESS:  Okay.

1      Q.   (By Mr. Longer)  Have you had any

2    communications with any other counsel in connection with

3    preparation for today's deposition?

4      A.   Mr. Chris Bandas.

5      Q.   And what have you done with Mr. Bandas in the

6    way of preparing for today's deposition?

7                 MR. HUSEMAN:  And if you'd be so kind to

8    allow me to interrupt on this.  You can tell him when

9    you met with him.

10                 THE WITNESS:  That is correct.

11                 MR. HUSEMAN:  But not the substance of any

12    communications with your attorneys, please.

13                 THE WITNESS:  I appreciate that.  Thank

14    you.

15      A.   We met -- we met a couple of times back on

16    September 28th, I believe, and then again -- is it okay

17    if I look at my schedule on my phone?

18      Q.   Sure.

19      A.   And October 17th.  And we have communicated, I

20    believe, one or two times on the phone as well.

21      Q.   All right.  And would anything in that

22    BlackBerry relate those communications?

23      A.   I mean, we talked on the phone.  I believe

24    there might have been like a text message just

25    confirming a time, I believe.

Confidential - Subject to Further Confidentiality Review

```
 1                    MR. HUSEMAN:  Make sure, Mr. Soto, you

 2    stay away from the substance of any communications.

 3                    THE WITNESS:  Okay.

 4                    MR. HUSEMAN:  The subject matter or the

 5    content, either one.

 6                    THE WITNESS:  Okay.

 7        Q.   (By Mr. Longer)  All right.  Now, the meeting

 8    on September 28, is that the first time that you met

 9    Mr. Bandas?

10        A.   That is the first time we met face-to-face.

11        Q.   Okay.  And how did you meet Mr. Bandas

12    otherwise prior to that?

13        A.   Through a friend of mine.

14        Q.   And your friend's name is?

15        A.   His name is Christopher Batman.

16        Q.   Can you spell that, please?

17        A.   C-h-r-i-s-t-o-p-h-e-r.

18        Q.   And the last name?

19        A.   Batman, B-a-t-m-a-n.

20        Q.   And who is Mr. Batman to you?

21        A.   He's just a friend who also is a customer of

22    mine.

23        Q.   And what sort of customer is he?

24        A.   We have done work for him on his home, some

25    remodeling and things of that nature.
```


```
 1          Q.   And what relationship, if any, does Mr. Batman
 2     have to Mr. Bandas, to your knowledge?
 3          A.   I believe they work in the same office.  I
 4     don't know exactly what they do together, to be honest
 5     with you.
 6          Q.   What is Mr. Batman's vocation?
 7          A.   He is a lawyer.
 8          Q.   And he is an attorney for the Bandas Law Firm?
 9          A.   I'm actually not sure.  I believe he operates
10     out of there, but he has his own law firm, which is the
11     Batman Law Firm.
12          Q.   Got it.  Now, you mentioned that you had met
13     Mr. Bandas prior to September 28th in connection with
14     Mr. Batman.  Was that by telephone?
15          A.   I had talked to him on the telephone before
16     that.
17          Q.   All right.  And what date was that?
18          A.   It was probably a few days before that.
19          Q.   So late September 2012?
20          A.   That is correct.
21          Q.   All right.  And when you spoke to Mr. Batman,
22     what was it that he was relating to you that you
23     should speak to Mr. Bandas?
24          A.   Obviously since we know each other and we've
25     worked together before, he knew that we -- you know, we
```

1    installed Sheetrock and we did things of that nature.

2    And we had also installed Sheetrock at a couple of jobs

3    at his house, so he let me know about this case.

4         Q.   Is that the first time you had ever heard about

5    the Chinese drywall case?

6         A.   That is correct.

7         Q.   And was Mr. Batman interested in -- did he

8    express any interest in you participating as an objector

9    to the settlement at that point in time?

10        A.   All he said is that, you know, knowing that I

11   had installed it before, that, you know, it was

12   something that I should probably look into.

13        Q.   What is it that you should look into?  I missed

14   that.

15        A.   As far as the installation of the Sheetrock

16   that we had done before.

17        Q.   Yeah, but what was it that he said you should

18   look into and the nature of the litigation?

19        A.   As far as being a class member.

20        Q.   And what was it that you were going to look

21   into?

22        A.   Well, seeing --

23        Q.   As far as being a class member?

24        A.   Well, seeing as I knew that I had installed

25   Sheetrock before, then I knew that I needed to look into

Confidential - Subject to Further Confidentiality Review

```
 1    it because I might have been involved in putting in

 2    defective Sheetrock in people's houses.

 3        Q.   Did he direct you to Mr. Bandas specifically?

 4        A.   Yes, he referred me.

 5        Q.   Is there anything else about that conversation

 6    that you can recollect with Mr. Batman?

 7        A.   That's pretty much everything, sir, that I can

 8    remember.

 9        Q.   Do you know if Mr. Batman and Bandas share

10    cases together?

11        A.   I don't know.

12        Q.   And the -- what's the next step that you

13    took in the way of following up on your conversation

14    with Mr. Batman?

15        A.   He gave me the number to Mr. Bandas and I

16    called it.

17        Q.   All right.  And that was the call that we

18    agreed was some time in late September 2012?

19        A.   That is correct.

20        Q.   And what was the nature of your conversation

21    with Mr. Bandas?

22             MR. HUSEMAN:  Once again, Mr. Soto, make

23    sure you do not talk about what was discussed.

24             MR. LONGER:  Well, let me just --

25             MR. HUSEMAN:  Let me give him that
```

```
 1    instruction, please.  Any content of your communication

 2    with Mr. Bandas should not be discussed here.

 3                  THE WITNESS:  Okay.

 4         Q.   (By Mr. Longer)  When you called Mr. Bandas,

 5    was it your -- what was your intention?

 6         A.   Well, to be honest with you, the first thing

 7    that came to mind and that got me worried was, man, you

 8    know, if I installed this Sheetrock in some people's

 9    houses, how can I be held liable against it?  Or how is

10    that, you know, going to affect me?

11         Q.   Okay.  Did Mr. Batman show you the settlement

12    agreement?

13         A.   No.

14         Q.   Did Mr. Batman direct you to the website or any

15    location where you could obtain the settlement

16    agreement?

17         A.   No, he didn't.

18         Q.   So he suggested to you at the time that you

19    could be held liable for something in the -- during your

20    conversation?

21         A.   He did not suggest that, no, sir.

22         Q.   Well, how is it that you became concerned and

23    were asking yourself how is that going to affect me?

24         A.   Well, as a business owner, I mean, I work off

25    of referrals, and that's the first thing that came to
```

1    mind.

2         Q.   Has anyone expressed to you a concern about

3    Chinese drywall being in their home?

4         A.   Nobody has called me on that.

5         Q.   Now, you called Mr. Bandas on September 20 --

6    I'm sorry, in late September?

7         A.   Yes.

8         Q.   And how long did you talk to Mr. Bandas?

9         A.   About a couple of hours.

10        Q.   And in the course of that conversation, were

11   you seeking to retain counsel?  Strike that.

12             Going into the conversation, were you seeking

13   to retain counsel?

14        A.   I knew that I needed to talk to a lawyer,

15   that's what I did know.

16        Q.   All right.  And at the end of the conversation,

17   what was your understanding about what you were going to

18   do about speaking to a lawyer?

19        A.   Well, my understanding was that, you know, I

20   was part of this class.  And after seeing pictures which

21   confirmed to me that I did install Sheetrock of that

22   nature that were made in China.  You know, the pictures

23   that I had seen showed -- you know, helped me understand

24   that it kind of was true.

25        Q.   Well, this is on the telephone.  Where did you

Confidential - Subject to Further Confidentiality Review

1    see pictures of Chinese drywall?

2         A.   You were talking about telephone?

3         Q.   The late September 2012 telephone call.  I

4    thought that's what we were talking about.

5         A.   Oh, okay.  I'm sorry.  I apologize.  Well, you

6    know, one thing is talking to somebody on the phone and

7    the other is meeting face-to-face to be able to

8    understand things a little bit more.  So that's the next

9    thing that we did is meet face-to-face.

10        Q.   All right.  So you spoke for a couple of hours.

11   And my question to you was:  Well, let me just break it

12   down.

13        A.   You know what, can I -- I didn't know that you

14   were talking about speaking on the phone.

15        Q.   All right.

16        A.   I apologize for that.  But what I can say,

17   though, that I did speak on the phone for not two hours.

18   I was thinking we were talking about the conversation

19   that we had -- well, the time --

20        Q.   The face-to-face meeting?

21        A.   The face-to-face meeting.  I'm sorry, sir.

22   That is what -- after speaking on the phone -- we spoke

23   on the phone maybe about maybe about ten or 15 minutes.

24   That was when we set something up to meet face-to-face.

25   And then when we met face-to-face, we spoke for about a

Confidential - Subject to Further Confidentiality Review

1    couple of hours.

2        Q.   Okay.

3        A.   I apologize for that.

4        Q.   So what was the nature of the telephone call

5    with Mr. Bandas for those ten or 15 minutes?

6             MR. HUSEMAN:  Do not discuss the content

7    of your discussions with your lawyer.

8        Q.   (By Mr. Longer)  Well, did he offer you any

9    legal advice?

10            MR. HUSEMAN:  Well, once again, he is your

11   lawyer, and what you discussed with him is privileged,

12   so don't respond to that.

13            MR. LONGER:  The only thing that's

14   privileged is if he offered legal advice.

15       Q.   (By Mr. Longer)  Did he offer you legal advice?

16       A.   He mentioned to me face-to-face.

17       Q.   That you should meet face-to-face?

18       A.   That is correct.

19            MR. HUSEMAN:  That was his advice to you.

20            THE WITNESS:  That was his advice to me.

21       Q.   (By Mr. Longer)  Did he mention to you that he

22   worked with Mr. Batman?

23            MR. HUSEMAN:  Once again, do not discuss

24   the content of your discussion with Mr. Bandas.

25       Q.   (By Mr. Longer)  Did you talk about the terms

Confidential - Subject to Further Confidentiality Review

1    of retention during that telephone call?

2         A.   No.

3         Q.   All right.  So you arranged for a meeting on

4    September 28th.  And how did that play out?  You went

5    over to the Bandas Law Firm?

6         A.   We met at Mr. Bandas' home.

7         Q.   At his home?

8         A.   Yes.

9         Q.   Okay.  Is that near your neighborhood?

10        A.   That is on the way to a job site that I was

11   going to go to that day.

12        Q.   I see.  And what time did you arrive at his

13   home on September 28th?

14        A.   If I remember correctly, it was around 9:30,

15   around that time.

16        Q.   All right.  And if you met for two hours, you

17   left around 11:30?

18        A.   Something like that, yes, sir.

19        Q.   And during the course of that meeting, did you

20   review any documents?

21              MR. HUSEMAN:  Once again, what you did

22   with counsel in terms of communication, you're not to

23   reveal.

24        Q.   (By Mr. Longer)  Well, my understanding is that

25   you saw pictures; is that true?

```
1                    MR. HUSEMAN:  Well, once again, what you
2      and Mr. Bandas discussed or did is not to be discussed
3      here.
4           Q.   (By Mr. Longer)  Did you sign any documents?
5                    MR. HUSEMAN:  If you signed a contract,
6      you can tell him that.  That's okay.
7           A.   Yes, yes.  Yes, sir.
8           Q.   So you talked about retention at that point in
9      time?
10          A.   Retaining counsel.
11          Q.   All right.
12                   MR. HUSEMAN:  Anything beyond where you
13     are right now, the fact that you signed up with him and
14     talked with him, do not go there.  Do not talk about
15     anything that you discussed, what you reviewed, what he
16     told you or what you told him.
17                   THE WITNESS:  Okay.
18                   MR. HUSEMAN:  All right.
19          Q.   (By Mr. Longer)  I'm just about to go into
20     marking this document as an exhibit, but before I do
21     that, Mr. Soto, you have in front of you whatever it is
22     you brought in that envelope.  Can you identify for the
23     record, please, what you've brought with you?
24          A.    This is an objection.  This is the request for
25     different productions.  And this is the subpoena that
```

Confidential - Subject to Further Confidentiality Review

1    you all issued to me.

2        Q.   Okay.  And your notes are in the envelope; is

3    that right?

4        A.   Yes, sir.

5        Q.   All right.  And how many pages are your notes?

6        A.   One page, front and back.

7        Q.   All right.  And would you just take it out of

8    the envelope, please, and show it to the camera so that

9    we can identify it.  And I would like to mark it.

10                 MR. HUSEMAN:  No, we're not going to do

11    that.

12                 MR. LONGER:  I would like to mark that.

13                 MR. HUSEMAN:  Showing it to the camera has

14    the same effect as showing it to you, and we're not

15    doing that.  So if you would like to have it marked --

16    and looking at this, I'll tell you, Counsel, what this

17    is are notes concerning how we prepared him for

18    deposition.

19                 MR. LONGER:  That's fine.

20                 MR. HUSEMAN:  That's our advice to him.

21    And we are not going to voluntarily give that to you,

22    unless the Judge for some reason orders us to.

23                 MR. LONGER:  What I'm thinking is that we

24    mark that as an exhibit and that it not be -- that the

25    court reporters will hold on to it, and that we may or

```
1     may not get it, depending on how the Court rules.
2                    MR. HUSEMAN:  Okay.  I don't have a
3     problem with that.
4                    MR. LONGER:  And you can have your court
5     reporter hold on to it.  We'll do it that way.
6                    MR. HUSEMAN:  That will be fine.  So
7     Ginny, if you'll make a copy of it when we come to a
8     break, and guard it with your life.
9                    MS. McCLUSKEY:  Do you want to seal it?
10                   MR. LONGER:  Sure.  I think that that's
11    appropriate.
12                   MR. HUSEMAN:  Make a copy of it.  We
13    don't want to take his notes from him entirely.
14                   MR. LONGER:  That will be Exhibit No. A.
15    And then I will have numbered documents going forward.
16                   MR. HUSEMAN:  Okay.
17         (Exhibit A & Exhibit No. 1 were marked.)
18         Q.  (By Mr. Longer)  Okay.  Exhibit No. 1 --
19         A.   Sir, I'm sorry.  Would it be okay if I went to
20    the restroom real quick?
21         Q.   Yeah.  Let's take a break.
22                   THE VIDEOGRAPHER:  Off the record at 5:40.
23                   (A recess was taken.)
24                   THE VIDEOGRAPHER:  We're on the record at
25    5:47.
```

Confidential - Subject to Further Confidentiality Review

1    Q.   (By Mr. Longer)  Mr. Soto, over the break, I

2    had the document that was provided to me by Mr. Huseman

3    marked as Exhibit No. 1.  It's in front of you.

4    A.   Okay.

5    Q.   This document is entitled Class-Action Objector

6    Power of Attorney and Contingent Fee Agreement; is that

7    correct?

8    A.   That is correct.

9    Q.   So the purpose -- this is your retainer

10   agreement with -- well, actually, let's go to page 3 of

11   the document.  Is that your signature?

12   A.   That is my signature, correct.

13   Q.   And it's also signed by Mr. Bandas, Christopher

14   A. Bandas; is that correct?

15   A.   On the back part of it?

16   Q.   Page 3, yes.

17   A.   Page 3, yes, sir.

18   Q.   Okay.  And this is the document that you signed

19   at Mr. Bandas' home on September 28th; is that correct?

20   A.   That is correct.

21   Q.   Did you sign any other documents on that day?

22   A.   Not that I can remember, sir.  No.

23   Q.   This retainer agreement -- well, it's a power

24   of attorney and contingent fee agreement, and it

25   purports to be for a class-action objector, correct?

Confidential - Subject to Further Confidentiality Review

```
 1        A.    That's what it looks like, sir.  Yes, sir.

 2        Q.    Did Mr. -- I take it from this document that

 3   Mr. Bandas has -- or you have not retained Mr. Bandas to

 4   pursue any claims that you may actually have based upon

 5   your fear of injury; is that correct?

 6        A.    That is correct.

 7        Q.    You have no expectation that Mr. Bandas will

 8   help you in any way if, in fact, you are personally

 9   injured to pursue that claim; is that right?

10        A.    That is correct.

11        Q.    And the same goes for any business claims.  You

12   have no expectation that Mr. Bandas is going to help you

13   out as a lawyer for any business losses?

14        A.    That is correct.

15        Q.    You have no expectations that Mr. Bandas is

16   going to help you out for any concerns that you may have

17   about lawsuits of anyone that you've installed drywall

18   into their homes who may sue you; is that correct?

19        A.    That is correct.

20        Q.    The only thing that you have retained him for

21   on a contingent basis, correct?  You retained him on a

22   contingent basis, right?

23        A.    Yes.

24        Q.    Is to object to a settlement?

25        A.    That is correct.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.   And he talks there that you may get -- or I'm

 2     sorry.  The document -- by the way, I just want to be

 3     sure now.

 4               If you go to paragraph 2.1 of the document, it

 5     says you represent you're a member of the class as

 6     defined in the materials published at

 7     https://ChineseDrywallClass.com.  Do you see that?

 8          A.   Yes, sir.

 9          Q.   Now, have you ever visited the website of

10     https://ChineseDrywallClass.com prior to signing this

11     document?

12          A.   Yes.

13          Q.   You did?

14          A.   Prior to signing it, yes.

15          Q.   All right.  And when was that?

16          A.   That same day.

17          Q.   Was that before you went to Mr. Bandas' house.

18          A.   No, sir.

19          Q.   So while you were at Mr. Bandas' house, you

20     visited a website, ChineseDrywallClass.com?

21          A.   Yes, sir.

22          Q.   Did you read the documents on

23     ChineseDrywallClass.com?

24          A.   Not all the documents, sir.

25          Q.   What documents did you read?
```

Confidential - Subject to Further Confidentiality Review

1      A.   Just kind of scanned through it and looked at

2    the -- more of the pictures.

3      Q.   Pictures of what?

4      A.   Of drywall.

5      Q.   So you can't tell us what -- apart from

6    photographs, what any of the definitions or documents

7    said on that visit of ChineseDrywallClass.com; is that

8    correct?

9      A.   Yeah, I can't remember any of that stuff.

10     Q.   Did you have a sense that the settlement

11   afforded benefits to persons who were class members?

12     A.   I did have a sense of it, yes.

13     Q.   And what benefits were provided to class

14   members that you discovered on September 28, 2012?

15     A.   Well, it just said to submit things.  I mean,

16   that's all I can remember.

17     Q.   Do you remember that it offered persons in the

18   class that they could take from a fund of $80 million?

19     A.   I'm sorry, say that again.

20     Q.   Do you remember the size of the fund that was

21   being --

22     A.   Oh, yes, sir.

23     Q.   -- provided?

24     A.   Yes, I do remember that.

25     Q.   And was it $80 million or was it $82.7 million?

Confidential - Subject to Further Confidentiality Review

1      A.   I don't remember that, but I know it was around

2  $80 million.  I don't remember the exact number.

3      Q.   And did you realize that you could, if you, in

4  fact, were a class member, you could take from the fund?

5      A.   I did realize that.

6      Q.   And did you look to see which participating

7  defendants were involved in the litigation that you --

8      A.   I did not, sir.

9      Q.   -- were associated with?

10      A.   I did not, sir.

11      Q.   Did you -- so as of September 28, 2012, you did

12  not know who the participating defendants were in the

13  litigation that you were related to that you might have

14  a claim against; is that correct?

15      A.   I'll be honest, I'm kind of confused.  Is there

16  a way you can maybe rephrase that a little bit for me?

17      Q.   Sure.  On the website, ChineseDrywallClass.com,

18  the settlement agreement was there.

19      A.   Okay.

20      Q.   It had exhibits to it --

21      A.   Uh-huh.

22      Q.   -- that identified the participating defendants

23  and the participating insurers.  Are you aware of that?

24      A.   I don't remember.  I can't say for sure.

25      Q.   Are you aware of it today?

Confidential - Subject to Further Confidentiality Review

```
1          A.    That there's participating defendants?

2    Defendant is -- can you explain the defendant exactly,

3    what that means?

4          Q.    Yeah.  Like South Florida Drywall.

5          A.    Okay.  There's several of them.  I think I

6    remember that now.

7          Q.    Okay.  And is that a vague recollection that

8    you saw that?  Or do you just remember the photos?

9          A.    As far as seeing --

10         Q.    What you saw when you visited --

11         A.    Correct.

12         Q.    -- the website?

13         A.    What I remember seeing is the pictures of made

14   in China on the backs of Sheetrocks.

15         Q.    Excuse me just one second.

16               Okay.  Now, the Exhibit 1 talks about

17   attorneys' fees, expenses and payments to you.  Do you

18   see that?

19         A.    Yes.

20         Q.    All right.  And actually -- I'm sorry.  This is

21   my bad.  Let's talk about section 2.2.

22         A.    Yes.

23         Q.    Actually, I'm going to have to go back to 2.1

24   again.  I'm a lawyer.  Excuse me.

25         A.    Okay.
```

Confidential - Subject to Further Confidentiality Review

```
 1         Q.   All right.  What did you understand the

 2    definition of the member of a class to be on September

 3    28th, 2012, based upon your review of

 4    ChineseDrywallClass.com?

 5         A.   Well, my understanding is you're part of that

 6    class if you installed it, you worked around it, you

 7    know, and you remember seeing those markings on the

 8    back.

 9         Q.   All right.  And it says that you can

10    demonstrate that you're entitled -- now I've gone to

11    section 2.2.

12         A.   Okay.

13         Q.   You can demonstrate you're entitled to receive

14    settlement benefits as a member through documentation or

15    by affidavit.  And you've brought with -- well, that's

16    what it says, correct?

17         A.   Correct.  That is correct.

18         Q.   And you've brought with you today three banker

19    boxes full of documents that do what?  They purport to

20    show that you are entitled to receive benefits?

21         A.   They show my purchases and me reselling

22    Sheetrock.

23         Q.   Okay.  Now, Sheetrock, as I understand it, is a

24    trade name, sort of like Kleenex is for tissue paper.

25    Is that your understanding?
```

Confidential - Subject to Further Confidentiality Review

1       A.   Yes, sir.

2       Q.   Who makes Sheetrock?

3       A.   There are many people that make Sheetrock.

4       Q.   Well, the brand name Sheetrock?

5       A.   I don't know, to be honest with you.

6       Q.   Do you know if it's a Chinese board Sheetrock?

7       A.   I don't know.

8       Q.   Are you aware that it's manufactured by United

9  States Gypsum, USG?

10      A.   I don't know.

11      Q.   All right.  At some point -- and I don't know

12  when, we can do it even now or later -- we'll mark these

13  boxes as exhibits.

14           MR. LONGER:  Let me ask your counsel,

15  though.  I want to do this -- let me just ask you real

16  fast.  Or I can go off the record.  These documents,

17  based on my quick look at this stuff, are

18  undifferentiated.  It's just his entire records for the

19  year and --

20           MR. HUSEMAN:  The records he has

21  possession of.  And we're not making representation that

22  there could not be other records, but these are the ones

23  in his possession.  And rather than try to discern which

24  ones were relevant to your gypsum board and not, we

25  produced them all so there's not any issue about that.

```
 1              MR. LONGER:  Will you later tell us which

 2     ones are relevant?  Or is it supposed to be a fishing

 3     expedition for us to figure it out?

 4              MR. HUSEMAN:  Well, what you asked for is

 5     contained in there.  And the extent of the subpoena is

 6     not absolutely clear to us on some documents because you

 7     have documents that involved more than one thing and

 8     which could arguably, for example, involve Sheetrock or

 9     gypsum board.  And so sort out of an abundance of

10     precaution, these were all produced to you.  If you

11     want us to go through them for you and give you sort of

12     a learned opinion on that, we'll do that.

13              MR. LONGER:  Well, I'm going to mark them

14     as exhibits.  Banker box 1, Exhibit No. 2.

15              MR. HUSEMAN:  Sure.

16              MR. LONGER:  Banker box 2, Exhibit No. 3.

17     And banker box 3, Exhibit No. 4.  And -- but I

18     absolutely believe that we shouldn't have to figure out

19     what is relevant, if you're fully capable of doing it.

20              MR. HUSEMAN:  Well, obviously that's

21     something I'm willing to inflict on Mr. Bandas at the

22     proper time since he's in the substance of the case to a

23     larger degree than we are, which I explained to you

24     before the deposition.  But I don't think he'd have any

25     problem trying to do that for you.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    MR. LONGER:  Should we do that now?

 2                    MR. HUSEMAN:  It depends on what you want

 3      to do.

 4                    MR. LONGER:   Is that the appropriate way

 5      to do this?  I want to put a sticker on it.  That was 2.

 6      Then it doesn't matter, 3 and 4. This will be Exhibit 2.

 7                    MR. DODSON:  Oh, because you've got that.

 8                    MR. HUSEMAN:  You've got three boxes,

 9      that's what was throwing us off.  You said that's No. 4,

10      I said, no, we've only got three boxes.  Okay.

11                    (Exhibit Nos. 2, 3, 4 were marked.)

12                    MR. LONGER:  I thank Ms. Bertolino for

13      teaching me how to count.

14          Q.   (By Mr. Longer)  All right.  So let's continue

15      now.  The next section of the document is 3 -- section

16      3, attorneys' fees, expenses and payments to you.

17                    Mr. Soto, in your words, can you tell us what

18      you understand your situation is in terms of how you're

19      going to get paid in this contract?

20          A.    Pretty much if the court approves something,

21      that's how I get paid.

22          Q.   Did you -- do you recall being told that you

23      could get an incentive award of $5,000 or up to $5,000?

24                    MR. HUSEMAN:  And that, of course, goes

25      into the substance of your discussion with Mr. Bandas,
```

1    and you're not to discuss that, please.

2              THE WITNESS:  All right.

3        Q.   (By Mr. Longer)  Well, apart from the

4    discussion with Mr. Bandas, the document says that you

5    were going to be entitled to an incentive award of not

6    to exceed $5,000; is that correct?

7        A.   That is what it says here.

8        Q.   All right.  By the way, I don't want to go into

9    the nitty-gritty of it, but you did discuss this

10   document with Mr. Bandas, did you not?

11             MR. HUSEMAN:  We're not going into any of

12   that.

13       Q.   (By Mr. Longer)  It's a yes or no.  Did you

14   discuss this document?

15             MR. HUSEMAN:  No, you're not to discuss

16   that.  You produced the document to him, the document

17   speaks for itself.  But your discussions with Mr. Bandas

18   regarding your relations with him are not to be

19   discussed otherwise.

20       Q.   (By Mr. Longer)  All right.  Next section, 3.3

21   says that in the alternative to an incentive award, "If

22   your objection is settled without the necessity for

23   Court approval, Attorneys agree to request as part of

24   the settlement a separate payment to you to compensate

25   you for your time, effort and/or the benefit you confer

Confidential - Subject to Further Confidentiality Review

1    on the Class through your service as an objector."  Do

2    you see that?

3         A.   I do see that.

4         Q.   "The amount of the payment is contingent on the

5    outcome of the settlement negotiations, but will not

6    exceed $5,000."  Do you see that?

7         A.   I do see that.

8         Q.   It says, "If the settling parties agree to make

9    such a payment, you will receive the amount of that

10   payment in addition to the benefits set forth in

11   paragraph 3.1," which is what you would have gotten from

12   the settlement anyway, correct?

13        A.   That's what it says here.

14        Q.   And "If the settling parties do not agree to

15   make a separate payment to you, you will receive only

16   the benefits set forth in paragraph 3.1," is that

17   correct?  Is that what it says?

18        A.   That's exactly what it says.

19        Q.   All right.  What's your understanding of that?

20        A.   What it says here.

21        Q.   Do you have -- did you have an understanding on

22   September 28th that your counsel may try to separately

23   negotiate a settlement of your objection?

24             MR. HUSEMAN:  Any discussions you had with

25   Mr. Bandas, you're not to discuss with counsel.

Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Correct.

 2                    MR. LONGER:  I'm not asking for

 3      discussions.  I'm asking for his understanding at the

 4      conclusion of that meeting or what his understanding of

 5      section 3.3 is.

 6                    MR. HUSEMAN:  To clarify, you're asking

 7      what his take-away was from his discussions with

 8      Mr. Bandas?

 9                    MR. LONGER:  Yes.

10                    MR. HUSEMAN:  Okay.  My instruction to you

11      is not to discuss that with him.

12          Q.   (By Mr. Longer)  Sir, did you have an

13      understanding of Mr. Bandas' business prior to meeting

14      with him?

15          A.   No.

16          Q.   In the course of your association with

17      Mr. Bandas, have you come to understand that he has

18      objected to many settlements, class-action settlements

19      throughout the country?

20          A.   I don't know anything about that, sir.

21          Q.   Are you aware of motions that have been filed

22      in the federal court seeking to sanction you and

23      Mr. Bandas for filing motions, frivolous motions, in

24      front of the court?

25          A.   I don't know anything about that, sir.
```

Q. You don't know that there's a motion for sanctions against you personally?

A. I did not know.

Q. Would it be of interest to you that you might be personally liable for a sanction that Judge Fallon and the federal court might impose on you because you filed frivolous papers in front of the federal court?

A. When you say frivolous, is that your opinion?

Q. I believe it's on its face obviously frivolous.

MR. HUSEMAN: So what's your question to him?

A. Yeah. What is the question? I'm sorry.

Q. I'll read it again. Would it be of interest to you that you might be personally liable for a sanction that Judge Fallon and the federal court may impose on you personally because your counsel filed frivolous papers on your behalf?

A. That I might be? So it hasn't been done, correct?

Q. It's before the Judge. Do you think it's something that your counsel should bring to your attention?

MR. HUSEMAN: Okay. Don't answer that question. If you're going to continue basically harassing him as you are, we're going to call -- stop

```
 1    that line of questioning.  You're welcome to ask him

 2    other questions.  But in terms of trying to drive a

 3    wedge between him and his lawyer or to interfere with

 4    the attorney/client privilege that he may have with

 5    Mr. Bandas, we're not going to go any further down that

 6    road without Judge Fallon saying that's appropriate.

 7              MR. LONGER:  Well, I believe in the

 8    conference that we had with Judge Fallon this afternoon,

 9    he instructed us that we could address standing, his

10    underlying objection, and his relationship with his

11    counsel.

12              MR. HUSEMAN:  And --

13              MR. LONGER:  And I believe that his

14    knowledge of what his counsel is doing in federal court

15    and what his counsel has done elsewhere is related to

16    his relationship with his counsel.

17              MR. HUSEMAN:  And your attempts -- just to

18    make sure we're clear about what I'm saying to you.

19    Your attempts to say would it be of interest to you or

20    would you like to know or those type of things are

21    basically calculated, at least in my view sitting here,

22    as a way of trying to interfere with Mr. Soto's

23    relationship with Mr. Bandas.  And if that's what the

24    Judge has in mind, then perhaps you all need to make a

25    more explicit ruling on it.  You've had a chance to
```

Confidential - Subject to Further Confidentiality Review

1    discuss the relationship with him.  You've had a

2    contract.  And in terms of your trying to make Mr. Soto

3    feel bad or to put Mr. Bandas in a bad light with his

4    client, that part I'm not going to go along with.

5        Q.   (By Mr. Longer)  Are you aware that courts

6    around the country have found Mr. Bandas to be a

7    professional objector?

8              MR. HUSEMAN:  Okay.  This is the same line

9    of questioning.  I'm telling Mr. Soto not to answer

10   that, pending the Judge ruling on that.

11             MR. DODSON:  Do we need to go ahead and

12   set a hearing on that?

13             MR. LONGER:  If you like.

14             MR. DODSON:  As I understand from the

15   rules, if we're not going to go into it, then we also

16   need to go ahead and file a motion.  So I can get that

17   cooking.

18             MR. HUSEMAN:  We will do that in a while.

19   And the other part of it is you can go ahead and ask him

20   questions that are not within dispute.  He's here for

21   your purposes.

22             MR. LONGER:  All right.  I'll move on.

23       Q.   (By Mr. Longer)  Okay.  There is a section in

24   here, also with section 5.2, Mr. Soto, dealing with

25   association of co-counsel.

Confidential - Subject to Further Confidentiality Review

1         A.    In section 2?

2         Q.    The last page of the document, page 3.

3         A.    Okay.  Association.  Okay.

4         Q.    And this talks about how Mr. Bandas can

5    associate with other co-counsel.  Is your understanding

6    that your counsel here today are governed by section

7    5.2?

8         A.    That is true.

9         Q.    Okay.  So you don't have a separate contract

10   with the gentlemen in this room?  Or do you?

11        A.    No, not an actual contract.  There's one, I

12   think you might have it, that shows that they would be

13   helping us, I think, with this.

14        Q.    I'm not sure of what you're referencing.  Can

15   you tell me --

16        A.    I don't know if you --

17              MR. HUSEMAN:  Do we have that document

18   that they signed off on, the disclosure document?

19              MR. DODSON:  Probably.

20              MR. HUSEMAN:  See if you can you get it.

21              THE WITNESS:  That's the one I'm

22   referring to.

23              MR. HUSEMAN:  To short-circuit your

24   inquiry a little bit, we're not sharing any of the fee

25   with Mr. Bandas.

1              MR. LONGER:  Okay.

2              MR. HUSEMAN:  We're not in plaintiff

3       lawyer mode.

4              MR. LONGER:  He's paying you directly?

5              MR. HUSEMAN:  That's right.  He's paying

6       us by the hour to do this.

7              MR. LONGER:  Okay.  All right.  Should we

8       go ahead while we're waiting?

9              MR. HUSEMAN:  It's your pleasure, whatever

10      you like.  No need to burn daylight.

11             MR. LONGER:  Yeah, that's my thinking.  I

12      thought he was just going to pop in and pop out.

13             MR. HUSEMAN:  I thought he was, too, but

14      let's keep the wheels rolling.

15      Q.   (By Mr. Longer)  So Mr. Soto, let me go back

16      one page to page 2, paragraph number 4.

17             Now, you've read this before you signed the

18      document, right?

19      A.   I did read it.

20      Q.   And you understood then that if the objection

21      that you filed was successful or any appeal there from,

22      any result in the disapproval or the rejection of the

23      proposed settlement which may, in turn, cause you to

24      lose your right to receive benefit under the proposed

25      settlement -- I'm sorry, I misread this.  It says --

Confidential - Subject to Further Confidentiality Review

```
 1          A.   I'm sorry.  Which one are we looking at?

 2          Q.   Section 4 on page 2.

 3          A.   The whole thing?  4 on or 4.4 or 4.5?  Just

 4     that one?  Okay.  Thank you, sir.

 5          Q.   You understood and it was explained to you,

 6     according to this, and you understand that if

 7     successful, the objection or any appeal there from may

 8     result in the disapproval or rejection of the proposed

 9     settlement.  Did you understand that?

10          A.   Yes.

11          Q.   So in other words, you could -- your objection

12     may tank this entire settlement and you understood that?

13          A.   I understand that if nothing happens, I don't

14     get anything.

15          Q.   Did you understand that if your objection is

16     successful, you may destroy the settlement from going

17     forward?

18          A.   May destroy?  Can you elaborate a little bit

19     more on that?

20          Q.   Sure.  I want to ask a question that you

21     understand.

22               Did you understand that if your objection was

23     successful, you could cause every class member not to

24     receive the benefits of the settlement?  In other words,

25     all the homeowners that are out there that could get
```

Confidential - Subject to Further Confidentiality Review

1    money from this settlement would be precluded from doing

2    so because your single objection could terminate the

3    settlement?

4         A.   I don't know, sir.

5         Q.   You didn't know that?

6         A.   I don't know.

7         Q.   Well, this says that it was explained to you

8    and you understand that.  You didn't understand that; is

9    that right?

10        A.   I read this before I signed it, and I signed it

11   based on what I read.

12        Q.   All right.  And it says that if you are

13   successful, it may result in the disapproval or

14   rejection of the proposed settlement which may in turn

15   cause you to lose your right to receive settlement

16   benefits under the proposed settlement to which you

17   object, correct?

18        A.   Yes, I could lose my right, yes, sir.

19        Q.   But you had -- you did understand that it

20   wouldn't be just you, it had to have been -- the entire

21   settlement would have been terminated or disapproved,

22   right?

23        A.   That I don't know.

24        Q.   Are you aware that that's the effect of your

25   objection today as we sit here now?

Confidential - Subject to Further Confidentiality Review

```
 1        A.   I didn't know that.

 2        Q.   Is it your intent to deprive other people from

 3   getting money from builders, installers, suppliers,

 4   insurers because of your single interest in objecting?

 5        A.   What I know is that I feel that it's unfair,

 6   one, that the lawyers are getting paid an obscene amount

 7   of money, and which I feel that that should go to the

 8   class.  That is what I do know.

 9        Q.   Do you have any concern about the other class

10   members getting benefits?

11        A.   Well, I feel if the lawyers get paid less, they

12   would probably get paid more.

13        Q.   I see. This concern -- is that the only concern

14   that you have about the settlement, by the way, is the

15   attorneys' fees being obscene, I think, was your word?

16        A.   That's one of them.  And I also feel it's just

17   unfair as far as everything; the settlement, if you

18   will.

19        Q.   The settlement is unfair, is that what you're

20   saying?

21        A.   I feel there should be more that should go to

22   the class.

23        Q.   That in other words, that we didn't get enough

24   money from the defendants?

25        A.   No.  That most of the money is going to the
```

Confidential - Subject to Further Confidentiality Review

1    lawyers versus going to the class.

2        Q.   Are you aware that Judge Fallon is going to

3    make the determination of how much money goes to the

4    lawyers and not -- and I guess by using your logic, to

5    the class?

6        A.   I believe so.

7        Q.   Do you know that we have asked the Court up to

8    32 percent, but the Court ultimately decides what the

9    amount is?

10       A.   That is true.

11       Q.   And that being true, you think that that's

12   wrong?

13       A.   I feel what's wrong is that you all would even

14   ask for 32 percent.

15       Q.   Do you think Judge Fallon would let an unfair

16   amount of money go to lawyers?

17       A.   I don't know.

18       Q.   Don't you think a federal judge has the

19   obligation to ensure that only a reasonable fee is

20   awarded?

21       A.   I would hope so.

22       Q.   And do you have faith that Judge Fallon will

23   award a reasonable fee and no more?

24       A.   I don't know.

25       Q.   Now, it also says that "Attorneys have also

Confidential - Subject to Further Confidentiality Review

```
 1    explained and you understand that if there are

 2    negotiations to settle your objection, Attorneys may

 3    negotiate the amount of any payment to you as well as

 4    the amount of attorneys' fees concurrently in order to

 5    arrive at a total settlement amount."

 6         Do you see that sentence in section 4?

 7    A.   "Attorneys have also explained and you

 8    understand that if there are negotiations to settle your

 9    objection, Attorneys may negotiate the amount of any

10    payment to you as well as the amount of attorneys' fees

11    concurrently in order to arrive at a total settlement

12    amount."

13    Q.   Is that a correct statement?

14    A.   Yes, that is a correct statement.

15    Q.   Just out of curiosity, how much time did

16    Mr. Bandas go over explaining this section to you?

17              MR. HUSEMAN:  Okay.  That goes to the

18    substance of what you all discussed.

19              MR. LONGER:  I'm just asking how many

20    minutes.

21              MR. HUSEMAN:  I understand.  You asked him

22    how long you talked about A or B, it's the same as

23    asking about his discussions of A and B.

24              MR. LONGER:  Well, let me just say the

25    document speaks for itself.
```

```
 1                    MR. HUSEMAN:  That's exactly right.

 2                    MR. LONGER:  It says, "Attorneys have also

 3      explained" it.

 4                    MR. HUSEMAN:  Right.

 5                    MR. LONGER:  So I'm asking how much time

 6      did his attorneys spend explaining it.

 7                    MR. HUSEMAN:  Anything beyond what the

 8      document says, I don't want him discussing, Fred.

 9                    MR. LONGER:  All right.  So that's going

10      to be part of your --

11                    MR. HUSEMAN:  Yes.

12                    MR. LONGER:  -- motion for protective

13      order?

14                    MR. HUSEMAN:  Yes.  How Mr. Bandas

15      explained it, how much time he spent, any of that stuff

16      is all privileged.  And we've given you the document

17      which sets forth the relationship.  He's confirmed that

18      is his relationship.  And that's pretty much where it's

19      going to end for now.

20                    MR. LONGER:  All right.  And Mr. Dodson

21      has returned to the room here with a document that

22      we were anxiously awaiting for.  And we do not have

23      the document; is that correct?

24                    MR. DODSON:  I don't have a signed copy

25      that I can find.  We're checking around for it.
```

Confidential - Subject to Further Confidentiality Review

1             MR. LONGER:  And just so I'm clear, the

2   name of the document or the description of the document

3   is what that we're waiting for?

4             MR. DODSON:  Disclosures to Mr. Soto about

5   our being involved in the case.

6             MR. LONGER:  Understood.  Thank you.  When

7   and if that arrives, we will have that marked as Exhibit

8   No. -- well, why don't we wait until it arrives because

9   otherwise it may get confused in the math.

10            MR. HUSEMAN:  It's in box 3.  No, I don't

11  know.  I have never seen a signed copy.  I know we

12  got -- his signature was obtained, I think, by probably

13  by Chris.

14            THE WITNESS:  Uh-huh.

15            MR. HUSEMAN:  I haven't seen the signed

16  copy.  We thought we had one, but apparently don't.

17       Q.   (By Mr. Longer)  Okay.  So Mr. Soto, have you

18  ever seen the -- I'm sorry.  Yeah, I'll ask the

19  question.

20            Prior to its filing, did you see the objection

21  that Mr. Bandas filed on your behalf?

22       A.   Prior to it being signed, I did see it.

23       Q.   All right.  Now, I just want to be clear.  The

24  document that's in front of you, the objection, you saw

25  that before it was filed?

Confidential - Subject to Further Confidentiality Review

```
 1          A.   I don't remember.  I'm trying to...

 2          Q.   Okay.  Now, you met with Mr. Bandas, you said,

 3     up until 11:30 on the 20th of September.  And at that

 4     point, did he show you what he was going to -- he didn't

 5     show you what he was going to file?

 6          A.   Say that again.  I'm sorry.

 7          Q.   All right.  Let me --

 8          A.   I'm sorry.  I'm sorry.

 9          Q.   Can I see the document in front of you?

10          A.   This one right here?

11          Q.   Yeah.

12          A.   Yeah.

13          Q.   Right.  So I'm -- I have my own copy.  You can

14     hold on to this.

15          A.   Okay.

16          Q.   I'm going to have that document, which is of

17     record, but I'm going to have it marked anyway as

18     Exhibit No. 5 to your deposition.

19               (Exhibit No. 5 was marked.)

20               MR. LONGER:  I have extra copies if anyone

21     wants one.

22               MR. HUSEMAN:  I've already got one, but I

23     always take more paper.  So this the same, let's see if

24     it's the same that you got.  Is it the same thing, Fred?

25               MR. GAUGHAN:  It's the same document.
```

Confidential - Subject to Further Confidentiality Review

1              MR. LONGER:  It's 15859.  Apart from his

2      being double-sided photocopying, it should be identical.

3              MR. HUSEMAN:  I'm looking at the

4      thickness, his is considerably thinner.

5              MR. LONGER:  His is double-sided.

6              MR. HUSEMAN:  Duplexed.

7      Q.  (By Mr. Longer)  All right.  When you -- well,

8      I'm sorry.  Is there a question pending?  All right.

9      Let me ask a question since it may have gotten lost in

10     the confusion, Mr. Soto.  And I apologize for that.

11             I've now given you Exhibit No. 5, which is

12     basically identical to the document that you have in

13     front of you.  It's entitled Objection to Class-Action

14     Settlement Agreement and Award of Attorneys' Fees and

15     Expenses by Objectors Jan Petrus; Saul Soto, SHS

16     Construction; Ronnie Garcia, Bay Area Contacting &

17     Construction, Inc.; and Ernest Vitela, E&E Construction

18     Co.

19     A.   Okay.  Okay.  I'm sorry.  Yes.

20     Q.   All right.  So that is the same document you

21     have in your hands, right?

22     A.   That is correct.

23     Q.   All right.  How did -- when did you obtain the

24     document that you have in your hand?

25     A.   I'm going to be honest, I really don't

Confidential - Subject to Further Confidentiality Review

1    remember.

2         Q.   Did it come in the mail to you?

3         A.   No.

4         Q.   Was it given to you by your counsel during one

5    of your meetings?

6         A.   I remember getting a copy of it at his office.

7    That's what I remember.

8         Q.   At whose office?  Mr. Bandas?

9         A.   That is correct.

10        Q.   All right.  And when was that?  When did you go

11   to his office and obtain this document?

12        A.   I don't remember, sir.  I honestly don't.

13        Q.   All right.  But it was after September 28th; is

14   that correct?

15        A.   I believe so.

16        Q.   All right.  Now, Exhibit B to Exhibit 5, as

17   confusing as that may be.

18        A.   I'm already getting all confused.

19        Q.   It's your declaration, sir.

20        A.   I understand.

21        Q.   So I'd ask you to turn to that document.

22        A.   Okay.  To my declaration?

23        Q.   Right.

24        A.   Okay.  Okay.

25        Q.   Does this declaration bear your signature?

1        A.    It does.

2        Q.    And you signed this when you were at

3    Mr. Bandas' house?

4        A.    I'm trying to remember.  I can't remember if it

5    was at his house or not.  I can't say for sure, sir.

6    I'm sorry.

7        Q.    All right.  Did you meet with Mr. Bandas at any

8    other time on September 28 other than the meeting that

9    you described earlier being at his house?

10       A.    I remember I had to go by the office to sign

11   something, but I can't remember right now.  I'm sorry.

12       Q.    All right.  You say that -- in the document

13   that you're a member of the class in that paragraph, the

14   third paragraph.

15       A.    Uh-huh.

16       Q.    It says, "I am not within any of the exclusions

17   in the class definition."

18             Which exclusions did you review?  And what do

19   you understand that to be?

20       A.    Like I'm not excluded from the class.

21       Q.    Okay.  All right.  The next paragraph says that

22   you or SHS -- and I'm paraphrasing here.

23       A.    Correct.

24       Q.    -- purchased, installed and used 1,000 to 1500

25   sheets of drywall over the last five to ten years.  Do

Confidential - Subject to Further Confidentiality Review

1    you see that?

2         A.    I do see that.

3         Q.    What -- do you know the brand that you usually

4    buy when you buy drywall?

5         A.    I mean, I obviously remember Sheetrock, but I

6    mean, I buy it different places.  So I mean, I just go

7    to get the Sheetrock that's there available at different

8    places.  I don't look at the brand so much.

9         Q.    Does brand mean anything to you when you're

10   using Sheetrock?

11        A.    Well, it means now more.  It means more now

12   knowing that, you know, we have installed it before

13   without -- I would have thought that, you know, there

14   wouldn't be inferior Sheetrock at these places.

15        Q.    Do you know that there is -- that there was

16   inferior Sheetrock at these places?

17        A.    Now I know.

18        Q.    How do you know?

19        A.    By knowing that it was available at those

20   areas -- in those stores.

21        Q.    How do you know that?

22        A.    By -- this is one thing I remember.  I do

23   remember this.  Years ago to talking to one of my

24   subcontractors, he asked me specifically, he says, where

25   do you get your Sheetrock from?  I said, well, different

```
 1    places, but mostly from Lowe's.  He says, well, you

 2    know, I don't really like to use that one.  I'm like,

 3    why?  He said, well, he says, that stuff is from China.

 4    And I said, from China?  He's like, yeah.  I said, okay.

 5    At that point I didn't really think anything of it.

 6    That's what I do remember.

 7        Q.   Was that true what you just told this

 8    gentleman, that you mostly get your Sheetrock from

 9    Lowe's?

10        A.   Mostly, that is true.

11             MR. LONGER:  All right.  We have to change

12    the tape.  So we'll take a break.

13             THE WITNESS:  Okay.

14             THE VIDEOGRAPHER:  We're going off the

15    record at 6:40, end of tape one.

16             (A recess was taken.)

17             THE VIDEOGRAPHER:  We're on the record at

18    6:51, beginning of tape two.

19        Q.   (By Mr. Longer)  When we took a break,

20    Mr. Bandas, you had said that you mostly get your

21    Sheetrock from Lowe's.  Do you recollect that testimony?

22        A.   Mr. Soto.

23        Q.   I'm sorry.  Mr. Soto.  Thank you for listening.

24        A.   That's okay.  Mostly through Lowe's and Home

25    Depot, but mostly through -- yeah.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And is that true throughout time, that you

 2   mostly got your Sheetrock from Lowe's?

 3        A.   As far as percentage-wise, yes, getting more

 4   from Lowe's than the other ones.

 5        Q.   And what is that percentage, if you could

 6   guesstimate?

 7        A.   I'll give you a broad percentage.  About a 60

 8   percent, 65 percent, somewhere around there.

 9        Q.   Is it your understanding that you're objecting

10   to Lowe's, the drywall in this -- in your objection,

11   Exhibit No. 5?

12        A.   As far as Lowe's?

13        Q.   Yes.

14        A.   No.  It was -- from my understanding, it was in

15   different other places as well.

16        Q.   Right.  But my question to you is:  Was it your

17   understanding that your objection pertained to Lowe's,

18   among other participating defendants?

19        A.   Among other, yes.

20        Q.   All right.  And so it was your understanding

21   that Lowe's was a participating defendant?

22        A.   I believe so, yes.

23        Q.   Okay.  And were you aware that Lowe's has a

24   settlement that has been judicially approved by a court?

25        A.   I can't say that I do know for sure, no, sir.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Are you aware that any claims that you may have

 2     related to your drywall purchase from Lowe's are barred

 3     by a settlement from a Georgia state court?

 4          A.   I don't know anything about that, sir.

 5          Q.   All right.  Are you aware that Mr. Bandas had

 6     his office manager object to that settlement?

 7          A.   I don't know anything about that, sir.

 8          Q.   Do you know Mr. Bandas' office manager?

 9          A.   Not personally I don't know.

10          Q.   Have you met -- her name is Jan Petrus.  Do you

11     know Ms. Petrus?

12          A.   I don't know her.

13          Q.   Her name appears on Exhibit No. 5, along with

14     yours and others.

15          A.   Okay.

16          Q.   Never met her?

17          A.   No.  No, sir.

18          Q.   So -- okay.  Your counsel has just given me a

19     document which is called an Attorney Disclosure to

20     Client and Client Consent.  I'm going to have that

21     marked as Exhibit No. 6.

22               MR. LONGER:  Is it a one-page document?

23               MR. DODSON:  That's what we got, final

24     document.

25               (Exhibit No. 6 was marked.)
```

Confidential - Subject to Further Confidentiality Review

```
1          Q.   (By Mr. Longer)  Your counsel have represented

2     to me that there is an endorsed copy of this Attorney

3     Disclosure to Client and Client Consent signed by you.

4     Do you recollect signing this document or something that

5     looks like this document?

6          A.   Yes, something similar, yes, sir.

7               MR. HUSEMAN:  You might want to explain

8     what that is that he has.

9               MR. DODSON:  If they've got any questions.

10              MR. HUSEMAN:  Okay.

11         Q.   (By Mr. Longer)  All right.  I believe we have

12    an agreement with counsel that we will include -- or I'm

13    sorry -- obtain the signed version of Exhibit No. 6.

14         A.   Okay.

15         Q.   And we will include that in the deposition.

16    And I'll ask that it be marked as Exhibit No. 7 when

17    it's produced.

18              MR. DODSON:  Yeah.  If you want, we can

19    try to get it tonight, but if it works for you, we can

20    get it in the morning.

21              MR. LONGER:  Well, is the -- it works for

22    me if you'll tell me that the only thing on the second

23    page is the signature lines.  Or if there's more to it,

24    then it doesn't really work, and I'd ask that you get it

25    tonight.
```

1           MR. DODSON:  That's all that I know of.

2           MR. LONGER:  That page 2 of the document

3    is a signature line?

4           MR. DODSON:  Signed.

5           MR. HUSEMAN:  These -- this was something

6    that we told Chris that we wanted to have them sign.  We

7    sent this over to him.  It didn't have a signature sheet

8    on it for him to put it in final form and get signed,

9    which we understood it had been done.  He says it's been

10   done.  But that it will look obviously somewhat

11   different if there is signature lines on other stuff.

12   But that's what we told him we wanted in the disclosure.

13          MR. LONGER:  And do you know what the

14   hourly rate is per hour?

15          MR. HUSEMAN:  Yeah, 4.

16          MR. LONGER:  $400 an hour.

17          MR. HUSEMAN:  Uh-huh.

18      Q.  (By Mr. Longer)  Is that obscene?  It's getting

19   there, huh?

20      A.  I don't know.  Yeah.

21          MR. HUSEMAN:  If not, I'll go back and try

22   again.

23      Q.  (By Mr. Longer)  Okay.  I'm going back to your

24   Exhibit No. 5, which is the objection that was filed on

25   your behalf.  And we're still looking at your

Confidential - Subject to Further Confidentiality Review

1    declaration.  So the paragraph dealing with the drywall

2    that you purchased, you say, "Over the years I have

3    purchased drywall from Lowe's."  And you mentioned that

4    you got the bulk of your drywall from them --

5         A.    Uh-huh.

6         Q.    -- correct?  It also says that you got it from

7    Home Depot, McCoy's, and a variety of other building

8    supply companies.  Do you see that?

9         A.    That is correct.  Yes, I see that.

10        Q.    Do you know if McCoy's is a participating

11   defendant in the settlement that you are objecting to?

12        A.    I don't know, sir.

13        Q.    Was it important for you to know who your

14   objections were lodged against or not?

15        A.    I knew it was a lot of people.  I knew it was a

16   lot of companies.

17        Q.    Okay.  Well, I will represent to you that

18   McCoy's is not a defendant that's participating in the

19   settlement that you're objecting to.

20        A.    Okay.

21        Q.    I will represent to you that Home Depot is a

22   participating defendant in the settlement.

23        A.    Okay.

24        Q.    Were you aware of that prior to me telling you

25   that?

Confidential - Subject to Further Confidentiality Review

```
 1        A.    That I was, yes.

 2        Q.    And how did you become aware of that?

 3        A.    I remember -- I think it was on the website.

 4        Q.    And what kind of drywall did you buy from Home

 5   Depot, if you remember a brand?

 6        A.    No, I don't remember a brand.  If we're

 7   going -- if you're asking about brand, I don't remember.

 8        Q.    Do you recollect buying -- do you recollect

 9   buying any domestic board from Home Depot?

10        A.    I don't recollect.  I can't say for sure.

11        Q.    Do you understand what I mean by "domestic"?

12        A.    Like made here?

13        Q.    Let me explain to you.  When I say "domestic

14   board," I mean drywall made in the United States.

15        A.    Okay.

16        Q.    So let me restate the question.

17        A.    Okay.  Thank you.

18        Q.    Do you remember buying domestic drywall at Home

19   Depot?

20        A.    I don't remember, sir, to be honest with you.

21        Q.    Do you remember buying any Chinese drywall at

22   Home Depot?

23        A.    I remember seeing Chinese stamped on the back,

24   that's what I do remember.

25        Q.    And why is that in your memory when you don't
```

Confidential - Subject to Further Confidentiality Review

```
 1    remember domestic board, just out of curiosity?

 2         A.   To be honest with you, it had to do with

 3    triggers as far as, you know, one thing that my -- that

 4    subcontractor had told me about.  And since then, I just

 5    kind of saw, oh, Chinese.  That's it.

 6         Q.   And you're saying you have a distinct memory?

 7         A.   As far as talking to that person, the

 8    conversation.

 9         Q.   Do you have a distinct memory of seeing a

10    marking on Chinese drywall -- I'm sorry -- on drywall

11    that you bought at Home Depot that said Made in China?

12         A.   I don't know if I bought it at Home Depot, but

13    I remember seeing Made in China.

14         Q.   I see.  So it could have been anywhere?

15         A.   It could have been.  I can't say for sure.

16         Q.   Not necessarily at Home Depot?

17         A.   Correct.

18         Q.   All right.  I have been represented to by

19    counsel for Home Depot that Home Depot is not aware of

20    any customer that purchased Chinese drywall from Home

21    Depot.  Do you have any reason to dispute that?

22         A.   I don't know it for sure.  I mean...

23         Q.   I also have been represented that Home Depot is

24    not aware of any customer who alleges that they

25    purchased Chinese drywall from a Home Depot store in
```

Confidential - Subject to Further Confidentiality Review

```
1    Texas.  Do you have any reason to dispute that

2    statement?

3         A.   I mean, I don't know for sure.

4         Q.   I have also been represented that Home Depot is

5    not aware of any claims asserted against it by customers

6    in Texas about Chinese drywall.  Do you have any reason

7    to dispute that statement?

8         A.   I don't know.

9         Q.   You say "I don't know."  Do you have any reason

10   to dispute that statement?  It's more yes or no.

11        A.   Where does that statement come from?  I don't,

12   you know--

13        Q.   Counsel for Lowe's -- or for Home Depot.

14        A.   Oh, okay.  If that's what they're saying, I

15   can't change what they're saying.

16        Q.   Do you have any reason to dispute that Home

17   Depot is not aware of any invoices, records or other

18   documents which identify a specific instance of the

19   purchase of Chinese drywall from Home Depot?

20        A.   Is that what they're saying?

21        Q.   Yes.

22        A.   I can't change what they're saying.

23        Q.   All right.  And are you aware that Home Depot

24   says that they only purchase drywall from domestic

25   drywall manufacturers?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   Okay.

 2        Q.   That's okay with you?

 3        A.   I mean --

 4        Q.   You don't dispute it?

 5        A.   -- that's what they're saying.  I mean, I can't

 6   change what they're saying.

 7        Q.   And you don't have any specific recollection,

 8   do you, of having purchased any drywall that was made in

 9   China from Home Depot, correct?

10        A.   I don't have a specific time, no.

11        Q.   I just want to be sure I understood your

12   answer.  You said, "I don't have a specific time, no."

13             You don't have any recollection of having

14   bought Chinese-manufactured drywall at Home Depot, do

15   you?

16        A.   I mean, I don't know where I bought it from,

17   but I remember seeing that in the back.

18        Q.   Okay.  But they are -- if you bought it from

19   some defendant -- or some supplier, excuse me --

20        A.   Okay.

21        Q.   -- other than Home Depot, they're not a

22   participating defendant in this settlement, are they?

23        A.   Are they not?

24        Q.   Apparently not.  But I take it that you

25   wouldn't know because you haven't looked at the
```

Confidential - Subject to Further Confidentiality Review

1    settlement agreement to be sure; is that correct?

2         A.   I can't remember, to be honest with you.

3         Q.   And the last paragraph of your declaration,

4    which says "Many of these sheets of drywall included the

5    letters 'China' or 'Made in China.'  I have looked at

6    the pictures of examples of Chinese drywall posted at

7    the settlement website and I can affirm that many of the

8    sheets of drywall that I have purchased, installed and

9    used during the class period have been marked in

10   similar, if not identical, ways indicating that they

11   were manufactured in China."

12             That's information that you've already covered

13   with me; is that correct?

14        A.   I have covered that I have seen the Chinese

15   stamped on the back.

16        Q.   Right.  You just spoke about that?

17        A.   Correct.

18        Q.   But you don't know where you got that board

19   from?

20        A.   I don't know where.

21        Q.   And you can't attribute that to Home Depot at

22   all, correct?

23        A.   I can't say for sure, no.

24        Q.   You can't say at all, can you?

25        A.   I don't remember.

Confidential - Subject to Further Confidentiality Review

1      Q.   If Home Depot says that they didn't get it, you

2    have no reason to dispute that they didn't get Chinese

3    drywall, correct?

4      A.   I mean, I can't change anything that they said,

5    that's correct.

6      Q.   Well, you have -- do you have any evidence to

7    suggest otherwise?

8      A.   I don't.

9      Q.   Okay.  The body of this objection, Exhibit No.

10   5, says that you -- on page 2, that you object to the

11   class definition.  Do you see that, the top of page 3?

12     A.   3 or 2?  You said 2, right?  I'm sorry.

13     Q.   I'm on page 3.  It says, "As an initial matter,

14   objection is made to the class definition."  Do you see

15   that?

16     A.   I see that.

17     Q.   So what is your objection to the class

18   definition, sir?

19     A.   It's written right here, sir.

20     Q.   All right.  Is this -- I wanted to ask:  Is

21   this the first time you've read this?

22     A.   No.

23     Q.   So it says it's vague and ambiguous.  Can you

24   tell me what you recollect the class definition to be?

25     A.   I can't remember at this moment.

```
1        Q.   Is it fair to say that -- strike that.

2             It says, "Moreover, the class is defined in

3    terms of" merit-based "criteria."  Do you see that?

4        A.   Uh-huh.

5        Q.   Do you know what merit-based criteria are?

6        A.   It's a criteria depending on your merits,

7    different things.

8        Q.   Okay.  I don't understand your answer.  Is that

9    the best -- and I don't mean to be flip here.

10       A.   No, that's fine.

11       Q.   Is that the best you can say?  Because you're

12   using the same word to define the term.

13       A.   That's the best I can say, sir.  I'm sorry.

14       Q.   That's fine.

15       A.   These are all lawyer words, you know, so

16   that's -- that's why I hired a lawyer to, you know...

17       Q.   So it fair to say then that Mr. Bandas wrote

18   these words, not you?

19       A.   It's fair to say that, you know, he's the

20   lawyer and he can -- what needs to be drafted correctly,

21   depending on what...

22       Q.   And you are the client, though, correct?

23       A.   Yes, sir.

24       Q.   Do you believe that you control Mr. Bandas'

25   actions and he is your representative?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    I believe he is my representative.

 2        Q.    Do you believe that you control his actions?

 3        A.    Actions in what way, sir?

 4        Q.    What he files in court, for example?

 5        A.    Well, of course.

 6        Q.    Okay.  But you didn't read this before it was

 7   filed, correct?

 8        A.    That I can't remember, to be honest with you.

 9   I know I read it.

10        Q.    You read it in preparation of your deposition,

11   correct?

12        A.    No.

13        Q.    You've not read it in preparation for today?

14        A.    That is not what I said.

15        Q.    I'm asking you a question.

16        A.    Okay.  I'm sorry.  I have read it before my

17   preparation.

18        Q.    I see.  All right.  The next objection, which

19   is on the next paragraph, is that "The proponents of the

20   settlement have not carried their burden of proof on the

21   fairness, adequacy and reasonableness of this

22   settlement."

23              Now, earlier you testified that you didn't like

24   the attorneys' fee.  I recollect that.

25        A.    Okay.
```

```
 1        Q.   Is there anything else that you think is
 2   unfair, inadequate or unreasonable about the settlement?
 3        A.   I feel it's unfair that it's not totally
 4   specific as far as what the class is going to get.
 5        Q.   Okay.  Do you think that that's unusual, that
 6   in a class-action people don't know precisely what
 7   they're going to get?
 8        A.   I don't know, sir.
 9        Q.   Next page.  You object that "the class...cannot
10   be maintained as a class-action under the requirements
11   of Rule 23 of the Federal Rules of Civil Procedure."
12        A.   That I wrote.  No, I'm just kidding.  I'm just
13   kidding.  I'm sorry.
14        Q.   It's getting late in the day, and I appreciate
15   your humor.  But --
16        A.   Okay.  I'm sorry.
17        Q.   That's something that Mr. Bandas wrote for you,
18   right?
19        A.   That is correct.
20        Q.   All right.  Are you familiar with Rule 23 of
21   the Federal Rules of Civil Procedure?
22        A.   No.
23        Q.   Do you have any idea why the class cannot be
24   maintained as a class-action under Rule 23?
25        A.   I don't know.
```

Confidential - Subject to Further Confidentiality Review

1           Q.   Next you say that "Objection is made to the

2    request for attorneys' fee under both a percentage of

3    recovery basis and a lodestar analysis."  Do you see

4    that?

5           A.   Yes, sir, I see that.

6           Q.   Can you tell us what a percentage of recovery

7    basis is for attorneys' fees?

8           A.   I cannot.  I don't know.

9           Q.   Can you tell us what a lodestar analysis is?

10          A.   No, sir.

11          Q.   Do you know what a mega-fund case is?

12          A.   No, sir.

13          Q.   Is it your position that counsel should only be

14   entitled to 10 percent of any recovery on a contingent

15   basis in a common fund case?

16          A.   That, yes, I feel 10 percent is reasonable.

17          Q.   Okay.  Have you ever been involved in any

18   lawsuit personally?

19          A.   No, sir, I haven't.

20          Q.   Any members of your family?

21          A.   Not that I can remember.

22          Q.   Any friends or relatives?

23          A.   Some friends that work for a lawyer, so...

24          Q.   Do you know what the going rate is for

25   contingency fee in Corpus Christi, Texas is today?

Confidential - Subject to Further Confidentiality Review

```
 1          A.    Contingency fee?  I don't know what exactly --
 2    like for a specific case or for specific something?
 3          Q.    Let's say for personal injury.
 4          A.    Okay.
 5          Q.    Car accident?
 6          A.    I don't know.
 7          Q.    Okay.  You mentioned that in preparation for
 8    your deposition you met with counsel and Mr. Garcia was
 9    present.  Do you recollect that?
10          A.    He was present.
11          Q.    Do you know Mr. Garcia?
12          A.    No, I don't know him personally.
13          Q.    When did you first meet Mr. Garcia?
14          A.    The first time we came here, which I think you
15    wrote down.  I don't remember the date.  That's when.
16    I'm sorry.
17          Q.    And do you have an understanding of how
18    Mr. Garcia came to be a plaintiff or objector in this
19    litigation, based upon your meetings with him?
20          A.    I think a friend of his or something like that.
21          Q.    Is that Mr. Batman?
22          A.    I don't think so.  What did he say?  Okay.  I
23    think it was Bert, Bert, Bert.
24          Q.    Okay.  Do you have any sense of who Bert was?
25    Just a --
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   Bert, yeah.  That's what I was trying to

 2   remember.  Bert works with Mr. Batman.  They're friends.

 3        Q.   Is Bert an attorney also?

 4        A.   I don't think so.  I remember he said he played

 5   golf with Bert, something like that.

 6        Q.   Just out of curiosity, are you familiar with

 7   Mr. Garcia's company, the Bay Area Contracting

 8   Construction, Inc.?

 9        A.   I'm not familiar with his company.

10        Q.   Okay.  In the course of your business as SHS

11   Construction, you've never observed them as, I'm going

12   to say, a competitor of yours?

13        A.   No.  I'm sorry if I eat.  I just needed a

14   little something.  I'm sorry.

15        Q.   Sure.  It looks good on video.

16        A.   I didn't mean to do that.  I'm sorry.  I

17   believe he does more commercial stuff.  And we don't do

18   as much commercial stuff as he did.  That's probably why

19   we never --

20        Q.   You do residential work?

21        A.   Residential and some commercial, but not as

22   much as he does.

23        Q.   Okay.  And how do you know that?  From having

24   met with him just recently?

25        A.   Yes.
```

```
 1        Q.   Do you know Ernest Vitela?

 2        A.   I do not.

 3        Q.   Have you ever met Mr. Vitela?

 4        A.   No, sir.

 5        Q.   Are you familiar with E&E Construction Company?

 6        A.   No, sir.

 7        Q.   Have you, prior to meeting with Mr. Bandas on

 8   September 28, did you go to the court's website?

 9        A.   No, sir.

10        Q.   Did you do any -- do you have a computer?

11        A.   Yes, I do.

12        Q.   And does that computer have Internet access?

13        A.   Yes, sir.

14        Q.   Have you done any personal investigation of the

15   proceedings that are taking place in the federal court

16   in New Orleans?

17        A.   A little bit.  Not a lot.  Some on you-all's

18   own website, on your own website.

19        Q.   At Levin Fishbein?

20        A.   On Herman & Herman & Katz or something like

21   that.  I don't know if that's yours.  I'm sorry.  I'm

22   assuming something.

23        Q.   No, don't apologize.  They have better

24   pictures.

25        A.   Yeah.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   So what did you find out in the course of
 2   your personal investigation?
 3        A.   I'm more of a picture person.  I remember just
 4   looking at those pictures again and seeing the markings.
 5        Q.   So is it fair to say that you did no personal
 6   investigation of the proceedings prior to your
 7   objection?  And when I say proceedings, I mean the
 8   judicial proceedings taking place in front of Judge
 9   Fallon.
10        A.   No, because I did look at the website before
11   then.  Not as far as the court one, but the other one.
12        Q.   The Herman, Herman website?
13        A.   No, that was at a different time.  The one that
14   you --
15        Q.   The Chinese drywall class?
16        A.   Yes, that one.
17        Q.   Okay.  And I'm not sure.  When did you do that
18   personal investigation?
19        A.   Okay.  Let me make sure here.  The personal
20   one -- if we're talking about personal, like at my own
21   computer?
22        Q.   Yes.
23        A.   It would be after some time of our meeting with
24   Mr. Bandas.
25        Q.   Okay.  So after you met with your counsel and
```

Confidential - Subject to Further Confidentiality Review

1    authorized him to object on your behalf is when you

2    began to look into what it was you were objecting to; is

3    that fair to say?

4         A.    I did more research after, in addition to what

5    I did.

6                   (Exhibit No. 8 was marked.)

7         Q.    (By Mr. Longer)  All right.  I'm going to

8    provide you with what's been marked as Exhibit No. 8,

9    which are the answers to interrogatories that have been

10   provided to us.  Take a look at that, if you would.

11        A.    Okay.

12        Q.    Are you familiar with that document?

13        A.    Yes.

14        Q.    These were answers to interrogatories that were

15   provided to us.  They were actually filed in the court.

16   I want to ask you to explain your answer to

17   Interrogatory No. 5.  And I guess just so it's clear,

18   Interrogatory No. 5 asks:  "For any Chinese Drywall you

19   purchased, state whether you ever complained, inquired,

20   made written and/or verbal notice that the Chinese

21   Drywall was defective."

22            And then it asks you to explain your answer

23   basically.  So if you could, in your response, you say,

24   "I have recollection of a conversation with a

25   subcontractor maybe two or three years ago about how

Confidential - Subject to Further Confidentiality Review

```
 1    Lowe's sold inferior Chinese drywall.  I have not

 2    communicated with any manufacturers, sellers or

 3    distributors of Chinese drywall about Chinese drywall."

 4         Did you already describe to us that

 5    conversation with the subcontractor about Lowe's?

 6    A.   Yes, that is what I had mentioned, correct.

 7    Q.   We've covered that already?

 8    A.   Yes, sir.

 9    Q.   And you're aware that Lowe's is not a defendant

10    in this settlement, correct?

11    A.   Correct.  But my --

12    Q.   So there's no -- and you're --

13    A.   Can I say something maybe?

14    Q.   It's your deposition.

15    A.   The reason I brought that up as far as

16    remembering that he had told me something about Lowe's,

17    the Chinese, was that from then on, that stayed in my

18    mind as far as the China thing.  That's what stayed in

19    my mind.  And then I remember like if I would see Made

20    in China, I was like, oh, okay.  But I mean, I didn't

21    know that this would happen to me.

22    Q.   Have you read any newspaper articles, Internet

23    websites, anything prior till very recently with your

24    meeting with Mr. Batman about Chinese drywall being

25    defective?
```

Confidential - Subject to Further Confidentiality Review

1      A.   No, sir.

2      Q.   Interrogatory No. 6, it actually asks who

3  installed drywall in your home in Ingleside, Texas and

4  the manufacturer of that drywall, but you don't live in

5  Ingleside?

6      A.   Correct.

7      Q.   So you were kind enough to point that out to

8  us.  And then you went on to explain that you in fact

9  live at Claride --

10     A.   Uh-huh.

11     Q.   -- 429 Claride, and that you bought your home

12  in 2003 or 2004.  And you say that you remodeled that

13  home?

14     A.   Correct.

15     Q.   And when you remodeled it, you used about 50

16  plus sheets of drywall?

17     A.   That is correct.

18     Q.   Do you remember what the manufacturer of that

19  drywall was?

20     A.   No, I do not, sir.

21     Q.   You say you think you bought that drywall at

22  Home Depot?

23     A.   That is correct.

24     Q.   It says that you're not sure?

25     A.   Yes, sir.

1      Q.   It could be anywhere?

2      A.   I'm not sure, correct.

3      Q.   Do you have any receipts in Exhibits No. 2, 3

4  or 4?  I'm sorry.  I said sheets, didn't I?

5           Do you have any documents in any of the boxes

6  here, Exhibits 3 -- 2, 3 and 4 that would indicate the

7  purchase of the drywall in your home?

8      A.   I can't say for sure, to be honest with you.

9      Q.   Do you know whether Chinese drywall was even

10  being imported into the United States in the time period

11  2003 and 2004?

12     A.   I don't know.

13     Q.   You recollect that Home Depot will -- has

14  stated to me that they never purchased Chinese drywall?

15     A.   I recollect that.

16     Q.   So would you agree with me that it's more than

17  likely that you bought at Home Depot, if you bought at

18  Home Depot, domestic board?

19     A.   I mean, I don't know exactly which one I put in

20  there.  I mean, you're asking domestic board as far as

21  the name brand?  I'm sorry.  You're asking is that the

22  name brand again?  Or is it --

23     Q.   No.  Domestic board being drywall made in the

24  United States.

25     A.   In the United States.  I don't know.

Confidential - Subject to Further Confidentiality Review

1        Q.    All right.  Are you at all familiar with the

2    problems that Chinese drywall causes?

3        A.    Yes.

4        Q.    What is it that you understand Chinese drywall

5    does?

6        A.    It has a foul smell, it causes corrosion.  It's

7    inferior.  Let me see.  I'm trying to remember here.

8    There's a discoloration on it.  Those are what I can

9    remember right now, sir.

10        Q.    Okay.  Is there a foul smell in your home?

11        A.    No, sir.

12        Q.    You mentioned that Chinese drywall causes

13    corrosion?

14        A.    Correct.

15        Q.    What kind of corrosion?

16        A.    On pipes, if I remember correctly.

17        Q.    Have you evaluated your home to see whether

18    there's been any corrosion in your home?

19        A.    Not that I can tell.

20        Q.    You mentioned discoloration.

21        A.    Correct.

22        Q.    Is there any discoloration in any of the

23    drywall that you've bought at Home Depot that's been

24    installed in your home?

25        A.    Not that I've seen.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.   You say that if you sell your home, you will

 2     have to disclose that -- I'm sorry, I'm skipping ahead.

 3     It says that you're worried and concerned that there

 4     could be Chinese drywall in your home, correct?

 5          A.   Yes, sir.

 6          Q.   Can you describe your worry and concern?

 7          A.   Well, if it is Chinese drywall, you know, and

 8     the only way to find that out is by taking it off.  But

 9     if it is, I mean, if I later want to sell my house, I'd

10     have to let them know it is Chinese drywall.

11          Q.   There's a lot of if's in that answer.  If it

12     was Chinese drywall, you would expect there to be a foul

13     smell in your house, correct?

14          A.   I don't remember if all of the Chinese drywall

15     had that smell.

16          Q.   If it was Chinese drywall, you would expect

17     there to be corrosion in your home, correct?

18          A.   Possibly, yes.

19          Q.   If there was Chinese drywall in your home, you

20     would expect there to be discoloration, correct?

21          A.   Correct.

22          Q.   And you've already told me that none of those

23     three things are present in your home, correct?

24          A.   That is what I remember, yes, sir.

25          Q.   So if there was Chinese drywall in your home,
```

Confidential - Subject to Further Confidentiality Review

1    you'd have to have pretty good Chinese drywall, right?

2        A.   I guess.

3        Q.   Are you aware that not all Chinese drywall is

4    containing sulfur or off-gassing sulfur, reduced sulfur

5    gases?  Really bad question.  Let me ask that again.

6        A.   Yeah, please.

7        Q.   Are you aware that not all Chinese drywall

8    emits reduced-sulfur gases?

9        A.   I think that's what I remember.  That's what I

10   was saying, that I don't think all of it has that smell.

11       Q.   Right.  Well, not only doesn't if have that

12   smell, but not all Chinese drywall is reactive.

13       A.   Okay.

14       Q.   Are you aware of that?

15       A.   No, sir.

16       Q.   So you may have nonreactive board in your home.

17       A.   I don't know.

18       Q.   Well, it sounds like you do, doesn't it?

19       A.   Well, I mean, if -- if those were the only

20   three factors that determine it, well, then if that's

21   what we went off of, well, then maybe not.

22       Q.   Do you intend to sell your home any time soon?

23       A.   Not right now, sir.

24       Q.   Do you have any intention to take out the board

25   that you bought at Home Depot and replace it with

Confidential - Subject to Further Confidentiality Review

```
 1     domestic board or other board?

 2         A.    I mean, even if I had wanted to, I mean, it's

 3     not a possibility.

 4         Q.    But you don't have any intention to do that?

 5         A.    Not right now, sir.

 6         Q.    And the fact of the matter is that you were

 7     never concerned that there was Chinese drywall in your

 8     home until after you spoke to Mr. Bandas or Mr. Batman;

 9     is that correct?

10         A.    It became a concern after that, yes, sir.

11         Q.    So after you talked to lawyers, that's when

12     your concern manifested?

13         A.    Correct.

14         Q.    All right.  You work with -- what is the nature

15     of SHS construction?  What do you do?

16         A.    We do a lot of remodeling; take down old stuff

17     and put new stuff up.

18         Q.    Soup to nuts in terms of you'll do demolition,

19     you'll do --

20         A.    Yes, sir, demolition.

21         Q.    -- framing?

22         A.    Yes.

23         Q.    And then finishing?

24         A.    All the way through.

25         Q.    All the way through.  So do you subcontract out
```

Confidential - Subject to Further Confidentiality Review

```
 1    the installation of drywall?  Or do you that yourselves

 2    as well?

 3        A.   It depends on the job.  Some of it we do, some

 4    of it we do it, I do it personally.

 5        Q.   Now, you said in 2009, I believe, you had

 6    employees?

 7        A.   Uh-huh.

 8        Q.   Since, say, I guess 2010 --

 9        A.   Uh-huh.

10        Q.   -- or some time in 2009, you no longer have

11    employees; is that right?

12        A.   We -- what we do is we sub -- pretty much

13    people want to get paid more, so they don't mind being

14    subs.

15        Q.   Okay.  I'm sure that works out well for

16    somebody.

17        A.   Yeah.  Yeah.

18        Q.   And so you don't have any employees that --

19    strike that.

20             So when you subcontract out the work for, let's

21    say, installation of drywall, somebody else is doing

22    that, right?

23        A.   Not all the time, sir.

24        Q.   Okay.  So tell me how that splits out.

25        A.   Well, depending on the job, of course, of how
```

Confidential - Subject to Further Confidentiality Review

```
 1    big it is, how small it is, I'm really kind of more of

 2    a hands-on, so people are paying me to make sure things

 3    are getting done.  So I'll be there most of the time

 4    helping them to put it up.  Sometimes I won't be there,

 5    I'll have to run to other appointments to do other

 6    estimates.

 7        Q.   All right.  So you run around from different

 8    sites to be sure that your crews are doing what they're

 9    supposed to be doing or your subcontractors?

10        A.   Subcontractors, yes, sir.

11        Q.   All right.  And in the course of that, you

12    breathe in whatever is there at the site, right?

13        A.   Uh-huh.

14        Q.   Up until meeting with Mr. Batman, did you ever

15    have concerns that what you were breathing in could be

16    causing you injury?

17        A.    I always had a fear that at a certain point

18    like, for example, in what we're at right now, that a

19    product or something that we use would be -- would be a

20    bad product, you know, and that it would affect me.

21    That I've always had without a doubt.  And now that this

22    is happening, you know, I've seen all of these things,

23    that has escalated more.  That -- that's how I felt.

24        Q.   Okay.  Are you the type of person that if, say,

25    for example, you're using a paint -- I'm making this up.
```

Confidential - Subject to Further Confidentiality Review

1      A.    Okay.

2      Q.    And the paint contained a lot of benzene.

3      A.    Okay.

4      Q.    Benzene is a known carcinogen.

5      A.    Uh-huh.

6      Q.    And you were exposed to the benzene in that

7   paint.  Are you the type of person that would hire a

8   lawyer and say, I want to sue the manufacturer of that

9   paint for putting in defective benzene?

10     A.    Am I that type of person?

11     Q.    Yeah.  I mean, like do you respect lawyers

12  enough that if you were injured, you would hire a lawyer

13  to represent you for your injury?

14     A.    Oh, yes.  Yes, sir, I can see that, yes.

15     Q.    All right.  But in this case, you did not hire

16  a lawyer to represent you for any of your concerns about

17  illness, disease or medical problems; isn't that true?

18  You testified to that earlier.

19     A.    Yes, sir.

20     Q.    I take it that your concerns about illness,

21  disease and medical problems are not very significant,

22  Mr. Soto; is that correct?

23     A.    I mean, I'm not dying right now, that's for

24  sure.

25     Q.    Well, they don't rise to the level that you

1    think that you need to take any legal action; isn't that

2    correct, sir?

3         A.   Yes.

4         Q.   Now, you also talk about some DeWalt drills.

5         A.   Uh-huh.

6         Q.   Do you know if any of the drill receipts are in

7    Exhibits 2, 3 or 4?

8         A.   They probably are, yes, sir.

9         Q.   All right.  And what -- when did you buy these

10   drills?

11        A.   It was a few years back.  Probably around 2009,

12   somewhere around that time, sir.  I can't say exactly

13   what day or time.

14        Q.   All right.  And you say that -- is it -- well,

15   actually, you say, "During the time period that I recall

16   working with Chinese drywall."  Do you see that, the

17   second sentence --

18        A.   Uh-huh.

19        Q.   -- of that paragraph?

20        A.   Uh-huh.

21        Q.   That's -- is that referencing the 2009 period

22   that you just now testified to?

23        A.   I think it's 2009.  I'm referencing that time

24   frame.

25        Q.   All right.  And once again, sir, you don't know

```
1    when Chinese drywall was imported into the United
2    States, correct?
3         A.   Correct.  Yes, sir.
4         Q.   What -- in 2009, how would you describe your
5    business?  Was it on -- was it coming out of the
6    recession?  Going into the recession?  Were you busy?
7    Were you not busy?
8         A.   2009.  In 2009 we were pretty busy.  I remember
9    that because I had several employees and I had a lot of
10   drills.
11        Q.   And you had a lot of business?
12        A.   Yeah.
13        Q.   So your lots of employees were using lots of
14   drills doing lots of jobs, right?
15        A.   Correct.
16        Q.   And that's more so than usual; is that what
17   you're telling us?
18        A.   As far as the work itself?  Is that what we're
19   referring to?
20        Q.   The use of the drills is what I'm referring to.
21        A.   The use of the drills.  Well, the drills are --
22   were assigned specifically to two people, one per --
23   each person had their own drill, you know what I mean?
24   So it might have not been used by a lot of different
25   people.  It's used by the same person at that time.
```

Confidential - Subject to Further Confidentiality Review

1      Q.   But they were very busy persons using those

2   drills?

3      A.   They were busy using drills, correct.

4      Q.   And they were more busy than usual in the

5   course of your business in that time period that we're

6   talking about?

7      A.   I don't know if more busy than usual, to be

8   honest with you.  I mean, we were busy, I know that.

9   And here's -- I'm sorry, let me say something on that.

10        The reason I say that is because around that

11   time, it had only been a couple of years since I had

12   started my business.  And as you're growing as a

13   business, you start learning things.  You know, what to

14   do and what not to do.  So I mean, we've always kept

15   busy.  But if you ask me if we were busy every year,

16   yes, we were busy every year.  If you ask me how much

17   money we made each year, it would be different, you

18   know.

19      Q.   All right.  I just -- I'm just looking at what

20   you're here in writing talking about, which is drills --

21      A.   Correct.

22      Q.   -- corroding within a few months and failing

23   prematurely.

24      A.   Correct.

25      Q.   Where did you buy the drills?

Confidential - Subject to Further Confidentiality Review

```
 1          A.    I mean, it was probably either Lowe's or Home

 2   Depot.

 3          Q.    Are you aware that they have return policies at

 4   Lowe's or Home Depot for products that fail prematurely?

 5          A.    Yes, sir.

 6          Q.    Have you ever returned something to Lowe's or

 7   Home Depot because of --

 8          A.    I have, yes, sir.

 9          Q.    Did you return the drills to Lowe's or Home

10   Depot?

11          A.    To be honest with you, no.

12          Q.    And did it ever dawn on you that's something

13   that you ought to do because they were failing

14   prematurely?

15          A.    It was probably something I should have done.

16          Q.    And you know, you're aware that drills have

17   warranties as well, right?

18          A.    Yes, sir.

19          Q.    And do you think that if you had bought these

20   within the -- when did you buy the drills?  In 2009?

21          A.    That's, again, I'm saying that's around the

22   time that I bought them.

23          Q.    But you were also saying drills usually last

24   more than a year, and these drills last less than a

25   year, right?
```

Confidential - Subject to Further Confidentiality Review

1        A.    Correct.

2        Q.    Do you know whether or not DeWalt drills have a

3    year -- a year -- a one-year warranty?

4        A.    Yes, now I do know that.

5        Q.    And they were covered by warranty, these

6    drills?

7        A.    Yes, sir.

8        Q.    But you think that the Chinese drywall that

9    these gentlemen were working with with these drills

10    caused them to corrode; is that your testimony?

11        A.    My testimony is that they failed prematurely

12    than they usually do because my drills usually last for

13    about a year.  That is what my testimony says there,

14    right there.

15        Q.    So --

16        A.    And the reason that I know that they were

17    corroded is because I took them apart and I saw the

18    corrosion inside of them.

19        Q.    All right.  Are you telling us that you are not

20    associating that corrosion with Chinese drywall?  Or are

21    you telling us that those drills corroded because those

22    gentlemen were working with the drills near Chinese

23    drywall?

24        A.    I can't say for sure.  I'm saying that that

25    could be a factor.

Confidential - Subject to Further Confidentiality Review

1        Q.   But you don't know?

2        A.   Correct, I don't know.

3        Q.   And you don't have any expert to support that

4   theory, right?

5        A.   No, sir.

6        Q.   And you haven't hired Mr. Bandas to hire an

7   expert to support that theory?

8        A.   No, sir.

9        Q.   So it's possible -- in fact, it's just your

10  speculation at best that there's an association between

11  those drills corroding and exposure to Chinese drywall?

12       A.   It is a possibility, correct.

13       Q.   It's you guessing?

14       A.   Okay.

15       Q.   Now, you say your business reputation has been

16  damaged.

17       A.   Uh-huh.

18       Q.   Tell me about that.

19       A.   Well, again, going back to always trying to

20  provide the best for our clients.  Now I know that, you

21  know, we've installed Chinese drywall in some of their

22  homes.  I don't know who or where, but just knowing that

23  has affected the reputation that we have because I would

24  have to inform them about that.

25       Q.   Okay.  Let's break that down.  Now you know --

```
1        A.    Correct.

2        Q.    -- that you've installed Chinese drywall in

3   some of your clients' homes.  How do you know that?

4        A.    By remembering the pictures that I saw and

5   remembering the markings that I saw.

6        Q.    All right.  And which clients have you gone to

7   the effort of telling them that they have Chinese

8   drywall in their home?

9        A.    I haven't gone to any of them.

10       Q.    Do you have any intention to do that?

11       A.    I don't know what I need to do.

12       Q.    Do you have any intention of telling any of

13  your clients, I installed Chinese drywall in your home?

14       A.    Intention, yes, I do have the intention.

15       Q.    Okay.  And when do you intend to effectuate

16  that intent?

17       A.    I don't know.

18       Q.    Have you consulted with any counsel as to your

19  obligation as to whether or not you need to make that

20  disclosure?

21              MR. HUSEMAN:  Any discussions you've had

22  with counsel are not to be discussed, Mr. Soto.

23              MR. LONGER:  He's counseled -- I'm just

24  asking if he's had a discussion about whether he needs

25  to make the disclosure.  He hasn't retained Mr. Bandas
```

Confidential - Subject to Further Confidentiality Review

1    to do -- to give him that advice.

2              MR. HUSEMAN:  You're asking him whether

3    he's talked with a lawyer about a particular subject.

4    That's what we're objecting to as being privileged.

5              MR. LONGER:  That's an invalid objection.

6    Mark that, please.

7         Q.   (By Mr. Longer)  Do you have any intention to

8    talk to a lawyer about whether or not you have a duty to

9    make that disclosure?

10             MR. HUSEMAN:  Without saying whether you

11   have or in fact are not.

12        A.   I do have an intention.

13        Q.   Okay.  And who are you going to talk to?

14        A.   I don't know.

15        Q.   Certainly not Mr. Bandas, right?

16        A.   I didn't say that.

17        Q.   Okay.  Now, none of your clients, I think you

18   told me earlier, have ever told you that they're

19   complaining to you about Chinese drywall in their homes;

20   is that correct?

21        A.   They have not called me personally.

22        Q.   Have you gone to any of the homes that you've

23   installed any drywall in that have the effects of

24   Chinese drywall?

25        A.   The effects, no.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Have you ever noticed foul smell in any of the

 2   homes that you've worked in from Chinese drywall?

 3        A.   I can't recall which homes those were.

 4        Q.   Have you ever noticed any corrosion in any of

 5   the homes that is indicative of Chinese drywall?

 6        A.   I don't remember what homes they were.

 7        Q.   Have you ever noticed any discoloration in any

 8   of the homes that you've installed Chinese drywall in?

 9        A.   I don't remember the homes.

10        Q.   And you don't know if you've even installed

11   Chinese drywall in those homes, right?

12        A.   I never said that.  What I said is I don't

13   remember the homes.

14        Q.   All right.  Now, tell me -- you're concerned

15   and you're telling me that you have emotional distress.

16   How is that going for you?

17        A.   Well, I have worry there that I didn't have

18   before.

19        Q.   And that's as a result of speaking to

20   Mr. Batman, right?

21        A.   That's as a result of knowing that I've

22   installed Chinese drywall.

23        Q.   I see.  And have you seen any medical

24   practitioner about your concerns?

25        A.   No, sir.
```

Confidential - Subject to Further Confidentiality Review

1      Q.    Do you have any intention to see a medical

2    practitioner about your concern?

3      A.    Yes, sir.

4      Q.    Who is your doctor?

5      A.    I don't have a doctor.

6      Q.    Who will you go to see when you fulfill this

7    intention?

8      A.    I will possibly go see Mr. Covarrubias.

9      Q.    Mr. --

10     A.    Dr. Covarrubias, I'm sorry, because he used to

11   be my -- years ago he used to be the person that I would

12   go to.

13     Q.    Now, have you ever seen -- I'm going to butcher

14   his name -- Dr. Covarrubias?

15     A.    Covarrubias.

16     Q.    I can't even get a good spelling.

17     A.    Cova --

18     Q.    Can you spell it, please?

19     A.    C-o-v-a-r-r-u-b-i-a-s.

20     Q.    Covarrubias?

21     A.    Yes, sir, you got it.

22     Q.    Thank you.  So Dr. Covarrubias, have you

23   visited with him about any of the concerns that you've

24   expressed about breathing in dust or anything?

25     A.    No, sir, I have not.

1    Q.   When was the last time you saw a doctor?

2    A.   For myself?

3    Q.   Yes, sir.

4    A.   Okay.  Probably about two or three years ago.

5    Q.   And what was the nature of that visit?

6    A.   I was having a lot of congestion that wouldn't

7    go away.

8    Q.   Like a cold?

9    A.   No, it wasn't a cold.  It was just cold air

10   would hit me and I would start coughing like I almost

11   wanted to kind of throw up.  And so I went to see the

12   doctor for that because the congestion would never go

13   away.

14   Q.   You know, you're from Corpus Christi.  It

15   doesn't get cold here too often.  But the --

16             MR. HUSEMAN:  Well, actually, Counsel, it

17   was down to 80 last week.

18             THE WITNESS:  Yeah, yeah.  No, it was

19   actually 60.

20             MR. LONGER:  So this is years ago, so

21   we've had climate warming.  I appreciate that.

22   Q.   (By Mr. Longer)  Now, back when you saw

23   Dr. Covarrubias --

24   A.   I didn't see him -- I didn't see him for that.

25   Q.   You saw another physician?

```
1        A.   Yes, sir.

2        Q.   It was a physician?

3        A.   It was a physician.

4        Q.   Okay.  And do you recollect that gentleman's

5    name?

6        A.   It was actually a woman's name.  It wasn't here

7    in Corpus.  It was actually in Reynosa, on the other

8    side of the border.

9        Q.   Do you recollect her name?

10       A.   Her name?  No, I don't, sir.  I'm sorry.

11       Q.   Okay.  And did you obtain a diagnosis at that

12   visit?

13       A.   I don't remember a diagnosis like what she said

14   exactly, but I do remember she gave me some pills to get

15   rid of the congestion.  That's what I do remember.

16       Q.   Do you remember what the pill was?

17       A.   No, sir.

18       Q.   Was it an antibiotic?  Was it --

19       A.   I don't remember.

20       Q.   -- an antibacterial drug or --

21       A.   It was probably a combination of a few things,

22   but I don't remember.

23       Q.   Was it a cough syrup?

24       A.   No, it wasn't a cough syrup.  It was a pill.

25   It was a couple of pills, actually, but I don't remember
```

Confidential - Subject to Further Confidentiality Review

```
 1    exactly what the name was.  I know obviously one was for

 2    congestion, but that's all I remember.

 3         Q.   And where did you fill the prescription?

 4         A.   Where did I fill the prescription?

 5         Q.   Was it a Walgreen's?  Was it Rite Aid?  I don't

 6    know what you have down here.  CVS?

 7         A.   I don't remember.  I don't remember exactly

 8    where.

 9         Q.   But back then, you didn't even know about

10    Chinese drywall, so you didn't explain to her that you

11    had any association between that and your work?

12         A.   I didn't know about it, correct.

13         Q.   Did you ever explain to her that you thought

14    that there was an association between that congestion

15    and your work?

16         A.   No, sir, I didn't know about it.

17         Q.   Well, you knew you were working, so did you

18    explain to the doctor that I have this congestion, do

19    you think it may be caused by my exposures to anything

20    in my line of business?

21         A.   Honestly, I feel that I take those matters a

22    little more seriously now that I'm a little bit older

23    than when I was a few years ago.  So at that point, I

24    did not say that to her.

25         Q.   I hope that you're right on that, that we're
```

```
 1    all older and wiser.

 2         A.   Well, I mean, I'm speaking for myself.  I'm

 3    sorry.

 4                   (Exhibit No. 9 was marked.)

 5         Q.   (By Mr. Longer)  Okay.  Now, I want to quickly

 6    go through your document request, which I don't believe

 7    that I've marked as an exhibit yet.  So I'm going to do

 8    that real quick.  And I hope that we can run through

 9    these faster.  This is Exhibit No. 9.  I'm going to hand

10    that to you.  There's a page missing.

11         A.   Sir, I hate to ask.

12         Q.   You need a break?

13         A.   Just a quick break.

14         Q.   Take a break.

15         A.   I need to talk to my wife because I'm sure

16    we've been here for quite a while and she hasn't heard

17    from me.

18                   MR. LONGER:  It's 8 o'clock.  Let's take a

19    break.

20                   THE WITNESS:  If you don't mind.  Thank

21    you, sir.

22                   THE VIDEOGRAPHER:  Off the record at 8:01,

23    end of tape two.

24                   (A recess was taken.)

25                   THE VIDEOGRAPHER:  On the record at 8:07,
```

1    beginning of tape three.

2        Q.  (By Mr. Longer)  Mr. Soto, we have just taken a

3    short break.

4        A.    Thank you for that.

5        Q.    And I want to thank you for your patience.  Let

6    me direct you to Exhibit No. 9, which I had produced to

7    you just before the break.

8        A.    Correct.

9        Q.    It's Objectors Saul Soto and SHS Construction's

10   Responses and Objections to Request for Production

11   Propounded by Class Counsel.  Do you have that document

12   in front of you?

13       A.    Correct.

14       Q.    All right.  Now, these were documents -- I'm

15   sorry.

16            This document was produced to me and filed in

17   the federal court in the Eastern District of Louisiana

18   by Mr. Bandas on your behalf.  Do you know that?

19       A.    Yes, sir.

20       Q.    All right.  So are there any communications

21   between you and anyone else in the Chinese drywall

22   litigation, to your knowledge?

23       A.    No, sir.

24            MR. HUSEMAN:  You mean other parties?

25            MR. LONGER:  Other litigants, other

```
 1    parties.

 2              MR. HUSEMAN:  Well, he obviously talked to

 3    his lawyers, you know.

 4              MR. LONGER:  Well, I said litigants,

 5    didn't I?

 6              MR. HUSEMAN:  Okay.

 7              MR. LONGER:  So maybe Mr. Bandas will

 8    become a litigant, I don't know.

 9              MR. HUSEMAN:  If your fondest wishes are

10    realized.

11              MR. LONGER:  But we shall see.

12        Q.   (By Mr. Longer)  Now, Document Request No. 4.

13        A.   Okay.

14        Q.   It references -- it asks for documents

15    reflecting damages to your property that you allege are

16    caused by Chinese drywall.  You say that after your

17    search that any documents responsive to this request

18    will be produced.

19         Now, you've produced to us three boxes here,

20    Exhibits 2, 3, and 4.  Is there anything else that you

21    have in your possession, control or custody that you

22    intend to produce to me that is responsive to this

23    request?

24        A.   That is what I could find.

25        Q.   That is the universe right there; is that
```

```
 1      correct?

 2           A.   That's as much as I could find pretty much.

 3           Q.   All right.  As to Document Request No. 5, we're

 4      asking there for documents that you intend to submit for

 5      other loss claims as that term is identified in the

 6      Chinese drywall litigation.  Do you see that?

 7           A.   Uh-huh.

 8           Q.   All right.  Do you know what the other loss

 9      claim is designed to cover?

10           A.   No, sir, I do not.

11           Q.   Do you have any understanding of why you

12      responded the way you did?  Or was this something that

13      you just allowed counsel to do for you?

14           A.   That's why I got a lawyer to help me with this

15      case.

16           Q.   Thank you.  No. 6, all invoices of your

17      purchase of Chinese drywall.  The universe is right in

18      front of us; is that correct?

19           A.   That's pretty much what I could find, yes, sir.

20           Q.   All right.  Do you own any companies?

21           A.   Any companies like all together?

22           Q.   Well, this question, Interrogatory No. 7, it

23      says, "For each company you own, all documents

24      reflecting your ownership or articles of incorporation."

25               You run SHS Construction, which is doing
```

Confidential - Subject to Further Confidentiality Review

```
 1     business -- I'm sorry.  It's Saul Soto doing business

 2     as --

 3          A.   Correct, as doing business as, yes, sir.

 4          Q.   -- SHS Construction?

 5          A.   That is correct.

 6          Q.   Do you own any incorporated companies?

 7          A.   One, which we never did anything with, which

 8     we're closing down this year.

 9          Q.   Okay.  And what is that company?

10          A.   Buena Vista Lawn and Landscaping, it's an LLC.

11          Q.   And I feel compelled to ask.  Is that a

12     business that ever engaged in practices that involved

13     Chinese drywall --

14          A.   No, sir.

15          Q.   -- or any drywall, for that matter?

16          A.   That I can tell you, no.  No, sir.

17          Q.   Okay.  All right.  Document Request No. 8, have

18     you produced all invoices, purchase orders, sales slips

19     or other paper reflecting the resale of Chinese drywall?

20          A.   In the resale as far as my understanding is the

21     contracts that I use to do my business.  And they're in

22     there as well.

23          Q.   Okay.  And are they -- if we were to look at a

24     contract --

25          A.   Okay.
```

```
1        Q.    -- would it be separately identified the resale

2   of drywall?

3        A.    As far as what invoice would go with the

4   paperwork, is that what you're saying?

5        Q.    How would we know --

6        A.    Okay.

7        Q.    -- that you were reselling drywall in any

8   document in there?  What would it say?  What would I

9   look for?

10       A.    Honestly, the only way that that would be in --

11  we have gotten a lot better with that -- is on the

12  invoices now, which that hasn't always been the policy,

13  but now we'll put the job that it goes to and we'll

14  write it on there.  Years ago we didn't used to do that.

15  The only way of knowing is the invoices that go to that

16  month pretty much.

17       Q.    When you say "now," when did that practice

18  begin?

19       A.    Well, my assistant has been with me for two

20  years, so she helps do all that stuff.

21       Q.    So since 2010?  Or --

22       A.    Somewhere around there, yes, sir.

23       Q.    Since you had an assistant?

24       A.    Yeah, she helps me with that.

25       Q.    All right.  If I were to ask you to stand up
```

1    and walk over to the boxes, would you be able to find an

2    example of where the drywall is separately identified?

3    Or would it take you forever because you'd have to look

4    at every single piece of paper?

5         A.   If I looked at 2011 or something, probably.

6         Q.   I'm just asking, do you think that you could

7    get up and put your hands on such a document right away?

8    Or are you as lost in the woods as I would be?

9         A.   You would probably be lost in the woods.  I

10   would know in the sense that because that's the work

11   that I did.  But it would take a little bit of time.

12        Q.   All right.  I'm not going to ask you to do that

13   now.  Thank you.

14             All right.  Request No. 9, "All expert reports

15   and analysis of the settlement at issue."  Do you have

16   anything there?

17        A.   No, sir.

18        Q.   All right.  No. 10, is it correct that you do

19   not have any documents responsive to that request which

20   asks you for what you intend to admit at the fairness

21   hearing?

22        A.   That is correct.

23        Q.   Do you intend to appear at the fairness

24   hearing?

25        A.   I don't know.

Confidential - Subject to Further Confidentiality Review

```
1          Q.    You don't know?

2          A.    No, I don't know.

3          Q.    Are you willing to appear at the fairness

4    hearing?

5          A.    If I need to be there, yes.

6          Q.    If the Court orders you to appear --

7          A.    Oh, of course.

8          Q.    -- you will appear?

9          A.    Without a doubt, yes, sir.

10         Q.    Is that expense something that Mr. Bandas will

11   advance for you?  Or is that an expense that you will

12   have to incur?

13         A.    I don't know.

14         Q.    What does your contract say about any expenses

15   in this litigation?  I see the title in Exhibit No. 1,

16   "Attorneys' fees, expenses and payments to you," but I'm

17   looking for what your understanding is as to expenses,

18   and I don't see any discussion of expenses.  There it

19   is.  4.4, "You will not be responsible to pay attorneys'

20   fees or expenses of any kind."

21              So is it your understanding that Mr. Bandas is

22   going to pay for you to go to New Orleans if you have

23   to?

24         A.    If that's what it says here and if that's the

25   way it needs to work, I guess so.
```

Confidential - Subject to Further Confidentiality Review

1      Q.    Well, you better hope so, right?

2      A.    I hope so.  We'll see.

3      Q.    All right.  Maybe there will be satellite

4    litigation, you never know.

5            All right.  Request No. 11 addresses affidavits

6    you intend to submit, and you say that you don't have

7    any --

8      A.    I don't have any, no, sir.

9      Q.    -- any documents, correct?

10     A.    That is correct.

11           MR. LONGER:  All right.  I'm going to take

12   a break now and go off the record.

13           THE VIDEOGRAPHER:  Off the record at 8:17.

14           (Off the record.)

15           THE VIDEOGRAPHER:  On the record at 8:23.

16     Q.    (By Mr. Longer)  Mr. Soto, on October 18, your

17   attorney sent to my office an e-mail containing invoices

18   from Home Depot and from Lowe's.

19     A.    Okay.

20           (Exhibit No. 10 was marked.)

21     Q.    (By Mr. Longer)  I'm going to show you the

22   documents that were produced.  And we can actually mark

23   that as Exhibit No. 10.  And I'm going to ask you if

24   you're familiar with producing that set of --

25     A.    Yes, sir.

Confidential - Subject to Further Confidentiality Review

```
1        Q.   -- invoices?

2        A.   Yes, sir, this is the -- this is correct.

3        Q.   How did you produce those, only those

4   documents to your counsel?

5        A.   Only these?  Well, at that point he -- well, we

6   had to get some things together that said Sheetrock on

7   them.  So this is what I could find at that time.

8        Q.   Okay.  And now are those documents that

9   comprise Exhibit No. 10 in these boxes?

10       A.   They are in there somewhere, yes, sir.

11       Q.   So we're going to re -- we're going to find

12   them again?  Or you're going to find them again?

13       A.   Well, actually --

14            MR. HUSEMAN:  Hopefully.

15       A.   -- these are -- I believe they're kind of out

16   kind of -- if you would go through a file, they would be

17   kind of all together.  But as far as exactly where

18   they're at, I don't know.

19       Q.   Okay.  All right.  Now, you had a choice in

20   this settlement to object, as you did.

21       A.   Okay.

22       Q.   Are you at all aware of the alternatives to

23   that choice?

24       A.   Alternatives as in what?

25       Q.   Well, the settlement agreement provides that
```

Confidential - Subject to Further Confidentiality Review

1    you could opt out of the class or request exclusion from

2    the class.

3         A.   Yes, sir.  Yes.

4         Q.   It suggests that you could object to the

5    settlement.

6         A.   Uh-huh.

7         Q.   Or it says that you can basically do nothing

8    and participate in the class.

9         A.   Yes, I'm aware of that, yes, sir.

10        Q.   All right.  And you chose to object.  I guess

11   the question is:  What was your consideration, if any,

12   about opting out of the settlement?

13               MR. HUSEMAN:  Once again, just out of an

14   abundance of caution, Mr. Soto, do not --

15        Q.   (By Mr. Longer)  Don't tell us what Mr. Bandas

16   said to you.

17               MR. HUSEMAN:  Well said.

18        A.   Okay.  You're asking what my thinking -- or say

19   that again.  I'm sorry.

20        Q.   You are the client.

21        A.   Correct.  Yes, sir.

22        Q.   You have an attorney?

23        A.   Correct.

24        Q.   You are responsible for your own choices?

25        A.   Correct.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Correct?

 2        A.    Correct.

 3        Q.    Mr. Bandas doesn't control your choices, does

 4   he?

 5        A.    That is true.

 6        Q.    Okay.  So as the master of your domain, why did

 7   you choose not to opt out?

 8        A.    Well, I didn't opt out because I was opposed to

 9   this case as an objector.  Sorry.  That was the option

10   that I chose.

11        Q.    Okay.  And what was the thought process that

12   you went through that got you to that point?

13        A.    Honestly, that the class should get a little

14   bit more.

15        Q.    And that was based upon discussions that you

16   only came about with counsel; is that fair to say?

17              MR. HUSEMAN:  Don't answer that question.

18        Q.    (By Mr. Longer)  Let me say it differently.

19   You don't have that opinion or that thought until after

20   you talked to counsel; is that correct?

21        A.    That came to mind after we talked.

22              MR. LONGER:  I have no further questions.

23   Thank you very much for your time, Mr. Soto.

24              THE WITNESS:  Thank you, sir.

25              MR. LONGER:  Do any of you gentlemen
```

```
 1      intend to ask the witness a question?

 2                   MR. HUSEMAN:  I must have left the wrong

 3      impression with you.

 4                   MR. DODSON:  Is there anything we want to

 5      try to resolve this evening?  There's been --

 6                   MR. LONGER:  Well, we have an issue about

 7      Mr. -- or Mrs. Petrus or Ms. Petrus.

 8                   COURT REPORTER:  Are we off the record?

 9                   MR. LONGER:  No, we can be on the record

10      until these gentlemen tell me it should be off the

11      record.  We have an issue.  And it's my understanding

12      from our discussions that despite the court hearing

13      today, Ms. Petrus will not be presented tomorrow and

14      Mr. Vitela will not be presented, correct?

15                   MR. DODSON:  More exactly, because of the

16      court hearing today they won't be presented.

17                   MR. LONGER:  Okay.  And we are going to

18      get a signed document, Exhibit No. -- did we say 6-A or

19      7 -- 7 for the Attorney Disclosure to Client and Client

20      Consent.

21                   MR. HUSEMAN:  We've already asked Chris to

22      send us the signed version.  We will get that and you'll

23      get it forthwith.

24                   MR. LONGER:  So much for tonight, is that

25      what you're saying?
```

```
 1                    MR. HUSEMAN:  Well --

 2                    MR. DODSON:  Well, I had hoped that --

 3                    MR. LONGER:  We can do it tomorrow.

 4                    MR. DODSON:  -- that it was okay with you

 5     for tomorrow is what I was understanding earlier.

 6                    MR. LONGER:  Yeah, that's fine.  It was.

 7                    MR. DODSON:  All right.

 8                    MR. LONGER:  And what else do you hope to

 9     clear up?

10                    MR. DODSON:  There was an issue where we

11     were going -- there was -- about some questions, I don't

12     remember specifically, that had to do with your going

13     into items with him about Chris', Mr. Bandas' work on

14     other cases.

15                    MR. LONGER:  You're going to file a motion

16     for protective order.

17                    MR. DODSON:  All right.

18                    MR. LONGER:  Is that correct?

19                    MR. HUSEMAN:  That's the question, yeah.

20                    MR. DODSON:  If I need to.

21                    MR. HUSEMAN:  If you want us to, we'll do

22     it.  If you're going to pass --

23                    MR. LONGER:  Well, I have a whole series

24     of questions about Mr. Bandas that I fully intended to

25     ask, but based upon your representation that if I asked
```

1    those questions, you will object and instruct him not to

2    answer.

3                    MR. HUSEMAN:  That's right.  And the

4    question was -- that was on the floor was whether or not

5    you were serious about pursuing that such that we need

6    to actually file the motion.  And if you are, then we

7    will.

8                    MR. LONGER:  Well, I took you at your

9    word.

10                   MR. DODSON:  Does your timing have any

11   sort of constraints about whether we need to get that

12   done tomorrow?

13                   MR. LONGER:  November 7 is when we intend

14   to have a hearing with Judge Fallon.  It should be

15   tee'ed up well before then so that we have time to

16   respond.

17                   MR. DODSON:  Do we need to do anything

18   that will make your travel easier?

19                   MR. LONGER:  Give it to me tomorrow.  I'll

20   look at it on the plane home on Friday.

21                   MR. DODSON:  We're not going to try to

22   get it resolved by phone calls before you leave Corpus

23   is what I'm hearing?

24                   MR. LONGER:  Well, if Mr. Soto will make

25   himself available, we could try to have a discussion

Confidential - Subject to Further Confidentiality Review

1    with Judge Fallon, in fact, tomorrow if you want to work

2    at it that way.

3              MR. DODSON:  I'm trying to make your life

4    easy.

5              MR. LONGER:  All right.  Well, I am here.

6    And Mr. Soto, is your schedule such that you can be

7    available on sort of short notice either Thursday or --

8    tomorrow being Thursday or Friday?

9              MR. HUSEMAN:  What this is about is that

10   if they're right and we're wrong about what they get to

11   ask you, we don't want them to have to make another trip

12   down here and depose you.

13             THE WITNESS:  No, I understand.

14             MR. HUSEMAN:  And I really don't like

15   depositions on telephones, and so I'd rather do it while

16   they're here.  And so we're trying to see if whether or

17   not you could do that if we had to squeeze in a little

18   bit more depo.

19             THE WITNESS:  Can I ask how long that

20   would be?

21             MR. DODSON:  When can you not?

22             MR. LONGER:  I think the deposition being

23   constrained as it was, it would last no more than about

24   a half hour.

25             THE WITNESS:  Okay.  If that is true, I

Confidential - Subject to Further Confidentiality Review

```
1    can make myself available.  Let me see.  Tomorrow is

2    Thursday, right?

3                  MR. HUSEMAN:  Yeah.  He's going to be

4    busy.

5                  THE WITNESS:  I know.  You're leaving

6    Friday or -- right?

7                  MR. LONGER:  Yes.

8                  MR. HUSEMAN:  Friday morning maybe, would

9    that work?

10                 MR. LONGER:  Friday morning would work.

11                 MR. HUSEMAN:  Okay.  Let's see if we can

12   make that happen.

13                 THE WITNESS:  Yeah.  If that's 30 minutes,

14   I think I should be okay.

15                 MR. LONGER:  All right.  Are we adjourned?

16                 THE VIDEOGRAPHER:  We're off the record at

17   8:33, end of deposition, end of tape three.

18                 (Exhibit No. 7 was marked.)

19

20

21                        * * * * * * *

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1

 2                    CERTIFICATE

 3

 4

 5           I HEREBY CERTIFY that the
       witness was duly sworn by me and that the
 6     deposition is a true record of the
       testimony given by the witness.
 7
               It was requested before
 8     completion of the deposition that the
       witness, SAUL SOTO have the
 9     opportunity to read and sign the
       deposition transcript.
10

11
               _____
12             SYLVIA KERR, Texas CSR #4776
               Certified Reporter
13             Notary Public
               Dated:  November 5, 2012
14

15

16               (The foregoing certification
17     of this transcript does not apply to any
18     reproduction of the same by any means,
19     unless under the direct control and/or
20     supervision of the certifying reporter.)
21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                   -   -   -   -   -   -

                         E   R   R   A   T   A

 2                   -   -   -   -   -   -

 3

 4       PAGE   LINE   CHANGE

 5       _____  _____  _____

 6            REASON:  _____

 7       _____  _____  _____

 8            REASON:  _____

 9       _____  _____  _____

10            REASON:  _____

11       _____  _____  _____

12            REASON:  _____

13       _____  _____  _____

14            REASON:  _____

15       _____  _____  _____

16            REASON:  _____

17       _____  _____  _____

18            REASON:  _____

19       _____  _____  _____

20            REASON:  _____

21       _____  _____  _____

22            REASON:  _____

23       _____  _____  _____

24            REASON:  _____

25
```

1

2          ACKNOWLEDGMENT OF DEPONENT

3

4               I,_____, do

5     hereby certify that I have read the

6     foregoing pages, and that the same is

7     a correct transcription of the answers

8     given by me to the questions therein

9     propounded, except for the corrections or

10    changes in form or substance, if any,

11    noted in the attached Errata Sheet.

12

13

14    _____

15     SAUL SOTO                    DATE

16

17

18    Subscribed and sworn

      to before me this

19    _____ day of _____, 20_____.

20    My commission expires:_____

21

      _____

22    Notary Public

23

24

25

Confidential - Subject to Further Confidentiality Review

```
  1                     LAWYER'S NOTES

  2      PAGE   LINE

  3      ____   ____   _____

  4      ____   ____   _____

  5      ____   ____   _____

  6      ____   ____   _____

  7      ____   ____   _____

  8      ____   ____   _____

  9      ____   ____   _____

 10      ____   ____   _____

 11      ____   ____   _____

 12      ____   ____   _____

 13      ____   ____   _____

 14      ____   ____   _____

 15      ____   ____   _____

 16      ____   ____   _____

 17      ____   ____   _____

 18      ____   ____   _____

 19      ____   ____   _____

 20      ____   ____   _____

 21      ____   ____   _____

 22      ____   ____   _____

 23      ____   ____   _____

 24      ____   ____   _____

 25      ____   ____   _____
```

Exhibit 1 to Soto 10/31/2012 Deposition

# CLASS ACTION OBJECTOR
## POWER OF ATTORNEY AND CONTINGENT FEE AGREEMENT

This agreement ("Agreement") is made between SAUL SOTO ("Client(s)" or "you") and BANDAS LAW FIRM, P.C. (hereinafter "Attorneys").

In consideration of the mutual promises contained herein, Client(s) and Attorneys agree as follows:

1. **SCOPE AND METHOD OF REPRESENTATION**

    1.1    Attorneys' Legal Services. You agree Attorneys will: Prepare and file on your behalf an objection to a proposed class action settlement in the case styled *MDL 2047; In Re: Chinese-Manufactured Drywall Products Liability Litigation*; In the United States District Court, Eastern District of Louisiana, and represent you in any appeal therefrom (the "Objection").

    1.2    **Method of Representation.** BLF is a Texas law firm located at 500 N. Shoreline, Suite 1020, Corpus Christi, Texas 78471, (361) 698-5200. No lawyer of the BLF is licensed in Louisiana federal court. However, if necessary, Attorneys will seek admission before Louisiana courts *pro hac vice* or as required by the applicable federal rules of practice and/or will seek to associate local counsel in order to properly effectuate this representation. Client authorizes that Attorneys prepare the Objection for filing *pro se* if necessary so as to allow Attorneys meet the Objection filing deadline and sufficient time in which seek admission *pro hac vice* and/or associate Lousiana counsel if the later cannot be accomplished before the Objection filing deadline.

2. **YOUR REPRESENTATIONS AND DUTIES AS AN OBJECTOR**

    2.1    You represent you are a member of the Class as defined in the materials published at https://chinesedrywallclass.com

    2.2    You represent you can demonstrate you are entitled to receive settlement benefits as a member of the Class through documentation or by affidavit.

3. **ATTORNEYS' FEES, EXPENSES AND PAYMENTS TO YOU**

    3.1    **Class Action Settlement:** If a settlement is approved by the Court, you will receive the full amount of any benefits you are entitled to receive under the settlement as a class member. Attorneys shall not be entitled to receive any portion of your share of the benefits under the class settlement.

    3.2    **Incentive Award:** If the outcome of your objection is determined by the Court or is settled and the settlement is presented to the Court for approval, Attorneys may, in their sole discretion, petition the Court for approval of a modest (not to exceed

DEPOSITION EXHIBIT

1

$5,000) payment to you to compensate you for your time, effort and/or the benefit you confer on the Class through your service as an objector (an "incentive award"). If the Court grants or approves an incentive award, you will receive the amount awarded to you by the Court in addition to the benefits set forth in paragraph 3.1. If Attorneys petition the Court for an incentive award on your behalf and the Court denies the incentive award, you will receive only the benefits set forth in section 3.1.

3.3    **Settlement:** In the alternative to section 3.2 above, if your objection is settled without the necessity for Court approval, Attorneys agree to request as part of the settlement a separate payment to you to compensate you for your time, effort and/or the benefit you confer on the Class through your service as an objector. The amount of the payment is contingent on the outcome of the settlement negotiations, but will not exceed $5,000. If the settling parties agree to make such a payment, you will receive the amount of that payment in addition to the benefits set forth in paragraph 3.1. If the settling parties do not agree to make a separate payment to you, you will receive only the benefits set forth in paragraph 3.1.

4.4    **Attorneys' Fees:** You agree the payment of attorneys' fees will be contingent upon the outcome of the objection. You will not be responsible to pay attorneys' fees or expenses of any kind. You agree Attorneys may receive a fee for their services if they are successful in pursuing an objection to the class settlement or any appeal therefrom. The attorneys' fees will be paid by the defendants or as part of the attorneys' fees awarded to class counsel. You acknowledge you do not have any interest in any such fees. You further acknowledge the attorneys' fees may substantially exceed any payments to you as set forth above.

4.5    You understand and acknowledge you will not receive any special benefits or recovery not afforded to other members of the Class by reason of your service as an objector other than as set forth above. You further acknowledge no other benefits or payments have been promised to you.

4.    **CONFLICTS OF INTEREST**

Attorneys have explained and you understand that, if successful, the objection or any appeal there from may result in the disapproval or rejection of the proposed settlement which may, in turn, cause you to lose your right to receive settlement benefits under the proposed settlement, to which you object. You acknowledge and agree to this risk and waive any conflict of interest arising from the objection or any appeal there from. Attorneys have also explained and you understand that if there are negotiations to settle your objection, Attorneys may negotiate the amount of any payment to you as well as the amount of attorneys' fees concurrently in order to arrive at a total settlement amount. You acknowledge and waive any conflict of interest between Attorneys and you arising out of any such negotiations and grant Attorneys sole discretion to propose the amount of any payment to you during the negotiations. The settlement will not be finally agreed upon, however, until you have approved the terms of the settlement, the amount of the payment to you, and the amount of attorneys' fees.

5.    **ADMINISTRATIVE MATTERS**

5.1    **Termination:**  Attorneys reserve the right to withdraw from this matter if you fail to honor this Agreement or for any reason permitted or required under the rules of the court or state in which the class action is pending.

5.2    **Association of Co-counsel:**  Attorneys may associate other lawyers to assist in representing you if, before any association becomes effective, you agree in writing to the terms of the arrangement including (1) the identity of all lawyers or law firms involved, (2) whether fees will be divided based on the proportion of services performed or by lawyers agreeing to assume joint responsibility for the representation, and (3) the share of the fee each lawyer or law firm will receive, or if the division is based on the proportion of services performed, the basis on which the division will be made.

5.3    **No Guaranty of Results:**  Attorneys will use their best efforts in representing you in this matter, but we cannot guarantee the outcome of any given matter.  You acknowledge Attorneys have made no promises or guarantees concerning the outcome of this matter, and nothing in this agreement shall be construed as such a promise or guarantee.

5.4    **Entire Agreement:**  This Agreement contains the entire agreement between us regarding this matter and the fees, expenses and payments relative thereto.  This Agreement shall not be modified except by written agreement signed by both parties.

I certify and acknowledge that I have had the opportunity to read this Agreement, that I have voluntarily entered into this Agreement fully aware of its terms and conditions, and that I have received a copy of this Agreement.

Signed and accepted on this 2B day of September 2012.

Clients: _____

Attorneys: _____
Christopher A. Bandas